# EXHIBIT 440

1           IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF OHIO
3                     EASTERN DIVISION
4   IN RE:  NATIONAL        :  MDL No. 2804
5   PRESCRIPTION OPIATE     :
6   LITIGATION              :  Case No. 17-md-2804
7                           :
8   APPLIES TO ALL CASES    :  Judge Dan Aaron Polster
9                           :
10                          :
11
12              HIGHLY CONFIDENTIAL
13      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
14
15                   - - - -
16               DECEMBER 13, 2018
17                   - - - -
18   VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S
19        DESIGNATED 30(B)(6) REPRESENTATIVE,
20                JAMES TSIPAKIS,
21   taken pursuant to notice, was held at Marcus & Shapira,
22   One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania
23   15219, by and before Ann Medis, Registered Professional
24   Reporter and Notary Public in and for the Commonwealth
25   of Pennsylvania, on Thursday, December 13, 2018,
26   commencing at 9:09 a.m.
27                   - - - -
28            GOLKOW LITIGATION SERVICES
29        877.370.3377 phone | 917.591.5672 fax
30                deps@golkow.com

```
 1   investigation, I mean, there was investigations
 2   done.  What's the specific question?
 3   BY MR. GADDY:
 4       Q.  Did you see anything from 2009 to 2014,
 5   any type of level of detail of investigation that
 6   we see here in Jason's 2016 email?  Did you see
 7   anything like that when you looked back or did
 8   your research from 2009 to 2014 when HBC was
 9   distributing hydrocodone combination products?
10            MR. BARNES:  Object to form.
11            THE WITNESS:  I did not, not that I
12   could find.
13   BY MR. GADDY:
14       Q.  I'm going to show you what I'll mark as
15   17.  I don't have this to put up on the screen.
16   This is what I just got this morning, so I only
17   have the one copy.
18            (HBC-Tsipakis Exhibit 17 was marked.)
19   BY MR. GADDY:
20       Q.  I'm going to hand it to you in just a
21   second.  I'm going to represent to you this is a
22   December 5, 2013 email from Joe Millward to
23   several individuals, including Greg Carlson who
24   you mentioned earlier, and the subject is --
25            MR. GADDY:  Can I swap and give him the
```

Highly Confidential - Subject to Further Confidentiality Review

1    one that's in evidence?

2            MR. BARNES:  Sure.

3    BY MR. GADDY:

4        Q.   So I've handed you No. 17 now.  Do you

5    see that's a December 5, 2013 email from Joe

6    Millward, the subject being 2401?

7        A.   Joe Millward, yes.  That's who -- yeah,

8    Joe Millward.

9        Q.   And what we just went through was a

10   suspicious order that was identified by HBC in

11   January of 2016.  That's what we just went through

12   a minute ago; correct?

13       A.   Sorry.  Let me just read it.  I'm sorry.

14   Your question was now that I had a chance to read

15   it?

16       Q.   That's fine.  I was actually asking

17   about the last one.

18           The last suspicious order that we looked at

19   was one that was reported by HBC for January 2016;

20   correct?

21       A.   Correct.

22       Q.   This is a separate suspicious order that

23   is being investigated by HBC; correct?

24       A.   '16.  Yes.  I was just trying to

25   ascertain -- I know we had a suspicious order in

1    2013.  Yeah, this is what you're showing me.

2        Q.   And if you turn the page -- maybe I

3    should have started on the back page.

4        It says, "HBC team, can you please be sure

5    pharmacy 2401 does not receive this particular

6    item," which is buprenorphine, "until further

7    notice.  Their ordering of the product has been

8    flagged as suspicious and are being reported to

9    the DEA."

10        Do you see that?

11        A.   Yes.

12        Q.   I probably should have started there.

13        A.   Yeah, that made it a lot clearer.  Thank

14    you.

15        Q.   Is buprenorphine an oxycodone

16    combination product?

17        A.   I don't know.

18        Q.   Has it ever been a Schedule II drug?

19        A.   No.

20        Q.   From 2009 when HBC first began

21    distributing controlled substances until the

22    present, so all the way through HBC's lifetime and

23    now through the Giant Eagle RX distribution

24    center, how many suspicious orders have been

25    reported to the DEA?

 1          MR. BARNES:  I'm going to object.  With

 2  respect to the discovery cut-off, we're not going

 3  to the present obviously.  We've indicated in our

 4  discovery responses that we're filing a June 1,

 5  2018 discovery cut-off.  So we would object to any

 6  questions beyond that date generally.

 7          THE WITNESS:  To answer your question,

 8  up until the date of June 1st of 2018, two, two

 9  orders.

10  BY MR. GADDY:

11      Q.   How many -- of those suspicious orders

12  that were reported, how many of those two orders

13  were for hydrocodone combination products?

14      A.   Zero.

15          (HBC-Tsipakis Exhibit 18 was marked.)

16  BY MR. GADDY:

17      Q.   I'm going to show what I'll mark as

18  Exhibit 18.

19          MR. GADDY:  It's HBC 1005 internally.

20  BY MR. GADDY:

21      Q.   And if you would start for me, please,

22  at the beginning of the email chain on page 2.

23      A.   .2?

24      Q.   Correct.  It starts about halfway down

25  the page with an email from Robert McClune.  Do

1    you see that?

2        A.    Yes.

3        Q.    The subject of the email is Thrifty

4    White Notes.  It says, "Team, I wanted to send a

5    note out regarding our trip to Thrifty White

6    yesterday in conjunction with the planned

7    warehouse move vault and refrigeration."

8        Do you see that?

9        A.    Yes.

10       Q.    What is Thrifty White?

11       A.    Thrifty White is another regional

12   pharmacy chain.

13       Q.    Is it white or right?

14       A.    White, Thrifty White.

15       Q.    What was the purpose in HBC and Giant

16   Eagle employees taking a visit to Thrifty White?

17       Let me ask you this:  Are you aware

18   independently without reviewing the email?

19       A.    No.

20       Q.    I'll withdraw the question.

21       So it says the team went to Thrifty White

22   yesterday.  Then it says in the next paragraph,

23   "Please chime into this email string with your

24   Thrifty White notes.  Do not worry about

25   duplication.  Just bring them."

1      Do you see that?

2      A.   Yes.

3      Q.   And then if you look at the bottom of

4  that page and flip to the next page, you just kind

5  of see a set of bullet points, and there's a

6  heading in that about Thrifty White notes.  Do you

7  see that?

8      A.   Yes.

9      Q.   And if we flip through back to the first

10 page of the document, do you see the response from

11 Joe Millward who I think you said was head of the

12 compliance department?

13     A.   Yes.

14     Q.   And he writes, "Here are my notes."  And

15 the title of his notes are Thrifty White Visit

16 Notes 8/19/2015.  Are you with me?

17     Note number one is, "Keep engaged with the

18 DEA through all steps of the process."

19     Do you see that?

20     A.   Yes are.

21     Q.   His second note that he writes is, "It

22 is critical to have a robust suspicious order

23 monitoring program."

24     Do you see that?

25     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Would you agree that from 2009 to 2014,

 2   HBC did not have a robust suspicious order

 3   monitoring program?

 4              MR. BARNES:  Object to form.

 5              THE WITNESS:  I do not.

 6   BY MR. GADDY:

 7        Q.    The next sentence says, "Relying on

 8   thresholds is not good enough for the DEA."

 9        Do you see that?

10        A.    Yes.

11        Q.    From '09 through '13, HBC didn't even

12   have thresholds; correct?

13        A.    Correct.

14        Q.    But you still believed that the

15   suspicious order monitoring program that HBC had

16   from '09 to '13 was robust?

17        A.    Yes.

18        Q.    It then goes on to say, "They have a

19   process to review the orders before they are

20   filled by the distribution center."

21        Do you see that?

22        A.    Yes.

23        Q.    And, in fact, that's opposite to HBC and

24   Giant Eagle's system where the orders are filled

25   and then reviewed afterwards; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   An investigation -- there could be

2    situations where investigation is happening while

3    orders are in transit for delivery, yes.

4        Q.   So HBC and Giant Eagle did not have a

5    program to review the orders before they're

6    filled?

7             MR. BARNES:  Object to form.

8             THE WITNESS:  Giant Eagle had a process.

9    Some of the investigative work would not have been

10   before the order was shipped.

11   BY MR. GADDY:

12       Q.   Then number three says that -- Thrifty

13   White, is that a standalone wholesale distributor,

14   or is that a distributor and a pharmacy?

15       A.   It's a pharmacy.

16       Q.   I went through a list earlier of other

17   folks that distribute to themselves.  Thrifty

18   White would fall under this bucket as well,

19   correct, of pharmacies that distribute to

20   themselves?

21       A.   Yes.

22       Q.   Number three says, "Thrifty White has

23   instituted guardrails for dispensing of controlled

24   substances."

25            And then down below it, if you go down,
```

Highly Confidential - Subject to Further Confidentiality Review

1    there's an (a) and (b) and then there's a little

2    lower case (i), and it gives some examples of

3    flags.  Do you see that?

4        A.   Yes.

5        Q.   And it talks about this cash versus

6    insurance, something we talked about a little

7    already; correct?

8        A.   Yes.

9        Q.   It talks about geographical relationship

10   of the prescriber and patient to the pharmacy?

11       A.   Yes.

12       Q.   Talks about combo drugs or a combination

13   of controls being dispensed.  Do you see that?

14       A.   Yes.

15       Q.   Again, these are all factors that we

16   ultimately end up seeing in a Giant Eagle policy

17   that comes out in 2015; correct?

18       A.   Components of this, yes.

19            MR. BARNES:  Jeff, if you're at a good

20   break, we've been going about an hour and 15

21   minutes.

22            MR. GADDY:  Yeah.  That's fine.

23            THE VIDEOGRAPHER:  2:43.  We're off the

24   video record.

25            (Recess from 2:43 p.m. to 3:05 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  3:05.  We're on the

 2    video record.

 3    BY MR. GADDY:

 4         Q.   Mr. Tsipakis, I'm going to hand you HBC

 5    1009, which I've marked, I believe, a Exhibit 19.

 6              (HBC-Tsipakis Exhibit 19 was marked.)

 7    BY MR. GADDY:

 8         Q.   Do you see this is a November 2015 email

 9    from Joseph Millward?

10         A.   Yes.

11         Q.   And do you see the subject of the email

12    is SOMS:  Suspicious order monitoring and

13    controlled drug monitoring.  Do you see that?

14         A.   Yes.

15         Q.   And he's writing to Phillip Raub, John

16    Hutten and Roger Wolfe.  Do you know what

17    department those folks are in and what they do?

18         A.   I know who Phil Raub is, but I don't

19    know what department these folks are in.

20         Q.   Who is Phil Raub and what does he do?

21         A.   I know what he does today.  I don't know

22    what he did at this time.

23         Q.   What's he do today?

24         A.   Today he works on our inventory team.

25         Q.   Is he more of an IT computer-type
```

Highly Confidential - Subject to Further Confidentiality Review

1    person?

2        A.    Yes.

3        Q.    And would it be accurate to say that one

4    of his functions is designing or implementing

5    technology or reports?  Does that make sense to

6    you?

7        A.    That doesn't exactly line up with what

8    he does, no.

9        Q.    Describe what he does.

10       A.    He basically makes sure -- he's a

11   liaison between like our McKesson, McKesson

12   account rep and other manufacturers' delivery

13   orders.  Again, just to be clear, you're talking

14   about what he does today; correct?

15       Q.    Yeah.

16       A.    So when we have late orders from

17   McKesson or Cardinal, he'll follow up on those,

18   stores, say they didn't get an order from the

19   wholesaler, those kind of things.  Inventory

20   control would be a better way to say it.

21       Q.    Let's go back to this document.  He

22   says, "Phil, John and Roger, on Friday George and

23   I participated in a conference call with Purdue

24   Pharma, maker of top self controlled substances

25   such as Oxycontin and Hyslinga ER, to discuss

1      Q.   He goes down in the next paragraph to

2   say, "It would be necessary to break dispensing

3   down to the following examples:  On weekly,

4   monthly, quarterly and year-to-date timelines.

5      And then he gives some examples of what type

6   of information he would like to see HBC or Giant

7   Eagle start gathering to issue these types of

8   reports; correct?

9      A.   Yes.

10      Q.   And it includes I think in the first

11   instance there -- it says the total number of

12   prescriptions and the total number of -- and the

13   percentage of controlled substance prescriptions;

14   correct?

15      A.   Yes.

16      Q.   And it talks about trying to figure out

17   the percentage in cash versus the percentage with

18   the discount card versus the percentage with

19   insurance; correct?

20      A.   Yes.

21      Q.   Then in the next line, he talks about

22   trying to determine the number and percentage of

23   total prescriptions and controlled substances of

24   what he calls there at the end his target

25   chemicals, which would be oxycocodone, hydrocodone

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and Suboxone; correct?

 2       A.   Correct.

 3       Q.   This process of him wanting to be able

 4   to see reports on a weekly, monthly, quarterly and

 5   year-to-date basis is something that he's asking

 6   these folks to look into implementing here in

 7   November of 2015; correct?

 8       A.   He's inquiring about them, yes.  As far

 9   as what exactly he's trying to do, I can't -- I

10   can speculate, but it's one email.  Certainly,

11   he's asking for more data.

12       Q.   Sure.  But you saw in the first

13   paragraph where he said that he wanted to

14   incorporate this factor and these types of things

15   into HBC's or Giant Eagle's suspicious order

16   monitoring program; correct?

17       A.   Sure.

18       Q.   He's wanting to do that in November of

19   2015; correct?

20       A.   He's inquiring about it in

21   November 2015, and this is a standard of trying to

22   improve the process and look deeper on things,

23   sure.

24       Q.   And he's looking to add that layer, the

25   percentage of cash versus third party, in November
```

 1   of '15?

 2       A.   Yes.

 3       Q.   I'm going to show you what I will mark

 4   as Exhibit No. 20.

 5            (HBC-Tsipakis Exhibit 20 was marked.)

 6            MR. GADDY:   This is HBC 1023, which

 7   we're marking as Exhibit 20.

 8   BY MR. GADDY:

 9       Q.   And if we look at the first page, do you

10   recognize this to be an email from Adam Zakin in

11   March of 2016?

12       A.   Yes.

13       Q.   You can go ahead and turn to the back

14   page so we can get to the earliest email in the

15   chain.

16       Do you see it says, "Hello, Joseph and

17   George.  As a follow-up to our discussions, I have

18   attached our SOM solution proposal for your

19   review.  Once you've had a chance to review this

20   internally, we would welcome an opportunity to

21   talk through our two SOM options and answer any

22   questions you have."

23       Do you see that?

24       A.   Yes.

25       Q.   And it's from Gary at Buzzeo.  Do you

1    see that?

2         A.    Yes.

3         Q.    Do you know what Buzzeo is?

4         A.    Yes.

5         Q.    What is that?

6         A.    Buzzeo is the compliance arm of IQVIA.

7    They purchased Buzzeo years back.  I'm familiar

8    with them.

9         Q.    Do you know what the purpose of

10   Buzzeo -- what service it is that they provide?

11        A.    Consultant services that they provide.

12        Q.    And what he's indicating here I think as

13   we'll see as we go through, he wants to talk to

14   Joe Millward and George Chunderlik regarding

15   suspicious order monitoring programs; correct?

16        A.    Yeah.  He's a salesmen trying to pitch a

17   solution or a consultant or consulting engagement,

18   sure.

19        Q.    If we go back to the first page and we

20   go two-thirds of the way down, you see an email

21   from George Chunderlik.

22        A.    First page?

23        Q.    Yes, about two-thirds of the way down.

24   Are you with me, George Chunderlik on March 24,

25   2016?

```
 1        A.    Um-hum.

 2        Q.    And he says, "Hi, Adam and Bob.  I think

 3   it would be" -- and to be clear -- never mind.

 4        He's writing to Bob McClune and Adam Zakin;

 5   correct?

 6        A.    Yes.

 7        Q.    Tell me who they are and what they do

 8   within HBC or Giant Eagle.

 9        A.    At the time of this email; correct?

10        Q.    Sure.

11        A.    So at the time of this email, Adam is

12   senior director of administration, which includes

13   the procurement team.  Bob works for Adam

14   basically on the procurement and analytics team.

15        Q.    Are they both still with the company?

16        A.    Yes.

17        Q.    George says, "I think it would be

18   worthwhile to talk to these guys about their SOM

19   program.  I'm curious to see their products.  I'm

20   going to set something up for us and include Jason

21   unless you have any objections."

22        Do you see that?

23        A.    Yes.

24        Q.    If you go back up to the top of the

25   page, you see Adam's response; correct?
```

1       A.   Yes.

2       Q.   He says, "We saw this.  We're not there.

3    At the end of day, the only thing it did that our

4    current system would not do was stop the orders

5    physically if there was a threshold."

6       Do you see that?

7       A.   Yes.

8       Q.   So in March of 2016, HBC or Giant Eagle,

9    their current system would not physically stop the

10   orders that rose above the threshold; correct?

11      A.   Correct.

12      Q.   This outfit was selling a product that

13   would have stopped the orders that were identified

14   as being above the threshold prior to them being

15   shipped to the store, correct, at least according

16   to George and Adam?

17      A.   I don't know what they were -- what they

18   looked at, what was presented.  So I can't

19   speculate what it does or doesn't do.

20      Q.   That's what Adam is representing they

21   did; correct?  He says, "The only thing it did

22   that our current system would not do was stop the

23   orders physically if there was a threshold."

24      A.   That's what it says here and he

25   represented here, yes.

```
 1        Q.   It says, "Also, it would benchmark

 2   against other retailer" and goes on to say, "It

 3   was fairly expensive in comparison to already

 4   having what we had for these two pieces of

 5   function."

 6        Do you see that?

 7        A.   Yes.

 8        Q.   He goes on to say, "If you want to bring

 9   them in to see them again, you can.  I don't think

10   Bob or I need to see them unless there's something

11   specific you want us to see post your review.  Let

12   me know if you have any questions.  Adam."

13        Is that it for that email?

14        A.   Yes.

15        Q.   So in March of 2016, Giant Eagle and HBC

16   did not have a system that would physically stop

17   orders if they violate the threshold, and when

18   offered to purchase or adopt a program that did,

19   at least Adam Zakin's position was to not do that;

20   correct?

21             MR. BARNES:  Object to form.

22             THE WITNESS:  In the research that I've

23   done, there was a lot of different things the

24   company was looking at, different external

25   solutions, internal solutions, coding internally
```

```
 1   versus buying off the shelf.  I believe I saw

 2   something about this was a cloud service that

 3   needed a tremendous amount of IT integration.  So

 4   I think there's more to this.

 5   BY MR. GADDY:

 6        Q.   As we sit here today, does HBC or Giant

 7   Eagle have a system that will physically stop

 8   orders from being shipped if they violate the

 9   threshold?

10        A.   For which time period?  I'm sorry.

11        Q.   Now.

12             MR. BARNES:  Same objection.  Take it

13   through June 1 of '18.

14             THE WITNESS:  Yes.

15   BY MR. GADDY:

16        Q.   June 1 of '18 HBC and Giant Eagle did

17   have a system that would stop an order if it

18   violated a threshold?

19        A.   Yes.

20        Q.   When did that happen?

21        A.   January of '17.

22        Q.   I'm going to show you HBC 1027 that I'm

23   going to mark --

24        A.   Let me be clear.  Early 2017.  It might

25   not be exactly January, but early 2017.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    I'm going to show you what I've marked

2   HBC 1027 or which is HBC 1027, which I'm going to

3   mark as Exhibit 21.

4           (HBC-Tsipakis Exhibit 21 was marked.)

5   BY MR. GADDY:

6     Q.    Do you see this document is an email,

7   and it's going to have some attachments.  The

8   email is from an individual named James Cornwell

9   written in August of 2016.  The subject of that

10  email is Order Item Blocking, December 5, 2013.

11        Do you see that?

12    A.    Yes.

13    Q.    Do you know who Mr. Cornwell is?

14    A.    Yes.

15    Q.    Who is he and what does he do?

16    A.    He's on the IT team.  He works on the IT

17  side.

18    Q.    He writes this email.  He says,

19  "Dominic, Phil, I didn't find much on this.  I do

20  see the SQL was written by Kayla."

21        Do you know what SQL means?

22    A.    SQL, yes.

23    Q.    What does that mean?

24    A.    SQL code.

25    Q.    So she designed the program that's

1    generating the report?  Explain that for me,

2    please.

3         A.   I know what SQL means.  I don't know who

4    Kayla is.

5         Q.   It goes on to say, "The requirements

6    were utilizing a monthly average looking back at

7    the last 12 months that had each item ordered

8    based on GPI."

9         Do you see that?

10        A.   Yes.

11        Q.   Is that describing the threshold system

12   that was put in place in 2013?

13        A.   Yes.

14        Q.   It says, "This value was a monthly

15   accumulation that reset the first of each month

16   had which mirrored McKesson's system but left big

17   holes in our logic."

18        Do you see that?

19        A.   Yes.

20        Q.   Do you know what big holes Mr. Cornwell

21   was referring to there?

22        A.   I do not.

23        Q.   Would you agree that it would not be

24   good to have a suspicious order monitoring program

25   with big holes in it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARNES:  Object to form.

 2              THE WITNESS:  If it was the only thing

 3    you were relying on.  In our system we had --

 4    threshold it was one of multiple layers of how we

 5    complied with the controlled substance security

 6    requirement.

 7    BY MR. GADDY:

 8         Q.   But you agree it would not be a good

 9    thing to have big holes in your suspicious order

10    monitoring program?

11         A.   I think generally big holes are a bad

12    thing.

13         Q.   It says, "If the items showed on the

14    report, George evaluated it, and if it was

15    determined it should be blocked, the blocking form

16    was filled out."

17         Do you see that?

18         A.   I'm sorry.  Where were you?

19         Q.   I just kept reading.  It says that items

20    showed on the report George evaluated -- I'm

21    sorry -- "If the item showed on the report, George

22    valuated it, and if it was determined it should be

23    blocked, a blocking form was filled out."

24         Do you see that?

25         A.   Yes.
```

1    inventory control suspicious order policy that was

2    enacted back in August of 2014?

3        A.   Yes.

4        Q.   I see a name there, the policy owner

5    being Matt Rogos?

6        A.   Yes.

7        Q.   Do you know that person?

8        A.   I do not.

9        Q.   Do you know whether Mr. Rogos indeed

10   worked for HBC back in 2014?

11       A.   I do not, no.

12       Q.   Do you know whether he currently works

13   for Giant Eagle?

14       A.   I do not.

15       Q.   Did you have an opportunity to try to

16   speak with Mr. Rogos to find out about his

17   knowledge concerning this policy?

18       A.   Are you asking me if I tried to reach

19   out to Mr. Rogos?

20       Q.   Yes.

21       A.   No.

22       Q.   Stay on that page with me, but go down

23   towards the bottom under Procedures.  You'll see

24   some bullet points.

25       A.   Yes.

1       Q.   Go down to the second bullet point, and

2    I'm going to read it, and tell me if I'm reading

3    it incorrectly.  Okay?

4       A.   Yes.

5       Q.   It appears to me the second bullet point

6    states that "Suspicious order criteria include,

7    but are not limited to, purchases over a defined

8    period that exceed a predetermined threshold."

9       Did I read that correctly?

10      A.   You did.

11      Q.   At least if we read that portion of this

12   policy, Exhibit 12, and we apply it to the

13   spreadsheet that we were just looking at for

14   December of 2013, does it appear to you that any

15   amount shipped in excess of the threshold quantity

16   should at least raise a question in someone's mind

17   as to whether there indeed is a suspicious order?

18      A.   Yes.

19      Q.   Are you able to sitting here today tell

20   us whether anybody raised any questions or raised

21   any red flags about the December 2013 order by

22   store number 8 or the shipment to store number 8

23   that month and whether it indeed was a suspicious

24   order?

25      A.   I can't tie back specifically to that,

Highly Confidential - Subject to Further Confidentiality Review

1    but certainly we just discussed a conversation

2    with the field ops. and corporate regarding store

3    8.

4         Q.   We did, and that was actually the month

5    after December 2013, January 2014.

6         A.   Yes.

7         Q.   And at least in January of 2014, someone

8    wanted to look into the ordering pattern of store

9    number 8 to find out whether this indeed was a

10   suspicious order for January of 2014?

11        A.   Yes.

12        Q.   But going back to 2013, at least sitting

13   here today, you're not aware of anyone questioning

14   the order by store number 8 in December 2013?

15        A.   I don't have anything in front of me

16   that there was or wasn't; correct.

17        Q.   Have you seen any documents or any

18   emails by anyone concerning any questions about

19   the orders by store number 8 in December of 2013?

20        A.   I did not.

21        Q.   If you go to page 1053, I'll represent

22   to you that this appears to be an end-of-the-month

23   report for November 2013 dated specifically 30

24   November 2013.  Are you with me?

25        A.   For November 2013?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Yes.

 2        A.    Yes.

 3        Q.    If you'll go to the spreadsheet, please.

 4   And if you go down to store number 8, which I

 5   believe is the fourth store from the bottom, and

 6   if you look at the amount shipped in November of

 7   2013 to store 8, it appears to be 12,298?

 8        A.    Yes.

 9        Q.    With a threshold quantity being 7257?

10        A.    Yes.

11        Q.    And correct me if you think I'm wrong,

12   but by my math, that's five times the monthly

13   average?

14        A.    Yes.

15        Q.    And knowing what you've told us about

16   your understanding of the store looking into any

17   orders that it thinks should be of concern, would

18   you have expected HBC or someone at HBC to have

19   investigated the amount shipped for the

20   hydrocodone product to store number 8 in that

21   month?

22        A.    I would have expected someone to look at

23   at each line item on the report or daily

24   throughout the month on this report and do their

25   due diligence on each of these line items, yes.
```

1      Q.    Would that be an investigation you would

2  expect to be done by the procurement department?

3      A.    It's a combination.  I think as we saw

4  in other documents, procurement would have been

5  involved.  Compliance is involved in some cases.

6  Loss prevention is involved.  So it's a whole

7  litany of folks depending what they need to look

8  at.

9      Q.    If you go now with me to internal

10  reference 1052, which is the end-of-the-month

11  report of October 2013, again, to the best of your

12  knowledge at least in 2013, the threshold quantity

13  was being applied across the store chain, an

14  average across the store chain; correct?

15      A.    Correct.

16      Q.    If you go to the second page, the

17  spreadsheet, with me, if you go to the very

18  bottom, you'll find store 8 again.

19      A.    Yes.

20      Q.    And here in -- at least at the end of

21  October of 2013, does it appear to you that the

22  total amount shipped of the hydrocodone products

23  to store number 8 exceeded the threshold quantity?

24      A.    Yes.

25      Q.    And again, you're not aware at least for

Highly Confidential - Subject to Further Confidentiality Review

1    this month of any emails by anyone asking anyone

2    to look into whether store 8 had any abnormal

3    ordering patterns for the hydrocodone products?

4        A.   I don't have any specific knowledge of

5    them or not.

6        Q.   I have one more spreadsheet I want to

7    ask you about, and it actually jumps forward.  It

8    fast forwards now to May of 2014.  Let me know

9    when you're with me.

10       A.   What number is that?

11       Q.   I think May of 2014.  Is that what you

12   have?

13       A.   Is it 1059 in the corner?

14       Q.   Yes, 1059.

15       A.   I'm tracking with you.

16       Q.   And if you'll go to the second page of

17   the spreadsheet again with me, again, you'll see

18   store number 8 about in the middle of that

19   spreadsheet.

20       And would you agree with me that the amount

21   shipped in this month of 10,879 exceeded the

22   threshold quantity, which was 5598?

23       A.   Yes.

24       Q.   And is it your understanding that even

25   as of 2016, the threshold quantity was still being

Highly Confidential - Subject to Further Confidentiality Review

1    applied as an average across the store chains?

2         A.   Yes.

3         Q.   I think I'm done with that exhibit.

4         When talking about the threshold system that

5    was put in place in 2013, I think I heard you

6    earlier say that it was done to improve the system

7    of monitoring for suspicious orders.

8         A.   To add further layers, yes.

9         Q.   Looking back, do you think back in 2013

10   putting the threshold system in place the way it

11   was put in place, that it was indeed an

12   improvement over what HBC had at that point in

13   time?

14        A.   It was an improvement that there was

15   automated reports, certainly some IT help to it in

16   some regards.

17        Q.   Because prior to 2013, there were no

18   automated reports; is that right?

19        A.   It was more a manual process, yes.

20        Q.   Not just more a manual process.  There

21   was no automated reporting coming out on a daily

22   basis; is that right?

23        A.   As far as I could find, no.

24        Q.   You may recall a little earlier today

25   that you were shown a couple of letters by the

1    Drug Enforcement Agency dating back to 2012 and

2    then prior to 2012.

3         A.   Yes.

4         Q.   Correct me if I'm wrong.  It's my

5    understanding that you cannot recall if you had

6    actually seen those letters before?

7         A.   Correct.

8         Q.   To your knowledge, did anyone at HBC

9    ever at any point in time from 2012 to 2014

10   initiate any communication to DEA in writing

11   stating that they had read the 2012 letter, but

12   that they either had any questions about it or

13   that they would not be able to comply with it for

14   one reason or another?

15        A.   I don't have any knowledge of that.

16        Q.   Did you speak to anyone at HBC who told

17   you that they had personally tried to contact DEA

18   with any questions about the contents of the 2012

19   letter?

20        A.   I do recall in the conversations from

21   our supervisor, Walt Durr, that there was

22   conversations about they were always in contact

23   with DEA on inspections.

24        I believe he mentioned that they had audits

25   that they had come in, some scheduled, some not

Highly Confidential - Subject to Further Confidentiality Review

```
 1    scheduled.  Certainly our loss prevention

 2    department has a history of being close with the

 3    different municipalities, both the boards as well

 4    as the DEA and others.

 5         Q.   We're going to get a chance to speak

 6    with Mr. Durr I think in a couple of weeks in a

 7    deposition.

 8         But to your knowledge, did he specifically

 9    tell you he had had any discussions with DEA about

10    the directives given in the DEA's 2012 letter?

11         A.   No.

12         Q.   Similarly, you had no discussions with

13    anyone else at HBC that recalls having any

14    discussions with DEA about the specific contents

15    of the 2012 letter?

16         A.   Not that I had, no.

17         Q.   As I listened to you explain the system

18    that was in place between 2009 and 2014 at HBC,

19    it's my understanding that there was communication

20    between HBC and the Giant Eagle pharmacies on a

21    regular basis.

22         A.   There's communication between the

23    warehouse, pharmacy operations, corporate.  So it

24    was not uncommon to have dialogue and

25    communication amongst those three teams and loss
```

```
 1    prevention, the constituents internally, all the

 2    stakeholders.

 3         Q.   Similarly, there was sharing of

 4    information so that if a question existed by HBC

 5    about a shipment, there was an email chain that

 6    somebody could email to a colleague at Giant Eagle

 7    to get information; is that right?

 8         A.   There was an ability to, sure.

 9         Q.   And we've seen some of those emails

10    today; right?

11         A.   Yes.

12         Q.   As I understand it from the spreadsheets

13    we were just looking at, did HBC have access to

14    Giant Eagle pharmaceutical data?

15         A.   Sure, yes.

16         Q.   If a pharmacist at Giant Eagle had a

17    question or had a concern they wanted to express

18    to HBC, they could do that by email?

19         A.   If a pharmacist?

20         Q.   Yes.

21         A.   Sure, they could.

22              MR. ROTTINGHAUS:  I'll show counsel what

23    has been marked as Exhibit 25.

24         P-GEN-0085.

25              (HBC-Tsipakis Exhibit 25 was marked.)
```

1   BY MR. ROTTINGHAUS:

2       Q.   Sir, was HBC a member of the National

3   Association of Chain Drugstores?

4       A.   Was HBC?  Giant Eagle was.

5       Q.   Was HBC?

6       A.   We would contract with that entity at

7   the parent level, so it would have been Giant

8   Eagle.

9       Q.   And would HBC have access -- as Giant

10  Eagle -- as part of Giant Eagle's membership,

11  would HBC have access to any information shared

12  among members of the National Association of Chain

13  Drugstores?

14      A.   Sure.

15      Q.   And have you confirmed that Giant Eagle

16  indeed was a member of the National Association of

17  Chain Drugstores between 2009 and 2014?

18      A.   Have I confirmed that?

19      Q.   Yes.

20      A.   No.

21      Q.   Is it your understanding that they were?

22      A.   Speculation, but I would assume they

23  were, yes.

24      Q.   Well, are you aware of any participation

25  by Giant Eagle in efforts to communicate with the

Highly Confidential - Subject to Further Confidentiality Review

1    Drug Enforcement Administration about the proposed

2    change of hydrocodone-containing products from

3    Schedule III to Schedule II?

4          MR. BARNES:  I'm going to object to the

5    form.  He's already said HBC wasn't a member.

6    You're asking him about a document for something

7    it wasn't a member.

8    BY MR. ROTTINGHAUS:

9          Q.   Are you, sir?

10         A.   I'm sorry.  Can you repeat the question,

11   please?

12         Q.   Let me ask you this:  Are you aware of

13   or do you know whether HBC had any involvement in

14   any efforts to communicate with the Drug

15   Enforcement Administration about any concerns HBC

16   had with the administration's proposed change for

17   hydrocodone-containing products from Schedule III

18   to Schedule II?

19         A.   I don't know.

20         Q.   And you'll see that Exhibit 25 is an

21   April 28, 2014 letter to the Drug Enforcement

22   Administration.

23         A.   Yes.

24         Q.   And if you look at the top right above

25   the date of the letter, you'll see that among