# EXHIBIT 449

```
                UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO

                     EASTERN DIVISION

                          - - -

IN RE:  NATIONAL              :
PRESCRIPTION                  :  MDL No. 2804
OPIATE LITIGATION             :
_____   :  Case No.
                              :  1:17-MD-2804
THIS DOCUMENT RELATES         :
TO ALL CASES                  :  Hon. Dan A. Polster

                          - - -

              Monday, January 7, 2019

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW

                          - - -
```

   Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                          - - -


           GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com

Page 110

1  the IT side.
2      Q.  Okay.  Was there ever any
3  discussion about whether a report like that
4  would be useful in detecting and halting
5  diversion in its tracks?
6      A.  No.
7      Q.  Okay.  All right.  We're going to
8  turn to what Mr. Knoll is going to mark as
9  Exhibit 3.
10         MR. MULLIGAN:  Actually, you know
11     what, before we get there, Jon, I've got
12     a couple questions.  So mark it and
13     we'll just --
14  BY MR. MULLIGAN:
15     Q.  You'd agree, Mr. Nameth, that
16  patient and customer safety are DDM's first
17  priority?
18     A.  I would agree.
19     Q.  Okay.  Along with maybe staying in
20  business?
21     A.  Well ...
22     Q.  Is that fair?
23     A.  I would say that we have a
24  responsibility to our customers' patients, yes.

Page 111

1      Q.  Okay.  Do you agree that DDM as a
2  handler of controlled substance also has an
3  obligation to the general public to prevent
4  diversion of opioids?
5      A.  Yes.
6      Q.  Okay.  And would you agree that
7  DDM was legally required to implement a system
8  of effective controls to prevent diversion?
9      A.  We were required to have a system.
10     Q.  Okay.  To prevent diversion,
11  correct?
12     A.  Yes.
13     Q.  Okay.  And not to respond to it,
14  right?
15     A.  Well, now, you're getting into --
16  we felt our system was adequate for what we
17  needed to be done.
18     Q.  Okay.  And what you needed to be
19  done is defined by the Controlled Substances
20  Act, right?
21     A.  Yes.
22     Q.  And you're a pharmacist, and you
23  know that, right?
24     A.  Yes.

Page 112

1      Q.  Okay.  And so let's talk about
2  this a little more.
3          Did that system have to prevent
4  diversion or simply identify it and respond to
5  it after the fact; do you know?
6      A.  Well, it would prevent diversion
7  as far as looking at the system and knowing
8  whether it was diversion or not.  If it wasn't,
9  then it wouldn't be diversion.
10     Q.  Your report would only allow you
11  to identify it had already happened --
12     A.  Yes.
13     Q.  -- which would then potentially
14  enable you to try and stop it in the future,
15  right?
16     A.  Well, but by following up,
17  wouldn't we be actually looking at that
18  particular issue?
19     Q.  Well, you tell me.
20     A.  Yes.  I mean, we would look at a
21  particular issue and follow up with a written
22  report and find out whether it was diversion or
23  not.  So ...
24     Q.  But you'd agree that that's

Page 113

1  identifying that diversion has already happened,
2  so it's not actually preventing diversion,
3  agree?
4      A.  What it is, it's -- in my opinion,
5  it's preventing diversion by looking at the
6  system and determining whether there's diversion
7  or not.  What you're asking is, are you going to
8  stop an order before it went out the door?
9      Q.  Correct.
10     A.  No, it did not.
11     Q.  Okay.  So it potentially was a
12  tool that could put you on notice that diversion
13  had already occurred and then give you the
14  option to try and stem it or prevent it in the
15  future, correct?
16     A.  Yes.
17     Q.  Okay.  And you guys never
18  identified a suspicious order, right?
19     A.  Right.
20     Q.  And so you never determined that
21  any diversion was taking place regarding
22  suspicious orders, right?
23     A.  Right.
24     Q.  And so, therefore, you guys didn't

29 (Pages 110 to 113)