# EXHIBIT 450

Highly Confidential - Subject to Further Confidentiality Review

```
                    UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                       EASTERN DIVISION

                            - - -

IN RE:  NATIONAL               :
PRESCRIPTION                   :  MDL No. 2804
OPIATE LITIGATION              :
_____  :  Case No.
                               :  1:17-MD-2804
THIS DOCUMENT RELATES          :
TO ALL CASES                   :  Hon. Dan A. Polster

                            - - -

               Monday, January 7, 2019

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW

                            - - -
```

       Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                            - - -



             GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com

Page 110

1  the IT side.
2      Q.  Okay.  Was there ever any
3  discussion about whether a report like that
4  would be useful in detecting and halting
5  diversion in its tracks?
6      A.  No.
7      Q.  Okay.  All right.  We're going to
8  turn to what Mr. Knoll is going to mark as
9  Exhibit 3.
10         MR. MULLIGAN:  Actually, you know
11     what, before we get there, Jon, I've got
12     a couple questions.  So mark it and
13     we'll just --
14  BY MR. MULLIGAN:
15     Q.  You'd agree, Mr. Nameth, that
16  patient and customer safety are DDM's first
17  priority?
18     A.  I would agree.
19     Q.  Okay.  Along with maybe staying in
20  business?
21     A.  Well ...
22     Q.  Is that fair?
23     A.  I would say that we have a
24  responsibility to our customers' patients, yes.

Page 111

1      Q.  Okay.  Do you agree that DDM as a
2  handler of controlled substance also has an
3  obligation to the general public to prevent
4  diversion of opioids?
5      A.  Yes.
6      Q.  Okay.  And would you agree that
7  DDM was legally required to implement a system
8  of effective controls to prevent diversion?
9      A.  We were required to have a system.
10     Q.  Okay.  To prevent diversion,
11  correct?
12     A.  Yes.
13     Q.  Okay.  And not to respond to it,
14  right?
15     A.  Well, now, you're getting into --
16  we felt our system was adequate for what we
17  needed to be done.
18     Q.  Okay.  And what you needed to be
19  done is defined by the Controlled Substances
20  Act, right?
21     A.  Yes.
22     Q.  And you're a pharmacist, and you
23  know that, right?
24     A.  Yes.

Page 112

1      Q.  Okay.  And so let's talk about
2  this a little more.
3          Did that system have to prevent
4  diversion or simply identify it and respond to
5  it after the fact; do you know?
6      A.  Well, it would prevent diversion
7  as far as looking at the system and knowing
8  whether it was diversion or not.  If it wasn't,
9  then it wouldn't be diversion.
10     Q.  Your report would only allow you
11  to identify it had already happened --
12     A.  Yes.
13     Q.  -- which would then potentially
14  enable you to try and stop it in the future,
15  right?
16     A.  Well, but by following up,
17  wouldn't we be actually looking at that
18  particular issue?
19     Q.  Well, you tell me.
20     A.  Yes.  I mean, we would look at a
21  particular issue and follow up with a written
22  report and find out whether it was diversion or
23  not.  So ...
24     Q.  But you'd agree that that's

Page 113

1  identifying that diversion has already happened,
2  so it's not actually preventing diversion,
3  agree?
4      A.  What it is, it's -- in my opinion,
5  it's preventing diversion by looking at the
6  system and determining whether there's diversion
7  or not.  What you're asking is, are you going to
8  stop an order before it went out the door?
9      Q.  Correct.
10     A.  No, it did not.
11     Q.  Okay.  So it potentially was a
12  tool that could put you on notice that diversion
13  had already occurred and then give you the
14  option to try and stem it or prevent it in the
15  future, correct?
16     A.  Yes.
17     Q.  Okay.  And you guys never
18  identified a suspicious order, right?
19     A.  Right.
20     Q.  And so you never determined that
21  any diversion was taking place regarding
22  suspicious orders, right?
23     A.  Right.
24     Q.  And so, therefore, you guys didn't

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : <br> : MDL No. 2804 <br> : |
| _____ | : Case No. <br> : 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : <br> : Hon. Dan A. Polster |

- - -

Thursday, December 6, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

      Videotaped deposition of JASON BRISCOE, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:05 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  distributor's registration are set forth in 21
2  U.S.C. 823(e). Listed among these factors is
3  the duty of the distributors to maintain
4  effective controls against diversion of
5  controlled substances into other than legitimate
6  medical, scientific, and industrial channels."
7      Correct?
8   A.  Yes.
9   Q.  It's crystal clear from this 2006
10  letter that the DEA, through the Department of
11  Justice, thought it was extremely important,
12  critical, that distributors fulfill its role to
13  implement a system to identify suspicious
14  orders, correct?
15      MR. JOHNSON: Objection.
16   A.  Maintain effective controls
17  against diversion of controlled substances, so
18  yes.
19   Q.  It was critical?
20      MR. JOHNSON: Objection.
21   A.  Their words or my opinion?
22   Q.  A simple question. It doesn't
23  matter whose words or your opinion.
24      It was critical that DDM design

Page 127

1  and implement a system to identify and report
2  suspicious orders?
3   A.  It was their regulation, which we
4  would, you know, take seriously and adhere to,
5  yes.
6   Q.  The DEA reiterates in the
7  paragraph below that, the 1301.74(b), with the
8  reg that we just looked through, reiterating
9  that it's extremely important for DDM to have a
10  system designed to identify suspicious orders,
11  correct?
12      MR. JOHNSON: Objection.
13   A.  How did you characterize --
14   Q.  Just a reminder, another
15  reiteration from the DEA --
16   A.  Yes.
17   Q.  -- quoting to 1301.74, correct?
18   A.  Reiteration, yes.
19      MR. JOHNSON: Objection.
20   Q.  Skip a paragraph. "Thus, in
21  addition to reporting all suspicious orders, a
22  distributor has a statutory responsibility to
23  exercise due diligence to avoid filling
24  suspicious orders that might be diverted into

Page 128

1  other than legitimate, medical, scientific, and
2  industrial channels."
3      Did I read that right?
4   A.  You did.
5   Q.  All right. Let's stop and focus
6  on that sentence for a minute.
7      So in addition to reporting
8  suspicious orders -- that's reiteration from the
9  DEA Number 1.
10      Do you see that in that sentence?
11   A.  If an order had been deemed
12  suspicious, it's required to report, yes.
13   Q.  A distributor has a statutory
14  responsibility to exercise due diligence to
15  avoid filling that order?
16   A.  It said to avoid filling
17  suspicious orders.
18   Q.  Yes, sir. DDM filled the orders
19  as they came in, whether it was identified as an
20  anomaly on a subsequent report or not, correct?
21      MR. JOHNSON: Objection.
22   A.  With the exception of the six-week
23  average report that could have led to an error,
24  that would have prevented that order from ever

Page 129

1  being processed.
2   Q.  The inventory management system?
3   A.  Yes.
4   Q.  Other than that, can you point me
5  to one order at DDM from 2006 until today that
6  was not filled, despite the fact it appeared as
7  an anomaly on the controlled monitor --
8  monitoring system report that we discussed
9  earlier?
10      MR. JOHNSON: Objection.
11   A.  My answer is I don't believe that
12  I could; however, I don't know that if there
13  were a situation by which an order was not sent
14  but yet populated in that report as if it was
15  received, that would be one example where --
16  that would -- that would be something I -- I
17  don't know for 100 percent certainty. But I
18  don't know of any documented examples of what
19  you described.
20   Q.  So DDM would fill orders, populate
21  a report subsequently as an anomaly, and then
22  perform due diligence, correct?
23   A.  We would first do the Tom
24  Nameth/Jason Briscoe review, and then, if it

33 (Pages 126 to 129)