# EXHIBIT 451

```
                    UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

                       EASTERN DIVISION

                          - - -

IN RE:  NATIONAL           :
PRESCRIPTION               :  MDL No. 2804
OPIATE LITIGATION          :
_____:  Case No.
                           :  1:17-MD-2804
THIS DOCUMENT RELATES      :
TO ALL CASES               :  Hon. Dan A. Polster

                          - - -

              Thursday, January 3, 2019

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW

                          - - -


     Videotaped deposition of JILL A. STRANG, held

at the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

8:57 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                          - - -


            GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
```

Page 106

1 an order as suspicious, correct?
2     A.  No.
3     Q.  Okay. And I'm assuming, based on
4 the testimony you just gave me, that there was
5 never a time where you or anyone at DDM stopped
6 a -- or suspended a shipment of a controlled
7 substance based on a concern that it was
8 suspicious, correct?
9     A.  Correct.
10    Q.  Do you know whether any DDM
11 pharmacist has refused to fill a prescription on
12 the belief that it was suspicious?
13        MR. JOHNSON: Objection.
14    A.  I do not.
15    Q.  You don't know? Do you know who
16 would know that?
17    A.  Peter or Jason.
18    Q.  Are you aware of the procedures
19 that they have in place with their pharmacists
20 to, you know, communicate about orders that a
21 pharmacist determined were suspicious?
22    A.  I do not, other than that report
23 that Jason uses on a monthly basis to ask about
24 that, but on a specific occasion, no, I do not.

Page 107

1 I do not -- I'm not involved in that.
2     Q.  When you communicate with
3 pharmacists about, you know, "Hey, was this
4 order what you meant to order," would you
5 provide them with any sort of forms, or would
6 that communication be oral?
7     A.  Oral.
8     Q.  Okay. Did you ever send an
9 e-mail?
10    A.  No.
11    Q.  Any reason why it would be oral
12 and not be an e-mail?
13    A.  Because an e-mail -- I needed an
14 answer right then and there so we could pull the
15 order, we could reduce the order, and have it
16 invoiced and ready to go for the day, because
17 we'd be waiting on that.
18    Q.  So you're in the midst of filling
19 this order and you catch this glitch and you --
20 everything has to stop until you resolve it so
21 you pick up the phone and you call them?
22    A.  Yes.
23    Q.  Okay. Do you know whether DDM has
24 ever identified a pill mill?

Page 108

1        MR. JOHNSON: Objection.
2     A.  I do not know that.
3     Q.  Okay.
4        THE VIDEOGRAPHER: Counsel on the
5     phone, could you put your phone on mute,
6     please.
7 BY MR. MULLIGAN:
8     Q.  Do you know whether DDM -- other
9 than that one-month report -- ever analyzed data
10 that it collected regarding the movement of
11 controlled substances to determine whether
12 diversion was taking place?
13    A.  I do not know.
14    Q.  You don't know? Okay.
15    A.  No.
16    Q.  Were you ever involved in any sort
17 of internal audit regarding the sale of opioids
18 to identify patterns regarding prescriptions?
19    A.  Repeat that, please.
20    Q.  Have you ever been involved in any
21 sort of DDM audit or investigation to look at
22 opioid sales to determine whether there were any
23 patterns that may reflect diversion was taking
24 place?

Page 109

1        MR. JOHNSON: Objection.
2        You can answer.
3     A.  No.
4     Q.  Okay. I know you said that you've
5 never identified a suspicious order, correct?
6     A.  Correct.
7     Q.  And you don't know of anyone at
8 DDM who has ever identified a suspicious order,
9 correct?
10    A.  Correct.
11    Q.  Have you or anyone ever identified
12 a possible suspicious order that required
13 additional due diligence or investigation?
14    A.  No.
15    Q.  If someone said to you, "I think
16 this order is potentially suspicious," what
17 would you do? Would you know what to do? Is
18 there a policy or procedure that says what the
19 next steps are?
20    A.  There is not a written policy, but
21 I would definitely go to my supervisor and make
22 them aware of it.
23    Q.  And that would be Jason and Pete?
24    A.  Correct.

Page 130

1  Q. And the response identifies Tom
2 Nameth, P.J. Ferut --
3      MR. JOHNSON: Ferut.
4  Q. -- Ferut, Jill Strang, Jason
5 Briscoe, Pete Ratycz, and Keith Miller.
6      Do you see that?
7  A. Yes.
8  Q. Do you know what each of these
9 individuals did as it relates to that activity?
10 I mean, obviously we talked about what you did.
11 And I'm just curious if you know the scope of
12 what everybody else did.
13      MR. JOHNSON: I'm going to object.
14      But go ahead.
15      MR. MULLIGAN: What's the basis of
16   your objection?
17  A. Well, P.J. -- oh, sorry.
18      MR. MULLIGAN: Tim --
19      MR. JOHNSON: What's -- I'm sorry?
20      MR. MULLIGAN: What's the basis of
21   your objection?
22      MR. JOHNSON: You haven't
23   established a foundation of knowledge
24   that she would know what everybody in

Page 131

1   the organization is doing. If you're --
2      MR. MULLIGAN: Well, I asked.
3      MR. JOHNSON: -- you're asking her
4   what their duties are, isn't that better
5   to ask the individuals?
6      MR. MULLIGAN: Well, I asked her
7   if she knew what their duties were.
8      MR. JOHNSON: Okay.
9      MR. MULLIGAN: That was the
10   premise of the question.
11 BY MR. MULLIGAN:
12  Q. You can answer.
13  A. Keith and P.J. are our computer IT
14 people. Pete, Jason, and Tom held the
15 responsibilities that we've talked about, and
16 then myself.
17  Q. Okay. So I appreciate that that's
18 what their titles were or that's what their
19 positions were, but do you know what they did as
20 it relates to suspicious order monitoring?
21  A. No.
22  Q. Okay. And I think earlier you
23 testified that there are 16 or 17 documents at
24 DDM which go in great detail about what DDM's

Page 132

1 suspicious order monitoring policies are,
2 correct?
3      MR. JOHNSON: Objection.
4  A. No.
5  Q. Okay. So clarify that for me.
6  A. There were 16 or 17 documents
7 about VAWD, one of which that's in that
8 procedure is about suspicious ordering. There's
9 nothing in writing about suspicious ordering, to
10 my knowledge.
11  Q. Okay. So DDM has no written
12 policies and procedures regarding suspicious
13 order monitoring?
14  A. Other than what I wrote in VAWD,
15 no.
16  Q. Which was something you wrote as
17 part of an application to get an accreditation,
18 correct?
19  A. Yes.
20  Q. But that's not actively used to
21 train people or to control what happens at DDM
22 regarding suspicious orders, correct?
23  A. No.
24  Q. Okay. And so would it be fair to

Page 133

1 say that other than what we've talked about you
2 do, you're not really aware of what anybody else
3 does regarding suspicious order monitoring,
4 other than Tom and Jason look at that monthly
5 report that reflects the year -- last year
6 history?
7  A. And I do know that P.J. and Keith
8 report to ARCOS.
9  Q. They make sure that information
10 goes into the system?
11  A. Yes, yes.
12  Q. Do you interact with these
13 people --
14      MR. JOHNSON: If you keep watching
15   that TV, you're going to get seasick.
16      THE WITNESS: Sorry.
17      MR. JOHNSON: Okay.
18 BY MR. MULLIGAN:
19  Q. Do you interact with these people
20 on a daily or weekly basis regarding suspicious
21 orders?
22  A. No.
23  Q. Okay. Has anybody at DDM or
24 outside of DDM ever indicated to you that they

Page 194

1  know, it wasn't a DDM policy or procedure ever?
2      A.  Shown to me, no.
3      Q.  Okay.  And I think as you
4  testified earlier, that if you were engaged
5  enough in DDM's suspicious order monitoring
6  policies, that if there was one, you'd know
7  about it, right?
8      A.  Correct.
9      Q.  Okay.  So is it possible that this
10 was just provided to the wholesaler to check a
11 box with them to say, "Hey, we've got something
12 in writing.  Here it is."
13     MR. JOHNSON:  Objection.
14         Go ahead and answer.
15     A.  The manufacturer.
16     Q.  Correct.
17     A.  Possibly, or they wanted to see --
18 because it -- it is policies written, I don't
19 know if the director of operations was going to
20 follow through and place it for all of us to
21 make it a true policy.
22     Q.  Okay.  But I think as you
23 testified earlier that as of even today, DDM
24 doesn't have any written suspicious order

Page 195

1  monitoring policies or procedures, right?
2      A.  Not that I was aware of, no.
3      Q.  So as far as you know, this could
4  have just been forwarded to the wholesaler to
5  satisfy what they needed so you could get drugs
6  for your stores?
7      A.  I can't say that --
8          MR. JOHNSON:  Objection to that.
9          You can answer the question.
10     A.  I can't say that because I don't
11 remember why it was forwarded.
12     Q.  Okay.
13         MR. MULLIGAN:  How do you feel
14 about lunch?  Do you want to do lunch
15 now?
16         MR. JOHNSON:  Yeah, it's as good
17 as any.
18         MR. MULLIGAN:  Okay.
19         THE VIDEOGRAPHER:  The time is
20 12:09.  Going off the record.
21         - - -
22     Thereupon, at 12:09 p.m. a lunch
23     recess was taken until 12:52 p.m.
24         - - -

Page 196

1          Thursday Afternoon Session
              January 3, 2019
2              12:52 p.m.
3          - - -
4      THE VIDEOGRAPHER:  The time is
5  12:52.  Back on the record.
6  BY MR. MULLIGAN:
7      Q.  All right.  We're back after
8  lunch.
9          Are you ready to go, Ms. Strang?
10     A.  Yes.
11     Q.  Okay.  Great.  Let's start with an
12 exhibit.  I'm going to have Ms. Roach hand you
13 what she's marking as Exhibit 10.
14         - - -
15     (DDM-Strang Exhibit 10 marked.)
16         - - -
17 BY MR. MULLIGAN:
18     Q.  And this is DDM12909.  And at the
19 top it says, "Rx operational procedure bulletin
20 Discount Drug Mart."  And the subject is
21 "Controlled substance quality assurance."
22         Do you see that?
23     A.  Yes.
24     Q.  Have you ever seen this before?

Page 197

1      A.  No.
2      Q.  So do you know whether this
3  relates to suspicious order monitoring?
4      A.  I do not, because it was sent to
5  all the pharmacists, technicians and interns,
6  and I do not believe I was given a copy of this.
7      Q.  Okay.  And so to the extent that
8  you're the process owner for suspicious order
9  monitoring, would you expect to have been
10 included in the drafting and distribution of
11 this policy?
12     A.  No.
13     Q.  And why is that?
14     A.  It was handled by either Tom or
15 Jason at the time.
16     Q.  So it would be fair to say that
17 your role in suspicious order monitoring is
18 limited solely to the distribution center?
19     A.  Yes.
20     Q.  So anything that has to do with
21 how pharmacists evaluate prescriptions and
22 monitor for diversion, you would not be involved
23 in that?
24     A.  No.

50 (Pages 194 to 197)

```
                UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO

                     EASTERN DIVISION

                         - - -

IN RE:  NATIONAL              :
PRESCRIPTION                  :  MDL No. 2804
OPIATE LITIGATION             :
_____ :  Case No.
                              :  1:17-MD-2804
THIS DOCUMENT RELATES         :
TO ALL CASES                  :  Hon. Dan A. Polster

                         - - -

             Monday, January 7, 2019

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW

                         - - -
```

         Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                         - - -


             GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

Page 22

1 believe, '02.
2 Q. Okay. So it would be fair to say
3 you've got a pretty in-depth understanding as to
4 how DDM's business works?
5 A. I would think so.
6 Q. And specifically as it relates to
7 its pharmacy?
8 A. Yes.
9 Q. And you're also very well versed
10 in sort of the pharmaceutical business, retail
11 business, if you will?
12 A. Yes.
13 Q. Okay. So as the director of
14 pharmacy operations, what were your primary
15 responsibilities?
16 A. Well, anything that went on, you
17 know, in the pharmacies themselves, hiring,
18 firing, you know, staffing, making sure the
19 stores are run properly, looking at stores', you
20 know, profitabilities and inventories.
21 Q. Is there anything else that you
22 were responsible for as director of pharmacy
23 operations that you can think of?
24 A. I mean, you know, not offhand.

Page 23

1 Q. Okay. You know why we're here
2 today, right?
3 A. Yes.
4 Q. And why is that?
5 A. Looking at the opioid problems,
6 situations, in the country.
7 Q. Okay. And could you be a little
8 more specific?
9 A. Looking at possible drug
10 diversion, what that is, and how do you go about
11 fighting that problem, I guess.
12 Q. Were you responsible for
13 overseeing DDM's system to detect and deter
14 diversion?
15 A. I wouldn't say responsible. As
16 far as what -- as far as writing it or as far as
17 operations or what?
18 Q. Go ahead and tell me what you were
19 responsible for.
20 A. More of the operational aspect of
21 it.
22 Q. Okay. How do you define
23 "operational"? I want to just make sure I
24 understand sort of the scope of what your

Page 24

1 responsibilities were related to diversion.
2 A. Okay. Once a policy was
3 determined on how we're going to go about
4 organizing and making sure that there was no
5 diversion, whether that be theft or whether it
6 be -- whether it be just routine distribution,
7 my job was to make sure that the process was
8 done on a regular basis and making -- and react
9 to situations when they did come up.
10 Q. Okay. When was a -- well, you
11 said when a policy was determined, what do you
12 mean by that?
13 A. Well, we're a small company, so we
14 determined what we wanted to do on a regular
15 basis, on an ongoing basis, whether or not --
16 there was -- at that time there was a report
17 that was run on a monthly basis, and someone had
18 to review the report on a regular basis, and
19 take appropriate steps when necessary. So, you
20 know, we knew our duties at that time and
21 fulfilled those duties.
22 Q. All right. So I'll just -- we're
23 talking -- you're talking in very general terms,
24 and so what that means is I'm going to have to

Page 25

1 ask you a lot of follow-up questions, so -- and
2 that's fine. But I'm going to try to dig into
3 that a little bit more --
4 A. Okay.
5 Q. -- so we don't -- we can get
6 through it quicker.
7 Okay. So you said you're a small
8 company. Can you tell me what the relevance of
9 that is to what your ultimate policy became?
10 A. Well, you know, our company is
11 small to the point where we have very little
12 turnover. So somebody that is in my position,
13 there's only two people really in the corporate
14 office that was looking at the reporting
15 systems.
16 So, you know, we didn't
17 necessarily have a written policy, per se, but
18 we knew what the policies were, what our jobs
19 were, what our functions were. So it was really
20 up to us to maintain that functionality on a
21 monthly basis to make sure that, you know, the
22 reports were looked at and followed up on,
23 so ...
24 Q. Who was the other person?

Page 206

1    Q.  Okay.  So the report would say
2  their average is one bottle for the last year
3  and this month they ordered five bottles, you've
4  got to look into it?
5    A.  We have to -- yes, that would be a
6  case where I knew that we had different sizes
7  and before they would -- they switched sizes.
8  They switched size bottles.
9    Q.  Okay.  Conversely, if a pharmacy
10  was ordering, let's say, two bottles of 100
11  tablets and that was their average for the last
12  12 months, okay?  Is that fair example to start?
13    A.  Yes.
14    Q.  All right.  And then they switched
15  the next month and they -- instead of getting
16  two bottles of 100 tablets, they get two bottles
17  of 500 tablets, would that show up on your
18  12-month average rolling report?
19    A.  Yes, because previously they
20  didn't order any of the 500s.  Now they're
21  ordering two.  So their history was different.
22    Q.  Okay.  So it would say -- it would
23  say your previous 12-month on a 500-tablet
24  bottle is zero and now you've ordered two?

Page 207

1    A.  Correct.
2    Q.  And that's greater than
3  99 percent?
4    A.  Correct.
5    Q.  So it wouldn't be based on the
6  tablet numbers, it would be based on the
7  bottle's size?
8    A.  Yes.
9    Q.  Okay.  Was there any other unit
10  that was tracked by that report that would cause
11  it to generate other than bottle size?
12    A.  Not to my knowledge.  It's been a
13  while since I looked at that report.
14    Q.  Okay.  After those two letters
15  that we looked at from the DEA, do you believe
16  that DDM complied with every obligation
17  underneath the Controlled Substances Act?
18    A.  I do.  I still think that our
19  system, our SOMS system, looked at -- it wasn't
20  just the 12-month rolling average.  It was --
21  you know, that was part and parcel of the plan,
22  the program.
23    Q.  Okay.
24    A.  We did have a prospective in

Page 208

1  regards to the six-week average if Jill was
2  looking at that, but that was still part of the
3  program.  It wasn't something that I look at,
4  but it was still something that was looked at by
5  humans, by people, a set of eyeballs on it.
6  So -- and if she had any questions about it, she
7  would either contact the stores or contact me
8  or -- you know.
9    Q.  Just to be clear, I don't want to
10  know what Jill did because obviously Jill did
11  that, so --
12    A.  All right.
13    Q.  Yeah.  But just after looking at
14  those two letters and all the things we
15  discussed, it's still your position that DDM
16  complied with the obligations that it had under
17  the Controlled Substances Act?
18    A.  I believe so.
19    Q.  Okay.  All right.  And just so
20  that we're clear, I want to just confirm, DDM's
21  suspicious order monitoring policies and
22  procedures were never put in writing, correct?
23    A.  Correct.
24    Q.  Okay.  And those policies and

Page 209

1  procedures were not effective at deterring or
2  preventing completely theft of hydrocodone from
3  stores, correct?
4       MR. JOHNSON:  Objection.
5    A.  I think that -- you're talking
6  about distribution level versus store level
7  here, right?
8    Q.  I'm just asking you whether DDM's
9  suspicious order monitoring policies were
10  effective at preventing --
11    A.  Yes.
12    Q.  -- theft.
13    A.  Yes.
14    Q.  Okay.  But you agreed with me
15  earlier today that there were several instances
16  where controlled substances were stolen from a
17  DDM pharmacy, right?
18    A.  But -- yes, but the system
19  caught -- the systems in place caught whatever
20  was missing based on our monthly reports, based
21  on the rolling reports, based on everything that
22  we reported.
23    Q.  Right.  They caught it after the
24  fact, but they didn't prevent it, right?

Page 358

1  Q.  Okay.  So a more aggressive
2  controlled substance monitoring system was never
3  implemented?
4  A.  Correct.
5  Q.  Okay.  Even though this e-mail
6  indicates that it was in the final process,
7  right?
8  A.  I'm trying to find where that
9  states.
10  Q.  Second sentence.
11  A.  Oh, we're in the final process?
12  Unless he is in reference to the Chain Drug
13  Consortium that was mentioned earlier in here
14  that we were looking to aggressively change our
15  controlled drug policy.
16  Q.  But this more aggressive
17  monitoring system was never put in place, as far
18  as you know, right?
19  A.  Correct.
20  Q.  Okay.  Is there a reason why you
21  guys were asking the DEA for guidance on your
22  monitoring system in 2013 and didn't do it
23  before that?
24  A.  No.  But even after attending this

Page 359

1  conference, they never really spelled out what
2  methodology they really wanted us to do.  It was
3  mentioned during this conference, "What are you
4  doing about all the prescriptions that we're
5  seeing?  You know, it's somebody's job to
6  monitor the doctors and all the scripts that
7  we're seeing."
8        That's -- that's the source of
9  what -- we're filling their orders.  Is anybody
10  monitoring the doctors?  Is the AMA?  Is the
11  DEA?  And their answer was no.
12  Q.  All right.  We're on 23 now, which
13  is DDM31931.
14        - - -
15  (DDM-Nameth Exhibit 23 marked.)
16        - - -
17  BY MR. MULLIGAN:
18  Q.  And just to confirm, you guys
19  never put your substance -- Controlled Substance
20  Monitoring Policy in writing, correct?
21  A.  Correct.
22  Q.  All right.  So this is an e-mail
23  from Ed McGinley and you're on the to line on
24  December 2, 2013.

Page 360

1  Do you see that?
2  A.  Yes.
3  Q.  And there's a CDC Controlled
4  Substances Model Policy attached, and this is
5  from Ed McGinley, right?
6  A.  Right.
7  Q.  And he says, "Attached is a
8  substance model policy."
9        And then down below, he says, "It
10  is a comprehensive document intended to be used
11  as a template to construct controlled substance
12  policies or to evaluate and enhance existing
13  policies."
14        Right?
15  A.  Correct.
16  Q.  And if you turn to the next page,
17  there's the document he's referring to.
18        Do you see that?
19  A.  Yes.
20  Q.  What, if anything, did you do with
21  this document?
22  A.  We reviewed it to see if it would
23  fit our model.
24  Q.  Did it fit?

Page 361

1  A.  For the most part, yes, with small
2  tweaks in there.
3  Q.  Okay.  Did you change your
4  unwritten controlled substance monitoring policy
5  at all after seeing this document?
6  A.  Not on a corporate level.
7  Q.  Okay.  Did you do it on a store
8  level?
9  A.  No.
10  Q.  Okay.  So this didn't cause you to
11  change anything that you were doing, correct?
12  A.  Correct.
13  Q.  Okay.  Did you ever provide a
14  document like this to a distributor if they
15  required evidence that you had a suspicious
16  order monitoring policy?
17  A.  Yes.  If they -- what we did, if I
18  remember correctly, in reviewing this -- this
19  was in late '13 -- we looked at this and
20  basically what a lot of this is, or most of it,
21  is what we currently were doing so that if
22  someone did ask us for a written policy -- if we
23  had a policy, this was already written in and it
24  matched what we were currently doing, so we

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION | :<br>: MDL No. 2804<br>: |
| _____ | : Case No.<br>: 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | :<br>: Hon. Dan A. Polster |

- - -

Thursday, December 6, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JASON BRISCOE, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:05 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  put in front of you marked as Briscoe 16?
2      A.   I believe I have, yes.
3      Q.   Okay.  And your counsel forwarded
4  this to us last Friday afternoon, and we were
5  trying to get the answers to DDM's suspicious
6  order monitoring policies and procedures and try
7  to put some kind of meat on the bone, so to
8  speak, okay?  And Judge Polster ordered the
9  Defendants to give us some answers to a few
10 questions, and I want to take you through a
11 couple of those, the ones that relate to your
12 suspicious order monitoring policy.
13          So who would be the right person
14 to talk to about the transactional data, those
15 two charts that we just went through from like
16 '99 to 2002, and what's there and what's not, is
17 it accurate, are we missing, is there holes --
18 who would be the right person that would know
19 that?
20     A.   So I believe both have been named.
21 The previous director or VP of IT, her name is
22 P.J. Ferut.
23     Q.   Okay.
24     A.   And then our current director of

Page 243

1  IT is Keith Miller.
2      Q.   All right.  So P.J. Ferut could
3  help --
4      A.   P.J. Ferut and Keith Miller.
5      Q.   Okay.  Perfect.
6          All right.  Number 2 is "Please
7  produce each of your Suspicious Order Monitoring
8  System (SOMS) policies and procedures since
9  January of '06 and identify the Bates stamp
10 range for each.  Please identify the effective
11 dates each was in force and effect."
12          Did I read that right?
13     A.   Yes.
14     Q.   Bear with me here, Mr. Briscoe.  I
15 just thought of something I forgot to look at
16 beforehand.
17          Now, your counsel was kind
18 enough -- as you can see here, it says, "To the
19 extent the Bates range stamps are needed, we
20 will supplement."  Okay?  And we did inquire to
21 try to get the Bates ranges.  And I'm going
22 to -- if the last few hours wasn't awkward
23 enough, this might be worse, because we got
24 those with working with your counsel yesterday

Page 244

1  about 1:30, and we were already en route here.
2  So I don't have a real good command of where we
3  are with all these, and they're a big stack,
4  okay?
5          So what I want you to do is not
6  worry about the stack so much, but recognize
7  that I might not have a real good command of the
8  stack.  And I just have a few questions.
9          So do you believe that from
10 January of '06 that the suspicious order
11 monitoring systems, policies, and procedures are
12 in writing within DDM evidencing what the
13 formulas and the methodology was?
14     A.   In writing from 2006?
15     Q.   Yes.
16     A.   I don't believe so.
17     Q.   Do you know when, at what point in
18 time, there was something in writing evidencing
19 DDM's system that was designed to identify
20 suspicious orders, when was that put into
21 writing?
22     A.   I don't know.
23     Q.   Do you know if it was ever put
24 into writing?

Page 245

1      A.   I know that in preparation for,
2  you know, these documents in my deposition, we
3  formalized by describing what our policies and
4  procedures are.
5      Q.   Now, what do you mean by that, "In
6  preparation for these documents in my deposition
7  we formalized by describing ..."?  What do you
8  mean?
9      A.   Meaning I did not go to a document
10 or a policy and procedure that was created to
11 hand over as describing our -- the way that we
12 operated.
13     Q.   That would have made it real easy,
14 wouldn't it?
15     A.   Yes, it would.
16     Q.   Because it really -- there wasn't
17 anything in writing, right?
18     A.   I think there were components in
19 writing.  I don't know that it was -- that all
20 the dots were connected in a policy and
21 procedure.
22     Q.   Let's make it -- let's maybe see
23 if we can connect some of those dots, okay?
24          The 52-week average report that we