# EXHIBIT 452

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : : : | MDL No. 2804 |
| _____ | : : | Case No. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : : | Hon. Dan A. Polster |

- - -

Thursday, December 6, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JASON BRISCOE, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:05 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 90

1  a monthly basis because there really were not
2  that many entries, correct?
3      A.   Well --
4           MR. JOHNSON:  Objection.
5      A.   Yeah.  I wouldn't say that we
6  didn't take that report seriously or it wasn't
7  reviewed in a significant manner.  It certainly
8  was.  The report and the number of examples that
9  would populate wouldn't -- does not take a
10 terribly long time to work based on the
11 infrequency by which a drug family populates.
12     Q.   From 2006 until last Friday, DDM
13 has never had an order from any of its
14 pharmacies that it considered suspicious and,
15 therefore, reported it to the DEA, correct?
16          MR. JOHNSON:  Objection.
17     A.   Yes.
18     Q.   "Yes" meaning --
19     A.   Correct.
20     Q.   -- DDM has never reported one
21 single order to the DEA as suspicious from 2006
22 until at least last Friday, correct?
23     A.   That is my understanding, yes.
24     Q.   Those two reports, pharmacy

Page 91

1  operations, Mr. Nasmith (phonetic) --
2           MR. JOHNSON:  Nameth.
3      Q.   Thank you.
4           -- Nameth and -- basketball,
5  football.
6           Those two reports, Mr. Nameth --
7  Ms. Strange, was it?  Stange?  Strange?
8           MR. JOHNSON:  Strang.
9           MR. MOUGEY:  Strang.  Thank you.
10 BY MR. MOUGEY:
11     Q.   Those two reports, Ms. Strang,
12 Mr. Nameth, outside of that description, what
13 else did DDM do to fulfill its responsibilities
14 under 1301.74 to identify suspicious orders of
15 controlled substances?
16     A.   So it would be that -- that third
17 phase where, once Mr. Nameth or myself would
18 work that report, if we were to identify that
19 followup was necessary, in our view, from the
20 store, we would send that form that I've
21 described as due diligence explaining why
22 they're receiving the form based on that monthly
23 report, and then with some instructions on what
24 information they would need to provide back to

Page 92

1  us, for us then to review their feedback on why
2  that order was shipped at the quantity it was
3  compared to the last 12 months, and then we
4  would make a decision on whether that would be
5  resolved or not.
6      Q.   So from 2006 until -- well, it's
7  almost a 13-year period -- based on these
8  reports, due diligence analysis, the monthly
9  analysis of the pharmacies under the controlled
10 substance monitor policy report, the six-week
11 average report, the follow-up on the due
12 diligence, DDM never identified one single order
13 as suspicious, despite the fact it shipped and
14 distributed 72 million dosage units of
15 hydrocodone in the State of Ohio, correct?
16          MR. JOHNSON:  Objection.
17     A.   Yeah, I can't speak to the dosage
18 units accuracy, but I can tell you that we've
19 not reported a suspicious order.
20     Q.   Do you have any idea what kind of
21 volume DDM has -- has distributed in the State
22 of Ohio dosage unit-wise?
23     A.   I know where I could grab that
24 information, but off the top of my head, I do

Page 93

1  not.
2      Q.   Would 72 million dosage units in
3  the State of Ohio from DDM surprise you from
4  2006 to 2014?
5           MR. JOHNSON:  Objection.
6      Q.   Hydrocodone?
7           MR. JOHNSON:  Objection.
8      A.   I would have to -- to -- again,
9  would it surprise me?  I'd have to look at other
10 information associated with dosage units,
11 associated all controlled substance or, further,
12 all dosage units of all medications that we
13 dispense to see what percentage of dosage units
14 we dispense at our retail locations were opioid
15 compared to the entire bucket.  Forgive my term.
16     Q.   Sir, did DDM have any part of the
17 process you just described to me where it was
18 monitoring Schedule IIs like OxyContin in
19 conjunction with its own Schedule III
20 distribution?
21     A.   From a distribution standpoint,
22 no.
23     Q.   Okay.  So 1301.74, the regs under
24 the Controlled Substances Act, you would agree

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  policies that we've walked through identified
2  orders as suspicious before they were shipped,
3  correct?
4      MR. JOHNSON: Objection.
5  Q. That's problem number one, right?
6      MR. JOHNSON: Objection.
7  A. There weren't any orders that were
8  suspicious, but in a hypothetical ...
9  Q. No, I'm not -- this isn't a
10 hypothetical. You didn't identify one order in
11 12 years, DDM, that was ever suspicious. So
12 this isn't a hypothetical.
13     In 12 years that we're talking
14 about, '06, to 2018, DDM used a formula to
15 compare one month's orders to previous orders,
16 correct?
17 A. We did, yes.
18 Q. And one of those formulas was
19 simply to confirm purchase orders with the
20 pharmacist, correct?
21     MR. JOHNSON: Objection.
22 A. One of the two reports?
23 Q. Yes, sir.
24 A. Yes.

Page 151

1  Q. Neither of the two reports were
2  designed to halt or cease shipments once that
3  anomaly -- that order was placed on a report,
4  correct?
5      MR. JOHNSON: Objection.
6  A. On their face --
7  Q. Yes.
8  A. -- by themselves?
9      No.
10 Q. Once -- even though it would
11 populate a report, the order would still go out
12 the door, correct?
13 A. Yes.
14 Q. Even though it would have been
15 identified as an anomaly on that report,
16 correct?
17     MR. JOHNSON: Objection.
18 A. Yes.
19 Q. The DEA relayed that formulas
20 comparing one month to a next are insufficient
21 to identify suspicious orders, correct?
22     MR. JOHNSON: Objection.
23 A. Yes.
24 Q. And that was DDM's system to

Page 152

1  generate -- the only -- only reports it
2  generated were both based on formulas comparing
3  month to month, correct?
4      MR. JOHNSON: Objection.
5  A. That is correct; however, that was
6  not the end of the system. That was only the
7  first portion of our system.
8  Q. But the only anomalies that were
9  reviewed by Mr. Nameth, DDM, anyone at DDM, were
10 anomalies on those reports, right?
11     MR. JOHNSON: Objection.
12 A. The only anomalies that would have
13 been investigated specific to these reports,
14 yes. If there was another situation that was
15 brought to our attention, I can't speak to
16 whether or not it was investigated, but I'm
17 certain it would have been.
18 Q. And the sentence here from the DEA
19 says, "For example, a system that identifies
20 orders as suspicious only if the total amount of
21 controlled substance ordered during one month
22 exceeds the amount ordered the previous month by
23 a certain percentage or more is insufficient."
24     That almost perfectly describes

Page 153

1  the DEA -- I'm sorry -- the DDM system of
2  populating reports based on averages from month
3  to month, correct?
4      MR. JOHNSON: Objection.
5  A. It doesn't describe our total
6  system. It describes the first phase of our
7  system accurately.
8  Q. It describes the first phase of
9  your system to identify anomalies --
10 A. Not suspicious orders.
11 Q. -- on reports?
12 A. Yes.
13 Q. Yes. You all didn't consider them
14 suspicious, correct?
15 A. On those reports, no, not at that
16 point.
17 Q. So even though an order might have
18 exceeded by 99 percent, you all didn't consider
19 that to be suspicious, correct?
20 A. Correct.
21 Q. So suffice it to say, when this
22 letter came out in 2007, DDM never changed its
23 SOM policies to incorporate or identify orders
24 that may be suspicious other than the rigid

39 (Pages 150 to 153)

Golkow Litigation Services - 877.370.DEPS