# EXHIBIT 453

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : : MDL No. 2804 : |
| _____ | : Case No. : 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : : Hon. Dan A. Polster |

- - -

Thursday, December 6, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JASON BRISCOE, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:05 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  30,000-foot.
2        You understand -- you've testified
3  repeatedly that DDM has a responsibility to
4  identify suspicious orders, right? We've gone
5  through what the systems are.
6        Prior to being shipped, what
7  system does DDM have in place to identify
8  suspicious orders prior to being shipped?
9        MR. JOHNSON: Objection.
10      A.   Again, I would point to that --
11 the report that we just spent some time.
12      Q.   The fat finger report?
13      A.   The six-week average report.
14      MR. JOHNSON: Objection.
15      Q.   So other than -- other than
16 confirming whether the purchase order is correct
17 from Ms. Strang to the pharmacist, is there any
18 system in place that DDM has to identify
19 suspicious orders before they were shipped?
20      A.   No.
21      Q.   All right. Let's turn the page
22 for me.
23      MR. JOHNSON: Exhibit 8?
24      MR. MOUGEY: Exhibit 8. Thank

Page 147

1  you.
2       Q.   Now, would you agree with me that
3  both of the reports you just identified, the
4  six-week average and the controlled substance
5  order monitoring report, are both based on rigid
6  formulas?
7       MR. JOHNSON: Objection.
8       A.   Would I agree that they're both
9  based on rigid --
10      Q.   Rigid formulas.
11      A.   No.
12      Q.   Both of those reports, in order to
13 populate -- let me do it this way:
14      The orders that populate those
15 reports are both based on formulas, correct?
16      A.   Yes.
17      Q.   And both of those formulas are
18 rigid, correct?
19      A.   "Rigid" meaning they're not fluid,
20 and they're not dynamic, and they're changing on
21 a regular basis?
22      Q.   Yes.
23      A.   That's correct.
24      Q.   There's no statistical analysis

Page 148

1  that goes into either that -- a report that's
2  identified as an anomaly populating those
3  reports, correct?
4       A.   No.
5       Q.   It's essentially one's a six-week
6  average and one's a 52-week average, right?
7       A.   Yes.
8       Q.   All right. One's based on bottles
9  and the other is a confirmation of the purchase
10 order, right?
11      A.   With the bottles, that's what --
12 the column that would -- the math is done on,
13 yes. But, again, there's granularity to all
14 NDCs within that family that would be displayed
15 with detail on that report.
16      Q.   So on the second page of
17 Briscoe 8, the DEA relays in 2007 that
18 "Registrants that rely on rigid formulas to
19 define whether an order is suspicious may be
20 failing to defect suspicious orders."
21      Did I read that right?
22      A.   You did.
23      Q.   "For example, a system that
24 identifies an order as suspicious only if the

Page 149

1  total amount of a controlled substance ordered
2  during one month exceeds the amount ordered by
3  the previous month by a certain percentage or
4  more is insufficient."
5       Do you see that?
6       A.   Yes.
7       Q.   So as of 2007, the DEA is telling
8  registrants like DDM that comparing one month to
9  the next based on a certain percentage is
10 insufficient, correct?
11      A.   Yes.
12      Q.   And DDM continued to use that
13 formula comparing orders to previous months
14 despite the DEA's edict in this letter, correct?
15      MR. JOHNSON: Objection.
16      A.   They were only components of our
17 SOMS, in that this report we recognized was not
18 precise enough -- I believe my words -- to have
19 it stand on its face. So, therefore, the
20 strength of our process involved the Tom Nameth
21 and Jason Briscoe review followed by due
22 diligence with the store, if necessary.
23      Q.   But we just went through the fact
24 that neither of the policies that -- none of the

```
                  UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                       EASTERN DIVISION

                            - - -

IN RE:  NATIONAL              :
PRESCRIPTION                  :  MDL No. 2804
OPIATE LITIGATION             :
_____  :  Case No.
                              :  1:17-MD-2804
THIS DOCUMENT RELATES         :
TO ALL CASES                  :  Hon. Dan A. Polster

                            - - -

              Monday, January 7, 2019

    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
           CONFIDENTIALITY REVIEW

                            - - -
```

Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                            - - -



            GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com

Page 190

1  correct?
2      A.   Yes.
3      Q.   Okay.  And the next sentence says,
4  "Registrants are reminded that their
5  responsibility does not end merely with the
6  filing of a suspicious order report."
7           Correct?
8      A.   Mm-hmm.
9      Q.   Do you agree with that?
10     A.   Yes.
11     Q.   Do you agree with that?
12     A.   Yes.
13     Q.   Okay.  And it says, "Registrants
14 must conduct an independent analysis of
15 suspicious orders prior to completing a sale to
16 determine whether the controlled substances are
17 likely to be diverted from legitimate channels."
18          Do you see that?
19     A.   Yes.
20     Q.   And that's what we looked at
21 earlier, which is similar to the language
22 regarding avoiding filling in advance, right?
23     A.   Yes.
24     Q.   Okay.  And do you think that DDA

Page 191

1  did that -- DDM did that?
2      A.   We did not do a -- stopping an
3  order prior to sending it out, so prospectively,
4  no.
5      Q.   Okay.  And, again, down below, it
6  says, "The regulation specifically states that
7  suspicious orders include orders of an unusual
8  size, orders deviating substantially from a
9  normal pattern and orders of an unusual
10 frequency."
11          Right?
12     A.   That's right -- that's correct.
13     Q.   And we saw that before, didn't we?
14     A.   Yes.
15     Q.   Okay.  If you go down about
16 halfway through that paragraph, in the middle it
17 says, "The size of an order alone, whether or
18 not it deviates from a normal pattern, is enough
19 to trigger the registrant's responsibility to
20 report the order as suspicious."
21          Do you see that?
22     A.   Yes.
23     Q.   Okay.  So that's saying that if
24 you have an order that's large, that's enough to

Page 192

1  trigger your duty to report as suspicious,
2  correct?
3      A.   That's what it states.
4      Q.   Okay.  Did DDM do that?
5      A.   No.
6      Q.   All right.  Second page.  At the
7  top it says, "Registrants that rely on rigid
8  formulas to define whether an order is
9  suspicious may be failing to detect suspicious
10 orders."
11          Do you see that?
12     A.   Yes.
13     Q.   Would you agree that your rolling
14 12-month average report was generated by a rigid
15 formula?
16     A.   It was a set formula, yes.
17     Q.   Okay.  And then it says, "For
18 example, a system that identifies orders as
19 suspicious only if the total amount of a
20 controlled substance ordered during one month
21 exceeds the amount ordered the previous month by
22 certain percentages or more is insufficient."
23          Do you see that?
24     A.   I do, yes.

Page 193

1      Q.   Okay.  So this is saying that
2  DDM's system, which did exactly that, was
3  insufficient, correct?
4      A.   No.  Our system was not just
5  that -- based on that particular situation.
6      Q.   Let's say -- okay.  That's fair.
7  Let's say -- let's just take your report, your
8  rolling 12-month average report.  You'd agree
9  that this is saying that if that report was all
10 you did, that it would be insufficient, correct?
11     A.   It says that during one month.  I
12 mean, when you throw in the average of the
13 previous year, that's a little bit different
14 than what that states.
15     Q.   Correct.  This system, one that
16 identified an order that was just bigger than
17 the last month, would actually be more sensitive
18 than yours, wouldn't it?
19     A.   I don't see how.
20     Q.   Well, okay.  Let's just say --
21 let's just say we've got store 1 orders five
22 pills -- five bottles in December, right?  And
23 then you order six bottles in January.  That
24 would trigger a report like this, wouldn't it?

```
                    UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                         EASTERN DIVISION

                             - - -

IN RE:   NATIONAL               :
PRESCRIPTION                    :   MDL No. 2804
OPIATE LITIGATION               :
_____   :   Case No.
                                :   1:17-MD-2804
THIS DOCUMENT RELATES           :
TO ALL CASES                    :   Hon. Dan A. Polster

                             - - -

                  Thursday, January 3, 2019

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW

                             - - -
```

        Videotaped deposition of JILL A. STRANG, held

at the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

8:57 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                             - - -


              GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

Page 150

1  before they were fulfilled?
2      MR. JOHNSON: Objection.
3      Q.  I think you've already answered
4  this.  I'm just asking you again.  I probably
5  shouldn't be, but ...
6      A.  That's okay.  I guess
7  suspicious -- when we're dealing with our
8  customers, which are our stores, knowing the
9  history of what we have -- sorry.  No, they were
10 not suspicious.  They were order errors and
11 treated as order errors and investigated.  And I
12 did my due diligence.
13     Q.  And I'm not accusing you of not
14 doing anything.  I'm just trying to understand
15 what you did.
16     A.  Right.
17     Q.  Okay.  Okay.  If you go to page --
18 the second page, at the top it says,
19 "Registrants that rely on rigid formulas to
20 define whether an order is suspicious may be
21 failing to detect suspicious orders."
22     Do you see that?
23     A.  Yes.
24     Q.  Okay.  And the next sentence says,

Page 151

1  "For example, a system that identifies orders as
2  suspicious only if the total amount of a
3  controlled substance ordered during one month
4  exceeds the amount ordered the previous month by
5  a certain percentage or more is insufficient."
6      Do you see that?
7      A.  Yes.
8      Q.  And that more or less describes
9  your six-week average report, although with
10 different time frames, correct?
11     A.  Correct.
12     Q.  And so you'd agree that this is
13 saying that that six-week average report would
14 be insufficient to identify suspicious orders
15 under the regulations, correct?
16         MR. JOHNSON: Objection.
17     A.  Can you repeat that, please?
18     Q.  You agree that this sentence
19 describes a report similar to the six-week
20 average report, correct?  I think you just said
21 that.
22     A.  It is based on the average, yes.
23     Q.  Okay.  And so you'd agree that
24 this letter says that the six-week average

Page 152

1  report that was generated at DDM would be
2  insufficient to identify suspicious orders under
3  the regulations, correct?
4      MR. JOHNSON: Objection.  Once
5  again, it says what it says.
6      MR. MULLIGAN: That's fine, Tim.
7  I'm just asking her the question.
8  BY MR. MULLIGAN:
9      Q.  Is this news to you?
10     A.  No, but I'm reading it as, is it
11 insufficient.  Is our report insufficient.
12     Q.  Right.
13     A.  And I'm reading this to say,
14 during one month exceeds the amount ordered the
15 previous month.  So I believe our six-week
16 average covers a six-week average.
17     Q.  Okay.  So the only thing that
18 you've identified that's different between the
19 report they're sort of describing here and your
20 report is that yours covers two more weeks,
21 right?
22     A.  Yes.
23     Q.  Okay.  But that report does
24 identify orders that exceed the history by a

Page 153

1  certain percentage; does it not?
2      A.  I didn't write it, but yes.
3      Q.  Okay.  And the next sentence says,
4  "This system fails to identify orders placed by
5  a pharmacy if the pharmacy placed unusually
6  large orders from the beginning of its
7  relationship with the distributor."
8      Do you see that?
9      A.  Mm-hmm, yes.
10     Q.  Okay.  And so what this -- this is
11 identifying a flaw in a report like that, which
12 is, it won't flag an order if the store already
13 has a pattern of ordering too much.
14     Does that make sense?
15     A.  And what is an unusually large
16 order?
17     Q.  Well, I don't know.  But you would
18 agree with that, right, that the six-week
19 average report -- if the stores were ordering
20 more than they should and they continue that
21 pattern, then the six-week average report
22 wouldn't flag that store as engaging in any
23 suspicious activity, right?
24     A.  Correct.