# EXHIBIT 454

```
                    UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                        EASTERN DIVISION

                            - - -

    IN RE:  NATIONAL              :
    PRESCRIPTION                  :  MDL No. 2804
    OPIATE LITIGATION             :
    _____  :  Case No.
                                  :  1:17-MD-2804
    THIS DOCUMENT RELATES         :
    TO ALL CASES                  :  Hon. Dan A. Polster

                            - - -

                  Thursday, January 3, 2019

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW

                            - - -
```

         Videotaped deposition of JILL A. STRANG, held

at the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

8:57 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                            - - -


              GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

Page 62

1    A.   They call if they need -- if they
2 have questions, if they need something.  I do
3 communicate with all of the stores.
4    Q.   Is it mostly a, "Hey, Jill, we
5 need this many bottles of this drug and it
6 didn't show up on time or we need it by this
7 date"?
8         Is that mostly what it's like?
9    A.   Every day when the trucks are
10 there, if they need something, if they have
11 questions about different topics, recalls.  I
12 mean, I talk to everybody about all the topics.
13    Q.   Okay.
14    A.   Daily.
15    Q.   Do you also communicate or act as
16 an intermediary between DDM and distributors or
17 manufacturers?
18    A.   I do.
19    Q.   Because you're the buyer, right?
20    A.   Yes.
21    Q.   So you're the primary person
22 communicating with them, at least on the front
23 end, to get product, correct?
24    A.   Yes.

Page 63

1    Q.   Okay.  Presumably somebody else
2 pays invoices later and they probably
3 communicate with their financial department, but
4 you're primarily communicating with them on a
5 drug procurement level, right?
6    A.   Yes.
7    Q.   And that would include, you know,
8 issues regarding diversion and suspicious order
9 monitoring?
10    A.   Yes.
11    Q.   And drug thresholds and things
12 like that?
13    A.   Yes.
14    Q.   Okay.  And as the individual at
15 DDM primarily responsible for suspicious order
16 monitoring on the distribution end, you agree
17 that DDM has an obligation to monitor orders and
18 shipments for suspicious -- or that look
19 suspicious or may have red flags?
20    A.   Yes.
21    Q.   Indicative of diversion?
22    A.   Yes.
23    Q.   Okay.  So tell me what -- and I'm
24 just going to talk generally speaking.  I'm not

Page 64

1 necessarily limiting it to you, but I can ask
2 follow -- I'll ask follow-ups, but describe for
3 me what DDM's policies and procedures are
4 regarding the diversion of opioids.
5    A.   Are you referring to when they
6 order from me, from the distribution center?
7    Q.   Just kind of -- what I'd like you
8 to do is give me a full picture of what DDM does
9 to prevent diversion and comply with the CSA.
10    A.   Okay.  So what we do is, the
11 stores order weekly.
12    Q.   Okay.
13    A.   It is ordered through a system
14 called Pioneer.  It gives them a recommended
15 order.  Each store can set their own minimums
16 and maximums on that.  So that way, you know,
17 everything is -- certain stores -- depending on
18 how much they've been dispensing.  That order is
19 sent over.
20         As soon as they send the order,
21 they receive back a document that says, "Order
22 items over six-week average."  They're given the
23 opportunity right there to review any items.
24 Sometimes it has no items.  I've seen a few that

Page 65

1 have just antibiotics on them, you know, nothing
2 controlled.  And, you know, they ordered three
3 bottles instead of two bottles.  But they are
4 given that chance to review if anything
5 populates over a six-week average.  They have
6 the opportunity to send that to me.
7         As we get the orders, prior to
8 2016, we had a -- it was called a pick ticket.
9 It was a manual way of pulling.  And the pullers
10 would -- you know, if it says they wanted two of
11 this, they'd put two, and they'd manually write
12 a two.  Items on that pick ticket would have an
13 asterisk next to it if it could have been on the
14 six-week average report, over six-week average.
15         It was very rare that any controls
16 would show up on that.  The other items --
17 unless something -- again, the pullers know
18 their product.  You know, if they wanted -- if
19 they normally pull one, two or three of
20 something and all of a sudden somebody wants 20
21 of something, that would be brought to my
22 attention.
23         In our system, I have history of
24 every item.  So I would go into the history of

Page 66

1  that particular store and the chain of all --
2  the whole chain. So I could see if that order
3  was an order error or I could see if -- you
4  know, if it meant a call to the store, which
5  usually I would call the store, based off of
6  their history.
7      And then if the store said, "Oh,
8  no, no. We'd prefer to have -- and we only need
9  two of those," let's say. We would manually
10 change that, and that got turned in to be
11 invoiced, so it never left the building, you
12 know, the product was shipped with the changes.
13     As far as controls, same thing,
14 same exact procedure. You know, if there was
15 any changes, we would make the change before it
16 left the building.
17     If I had a store -- and this is
18 just as an example. If I had a store that I
19 thought every week was ordering something and
20 for whatever reason it was every week I was
21 calling the same store, I would then go to Jason
22 and Pete. That was usually never the case.
23     We usually resolved what that
24 issue was, you know, whether it was -- it might

Page 67

1  have said, you know, eleven instead of one or
2  whatever. But we would fix that. It was
3  invoiced, and that would be the procedure for
4  it.
5       Once everything is invoiced, we
6  always made sure that the invoice was in with
7  the control tote, all changes were done, and
8  we'd leave.
9      Q.  Okay. I appreciate that.
10          Was that -- did the scope of what
11 you did, what you just described, has that
12 changed at any time?
13     A.  It has only because in 2016, we
14 went to a voice-activated pulling system.
15     Q.  Okay.
16     A.  And so now instead of having the
17 manual paper in front of you, it's read -- the
18 slot is read to the puller. They have a check
19 digit that they read back to them to say that
20 they are pulling the correct item. The voice
21 activation says "pull two." They say "grab
22 two." It's confirmed and they put it in the
23 tote.
24     Q.  And what you're talking about

Page 68

1  right now is just the accuracy of pulling the
2  right amount that's needed, right?
3      A.  And the accuracy of the drug
4  pulled.
5      Q.  Okay. Which -- and my question
6  had to do with suspicious order monitoring and
7  diversion, right?
8      A.  Yes.
9      Q.  So certainly that's -- those --
10 that type of precision would prevent against
11 inventory problems or theft, right?
12     A.  Mm-hmm.
13     Q.  But it wouldn't address other
14 issues like associated with suspicious orders,
15 right?
16     A.  Not this part of it, no.
17     Q.  Okay. And so I want to just make
18 sure I'm clear. As it relates to suspicious
19 orders, what you would do is you would get a --
20 was it a weekly report?
21     A.  No. The store would get the -- as
22 soon as they sent their order --
23     Q.  Okay.
24     A.  -- they would get a report, right,

Page 69

1  about that order and what items might be over a
2  six-week average.
3      Q.  Okay. So let's say store number 1
4  sends in an order for hydrocodone, and this
5  obviously would have been prior to 2014 when it
6  became Schedule II, right?
7      A.  Yes.
8      Q.  Okay. So store number 1 sends in
9  an order for hydrocodone and it exceeds what
10 their prior six-week average is. Does it have
11 to exceed it by a certain percent?
12     A.  It must have -- to be on that
13 form, it has to be the six-week average. So if
14 they ordered one, one, one, and then two, it
15 might hit the six-week average --
16     Q.  And that would be --
17     A.  -- if it's above.
18     Q.  Okay. It would have to be
19 99 percent above the six-week average; is that
20 right?
21     A.  I don't know.
22     Q.  You're not sure. Okay.
23         So as far as you know, if it was
24 above the six-week average, then the Pioneer

Page 70

1  would automatically spit out a report that would
2  go to them, to the store?
3      A.  It would go to the store.
4      Q.  Okay. Would it come to you?
5      A.  Not unless -- not unless they sent
6  it to me.
7      Q.  Not unless the store sent it to
8  you?
9      A.  Exactly.
10     Q.  Okay. So store 1 submits an order
11 for hydrocodone, and let's say in your example
12 they order one bottle a week for the prior six
13 weeks, okay?
14     A.  Yes.
15     Q.  And then on the seventh week they
16 order two bottles, right?
17     A.  Yes.
18     Q.  Okay. And this is just my
19 hypothetical. They would then get a report from
20 Pioneer that says, "Hey, this order is greater
21 than your six-week average," fair?
22     A.  Yes, yes.
23     Q.  Okay. But you wouldn't get that
24 report, right?

Page 71

1      A.  I do not.
2      Q.  Okay. And the only way you would
3  learn that they were ordering more than their
4  six-week average would be if the chief
5  pharmacist contacted you and told you about it,
6  correct?
7      A.  Yes.
8      Q.  Okay. And so was there anybody at
9  DDM corporate or in the warehouse that would
10 also be notified when one of those reports was
11 generated?
12     A.  Yes -- not when the report was
13 generated. If the order was pulled as two, as
14 in your example, monthly there was a report that
15 Tom Nameth and Jason Briscoe would look at, and
16 they would contact that store and inquire, you
17 know, as to why.
18     Q.  Okay.
19     A.  If there was more patients or
20 whatever, and they would have the ability to
21 answer back as to why.
22     Q.  You'd agree that that's sort of
23 more of a retrospective report, correct?
24     A.  Yes.

Page 72

1      Q.  Okay. So all the drugs that are
2  listed on that report have already been shipped
3  out, right?
4      A.  Yes.
5      Q.  Okay. And so the only potentially
6  prospective report would be the six-week average
7  report, right?
8      A.  That, and the knowledge of the
9  person pulling. If it was two bottles instead
10 of one bottle, but if there were five, six,
11 seven bottles, that would definitely be in
12 question.
13     Q.  Okay. But you're just relying on
14 someone's memory at that point, right?
15     A.  And their knowledge of our stores.
16     Q.  Okay. And there's 74 of them,
17 right?
18     A.  Yes.
19     Q.  Okay. And so let's say a
20 pharmacist gets this, you know, six-week average
21 report, and they ordered one bottle and this
22 time they order two and they get it and they're
23 like, "Well, I know, you know, this is legit."
24         Were there ever instances where

Page 73

1  they would just, you know, file that report away
2  and not do anything further, that you know of?
3      A.  That I know of, yes.
4      Q.  Okay. And so did DDM require the
5  chief pharmacist to take any action when they
6  received a report like that?
7      A.  No. It's up to their discretion.
8      Q.  Okay. And it was sort of a, "Hey,
9  heads up, your average is this, but this time
10 you ordered that. Just wanted to make sure that
11 was right."
12     A.  Yes.
13     Q.  Okay. And so in that sense, I
14 think this phrase we've used before is it was
15 kind of a fat-finger report to make sure there
16 were no typing errors?
17     A.  Yes.
18         MR. JOHNSON: That's a term that
19     you have used.
20         MR. MULLIGAN: Well, other people
21     have used it, too. I think one of your
22     witnesses used it once.
23         MR. JOHNSON: Only in response to
24     the questioning.

19 (Pages 70 to 73)

Page 74

1  MR. MULLIGAN: I like it.
2  BY MR. MULLIGAN:
3  Q. Okay.
4  A. And that is what we call it.
5  Q. You do call it that?
6  MR. MULLIGAN: Well, there we go.
7  MR. JOHNSON: There you go.
8  MR. MULLIGAN: Your objection is
9  now gone. Thank you. That's funny.
10 BY MR. MULLIGAN:
11 Q. Okay. So you do call that the
12 fat-finger report?
13 A. Well, not all the time.
14 Q. Okay.
15 A. If you see an eleven and they
16 really wanted one, back when they used to order,
17 that could have been typed in that way.
18 That's --
19 Q. You mean they held the one down a
20 little bit too --
21 A. Yes, to us an order error, and we
22 definitely questioned those.
23 Q. Okay. Was that the primary
24 purpose of that six-week average report, was to

Page 75

1  make sure that you didn't send eleven bottles to
2  a pharmacist who really just wanted one?
3  A. Yes.
4  Q. Okay. And so would it be fair to
5  say that that six-week average report, at least
6  for your purposes, wasn't really part -- wasn't
7  really something that you used to monitor for
8  suspicious orders?
9  A. It was one of the layers that we
10 used at store level to raise the fact that there
11 might be one or two items on there that you may
12 want or may not want due to the eleven and one
13 example.
14 Q. Okay. But it wasn't a report that
15 you got every week and you looked at every one
16 and you call all the pharmacists?
17 A. No.
18 Q. Okay. So it was really just left
19 to the pharmacist to make sure that they were
20 getting what they wanted to get and it was sort
21 of a check to make sure you didn't ship ten
22 bottles when they only wanted one?
23 A. It was definitely a tool that they
24 could use.

Page 76

1  Q. Okay. But it wasn't really part
2  of Jill Strang's suspicious order monitoring --
3  A. It was not part of mine. It was a
4  layer to --
5  MR. JOHNSON: Let him get his
6  questions all the way out.
7  Q. So that six-week average report
8  wasn't part of yours or corporate's suspicious
9  order monitoring tools?
10 A. No.
11 Q. Okay. And, again, you'd agree
12 that was the only report that was actually
13 prospective. It was a report that generated
14 before the drugs were shipped, correct?
15 A. Yes.
16 Q. Okay. And I think you mentioned a
17 different report. It was a monthly report,
18 correct?
19 A. Yes.
20 Q. Okay. And that was a report that
21 was generated monthly by either Tom or Jason?
22 A. It was an automatic report that
23 was given to Tom, and then when Tom retired,
24 Jason took it over, that they could review it to

Page 77

1  see if there were any increases in families of
2  drugs, I suppose.
3  Q. Was that report on a store level
4  or a chain level; do you know?
5  A. Chain. It was by store but for
6  the whole chain.
7  Q. Okay. And it was automatically
8  generated each month?
9  A. Yes.
10 Q. And it was e-mailed by Pioneer
11 to -- how was that done?
12 A. I think it was generated at
13 corporate.
14 Q. Okay. So it sounds like you
15 weren't part of that process?
16 A. I was not.
17 Q. Okay. Have you ever looked at
18 that report?
19 A. I've seen it, but I've never
20 analyzed it, and I've never done anything with
21 it.
22 Q. Okay. So you're not the person to
23 ask about that?
24 A. No.