# EXHIBIT 456

```
                    UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                         EASTERN DIVISION

                             - - -

    IN RE:  NATIONAL              :
    PRESCRIPTION                  :  MDL No. 2804
    OPIATE LITIGATION             :
    _____   :  Case No.
                                  :  1:17-MD-2804
    THIS DOCUMENT RELATES         :
    TO ALL CASES                  :  Hon. Dan A. Polster

                             - - -

                   Thursday, January 3, 2019

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW

                             - - -
```

        Videotaped deposition of JILL A. STRANG, held

at the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

8:57 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                             - - -


              GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

Page 146

1 question was a little bit different.
2    A.   Okay.
3    Q.   We talked all about your six-week
4 average report today, correct?
5    A.   Yes.
6    Q.   And the entire purpose of that
7 report is to identify orders that are of an
8 unusual or larger size than normal, correct?
9    A.   Greater than their six-week
10 average, yes.
11    Q.   So the only thing showing up there
12 is an order that's different than usual, right,
13 and larger, specifically?
14    A.   Yes.
15    Q.   Okay. And correct me if I'm
16 wrong, but you never did anything to investigate
17 whether any of those orders were suspicious or
18 related to diversion, correct?
19    A.   I treated them all as order errors
20 before they left the distribution center.
21    Q.   So is that a "yes"?
22         You never did any due diligence
23 into anything that showed up on that six-week
24 average report to determine whether those orders

Page 147

1 were part of a diversionary scheme or were
2 suspicious in any way, correct?
3         MR. JOHNSON:  Objection.
4    Q.   You can answer.
5    A.   Say that again. Sorry.
6    Q.   So you never did any due diligence
7 or looked at anything -- strike that. That's
8 what happens when you read your question back.
9         When you had that six-week average
10 report, if someone gave it to you, you never did
11 anything to investigate whether those unusual or
12 larger orders were part of some diversionary
13 scheme, correct?
14         MR. JOHNSON:  Objection.
15    A.   Correct.
16    Q.   Because you saw them as potential
17 order errors but you never considered that they
18 could be suspicious, correct?
19         MR. JOHNSON:  Objection.
20    A.   Correct.
21    Q.   All right. If you look at the
22 third sentence there, it says, "For example, if
23 an order deviates substantially from a normal
24 pattern, the size of the order does not matter

Page 148

1 and the order should be reported as suspicious."
2         Do you see that?
3    A.   Yes.
4    Q.   And DDM never did that, correct?
5    A.   No.
6    Q.   Okay. But you're aware of -- I
7 mean, it was pretty common for there to be
8 orders that deviated from a normal pattern,
9 because that's the whole purpose of that
10 six-week average report, correct?
11    A.   Yes.
12    Q.   All right. If you go further down
13 in the paragraph, about halfway down the middle,
14 the sentence starts with, "The size of an order
15 alone, whether or not it deviates from a normal
16 pattern, is enough to trigger the registrant's
17 responsibility to report the order as
18 suspicious."
19         Do you see that?
20    A.   Yes.
21    Q.   Okay. But that's not something
22 that DDM ever did, correct?
23         MR. JOHNSON:  Objection.
24         Go ahead.

Page 149

1    A.   We did not consider them
2 suspicious.
3    Q.   Okay. But this sentence says that
4 a deviation in size of an order is enough to
5 trigger the responsibility to report, correct?
6    A.   Correct.
7    Q.   But DDM never did that, right?
8    A.   Not based on the tools we were
9 using, no.
10    Q.   And that's because your tools were
11 not designed to identify suspicious orders
12 before they were shipped, correct?
13         MR. JOHNSON:  Objection.
14    A.   They were to, again, create --
15 create as a tool to use as a reason to
16 investigate the history of the store, whether it
17 was a controlled substance or not a controlled
18 substance, to count as an order error before it
19 left the distribution center.
20    Q.   Right. The tools that you had
21 were designed to improve operational
22 efficiencies, correct?
23    A.   Correct.
24    Q.   Not to identify suspicious orders