# EXHIBIT 459

```
                   UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                        EASTERN DIVISION

                             - - -

    IN RE:  NATIONAL            :
    PRESCRIPTION                :  MDL No. 2804
    OPIATE LITIGATION           :
    _____ :  Case No.
                                :  1:17-MD-2804
    THIS DOCUMENT RELATES       :
    TO ALL CASES                :  Hon. Dan A. Polster

                             - - -

                  Thursday, January 3, 2019

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW

                             - - -


         Videotaped deposition of JILL A. STRANG, held

    at the offices of Cavitch, Familo & Durkin,

    1300 East Ninth Street, Cleveland, Ohio, commencing at

    8:57 a.m., on the above date, before Carol A. Kirk,

    Registered Merit Reporter and Notary Public.



                             - - -



              GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
```

Page 226

1   the pick ticket when it was asterisked.  I think
2   that we did a very good job of not letting it
3   leave the distribution center.
4        Q.   And I'm not disputing whether you
5   did a good job of catching order errors.  What
6   I'm asking is, do you think DDM did everything
7   it could have possibly done to identify
8   suspicious orders that would be indicia that
9   diversion was taking place within its business?
10            MR. JOHNSON:  Objection.
11       A.   I think we did everything we could
12  at the distribution level, yes.
13       Q.   Do you think DDM in general did
14  everything that they could have done to identify
15  and report suspicious orders?
16            MR. JOHNSON:  Objection.
17       A.   At the distribution center, yes.
18  Outside of that, I do not know.
19       Q.   And even though you were the
20  keeper of the suspicious order monitoring
21  policies and procedures, you don't know whether
22  more could have been done outside of the narrow
23  scope of the distribution center?
24            MR. JOHNSON:  Objection.

Page 227

1        Q.   Correct?
2             MR. JOHNSON:  Objection.
3        A.   Although there was nothing in
4   writing, I still believe we did everything we
5   could.
6        Q.   Did DDM possess information that
7   it could have analyzed to help it identify
8   suspicious orders that it did not use?
9             MR. JOHNSON:  Objection.
10       A.   I don't know.
11       Q.   Okay.  Well, you don't know what
12  information Pete and Jason looked at, right?
13       A.   I don't know.
14       Q.   Okay.  So how can you take a
15  position on whether DDM did everything it could
16  have done to identify suspicious orders if you
17  don't know what information they considered?
18            MR. JOHNSON:  Objection.
19       A.   Because I don't know what other
20  information is available to make an educated
21  judgment on how to move forward with the orders.
22  We used what we had, and the trust of the
23  pharmacists doing their professional judgment,
24  and I know you're not questioning that, but

Page 228

1   that's how I -- we've looked at it over this
2   time.
3        Q.   So the crux of the suspicious
4   order monitoring policy is, "We trust the
5   pharmacist to make a good judgment"?
6        A.   I do.
7        Q.   Okay.  But that's really -- that's
8   really what the DDM suspicious order monitoring
9   policies and procedures rise and fall on, right?
10            MR. JOHNSON:  Objection.
11       A.   There has to be a level of trust.
12  There has to be a level of we -- I'm shipping
13  only to our stores.  Once it leaves the
14  facility, I'm trusting that they are doing their
15  job to make sure that there is no suspicious
16  orders, prescriptions, any of the red flags.
17            My job is at the distribution
18  center, and I've used everything I can, as of
19  today, to make sure that those orders do not go
20  out.
21       Q.   What orders are you talking about?
22       A.   Any order errors.
23       Q.   Right.  So order errors; but we're
24  not talking about order errors, we're talking

Page 229

1   about suspicious orders, right?  And you don't
2   have the tools to identify a suspicious order,
3   right?
4             MR. JOHNSON:  Objection.
5        Q.   I mean, you've already testified
6   to that.  I'm just trying to clarify.
7             MR. JOHNSON:  Objection.
8             MR. MULLIGAN:  What's the basis of
9        your objection?
10            MR. JOHNSON:  She hasn't testified
11       to that.
12            MR. MULLIGAN:  She has testified
13       to that.
14            MR. JOHNSON:  Well, the transcript
15       will bear it out.
16            MR. MULLIGAN:  Okay.
17       A.   I did not consider them -- I
18  consider them order errors.
19       Q.   Okay.  You considered anything
20  that looked abnormal to be an order error,
21  correct?
22       A.   Correct.
23       Q.   Okay.  You never considered
24  whether they could be suspicious orders or part