EXHIBIT 461

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE:  NATIONAL | : |
| PRESCRIPTION | :  MDL No. 2804 |
| OPIATE LITIGATION | : |
| _____ | :  Case No. |
| | :  1:17-MD-2804 |
| THIS DOCUMENT RELATES | : |
| TO ALL CASES | :  Hon. Dan A. Polster |

- - -

Friday, December 21, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of PETER RATYCZ, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

8:59 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    A.   Yes.
2    Q.   Okay.  And I think what you used
3  is that the six-week report is prospective.  Is
4  that what you said?
5    A.   Correct.
6    Q.   Okay.  And I think there is kind
7  of a pregnant negative there in that the monthly
8  average is retrospective, correct?
9    A.   That's correct.
10    Q.   So fair to say that the 12-month
11  is retrospective where the six-week is
12  prospective?
13    A.   That's correct.
14           - - -
15    (DDM-Ratycz Exhibit 2 marked.)
16           - - -
17    Q.   Okay.  I'm now handing you what --
18  I think we're on Plaintiff's Exhibit 2.
19       Do you have it in front of you
20  sir?
21    A.   Yes, I do.
22    Q.   Do you need time to review it?
23  And I'll -- you can review the whole document if
24  you'd like, but I'll tell you the first

Page 99

1  paragraph is the only thing I'm going to
2  question you on.
3    A.   Okay.  I'm fine.
4    Q.   Okay.  Have you ever seen this
5  document before today?
6    A.   Yes.
7    Q.   All right.  We talked about your
8  deposition review earlier, the seven- to
9  eight-hour period.  Did you see this document in
10  your review?
11    A.   Yes, I did.
12    Q.   Okay.  So you're familiar with
13  that first paragraph there?
14    A.   Yes, I am.
15    Q.   Okay.  And as I'm sure you're
16  aware, my interest in that paragraph, starting
17  with the second sentence, "We do not sell any
18  items outside our own company, so there is no
19  policy in place for ordering patterns or
20  payments amounts that would identify potential
21  diversion or criminal activity."
22       First of all, do you believe
23  that's an accurate statement?
24    A.   Absolutely not.

Page 100

1    Q.   Okay.  Why not?
2    A.   Because we do have a procedure --
3  what happened here is that -- this was tied to
4  our VAWD accreditation.  And there's some
5  background on that.  We thought we needed to
6  have this VAWD accreditation.  VAWD stands for
7  Verified Accredited Wholesaler Distributor.
8       And this accreditation is for
9  anybody who's selling, you know, medications.
10  It was a requirement by a payer to have this in
11  place.  There was a gray area there in our
12  interpretation.  And I'll answer your question.
13  It's just some background there.
14    Q.   No, no.  Please continue.
15    A.   There was a gray area there that
16  we did not -- since we're a distributor to our
17  own stores, whether we needed that.  Because
18  we're not distributing to a customer.
19  Essentially our stores, I guess, are our
20  customer.
21       So we didn't think we needed it.
22  It was recommended that we go through this VAWD
23  accreditation process.  We got halfway through
24  that process.  The payer said, "No, you don't

Page 101

1  need that because you're only sending it to your
2  own stores.  If you were selling this to another
3  entity outside of Discount Drug Mart, then that
4  would be required."
5       So the steam sort of came -- the
6  wind was sort of out of the sails for this
7  entire process with the VAWD here.  So, in other
8  words, I don't think that there was a great deal
9  maybe spent on formalizing our policies
10  correctly.
11       But in this situation, when I read
12  it, the word that threw me off was -- I mean,
13  there's obviously, do not sell any items outside
14  our own company, but payment amounts, because
15  that made no sense.  Because we don't -- we move
16  product from our distribution center to our
17  store.  We don't make revenue off of that move.
18  Certainly if there's a sale at that particular
19  point at the store, we would.
20       So as I read that, "payment
21  amounts" made absolutely no sense.  And what
22  happened here was, when Jill completed a
23  template -- VAWD would provide you a template
24  and you would answer questions.  And those,

26 (Pages 98 to 101)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

IN RE:  NATIONAL            :
PRESCRIPTION               :  MDL No. 2804
OPIATE LITIGATION          :
_____ :  Case No.
                           :  1:17-MD-2804
THIS DOCUMENT RELATES      :
TO ALL CASES               :  Hon. Dan A. Polster

- - -

Thursday, January 3, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JILL A. STRANG, held

at the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

8:57 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  would automatically spit out a report that would
2  go to them, to the store?
3      A.  It would go to the store.
4      Q.  Okay.  Would it come to you?
5      A.  Not unless -- not unless they sent
6  it to me.
7      Q.  Not unless the store sent it to
8  you?
9      A.  Exactly.
10     Q.  Okay.  So store 1 submits an order
11  for hydrocodone, and let's say in your example
12  they order one bottle a week for the prior six
13  weeks, okay?
14     A.  Yes.
15     Q.  And then on the seventh week they
16  order two bottles, right?
17     A.  Yes.
18     Q.  Okay.  And this is just my
19  hypothetical.  They would then get a report from
20  Pioneer that says, "Hey, this order is greater
21  than your six-week average," fair?
22     A.  Yes, yes.
23     Q.  Okay.  But you wouldn't get that
24  report, right?

Page 71

1      A.  I do not.
2      Q.  Okay.  And the only way you would
3  learn that they were ordering more than their
4  six-week average would be if the chief
5  pharmacist contacted you and told you about it,
6  correct?
7      A.  Yes.
8      Q.  Okay.  And so was there anybody at
9  DDM corporate or in the warehouse that would
10  also be notified when one of those reports was
11  generated?
12     A.  Yes -- not when the report was
13  generated.  If the order was pulled as two, as
14  in your example, monthly there was a report that
15  Tom Nameth and Jason Briscoe would look at, and
16  they would contact that store and inquire, you
17  know, as to why.
18     Q.  Okay.
19     A.  If there was more patients or
20  whatever, and they would have the ability to
21  answer back as to why.
22     Q.  You'd agree that that's sort of
23  more of a retrospective report, correct?
24     A.  Yes.

Page 72

1      Q.  Okay.  So all the drugs that are
2  listed on that report have already been shipped
3  out, right?
4      A.  Yes.
5      Q.  Okay.  And so the only potentially
6  prospective report would be the six-week average
7  report, right?
8      A.  That, and the knowledge of the
9  person pulling.  If it was two bottles instead
10  of one bottle, but if there were five, six,
11  seven bottles, that would definitely be in
12  question.
13     Q.  Okay.  But you're just relying on
14  someone's memory at that point, right?
15     A.  And their knowledge of our stores.
16     Q.  Okay.  And there's 74 of them,
17  right?
18     A.  Yes.
19     Q.  Okay.  And so let's say a
20  pharmacist gets this, you know, six-week average
21  report, and they ordered one bottle and this
22  time they order two and they get it and they're
23  like, "Well, I know, you know, this is legit."
24         Were there ever instances where

Page 73

1  they would just, you know, file that report away
2  and not do anything further, that you know of?
3      A.  That I know of, yes.
4      Q.  Okay.  And so did DDM require the
5  chief pharmacist to take any action when they
6  received a report like that?
7      A.  No.  It's up to their discretion.
8      Q.  Okay.  And it was sort of a, "Hey,
9  heads up, your average is this, but this time
10  you ordered that.  Just wanted to make sure that
11  was right."
12     A.  Yes.
13     Q.  Okay.  And so in that sense, I
14  think this phrase we've used before is it was
15  kind of a fat-finger report to make sure there
16  were no typing errors?
17     A.  Yes.
18        MR. JOHNSON:  That's a term that
19     you have used.
20        MR. MULLIGAN:  Well, other people
21     have used it, too.  I think one of your
22     witnesses used it once.
23        MR. JOHNSON:  Only in response to
24     the questioning.

Page 230

1 of a diversionary scheme, correct?
2    A.   Not when the orders were, again, a
3 quantity of one and they're ordering two or a
4 quantity of two and they're ordering three.
5    Q.   Well, that's just an example,
6 though.
7    A.   It is an example.
8    Q.   Did you ever identify any order
9 from any store that you treated as potentially
10 suspicious?
11   A.   No.
12        ---
13   (DDM-Strang Exhibit 16 marked.)
14        ---
15   Q.   All right.  Let's look at
16 Exhibit 16, which is DDM453459.  This is an
17 e-mail dated February 2018, so less than a year
18 ago, from Joe Muha to Pete Ratycz, Keith Miller,
19 Jason Briscoe, and yourself.
20        Do you see that?
21   A.   Yes.
22   Q.   And the subject is, "SOM is
23 becoming a bigger deal."
24        Do you see that?

Page 231

1    A.   Yes.
2    Q.   Was suspicious order monitoring a
3 big deal before February 2018?
4    A.   Yes.
5    Q.   And why was it a big deal?
6    A.   Because it is.  Because it is --
7 it was a big deal.  It is a big deal, and we
8 take it seriously.  But any orders that I've
9 seen have not been suspicious.
10   Q.   That's not what I asked you.  I
11 asked you -- you said that suspicious order
12 monitoring is a big deal, right?
13   A.   Yes.
14   Q.   Okay.  And I asked you why is it a
15 big deal?
16   A.   Because we need to do our job to
17 make sure that anything that we're distributing
18 from our distribution center is not adding to
19 that problem.
20   Q.   Okay.  And this e-mail suggests
21 that it's becoming -- it has become a bigger
22 deal in around the 2018 time frame, right?
23        Do you agree with that?
24   A.   Yes.

Page 232

1    Q.   Do you think that that means that
2 it's -- well, how did you perceive that subject?
3 What did you perceive that to mean?
4    A.   I perceived that it is becoming a
5 bigger deal, but I'm still doing everything we
6 can the exact same that I was doing last week
7 and two months ago.  It's just as serious today
8 as it was two years ago, three years ago, ten
9 years ago.
10   Q.   And so you're doing the same thing
11 you were doing ten years ago?
12   A.   Yes.
13   Q.   And despite the fact that we saw
14 an e-mail where Mr. Ratycz said that you guys
15 needed to develop further reporting to
16 effectively identify suspicious orders, you guys
17 are doing the same thing as you were ten years
18 ago, right?
19        MR. JOHNSON:  Objection.
20   A.   We are at the distribution center.
21   Q.   Okay.
22   A.   If he wants to tighten up or make
23 a policy for something else or develop maybe a
24 stronger policy for us.  Today, that's what

Page 233

1 we're doing.
2    Q.   Do you know whether anything has
3 been done to draw up more effective controls to
4 identify suspicious orders, like he mentioned
5 that was needed in that e-mail?
6    A.   I don't know.
7        MR. JOHNSON:  Objection.
8        THE WITNESS:  I'm sorry.
9        MR. JOHNSON:  Go ahead.
10   A.   I don't know because that could
11 deal with store level and pharmacists.  And,
12 again, distribution center.
13   Q.   Okay.  So I know you've been
14 distinguishing between the store and corporate
15 and then distribution.  But at the beginning of
16 the deposition today, you told me that you were
17 the one responsible for DDM's suspicious order
18 monitoring policies and procedures, correct?
19        MR. JOHNSON:  Objection.
20   A.   I am, but nobody told me to have
21 it in writing.  I'm in charge of making sure
22 that the orders go out with history and making
23 sure that they're all --
24   Q.   Okay.  So when you say you're

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 responsible --
2 　　A. -- input properly.
3 　　Q. -- for DDM suspicious order
4 monitoring policies and procedures, you mean
5 within the silo of the distribution center,
6 correct?
7 　　A. Yes.
8 　　Q. You don't have any responsibility
9 for what the pharmacy operations people do and
10 what the pharmacists do, correct?
11 　　A. I think there is -- I think we're
12 all responsible for each part of our job. They
13 do overlap a little bit, but, again, when the
14 orders come in, that's my job. When they're
15 filled, that's my job. And when they leave,
16 that's my job.
17 　　Q. Okay.
18 　　A. And the invoicing is my job.
19 After that, that's up to the pharmacy
20 operations. And before that, obviously these
21 reports were created to help us.
22 　　Q. Okay. And I just want to -- I'm
23 just looking for clarification.
24 　　A. Yeah.

Page 235

1 　　Q. I haven't heard anything today
2 where you said, "This is what I do to help
3 identify suspicious orders." It seems to me
4 like your role is to make sure that what's
5 ordered was ordered right and that it's
6 fulfilled, but it doesn't seem like there's any
7 part of your job that goes beyond that into the
8 realm of, "Is this suspicious or not?"
9 　　　Is that fair?
10 　　MR. JOHNSON: Objection.
11 　　A. No. Because I think suspicious --
12 it depends on, again, the quantity and what the
13 orders are coming through as. Am I contacting
14 the same stores all the time? Am I talking to
15 the same pharmacists all the time? There's two
16 pharmacists at every store, so it's nice to
17 verify that sometimes. The history. All the
18 history.
19 　　Q. But you're just looking at that to
20 see whether they made a typo, right?
21 　　MR. JOHNSON: Objection.
22 　　A. Correct. But I would assume that
23 I could also tell, if that was an order error,
24 I'm cutting it off at the pass before they even

Page 236

1 get the product.
2 　　Q. Right. But that may not have
3 anything to do with diversion, right?
4 　　A. Maybe not, but maybe.
5 　　Q. Okay. I just -- I'm just trying
6 to understand because I -- you said you're
7 responsible for suspicious order monitoring
8 policies and procedures in the beginning, which
9 was broad, and then now it's just within the
10 silo of distribution. But I -- you haven't told
11 me anything that would suggest that you actually
12 do anything to identify suspicious orders other
13 than to identify typos in orders; is that fair?
14 　　MR. JOHNSON: Objection.
15 　　A. No. I think that my job is, if
16 there is something that shows up on a report and
17 someone wants it to be cut, that's part of my
18 job. If one of my pullers that have had
19 experience for years doing this and they see an
20 asterisk on an order or they brought something
21 to my attention, that was my job.
22 　　　Did I ever think that that was
23 suspicious? No. Once I investigated it,
24 history, talked to the pharmacist, I mean, did

Page 237

1 my due diligence, I would never say that there
2 was ever a suspicious order. It was always, "We
3 ordered six of these ointments and we only want
4 two."
5 　　　"I ordered three bottles of this
6 of 30. We only need one." There was never
7 anything that was a red flag of multiple weeks,
8 multiple huge quantities, multiple controls.
9 　　　It's very rare that we have a
10 control that someone's like, "Oh, no, no, we
11 only wanted one." It's more along the lines of
12 everything else. So I watch those orders. I'm
13 told about those orders, and I feel like I am
14 doing our due diligence at the distribution
15 center.
16 　　Q. To make sure that the pharmacies
17 get what they ordered, right? To make sure that
18 what you send them is what they actually need?
19 　　A. What they actually need.
20 　　Q. Okay. It's not your job to
21 second-guess what the pharmacy is ordering?
22 　　A. It's my job to trust who I work
23 with, that every day when I talk to all these
24 people -- and they call more often than just

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE:  NATIONAL | : |
| PRESCRIPTION | :  MDL No. 2804 |
| OPIATE LITIGATION | : |
| _____ | :  Case No. |
| | :  1:17-MD-2804 |
| THIS DOCUMENT RELATES | : |
| TO ALL CASES | :  Hon. Dan A. Polster |

- - -

Monday, January 7, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -


Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


- - -




GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    A.   Yes.

2    Q.   And under c, obviously none of

3  them were ever reported to the DEA, correct?

4    A.   Correct.

5    Q.   Okay.  And the due diligence that

6  would have been performed on anything that

7  showed up on that 12-month report would have

8  been the form you sent to the stores; is that

9  correct?

10   A.   Yes.

11   Q.   And would there be any other

12  documentation to reflect any due diligence that

13  was done?

14   A.   Not to my knowledge, no.

15   Q.   Okay.  Did you keep files in your

16  office or that were accessible to you that

17  contained those documents or some sort of a

18  running file that would show your due diligence

19  over time as it related to a particular store?

20   A.   Yes.

21   Q.   And would that just be by store?

22   A.   It would be by month.

23   Q.   So it would be by month, not by

24  store?

Page 87

1    A.   Correct.

2    Q.   Okay.  And would that basically

3  consist of you taking the report that was

4  printed out and just putting it in a file?

5    A.   Well, the reports -- those whole

6  reports were kept.  Usually I indicated on the

7  report which ones that I notified the stores

8  about, on that report.  But then also when the

9  report was generated and went out to the stores,

10  there was also a follow up that had to make sure

11  that those answers were received.

12   Q.   Okay.  And so you would write on

13  the physical report that was printed each month?

14   A.   Yes.

15   Q.   And was that report only in hard

16  copy?

17   A.   Yes.

18   Q.   And -- but you retained that

19  report?

20   A.   Yes.

21   Q.   Do you know whether DDM still has

22  those reports?

23   A.   I can't answer that.

24   Q.   Okay.  Would you have written the

Page 88

1  reasons why you determined a possible suspicious

2  order was not suspicious on that report?

3    A.   No.

4    Q.   Would that be reflected in the

5  form that you sent to the store?

6    A.   Correct.

7    Q.   Okay.  Did you ever halt or

8  suspend any order as suspicious?

9    A.   Did not.

10   Q.   Okay.  And, in fact, I believe the

11  report you've been talking about, the 12-month

12  report, was a retrospective report, correct?

13   A.   Yes.

14   Q.   So that report was not -- didn't

15  work in a way that would allow you to stop an

16  order before it was filled, right?

17   A.   No.  But there was another report

18  that was generated that Jill looked at that

19  could have fulfilled that.

20   Q.   Okay.  And so the only prospective

21  system that was in place at DDM to identify

22  suspicious orders, that you know of, was the

23  report that Jill looked at, correct?

24   A.   Yes.

Page 89

1    Q.   Okay.  And so it wasn't your job

2  or responsibility to identify orders that were

3  suspicious and should be halted before they went

4  out, correct?

5    A.   Say again.

6    Q.   It wasn't your job or

7  responsibility at DDM to identify suspicious

8  orders and then halt them before they went out,

9  correct?

10   A.   Well, you're using the term

11  "suspicious order."  We didn't -- but if there

12  was a suspicious order, then they would have

13  gone out.  We would have followed up at the back

14  side, on the back end.

15   Q.   They would have gone out but you

16  would have followed up later?

17   A.   Yes.

18   Q.   Okay.  Do you know whether that

19  complies with the Controlled Substances Act

20  requirement that you have effective controls in

21  place to prevent against diversion?

22   A.   Well, when you look at our -- you

23  know, because we're still a closed system, there

24  was some conversations whether or not, because

23 (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    Q.   Okay.  So the report would say
2  their average is one bottle for the last year
3  and this month they ordered five bottles, you've
4  got to look into it?
5    A.   We have to -- yes, that would be a
6  case where I knew that we had different sizes
7  and before they would -- they switched sizes.
8  They switched size bottles.
9    Q.   Okay.  Conversely, if a pharmacy
10 was ordering, let's say, two bottles of 100
11 tablets and that was their average for the last
12 12 months, okay?  Is that fair example to start?
13   A.   Yes.
14   Q.   All right.  And then they switched
15 the next month and they -- instead of getting
16 two bottles of 100 tablets, they get two bottles
17 of 500 tablets, would that show up on your
18 12-month average rolling report?
19   A.   Yes, because previously they
20 didn't order any of the 500s.  Now they're
21 ordering two.  So their history was different.
22   Q.   Okay.  So it would say -- it would
23 say your previous 12-month on a 500-tablet
24 bottle is zero and now you've ordered two?

Page 207

1    A.   Correct.
2    Q.   And that's greater than
3  99 percent?
4    A.   Correct.
5    Q.   So it wouldn't be based on the
6  tablet numbers, it would be based on the
7  bottle's size?
8    A.   Yes.
9    Q.   Okay.  Was there any other unit
10 that was tracked by that report that would cause
11 it to generate other than bottle size?
12   A.   Not to my knowledge.  It's been a
13 while since I looked at that report.
14   Q.   Okay.  After those two letters
15 that we looked at from the DEA, do you believe
16 that DDM complied with every obligation
17 underneath the Controlled Substances Act?
18   A.   I do.  I still think that our
19 system, our SOMS system, looked at -- it wasn't
20 just the 12-month rolling average.  It was --
21 you know, that was part and parcel of the plan,
22 the program.
23   Q.   Okay.
24   A.   We did have a prospective in

Page 208

1  regards to the six-week average if Jill was
2  looking at that, but that was still part of the
3  program.  It wasn't something that I look at,
4  but it was still something that was looked at by
5  humans, by people, a set of eyeballs on it.
6  So -- and if she had any questions about it, she
7  would either contact the stores or contact me
8  or -- you know.
9    Q.   Just to be clear, I don't want to
10 know what Jill did because obviously Jill did
11 that, so --
12   A.   All right.
13   Q.   Yeah.  But just after looking at
14 those two letters and all the things we
15 discussed, it's still your position that DDM
16 complied with the obligations that it had under
17 the Controlled Substances Act?
18   A.   I believe so.
19   Q.   Okay.  All right.  And just so
20 that we're clear, I want to just confirm, DDM's
21 suspicious order monitoring policies and
22 procedures were never put in writing, correct?
23   A.   Correct.
24   Q.   Okay.  And those policies and

Page 209

1  procedures were not effective at deterring or
2  preventing completely theft of hydrocodone from
3  stores, correct?
4        MR. JOHNSON:  Objection.
5    A.   I think that -- you're talking
6  about distribution level versus store level
7  here, right?
8    Q.   I'm just asking you whether DDM's
9  suspicious order monitoring policies were
10 effective at preventing --
11   A.   Yes.
12   Q.   -- theft.
13   A.   Yes.
14   Q.   Okay.  But you agreed with me
15 earlier today that there were several instances
16 where controlled substances were stolen from a
17 DDM pharmacy, right?
18   A.   But -- yes, but the system
19 caught -- the systems in place caught whatever
20 was missing based on our monthly reports, based
21 on the rolling reports, based on everything that
22 we reported.
23   Q.   Right.  They caught it after the
24 fact, but they didn't prevent it, right?