# EXHIBIT 463

```
                    UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

                         EASTERN DIVISION

                             - - -

  IN RE:  NATIONAL             :
  PRESCRIPTION                 :  MDL No. 2804
  OPIATE LITIGATION            :
  _____ :  Case No.
                               :  1:17-MD-2804
  THIS DOCUMENT RELATES        :
  TO ALL CASES                 :  Hon. Dan A. Polster

                             - - -

                  Thursday, January 3, 2019

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW

                             - - -


        Videotaped deposition of JILL A. STRANG, held

  at the offices of Cavitch, Familo & Durkin,

  1300 East Ninth Street, Cleveland, Ohio, commencing at

  8:57 a.m., on the above date, before Carol A. Kirk,

  Registered Merit Reporter and Notary Public.


                             - - -


              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
```

Page 62

```
 1      A.   They call if they need -- if they
 2  have questions, if they need something.  I do
 3  communicate with all of the stores.
 4      Q.   Is it mostly a, "Hey, Jill, we
 5  need this many bottles of this drug and it
 6  didn't show up on time or we need it by this
 7  date"?
 8           Is that mostly what it's like?
 9      A.   Every day when the trucks are
10  there, if they need something, if they have
11  questions about different topics, recalls.  I
12  mean, I talk to everybody about all the topics.
13      Q.   Okay.
14      A.   Daily.
15      Q.   Do you also communicate or act as
16  an intermediary between DDM and distributors or
17  manufacturers?
18      A.   I do.
19      Q.   Because you're the buyer, right?
20      A.   Yes.
21      Q.   So you're the primary person
22  communicating with them, at least on the front
23  end, to get product, correct?
24      A.   Yes.
```

Page 63

```
 1      Q.   Okay.  Presumably somebody else
 2  pays invoices later and they probably
 3  communicate with their financial department, but
 4  you're primarily communicating with them on a
 5  drug procurement level, right?
 6      A.   Yes.
 7      Q.   And that would include, you know,
 8  issues regarding diversion and suspicious order
 9  monitoring?
10      A.   Yes.
11      Q.   And drug thresholds and things
12  like that?
13      A.   Yes.
14      Q.   Okay.  And as the individual at
15  DDM primarily responsible for suspicious order
16  monitoring on the distribution end, you agree
17  that DDM has an obligation to monitor orders and
18  shipments for suspicious -- or that look
19  suspicious or may have red flags?
20      A.   Yes.
21      Q.   Indicative of diversion?
22      A.   Yes.
23      Q.   Okay.  So tell me what -- and I'm
24  just going to talk generally speaking.  I'm not
```

Page 64

```
 1  necessarily limiting it to you, but I can ask
 2  follow -- I'll ask follow-ups, but describe for
 3  me what DDM's policies and procedures are
 4  regarding the diversion of opioids.
 5      A.   Are you referring to when they
 6  order from me, from the distribution center?
 7      Q.   Just kind of -- what I'd like you
 8  to do is give me a full picture of what DDM does
 9  to prevent diversion and comply with the CSA.
10      A.   Okay.  So what we do is, the
11  stores order weekly.
12      Q.   Okay.
13      A.   It is ordered through a system
14  called Pioneer.  It gives them a recommended
15  order.  Each store can set their own minimums
16  and maximums on that.  So that way, you know,
17  everything is -- certain stores -- depending on
18  how much they've been dispensing.  That order is
19  sent over.
20           As soon as they send the order,
21  they receive back a document that says, "Order
22  items over six-week average."  They're given the
23  opportunity right there to review any items.
24  Sometimes it has no items.  I've seen a few that
```

Page 65

```
 1  have just antibiotics on them, you know, nothing
 2  controlled.  And, you know, they ordered three
 3  bottles instead of two bottles.  But they are
 4  given that chance to review if anything
 5  populates over a six-week average.  They have
 6  the opportunity to send that to me.
 7           As we get the orders, prior to
 8  2016, we had a -- it was called a pick ticket.
 9  It was a manual way of pulling.  And the pullers
10  would -- you know, if it says they wanted two of
11  this, they'd put two, and they'd manually write
12  a two.  Items on that pick ticket would have an
13  asterisk next to it if it could have been on the
14  six-week average report, over six-week average.
15           It was very rare that any controls
16  would show up on that.  The other items --
17  unless something -- again, the pullers know
18  their product.  You know, if they wanted -- if
19  they normally pull one, two or three of
20  something and all of a sudden somebody wants 20
21  of something, that would be brought to my
22  attention.
23           In our system, I have history of
24  every item.  So I would go into the history of
```

Page 70

1  would automatically spit out a report that would
2  go to them, to the store?
3      A.   It would go to the store.
4      Q.   Okay.  Would it come to you?
5      A.   Not unless -- not unless they sent
6  it to me.
7      Q.   Not unless the store sent it to
8  you?
9      A.   Exactly.
10     Q.   Okay. So store 1 submits an order
11 for hydrocodone, and let's say in your example
12 they order one bottle a week for the prior six
13 weeks, okay?
14     A.   Yes.
15     Q.   And then on the seventh week they
16 order two bottles, right?
17     A.   Yes.
18     Q.   Okay.  And this is just my
19 hypothetical.  They would then get a report from
20 Pioneer that says, "Hey, this order is greater
21 than your six-week average," fair?
22     A.   Yes, yes.
23     Q.   Okay.  But you wouldn't get that
24 report, right?

Page 71

1      A.   I do not.
2      Q.   Okay.  And the only way you would
3  learn that they were ordering more than their
4  six-week average would be if the chief
5  pharmacist contacted you and told you about it,
6  correct?
7      A.   Yes.
8      Q.   Okay.  And so was there anybody at
9  DDM corporate or in the warehouse that would
10 also be notified when one of those reports was
11 generated?
12     A.   Yes -- not when the report was
13 generated. If the order was pulled as two, as
14 in your example, monthly there was a report that
15 Tom Nameth and Jason Briscoe would look at, and
16 they would contact that store and inquire, you
17 know, as to why.
18     Q.   Okay.
19     A.   If there was more patients or
20 whatever, and they would have the ability to
21 answer back as to why.
22     Q.   You'd agree that that's sort of
23 more of a retrospective report, correct?
24     A.   Yes.

Page 72

1      Q.   Okay.  So all the drugs that are
2  listed on that report have already been shipped
3  out, right?
4      A.   Yes.
5      Q.   Okay.  And so the only potentially
6  prospective report would be the six-week average
7  report, right?
8      A.   That, and the knowledge of the
9  person pulling.  If it was two bottles instead
10 of one bottle, but if there were five, six,
11 seven bottles, that would definitely be in
12 question.
13     Q.   Okay.  But you're just relying on
14 someone's memory at that point, right?
15     A.   And their knowledge of our stores.
16     Q.   Okay.  And there's 74 of them,
17 right?
18     A.   Yes.
19     Q.   Okay.  And so let's say a
20 pharmacist gets this, you know, six-week average
21 report, and they ordered one bottle and this
22 time they order two and they get it and they're
23 like, "Well, I know, you know, this is legit."
24          Were there ever instances where

Page 73

1  they would just, you know, file that report away
2  and not do anything further, that you know of?
3      A.   That I know of, yes.
4      Q.   Okay.  And so did DDM require the
5  chief pharmacist to take any action when they
6  received a report like that?
7      A.   No.  It's up to their discretion.
8      Q.   Okay.  And it was sort of a, "Hey,
9  heads up, your average is this, but this time
10 you ordered that.  Just wanted to make sure that
11 was right."
12     A.   Yes.
13     Q.   Okay.  And so in that sense, I
14 think this phrase we've used before is it was
15 kind of a fat-finger report to make sure there
16 were no typing errors?
17     A.   Yes.
18          MR. JOHNSON:  That's a term that
19     you have used.
20          MR. MULLIGAN:  Well, other people
21     have used it, too.  I think one of your
22     witnesses used it once.
23          MR. JOHNSON:  Only in response to
24     the questioning.

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : : MDL No. 2804 : |
| _____ | : Case No. : 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : : Hon. Dan A. Polster |

- - -

Thursday, December 6, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JASON BRISCOE, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:05 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  It would have just been a distribution to one of
2  our stores, since they're not our customers and
3  it's not a transaction by which we are creating
4  revenue. It's just distribution. But --
5      Q. Let's use the word "order," okay?
6      A. Okay.
7      Q. Order, sale, DEA --
8      A. Can you repeat -- I got off track.
9      Q. That's okay.
10         So DDM is not determining whether
11 an order is -- it's an anomaly, it appears in
12 that report -- whether it's suspicious or not
13 until after it completes the order, correct?
14         MR. JOHNSON: Objection.
15     A. The realtime opportunity to
16 identify an order to be an anomaly that
17 potentially would lead to due diligence and
18 identified as an unresolved suspicious order
19 would be based on that -- that inventory
20 management report that every purchase order,
21 regardless of schedule -- when that's created.
22         But the second phase of our system
23 is a retrospective analysis of the previous
24 month's purchases.

Page 139

1      Q. Let's go back to that inventory
2  management report, the six-week average, right,
3  with -- is it Ms. Strang? Am I saying that
4  right?
5      A. You got it.
6      Q. Okay. Thanks.
7         Ms. Strang, she would call the
8  pharmacy, right, if she got -- something popped
9  up on that six-week average report?
10     A. Whether it's blood pressure or --
11     Q. Yep.
12     A. Yep.
13     Q. I mean, it doesn't matter. The
14 blood pressure, acne medicine, birth control, it
15 doesn't make any difference what it is, right?
16 She'd call the pharmacy and say, "You've popped
17 up on my six-week average report."
18         Right? She was confirming that
19 that order was placed and there was no fat
20 fingers or anything, right?
21     A. True.
22     Q. There was no due diligence at that
23 point other than confirming there were no fat
24 finger entries on the keyboard, correct?

Page 140

1         MR. JOHNSON: Objection.
2      A. It depends on how you're defining
3  "due diligence," but I would think that that
4  extra set of eyes in both the pharmacy and at
5  the distribution center would be a layer of
6  protection.
7      Q. If the pharmacist said, "Yes, I
8  ordered seven bottles of some prescription acne
9  medication," then it would get -- the order
10 would go through, correct?
11         MR. JOHNSON: Objection.
12     A. I can't put myself in Jill's
13 shoes. Depending upon the store, the
14 medication, the situation, the answer, you know,
15 Jill might have come to us to say, "We need to
16 take a further look."
17     Q. I'm not asking you to be in Jill's
18 shoes. I'm asking you from DDM's perspective.
19 If DDM has a six-week average report, contacts
20 the pharmacist and said, "This purchase order
21 has popped up on my six-week average report.
22 Did you, in fact, order seven bottles of this
23 acne medication," and the pharmacist says, "Why,
24 yes, we did," it would get shipped, correct?

Page 141

1         MR. JOHNSON: Objection.
2      A. Depends, again, on Jill's
3  interaction at -- with that particular
4  conversation, but, you know, it --
5      Q. Let's call that the fat finger
6  report. She's calling to check to make sure
7  that the entry wasn't incorrect --
8         MR. JOHNSON: Objection.
9      Q. -- correct?
10     A. That's the initiation of her call,
11 yes.
12     Q. Yes, sir. That report is simply
13 checking to make sure that the purchase order
14 matches what the pharmacist intended to enter,
15 correct?
16     A. Yes.
17     Q. And if DDM calls and certifies and
18 the pharmacy says, "Yes, that's what I intended
19 to order," boom, it was -- it was sent out,
20 correct?
21         MR. JOHNSON: Objection.
22     A. Possibly, yes.
23     Q. Okay. Well, when you say
24 "possibly," what other -- what other policies

36 (Pages 138 to 141)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  policies that we've walked through identified
2  orders as suspicious before they were shipped,
3  correct?
4         MR. JOHNSON: Objection.
5     Q.  That's problem number one, right?
6         MR. JOHNSON: Objection.
7     A.  There weren't any orders that were
8  suspicious, but in a hypothetical ...
9     Q.  No, I'm not -- this isn't a
10 hypothetical. You didn't identify one order in
11 12 years, DDM, that was ever suspicious. So
12 this isn't a hypothetical.
13        In 12 years that we're talking
14 about, '06, to 2018, DDM used a formula to
15 compare one month's orders to previous orders,
16 correct?
17    A.  We did, yes.
18    Q.  And one of those formulas was
19 simply to confirm purchase orders with the
20 pharmacist, correct?
21        MR. JOHNSON: Objection.
22    A.  One of the two reports?
23    Q.  Yes, sir.
24    A.  Yes.

Page 151

1     Q.  Neither of the two reports were
2  designed to halt or cease shipments once that
3  anomaly -- that order was placed on a report,
4  correct?
5         MR. JOHNSON: Objection.
6     A.  On their face --
7     Q.  Yes.
8     A.  -- by themselves?
9         No.
10    Q.  Once -- even though it would
11 populate a report, the order would still go out
12 the door, correct?
13    A.  Yes.
14    Q.  Even though it would have been
15 identified as an anomaly on that report,
16 correct?
17        MR. JOHNSON: Objection.
18    A.  Yes.
19    Q.  The DEA relayed that formulas
20 comparing one month to a next are insufficient
21 to identify suspicious orders, correct?
22        MR. JOHNSON: Objection.
23    A.  Yes.
24    Q.  And that was DDM's system to

Page 152

1  generate -- the only -- only reports it
2  generated were both based on formulas comparing
3  month to month, correct?
4         MR. JOHNSON: Objection.
5     A.  That is correct; however, that was
6  not the end of the system. That was only the
7  first portion of our system.
8     Q.  But the only anomalies that were
9  reviewed by Mr. Nameth, DDM, anyone at DDM, were
10 anomalies on those reports, right?
11        MR. JOHNSON: Objection.
12    A.  The only anomalies that would have
13 been investigated specific to these reports,
14 yes. If there was another situation that was
15 brought to our attention, I can't speak to
16 whether or not it was investigated, but I'm
17 certain it would have been.
18    Q.  And the sentence here from the DEA
19 says, "For example, a system that identifies
20 orders as suspicious only if the total amount of
21 controlled substance ordered during one month
22 exceeds the amount ordered the previous month by
23 a certain percentage or more is insufficient."
24        That almost perfectly describes

Page 153

1  the DEA -- I'm sorry -- the DDM system of
2  populating reports based on averages from month
3  to month, correct?
4         MR. JOHNSON: Objection.
5     A.  It doesn't describe our total
6  system. It describes the first phase of our
7  system accurately.
8     Q.  It describes the first phase of
9  your system to identify anomalies --
10    A.  Not suspicious orders.
11    Q.  -- on reports?
12    A.  Yes.
13    Q.  Yes. You all didn't consider them
14 suspicious, correct?
15    A.  On those reports, no, not at that
16 point.
17    Q.  So even though an order might have
18 exceeded by 99 percent, you all didn't consider
19 that to be suspicious, correct?
20    A.  Correct.
21    Q.  So suffice it to say, when this
22 letter came out in 2007, DDM never changed its
23 SOM policies to incorporate or identify orders
24 that may be suspicious other than the rigid

39 (Pages 150 to 153)