# EXHIBIT 467

Highly Confidential - Subject to Further Confidentiality Review

```
                  UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                        EASTERN DIVISION

                             - - -

IN RE:  NATIONAL            :
PRESCRIPTION                :   MDL No. 2804
OPIATE LITIGATION           :
_____ :   Case No.
                            :   1:17-MD-2804
THIS DOCUMENT RELATES       :
TO ALL CASES                :   Hon. Dan A. Polster

                             - - -

                   Monday, January 7, 2019

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW

                             - - -
```

Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                             - - -



            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

```
 1                    This says, right, "DDM
 2    distributors must be vigilant in deciding
 3    whether a prospective customer" -- which is the
 4    store or a pharmacist -- "can be trusted."
 5                    And I'm asking you what you did,
 6    other than just blindly trusting them, to
 7    determine whether they could be trusted.
 8            A.      Well, we didn't blindly trust
 9    them.  I mean, if I know a pharmacist for -- we
10    had a long-standing history of having
11    pharmacists under our control for numbers of
12    years.  We did not have a high turnover.  We
13    knew our people in the stores.
14                    So a trust is determined over a
15    segment of time with that person.  So obviously
16    if you're looking at -- things were in place as
17    far as licensures was correct.  That was one
18    aspect of it.  But the other aspect of it is
19    to -- we're not sending it to someone we don't
20    know.
21            Q.      Okay.  So the two prongs of your
22    discharging your duty to be vigilant is:  One,
23    the pharmacist has a license of his own or her
24    own; and two, you know them personally, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.
 2          Q.    Okay.  Okay.  If you go to the
 3   next page, page 2, second paragraph, second
 4   sentence, it says, "Moreover, all registrants -
 5   manufacturers, distributors, pharmacies, and
 6   practitioners - share responsibility for
 7   maintaining appropriate safeguards against
 8   diversion."
 9                Do you see that?
10          A.    Mm-hmm.
11          Q.    And so you'd agree that that means
12   that DDM and its pharmacies have a corresponding
13   responsibility to protect against diversion,
14   right?
15          A.    Yes.
16          Q.    Okay.  And it says, "Nonetheless,
17   given the extent of prescription drug abuse in
18   the United States, along with the dangerous and
19   potentially lethal consequences of such abuse,
20   even just one distributor that uses its DEA
21   registration to facilitate diversion can cause
22   enormous harm."
23                Do you see that?
24          A.    Mm-hmm.
```

```
 1            Q.   Would you agree with that?
 2            A.   Yes.
 3            Q.   Okay.  If you go to the next
 4   paragraph.  This is referencing a federal
 5   statute.  Are you familiar with that statute,
 6   21 U.S.C. 823(e)?
 7            A.   I'd have to review it.
 8            Q.   Okay.  It says -- and it talks
 9   about it here a little bit.  It says listed
10   among the factors on that statute is "the duty
11   of a distributor to maintain effective controls
12   against diversion of controlled substances into
13   other than legitimate medical, scientific, and
14   industrial channels."
15                 Do you see that?
16            A.   Mm-hmm, yes.
17            Q.   And that's what we've been talking
18   about today, right?
19            A.   Yes.
20            Q.   Okay.  And down below it says,
21   "The DEA regulations require all
22   distributors" -- and that's DDM, right?
23            A.   Yes.
24            Q.   -- "to report suspicious orders of
```

```
 1   controlled substances."
 2              Do you see that?
 3        A.    Yes.
 4        Q.    And the regulations state in
 5   21 C.F.R. 1301.74(b) the following --
 6        A.    Where are you?
 7              MR. JOHNSON:  Where are you right
 8        now?
 9        A.    I think I lost you.
10              MR. JOHNSON:  It's not up on the
11        screen.
12              MR. MULLIGAN:  Yeah.  We're good
13        now.  Do you guys see that now?
14   BY MR. MULLIGAN:
15        Q.    So I'm looking at the indented
16   paragraph, okay?
17        A.    Go ahead and start.
18        Q.    It says, "The registrant shall
19   design and operate a system to disclose to the
20   registrant suspicious orders of controlled
21   substances."
22              Do you see that?
23        A.    Yes.
24        Q.    And so -- and that's -- the system
```

```
 1    that DDM designed is the one that we've talked

 2    about today, right?

 3         A.    Yes.

 4         Q.    It says, "The registrant" -- which

 5    is DDM -- "shall inform the Field Division

 6    Office of the Administration in his area of

 7    suspicious orders when discovered by the

 8    registrant."

 9               Do you see that?

10         A.    Yes.

11         Q.    And you'd agree that that means

12    that as soon as a suspicious order is

13    identified, it must be reported immediately,

14    right?

15               MR. JOHNSON:  Objection.

16         A.    Yes.

17         Q.    Okay.  It doesn't say within a

18    week, right?

19         A.    Right.

20         Q.    And it doesn't say within a month,

21    right?

22         A.    Right.

23         Q.    And it doesn't say after you've

24    done your due diligence, right?
```

```
 1        A.    Correct.
 2        Q.    It just says when it's identified,
 3   right?
 4        A.    Yes.
 5        Q.    Okay.  "Suspicious orders include
 6   orders of unusual size, orders deviating
 7   substantially from a normal pattern, and orders
 8   of unusual frequency."
 9              Do you see that?
10        A.    Yes.
11        Q.    So here the C.F.R. is actually
12   defining the word "suspicious order," isn't it?
13        A.    It says what it includes.  It's
14   not inclusive, but --
15        Q.    Right.  It's not -- it's not an
16   exhaustive list --
17        A.    Right.
18        Q.    -- but it tells you what is a
19   suspicious order under the regulations, right?
20   And that would include an order of unusual size,
21   right?
22        A.    It includes orders of unusual
23   size.
24        Q.    Okay.  And would you agree that
```

```
 1    any order that shows up on your 12-month report
 2    or your monthly -- 12-month average report would
 3    reflect orders of unusual size by definition?
 4           A.    By definition, yes.
 5           Q.    Okay.  And a suspicious order also
 6    includes orders deviating substantially from a
 7    normal pattern, correct?
 8           A.    Yes.
 9           Q.    And by definition, your report
10    would also include orders deviating
11    substantially from a normal pattern, right?
12           A.    Yes.
13           Q.    Okay.  And the last thing is
14    "orders of unusual frequency."
15                 Do you see that?
16           A.    Yes.
17           Q.    Okay.  So this definition of
18    suspicious order would seem to include anything
19    that would show up on your 12-month average
20    report, correct?
21           A.    Depends on what they're stating is
22    unusual size.
23           Q.    Well, I mean --
24           A.    I mean, if on our report we look
```

```
 1   at it, and if we could answer the reason why,
 2   then, you know, we could justify the order.
 3           Q.    Okay.  But this -- the sentence
 4   above it says that you "shall inform the DEA of
 5   suspicious orders when discovered," right?  And
 6   it doesn't say after doing due diligence, does
 7   it?
 8                 MR. JOHNSON:  Objection.
 9           Q.    So you're getting -- is that
10   right?
11           A.    It doesn't say when.
12           Q.    It says you have to -- well, it
13   says, "The registrant shall inform the Field
14   Division Office of the Administration in his
15   area of suspicious orders when discovered."
16           A.    Right.
17           Q.    Okay.  So you're saying that you
18   didn't discover a suspicious order when you
19   looked at the report; it was only after you did
20   due diligence?
21           A.    Correct.
22           Q.    Okay.  But you don't see that
23   leeway in this text here, do you?
24           A.    I'm looking at it.  And when it
```

```
 1   says -- are you pointing specifically to orders
 2   of unusual size, that particular aspect of it?
 3   We never identified suspicious orders, so ...
 4          Q.    Did you ever have an order of
 5   unusual size?
 6          A.    Yes.
 7          Q.    Okay.  Did you ever report those
 8   orders?
 9          A.    Not after we reviewed them, no.
10          Q.    The answer to that question is you
11   never reported them, right?
12          A.    We never reported a suspicious
13   order.
14          Q.    Okay.  So DDM had unusual --
15   orders of unusual size, right?
16          A.    In this definition, it doesn't say
17   what unusual size is.  Is unusual size 100
18   bottles in their definition or not?  I mean,
19   that's very -- you know, you can determine
20   however you want the number on that.  So ...
21          Q.    But DDM defined unusual size to
22   orders on its own with its report that you
23   reviewed, didn't it?
24          A.    We looked at higher than normal
```

```
 1   orders.
 2          Q.    Okay.  That's -- is that
 3   substantially different than an unusually sized
 4   order?
 5          A.    That's an interpretation.
 6          Q.    I mean, if a pharmacy is ordering
 7   ten bottles a month over 12 months and then they
 8   order twenty, that's unusual isn't it?
 9          A.    Can be.
10          Q.    That's the whole point of the
11   rolling average, right?
12          A.    Can be.
13          Q.    Okay.  So DDM defined what an
14   order of unusual size was through its report,
15   right?  And that was a report that you guys
16   designed to identify suspicious orders, right?
17          A.    Could be.
18          Q.    Okay.  Well, did it or not?
19          A.    Again, I -- you know, according to
20   this, that was our -- our report listed anything
21   over 99 percent.  I don't know what this unusual
22   size means.  Does it determine -- why didn't
23   they tell me in the -- in this, why didn't they
24   say -- give me a percentage and something
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   concrete to work with.
 2         Q.    All right.  Sir, I'm asking you
 3   very specific questions and I'm happy to talk
 4   about this paragraph for the rest of the day if
 5   you want.  But if you can listen to my questions
 6   and answer them, we'll be able to get through my
 7   remaining stack of documents a lot faster.
 8               Okay.  So I --
 9               MR. JOHNSON:  Objection.
10         Q.    Would you agree with me that the
11   DEA is saying that a suspicious order is one
12   that includes orders of unusual size.  Would you
13   agree with that?
14         A.    That's what it says.
15         Q.    Okay.  And would you agree that
16   your rolling 12-month report showed orders of
17   unusual size by definition?
18         A.    I can't agree to that.
19         Q.    You don't agree?  So they were
20   normal?  There was nothing abnormal about those
21   orders?
22         A.    No.  They were -- they could have
23   been larger than normal, but what's unusual --
24   it's not unusual to me once I find out the
```

```
 1    reasoning.
 2         Q.    Okay.  So therein lies what we
 3    talked about earlier, which is DDM's suspicious
 4    order monitoring policies turned on your
 5    subjective belief about what was unusual and
 6    what wasn't; is that fair?
 7         A.    Possibly.
 8         Q.    DDM didn't define unusual --
 9    orders of unusual size?
10         A.    Well, they did when they said
11    99 percent.
12         Q.    Exactly.  So anything that showed
13    up on that report was an order of unusual size,
14    right?
15         A.    In DDM's mind but not necessarily
16    in the DEA's mind.
17         Q.    Okay.  But in DDM's mind, DDM had
18    orders of unusual size, correct?
19         A.    Yes.
20         Q.    Okay.  And this says a suspicious
21    order is one that is an order of unusual size,
22    correct?
23         A.    In -- in --
24         Q.    Right?
```