EXHIBIT 468

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE: NATIONAL | : | |
| PRESCRIPTION | : | MDL No. 2804 |
| OPIATE LITIGATION | : | |
| _____ | : | Case No. |
| | : | 1:17-MD-2804 |
| THIS DOCUMENT RELATES | : | |
| TO ALL CASES | : | Hon. Dan A. Polster |

- - -

Monday, January 7, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    And that's how you operated at

 3     DDM?

 4            A.    Yes.

 5            Q.    Okay.  Was there ever an instance

 6     at DDM where you found a possible suspicious

 7     order and you reported it immediately to the

 8     DEA?

 9            A.    No.

10            Q.    Was there ever a time when you

11     reported any order as suspicious to the DEA at

12     any time?

13            A.    We did not.

14            Q.    Okay.  That would include you and

15     anyone else; is that fair?

16            A.    To my knowledge, yes.

17            Q.    Okay.  Is that knowledge partially

18     reflective of what you read in those

19     depositions?

20            A.    No.  I'm just speaking -- I don't

21     recall -- I mean, you know, not that I'm aware

22     of that we ever reported a suspicious order to

23     the DEA.

24            Q.    Okay.  Okay.  So let's go back to
```

Highly Confidential - Subject to Further Confidentiality Review

1    Interrogatory Number 4, and I think as you aptly

2    pointed out, it includes the words "possible

3    suspicious order," correct?

4           A.    Yes.

5           Q.    And so with the addition of that

6    word, would you agree that any order that

7    appeared on your 12-month report should probably

8    be listed here in the response?

9                 MR. JOHNSON:  Objection.

10          A.    When you list this as possible

11   suspicious orders, then I guess anything on the

12   report could be provided.

13          Q.    Except for the fact maybe that

14   that report didn't actually show specific

15   orders, right, it just showed how much you had

16   ordered in the month?

17          A.    Correct.

18          Q.    Okay.  And so let's look at the

19   information that was requested for each of

20   those.  It says, "The date of the suspicious

21   order and the customer's identity and address."

22                Do you see that under a?

23          A.    Yes.

24          Q.    That -- your report wouldn't

1    actually show the date of the suspicious order,

2    would it?

3           A.    No.

4           Q.    Okay.  It would just show how much

5    was ordered the month -- in that month, right?

6           A.    Yes.

7           Q.    Okay.  And then b, "A description

8    of said order."  Would that information be

9    contained in that report?

10          A.    Yes.

11          Q.    So like how much was ordered --

12   the --

13          A.    The description being the type of

14   drug that it was.

15          Q.    Would that include NDC number?

16          A.    Yes.

17          Q.    The name of the drug?

18          A.    Yes.

19          Q.    Where the drug came from, like the

20   manufacturer?

21          A.    That would -- that's by the NDC

22   number you would know what manufacturer.

23          Q.    Okay.  And it would have like

24   quantity and strength?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And under c, obviously none of

 3    them were ever reported to the DEA, correct?

 4              A.    Correct.

 5              Q.    Okay.  And the due diligence that

 6    would have been performed on anything that

 7    showed up on that 12-month report would have

 8    been the form you sent to the stores; is that

 9    correct?

10              A.    Yes.

11              Q.    And would there be any other

12    documentation to reflect any due diligence that

13    was done?

14              A.    Not to my knowledge, no.

15              Q.    Okay.  Did you keep files in your

16    office or that were accessible to you that

17    contained those documents or some sort of a

18    running file that would show your due diligence

19    over time as it related to a particular store?

20              A.    Yes.

21              Q.    And would that just be by store?

22              A.    It would be by month.

23              Q.    So it would be by month, not by

24    store?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    Okay.  And would that basically

 3   consist of you taking the report that was

 4   printed out and just putting it in a file?

 5          A.    Well, the reports -- those whole

 6   reports were kept.  Usually I indicated on the

 7   report which ones that I notified the stores

 8   about, on that report.  But then also when the

 9   report was generated and went out to the stores,

10   there was also a follow up that had to make sure

11   that those answers were received.

12          Q.    Okay.  And so you would write on

13   the physical report that was printed each month?

14          A.    Yes.

15          Q.    And was that report only in hard

16   copy?

17          A.    Yes.

18          Q.    And -- but you retained that

19   report?

20          A.    Yes.

21          Q.    Do you know whether DDM still has

22   those reports?

23          A.    I can't answer that.

24          Q.    Okay.  Would you have written the
```

1    reasons why you determined a possible suspicious

2    order was not suspicious on that report?

3            A.    No.

4            Q.    Would that be reflected in the

5    form that you sent to the store?

6            A.    Correct.

7            Q.    Okay.  Did you ever halt or

8    suspend any order as suspicious?

9            A.    Did not.

10           Q.    Okay.  And, in fact, I believe the

11   report you've been talking about, the 12-month

12   report, was a retrospective report, correct?

13           A.    Yes.

14           Q.    So that report was not -- didn't

15   work in a way that would allow you to stop an

16   order before it was filled, right?

17           A.    No.  But there was another report

18   that was generated that Jill looked at that

19   could have fulfilled that.

20           Q.    Okay.  And so the only prospective

21   system that was in place at DDM to identify

22   suspicious orders, that you know of, was the

23   report that Jill looked at, correct?

24           A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  And so it wasn't your job

 2     or responsibility to identify orders that were

 3     suspicious and should be halted before they went

 4     out, correct?

 5              A.    Say again.

 6              Q.    It wasn't your job or

 7     responsibility at DDM to identify suspicious

 8     orders and then halt them before they went out,

 9     correct?

10              A.    Well, you're using the term

11     "suspicious order."  We didn't -- but if there

12     was a suspicious order, then they would have

13     gone out.  We would have followed up at the back

14     side, on the back end.

15              Q.    They would have gone out but you

16     would have followed up later?

17              A.    Yes.

18              Q.    Okay.  Do you know whether that

19     complies with the Controlled Substances Act

20     requirement that you have effective controls in

21     place to prevent against diversion?

22              A.    Well, when you look at our -- you

23     know, because we're still a closed system, there

24     was some conversations whether or not, because
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    we didn't -- it didn't leave our -- in other

 2    words, it didn't leave our small group of

 3    individual stores, because they're still within

 4    our family of stores, that we let the orders go,

 5    but we could follow up and then -- we didn't cut

 6    orders, so to speak, before they went out the

 7    door.

 8           Q.   Okay.  So it would be fair to say

 9    that DDM -- the extent of DDM's system to put in

10    place effective controls to prevent diversion

11    would have been reliance on the pharmacist; is

12    that fair?

13           A.   Yes.

14           Q.   Okay.  All right.  If you look at

15    5.  It says, "Please identify any persons" --

16    I'm going to paraphrase -- "who reviewed or

17    analyzed data regarding the distribution or

18    dispensing of opioids or your opioid products."

19                Do you see that?

20           A.   Mm-hmm.

21           Q.   Okay.  And if you flip the next

22    page, it's got yourself, Jill Strang, Jason

23    Briscoe, and Pete Ratycz.

24                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes, I do.

 2            Q.    Did you ever review any reports

 3    that reflected ordering history of opioids over

 4    time?

 5            A.    Other than the report that I

 6    reviewed?

 7            Q.    Correct.

 8            A.    No.

 9            Q.    Okay.  And that report only showed

10    what the average was for the prior 12 months,

11    correct?

12            A.    Yes.

13            Q.    Okay.  So you didn't look at any

14    reports that showed, over the last three years

15    Store 33's orders have gone from X to Y,

16    correct?

17            A.    That's correct.

18            Q.    Okay.  Do you know if anybody else

19    did?

20            A.    Not that I'm aware of.

21            Q.    Okay.  And so would the only

22    information that you analyzed regarding the

23    distribution or dispensing of opioids be that

24    12-month rolling report?
```

```
1            A.    Yes.

2            Q.    Okay.  Do you know whether anybody

3    else at DDM reviewed any report other than that

4    one which would have allowed them to analyze the

5    movement of opioids?

6            A.    Unless it was Pete in his

7    responsibilities.  I wasn't quite sure from a

8    30-foot -- 30,000-foot level what he was doing.

9    He could have been.  I wasn't aware of it.

10           Q.    Okay.  But he was running the

11   show, right?

12           A.    Yes.

13           Q.    And your piece of this was to

14   review and monitor that 12-month rolling report?

15           A.    Right.  Right.

16           Q.    Okay.  And that -- it was limited

17   to that, correct?

18           A.    Correct.

19           Q.    Okay.  Let's go to Interrogatory

20   Number 12, which is on page 6.  So this one

21   asks, "Please identify" -- or "For each

22   customer" -- and that would be a DDM store in

23   this context.  "Please identify their thresholds

24   and/or controlled substance limits at the time
```

1    the order -- of the order and identify personnel

2    who were responsible for establishing and/or

3    approving any thresholds or controlled substance

4    limit, as well as any overrides."

5                Do you see that?

6        A.    Mm-hmm.

7        Q.    And the answer there is "None,"

8    right?

9        A.    That's the answer, yes.

10       Q.    Would that be consistent with your

11   understanding of how DDM operated?

12       A.    I'm reading through it again.

13       Q.    Sure.

14             MR. JOHNSON:  It's also up on the

15       screen if that's easier for you.

16             THE WITNESS:  Yeah, that's

17       probably easier.

18   BY MR. MULLIGAN

19       Q.    Maybe I can para -- I --

20             MR. JOHNSON:  It takes getting

21       used to.

22             MR. MULLIGAN:  Sure.  Yeah.

23   BY MR. MULLIGAN:

24       Q.    And I can paraphrase even more.

Highly Confidential - Subject to Further Confidentiality Review

1   Really what I'm asking is, did -- were there --

2   were -- did individual DDM stores ever have any

3   thresholds for how much they could order?

4          A.   No.

5          Q.   Okay.  And so there would never

6   have been a time where Store 33 ordered X amount

7   and automatically that order would be halted if

8   it exceeded a certain limit, correct?

9          A.   Correct.

10         Q.   Okay.  Did DDM ever discuss the

11  merits of imposing thresholds upon its stores?

12         A.   No, but it could have been at a

13  different level.

14         Q.   Okay.  So nobody ever approached

15  you and said, "Hey, maybe we should put some

16  thresholds on our stores in light of the opioid

17  crisis that seems to be developing"?

18         A.   Well, all our C-IIs did not come

19  from our warehouse.  The only thing that was

20  coming from our warehouse was the hydrocodones.

21         Q.   Okay.

22         A.   So there were -- I assume there

23  were limits from the wholesalers.

24         Q.   Okay.  At some point, DDM stores