# EXHIBIT 470

Highly Confidential - Subject to Further Confidentiality Review

```
              UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

                   EASTERN DIVISION

                        - - -

IN RE:  NATIONAL            :
PRESCRIPTION                :  MDL No. 2804
OPIATE LITIGATION           :
_____ :  Case No.
                            :  1:17-MD-2804
THIS DOCUMENT RELATES       :
TO ALL CASES                :  Hon. Dan A. Polster

                        - - -

              Monday, January 7, 2019

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW

                        - - -
```

Videotaped deposition of TOM NAMETH, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:03 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1   process.
 2         Q.   As a pharmacist, and based on your
 3   understanding of the Controlled Substances Act,
 4   to the extent that DDM could have done that, do
 5   you think it should have?
 6         A.   In my opinion, I think we -- the
 7   system that we had was working well enough that
 8   we didn't need to do that.
 9         Q.   Okay.
10         A.   And there's other problems with
11   that.  When you get into a system that only has
12   black and white, that doesn't look at anything
13   else besides the number.
14         Q.   Okay.
15         A.   We think by looking -- having an
16   eyeball on a human being, looking at -- knowing
17   our stores and knowing our pharmacists, knowing
18   the store locations, the growth of the store and
19   all that, we have actually maybe a better aspect
20   of what's going on at store level than someone
21   that's just doing a black and white aspect of
22   cutting an order.
23         Q.   Why couldn't you do both?
24         A.   We felt that we didn't need to.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Would imposing a system that would
 2    identify possible suspicious orders in advance
 3    and halt shipments, that would create more work,
 4    wouldn't it?
 5            A.    Well, if you're going to stop --
 6            Q.    It's a very simple question.  I'm
 7    just -- would it create more work or not?
 8            A.    You've got to create another
 9    system.
10            Q.    Okay.  So it would be more work
11    for somebody at DDM, right?
12            A.    But that's not why we did it --
13    didn't do it.
14            Q.    But I didn't ask that question.  I
15    just asked if it would create more work.
16            A.    Possibly.
17            Q.    Okay.  Can you think of an
18    instance where it would create less work?
19            A.    Depends how smart your system was.
20    I don't know.
21            Q.    So but presumably if you put that
22    system in place, it would stop an order, right?
23    All of a sudden now someone's got to deal with a
24    stopped order, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.  Now -- so if you're saying
 2   then you're going to stop an order and then have
 3   somebody look at it and then override that
 4   stopped order, then is there a reason why you're
 5   stopping the order?
 6            Q.    Well, I mean, just let's say
 7   there's an order that shows up on your 12-month
 8   report.  Let's say prospectively you get the
 9   report, the second the order is placed, and it
10   says, "Hey, this person is ordering more than
11   what their average has been now with this last
12   order," you could do that, right?
13            A.    So you're going to do exactly what
14   we're doing now in a quicker time -- in an
15   earlier time frame.
16            Q.    It would be designed to catch
17   those orders before they went out, right?
18            A.    Yes.
19            Q.    Is there any reason why you
20   couldn't have done that, other than IT problems?
21            A.    Not that I would recall.
22            Q.    Okay.  Do you think that a system
23   like that would have been useful to help stop --
24   to identify suspicious orders and stop
```

```
 1   diversion?
 2        A.    Well, based on my knowledge and
 3   looking at what I dealt with and the reason --
 4   and not having a suspicious order, you know,
 5   retrospectively in my mind, I wouldn't have a
 6   need to do it.
 7        Q.    Okay.  But, again, that's based on
 8   the fact that you never personally identified an
 9   order that you decided was suspicious, correct?
10        A.    Correct.
11        Q.    Okay.  But if that system or that
12   report you reviewed was designed to generate
13   every time a store exceeded their threshold with
14   an order, that wouldn't require that much more
15   work for you, right?  You might have had to look
16   at the report more often, but it would have been
17   the same process, right?
18        A.    Yes.
19        Q.    Okay.  You would agree that DDM
20   had the tools necessary, therefore, to identify
21   suspicious orders, stop them before they went
22   out, and report them to the DEA immediately if
23   it chose to, correct?
24        A.    I can't answer that, because
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you're -- like I stated before, that I'm not
 2   quite sure if our IT department would have the
 3   ability to do that.
 4          Q.    Okay.
 5          A.    And you're saying they did.
 6          Q.    So you don't know, as you sit here
 7   today, whether DDM had the tools necessary to
 8   identify suspicious orders in advance and stop
 9   them before they went out?
10          A.    That's basically what I'm saying,
11   yeah, without looking into it further.
12          Q.    Okay.
13          A.    I mean, I can't answer that.
14          Q.    So would that also mean that DDM
15   didn't actually do that?
16          A.    No.  I mean, you know, that they
17   looked at it and said that they weren't going to
18   do it?
19          Q.    Well, you just told me you didn't
20   know whether DDM had the tools necessary to
21   identify a suspicious order and stop it before
22   it went out, right?
23          A.    Right.
24          Q.    So that would suggest to me that
```

```
 1    DDM didn't identify suspicious orders or stop
 2    them before they went out, right?
 3                MR. JOHNSON:  Objection.
 4         Q.    So that it could stop them before
 5    they went out?
 6         A.    So that they could stop them
 7    before they went out?
 8         Q.    Correct.
 9         A.    Yeah.
10         Q.    Okay.  They didn't?
11         A.    They didn't what?
12         Q.    This is like a Monty Python movie,
13    right?  Sometimes.  Let me ask the question
14    again.
15                So your testimony is that you
16    don't know whether DDM had the tools necessary
17    to identify suspicious orders and stop them
18    before they went out, right?
19         A.    Correct.
20         Q.    Okay.  So you would also agree
21    that DDM did not identify suspicious orders in a
22    way that would allow them to stop them before
23    they went out, right?
24                MR. JOHNSON:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And I think you said yes?
 2          A.    Yes.
 3          Q.    Okay.  You would agree that DDM's
 4   in the best position to ensure that any
 5   suspicious orders placed within its business are
 6   reported to the Ohio State Board and the DEA,
 7   right?
 8          A.    Yes.
 9          Q.    Okay.  Do you know what the most
10   dispensed drug was at DDM pharmacies, let's say
11   in 2014?
12          A.    Offhand, no.
13          Q.    Okay.  Do you know what the most
14   dispensed controlled substance was?
15          A.    I would -- I would be guessing if
16   I gave you an answer.
17          Q.    Okay.  Do you have a couple that
18   might be in the running?
19          A.    Controlled drugs?
20          Q.    Yeah.
21          A.    It could have been a
22   codeine-containing cough syrup.  Could have been
23   Ambien.
24          Q.    Anything else?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    It could have been a family of
 2   hydrocodones, you know, as a group.
 3         Q.    Okay.  That would include brand,
 4   generic, et cetera?  Different --
 5         A.    Different strengths.
 6         Q.    -- strengths?
 7         A.    Different -- yeah.
 8         Q.    Okay.  What percentage of DDM's
 9   pharmacy business was controlled versus not
10   controlled in 2014, do you know?
11         A.    I don't know.
12         Q.    Do you know, was it reflective of
13   the national average; was it higher or lower?
14         A.    I can't really answer that.
15         Q.    Did you ever do anything to
16   monitor or identify what the most -- or the
17   largest -- strike that.
18               Did you ever do anything to
19   identify or monitor which controlled substance
20   was being prescribed the most frequently and
21   filled in your stores?
22         A.    Did we monitor that?
23         Q.    Yeah, did you ever do anything to
24   monitor that?
```

```
 1         A.    No.

 2         Q.    Do you know if anybody else did?

 3         A.    I don't know that.

 4         Q.    Do you know whether there were

 5   ever any large unexplained increases of, let's

 6   say, hydrocodone prescriptions at any time when

 7   you were at DDM?

 8         A.    They showed up on our reports, if

 9   there were large increases in orders.

10         Q.    Do you know just from a chain wide

11   standpoint, were there ever any large

12   unexplained trends of use of hydrocodone within

13   the DDM system?

14         A.    Well, I'm sure we followed the

15   national trend, and the national trend was an

16   increase in hydrocodone use.  So we wouldn't be

17   any different than anybody else.

18         Q.    But you're just speculating,

19   right?  You don't actually know?

20         A.    Yes.

21         Q.    Okay.  Do you know what the most

22   commonly diverted drugs are?

23         A.    I would say that Schedule II

24   narcotics.
```

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.    Would that include hydrocodone?

 2      A.    It does now.  It didn't then.

 3      Q.    Well, you're saying the
 4  Schedule II didn't include hydrocodone then?

 5      A.    Well, no.  I mean, I'm not sure of
 6  your question.  The most highly diverted drugs?

 7      Q.    Mm-hmm.

 8      A.    I would have to assume it would be
 9  any Schedule II or hydrocodones or IIIs at that
10  particular point.

11      Q.    Were you aware of the most highly
12  diverted or most likely to be diverted drugs
13  were when you were working at DDM?

14      A.    I knew that hydrocodones were a
15  particular potential problem.

16      Q.    And that, in addition to those
17  other two drugs that make up the trilogy; is
18  that right?

19      A.    Yes.

20      Q.    And that's -- what, benzo is the
21  other one.  What's the third one?

22      A.    Basically codeine-containing cough
23  syrups, because of cough, cold and flu seasons.
24  I mean, that's a very highly used particular

Highly Confidential - Subject to Further Confidentiality Review

```
 1   product.
 2         Q.    So as a pharmacist and the
 3   director of pharmacy operations at DDM, you were
 4   aware of the types of drugs that were most
 5   commonly diverted, correct?
 6         A.    I would say yes.
 7         Q.    And did you do anything special to
 8   monitor the movement of those drugs within DDM's
 9   system, other than what we've talked about today
10   with that 12-month report?
11         A.    No.
12         Q.    Okay.  Did you ever run any
13   reports or look at any trends over time to see
14   how commonly those types of drugs were being
15   filled at DDM stores?
16         A.    Did not.
17         Q.    Are you aware of anybody that did?
18         A.    I'm not aware of that.
19         Q.    Is that something you could have
20   done?
21         A.    A trend for us?  It's possible,
22   yes.
23         Q.    Okay.  Do you think looking at
24   trends of how hydrocodone was being filled in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   your stores over time would have been helpful to
 2   determine whether your suspicious order
 3   monitoring policies and procedures were
 4   adequate?
 5           A.   Well, the problem with that is
 6   that if you're getting actual legitimate
 7   prescriptions for particular products, you
 8   would -- if the trend was upward, then we would
 9   actually not look at that because we have
10   legitimate prescriptions that we're filling.  So
11   it would determine whether or not you're filling
12   legitimate prescriptions at that point.
13               So if the prescription use was up,
14   then we would assume that the orders were going
15   to be up, and the distribution was up.
16           Q.   But we know -- it's common
17   knowledge that there were tons of illegitimate
18   prescriptions that led to this opioid crisis,
19   correct?
20               MR. JOHNSON:  Objection.
21           A.   Define "illegitimate
22   prescriptions."
23           Q.   Prescriptions that were written by
24   pill mills.  Prescriptions that were written for
```