# EXHIBIT 472

```
                UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO

                    EASTERN DIVISION

                        - - -

IN RE:  NATIONAL              :
PRESCRIPTION                  :   MDL No. 2804
OPIATE LITIGATION             :
_____  :   Case No.
                              :   1:17-MD-2804
THIS DOCUMENT RELATES         :
TO ALL CASES                  :   Hon. Dan A. Polster

                        - - -

              Monday, January 7, 2019

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW

                        - - -
```

        Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                        - - -


            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

Page 78

1 completed, with the help of some individuals.
2     And I want to just know, are
3 you -- did you assist in preparing these answers
4 in any way?
5     A.  No.
6     Q.  Okay. And so you weren't
7 contacted and asked to help provide answers to
8 this document; is that fair?
9     A.  That's correct.
10     Q.  Okay. And I'll just represent to
11 you, this was served on October 29th of 2018.
12 Had you been contacted about this litigation or
13 did you know about this litigation as of that
14 date?
15     A.  No.
16     Q.  Okay. If you can turn to page 3.
17 This is Interrogatory Number 4. And it says --
18 I'm going to skip -- I'm not going to read it
19 verbatim but, "Please identify any orders
20 you" -- and that's DDM -- "received that were at
21 any point identified as a possible suspicious
22 order."
23     Do you see that?
24     A.  Yes.

Page 79

1     Q.  And if you go down to the response
2 at the bottom, it says "None."
3     Do you see?
4     A.  Mm-hmm.
5     Q.  Would that be accurate based on
6 your understanding of -- from your role at DDM?
7     A.  When you say -- when you throw in
8 the word a "possible" suspicious order, there
9 could have been -- there could have been
10 possible suspicious orders, because then we
11 would have to follow up and determine whether it
12 was suspicious or not.
13     Q.  Okay. So depending upon how one
14 would define "possible suspicious order," you'd
15 agree that that could -- may or may not include
16 orders or histories that show up on your
17 12-month rolling report, correct?
18     A.  Yes.
19     Q.  Okay. And to the extent that you
20 then decided to do due diligence and got an
21 explanation, then potentially those would be not
22 considered suspicious orders at that point,
23 correct?
24     A.  Correct.

Page 80

1     Q.  Okay. And so you were the one who
2 was determining whether those possible -- well,
3 strike that.
4     They weren't really orders, right?
5 They were ordering histories, weren't they, for
6 the prior month?
7     A.  Yes.
8     Q.  Okay. So you would decide whether
9 the ordering history from the prior month was
10 suspicious, but it being on that report to you
11 would be an indication that it was possibly
12 suspicious, right?
13     A.  Correct.
14     Q.  Okay. And to the extent that you
15 got a sufficient explanation, then they would --
16 you'd just say, "Well, check that box. It's not
17 suspicious." Right?
18     A.  Right.
19     Q.  Okay. When you got that report,
20 did you ever just report that to the DEA, the
21 fact that a store appeared on there and had a
22 larger had than normal ordering history?
23     A.  Other than ARCOS?
24     Q.  I'm asking if you --

Page 81

1     A.  We reported to ARCOS but not to
2 that report.
3     Q.  Okay.
4     A.  Not that report.
5     Q.  You didn't fill out -- you didn't
6 specifically report that -- those as possible
7 suspicious orders to the DEA, correct?
8     A.  Correct, because they weren't
9 suspicious at that time.
10     Q.  Okay. But you would agree that
11 they were possibly suspicious, right?
12     A.  They could have been.
13     Q.  Okay. Do you know whether the
14 reporting obligation under the Controlled
15 Substances Act requires you to report possible
16 suspicious orders?
17     A.  I'm not aware of that.
18     Q.  Okay. Do you know what the
19 criteria is that the CSA provides for when you
20 have to report a suspicious order?
21     A.  Say again.
22     Q.  Do you -- what is the -- do you --
23 well, strike that.
24     Do you generally know, as you sit

21 (Pages 78 to 81)

Page 82

1  here today, what types of orders should be
2  reported to the DEA under the Controlled
3  Substances Act?
4      A.   Suspicious orders.
5      Q.   Okay. And how would you define a
6  suspicious order?
7      A.   One that we could not identify a
8  reason of why it was ordered.
9      Q.   Okay. And so my understanding is
10 that you don't believe that the Controlled
11 Substances Act required you to report possible
12 suspicious orders, only suspicious ones,
13 correct?
14     A.   Yes.
15     Q.   And it was okay that you didn't
16 report an order until after due diligence was
17 done to determine whether it was, in fact,
18 suspicious, correct?
19     A.   Yes.
20     Q.   Okay. And if that due diligence
21 took a week, it was okay for you to take that
22 time to determine whether the order was
23 suspicious or not before you could report it to
24 the DEA, correct?

Page 83

1      A.   Yes.
2      Q.   And that's how you operated at
3  DDM?
4      A.   Yes.
5      Q.   Okay. Was there ever an instance
6  at DDM where you found a possible suspicious
7  order and you reported it immediately to the
8  DEA?
9      A.   No.
10     Q.   Was there ever a time when you
11 reported any order as suspicious to the DEA at
12 any time?
13     A.   We did not.
14     Q.   Okay. That would include you and
15 anyone else; is that fair?
16     A.   To my knowledge, yes.
17     Q.   Okay. Is that knowledge partially
18 reflective of what you read in those
19 depositions?
20     A.   No. I'm just speaking -- I don't
21 recall -- I mean, you know, not that I'm aware
22 of that we ever reported a suspicious order to
23 the DEA.
24     Q.   Okay. Okay. So let's go back to

Page 84

1  Interrogatory Number 4, and I think as you aptly
2  pointed out, it includes the words "possible
3  suspicious order," correct?
4      A.   Yes.
5      Q.   And so with the addition of that
6  word, would you agree that any order that
7  appeared on your 12-month report should probably
8  be listed here in the response?
9          MR. JOHNSON: Objection.
10     A.   When you list this as possible
11 suspicious orders, then I guess anything on the
12 report could be provided.
13     Q.   Except for the fact maybe that
14 that report didn't actually show specific
15 orders, right, it just showed how much you had
16 ordered in the month?
17     A.   Correct.
18     Q.   Okay. And so let's look at the
19 information that was requested for each of
20 those. It says, "The date of the suspicious
21 order and the customer's identity and address."
22         Do you see that under a?
23     A.   Yes.
24     Q.   That -- your report wouldn't

Page 85

1  actually show the date of the suspicious order,
2  would it?
3      A.   No.
4      Q.   Okay. It would just show how much
5  was ordered the month -- in that month, right?
6      A.   Yes.
7      Q.   Okay. And then b, "A description
8  of said order." Would that information be
9  contained in that report?
10     A.   Yes.
11     Q.   So like how much was ordered --
12 the --
13     A.   The description being the type of
14 drug that it was.
15     Q.   Would that include NDC number?
16     A.   Yes.
17     Q.   The name of the drug?
18     A.   Yes.
19     Q.   Where the drug came from, like the
20 manufacturer?
21     A.   That would -- that's by the NDC
22 number you would know what manufacturer.
23     Q.   Okay. And it would have like
24 quantity and strength?

Page 154

1  at it, and if we could answer the reason why,
2  then, you know, we could justify the order.
3      Q.  Okay.  But this -- the sentence
4  above it says that you "shall inform the DEA of
5  suspicious orders when discovered," right?  And
6  it doesn't say after doing due diligence, does
7  it?
8          MR. JOHNSON:  Objection.
9      Q.  So you're getting -- is that
10 right?
11     A.  It doesn't say when.
12     Q.  It says you have to -- well, it
13 says, "The registrant shall inform the Field
14 Division Office of the Administration in his
15 area of suspicious orders when discovered."
16     A.  Right.
17     Q.  Okay.  So you're saying that you
18 didn't discover a suspicious order when you
19 looked at the report; it was only after you did
20 due diligence?
21     A.  Correct.
22     Q.  Okay.  But you don't see that
23 leeway in this text here, do you?
24     A.  I'm looking at it.  And when it

Page 155

1  says -- are you pointing specifically to orders
2  of unusual size, that particular aspect of it?
3  We never identified suspicious orders, so ...
4      Q.  Did you ever have an order of
5  unusual size?
6      A.  Yes.
7      Q.  Okay.  Did you ever report those
8  orders?
9      A.  Not after we reviewed them, no.
10     Q.  The answer to that question is you
11 never reported them, right?
12     A.  We never reported a suspicious
13 order.
14     Q.  Okay.  So DDM had unusual --
15 orders of unusual size, right?
16     A.  In this definition, it doesn't say
17 what unusual size is.  Is unusual size 100
18 bottles in their definition or not?  I mean,
19 that's very -- you know, you can determine
20 however you want the number on that.  So ...
21     Q.  But DDM defined unusual size to
22 orders on its own with its report that you
23 reviewed, didn't it?
24     A.  We looked at higher than normal

Page 156

1  orders.
2      Q.  Okay.  That's -- is that
3  substantially different than an unusually sized
4  order?
5      A.  That's an interpretation.
6      Q.  I mean, if a pharmacy is ordering
7  ten bottles a month over 12 months and then they
8  order twenty, that's unusual isn't it?
9      A.  Can be.
10     Q.  That's the whole point of the
11 rolling average, right?
12     A.  Can be.
13     Q.  Okay.  So DDM defined what an
14 order of unusual size was through its report,
15 right?  And that was a report that you guys
16 designed to identify suspicious orders, right?
17     A.  Could be.
18     Q.  Okay.  Well, did it or not?
19     A.  Again, I -- you know, according to
20 this, that was our -- our report listed anything
21 over 99 percent.  I don't know what this unusual
22 size means.  Does it determine -- why didn't
23 they tell me in the -- in this, why didn't they
24 say -- give me a percentage and something

Page 157

1  concrete to work with.
2      Q.  All right.  Sir, I'm asking you
3  very specific questions and I'm happy to talk
4  about this paragraph for the rest of the day if
5  you want.  But if you can listen to my questions
6  and answer them, we'll be able to get through my
7  remaining stack of documents a lot faster.
8          Okay.  So I --
9          MR. JOHNSON:  Objection.
10     Q.  Would you agree with me that the
11 DEA is saying that a suspicious order is one
12 that includes orders of unusual size.  Would you
13 agree with that?
14     A.  That's what it says.
15     Q.  Okay.  And would you agree that
16 your rolling 12-month report showed orders of
17 unusual size by definition?
18     A.  I can't agree to that.
19     Q.  You don't agree?  So they were
20 normal?  There was nothing abnormal about those
21 orders?
22     A.  No.  They were -- they could have
23 been larger than normal, but what's unusual --
24 it's not unusual to me once I find out the

Page 158

1  reasoning.
2      Q.  Okay.  So therein lies what we
3  talked about earlier, which is DDM's suspicious
4  order monitoring policies turned on your
5  subjective belief about what was unusual and
6  what wasn't; is that fair?
7      A.  Possibly.
8      Q.  DDM didn't define unusual --
9  orders of unusual size?
10     A.  Well, they did when they said
11 99 percent.
12     Q.  Exactly.  So anything that showed
13 up on that report was an order of unusual size,
14 right?
15     A.  In DDM's mind but not necessarily
16 in the DEA's mind.
17     Q.  Okay.  But in DDM's mind, DDM had
18 orders of unusual size, correct?
19     A.  Yes.
20     Q.  Okay.  And this says a suspicious
21 order is one that is an order of unusual size,
22 correct?
23     A.  In -- in --
24     Q.  Right?

Page 159

1      A.  That's what it says.
2      Q.  Okay.  And DDM had orders of
3  unusual size and you knew about them when you
4  saw them, right?
5          We're almost there.
6      A.  It was only unusual if we didn't
7  have an answer for it.
8      Q.  Okay.  I'll go around this
9  merry-go-round with you all day.
10         All right.  You've agreed with me
11 that DDM had orders of unusual size and they
12 showed up on your 12-month rolling report,
13 right?
14     A.  Yes.
15     Q.  Okay.  And you saw those, right?
16     A.  Mm-hmm.
17     Q.  And you didn't report them, right?
18     A.  Right.
19     Q.  Okay.  What would have been the
20 harm in reporting those orders?
21     A.  Well, in our opinion, that --
22 there's no sense of calling the DEA in when
23 there was no necessary need to.
24     Q.  But that would have been the safe

Page 160

1  route to go, wouldn't it?
2      A.  I don't think -- would DEA have
3  all the manpower to do all that?
4      Q.  That's not your problem, though --
5      A.  I mean I don't know.
6      Q.  -- is it?
7      A.  No, but there's no sense of
8  instigating a situation when you didn't have to.
9      Q.  But if you were going to be extra
10 safe, if you were going to dot all your Is and
11 cross all your Ts, wouldn't it have been easy to
12 just submit the orders that showed up on that
13 report to the DEA and just --
14     A.  Easy for me, but why should I make
15 it easy for me.  You know, I -- my job is to
16 determine whether or not that order is
17 legitimate or not, okay?  And so I'm taking the
18 stance that I'm going to do the legwork and not
19 throw it at the DEA without even looking at it.
20 That, to me, doesn't do service to the DEA.
21     Q.  Sir, as a pharmacist, you were not
22 given the subjective ability to decide what was
23 suspicious or not under the regulations,
24 wouldn't you agree?

Page 161

1         MR. JOHNSON:  Objection.
2      A.  Yes.
3      Q.  Okay.  So this is a pretty hard
4  and fast requirement to identify and report
5  suspicious orders, isn't it?
6         MR. JOHNSON:  Objection.
7      A.  It doesn't specify specifics.
8      Q.  Okay.  We've been down that road,
9  so I'm not going to go down that road again.
10        But it would have been easy for
11 you to just take your report that you got every
12 month and just send it on to the DEA, right?
13     A.  I could have, but I don't think
14 that would be -- it would be unverifiable
15 numbers.
16     Q.  Okay.  But you didn't do that,
17 right?
18     A.  No.
19     Q.  Okay.  The next paragraph says,
20 "It bears emphasis that the foregoing reporting
21 requirement is in addition to, and not in lieu
22 of, the general requirement under 21 U.S.C.
23 823(e) that a distributor maintain effective
24 controls against diversion."