# EXHIBIT 473

```
                    UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF OHIO

                         EASTERN DIVISION

                              - - -

IN RE:  NATIONAL             :
PRESCRIPTION                 :  MDL No. 2804
OPIATE LITIGATION            :
_____ :  Case No.
                             :  1:17-MD-2804
THIS DOCUMENT RELATES        :
TO ALL CASES                 :  Hon. Dan A. Polster

                              - - -

                   Monday, January 7, 2019

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW

                              - - -
```

        Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                              - - -



              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com

Page 82

1 here today, what types of orders should be
2 reported to the DEA under the Controlled
3 Substances Act?
4     A.   Suspicious orders.
5     Q.   Okay. And how would you define a
6 suspicious order?
7     A.   One that we could not identify a
8 reason of why it was ordered.
9     Q.   Okay. And so my understanding is
10 that you don't believe that the Controlled
11 Substances Act required you to report possible
12 suspicious orders, only suspicious ones,
13 correct?
14     A.   Yes.
15     Q.   And it was okay that you didn't
16 report an order until after due diligence was
17 done to determine whether it was, in fact,
18 suspicious, correct?
19     A.   Yes.
20     Q.   Okay. And if that due diligence
21 took a week, it was okay for you to take that
22 time to determine whether the order was
23 suspicious or not before you could report it to
24 the DEA, correct?

Page 83

1     A.   Yes.
2     Q.   And that's how you operated at
3 DDM?
4     A.   Yes.
5     Q.   Okay. Was there ever an instance
6 at DDM where you found a possible suspicious
7 order and you reported it immediately to the
8 DEA?
9     A.   No.
10     Q.   Was there ever a time when you
11 reported any order as suspicious to the DEA at
12 any time?
13     A.   We did not.
14     Q.   Okay. That would include you and
15 anyone else; is that fair?
16     A.   To my knowledge, yes.
17     Q.   Okay. Is that knowledge partially
18 reflective of what you read in those
19 depositions?
20     A.   No. I'm just speaking -- I don't
21 recall -- I mean, you know, not that I'm aware
22 of that we ever reported a suspicious order to
23 the DEA.
24     Q.   Okay. Okay. So let's go back to

Page 84

1 Interrogatory Number 4, and I think as you aptly
2 pointed out, it includes the words "possible
3 suspicious order," correct?
4     A.   Yes.
5     Q.   And so with the addition of that
6 word, would you agree that any order that
7 appeared on your 12-month report should probably
8 be listed here in the response?
9         MR. JOHNSON:  Objection.
10     A.   When you list this as possible
11 suspicious orders, then I guess anything on the
12 report could be provided.
13     Q.   Except for the fact maybe that
14 that report didn't actually show specific
15 orders, right, it just showed how much you had
16 ordered in the month?
17     A.   Correct.
18     Q.   Okay. And so let's look at the
19 information that was requested for each of
20 those. It says, "The date of the suspicious
21 order and the customer's identity and address."
22         Do you see that under a?
23     A.   Yes.
24     Q.   That -- your report wouldn't

Page 85

1 actually show the date of the suspicious order,
2 would it?
3     A.   No.
4     Q.   Okay. It would just show how much
5 was ordered the month -- in that month, right?
6     A.   Yes.
7     Q.   Okay. And then b, "A description
8 of said order." Would that information be
9 contained in that report?
10     A.   Yes.
11     Q.   So like how much was ordered --
12 the --
13     A.   The description being the type of
14 drug that it was.
15     Q.   Would that include NDC number?
16     A.   Yes.
17     Q.   The name of the drug?
18     A.   Yes.
19     Q.   Where the drug came from, like the
20 manufacturer?
21     A.   That would -- that's by the NDC
22 number you would know what manufacturer.
23     Q.   Okay. And it would have like
24 quantity and strength?

Page 86

1  A. Yes.
2  Q. And under c, obviously none of
3  them were ever reported to the DEA, correct?
4  A. Correct.
5  Q. Okay. And the due diligence that
6  would have been performed on anything that
7  showed up on that 12-month report would have
8  been the form you sent to the stores; is that
9  correct?
10 A. Yes.
11 Q. And would there be any other
12 documentation to reflect any due diligence that
13 was done?
14 A. Not to my knowledge, no.
15 Q. Okay. Did you keep files in your
16 office or that were accessible to you that
17 contained those documents or some sort of a
18 running file that would show your due diligence
19 over time as it related to a particular store?
20 A. Yes.
21 Q. And would that just be by store?
22 A. It would be by month.
23 Q. So it would be by month, not by
24 store?

Page 87

1  A. Correct.
2  Q. Okay. And would that basically
3  consist of you taking the report that was
4  printed out and just putting it in a file?
5  A. Well, the reports -- those whole
6  reports were kept. Usually I indicated on the
7  report which ones that I notified the stores
8  about, on that report. But then also when the
9  report was generated and went out to the stores,
10 there was also a follow up that had to make sure
11 that those answers were received.
12 Q. Okay. And so you would write on
13 the physical report that was printed each month?
14 A. Yes.
15 Q. And was that report only in hard
16 copy?
17 A. Yes.
18 Q. And -- but you retained that
19 report?
20 A. Yes.
21 Q. Do you know whether DDM still has
22 those reports?
23 A. I can't answer that.
24 Q. Okay. Would you have written the

Page 88

1  reasons why you determined a possible suspicious
2  order was not suspicious on that report?
3  A. No.
4  Q. Would that be reflected in the
5  form that you sent to the store?
6  A. Correct.
7  Q. Okay. Did you ever halt or
8  suspend any order as suspicious?
9  A. Did not.
10 Q. Okay. And, in fact, I believe the
11 report you've been talking about, the 12-month
12 report, was a retrospective report, correct?
13 A. Yes.
14 Q. So that report was not -- didn't
15 work in a way that would allow you to stop an
16 order before it was filled, right?
17 A. No. But there was another report
18 that was generated that Jill looked at that
19 could have fulfilled that.
20 Q. Okay. And so the only prospective
21 system that was in place at DDM to identify
22 suspicious orders, that you know of, was the
23 report that Jill looked at, correct?
24 A. Yes.

Page 89

1  Q. Okay. And so it wasn't your job
2  or responsibility to identify orders that were
3  suspicious and should be halted before they went
4  out, correct?
5  A. Say again.
6  Q. It wasn't your job or
7  responsibility at DDM to identify suspicious
8  orders and then halt them before they went out,
9  correct?
10 A. Well, you're using the term
11 "suspicious order." We didn't -- but if there
12 was a suspicious order, then they would have
13 gone out. We would have followed up at the back
14 side, on the back end.
15 Q. They would have gone out but you
16 would have followed up later?
17 A. Yes.
18 Q. Okay. Do you know whether that
19 complies with the Controlled Substances Act
20 requirement that you have effective controls in
21 place to prevent against diversion?
22 A. Well, when you look at our -- you
23 know, because we're still a closed system, there
24 was some conversations whether or not, because

Page 98

1    a question with regards to the six-week order,
2    that six-week average, she had the ability to
3    come to us and ask questions about it prior. So
4    there was another aspect other than the 12-month
5    average that I could have had an input in. But
6    I don't know if that's what you're after.
7         Q.   Sure. Did you ever go and meet
8    with Jill on a periodic basis to discuss any
9    possible suspicious orders?
10        A.   No.
11        Q.   Have you ever met with Jill at any
12   time to discuss possible suspicious orders from
13   stores?
14        A.   As far as her report was
15   concerned?
16        Q.   Just in general about --
17        A.   In general? Not to my knowledge.
18        Q.   Okay. Let's go to page 12, which
19   is Interrogatory Number 26. And this says,
20   "Please identify for all your subsidiaries,
21   affiliates, et cetera" -- which is probably
22   poorly worded -- "who were involved in
23   distributing opioids or opioid products in the
24   State of Ohio the following: A, board of

Page 99

1    directors; b, senior management; c, person in
2    charge of detecting and preventing diversion;
3    all persons employed by that exact entity
4    involved in detecting and preventing diversion;
5    and e, total number of employees." And then
6    there's "f, address of each facility."
7             So c is "person in charge of
8    detecting and preventing diversion." And if you
9    look on the answer, c lists Pete Ratycz.
10            Do you see that?
11        A.   Mm-hmm.
12        Q.   Would you agree that he was the
13   person in charge of detecting and preventing
14   diversion at DDM?
15        A.   Yes.
16        Q.   And I would imagine, based on the
17   testimony that you've given today and what we
18   know, that the two prongs of that were the
19   12-month rolling average report that you were
20   responsible for and the greater than six-week
21   average report that Jill was responsible for; is
22   that fair?
23        A.   That was a portion of it, yeah --
24        Q.   Okay.

Page 100

1        A.   -- and then we would determine
2    whether or not from that point.
3         Q.   And then the due diligence would
4    be the last piece?
5         A.   Correct.
6         Q.   But that was the whole system,
7    correct?
8         A.   Yes.
9         Q.   Okay. Who is John Gans?
10        A.   He's the president of the company.
11        Q.   And do you know what role he
12   played in suspicious order monitoring?
13        A.   Very little. I mean, John was
14   more or less in charge of the company, not
15   the -- he had really no functionality in
16   pharmacy.
17        Q.   Okay. Did he play any role in
18   helping to design DDM's suspicious order
19   monitoring policies and procedures?
20        A.   No.
21        Q.   Okay. Do you know whether he ever
22   asked to be informed or updated as to what they
23   were?
24        A.   I don't believe so.

Page 101

1         Q.   Okay. Do you ever remember
2    meeting with him or anyone else in senior
3    management regarding the adequacy of DDM's
4    suspicious order monitoring policies once the
5    opioid epidemic became more apparent?
6         A.   Other than Pete?
7         Q.   Correct.
8         A.   No.
9         Q.   Did you and Pete and Jill ever sit
10   down to discuss the adequacy of DDM's suspicious
11   order monitoring policies?
12        A.   Not that I recall.
13        Q.   Did you ever have any concerns
14   that DDM's suspicious order monitoring policies
15   and procedures were inadequate to identify
16   suspicious orders in advance of them going out?
17        A.   No. I don't think that -- you're
18   talking about in advance now?
19        Q.   Correct.
20        A.   We thought that -- we never had an
21   instance where we had a suspicious order after
22   our due diligence, and so it wouldn't lend us to
23   be suspicious or to have concerns about it.
24        Q.   And when you say you never had a

Page 102

1 suspicious order, what you really mean is you
2 never identified an order as suspicious,
3 correct?
4   A.  Well, we looked at --
5       MR. JOHNSON: Objection.
6   A.  -- we looked at them all. I don't
7 think we ever had a suspicious order.
8   Q.  Okay. But do you get my -- in
9 order for it to be suspicious, someone has to
10 look at it and say, "That doesn't look right,"
11 correct?
12  A.  Correct.
13  Q.  Okay. And so your ability to
14 identify it is only as good as the person who's
15 looking at the information and the criteria that
16 they're applying, correct?
17  A.  Correct.
18  Q.  Okay. And I recognize this
19 document's a little bit long. I'm trying to get
20 through it so we can all take a break. I
21 apologize.
22      All right. D asks for, "All
23 persons employed by the exact entity involved in
24 detecting and preventing diversion."

Page 103

1       Do you see that?
2   A.  Mm-hmm.
3   Q.  And the answer is, "All pharmacy
4 employees."
5       Do you see that?
6   A.  Yes.
7   Q.  And that's what we were talking
8 about earlier about how you guys relied on the
9 pharmacy employees, correct?
10  A.  Correct.
11  Q.  Okay. How many pharmacy employees
12 did you have at a given time? And we talked
13 about all the levels.
14  A.  Around 180 maybe, in that range.
15  Q.  Okay. So out of the
16 4,000-some-odd DDM employees, there's only 180
17 pharmacy employees?
18  A.  Yes.
19  Q.  Does that include the techs and
20 the floaters?
21  A.  It does not.
22  Q.  Okay. So if you include the --
23  A.  Pharmacists.
24  Q.  -- the regional people, the chief,

Page 104

1 the staff, the floater and the techs, how many
2 would you have?
3   A.  Including regional?
4   Q.  Mm-hmm.
5   A.  Maybe 190.
6   Q.  So only 190 employees?
7   A.  In the pharmacy?
8   Q.  Correct.
9   A.  As far as that handled the
10 controlled drugs?
11  Q.  I'm just asking how many pharmacy
12 employees you had that included the regional
13 supervisors, the chief pharmacists, the staff
14 pharmacists, the floating pharmacists, and the
15 pharmacy techs.
16  A.  I would say that number is in that
17 range, about 190 or so.
18  Q.  Did you know them all on a name
19 basis?
20  A.  Yes.
21  Q.  Could you have walked into any
22 store on any given day and known the names of
23 every single person working in the pharmacy?
24  A.  Yes.

Page 105

1   Q.  Okay. Did anybody ever indicate
2 to you that they were concerned that there were
3 suspicious orders being placed in the DDM
4 system?
5   A.  No.
6       MR. MULLIGAN: All right. Now, we
7 can take a break.
8       MR. JOHNSON: Okay.
9       MR. MULLIGAN: Sorry about that.
10      THE VIDEOGRAPHER: We're going off
11 the record at 10:36.
12      (Recess taken.)
13      THE VIDEOGRAPHER: We're back on
14 the record at 10:49.
15 BY MR. MULLIGAN:
16  Q.  Earlier we were talking about the
17 trust that you place in the pharmacists and the
18 pharmacy employees at DDM, correct?
19  A.  Correct.
20  Q.  And did you do anything to verify
21 that the pharmacy level employees were doing
22 everything they could to prevent diversion,
23 other than trusting them?
24  A.  Making sure that when the

27 (Pages 102 to 105)

Page 154

1 at it, and if we could answer the reason why,
2 then, you know, we could justify the order.
3   Q.  Okay.  But this -- the sentence
4 above it says that you "shall inform the DEA of
5 suspicious orders when discovered," right?  And
6 it doesn't say after doing due diligence, does
7 it?
8       MR. JOHNSON:  Objection.
9   Q.  So you're getting -- is that
10 right?
11  A.  It doesn't say when.
12  Q.  It says you have to -- well, it
13 says, "The registrant shall inform the Field
14 Division Office of the Administration in his
15 area of suspicious orders when discovered."
16  A.  Right.
17  Q.  Okay.  So you're saying that you
18 didn't discover a suspicious order when you
19 looked at the report; it was only after you did
20 due diligence?
21  A.  Correct.
22  Q.  Okay.  But you don't see that
23 leeway in this text here, do you?
24  A.  I'm looking at it.  And when it

Page 155

1 says -- are you pointing specifically to orders
2 of unusual size, that particular aspect of it?
3 We never identified suspicious orders, so ...
4   Q.  Did you ever have an order of
5 unusual size?
6   A.  Yes.
7   Q.  Okay.  Did you ever report those
8 orders?
9   A.  Not after we reviewed them, no.
10  Q.  The answer to that question is you
11 never reported them, right?
12  A.  We never reported a suspicious
13 order.
14  Q.  Okay.  So DDM had unusual --
15 orders of unusual size, right?
16  A.  In this definition, it doesn't say
17 what unusual size is.  Is unusual size 100
18 bottles in their definition or not?  I mean,
19 that's very -- you know, you can determine
20 however you want the number on that.  So ...
21  Q.  But DDM defined unusual size to
22 orders on its own with its report that you
23 reviewed, didn't it?
24  A.  We looked at higher than normal

Page 156

1 orders.
2   Q.  Okay.  That's -- is that
3 substantially different than an unusually sized
4 order?
5   A.  That's an interpretation.
6   Q.  I mean, if a pharmacy is ordering
7 ten bottles a month over 12 months and then they
8 order twenty, that's unusual isn't it?
9   A.  Can be.
10  Q.  That's the whole point of the
11 rolling average, right?
12  A.  Can be.
13  Q.  Okay.  So DDM defined what an
14 order of unusual size was through its report,
15 right?  And that was a report that you guys
16 designed to identify suspicious orders, right?
17  A.  Could be.
18  Q.  Okay.  Well, did it or not?
19  A.  Again, I -- you know, according to
20 this, that was our -- our report listed anything
21 over 99 percent.  I don't know what this unusual
22 size means.  Does it determine -- why didn't
23 they tell me in the -- in this, why didn't they
24 say -- give me a percentage and something

Page 157

1 concrete to work with.
2   Q.  All right.  Sir, I'm asking you
3 very specific questions and I'm happy to talk
4 about this paragraph for the rest of the day if
5 you want.  But if you can listen to my questions
6 and answer them, we'll be able to get through my
7 remaining stack of documents a lot faster.
8       Okay.  So I --
9       MR. JOHNSON:  Objection.
10  Q.  Would you agree with me that the
11 DEA is saying that a suspicious order is one
12 that includes orders of unusual size.  Would you
13 agree with that?
14  A.  That's what it says.
15  Q.  Okay.  And would you agree that
16 your rolling 12-month report showed orders of
17 unusual size by definition?
18  A.  I can't agree to that.
19  Q.  You don't agree?  So they were
20 normal?  There was nothing abnormal about those
21 orders?
22  A.  No.  They were -- they could have
23 been larger than normal, but what's unusual --
24 it's not unusual to me once I find out the

Page 210

1  A.  On -- in a theft situation, we
2  caught it after the fact.
3  Q.  And DDM has never reported a
4  single suspicious order to the DEA or the Ohio
5  State Board, right?
6  A.  Correct.
7  Q.  And DDM has never identified or
8  reported a single possible suspicious order
9  either, correct?
10  A.  Correct.
11  Q.  Okay.  All right.  Let's look at
12  Exhibit -- I think we're on 5.
13  MR. JOHNSON:  4 maybe.
14  MR. MULLIGAN:  The last letter was
15  4.
16  MR. JOHNSON:  You're right.  I'm
17  sorry.
18  ---
19  (DDM-Nameth Exhibit 5 marked.)
20  ---
21  BY MR. MULLIGAN:
22  Q.  Okay.  So this is an e-mail with
23  an attachment.  The e-mail is DDM53874, and the
24  attached document is DDM53912.  And I'll just

Page 211

1  tell you, this is an e-mail from after you
2  retired.  But I mostly just want to know if you
3  know what this attachment is.  It's the -- the
4  attachment is -- the title says "Shipments
5  Greater Than 99 percent of Average Movement."
6  And then it says "Controlled Drugs."
7  And the e-mail says, "Attached is
8  our suspicious monitoring report for the last 12
9  months."
10  Does that look like -- is this the
11  report that you would have reviewed -- I mean,
12  obviously the date is different but ...
13  A.  I didn't see it in this form.
14  Q.  Okay.
15  A.  But, you know.
16  Q.  This contains the information that
17  you would have reviewed on your -- on the report
18  that you got?
19  A.  Yes.
20  Q.  Okay.  That's all I've got for
21  that one.
22  Let's do Exhibit 6.
23  Actually, no.  Let's skip that
24  one.

Page 212

1  ---
2  (DDM-Nameth Exhibit 6 marked.)
3  ---
4  BY MR. MULLIGAN:
5  Q.  This is DDM11545.  And this is a
6  letter from Pete Ratycz to the U.S. Department
7  of Justice dated November 13, 2001.
8  Do you see that?
9  A.  Yes.
10  Q.  Okay.
11  MR. JOHNSON:  Can you give him a
12  second to look at it?
13  Q.  I mean, if you need time to read
14  it, feel free, but I'm just going to ask you
15  some questions about it.  We're going to walk
16  through it.
17  It says, "Dear Sirs:  Please be
18  advised on November 6, 2001 a pharmacy
19  technician, Darlene Cottle, was apprehended
20  selling controlled substances to an undercover
21  officer outside our pharmacy located at -- in
22  Bellbrook, Ohio."
23  Do you see that?
24  A.  Mm-hmm, yes.

Page 213

1  Q.  Do you recall that instance?
2  A.  Vaguely.
3  Q.  Okay.  Do you know who Darlene
4  Cottle is?
5  A.  I believe she is a pharmacy tech.
6  Q.  Okay.  Could you pick her out of a
7  lineup?
8  A.  No.
9  Q.  Okay.  And so if you go down
10  further, it's talking about the drugs she had on
11  her.  And it says, "However, a complete audit of
12  the suspected drugs indicate significant
13  shortage."
14  Do you see that?
15  A.  Yes.
16  Q.  Okay.  And so this would indicate
17  that this store -- and I'm not sure what the
18  store number was, but they had a significant
19  shortage of their drugs, which was identified
20  after this pharmacy tech was caught selling
21  controlled substances to an undercover officer
22  just outside the pharmacy, right?
23  A.  Yes.
24  Q.  Okay.  Is that concerning to you?

```
                 UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

                       EASTERN DIVISION

                            - - -

IN RE:  NATIONAL              :
PRESCRIPTION                  :  MDL No. 2804
OPIATE LITIGATION             :
_____ :  Case No.
                              :  1:17-MD-2804
THIS DOCUMENT RELATES         :
TO ALL CASES                  :  Hon. Dan A. Polster

                            - - -

                  Thursday, January 3, 2019

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW

                            - - -
```

Videotaped deposition of JILL A. STRANG, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 8:57 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

                            - - -

              GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com

Page 106

1 an order as suspicious, correct?
2  A. No.
3  Q. Okay. And I'm assuming, based on
4 the testimony you just gave me, that there was
5 never a time where you or anyone at DDM stopped
6 a -- or suspended a shipment of a controlled
7 substance based on a concern that it was
8 suspicious, correct?
9  A. Correct.
10  Q. Do you know whether any DDM
11 pharmacist has refused to fill a prescription on
12 the belief that it was suspicious?
13   MR. JOHNSON: Objection.
14  A. I do not.
15  Q. You don't know? Do you know who
16 would know that?
17  A. Peter or Jason.
18  Q. Are you aware of the procedures
19 that they have in place with their pharmacists
20 to, you know, communicate about orders that a
21 pharmacist determined were suspicious?
22  A. I do not, other than that report
23 that Jason uses on a monthly basis to ask about
24 that, but on a specific occasion, no, I do not.

Page 107

1 I do not -- I'm not involved in that.
2  Q. When you communicate with
3 pharmacists about, you know, "Hey, was this
4 order what you meant to order," would you
5 provide them with any sort of forms, or would
6 that communication be oral?
7  A. Oral.
8  Q. Okay. Did you ever send an
9 e-mail?
10  A. No.
11  Q. Any reason why it would be oral
12 and not be an e-mail?
13  A. Because an e-mail -- I needed an
14 answer right then and there so we could pull the
15 order, we could reduce the order, and have it
16 invoiced and ready to go for the day, because
17 we'd be waiting on that.
18  Q. So you're in the midst of filling
19 this order and you catch this glitch and you --
20 everything has to stop until you resolve it so
21 you pick up the phone and you call them?
22  A. Yes.
23  Q. Okay. Do you know whether DDM has
24 ever identified a pill mill?

Page 108

1   MR. JOHNSON: Objection.
2  A. I do not know that.
3  Q. Okay.
4   THE VIDEOGRAPHER: Counsel on the
5   phone, could you put your phone on mute,
6   please.
7 BY MR. MULLIGAN:
8  Q. Do you know whether DDM -- other
9 than that one-month report -- ever analyzed data
10 that it collected regarding the movement of
11 controlled substances to determine whether
12 diversion was taking place?
13  A. I do not know.
14  Q. You don't know? Okay.
15  A. No.
16  Q. Were you ever involved in any sort
17 of internal audit regarding the sale of opioids
18 to identify patterns regarding prescriptions?
19  A. Repeat that, please.
20  Q. Have you ever been involved in any
21 sort of DDM audit or investigation to look at
22 opioid sales to determine whether there were any
23 patterns that may reflect diversion was taking
24 place?

Page 109

1   MR. JOHNSON: Objection.
2   You can answer.
3  A. No.
4  Q. Okay. I know you said that you've
5 never identified a suspicious order, correct?
6  A. Correct.
7  Q. And you don't know of anyone at
8 DDM who has ever identified a suspicious order,
9 correct?
10  A. Correct.
11  Q. Have you or anyone ever identified
12 a possible suspicious order that required
13 additional due diligence or investigation?
14  A. No.
15  Q. If someone said to you, "I think
16 this order is potentially suspicious," what
17 would you do? Would you know what to do? Is
18 there a policy or procedure that says what the
19 next steps are?
20  A. There is not a written policy, but
21 I would definitely go to my supervisor and make
22 them aware of it.
23  Q. And that would be Jason and Pete?
24  A. Correct.

28 (Pages 106 to 109)

Page 122

 1  Number 4.  And we've already talked about this
 2  today.  But this says, "Please identify any
 3  orders you received" -- and "you" I'll just
 4  represent to you for this document means DDM,
 5  okay, but I'm going to ask you about you
 6  specifically.
 7       It says, "Please identify any
 8  orders you received that were at any point
 9  identified as a possible suspicious order."  And
10  then it says, "For each of those, identify the
11  following information."  And then the response
12  is "None."
13       And that's consistent with what
14  you've told me, right?
15       A.  Yes.
16       Q.  Okay.  And so there wouldn't have
17  ever been an instance at DDM where anybody had
18  to do any due diligence regarding a possible
19  suspicious order because none was ever
20  identified, correct?
21       A.  Correct.
22       Q.  In response to -- well, strike
23  that.
24       Did Jason or Pete ever contact you

Page 123

 1  and say, "We've been looking at this one-month
 2  report and this -- we have some concerns about
 3  this particular store's ordering habits.  We
 4  would like you to impose a threshold on them."
 5       MR. JOHNSON:  It's really a
 6  12-month report, isn't it?  You're
 7  referring to the --
 8       MR. MULLIGAN:  Oh.  Is it?
 9       MR. JOHNSON:  Yeah.  It's a
10  rolling 12-month report.
11       MR. MULLIGAN:  I guess I meant the
12  monthly report.
13       MR. JOHNSON:  Yeah, everybody's
14  been calling it different things,
15  but ...
16  BY MR. MULLIGAN:
17       Q.  Yeah.  So I'm talking about the --
18  I'm talking about the report that they generate
19  each month that showed the ordering history for
20  the prior year; is that correct?
21       A.  Correct.
22       Q.  Okay.  Was there ever a time where
23  either Tom Nameth, Jason Briscoe, or Pete Ratycz
24  contacted you and said, "We've been looking at

Page 124

 1  this report we generate monthly and we have
 2  concerns about the way that this particular
 3  store is ordering controlled substances.  We'd
 4  like to impose a threshold or take some other
 5  action"?
 6       A.  No.
 7       Q.  Did you ever learn of any issues
 8  that they identified from that report regarding
 9  possible diversion or suspicious ordering?
10       A.  No.
11       Q.  Okay.  So correct me if I'm wrong.
12  As far as you know, the two reports that DDM
13  uses as part of their process have never
14  identified a suspicious order or even a possible
15  suspicious order, correct?
16       A.  Correct.
17       Q.  If you look at Interrogatory
18  Number 5.  This asks to, "Identify any persons
19  who reviewed or analyzed data regarding the
20  distribution and/or dispensing of opioids or
21  your opioid products."
22       I'm not going to read the whole
23  thing.  But if you turn to the next page,
24  there's just four individuals.  It's Tom Nameth,

Page 125

 1  yourself, Jason Briscoe, and Pete Ratycz.
 2       Do you see that?
 3       A.  Yes.
 4       Q.  Do you know of anybody else that
 5  would be involved in analyzing data regarding
 6  distribution of opioids?
 7       A.  No.
 8       Q.  Okay.  And it sounds like your
 9  analysis would have been limited to, is this
10  amount of drugs actually what the pharmacist
11  wanted, correct?
12       A.  Correct.
13       Q.  Okay.  Let's go to Interrogatory
14  Number 12.  And this asks to, "Identify any
15  threshold or controlled substance limit and all
16  personnel who are responsible for establishing
17  or approving thresholds or controlled substance
18  limits as well as any overrides or
19  modifications."
20       Do you see that?
21       A.  Yes.
22       Q.  And the answer is "None."  I
23  assume that's consistent with your testimony
24  where you said that DDM never had any

Page 314

1    and I know what --
2        A.  Sorry.
3        Q.  -- you're doing, and it's okay.
4    But we can go back and look at a document.
5            Do you remember the document where
6    they notified you guys that there was an order
7    that was cut, it was reported to the DEA as
8    suspicious, and it wasn't shipped, and then they
9    said, "Maybe it was a fat finger," right?
10       A.  Correct.
11       Q.  So they already reported it to the
12   DEA before they asked whether it was a fat
13   finger, right?
14       A.  They cut it.
15       Q.  Yeah.  But you -- if it had been
16   you, there wouldn't have been a threshold.  You
17   would have looked at it, and then you would have
18   done some diligence, due diligence, and then
19   you -- well, you didn't, because you never
20   did -- you would not have reported that to the
21   DEA, right?
22       A.  I did do my due diligence.
23       Q.  But you didn't ever report
24   anything to the DEA?

Page 315

1        A.  I did not.
2        Q.  Okay.  You would identify the fat
3    finger situation, fix it or resolve it, work it
4    out, but it wouldn't get reported; whereas
5    Cardinal reports it, and then after the fact,
6    you've got to go and figure out what happened,
7    right?
8        A.  Yes.  Probably because, again, we
9    know our customers.  So our customers are the
10   stores, and I'm -- I'm not going to look at it
11   as -- I'm going to look at it as "Let's fix
12   this" because it was wrong when it came over.
13       Q.  Okay.  And so I'm going back to my
14   question I asked you before, which is you would
15   agree, based on these documents, that Cardinal's
16   reporting system to the DEA was more sensitive
17   than DDM's in that they would report more stuff
18   than you would?
19           MR. JOHNSON:  Objection.
20       A.  They see way more orders than I
21   do.
22       Q.  That's not an answer to my
23   question.
24       A.  But I don't know how to answer

Page 316

1    your question.
2        Q.  Okay.  That fat finger one that
3    they cut, would you have reported that to the
4    DEA?
5        A.  No, because it would --
6            MR. JOHNSON:  Objection.
7            But go ahead.
8        A.  No, because it wouldn't -- when it
9    came over, it would have been investigated and
10   looked at --
11       Q.  Right.
12       A.  -- and stopped before it left the
13   distribution center.
14       Q.  Right.
15       A.  They just automatically cut.
16       Q.  But they didn't send it either,
17   did they?
18       A.  They automatically cut it.  They
19   didn't even ask any questions.
20       Q.  Right.  So they cut it, didn't
21   ship it, and reported it.  You would have
22   called, stopped it, but not reported it, fair?
23       A.  Fair, as an order, yes.
24       Q.  And you -- because you've never

Page 317

1    reported a single suspicious order to the DEA
2    ever, right?
3        A.  Correct.
4            MR. MULLIGAN:  Okay.  No further
5    questions.
6            THE VIDEOGRAPHER:  The time is now
7    2:55.  This concludes the deposition.
8    Going off the record.
9        (Signature not waived.)
10               - - -
11           Thereupon, at 2:55 p.m., on Thursday,
12   January 3, 2019, the deposition was concluded.
13               - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

```
IN RE:  NATIONAL              :
PRESCRIPTION                  :   MDL No. 2804
OPIATE LITIGATION             :
_____ :   Case No.
                              :   1:17-MD-2804
THIS DOCUMENT RELATES         :
TO ALL CASES                  :   Hon. Dan A. Polster
```

- - -

Thursday, December 6, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JASON BRISCOE, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:05 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 90

1  a monthly basis because there really were not
2  that many entries, correct?
3      A.   Well --
4          MR. JOHNSON:  Objection.
5      A.   Yeah.  I wouldn't say that we
6  didn't take that report seriously or it wasn't
7  reviewed in a significant manner.  It certainly
8  was.  The report and the number of examples that
9  would populate wouldn't -- does not take a
10 terribly long time to work based on the
11 infrequency by which a drug family populates.
12     Q.   From 2006 until last Friday, DDM
13 has never had an order from any of its
14 pharmacies that it considered suspicious and,
15 therefore, reported it to the DEA, correct?
16         MR. JOHNSON:  Objection.
17     A.   Yes.
18     Q.   "Yes" meaning --
19     A.   Correct.
20     Q.   -- DDM has never reported one
21 single order to the DEA as suspicious from 2006
22 until at least last Friday, correct?
23     A.   That is my understanding, yes.
24     Q.   Those two reports, pharmacy

Page 91

1  operations, Mr. Nasmith (phonetic) --
2          MR. JOHNSON:  Nameth.
3      Q.   Thank you.
4          -- Nameth and -- basketball,
5  football.
6          Those two reports, Mr. Nameth --
7  Ms. Strange, was it?  Stange?  Strange?
8          MR. JOHNSON:  Strang.
9          MR. MOUGEY:  Strang.  Thank you.
10 BY MR. MOUGEY:
11     Q.   Those two reports, Ms. Strang,
12 Mr. Nameth, outside of that description, what
13 else did DDM do to fulfill its responsibilities
14 under 1301.74 to identify suspicious orders of
15 controlled substances?
16     A.   So it would be that -- that third
17 phase where, once Mr. Nameth or myself would
18 work that report, if we were to identify that
19 followup was necessary, in our view, from the
20 store, we would send that form that I've
21 described as due diligence explaining why
22 they're receiving the form based on that monthly
23 report, and then with some instructions on what
24 information they would need to provide back to

Page 92

1  us, for us then to review their feedback on why
2  that order was shipped at the quantity it was
3  compared to the last 12 months, and then we
4  would make a decision on whether that would be
5  resolved or not.
6      Q.   So from 2006 until -- well, it's
7  almost a 13-year period -- based on these
8  reports, due diligence analysis, the monthly
9  analysis of the pharmacies under the controlled
10 substance monitor policy report, the six-week
11 average report, the follow-up on the due
12 diligence, DDM never identified one single order
13 as suspicious, despite the fact it shipped and
14 distributed 72 million dosage units of
15 hydrocodone in the State of Ohio, correct?
16         MR. JOHNSON:  Objection.
17     A.   Yeah, I can't speak to the dosage
18 units accuracy, but I can tell you that we've
19 not reported a suspicious order.
20     Q.   Do you have any idea what kind of
21 volume DDM has -- has distributed in the State
22 of Ohio dosage unit-wise?
23     A.   I know where I could grab that
24 information, but off the top of my head, I do

Page 93

1  not.
2      Q.   Would 72 million dosage units in
3  the State of Ohio from DDM surprise you from
4  2006 to 2014?
5          MR. JOHNSON:  Objection.
6      Q.   Hydrocodone?
7          MR. JOHNSON:  Objection.
8      A.   I would have to -- to -- again,
9  would it surprise me?  I'd have to look at other
10 information associated with dosage units,
11 associated all controlled substance or, further,
12 all dosage units of all medications that we
13 dispense to see what percentage of dosage units
14 we dispense at our retail locations were opioid
15 compared to the entire bucket.  Forgive my term.
16     Q.   Sir, did DDM have any part of the
17 process you just described to me where it was
18 monitoring Schedule IIs like OxyContin in
19 conjunction with its own Schedule III
20 distribution?
21     A.   From a distribution standpoint,
22 no.
23     Q.   Okay.  So 1301.74, the regs under
24 the Controlled Substances Act, you would agree

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1   A.   And it's not -- you're
2   characterizing it as a difficult process, but
3   it's not.
4   Q.   Sure.  So that 140-page report,
5   30 days -- it could come out 30 days after the
6   order was entered, right?  So there's 30 days in
7   the rearview mirror, correct?
8   A.   Potentially, yes.
9   Q.   You've got to go flip through the
10  report, you've got to do some manual
11  calculations, correct?
12  A.   Yes.
13  Q.   No one ever automated those
14  calculations from 2006 until 2018 to make the
15  calculations, just self-reporting, right?
16  A.   Excuse me.  I think those
17  calculations, whether it's Discount Drug Mart or
18  any entity, including the DEA, that's difficult
19  to create something that is precise that you
20  could treat as the truth without somebody taking
21  a look at it.
22  Q.   I'm not asking you that.  What I'm
23  simply asking you is, instead of bottle count,
24  measuring dosage units could have been done with

Page 103

1   a simple calculation, a simple formula within
2   that report, correct?
3        MR. JOHNSON:  Objection.
4   A.   I think what you're suggesting is
5   maybe the report could be enhanced that would
6   make Tom's job or my job easier in normalizing
7   the quantity that would have been received on a
8   monthly basis.
9   Q.   Sure.  Because measuring bottle to
10  bottle to bottle to bottle really isn't a --
11  comparing apples to apples, correct?
12       MR. JOHNSON:  Objection.
13  A.   It's exposed on the report, so
14  the -- the extra layer is a little bit more work
15  for those that are reviewing it.
16  Q.   And over a 12-year period, no one
17  ever thought at DDM to embed a simple formula,
18  the NDC code with the number of dosage units in
19  a bottle, so you could quickly see apples to
20  apples, correct?
21       MR. JOHNSON:  Objection.
22  A.   I can't speak to if anybody
23  thought about that or not.  It certainly hasn't
24  been implemented in a change.  I could say

Page 104

1   that's likely due to our past performance, in
2   that we haven't had issues that would have had
3   us take a longer look at the way that we're
4   having this approach, again, in its totality.
5   Q.   Sure.  And you've never reported a
6   suspicious order to the DEA as required under
7   1301.74 in 12 years, correct?
8        MR. JOHNSON:  Objection.
9   A.   Correct.
10  Q.   So maybe saying "We're the gold
11  standard and we've never had an issue," you
12  recognize as DDM it's your responsibility to
13  identify suspicious orders, and no one at DDM
14  ever thought about embedding a simple formula
15  translating bottle count into dosage units so
16  the person reviewing the report could compare
17  apples to apples, correct, sir?
18       MR. JOHNSON:  Objection.
19  A.   I wouldn't -- I mean, I didn't say
20  we were the gold standard.  I would say we have
21  confidence in the way that we operate.  And,
22  again, I can't speak to if anybody thought about
23  that.  I would agree that that hasn't been
24  changed since the time the report was first

Page 105

1   created.
2   Q.   And no one from DDM ever took the
3   time to embed a simple formula translating
4   bottle counts into dosage units so the
5   individual reviewing that report could compare
6   apples to apples, correct?
7        MR. JOHNSON:  Objection.  Asked
8        and answered, I believe.  Yeah.
9   Q.   Please answer the question.
10  A.   Yeah.  Correct.  And, again, I
11  view that as it -- it would make the process of
12  reviewing the report slightly easier for Tom
13  Nameth or myself.
14  Q.   Sir, if you'd turn to page 71.
15  A.   Sure.
16  Q.   We've already covered this
17  generally.  I just want to -- specifically on
18  page 70, do you see the title Part 1306,
19  Prescriptions?
20  A.   I'm sorry.
21  Q.   Page 70, bottom of the --
22  A.   Seventy?
23       MR. JOHNSON:  Lower left of 70.
24  Q.   Seventy.

27 (Pages 102 to 105)