# EXHIBIT 474

Highly Confidential - Subject to Further Confidentiality Review

```
                UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

                       EASTERN DIVISION

                            - - -

IN RE:  NATIONAL              :
PRESCRIPTION                  :  MDL No. 2804
OPIATE LITIGATION             :
_____ :  Case No.
                              :  1:17-MD-2804
THIS DOCUMENT RELATES         :
TO ALL CASES                  :  Hon. Dan A. Polster

                            - - -

              Monday, January 7, 2019

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW

                            - - -
```

Videotaped deposition of TOM NAMETH, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:03 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 166

1  notifications to our stores about not filling
2  legitimate prescriptions.
3      Q.  Okay.  And so you're saying
4  prescriptions, you're talking about pharmacists
5  again.  But we're talking about the distributor
6  and orders.
7      A.  Okay.
8      Q.  Orders are things that are placed
9  by the store to the distribution center,
10 correct?
11     A.  Yes.
12     Q.  Okay.  So other than looking at
13 your 12-month rolling report, DDM didn't do
14 anything else --
15     A.  No.
16     Q.  -- to avoid filling suspicious
17 orders, right?
18     A.  Correct.
19     Q.  Okay.  And had you had your report
20 populate when the order was placed, as we talked
21 about hypothetically before, you actually would
22 have complied with that obligation, wouldn't
23 you?
24     A.  Possibly.

Page 167

1      Q.  What do you mean by "possibly"?
2      A.  Your point is that prospectively
3  we should have been stopping orders, and we were
4  doing it after the fact, right?
5      Q.  Mm-hmm.
6      A.  So in this instance, you're saying
7  they have -- we have -- the distributor has a
8  statutory responsibility to avoid filling
9  suspicious orders.  We felt that we were
10 accomplishing our goal by doing that by looking
11 at our 12-month order and sending it to -- the
12 response to the stores.
13     Q.  But that wasn't narrowly tailored
14 to stop suspicious orders from being filled when
15 they happened, right?  It was after the fact?
16     A.  Right.
17     Q.  My question to you was, if that
18 report had been changed so that you would get it
19 when the order was placed, you actually could
20 have possibly put measures in place to avoid
21 filling suspicious orders, correct?
22     A.  I think that the system we did
23 have worked for us and --
24     Q.  That's not what I asked.  That's

Page 168

1  not an answer to the question I asked.
2          And, again, we can be here all
3  day, but if you listen to the question I'm
4  asking you, I'm trying to ask you narrowly
5  tailored questions so that the answer is
6  relatively easy.  All right.  Let me start
7  again.
8          My question is, if the 12-month
9  average report had been changed so you would get
10 it when the order pushing the store over the
11 limit was placed, you could have actually put
12 measures in place to avoid filling suspicious
13 orders in advance, right?
14     A.  What that would do would -- we
15 would do our due diligence after looking at that
16 report.  We would still do the same due
17 diligence.  So you're saying -- if you look at
18 what Cardinal or any other wholesaler was doing,
19 they did it prospectively, correct?
20     Q.  I don't know.
21     A.  But they also said, "Notify us if
22 there's any change in the way your orders were
23 needed.  In other words, if you had a clinic
24 move in or if there was a reason -- give us a

Page 169

1  reason why we should change that number."
2          What we were doing was looking at
3  the number and then verifying the reason why the
4  order was placed.  So ...
5      Q.  My question's really specific,
6  okay?  And I -- that -- again, I don't think
7  you're answering my question.  I understand what
8  you're doing, but I -- if you read the sentence,
9  okay, let's just break it down.
10         "A distributor has a statutory
11 responsibility."  That means federal law
12 requires DDM to exercise due diligence, right?
13     A.  Mm-hmm.
14     Q.  To avoid filling, right?  That's
15 prospective, isn't it?
16     A.  Yes.
17     Q.  That means to identify a
18 suspicious order and to not fill it before it
19 leaves the distribution facility, correct?
20     A.  Yes.
21     Q.  Okay.  And I just want to be
22 clear.  The question I'm asking you is, if your
23 12-month rolling report, which was
24 retrospective, had been generated when that

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION | : :  MDL No. 2804 : |
| _____ | : Case No. : 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : : Hon. Dan A. Polster |

- - -

Thursday, December 6, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JASON BRISCOE, held at the offices of Cavitch, Familo & Durkin, 1300 East Ninth Street, Cleveland, Ohio, commencing at 9:05 a.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  distributor's registration are set forth in 21
2  U.S.C. 823(e).  Listed among these factors is
3  the duty of the distributors to maintain
4  effective controls against diversion of
5  controlled substances into other than legitimate
6  medical, scientific, and industrial channels."
7           Correct?
8       A.  Yes.
9       Q.  It's crystal clear from this 2006
10 letter that the DEA, through the Department of
11 Justice, thought it was extremely important,
12 critical, that distributors fulfill its role to
13 implement a system to identify suspicious
14 orders, correct?
15          MR. JOHNSON:  Objection.
16      A.  Maintain effective controls
17 against diversion of controlled substances, so
18 yes.
19      Q.  It was critical?
20          MR. JOHNSON:  Objection.
21      A.  Their words or my opinion?
22      Q.  A simple question.  It doesn't
23 matter whose words or your opinion.
24          It was critical that DDM design

Page 127

1  and implement a system to identify and report
2  suspicious orders?
3       A.  It was their regulation, which we
4  would, you know, take seriously and adhere to,
5  yes.
6       Q.  The DEA reiterates in the
7  paragraph below that, the 1301.74(b), with the
8  reg that we just looked through, reiterating
9  that it's extremely important for DDM to have a
10 system designed to identify suspicious orders,
11 correct?
12          MR. JOHNSON:  Objection.
13      A.  How did you characterize --
14      Q.  Just a reminder, another
15 reiteration from the DEA --
16      A.  Yes.
17      Q.  -- quoting to 1301.74, correct?
18      A.  Reiteration, yes.
19          MR. JOHNSON:  Objection.
20      Q.  Skip a paragraph.  "Thus, in
21 addition to reporting all suspicious orders, a
22 distributor has a statutory responsibility to
23 exercise due diligence to avoid filling
24 suspicious orders that might be diverted into

Page 128

1  other than legitimate, medical, scientific, and
2  industrial channels."
3           Did I read that right?
4       A.  You did.
5       Q.  All right.  Let's stop and focus
6  on that sentence for a minute.
7           So in addition to reporting
8  suspicious orders -- that's reiteration from the
9  DEA Number 1.
10          Do you see that in that sentence?
11      A.  If an order had been deemed
12 suspicious, it's required to report, yes.
13      Q.  A distributor has a statutory
14 responsibility to exercise due diligence to
15 avoid filling that order?
16      A.  It said to avoid filling
17 suspicious orders.
18      Q.  Yes, sir.  DDM filled the orders
19 as they came in, whether it was identified as an
20 anomaly on a subsequent report or not, correct?
21          MR. JOHNSON:  Objection.
22      A.  With the exception of the six-week
23 average report that could have led to an error,
24 that would have prevented that order from ever

Page 129

1  being processed.
2       Q.  The inventory management system?
3       A.  Yes.
4       Q.  Other than that, can you point me
5  to one order at DDM from 2006 until today that
6  was not filled, despite the fact it appeared as
7  an anomaly on the controlled monitor --
8  monitoring system report that we discussed
9  earlier?
10          MR. JOHNSON:  Objection.
11      A.  My answer is I don't believe that
12 I could; however, I don't know that if there
13 were a situation by which an order was not sent
14 but yet populated in that report as if it was
15 received, that would be one example where --
16 that would -- that would be something I -- I
17 don't know for 100 percent certainty.  But I
18 don't know of any documented examples of what
19 you described.
20      Q.  So DDM would fill orders, populate
21 a report subsequently as an anomaly, and then
22 perform due diligence, correct?
23      A.  We would first do the Tom
24 Nameth/Jason Briscoe review, and then, if it

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 warranted due diligence, due diligence would
2 follow, yes.
3    Q.  And that process that you just
4 described does not comply with the DEA's
5 direction in the September 27, 2006
6 correspondence that a distributor has a
7 statutory responsibility to exercise due
8 diligence to avoid filling suspicious orders,
9 correct?
10       MR. JOHNSON:  Objection.
11    A.  While you might describe our
12 process as potentially leading to an order that
13 would have been filled that shouldn't have
14 because it would have been deemed suspicious,
15 we've never had a suspicious order in the time
16 frame that we are looking at.
17    Q.  All right.  Please keep that --
18    A.  7?
19    Q.  -- 7 in front of you.
20    A.  Sure.
21         - - -
22    (DDM-Briscoe Exhibit 8 marked.)
23         - - -
24    Q.  And I'm going to hand you

Page 131

1 Briscoe 8, which is reference number 00051.
2    A.  What time do we have?
3    Q.  A half an hour to lunch.
4    A.  Okay.
5    Q.  Hand you Briscoe 8.
6    A.  I have it.
7    Q.  Take a minute, if you would, sir,
8 and compare -- well, let's do this:
9       Briscoe 8 is U.S. Department of
10 Justice, Drug Enforcement Administration, dated
11 December 27, 2007, correct?
12    A.  It is.
13    Q.  And that's approximately -- what
14 is that? -- 14, 15 months after the letter we
15 just reviewed, Briscoe 7, correct?
16    A.  Yes.
17    Q.  And take a minute, but these two
18 letters appear to be almost identical, correct?
19    A.  Yes.  I'm slightly confused by
20 the --
21       MR. JOHNSON:  Well, we'll take
22    your representation.  Do you want him to
23    read the whole -- the whole -- the
24    letters?

Page 132

1       MR. MOUGEY:  It's a page and a
2    half.  I don't want anybody to take my
3    representation.
4 BY MR. MOUGEY:
5    Q.  The message in the September 2006
6 letter and the December 2007 letter, Briscoe 7
7 and 8, the messaging from the Department of
8 Justice is -- is very similar, correct?
9    A.  I'm not -- I'm not familiar with
10 the letter.  I may have read it in the past.  I
11 don't believe that I have, but I certainly
12 wouldn't be able to attest that this letter is
13 similar to the previous one, and I'm slightly
14 confused why the header would include McKesson
15 Corporation.
16    Q.  It's because you all haven't
17 produced this letter, so I used the example from
18 McKesson.
19    A.  Thank you.
20    Q.  It's the same entry -- let's just
21 go ahead and review the letter.  And the letter
22 is being sent to every entity in the U.S.
23 registered with the Drug Enforcement
24 Administration to manufacture or distribute

Page 133

1 controlled substances.
2       Do you see that?
3    A.  Yes, sir.
4    Q.  Same entry as the previous letter,
5 correct?  We're sending it to everybody licensed
6 in the closed system, correct?
7    A.  Yes.  Sorry.
8    Q.  And that would be DDM.  That would
9 include DDM, correct?
10    A.  Yes.  At that time, yes.
11    Q.  Yes.  "The purpose of this letter
12 is to reiterate the responsibility of controlled
13 substance manufacturers and distributors to
14 inform DEA of suspicious orders, in accordance
15 with 21 CFR 1301.74."
16       Correct?
17    A.  Yes.
18    Q.  Very similar message to what came
19 out in September of 2006, correct?
20    A.  That paragraph, yes.  Again,
21 I'm -- I apologize.  I'm not familiar with the
22 guts of the rest of the letter yet.
23    Q.  That's okay.  We're going to keep
24 walking through it.

34 (Pages 130 to 133)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  formulas, correct?
2       MR. JOHNSON:  Objection.
3   A.  Not to my knowledge.
4   Q.  The second paragraph from the
5  bottom of the page, "Lastly, registrants that
6  routinely report suspicious orders, yet fill
7  these orders without determining that order is
8  not being diverted into other legitimate,
9  medical, scientific, and industrial channels,
10  may be failing to maintain effective controls
11  against diversion."
12       Do you see that?
13   A.  Yes.
14   Q.  And doesn't that sentence tell DDM
15  that if you're filling orders prior to
16  performing due diligence, you may not be
17  maintaining effective controls against
18  diversion?
19       MR. JOHNSON:  Objection.
20   A.  That paragraph I read as if you
21  are a registrant that routinely has reported
22  suspicious orders but did not do anything about,
23  that would be an issue.
24   Q.  So you all took care of that by

Page 155

1  just not reporting any suspicious orders,
2  correct?
3       MR. JOHNSON:  Objection.
4   A.  No.
5   Q.  So you didn't report any
6  suspicious orders --
7   A.  We didn't have any suspicious
8  orders.
9   Q.  Yes, sir.  But you didn't figure
10  out whether -- you didn't do any homework to
11  figure out whether they were suspicious or not
12  until the order had already went out the door?
13       MR. JOHNSON:  Objection.
14   A.  The process that is described by
15  the 12-month average and Tom Nameth/Jason
16  Briscoe followed by due diligence would be
17  retrospective, yes.  But in a way that would
18  certainly curb or curtail or prevent future
19  issues, if there were any, at a particular
20  location or a particular family of medication at
21  a location.
22   Q.  And that's it exactly.  Your
23  system was designed to prevent future problems
24  looking at month-old reports, but there was

Page 156

1  nothing in place to cease or halt a shipment
2  that was a potential problem or had been flagged
3  prior to it going out the door, correct?
4       MR. JOHNSON:  Objection.
5   A.  The six-week PO report could
6  certainly lead to that being halted, but that
7  report didn't speak to "this must be halted."
8   Q.  And I appreciate you going
9  routinely back to the six-week report or the fat
10  fingers report, but you can't identify one
11  single instance a suspicious order was not
12  shipped based on that six-week average or the
13  fat finger report, right?
14       MR. JOHNSON:  Objection.
15   A.  Well, I'm not trying to split
16  hairs.  If it were identified in that manner, it
17  would not have been a suspicious order.  It
18  would have been an ordering error, and it never
19  would have been part of an invoice that would
20  have been intended to be shipped.  So we would
21  have cut that off proactively at the pass.
22   Q.  Sure.  An ordering error.  The fat
23  finger report, you would have cut that off at
24  the pass.  Other than someone hitting a 9 rather

Page 157

1  than a 6 --
2   A.  I don't --
3   Q.  -- it wouldn't have -- that
4  wouldn't have stopped anything, right?
5   A.  That is one --
6       MR. JOHNSON:  Objection.
7   A.  That's one mechanism by which a
8  quantity that would appear to be much greater
9  than the norm could happen.  A fat finger is an
10  example of that happening, or it could be, you
11  know, other -- other examples.
12   Q.  And the only reason we keep going
13  back to this is because you keep referring back
14  to it.  But it's crystal clear that if the
15  pharmacist confirmed, "Yes, I ordered that many
16  bottles of hydrocodone," that there is no
17  written policy or procedure in place --
18   A.  That's not true.
19   Q.  -- for DDM --
20   A.  Excuse me.  Sorry.
21   Q.  -- to follow up on any criteria on
22  that inventory control report?
23   A.  I wouldn't say --
24       MR. JOHNSON:  Objection.

40 (Pages 154 to 157)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  Thursday Afternoon Session
   December 6, 2018
2  1:01 p.m.
3  ---
4      THE VIDEOGRAPHER: Back on record
5  at 1:01 p.m.
6  BY MR. MOUGEY:
7      Q.  Mr. Briscoe, I'd like to go back
8  to -- I forget if you were referring to it as
9  Phase 2 or Tier 2, you and Mr. Nameth, DDM
10 performing due diligence on orders that were
11 identified as anomalies shipped, and then you
12 all would perform the due diligence.
13     Do I have that sequence right?
14     MR. JOHNSON:  Objection.
15     A.  Can you repeat?
16     Q.  Order comes in.  It's shipped,
17 placed on an order as an anomaly, and then DDM
18 performs due diligence, correct?  Do I have that
19 sequence right?
20     MR. JOHNSON:  Objection.
21     A.  The first phase would be the, you
22 know, review of the report, review of the
23 anomaly, we would characterize due diligence.
24 If that evaluation by Mr. Nameth or myself would

Page 163

1  resolve it in a way that we wouldn't need to do
2  the due diligence at store level, then the next
3  level would be due diligence, and that would be
4  communication in that form back to the store.
5      Q.  So you're taking issue with the
6  language "due diligence"?  You said that the
7  review of the report, review of the anomaly.
8  You don't call that due diligence?  That's fine.
9  I just am trying --
10     A.  No.  Formally due diligence would
11 be the third layer, which would be those
12 situations that got -- you know, that Tom or
13 myself identified that deserved communication
14 back to the store, with the store communicating
15 back to us.  So that's why I'm making that -- I
16 don't have a problem with your words.  I'm just
17 making sure that we're distinguishing the
18 different layers of the SOMS.
19     Q.  Let's take the people out of it,
20 then.  Let's say that order comes in, okay?
21 It's shipped.
22     Are we still on the same page?
23     A.  Assuming that there wasn't
24 anything along the way that would have prevented

Page 164

1  it from being shipped, such as the six-week
2  average report, yes.
3      Q.  So let's do it that way.  So order
4  comes in.  It passes the scrutiny of the fat
5  fingers report, right?
6      A.  The six-week average report.
7      Q.  Then it's shipped, okay?  So --
8  and then it's shipped after the six-week average
9  or fat fingers report, right?
10     A.  Yes.  Yes, sir.
11     Q.  All right.  So after that, if it
12 meets one of the thresholds we discussed
13 previously and is identified as an anomaly, it
14 goes on the SOMS report, correct?
15     A.  Yes.
16     Q.  And the first review of that is
17 you or Mr. Nameth reviewing that anomaly report,
18 right?
19     A.  Yes.
20     MR. JOHNSON:  Objection.
21     MR. MOUGEY:  What's the basis for
22 the objection?
23     MR. JOHNSON:  You're saying the
24 first review of it.  I mean, as I

Page 165

1  understand his testimony, there's a
2  number of different components to the
3  whole SOMS thing.  The six-week report,
4  Jill's intervention, then the --
5      MR. MOUGEY:  Okay.  So your basis
6  is that I'm mischaracterizing the
7  evidence?  I didn't want a recitation.
8  Just did I miss --
9      MR. JOHNSON:  Oh, I'm sorry.  Yes.
10 We skipped the Jill part.
11 BY MR. MOUGEY:
12     Q.  Did Jill at any point in time,
13 Ms. Strang, ever bring to you an order that she
14 wanted you or Mr. Nameth to review as a
15 potential issue for diversion?
16     A.  I don't recall her bringing one to
17 me.
18     Q.  Okay.  Did you see any evidence in
19 your preparation today that Ms. Strang had ever
20 brought an order to you -- I'm sorry -- to
21 Mr. Nameth with his help as -- to review for
22 potential diversion?
23     A.  No.
24     Q.  So the order comes in.  It doesn't

42 (Pages 162 to 165)