# EXHIBIT 478

```
                    UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

                         EASTERN DIVISION

                              - - -

   IN RE:  NATIONAL            :
   PRESCRIPTION                :  MDL No. 2804
   OPIATE LITIGATION           :
   _____ :  Case No.
                               :  1:17-MD-2804
   THIS DOCUMENT RELATES       :
   TO ALL CASES                :  Hon. Dan A. Polster

                              - - -

                   Thursday, January 3, 2019

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW

                              - - -
```

        Videotaped deposition of JILL A. STRANG, held

at the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

8:57 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                              - - -


               GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com

Page 206

1  show us something in writing, not that they --
2  that they didn't want us to have something in
3  writing.
4      Q.   Okay.
5      A.   Yeah, just the policy itself.
6      Q.   So based on that document and the
7  testimony you just gave me, it sounds like you
8  don't actually know what the nature and extent
9  of DDM's SOM policies are, correct?
10     A.   Correct.
11     Q.   All right. Let's go to
12 Exhibit 12, which is DDM74952.
13         ---
14     (DDM-Strang Exhibit 12 marked.)
15         ---
16     Q.   There's two pages here, but the
17 second page is just a bunch of gibberish so
18 we're going to look at the bottom of the first
19 page.
20          This is an e-mail from Pete Ratycz
21 on January 20, 2017 that was ultimately
22 forwarded to you, but I want to look at this
23 e-mail.
24          It says, "Chris, I think we need

Page 207

1  to reemphasize our controlled substance program
2  at the upcoming pharmacist meeting. Also, we
3  need to look at developing reporting to help us
4  effectively identify outliers and/or suspicious
5  store ordering."
6          Do you see that?
7      A.   Yes.
8      Q.   And, again, this is dated
9  January 20, 2017, correct?
10     A.   Yes.
11     Q.   So that was just about two years
12 ago. So this would suggest that as of January
13 of 2017, DDM did not have reporting to help it
14 effectively identify outliers and/or suspicious
15 store ordering, correct?
16         MR. JOHNSON: Objection.
17     A.   I would say that to develop it
18 more than what we were currently using.
19     Q.   Well, you're reading the word
20 "more" in there, aren't you? That word doesn't
21 appear there, does it?
22     A.   No.
23     Q.   Okay. So it just says, "We need
24 to look at developing," which doesn't even say

Page 208

1  "We need to develop," it says "we need to
2  consider developing" --
3      A.   Okay.
4      Q.   -- "reporting to help us
5  effectively identify outliers and/or suspicious
6  store ordering," correct?
7          MR. JOHNSON: Objection.
8      Q.   Does DDM have reporting now that
9  helps it effectively identify outliers and/or
10 suspicious store ordering, that you know of?
11     A.   Other than what I've used myself,
12 I do not know.
13     Q.   Okay. Do you know why this was
14 forwarded to you?
15     A.   I do not.
16     Q.   Did you do anything with this
17 e-mail?
18     A.   I did not.
19     Q.   Did you assist in looking at
20 developing reporting that we were discussing
21 earlier?
22     A.   No. I think we -- somebody would
23 have been letting me know that he was going to
24 be doing audits for those stores. That's all.

Page 209

1      Q.   And the subject of this e-mail is,
2  "DEA fines Costco 11.75 million over laxed U.S.
3  pharmacies controls."
4          Do you see that?
5      A.   Yes, I do.
6      Q.   Did you know about that at all?
7      A.   No.
8      Q.   Are you aware that other
9  distributors and pharmacies have been fined by
10 the DEA for not having strong enough suspicious
11 order monitoring policies and procedures?
12     A.   Yes, but I don't know specifics.
13 But yes, I do know of that.
14     Q.   We're going to look at Exhibit 13
15 now, which is DDM467.
16         ---
17     (DDM-Strang Exhibit 13 marked.)
18         ---
19         MS. HARRIS: Excuse me. This is
20 Shubha Harris on behalf of Walmart. I'm
21 having a hard time hearing the witness.
22 If you could place the speaker, perhaps,
23 closer to her.
24         MR. MULLIGAN: She moved the

Highly Confidential - Subject to Further Confidentiality Review

```
                    UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

                         EASTERN DIVISION

                              - - -

 IN RE:  NATIONAL             :
 PRESCRIPTION                 :  MDL No. 2804
 OPIATE LITIGATION            :
 _____ :  Case No.
                              :  1:17-MD-2804
 THIS DOCUMENT RELATES        :
 TO ALL CASES                 :  Hon. Dan A. Polster

                              - - -

               Monday, January 7, 2019

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW

                              - - -
```

          Videotaped deposition of TOM NAMETH, held at

the offices of Cavitch, Familo & Durkin,

1300 East Ninth Street, Cleveland, Ohio, commencing at

9:03 a.m., on the above date, before Carol A. Kirk,

Registered Merit Reporter and Notary Public.


                              - - -



              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com

Page 366

1     A.   Yes.
2     Q.   And underneath that it says, "Does
3  your company have procedures in place for
4  adhering to the DEA's Know Your Customer
5  policy?"
6          And it says "Yes."
7          Do you see that?
8     A.   Yes.
9     Q.   And then it says, "We only sell to
10 our own retail locations.  All pharmacies are
11 monitoring their patients for abuse potential."
12         Right?
13    A.   Yes.
14    Q.   And there's nothing in here that
15 says what DDM corporate is doing to monitor its
16 own people and to know its own pharmacists in
17 stores, correct?
18    A.   Correct.
19    Q.   And as we talked about earlier,
20 all you guys were doing in that respect was,
21 one, you knew who they were, or at least you
22 thought you did, and you knew that they had a
23 license, correct?
24    A.   Mm-hmm, yes.

Page 367

1     Q.   Okay.  And you also remember we
2  looked at that DEA letter which says that you
3  actually can't rely upon your pharmacists,
4  right?  You have a corresponding obligation as a
5  distributor, correct?
6          MR. JOHNSON:  Objection.
7     A.   I think that, in my opinion,
8  referred to the stores themselves, of the
9  customers at the end --
10    Q.   And we're splitting hairs on that,
11 but you'd agree that you can't rely on the store
12 to determine or prevent diversion, you have to
13 do it too, right?
14    A.   Well, we're going to continue to
15 split hairs on that, because we knew our
16 customers.
17    Q.   But you didn't, and you've
18 testified you didn't, because we went through a
19 whole pile of documents that show that DDM
20 employees, which included pharmacists, were not
21 only stealing drugs but they were addicted to
22 them, right?
23         MR. JOHNSON:  Objection.
24    A.   We were sending them to legitimate

Page 368

1  locations, okay?  So we can never be 100 percent
2  on any employee in any business.  It doesn't
3  matter what you're doing; you have the potential
4  for theft.
5     Q.   Okay.  And we've identified one
6  way that you can weed out those bad people,
7  though, and that's through drug screening,
8  right?
9     A.   That necessarily won't be
10 100 percent effective.
11    Q.   But it's better than nothing,
12 isn't it?
13    A.   Yes.
14    Q.   Okay.  All right.  On page 4, you
15 actually attested that DDM is aware of and
16 complies with all laws and regulations enforced
17 by the DEA and applicable state authorities.
18         Do you see that?
19    A.   Yes.
20    Q.   And then you signed your name?
21    A.   Yes.
22    Q.   Do you know after you left whether
23 DDM's suspicious order monitoring policies were
24 ever put into writing?

Page 369

1     A.   I don't know that.
2     Q.   Okay.  Did DDM ever have reporting
3  to help it effectively identify outlier stores
4  or suspicious store ordering?
5     A.   It never identified outlier
6  stores.
7     Q.   Did it have effective reporting to
8  help you identify suspicious store ordering?
9     A.   Part of our process was looking at
10 possible suspicious store ordering.
11         MR. MULLIGAN:  Okay.  This is
12    going to be 27, right?  It's this one.
13         MR. JOHNSON:  26, I think.
14         MR. KNOLL:  26.
15         MR. MULLIGAN:  26?
16         MR. JOHNSON:  Yeah, 26.
17              - - -
18    (DDM-Nameth Exhibit 26 marked.)
19              - - -
20 BY MR. MULLIGAN:
21    Q.   This is DDM74952.  This is an
22 e-mail from Pete Ratycz.  This is actually dated
23 after you were probably well into retirement.
24 It's dated January 20, 2017.  And I just wanted

93 (Pages 366 to 369)