# EXHIBIT 508

```
 1                  UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF OHIO

 3                        EASTERN DIVISION

 4

 5    -----------------------------) MDL No. 2804

 6    IN RE NATIONAL PRESCRIPTION   )

 7    OPIATE LITIGATION             )

 8                                  ) Case No. 17-md-2804

 9    This document relates to:     )

10    All Cases                     )

11    -----------------------------) Hon Dan A. Polster

12

13                       HIGHLY CONFIDENTIAL

14          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16              The 30(b)(6) videotaped deposition of

17    ALLERGAN by and through MARY WOODS, called for

18    examination, taken pursuant to the Federal Rules of

19    Civil Procedure of the United States District Courts

20    pertaining to the taking of depositions, taken before

21    JULIANA F. ZAJICEK, a Registered Professional Reporter

22    and a Certified Shorthand Reporter, at Lieff Cabraser

23    Heimann & Bernstein, 8th Floor, 250 Hudson Street, New

24    York, New York, on January 9, 2019, at 9:10 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   policy at this point.
 2        Q.    Oh, okay.
 3        A.    Okay.  It is a document that they wrote,
 4   but I don't see that this is actually turned into a
 5   policy.
 6        Q.    All right.  Do you remember if this ever
 7   became a policy?
 8        A.    I don't see this in a policy form.  I'm
 9   not aware if it did or didn't.  I think that this was
10   something that they may have been intending, but I
11   think we would have to ask -- ask Tom that question,
12   because this is something that they documented.
13        Q.    All right.  With regard to the procedures
14   that's laid down here, can you point out where in here
15   a -- an order could pend but not become an order of
16   interest?
17        A.    I think we have that in our operational
18   procedures which they review.
19        Q.    Okay.  Do you know whether that procedure
20   is in the compendium of documents that you -- you gave
21   to me today?
22        A.    Yes.
23        Q.    Okay.  Where -- where is it?
24        A.    Let me just verify and then I will tell
```

```
 1    you.
 2        Q.    Yep.
 3        A.    Tab 17.
 4        Q.    All right.  And can you -- as you are
 5    looking through Tab 17, I'll read into the record
 6    that -- we'll make it Exhibit 17, and it's part of the
 7    compendium of documents submitted as Exhibit 25, and
 8    for the record, Exhibit 17 is Allergan_MDL_03750135
 9    through 146.  And...
10        A.    And if you'll give me a minute.
11        Q.    Right, sure.
12        A.    So if you want to turn to Page 7.
13        Q.    All right.
14        A.    It starts there and then it goes to
15    Page 9.  And it talks on Page 9.  So if you look about
16    the fifth paragraph, one, two, three, four, fifth
17    paragraph down on Page 9:
18              "Once the SOMS form is confirmed and
19    verified, the MDA will release the SOMS violation
20    block, otherwise the MDA" -- that's master data
21    administrator -- "will escalate the order of interest
22    to the DEA Affairs department for review and feedback.
23    If DEA Affairs determines the order of interest needs
24    to be communicated to the DEA, then DEA Affairs will
```

1  contact the DEA."

2    Q.   So under this policy, which of the bullet
3  points that appear above the paragraph that you just
4  wrote are conditions under which a pended order could
5  be released prior to it being sent to the DEA Affairs
6  department?

7    A.   So, everything on Page 8, all of that
8  needs to occur, so all of the investigation needs to
9  be done.

10    Q.   Okay.

11    A.   Once all of the investigation is done,
12  once this -- and the SOMS form is confirmed and
13  verified, they can release that.  So they have to go
14  through that entire process.

15    Q.   All right.  With regard to the bullet
16  points that a -- appear above that paragraph that you
17  just wrote -- or you just read, let me -- is there --
18  let me start over.

19    With regard to the bullet points that
20  appear above the paragraph you just read on Page 9 of
21  Exhibit 17, is there a situation under which
22  reassurance from a Actavis employee could be the sole
23  reason for an order to be cleared of a suspicious
24  order monitoring system pend?

```
 1         A.    I'm -- I'm sorry.  I don't think I quite
 2   understand.
 3         Q.    So could the -- the impressions or
 4   perceptions of a -- of an Actavis employee be the sole
 5   reason that a -- a suspicious order could be removed
 6   from the pending list?
 7         A.    I wouldn't say impressions.  I would say
 8   factual information provided and backup documentation
 9   of those facts, but not impressions.
10         Q.    So is it your impression as you sit here
11   today that backup documentation materials would be
12   required to remove any pending order from a pending
13   order list under this procedure that's listed in
14   Exhibit 17?
15         A.    Yes.
16         Q.    All right.  If there were no backup
17   documentation provided, what would the typical process
18   be with regard to the acceptance or non-acceptance of
19   a assertion by an Actavis employee?
20         A.    If there was no information available, no
21   justification, the order would not be accepted.
22         Q.    And when you say information and
23   justification, just so we are clear, that's
24   information and justification beyond a -- a assurance
```

1   without further backup by an Actavis employee, is that
2   right?
3        A.   What I am stating is that we have to have
4   backup information, additional information
5   justification.  If that did not exist or we couldn't
6   get that information, then the order would be
7   cancelled.  We would not accept that order.
8        Q.   Okay.  And would that -- could the backup
9   and justification be based on a -- just a verbal or
10  e-mail reassurance by an Actavis employee standing
11  alone?
12       A.   No, it couldn't be from another Actavis
13  employee.
14       Q.   Okay.  All right.
15       A.   Or let me -- let me correct that.
16            One of the tools might be that there was a
17  market shortage on a particular product --
18       Q.   Uh-huh.
19       A.   -- so there were different elements of
20  items that we had to gather in order to have
21  justification.  It could be an e-mail stating that
22  there was a market shortage on a product, which means
23  we were supplying the product and hadn't been before,
24  that could be a justification from a Watson

Highly Confidential - Subject to Further Confidentiality Review

1  Pharmaceuticals or Actavis, Inc. employee that we
2  would have had as backup.
3       Q.   Okay.
4       A.   Is that -- that -- that could be an
5  employee inside of the company providing the
6  justification.
7       Q.   Any other situations that you can see?
8            And where is the market share -- sorry.
9       A.   Could be a -- it could be a customer that
10 has a new product added to a contract that we would
11 get that information from the contracts team.
12      Q.   Uh-huh.
13      A.   It could be a new product launch, we would
14 get that information.  I think in just general it says
15 that we would contact other teams for information, so
16 that would be something we would do internally to
17 understand what was going on in the market.
18      Q.   Where is the language that you say
19 "contacting other teams"?
20      A.   It just says "some of the tools used
21 during analysis."
22      Q.   Okay.  And so your impression from reading
23 that language that's on Page 8, and it's Bates
24 number 142, and those sub paragraphs leaves you to

1  believe that some orders could be removed from the
2  pend list based on either written or verbal assurances
3  without documentational backup?
4      A.   I don't think verbal.
5      Q.   Okay.
6      A.   There would always be documentation.  Your
7  question was could it be another Actavis employee.
8      Q.   Yes.
9      A.   That sent an e-mail, not verbal.
10     Q.   So based on the representation of another
11 Actavis employee, pending orders could be released?
12     A.   If it was the correct related information,
13 yes, not just you are free to release this.
14     Q.   Okay.
15     A.   That would not suffice.
16     Q.   And is that -- is -- is what you are
17 saying listed anywhere here in particular or is it
18 your impression based on reading this information?
19     A.   It is not my impression.  I know what the
20 process was and it states, you know, some of the tools
21 used during the analysis, which means that that's not
22 all inclusive.
23     Q.   All right.
24     A.   They would make sure to do a thorough

```
 1    investigation.  So these would be tools that they used
 2    and if they had other tools they needed to use, they
 3    would do that.
 4         Q.   All right.  Do you remember a -- whether
 5    there was ever training or discussion of the total
 6    scope of the tools that were available to the people
 7    analyzing pended orders under this policy?
 8         A.   Yeah, these people went through
 9    significant training annually.
10         Q.   So as part of that training, do you
11    remember whether the -- the written e-mail evidence
12    that you are talking about was made known to the
13    people being trained as --
14         MS. LEVY:  Object to the form.
15    BY MR. EGLER:
16         Q.   -- acceptable evidence for removing an
17    order from the pending list?
18         A.   They kept all of the backup documentation
19    with the approval and knew exactly what they needed to
20    have to release an order.
21         Q.   All right.  But do you remember whether
22    the training ever included the ability to release an
23    order based on an e-mail representation from an
24    Actavis employee?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     I -- if you are asking me to recall off
 2    the top of my head, I probably can't recall off the
 3    top of my head.
 4         Q.     In your preparation for the deposition
 5    today, did you ever come across a document that said
 6    that it was the policy of Actavis that an order could
 7    be removed from a pending order list based on an
 8    e-mail representation of an Actavis employee?
 9         A.     I don't know if we saw anything that
10    specific.  I know we reviewed the policies.
11         Q.     And in reviewing of all of the policies
12    that you saw, was there ever a policy that said
13    anything to the effect of that -- affirmatively said
14    anything to the effect that an e-mail from another
15    Actavis employee was all that was required to release
16    an order from the pending list?
17         A.     And are we -- are we talking about
18    Actavis Inc. now or Actavis, Inc.?
19         Q.     Any of the policies that you looked at,
20    whether at Watson, Actavis Inc. or Actavis, Inc.
21         A.     I don't recall.
22         Q.     So you don't recall seeing that one way or
23    the other?
24         A.     I do not.
```

Highly Confidential - Subject to Further Confidentiality Review

1  Q.  All right.  Do you think that would have
2  been something that would have been written down, if
3  that was specifically affirmatively part of the
4  policy?
5  A.  I think the policy would have stated that
6  backup documentation is required to release any order.
7  Q.  All right.  And does it say that the
8  backup -- that backup documentation includes an e-mail
9  representation by another Actavis employee?
10  A.  I don't think it would be that specific.
11  I think it would be specific that all backup
12  documentation is to be attached to the order before
13  releasing.
14  Q.  And as you are sitting here today, do you
15  consider the backup documentation to include an e-mail
16  representation from another Actavis employee?
17  A.  I would say it should be -- I would say
18  any documentation received would be part of that
19  backup documentation.  I'm not being specific about
20  what it is because I don't know what they would have
21  received for a particular order.
22  Q.  All right.  All right.
23  So, with regard to this -- with regard to
24  the language that you were just pointing me to on

```
 1   Pages 8 and 9 of this Exhibit 17, can you turn to
 2   Page 7 of this document, and it says:  "C-II schedule
 3   drugs and SOM blocks."
 4            Do you see that there?
 5       A.   I do.
 6       Q.   So, with regard to this issue that
 7   you're -- that we were just discussing, is this a -- a
 8   policy that only applies to Schedule II controlled
 9   substance drugs?
10       A.   No.  Specifically right underneath it
11   says:  "SOMS, Suspicious Order Monitoring System (of
12   Control Drug Substances)."
13       Q.   So on the -- the line there that says
14   No. 9, the C-II scheduled drugs, how does that limit,
15   if at all, the -- the language that's listed below?
16       A.   It doesn't.
17       Q.   All right.  So why -- do you have a
18   understanding as to why that is listed there as C-II
19   scheduled drugs?
20       A.   I don't know today why it would have been
21   listed that way.  I think people sometimes
22   misunderstand that C-III through Vs are, so I think we
23   specifically listed out C-IIs and SOMS blocks, and
24   then listed of controlled substances -- controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    drug substances so people would not be confused --

2    Q.    Okay.

3    A.    -- that C-IIs are the only drugs.

4    Q.    All right.

5        All right.  You can set this document

6    aside for now and...

7        All right.  Could you look at what's in

8    the compendium that you provided today at Exhibits 15

9    and 16, and I'm going to ask you a question and then

10    you can look through them.

11        The -- the question is:  Can you tell me

12    the -- the difference between the two documents, 15

13    and 16?  And as you are doing that, I'm going to read

14    into the record, it's Allergan_MDL_06 -- I'm sorry --

15    01684748 through 4752.  And then 16 is All --

16    Allergan_MDL_01979834 through 9838.

17        And before you start answering it, I'm

18    just going to make for the record that 15 and 16 are

19    part of the compendium of exhibits that's marked as

20    25.

21        Okay.  Go ahead.

22    A.    So, I'll -- I'll help you with this to the

23    best of my ability.  This is Actavis Inc.

24    Q.    So when you say it's Actavis Inc., this is