```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                    -  -  -
          Thursday, December 13, 2018
11                    -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                      -  -  -
14
               Videotaped deposition of
15   SHAUN ABREU, taken pursuant to notice,
     was held at the law offices of Locke
16   Lord, LLP, Brookfield Place, 200 Vesey
     St., 20th Floor, New York, New York
17   10281-2101, beginning at 9:06 a.m., on
     the above date, before Amanda Dee
18   Maslynsky-Miller, a Certified Realtime
     Reporter.
19
                      -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
       877.370.3377 ph| 917.591.5672 fax
24            deps@golkow.com
```

Page 2

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | MOTLEY RICE LLC |
| | BY: DONALD A. MIGLIORI, ESQUIRE |
| | KATHLEEN LUCAS, PARALEGAL |
| 4 | 28 Bridgeside Boulevard |
| | Mount Pleasant, SC 29464 |
| 5 | (843) 216-9000 |
| | Dmigliori@motleyrice.com |
| 6 | Representing the Plaintiffs |
| 7 | |
| 8 | |
| 9 | LOCKE LORD, LLP |
| | BY: C. SCOTT JONES, ESQUIRE |
| 10 | 2200 Ross Avenue |
| | Suite 2800 |
| 11 | Dallas, Texas 75201 |
| | (214) 740-8000 |
| 12 | Sjones@lockelord.com |
| | Representing the Defendant, |
| 13 | Henry Schein, Incorporated |
| 14 | |
| 15 | ROPES & GRAY LLP |
| | BY: SARA E. BERINHOUT, ESQUIRE |
| 16 | Prudential Tower |
| | 800 Boylston Street |
| 17 | Boston, Massachusetts 02199 |
| | (617) 951-7000 |
| 18 | Sara.Berinhout@ropesgray.com |
| | Representing the Defendant, |
| 19 | Mallinckrodt Pharmaceuticals |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 2

Page 3

| | |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | |
| 3 | COVINGTON & BURLING LLP |
| | BY: MADISON ARENT, ESQUIRE |
| 4 | The New York Times Building |
| | 620 Eighth Avenue |
| 5 | New York, New York 10018 |
| | (212) 841-1000 |
| 6 | Marent@cov.com |
| | Representing the Defendant, |
| 7 | McKesson Corporation |
| 8 | |
| 9 | |
| 10 | GIBBONS PC |
| | BY: PAUL E. ASFENDIS, ESQUIRE |
| 11 | One Pennsylvania Plaza |
| | 37th Floor |
| 12 | New York, New York 10119 |
| | (212) 613-2000 |
| 13 | Pasfendis@gibbonslaw.com |
| | Representing the Defendant, |
| 14 | AmerisourceBergen Corporation |
| 15 | |
| 16 | |
| 17 | FARRELL FRITZ, P.C. |
| | BY: JAMES M. WICKS, ESQUIRE |
| 18 | 400 RXR Plaza |
| | Uniondale, New York 11556 |
| 19 | (516) 227-0700 |
| | Jwicks@farrellfritz.com |
| 20 | Representing the Defendant, |
| | Cardinal Health |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 3

Page 4

| | |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | VIA TELEPHONE/LIVESTREAM: |
| 3 | |
| 4 | JONES DAY |
| | BY: PATRICK J. BEISELL, ESQUIRE |
| 5 | 77 West Wacker |
| | Chicago, Illinois 60601 |
| 6 | (312) 782-3939 |
| | Pbeisell@jonesday.com |
| 7 | Representing the Defendant, |
| | Walmart |
| 8 | |
| 9 | |
| 10 | MARCUS & SHAPIRA LLP |
| | BY: DANIEL B. MULLIN, ESQUIRE |
| 11 | BY: JAMES F. ROSENBERG, ESQUIRE |
| | One Oxford Centre |
| 12 | 35th Floor |
| | Pittsburgh, Pennsylvania 15219 |
| 13 | (412) 471-3490 |
| | Mullen@marcus-shapira.com |
| 14 | Rosenberg@marcus-shapira.com |
| | HBC Company |
| 15 | |
| 16 | |
| 17 | ARNOLD & PORTER KAYE SCHOLER LLP |
| | BY: WREDE SMITH, ESQUIRE |
| 18 | 601 Massachusetts Ave, NW |
| | Washington, DC 20001 |
| 19 | (202) 942-5000 |
| | Wrede.smith@arnoldporter.com |
| 20 | and |
| | BY: ZENO HOUSTON, ESQUIRE |
| 21 | 250 West 55th Street |
| | New York, New York 10019 |
| 22 | (212) 836-8000 |
| | Zeno_houston@arnoldporter.com |
| 23 | Representing the Defendant, |
| | Endo Pharmaceuticals |
| 24 | |

Page 4

Page 5

| | |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | VIA TELEPHONE/LIVESTREAM: |
| 3 | |
| 4 | COVINGTON & BURLING LLP |
| | BY: MICHELLE L. YOCUM, ESQUIRE |
| 5 | One CityCenter |
| | 850 Tenth Street NW |
| 6 | Washington, DC 20001 |
| | (202) 662-6000 |
| 7 | Myocum@cov.com |
| | Representing the Defendant, |
| 8 | McKesson Corporation |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | ALSO PRESENT: |
| | Ray Moore, Videographer |
| 15 | Marjorie Han, Henry Schein, Incorporated |
| | Janim Downing, Henry Schein, Incorporated |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 5

Page 6

```
1           - - -
2        I N D E X
3           - - -
4
5   Testimony of: SHAUN ABREU
6    By Mr. Migliori        11, 454
     By Mr. Jones           449
7
8
           - - -
9      E X H I B I T S
10
           - - -
11
12  NO.        DESCRIPTION        PAGE
13  Schein-Abreu-1   First Amended Notice
           of Deposition        31
14  Schein-Abreu-2   Objections and Responses
           To First Amended Notice
15         Of Deposition        39
16  Schein-Abreu-3   Amended Objections and
           Responses to Plaintiffs'
17         First Combined Discovery
           Requests            98
18
19  Schein-Abreu-4   21 C.F.R. 1301.74    140
20  Schein-Abreu-5   HenrySchein.com
           Printout            149
21  Schein-Abreu-6   Verification Team
           Overview; July 2015  162
22
23  Schein-Abreu-7   HSI-MDL-00000086-103  173
24  Schein-Abreu-8   HSI-MDL-00231455-458  183
```

Page 8

```
1           - - -
2      E X H I B I T S
3           - - -
4   NO.        DESCRIPTION        PAGE
5   Schein-Abreu-26  HSI-MDL-00039634    424
6   Schein-Abreu-27  HSI-MDL-00156897-899  434
7   Schein-Abreu-28  HSI-MDL-000009208-218  443
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
1           - - -
2      E X H I B I T S
3           - - -
4   NO.        DESCRIPTION        PAGE
5   Schein-Abreu-9    HSI-MDL-000993112-115  204
6   Schein-Abreu-10   HSI-MDL-00404079-080  206
7   Schein-Abreu-11   HSI-MDL-00404222-223  226
8   Schein-Abreu-12   HSI-MDL-00404203-209  232
9   Schein-Abreu-13   HSI-MDL-00404219     256
10  Schein-Abreu-14   HSI-MDL-00386726     262
11  Schein-Abreu-15   HSI-MDL-00374284-285  266
12  Schein-Abreu-16   HSI-MDL-00040712     270
13  Schein-Abreu-17   HSI-MDL-00404369-373  283
14  Schein-Abreu-18   HSI-MDL-00072607     293
15  Schein-Abreu-19   Memorandum Opinion and
           Order; USA v Heim      315
16
    Schein-Abreu-20   HSI-MDL-00001198-210  323
17
    Schein-Abreu-21   HSI Shipped Order by
18         DEA - Run Date 7/11/12 342
19  Schein-Abreu-22   HSI-MDL-00019701-704  377f
20  Schein-Abreu-23   HSI-MDL-00002760     390
21  Schein-Abreu-24   HSI-MDL-00020069-070  395
22  Schein-Abreu-25   HSI-MDL-00397293-294  411
23
24
```

Page 9

```
1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
5   Direction to Witness Not to Answer
6   Page Line   Page Line   Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line   Page Line   Page Line
12  None
13
14
15  Stipulations
16  Page Line   Page Line   Page Line
17  10    1
18
19
20  Question Marked
21  Page Line   Page Line   Page Line
22  None
23
24
```

Page 10

1           - - -
2           (It is hereby stipulated and
3   agreed by and among counsel that
4   sealing, filing and certification
5   are waived; and that all
6   objections, except as to the form
7   of the question, will be reserved
8   until the time of trial.)
9           - - -
10          VIDEO TECHNICIAN:  We are
11  now on the record.  My name is Ray
12  Moore, I'm a videographer with
13  Golkow Litigation Services.
14  Today's date is December 12, 2018,
15  and the time is 9:06 a.m.
16          This video deposition is
17  being held in New York, New York,
18  in the matter In Re National
19  Prescription Opiate Litigation for
20  the United States District Court
21  for the Northern District of Ohio,
22  Eastern Division MDL2804.
23          The deponent is Shaun Abreu.
24  Counsel will be noted on the

Page 11

1   stenographic record.  The court
2   reporter is Amanda Miller, and
3   will now swear in the witness.
4           - - -
5           SHAUN ABREU, after having
6   been duly sworn, was examined and
7   testified as follows:
8           - - -
9           EXAMINATION
10          - - -
11  BY MR. MIGLIORI:
12      Q.   Good morning, Mr. Abreu.
13      A.   Good morning.
14      Q.   My name is Don Migliori, I'm
15  from the law firm Motley Rice, and I'm
16  one of the lawyers representing the
17  various plaintiffs in this litigation.
18          I'll be asking you questions
19  throughout the course of today.  My voice
20  is a little low.  If you can't hear me or
21  if you can't understand me, please stop
22  me, and I'll clarify or raise my voice.
23          If there's any questions
24  that you have during the deposition,

Page 12

1   there's nothing so formal about this that
2   you can't stop and ask to talk to your
3   lawyer.  If there's some issue between
4   us, then the lawyers will handle that
5   between ourselves.
6           But, otherwise, as we go
7   through today, if I ask a question and
8   you answer it, for my purposes, I'm going
9   to assume that you've understood the
10  question.
11          Is that a fair way to start?
12      A.   Yes.
13      Q.   Okay.  Your answers have to
14  be verbal, that is, the court reporter is
15  taking down each word, so gestures or
16  sounds are hard to type.  So please
17  articulate all of your answers verbally.
18          And also because the court
19  reporter is taking this down, please wait
20  for my question to finish before you
21  answer.  And I'll do the same, I'll try
22  not to interrupt your response.
23          Do you have any questions
24  before we get started?

Page 13

1       A.   No.
2       Q.   Okay.  Have you done this
3   before?
4       A.   No.
5       Q.   Again, at any time if you
6   have any questions, just stop and we'll
7   take a break or clarify whatever you
8   need.
9           Let's get started.
10          So could you give me your
11  full name and your current residence?
12      A.   Shaun Terrence Abreu.  And
13  that's 686 North Fulton Avenue,
14  Lindenhurst, New York 11757.
15      Q.   What is your job title and
16  employment?
17      A.   I work for Henry Schein.
18  I'm a senior manager of the verifications
19  team.
20      Q.   And what are your
21  responsibilities as a senior manager?
22      A.   So I'm responsible for
23  overseeing our licensing verification
24  process, as well as our program for

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 suspicious order monitoring and customer
2 due diligence.
3     Q.   Okay.  Let's break that
4 down.
5         Let's start with the
6 licensing side.  Licensing for what
7 processes within Henry Schein?
8     A.   So customers' orders of
9 prescription products, devices, drugs and
10 controlled substances.  We validate
11 licensure and credentials for the
12 shipment of those products.
13     Q.   On the suspicious order
14 monitoring side, what are your
15 responsibilities, more precisely?
16     A.   To, you know, control the
17 system itself, you know, review orders
18 and conduct customer due diligence to
19 ship those orders.
20     Q.   Are you part of the
21 verification department, or is there
22 another name for the department that
23 you're in?
24     A.   No, it's the verifications

Page 15

1 department.
2     Q.   And that's separate, as I
3 understand it, from the regulatory
4 affairs department?
5     A.   That's correct.
6     Q.   Is there overlap or
7 oversight for both of those departments
8 that you report to?
9     A.   I'm sorry, say that one more
10 time.
11     Q.   Not a good question.
12         Who do you report to?
13     A.   The name of my --
14     Q.   Supervisor.
15     A.   -- my manager?
16     Q.   His or her title.
17     A.   Bill Brandt.
18     Q.   And what is his title?
19     A.   He's the executive director
20 of customer service.
21     Q.   Is that role above
22 regulatory affairs as well?
23     A.   No, it's separate.
24     Q.   What, if any, overlap is

Page 16

1 there between verification and the
2 regulatory affairs department?
3         MR. JONES:  Object to the
4     form.  Vague.
5 BY MR. MIGLIORI:
6     Q.   What's the relationship?
7 Are you in parallel departments?  Do you
8 have any responsibilities within
9 regulatory affairs?
10     A.   I don't have responsibility
11 within regulatory affairs.
12     Q.   Does regulatory affairs have
13 responsibilities within the suspicious
14 order monitoring program?
15     A.   Yes.  They have oversight.
16     Q.   Okay.  So in that sense, is
17 the verification process for which you're
18 a senior manager, does that report to
19 regulatory affairs, or does regulatory
20 affairs have oversight over your
21 verification process?
22     A.   Regulatory has oversight
23 over the verification process.
24     Q.   And has that been true as

Page 17

1 long as you've been involved with
2 verifications?
3     A.   Yes.
4     Q.   And who is the senior-most
5 person in the regulatory affairs
6 department?
7     A.   Jeff Peacock.
8     Q.   And how many people does
9 Jeff Peacock have underneath him?
10     A.   I'm not sure of an exact
11 number.
12     Q.   When you interact with
13 regulatory affairs in its oversight
14 capacity, who do you deal with on a
15 day-to-day basis?
16     A.   Sergio Tejeda.
17     Q.   And what's Sergio's title?
18     A.   He's the director of
19 regulatory affairs.
20     Q.   And what kind of
21 interactions would you have in
22 verifications with Sergio?
23     A.   Just understanding
24 requirements and systems, and just

Page 18

1  collaboration on a day-to-day basis.
2      Q.   And in terms of suspicious
3  orders, is there a process today where
4  you formally seek approval for shipment
5  from the regulatory affairs department?
6      A.   We collaborate, yes.
7      Q.   And, ultimately, when you
8  collaborate with regulatory affairs,
9  whose decision is it to decide to ship or
10 not ship an order?
11     A.   On ones that we discuss,
12 regulatory would have the final say.
13     Q.   Are there some suspicious
14 orders that are allowed to be cleared
15 today that don't require you to go to
16 regulatory affairs?
17         MR. JONES:  Object to the
18     form.  Vague.
19         MR. MIGLIORI:  Go ahead.
20         THE WITNESS:  Sorry?
21 BY MR. MIGLIORI:
22     Q.   Do you understand the
23 question?  I can repeat it.
24     A.   Yes.  I'm sorry, can you

Page 19

1  repeat it?
2      Q.   Sure.
3          Are there some suspicious
4  orders that can be cleared for shipment
5  that don't require verifications to go to
6  regulatory affairs --
7          MR. JONES:  Same objection.
8  BY MR. MIGLIORI:
9      Q.   -- today?
10         You may answer.
11     A.   Yes.
12     Q.   And we'll go through those
13 systems.
14         Would you be the person
15 responsible, within verifications, to
16 clear those orders, the ones that do not
17 go to regulatory affairs?
18     A.   One of the people
19 responsible.
20     Q.   And who would be the other
21 people in verifications?
22     A.   People on my team that would
23 report to me.
24     Q.   Could you give me the names

Page 20

1  of the folks that are on your team?
2      A.   It's a lot of people.
3      Q.   Okay.  How many people?
4  Let's start there.
5      A.   About 42.
6      Q.   Okay.  Are they all in the
7  same location, or are they throughout the
8  country?
9      A.   Two different locations.
10     Q.   What are the two locations?
11     A.   Melville, New York and Reno,
12 Nevada.
13     Q.   So you're in Melville, New
14 York, correct?
15     A.   Correct.
16     Q.   And how many people are in
17 the verifications department in the
18 Melville, New York office?
19     A.   Twenty-five.
20     Q.   And the balance of the 42
21 are in Reno?
22     A.   Correct.
23     Q.   And are the responsibilities
24 divided between those two offices

Page 21

1  geographically?
2      A.   No.
3      Q.   How are they divided?
4      A.   It's one team working on
5  everything in collaboration.  It's not
6  divided geographically.
7      Q.   So we're going to get more
8  into many of the issues that we've
9  touched upon.  But let me start by asking
10 a little bit about you.
11         You've been at Henry Schein
12 since you graduated from college,
13 correct?
14     A.   That's correct.
15     Q.   You initially went to Nassau
16 Community College until 2003.  And from
17 2003 to 2005, you went to Farmingdale
18 State University of New York?
19     A.   That's correct.
20     Q.   You obtained a Bachelor's
21 degree in business management technology,
22 correct?
23     A.   Correct.
24     Q.   And after that, within

Page 22

1 December, I guess, of 2005 you started
2 with Henry Schein as a customer service
3 representative, correct?
4      A.   Yes.
5      Q.   What responsibilities did
6 you have as a customer service
7 representative?
8      A.   I would handle customer
9 inquiries, you know, returns, credits,
10 tracking, those types of inquiries.
11      Q.   Did that include controlled
12 substances?
13      A.   Tracking, yes.
14      Q.   And did you have any role,
15 at that period of time, from 2005 to
16 2006, as a customer service
17 representative, in any suspicious order
18 monitoring process?
19      A.   No.
20      Q.   In January of 2007, you
21 became a customer service trainer?
22      A.   Correct.
23      Q.   And you held that position
24 for approximately a year, correct?

Page 23

1      A.   Correct.
2      Q.   And what were your
3 responsibilities there?
4      A.   I was to train new hires in
5 the role that I was previously in.
6      Q.   In the customer service
7 representative role?
8      A.   Correct.
9      Q.   In that training, were there
10 any aspects of that training that
11 involved suspicious order monitoring
12 processes for controlled substances?
13      A.   No.
14      Q.   In January of --
15           MR. BEISELL:  I'm sorry to
16      interrupt, can we move the mike to
17      the witness?  I can't hear the
18      witness at all from the phone.
19           - - -
20           (Whereupon, a discussion off
21      the record occurred.)
22           - - -
23 BY MR. MIGLIORI:
24      Q.   In January of 2008 you

Page 24

1 became a lead representative for
2 database; is that correct?
3      A.   That's right.
4      Q.   You held that position for a
5 little more than a year and-a-half?
6      A.   I think it was a little
7 longer, but yes.
8      Q.   And what did you do in that
9 capacity?
10      A.   We were responsible for
11 maintaining the customer database.
12      Q.   And the customers being the
13 physicians and healthcare facilities that
14 purchased devices and drugs and
15 controlled substances from Schein?
16      A.   Correct.
17      Q.   In that role, as a database
18 representative, did you have any
19 responsibilities relating to suspicious
20 order monitoring?
21      A.   No.
22      Q.   Did you have any training,
23 as of September of 2009, in any aspects
24 of suspicious order monitoring?

Page 25

1           MR. JONES:  Object to the
2      form.  Vague.  Overly broad.
3           MR. MIGLIORI:  Go ahead.
4           THE WITNESS:  Can you, I'm
5      sorry, repeat the question?
6 BY MR. MIGLIORI:
7      Q.   Sure.
8           So I understand you held a
9 role as a representative for the
10 database, customer database, through
11 September of 2009; is that correct?
12      A.   Correct.
13      Q.   Through September of 2009,
14 did you receive any training with respect
15 to suspicious order monitoring?
16      A.   No.
17      Q.   All right.  In October of
18 2009, you began working in the
19 verifications department, correct?
20      A.   That's correct.
21      Q.   At that point, did you
22 receive particularized training with
23 respect to suspicious order monitoring
24 and controlled substances?

Page 26

1    MR. JONES:  Object to the
2  form.  Vague.  Overly broad.
3    MR. MIGLIORI:  Go ahead.
4    THE WITNESS:  Yes, I began
5  training.  Yes.
6  BY MR. MIGLIORI:
7    Q.   Describe the training you
8  would have received, in October of 2009,
9  relative to suspicious order monitoring
10  programs and controlled substances?
11    A.   I was training with the
12  trainer at the time.  And, you know, we
13  started going through training for
14  license verification and understanding
15  what the SOM processes and protocols were
16  at that time.
17    Q.   At that time, there was a
18  suspicious order monitoring program in
19  place, correct?
20    A.   Correct.
21    Q.   At that time, you were not
22  in the division of suspicious order
23  monitoring; that is, you were not in
24  regulatory affairs, I should say,

Page 27

1  correct?
2    A.   I was not in regulatory
3  affairs.
4    Q.   In verifications, your
5  responsibilities, within the suspicious
6  order monitoring program in 2009, were
7  limited to license verification and
8  registration verification, correct?
9    A.   Can you repeat that
10  question?
11    Q.   Sure.
12    When you started in the
13  verifications department, and you started
14  to receive your training relative to
15  suspicious order monitoring and
16  controlled substances, you were training
17  within a division of verifications,
18  correct?
19    A.   Correct.
20    Q.   And verifications is a
21  component part of the suspicious order
22  monitoring program, correct?
23    A.   Correct.
24    Q.   It is not the entire

Page 28

1  suspicious order monitoring program, that
2  is covered by regulatory as well,
3  correct?
4    MR. JONES:  Object to the
5  form.
6    THE WITNESS:  Correct.
7  BY MR. MIGLIORI:
8    Q.   All right.  So your training
9  in verifications in 2009 was specific to
10  the -- what you call license verification
11  or registration verification of your
12  customers, correct?
13    A.   Correct.
14    Q.   Tell me what you learned at
15  that point about the verification
16  component of suspicious order monitoring
17  in 2009.
18    MR. JONES:  Object to the
19  form.  Overly broad.  Vague.
20    MR. MIGLIORI:  Go ahead.
21    THE WITNESS:  So when you
22  say the "verification component,"
23  are you talking about the
24  licensing part and inclusive of

Page 29

1  suspicious order monitoring?
2  BY MR. MIGLIORI:
3    Q.   Even more basic.
4    What became your job with
5  respect to verifications and suspicious
6  order monitoring in October of 2009?
7    A.   To, you know, to run the
8  system and our protocols for validating
9  licensure, right, state licensure,
10  federal licensure, for customers to
11  receive prescription products, including
12  controlled substances.
13    Q.   And as of --
14    MR. JONES:  Hang on.  Were
15  you finished?
16    THE WITNESS:  Hmm?
17    MR. JONES:  Were you
18  finished with your answer?
19    THE WITNESS:  Yes.
20    MR. MIGLIORI:  He nodded.
21  You may not have seen it.
22  BY MR. MIGLIORI:
23    Q.   Okay.  And how long was that
24  your job in verifications, that is, the

Page 30

1 description you just provided?
2     A.   It continues to be to
3 present day.
4     Q.   From the end of 2009 to
5 today, how have your responsibilities
6 evolved within the verifications
7 department, and, specifically, to the
8 suspicious order monitoring program?
9     A.   I mean, they basically have
10 been the same since the beginning.  I've
11 had responsibility for the license
12 verification and the suspicious order
13 monitoring since day one.
14     Q.   All right.  Did you -- I
15 understood you to say that you're a
16 senior manager now?
17     A.   Yes.
18     Q.   What's the difference
19 between being a senior manager today and
20 what you started at in verifications back
21 in 2009, if anything?
22     A.   Responsibility-wise?
23     Q.   Yes.
24     A.   Well, I do oversee another

Page 31

1 team as well.
2     Q.   What team is that?
3     A.   The gatekeepers.
4     Q.   And what role -- what does
5 that department do?  What does that team
6 do?
7     A.   It's the database team that
8 I formerly worked in years prior.
9     Q.   So your responsibilities
10 relative to verifications has not
11 changed, but now you've added an
12 oversight component to your job, which
13 now includes the database -- customer
14 database responsibilities you had
15 previously; is that a fair statement?
16     A.   Yes.
17     Q.   Okay.  Let me show you
18 what's been premarked as Exhibit-1.
19          - - -
20          (Whereupon, Exhibit
21     Schein-Abreu-1, First Amended
22     Notice of Deposition, was marked
23     for identification.)
24          - - -

Page 32

1 BY MR. MIGLIORI:
2     Q.   This is a notice, it's
3 called the first amended notice of
4 deposition for today.
5          Have you seen this before?
6     A.   Yes.
7     Q.   And you understand that
8 you're being asked to be here today as a
9 representative of the company, Henry
10 Schein, Inc., correct?
11     A.   Yes.
12     Q.   That is, we call this a
13 30(b)(6) deposition, but it's another way
14 of saying that we're asking you to be
15 here today to speak for the company
16 relative to certain topics that are
17 specifically referenced in this notice.
18          Do you understand that?
19     A.   Yes.
20     Q.   And that today we're not
21 here to take your personal deposition as
22 to facts that you have come across that
23 are outside the scope of this.
24          If, and when, we ever need

Page 33

1 that kind of deposition, that would be a
2 separate process, okay?
3     A.   Okay.
4     Q.   And I'm not going to go
5 through them here, it's not as
6 productive, but on Page 6 of this notice,
7 those subjects, those specific subjects
8 for this deposition, are enumerated in
9 Subparagraphs A through N on Page 7.
10          Do you see that?
11     A.   Yes.
12     Q.   And did you review these
13 topics with your counsel?
14     A.   Yes.
15     Q.   All right.  And in
16 preparation for this deposition, did you
17 meet with counsel?
18     A.   Yes.
19     Q.   How many times did you meet
20 with your counsel to prepare for today?
21     A.   Twice.
22     Q.   When were those occasions?
23     A.   Once last week and once
24 yesterday.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  Q.  And those are the only two
2  meetings you've had in preparation for
3  this deposition?
4      A.  Yes.
5      Q.  Nothing by telephone of
6  substance?
7      A.  No.
8      Q.  And the meeting last week,
9  how long did that meeting last?
10     A.  It was for almost one day.
11     Q.  And did you review
12 documents?
13     A.  Sorry?
14     Q.  Did you review documents
15 with counsel?
16     A.  Yes.
17     Q.  Did you bring any of your
18 own documents to share with counsel that
19 you maintain?
20     A.  No.
21     Q.  And was Mr. Jones present
22 during that meeting?
23     A.  Yes, he was.
24     Q.  Was it here at this office?

Page 35

1      A.  The one yesterday.
2      Q.  Okay.  How long did you meet
3  yesterday?
4      A.  For four hours.
5      Q.  Did you review additional
6  documents?
7      A.  No.
8      Q.  Did you review any testimony
9  of any other witness in this litigation?
10     A.  No.
11     Q.  Did you speak with any other
12 employees at Schein to help inform
13 yourself about certain topics that we're
14 going to discuss?
15     A.  Yes.
16     Q.  Which other employees --
17 don't tell me the nature of the
18 conversations, but which other employees
19 did you speak with?
20     A.  Sergio Tejeda.
21     Q.  That's your supervisor?
22     A.  No.
23     Q.  Sorry, strike that.
24         That is the person within

Page 36

1  regulatory affairs that has oversight of
2  your verifications department?
3      A.  That's correct.
4      Q.  Anyone else?
5      A.  No.
6      Q.  Was Sergio at the meetings?
7      A.  Yes.
8      Q.  Both of them?
9      A.  No.
10     Q.  Who else -- just the meeting
11 yesterday, or which meeting?
12     A.  Sergio was at the meeting
13 last week.
14     Q.  And did you meet with
15 anybody else besides counsel and Sergio?
16     A.  Yes.  Frank O'Regan.
17     Q.  And who is Frank O'Regan?
18     A.  He's the manager for
19 regulatory affairs.
20     Q.  And does Sergio report to
21 Frank?
22     A.  No, Frank reports to Sergio.
23     Q.  Okay.  And was he also at
24 the meeting last week?

Page 37

1      A.  Yes, briefly.
2      Q.  Anyone else that you can
3  recall?
4      A.  Just my inside attorney.
5      Q.  And by that you mean the
6  general counsel --
7      A.  Yes.
8      Q.  -- or someone from the
9  general counsel's office?
10     A.  Yes.
11     Q.  Other than those meetings
12 and the documents you reviewed and the
13 two other employees that you spoke with,
14 did you do anything else to prepare for
15 your testimony today?
16     A.  No.
17     Q.  Over the course of your time
18 at Schein, were you involved, at any
19 point, with the development of
20 standing -- standard operating
21 procedures, or SOM procedures, at Schein?
22     A.  Yes.
23     Q.  What responsibilities have
24 you had, and when?

Page 38

1     A.   I created an SOP in 2011 or
2 2012.
3     Q.   Okay. And what was that SOP
4 for?
5     A.   For our suspicious order
6 monitoring and due diligence program.
7     Q.   And what component did you
8 work on for that particular standard
9 operating procedure?
10     A.   I drafted the SOP.
11     Q.   The entire SOP?
12     A.   Yes.
13     Q.   We'll go through that
14 specifically.
15     Anything else that you did
16 personally with respect to developing
17 SOPs or modifying the suspicious order
18 monitoring program?
19     A.   I've been involved. But,
20 you know, just drafting of the SOP.
21     Q.   The one SOP that we spoke
22 of?
23     A.   And the one for the
24 licensing.

Page 39

1     Q.   And the one for licensing.
2     What was the year for the
3 one for the licensing?
4     A.   It's been in existence.
5 It's just been revisions to it over the
6 years.
7     Q.   And by that, that is a
8 verification that a customer, in fact,
9 maintains the appropriate DEA
10 registration and state licensing before
11 you'll ship medications to that doctor,
12 correct?
13     A.   That's correct.
14     Q.   I'll show you what's been
15 premarked as Exhibit-2.
16     - - -
17     (Whereupon, Exhibit
18 Schein-Abreu-2, Objections and
19 Responses to First Amended Notice
20 of Deposition, was marked for
21 identification.)
22     - - -
23 BY MR. MIGLIORI:
24     Q.   Exhibit-2 is Schein's

Page 40

1 response to that notice that I just
2 showed you.
3     And it's -- references the
4 topics specifically and what limitations,
5 if any. I just want to go through these
6 topics really quickly to make sure that
7 we're on the same page.
8     A.   Okay.
9     Q.   If we go to Page 5 of
10 Exhibit-2, and just for the record, this
11 is, Distributor Defendant Henry Schein's
12 Objections and Responses to Plaintiffs'
13 First Amended Notice of Deposition. This
14 one is dated December 7th, 2018.
15     The first topic listed is,
16 Your duty and the basis of said duty
17 relating to the maintenance of effective
18 controls against diversion and/or your
19 duty and the basis of said duty to design
20 and operate a system to disclose
21 suspicious orders of controlled
22 substances pursuant to federal law,
23 including but not limited to the
24 following topics.

Page 41

1     Counsel here is indicating
2 that you're not here to talk about your
3 legal obligations.
4     Do you understand that to be
5 a limitation of your testimony today?
6     A.   Yes.
7     Q.   The first enumerated item is
8 A, it says, Your past and present
9 suspicious order monitoring program, SOM
10 programs, and procedures.
11     You are identified, with
12 some reservations, as being the person
13 with most knowledge within the company to
14 speak on that topic.
15     Do you understand that to be
16 your role?
17     A.   Yes.
18     Q.   Do you know of other people
19 in your company that have equal or
20 greater information about the suspicious
21 order monitoring programs, policies and
22 procedures --
23     MR. JONES: Objection.
24 BY MR. MIGLIORI:

Page 42

1    Q.  -- over the course of the
2  past 20 years?
3          MR. JONES:  Objection.
4  Form.  Vague.  Overly broad.
5          MR. MIGLIORI:  Go ahead.
6          THE WITNESS:  Only Sergio
7  Tejeda.
8  BY MR. MIGLIORI:
9    Q.   And that's -- again, Sergio
10  is the -- in the regulatory affairs
11  department, and he has -- and his
12  department has oversight of verifications
13  with respect to suspicious orders,
14  correct?
15    A.   Correct.
16    Q.   All right.  The next topic
17  is, Your past, present Know Your Customer
18  program policies and procedures.
19          Are you familiar with the
20  term "Know Your Customer"?
21    A.   Yes.
22    Q.   Have you been involved in
23  the Know Your Customer evolution within
24  the suspicious order monitoring program

Page 43

1  at Schein?
2    A.   Yes.
3    Q.   And your involvement
4  includes the 2011/2012 SOP that you wrote
5  on due diligence?
6    A.   Yes.
7    Q.   Do you consider Know Your
8  Customer to include, among other things,
9  your obligations with respect to due
10  diligence?
11          MR. JONES:  Objection.
12  Form.  Vague.
13          THE WITNESS:  Can you
14  restate the question?
15  BY MR. MIGLIORI:
16    Q.   Sure.
17          Is due diligence a component
18  part of Know Your Customer?
19    A.   Yes.
20    Q.   Are you the person with the
21  most knowledge about the issue of knowing
22  your customer obligations?
23    A.   Yes.
24    Q.   Is there anybody else in the

Page 44

1  company that has equal to or greater
2  knowledge about the Know Your Customer
3  requirements?
4    A.   Again, it would be Sergio
5  Tejeda.
6    Q.   And you understand you're
7  here to talk to me today about that
8  topic?
9    A.   Yes.
10    Q.   All right.  The next topic,
11  Your past and present interpretation,
12  compliance agreement and/or disagreement
13  with various Dear Registrant letters from
14  the DEA outlining the duties imposed on a
15  distributor by federal law.
16          Are you familiar with the
17  so-called Rannazzisi letters?
18    A.   Yes.
19    Q.   Did you review those in
20  preparation for today?
21    A.   Yes.
22    Q.   Do you believe that you
23  reviewed the four that are specifically
24  dated and referenced here in this notice?

Page 45

1          MR. JONES:  Objection.
2  Form.  Misstates the topic.
3  BY MR. MIGLIORI:
4    Q.   Do you see those?
5    A.   Yes.
6    Q.   The dates here, 9/26/06,
7  2/7/07, and 12/27/2007 --
8    A.   Yes.
9    Q.   -- do you see those?
10          Have you seen other
11  Rannazzisi letters?
12    A.   No.
13    Q.   Have you read those three?
14    A.   Yes.
15    Q.   Do you feel that you are
16  qualified and prepared to speak on behalf
17  of the company with respect to those
18  letters?
19    A.   Yes.
20    Q.   Are you -- you were not in
21  the SOM or verification program during
22  those years, were you?
23    A.   No.
24    Q.   You didn't become part of

Page 46

1 any verification process or suspicious
2 order monitoring program process until
3 2009, correct?
4     A.   Correct.
5     Q.   Is there any other person in
6 the company that you believe has equal to
7 or superior knowledge about the
8 Rannazzisi letters?
9     A.   Sergio Tejeda.
10     Q.   Anyone else?
11     A.   No.
12     Q.   The next topic.  Past and
13 present interpretation, compliance,
14 agreement and/or disagreement with the
15 reporting requirements and shipping
16 requirement as referenced in a particular
17 written opinion.
18         Have you read the opinion
19 that's referenced here that's called the
20 Masters Pharmacy Versus Drug Enforcement
21 Administration?
22     A.   Which opinion?  I'm sorry.
23     Q.   If you look at D on the top
24 of Page 8.  There's referenced on the

Page 47

1 very top caption, the very title, the
2 emboldened, the very top, under Subpart
3 D, there's a reference, in italics, to
4 Masters Pharmacy Inc. versus Drug
5 Enforcement Administration.
6         Do you see that?
7     A.   Yes.
8         No, I did not read the
9 opinion.
10     Q.   Do you recall speaking to
11 counsel about that opinion?
12     A.   Yes.
13     Q.   And did counsel inform you
14 what the opinion holds?
15     A.   We worked with regulatory
16 regarding that opinion.
17     Q.   So regulatory, during your
18 meeting last week, and counsel explained
19 to you what that case provides?
20         MR. JONES:  Objection.
21 Form.  Vague.  Misstates.
22         You can answer.
23         THE WITNESS:  Not last week,
24 no.  When the opinion came out.

Page 48

1 BY MR. MIGLIORI:
2     Q.   Okay.  Let's break that
3 down.
4         At any point in your
5 preparation for today, did you review
6 that opinion or the substance of that
7 opinion?
8     A.   No.  I'm familiar with the
9 topic, but I have not read the opinion
10 itself.
11     Q.   When this opinion came out
12 in 2017, last year, you recall that it
13 had come out?
14     A.   Yes.
15     Q.   And when it came out, you
16 and regulatory had conversations about
17 what it means for your company; is that a
18 fair statement?
19     A.   Yes.
20     Q.   Who were those conversations
21 with?
22     A.   With Sergio Tejeda and Frank
23 O'Regan.
24     Q.   And, again, those are both

Page 49

1 from regulatory affairs?
2     A.   Correct.
3     Q.   And they were involving you
4 with respect to any implications it may
5 have for the verification process?
6     A.   Correct.
7     Q.   Is it fair to say that
8 within the suspicious order monitoring
9 program, your responsibilities are
10 limited to the verification side,
11 correct?
12         MR. JONES:  Objection.
13 Form.  Misstates prior testimony.
14 BY MR. MIGLIORI:
15     Q.   Is that correct?
16     A.   Correct.
17     Q.   All right.  So what do you
18 understand, as you sit here today, if you
19 can remember back to 2017 and your
20 conversations, what do you understand
21 that decision to mean?
22         MR. JONES:  Objection.
23 Form.  Vague.
24         Don, we're now starting to

Page 50

1  get into the areas that Special
2  Master Cohen said that witnesses
3  are not to be testifying to, as to
4  the interpretation and the legal
5  import of the Masters decision.
6      MR. MIGLIORI:  I appreciate
7  that.  I'm not asking -- you have
8  identified, in this answer, that
9  you're designating Shaun Abreu to
10 testify with regard to this topic,
11 to the extent it seeks
12 nonprivileged information that is
13 relevant to the case.
14     I'm only asking what his
15 impression is.  I'm not asking him
16 to give me a judicial or legal
17 opinion.
18     MR. JONES:  That is fine.
19 Just so we're clear, he's here to
20 testify to that topic, subject to
21 our objections, which includes the
22 rulings from Special Master Cohen
23 as to all of the legal nuances,
24 interpretation, agreement or

Page 51

1  disagreement with the Masters
2  decision or the statutes.
3      MR. MIGLIORI:  Fair enough.
4  BY MR. MIGLIORI:
5      Q.   To understand what we're
6  doing, let me just ask the question this
7  way.  I'm not asking you for a legal
8  opinion or for a conclusion about the
9  case.
10     You said contemporaneously
11 with the case coming out, within the
12 ordinary business of your company, you
13 and regulatory, that is, you, Frank and
14 Sergio, actually had a conversation about
15 something that happened in the court
16 systems in this case, correct?
17     A.   Correct.
18     Q.   From that conversation, what
19 came of it within your company, that is,
20 what is it that you believe, or believed
21 at the time, that meant for you
22 operationally within your company?
23     A.   We were discussing the
24 potential change of reporting orders to

Page 52

1  DEA.
2      Q.   And what change do you think
3  that case required of your company?
4      MR. JONES:  Objection.
5  Form.  Objection.  It calls for a
6  legal conclusion.
7      THE WITNESS:  Can you
8  repeat?
9  BY MR. MIGLIORI:
10     Q.   You said -- you referenced a
11 change that may have come from that
12 decision.
13     What did you understand that
14 change to be?
15     A.   The reporting of orders to
16 DEA, when to report.
17     Q.   So is it fair to say that,
18 as of 2017, Schein believed that it had a
19 change in obligation to report suspicious
20 orders in a different manner?
21     MR. JONES:  Objection.
22 Form.  Vague.  Objection.  Calls
23 for legal conclusion.
24     MR. MIGLIORI:  Go ahead.

Page 53

1      THE WITNESS:  Not a change
2  in obligation.  We were always
3  reporting suspicious orders, but
4  the timeliness, the timing of
5  reporting those orders.
6  BY MR. MIGLIORI:
7      Q.   And what was the change that
8  you believe had to happen?
9      A.   That we needed to report the
10 orders more timely.
11     Q.   By "timely," do you mean
12 when discovered?
13     MR. JONES:  Objection.
14 Form.  Vague.
15 BY MR. MIGLIORI:
16     Q.   What do you mean by "more
17 timely"?
18     A.   When the orders are pended.
19     Q.   So prior to that moment in
20 time, how was Schein reporting suspicious
21 orders, in terms of timeliness?
22     A.   It depends on what time
23 frame you're referring to.
24     Q.   Let's start with immediately

Page 54

1 prior to the decision in 2017.
2      A.   We were reporting orders
3 when they were deemed to be suspicious.
4      Q.   And what would cause
5 something, in 2017, to be deemed
6 suspicious?
7           MR. JONES:  And, again, are
8      you talking before Masters came
9      out or after?
10          MR. MIGLIORI:  I'm all in
11     the same period, immediately
12     prior.
13 BY MR. MIGLIORI:
14     Q.   What caused something to be
15 deemed suspicious, in 2017, before
16 Masters?
17     A.   As a result of our due
18 diligence, we would potentially deem an
19 order as suspicious.
20     Q.   If an order was a variance
21 in size or frequency or pattern of a
22 particular company, before any due
23 diligence had been conducted, in 2017,
24 was that deemed a suspicious order within

Page 55

1 Henry Schein?
2           MR. JONES:  Excuse me.  Just
3      so we're clear, we're talking
4      about 2017, we're talking about
5      before Masters?
6           MR. MIGLIORI:  Yes.
7           MR. JONES:  Okay.
8           THE WITNESS:  Sorry.  Can
9      you restate the question?
10 BY MR. MIGLIORI:
11     Q.   Sure.
12          In 2017, prior to the
13 Masters decision, if an order was above
14 or in excess of size, frequency or
15 pattern, that is, if there's a deviation
16 in size, frequency or pattern of a
17 customer's order in early 2017, but
18 before any due diligence was conducted,
19 was that order deemed, in your system at
20 Schein, suspicious?
21          MR. JONES:  Objection.
22     Form.  Vague.
23          THE WITNESS:  No, it was
24      deemed as an order of interest.

Page 56

1 BY MR. MIGLIORI:
2      Q.   And Schein maintained that
3 process up until the Masters decision?
4      A.   That's correct.
5      Q.   As a result of the Masters
6 decision, did Schein change the
7 timeliness of when something was to be
8 deemed suspicious?
9           MR. JONES:  Objection.
10     Form.
11          MR. MIGLIORI:  Go ahead.
12          MR. JONES:  Vague.
13          THE WITNESS:  Sorry.  Can
14     you repeat the question?
15 BY MR. MIGLIORI:
16     Q.   Did Masters change that
17 process?
18     A.   Yes.
19     Q.   How?
20     A.   The order was reported when
21 it pended as an order of interest.
22     Q.   And "pended" is a term of
23 art to Schein, that is, in Schein's
24 system, "pended" means that something

Page 57

1 triggered a potential for an order to
2 become suspicious, correct?
3      A.   Potential, yes.
4      Q.   And up until Masters, Schein
5 treated a deviation of size, frequency or
6 pattern to be a pended order, subject to
7 some due diligence, before it would be
8 deemed suspicious?
9      A.   That is correct.
10     Q.   After Masters, Schein
11 changed that to be as soon as a
12 triggering event, like a threshold,
13 deviation of size, deviation of pattern
14 of ordering, or deviation of frequency of
15 ordering by a customer, any of those
16 deviations would immediately cause that
17 order to be deemed suspicious, subject to
18 further due diligence, correct?
19          MR. JONES:  Objection to
20     form.
21          THE WITNESS:  The order was
22     still an order of interest to us,
23     but it was reported at that point.
24 BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.   But did you report it, after
2  Masters, as an order of interest or did
3  you report it as a suspicious order?
4         MR. JONES:  Objection to
5     form.  Vague.
6  BY MR. MIGLIORI:
7     Q.   How did you report it?
8     A.   We reported it as a pended
9  order.
10    Q.   So of all of the reporting
11 at Schein, before and after Masters, all
12 of the reporting of orders were separated
13 into pended orders separately from
14 suspicious orders?
15    A.   I'm sorry, can you restate
16 that question?
17    Q.   Sure.
18         Did you report suspicious
19 orders after they were no longer pending?
20         MR. JONES:  Objection to
21    form.  Vague.
22         THE WITNESS:  I'm sorry, I'm
23    not sure I understand the
24    question.

Page 59

1  BY MR. MIGLIORI:
2     Q.   I'll walk you through a
3  hypothetical.
4         After Masters, an order
5  comes in and it deviates from size,
6  frequency or pattern of that customer's
7  prior purchasing history, okay?
8         Are we on the same page?
9     A.   Yes.
10    Q.   In the system, after
11 Masters, that would be deemed a pended
12 order that was immediately reportable to
13 the DEA, correct?
14    A.   Correct.
15    Q.   Under Schein's suspicious
16 order monitoring program, that order
17 would then be investigated, that is,
18 there would be a due diligence component
19 to determine whether or not to consider
20 that order suspicious, correct?
21    A.   That's correct.
22    Q.   If an order, after due
23 diligence, was deemed suspicious, was it
24 again reported to DEA?

Page 60

1     A.   Yes.
2     Q.   Have you seen examples of
3  reports, post-Masters, of pended orders
4  that were again later reported as
5  suspicious orders?
6     A.   Yes.
7     Q.   And where are those reports
8  maintained?
9     A.   Internally in our system.
10    Q.   What's the system called?
11    A.   It would be JD Edwards and,
12 you know, other local drives in the
13 company.
14    Q.   Is that part of your
15 database department that you oversee?
16    A.   No.
17    Q.   So the database department
18 you oversee is a certain platform, and
19 that manages relationships with
20 customers, correct?
21    A.   It's customer maintenance.
22    Q.   Okay.  And that has no
23 component parts of it that relate to the
24 suspicious order monitoring program,

Page 61

1  correct?
2     A.   Correct.
3     Q.   Separately, a database
4  exists that maintains all of the pended
5  orders that have been reported to DEA and
6  suspicious orders that have been reported
7  to DEA, correct?
8     A.   They're in two different
9  databases, but yes.
10    Q.   And what are the two
11 databases -- what are the platforms of
12 the two databases for pended orders and
13 suspicious orders?
14    A.   The pended orders are housed
15 in our JDE, our ERP system.
16    Q.   You have to help me with
17 names.
18    A.   So it's JD Edwards, that's
19 our system, our customer master system,
20 which we would store the pended orders.
21         And then the suspicious
22 order letters would be housed on a, like,
23 a local drive, a network drive.
24    Q.   Okay.  And is that

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  accessible by every employee of the
2  company, that local network drive?
3      A.   No.
4      Q.   Who has access to those
5  suspended order letters?
6      A.   The ones that --
7      Q.   Suspicious order letters,
8  sorry.
9      A.   The regulatory affairs team
10  and verifications.
11     Q.   All right.  So you have
12  access to those?
13     A.   Yes.
14     Q.   And how far does that
15  database go back, the suspicious orders
16  database?
17     A.   I'm not sure.
18     Q.   Do you, from time to time,
19  go into that local drive to review
20  suspicious orders?
21     A.   Generally not.
22     Q.   If a pended orders comes up,
23  do you check your suspicious orders
24  database to see if that customer has

Page 63

1  previously had a suspicious order?
2      A.   No.
3      Q.   Why not?
4      A.   Because they would be
5  disconnected.
6      Q.   So in your system at Schein,
7  as of today, if a customer has been
8  subject to a suspicious order, that
9  customer relationship is terminated?
10     A.   That's correct.
11     Q.   So the definition of a
12  suspicious order, in Henry Schein's
13  suspicious order monitoring program
14  today, is a decision not only that the
15  order was suspicious but a decision to
16  terminate the relationship with the
17  client?
18     A.   That's correct.
19          MR. JONES:  Objection to
20  form.
21  BY MR. MIGLIORI:
22     Q.   All right.  Has that always
23  been the definition of suspicious order
24  at Henry Schein?

Page 64

1          MR. JONES:  Objection.
2  Form.  Vague.
3          THE WITNESS:  That we --
4  sorry, can you clarify that?
5  BY MR. MIGLIORI:
6      Q.   You understand you're here
7  as the person with the most knowledge
8  about suspicious orders at Henry Schein,
9  correct?
10     A.   Yes.
11     Q.   Has it always been the
12  definition of a suspicious order at
13  Schein that the order was pended,
14  investigated and determined to be
15  suspicious and, therefore, required
16  termination with the client?
17     A.   For controlled substances,
18  yes.
19     Q.   All right.  And I appreciate
20  that clarification.  Okay.
21          So we were talking about the
22  Masters case.
23          Is it still, pre and post
24  Masters, the understanding -- the

Page 65

1  definition at Schein that you only report
2  an order as suspicious if you've gone
3  ahead and terminated the relationship
4  with the client?
5          MR. JONES:  Objection.
6  Form.  Vague.
7          MR. MIGLIORI:  Go ahead.
8          THE WITNESS:  No.  We are
9  still reporting the order when
10  it's pended to DEA.
11  BY MR. MIGLIORI:
12     Q.   And I'm trying to make that
13  distinction.
14          You report pended orders to
15  the DEA when something deviates from
16  size, frequency and pattern, correct?
17     A.   Correct.
18          MR. JONES:  Again, I'm
19  sorry, we're talking post Masters?
20          MR. MIGLIORI:  Right now I'm
21  talking about today, and I'll go
22  back.  Yes, post Masters.
23          MR. JONES:  Okay.
24  BY MR. MIGLIORI:

Page 66

1    Q.   You report pended orders as
2  soon as they pop up as being deviations
3  from size, frequency and pattern,
4  correct?
5    A.   Correct.
6    Q.   You do due diligence on
7  them.  You don't report those as
8  suspicious orders, today, until you've
9  made a decision that, in fact, it was
10  suspicious and terminate the client
11  relationship, correct?
12    A.   Correct.
13    Q.   And so going back in
14  history, has that been the definition of
15  a suspicious order at Schein, that is, an
16  order that reaches the level that it not
17  only deviates from size, frequency and
18  pattern, but it also requires termination
19  of the relationship with the client?
20        MR. JONES:  Objection.
21  Form.  Vague.  Overly broad.
22        MR. MIGLIORI:  Go ahead.
23        THE WITNESS:  Yes.
24  BY MR. MIGLIORI:

Page 67

1    Q.   All right.  I know that
2  there's a timing issue.  You mentioned
3  timing in this conversation about
4  Masters.  I have one other timing
5  question for you.
6        There was a period of time
7  at Schein that the pended orders were not
8  reported to DEA until 15 days or so after
9  the month in which it happened.
10        Are you familiar with that
11  policy?
12    A.   We would send the report
13  monthly, yes, to the DEA local offices.
14    Q.   Right.  So it could be as
15  much as 45 days after the report, if it
16  were on the first of the month, those
17  reports would go out on the 15th of the
18  following month, correct?
19    A.   The report would go out
20  monthly, yes.
21    Q.   All right.  And that process
22  was determined to be noncompliant with
23  DEA's expectations at some point in the
24  process, correct?

Page 68

1        MR. JONES:  Objection.
2  Form.  Objection.  Calls for a
3  legal conclusion.
4        MR. MIGLIORI:  Go ahead.
5  BY MR. MIGLIORI:
6    Q.   There was an audit where
7  Schein was told, you need to report at
8  the time you discover the deviation in
9  size, frequency and pattern, wasn't
10  there?
11    A.   An audit? I'm sorry? I
12  don't believe so, no.
13    Q.   Did you review any audits in
14  preparation for today, that is, any
15  outside vendor audits or reviews of the
16  suspicious order monitoring program at
17  Schein?
18    A.   No.
19    Q.   We'll go through those in a
20  minute.
21        Okay.  Any other changes
22  that you recall operationally as a result
23  of the Masters decision in 2017?
24        MR. JONES:  Objection.

Page 69

1  Form.  Overly broad.
2  BY MR. MIGLIORI:
3    Q.   That you can remember.
4    A.   No.
5    Q.   The next topic is, How your
6  interpretation and compliance with the
7  reporting requirement has changed over
8  time.
9        We've talked a little bit
10  about that.  You're designated here for
11  that topic.
12        Would you also include
13  Sergio and Frank as people who would have
14  equal or superior knowledge about that?
15    A.   Yes.
16    Q.   And we'll get into the more
17  specifics of that a little later.
18        F, on Page 9, you're here to
19  talk about how your interpretation and
20  compliance with the shipping requirement
21  has changed over time.  And, again, on
22  Page 10, you're designated as the person
23  to testify on this topic.
24        Do you understand what the

Page 70

1 shipping requirement is?
2     A.   Yes.
3     Q.   What do you understand it to
4 be?
5     A.   That due diligence needs to
6 be conducted prior to the shipment of an
7 order, to dispel any suspicion.
8     Q.   If an order is pended in
9 your system, is it halted --
10     A.   Yes.
11     Q.   -- today?
12         Has that always been the
13 case?
14     A.   Yes.
15     Q.   So if you have a pended
16 order, is the whole order pended or just
17 a component part of the order, today?
18     A.   The whole order is pended.
19     Q.   Has that always been the
20 case?
21     A.   Yes.
22     Q.   And as subject to due
23 diligence -- would you report that pended
24 order, by the way?

Page 71

1     A.   Can you repeat that part?
2     Q.   Yes.  Strike all of that.  I
3 changed my thought in the middle of it.
4         Do you report the pended
5 order before you do the due diligence?
6     A.   I'm sorry, the timing we're
7 talking about?
8     Q.   Today.
9     A.   Today.  That's correct, yes.
10     Q.   And that's evolved over
11 time; that wasn't always the case,
12 correct?
13     A.   Correct.
14     Q.   Do you recall exactly, or
15 roughly, when that change occurred?
16     A.   Where we pended -- where we
17 reported every pended order?
18     Q.   Yes.
19     A.   It was some time in February
20 of 2018.
21     Q.   And was that a result of, at
22 least in part, the Masters decision?
23     A.   Yes.
24     Q.   Prior to that, pended orders

Page 72

1 were not reported?
2     A.   They were reported monthly.
3     Q.   Monthly, but not immediately
4 upon discovery, correct?
5         MR. JONES:  Objection.
6 Form.  Vague.
7         THE WITNESS:  They were
8     reported when they pended.
9 BY MR. MIGLIORI:
10     Q.   Prior to Masters, they
11 reported at the end of every month as a
12 single report, correct?
13     A.   Correct.
14     Q.   After Masters, they reported
15 as they pended, that is, when they were
16 discovered, correct?
17         MR. JONES:  Objection.
18     Form.  Vague as to "discovered."
19         MR. MIGLIORI:  Well, I can
20     show you the statute.
21 BY MR. MIGLIORI:
22     Q.   But when did an order
23 pend -- a pended order get reported,
24 after Masters?

Page 73

1     A.   The day -- the day that
2 it -- the day after it pended.
3     Q.   Within 24 hours of it being
4 discovered?
5     A.   Correct.
6     Q.   All right.  So the question
7 I think I had asked was, at what point
8 did shipment -- strike that.
9         Have all pended orders been
10 halted from shipment at the time that
11 they were pended, that is -- strike that.
12 I'm actually going to read it.
13         That's really terrible.
14         An order gets pended --
15         MR. JONES:  No objection.
16         MR. MIGLIORI:  I think we
17     can stipulate to that.
18 BY MR. MIGLIORI:
19     Q.   If an order is pended today,
20 that order is halted, correct?
21     A.   Correct.
22     Q.   And the shipping requirement
23 that we're talking about here is the
24 decision to ship or not ship after some

Page 74

1  level of due diligence, correct?
2      A.   Correct.
3      Q.   By the way, on due
4  diligence, due diligence is a process of
5  knowing your customer, correct?
6      A.   Correct.
7      Q.   Early in time, that involved
8  sending a letter and the customer sending
9  back responses to a one-page letter,
10 correct?
11     A.   At what period?  I'm sorry.
12     Q.   Early on --
13     A.   Early on, yes.
14     Q.   -- 2005, when you first
15 started with the company.
16     A.   Correct, yes.
17     Q.   That process evolved over
18 time and, really, in 2009, a due
19 diligence program was in place that
20 involved things like on-site visits and
21 interviews and the like, correct?
22         MR. JONES:  Objection.
23     Form.  Overly broad.  Vague.
24 BY MR. MIGLIORI:

Page 75

1      Q.   Correct?
2      A.   Correct.
3      Q.   All right.  And an important
4  component part of due diligence and
5  knowing your customer is not just the
6  investigation but documentation of that
7  investigation, correct?
8      A.   Correct.
9      Q.   There's an adage that, "if
10 it's not written down, it didn't happen."
11         Is that a component part of
12 the Schein due diligence suspicious order
13 monitoring program?
14         MR. JONES:  Objection.
15     Form.  Vague.
16         THE WITNESS:  Depending on
17     the time period.
18 BY MR. MIGLIORI:
19     Q.   When would that have become
20 the rule?
21         MR. JONES:  Objection.
22     Form.
23         THE WITNESS:  I would say
24     post 2009.

Page 76

1  BY MR. MIGLIORI:
2      Q.   And the due diligence files,
3  where are they maintained in Schein?
4      A.   In our JDE system, our
5  customer system.
6      Q.   And that system is
7  maintained by who?
8      A.   The whole company.  The
9  entire company.
10     Q.   Is there a manager of it?
11     A.   Our IT team.  I'm not sure
12 if there's somebody specifically.
13     Q.   So you can sit at your desk
14 and log into the due diligence files of
15 all of your customers?
16     A.   Me personally?
17     Q.   Yes, you personally.
18     A.   Yes.
19     Q.   And that's because of your
20 role within verification?
21     A.   Correct.
22     Q.   And folks in regulatory can
23 do that as well, correct?
24     A.   Yes.

Page 77

1      Q.   And those due diligence
2  files, do they exist for every customer
3  of Schein?
4      A.   Yes.
5      Q.   And how long are those files
6  maintained?
7      A.   They've never been --
8  they've never been purged.
9      Q.   So if you have a doctor that
10 you have been supplying controlled
11 substances to for 15 years, you should
12 have all of your due diligence
13 interactions with that doctor going back
14 the entire time, correct?
15     A.   Clarification.  We used to
16 have an older system that was purged a
17 number of years ago.
18         Everything, I would say,
19 since 2009 or so, it still exists.  Prior
20 documents have been purged.
21     Q.   What was the name of the
22 other system?
23     A.   It was a microfilm system.
24     Q.   Like the old library, you

Page 78

1 got --
2     A.    With the reels, yes.
3     Q.    Okay.  Great.  Thank God I
4 don't do that part of the business
5 anymore.
6         And when you say they were
7 purged, they were just discarded?
8     A.    Sorry?
9     Q.    They were discarded?
10     A.    Yes.  Everything on the
11 reels was discarded.
12     Q.    So if you had a doctor that
13 had an event that was investigated before
14 2009, there is no place in the company to
15 find out what the outcome of that
16 investigation was?
17     A.    We have internal notes in
18 the system, but not the actual documents
19 themselves.
20     Q.    Okay.  So something from the
21 earlier years is maintained in the JDE
22 system reflecting what happened prior in
23 the now-purged, older due diligence
24 files?

Page 79

1     A.    Yes.
2     Q.    And so for you to access Dr.
3 Jones's due diligence file today, how
4 would you do it physically?  What do you
5 do?
6     A.    It's a keystroke in the
7 system to retrieve an image.
8     Q.    And are those images also
9 associated with internal discussion about
10 investigations and follow-ups and
11 interviews and deficiencies and the like?
12     A.    It would be everything about
13 that customer.
14     Q.    Okay.  And is there a name
15 of that system?  When you talk to Sergio
16 and you say, I don't know, I'll go check,
17 I'm going to go look in X.
18         What is that X?
19     A.    We just refer to it as our
20 imaging database or system.
21     Q.    Okay.  And so in your
22 imaging database, in the -- locally
23 housed, right?  That server is onsite in
24 Melville?

Page 80

1     A.    I'm not sure of its
2 location.  But it can be accessed, yes.
3     Q.    So you would tell Sergio,
4 I'll go look at the due diligence files
5 in the imaging system?
6     A.    Yes.
7     Q.    And you can make whatever
8 decisions about the shipping requirements
9 or the suspicious order reporting
10 requirements, in part, by going into that
11 system to find out the history of that
12 particular doctor or healthcare facility,
13 correct?
14     A.    For the shipping
15 requirement, yes.
16     Q.    What about for -- I said
17 shipping, but I also mentioned for
18 reporting requirements.
19         Are there some components of
20 whether to report that are also in that
21 database?
22         MR. JONES:  Objection.
23     Form.  Vague.
24 BY MR. MIGLIORI:

Page 81

1     Q.    As part of your due
2 diligence to look at the history, the
3 dispensing history, and investigations of
4 that doctor in that database.
5     A.    For due diligence, yes.
6     Q.    Okay.  Fair enough.
7         And Know Your Customer
8 generally?
9     A.    Correct.
10     Q.    All right.  Next topic, G,
11 whether you historically ship suspicious
12 orders without conducting due diligence
13 prior to Masters.
14         We've talked about this a
15 little bit.  You are listed here as a
16 person with most knowledge.
17         MR. JONES:  Just to be
18     clear, I mean, you keep asking if
19     he's with most knowledge.  I mean,
20     he's here as a 30(b)(6)
21     representative.
22         So -- I think that's
23     probably what you're getting at,
24     but I just want to make sure the

Page 82

1  record is clear.
2      MR. MIGLIORI:  Sure.  We can
3  rely on the statute for what it
4  means.
5  BY MR. MIGLIORI:
6      Q.   You're listed here as the
7  person to talk about it, right?
8      A.   Right.
9      Q.   And people with equal or
10 superior knowledge to you about that
11 include Sergio and Frank, from regulatory
12 affairs, correct?
13     A.   Correct.
14     Q.   And in this topic of
15 shipping suspicious orders, is it fair to
16 say that, given the definitions you've
17 given me today about what is a suspicious
18 order versus a pended order, that,
19 historically, Schein did not ship
20 suspicious orders prior to the Masters
21 decision?
22     A.   We don't ship suspicious
23 orders.
24     Q.   All right.  We'll get into

Page 83

1  that a little more later, too.
2      H -- we're almost done with
3  this -- Your past and present policies
4  related to due diligence following the
5  detection of a suspicious order.
6      So you are listed here.  I
7  assume Frank and Sergio could also talk
8  on this topic as well?
9      A.   Yes.
10     Q.   And based on what you've
11 told me so far, would it be a true
12 statement that due diligence, in the
13 Schein system, was done before detection
14 of a suspicious order and not after?
15     A.   Correct.
16     Q.   That is, you didn't consider
17 an order suspicious until you conducted
18 due diligence and that due diligence
19 found that it was an order that should
20 not be shipped --
21     A.   That's right.
22     Q.   -- is that correct?
23     The next topic, I, Your past
24 and present policy, procedures, standards

Page 84

1  and metrics used to identify orders of
2  unusual size, orders deviating
3  substantially from normal pattern, and
4  orders of unusual frequency.
5      You're listed here.  I
6  assume Sergio and Frank are also people
7  with knowledge on this topic?
8      A.   I would say Sergio.
9      Q.   Okay.  And of that, you're
10 saying that -- you understand that the
11 language of unusual size, pattern and
12 frequency, that that comes out of what's
13 called the Controlled Substances Act?
14     A.   Yes.
15     Q.   All right.  And you know
16 that that act was -- became effective, as
17 amended for this purpose, in 1971?
18     A.   Yes.
19     Q.   And that's been the law
20 since 1971?
21     A.   Yes.
22     Q.   And, that is, the statutory
23 definition of suspicious order under the
24 Act?

Page 85

1      MR. JONES:  Objection.
2  Form.  Misstates the law.
3      THE WITNESS:  Yes.
4  BY MR. MIGLIORI:
5      Q.   All right.  And you're here
6  to talk about those policies and
7  procedures and how they've changed over
8  time, correct?
9      A.   Correct.
10     Q.   How your policies,
11 procedures, standards, and metrics used
12 to identify suspicious orders has changed
13 over time.
14     I don't even know how that's
15 different from the other, but you're here
16 for that?
17     A.   Yes.
18     Q.   All right.  Subject K, on
19 Page 13, Your policies, procedures,
20 standards and metrics used to set and/or
21 alter thresholds.
22     Are you familiar with the
23 process of setting a threshold?
24     A.   Yes.

Page 86

1  Q.   And you understand what a
2  threshold is?
3      A.   Yes.
4      Q.   Are thresholds today at
5  Schein calculated on an individual
6  customer basis?
7      A.   No.
8      Q.   Have they ever been
9  calculated based on an individual's
10  dispensing or purchasing history?
11      A.   No.
12      Q.   At Schein, it has always
13  been the policy to set thresholds based
14  on groups of physicians or similar
15  practitioners and their dispensing or
16  ordering histories, correct?
17      A.   Depending on the time frame.
18      Q.   Right.  And so -- but it's
19  never been the case that a suspicious
20  order threshold has been set based on the
21  individual's ordering practices himself
22  or herself, correct?
23      A.   We did begin to set
24  individual thresholds earlier this year.

Page 87

1      Q.   In 2018?
2      A.   In 2018.
3      Q.   Okay.  Prior to that, it had
4  always been aggregated, correct?
5      A.   Correct.
6      Q.   L, Your policies and
7  procedures used to perform due diligence
8  related to new and existing buyers of
9  controlled substances.
10      You're here to talk about
11  the onboarding of new clients.
12      Do you understand that?
13      A.   Yes.
14      Q.   And in that process, that
15  changes over time at Schein about what,
16  if any, due diligence needed to be done
17  for bringing a new client on board,
18  correct?
19      A.   Correct.
20      Q.   And who, at what level in
21  the company, was best suited to make
22  decisions about due diligence relative to
23  a new client, correct?
24      MR. JONES:  Objection.

Page 88

1  Form.  Vague.
2      THE WITNESS:  I'm sorry,
3  could you restate that question?
4  BY MR. MIGLIORI:
5      Q.   Are you familiar with any
6  changes over time with respect to what
7  level person within the company could not
8  just perform the due diligence but also
9  clear a new client for controlled
10  substances?
11      A.   Yes.
12      Q.   All right.  And those due
13  diligence files for onboarding of new
14  customers, are those maintained in the
15  same place that we've discussed earlier,
16  in the imaging files of the company in
17  the JWE system?
18      A.   Yes.
19      Q.   Let me just ask a question
20  in particular about it.
21      Today, if a doctor had a
22  prior history of criminal conviction for
23  a drug-related offense, today, under
24  Schein's system, would that client be

Page 89

1  allowed to become a customer of the
2  company?
3      MR. JONES:  Objection.
4  Form.  Vague.
5      THE WITNESS:  Potentially.
6  BY MR. MIGLIORI:
7      Q.   And what would be the
8  analysis?
9      A.   We would go through our Know
10  Your Customer due diligence process.
11      Q.   And if that client -- if
12  that doctor client lost his or her
13  license as a result of that conviction
14  and got his or her license back, would
15  that change whether or not that client
16  would be allowed to purchase controlled
17  substances from Schein?
18      MR. JONES:  Objection.
19  Form.
20      THE WITNESS:  Well, they
21  would have to have a license in
22  order to purchase from us.
23  BY MR. MIGLIORI:
24      Q.   Is that the only thing that

Page 90

1 they need to demonstrate?
2     A.   No.
3     Q.   What else do they need to
4 demonstrate, with that history?
5     A.   We need to show that the due
6 diligence supports that customer
7 purchasing those products.
8     Q.   And within due diligence,
9 what are you looking for, that a person
10 with a felony criminal conviction for a
11 drug-related offense and a loss of
12 medical licensure, with a renewed
13 license, looking to come back on board as
14 a customer, what else are you looking for
15 in due diligence to say, yes, that's a
16 customer that Schein will take?
17         MR. JONES:  Object to the
18     form.
19         THE WITNESS:  It would be on
20     a case-by-case basis.  There's
21     nothing specific, per se.
22 BY MR. MIGLIORI:
23     Q.   You perform due diligence
24 and you oversee people that perform due

Page 91

1 diligence, correct?
2     A.   Yes.
3     Q.   And you -- have you
4 experienced doctors who have lost their
5 license and have served felony
6 convictions for drug-related offenses who
7 have then come out and become a new
8 customer of Schein?
9     A.   Yes.
10     Q.   And what about that
11 customer, in your experience, made that a
12 person that you felt was an appropriate
13 client for Schein?
14     A.   In many cases, you know, as
15 I said, we go through the due diligence
16 process.  And depending on the severity
17 of the offense.
18     Q.   Okay.  And what in the due
19 diligence do you ask?  Are there special
20 questions you ask that new client?
21     A.   We would go through pretty
22 much a similar process.  A customer could
23 receive an on-site audit, potentially.
24     Q.   So if the office is clear

Page 92

1 and nobody else in the office has
2 drug-related offenses, is that enough?
3     A.   It's hard to say without a
4 specific set of circumstances that we
5 would evaluate.
6     Q.   How many times, in your
7 experience, or within the company, to
8 your knowledge, has Schein taken back or
9 started a new relationship with a doctor
10 that lost a license and had a prior
11 felony conviction for a drug-related
12 offense?
13     A.   I would say not very many.
14     Q.   Less than ten?
15     A.   I would say so, yes.
16     Q.   Do you know of any in the
17 state of Ohio?
18     A.   Not to my recollection, no.
19     Q.   All right.  Category M --
20 there's only two more -- Your past,
21 present programs, policies and procedures
22 relating to the maintenance of effective
23 controls against diversion.
24         Are you the person here to

Page 93

1 talk about that program?
2     A.   Yes.
3     Q.   And do you understand that
4 program at Schein to effectively be the
5 suspicious order monitoring program and
6 its history?
7         MR. JONES:  Objection to the
8     form.
9         THE WITNESS:  Yes.
10 BY MR. MIGLIORI:
11     Q.   Is there any other program
12 within Schein, aside from the suspicious
13 order monitoring program, that we'll
14 speak about today, that you fit -- you
15 think would also be included in a program
16 for maintaining effective controls
17 against diversion?
18     A.   License verification.
19     Q.   So the suspicious order
20 monitoring program and the license
21 verification program are the two
22 component parts of Schein's maintenance
23 and effective control against diversion;
24 is that a fair statement?

Page 94

1 A. Including Know Your Customer
2 due diligence, yes.
3 Q. Which is within --
4 A. Which is within the
5 suspicious order monitoring.
6 Q. And then the last topic is,
7 Your past and present interpretation,
8 agreement or disagreement with the
9 positions or arguments asserted in the
10 brief related to HDMA.
11 Your counsel says in here
12 that nobody is going to present on this.
13 I'm okay with that for now.
14 But let me ask you a
15 question about the HDMA.
16 Are you familiar with the
17 Healthcare Distributor Management
18 Association, or the -- what's now called
19 Healthcare Distribution -- Distributors
20 Association?
21 A. I know who they are, yes.
22 Q. Are you an active member of
23 it yourself?
24 A. No.

Page 95

1 Q. You understand that Henry
2 Schein, Inc. is a member of the HDA?
3 A. Yes.
4 Q. And, in fact, you have a
5 person that sits on the board of the
6 HDMA?
7 A. I'm not sure who it is.
8 Q. Okay. Have you ever
9 attended an HDMA event? Seminar?
10 A. No.
11 Q. Are you familiar with the
12 HDA's guidance relative to suspicious
13 order monitoring programs that was issued
14 in 2008?
15 A. Not directly. Maybe through
16 conversations with regulatory.
17 Q. And so when you started to
18 get trained in late October, I guess, of
19 2009 on suspicious order monitoring
20 programs, do you recall ever being shown
21 or taught that the HDA issued a guidance
22 for all distributors in the United
23 States?
24 A. Maybe through a

Page 96

1 conversation.
2 Q. And do you know who that
3 conversation would have been with, if you
4 had one?
5 A. It would have been with
6 Sergio Tejeda.
7 Q. Okay. Are you familiar
8 with -- he's a very good-looking guy --
9 Louis Ferraro?
10 A. I know him, yes.
11 Q. And he's a vice president
12 today of generic pharmaceutical sourcing
13 and administration at Henry Schein?
14 A. I believe so, yes.
15 Q. And he also sits on the
16 board of the HDA.
17 Are you aware of that?
18 A. I am now, yes.
19 Q. Have you ever had any
20 conversations with him about the HDA or
21 the guidances as it relates to suspicious
22 order monitoring programs?
23 A. No.
24 Q. The last part of this notice

Page 97

1 I sent you in Exhibit-2 has a component
2 that is asking you to bring documents
3 with you that you rely on.
4 Did you bring any documents
5 with you today?
6 A. No, I did not.
7 Q. The documents that you
8 reviewed in preparation for today, were
9 they given to you in a binder of some
10 sort, or were they just shared with you
11 one by one?
12 A. In a binder.
13 Q. And did you take that binder
14 home in between your meetings and review
15 them?
16 A. Yes.
17 Q. And do you still maintain
18 that binder?
19 A. Yes.
20 Q. But as you sit here today,
21 you haven't brought any documents with
22 you that you used to help you educate
23 yourself to serve in this role as a
24 person knowledgeable on these various

Page 98

1 topics?
2    A.   Correct.
3         MR. MIGLIORI:  Do you want
4 to take a break?  I can keep
5 going, or we can take a break.
6 It's been about an hour and 15.
7         MR. JONES:  If you're at a
8 stopping point.
9         VIDEO TECHNICIAN:  The time
10 is now 10:19 a.m.  We're going off
11 the record.
12              - - -
13         (Whereupon, a brief recess
14 was taken.)
15              - - -
16         VIDEO TECHNICIAN:  The time
17 is now 10:35 a.m.  We are back on
18 the record.
19              - - -
20         (Whereupon, Exhibit
21 Schein-Abreu-3, Amended Objections
22 and Responses  to Plaintiffs'
23 First Combined Discovery Requests,
24 was marked for identification.)

Page 99

1              - - -
2 BY MR. MIGLIORI:
3    Q.   I'm going to do this very
4 quickly, but in this case, we received
5 some documents responsive to certain
6 questions from your company.  This
7 Exhibit Number 3 is the document that
8 references what's been produced, in part,
9 okay?
10    A.   Okay.
11    Q.   Have you, first of all, seen
12 this document before?
13    A.   This document --
14    Q.   Yes.
15    A.   -- here?
16         I don't believe so, no.
17    Q.   Do you know whether you
18 participated in gathering documents that
19 are responsive to our request for
20 information, documents?
21    A.   Yes, I did.
22    Q.   And the sources of
23 information that you went to, to help
24 find documents, included the JWE system,

Page 100

1 correct?
2    A.   Correct.
3    Q.   The internal local drives of
4 the company, correct?
5    A.   Correct.
6    Q.   Any other systems?
7    A.   No.  I don't believe so, no.
8    Q.   Do you maintain any reports,
9 data -- strike that.
10         So you have a platform for
11 your customer client bases, correct?
12    A.   Right.
13    Q.   And what do we call that
14 again?
15    A.   I'm sorry?
16    Q.   What's the name of the
17 database that you oversee for clients?
18    A.   For -- JD Edwards.
19    Q.   That's all part of the same
20 database?
21    A.   Yes.
22    Q.   Any other platforms that you
23 would look to, to answer any questions
24 about where documents are, other than

Page 101

1 those that you've mentioned?
2    A.   No.  Just, maybe, something
3 on my own computer, but --
4    Q.   Do employees of Schein
5 maintain documents locally on their own
6 computers that are not connected to a
7 main server?
8    A.   Yes.
9    Q.   And do employees of Schein
10 maintain documents, hard copies of
11 documents, in their own files that are
12 not part of a computerized system?
13    A.   Yes.
14    Q.   Yes?
15    A.   Yes.
16    Q.   Did you do any searching in
17 the hard files or the local computers of
18 certain employees in efforts to help be
19 responsive to document requests?
20    A.   Yes.
21    Q.   All right.  And were all of
22 those searches, on your part, directed by
23 counsel for you, that is, were they
24 specific instructions that you received

Page 102

1  to look for certain things?
2      A.   Yes.
3      Q.   And over what period of time
4  did you do that?
5      A.   Sorry, the timeline for the
6  request, or the time period for me to do
7  it?
8      Q.   Your effort to do it.
9          When did you do that?
10     A.   I guess it's been over the
11  last couple of months.
12     Q.   And did you produce, in
13  fact, documents that were responsive to
14  certain requests?
15     A.   Yes.
16     Q.   Do you know anybody else in
17  your company that was also asked to
18  perform that same task, to your
19  knowledge?
20     A.   Yes.
21     Q.   Who else?
22     A.   It would be Sergio Tejeda
23  and, I believe, Frank O'Regan as well.
24     Q.   Anyone else you can think

Page 103

1  of?
2      A.   I don't think so, no.
3      Q.   If you go to Page 6 of this
4  Exhibit-3, there's a response to the
5  first question asking for transactional
6  data of the company.
7          Do you have access yourself
8  to the transactional data of Henry
9  Schein?
10     A.   Yes.
11     Q.   And where is that
12  information stored and located?
13     A.   It would be in our JDE
14  system.
15     Q.   JDE system?
16     A.   Yes.
17     Q.   Have I been saying a
18  different letter?
19     A.   Have you?
20     Q.   Maybe.
21         So if I said JWE, it would
22  be -- I would be wrong, that it's the JDE
23  system?
24     A.   Yes, yes.

Page 104

1      Q.   And there's only one system
2  that begins with a J and ends with an E,
3  correct?
4      A.   I think so.
5      Q.   All right. I just want to
6  make sure. I apologize.
7          So you go into the JDE
8  system to find transactional data?
9      A.   Correct.
10     Q.   And how far back does the
11  transactional data go, to your knowledge?
12     A.   It went back to 2009,
13  January of 2009.
14     Q.   Do you know what happened to
15  the transactional data before 2009?
16     A.   It would have been purged.
17     Q.   And what system was it on at
18  that point?
19     A.   Sorry?
20     Q.   Was it on a different
21  platform then?
22     A.   No. It still would have
23  been on JDE.
24     Q.   It was just purged because

Page 105

1  it was -- a decision was made to purge
2  prior to 2009?
3      A.   Yes. It would have been
4  from our IT team.
5      Q.   And do you know when that
6  purging happened?
7      A.   No, I don't.
8      Q.   Do you know the retention
9  policy of the company relative to
10  transactional data?
11     A.   I'm familiar with the
12  retention policy, yes.
13     Q.   What is your understanding
14  of it?
15     A.   My understanding, I believe,
16  is seven years.
17     Q.   Would that apply to
18  suspicious order monitoring records as
19  well?
20     A.   I don't believe those are
21  purged to the best of my --
22     Q.   So if there was a suspicious
23  order within the Henry Schein company, to
24  your knowledge, that information would

Page 106

1 not have been purged?
2      A.   After 2009.
3      Q.   After 2009.
4          Prior to 2009, were the
5 suspicious orders -- is this what was on
6 the microfilm, or was this something
7 else?
8      A.   No.  It's something else.
9      Q.   So a decision was made, at
10 some point, to purge the transactional
11 data and the suspicious order monitoring
12 data prior to 2009?
13     A.   I guess, yes.
14     Q.   And it's your understanding
15 that both of those types of information
16 were purged at the same time?
17     A.   That, I don't know.
18     Q.   But do you think the start
19 date for the purge or the end date for
20 the purge would be the same?
21     A.   I just know that we have the
22 data from January 2009 going forward.
23     Q.   Have you asked whether that
24 data prior to 2009 was stored or backed

Page 107

1 up somewhere else?
2      A.   Yes.
3      Q.   And what was the answer to
4 that question?
5      A.   That we don't have it.
6      Q.   And who gave you that
7 answer?
8      A.   Our IT team.
9      Q.   Who at the IT team?
10     A.   The director, I believe, of
11 IT.
12     Q.   And that director's name is
13 what?
14     A.   Gavin Dsouza.
15     Q.   Could you spell the last
16 name?
17     A.   I think it's D-S-O-U-Z-A.
18     Q.   Same for pending orders,
19 would those have been purged prior to
20 2009, pended orders?
21     A.   Yes.
22     Q.   But policies, procedures,
23 those types of documents were not purged,
24 correct?

Page 108

1      A.   Referring to SOPs?
2      Q.   Correct.
3      A.   Correct.
4      Q.   All right.  So databases
5 relative to clients' suspicious orders
6 transactions were purged for all records
7 prior to 2009?
8          MR. JONES:  And I'm just
9 going to make an objection.  This
10 is outside the scope for which
11 he's designated as a 30(b)(6)
12 witness.
13         I assume you're asking him
14 his personal understanding.
15         MR. MIGLIORI:  I don't think
16 so.  Because I asked -- it asks
17 about past and present suspicious
18 orders.  I'm trying to keep it to
19 the topics that we're talking
20 about.
21         MR. JONES:  I'm not sure --
22 I'm sorry.  Go ahead.
23         MR. MIGLIORI:  Transactions
24 are related because the

Page 109

1 transactions are what are being
2 monitored.  Suspicious orders
3 would be the -- those that didn't
4 make it through the system and the
5 pended orders would be something
6 in the middle.
7          So I'm not trying to be
8 obstreperous or short-circuit this
9 process.  I think they are within
10 the scope of his testimony.
11         MR. JONES:  And I understand
12 where you're coming from.  Insofar
13 as he's answering questions about
14 the nuances of the technology and
15 policies related to overall
16 document policies, you know,
17 that's probably something that
18 he's not here to testify about.
19         But, obviously, if he knows
20 in his personal capacity, he can
21 tell you.
22         MR. MIGLIORI:  Right now I'm
23 just more interested in the
24 information, anyway.

Page 110

BY MR. MIGLIORI:

Q. So if it's only based on your understanding, I'm okay with that answer, and you can tell me that.

But my question is simply, the transactional data of Henry Schein relative to controlled substances, the pended orders that were reported and the suspicious orders that were deemed and reported, those files, those records at Henry Schein are all purged if they are prior to 2009; is that your understanding?

A. That's my understanding.

Q. All right. The policies and procedures, the handbooks, the revisions, those were not purged, to your knowledge, in 2009, correct?

A. Correct.

Q. You've reviewed a lot of those procedures that predate 2009, correct?

A. Correct.

Q. And the person that would

Page 111

have the most knowledge about when those records were purged and why would be the director of IT?

MR. JONES: Objection. Form.

You can answer if you know.

BY MR. MIGLIORI:

Q. To your knowledge.

A. I believe so.

Q. Have you reviewed any suspicious order databases for your testimony here?

A. I'm sorry, when you say "databases"?

Q. Files, records.

A. Yes.

Q. Have you reviewed any -- yes.

If you went into the system, could you print out a list of all suspicious orders in a state, particular state?

A. Me personally, no.

Q. Is it feasible within your

Page 112

system to do that?

A. Yes.

Q. And who would you ask to do that, if you had to run that report?

A. Our IT team.

Q. And starting with the director?

A. Yes.

Q. All right. And if you look further in Exhibit-3, there are responses relative to finding suspicious orders.

We -- and your counsel will argue about whether the answers are responsive or complete or whatever. I'm referring you only to this for one purpose, which is simply, did you help gather any information about whether or not suspicious orders existed in Ohio or within Summit County?

A. I'm sorry, which part of the document?

Q. Page 6, Question Number 2, we can start with.

Question 2 asks for the SOM

Page 113

systems themselves. And there's 141 pages that were produced in response to that.

The next question --

MR. JONES: Just so we're clear, it's 441.

MR. MIGLIORI: I'm sorry. That was my bad.

BY MR. MIGLIORI:

Q. 441 pages produced.

And then on Number 3 it says, suspicious orders -- it asks for any suspicious orders beginning at a certain date.

But the answer says that there were none in Summit County.

Were you involved with gathering any of that data?

A. Yes.

Q. And did you look and search for Summit County suspicious orders going back to 2006?

A. Yes.

Q. And is this, in part, this

Page 114

1  answer that there were none that could be
2  found in Summit County, was that an
3  answer that was consistent with your
4  investigation into that?
5       A.   Yes.
6       Q.   Did you look for suspicious
7  orders in the state of Ohio beyond Summit
8  County?
9       A.   No.
10       Q.   Did you look for suspicious
11  orders throughout the country?
12       A.   Responsive to this?
13       Q.   To respond to this question.
14       A.   No.
15       Q.   Does that information exist
16  in the system that you were looking at?
17       A.   Yes.
18       Q.   And then there are several
19  different ways of asking different
20  questions about suspicious orders.
21            But is it fair to say, as
22  you sit here today, at least relative to
23  Summit County, you're aware of no
24  suspicious orders that have been reported

Page 115

1  to the DEA relative to any Schein clients
2  or customers from 2006 to the present,
3  correct?
4            MR. JONES:  Objection.
5       Form. Objection. Vague. Overly
6       broad.
7  BY MR. MIGLIORI:
8       Q.   Is that correct?
9       A.   So we did report orders to
10  DEA during that time period, the monthly
11  reports that we discussed earlier.
12       Q.   The pended orders?
13       A.   Correct.
14       Q.   So let's break that down.
15            You'll agree with me that
16  Henry Schein has always had the
17  obligation, relative to controlled
18  substances, to report the transactions to
19  DEA on a quarterly basis, correct?
20       A.   Correct.
21       Q.   And those transactions are
22  reported into what's called the ARCOS
23  database, correct?
24       A.   Correct.

Page 116

1       Q.   In addition to that, there
2  is, federally, a requirement that you
3  report suspicious orders to the DEA,
4  correct?
5       A.   Correct.
6       Q.   And at least under the
7  statute that the suspicious order
8  monitoring program addresses, that those
9  suspicious orders are to be reported when
10  discovered, correct?
11            MR. JONES:  Objection.
12       Form. Vague.
13            THE WITNESS:  Sorry, can you
14       restate the question?
15  BY MR. MIGLIORI:
16       Q.   Sure.
17            You're supposed to report
18  suspicious orders when you discover them,
19  correct?
20       A.   Correct.
21            MR. JONES:  Objection.
22       Form.
23  BY MR. MIGLIORI:
24       Q.   And in addition to that,

Page 117

1  you're telling me that Schein reported
2  monthly what it called pended orders,
3  correct?
4       A.   Correct.
5       Q.   And those were orders that
6  triggered based on an excessive threshold
7  for that group of doctors, correct?
8            MR. JONES:  Objection.
9       Form. Objection as to overly
10       broad as to time.
11  BY MR. MIGLIORI:
12       Q.   Today.
13       A.   We reported orders that
14  pended, yes; and that we reported orders
15  that were pended and cancelled.
16       Q.   Pended and cancelled is your
17  definition of a suspicious order,
18  correct?
19       A.   Potentially.
20       Q.   Is there a pended and
21  cancelled that is not suspicious?
22       A.   Could be.
23       Q.   So -- and we've already said
24  that it's only after Masters, so,

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  basically, beginning in 2018, that you
2  started reporting suspicious orders
3  before due diligence, correct?
4         MR. JONES:  Objection.
5     Form.  It's not it was part of his
6     testimony.
7         THE WITNESS:  I'm sorry?
8         MR. MIGLIORI:  We already
9     covered it.  I don't have to do it
10    again.
11 BY MR. MIGLIORI:
12    Q.   You found no reports of
13 suspicious orders in Summit County
14 beginning in 2006, correct?
15    A.   The ones we did report
16 monthly to DEA, we reported.
17    Q.   I want to be very specific,
18 because you reported different things,
19 and I want to make sure we're talking
20 about the same thing.
21       In helping to respond to the
22 answers in Exhibit Number 3, you looked
23 at the database, the files of Schein, to
24 find whether or not there were any -- as

Page 119

1  the request specifically says, any
2  suspicious orders in Summit County;
3  that's what you were asked to look for,
4  correct?
5     A.   Correct.
6     Q.   And you found none, correct?
7     A.   Correct.
8     Q.   That is, at least you went
9  back in time to 2006.
10       And from 2006 until today,
11 you found no suspicious orders reported
12 by Henry Schein, Incorporated for Summit
13 County, Ohio, correct?
14       MR. JONES:  Object to the
15    form.  Vague.  Overly broad.
16    Also, the statement that you're
17    referencing in Exhibit-3, subject
18    to our limitations, clarifications
19    and objections.
20       MR. MIGLIORI:  I'm just
21    asking only about your search,
22    okay?  I'm not asking about any of
23    the other aspects of this
24    question.

Page 120

1  BY MR. MIGLIORI:
2     Q.   You were asked to go look
3  for information to be responsive to this
4  question, correct?
5     A.   Correct.
6     Q.   One of the things you did is
7  you went into your JDE system and you
8  looked where you would find suspicious
9  orders, correct?
10    A.   Correct.
11    Q.   And you did that for Summit
12 County, Ohio, correct?
13    A.   Yes.
14    Q.   And you were told to start
15 in January of 2006, correct?
16    A.   Correct.
17    Q.   And when you did that, you
18 produced zero suspicious orders that are
19 responsive to that question, correct?
20       MR. JONES:  Objection.
21    Form.  Vague as to "suspicious
22    orders."
23 BY MR. MIGLIORI:
24    Q.   You're here to talk about

Page 121

1  suspicious orders, right?
2         MR. JONES:  Objection.
3     Overly broad.
4  BY MR. MIGLIORI:
5     Q.   You've been designated as a
6  person to talk about suspicious orders
7  today, correct?
8     A.   Yes.
9     Q.   You understand what a
10 suspicious order is, under Henry Schein's
11 definition anyhow, correct?
12    A.   Yes.
13    Q.   Under Henry Schein's
14 definition, did you find any suspicious
15 orders in Summit County from 2006 to
16 today?
17    A.   From 2009 to today, no.
18    Q.   The request here says from
19 2006.
20    A.   Right.
21    Q.   Did you not -- you couldn't
22 go back --
23    A.   We couldn't go back to 2006.
24    Q.   So the limitation here,

Page 122

1 which -- I'm glad you told me, because
2 that's actually not clear here.
3            You were told to go back to
4 2006 to find suspicious orders in Summit
5 County and you went back to 2009 because
6 that's all you could find; is that fair?
7    A.   Fair, yes.
8    Q.   And in going back to 2009,
9 you found no suspicious orders in Summit
10 County, based on Schein's definition of
11 suspicious orders?
12    A.   Correct.
13    Q.   Is there another definition
14 of suspicious orders that you went to go
15 look back at the same data for?
16    A.   No.
17    Q.   If a suspicious order -- did
18 you go back and look for -- strike that.
19            Did you go back and look for
20 pended orders?
21    A.   Yes.
22    Q.   And did you find pended
23 orders in Summit County?
24    A.   Yes.

Page 123

1    Q.   And you'll see that there
2 are no pended orders referenced here.
3 I'll ask you to take my representation,
4 but you're welcome to look.
5            When asked about suspicious
6 orders, you didn't respond -- or you
7 didn't find or report pended orders in
8 your search for documents, did you?
9    A.   I believe there were -- I
10 believe there were three for Summit
11 County, pended orders.
12    Q.   And, again, you were asked
13 to go back to 2006; you could only go
14 back to 2009 because those documents had
15 been purged between 2006 and 2009,
16 correct?
17    A.   The data had been purged.
18    Q.   So in your search from 2009
19 to present, you believe that there were
20 three pended orders in Summit County?
21    A.   Correct.
22    Q.   Do you recall the dates of
23 those pended orders?
24    A.   No.

Page 124

1    Q.   Did you produce a list of
2 those three pended orders to counsel?
3    A.   Yes.
4    Q.   That list of three pended
5 orders, what were -- in the years that
6 they were pended, what would have been
7 the definition of a pended order to cause
8 them to be deemed pended?  By what
9 definition were they pended?
10    A.   I don't remember -- I don't
11 recall the time frame of the pend.
12    Q.   Is it fair to say that since
13 2009, after the revamp of the suspicious
14 order monitoring program was implemented,
15 that pended orders had the same
16 definition?
17            MR. JONES:  Objection.
18 Form.
19 BY MR. MIGLIORI:
20    Q.   Isn't that a fair statement?
21    A.   Can you clarify that?
22    Q.   Sure.
23            Since 2009, the definition
24 of pended really hasn't changed at

Page 125

1 Schein, has it?
2    A.   No.
3    Q.   All right.  So what would
4 have made these three Summit County
5 orders pended?  What were the different
6 things that could have pended those three
7 orders?
8    A.   So it could have been -- it
9 could have been for size, frequency or
10 pattern.  It could have been a first-time
11 active ingredient.  Or it could be that,
12 you know, there wasn't enough history
13 available, potentially, to score a
14 customer's particular order.
15    Q.   And do you know the
16 customers for those, any of those three
17 pended orders?
18    A.   No.
19    Q.   But that's information you
20 provided to counsel?
21    A.   Yes.
22    Q.   And so by Schein's
23 definition, those pended orders had to
24 have some component within the system to

Page 126

1 trigger a concern, correct?
2     A.   To trigger a pend.
3     Q.   And as of 2009, the
4 triggering of a pend, unless it's a new
5 client, is an algorithm, that is, it's a
6 computer trigger, isn't it?
7     A.   It's a computer trigger,
8 yes.
9     Q.   So it would have had to have
10 been some change or deviation in size,
11 frequency or pattern at some level to
12 cause it to be questioned, correct?
13     A.   Unless it was a first-time
14 purchase of a particular ingredient.
15     Q.   Right.  But even that would
16 be triggered electronically, correct?
17     A.   Correct.
18     Q.   And that's part of the
19 algorithm, at least as of 2009?
20     A.   Yes.
21     Q.   And then who gets that
22 trigger?  Who is told, we need to look at
23 this, this is now pended?
24     A.   The system will write the

Page 127

1 pend into the system, and then it would
2 be reviewed by my team in verifications.
3     Q.   All right.  And so your team
4 would get it, and then there would be a
5 review process at your level, and if
6 necessary, a review process at the
7 regulatory level?
8     A.   That's right.
9     Q.   Do you know whether these
10 three pends were reviewed and cleared?
11     A.   I don't -- I'm not sure.
12     Q.   You didn't investigate that?
13     A.   No.
14     Q.   Do you know whether
15 regulatory got involved with any of these
16 pends?
17     A.   I'm not sure.
18     Q.   Under your system, at least
19 as of 2009, a pend would have necessarily
20 required a due diligence follow-up,
21 correct?
22     A.   Say that one more time.  I'm
23 sorry.
24     Q.   As of 2009 --

Page 128

1     A.   Yes.
2     Q.   -- these three pends in
3 Summit County would have necessarily
4 triggered a due diligence inquiry,
5 correct?
6     A.   Correct.
7     Q.   And that would have included
8 a letter to the customer, correct,
9 requesting information?
10     A.   A questionnaire, yes.
11     Q.   It would have, by 2009, also
12 included a phone call to the customer,
13 correct?
14     A.   Potentially, yes.
15     Q.   Which would be done by the
16 verification team, typically?
17     A.   Yes.
18     Q.   All of this level of due
19 diligence is done by your verification
20 team, correct?
21     A.   The preliminary --
22     Q.   Yes.
23     A.   -- yes.
24     Q.   So in the preliminary due

Page 129

1 diligence, we have a questionnaire, we
2 have, potentially, a phone call.
3         What other things might have
4 happened with respect to this -- these
5 three pends in Summit County?
6     A.   Referring to the specific
7 time frame of the pend?
8     Q.   Yeah.  What are the
9 possibilities of initial review in due
10 diligence after 2009?
11         MR. JONES:  Objection.
12     Overly broad as to time.
13         Go ahead.
14         THE WITNESS:  So I guess it
15     depends on when the pend took
16     place; so, you know, depending on
17     the year.  The due diligence
18     process has evolved.
19 BY MR. MIGLIORI:
20     Q.   Okay.  What was it in 2009?
21     A.   It would be a questionnaire
22 or a phone call, as you stated.
23     Q.   So you send out a
24 questionnaire and that questionnaire

Page 130

1  would come back within a certain amount
2  of time, correct?
3      A.   Correct.
4      Q.   It's all done by regular
5  mail, correct?
6      A.   No.  We would fax on
7  occasion.
8      Q.   That questionnaire would
9  come back.  And the verification team
10  could take that questionnaire, and we
11  have some we can show, if you need, but
12  take that questionnaire and a decision
13  could be made right there at verification
14  that it's okay to clear this for
15  shipment, correct?
16      A.   Depending on the
17  circumstances, yes.
18      Q.   And if a follow-up phone
19  call happened, who would make that call?
20      A.   It could be somebody from my
21  team in verifications.
22      Q.   All right.  What other
23  potential aspects of due diligence, from
24  the verification team, could happen from

Page 131

1  2009 up to today?
2      A.   Up to today?
3      Q.   Yes.
4      A.   We would get -- we would
5  still request the customer to fill out
6  the questionnaire.
7           And in today's world, you
8  know, we would perform Internet searches
9  of the customer, check all their licenses
10  at the state and federal level, review
11  product history.
12      Q.   Okay.  You would check
13  licenses in 2009, too, correct?
14      A.   Yes.
15      Q.   That was -- has been a part
16  of verification since you got there,
17  correct?
18      A.   Correct.
19      Q.   All right.  And then you
20  would report that pend, on a monthly
21  basis, to DEA in 2009, correct?
22      A.   Correct.
23      Q.   And you did that through
24  2017, until you changed that process

Page 132

1  after Masters, correct?
2           MR. JONES:  Objection.
3           THE WITNESS:  No.  That was
4      changed --
5  BY MR. MIGLIORI:
6      Q.   Go ahead.
7      A.   That was changed in 2015.
8      Q.   2015.
9           What caused that reporting
10  process to change relative to pended
11  orders?
12      A.   It was based on guidance
13  that we had received from industry and
14  from DEA expectations.
15      Q.   Okay.  Did you, in 2009,
16  also report pended orders to the state of
17  Ohio?
18      A.   I don't recall.
19      Q.   Are you aware of the Ohio
20  requirements to report controlled
21  substances and suspicious orders?
22           MR. JONES:  Objection.  Goes
23      outside the scope.
24           MR. MIGLIORI:  I don't know

Page 133

1  that it is.  But I'll accept
2  whatever his answer is as to
3  whether or not he's aware of it.
4           THE WITNESS:  I'm aware of
5      it now.
6  BY MR. MIGLIORI:
7      Q.   When did you become aware of
8  the Ohio reporting requirements?
9      A.   I don't -- I don't recall.
10      Q.   Do you know if today Schein
11  reports to Ohio its pended orders?
12      A.   Pended orders?
13      Q.   Pended orders.
14      A.   I'm not sure.
15      Q.   Do you know if today Schein
16  reports its suspicious orders to the
17  state of Ohio?
18      A.   Yes.
19      Q.   And to which part, division,
20  of the Ohio government do you report
21  those?
22      A.   I believe it's Board of
23  Pharmacy.
24      Q.   And when, if you know, did

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  Schein begin reporting suspicious orders
2  to the Board of Pharmacy?
3      A.  I'm not sure.
4      Q.   Is the definition that you
5  use for suspicious orders for Ohio the
6  same as the definition that you, Henry
7  Schein, use for suspicious orders for DEA
8  purposes?
9      A.  Yes.
10     Q.   So the only reporting you
11 would do to the Board of Pharmacy to Ohio
12 for suspicious orders would be those
13 orders that have pended, been
14 investigated in due diligence, and
15 cancelled, correct?
16     A.  Yes.
17         MR. JONES:  Objection to
18 form.
19 BY MR. MIGLIORI:
20     Q.   And the database for the
21 Ohio reporting of those suspicious orders
22 is located where?
23     A.  I'm sorry?
24     Q.   Is it the same database for

Page 135

1  reporting Ohio suspicious orders that you
2  use for DEA suspicious orders?
3      A.   Internally?
4      Q.   Yes.
5      A.   Yes.
6      Q.   So if I wanted a list of all
7  Ohio suspicious orders, you would look in
8  the same place that you look for DEA
9  suspicious orders, correct?
10     A.   Correct.
11     Q.   But as you sit here today,
12 you only reported pended orders to the
13 DEA; you did not, at Schein, report
14 pended orders to Ohio's Board of
15 Pharmacy, correct?
16     A.   That's right.
17     Q.   Do you know if the three
18 pended orders that you found in Summit
19 County, from 2009 to present, were also
20 reported to the Ohio Board of Pharmacy?
21     A.   I don't know.
22     Q.   Do you know if the three
23 pended orders were cancelled in Summit
24 County?

Page 136

1          MR. JONES:  Objection.
2  Asked and answered.
3          MR. MIGLIORI:  I'm sorry if
4  I did.
5  BY MR. MIGLIORI:
6      Q.   Do you know if they were
7  cancelled?
8      A.   I don't know.
9      Q.   And do you know if they were
10 related to any criminal convictions of
11 any doctors in Summit County?
12     A.   I'm not sure.
13     Q.   Are you familiar with Dr.
14 Heim?
15     A.   No.
16     Q.   Are you aware of a
17 conviction of a doctor in Summit County
18 for controlled substance-related felonies
19 in 2014?
20         MR. JONES:  Objection.
21 Vague.
22         THE WITNESS:  I may have
23 been, but I don't recall.
24 BY MR. MIGLIORI:

Page 137

1      Q.   And so do you know whether
2  or not -- if -- strike that.
3          If there were a conviction
4  in Summit County of a physician relative
5  to, among other things, controlled
6  substances sold to him by Schein and due
7  diligence had been performed on the
8  ordering of that doctor, would that due
9  diligence exist in the same place that
10 you've already described within the JDE
11 system?
12         MR. JONES:  Objection.
13 Overly broad.  Calls for
14 speculation.
15         THE WITNESS:  Yes.
16 BY MR. MIGLIORI:
17     Q.   All right.  In your -- so
18 just to wrap up Exhibit-3, in your effort
19 to help counsel find documents responsive
20 to these document requests, you found,
21 from 2009 to present, no suspicious
22 orders that reported to the DEA or to the
23 Ohio Board of Pharmacy, correct?
24         MR. JONES:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    Compound.  Objection.  Vague.
2  BY MR. MIGLIORI:
3    Q.   Correct?
4    A.   Correct.
5    Q.   And you found three pended
6  orders that you understand were reported
7  to the DEA for three orders in Summit
8  County, Ohio, correct?
9    A.   I'm sorry?
10    Q.   You found three pended
11  orders for Summit County, Ohio --
12    A.   Yes.
13    Q.   -- in that time frame,
14  correct?
15    A.   Correct.
16    Q.   And do you know whether
17  those three pended orders were, in fact,
18  reported to DEA?
19    A.   I'm not sure, because of the
20  time frame.
21    Q.   Okay.  Is there a time frame
22  between 2009 and present when a pended
23  order would not have been reported to the
24  DEA?

Page 139

1    A.   After 2015, April 2015.
2    Q.   In April of 2015, you would
3  have stopped sending pended orders to the
4  DEA?
5    A.   That's correct.
6    Q.   And that guidance, the
7  industry guidance, what do you recall
8  about that, that dictated that you should
9  no longer send pended orders to DEA?
10    A.   That DEA was particularly
11  interested in orders that we deemed as
12  suspicious and not orders that pended, as
13  an order of interest.
14    Q.   So I understand the
15  definition, at Schein, up until today,
16  the mere fact that an order deviated from
17  size, frequency and pattern was not
18  enough -- is not enough to deem that
19  order suspicious, correct?
20    A.   You said up until today?
21    Q.   Yes.
22    A.   Correct.
23        MR. JONES:  Objection.  Form
24    as to time.

Page 140

1        MR. MIGLIORI:  Let me show
2  you Exhibit-4.
3        - - -
4        (Whereupon, Exhibit
5    Schein-Abreu-4, 21 C.F.R. 1301.74,
6    was marked for identification.)
7        - - -
8        MR. JONES:  Actually, I
9  withdraw that objection.
10        MR. MIGLIORI:  I wasn't
11  really going to give you any
12  credit for it, anyway.
13        MR. JONES:  I'm surprised
14  you're not over there issuing
15  rulings.
16        MR. MIGLIORI:  I am, just in
17  my head.
18  BY MR. MIGLIORI:
19    Q.   Yours has the sticker on it,
20  sir.
21        I'm not going to ask you to
22  interpret law.  This is just simply right
23  out of the Controlled Substances Act that
24  we've been talking about, upon which the

Page 141

1  suspicious orders -- and you certainly
2  have seen this before, correct?
3    A.   Yes.
4    Q.   This is sort of the
5  boilerplate that dictates all -- all
6  things?
7        MR. WICKS:  What exhibit is
8    this?
9        MR. MIGLIORI:  This is
10    Exhibit-4.
11  BY MR. MIGLIORI:
12    Q.   So, again, this is effective
13  as of 1971.
14        Were you born yet?
15    A.   No.
16    Q.   The registrant -- you
17  understand in the law that the registrant
18  means the manufacturer, distributor,
19  pharmacy that is in the business of
20  making, distributing and selling
21  controlled substances, correct?
22    A.   Yes.
23    Q.   All right.  That is, they
24  have to have a registration with the DEA

Page 142

1 in order to sell and distribute
2 controlled substances, correct?
3     A.   Correct.
4     Q.   And Henry Schein is a
5 registrant of the DEA, correct?
6     A.   Yes.
7     Q.   The registrant shall design
8 and operate a system to disclose to the
9 registrant suspicious orders of
10 controlled substances.
11         That's the mandate that
12 requires companies like yours to develop
13 a suspicious order monitoring program for
14 controlled substances, correct?
15     A.   Correct.
16     Q.   The registrant shall inform
17 the field division of the
18 administration -- that is, the DEA -- in
19 his area of suspicious orders when
20 discovered by the registrant.
21         Do you see that as part of
22 the requirement?
23     A.   Yes.
24     Q.   So when a suspicious order

Page 143

1 is discovered by the company, it shall
2 report that suspicious order to the field
3 division of the DEA.
4         Do you understand that to be
5 the requirement of this act?
6     A.   Yes.
7         MR. JONES:  And just so
8     we're clear, I'm sure this is what
9     it says, but this is something
10     that you've put together; this is
11     not an actual copy of the statute?
12     Because, obviously, it doesn't
13     have the whole CFR provision.
14         MR. MIGLIORI:  No.  If you
15     really want it, I've got it.
16         MR. JONES:  No.  I --
17         MR. MIGLIORI:  But it's just
18     for illustration purposes.
19         MR. JONES:  Got it.
20         MR. MIGLIORI:  And if there
21     are typos, it's probably mine and
22     not the statute.
23 BY MR. MIGLIORI:
24     Q.   The act then says,

Page 144

1 Suspicious orders include orders of
2 unusual size, orders deviating
3 substantially from a normal pattern and
4 orders of unusual frequency.
5         Were you aware that that was
6 a definition within the statute?
7     A.   Yes.
8     Q.   So once an order deviated in
9 size or pattern or frequency, under the
10 Act it was suspicious.
11         Do you see that?
12         MR. JONES:  Objection.
13     Form.  The statute speaks for
14     itself.  Also object to the extent
15     that it calls for a legal
16     conclusion.
17 BY MR. MIGLIORI:
18     Q.   First of all, do you see
19 that in the statute?
20     A.   Yes.
21     Q.   But that's not the
22 definition that Schein works with, with
23 respect to suspicious orders.
24         In the Schein system, what I

Page 145

1 just described there, what the statute
2 just described there, would be called a
3 pended order, not a suspicious order; is
4 that a fair understanding of what you're
5 saying?
6         MR. JONES:  Objection.
7     Form.  Compound.  Object as to
8     time.  Vague.
9         THE WITNESS:  Say that
10     again.  I'm sorry.
11 BY MR. MIGLIORI:
12     Q.   Sure.
13         If I were to take that last
14 sentence, starting with "suspicious
15 orders," okay, we've read that together,
16 and you understand that to be part of the
17 Act, correct?
18     A.   Correct.
19     Q.   If I were to take that
20 sentence, in Schein's system, including
21 you looking back into Summit County to
22 find suspicious orders and pended orders,
23 in Schein's system, this wouldn't say
24 suspicious orders, this would say pended

Page 146

1 orders include orders of unusual size,
2 orders deviating substantially from a
3 normal pattern and orders of unusual
4 frequency, correct?
5        MR. JONES:  Same objections.
6        THE WITNESS:  Yes.  It would
7    be considered an order of
8    interest.
9 BY MR. MIGLIORI:
10    Q.   An order of interest is
11 another way to describe it.
12        A pended interest is another
13 way you've described it today, correct?
14    A.   Correct.
15    Q.   But an order that was only
16 unusual in size, deviated from a normal
17 pattern or of unusual frequency, in the
18 Schein system, by itself, is not
19 suspicious, correct?
20    A.   In the Schein system, based
21 on, you know, discussions with industry
22 and input from DEA, yes.
23    Q.   All right.  So to the extent
24 that the Act requires reporting to DEA,

Page 147

1 at the time discovered, of suspicious
2 orders, Henry Schein has only reported,
3 from 2009 to today, pended orders,
4 correct?
5        MR. JONES:  Objection.
6    Form.
7 BY MR. MIGLIORI:
8    Q.   I'm sorry, to 2015.
9    A.   Yes.
10    Q.   All right.  So if, from 2009
11 to 2015, the algorithm triggered a
12 deviation in size, pattern or frequency
13 of an order, Henry Schein did not report
14 that as a suspicious order to DEA until
15 after 2015, correct?
16    A.   Can you say that one more
17 time?  I'm sorry.
18    Q.   If, from 2009 to 2015, the
19 system at Henry Schein triggered a
20 deviation for a customer in a controlled
21 substance order of size, pattern and
22 frequency, Henry Schein did not report
23 that as a suspicious order to DEA until
24 after 2015, correct?

Page 148

1        MR. JONES:  Objection.
2    Form.
3        THE WITNESS:  We reported
4    them as pended orders.
5 BY MR. MIGLIORI:
6    Q.   And those weren't reported
7 when they were discovered, they were
8 reported, in an aggregate, on a monthly
9 basis, correct?
10    A.   They were reported monthly,
11 yes.
12    Q.   Were they reported
13 electronically, automatically?
14    A.   The program created a report
15 electronically, but they were mailed to
16 DEA.
17    Q.   So if after a month there
18 were no pended orders, did a report still
19 go?
20    A.   Yes.
21    Q.   And what did that report
22 say?
23    A.   Because the report contained
24 orders from prior months as well.

Page 149

1    Q.   So as long as an order
2 remained in investigation, it repeatedly
3 got reported on a monthly basis?
4    A.   Not whether it remained in
5 investigation, but whether it pended, we
6 would still, historically, go back for a
7 period of months.
8    Q.   When does an order no longer
9 pend in the system, from 2009 to 2015?
10    A.   It will pend -- it will stop
11 pending when it's either cancelled or
12 released.
13    Q.   And by "released" you mean
14 shipped?
15    A.   Correct.
16    Q.   It's a little glossy, but I
17 want to make sure I know what you're
18 speaking for.
19        This is from the website,
20 and it's called, Henry Schein at a
21 Glance.
22        - - -
23        (Whereupon, Exhibit
24    Schein-Abreu-5, HenrySchein.com.

Page 150

1 Printout, was marked for
2 identification.)
3         - - -
4         MR. MIGLIORI:  It's Exhibit
5 Number 5.
6 BY MR. MIGLIORI:
7     Q.   When you speak for Henry
8 Schein, you are speaking for the entire
9 company on these topics, correct?
10         MR. JONES:  Object to the
11     form.  He's here as a corporate
12     representative of Henry Schein,
13     Inc.
14 BY MR. MIGLIORI:
15     Q.   Well, that's what -- I'm not
16 trying to ask a bad question.  I'm trying
17 to make sure I know why you're here and
18 who you're speaking for.
19         You have, within Henry
20 Schein, divisions that sell for animal
21 and veterinary health, correct?
22     A.   Yes.
23     Q.   Is that within Henry Schein,
24 Inc.?

Page 151

1     A.   No.
2         MR. JONES:  Form.
3 BY MR. MIGLIORI:
4     Q.   And are the systems in place
5 for suspicious orders the same systems
6 for the animal health systems?
7         MR. JONES:  Object to the
8     form.  Object that this goes
9     outside the scope.  He's already
10     said that these other divisions
11     are not part of Henry Schein, Inc.
12         So he's not here as a
13     corporate representative to
14     testify as to them or as to their
15     corporate structure.
16 BY MR. MIGLIORI:
17     Q.   I'm asking, within Henry
18 Schein, Inc., are you responsible for
19 your divisions, in terms of suspicious
20 order monitoring?
21     A.   I'm not responsible for the
22 animal health.
23     Q.   So, apparently, it seems,
24 that when taking care of animals, they

Page 152

1 also use controlled substances.
2         Is there a separate division
3 in those companies for that suspicious
4 order monitoring?
5     A.   Yes.
6     Q.   All right.  And you have no
7 role with that whatsoever?
8     A.   That's correct.
9     Q.   All right.  And the doctors
10 and customers Henry Schein, Inc. services
11 are primarily dentists and orthodontists,
12 right?
13     A.   Correct.
14     Q.   What other areas of
15 medicine?
16     A.   Medical.
17     Q.   Medical.
18         And more -- many of your
19 customers are, in fact, the doctors and
20 healthcare facilities themselves,
21 correct?
22     A.   They're office-based
23 practitioners, yes.
24     Q.   Do you do any distribution

Page 153

1 to retail pharmacies, independents or
2 national chains?
3     A.   It is a separate division.
4     Q.   And is that contained within
5 your suspicious order monitoring program?
6     A.   They use the same systems.
7     Q.   Is there a different group
8 of people that do the regulatory and
9 verification process of that?
10     A.   Yes.
11     Q.   And you have no role within
12 that whatsoever?
13     A.   I don't have oversight.
14     Q.   So to the extent you're
15 speaking here today, you're only speaking
16 about customers that are practitioners or
17 healthcare facilities themselves?
18     A.   Yes.
19     Q.   And if there's a change in
20 your system, does it also effectuate a
21 change in the same for dispensaries?
22     A.   Sorry, when you say
23 "dispensaries" --
24     Q.   So you're here to talk about

Page 154

1 policies and standard operating
2 procedures for your suspicious order
3 monitoring program at Henry Schein, Inc.
4        I'm just wondering whether
5 the policies and procedures that you're
6 here to talk about are the same as those
7 that are used in the relationships with
8 dispensaries?
9        MR. JONES:  Objection.
10 Form.  Vague as to "dispensaries."
11 BY MR. MIGLIORI:
12    Q.   CVS.  Pick a pharmacy.
13    A.   They use the same systems.
14    Q.   If you change your system
15 for your customer base, is it usually the
16 case that that changes for the suspicious
17 ordering system for the pharmacies?
18    A.   The system itself, yes.  But
19 not necessarily practices and policy.
20    Q.   Do, ever, the two regulatory
21 groups regularly interact on DEA
22 requirements and expectations and
23 guidances?
24        MR. JONES:  Objection.

Page 155

1 BY MR. MIGLIORI:
2    Q.   Is there any interface
3 between the dispensary retail side and
4 the direct customer side?
5        MR. JONES:  Object to the
6        form.  Objection.  It goes outside
7        the scope.
8 BY MR. MIGLIORI:
9    Q.   Go ahead.
10    A.   In terms of sharing best
11 practices.
12    Q.   Okay.  And are those best
13 practices memorialized somewhere?
14    A.   In an SOP.
15    Q.   Okay.  So if we go through
16 the SOPs that we've been provided, the
17 441 pages, or whatever they are, those
18 would apply both to direct customers and
19 to retail; and to the extent they're not
20 consistent, it would be in the SOP?
21        MR. JONES:  And, again,
22        you're talking about those
23        customers with whom Henry Schein,
24        Inc. does business?

Page 156

1        MR. MIGLIORI:  Right.
2 BY MR. MIGLIORI:
3    Q.   I just want to know, if you
4 change a system for a pharmacy, will that
5 show up in the same documents I'm looking
6 at if you change the system for direct
7 customers at Henry Schein, Inc.?
8    A.   So SOPs are maintained
9 separately.
10    Q.   Okay.  Do you have regular
11 meetings to talk about best practices?
12    A.   No.
13    Q.   And who is the person with
14 the most knowledge, to your knowledge, of
15 those relationships, that is, the
16 relationships between Henry Schein and
17 the pharmacies?
18    A.   That would be Sergio Tejeda.
19    Q.   So regulatory covers both,
20 verification doesn't?
21    A.   Correct.
22    Q.   And that's because direct
23 customers, you have to verify their
24 medical practices, licenses and the like,

Page 157

1 correct?
2    A.   Yes.
3    Q.   So if I wanted to know about
4 the overall Henry Schein standard
5 operating procedures for suspicious order
6 monitoring throughout the company, Sergio
7 and the regulatory team is involved with
8 all of those, correct?
9        MR. JONES:  Object to the
10        form.  Vague.  Overly broad.
11        THE WITNESS:  I don't know
12        if I would say necessarily "all."
13 BY MR. MIGLIORI:
14    Q.   Is there another regulatory
15 division besides the one that Sergio is
16 in?
17    A.   I don't believe so.
18    Q.   Okay.  As it says here in
19 Exhibit-5, Schein is a Fortune 500
20 company, NASDAQ.
21        The company you work for is
22 one of the largest suppliers of medical
23 devices, pharmaceuticals and controlled
24 substances to the dental and orthodontic

Page 158

1 physicians in the United States, aren't
2 they?
3       MR. JONES:  Objection.
4 Form.  Goes outside the scope.
5 BY MR. MIGLIORI:
6    Q.   Is that true?
7       MR. JONES:  You can answer
8 if you know.
9       THE WITNESS:  I'm not sure.
10 BY MR. MIGLIORI:
11    Q.   Okay.  Are you familiar with
12 the volume of shipments within your
13 company that you are required to manage
14 and monitor for suspicious orders?
15    A.   Yes.
16    Q.   On Page 2 of this document,
17 it refers to serving more than 1 million
18 customers.
19       And just so you know, this
20 was, I think, a 1917 -- I think this has
21 been on the website since 1917, or
22 1917 -- I mean 2017.
23       Eighty-six years in
24 business.  You have more than 22,000

Page 159

1 Schein employees.
2       Does that sound right?
3    A.   Yes.
4    Q.   4,100 field sales
5 consultants.
6       Do you interact with the
7 sales force at all for any of the
8 suspicious order monitoring processes?
9    A.   Yes.
10    Q.   How?
11    A.   Just through collaboration
12 with the customer.
13    Q.   Are they part of the due
14 diligence process?
15    A.   No.
16    Q.   Have they ever been part of
17 the due diligence process?
18    A.   No.
19       MR. JONES:  Let me just be
20 clear.  I mean, you're asking him
21 questions about a document that
22 you haven't established a
23 foundation for.
24       But it's misleading, insofar

Page 160

1 as you're trying to tie together
2 4,100 field sales consultants and
3 controlled substances.  I mean,
4 Henry Schein is a big company that
5 sells lots of products that are
6 not controlled substances.  So I
7 object to you misleading what this
8 document says with respect to the
9 topics in this deposition.
10       MR. MIGLIORI:  I'm sure when
11 you go back and read this, you'll
12 see that three questions ago I
13 mentioned devices, drugs and
14 controlled substances.
15       MR. JONES:  You moved away
16 from that, Don.
17       MR. MIGLIORI:  I can't say
18 it in every question.  But I'll
19 accept your running objection to
20 that clarification.
21       MR. JONES:  Thank you.
22       MR. MIGLIORI:  But I'll have
23 to swear you in next time you do
24 that, okay.

Page 161

1 BY MR. MIGLIORI:
2    Q.   It says here that you have
3 63 distribution centers.
4       Are those -- are all the
5 distribution centers within Henry Schein
6 centers that distribute controlled
7 substances?
8    A.   I'm not sure.
9    Q.   Do you know -- but the
10 suspicious order monitoring programs that
11 we're talking about relate to all the
12 distribution centers that maintain and
13 supply controlled substances, correct,
14 nationwide?
15    A.   Nationwide, yes.
16    Q.   All right.  You talked a
17 couple of times about your team.  I just
18 want to make sure I understand who your
19 team is.
20       This is a PowerPoint that I
21 think you helped to prepare with BriAnne
22 Elia.  Is that right?
23    A.   Yeah.  Elia.
24          - - -

Page 162

1      (Whereupon, Exhibit
2   Schein-Abreu-6, Verification Team
3   Overview; July 2015, was marked
4   for identification.)
5           - - -
6   BY MR. MIGLIORI:
7      Q.   Elia.
8           Who is she?
9      A.   She works on my team.
10     Q.   Do you recall -- it's a
11  July -- it's Exhibit Number 6.  It's a
12  July 2015 PowerPoint, verifications team
13  overview.
14          Do you remember preparing
15  this?
16     A.   2015?  I'm sure I did.  I
17  don't recall specifically.
18     Q.   That's you on the front
19  cover, anyway?
20     A.   Yes.
21     Q.   And it really goes into the
22  verification component of suspicious
23  orders, right?  The second page is the
24  licensing requirements?

Page 163

1      A.   Yes.
2      Q.   And so part of verification
3   is that you have to make sure that your
4   doctors and customers, where applicable,
5   maintain state licensure, correct?
6      A.   Correct.
7      Q.   Do you know if Ohio -- it
8   says here, Example, Ohio.
9           Are you familiar with the
10  additional state requirements of state
11  licensure in Ohio?
12     A.   Yes.
13     Q.   What are they?
14     A.   That a customer maintain a
15  terminal distributor of dangerous drugs
16  license, Category III, for controlled
17  substances.
18     Q.   And does that change -- is
19  that any -- strike that.
20          Are your reporting
21  requirements different in Ohio because of
22  that requirement?
23     A.   Sorry, I'm not sure I
24  understand the question.

Page 164

1      Q.   Do you understand, as you
2   sit here today, that you have additional
3   reporting requirements to Ohio?
4      A.   For?
5      Q.   For controlled substances,
6   for the sale.
7      A.   To report transactions?
8      Q.   Yes.
9      A.   Yes.
10     Q.   Do you know how long that's
11  been in existence in Ohio?
12     A.   No, I'm not sure.
13     Q.   And, to your knowledge, has
14  Schein complied with that requirement?
15     A.   Yes.
16     Q.   Does Ohio have a suspicious
17  order monitoring -- a suspicious order
18  reporting requirement?
19     A.   I believe so.
20     Q.   And for all times that
21  you've -- that you -- going back to 1996,
22  or whenever the requirements started, has
23  Schein complied with the Ohio suspicious
24  order requirements?

Page 165

1           MR. JONES:  Object to the
2       form.  Scope.  Calls for a legal
3       conclusion.
4           THE WITNESS:  Yeah, I'm not
5       sure, going back.
6   BY MR. MIGLIORI:
7      Q.   Have you looked for those
8   reporting -- that reporting data in Ohio?
9      A.   No.
10     Q.   All right.  There's a
11  controlled substance state licensure and
12  then a federal DEA licensure.
13          So that's part of your
14  verification team?
15     A.   Correct.
16     Q.   You also state here that, on
17  the next page, in your suspicious order
18  monitoring due diligence process, Henry
19  Schein has a Know Your Customer DEA
20  overview.
21          What is that?
22     A.   It's just something that we
23  provide to customers to explain our
24  process.

Page 166

1    Q.    And is it a document?
2    A.    Yes.
3    Q.    Is it, like, a pamphlet?  Is
4 it a booklet?  What does it look like?
5    A.    It's just a two-page, or a
6 one-page, front-and-back, document.
7    Q.    Did you look at that in
8 preparation for today?
9    A.    No.
10   Q.    But it exists?  If I were to
11 say, can you send me over the Henry
12 Schein Know Your Customer DEA overview as
13 of 2015, that exists in your files,
14 right?
15   A.    Yes.
16   Q.    Okay.  The suspicious order,
17 due diligence suspicious order
18 monitoring, these are different things
19 that you look for, for verification,
20 correct?
21   A.    Yes.
22   Q.    One of them says, License
23 background review, disciplinary actions.
24       You do, at least as of 2015,

Page 167

1 look back to see whether or not there
2 have been any disciplinary, whether it be
3 licensure or, I assume, criminal
4 disciplinary actions for your customers,
5 correct?
6    A.    Correct.
7    Q.    And that information would
8 be in the due diligence file that we've
9 already talked about, right?
10   A.    Right.
11   Q.    You have an online
12 controlled substances form.
13       So you create an
14 Internet-based interface with the
15 clients, correct?
16   A.    Correct.
17   Q.    And there's a requirement
18 that the customer, at least as of 2015,
19 have a complete form, all fields are
20 filled in and an E-signature, right?
21   A.    Right.
22   Q.    And so for every customer,
23 in some accounting, for example, today,
24 there would be an online file relative to

Page 168

1 the due diligence for each and every
2 customer, correct?
3    A.    Could be a paper version as
4 well.
5    Q.    Okay.  It wasn't always the
6 case that every customer had a due
7 diligence file, correct?
8    A.    That's correct.
9    Q.    We'll get into that.
10       And then onboarding is
11 bringing on a new client, right?
12   A.    Right.
13   Q.    On Page 4 of Exhibit-6,
14 there are some additional due diligence
15 requirements for bringing on a new client
16 as of 2015.
17       It says, Speaking with the
18 sales team and attending onboarding
19 conference calls.
20       So the sales team is part of
21 the onboarding process, right?  They
22 bring in the new client?
23   A.    Yes.
24   Q.    And then you interact with

Page 169

1 the sales team in whether or not that
2 client, in fact, can be onboarded after
3 some due diligence, correct?
4    A.    Correct.
5    Q.    In 2015, the elements of
6 that due diligence for onboarding
7 included the questionnaire, correct?
8    A.    And licensing.
9    Q.    And licensing.
10       So they would have to fill
11 out a one-page questionnaire?
12   A.    It became two pages.
13   Q.    And then that questionnaire
14 goes in the due diligence file
15 immediately?
16   A.    Yes.
17   Q.    And then you would have to
18 go through a verification of the various
19 licenses for that state and federally,
20 correct?
21   A.    Correct.
22   Q.    And then, finally, on this,
23 this is a list, at least in 2015, of the
24 people within verification.  It lists you

Page 170

1  as the verifications manager.
2       What does Maggie Wilding do?
3       A.   She is the supervisor of our
4  team in Reno for verifications.
5       Q.   Does she report to you?
6       A.   Yes.
7       Q.   So Reno reports, generally,
8  to the Melville facility?
9       A.   To me, yes.
10      Q.   You oversee all the
11 verifications?
12      A.   Yes.
13      Q.   Christine Stratton, she is a
14 suspicious order monitoring team lead.
15      What department is she in?
16      A.   She is still in
17 verifications.
18      Q.   And what does she do?  What
19 does a team lead do?
20      A.   So, currently, she actually
21 is a supervisor.  But it would be her
22 role to assist in the SOM and Know Your
23 Customer processes.
24      Q.   Is she a supervisor in New

Page 171

1  York?
2       A.   Yes.
3       Q.   But she still reports to
4  you?
5       A.   Yes.
6       Q.   And Maggie, is she still the
7  supervisor in Reno?
8       A.   Yes.
9       Q.   How about Leah Mannino?
10      A.   She is no longer with the
11 company.
12      Q.   But she would have done the
13 same things that Christine was doing with
14 respect to team lead?
15      A.   Yes.
16      Q.   And she was in New York?
17      A.   Yes.
18      Q.   Has somebody filled in for
19 her now, that's there now?
20      A.   Yes.
21      Q.   Who is that?
22      A.   BriAnne Elia.
23      Q.   Judy Labarbera, a licensing
24 team lead.

Page 172

1       First of all, is Judy still
2  there?
3       A.   No.
4       Q.   Does somebody else have that
5  role?
6       A.   Yes.
7       Q.   Who is that?
8       A.   George Rodriguez.
9       Q.   And what does a licensing
10 team lead do?
11      A.   They work with the team on
12 verification for licensing credentials.
13      Q.   And BriAnne is now a team
14 lead, an SOM team lead, but here it says,
15 Verifications, manage accounts.
16      What is that job title?
17      A.   That was part of the
18 onboarding that we spoke of earlier.  So
19 she would engage with the customer to set
20 expectations for coming over.
21      Q.   Who is doing that now?
22      A.   Brian Fishman.
23      Q.   None of those folks have any
24 responsibilities with respect to the

Page 173

1  database that you also manage, correct?
2       A.   That's correct.
3       Q.   I'll show you Exhibit Number
4  7.
5            -  -  -
6            (Whereupon, Exhibit
7       Schein-Abreu-7,
8       HSI-MDL-00000086-103, was marked
9       for identification.)
10           -  -  -
11 BY MR. MIGLIORI:

23      Q.   And you've seen forms like
24 this?  Every change to the standard

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 operating procedures of Schein relative
2 to suspicious order monitoring is
3 reflected somehow -- to the extent that
4 it's a change that goes into the books,
5 is reflected in one of these forms,
6 correct?
7      A.   Correct.
8      Q.   We'll get into different
9 things here, but this is an SOM from this
10 year.  It talks about some of the things
11 that we've already talked about today.
12          But for this purpose right
13 now, I just want to bring you to the page
14 that ends in 98.  There's a list of
15 states that have reporting requirements.
16 And it appears that this has been added
17 to the SOP for Henry Schein for Ohio.
18          Have you reviewed this in
19 preparation for today?
20      A.   Yes.
21      Q.   So you'll see that the Ohio
22 requirements are separate and apart from
23 the DEA requirements.
24          You agree with that, right?

Page 175

1      A.   Yes.
2      Q.   And here is the citation,
3 and it's a requirement for wholesalers.
4          You understand that Schein
5 is considered a wholesaler in this
6 context, correct?
7      A.   Correct.
8      Q.   And that the reporting
9 requirement is to the Ohio Board of
10 Pharmacy in Columbus, Ohio.
11          Do you see that?
12      A.   Yes.

Page 176

Page 177

1          So if the board asks for
2 something, you have to respond.
3          Do you recall ever having to
4 do that at Schein, that is, provide a
5 report to the board specifically upon
6 their request?
7      A.   Not to my recollection, no.



Highly Confidential - Subject to Further Confidentiality Review

Page 178



20          MR. JONES:  Object to the
21     form.  Misstates the document.
22          THE WITNESS:  Are we talking
23     with respect to Summit County or
24     Ohio as a whole?

Page 179

1  BY MR. MIGLIORI:
2     Q.   I'm asking for Ohio.
3          But if you only did it for
4  Summit, you can tell me that.
5     A.   Yes, I did, I searched for
6  Summit County.
7     Q.   And did you find any in
8  Summit County?
9     A.   No.
10    Q.   And folks that would fall
11 into the category of not being authorized
12 to use drugs would include, for example,
13 an orthodontist should not be ordering
14 things like anti-anxiety medication,
15 correct?  Is that within the system?
16         MR. JONES:  Objection to
17    form.  Lack of foundation.  Calls
18    for a legal conclusion.
19         THE WITNESS:  Arbitrarily or
20    regarding that specific example
21    you gave?
22 BY MR. MIGLIORI:
23    Q.   Isn't that -- I'm giving you
24 an example as something in the standard

Page 180

1  operating procedures of your company as
2  being an unauthorized purchase.
3     A.   We have --
4          MR. JONES:  Same objections.
5          THE WITNESS:  We have
6     restrictions in place.
7  BY MR. MIGLIORI:
8     Q.   Yes.
9          And one of the restrictions
10 is, dentists don't normally prescribe
11 anti-anxiety medications, correct?
12         MR. JONES:  Objection to
13    form.
14         THE WITNESS:  Specifically
15    to that example?
16 BY MR. MIGLIORI:
17    Q.   Yes.
18    A.   Potentially.
19    Q.   In fact, there is a standard
20 operating procedure that says that if a
21 dentist is ordering anti-anxiety and
22 controlled substances, like a morphine
23 equivalence, that that is a red flag,
24 correct?

Page 181

1     A.   I'm not sure about that.
2          MR. JONES:  Objection.
3  BY MR. MIGLIORI:
4     Q.   One of the practices, or one
5  of the policies and procedures that
6  Schein adopted more recently is that
7  doctors can't self-medicate or order
8  controlled substances for their own
9  personal use.  Isn't that one of the
10 Schein policies?
11    A.   That's one of our policies.
12    Q.   Did you look, within the
13 Ohio reporting databases, for any reports
14 of doctors that you found, upon due
15 diligence, were using opiates or morphine
16 equivalents for self-medicating purposes?
17    A.   With respect to Summit
18 County?
19    Q.   I'm asking for Ohio, but you
20 can limit it to what you looked for.
21    A.   With respect to Summit
22 County, no.
23    Q.   So with respect to Summit
24 County, you did look for it and you did

Page 182

1 not find any?
2    A.   Correct.
3    Q.   If, in fact, though, you had
4 a doctor in Summit County that was
5 self-medicating and you became aware of
6 that, that fact would be, first, in the
7 due diligence file, correct?
8    A.   Yes.
9    Q.   And by operation of law, you
10 would have reported that to Ohio and to
11 the DEA?
12    A.   Yes.
13    Q.   And that would have been
14 reported as a suspicious order, correct?
15    A.   Correct.
16    Q.   And you've looked for both
17 the DEA and Ohio, and you found none for
18 Summit County?
19    A.   That's correct.
20    Q.   From 2009 to present?
21    MR. JONES:  Objection.
22    VIDEO TECHNICIAN:  The time
23 is now 11:49 a.m.  And we are
24 going off the record.

Page 183

1        - - -
2        (Whereupon, a brief recess
3 was taken.)
4        - - -
5    VIDEO TECHNICIAN:  The time
6 is now 11:51 a.m.  We are back on
7 the record.
8        - - -
9        (Whereupon, Exhibit
10 Schein-Abreu-8,
11 HSI-MDL-00231455-458, was marked
12 for identification.)
13        - - -
14 BY MR. MIGLIORI:
15    Q.   Let me show you -- we talked
16 a little bit about the Rannazzisi
17 letters.  Let me show you Exhibit Number
18 8.
19        This is the Dear Registrant
20 letter of September 27th, 2006.
21        Have you reviewed this?
22    A.   Yes.
23    Q.   And you see that this
24 document has actually got an HSI number

Page 184

1 on the bottom?  That means we received it
2 from your company.
3        So you'll agree with me that
4 Henry Schein, Inc., in fact, received and
5 maintained in its files a copy of the
6 September 27, 2006 letter -- I'll show
7 the name -- from Joseph Rannazzisi,
8 deputy assistant administrator, Office of
9 Diversion Control?
10    A.   Yes.
11    Q.   As the letter states, it's
12 being sent to every commercial entity
13 registered with the Drug Enforcement
14 Agency to distribute controlled
15 substances.
16        That would have included
17 Schein in 2006, correct?
18    A.   Yes.
19    Q.   The purpose of this letter
20 is to reiterate the responsibilities of
21 controlled substance distributors in view
22 of the prescription drug abuse problem
23 our nation currently faces.
24        You will agree with me that,

Page 185

1 as of 2006, it was understood within the
2 industry that the country was in a
3 drug -- a prescription drug abuse
4 national crisis --
5    MR. JONES:  Object to the
6 form.
7 BY MR. MIGLIORI:
8    Q.   -- wouldn't you?
9    A.   Yes.
10    Q.   And that this letter was
11 not, on its face, designed to give new
12 guidance, but it was to, as he puts it,
13 reiterate the responsibilities of
14 controlled substance distributors in view
15 of that crisis.
16        Do you see that?
17    A.   Yes.
18    Q.   All right.  Rannazzisi says,
19 As each of you undoubtedly -- is
20 undoubtedly aware, the abuse of
21 controlled prescription drugs is a
22 serious and growing health problem in the
23 country.  DEA has an obligation to combat
24 this problem, as one of the agency's core

Page 186

1 functions is to prevent the diversion of
2 controlled substances into illicit
3 channels. And Congress assigned DEA to
4 carry out this function through the
5 enforcement of the Controlled Substances
6 Act and the DEA regulations to implement
7 that.
8        So on its face, Schein, you
9 would agree, was aware that in 2006, at
10 least, the purpose of the Controlled
11 Substances Act was to prevent diversion
12 of prescription drugs for illicit use and
13 abuse, correct?
14    A.   Correct.
15    Q.   And, in fact, that
16 relationship between the Controlled
17 Substances Act and the abuse of
18 prescription medications actually went
19 back to 1971, as we saw, correct?
20    A.   When it was initially
21 written?
22    Q.   Correct.
23    A.   Yes.
24    Q.   It says, in the middle of

Page 187

1 the next paragraph, Distributors are, of
2 course, one of the key components of the
3 distribution chain. If the closed system
4 is to function properly, as Congress
5 envisioned, distributors must be vigilant
6 in deciding whether a prospective
7 customer can be trusted to deliver
8 controlled substances only for lawful
9 purposes.
10        You'll agree with me that
11 Henry Schein understood that the
12 distributors play an important role in
13 the prevention of diversion?
14    MR. JONES: Object to the
15 form. It goes outside the scope.
16    MR. MIGLIORI: Well, that's
17 directly referencing a Rannazzisi
18 letter that's specifically
19 referenced in the notice. So if
20 you don't -- if you don't have an
21 opinion on that, you can tell me
22 that.
23    MR. JONES: It's also
24 outside the scope, per Special

Page 188

1 Master Cohen's ruling in
2 September.
3    MR. MIGLIORI: What part of
4 the ruling? Because if I can
5 avoid it, I will.
6    MR. JONES: Asking him about
7 his -- about past, present
8 interpretation, agreement or
9 disagreement with statements made
10 in the Rannazzisi letters.
11        I mean, we'll stipulate that
12 that's what the letter says. But
13 as far as you're going to ask him
14 questions about what Henry Schein
15 thinks or believes or disagrees
16 with, then we're going to object
17 to the scope.
18 BY MR. MIGLIORI:
19    Q.   Well, I'm only going to ask
20 you questions to the extent that this
21 informs what the purpose of your
22 suspicious order monitoring program is,
23 okay? I'm not asking you to confirm that
24 that's what Rannazzisi thought or what

Page 189

1 the company thought back in 2006 or
2 before, okay?
3        It says that, The Controlled
4 Substances Act uses a concept of
5 registration as a primary means by which
6 manufacturers, distributors, and
7 practitioners are given legal authority
8 to handle controlled substances.
9        So you understand that the
10 registration of all of those entities is
11 what allows the DEA to require reporting
12 and detection of suspicious orders,
13 right?
14    MR. JONES: Object to the
15 form. Outside the scope.
16 BY MR. MIGLIORI:
17    Q.   Do you understand that? If
18 you're a registrant, that you have to
19 comply with the Controlled Substances
20 Act?
21    A.   Yes.
22    MR. JONES: Same objection.
23 BY MR. MIGLIORI:
24    Q.   All right. In the middle of

1 the second page, it says, The DEA
2 regulations require all distributors to
3 report suspicious orders of controlled
4 substances.  Specifically, the
5 regulations state the registrant shall
6 design and operate a system to disclose
7 to the registrant suspicious orders of
8 controlled substances.  The registrant
9 shall inform the field division of the
10 Office of the Administration in this area
11 of suspicious orders when discovered by
12 the registrant.  Suspicious orders
13 include orders of unusual size, orders
14 deviating substantially from normal
15 pattern, and orders of unusual frequency.
16        So we read this earlier.
17 But you'll agree with me that Henry
18 Schein was in receipt of this specific
19 provision and requirement of the CSA of
20 Henry Schein relative to controlled
21 substances and its customers, correct?
22        MR. JONES:  We'll stipulate
23     that Henry Schein received this
24     Rannazzisi letter on or about when

1        Now, do you understand that
2 to mean that a suspicious order requires
3 due diligence in order for it to be
4 determined to be suspicious?
5        MR. JONES:  Object to the
6     form.  Object.  Goes specifically
7     and expressly outside the scope
8     that is allowed by the special
9     master's order.
10        You can ask him in his
11     individual capacity.  But this is
12     going outside the scope for which
13     this witness is here and outside
14     what the court has allowed.
15        MR. MIGLIORI:  That's fine.
16     I've got your objection.
17        And if that's what's ruled,
18     that this is his individual
19     capacity, I'm okay with that.
20 BY MR. MIGLIORI:
21     Q.  But I'm asking you, as your
22 capacity here, in regards to the stated
23 area of inquiry about the Rannazzisi
24 letter, would you agree with me that, at

1     it was dated.
2        Otherwise, I object --
3        MR. MIGLIORI:  You can
4     answer.
5        MR. JONES:  Otherwise, I
6     object to the question as outside
7     the scope.  The document speaks
8     for itself.
9        MR. MIGLIORI: Okay.  And
10     I'll note that.
11 BY MR. MIGLIORI:
12     Q.   You see that, in fact,
13 Schein received this excerpt in 2016 in
14 this Rannazzisi letter, correct?
15     A.   Correct.
16     Q.   You'll also see it says, in
17 the next -- two following paragraphs, it
18 says, Thus, in addition to reporting all
19 suspicious orders, a distributor has a
20 statutory responsibility to exercise due
21 diligence to avoid filling suspicious
22 orders that might be diverted into
23 other-than-legitimate medical, scientific
24 and industrial channels.

1 least as of 2006, Henry Schein was put on
2 notice that the reporting requirement of
3 a suspicious order was separate and
4 distinct from the obligation to perform
5 due diligence?
6        MR. JONES:  Objection.
7     Form.  Calls for legal conclusion.
8     Outside the scope.  Runs afoul of
9     the court's order.
10 BY MR. MIGLIORI:
11     Q.  Sir, you can answer.  And
12 the court will determine whether you
13 answer it just for you or for the
14 company.
15     A.  Yes.
16     Q.  Okay.  So at least according
17 to this letter that Schein received in
18 2006, once something deviated from an
19 unusual size, pattern or frequency, that
20 was, by the DEA's perspective, a
21 suspicious order that needed to be
22 reported, and that was separate and
23 distinct from the obligation to then do
24 due diligence to see whether or not that

Page 194

1 order could be shipped?
2        Would you agree with me that
3 that's at least what Schein has been put
4 on notice of in 2006?
5        MR. JONES:  Object to the
6     form.  Object.  Compound.  Calls
7     for a legal conclusion.  Outside
8     the scope.  Calls for speculation.
9     The document speaks for itself.
10 BY MR. MIGLIORI:
11     Q.   Go ahead.
12     A.   I'm sorry, can you restate
13 the question?
14     Q.   Sure.
15        MR. MIGLIORI:  And I'll
16     accept the objection that comes
17     back as well.
18 BY MR. MIGLIORI:
19     Q.   You'll agree with me that at
20 least with respect to this letter that
21 Schein received in 2006, it made it clear
22 that a suspicious order was a deviation
23 of size, frequency and pattern, and that
24 alone had to be reported; separate and

Page 195

1 distinct from that, there was an
2 obligation to then do due diligence?
3        That's at least what the DEA
4 is telling Schein here in 2006, correct?
5        MR. JONES:  Same objections.
6        THE WITNESS:  Yes.
7 BY MR. MIGLIORI:
8     Q.   That system, though, was not
9 put in place at Schein where the
10 reporting occurred before due diligence
11 until, I think you said, after the
12 Masters decision, correct?
13        MR. JONES:  Objection.
14     Vague.  Objection as to time.
15        THE WITNESS:  So what time
16     periods are you referring to?
17 BY MR. MIGLIORI:
18     Q.   The Schein system didn't
19 report that way, that is, suspicious
20 orders the way it's described here in the
21 Rannazzisi letter, didn't report that way
22 to DEA until after the Masters decision
23 in 2017, correct?
24        MR. JONES:  Object to the

Page 196

1     form.  Lack of foundation.  Vague.
2     Outside the scope.  Calls for a
3     legal conclusion.
4 BY MR. MIGLIORI:
5     Q.   Go ahead.
6     A.   We reported orders that were
7 deemed suspicious.
8     Q.   Right.  I understand that.
9 I'm trying to figure out by which
10 definition.
11        The definition in this
12 Exhibit-7 that I'm reading from right
13 now, where -- I'm sorry, Exhibit-8, where
14 a suspicious order needs to be reported
15 if it's in deviation of size, pattern or
16 frequency at the time that that deviation
17 is discovered, that's what's said here in
18 this letter, correct?
19        MR. JONES:  Objection.
20     Form.  Document speaks for itself.
21 BY MR. MIGLIORI:
22     Q.   Go ahead.
23     A.   Correct.
24     Q.   Schein reported it as a

Page 197

1 suspicious order to DEA only after it did
2 due diligence and determined that it was
3 suspicious, until the Masters decision in
4 2017, correct?
5     A.   Correct.
6        MR. JONES:  Asked and
7     answered.  Objection.  Asked and
8     answered.
9 BY MR. MIGLIORI:
10     Q.   Only after Masters did
11 Schein begin to report suspicious orders
12 when they deviated from size, pattern and
13 frequency and then performed due
14 diligence to determine whether or not to
15 ship the order, correct?
16     A.   Correct.
17     Q.   The letter goes on to say,
18 In a similar vein, given the requirement
19 under Section 823(e) that a distributor
20 maintain effective controls against
21 diversion, a distributor may not simply
22 rely on the fact that the person placing
23 the suspicious order is a DEA registrant
24 and turn a blind eye to the suspicious

Page 198

1 circumstances.
2      So verification in and of
3 itself is not due diligence; is that a
4 fair statement?
5      MR. JONES: Objection.
6 Form. Vague. Overly broad.
7 Misstates the document.
8 BY MR. MIGLIORI:
9      Q. Will you agree with that?
10      A. License verification?
11      Q. Yes.
12      A. Yes.
13      Q. So the fact, merely, that
14 somebody has a DEA registration, one of
15 the customers of Schein, or is registered
16 with the Ohio Board of Pharmacy, that
17 process, while it's part of your due
18 diligence to make sure they, in fact, are
19 licensed, that is not a sufficient amount
20 of due diligence at any time from 1996 to
21 present, that's not enough due diligence
22 at any level, correct?
23      MR. JONES: Object as to
24 form. Overly broad. Vague.

Page 199

1      THE WITNESS: Correct.
2 BY MR. MIGLIORI:
3      Q. Do you want me to restate
4 it?
5      A. No.
6      Yes.
7      Q. So if we were to start in
8 1996, due diligence has always been more
9 than just verification, according to the
10 Controlled Substances Act, correct?
11      A. Which time are you talking
12 about? The time period from --
13      Q. From 1996 on.
14      A. Yes.
15      Q. That is, because you had a
16 license, you were required to design a
17 system and monitor a system, but the mere
18 fact of a physician or a healthcare
19 provider having a license, that wasn't,
20 by itself, sufficient due diligence with
21 respect to investigating what could
22 potentially be a suspicious order,
23 correct?
24      MR. JONES: Objection.

Page 200

1 Form. Vague. Overly broad.
2 Compound.
3 BY MR. MIGLIORI:
4      Q. Is that correct?
5      A. Correct.
6      Q. All right. And then this
7 same letter in 2006 lists certain
8 activities that should raise suspicions
9 of a concern, at least, for diversion of
10 controlled substances.
11      Do you see that?
12      A. Yes.
13      Q. And if you go through some
14 of these, ordering excessive quantities
15 of a limited variety of controlled
16 substances while ordering few, if any,
17 other drugs; that will be a red flag,
18 correct?
19      A. A potential red flag, yes.
20      Q. And in terms of putting that
21 into the Henry Schein due diligence
22 program, that really started some time in
23 2011 and '12, correct?
24      MR. JONES: Objection.

Page 201

1 Form.
2      THE WITNESS: So when you
3 say "in part of that program"?
4 BY MR. MIGLIORI:
5      Q. So the initial due diligence
6 program that we talked about was really
7 if an order triggered and became pended
8 in the Henry Schein system, a form -- a
9 one-page form would be mailed out to the
10 doctor -- let's start in 2006 -- a
11 one-page form would be sent out to the
12 doctor, the doctor would send it back
13 filling in the different information
14 requested.
15      And that would be a basis
16 for a determination about whether an
17 order was suspicious; is that true?
18      A. True.
19      Q. That system evolved, as you
20 said, over time.
21      And the on-site visits and
22 the phone calls and the Internet
23 searches, that really began around 2012,
24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    A.   That's right.
2    Q.   And in 2012, you would look
3  at factors like the -- let's see,
4  ordering excessive quantities of a
5  limited variety of controlled substance
6  in combination with excessive quantity of
7  lifestyle drugs.
8       Sort of the analysis of
9  dispensing history and on-site visits,
10  that really was an evolution of the Know
11  Your Customer policies that began in
12  2012, ramping up to 2015, right?
13       MR. JONES:  Objection.
14  Form.  Overly broad.  Vague.
15  BY MR. MIGLIORI:
16    Q.   Is that right?
17    A.   It may have been prior to
18  that.  I don't remember the exact year.
19    Q.   Well, you know that the
20  suspicious order monitoring program
21  revision that started to look at the due
22  diligence component began in 2009.
23       Have you heard of the
24  company Buzzeo?

Page 203

1    A.   Yes.
2    Q.   Did you ever work with
3  Buzzeo?
4    A.   Yes.
5    Q.   And Buzzeo was brought in to
6  help redesign the suspicious order
7  monitoring program and develop the Know
8  Your Customer component as part of its
9  charge, correct?
10    A.   Yes.
11    Q.   And that charge, really, was
12  investigated and analyzed over time; but
13  it really wasn't until 2010, '11, '12,
14  that those aspects of Know Your Customer
15  were codified in changes to the standard
16  operating procedures, correct?
17       MR. JONES:  Object to form.
18  Overly broad.  Object as to time.
19  BY MR. MIGLIORI:
20    Q.   Is that correct?
21    A.   Sounds right, yes.
22       MR. JONES:  Don, lunch is
23  here, if you're at a transition
24  point.

Page 204

1       MR. MIGLIORI:  How about,
2  let me -- just give me one second,
3  because it might cause me to cut
4  out some of these documents.
5       Can you give me ten minutes,
6  does that work?
7       MR. JONES:  Ten minutes
8  to --
9       MR. MIGLIORI:  Before we
10  break.
11       MR. JONES:  Yes.
12       MR. MIGLIORI:  Thanks.
13  This is Exhibit Number 9.
14       - - -
15       (Whereupon, Exhibit
16  Schein-Abreu-9,
17  HSI-MDL-000993112-115, was marked
18  for identification.)
19       - - -
20  BY MR. MIGLIORI:
21    Q.   This is the February 7, 2007
22  Rannazzisi letter.
23       Again, this was -- if you
24  look at the bottom of this document, it's

Page 205

1  got the HSI number on it.  So that's
2  produced to us by Henry Schein.
3       Do you see that?
4    A.   Yes.
5    Q.   I will simplify this by just
6  simply saying, you'll agree with me that
7  Henry Schein was, in fact, in receipt of
8  this particular Rannazzisi letter,
9  correct?
10    A.   Right.
11    Q.   And I'll accept that this
12  letter speaks for itself in its contents.
13       It does talk about the
14  obligations, though, of the distributor
15  of controlled substances, correct?
16    A.   Yes.
17    Q.   It uses the same term here
18  that the letter is to reiterate the
19  responsibilities, correct?
20    A.   Yes.
21    Q.   Meaning it's to remind the
22  company of the responsibilities, not to
23  state new responsibilities.
24       Do you understand that?

Page 206

1    MR. JONES:  Objection to
2    form.  The document speaks for
3    itself.  Goes outside the scope.
4  BY MR. MIGLIORI:
5    Q.   You'll agree with me the
6  word "reiterate" has that meaning, right?
7    A.   Yes.
8    Q.   All right.
9        And then your company also
10  produced to us and showed that it was in
11  receipt of the December 27th, 2007 Dear
12  Registrant letter.
13        - - -
14    (Whereupon, Exhibit
15    Schein-Abreu-10,
16    HSI-MDL-00404079-080, was marked
17    for identification.)
18        - - -
19    MR. WICKS:  Is that a
20  separate exhibit?
21    MR. MIGLIORI:  Yes.  This is
22  Number 10.  This one, actually,
23  not only was produced by Henry
24  Schein by Bates number, but

Page 207

1  actually has -- addressed to Henry
2  Schein in Jacksonville, Florida.
3  BY MR. MIGLIORI:
4    Q.   Is this address in
5  Jacksonville, is that a distribution
6  center?
7    A.   Yes.
8    MR. JONES:  Just so we're
9    clear, I mean, I've got a copy,
10    and it looks like you're working
11    from one, too, that's got some
12    edits and marks on it.
13    MR. MIGLIORI:  That's how it
14    was produced.  I did not -- this
15    is not a copy that we copied of
16    ours.
17    MR. JONES:  Okay.
18  BY MR. MIGLIORI:
19    Q.   And if that proves not to be
20  true, I'm happy to substitute.  But
21  that's how I received it, so I assume
22  that's how we produced it.
23        And in this letter it,
24  again, talks about the obligations with

Page 208

1  respect to distributing controlled
2  substances and reiterating the
3  responsibility of the distributor,
4  manufacturer for controlled substances,
5  correct?
6    A.   Correct.
7    Q.   And it talks about the
8  obligation to design and operate a
9  suspicious order monitoring program.
10        It says here, though, in the
11  middle of the second paragraph, The
12  regulation clearly indicates that it is
13  the sole responsibility of the
14  registrant -- you'll agree with me that
15  in this context that's Henry Schein,
16  Inc., correct?
17    A.   Yes.
18    Q.   It's the sole responsibility
19  of the registrant to design and operate
20  such a system.  Accordingly, DEA does not
21  approve or otherwise endorse any specific
22  system for reporting suspicious orders.
23  Past communications with DEA, whether
24  implicit or explicit, that can be

Page 209

1  construed as an approval of a particular
2  system for reporting suspicious orders
3  should no longer be taken to mean that
4  DEA approves a specific system.
5        Did you, at Henry Schein,
6  appreciate that conversations with DEA
7  were not to be deemed or viewed as
8  approval of any particular suspicious
9  order monitoring program at Henry Schein?
10    MR. JONES:  Objection.
11    Form.  You mean as of the time of
12    the receipt of this letter?
13    MR. MIGLIORI:  He can
14    clarify.
15  BY MR. MIGLIORI:
16    Q.   I mean period.
17        But if you have a
18  qualification in terms of when it may or
19  when it may not, you can tell me that.
20    MR. JONES:  Object to the
21    form.  Overly broad.  Object as to
22    time.
23    THE WITNESS:  We did have
24    several conversations with DEA

Page 210

1    regarding our reporting.
2    BY MR. MIGLIORI:
3        Q.    And did you understand in
4    those conversations, at least to the
5    extent that they occurred after 2007,
6    that those weren't to be construed as
7    approvals of your program?
8            MR. JONES:  Objection.
9        Form.  Objection as to the
10       mischaracterization of Exhibit-10.
11           THE WITNESS:  I understood
12       it's not approval, per se, but,
13       you know, if we were doing
14       something that we shouldn't have
15       been doing, or should be doing
16       something different, we also would
17       have expected that they informed
18       us.
19   BY MR. MIGLIORI:
20       Q.    But to represent to any
21   other entity that your suspicious order
22   monitoring program was approved by the
23   DEA, you understood that that was not
24   something DEA would have agreed to?

Page 211

1            MR. JONES:  Objection.
2        Form.  Objection insofar as it
3        mischaracterizes the document,
4        Exhibit-10.
5            THE WITNESS:  I understand
6        it's not an official approval,
7        yes.
8    BY MR. MIGLIORI:
9        Q.    Okay.  And you understand,
10   and it was true as of 2006, and still
11   true today, that the obligation to design
12   and operate a system to prevent diversion
13   is the responsibility of the registrant,
14   not the DEA?
15           MR. JONES:  Objection to
16       form.  Goes outside the scope.
17   BY MR. MIGLIORI:
18       Q.    You understand that, right?
19           MR. JONES:  Same objections.
20           THE WITNESS:  Yes.
21   BY MR. MIGLIORI:
22       Q.    So if you go a little
23   further down, it continues to talk about
24   how suspicious orders have to be reported

Page 212

1    to the local DEA division when
2    discovered -- again, I didn't do that
3    writing, but you see that here in the
4    document, correct?
5        A.    Correct.
6        Q.    -- by the registrant,
7    filling a monthly report of completed
8    transactions, for example, excessive
9    purchase report or high unit purchases,
10   does not meet the regulatory requirement
11   to report suspicious orders.
12           Were you aware of that
13   guidance from the DEA in 2006?
14           MR. JONES:  Objection.  I
15       think you mean 2007.
16           MR. MIGLIORI:  2007, I'm
17       sorry.
18           THE WITNESS:  Based on this
19       letter.
20   BY MR. MIGLIORI:
21       Q.    And registrants are reminded
22   that their responsibility does not end
23   merely with the filing of a suspicious
24   order report.

Page 213

1            That is, the filing of the
2    report does not relieve the distributor,
3    does not relieve Henry Schein, of its
4    obligation to prevent diversion, correct?
5        A.    Yes.
6            MR. JONES:  Object to the
7        form.  Outside the scope.
8    BY MR. MIGLIORI:
9        Q.    Registrants must conduct an
10   independent analysis of suspicious
11   orders, prior to completing a sale, to
12   determine whether the controlled
13   substances are likely to be diverted from
14   legitimate channels.
15           So at least according to
16   this letter in 2007, the DEA is telling
17   Henry Schein that after reporting a
18   suspicious order, the registrant, Henry
19   Schein, must conduct independent analysis
20   of suspicious orders, must perform due
21   diligence.
22           That's what this letter
23   says, correct?
24           MR. JONES:  Objection.

highly confidential -- subject to further confidentiality review

| | |
|---|---|
| Page 214 | Page 216 |

Page 214

1    Form.  Document speaks for itself.
2  BY MR. MIGLIORI:
3    Q.   Correct?
4    A.   Correct.
5    Q.   Reporting an order as
6  suspicious will not absolve the
7  registrant of responsibility if the
8  registrant knew or should have known that
9  the controlled substances were being
10 diverted.
11         So the mere reporting of the
12 suspicious order to DEA does not relieve
13 Schein, or any other registrant, of its
14 obligation to know, or learn when it
15 should know, that a controlled substance
16 was being diverted?
17         MR. JONES:  Objection.
18 BY MR. MIGLIORI:
19    Q.   That was expressed to Schein
20 in 2007, correct?
21         MR. JONES:  Objection to
22    form.  The document speaks for
23    itself.  Goes outside the scope.
24 BY MR. MIGLIORI:

Page 216

1  DEA at that time it's discovered as a
2  suspicious order; that's what this
3  document says, correct?
4         MR. JONES:  Objection.
5    Form.  The document speaks for
6    itself.  You don't need him to
7    tell you that you read it right.
8    And insofar as you're asking for
9    him to give you a legal
10    interpretation or if he agrees
11    with your construction of it,
12    that's outside the scope.
13    Objection.
14 BY MR. MIGLIORI:
15    Q.   Correct?
16    A.   Yes.
17    Q.   So if it only triggers one
18 of those things, that is, when it says,
19 for example, if an order deviates
20 substantially from a normal pattern, that
21 alone requires a report of that order to
22 the DEA as suspicious, correct?
23         MR. JONES:  Same objections.
24    Outside the scope.

Page 215

1    Q.   Correct?
2    A.   Yes.
3    Q.   The regulation specifically
4  states that suspicious orders include
5  orders of unusual size, orders deviating
6  substantially from a normal pattern and
7  orders of an unusual frequency.  These
8  criteria are disjunctive and are not
9  all-inclusive.  For example, if an order
10 deviates substantially from a normal
11 pattern, the size of the order does not
12 matter and the order should not -- should
13 be reported as suspicious.
14         Do you see that?
15    A.   Yes.
16    Q.   I kind of screwed up the
17 reading of it, so I want to make sure we
18 understand it.
19         The three issues, unusual
20 size, unusual pattern, unusual frequency
21 are disjunctive, meaning if any one of
22 those factors shows a deviation in an
23 order, according to Joe Rannazzisi in
24 2007, that order must be reported to the

Page 217

1  BY MR. MIGLIORI:
2    Q.   Correct?
3    A.   Based on what the document
4  says --
5    Q.   Yes.
6    A.   -- yes.
7    Q.   So the same would be true
8  with abnormal size, if an order didn't
9  deviate from a pattern but it was a
10 deviation in size, that alone, according
11 to this letter in December of 2007, would
12 necessitate a reporting of that order as
13 suspicious to the local DEA field office,
14 correct?
15         MR. JONES:  Objection.
16    Form.  Calls for a legal
17    conclusion.  Outside the scope.
18         THE WITNESS:  Based on the
19    letter, yes.
20 BY MR. MIGLIORI:
21    Q.   All right.  It goes on to
22 say, Likewise, a registrant need not wait
23 for a normal pattern to develop over time
24 before determining whether a particular

Page 218

1 order is suspicious. The size of an
2 order alone, whether or not it deviates
3 from a normal pattern, is enough to
4 trigger the registrant's responsibility
5 to report the order as suspicious. The
6 determination of whether an order is
7 suspicious depends not only on the
8 ordering patterns of the particular
9 customer, but also on the patterns of the
10 registrant's customer base and the
11 patterns throughout the relevant segment
12 of the regulated industry.
13        So in Schein's system in
14 2007, the thresholds for looking for
15 deviations in size, pattern and frequency
16 were not based on the individual
17 customer, but they were, in fact, based
18 on a relevant segment of that customer's
19 industry, correct?
20        MR. JONES:  Objection.
21     Vague.
22 BY MR. MIGLIORI:
23     Q.   Correct?
24        MR. JONES:  Objection to the

Page 219

1     sidebar.
2 BY MR. MIGLIORI:
3     Q.   Correct?
4     A.   Correct.
5     Q.   And at least in this letter
6 that Henry Schein received in December of
7 2007, it says that the determination of
8 whether an order was suspicious depends
9 not only on the ordering patterns of the
10 particular customer, but also of the
11 relevant segment of the industry.
12        That is, if it triggered a
13 change in size, pattern or frequency for
14 the industry, not just for the customer,
15 according to this letter, that was
16 something that needed to be reported as
17 suspicious to the DEA, correct?
18        MR. JONES:  Objection.
19 Form.  Calls for a legal
20 conclusion.  Outside the scope.
21 BY MR. MIGLIORI:
22     Q.   Correct?
23     A.   Correct, yes.
24     Q.   Again, this is the same

Page 220

1 author, Joe Rannazzisi.
2        On the second page of this
3 exhibit, Number 10, the December 2007
4 letter to Schein, it says, Registrants --
5 or Schein in this case -- that rely on
6 rigid formulas to define whether an order
7 is suspicious may be failing to detect
8 suspicious orders.  For example, a system
9 that identifies orders as suspicious only
10 if the total amount of controlled
11 substances ordered during one month
12 exceeds the amount ordered for the
13 previous month by a certain percentage or
14 more is insufficient.
15        Do you understand that the
16 mere creation of a formula to pick up a
17 deviation in size and a deviation in
18 pattern or frequency, by itself, may not
19 be sufficient to comply with the DEA's
20 suspicious ordering -- suspicious order
21 reporting requirements?
22        MR. JONES:  Objection.
23 Form.  Misstates the document.
24 Calls for a legal conclusion.

Page 221

1        Outside the scope, insofar as it's
2     referencing the letter.
3 BY MR. MIGLIORI:
4     Q.   Do you agree?
5     A.   Can you restate that
6 question?
7     Q.   Sure.
8        Simply stated, it's not
9 enough to just have a formula to identify
10 suspicious orders, according to this
11 letter that Schein received in 2007, the
12 formula has to have some sensitivity to
13 other factors that may prove or show
14 deviation in size, frequency and pattern,
15 correct?
16        MR. JONES:  Objection.
17 Form.  The document speaks for
18 itself.  Insofar as you're asking
19 the witness for his interpretation
20 of the letter, it's outside the
21 scope.
22 BY MR. MIGLIORI:
23     Q.   Do you agree with that?
24     A.   Yes.

Page 222

1    Q.   All right.  And it's also
2 true that a mere threshold number, a
3 threshold system, by itself, is not a
4 complete suspicious order monitoring
5 program?  That is, you can have a
6 suspicious order that does not trigger a
7 deviation in size, frequency and pattern,
8 correct?
9        MR. JONES:  Objection.
10    Form.  Compound.  Calls for
11    speculation.  Vague.
12 BY MR. MIGLIORI:
13    Q.   Correct?
14    A.   Yes.
15    Q.   In fact, that's the whole
16 concept behind Know Your Customer and due
17 diligence, that an order on its face that
18 does not trigger a threshold may be
19 suspicious upon due diligence and
20 investigation of other factors besides
21 the size of the order, correct?
22        MR. JONES:  Objection.
23    Form.  Vague.  Calls for
24    speculation.  Lack of foundation.

Page 223

1 BY MR. MIGLIORI:
2    Q.   Correct?
3    A.   Yes.
4    Q.   So any suspicious order
5 monitoring program that solely relies on
6 a formula to determine whether the order
7 deviates from size, pattern or frequency
8 is, on its face, insufficient to find
9 suspicious orders; it requires a
10 component part of Know Your Customer and
11 due diligence, correct?
12        MR. JONES:  Objection.
13    Form.  Outside the scope.  Vague.
14 BY MR. MIGLIORI:
15    Q.   Correct?
16    A.   Due diligence is a
17 component, yes.
18    Q.   And it's a separate
19 component?  That is, if, for example, a
20 dentist is receiving an order that is not
21 a deviation from size, pattern and
22 frequency but to a home address and not a
23 business office, that is an order that
24 needs to have further investigation

Page 224

1 before shipped, correct?
2    A.   Potentially, yes.
3    Q.   So a robust suspicious --
4        MR. JONES:  Hang on, I think
5    you got it -- was your answer
6    essentially, yes or potentially
7    yes?
8        THE WITNESS:  Potentially.
9        MR. MIGLIORI:  I'll give you
10    plenty of time to redirect him.
11    That's a little bit over the
12    border.  You seem like a nice guy
13    and that's a little bit on the
14    edge.  I'll go at it again.
15 BY MR. MIGLIORI:
16    Q.   You have, in fact, been
17 involved in orders at Schein where
18 something was deemed pended and, in fact,
19 ultimately deemed suspicious because you
20 found out that the orders were going to
21 the doctor's house, correct?
22    A.   Yes.
23    Q.   And so that is not a
24 suspicious order because of a deviation

Page 225

1 in size, pattern or frequency, that's a
2 suspicious order because you have an
3 obligation to know the customer, correct?
4    A.   Correct.
5    Q.   And so any system that only
6 relies on an algorithm to trip a system
7 to find a pended or suspicious order is
8 not a complete system, correct?
9        MR. JONES:  Objection.
10    Form.  Vague.  Objection as to
11    time.
12 BY MR. MIGLIORI:
13    Q.   Correct?
14    A.   Correct.
15    Q.   And, in fact, in this letter
16 in 2007, that's what Joe Rannazzisi is
17 referencing when he sends this to Schein,
18 Inc., that a rigid formula by itself is
19 not enough; you need to do more, you need
20 to Know Your Customer to make sure that
21 the controlled substances that you're
22 supplying and selling don't end up in the
23 wrong hands, correct?
24        MR. JONES:  Again,

Page 226

1    objection.  Form.  The document
2    speaks for itself.  Outside the
3    scope.
4  BY MR. MIGLIORI:
5    Q.   Correct?
6    A.   Yes.
7        MR. MIGLIORI:  All right.
8    Why don't we take a break for
9    lunch?
10       VIDEO TECHNICIAN:  The time
11   is now 12:31 p.m.  We're going off
12   the record.
13          - - -
14       (Whereupon, a luncheon
15   recess was taken.)
16          - - -
17       VIDEO TECHNICIAN:  The time
18   is now 1:20 p.m.  We are back on
19   the record.
20          - - -
21       (Whereupon, Exhibit
22   Schein-Abreu-11,
23   HSI-MDL-00404222-223, was marked
24   for identification.)

Page 227

1          - - -
2  BY MR. MIGLIORI:



9        In your review of documents
10   as a 30(b)(6) witness today, did you
11   review documents that predated your time
12   in the verification department?
13       A.   Yes.
14       MR. JONES:  And, Don, I'm
15   sorry, I don't see a Bates number
16   on this.  Is this from our
17   production?
18       MR. MIGLIORI:  Yes.  Let's
19   see.  It's how we received it, so
20   we can figure out where.
21       MR. JONES:  I mean, is this
22   from our production or --
23       MR. MIGLIORI:  I mean, I
24   have no other source, so I don't

Page 228

1    know how else I would have gotten
2    it.
3        MR. JONES:  That was going
4    to be my next question.
5        MR. MIGLIORI:  But I do
6    notice some of your documents,
7    just for clarification, only have
8    one page.  So I'm wondering if
9    there was a blank page that had a
10   Bates number on top.  Some of them
11   don't have Bates numbers after the
12   first page, as they were produced
13   to us.  So I'll figure that out.
14       MR. JONES:  Okay.  All
15   right.  Thank you.
16       MR. MIGLIORI:  No problem.
17  BY MR. MIGLIORI:
18       Q.   So the verification
19   department is the department that you now
20   run, correct?
21       A.   Correct.
22       Q.   Obviously, you were not
23   there in 1992, correct?
24       A.   Correct.

Page 229

1        Q.   But it did have a -- you did
2    have some form of suspicious order
3    monitoring system in place at the company
4    before you got there, correct?
5        A.   Correct.
6        Q.   And so this memo is from a
7    Wally White.
8        Do you know who that is?
9        A.   No.
10       Q.   And it goes to the
11   verification department, and then the
12   Schein regulatory committee and C.
13   Laskowski.
14       Do you know who that is?
15       A.   I know who C. Laskowski is,
16   yes.
17       Q.   Who is that?
18       A.   She currently is in IT.
19       Q.   But regulatory is where
20   Sergio and Frank are, correct?
21       A.   Yes.



Page 230

Page 232

1  Schein-Abreu-12,
2  HSI-MDL-00404203-209, was marked
3  for identification.)
4        - - -
5  BY MR. MIGLIORI:
6      Q.   Can you just tell me
7  generally what you understand Buzzeo to
8  be?
9          This is Exhibit Number 12
10 I'm handing you.
11         What's your understanding of
12 Buzzeo?
13     A.   That they are a consultant
14 for industry, for regulatory compliance.
15     Q.   And they are a consultant
16 with respect to suspicious order
17 monitoring designs, correct?
18     A.   Among other things.
19     Q.   Among other things, correct?
20     A.   Correct.

Page 231

1      Q.   And that was triggered by
2  computer, right, an algorithm?
3      A.   Yes.
4      Q.   And as of this time, the
5  Controlled Substances Act had been in
6  effect for 21 years.
7          At least on the face of the
8  Act, if this is the operational
9  definition of a suspicious order at
10 Schein, this order, if it exceeded any of
11 those parameters, the suspicious order
12 would have to be reported to the DEA at
13 the time it was discovered, correct?
14         MR. JONES:  Object to the
15     form.
16         THE WITNESS:  Yes, it would
17     be reported.
18 BY MR. MIGLIORI:
19     Q.   Okay.  I'm going to -- we
20 talked a little bit about Buzzeo.  I want
21 to ask you some questions about that
22 company.
23         - - -
24         (Whereupon, Exhibit

Page 233

20         Do you know Kathie Malone?
21     A.   No.
22     Q.   Did you work with anybody at
23 Buzzeo once you started in verifications
24 in 2009?

Page 234

1  A. Yes.
2  Q. All right. But at that
3  point, at least, she wasn't one of the
4  people that you recall working with,
5  correct?
6  A. Not to my recollection.

Page 235

3  Q. And the thresholds were not
4  automatically adjusted over time based on
5  anything; they were manually adjusted
6  based on new product entry since 2002,
7  correct?
8  A. I'm not sure about the
9  adjustment, the timing of adjustments.
10  Q. But you'll agree with me
11  that in 2005, thresholds were manually
12  adjusted, not automatically adjusted,
13  correct?
14  A. Correct.
15  Q. It wasn't based on an
16  algorithm, it was based -- or at least an
17  electronic algorithm, it was based on a
18  manual input from the discretion of some
19  human being to go in and change the
20  system, correct?
21  A. Yes.
22  Q. And that was done by the
23  team that you ultimately are now
24  responsible for, the verification team,

Page 236

1  correct?
2  A. Correct.
3  Q. Were you ever involved with
4  manually changing thresholds once you
5  became a member of the verification team?
6  A. Individual customer
7  thresholds?
8  Q. Individual and/or aggregate.
9  A. Only recently, as I
10  mentioned earlier.
11  Q. When did you recently change
12  a threshold?
13  A. In 2018.
14  Q. And why did you do that?
15  A. We were evaluating false
16  positive pends.
17  Q. And false positive pends is
18  basically the system was spitting out
19  pended orders that, upon investigation or
20  reflection, either should not have been
21  pends or were missing pends that should
22  have been detected, correct?
23  A. As a result of -- yes.
24

Page 237

1

Page 238

1    Is it true that as of
2 September 16, 2005, Henry Schein's
3 suspicious monitoring program only
4 triggered excessive orders and was not
5 triggering deviations in frequency and
6 patterns?
7    A.   Yes.
8    Q.   When an order pends, the
9 investigation conducted by the
10 verification team includes the review of
11 ordering frequency and patterns; however,
12 this review will only occur if the order
13 reaches the threshold limit.
14    So it's fair to say that as
15 of September of 2005, normal-sized
16 orders, that is, orders that were not in
17 excess of prior orders but were different
18 in frequency and pattern, were not being
19 detected in the suspicious order
20 monitoring programs at Henry Schein?
21    MR. JONES:  Objection.
22    Form.  Vague.
23 BY MR. MIGLIORI:
24    Q.   Correct?

Page 239

1    A.   Yes.



Page 240

Page 241

6    Were you a part of any
7 process to implement regular, formal
8 periodic reviews of threshold data?
9    MR. JONES:  Objection.
10    Form.  Vague.
11    THE WITNESS:  In this time
12    period?
13 BY MR. MIGLIORI:
14    Q.   At any time.
15    Were you personally involved
16 in implementing a new system of formal,
17 regular periodic review of the threshold
18 data?
19    A.   Yes.
20    Q.   And when did you first
21 become involved with that?
22    A.   When I began in the position
23 in 2009.
24    Q.   Okay.  So you're not --



Page 242

1 other than what's in this document, you
2 don't have personal knowledge of when
3 periodic regular reviews of threshold
4 data began after this September 2005
5 document, correct?
6     A.   Correct.

Page 244

1

17     Q.   Okay.  Do you know when that
18 process became part of the program?
19     A.   I would say in 2009.
20     Q.   And why do you put it in
21 2009?
22     A.   Because that was when our
23 enhanced system went live.
24     Q.   And the enhanced system,

Page 243

Page 245

1 we'll talk about that very, very shortly,
2 but the enhanced system is a result of
3 the Buzzeo interactive process of
4 reviewing the existing systems and these
5 recommendations, correct?
6         MR. JONES:  Objection.
7     Form.  Foundation.
8 BY MR. MIGLIORI:
9     Q.   If you don't recall now, I
10 have presentations later to show you.
11         But Buzzeo was one of the
12 consultants on the enhanced suspicious
13 order monitoring program that you just
14 referenced, correct?
15     A.   Correct.



Page 246

Page 248

<sup>24</sup>  In 2005, did Henry Schein

Page 247

<sup>1</sup> send to the DEA a list of pended orders
<sup>2</sup> that were cleared from being suspicious?
<sup>3</sup>    A.   Yes.
<sup>4</sup>    Q.    And they did that on a
<sup>5</sup> monthly basis?
<sup>6</sup>    A.   Yes.
<sup>7</sup>    Q.    The second report reflects
<sup>8</sup> those orders that were deemed suspicious
<sup>9</sup> and cancelled.
<sup>10</sup>        So on a monthly basis, both
<sup>11</sup> those reports were submitted, correct?
<sup>12</sup>    A.   Correct.

Page 249



Page 250

Page 252

¹ questionnaire.
² Q. Okay. The letter is then
³ received and reviewed, and if the
⁴ explanation is found reasonable, the
⁵ order is released and the letter is
⁶ retained in the file.
⁷ Was that the process in
⁸ 2005?
⁹ A. Yes.
¹⁰ Q. Is that letter kept, in the
¹¹ ordinary course of business, in the same
¹² place that the due diligence information
¹³ is kept?
¹⁴ A. Same system but different
¹⁵ database.
¹⁶ Q. All right. What database
¹⁷ would that letter go into?
¹⁸ A. So the letters from --
¹⁹ anything from prior to 2009 would have
²⁰ been that microfilm area.
²¹ Q. But at least then, in that
²² microfilm area, all of the due diligence
²³ pre-2009 would have been in the same
²⁴ place as this letter, correct?

Page 251

Page 253

¹ A. Centralized, yes.
² Q. And prior to 2009, any such
³ letters would be destroyed or purged?
⁴ A. Yes.
⁵ Q. Post-2009, any such letters,
⁶ questionnaires, due diligence, would
⁷ still be at Schein, and under the
⁸ retention policy, still retained,
⁹ correct?
¹⁰ A. Yes.

¹⁵ So this was the letter we
¹⁶ were talking about earlier. There was,
¹⁷ at this time, in 2005, a process that
¹⁸ once, as they put it, an order pends as
¹⁹ suspicious, Schein sends that customer a
²⁰ one-page questionnaire to fill out,
²¹ correct?
²² A. I think at this time period
²³ it was more of a request of a letter from
²⁴ the customer, rather than a

²³ In other words, the one
²⁴ letter isn't enough to clear future

Page 254

1 orders that are pended to be excessive,
2 correct?
3          MR. JONES: Objection.
4      Form. Outside the scope. The
5      document speaks for itself.
6 BY MR. MIGLIORI:
7      Q.   Correct?
8      A.   So I would say no in that
9 case.
10     Q.   Why?
11     A.   Because it's saying that the
12 letter still could be considered to be
13 used, but a review of that letter should
14 be done.
15     Q.   Right.  So maybe I was being
16 a little too careful with the word.
17          The letter itself is not
18 enough to clear the future order, it
19 requires verification that that letter
20 still applies; is that a fair statement?
21          MR. JONES:  Hang on.  Are
22     you asking him if that's what the
23     recommendation is, or if that's
24     what Henry Schein's practice was?

Page 255

1          MR. MIGLIORI:  I'm asking --
2          MR. JONES:  Or should have
3     been.
4          MR. MIGLIORI:  Fair enough.
5 BY MR. MIGLIORI:
6      Q.   That's what the
7 recommendation is here, correct, that
8 that letter be reviewed for whether or
9 not it's still viable as an explanation
10 for future orders, correct?  That's the
11 recommendation?
12     A.   Based on the recommendation,
13 yes.
14     Q.   Did that ever get
15 implemented, do you know?
16     A.   We would still -- we could
17 still rely on existing due diligence to
18 clear a future order.
19     Q.   Without any further
20 investigation?
21     A.   Well, there would be some
22 investigation taking place, to review the
23 due diligence that we have.
24     Q.   Without any contact with the

Page 256

1 customer?
2      A.   Potentially, depending on
3 the circumstances.
4      Q.   So there are instances, in
5 your experience, where Schein will rely
6 on a letter in the file for a prior
7 pended order as a basis to clear a future
8 order, without contacting the client?
9      A.   If the information contained
10 in the letter still holds true, yes.
11     Q.   Is that still true as of
12 today?
13     A.   Yes.

Page 257

11          Do you know who those two
12 are?
13     A.   Yes.
14     Q.   Who are they?
15     A.   Ron Buzzeo was with Buzzeo,
16 and Mike DiBello was a former director
17 for regulatory affairs.
18     Q.   At Henry Schein?
19     A.   At Henry Schein.



Page 258

10    Now, you just mentioned in a
11 prior answer false positives for
12 suspicious orders, correct?
13    A.   Yes.

Page 259

17    As of 2005, Henry Schein
18 determined -- set its thresholds based on
19 aggregated data, correct?
20    A.   Correct.
21    Q.   As we saw from the last
22 document, that aggregated data, as of
23 2005, was the 2002 study of Jay Schein of
24 industry-wide behavior, correct?

Page 260

1    A.   I'm not sure about the
2 industry-wide behavior.
3    Q.   It wasn't based on the --
4 only upon the customers of Schein,
5 correct?
6    A.   Again, I'm not sure on that.
7    Q.   By the way, who is Jay
8 Schein?
9    A.   I think he was a staff
10 pharmacist at the time.
11    Q.   Related to Schein, Schein?
12    A.   I've been told no, no
13 relation.
14    Q.   Okay.  So as of October of
15 2005, it was still the case that the
16 thresholds were set by aggregated data,
17 correct?
18    A.   Correct.
19    Q.   And here the concern is that
20 doing that creates a bunch -- a fair
21 number of false positives, meaning
22 suspicious orders that may be there or
23 suspicious orders that may be missed,
24 correct?

Page 261

1    MR. JONES:  Objection.
2    Form.  Misstates the document.
3 BY MR. MIGLIORI:
4    Q.   You used the word "false
5 positives" before.
6    That's your understanding of
7 what a false positive is, correct?
8    A.   Yes.
9    Q.   All right.  Did Henry Schein
10 change, ever, its threshold
11 determinations from aggregated data to
12 individual practitioner data, as
13
14
15
16
17
18
19
20
21
22
23
24



Page 262

15    Now, we've talked about
16 Sergio Tejeda.
17    Who is Craig Schiavo?
18    A.   He was a former Henry Schein
19 regulatory employee.
20    Q.   Maggie Wilding, we talked
21 about her, right?
22    A.   Verification.
23    Q.   Verification.
24    Patrick Hannehoe?

Page 263

1    A.   He was one of the directors
2 of our IT at the time.
3    Q.   Jaysari Pal?
4    A.   She was an IT project
5 manager.
6    Q.   Andi Tiller?
7    A.   She -- I'm not sure what she
8 was then, but she works under the
9 regulatory as well.
10    Q.   And Mark Wilburn?
11    A.   Also a regulatory employee.
12 Was, sorry, former regulatory employee.
13    Q.   So these are representatives
14 of regulatory, verification and IT,
15 correct?
16    A.   Yes.

22    What is "IS"?
23    A.   Information systems.
24    Q.   So the IT?

Page 264

1    A.   IT.
2    Q.   IS agreed to start figuring
3 out how the system should be set up
4 immediately and will supply regulatory
5 with the specialty codes.
6    Are you familiar with this
7 decision, in October 2007, to set up an
8 electronic system through IS for the
9 suspicious monitoring program?
10    A.   I know it was in process at
11 that time, yes.
12    Q.   The system they were talking
13 about, it says, The system needs to be
14 able to set thresholds and flag all
15 suspicious orders.
16    Do you see that?
17    A.   Yes.
18    Q.   Now, by that, is this the
19 beginning of the process of Schein of
20 having the computer adjust for thresholds
21 versus manual input?
22    A.   To create the project to do
23 it, yes.
24    Q.   And that project began

Page 265

1 around 2007, 2008 and continued through
2 2009, correct?
3    A.   Correct.
4    Q.   And that's what you've
5 referred to as the enhanced program,
6 correct?
7    A.   Yes.
8    Q.   Then it talks about flagging
9 all suspicious orders based on those
10 thresholds, correct?
11    A.   Which -- I'm sorry, where
12 are you reading from?
13    Q.   The system needs to be able
14 to set thresholds and flag all suspicious
15 orders.
16    Correct?
17    A.   Yes.
18    Q.   So, again, the system would
19 automatically set a threshold and reset a
20 threshold, and the system would
21 automatically flag a suspicious order
22 based on that threshold, correct?
23    A.   Yes.
24    Q.   Exhibit-15.

Page 266

1           - - -
2           (Whereupon, Exhibit
3       Schein-Abreu-15,
4       HSI-MDL-00374284-285, was marked
5       for identification.)
6           - - -
7   BY MR. MIGLIORI:
8       Q.   Another Henry Schein
9   document produced called, Suspicious
10  Monitoring System Specifications Draft.
11  I have from the metadata that this is
12  dated January 16th of 2008.
13          You'll see that the first
14  paragraph talks about the DEA standard
15  and requirement, correct?
16      A.   Yes.
17      Q.   The second one talks about
18  the need to inform the DEA of suspicious
19  orders when discovered by the registrant,
20  correct?
21          MR. JONES:  Hang on.  I
22      mean, if you're going to ask him
23      to confirm what the document says,
24      give him an opportunity to read

Page 267

1   it.
2           Again, I don't think you
3       need him to tell you what the
4       document says.
5           MR. MIGLIORI:  If I don't do
6       it, then I don't get the
7       foundation.  So you tell me which
8       objection you'd like us to follow,
9       and I'll be happy to follow it.
10          MR. JONES:  If you want to
11      ask him a question about the
12      document, then let him read it,
13      then that's perfectly allowable.
14          MR. MIGLIORI:  Let me know
15      when I'm not doing it right.
16          MR. JONES:  Well, Don --
17  BY MR. MIGLIORI:
18      Q.   The document says, The
19  regulation also requires the registrant
20  to inform the local DEA of suspicious
21  orders when discovered.
22          We've talked about that
23  several times today, correct?
24      A.   Yes.

Page 268

1       Q.   The DEA defines a suspicious
2   order as orders of unusual size, orders
3   deviating substantially from normal
4   pattern, and orders of unusual frequency.
5           You'll agree with me that
6   this document from Henry Schein
7   acknowledges the definition of a
8   suspicious order that the DEA has,
9   correct?
10      A.   Correct.
11      Q.   And that these criteria are
12  disjunctive and not inclusive, that means
13  a trip of any one of those deviations is
14  enough for it to become a suspicious
15  order, correct?
16      A.   Yes.
17      Q.   And then it restates, again,
18  that registrants that rely on rigid
19  formulas to define whether an order is
20  suspicious may be failing to detect them.
21          We've seen that language in
22  other documents, including this one from
23  Henry Schein, correct?
24      A.   Correct.

Page 269

1           MR. JONES:  Now, just to be
2       clear, I mean, I know that this
3       came from our production, but are
4       you representing that this was
5       something that was prepared by
6       somebody within Henry Schein?
7           MR. MIGLIORI:  I think the
8       next question will answer that.
9           MR. JONES:  Okay.
10  BY MR. MIGLIORI:
11      Q.   The new monitoring system
12  will review orders based on -- and then
13  it gives three categories -- customer's
14  market segment; medical, dentistry,
15  veterinary, specialty.  Purchasing
16  patterns; low, large patterns.  And
17  productive ingredient.
18          Are those the four areas of
19  threshold data that were added to the new
20  enhanced program that you spoke of?
21      A.   We also had added practice
22  type as one of the fields.
23      Q.   So market segment and
24  practice type?

Page 270

1     A.   Uh-huh.
2     Q.   Okay.  And those would be
3  part of the enhanced program that
4  ultimately got fully implemented in 2009,
5  correct?
6     A.   Correct.
7     Q.   All right.  Exhibit Number
8  16.
9           - - -
10          (Whereupon, Exhibit
11    Schein-Abreu-16, HSI-MDL-00040712,
12    was marked for identification.)
13          - - -
14  BY MR. MIGLIORI:
15    Q.   This is a document, through
16  metadata, that's dated November 2nd of
17  2009.
18          So at this point, you would
19  now -- you would now have been in the
20  verification department for a month or
21  so, correct?
22    A.   Yes.
23    Q.   This is a November 2nd, 2009
24  PowerPoint presentation of -- I refer to

Page 271

1  it as Dendrite.
2          How do you pronounce the
3  full name, do you know?
4     A.   Cegedim.
5     Q.   Cegedim Dendrite.
6          Compliance solutions powered
7  by Buzzeo.  So this is the Buzzeo company
8  that we've been referring to over the
9  past two years, that is, from 2007
10  through this date, November of 2009,
11  correct?
12    A.   Correct.
13    Q.   They have the Seventh Annual
14  Controlled Substance Conference, current
15  DEA challenges from a distributor's
16  perspective, and presenting with Buzzeo
17  is Mike DiBello.
18          And I think you told me
19  earlier that he was the director, at the
20  time, of regulatory affairs for your
21  company, Henry Schein, correct?
22    A.   Correct.
23    Q.   And so have you seen this
24  before, by the way?

Page 272

1     A.   No.
2     Q.   All right.  So in this
3  presentation, he talks about the company
4  generally, the suspicious order
5  monitoring program and its challenges in
6  the system at Henry Schein, and some of
7  the other -- new accounts setup, standard
8  operating procedures, some of the other
9  things that we've already talked about a
10  lot today, correct?
11    A.   Yes.
12    Q.   He states that, Henry Schein
13  is the largest distributor of healthcare
14  products and services to office-based
15  practitioners in the combined North
16  America and European markets.
17          Were you aware of that?
18    A.   Yes.
19    Q.   Customers include dental
20  practices and laboratories, physician
21  practices and animal health clinics, as
22  well as government and other
23  institutions.
24          And, In 23 countries over $6

Page 273

1  billion in sales.
2          Were you familiar with that?
3     A.   Yes.
4     Q.   They recite the, yet again,
5  the DEA regulations, this time from the
6  December 2010 letter from the DEA that we
7  already talked about, correct?
8     A.   Uh-huh, yes.
9     Q.   On Page 4.
10          It talks about the unclear
11  requirements with lack of guidance as to
12  Know Your Customer.
13          You'll agree with me that
14  this enhanced program had a substantial
15  focus on trying to define and implement
16  best practices for the Know Your Customer
17  requirement, correct?
18    A.   Yes.
19    Q.   Know Your Customer
20  requirements have always existed, but at
21  this time, in 2009, what was deemed to be
22  sufficient or compliant was something
23  that everybody, all the distributors in
24  your industry, had been working on,

Page 274

1 correct?
2    A.   Correct.
3    Q.   By this time, if you look at
4 Page 7, your suspicious order monitoring
5 program was computer Internet-based,
6 correct?
7    A.   Computer.  Not Internet.
8    Q.   Okay.  When you started, was
9 this a screen, on Page 7, that you would
10 be able to access for purposes of looking
11 into a particular order or customer?
12    A.   Yes.
13    Q.   What was this system called
14 that I'm looking at here?
15    A.   It's part of JDE.
16    Q.   Okay.  So you would click on
17 a -- was there a particular icon you
18 click on for the suspicious order
19 monitoring system?
20    A.   It's an option, a menu
21 option within the system.
22    Q.   Within the JDE system?
23    A.   Yes.
24    Q.   All right.  And so when you

Page 275

1 trained, you trained on how to use and
2 access this information, correct?
3    A.   Correct.
4    Q.   And then when you talked
5 about the standard operating procedures
6 and the enhanced system, in 2009, what --
7 according to Page 10 of this
8 presentation, what was enhanced and
9 changed in the policy included outlines
10 to specifications of a new S1 system and
11 the three components that make up the
12 entire system.
13         So the new system had new
14 components?  Do you know what those three
15 components are?
16         MR. JONES:  Objection.
17    Form.
18 BY MR. MIGLIORI:
19    Q.   I'm just asking if you know.
20 If you don't, you don't.
21    A.   Not three, no.
22    Q.   Added out-of-practice
23 section outlining practices that can and
24 cannot purchase specific controlled

Page 276

1 substances.
2         So did this enhanced system
3 add a component of when a doctor cannot
4 order controlled substance based on the
5 practice area?
6    A.   There were restrictions put
7 in place, yes.
8    Q.   That was part of this
9 enhanced program that was launched at the
10 end of 2009, correct?
11    A.   I'm not sure of the date on
12 that part of it.
13
14
15
16
17
18
19
20
21
22
23
24



Page 277

1
2
3
4
5         Was that a new process added
6 to the standard operating procedures for
7 new clients?
8    A.   Around the same time period.
9    Q.   Yes?
10    A.   Around the same time, yes.
21         And that's consistent with
22 your understanding, correct?
23    A.   Yes.
24    Q.   The restrictions set up to

Page 278

1 prevent accounts from ordering products
2 not normally used in their process.
3       Those restrictions were
4 established or set up in October of 2007;
5 does that sound right?
6       A.   It says November 2007.
7       Q.   I'm sorry, November.  You're
8 correct.
9       A.   Yep.
10      Q.   Is that about when you
11 recall those restrictions being set up?
12      A.   I don't recall.  I wasn't
13 there at the time.
14      Q.   Okay.  In December of 2007,
15 that's when Schein received one of those
16 DEA Rannazzisi letters that we spoke of
17 earlier, correct?
18      A.   Yes.
19      Q.   In April of 2008, the
20 Product Normalization Project was
21 finished.
22       Do you know what that was?
23      A.   No, I'm not sure what the
24 name -- what that means.

Page 279

1       Q.   Do you know what the Gantt
2 chart was in April of 2008?
3       A.   No.
4       Q.   In March of 2009, the
5 suspicious order monitoring statistical
6 approach specs were finalized and
7 submitted.
8        Is that your recollection,
9 that, in September of 2009, the
10 statistical threshold setting
11 specifications were finalized?
12      A.   You're talking about in
13 March, right?
14      Q.   In March of 2009.
15      A.   March of 2009.
16       It was prior to me coming on
17 board.
18      Q.   So that would be consistent
19 with your understanding?
20      A.   It would be consistent with
21 my understanding, yes.
22      Q.   Because you came on board
23 about seven months later?
24      A.   Yes.

Page 280

1       Q.   In June of 2009, the
2 customer questionnaire implemented for
3 due diligence purposes for new onboarded
4 customers had been developed, correct?
5       A.   Correct.
6       Q.   Prior to that, there was no
7 customer questionnaire for new onboarded
8 clients, correct?
9       A.   There wasn't a specific
10 questionnaire.  We did seek other
11 means --
12      Q.   Right.
13      A.   -- to obtain information.
14      Q.   But it wasn't a standardized
15 questionnaire, correct?
16      A.   Correct.
17      Q.   In July of 2009, the
18 suspicious order monitoring SOP was
19 revised and finalized, that is, all of
20 the changes to the standard operating
21 procedures for SOM as it related to this
22 enhanced program had been revised and
23 approved and finalized, correct?
24      A.   Yes.

Page 281

1       Q.   And then all of those
2 changes over that two-year period were
3 implemented, that is, put into effect,
4 beginning in October of 2009, right when
5 you got to verifications, correct?
6       A.   Correct.
7       Q.   Do you remember, in your
8 training, that you were actually there at
9 a time when this was just launching?
10      A.   Yes.
11      Q.   Were you, in fact, hired
12 into verification at this point because
13 of this program?
14      A.   That, I don't know.
15      Q.   Okay.  Do you remember why
16 you wanted to move into verifications
17 after being in database?
18      A.   It was offered to me.
19      Q.   And do you recall who hired
20 you or recruited you into that
21 department?
22      A.   Yes.
23      Q.   Who was that?
24      A.   It was my manager and

Page 282

1  director at the time.
2      Q.   Named?
3      A.   Lisa Madalon was my manager
4  and Bill Brandt was my director.
5      Q.   So in October of 2009, the
6  system was tested and folks were trained.
7          So you were part of that
8  training, correct?
9      A.   Yes.
10     Q.   And October 5th of 2009, it
11  says, A new item setup process was
12  implemented.
13         What does that mean?  Is
14  that standard operating procedure lingo?
15     A.   Yeah.  It was to add new
16  items into our SOM system.
17     Q.   Okay.  So, basically, all of
18  the things that we're talking about here
19  got -- went online; is that a fair way to
20  say it?
21     A.   Yes.
22     Q.   And then in October of 2009,
23  the system itself was completed.
24         So as of October 9th, 2009,

Page 283

1  this enhanced suspicious order monitoring
2  program was in place, correct?
3      A.   Correct.
4      Q.   All right.
5              - - -
6          (Whereupon, Exhibit
7      Schein-Abreu-17,
8      HSI-MDL-00404369-373, was marked
9      for identification.)
10             - - -
11  BY MR. MIGLIORI:

Page 284

4          MR. JONES:  Objection.
5  Form.
6          Don, you said this document,
7  December 2009.  Are you getting
8  that from the metadata, or is it
9  referenced?
10         MR. MIGLIORI:  That's -- I
11  will tell you.  That is metadata.
12         MR. JONES:  It's metadata.
13         MR. MIGLIORI:  Yes.
14         MR. JONES:  Okay.  Well,
15  I'll object to the document,
16  insofar as it's not dated and it's
17  entitled, Draft.
18  BY MR. MIGLIORI:
19     Q.   Were you involved with any
20  of that process, close the loop on those
21  open items?
22     A.   I'm not sure what they mean
23  by "control access codes."  So that
24  doesn't ring a bell.

Page 285



Page 286

1
2      Did a compliance agreement
3  form get developed as a result of the
4  recommendations from Buzzeo?
5          MR. JONES:  Objection to the
6      sidebar.  Objection.  Form.
7          THE WITNESS:  We developed
8      and implemented the customer
9      questionnaire.
10 BY MR. MIGLIORI:
11     Q.   Is that what the compliance
12 agreement is?  Is that another name for
13 it?
14         MR. JONES:  Objection.
15     Form.  Lack of foundation.  Calls
16     for speculation.
17         THE WITNESS:  I'm not sure
18     if it's synonymous.
19 BY MR. MIGLIORI:
20     Q.   That's all I'm asking.
21     A.   Yeah.
22     Q.   Have you ever heard that
23 term, "compliance agreement" form?
24     A.   No.

Page 287

1      Q.   But would you agree that the
2  questionnaire that you developed, in
3  fact, dealt with, quote, Customer's
4  previous history of using controlled
5  substances, office practice rules and
6  general practice expectations?
7      A.   Yes.
8      Q.   All right.  So were you
9  involved in developing that
10 questionnaire?
11     A.   No.
12     Q.   Did you, in fact, implement
13 such a questionnaire after the launch of
14 the enhanced SOM?
15     A.   Yes.
16         MR. JONES:  Objection.
17     Form.  Objection.  Vague.
18         Just pause, please.
19 BY MR. MIGLIORI:
20     Q.   Do you know when it started
21 that you started to use that
22 questionnaire?
23     A.   It was right around the time
24 when I joined.

Page 288

1      Q.   Do you know what a MedPro
2  inquiry is?
3      A.   MedPro is a third-party
4  licensed provider that we use.
5      Q.   Is that a way of verifying
6  licenses?
7      A.   Yes.
8      Q.   And according to this
9  recommendation, it appears that Schein
10 used MedPro in states that required
11 background checks but not in other
12 states.
13         Was that true, to your
14 experience, when you started in the
15 verification department?
16         MR. JONES:  Objection.
17     Form.  Lack of foundation.  Calls
18     for speculation.
19         THE WITNESS:  Yeah, I'm
20     not -- I'm not sure on that one.
21 BY MR. MIGLIORI:
22     Q.   Fair enough.
23         It also says that, Henry
24 Schein, Inc., has conducted some on-site

Page 289

1  investigations for prospective customers.
2  However, the criteria for the level of
3  due diligence has not been documented in
4  any standard operating procedure or
5  memorandum.
6          Were you involved, at any
7  point, in developing an SOP or memorandum
8  for what level of due diligence is
9  required for onboarding a new customer?
10         MR. JONES:  Object to the
11     sidebar.  Objection to form.
12         THE WITNESS:  In relation to
13     a site visit?
14 BY MR. MIGLIORI:
15     Q.   In relation -- in
16 relationship to due diligence for new
17 customers.
18         Did you develop any written
19 documented SOP or memorandum for
20 onboarding new customers?
21     A.   During this time period --
22     Q.   At any time.
23     A.   -- or at any time?
24         At any time, yes.

Page 290

1    Q.   When?
2    A.   I think it was 2012.
3    Q.   Okay.  So three years after
4 this, or so?
5    A.   Yes.
6         MR. JONES:  Object to the
7    form.
8 BY MR. MIGLIORI:
9    Q.   Another observation of
10 Buzzeo is that lower-level staff is
11 actively involved in clearing pended
12 orders.  Pended orders should be cleared
13 by a management official.
14        When you started in the
15 verification department, were pended
16 orders being cleared by non-management?
17        MR. JONES:  Objection --
18    object to the sidebar.  Objection.
19    Form.  Objection.
20    Mischaracterizes the document.
21 BY MR. MIGLIORI:
22    Q.   Go ahead.
23    A.   Sorry, could you restate
24 that one?

Page 291

1    Q.   Were staff in the
2 verification department, or in
3 regulatory, actively involved in clearing
4 pended orders when you got to the
5 verification department in 2009?
6    A.   It was a collaboration of
7 multiple people within all the different
8 teams.
9    Q.   Do you recall a
10 recommendation by Buzzeo, at any point,
11 saying that pended orders should be
12 cleared by management, not by staff?
13    A.   No.
14    Q.   Does Henry Schein still
15 allow staff to clear pended orders?
16    A.   All customer due diligence
17 reviews are reviewed by a member of the
18 management team.
19    Q.   The last comment is that,
20 Henry Schein has clearly invested a great
21 deal of time and energy in developing an
22 adequate S1 system.  However, the
23 responsibilities of the customer service
24 department, the verifications department

Page 292

1 and the regulatory department appear to
2 be poorly defined and reliant, to some
3 extent, upon the judgment of individual
4 employees regarding what types of
5 situations should be referred to
6 management for approval or forwarded to
7 regulatory for investigation.
8         Do you recall Buzzeo making
9 any kind of observation like that when
10 you were first hired on to the
11 verification department in 2009?
12        MR. JONES:  Objection.
13    Vague.
14        THE WITNESS:  No.
15 BY MR. MIGLIORI:
16    Q.   Do you have any reason to
17 dispute that Buzzeo made that observation
18 to Henry Schein in November of 2009?
19        MR. JONES:  Objection.
20    Form.  Mischaracterizes the
21    document.  Misleading.
22        THE WITNESS:  To the extent
23    that it's in this memo or
24    document, yes.

Page 293

1 BY MR. MIGLIORI:
2    Q.   Yes, you have a reason to
3 dispute it; or, yes, it appears from the
4 document that that was a recommendation?
5         MR. JONES:  Objection.
6    Form.
7 BY MR. MIGLIORI:
8    Q.   Go ahead.
9    A.   It appears from the
10 document, yes, that it was a
11 recommendation.
12    Q.   Okay.
13        - - -
14    (Whereupon, Exhibit
15    Schein-Abreu-18, HSI-MDL-00072607,
16    was marked for identification.)
17        - - -
18 BY MR. MIGLIORI:
19    Q.   I'll show you Exhibit-18,
20 please.
21        Exhibit-18 was produced by
22 Henry Schein.  It is, again, by metadata
23 only, because it's not dated otherwise,
24 November 27th, 2013.  And it's called,

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  The Individual Opportunity/Issue
2  presented by Tina Steffanie-Oak.
3        In 2013, who was Tina
4  Steffanie-Oak in Henry Schein?
5        A.   She was a former supervisor
6  or manager for regulatory.
7        Q.   So she was in the compliance
8  department?
9        A.   Regulatory, yes.

21        In 2013, was it true that
22  Henry Schein only had due diligence --
23  Know Your Customer due diligence for 40
24  percent of its customers?

Page 295

1        A.   I'm not sure of the exact
2  number.
3        Q.   Do you have any reason to
4  dispute that that was an observation of
5  Tina Steffanie-Oak in the regulatory
6  department?
7        A.   No.

19        Q.   That was true in 2013 and
20  it's true today, correct?
21        A.   Correct.
22        Q.   It's also true in 2006,
23  correct?
24        A.   Correct.

Page 296

1        Q.   In fact, it was true going
2  back to the enactment of the statute for
3  controlled substances in 1971, correct?
4        A.   Yes.

11        First of all, in 2013, had
12  you been to any DEA conferences?
13        A.   By that point, yeah, I
14  believe so.  Yes.
15        Q.   Do you think you ever met or
16  came across James Arnold?
17        A.   I had seen him at
18  conferences, yes.
19        Q.   These are quotes, now,
20  attributed to him by Tina Steffanie-Oak.
21        Do what you're supposed to
22  do and we won't have a problem.
23        Do you recall DEA ever
24  making that statement or representation

Page 297

1  to Henry Schein?
2        A.   No.
3        Q.   Tina Steffanie-Oak then says
4  that the DEA is quoted as saying, All you
5  need to do is to identify and report.
6  It's that simple.
7        Did you ever hear that from
8  anybody at the DEA?
9        A.   Not personally, no.
10        Q.   Legitimate medical need is
11  key.
12        Have you heard that
13  statement made about suspicious order
14  monitoring?
15        A.   No.
16        Q.   Would you agree with the
17  statement that legitimate medical need is
18  key to a good, robust, best practices
19  suspicious order monitoring program?
20        A.   Yes.
21        Q.   Volume will tell you a lot
22  about the customer.
23        Have you ever heard that
24  statement from anyone from the DEA?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    A.   Just that volume may be
2 indicative of a suspicious order.
3    Q.   And you would agree that
4 volume may, in fact, be indicative of a
5 suspicious order, correct?
6    A.   Yes.
7    Q.   You should know what a
8 suspicious, more than the DEA would know
9 because you see all of the numbers and
10 deal with the customers every day.
11       Have you ever heard that
12 from the DEA?
13    A.   No.
14    Q.   Would you agree with me that
15 the suppliers of controlled substances
16 know the numbers of their orders and
17 transactions and deal with their
18 customers more than the DEA?
19       MR. JONES:  Objection.
20    Form.
21       THE WITNESS:  We report all
22    of our controlled substances
23    transactions to DEA.  So I would
24    think they would know as much as

Page 299

1    we do.
2 BY MR. MIGLIORI:
3    Q.   On the transactions?
4    A.   On the transactions.
5    Q.   What about with respect to
6 knowing the customer?
7    A.   The customer themselves, I
8 would agree, yes, that we probably know
9 more.
10    Q.   And the suspicious order
11 monitoring program, in order to be robust
12 and lawful, needs to have a strong Know
13 Your Customer component, correct?
14       MR. JONES:  Objection.
15    Form.  Vague.  Calls for a legal
16    conclusion.
17 BY MR. MIGLIORI:
18    Q.   Correct?
19    A.   Yes.
20    Q.   And then Tina Steffanie-Oak
21 said that the DEA represented to the
22 industry that was present at this
23 conference that, Unacceptable excuses for
24 failure to report a suspicious order,

Page 300

1 according to the DEA, include that the
2 customer had a valid DEA registration.
3       You agree that it was known
4 then, and it's known today, that mere
5 registration is not enough to clear a
6 suspicious order, correct?
7    A.   Correct.
8    Q.   She then said, We are only a
9 link -- one link in the supply chain.
10       That is, the DEA said to the
11 distributors, the fact that you're only
12 one link in the supply chain is not a
13 defense to failure to report suspicious
14 orders.
15       Is that a true statement?
16       MR. JONES:  Object to the
17    form.  Did you read it right, or
18    is that an accurate statement?
19       MR. MIGLIORI:  I can say it
20    a little differently.
21       MR. JONES:  Object to the
22    form to the extent it calls for a
23    legal conclusion.
24 BY MR. MIGLIORI:

Page 301

1    Q.   I think your counsel wants
2 me to get you to agree that's what it
3 says.
4       Can we agree it says that --
5 she reported it's unacceptable, for
6 failure to report a suspicious order, to
7 say that we are only a link, one link in
8 the supply chain?
9       MR. JONES:  Object to the
10    form.
11 BY MR. MIGLIORI:
12    Q.   Is that what it says?
13    A.   Yes.
14    Q.   You'll agree, as the person
15 with knowledge of Henry Schein's
16 suspicious order monitoring policies and
17 procedures, that that is not a viable
18 defense to reporting or failing to report
19 a suspicious order, that you're just one
20 of the actors in the supply chain,
21 correct?
22       MR. JONES:  Objection.
23    Form.  Objection to the extent it
24    calls for a legal conclusion.

Page 302

1  BY MR. MIGLIORI:
2      Q.   You agree with that, right?
3      A.   Sorry, can you restate that?
4      Q.   Yes.
5          You'll agree that, as a
6  person with the knowledge of Henry
7  Schein's policies and procedures on
8  suspicious order monitoring, that it is
9  not a defense, for failure to report a
10  suspicious order, that Schein is only one
11  link in the supply chain --
12         MR. JONES:  Same objection.
13  BY MR. MIGLIORI:
14      Q.   -- correct?
15         MR. JONES:  Sorry.
16         THE WITNESS:  Yes.
17  BY MR. MIGLIORI:
18      Q.   It's not a defense to
19  failure to report a suspicious order that
20  you can't look at every customer's order,
21  correct?
22         MR. JONES:  Object to the
23      form.  Calls for a legal
24      conclusion.

Page 303

1         THE WITNESS:  Yes.
2  BY MR. MIGLIORI:
3      Q.   Yes, it's correct?
4      A.   Yes.
5      Q.   It's not a defense to
6  failure to report a suspicious order that
7  Schein is not responsible for what a
8  customer does with the drugs.
9          You agree with that
10  statement, correct?
11         MR. JONES:  Objection.
12      Form.  Calls for a legal
13      conclusion.
14  BY MR. MIGLIORI:
15      Q.   Do you agree with that?
16      A.   Can you restate it?  I'm
17  sorry.
18      Q.   Yes.
19          You would agree with Tina
20  Steffanie-Oak -- strike that.
21          You'll agree that it is not
22  a defense for Henry Schein, in failing to
23  report a suspicious order, that Schein
24  would represent that it's not responsible

Page 304

1  for what its customers do with the
2  drugs --
3         MR. JONES:  Object to the
4      form.
5  BY MR. MIGLIORI:
6      Q.   -- correct?
7         MR. JONES:  Object to the
8      form.  Calls for a legal
9      conclusion.  Outside the scope.
10         THE WITNESS:  I think to an
11      extent, yes.
12  BY MR. MIGLIORI:
13      Q.   All right.  Well, by itself,
14  once the drugs leave -- once controlled
15  substances leave Henry Schein, the
16  obligation of Schein to make sure that an
17  order, if suspicious, be reported,
18  doesn't absolve Schein of future
19  responsibility, correct?
20         MR. JONES:  Objection.
21      Form.  Calls for legal conclusion.
22      Outside the scope.
23  BY MR. MIGLIORI:
24      Q.   Is that correct?

Page 305

1      A.   Yes.
2      Q.   And it's not a defense for
3  Schein to say, in failing to report a
4  suspicious order, that it's not a doctor
5  or pharmacist, correct?
6         MR. JONES:  Objection.
7      Form.  Outside the scope.  Calls
8      for legal conclusion.
9  BY MR. MIGLIORI:
10      Q.   Is that correct?
11      A.   Yes.
12         MR. JONES:  Don, if you're
13      getting ready to move to another
14      exhibit, can we take a break?
15         MR. MIGLIORI:  Yeah.  Let me
16      just make sure I'm done with this
17      one, and then I'll be happy to.
18      Just a second.
19          Let me just finish this
20      document, and then we'll break.
21         MR. JONES:  Sure.
22         MR. MIGLIORI:  Thank you.
23  BY MR. MIGLIORI:
24  ████████████████████████



Page 306

17    You are aware that the
18 failure of the DEA registrant to maintain
19 effective controls against diversion can
20 result in the registration being revoked
21 by the DEA, aren't you?
22    MR. JONES: Objection.
23    Form. Outside the scope. Calls
24    for speculation.

Page 307

1 BY MR. MIGLIORI:
2    Q.   Correct?
3    A.   Yes.
4    Q.   In fact, that's the whole
5 point of a suspicious order monitoring
6 program, to effectuate effective controls
7 against diversion, correct?
8    MR. JONES: Objection.
9    Form. Calls for a legal
10    conclusion.
11    THE WITNESS: Yes.
12 BY MR. MIGLIORI:
13    Q.   What's that?
14    A.   Yes.
15    Q.   Any distributor who is
16 selling drugs that are being dispensed
17 outside the course of professional
18 practice must stop immediately.
19    That is true in 2013,
20 correct?
21    A.   Yes.
22    Q.   And that policy was
23 implemented by Schein in its suspicious
24 order monitoring program, I think you

Page 308

1 said, some time in -- the end of 2009
2 with this enhanced SOM program, correct?
3    A.   As part of it, yes.
4    Q.   The DEA cannot guarantee
5 that past failure to maintain effective
6 controls against diversion will not
7 result in action against a distributor.
8    Strike it. I don't need to
9 ask you about that.

19    Were you part of an effort
20 around this time frame of 2013, November
21 of 2013, to develop a plan to get due
22 diligence information on all Henry Schein
23 customers?
24    A.   Yes.

Page 309

1    Q.   And what role did you play,
2 beginning in November of 2013, to develop
3 and execute a plan to get due diligence
4 on all of Henry Schein's customers?
5    A.   So we helped with flagging
6 the system to ensure that customer orders
7 were pended to request due diligence.
8    Q.   So, effectively, if 60
9 percent of the customers had no due
10 diligence at all, did this program pend
11 all of that 60 percent until the due
12 diligence could be collected?
13    A.   It was done in a series of
14 steps.
15    Q.   And when you pended a
16 customer that did not have any due
17 diligence in the file, I'm talking about
18 the 60 percent group right now, did those
19 pended customers get reported to DEA as
20 pended?
21    A.   In 2013?
22    Q.   And thereafter.
23    A.   They would have up until
24 April of 2015, yes.

Page 310

1 Q. So this program of pending
2 the customer and then obtaining due
3 diligence, how long did it take to
4 execute that plan?
5 A. It took a number of years.
6 Q. Was it completed by April of
7 '15, or did it continue after that as
8 well?
9 A. It continued after that.
10 Q. And is it still going on
11 today? Are you still catching up on the
12 due diligence project referred to in this
13 exhibit?
14 A. No.
15 Q. Do you recall when it may
16 have been final, that is, when you
17 finally caught up?
18 A. I believe it was some time
19 last year, in 2017.
20 Q. So it's fair to say that
21 Henry Schein first had complete due
22 diligence files on all of its customers
23 some time in 2017?
24 A. Yes.

Page 311

1 Q. Was the process different
2 for the 40 percent of the customers that
3 had varying levels of due diligence in
4 their files? Was there a different plan
5 for those?
6 A. When you say "was the
7 process different," what do you mean?
8 Q. So in -- earlier in this
9 presentation she points out that 40
10 percent of the then-existing customers in
11 November of 2013, 40 percent has varying
12 degrees of due diligence. Files are not
13 consistent.
14 Do you see that?
15 A. Yes.
16 Q. And you have no reason to
17 refute that, right?
18 A. No.
19 Q. You then talked about how
20 you worked on a program for the 60
21 percent that had no due diligence.
22 You worked on a program that
23 went from the end of 2013 through 2017 to
24 get up to date on Know Your Customer

Page 312

1 requirements for all customers, correct?
2 A. Correct.
3 Q. Did you -- for the 40
4 percent that had varying degrees of due
5 diligence, was there a program put in
6 place to get all of those files more
7 consistent or complete?
8 MR. JONES: Object to form.
9 Vague.
10 THE WITNESS: As customers
11 were flagged by our monitoring
12 system, we would update the
13 customer due diligence, yes.
14 BY MR. MIGLIORI:
15 Q. But there wasn't a program
16 that started some time after this
17 November 2013 presentation that
18 systematically went through this 40
19 percent of customer files to upgrade
20 their Know Your Customer due diligence
21 files, correct?
22 A. It was based on our
23 monitoring system.
24 Q. Only if it got tripped by a

Page 313

1 threshold?
2 A. By anything in the SOMS
3 system, yes.
4 Q. So if nothing tripped, none
5 of those files were reviewed for updated
6 Know Your Customer review?
7 A. They may have been revisited
8 over time. But the immediate was the
9 pend, yes.
14 Were more people added to
15 the process when you started this project
16 of getting complete due diligence Know
17 Your Customer files for your customers?
18 A. Yes.
19 Q. Do you know how many people
20 were added?
21 A. From -- I'm not sure about
22 from the regulatory team.
23 But, yeah, my team grew
24 significantly in verifications.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1 Q. So from November of 2013 to
2 2017, how big did your verification
3 department grow?
4 A. We added, I would say, at
5 least ten people.
6 Q. And you don't know how many
7 regulatory added?
8 A. I'm not sure. It was a
9 couple. I'm not sure of the exact
10 number.
11 Q. And the purpose of adding
12 all those folks was to get up to date on
13 the Know Your Customer due diligence
14 project, correct?
15 A. Correct.
16 MR. MIGLIORI: All right.
17 Why don't we take a break here?
18 VIDEO TECHNICIAN: The time
19 is now 2:46 p.m. We're going off
20 the record.
21 - - -
22 (Whereupon, a brief recess
23 was taken.)
24 - - -

Page 315

1 VIDEO TECHNICIAN: The time
2 is now 3:09 p.m. We are back on
3 the record.
4 - - -
5 (Whereupon, Exhibit
6 Schein-Abreu-19, Memorandum
7 Opinion and Order; USA v Heim, was
8 marked for identification.)
9 - - -
10 BY MR. MIGLIORI:
11 Q. We were talking before the
12 break about due diligence and Know Your
13 Customer requirements.
14 Do you recall that?
15 A. Yes.
16 Q. And due diligence and Know
17 Your Customer requirements are not just
18 for the onboarding of new clients, that's
19 an ongoing responsibility with respect to
20 all clients, correct?
21 A. Correct.
22 Q. And the project that you
23 undertook from 2013 to 2017 was to update
24 all due diligence files for all types of

Page 316

1 customers, new and existing, so that
2 those due diligence files at Schein would
3 be complete, correct?
4 A. Correct.
5 Q. I want to show you what's
6 been marked as Exhibit Number 19.
7 This is a memorandum and
8 opinion -- memorandum opinion and order
9 relative to a Schein customer named Brian
10 D. Heim, MD.
11 Are you familiar with Dr.
12 Heim?
13 A. No.
14 Q. All right. This is an
15 opinion of a court. It actually happens
16 to be the same court that this case is
17 pending in, in Ohio. I want to direct
18 your attention to Page 4.
19 On Page 4, there are, under
20 Section B, what are referenced as
21 undisputed facts. It's referring to the
22 defendant, Dr. Heim, registered under the
23 Act, that is, a DEA registrant, as a
24 medical practitioner and was authorized

Page 317

1 to handle controlled substances,
2 Schedules II, III, IV and V. His
3 registered location was 3562 Ridge Park
4 Drive, Suite A, Akron, Ohio.
5 Do you recall whether Dr.
6 Heim may have been one of the three
7 pended customers that you found in
8 looking at Summit County?
9 A. I don't recall.
10 Q. I'm going to represent to
11 you that Akron, Ohio is in Summit County,
12 okay.
13 And I will show you later
14 here, but I represent to you that this is
15 one of the Schein clients.
16 In 1998, Heim entered guilty
17 pleas to 24 felony counts of theft of
18 drugs and 21 felony counts of illegal
19 processing of drug documents. His
20 medical license was suspended and he was
21 given treatment in lieu of conviction.
22 On June 6, 2012, Heim was
23 arraigned in Summit County Court of
24 Common Pleas on seven counts of

Page 318

1  aggravated trafficking in drugs and one
2  count of tampering with evidence.  The
3  drug charges were eventually dropped in
4  return for defendant's guilty plea to one
5  count of obstruction of justice.  He also
6  agreed to surrender his medical license
7  and his DEA registration as part of his
8  plea.  As a result, the defendant is no
9  longer permitted to dispense or prescribe
10  Schedule II through IV drugs.
11         On July 5, 2012, Brinks
12  checked with the DEA Automation of
13  Reports and Consolidated Order System,
14  ARCOS, which is a DEA database used to
15  capture the activity of controlled
16  substances from a point of manufacture
17  and/or distribution to the point of sale
18  to the retail level registrant.  This
19  check of ARCOS revealed that the
20  defendant was purchasing extraordinarily
21  large amounts of hydrocodone APAP
22  tablets, hydrocodone and acetaminophen,
23  from the pharmaceutical wholesaler Henry
24  Schein, Inc.

Page 319

1         Now, based on these
2  undisputed facts in this finding -- and
3  Schein cooperated with this, just so
4  we're clear on that, based on these
5  findings, Schein would have, when it
6  learned of the -- certainly of the
7  indictment on seven counts of aggravated
8  trafficking in drugs and one count of
9  tampering with evidence, upon learning
10  that, that would be cause enough to not
11  just pend but to discontinue or cancel
12  the relationship with this doctor,
13  correct?
14         MR. JONES:  Object to the
15     form.  Object to the sidebar.
16     Outside the scope.  Calls for
17     speculation.
18         THE WITNESS:  I'm not sure
19     on that one.
20  BY MR. MIGLIORI:
21     Q.   If you -- and so I'm going
22  back to your Know Your Customer due
23  diligence operations.
24         You told me that the

Page 320

1  verification department expanded to
2  develop the Know Your Customer database
3  knowledge of your clients.  So that's
4  within your department, correct, that you
5  conduct due diligence of your customers,
6  correct?
7         MR. JONES:  Object to the
8     form.
9  BY MR. MIGLIORI:
10     Q.   Correct?
11     A.   Yes.
12     Q.   And certainly criminal
13  background relative to drug trafficking
14  felonies would be a relevant factor in
15  your due diligence analysis, correct?
16     A.   Yes.
17     Q.   And that would include,
18  going back to Page 4, the 1998 entering
19  of guilty pleas for 24 felony counts of
20  theft in drugs, that would be something
21  that you would want to know in a robust
22  due diligence program to know your
23  customer at Henry Schein, correct?
24         MR. JONES:  Object to the

Page 321

1     form.  Vague.
2  BY MR. MIGLIORI:
3     Q.   You would want to know about
4  drug trafficking guilty pleas, wouldn't
5  you, in due diligence?
6     A.   Yes.
7     Q.   And the fact that there were
8  in 1998, and that the doctor lost his
9  license, temporarily, to practice
10  medicine as a result of that is something
11  that is a relevant piece of information
12  for the Henry Schein Know Your Customer
13  due diligence analysis, correct?
14         MR. JONES:  Object.  Object
15     to the question.  Did you say
16     1998?
17         MR. MIGLIORI:  I'm talking,
18     first, about the 1998
19     convictions -- pleas, guilty
20     pleas.
21  BY MR. MIGLIORI:
22     Q.   Correct?
23     A.   Yes.
24     Q.   And so if this doctor came

Page 322

1  back to practice after 1998 and started
2  to prescribe drugs and started to buy
3  drugs, as is represented here from Henry
4  Schein, if you look at the footnote on
5  Page 6, it says, On July 12th Henry
6  Schein, Inc. provided a summary of
7  defendant's purchases of controlled
8  substances between January of 2011 and
9  July of 2012.  And it's attached as
10  Exhibit B.  And I'll show that to you in
11  a minute.
12      But for Henry Schein to
13  start supplying controlled substances to
14  this doctor as of January 1st, 2011, it
15  would have conducted new customer due
16  diligence on that customer, correct?
17      A.   Yes.
18      Q.   And that information in 2011
19  should still be in the system, because
20  it's after the 2009 purge, correct?
21      A.   I would think so, yes.
22      Q.   Okay.  So let me show you
23  Exhibit Number 20.
24          - - -

Page 323

1      (Whereupon, Exhibit
2      Schein-Abreu-20,
3      HSI-MDL-00001198-210, was marked
4      for identification.)
5          - - -
6      MR. MIGLIORI:  And for my
7  kind brother at the end of the
8  table.  Exhibit-20 has a Bates
9  number of HSIMDL1198.
10     MR. ASFENDIS:  Appreciate
11  it.
12     MR. MIGLIORI:  You don't
13  trust me, you want to see it.
14  BY MR. MIGLIORI:
15
16
17
18
19
20
21
22
23
24



Page 324

1
2
3
4
5
6
7
8
9
10     A.   Yes.
11     Q.   Is this the -- is this a new
12  customer questionnaire, or is this a
13  different kind of questionnaire?
14     A.   This was the -- yeah, the
15  standard questionnaire.
16     Q.   For a new client or for a
17  suspicious order, or for both?
18     A.   For both.
19     Q.   All right.  So if you
20  brought on a new client, you would send
21  this form out, and that would be part of
22  your new client due diligence in 2011;
23  but it would also be the same
24  questionnaire you would send out if you

Page 325

1  had an order that you had pended,
2  correct?
3      A.   Correct.
4      Q.   All right.  And so we can go
5  through it.
6      But you wrote to him at that
7  address.  And the questionnaire just
8  asks, Are you a large group or solo
9  practice?  He said, Solo practice.
10  What's your specialty?  He wrote, Family
11  medicine.
12     Correct?
13     A.   Yes.
14     Q.   Is the practice owned by a
15  licensed practitioner?  He checked off
16  yes.  The address is an office address,
17  not a home address.
18     That's an important Know
19  Your Customer distinction, correct?
20     A.   Yes.
21     Q.   Because as of this time, it
22  was not the standard operating procedure
23  to send controlled substances to a
24  doctor's home address, correct?

Page 326

```
1       A.   No, we still could send
2  controlled substances to a home address.
3       Q.   Is there any point at which
4  that stopped?
5       A.   No.  We have plenty of
6  doctors who have home offices.
7       Q.   Okay.  It gives phone
8  numbers, hours of operation, whether he
9  accepts insurances.
```

```
17           So these answers are, on
18 their face, responsive, right?  They're
19 not deficient, from a verification due
20 diligence standpoint, correct?
21           MR. JONES:  Objection.
22      Form.  Vague.
23 BY MR. MIGLIORI:
24      Q.   You're here to talk about
```

Page 327

```
1  your company's suspicious order
2  monitoring program.
3           This form is part of that
4  program, correct?
5       A.   Yes.
6       Q.   This form is sent out for
7  both the new customer and for concerns
8  about suspicious orders, correct?
9       A.   Correct.
10      Q.   Can you tell, by looking at
11 the document, whether this was sent out
12 as a new customer request or as a
13 suspicious order request?
14      A.   No.
15      Q.   All right.  If you go
16 forward, there's another license -- on
17 Page 1207, there's another license
18 verification from Ohio.
19           Again, that's done by your
20 department, correct?
21      A.   Yeah, it looks that way.
22 Yes.
23      Q.   And it looks like his
24 license was reissued, based on this page,
```

Page 328

```
1  in August of 2007; first issue date.
2           Do you see that?
3       A.   Yes.
4       Q.   So based on the
5  indictment -- or the opinion and order of
6  the court, the loss of license would have
7  ended around August of 2007.
8           Am I reading this type of
9  document correctly?
10      A.   I'm not --
11           MR. JONES:  Objection.
12      Vague.
13 BY MR. MIGLIORI:
14      Q.   You can tell me --
15      A.   Yeah, I'm not sure.
16      Q.   All right.  If you turn to
17 the page that's 1206 in your due
18 diligence file, it asks for, as an answer
19 to a question, information about
20 testosterone.  It's Question Number 17.
21 And it's signed by the doctor.
22           Is this document a different
23 questionnaire?  It starts on Page 1205.
24 This one is dated August 23rd, 2012.
```

Page 329

```
1  Same doctor, same address.  Similar
2  questions on the front page, but it seems
3  to be a little bit more extensive.
4           Is this a different type of
5  follow-up question?  It's one year later.
6       A.   It's just a -- it's just a
7  revised version.
8       Q.   Okay.  If you're sending
9  this out, though, you can't tell, by
10 looking at it, whether you're sending it
11 out because of a suspicious order issue
12 or just an update?
13      A.   That's right.
14      Q.   Let's go to Page 1204.  It
15 says, Supplemental data narrative
16 customers.
17           This form that we're looking
18 at here, is this a -- can you tell from
19 looking at it where this information
20 comes from?  Is this from the PDE system?
21      A.   JDE.
22      Q.   JDE.  I'll never get it
23 right.
24           The JDE system?
```



Page 330
1   A.   Yes, it is.
2       Q.   And then there's a reference
3  here, it says, August 23rd, 2012, as per
4  Shaun to EML.
5       Who is that?
6       A.   I think that's to e-mail.
7       Q.   Oh, to e-mail.
8       The doctor, a new quest
9  sent -- and then it gives a date.
10      So a new questionnaire was
11 sent out in August of 2012 by your
12 instruction?  Is that you?
13      A.   I assume so.  I don't
14 recall, but --
15      Q.   Do you know why?  Can you
16 tell, by looking at this narrative, why
17 you sent out a new form?
18      A.   No.
19      Q.   August 23rd, 2012, Received
20 completed questionnaire, placed in bin to
21 be approved.
22      And then it says on August
23 25th, Gave to Shaun, TH.
24      Who would TH be?  Is that a

Page 331
1  person?
2       A.   Probably the initials of
3  somebody on my team.
4       Q.   Can you tell whether or not
5  the form was approved, by looking at
6  this?
7       A.   Not based on this page, no.
17      What does that mean, do you
18 know?
19      A.   That's referring to his
20 terminal distributor of dangerous drugs
21 license, it's a Category III.
22      Q.   So what does that mean?  Is
23 it a verification that he has one?
24      A.   Yes.

Page 332
1       Q.   So there's nothing negative
2  to report in that, it's just that it's
3  been verified or -- that he's got a Cat
4  III license?
5       A.   Correct.
6       Q.   And is that for controlled
7  substances?
8       A.   Among other things, yes.
9  But it gives the authority for it.
10      Q.   If you go to Page 1201, I
11 can't tell if there's a date on this.  It
12 says, Effective date 08/17/11.
13      So is that August 17th of
14 '11?  On the top right corner, Page 1201.
15 When I'm looking at the pages, I'm
16 looking at the bottom right.
17      A.   Yeah, down here.  1201.
18      Yeah, 8/17/11.  Yes, that
19 looks like it.  Yeah.

Page 333
18      What does that mean?
19      A.   I'm honestly not sure.
20      Q.   And then the top page of
21 this exhibit, Number-20, is sort of a, I
22 guess, a summary.
23      Starting from the bottom, I
24 guess, chronologically, June 3rd of '11.

Page 334

1  W/MP.
2      What is that?  Does that
3  mean anything to you?
4      A.   It's MP was abbreviated for
5  MedPro.
6      Q.   So that means that the
7  license was verified in June of 2011,
8  correct?
9      A.   Yes.
10     Q.   So if the license was
11 verified any time prior to that, it
12 should appear here, correct?
13     MR. JONES:  Objection to
14 form.
15 BY MR. MIGLIORI:
16     Q.   I didn't produce this
17 document.  I'm just trying to understand
18 it.
19     I don't know if there's a
20 page in your system where all of these
21 things are indexed or catalogued, like
22 this page.
23     But according to this page,
24 the license seems to have been verified

Page 335

1  on June 3rd, 2011 from MedPro.
2      Is that a reasonable
3  assumption from this page?
4      A.   Yes.
5      Q.   It seems that on June 3rd of
6  2011, it says, WIV.
7      What kind of license would
8  that be, if a license?
9      A.   That would have been the
10 TDDD.
11     Q.   Which is what?
12     A.   The terminal distributor of
13 dangerous drugs license.
14     Q.   Okay.  We saw that document.
15 Okay.
16     On June 10th of 2011, it
17 says, TP web.
18     What does that mean?
19     A.   So we used to receive DEA
20 information via a tape reel.
21     Q.   So you got some information
22 from tape.
23     Is that stored somewhere?
24     A.   We used to back it up.  I'm

Page 336

1  not sure now.
2      Q.   What kind of information
3  would you get from DEA?
4      A.   It was a list of active
5  registrations.
6      Q.   Okay.  So that's just
7  verifying that he's actively registered
8  with DEA?
9      A.   Uh-huh, yes.
10     Q.   Yes?
11     A.   Yes.
12     Q.   That's not a report of any
13 Know Your Customer elements, past
14 convictions, all that kind of stuff;
15 that's purely a license verification?
16     A.   Yes.
17     Q.   All right.  August 17th,
18 2011, Received HS letter, approved.
19     So is that the initial
20 onboarding client letter?
21     A.   Yeah.  HS letter was kind of
22 team jargon for the questionnaire.
23     Q.   Okay.  On October of 2011,
24 Within scope, HS letter on file.

Page 337

1      So is that a pend that is
2  overridden because it's within the scope
3  of his practice as reflected in his HS
4  letter?
5      A.   So it was likely a pended
6  order that they consulted the
7  questionnaire on.
8      Q.   Okay.  So an order in
9  October of 2011 gets pended, somebody in
10 verification goes into the system here to
11 look at the HS letter and makes a
12 decision to approve or not approve the
13 order; is that how it works?
14     A.   That's right.
15     Q.   And can you tell, from
16 looking at this, who would have approved
17 that?  Are those initials on the side, TH
18 Harrington?
19     A.   Yes.  That's the user ID of
20 the person.
21     Q.   Who is that person that --
22 I'm sorry, for the -- for the within
23 scope was P. Hall.
24     Do you know who that is?

Page 338

1    A.   Patti Hall.
2    Q.   Is Patti Hall in
3  verifications or in regulatory?
4    A.   In -- she was in
5  verifications.
6    Q.   So if I understand this
7  correctly, there was an order in October
8  of 2011.  It was pended.  And Patti Hall
9  would have gone to this due diligence
10 file, read the HS letter on file, and
11 then made a decision about whether to
12 supply, whether to ship?
13   A.   Yes.
14   Q.   And can you tell here
15 whether or not that was shipped?
16   A.   No.
17   Q.   Would it say here, rejected?
18 Would there be a letter if it were
19 cancelled?
20   A.   No.
21   Q.   Would a suspicious order get
22 put into the due diligence file?
23   A.   No.
24        It looks like -- it looks

Page 339

1  like it was released, based on the note.
2    Q.   "Released" meaning that the
3  order was sent to the doctor?
4    A.   Yes.
5    Q.   In January of 2012, it says,
6  IVS, and then a number.
7         Is that another verification
8  of the license?
9    A.   Yes, for the TDDD.
10   Q.   And then there's another --
11 I'm sorry, March 2011, '12, Within scope,
12 letter HS.
13        It seems like Patti Hall
14 again had a pended order that was
15 researched.  The letter was in the file,
16 the HS letter was in the file.  And if
17 it's similar to the prior entry for her,
18 it looks like that was released to the
19 client as well, correct?
20   A.   Yes.
21   Q.   And then on August 30th of
22 2012, it just says, HS on file.  And it
23 refers to you, Shaun Abreu.
24        Do you see that?

Page 340

1    A.   Yes.
2    Q.   What does that entry mean?
3  Does that mean that there was another
4  pended order, or does that mean that
5  there was something else that caused you
6  to look for the HS letter?
7    A.   That was a scan of the
8  actual document.
9    Q.   Okay.  So based on just that
10 information, anyway, there are no --
11 there seems to be an indication of two
12 pended orders and no cancelled orders,
13 correct?
14   A.   Based on these notes, I
15 would say yes.
16   Q.   All right.  I want to take
17 you back to Exhibit Number 19, because I
18 want to go through the timing again with
19 both of these documents.
20        On June 6th, 2012 --
21   A.   Sorry, which page are you
22 on?
23   Q.   This is Page 5 of the
24 opinion.

Page 341

1    A.   Okay.
2    Q.   On June 6th of 2012, Dr.
3  Heim was arraigned in Summit County Court
4  of Common Pleas on seven counts of
5  aggravated trafficking of drugs and one
6  count of tampering with evidence.
7         Is that arraignment
8  something that would appear in this due
9  diligence file if it were known to the
10 company at the time?
11   A.   Would a copy of the
12 arraignment?
13   Q.   Or concern about the client,
14 that is, the due diligence performed to
15 know this client, would that have somehow
16 appeared in the due diligence file if it
17 were known to the company?
18        And I'm not intimating that
19 it was known to the company.
20   A.   If we had a copy of the
21 license that we had pulled and it
22 reflected it, then it would probably be
23 in the file.
24   Q.   All right.  There is an

Page 342

1 exhibit to this order that I referenced
2 that Schein provided to the United States
3 government as Exhibit B to what it filed
4 as a motion for summary judgment. I'm
5 going to mark it as Exhibit-21.
6        - - -
7        (Whereupon, Exhibit
8    Schein-Abreu-21, HSI Shipped Order
9    by DEA - Run Date 7/11/12, was
10   marked for identification.)
11       - - -
12 BY MR. MIGLIORI:
13   Q.   These are the orders that
14 Schein sent to Dr. Heim over the course
15 of its relationship with Dr. Heim.
16       Now, Exhibit-21 is a
17 printout from Schein that the government
18 used in its prosecution of Dr. Heim.
19       Is this in a form that is
20 known to you, that is, in a Henry Schein
21 format?
22   A.   Yes.
23   Q.   What would you call this
24 printout?

Page 343

1    A.   We actually -- we refer to
2 it by the report number on the top left,
3 the ORDB81 report.
4    Q.   And so if you want to know
5 an individual doctor's ordering history,
6 this is something that you would look to?
7    A.   For controlled substances,
8 yes.
9    Q.   All right. And in reading
10 this, can you tell me the dates, based on
11 this, that you supplied controlled
12 substances to Dr. Heim, that is, the
13 range of dates? You don't have to give
14 me each one.
15   A.   The first order was June
16 10th, 2011.
17   Q.   Okay. And then?
18   A.   Through the last order of
19 July 10th, 2012.
20   Q.   Okay. So is there any way
21 to look at these orders and tell me which
22 two of these orders were pended? Is
23 there any way to read this information?
24   A.   Only based on the date, if

Page 344

1 it corresponds.
2    Q.   Okay. So if we look at the
3 dates that Patti Hall, in Exhibit-20,
4 that Patti Hall cleared a pended order,
5 the first one is October 24th, 2011,
6 correct?
7    A.   Yes.
8    Q.   If we go to October 24th,
9 2011, there is an order that says,
10 Quantity of 3.
11       Do you see that?
12   A.   For testosterone, yes.
13   Q.   And hydrocodone, a quantity
14 of 1.
15       Do you see that?
16   A.   Yes.
17   Q.   And that was an order that
18 was cleared by Patti Hall, even though it
19 was tagged by the computer as pended?
20   A.   Yes.
21   Q.   What is the deviation that
22 would have been tagged by the computer in
23 looking at that order?
24   A.   I couldn't say, without

Page 345

1 seeing it.
2    Q.   So the two substances being
3 ordered are testosterone and hydrocodone,
4 correct?
5    A.   Yes.
6    Q.   What is the line that says,
7 LNE?
8    A.   Oh, the column on the top
9 right, you mean?
10   Q.   Correct.
11   A.   That's the line number on
12 the order.
13   Q.   So when it says, 6 and 7,
14 what does that mean?
15   A.   So if you have an order that
16 contains ten different products, it's the
17 sequence in which the lines were keyed
18 for the order.
19   Q.   Is there anything about the
20 line order and that sequence that is part
21 of the algorithm, in 2011, for suspicious
22 orders or pended orders?
23   A.   I don't believe so, no.
24   Q.   So for hydrocodone, it's

Page 346

1   500BT.
2        That's the size, or the
3   strength?
4        A.   That's the size.
5        Q.   The size.
6        So what does that mean?   500
7   what?
8        A.   That's 500 dosage units, or
9   pills, in a bottle.
10       Q.   Is that a dosage units or
11  pills, or is that the same thing?
12       A.   Same thing.
13       Q.   All right.   The strength, it
14  says 10 to 500.
15       What is that?
16       A.   That's the strength.
17       Q.   What does the 10 represent,
18  and what does the 500 represent?
19       A.   The 10 represents milligrams
20  of hydrocodone, and the 500 represents
21  milligrams of acetaminophen.
22       Q.   Okay.   And according to
23  this, it was one order of 500 doses of
24  hydrocodone, correct?

Page 347

1        A.   Yes.
2        Q.   All right.   And so that
3   appears -- does that appear to be the one
4   that was cleared?
5        A.   The one on 10/24?
6        Q.   The one on 10/24 that we
7   just went through --
8        A.   Yes.
9        Q.   -- that was cleared by Patti
10  Hall, okay.
11       The second one she cleared
12  was on March 1st, 2012, correct?
13       I don't see --
14       A.   That, I was going to say,
15  that's the date of the notation.  I'm not
16  sure of the date of the order.
17       Q.   So could it be this order
18  two days earlier on February 29th, 2012?
19  Because it has a release date here of
20  3/27, so would that mean that it pended
21  for a month?
22       A.   3/27?
23       Q.   Do you see the --
24       MR. JONES:  Object to the

Page 348

1   form.
2        MR. MIGLIORI:  I'm just
3   trying to understand the document.
4        MR. JONES:  Yes, I know you
5   are.
6   BY MR. MIGLIORI:
7        Q.   There is an order dated
8   February 29th, 2012, correct?
9        A.   Yes.
10       Q.   It is for -- it was ordered
11  on 2/29/12.  It was released on 3/27/12,
12  correct, almost a month later?
13       A.   No, I don't see that.
14       Q.   Do you see the release date
15  right next to it?  You can look at my
16  finger.
17       MR. JONES:  You're looking
18  at a different page.
19       THE WITNESS:  I don't see
20  3/27 anywhere.
21  BY MR. MIGLIORI:
22       Q.   Look at the screen, I can
23  show it to you.
24       MR. JONES:  Here, on the

Page 349

1   second page.
2        THE WITNESS:  Oh, you're on
3   the next page.  Okay.
4        Yes.  Okay.  Yes, I see it.
5   BY MR. MIGLIORI:
6        Q.   It is the customer number,
7   it's the DEA registration number, and
8   then the quantity now is two orders of
9   500 pills of 10 milligrams of hydrocodone
10  and 500 milligrams of acetaminophen,
11  correct?
12       A.   Yes.
13       Q.   And it says that order took
14  a month to release, as opposed to the
15  order above it that took one day to
16  release, right?  I'm reading this
17  correctly, aren't I?
18       A.   It shows the release date of
19  3/27.
20       Q.   If you look at all the other
21  orders and release dates, they are either
22  the same day or the next day?
23       A.   Uh-huh.
24       Q.   This is the only one that's

Page 350

1  a month apart.
2      So does that in any way
3  inform you about whether or not this
4  would have been the pended order that got
5  reviewed?
6      A.  It's difficult to say,
7  because the order on the Page 1 says
8  2/29/12, released 3/1/12, which
9  corresponds to the date of the note.
10     Q.  So this doctor ordered, on
11 the same day, hydrocodone, two quantities
12 of 500, which were released in a day.
13 And on the same day ordered another two
14 orders of hydrocodone and that was
15 released a month later, correct?
16     So based on these records,
17 in one day this doctor ordered four
18 orders of 500 hydrocodone pills, correct?
19     A.  No, I don't think so.
20     So he -- so on the -- at the
21 bottom of Page 1 --
22     Q.  Let's go through it
23 together.  Yes.
24     A.  -- it shows the order

Page 351

1  quantity is two.
2      Q.  All right.
3      A.  But if you look all the
4  way --
5      Q.  Let's make sure we're
6  looking at the same line.
7      If you look at the screen,
8  it's the last entry on the page.
9      A.  Yes.
10     Q.  On 2/29/12, Dr. Heim ordered
11 two quantities of 500 pills of
12 hydrocodone -- 10 milligrams hydrocodone,
13 500 milligrams acetaminophen, correct?
14     A.  Correct.
15     Q.  And that says that it was
16 released on 3/1/2012?
17     A.  Yes.
18     But if you look to the
19 right -- I'm sorry, if you go back, on
20 the last column, it says ship.
21     Q.  Right.
22     A.  It says one.
23     Q.  So he ordered two and they
24 shipped one?

Page 352

1      A.  Yes.
2      Q.  So it showed up as a -- what
3  you called a pended order, right?
4      A.  Uh-huh.
5      Q.  Because it was a deviation
6  of size, frequency or strength or
7  pattern, correct?
8      A.  Well, to clarify, there was
9  hydrocodone and depotestosterone that
10 were placed on that order.
11     Q.  Right.
12     A.  So I'm not sure which of the
13 items caused that order to pend.
14     Q.  Okay.  And shouldn't that be
15 reflected in the due diligence file?
16     A.  I don't think that it is.
17     Q.  So how does Patti Hall know
18 what to look for if it's not in the due
19 diligence file that pends?
20     A.  In the system it would show
21 what was -- what pended.
22     Q.  So if this is what I have
23 for a due diligence file, it's not
24 complete, then?

Page 353

1      MR. JONES:  Object to the
2      form.  Misstates the testimony.
3  BY MR. MIGLIORI:
4      Q.  Well, the information of why
5  it pends exists in the system, correct?
6      A.  Correct.
7      Q.  And it wouldn't be purged in
8  2011, it would still be there today,
9  correct?
10     A.  Correct.
11     Q.  And you'll agree with me, at
12 least in Exhibit-21 that we looked
13 through -- or 20 that we looked through
14 together, there was nothing in this
15 exhibit that I have that shows why it was
16 pended, whether it was for testosterone
17 or for hydrocodone or both, correct?
18     A.  Correct.
19     Q.  But if you do look at
20 Exhibit-21 and you see that they ordered
21 two on the bottom of the first page, Dr.
22 Heim ordered two 500-pill orders of
23 hydrocodone, but you only shipped one.
24     Does that tell you that that

Page 354

1  was, at least, part of the pended order?
2       MR. JONES:  Object to the
3    form.
4  BY MR. MIGLIORI:
5       Q.   If that weren't a pended
6  order, wouldn't you have shipped two
7  bottles instead of one?
8       A.   Not necessarily.
9       Q.   Why would you have only
10  shipped half the order?
11       A.   It could have been
12  inventory.
13       Q.   Okay.  Well, is there any
14  way it says here whether it was
15  inventory?
16       A.   No.  It's not reflected on
17  the report.
18       Q.   We know it would have been
19  around the time of a pended order, based
20  on the front page, correct?
21       A.   Yes.
22       Q.   And if we look at the
23  testosterone that you point out on the
24  second page, he ordered four vials of

Page 355

1  testosterone and he got four bottles of
2  testosterone, correct?
3       A.   That's right.
4       Q.   Isn't it fair to assume,
5  from that document, that the concern had
6  to do with the hydrocodone, which only
7  half was shipped, as compared to the
8  testosterone, where all of it was
9  shipped?
10       A.   No, not necessarily.
11       Q.   All right.  So you can't
12  tell me, looking at the files that I've
13  been given and that I'm showing you,
14  what, of that order, was pended and what
15  was cleared and released, correct?
16       MR. JONES:  Object to the
17    form.
18       THE WITNESS:  Correct.
19  BY MR. MIGLIORI:
20       Q.   But you can confirm for me,
21  looking at this, that on February 29th of
22  2012, Dr. Heim ordered two bottles of
23  hydrocodone and the next day your
24  company, based on this report, only

Page 356

1  shipped one, correct?
2       A.   That's right.
3       Q.   And on that same day of
4  March 1st, if we go back to Exhibit-20,
5  that same day, March 1st, 2012, Patti
6  Hall made a finding that, whatever it was
7  that was of concern and pended, was
8  within the scope of the letter; that is,
9  her clearing a shipment happened on March
10  1st, the same day that that order was
11  shipped?
12       A.   Yes.
13       Q.   All right.  So the
14  testosterone went as ordered, four
15  bottles were ordered, four bottles were
16  sent; as opposed to the hydrocodone, two
17  bottles were ordered on that day and only
18  one was shipped, correct?
19       A.   Correct.
20       Q.   Then on that same day, in
21  your same system, Dr. Heim has another
22  order with a different number.  You'll
23  agree with me that this is a different
24  number, right, a different -- totally

Page 357

1  different order?  It has a different
2  invoice number, correct?
3       A.   Are you talking about the
4  3551823?
5       Q.   Yes.  There's a 3551823.1
6  and a 3551823.2.
7       A.   Right.  So that's the same
8  order with two different invoices.
9       Q.   Why would it have two
10  different invoices?
11       A.   Because the whole order
12  didn't ship initially.
13       Q.   All right.  So then the
14  second bottle that he ordered did ship,
15  according to this documentation, on
16  3/27/12?
17       A.   Correct.
18       Q.   All right.  So now we know
19  that Patti Hall had a pended order, we
20  don't know -- you can't tell me which
21  one, but everything in the original order
22  gets shipped within a day except for one
23  order of hydrocodone.
24       And a month later, that

Page 358

1  second bottle of hydrocodone gets shipped
2  to Dr. Heim, correct?
3      A.   Yes.
4      Q.   And based on all of those
5  facts, you can't tell me that the reason
6  for the pend was the investigation into
7  the hydrocodone?
8      A.   That's right.
9      Q.   All right.  So you ship the
10 second bottle to Dr. Heim.
11          And you'll agree with me
12 that if you are just looking at
13 hydrocodone -- strike that.
14          It's so hard for me to read
15 this thing.  If you're looking at
16 hydrocodone, he, less than a month before
17 that, ordered two bottles in February of
18 2012, just three weeks earlier, and those
19 shipped to -- those two bottles shipped
20 to him on the same day that he ordered
21 them, correct?
22     A.   Correct.
23     Q.   So you've got a frequency of
24 less than a month where he's now ordered

Page 359

1  four bottles, correct?
2      A.   Yes.
3      Q.   And you still can't tell me
4  that that's what caused the pend?
5      A.   Correct.
6      Q.   And nowhere in this due
7  diligence file that you show me does it
8  cause -- can you tell me any more
9  information about what caused the pend,
10 correct?
11     A.   Correct.
12     Q.   But we do know that somehow
13 in this short -- strike that.
14          We do know that from June of
15 2011 through July of 2012, in thirteen
16 months, 11,500 doses of hydrocodone were
17 sent to Dr. Heim by Schein?
18          MR. JONES:  Object to the
19     form.
20 BY MR. MIGLIORI:
21     Q.   Correct?
22          MR. JONES:  Lack of
23     foundation.
24 BY MR. MIGLIORI:

Page 360

1      Q.   Is that correct?
2      A.   You want me to add it up?
3      Q.   I can show you the
4  government's math if it helps you.
5          MR. JONES:  I'm not sure if
6      the math is right, so object to
7      form.
8          MR. MIGLIORI:  Since you did
9      that, I'm going to take the time
10     to do it.
11         That Exhibit-20 that I gave
12     you is an addendum to this.  I'm
13     not going to mark it, unless you
14     want me to.  I only have one copy.
15 BY MR. MIGLIORI:
16     Q.   This is the motion -- I'll
17 show it to you.  It's in front of Judge
18 Polster, who is the judge in this case,
19 in the Northern District of Ohio.
20          And that motion from the
21 United States government against Dr. Heim
22 refers to a table that Henry Schein
23 helped the government put together of all
24 orders.

Page 361

1          And this list actually comes
2  from -- this list actually, I think,
3  comes from you.  Let me verify this.
4          MR. JONES:  I'm sorry, Don,
5      what number are you representing
6      is the total number on this
7      exhibit?
8          MR. MIGLIORI:  That's what
9      I'm going -- I'm going to verify.
10     Just one second, please.
11         I wasn't planning to pull
12     this out, so I need to quickly
13     make sure I get the source right.
14         MR. JONES:  I think you're
15     close, Don.  With my math, it's
16     coming up with the same little
17     glitch that we were talking about,
18     where it's double counted where
19     that order was split.
20         MR. MIGLIORI:  I promise
21     you, I'm not making it up.  But if
22     it double counts the one 500 and
23     it's only 11,000, I'm okay with
24     that.

Page 362

1 MR. JONES: I think it's
2 somewhere around there. If I'm
3 reading it right -- I mean, I'd
4 like the witness to look at it.
5 But just so we have a
6 clarification on the record that
7 might not be reflected in whatever
8 submission you're looking for.
9 MR. MIGLIORI: Well, I'd
10 like to do it off your own records
11 because you're used to it.
12 BY MR. MIGLIORI:
13 Q. But if you add up all the
14 500s of hydrocodone --
15 MR. JONES: On the ships?
16 BY MR. MIGLIORI:
17 Q. -- on the ships, you're
18 talking about one, two, three, four,
19 five, six, seven, eight, nine, ten, 11,
20 12, 13, 14, 15, 16, 17, 18, 19, 20, 21?
21 A. I'm coming to 21 also.
22 Q. Twenty-one --
23 A. Which would be 11,500.
24 Q. All right. So I was right.

Page 363

1 Accidentally.
2 MR. JONES: I was wrong.
3 BY MR. MIGLIORI:
4 Q. 11,500 pills were shipped to
5 Dr. Heim in a 13-month period, based on
6 your records, correct?
7 A. Correct.
8 Q. Of that 11,500 pills
9 shipped, somewhere in there, two orders,
10 which also had testosterone, all orders
11 at the same time, two orders were flagged
12 by the computer system as pended orders,
13 correct?
14 A. Yes.
15 Q. Which means that something
16 in the algorithm, in the order, told the
17 computer that there was a deviation of
18 some sort.
19 And based on the other
20 documents we've seen as of this point,
21 the deviation would have been in size,
22 because it wasn't yet calculating for
23 pattern or frequency, correct?
24 A. At this time, we would have

Page 364

1 been accounting for pattern and
2 frequency.
3 Q. Okay. So twice over this
4 13-month period the system, suspicious
5 order monitoring system at Schein, caused
6 the ordering practice of Dr. Heim to
7 trigger for deviation in size, pattern
8 and/or frequency, correct?
9 A. Correct.
10 Q. Manually, an employee at
11 Schein named Patti Hall overrode both of
12 those pended orders, correct?
13 A. Correct.
14 Q. That is, everything ordered
15 in that 13-month period of time by Dr.
16 Schein was, in fact, delivered to him,
17 correct?
18 MR. JONES: I'm sorry, you
19 keep saying, as of late, Dr.
20 Schein.
21 MR. MIGLIORI: Dr. Heim.
22 They're too close.
23 BY MR. MIGLIORI:
24 Q. Everything ordered by Dr.

Page 365

1 Heim in that period of time was shipped,
2 correct?
3 A. I'm not certain of that.
4 Q. Based on this document --
5 A. Well, this is a purchase
6 record.
7 Q. Right. There's an order
8 column and there's a ship column.
9 And those, at least, match
10 up, correct?
11 A. Uh-huh.
12 Q. Yes?
13 A. Yes.
14 Q. So during the same period of
15 time, as I showed you in Exhibit-19, the
16 U.S. government, the DEA, looked at the
17 ARCOS database and noticed an excessively
18 high order of hydrocodone.
19 I'll refer you back to
20 Exhibit-19, Page 5, on July 5th, 2012.
21 We can agree this is within the time
22 frame, right?
23 MR. JONES: Object to the
24 form.

Page 366

1 BY MR. MIGLIORI:
2    Q.   Brinks, the DEA agent,
3 checked the DEA Automation of Reports and
4 Consolidated Order System, ARCOS, which
5 is a DEA database used to capture the
6 activity of controlled substances from
7 the point of manufacture and/or
8 distribution to the point of sale to the
9 retail level registrant.
10       Here, that would be Dr.
11 Heim.
12       This check of ARCOS revealed
13 that the defendant, Dr. Heim, was
14 purchasing extraordinarily large amounts
15 of hydrocodone tablets, hydrocodone and
16 acetaminophen, from the pharmaceutical
17 wholesaler Henry Schein, Inc.
18       In July of 2012, did you, at
19 Schein, make any such observation as
20 reflected in any of the documents that
21 I've shown you, that this was an
22 excessively or an extraordinarily large
23 amount of hydrocodone being purchased
24 from wholesaler Henry Schein?

Page 367

1       MR. JONES:  Objection.
2    Form.
3       THE WITNESS:  I don't know.
4 BY MR. MIGLIORI:
5    Q.   Based on anything you've
6 seen here, did Henry Schein in any way
7 catch that Dr. Heim was getting an
8 extraordinarily large amount of
9 hydrocodone?
10       MR. JONES:  Object to the
11    form.
12       THE WITNESS:  I don't know.
13 BY MR. MIGLIORI:
14    Q.   You don't know?
15       Do you see anything that
16 tells you that they did?
17    A.   I don't see anything in the
18 documentation.
19    Q.   Do you see anything in the
20 due diligence file that I just showed you
21 that, other than the two pends by Patti
22 Hall that were released, that showed that
23 Henry Schein, in fact, identified an
24 extraordinarily large amount of

Page 368

1 hydrocodone being shipped to Dr. Heim of
2 Akron, Ohio?
3       MR. JONES:  Objection.
4    Asked and answered.  Objection.
5    Form.  Outside the scope.
6       THE WITNESS:  I don't see
7    anything in the documentation.
8 BY MR. MIGLIORI:
9    Q.   So it's fair to say that the
10 United States government, by looking at
11 ARCOS, could identify this pattern of
12 extraordinarily high supply of
13 hydrocodone to Dr. Heim, but, at least
14 based on what we have in front of us from
15 Dr. Heim's due diligence file at Schein,
16 there is no indication of a similar
17 detection within the Schein -- Henry
18 Schein suspicious order monitoring
19 program, correct?
20       MR. JONES:  Objection.
21    Form.  Calls for speculation.
22    Outside the scope.
23 BY MR. MIGLIORI:
24    Q.   Correct?

Page 369

1    A.   Yes.
2    Q.   And this program, by this
3 time, is the enhanced program, correct?
4    A.   I'm sorry, repeat that one.
5    Q.   The program that would have
6 been in place by June of 2011 through
7 August of 2012 would have been Henry
8 Schein's enhanced program, correct?
9    A.   Enhanced system.
10    Q.   Enhanced suspicious order
11 monitoring system?
12    A.   Correct.
13    Q.   And to the extent that any
14 such information exists within the Henry
15 Schein suspicious order monitoring system
16 that identifies an extraordinarily large
17 amount of supply going to Dr. Heim, that
18 information would rest in the JDE system
19 and would still exist today, correct?
20    A.   Correct.
21    Q.   To close this story, Dr.
22 Heim was sentenced to five years --
23 sentenced to five years in federal prison
24 for drug-related offenses.

Page 370

1    If Dr. Heim never made
2  another order, would he ever pop up in
3  the system as being suspend or cancelled
4  as a client?
5        MR. JONES:  Object to form.
6    Vague.  Outside the scope.  Calls
7    for speculation.
8        THE WITNESS:  Sorry, can you
9    restate?
10 BY MR. MIGLIORI:
11   Q.   Sure.
12       I don't see anything else,
13 other than what I have here in the due
14 diligence file for Dr. Heim, about -- I
15 don't see anything about an indictment.
16 I don't see anything about a conviction.
17 I don't see anything about a sentencing.
18       All I have on here is a last
19 entry that -- from you on August 30th,
20 2012 that is, Henry Schein letter is on
21 file.
22       That's all that I have.
23       If he never placed another
24 order with Henry Schein, is it possible

Page 371

1  that his account is still open with
2  Schein?
3        MR. JONES:  Object to the
4    form.  Outside the scope.  Calls
5    for speculation.
6        THE WITNESS:  Yeah, I don't
7    know.  I mean, he wouldn't have
8    his licenses, I presume.
9  BY MR. MIGLIORI:
10   Q.   Right.  So let's say Dr.
11 Heim put in an order four years later
12 after his last order.
13       In the suspicious order
14 monitoring program at Henry Schein, is
15 there a trigger that says, we haven't
16 heard from him in a couple of years, we
17 need to pend this order?
18   A.   If it was input, yes.
19   Q.   What do you mean "if it was
20 input"?
21   A.   Somebody has to flag the
22 system.
23   Q.   Does the system say, it's
24 been 12 months, it's been 24 months, pend

Page 372

1  this order and investigate whether Dr.
2  Heim should get oxy -- hydrocodone?
3        A.   The only time trigger would
4  be the license.
5        Q.   So if the license were not
6  verified -- how frequently does the
7  license have to be verified within the
8  Henry Schein system, the SOM?
9        A.   It's not part of our SOM
10 process.
11       Q.   So if this is current, if
12 this is, if this is the due diligence
13 file as of today, there is nothing saying
14 that the relationship with Dr. Heim has
15 been terminated?
16       If what we're looking at
17 today in Exhibit-20 in front of you right
18 now is all that you have, there is
19 nothing to indicate your client --
20 customer relationship with him has been
21 terminated, correct?
22       MR. JONES:  Object to form.
23    Calls for speculation.  Outside
24    the scope.

Page 373

1  BY MR. MIGLIORI:
2        Q.   Is that correct?
3        A.   It mentioned in the document
4  that if Dr. Heim were to order, that we
5  contact DEA.
6        Q.   Great.  Let's go to that.
7        You're talking about Page
8  1199, Dr. Heim, August 30th of 2012, as
9  of this point, he's been indicted for
10 drug-related offenses, correct, based on
11 that document?
12       A.   Yes.
13       Q.   It is now clear that he --
14 strike that.
15       So at this point, you're
16 already cooperating with DEA on the
17 investigation by providing them with the
18 amount of supplied controlled substances
19 you shipped to him over those 13 months,
20 correct?
21       A.   I'm not sure when we
22 produced it.
23       Q.   And this entry here, do you
24 know who makes this entry?  Can you tell

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1 by looking at it?
2     A.    No.
3     Q.    This entry says, as of
4 August 30th, 2012, Dr. Brian Heim, who
5 has pled guilty to 24 felony counts of
6 drug trafficking in 1998 and has just
7 been indicted in Summit County in Ohio,
8 where this court sits, on drug
9 trafficking charges, that he's been
10 approved within the Schein system to
11 purchase testosterone and you'll continue
12 to notify DEA if he orders it.
13        That's the status of your
14 relationship with this customer as of
15 August 30th, 2012?
16     A.    Right.  Which indicates to
17 me that, your question earlier, if Dr.
18 Heim had placed another order, would we
19 have contacted him for updated due
20 diligence; based on that note, the answer
21 would be yes.
22     Q.    So would you have sent out
23 another letter to him?
24     A.    It would have been another

Page 375

1 questionnaire we would have sent.
2     Q.    So you would have relied on
3 his responses to a questionnaire.
4        If we go back to the
5 questionnaire, one of them is, in fact,
6 dated August of 2012.
7        You did send him a
8 questionnaire in August, right?
9     A.    Uh-huh.
10    Q.    Is there anywhere in this
11 questionnaire where it says to Schein,
12 oh, by the way, I've been indicted on
13 drug trafficking charges for medications
14 that you supplied to me?
15    A.    No.
16    Q.    Is there anywhere in this
17 due diligence file that suggests that
18 somebody picked up the phone to call him
19 and talk to him about this questionnaire?
20    A.    No.
21    Q.    Does this questionnaire even
22 ask if you have a felony drug-related
23 history?
24    A.    No.

Page 376

1     Q.    And yet, according to this
2 file, if Dr. Brian Heim, on August 24th,
3 2012, while being prosecuted by the
4 United States government, if he wanted to
5 order testosterone, on its face it would
6 not have been pended, right?
7     A.    I don't know.
8        MR. MIGLIORI:  Why don't we
9 take a break here?
10        VIDEO TECHNICIAN:  The time
11 is now 4:15 p.m.  We're going off
12 the record.
13        - - -
14        (Whereupon, a brief recess
15 was taken.)
16        - - -
17        VIDEO TECHNICIAN:  The time
18 is now 4:35 p.m.  We are back on
19 the record.
20        - - -
21        (Whereupon, Exhibit
22 Schein-Abreu-22,
23 HSI-MDL-00019701-704, was marked
24 for identification.)

Page 377

1        - - -
2 BY MR. MIGLIORI:
3     Q.    Mr. Abreu, this is Exhibit
4 Number 22.
5        We're in the home stretch, I
6 promise.
7        MR. MIGLIORI:  Counsel, it's
8     HSIMDL1970 -- I'm sorry, 19701.
9 BY MR. MIGLIORI:

21        As you're looking through
22 this, have you seen this before?
23    A.    No.
24    Q.    I'm only going to start on

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1 the second page, the one that ends in
2 19702, and the e-mail from Donna
3 Raymondito to Sergio Tejeda.
4         Do you see that?
5     A.   Yes.
6     Q.   So that's an e-mail dated
7 March 21st, 2007.
8         At this time, you are an
9 employee of Henry Schein, but you're not
10 in verifications yet, correct?
11     A.   That's right.
12     Q.   But Sergio Tejeda is in
13 regulatory at this time, correct?
14     A.   Correct.
15     Q.   And Donna Raymondito, is she
16 in verifications?
17     A.   Yes.

Page 380

1 divisions would interact with each other,
2 correct?
3     A.   Collaboration.
4     Q.   Collaboration.
5         So if verification saw a
6 zero pend for a doctor and wanted to know
7 whether it could ship orders being
8 placed, it wouldn't be irregular for
9 verification to contact Sergio and say,
10 can you tell me what's going on here,
11 correct?
12     A.   It depends on the
13 circumstances.
14     Q.   Okay.  In this circumstance,
15 as you can tell, this is normal
16 collaboration interaction, correct?
17         MR. JONES:  Objection.
18     Form.  Outside the scope.
19 BY MR. MIGLIORI:
20     Q.   Yes?
21     A.   Yes.
22     Q.   All right.  If you go -- to
23 read e-mail strings, you have to actually
24 go back to front.

Page 381

12         Would this be, if this came
13 to the attention of somebody in
14 verification, would this be a customary
15 practice, in your experience, for
16 somebody from verification -- from
17 verification to write to Sergio or
18 regulatory to ask about a threshold
19 that's been set at zero?
20         MR. JONES:  Object to the
21     form.  Outside the scope.
22         THE WITNESS:  I'm not sure.
23 BY MR. MIGLIORI:
24     Q.   That's how these two



Page 382

12      Is the release of an order
13 like this, in the context of a zero pend,
14 something that a staff level person in
15 verification would be authorized to do in
16 2007?
17      A.   I'm not sure.
18      Q.   The drug is hydromorphone.
19      You would agree with me that
20 that is a Class II controlled substance,
21 correct?
22      A.   Correct.
23      Q.   That it is subject to the
24 suspicious order monitoring requirements

Page 383

1 of the DEA, correct?
2      A.   Correct.
3      Q.   And it was released here,
4 according to this e-mail, by Donna on her
5 own, at least based on what she
6 represents here, after doing her own
7 research on what that drug is indicated
8 for.
9      Is that what it appears to
10 be?
11      A.   Yeah, I'm not sure if
12 additional discussions took place.
13      Q.   Okay.  But we know that
14 nobody -- at least Sergio, didn't get
15 back to her, correct, according to this
16 e-mail?
17      A.   Based on what was written.
18      Q.   Okay.
19      A.   But I don't know if they did
20 speak.
21      Q.   Well, let's go up a little
22 bit.

Page 384

Page 385

1
2      Now, Lisa Madalon, at that
3 point, is verification, correct?
4      A.   Correct.
5      Q.   And you'd agree --
6      MR. JONES:  Objection to the
7      sidebar.
8 BY MR. MIGLIORI:
9      Q.   And you would agree with me
10 that, at this time, verification is not
11 regulatory, correct?
12      A.   Correct.
13      Q.   And in this exchange back
14 and forth, Lisa is expressing to the
15 customer service folks that she's really
16 concerned because verification has become
17 regulatory.
18      Do you see that?
19      MR. JONES:  Objection.  The
20      document speaks for itself.
21      Outside the scope.  Calls for
22      speculation.
23 BY MR. MIGLIORI:
24      Q.   Do you see that?

Page 386

1  A.  I see what the document
2  says.
3  Q.  Did you hear, or did you
4  know of complaints, within the Henry
5  Schein verification department, that you
6  now run, that the support and
7  collaboration with regulatory was not
8  strong prior to you getting there in
9  2009?
10  MR. JONES:  Objection.
11  Form.  Outside the scope.
12  THE WITNESS:  No, I'm not
13  aware.
14  BY MR. MIGLIORI:
15  Q.  You would agree with me that
16  if what's represented in this e-mail is
17  true, that's not good coordination
18  between verification and regulatory,
19  correct?
20  MR. JONES:  Objection.
21  Form.  Calls for speculation.
22  Outside the scope.
23  THE WITNESS:  I really can't
24  say.

Page 387

1  BY MR. MIGLIORI:
2  Q.  Well, you're here, as a
3  representative of the company, to talk
4  about the suspicious order monitoring
5  program, correct?
6  A.  Correct.
7  Q.  Is this something, today,
8  that you would be -- that you would
9  accept, as a manager of the verifications
10  department, as a process for releasing an
11  order of hydromorphone when the system
12  has it listed as a zero pend customer?
13  Would you be okay with this?
14  A.  Would I be okay with it?
15  Q.  Yes.
16  A.  It's from 2007.  It was
17  before my time.
18  Q.  I'm asking today.  Just so
19  we're clear, I'm asking today, if you
20  received this, if you were in Lisa
21  Madalon's shoes, which you are now, is
22  this acceptable to you?
23  MR. JONES:  Object to the
24  form.  Same objection.  Outside

Page 388

1  the scope.
2  THE WITNESS:  I'm not sure.
3  BY MR. MIGLIORI:
4  Q.  Would you be okay with
5  somebody working for you, today,
6  releasing an order of hydromorphone
7  without collaborating with regulatory
8  under the existing today suspicious order
9  monitoring program at Henry Schein?
10  MR. JONES:  Objection.
11  Form.
12  THE WITNESS:  There needs to
13  be collaboration.
14  BY MR. MIGLIORI:
15  Q.  And if this is accurate,
16  there was none in this case, correct?
17  A.  I can't speak to that.
18  Q.  All right.  If you found out
19  that your employee working in
20  verification did that today, what would
21  be your next step, once you found out?
22  A.  Sorry, can you rephrase
23  that?
24  Q.  Yes.

Page 389

12  MR. JONES:  Objection.
13  Form.
14  BY MR. MIGLIORI:
15  Q.  Under your system in place
16  today.
17  A.  I'm not sure.  It's a
18  hypothetical.
19  Q.  That's okay.  You can answer
20  a hypothetical.
21  A.  I'm not sure what I would
22  do.
23  Q.  Would you be okay with it?
24  A.  I'd probably make a phone

Page 390

1  call.
2       Q.   To whom?
3       A.   To regulatory.
4       Q.   And what would be your
5  concern, that regulatory wasn't
6  cooperating?
7       A.   That there be collaboration.
8       Q.   Would you talk to Donna
9  Raymondito and tell her that, next time
10 you have to wait until you actually get
11 collaboration?
12      A.   Yes.
13      Q.   You can put that to the
14 side.  I'll show you Exhibit Number 23.
15               - - -
16      (Whereupon, Exhibit
17      Schein-Abreu-23, HSI-MDL-00002760,
18      was marked for identification.)
19               - - -
20 BY MR. MIGLIORI:
21      Q.   Exhibit-23 is Bates number
22 HSIMDL2760.  This is dated December of
23 2009.  The issue is scheduling a team
24 meeting.

Page 391

1       At this point, you are now
2  part of verification, correct?
3       A.   Yes.
4       Q.   The organizer is Donna
5  Raymondito, now Tomacello -- she's trying
6  to collect as many Italian syllables as
7  she can.  Only I can say that in this
8  room.
9            You're at this meeting,
10 right?  Required attendees, Shaun Abreu.
11 Maggie Wilding and Judy Labarbera?
12      A.   Labarbera.
13      Q.   Do you recall this meeting?
14      A.   No.
15      Q.   It appears that Donna
16 Raymondito Tomacello is asking for a
17 meeting.  And it says, I would like to
18 schedule a team meeting on Friday for
19 both New York and Reno to cover our
20 missed meeting for November.
21           So would this be a meeting
22 of the New York and Reno verification
23 departments?
24      A.   It appears that way, yes.

Page 392

8        Is Huddles a program at
9  Schein?
10      A.   Yes.  It's kind of like a
11 quick meeting.
12      Q.   Is it -- but it's an
13 in-person meeting or web cam or
14 something?
15      A.   Yes.  Most of the time in
16 person.
17      Q.   It's not a particular
18 platform or Internet-based or anything
19 like that?  It's just sort of jargon?
20      A.   Jargon for a quick meeting,
21 yes.
22      Q.   Got you.

Page 393

14       In 2009, do you recall
15 instances where sales reps were actually
16 educating the customers about their
17 orders in order to avoid a suspicious
18 order monitoring pend?
19      A.   No, not to my knowledge.
20      Q.   You would agree with me that
21 it would not be good practice to give
22 dispensing history or information to your
23 customers for the purposes of avoiding a
24 suspicious order monitoring inquiry,

Page 394

1 correct?
2     A.   Correct.
3     Q.   And that's because the
4 purpose of the suspicious order
5 monitoring program is to prevent
6 diversion, not to get around the
7 requirements of the DEA in order to
8 prevent diversion, correct?
9     A.   Correct.
10     Q.   Have you ever seen instances
11 of your sales rep giving customers
12 information on their ordering history in
13 order to help them get around a
14 suspicious order inquiry?
15     MR. JONES:  Objection.
16 Form.  Vague.
17 BY MR. MIGLIORI:
18     Q.   Have you ever seen examples
19 of that?
20     A.   Not to my recollection.
21     Q.   Okay.  Do you recall that
22 meeting and whether or not that issue was
23 ultimately discussed at your meeting?
24     A.   I don't recall the meeting,

Page 395

1 no.
2     Q.   All right.  I'll show you
3 Exhibit-24.  You know what, I'll spare
4 you that.
5     Here is Exhibit-24.
6     - - -
7     (Whereupon, Exhibit
8     Schein-Abreu-24, HSI-MDL-00002760,
9     was marked for identification.)
10     - - -
11 BY MR. MIGLIORI:
12     Q.   It is Bates number
13 HSIMDL20069.  It's an e-mail chain that
14 involves Shaun Abreu and Craig Schiavo
15 and Bill Brandt.
16     The e-mail on the bottom is
17 dated January 31st, 2012.  It's from you
18 to Craig Schiavo and Bill Brandt.
19     Craig, at this point, is in
20 what department?
21     A.   Regulatory.
22     Q.   Regulatory.
23     You write, January 30th,
24 2012, Hi, Craig, please see the attached

Page 396

1 file from the Know Your Customer
2 proactive process.
3     Is that the process that
4 we're talking about to fill the due
5 diligence files of the 60 percent of the
6 customers that didn't have due diligence?
7 Is that what's referred to as the
8 proactive --
9     A.   It may have been part of
10 that process, or just a customer that we
11 reached out to proactively.
12     Q.   You'll agree with me that --
13 strike that.
14     This doctor was
15 self-medicating, but he did 31,000 in
16 sales for 2011.  I had him send us
17 justification stating that he will no
18 longer order the product to self-medicate
19 and that all future controlled substance
20 orders will be for patients' use.  Are
21 you okay with reinstating?  See attached
22 file.
23     Do you recall this
24 particular doctor, Timothy Kowalski?

Page 397

1     A.   No.
2     Q.   Do you recall any doctors
3 that you had interaction with that you've
4 learned, in your proactive Know Your
5 Customer process, were self-medicating?
6     A.   Not specifically by name,
7 no.
8     Q.   And is it -- was it, in
9 2012, acceptable to clear a doctor for
10 controlled substance orders based on his
11 promise not to take anymore drugs
12 himself?
13     A.   Sorry, restate the question.
14     Q.   Is this a normal process
15 within Henry Schein, at least in 2012,
16 that a letter from a doctor who is
17 self-medicating with controlled
18 substances promising not to do it anymore
19 would be enough to reinstate him?
20     A.   Not that -- not that alone,
21 no.  It depends on the circumstances.
22     Q.   What is the relevance of the
23 fact that he did 31,000 in sales in 2011?
24     A.   Well, you have -- there are

Page 398

1 doctors who self-prescribe or
2 self-medicate that don't have an active
3 practice.
4     Q.    So the fact that he had an
5 active practice and generated $31,000 in
6 sales made him less likely to
7 self-medicate?
8     A.    Not less likely.  But, I
9 guess, the risk for future
10 self-medication would be lower.
11     Q.    Based on what?
12     A.    What?
13     Q.    Based on what?
14     A.    Based on the active practice
15 and him putting -- the doctor putting it
16 in writing.
17     Q.    You acknowledge that even in
18 the Controlled Substances Act, by
19 definition, a Schedule II drug, a
20 controlled substance Schedule II drug,
21 is, by definition, at high risk for
22 abuse?
23     A.    Yes.
24     Q.    You would acknowledge that

Page 399

1 doctors who self-medicate and use their
2 DEA registration number to get controlled
3 substances in order to self-medicate are
4 at a higher risk of abuse?
5         MR. JONES:  Object to the
6     form.  Outside the scope.  Calls
7     for speculation.
8 BY MR. MIGLIORI:
9     Q.    You would agree with that,
10 right?
11     A.    Potentially.  I'm not sure.
12     Q.    Schedule II drugs are -- can
13 be highly addictive and are, by
14 definition, much more highly likely to be
15 abused by the person taking them,
16 correct?
17     A.    By schedule?
18     Q.    By definition in the
19 schedule, yes.
20     A.    Yes.
21     Q.    So a doctor that's taking
22 morphine equivalents has a -- at least a
23 risk of saying whatever he or she needs
24 to say in order to continue to receive

Page 400

1 controlled substances from your company,
2 correct?
3     A.    Possibly.
4     Q.    Is him writing a letter to
5 the company, in your view, a robust due
6 diligence, Know Your Customer process,
7 for avoiding the potential diversion of
8 those drugs by this doctor?
9         MR. JONES:  Object to the
10     form.
11         THE WITNESS:  It's difficult
12     to say.
13 BY MR. MIGLIORI:
14     Q.    It is difficult to say,
15 right?
16     A.    No, I'm saying, it's
17 difficult to answer you, depending --
18 because you don't know what due diligence
19 was conducted, based on this e-mail.
20     Q.    Based on this e-mail it says
21 you asked him to write you a letter.
22         Is that enough?
23     A.    I'm not saying that that's
24 all that was -- that was done.

Page 401

1     Q.    Well, assuming that this
2 e-mail is enough -- is what was done, is
3 that enough?
4         MR. JONES:  Object to the
5     form.
6 BY MR. MIGLIORI:
7     Q.    That is, in your own words,
8 you say, I had him send us justification
9 stating that he will no longer order the
10 product to self-medicate and that all
11 future controlled substance orders will
12 be for patient use.
13         As manager of the
14 verification department at Henry Schein,
15 Inc., is that a sufficient basis to say
16 that this doctor is not at risk of
17 diverting controlled substances?
18         MR. JONES:  Object to the
19     form.
20         THE WITNESS:  Yeah, I can't
21     say.  It says, See attached file.
22     So I'm not sure what was produced.
23 BY MR. MIGLIORI:
24     Q.    That's fine.

Page 402

1    I'm asking the question that
2  is, if this is all that you asked for,
3  which is what you wrote, that you had him
4  send justification that he will no longer
5  do it and he will only use controlled
6  substances for his patients, if that's
7  all that happened -- and I'm not saying
8  that is -- if that's all that happened,
9  would you agree with me that that's not
10  enough due diligence to clear a doctor
11  from the potential risk of him or her
12  diverting the controlled substance?
13    MR. JONES:  Object to the
14  form.  Asked and answered.
15  BY MR. MIGLIORI:
16    Q.   Go ahead.
17    A.   I think it depends on the
18  circumstances.
19    Q.   So there is a circumstance
20  where a letter promising not to do it
21  again is sufficient, in the Henry Schein
22  suspicious order monitoring system?
23  There is a circumstance where that would
24  be fine?

Page 403

1    A.   There may be.
2    Q.   And it would be okay that
3  just if the doctor wrote and said, I
4  promise, I won't do it again?
5    A.   There may be.  It depends on
6  the circumstances.
7    Q.   Is that true today, too?  Is
8  that true today, too, not just in 2012?
9    A.   That a letter --
10    MR. JONES:  Object to the
11  form.
12  BY MR. MIGLIORI:
13    Q.   That a letter would be
14  enough; that a letter would be consistent
15  with the standard operating procedures of
16  Henry Schein, Inc. for the suspicious
17  order monitoring system in place today?
18    A.   Generally, no.
19    Q.   All right.  Craig wrote back
20  to you and said, Shaun, I'm okay with
21  reinstating.  Do you think we should send
22  this to DEA as a follow-up to our
23  reporting letter?
24    You wrote back on February

Page 404

1  1st, 2012.  Hi, Craig, we never reported
2  to DEA.  It was part of the proactive
3  process.  I can simply reinstate the
4  customer.
5    If you would agree with me
6  that a customer that shows up as a pend
7  or a suspicious order not by algorithm,
8  but by Know Your Customer criteria, that
9  once it is determined that there is a
10  concern that this could be a suspicious
11  order, that the obligation of Henry
12  Schein is to report the pend or
13  suspicious order, as you defined it, in
14  2012?
15    MR. JONES:  Object to the
16  form.
17    THE WITNESS:  If there was a
18  pend, we would have reported it.
19  BY MR. MIGLIORI:
20    Q.   And you would agree with me
21  that the Know Your Customer process,
22  proactive process at Schein, by itself,
23  can produce a pend, correct?
24    A.   I'm sorry, can you restate

Page 405

1  that?
2    Q.   Sure.
3    By definition, this is a
4  pend, right?
5    MR. JONES:  Objection.
6  BY MR. MIGLIORI:
7    Q.   You received a bit of
8  information from a doctor about
9  self-medicating.
10    That, by definition, in
11  2012, is a pend, correct, requiring
12  further due diligence?  Correct?
13    MR. JONES:  Object to the
14  form.
15    THE WITNESS:  I don't know
16  if there was an order.
17  BY MR. MIGLIORI:
18    Q.   That's not my question.
19  Forget the letter.  Forget the date.
20    Today, if you find out that
21  a doctor is self-medicating, that
22  requires further due diligence, correct?
23    A.   Correct.
24    Q.   You'd call that a pend in

Page 406

1 the Henry Schein system, correct?
2        MR. JONES:  Object to the
3    form.  Misstates prior testimony.
4        THE WITNESS:  Not
5    necessarily, no.
6 BY MR. MIGLIORI:
7    Q.    You'd call it -- it's
8 something that requires further due
9 diligence, right?
10    A.   Yes.
11    Q.    So that further due
12 diligence necessarily, in the Henry
13 Schein system, prevents you from shipping
14 until you resolve the issue, correct?
15    A.   Yes.
16    Q.    All right.  So when you
17 learn in 2012 that a doctor is
18 self-medicating, you do the due
19 diligence, as you report in this e-mail,
20 to make sure that this isn't going to be
21 a diverted supply of controlled
22 substance, correct?
23        MR. JONES:  Object to the
24    form.  Asked and answered.

Page 407

1 BY MR. MIGLIORI:
2    Q.    Correct?
3        MR. JONES:  Outside the
4    scope.
5 BY MR. MIGLIORI:
6    Q.    Correct?
7    A.   Yes.
8    Q.    And so by that definition,
9 this should have been reported at least,
10 in the Henry Schein system, as a pend,
11 correct?
12        MR. JONES:  Objection.
13    Form.  Asked and answered.
14 BY MR. MIGLIORI:
15    Q.    Correct?
16    A.   If there was a pend, it
17 would have been reported.
18    Q.    Knowing that a doctor was
19 self-medicating produces at least a pend
20 in the Schein monitoring system, correct?
21        MR. JONES:  Objection.
22    Asked and answered three times.
23        MR. MIGLIORI:  No, it's
24    three different ways.  I'm just

Page 408

1    trying to get the last one.
2 BY MR. MIGLIORI:
3    Q.    Correct?
4        MR. JONES:  Same objection.
5 BY MR. MIGLIORI:
6    Q.    Correct?
7    A.   I'm not sure I understand
8 the question.
9    Q.    A doctor that's
10 self-medicating is a red flag, correct?
11        MR. JONES:  Object to the
12    form.
13        THE WITNESS:  Potentially,
14    yes.
15 BY MR. MIGLIORI:
16    Q.    Is there any instance where
17 a doctor who is self-medicating with a
18 controlled substance is not a red flag?
19    A.   If it was prescribed.
20    Q.    By himself, or herself?
21    A.   No, by the doctor.
22    Q.    If a doctor is
23 self-medicating, as is described right
24 here -- which means prescribed to

Page 409

1 himself, correct?
2    A.   Correct.
3    Q.    -- that is a pend red flag
4 in the Henry Schein system today,
5 correct?
6    A.   So I think maybe you're
7 confusing the pend.  So it's not a pend,
8 because there's no order.
9    Q.    All right.
10        Does the file, like we saw
11 in the last exhibit where it says zero
12 pend on all orders, does something happen
13 in the system, when you have a proactive
14 Know Your Customer bit of information
15 like this, does something happen in your
16 system that tells people, don't do
17 anything until we do our due diligence?
18    A.   Yeah, we may flag the
19 account.  Yes.
20    Q.    Flag the account, that's the
21 term we'll use.
22        You'll agree with me that a
23 doctor who self-medicates in 2012 will
24 cause you, once you learn of it, to flag

Highly Confidential — Subject to Further Confidentiality Review

Page 410

1 the account, correct?
2     A.   Correct.
3     Q.   And that flagging of the
4 account prevents any shipment to that
5 doctor until that flag is resolved,
6 correct?
7     A.   Correct.
8     Q.   And whether you call it a
9 flag, or anything else, that information
10 is reportable to the DEA, correct?
11          MR. JONES:  Object to the
12     form.
13 BY MR. MIGLIORI:
14     Q.   Even Craig asked you, do we
15 report this to the DEA?
16     A.   As a -- he asked if we
17 should send a follow-up to the DEA saying
18 that we cleared it --
19     Q.   Right.
20     A.   -- was the question.
21     Q.   Do you have to report that
22 you're reinstating a doctor -- when you
23 use the word "reinstating," it suggests
24 to me that the doctor had been suspended

Page 411

1 or pended or something.
2          Am I wrong to assume that?
3     A.   No, it would have been -- it
4 would have been placed on hold.
5     Q.   All right.  Do you place --
6 do you tell the DEA when you have to
7 place a doctor on hold?
8     A.   Not necessarily.
9     Q.   All right.  And it appears
10 from that document that you're looking at
11 that, in this instance, you didn't notify
12 the DEA, correct?
13     A.   Correct.
14     Q.   Exhibit-25.
15          - - -
16          (Whereupon, Exhibit
17     Schein-Abreu-25,
18     HSI-MDL-00397293-294, was marked
19     for identification.)
20          - - -
21 BY MR. MIGLIORI:

Page 412

3          Have you seen this document
4 before?
5     A.   I don't believe so, no.
6     Q.   And it's signed by Sergio
7 Tejeda, the director of regulatory
8 operations and compliance.
9          We've been talking about him
10 all day, correct?
11     A.   Yes.

24          First off, do you know what

Page 413

1 the six distribution centers are that are
2 licensed to sell prescription drugs in
3 Ohio?  Do you know which ones they are?
4     A.   Yeah.  We have six in the
5 U.S.
6     Q.   Do you know where they are
7 located?  Can you give me the names by
8 city?
9     A.   Yes.
10     Q.   What are they?
11     A.   So it would be Indianapolis;
12 Jacksonville; Grapevine, Texas; Reno,
13 Nevada; and Denver, Pennsylvania; and
14 Bastion, Virginia.
15     Q.   And all six of those
16 distribution centers are subject to the
17 suspicious order monitoring systems that
18 we've been talking about all day,
19 correct?
20     A.   Yes.
21     Q.   That is, whatever we've been
22 talking about applies to all the
23 distribution centers that supply to the
24 state of Ohio, correct?

Page 414

1    A.   Yes.
2    Q.   Is there any basis for why
3  one distribution center versus another
4  would be shipping into the state?
5    A.   It would just be
6  availability of product.
7    Q.   Supply?
8    A.   Yes.
9    Q.   Okay.  Mr. Tejeda goes on to
10  say, The purpose of this letter is to
11  notify the Ohio Board of Pharmacy of an
12  issue that was recently discovered while
13  conducting a routine internal review of
14  our operations.  During the course of our
15  internal review, we realized that Henry
16  Schein, Incorporated, has been
17  underreporting sales of controlled
18  substances to the Ohio Board of Pharmacy
19  as required by the state's prescription
20  monitoring program, PMP.  The reports
21  included sales of products that contained
22  Tramadol and carisoprodol, but did not
23  include the sale of other controlled
24  substances.  We believe the

Page 415

1  underreporting error was due to
2  misinterpretation and/or miscommunication
3  of the state requirement that happened
4  during the implementation of our computer
5  automated reporting system.
6         Do you recall -- now, in
7  November of 2012, you were, in fact, part
8  of the verification team and the SOM
9  program, correct?
10    A.   Correct.
11    Q.   At this point, the enhanced
12  SOM program is in place and implemented,
13  correct?
14    A.   The one from 2009 you're
15  referring to?
16    Q.   The one that Buzzeo helped
17  to design and then launched through
18  October of 2011, correct?
19    A.   I mean, it's been enhanced,
20  you know, up until present day.
21    Q.   But it's post Buzzeo
22  review --
23    A.   Yes.
24    Q.   -- correct?  All right.

Page 416

1         Do you recall that you had
2  only been, at Schein, reporting to the
3  Ohio Board of Pharmacy, as of that date,
4  Tramadol and carisoprodol?
5    A.   No.
6    Q.   Would it be fair to say that
7  based on this -- strike that.
8         Do you recall this letter?
9    A.   No.
10    Q.   Do you recall this instance?
11    A.   No.
12    Q.   Were you in any way, to your
13  knowledge, made aware of this
14  underreporting to the state of Ohio?
15    A.   I may have been, but I don't
16  recall.
17    Q.   And based on this, the only
18  controlled substances being reported to
19  Ohio were those two morphine equivalents,
20  Tramadol and carisoprodol, correct?
21    A.   That's what the letter says,
22  yes.
23    Q.   That leaves out every other
24  Schedule II drug, like hydrocodone, that

Page 417

1  we discussed earlier, correct?
2    A.   Correct.
3    Q.   So even at this stage, in
4  November of 2012, all 11,500 pills
5  supplied to Dr. Heim were not reported to
6  the Ohio Board of Pharmacy, correct?
7    A.   Yes.
8         MR. JONES:  Objection.
9  Form.  Beyond the scope.  Calls
10  for speculation.
11  BY MR. MIGLIORI:
12    Q.   I'll get to the connection
13  to it.
14         You would agree that the
15  11,500 doses of hydrocodone to Dr. Heim
16  were not reported to the Ohio Board of
17  Pharmacy as of November 2012, correct?
18         MR. JONES:  Same objections.
19         THE WITNESS:  Based on the
20  letter, I would say yes.
21  BY MR. MIGLIORI:
22    Q.   Okay.  And that would be in
23  violation of the Ohio requirements for
24  reporting transactions, correct?

Page 418

1    MR. JONES: Objection.
2 Calls for speculation. Form.
3 Outside the scope.
4    THE WITNESS: I'm not sure
5 if it's a violation.
6 BY MR. MIGLIORI:
7    Q.   I showed you the Ohio
8 regulations as your own company
9 incorporated them into the standard
10 operating procedures.
11    Do you recall that earlier
12 today?
13    A.   Yes.
14    Q.   And you'll agree that the
15 Ohio Board of Pharmacy is -- requires
16 that you report transactional data to
17 Ohio just like you do to the DEA,
18 correct?
19    MR. JONES: Object to the
20 form. Calls for a legal
21 conclusion. Outside the scope.
22    THE WITNESS: Right.
23 BY MR. MIGLIORI:
24    Q.   So to the extent that the

Page 419

1 letter is correct, that was being sent by
2 Sergio Tejeda to the Ohio Board of
3 Pharmacy, those pills that we talked
4 about today to Dr. Heim would not be part
5 of any of the reporting done to the Ohio
6 Board of Pharmacy as of November 2012,
7 based on this letter, correct?
8    MR. JONES: Objection.
9 Calls for speculation. Form.
10 Outside the scope.
11 BY MR. MIGLIORI:
12    Q.   Correct?
13    A.   Yes.
14    Q.   To date, Henry Schein, Inc.,
15 has consistently filed the reports on a
16 timely basis as required by the PMP. And
17 prior to the discovery of this issue, HSI
18 was not aware that the reports were
19 incomplete. Please be reassured that
20 there was never any intent to avoid or
21 circumvent the company's obligation under
22 Ohio state law, and as a fact of good
23 faith, Henry Schein, Incorporated is
24 providing all controlled substance sales

Page 420

1 information which was mistakenly omitted
2 for the previous two years. See
3 enclosures.
4    Have you ever seen that list
5 that was provided to the Ohio Board of
6 Pharmacy with this letter, November of
7 2012?
8    A.   No.
9    Q.   Do you know if that list
10 contains any of the shipments of Schedule
11 II drugs into Summit County, Ohio?
12    A.   I've never seen the list.
13    Q.   So you wouldn't know whether
14 or not it also contained shipments into
15 Cuyahoga County, correct?
16    A.   I've never seen it.
17    Q.   You haven't seen it.
18    HSI would like to ensure the
19 Ohio Board of Pharmacy that our
20 electronic reporting process has been
21 modified so that future reports,
22 including the current reporting period,
23 will include all required information.
24    Would you agree with me that

Page 421

1 all required information, under the Act
2 in Ohio, would include all shipments into
3 Ohio of Schedule II drugs?
4    MR. JONES: Object to the
5 form. Outside the scope. Calls
6 for a legal conclusion.
7 BY MR. MIGLIORI:
8    Q.   Would you agree with that?
9    A.   Can you restate?
10    Q.   Yes.
11    Would you agree with me that
12 this process that's been modified in the
13 electronic reporting system would now
14 include, in order to be current and
15 compliant with Ohio law, would include
16 all controlled substances?
17    MR. JONES: Same objections.
18    THE WITNESS: If that's what
19 the law called for.
20 BY MR. MIGLIORI:
21    Q.   The suspicious order
22 monitoring program that you're here to
23 talk about includes state obligations to
24 report as well, right? We just saw that

Page 422

1  in the policies and procedures.
2       MR. JONES:  Object to form.
3       Overly broad as to time.
4  BY MR. MIGLIORI:
5       Q.   Correct?
6       A.   Yes.
7       Q.   All right.  And we saw that
8  Ohio -- and Mr. Tejeda states it right
9  here, under Ohio state law, it is
10  required to report to the board in Ohio
11  all controlled substances distributed and
12  sold in the state of Ohio, correct?
13       A.   Yes.
14       Q.   Failure to report, prior to
15  November of 2012, the transactions of all
16  controlled substances in the state of
17  Ohio would be a failure to comply with
18  that provision, correct?
19       MR. JONES:  Object to the
20       form.  Outside the scope.  Calls
21       for legal conclusion.
22  BY MR. MIGLIORI:
23       Q.   Correct?
24       A.   I'm not sure of the legal

Page 423

1  implication.
2       Q.   If you don't report and
3  you're required to report, you would
4  agree it's not compliant, correct?
5       MR. JONES:  Object to the
6       form.  Outside the scope.  Overly
7       broad as to time.  Vague as to
8       time.  Outside -- calls for a
9       legal conclusion.
10  BY MR. MIGLIORI:
11       Q.   Correct?
12       A.   Sorry?
13       Q.   If you're obligated to
14  report, you don't do it, that's not
15  compliant, correct?
16       A.   You're not fulfilling the
17  requests.
18       MR. JONES:  Same objection.
19  BY MR. MIGLIORI:
20       Q.   Which means you're not
21  compliant with the request, right?
22       A.   Yes.
23       MR. MIGLIORI:  Exhibit-26.
24       Two more documents and we're done.

Page 424

1       - - -
2       (Whereupon, Exhibit
3  Schein-Abreu-26, HSI-MDL-00039634,
4  was marked for identification.)
5       - - -
6  BY MR. MIGLIORI:

Page 425

5       Now, Beverly Butcher is in
6  regulatory, correct?
7       A.   Correct.
8       Q.   That's part of Sergio's
9  department, correct?
10       A.   Yes.
11       Q.   She did a site visit on Dr.
12  Spendle, and the report restricting him
13  from the purchase of controlled
14  substances was put on the M drive.
15       Is that part of the JDE
16  system?
17       A.   No, that's a separate --
18       Q.   What is that?
19       A.   It's a local network drive.
20       Q.   Why would the report be
21  placed on the M drive versus the JDE
22  system?
23       A.   Eventually it will get
24  placed in both.

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1   Q.   Which is the official
2   repository?
3       A.   You can argue they both are,
4   but JDE captures everything.
5       Q.   When you go -- when the DOJ
6   or DEA comes to you and says, we need
7   information, do you go to the M drive or
8   do you go to the JDE, or do you go to
9   both?
10      A.   Usually both.
11      Q.   So if I needed due diligence
12  on Dr. Heim, might there be something on
13  the M drive that's not contained in that
14  JDE due diligence file?
15      A.   Potentially.
16      Q.   Did you look at the M drive
17  in preparing or assisting in the
18  production of documents in this case, as
19  we discussed earlier today?
20      A.   Not me personally.  But
21  somebody did check it, yes.
22      Q.   At your direction?
23      A.   Yes.
24      Q.   So the doctor gets put on

Page 427

1   restriction for the purpose of controlled
2   substances.  Steffanie-Oak writes to
3   Kathleen Reid -- who is Kathleen Reid at
4   this point?
5       A.   She's a member of
6   regulatory.
7       Q.   So Tina Steffanie-Oak writes
8   to Kathleen and says, I just found out
9   from Shaun that verifications
10  accidentally released his hydrocodone
11  order on February 23rd.  Please do not
12  send a suspicious order letter to the
13  DEA.  Thanks.
14          Does verifications release
15  hydrocodone that is pended as a practice?
16      A.   That is --
17          MR. JONES:  Objection.
18  Form.
19              - - -
20          (Whereupon, a discussion off
21      the record occurred.)
22              - - -
23  BY MR. MIGLIORI:
24      Q.   You write in this e-mail --

Page 428

1   or I should say Tina writes in this
2   e-mail to Kathleen, on February 27th,
3   2015, that she just found out from
4   Shaun -- that would be you in
5   verifications, correct?
6       A.   Yes.
7       Q.   -- that verifications
8   accidentally released his hydrocodone
9   order on February 23rd.  Please do not
10  send a suspicious order letter to the
11  DEA.  Thanks.
12          Now, I want to understand
13  the process of the verifications
14  department releasing hydrocodone in a
15  pended order.
16          How is it that verifications
17  is involved with releasing a hydrocodone
18  order in the Henry Schein system in 2015?
19      A.   You're asking if we were
20  able to release it?
21      Q.   How is it that that happens?
22  Is that part of the normal process, that
23  verifications would release a hydrocodone
24  order?

Page 429

1       A.   Yes.
2       Q.   Is that the normal release
3   process?
4       A.   Based on existing due
5   diligence, yes.
6       Q.   So let's say the order
7   didn't get pended or flagged in any way.
8          The doctor makes an order,
9   would verifications be involved in the
10  order at all?
11      A.   If the order wasn't flagged?
12      Q.   Right.
13      A.   So it didn't pend?
14      Q.   Right.  The order doesn't
15  pend.
16          Would verifications have any
17  role whatsoever, in a normal order that's
18  not pended or flagged, in releasing the
19  order to the customer?
20      A.   Not unless --
21          MR. JONES:  Objection.
22  Form.
23          THE WITNESS:  Not unless it
24  was for a license.

Page 430

BY MR. MIGLIORI:

Q. Okay. But that's still a flag, that is, it would be flagged for a license, correct?

A. Correct.

Q. So in order for verifications, as represented in this e-mail, to be in a position to even release the hydrocodone, somehow this order was pended or flagged for verifications, correct?

A. That's what it appears, yes.

Q. And based on this e-mail, according to Tina, somebody in the verifications department released the pend, released the flag, allowed the order to get filled; is that accurate?

A. Yes.

Q. And as we discussed earlier, in e-mail, this is actually a doctor who ordered who has been restricted from the purchase of controlled substances, correct?

A. As a result of the site

Page 431

visit.

Q. As a result of a site visit. So you have a site visit and you make a decision to restrict his purchase of controlled substances, at Henry Schein, correct?

A. If -- after the site visit.

Q. The site visit would only be triggered by some kind of flag or pend, correct?

A. Maybe, not necessarily. It could have been -- it could have been triggered as a result of our due diligence review.

Q. All right. In any event, in February, February 27th, a site review is done and they decide, yes, in fact, we need to restrict this doctor's use of controlled substances, correct?

A. Yes.

Q. That same day, Tina Steffanie-Oak says that there is a current open order, and Schein will need to reopen -- I'm sorry, will need to be

Page 432

reported -- strike that.

On February 27th, 2005, in response to the statement that this doctor has been restricted from the purchase of controlled substances, Steffanie Tina Oak writes that this doctor has a current open order and will need to be reported to the DEA.

That's what Tina said on that date, correct?

A. Yes.

Q. You have no reason to dispute that a doctor who is visited on site and it's determined needs to be restricted from the purchase of controlled substances would be reported to the DEA, correct?

MR. JONES: Objection.

BY MR. MIGLIORI:

Q. That is part of the suspicious order monitoring system at Schein in 2015, correct?

MR. JONES: Objection to form.

Page 433

THE WITNESS: Yes.

BY MR. MIGLIORI:

Q. You have to let the DEA know when a doctor can't get drugs, correct, controlled substances?

A. Yes.

Q. In response to that, though, Tina Steffanie-Oak responds again and says, I just found out from Shaun that verifications -- your department -- accidentally released the hydrocodone order four days earlier, on February 23rd, correct?

A. Yes.

Q. And Tina is instructing Kathleen Reid in regulatory, please do not send a suspicious order letter to the DEA.

Do you see that?

A. Yes.

Q. Do you recall this happening?

A. No.

Q. That is not lawful, correct?

Page 434

1    MR. JONES:  Object to the
2 form.  Calls for a legal
3 conclusion.  Outside the scope.
4 BY MR. MIGLIORI:
5    Q.   That's not lawful, is it?
6    MR. JONES:  Same objections.
7    THE WITNESS:  No.
8 BY MR. MIGLIORI:
9    Q.   Do you know if that was
10 reported to the DEA or not?
11   A.   No, I'm not sure.
12   Q.   Exhibit-27.
13       - - -
14   (Whereupon, Exhibit
15 Schein-Abreu-27,
16 HSI-MDL-00156897-899, was marked
17 for identification.)
18       - - -
19 BY MR. MIGLIORI:
20   Q.   This is Bates Number
21 HSI156897.
22     Have you ever dealt with
23 William Crawford at DOJ?
24   A.   Not to my recollection.

Page 435

1    Q.   Doug Crawford, which is
2 William Doug Crawford, is from the DEA,
3 in the tactical diversion squad from
4 Columbus, Ohio.

Page 436

Page 437

3    Q.   Do you know that when you
4 look back in the Ohio -- I'm sorry, when
5 you look back in the Henry Schein system
6 for pends or for suspicious orders, do
7 you know whether or not Dr. Mason was one
8 of the three pends that you identified?
9    A.   No, I'm not sure.
10   Q.   This was in 2016.
11     So this would be information
12 that's in the Henry Schein system, that
13 is, this would not be purged information,
14 correct?
15   A.   Correct.
16   Q.   And so if there were a due
17 diligence file -- strike that.
18     By 2016, you were well into
19 your proactive program of completing due
20 diligence files for all of your
21 customers, correct?
22   A.   I would say yes.
23   Q.   And in that proactive
24 process of due diligence, did you go and

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1  look at doctors' reporting history to the
2  Ohio Board of Pharmacy where, in a state
3  like Ohio, reporting was a requirement?
4         Is that part of the due
5  diligence proactive process at Henry
6  Schein?
7         MR. JONES:  Object to the
8     form.
9         THE WITNESS:  We don't have
10    access to that information.
11 BY MR. MIGLIORI:
12    Q.   Well, you certainly have the
13 ability to write to the Ohio Board of
14 Pharmacy to make sure they have a
15 license?  You had been doing that all
16 along, correct?
17    A.   We've been verifying it on
18 the web.
19    Q.   Okay.  And could you have --
20 or did you ever go to the Ohio Board of
21 Pharmacy to find out directly from them
22 of any reporting history that any doctor
23 would have in the state of Ohio?
24    A.   I don't believe so.  I'm not

Page 439

1  sure they would provide it.
2     Q.   And if you at Schein
3  determined that Dr. Mason had an unusual
4  ordering pattern or anything was
5  suspicious in the 10,000 hydrocodones he
6  ordered between 2012 and 2016, you would
7  have a file on that, right?
8         MR. JONES:  Object to the
9     form.
10        THE WITNESS:  I don't know
11    that we sold him 10,000 units of
12    hydrocodone.
13 BY MR. MIGLIORI:
14    Q.   Well, it said that a few
15 days later, The state pharmacy board went
16 to inspect his records, at which time Dr.
17 Mason admitted to them that he lied to me
18 and had no dispensing records because he
19 was addicted to hydrocodone and had been
20 ordering hydrocodone from your company
21 for his personal use.
22        You would agree with me that
23 that is an unlawful use, by Dr. Mason, of
24 hydrocodone, correct?

Page 440

1     A.   Yes.
2     Q.   You would agree with me that
3  as part of your Know Your Customer
4  requirements, nationally and in Ohio,
5  knowing whether or not a physician is
6  self-medicating is part of your
7  obligation at Schein, correct?
8     A.   Yes.
9     Q.   And if on the magnitude of
10 10,000 hydrocodone pills had been sold to
11 him by your company between 2012 and 2016
12 and he used them for his own personal
13 use, that would be, in no uncertain
14 terms, a diversion of those pills,
15 correct?
16        MR. JONES:  Objection.
17    Form.  Lack of foundation.
18    Mischaracterizes Exhibit-27.
19 BY MR. MIGLIORI:
20    Q.   Correct?
21    A.   Well, we don't --
22        MR. JONES:  Are you
23    representing that all 10,000
24    hydrocodone referenced in

Page 441

1  Exhibit-27 came from Henry Schein?
2         MR. MIGLIORI:  I'm
3     representing that that's what is
4     said by the doctor.  I have no
5     idea if it's true.
6  BY MR. MIGLIORI:
7     Q.   I'm asking you, if that's
8  true, if what's written in this e-mail is
9  true, you would agree with me,
10 unequivocally, that the pills sold by
11 Henry Schein to this doctor for his own
12 personal use is, by definition,
13 diversion?
14        MR. JONES:  Objection.
15    Form.  Misstates the document.
16 BY MR. MIGLIORI:
17    Q.   Correct?
18        MR. JONES:  Outside the
19    scope.
20        THE WITNESS:  I don't see
21    that it says that Henry Schein
22    sold him 10,000 pills of
23    hydrocodone.
24 BY MR. MIGLIORI:

Page 442

1    Q.   My last question didn't say
2  that either.  Your counsel raised that
3  objection, and I accept it, okay.
4        Let me focus on the new
5  question, okay.
6        The new question is, if Dr.
7  Mason purchased hydrocodone pills from
8  Schein between -- any time up until
9  January 25th of 2016, and those pills
10 weren't used for patients but were used
11 for his own personal use, by definition,
12 those pills sold and supplied to him by
13 Henry Schein were diverted, correct?
14       MR. JONES:  Objection.
15 Form.  Lack of foundation.  Calls
16    for speculation.
17 BY MR. MIGLIORI:
18    Q.   Correct?
19    A.   Yes.
20    Q.   And the whole point of the
21 suspicious order monitoring program and
22 the Know Your Customer due diligence
23 requirements is to prevent diversion;
24 that's the stated purpose in the Act,

Page 443

1  correct?
2    A.   Correct.
3    Q.   I promise you this is the
4  last one, because I want to make sure I
5  understand where we are today.  Number
6  28.
7           - - -
8        (Whereupon, Exhibit
9    Schein-Abreu-28,
10   HSI-MDL-000009208-218, was marked
11   for identification.)
12          - - -
13 BY MR. MIGLIORI:
14    Q.   And you know what, there's
15 only one copy of it.  So I'm going to --
16 I am going to give it to you.  You can
17 read it.  Your counsel can look at it.  I
18 don't even need to see it.
19       My question to you is, it's
20 dated -- if you can read that, for my
21 counsel on the table, if you can read the
22 Bates number, I would appreciate it.
23       MR. WICKS:  Describe what it
24    is.

Page 444

1        MR. MIGLIORI:  On the
2  bottom -- what's the number, HSI?
3        THE WITNESS:  208.
4        MR. MIGLIORI:  208?
5        THE WITNESS:  Yes.
6  BY MR. MIGLIORI:
7    Q.   It's a standard operating
8  procedure dated March of 2018 for
9  suspicious order monitoring systems.
10       Have you seen that?
11    A.   Yes.
12    Q.   My only question to you
13 about it is, does that reflect the
14 current -- most current changes to Henry
15 Schein's suspicious order monitoring
16 system as published in the standard
17 operating procedures?  Have there been
18 revisions since that date?
19    A.   Since this date, I don't
20 believe so.
21    Q.   Okay.
22       MR. MIGLIORI:  That's all I
23 have.  I appreciate your time.  If
24    it proves that there is a

Page 445

1  subsequent one -- I don't have one
2  that is subsequent to that, but if
3  it proves --
4        MR. JONES:  It's just that
5  you went over an earlier SOP, a
6  different title, but it's more
7  recently dated.
8        MR. MIGLIORI:  Oh, it is?
9  Maybe that's why I didn't have it.
10 Because I already used it.
11       What's that date?
12       MR. JONES:  May 31st, 2018.
13       THE WITNESS:  It's the same
14 document.
15       MR. JONES:  It's not the
16 same document.
17       MR. MIGLIORI:  But it's a
18 revision to the SOP.
19       MR. JONES:  They're
20 different SOPs, though.
21       MR. MIGLIORI:  What's the
22 exhibit number on that, please,
23 the one that I did earlier?  Do
24 you know?

Highly Confidential — Subject to Further Confidentiality Review

Page 446

1   MR. JONES:  This is the one
2   that I didn't write down the
3   exhibit number on.
4   THE WITNESS:  Maybe I have
5   it.
6   MR. WICKS:  7, I think.
7   MR. MIGLIORI:  7.
8   MR. JONES:  Yes.  That makes
9   sense, because that's the one I
10  was missing.
11  BY MR. MIGLIORI:
12  Q.  So my question is this,
13  simply, Mr. Abreu, if you look at
14  Exhibit-7 and this last exhibit I gave
15  you, Exhibit-28, to your knowledge, as
16  you sit here today, do those reflect the
17  last revisions to Henry Schein's standard
18  operating procedures for suspicious order
19  monitoring systems, to the best of your
20  knowledge?
21  A.  What was the other one?
22  Q.  Exhibit 7 and 28.  One is
23  dated May of 2018 --
24  A.  I don't know.  I don't see

Page 447

1   it.  Hold on.
2   Q.  And one is March of 2018.
3   It will probably be closer to the bottom,
4   if it's Number 7.
5   A.  Controlled substance
6   monitoring reporting.
7   Okay.  I would say the
8   answer is, yes, it is the most current.
9   Q.  So, currently, the system is
10  entirely -- strike that.
11  Is there any outside vendor
12  that is currently operating the
13  algorithms for suspicious order
14  monitoring at Henry Schein?
15  A.  Operating?
16  MR. JONES:  Objection.
17  Form.
18  BY MR. MIGLIORI:
19  Q.  Is the platform for the
20  current suspicious order monitoring
21  program at Henry Schein managed entirely
22  in-house?
23  A.  Yes, with outside
24  consultants.

Page 448

1   Q.  The outside consultants that
2   consult on this, do they consult on
3   setting the maintenance of the
4   algorithms?
5   A.  Yes.
6   Q.  And which outside
7   consultants are currently doing that?
8   A.  The most recent was Buzzeo.
9   Q.  And is the data associated
10  with those thresholds housed inside Henry
11  Schein?
12  A.  Yes.
13  Q.  And are you involved,
14  day-to-day, with the revision or
15  refinement of those thresholds?
16  A.  Yes.
17  Q.  In what capacity?  How do
18  you participate in that?
19  A.  Just periodic reviews of
20  thresholds.
21  Q.  And is that now based on
22  individual customer purchasing history?
23  A.  Yes.
24  Q.  Okay.  And I'm sorry if you

Page 449

1   said this before.
2   But when did that begin that
3   you transitioned over to individual
4   customer purchasing history to set
5   thresholds?
6   A.  It was some time in 2017.
7   MR. MIGLIORI:  Okay.  That's
8   all I have.  And I really
9   appreciate your time.
10  MR. JONES:  I've got a few
11  questions.
12  Can we get Exhibit-17?
13  - - -
14  EXAMINATION
15  - - -
16  BY MR. JONES:
17  Q.  Do you have Exhibit-17 in
18  front of you?  Do you remember going over
19  that with plaintiffs' counsel?
20  A.  Yes.
21  Q.  Do you see where it says
22  "draft" at the top?
23  A.  Yes.
24  Q.  Do you know if there was

Page 450

1 ever a version circulated that was final?
2     A.   Not to my knowledge.
3     Q.   Do you know whether or not
4 Henry Schein was given an opportunity to
5 review or comment on Exhibit-17, the
6 draft?
7     A.   No, I don't.
8     Q.   Do you know if any changes
9 were made to Exhibit-17 between being a
10 draft and being final?
11     A.   No.
12     Q.   Insofar as Henry Schein had
13 opioid orders that were of unusual size
14 or deviated substantially from a normal
15 pattern or an unusual frequency, did
16 those get reported to the DEA?
17     A.   Yes.
18     Q.   For what period of time?
19     A.   From early or mid 1990s
20 until April 2015.
21     Q.   And in April 2015, that
22 stopped?
23     A.   Yes.
24     Q.   Why?

Page 451

1     A.   Because we received guidance
2 from -- industry received guidance and
3 based on feedback from DEA, they didn't
4 want those pended order reports.
5     They wanted orders that we
6 deemed as truly suspicious as a result of
7 our Know Your Customer investigations.
8     Q.   And so after you halted
9 sending those monthly reports, did anyone
10 from DEA complain?
11     A.   No.
12     Q.   Anybody object to you all
13 stopping sending those reports?
14     A.   No.
15     Q.   Express any sort of concerns
16 whatsoever to you or Henry Schein?
17     MR. MIGLIORI:  Objection to
18     form.
19     THE WITNESS:  No.
20 BY MR. JONES:
21     Q.   Now, those orders -- or
22 those reports that you sent from -- or
23 Henry Schein sent from the mid 1990s up
24 until 2015, were those sent in realtime?

Page 452

1     A.   They were sent monthly.
2     Q.   And did the DEA ever
3 complain about receiving those reports on
4 a monthly basis?
5     A.   No.
6     Q.   Did anybody tell you that
7 no, we want those orders, the ones that
8 are -- deviated substantially from normal
9 pattern or of unusual size or unusual
10 frequency, did anyone tell you, from DEA,
11 that we want them in realtime?
12     A.   No.
13     MR. MIGLIORI:  Objection.
14 BY MR. JONES:
15     Q.   You sent those reports of
16 those orders regardless of whether or not
17 you or anyone else labeled them
18 suspicious, pended, or orders of
19 interest?
20     A.   Correct.
21     Q.   And did you also include
22 cancelled orders as well?
23     A.   Yes.
24     Q.   And how were those sent?

Page 453

1     A.   They were sent monthly as
2 well.
3     Q.   Is it fair to say that every
4 month DEA had all of the information that
5 Henry Schein had for all of its pended
6 orders or cancelled orders?
7     MR. MIGLIORI:  Objection to
8     form.
9     THE WITNESS:  Yes.
10 BY MR. JONES:
11     Q.   And, again, I'm talking
12 about that time period from the mid 1990s
13 up until 2015.
14     A.   Yes.
15     Q.   Prior to when the Masters
16 decision came out in the summer of 2017,
17 when Henry Schein would investigate a
18 pended order, if it determined that the
19 order was, in fact, suspicious, what
20 would Henry Schein do?
21     A.   We would report the order to
22 DEA.
23     Q.   When?
24     A.   Immediately.

Highly Confidential - Subject to Further Confidentiality Review

| Page 454 | Page 456 |
|---|---|
| 1      Q.   And upon determining that | 1   yes. |
| 2   the order was, in fact, suspicious, what | 2      Q.   That is, they should have |
| 3   would you all do with that order? | 3   been pended, but under the system they |
| 4      A.   We would cancel it. | 4   were not captured at Henry Schein, until |
| 5      MR. JONES:   Thank you.   Pass | 5   2009, correct? |
| 6   the witness. | 6      MR. JONES:   Objection. |
| 7      - - - | 7   BY MR. MIGLIORI: |
| 8      EXAMINATION | 8      Q.   If they were deviations of |
| 9      - - - | 9   pattern or frequency, correct? |
| 10   BY MR. MIGLIORI: | 10      MR. JONES:   Objection. |
| 11      Q.   Two questions. | 11   Form. |
| 12      You were asked whether or | 12   BY MR. MIGLIORI: |
| 13   not the DEA had all the information for | 13      Q.   Correct? |
| 14   pended orders between the 1990s and 2015. | 14      A.   Correct. |
| 15      Do you remember answering | 15      Q.   So they only got part of the |
| 16   that question right now? | 16   story for pended orders from the '90s to |
| 17      A.   Yes. | 17   2009, correct? |
| 18      Q.   Through that entire time, | 18      A.   They got the orders based on |
| 19   isn't it true that the system only | 19   thresholds. |
| 20   produced pended orders when it tripped | 20      Q.   On size only, correct? |
| 21   the size threshold in the system, | 21      A.   On size only. |
| 22   correct? | 22      Q.   Only part of what would now |
| 23      MR. JONES:   Objection. | 23   be considered a pended order, correct? |
| 24   Form. | 24      A.   Correct. |

| Page 455 | Page 457 |
|---|---|
| 1      THE WITNESS:   It depends on | 1      MR. MIGLIORI:   That's all I |
| 2   the year. | 2   have. |
| 3   BY MR. MIGLIORI: | 3      VIDEO TECHNICIAN:   The time |
| 4      Q.   Through 2011. | 4   is now 5:52 p.m.   This concludes |
| 5      A.   Through -- so from the '90s | 5   today's deposition.   We're going |
| 6   up until 2009? | 6   off the record. |
| 7      Q.   2009. | 7      - - - |
| 8      A.   It would be based on size. | 8      (Whereupon, the deposition |
| 9      Q.   So orders that today would | 9   concluded at 5:52 p.m.) |
| 10   be considered pended because of | 10      - - - |
| 11   deviations in frequency and pattern | 11 |
| 12   weren't deemed pended prior to 2009, | 12 |
| 13   correct? | 13 |
| 14      A.   That's correct. | 14 |
| 15      Q.   And they weren't reported to | 15 |
| 16   the DEA, correct? | 16 |
| 17      A.   They weren't pended. | 17 |
| 18      Q.   Right.   But, by definition, | 18 |
| 19   under the statute, which requires | 19 |
| 20   identifying deviations in frequency and | 20 |
| 21   pattern, not just size, they would have | 21 |
| 22   been pended, correct? | 22 |
| 23      A.   If that was -- yes, if that | 23 |
| 24   was the -- if the orders were pended, | 24 |

Page 458

CERTIFICATE

1
2
3
4    I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10

        Amanda Maslynsky-Miller
11      Certified Realtime Reporter
        Dated:  December 15, 2018
12
13
14
15
16
17    (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 460

        - - - - - -
        E R R A T A
        - - - - - -
PAGE  LINE  CHANGE

Page 459

INSTRUCTIONS TO WITNESS

3    Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8    After doing so, please sign
9  the errata sheet and date it.
10   You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14   It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.

Page 461

ACKNOWLEDGMENT OF DEPONENT

    I,_____, do
hereby certify that I have read the
foregoing pages,  1 - 457, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
SHAUN ABREU          DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Page 462

1            LAWYER'S NOTES
2  PAGE  LINE
3    _____ _____  _____
4    _____ _____  _____
5    _____ _____  _____
6    _____ _____  _____
7    _____ _____  _____
8    _____ _____  _____
9    _____ _____  _____
10   _____ _____  _____
11   _____ _____  _____
12   _____ _____  _____
13   _____ _____  _____
14   _____ _____  _____
15   _____ _____  _____
16   _____ _____  _____
17   _____ _____  _____
18   _____ _____  _____
19   _____ _____  _____
20   _____ _____  _____
21   _____ _____  _____
22   _____ _____  _____
23   _____ _____  _____
24   _____ _____  _____