```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                       -  -  -
 5
    IN RE:  NATIONAL         :  HON. DAN A.
 6  PRESCRIPTION OPIATE      :  POLSTER
    LITIGATION               :
 7                           :
    APPLIES TO ALL CASES     :  NO.
 8                           :  1:17-MD-2804
                             :
 9
              - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       -  -  -
12
                  January 30, 2019
13
                       -  -  -
14
15            Videotaped deposition of
    JOHN ADAMS, taken pursuant to notice,
16  was held at the offices of Carella Byrne,
    P.C., 5 Becker Farm Road, Roseland, New
17  Jersey, beginning at 9:22 a.m., on the
    above date, before Michelle L. Gray, a
18  Registered Professional Reporter,
    Certified Shorthand Reporter, Certified
19  Realtime Reporter, and Notary Public.
20                       -  -  -
21
             GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
```

Page 2

```
1   APPEARANCES:
2
3   ROBBINS GELLER RUDMAN & DOWD, LLP
    BY:  AELISH M. BAIG, ESQ.
    Post-Montgomery Center
4   One Montgomery Street,
    Suite 1800
5   San Francisco, California 94104
    (415) 288-4545
6   aelishb@rgrdlaw.com
7       - and -
8   ROBBINS GELLER RUDMAN & DOWD, LLP
    BY:  HENRY ROSEN, ESQ.
9   655 West Broadway
    Suite 1900
10  San Diego, California 92101
    (619) 231-1058
11  tegler@rgrdlaw.com
    hrosen@rgrdlaw.com
12
        - and -
13
    BRANSTETTER, STRANCH & JENNINGS, PLLC
14  BY:  BENJAMIN A. GASTEL, ESQ.
    223 Rosa L. Parks Avenue
15  Suite 200
    Nashville, Tennessee 37203
16  (615) 254-8801
    Beng@bsjfirm.com
17  Representing the Tennessee Plaintiffs
18
19
20
21
22
23
24
```

Page 4

```
1   TELEPHONIC APPEARANCES:
2
3   COVINGTON & BURLING, LLP
    BY:  PAUL F. DOWNS, ESQ.
    620 Eighth Avenue
4   New York, NY 10018
    (212) 841-1000
5   Pdowns@cov.com
    Representing the Defendant, McKesson
6   Corporation
7   ARNOLD & PORTER KAYE SCHOLER, LLP
8   BY:  SEAN A. McCORMICK, ESQ.
    777 South Figueroa Street, 44th Floor
9   Los Angeles, California 90017
    (213) 243-4000
10  Sean.mccormick@arnoldporter.com
    Representing the Defendants, Endo
11  Health Solutions; Endo
    Pharmaceuticals, Inc.; Par
12  Pharmaceutical Companies, Inc. f/k/a
    Par Pharmaceutical Holdings, Inc.
13
14  JACKSON KELLY, PLLC
    BY:  JAMES D. JOHNSON, ESQ
15  221 NW Fifth Street
    Evansville, IN 47708
16  (812) 422-9444
    Jdjohnson@jacksonkelly.com
17  Representing the Defendant,
    AmerisourceBergen
18
19
20
21
22
23
24
```

Page 3

```
1   APPEARANCES:  (Cont'd.)
2
3   ROPES & GRAY, LLP
    BY:  ROCKY C. TSAI, ESQ.
    Three Embarcadero Center
4   San Francisco, California 94111
    (415) 315-6300
5   Rocky.tsai@ropesgray.com
6       - and -
7   ROPES & GRAY, LLP
    BY:  CASSANDRA A. LaRUSSA, ESQ.
8   Prudential Tower
    800 Boylston Street
9   Boston, Massachusetts 02199
    (617) 951-7000
10  Cassandra.larussa@ropesgray.com
    Representing the Defendant,
11  Mallinckrodt and the Witness
12
    JONES DAY
13  BY:  RICHARD M. BRODSKY, ESQ.
    150 West Jefferson, Suite 2100
14  Detroit, Michigan 48226
    (313) 733-3939
15  rbrodsky@jonesday.com
    Representing the Defendant, Walmart
16
17  WILLIAMS & CONNOLLY, LLP
    BY:  JOEL S. JOHNSON, ESQ.
18  725 12th Street, NW
    Washington, D.C. 20005
19  (202) 434-5148
    jjohnson@wc.com
20  Representing the Defendant, Cardinal
    Health
21
22
23
24
```

Page 5

```
1   APPEARANCES:  (Cont'd.)
2
3   ALSO PRESENT:
4
5   VIDEO TECHNICIAN
    Dan Lawlor
6
7   LITIGATION TECHNICIAN
    Zach Hone
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

- - -
I N D E X
- - -

Testimony of:

JOHN ADAMS

By Ms. Baig            15, 393
By Mr. Gastel             357
By Mr. Tsai               389

- - -
E X H I B I T S
- - -

NO.         DESCRIPTION         PAGE
Mallinckrodt
Adams-1     Curriculum Vitae      33
            John G. Adams
Mallinckrodt
Adams-2     E-mail Thread         34
            8/23/10
            Subject, John Adams
            Address Change
            MNK-T1_0007918669-12

Page 8

- - -
E X H I B I T S (Cont'd.)
- - -

NO.         DESCRIPTION         PAGE
Mallinckrodt
Adams-7     E-mail Thread        117
            10/17/08
            Subject, Sales Reports
            MNK-T1_0006339059-66
Mallinckrodt
Adams-8     E-mail, 11/20/09     134
            Subject, Business
            Review
            MNK-T1_0006305472-79
Mallinckrodt
Adams-9     E-mail, 10/2/05      148
            Subject, Gained
            Accounts & Rebate
            Reports
            MNK-T1_0007917528-76

Mallinckrodt
Adams-10    E-mail Thread        160
            2/8/07
            Subject, Monthly
            Report
            MNK-T1_0006685111-50
Mallinckrodt
Adams-11    E-mail Thread        179
            9/6/07
            Subject, Monthly Report
            MNK-T1_0004923043-50

Page 7

- - -
E X H I B I T S (Cont'd.)
- - -

NO.         DESCRIPTION         PAGE
Mallinckrodt
Adams-3     Packet of             55
            Performance Goals
            Covidien for
            John Adams
            (No Bates)

Mallinckrodt
Adams-4     E-mail, 7/28/05       90
            Subject, Updated
            Generics Marketing
            Roles & Responsibilities
            MNK-T1_0005426063
            MNK-T1_0000565464

Mallinckrodt
Adams-5     E-mail Thread        105
            5/17/05
            Subject, PCL Library
            Pharmaceutical
            Industry Newsletter
            MNK-T1_0007917913-24

Mallinckrodt
Adams-6     E-mail Thread        113
            1/23/07
            Subject, Product
            Manual Updates
            MNK-T1_0004839173-74

Page 9

- - -
E X H I B I T S (Cont'd.)
- - -

NO.         DESCRIPTION         PAGE
Mallinckrodt
Adams-12    E-mail Thread        193
            8/5/09
            Subject, Monthly Report
            MNK-T1_0000418847-50
Mallinckrodt
Adams-13    E-mail Thread        217
            6/6/08
            Subject, Suspicious
            Order Monitoring
            Training Notes
            MNK-T1_0000304559-72
Mallinckrodt
Adams-14    E-mail Thread        237
            9/17/09
            Subject, Suspicious
            Order Monitoring
            Presentation
            MNK-T1_0000277124-41
Mallinckrodt
Adams-15    E-mail Thread        244
            6/2/08
            Subject, Suspicious
            Order Monitoring
            Customer Checklist
            Facility Photographs
            MNK-T1_0000391421-22

Mallinckrodt
Adams-16    E-mail, 7/15/08      246
            Subject, July 15th
            IntegriChain Meeting
            MNK-T1_0002906782-83

Page 10

1
2       - - -
        E X H I B I T S  (Cont'd.)
3       - - -
4
5   NO.      DESCRIPTION        PAGE
6   Mallinckrodt
    Adams-17   E-mail Thread    257
7           9/27/07
            Subject, Masters
8           MNK-T1_0000383892
9   Mallinckrodt
    Adams-18   E-mail Thread    260
10          6/3/08
            Subject, Oxy Monthly
11          Usage
            MNK-T1_0000562701-04
12
    Mallinckrodt
13  Adams-19   E-mail Thread    269
            5/1/09
14          Subject, Masters
            MNK-T1_0000565729-30
15
    Mallinckrodt
16  Adams-20   E-mail Thread    277
            7/9/09
17          Subject, Sunrise
            Follow-up
18          MNK-T1_0000459331-32
19
20
21
22
23
24

Page 12

1
2       - - -
        E X H I B I T S  (Cont'd.)
3       - - -
4
5   NO.      DESCRIPTION        PAGE
6   Mallinckrodt
    Adams-26   E-mail, 3/4/11    334
7           Subject, Morelli CA
            NSM Presentation
8           Short Version
            MNK-T1_0007094264-94
9
    Mallinckrodt
10  Adams-27   E-mail, 6/18/10   368
            Subject, Oxycodone
11          Sales in Florida
            Summary
12          MNK-T1_0000561028-29
13
14
15
16
17
18
19
20
21
22
23
24

Page 11

1
2       - - -
        E X H I B I T S  (Cont'd.)
3       - - -
4
5   NO.      DESCRIPTION        PAGE
6   Mallinckrodt
    Adams-21   E-mail, 7/10/09   287
7           Subject, Sunrise
            Reports
8           MNK-T1_0000448872-73
9   Mallinckrodt
    Adams-22   E-mail Thread    290
10          7/29/09
            Subject, Rx Drug
11          Abuse Epidemic
            MNK-T1_0000290150-51
12
    Mallinckrodt
13  Adams-23   E-mail Thread    300
            7/27/09
14          Subject, Pete
            Kleissle, Oxy
15          Investigation
            MNK-T1_0000290175-77
16
    Mallinckrodt
17  Adams-24   E-mail Thread    305
            8/4/09
18          Subject, Florida
            Medication Coming
19          Into Tennessee
            MNK-T1_0000562325-29
20
    Mallinckrodt
21  Adams-25   E-mail, 8/26/09   319
            Subject, Sunrise
22          Audit Report Draft
            MNK-T1_0000388379-86
23
24

Page 13

1
2       - - -
        DEPOSITION SUPPORT INDEX
3       - - -
4
5   Direction to Witness Not to Answer
6   PAGE   LINE
    None.
7
8   Request for Production of Documents
9   PAGE   LINE
    None.
10
11  Stipulations
12  PAGE   LINE
    None.
13
14  Questions Marked
15  PAGE   LINE
    None.
16
17
18
19
20
21
22
23
24

Page 14

1              - - -
2          THE VIDEOGRAPHER:  We are
3    now on the record.
4          My name is Dan Lawlor, I'm a
5    videographer with Golkow
6    Litigation Services.
7          Today's date is January 30,
8    2019.  And the time is 9:22 a.m.
9          This video deposition is
10   being held in Roseland, New
11   Jersey, in the matter of National
12   Prescription Opiate Litigation,
13   MDL Number 2804.
14         The deponent is John Adams.
15   Counsel will be noted on the
16   stenographic record.
17         The court reporter is
18   Michelle Gray and will now swear
19   in the witness.
20             - - -
21         ... JOHN ADAMS, having
22   been first duly sworn, was
23   examined and testified as follows:
24             - - -

Page 15

1          EXAMINATION
2              - - -
3    BY MS. BAIG:
4          Q.   Hi.  Good morning.
5          A.   Good morning.
6          Q.   We met briefly off the
7    record, but could you please state your
8    full name and address for the record?
9          A.   John Adams.  ████████
10   ███████████████████████████████.
11         Q.   And have you ever had your
12   deposition taken before?
13         A.   Yes.
14         Q.   How many times?
15         A.   Four or five.
16         Q.   So you're generally familiar
17   with the -- the protocols for -- for
18   deposition?
19         A.   Correct.
20         Q.   Okay.  Have you had your
21   deposition taken in connection with any
22   sort of opioid products or litigation?
23         A.   I have not.
24         Q.   And what did you do to

Page 16

1    prepare for today's deposition?
2          A.   I met with counsel.
3          Q.   How many times?
4          A.   Twice.
5          Q.   And for how long?
6          A.   Six hours one day, and maybe
7    seven hours another.
8          Q.   Did you read any deposition
9    transcripts?
10         A.   No.
11         Q.   Did you talk to anybody from
12   Mallinckrodt?
13         A.   No, I did not.
14         Q.   And are you being paid for
15   your -- your time here today?
16         A.   Yes, I am.
17         Q.   At what hourly rate?
18         A.   $225.
19         Q.   And -- and you were paid at
20   that rate for your prep time as well?
21         A.   During the -- just for the
22   sessions that we held, yes, correct.
23         Q.   Okay.  And did you review
24   documents in connection with your

Page 17

1    preparation for this deposition?
2          A.   I did.
3          Q.   And did any of those
4    documents refresh your recollection?
5          A.   Yes.
6          Q.   And what documents did you
7    look at in preparation for this
8    deposition?
9              MR. TSAI:  Instruct the
10   witness not to reveal any specific
11   documents that were identified,
12   compiled, and discussed with
13   counsel.
14         You can talk in general
15   terms about categories.
16             THE WITNESS:  Sure.
17         Primarily e-mails, some that
18   I was -- that were sent to me
19   directly, but many which I was
20   copied on.
21   BY MS. BAIG:
22         Q.   Anything else other than
23   e-mails that you recall?
24         A.   Attachments affiliated with

Page 18

1 those e-mails. And I don't recall any
2 other items, no.
3      Q.   Are you familiar with the
4 complaints on file in this action?
5      A.   I know very high level.
6      Q.   What's your understanding of
7 what this case is about?
8      A.   There is action taking place
9 from city, state, and county level
10 relative to potential abuse of opioids
11 and the implications of that.
12      Q.   At what company did you
13 first work on any opioid products?
14      A.   Upsher-Smith Laboratories.
15      Q.   And what opioids did you
16 work on there?
17      A.   RMS, the rectal morphine
18 suppository, and OMS, oral morphine
19 sulfate concentrate. It was a liquid.
20      Q.   And had that -- how long did
21 you work there?
22      A.   I worked there for 15 years.
23 The products themselves were not -- were
24 not marketed throughout that entire time

Page 19

1 frame. I believe they were discontinued
2 as part of the -- during my tenure at
3 some point. I don't recall.
4      Q.   Did you have any training in
5 connection with your work on the RMS and
6 the other opioid product you mentioned in
7 terms of -- in terms of the Controlled
8 Substances Act?
9      A.   More from a sales
10 perspective.
11      Q.   What do you mean by that?
12      A.   Really talking about the --
13 the features and benefits as it would
14 relate to selling to customers, and by
15 customers, that would be defined as
16 wholesalers, chains, and to pharmacists.
17      Q.   Did you have any training
18 with respect to the Controlled Substances
19 Act before you got to Mallinckrodt?
20      A.   I don't recall.
21      Q.   What years did you work at
22 Mallinckrodt?
23      A.   2004 to spring of 2010.
24      Q.   What positions did you hold

Page 20

1 at Mallinckrodt?
2      A.   Senior product manager I
3 started out as. And then I believe I
4 transitioned into director of sales, and
5 by the time I left Mallinckrodt I was
6 vice president of sales.
7      Q.   And about when did you
8 transition from senior product manager to
9 director of sales?
10      A.   I don't recall. I could
11 estimate around 2006 into director of
12 sales.
13      Q.   And about when did you
14 transition from director of sales to VP
15 of sales?
16      A.   I believe it was somewhere
17 in 2008.
18      Q.   What was your title at
19 Upsher-Smith?
20      A.   I was there for 15 years.
21 So I started out as a territory sales
22 representative, and by the time I left, I
23 was a supervisor of planning and
24 analysis.

Page 21

1      Q.   And can you describe your
2 responsibilities as senior product
3 manager at Mallinckrodt?
4      A.   Yes. I had a product
5 manager, perhaps two, who would report to
6 me. And so these product managers would
7 develop forecasts and would work on
8 pricing relative to budgeting as well as
9 at the customer level. So that group
10 would -- part of that group would report
11 to me.
12      Q.   And who were those two
13 reports?
14      A.   One was Rebecca Coyner, and
15 the other individual's name was John.
16 And I don't recall his last name.
17      Q.   And how did your
18 responsibilities change when you became
19 director of sales?
20      A.   So at that point there were
21 six national account managers who then
22 reported directly to me. So I didn't
23 have any account responsibility, per se,
24 but I was responsible for the -- the fact

Page 22

1 that they reported to me, the national
2 account directors, or managers rather.
3    Q.   And who were those national
4 account managers?
5    A.   Dave Irwin, Toby Bane, Tim
6 Berry, Bonnie New, Victor Borelli, and I
7 hope I'm not insulting someone else, but
8 I don't recall.
9    Q.   And how did your
10 responsibilities change when you became
11 VP of sales?
12    A.   It was a natural progression
13 of my career.  It was an acknowledgement
14 of contributions I made.  I still had
15 that same team reporting to me.  And as
16 far as expansion of that, it really -- it
17 wasn't a significant jump, if you will.
18    Q.   In terms of
19 responsibilities?
20    A.   Yeah, I had -- I had very
21 much the same.
22    Q.   When you were senior product
23 manager, who did you report to?
24    A.   Rick Coulon.

Page 23

1    Q.   And what was his position?
2    A.   Director of marketing.
3    Q.   At Mallinckrodt?
4    A.   Correct.
5    Q.   And who did Rick Coulon
6 report to?
7    A.   Michael Gunning.
8    Q.   And what was his position?
9    A.   I believe it was vice
10 president of sales and marketing at that
11 time.  I don't know specifically.
12    Q.   At Mallinckrodt?
13    A.   Correct.
14    Q.   And when you were senior
15 product manager, which Mallinckrodt
16 company did you work for?
17    A.   Mallinckrodt Generics.  And
18 to differentiate there's a health systems
19 division and a retail.  I was on the
20 retail side.
21    Q.   And you worked for
22 Mallinckrodt Generics.  Was it your
23 understanding that Mallinckrodt Generics
24 was part of Covidien?

Page 24

1    A.   I believe when I first
2 started it was part of Tyco Healthcare.
3 At some point it transitioned to Covidien
4 Health.  I don't know the specifics on
5 that.  Really the change in name was --
6 it didn't -- it didn't have any impact,
7 bearing.
8    Q.   And was Tyco Healthcare part
9 of Mallinckrodt PLC?
10    MR. TSAI:  Object to form.
11    Go ahead.
12    THE WITNESS:  I don't know.
13 BY MS. BAIG:
14    Q.   Who was the chief officer of
15 Tyco Healthcare?
16    A.   I don't recall.
17    Q.   So Mike Gunning was VP of
18 sales and marketing at Tyco or at
19 Mallinckrodt Generics?
20    A.   Mallinckrodt Generics.
21    Q.   And do you know who Mike
22 Gunning reported to?
23    A.   Vince Kaiman.
24    Q.   What was his position?

Page 25

1    A.   I believe it was general
2 manager.
3    Q.   At what company?
4    A.   At Mallinckrodt.
5    Q.   Mallinckrodt PLC?
6    MR. TSAI:  Object to form.
7    Go ahead.
8    THE WITNESS:  I don't
9 recall.
10 BY MS. BAIG:
11    Q.   And when you were director
12 of sales, who did you report to?
13    A.   Mike Gunning.
14    Q.   So that stayed the same?
15    A.   No.  Initially I reported to
16 Rick Coulon.
17    Q.   Oh, got it.  Okay.  And Rick
18 Coulon reported to Mike Gunning?
19    A.   Correct.
20    Q.   Okay.  So as director of
21 sales then you began reporting directly
22 to Mike Gunning?
23    A.   And Rick Coulon had resigned
24 by that point.

1  Q.  And Mike Gunning at that
2 point, did he still report to Vince
3 Kaiman?
4  A.  Yes.  I believe that was his
5 reporting structure.
6  Q.  And you -- and you don't
7 know who Vince Kaiman reported to?
8  A.  I don't know who was there
9 at the time.  I'm not sure.  Whoever his
10 boss was, I know initially was named
11 Mike.  I don't remember his last name.  I
12 didn't know him.  But that again changed
13 over time.
14  Q.  And do you remember who it
15 changed to?
16  A.  Tim Wright.
17  Q.  And what was Tim Wright's
18 position?
19  A.  Correction.  I don't believe
20 it was Tim Wright directly.  There was
21 somebody in between that, that I don't
22 know who it was.
23  Q.  But at some point it became
24 Tim Wright?

1  A.  I don't know that.  I think
2 there was one other person in there who
3 was -- I just don't remember.
4  Q.  Okay.  What was Tim Wright's
5 position?
6  A.  I don't know his title.
7  Q.  Do you know what company he
8 worked for?
9  A.  I do not.
10  Q.  And when you were VP of
11 sales, who did you report to?
12  A.  Mike Gunning.
13  Q.  When you worked at
14 Mallinckrodt, do you recall ever
15 interacting with anybody from corporate?
16  A.  I guess maybe I could
17 clarify that.  What do you define as
18 corporate?  I don't know what that would
19 stand for.
20  Q.  Did you talk internally
21 about a corporate office or no?
22  A.  No.  I mean -- Tyco
23 Healthcare, they were based in
24 Massachusetts.  I don't -- I never had

1 any interaction that I recall with anyone
2 outside of the St. Louis business.
3  Q.  And by the St. Louis
4 business, you mean Mallinckrodt Generics?
5  A.  That is correct.
6  I'm sorry.  I should -- I
7 interacted but not in a formal sense with
8 the Mallinckrodt API team as well.  But
9 again, not in a reporting structure kind
10 of a way, but I did interact with them.
11  Q.  What's the Mallinckrodt API
12 team?
13  A.  It's the raw material team,
14 deal with -- manufacture all the raw
15 materials.
16  Q.  And which company did they
17 work for?
18  A.  I don't know where they
19 rolled up.  I'm not sure.
20  Q.  But they did not work with
21 Mallinckrodt Generics; is that right?
22  A.  I don't know which group
23 they rolled into.
24  Q.  Did you ever have any

1 interaction with anyone from Mallinckrodt
2 Pharmaceuticals Inc., the Irish company?
3  MR. TSAI:  Object to form.
4  THE WITNESS:  I don't
5 recall.
6 BY MS. BAIG:
7  Q.  You don't recall one way or
8 the other?
9  A.  I don't recall one way or
10 the other.  It was a -- if I recall, a
11 Bermuda corporation.  I don't remember.
12 I don't recall anything regarding -- did
13 you say an Irish entity?  I don't recall
14 that being a place.  That may have been
15 after my tenure.  I just -- again, I left
16 in 2010, early.
17  Q.  Okay.  And why did you leave
18 the company?
19  A.  I had an opportunity at a
20 different company.
21  Q.  Which company did you go to?
22  A.  Dr. Reddy's Laboratories.
23  Q.  And you're still there now?
24  A.  I am not.

Page 30

1 Q. Did you go to another
2 company after Dr. Reddy's?
3 A. Yes.
4 Q. Which company?
5 A. Ajanta Pharma.
6 Q. Are you there now?
7 A. I am.
8 Q. What is your position at
9 Ajanta Pharma?
10 A. Senior vice president,
11 commercial operations.
12 Q. And do you work on any
13 opioid products at Ajanta Pharma?
14 A. I do not.
15 Q. And when you were at
16 Dr. Reddy's, what was your position
17 there?
18 A. Vice president of sales and
19 marketing.
20 Q. And you worked on opioid
21 products at Dr. Reddy's, did you not?
22 A. I did not.
23 Q. Dr. Reddy's didn't have any
24 opioid products?

Page 31

1 A. No. I was in the generic
2 division. I don't recall any in the
3 organization at all.
4 Q. When you left the company,
5 did you enter into a severance agreement?
6 A. No. I believe I had a
7 signing agreement.
8 Q. When you left?
9 A. No. When I joined --
10 Q. When you joined.
11 A. -- the organization, I
12 believe I signed.
13 Q. So you didn't receive any
14 sort of payout when you left
15 Mallinckrodt?
16 A. Oh, I'm sorry.
17 Q. Any sort of severance pay?
18 A. Let me -- let me just
19 clarify. I thought you were asking me
20 initially about Dr. Reddy's. Are you
21 asking separate questions now? Can you
22 clarify?
23 Q. Yeah, sure. No, I'm just
24 asking if when you left Mallinckrodt, if

Page 32

1 you entered into a severance agreement
2 with Mallinckrodt.
3 A. No, I don't recall any.
4 Q. Okay.
5 A. There was no payout, if
6 that's your question.
7 Q. Yeah.
8 A. Okay.
9 Q. Okay. Did you ever use any
10 personal e-mail addresses when you worked
11 at Mallinckrodt?
12 A. Not that I recall.
13 Q. What about text messages?
14 A. Yes.
15 Q. And did you look at any text
16 message documents when you were preparing
17 for your deposition today?
18 A. No.
19 Q. Do you know whether those
20 text message documents were produced in
21 this action?
22 A. I don't recall. I don't --
23 I don't know.
24 Q. And did you -- did you use

Page 33

1 the text messaging to communicate with
2 colleagues at Mallinckrodt?
3 A. Yes.
4 Q. On a pretty regular basis?
5 A. Yes.
6 MS. BAIG: Let's have this
7 document marked as Exhibit 1.
8 (Document marked for
9 identification as Exhibit
10 Mallinckrodt-Adams-1.)
11 THE WITNESS: Is that for
12 me?
13 BY MS. BAIG:
14 Q. This document is
15 Bates-stamped Mallinckrodt_0007918702
16 through 8704. It appears to be a copy of
17 your resumé. Have you seen this document
18 before?
19 A. Yes.
20 Q. And was this your resumé
21 that you submitted to Mallinckrodt when
22 you joined the firm?
23 A. I believe so.
24 Q. And was this a true and

Page 34

1 accurate copy of your -- or summary of
2 your work credentials at that time?
3     A.   Let me review.  Yes, it is.
4     Q.   Is there any reference to
5 the opioid products at Upsher on this
6 resumé?
7     A.   No, there is not.
8         Just to add to that, it was
9 a non-promoted product.  So it wasn't
10 something that -- it was on the
11 portfolio.  But it was not part of the
12 promotion.  We had maybe a half a dozen
13 products that we'd focus on doing
14 marketing programs on.  And this was not
15 one of them.
16     Q.   And that was at Upsher,
17 correct?
18     A.   Correct.
19     MS. BAIG:  Let's have this
20 document marked as Exhibit 2.
21     (Document marked for
22 identification as Exhibit
23 Mallinckrodt-Adams-2.)
24 BY MS. BAIG:

Page 35

1     Q.   When you were at
2 Mallinckrodt, did you receive regular
3 performance evaluations?
4     A.   Yes, I did.
5     Q.   And -- well, for the record,
6 this document is Bates-stamped
7 MNK-T1_0007918669 through 8712.  And if
8 you turn to the second page.
9     A.   I'm sorry, can you clarify
10 who Louise Yaeger is?  I don't recall.
11     Q.   I can't answer that, because
12 I don't know the answer to that.  These,
13 I can represent to you, the vast majority
14 of these documents that we'll be looking
15 at today came from your custodial files
16 from your counsel.  And so that might
17 have been one of the questions I might
18 have asked you.
19         But you don't -- so you
20 don't know who Louise Yaeger is?
21     A.   I'm not familiar with the
22 name.  I've heard it before, but I
23 couldn't tell you the context at all.  I
24 have no clue.

Page 36

1     Q.   Okay.  And you see that the
2 second page after the e-mail states it's
3 an ECF Global Peoplesoft Employee Change
4 Form.  Do you see that?
5     A.   I see the title.  Let me --
6 let me just try and get some recollection
7 here.
8     Q.   Sure.
9     A.   Okay.
10     Q.   If you could look through,
11 four pages in to the document that ends
12 in a Bates stamp number 687.  It appears
13 to be a performance -- it states it's a
14 performance management document for
15 October of 2004.
16     A.   I'm sorry.  Just to make
17 sure.  Okay, I see this.
18     Q.   You should be able to see it
19 on your screen too.
20     A.   Yeah, okay, perfect.  Thank
21 you.
22     Q.   Great.  Is this a
23 performance evaluation from your time at
24 Mallinckrodt?

Page 37

1     A.   Yes, it appears so.
2     Q.   Okay.  If you -- if you turn
3 two pages in, you'll see on the page that
4 ends in Bates stamped 690, you'll see
5 where it's talking about expected results
6 and actual results.  Do you see that?
7     A.   I see three different
8 headings with that, yes.
9     Q.   Yeah.  And so if you look at
10 the second actual result.  Do you see it
11 says, "John communicated a creative brief
12 outlining the desired message of the new
13 hydrocodone advertisement."
14         Do you see that?
15     A.   I'm just -- I'll read
16 through the whole thing here.
17         Yes.
18     Q.   And so was it -- was it your
19 job to help create this new hydrocodone
20 advertisement?
21     A.   So my -- my role was to
22 provide insights into that.  We had a
23 different group who would develop
24 advertising.  But I certainly would work

Page 38

1 with that group, and I see that this does
2 talk about kind of looking at
3 communicating advertisement.
4        I just want to clarify that
5 advertisements that we did were done to
6 the chain headquarters, wholesaler
7 headquarters, distributor headquarters,
8 and that was our audience.
9    Q.   What do you mean by chain
10 headquarters?
11    A.   So let's look at Walgreens
12 for example.  I wouldn't go and call on,
13 or my team wouldn't go and call on a
14 Walgreens pharmacy on Main Street.  Our
15 team was responsible for calling on the
16 national headquarters in Deerfield,
17 Illinois, for that.  And that was our --
18 that was our contact.
19    Q.   Understood.  But you were
20 responsible then for outlining the
21 desired message of the new hydrocodone
22 advertisement; is that right?
23    A.   I would be -- I would be
24 included in that discussion, yes.

Page 39

1    Q.   And do you recall the
2 hydrocodone advertisement at that time?
3    A.   I don't remember it
4 specifically, but maybe to put it into
5 context, more hydrocodone messaging would
6 be -- it would list the NDC, national
7 drug code.  It would list the item
8 number, product description, and some
9 bullet points.  So it was something that
10 we could provide at the headquarter level
11 for -- for them to kind of build again,
12 kind of reinforce our position in the
13 market, the market defined as
14 headquarters and national distributors
15 and chains, et cetera.
16    Q.   Do you recall whether that
17 hydrocodone advertisement was a graphic
18 with a picture?
19    A.   I don't recall.
20    Q.   You don't recall anything
21 about it?
22    A.   No, I don't.  No, I don't.
23    Q.   And -- and it goes on to
24 state that the "advertisement, sell

Page 40

1 sheet, and sales aid were rolled out in
2 August."
3        Do you see that?
4    A.   I do see that.
5    Q.   Okay.  And what was the sell
6 sheet?
7    A.   That -- that's another term
8 for an advertisement if you will.  So a
9 sell sheet is basically, again, given to
10 the headquarter level to create awareness
11 at that level.
12    Q.   And do you recall anything
13 about that particular sell sheet?
14    A.   I don't recall anything
15 about that particular sell sheet, no.
16    Q.   And what was the sales aid?
17    A.   I would use those
18 interchangeably.
19    Q.   Sales aid and sell sheet?
20    A.   Yeah, I can't think of how
21 to differentiate the two, because I don't
22 recall a different -- a different
23 component of that.
24    Q.   And do you see it goes on to

Page 41

1 state that the "advertisement
2 communicates the strengths of our line as
3 well as highlights the fact that this is
4 the Number 1 selling generic in the U.S."
5        Do you see that?
6    A.   I do see that.
7    Q.   So you had an understanding
8 at the -- at the time that hydrocodone
9 was the Number 1 selling generic in the
10 United States?
11    A.   It was based on IMS data.
12 So IMS basically highlights the units
13 sold into the market, and by market, it's
14 not down to any level other than into the
15 channel of distribution, independents,
16 change, long-term care facilities, et
17 cetera.
18        So by units, that was the
19 definition that IMS utilized.
20    Q.   By units, hydrocodone was
21 the Number 1 selling generic in the U.S.
22 in 2004, correct?
23    A.   Yes.
24    Q.   Okay.  And the secondary

Page 42

1 messages of the advertisements were that,
2 "A, the benefits to patients by the
3 extent of offerings of strengths and
4 dosage forms; and B, the benefits to
5 pharmacists by offering punch cards, unit
6 dose and bulk totes; and C, reliable
7 service and supply leveraging the
8 vertical integration."
9        Do you see that?
10     A.   I do see that, yes.
11     Q.   And do you recall what
12 benefits to patients were stated on the
13 advertisements?
14     A.   Well, maybe if -- if we can
15 look at all of these kind of in -- in
16 context.  The benefits would be
17 communicated to the pharmacist who would
18 be then dispensing a product based on a
19 physician's prescription, that we had
20 various strengths.  So you would have a
21 5-milligram of hydrocodone and
22 325 milligrams of acetaminophen.  That
23 patient who, because of their doctor's
24 prescription was prescribed that amount.

Page 43

1 We also would have a strength
2 10-milligram of hydrocodone and
3 600 milligrams of acetaminophen, the
4 doctor deemed that the patient needed
5 that amount.  So that's why, when you
6 talk about the benefits to the patient,
7 you have a different dose of product as
8 the doctor determines is needed for that
9 specific patient.
10     Q.   But you don't recall, as you
11 sit here today, what the benefits were
12 that were identified on these advertising
13 documents, correct?
14     A.   The -- the benefits as
15 highlighted here.  I can only take it for
16 the context I can provide, and that is
17 based on what the doctor deemed was a
18 benefit to the patient, we had the
19 offering that could be -- be available
20 there.
21        So -- and as I mentioned
22 before, I think to put it all into
23 context is again punch cards, unit dose
24 and bulk totes, those all were designed

Page 44

1 to make sure that if you were in a
2 hospital, you had a unit-dose product.
3 If you were -- and that's long-term care.
4        A punch card would be there
5 so you could have that, that would
6 benefit that healthcare facility who is
7 dispensing what the physician prescribed.
8 And bulk totes, similarly they would put
9 those into a dispensing machine for the
10 convenience of the pharmacy.
11     Q.   What -- what is a bulk tote
12 exactly?
13     A.   A bulk tote, so typically
14 you would sell a product in a bottle of
15 100 tablets or capsules, whatever the
16 dosage form is, 500 count.  A lot of
17 times you would take a bulk tote and you
18 would sell it in a quantity of a
19 thousand, for example.  And let's say
20 that a hospital was using a product like
21 this.  And while we had a unit dose
22 package or a punch card, some hospitals
23 chose to have their own proprietary
24 packaging configuration.  They would take

Page 45

1 the bulk tote and put it into their own
2 repackaging machine.
3        And then they could use it
4 to their configuration.  So it was -- it
5 gave them what fit their need at the
6 pharmacy level versus, you know, trying
7 to have them fit into what package
8 offerings we held.
9     Q.   And when you referenced a
10 dispensing machine, who had access to the
11 dispensing machine?
12     A.   The pharmacist would -- the
13 actual pharmacy would have a potential
14 different machine that they could pour
15 the pills into, and then it would count
16 out if that -- if the patient was
17 prescribed by their physician five
18 tablets, it could dispense five.
19        Or it could take that and
20 take and put one tablet into a little
21 unit dose pouch and do that for each
22 individual patient that the physician had
23 prescribed the product for.  And so it's
24 just a -- there are multiple companies

Page 46

1 that have different dispensing based on
2 their particular needs.
3    Q.   And what's a punch card
4 exactly?
5    A.   A punch card is -- it's a --
6 think of a bingo card.  And the bingo
7 card, it has a punch that you could punch
8 a pill out of.  And in a nursing home for
9 example, there may be a patient who would
10 have a one-week supply of product
11 prescribed by their doctor.  And that
12 punch card could have hydrocodone in it.
13 And they can put in day one, day two, day
14 three, day four, day five, day six, day
15 seven, exactly those days, and put in
16 that full week of that product, as well
17 as atenolol or other prescription
18 products.
19        We wouldn't put it in in
20 that form, but we could do it with just
21 the hydrocodone in what a long-term care
22 facility would require.
23    Q.   Okay.  If you turn to the
24 next page you'll see under one part of

Page 47

1 the performance evaluation, there's a
2 heading, "Continuous Quality
3 Improvement."
4        Do you see that?
5    A.   What page are you on here?
6    Q.   It ends in 692.
7    A.   I see that heading, yes.
8    Q.   And towards the end of that
9 paragraph it states, "Additionally, under
10 his leadership, he was able to get the
11 new hydrocodone advertising back on track
12 and execute in time to meet the deadlines
13 for the wholesaler trade shows and
14 NACDS."  It goes on to state, "He
15 improved the direction and clarity of
16 communication to our ad agency and
17 responded quickly gaining management's
18 approval for the concept."
19        Do you see that?
20    A.   Yeah.  If I could I'll read
21 it in full context.
22    Q.   Okay.
23    A.   Thank you.  Okay, I have the
24 context.  Could you repeat?

Page 48

1    Q.   Do you recall using that new
2 hydrocodone advertising at any wholesaler
3 trade shows?
4    A.   I don't recall it
5 specifically, but I do recall having sell
6 sheets, if you will, for the wholesaler
7 trade shows and NACDS.
8    Q.   And who attended the
9 wholesaler trade shows?
10    A.   The wholesaler trade shows
11 would be the wholesaler who's -- who we'd
12 be calling on, so for example McKesson,
13 AmerisourceBergen, Cardinal, just to name
14 a few.
15        And then who would be
16 attending that would be their customers,
17 the pharmacy level.  So that would be you
18 know, Joe's Pharmacy on Main Street.  It
19 could be Rite Aid pharmacy.  It could be
20 a CVS pharmacy who purchases through one
21 of these wholesalers.  So it's all at the
22 pharmacist level.
23    Q.   And do you recall, did
24 Mallinckrodt have a booth at these trade

Page 49

1 shows?
2    A.   It would depend upon the
3 show.
4    Q.   And did you attend the shows
5 yourself?
6    A.   I would attend shows, not
7 all of them, but some of them, yes.
8    Q.   Generally how often did you
9 attend trade shows related to your opioid
10 products?
11    A.   I would attend an estimated
12 three trade shows per quarter.  But it
13 wasn't specific to opioid products.  It
14 would be for the Mallinckrodt as an
15 organization, and also, just to represent
16 a full product line that we had.
17    Q.   And at those trade shows,
18 you would have -- you would -- -- would
19 you pass out the sell sheets?
20    A.   We would have trade -- we
21 would have sell sheets at trade shows
22 available as a reference, and it would be
23 sitting on the table as a handout as
24 well.

Page 50

1    Q.    And what was NACDS?
2    A.    The National Association of
3  Chain Drug Stores.  That is -- that is
4  the trade association for the chain
5  headquarters that were our customers.  So
6  if -- to put it into context, think CVS,
7  Walgreens, Rite Aid, those types of
8  organizations were members of the NACDS.
9    Q.    And did you -- did you
10 attend NACDS trade shows as well?
11   A.    Yes, I would attend those on
12 an annual basis.
13   Q.    And you would bring the same
14 hydrocodone marketing materials to those
15 as well?
16   A.    NA -- no, traditionally with
17 that you would bring more of a business
18 review.  And that was more of a
19 discussion of how your sales dollars
20 were, how was your performance.  And you
21 would have typically a presentation that
22 you would go over.  We would have, for
23 example, an LCD -- an LCD project or on
24 the screen, and we would use that

Page 51

1  messaging in our presentation and
2  business review with, for NACDS, the
3  chains.  But wholesalers would also
4  attend that, distributors would also
5  attend that meeting.  So that would be
6  the customer base that we would have.
7    Q.    Did anybody else attend the
8  NACDS meetings that you recall?
9    A.    As far as competitors?  Or
10 as far as Mallinckrodt employees?  What
11 are you --
12   Q.    No.  Outside of
13 Mallinckrodt.
14   A.    Outside of Mallinckrodt.
15 Yeah, it would encompass the majority of
16 pharmaceutical companies in the country.
17 It would also include pharmacy providers.
18 So as I spoke to the bulk totes in the
19 past, earlier today, there would be
20 manufacturers of the dispensing machines
21 who would be present.  There would be
22 people who would be there representing
23 over-the-counter medications, greeting
24 cards.

Page 52

1    So it really run anything
2  that you would walk into a chain pharmacy
3  and see, could be attending a meeting
4  such as this.
5    Q.    And when you did
6  presentations at NACDS meetings, did
7  those presentations include
8  product-specific information for your key
9  products?
10   A.    We would tend to go down --
11 I can't say this for every meeting.  But
12 as a general rule, we would have a
13 business review that would start at the
14 top level.  Here are your sales year to
15 date.  Here they are compared to last
16 year.  Then you would drill down into
17 product specific, how are you doing in
18 your sales versus previous years.
19   Q.    Do you recall placing
20 journal advertisements for Mallinckrodt's
21 opioid products?
22   A.    We had a team that would do
23 that, a different division that would do
24 that.  But I do recall advertisements to

Page 53

1  pharmacies, chain and wholesaler
2  headquarters, as our target, yes.
3    Q.    And do you remember what
4  journals -- in what journals you placed
5  such ads for opioid products?
6    A.    Drug Store News, Pharmacy
7  Times, Drug Store Management, Chain Drug
8  Review.
9    So those are the ones --
10 U.S. Pharmacist.
11   So those are the ones that I
12 can recall.
13   Q.    Was the NACDS conference
14 considered a key project -- strike that.
15   How many NACDS conferences
16 would you attend per year?
17   A.    They have two separate
18 meetings.  One -- so there are two per
19 year.  One is the one I referred to
20 earlier.  And that is now referred to as
21 NACDS Total Store Expo.  And that is a
22 meeting that occurs at the end of August
23 every year.  I would attend that on an
24 annual basis.

Page 54

1      There's also another meeting
2  called NACDS annual that occurs roughly
3  April of every year. I didn't begin
4  attending that, I don't believe, until I
5  was director of sales and vice president
6  of sales.
7      In that case, you would meet
8  with the senior management teams from
9  wholesalers. Most of the time
10  distributors would not be there. But
11  wholesalers and chain headquarters.
12      MS. BAIG: Counsel, do you
13    know whether the sell sheets and
14    the advertising that we've just
15    talked about has all been
16    produced?
17      MR. TSAI: I can check and
18    confirm with you.
19      MS. BAIG: That would be
20    great. Thank you.
21      Let's have marked as
22    Exhibit 3 this stack of
23    performance evaluations. I will
24    represent that was produced to us

Page 55

1  last night at about 10:45 p.m.
2      (Document marked for
3    identification as Exhibit
4    Mallinckrodt-Adams-3.)
5  BY MS. BAIG:
6      Q. So we just have that one
7  copy that you'll have to share with your
8  counsel.
9      MS. BAIG: And obviously I
10    have not had an opportunity to
11    read these in detail. But I'd
12    like to attach them to the record.
13    And -- and we reserve our right to
14    reopen questioning if necessary.
15      This document does not
16    appear to be Bates stamped; is
17    that right?
18      MR. TSAI: We have produced
19    a Bates-stamped copy yesterday and
20    we identified that to you.
21      For convenience we
22    separately printed out a hardcopy
23    to use it as an exhibit today. So
24    there -- the -- there is a

Page 56

1  Bates-stamped copy that you have.
2      MS. BAIG: Well, for the
3    record, it appears to be a
4    document about half an inch thick
5    that begins -- it states it's
6    Covidien John Adams view
7    assessment, and starts with
8    performance goals for 2007.
9  BY MS. BAIG:
10      Q. Do you see that?
11      A. I do.
12      Q. Okay. And if you flip
13  through this document, do you see that it
14  generally appears to be a series of -- of
15  performance evaluations and other
16  documents from your personnel file?
17      A. Yes.
18      Q. And in -- the first one is
19  for 2007. So at that time, your position
20  was what, again?
21      A. I believe this was still
22  senior product manager. I can't say that
23  for certain. I mean there -- there's
24  again timelines when the promotions

Page 57

1  were -- I don't -- I don't recall
2  exactly, so...
3      Q. Okay. But in all of --
4      A. I'm just looking to see if
5  it does state that. I just don't recall.
6      Q. In all of your positions at
7  Mallinckrodt, did you understand that it
8  was your job to maximize sales?
9      MR. TSAI: Object to form.
10    Go ahead.
11      THE WITNESS: My -- my
12    goal -- certainly one of the
13    objectives that I had is to -- to,
14    yes, have sales targets and to
15    work to achieve or exceed those,
16    but as you can see from this,
17    there are multiple goals, that
18    being one of them.
19  BY MS. BAIG:
20      Q. Would you agree that that
21  was one of the key goals?
22      A. They all have various
23  weightings just like any performance
24  review. I don't have the exact weighting

Page 58

1 for this scenario.
2      Q.   Do you see at the very top
3 of this page, the first item that's
4 listed under expected results, it states,
5 "Increase net margin of products
6 available through the Zydus alliance from
7 200,000 to $7.9 million before split by
8 gaining share of already launched
9 products and capitalize on fiscal year
10 '07 launches."
11      Do you see that?
12      A.   I do.
13      Q.   And what was Zydus alliance?
14      A.   Zydus was a pharmaceutical
15 company in which Mallinckrodt had an
16 alliance.  So Zydus was -- existed
17 outside the U.S., but was just launching
18 its own product in the U.S. and needed to
19 have a sales team represent them at
20 various chains and wholesalers.  And so
21 this alliance was developed.
22      They had a different product
23 portfolio that was all noncontrolled,
24 non-opioid drugs.  And so this was an

Page 59

1 initiative that we worked on to -- to
2 drive sales of, as I stated, non-opioids,
3 non -- noncontrolled substances.
4      And to inject some humor
5 into this, I can say I failed in my
6 objective.  Apparently I fell
7 $2.5 million short of my objective.  So
8 not a good performance.
9      Q.   If you skip to the second
10 stapled document in the packet.  That
11 appears to be performance goals for 2006.
12 Do you see that?
13      A.   I do see that, yes.
14      Q.   And if you skip -- skip then
15 to the third document.  It's titled
16 Marketing Department Overview.  Do you
17 see that?
18      A.   I do see this, yes.
19      Q.   And it's -- it's showing
20 that, as senior product manager, you were
21 part of the marketing department; is that
22 right?
23      A.   That is correct.
24      Q.   And those are the two

Page 60

1 reports, Jeff Burd and Bonnie New that
2 you mentioned earlier?
3      A.   Yes, that's true.
4      Actually correction.  I
5 didn't mention them earlier.  I don't
6 recall them reporting to me, which is --
7 again, I hope they won't be insulted by
8 that.  But that is not who I mentioned
9 before.  I mentioned Rebecca Coyner and a
10 person with the name John who I don't
11 recall his name.  I didn't recall that
12 Jeff and Bonnie reported to me.
13      Q.   Okay.  But here, now that
14 you see this document, do you recall that
15 Jeff Burd reported to you?
16      A.   Yeah, I -- I --
17      Q.   And he was the product
18 manager for product pricing and promotion
19 of the hydrocodone family and the
20 oxycodone family?
21      A.   Yeah, yeah.  I mean this --
22 this triggers that.  But again, I didn't
23 recall that.
24      Q.   And then if you look at the

Page 61

1 next document, it appears to be
2 performance goals for 2005.  Do you see
3 that?
4      A.   I do see that.
5      Q.   And there's a reference in
6 expected results to HD/APAP.  What is
7 that?
8      A.   Hydrocodone with
9 acetaminophen.
10      Q.   And so your expected result
11 here was to formalize the micro-marketing
12 campaign strategy for hydrocodone with
13 acetaminophen by the end of Quarter 2 and
14 achieve $130 million in fiscal year '05
15 sales or a $17 million increase over
16 fiscal year '04.
17      Do you see that?
18      A.   I do.  This was specific to
19 the micro-marketing that's being referred
20 here.
21      Let me just finish this.
22      Okay.  Yes.  I'm sorry,
23 could you repeat your question?
24      Q.   So your expected result was

1 to formalize the micro-marketing campaign
2 strategy for hydrocodone with
3 acetaminophen by the end of fiscal year
4 '05?
5      A.   Yes.  And the
6 micro-marketing campaign, as I look
7 through this, AmerisourceBergen has a
8 generic source program, which they have
9 customers that are enrolled in this
10 program.  And so if a pharmacy orders a
11 specific product -- so in this case,
12 let's say -- let's say they order
13 hydrocodone with acetaminophen, the goal
14 was to be the primary dispensed product.
15 So that pharmacist would order a product
16 based on their demand.  And then
17 AmerisourceBergen in this case would ship
18 their primary product that was on that
19 source program.
20      In this case, we were not
21 initially the primary product, but we
22 earned what was called a dual primary.
23 So that meant the pharmacist, in ordering
24 the product, could choose Actavis, or at

1 that time Watson product, or Mallinckrodt
2 product.
3      So our goal was if that
4 pharmacist was to order the product based
5 on their own demand, that the product
6 that was -- that was -- that they chose
7 was ours, instead of Watson.
8      So it was nothing more
9 than -- than if 100 percent of the market
10 is being pulled through this particular
11 wholesaler, we wanted to be the one that
12 the pharmacist chose.
13      Q.   You wanted to increase
14 market share?
15      A.   We wanted to increase our
16 market share of that customer.  But that
17 does not do anything to increase the
18 market itself.  So if AmerisourceBergen
19 has 100 million doses that they sell into
20 the market, our goal was to get six --
21 excuse me, 600,000 -- excuse me, 600 --
22 sorry, what did I say, a hundred million.
23 Sorry.
24      A hundred million doses.

1 Our goal was to get 600 thousand of that.
2      Is that right?  Yeah, of
3 that amount to -- which was again just
4 filling what was already there as the
5 demand that their pharmacist had, but it
6 didn't expand the amount of pills being
7 used.
8      Q.   And what was the
9 micro-marketing campaign strategy for
10 this hydrocodone product?
11      A.   I don't remember specifics,
12 but as I read through this, there is an
13 inside sales team that would call the
14 pharmacies and let the pharmacies -- make
15 them aware that when they ordered from
16 AmerisourceBergen, they had a choice
17 between Mallinckrodt product or Watson
18 product.  And they could work to talk
19 with those pharmacists to make them aware
20 of our access on that contract.
21      Q.   Do you see maybe two pages
22 in, there's a document with an eagle on
23 it that states, "Trust in our strengths"?
24      A.   Yes.

1      Q.   It also states, "Hydrocodone
2 bitartrate and acetaminophen."
3      A.   Yes.
4      Q.   Do you -- do you know what
5 this is?
6      A.   Yes, I'm familiar with --
7 I'm familiar with the document.
8      Q.   What is it?
9      A.   This would be considered a
10 sell sheet or something that would -- in
11 this case I don't know how it was used.
12 But it would talk about the key strengths
13 of Mallinckrodt.  And it -- you can't --
14 you can't read it down below here, but
15 that we made the active ingredient, that
16 we manufactured the actual product
17 itself.  We had specific packaging to
18 meet the pharmacist's need.  And we were
19 able to distribute product into the
20 marketplace through our -- through our
21 trade partners.
22      Q.   And do you see, though it's
23 hard to read, just under, "Trust in our
24 strengths," it says, "Soar" -- S-O-A-R --

Page 66

1   "Soar with the Number 1 selling generic
2   in America."
3        Do you see that?
4        A.   I do see that.  So that
5   again is referencing the IMS.  You can't
6   make a claim without having a reference
7   on something like that.
8        So that was just referencing
9   our position in the market relative to
10  the IMS data.
11       Q.   So you were able to track
12  that hydrocodone was the Number 1 product
13  in America from the IMS data, correct?
14       A.   As far as -- every generic
15  pharmaceutical company in the country is
16  able to and does purchase IMS data to
17  obtain reporting.
18       Q.   And the next page --
19       A.   And just to clarify.  The
20  IMS data is products sold into
21  pharmacies, long-term care, all of that.
22  It's not sales out of pharmacies into
23  patients.  We just don't have that
24  visibility through an IMS report.

Page 67

1        Q.   No.  But you have that
2   visibility through your chargeback data,
3   correct?
4        A.   No.  That is incorrect.  You
5   don't know what happens beyond the
6   pharmacy itself.
7        So where that goes to a
8   patient -- chargeback data is a financial
9   transaction, basically bringing product
10  from gross to net.  A chargeback does not
11  give you any information that would say
12  why the doctor prescribed your product,
13  who it went to, the reason that it went
14  to that patient.
15       Q.   So your understanding of
16  chargeback data, as you sit here right
17  now, is that you would not be able to see
18  any of your downstream customers, so you
19  would only be able to see sales to your
20  direct customers, but you had no access
21  to any data for any of their customers.
22  Is that your understanding?
23       MR. TSAI:  Object to form.
24  Mischaracterizes testimony.

Page 68

1        MS. BAIG:  I'm just asking.
2        THE WITNESS:  Yeah, yeah, no
3   problem.
4        So what you had access to --
5   I don't agree with the beginning
6   part of that.  Or maybe that's why
7   it's the question.
8        What it provides you is
9   information on where it was sold
10  to from the wholesaler or
11  distributor in this case.  And so
12  what I will -- what I'll do is
13  kind of walk through that process.
14       When I sold a product to
15  AmerisourceBergen, I didn't know
16  where that product was going to be
17  purchased, what pharmacy was going
18  to purchase it off of which
19  contract.
20       So when I would sell it to
21  AmerisourceBergen for $100, there
22  were contracts with various
23  pharmacy groups that would
24  purchase that product from

Page 69

1   AmerisourceBergen.
2        So a GPO, a group purchasing
3   organization, who buys for a group
4   of hospitals, negotiates for a
5   group of hospitals, I don't know,
6   when AmerisourceBergen purchases
7   that, where that's going to go.
8        So it may go to a hospital.
9   It may go to an independent
10  pharmacy.  It may go to a
11  long-term care nursing home.  It
12  may go to a chain pharmacy.
13       So this is a way of
14  reconciling what you sold at that
15  $100 price to net it down to that
16  contract price that was there.  So
17  I sold it to AmerisourceBergen for
18  100.  They sold it to that
19  contract for $75.
20  AmerisourceBergen is not going to
21  take a loss on that product.  They
22  charge me back for the difference
23  between what they purchased for
24  and then what they sold it to that

Page 70

1 specific customer for.
2 BY MS. BAIG:
3     Q.   Sure.  And when they -- when
4 they submit that chargeback data to you,
5 you are then able to see who it was that
6 AmerisourceBergen sold the product to,
7 whether it was a pharmacy or whether it
8 was a pain clinic or whether it was a
9 hospital or whoever it was, correct?
10     A.   You could see that it went
11 to a pharmacy.  So yes, but you didn't
12 know that -- what that pharmacy, you
13 know, did they -- what physician
14 prescribed that product or did it go to,
15 you know -- what information went beyond
16 that pharmacy, you don't have that
17 information.
18     Q.   You could see who
19 AmerisourceBergen sold the product to,
20 though, correct?
21     A.   There was data that would
22 tell you which pharmacy it went to.  But
23 if you're asking who it went to, nothing
24 beyond the pharmacy was included in that

Page 71

1 data.
2     Q.   Right.  But you could see
3 who AmerisourceBergen was selling the
4 product to, so whether it was a pharmacy,
5 a hospital, a pain clinic, whoever it
6 was, you could see the entity that
7 AmerisourceBergen sold the product to.
8     A.   It wouldn't come across as a
9 class of trade.  So let's say
10 AmerisourceBergen sold to Joe's Pharmacy,
11 or it sold to CVS.  I could say, oh, it's
12 sold to CVS.  Yes, that is a chain
13 pharmacy.  When it sold to Joe's
14 Pharmacy, I wouldn't know if Joe's
15 pharmacy was affiliated with a hospital,
16 was affiliated with a pain clinic.  I
17 wouldn't know what type of pharmacy that
18 was.  It didn't come across and say, oh,
19 this is a chargeback affiliated with a
20 specific class of trade.
21     Q.   So it didn't tell you the
22 class of trade of Joe's Pharmacy, but you
23 could see that AmerisourceBergen sold the
24 product to Joe's Pharmacy, right?

Page 72

1     A.   Correct.  And you wouldn't
2 know what type of pharmacy Joe's Pharmacy
3 was.  You could say -- Joe's Pharmacy, it
4 may be an independent pharmacy.  It may
5 be a long-term care pharmacy.  You don't
6 know what their particular patient
7 population is that they serve or what
8 channel they're in.
9     Q.   And if you turn to, I
10 believe, what is the next document.  It
11 states, "October 1, 2003, to
12 September 30, 2004, Tyco Healthcare
13 annual incentive plan."
14       Do you see that?
15     A.   I do see the document.  Yes.
16     Q.   And was this your annual
17 incentive plan at the time?
18     A.   I have to look to see if
19 it's specific for me.  I know it's got my
20 name on it.  But if this is broader,
21 so...
22       Yes.
23     Q.   Okay.  And you see under
24 Objective 2, it says, "Base products,

Page 73

1 create/execute new sales/" -- I think it
2 says -- "AFO/graphics for the hydrocodone
3 product line."
4       Do you see that?
5     A.   I do see the line that
6 you're referring to.  I don't know what
7 AFO stands for.  So this is, yes, one of
8 two objectives.  One is sales on
9 anagrelide.  One is on base products,
10 yes.
11     Q.   And this objective was
12 weighted at 50 percent; is that right?
13     A.   That is correct.
14     Q.   What was your understanding
15 of your annual incentive plan?
16       Or let me put it this way.
17 Is your annual incentive plan, is that a
18 bonus plan?
19     A.   Yes.  It -- it would tie
20 into your bonus at the end of the year,
21 correct.
22     Q.   And did you have any other
23 incentive plans other than an annual
24 incentive plan?  For example, did you

Page 74

1 also have a long-term incentive plan?
2     A.   I -- I don't know
3 specifically. I just don't recall.
4     If -- if there was a
5 breakout of long-term and short-term, I
6 had that at Dr. Reddy's. I'm just foggy
7 on if I had that at Mallinckrodt.
8     Q.   And do you recall what your
9 base salary was roughly when you began at
10 Mallinckrodt and what it was when you
11 left?
12     A.   I know when I started it was
13 ██████ a year plus bonus. But I don't
14 know what the bonus was.
15     And then I don't remember
16 what it was when I left.
17     Q.   Do you -- can you give me
18 your best estimate of around what it was
19 when you left?
20     A.   I would say around ██████
21 annually.
22     Q.   And do you have a general
23 recollection of the way that your
24 bonus -- bonuses changed over the years

Page 75

1 while you were at Mallinckrodt?
2     A.   I don't recall.
3     Q.   Do you recall whether or not
4 they grew?
5     A.   I don't recall specifically.
6 I would assume that with increasing
7 responsibility I had increasing bonus
8 percent.
9     I know as I transitioned
10 into vice president of sales, there would
11 be higher potential relative to that
12 bonus. I just don't recall along the way
13 what the progression was.
14     Q.   Do you recall being part of
15 the stock -- a stock plan at some point?
16     A.   Yes. I don't remember
17 specifics on it. But I did receive stock
18 based on some interval and I don't know
19 what it was. I just don't recall.
20     Q.   So if you turn a couple
21 pages down, you'll see, "Tyco TAIP
22 summary bonus payout breakdown for fiscal
23 year '04."
24     Do you see that?

Page 76

1     A.   I do see that, yes.
2     Q.   And it indicates that your
3 annual salary is about ██████ and your
4 target bonus opportunity was about
5 ██ percent.
6     Do you see that?
7     A.   Yes, I do.
8     Q.   And right under that it
9 states, "Bonus multiplier of
10 ██████ percent."
11     Do you see that?
12     A.   I do see that.
13     Q.   What was the bonus
14 multiplier?
15     A.   So if my target was
16 ██ percent, which again I didn't recall,
17 that meant that I was -- that I earned
18 ██████ percent of the ██ percent. And
19 then the proration is -- I don't remember
20 the fiscal year. But that must have been
21 the amount of months I was in during the
22 fiscal year at Mallinckrodt.
23     Q.   And if you skip maybe five
24 or six pages you'll see a page that

Page 77

1 begins "A career built on more than
2 words: Tyco Healthcare internal job
3 board." And it says position director --
4     A.   Sorry, I'm -- I haven't
5 found it.
6     Q.   -- director of sales.
7     So I'm just describing it so
8 you can see it since it's not Bates
9 stamped.
10     A.   Okay. I see it.
11     Q.   And this is the position
12 description for the position that you
13 moved into when you became director of
14 sales; is that right?
15     A.   Yes.
16     Q.   And if you skip maybe five
17 or six more pages. You'll see a 2007
18 stock and incentive plan.
19     A.   It looks like there are two
20 of them with the same title.
21     Q.   Let's look at the 2007 -- or
22 the -- I'm looking at the one granted on
23 July 1st, 2008.
24     A.   They both have the same

Page 78

1 heading.  I'm sorry.  Maybe this -- I
2 just want to make sure I'm referring to
3 the right one.
4     Q.    Let's look at the first one.
5     A.    Okay.
6     Q.    And does this refresh your
7 recollection that at least around July of
8 2008, that you were part of the stock and
9 incentive plan?
10     A.    This -- yeah, this looks
11 like the plan laid out.  What I don't
12 know is how it -- if it -- this was
13 specific to me or what, you know, what
14 was the context of this relative to
15 anyone else in the division.  So I don't
16 know.  Yeah, I don't know specifically if
17 this is related to me or -- or just as a
18 broad organization.
19     Q.    Well, I can represent to you
20 that your counsel produced it as part of
21 your personnel file.  Do you have any
22 reason to doubt that this was the plan
23 that you were part of?
24         MR. TSAI:  Oh, just as a

Page 79

1     clarification.  I think we -- it
2     was his home personal file.
3     Just -- you said personnel.  So
4     these were hard copies that we
5     gathered from Mr. Adams' home,
6     home office.
7         MS. BAIG:  Oh, I see.
8 BY MS. BAIG:
9     Q.    So you produced these from
10 files that you had at your home?
11     A.    Correct.  I have a
12 compensation history file --
13     Q.    Okay.
14     A.    -- and that's what this came
15 from, correct.
16     Q.    Okay.  So is there any
17 reason to doubt that this was the plan
18 that you were part of?
19     A.    No.  I don't know that it
20 was specifically for me, but it
21 certainly -- if I received information
22 regarding incentives that related to me,
23 I would have -- I would have it retained
24 somewhere.  Somewhere in this file.

Page 80

1     Q.    And if you skip a couple
2 documents further, you'll see there is a
3 document titled "2008 total cash
4 compensation statement "for John Adams,"
5 with a pie chart.
6         I think it's before that
7 document.  So it's the document before
8 this one.
9     A.    Thank you.  Appreciate it.
10     Q.    Sure.
11         So you see here it reflects
12 your 2008 base salary as being ████.
13 And a few lines down, your 2009 base
14 salary as being ████.  Do you see
15 that?
16     A.    I do see that, yes.
17     Q.    And then it identifies your
18 target bonus opportunities, correct?
19     A.    I do see, yes, the various
20 components, yes.
21     Q.    Okay.  And it identifies as
22 target bonus opportunities, pharma sales
23 growth at 40 -- 40 percent, pharma gross
24 margin at 30 percent, and pharma

Page 81

1 operating income at 30 percent.  Do you
2 see that?
3     A.    I do see that, yes.
4         What I don't know on this,
5 and I don't recall if -- as -- as this
6 was VP of sales, pharma, I don't know if
7 that's tied to just generics, or if
8 that's tied to more, is it a global
9 number, global being defined as the
10 broader than just generic.  I don't know
11 what this references.  And so I -- I wish
12 I had more detail, and I just don't.
13     Q.    Do you see the pie chart to
14 the right where it states your total cash
15 compensation?
16     A.    I do.
17     Q.    And there's a shaded area
18 that reflects merit increase?
19     A.    Yes.  There's two shaded
20 areas.  One is merit and one is
21 performance bonus.
22     Q.    And then there's the current
23 base salary, correct?
24     A.    Correct.

Page 82

1   Q.   And the next document is
2   titled "The Covidien annual incentive
3   plan for fiscal year 2009."
4        Do you see that?
5   A.   I do.
6   Q.   And is it your understanding
7   that this was the annual incentive plan
8   that applied to you at that time?
9   A.   This appears to be more of a
10  global document than a specific document.
11  This was designed to help employees
12  understand.
13       I -- I don't -- let me
14  review it just to see where else it goes.
15       I see here it's not
16  specifics.  They are not in there.  It
17  talks about measured on sales growth,
18  operating income, and strategic focus
19  metrics.  So this is -- this appears to
20  be a little bit more global in nature.
21  Q.   But this was the annual
22  incentive plan in place at -- at that
23  time in 2009, correct?
24  A.   Yes.  Yes.

Page 83

1   Q.   If you look at the next
2   document, it starts fiscal year '10,
3   equity talking points.  Do you see that?
4   A.   I do see that, yes.
5   Q.   And if you turn two pages,
6   you'll see a page that begins "achieve
7   net sales and net margin objectives for
8   fiscal year '09."
9        Do you see that?
10  A.   I do.
11  Q.   And it states, "Fiscal year
12  '09 NS goal was $80,127,760 and NS for
13  the year came in at $108,199,828."
14       Do you see that?
15  A.   I do see that, yes.
16  Q.   And then it states, it's
17  1 -- in parentheses, 135.1 percent.  Do
18  you see that?
19  A.   I do see that.
20  Q.   What was the NS goal?
21  A.   I don't know what the --
22  there is a net sales and a net margin.
23  So net sales and net margin are both
24  defined here.

Page 84

1   Q.   Okay.  So the NS goal was
2   net sales and the NM goal was net margin?
3   A.   Correct.
4   Q.   And the net sales goal came
5   in at 135.1 percent, and the net margin
6   goal came in at 163.7 percent, correct?
7   A.   Correct.  And I would -- to
8   put it into context, I wish I could look
9   at that to see was that driven on supply
10  disruptions from competitors that that
11  was driven up.  Was that -- was that
12  driven on the fact that one of our
13  competitors went out of the market which
14  happened sometime while I was there.  So
15  there are certain scenarios in which you
16  can have a growth.  Or -- it doesn't tell
17  me as well what products were launched
18  during that time.  This could be a new
19  product launch that occurred during that
20  time frame.  So I don't know what's
21  behind the numbers.
22  Q.   You just can see that there
23  was significant growth?
24  A.   I can see there -- there was

Page 85

1   growth, absolutely.
2   Q.   And do you see the next --
3   the next sentence says, "John Adams
4   summary."  And it follows:  "Victor
5   continually identified opportunities to
6   grow the business despite some of the
7   challenges.  This includes maximizing oxy
8   5, 15 and 30 as select accounts and
9   delaying price decreases to maximize
10  sales in the face of growing
11  competition."
12       Do you see that?
13  A.   I do see that, yes.
14  Q.   And was Victor Borelli one
15  of your top sales reps?
16  A.   I don't believe he was one
17  of the top sales reps, no.  He was -- I
18  only had six.  So if you're in the top
19  five, it doesn't do too -- too much to
20  differentiate you.
21       But I believe Dave Irwin was
22  top.  And I believe Toby -- Toby Bane was
23  second.  And that is often based on the
24  accounts in which you call on, so

Page 86

1 hopefully that provides the context
2 you're looking for.
3     Q.   Did those two individuals
4 also work on opioid products?
5     A.   Yes.
6     Q.   Okay.  So your top sales
7 reps for the opioid products were those
8 two?
9     A.   They didn't just do opioid
10 products.  That was for the entire
11 Mallinckrodt generic portfolio which
12 included non-opioid -- non-opioids.
13     Q.   Was the vast majority of
14 that portfolio opioid products?
15     A.   The vast majority was opioid
16 products, correct, in -- as far as
17 dollars were concerned, yes.
18     Q.   Roughly 80 to 90 percent?
19     A.   I don't know that
20 specifically.
21         So I -- I do know that that
22 was one goal across this entire -- and I
23 don't know if -- if you want to -- to
24 review building effective teams, or a

Page 87

1 summary of -- of, you know.
2     Q.   I don't think there's a
3 question pending, but we're not going to
4 review every line of this document,
5 because it's a half inch thick.
6     A.   Okay.  Sounds good.
7     Q.   So the sales targets that we
8 just reviewed, do you know who set those
9 sales targets for you?
10     A.   Not specifically, no.
11     Q.   Do you know who communicated
12 them to you?
13     A.   Not specifically.  Certainly
14 I would sit down with Mike Gunning and go
15 through numbers.
16     Q.   Anyone else?
17     A.   No he'd be -- as my manager,
18 that's who would walk through objectives.
19     Q.   And were you involved in
20 creating the targets for the people that
21 reported to you?
22     A.   At the territory level, yes,
23 I was.
24     Q.   And do you recall increasing

Page 88

1 your sales reps' targets each year while
2 you were at Mallinckrodt?
3     A.   I don't remember
4 specifically if there was increases or
5 decreases.  In all likelihood it would
6 vary depending upon launches, or if there
7 were discontinuations, those would also
8 factor.
9     Q.   Do you recall generally that
10 the sales targets for opioid products
11 were increasing over the period of time
12 that you were at Mallinckrodt?
13     A.   Generally they did increase.
14 As I mentioned, there were some products
15 that were launched and then discontinued
16 later, or there were significant
17 backorders which also led to targets
18 being increased but actuals not.
19     Q.   And like you, your sales
20 reps' bonuses were contingent on their
21 ability to maximize sales of opioid and
22 other products; is that right?
23         MR. TSAI:  Object to form.
24         Go ahead.

Page 89

1         THE WITNESS:  As we've seen
2     here, there are a number of
3     parameters in which the sales reps
4     are, and I was evaluated on.
5     Sales was one of those, but there
6     were others.
7 BY MS. BAIG:
8     Q.   Would you agree that it was
9 one of the key metrics by which they were
10 evaluated?
11     A.   I would agree that anyone in
12 sales would have a part -- a larger part
13 of their incentives based on that.
14         MR. TSAI:  Aelish, we've
15     been going about an hour and a
16     half.  Can we take a quick break?
17         MS. BAIG:  Sure.  How long
18     would you like?
19         MR. TSAI:  Five minutes.
20         THE VIDEOGRAPHER:  Going off
21     the record.  The time is 10:46.
22         (Short break.)
23         THE VIDEOGRAPHER:  We're
24     going back on record.  Beginning

Page 90

1  Media File Number 2.  The time is
2  11:03.
3       MS. BAIG:  We'll have this
4  marked as Exhibit 4.
5       (Document marked for
6  identification as Exhibit
7  Mallinckrodt-Adams-4.)
8  BY MS. BAIG:
9       Q.   This document is
10  Bates-stamped Mallinckrodt 21 -- or
11  Mallinckrodt 10005426063 through 64.  But
12  64 appears to be a multiple-page
13  document.
14       And it starts as an e-mail
15  dated July 28, 2005, from Mary Beth
16  Walton to you and a number of others.
17  Subject, updated generics marketing roles
18  and responsibilities.
19       Do you see this e-mail?
20       A.   I do.  I do see this.
21       Q.   And who is Mary Beth Walton?
22       A.   She was the administrative
23  assistant for Mike Gunning.
24       Q.   And have you seen this

Page 91

1  document before?
2       A.   I don't recall.
3       Q.   And does this appear to be a
4  bonus plan to you?
5       A.   It does not.
6       Q.   What does this appear to be
7  to you?
8       A.   This appears to be budget
9  numbers by territory.  But again I
10  haven't looked through all the details.
11       Q.   And so if you look at the
12  first page of -- of the chart, the
13  colored chart.
14       A.   Yes.
15       Q.   Those are sales reps for oxy
16  ER in or about 2005; is that right?
17       A.   Yes.
18       Q.   And at the bottom of that
19  chart it shows net sales increases and
20  net margin increases with and without oxy
21  ER.  Do you see that?
22       A.   I do see that, yes.
23       Q.   And the net sales increase
24  with oxy ER is 17 percent and without oxy

Page 92

1  ER it's only 7 percent.  Do you see that?
2       A.   I see that, yes.
3       Q.   And the two right-hand
4  columns on that page, the pink one and
5  the tan one, those are net sales and net
6  margin quota without oxy ER; is that
7  right?
8       A.   Yes.
9       Q.   And if you look at --
10       A.   It appears.
11       Q.   If you look at the next
12  page, do you see there's a line -- a
13  column third from the right called "net
14  sales bonus"?
15       A.   I do see that, yes.
16       Q.   And fourth from the right,
17  it says "attainment."  So does this
18  identify which sales reps for oxy ER were
19  meeting -- were meeting or attaining
20  their bonuses -- bonus potential?
21       A.   I'm pausing on this because
22  I can't imagine -- I can't imagine an
23  e-mail going out to the entire group that
24  would indicate a bonus that would be paid

Page 93

1  to individuals that would literally go
2  out to the entire team.  So I can't
3  speculate on what NS bonus and NM bonus
4  are relative to the context here.
5       Q.   So where it shows, for
6  example, for Steve Becker, was he an oxy
7  ER sales rep?
8       A.   No.  He was a national
9  account manager representing the entire
10  line.
11       Q.   Including oxy ER?
12       A.   Yes.  However, I don't know
13  when oxy ER launched.  And as you know --
14  or as you may know, it was only on the
15  market for a short amount of time with a
16  specific amount of product.  So again,
17  I'm not sure.
18       Q.   Okay.  Do you see where it
19  says, "Totals with oxy ER," and, "Totals
20  without oxy ER," and then it identifies
21  Steve Becker's name?
22       A.   Are you back on the front
23  page?  Which page are you on there?
24       Q.   Page 2 of the chart.

Page 94

1    A.   Oh, gotcha.  Yes, I do see
2  that.
3    Q.   Okay.  And there's numbers
4  identifying his fiscal year '08 quota net
5  sales.
6       Do you see that?
7    A.   I do see that, yes.
8    Q.   And his December quota.  Do
9  you see that?
10   A.   I do see that, yes.
11   Q.   And then it shows his
12 December net sales.
13      Do you see that?
14   A.   I do see that.
15   Q.   And then it states in the
16 first row for totals with oxy ER, his
17 attainment was 75 percent.
18      Do you see that?
19   A.   I do see that.
20   Q.   And then it goes on to state
21 fiscal '08 quota net margin, and it
22 identifies a figure, $34.3 million.
23      Do you see that?
24   A.   I do see that.

Page 95

1    Q.   And a December quota figure.
2       Do you see that?
3    A.   I do see that.
4    Q.   And then it lists
5  attainment, 75 percent.
6       Do you see that?
7    A.   I do see that, attainment of
8  75 percent.
9    Q.   Okay.  And then for net
10 sales bonus and net margin bonus, it
11 lists no number.  And no total number.
12      Do you see that?
13   A.   That is correct.  I do see
14 that has zero.
15   Q.   However, if you look further
16 down to some of the other sales reps, you
17 see that their attainment figures were
18 over 100 percent and they have bonuses
19 identified in the net sales bonus column
20 and the net margin bonus column.
21      Do you see that?
22   A.   I do see that.
23   Q.   Does that suggest to you
24 that the people with higher -- the sales

Page 96

1  reps with higher attainment received
2  higher bonuses?
3    A.   Again, I'll put out there
4  this is a document that I don't think
5  would be published to this entire group.
6  But what I will say is product is
7  allocated out to customers, and you may
8  find yourself -- you, being the sales rep
9  for a specific territory -- having more
10 of the finite amount of product available
11 allocated to your customers and not to
12 others.
13      So that attainment can be
14 driven on a number of factors.
15   Q.   Sure.  But all I'm asking
16 you is does this document suggest to you
17 that the higher your attainment, the
18 higher your bonus?
19   A.   Yes.  That is what it would
20 suggest.  You do have to hit a certain
21 level of attainment in order to get one.
22   Q.   And these appear to be the
23 figures for oxy ER at that time, based on
24 the chart, correct?

Page 97

1    A.   With and without.
2    Q.   Correct.  So these sales
3  reps' bonuses were contingent on their
4  ability to maximize sales of opioid
5  products, including oxy ER in this case;
6  is that right?
7       MR. TSAI:  Object to form.
8       Go ahead.
9       THE WITNESS:  This would
10 suggest -- sorry.  I guess a few
11 different points.
12      It wouldn't necessarily
13 relate to just opioid products.  I
14 think the other thing it would
15 suggest is their attainment to
16 this number, there are a couple of
17 factors.  One, I mentioned, is
18 allocation.  Number two is, was
19 the -- was the objective, was the
20 goal correct.
21      So the goal could have been
22 set arbitrarily high for one
23 person and arbitrarily low for
24 another person.

Page 98

1    So the fact that there was
2  an attainment level for a specific
3  person, there are many variables
4  that go into that.
5  BY MS. BAIG:
6    Q.   Have you had any experience
7  marketing or selling drugs to treat the
8  addiction to opioids?
9    A.   I have not.
10   Q.   Did you understand while you
11 were at Mallinckrodt that opioid sales
12 were increasing exponentially across the
13 country?
14   A.   Yes.  IMS data would show
15 what the -- what the growth or decline
16 rate was by molecule.  So you would be
17 able to identify it from that, what the
18 market growth and decline would be.
19   Q.   And you understood that it
20 was growing exponentially across the
21 country, correct, opioid sales?
22   A.   I would view the IMS data
23 and understand that.  I wouldn't
24 necessarily look at that as, okay, this

Page 99

1  product is growing, and this one is
2  declining as an indication of what was
3  sold into the market.  It's driven by the
4  demand that physicians are writing
5  prescriptions for patients, is what's
6  driving demand.
7    Q.   But you --
8    A.   So it's not --
9    Q.   -- understood that demand --
10   A.   No, I -- but I -- sorry.
11 But IMS data is sales out into the
12 outlets.  And so that would be the
13 indication of, yes, I could see that it
14 was either growing or declining.  But
15 again, that's driven by prescriptions,
16 which we don't drive prescriptions.
17   Q.   But my question is not
18 whether you could see whether it was
19 growing or declining.  My question is
20 whether you understood that it was in
21 fact growing during the period that you
22 were there.
23   A.   There were years of decline
24 as well regarding -- or at least periods

Page 100

1  of decline, I believe, on specific
2  molecules.  I don't recall which.  But I
3  believe there were times of decline.  A
4  lot of times that was driven by -- it was
5  driven by supply disruption.
6    Q.   So you had no understanding
7  when you were at Mallinckrodt that
8  generally speaking opioid sales were
9  growing nationally.  You didn't
10 understand that?
11   A.   No, I understood that there
12 were products that grow -- that did
13 accelerate, that did grow.  And there --
14 I understood at times there were ones
15 that declined.  You can look at any
16 period in time and derive various
17 conclusions.
18     But yes, I do agree that
19 there was growth in opioids across the
20 market and growth in overall dispensed
21 products, non-opioids as well, because of
22 the aging population, et cetera.
23 Prescriptions and particularly conversion
24 to generics of non-opioids was growing.

Page 101

1    Q.   Were you aware that the
2  growth for the product oxy 15 and oxy 30
3  was very significant during the period --
4  nationally during the period that you
5  were at Mallinckrodt?
6    A.   I understand that they grew.
7  What I don't know is, was that driven
8  because of oxy ER being on and off the
9  market, and details surrounding that I
10 just don't recall.
11   Q.   So you don't understand why,
12 but -- or you didn't understand why, but
13 you understood that oxy 15 and oxy 30
14 were growing significantly in terms of
15 sales across the country; is that right?
16   A.   I don't -- I don't recall
17 the why.  Again, the demand is not
18 generated by a generic manufacturer.  The
19 demand is generated by prescriptions
20 writing -- being written by doctors.
21   Q.   And did you oversee sales of
22 any branded opioid products?
23   A.   I did not.
24   Q.   Did you have any insight

Page 102

1 into the sales of the branded opioid
2 products at Mallinckrodt?
3     A.   I don't recall.
4     Q.   You don't recall reviewing
5 reports for branded opioid products at
6 Mallinckrodt?
7     A.   I don't recall, no.
8     Q.   You don't recall one way or
9 the other or you don't recall ever having
10 done that?
11     A.   I don't recall having done
12 that.  And to add further, I didn't
13 recall that the branded side had opioids.
14 I'm trying to think if -- I don't recall.
15 If those were even on the market while I
16 was there.  And again, I just don't
17 recall them having any opioids.
18     Q.   Do you recall Exalgo being
19 part of Mallinckrodt portfolio while you
20 were there?
21     A.   I recall the trade name.  I
22 don't know if --
23     Q.   How about Xartemis?
24     A.   I don't know if it was while

Page 103

1 I was there though.  I just know the
2 name.
3     Q.   Okay.  How about Xartemis?
4     A.   That name is not familiar to
5 me.  Just don't recall the name.
6     Q.   Did you understand while you
7 were at Mallinckrodt, that Mallinckrodt
8 was a world leader in the manufacture and
9 distribution of opioid painkillers?
10     A.   I recognize that yes
11 Mallinckrodt had a key position in
12 manufacturing raw material and finished
13 dosage forms.
14     Q.   Not just a key position, but
15 a world leader, did you understand that
16 at the time?
17         MR. TSAI:  Object to form.
18         Go ahead.
19         THE WITNESS:  I don't have
20 vision to outside the U.S.  And
21 from an opioid perspective, my
22 understanding is products in the
23 U.S. have to be manufactured in
24 the U.S., and products

Page 104

1 manufactured in the U.S. cannot go
2 outside the U.S.
3         That's my understanding of
4 it.  So what happens outside of
5 the U.S. in this regard, I don't
6 recall any insights there.
7 BY MS. BAIG:
8     Q.   You don't recall
9 Mallinckrodt touting itself as a world
10 leader in the manufacture and
11 distribution of opioid analgesics?
12     A.   No.  I don't recall that.
13     Q.   Do you recall which generic
14 opioids were part of Mallinckrodt's
15 portfolio while you were there?
16     A.   So hydrocodone -- well, so,
17 hydrocodone, oxycodone, oxycodone with
18 acetaminophen, morphine.  Oxy ER for a
19 finite amount of time.
20     Q.   Was fentanyl also a
21 Mallinckrodt product?
22     A.   Launched that sometime near
23 the end of my tenure there.
24         (Document marked for

Page 105

1     identification as Exhibit
2     Mallinckrodt-Adams-5.)
3 BY MS. BAIG:
4     Q.   I'm handing you what's been
5 marked as Exhibit 5.
6         This document starts as an
7 e-mail from Phyllis Fischer dated May 17,
8 2005.  Bates-stamped Mallinckrodt
9 0007917913 through 7925.
10         And its subject line is PCL
11 library, pharmaceutical industry
12 newsletter.  Do you see that?
13     A.   I do see that.
14     Q.   What is the PCL library?
15     A.   I'm not certain.  I don't --
16 I don't recall any PCL library or -- if
17 it's a virtual or an actual.  I don't
18 know.  I just don't recall.
19     Q.   Do you recall a pharmacy --
20 pharmaceutical industry newsletter?
21     A.   I don't recall.
22     Q.   You don't recall receiving
23 those types of newsletters on a regular
24 basis?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    A.   I do not.  It doesn't ring a
2  bell to me.
3    Q.   Do you ever -- ever recall
4  learning that OxyContin was -- was a drug
5  that had a high potential for abuse?
6         MR. TSAI:  Object to form.
7         Go ahead.
8         THE WITNESS:  As far as
9     OxyContin, the branded drug by
10    Purdue, I am aware of that now as
11    I look through and hear things in
12    the press.
13         At the time, I'm trying to
14    think of how much controversy
15    there was.  But ultimately I'm not
16    sure what I would put that into
17    context.  But oxycodone -- or
18    OxyContin written by doctors as a
19    Purdue product, it makes sense
20    that there would be -- what did
21    you say?
22  BY MS. BAIG:
23    Q.   High potential for abuse.
24    A.   It makes sense, again, I

Page 107

1  can't put a timeline into that, but based
2  on kind of everything that I'm reading
3  and all of that.
4    Q.   Do you recall learning that
5  while you were at Mallinckrodt or having
6  discussions with folks at Mallinckrodt
7  about the high level of abuse for opioid
8  products generally?
9    A.   I recall components of that
10  because there was an initiative to
11  make -- there was -- abuse resistant
12  technology was something that was in
13  development.  So I recall in that
14  context.
15    Q.   Okay.  Do you recall it in
16  any other context?
17    A.   I don't recall.
18    Q.   So if you turn to the fourth
19  page of this 2005 document.  Do you see
20  that there's a section titled --
21    A.   I'm sorry, what is the
22  number on the bottom?  Sorry.
23    Q.   It ends in 916.
24    A.   Okay.

Page 108

1    Q.   In the middle of the page
2  there's a section titled -- in this
3  newsletter titled, "Pain patients take
4  fewer than half of OxyContin scripts as
5  directed."
6         Do you see that?
7    A.   I see the heading, yes.
8    Q.   And it goes on to state that
9  "just 45 percent of prescriptions for the
10  opiate OxyContin (oxycodone HC)
11  controlled-release are taken as directed
12  by patients being treated for
13  nonmalignant pain, according to a study
14  of urine samples from approximately
15  5 percent of the nation's outpatient pain
16  clinics."
17         Do you see that paragraph?
18    A.   I see that paragraph, yes.
19    Q.   Do you recall ever learning
20  a statistic on par with 45 percent of
21  OxyContin and oxycodone being --
22    A.   I -- I -- no.
23    Q.   -- being -- hang on.  Hang
24  on.

Page 109

1    A.   Okay.
2    Q.   -- not being taken as
3  directed?
4    A.   I don't recall that.  And --
5  and truthfully, what it was being
6  prescribed for was obviously pain.  But
7  beyond, I don't know what a treatment
8  profile would be for a patient, if they
9  are supposed to take -- I don't even know
10  the strengths of -- of oxy ER, but -- if
11  they are supposed to take one or two or
12  three a day, I don't know.
13    Q.   And do you see it goes on to
14  state that "fully 40 percent of the drug
15  was recycled among other patients being
16  treated for pain in 264 clinics whose
17  combined case loads exceeded 33,000
18  patients."
19         Do you see that?
20    A.   I see that, yes.
21    Q.   And then the next paragraph
22  states, "Another 15 percent of OxyContin
23  prescriptions apparently were diverted to
24  the black market."

Page 110

1  Do you see that?
2  A.  I do see that.
3  Q.  Do you recall having any
4  discussions at Mallinckrodt about figures
5  such as these and the potential for
6  OxyContin and oxycodone to be abused?
7  A.  I -- I recall discussions
8  about a scenario where, like a -- Watson
9  had a truck that was hijacked that was
10 filled with some sort of opioid.  I don't
11 know exactly which one.  So I recall that
12 scenario.
13  But as far as looking at
14 diverted, and if there was anything --
15 this is outside of my purview as far as
16 kind of who would investigate.  I think
17 compliance is probably better suited for
18 that scenario, if they would go and find
19 the situation.  Or be made aware of is
20 probably better.
21  Q.  Apart from the isolated
22 incident of the theft with respect to
23 the -- I think it was a UPS truck --
24  A.  I don't know.  I don't know

Page 111

1  exactly.
2  Q.  Do you recall any other
3  discussions at Mallinckrodt about the
4  high potential for diversion of opioids?
5  A.  I know that there were
6  always controls in place that were
7  established.  I remember at a UPS
8  facility when some product went missing,
9  that there was -- and I don't know if it
10 was our specific product or someone
11 else's, but that investigations down to
12 the camera level would be -- would be
13 there to try and isolate where the
14 product may have -- who may have stolen
15 it, if that was the case or why it was
16 missing.  I do recall those
17 investigations taking place through the
18 supply chain.
19  Q.  But you don't recall stats
20 such as these, as at 45 percent or
21 40 percent level in terms of diversion or
22 discussing those at Mallinckrodt?
23  A.  Related to OxyContin,
24 absolutely not.  And as far as diversion

Page 112

1  in general, I can tell you that, you
2  know, we worked and had appropriate
3  channels in which we sold through, and if
4  there was any deviation, obviously our
5  compliance team would certainly
6  investigate those.  I don't remember a
7  lot of cases where that would happen
8  truthfully.
9  Q.  And the generic for
10 OxyContin was oxycodone HC, right?
11  A.  I'm sorry?
12  Q.  The generic for OxyContin
13 was oxycodone HC, right?
14  A.  No, that is not correct.
15 The generic for OxyContin is oxy ER.
16  Q.  Okay.
17  A.  Yes.
18  Q.  Do you see here where it
19 says, "Just 45 percent of prescriptions
20 for opioid OxyContin" and then in parens
21 it says oxycodone HC.  Do you know what
22 oxycodone HC stands for?
23  A.  Oxycodone hydrochloride.
24 But as far as -- those products -- if a

Page 113

1  doctor writes a prescription for
2  OxyContin, that product cannot be
3  substituted by the pharmacist for oxy IR.
4  That's an illegal substitution.  They
5  would have to call the doctor.  It's
6  considered a different dosage form
7  because of how it's delivered.  Extended
8  release versus immediate release cannot
9  be substituted without a call to the
10 doctor.
11  MS. BAIG:  Let's have this
12  document marked as Exhibit 6,
13  please.
14  (Document marked for
15  identification as Exhibit
16  Mallinckrodt-Adams-6.)
17 BY MS. BAIG:
18  Q.  This document starts as an
19 e-mail from LouAnn Behlmann to you and
20 others.  It's Bates-stamped Mallinckrodt
21 0004839173 through 9174; 9174 is a
22 multipage document and it's dated
23 January 23, 2007.
24  It states in the first line

Page 114

1 of the e-mail, "Attached is the updated
2 master EOE generic product list."
3 　　　Do you see that?
4 　　A.　I do see that.
5 　　Q.　What's EOE stand for?
6 　　A.　Let me look through this and
7 see if it triggers anything.  Off the
8 top, I don't know.
9 　　　I believe this would be
10 order entry numbers.  So when we sell to
11 a wholesaler or, let's say, Walgreens,
12 they would have a number that they would
13 assign for a specific product.  So for
14 us, we have an NDC number on our product.
15 That NDC number is not how a pharmacy
16 would order from a wholesaler.  They
17 would look at what is this item number.
18 　　　So similar going to Best
19 Buy, and you see SKU number, this is
20 assigned by the customer for their
21 patient purview.  I don't know what EOE
22 stands for truthfully.
23 　　Q.　Okay.  And this was
24 Mallinckrodt's generic product list as of

Page 115

1 2007?
2 　　A.　It appears -- it appears
3 that way.
4 　　Q.　Do you see that, on the
5 second page of the product list, there's
6 a product called methadone listed?
7 　　A.　I do see that.
8 　　Q.　Do you know what methadone
9 is used for?
10 　　A.　I don't know what the exact
11 indication is.  But it's something to do
12 with addiction treatment.
13 　　Q.　So does this refresh your
14 recollection that you worked on products
15 that were designed to treat addiction of
16 opioids?
17 　　A.　I know we had a sales team
18 that called specifically on methadone
19 clinics.  That was what the lion's share
20 of methadone was used for, is my
21 understanding.  So, yeah, I didn't recall
22 that this was part of the portfolio.  I
23 don't know how much this represents
24 relative to sales.  It may have been one

Page 116

1 that was so small that it wasn't on my
2 radar.
3 　　Q.　Do you recall that methadone
4 sales were increasing --
5 　　A.　No.
6 　　Q.　-- significantly during the
7 time that you were at Mallinckrodt?
8 　　A.　I don't recall.
9 　　Q.　You didn't have a general
10 awareness of that while you were there?
11 　　A.　I can't speak to when I was
12 there.  I can only say right now that I
13 do not recall it at all.
14 　　Q.　Do you recall having any
15 discussions with anybody at Mallinckrodt
16 about the simultaneous sale of opioid
17 products and methadone and the
18 simultaneous increasing on both sides?
19 　　A.　I don't remember any
20 conversations like that.  I just don't
21 recall.
22 　　Q.　Do you recall that
23 Mallinckrodt's opioid products accounted
24 for more than 90 percent of total sales?

Page 117

1 　　A.　I couldn't have told you a
2 percentage, so I don't recall what the
3 percentage would be.
4 　　Q.　Do you recall it being high?
5 　　A.　I do recall it being high,
6 yes.
7 　　Q.　Do you recall that methadone
8 was also among the company's top
9 products?
10 　　A.　I don't recall, and it would
11 surprise me.  But again, I only had
12 vision to the retail segment.  There is
13 the methadone clinic -- at least I don't
14 recall any sort of vision to that other
15 segment and the sales affiliated with it.
16 　　　(Document marked for
17 　　　identification as Exhibit
18 　　　Mallinckrodt-Adams-7.)
19 BY MS. BAIG:
20 　　Q.　I'll have this document
21 marked as Exhibit 7.
22 　　A.　Thank you.
23 　　Q.　This is a document that
24 starts as an e-mail from Steven Becker

Page 118

1 dated October 17, 2008, Bates-stamped
2 Mallinckrodt_0006339059 through 9065.
3       And if you turn to the
4 second page. The title is "Covidien
5 Mallinckrodt Pharmaceuticals." And
6 there's a reference to HD Smith executive
7 visit dated October 16, 2008.
8       Do you see that?
9       A. I do.
10       Q. And do you recall receiving
11 this document while you were at
12 Mallinckrodt?
13       A. I don't.
14       Q. Do you recall an executive
15 visit with HD Smith at or around October
16 of 2008?
17       A. I don't recall. Executive
18 visits occurred multiple times, not
19 specifically HD Smith, but just in
20 general. So I don't recall.
21       Q. I see. And would you
22 participate in executive visits?
23       A. Yes, I would on occasion.
24       Q. Okay. And would you

Page 119

1 typically create PowerPoints like the one
2 included here, or would Mallinckrodt
3 create PowerPoints like the one included
4 here for executive visits?
5       A. There would be PowerPoint
6 presentations. Whether or not sales and
7 marketing created those, I can't speak to
8 that on a broad spectrum.
9       Q. Do you have any reason to
10 doubt that this was a PowerPoint created
11 for the HD Smith executive visit
12 October 16, 2008?
13       A. I don't have any doubt based
14 on this. I do find it somewhat
15 interesting to see sales from the dosage
16 and API group on Page 7, as I'm looking
17 at this. So from my perspective, that's
18 pooling data from other areas, is my
19 assumption.
20       Q. And it states here on Page
21 three of the PowerPoint, "Understanding
22 the organization." It identifies
23 Covidien as having 43,000 employees in 57
24 countries.

Page 120

1       Do you see that?
2       A. I do see that.
3       Q. And 8.9 billion in annual
4 sales.
5       Do you see that?
6       A. I do see that.
7       Q. Do you know if that
8 8.9 billion is global or limited to the
9 U.S.?
10       A. I don't -- I don't know.
11 But since it references 57 countries,
12 I'll assume here, but again I didn't know
13 or I don't know. Since it references
14 that, I would assume it's global.
15       Q. And if you -- if you -- if
16 you move three pages in, you'll see a
17 document titled -- or a page titled "Five
18 Growth Platforms."
19       A. I see that, yes.
20       Q. And under -- do you see on
21 the left-hand side it identifies
22 generics?
23       A. I do see that.
24       Q. And it states, "Number one

Page 121

1 pain med"?
2       A. I do see that.
3       Q. Was that because pain
4 medication was Mallinckrodt's number one
5 generic category of drugs at the time?
6       A. So I know -- obviously this,
7 I wasn't included in this e-mail chain.
8 As far as kind of speculating on this,
9 this appears to be number one pain med as
10 if it may be referencing hydrocodone,
11 because that was, I think, as we
12 discussed earlier, the number one product
13 in the U.S. per IMS.
14       Q. And it states here that
15 Mallinckrodt was number six in terms of
16 generics in the U.S. Is that -- is your
17 understanding of that that you were
18 number six in terms of generic market
19 share?
20       A. Yeah, that number, if I
21 recall fluctuated, and it's based on IMS
22 data, number of -- number of pills if I'm
23 not mistaken, or extended -- it was
24 called extended units, is the way IMS

Page 122

1  defined it.
2      Q.   And do you see on the next
3  page in the pie chart that shows 2007
4  sales by product type?
5      A.   I do see the pie, yes.
6      Q.   The majority of the drugs
7  are controlled drugs?
8      A.   Yes.  It appears to be
9  about, I would estimate, 65/35, something
10 like that, percent.
11     Q.   And just to the right of
12 that it states, "Areas of focus,
13 controlled substances and pain
14 management."
15         Do you see that?
16     A.   Yes.  Sorry.
17     Q.   And that was one of
18 Mallinckrodt's key areas of focus at the
19 time.  Would you agree?
20     A.   Yes, it was at the time.
21     Q.   And if you flip two more
22 pages, you'll see Covidien Mallinckrodt
23 organizational chart.  And it has you
24 reporting to Mike Gunning who was

Page 123

1  reporting to Chuck Bramlage who was
2  reporting to Tim Wright.
3          Do you see that?
4      A.   I do see that.
5      Q.   Is it your understanding
6  that that is accurate for the time?
7      A.   Yes.  As I see this now,
8  yes.
9      Q.   And if you skip two more
10 pages you'll see HD Smith 2007 versus
11 2008 net sales.
12         Do you see that?
13     A.   I do see that, yes.
14     Q.   Do you recall HD Smith being
15 one of Mallinckrodt's key customers?
16     A.   I recall them being a
17 customer.  But I -- I don't believe they
18 would fall into a top ten.
19     Q.   Do you see that their sales
20 from '07 to '08 more than tripled?
21     A.   I do see that.  I don't know
22 what drove that, if it was opioids or
23 non-opioids or if it was supply
24 disruptions.  I just don't know.

Page 124

1      Q.   And do you see, flipping two
2  more pages, that -- that HD Smith was
3  part of Mallinckrodt's volume incentive
4  program?
5      A.   I'm sorry, I just noticed
6  that units grew quite a bit less than did
7  dollars.  So it looks like there was an
8  increase in average selling price per
9  dose on the last slide.  So, I'm sorry, I
10 was still reflecting since again, I don't
11 know -- this wasn't to me, so I'm just --
12 I'm still catching up.
13     Q.   So I think my question to
14 you on that was whether sales increased
15 more than three times from 2007 to 2008.
16 And I'm looking at the first -- the first
17 row.
18     A.   Dollar sales did, but unit
19 sales did not.
20     Q.   For which drug, do you know?
21     A.   I don't know.  This -- this
22 would be a -- I assume a full list of the
23 products that Mallinckrodt sold to HD
24 Smith from the retail segment.

Page 125

1      Q.   I think we're going to get
2  to the products in a few pages.
3      A.   Okay.
4          And I'm sorry, you had a
5  follow-up question or another question,
6  and I don't know which page you went to.
7  I apologize.
8      Q.   Two more pages later.
9      A.   Okay.
10     Q.   You'll get to HD
11 Smith-Mallinckrodt volume incentive
12 program.
13     A.   Okay.
14     Q.   Was HD Smith part of
15 Mallinckrodt's volume incentive program?
16     A.   I don't recall.
17     Q.   Does this suggest to you
18 that they might have been?
19     A.   This does not suggest it --
20 that, no.  It doesn't suggest it one way
21 or the other.
22     Q.   Okay.  Did Mallinckrodt have
23 a volume incentive program?
24     A.   Yes.

Page 126

1  Q.  And what is your
2  understanding of how that program worked?
3  A.  So, basically, that program
4  worked where you would look at historical
5  sales.  So what was the -- what were --
6  what was the purchasing that they made
7  from Mallinckrodt.  And you would use
8  that, and you would tie in what is the
9  market growth as driven by demand, and
10  you would layer on top of that any new
11  products that may be introduced in the
12  market.  You would layer in market
13  declines on the molecules.  And you would
14  estimate what the dollar sales would be.
15  Upon doing that, you would
16  say, if your dollar sales are, let's just
17  say $2 million today, and you build them
18  to $4 million, you'll get an extra
19  1 percent rebate.  You build them to
20  6 million, you get an extra 2 percent
21  rebate.  Build them to 10 million, you'll
22  get an extra 3 percent rebate.  That's
23  just an example.
24  Q.  And if you turn to the next

Page 127

1  page, you see key product drivers.
2  A.  I'm sorry, what page are you
3  on?  I don't see it.
4  Q.  The one ending 060.
5  A.  Okay.  Gotcha.  I wasn't on
6  that page.
7  Okay.  I didn't realize,
8  when you said, did they have the volume
9  incentive, I wasn't on that page.  I was
10  two pages before that.  So that's why I
11  said I couldn't derive that they had a
12  volume incentive program.  So I was on
13  page ending in 9060.
14  Now turning to -- sorry,
15  whatever page this is, I now know that
16  you were referencing this.  So yes, I can
17  confirm that they had a volume incentive
18  program.
19  Q.  Okay.
20  A.  So I was on the wrong page
21  when you asked that question.
22  Q.  Understood.
23  A.  Okay.  So, sorry, now we're
24  on --

Page 128

1  Q.  So HD Smith -- so we've
2  established HD Smith had a volume
3  incentive program.
4  And can you look at the
5  page -- if you look in the bottom
6  left-hand corner there's a page
7  Number 16?
8  A.  I see, yes.
9  Q.  And it says key product
10  drivers?
11  A.  Yes, I see that.
12  Q.  And it appears to identify
13  HD Smith products for which Mallinckrodt
14  was supplying?
15  Do you see that?
16  A.  I do see that, yes.
17  Q.  And is that your read of
18  what this chart shows?
19  A.  Yes, it is.
20  Q.  Okay.  And if you go to the
21  next page, you see the top ten
22  Mallinckrodt products?
23  A.  I do see that, yes.
24  Q.  And can you see that all of

Page 129

1  these products are opioid products?
2  A.  Yes, I do see that.
3  Q.  And does this refresh your
4  recollection that methadone was among
5  Mallinckrodt's top ten products?
6  A.  It does not.  I mean I --
7  like I said before, I don't recall that
8  it would be at that level.  And as I
9  stated before, that would surprise me
10  that it was a top ten product.
11  Looking at this in
12  isolation, I still can't derive that.
13  This is what HD Smith had as their -- one
14  of their top ten products.  So again I
15  can't speak to the -- how it fit into our
16  overall portfolio.
17  Q.  I see.  So for HD Smith
18  though, methadone was among the top ten
19  Mallinckrodt products, correct?
20  A.  That's -- that's what --
21  that is what is in the presentation,
22  correct.
23  Q.  And it shows here that for
24  example, the first -- the first row for

Page 130

1  oxycodone HCL, 30 milligrams, do you see
2  that?
3      A.   I do.
4      Q.   And the percent increase
5  from 2007 to 2008 is 37,000 percent,
6  about 37,000 percent. Do you see that?
7      A.   I do see that. So what that
8  would indicate to me, I don't know when
9  oxy 30-milligram was launched. But it
10  may have been launched with one month in
11  the 2007 time frame and 2008 showed a
12  full year. So I don't know what the
13  comparison is.
14          And the other component of
15  this is oxy 30 may have been a product
16  that used to be an Ethex product,
17  supplied product, and that Mallinckrodt
18  earned that award when Ethex had supply
19  issues or we just earned it on the merits
20  of relationship or price. And so it was
21  a conversion from their product to our
22  product. It doesn't indicate that it's
23  an increase in demand as driven by
24  physician prescribing or any other

Page 131

1  reason.
2      Q.   It doesn't necessarily
3  indicate that, but as you sit here right
4  now, do you recall why it increased
5  specifically 37,000 percent from one year
6  to the next?
7      A.   I -- I do not.
8      Q.   Okay. And do you see that
9  the methadone 10-milligram tabs increased
10  about 238 percent from 2007 to 2008?
11      A.   I'll reiterate. I see that
12  it does. But I'll reiterate, I don't
13  know what drove that. If it was a
14  situation where someone else had that
15  product and we earned the award
16  throughout there, I don't know.
17      Q.   And do you see that the oxy
18  APAP product increased from 2007 to 2008
19  at a rate of 374.6 percent?
20      A.   I do see that. And I'll
21  just reiterate what I said before, I
22  don't know what was the key driver behind
23  that.
24      Q.   And do you see that the

Page 132

1  hydrocodone APAP 10/500 tabs increased at
2  136.8 percent from 2007 to 2008?
3          Do you see that?
4      A.   I do see that. And I'll
5  reiterate the -- same, that I don't
6  know what drove that, if that was a
7  transition from another company to us as
8  a primary supplier. I don't know.
9      Q.   And what's 10/500 indicate?
10      A.   That is 10 milligrams of
11  hydrocodone and 500 milligrams of
12  acetaminophen.
13      Q.   Okay. And just beneath the
14  chart it states, "The top ten products
15  account for 91.3 percent of total net
16  sales volume."
17          Do you see that?
18      A.   I do see that.
19      Q.   The next page is relatively
20  blank, but has a heading entitled
21  "Mallinckrodt RiskMAPs." Do you know
22  what RiskMAPs are?
23      A.   I remember the -- I remember
24  the term. I don't remember the concept.

Page 133

1      Q.   You don't remember it at
2  all?
3      A.   No, I don't recall the
4  concept of it, but I -- like I said, I
5  remember the term.
6      Q.   And the last three pages of
7  the document. Do you see it identifies
8  HD Smith net sales and lists 2007 totals,
9  2008 totals, the change in the percentage
10  and the forecast?
11      A.   Sorry, you jumped through --
12  you're faster than me. The third from
13  the back, is that what you --
14      Q.   Yeah, the last three pages
15  are basically the same. Or there's a
16  chart that covers the last few pages. Do
17  you see that?
18          I'm looking at the very end,
19  the one you're holding.
20      A.   Okay. Great. I just wanted
21  to make sure. They all look the same so
22  I wasn't sure. Okay. I'm sorry.
23      Q.   And the left -- the
24  left-hand column identifies HD Smith net

Page 134

1 sales. Do you see that?
2     A.   I do see that, yes.
3     Q.   And then there's a column of
4 2007 totals, 2008 totals, a change, a
5 percent, and a forecast. Do you see
6 that?
7     A.   I do see that, yes.
8     Q.   Does it suggest to you that
9 these are the figures that back up the
10 data that was in the PowerPoint we just
11 went through?
12     A.   This does look like the
13 supporting data for the dollars.
14 Interesting, it does not include the
15 average selling price.
16        MS. BAIG: We'll have this
17        document marked as Exhibit 8.
18        (Document marked for
19        identification as Exhibit
20        Mallinckrodt-Adams-8.)
21 BY MS. BAIG:
22     Q.   This document begins as an
23 e-mail from Ginger Collier to you and
24 others. It's dated November 20, 2009.

Page 135

1 It's Bates-stamped Mallinckrodt
2 0006305472 through 5474.
3        And again, if you -- if you
4 skip to the first page of the PowerPoint,
5 it's titled "Covidien Pharmaceuticals,
6 specialty generics business review." It
7 has your name on the front page along
8 with Ginger Collier and Bob Lesnak, dated
9 January 6, 2010.
10        Do you see that?
11     A.   I do.
12     Q.   Okay. And do you recall
13 receiving this document?
14     A.   I do not.
15     Q.   Did you help -- do you
16 recall helping create this document?
17     A.   I do not.
18     Q.   Was this the type of
19 document -- and this looks, at least in
20 form, to be similar to the one that we
21 just looked at. Would you agree?
22     A.   I do. I do agree at least
23 based on the first two pages. What I'm
24 trying --

Page 136

1     Q.   All the --
2     A.   I would assume, but I -- no,
3 I can't make an assumption on that.
4     Q.   Do you recall seeing such
5 documents created, business review type
6 documents?
7     A.   I do recall business review
8 documents.
9     Q.   Okay. And this one is
10 specific to specialty generics?
11     A.   I -- so specialty generics,
12 I didn't recall this but it did take on a
13 new name, not just generics. So I think
14 that was part of a, not a rebranding of
15 the -- of the division of generics, but
16 that's the best way I can categorize it.
17 I didn't recall that it occurred until I
18 see this title.
19     Q.   But this was a review of the
20 generics department, which you were
21 overseeing; is that right?
22     A.   I only oversaw the retail
23 segment. So this looks like it may go
24 beyond that since Bob Lesnak is on there.

Page 137

1     Q.   And Bob Lesnak is listed as
2 VP of sales, addiction treatment?
3     A.   Correct. Correct.
4     Q.   And would that have been of
5 methadone?
6     A.   Yes. He oversaw that team.
7     Q.   Do you recall working with
8 him on this?
9     A.   I don't recall working with
10 him on this.
11     Q.   Do you recall working with
12 him generally?
13     A.   Not too much, truthfully.
14 Yeah, I'm trying to think. It was more
15 towards the end of my tenure at
16 Mallinckrodt that Bob was even present.
17 He was a remote employee. So I didn't
18 see or talk with him much.
19     Q.   Do you recall working with
20 somebody else before Bob on addiction
21 treatment?
22     A.   I don't. I remember the
23 team. Not the members of the team, but I
24 remember the team.

Page 138

1 Q. What do you remember about
2 that team?
3 A. That they called on
4 methadone clinics. It was an area I
5 didn't have any familiarity with, that it
6 even existed until I learned of this
7 team.
8 Q. And the next page has an org
9 chart.
10 Do you see that?
11 A. I do see that.
12 Q. And that was accurate -- to
13 your understanding, that was accurate for
14 the time?
15 A. Yes. That looks like a good
16 representation.
17 Q. And the people underneath
18 your name were reporting to you; is that
19 right?
20 A. That is correct.
21 Q. So Bob Lesnak was VP of
22 sales or VP of sales for addiction
23 treatment?
24 A. Based on this, health

Page 139

1 systems, which included hospitals,
2 federal government, self-explanatory.
3 And AT would be addiction treatment. So
4 he had that team.
5 Q. And the next page says,
6 "Sales performance and forecast."
7 Do you see that?
8 A. I do see that.
9 Q. And then you see two pages
10 down, you have a pie chart with products
11 driving modified gross.
12 Do you see that?
13 A. I do see that.
14 Q. It looks like the key
15 products are hydrocodone APAP, oxycodone
16 IR, oxycodone APAP, and morphine ER; is
17 that right?
18 A. Yes, that's correct.
19 Q. And it states that those
20 four key product families represent
21 82 percent of total modified gross sales;
22 is that right?
23 A. That's what it's
24 representing here, yes. That's what it

Page 140

1 appears to be.
2 Q. And do you see down at the
3 bottom there's a reference to a fentanyl
4 lozenge?
5 A. I do see that now.
6 Q. Was Mallinckrodt selling
7 both a fentanyl patch and a fentanyl
8 lozenge?
9 A. I don't recall the timing in
10 which the lozenge was launched. And I
11 don't recall the fentanyl patch, if that
12 was approved while I was there or not. I
13 just -- I don't remember if that was
14 marketed to the wholesalers and chains
15 and distributors at that time.
16 Q. And the next -- the next
17 chart is a bar graph for hydrocodone APAP
18 and modified gross sales.
19 Do you see that?
20 A. I do see that, yes.
21 Q. And the one following is
22 also hydrocodone APAP extended units,
23 right?
24 A. Yes.

Page 141

1 Q. And the first -- the first
2 one shows an increase from 2006 through
3 2010 of hydrocodone APAP in terms of
4 modified gross sales, correct?
5 A. I'm sorry. What about the
6 ten? I'm sorry. Oh, the year?
7 Q. This chart shows an increase
8 from 2006 to 2010 of modified gross sales
9 for hydrocodone APAP, the chart on
10 Page 7?
11 A. Yes, it does.
12 Q. Okay. And similarly, the
13 next chart shows increase of hydrocodone
14 APAP from extended units from 2006 to
15 2010, correct?
16 A. Yes. So, it looks like
17 during that time, we may have encountered
18 Watson having a scenario of supply. And
19 so it looks like we may have been able to
20 transition some product usage from Watson
21 to us.
22 I'm trying to look at this.
23 Q. If you go two pages further,
24 you see a similar bar graph chart for

Page 142

1 oxycodone IR, modified gross sales?
2    A.   Yes, I do see that.
3    Q.   And it shows in the table
4 above, an 83 percent increase from 2007
5 to 2008?
6    A.   I see that, yes.  I do see
7 it declining in 2010.  I don't know what
8 drove that.
9    Q.   And do you see oxycodone IR
10 on the next page?
11    A.   I do see that.
12    Q.   And that shows a 54 percent
13 increase from 2007 to 2008 in terms of
14 extended units?
15    A.   Yes.  It appears as if a
16 competitor exited the market.
17    Q.   Ethex and Actavis?
18    A.   Correct.  I guess it was a
19 big driver, is what it indicates here, at
20 least as an assumption.
21    Q.   So was this the type of data
22 that Mallinckrodt typically -- I mean was
23 this a typical tracking of the data of
24 its products?

Page 143

1    A.   This appears to be more in
2 depth than would be traditional.  I don't
3 recall a format like this.
4    Q.   If you go a couple pages
5 further, you'll see on Page 19 of the
6 presentation, it states, "Customers
7 driving modified gross."
8    A.   Yes, I see that.
9    Q.   Does this identify
10 Mallinckrodt's key customers?
11    A.   It looks -- identifies --
12 yes, it looks like potentially, yeah, it
13 does.
14    Q.   Is McKesson OneStop
15 different than just McKesson?
16    A.   Yes.  So McKesson OneStop,
17 OneStop is a generic source program, and
18 McKesson has pharmacies that are apart of
19 that program.  And we negotiate with
20 McKesson to gain a primary position on
21 their contract.  And the pharmacies that
22 they sign on with this program, when they
23 purchase product from McKesson, they
24 would put in, if they put in a

Page 144

1 hydrocodone with acetaminophen, it would
2 be our product, then it would be shipped
3 to that pharmacy.
4    McKesson, when you sell to
5 McKesson, you don't know where that
6 product is going.  There is a component
7 that's OneStop.  But McKesson also had
8 hospitals, chain accounts, long-term care
9 facilities.  And so this was their, we'll
10 call it, generic source programs.  But it
11 would go elsewhere outside of the OneStop
12 generic source program.
13    MR. DOWNS:  This is Paul
14    Downs from Covington.  I'm just
15    going to place an objection on the
16    record.
17 BY MS. BAIG:
18    Q.   If you skip to Page 38 of
19 the PowerPoint presentation, you see a
20 market share report for hydrocodone/APAP
21 tabs?
22    A.   I do see that.
23    Q.   Does this show that
24 Mallinckrodt was third in terms of market

Page 145

1 share for hydrocodone APAP at this time
2 or for 2007 to 2009?
3    A.   It does not show that, no.
4    Q.   What does it show?
5    A.   Mallinckrodt was the number
6 one supplier of hydrocodone to pharmacies
7 through its wholesale and chain partners.
8    Q.   I see.
9    A.   It does show here that it
10 has declined throughout FY '07 from
11 52 percent in Q1 down to 40 percent in
12 Q4, at the expense of Watson increasing
13 its share.
14    But again, this is not
15 indicative of the market getting bigger.
16 It's indicative of, we'll call it that --
17 that pie, what percentage of that pie was
18 earned by each respective company.
19    Q.   And your understanding is
20 that pie remained the same size in the
21 last two decades?
22    A.   My understanding is that the
23 pie is influenced by prescribers of, in
24 this case, hydrocodone, not by supplying

Page 146

1 or shipping the product.
2     MR. TSAI:  Do you folks want
3 to take a break, do another hour,
4 or do you want to break for lunch
5 now?
6     Most important for you.
7     THE WITNESS:  Yeah.  On the
8 record my bladder won't make it an
9 hour, but I can keep on going for
10 a bit if --
11     MR. TSAI:  We can take a
12 short break now.  Do you want to
13 do another hour?
14     MS. BAIG:  Do you want to
15 break now or keep going?
16     THE WITNESS:  I can keep
17 going for a little while.  Yeah.
18     MS. BAIG:  Okay.  Just let
19 me know when you'd like a break.
20     THE WITNESS:  Okay.  Sounds
21 good.
22 BY MS. BAIG:
23    Q.  Did Mallinckrodt use a
24 rebate program in order to maximize its

Page 147

1 sales of opioid products?
2    A.  No.  Rebate programs were --
3 they did a number of different things.
4 Certainly a volume incentive program was
5 designed to choose our product over a
6 competitor's product relative to what
7 they decided to purchase.  Rebates are
8 part of an industry norm, whether it's
9 controlled or noncontrolled, whether it's
10 opioids or non-opioids.  It is a
11 structure that's -- is fairly common.
12    Q.  My question was just
13 whether -- whether Mallinckrodt used a
14 rebate program in order to maximize sales
15 of opioid products.
16    A.  Mallinckrodt used a rebate
17 program, but not to -- designed to
18 increase -- with the exception of the
19 volume incentive program, which was
20 designed to choose our product over
21 another competitor's product.
22     So as far as maximizing
23 sales, it did -- the intent was to make
24 sure that our product was the selected

Page 148

1 product on the contract.  So it is a
2 function that is used.
3     I will say again, rebates
4 are a part of the financial interaction
5 between manufacturer and wholesaler,
6 manufacturer and chain headquarters.  But
7 that in itself does not drive demand.
8 That in and of itself hopefully
9 encourages them to use our product over a
10 competitor's product.
11     MS. BAIG:  Let's have this
12 document marked as Exhibit 9.
13     (Document marked for
14     identification as Exhibit
15     Mallinckrodt-Adams-9.)
16 BY MS. BAIG:
17    Q.  This document starts as an
18 e-mail from Jeff Burd to you and others,
19 dated October 5, 2005.  It's
20 Bates-stamped Mallinckrodt 0007917528
21 through 7576.
22     And as the subject it says,
23 "Gained accounts and rebate reports."
24 For attachments it says, "Gained

Page 149

1 accounts, rebate matrix, and rebate
2 schedule."  And the first line of the
3 e-mail states, "Please find attached the
4 updated gained accounts and rebate
5 reports with pricing and sales effective
6 as of September 30, 2005."
7     Do you see that?
8    A.  I do see that.
9    Q.  And did you have the
10 opportunity to review these types of
11 reports in the regular course of your
12 business at Mallinckrodt?
13    A.  Yes, I would -- I would
14 regularly see what the rebate structure
15 was for customers.
16    Q.  And on the first page of
17 the -- first attachment where it says,
18 "Rebate matrix by contract," do you see
19 that?
20    A.  I do.
21    Q.  And this shows the customers
22 on the left-hand side and then under
23 rebate percentage, does it show the
24 rebates that are being offered for their

Page 150

1 entire portfolio of products?
2     A.   It shows the rebate
3 percentage.  Some products may be
4 included or excluded.  But that would be
5 correct, as far as kind of what the
6 rebate percentage is in general.
7     Q.   And what's the difference
8 between direct and indirect?
9     A.   So direct, so in the case
10 of -- I'll use an example here,
11 Burlington Drug.  They would not be --
12 from an indirect perspective, they would
13 be buying off a contract that they didn't
14 necessarily negotiate directly.  They
15 would -- that contract was negotiated by
16 a group purchasing organization called
17 Opti-Source.
18           Associated Pharmacies was
19 considered direct.  They had their own
20 warehouse.  So Mallinckrodt would
21 negotiate with Associated Pharmacies,
22 would sell into their warehouse and their
23 warehouse would sell into their -- the
24 pharmacies within their own network.

Page 151

1     Q.   So ABC Progenerics primary,
2 one of the first ones listed here, do you
3 see that?
4     A.   I do.
5     Q.   What does ABC stand for?
6     A.   AmerisourceBergen.
7     Q.   Okay.  And it shows
8 different types of rebate percentages
9 for -- what -- what does this show?
10 There -- there's more data under the ABC
11 Progenerics primary than there is for
12 many of the others.
13           And you see for example,
14 it's discussing morphine only.  And then
15 it says for $10 million and above there's
16 a $1 million rebate; is that right?
17     A.   That's correct.
18     Q.   So that means they need to
19 sell $10 million in order to receive the
20 $1 million rebate; is that right?
21     A.   They need to purchase.
22     Q.   They need to purchase, okay.
23           And then -- and then that's
24 different thresholds of -- of purchases

Page 152

1 for other Progenerics sales; is that
2 right?
3     A.   So this is a volume
4 incentive program.  The other Progen
5 sales is considered a volume incentive
6 program.  So that's what you'll see here.
7 And morphine is excluded, apparently,
8 from this -- from the volume incentive
9 program.
10     Q.   So instead of getting a
11 rebate percentage, they are just getting
12 a $1 million rebate for morphine; is that
13 right?
14     A.   On purchases of 10 million
15 and above.
16     Q.   Okay.  And this document
17 shows rebates ranging up to 25 percent or
18 so?
19     A.   I don't have the full
20 purview of the document in front of me.
21 I do see one at 25 percent, yes.  So when
22 developing a contract with a specific
23 customer, you would look at what is the
24 net price that you are going to sell to

Page 153

1 that customer at.  And then you would
2 gross up the contract price by this
3 percentage.
4           So, in the case of
5 AmerisourceBergen Progenerics primary, if
6 you were selling to them at a net price,
7 which is what you would -- internally how
8 we would do it, we would say okay, great,
9 this is a $10 net price.  And then we
10 would gross up their contract price to
11 5 -- 5 percent above that.
12           So this is all what is the
13 net price that is being sold to our
14 customers at, is what drives it, not the
15 rebate.  Each customer has their own
16 rebate type of program and process.
17     Q.   And if you turn a couple
18 pages further, you'll see a new document
19 starts that's titled Rebate Product
20 Schedule?
21     A.   Do you have a page number
22 here?  Okay.  I see, yes.
23     Q.   And it's a little bit
24 different, because here you have not just

Page 154

1  a rebate percentage, but also a rebate
2  per bottle figure. Do you see that?
3      A.   Yeah. It's -- it's -- I
4  can't speak to the rest of the pages, but
5  it is not on a per bottle. It is -- here
6  are the -- using methylplenidate. It is
7  a rebate percentage based on that
8  particular molecule. So it's not on a
9  different size bottle do you get a
10  different rebate. It's on that
11  particular molecule.
12         I don't know if there are
13  circumstances where it's a different
14  rebate per bottle size within a product
15  family. I can't speak to that by what
16  I've seen here yet.
17      Q.   So if you move about halfway
18  down, you'll see APAP codeine and 300/15
19  tabs bottle of 1,000.
20      A.   Yes.
21      Q.   And there's zero percent
22  rebate offered on that? But then it says
23  $14 rebate per bottle. What does that
24  $14 figure mean?

Page 155

1      A.   So a couple different things
2  here is, I -- you really can't look at
3  APAP codeine and say there's zero percent
4  rebate. What you can do is, let's say
5  here's Albertsons. And Albertsons has a
6  zero percent rebate for whatever products
7  they stock. So these are the products
8  that they stock. And that's -- they just
9  don't have any rebates affiliated with
10  that from a percentage basis.
11         Now, this rebate per bottle.
12  Instead of doing a percent, you can do it
13  at a bottle level. So it's one or the
14  other. Very rarely would it be both. I
15  don't know if there's circumstances where
16  we -- you would do a per bottle and a
17  percent rebate. I don't know off the
18  top. I don't recall.
19      Q.   I see. So they are getting
20  a $14 rebate per bottle for that
21  particular drug at Albertsons, correct?
22      A.   For a bottle of a thousand.
23  So they are getting that rebate, yes.
24  But again, that rebate was first

Page 156

1  calculated on, what is the net price that
2  we would sell to them. And then the $14
3  rebate you would gross that up from what
4  the net price was up to the $14. So the
5  real, true price in how you compare
6  across your customers is the net price,
7  which is not listed here.
8      Q.   If you move a little further
9  down, you'll see that's two references to
10  morphine sulfate ER?
11      A.   Yes.
12      Q.   One is for 200 milligrams --
13      A.   Yes.
14      Q.   -- in tabs, bottle of 100.
15  And one is for 100 milligrams in tabs
16  bottle of 100. And the 200-milligram
17  tabs have a rebate per bottle of $165.
18  And the 100-milligram tabs have a rebate
19  per bottle of $90, correct?
20      A.   Yes. And so what you can't
21  tell here is, is that equivalent to a 10
22  percent rebate on what the price is? Is
23  that 165 and is that 90 a 10 percent
24  rebate? I don't know what the price is

Page 157

1  as the basis for this. So the percentage
2  may be very low, 5, 10 percent, whatever.
3      Q.   Mm-hmm, of the total price.
4  But you can see that the higher strength
5  morphine sulfate is receiving, at least
6  in this case, a higher rebate per bottle?
7      A.   That's correct. It's more
8  of the raw material in there.
9         So in certain circumstances
10  that would be the situation.
11      Q.   Do you recall hydrocodone
12  and oxy being big sellers back in the
13  mid-2000s time frame?
14      MR. TSAI:  Object to form.
15      Go ahead.
16      THE WITNESS:  Oxycodone and
17      hydrocodone were certainly large
18      dollar producers for Mallinckrodt,
19      yes.
20  BY MS. BAIG:
21      Q.   And did you have key clients
22  ordering ahead of schedule for those
23  drugs? Do you recall?
24      A.   What would you say -- I'm

Page 158

1 not sure what ahead of schedule is.
2          The only -- not the only,
3 but a scenario in which I could imagine
4 is we were awarded the product in January
5 but the contract didn't start until May.
6 So instead of having them order the
7 product on May 1st, in anticipation of
8 the conversion to our product versus
9 Watson, they would buy it two weeks in
10 advance so they could take the
11 distribution network and make sure the
12 product was stocked in the distribution
13 center for when their pharmacies would
14 order it.
15     Q.   I think we've touched
16 already on volume incentive programs.
17 We've touched upon rebates. I'm
18 wondering if there are strategies, other
19 strategies that Mallinckrodt used in
20 order to maximize its sales or increase
21 its market share with respect to opioid
22 products, apart from the volume incentive
23 program, and the rebates.
24     A.   I'm trying to think if there

Page 159

1 are any other scenarios that you would do
2 besides rebates, volume incentive
3 program, per -- per bottle rebates. So
4 there can be a per bottle rebate as
5 opposed to a percentage rebate.
6          There was a reference to a
7 vault program, which was -- which was
8 included in one of the documents we
9 reviewed. So there may be others. I
10 just don't recall others.
11     Q.   What was the vault program?
12     A.   The vault program was a
13 program where a particular customer,
14 as -- well, maybe I'll backup one step.
15 Controlled substances, Schedule II, would
16 be stored in a vault. In that vault we
17 would basically say to a customer, and it
18 was not something that we did for
19 everybody, but we would say, "Hey, we
20 understand that you're going to be
21 expanding your vault. We would like for
22 you to choose our product over Actavis,
23 over Ethex," whoever the alternate
24 manufacturer was. "And if you meet

Page 160

1 certain dollar goals, we will help fund
2 part of that vault program, or that
3 vault."
4          So they would have to hit
5 targets in order for us to make that
6 payment for their vault.
7     Q.   I see.
8     MS. BAIG: Let's have this
9 document marked as Exhibit 10.
10          (Document marked for
11 identification as Exhibit
12 Mallinckrodt-Adams-10.)
13     THE WITNESS: Is this a good
14 time to take a break --
15     MS. BAIG: Sure.
16     THE WITNESS: -- since we're
17 moving documents.
18     MS. BAIG: Okay.
19     THE WITNESS: Great.
20     THE VIDEOGRAPHER: Going off
21 the record. The time is 12:24.
22          - - -
23          (Lunch break.)
24          - - -

Page 161

1 A F T E R N O O N   S E S S I O N
2          THE VIDEOGRAPHER: We are
3 going back on record. Beginning
4 of Media File 3. The time is
5 1:04.
6          - - -
7     EXAMINATION  (Cont'd.)
8          - - -
9 BY MS. BAIG:
10     Q.   Okay. Let's have this
11 document marked as Exhibit 10, please.
12          This is a document that
13 starts as an e-mail from you to Kevin
14 Vorderstrasse dated February 8, 2007.
15 Bates-stamped with Mallinckrodt 000685111
16 through 121?
17          And it states, "Attached is
18 the monthly report."
19          If you look into the
20 attachment, it appears to be a monthly
21 report for -- for January of 2007. Do
22 you see that?
23     A.   I do.
24     Q.   And do you recall receiving

Page 162

1  reports like -- like this on a regular
2  basis at Mallinckrodt?
3      A.  No, I don't recall that.
4  Can I take a look at it though, just to
5  go through it a little bit more here?
6      (Whereupon, a discussion was
7  held off the record.)
8      THE WITNESS:  Okay.
9  BY MS. BAIG:
10      Q.  So do you recall receiving
11  monthly reports like this?
12      A.  No, I don't remember this
13  type of detail.
14      Q.  Who is Kevin Vorderstrasse?
15      A.  Kevin, I don't know what his
16  title was, but Kevin would -- he would
17  look at a lot of the IMS data.  And he
18  would do analytics, that type of
19  reporting.  Some business development
20  too.
21      Q.  I see.  And you see the
22  first -- second -- or first couple lines
23  of the e-mail at the end it says, "I know
24  you mentioned it was just for a month or

Page 163

1  two."
2      It appears to be referring
3  to the monthly reports.  Do you recall
4  that there was a short period of time
5  where monthly reports were generated?
6      A.  I don't.
7      Q.  You don't recall one way or
8  another?
9      A.  I don't.
10      Q.  But you don't have any
11  reason to doubt that you received this,
12  given that you e-mailed it, right?
13      A.  No, I don't have any doubt.
14      Q.  Okay.  If you look to the
15  product forecast variances, it's showing
16  that generics had an extremely strong
17  January, driven by hydrocodone and
18  oxycodone in the second -- third line.
19      Do you see that?
20      A.  I do.
21      Q.  It goes on to state, "Both
22  appeared to be strong, as though
23  wholesalers loaded in additional product
24  at the end of last year.  They did not

Page 164

1  lower ordering much in January."
2      Do you see that?
3      A.  I do.
4      Q.  And then a little bit
5  further down, it states, "Oxycodone was
6  extremely strong this month, primarily
7  driven by the oxy APAP
8  10/325 milligrams."
9      Do you see that?
10      A.  I do.
11      Q.  What is 10/325?
12      A.  Ten is the milligrams of
13  oxycodone.  325 is the milligrams for the
14  acetaminophen.
15      Q.  Okay.  And it goes onto
16  state, "The forecast was artificially low
17  on this SKU but the majority of the
18  additional demand was higher than normal
19  ordering from Walgreens and Cardinal
20  needing product ahead of our previously
21  agreed upon schedule."
22      Do you see that?
23      A.  I do.
24      Q.  And then a little bit

Page 165

1  further down, maybe two lines further, it
2  states, "We will need to stimulate sales
3  demand through a promotion."
4      Do you see that?
5      A.  I do see that.
6      Q.  And are you familiar with
7  what types of promotions Mallinckrodt
8  would use in order to stimulate sales
9  demand?
10      A.  So with this, I don't
11  remember this specifically, but to your
12  question, this would be demand that would
13  not be new demand.  It would be demand
14  that exists already as a result of
15  physicians prescribing the product.  So
16  what would stimulate purchases from
17  wholesalers, chains, et cetera, would be
18  along the lines of trying to make sure
19  that we garnered our part of what that
20  potential unit usage was.
21      As far as some of these, we
22  referred to it earlier, through like
23  AmerisourceBergen, there was the inside
24  sales group who would call pharmacies to

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  increase awareness of the product. That
2  would certainly be a good example of what
3  would be done to do work with the
4  customer base, customers again being
5  defined as pharmacies.
6       Q.   But you see the line here
7  that says, "We will need to stimulate
8  sales demand through a promotion, et
9  cetera."
10           Do you see that?
11      A.   I do.
12      Q.   Does it say anywhere there
13 that it's not intended to stimulate new
14 demand?
15      A.   Sales is -- we'll -- we'll
16 say it's synonymous with demand, we can't
17 generate new prescriptions.  That is
18 not -- by definition of a generic
19 company, we can't generate new demand.
20 We can work with our customers to supply
21 them product.  Again, even the
22 wholesalers, et cetera, and chains can't
23 be the ones to prescribe a product.  So
24 they can't do it either.  It's just more

Page 167

1  of what part of it can we get to -- what
2  part of that market can we earn, if you
3  will.
4       Q.   Sure.  Stimulate sales
5  demand.  I'm not asking if you had an
6  opportunity to prescribe product,
7  obviously.  I'm just asking what tools
8  you used to stimulate demand.  Did you
9  use promotions?
10      A.   Sorry, I may have --
11      Q.   What types of promotion?
12      A.   I may have misunderstood
13 your question, your last one.
14      Q.   Well, let me rephrase.  It
15 states, "We will need to stimulate sales
16 demand through a promotion, et cetera,"
17 correct?
18      A.   That's correct, sales
19 demand.
20      Q.   Sales demand, yes, through a
21 promotion.  Are you familiar with
22 promotions that Mallinckrodt used to
23 stimulate demand, sales demand?
24      A.   The one that I recalled, I

Page 168

1  just mentioned, regarding calling
2  AmerisourceBergen, the pharmacies that
3  purchase through them, to hopefully have
4  them choose our product over a Watson
5  product which was on a dual primary
6  contract.
7       Q.   Do you recall fax blasts out
8  to hospitals about certain opioid
9  products?
10      A.   I didn't recall that.  I'll
11 reiterate that I was on the retail side
12 and not on the hospital health system
13 side.
14      Q.   So if you look at the bottom
15 of the second page of this document, do
16 you see where it says, "Unit dose oxy
17 APAP and morphine, buy two get one free
18 promotion starts on February 1st and ends
19 on March 31st.  Faxes will be sent to
20 approximately 47,000" -- sorry -- "4,700
21 hospitals."
22           Do you see that?
23      A.   I do see that.
24      Q.   Do you recall promotions

Page 169

1  like buy two, get one free promotions?
2       A.   I don't recall that.  I can
3  certainly see where this would certainly
4  drive the demand as defined purchases
5  from the hospital through the wholesaler.
6  It doesn't mean that the hospital would
7  have more demand from patients' needs or
8  from prescriptions.
9       Q.   Why don't we just clarify
10 when we're talking about demand and
11 sales, we're talking about Mallinckrodt
12 sales, right?
13      A.   We are talking about
14 Mallinckrodt sales into wholesalers and
15 distributors.
16      Q.   Correct.
17      A.   Correct.
18      Q.   So when you send a buy two,
19 get one free promotion to 4,700
20 hospitals, do you have any recollection
21 of what that promotion looked like?
22      A.   Maybe -- let me just state
23 it once again.  This is -- this is the
24 health system side.  So I can't speak

Page 170

1 specifically to this. But I can
2 speculate that what this is is if they
3 will buy those two bottles from their
4 wholesaler, then a -- then that third one
5 would be free. And that would be -- that
6 would be coordinated, if you will, to
7 have them put the product on the shelf.
8     Q.   And who designed these buy
9 two, get one free promotions? Who would
10 have designed that? The marketing
11 department?
12     A.   I don't know truthfully.
13 I'm not sure.
14     Q.   Mallinckrodt had a generics
15 marketing department, right?
16     A.   Yes, that's correct.
17     Q.   Would your best guess be
18 that it probably would have been the
19 generics marketing department that
20 designed the promotion such as this?
21     A.   Again, this is -- this is a
22 different non-retail segment. So I don't
23 know how that was derived or how that was
24 developed.

Page 171

1     Q.   If you wanted to know, who
2 would you ask at Mallinckrodt?
3     A.   I can certainly ask the
4 person who -- what's the time? I don't
5 even know who it would be at this time.
6 January of '07. I don't know if that was
7 Bob Lesnak who would see the health
8 systems, or if that was -- I'm trying to
9 think of the person's name. Lewis
10 Archibeck. I don't know which one of
11 those would be leading at that time.
12     Q.   And if you look back again
13 to the first page of this monthly report.
14 Do you see under products, it identifies
15 a number of opioid products, the HB/APAP,
16 the morphine ER, and the oxycodone
17 family?
18     A.   I do.
19     Q.   And it states that for
20 HB/APAP, actual sales were 41 percent
21 over forecast in terms of units and
22 31 percent over forecast in terms of
23 dollars.
24         Do you see that?

Page 172

1     A.   I do.
2     Q.   And it states, "The unit
3 variance was due to stronger orders from
4 McKesson, Walmart, and CVS."
5         Do you see that?
6     A.   Yes, I do.
7     Q.   And then a little bit
8 further down, next to oxycodone family,
9 it states, "The adjusted gross sales for
10 the family were over 100 percent above
11 the forecasted dollars."
12         Do you see that?
13     A.   I do.
14     Q.   And volume was also up by
15 38 percent from forecasted units?
16     A.   Correct.
17     Q.   Would you agree that that's
18 trending pretty strongly at this point?
19     A.   What I would look at is, was
20 the forecast wrong? It certainly could
21 be. And so -- so there could be a
22 forecasting issue. I don't know if from
23 the perspective of, in this case, does
24 that mean that they were putting that in,

Page 173

1 whether they were purchasing that and
2 that increased their inventory? I don't
3 know what the key driver was that really
4 drove those stronger orders.
5     Q.   If you turn two pages
6 further, you'll see a heading "Fentanyl
7 Transdermal System." And that was one of
8 Mallinckrodt's fentanyl products; is that
9 right?
10     A.   I'm sorry. I'm not quite
11 there yet.
12     Q.   It's the page ending Bates
13 Number 116. Was the fentanyl transdermal
14 system one of Mallinckrodt's fentanyl
15 products?
16     A.   Yes. I don't know when it
17 launched. Just so let me look at this.
18         So this appears as if the
19 product has not been launched. I'll
20 define "launch" as us trying to gain the
21 primary position of the wholesalers and
22 the chains. A launch was not defined as
23 physicians and us promoting to physicians
24 to write prescriptions. So the market

Page 174

1  that was there, it was our goal when
2  launching a generic, is to get our part
3  of that share that was already out there.
4  So I'll define that as launch.
5       It does not appear that
6  we've launched yet, and that we are
7  preparing for that by building inventory.
8       Q.   And the concern there was to
9  maintain inventory levels to support the
10  potential for you to garner additional
11  market share right out of the gate at
12  launch; is that right?
13      A.   So, yes, what that would
14  mean is that we need inventory in our
15  distribution center, so that when we
16  sign -- when we obtain a contract from a
17  wholesaler or chain or distributor, that
18  we would then be able to support those
19  purchases from them.
20      Q.   What was Project Orange?
21      A.   Can you -- where -- where is
22  that?
23      Q.   Next page.  Halfway down.
24      A.   I don't recall Project

Page 175

1  Orange.  I remember the name.  I don't
2  recall what it was.
3       Q.   If you turn to the next
4  page.  Do you see there's a reference to
5  a cocaine topical?
6       A.   I do see that, yes.
7       Q.   What was a cocaine topical?
8       A.   I don't know from -- this
9  isn't the product that I believe was in
10  the generic retail side.
11       I believe the cocaine was
12  used -- no, I'm not sure, I'm not sure
13  who would use that.  But yeah, I don't
14  know.  I don't know about that product.
15      Q.   It says, "Moved launch until
16  July of 2007."  Do you know whether it
17  was ever launched?
18      A.   I don't know if it was ever
19  launched.  Again, it may have happened
20  after my time.  I just don't remember.
21      Q.   In addition to the volume
22  incentive programs, the rebate practice
23  programs, the two-for-one offers, some of
24  the sales brochures that we've talked

Page 176

1  about, can you think of any other
2  marketing tools that were used in order
3  to maximize sales of opioids?
4       A.   I don't recall.  I will say
5  to maximize purchases of opioids is --
6  is -- purchases from our customers to us,
7  not -- not to enhance demand.
8       I don't recall any other
9  promotions off the top though.
10      Q.   If you turn to the last page
11  of this document.  Do you see under the
12  heading Top 3 Issues, under Point 2-C,
13  there is a reference to marketing tools?
14      A.   I'm sorry, I'm not there
15  yet.
16      Q.   Last page.  Under Top 3
17  Issues, under 2-C, there's a reference to
18  marketing tools.  Do you see that?
19      A.   I do see that.
20      Q.   Okay.  And it references
21  "promotions sales aids, wholesaler
22  stickers are being made and supplied to
23  the sales team."
24       Do you know what promotions

Page 177

1  sales aids are being referenced here?
2       A.   I don't.  And I didn't write
3  this.  I'm -- I'm looking at this as,
4  since it's unit dose, probably under
5  health systems, hospital purchases, but
6  that I can't -- I can't say for certain.
7       Q.   And are you familiar with
8  the concept of wholesaler stickers?
9       A.   I'm not -- I'm not confident
10  in what it was or what it is.  If I was
11  to -- if I was to guess, remember we saw
12  the order numbers, it may be something
13  that would go on the -- on the carton
14  that would have the order number from a
15  particular wholesaler or a particular,
16  maybe chain, but where, that way the
17  pharmacist, when they ordered, they would
18  see that order number.  That's -- that's
19  kind of what I'm recalling.
20      Q.   And how would that be a
21  marketing tool?
22      A.   If you have the order
23  sticker on there, as a pharmacist you
24  could then look at that order number

Page 178

1  without having to look it up in the
2  system and you can say, oh okay,
3  AmerisourceBergen, their order number for
4  this product is 654321.  And you could
5  use that to then purchase the product
6  from the wholesaler or distributor, as it
7  were.
8      Q.    And at least according to
9  this document, wholesaler stickers were
10  being made and supplied to the sales
11  team.  Do you see that?
12      A.   I do see that.
13      Q.    And do you have any
14  recollection of what those wholesaler
15  stickers that were made and supplied to
16  the sales team as a marketing tool looked
17  like?
18      A.   No, I think I mentioned
19  earlier, I don't recall the program or --
20  or what it was.  I certainly was
21  speculating on what it was to you just
22  now.
23      Q.   Okay.
24      MS. BAIG:  Rocky, do you

Page 179

1      know if the promotion sales aids
2      and the wholesaler stickers that
3      are referenced here have been
4      produced?
5      MR. TSAI:  I will check and
6      get back to you.
7      MS. BAIG:  That would be
8      great.  Thank you.
9      Let's have this document
10      marked as Exhibit 11.
11      (Document marked for
12      identification as Exhibit
13      Mallinckrodt-Adams-11.)
14  BY MS. BAIG:
15      Q.   This is a document that
16  starts as an e-mail from -- from you
17  dated September 6, 2007.  It's
18  Bates-stamped Mallinckrodt 0004923043
19  through 3048.
20      Again, in the first sentence
21  it -- it seems to attach a monthly
22  report.  And the subject line is monthly
23  report.  Do you see that?
24      A.   I do.

Page 180

1      Q.   And here it appears to be a
2  report from you to Mike Gunning, if you
3  look at the first page of the report.  Do
4  you see that?
5      A.   I do.
6      Q.   Do you recall creating this
7  document?
8      A.   I do not.
9      Q.   Do you recall working on
10  these types of monthly reports when you
11  were at Mallinckrodt?
12      A.   I do not.
13      Q.   Do you have any doubt --
14  reason to doubt that this was created by
15  you since it's -- it states to -- that
16  it's to Mike Gunning from you?
17      A.   Yeah, it looks -- that would
18  be reasonable to assume.  What I might
19  suggest, and this is -- that -- I didn't
20  pull the data, but it would be provided
21  to me from various members of different
22  teams.  I would aggregate the data and
23  put it forth.
24      Q.   Okay.  And if you -- if you

Page 181

1  scan the first page, you see there's a
2  forecast summary for various products.
3      A.   Yes.
4      Q.   And customers, correct?
5      A.   Hold on one second.  Yes.
6      Q.   And then there's retail
7  highlights.  And it -- there's a
8  paragraph on a number of various
9  customers, right, beginning with Rite
10  Aid?
11      A.   That's correct.
12      Q.   And there's a reference
13  there to your attending Rite Aid's recent
14  trade showed where you met and mingled
15  with store pharmacists as well as top
16  pharmacy management?
17      A.   Yes.
18      Q.   And would you participate in
19  these types of -- of trade shows in order
20  to form strong relationships with the
21  store pharmacists and the top pharmacy
22  management so -- as ultimately to
23  maximize sales?
24      A.   Similar to the CVS meeting

Page 182

1 that we spoke about before. No. Sorry,
2 with reference to that, this is a
3 scenario where you would attend and the
4 attendance was primarily driven via
5 headquarters of the retail national
6 accounts. So in this case Rite Aid.
7     You -- as a manufacturer who
8 supplied product to them, you would be --
9 you wouldn't really have a choice but to
10 be there. But really, the top pharmacy
11 management is what drove you to be there.
12 Being with the pharmacists wasn't
13 something that was of value, it was more
14 at the senior level.
15     Q.   So where you note here that
16 you met and mingled with store
17 pharmacists, that wasn't valuable?
18     A.   No, that -- the pharmacists
19 don't have a say in the product that is
20 selected. That occurs at the headquarter
21 level. We don't call on pharmacists. We
22 call on the headquarter level who then
23 makes the decision on which product to
24 stock, ours or Watson for example. So

Page 183

1 the pharmacists themselves aren't the
2 ones who are deciding which one's on
3 contract.
4     And I'll make a distinction
5 here is a pharmacy chain with a warehouse
6 has more control over compliance to a
7 contract. So a Rite Aid pharmacist has
8 very little control over what products
9 they can purchase off -- off of that
10 contract that the headquarters has
11 supplied.
12     Q.   But according to this
13 document, you did meet and mingle with
14 store pharmacists, correct?
15     A.   We -- we did. Again from
16 this, I gather that we did. I will say a
17 traditional format would be that you
18 would have a booth that was supplied by
19 Rite Aid in this case, so a draped table.
20 And the pharmacists would rotate around
21 from booth to booth to -- to talk with
22 the -- each manufacturer.
23     Q.   And there is also a
24 reference to "the implementation of the

Page 184

1 formulary covering Brooks Eckerd's stores
2 is progressing smoothly."
3     Do you see that?
4     A.   I do see that.
5     Q.   Do you know what that's
6 referring to?
7     A.   I believe that Rite Aid
8 purchased Brooks Eckerd's stores. And so
9 they were transitioning from being a
10 specific Brooks Eckerd's pharmacy chain
11 to being operated under Rite Aid. So
12 they would start to operate as if they
13 were under the same contract that Rite
14 Aid negotiates with manufacturers.
15     Q.   Do you recall working to
16 develop something called a Narcotics
17 Story?
18     A.   A Narcotics Story? I don't
19 remember any specifics on a Narcotics
20 Story. I do recall kind of our component
21 where we would talk about our API and
22 kind of the benefits of us manufacturing
23 our own API and the value of that.
24     Q.   What is API again?

Page 185

1     A.   Active pharmaceutical
2 ingredient. So where we would make the
3 raw material -- by we, the API team.
4     Q.   Do you recall that being
5 called a Narcotics Story?
6     A.   I don't recall it being a
7 Narcotics Story. That was kind of, if
8 you will -- we would talk the fact that
9 we made our own raw material, and that
10 certainly was a benefit in the narcotics
11 industry. Any industry, truthfully,
12 where you can make your own raw material.
13     Q.   So if you skip to the page
14 that ends in 047, you'll see there are a
15 few references to McKesson.
16     A.   Yes.
17     Q.   And the second one states,
18 "Concerns by McKesson have been expressed
19 regarding the upcoming pedigree law
20 changes for California set for
21 January 1st, 2009, will new law will
22 require manufacturers to attach a unique
23 identifier to each dangerous drug at the
24 smallest packaging level or container

Page 186

1  distributed to the wholesaler. Sales and
2  marketing will meet" -- "sales and
3  marketing -- it says, "with meet with
4  logistics." I assume it intends to say,
5  "Sales and marketing will meet with
6  logistics."
7        Do you see that?
8     A.  I see that.
9     Q.  Are you familiar with this
10 law that was set for January 1st, 2009,
11 in California?
12    A.  I don't remember the
13 specific timeline. But I do remember
14 that the state of California, we'll call
15 it, was ahead of the curve relative to
16 developing pedigree to trace product
17 through the supply chain, so from
18 manufacturer to the wholesaler who the
19 pharmacy.
20        And so from this, certainly
21 logistic -- logistical challenges appear
22 to be present.
23    Q.  And you understood at the
24 time that the reason for those pedigree

Page 187

1  law changes in California were that these
2  drugs were dangerous, and there was a
3  potential -- potential risk of abuse and
4  diversion?
5     A.  I don't recall that it was
6  specific to that. It does talk about
7  dangerous drugs. I don't know if it
8  refers to non-opioids as well. It
9  certainly has expanded into non-opioids
10 as of today.
11    Q.  And why would the sales and
12 marketing team meet with logistics with
13 respect to this particular pedigree law
14 change in California?
15    A.  So really in this case it
16 would be important that sales and
17 marketing understand how logistics would
18 roll out such a program, because the
19 sales and marketing team would be talking
20 and speaking with headquarters for
21 wholesalers and distributors that -- that
22 sell into the state of California, which
23 is virtually every wholesaler and
24 distributor would sell into the state of

Page 188

1  California.
2     Q.  And do you see on the next
3  paragraph it states, "John Adams and Tim
4  Berry met with 35 McKesson marketing
5  members in San Francisco to present the
6  Narcotics Story."
7        Do you see that?
8     A.  I see that line, yes.
9     Q.  Do you recall meeting with
10 35 McKesson marketing members in San
11 Francisco to present the Narcotics Story?
12    A.  I do remember that, yes.
13    Q.  Okay. So does that refresh
14 your recollection as to what the
15 Narcotics Story was?
16    A.  Yes. It is in line with
17 what I was talking about relative to the
18 Narcotics Story, is we basically, from
19 the perspective of Mallinckrodt, would
20 purchase the raw opium from India.
21        It would then be brought
22 into the U.S., and Mallinckrodt would
23 then transition that product from raw
24 opium into powder, which would then be

Page 189

1  used for -- that would go into finished
2  dosage forms for Mallinckrodt, as well as
3  other manufacturers of opioids.
4        And so that reinforced the
5  message of really a vertically
6  integrated -- meaning, we did the
7  manufacturing from start to finish.
8        So that was truly the
9  Narcotics Story. I don't remember it
10 being called that. But from the
11 perspective of doing that, the real value
12 to the McKesson marketing members who
13 were present is to talk about surety of
14 supply.
15        So when they order product
16 from us, the objective was that hopefully
17 there's a benefit that we can supply
18 product in those scenarios to fill the
19 demand that McKesson's pharmacies have,
20 that, again, they don't control.
21    Q.  Were there graphics or
22 PowerPoint presentations in connection
23 with that Narcotics Story that was
24 presented to 35 McKesson marketing

Page 190

1 members?
2     A.   There would likely be, yes,
3 a PowerPoint presentation with that.
4         MS. BAIG:  Counsel, can you
5     make that that was produced,
6     please?
7         MR. TSAI:  I'll follow-up
8     and let you know.
9 BY MS. BAIG:
10    Q.   And who was Tim Berry?
11    A.   Tim Berry was a national
12 account manager who reported to me.
13    Q.   It says here that that same
14 presentation was then delivered to 60
15 employees in the Carrolton, Texas, office
16 in September.
17        Do you see that?
18    A.   I do.  Yes.
19    Q.   And were those also 60
20 McKesson marketing employees in
21 Carrolton, Texas?
22    A.   That's correct.  Those
23 individuals -- so when you talk
24 marketing, again it's just to drive

Page 191

1 compliance to a contract.  So those
2 employees would contact -- would contact
3 pharmacies within their network.  So we
4 wanted to educate them on Mallinckrodt.
5     Q.   And on Mallinckrodt
6 narcotics, correct?
7     A.   Yes on the vertical
8 integration and the value of being
9 vertically integrated relative to supply.
10    Q.   On the last page under
11 NACDS, there is a reference to an event
12 at Boston's Fenway Park utilizing the
13 Covidien tickets resulting in numerous
14 business interactions including Harvard
15 Drug, PBA, TrueCare, ABC, Walmart, CVS
16 Caremark.
17        Do you see that?
18    A.   Yes.
19    Q.   And do you recall being at
20 the Boston Fenway Park event?
21    A.   I do.
22    Q.   And who else was there?
23    A.   It would be the sales team
24 and potentially a person or two from

Page 192

1 marketing.  So that's who would be in
2 attendance from the Mallinckrodt team.
3     Q.   Do you recall who --
4     A.   And again, the retail team,
5 just to define that.
6     Q.   Do you recall who was there
7 from the marketing team?
8     A.   I don't know, no.
9     Q.   And that was a follow-up to
10 the NACDS meeting; is that right?
11    A.   So it's in conjunction with
12 NACDS.  So NACDS, if you recall, is the
13 National Association of Chain Drug
14 Stores.  Part of their meeting that they
15 would have every August, I believe --
16 yes, every August, there would be, like I
17 said, a three or four-day meeting.
18        And one of the evenings, not
19 every year, but some years we would host
20 an event.  And in this case, Covidien had
21 a booth -- or excuse me, had a suite at
22 Fenway Park.  And so we invited customers
23 to attend that.  And we would have food
24 and entertainment there relative to

Page 193

1 customers.
2         And again, I will define
3 customers as the buyers, the purchasers
4 of products for wholesalers and chains at
5 the headquarter level, not at the
6 individual pharmacy level and certainly
7 nothing below that.
8     Q.   Do you know what the root
9 learning program was?
10    A.   I don't recollect the root
11 learning program.
12    Q.   You don't recall receiving
13 training in a root learning program as is
14 referenced here?
15    A.   I do not recall, no.
16    Q.   It goes onto state, the
17 objective is to have all 43,000 employees
18 of Covidien be trained by the end of the
19 year.
20        Do you recall?
21    A.   I do not recall.
22        (Document marked for
23     identification as Exhibit
24     Mallinckrodt-Adams-12.)

Page 194

1  BY MS. BAIG:
2      Q.   We'll have this document
3  marked as Exhibit 12, please.  It starts
4  as an e-mail from you to Michael Gunning
5  and Ginger Collier dated August 6, 2009.
6  Bates-stamped twice, but the bottom Bates
7  stamp is MNK-T1_0000418847 through 8850.
8          And again the subject is
9  "Monthly Report."
10     A.   Okay.
11     Q.   It states from you,
12 "Attached is the monthly report for the
13 retail team.  Please do not hesitate to
14 reach out if you have any questions."
15         Do you recall generating --
16 is this refreshing your recollection that
17 were you generating monthly reports at
18 least at about this time?
19     A.   I see that it's here.  I
20 don't recall generating monthly reports
21 in general.
22     Q.   But you don't have any
23 reason to doubt that you did, given that
24 it's attached to your e-mail, right?

Page 195

1      A.   I agree.  I do not have any
2  doubts.
3      Q.   Do you recall that there was
4  a telemarketing program?
5      A.   Can you refer -- is there
6  any reference point?
7      Q.   I was just wondering
8  generally if you recall there ever being
9  any sort of telemarketing program for
10 your generics products?
11     A.   I think we had some other
12 reference before.  I didn't recall there
13 was that group.  But that was the group
14 that, I think we referenced, would call
15 individual pharmacies at
16 AmerisourceBergen, I believe that was
17 part of that program, where they would
18 work to -- to have the pharmacies by our
19 product off contract.
20     Q.   And was that overseen by the
21 generics marketing department at
22 Mallinckrodt?
23     A.   That's a great question.
24 Telemarketing, I don't know if there's a

Page 196

1  focus on the retail or if it's a focus on
2  the health systems.  I don't recall.
3      Q.   But would it have been
4  overseen by the marketing department?
5      A.   I don't know if that would
6  be overseen by the marketing department.
7  I don't know if that would be overseen by
8  the retail -- or, excuse me, by the
9  health systems team which could include
10 from a sales perspective.  I don't know.
11     Q.   And do you see on the second
12 page under McKesson.  That's two bullets.
13 And under the first bullet it states, "To
14 attain the 70 percent compliance level,
15 the GenericsConnect group (telesales) of
16 McKesson will start a Mallinckrodt
17 HB/APAP promotion.  The GenericsConnect
18 telephone sales team will be offering
19 incentives to the pharmacy to make a
20 conversion."
21         Do you see that?
22     A.   I do.  Let -- can I read it
23 within the context of the whole bullet?
24     Q.   Mm-hmm.

Page 197

1      A.   Thank you.
2          Okay.  Thank you.
3      Q.   Do you recall -- do you
4  recall Mallinckrodt contacting with any
5  of its large customers for their
6  customers to do marketing for them?
7      A.   So this GenericsConnect
8  group --
9      Q.   Well, first I'm just ask --
10 asking generally if you recall that type
11 of arrangement.
12     A.   I do not.
13     Q.   You don't recall having
14 marketing agreements with your large
15 distributor customers?
16     A.   No.  I -- but I can give you
17 reference to -- I can give you context
18 for this one.
19     Q.   Okay.
20     A.   But I don't remember having
21 a similar program at Cardinal or a
22 similar program at AmerisourceBergen or
23 other wholesalers.
24     Q.   Okay.  Or any other sorts of

Page 198

1 marketing agreements with your
2 distributor clients, you don't remember
3 having any kind of marketing agreements
4 with them?
5    A.   Can you define marketing
6 agreements?
7    Q.   Any sort of agreement that
8 you would enter into with a customer like
9 McKesson or AmerisourceBergen or any
10 other large customer, distributor
11 customer, whereby they would market your
12 drugs for you?
13    A.   I don't recall anything
14 specific, but I know that for us to work
15 with the folks, with the McKessons, and
16 with wholesalers, distributors, that -- I
17 do recall one now that you say that.
18        So group -- some groups
19 besides McKesson would have a telephone
20 sales group who would call on pharmacies.
21 So I do remember a couple of specific
22 scenarios like that.  And as far as that
23 was concerned, again, it would be the
24 goal to have the product that we provide

Page 199

1 to that customer as defined by the
2 wholesaler distributor, it would be
3 designed for them to have their
4 pharmacists who are in their network
5 purchase from them.
6    Q.   Purchase your product from
7 them?
8    A.   Yes, have the pharmacies
9 purchase the product from us.
10        Again, not to drive demand
11 of the product, but if there is 100
12 bottles being purchased, we would
13 certainly want to have them work with
14 their pharmacy partners to have it be
15 ours.  That would be our objective.
16    Q.   But that is driving demand
17 for your product.
18    A.   It is not driving demand in
19 the sense of increased prescriptions.  It
20 is driving demand in the case of --
21    Q.   Increased purchases from
22 Mallinckrodt?
23    A.   Purchases from Mallinckrodt,
24 yes.

Page 200

1    Q.   Okay.  And the
2 GenericsConnect group, that was the
3 telesales department of McKesson that
4 would promote Mallinckrodt opioid
5 product?
6    A.   In this case, it would be --
7        MR. DOWNS:  Objection.
8        THE WITNESS:  In this case
9    it was hydrocodone.  And this is
10    what we referred to in the
11    previous document where Tim Berry
12    and I went to Carrolton, Texas, to
13    discuss the Narcotics Story.
14        So that was -- that was the
15    group that we spoke with.
16 BY MS. BAIG:
17    Q.   The telephone sales team?
18    A.   That's right.  That's the
19 GenericsConnect.  That's the group that
20 we communicated the Narcotics Story to.
21    Q.   So that they could
22 communicate it to others?
23    A.   So that the pharmacies that
24 purchased through McKesson, when the --

Page 201

1 when the GenericsConnect group talked to
2 them, they could help drive compliance to
3 the contract toward Mallinckrodt, as
4 opposed to other manufacturers of
5 hydrocodone, and hydrocodone with
6 acetaminophen.
7        MR. DOWNS:  Objection.
8 BY MS. BAIG:
9    Q.   All right.  You understood
10 while you were at Mallinckrodt that
11 opioids were controlled substances,
12 right?
13    A.   That is correct.
14    Q.   And that they were
15 classified by the DEA as Schedule II
16 narcotics?
17    A.   Yes.  There are Schedule III
18 as well.  I don't know classification of
19 opioid or not.  But yes, there are
20 Schedule IIIs, IVs as well.
21    Q.   Which were the Schedule III
22 products?
23    A.   Hydrocodone with
24 acetaminophen is a Schedule III, or -- I

Page 202

1  said is.  My understanding is that
2  classification has since changed.  But
3  that did not occur -- I was gone from
4  Mallinckrodt at that time.
5      Q.   All the other opioid
6  products that we've looked at so far were
7  Schedule II at the time; is that right?
8      A.   I can't say that for
9  certain.  I don't know with -- did we
10 have -- I can't say that for certain.
11 I'm trying to think of some of the other
12 products, if there are other
13 Schedule IIIs, and IVs, and actually a V.
14     Q.   Were you aware that
15 oxycodone was a Schedule II product?
16     A.   Yes.
17     Q.   Were you aware that
18 hydrocodone was a Schedule II product?
19     A.   It was not a Schedule II
20 product.
21     Q.   The straight hydrocodone?
22     A.   I didn't -- I don't recall
23 selling a straight hydrocodone.
24 Hydrocodone, when I was at Mallinckrodt,

Page 203

1  was a Schedule III product.
2      Q.   And were you aware that the
3  morphine sulfate was a Schedule II
4  product?
5      A.   Yes.
6      Q.   Were you aware that the
7  fentanyl products were Schedule II
8  products?
9      A.   Yes.
10     Q.   And as Schedule II products,
11 were you aware that they had a high
12 potential for abuse?
13     A.   I wasn't sure why they were
14 classified the way they were.  So I
15 can't -- I can't speak to how they became
16 a II or a III or a IV or a V.
17     Q.   You never had any
18 understanding of -- of why a product
19 would be classified as a Schedule II
20 product?
21     A.   I wouldn't know necessarily.
22 Or I don't know now necessarily on why
23 that would be.  Potentially there's --
24 that would be a gap in my -- again, in my

Page 204

1  recollection.  But ultimately why it's
2  put in as a II or a III or a IV or a V, I
3  don't know the reasoning behind that.  I
4  just don't recall.
5      Q.   And do you know that there
6  were sort of gradations of -- of dangers
7  associated with these sorts of drugs?
8      A.   I don't know what the --
9  what the -- why they had different
10 gradations to use your word.  I just
11 don't recall.
12     Q.   Do you have an understanding
13 of what a Schedule I drug is?
14     A.   Schedule I is, I believe, an
15 illegal product.  So that can't be
16 prescribed in the U.S.
17     Q.   And so what was your
18 understanding of what a Schedule II
19 product was when you were there?
20     A.   It was a legal product that
21 was available, and that FDA deemed was a
22 legal product that could be sold in the
23 United States, and that physicians could
24 prescribe the product.

Page 205

1      Q.   Well, that's for all -- all
2  scheduled products that were not
3  Schedule I, right?
4          My question to you is, did
5  you have any understanding of what
6  Schedule II meant, or no, maybe you
7  didn't?
8      A.   The distinction that I
9  understand was the Schedule II required a
10 DEA 222 form.  But Schedule III, I don't
11 believe did.
12     Q.   And did you have an
13 understanding as to why there were more
14 regulatory requirements for Schedule II
15 than for Schedule III?
16     A.   I don't recall at the time.
17     Q.   You don't remember?
18     A.   No.
19     Q.   Whether you ever knew --
20     A.   I don't recall, no.  I'm not
21 sure how the classification came to be.
22     Q.   Were you aware that for
23 Schedule II drugs, Mallinckrodt had an
24 obligation to comply with the Controlled

Page 206

1 Substances Act?
2      A.   I was aware that we had
3 guidelines that we needed to follow, yes.
4 And by we, it's not my area of expertise.
5 But we had a compliance team and a
6 regulatory team that is well versed in
7 that area.
8      Q.   And when did you first
9 become aware that -- for Schedule II
10 drugs Mallinckrodt was required to comply
11 with the Controlled Substances Act?
12     A.   I don't know.  But as far as
13 kind of, again in that area, it's a
14 better question for compliance than it is
15 for me.
16     Q.   So you don't recall when you
17 became aware of it.
18          Are you familiar with the
19 Controlled Substances Act?
20     A.   I'm familiar that it exists.
21 I don't know now the details of it.  I
22 just don't recall.
23     Q.   Were you aware that
24 Mallinckrodt was a DEA registered

Page 207

1 manufacturer and distributor for purposes
2 of the Controlled Substances Act?
3      A.   I know that Mallinckrodt was
4 approved by the DEA and was allocated
5 quota to manufacture product, and that
6 there was reporting that occurred
7 relative to Mallinckrodt.  I don't know
8 necessarily the details of those.
9      Q.   Do you have an understanding
10 of what Mallinckrodt's responsibilities
11 were under federal law with respect to
12 preventing diversion of opioids?
13     A.   As far as kind of specifics,
14 again, this is not my area of expertise.
15 But certainly, Mallinckrodt would take
16 any, quote-unquote, to use your term
17 diversion, extremely seriously.  I mean
18 as we look at the sale of narcotics,
19 opioids legally, through normal channels,
20 would go from the manufacturer to the
21 wholesaler or chain headquarters, and
22 they would then distribute that to their
23 pharmacies.  That normal chain is a
24 legal, recognized process through the

Page 208

1 channel.
2          From the pharmacy on down,
3 that was -- that was not within the
4 purview of what I had and certainly I
5 don't believe that was something that was
6 within the purview of even a compliance
7 team.
8      Q.   So it was your understanding
9 that Mallinckrodt had no obligation to
10 prevent diversion?
11          MR. TSAI:  Object to form.
12     Mischaracterizes testimony.
13          MS. BAIG:  I'm not done with
14     the question.
15 BY MS. BAIG:
16     Q.   To prevent diversion of
17 opioid products from its downstream
18 customers?
19     A.   I guess there's a couple
20 things that I would put into there.
21 Mallinckrodt hadn't really put the
22 controls in place to ensure that
23 downstream customers, and I'll define
24 customers as all the way to the pharmacy,

Page 209

1 that the supply chain tracking that took
2 place was secure and if there was a
3 breach of the supply chain from
4 manufacturer to wholesaler distributor,
5 or to a pharmacy, that they would take
6 that very seriously and investigate.
7      Q.   So you started by saying
8 that Mallinckrodt hadn't really put the
9 controls in place to ensure that
10 downstream customers -- and then it
11 trailed off from there.  Hadn't put what
12 controls in place?
13     A.   Sorry, I want to read this
14 back.  Downstream customers beyond the
15 pharmacy components, beyond the pharmacy.
16 So from the perspective of past the
17 pharmacy, they didn't have anything
18 downstream because that was not something
19 that -- we didn't interact with
20 physicians.  We didn't interact with
21 patients.  So there weren't controls that
22 we had, at least that I'm aware of --
23 again it's not an area of my expertise.
24 But we -- we -- from the perspective of

Page 210

1  had controls at the patient and physician
2  level, that is certainly not the area
3  that I understood that -- basically the
4  controls were in place, but if there was
5  anything that ever came to the attention
6  of that group, my understanding is that
7  they would investigate it.
8      Q.   So you understood that
9  Mallinckrodt was required to have a
10 suspicious order monitoring system in
11 place, correct?
12     A.   Correct.
13     Q.   And when did you first come
14 to understand that?
15     A.   I don't recall a timeline.
16     Q.   Well, do you recall when
17 Mallinckrodt put in a suspicious order
18 monitoring system?
19     A.   I don't recall.  That was,
20 you know, obviously driven -- driven
21 through a different department.  I was
22 obviously aware and was certainly the
23 eyes and ears of the customer to the
24 extent that I could.

Page 211

1      Q.   Could you give me your best
2  estimate as to when that system was put
3  into place?
4      A.   I really don't have an
5  estimate for you.
6      Q.   So you don't know if it was
7  towards the beginning of your tenure at
8  Mallinckrodt or toward the end of your
9  tenure at Mallinckrodt?
10     MR. TSAI:  Object to form.
11     Go ahead.
12     THE WITNESS:  I don't know.
13 I'd certainly -- I don't know the
14 timeline that it was put in place.
15 For all I know it could have been
16 put in place before I was --
17 before I was aware.
18 BY MS. BAIG:
19     Q.   And did you have an
20 understanding that Mallinckrodt was
21 required to identify and halt shipments
22 of suspicious orders?
23     A.   I understood that
24 Mallinckrodt would -- had a team that

Page 212

1  would flag orders.  And if they were
2  stopped for any reason and it was raised
3  up, if I knew that a -- and I'll use
4  McKesson, since I understand -- if there
5  was an order from McKesson, and it
6  caught -- if it raised a red flag from
7  that team, they would do what they needed
8  to do to ensure that we were compliant to
9  the regulation.
10     Q.   Did you have an
11 understanding that Mallinckrodt had a
12 duty to identify suspicious orders?
13     A.   I understood that they had a
14 process in place.
15     Q.   Okay.  And what was that
16 process and how did it change while you
17 were there, if at all?
18     A.   I don't know the full
19 process.  But I know that there was a
20 team in place who would review orders.
21 And I don't know -- I understand that
22 there was some sort of algorithm or --
23 that would -- that would basically have
24 an order come out as an exception.  Then

Page 213

1  it would be held for further review.
2      Q.   Do you have an understanding
3  of what that algorithm was?
4      A.   I don't have full details.
5  Again, that's a question for another
6  group.  I do know that it would tie into
7  historical purchases that were made in
8  the past.  So as it relates to if they
9  have a history of buying 100 bottles a
10 quarter, and all of the sudden it was 600
11 bottles a quarter, certainly, unless
12 there was an explainable cause, it may
13 kick out as a -- needed to be reviewed.
14     Q.   And do you recall what the
15 percentage of increased threshold, what
16 percentage was used to trigger an order
17 being considered suspicious by
18 Mallinckrodt?
19     A.   I don't know if there was a
20 percentage as part of the algorithm.  I
21 just don't know how it was built.
22     Q.   So then you probably don't
23 have any understanding as to -- or memory
24 as to how it changed, if it did; is that

Page 214

1  right?
2      A.   I don't have a memory of
3  what it was or how it changed.
4          What I will tell you is
5  whether it's narcotic or a non -- or a
6  non-opioid, purchases fluctuate
7  significantly within the generic
8  industry.  One month they can buy 100.
9  The next month they can buy 20.  The next
10 month they can buy 180.  It is not a
11 straight line demand number.  You
12 don't -- you don't see that.  So it's not
13 a straight line demand, like on the brand
14 side where physicians -- you know, sales
15 reps work with physicians, and they write
16 prescriptions.  That is a steady increase
17 or decrease in prescription growth.  This
18 is a selling into a distribution center.
19          And so they may be
20 increasing their stock.  They may be
21 drawing down inventory.  There's a whole
22 multitude of reasons why orders fluctuate
23 to a great degree.  But again, that is
24 not isolated to opioids.  That is the

Page 215

1  generics industry in general.
2      Q.   Sure.  But what we're
3  talking about here is the suspicious
4  order monitoring process, right?
5      A.   Of which I'm certainly not
6  an expert on.
7      Q.   Okay.
8      A.   Yes.
9      Q.   And so do you have any
10 further understanding of what suspicious
11 order monitoring process was in place at
12 Mallinckrodt, apart from what you've just
13 told me about the fact there was an
14 algorithm used that you're not sure how
15 it worked?
16     A.   That there was a team or
17 there was -- there were individuals who
18 would review that.  They would see the
19 order, and it would kick out.  And I
20 don't know how it was classified.  My
21 understanding there were different
22 classifications.  I don't know if
23 everything reached the level of
24 suspicious order monitoring or suspicious

Page 216

1  order, or if there was various levels of
2  that.
3      Q.   Do you recall there being a
4  level called "peculiar"?
5      A.   I recall that now that you
6  say it.
7      Q.   Do you recall any other
8  levels, apart from peculiar and
9  suspicious?
10     A.   I do not.
11     Q.   Do you recall receiving
12 training on the suspicious order
13 monitoring program?
14     A.   I don't remember the
15 training specifically.  But I'm -- I'm
16 certain it occurred.
17     Q.   Do you recall giving
18 training to others on the suspicious
19 order monitoring program?
20     A.   I don't recall training
21 others.  No, I don't recall that.  I'm
22 trying to think if there would be a time.
23         MR. TSAI:  We've been going
24         about an hour.  If we could take a

Page 217

1  break.
2          MS. BAIG:  Sure.
3          THE VIDEOGRAPHER:  Going off
4  the record.  The time is 2:04.
5          (Short break.)
6          THE VIDEOGRAPHER:  We're
7  going back on record.  Beginning
8  of Media File Number 4.  The time
9  is 2:17.
10         MS. BAIG:  Okay.  Let's have
11 this document marked as
12 Exhibit 13.
13         (Document marked for
14         identification as Exhibit
15         Mallinckrodt-Adams-13.)
16 BY MS. BAIG:
17     Q.   It starts as an e-mail from
18 Karen Harper to you and others.
19 Bates-stamped Mallinckrodt 0000304559
20 through 698.
21         It's dated June 6, 2008.
22 And the subject is suspicious order
23 monitoring training notes from bulk
24 narcotic sales meeting presentation.

1    The attachments are customer
2  checklist, suspicious order monitoring
3  training presentation.
4    And do you see in the first
5  sentence, Karen Harper is stating that
6  she and Bill Ratliff did an introductory
7  controlled substance suspicious order
8  monitoring training for field sales?
9    A.  I'm sorry --
10   Q.  Do you see that in the first
11 sentence?
12   A.  Field sales.
13   Q.  Okay.
14   A.  I thought you were going to
15 finish the sentence.  Sorry.
16   Q.  So she and Bill performed
17 this training at the domestic sales
18 meeting for bulk narcotics.  Do you see
19 that?
20   A.  I do see that, yes.
21   Q.  And what was the domestic
22 sales meeting for bulk narcotics?
23   A.  I'm not sure.  I was not
24 involved in bulk narcotics.  So I'm not

1  sure -- I don't know who would be
2  comprised of that group.  And then I
3  guess field sales, maybe just want to put
4  some context around that.  Field sales
5  for -- field sales would not be calling
6  on physicians or working with patients at
7  any level.  Field sales is something that
8  appears to be a term here that is
9  national account, where you call in
10 headquarters for chains, and in that --
11 in this case, I guess bulk narcotics.
12 You wouldn't be calling on anything other
13 than a headquarter level type call.
14   Q.  It doesn't state here who
15 the field sales force were calling on,
16 does it?
17   A.  It doesn't.  It's just the
18 term field sales, for branded -- for
19 branded products, it tends to be more
20 where you'd call on a doctor.  But field
21 sales in the generic certainly would mean
22 calling on headquarters -- headquarter
23 level and not to physicians or
24 prescribers, as it were.

1    Q.  Headquarter level of your
2  customers, correct?
3    A.  That's -- that's correct.
4    Q.  And the domestic sales
5  meeting for bulk narcotics, is it your
6  understanding that that was an internal
7  Mallinckrodt meeting or -- or a meeting
8  with people from outside of Mallinckrodt?
9    A.  Again, this is outside of my
10 area.  But for me, a sales meeting, a
11 domestic sales meeting would mean for the
12 internal team.
13   Q.  So was there a sales team
14 for bulk narcotics that you're aware of?
15   A.  I don't know -- I don't know
16 of a sales team.  I'm sure there was.  I
17 mean, for bulk narcotics, which is,
18 again, selling the raw material, the
19 actual powder that other manufacturers
20 make, their customer base would be
21 calling on -- like -- excuse me, like a
22 Watson or Amneal or Ethex.  Another
23 manufacturer would be -- where you would
24 sell bulk narcotics, it's my

1  understanding.
2    Q.  And you don't know who this
3  presentation was made to, who was on that
4  field sales meeting?
5    A.  I don't.  I don't recall.
6  If I -- if I knew, I don't recall it.
7    Q.  And do you see the next
8  page, there's a customer checklist?
9    A.  I do see that.  Yes.
10   Q.  Do you recall seeing
11 customer checklists when you were at
12 Mallinckrodt, like this?
13   A.  It isn't specifically -- I
14 don't remember it specifically.  But what
15 this -- this is jogging -- there's some
16 familiarity as I look at it.
17   Q.  Do you know who created this
18 or when?
19   A.  No, I don't know.
20   Q.  And you don't know when it
21 was implemented?
22   A.  I don't recall anyway.  I'm
23 sorry?
24   Q.  Do you know when -- know

Page 222

1 when the use of this checklist was
2 implemented, if at all, at Mallinckrodt?
3     A.   No, I don't recall.
4     Q.   And the next -- who was
5 Mallinckrodt's security director?
6     A.   I'm going to speculate it
7 was Bill Ratliff, but I don't know that
8 to be the case.
9     Q.   Okay.  And you see the next
10 page starts a PowerPoint, "Mallinckrodt
11 controlled substance suspicious order
12 monitoring program."
13     A.   I'm sorry.  Where are you?
14 Oh, there we are.
15     Q.   First page of the
16 PowerPoint.
17     A.   Yep.
18     Q.   And do you see the heading
19 there?
20     A.   Yes.
21     Q.   And it states, "Introductory
22 training for field sales, June 5th,
23 2008."
24        So you don't know who's in

Page 223

1 the field sales group that got this
2 training, right?
3     A.   My -- no.  I wouldn't know
4 who would be involved in that.  The only
5 thing that I can define as field sales is
6 not calling on doctors.
7     Q.   You see here that it
8 identifies the Mallinckrodt suspicious
9 order monitoring procedure team?
10     A.   Yes.
11     Q.   And you are identified on
12 that team?
13     A.   That is correct.
14     Q.   Do you have any further
15 recollection of what you did as being
16 part of that team?
17     A.   I don't.  Being part of the
18 team just heading up the sales group,
19 certainly as eyes and ears of the
20 organization, certainly makes sense to be
21 kind of there on the periphery.
22     Q.   And the marketing directors
23 were also on that team, Jeff Burd and Bob
24 Lesnak.

Page 224

1        Do you see that?
2     A.   I do see that.
3     Q.   And the next page states
4 that, "DEA policy requires that
5 registrants report suspicious order to
6 the DEA when discovered through
7 monitoring."
8        Do you see that?
9     A.   I do see that.
10     Q.   And do you know who at
11 Mallinckrodt was responsible for
12 reporting suspicious orders to the DEA?
13     A.   Again, this is outside of my
14 area of expertise.  But I would -- I
15 believe it would be, like, a compliance
16 team or a regulatory team that would --
17     Q.   Do you know?
18     A.   No, I do not.
19     Q.   So while you were at
20 Mallinckrodt, were you aware of the
21 people who were charged with that task or
22 if people were actually charged with that
23 task?
24     A.   I don't know for that task,

Page 225

1 but I know compliance was, like, Karen
2 Harper is -- who -- who would be the
3 person that would be over the compliance
4 team.
5     Q.   And did you ever see any
6 suspicious orders that were reported to
7 the DEA?
8     A.   I wasn't -- I wasn't
9 monitoring orders.  That was a different
10 group that would do that.  So I -- I
11 can't speculate on that.
12     Q.   You don't recall ever seeing
13 any reports to the DEA of suspicious
14 orders?
15     A.   That's correct.  I would not
16 be -- I don't believe that I would ever
17 be copied on a document to the DEA for
18 suspicious orders.  But again, I don't
19 recall any situation where that would
20 occur.
21     Q.   Do you recall where, at
22 Mallinckrodt, those reports, if they
23 existed, would have been kept?
24     A.   I don't.  Again, that would

Page 226

1 be a compliance topic or question.
2     Q.   And do you see the next
3 bullet on the DEA policy on suspicious
4 orders states that, "Registrant is
5 reminded that their responsibility does
6 not end merely with the filing of a
7 suspicious order report."
8         Do you see that?
9     A.   I see the statement.
10     Q.   And did you have an
11 understanding that Mallinckrodt was
12 required not only to report suspicious
13 orders, but also to halt shipment of
14 them?
15     A.   I don't know what
16 constituted at what level it was halted
17 or if it was stopped altogether, later
18 released.  I don't know the level in
19 that.  Again, compliance has their
20 parameters in that regard.
21     Q.   If you skip two pages
22 further onto -- looking at the bottom
23 left, Page 8 of the PowerPoint.  Do you
24 see a slide that says, "Revised

Page 227

1 controlled substance suspicious order
2 monitoring procedure highlights"?
3     A.   Sorry.  This is what gets
4 confusing.  When you say two pages, it's
5 actually four for me, so that's I'm
6 sometimes having trouble --
7     Q.   Sorry.  Mine are --
8     A.   -- with mine.  So I just --
9     Q.   Mine are double-sided.
10     A.   Yeah, yeah, gotcha.  So
11 anyway, if you could restate that, that
12 would be helpful.
13     Q.   Sure.  If you go to Page 8.
14     A.   Yes.
15     Q.   And there's a heading there
16 that says, "Revised controlled substance
17 suspicious order monitoring procedure
18 highlights"?
19     A.   Okay.
20     Q.   The fourth entry under the
21 heading states, "Order entry system flags
22 peculiar orders of unusual size/frequency
23 based upon algorithm."
24         Do you see that?

Page 228

1     A.   I do see that.
2     Q.   Do you have an understanding
3 as to why the orders were flagged as
4 peculiar instead of suspicious?
5     A.   I don't know.  If I recall
6 there was a -- from a compliance
7 perspective, I don't know what hit one
8 level to another and what the differences
9 were.  But peculiar, I think is the --
10 we'll call it one level and then
11 suspicious order is the next level up, if
12 I recall.
13     Q.   Do you know if any orders
14 actually went from the peculiar level to
15 the suspicious order at Mallinckrodt
16 while you were there?
17     A.   I don't recall anything
18 specifically.
19     Q.   Generally?
20     A.   I don't recall anything
21 generally.
22     Q.   Do you know what threshold
23 was used in the algorithm to flag an
24 order as peculiar?

Page 229

1     A.   I think I answered that no,
2 I do not know that.  I just don't recall
3 anything relative to the algorithm that
4 would give us that information.
5     Q.   Do you see on the next page,
6 the heading is, "Revised controlled
7 substance suspicious order customer
8 checklist."
9         Do you see that?
10     A.   I do see that.
11     Q.   And it states, "To be
12 completed by field sales."
13         Do you see that?
14     A.   I do see that.
15     Q.   So do you know who -- who
16 was required to complete the checklist?
17     A.   Field sales says defined by
18 the folks who call on customer, defined
19 as -- if you're referring specifically to
20 this training, it looks like to the field
21 sales for the bulk side.  But again, I'm
22 not sure.  I don't recall.
23     Q.   Do you know whether your
24 sales team was required to complete the

Page 230

1 controlled substance suspicious order
2 customer checklist, the generic sales
3 team?
4      A.   Yeah.  I don't recall if
5 they were required, but again, the form
6 looked familiar to me.
7      Q.   Well, I think this is a
8 different customer checklist.  I'm
9 reading from this that these are the
10 checklists.  Are you reading it somehow a
11 little bit differently?
12      A.   I thought you were
13 referencing back to the form itself.  And
14 I guess when we first looked at the form,
15 I just -- like I said, the form looked
16 familiar to me, but...
17      Q.   So here it states, "Revised
18 controlled substance suspicious order
19 customer checklist.  To be completed by
20 field sales."  It goes on to state, "Know
21 your customer is the goal."  It goes on
22 to state, "Description of neighborhood,
23 high crime area, et cetera."
24           Do you know whether or not

Page 231

1 your sales team was doing any monitoring
2 of neighborhoods of customers?
3      A.   As far as going into
4 neighborhoods, there's only one scenario
5 where I'm aware of one of our reps who
6 road along with a consultant from DEA,
7 and one scenario.
8      Q.   Which one was that?
9      A.   That was Victor Borelli.
10      Q.   And who was the customer?
11      A.   I'm not sure.  I'm not sure.
12      Q.   Do you recall what the
13 outcome was of that ride-along?
14      A.   No, I don't.
15      Q.   Do you require -- do you
16 recall any on-site visits such as
17 indicated in the next line?
18      A.   I'm not sure exactly what
19 on-site -- but certainly going to a
20 customer is defined by the headquarters
21 for a chain wholesaler distributor.  It
22 was not uncommon for us to go and meet
23 with our customers at their location.
24      Q.   And did you take pictures of

Page 232

1 their locations?
2      A.   Not that I recall.
3      Q.   So is it your understanding
4 that this check -- this -- this checklist
5 here identified on this page on Page 9
6 that identifies knowing your customer,
7 knowing a description of the neighborhood
8 and whether it's a high crime area,
9 requiring an on-site visit inside and
10 out, requiring physical description of
11 facility or photos, and including a list
12 of indicators (watch outs), that require
13 further review by security, it's your
14 understanding that this list was to be
15 applied to whom?
16      A.   I'm not sure.  I know from
17 maybe looking through this as far as kind
18 of a description of neighborhood, I was
19 describing more of a pharmacy.  So when I
20 mentioned with Victor, I don't know
21 necessarily that this is a neighborhood
22 relative to a distributor or a chain.
23           As far as photos, I don't
24 believe many customers would allow you to

Page 233

1 take photos.  But nonetheless -- at least
2 inside.
3           So from this perspective, I
4 can't speak to the context of this
5 specific, as it was delivered to a
6 different group.  Again, I received it as
7 part of this e-mail.
8      Q.   Do you recall having
9 communications with your generic sales
10 team about descriptions of neighborhoods
11 of certain customers and whether they
12 were in high crime areas?
13      A.   I don't remember specific
14 conversations regarding that.
15      Q.   What about with respect to
16 on-site visits?
17      A.   Again, we would be at
18 customers, headquarters, for wholesalers,
19 chains, distributors.  We would
20 definitely be on site to have those
21 meetings.
22      Q.   So your only understanding
23 for on-site visit would be the
24 headquarters for a distributor.  You're

Page 234

1 not aware of any other on-site visits
2 that Mallinckrodt performed?
3     A.   I don't know about
4 Mallinckrodt in general.  But the
5 meetings I would -- I'm trying to think
6 if I had meetings at a different level
7 other than headquarters for chains and
8 wholesalers and distributors.
9     Q.   You or your team?
10     A.   It would be highly unusual.
11 That was not -- yeah, that would be
12 highly unusual.
13     Q.   You don't recall any?
14     A.   No.  I mean again, Victor
15 may have done that on one occasion,
16 Victor Borelli, as I mentioned before.
17     Q.   You -- you don't recall
18 where?
19     A.   I don't recall.
20     Q.   Do you know what's in --
21 what's referenced here when it says watch
22 outs, including a list of indicators or
23 watch outs?
24     A.   Compliance would be better

Page 235

1 to identify what that is.  I mean --
2     Q.   Yeah, but I'm just wondering
3 if you have an understanding given your
4 years of experience.
5          Do you have an understanding
6 of what was referenced there by watch
7 outs?
8     A.   And I'll just put into
9 context.  My -- my years of experience
10 were certainly limited relative to -- to
11 this.
12          But as far as watch outs, I
13 just viewed that as a general term of
14 anything raised a flag, red flag.  So I
15 view that as --
16     Q.   And what sorts of things
17 would raise a red flag, if anything, that
18 you're aware of?
19     A.   I think, again, compliance
20 would be better to put that out there as
21 kind of what would be included in that
22 list.
23     Q.   Are you aware of anything,
24 or no?

Page 236

1     A.   I'm not aware of red flags
2 or watch outs that were list -- that were
3 listed or identified through any
4 discussions.  I just don't recall
5 anything.
6     Q.   Who is Cathy Stewart?
7     A.   I'm not sure what her title
8 is truthfully.  I don't remember what her
9 responsibility was.
10     Q.   Do you remember what area of
11 the company she worked in?
12     A.   I don't remember.
13     Q.   Do you remember working with
14 her on any projects?
15     A.   I remember Cathy.  I'm sure
16 I could pick her out of a crowd of one,
17 but I don't recall -- I don't recall her
18 role or what she did.
19     Q.   How about George Saffold?
20     A.   I don't -- I don't recall.
21 I remember the name.  I don't recall what
22 George's role was.
23          (Document marked for
24     identification as Exhibit

Page 237

1     Mallinckrodt-Adams-14.)
2 BY MS. BAIG:
3     Q.   I'll have this document
4 marked as Exhibit 14.  And it appears to
5 be an e-mail from Karen Harper dated --
6 or it starts as an e-mail from Karen
7 Harper dated September 17, 2009, with the
8 subject suspicious order monitoring
9 presentation.  Bates-stamped at the
10 bottom Mallinckrodt 21000027124 through
11 18266.
12          And this, if you turn to the
13 attachment.  It's Mallinckrodt's
14 controlled substance suspicious order
15 monitoring program, and it says API sales
16 and marketing meeting, September 30,
17 2009.
18          Do you recall an API sales
19 and marketing meeting from September 30,
20 2009?
21     A.   I don't.  I was not part of
22 that group.  That's -- that's the bulk --
23 bulk raw material team.  I don't recall.
24     Q.   And this presentation

Page 238

1  appears to be similar but not exactly the
2  same as the one we looked at.
3          But if you turn to the
4  Bates-stamped page at the bottom that
5  ends 132, which if you're looking at the
6  bottom left is Page 8 of the PowerPoint.
7      A.   Okay.
8      Q.   Do you see it says,
9  "Statistics on national drug abuse
10 trends.  Findings from the most recent
11 data available from the National
12 Institute of Drug Abuse."
13         Do you see that?
14     A.   I do see that.
15     Q.   Do you recall Mallinckrodt
16 tracking data available from the National
17 Institute of Drug Abuse?
18     A.   This, again, was outside of
19 anything relative to, as an API and
20 bulk -- or -- and sales and marketing, I
21 don't recall that.  So this is outside of
22 my context, if you will.
23     Q.   Okay.  You don't recall ever
24 seeing any sort of data from National

Page 239

1  Institute of Drug Abuse?
2      A.   I don't recall any data from
3  them.
4      Q.   Do you recall seeing
5  information about commonly abused opioids
6  and morphine derivatives?
7      A.   I don't recall that
8  terminology.
9      Q.   And here it identifies
10 codeine -- codeine, opium, morphine,
11 oxycodone, hydrocodone, fentanyl and
12 fentanyl analogs, and then heroin.  Do
13 you see that?
14     A.   I do see that.
15     Q.   And on the next page, do you
16 see there's a heading called Abuse
17 Trends.  Do you see the abuse trends
18 slide?
19     A.   I do see the side -- slide,
20 yes.
21     Q.   And it states that "an
22 estimated 48 million people, ages 12 and
23 older, have used prescription drugs for
24 nonmedical reasons in their lifetimes."

Page 240

1          Do you see that?
2      A.   I do see that.
3      Q.   And that this represents
4  approximately 20 percent of the U.S.
5  population?
6      A.   I do see that.
7      Q.   And it goes on to state that
8  "among persons aged 12 or older who used
9  pain relievers nonmedically in the past
10 12 months, 55.7 percent got the drug from
11 someone they knew, and only 3.9 percent
12 purchased the pain reliever from a drug
13 dealer or other stranger."
14         Do you see that?
15     A.   I do see that.
16     Q.   Did you have an
17 understanding of these basic abuse trends
18 while you were at Mallinckrodt?
19     A.   I guess from the perspective
20 of this -- again I've not seen this slide
21 that I'm aware of, as far as kind of this
22 context here.
23         Pain relievers sounds pretty
24 broad, so I'm not sure what's included in

Page 241

1  that.  As far as kind of anything from --
2  that I can derive from this, again
3  outside of my area of expertise, I'm not
4  sure.
5      Q.   So you don't recall having
6  any communications with anybody at
7  Mallinckrodt about abuse trends such as
8  these or anything similar?
9      A.   This -- this does not look
10 familiar to me.  I don't recall it.
11     Q.   But my question is a little
12 bit broader.
13     A.   Oh.
14     Q.   Do you recall ever having
15 communications with anybody at
16 Mallinckrodt about abuse trends such as
17 these or similar to these?
18     A.   I don't recall anything
19 specifically.  But as far as kind of
20 abuse, certainly at times and I can't
21 pinpoint an example, any example of the
22 fact that there were people who were
23 abusing prescription products.  I know
24 from the perspective of, you know, the

Page 242

1 channel of distribution, it was -- it was
2 our goal to make sure and supply the
3 product that physicians were prescribing
4 to patients for legitimate pain use.
5 That was our objective, is to make sure
6 and have that supply available for that
7 legitimate use.
8     Q.   Do you recall having any
9 communications with anybody at
10 Mallinckrodt about addiction rates for
11 opioid products?
12     A.   I don't recall having any
13 discussions on that.
14     Q.   Were you aware of the Rite
15 Aid issues identified on the next page?
16     A.   I have not seen it yet.  Is
17 that two pages?  Hold on one second.
18     Q.   It begins by stating, "On
19 January 12, 2009, Rite Aid and nine of
20 its subsidiaries in eight states have
21 agreed to pay $5 million in civil
22 penalties.  The investigation revealed a
23 pattern of violations of the Controlled
24 Substances Act."

Page 243

1     A.   I don't recall this.
2     Q.   You don't recall any of
3 these types of issues arising with Rite
4 Aid while you were there?
5     A.   I do not.
6     Q.   Okay.  Do you see the next
7 page, Page 12, it begins "Masters
8 Pharmaceutical"?  Do you recall Masters
9 Pharmaceutical being fined by the DEA?
10     A.   I do recall.
11     Q.   What do you recall about
12 that?
13     A.   That they were fined by DEA.
14 I remember fined.  And if I'm not
15 mistaken, I believe that they were
16 fighting that fine.  Based on what
17 premise, I don't know.
18     Q.   And it states here that
19 Masters sold more than four million doses
20 of hydrocodone, phentermine and
21 alprazolam to internet pharmacies between
22 2005 and 2008 without reporting its sales
23 to the DEA.
24         Do you see that?

Page 244

1     A.   I do see that.
2     Q.   Were you familiar with --
3 when you were at Mallinckrodt with
4 Mallinckrodt -- with Masters' massive
5 amounts of sales of opioid products?
6     A.   I more recall -- no
7 necessarily.  I do remember, though,
8 internet pharmacies as being a red flag
9 in that time frame.
10         Back to the question.  Do I
11 recall that they sold massive amounts?  I
12 can't really define massive.  What I can
13 say is Masters certainly had increased
14 sales while I was there.  And I'll say
15 that Masters certainly had the ability in
16 short supply scenarios to -- to be able
17 to reach pharmacies.  And they were more
18 nimble than most.
19         (Document marked for
20         identification as Exhibit
21         Mallinckrodt-Adams-15.)
22 BY MS. BAIG:
23     Q.   We'll have this document
24 marked as Exhibit 15.  It begins as an

Page 245

1 e-mail from Karen Harper to you dated
2 June 2, 2008.  Subject:  "Suspicious
3 order monitoring customer
4 checklist/facility photographs."
5         And I would just direct you
6 to the very end of the document where
7 Karen Harper writes, "A subcommittee
8 composed of CSR managers, John Adams, and
9 DEA compliance will meet tomorrow,
10 June 3, 2008, to formulate algorithms to
11 be used for detection of peculiar or
12 suspicious orders."
13         Does this refresh your
14 recollection that you were involved in
15 formulating these algorithms?
16     A.   It does not.  I don't know
17 if I was present at that meeting or -- or
18 not.  So no, I don't recall being part of
19 that algorithm creation.
20     Q.   And you don't recall what
21 the algorithms were, correct?
22     A.   That's correct.  I do not
23 recall that.
24     Q.   Okay.  Do you know if

Page 246

1 Mallinckrodt worked with any -- with any
2 third parties to outsource its obligation
3 to prevent oversupply and diversion of
4 controlled substances under the
5 Controlled Substances Act or did it
6 oversee compliance entirely itself?
7          MR. TSAI:  Object to form.
8          Go ahead.
9          THE WITNESS:  I don't recall
10         having outside third party from a
11         compliance perspective.  I'm
12         trying to think if there's any
13         scenario.  I don't recall of any
14         scenario.
15 BY MS. BAIG:
16     Q.   So you don't recall working
17 with any third parties on suspicious
18 order monitoring?
19     A.   I don't recall that that was
20 part of any process for suspicious order
21 monitoring.
22          (Document marked for
23          identification as Exhibit
24          Mallinckrodt-Adams-16.)

Page 247

1 BY MS. BAIG:
2     Q.   Let's have this document
3 marked as Exhibit 16.  It begins as an
4 e-mail from Gretta Turner dated July 15,
5 2008.  First page is
6 Mallinckrodt_0002906782 through 6783.
7          And it's from -- who is
8 Gretta Turner?
9     A.   I'm not sure.
10     Q.   It's from Gretta Turner to
11 you.  And the subject is "July 15th
12 IntegriChain meeting."
13     A.   It looks like it's to a
14 broader group than just me.
15     Q.   To you and others, yes.  To
16 you and others.
17     A.   Okay.
18     Q.   Do you recall working with a
19 company called IntegriChain?
20     A.   I don't recall working with
21 them.  I do recall IntegriChain in
22 general.  That certainly is something --
23 I don't recall this presentation, but
24 them trying to come in and sell some of

Page 248

1 their services.
2     Q.   Okay.  And actually I see at
3 the bottom of this, it says that Gretta
4 Turner is from risk management.  I'm
5 sorry, from -- wait, from medical
6 affairs.
7     A.   Okay.
8     Q.   She is the risk management
9 coordinator for Covidien in the medical
10 affairs department.
11          Do you see that?
12     A.   I do see that.
13     Q.   And IntegriChain -- was
14 IntegriChain hired -- hired by
15 Mallinckrodt?
16     A.   I don't recall.  I don't
17 believe so, but I don't recall.
18     Q.   You don't recall ever
19 working with anybody from IntegriChain?
20     A.   I recall some time
21 throughout my career that IntegriChain
22 made presentations about their services,
23 but I don't know if it was relative to
24 this or other times.

Page 249

1     Q.   And if you turn to the
2 Page 3, looking at the middle of the
3 page, of the PowerPoint, this slide is
4 titled "Background."
5          Do you see that?
6     A.   Yes.
7     Q.   And the first line says,
8 "Covidien has engaged IntegriChain in a
9 proof-of-concept program that leverages
10 Covidien's channel data to proactively
11 monitor channel integrity."
12          Do you see that?
13     A.   I do see that.
14     Q.   What's your understanding of
15 what that means?
16     A.   I don't know specifically
17 here.  But IntegriChain, in general -- so
18 I can speak not specifically to this and
19 what that means.  But basically what they
20 look at is inventory levels at a
21 wholesale level, certainly.  I don't know
22 if they have inventory level data at
23 other -- if they have it at chains'
24 headquarters, or if they have it at

Page 250

1 distributors.
2        So their channel data, I
3 don't know specifically what that would
4 mean.
5    Q.   Does this suggest to you
6 that Covidien actually engaged
7 IntegriChain?
8    A.   By engaged, it looks like
9 they met with them.  But I don't know
10 that they engaged them.  So I can't speak
11 to that truthfully.
12    Q.   But you would agree that the
13 first sentence says, "Covidien has
14 engaged IntegriChain in a
15 proof-of-concept program that leverages
16 Covidien's channel data to proactively
17 monitor channel integrity."
18        Correct?
19    A.   This is developed by
20 IntegriChain, so I don't know what their
21 level of -- what their definition of
22 "engaged" means.  Again, I don't recall
23 -- I don't recall this, and I don't
24 recall ever bringing on IntegriChain

Page 251

1 services.
2    Q.   Okay.
3    A.   So I just don't recall.
4    Q.   Do you see the last --
5 there's a Phase I and Phase II paragraph
6 here.
7        Do you see that?
8    A.   Mm-hmm.
9    Q.   And under Phase II, the last
10 bullet says, "Demonstrate whether ARCOS
11 data, as provided by the government under
12 FOIA request, can support comprehensive
13 geographically specific monitoring of
14 controlled substance inventory change and
15 risk."
16        Do you see that?
17    A.   Yeah, hold on.  Gotcha.  I
18 see that.  Yes.
19    Q.   Do you know whether
20 Mallinckrodt ever used ARCOS data in
21 connection with the controlled substance
22 monitoring?
23    A.   I don't know.
24    Q.   And you don't know whether

Page 252

1 Mallinckrodt used IntegriChain to use
2 ARCOS data in connection with controlled
3 substance monitoring, right?
4    A.   I don't know that.  Yes.
5 And I guess further, Phase II, is this a
6 theoretical scenario, or is this
7 something that IntegriChain actually had
8 the ability to do?  That, potentially
9 they're over promising and would
10 underdeliver.  I just don't know.  I've
11 been presented IntegriChain data services
12 and have declined their services in every
13 scenario.
14        I don't recall if this was
15 ever presented to me.  But I have never
16 hired them as a result of not believing
17 their data has good integrity.
18    Q.   You personally have not, but
19 you're still unsure as to whether
20 Mallinckrodt did, right?
21    A.   I'm uncertain if
22 Mallinckrodt did.  I certainly did not
23 see or don't recall seeing anything
24 relative to that.  And again, I can tell

Page 253

1 you that I've been presented that, since
2 departing Mallinckrodt and I've chose not
3 to purchase that data.
4    Q.   Okay.
5    A.   Because of concerns of
6 integrity.
7    Q.   Okay.  So if you turn to
8 Page 27, you see there's a page that
9 says, "Orders from high-risk channels."
10 And it states, "Examples of wholesalers
11 with counterfeiting/diversion ties
12 purchasing Covidien products."
13        Do you see that?
14    A.   I do see that.
15    Q.   And then there's a list of
16 products:  Methadone, oxycodone with
17 APAP, methadone --
18    A.   Oh wait, sorry, maybe I'm on
19 the wrong page.
20    Q.   I'm on Page 27.
21    A.   Okay.  List of products.
22    Q.   It starts, "Orders from high
23 risk channels."
24    A.   Oh, I'm sorry, I didn't see

**Page 254**

1 the products on the left.  Thank you for
2 clarifying.
3      Q.   Okay.  You got it?
4      A.   I do.
5      Q.   All right.  So this doesn't
6 necessarily refresh your recollection
7 that they did any analysis with respect
8 to Covidien, it could still be a pitching
9 document; is that right?
10      A.   Absolutely.  It doesn't --
11 it doesn't help me recall anything.  Nor
12 does -- does it give me any indication on
13 the viability of data.
14      Q.   And if you turn two pages
15 further you see a slide, order diversion
16 risk analysis.
17      A.   Yes.  Do you know if they
18 know whose product that is or if these
19 are actual -- oh, never mind.  Never
20 mind.
21           Say -- okay.  Under order
22 diversion risk analysis.  Yes.
23      Q.   I can just see what it says
24 at the top, which is "oxycodone customers

**Page 255**

1 with largest relative growth."  Do you
2 see that?
3      A.   I'm now -- I'm now on the
4 right page again.  We just have a page
5 difference.
6      Q.   Page 29.
7      A.   Yep, I'm there.
8      Q.   Okay.  And it says,
9 "Oxycodone customers with largest
10 relative growth."  Do you see that?
11      A.   I do see that.
12      Q.   And it identifies a number
13 of customers.  Do you see that?
14      A.   I do see that.
15      Q.   Okay.  But you've -- you
16 don't have any recollection of this
17 document, correct?
18      A.   I don't have any
19 recollection.  I do find it interesting.
20 So Kaiser is a health maintenance
21 organization that employs physicians and
22 pharmacists, and patients outside of
23 Kaiser cannot actually buy product from
24 their pharmacy.  So that's an interesting

**Page 256**

1 dynamic.
2           Vermont Veterans Home is a
3 government facility, so I'm not sure what
4 to derive from that.  And Community Care
5 I don't have any insight into either.
6           Six months does not make a
7 trend.  So when I look at this data,
8 again, it just raises further data
9 integrity issues.  So I'll just leave it
10 at that.
11      Q.   Did you ever have any
12 communications with anyone at the DEA
13 regarding Mallinckrodt's suspicious order
14 monitoring procedures?
15      A.   Not that I recall.
16      Q.   Do you recall a customer by
17 the name of Sunrise?
18      A.   I do.
19      Q.   And do you recall that in or
20 about 2007 they were placed on a
21 do-not-ship list?
22      A.   I don't recall that.
23           (Document marked for
24      identification as Exhibit

**Page 257**

1      Mallinckrodt-Adams-17.)
2 BY MS. BAIG:
3      Q.   We'll have this document
4 marked as Exhibit 17.
5           The bottom Bates-stamped
6 number is Mallinckrodt 0000383892, and it
7 is an e-mail from Victor Borelli to you,
8 dated September 27, 2007, with the
9 subject line Masters.
10           Do you see that?
11      A.   I do see that.
12      Q.   So in the first -- in the
13 first sentence the subject is Masters,
14 and it's from Victor Borelli.  And it
15 states, "I already had a conversation
16 with them about this customer (Sunrise)
17 back in June and it slipped through one
18 of the cracks.  They remembered the
19 conversation distinctly.  They now have
20 that customer on a do-not-ship list."
21           Does this refresh your
22 recollection at all that Masters may have
23 put Sunrise on a do-not-ship list in or
24 about 2007?

Page 258

1    A.   It does.
2    Q.   And what do you recall about
3 this incident?
4    A.   So when we sold to one
5 wholesaler or distributor, we didn't
6 intend for that wholesaler or distributor
7 to ship to another wholesaler or
8 distributor, so the fact that Masters, a
9 distributor, was selling to Sunrise, a
10 distributor, wasn't what the sale chain
11 was intended to be.
12       So instead of selling to a
13 Masters, it's not like Masters had a
14 do-not-ship.  It's, we said do not sell
15 to them because we would instead never go
16 through the process of having a
17 wholesaler distributor sell to another.
18       Our intent to sell to
19 Masters is that they would sell to their
20 retail pharmacies that are in their
21 network, not to other distributors.  So
22 do-not-ship doesn't mean it was illegal
23 or that they were flagged or that there
24 was any concern about the legality of the

Page 259

1 shipment.  It is more that they are not
2 to be shipping to another wholesaler
3 distributor.
4    Q.   And do you see the beginning
5 of the e-mail, it starts with you asking
6 Victor, "How did Masters take it when the
7 chargeback was denied because of their
8 sales to Sunrise wholesale"?
9    A.   Yes.
10    Q.   Am I to understand from that
11 that basically Masters didn't get their
12 chargeback because their sales were
13 reduced because they had to stop shipping
14 to Sunrise?
15    A.   That's not how to interpret
16 that, if you will.
17       No disrespect by the way.
18    Q.   It's okay.
19    A.   What -- what it means is
20 Masters bought it from us at wholesale
21 acquisition cost.  And let's say that was
22 $100.  They then sold it to Sunrise at a
23 price that was lower than $100, which
24 would then trigger a chargeback.  That

Page 260

1 chargeback is what we would pay Masters.
2       In this case we said I know
3 you bought it from us for 100.  I know
4 you sold it to Sunrise for some price
5 lower than that.  But because we had them
6 on a do not ship to another wholesaler
7 distributor, we are denying your
8 chargeback.  So even though you bought it
9 for 100 and you sold it to them for $75,
10 we're not paying you that $25 that you
11 believe you're owed.
12       So it potentially is -- is a
13 good way to upset your customer that
14 you're not going to honor a chargeback.
15    Q.   I see.  Okay.
16       So that was in September of
17 2007.
18       (Document marked for
19       identification as Exhibit
20       Mallinckrodt-Adams-18.)
21 BY MS. BAIG:
22    Q.   And then we'll have this
23 document marked as Exhibit 18.  And it's
24 an e-mail that begins from Victor Borelli

Page 261

1 to you dated -- no, it's an e-mail from
2 Kate Neely to Michael Gunning, it starts.
3 Dated June 3, 2008.
4    A.   Yes.
5    Q.   And it also deals with
6 Masters.  If you take a look at the
7 document.  And if you start at the end of
8 the e-mail chain, you see an e-mail from
9 Victor Borelli to Kate Muhlenkamp and --
10 or Kate Neely.  Who is Kate Neely?
11    A.   She is a marketing manager
12 or product manager.
13    Q.   Okay.  And Victor is -- is
14 identifying some of his larger customers
15 by monthly volume.  Do you see that?
16    A.   I do see that.
17    Q.   And that includes both
18 Masters and Sunrise.  Do you see that?
19    A.   I do see that.
20    Q.   So is -- is Sunrise now a
21 customer -- a direct customer of yours
22 because you are not shipping to Masters
23 who is shipping to Sunrise?
24    A.   That's correct.

Page 262

1 Q. Okay.
2 A. Well, I -- at this time I
3 don't know if they are. But that looks
4 like -- it looks like they were set up by
5 then, yes.
6 Q. Okay. And Kate -- Kate
7 Neely says, "Is Masters ongoing?" And
8 Victor Borelli says, "Yes," correct?
9 "They have moved us from
10 secondary to primary and it is ours to
11 lose going forward."
12 A. Yes.
13 Q. And they have -- appear to
14 have pretty substantial volume
15 particularly in the oxy 30-milligram, do
16 you see that?
17 A. I do see that relative to
18 these other customers. Relative to the
19 overall market, I don't know, off the
20 top, if this is high volume or just
21 relative to the smaller -- these other
22 distributors.
23 Q. But we see that he's
24 identifying them as one of his larger

Page 263

1 customers by monthly volumes in any
2 event, correct?
3 A. That's correct. And Victor
4 had smaller regional accounts at that
5 time.
6 Q. And do you see Kate --
7 Kate's response where she states, "These
8 usages account for 10 percent of the 15
9 and 30-milligram market, and in the case
10 of the 30-milligram are significantly
11 higher than those of Cardinal, who we
12 have on source. They look" -- all
13 caps -- "VERY high and are concerning to
14 me. We need to talk as I don't know that
15 I feel comfortable shipping them at such
16 high levels."
17 Do you see that?
18 A. I do see that.
19 Q. Would that suggest to you
20 that these are pretty high levels for oxy
21 15 and oxy 30?
22 A. Just as a top line
23 statement. Certainly, when it's 10
24 percent, that's significant. I would say

Page 264

1 that the selection of Cardinal as a
2 choice to compare it against is probably
3 not a good comparison. Cardinal has the
4 least amount of independent pharmacies in
5 its network. So -- so for them most of
6 the product that would be sold through
7 Cardinal goes to a small number of
8 independents, but a large number of chain
9 pharmacies. We'd have a contract with
10 CVS, and they would buy through Cardinal.
11 So to put in Masters, who
12 competes against -- you know, in the
13 independent market against Cardinal who
14 doesn't have a huge independent base, is
15 an apples and orange comparison. So that
16 is one component that I guess is worth
17 looking into further.
18 Q. You don't -- her comment is
19 simply that --
20 MR. DOWNS: Objection.
21 BY MS. BAIG:
22 Q. -- here we have an
23 independent -- we have monthly volumes
24 for these smaller customers that are

Page 265

1 actually higher than one of the three
2 largest distributors in the company,
3 Cardinal Health, correct?
4 A. Yes.
5 MR. TSAI: Objection to
6 form.
7 Go ahead.
8 THE WITNESS: Yes. Their
9 purchases here are higher than
10 Cardinal. And it's -- it would be
11 the Cardinal Source program. So
12 again, different customer base
13 relative to Masters and Cardinal.
14 BY MS. BAIG:
15 Q. And you see that, at least
16 for -- for Kate Neely, she finds these
17 concerning?
18 A. Yeah, and I think that's, as
19 a marketing person, is it that person's
20 right to look at and say, "What is this
21 volume relative to IMS?" And so this is
22 a comparison of those volumes to IMS
23 extended units. But that -- she has
24 every right to ask that question. And I

Page 266

1  think that's a good sign that she is
2  taking that step of due diligence.
3      (Brief interruption.)
4  BY MS. BAIG:
5      Q.  So do you see in Victor
6  Borelli's response, he states that under
7  Item 1, "Sunrise business was in their
8  overall monthly usage number.  That
9  brings the Masters number down 25 percent
10  right off the bat."
11      A.  Yes, I see that.
12      Q.  Okay.  And so that -- is
13  that because Masters is no longer
14  shipping to Sunrise because of the e-mail
15  chain we looked at a few moments ago?
16      A.  That's correct.
17      Q.  Okay.  And he goes on to
18  explain that, "We have begun to ship
19  Sunrise an assortment of products:
20  Hydromorphone, oxy APAP, methadone, oxy
21  tabs, et cetera.  And you and I have
22  discussed this already."
23      Do you see that?
24      A.  I do see that, yes.

Page 267

1      Q.  Do you recall generally
2  weighing in on this discussion and
3  talking with them about the high volume
4  amounts going to Masters, KeySource,
5  Sunrise or NCM?
6      A.  I don't recall specifically
7  diving into this discussion.
8      Q.  And in Item 3, with respect
9  to the growth pattern of the molecule,
10  Victor Borelli states, "They had very
11  solid numbers on these two SKUs over the
12  past few years, but since oxy ER came off
13  the market, those two SKUs have
14  skyrocketed.  I just took a look at year
15  over year numbers, and the 15-milligram
16  SKU has an '06/'07 growth rate of
17  60 percent and an '07/'08 growth rate of
18  43 percent, and the 30 milligrams is even
19  stronger with an '06/'07 growth rate of
20  80 percent and '07/'08 growth rate of
21  68 percent."
22      Do you see that?
23      A.  Yes, I do see that.
24      Q.  And is it your understanding

Page 268

1  that those growth rates are for Masters?
2      A.  That would have been my
3  understanding.  I think the context of
4  this is really important.  Oxycodone
5  extended-release, when that went off the
6  market, that basically indicates that
7  there is a segment of the pain market,
8  and the market that would be sold to
9  would be the legitimate pain market, is
10  what this is presumably speaking to, but
11  when oxy ER went off the market, that
12  leaves a gap where patients who need pain
13  medications had to have their doctor
14  write a prescription to change it from
15  oxy ER to oxy IR, which then helped drive
16  the growth rate of that.
17      So that's a good context to
18  have in there and why the growth rate
19  jumped so much.
20      Q.  Do you have -- do you recall
21  the DEA raising an issues with Masters in
22  or about 2009?
23      A.  I think we looked at a
24  document about that not too long ago in

Page 269

1  this.
2      (Document marked for
3      identification as Exhibit
4      Mallinckrodt-Adams-19.)
5  BY MS. BAIG:
6      Q.  I'll have this document
7  marked as Exhibit 19.  It's Bates-stamped
8  Mallinckrodt_0000565729 through 5730.  It
9  starts as an e-mail from you to Michael
10  Gunning dated May 1st, 2009.
11      A.  I see it, yes.
12      Q.  Okay.  And it starts off
13  with a reference to Masters resolving
14  their DEA issues.
15      Do you see that?
16      A.  Can I take -- can I go ahead
17  and read?
18      Q.  Mm-hmm.
19      A.  Thank you.  Okay.
20      Q.  And it begins as an e-mail
21  from someone at Masters to you and Victor
22  Borelli, correct?
23      A.  Correct.
24      Q.  Do you recall communicating

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  with Denny Smith from Masters?
2      A.   I do.
3      Q.   On this occasion or just
4  generally?
5      A.   Generally.
6      Q.   Did you have numerous
7  communications with Denny Smith at
8  Masters?
9      A.   No, I did not have numerous
10  discussions with him.
11      Q.   What do you recall
12  communicating with him about?
13      A.   My first communication with
14  him wasn't so pleasant.  I didn't like
15  the way that he was advertising at a
16  national trade show that I attended.
17         He was advertising,
18  basically calling AmerisourceBergen,
19  Cardinal and McKesson, The Three Stooges.
20  And I took issues with how unprofessional
21  his advertising was for the industry as a
22  whole.
23      Q.   And did you let him know
24  that?

Page 271

1      A.   I did.
2      Q.   And what was his response?
3      A.   He thought that I needed to
4  obtain a sense of humor.
5      Q.   Okay.  Any other
6  communication?  Do you recall?
7      A.   No.  In this context right
8  here.
9      Q.   Do you see in the e-mail at
10  the bottom of the first page from Denny
11  Smith at Masters, he starts off, "Thank
12  you for taking the time to hear our reply
13  to your concerns on Friday."
14         And he goes on to state, "As
15  you know, the sale of controlled
16  substances to dispensers by distributors
17  has come under great debate and concern
18  from the DEA."
19         Were you aware of that at
20  the time?
21      A.   I'm sorry.  Say it -- sorry.
22      Q.   Were you aware of the fact
23  what he's saying, the sale of controlled
24  substances to dispensers by distributors

Page 272

1  has come under great debate and concern
2  from the DEA?
3      A.   I don't know the exact
4  timeline, but certainly that is a -- that
5  is a debate that certainly is valid.
6      Q.   You became aware of that
7  generally around that time?
8      A.   I'm not sure exactly what
9  time I became aware of that.
10      Q.   But you did receive this
11  e-mail in or about March of 2009, right?
12      A.   Correct.
13      Q.   And he goes on to state,
14  "Many wholesale drug distributors have
15  already had significant fines and had to
16  add to their existing protocols."
17         Were you aware of that at
18  the time?
19      A.   Yes.
20      Q.   Okay.  And he goes on to
21  state, "Distributors are how charged with
22  policing dispensers by increasing
23  pharmacy due diligence through technology
24  and staff."

Page 273

1         Were you aware of that at
2  the time?
3      A.   At the time, I didn't know
4  what the level that distributors or
5  wholesalers were charged with doing.
6      Q.   So did you have an
7  understanding at the time that
8  distributors had an obligation to monitor
9  dispensers by increasing pharmacy due
10  diligence?
11      A.   I don't know specifically
12  relative to this time.  I know I had a
13  conversation with HD Smith senior
14  management that basically said they
15  believe they are doing everything right.
16  But ultimately the rules keep on changing
17  from DEA and they had a hard time, so I
18  know that that was an issue that I heard
19  from various wholesalers and distributors
20  that the rules kept on changing for them.
21      Q.   Do you recall learning, as
22  is reflected in the -- in the top portion
23  of the e-mail, that Masters had made a
24  decision to greatly curtail shipments to

Page 274

1  Florida for oxy IR, separate from the DEA
2  action, because they saw a lot of red
3  flags when visiting a bunch of clinics?
4      A.   Sorry.  Where are you
5  reading from?
6      Q.   The third paragraph of your
7  e-mail.
8      A.   Oh, yes.  Yep.
9      Q.   Do you recall being aware of
10 that at the time?
11     A.   Quite a -- quite a span
12 between the time that -- Denny's e-mail
13 from March 16th till May 1st.  So I don't
14 know at what time that came through or
15 how that was confirmed.  I don't know
16 exactly the -- the timeline.
17     Q.   Well, you wrote this e-mail
18 on May 1st, 2009, correct?
19     A.   Correct.  I just don't know
20 when I learned it.  There's a long span
21 between those dates.
22     Q.   But certainly by May 1st,
23 2009 you learned it, correct?
24     A.   Yes.

Page 275

1      Q.   And are you aware of what
2  red flags were found and are being
3  referenced here?
4      A.   I don't know specifically
5  what they found.
6      Q.   Do you know generally?
7      A.   No.  Obviously they saw
8  something that was concerning to them.
9  And after having had this scenario,
10 certainly it looks like they made a
11 change.
12     Q.   But you don't know what
13 types of red flags were found?
14     A.   Not specifically, no.
15     Q.   And not generally either?
16     A.   No.  I'm not sure exactly
17 what would come up in those scenarios.
18     Q.   And --
19     A.   Again, this is -- this is
20 what I'm hearing from them.  So it's hard
21 for me to interpret what the customer has
22 determined those red flags could be.
23     Q.   And you were aware that the
24 DEA was requesting penalty money from

Page 276

1  Masters?
2      A.   Yes, from the discussions
3  and I think from -- yeah.
4      Q.   And that the DEA also asked
5  for personal financial statements from
6  all the officers at Masters?
7      A.   I didn't recall that.
8      Q.   Okay.  But you wrote it here
9  in the e-mail, correct?
10     A.   Yeah, I didn't recall that.
11     Q.   You mean you don't recall it
12 now, but you did at the time, right?
13     A.   I -- I don't recall it now.
14 And I wrote it, so I must have had
15 insight into that, yes, correct.
16     Q.   Okay.  Did you ever have
17 a -- or did you have an understanding at
18 the time that the officers at Masters
19 were earning significant dollar amounts
20 as a result of exceedingly high sales of
21 oxy?
22     A.   I can't -- I can't speculate
23 on how it is that they became -- what was
24 your term, "wealthy"?  Or how they gained

Page 277

1  personal financial wealth.  I can't
2  speculate on all the reasons that would
3  be.
4      Q.   And do you recall the DEA
5  reaching out to you about Sunrise,
6  reaching out to Mallinckrodt about
7  Sunrise?
8      A.   I remember circumstances
9  around it.  I don't -- I don't believe
10 the DEA reached out to me.
11     Q.   But you recall that the DEA
12 reached out to Mallinckrodt, correct?
13     A.   I don't know if they reached
14 out directly or -- or if Mallinckrodt
15 reached out to them as a result of
16 information that they identified.  I
17 don't know who reached out to who.
18         (Document marked for
19         identification as Exhibit
20         Mallinckrodt-Adams-20.)
21 BY MS. BAIG:
22     Q.   Let's have this --
23     A.   I just don't recall.
24     Q.   -- document marked as

1 Exhibit 20.
2      A.   Okay.
3      Q.   And this is from Victor
4 Borelli.  It starts as an e-mail from
5 Victor Borelli to Michael Gunning dated
6 July 9, 2009.  Bates-stamped Mallinckrodt
7 0000459331 to 459332.
8           And it says Sunrise
9 follow-up.
10      A.   Great, yeah.
11      Q.   Does this e-mail refresh
12 your recollection, do you know what call
13 is being discussed in the e-mail from you
14 to Victor Borelli and Mike Gunning?
15      A.   I don't recall the call, no.
16      Q.   You don't recall anything
17 about it?
18      A.   I don't recall the call
19 occurring at all.
20      Q.   Do you recall the incident?
21      A.   I recall excerpts from here.
22 Such as Victor was in the field with an
23 ex-DEA agent, I remember that.
24      Q.   Do you recall the fact that

1 Sunrise had retained an ex-DEA agent?
2      A.   Yes.
3      Q.   Do you recall who that was?
4      A.   I don't know.  I believe
5 from -- from -- there's two names that
6 stand out, and I can't remember.
7      Q.   And do you see you're --
8 would you agree that you're sort of
9 commending Victor Borelli here where you
10 state, "I wanted to follow up on the
11 meeting with Karen Harper, Bill Ratliff
12 and others regarding the potential issues
13 for oxy 30.  The initial tenure" --
14 excuse me, "tenor of the call relative to
15 suspicion and due diligence of Sunrise
16 wholesale was quickly diffused by your
17 initiative and I want to thank you.  The
18 information was vital and presentation of
19 it was fantastic, not defensive or
20 emotional which could be possible given
21 the dollars at stake."
22           Do you see that?
23      A.   I do see that.
24      Q.   Does this suggest to you

1 that there were -- there was a good
2 amount of money at stake with respect to
3 the Sunrise issues?
4      A.   Relatively speaking, it does
5 look like there were dollars at stake
6 relative to that customer, but it does
7 look like this -- this was brought up to
8 the appropriate people to have the
9 discussion as sales is the eyes and ears
10 to the customer.
11      Q.   So is it your position that
12 the -- the salespeople are the -- the
13 best people to be monitoring suspicious
14 orders?
15      A.   It would be my opinion and
16 it would be my understanding is that, my
17 knowledge is that the sales team does not
18 review suspicious orders, that there is a
19 separate team that does that.  And from
20 the perspective of if the team that
21 reviews or if compliance has questions, I
22 believe it's perfectly valid to reach out
23 to the sales team and investigate, gain
24 information and insights as needed, and

1 then validate that for themselves if they
2 need to.
3      Q.   And was that the practice at
4 Mallinckrodt at the time?
5      A.   I don't remember any
6 specific formal practice.
7           But certainly if there's a
8 compliance team that is flagging what
9 either is -- I think you mentioned the
10 word suspicious order, or the words, or
11 something along that line.  If there is a
12 team that does that and they raise up the
13 issue, potential questions, it would
14 behoove anyone and everyone to respond to
15 that, provide as much information to that
16 group and so then, that group can make
17 the decision as they see fit.  Ultimately
18 the decision will always fall to the
19 compliance group.
20      Q.   And was it the sales team's
21 responsibility to defuse concerns raised
22 about suspicious orders?
23      A.   So I think the word defuse
24 is -- is the word of, if there is a

Page 282

1  conversation to take place to be
2  even-keeled in that, if there are dollars
3  at stake and for an individual
4  compensation, it would be easy to become
5  emotional about that.
6          But in this case, it wasn't
7  defensive, it wasn't emotional about it,
8  but brought a, per my e-mail, a tenor of
9  professionalism to it, is -- is what I'm
10 deriving from this.
11      Q.   It would be easy to become
12 emotional because the sales rep also has
13 dollars at stake given that his bonus is
14 tied to his ability to meet sales
15 targets, right?
16      A.   That would be easy to do,
17 but that is not what occurred.
18          MR. TSAI:  Do you want to
19 take a quick break?
20          MS. BAIG:  Sure.
21          THE VIDEOGRAPHER:  We're
22 going off record.  The time is
23 3:29.
24          (Short break.)

Page 283

1          THE VIDEOGRAPHER:  We're
2  going back on record.  Beginning
3  Media File Number 5.  The time is
4  3:43.
5  BY MS. BAIG:
6      Q.   All right.  Going back to
7  Exhibit 20 for just a moment please.
8      A.   Yes.
9      Q.   Do you see at the very end
10 of the e-mail from you, you state, "As a
11 result of the information, Sunrise orders
12 will be released per Bill and Karen.
13 Bill will use the information that you
14 provide to dive deeper into reviewing the
15 oxy 30-milligram lot and an audit will be
16 scheduled over the next six weeks with
17 Sunrise."
18          Do you see that?
19      A.   I do see that.
20      Q.   So ultimately at least with
21 respect to this order, the order was
22 released; is that right?
23      A.   It appears to be.
24      Q.   And it was released from

Page 284

1  what?
2      A.   From Bill and Karen as part
3  of the compliance team.
4      Q.   So it was released from a
5  suspicious order monitoring hold?
6      A.   I don't know the
7  technicality of if it was a peculiar, I
8  think is what came up earlier, or if it
9  was actually a suspicious order.  I don't
10 know what level it is.  It is just
11 outside of my -- my purview if you will.
12      Q.   So you never knew what
13 the -- what the threshold was that was
14 triggering it as a peculiar or suspicious
15 order, correct?
16      A.   I don't understand what the
17 threshold is and -- or the algorithm or
18 kind of how it was -- it was
19 characterized; that's correct.
20      Q.   And before -- before it's
21 released, did you do a site visit of
22 Sunrise or any of its customers?
23      A.   I don't -- I don't recall if
24 I visited them before this or after.  As

Page 285

1  you can see, it looks like there was
2  going to be a meeting scheduled after.  I
3  don't recall if there was one prior to
4  this or not.
5      Q.   Okay.  But there's no
6  suggestion in here that you had already
7  been to Sunrise to do it -- to a site
8  visit; is that right?
9      A.   You can't -- can't -- you
10 can't take that one way or another.  I'm
11 not sure.
12      Q.   Okay.  And you -- but you
13 don't recall doing a site visit at
14 Sunrise before releasing this order, do
15 you?
16      A.   Not -- not specifically for
17 this order, no.
18      Q.   Do you recall doing a site
19 visit of any of Sunrise's customers
20 before releasing this order?
21      A.   No.
22      Q.   So there weren't any
23 pictures that you saw of Sunrise or its
24 customers before releasing this order; is

Page 286

1 that right?
2    A.   I think from a compliance
3 perspective, that's a better question for
4 them as far as kind of, again, went
5 through training on compliance.  Went
6 through -- I believe, based on this, I
7 went through some training.  But as far
8 as kind of a requirement, is it a
9 requirement of us for our wholesalers,
10 distributors, to take a picture there, I
11 don't -- I don't know that that was ever
12 done.  And I don't know if that was a
13 recommendation, a guideline or a
14 requirement.  I just don't know.
15    Q.   But I'm just asking you if
16 you recall seeing any pictures of Sunrise
17 or any of its customers before releasing
18 this order.
19    A.   I don't recall seeing a
20 picture of any customer.
21    Q.   Or of Sunrise, correct?
22    A.   As a customer, they would
23 fall into that statement.
24    Q.   Okay.  And do you recall

Page 287

1 reviewing any of the data that would have
2 shown the delta between these particular
3 orders and -- and the usual orders from
4 Sunrise before releasing these orders?
5    A.   No.
6       (Document marked for
7       identification as Exhibit
8       Mallinckrodt-Adams-21.)
9 BY MS. BAIG:
10    Q.   Let's have this document
11 marked as Exhibit 21.  And this is an
12 e-mail from Lisa Lundergan to Victor
13 Borelli, and you and Kate Neely.  Subject
14 is Sunrise reports, dated July 10, 2009.
15    A.   I was copied on this.  Not
16 to.  But yes.
17    Q.   But you received it,
18 correct?
19    A.   Yeah, I think so.
20    Q.   Okay.  And it's
21 Bates-stamped Mallinckrodt 0000448872
22 through 8874, which is a multi-page
23 document.
24       And it says, "Please find

Page 288

1 attached the requested reports.  The
2 first report is all DEA numbers that have
3 been shipped product from Sunrise in the
4 past 12 months.  This second report is a
5 chargeback report by DEA and SKU showing
6 Sunrise sales as well as other
7 wholesalers."
8       So do you recall whether or
9 not you were the person that requested
10 this data regarding Sunrise?
11    A.   Let me look at it and see
12 what the distinction is.
13       Okay.  I'll see if I can
14 decipher it as we go along.
15    Q.   Do you recall requesting
16 this data?
17    A.   I do not.
18    Q.   Okay.  But you have no
19 reason to doubt that you received it,
20 given that you were cc'd on this e-mail,
21 correct?
22    A.   That is correct.
23    Q.   Okay.  And does this -- if
24 you look at the chart, do you see you

Page 289

1 have in column E, you have a product
2 description.  In product -- column F you
3 have pricing quantity.  Column G you have
4 net sales.  Column C you have Sunrise
5 wholesaler.  So that's your client here,
6 correct?
7    A.   Correct.
8    Q.   And then column B you have
9 ship to customer name, and that would be
10 your customer's customer, meaning
11 Sunrise's customer, correct?
12    A.   That's correct.
13    Q.   Now, looking at this list,
14 does this refresh your recollection that
15 Mallinckrodt did actually have data that
16 showed its customer's customers including
17 not just pharmacies, but also physicians?
18    A.   So this -- this is data that
19 was available.  So when you look at this
20 and say it's a physician, again from a
21 physician, they are still the ones
22 determining whether or not it's writing a
23 prescription for a legitimate pain
24 patient.  So...

Page 290

1  Q.  Correct.  But Mallinckrodt
2  had access to data with respect to, for
3  example, here, its customer's customers,
4  Sunrise's customers, including
5  physicians, correct?
6  A.  Well, it wasn't a full
7  database.  You'd have to pull this data
8  together.  But it -- you can see that
9  there are physicians and pharmacists
10  listed in this data by product, that's
11  correct.
12        (Document marked for
13        identification as Exhibit
14        Mallinckrodt-Adams-22.)
15  BY MS. BAIG:
16  Q.  Let's have this document
17  marked as Exhibit 22 please.  This is
18  an -- it starts as an e-mail string from
19  Victor Borelli to you and others.
20  Bates-stamped Mallinckrodt 0000290150
21  through 151.  And you'll see the subject
22  is prescription drug abuse epidemic.
23        Do you see that?
24  A.  I see that.  I don't believe

Page 291

1  it was Victor who initiated this e-mail
2  chain.
3  Q.  Correct.  I'm just labeling
4  these documents by the very first e-mail
5  on the chain --
6  A.  Oh.  Okay.
7  Q.  -- so that if there's any
8  question later --
9  A.  Gotcha.
10  Q.  -- we can find the document
11  that is this exhibit.
12  A.  Great.  Sorry.
13  Q.  So do you recall receiving
14  an e-mail about the prescription drug
15  abuse epidemic in or about 2009, July of
16  2009?
17  A.  I'm sorry.  Not
18  specifically, no.
19  Q.  Okay.  Do you recall
20  generally?
21  A.  I don't remember specific
22  articles or even generally having access
23  to a large number of articles.
24  Q.  Okay.  Do you recall

Page 292

1  learning that South Florida had become
2  the largest supplier of illegal
3  prescription drugs in the country?
4  A.  Not specifically.
5  Q.  Generally?
6  A.  Florida in general.  I think
7  this is South Florida.  But Florida in
8  general, as I understood it, was a -- was
9  a higher -- higher use of -- of
10  prescription medications.
11        And I guess from my
12  perspective, obviously Florida has an
13  aging population, and I mean certainly
14  that is a key driver for increased
15  prescriptions.  But ultimately this is
16  giving more color around it.
17  Q.  Was it -- was it your read
18  of this article that the prescription
19  drug abuse epidemic in Florida was a
20  result of the aging population in
21  Florida?
22  A.  I don't recall the article
23  at the time.  And so I don't recall what
24  it triggered in my mind.

Page 293

1  Q.  Well, as you read it now, is
2  it your understanding that the gist of
3  this article is about the aging
4  population in Florida is causing the
5  prescription drug abuse epidemic there?
6  A.  I'll take the time to read
7  it.  I haven't read it.
8  Q.  Okay.
9  A.  Thank you.
10  Q.  Do you recall understanding
11  at the time that -- that there was an
12  alarming problem facing the country with
13  nearly one in five teens abusing
14  prescription medications?
15  A.  I don't remember that at the
16  time.  I don't remember it now rather.
17  Q.  You don't remember -- you
18  don't remember hearing anything about
19  that at the time?
20  A.  Specifically with teens,
21  absolutely not.
22  Q.  Generally speaking, do you
23  recall hearing that there was an opioid
24  epidemic?

Page 294

1    A.   I recall there were issues
2 with opioids that would raise the alarm.
3 And I guess I'll just call out that the
4 illegal aspect of opioids is what was
5 causing the problem.  The legal component
6 of it is where we were practicing and
7 filling supply from prescriptions written
8 legally by physicians.
9    Q.   Well, the title of this
10 article is "Prescription Drug Abuse
11 Epidemic," correct?
12    A.   Correct.
13    Q.   So this article is
14 specifically about prescription drugs,
15 correct?
16    A.   It is.  And I guess I was
17 just making the distinction of, there are
18 prescription drugs that are -- and
19 prescriptions that are filled
20 legitimately, and there apparently are
21 prescription drugs that are filled
22 illegitimately.
23    Q.   Were you aware that South
24 Florida became the largest supplier of

Page 295

1 illegal prescription drugs in the
2 country?
3    A.   I think asked and answered.
4 South Florida, I didn't recall that it
5 was specifically to South Florida.  So,
6 no, I don't recall that.
7    Q.   As it states here, "The
8 number of pain clinics and doctors
9 willing to prescribe these medications
10 has made the area the logical choice for
11 traffickers and drug addicts looking to
12 obtain prescription drugs, including
13 powerful painkillers."
14    Do you see that?
15    A.   I do see that.
16    Q.   And did you understand that
17 to be the case at the time?
18    A.   I don't recall reading this
19 article or seeing this article at the
20 time.  Or I don't recall seeing it.
21    Q.   Okay.  And it goes on to
22 state that, "Some pharmacies have hired
23 bouncers and lookouts in order to alert
24 the owners of the stores to

Page 296

1 investigations."
2    Do you recall hearing
3 anything about that?
4    A.   I do not.
5    Q.   It goes on to state, "A lot
6 of the mom and pop pharmacies, the only
7 way they are surviving is by putting out
8 oxycodone, according to Broward Sheriff's
9 Office Sergeant Richard Pisanti."
10    Do you see that?
11    A.   I do.
12    Q.   Do you recall hearing that
13 generally at the time?
14    A.   I don't.  It's hard to draw
15 a conclusion from one person's opinion.
16 But, yes, I see that.
17    Q.   The Broward County Sheriff's
18 opinion you mean?
19    A.   Yes.
20    Q.   Was your understanding that
21 the problem was not as severe in Florida
22 as this article suggests?
23    A.   No, I didn't say that.  I
24 just said that I don't recall -- I don't

Page 297

1 recall this context.  But I think I
2 stated earlier that Florida had a high
3 volume, if I'm not mistaken.  I can look
4 back exactly.
5    Q.   Okay.  And the article goes
6 on to state, "Statistics show an alarming
7 problem facing America."
8    Do you see that?
9    A.   Yes.
10    Q.   And at the very end, it
11 references an interview on the CBS Early
12 Show, "National drug control policy
13 director Gil Kerlikowske said, 'The issue
14 of prescription drug abuse, which the
15 Office of National Drug Control Policy
16 has been shouting about from the rooftops
17 is a significant problem in this
18 country.'"
19    Do you see that?
20    A.   I do see that.
21    Q.   It's not just necessarily
22 the opinion of would be person, correct?
23    A.   I'm referring to a lot of
24 the mom and pop pharmacies, the only way

Page 298

1 they are surviving is putting out
2 oxycodone. I can't speak to mom and pop
3 pharmacies have been challenged -- the
4 independent pharmacies have had
5 challenges across the industry that have
6 been well known because their pricing
7 doesn't tend to be as advantageous as
8 chain pharmacies.
9 So to draw a conclusion that
10 mom and pop pharmacies, because of
11 oxycodone output is the way they are
12 surviving, I think is a large leap.
13 Q. Is a largely what?
14 A. It's a large leap to make
15 that conclusion.
16 Q. Oh, large leap.
17 A. Yes, sorry. Sorry, yeah.
18 Q. And do you see Mr. Borelli's
19 response? He states, "This is an
20 interesting article. This is exactly why
21 Sunrise works/hires Lewis Fischer."
22 Do you see that?
23 A. I see that, yes.
24 Q. Do you know who Lewis

Page 299

1 Fischer is?
2 A. I think there's reference to
3 that. I couldn't recall the name. So I
4 believe he is the ex-DEA agent.
5 Q. And did you understand
6 Victor Borelli to be saying that the
7 prescription drug abuse epidemic was
8 largely why Sunrise works?
9 A. That's not the way I would
10 read this. The way that they are going
11 through is to try and have someone who
12 can do an audit of their customers, so
13 that is their due diligence that they are
14 doing.
15 So hiring an ex-DEA agent to
16 look at pharmacies or to -- whoever is
17 dispensing the product, that is what
18 Sunrise appears to have done.
19 Q. Did you ever interact with
20 Lewis Fischer?
21 A. I did not.
22 Q. Do you know anything about
23 him?
24 A. Ex-DEA agent. And that's

Page 300

1 the extent.
2 (Document marked for
3 identification as Exhibit
4 Mallinckrodt-Adams-23.)
5 BY MS. BAIG:
6 Q. We'll have this document
7 marked as Exhibit 23. It's an e-mail
8 that starts with a string from Bill
9 Ratliff on Monday, July 27, 2009. Bottom
10 Bates stamp number is 0000290175 through
11 177.
12 If you turn to the very last
13 page.
14 A. Okay.
15 Q. Do you see that the string
16 starts as e-mail from Paul Kleissle at
17 the DOJ to Bill Ratliff and Karen Harper,
18 correct?
19 A. I do see that, yes.
20 Q. Okay. Bill Ratliff's
21 position again, please?
22 A. I'm not sure. I think we
23 were estimating potentially security,
24 director of security.

Page 301

1 Q. Okay. And so the DEA -- DOJ
2 is calling Bill Ratliff and asking him to
3 give him a call regarding the oxy case;
4 is that right?
5 A. That's what it states, yes.
6 Q. Okay. And Bill Ratliff
7 reports to you and others that, "The DEA
8 diversion group supervisor recommended
9 that we audit Sunrise as soon as
10 possible."
11 Do you see that?
12 A. I do see that, yes.
13 Q. Does this refresh your
14 recollection that it was the DOJ that was
15 recommending the audit and not
16 Mallinckrodt?
17 A. No, I didn't recall the DOJ
18 being brought up.
19 Q. Well, the DEA, diversion
20 group of the DOJ, correct?
21 A. I didn't know they were
22 affiliated.
23 Q. Okay. So here -- if you see
24 Paul Kleissle, the initial e-mail is

Page 302

1 coming from USDOJ.gov, correct?
2    A.   Correct.
3    Q.   Okay.  And you see that Bill
4 Ratliff is reporting, "The DEA diversion
5 group supervisor recommended that we
6 audit Sunrise as soon as possible."
7        Do you see that?
8    A.   I do.
9    Q.   So in any event, it was not
10 Mallinckrodt that initiated the audit of
11 Sunrise.  Does this refresh your
12 recollection of that fact?
13    A.   I didn't -- no, it does not
14 refresh me on that memory.  Now I see it,
15 but I didn't know at the time.
16    Q.   Okay.
17    A.   Yep.
18    Q.   Well, you knew it when you
19 got this e-mail, though, right?
20    A.   I didn't recall that I knew
21 it at that time.
22    Q.   Right.
23    A.   Right.
24    Q.   Okay.

Page 303

1    A.   I think I went on to state,
2 "We'll make this a priority."
3        So I think obviously we're
4 going to take it seriously.  I think
5 that's -- the whole process is designed
6 to do that, is to make sure that we can
7 take that up to the compliance -- the
8 level of review that's required from a
9 compliance perspective.
10    Q.   And Karen Harper suggests
11 that we keep -- "The scope of the review
12 will be at a fairly high security and
13 compliance level."
14        Do you see that?
15    A.   Yes, I see that.
16    Q.   And she goes on to state
17 that, "I don't know anything about the
18 chargeback system, which is how we
19 detected which physicians/pain clinics
20 are receiving our product through
21 Sunrise."
22        Do you see that?
23    A.   I do see that.
24    Q.   And Karen Harper's position

Page 304

1 was again what?
2    A.   Right there, controlled
3 substance compliance, global logistics
4 manager, Covidien Mallinckrodt.
5    Q.   So does this suggest to you
6 that, at least at that point in time,
7 Mallinckrodt was not using the chargeback
8 system on a regular basis for suspicious
9 order monitoring, the fact that she
10 doesn't know anything about the
11 chargeback system?
12    A.   I -- I think --
13        MR. TSAI:  Object to form.
14        Go ahead.
15        THE WITNESS:  I can't
16    speculate on what Karen's thought
17    process was there.
18 BY MS. BAIG:
19    Q.   Okay.  But she does state
20 here, "I don't know anything about the
21 chargeback system," correct?
22    A.   She does indicate that.  So
23 I think we all have our areas of
24 expertise.  So I can speak to

Page 305

1 chargebacks.  And she can speak to
2 compliance.  So I think from an expertise
3 perspective, this makes sense that this
4 is not a deep level awareness for her.
5    Q.   Okay.  And you can speak to
6 chargebacks, but you're not aware, are
7 you, of the chargeback system being used
8 on a regular basis as part of the
9 suspicious order monitoring process?
10    A.   I don't know.  I didn't know
11 if that was part of the suspicious order
12 monitoring process.
13        So, I don't have awareness
14 that that was an integral part or a part.
15    Q.   You don't know one way or
16 another?
17    A.   I don't.  They had their own
18 algorithms that compliance developed.
19 And they had their methods in which they
20 tracked and did what they needed to do in
21 compliance with that program.
22        (Document marked for
23    identification as Exhibit
24    Mallinckrodt-Adams-24.)

Page 306

1  BY MS. BAIG:
2      Q.   Let's have this document
3  marked as Exhibit 24.
4      A.   Okay.
5      Q.   This is a document that
6  begins with an e-mail from Victor Borelli
7  to Bill Ratliff, you and others.  Dated
8  August 4, 2009, Bates-stamped
9  Mallinckrodt 0000562325 through 2329.
10     Do you recall generally an
11 issue arising regarding Florida
12 medication going into Tennessee?
13     A.   Hold on one moment if I
14 could.  Sorry, this is a lengthy one.  I
15 just want to make sure I can go through
16 this.
17     MS. BAIG:  Sure.  We can go
18 off the record.
19     THE VIDEOGRAPHER:  Going off
20 the record.  The time is 4:08.
21     (Brief pause.)
22     THE VIDEOGRAPHER:  We are
23 going back on record.  Beginning
24 of Media File Number 6.  The time

Page 307

1      is 4:10.
2  BY MS. BAIG:
3      Q.   Okay.  If you turn back
4  towards -- towards the end of the string.
5  So starting at the beginning.
6      A.   Okay.
7      Q.   Do you see that there's an
8  e-mail from Dwayne Collins to Bill
9  Ratliff, subject, Florida medication
10 coming into Tennessee?
11     A.   I do see that, yes.
12     Q.   And Dwayne Collins, his
13 e-mail address is at mymorristown.com.
14 Do you see that?
15     A.   I do, yes.
16     Q.   And he describes himself as
17 writing from the Morristown, Tennessee,
18 police department, correct?
19     A.   Correct.
20     Q.   Okay.  And he's raising an
21 issue about Mallinckrodt medications
22 coming from Florida to Tennessee.  Do you
23 recall this issue being raised?
24     A.   I recall the issue being

Page 308

1  raised.  I think you mentioned
2  medications.  If I'm not mistaken, this
3  is isolated to one medication and a small
4  amount.  But yes, I do remember this
5  being raised.
6      Q.   And -- and he states in this
7  second paragraph, "In October 2008,"
8  that's the general time frame, he goes on
9  to state, "My first eye-opening
10 experience to the pharmaceutical sale of
11 oxycodone sent me off into the direction
12 of looking at the pharmacies that were
13 filling the scripts.  It was then that I
14 found that we were dealing with several
15 pain clinics in Florida where doctors
16 were prescribing an abundant amount of
17 oxycodone medication to numerous
18 Tennesseans, especially within the
19 jurisdiction that I assigned."
20     Do you see that?
21     A.   I do see that.
22     Q.   He's not referencing a very
23 small amount.  He's referencing an
24 abundant amount, correct?

Page 309

1      A.   That's an ambiguous term as
2  far as abundant.  But, you know, I guess
3  to prescribe it to Tennesseans in October
4  of 2008, perhaps there's people going
5  down for the wintertime.  I don't know,
6  but certainly I'll take your word for it.
7      Q.   But I'm just reading his
8  words.  He uses an -- he's describing an
9  "abundant amount of oxycodone medications
10 to numerous Tennesseans," correct?
11     A.   Yep.
12     Q.   And he -- a little further
13 on, he says, "I have three individuals
14 who are coming up out of Florida on a
15 regular basis and selling massive amounts
16 of oxycodone 30 -- 30 milligrams."
17     Do you see that?
18     A.   I'm not sure where you are
19 at yet.
20     Q.   I'm right in the middle
21 of --
22     A.   I see.
23     Q.   -- his third paragraph.
24     A.   I see that, yes.

Page 310

1  Q.  Okay.  So he's talking, at
2  least from his perspective, about massive
3  amounts of oxycodone 30 milligrams,
4  correct?
5  A.  Yep.
6  Q.  Okay.
7  A.  I'm not sure what massive
8  is, but yes.
9  Q.  Okay.  The next paragraph he
10 goes on to state, in the second sentence,
11 "One of the individuals from Florida who
12 has local ties here told my informant
13 that they would be in Morristown on the
14 18th of this month and had enough,
15 (meaning oxycodone 30 milligrams) to OD
16 all of Morristown.  This comment leads me
17 to believe that they are coming with a
18 sizable shipment."
19      Do you see that?
20 A.  I do see that.
21 Q.  Okay.  So "enough to OD all
22 of Morristown" is certainly, at least
23 from his perspective, sizable, correct?
24 A.  Correct.

Page 311

1  Q.  Okay.  If you skip down a
2  couple of paragraphs, you'll see he goes
3  on to state, "My motel subpoena indicated
4  that these people were in this area
5  routinely beginning since March 2009 and
6  it is my opinion that if these people
7  were coming into this area as often as
8  they were and selling the amount that's
9  suspected, this possibly has to lead back
10 to a holding facility in Florida where
11 the amount taken is not as obvious as
12 would be if taken out of a pharmacy."
13      Do you see that?
14 A.  I do see that.
15 Q.  And then he goes on to
16 describe the bottle, and he states,
17 "Small white bottle without pharmacy
18 label.  100-tablet capacity.  CI's advise
19 that the silver foil is still intact when
20 the cap is unscrewed."
21      And then he goes on to
22 state, "Oxycodone hydrochloride
23 manufactured by Mallinckrodt."
24      And he gives a barcode and a

Page 312

1  lot number.  Do you see that?
2  A.  I do see that, yes.
3  Q.  Okay.  And then he is
4  essentially asking for help.  "I
5  appreciate your help, and if there is any
6  further information you need from me,
7  please call me."
8      Do you see that?
9  A.  Yes.
10 Q.  Okay.  So Mallinckrodt was
11 then able to identify that batch by the
12 lot number.  Do you -- is that your
13 recollection or do you understand that?
14 A.  That's what it looks like,
15 correct.
16 Q.  Okay.  And Mallinckrodt was
17 also able to identify the doctor, do you
18 see that?
19 A.  Where are you referring to,
20 I'm sorry?
21 Q.  I'm looking at Bill
22 Ratliff's e-mail.  So the prior page, the
23 page that ends in 327.  And Bill Ratliff
24 sends to Dwayne Collins in Morristown an

Page 313

1  e-mail that states, "Dwayne, the doctor
2  we discussed ordered the following during
3  the last 12 months:  78 bottles oxy
4  15 milligrams, 204 oxy 30 milligrams, 20
5  methadone 10 milligrams, and 4
6  hydromorphone.  All came from the
7  customer we discussed except the
8  hydromorphone."
9      Do you see that?
10 A.  I do see that.
11 Q.  Okay.  So is it your
12 understanding that Mallinckrodt was able
13 to identify precisely the doctor that had
14 ordered the -- the drugs that are being
15 raised as suspicious by Dwayne Collins?
16      MR. TSAI:  Object to form.
17      Go ahead.
18      THE WITNESS:  It was -- they
19      were able to based on the name of
20      the doctor being provided.  They
21      certainly could go back and look
22      at that to identify that
23      information.
24 BY MS. BAIG:

Page 314

1    Q.   And if you go a little bit
2 further up in the chain, if you're
3 looking at the e-mail from Bill Ratliff
4 to Tim Wright and others, you'll see Bill
5 Ratliff states, "We advised that Sunrise
6 Wholesale Inc. was the only distributor
7 residing in Florida that received this
8 lot."
9         Do you see that?
10    A.   I do see that.
11    Q.   "In addition, we advised
12 that Cardinal Health in Ohio has a
13 distribution center in Florida and had
14 received some of the lot, but the doctor
15 listed on one of the 100-count bottles
16 that was recovered only purchased oxy
17 from Sunrise."
18         And then a little -- then it
19 goes on. "For background, Sunrise sells
20 mainly to pain clinics and to dispensing
21 doctors. One doctor was identified by an
22 empty 100-count bottle found by one of
23 the two informants in the investigation.
24 We tracked the doctor's purchases through

Page 315

1 our chargeback system. See below."
2         Do you see that?
3    A.   I do see that, yes.
4    Q.   Okay. And then a little
5 further down it states, "Initially I
6 recommended that we stop shipping to
7 Sunrise until a meeting could be held to
8 discuss our due diligence with them.
9 This is part of our suspicious order
10 monitoring system mandated by DEA. Since
11 Sunrise was having some credit issues,
12 this was not a problem."
13         And then it goes on a little
14 further down, "It was determined that
15 Victor Borelli had visited Sunrise when
16 they became a customer, approximately
17 18 months ago. Originally they purchased
18 their material from Masters distribution,
19 another customer. Also Victor advised
20 that Sunrise employed a part-time
21 contract employee Lewis Fischer, former
22 DEA pharmacist, to contact customers to
23 determine if they were legitimate.
24 Victor actually rode with Lewis and me.

Page 316

1 Lewis explained how he made the decision
2 on future customers for Sunrise.
3         "Also Sunrise was recently
4 audited by the DEA and no issues were
5 identified.
6         "During the teleconference a
7 $500,000 check was received from Sunrise
8 through FedEx. After reviewing all of
9 the facts it was determined to continue
10 with the relationship with Sunrise and
11 fill their current order."
12         Do you see that?
13    A.   I do see that. Yes.
14    Q.   So does this -- is it your
15 understanding that -- that essentially
16 Mallinckrodt made the decision to fill --
17 continue filling Sunrise's current order?
18    A.   Yes, it appears as if they
19 did fill the order, and it appears that,
20 you know, based on the look of kind of
21 going through this information now -- so
22 it's good to have the context of the
23 number of bottles written by this
24 physician. What you don't know is how

Page 317

1 many of those -- basically where their
2 proximity was. Was his proximity close
3 to an oncology clinic? Kind of how that
4 all type of usage was transformed or
5 what -- what in the context of it was
6 important.
7         What was interesting here,
8 though, was that DEA did audit them. And
9 the DEA went through, and I think we go
10 on further to say that they complimented
11 Covidien on the fact that they'd acted in
12 a responsible way and the DEA saw no
13 issues with regard to this matter. So I
14 think it's -- and went on further to
15 compliment Covidien for that process.
16         So I think those are all
17 good points that kind of show that the
18 system is alerting people. But again,
19 when it comes down to compliance, they
20 can determine, based on all the facts in
21 front of them, on what to take as -- you
22 know, what step is appropriate.
23    Q.   And is it your understanding
24 that the DEA did the audit or the DEA

Page 318

1  asked Mallinckrodt to do the audit and
2  Mallinckrodt performed the audit?
3      A.  I'll read it again.
4  "Sunrise was recently audited by the
5  DEA."
6          So the DEA audited them, and
7  no issues were identified.
8          So yeah, the DEA did the
9  audit prior to this scenario all coming
10 up and found that -- found no issues.
11     Q.   Do you have a recollection
12 of that or are you just reading that from
13 the e-mail?
14     A.   I'm reading that from the
15 e-mail.
16     Q.   Okay.  Do you have a
17 recollection of the DEA asking, from the
18 documents we looked at a few minutes ago,
19 the DEA asking Mallinckrodt to perform
20 the audit?
21     A.   No, I don't recall that.
22     Q.   Okay.  And you don't have
23 any recollection of the audit that was
24 performed?

Page 319

1      A.   By the DEA, no.
2      Q.   By Mallinckrodt, at the
3  DEA's request.
4      A.   I remember scheduling this
5  appointment, and I don't remember the
6  specifics of traveling down there.  But I
7  see they've asked for appointments to be
8  set up.  So it's part of the reading
9  through here.  So that's what I recall
10 from the reading.
11     Q.   Do you remember
12 participating in an audit of Sunrise?
13     A.   I remember going to a
14 meeting.  But I don't remember it
15 specifically being an audit.
16     Q.   Okay.
17         (Document marked for
18         identification as Exhibit
19         Mallinckrodt-Adams-25.)
20 BY MS. BAIG:
21     Q.   Okay.  Let's have this
22 marked as Exhibit 25.  This is a document
23 that starts as an e-mail from Karen
24 Harper to you and others, dated

Page 320

1  August 26, 2009.  Bates-stamped
2  Mallinckrodt_000388379 through 386.
3          And Karen Harper's title
4  identified here is controlled substance
5  compliance, global logistics manager from
6  Mallinckrodt, is sending "Sunrise audit
7  report draft."
8          Do you see that?
9      A.   I do.
10     Q.   Okay.  And if you turn to
11 the next page, you'll see that it starts
12 with the controlled substance compliance
13 suspicious order monitoring customer
14 audit checklist.
15         Do you see that?
16     A.   I do see that, yes.
17     Q.   Okay.  And there are certain
18 items filled in on the checklist.  If you
19 look through Section 2, for example,
20 well, the customer name is identified at
21 the top.  And if you look at the first
22 box in Section 2, you see, "Ordering
23 excessive quantities of a limited variety
24 of controlled substances while ordering

Page 321

1  few if any other drug."  And that box is
2  checked yes.
3          Do you see that?
4      A.   I do see that.
5      Q.   Oh, and also at the top of
6  this page it says, "Checklist completed
7  by Karen Harper."
8          Do you see that?
9      A.   I do see that, yes.
10     Q.   Okay.  And then the next box
11 says, "Ordering a limited variety of
12 controlled substances in quantities
13 disproportionate to the quantity of
14 noncontrolled medications ordered."  And
15 that check box is marked yes as well.
16         Do you see that?
17     A.   I do see that.
18     Q.   Do you know what a lifestyle
19 drug is?
20     A.   I know of an example of a
21 lifestyle drug, I guess.  So yes, I can
22 piece that together.
23     Q.   Did you ever hear any opioid
24 products being referred to as lifestyle

Page 322

1 drugs?
2    A.   No, I'm not familiar with
3 that.  I just don't recall that
4 terminology.
5    Q.   And do you see in Section 3,
6 it states at the top, on the next page,
7 "Per DEA, a distributor seeking to
8 determine whether a suspicious order is
9 indicative of controlled substance
10 diversion to other than legitimate
11 medical channels may wish to inquire of
12 the ordering pharmacy about the
13 following:  Has the audit candidate
14 exercised due diligence and determined:"
15       And then there's a number of
16 items to be checked.
17       Do you see that?
18    A.   I do see that.
19    Q.   And for example, the first
20 one checked yes states, "The physician
21 complies with the laws of every state in
22 which controlled substances are sold or
23 shipped."  And it states yes.
24       Do you see that?

Page 323

1    A.   I do see that.
2    Q.   And the next one says, "Does
3 the physician solicit buyers of
4 controlled substances via the internet or
5 is the subject company affiliated with an
6 internet site that solicits orders for
7 controlled substances?"  And it's checked
8 yes.
9       Do you see that?
10    A.   I do.
11    Q.   And a couple -- a couple
12 boxes down, it says, "Does the subject
13 company fill prescriptions issued by
14 practitioners based solely on an online
15 questionnaire without a medical
16 examination or bona fide doctor-patient
17 relationship."
18       Do you see that?
19    A.   Yes.
20    Q.   And that's checked yes,
21 correct?
22    A.   Correct.
23    Q.   So your understanding is
24 after Karen Harper looked at Sunrise,

Page 324

1 she's the one that is checking these
2 boxes, correct?
3    A.   Yes.  Karen -- Karen would
4 be the one to fill this out.
5    Q.   Okay.  A couple boxes down
6 it states, "Is there any evidence the
7 physician offers to sell controlled
8 substances without a prescription?"
9       Do you see that?
10    A.   Yes.
11    Q.   And that box is checked yes,
12 correct?
13    A.   Correct.
14       My interpretation of this
15 is --
16    Q.   I just have a few more
17 questions.  Hang on.
18    A.   Oh, sure.
19    Q.   And I'll let you opine.
20    A.   Okay.
21    Q.   If you look then to the --
22 to the back of this checklist, there's a
23 narrative.
24       Do you see that?

Page 325

1    A.   I see where it starts, yes.
2    Q.   It states under general
3 information, "Sunrise business model is
4 to pre-book sales in advance and order
5 from dosage manufacturers such as
6 Mallinckrodt."
7       Do you see that?
8    A.   I do see that.
9    Q.   Do you see a little further
10 down it states, "Sunrise accepts orders
11 for C-II controlled substances and has
12 made the business decision to avoid
13 distribution of C-III and C-IV products
14 due to potential internet sales and
15 increased diversion risk of C-III and
16 C-IV products."
17       Do you see that?
18    A.   I do see that.
19    Q.   Is it your understanding
20 that there was more diversion risk for
21 C-III and C-IV products than there was
22 for C-II products?
23    A.   I would interpret this as
24 it's not necessarily C-III and C-IV, as

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  opposed to internet sales is what has the
2  higher propensity for diversion. So it's
3  not the fact that it's classified one way
4  or the other. It's just that the
5  internet sales would raise the potential
6  issue.
7      Q.   Do you see two pages over
8  there's a heading that starts, "Sunrise
9  customer files and DEA 222 forms
10 reviewed"?
11     A.   Yes.
12     Q.   And there are a number of
13 items following, numbered.
14         Do you see those?
15     A.   I do see that.
16     Q.   And Item 4 identifies Barry
17 Schultz.
18         Do you see that?
19     A.   I see the name, yes.
20     Q.   And it states, "Within this
21 customer's file, there was both a formal
22 questionnaire filled out by Lewis Fischer
23 as well as recent 222 forms with orders
24 attached. This customer had 222 orders

Page 327

1  for 100 bottles of oxy 30 milligrams, but
2  Sunrise shipped them 24 bottles and
3  closed down the order. This may have
4  been done due to the tiered system of
5  ordering that Carlos Veron had been
6  referring to during today's meetings."
7          Do you see that?
8      A.   I do see that.
9      Q.   And this would have been
10 written by Karen Harper, correct?
11     A.   I believe she wrote the
12 entire report.
13     Q.   Okay. Are you familiar with
14 who Barry Schultz is?
15     A.   It doesn't ring a bell, no.
16     Q.   You haven't heard his name?
17     A.   No. It appears to be -- no.
18 It doesn't sound familiar to me.
19     Q.   Did you happen to see the
20 60 Minutes episode on Mallinckrodt that
21 came out in the last few months?
22     A.   I have not.
23     Q.   Were you aware that Barry
24 Schultz is now in jail?

Page 328

1      A.   I am not.
2      Q.   Okay. Do you see on the
3  very last page there is a section
4  entitled "Mallinckrodt information shared
5  with Sunrise"?
6      A.   Yes.
7      Q.   And it states, "John Adams
8  showed Sunrise some graphs depicting
9  oxycodone 30 milligrams customer
10 distribution" -- "distribution"
11 information extracted from the
12 Mallinckrodt chargeback system."
13         Do you recall doing this?
14     A.   I don't recall doing that,
15 no.
16     Q.   You don't recall doing
17 anything about pulling the graphs or
18 shows the graphs at Sunrise?
19     A.   No. I certainly wouldn't
20 have pulled the graphs. Someone else
21 would have done that for me.
22         As far as even sharing those
23 graphs, A, I don't remember them, and B,
24 I don't remember sharing them.

Page 329

1      Q.   And it goes on to state,
2  "The chargeback system gives Mallinckrodt
3  visibility to which end user customer is
4  purchasing oxycodone 30 milligrams, from
5  which Mallinckrodt wholesaler/distributor
6  customers."
7          Do you see that?
8      A.   I do see that, yes.
9      Q.   And then the example that's
10 given a little bit further down the page
11 states, "The Mallinckrodt chargeback
12 system can identify that customer A
13 purchases 11 percent of their oxycodone
14 30 milligrams from Sunrise and customer A
15 also purchases 89 percent of their
16 oxycodone 30 milligrams from other
17 Mallinckrodt wholesaler/distributor
18 customers such as HD Smith."
19         Do you see that?
20     A.   I do see that.
21     Q.   So all of that was, at least
22 according to this, available in your
23 chargeback data, correct?
24     A.   It appears so.

Page 330

1    Q.   And the audit findings at
2 the bottom.  Do you see that?
3    A.   Just in that same section.
4 It appears as if we can see what we saw,
5 but we don't know what that customer
6 purchased from others.  So you have
7 visibility of what you've done, but --
8 and you don't know exactly if that
9 pharmacy is affiliated with an oncology
10 clinic or if there's any specific type of
11 information.  So this is one slice.  The
12 only place where that information is all
13 aggregated is at DEA.
14    Q.   Do you know whether
15 Masters -- whether Sunrise was affiliated
16 with an oncology clinic?
17    A.   Sunrise would not be.  What
18 I'm referring to is who would buy from
19 Sunrise.  So the chargeback data would
20 show that particular pharmacy or in this
21 case potentially a physician.  It would
22 show their usage, but it wouldn't show
23 their proximity to a clinic.  So it
24 wouldn't be Sunrise, it would be that.

Page 331

1    And -- and maybe I'm going
2 to define end user customer, because that
3 sounds like a patient.  It is not.  An
4 end user customer is a pharmacy.
5 Anything that happens from the pharmacy
6 prior to that point is a physician
7 writing a prescription.  And that
8 prescription then being filled by a
9 pharmacy.  The pharmacy is defined as an
10 end user customer in this context.
11    Q.   Well, not necessarily,
12 because Barry Schultz is identified in
13 this report and he's not a pharmacy.
14    A.   No, but he is a dispensing
15 physician.
16    Q.   Sure.
17    A.   So he can write a
18 prescription if he deems the patient to
19 have legitimate pain, so he can
20 legitimately and legally write that
21 prescription and then that could be
22 filled by that same person.  That is a
23 legal method, at least it was at that
24 point.

Page 332

1    So from the end user, end
2 user is a -- is a pharmacy, it is not a
3 patient.  Or it is a physician who can
4 prescribe but it is not a patient.  So it
5 is not -- you can't determine -- you
6 can't determine if that physician wrote
7 that product, what type of patient.
8 There's patient laws regarding patient
9 confidentiality.  You can't have that
10 information.  It's not available.
11    Q.   But you can certainly
12 determine how many prescriptions that
13 Mr. Barry Schultz is writing?
14    A.   No, that's not true.  You
15 don't know --
16    Q.   Well, you can -- okay.
17 Well, you can determine how many orders
18 Barry Schultz is essentially purchasing?
19    A.   You can determine that, but
20 you -- by determining that, it doesn't
21 tell you the full context of what type of
22 practice, is that physician an
23 oncologist, is that physician next to a
24 pain clinic or affiliated, is it a pain

Page 333

1 clinic.  You don't know that context from
2 chargeback data.
3    Q.   No, but you could -- you
4 could look it up if you wanted to, right?
5    A.   I don't know.  I -- if you
6 can pick up the Yellow Pages and find
7 something like that out, I'm not sure.
8    Q.   And the audit findings here
9 was that Sunrise has systems in place to
10 maintain a suspicious order monitoring
11 program that meets the guidelines
12 outlined in C.F.R. 21 1301.74.
13    Do you see that?
14    A.   I do see that, yes.
15    Q.   And it goes on to state,
16 "There were no adverse audit findings as
17 a result of the Sunrise customer files
18 and DEA 222 forms reviewed."
19    Do you see that?
20    A.   I do see that.
21    Q.   Okay.
22    A.   I know there's a part that,
23 to use your word opine.  If I could go
24 back to that?

Page 334

1  Q.   You know what, why don't we
2  save that for the end.  Because I'm just
3  worried that we're running out of time.
4      A.   Fair enough.  Fair enough.
5      Q.   Each one of these documents
6  is so many pages long, and I -- I know
7  people are trying to get out of here.
8      A.   I know.  I'm trying to read
9  and keep up with that.  I understand that
10 as well.
11     Q.   Have you ever heard of Cares
12 Alliance?
13     A.   Cares Alliance does not ring
14 a bell.
15         (Document marked for
16         identification as Exhibit
17         Mallinckrodt-Adams-26.)
18 BY MS. BAIG:
19     Q.   Let's have this document
20 marked as Number 26.
21     A.   Thank you.
22     Q.   This document starts as an
23 e-mail from Gretta Turner to Jennifer
24 Lierman and Art Morelli, Bates-stamped

Page 335

1  Mallinckrodt 0007094264 through 4294,
2  with the subject Morelli CA NSM
3  presentation short version.
4          Do you see that?
5      A.   I do see that, yes.
6      Q.   And do you know who Arthur
7  Morelli is?
8      A.   It does not -- does not
9  sound familiar to me.  So I don't recall.
10     Q.   And you don't know what
11 Cares Alliance is?
12     A.   I don't recall that.
13     Q.   If you flip through this
14 PowerPoint presentation a little bit,
15 we'll see if it refreshes your
16 recollection.
17         For the record, the title of
18 the PowerPoint is "Safe and Appropriate
19 Use of Opioids," by Herbert Neuman, M.D.,
20 chief medical officer and vice president
21 of medical affairs, and Arthur Morelli,
22 VP medical affairs operations for REMS,
23 and then medical affairs.
24         Do you know either of those

Page 336

1  people?
2      A.   I don't.  I don't recall
3  them.  Herb Neuman sounds -- or Herbert
4  Neuman sounds familiar, but I can't place
5  him.
6      Q.   Do you know who Gretta
7  Turner is?
8      A.   I think we ran -- had an
9  e-mail from Gretta in the past --
10     Q.   Medical affairs department,
11 according -- according to the first page
12 of this document.
13     A.   Okay.
14     Q.   But you don't recall her?
15     A.   I don't recall.
16     Q.   How about Jennifer Lierman?
17     A.   I recall the name and I
18 recall the face.  I don't recall the
19 responsibility or the title or, you know,
20 where she was at in the organization.
21     Q.   Okay.  And do you see there
22 are a number of stats in this report
23 looking at, for example, about the third
24 page in, I think -- the fourth page in --

Page 337

1  misuse, abuse, and addiction.
2          Do you see that?
3      A.   I see that slide.
4      Q.   Okay.  And then the next
5  slide is source of abuse of prescription
6  opioids.  Do you recall seeing stats like
7  this before?
8      A.   I don't recall seeing stats
9  like this.  I -- I do see this was
10 regarding a branded product.
11     Q.   Where do you see that?
12     A.   On the page entitled Agenda,
13 Exalgo, which was again a branded
14 product.  But I don't know if it was
15 there when I was there.  I just remember
16 hearing the name.  But that was a
17 different division within Mallinckrodt.
18     Q.   Well, it's unclear whether
19 the entire agenda is about Exalgo, or
20 whether the one, two, three, the fourth
21 item on the agenda is about Exalgo,
22 right?
23     A.   Fair enough.  It -- yeah,
24 it's certainly unclear to me because I

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  don't have any recollection of it.
2      Q.   And if you go to the next
3  page after the agenda, you see
4  the introduction?
5      A.   I -- I can see what, I'm
6  sorry?
7      Q.   The introduction?
8      A.   Yes.
9      Q.   And do you see on the
10 introduction there's a reference to the
11 American Pain Society and the American
12 Academy of Pain Medicine?
13     A.   I do see that reference.
14     Q.   Do you recall if
15 Mallinckrodt had any interaction with the
16 American Pain Society and the American
17 Academy of Pain Medicine when you were
18 there?
19     A.   I don't recall.  Certainly
20 we weren't affiliated from a generics
21 perspective that I'm aware of with any
22 society such as these.
23     Q.   When you say from a generics
24 perspective, was Mallinckrodt affiliated

Page 339

1  in any perspective with the American Pain
2  Society or the American Academy of Pain
3  Medicine to your knowledge?
4      A.   I don't know.  I don't
5  recall any -- and context there.
6      Q.   And do you see at the bottom
7  there's a reference to S.M. Fishman,
8  and --
9      A.   I see that.
10     Q.   Who I'm assuming is Scott
11 Fishman who is the author of the book,
12 "Responsible opioid prescribing:  A
13 decisions guide."
14         Do you see that?
15     A.   I do see that.
16     Q.   And do you know if
17 Mallinckrodt had any interaction with
18 Scott Fishman?
19     A.   I don't recall any reference
20 to the name or to the person.
21     Q.   And do you know if
22 Mallinckrodt contributed to the writing
23 of that book?
24     A.   I don't recall.

Page 340

1      Q.   Or contributed to the
2  funding for the writing of that book?
3      A.   I don't recall.
4      Q.   Would you have been involved
5  in that, if Mallinckrodt did in fact
6  contribute?
7      A.   I don't recall.  Again I
8  don't have any knowledge of this, so I
9  don't recall any sort of interaction with
10 regards to it.  Oh, this was almost a
11 year after I left Mallinckrodt.  This was
12 from March of 2011.  I left in the spring
13 of 2010.  So I apologize for my -- I
14 literally was having a strong gap there.
15     Q.   Okay.  My understanding is
16 this was pulled from your custodial
17 files.  I don't know.  Maybe it's because
18 there is a reference to John Quincy Adams
19 in there.  I just noticed that.  I mean,
20 maybe that's why.
21         But in any event, you have
22 not seen this document before?
23     A.   No.
24     Q.   Okay.  To your knowledge,

Page 341

1  did Mallinckrodt have a speakers bureau
2  program?
3      A.   From generics, I don't
4  recall any program that the generics
5  would have.
6      Q.   I'm talking about
7  Mallinckrodt generally.
8      A.   I don't -- I don't remember
9  a speakers program regardless.
10     Q.   Have you ever heard of
11 Campbell Alliance?
12     A.   It doesn't -- it doesn't
13 sound familiar to me.
14     Q.   Are you aware of
15 Mallinckrodt working with any outside
16 organizations with respect to speakers
17 bureaus or key opinion leaders?
18     A.   It's not familiar to me.
19     Q.   Are you aware of
20 Mallinckrodt working at all with any key
21 opinion leaders?
22     A.   It does not sound familiar
23 to me.
24     Q.   You know what a key opinion

Page 342

1  leader is though, right?
2      A.   Yes.
3      Q.   Okay.  But you just don't
4  recall Mallinckrodt working with key
5  opinion leaders to your knowledge?
6      A.   I don't recall any key
7  opinion leaders, no.  I don't recall
8  Mallinckrodt working with key opinion
9  leaders.
10     Q.   And you left in 2010, right?
11     A.   Correct.
12     Q.   That takes care of that one.
13     A.   I might be able to get to
14  opine yet.
15     Q.   Are you familiar with
16  monthly call plan detail?
17     A.   The term sounds familiar to
18  me.  I don't recall anything specifically
19  on that.
20     Q.   Would you have been involved
21  in any monthly call plan details for
22  Exalgo?
23     A.   I don't recall being
24  involved in Exalgo.  Like I said, I know

Page 343

1  the name of the product.
2      Q.   Were you aware at the time
3  that you were at Mallinckrodt that oxy 15
4  and oxy 30 were among the most abused
5  products -- most abused opioids in
6  Florida?
7      A.   I don't recall that.  I know
8  we've gone through some documents that
9  showed that, or at least stated that, I
10  should say.
11     Q.   But you were aware that they
12  were two of Mallinckrodt best selling
13  products, correct?
14     A.   The oxycodone family was
15  certainly, yes, one of the top selling
16  products.
17     Q.   Were you aware that you had
18  many Florida distributors buying solely
19  oxy 15 and oxy 30?
20         MR. TSAI:  Object to form.
21         Go ahead.
22         THE WITNESS:  I'll just make
23  a clarifying statement there, that
24  Florida -- Florida distributors

Page 344

1  can sell to any state in the union
2  for the most part if they gain
3  state licensing, as does a
4  pharm -- excuse me -- as does a
5  wholesale distributor in
6  California can sell to virtually
7  every -- all 50 states.
8         So the proximity or the
9  location of them doesn't
10  necessarily indicate where that
11  product is being shipped to.
12  BY MS. BAIG:
13     Q.   Sure.  But I'm asking if you
14  were aware that you had many Florida
15  distributors buying solely oxy 15 and oxy
16  30?
17     A.   I'm not familiar.  I'm
18  trying to recall if that would even be
19  the case.  I'm trying to recall how many
20  distributors there are or were in
21  Florida.  I can think of two.
22     Q.   Can you think of any actions
23  that Mallinckrodt took to curb the abuse
24  of oxy 15 and oxy 30 in Florida?

Page 345

1      A.   Probably a better question
2  for compliance, as compliance had a
3  process in place to detect suspicious
4  orders and peculiar orders, I think is
5  what the reference is.  So that certainly
6  was a process that compliance put in
7  place.
8      Q.   Are you aware of any actions
9  that Mallinckrodt took to curb the abuse
10  of oxy 15 and oxy 30 in Florida?
11     A.   I'm not aware.  And abuse is
12  really through the -- not from the -- you
13  know, this is -- we're selling into a
14  distribution network.  This is abuse if
15  it's a prescription product, and the
16  physician is writing the prescription.  I
17  don't know at what point we could
18  intervene on that physician writing a
19  prescription.
20     Q.   Are you -- if I ask that
21  same question but for elsewhere in the
22  country, is your answer the same?
23     A.   That is correct.  It would
24  be the same.

Page 346

1  Q.  Do you know if Mallinckrodt
2 ever had communications with the DEA in
3 efforts to try to increase DEA quotas
4 that governed the manufacture and
5 distribution of prescription opioids?
6  A.  I understand that there was
7 communication on a regular basis with DEA
8 regarding quota.
9  Q.  Were you involved in that
10 communication?
11  A.  I was not, not that I recall
12 ever having any interaction in that.
13  Q.  Do you remember hearing
14 about those types of communications with
15 the DEA?
16  A.  I remember having roughly
17 $100 million at wholesale dollars on
18 backorder, which was largely driven by
19 not having quota.  And I don't know if it
20 was on the API side or the finished
21 dosage side.  I don't recall.  But
22 fighting and trying to manage rather the
23 back order situation was significant.
24  Q.  And so did that prompt

Page 347

1 Mallinckrodt to request higher quotas
2 from the DEA?
3  A.  I don't know what the
4 quota -- I don't know what the request
5 volume was made.  The fact it's on
6 backorder wouldn't drive the volume.  It
7 would be driven based off what the
8 forecasted volume would be as it relates
9 to purchases made by wholesalers, chains,
10 et cetera.
11  Q.  My question, though, is a
12 little bit more narrow.  It's -- are you
13 aware of communications with the DEA
14 regarding quota and request for increase
15 in quota levels?
16  A.  I'm not aware of
17 conversations.  But I know that our
18 team -- by our team, I'm saying -- I
19 believe it was Karen Harper's team, so I
20 used the collective "our" -- was working
21 with DEA to obtain quota.  How -- the
22 levels, the amounts, the frequency, I
23 don't know specifics on that.  That is
24 something that is their area of

Page 348

1 expertise.
2  Q.  And was it your general
3 understanding, though, that
4 Mallinckrodt's typical position would be
5 to want to increase quota?
6  MR. TSAI:  Object to form.
7  Go ahead.
8  THE WITNESS:  I think really
9 what it would come down to is we
10 would want to make sure that we
11 would fill the demand that was
12 generated by our customers, and
13 customers again defined as
14 wholesalers, chain headquarters.
15  And so to fill those orders,
16 certainly, is part of the
17 objective that you would want to
18 achieve.
19 BY MS. BAIG:
20  Q.  And as part of that
21 objective, did Mallinckrodt request that
22 the DEA increase quotas?  Do you know
23 that?
24  A.  I don't know that

Page 349

1 specifically.  I know they had
2 communication, so -- but I don't know
3 what those communications, how they took
4 form.  I just don't recall any -- any
5 component of the communication and how
6 they communicated with the DEA.
7  Q.  So we have already talked
8 about chargeback data, and we've talked
9 about IMS data, which I believe is the
10 same as IQIVIA data.
11  A.  Yes.
12  Q.  Correct?
13  A.  Yes.
14  Q.  Okay.  Did Mallinckrodt
15 purchase any other -- or did Mallinckrodt
16 have access to any other data in which it
17 was tracking -- tracking its products,
18 essentially?
19  A.  I don't believe there was
20 any other data.  I think IMS at that time
21 was called National Sales Perspectives, I
22 believe was the audit that was available.
23  Q.  Did you -- did Mallinckrodt
24 have Wolters Kluwer data?

Page 350

1    A.   I don't know if they
2  purchased Wolters Kluwer data.  I don't
3  know what their data entails, other than
4  now they are a pricing database.  But
5  they have -- that's -- that's the only
6  context I can think of Wolters Kluwer off
7  the top.  I just don't recall any other
8  context.
9    Q.   So I believe you testified
10  that you were not involved in any talks
11  with the DEA regarding any Mallinckrodt
12  opioid product; is that right?
13    A.   I don't believe I was
14  involved in any discussions with DEA or
15  communication with them.
16    Q.   Okay.  How about FDA?
17    A.   No.  I would -- I can't
18  think of a scenario.  I don't recall any
19  scenario where I would be involved at the
20  FDA level.
21    Q.   No communications with the
22  FDA about REMS, risk evaluation
23  mitigation strategies?
24    A.   So not with FDA.  We had a

Page 351

1  risk mitigation person, I forget her
2  name, who headed up REMS.  And from that
3  perspective, there would be discussions
4  with that individual.  To the extent
5  there would be any involvement from FDA,
6  I don't -- I don't recall any scenario
7  where that interaction would occur.
8    Q.   Did that person report to
9  you?
10    A.   No.
11    Q.   Who would they report to?
12    A.   I have no idea.  I don't
13  recall.
14    Q.   And did you work with any
15  third parties with respect to REMS?
16    A.   I don't recall personally
17  doing that.  I know that, as I understand
18  it, whoever headed up REMS, again I don't
19  remember her name, interacted with --
20  with a group.
21    Q.   Were you on any -- on any
22  pharmaceutical boards while you were at
23  Mallinckrodt?
24    A.   Pharmaceutical boards.  So I

Page 352

1  can say manufacturer advisory boards.
2    Q.   Okay.
3    A.   So I was on the manufacturer
4  advisory board for AmerisourceBergen.
5    Q.   Any others?
6    A.   Not that I recall.
7    Q.   And what was your
8  responsibility on the manufacturer
9  advisory board for AmerisourceBergen?
10    A.   On an annual basis, we would
11  meet with the members of the manufacturer
12  advisory board, the AmerisourceBergen
13  leadership team, which would be the folks
14  overseeing the purchasing of product,
15  would have that annual meeting and go
16  through various topics of discussion
17  regarding logistics, supply, those types
18  of topics.
19    Q.   And that was the generic
20  manufacturers advisory board?
21    A.   I believe that's what it's
22  called.  I don't remember any brand
23  companies being a part of that.
24    Q.   Were you on any other

Page 353

1  boards?
2    A.   Not that I recall.
3    Q.   Were you involved with any
4  lobbying efforts on Mallinckrodt's part
5  with respect to any opioid products
6  specifically or generally?
7    A.   Not that I recall.
8    Q.   What department at
9  Mallinckrodt was involved in lobbying?
10    A.   I am not sure.
11    Q.   You don't know, you have no
12  idea?
13    A.   I have no idea.
14    Q.   Do you know if Mallinckrodt
15  was a member of the Pain Care Forum?
16    A.   I'm not familiar with that.
17  So I don't know.
18    Q.   How about the Pain Care
19  Coalition?
20    A.   I'm not familiar with that.
21  I don't know.
22    Q.   American Pain Society?
23    A.   I'm not familiar with that,
24  other than I think it was maybe

Page 354

1 referenced in another document. But I'm
2 not familiar with any affiliation.
3    Q.  HDA Research Foundation?
4    A.  I'm familiar with a
5 relationship with the HDA, they are the
6 Healthcare Distribution Association. So
7 that is the association affiliated with
8 wholesalers and distributors.
9    Q.  And did you have interaction
10 with HDA while you were at Mallinckrodt?
11    A.  I would attend their
12 meetings, but not their association
13 meetings.
14    Q.  Can you clarify what you
15 mean by the distinction?
16    A.  So they would hold a
17 meeting, I believe at that time it was
18 twice a year. It's now once a year. But
19 we would pay a fee to go to this meeting,
20 members of HDA, was called HDMA, HDA, so
21 members of McKesson, AmerisourceBergen,
22 HD Smith, various wholesalers and
23 distributors, there would be a meeting.
24 Each member, each company would have

Page 355

1 specific tables set up and HDA would
2 organize a meeting time for us to go in
3 and talk with their folks. That could be
4 anywhere from the finance team to the
5 purchase -- you know, the buyers. So we
6 would have meetings with each group from
7 those various companies.
8    Q.  How about the Center For
9 Healthcare Supply Chain Research?
10    A.  It doesn't -- it doesn't
11 sound familiar to me. I'm not sure.
12    Q.  Just going back for a
13 moment. How often would you go to HDA
14 Research Foundation meetings?
15    A.  So let me clarify. HDA
16 research meetings, I don't believe I'd be
17 any part of. I would be part of the HDA
18 business leadership conference. So the
19 research was not a component that I'm
20 familiar with.
21    Q.  Okay. So HDA business
22 leadership meetings you attended how
23 often when you were at Mallinckrodt?
24    A.  They had two meetings, HDA

Page 356

1 annual and HDA business leadership. I
2 believe that's how it went. So that
3 would be twice a year.
4    Q.  How about the National
5 Wholesale Druggist Association?
6    A.  That is the old name of HDA.
7    Q.  Okay. So same answer?
8    A.  Same answer.
9    Q.  National Association of
10 Chain Drug Stores?
11    A.  That's what -- we talked
12 about that one earlier, yes.
13    Q.  How often did you go to
14 those meetings?
15    A.  That was the --
16    Q.  Oh, is that the NACDS?
17    A.  Yes, that's correct.
18    Q.  Alliance For Patient Access?
19    A.  It's not familiar to me.
20    Q.  Federation of State Medical
21 Boards?
22    A.  Not familiar to me.
23    Q.  U.S. Pain Foundation?
24    A.  Not familiar to me.

Page 357

1    Q.  American Geriatric Society?
2    A.  Not familiar to me.
3    Q.  Pharmaceutical Research and
4 Manufacturers of America?
5    A.  I've heard of them, but I'm
6 not familiar with them -- or I don't
7 recall any interaction.
8      (Whereupon, a discussion was
9    held off the stenographic record.)
10      MS. BAIG: I actually have
11    no further questions.
12      THE VIDEOGRAPHER: We're
13    going off the record. The time is
14    5:03.
15      (Short break.)
16      THE VIDEOGRAPHER: We are
17    going back on record, beginning of
18    Media File Number 7. The time is
19    5:13.
20      - - -
21      EXAMINATION
22      - - -
23 BY MR. GASTEL:
24    Q.  Good evening.

Page 358

1    A.   Good evening.
2    Q.   My name is Ben Gastel, I
3  represent plaintiffs in the Tennessee
4  lawsuit that have been cross-noticed into
5  this deposition.
6        MR. GASTEL:  We'll lodge our
7    usual objection about the lack of
8    timely document production and the
9    necessary limiting of time
10   examination of the witness.
11       Subject to that objection,
12   I'm going to ask you a few
13   questions.
14 BY MR. GASTEL:
15   Q.   Mr. Adams, do you know
16 anything about the Tennessee litigation?
17   A.   I do not.
18   Q.   In your work for
19 Mallinckrodt, did you ever travel to the
20 state of Tennessee?
21   A.   Not that I'm aware of.
22   Q.   Ms. Baig showed you a
23 document earlier from a police officer
24 from Morristown, Tennessee.

Page 359

1        Do you recall that document?
2    A.   I do recall that document.
3    Q.   And you recall that incident
4  involving the Morristown police
5  investigation, correct?
6    A.   Yeah.  At a top level, yes.
7    Q.   You didn't travel to
8  Morristown, Tennessee as part of that
9  investigation?
10   A.   No.  I did not.  That would
11 be largely restricted to the compliance
12 team --
13   Q.   Sure.
14   A.   -- and security, if you
15 will.
16   Q.   Did you ever talk to that
17 police officer from Morristown,
18 Tennessee?
19   A.   No, I would not -- I don't
20 recall any conversation.  Typically I
21 would again stay with compliance and
22 regulatory -- excuse me -- compliance and
23 security.
24   Q.   Sure.  I should cover this

Page 360

1  first, and you might have covered it this
2  morning.  I missed it and I apologize.
3  But where do you live?  What is your
4  specific residential address?
5    A.   21 Wellington Drive, Long
6  Valley, New Jersey 07853.
7    Q.   And who lives there with
8  you?
9    A.   My wife and two kids.
10   Q.   And how long have you lived
11 there?
12   A.   Since 2010.
13   Q.   And do you have any plans to
14 move anytime soon?
15   A.   Retirement time.
16   Q.   I won't ask you if you have
17 plans for that.
18       Do you have any
19 understanding of opioid prescription
20 rates in the state of Tennessee?
21   A.   I do not.
22   Q.   Do you have -- what is your
23 understanding of the opioid crisis in
24 this country?  Do you have an

Page 361

1  understanding of it?
2    A.   Yeah, I guess from the
3  perspective, I -- I can kind of put in an
4  overall perspective relative to more
5  recent.  It's obviously in the news all
6  the time regarding opioid deaths and
7  regarding opioid abuse.  So that is
8  definitely something that you read and
9  see in the news with some regularity.
10   Q.   Do you believe this
11 crisis -- this country is in the middle
12 of an opioid epidemic?
13   A.   I've heard that term.
14 Whether or not it's reached -- you know,
15 reached epidemic proportions, I can't say
16 for certain.  I feel like potentially --
17 I haven't had any personal experience
18 with this -- with it at all.
19       So from the perspective of
20 an epidemic, I know from the press and
21 what I see on TV, it is certainly a
22 challenge.
23   Q.   Do you know if certain
24 portions of the country are more affected

Page 362

1 by that opioid crisis than other parts of
2 the country?
3      A.   I don't know the specifics
4 on that, no.
5      Q.   Have you ever reviewed
6 materials published by the Tennessee
7 Department of Health on Tennessee's
8 opioid crisis?
9      A.   I have not.
10      Q.   Are you aware that as of
11 2013, the Tennessee Department of Health
12 has estimated that there are 221,000
13 adults in Tennessee using prescription
14 pain relievers for nonmedical purposes?
15      A.   I -- yeah, I've been out --
16 I've been out of the opioid component
17 since 2010.  I just haven't kept up with
18 that type of statistic or information.
19 So no, I'm not familiar with that number,
20 and don't know how to quite put it in
21 context.
22      Q.   Sure.  Would it surprise you
23 if the Department of Justice has found
24 that prescription opioids rank as the

Page 363

1 number one abused drug among individuals
2 receiving state funded services in
3 Tennessee?
4      A.   Yeah, I -- was the question
5 would it surprise me?
6      Q.   Yes.
7      A.   Is that what the question
8 was?
9      MR. TSAI:  Objection.  Lacks
10      foundation.
11      Go ahead.
12      THE WITNESS:  I don't have
13      much basis for that as far as what
14      my reaction would be.  I don't
15      know how to put that into context.
16      It certainly isn't a number that I
17      would have off the top of my head.
18 BY MR. GASTEL:
19      Q.   And I don't necessarily want
20 to go back to the document.  But the
21 document that Ms. Baig showed you earlier
22 regarding the Morristown police officer,
23 you recall that document, right?
24      A.   Yes, I do.

Page 364

1      Q.   So during your time with
2 Mallinckrodt, based on that e-mail
3 exchange and your experience with the
4 Morristown police investigation, you
5 learned that Mallinckrodt drugs had been
6 illegally diverted into Tennessee from
7 Florida, right?
8      MR. TSAI:  Object to form.
9      Go ahead.
10      THE WITNESS:  I learned from
11      that document that there were
12      some -- a bottle.  I'm not sure
13      beyond that what could be
14      quantified.
15 BY MR. GASTEL:
16      Q.   In your mind, is it legal
17 for a physician to write a prescription
18 for an opioid for a nonmedical reason?
19      MR. TSAI:  Objection.  Calls
20      for a legal conclusion.
21      Go ahead.
22      THE WITNESS:  I don't know
23      why a physician -- I can't imagine
24      a physician like that.  So I don't

Page 365

1      know why a physician would
2      prescribe in that situation.
3 BY MR. GASTEL:
4      Q.   You can't contemplate the
5 idea that a physician writes a
6 prescription for an opioid for a
7 nonmedical reason?
8      A.   The product is -- first of
9 all, I'll say, I'm not in -- and I
10 haven't been in the industry where I
11 would call on prescribers, that I would
12 talk indications, that I would go through
13 any process that would interact with the
14 physician.  So from the perspective of me
15 personally, that is not an area of
16 expertise.  Dosing, none of that would be
17 anything that I would have any awareness
18 of.
19      So from a layman's
20 perspective, I cannot imagine a scenario
21 on why a legitimate pain -- FDA approved
22 pain medication would be written for
23 anything other than pain.
24      Q.   And you recall, Miss Baig

Page 366

1 took you through the documents regarding
2 your trip down to Sunrise and your audit
3 of the Sunrise facility. Do you recall
4 that document and that testimony?
5     A. I do.
6     Q. Are you aware that less than
7 one year after your Sunrise audit that
8 found no problem with Sunrise operations
9 in Florida, the DEA suspended Sunrise's
10 license because of its sales of oxy in
11 the state of Florida?
12     A. Maybe a couple points. I
13 don't know when that occurred. It was
14 probably after my time at Mallinckrodt,
15 because I just don't know.
16     I will say that that will
17 likely be tied to the same time or
18 roughly the same window of time that DEA
19 inspected them and found their practices
20 to be satisfactory.
21     So at that point, again I'll
22 reiterate what I -- what I said in that
23 testimony. And that is that we were --
24 we being Mallinckrodt was actually

Page 367

1 complimented on how that was managed. So
2 what happened and transpired after I left
3 I can't -- I can't speculate.
4     Q. Sure. And you didn't have
5 any specific conversations with DEA that
6 their audit of Sunrise was -- was --
7 found no problems, right?
8     You didn't have any specific
9 conversations with the DEA about their
10 audit of Sunrise, right?
11     A. I don't have those -- I'm --
12 I'm not familiar with any conversations
13 I've had from DEA. What I've -- what I
14 saw in the e-mail that was produced, is
15 that it indicated a compliment to the
16 organization for how it was managed by
17 Mallinckrodt.
18     Q. That was Mr. Ratliff's
19 interpretation of a conversation that he
20 had with the DEA agent; is that fair?
21     A. I believe so, from --
22     Q. And you weren't a party to
23 that conversation, right?
24     A. I was not a party to that

Page 368

1 conversation. I will say that it does
2 still follow on the heels of the DEA of
3 having an audit of their facilities and
4 finding it to be satisfactory to the
5 controls that they have in place.
6     (Document marked for
7     identification as Exhibit
8     Mallinckrodt-Adams-27.)
9 BY MR. GASTEL:
10     Q. I'm going to hand you a
11 document that we'll mark as Exhibit 27.
12 This is actually my third document.
13     This is an e-mail that was
14 previously introduced in this litigation
15 during Steven Becker's deposition. You
16 are familiar with Mr. Becker, right?
17     A. I am familiar with Steve,
18 yes.
19     Q. He was one of the national
20 sales directors that reported to you,
21 correct?
22     A. That's correct.
23     Q. I want to direct -- and this
24 is an e-mail dated June 18, 2010, from

Page 369

1 Kate Muhlenkamp to a variety of people in
2 the sales department at Mallinckrodt. Do
3 you see that?
4     A. I do, and if I could just
5 interject. I was working at Dr. Reddy's
6 at this time.
7     Q. Sure.
8     A. I was no longer an employee.
9     Q. And you left Mallinckrodt in
10 June of 2010, correct?
11     A. I did not. I left in May of
12 2010.
13     Q. So you left approximately a
14 month before this e-mail was sent?
15     A. I started at Dr. Reddy's on
16 June 3rd, if I'm not mistaken. If that's
17 Monday, I started on that time at a
18 different organization, yes.
19     Q. Sure. Do -- all I want to
20 direct your attention to, the third
21 paragraph in this e-mail where it says,
22 "Additionally, it came to our attention
23 that Sunrise wholesaler's DEA license was
24 suspended pending further investigation.

Page 370

1 Although the official reason for the
2 suspension has not been named, we are
3 under the impression that it is also due
4 to the sale of oxycodone in the state of
5 Florida."
6          Did I read that correctly?
7      A.   That is what it states.
8 Yeah, it sounds like you read it
9 correctly, yes.
10     Q.   So if that's true, does that
11 cause you any concern that less than a
12 year after you audited Sunrise's
13 facility, that the DEA suspended
14 Sunrise's license for its sale of
15 oxycodone in the state of Florida?
16     A.   I guess we can talk about
17 ifs, which -- which it is.
18          So from the perspective of,
19 I mentioned this earlier that at least in
20 conversations that I had with wholesalers
21 was, we believed we are doing everything
22 correct; however, the DEA and -- and the
23 rules keep changing, or they are not
24 providing the guidance necessary to be

Page 371

1 able to make sure that we can be
2 adherent.  So we are having a challenging
3 time, despite believing we do everything
4 correctly.
5          That's not Sunrise.  But
6 that was a general theme that would come
7 out of various meetings.  So I remember
8 that specifically.
9          But in reference to this,
10 and, you know, answering the if question
11 that you state, I certainly, again,
12 can -- can state our audit followed a DEA
13 audit that found them at that time to be
14 in compliance.
15     Q.   So my question is, is does
16 it cause you any certain that less than a
17 year later the DEA suspends their license
18 for -- because of sales of oxy in
19 Florida, the oxy that you were selling to
20 them in Florida?
21     A.   As far as a concern, what it
22 shows me, the fact that it was suspended,
23 is that the controls that are in place
24 from a compliance perspective actually

Page 372

1 took form.  And -- and the DEA is the
2 organization that has oversight and has a
3 duty and has a responsibility for this
4 and has the most global viewpoint of such
5 a distributor.  So the fact that, if they
6 were doing things inappropriately, and
7 that they were suspended, I applaud that.
8     Q.   And you say that the DEA has
9 the most global view of what's going on,
10 but with regard to Mallinckrodt products,
11 Mallinckrodt knows just as much
12 information as the DEA through its
13 chargeback data, right?
14     A.   It knows what is happening
15 from Mallinckrodt to the distributor to
16 the pharmacy.  Beyond that it doesn't
17 have any other information.
18          So it doesn't know why that
19 product was prescribed.  It doesn't know
20 why that -- if that particular
21 prescription was generated and put
22 through a pharmacy or dispensing
23 physician as it relates to its servicing
24 a patient population of oncology patients

Page 373

1 or a pain center.  So the purview that as
2 a manufacturer extends only so far.
3          The extent that it's deeper
4 than that resides above a Mallinckrodt,
5 or a manufacturer.
6     Q.   Miss Baig showed you some
7 sales figures earlier showing
8 Mallinckrodt sales of opioids increased
9 over time, including at least one
10 instance an increase in oxy
11 37,000 percent of oxy 30 sales.  Do you
12 recall those sales figures and that
13 testimony?
14     A.   I do.
15     Q.   When you saw that
16 Mallinckrodt's sales figures for opioids,
17 including oxy 30, were increasing, what
18 investigation did you do to ensure that
19 those sales were being driven by
20 legitimate medical needs?
21          MR. TSAI:  Object to form.
22          THE WITNESS:  As far as
23     investigating, that is a
24     compliance.  The compliance team

Page 374

1 has the processes in place to
2 investigate those. Again, as
3 those -- certain things -- when
4 there's an order placed and it
5 seems to be out, there is a
6 suspicious order monitoring
7 process that's in place and those
8 controls are certainly designed to
9 highlight that.
10      Now, the fact their sales
11 growth can be driven, as I
12 mentioned I believe during my
13 testimony, it can be driven on a
14 number of scenarios.
15      One is, it could be a new
16 customer who we gained. And so
17 the comparison from the first set
18 of data to the second could be
19 going from zero to one or from one
20 bottle to 100. Okay, great,
21 you've got a huge percent
22 increase, right.
23      It could be that we
24 basically looked at that -- or

Page 375

1 that customer looked at us and
2 said, you know what, we want you
3 to be the primary, and we no
4 longer want to be able to -- or
5 have additional manufacturers of
6 this product within our
7 distribution network. That could
8 be their decision to do that.
9      The other one is, when was
10 the product launched. Was the
11 product just launched? So you're
12 comparing a -- two months of sales
13 versus 12 months of sales.
14 There's many variables that can
15 happen there. Or was there a
16 supply disruption that occurred
17 from another manufacturer or a
18 discontinuation of a product.
19      All of those factor into
20 what can drive a number.
21 BY MR. GASTEL:
22      Q.   Sure. And one way to drive
23 that number would be if there's an
24 explosion of abuse and diversion like we

Page 376

1 saw in the state of Florida during the
2 time period that you were the director of
3 sales for Mallinckrodt, right?
4      A.   An explosion of sales. I
5 wouldn't characterize it as that. And I
6 can't speak specifically to Florida.
7      But as far as the
8 prescriptions generated, again
9 Mallinckrodt was not calling on
10 physicians to generate prescriptions.
11 The fact that prescriptions were being
12 written, were being written by
13 physicians. And if there was any
14 promotional activity that was being done
15 to physicians, it was not as a result of
16 Mallinckrodt. If there was anything that
17 was out there relative to having that
18 physician look at the features and
19 benefits and details of a prescription
20 product, it was not -- it was not a
21 Mallinckrodt generics -- that was not
22 within our -- within how we promoted
23 products.
24      Q.   I get that that's how -- was

Page 377

1 not within how you promoted products, but
2 that wasn't my question.
3      My question was, one factor
4 that could also be driving a demand in
5 increased sales is an explosion of abuse
6 and diversion of prescription opioids,
7 right?
8      A.   As far as an abuse, again,
9 you saw things in the press on that. But
10 how -- how does the fact that you are
11 manufacturing and supplying, that does
12 not create the demand. And so that
13 explosion isn't something that we
14 created. And so from the perspective of
15 the way you help in that whole process is
16 to put in a process in place to identify,
17 which our compliance team, as I
18 understand, did, was to identify
19 suspicious orders, et cetera.
20      So that's certainly the
21 responsibility that the organization took
22 seriously.
23      Q.   Do you know how many
24 suspicious orders of Sunrise or Masters

Page 378

1  Pharmaceuticals that your compliance team
2  reported to the DEA in the period of
3  2008?
4      A.   I do not know.
5      Q.   Do you know how many
6  suspicious orders your compliance team
7  reported to the DEA from Sunrise or
8  Masters in 2009?
9      A.   I don't know.
10     Q.   Do you know how many orders
11  of Sunrise and Masters orders that your
12  compliance team reported to the DEA in
13  2010?
14     A.   I think that would be a
15  better question, all of these, would be
16  for the compliance team.  That was a
17  separate team.  So I don't -- I don't
18  know how many suspicious orders were
19  flagged for any customer.
20     Q.   You spoke with Ms. Baig
21  earlier about your compensation.  Do you
22  recall that testimony?
23     A.   Yes.  I don't remember
24  specific.  I mean, we talked about it for

Page 379

1  a while.
2      Q.   And as part of your role as
3  vice president of sales, you oversaw a
4  team of national sales directors, right?
5      A.   That's correct.
6      Q.   And as part of that, did you
7  put together their compensation packages
8  too?
9          MR. TSAI:  Objection.
10  Duplicative.  Non-Tennessee
11  specific.
12         THE WITNESS:  So the
13  objectives were brought down from
14  the organization on what metrics
15  could be used.  And I don't
16  remember the term or even know
17  what it stands for.  But SFM or
18  something like that was in the
19  documents.  So there's corporate
20  objectives, and then there are
21  individual objectives.
22         And from that, certainly we
23  would look at what are the sales
24  objectives, as one.  What would be

Page 380

1  the developmental objectives,
2  would be another.  Those would
3  certainly be part of what I would
4  do in developing their objectives.
5  BY MR. GASTEL:
6      Q.   Sure.  And as part of that,
7  and as part of their compensation
8  structure, there would be a bonus if they
9  met certain sales quotas, correct?
10         MR. TSAI:  Objection.
11  Cumulative.  Duplicative.
12  Non-Tennessee specific.
13         THE WITNESS:  That would be
14  a component of their compensation.
15  BY MR. GASTEL:
16     Q.   Sure.  And part of that is
17  to incentivize those national sales
18  directors to go make sales, right?
19         MR. TSAI:  Object to form.
20  Can I get a standing objection to
21  this?
22         MR. GASTEL:  Sure.
23         MR. TSAI:  I think this
24  is -- I think this violates our

Page 381

1  agreement about these questions
2  being Tennessee specific.
3          MR. GASTEL:  That's all
4  right.
5          MR. TSAI:  Go ahead.
6          THE WITNESS:  So as far as
7  to have them make more sales, let
8  me just be clear that it wasn't us
9  going out trying to drive demand
10  for a product or not even trying.
11         It's outside of our ability
12  to drive demand for a product.
13  Our goal was to, when we got a new
14  product, legally approved by FDA,
15  when that product was launched to
16  gain distribution for that
17  product.  Our goal was, if we had
18  part of the business and our
19  competitor had part of the
20  business, we wanted to be the one
21  that was the primary product for
22  that.
23         Our sales team was -- was
24  incentivize to make ours the

Page 382

1  preferred product by our
2  customers, and customers defined
3  by the wholesalers and the chain
4  headquarters, not at any
5  individual pharmacy or in the
6  individual -- beyond the pharmacy.
7      We wouldn't even call on
8  pharmacies.
9  BY MR. GASTEL:
10      Q.   When you say that it's to
11  incentivize them to make ours the
12  preferred product by our customers, you
13  mean it's to incentivize them to make
14  sales, right?
15      A.   Preferred product is -- the
16  preferred product would be, can you --
17  because it's a generic, it can be
18  substituted for a same dose strength
19  product.  If a pharmacist places an
20  order, you want it to be the preferred
21  product, in the fact that for that
22  pharmacist placing an order for
23  hydrocodone, that it specifically is then
24  sold from the wholesaler to the pharmacy,

Page 383

1  our hydrocodone, as opposed to another
2  competitor's hydrocodone.
3      So it is not driving
4  anything more than as a preferred
5  product, you have a preferred position on
6  a contract.
7      So that's what's the
8  preferred component of it, a preferred
9  position on the contract.
10      Q.   And getting that preferred
11  position was part of the reason why they
12  would get a sales bonus if they met
13  certain sales targets, right?
14      A.   Yes.  Their goal was to be
15  that preferred contract item that would
16  then say, if there are multiple
17  manufacturers of the same product, the
18  ideal scenario is that that would then be
19  sold from the wholesaler to that
20  pharmacy, that it was our product, our --
21  we can't incentivize our sales team to
22  sell a competitor product.
23      Q.   Sure.
24      A.   So it is tied to the sales

Page 384

1  of a Mallinckrodt product.
2      Q.   Sure.
3      A.   And the sales, that's the
4  purchases from our customer to us.
5      Q.   And so you developed that
6  program and that incentive structure to
7  drive sales of Mallinckrodt's products to
8  those customers, right?
9      A.   And that sales is whether or
10  not it's an opioid or non-opioid, that is
11  the same design that you would build for
12  any pharmaceutical generic sales
13  organization.
14      Q.   Sure.
15      A.   It is non-opioid specific.
16      Q.   Did you ever develop a
17  program to incentivize the sales force to
18  locate pill mills?
19      A.   That would -- that was not
20  anything that was even thought about.
21  Compliance may have directed something
22  like that if there was any vision or
23  viewpoint to that.
24      I don't know how that would

Page 385

1  be identified.  To have a -- to have a
2  sales force of six -- six people who
3  covered the country to go and look at
4  individual pharmacies or dispensing
5  physicians, I don't think that would be
6  logistically possible.  You know, a team
7  of six.
8      Q.   Did you ever develop a
9  program to incentivize the sales force to
10  locate and report suspicious orders?
11      A.   The sales team would not
12  be -- it's not like they receive an
13  order.  An order comes in electronically.
14  And 90 percent of the times, it comes in
15  electronically through electronic --
16  electronic data interchange.  A sales rep
17  never sees an order.  The other 10
18  percent of orders that come in would come
19  in either by fax or by e-mail.  And that
20  would go directly to the customer service
21  team or somewhere else that would then
22  fulfill the order.
23      The salesperson never saw
24  the orders come in.

Page 386

1  Q.  Sure.  But the salesperson,
2  if they wanted to, could go find the
3  orders that their customers were making,
4  right?
5      A.  The only place that the
6  salesperson could look and see an order
7  is to do exactly what you said, and that
8  is to reach out.  And what that would
9  give them is how much product did this
10 individual order -- what was on there
11 from Walgreens.  That doesn't say how
12 much went out to the Walgreens
13 pharmacies.  They can see how much was
14 purchased by McKesson.
15      And by the way, McKesson
16 then sells it out to -- I don't know the
17 customer base.  I'll speculate and say
18 20,000 different outlets.  You don't know
19 where that product from the perspective
20 of a purchase order, when it goes into
21 the wholesaler, you don't know where it's
22 going to go.  You have no concept of
23 which customer, hospital, independent,
24 chain, where -- who is going to be

Page 387

1  purchasing that from a pharmacy
2  perspective from a wholesaler
3  distributor.
4      Q.  Sure.  You can then find it
5  out on the back end through the
6  chargeback data, right?
7      A.  There is a lag effect of
8  roughly 30 days from the time that you
9  get a purchase order, you ship it out,
10 let's say in theory within a day.  It
11 takes five days to get to the wholesaler
12 distributor.  From there, the wholesaler
13 distributor stocks four to six weeks of
14 supply.  From that point on the product
15 then is purchased.  So from the time of
16 point of sale all the way through until
17 you actually could see what happened to
18 that bottle, if you could isolate that
19 individual bottle, then you could see it
20 may be six weeks later.
21      Q.  But the point is, that the
22 sales staff could look at orders and
23 could look at chargeback data to figure
24 out where the downstream customer was

Page 388

1  ultimately receiving those orders, right?
2      A.  It's a rear -- it's a
3  rearview.  It's like driving a car
4  looking through your rearview mirror.
5      Q.  But it could be done?
6      A.  Again, there's lag data
7  there.  You wouldn't be able to draw a
8  correlation.
9      There is new technology that
10 is going into play.  The U.S. is now
11 requiring track and trace.  And that will
12 give individual serialized bottles of
13 prescription.  So the prescription
14 itself -- excuse me.  The product itself
15 will be serialized so you know where that
16 bottle goes.  You don't know where the
17 bottles go when you sell a product into a
18 wholesaler or a chain distribution
19 center.  You don't know where that
20 product goes, other than to a pharmacy.
21 But to trace that individual bottle, that
22 is not possible today.  You can do it at
23 the lot number and expiration date, but
24 not the specific bottle.

Page 389

1      Q.  Were you ever on the
2  suspicious order monitoring steering
3  committee?
4      A.  I didn't recall it.  But I
5  see from the documents here that I was
6  included in a team.
7      Q.  And you don't recall
8  anything specifically about your work on
9  the team?
10     A.  I don't.
11     MR. GASTEL:  Mr. Adams, I
12 appreciate the time.  Subject to
13 my earlier objection, we'll
14 reserve any other questions.
15     MR. TSAI:  I have just about
16 two minutes.  Just three or four
17 cleanup questions.
18     THE WITNESS:  Okay.  So
19 where should I face?
20     MR. TSAI:  Keep facing.
21     - - -
22     EXAMINATION
23     - - -
24 BY MR. TSAI:

Page 390

1    Q.   So earlier today we talked a
2  bit about text messages during your time
3  at Mallinckrodt.  Do you recall that?
4    A.   I do.
5    Q.   So just to be clear, do you
6  have or have access to any actual text
7  messages from your time at Mallinckrodt?
8    A.   I do not.
9    Q.   And do you have or have
10  access to the old phone that you used
11  while you were employed at Mallinckrodt?
12    A.   I do not.
13    Q.   Do you know for sure whether
14  or not Mallinckrodt has or has access to
15  that phone?
16    A.   I do not.
17    Q.   And if we could go back
18  to -- I think it was Exhibit 25.  This is
19  the one where you were saying that you
20  wanted to opine on your interpretation of
21  the -- of the checklist that we went
22  through.  And I don't think you got that
23  opportunity.
24    A.   Yeah.

Page 391

1    Q.   So you've got that in front
2  of you.  If you can turn to Section 3.
3    A.   Yes.
4    Q.   So it's a checklist that it
5  appears Karen Harper went through during
6  the audit of Sunrise in August of 2009.
7  And the various line items are checked
8  yes.
9         What is your interpretation
10  or reading of this checklist?
11    A.   So this is a questionnaire
12  that, as I understand it, that the
13  compliance team developed.  Karen in
14  particular then delivered this and went
15  through this with the customer.
16         And the question is, from
17  Karen, she will ask Sunrise, "Does your
18  questionnaire include a question that
19  asked if the physician complies with laws
20  of every state in which controlled
21  substances are sold or shipped?"
22         So Sunrise, if in fact it's
23  true, says, "Yes, we have a question that
24  asks if a physician complies with the

Page 392

1  laws."  So if Sunrise has that question
2  in their questionnaire, the fact that
3  every one of these is a yes is actually a
4  positive.  It seems at the outset that
5  initially the questions that I -- I was
6  concerned that I was receiving indicated
7  yes was a bad thing, that does the
8  subject company fill prescriptions issued
9  by practitioners based solely on an
10  online questionnaire without a medical
11  examination or bona fide doctor-patient
12  relationship?
13         The answer is checked yes.
14  That means that Sunrise asks that on
15  their questionnaire to the people that
16  they are vetting, which means that that
17  is a good thing.  They have that as part
18  of their vetting of their customers.
19         So their compliance to each
20  one of these as a yes appears to be a
21  positive response and as part of the
22  analysis that -- that Karen did in
23  auditing.
24         MR. TSAI:  I have no further

Page 393

1  questions.
2         MS. BAIG:  I have one
3  follow-up question, or a couple
4  follow-up questions.
5         - - -
6         EXAMINATION
7         - - -
8  BY MS. BAIG:
9    Q.   Where does it say on this
10  form that these -- that these questions
11  are questions that Sunrise was to ask?
12    A.   So, "A distributor seeking
13  to determine whether a suspicious order
14  is indicative of controlled substance
15  diversion to other than legitimate
16  medical channels may wish to inquire of
17  the ordering pharmacy about the
18  following."
19         So the distributor may want
20  to ask these questions of the ordering
21  pharmacy in order -- so that's --
22    Q.   Does it say that?
23    A.   Yeah.
24    Q.   The distributor may want to

Page 394

1  ask these questions?
2      A.  "The distributor seeking to
3  determine whether a suspicious order is
4  indicative of controlled substance
5  diversion to other than legitimate
6  medical channels may wish to inquire of
7  the ordering pharmacy about the
8  following."
9          And the fact that they may
10  wish to inquire, what this does is Karen
11  asked them, "Do you inquire that the
12  physician complies with the laws of every
13  state in which controlled substances are
14  sold or shipped?
15          "Yes."
16          So the "may wish" is how
17  this is defined per DEA.
18          The fact that Karen asked
19  these questions, not just may but do you,
20  and the answer is affirmative.  That
21  shows that Sunrise was doing their due
22  diligence when vetting pharmacies.
23      Q.   So Karen asked Sunrise if
24  Sunrise was asking each one of its

Page 395

1  customers the following questions, and
2  Sunrise responded yes?
3      A.   Yes.  And I --
4      Q.   And Karen took their word
5  for it?
6      A.   I don't know if she -- if
7  they gave a hardcopy of what it is they
8  asked.  Or if they went through and
9  identified that.  So...
10      Q.   And you don't know whether
11  Karen actually went and did any
12  additional follow-up with respect to
13  whether or not Sunrise's responses
14  received from customers were adequate.
15  Do you know the answer to that?
16      A.   Say -- say it one -- which
17  one?  I'm sorry.
18      Q.   Do you know whether Karen
19  did any additional follow-up to determine
20  whether the responses received by Sunrise
21  were adequate?
22      A.   The responses received by
23  Sunrise to the questions --
24      Q.   Well, you're -- yeah.  You

Page 396

1  are suggesting that Sunrise was asking
2  these questions, right?
3      A.   Yes.  Yes.
4      Q.   Do you know whether Karen
5  did any follow-up to determine whether
6  the responses that Sunrise received --
7  well, whether, one, Sunrise actually
8  asked those questions to all its
9  customers, and two, whether the responses
10  received were adequate?
11      A.   So I guess the extent that I
12  have vision to is yes, the question was
13  asked and answered.  And if these similar
14  questions prove that this is a past
15  audit, it doesn't -- basically you can
16  say this isn't the only audit that
17  Sunrise has passed in this time frame.
18  DEA also had an audit and found it to
19  be -- that they passed.  So that's my
20  only point.
21      Q.   Well, sure.  But -- so
22  according to your interpretation of this
23  document, basically Sunrise would have
24  asked for example, Mr. Barry Schultz all

Page 397

1  of these questions.  And Karen is just
2  responding here that yes, they asked the
3  question?
4      A.   That's correct.
5      Q.   And there's no information
6  here as to what for example,
7  Mr. Schultz's response might have been,
8  correct?
9      A.   No, but I can't say for
10  certain that they have that form sitting
11  in there in a file.
12      Q.   You don't know one way or
13  another?
14      A.   I don't know one way or the
15  other.  I just know what's being asked
16  and answered in this particular scenario.
17          So again it sounded like it
18  was a negative by having a yes answer.
19  It shows that a yes answer is
20  great.  This is on your questionnaire,
21  this is what -- what you were asking of
22  your customers.
23      Q.   A yes answer is great from
24  Sunrise, who was then eventually shut

Page 398

```
1  down, correct?
2      A.   It is a great component from
3  a compliance perspective.  It has nothing
4  to do with the fact that they were closed
5  or suspended a year later.
6          It has everything to do with
7  these are part of the processes that when
8  it's a yes, these questions were part of
9  the vetting process that were stated to
10 be occurring.
11     Q.   Karen Harper asked --
12 according to you, Karen Harper asked
13 Sunrise if they asked these questions and
14 Sunrise responded yes.  And in the end,
15 Karen Harper ultimately concluded that
16 there were no problems at Sunrise and
17 that the -- what was it?  That Sunrise
18 has systems in place to maintain a
19 suspicious order monitoring program that
20 meets the guidelines, correct?
21     A.   And ultimately, as part of
22 an audit, the due diligence was there to
23 ask and -- and have the questions
24 answered.  And whether or not there was a
```

Page 399

```
1  paper copy of validation, I can't state.
2  I don't know.
3      Q.   And you can't remember any
4  of the work that you individually did
5  with respect to the suspicious order
6  monitoring systems, correct?
7      A.   That's correct.
8      Q.   And you don't remember
9  actually doing any follow-up with respect
10 to this audit of Sunrise, correct?
11     A.   That's correct.
12     Q.   Even though you were on the
13 suspicious order monitoring committee,
14 correct?
15     A.   Again, if there were
16 questions where the suspicious order
17 monitoring team had about a specific
18 customer, then that question may be --
19 may be asked of me, but I can't --
20     Q.   And you don't know whether
21 or not any additional -- apart from this
22 checklist form, was there any additional
23 information or backup file with respect
24 to Mallinckrodt's audit of Sunrise?
```

Page 400

```
1      A.   This would be a good
2  question for compliance --
3      Q.   You don't know the answer?
4      A.   -- as this is their area of
5  expertise.
6          MS. BAIG:  Okay.  I have no
7  further questions on that.
8          THE VIDEOGRAPHER:  This
9  concludes today's deposition.
10 We're going to go off record.  The
11 time is 5:50.
12         (Excused.)
13         (Deposition concluded at
14 approximately 5:50 p.m.)
```

Page 401

```
1
2          CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
       It was requested before
8  completion of the deposition that the
   witness, JOHN ADAMS, have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
       MICHELLE L. GRAY,
13 A Registered Professional
   Reporter, Certified Shorthand
14 Reporter, Certified Realtime
   Reporter and Notary Public
15 Dated:  February 4, 2019
16
17
18     (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24
```

Page 402

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign
9   the errata sheet and date it.
10       You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14       It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 404

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4        I,_____, do
5   hereby certify that I have read the
6   foregoing pages, 1 - 405, and that the
7   same is a correct transcription of the
8   answers given by me to the questions
9   therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  JOHN ADAMS              DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22
    _____
23  Notary Public
24

Page 403

1        - - - - - -
           E R R A T A
2        - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____
6       REASON: _____
7   ____  ____
8       REASON: _____
9   ____  ____
10      REASON: _____
11  ____  ____
12      REASON: _____
13  ____  ____
14      REASON: _____
15  ____  ____
16      REASON: _____
17  ____  ____
18      REASON: _____
19  ____  ____
20      REASON: _____
21  ____  ____
22      REASON: _____
23  ____  ____
24      REASON: _____

Page 405

LAWYER'S NOTES

1
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____