Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION               )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7
 8
 9                       __ __ __
10              Friday, April 26, 2019
                         __ __ __
11
12      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
                         __ __ __
13
14
15
16         Videotaped Deposition of G. CALEB
      ALEXANDER, M.D., M.S., held at the Law
17    Offices of Peter Angelos, 100 North Charles
      Street, Suite 2200, Baltimore, Maryland,
18    commencing at 9:03 a.m., on the above date,
      before Michael E. Miller, Fellow of the
19    Academy of Professional Reporters, Registered
      Diplomate Reporter, Certified Realtime
20    Reporter and Notary Public.
21
22
23                       __ __ __
24         GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        MOTLEY RICE LLC
          BY:  ANN K. RITTER, ESQUIRE
 3             aritter@motleyrice.com
               ANNE MCGINNESS KEARSE, ESQUIRE
 4             akearse@motleyrice.com
               ANDREW ARNOLD, ESQUIRE
 5             aarnold@motleyrice.com
          28 Bridgeside Boulevard
 6        Mt. Pleasant, South Carolina 29464
          (843) 216-9000
 7        Counsel for MDL Plaintiffs
 8
 9        NAPOLI SHKOLNIK PLLC
          BY:  JOSEPH CIACCIO, ESQUIRE
10             jciaccio@napolilaw.com
               (via teleconference)
11        400 Broadhollow Drive
          Suite 305
12        Melville, New York 11747
          (212) 397-1000
13        Counsel for Plaintiff Cuyahoga
          County
14
15        DECHERT LLP
          BY:  ERIK W. SNAPP, ESQUIRE
16             erik.snapp@dechert.com
               ALISON COONEY, ESQUIRE
17             alison.cooney@dechert.com
          35 West Wacker Drive
18        Suite 3400
          Chicago, Illinois 60601
19        (312) 646-5800
          Counsel for Purdue Pharma
20
21        BARTLIT BECK LLP
          BY:  PETER B. BENSINGER, JR., ESQUIRE
22             peter.bensinger@bartlit-beck.com
          54 West Hubbard Street
23        Suite 300
          Chicago, Illinois 60654
24        (312) 494-4400
          Counsel for Walgreens Company
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S :
 2        ROPES & GRAY LLP
          BY:  LEON KOTLYAR, ESQUIRE
 3            leon.kotlyar@ropesgray.com
          1211 Avenue of the Americas
 4        New York, New York 10036-9704
          (212) 256-9000
 5        Counsel for Mallinckrodt
          Pharmaceuticals
 6
 7        O'MELVENY & MYERS LLP
          BY:  HOUMAN EHSAN, ESQUIRE
 8            hehsan@omm.com
          400 South Hope Street
 9        18th Floor
          Los Angeles, California 90071-2899
10        (213) 430-6000
          Counsel for Janssen Pharmaceuticals Inc.
11
12        JONES DAY
          BY:  SARAH CONWAY, ESQUIRE
13            sgconway@jonesday.com
          555 South Flower Street
14        Fiftieth Floor
          Los Angeles, California 90071
15        (213) 489-3939
          Counsel for Walmart Corporation
16
17        ARNOLD & PORTER KAYE SCHOLER LLP
          BY:  SEAN MORRIS, ESQUIRE
18            sean.morris@arnoldporter.com
          777 South Figueroa Street
19        44th Floor
          Los Angeles, California 90017
20        (213) 243-4000
          Counsel for Endo Health
21        Solutions Inc., Endo
          Pharmaceuticals Inc.,
22        Par Pharmaceutical, Inc. and
          Par Pharmaceutical Companies, Inc.
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         MARCUS & SHAPIRA LLP
           BY:  ELLY HELLER-TOIG, ESQUIRE
 3              ehtoig@marcus-shapira.com
           One Oxford Centre
 4         35th Floor
           Pittsburgh, Pennsylvania 15219
 5         (412) 471-3490
           Counsel for HBC Services
 6
 7         KIRKLAND & ELLIS LLP
           BY:  MARIA PELLEGRINO RIVERA, ESQUIRE
 8              mrivera@kirkland.com
           300 North LaSalle
 9         Chicago, Illinois 60654
           (312) 862-2000
10         Counsel for Allergan Finance LLC
11
12         REED SMITH LLP
           BY:  ERIC L. ALEXANDER, ESQUIRE
13              ealexander@reedsmith.com
           1301 K Street N.W.
14         Suite 1100 - East Tower
           Washington, D.C. 20005
15         (202) 414-9403
           Counsel for AmerisourceBergen Drug
16         Corporation
17
18         MORGAN LEWIS & BOCKIUS LLP
           BY:  BRUNO REATEGUI, ESQUIRE
19              breategui@morganlewis.com
                (via teleconference)
20         200 South Biscayne Boulevard
           Suite 5300
21         Miami, Florida 33131
           (305) 415-3000
22         Counsel for Teva Pharmaceutical
           Industries Ltd.
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         COVINGTON & BURLING LLP
           BY:  LAURA FLAHIVE WU, ESQUIRE
 3              lflahivewu@cov.com
                (via teleconference)
 4         850 Tenth Street, NW
           Washington, D.C. 20001-4956
 5         (202) 662-5575
           Counsel for McKesson Corporation
 6
 7         COVINGTON & BURLING LLP
           BY:  MICHAEL J. LANOSA, ESQUIRE
 8              mlanosa@cov.com
                (via teleconference)
 9         1999 Avenue of the Stars
           Los Angeles, California 90067
10         (424) 332-4800
           Counsel for McKesson Corporation
11
12         LOCKE LORD LLP
           BY:  CHRISTOPHER M. BOECK, ESQUIRE
13              cboeck@lockelord.com
                (via teleconference)
14         2200 Ross Avenue
           Suite 2800
15         Dallas, Texas 75201-6776
           (214) 740-8000
16         Counsel for Henry Schein, Inc. and
           Henry Schein Medical Systems, Inc.
17
18         LOCKE LORD LLP
           BY:  LAUREN MORGAN FINCHER, ESQUIRE
19              lfincher@lockelord.com
                (via teleconference)
20         600 Congress Avenue
           Suite 2200
21         Austin, Texas 78701
           (512) 305-4700
22         Counsel for Henry Schein, Inc. and
           Henry Schein Medical Systems, Inc.
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     A P P E A R A N C E S:

2     ALSO PRESENT:

3          TIFFANY SHIH

           CORNERSTONE RESEARCH

4          (via teleconference)

5

6     VIDEOGRAPHER:

7          DAVID LANE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          INDEX
 2
     APPEARANCES                              2
 3
     PROCEEDINGS                             10
 4
 5
     EXAMINATION OF G. CALEB ALEXANDER, M.D., M.S.:
 6
          BY MR. SNAPP                       10
 7
          BY MR. ALEXANDER                  290
 8
          BY MR. BENSINGER                  341
 9
          BY MR. MORRIS                     352
10
11
     CERTIFICATE                            360
12
     ERRATA                                 362
13
     ACKNOWLEDGMENT OF DEPONENT             363
14
     LAWYER'S NOTES                         364
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  DEPOSITION EXHIBITS
             G. CALEB ALEXANDER, M.D., M.S.
 2                   April 26, 2019
 3     NUMBER            DESCRIPTION            PAGE
 4     Alexander-1   Alexander Supplemental       14
                     Expert Report
 5
       Alexander-2   Alexander Expert Report      36
 6
       Alexander-3   Alexander Supplemental       37
 7                   Expert Report Update
 8     Alexander-4   Questions Re: Treatment      50
                     and Recovery/Notes from
 9                   Akron
10     Alexander-5   Alexander Curriculum         60
                     Vitae
11
       Alexander-6   Alexander Open Payments      74
12                   Data Webpage
13     Alexander-7   2018 Pitt et al             110
                     Publication
14
       Alexander-8   Spreadsheet, Medical        166
15                   Assisted Treatment, etc.
16     Alexander-9   Spreadsheet, Medical        167
                     Assisted Treatment, etc.
17
       Alexander-10  Press Release, NIH          205
18                   launches HEAL Initiative
19     Alexander-11  Spreadsheet, Redress        211
                     Models
20
       Alexander-12  2011 Huddleston et al       223
21                   NDIC Publication
22     Alexander-13  Office of National Drug     232
                     Control Policy Webpage
23
       Alexander-14  Consumer Price Index        248
24                   Webpage
25
```

Highly Confidential - Subject to Further Confidentiality Review

1                       DEPOSITION EXHIBITS

2

     Alexander-15  Consumer Price Index          254

3                    Spreadsheet

4     Alexander-16  USB Drive Containing MAT       288

                     Model 2.0 V51 Spreadsheet

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    PROCEEDINGS

2              (April 26, 2019 at 9:03 a.m.)

3              THE VIDEOGRAPHER:  We're now on

4        the record.  My name is David Lane,

5        videographer for Golkow Litigation

6        Services.  Today's date is April 26th,

7        2019.  Our time is 9:03 a.m.

8              This deposition is taking place

9        in Baltimore, Maryland in the matter

10       of National Prescription Opiate

11       Litigation.  Our deponent today is

12       Dr. George Caleb Alexander, M.D., M.S.

13             Counsel will be noted on the

14       stenographic record.  The court

15       reporter today is Mike Miller, who

16       will now swear in the witness.

17

18        G. CALEB ALEXANDER, M.D., M.S.,

19             having been duly sworn,

20             testified as follows:

21                    EXAMINATION

22   BY MR. SNAPP:

23       Q.    Good morning, Dr. Alexander.

24   I'm Erik Snapp, I represent the Purdue

25   defendants.  I'll be asking you the initial
```

1    set of questions today.

2              First of all, have you been

3    deposed before?

4         A.    No, I have not.

5         Q.    So let me just give you a few

6    ground rules.  First of all, it's really

7    important that we not speak over each other,

8    so if you'd wait until I finish my question

9    before you start your answer, Mike here will

10   be able to get down a better record.

11             Second of all, if you have any

12   questions or if my questions are unclear,

13   please let me know and I'll try to clarify my

14   questions.  Otherwise, I'll assume that you

15   understand my questions; is that fair?

16        A.    Yes, it is.

17        Q.    Okay.  Very good.

18             You understand that you're here

19   testifying in a case that's set to go to

20   trial in Ohio in October?  Do you understand

21   that?

22        A.    I do.

23        Q.    And have you been asked to

24   testify at trial in this case?  Have you been

25   asked to set aside any time to testify at

```
 1    trial?

 2         A.     No, I have not.

 3         Q.     Do you anticipate that you will

 4    be testifying at trial?

 5         A.     I don't know.

 6         Q.     One other thing.  At any time,

 7    if you need a break, just let me know and

 8    we'll take a break, a short break, as long as

 9    there's not a question pending.

10                Fair enough?

11         A.     Yes.

12         Q.     Okay.  Good.

13                So, Doctor, I want to start by

14    trying to define some terms that were used in

15    your expert reports.

16                First of all, can you tell me,

17    when you use the term "opioids," what do you

18    mean?

19         A.     It would depend upon the

20    context.

21         Q.     Okay.  Can you explain?

22         A.     In -- you know, without looking

23    at the report, you know, it's hard to provide

24    a specific instance or example, but in

25    general, I'm probably referring to both
```

1    prescription and nonprescription opioids.

2         Q.    And when you're talking about

3    nonprescription opioids, what are you

4    referring to?

5         A.    Once again, it would be helpful

6    to know the specific context within the

7    report, but generally, heroin and illicit

8    fentanyl and fentanyl derivatives.

9         Q.    How do you define opioid use

10   disorder?  And if you want to know what I'm

11   referring to, in paragraph 40 of your report,

12   which I'll show you in a little bit -- you'll

13   just have to take my word for it now unless

14   you want to see it -- you referred to the

15   formal criteria for an opioid use disorder.

16   But I didn't see those formal criteria listed

17   anywhere in your report, so what are those?

18             MS. RITTER:  Objection, form.

19        It's compound.

20             MR. SNAPP:  Let me just ask a

21        new question.

22   BY MR. SNAPP:

23        Q.    What are the formal criteria

24   for an opioid use disorder?

25        A.    Well, having referred to my

1    report, it would be helpful to see the report

2    so that I could see the context.

3              MR. SNAPP:  Let's mark the

4         report.

5              (Whereupon, Deposition Exhibit

6         Alexander-1, Alexander Supplemental

7         Expert Report, was marked for

8         identification.)

9    BY MR. SNAPP:

10        Q.    Doctor, I'm handing you what

11   I've marked as Deposition Exhibit 1, which is

12   the report that we received from plaintiffs'

13   counsel on April 3rd, which was your

14   supplemental expert report, expert witness

15   report, and it was in paragraph 40 that you

16   referred to formal criteria for an opioid use

17   disorder.

18              MR. SNAPP:  And I can send you

19         one of these over.

20              MS. RITTER:  That would be

21         good.  I just don't want to have --

22              MR. SNAPP:  It's going to be a

23         challenge with all the screens, but

24         we'll make it work.

25              (Document review.)

Highly Confidential - Subject to Further Confidentiality Review

1       A.      So I think elsewhere in my

2   report I refer to another's expert report in

3   terms of providing precise definitions for

4   many of the terms that I use like "opioid use

5   disorder," such as that term.

6   BY MR. SNAPP:

7       Q.      And who -- who was that?  Which

8   expert?

9       A.      Katherine Keyes.

10      Q.      Okay.  How do you define

11  "nonmedical opioid use"?

12      A.      Once again, I think that I --

13  in my report, I refer to her report for

14  providing definitions for these terms.

15      Q.      So sitting here today, you

16  don't know those definitions based on your

17  experience?

18      A.      I'm sorry, can you restate

19  that, please.

20      Q.      Sitting here today, when I'm

21  asking you questions about these issues,

22  you're not able to tell me what the formal

23  criteria for "opioid use disorder" is or the

24  definition of "nonmedical opioid use"; is

25  that fair?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      No.

2      Q.      That's not correct?

3      A.      Correct.

4      Q.      Okay.  So tell me what the

5   criteria are, the definition.

6      A.      So, for example, for -- you

7   know, when I consider nonmedical use of

8   opioids, generally I'm referring to use for

9   durations or for purposes other than for

10   which the product has been prescribed or

11   as -- or for use for the feeling that it

12   provides to the user.

13            And generally, you know, these

14   individuals -- so I would -- that's how I

15   would define it.

16      Q.      Is that the same as abuse?

17      A.      No.

18      Q.      Is it the same as misuse?

19      A.      I mean, I think that these are

20   all distinct and important terms that capture

21   different concepts pertaining to how opioids

22   are used by individuals.

23      Q.      I'm just trying to understand

24   how you used some of these terms in your

25   report.  I understand you want to look at the

1    report, but how do you define "abuse" and

2    "misuse," if not the same as nonmedical

3    opioid use?

4          A.     Well, I think all of these

5    capture concepts regarding the use of

6    products for indications or for reasons other

7    than for which they have been prescribed.

8          Q.     And abuse can also happen when

9    they haven't been prescribed to the person

10   using the product, right?

11         A.     Can you restate that, please.

12         Q.     So abuse exists or occurs also

13   when the person using the product was not the

14   person who was originally prescribed the

15   product?

16         A.     Yes.

17         Q.     Now, how do you define the

18   "opioid epidemic," as you used that term in

19   your report, throughout your report?

20         A.     Well, the epidemic as a concept

21   refers to an outbreak of a disease or

22   morbidity within a constrained geographic

23   area and within a time period greater than

24   what would be expected normally to occur.

25         Q.     When you use that term, is it

1     the same as the term "opioid crisis" that's

2     sometimes used?  Opioid epidemic and opioid

3     crisis, are they the same?

4          A.    I mean, I think they capture

5     similar elements.

6          Q.    I'm just trying to make our day

7     go faster.  So if I use the term "opioid

8     crisis" instead of "opioid epidemic" at some

9     point, will you understand that I'm referring

10    to the same phenomenon?

11         A.    For the purposes of this

12    discussion?  You're asking me -- are you

13    asking me to treat these as synonymous?

14         Q.    Well, do you view them as

15    synonymous?

16         A.    I mean, I think the epidemic is

17    a bit more of a scientific and public health

18    term, but I'm -- but I'm willing to treat

19    them as such for this conversation.

20         Q.    Fair enough.  Thank you.

21            When did the current opioid

22    epidemic begin?

23         A.    I think it depends.

24         Q.    On what?

25         A.    On many different factors.  On

Highly Confidential - Subject to Further Confidentiality Review

```
 1    where one looks, on how precisely one -- on
 2    knowledge of the magnitude of harms
 3    occurring, of information about how much
 4    harms over what amount of time in what
 5    geographic area and the like.
 6         Q.    Well, are you going to be
 7    providing testimony at trial related to when
 8    the opioid epidemic began?
 9         A.    I don't know.
10         Q.    Well, I'm just trying to
11    understand your testimony.  This is my one
12    chance -- this is one chance for all the
13    defendants here today to ask you questions
14    about these issues before trial, so I'm just
15    trying to understand.
16              If you're going to testify that
17    the opioid epidemic began on -- in such and
18    such year, I want to know what that year was.
19         A.    I think what there's no
20    controversy about is that there's a current
21    epidemic, and that as I outline in my report,
22    that there are many evidence-based methods to
23    abate it.
24         Q.    Has -- okay.  So you don't have
25    an answer as to when the opioid epidemic
```

Highly Confidential - Subject to Further Confidentiality Review

1    began?

2              MR. ARNOLD:  Objection,

3       mischaracterizes --

4              MR. SNAPP:  I'm sorry, who is

5       going to be objecting?  Are you going

6       to be objecting or are you going to be

7       objecting?

8              MR. ARNOLD:  My understanding

9       is that the order allows for two

10      people.

11             MR. SNAPP:  Okay.  So one of

12      you represents Summit and the other

13      represents Cuyahoga?  Is that --

14             MS. RITTER:  I don't think we

15      have to do that.  We represent the

16      plaintiffs in the MDL, whatever.

17             MR. ALEXANDER:  It's one

18      objection per party.

19             MR. SNAPP:  Yeah, it's one per

20      party.  If you represent the

21      plaintiffs, then one of you objects.

22             MS. RITTER:  Okay.  Objection

23      to the form.

24             MR. SNAPP:  Thank you.

25   BY MR. SNAPP:

1     Q.     So, Dr. Alexander, can you tell

2    me when the current opioid epidemic or opioid

3    crisis began?

4     A.     In my report I outline what I

5    believe to be the genesis of the epidemic

6    dating back to the late 1980s or the 1990s.

7     Q.     So the epidemic -- the genesis

8    of the epidemic was in the 1980s, you're

9    saying?  Is that your expert testimony?

10    A.     Well, in my report I discuss my

11    belief that the genesis of the epidemic lies

12    in the late 1980s and the 1990s.

13    Q.     Fair enough.

14           Has the opioid crisis or

15    epidemic changed during the time from the

16    1980s and early 1990s to the present in terms

17    of the compounds involved?

18    A.     Yes, it has.

19    Q.     How so?

20    A.     Can you be more specific,

21    please?

22    Q.     I'm just trying to understand

23    how it's changed since it began in the late

24    1980s and early 1990s.

25    A.     There have been many changes

Highly Confidential - Subject to Further Confidentiality Review

1      over this time period.

2          Q.     Will you be testifying at trial

3      about any of those changes?

4          A.     Once again, it's not clear to

5      me whether or not I would be testifying in

6      this case.

7          Q.     If you testify at trial, do you

8      have opinions as to what those changes in the

9      compounds that have been the focus of the

10     opioid crisis or epidemic -- do you have

11     opinions as to how those compounds have

12     changed over time?

13              MS. RITTER:  Objection to form.

14     BY MR. SNAPP:

15         Q.     For example --

16              MS. RITTER:  I'm sorry, you

17         weren't finished.  Go ahead.

18              MR. SNAPP:  Let me clarify.

19              MS. RITTER:  Yeah.

20     BY MR. SNAPP:

21         Q.     Do you agree that the current

22     opioid crisis or epidemic is a crisis of

23     illicit fentanyl and heroin?

24         A.     Are you asking whether I

25     believe that it's a crisis of these alone?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you believe those are the

2   primary compounds involved in the current

3   opioid crisis?

4    A.    I think there's enormous

5   morbidity and mortality occurring from both

6   prescription and illicit opioids at this

7   time.

8    Q.    So how do you define the

9   current opioid crisis in comparison to the

10  opioid crisis in the late 1980s and

11  early '90s when it began?

12   A.    Well, far too many people are

13  dying from both prescription and illicit

14  opioids over this time period.  More

15  individuals in the early years of the

16  epidemic prescription opioid -- prescription

17  opioids may have accounted for a greater

18  fraction of the morbidity than now relative

19  to heroin and illicit fentanyl.

20   Q.    So, Dr. Alexander, I want to

21  shift gears.  You're a medical doctor, right?

22   A.    Yes, I am.

23   Q.    And you're relying in part on

24  your experience as a medical doctor to

25  testify today for your opinions?

```
 1            A.     Yes, I am.

 2            Q.     So let's see if there are some

 3    things that we can actually agree on.

 4                   Do you agree that chronic pain

 5    is a serious medical condition?

 6            A.     Yes, I do.

 7            Q.     And do you agree that chronic

 8    pain affects millions of people in the U.S.?

 9            A.     Yes, I do.

10            Q.     Do you agree that chronic pain

11    affects people in Summit County, Ohio and

12    Cuyahoga County, Ohio?

13            A.     I do.

14            Q.     Do you agree that there are

15    risks associated with untreated chronic pain?

16            A.     Yes, I do.

17            Q.     Do you agree that every patient

18    must be treated individually?

19            A.     Can you rephrase that or be

20    more specific?

21            Q.     Well, do you agree as a medical

22    doctor that when you see a patient, you need

23    to treat that patient as an individual based

24    on that person's particular medical

25    presentation and circumstances?
```

1      A.     I do.

2      Q.     Do you agree that no single

3   treatment option will be appropriate for

4   every chronic pain patient?

5      A.     Are you asking whether I

6   believe that there's one treatment that could

7   be applied to every patient?

8      Q.     Yes.

9      A.     I do not.

10      Q.     And do you agree that it's

11   important for physicians like yourself to

12   have a variety of treatment options to choose

13   from when treating a medical condition such

14   as pain?

15      A.     I do.

16      Q.     Do you agree that all

17   treatments for chronic pain have risks?

18      A.     Yes.

19      Q.     Do you agree that it's the role

20   of the prescribing physician to weigh the

21   risks and benefits of any pain medication

22   when treating an individual patient?

23      A.     I do.

24      Q.     And you agree that a physician

25   should use his or her best judgment when

1    deciding whether to prescribe a medication?

2         A.    I do.  I do, but, you know,

3    physicians are -- I think physicians are

4    trying to do the best thing and do right by

5    their patients, including to treat them

6    individually, but physicians are -- you know,

7    their knowledge of treatment options is

8    impacted by the information that they receive

9    about the safety and effectiveness of

10   treatments, and that includes information

11   from pharmaceutical manufacturers as well as

12   through third-party organizations and others

13   that may shape the way that they practice and

14   their approaches to treating conditions.

15        Q.    It also includes information

16   that they receive in medical school, correct?

17        A.    Can you state that again,

18   please?

19        Q.    Well, you just testified that

20   prescribing physicians' decisions are

21   impacted by certain things that you listed.

22             MS. RITTER:  Objection --

23   BY MR. SNAPP:

24        Q.    And I'm asking if that decision

25   with respect to prescribing decisions is also

1    impacted by the information that they receive

2    while in medical school.

3              MS. RITTER:   Objection, form.

4         That's a different question.

5         A.    Yes, I believe it is.

6    BY MR. SNAPP:

7         Q.    And physicians also learn about

8    the prescriptions -- the prescription

9    medications that they're prescribing through

10   looking at the prescribing information that's

11   FDA approved, right?

12        A.    Can you ask that again, please?

13        Q.    Do doctors learn about the

14   drugs that they're prescribing by looking at

15   and reading and understanding the prescribing

16   information that's been FDA approved for a

17   particular drug?

18        A.    I would say some doctors in

19   some instances, yes.

20        Q.    They should, right?  They

21   should understand those risks and benefits

22   that are listed in the FDA-approved labeling?

23        A.    Yes.

24        Q.    And they also receive

25   information from continuing medical education

Highly Confidential - Subject to Further Confidentiality Review

1    programs that are put on by organizations

2    like Johns Hopkins, right?

3         A.    Some may, yes.

4         Q.    So just so we're clear, the

5    information that doctors base their

6    prescribing decisions on is not solely

7    information they receive from pharmaceutical

8    companies or third parties, right?

9         A.    That's -- yes, I believe that's

10   true.

11        Q.    They also might review medical

12   journal articles that provide information

13   that guide their prescribing decisions; fair

14   enough?

15        A.    Some -- you know, all of these,

16   I would say some -- some may, yes.

17        Q.    Dr. Alexander, do you agree

18   that opioid medications are Schedule II

19   controlled substances under the Controlled

20   Substances Act?

21        A.    Yes.

22        Q.    And you understand that

23   Schedule II controlled substances are defined

24   as substances that, and I'm quoting, have a

25   high potential for abuse which may lead to

1    severe psychological or physical dependence.

2            You understand that, right?

3        A.      Yes.

4        Q.      Do you agree that opioid

5    medications are approved by the FDA as safe

6    and effective for their intended use?

7        A.      I'm sorry, can you ask that

8    again?

9        Q.      I'll rephrase it.

10            Do you agree that the opioid

11    medications that are on the market today are

12    approved by the FDA as safe and effective for

13    their intended use?

14        A.      So you're asking me whether I

15    believe that the opioids are -- you know,

16    what the evidentiary basis is for approval

17    or --

18        Q.      No, I'm asking you if the FDA

19    has approved the opioid medications that are

20    on the market today as safe and effective for

21    their intended use?

22        A.      Yes, I believe they have.

23        Q.      Do you know that?  Okay.

24            And do you agree that different

25    opioids can have different side effects?

Highly Confidential - Subject to Further Confidentiality Review

1           A.      Yes, I do.

2           Q.      Do you agree that the

3      scientific data regarding opioids has changed

4      over time?

5           A.      Yes, I do.

6           Q.      Do you agree that individual

7      patients can react differently from other

8      patients to the same opioid medication?

9           A.      Yes, I do.

10           Q.      Do you agree that the

11      scientific data regarding opioid medications

12      will continue to evolve over time?

13           A.      I do.

14           Q.      Similarly, there's some

15      opinions in your report related to HIV and

16      hepatitis treatments.  Do you remember those

17      opinions?

18           A.      In broad form, although it

19      would be helpful if you're asking specific

20      questions --

21           Q.      I just have a general question.

22           A.      Okay.  Yeah.

23           Q.      I just want to confirm.  Is it

24      fair to say, similar to the scientific data

25      regarding opioid medications, that the

Highly Confidential - Subject to Further Confidentiality Review

1    scientific data regarding HIV and hepatitis C

2    treatments will also evolve over time?

3         A.     Yes, I believe it will.

4         Q.     Do you agree that a physician

5    prescribing opioid medications should

6    consider and monitor the potential for abuse,

7    misuse, addiction and diversion?

8         A.     Yes, I do.

9         Q.     And are you aware that the FDA

10   product labeling for some of the opioids

11   involved in this litigation actually inform a

12   prescriber that they should do that?

13        A.     I believe the labeling has

14   changed over time.  Are you asking about the

15   current labeling?

16        Q.     Well, the labeling for the --

17   sure, let's talk about the current labeling.

18        A.     Okay.

19        Q.     The current labeling informs

20   doctors that they should monitor the

21   potential for abuse, misuse, addiction and

22   diversion, correct?

23        A.     Yes.

24        Q.     Do you agree that in some

25   patients, opioids may be the only effective

1    treatment for chronic noncancer pain?

2        A.    Yes.

3        Q.    Do you agree that in some

4    patients, opioid medications may be the most

5    effective treatments for chronic pain?

6        A.    Yes.

7        Q.    Dr. Alexander, do you agree

8    that opioid medications should be available

9    to doctors and patients on the market today?

10       A.    I do.

11       Q.    Do you agree that opioid

12   medications are an appropriate treatment for

13   chronic pain related to cancer?

14       A.    You know, it depends on the

15   context.

16       Q.    Of course.

17             Generally speaking, do you

18   believe that opioid medications should be

19   available as a treatment option for chronic

20   pain related to cancer?

21       A.    Yes.

22       Q.    Do you agree that opioid

23   medications are an appropriate treatment

24   option for acute pain?

25       A.    Once again, it depends on the

1    context.

2         Q.      In certain circumstances, do

3    you agree that opioid medications are an

4    appropriate treatment for acute pain?

5         A.      I do.

6         Q.      And do you agree that in

7    certain circumstances opioid medications are

8    an appropriate treatment option for

9    post-surgical pain?

10        A.      Once again, it depends on the

11   context.  In certain circumstances, yes.

12        Q.      Do you agree that the majority

13   of patients who have ever been prescribed an

14   opioid have not gotten addicted?  That's an

15   imprecise question, let me reask the

16   question.

17            Do you agree that the majority

18   of patients who have been prescribed an

19   opioid medication have not become addicted to

20   that opioid medication?

21        A.      I do.

22        Q.      Doctor, do you agree that

23   addiction can occur with other medications as

24   well?

25        A.      What type of addiction?

1    Q.    I'm sorry.  I'm just asking --

2    let me just ask a different question.

3         So do you agree that addiction

4    can occur with illegal drugs?

5    A.    Yes.

6    Q.    Do you agree that addiction can

7    occur with illegal use of opioid medications?

8    A.    Yes.

9    Q.    And addiction can occur with

10   alcohol?

11   A.    Yes.

12   Q.    Addiction can occur with

13   tobacco and nicotine?

14   A.    You know, I mean, we don't talk

15   about tobacco use disorder, but certainly

16   people are dependent on tobacco and use it

17   habitually, yes.

18   Q.    Do you agree that people can

19   become addicted to using their smartphones?

20   A.    Here again, you know, my report

21   focuses on opioid use disorder and ways to

22   abate it in Cuyahoga and Summit Counties.

23   Q.    Let me go back to opioid

24   prescriptions, opoid medications.  Do you

25   agree that individuals can -- can and do

1   become addicted to opioids without ever

2   obtaining a legal prescription for the

3   medication?

4        A.    I'm sorry, can you ask the

5   question again, please?

6        Q.    Certainly.

7              Do you agree that an individual

8   can become addicted to opioids without ever

9   obtaining a legal prescription for a

10  medication -- for an opioid medication?

11       A.    Can they become addicted to

12  prescription opioids or to other -- heroin or

13  illicit fentanyl?

14       Q.    Well, let's start with

15  prescription opioids.

16       A.    Okay.  Yes, I do.

17       Q.    What about heroin and fentanyl?

18       A.    Yes, I do.

19       Q.    Do you agree that the question

20  of who may become addicted is highly

21  individualized?

22       A.    Can you say more about what you

23  mean by highly individualized, please?

24       Q.    Well, I'm just trying to

25  understand.  If a -- my question is simply:

Highly Confidential - Subject to Further Confidentiality Review

1    Do you agree that if you're trying to

2    identify people who might become addicted to

3    a particular substance, that inquiry is

4    highly individualized, correct?

5         A.    What do you mean by inquiry?

6    Are you asking whether I think it's easy to

7    predict who --

8         Q.    Sure.

9         A.    I do not.

10        Q.    Do you agree that

11   nonprescription pain medications taken at

12   inappropriate doses can cause serious side

13   effects?

14        A.    Nonprescription pain medicines?

15        Q.    Correct.

16        A.    Such?  Can you give me an

17   example or two?

18        Q.    Acetaminophen.

19        A.    And when taken at what doses?

20        Q.    Inappropriate doses, high

21   doses.

22        A.    I do.

23              (Whereupon, Deposition Exhibit

24        Alexander-2, Alexander Expert Report,

25        was marked for identification.)

```
 1    BY MR. SNAPP:
 2         Q.    I'm just going to take care of
 3    some housekeeping, Dr. Alexander.
 4         A.    Okay.
 5         Q.    This is Deposition Exhibit 2,
 6    and this is your original March 25th expert
 7    report.
 8         A.    Okay.
 9              (Whereupon, Deposition Exhibit
10         Alexander-3, Alexander Supplemental
11         Expert Report Update, was marked for
12         identification.)
13    BY MR. SNAPP:
14         Q.    And finally, I'm going to mark
15    as Deposition Exhibit 3 a three-page document
16    that we received on April 17th that's titled
17    G. Caleb Alexander, M.D., M.S., Supplemental
18    Expert Report Update.
19              Do you recognize
20    Deposition Exhibits 2 and 3 to be your
21    reports in this case, two of the three
22    reports in this case?
23         A.    I do.
24         Q.    Dr. Alexander, have you served
25    as an expert witness previously, before this
```

Highly Confidential - Subject to Further Confidentiality Review

1   case?

2       A.      I've testified before the U.S.

3   Senate and the U.S. House of Representatives

4   and the FDA, but I've not served in a -- I've

5   not testified in this context previously.

6       Q.      So the reports that I put in

7   front of you as Deposition Exhibits 1, 2 and

8   3, are those accurate?

9       A.      Well, the most recent update,

10  Exhibit 3, represents my best estimates

11  regarding the matters to which Exhibit 3

12  speaks and so -- and, you know, but anything

13  that's not updated in Exhibit 3 that was

14  present in Exhibit 2, yes, I would say is

15  accurate in reflecting my best thinking about

16  the matter.

17      Q.      Fair enough.

18              So Exhibit 3 made some

19  corrections to Exhibit 2; is that fair, made

20  it more accurate?

21      A.      Well, I think Exhibit 3

22  provides better estimates for the courts to

23  consider.

24      Q.      Well, do these exhibits contain

25  all of your opinions that you intend to

Highly Confidential - Subject to Further Confidentiality Review

1    testify about at trial?

2        A.    Once again, I don't know

3    whether I'll be testifying, and I don't feel

4    that I can answer that question.

5        Q.    Well, is there anything that's

6    not included in these reports that you intend

7    to testify about at trial, if you testify?  I

8    understand you don't know if you're going to

9    testify.

10       A.    Not at this time.  I'm not --

11   there's nothing that I'm -- not at this time.

12       Q.    So we've received two

13   supplements or amendments to your reports.

14   Do you anticipate providing any additional

15   supplements or amendments to your reports?

16       A.    I don't anticipate doing so at

17   this time.

18       Q.    Did you bring any documents or

19   anything with you today to the deposition?

20       A.    No, I did not.

21       Q.    Tell me what you did to prepare

22   for this deposition today.

23       A.    I reviewed my report.  I

24   reviewed my report.

25       Q.    Which one did you review?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      All of them.

2      Q.      Okay.

3      A.      All three of these exhibits.

4      Q.      Okay.

5      A.      I had several phone

6   conversations with members of my team that I

7   supervised in the process of developing these

8   estimates, and I met with counsel, and I

9   reviewed a number of references and cited

10  material that I relied upon to produce my

11  report.

12             And I think those were the --

13  those were the major four -- I believe there

14  were four.  Those were the major four

15  activities that I undertook.

16     Q.      Okay.  So did you meet with

17  Ms. Ritter?

18     A.      I did.

19     Q.      Any other attorneys?

20     A.      Yes.

21     Q.      Who else did you meet with?

22     A.      I don't know their names, but

23  there's a written record of it, I would

24  imagine.

25     Q.      And when you say there's a

Highly Confidential - Subject to Further Confidentiality Review

 1    written record, are you referring to billing

 2    records?

 3         A.     No.  No.  So I traveled to

 4    Charleston, and there were several attorneys

 5    in the room.

 6         Q.     When did you -- when did that

 7    meeting take place?

 8         A.     About two weeks ago.

 9         Q.     How long were you there?

10         A.     In the room or in the city?

11         Q.     Well, just -- I just want to

12    understand how long the meetings were.

13         A.     It was a day trip.

14         Q.     A day trip.  So how long did

15    you meet with them?

16         A.     Perhaps five hours.

17         Q.     Other than the attorneys for

18    the plaintiffs, were any other individuals

19    present?

20         A.     There, I believe, was at least

21    one, if not more than one, paralegal.  There

22    was an attorney named Don whose, perhaps,

23    last name you're familiar with.  I'm sorry

24    that I don't know his last name.  So there

25    were one or more paralegals, and I believe

1    there was someone from an outside group also.

2           Q.     Which outside group?

3           A.     I believe it's a litigation

4    support group or something like that.

5           Q.     Did this meeting in Charleston

6    take place before you provided the report

7    that's marked as Deposition Exhibit 2?

8           A.     I don't believe so.

9           Q.     I want to understand what else

10   you did to prepare your reports also.  So you

11   mentioned that you talked with members of

12   your team that you supervised.

13              Are you talking about a -- who

14   are you speaking about when you talk about

15   members of your team?

16          A.     Several individuals that worked

17   with me to build the models that I've

18   provided.

19          Q.     Are these individuals employees

20   of Monument Analytics, your company?

21          A.     Some.

22          Q.     Well, tell me who they are.

23   Tell me who all these -- tell me who was on

24   your team that helped you put together these

25   reports.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      Omar Mansour, M-A-N-S-O-U-R;

 2     Francine Chingcuanco, C-H-I-N-G-C-U-A-N-C-O;

 3     Ellen Hu, last name H-U; Jeromie Ballreich,

 4     last name, B-A-L-L-R-E-I-C-H, I believe.

 5     David Dowdy, D-O-W-D-Y; Harold Pollack,

 6     P-O-L-L-A-C-K, and Josh Sharfstein.

 7                 So those are the --

 8           Q.      Seven people?

 9           A.      That -- yeah.  Although with

10     varied roles, but yes.

11           Q.      Okay.  And which of those are

12     employees of your company?

13           A.      Omar, Francine.

14                 Do you mean full time or part

15     time?

16           Q.      Part time.

17           A.      Work --

18           Q.      Full time.

19           A.      Consultants.  I mean --

20           Q.      Whoever is getting paid by the

21     plaintiffs' counsel, through your company or

22     otherwise, as part of this --

23           A.      Okay.  I mean, some

24     participated very minimally, but all but

25     Joshua Sharfstein would meet your definition.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Okay.  So all of them somehow

2    are affiliated with your company,

3    Monument Analytics, except for

4    Mr. Sharfstein.  Fair enough?

5        A.      Yes.

6        Q.      And are they all billing for

7    their time spent on this matter?  Have they

8    been?

9        A.      Yes.

10       Q.      Do you know how much your firm

11   has -- well, first of all, I should clarify.

12               Is your time being billed to

13   the plaintiffs' counsel through your company

14   or separately?

15       A.      Through my company.

16       Q.      And your company is

17   Monument Analytics; is that correct?

18       A.      Yes.

19       Q.      So how much has your firm

20   billed the plaintiffs' counsel so far in this

21   litigation?

22       A.      I don't know.

23       Q.      Can you give me a ballpark

24   estimate?

25       A.      I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Is it more than a million

2    dollars?

3                  MS. RITTER:  Objection.

4          A.      No, I do not believe so.

5    BY MR. SNAPP:

6          Q.      Is it more than $750,000?

7          A.      Once again, I do not know, but

8    I do not believe so.

9          Q.      Do you believe it's more than

10   $500,000?

11         A.      Since the -- since initial

12   engagement with this matter, with this

13   litigation, it could be.

14         Q.      And when was that initial

15   engagement?

16         A.      I don't know.

17         Q.      Do you have -- was it last

18   month?  Was it last summer?

19                 MS. RITTER:  Objection, asked

20         and answered.

21                 MR. SNAPP:  Well, let me

22         clarify.

23   BY MR. SNAPP:

24         Q.      So we have some notes that

25   plaintiffs' counsel provided us of a meeting

1    that you attended apparently in Akron, Ohio

2    in July of 2018.

3              Did your engagement in this

4    matter occur prior to July of 2018?

5         A.    Yes, it did.

6         Q.    How far before?  How much

7    before July of 2018 were you engaged by the

8    plaintiffs in this case?

9         A.    I don't know.

10        Q.    Was it six months, a year?  I'm

11   just trying to -- just a ballpark.  That's

12   all.  I'm not asking for an exact date.

13        A.    Sure.  Sure.  My guess is it

14   would be -- have been less than a year prior

15   to then, so that is my guess is it was more

16   recently than July 2017.

17        Q.    Okay.  Fair enough.

18              So it was more than a year ago

19   from now, we're sitting here in April of

20   2019.  Would it have been more than a year

21   before now?

22        A.    I don't know.

23        Q.    Okay.  I'm just trying to

24   understand how long you were spending putting

25   together these reports.

1      So it's at least sometime

2   before July of 2018, fair enough?

3            MS. RITTER:  Objection to form.

4        It's mischaracterizing what he said.

5            THE WITNESS:  Can you ask the

6        question again, please?

7            MR. SNAPP:  I'm just trying to

8        understand.  Let me ask a different

9        question.

10   BY MR. SNAPP:

11       Q.    How long did it take you and

12   your team to put together the reports that

13   are marked as Deposition Exhibits 1, 2 and 3?

14       A.    I don't know.

15       Q.    Who would know?

16       A.    Well, I've worked most

17   intensively on these reports over several

18   months.

19       Q.    The last several months?

20       A.    Yes.

21       Q.    When did you start working

22   intensively on these reports?

23       A.    I don't have a specific date.

24   I don't know.

25       Q.    Well, was it in 2019 or 2018?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      My guess is 2018.

2              Q.      Okay.  So, sir, in preparing

3     these reports, in preparing for your

4     testimony today, have you reviewed any

5     transcripts of testimony that was taken in

6     this matter?

7                      MS. RITTER:  Objection, form,

8              compound.

9                      THE WITNESS:  Can you restate

10             that, please.

11    BY MR. SNAPP:

12             Q.      In your work on this case, have

13    you reviewed any transcripts of testimony

14    taken in this matter?

15             A.      Testimony from whom?

16             Q.      Anyone.

17             A.      I do not recall reviewing any

18    transcripts of testimony at this time, no.

19             Q.      Have you reviewed any

20    documents, internal company documents from

21    any of the defendants in this case as part of

22    your work on this case?

23             A.      I don't recall at this time

24    having reviewed any internal company

25    documents.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sir, your report that's marked

2    as Exhibit 2 includes 488 references.  Have

3    you reviewed each of those references?

4    A.    They -- yes, insofar as they

5    served as a basis for my report.

6    Q.    Did you write the report

7    yourself?

8    A.    The vast majority of it, I did.

9    There were probably -- you know, of the 187

10   paragraphs, there are probably 10 or so that

11   someone else drafted and that I reviewed and

12   edited and substantively revised, and

13   ultimately, the report represents my own

14   views and my own expertise.

15   Q.    Now, we mentioned -- I

16   mentioned earlier the meeting that you had in

17   Akron, Ohio in July 2018.  I believe it was

18   described in your notes as a stakeholder

19   meeting; is that right?

20   A.    Yes.

21   Q.    Now, did you meet with anyone

22   in Cleveland?

23   A.    There may have been Cleveland

24   representatives at the meeting.  I do not

25   know.

1    Q.    Did you meet with any

2   representatives of Cuyahoga County?

3    A.    Once again, there may have been

4   representatives at the meeting.  I do not

5   know.

6    Q.    Did you meet with anyone from

7   Summit County?

8    A.    Yes.

9    Q.    And who did you meet with from

10  Summit County?

11   A.    I do not know.

12        (Whereupon, Deposition Exhibit

13       Alexander-4, Questions Re: Treatment

14       and Recovery/Notes from Akron, was

15       marked for identification.)

16  BY MR. SNAPP:

17   Q.    I'm just going to mark for the

18  record the notes of that meeting just so

19  we're clear.  This is Deposition Exhibit 4.

20  I just want to be clear what we're speaking

21  about.  I'll come back to those and ask some

22  questions about them later, but for now I

23  just want to mark them for the record so

24  we're all on the same page.

25   A.    Okay.

1      Q.     So you're saying it's possible

2   that you did meet with someone from Cuyahoga

3   and Cleveland, but you don't know?

4      A.     Correct.

5      Q.     Other than the meeting in

6   Akron, did you conduct any research in

7   Cuyahoga County or Summit County related to

8   this case?

9      A.     Do you mean primary research

10  where I would interview patients, or what do

11  you mean by research?

12     Q.     What do you mean by research?

13     A.     Can you ask the question again,

14  please?

15     Q.     I'm just trying to understand:

16  Other than the meeting in Akron --

17     A.     Yeah.

18     Q.     -- in July of 2018, did you do

19  anything else to -- do any research in the

20  counties that we're talking about, Cuyahoga

21  and Summit Counties?

22     A.     I did.  I did.

23     Q.     What did you do?

24     A.     I reviewed a variety of

25  materials that have been produced or provided

1    for this case that reflect the conditions on

2    the ground in these counties.

3           Q.      And are those the materials

4    that we received with your expert report?  We

5    received a list of materials that included

6    some task force reports and other things.

7    Are those the materials you're talking about?

8           A.      Yes.

9           Q.      And did you receive those

10   materials from counsel, plaintiffs' counsel?

11          A.      Yes.

12          Q.      So other than reviewing some

13   documents provided to you by plaintiffs'

14   counsel, you didn't do anything else to do

15   any research, conduct any research in

16   Cuyahoga and Summit Counties; is that fair?

17          A.      Yes.

18          Q.      Now, there were some changes to

19   your reports, and I want to start with

20   Deposition Exhibit 1 and Deposition

21   Exhibit 2, and I want to make sure I

22   understand the changes that you made between

23   Exhibit 1 and Exhibit 2.

24              MS. RITTER:  Objection to the

25          form.  And I think that they're

1       numbered the other way.

2               MR. SNAPP:  I think you're

3       right.

4               MS. RITTER:  Exhibit 2 is --

5       okay.  Yeah.

6               MR. SNAPP:  I think you're

7       right.  Thank you for clarifying.

8               MS. RITTER:  Okay.

9   BY MR. SNAPP:

10      Q.      So Exhibit 2 is your original

11  report from March 25th.  I want to understand

12  the differences between Exhibit 2 and the

13  April 3rd report that's marked as Exhibit 1.

14              Can you tell me, first of all,

15  why did you make changes?

16      A.      I thought I could provide

17  better estimates.

18      Q.      Okay.  And why did you think

19  that?

20      A.      In reviewing the components of

21  the -- in reviewing the estimates that we

22  provided, I identified areas where I thought

23  that we could make more conservative and

24  better estimates either of the population

25  within a given category or the costs

1    attributable to a population.

2         Q.    And what specific changes did

3    you make?

4         A.    For example, the --

5         Q.    Which paragraph are you looking

6    at?

7         A.    Just give me one minute,

8    please.

9         Q.    Sure.

10        A.    So, for example, the harm

11   reduction interventions category, I believe

12   in the original report, we did not estimate

13   the costs of fentanyl testing strips or

14   supervised consumption facilities, so those

15   were added in the supplemental report.  And

16   that accounts for the increase in the

17   estimates costs for that category.

18        Q.    And nationally, those increases

19   for all the categories were $30.4 billion,

20   correct, the difference between Exhibit 2 and

21   Exhibit 1?

22        A.    Yes.

23        Q.    When you map that out using the

24   1.5% that you used to allocate a portion of

25   the national abatement costs to Cuyahoga and

```
1    Summit Counties, that difference is

2    $450 million, correct?

3         A.    I don't have that number in

4    front of me, but if that's -- but that sounds

5    like that could be the case.

6         Q.    And just so I understand, is

7    there any reason you couldn't have done the

8    analysis that you did in the April 3rd report

9    for your March 25th report?

10        A.    Well, those -- can you ask the

11   question again, please?

12        Q.    I'm just trying to understand

13   why you didn't make -- why Exhibit 1, the

14   analysis that you conducted in Exhibit 1 was

15   something that you had to wait until after

16   the original deadline of March 25th --

17        A.    Right.  Right.

18        Q.    -- to do.

19        A.    So in reviewing the estimates

20   that were provided, I felt that there were

21   better estimates that could have been

22   provided in these instances, and so that's

23   why I submitted a supplemental report.

24              But in my report, I identify

25   both that -- this is a framework, really.
```

Highly Confidential - Subject to Further Confidentiality Review

1    This is intended as a framework for the

2    communities and the courts to consider as the

3    costs of abatement are -- are evaluated, and

4    also that, you know, detailed assessments of

5    the costs for Cuyahoga and Summit Counties

6    are another matter.

7            This is really meant just to

8    provide an overall framework at a national

9    level for the potential costs of abatement.

10        Q.      And so the detailed assessments

11   of the cost of Cuyahoga and Summit Counties

12   in terms of abatement costs, you said those

13   are another matter, and you didn't attempt to

14   do those, did you?

15        A.      I did not.

16        Q.      Now, if you look at

17   Deposition Exhibit 3, which is the three-page

18   document that we received on April 17th --

19        A.      Uh-huh.

20        Q.      -- there were a number of

21   changes or corrections to your redress model

22   that are included on the first page, correct?

23        A.      Yes.

24        Q.      And then on the second and

25   third page, you discuss Scenarios A, B, C,

Highly Confidential - Subject to Further Confidentiality Review

1    and D; is that right?

2           A.      Yes.

3           Q.      And these are four different

4    ways of looking at national abatement costs,

5    correct?

6           A.      Yes.

7           Q.      And are these -- do these

8    scenarios that are listed on the second and

9    third page of Deposition Exhibit 3, do those

10   scenarios replace the abatement cost

11   conclusion in paragraph 180 of

12   Deposition Exhibit 1?

13          A.      So if you're asking whether the

14   452.9 billion figure in paragraph 180 of

15   Exhibit 1 should be replaced by one of

16   these -- so that value is the same value as

17   Scenario A.

18          Q.      Correct.

19          A.      And so can you please ask a

20   question again about that?

21          Q.      Certainly.

22                  So Scenario 3 --

23          A.      Yes.

24          Q.      -- is the original model --

25          A.      Yes.

1          Q.      -- with the corrections that

2     are listed on Table 1 --

3          A.      Correct.

4          Q.      -- of Deposition Exhibit 3,

5     correct?

6          A.      Yes.

7          Q.      So is it fair to say that those

8     corrections essentially remove from your

9     analysis Scenario A?

10         A.      Yes.

11         Q.      And I noticed that in this

12    exhibit that we've marked as

13    Deposition Exhibit 3, which is your updated

14    April 17th supplemental report, you did not

15    do a Cuyahoga- and Summit-specific mapping

16    calculation that you had done previously in

17    the other exhibits.

18         A.      Uh-huh.

19         Q.      Will you be restricting your

20    testimony -- I guess I'm just trying to

21    understand.

22              Is Deposition Exhibit 3 -- it

23    seems to show that your testimony will only

24    focus on national abatement costs at this

25    point; is that correct?

```
 1              A.      Well, I don't -- as I said, I
 2     don't know if I'm testifying.
 3              Q.      Understood.  But do you have --
 4     I didn't see any attempt in Deposition
 5     Exhibit 3 to allocate Scenario B, C and D to
 6     Cuyahoga and Summit Counties.
 7              A.      Is that a question or can you
 8     ask a question about --
 9              Q.      Well, is there some attempt?
10     Did I just miss it I guess is the question?
11              A.      No, you did not.
12              Q.      Okay.  So you have not done
13     that next step to try to take these abatement
14     costs that are listed in Deposition Exhibit 3
15     and figure out which portion of the national
16     abatement costs are apportioned to Cuyahoga
17     and Summit Counties; is that fair?
18                   MS. RITTER:  Objection to the
19              form.
20              A.      Yes, that's fair.
21     BY MR. SNAPP:
22              Q.      Do you intend to do so?
23              A.      Not at this time.
24                   THE WITNESS:  Can we do a
25              five-minute break at your convenience?
```

1          MR. SNAPP:  Absolutely.  This

2     is a good time.

3          THE WITNESS:  Okay.  Very good.

4          THE VIDEOGRAPHER:  Going off

5     the record at 10:05 a.m.

6          (Recess taken, 10:05 a.m. to

7     10:15 a.m.)

8          THE VIDEOGRAPHER:  We're back

9     on the record at 10:15 a.m.

10          (Whereupon, Deposition Exhibit

11     Alexander-5, Alexander Curriculum

12     Vitae, was marked for identification.)

13   BY MR. SNAPP:

14     Q.    Dr. Alexander, I've handed you

15   what's been marked as Deposition Exhibit 5,

16   which is your CV that was provided to us.

17   I'm not going to spend a lot of time on it.

18   I just want to understand:  Is this your

19   current CV?

20     A.    Well, I may have an update, you

21   know, on my desktop from April, but it

22   reflects a recent CV.

23     Q.    Okay.  Do you have any

24   additions you'd like to make to it at this

25   time?  I guess a better question would be:

1    The one on your desktop, have you made

2    additions to that in the last couple of

3    months?  Because this one is marked -- it's

4    dated February 2019.

5         A.    I was promoted to full

6    professor.

7         Q.    Congratulations.

8         A.    Thank you.

9         Q.    Other than being promoted to

10   full professor, are there any other changes

11   you can think of?

12        A.    There are -- I mean, the most

13   relevant would be additional publications.

14        Q.    Okay.  Can you think of any in

15   particular that you've published since

16   February of 2019?  Looks like the last one is

17   on page 25.  There's a publication

18   number 243.

19        A.    No, I cannot.

20        Q.    Okay.  Are you board certified?

21        A.    Yes, I am.

22        Q.    In what?

23        A.    Internal medicine.

24        Q.    Okay.  I see that right down at

25   the bottom of page 1; is that right?  Am I

1    looking in the right place, Medical Board

2    Certification?

3         A.    Yes.

4         Q.    But just so we're clear, you're

5    not a pharmacist, are you?

6         A.    No, I'm not.

7         Q.    And you're not a

8    pharmacologist?

9         A.    No, I am not.

10        Q.    Are you a toxicologist?

11        A.    No, I am not.

12        Q.    Are you an economist?

13        A.    No, I am not.

14        Q.    Are you a statistician?

15        A.    I wouldn't call myself a

16   statistician, but as with pharmacology and

17   economics, I use these as part of my

18   professional activities as a

19   pharmacoepidemiologist.

20        Q.    Just so we're clear, you don't

21   have any degrees in statistics?

22        A.    No, I do not.

23        Q.    And you don't have any

24   certifications as a statistician, if there

25   are any available?

1        A.      No, I do not.

2        Q.      And are you an epidemiologist?

3        A.      Yes, I am.

4        Q.      Do you have any degrees or

5    certifications in epidemiology?

6        A.      I have a master's in science

7    from the University of Chicago, and that

8    included training in epidemiology.

9        Q.      What was your master's in?

10       A.      Well, it was awarded through

11   the Department of Health Studies, and it

12   focused heavily on health studies, health

13   services research and epidemiology.

14       Q.      Are you a pain management

15   specialist?

16       A.      No, I am not.

17       Q.      Are you an addiction

18   specialist?

19       A.      No, sir.

20       Q.      Are you a specialist in opioid

21   use disorder?

22       A.      Are you asking whether I'm a

23   clinical specialist in these matters?

24       Q.      Sure.

25       A.      No, I am not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you consider yourself an

2    expert in FDA regulatory matters?

3    A.    I consider myself knowledgeable

4    about regulatory matters, yes.

5    Q.    Will you be offering any

6    opinions with respect to regulatory matters

7    in this case?

8    A.    Once again, with the caveat

9    that I have no idea whether I would be

10   testifying or further involved in the case, I

11   was asked to develop estimates of the most

12   evidence-based programs -- you know, I was

13   asked to develop a national abatement program

14   based on my best judgments about the

15   scientific evidence.  So I was not asked

16   about regulatory matters in this case.

17   Q.    Okay.  So will you be offering,

18   if you testify, any opinions with respect to

19   the regulatory history of any opioid

20   medicines?

21   A.    I don't know, but I don't

22   anticipate so.

23   Q.    You haven't done work in that

24   area in preparation for this case, have you?

25   A.    No, I have not.

```
 1              Q.      And do you consider yourself a

 2      marketing expert?

 3              A.      No, I do not.  But as with the

 4      other fields that I mentioned, these are --

 5      the tools and methods and insights from these

 6      fields are used by pharmacoepidemiologists.

 7              Q.      Understood.  But you have

 8      not -- I just want to make sure I understand.

 9      I didn't see anything in your report

10      reflecting any work that you've done in this

11      case to evaluate any of the defendants'

12      marketing of opioid prescription drugs; is

13      that fair?

14              A.      Can you state that as a -- or

15      say it as a question?

16              Q.      Certainly.

17                      Have you done any work in this

18      case to evaluate -- review and evaluate any

19      defendant's marketing for its prescription

20      opioid medicines?

21              A.      No, I have not.

22              Q.      Okay.  So in this case, is it

23      fair to say that you're not offering any

24      opinions on any defendant's marketing?

25              A.      I've not been asked -- I've not
```

1    been asked to do that in preparation of my

2    expert report.

3          Q.    Have you been asked to provide

4    any opinions with respect to any defendant's

5    conduct historically, its historic conduct?

6          A.    No, I have not.

7          Q.    Have you been asked to provide

8    any opinions with respect to the cause of the

9    opioid crisis or opioid epidemic, as you put

10   it?

11         A.    Yes, I have.

12         Q.    And what opinions do you intend

13   to offer if you testify at trial with respect

14   to the cause of the opioid crisis?

15         A.    May I look briefly at my

16   report?

17         Q.    Certainly.

18         A.    So paragraphs -- there are

19   paragraphs in my report that address what I

20   referred to as the genesis of the epidemic,

21   so I don't know if that answers your

22   question, but I guess my -- maybe you could

23   repeat your question for me.

24         Q.    Which paragraphs are you

25   referring to, Doctor?

1       A.      Could you repeat your question,

2    please, just so I'm sure I refer to the right

3    paragraphs.

4       Q.      Well, I'm just trying to

5    understand if you have been asked to provide

6    opinions in this case with respect to the

7    cause of the opioid crisis or opioid

8    epidemic.

9       A.      I mean, I'd say only in the

10   highest -- only at the highest level of

11   abstraction.  I was asked to provide my best

12   judgments about what interventions should be

13   employed to abate the epidemic.

14              So in sort of laying the

15   groundwork for that in my report, I do

16   discuss, for example, in paragraph 16, the

17   modern opioid epidemic can be traced to the

18   1980s; paragraph -- paragraphs 31 through 34,

19   where I discuss misconceptions that I believe

20   must be addressed.  So, for example, there's

21   a conflict between reducing opioid oversupply

22   and improving quality of care for people with

23   pain.

24              So those are the only places in

25   my report where I discuss -- that I think are

1    relevant to your question.

2         Q.    So I'm just trying to

3    understand.

4              So will you be -- if you

5    testify at trial, do you expect to provide

6    testimony related to any defendant's

7    responsibility for the opioid crisis?

8              MS. RITTER:  Objection, asked

9         and answered.

10        A.    I will do my best to speak to

11   whatever I'm asked to speak to, but my report

12   that I submitted contains what I've focused

13   on and what I would anticipate would be the

14   focus of any testimony.

15   BY MR. SNAPP:

16        Q.    Okay.  I'm just trying to

17   understand if you're going to be providing

18   testimony that any of the defendants caused

19   the opioid crisis or opioid epidemic, and if

20   so, I'm going to ask you questions about what

21   they did, so...

22        A.    Of course.  Of course.

23              I don't anticipate doing so.

24        Q.    Thank you.

25              So I noticed that in your CV --

Highly Confidential - Subject to Further Confidentiality Review

1    well, strike that.

2            Just to be clear, there's one

3    statement in paragraph 16, and I just want to

4    ask about --

5            MS. RITTER:  Excuse me, do you

6        mean Exhibit --

7            MR. SNAPP:  Paragraph 16 in

8        Deposition Exhibit 1.

9            MS. RITTER:  Okay.

10           MR. SNAPP:  I'm sorry.  I might

11       be looking at the wrong paragraph.

12       Forgive me.

13   BY MR. SNAPP:

14       Q.    Now, in the spillover sentence

15   from page 4 to page 5, you refer to the

16   activities of a number of intermediary

17   organizations supported by manufacturers.

18           Do you see that?

19       A.    I do.

20       Q.    What organizations are you

21   referring to in that sentence?

22       A.    Well, I believe they're cited

23   and discussed in the references that I

24   provide to support that assertion, and I also

25   see in footnote 3 that I provided some

1    further context for that comment.

2         Q.     And is it your testimony --

3    well, first of all, let me ask:  Have you

4    studied the manufacturer's -- any

5    manufacturer's relationship with third

6    parties, third-party organizations like those

7    you're speaking of in footnote 3 in

8    paragraph 16?

9         A.     I have.

10        Q.     For this case?

11        A.     Not to prepare my report, no.

12        Q.     So I just want to make sure I

13   understand, if you're going to be providing

14   testimony with respect to -- assuming you

15   testify -- the activities of intermediary

16   organizations that were supported by

17   manufacturers.

18             What activities are you talking

19   about?

20             MS. RITTER:  Objection, asked

21        and answered.

22             THE WITNESS:  Can you ask the

23        question again, please?

24   BY MR. SNAPP:

25        Q.     In the sentence that we're

Highly Confidential - Subject to Further Confidentiality Review

1   talking about, you refer to the activities of

2   a number of intermediary organizations

3   supported by manufacturers.

4           A.      Right.

5           Q.      What specific activities are

6   you referring to?

7                   MS. RITTER:  Objection, asked

8           and answered.

9           A.      You're asking about the

10  activities rather than the organizations

11  themselves?

12  BY MR. SNAPP:

13          Q.      Well, the -- yes, I am.

14          A.      And you're asking whether or

15  not -- I mean, once again, my report focuses

16  on a national abatement plan.

17          Q.      Understood.

18          A.      The -- and I reference -- to

19  support this assertion, I reference -- I have

20  a footnote that describes financial support,

21  and I discuss that, and then I also cite

22  studies that I think provide more context to

23  support this assertion.

24          Q.      Is it your view, sir, that

25  financial support of these organizations or

1    individuals somehow impacted the veracity,

2    scientific veracity of the work that they

3    were doing?

4         A.    I mean, that's not what I was

5    asked to assist the courts with in this case.

6         Q.    Okay.  So is it fair to say you

7    won't be providing testimony on that issue,

8    if you testify?

9         A.    If I testify, I would

10   anticipate testifying about anything that I

11   was asked to testify about.  I don't expect

12   at present for my testimony to be focused on

13   this matter.

14        Q.    The issue of --

15        A.    The issue of --

16        Q.    -- the company support --

17        A.    -- the relationship between

18   intermediary organizations and manufacturers.

19        Q.    All right.  Or individuals as

20   well, right?  You don't expect to provide

21   testimony about the relationship between any

22   manufacturer and key opinion leaders, for

23   example?

24        A.    It's not what I've -- were I to

25   testify, I don't -- you know, were I to

1    testify, I anticipate that my testimony would

2    focus on the substance of my report and the

3    substance of my report is on abatement

4    remedies.

5         Q.    In fact, you yourself have

6    received funding from a pharmaceutical

7    company, correct?

8         A.    Can you be more specific?

9         Q.    You did work for -- well, you

10   received funding from a company called

11   AstraZeneca?

12        A.    I did not.  I worked on a

13   contract that was awarded to Johns Hopkins,

14   and so that did -- so indirectly I did, but

15   the contractual relationship was between

16   AstraZeneca and Johns Hopkins, not

17   AstraZeneca and me in the instance that I

18   believe you're referring to.

19        Q.    Sir, are you familiar with the

20   open payments data that's available from

21   CMS --

22        A.    I am.

23        Q.    -- Center for Medicaid

24   Services?

25             (Whereupon, Deposition Exhibit

1          Alexander-6, Alexander Open Payments

2          Data Webpage, was marked for

3          identification.)

4    BY MR. SNAPP:

5          Q.    I'm handing you a report as

6    Deposition Exhibit 6 from the

7    openpaymentsdata.gov website that reflects

8    that you received a total of $93,000 from

9    AstraZeneca in 2017.  Is this report

10   accurate?

11              It's double-sided, just so

12   we're clear.

13         A.    Thank you.

14              I do not believe it is.

15         Q.    What's inaccurate about it?

16         A.    I believe that these funds

17   represent a part of a contract that was

18   awarded to Johns Hopkins from AstraZeneca,

19   and I would have to -- you know, I'd have to

20   evaluate this further, examine this further.

21              But I did work on a project

22   that was awarded to Johns Hopkins from

23   AstraZeneca, and I was the principal

24   investigator on that project.

25         Q.    And were you aware at the time

1     that you were working on it that it was

2     funded by AstraZeneca?

3          A.     Yes, I was.

4          Q.     And did the fact that it was

5     being funded by AstraZeneca impact, one way

6     or another, the scientific veracity of the

7     work that you did?

8          A.     I don't know.

9          Q.     Well, do you believe that you

10    did what you could to make sure that the

11    results of whatever research you were doing

12    were more favorable to AstraZeneca than the

13    data presented?

14         A.     Can you ask that again, please?

15         Q.     I'm just trying to understand:

16    Did the fact that AstraZeneca was funding

17    your research impact the results?

18         A.     I don't know.

19         Q.     Who would know?

20         A.     Well, you know, I'd be in as

21    good a position as anybody.

22         Q.     Do you think it's possible that

23    it did?

24         A.     I don't believe so.

25         Q.     Did you do your best to follow

1    scientific principles throughout the research

2    that you were doing?

3           A.     Yes, I did.

4           Q.     And you provided unbiased

5    results?

6           A.     You know, as a scientist, my

7    goal is to do so, yes.

8           Q.     And you did so in the case of

9    the research you were doing for AstraZeneca?

10          A.     Can you ask the question again,

11   please?

12          Q.     I'm just trying to understand

13   if you followed sound scientific principles

14   when you were doing the work that you did for

15   AstraZeneca through this grant that was

16   provided to your employer.

17          A.     I believe so.

18          Q.     Thank you.

19                 Now, on your CV, there is a

20   mention -- your CV is marked as -- I know I

21   have it here somewhere -- Exhibit 5.  And on

22   pages 33 and 34, there is a mention of the

23   grant from AstraZeneca.  You see that?

24                 It doesn't say anything about

25   the grant being to Johns Hopkins.  It says

1    it's to you; is that correct?

2         A.    Yes.

3         Q.    Now, did you also --

4         A.    I'm --

5         Q.    Sure.

6         A.    I'm sorry.  May I say yes, but

7    it was through Johns Hopkins.

8         Q.    Okay.

9         A.    And this is how all of these --

10   I would have to look carefully, but my guess

11   is that all of these are through Johns

12   Hopkins, but the name that's identified

13   represents the principal investigator.

14        Q.    Did you also serve as a

15   consultant to AstraZeneca and participate in

16   a mock advisory committee meeting for a drug

17   called naloxegol at one point?  I couldn't

18   find it in your CV.

19        A.    I believe I've done one or two

20   mock advisory committees.  I don't recall the

21   product or the manufacturer for those.

22        Q.    Did you include those on your

23   CV?

24        A.    I would have to check.

25        Q.    So just one more question on

Highly Confidential - Subject to Further Confidentiality Review

1    this marketing issue.  Okay.

2              So in paragraph 16 of

3    Deposition Exhibit 2 -- I'm sorry, Deposition

4    Exhibit 1 that we were looking at earlier,

5    you mentioned that sales accelerated, fueled

6    in part by aggressive marketing and

7    promotion.

8              Did you conduct any study or do

9    any research to conclude that sales

10   accelerated, fueled in part by aggressive

11   marketing and promotion?

12             MS. RITTER:  Objection, form.

13        A.    Which paragraph?  Can you --

14   BY MR. SNAPP:

15        Q.    The bottom.  I think you're on

16   the right page.  It's the bottom of page 4,

17   the very last two lines of paragraph 16.

18        A.    And can you ask the question

19   again, please?

20        Q.    Sure.

21             You say in this paragraph that

22   sales accelerated, fueled in part -- and

23   you're talking about opioid sales -- sales

24   accelerated, fueled in part by aggressive

25   marketing and promotion.

Highly Confidential - Subject to Further Confidentiality Review

1    I'm just trying to understand

2    what methodology you used to conclude that

3    sales accelerated fueled in part by

4    aggressive marketing and promotion.

5         A.    And so your question is what

6    methods did I use to conclude that?

7         Q.    Yes, sir.

8         A.    I believe I provide a citation

9    to a reference 51, which is the Christie

10   Commission report, and I believe that in turn

11   includes a fairly lengthy discussion of that

12   matter.

13        Q.    But as we discussed earlier,

14   you haven't done any research yourself to

15   evaluate whether sales accelerated in part --

16   fueled in part by aggressive marketing and

17   promotion; is that correct?

18        A.    Yes, that's correct.

19        Q.    Okay.  And then similarly, if

20   we could flip over to paragraph 25 on page 7.

21   Are you there?

22        A.    Uh-huh.  Yes.

23        Q.    So here, you're talking about,

24   in the middle of the paragraph, you said:

25   Historical precedence suggests that the

1    current crisis can be successfully reversed

2    with a multifaceted approach that addresses

3    the root causes of the epidemic, including

4    misleading marketing and promotion.

5           Did I read that correctly?  And

6    then the sentence continues after that.

7       A.    Yes.

8       Q.    Okay.  And did you do any

9    independent analysis yourself to conclude

10   that misleading marketing and promotion was

11   one of the root causes of the current opioid

12   epidemic for purposes of this case?

13          MS. RITTER:  Objection, form.

14      A.    No, I did not.  I mean, if by

15   independent analysis you mean data-intensive

16   analysis, no, I did not.

17   BY MR. SNAPP:

18      Q.    And so I'm just trying to

19   understand the methodology that you used to

20   conclude that one of the root causes of the

21   epidemic was misleading marketing and

22   promotion.

23          Can you explain that to me,

24   please?

25      A.    I believe here again I'm citing

Highly Confidential - Subject to Further Confidentiality Review

1    the Christie Commission report which provides

2    what I felt was a reasonable treatment of

3    this matter for the purposes of the

4    preparation of my report, which was focused

5    on identifying evidence-based remedies that

6    could be employed to reverse opioid-related

7    harms.

8         Q.    But you haven't looked at --

9    just to be fair, you haven't looked at any of

10   the underlying documents supporting the

11   Christie Commission report that you cited to,

12   have you?

13        A.    I have.

14        Q.    And have you studied in

15   particular whether the Christie Commission's

16   conclusions with respect to the defendants'

17   marketing and promotion were accurate?

18        A.    I don't recall the level of --

19   I don't recall the level of analysis that I

20   did of each of the references that may have

21   been cited in the Christie Commission report,

22   but overall, I felt that this was an

23   authoritative treatment of the matter that

24   would serve the purposes of the reference

25   that I provide.

1    Q.    But again, you haven't done any

2  independent analysis yourself to determine

3  whether any particular defendant's marketing

4  and promotion was misleading; is that fair?

5    A.    I have not.

6    Q.    Okay.  I want to move on to a

7  different topic.

8         So do you agree that the high

9  prevalence of chronic pain has been an

10 important driver in the development of the

11 current opioid crisis?

12   A.    I do.

13   Q.    And do you agree that

14 prescription opioids play a vital role in the

15 treatment of severe acute pain and pain at

16 the end of life?

17   A.    I do.

18   Q.    Are there situations, Doctor,

19 when a -- in which a prescription for acute

20 pain would be medically necessary?

21   A.    Yes.

22   Q.    Are there situations in which a

23 prescription for active -- pain related to

24 active cancer treatment would be medically

25 necessary?  Just to be clear, I'm talking

1    about a prescription for opioid medicines, so

2    let me rephrase the question, just so we're

3    clear, on the same page.

4                    Are there situations when a

5    prescription for an opioid medication would

6    be medically necessary for active cancer

7    treatment?

8         A.    Yes, there are.

9         Q.    Are there situations in which a

10   prescription opioid would be medically

11   necessary for palliative care?

12        A.    Yes, there are.

13        Q.    Are there situations in which a

14   prescription for -- when a prescription

15   opioid would be medically necessary if that

16   prescription was less than or equal to a

17   three-day supply of the opioid?

18        A.    Yes.

19        Q.    Are there situations in which a

20   prescription for a prescription opioid

21   medicine would be medically necessary for

22   less than or equal to seven days of supply?

23        A.    Yes.

24        Q.    Are there situations in which a

25   prescription opioid would be medically

Highly Confidential - Subject to Further Confidentiality Review

1    necessary for a time period of less than or

2    equal to a 14-day supply?

3          A.     Yes.

4          Q.     Are there situations in which a

5    prescription would be medically necessary for

6    a prescription opioid that would amount to

7    therapy lasting three or fewer months?

8          A.     Well, that judgment isn't made

9    at the time that a patient is in front of

10   one, so I'm not clear if you're asking it at

11   time zero -- yeah, can you ask the question

12   again, please?

13         Q.     Sure.

14                I'm just trying to understand

15   if there are situations in which a

16   prescription for a prescription opioid would

17   be medically necessary where that

18   prescription lasted three months?

19         A.     Without any contact with a

20   clinician, just here's a prescription for

21   90 days, call me in 90 days?  Is that what

22   you're --

23         Q.     I'm just trying to understand

24   if it would be appropriate, medically

25   necessary for a patient to take, in certain

Highly Confidential - Subject to Further Confidentiality Review

1    circumstances, a prescription opioid

2    analgesic for three months.

3          A.     Oh, for as long as three

4    months?

5          Q.     Correct.

6          A.     Yes.

7          Q.     What about six months?

8          A.     Yes.

9          Q.     What about 12 months?

10         A.     Yes.

11         Q.     Are there situations when it

12   would be appropriate for a patient to take a

13   prescription opioid with stable dosing as

14   high as 200 morphine equivalents a day, MMEs

15   a day?

16         A.     Well, I mean, exceedingly

17   unusual cases, I suppose, plausibly, yes.

18         Q.     What about 150 MMEs a day?

19         A.     Here again, I was asked to

20   provide estimates regarding abatement, and,

21   you know, with respect to the treatment of

22   chronic pain and the appropriateness of

23   opioids in that context, I certainly think

24   the examples that you've given thus far,

25   there are some patients and some clinical

Highly Confidential - Subject to Further Confidentiality Review

1    instances where those types of treatments are

2    appropriate.

3        Q.    Doctor, I just want to -- I

4    haven't really gone through much of your

5    background at all, so I just want to make

6    clear.

7            You were trained -- is it fair

8    to say you were trained at a highly regarded

9    medical school, Case Western?

10       A.    I did go to medical school in

11   Cleveland for four years, yes, at Case

12   Western.

13       Q.    And you completed your

14   internship and residency at University of

15   Pennsylvania?

16       A.    I did.

17       Q.    Do you think you received a

18   high-quality medical education?

19       A.    You know, that's a difficult

20   question to answer.  I'm pleased with the

21   training that I received.

22       Q.    You were taught by

23   well-regarded professors in the field?

24       A.    There are, you know, professors

25   of varying quality at every institution and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    hospital.
 2         Q.      Did you have any bad professors
 3    that you can think of?
 4         A.      Yes, I did.
 5         Q.      Anyone who taught you anything
 6    that you believe was incorrect with respect
 7    to prescribing?
 8         A.      That was -- I don't recall.
 9         Q.      Is it fair to say that what you
10    were taught in medical school was reflective
11    of what was known in the scientific and
12    medical community at the time?
13         A.      I don't recall, and I don't
14    feel able to judge that question.
15         Q.      Fair enough.
16              Let me ask you -- so we talked
17    about a number of issues earlier that we were
18    able to agree on with respect to a number of
19    topics, so I want to ask some similar
20    questions.
21              Do you agree that doctors are
22    trained in medical school how to evaluate
23    risks?
24         A.      I think it depends across
25    medical schools and across training settings.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Were you trained how to
2     evaluate risks?
3          A.      Can you be more specific,
4     please?
5          Q.      Well, were you trained how to
6     evaluate risks associated with a medicine
7     that you're prescribing?
8          A.      Not -- not extensively.
9          Q.      Should you have been?
10         A.      Yes.  I mean, I don't want to
11    misrepresent how much I was trained about
12    this.  It's hard for me to provide what I
13    feel is a reliable scientific appraisal about
14    the full context of my training that occurred
15    25 years ago or so.
16                 But -- but my perspective today
17    is that the training that clinicians receive
18    in medical school is -- that there's some
19    room for improvement.
20         Q.      Do you agree that a doctor
21    should prescribe prescription medications
22    based on their medical judgment after
23    weighing the risks and benefits of the
24    medication for the particular patient?
25         A.      I do.
```

```
 1              Q.     Now, there's a paragraph in

 2    your report that I just want to understand,

 3    that -- it's paragraph 31 of

 4    Deposition Exhibit 1.  In the second sentence

 5    of that paragraph you say:  For example,

 6    during the first decade of the epidemic --

 7                   Just so we're clear, I think we

 8    established earlier that was from the

 9    late '80s or early '90s was the first decade?

10         A.     Well, I said -- I believe I

11    said the genesis of the epidemic.

12         Q.     Okay.  So what would be the

13    first decade of the epidemic?

14         A.     I think in this context, I was

15    referring to what typically in many

16    scientific and public health communications

17    regards the epidemic as having began in the

18    late 1990s.  So I think in this context, I'm

19    referring to that period.

20         Q.     And you say in your report that

21    some said -- and I'm quoting -- some said

22    that if a patient has organic pain, one need

23    not worry about the addictive potential of

24    opioids.

25                   Did I read that correctly?
```

1       A.      Yes.

2       Q.      Who said that?

3       A.      Are you asking me the name of a

4  specific person?

5       Q.      Well, I'm just trying to

6  understand what you meant by some said that

7  if a patient has organic pain, one need not

8  worry about the addictive potential of

9  opioids.

10              Let me ask a more specific

11  question.

12      A.      Please.

13      Q.      Were you referring in this

14  sentence to someone during your medical

15  school training who said that?

16      A.      This -- I believe I'm writing

17  here more about my experience as a resident

18  than as a medical student.  That would have

19  been the first time that I would be

20  prescribing independently.

21      Q.      And so --

22      A.      Or more independently.

23      Q.      So the person or persons who

24  said that if a patient has organic pain, one

25  need not worry about the addictive potential

1    of opioids, is that someone that you worked

2    with?

3        A.    I don't -- there's not a

4    specific person in mind that I can provide to

5    you to attribute that statement to --

6        Q.    Okay.  Fair enough.

7        A.    -- or that idea, that concept.

8        Q.    Is it fair to say then that it

9    wasn't one of the defendants in this case who

10   said that to you?

11       A.    No, I don't -- I have -- no, I

12   don't feel -- I mean, I don't -- you know,

13   the paragraph -- in writing this, my effort

14   was to communicate the general teaching and

15   general approach to pain treatment with

16   opioids that I recall from my residency

17   training period.

18       Q.    Fair enough.

19             So during that residency time

20   period, the residency training period, and

21   since then, have you reviewed -- if I asked

22   you this already, please excuse me -- have

23   you reviewed any particular defendant's

24   labeling for their prescription medications?

25       A.    Can you ask the question again,

Highly Confidential - Subject to Further Confidentiality Review

1    please?

2         Q.    Sure.

3               Have you reviewed the labeling

4    or prescribing information for any

5    defendant's opioid medications?

6         A.    Yes, I have.

7         Q.    And is the statement that a

8    patient -- if a patient has organic pain, one

9    need not worry about the addictive potential

10   of opioids, consistent with the labeling that

11   you've reviewed?

12        A.    I don't recall the precise

13   wording of the labeling, if that's what

14   you're asking.

15        Q.    I'm just asking if the

16   statement that you included here in

17   paragraph 31 is consistent with the labeling.

18   Is it fair to say you don't know?

19        A.    Well, I don't -- I mean, I

20   don't think -- this isn't a statement that I

21   would expect to see on a drug label, if

22   that's what you're asking.  Yeah, it's not

23   something I would expect to see on a drug

24   label.

25        Q.    But if you were weighing the

Highly Confidential - Subject to Further Confidentiality Review

1    risks and benefits and the addictive

2    potential of a particular opioid medication,

3    would you rely on the information in the drug

4    label or the information that some unknown

5    person said that if a patient has organic

6    pain, one need not worry about the addictive

7    potential of opioids?

8         A.    Well, I mean, I think -- as

9    I've said before, I think clinicians are

10   trying, in general, to do the right thing,

11   and they are working within the systems

12   that -- in which they exist and practice, and

13   their practice patterns are shaped by the

14   information that they receive in many

15   different ways, shapes and form that

16   originate from manufacturers.

17            So -- so that is -- you know,

18   so that's my answer.

19         Q.    In your practice,

20   Dr. Alexander, have you seen sales reps from

21   pharmaceutical manufacturers?

22         A.    Exceedingly and infrequently --

23   I mean exceedingly infrequently.

24         Q.    Do you recall any visit by a

25   sales rep in which a sales rep discussed with

1    you opioid medications?

2         A.    I don't think I've had a

3    visit -- I mean, I'm answering cautiously and

4    being forthright, but I don't recall.  I

5    think that my interactions with sales reps

6    have only been through infrequent inpatient

7    interactions, not through interactions in

8    ambulatory practice.

9              I mean, I -- you know, my best

10   guess is I've interacted with -- yeah, so

11   I -- if you could ask the question again,

12   please.

13        Q.    You were just about to say, I

14   think, your best guess is that you've

15   interacted with a certain number of sales

16   reps.  How many sales reps do you think that

17   you've interacted with?

18        A.    Very few.

19        Q.    A dozen?  Less than a dozen?

20             MS. RITTER:  Objection, form,

21        asked and answered.

22        A.    Perhaps less than a dozen.

23   BY MR. SNAPP:

24        Q.    Do you know which companies

25   they were from?

1        A.      I do not.

2        Q.      Is it fair to say, Doctor, that

3    you're not offering any opinions in this case

4    on the accuracy of the labeling or

5    prescription information for any particular

6    prescription medicine?

7        A.      I've not been asked in

8    preparing my report to focus on that matter.

9        Q.      Now, in the same paragraph we

10   were just looking at, paragraph 31, there's a

11   sentence, a long sentence at the end, the

12   last five lines in the paragraph that says:

13   This approach led me and my fellow physicians

14   to prescribe opioids more liberally than we

15   might have otherwise for patients who had a

16   clear source of the pain.

17              First of all, did I read that

18   correctly?

19       A.      Yes.

20       Q.      And have you, in fact,

21   prescribed opioids in your practice?

22       A.      Yes.

23       Q.      How recently?

24       A.      I don't recall.

25       Q.      In 2019?

1        A.     I don't recall.

2        Q.     2018?

3        A.     I would guess, yes, in 2018.

4        Q.     Okay.  And how often in your

5   practice currently do you prescribe opioid

6   medications?

7        A.     Infrequently.

8        Q.     For what -- in what

9   circumstances do you prescribe them?  Just to

10   be clear, I'm not asking for any patient

11   information.  I just want to understand the

12   type of patient that you might prescribe an

13   opioid for.

14        A.     Patients with acute pain or

15   acute exacerbations of chronic pain that have

16   failed what I believe are safer and more

17   effective alternatives.

18        Q.     Which opioid medications have

19   you prescribed?

20        A.     I don't recall.

21        Q.     Have you prescribed OxyContin?

22        A.     My guess is I have, but

23   exceedingly infrequently.

24        Q.     Have you prescribed Hysingla or

25   Butrans?

1          A.      I do not believe so.

2          Q.      Do you have a ballpark estimate

3   the last time you prescribed OxyContin?

4          A.      Well, I think in 2009 or 2010 I

5   prescribed some -- perhaps 2009 or 2010.

6          Q.      By the way, just going back to

7   the sales rep point, my question is about

8   sales reps:  Did anything that you were told

9   by a sales rep at any point impact your

10  prescribing decisions with respect to opioid

11  medications?

12         A.      I don't know.

13         Q.      Sitting here today, you don't

14  know one way or another?

15         A.      Correct.

16         Q.      Is there anything -- do you

17  expect to remember anything in the future as

18  to what a particular sales rep might have

19  told you that would impact -- that impacted

20  your sales -- your prescribing information --

21  I'm sorry, your prescribing decision?

22         A.      Your question is whether I

23  anticipate in the future --

24         Q.      Well, I'm just trying to

25  understand --

1          A.      -- being able to remember

2     something that I don't remember now.

3          Q.      I'm just trying to -- I'm sorry

4     for talking over you.

5          A.      Yeah.

6          Q.      I just want to understand:  Is

7     it fair to say, sir, that you don't recall

8     any specific statement by any sales rep that

9     impacted your prescribing decisions with

10    respect to a prescription opioid medication?

11              MS. RITTER:  Objection, form,

12         asked and answered.

13         A.      I do not.

14    BY MR. SNAPP:

15         Q.      Have you ever written a

16    prescription for an opioid analgesic that was

17    medically unnecessary?

18         A.      I believe so.

19         Q.      In what context?

20         A.      For example, prescribing -- I

21    mean, let me ask a clarifying question,

22    please.

23              Are you asking whether at the

24    time I believed that it was medically

25    unnecessary or now, knowing if I knew now

Highly Confidential - Subject to Further Confidentiality Review

1    what I knew then, I believe it would be

2    medically unnecessary?

3         Q.    Well, let's start with the

4    first question, and then you can answer the

5    second question.

6         A.    I've prescribed -- I mean, I

7    can recall a patient where I had some

8    misgivings about prescribing an opioid, yes.

9         Q.    And did you ultimately regret

10   prescribing that opioid to that particular

11   patient?

12        A.    Once again, I think I did the

13   best thing that I could have done at the time

14   with the information that I had.

15        Q.    And what were your misgivings

16   based on?

17        A.    Whether there were safer and

18   more effective alternatives for the patient

19   for that instance.

20        Q.    Were you concerned about the

21   potential for abuse with this particular

22   patient?

23        A.    No.

24        Q.    Do you -- have you ever seen

25   any of your colleagues, other medical

Highly Confidential - Subject to Further Confidentiality Review

1    providers, write an opioid prescription that

2    you believed was medically unnecessary?

3            A.      Yes.

4            Q.      In what context?

5            A.      Well, you know, here again,

6    this was not the focus of my report, but I do

7    touch upon the vast oversupply of opioids,

8    and one of the many ways that that's taken

9    place is through the quantities dispensed,

10   and I think that opioids have been dispensed

11   in quantities far beyond what's necessary for

12   many common conditions.

13           Q.      Do you believe that you ever

14   dispensed or prescribed opioid medications

15   far beyond what's necessary for many common

16   conditions?

17           A.      In residency, I believe I may

18   have, yes.

19           Q.      Were you making your decision

20   with respect to prescribing those opioids

21   based on your best medical judgment after

22   weighing the risks and benefits of the

23   particular medication for the particular

24   patient?

25           A.      I mean, it's very hard for me

Highly Confidential - Subject to Further Confidentiality Review

1    to, you know, make what I feel is a solid

2    scientific judgment and appraisal of my

3    prescribing decisions in residency.

4         Q.    By the way, did you receive --

5    going back to the issue of Pharmaceutical

6    company funding, did you receive a consultant

7    fee from a company called Otsuka America

8    Pharmaceutical?

9         A.    I believe I did.

10        Q.    And what was that for?

11        A.    It -- I believe it was for a

12   one-time two- to four-hour meeting that took

13   place in Baltimore.

14        Q.    What was the meeting about, to

15   the extent you're able to talk about it?

16        A.    I -- my guess is I've signed a

17   nondisclosure agreement regarding that

18   matter.

19        Q.    Okay.  I want to turn to your

20   model and the methodology that you used with

21   respect to the abatement plan.

22             First of all, can you tell me,

23   what is the goal of the abatement plan

24   included in your reports?

25        A.    My goal was to identify -- to

1    identify methods that have evidence behind

2    them that can be implemented, and to reduce

3    opioid-related injuries and addiction and

4    death.

5         Q.    Is the goal to completely

6    eliminate opioid-related injuries and

7    addiction and death?

8         A.    Well, you know, I -- no, it is

9    not.

10        Q.    So you said it's to reduce

11   opioid-related injuries and addiction and

12   death.  How much are you seeking to reduce?

13        A.    A lot.  I mean we have an

14   enormous way to go, so -- and I think, you

15   know, there's an enormous need in Summit and

16   Cuyahoga Counties, and, you know, it's clear

17   that there's an epidemic in those counties.

18   And so there's an enormous way to go.

19        Q.    You used something called the

20   Markov model in your work in this case; is

21   that correct?

22        A.    Yes, it is.

23        Q.    Can you describe for me, what

24   is the Markov model?

25        A.    A Markov model is a

1    mathematical model that allows for one to

2    examine dynamic processes within a

3    population.

4         Q.    Now, I've looked at a lot of

5    the papers that you've written, and I didn't

6    see any that included the Markov model.  Have

7    you -- correct me if I'm wrong.  Have you

8    ever published with respect to the Markov

9    model?

10              MS. RITTER:  Objection, form.

11              MR. SNAPP:  Let me ask a

12         clearer question.

13              THE WITNESS:  Please.

14    BY MR. SNAPP:

15         Q.    Sure.  I'm just trying to

16    understand.  Have you used the Markov model

17    in academic research before your

18    participation in this case?

19              MS. RITTER:  Objection, form.

20         A.    I believe -- can you ask one

21    more time, please?

22    BY MR. SNAPP:

23         Q.    Sure.

24              I'm just trying to understand

25    if you've used the Markov model in a

1    non-litigation context --

2              MS. RITTER:  Did you say a --

3    BY MR. SNAPP:

4         Q.    -- prior to this?

5              MS. RITTER:  -- a Markov model?

6         Is that what you said?  I couldn't

7         hear you.  I'm sorry.

8              MR. SNAPP:  I might have said

9         the Markov, but we can use a Markov

10        model.

11   BY MR. SNAPP:

12        Q.    Have you used a Markov model

13   prior to your work in this case?

14        A.    I have not.

15        Q.    Do you know if the Markov model

16   that you used in this case has been subject

17   to any peer review?

18        A.    It has, but -- it has.

19        Q.    In what context?

20        A.    It's based on the inputs of a

21   number of renowned modeling experts.

22        Q.    Who are those experts?

23        A.    Harold Pollack, P-O-L-L-A-C-K,

24   David Dowdy, D-O-W-Y [sic], are the main two,

25   but it also reflects the contributions of

Highly Confidential - Subject to Further Confidentiality Review

1    Jeromie Ballreich, J-E-R-O-M-I-E,

2    B-A-L-L-R-E-I-C-H.

3         Q.     And did you consult with

4    Mr. Pollack and Mr. Dowdy and Mr. Ballreich

5    in preparing your report in this case?

6         A.     Regarding the component of the

7    report that's focused on the Markov model, I

8    did.

9         Q.     You did?

10        A.     I did.

11        Q.     Okay.  And where are these

12   three -- is -- Mr. Ballreich is one of your

13   employees, right?

14        A.     He's a consultant, yes.

15        Q.     As is Mr. Dowdy and

16   Mr. Pollack, correct?

17        A.     Yes.

18        Q.     They're on the list of people

19   you told me before were paid by your company;

20   is that correct?

21        A.     Yes.  Yes.

22        Q.     And so when I asked you if it

23   has been subject to any peer-review process,

24   let me ask it sightly differently.

25             Has the Markov model that you

Highly Confidential - Subject to Further Confidentiality Review

1    used in this case been subject to any peer

2    review through the publication process?

3          A.     It has not.

4          Q.     Do you consider this an

5    economic model?

6          A.     Well, it's useful for both

7    epidemiology and economics.

8          Q.     Have you ever used it -- I

9    think you said you -- well, strike that.

10                What training have you received

11   yourself on using a Markov model?

12         A.     I have -- can you ask again,

13   please?

14         Q.     Sure.

15                I'm just trying to understand

16   what training you've received with respect to

17   using a Markov model.

18         A.     Right.  My learning about this

19   methodology has occurred through working with

20   the people that I identified as well as

21   working previously with health economists,

22   primarily at the University of Chicago during

23   my training there, and during my subsequent

24   faculty life there.

25         Q.     And so that was in the early

Highly Confidential - Subject to Further Confidentiality Review

1    2000s?

2         A.    Yes.

3         Q.    And since then, have you used a

4    Markov model in any context for any analysis

5    that you have performed?

6         A.    I have not.

7         Q.    How did you choose the Markov

8    model for this case?  How did you choose to

9    use a Markov model as opposed to some other

10   model?

11        A.    It's a useful tool in this

12   instance because of its ability to allow for

13   one to follow populations over time and

14   through different transition states.  And I

15   think this is the reason that two or three

16   prior models of the opioid epidemic that have

17   been published have also used Markov models

18   and upon which our model was based.

19        Q.    And are you referring to the

20   Chen and Pitt articles that you cited in your

21   report?

22        A.    Among others, yes.

23        Q.    Do you consider yourself an

24   expert in the application of a Markov model?

25        A.    I think in this instance I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    consider myself an expert in helping to

 2    advise the courts regarding the remedies that

 3    should be instituted in any abatement plan as

 4    well as understanding the costs of those

 5    remedies.  And as part of that, I believe the

 6    Markov model provides value.

 7          Q.    Did you consider using anything

 8    other than a Markov model to estimate

 9    abatement costs in this case?

10          A.    Yes.

11          Q.    What other models did you

12    consider?

13          A.    So we considered just a flat

14    spreadsheet, you know, just a flat Excel

15    file, rows and columns.  We considered a

16    decision tree, we considered a systems

17    dynamics model, and we considered a Markov

18    model.

19          Q.    And why did you choose a Markov

20    model over the three other methodologies you

21    just mentioned?  Why did you decide on a

22    Markov model as opposed to a flat

23    spreadsheet, a decision tree or a systems

24    dynamics model?

25          A.    We felt it would give us the
```

Highly Confidential - Subject to Further Confidentiality Review

1    best answers to the questions that we posed.

2        Q.    Are there any limitations to

3    the Markov model that you used?

4        A.    Yes.

5        Q.    What are those limitations?

6        A.    One limitation is that it's

7    dependent upon assumptions about the

8    populations and transitions -- the

9    populations within different compartments of

10    the model, if you will, and the transitions

11    that individual -- the probabilities of

12    transitioning from one compartment to

13    another.

14        Q.    Okay.  There are also

15    assumptions with respect to certain costs

16    that you've used as well, right?

17        A.    Yes.

18        Q.    So there are assumptions

19    related to the populations, the transitions

20    and the costs.

21        Any other assumptions that you

22    can think of?  I should say any other

23    categories of assumptions?

24        A.    Assumptions or limitations?

25        Q.    Well, you identified the fact

1    that it's dependent -- that the model is

2    dependent on assumptions --

3         A.     Right.

4         Q.     -- as a limitation of the

5    model.

6         A.     Right.

7         Q.     And I'm asking if there are

8    other assumptions other than population,

9    transition and costs.

10        A.     I mean, those are the big ones.

11        Q.     Okay.  So other than the fact

12   that the model is dependent on assumptions,

13   are there other limitations to your model?

14        A.     Well, the epidemic is dynamic,

15   and so I think that the answer is no -- I

16   mean, I think that assumptions are the major

17   matter here.  The epidemic is dynamic and

18   will continue to change and evolve, and so --

19   so what we've done and what I've tried to do

20   in my report is to provide a framework for

21   the courts and parties to use going forward.

22        Q.     Okay.

23             (Whereupon, Deposition Exhibit

24        Alexander-7, 2018 Pitt et al

25        Publication, was marked for

Highly Confidential - Subject to Further Confidentiality Review

1              identification.)

2    BY MR. SNAPP:

3         Q.    I'm handing you, Doctor, what's

4    been marked as Deposition Exhibit 7.  Do you

5    recognize this as the Pitt article that you

6    cited in your report?

7         A.    I do.

8         Q.    And the Pitt article, if you

9    turn to -- I'm sorry, give me one moment,

10   please.

11              The Pitt article lists a number

12   of limitations on page 1399.

13        A.    Uh-huh.

14        Q.    You see those?

15        A.    Yes.

16        Q.    So the first one is:  The

17   drivers behind the opioid epidemic are

18   dynamic, nonlinear and uncertain.

19              Do you agree with that as a

20   limitation to your model as well?

21        A.    I do.

22        Q.    And the authors here go on to

23   say:  Although we tested the impact of each

24   policy on multiple potential models of the

25   current state, the epidemic continues to

1     change and may be substantially different in

2     just five years. For example, the increasing

3     prevalence of fentanyl makes heroin use more

4     deadly.

5            Did I read that correctly? As

6     a --

7       A.    Yes.

8       Q.    And do you agree that the

9     same -- that limitation that the authors of

10    the Pitt article identified is also a

11    limitation of your use of the Markov model?

12       A.    It is. And -- it is, and that

13    falls under the category of the assumptions

14    that are made regarding the populations and

15    the transition probabilities. But, yes, I do

16    certainly agree with that.

17       Q.    The second limitation that the

18    authors of the Pitt article identify was, the

19    next paragraph says: Substance use disorder

20    is a complex disease with varying degrees of

21    severity and high relapse and recurrence

22    rates. Our model is a simplification of the

23    phenomenon intended to capture only enough

24    detail to inform key high-level policy

25    questions.

Highly Confidential - Subject to Further Confidentiality Review

1           Does that paragraph that I just

2    read also apply as a limitation to your use

3    of the Markov model in this case?

4           A.      Well, our model, we believe --

5    I believe improves upon prior models in

6    several ways.  So, for example, we allow for

7    many different subgroups of patients with

8    opioid use disorder that take into account

9    the varied complexity that Pitt is referring

10   to.

11           We account for the large

12   population of individuals that have prior

13   opioid use disorder, but not past-year opioid

14   use disorder, and there's several other

15   differences as well between our model and the

16   Pitt model that we believe address this

17   concern.

18           But nevertheless, I would still

19   agree, substance use disorder is a complex

20   disease and with varying degrees of severity

21   and high relapse and recurrence rates.  And

22   our model nevertheless still represents a

23   simplification.  I believe it is -- improves

24   upon the Pitt one in several ways, but it is

25   a simplification, yes.

1    Q.    And then if we skip down to the

2    final limitation that's articulated in the

3    Pitt article, the authors say:  Though we

4    model the U.S. population on average to gain

5    high-level policy insights, different

6    geographical regions, age groups, races and

7    genders will experience different severities

8    and drivers of opioid-related problems.

9            As an initial matter, do you

10    agree with that statement?

11    A.    Yes, I do.

12    Q.    And do you agree that that is a

13    limitation of your model?

14    A.    I think for the purposes that

15    we designed our model, I'm not sure that this

16    is inherent limitation.  Our effort wasn't to

17    provide inputs to provide specific estimates

18    for Cuyahoga and Summit Counties, although

19    our model could potentially be used for that

20    purpose.

21            But it's certainly the case

22    that there's geographic variation in the ways

23    that the epidemic has manifest, if that's

24    what you're asking.

25    Q.    Well, I'm just trying to

1    understand if your model has the same

2    limitation that this model does in terms of

3    if you wanted to localize your national

4    estimates to a particular geographic

5    location, you'd have to deal with these

6    limitations identified in this paragraph that

7    I just read from the Pitt article; is that

8    fair?

9         A.    One would have to consider

10   those matters, yes.

11        Q.    And that's not something that

12   you've done in your work for this case with

13   respect to Cuyahoga and Summit Counties,

14   correct?

15        A.    No, that's not fully correct.

16        Q.    How is that incorrect?

17        A.    We -- I have attempted to use

18   limited data from the counties that was

19   available to try to -- I've considered and

20   looked at some limited county data to see

21   whether, you know, in an effort to consider

22   applying the model locally, but I did not

23   pursue that exercise.

24        Q.    Okay.  So just so we're clear,

25   you have not applied your model locally based

1    on the criteria that we just read from the

2    Pitt article or any other criteria.  Fair

3    enough?

4              MS. RITTER:  Objection, form,

5         compound.

6              THE WITNESS:  Can you ask that

7         again, please?

8              MR. SNAPP:  Let me just be very

9         simple.

10   BY MR. SNAPP:

11        Q.    You have not attempted to apply

12   your model locally in Cuyahoga and Summit

13   Counties, correct?

14        A.    No, that's correct.  And in my

15   report I speak to -- I speak to this matter

16   in the way that I believe that our national

17   estimates can be useful, and as well as the

18   limits of their utility for developing

19   precise estimates for the Cuyahoga and Summit

20   County.

21        Q.    Fair enough.

22              So, sir, you refer in your

23   report to something called the APOLLO model.

24   What is the APOLLO model?

25        A.    The APOLLO model refers to the

Highly Confidential - Subject to Further Confidentiality Review

1    Markov model that we used to estimate changes

2    in populations affected by the opioid

3    epidemic over time.

4         Q.     And APOLLO is in all caps.  Is

5    it an acronym for something?

6         A.     It is not an acronym.

7         Q.     So is this a model -- the

8    APOLLO model, is this something that your

9    company, Monument Analytics, came up with?

10        A.     Yes, it is.

11        Q.     So it's not a model that's

12   published anywhere; is that fair?

13        A.     Yes, that's true.

14        Q.     In terms of -- is the APOLLO

15   model -- I just want to make sure I'm using

16   the right terminology for the rest of the

17   day.

18        A.     Of course, of course.

19        Q.     Is the APOLLO model the same as

20   the Markov model for purposes of your report?

21        A.     Yes, it is.

22        Q.     So the APOLLO model is your

23   application of the Markov model to this case;

24   is that fair?

25        A.     Yes, it is.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Thank you for clarifying

2    that.  Okay.

3         So why don't we take a short

4    break before I move any deeper into the

5    model.

6         MS. RITTER:  Good idea.

7         Everybody get some coffee.

8         THE VIDEOGRAPHER:  Going off

9         the record, 11:31 a.m.

10        (Recess taken, 11:31 a.m. to

11        11:43 a.m.)

12        THE VIDEOGRAPHER:  We're back

13        on the record at 11:43 a.m.

14   BY MR. SNAPP:

15        Q.    So, Doctor, we were talking

16   about the APOLLO model, the APOLLO Markov

17   model that you used in this case, and I want

18   to ask you some questions in particular about

19   how you determined the sequencing in the

20   APOLLO model.

21        MR. SNAPP:  David, could I get

22        my computer screen, please.

23   BY MR. SNAPP:

24        Q.    So I've put on the screen one

25   of the pages from one of your supporting

Highly Confidential - Subject to Further Confidentiality Review

1    spreadsheets.  Do you recognize this

2    document?

3          A.    I do.

4          Q.    It's very difficult to print it

5    out because of the format, so I thought it

6    would be easier just to show it on the

7    screen.

8                MR. SNAPP:  And we'll mark a

9          thumb drive with these on so that

10         we'll all be on the same page in terms

11         of what's in the record, okay?  Is

12         that okay with you?

13               MS. RITTER:  Okay.

14   BY MR. SNAPP:

15         Q.    So I want to understand the

16   sequencing.  So your model assumes that from

17   the general population, which is shown in the

18   top left box number 1 or bubble number 1,

19   people can only transition directly into

20   medical use of opioids or to heroin use,

21   correct?

22         A.    Yes.

23         Q.    In other words, a person cannot

24   transition directly from the general

25   population to nonmedical use of opioids under

Highly Confidential - Subject to Further Confidentiality Review

1    your model.

2              Am I correct about that?

3         A.    Yes.

4         Q.    What's your basis for not

5    including a transition directly from the

6    general population to the nonmedical use of

7    opioids?

8         A.    Can you go to the Inputs tab,

9    please?

10        Q.    Certainly.  What do you need --

11   before we go there, what do you need to look

12   at to answer my question?

13        A.    Yeah.  So I'm interested in

14   reviewing the inputs that go -- that lead

15   from Box 1, the transition probabilities from

16   Box 1.

17        Q.    Okay.

18        A.    So I just would like to confirm

19   the transitions that are depicted.

20        Q.    And just so we're clear, just

21   so the record is clear, what I'm talking

22   about is that you can go from the general

23   population down to -- which is Box 1, down to

24   Box 3H, or you can go from the general

25   population to Box 2, which is the medical use

Highly Confidential - Subject to Further Confidentiality Review

1    of opioids.

2              But under your model, you can't

3    go from the general population, Box 1, down

4    to Box 3, which is the nonmedical use of

5    opioids.  Correct?

6         A.    Yes.

7         Q.    Okay.  And you'd like to look

8    at the inputs, which I've put on the screen

9    now.

10        A.    Correct.  So if you scroll down

11   further, please.

12        Q.    Yes, sir.

13        A.    And further still.  Okay.

14             MS. RITTER:  Can we make it

15        clear for the record which table --

16        it's going to be hard for people --

17             MR. SNAPP:  Yes, we're looking

18        at the table that's -- the filename is

19        MAT Model 2.0 version 51.xlsm.

20             My understanding is that this

21        table, including the filename at the

22        very top, will be reflected on the

23        video record.

24        A.    So thank you for this.  That

25   was helpful.

1        So in some cases we may not

2   have had a transition -- so I think -- so you

3   had asked why there's not a direct transition

4   from general population to nonmedical use.

5   BY MR. SNAPP:

6        Q.    Correct.

7        A.    And the model represents a

8   schematic or a simplification of all of

9   the -- necessarily represents a

10  simplification of all of the potential

11  transitions and populations, just as we

12  discussed a few minutes ago with the Pitt's

13  approach.  And it may also have been that we

14  didn't feel that we had as reliable inputs to

15  provide a transition probability for this

16  number.

17       Q.    Okay.  Well, I'd like you to

18  keep this -- we're going to keep this on the

19  screen, but I'd like you to take a look at

20  Deposition Exhibit 1, which is your report.

21  It's right on the top there.  It's your

22  April 3rd report.  And I'd like you to flip

23  to page 25, paragraph 73, please.

24            I'm directing you in

25  particular -- feel free to read the whole

Highly Confidential - Subject to Further Confidentiality Review

1    thing, if you'd like, but I'm particularly

2    interested in the last sentence of that

3    paragraph 73 of your report.

4              And just for the record, it

5    reads:  For example, of the 11.4 million

6    individuals in the United States reporting

7    opioid misuse in 2017, more than four-fifths,

8    83%, reported that they bought, were given,

9    or stole opioids from individuals who were in

10   turn prescribed these drugs by a licensed

11   prescriber.

12             Did I read that correctly?

13   A.    Yes.

14   Q.    And so my question is:  Your

15   model does not account for that 83% of people

16   in 2017 who reported opioid misuse and

17   bought, were given, or stole opioids from

18   individuals who were, in turn, prescribed

19   those drugs by a licensed prescriber,

20   correct?

21   A.    I do not believe that's

22   correct.

23   Q.    Well, some of these 83% would

24   have gone directly from the general

25   population, which is Box 1 on the chart,

Highly Confidential - Subject to Further Confidentiality Review

1    directly to Box 3, nonmedical use of opioids,

2    by either being given, buying or stealing

3    opioids from individuals who were, in turn,

4    prescribed the drugs by a licensed

5    prescriber, correct?

6         A.    There -- each box has a

7    population associated with it.  So if you go

8    to the Inputs tab again, Tab 3.

9         Q.    Okay.  Can you answer my

10   question first?

11        A.    Can you please ask the question

12   again?

13             MR. SNAPP:  Mr. Court Reporter,

14        could you please read the question

15        back.

16             (The following portion of the

17        record was read.)

18             "QUESTION:  Well, some of these

19        83% would have gone directly from the

20        general population, which is Box 1 on

21        the chart, directly to Box 3,

22        nonmedical use of opioids, by either

23        being given, buying or stealing

24        opioids from individuals who were, in

25        turn, prescribed the drugs by a

1    licensed prescriber, correct?"

2              (End of readback.)

3        A.     It's hard for me to

4    understand -- I mean, it's hard for me to

5    understand the question.  I mean, I agree

6    with this question in the report -- or this

7    statement in the report, and I can explain

8    the way that we addressed the significant

9    population of people that use opioids

10   nonmedically.

11             But we do not have a direct

12   transition probability over time from the

13   general population to nonmedical use of

14   opioids.

15             We do consider the significant

16   number of people that use opioids

17   nonmedically and our model does allow for

18   these individuals to use opioids nonmedically

19   without having received a prescription first.

20             So I think if, you know -- but

21   as to the -- you know, as to the specific

22   reason for the absence of a transition

23   probability from Box 1 to Box 3, I would want

24   to spend more time looking at the model and

25   consulting with the others that developed it

Highly Confidential - Subject to Further Confidentiality Review

1    with me.

2    BY MR. SNAPP:

3         Q.    But just to be clear, this

4    concept page that we're looking on -- at

5    right now is intended to show the different

6    transitions that are accounted for in your

7    model, correct?

8         A.    Yes.

9         Q.    The transitions from one

10   population to another population?

11        A.    Yes.  Although there are some

12   transitions that are not depicted in this

13   schematic.

14        Q.    When we looked at the inputs,

15   Tab 3, there was no transition probability

16   for going from the general population to the

17   nonmedical use of opioids, correct?  If we go

18   down to the -- maybe I went past it.

19        A.    If you go up here -- so can you

20   go up further, please?  And up further still,

21   please.  Up further still, please.

22             So Box 3 has 5 million

23   individuals in it in --

24        Q.    That is misuse of opioid

25   population that I've highlighted?

1        A.      Correct, the box that we were

2    looking at has 5 million individuals in it at

3    the start of the model.

4        Q.      Understood.  But you do not

5    take into account anywhere here a transition

6    from the general population to nonmedical use

7    of opioids, correct?

8        A.      I think that the model allows

9    for a growth in this population over time,

10    but it is a pathway that's mediated through

11    prescription opioid use, yes.

12        Q.      So in other words, in your

13    model, the only way someone gets to

14    nonmedical use of opioids is to first get a

15    prescription for prescription opioids,

16    correct?

17        A.      No.  At the start of the model,

18    the model runs through 10 or 15 years, and at

19    the starting population of the model, there's

20    5 million individuals that have nonmedical

21    use.

22        Q.      Fair enough.  Let me rephrase

23    my question.

24                So your model does not permit

25    any additional population -- additions to the

Highly Confidential - Subject to Further Confidentiality Review

1    population of those who have nonmedical use

2    of opioids, unless they first get a

3    prescription.  Fair enough?

4         A.     Yes, I believe that's -- that's

5    the case.

6         Q.     And does that fact impact the

7    ability of your model to predict what really

8    happens in the real world based on the fact

9    that there are 83%, according to your report,

10   who reported that they bought, were given or

11   stole opioids from individuals, who were, in

12   turn, prescribed these drugs by a licensed

13   prescriber?

14        A.     I'm not sure that it does.

15        Q.     It could though, right?

16        A.     Theoretically, it could, yes.

17        Q.     Because if you don't account

18   for those people, your numbers are not going

19   to be reliable.

20        A.     I'm sorry, say that again,

21   please.

22        Q.     If you don't account for the

23   people who went from the general population

24   at the beginning of your model, they were in

25   that general population number, which you

1    have as over 240 million people, if they then

2    buy, are given or steal opioids from

3    individuals who were in turn prescribed these

4    drugs by a licensed prescriber, they will not

5    be reflected accurately in your model,

6    correct?

7        A.    Well, once again, my guess

8    would be that either -- there are dozens or a

9    hundred or more different inputs and

10   populations in the model.

11       Q.    Correct.  We'll be looking at

12   some of those.

13       A.    And we assess its performance

14   relative to other models as well as to data

15   that we have in hand.  We calibrate the

16   model, and it both is calibrated -- you know,

17   it's both calibrated to data that exists and

18   we also assess its performance relative to

19   others.

20            But the model represents a

21   simplification, and so the absence of a

22   specific transition probability from Box 1 to

23   Box 3 I believe represents either a decision

24   regarding a simplification or a data point

25   that wasn't readily available to us, so we

Highly Confidential - Subject to Further Confidentiality Review

1    didn't feel that we were confident about that

2    number.

3              MR. SNAPP:  Turn my computer

4         off, please.  Thank you.

5    BY MR. SNAPP:

6         Q.    Dr. Alexander, you mentioned in

7    paragraph 12 of your report which you have in

8    front of you Hill criteria.  Did you actually

9    use Hill criteria anywhere in your analysis?

10             They're often referred to as

11   Bradford Hill criteria, correct?

12        A.    Yes.

13        Q.    Did you use the Bradford Hill

14   or Hill criteria anywhere in your report?

15        A.    Yes.

16        Q.    In what way?

17        A.    As I note in paragraph 12,

18   these are qualitative criteria that one can

19   apply in order to assess the strength of

20   causal inference that's possible from a given

21   scientific study.

22        Q.    I understand that's what it

23   says in your report.  I'm trying to

24   understand how you applied that sentence

25   anywhere else in your analysis, because I

Highly Confidential - Subject to Further Confidentiality Review

1    didn't see it mentioned elsewhere in your

2    report.  So I'm just trying to understand it.

3         A.    Yeah.  So these are the types

4    of criteria that one -- that we're trained to

5    always use, as we're examining evidence in

6    order to try to draw the most scientifically

7    sound conclusions possible.

8         Q.    So how did you apply them in

9    this case?  That's my question.

10        A.    Well, implicitly, I apply them

11   as I'm evaluating scientific studies.  So,

12   for example, if I'm examining a study that

13   looks at the evidence to support an

14   intervention to increase access to treatment

15   for opioid addiction, I would consider these

16   types of criterias in evaluating whether or

17   not I believe that study is appropriately

18   framed and interpreted.

19              So, for example -- well, let me

20   stop there.

21        Q.    Well, no, go ahead.  Do you

22   have an example?

23        A.    You know, a cross-sectional

24   study that's done at one point in time

25   doesn't provide temporality, which is one of

Highly Confidential - Subject to Further Confidentiality Review

1     the criteria.  So if someone made very strong

2     claims about a cross-sectional study, very

3     strong causal claims about a cross-sectional

4     study that seemed implausible, for example,

5     and that had weak association -- so I've just

6     provided three of the criteria and the ways

7     that they would qualitatively affect my

8     conclusions about what I can and can't take

9     from that study.

10          Q.     Fair enough, sir.

11               In terms of your use of the

12    Hill criteria in this particular case, is it

13    fair to say that you evaluated the studies

14    that you've cited based on your analysis

15    using the Hill criteria?

16          A.     In general, this -- these are

17    the types of criteria that I carry with me

18    and use in all of my scientific affairs.

19          Q.     Okay.  But you didn't do any

20    specific analysis in this case of any

21    particular causal connection between one

22    thing and -- for example, you didn't do any

23    analysis of any causal connection between the

24    defendants' conduct and any particular harm;

25    is that correct?

1          MS. RITTER:  Objection.  Object

2     to the form.

3          A.     Well, I think I felt that we

4     discussed that before.  My report was not

5     focused on examining, you know, discoverable

6     materials from defendants and trying to

7     conclude something about how their actions

8     led to the epidemic.

9     BY MR. SNAPP:

10          Q.     Fair enough.

11               I just want to talk about a few

12     portions of your report.  So page -- I'm

13     sorry, paragraph 126.

14               Do you agree with your

15     statement here that the opioid epidemic is a

16     complex phenomenon with many different

17     dimensions and impacts, and it continues to

18     change and evolve rapidly at national, state

19     and local levels?

20          A.     Yes.  I mean, I suppose I could

21     have further qualified that it's evolving

22     more rapidly in some than others, but, yes, I

23     agree with the general statement.

24          Q.     And in paragraph 175 -- and

25     it's on page 54.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Uh-huh.

 2              Q.      You note that the exact -- in

 3     the second sentence, the exact costs of

 4     abatement are difficult to estimate.

 5                      Do you agree with that?

 6              A.      Yes.

 7              Q.      And you agree that those exact

 8     costs of abatement will depend upon the

 9     population requiring services and the

10     programs in existence in each jurisdiction?

11              A.      Yes.  If you're asking about

12     jurisdiction-level costs, yes, those costs I

13     believe will depend upon the specifics of

14     individual jurisdictions.

15              Q.      Including the populations

16     requiring services and the existing programs,

17     correct?

18              A.      Yes.

19              Q.      Okay.  And in paragraph 176,

20     you described your analysis as a preliminary

21     analysis of the national costs of 15 types of

22     remedies, correct?

23              A.      Yes.

24              Q.      And if we look at Deposition

25     Exhibit 3, which is the April 17th update to
```

1    your supplemental expert report, do the

2    estimates -- if you turn to the third page --

3    there it is -- the table also refers to your

4    estimates as preliminary estimates, correct?

5         A.    Yes.

6         Q.    Can you explain what you meant

7    in this context by preliminary estimates?

8         A.    I meant that, you know, as I

9    state, my goal wasn't to identify the precise

10   costs in a given category, but to provide an

11   initial estimate and initial framework upon

12   which more precise estimates could be

13   derived.  So by preliminary, I meant a

14   reasonable starting point.

15        Q.    And then as you explained in

16   your report, in paragraph 180, detailed

17   assessments of the specific costs in Cuyahoga

18   and Summit Counties will be required, and

19   there are a number of limitations in

20   extrapolating from national estimates to

21   specific localities.

22              That's what you said in your

23   report, correct?

24        A.    Yes.

25        Q.    And you have not conducted any

Highly Confidential - Subject to Further Confidentiality Review

1    detailed assessments of the specific costs

2    within Cuyahoga and Summit Counties that will

3    be required in this case -- strike that.

4              Is it fair to say, sir, that

5    you have not conducted any detailed

6    assessments of the specific costs within

7    Cuyahoga and Summit Counties?

8         A.    Yes, sir.

9         Q.    Now, you have -- going back --

10   we touched on this earlier.  In Deposition

11   Exhibit 3, you have four different scenarios,

12   and correct me if I'm wrong, but I believe

13   you testified earlier that Scenario A is no

14   longer in play, for lack of a better term; is

15   that fair?

16        A.    Yes.

17        Q.    So the focus would be on

18   Scenarios B, C and D; is that correct?

19        A.    Yes.

20        Q.    Okay.  And so we talked earlier

21   that Scenario C is simply Scenario A with the

22   corrections included on the first page of

23   Exhibit 3, correct?

24        A.    Yes.

25        Q.    And can you describe for me

Highly Confidential - Subject to Further Confidentiality Review

 1    what Scenario B is?

 2         A.     Scenario B provides an estimate

 3    that assumes that -- the status quo with

 4    respect to the provision of treatment for

 5    opioid addiction and other services for

 6    opioid use disorder over time.

 7              So Scenario B assumes that

 8    there's no increased treatment provided for

 9    opioid use disorder; that there is no

10    reduction in the churning of patients that

11    have opioid use disorder; and that the

12    population in year one of these estimates, in

13    other words, the 2019 population, is fixed

14    for the remaining nine years of observation.

15              So essentially -- and that

16    there's no infrastructure expansion for the

17    treatment of opioid use disorder.

18              So Scenario B essentially

19    assumes the status quo, takes the costs of

20    treatment in year one, assumes the

21    populations remain fixed as they are in year

22    one, in other words, doesn't account for any

23    changes in dynamic population flow, and

24    multiplies by ten and accounts for the price

25    of inflation.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It also doesn't take into

2  account any changes in the populations as a

3  result of the abatement remedies actually

4  working, right?

5    A.    That's correct.

6    Q.    Now, I want to go back before

7  we move on to Scenario A versus Scenario C.

8         On the first page there's a

9  list of changes that you made to the redress

10  models, and those changes are all reflected

11  in the numbers that you included in

12  Scenario C, correct?

13    A.    Yes, sir.

14    Q.    And some of those changes were

15  relatively minor, such as changing the number

16  of detectives required for large police

17  departments for specialized overdose units

18  from ten to seven, right?

19    A.    Yes, sir.

20    Q.    Or changing the number of

21  detectives from four to three in a midsize

22  police department, correct?

23    A.    Yes, sir.

24    Q.    But cumulatively, when you made

25  all these changes -- well, first of all, let

1    me back up.

2              Does the fact that you made all

3    these changes, these corrections, mean that

4    the numbers that were included in Exhibits 1

5    and 2 were incorrect?

6         A.    No, they were our best -- they

7    were my best estimates at the time, and these

8    updates reflect what I believe are better

9    estimates.

10        Q.    For example, you changed the

11   post-incarceration population downward by

12   more than 50%, correct?

13        A.    That's correct.

14        Q.    You went from 250,000 to

15   120,000; is that correct?

16        A.    Yes, sir.

17        Q.    And the net result of all these

18   changes was a change in the total national

19   abatement costs from 452.9 billion to

20   $382.6 billion, correct?

21        A.    Yes, sir.

22        Q.    And that's $70.6 billion -- I'm

23   sorry, $70.3 billion of difference, right?

24        A.    Yes, sir.

25        Q.    And that's based solely on the

1    12 updates that you made in Deposition

2    Exhibit 3?

3          A.      Yes, sir.

4          Q.      You didn't change any trend

5    ratios.

6          A.      Between which scenarios?

7          Q.      Well, between A and C,

8    Scenario A and Scenario C.

9          A.      I do not believe we did.

10          Q.      And you made no other changes

11    other than the changes that are reflected on

12    the first page of Deposition Exhibit 3?

13          A.      I believe that's the case, yes.

14          Q.      So let's take a look at

15    specifically the change that you made on the

16    first page of Exhibit 3 to the

17    hepatitis C/HIV line.

18                  Do you see that?

19          A.      Yes, sir.

20          Q.      You changed the annual cost of

21    hepatitis -- HCV treatment -- what's HCV

22    treatment?

23          A.      Hepatitis C.

24          Q.      And you changed the annual cost

25    of hepatitis C treatment from $50,400 to

1    $26,400, correct?

2        A.      Yes, sir.

3        Q.      And why did you make that

4    change?

5        A.      I thought the latter value was

6    a better estimate.

7        Q.      What did you base the initial

8    value of 50,400 on?

9        A.      I believe -- you know, there

10   were dozens if not hundreds of sources used

11   in this, and I believe these would have been

12   produced for you as part of an Excel document

13   that's listed as abatement sources.

14       Q.      And so --

15               MR. SNAPP:  Could I have my

16       screen, please.  Thank you.

17   BY MR. SNAPP:

18       Q.      I'm showing what I believe is

19   the source that you're referring to, and I've

20   highlighted a particular line that shows your

21   source of 26 -- for the 26,400.

22       A.      Uh-huh.

23       Q.      Do you see that?

24       A.      Yes, sir.

25       Q.      And your source is a pharma

1    blog called fiercepharma.com, correct?

2         A.    Yes, sir.

3         Q.    And you're aware that

4    fiercepharma.com is a blog that anyone can

5    post to as long as they're registered?

6         A.    I'm not -- I mean, I would want

7    to see this -- I'd be happy to look at this

8    information in detail with you, but I -- I'm

9    sorry.

10              Can you ask the question again,

11   please?

12        Q.    I'm just trying to understand.

13        A.    Yeah.

14        Q.    Let me ask a different

15   question.

16              Is fiercepharma.com a reliable

17   source that's typically used by experts in

18   your field?

19        A.    Well, it would depend on what

20   the information is that's sourced within the

21   article itself.

22        Q.    So is the answer to my question

23   that you don't know right now, sitting here?

24        A.    Well, I -- you know, I don't

25   think that -- just because something is in a

Highly Confidential - Subject to Further Confidentiality Review

1    blog doesn't mean that it's high-quality

2    scientific information or low-quality

3    scientific information.  I think one has to

4    have more information in order to judge the

5    quality of the information that's contained.

6              MR. SNAPP:  Can you turn it

7         off, please.  Thank you.

8    BY MR. SNAPP:

9         Q.    Sir, I'm now showing you --

10             MR. SNAPP:  Just one second,

11        I'm sorry.  Sorry.  Okay.  Go ahead,

12        please.

13   BY MR. SNAPP:

14        Q.    I'm now showing you the same

15   line for your April 3rd report.

16        A.    Uh-huh.

17        Q.    And the source you cite there

18   is an article called Surprise:  Gilead's hep

19   C wonder Harvoni costs less in the U.S. than

20   in EU, Japan.  It again was retrieved from

21   FiercePharma, correct?

22        A.    Yes, sir.

23   BY MR. SNAPP:

24        Q.    So it looks like you changed

25   sources for this number, and that was the

Highly Confidential - Subject to Further Confidentiality Review

1    only thing you did to change the assumption

2    from 50,400 to 26,700, correct?

3          A.    No --

4          Q.    I'm sorry, 26,400.  My

5    apologies.

6          A.    Yeah.  These may have

7    represented -- I would need to look at the

8    information contained within these articles.

9    In other words, these articles may have

10   quoted the national acquisition costs.  They

11   could have quoted a different cost,

12   et cetera.

13          So I don't think that I can

14   judge the -- or really discuss the quality of

15   the information from the blog site alone.

16          Q.    Okay.  But did you analyze,

17   before using the blog site that's used here

18   on the screen right now that is from your

19   April 3rd report -- did you analyze whether

20   the data underlying that 50,400 number was

21   valid?

22          A.    I believe the costs of hep C

23   treatment have continued to decline, and so

24   our reduction in estimates from $50,400 to

25   $26,400 was incorporated into updates to the

1    model to reflect what I believe to be lower

2    costs of hepatitis C treatment.

3              And so that's what accounts for

4    the reduction in -- you know, the reductions

5    in the estimates between Scenario A and

6    Scenario C.

7         Q.    Do you expect the costs of

8    treatment for hepatitis C to continue to

9    decline?

10        A.    You know, with current

11   treatments on the market, I do.  But, you

12   know, there's continued innovation and drug

13   costs are hard to predict.

14        Q.    And so did you do anything in

15   your model to account for the potentially

16   decreasing costs of hepatitis C treatment

17   over the next ten years that you've modeled

18   out?

19        A.    We did not.

20        Q.    Now, in terms of the --

21              MR. SNAPP:  You can take it

22        down, thank you.

23   BY MR. SNAPP:

24        Q.    -- the impact of this one

25   change from 50,400 to 26,400 for the annual

1    cost of HCV treatment, if you turn to page 3

2    of 3 of Deposition Exhibit 3 that you have in

3    front of you --

4          A.     Yeah.

5          Q.     -- you can see in line 9 that

6    the change was from $32.5 billion nationally

7    to $23.9 billion, correct?

8          A.     Yes.

9          Q.     So it's -- if my math is right,

10   it's over $11 million [sic], correct -- just

11   under 11 million, I guess.

12         A.     Yes.

13         Q.     I'm sorry, 11 billion.  I

14   said million.  It's 11 billion, correct?  My

15   math is off.

16         A.     Well, it's the difference

17   between 23.9 and 32.5 --

18         Q.     My math is off.  It's over

19   $9 billion, correct?

20         A.     Yes, sir.

21         Q.     All right.  I apologize.  My

22   math is a little rusty.

23                So do you agree, sir, that

24   small changes to the input assumptions in

25   your model can have major impacts on the

Highly Confidential - Subject to Further Confidentiality Review

1    estimated abatement costs on a national

2    level?

3         A.    It depends.

4         Q.    On what?

5         A.    On what specific abatement

6    category one is considering and the

7    population affected.

8         Q.    Okay.  Well, we'll take a look

9    at some more of those in a bit, but, first of

10   all, let me ask you that -- I want to go back

11   to the differences between the various

12   scenarios in Exhibit 3.

13              I think you've described

14   Scenario B.  Can you describe what Scenario D

15   shows?

16        A.    Scenario D provides estimated

17   costs of abatement over ten years at a

18   national level assuming interventions are

19   implemented to increase the uptake of MAT,

20   decrease the rate at which patients churn

21   through MAT and discontinue it, expand

22   naloxone distribution and reduce prescription

23   opioid prescribing.

24              So these estimates in

25   Scenario D reflect the result of a smaller

1    population requiring many, but not all, of

2    these abatement categories.

3         Q.    In other words, you attempted

4    to estimate the impact of certain abatement

5    programs on the model's parameters; is that

6    correct?

7         A.    No.

8         Q.    It's not?

9         A.    No.

10        Q.    Isn't that what you just told

11   me in terms of reducing opioid prescribing,

12   expanding uptake and reducing churn and

13   distributing naloxone?

14        A.    It was to estimate the effect

15   of these interventions on the model output,

16   not on the model parameters.

17        Q.    Okay.  Sorry if I misspoke.

18             So you attempted to estimate

19   the impact of those certain abatement

20   programs on the model's output in terms of

21   national abatement costs, correct?

22             MS. RITTER:  Objection, form.

23        A.    I don't -- yeah, I don't think

24   so.  We attempted to model the impact of

25   different interventions on -- we attempted to

Highly Confidential - Subject to Further Confidentiality Review

1    assess how much less it would cost to abate

2    the epidemic if several interventions were

3    implemented simultaneously, and those three

4    interventions, one was an MAT intervention,

5    which has two components, increasing the use

6    of MAT and decreasing the churn of patients

7    through MAT.

8              The second was a naloxone

9    intervention and the third was an opioid

10   prescribing intervention.

11             So we attempted to look at how

12   much less it would cost to abate the epidemic

13   if these interventions were implemented.

14   BY MR. SNAPP:

15        Q.    So specifically with respect to

16   the opioid prescribing intervention, what

17   components of your analysis are included

18   within that opioid prescribing intervention?

19        A.    Can you be more specific when

20   you say what components of our analysis?

21        Q.    What abatement categories fall

22   within the opioid prescribing intervention?

23        A.    Well, the -- what do you mean

24   by fall within?  Do you mean what --

25        Q.    You have 15 -- on page 3 of

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Exhibit 3 --
 2           A.      Yeah.
 3           Q.      -- you have 15 different
 4      abatement categories.  These are the same
 5      categories that appeared in Exhibits 1 and 2,
 6      correct?
 7           A.      Right.  Yes.
 8           Q.      So I'm asking:  These are
 9      different abatement strategies --
10           A.      That's right.
11           Q.      -- interventions, correct?
12           A.      Yeah.
13           Q.      And are any of these
14      interventions that are listed in numbers 1
15      through 15 included within the opioid
16      prescribing intervention that you
17      incorporated into Scenario D?
18           A.      Okay.  The primary abatement
19      category -- I mean, there's several remedies
20      that I discuss in my report that I believe
21      can positively impact the quality of opioid
22      prescribing.
23                   For example, academic detailing
24      is focused squarely on trying to train
25      prescribers and nonprescribers alike in
```

Highly Confidential - Subject to Further Confidentiality Review

1    appropriate treatment of pain as well as the

2    identification and management of patients

3    that have opioid use disorder.

4              So there are several -- several

5    of the remedies could potentially impact

6    prescribing.

7    Q.    Other than academic detailing,

8    which other ones?

9    A.    Well, I mean, on the back end,

10   something like drug disposal programs affects

11   the oversupply of opioids in the population.

12   Prescription drug monitoring programs can

13   impact prescribing.  Research can impact

14   prescribing.  Law enforcement indirectly can

15   impact prescribing.

16             So many of these -- pregnant

17   women and neonates, I mean, prescription of

18   opioids is kind of embedded through this mass

19   media campaign.  But I think the one that

20   most squarely addresses it is -- so I would

21   say that several of these categories can

22   affect prescribing.

23   Q.    But the one that most squarely

24   addresses it is academic detailing, correct?

25   A.    Well, I mean, that's

1    academic -- the academic detailing remedy is

2    designed to train prescribers and

3    nonprescribers alike in the evidence-based --

4    in evidence-based treatment of patients with

5    pain as well as use of opioids as well as

6    identification and treatment of people with

7    opioid use disorder.

8          Q.    So what methodology did you

9    employ to identify the impact that certain

10   abatement interventions would have on the

11   populations in Scenario D?

12         A.    We -- I provide more

13   information regarding the assumptions that we

14   make regarding the impact of different

15   interventions in documents that I think have

16   been produced in this case, including a

17   technical appendix and a tab within the model

18   itself.

19         Q.    To my knowledge, we do not have

20   a technical appendix with respect to

21   Scenarios B, C and D.  Is that something that

22   you provided to counsel?

23         A.    I believe so, although I think

24   that information also is largely contained

25   within the Markov model, the Excel document

1    itself.

2         Q.    There is a technical appendix

3    attached to Exhibit 1 from April 3rd, but it

4    does not include information with respect to

5    Scenarios B, C and D.

6         A.    Oh, I think --

7         Q.    Correct?

8         A.    I'm sorry for any confusion.

9    So I think this is the technical appendix

10   that I'm referring to.

11        Q.    Okay.

12        A.    Scenario B -- the information

13   about Scenarios B, C and D is provided within

14   this document itself.

15        Q.    Okay.

16        A.    So I don't know if that answers

17   your question, but the technical appendix

18   that I was referring to is what's provided as

19   a -- at the end of Exhibit 1.

20        Q.    All right.  I'm going to switch

21   to another spreadsheet that I want to show

22   you in a moment.

23        A.    And I would just note that the

24   estimates of the magnitude of the

25   interventions that we assessed were built

Highly Confidential - Subject to Further Confidentiality Review

1  upon and built from estimates that have been

2  assessed in other models that have been

3  performed.

4         So, for example, reduction in

5  opioid prescribing.  You know, in the

6  intervention that we assessed, we modeled

7  the -- in Scenario D, we modeled the impact

8  of, say, a 5% additional annual decrease in

9  rate of opioid prescribing.

10     Q.     One thing you did not do in

11  Scenario D was account for, for example, in

12  your mass media campaign, those numbers

13  remained constant in all of the scenarios,

14  correct?

15     A.     Correct.  So we apply -- I'm

16  sorry.  Yes, correct.  We do not apply trend

17  ratios to every abatement category.

18     Q.     And so the same is true for the

19  academic detailing piece, correct?

20     A.     I believe that's correct, and I

21  believe there was a document produced that

22  listed the abatement categories where we did

23  or did not apply a trend ratio.

24     Q.     But in terms of the effects of

25  the 15 different abatement strategies that

Highly Confidential - Subject to Further Confidentiality Review

1    you're proposing as part of your national

2    model, you're assuming that the mass media

3    campaign and the academic detailing would

4    remain constant throughout the ten-year

5    period, correct?

6         A.     That the -- that the -- we're

7    assuming that the investments in those would

8    be a constant investment, yes.

9         Q.     And you're not taking into

10   account the fact that some of those -- the

11   need for some of those interventions might

12   decrease over time, correct?

13        A.     The -- correct.  The need for

14   them could decrease or it could increase, or

15   it could stay the same.  And our model

16   provides a framework that would allow for one

17   to test different -- different trajectories

18   of the epidemic.

19        Q.     All right.  I want to take a

20   look at your calibration spreadsheet for

21   the --

22             MR. SNAPP:  If we put it on the

23        screen, please.

24             MS. RITTER:  Is this all going

25        to be part of the same thumb drive?

1          Or are you making different exhibits?

2          This is all the same?

3               MR. SNAPP:  So what we can

4          do -- we can talk about it off the

5          record, but I want to make sure that

6          the record is clear as you want.

7               MS. RITTER:  Yeah, that's

8          what --

9               MR. SNAPP:  Why don't we talk

10         about it off the record because I want

11         to make sure that we have it all

12         perfectly clear.

13              MS. RITTER:  Okay.

14              MR. SNAPP:  I think there might

15         be only one spreadsheet that's too

16         voluminous to mark as an actual

17         exhibit.  It's just easier to show

18         them on the screen.  The one that I'm

19         talking about is the one that's on the

20         screen now.

21              MS. RITTER:  I mean, I would

22         have an objection for foundation if

23         it's not really clear what document

24         you're --

25              MR. SNAPP:  Ill try to make it

Highly Confidential - Subject to Further Confidentiality Review

1        perfectly clear.

2                MS. RITTER:  Yeah.

3    BY MR. SNAPP:

4        Q.    So we're now looking at the

5    calibration tab for the spreadsheet we

6    received from your counsel that's entitled

7    MAT Model 2.0 version 51, correct?

8        A.    Yes, sir.

9        Q.    And I'm particularly focusing

10   your attention on the total OUD lines 20 and

11   21, correct?

12       A.    Yes, sir.

13       Q.    So I've got those highlighted

14   here.  Let me highlight them so it's clear.

15   Sorry.  All right.

16                So in these you show in line 20

17   actual data based on the national survey,

18   right?

19       A.    (Nods head.)

20       Q.    How do you pronounce it?

21       A.    NSDUH, National Survey on Drug

22   Use and Health.

23       Q.    NSDUH, okay.  And below that

24   you show your model outputs for the same

25   number, for total OUD, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes, sir.

2        Q.      And that's in line 21.

3                And in every year from 2011 to

4     2016 your model overestimated the total OUD

5     population based on actual experience,

6     correct?

7        A.      Well, I think in the first

8     year, isn't our model lower than the actual?

9        Q.      I'm sorry, I said 2011 to 2016.

10       A.      Oh, I see, yes, yes.

11       Q.      So 2011, '12, '13, '14, '15 and

12    '16, your model overestimated the total

13    over -- I'm sorry, opium -- tell me what OUD

14    is.

15       A.      OUD, opioid use disorder.

16       Q.      Thank you, opioid use disorder.

17    Your model overestimated opioid use disorder

18    population in every one of those years from

19    2011 to 2016, correct?

20       A.      Yes, sir.

21       Q.      In fact, it was 15% higher in

22    2016.  If you look at 2016, this column,

23    column O, this is the 2016 predicted versus

24    actual.

25                And in 2016, you were 15%

1    higher than the actual data, correct?

2         A.    Yes, sir.

3         Q.    Now, did your model -- did you

4    do anything to address in your model the fact

5    that your model was overpredicting the

6    population for opioid use disorder?

7         A.    Well, I mean, this model has

8    dozens of moving parts, and overall, I was

9    pleased with the -- and felt satisfied for

10   the purposes of this report in the

11   calibration that we were able to achieve.

12              Opioid use disorder is -- you

13   know, there are a number of shortcomings in

14   the ways that opioid use disorder is captured

15   and defined in the NSDUH, and so we -- so I

16   feel that this is -- you know, so we focused

17   on calibrating the model most tightly to more

18   recent years and to outcomes and populations

19   such as the population with the total

20   population and the population with overdose

21   that we had the greatest confidence in.

22        Q.    So is the answer to my question

23   that you did not do anything to try to

24   recalibrate your model based on the 15%

25   difference in 2016 between your model's

1    predictions and the actual-world data?

2        A.    That's not -- not the case.

3        Q.    What did you do to try to

4    change your model so that it was -- it more

5    closely tracked real-world experience as

6    demonstrated by the NSDUH data?

7        A.    Right.  So in the course of

8    building a model, one is continuously

9    examining and evaluating the inputs and

10   parameters and evaluating their impact on any

11   number of outcomes.

12              And the calibration of the

13   model is one set of outcomes that one is

14   continually using as the model is being built

15   and refined.

16       Q.    So does your final --

17       A.    It's like --

18       Q.    I'm sorry, go ahead.

19       A.    It's like a control panel, I

20   mean, that one is looking at this as one of

21   many measures of -- in the process of

22   building and developing a model.

23       Q.    But does your model in its

24   final form include an estimate for 2016 of

25   total OUD that's 15% higher than the NSDUH

Highly Confidential - Subject to Further Confidentiality Review

1   data?

2              MS. RITTER:  Objection, asked

3        and answered.

4        A.    Yes, it does.

5   BY MR. SNAPP:

6        Q.    Let me look at another line,

7   which -- and then we can take a lunch break

8   after this, but let me look at another line,

9   lines 42 and 43, which I've highlighted on

10  the screen.

11              And these are data related to

12  overdose death Rx.  What does that mean?

13       A.    Overdose deaths attributed to

14  prescription opioids.

15       Q.    And that data came from -- the

16  real-world data, actual data came from the

17  CDC, correct?

18       A.    Yes, sir.

19       Q.    And is that CDC WONDER data?

20       A.    Yes, sir.

21       Q.    Now, does the CDC WONDER data

22  have any shortcomings?

23       A.    Yes, it does.

24       Q.    You mentioned earlier that

25  there were certain shortcomings with

Highly Confidential - Subject to Further Confidentiality Review

1    calculation of OUD in the NSDUH data.  Can

2    you describe those shortcomings first, and

3    then I'll ask you about the CDC shortcomings?

4         A.    The NSDUH data, the data from

5    the National Survey on Drug Use and Health,

6    does not capture well individuals who may be

7    institutionalized, individuals who may be in

8    jail or in long-term care facilities,

9    individuals who are homeless, nor does it

10   capture individuals that may have a lifetime

11   history of opioid use disorder but not active

12   or past-year opioid use disorder.

13              And this is a difference and an

14   improvement of our model compared with many

15   others, because our model does account for

16   the 2.5 to 3 million people that may have

17   lifetime use of -- opioid use disorder but

18   not past-year opioid use disorder.

19        Q.    So is your expectation based on

20   the fact that they're not -- they don't have

21   past-year opioid use disorder, is your

22   expectation that they'll enter the opioid use

23   disorder population actively at some time in

24   the future?

25        A.    Some, absolutely.

1    Q.     How did you -- what are you

2    relying on to calculate how many of those

3    nonactive lifetime opioid use disorder

4    population are going to actually reenter the

5    active OUD population?

6    A.     Here again, our model included

7    dozens, if not more, sources and populations,

8    and I would want to refer to that

9    documentation in order to, you know, provide

10   that for you.

11   Q.     Let's take a look at what we

12   have on the screen right here.  Before we do

13   that, you mentioned there were some

14   shortcomings with respect to the CDC WONDER

15   data that you used in line 42.  Can you

16   describe those shortcomings for us?

17   A.     Well, I think one concern is

18   the adequacy of attribution of death within

19   the data and variation across -- you know, so

20   I think that's one of the main shortcomings.

21   Q.     Explain that, please.

22   A.     Well, it's not always obvious

23   or clear to determine how someone died.

24   Q.     Do you know how it's determined

25   in Cuyahoga or Summit County how someone

Highly Confidential - Subject to Further Confidentiality Review

 1    dies?

 2                    MS. RITTER:  Objection, form.

 3          A.     It's -- you know, it's not what

 4    I was asked to assist the courts with.  My

 5    belief is that they have medical examiners.

 6    BY MR. SNAPP:

 7          Q.     And so what are some of the

 8    issues that arise in terms of medical

 9    examiners or others determining the cause of

10    death when there are drugs involved?

11          A.     I mean, that's beyond the scope

12    of what I was asked to assist with in this

13    setting.

14          Q.     But you acknowledge that there

15    are certain challenges with identifying

16    opioid-related deaths like the ones you

17    talked about before?

18          A.     My sense is identifying cause

19    of death can be tricky for a number of

20    reasons.  I mean, if you have just a body

21    that shows up at the morgue, trying to walk

22    through the cause of death I think can be a

23    complicated task.

24          Q.     For example, there might be

25    polysubstance use?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      And then do you know how a

 3     medical examiner or other might decide of the

 4     various substances that show up in the

 5     toxicology screen, which one of those they

 6     might attribute as the cause of death?  Do

 7     you know how that's done?

 8              A.      I do not.

 9              Q.      But that's one of the

10     limitations of using the CDC WONDER data,

11     correct?

12              A.      Well, I think the wonder

13     data -- I'm sorry, can you please repeat the

14     question?

15              Q.      So one of the limitations of

16     using CDC WONDER data is the fact that

17     different jurisdictions, different medical

18     examiners, different people evaluating the

19     cause of death might reach different

20     conclusions based on the same toxicology

21     screen?

22              A.      I believe that's true.

23              MR. SNAPP:  Okay.  Why don't we

24         take our lunch break now.

25              MS. RITTER:  Okay.
```

```
 1              THE VIDEOGRAPHER:  Going off

 2         the record at 12:43 p.m.

 3              (Recess taken, 12:43 p.m. to

 4         1:14 p.m.)

 5              THE VIDEOGRAPHER:  We're back

 6         on the record at 1:14 p.m.

 7              (Whereupon, Deposition Exhibit

 8         Alexander-8, Spreadsheet, Medical

 9         Assisted Treatment, etc., was marked

10         for identification.)

11              MR. SNAPP:  Okay.  Just for

12         housekeeping purposes, Doctor, I'm

13         handing you what's been marked as

14         Exhibit 8, and this is the spreadsheet

15         that we looked at on the screen

16         earlier that shows the cost -- well,

17         this is the one from April 17th.  It's

18         the one that's called Monument

19         Analytics Abatement Sources, 7

20         April 19 V10.  I'm just marking it for

21         the record, and here's a copy for

22         counsel.

23              MS. RITTER:  And you're saying

24         you want him to confirm that this is

25         the one you asked him about?  Is that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            what you're asking?

 2                 MR. SNAPP:  I'm just putting it

 3            in the record just so we have a copy

 4            of everything that was in the record.

 5            That's all.

 6                 MS. RITTER:  So that's what

 7            you're saying this is.

 8                 MR. SNAPP:  Yes.

 9                 MS. RITTER:  Okay.

10                 MR. SNAPP:  I am.  He's welcome

11            to check it during a break if he

12            wants, but I'm representing that

13            that's what it is.

14                 (Whereupon, Deposition Exhibit

15            Alexander-9, Spreadsheet, Medical

16            Assisted Treatment, etc., was marked

17            for identification.)

18                 MR. SNAPP:  And this one that

19            I'm marking as Exhibit 9 is the

20            Monument Analytics Abatement Sources

21            from April 3rd, so it's the same

22            spreadsheet only from the April 3rd

23            report.

24                 THE WITNESS:  Uh-huh.

25                 MR. SNAPP:  And that's
```

1          Deposition Exhibit 9.  Okay.

2     BY MR. SNAPP:

3          Q.     So, sir, we were talking about

4     your model, and specifically we were looking

5     at the calibration sheet -- let me pull that

6     up again and put it back on the screen.

7               We're looking at MAT Model 2.0

8     Version 51 on the screen right now, the

9     calibration tab.

10         A.     That's great.  That's great.

11    Thank you.

12         Q.     I started asking you about

13    lines 42 and 43, which are overdose death

14    statistics, correct?

15         A.     Yes, sir.

16         Q.     And line 42, which I'm

17    highlighting now, says:  Actual overdose

18    death Rx actual, and it cites as a source

19    CDC, correct?

20         A.     Yes, sir.

21         Q.     Line 43 directly under that,

22    which I'm highlighting now, says:  Model

23    overdose death Rx, and those are the

24    numbers -- that line shows the numbers that

25    were predicted by your model, correct?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Yes, sir.

 2          Q.      And am I correct that your

 3     model relative to the CDC actual data

 4     overestimated overdose deaths from

 5     prescription opioids in every year shown on

 6     this sheet --

 7          A.      I don't --

 8          Q.      -- except 2015, it looks like.

 9     I'm sorry.

10               MS. RITTER:  Objection to form.

11               THE WITNESS:  Could you ask the

12          question again, please.

13               MR. SNAPP:  Certainly.

14     BY MR. SNAPP:

15          Q.      Can you tell me which years,

16     based on these two lines, your model as shown

17     in line 43 overestimated overdose deaths --

18     prescription overdose deaths when compared to

19     the CDC data in line 42.

20          A.      Well, I can't see the subject

21     headers at the top to know the years, but --

22          Q.      Sure.

23          A.      Okay.  2010 through 2018.

24          Q.      E is 2010.

25          A.      Okay.  So it looks to me as if

1    for the last two years our model -- so for

2    2010, '11, '12, '13, '14 and '15, I believe

3    our model reports a greater number of

4    overdose deaths.

5        Q.    Than the CDC data?

6        A.    That's right, than the CDC

7    data.  2016, they're remarkably similar, I

8    mean, a difference of 31 or something, 36 out

9    of 17,000 deaths, so they're more or less the

10   same, very, very similar.  And then the last

11   year, our model predicts a very slightly

12   greater number of overdose deaths than the

13   CDC data.

14       Q.    You're talking about 2017?

15       A.    That's right.

16       Q.    Okay.

17       A.    I'm comparing 17,075 to 17,029.

18       Q.    Now, looking at O, which

19   compares 2016 -- I'm talking about column O.

20   It compares 2016 predicted versus actual

21   numbers.

22       A.    Uh-huh.

23       Q.    You show that your model

24   overestimated the number by 10.3%; is that

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Well, can you click on the

2    10.3%, please, to see what the formula is.

3        Q.     Yes, I've clicked on it right

4    now.  It shows J43 over J42 minus 1.

5             MS. RITTER:  Objection, form.

6        Plus, I've lost the question.

7        A.     So it looks to me as if that is

8    calculating the difference in the overdose

9    deaths from the year represented by column J,

10   which would be 2015, which is not the most

11   recent year of observation.

12   BY MR. SNAPP:

13       Q.     Okay.  But in 2015 your model

14   predicted 10.3% more deaths than actual

15   numbers shown by CDC WONDER data, correct?

16       A.     Yes, sir, I believe so.

17       Q.     Now, did you do anything --

18   does your model do anything to account for

19   this variance between your predictions and

20   the actual real-world data according to the

21   CDC?

22       A.     Yes.  Yes, we did.

23       Q.     How so?

24       A.     As I noted before, as we build

25   and design and iteratively develop the model,

1    I'm continually examining the -- the

2    calibration of the model is one of the

3    factors that we use as we evaluate its

4    adequacy.

5        Q.     But in terms of predicting

6    future overdose deaths, you didn't do

7    anything to correct for the fact that your

8    model predicted many more -- 10.3% more

9    overdose deaths in 2015 than were actually

10   shown by the CDC data, correct?

11       A.     Well, we -- you know, in -- the

12   calibration of the model, the model --

13   because, you know, changing a model parameter

14   can affect multiple things, I'm

15   continually -- the model is calibrated with

16   an attention towards all of the -- its global

17   performance.

18            And so I don't recall

19   specifically the number of times and the

20   approaches that we used to see whether we

21   could better calibrate this parameter without

22   affecting a different parameter.

23       Q.     Because if you make a small

24   change in one part of the model, it could

25   impact other parts of the model dramatically,

1   correct?

2        A.     The model is interdependent,

3   but it all depends.

4        Q.     But it's conceivable that a

5   small change to one parameter could impact

6   other portions of the model, correct?

7        A.     Yes, it is.

8        Q.     And ultimately, that small

9   change could impact in a significant way the

10  amount of national abatement costs that

11  you're calculating at the end of your model,

12  correct?

13       A.     Well, it -- it depends.

14       Q.     It depends on what the

15  parameter is that you're changing I assume,

16  correct?

17       A.     Yes.  And the magnitude of the

18  change and what -- how one defines small.

19       Q.     Sir, I'm going to switch to --

20  switch the screen to a different one of the

21  spreadsheets, and this one is Monument

22  Analytics Abatement Sources 17 April 19 V10,

23  which we've previously marked as

24  Deposition Exhibit 8.  And the way, when I

25  printed it out, each --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm with you.

2    Q.    Two pages, you have to lay them

3    down next to each other.  Exactly.  Thank

4    you.  But I can show them on the screen for

5    purposes of what we're going to be looking at

6    here.

7              Now, I want to talk to you

8    about, in developing your model to predict

9    national abatement costs, you had to make

10    certain assumptions; is that correct?

11    A.    Yes.

12    Q.    And I want to talk to you about

13    the assumptions that you made.  Let's take a

14    look at them.

15              So in -- I'm going to highlight

16    on the screen Exhibit 8, lines 6, 7 and 8.

17    You see I've highlighted them?  Those values

18    are assumed for purposes of the model,

19    correct?

20    A.    Yes.

21    Q.    And if we go down to -- sorry.

22    If we go down to line 20, the mass media

23    target population is also assumed, correct?

24    A.    Yes.

25    Q.    How did you -- how did you come

Highly Confidential - Subject to Further Confidentiality Review

1    up with the number of 150 million for the

2    mass media target population?

3         A.    Well, this is an epidemic

4    that's national in scope and affects, you

5    know, tens of millions or hundreds of

6    millions of people.  So we felt that this was

7    a reasonable starting point as an assumption

8    for the number of people that might be

9    reached.

10        Q.    So were you trying to target a

11   certain percentage of the overall U.S.

12   population?

13        A.    No.

14        Q.    How did you come up with the

15   number of 150 million?

16        A.    Once again, it was based on

17   what we believed would be a reasonable

18   starting point for estimates and discussion

19   around abatement costs for a media campaign.

20        Q.    So in order to figure out how

21   much -- what the target population in

22   Cuyahoga and Summit Counties were, you'd need

23   to actually understand the actual population

24   of those counties; is that correct?

25        A.    Can you ask that again, please?

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      If you wanted to localize the

2    mass media target population to Cuyahoga and

3    Summit Counties, how would you do so?

4       A.      Well, one would want to know

5    the size of the population and the nature of

6    the media markets in those counties.

7       Q.      Okay.  But you haven't done

8    that?

9       A.      No.

10      Q.      If we go down to line 28, this

11   is the length of first responder training.

12   That's another assumed number, correct?

13      A.      Yes, sir.

14      Q.      And if we look at line 30, is

15   that another assumed number of the cost per

16   first responder training?

17      A.      Yes, sir.

18      Q.      And then if we go down to

19   line 47, which is the residential program

20   population for pregnant women, is that

21   another assumed number, sir?

22      A.      Yes, sir.

23      Q.      And if we go down to line 52,

24   the cost per detailer per year, is that an

25   assumed number also, sir?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Well, there are -- I think we

2   provide some information there as you've

3   highlighted.

4      Q.      Right.  In fact, it's based on

5   four separate assumptions within that

6   particular parameter, correct?  It says:

7   These costs are based on several assumptions.

8   Number one, detailers would work

9   approximately 2,000 hours per year or 250

10  eight-hour days.

11           Number two, approximately one

12  fifth of the detailer time would be

13  administrative.

14           Number three, detailers would

15  see approximately three prescribers per day

16  and visit each prescriber once per calendar

17  quarter, thus seeing approximately 150 unique

18  prescribers per year.

19           Number four, the salary for a

20  detailer, typically a trained pharmacist,

21  would be approximately $125,000 per year.

22  With travel, fringe and administrative

23  support, the cost per detailer would be

24  approximately $176,000 per year.

25           So is it fair to say that

Highly Confidential - Subject to Further Confidentiality Review

1    line 53, the cost per detailer per year, is

2    itself an assumed number based on four

3    separate assumptions?

4        A.    Yes.  Although we -- yes, it

5    is, although I consulted with -- I mean, I

6    reviewed some source information about

7    academic detailing in order to derive that

8    estimate.

9        Q.    But it's an assumed number for

10   purposes of your analysis, correct, the

11   276,000?

12       A.    Yes.  Yes.

13       Q.    And if we look at line 56,

14   number of physicians visited by a detailer

15   per day, that's also an assumed number,

16   correct?  It says right here, assumed in --

17       A.    Yeah, I don't know why --

18       Q.    -- D.

19       A.    Yes, I think it's an assumed

20   number, although I don't fully understand the

21   300.  There must have been -- I don't think

22   that the value in the cell B56 is accurate,

23   but I would guess that that was an assumed

24   number, the number that would be visited a

25   day.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Okay.  I'm not sure where the
2    300% either came from, because in the
3    printout it shows as 3.
4          A.     Yeah, I would expect 3 sounds
5    like the right number.
6          Q.     Is it all right with you if I
7    change that to 3 just so we're clear?
8    Because I'm not sure why that came up that
9    way.
10         A.     Well, I'd want to consult the
11   materials --
12         Q.     Fine, absolutely.
13         A.     -- but if you want to for the
14   purposes of this discussion, that's fine.
15         Q.     We'll leave it.  We'll leave it
16   as it is.
17         A.     Okay.
18         Q.     Line 57, number of unique
19   physician visits by a detailer, it says 150,
20   correct?
21         A.     Yes, sir.
22         Q.     And that's assumed.  That's
23   assuming that each physician will be visited
24   each calendar quarter by a detailer, correct?
25         A.     Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then line 58 and 59 are

2    also assumed numbers, correct?

3    A.    Yes, sir.  Although once again,

4    as with other estimates that I've provided

5    for academic detailing, I reviewed a number

6    of source documents that I include in my

7    expert report, and I believe that I may have

8    used some of these in order to provide the --

9    in order to -- as a basis for the assumptions

10   that are contained herein.

11   Q.    But in many of these other

12   lines, you've provided a source for the

13   numbers, right?

14   A.    Right.

15   Q.    And for these that you just

16   said "Assumed," you're just coming up with a

17   number and plugging it in based on, I guess,

18   your general knowledge based on the

19   experience you've had, or what's it based on?

20   A.    I don't recall precisely how I

21   derived these estimates, but I have reviewed

22   many scientific papers about academic

23   detailing, and I've also reviewed proposals

24   that have been written for the conduct of

25   academic detailing.  So that is to support

Highly Confidential - Subject to Further Confidentiality Review

1  academic detailing programs.

2       Q.     Well, are these assumptions --

3  some of these assumptions -- and we're going

4  to go through more -- some of these

5  assumptions, assumptions that were made by

6  the seven people that worked on your team to

7  put together this report?

8       A.     Well, I mean, ultimately, I

9  supervised the entire time and I take full

10  responsibility for all of the information

11  that's presented within the materials that

12  have been provided for the court.

13       Q.     But I'm just trying to

14  understand.  Is the reason you don't know

15  what they based a particular assumption on

16  because it was something that was done by one

17  of your team members and not by you directly?

18             MS. RITTER:  Objection to form.

19       That's not --

20             THE WITNESS:  Can you ask that

21       again, please?

22             MS. RITTER:  Foundation.

23  BY MR. SNAPP:

24       Q.     Sure.

25             Is the fact that you don't know

Highly Confidential - Subject to Further Confidentiality Review

1    what the source was for some of these

2    assumptions that we've highlighted, is that

3    fact because those assumptions were actually

4    plugged in by one of your team members

5    instead of you?

6          A.      I don't believe so.  I -- you

7    know, there are dozens of sources here.

8          Q.      Yes.

9          A.      But if anything, I would -- but

10   I was closely involved with the development

11   of all of these materials, and I think if

12   anything, if there's an -- if there was a

13   source for which there was unclear value,

14   that would significantly increase rather than

15   decrease the likelihood of my participation

16   in its -- in its estimation.

17               In other words, if there was --

18   the less clear the value, the greater the

19   likelihood that I would have been even more

20   integrally involved.

21         Q.      But do you remember

22   specifically any discussions with your team

23   with respect to the assumed values that we've

24   included so far, that we've highlighted so

25   far, I should say, on this sheet?

1          A.     I do.

2          Q.     Okay.  Which ones?

3          A.     Well, if we can start from the

4     top.

5          Q.     Sure.

6          A.     So I recall discussions about

7     the split of different MAT treatments.

8          Q.     Okay.  But those are still

9     assumed numbers, right?

10         A.     They are.  And as I note, the

11    current distribution is less evenly weighted

12    across these three treatments.

13         Q.     What about the mass media

14    target population and the others highlighted

15    here?

16         A.     So I do -- I recall, you know,

17    at the vaguest level, a discussion about the

18    size of the mass media target population.

19         Q.     Now, I asked you some questions

20    about trying to localize the mass media

21    target population.

22                In your April 3rd report, you

23    localized one abatement number to Cuyahoga

24    and Summit County by multiplying it by 1.5%,

25    correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes, as a -- I think the

2    language that I included in the report about

3    that process captures well my confidence and

4    belief about that calculation.

5        Q.      And what is your confidence and

6    belief about that calculation?

7        A.      Well, I'd like to refer to my

8    report, if that's okay.

9        Q.      It's right in front of you.  Go

10   ahead.

11       A.      Okay.  So in paragraph 175, I

12   note that while the exact costs of abatement

13   are difficult to estimate, and will depend

14   upon the population requiring services -- so

15   we've reviewed that sentence, so I think

16   that's important.

17       Q.      Right.  You go on to say:  It's

18   possible to estimate the cost, nationally, of

19   the efforts required to reduce further harms,

20   in that sentence, correct?

21       A.      The costs nationally, correct.

22       Q.      Okay.

23       A.      And then I note, in 176:  I

24   performed preliminary analyses of the

25   national costs.  My goal was not to identify

Highly Confidential - Subject to Further Confidentiality Review

1    the precise costs of any category, but rather

2    to develop an initial estimate from which

3    costs could be based -- and then I discuss

4    my --

5         Q.    Could be based, I'm sorry, just

6    to finish.  Could be based -- could be

7    developed based on this Court's findings with

8    regard to the nuisance in these

9    jurisdictions.  That's what you wrote,

10   correct?

11        A.    Correct.  Correct.

12        Q.    Okay.  Go ahead.

13        A.    And then I discussed the steps,

14   and then I note in 179:  For some categories,

15   specific costs will depend upon decisions

16   made by the Court or its designees, local

17   policymakers and service providers.

18              And I give an example just of

19   one -- one product, naloxone, and the very

20   factors that could influence that.

21              And then I identify potential

22   limitations of extrapolating from the

23   national to a local level.

24        Q.    Which paragraph is that?

25        A.    180.

Highly Confidential - Subject to Further Confidentiality Review

1           And then I -- and then I -- and
2    then I say but nevertheless, and then, you
3    know, I -- and I use just one proxy for the
4    fraction of the global abatement needs that
5    are represented by the counties of interest,
6    Summit and Cuyahoga County.  And that's the
7    basis for that calculation.
8           Q.    Okay.  And you said global
9    abatement.  I think you meant national?
10          A.    Correct.  Correct.  Yes.
11          Q.    Okay.  Very good.
12                So we'll come back to that, but
13   I just want to -- let's continue going
14   through the spreadsheet.
15          A.    Yeah.
16          Q.    This line 76, percentage of
17   foster and adoption population younger than
18   eight, that's another assumed number,
19   correct?
20          A.    Yes, sir.
21          Q.    And line 78, rate of IVDU that
22   is opioid use.  That's an assumed number,
23   correct?
24          A.    Yes, sir.
25          Q.    If we go down to line 98 where

Highly Confidential - Subject to Further Confidentiality Review

1    we're talking about drug disposal programs,

2    lines 98 and 99 are both assumed numbers,

3    correct?

4         A.    Yes, sir.  Here and in all

5    instances, I should say assumed for the

6    purposes of the estimates that I've provided.

7         Q.    And assumed for purposes of

8    running your model to calculate national

9    abatement costs, correct?

10        A.    Yes, sir, for these preliminary

11   estimates, yes.

12        Q.    If we look at line 119, this is

13   the proportion of individuals served by each

14   SSP.  What's an SSP?

15        A.    Syringe exchange program.

16        Q.    And that's an assumed number

17   also, correct?

18        A.    Yes, sir.

19        Q.    Now, lines 120 through 128

20   refer to, quote, unpublished federal data as

21   your source.

22             Do you see that?

23        A.    I do.

24        Q.    What unpublished federal data

25   are you referring to there?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      These were derived from a -- I

 2    don't know the specific source for these data

 3    points.

 4          Q.      Who would know?

 5          A.      One of the team members that

 6    assisted me in producing these estimates.

 7          Q.      And do you know if you provided

 8    that unpublished federal data to plaintiffs'

 9    counsel so that we could receive it as part

10    of our review of this case?

11          A.      I do not know.

12          Q.      To my knowledge, we haven't

13    received it, so I'm not sure what it is

14    either.

15                  If we look at the next line --

16          A.      I mean, I can -- let me just

17    say, I think there was a slide presentation,

18    a PowerPoint deck that contained these

19    estimates, and I think the deck was -- was

20    delivered or built by someone working within

21    a federal agency, but I don't have the

22    specific source in my head, and I don't know,

23    as I said, whether it was provided as part of

24    the materials that were produced.

25                  MR. SNAPP:  I'm not typically
```

Highly Confidential - Subject to Further Confidentiality Review

1          one to request materials during a

2          deposition, but we would like to

3          receive those.

4                    MS. RITTER:  We made a note of

5          that.  I don't remember if you have it

6          or not.  I'll have to look.

7                    MR. SNAPP:  Thank you.

8     BY MR. SNAPP:

9          Q.    Now, 132 and 133, lines 132 and

10    133, these are some more assumed values,

11    assumed parameters in your model, correct?

12         A.    Yes, sir.

13         Q.    And those are the proportion of

14    SCFs in cities similar to Baltimore and

15    proportion of SCFs in cities similar to

16    San Francisco, correct?

17         A.    Yes, sir.

18         Q.    Now, did you do any analysis of

19    the proportion of SCFs in the cities of Akron

20    or Cleveland or cities similar to Akron and

21    Cleveland?

22         A.    No, did not.

23         Q.    So why did you choose Baltimore

24    and San Francisco?

25         A.    These -- I think that these

1    cities were selected based on population and

2    the -- I don't have a good answer for you.  I

3    didn't select these cities.

4          Q.    Someone on your team did?

5          A.    Yes, sir.  And I --

6          Q.    And line -- I'm sorry.

7          A.    I should mention as well, you

8    had asked for the individuals that worked on,

9    you know, these materials, and so in

10   reviewing this, it occurs to me that two

11   additional people, I should mention.  So one

12   is Susan Sherman, S-H-E-R-M-A-N, and the

13   other is Cassandra Crifasi.  I believe her

14   last name is C-R-I-F-A-S-I.

15              And so they -- they worked a

16   long time ago -- which is why I wasn't

17   thinking of them actively -- with me on

18   individual abatement categories.

19         Q.    How long ago?

20         A.    I don't know.

21         Q.    Before you started putting

22   together your report?

23         A.    Yes.

24         Q.    Before your visit to Akron in

25   July of 2018?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     I don't know.

2        Q.     Just so we're clear, I

3  highlighted line 129.  That's another

4  assumption.  I don't think I asked you about

5  that one, but that's another assumed number,

6  correct, the number of new supervised

7  consumption facilities to open in the U.S.?

8        A.     Yes, it is.

9        Q.     Is that an annual number?

10       A.     Yes, it is.

11       Q.     And do you have an

12  understanding of whether certain laws would

13  need to be changed to open a supervised

14  consumption facility in some jurisdictions?

15       A.     Can you ask the question again,

16  please?

17       Q.     Do you know one way or another

18  if supervised consumption facilities are

19  allowed in every jurisdiction in the United

20  States?

21       A.     My understanding is that

22  currently they are not.

23       Q.     And so in some jurisdictions,

24  there would be a need -- there would need to

25  be a change in law for a new supervised

1    consumption facility to open, correct?

2         A.    Yes, sir, I believe that's the

3    case.

4         Q.    Do you know if that's the case

5    in Cuyahoga or Summit Counties?

6         A.    I believe it's the case.

7         Q.    And so the abatement remedy

8    with respect to -- that you're proposing with

9    respect to supervised consumption facilities

10   would require a change in the law in Summit

11   and Cuyahoga counties; is that fair?

12        A.    No.  I was not asked to design

13   an abatement program for these counties.  I

14   was asked to identify evidence-based

15   approaches to abate the opioid epidemic at a

16   national level.

17              And in my report, I both

18   qualify with respect to this particular

19   instance and also note in many places that it

20   really falls upon the communities themselves

21   to review what I've proposed and to decide

22   what they're already doing, what they need to

23   do more of, what they should be doing less of

24   and how it all fits together.

25        Q.    Do you know if the judge in

1    this case would be able to order a

2    change in law to require the opening of

3    additional supervised consumption facilities?

4              MS. RITTER:  Objection,

5         foundation.

6         A.    You said additional -- can you

7    you that --

8    BY MR. SNAPP:

9         Q.    Supervised consumption

10   facilities.

11             Do you know if the judge in

12   this case has the power to change the law so

13   that additional supervised consumption

14   facilities can be opened in the U.S.?

15             MS. RITTER:  Same objection.

16        A.    I do not.

17   BY MR. SNAPP:

18        Q.    The next one that I highlighted

19   here is line 137, number of fentanyl testing

20   strips needed per injection, and that's an

21   assumed number, correct, for purposes of your

22   calculations?

23        A.    Yes, sir.

24        Q.    And line 140, extra costs for

25   program management, administrative personnel,

1    shipping.  If you look up at the top,

2    machines set up and maintenance for harm

3    reduction total cost.

4              Do you see that up here?

5    A.     Yes, sir.

6    Q.     So is that an assumed number

7    also, sir?

8    A.     Yes, it is.

9    Q.     Please scroll down on the

10   spreadsheet to lines 152 through 156.  Are

11   these all numbers that were assumed for

12   purposes of your model?

13   A.     Yes, they were.  Although here

14   again, these were developed with -- as with

15   many other estimates, with either or both a

16   review of literature and scientific findings

17   as well as a consultation with experts in the

18   field.

19   Q.     But for each of these numbers,

20   the midsized police departments, law

21   enforcement-assisted diversion cost and the

22   same cost from small police departments as

23   well as the size of specialized overdose

24   units for large police departments, for

25   midsized police departments and for small

Highly Confidential - Subject to Further Confidentiality Review

1    police departments, you don't have a source

2    other than to say that you're assuming these

3    numbers, correct?

4        A.    For the purposes of the

5    materials that have been produced, we've --

6    I've identified these as assumed values.

7    They are based, once again -- all of these

8    parameters and estimates are based on a

9    combination of our best judgment, my

10   expertise, review of scientific information,

11   and the experience of others that provided

12   input as I developed these estimates.

13              And this really was, once

14   again, intended as a framework for

15   considering the cost of abatement.

16       Q.    Understood.

17              And so one last assumed number

18   here is in line 160, which I'm highlighting

19   on the screen, number of hours required for

20   stigma reduction training.

21              That's also an assumed number

22   for purposes of your model; is that correct,

23   sir?

24       A.    Yes, sir.

25       Q.    So we have gone through, and we

1    counted them up and we can count them up

2    again if you want, but I've highlighted 28

3    separate lines of assumed values within the

4    parameters that you have plugged into your

5    model.

6              Does that sound about right?  I

7    mean, you can count them if you'd like.

8         A.    I would have to if I --

9         Q.    Okay.  Well, would you like to,

10   because I'm --

11        A.    No, I don't feel the need to.

12        Q.    Okay.

13        A.    But I just can't -- I'm not

14   positive there are 28, but I take your word

15   for it.

16        Q.    There are 28.

17        A.    Okay.

18        Q.    I'm told there are 28.

19        A.    Okay.  Fair enough.

20        Q.    And that's 28 out of -- you

21   have a total of 164 parameters, correct?

22              I'm sorry, it's actually less

23   than 164 parameters because you've got titles

24   in here.

25        A.    Line headers, right.

1        Q.      So it's somewhere less than

2    that.

3        A.      Okay.

4        Q.      So give or take --

5        A.      15.

6        Q.      -- roughly 15-20% of your

7    parameters are assumed; is that right, sir?

8        A.      I think there are about 150

9    total, and how many did you say were assumed?

10       Q.      28.

11       A.      Okay.  So it would be about one

12   sixth.

13       Q.      So 15 to 20% is accurate?

14       A.      Yes.

15       Q.      Now, I want to make sure I

16   understand your testimony.  You said the

17   assumed parameters, the assumptions were

18   based on judgment, your experience, review of

19   scientific information and the experience of

20   others who provided input as you developed

21   these estimates; is that right?

22       A.      Can you please read the list

23   again?

24       Q.      Judgment?

25       A.      Yes.

```
1            Q.      Your experience?

2            A.      Yes.

3            Q.      Review of scientific

4    information?

5            A.      Yes, sir.

6            Q.      And the experience of others

7    who provided input as you developed these

8    estimates, correct?

9            A.      Right.

10           Q.      So if another expert looked at

11   this model and made different assumptions,

12   would you agree that the results would

13   change?

14                   MS. RITTER:  Objection, form.

15           A.      They -- yes.  If -- if you're

16   asking whether if you put in different values

17   do the numbers ultimately change, the answer

18   is yes.

19   BY MR. SNAPP:

20           Q.      So in other words, to replicate

21   your model, is it fair to say that one would

22   have to use the exact same assumptions that

23   you did?

24                   MS. RITTER:  Objection to the

25           form.
```

1        A.        To get -- to get the -- down to

2    the penny, to get the exact same answer?  Is

3    that what you're asking?

4    BY MR. SNAPP:

5        Q.        I'm asking, to replicate your

6    model, would one have to use the exact same

7    assumptions, yes.

8        A.        To replicate our model.  I'm

9    just trying to figure out what it means to

10   replicate our model.  I mean, to derive the

11   exact same estimates, you would either have

12   to use the exact same assumptions or you

13   would have to use different assumptions that

14   happened to offset each other.

15                 For example, you know, if you

16   assume that the population is half the

17   population but the costs are twice as much,

18   multiply them together, you could

19   theoretically get the same estimates.

20       Q.        But it's reasonable to assume

21   that an expert looking at your model might

22   make -- reach different conclusions as to

23   certain of the assumptions that you made,

24   correct?

25       A.        Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And if an expert using your

2  model used different assumptions, unless they

3  were offsetting assumptions, as you pointed

4  out, it's fair to assume that that expert's

5  conclusions would be different than yours,

6  correct?

7    A.    Yes.  They could be higher.

8  They could be lower.

9    Q.    But you agree that another

10  expert evaluating abatement remedies,

11  national abatement remedies, is likely to

12  make at least some different assumptions than

13  the assumptions that you and your team made

14  in the 28 highlighted lines on the screen

15  right now, correct?

16    A.    Yes.

17    Q.    Did you conduct any analysis of

18  how any changes in these assumptions, the 28

19  highlighted assumptions that are on the

20  screen -- how those changes in assumptions

21  would affect your results?

22    A.    Yes.

23    Q.    What did you do to analyze how

24  changes in your assumptions would affect the

25  results?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Well, it depends.  I mean,

2   that's hard to talk about in the abstract,

3   because there are 15 different Excel sheets,

4   one for each abatement category.

5      Q.      Right.  And so have you done

6   any sort of sensitivity analysis to determine

7   what would change?

8      A.      Yes.

9      Q.      Where would I find that in your

10  spreadsheets?

11     A.      Well, for -- for

12  medication-assisted treatment, you would find

13  it in the Markov model.

14     Q.      Okay.  We'll talk a look at the

15  Markov model some more in a moment.

16             But by the way, some of your

17  other assumptions that I didn't highlight are

18  actually derived from assumed numbers,

19  correct?  Let me see if I can find a good

20  example.

21             Let's take a good example here.

22  We've got some in law enforcement.  So you

23  have got some here, the stigma reduction

24  training cost per patrol officer is something

25  that you derived based on the numbers above,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.    Yes, sir.

3         Q.    And so the number of

4    assumptions that are included -- incorporated

5    into your model are actually more than just

6    the 28 I pointed out to you, correct?

7         A.    Yes, sir.  I mean -- yes, sir.

8         Q.    So what I'm talking about is

9    the assumed parameters that you plugged into

10   the model, there are more than just the 28

11   that I highlighted on the screen.  There are

12   others that are derived from those

13   highlighted assumed numbers, correct?

14        A.    Yes, sir.

15        Q.    Okay.  If we count those up --

16   I think we counted 52, but we're not going to

17   go through those today.

18        A.    Okay.

19        Q.    It's 52, the 28 plus 24 would

20   get you to 52, so...

21             So we were looking before we

22   started --

23             MR. SNAPP:  We can turn that

24        off.  Thank you.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. SNAPP:

2        Q.    Before we started looking at

3    the spreadsheet we were looking at

4    paragraph 180 and 181 of your report.  I

5    think you were reading some language from

6    180.

7              In paragraph 181, you state

8    that your abatement estimate does not address

9    how abatement costs should be shared across

10    different parties; is that correct?

11        A.    Yes, sir.

12        Q.    And so just to be clear, you

13    haven't attempted to identify and quantify

14    the impact of any alleged wrongdoing by any

15    defendants on opioid-related outcomes and

16    subsequent costs, correct?

17        A.    Correct.

18        Q.    Does your model assume that the

19    defendants are responsible for all of the

20    abatement costs --

21        A.    No, sir.

22        Q.    -- that it predicts?

23              Does your model have anything

24    to do with who should pay for what?

25        A.    No, sir.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Now, if we look at -- staying

2    on the same spreadsheet, if we go up to

3    line 145, this is your research line?

4       A.      Can you power up my screen,

5    please?

6       Q.      Oh, I'm sorry, yes.  Can we

7    have that?  Thank you.

8       A.      Thank you.

9       Q.      If we're looking at the

10   research line, which is 145, I'm going to

11   highlight it in green.  It's -- that makes it

12   difficult to read.  Sorry.  Let's change it

13   to a different color.

14               It's -- your source for your

15   $1.1 billion research budget is the NIH 2018

16   HEAL Initiative budget.  What is that?

17      A.      It's a -- I'm sorry, can you

18   please ask the question again.

19      Q.      Sure.  What is NIH 2018 HEAL

20   Initiative budget?

21      A.      Well, I provide a source that

22   describes in further detail the HEAL

23   Initiative.

24      Q.      Okay.

25      A.      This is a broad-reaching, you

```
 1   know, multi-institute initiative of the

 2   National Institutes of Health to reduce

 3   morbidity and mortality from the opioid

 4   epidemic and to improve pain care through

 5   scholarship and discovery, through scientific

 6   investigation.

 7        Q.    Are you aware from the source

 8   that you cite there that the $1.1 billion of

 9   funding for the HEAL program already exists

10   through congressional funding?

11             MS. RITTER:  Objection,

12        foundation.

13             THE WITNESS:  Can you ask that

14        question again, please?

15             MR. SNAPP:  Sure.

16   BY MR. SNAPP:

17        Q.    Have you -- in the source...

18             (Whereupon, Deposition Exhibit

19        Alexander-10, Press Release, NIH

20        launches HEAL Initiative, was marked

21        for identification.)

22   BY MR. SNAPP:

23        Q.    Sir, I'm handing you what's

24   been marked as Exhibit 10 to your deposition.

25   Thank you.  And this is a press release from
```

Highly Confidential - Subject to Further Confidentiality Review

1    April 4th, 2018 talking about -- the title is

2    NIH launches HEAL Initiative, doubles funding

3    to accelerate scientific solutions to stem

4    national opioid epidemic.

5              Do you see that?

6         A.    Uh-huh.

7         Q.    You have to answer verbally.

8    Sorry.

9         A.    Yes.  Yes.  I'm sorry.

10        Q.    Thank you.

11             And in the first paragraph

12   below the picture, there's a sentence that

13   says:  NIH is nearly doubling funding for

14   research on opioid misuse/addiction and pain

15   from approximately 600 million in fiscal year

16   2016 to 1.1 billion in fiscal year 2018, made

17   possible from a funding boost by Congress.

18             Do you see that?

19        A.    Yes, sir.

20        Q.    So do you have an understanding

21   that the $1.1 billion that you included as

22   part of your abatement remedy for the NIH

23   2018 HEAL Initiative is actually already

24   fully funded by Congress?

25        A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And are you going to be giving

2    any testimony if you testify at trial with

3    respect to whether the defendants should pay

4    for that $1.1 billion in funding?

5    A.    Well, I -- once again, I don't

6    know whether I would be testifying in trial,

7    and if so, I would speak to anything that I

8    was asked to speak to.

9    Q.    Were you suggesting, sir, by

10   including that number in your analysis, that

11   the defendants should pay for the entirety of

12   this program that's already federally funded?

13   A.    I -- my goal was to identify

14   remedies and then to try to provide national

15   estimates for what I thought these would

16   cost.

17            And in some cases, considerable

18   investments may already be being made by any

19   number of parties in some of these

20   categories, and so I wasn't asked nor did I

21   attempt to identify either how responsibility

22   should be shared across parties or how monies

23   should be -- how claims should be made

24   against various parties as a function of how

25   much has already been invested.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So I don't know if that answers
 2    the question, but I really didn't consider
 3    the amount already being invested as I made
 4    estimates of what I thought investments would
 5    ultimately take.
 6         Q.    So it's fair to say that you
 7    don't think -- you don't have an opinion one
 8    way or another whether the defendants should
 9    pay for a program that's already been
10    federally funded; is that fair?
11         A.    No.
12         Q.    That's not fair?
13         A.    No.  I mean, I have not thought
14    a lot about it, but I don't have a
15    formulated -- at this point, I would want to
16    think more about it.  It's a complex
17    question, and I would want to think more
18    about it.  It's not something that I was
19    asked to prepare for in this report.
20         Q.    Fair enough.  And you don't
21    have an opinion on that issue today, correct?
22         A.    Correct.
23         Q.    Thank you.
24              So I assume, sir, that the same
25    analysis that you just went through in your
```

1    answer to me would apply with respect to the

2    existence of Ohio's prescription drug

3    monitoring program, correct?

4         A.    When you say the same analysis,

5    can you ask the question again?

6         Q.    Sure, I'm sorry.  I was just

7    trying to shortcut things.

8         A.    Of course.

9         Q.    Trying to get you out of here.

10         A.    Well, I'm not complaining about

11    that, but...

12         Q.    So my point is simply that you

13    have not taken into account the costs that

14    the state of Ohio has already incurred in

15    establishing its PDMP or prescription drug

16    monitoring program, as part of your model; is

17    that correct?

18         A.    Correct.  Correct.  My -- in no

19    case did I look at how much is actually being

20    expended and use that to decide how much I

21    thought future abatement costs would be.

22         Q.    Fair enough.

23               And in terms of the PDMP that

24    exists in Ohio, is it your understanding that

25    that's a state program or a county program?

 1          A.      I don't know the details of how

 2     it's funded.  But I believe -- so if you were

 3     asking about funding, I don't know the

 4     details, but my understanding is that OARRS

 5     is a statewide program.

 6          Q.      And do you know if it's even

 7     possible to have a county-level PDMP in Ohio?

 8          A.      Well, as I discuss in my

 9     report, PDMPs are state-level programs.  But

10     I think surveillance is very important, and

11     that's why I discussed that in my report.

12     That is, surveillance at a local level.

13          Q.      Now, there are certain programs

14     in your model that you assume will serve a

15     constant population over time, correct?

16          A.      Yes, sir.

17          Q.      And if we wanted to understand

18     what those are, we could look at your redress

19     model spreadsheet, and we'd look at the trend

20     ratios tab, correct?

21          A.      Yes, sir.

22          Q.      And this is the one that's

23     called All Redress Models 17 April 19,

24     Version 14.  And I can mark that as an

25     exhibit so you can look at it and we'll have

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it in the record.  I'm going to mark it as

 2    Deposition Exhibit 11.

 3                   (Whereupon, Deposition Exhibit

 4           Alexander-11, Spreadsheet, Redress

 5           Models, was marked for

 6           identification.)

 7                   MR. SNAPP:  Here's a copy for

 8           Ms. Ritter.

 9                   THE WITNESS:  Thank you.

10    BY MR. SNAPP:

11         Q.    If you turn to the second page

12    of the exhibit, or you can look on the

13    screen -- it's the same information either

14    way -- the population stayed constant for

15    item 3, the mass media campaign, correct?

16         A.    Yes, sir.

17         Q.    And for the academic detailing?

18         A.    Yes, sir.

19         Q.    And for drug disposal programs?

20         A.    Yes, sir.

21         Q.    And surveillance?

22         A.    Yes.

23         Q.    And PDMPs?

24         A.    Yes.

25         Q.    And research?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And law enforcement

3    inventions -- interventions, correct?

4    A.    Yes.

5    Q.    So why did you assume in your

6    model a constant population for each of these

7    abatement categories?

8    A.    Well, you know, this model

9    provides a framework, and my preliminary best

10   estimates, and for some categories I felt

11   that it was important to modify the costs

12   over time based on how the -- based on our

13   best estimations of how the epidemic will

14   unfold.  In some cases costs may go up and

15   some down.

16         In other cases I felt that in

17   order to best remedy the epidemic, a constant

18   investment should be made over time.

19   Q.    But if abatement efforts are

20   successful, shouldn't the need for these

21   programs reduce over time, these ones that

22   are listed as constant here?

23   A.    Well, I mean, we could look at

24   the tabs where we estimate the effects of

25   different abatement interventions, and while

Highly Confidential - Subject to Further Confidentiality Review

1   overdose deaths with multiple combined

2   interventions could decrease by as much as

3   39.5% we estimate in the models, we're still

4   talking about tens of thousands of

5   individuals dying because of the epidemic,

6   even ten years out.

7              And so the -- so the answer to

8   your question is that even with aggressive

9   intervention, while we believe that these --

10  while I believe that these programs are

11  evidence based and should be implemented, and

12  that's my expertise, nevertheless, for some

13  of these abatement categories, I think

14  constant continuous investment should be

15  made.

16       Q.    Including mass media, academic

17  detailing, drug disposal programs,

18  surveillance, PDMPs, research and law

19  enforcement initiatives?

20       A.    Yes, sir.

21       Q.    For any of these categories,

22  did you do anything -- I'm sorry, let me back

23  up.

24              For your calculations with

25  respect to any of these categories and the

1    national abatement costs within any of these

2    categories, did you calculate a confidence

3    interval for your estimates?

4         A.    We -- are you asking about a

5    specific one of these or for any of them?

6         Q.    Any of them.

7         A.    Okay.  In developing these

8    estimates, I examined a number of different

9    assumptions around -- assumptions regarding

10   the components of a given category.

11             So, for example, if we consider

12   the effects of -- if we consider the costs of

13   care required for pregnant women and

14   neonates, so these are women that have opioid

15   use disorder or children born, for example,

16   with opioid use disorder, I examined how the

17   estimates that I provided would vary based on

18   differences in the inputs.

19             So essentially, I did examine

20   how sensitive the final dollar amount was to

21   the assumptions we were making.

22        Q.    That's not a true confidence

23   interval, is it?

24        A.    No, it is not.

25        Q.    And so you did not calculate a

Highly Confidential - Subject to Further Confidentiality Review

1    confidence interval around your calculations,
2    your abatement cost calculations; is that
3    correct?
4        A.    I did not.
5        Q.    Now, with respect to these
6    abatement cost interventions that are listed
7    on the sheet that we have on the screen, you
8    would certainly expect the need for a mass
9    media campaign to go down over time, right?
10       A.    I am not sure about that.
11       Q.    Why not?
12       A.    Because as I outline in my
13   report, there are profound misconceptions
14   that have allowed for the epidemic to
15   flourish, and substantial gaps in quality of
16   care for those in pain as well as gaps in
17   care with respect to the use of opioids.
18            So I think this is an epidemic
19   that's been -- depending upon when you define
20   the start, that's been, you know, decades in
21   the making, and I believe that constant
22   investment in a media campaign over the next
23   decade is a reasonable approach.
24       Q.    Just focusing on this mass
25   media campaign for a moment -- well, strike

1    that.

2              There's a paragraph in your

3    report that I want to ask you about.  I just

4    didn't understand it, so paragraph 181,

5    Deposition Exhibit 1.  Second sentence says:

6    In addition, some (e.g., "Medication Assisted

7    Treatment"), but not all, of my estimates

8    exclude costs arising from individuals with

9    heroin use disorders without prior

10   prescription opioid use.

11             Can you explain what you mean

12   by that?

13        A.    One of the improvements that I

14   believe is reflected in our model that has

15   not been reflected in prior Markov models of

16   the opioid epidemic is that we separately

17   account for a population, the minority of

18   individuals that have heroin use that have

19   not had prior prescription opioid use

20   preceding the heroin use.

21             And in our estimates of the

22   costs of treatment that we reviewed in

23   Scenarios B, C and D, we exclude the costs of

24   treatment for individuals using heroin whose

25   heroin use did not start with prescription

1    opioids.  In other words, we provide

2    conservative estimates that exclude the

3    population of users of heroin that didn't

4    start with prescription opioids.

5         Q.     Did you do anything to exclude

6    heroin users who started with nonmedical use

7    of opioids?

8         A.     I would have to review the

9    source documentation for the specific

10   questions that we used from the data sources

11   that we used, such as NSDUH, in order to

12   understand -- in order to be able to answer

13   that question accurately.

14        Q.     Because when we started out

15   today looking at one of your -- we were

16   actually looking at this cover sheet --

17   actually, I'm sorry, wrong model.  We were

18   looking at the concept sheet of your

19   MAT Model 2.0 version 51.  We talked about

20   the fact that you can't go from the general

21   population to nonmedical use of opioids.

22              But did you exclude from your

23   model heroin users who went directly from the

24   general population to the nonmedical use of

25   opioids without the interim step of a medical

1   use of opioids?

2           MS. RITTER:  Objection, form,

3       foundation.

4           THE WITNESS:  Can you ask that

5       again, please?

6           MR. SNAPP:  Not easily, but I

7       will try.

8   BY MR. SNAPP:

9       Q.    Does your model exclude heroin

10  users who had previous nonmedical use of

11  opioids but did not previously have medical

12  use of opioids?

13      A.    I don't think that we

14  differentiate.  I don't believe so.

15      Q.    So I want to go back to a

16  different sheet here, which has been -- I

17  want to go back to the --

18          MR. SNAPP:  Well, let's just --

19      we can take the screen off, please.

20  BY MR. SNAPP:

21      Q.    I want to go back to what's

22  been marked as Deposition Exhibit 3, okay?

23      A.    Yes, sir.

24      Q.    That's the amendment that we

25  received on April 17.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes, sir.

2      Q.     Here you decreased -- I want to

3  focus specifically on criminal justice

4  interventions on the first page.  You

5  decreased your drug court population

6  parameter from 250,000 to 120,000; is that

7  correct?

8      A.     Yes, sir.

9      Q.     Was that just based on a change

10  in the data that you were relying on?

11      A.     It was -- as with all of these

12  changes, they were based on my review of the

13  information and belief that, you know, this

14  was an area where I felt that there were --

15  there was a more conservative assumption that

16  could be made.

17      Q.     Okay.

18      A.     And thus, I implemented that.

19      Q.     And it looks like you cited --

20  I'm putting on the screen right now -- if we

21  can put the screen on, please -- the White

22  House report as a source for that 120,000.

23  That was the -- what you referred to as the

24  Christie Commission report; is that correct?

25      A.     No, sir.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     What is this one then?  I'm

2   sorry.

3      A.     I believe this was a separate

4   source document from the Christie Commission

5   report.

6      Q.     Oh, I see.  You're right.  This

7   is a fact sheet from ONDCP, correct.  Okay.

8              And do you have an

9   understanding of the drug court population,

10  that includes people who are there because of

11  use of all different kinds of drugs, right?

12     A.     Yes, sir.

13     Q.     Not just opioids?

14     A.     No, sir.

15     Q.     So it could include people who

16  were there because of their use of cocaine?

17     A.     Yes, sir, I believe so.

18     Q.     Methamphetamine?

19     A.     Yes, sir.

20     Q.     Alcohol?

21     A.     Yes, sir.

22     Q.     And yet you used the total drug

23  court population in your model, correct?

24     A.     I -- I would have to go back

25  and review the source documentation in order

1    to, you know, provide more information on

2    this estimate.

3         Q.    You didn't do that before

4    today?

5         A.    I -- I'm sorry, can you ask the

6    question again, please?

7         Q.    Did you go back and look at

8    your sources to make sure that these were

9    accurate and to make sure that you understood

10   them before coming in to testify today?

11        A.    Well, I did review a lot of

12   information in preparation for today, but I

13   did not review every reference within my

14   report and within each of these source

15   documents.

16        Q.    Would you agree that if you

17   included in your numbers the entire drug

18   court population, including those who were in

19   drug court because of their use of cocaine,

20   methamphetamine, alcohol, any number of other

21   drugs, you would be overinclusive in your

22   numbers, correct?

23             Would you agree with that?

24        A.    Well, you know, the needs for

25   drug court could be -- I would have to review

1    the documents, but, you know, I think that

2    some of the information that I included in my

3    report suggests that there are enormous

4    opportunities for expanding drug courts and

5    processing many more people that ultimately

6    are tried and processed and convicted through

7    the nondrug court system into the drug court

8    system.

9              So, you know, my point is this,

10   that this -- that I provided this as an

11   addition -- as an initial framework to

12   develop preliminary estimates and that my

13   hope is that it can be used by the courts

14   to -- you know, to -- as a starting point for

15   this process.

16        Q.    But if this 120,000 drug court

17   population includes nonopioid users, you

18   would agree that as an abatement remedy for

19   the opioid crisis or epidemic, that number

20   would be overinclusive, right?

21        A.    It would be helpful for me to

22   see the source in order to review it

23   carefully, in order to understand the degree

24   to which -- in order to understand the

25   population that this is referring to.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     I understand that, but I'm just

2     asking:  If that were the case, you would

3     agree that your model is overestimating the

4     costs of abatement for the opioid crisis,

5     correct?

6               MS. RITTER:  Objection, asked

7          and answered.

8          A.     Yes.  Yes, if this was -- if

9     the 120,000 figure was the figure for the

10    total number of individuals that -- that

11    because of this document could be served by

12    drug courts and it includes a lot of

13    nonopioid-related crimes, then I would agree

14    that that may represent an overestimate.

15               (Whereupon, Deposition Exhibit

16          Alexander-12, 2011 Huddleston et al

17          NDIC Publication, was marked for

18          identification.)

19    BY MR. SNAPP:

20         Q.     Sir, I'm handing you what's

21    been marked as Exhibit 12.  This is one of

22    the sources that you cited in your report.

23               Do you recognize this document?

24         A.     I believe so.

25         Q.     Okay.  So I just want to direct

Highly Confidential - Subject to Further Confidentiality Review

1    your attention to page 31 of this document.

2    If you look at the right-hand side there,

3    there's some numbers.  It says:  Cocaine or

4    crack, 27%; alcohol, 27%; cannabis, 22%; and

5    methamphetamine, 16% were reported to be the

6    primary substances of abuse among

7    participants in urban drug courts.

8              Did I read that correctly, sir?

9         A.    I'm sorry, where were you

10    reading?  I was looking at other information.

11         Q.    The right-hand column, very

12    top.

13         A.    Okay.  Yes, sir.

14         Q.    Cocaine/crack, 27%; alcohol,

15    27%; cannabis, 22%; and methamphetamines, 16%

16    were reported to be primary substances of

17    abuse among participants in urban drug

18    courts.

19              Did I read that correctly, sir?

20         A.    Yes, sir.

21         Q.    Then next it talks about

22    suburban drug courts, and it says:  Alcohol,

23    33%; cannabis, 20%; cocaine/crack, 18%; and

24    methamphetamine, 18% were reported to be the

25    primary substances of abuse among

Highly Confidential - Subject to Further Confidentiality Review

1    participants in suburban drug courts.

2            Do you see that?

3        A.    Tell me again where that is,

4    I'm sorry.

5        Q.    I'm sorry, sir.  Right here in

6    the middle.

7        A.    Yes, sir.  Yes, sir.

8        Q.    And right below that is the

9    first time there's a mention of any opioid,

10   and it says:  Methamphetamine, 30%; alcohol,

11   30%; cannabis, 14%; and heroin, 12% were

12   reported to be the primary substances of

13   abuse among participants in rural drug

14   courts; is that correct?

15       A.    Yes, sir.

16       Q.    And do you dispute those

17   numbers?

18       A.    I don't, but, I mean, I have --

19   you know, there's a lot of information that I

20   would want to carefully consider in

21   evaluating how informative that is in

22   effecting the estimates that I've provided.

23            For example, I don't know if

24   this was done in 2008, but I see at the

25   bottom of page 31 a note about 2008.  This

Highly Confidential - Subject to Further Confidentiality Review

1    also -- the sampling method makes a big

2    difference in terms of the ways that

3    individuals were sampled.  And lastly, this

4    may be examining current participants rather

5    than the opportunities for future use.  And

6    my abatement plan is forward-looking.  It's

7    not looking back.  It's looking forward.

8              So I don't -- so while this

9    information is helpful, it would only be one

10   of many pieces of information that I would

11   rely on to derive an estimate regarding the

12   number of people that would be appropriate

13   for drug court.

14        Q.    Well, wouldn't it be more

15   reliable if your model looked at just those

16   in drug courts, the drug court population

17   that was there because of prescription opioid

18   use?

19              MS. RITTER:  Objection, form.

20              THE WITNESS:  Can you ask that

21        again, please?

22   BY MR. SNAPP:

23        Q.    Sure.

24              I'm just trying to understand

25   if your model would be more reliable if it

Highly Confidential - Subject to Further Confidentiality Review

1  included, rather than the entire drug court

2  population that includes all these other

3  drugs, it only included those who were there

4  for prescription opioid use.

5           MS. RITTER:  Objection, form,

6      foundation.  That's not what he said.

7           MR. SNAPP:  Let's broaden it.

8  BY MR. SNAPP:

9      Q.    Let me just broaden it.

10          Wouldn't your model be more

11 reliable, sir, if it focused only on the drug

12 court population that was in drug court

13 because of opioid use?

14          MS. RITTER:  Objection, form.

15     A.    My goal is in identifying

16 national needs, and specifically with respect

17 to drug courts, I think that these should be

18 forward looking and based not just on the

19 number of current utilizers that have

20 opioid-related encounters with the criminal

21 justice system, but also the number that --

22 the unmet need and the unfulfilled need.

23          So I think that's very

24 important, and I do note here this -- on

25 page 27, it appears to me that these data

Highly Confidential - Subject to Further Confidentiality Review

1    were derived from 2008, and, of course,

2    there's been enormous changes since 2008 in

3    terms of morbidity and mortality from the

4    epidemic.

5             But --

6             MR. SNAPP:  Can we get the

7        screen again, please.

8    BY MR. SNAPP:

9        Q.    So is it your testimony, sir,

10   that this number, this 120,000 drug court

11   population, is exclusively people who are in

12   drug court because they used opioids?

13       A.    No, it is not.

14       Q.    And your model would be more

15   reliable in addressing the opioid issues that

16   arise from the opioid epidemic if it were

17   focused solely on a drug court population of

18   opioid users, correct?

19            MS. RITTER:  Objection to form,

20        foundation.

21            THE WITNESS:  Can you ask that

22        again, please?

23            MR. SNAPP:  Certainly.

24   BY MR. SNAPP:

25       Q.    Your model, in terms of its

Highly Confidential - Subject to Further Confidentiality Review

1    criminal justice intervention abatement cost

2    calculations, would be more reliable if the

3    drug court population that you were focused

4    on was only the drug court population that

5    was in drug court because of the use of

6    opioids?

7               MS. RITTER:  Same objection,

8          form, foundation.

9          A.     Yeah.  What I would say is that

10   the population that I think abatement

11   estimates should be built on for this

12   category is the population that are either

13   currently in drug courts because of

14   opioid-related crimes or encounters with the

15   criminal justice system, or the population

16   where there's unmet need and where drug court

17   should be expanded.

18               And it may be that that latter

19   group is an enormous population.  I think

20   that I would want to look at this and other

21   documentation in order to be able to provide

22   the courts with additional information about

23   that.

24   BY MR. SNAPP:

25        Q.     Understood.

Highly Confidential - Subject to Further Confidentiality Review

1        Just so we're clear, though,

2    you have not attempted to segregate out the

3    drug court population that's in drug court

4    because of the use of opioids, correct?

5        MS. RITTER:  Objection, form,

6        foundation.

7    A.    It would be helpful for me to

8    see the source documentation associated with

9    this estimate of 120,000 in order to be able

10    to answer that question.

11    BY MR. SNAPP:

12    Q.    So you don't know if you have

13    or not?

14    A.    In order to be able to be -- to

15    answer that question as precisely as

16    possible, it would be helpful to see the

17    source documentation.

18    Q.    So is the answer to my

19    question, yes, you don't know?

20        MS. RITTER:  Objection, asked

21        and answered.

22        MR. ARNOLD:  He said if you

23        would provide the source document --

24        MR. ALEXANDER:  You can't have

25        two people objecting at once.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. RITTER:  He's asking -- he
 2        wasn't objecting.  He was asking a
 3        question.  He's just asking a
 4        question.
 5              MR. SNAPP:  He has two -- three
 6        lawyers sitting to his left who can
 7        provide him the source document, or he
 8        has nine different team members back
 9        at the shop who can provide him the
10        source document.  I don't have it.
11              MS. RITTER:  Well, I didn't
12        think that I should be handing him
13        documents during your questioning.  If
14        you're suggesting I should, I could
15        think about that.  But all -- I don't
16        even remember what the question is
17        because I feel like it had been asked
18        like three times.
19              But go ahead if you want to --
20        maybe the court -- I don't even know
21        where we were.  Do you want him to ask
22        the question again?
23              MR. SNAPP:  No.
24              MS. RITTER:  We're finished
25        with that question?  Okay.
```

1    BY MR. SNAPP:

2         Q.     So, sir, I understand you want

3    to look at the source document for your

4    120,000 number, correct?

5         A.     It would be helpful for me to

6    see that if -- if we were to discuss that

7    value in more detail, yes.

8              MR. SNAPP:  All right.  Let's

9         take a break.

10             THE VIDEOGRAPHER:  Going off

11        the record, 2:34.

12             (Recess taken, 2:34 p.m. to

13        2:55 p.m.)

14             THE VIDEOGRAPHER:  We're back

15        on the record at 2:55 p.m.

16             (Whereupon, Deposition Exhibit

17        Alexander-13, Office of National Drug

18        Control Policy Webpage, was marked for

19        identification.)

20   BY MR. SNAPP:

21        Q.     Dr. Alexander, I'm handing you

22   what we've identified as the source for your

23   120,000 drug court population number in your

24   model.  Just let me know when you've had a

25   chance to look at it.

1          MR. SNAPP:  Oh, I'm sorry, I

2     didn't give you a copy.  I'm sorry.

3          Just for the record, I've

4     marked it as Exhibit 13.

5          (Document review.)

6     A.     Thank you.

7  BY MR. SNAPP:

8     Q.     Now, does this document, sir,

9  clarify for you what's included in the

10  120,000 that you used as the drug court

11  population?

12     A.     It does.

13     Q.     And what is it?  What is that

14  number?

15     A.     Well, the -- both the

16  Exhibit 12 and Exhibit 13 are remarkably

17  consistent in identifying that about half of

18  counties in the United States don't have a

19  drug court.

20     Q.     Okay.

21     A.     And I also note in Exhibit 12

22  that the data are from 2008, and so I do see

23  the estimate of 120,000 Americans annually

24  that --

25     Q.     In drug courts, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Correct.  Correct.

 2            Q.      So that's not -- I'm sorry.  Go

 3    ahead.  I don't mean to talk over you, sir.

 4            A.      So I think that would

 5    represent -- if we think that that represents

 6    half of the counties, that's the current

 7    volume of participants in drug courts in half

 8    of the counties in the United States.

 9                    So even without assuming

10    something about unmet need, of which I think

11    in many communities there's large amounts of

12    unmet need, it would suggest that if there

13    were drug courts in the entire United States,

14    assuming that these 50% where the drug courts

15    are currently present are representative of

16    the counties where they're not, that the drug

17    court population could be currently as high

18    as 240 without any scaling of that 240,000.

19            Q.      Assuming that's correct, only

20    some subset of that population, even your

21    assumed population --

22            A.      Yeah.

23            Q.      -- would actually be in drug

24    court due to opioid use, correct?

25            A.      That's correct.
```

1      Q.     And so you have done no

2   calculations to determine what percentage of

3   your 120,000 drug court population is

4   actually in drug court as a result of using

5   opioids; is that correct?

6            MS. RITTER:  Objection, form.

7      A.     Well, if we use the numbers

8   from this report and we assume that if there

9   are 120,000 in drug courts in half of the

10  counties because half of the counties don't

11  have them, and so we double that to assume

12  that if every county had them and they were

13  operating at the same capacity, we'd have

14  about 240,000, then our estimate of 120 would

15  represent that -- an assumption that about

16  half of current -- current drug court

17  participants are utilizing the drug courts

18  because of opioid-related offenses.

19  BY MR. SNAPP:

20     Q.     But that's not what you did in

21  your model, right?

22     A.     Well, we have in our model an

23  estimate, and the estimate was derived from

24  this source documentation.

25     Q.     But you have no -- no source

Highly Confidential - Subject to Further Confidentiality Review

1    for an estimate that half of the participants

2    in drug court are there because of the use of

3    opioids.

4         A.    I don't have a precise source

5    to provide you to support that assumption.

6         Q.    You don't have any source to

7    support that assumption, do you?

8         A.    Well, as I noted before, there

9    were four categories of -- there were four

10   sources, ultimately, of information, at

11   least, that I used to derive the estimates

12   that I've provided, these preliminary

13   estimates and this framework, and so -- but I

14   can't identify specific -- you know, there

15   are no further written sources that I

16   provided of peer-reviewed publications or

17   other publications.

18        Q.    Those four sources were

19   judgment, your experience, your review of

20   scientific literature, and the experience of

21   your team members, correct?

22        A.    Yes.

23        Q.    And you can't point to any one

24   of those that tell me that -- what percentage

25   of this 120,000 drug court population can be

Highly Confidential - Subject to Further Confidentiality Review

```
 1    attributed to those in drug court because of

 2    opioids?

 3         A.     The 120,000 is our -- the

 4    120,000 is my estimation of the population

 5    that could be served because of

 6    opioid-related crimes in a national abatement

 7    model.

 8         Q.     With drug courts in every

 9    county in the United States, correct?

10         A.     Well, I mean...

11         Q.     Maybe I'm misunderstanding your

12    testimony.  Is that what you testified to a

13    few minutes ago?

14         A.     The estimates that I provide

15    for -- the 120,000 is my best current

16    estimate of the number of individuals that

17    could be served for -- through drug courts

18    for opioid-related morbidity in the United

19    States.

20         Q.     Existing drug courts or drug

21    courts in every county?

22              MS. RITTER:  Objection, form.

23         A.     I don't address that in my --

24    you know, in my report.

25              ///
```

1    BY MR. SNAPP:

2         Q.    I'm just trying to understand

3    where we are here on this drug court

4    population issue.

5         A.    Sure.  Sure.  I mean, I think

6    that looking at historic data is of value and

7    important, but there's also a large unmet

8    need, as I discuss in my report.

9         Q.    But the source that you cited

10   for 120,000 is the one that you have in front

11   of you as Exhibit 13, and it identifies

12   120,000 Americans who actually received the

13   help they need through drug court, right?

14        A.    In half of the county -- with

15   half of the counties being served.

16        Q.    Okay.  But you didn't say

17   anything in your report about providing an

18   abatement plan that covers all of the

19   counties in the U.S., right?  You just used

20   the 120,000, which is the current population

21   of drug courts?

22        A.    But the -- I guess my point is

23   this, that the 120,000 was based on this

24   estimate and knowledge that they were

25   operative in half of the counties in the

1    United States.

2         Q.    Okay.  Sir, is it fair to say

3    that your model does not include abatement

4    estimates -- estimates of abatement costs for

5    trying to stop the supply of the illegal and

6    illicit opioids coming into the country?

7         A.    No.

8         Q.    It does not include those,

9    correct?

10        A.    No, I do not believe that it's

11   fair to state that.

12        Q.    How does your model include

13   abatement costs for trying to stop the supply

14   of illegal and illicit opioids coming into

15   the country?

16        A.    One of the abatement categories

17   that I call for and suggest for the courts to

18   carefully consider is expansion of law

19   enforcement, and that law enforcement

20   capacity-building will including addressing

21   the areas that you identify.

22        Q.    Well...

23             MR. SNAPP:  Could we turn on my

24        screen, please?

25             ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. SNAPP:

2        Q.      If we look at the law

3    enforcement categories, the law enforcement

4    parameters that you've included, which we

5    have on the screen right now, and these are

6    part of Exhibit 8, if you look at the law

7    enforcement parameters, none of these address

8    national efforts to prevent supply of illegal

9    or illicit opioids coming into the country,

10   do they?

11       A.      Well, in my report, I discuss

12   the role of the DEA, but I -- that is not the

13   focus of my report.  Within the law

14   enforcement category, I do discuss

15   specialized overdose units.

16              So whether or not you frame

17   that as addressing a national effort, one of

18   the roles of these overdose units is to track

19   down and disrupt supply chain of illicit

20   opioids.

21       Q.      But your entire law enforcement

22   category is focused on police and sheriffs'

23   departments in the U.S., not on federal

24   efforts to stop the flow of drugs across the

25   borders, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      No, that's not correct.

2          Q.      Where in your law enforcement

3    parameters that are on the screen right now

4    do you include any cost for federal funding?

5          A.      I'm sorry, I should have asked

6    for you to please ask the sentence again, but

7    it felt like you were asking two separate

8    questions, because I believe you began by

9    stating that our entire -- that my entire law

10   enforcement category is focused on police and

11   sheriffs, and that's what I was noting was

12   incorrect.

13         Q.      Which of the categories on the

14   screen right now in lines 146 through 165

15   have anything to do with other than a local

16   police or sheriff department?

17         A.      So I'm sorry, I'm thinking of

18   the -- my report and what I include in my

19   discussion of law enforcement, which

20   includes, very importantly, ramping up

21   treatment within the criminal justice system.

22              So the entire criminal justice

23   system, including jails and prisons and

24   detention facilities, is an important

25   component of the law enforcement abatement

Highly Confidential - Subject to Further Confidentiality Review

1    remedy that I propose, though not included in

2    this line item budget.

3         Q.    And again, those costs with

4    respect to incarceration-related costs don't

5    actually address the issue of trying to stop

6    the supply of illegal or illicit opioids

7    coming across the border into this country,

8    do they?

9         A.    That's true, they do not.

10        Q.    Sir, I want to shift gears a

11   little bit and talk about the inflation rate

12   that you used, and I'm going to pull that up

13   in a different one of your documents.  It's

14   the All Redress Models 17 April 19, Version

15   14 spreadsheet that's on the screen now.

16             And we're on the cover sheet

17   where you include the inflation rate that you

18   applied to all aspects of your model,

19   correct?

20        A.    Yes, sir.

21        Q.    And you -- it's Exhibit 11, for

22   the record.

23             And you used a five-year

24   average of 3.24%, correct?

25        A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I noticed you have your phone

2    there.  Can you just tell me:  If you do an

3    average of any five of the numbers on the

4    screen right now, does it actually come out

5    to 3.24%?

6            MS. RITTER:  You mean me?  Oh,

7        him.

8    BY MR. SNAPP:

9    Q.    Yeah.  You can use the

10   calculator on your phone if you want to do

11   the addition -- do the calculations.

12   A.    I would have -- I mean, if you

13   know the answer, then I'm happy to hear from

14   you whether or not that's the case.

15   Q.    Okay.  Well, it doesn't.

16   A.    Okay.

17   Q.    It doesn't equal 3.24%.

18           So if you actually look at

19   years 2013 through 2017, the average is 2.7%.

20   This is just the simple math of using the

21   numbers on your screen here.

22   A.    Okay.

23   Q.    Which we've tied back to the

24   source that you cite there.

25           And if you include 2014 to

1    2018, which is five years, the average is

2    2.8%.

3         A.    Okay.

4         Q.    Do you have any reason to

5    dispute the math that we did?

6         A.    No, I do not.

7         Q.    Okay.  Do you know how you came

8    up with a 3.24% five-year average?

9         A.    I do not.

10        Q.    And so is it fair to say

11   that -- you can see I just clicked on that,

12   and there's no calculation there, there's no

13   formula up in the formula bar.  It's just an

14   entered number, 3.24.

15        A.    Uh-huh.

16        Q.    And so is it fair to say that

17   if the inflation rate you used was actually

18   2.8 or 2.7% instead of 3.24%, your total

19   abatement cost estimates would be much lower?

20        A.    I believe they could be.  And,

21   you know, this was -- I don't -- I can't tell

22   you with confidence the basis for what sounds

23   like, you know, a discrepancy between the

24   average that's provided and the values that

25   are there.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I would want to go back and
 2    look at that carefully and consult with some
 3    of the individuals who worked with me to
 4    derive these estimates.  It may have been
 5    that I previously had relied on another
 6    source to derive the estimates of inflation.
 7    We also previously had considered a discount
 8    rate.
 9              So there were a number of
10    different approaches that were taken, and my
11    guess is that in that process, this -- this
12    discrepancy occurred.
13         Q.    But if you used a 2.7 or 2.8%
14    inflation rate, your results would be
15    dramatically different than they are,
16    correct?
17         A.    I would want to look at that.
18    I mean, that's a very straightforward
19    calculation to examine the impact of.
20         Q.    And you'd agree that the fact
21    that the inflation rate that you used is not
22    supported by the data that you cite calls
23    into question the reliability of the
24    calculations that you derived from that
25    calculation, correct?
```

1          MS. RITTER:  Objection, form.

2          THE WITNESS:  Can you ask that

3      again, please?

4          MR. SNAPP:  Sure.

5  BY MR. SNAPP:

6      Q.     You'd agree with the fact that

7  you used an interest rate -- I'm sorry, an

8  inflation rate that is significantly

9  different than the actual data that you used

10 to underlie it calls into question the

11 reliability of your entire model?

12     A.     I mean, I believe that the

13 model represents my current best estimates

14 regarding the costs of abating the epidemic,

15 and these costs are informed by -- you know,

16 by the estimates that we make about how the

17 epidemic will evolve over time.

18          So I would want to go back, and

19 as I said, I would want to look again and

20 look at this carefully and try to understand

21 the basis for why this is present.

22     Q.     Do you have an understanding of

23 the basis for using the medical care CPI as

24 opposed to some other Bureau of Labor

25 statistic CPI?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      No, I do not.

 2          Q.      Sir, do you know the components

 3     of the medical care CPI?  Are you familiar

 4     with those?

 5          A.      No, I do not.

 6          Q.      Did you look at that as part of

 7     your work in this case to decide whether it

 8     was appropriate and valid to use the medical

 9     care CPI as the basis of your inflation rate

10     calculations?

11          A.      I believe there were

12     discussions between multiple parties

13     regarding the most appropriate discount rate

14     or inflation rate or -- to use, and

15     ultimately, this was the rate that we decided

16     to use, and I believe there may have been

17     some consultation with other parties about

18     this.

19          Q.      Well, what other -- are these

20     parties within your group that you identified

21     before, the nine people that helped you

22     work -- put together your report, or were

23     there other parties outside?

24          A.      No, there were no other parties

25     beyond those that I've identified and

Highly Confidential - Subject to Further Confidentiality Review

1    counsel.

2              (Whereupon, Deposition Exhibit

3         Alexander-14, Consumer Price Index

4         Webpage, was marked for

5         identification.)

6    BY MR. SNAPP:

7         Q.    So I'm going to hand you what's

8    a printout from the Bureau of Labor

9    Statistics website related to measuring price

10   change in a CPI, medical care.

11              I just want to point out, on

12   the second page of this document, there's a

13   table that lists the components of the

14   medical care CPI.

15              Do you see that?

16        A.    Table A?

17        Q.    Yes, sir.

18              Do you see that?

19        A.    Yes, I do.

20        Q.    And you'll see partway down the

21   page that the medical care CPI includes

22   dental services?

23              You see that on the left-hand

24   column, B.1.b., dental services is included

25   in the medical care CPI?

1      A.      Yes, I see that.

2      Q.      And immediately underneath that

3   is eyeglasses and eye care; is that correct?

4      A.      Yes.

5      Q.      And the last two components of

6   the medical care CPI are nursing home and

7   adult daycare services and care of invalids,

8   elderly and convalescents in the home,

9   correct?

10      A.      I'm sorry, where are you

11   pointing?

12      Q.      The same table.

13      A.      Yeah.

14      Q.      The last two, nursing home and

15   adult daycare services --

16      A.      Yeah.

17      Q.      -- which includes things such

18   as adult daycare?

19      A.      Yeah.

20      Q.      And then on the bottom, care of

21   invalids, elderly and convalescents in the

22   home, and that includes things such as food

23   preparation, bathing, light housecleaning; is

24   that correct, sir?

25      A.      Yes, sir.

1    Q.    And so do you agree, sir, that

2    the medical care CPI calculation includes a

3    number of services that would not be part of

4    your abatement remedies?

5    A.    Well, the -- may I look at this

6    document for a few more minutes?

7    Q.    We can go off the record and

8    you can look at it, sure.

9         MS. RITTER:  Okay.

10   A.    Well, I don't -- what do you

11   mean by off the record?  Just take a break?

12   BY MR. SNAPP:

13   Q.    So it's not counting against my

14   time.

15   A.    Oh, no, no, that's fine then,

16   we don't have to do that.  Can you ask the

17   question again, please?

18   Q.    Do you agree, sir, that the

19   medical care CPI calculation includes a

20   number of services that would not be part of

21   your abatement remedies?

22   A.    I do.

23   Q.    Did you consider using any

24   other measure of CPI from the Bureau of Labor

25   Statistics?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Once again, the decision about

2    which inflation rate to use and how it should

3    be applied I believe was made based on the

4    expertise and the input of members of my team

5    as well as conversations with counsel and

6    perhaps others involved in the litigation.

7    Q.    Did you consider using any

8    other CPI measures?

9    A.    I believe that several may have

10   been considered, and it's a -- so I believe

11   that several may have been considered.

12   Q.    Did you consider, sir, using

13   the U.S. City All Urban Consumers CPI.

14   A.    I don't know -- I don't know

15   which indices were evaluated and so -- I

16   don't know which indices were evaluated.

17   Q.    So you don't know if you

18   considered the  All Items CPI for all U.S.

19   cities?

20   A.    When you say "you," are you

21   referring to the team that I supervised as

22   well as the others that were involved in this

23   process?

24   Q.    Sir, you've said a number of

25   times that this is your report and you're

Highly Confidential - Subject to Further Confidentiality Review

1    responsible for the report, so I'm talking

2    about you.

3         A.     Okay.

4         Q.     And you supervised the team, so

5    I'm asking:  Did you consider using any other

6    alternative measures of the inflation rate

7    using other CPI indices?

8         A.     I believe we did.

9         Q.     And did you include -- in your

10   analysis, did you consider using the All

11   Items U.S. CPI from the Bureau of Labor

12   Statistics?

13        A.     I don't recall.

14        Q.     Are you aware that there are

15   CPI statistics for the Midwest, which include

16   Ohio, available?  You're aware that those

17   statistics are available, right?

18        A.     I'm sorry, can you ask the

19   question again?

20        Q.     Let me back up, sir.

21               Have you used Bureau of Labor

22   Statistics inflation rates in any of your

23   other work?

24        A.     I do not believe so.

25        Q.     And is it fair to say that you

Highly Confidential - Subject to Further Confidentiality Review

1    relied on your team to decide which CPI

2    number to use in this context, and the

3    lawyers involved?

4         A.    Yes, it is.

5         Q.    Do you know if they considered

6    using -- if your team and the lawyers

7    considered using the Cleveland/Akron all item

8    CPI data from the Bureau of Labor Statistics?

9         A.    I don't know, but I'm not sure

10   that I would have suggested such, because my

11   report focuses on developing a national

12   abatement plan, and I've left it to other

13   experts to develop plans specific to Cuyahoga

14   and Summit Counties.

15             So in developing my national

16   estimates, I don't know that I would be

17   comfortable or advise using one

18   jurisdiction's inflation factor over

19   another's.

20        Q.    Okay.  But even in your -- in

21   your 15 categories, many of these categories

22   that are on the screen right now do not

23   relate to medical care, correct?

24        A.    That's correct.

25        Q.    And yet, your team and the

1    lawyers decided to use a medical care

2    inflation rate to inflate all of the numbers

3    in your model forward for ten years, correct?

4         A.    For these preliminary national

5    estimates, yes, that's correct.

6         Q.    So, for example, the mass media

7    campaign was inflated using a 3.24% inflation

8    rate per year even though the mass media

9    campaign is not a medical care cost, correct?

10        A.    Yes, that's correct.

11        Q.    And the same would be true with

12   respect to the academic detailing and the

13   drug disposal programs and the law

14   enforcement interventions, the PDMPs,

15   correct?

16        A.    Yes, sir.

17        Q.    Now, if you had considered --

18   if you had used the U.S. All Items CPI, I can

19   show you the -- I'll mark as Exhibit 16 [sic]

20   the spreadsheet that we pulled from the

21   Bureau of Labor Statistics.  This is

22   Exhibit 15.

23             (Whereupon, Deposition Exhibit

24        Alexander-15, Consumer Price Index

25        Spreadsheet, was marked for

Highly Confidential - Subject to Further Confidentiality Review

1          identification.)

2    BY MR. SNAPP:

3          Q.     Exhibit 15.  And you're welcome

4    to do the math, but if you take years 2013 to

5    2017, the average inflation rate for all

6    items in the U.S. for all urban consumers is

7    2 -- I'm sorry, 1.3%.  And if you did a

8    five-year average from 2014 to 2018, the

9    average is 1.5%.

10             Now, would you agree that using

11   the all items, all urban consumers U.S. city

12   average would be more accurate and reliable

13   than using the medical care CPI that we

14   looked at earlier?

15             MS. RITTER:  Objection, form.

16             THE WITNESS:  Can you ask that

17        again, please?

18             MR. SNAPP:  Sure.

19   BY MR. SNAPP:

20        Q.     I'm just trying to understand

21   if you agree that using an All Items CPI,

22   given the fact that many of your

23   interventions are not medical care related,

24   would be more reliable as an inflation rate

25   estimate for your model than the medical care

1    inflation rate?

2        A.    Well, I'd want to think about

3    that further and consider what the arguments

4    would be.  You know, I'd want to think about

5    that further.  Some of these categories are

6    more closely aligned with medical care than

7    others, and, you know, I'd want to think

8    about that.

9        Q.    But you haven't done that

10   analysis for today, right?

11       A.    Are you asking whether I've

12   included it in the submitted materials?

13       Q.    I'm just asking if you have

14   considered, yourself, any other inflation

15   rate possibilities, possible measures of

16   inflation rate, sitting here today.

17            MS. RITTER:  Objection.  I

18       think that was asked and answered.

19       A.    I believe -- yeah, I believe I

20   noted that -- I believe that we considered a

21   number of different approaches for managing

22   issues of discounting costs or inflating

23   costs.

24   BY MR. SNAPP:

25       Q.    Understood.

1    But you don't know why you

2    chose the medical care over any other

3    measure, correct?

4        A.    I think, as I said, this was

5    based on discussions among members of my team

6    and counsel and involved considerations of,

7    you know, the most consistent and appropriate

8    rate to use, but I don't recall the specific

9    conversations and ultimate decision about

10    that.

11        Q.    Sir, can you tell me which

12    other components of your model were subject

13    to counsel's input as to the parameters that

14    you used?

15        A.    Well, really --

16            MS. RITTER:  Objection.  I

17        mean, you're asking him to list the

18        categories because we would have to

19        object to privilege for any

20        conversation, content of conversation.

21            So I don't -- I mean, I would

22        object to your trying to inquire into

23        conversations that he had with

24        counsel.

25            MR. SNAPP:  No, I'm not asking

Highly Confidential - Subject to Further Confidentiality Review

1          about the substance of the

2          conversation.  I'm asking about which

3          of the other categories are not truly

4          just his work, but ones that counsel

5          weighed in on, as they did with the

6          inflation rate, which he just

7          testified to twice or three times.

8                    MS. RITTER:  Objection to form,

9          that's not what he testified to.

10         Foundation.

11                   MR. SNAPP:  I believe he --

12    BY MR. SNAPP:

13         Q.    Did you not -- sir, did you

14    testify that --

15                   MS. RITTER:  It wasn't a

16         category.  That was the inflation

17         rate.

18                   MR. SNAPP:  Are you done?

19                   MS. RITTER:  Yes.

20    BY MR. SNAPP:

21         Q.    Sir, did you testify just a few

22    minutes ago that the inflation rate that you

23    selected for use in your model was selected

24    as a result of conversations among your team

25    and counsel?

Highly Confidential - Subject to Further Confidentiality Review

 1          MS. RITTER:  Objection, asked

 2     and answered.

 3          A.    Yes.

 4  BY MR. SNAPP:

 5          Q.    Were there other categories of

 6  information that were chose -- particular

 7  parameters were chosen based on conversations

 8  among your team and counsel?

 9          A.    No.  And this wasn't an

10  abatement category.  This was a method of

11  managing inflation over time.

12          Q.    But it had a material impact on

13  the final numbers of your model, correct?

14          A.    Yes.

15          Q.    The selection of the inflation

16  rate could change the model by hundreds of

17  millions, if not billions, of dollars on a

18  national level, correct?

19          A.    I would have to look at the

20  numbers, but I would agree that it could have

21  a material impact.

22          Q.    Sir, in your April 3rd report

23  that's been marked as Deposition Exhibit 3,

24  in Exhibit -- I think it was paragraph 180

25  that we looked at previously -- I think you

1    have it in front of you there, but I'm not

2    sure.

3              MS. RITTER:  Which exhibit

4         number?  I'm lost.

5              THE WITNESS:  It would be

6         Exhibit 1 or 2, I believe.

7              MR. SNAPP:  Exhibit 1.  It's

8         Exhibit 1.

9              THE WITNESS:  Okay.

10   BY MR. SNAPP:

11        Q.    In paragraph 180 -- and we

12   talked about this briefly before.  You used a

13   percentage of 1.5% to try to map nationwide

14   cost to Cuyahoga County and Summit County; is

15   that correct?

16        A.    Yes, sir.

17        Q.    And as I understand your

18   testimony earlier today, I'm just trying to

19   understand whether I need to go into that

20   1.5% --

21        A.    Yeah.

22        Q.    -- or if you've abandoned that

23   1.5% attempt to map to Cuyahoga and Summit.

24              Because I think what you told

25   me earlier was that in Exhibit 3, which was

Highly Confidential - Subject to Further Confidentiality Review

1    the April 17th amendments to the supplement,

2    you didn't do any calculation to try to

3    attribute certain percentage of your

4    Scenarios A, B, C, and D to Cuyahoga and

5    Summit.

6              So do you intend to, at any

7    time in this case, try to attribute some

8    portion of your national estimates to

9    Cuyahoga and Summit?

10             MS. RITTER:  Objection, form,

11        compound.

12             THE WITNESS:  Can you ask the

13        sentence again, please?

14             MR. SNAPP:  Sure.

15   BY MR. SNAPP:

16        Q.    I'm just trying to understand,

17   trying to short-circuit, maybe take out an

18   hour of questioning.

19             Did you -- do you intend at any

20   point in this case to try to attribute some

21   portion of your bottom-line abatement numbers

22   in Scenarios A through D in Exhibit 3 to

23   Cuyahoga and Summit Counties?

24        A.    I -- I am -- I will do what

25   I'm -- I mean, I'm here to serve the courts

Highly Confidential - Subject to Further Confidentiality Review

1    as best I can with my scientific knowledge.

2              I did not multiply 0.015 times

3    the bottom-line numbers in any of those

4    scenarios in order to identify a value that

5    would be the analogous value to the

6    $6.7 billion that's in paragraph 180 of

7    Exhibit 1, but that would be the nature of

8    such a calculation.

9         Q.    Sir, are you saying that you

10   intend to do so in the future, if asked?

11        A.    Are you asking whether I intend

12   to multiply one number by 1.5%?

13        Q.    Yes.

14        A.    Because that's -- that's what

15   we would be talking about.

16        Q.    Okay.

17        A.    I don't know.

18        Q.    Okay.  Do you think that 1.5%

19   calculation that you did in paragraph 180, is

20   that a reliable method of determining what

21   portion of abatement costs should be

22   attributed to Cuyahoga and Summit Counties?

23        A.    I believe there's other -- I

24   believe there are other experts who are

25   focused squarely on doing just that.

1          Q.     And so is the answer to my

2     question you don't know?

3          A.     I'm sorry.  Let me clarify.

4                 I believe there are other

5     experts whose work is focused on estimating

6     the specific costs in Cuyahoga and Summit

7     Counties.

8          Q.     Do you see any limitations in

9     doing the calculation that you did to get to

10    1.5%?

11         A.     Yes, I do.

12         Q.     And what are those limitations,

13    sir?

14         A.     I looked at one measure of

15    morbidity or mortality in one year as the

16    method of allocation, and I believe that

17    that's a limited -- a limited way to appraise

18    attributable share or allocation share.

19                It's not what I was asked to

20    do.  I was not asked -- I mean, I provided

21    paragraph 180 as a high-level qualified

22    caveated approach of thinking about the

23    potential costs in two counties in the United

24    States.

25         Q.     And so that 1.5%, if you

1  applied it to each of your individual

2  abatement remedies, would that be a way to

3  figure out, with all the caveats that you

4  included, how much each of those abatement

5  remedies should cost within Cuyahoga and

6  Summit Counties?

7       A.      There are other experts whose

8  work has focused squarely on identifying the

9  needs and costs of those counties.

10      Q.      For example, if I wanted to

11 determine -- I understand what you're saying,

12 but if I wanted to determine for your mass

13 media campaign the population that you were

14 focused on with your mass media campaign in

15 Cuyahoga and Summit Counties, would I take

16 the 150 million multiplied by 1?%?

17      A.      I'm sorry, where is the

18 150 million coming from?

19      Q.      Well, that's the population

20 that you used in mass -- for mass media, the

21 mass media target population that's on the

22 screen right now.  And you -- that remained

23 constant year after year.

24              So if I wanted to figure out

25 the mass media target population within

1    Cuyahoga and Summit Counties, would I

2    multiply that by 1?% if I were using your

3    methodology?

4         A.    No.

5         Q.    What would I do?

6         A.    Well, I'm not sure -- I mean,

7    if you multiply 150 million by 1.5%, there's

8    no dollar signs in there, so I don't know

9    that that -- that's a population times a

10   percent.

11        Q.    Well, there's no dollar signs

12   in opioid overdose deaths either, sir, but

13   you used that as a percentage -- that's how

14   you got your percentage, right?

15        A.    Yeah, I think I may have

16   misunderstood your question.  Can you please

17   ask again the question about mass media?

18        Q.    Sure.

19             So using your methodology of

20   attributing a certain portion of national

21   abatement costs to Cuyahoga and Summit County

22   by multiplying the numbers by 1.5%, if I

23   wanted to figure out the mass media target

24   population in Cuyahoga and Summit Counties,

25   would I multiply the 150 million by 1.5%?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. RITTER:  Objection,
 2        foundation.
 3        A.    No.  I mean, I didn't design
 4    these estimates to be multiplied by 1.5% to
 5    derive individual abatement estimates for
 6    each category for the counties.  But even if
 7    you -- so that was not my intent, but even --
 8    so that was not my intent.
 9    BY MR. SNAPP:
10        Q.    But isn't that essentially what
11    you did by taking the -- all the different
12    numbers, all of the different calculations
13    that are here in Exhibit 3 for each of the
14    abatement categories and adding them up and
15    then multiplying them by 1.5%?  Isn't that
16    exactly what you did?
17        A.    Well, so I guess I'm not fully
18    understanding the intention of your question.
19    So let me clarify one thing first.
20              I think if you were to want to
21    know if you -- assuming that the abatement
22    estimate that I made for mass media is
23    correct, let's just take year one, it was,
24    based on what you're showing here, about
25    $568 million.  So the 1.5 would be
```

Highly Confidential - Subject to Further Confidentiality Review

1    multiplied by 568 --

2              MS. RITTER:  5.6 billion.

3              THE WITNESS:  That's the

4         ten-year cost.  I was just doing

5         year-one costs.

6              MS. RITTER:  Okay.  I'm sorry.

7         A.    Okay.  We can take the ten-year

8    costs.  If one were to multiply out, one

9    would be multiplying 1.5% by the 5.7 billion,

10   not by 150 million.  In other words, you

11   would be multiplying the fractional morbidity

12   that we believe has accrued in the counties

13   by the total estimated cost for the media

14   abatement campaign in the counties.

15              So that's to clarify a prior

16   question that I believe you asked when you

17   asked would you multiply 150 million by

18   something.

19   BY MR. SNAPP:

20        Q.    So --

21        A.    But with all of that said, this

22   was just -- as I write in my report, this

23   was, you know, ultimately detailed

24   assessments of the specific costs will be

25   required and there are a number of

```
 1    limitations in extrapolating from national

 2    estimates to specific localities.

 3    Nevertheless -- and then I used this example.

 4              And I've provided -- I've given

 5    you some examples of why I think that 2017

 6    overdoses has limits in terms of

 7    understanding the share of the total

 8    abatement costs that would be reasonable to

 9    allocate to these specific counties.

10         Q.    Okay.  So just as another

11    example, if you were to take your 1.5% and

12    multiply it by the mass media target

13    population, you'd get 2.25 million.  That's

14    the math, okay?

15         A.    Okay.  Okay.

16         Q.    And just for your information,

17    in Cuyahoga and Summit Counties -- and I can

18    show you the Census Bureau information --

19         A.    Right.

20         Q.    -- there are only 1.78 million

21    people in both counties combined, so you'd be

22    overestimating the mass media target

23    population costs by using the simple 1.5%,

24    correct?

25         A.    Yes.
```

1          Q.     And that's a limitation of

2    using any sort of calculation to allocate --

3    any sort of simple calculation to allocate

4    national abatement costs to any particular

5    jurisdiction, correct?

6          A.     Yes.  Yes.

7          Q.     Sir, if you could turn to your

8    Exhibit 1 again, which is your April 3rd

9    report, I think you've already explained

10   this, but I just want to make sure I

11   understand.

12              In paragraphs 35 through 39 of

13   the report, you discuss the fact that

14   opioid -- the opioid epidemic has impacted

15   communities differently, correct?

16         A.     Yes, sir.

17         Q.     And you say, because of that --

18   because of this, there's not a

19   one-size-fits-all approach with respect to

20   the abatement remedies, correct?

21         A.     Yes, sir.

22         Q.     And then further down in the

23   paragraph -- well, you discussed in that same

24   paragraph the fact that some communities have

25   had different investments in abatement

1    remedies and others have invested in other

2    types of remedies.

3              And then you go on to say:

4    Each of the remedies are worthy of

5    consideration.  Some will be far more

6    important than others in specific communities

7    and stakeholders should be consulted as

8    abatement remedies are iteratively designed,

9    deployed and evaluated at local levels.

10             Is that essentially what you've

11   been trying to say all day?

12        A.    That's a statement that I agree

13   with, yes.

14        Q.    Okay.  You agree with that

15   statement.

16             And then you go on in the next

17   paragraph, paragraph 36, and you note that

18   the foundation of any community's response

19   should be a comprehensive needs assessment

20   which is based on a systematic approach for

21   reviewing the public health needs faced by a

22   population.

23             Do you agree with that

24   statement as well, sir?

25        A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so the foundation, what do

2    you mean by the foundation?  Does that mean

3    the bedrock principle that it's required, you

4    absolutely have to do a comprehensive needs

5    assessment?

6    A.    Well, unfortunately, as I write

7    about elsewhere in my report, communities

8    haven't necessarily had the luxury to -- you

9    know, communities vary in their resources and

10   their ability to perform comprehensive needs

11   assessments.

12         So by foundation, I mean that I

13   think that abatement remedies will be most

14   effective when they're based on careful

15   examination of the needs of a specific

16   community.

17   Q.    Just so we're clear, you have

18   not conducted yourself a comprehensive needs

19   assessment in Cuyahoga and Summit Counties,

20   correct?

21   A.    That's correct.

22   Q.    Have you suggested to anyone in

23   Cuyahoga or Summit County government that

24   they should conduct a comprehensive needs

25   assessment?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     No.

2      Q.     Just sticking on the same

3  general issue, sir, if you turn to the next

4  page, there's a footnote at the bottom of

5  page 12, and you're footnoting to one of the

6  six steps that you've listed above for

7  conducting a comprehensive needs assessment.

8             And you say in footnote 10:

9  Strategies should be prioritized given

10  pre-identified criteria, such as size and

11  severity of problem, current interventions

12  and resources, economic and social impact and

13  magnitude of public health concern.

14             Is that correct, sir?  Do you

15  agree with that?

16      A.     With the statement?

17      Q.     Yes.

18      A.     Yes, sir.

19      Q.     And just so we're clear, you

20  have not yourself in your model taken into

21  account these factors, in particular, the

22  current interventions and resources that have

23  been implemented in Cuyahoga and Summit

24  Counties; is that correct?

25      A.     Yes, it is.  My model is a

1    national model, not a local model.

2        Q.    Thank you, sir.

3            MR. SNAPP:  I'm just going to

4        take a look at my notes here.

5            THE WITNESS:  Sure.

6            (Document review.)

7    BY MR. SNAPP:

8        Q.    So I know you've already

9    mentioned some of the limitations of using

10   the 2017 overdose death rates as a proxy

11   for -- to allocate the national abatement

12   cost to Cuyahoga and Summit Counties, but I

13   want to just ask a few more questions about

14   that issue.

15       A.    Of course.

16       Q.    So are there other proxies you

17   could have used?

18       A.    Yes, sir.

19       Q.    Is one of them, for example,

20   the general population within Cuyahoga and

21   Summit Counties as -- in comparison to the

22   general population of the U.S.?

23       A.    Yes, although that may raise

24   concerns because Ohio has beared an

25   especially large brunt of the opioid

Highly Confidential - Subject to Further Confidentiality Review

1    epidemic, and so the rate of morbidity and

2    mortality in Ohio is phenomenally high

3    compared with many parts of the country.

4         Q.    If you had done a comparison --

5    do you know what the -- strike that.

6              If you had used the general

7    population as a proxy, do you know what the

8    percentage would be instead of 1.5%?

9         A.    I do not.

10        Q.    I did the math, and it would be

11   roughly .55% instead of 1.5%.  In other

12   words, I could show you the source documents

13   if you'd like to see them from the Census

14   Bureau.

15        A.    No that's fine.

16        Q.    So in Cuyahoga and Summit

17   Counties, the total population is 1,785,775,

18   and the total U.S. population according to

19   census data on the same date is 327,167,434.

20              And so if you do the math, sir,

21   the percentage of the total U.S. population

22   that's in Cuyahoga and Summit Counties is

23   0.55%.

24        A.    Uh-huh.

25        Q.    Would you think that would be a

Highly Confidential - Subject to Further Confidentiality Review

1    reasonable way to try to allocate national

2    costs to those counties?

3              MS. RITTER:  Objection, asked

4        and answered.

5        A.    No, I do not.

6    BY MR. SNAPP:

7        Q.    And why is that?

8        A.    I believe I noted already that

9    Ohio and, including Summit and Cuyahoga

10   County, have borne an especially large brunt

11   of the epidemic, and the -- with rates of

12   overdose and death that are phenomenally

13   higher than many other parts of the country.

14             So I -- as a public health

15   expert, my recommendation for the courts

16   would not be to allocate resources based on

17   population alone because the population

18   living in an area may or may not be in dire

19   need of services.

20       Q.    Sir, do you know if national --

21   nationally, the overdose death rate in 2018

22   is higher or lower than in 2017?

23       A.    I'm not aware that we have

24   final data on the 2018 overdose deaths.

25       Q.    Do you have any preliminary

1   data you've seen?

2        A.    I don't recall, but what I

3   would say is that based on -- you know, as I

4   discuss in my report and based on my read of

5   the landscape, that there remains, you know,

6   a dire epidemic in many communities,

7   including Summit and Cuyahoga County.

8        Q.    Your model estimates that -- it

9   predicts that 2018 overdose deaths will

10   increase over 2017, right?

11        A.    I'd want to look with you to

12   make sure, if that's the case.

13        Q.    We can take a look.

14        MR. SNAPP:  Let me just -- if

15       you can take it down for just a second

16       and let me see if I can find that

17       particular cover sheet -- or

18       particular sheets.

19       Okay.  You can put it up.

20   BY MR. SNAPP:

21        Q.    It actually looks like your

22   model actually does -- I misspoke, it

23   actually shows a slight decrease from 17,075

24   in 2017 to 17,057 in 2018; is that correct?

25        A.    For prescription --

1    Q.    For prescription death.

2    A.    For prescription opioid deaths,

3  but that excludes opioid deaths from

4  individuals dying from heroin --

5    Q.    Okay.

6    A.    -- whose initial opioid of use

7  was a prescription opioid.

8    Q.    So if we look at total overdose

9  death, including illicit fentanyl, you

10 actually have increasing numbers in your

11 model, correct?

12   A.    Yes, sir.

13   Q.    And so is that the number we

14 should be looking at?

15   A.    It depends on your question.

16   Q.    Well, I'm just trying to figure

17 out if the national trends for overdose

18 deaths that you used in your calculation of

19 the 1.5% is rising or going down.

20   A.    The -- well, both the -- all of

21 the numbers are dynamic, and all of the

22 numbers are dynamic, both the numbers for

23 Cuyahoga and Summit County as well as the

24 national numbers.

25        So these numbers could be

1    updated to 2018.  There are a number of ways

2    that one could look at different measures in

3    order to try to estimate an allocation share

4    for the -- for Summit and Cuyahoga County.

5             But once again, that was not

6    the focus of my work.

7         Q.    Understood.

8             But you did note in

9    paragraph 23 that overdose deaths in Cuyahoga

10   county are estimated to have dropped from

11   2017 to 2018, and in Summit County, total

12   overdose deaths declined also from 2016 to

13   2018, correct?

14            MS. RITTER:  Objection to the

15        form, foundation.  That's not

16        precisely what's written there.

17        A.    Yeah.  Yes, in paragraph 23, I

18   identify what I refer to as some gains in

19   Cuyahoga and Summit County, including

20   reductions in deaths from fentanyl and heroin

21   in Cuyahoga County, and reductions in total

22   overdose deaths in Summit County.

23   BY MR. SNAPP:

24        Q.    And so if overdose deaths are

25   declining in Cuyahoga and Summit County

1    generally, and according to your model, total

2    overdose deaths are increasing nationally, if

3    you were using 2018 numbers to get a

4    percentage attributable to Cuyahoga and

5    Summit County, it would be less than 1.5%,

6    right?

7         A.    Yes, I -- yes.  If I'm

8    understanding your question correctly, yes,

9    it would.

10              MR. SNAPP:  Okay.  Let me take

11        a look at my notes.  I might be very

12        close to done, sir.

13              THE WITNESS:  Okay.

14              THE REPORTER:  Want to go off?

15              MR. SNAPP:  No.

16              (Document review.)

17   BY MR. SNAPP:

18        Q.    I did want to ask you, sir,

19   about the -- I think we've marked previously

20   your notes from your trip to Akron.

21        A.    Yes, sir.

22        Q.    I just wanted to ask you a few

23   questions about those just to clarify a few

24   things.

25        A.    Of course.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      They're marked as Exhibit 4.

2          A.      Okay.

3          Q.      Now, do you have any other

4    notes other than the notes that we've marked

5    as Exhibit 4 from your meetings in Akron?

6          A.      No, I do not.

7          Q.      Did you take these notes

8    yourself?

9          A.      Yes, I did.

10         Q.      Who did you meet with?

11         A.      I don't recall their names.

12         Q.      Do you know their positions?

13         A.      I could provide my best recall,

14    if that's helpful.

15         Q.      Yes, please.

16         A.      The people I met with included

17    experts in addiction and -- the people I met

18    with included experts in addiction and

19    individuals within the addiction treatment

20    facilities, at least within Summit County, if

21    not some individuals from Cuyahoga County as

22    well.

23                 There were I believe one or

24    more sheriffs present.  I believe there were

25    detectives present, police officers.  I

Highly Confidential - Subject to Further Confidentiality Review

1    believe there were public health officials

2    and experts from the Department of Public

3    Health -- from the departments of public

4    health from these communities.

5         Q.    Okay.

6         A.    I believe there were

7    individuals from the foster care and child

8    protective services organizations within

9    these communities.  I believe there were

10   representatives from counsel from the

11   communities.

12        Q.    Okay.  I don't mean to cut you

13   off, but that's a lengthy list.

14        A.    Yeah.

15        Q.    And I just want to understand,

16   sir:  Were you -- were these people all

17   gathered just to meet with you, or was this

18   part of some other meeting?

19        A.    I believe the goal of the

20   meeting was to allow for me to have an

21   opportunity to supplement the various written

22   materials that were and after the fact were

23   provided to me --

24        Q.    Okay.

25        A.    -- with -- with an opportunity

Highly Confidential - Subject to Further Confidentiality Review

1    to speak with individuals from the

2    communities.

3          Q.     Okay.  So I just want to ask

4    about a few of your notes here.

5                Down on the bottom of the first

6    page, about seven bullets down, there's a

7    reference about 28 beds of detox.  Do you see

8    where I'm talking about?

9          A.     Yes, sir.

10         Q.     It says:  28 beds of detox, was

11   expanded from 16 to 28 beds, but at times

12   they have had only four people in the

13   program.

14               So my question is:  To me, this

15   sounds like there was an underutilization of

16   the available resources.  Does that sound

17   right to you, sir?

18         A.     Yes, sir.

19         Q.     So if the existing resources

20   aren't used, why would there be a need to --

21   for an abatement program to add more

22   resources?

23         A.     Well, you know, my report was

24   focused on national abatement remedies, and I

25   believe that other experts are providing

Highly Confidential - Subject to Further Confidentiality Review

1    detailed recommendations regarding the

2    community.

3              But, you know, this

4    represents -- I don't know the context in

5    which this quote was provided, and this

6    represents, I presume, one person's

7    perspective at one point in time about one

8    small piece of a broad and complex treatment

9    landscape.

10              So I certainly would not want

11   to conclude from this that enough is being

12   done.  I think the real measure of that is

13   the number of people that are dying or

14   developing addiction from opioids in the

15   communities.

16        Q.    I understand, but from your

17   notes at least, it appears that some of the

18   existing resources are underutilized,

19   correct?

20        A.    Yes, sir.

21        Q.    Now, if you turn to the next

22   page, near the bottom -- well, I guess

23   partway down, there's a bullet that says:

24   Right now Akron City Fire, 50 ODs a month.

25   Last year it was 100 ODs a month.

1          Do you see that?

2     A.     Yes, sir.

3     Q.     And then further down there's a

4  reference -- and I think it's referring to

5  the same ODs.  It says:  Variety of reasons

6  ODs have gone down.

7          Do you see that?

8     A.     Yes, sir.

9     Q.     It goes on to say:  More meth

10  is coming into the city.

11          Is that a reference to

12  methamphetamine?

13     A.     Yes, sir.

14     Q.     Another illicit drug?

15     A.     Yes, sir.

16     Q.     People are cutting heroin with

17  fentanyl more carefully, getting carfentanil

18  off the street.  And then it says:  Mixed

19  signals from group regarding whether or not

20  number of these -- those with OUD have

21  declined.

22          Now, do you have an

23  understanding of what's causing -- well, let

24  me ask you this.

25          Do you know one way or another

Highly Confidential - Subject to Further Confidentiality Review

1    whether those are the reasons that overdoses

2    have gone down in the city of Akron?

3         A.    Well, I wouldn't -- I wouldn't

4    want to infer from my notes of a -- from my

5    review of these notes of a meeting that took

6    place a year ago, you know, I wouldn't want

7    to attribute causality here.

8         Q.    Okay.  Fair enough.

9              If we could turn to the next --

10   a couple of pages later, the page that has

11   "Is there any estimate" at the top.

12        A.    Okay.

13        Q.    Partway down, there is a

14   lengthy paragraph that starts with

15   "Children," and it ends with "lots of

16   polysubstance abuse -- substance use."

17              Do you see that?

18        A.    Yes, sir.

19        Q.    What is polysubstance use?

20        A.    That refers to individuals that

21   use more than one illicit substance.

22        Q.    So it sounds like, based on

23   your notes of your meeting with the people in

24   Akron, that someone during that meeting said

25   that there's lots of polysubstance use in

1    their community; is that correct?

2          A.    Yeah.  Within the context of

3    discussing -- I want to read this more

4    carefully, but in my brief review of this

5    paragraph, it looks as if I'm discussing

6    pregnant women and children.  So, for

7    example, I say:  Over 200 or more that are

8    under child protective services' care; a

9    quarter of kids are felt to be opioid-related

10   children.  The number of people -- children

11   in permanent custody available for adoption

12   has doubled, a significant number of families

13   in drug courts.

14         Q.    Right.

15         A.    A lot of NAS, neonatal

16   abstinence syndrome, no specific numbers, and

17   lots of polysubstance use.

18               So I think that I'm referring

19   to -- in this case I'm probably taking notes

20   based on the feedback from one of the leaders

21   from the community that helps take care of

22   pregnant women and their children.

23         Q.    Sir, you'd agree there's lots

24   of polysubstance use all over the country,

25   right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Well, I mean, there are -- yes.

2     Yes, I would.

3          Q.    And in your model, did you make

4     any attempt to segregate out abatement costs

5     for prescription opioid use or abuse as

6     opposed to polysubstance use and abuse?

7          A.    I mean, indirectly in that we

8     account for individuals that may have complex

9     opioid use disorders that may be more costly

10    to care for, that's another benefit, an

11    incremental benefit that we believe our model

12    poses over other models that have been

13    developed.  And some of these individuals

14    with opioid use disorder are individuals that

15    have polysubstance use.

16               So indirectly we did in terms

17    of thinking about the treatment population

18    that has opioid use disorder.

19         Q.    Sure.  But directly, you

20    haven't directly tried to segregate out

21    opioid abatement costs for those who are

22    nonpolysubstance users, right?

23         A.    No.  I mean, it would be --

24    we've not.

25               MR. SNAPP:  Can we take a

Highly Confidential - Subject to Further Confidentiality Review

```
 1          break?

 2                    THE WITNESS:  Yes.

 3                    MR. SNAPP:  Okay.  Thank you.

 4                    THE WITNESS:  Thank you.

 5                    THE VIDEOGRAPHER:  Going off

 6          the record at 4:02 p.m.

 7                    (Recess taken, 4:02 p.m. to

 8          4:16 p.m.)

 9                    (Whereupon, Deposition Exhibit

10          Alexander-16, USB Drive Containing MAT

11          Model 2.0 V51 Spreadsheet, was marked

12          for identification.)

13                    THE VIDEOGRAPHER:  We're back

14          on the record at 4:17 p.m.

15                    MR. SNAPP:  Dr. Alexander, I'm

16          marking -- and this is for the record,

17          Deposition Exhibit 16, which is a

18          flash drive that contains the

19          spreadsheet that contains your MAT --

20          just give me one second, I'll tell you

21          exactly what it's called.  It is the

22          MAT Model 2.0 V51.  So we will now

23          have that as part of the record.  And

24          we already had the other two other

25          spreadsheets.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            And I just have a couple more
 2        questions for you and then I'm going
 3        to pass you to one of the other
 4        lawyers who's going to ask you some
 5        questions.
 6            THE WITNESS:  Sure.
 7  BY MR. SNAPP:
 8        Q.    So, sir, based on everything
 9  that we've talked about today, do you have
10  any changes that you'd like to make to any of
11  your prior answers?
12        A.    No.  I appreciate your asking,
13  but I do not.
14        Q.    And based on everything that
15  we've talked about today, do you intend to
16  make any changes to any of your opinions that
17  are included in your reports that are marked
18  as Deposition Exhibits 1, 2 and 3?
19        A.    No, not at this time.
20            MR. SNAPP:  I have no further
21        questions.  I'm going to pass you to
22        Mr. Alexander.
23            THE WITNESS:  Thank you very
24        much.
25            THE VIDEOGRAPHER:  Off the
```

Highly Confidential - Subject to Further Confidentiality Review

 1              record at 4:18 p.m.

 2                   (Recess taken, 4:18 p.m. to

 3              break 4:19 p.m.)

 4                   THE VIDEOGRAPHER:  We're back

 5              on the record at 4:19 p.m.

 6                       EXAMINATION

 7     BY MR. ALEXANDER:

 8         Q.     Dr. Alexander, my name is Eric

 9     Alexander.  I have a couple more questions

10     for you.  I represent a different defendant

11     than the prior questioner.  So I have some

12     different questions.  I'm going to try not to

13     repeat anything that he asked.  In fact, I'm

14     pretty sure I won't, other than to maybe use

15     it as a predicate for some additional

16     questions.

17                   Does that make sense?

18         A.     Yes, it does.

19         Q.     I'll give you an example.  So

20     you were asked earlier some questions about

21     whether you had any opinions specific to the

22     conduct of any or all of the defendants

23     collectively.

24                   Do you remember those

25     questions?

1          A.      Yes, in broad form.

2          Q.      And you were also asked

3     questions about whether you had opinions

4     where you could attribute any kind of fault

5     or portion of any sort of abatement plan to

6     anything specific to what the specific

7     defendants or defendants in groups of

8     defendants did.

9               Do you remember those questions

10    and answers?

11         A.      Yes, I do, once again, in broad

12    form.

13         Q.      So there were 17 different

14    defendants in the case in which -- or cases

15    in which you've been designated as an expert.

16    Do you know the names of any of them?

17         A.      I believe I do.

18         Q.      Which ones do you think you

19    know?

20         A.      I believe Purdue is a

21    designated defendant.  I believe Janssen may

22    be.  I believe Mallinckrodt may be.  I

23    believe Teva may be, and I believe the three

24    large wholesalers also, McKesson,

25    AmerisourceBergen and Cardinal, may be.

1    Q.    Okay.

2    A.    And I also believe that some

3    pharmacies such as Walgreens may be.

4    Q.    Okay.  So for the ones you

5    named, even though you know their names, you

6    don't have any opinions specific to the

7    conduct or the impact of the specific conduct

8    by any of those defendants, correct?

9    A.    What do you mean when you say

10    opinions?

11    Q.    Opinions that you would offer

12    at trial if called at trial to testify as an

13    expert within the scope of the report and the

14    supplemental reports that you've provided so

15    far.

16    A.    You know, as I noted earlier,

17    I'm here to serve, and if I'm asked to assist

18    the court in some matter, I will do my best

19    to do so.  But I was not asked as part of the

20    report that I've prepared to evaluate or

21    attempt to apportion responsibility across

22    defendants.

23    Q.    Okay.  Let me ask my question

24    again.

25          Sitting here today under oath,

Highly Confidential - Subject to Further Confidentiality Review

1    do you have any opinions that you would offer

2    about the conduct of any of the specific

3    defendants in this case who you know their

4    names?

5         A.    Yeah, I'm not quite sure if by

6    opinion you're using that term in like a

7    legal sense or just a more broad sense; for

8    example, so maybe you would help clarify for

9    me if you mean a -- what you mean by opinion.

10        Q.    Sure.

11              So you know you're here as a

12   designated expert witness?

13        A.    Yes.

14        Q.    And experts can give opinions

15   within the scope of their designation

16   according to what they've put in their report

17   and --

18        A.    Yes.

19        Q.    -- consistent with whatever the

20   court rules about what's permissible.

21              You understand that, right?

22        A.    Yes.

23        Q.    So it's not your opinion about

24   whose crab cakes you like better or which

25   lacrosse team you like better or anything

Highly Confidential - Subject to Further Confidentiality Review

1    like that.  It's actually an expert opinion

2    within the areas where you claim an expert.

3         A.    Okay.

4         Q.    Which is why you had those

5    questions earlier about what are the areas

6    where you're an expert and what are the areas

7    where you're not an expert.

8         A.    Right.

9         Q.    Does that make sense?

10        A.    Yes, it does.

11        Q.    So focusing on actual expert

12   opinions, do you intend to offer any opinions

13   specific to the conduct of any of the

14   specific defendants whose names you know?

15        A.    Not at this time.

16        Q.    Okay.  And in terms of the

17   groups of defendants, you were asked a number

18   of questions about various aspects relating

19   to manufacturing defendants.  Do you remember

20   those questions?  Or manufacturers?

21        A.    As to whether I -- yes, I do

22   remember in broad form those questions.

23        Q.    Okay.  So even if you don't

24   know the name of a specific manufacturer, you

25   don't intend to offer any opinions about what

1    the manufacturers individually or

2    collectively did or didn't do and what impact

3    that had, correct?

4           A.     Correct.

5           Q.     Okay.  And the distributors,

6    you knew the names of three big distributors

7    or wholesalers as you called them.

8                  You don't know -- I'm sorry,

9    you don't intend to offer any expert opinions

10   about what the distributors individually or

11   collectively did or didn't do and what the

12   impact would be of any of that, correct?

13          A.     Yes, correct.

14          Q.     Okay.  Same thing goes for the

15   other class of defendants, the retail

16   pharmacy defendants and anybody else who's a

17   defendant in this case, you don't intend to

18   offer an expert opinion about what they did

19   or didn't do individually or collectively and

20   what the impact would be of any of that,

21   correct?

22          A.     Correct.

23          Q.     Okay.  So to take it a step

24   further, there have been a couple of specific

25   prescription drugs identified during the

1   course of the deposition, correct?

2        A.    Yes.

3        Q.    And I'm not going to go through

4   all of the brand names or the generic names

5   or the chemical names of all of them, but

6   none of your opinions are specific to

7   specific prescription drugs by saying here's

8   the percentage of harm caused by the use of

9   this particular compound, whether it was

10  branded or generic, correct?

11       A.    Correct.

12       Q.    And the same thing goes for any

13  of the various illicit drugs, including

14  fentanyl analogs or nonopioids, there's no

15  part of your opinion where you're breaking it

16  down and saying here's a percentage of harm

17  or here's an amount of harm or necessary

18  abatement that I can attribute to a specific

19  category of drugs, other than what you said

20  altogether of everything's opioid crisis,

21  correct?

22       A.    That's not correct.

23       Q.    So is there some category of

24  drugs where you're offering specific opinions

25  about the amount of abatement or the specific

Highly Confidential - Subject to Further Confidentiality Review

1    remedies in terms of abatement that would be

2    necessary?

3         A.     Yes, sir.

4         Q.     What category?

5         A.     Prescription opioids,

6    prescription opioid use disorder, heroin use

7    disorder that's started among individuals

8    that have prior prescription opioid use and

9    heroin use disorder among individuals that

10   have never used prescription opioids before.

11        Q.     Okay.  And you feel during the

12   first round of questioning by Mr. Snapp that

13   you went over all of your opinions relating

14   to that subject of what you could attribute

15   to those use categories, correct?

16        A.     No, not correct.

17        Q.     You have other opinions that

18   weren't disclosed or weren't discussed that

19   are specific to a portion of harm

20   attributable to, let's say, heroin use?

21        A.     Yes.

22        Q.     Are those in your report

23   somewhere?

24        A.     I would have to look carefully,

25   but they're contained within either my report

1    or the materials that were produced as part

2    and parcel of my report.

3         Q.    So let's try it this way.

4              In terms of the specific

5    prescription drugs, is there some portion of

6    the harm or the need for remedies that you

7    can attribute to a specific name of a

8    prescription drug, even if you don't know who

9    manufactured it?

10        A.    Not based on the materials that

11   I've provided to the courts thus far.

12        Q.    Have you looked at any data

13   that would let you look at Cuyahoga and

14   Summit County in particular to look at the

15   specific usage or distribution patterns among

16   the various prescription drugs or among the

17   various illicit drugs or combinations of

18   illicit drugs?

19        A.    I've looked at those data, but

20   not with an intention of apportioning in the

21   respect that you're inquiring about.

22        Q.    Okay.  So when it comes to

23   groups of drugs or kind of users of drugs,

24   the only way in which you're drawing these

25   sorts of lines is as part of your model that

1    you went over earlier with basically the flow

2    sheet for how different populations change

3    over time; is that correct?

4         A.    Yes.  The flow sheets, the

5    attendant costs of those populations.  I

6    suppose the other areas, you know, with MAT,

7    I have some specific discussion of individual

8    products, but that's not with respect to

9    apportioning harms.

10        Q.    Right.  You're not saying

11   here's how much of the cost would be related

12   to the use of buprenorphine versus methadone

13   versus morphine or something?

14        A.    Well, I do in providing a broad

15   framework with assumptions, as we discussed,

16   in the context of the initial national

17   abatement estimates, you know, I assume a

18   certain distribution of those, so I do in

19   that context.

20        Q.    Sitting here today, do you know

21   a portion of users of MAT start with an

22   illegal drug of some sort as opposed to with

23   some sort of direct progression from a

24   prescription opioid?

25        A.    I'm sorry, you're asking -- can

Highly Confidential - Subject to Further Confidentiality Review

1    you repeat the question, please.

2         Q.    Sure.

3               You talked about

4    medical-assisted therapy and the drugs used

5    in that, correct?

6         A.    Right.

7         Q.    Do you know the portion of MAT

8    users, either in the United States or

9    Cuyahoga and Summit County, who actually

10   start with an illicit drug or combination of

11   illicit drugs as their drug of abuse?

12        A.    Well, our -- yes, I have -- you

13   know, our model includes inputs from a

14   variety of data sources in order to be able

15   to estimate that proportion.

16        Q.    Okay.  And so whatever you know

17   about the percentage of users of MAT to come

18   up with your model is accounted for in the

19   various spreadsheets and supporting data,

20   correct?

21        A.    I'm sorry.  Can you ask the

22   question again?

23        Q.    Let me ask:  Sitting here

24   today, do you know what percentage that is of

25   the users of MAT who start with an illicit

1    drug as their substance of abuse?

2        A.    Well, as when you say users of

3    MAT, I'm thinking of people that are in

4    treatment for opioid use disorder, and of

5    people that are being currently treated for

6    opioid use disorder, I cannot provide a

7    precise estimate at this time regarding, of

8    all people currently in treatment for opioid

9    use disorder, what proportion have

10   prescription opioid use disorder, what

11   proportion have heroin opioid use disorder

12   that started with prescriptions first, and

13   what proportion had pure heroin use disorder.

14       Q.    In terms of the word

15   "precision," does that have a specific

16   meaning in your world as a

17   pharmacoepidemiologist?

18       A.    Yes.  I mean, the term can be

19   used in a variety of contexts, but yes.

20       Q.    So you asked earlier about

21   confidence intervals and how you didn't have

22   any confidence intervals for any kind of end

23   number that came out of your model.

24            Do you remember that

25   questioning?

Highly Confidential - Subject to Further Confidentiality Review

1          A.       Yes, I do.

2          Q.       Do you have any a priori

3    precision requirements for your model?

4          A.       Well, the model -- I mean,

5    there's a Markov model and then there are

6    redress estimates, and so are you referring

7    to the Markov model or the redress estimates?

8          Q.       The one you called the APOLLO

9    model, I suppose.

10         A.       Okay.  And your question is do

11   I have a priori requirements for certain

12   levels of precision?

13         Q.       That's exactly what I asked,

14   yes.

15         A.       Yeah.  We -- you know, I think

16   as I spoke before, ultimately the model is

17   calibrated, and those calibrations are one of

18   the principal methods that we use to examine

19   and that one uses to exam the adequacy of the

20   model.

21              And in this instance, I

22   calibrated the model in order to fit it as

23   best I could to a variety of parameters that

24   I had the greatest confidence in.  And then

25   we assessed the -- you know, we assessed the

Highly Confidential - Subject to Further Confidentiality Review

1    quality of the model in many ways.

2         Q.    So let me go back to my

3    question.

4         A.    Yeah.  Yeah.

5         Q.    Sitting here today, are there

6    current precision requirements for your

7    model, that it has to be within plus or minus

8    5%, 10%, some other measure that one might

9    have for precision according to the standards

10   of pharmacoepidemiology?

11        A.    No, the overall fit and quality

12   of the model is based on many different

13   factors.

14        Q.    Okay.

15        A.    And so there's not one single

16   parameter that we say we need to be able to

17   estimate overdose deaths plus or minus 5% or

18   this model is no good.  The answer is no,

19   there's no single factor -- there's no single

20   a priori requirement for a given component

21   because there are, you know, dozens of

22   parameters and a dozen or more boxes.

23        Q.    So you're not even saying I

24   know that whatever comes out of my model will

25   be plus or minus 5%, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Well, there are a number of

2  ways that -- there are a number of steps that

3  I took and that one takes in order to assess

4  and ensure the quality of a model such as the

5  model that we've built.

6      Q.      Sitting here today in terms of

7  the requirements of your model, it wasn't

8  built in a way that it can guarantee the

9  results will be even within 5%.  You'll give

10  a point estimate, but you won't have any

11  degree of precision as to the reliability of

12  that, correct?

13          MS. RITTER:  Objection to form.

14          THE WITNESS:  Can you ask that

15      again, please?

16          MR. ALEXANDER:  Sure.

17  BY MR. ALEXANDER:

18      Q.      The way your model is set up,

19  it gives a variety of point estimates,

20  correct?

21      A.      Yes.

22      Q.      And there will be no level of

23  certainty that any of those point estimates

24  will be accurate within any certain percent,

25  even 5% or 10%, correct?

1          A.     Well, we -- you know, we did

2    not have an opportunity to discuss this, but

3    we include sensitivity analyses, and these

4    have been provided as part of the model.  And

5    what these analyses do is they assess the

6    robustness of the model.  They assess whether

7    or not, when you change one parameter, an

8    outcome that one cares about changes plus or

9    minus 5% or not.

10         Q.     So sensitivity is different

11   than what I'm talking about, which is that

12   you have a degree of confidence, like --

13   let's take a step back.

14                When you publish papers, you

15   typically have something where you say --

16   before you ever start the research project,

17   you'll have a requirement that whatever you

18   will present will have to be statistically

19   significant within certain parameters based

20   upon like a .05 p value or other fairly

21   standard statistical measures, correct?

22         A.     When conducting hypothesis

23   testing, yes.

24         Q.     And when conducting something

25   that's going to put out any kind of point

Highly Confidential - Subject to Further Confidentiality Review

1    estimate like this, you also typically have

2    something where you have a requirement as to

3    the degree of precision that your ultimate

4    estimate will have; otherwise, you could

5    always just give an estimate between zero and

6    like 10 trillion, and it would be, you know,

7    about as reliable as what you're putting out,

8    right?

9         A.    Well, we weren't --

10             MS. RITTER:  Object to the

11        form.

12        A.    We were not conducting

13   hypothesis testing here.

14   BY MR. ALEXANDER:

15        Q.    I understand.  So I'm saying

16   did you have any requirement for how you

17   designed the model that you would have any

18   degree of precision by plus or minus any

19   percent?

20        A.    There was no single parameter

21   that I identified a priori as we must be

22   within X percent of this estimate for this

23   value, so that's -- that's not how these

24   models are generally built.

25        Q.    Okay.  And your hope is that

Highly Confidential - Subject to Further Confidentiality Review

1   whatever the specific model that is chosen in

2   terms of what would be done to try to remedy

3   the harm would remedy as much of the harm as

4   possible.  That's your hope out of all of

5   this, right?

6        A.     Yes.

7        Q.     And you said you didn't have

8   some preset requirement for what percentage

9   of the opioid-related, as it's been termed so

10  far, deaths would be eliminated or any

11  measure by which you're trying to reduce any

12  of the harms you've identified; you're just

13  trying to reduce all of them as much as

14  possible.

15            Is that a fair statement?

16       A.     No.  I mean, in our model we

17  include an entire tab that includes output

18  with our having assessed different

19  interventions, and, in fact, the estimates

20  that we provide for the number of

21  intervention -- for the number, for example,

22  of overdose deaths that we believe could be

23  achieved over ten years is -- is similar in

24  magnitude to those estimated by other models

25  that have been published.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Okay.

2        A.      And so we use both an

3    understanding of the development of the

4    model, the calibration of the model, and then

5    the concordance of the model with other

6    published models as some of many measures to

7    understand overall whether we believe the

8    model is performing well or not.

9        Q.      So the -- you said this before,

10   that the model doesn't take into account

11   what's already being done in Cuyahoga and

12   Summit Counties or do anything to make it be

13   specific to Cuyahoga and Summit Counties

14   because it's a national model, correct?

15       A.      Well, here --

16       Q.      Is that correct or is that not

17   correct?

18       A.      Well, we're talking about a

19   different model than the last line of

20   questioning.

21       Q.      Right.  So -- I know it's late,

22   but if you could just -- some of these --

23   it's yes or no and then you can explain.

24       A.      Okay.

25       Q.      So you have a national model?

Highly Confidential - Subject to Further Confidentiality Review

 1      A.      Yes.

 2      Q.      That's what you've put forward

 3  in the bulk of your expert report that's been

 4  gone over in the course of the deposition so

 5  far?

 6      A.      Yes, sir.

 7      Q.      And no portion of that is

 8  focused on taking into account what Cuyahoga

 9  or Summit County have been doing thus far or

10  how effective those measures have been,

11  correct?

12      A.      That's correct.

13      Q.      Okay.  And in the course of the

14  kind of narrative part of your report, you

15  say in a number of places that some of the

16  measures taken by Cuyahoga or Summit County

17  have helped in various ways in terms of like

18  reducing deaths so far over the last couple

19  of years or increasing the number of people

20  getting treatment.

21          You remember those sorts of

22  general statements in your report?

23      A.      Yes, I do.

24      Q.      Okay.  Is it your hope that

25  whatever happens going forward in Cuyahoga

Highly Confidential - Subject to Further Confidentiality Review

1    and Summit County will make things better?

2         A.    Yes.

3         Q.    Okay.  And there are various

4    ways in which you would measure improvement,

5    correct?

6         A.    Yes.

7         Q.    And is it also your view that

8    the earlier measures are put in place that

9    are going to be effective, the better the

10   overall result will be in terms of reducing

11   the harms you're trying to reduce?

12        A.    I think there's an urgency to

13   act, but that urgency has to be -- those

14   actions have to be well informed.

15        Q.    Right.  So like I said, if you

16   put in place the measures that you think will

17   be effective based upon well-informed

18   consideration of what those measures should

19   be, the earlier they're put in place, the

20   greater the cumulative positive effect?

21        A.    In general, yes.  I mean,

22   there's a complicated trade-off that has to

23   happen, right, because if you don't -- if you

24   act blindly --

25        Q.    Right, if you -- the question

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is:  If you act reasonably and with good

 2    measures --

 3         A.    Right.

 4         Q.    -- the earlier you do it, the

 5    better the result will be.  That's the hope

 6    of all of what you're engaged in here,

 7    correct?

 8         A.    I think there is an urgent need

 9    for intervention at a national and local

10    level.

11         Q.    And so we said that you haven't

12    looked at any documents produced by any of

13    the defendants in the case, and you don't

14    remember reviewing any depositions taken of

15    anybody in the case, correct?

16              MS. RITTER:  Objection, form.

17         A.    That's not -- yeah, that's not

18    correct.

19    BY MR. ALEXANDER:

20         Q.    So earlier when you said you

21    hadn't reviewed any testimony taken in the

22    case, you've now remembered that you have?

23              MS. RITTER:  Objection, form.

24         That wasn't what was said.

25         Transcript.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yeah, I -- I think I was asked

2    whether I had reviewed any transcripts

3    previously.

4    BY MR. ALEXANDER:

5      Q.      Okay.  So have you reviewed any

6    deposition transcripts of anybody deposed in

7    connection with this litigation?

8      A.      Not that I recall.

9      Q.      Okay.  All right.  So you

10   haven't reviewed any documents produced by

11   the defendants.  You haven't reviewed any

12   deposition transcripts.

13            Have you reviewed any documents

14   produced by Cuyahoga or Summit County in this

15   litigation?

16     A.      Yes, I have.

17     Q.      Did you review the documents

18   produced by Summit and Cuyahoga County with

19   an eye towards assessing whether the measures

20   that they had adopted over time were measures

21   that you thought were reasonable both in

22   terms of what they did and when they did it?

23     A.      Not at a -- that was not my

24   intention in reviewing those documents.

25     Q.      Okay.  So sitting here --

```
1              A.     That was not my -- I'm sorry.

2              Q.     So sitting here today, are you

3      in a position to say that Cuyahoga and Summit

4      County have been reasonable both in terms of

5      what they did and when they did it in terms

6      of initiating abatement or remedial measures

7      to try to fix or mitigate some of these

8      problems that you've been talking about?

9              A.     You know, the focus of my

10     report was on a national abatement plan, and

11     in pursuing this, I did review materials from

12     Cuyahoga and Summit County and traveled to

13     Akron, as we've discussed.

14                    My focus was not on evaluating

15     the -- on fully evaluating the adequacy,

16     comprehensiveness or impact of the measures

17     that they've taken thus far.

18             Q.     Okay.  So this is an easy one.

19     The answer to my question is, no, sitting

20     here today, I'm not in a position to say that

21     their conduct was reasonable in terms of when

22     they did it -- when they started taking

23     measures and what they did, right?

24             A.     Well, it's -- it's not what I

25     was asked to do.  I mean, I reviewed -- I did
```

1    review the -- I did review documents that

2    have given me the -- that have led to my

3    opinions that are included in my report, and

4    those opinions include many mentions of

5    activities that they've undertaken within

6    Summit and Cuyahoga County.

7              And I believe in my report I

8    speak to what I believe to be the

9    reasonableness of those interventions as well

10   as in some cases the potential impact that

11   they've had and the gains that they've been

12   accounted for.

13             But I would not characterize my

14   report as having conducted a comprehensive

15   evaluation of -- of the activities to date in

16   those counties.

17        Q.    So did you ever look at the

18   timeliness of any of the actions from Summit

19   or Cuyahoga County in terms of whether, from

20   your perspective, they started taking

21   reasonable activities as soon as you think

22   they should have?

23        A.    No, I did not.

24        Q.    And you've been personally

25   involved in research and evaluation of these

1    issues outside of litigation for ten years

2    now; is that right?

3         A.    I believe in my report I say

4    eight years, but about eight to ten years,

5    yes.

6         Q.    And you know from some of the

7    stuff you've looked at that there have been

8    some statewide measures in Ohio that go back

9    to around 2010, correct?

10        A.    Can you say more, please, by

11   what you mean by measures?

12        Q.    Do you know when they started

13   having like statewide task forces or

14   committees to look at reducing any issues

15   relating to opioid abuse in the state of

16   Ohio?

17        A.    I do not know the precise

18   dates.

19        Q.    Okay.  So you think some of the

20   things that Summit and Cuyahoga County have

21   been doing have been beneficial, correct?

22        A.    Yes.

23        Q.    And you think some of the

24   things that they've been doing recently, like

25   some of the changes in practices, are things

Highly Confidential - Subject to Further Confidentiality Review

1    that if they had been started earlier would

2    have had an even greater beneficial effect

3    than what they've had so far, correct?

4         A.    I mean, it's very hard to talk

5    about that in the abstract, but I think it's

6    plausible that greater resources devoted

7    earlier within a community could help to head

8    off community-level harms, yes.

9         Q.    For instance, there are some

10   things that you note that Cuyahoga County has

11   been doing since like 2014, but Summit County

12   only started in 2018.

13             Remember some of those sorts of

14   observations that you set out in your report?

15        A.    Well, I can -- I can -- I don't

16   have -- I don't remember specifically, but I

17   can -- so I don't remember specifically, no.

18        Q.    Okay.  So sitting here today,

19   can you offer an expert opinion that what

20   Summit County did to combat the impacts of

21   the opioid epidemic in Summit County have

22   been timely and reasonable with regard to all

23   the things you think that they should be

24   doing now?

25        A.    No, I cannot.

```
 1              Q.     Okay.  Same question for

 2    Cuyahoga County.  Sitting here today, can you

 3    give an expert opinion that Cuyahoga County

 4    has behaved reasonably in terms of timing and

 5    effort to do all of the things you think they

 6    should be doing to combat the opioid crisis

 7    in Cuyahoga County?

 8              A.     Well, I mean, it's not what I

 9    was asked to do.  I guess I'm rethinking my

10    answer to the Summit County question just in

11    thinking about this further.

12                     I mean, once again, I was not

13    asked to conduct a detailed evaluation of the

14    appropriateness of the totality of activities

15    undertaken by these counties, but I think

16    that it would be hard to imagine finding any

17    county in the U.S. that has -- that has

18    totally licked this one.

19                     I mean, I just don't -- I mean,

20    I think that if you look at any county,

21    there's bound to be areas where one can

22    identify where there have been, you know,

23    opportunities that have been passed up,

24    whether due to resource constraints or any

25    number of other causes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     And you don't know what any of
 2      those reasons would be for Cuyahoga or Summit
 3      Counties in terms of why they did what they
 4      did or why they failed to do what they might
 5      have done better?
 6              A.     That's not true.
 7              Q.     Do you know like what the
 8      budget restrictions have been or impact of
 9      budget cuts since 2008 have been in those
10      counties?
11              A.     Well, it wasn't the focus of my
12      report, but in the -- in the materials that
13      I've read, it's clear that resource
14      constraints are a major issue for both
15      counties.
16              Q.     Okay.  And did you look at why
17      there have been resource constraints?
18              A.     Can you say more about what you
19      mean by look?
20              Q.     For purposes of forming an
21      expert opinion in this case that you would
22      offer at trial if called at trial, have you
23      evaluated why there have been resource
24      constraints in Cuyahoga and Summit County
25      that affected their ability to institute
```

Highly Confidential - Subject to Further Confidentiality Review

1    timely and effective measures to combat the

2    opioid epidemic?

3          A.     I've not done so

4    comprehensively, no.

5          Q.     Does any aspect of your model

6    take into account how things would be

7    different if either or both of these counties

8    had acted reasonably in terms of combatting

9    the crisis from the first time that they

10   should have started acting to combat it?

11                MS. RITTER:  Objection to the

12          form.

13                THE WITNESS:  Can you ask that

14          again, please?

15                MR. ALEXANDER:  I can have it

16          read back.  Could you please do that.

17                (The following portion of the

18          record was read.)

19                "QUESTION:  Does any aspect of

20          your model take into account how

21          things would be different if either or

22          both of these counties had acted

23          reasonably in terms of combatting the

24          crisis from the first time that they

25          should have started acting to combat

1       it? "

2                   (End of readback.)

3                   MS. RITTER:  Then there's my

4           objection to the form, foundation.  I

5           guess it shows up again.

6           A.      So I developed a national

7    model.  I didn't develop a county model.

8    BY MR. ALEXANDER:

9           Q.      Okay.  So the answer is no, no,

10   my model doesn't do that and I didn't account

11   for that?

12                  MS. RITTER:  Objection to the

13          form, foundation again.

14          A.      Yeah, my model is not -- you

15   know, the redress estimates that I provide do

16   not factor in the ways that different

17   jurisdictions may or may not have acted most

18   efficiently in combatting the opioid

19   epidemic.

20   BY MR. ALEXANDER:

21          Q.      Let me ask it this way.

22          A.      Yeah.

23          Q.      So you've recognized in some of

24   your questioning and in the report that some

25   of what you propose requires actions at the

1    local level, the county level, the state

2    level, the federal level, and by various

3    stakeholders, including healthcare

4    professionals and other kind of private

5    citizens and companies.

6              Is that a fair statement?

7        A.    Yes.

8        Q.    And so your model isn't

9    directed towards saying here are the costs

10   that would only be incurred by a certain

11   level of government, the county-level costs

12   or the federal costs or the state costs.

13             All of your costs are across

14   all of those governmental levels and include

15   private costs as well, correct?

16             MS. RITTER:  Objection to the

17        form.

18        A.    Yeah, my model wasn't focused

19   on figuring out who should shoulder the

20   costs; it was merely to estimate the costs.

21   So it wasn't to figure out who should

22   shoulder them or how much they're already

23   being paid for by others.  It was just to

24   figure out what the costs -- it was to

25   provide a preliminary framework for thinking

Highly Confidential - Subject to Further Confidentiality Review

1    about national costs.

2    BY MR. ALEXANDER:

3        Q.    So if the question is how much

4    extra have Cuyahoga and Summit County had to

5    incur in terms of their own costs because of

6    anything relating to the opioid epidemic,

7    your model does not help answer that

8    question, correct?

9        A.    Correct.

10       Q.    And if the question is, going

11   forward, how much will Cuyahoga or Summit

12   County -- and/or Summit County -- have to

13   incur because of anything relating to the

14   opioid epidemic, your model also does not

15   help answer that question, correct?

16       A.    I think that's incorrect.

17       Q.    Because you have global costs

18   and some portion of the global costs could be

19   attributed to counties and then somebody else

20   maybe could figure out how much of that would

21   be a county cost as opposed to a state,

22   federal or private cost.

23              Is that what you're saying?

24              MS. RITTER:  Objection to the

25        form.

Highly Confidential - Subject to Further Confidentiality Review

1        A.     No.

2   BY MR. ALEXANDER:

3        Q.     So how does your model help

4   answer that question of how much extra,

5   not -- not just total, but how much extra

6   would Cuyahoga County have to pay to render

7   services to combat the opioid crisis, does

8   your --

9        A.     Extra above and beyond what?

10       Q.     What it would without an opioid

11  crisis.

12       A.     Well, our estimates are

13  national estimates, and, you know, in

14  paragraph 180 or -- one paragraph that we've

15  considered --

16       Q.     It's 180.

17       A.     -- I provide one very

18  proxy-qualified means of thinking about what

19  costs could be in Cuyahoga and Summit County.

20              I thought previously you were

21  asking about future costs, and the reason

22  that I answered the way I did is because our

23  Markov model is designed to help develop the

24  trend ratios that help one think about future

25  costs.

1          Q.      I understand the whole idea of

2     help you think, and I understand the proxy

3     thing from paragraph 180.  We'll return to

4     that probably in a second.

5          A.      Right.  Right.

6          Q.      I'm asking actually something a

7     little different and I want you to try to

8     focus on this.

9          A.      Okay.

10         Q.      Okay.  So any county -- you

11    could go out to Baltimore County here or

12    Howard County, wherever --

13         A.      Right.

14         Q.      -- they pay money and they have

15    services that they render as kind of a

16    baseline.  Does that make sense?

17         A.      Yes.

18         Q.      Okay.  And if the question is,

19    above and beyond the baseline, because of the

20    opioid crisis, how much more would Cuyahoga

21    County have already paid or have to pay going

22    forward to do the reasonable things to try to

23    address it, your model doesn't answer that

24    question, correct?

25         A.      Correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And the same thing goes for

2    Summit County, correct?

3      A.      Yes, correct.

4      Q.      Okay.  So your model, in

5    addition to not being local to those

6    counties, isn't addressing the issue of

7    additional costs or additional burdens,

8    services incurred by the counties because of

9    the opioid crisis, correct?

10     A.      Yes.

11     Q.      All right.  And have you

12   compiled somewhere the list of all of the

13   state, local and federal laws that you would

14   need to change to make your plan happen?

15     A.      No, I've not.

16     Q.      We identified one earlier in

17   terms of there are some places where you

18   can't have these kind of safe places to

19   administer drugs, correct?

20     A.      Yes.

21     Q.      And we know that most of the

22   conduct that we're talking about in terms of

23   people with opioid use disorder does involve

24   some violation of state and/or federal law by

25   stealing a drug, taking a drug that wasn't

Highly Confidential - Subject to Further Confidentiality Review

1    prescribed for you that's scheduled or taking

2    an illicit drug like heroin, right?

3              MS. RITTER:  Objection to the

4         form, foundation.

5              THE WITNESS:  Can you ask that

6         again, please?

7    BY MR. ALEXANDER:

8         Q.    You do understand that a lot of

9    the conduct that you've talked about in terms

10   of people on opioid use -- with opioid use

11   disorder and how they get there does involve

12   some violation of state or federal law,

13   correct?

14        A.    I mean, I wasn't asked to

15   apportion -- apportion responsibility or to

16   look at law-breaking as a function of how

17   people develop opioid use disorder, but I

18   believe I write in my report and I reference

19   the report by Katherine Keyes that the

20   majority of people that have opioid -- I

21   would want to be sure I'm not misstating the

22   specific reference that I make, but I do

23   highlight and refer to her report where she

24   makes a case, and I believe on reasonable

25   evidence, about how people end up with opioid

Highly Confidential - Subject to Further Confidentiality Review

1    use disorder or other adverse --

2         Q.    And I'm not asking about that.

3              MS. RITTER:  You're talking on

4         top of him, please.

5    BY MR. ALEXANDER:

6         Q.    Were you done with your answer?

7         A.    Yes.

8         Q.    Okay.  I'm not even talking

9    about that.  I'm saying that you understand

10   that there are various laws, state, local,

11   federal, that affect whether some or all of

12   your plan would be feasible to be carried out

13   in a specific jurisdiction, correct?

14        A.    Yes.

15        Q.    And you've acknowledged at

16   various parts of your report that there would

17   need to be essentially lobbying and

18   legislative efforts to make some of this

19   happen, correct?

20        A.    Which specific parts are you

21   referring to?

22        Q.    Let me go on, then.

23              I know that you said you're not

24   sure how deaths are tallied for purposes of

25   the CDC WONDER database to be attributable to

Highly Confidential - Subject to Further Confidentiality Review

1     unintentional opioid overdose.  Do you know

2     anything about the practices in Cuyahoga and

3     Summit Counties in terms of how they do the

4     same thing?

5          A.     Not in great detail.

6          Q.     Do you know if there are

7     differences between how Cuyahoga and Summit

8     County do it, including in practice versus

9     how it's done nationally, that might further

10    complicate making a comparison based upon the

11    percentage of overdose deaths?

12         A.     I do not.

13         Q.     Do you know if there's anything

14    going on in Cuyahoga or Summit County where

15    opioids are overattributed as a cause of

16    overdose death based upon any of the

17    practices going on in those counties?

18         A.     I do not.

19         Q.     If they have anything that

20    leads to them being overattributed, either

21    because of issues with how they test or their

22    evaluation in autopsy or how they treat

23    suicide or any of the other things that might

24    go into attributing death to unintentional

25    overdose, the effect would be -- the way

1    you've done it through this one proxy measure

2    in paragraph 180, would be to increase the

3    percentage of damages to these counties

4    artificially, correct?

5              MS. RITTER:  Object to the

6         form, compound.

7         A.    It would depend upon the

8    precision of estimates or the amount of error

9    around the estimates in these counties

10   relative to the national levels.

11   BY MR. ALEXANDER:

12        Q.    So I can make it really simple.

13             If a death in Cuyahoga or

14   Summit County is more likely to be attributed

15   to opioid overdose, specifically

16   unintentional opioid overdose, than it would

17   be nationally because something about the

18   differences in practices and maybe other

19   factors and biases, then that would lead to

20   an overattribution by the proxy measure you

21   have in paragraph 180, correct?

22        A.    Yes, that's correct.

23        Q.    And that could lead to

24   overestimating the amount of costs for

25   abatement in those counties by billions of

Highly Confidential - Subject to Further Confidentiality Review

1    dollars conceivably, correct?

2         A.    I would have to look at the

3    numbers, but it could certainly lead to

4    overestimation, yes.

5         Q.    But conceivably by a

6    significant factor, right?

7         A.    Well, it would depend on the

8    magnitude of overestimation.

9         Q.    Okay.  Have you considered at

10   all any measures that would reduce the supply

11   of illicit drugs into this country as part of

12   your model and what effect those would have

13   on what would need to happen going forward to

14   get rid of the opioid crisis or minimize it

15   as much as it could be minimized?

16        A.    Yes.

17        Q.    Is that anywhere in your report

18   where you talk about interdiction and how, if

19   there's better interdiction, so that less

20   heroin comes in or less carfentanil comes in

21   or some other illegal drug, then there will

22   be less problems going forward?

23        A.    I don't know that I used the

24   word "interdiction," but the answer is yes.

25   I refer both, I think as we discussed before,

Highly Confidential - Subject to Further Confidentiality Review

1    I both refer to the importance of the Drug

2    Enforcement Agency and interventions that

3    they employ, and then I also discuss later in

4    the report within the context of law

5    enforcement the importance of overdose teams

6    that can identify and -- that can identify

7    and disrupt supply chains.

8         Q.    So like, that's not actually

9    what I was asking about, but you don't have

10   an assumption for your model that assumes

11   that the supply of illegal drugs into this

12   country will remain the same as opposed to go

13   up or down, do you?

14        A.    Our model does include a sort

15   of leveling-off or an inflection point

16   whereby we believe and we model -- and

17   indeed, this has been borne out a bit by CDC

18   data -- that there will be declining

19   rates of -- that the rate of increase in

20   deaths from heroin and fentanyl will decline

21   some.

22             So -- and our model also allows

23   for different assumptions about the effects

24   of interdiction to be empirically tested.

25             MR. ALEXANDER:  I have limited

Highly Confidential - Subject to Further Confidentiality Review

```
 1              time and I'm going to pass the
 2              remainder of the questioning to the
 3              representative for the pharmacies.
 4                     THE WITNESS:  Thank you very
 5              much.
 6                     MS. RITTER:  Can we get a time
 7              check?
 8                     THE VIDEOGRAPHER:  29 minutes
 9              left.
10                     MS. RITTER:  You had more than
11              you thought.
12                     MR. ALEXANDER:  I thought I was
13              out.  I wouldn't have passed.  My
14              goodness.
15                     MR. BENSINGER:  Do you want to
16              ask another question?
17                     MR. ALEXANDER:  If you don't
18              mind.
19      BY MR. ALEXANDER:
20         Q.    Okay.  Let me just ask some
21      quick questions.
22         A.    Yeah.
23         Q.    Are you familiar with the term
24      "breakthrough pain"?
25         A.    Yes.
```

1       Q.      And is it appropriate to treat

2    breakthrough pain with opioids in some

3    situations?

4       A.      Yes.

5       Q.      Are there any statements in

6    your report that you think are inaccurate,

7    any statements where you've quoted anything

8    about the role of medications in terms of

9    treating pain or any other specific

10   statements that you're aware are inaccurate

11   and need to be changed?

12      A.      At the time -- I mean, at the

13   time that the report was submitted, it

14   represents my -- represented my best

15   judgments about the matters at hand, and

16   there's nothing that comes to -- there's

17   nothing that's top of mind that I would

18   correct in the week or two since it was --

19   you know, or three weeks since it was

20   submitted.

21      Q.      Sure.

22              So like going back to what we

23   said about breakthrough pain and that it's

24   appropriate to treat it in some situations

25   with prescription opioids.

Highly Confidential - Subject to Further Confidentiality Review

1          Is it your belief that it is

2    vital that prescription opioids be available

3    to treat breakthrough pain in some patients?

4         A.    Yes.

5         Q.    Okay.  Let me ask it this way.

6          Is there any portion of your

7    model that accounts for how things would be

8    different in terms of the need for a national

9    abatement if all the actors across the

10   country, including states, federal

11   government, insurance companies, all the

12   other entities whose conduct you do talk

13   about in your report, had behaved

14   appropriately and reasonably from the start

15   to reduce the effects of the opioid epidemic?

16             MS. RITTER:  Objection to form.

17             THE WITNESS:  Can you ask that

18        again, please?

19             MR. ALEXANDER:  Sure.

20   BY MR. ALEXANDER:

21        Q.    One of the things that you

22   identified in your report, for instance, is

23   you think that there have been coverage

24   decisions of insurers --

25        A.    I see.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      -- private insurers, public

2     insurers and health plans relating to like

3     when they'll pay for nonpharmacologic

4     treatment for pain, things like that.

5               That's been one of your

6     research topics about how some of those

7     decisions have actually made things worse or

8     contributed to the opioid epidemic, correct?

9          A.      Yes.

10          Q.      Okay.  And so if we look at the

11     things that you think that the government --

12     federal government should have been doing all

13     along --

14          A.      Right.

15          Q.      -- and the private insurers

16     should have been doing all along and the

17     states should have been doing all along and

18     all the other stakeholders, if you will,

19     should have been doing all along to minimize

20     the effects of the opioid epidemic as you

21     understand it and have described it, you

22     think that things would be better now than

23     they are, correct?

24          A.      Yes.

25          Q.      Okay.  And you think that less

1    measures would be needed going forward to try

2    to redress or improve the situation with the

3    opioid epidemic, correct?

4         A.    Yes.

5         Q.    Okay.  And your model as set up

6    now doesn't address how things would be if

7    any or all of these other actors had been

8    behaving reasonably in terms of taking steps

9    to address and minimize the opioid epidemic

10   from the time that you think they should have

11   started doing that, correct?

12        A.    That's correct.

13        Q.    So if the question is -- so if

14   the question is what's the amount that would

15   be reasonable to address the additional

16   expenses of the counties if the counties had

17   behaved reasonably, your model as we already

18   said doesn't address that issue, both because

19   you're not looking at the counties and

20   because you're not looking at this general

21   issue of if the counties had behaved

22   reasonably, correct?

23             MS. RITTER:  Objection,

24        foundation.

25        A.    Yeah, I don't feel that I'm in

1    a position to provide -- at this time I

2    haven't prepared my report to focus on

3    whether or not the counties have behaved

4    reasonably, so I wouldn't want to suggest

5    otherwise.  I don't -- that wasn't my point.

6              But it is the case that I did

7    not try to estimate a counterfactual, which

8    is what -- how I would refer to it, you know,

9    epidemiologically for what the costs would

10   have been but for, you know, X, Y and Z.

11   BY MR. ALEXANDER:

12        Q.    Right.  And you said earlier

13   that you did review some testimony but not

14   through a transcript?  Did you watch a video

15   of some testimony?

16        A.    I did.

17        Q.    Who was that?

18        A.    I don't know her name.

19        Q.    In what circumstance was it?

20        A.    It was -- I reviewed the

21   testimony of, I believe, a medical -- I

22   believe it was the medical examiner of Summit

23   County.

24        Q.    Okay.  Is that Dr. Gilson?

25              MS. RITTER:  No, that's the

Highly Confidential - Subject to Further Confidentiality Review

 1          other one.

 2                  MR. ALEXANDER:  Okay.

 3    BY MR. ALEXANDER:

 4          Q.     So was it sworn testimony under

 5    oath where people were asking questions in

 6    connection with the case?

 7          A.     I believe it was.

 8          Q.     Okay.  And have you reviewed

 9    any other testimony from -- taken in the case

10    either by looking at a transcript or watching

11    a video?

12          A.     Not that I can recall.

13          Q.     And did you pick that one

14    medical examiner's video to watch or was that

15    picked for you?

16          A.     I did not pick it.

17          Q.     Let me just show you something.

18    This -- these are cites at the end of your

19    report, it's page 69.  This correlates to

20    some cites in paragraph -- in a paragraph

21    that talks -- I guess it's paragraph 24 that

22    talks about some of what you think is going

23    on in the counties in terms of resources

24    being exerted to address social ills, if you

25    will.

 1                   And so you see at the top of
 2      page 69, there's a reference to a series of
 3      depositions, Cabot, Merriman, Johnson,
 4      Tucker, Gilson, Reyes, Keenan.  Do you see
 5      those all in a row at the top of page 69?
 6           A.     I do.
 7           Q.     Did you actually review any of
 8      those depositions?
 9           A.     I did not.
10           Q.     Any idea how you have citations
11      to specific pages and lines in their -- from
12      their depositions in your report to talk
13      about specific propositions for what's going
14      on in the counties?
15           A.     I believe that I requested --
16      you know, I reviewed a number of source
17      documents from the counties, and I believe
18      that these were references that I may have
19      requested from counsel to help support the --
20      the statements that I was making.
21           Q.     So other than the Summit County
22      medical examiner, whose video you watched at
23      least some part of it, you don't actually
24      know what any of the sworn testimony any of
25      the current or former employees of Summit or

1    Cuyahoga Counties say about any of the issues

2    addressed in your report, including what

3    they've actually been doing or what their

4    burdens have been, correct?

5        A.    No, I believe that's correct.

6    My sources of information about Summit and

7    Cuyahoga County were based on my trip there

8    as well as the review of many different

9    written reports, and those reports I believe

10   have been provided as resources here.

11           I may well have interacted with

12   people who were deposed.  And the course of

13   those -- the meeting in Akron and the reports

14   that I reviewed may well have been provided.

15   For example, I reviewed a medical examiner's

16   report, so the reports that I reviewed may

17   well have been provided by people who

18   subsequently provided sworn testimony.

19           But I did not -- I do not

20   believe that I've reviewed the sworn

21   deposition of the -- that's represented by a

22   reference such as reference 91.

23           MR. ALEXANDER:  At this time

24       I'm actually switching for real.  This

25       is not a fake out.  Switching

1          questioning to another defendant.

2                    MS. RITTER:  Thank you very

3          much.

4                         EXAMINATION

5     BY MR. BENSINGER:

6          Q.     Dr. Alexander, my name is Peter

7     Bensinger Jr.  I represent Walgreens.

8                    Could you refer to Exhibit 1,

9     your April 3rd, 2019 expert report.  Do you

10    have it there?

11         A.     Yes, sir.

12         Q.     Would you turn to page 7,

13    please.  Paragraph 25, do you have it?

14         A.     Yes, sir.

15         Q.     In the middle of that

16    paragraph, you write:  Historical precedent

17    suggests that the current crisis can be

18    successfully reversed with a multi-faceted

19    approach that addresses the root causes of

20    the epidemic, including misleading marketing

21    and promotion and widespread overprescribing,

22    while also investing in treatment and

23    recovery.

24                    Do you see that?

25         A.     Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      I want to ask you a question
 2     about your reference to widespread
 3     overprescribing.
 4                      When you refer to
 5     overprescribing, you're referring there to
 6     prescriptions written by doctors, correct?
 7              A.      Well, or other licensed
 8     prescribers.
 9              Q.      Is there a licensed prescriber
10     who's not a doctor?
11              A.      Yes, sir.
12              Q.      You're referring to people who
13     are authorized by the DEA to write
14     prescriptions?
15              A.      Yes, sir.
16              Q.      And with respect to the
17     overprescribers who are persons authorized by
18     DEA to write prescriptions, are you here
19     referring to prescriptions written to
20     patients where there's a determination they
21     need opioids for medical reasons?
22              A.      I mean, I'm referring to -- so
23     you asked whether I'm referring to
24     prescriptions for patients where the
25     clinician has made a determination that
```

Highly Confidential - Subject to Further Confidentiality Review

1    opioids are -- should be used?

2         Q.    Yes.

3         A.    Yes, I am.

4         Q.    You are not referring to

5    pharmacists when you refer to overprescribing

6    in your report, correct?

7         A.    In this instance, no.

8         Q.    What I stated is correct; you

9    are not referring to pharmacists with respect

10   to overprescribing as you used the term in

11   paragraph 25?

12        A.    Yeah, here I'm referring just

13   to licensed prescribers.  Pharmacists are a

14   part of the overall system, but here, I'm

15   referring just to prescribers.

16        Q.    Pharmacists are not licensed

17   prescribers, correct?

18        A.    Correct.

19        Q.    Okay.  If you turn now to

20   page 10 in your April 3rd report, which is

21   Exhibit 1, referring you to paragraph 33.  Do

22   you have it?

23        A.    Yes, sir.

24        Q.    Here you write:  A related

25   misconception is that the epidemic is largely

```
 1    driven by devious individuals such as rogue

 2    physicians and patients who are doctor

 3    shoppers.

 4              Do you see that?

 5    A.     Yes, sir.

 6    Q.     What's a doctor shopper?

 7    A.     Well, casually, it's a term

 8    used to refer to individuals that may seek

 9    controlled substances in this context from

10    multiple physicians or multiple prescribers

11    or pharmacies.

12    Q.     And you refer here to "bad

13    actors."

14              Do you see that in quotes?

15    A.     Yes.

16    Q.     What did you mean by bad

17    actors?

18    A.     I meant individuals that are

19    egregiously, you know, sort of orders of

20    magnitude beyond usual standards of care.

21    You know, by any standard, individuals who --

22    I mean, for example, a, quote/unquote, pill

23    mill doctor.

24    Q.     All right.  You -- in Figure 4,

25    you have a chart captioned Opioid Shoppers
```

1    Dwarfed By Other High-Risk Patient Groups.

2    Many High-Risk Patients Get Opioids from

3    Low-Volume Prescribers.

4                Do you see that?

5        A.    Yes, sir.

6        Q.    Can you explain what this chart

7    shows with respect to the opioid shoppers

8    being dwarfed by other high-risk patient

9    groups?

10       A.    Yes.

11       Q.    What's important here?

12       A.    In looking at this population

13   of individuals, the proportion of individuals

14   who were at risk from opioids because they

15   are, for example, at -- at

16   higher-than-average risks from opioids

17   because, for example, they're combining them

18   with benzodiazapines or because, for example,

19   they're on chronic, I believe here, high-dose

20   opioids.

21                Those are much greater

22   proportions of the universe of opioid

23   recipients than the proportion of the

24   universe of opioid recipients that we

25   identified using this study and the

1    assumptions of this study that are opioid

2    shoppers.

3         Q.    And that's why you write in

4    paragraph 33, quote:  In other words,

5    individuals such as doctor shoppers represent

6    a very small proportion of people who are at

7    high risk for opioid-related adverse events,

8    and they also account for a small proportion

9    of prescription opioids entering the general

10   circulation; is that right?

11        A.    Yes, sir.

12        Q.    If you turn, please, to

13   page 24, paragraph 72.  Tell me when you have

14   it.

15        A.    Okay.

16        Q.    You refer in this paragraph to

17   a prevalent yet insidious stigma that erodes

18   effective community responses to the opioid

19   epidemic.

20             Do you see that?

21        A.    Yes, sir.

22        Q.    And elsewhere in your report

23   you refer to stigma.  Do you recall that?

24        A.    Yes.

25        Q.    When you use the term "stigma"

Highly Confidential - Subject to Further Confidentiality Review

1    in connection with the opioid epidemic, what

2    do you mean?  What are you referring to?

3         A.    I'm referring to the manner in

4    which individuals, organizations,

5    communities, societies, conceptualize and

6    treat people that have opioid use disorder

7    or, indeed, nonmedical use of opioids.

8         Q.    And you found that the stigma

9    can discourage patients from seeking

10   treatment, correct?

11        A.    I believe that's the case, yes.

12        Q.    You found that the stigma can

13   discourage clinicians from providing

14   treatment as well, correct?

15        A.    Yes, that's my belief.

16        Q.    You've also found that stigma

17   affects law enforcement first responders,

18   correct?

19        A.    Yes, that's my belief.

20        Q.    You also believe that the

21   stigma affects referrals for services for

22   those with opioid use disorder, correct?

23        A.    Yes, sir.

24        Q.    I want to now ask you questions

25   about Exhibit 3, which is the supplemental

1    expert report update of April 17th, 2019.

2                 Do you have it?

3         A.    I'm sure I can find it here,

4    thank you.  Yes, sir.

5         Q.    At the top you write:  Table 1

6    represents changes to the redress models used

7    to develop preliminary estimates of the

8    national abatement costs to address the

9    opioid epidemic.  Please refer to

10   paragraphs 176 through 180 in my report for

11   additional details.

12                Do you see that?

13        A.    Yes, sir.

14        Q.    When you refer to "my report"

15   in that sentence, to which report are you

16   referring?

17        A.    The most recent that was

18   submitted that this updates, namely, the

19   supplemental report.

20        Q.    Is that the one we've marked as

21   Exhibit 1 dated April 3rd, 2019?

22        A.    Yes, sir.

23        Q.    What caused you to make changes

24   to certain items of your redress model?

25        A.    I believe we've discussed that,

Highly Confidential - Subject to Further Confidentiality Review

1    but I felt that there were better estimates

2    that could be provided.

3         Q.    Did somebody suggest to you

4    that you should update the redress model that

5    you originally submitted on March 25th, 2019?

6         A.    No, sir.

7         Q.    You concluded that on your own?

8         A.    Yes, sir.

9         Q.    As a result of what?

10        A.    As a result of my review of the

11   materials that were submitted.

12        Q.    You hadn't reviewed materials

13   submitted before you actually submitted your

14   March 25, 2019 report?

15             MS. RITTER:  Objection, form.

16             THE WITNESS:  Can you ask

17        again, please?

18   BY MR. BENSINGER:

19        Q.    When you said a moment ago you

20   hadn't reviewed materials submitted, to what

21   were you referring?

22        A.    I don't believe I said that I

23   hadn't reviewed materials submitted.

24        Q.    When you were inspired to

25   change your report, was it because you

1    reviewed additional materials after you

2    submitted your initial report on March 25th,

3    2019?

4         A.     The reason I submitted a

5    supplement and an update to the supplement in

6    both instances were because of a combination

7    of my reviewing the materials that I had

8    submitted as well as source documentation to

9    support those.

10        Q.     So you wanted a do-over after

11   the initial submission based on further

12   reflection?

13        A.     Well, I'm not sure I would

14   characterize it as a do-over, but I felt that

15   there were better estimates and I wanted to

16   have my best estimates for the courts to

17   consider.

18        Q.     Let me ask you now a question

19   about page 25 of your April 3rd report.  This

20   is Exhibit 1.  I want to refer you to

21   paragraph 73.  Tell me when you have it.

22        A.     Yes, sir.

23        Q.     Here you're discussing safe

24   storage and drug disposal guidelines,

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes, sir.

 2              Q.      And the problem you identify

 3      here is that there's an overstock of opioids

 4      that people retain; is that correct?

 5              A.      Yes, sir.

 6              Q.      They don't actually use them

 7      for medical purposes, but they're lying

 8      around afterwards and then are used for

 9      nonmedical purposes?

10              A.      Yes, sir.

11              Q.      But in the instance where

12      you're discussing the problem of overstock,

13      in the first instance, those prescriptions

14      were written by licensed prescribers?

15              A.      Yes, sir.

16              MR. BENSINGER:  I don't have

17          any additional questions at this time.

18              THE VIDEOGRAPHER:  Going off

19          the record, 5:25 p.m.

20              (Recess taken, 5:25 p.m. to

21          5:34 p.m.)

22              THE VIDEOGRAPHER:  We're back

23          on the record at 5:34 p.m.

24              MR. MORRIS:  Dr. Alexander,

25          thank you for your time so far today.
```

1        A.      Thank you.

2                EXAMINATION

3    BY MR. MORRIS:

4        Q.      My name is Sean Morris.  I

5    represent one of the manufacturer defendant

6    groups.

7                You talked today about

8    abatement of the epidemic or the crisis.  As

9    part of your opinion, do you have a measure

10   by which you were going to -- or propose to

11   determine success of your abatement program?

12               In other words, I'm used to

13   dealing with environmental cases where you

14   have a groundwater cleanup, say, and there

15   are defined sets of things that need to be

16   done and that's how you measure success.

17               Do you have an opinion about

18   that for your abatement program?

19       A.      The interventions that I've

20   proposed work and there's consensus about

21   that, and if they're implemented in a

22   coordinated fashion, I believe they will lead

23   to large reductions in opioid-related

24   morbidity and mortality.

25               I've not developed a

Highly Confidential - Subject to Further Confidentiality Review

1    specific -- and I also emphasize in my report

2    the importance of surveillance and local

3    leadership and ongoing evaluation of

4    abatement programs.

5              So if you're asking if there's

6    a concrete number that I have where I would

7    say, well, we've been successful or not

8    successful based on achieving X, I don't have

9    a single number.  I think communities need to

10   develop these programs and their evaluation

11   metrics as well.

12        Q.    Okay.  So to put it another

13   way, there's not a set of numbers or

14   specifications that you are seeking to

15   achieve though your abatement plan?

16        A.    Well, I'm just a small part of

17   this.  I'm just providing my expertise to the

18   courts and my best evaluation, so, you know,

19   my best recommendation.

20              So I wasn't asked -- I was not

21   asked as part of the materials that I

22   prepared to provide such a number, but I

23   would certainly do so if I was asked to do

24   so.

25        Q.    And I understand that you're

1    describing yourself as part of the piece of

2    this, perhaps, but the abatement numbers and

3    proposals as part of your report that you

4    have are a significant number of dollars.

5           And so I'm wondering -- I'm

6    just exploring whether or not there are ways

7    that you are providing as part of your

8    opinion that are going to measure by actual

9    metrics the way in which there is a success

10    or not with those programs.

11    A.    Yeah.

12    Q.    And my understanding is that

13    you're saying you do not have that as part of

14    your plan, correct?

15    A.    No, I would not say that.  I

16    think there are -- I speak in my report to

17    the return on investment, so I speak in my

18    report to the -- to the -- what we know about

19    some of the economics of these interventions

20    in terms of their worth, their return on

21    investment.

22           We also in the Markov model

23    provide estimates for the magnitude of

24    reductions that we believe can be achieved in

25    ten years with coordinated comprehensive

Highly Confidential - Subject to Further Confidentiality Review

1    intervention of these programs.

2              These estimates are in line

3    with those of other estimates that have been

4    provided by other teams using Markov models,

5    and as one example that I think I gave

6    earlier today, with investments in medication

7    treatment and other services for individuals

8    with opioid use disorder, as well as fairly

9    modest reductions in opioid prescribing and

10   in naloxone distribution, I estimate that we

11   could reduce as many as 40% of overdose

12   deaths in the text ten years.

13       Q.     As part of your plan, do you

14   have, though, a measure by which you will

15   have achieved success?

16       A.     Thus far I have not been asked

17   as part of my expert report to provide such

18   information.

19       Q.     As part of your plan, the

20   numbers that you're talking about of the

21   dollars that you would be used for abatement, do

22   you have an opinion about where are those

23   dollars going to go, meaning -- and I don't

24   mean like for what programs.  Literally, who

25   is going to administer the program?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      I've not been asked to provide
2    my thoughts about that to the court at this
3    time.
4          Q.      Okay.  So you're not proposing
5    that there be some sort of fund set up where
6    these dollars get put into and then used?
7          A.      No, I've not developed a -- you
8    know, a strategic action plan for the
9    disbursement of funds as part of the
10   materials that I've developed for the report
11   thus far.
12         Q.      Okay.  As part of your
13   abatement plan, there are aspects of it where
14   there are individuals who are going to
15   receive treatment through these dollars,
16   correct?
17         A.      Yes, sir.
18         Q.      Okay.  And those are actual
19   individuals that will be receiving treatment;
20   those aren't just statistics, correct?
21         A.      Yes.  Yes, sir.  That's exactly
22   right.
23         Q.      Right.
24                 And so I understand from your
25   testimony that there -- you're not providing
```

1    an opinion about whether any particular

2    defendant or any other group is -- what

3    portion of responsibility they may have for

4    the abatement plan that you're proposing?

5         A.    That's correct.

6         Q.    But there are going to be --

7    since there are going to be individuals who

8    are treated, there are going to be some

9    individuals who are going to receive

10   treatment as part of your plan that have no

11   connection at all to the defendants in this

12   case, correct?

13             MS. RITTER:  Objection.

14   BY MR. MORRIS:

15        Q.    For example, someone five years

16   from now who may receive treatment under your

17   proposed plan who started off on an opioid

18   that was not a prescription opioid but

19   instead was an illegal fentanyl, that has

20   nothing to do with the defendants in this

21   case, correct?

22             MS. RITTER:  Objection, form,

23        foundation.

24        A.    I'm not sure that I would say

25   that has nothing to do with the defendants in

1    this case, but as I highlighted earlier, our

2    estimated costs for treatment exclude the

3    costs of treating the population that has

4    heroin or illicit fentanyl use that was not

5    preceded by prescription opioid use.

6            MS. RITTER:  The bell has rung.

7        It's perfect.  You got that big

8        question.

9            MR. MORRIS:  Okay.  I

10       understand, and, Doctor, thank you for

11       your time.  I'll simply note for the

12       record that we object -- it's all over

13       the papers, but for the purpose of

14       keeping it on the record, we object to

15       the limitation of the seven hours but

16       understand that those are the rules

17       that we're operating under per the

18       court, and I personally thank you for

19       your time today.

20           THE WITNESS:  Thank you very

21       much.  I appreciate the opportunity.

22           MR. REATEGUI:  This is Bruno

23       Reategui, counsel for the Teva

24       defendants.  I would like to place a

25       due process violation on the record

1          for not being able to ask questions in

2          any meaningful way today.  That is

3          all.

4                    MS. RITTER:  That's between you

5          guys.

6                    Cuyahoga has counsel on by

7          phone.  Does Cuyahoga have any

8          questions, if they're still on?  Sal?

9                    MR. CIACCIO:  No.  This is Joe

10         Ciaccio for Cuyahoga, but we don't

11         have any questions.

12                   MS. RITTER:  Okay.  Neither do

13         we.  Thank you very much.

14                   THE VIDEOGRAPHER:  This ends

15         today's deposition.  We're going off

16         the record at 5:42 p.m.

17                   (Proceedings recessed at

18         5:42 p.m.)

19                        --o0o--

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       CERTIFICATE
 2              I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    G. CALEB ALEXANDER, M.D., M.S. was duly sworn
      by me to testify to the truth, the whole
 6    truth and nothing but the truth.
 7              I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
                I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13              I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
19    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
20    NCRA Certified Realtime Reporter
      Certified Court Reporter
21
      Notary Public
22    My Commission Expires:  7/9/2020
23    Dated: May 1, 2019
24
25
```

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4       carefully and make any necessary corrections.

 5       You should state the reason in the

 6       appropriate space on the errata sheet for any

 7       corrections that are made.

 8              After doing so, please sign the

 9       errata sheet and date it.

10              You are signing same subject to

11       the changes you have noted on the errata

12       sheet, which will be attached to your

13       deposition.

14              It is imperative that you return

15       the original errata sheet to the deposing

16       attorney within thirty (30) days of receipt

17       of the deposition transcript by you.  If you

18       fail to do so, the deposition transcript may

19       be deemed to be accurate and may be used in

20       court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          ERRATA

 2     PAGE   LINE   CHANGE

 3     _____  _____  _____

 4            REASON: _____

 5     _____  _____  _____

 6            REASON: _____

 7     _____  _____  _____

 8            REASON: _____

 9     _____  _____  _____

10            REASON: _____

11     _____  _____  _____

12            REASON: _____

13     _____  _____  _____

14            REASON: _____

15     _____  _____  _____

16            REASON: _____

17     _____  _____  _____

18            REASON: _____

19     _____  _____  _____

20            REASON: _____

21     _____  _____  _____

22            REASON: _____

23     _____  _____  _____

24            REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I, G. CALEB ALEXANDER, M.D., M.S.,
      do hereby certify that I have read the
 5    foregoing pages and that the same is a
      correct transcription of the answers given by
 6    me to the questions therein propounded,
      except for the corrections or changes in form
 7    or substance, if any, noted in the attached
      Errata Sheet.

 8

 9

10

11

12    _____

       G. CALEB ALEXANDER, M.D., M.S.        DATE
13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    _____

20    Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2

 3     PAGE      LINE

 4     _____     _____     _____

 5     _____     _____     _____

 6     _____     _____     _____

 7     _____     _____     _____

 8     _____     _____     _____

 9     _____     _____     _____

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23     _____     _____     _____

24     _____     _____     _____

25
```