IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


~~~~~~~~~~~~~~~~~~~~


IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
OPIATE LITIGATION
                                   Case No. 17-md-2804

                                   Judge Dan Aaron
This document relates to:          Polster

The County of Summit, Ohio, et al.
v. Purdue Pharma L.P., et al.
Case No. 17-OP-45004

The County of Cuyahoga v. Purdue
Pharma L.P., et al.
Case No. 18-OP-45090

City of Cleveland, Ohio v. Purdue
Pharma L.P., et al
Case No. 18-OP-45132


~~~~~~~~~~~~~~~~~~~~~


Videotaped deposition of
TERRENCE M. ALLAN


December 17, 2018
9:05 a.m.



Taken at:
Tucker Ellis
950 Main Avenue, Suite 1100
Cleveland, Ohio.


Renee L. Pellegrino, RPR, CLR

```
 1    APPEARANCES:

 2    On behalf of Cuyahoga County:
          Plevin & Gallucci
 3        FRANK L. GALLUCCI, III, ESQ.
          55 Public Square.
 4        Suite 2222
          Cleveland, Ohio  44113-1901
 5        (216) 861-0804
          fgallucci@pglawyer.com
 6           - and -
          Thrasher, Dinsmore & Dolan
 7        LEO M. SPELLACY, JR., ESQ.
          1111 Superior Avenue, Suite 412
 8        Cleveland, Ohio  44114
          (216) 255-5434
 9        lspellacy@tddlaw.com

10    On behalf of Johnson & Johnson and Janssen
      Pharmaceuticals, Inc.:
11        Tucker Ellis LLP
          ERICA M. JAMES, ESQ.
12        950 Main Avenue
          Suite 1100
13        Cleveland, Ohio  44113-7213
          (216) 592-5000
14        erica.james@tuckerellis.com

15    On behalf of Walmart, Inc.
          Jones Day
16        BRANDY H. RANJAN, ESQ.
          325 John H. McConnell Boulevard
17        Suite 600
          Cleveland, Ohio  43215-2673
18        (614) 469-3939
          branjan@jonesday.com
19

20                    ~ ~ ~ ~ ~

21

22

23

24

25
```

```
 1   APPEARANCES, CONT'D:

 2   On behalf of Endo Pharmaceuticals, Inc., Endo
     Health Solutions, Inc., Par Pharmaceuticals,
 3   Inc. and Par Pharmaceutical Companies, Inc.:
          (Via Telephone)
 4        Baker Hostetler
          DOUGLAS A. SHIVELY, ESQ.
 5        Key Tower, 127 Public Square
          Cleveland, Ohio  44114-1214
 6        (216) 621-0200
          dshively@bakerhostetler.com
 7
     On behalf of Teva Pharmaceutical Industries:
 8        (Via Telephone)
          Morgan Lewis & Bockius LLP
 9        MAUREEN K. BARBER, ESQ.
          One Oxford Centre
10        Thirty Second Floor
          Pittsburgh, Pennsylvania  15219-6401
11        (412) 560-7455
          maureen.barber@morganlewis.com
12
     On behalf of Cardinal Health, Inc.:
13        Williams & Connolly LLP
          J. ANDREW KEYES, ESQ.
14        MONIKA ISIA JASIEWICZ, ESQ.
          725 12th Street NW
15        Washington, D.C.  20005
          (202) 434-5000
16        akeyes@cov.com
          ijasiewicz@wc.com
17
     On behalf of CVS Indiana, LLC and CVS Rx Services,
18   Inc.:
          Zuckerman Spaeder LLP
19        DANIEL P. MOYLAN, ESQ.
          100 East Pratt Street, Suite 2440
20        Baltimore, Maryland  21202-1031
          (410) 949-1159
21        dmoylan@zuckerman.com

22
                     ~ ~ ~ ~ ~
23

24

25
```

```
 1    APPEARANCES, CONT'D:

 2    On behalf of AmerisourceBergen Drug Corporation:
          (Via Telephone)
 3        Reed Smith LLP
          SHANA RUSSO, ESQ.
 4        136 Main Street, Suite 250
          Princeton Forrestal Village
 5        Princeton, New Jersey  08540
          (609) 987-0050
 6        srusso@reedsmith.com

 7
      ALSO PRESENT:  Joe VanDetta, Videographer
 8

 9                      ~ ~ ~ ~ ~

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    TRANSCRIPT INDEX

2    APPEARANCES ....................................2

3    INDEX OF EXHIBITS ..............................6

4    INDEX OF OBJECTIONS ............................8

5

6    EXAMINATION OF TERRENCE M. ALLAN:

7    BY MR. KEYES .................................15

8    BY MS. JAMES ................................284

9    BY MR. MOYLAN ...............................299

10

11   AFTERNOON SESSION ...........................157

12

13   REPORTER'S CERTIFICATE ......................307

14

15   EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS

2      Number            Description            Marked

3

4    Exhibit 1    Resume - Terry Allan, Beginning  148
                  Bates Number CUYAH-01437729 -
5                 Marked "Confidential"

6    Exhibit 2    Plaintiffs The County of         157
                  Cuyahoga, Ohio and the State of
7                 Ohio Ex Rel. Prosecuting
                  Attorney of Cuyahoga County,
8                 Michael C. O'Malley's Second
                  Supplemental Responses and
9                 Objections to Distributor
                  Defendants' Interrogatory No. 18
10                Pursuant to the Court's November
                  21, 2018 Order
11
     Exhibit 3    Plaintiffs the County of         164
12                Cuyahoga, Ohio and the State of
                  Ohio Ex Rel. Prosecuting
13                Attorney of Cuyahoga County,
                  Michael C. O'Malley's Second
14                Amended Responses and Objections
                  to Manufacturer Defendants'
15                First Set of Interrogatories

16   Exhibit 4    Cuyahoga County Board of Health  167
                  2010 Annual Report
17
     Exhibit 5    Cuyahoga County Board of Health  185
18                2012 Annual Report

19   Exhibit 6    Cuyahoga County Board of Health  192
                  2015 Annual Report
20
     Exhibit 7    Cuyahoga County Board of Health  210
21                Annual Report 2016

22   Exhibit 8    Cuyahoga County Board of Health  216
                  Annual Report 2017
23
     Exhibit 9    Cuyahoga County Board of Health  222
24                Website Printout

25

```
 1              INDEX OF EXHIBITS, CONT'D

 2
     Exhibit 10   E-Mail String Beginning Bates    247
 3                Number CUYAH_002350842 - Marked
                  "Confidential"
 4
     Exhibit 11   Cuyahoga County Opiate Task      261
 5                Force Report 2014

 6   Exhibit 12   E-Mail String Beginning Bates    264
                  Number CUYAH_001635636 - Marked
 7                "Confidential"

 8   Exhibit 13   E-Mail String Beginning Bates    269
                  Number CUYAH_014232916 - Marked
 9                "Confidential"

10   Exhibit 14   E-Mail String Beginning Bates    274
                  Number CUYAH_014270428 - Marked
11                "Confidential"

12   Exhibit 15   Cuyahoga County Opiate Task      286
                  Force Report 2016, Beginning
13                Bates Number CUYAH_000018265

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF OBJECTIONS
```

```
 2   Objection ..................................25
     Objection ..................................25
 3   Objection ..................................25
     Objection ..................................28
 4   Objection ..................................28
     Objection ..................................28
 5   Objection ..................................29
     Objection ..................................29
 6   Objection ..................................31
     Objection ..................................31
 7   Objection ..................................32
     Objection ..................................34
 8   Objection ..................................36
     Objection ..................................36
 9   Objection ..................................40
     Objection ..................................44
10   Objection ..................................46
     Objection ..................................47
11   Objection ..................................48
     Objection ..................................48
12   Objection ..................................53
     Objection ..................................54
13   Objection ..................................57
     Objection ..................................58
14   Objection ..................................62
     Objection ..................................63
15   Objection ..................................65
     Objection ..................................71
16   Objection ..................................71
     Objection ..................................71
17   Objection ..................................72
     Objection ..................................72
18   Objection ..................................86
     Objection ..................................86
19   Objection ..................................88
     Objection ..................................88
20   Objection ..................................88
     Objection ..................................89
21   Objection ..................................90
     Objection .................................101
22   Objection .................................105
     Objection .................................107
23   Objection .................................108
     Objection .................................108
24   Objection .................................108
     Objection .................................108
25   Objection .................................109
```

1                    INDEX OF OBJECTIONS

2    Objection .......................................110
     Objection .......................................110
3    Objection .......................................110
     Objection .......................................112
4    Objection .......................................113
     Objection .......................................114
5    Objection .......................................114
     Objection .......................................115
6    Objection .......................................115
     Objection .......................................115
7    Objection .......................................117
     Objection .......................................120
8    Objection .......................................120
     Objection .......................................121
9    Objection .......................................121
     Objection .......................................122
10   Objection .......................................123
     Objection .......................................124
11   Objection .......................................125
     Objection.......................................125
12   Objection .......................................126
     Objection .......................................126
13   Objection .......................................127
     Objection .......................................127
14   Objection .......................................127
     Objection .......................................127
15   Objection .......................................128
     Objection .......................................129
16   Objection .......................................129
     Objection .......................................129
17   Objection .......................................129
     Objection .......................................131
18   Objection .......................................131
     Objection .......................................131
19   Objection .......................................131
     Objection .......................................132
20   Objection .......................................132
     Objection .......................................132
21   Objection .......................................133
     Objection .......................................133
22   Objection .......................................133
     Objection .......................................135
23   Objection .......................................135
     Objection .......................................136
24   Objection .......................................136
     Objection .......................................136
25   Objection .......................................137

```
 1              INDEX OF OBJECTIONS, CONT'D
```

```
 2   Objection ...................................137
     Objection ...................................138
 3   Objection ...................................138
     Objection ...................................139
 4   Objection ...................................139
     Objection ...................................139
 5   Objection ...................................141
     Objection ...................................141
 6   Objection ...................................142
     Objection ...................................142
 7   Objection ...................................142
     Objection ...................................142
 8   Objection ...................................142
     Objection ...................................144
 9   Objection ...................................144
     Objection ...................................145
10   Objection ...................................146
     Objection ...................................146
11   Objection ...................................146
     Objection ...................................146
12   Objection ...................................147
     Objection ...................................147
13   Objection ...................................147
     Objection ...................................148
14   Objection ...................................150
     Objection ...................................163
15   Objection ...................................163
     Objection ...................................163
16   Objection ...................................164
     Objection ...................................169
17   Objection ...................................169
     Objection ...................................170
18   Objection ...................................170
     Objection ...................................171
19   Objection ...................................172
     Objection ...................................172
20   Objection ...................................172
     Objection ...................................172
21   Objection ...................................174
     Objection ...................................175
22   Objection ...................................176
     Objection ...................................177
23   Objection ...................................178
     Objection ...................................179
24   Objection ...................................179
```

```
25
```

```
 1              INDEX OF OBJECTIONS
```

```
 2   Objection ...................................180
     Objection ...................................181
 3   Objection ...................................181
     Objection ...................................182
 4   Objection ...................................182
     Objection ...................................182
 5   Objection ...................................182
     Objection ...................................183
 6   Objection ...................................183
     Objection ...................................183
 7   Objection ...................................186
     Objection ...................................186
 8   Objection ...................................187
     Objection ...................................187
 9   Objection ...................................188
     Objection ...................................188
10   Objection ...................................190
     Objection ...................................190
11   Objection ...................................190
     Objection ...................................191
12   Objection ...................................191
     Objection ...................................191
13   Objection ...................................192
     Objection ...................................193
14   Objection ...................................193
     Objection ...................................194
15   Objection ...................................194
     Objection ...................................195
16   Objection ...................................196
     Objection ...................................196
17   Objection ...................................196
     Objection ...................................197
18   Objection ...................................197
     Objection ...................................197
19   Objection ...................................197
     Objection ...................................198
20   Objection ...................................198
     Objection ...................................199
21   Objection ...................................199
     Objection ...................................207
22   Objection ...................................207
     Objection ...................................207
23   Objection ...................................209
     Objection ...................................210
24   Objection ...................................211
     Objection ...................................211
25   Objection ...................................211
```

```
 1              INDEX OF OBJECTIONS, CONT'D
 2   Objection ....................................212
     Objection ....................................212
 3   Objection ....................................212
     Objection ....................................213
 4   Objection ....................................213
     Objection ....................................214
 5   Objection ....................................215
     Objection ....................................217
 6   Objection ....................................218
     Objection ....................................220
 7   Objection ....................................220
     Objection ....................................220
 8   Objection ....................................221
     Objection ....................................221
 9   Objection ....................................222
     Objection ....................................224
10   Objection ....................................224
     Objection ....................................225
11   Objection ....................................226
     Objection ....................................227
12   Objection ....................................227
     Objection ....................................227
13   Objection ....................................228
     Objection ....................................228
14   Objection ....................................228
     Objection ....................................229
15   Objection ....................................229
     Objection ....................................231
16   Objection ....................................232
     Objection ....................................232
17   Objection ....................................234
     Objection ....................................235
18   Objection ....................................236
     Objection ....................................237
19   Objection ....................................237
     Objection ....................................238
20   Objection ....................................238
     Objection ....................................239
21   Objection ....................................239
     Objection ....................................240
22   Objection ....................................242
     Objection ....................................242
23   Objection ....................................243
     Objection ....................................244
24   Objection ....................................245
     Objection ....................................247
25   Objection ....................................247
```

1                    INDEX OF OBJECTIONS, CONT'D

2     Objection ...................................250
      Objection ...................................252
3     Objection ...................................255
      Objection ...................................256
4     Objection ...................................256
      Objection ...................................256
5     Objection ...................................258
      Objection ...................................263
6     Objection ...................................263
      Objection ...................................265
7     Objection ...................................265
      Objection ...................................267
8     Objection ...................................267
      Objection ...................................269
9     Objection ...................................272
      Objection ...................................277
10    Objection ...................................285
      Objection ...................................288
11    Objection ...................................288
      Objection ...................................290
12    Objection ...................................291
      Objection ...................................291
13    Objection ...................................292
      Objection ...................................292
14    Objection ...................................293
      Objection ...................................294
15    Objection ...................................295
      Objection ...................................295
16    Objection ...................................295
      Objection ...................................296
17    Objection ...................................297
      Objection ...................................298
18    Objection ...................................299
      Objection ...................................300
19    Objection ...................................304
      Objection ...................................304
20    Objection ...................................304
      Objection ...................................304
21    Objection ...................................304

22

23

24

25

 1                   THE VIDEOGRAPHER:  We are now on the

 2    record.  The date is December 17th, 2018.  The

 3    time is 9:05 a.m.  The caption of this case is

 4    In Re: National Prescription Opiate Litigation.

 5    The name of the witness is Terry Allan.

 6                   At this point the attorneys present

 7    and those attending remotely will identify

 8    themselves and the parties they represent.

 9                   MR. KEYES:  Andrew Keyes of Williams

10    & Connolly on behalf of Cardinal Health.

11                   MS. JASIEWICZ:  Isia Jasiewicz, also

12    of Williams & Connolly, on behalf of Cardinal

13    Health.

14                   MS. JAMES:  Erica James of Tucker

15    Ellis on behalf of Janssen Pharmaceuticals and

16    Johnson & Johnson.

17                   MS. RANJAN:  Brandy Ranjan from

18    Jones Day on behalf of Walmart.

19                   MR. MOYLAN:  Daniel Moylan,

20    Zuckerman Spaeder, on behalf of CVS.

21                   MR. GALLUCCI:  Frank Gallucci,

22    Plevin & Gallucci, on behalf of Plaintiff,

23    Cuyahoga County.

24                   MR. SPELLACY:  Leo Spellacy,

25    Thrasher, Dinsmore & Dolan, on behalf of

1  Cuyahoga County.

2              THE VIDEOGRAPHER:  People on the

3  phone?

4              MS. ZOLLER:  Rebecca Zoller with

5  Arnold & Porter on behalf of the Endo and Par

6  Defendants.

7              MS. RUSSO:  Shana Russo, Reed Smith,

8  on behalf of AmerisourceBergen Drug Corporation.

9              MS. BARBER:  Maureen Barber of

10  Morgan Lewis & Bockius on behalf of the Teva

11  Defendants.

12             THE VIDEOGRAPHER:  Anyone else on

13  the phone?

14             MR. SHIVELY:  Doug Shively, Baker &

15  Hostetler, on behalf of the Endo Defendants.

16             THE VIDEOGRAPHER:  Will the court

17  reporter please swear in the witness?

18        TERRENCE M. ALLAN, of lawful age, called

19  for examination, as provided by the Federal Rules

20  of Civil Procedure, being by me first duly sworn,

21  as hereinafter certified, deposed and said as

22  follows:

23             EXAMINATION OF TERRENCE M. ALLAN

24  BY MR. KEYES:

25        Q.    Good morning, Mr. Allan.

1          A.      Good morning.

2          Q.      Would you please state your full

3     name for the record?

4          A.      Terrence Michael Allan.

5          Q.      And where do you currently live?

6          A.      I live in Bay Village, Ohio.

7          Q.      Is that -- how long have you lived

8     there?

9          A.      Thirteen years.

10         Q.      Are you currently employed?

11         A.      I am.

12         Q.      Who is your employer?

13         A.      The Cuyahoga County Board of Health.

14         Q.      How long have you been employed by

15    the Cuyahoga County Board of Health?

16         A.      Almost 30 years.

17         Q.      What is your current position?

18         A.      I'm the health commissioner.

19         Q.      How long have you been the health

20    commissioner?

21         A.      Since 2004.

22         Q.      Are you a salaried employee?

23         A.      I work on contract at the pleasure

24    of the board.

25         Q.      At the pleasure of the board itself

Page 17

1   for the Cuyahoga County Board of Health?

2           A.     The board appoints the health

3   commissioner.

4           Q.     How many people are on the board

5   itself?

6           A.     Five.

7           Q.     Does each board member serve a term?

8           A.     Yes.

9           Q.     How long is the term?

10          A.     Five years.

11          Q.     And is this an elected position to

12  the Board of Health?

13          A.     The board is appointed by -- in Ohio

14  boards of health at the county level are

15  appointed by a district advisory council, which

16  is comprised of village and township mayors, and

17  a representative from the county executive's

18  office.  They appoint the board to five-year

19  staggered terms.

20          Q.     Are you a member of the board?

21          A.     I am considered the secretary of the

22  board.

23          Q.     Is that a voting position?

24          A.     No.

25          Q.     And you said you're on contract with

Page 18

1    the Cuyahoga County Board of Health and serve at

2    the pleasure of the board.  Do you have a

3    written contract?

4         A.    I do.

5         Q.    Have you had a written contract

6    throughout your tenure as the health

7    commissioner?

8         A.    Yes.

9         Q.    Is it an annual contract?

10        A.    I'm in a five-year contract

11   currently.

12        Q.    So what year are you in of that

13   five-year contract term?

14        A.    I'm finishing year three.

15        Q.    How many separate contracts have you

16   had with the Cuyahoga County Board of Health

17   during your tenure as health commissioner?

18        A.    I guess this is -- I think this is

19   my third, my third contract.

20        Q.    What was the term of the first

21   contract?

22        A.    I can't recall specifically because

23   there was one contract that was a year contract,

24   and then, for some reason that I can't recall,

25   there was a -- a decision to do a five-year

Page 19

1   contract after that.  I mean, there was a

2   transition.  We had a five-year contract, and

3   then there was a decision to look at it again

4   and renew it as a five-year starting again the

5   following year.  So usually they've been

6   five-year contracts from the beginning, but

7   there was some -- but at the beginning there was

8   a distinction that I can't recall specifically

9   at the moment.

10       Q.    So with the exception of perhaps a

11  year, you've always been on a five-year

12  contract?

13       A.    Yes.

14       Q.    And do you receive a salary under

15  that contract?

16       A.    Yes.  I'm paid under that contract.

17       Q.    Are you paid a salary?

18       A.    I'm paid -- what do you mean when

19  you say "salary"?  I work in government.  What

20  do you mean by "salary"?

21       Q.    Well, would you describe how your

22  compensation is structured under your existing

23  contract with the Cuyahoga County Board of

24  Health?

25       A.    I receive biweekly compensation,

1    like everyone else.

2         Q.    And have you received biweekly

3    compensation throughout your tenure under the

4    current five-year contract?

5         A.    Yes.

6         Q.    Did you receive biweekly

7    compensation under your prior multi-year

8    contracts with the Cuyahoga County Board of

9    Health?

10        A.    Yes.

11        Q.    What is the role or responsibility

12   of the Cuyahoga County Board of Health?

13        A.    We provide a range of public health

14   services to -- to 58 Cuyahoga County

15   communities, about 850,000 people.  We also have

16   some regional responsibilities.  And that

17   involves prevention, recognition, response

18   around a range of preventible illnesses.

19             We're involved in environmental

20   health issues like food protection, foodborne

21   outbreak response.  We do work around vector

22   control of things like mosquito-borne diseases.

23   We inspect and evaluate septic systems for their

24   discharges to ensure the waterways are

25   protected.  Those are some of the programs in

1   environmental health.

2           In prevention and wellness we do

3   vaccine-preventible diseases.  We have a travel

4   clinic.  We do a family planning clinic.  We

5   have some school health programs, tobacco

6   prevention, newborn home visiting programs, a

7   lot of early childhood obesity prevention

8   activities.

9           We run a multi-county Ryan White

10  program, which provides resources and support

11  for people living with HIV and AIDS.  We run an

12  18-county breast and cervical cancer prevention

13  program through the Centers for Disease Control

14  that provides breast and cervical cancer

15  screening for people who are -- who do not have

16  access to healthcare, and then also provides

17  resources for treatment.

18          So those are a range of programs.

19  It may not be all.  We have 44.  So I'm giving

20  you a range of the types of things we do.

21          Moving into epidemiology,

22  surveillance and informatics, we analyze lots of

23  data from things like infectious diseases, lead

24  poisoning.  We look at concentration of grocery

25  stores, access to vehicles, and healthy food

1    access in communities.  We respond to

2    emergencies.  Since 9/11 we've been actively

3    involved with a range of responses, including

4    anthrax and Ebola response.  We had some Ebola

5    people who were exposed in Dallas, traveled to

6    Cleveland, and we were in the middle of that

7    response; H1N1 influenza, we were in the middle

8    of that response, and coordinating the public

9    health activities there.

10                We -- so those are the range of

11   things that are involved in -- we also do a lot

12   of assessment activities, working with hospital

13   systems and others, to determine what the public

14   health issues are in the community, and then

15   work together around improvement.

16                And then we have administration,

17   which manages the fiscal activities, human

18   resources, performance, management, legal.

19                So that's kind of the high-level

20   view of what we do.

21        Q.    In your prior answer you said we

22   have 44 --

23        A.    44 programs and services.

24        Q.    Within a particular area or all

25   across the Board of Health?

1          A.      All across the Board of Health.

2          Q.      Okay.  So all told, the Cuyahoga

3     County Board of Health has 44 different programs

4     and services?

5          A.      Right.  And that number can

6     fluctuate based on availability of funds and

7     things like that over the years.

8          Q.      How large is the Cuyahoga County

9     Board of Health staff currently?

10         A.      About 150.

11         Q.      And does that include employees?

12         A.      Yes.

13         Q.      Does it include contractors?

14         A.      We have -- no, that would not

15    include contractors.  We have also some seasonal

16    staff that come in the summer to do some work,

17    usually something less than 20.

18         Q.      And what type of work does the

19    seasonal staff do?

20         A.      They do stormwater assessments, so

21    there are -- communities have outfalls where

22    pipes that basically -- things pour out of into

23    streams and other places, and they assess what's

24    coming out of the pipes and determine if there's

25    cross-connections, sewage, et cetera, and

Page 24

1    then -- they do that sort of work, helping

2    cities determine how they're going to deal with

3    their stormwater cross-connections required by

4    Ohio EPA.  And they also do vector control

5    programs.  So we identify places that mosquitoes

6    breed around the county.  There are lots of

7    places.  And we do that to control

8    mosquito-borne disease throughout those

9    communities.  And we also do a lot of education

10   around things like tick-borne diseases and the

11   like.

12        Q.    So have you described for me the

13   types of work that the seasonal staff do?

14        A.    Yes.

15        Q.    Stormwater assessments, vector

16   control programs and education, including

17   tick-borne diseases?

18        A.    Um-hum.

19        Q.    Anything else you would add to that

20   list?

21        A.    Not that I can think of right now.

22        Q.    And you told me that the current

23   staff is about 150 employees.  Has that

24   fluctuated significantly from year to year over

25   the past ten years?

1          MR. GALLUCCI:  Object to form.

2          You can answer.

3      A.    Okay.  During the recession,

4  somewhere in at least ten years -- around ten

5  years back, we decided to move significantly

6  away from the school health program because

7  private industry was providing those services,

8  and it was no longer -- we no longer had the

9  ability to compete, and since there was another

10  resource available through private industry to

11  provide basic school health services, we largely

12  moved out of that arena, except for some -- a

13  few small schools, and so at the time we lost

14  about 35 staff of nurses and clinic aides that

15  worked in those schools.

16      Q.    So is it accurate to say that

17  roughly ten years ago, before the recession, the

18  Cuyahoga County Board of Health had roughly 185

19  employees?

20          MR. GALLUCCI:  Object to form.

21      A.    I'd have to go back and look at that

22  number, but -- I'd have to go back and look.

23      Q.    Does that sound right generally?

24          MR. GALLUCCI:  Object to form.

25      A.    I think I'd have to go back and look

1    to be able to give an accurate answer.

2         Q.    Okay.  Over the past ten years, what

3    was the highest number of employees the Cuyahoga

4    County Board of Health had?

5         A.    I think I'd give the same answer.

6    I'd have to go back and look to give you an

7    accurate answer.

8         Q.    Okay.  What was the lowest?

9         A.    I think I'd have to go back to give

10   you an accurate answer.

11        Q.    Okay.  Where would you look to

12   identify the highest number of employees, the

13   lowest number of employees, and the number of

14   employees you had ten years ago?

15        A.    We'd have to go back through our

16   human resource records.

17        Q.    And who in particular would you talk

18   to about obtaining and reviewing the human

19   resource records?

20        A.    Our director of organizational

21   development is Najeebah Shine, N-a-j-e-e-b-a-h,

22   Shine.  And she would have -- be able to look at

23   some of the historical data.

24        Q.    You mentioned scaling back away from

25   school health programs.  And did you place that

1    in connection with the recession?

2          A.    Yes.

3          Q.    So what recession are you referring

4    to?

5          A.    The -- as much as I can speak to it,

6    sort of the economic recession where there were

7    a number of challenges for resources that were

8    available to lots of people around the country,

9    health departments included, and job losses,

10   and, in that context, we would have to provide

11   general revenue resources to support school

12   health because of challenges that schools may

13   have with levies and the like to sustain their

14   work.

15              And we did our best to -- we believe

16   we provided the best range of services to

17   schools because we had certified school health

18   nurses and we felt that the ratio of school

19   health nurses to clinic aides was appropriate.

20   And so we tried to sustain that and realized we

21   got to a point that we could not sustain it, and

22   we knew that there was a -- as I mentioned,

23   there was a -- there are other companies that

24   provided that service, and so we made a decision

25   to move away from that service.

Page 28

 1      Q.    And you placed that economic

 2   recession in time about ten years back?

 3            MR. GALLUCCI:  Object to form.

 4      A.    Around.

 5      Q.    Around ten years ago?

 6      A.    Around.

 7      Q.    But you say "around."  I'm trying to

 8   understand what you mean by "around."  Does that

 9   mean around ten years ago is when you believe

10   the recession took place?

11            MR. GALLUCCI:  Object to form.

12      A.    Around.  You said what do you mean

13   by around, and then you said around, and I'm

14   saying around.

15      Q.    Around ten years?

16            MR. GALLUCCI:  Object to form.

17      A.    I don't understand.

18      Q.    Well, you articulated for me why the

19   number of employees for the Cuyahoga Board of

20   Health went down.  You told me that it was the

21   result of a decision to move away from providing

22   school health programs.  You said that was an

23   outgrowth of the economic recession that was

24   providing challenges for resources to public

25   health departments around the country.  And I'm

Page  29

1    asking you, can you place in time when that

2    happened?

3                MR. GALLUCCI:  Object to form.

4        A.    I think I said around ten years ago.

5        Q.    Okay.

6        A.    I know I said that multiple times,

7    around ten years ago.

8        Q.    What is the Cuyahoga County Board of

9    Health's total budget currently?

10       A.    It's approximately 22 million

11   dollars.

12       Q.    And what are the sources of that 22

13   million dollars?

14       A.    We have general revenue funds that

15   we receive from our villages and townships.  We

16   receive some infrastructure support from the

17   county administration.  We have permits and fees

18   that support programs and some contract work

19   that supports programs.  We also receive

20   federal, state and local grants.

21       Q.    Roughly, how much does the Cuyahoga

22   County Board of Health receive in federal, state

23   and local grants?

24                MR. GALLUCCI:  Object to form.

25       A.    Approximately 50 percent.

1      Q.    And when you say "federal, state and

2  local grants," what is the local?  What is the

3  source of the local grants?

4      A.    Could be local foundations, the

5  philanthropic community, as an example.

6      Q.    Are there other sources of local

7  grants?

8      A.    I would say that's -- primarily the

9  local grants are the philanthropic community.

10      Q.    And you mentioned another source of

11  revenue for the Cuyahoga County Board of Health

12  is contract work?

13      A.    Yes.

14      Q.    Is that where the Board of Health is

15  providing services under a contract and receives

16  compensation in exchange for those services?

17      A.    Yes.

18      Q.    And what percentage of the 22

19  million dollars is attributable to contract

20  work?

21      A.    I don't know exactly.

22      Q.    Can you give me a ballpark?

23      A.    I don't feel comfortable with that.

24  I'd have to have the paperwork in front of me.

25      Q.    Less than 10 percent?

```
 1                    MR. GALLUCCI:  Object to form.

 2          A.    I don't feel comfortable answering

 3    that.

 4          Q.    Less than 20 percent?

 5                    MR. GALLUCCI:  Object to form.

 6          A.    I don't feel comfortable answering

 7    that.

 8          Q.    You identified another source of

 9    revenue as being permits and fees.  What kinds

10    of permits and fees?

11          A.    We have permits for septic systems,

12    for water wells, for food protection, for

13    tattoos and body art, things like that; and so

14    there are permits for restaurants, grocery

15    stores, and those permit fees come to us and we

16    use -- remit some of those to the state and use

17    others to implement the program.

18          Q.    And how much each year does the

19    Cuyahoga County Board of Health receive in

20    permits and fees?

21          A.    I don't know that number right now.

22          Q.    Do you know it as a percentage of

23    the 22 million?

24          A.    I don't.

25          Q.    You also mentioned that the Cuyahoga
```

```
 1    County Board of Health gets support from the

 2    county?

 3         A.    Yes.

 4         Q.    What support does the Cuyahoga

 5    County Board of Health receive from Cuyahoga

 6    County?

 7               MR. GALLUCCI:  Object to form.

 8         A.    We have a number of programs -- so

 9    there's several layers.

10               One is they provide some

11    infrastructure support for our utilities, that

12    sort of thing.

13               They also -- we also have contracts

14    for services from them for child fatality review

15    from birth to 18.  We have a contract with them

16    to do newborn home visiting of moms who receive

17    Medicaid and whose children may be at risk for

18    adverse outcomes, health outcomes.

19               We receive through the county

20    planning commission dollars to support the solid

21    waste programs, so there are landfills and

22    transfer stations and compost facilities, and so

23    we receive some funding to do that work.

24               Those are things we get from the

25    county.
```

1          Q.     And are you able to identify how

2    much the Cuyahoga County Board of Health gets

3    from the county itself?

4          A.     I don't have that number.

5          Q.     And are you able to tell me as a

6    percentage of the 22 million dollar total

7    budget?

8          A.     Not off the top of my head.

9          Q.     You also said that the Cuyahoga

10   County Board of Health receives general revenue

11   funds from the villages and townships within the

12   county?

13         A.     Um-hum.

14         Q.     So are those general revenue funds

15   that are being paid by Cuyahoga County itself?

16         A.     By the villages and townships, so

17   not by county government but by each of those

18   individual municipalities, communities.

19         Q.     And do each of those individual

20   municipalities pay those funds directly to the

21   Cuyahoga County Board of Health?

22         A.     They come through the county through

23   property tax assessment.

24         Q.     And how much of the 22 million

25   dollars in the Board of Health's total budget

1    comes from these general revenue funds that are

2    paid by villages and townships within Cuyahoga

3    County?

4        A.    That number has changed, so I'm not

5    comfortable -- I'd have to go back and look and

6    have those numbers in front of me.

7        Q.    Are you able to give me a percentage

8    of the 22 million dollars?

9        A.    I'd have to look.

10       Q.    In prior years has the funding that

11   the Cuyahoga County Board of Health received

12   differed markedly from what you described as the

13   sources of revenue for 2018?

14             MR. GALLUCCI:  Object to form.

15       A.    I think it's been fairly stable.

16   There have been some -- perhaps some small

17   changes, but it's been fairly consistent, I

18   think.

19       Q.    When did you first learn that you

20   would be deposed in this case?

21       A.    I think a few months ago.

22       Q.    How did you learn?

23       A.    Through our legal counsel.

24       Q.    Who?

25       A.    Tom O'Donnell.

1          Q.     What is Tom O'Donnell's position?

2          A.     He's our legal counsel.

3          Q.     Is he the general counsel for the

4     Cuyahoga County Board of Health?

5          A.     Yes.

6          Q.     Did you do anything to prepare for

7     today's deposition?

8          A.     I met with lawyers.

9          Q.     How many times did you meet with

10    lawyers?

11         A.     Twice.

12         Q.     When was the first meeting with

13    lawyers to prepare for today's deposition?

14         A.     Last week.

15         Q.     Who did you meet with?

16         A.     I met with Mr. Gallucci and Mr.

17    O'Donnell; a gentleman, Sal.  I don't remember

18    Sal's last name.  And there was one other

19    gentleman present and I don't recall his name.

20         Q.     Did you meet with any non-lawyers?

21         A.     No.

22         Q.     Were there any non-lawyers attending

23    that meeting last week with Sal, Mr. Gallucci

24    and Mr. O'Donnell?

25         A.     No.

Page 36

1          Q.     How long was that meeting last week

2     with the lawyers?

3          A.     It was the day.

4          Q.     Where did you meet?

5          A.     We met at Mr. Gallucci's office.

6          Q.     Did you review documents?

7          A.     Yes.

8          Q.     What documents did you review?

9                 MR. GALLUCCI:  Objection.

10                Do not answer.  Privilege.

11         Q.     Did reviewing the documents refresh

12    your recollection or jog any memories?

13         A.     No.

14         Q.     None?

15                MR. GALLUCCI:  Objection.

16         A.     No.

17         Q.     You said you met with lawyers twice

18    to prepare for today's deposition.  The first

19    one was last week.  When was the second?

20         A.     It was last week.  It was a phone

21    call.

22         Q.     And did this phone call proceed or

23    follow the in-person meeting?

24         A.     It followed.

25         Q.     How long was the phone call?

1          A.     Less than an hour.

2          Q.     Who participated in the phone call?

3          A.     Mr. Gallucci and Sal.  Forgive me

4     for not knowing Sal's last name.

5          Q.     Did Mr. O'Donnell participate in

6     that call?

7          A.     No.

8          Q.     Did anyone else participate in that

9     call?

10         A.     No.

11         Q.     Did you review documents during that

12    phone call?

13         A.     No.

14         Q.     Other than the two meetings you've

15    described, the all-day meeting last week and the

16    follow-up phone conversation, did you do

17    anything else to prepare for today's deposition?

18         A.     No.

19         Q.     Did you review the complaint in this

20    case?

21         A.     No.

22         Q.     Did you review any of the pleadings

23    or submissions by the lawyers in the court?

24         A.     No.

25         Q.     Did you review any transcript of

Page 38

1    deposition testimony given by anyone else in the

2    case?

3         A.    No.

4         Q.    Did you review any excerpts or

5    summaries of any testimony given in a deposition

6    by anyone else in the case?

7         A.    No.

8         Q.    Did you review any of the documents

9    that have been produced by any of the parties in

10   this case?

11        A.    No.

12        Q.    Did you review any of your own

13   documents?

14        A.    With Mr. Gallucci.

15        Q.    Outside your meeting with

16   Mr. Gallucci, did you review any documents?

17        A.    No.

18        Q.    Either documents produced by another

19   party, your own documents, or the Cuyahoga

20   County Board of Health documents?

21        A.    No.

22        Q.    Did you have any conversations with

23   any non-lawyers for the Board of Health or for

24   Cuyahoga County?

25        A.    No.

Page 39

1        Q.      Have you discussed you're being

2   deposed today with anyone?

3        A.      My folks at work know I won't be

4   there today.  My leadership group knows I won't

5   be there because I'm here.

6        Q.      And who do you put in the leadership

7   group at the Cuyahoga County Board of Health?

8        A.      The -- it would be our fiscal,

9   legal, and our directors.

10       Q.      And who are you referring to when

11  you say "fiscal"?

12       A.      Our chief fiscal officer.

13       Q.      Who is that?

14       A.      Judy Wirsching.

15       Q.      Who are you referring to when you

16  say "legal"?

17       A.      Mr. O'Donnell.

18       Q.      And who are you referring to as the

19  directors?

20       A.      Rick Novickis is the environmental

21  health director.  Claire Boettler.  I sent an

22  e-mail to them and told them I wouldn't be in.

23  So Claire Boettler and Najeebah Shine.  I

24  mentioned her earlier.  And Chris Kippes, who is

25  our director of epidemiology, surveillance and

Page 40

1    informatics.

2         Q.    Did you alert anyone else that you

3    would be deposed today?

4         A.    No.

5         Q.    You sent a single e-mail to this

6    group?

7         A.    Yes.

8         Q.    Besides that e-mail, did you tell

9    anyone that you would be deposed today?

10        A.    No.

11        Q.    What is your understanding of this

12   lawsuit?

13        A.    I have only a basic understanding,

14   that the county is in a legal suit with the

15   pharmaceutical industry.

16        Q.    You said your understanding is the

17   county is in a suit with the pharmaceutical

18   industry.  Can you provide any more details?

19        A.    No.

20        Q.    Is the county the plaintiff or the

21   defendant in the lawsuit?

22             MR. GALLUCCI:  Object to form.

23        A.    The county is the plaintiff, I

24   think.

25        Q.    Who are the defendants?

1        A.      I don't know specifically.

2        Q.      Do you know generally?

3        A.      Not really.

4        Q.      Are you able to identify any person

5    or entity that is a defendant in the lawsuit?

6        A.      No.

7        Q.      Are you able to identify any

8    category or group of entities that are

9    defendants?

10       A.      Other than what I've said, no.

11       Q.      You said that you understand that

12   Cuyahoga County is in a suit with the

13   pharmaceutical industry.  What do you mean by

14   "pharmaceutical industry"?

15       A.      Companies that make pharmaceuticals.

16       Q.      So do I understand you correctly

17   that you believe that companies that make

18   pharmaceuticals are defendants in this lawsuit?

19       A.      That's my understanding.

20       Q.      Do you have an understanding as to

21   whether there are any other defendants in this

22   case --

23       A.      No.

24       Q.      -- besides companies that make

25   pharmaceuticals?

Page 42

1      A.    No.

2      Q.    What is your understanding of why

3  companies that make pharmaceuticals are

4  defendants in this case?

5      A.    I don't have details to the case at

6  all.

7      Q.    Even if you don't have details, what

8  is your understanding of why the companies that

9  make pharmaceuticals are defendants in this

10  case?

11      A.    I don't have any details to that

12  matter.

13      Q.    Do you understand what the alleged

14  wrongdoing is by the pharmaceutical companies

15  that warrants them being defendants?

16      A.    I haven't read any of the material

17  related to the case or have any details to make

18  that determination.

19      Q.    I'm not asking you for a

20  determination.  I'm just asking you for your

21  understanding.  What is your understanding of

22  why Cuyahoga County has sued companies that make

23  pharmaceuticals?

24      A.    I haven't read any of the material

25  or details of the case to answer that question.

Page 43

1        Q.    So is it accurate to say that the

2   only thing you know about this lawsuit is that

3   Cuyahoga County is the Plaintiff, it filed a

4   lawsuit against companies that make

5   pharmaceuticals?

6        A.    Yes.

7        Q.    And you don't know anything else

8   about the lawsuit, the claims that have been

9   asserted or the allegations that have been made?

10       A.    I can't speak to the details of the

11  case.  I'm not familiar with the details of the

12  case.

13       Q.    Well, can you tell me anything else

14  about the claims that have been made in this

15  case?

16       A.    I can't speak to any details, any

17  more details than I've provided.

18       Q.    Can you identify for me the

19  allegations made against any of the companies

20  that make pharmaceuticals?

21       A.    No.

22       Q.    Can you tell me what the theory of

23  wrongdoing is against the companies that make

24  pharmaceuticals?

25             MR. GALLUCCI:  Object to form.

1       A.      No.

2       Q.      Have you had any dealings with

3  Cardinal Health?

4       A.      No.

5       Q.      Have you spoken or communicated with

6  anyone from Cardinal Health?

7       A.      No.

8       Q.      Have you had any dealings with

9  McKesson Corporation?

10      A.      No.

11      Q.      Have you spoken or communicated with

12 anyone from McKesson Corporation?

13      A.      No.

14      Q.      Have you had any dealings with

15 AmerisourceBergen Corporation?

16      A.      No.

17      Q.      Have you spoken or communicated with

18 anyone at AmerisourceBergen Corporation?

19      A.      No.

20      Q.      The Cuyahoga County Board of Health

21 website lists you as part of the Agency

22 Leadership Team.  Does that sound right to you?

23      A.      Yes.

24      Q.      What is the Agency Leadership Team

25 at the Cuyahoga County Board of Health?

1        A.     Those are the -- the directors from

2   the -- all the service areas of the agency and

3   people from leadership, from administration.

4        Q.     And do you consider yourself to be

5   part of the leadership team of the Cuyahoga

6   County Board of Health?

7        A.     Yes.

8        Q.     Since 2004, when you became the

9   health commissioner?

10       A.     Um-hum.  Yes.

11       Q.     Do you consider yourself to be part

12  of the leadership team at the Cuyahoga County

13  Board of Health for the period prior to 2004

14  when you became the health commissioner?

15       A.     For a couple years I served as

16  assistant health commissioner, but the structure

17  of the leadership team was something that we

18  recently structured and named over the last few

19  years.

20       Q.     Have you ever testified in a

21  deposition before today?

22       A.     Yes.  A long time ago.

23       Q.     How many times?

24       A.     I think only once.

25       Q.     And in that case where you were

Page 46

1    deposed, were you a party or a witness?

2         A.    I was a witness.

3         Q.    What type of case was it?

4         A.    It was a long time ago, but as I

5    recall, it was a concern about -- from a

6    homeowner about mold exposure in a home, and I

7    had been asked -- it's at least 20 years ago.  I

8    was asked to provide my context for what I saw

9    in the unit and the disposition of it.

10        Q.    Did you give testimony in connection

11   with your work for the Cuyahoga County Board of

12   Health?

13        A.    Yes.

14        Q.    Did you get a transcript of your

15   testimony afterwards?

16        A.    I don't remember.

17        Q.    Do you remember reviewing the

18   transcript to identify whether there were any

19   errors?

20        A.    No.

21        Q.    Separate from that instance where

22   you were deposed, have you ever testified under

23   oath?

24              MR. GALLUCCI:  Object to form.

25        A.    Testified under oath?  I don't think

Page 47

1    so, no.

2          Q.    Have you ever testified at a trial?

3          A.    No.

4          Q.    Have you ever testified at an

5    evidentiary hearing in a court?

6          A.    No.

7          Q.    Have you ever testified at an

8    arbitration?

9          A.    No.

10         Q.    Do you understand that you are under

11   oath today?

12         A.    Yes.

13         Q.    Do you understand what it means to

14   be under oath?

15         A.    Yes.

16         Q.    Do you understand that you must tell

17   the truth, the whole truth and nothing but the

18   truth?

19         A.    Yeah.

20         Q.    Do you understand that you must

21   testify about what you know, not what someone

22   told you to say?

23               MR. GALLUCCI:   Object to form.

24         A.    Yes.

25         Q.    Do you understand that you're

1   required to testify about what you know, not

2   what you think someone wants you to say?

3              MR. GALLUCCI:  Object to form.

4       A.    Yes.

5       Q.    Do you understand that you're

6   required to testify about what you know and not

7   what someone else thinks you should say?

8              MR. GALLUCCI:  Object to form.

9       A.    Yes.

10      Q.    Could you briefly describe your

11  educational background?

12      A.    Sure.

13             I have an undergraduate degree in

14  biology from Bowling Green State University in

15  Ohio.  I have a Master of Public Health from the

16  University of Hawaii, Manoa.

17      Q.    Do you have any professional

18  certifications?

19      A.    I have a registered sanitarian

20  certification, which is an environmental health

21  credential.

22      Q.    When did you get that registered

23  sanitarian certification?

24      A.    Probably, you know, near -- around

25  1990, I guess.

Page 49

1        Q.     And what is involved in getting that

2    registered sanitarian certificate?

3        A.     You have to have basic science

4    courses to be eligible, and then you are a

5    sanitarian in training for a couple years, and

6    then you have to study for and sit for an exam,

7    and then receive continuing education credits.

8        Q.     What are the continuing education

9    requirements?

10       A.     For environmental health coursework.

11       Q.     And is there a certain number per

12   year?

13       A.     Yeah.  It's changed over the years.

14       Q.     Have you maintained that

15   certification through the present?

16       A.     Yes.

17       Q.     Continuously since, roughly, 1990,

18   when you first got it?

19       A.     Yes.

20       Q.     What did you mean before when you

21   said it's an environmental health credential?

22       A.     So for the -- I mentioned our

23   environmental health service area.  To have

24   the -- to be able to conduct food protection

25   services, so a range of environmental health

Page 50

1    programs, you have to have the credential in

2    order to be eligible to do the work.

3         Q.    Do you have any other professional

4    certifications?

5         A.    No.

6         Q.    Are you a lawyer?

7         A.    No.

8         Q.    Are you -- do you have any training

9    as a lawyer?

10        A.    No.

11        Q.    Are you a pharmacist?

12        A.    No.

13        Q.    Do you have any training as a

14   pharmacist?

15        A.    No.

16        Q.    Are you a statistician?

17        A.    No.

18        Q.    Do you have any training as a

19   statistician?

20        A.    Only basic coursework for my

21   Master's level, some basic statistical

22   coursework, but I'm not a statistician.

23        Q.    So you took some basic coursework in

24   statistics in connection with your Master's of

25   Public Health degree?

1          A.    Yes.

2          Q.    Have you taken any coursework since

3    then?

4          A.    No.

5          Q.    Are you an accountant?

6          A.    No.

7          Q.    Do you have any training as an

8    accountant?

9          A.    No.

10         Q.    Do you have any training or

11   expertise in pharmacology?

12         A.    No.

13         Q.    Do you have any training or

14   expertise in behavioral health?

15         A.    No.

16         Q.    Do you have any training or

17   expertise in mental health?

18         A.    No.

19         Q.    Do you have any training or

20   expertise in psychology?

21         A.    No.

22         Q.    Do you have any training or

23   expertise in psychiatry?

24         A.    No.

25         Q.    Do you have any training or

Page 52

1    expertise in toxicology?

2         A.    In my Master's coursework, I took

3    some toxicology.

4         Q.    Basic toxicology materials?

5         A.    Yes.

6         Q.    In connection with your Master's of

7    Public Health degree?

8         A.    Yes.

9         Q.    Have you had -- taken any coursework

10   or had any training in toxicology since getting

11   your Master's in Public Health?

12        A.    No.

13        Q.    Do you have any training or

14   expertise in addiction medicine?

15        A.    No.

16        Q.    Any training or expertise in

17   substance abuse counseling?

18        A.    No.

19        Q.    Do you have any training or

20   expertise in epidemiology?

21        A.    In my coursework for the Master's

22   degree, I took epidemiology courses.

23        Q.    So you took the basic epidemiology

24   courses in connection with your Master's in

25   Public Health degree?

1        A.    I might have taken several

2   epidemiology courses at the time.  I'd have to

3   go back and -- that was 1992, so it's been a

4   number of years.

5        Q.    Have you had any coursework in

6   epidemiology since then?

7        A.    I think from maybe continuing

8   education -- there's been epidemiology

9   components of continuing education through the

10  years, but I can't specifically note that.  But

11  it's part of the work that I do.

12       Q.    Have you received any training in

13  epidemiology separate and apart from the fact

14  that there may be some epidemiology covered in

15  your continuing education courses?

16       A.    No, no additional training.

17       Q.    Have you ever posted to social media

18  about issues that relate to your work with the

19  Cuyahoga County Board of Health?

20            MR. GALLUCCI:  Object to form.

21       A.    Occasionally to Twitter.

22       Q.    What kinds of postings have you made

23  to Twitter in connection with your work?

24       A.    Not often.  Around -- issues around

25  tobacco, for instance, electronic cigarettes,

Page 54

1    support for Medicaid expansion, things like

2    that.  And not often; occasionally.

3         Q.    Have you ever posted to Twitter

4    about opioids?

5         A.    No.  I don't think so.

6         Q.    Have you ever posted to Twitter

7    about drug abuse?

8         A.    No.

9         Q.    Have you ever posted to Twitter

10   about drug addiction?

11        A.    No.  I don't believe so.

12        Q.    Have you ever posted to Twitter

13   about overdoses from drug use?

14        A.    I don't think so.

15        Q.    Have you posted to other social

16   media about issues that relate to your work with

17   the Cuyahoga County Board of Health?

18             MR. GALLUCCI:  Object to form.

19        A.    No.

20        Q.    Earlier you described the 44

21   programs and services that the Cuyahoga County

22   Board of Health has.

23        A.    I described some of them.  I don't

24   think I hit all 44.

25        Q.    Fair enough.  Fair enough.

Page 55

1              You said that the Cuyahoga County

2    Board of Health has 44 different programs and

3    services?

4         A.    I did say that, yes.

5         Q.    Okay.  And you described some of

6    them?

7         A.    Yes.

8         Q.    Do any of those programs and

9    services involve drug abuse?

10        A.    We have what we call an opioid task

11   force that we facilitate on behalf of the

12   county.  We also have supported a program that

13   provides -- we support a community agency that

14   does syringe services, where they provide clean

15   needles for people in the community to prevent

16   disease transmission.

17        Q.    Anything else?

18        A.    I think those are the ones I can

19   think of right now.

20        Q.    So what is the community agency that

21   is supported by the Cuyahoga County Board of

22   Health that provides clean needles?

23        A.    Circle Health Services.

24        Q.    Circle Health Services, is that a

25   governmental entity?

1        A.     No.  It's a non-profit.

2        Q.     Circle Health Services is a

3    non-profit organization?

4        A.     Yes.

5        Q.     And for how long has the Cuyahoga

6    County Board of Health been supporting Circle

7    Health Services?

8        A.     Several years ago there was some

9    statutory change at the state level that

10    required that local health departments provide

11    support for governance structure for entities

12    that were providing syringe services in Ohio,

13    and at that time we worked with our partners at

14    the Cleveland Department of Public Health and

15    convened partners in the agency that -- partners

16    in the community that were involved in the work,

17    and -- as required under the statute, so we did

18    that, and at the time -- and also advocated for

19    resources, and continue to advocate for

20    resources, for Circle Health to provide both

21    fixed and mobile sites for syringe services and

22    referral to treatment programs.

23        Q.     Has the Cuyahoga County Board of

24    Health provided any funding to Circle Health

25    Services in 2018?

1      A.      No.

2      Q.      Did the Cuyahoga County Board of

3  Health provide any funding to Circle Health

4  Services in 2017?

5      A.      No.

6      Q.      Did the Cuyahoga County Board of

7  Health provide funding to Circle Health Services

8  in any prior year?

9      A.      No.

10      Q.      So has the Cuyahoga County Board --

11      A.      Excuse me.  We provide research to

12  Circle Health through our Ryan White program,

13  but not for the syringe service program.  They

14  compete and received grants for Ryan White.

15  That is HIV and AIDS support services.

16      Q.      Has the Cuyahoga County Board of

17  Health ever provided funding to Circle Health

18  Services in connection with its program to

19  provide clean needles?

20          MR. GALLUCCI:  Object to form.

21      A.      No.

22      Q.      Is the only funding that the

23  Cuyahoga County Board of Health has provided to

24  Circle Health Services in connection with the

25  Ryan White HIV and AIDS support program?

Page 58

1        A.    Yes, that I'm aware of.  That would

2   be the --

3        Q.    You said earlier, "We have the

4   opiate task force."  Is that the Cuyahoga County

5   Opiate Task Force?

6             MR. GALLUCCI:  Object to form.

7        A.    Yes.  There are several task forces.

8   Well, there's at least a couple that I'm aware

9   of.

10        Q.    What were you referring to?

11        A.    I was referring to the Cuyahoga

12   County Opiate Task Force, and there also is a --

13   the U.S. Attorneys has a task force.

14        Q.    Does the Cuyahoga County Board of

15   Health provide support to the U.S. Attorney's

16   task force?

17        A.    Our staff have over the years.  When

18   Steve Dettelbach and Carole Rendon were part of

19   that, I think Vince -- Vince Caraffi I think

20   participated on that.  He's been involved with

21   the -- with our opiate task force for some time.

22        Q.    Vince Caraffi is an employee of the

23   Board of Health?

24        A.    Um-hum.

25        Q.    What is his position?

Page 59

```
 1          A.    He's a supervisor.

 2          Q.    In what area or areas?

 3          A.    He's in environmental health.

 4          Q.    And did Vince Caraffi, in that

 5   capacity, participate in the U.S. Attorney's

 6   task force?

 7          A.    I believe he did, yes, for a period

 8   of time.  I'm not sure of the current status.

 9          Q.    Do you know what period of time he

10   was involved?

11          A.    No.  You have to ask him.

12          Q.    Was anyone else on the Cuyahoga

13   County Board of Health staff involved in the

14   U.S. Attorney's task force?

15          A.    I don't know.

16          Q.    Were you ever involved in the U.S.

17   Attorney's task force?

18          A.    No.

19          Q.    When was the Cuyahoga County Opiate

20   Task Force created?

21          A.    I guess it was about --

22   approximately five years ago.

23          Q.    And did it exist prior to five years

24   ago, albeit under a different name?

25          A.    I don't know.
```

Page 60

1      Q.     You said earlier, "We facilitate the

2   Cuyahoga County Opiate Task Force on behalf of

3   Cuyahoga County."  What do you mean?

4      A.     We work in conjunction with county

5   administration and facilitate a collaborative of

6   community agencies, discussion group, and

7   sharing resources, experiences and actions.

8      Q.     And when you say "county

9   administration," who are you referring to?

10      A.     Cuyahoga County administration.

11      Q.     Has the Cuyahoga County Board of

12   Health provided funding to the Cuyahoga County

13   Opiate Task Force in 2018?

14      A.     We have funding -- we have staff

15   that facilitate that, so we're providing staff

16   resource time to do that work, yes.

17      Q.     So the Cuyahoga County Board of

18   Health provides staff who spend some of their

19   time arranging for funding for the Cuyahoga

20   County Opiate Task Force?

21      A.     We provide staff that facilitate the

22   Cuyahoga County Opiate Task Force.

23      Q.     Does the Cuyahoga County Board of

24   Health give any money to the Cuyahoga County

25   Opiate Task Force?

Page 61

1          A.     I think I consider our staff time to

2    be -- to be a resource, and that's money, that's

3    people's time that are committed to do the work,

4    and the facilitation.

5          Q.     Okay.  I hear you that the Cuyahoga

6    County Board of Health gives staff time to

7    facilitate the work of the opiate -- Cuyahoga

8    County Opiate Task Force, but I'm asking about

9    the transfer of dollars.

10         A.     Okay.

11         Q.     Does the Cuyahoga County Board of

12   Health transfer any dollars to the Cuyahoga

13   County Opiate Task Force?

14         A.     So the task force itself is not like

15   a non-profit entity.  It doesn't exist like

16   formally.  So there are partners, you know, that

17   are on the task force that way.  So we have

18   funds that we receive that may go to partners on

19   the task force, but not to -- to member agencies

20   in the task force to perform services.

21         Q.     So if I heard you correctly, you

22   said that the Cuyahoga County Opiate Task Force

23   is not a legal entity.  Did I hear you

24   correctly?

25         A.     Yes.

1    Q.    So the task force is a collection of

2  individuals and organizations that share a

3  common interest?

4    A.    Yes.

5    Q.    And so has the Cuyahoga County Board

6  of Health ever transferred dollars to the

7  Cuyahoga County Opiate Task Force?

8    A.    You asked that question before.  The

9  opiate task force doesn't exist as a legal

10 entity, and so there -- and I'll repeat.  The

11 partner agencies -- as I said just before, the

12 partner agencies, there are members that may

13 receive funding to perform specific tasks

14 related to the work of the task force.

15   Q.    Right.  So I think you're saying it

16 is true that the Cuyahoga County Board of Health

17 has not transferred any dollars to the Cuyahoga

18 County Opiate Task Force.

19         MR. GALLUCCI:  Object to form.

20   A.    I don't understand how this is

21 different than what you just asked me.

22   Q.    Because you keep qualifying it by

23 saying we may have given money to partners who

24 were involved in the Cuyahoga County Opiate Task

25 Force.  I hear you.  I'm not asking about money

1    going to partners in the task force.  I'm asking

2    about money that goes to the task force itself.

3    And you may say that's a non-sensical question

4    because the task force is not a legal entity, it

5    doesn't exist formally and it can't receive

6    funds.  I still want to establish, just so

7    there's no ambiguity, is it accurate to say that

8    the Cuyahoga County Board of Health has not

9    transferred any dollars to the Cuyahoga County

10   Opiate Task Force?

11              MR. GALLUCCI:  Object to form.

12        A.    I think the partners are the task

13   force.  The task force would not exist without

14   the partners.

15        Q.    Okay.  So what funds has the

16   Cuyahoga County Board of Health given to the

17   partners in the Cuyahoga County Opiate Task

18   Force?

19        A.    I can't speak to exactly what those

20   funds are.  I know that there are funds relative

21   to the work of the task force that are allocated

22   through funds that we have, but I can't speak to

23   the details.

24        Q.    So who at the Cuyahoga County Board

25   of Health is knowledgeable about funds that the

Page 64

1    Board of Health has given to individuals or

2    entities you've described today as partners in

3    the Cuyahoga County Opiate Task Force?

4         A.    Vince Caraffi would be probably the

5    most -- the person to speak to the most.

6         Q.    Anyone else?

7         A.    April Vince, I think.

8         Q.    Anyone else?

9         A.    I think right now those are the two

10   I can think of that would be most aware.

11        Q.    So if you wanted to figure out what

12   money the Cuyahoga County Board of Health has

13   paid to entities you've described as partners in

14   the Cuyahoga County Opiate Task Force, you would

15   ask Mr. Caraffi and Ms. Vince?

16        A.    Yes.

17        Q.    Why would you ask Mr. Caraffi?

18        A.    Because he has been a facilitator of

19   the task force work.

20        Q.    Why would you ask Ms. Vince?

21        A.    Because she's also been involved in

22   the facilitation of the task force.

23        Q.    Is Ms. Vince an employee of the

24   Cuyahoga County Board of Health?

25        A.    Yes.

Page 65

1          Q.     What is her position?

2          A.     I believe she is a program manager.

3          Q.     In what division?

4          A.     Environmental health.

5          Q.     Sitting here today, can you identify

6     any funding that the Cuyahoga County Board of

7     Health has provided at any time to any entity in

8     connection with its involvement in the Cuyahoga

9     County Opiate Task Force?

10         A.     Can you repeat that again?  I'm

11    sorry.

12         Q.     Sure.

13                Sitting here today, can you identify

14    any funding that the Cuyahoga County Board of

15    Health has provided at any time to any entity in

16    connection with its involvement in the Cuyahoga

17    County Opiate Task Force?

18                MR. GALLUCCI:  Object to form.

19         A.     I think I need to do that in the

20    context of understanding everyone involved, and

21    I would refer back to Vince to provide that

22    context appropriately.  So I don't -- I would --

23    I can't speak to that in the detail necessary

24    for clarity.

25         Q.     You said earlier that the Cuyahoga

1   County Board of Health gives staff time that

2   facilitates the opiate task force.  Which staff

3   are you referring to?

4        A.    That would be Vince Caraffi, April

5   Vince.  There may be questions that are needed

6   or other support people in the agency that

7   are -- from time to time participate.  I know

8   that I've participated from time to time in

9   meetings.  Rick Novickis has participated from

10  time to time in meetings.  I'm sure our legal

11  counsel has participated in support of the task

12  force.  I'm sure, given the transactions of

13  dollars, that our fiscal people have been

14  involved in supporting the task force.  And I

15  know there are probably people that I haven't

16  named.  So it has had -- there are a range of

17  supports, supports that I don't have in front of

18  me, that people are in place to support the work

19  of the task force.

20       Q.    What support have you personally

21  provided to the Cuyahoga County Opiate Task

22  Force?

23       A.    I've attended -- I attend meetings

24  from time to time.  I've talked to them about

25  the syringe service program and what it does and

Page 67

1    the harm reduction approach that is involved

2    there.

3         Q.    Anything else?

4         A.    Not that I can think of, no.

5         Q.    So I'm trying to identify what time

6    you've spent in support of the work of the

7    Cuyahoga County Opiate Task Force, and I heard

8    you say you've attended meetings and you've

9    provided information about the syringe service

10   program?

11        A.    Um-hum.

12        Q.    Is that accurate?

13              MR. GALLUCCI:  You need to say yes

14   or no.  When you answer, say yes or no as

15   opposed to um-hum.

16              THE WITNESS:  Oh, I'm sorry.  Thank

17   you for the reminder.

18        A.    I'm sorry.  Could you repeat that

19   again?

20        Q.    Yeah.

21              So I want to understand what you've

22   done to support the work of the Cuyahoga County

23   Opiate Task Force, and I understood you to say

24   you've done two things; one, you've attended

25   meetings --

Page 68

1          A.      Um-hum.

2          Q.      -- correct?

3          A.      Yes, I have.

4          Q.      And, two, you've provided

5    information about the syringe service program,

6    correct?

7          A.      Yes.

8          Q.      Is there anything you would add to

9    that list?

10         A.      I probably have -- maybe once a

11   year, maybe twice, we brief our board about

12   activities.

13         Q.      And you say "brief our board."  Are

14   you referring to the Board of Health itself?

15         A.      Yes.

16         Q.      And you say "we."

17         A.      Well, I may do that in conjunction

18   with Vince or others.

19         Q.      So you're saying you, perhaps with

20   Vince or others, may have briefed the Board of

21   Health on the work of the Cuyahoga County Opiate

22   Task Force?

23         A.      Yes.

24         Q.      You say "may."  Do you have a

25   recollection of -- of giving an update or a

1    briefing to the Board of Health --

2         A.    Yes.

3         Q.    -- on the work of the task force?

4         A.    I don't have exact dates, but we --

5    as I mentioned earlier, we have 44 programs and

6    services, so from time to time we provide board

7    updates on activities that are occurring in the

8    agency, and so I know that once, maybe twice a

9    year, we might brief the board on activities of

10   the opiate task force.

11        Q.    Are you a member of the Cuyahoga

12   County Opiate Task Force?

13        A.    I think their members are agency

14   members, and so yes, our agency is a member, and

15   different agencies may send different people to

16   the meetings, so there really, I think, are

17   predominantly member agencies.

18        Q.    Have you chaired any committee of

19   the Cuyahoga County Opiate Task Force?

20        A.    No.

21        Q.    Have you chaired any subcommittee of

22   the Cuyahoga County Opiate Task Force?

23        A.    No.

24        Q.    Have you served on any committee of

25   the Cuyahoga County Opiate Task Force?

Page 70

1        A.     No.

2        Q.     Have you served on any subcommittee

3   of the Cuyahoga County Opiate Task Force?

4        A.     No.

5        Q.     Have you done any fieldwork on

6   behalf of the Cuyahoga County Opiate Task Force?

7        A.     Can you explain what you mean by

8   "fieldwork"?

9        Q.     Yes.

10              Have you gone into the field to

11  gather data or evidence?

12       A.     Oh.  No.

13       Q.     So, with that definition, have you

14  done any fieldwork for the Cuyahoga County

15  Opiate Task Force?

16       A.     No.

17       Q.     Have you analyzed any data for the

18  Cuyahoga County Opiate Task Force?

19       A.     Not on behalf of the opiate task

20  force.

21       Q.     Have you given any presentations to

22  the Cuyahoga County Opiate Task Force?

23       A.     Yes.  I spoke to them about the

24  syringe service program, as I mentioned earlier.

25       Q.     Other than speaking to the Cuyahoga

Page 71

1    County Opiate Task Force about the syringe

2    service program, have you ever made a

3    presentation to the task force?

4         A.    Not that I can recall.

5         Q.    Have you participated in the

6    drafting or development of presentations by

7    others to the Cuyahoga County Opiate Task Force?

8              MR. GALLUCCI:  Objection to form.

9         A.    Have I -- I've watched people

10   present to the task force.

11        Q.    You've watched the presentations

12   themselves?

13        A.    Yes.

14        Q.    Before the presentations are given,

15   have you assisted in drafting or revising or

16   developing any presentations that were to be

17   given to the Cuyahoga County Opiate Task Force?

18             MR. GALLUCCI:  Object to form.

19        A.    No.

20        Q.    Have you given any presentations on

21   behalf of the Cuyahoga County Opiate Task Force

22   to others?

23             MR. GALLUCCI:  Object to form.

24        A.    When I present -- and I present in

25   the community on a lot of public health issues

Page 72

1    -- I've talked about the work of the opiate task

2    force, yes.

3         Q.    Have you done any work for any other

4    task force or commission that is looking at the

5    problem of opioids in the county?

6              MR. GALLUCCI:  Objection to form.

7         A.    No, I don't think so.

8         Q.    Have you served as any -- as a

9    member of any task force or commission looking

10   at the problem of opioids anywhere in Ohio?

11             MR. GALLUCCI:  Object to form.

12        A.    No commission or anything of that

13   nature, no.

14        Q.    You said earlier that you have

15   provided information to the Cuyahoga County

16   Opiate Task Force about the syringe service

17   program?

18        A.    Yes.

19        Q.    What is the syringe service program?

20        A.    So, in Cleveland, at least 20 years

21   ago, a program was established to provide clean

22   syringes to people who -- to people who are

23   addicted to substances.  And so the program was

24   established to try to control HIV, hepatitis C,

25   hepatitis A transmission, which is a -- sort of

1    a -- part of this continuum from what we're

2    seeing in the -- the prescription opioid

3    transition.

4              The story from the task force is

5    for -- this is for context.  So the prescription

6    opioids -- there were a lot of opioids in the

7    community.  People became addicted.  People --

8    based on that addiction, some people went into

9    treatment, they went into relapse, and then

10   based on relapse, they may go to a street form

11   of opiates.  It could be heroin -- and the data

12   from the medical examiner describes it.  It

13   could be heroin.  It could be fentanyl.  It

14   could be carfentanil.  There's been a cascade,

15   and the medical examiner's data describes that,

16   I think, in great detail.

17             And so in that process we then

18   started to see, through the syringe service

19   program, that we had not only heroin as being

20   injected, we started to see also other

21   substances that were being injected, so there's

22   this continuum from prescription opioids to

23   folks who either had -- no longer had access to

24   prescription opioids and then went to some

25   illicit form, or went into treatment and

Page  74

1    relapsed and then they overdosed and we had

2    overdose deaths, which then I think was part of

3    this fulmination that we're seeing, and this

4    became a major problem in Ohio and other places.

5             So the whole purpose of the syringe

6    service program specifically was to try to

7    mitigate these -- this cascade of problems.  And

8    I've talked with a number of people that have

9    had -- there was people that were -- on that

10   service that -- the military service, that were

11   in this -- in this sort of difficult spiral,

12   tragic stories, and in those discussions.

13            The idea of syringe service program

14   is not only to provide clean syringes and to

15   prevent transmission.  In Indiana they had a

16   huge outbreak of HIV occur because of dirty

17   needles.  And then hepatitis C is also a

18   problem.  It also has caused problems with

19   endocarditis, which is an infection of a heart

20   valve, we hear from the Cleveland Clinic

21   doctors.  And endocarditis causes heart valves

22   not to work and they have to replace heart

23   valves.  So this is an additional facet of this

24   cascade of problems.

25            And so the harm reduction approach

Page 75

1    from the syringe service program is meant to try

2    to mitigate the -- sort of the downstream

3    effects of this large problem, for context.

4         Q.    You said earlier you attend meetings

5    of the Cuyahoga County Opiate Task Force?

6         A.    Yes.

7         Q.    Do you attend each meeting?

8         A.    No.

9         Q.    Do you attend most meetings?

10        A.    I attend several meetings a year.

11        Q.    Several meetings a year?

12        A.    Yeah.

13        Q.    And what are the factors that

14   determine whether you attend a meeting or not?

15        A.    Availability, maybe context of the

16   discussion.  Most of the time we have two staff

17   people in the room at least, if not more, for

18   every discussion.

19        Q.    And for how long have you been

20   attending meetings of the Cuyahoga County Opiate

21   Task Force?

22        A.    Probably from time to time I would

23   think probably from when it was started.

24        Q.    What percentage of your work time in

25   2018 has been spent on the work of the Cuyahoga

Page 76

1    County Opiate Task Force?

2            A.    I don't know.

3            Q.    Less than 25 percent?

4            A.    I don't know.

5            Q.    You can't give me an estimate at

6    all?

7            A.    I don't feel comfortable estimating

8    if I don't have the numbers in front of me.

9            Q.    What numbers do you need in front of

10   you to figure out what percentage of time you

11   spend on the work of the Cuyahoga County Opiate

12   Task Force as opposed to --

13           A.    There's a lot of time I spend in

14   general administration.  I don't have the

15   numbers to say exactly.

16           Q.    Okay.  And how would you go about

17   determining the answer to that question?  What

18   numbers would you look at?

19           A.    We'd probably have to look at some

20   of our internal reports to try to determine what

21   that number looks like.

22           Q.    What internal reports?

23           A.    To some degree, probably our daily

24   reports.

25           Q.    Why would you look at the daily

1  reports?

2       A.    Because there's some daily reports

3  that provide -- that we have codes that we use.

4  I usually, from an administrative standpoint,

5  use general codes, so my codes would be more

6  general for program administration, which would

7  give a sense of my overall responsibility of

8  program administration across the agency.  They

9  would still be only estimates.

10      Q.    What is the daily report?

11      A.    They're reports where we catalog our

12  time for our activities.

13      Q.    And what is the purpose of

14  cataloging your time in a daily report?

15      A.    The daily report is to be able to

16  demonstrate our activities back to our

17  communities that we serve and also to agencies

18  where we may receive funds to conduct work.

19      Q.    So do you prepare this daily report

20  for each day of work?

21      A.    Yes.  All employees provide -- do

22  daily reports for each day of work.

23      Q.    Every employee of the Cuyahoga

24  County Board of Health generates a daily report

25  cataloging their time?

1          A.     Yes.

2          Q.     And what are the codes that are used

3     in these daily reports?

4          A.     There are lots of codes.

5          Q.     Are there categories of codes?

6          A.     There are codes for -- yes, by

7     category, that are put together.

8          Q.     What are the different categories?

9          A.     There are many.

10         Q.     Can you give me a few examples?

11         A.     So there are codes that, first,

12    relate back to whether you're doing something

13    for an individual community or the county

14    overall.  We have some programs that are

15    regional, so it would need to indicate if you

16    were working out of the county.

17               There are some codes then that

18    relate back to a disease event; for instance,

19    you're responding to an outbreak, you're

20    responding to Ebola, something like that, when

21    that happened here in Cleveland.

22               And then there are codes that then

23    relate back to specific programs and services

24    that people provide.  It may be food protection.

25    It may be tobacco reduction.

1          And then you provide and estimate

2     the amount of time associated with those.

3          And then there's a further category

4     to say whether it's personnel, program

5     administration, program assistance, development

6     and assistance, that sort of thing.  But there

7     are lots of codes.

8          Q.     Is there a listing of the codes

9     somewhere that you can use as a guide when

10     trying to determine how to code your time?

11          A.     There are drop-down menus.

12          Q.     Drop-down menus where?

13          A.     We have a system called the

14     Enterprise system.

15          Q.     Does every employee have access to

16     this Enterprise system?

17          A.     Yes.

18          Q.     And where do you go within the

19     Enterprise system to get the drop-down menu

20     showing the codes?

21          A.     You go into the system.  You log in

22     as an employee, and once you come up, then you

23     have access to your daily reports to fill them

24     out.

25          Q.     Are there any codes that are

1    specific to drug abuse?

2         A.    I don't know specifically.

3         Q.    Are there any codes that are

4    specific to opioids?

5         A.    Probably.

6         Q.    Why do you say "probably"?

7         A.    Because it's a program activity that

8    some of our staff use.  Most of the

9    administration people, like me, use more of the

10   general codes around program administration or

11   program assistance, development and assistance

12   codes, which are more general.

13        Q.    Separate from how much time you

14   spend in connection with the Cuyahoga County

15   Opiate Task Force, what percentage of your time

16   do you spend on the problem of opioids?

17        A.    I think they're connected.  The task

18   force and -- overall, I would just -- I'd put it

19   in one category.

20        Q.    So whatever time you spent on the

21   Cuyahoga County Opiate Task Force is the time

22   you spent on the problem of opioids?

23        A.    No.  I misunderstood.  Thank you for

24   the clarification.

25             I speak in the community on a range

1   of public health problems and I'm asked to do

2   that all the time, and so when I do that, I may

3   speak on a range of our services and have for

4   some time generally include information on the

5   work of the task force and talk about the scope

6   of the problem.

7          Q.    So how would you go about

8   identifying the percentage of your time that you

9   spend on the problem of opioids in the

10  community?

11         A.    I'd have to think about that.  I'd

12  have to think about that.  I don't know that I

13  can answer that right now.

14              MR. GALLUCCI:  Counsel, when you

15  have a minute, if we could break.  I don't want

16  to -- you know, find a logical spot for you.

17              MR. KEYES:  That's fine.  We can

18  take a break now.

19              THE VIDEOGRAPHER:  Off the record,

20  10:22.

21                  (Recess had.)

22              THE VIDEOGRAPHER:  On the record,

23  10:38.

24  BY MR. KEYES:

25         Q.    Mr. Allan, prior to the break you

1    had said that the Cuyahoga County Board of

2    Health has 44 different programs and services.

3    I had asked which of those programs and services

4    relate to the problem of opioids in the

5    community, and I believe you told me that,

6    number one, the Board of Health provides staff

7    to support the work of the opiate task force;

8    and, two, the Board of Health supports Circle

9    Health Services in providing clean needles,

10   correct?

11         A.    Yes.

12         Q.    Does the Board of Health do anything

13   beyond those two things regarding the problem of

14   opioids in the community?

15         A.    Well, I know that we have a range of

16   programs that touch families, and so, to the

17   extent that there would be concerns about

18   addiction, people could be referred through

19   networks to services in the community, whether

20   it be the Alcohol, Drug Addiction and Mental

21   Health Services Board or other support programs.

22   So I'm not -- I can't speak to the specifics of

23   where -- incidents where that would occur, but

24   we refer people routinely.  You know, when we're

25   out in the community doing newborn home

1    visiting, we might have a mom or there may be

2    families that have issues, and our nurses do

3    referrals as necessary, and those referrals just

4    happen as a matter of course.  So we do that.

5              The work of the opiate task force

6    involves work in our injury prevention program,

7    so I would refer -- as I mentioned, Vince

8    Caraffi could speak to the specifics of how the

9    resources and dollars that we have are used to

10   not only support the work of the task force, but

11   to mitigate and address issues related to the --

12   to the problem.

13        Q.    Does the Cuyahoga County Board of

14   Health have any other program or service geared

15   towards the problem of opioids in the community?

16        A.    I think those are the ones that --

17   the ones I've described so far.

18        Q.    You said earlier that you've talked

19   about the work of the Cuyahoga County Opiate

20   Task Force?

21        A.    Um-hum.

22        Q.    Where and when do you talk about the

23   work of the task force?

24        A.    Well, I, on a regular basis, talk in

25   the community at meetings and usually talk about

1    -- just generally about lots of programs that we

2    offer.  As I mentioned, we provide 44 different

3    programs and services.  And so in my discussions

4    with communities, with community groups, at

5    different professional meetings, work that I do

6    at the national level, working with the Centers

7    for Disease Control and Prevention, I may and

8    have mentioned not only, you know, about a range

9    of programs, including the work of the opiate

10   task force and the scope of the problem in

11   Greater Cleveland and Ohio.

12        Q.    When you do this speaking, do you

13   have any handouts that you distribute?

14        A.    Generally I refer -- I do a lot of

15   just sharing stories because I feel that's a

16   good way to connect with people, and also the --

17   you know, I refer routinely people to the

18   website for the medical examiners because a lot

19   of the data that we work with has been generated

20   by the medical examiners -- Cuyahoga County

21   Medical Examiner.

22        Q.    When you speak in the community, do

23   you distribute handouts?

24        A.    I think that I've used the medical

25   examiner's slides specifically or made -- used

1    slides for the medical examiner's -- from their

2    website to show, you know, the numbers.

3         Q.    Other than -- are those slides that

4    are available on the medical examiner's website?

5         A.    Yes, they are.

6         Q.    So you have, on occasion,

7    distributed to these community groups the slides

8    from the medical examiner's website?

9         A.    I don't know if I've distributed the

10   slides.  I've shown them, you know.  Sometimes

11   -- I don't know.  Sometimes people don't want

12   handouts.  Oftentimes I just present and talk.

13        Q.    Well, have you distributed any

14   handouts in any of your meetings with these

15   various community groups?

16        A.    Actually, I think we did distribute

17   data from the -- at the syringe service program

18   I think when we talked to our community

19   partners.  I would have distributed something

20   then.  I can recall that specifically.

21        Q.    Have you distributed any other

22   handouts at any of your meetings with community

23   groups?

24        A.    I'm sure I have, but I, you know --

25        Q.    Can you think of any at all today?

Page 86

1        A.     Relevant to this, I'd have to -- no,

2    I can't think of any specifically relevant to

3    this topic.

4        Q.     Separate from distributing a

5    handout, have you used visuals or slides as part

6    of your presentation besides the slides from the

7    medical examiner's website?

8               MR. GALLUCCI:  Object to form.

9        A.     Not that I can recall.

10       Q.     Do you have a standard presentation

11   that you give to these community groups?

12       A.     It depends on the community.  It

13   depends on what they want to hear about, what

14   the nature of the forum is that I'm talking.  So

15   it will depend.  I may tailor my discussion

16   based on issues that are of concern to a

17   particular community group.

18       Q.     Do you have a standard script that

19   you follow?

20               MR. GALLUCCI:  Object to form.

21       A.     No, I don't.  I do not.

22       Q.     Do you have files that show the

23   presentations or the scripts or the talking

24   points that you've used in the past in speaking

25   to the community?

1        A.    I know that I have the syringe

2   service program presentation.  That was part of

3   the governing structure I described earlier

4   because we coordinate that, and so -- but

5   oftentimes I talk based on my experience

6   because, as I mentioned, I've been with the

7   board almost 30 years and have worked in a lot

8   of different programs and services, so I will

9   provide information and material topically, but

10  I can't provide specific examples off the top of

11  my head.

12       Q.    Have you given any presentation that

13  is specific to the problem of opioids?

14       A.    I did at the syringe service

15  programs.  I gave a presentation.  I've

16  talked -- there have been discussions -- when

17  you say "presentation," are you talking like a

18  formal sort of thing, because there's a lot of

19  dialogue where you just -- I consider

20  presentation that you're at like a meeting, you

21  know, and you're like on an agenda as a formal

22  presenter.  We have lots of discussions among

23  groups, and I do that all the time.

24       Q.    Well, let's divide it between formal

25  and informal.

1          Have you given any formal

2    presentations that is specific to the problem of

3    opioids in the community?

4               MR. GALLUCCI:  Object to form.

5         Q.    Not just including a description of

6    what the opiate task force does as part of a

7    larger presentation, but a presentation that is

8    specific to the problem of opioids in the

9    community.

10              MR. GALLUCCI:  Object to form.

11        A.    I don't think that specific, no.

12        Q.    And have you given --

13        A.    Not that I can recall.

14        Q.    Have you given any informal

15   presentations that are specific to and focused

16   on the problem of opioids in the community?

17              MR. GALLUCCI:  Object to form.

18        A.    As I mentioned earlier, I will talk

19   about a range of public health topics when I go

20   to community groups and different places, and

21   I'll incorporate background stories in my

22   discussion with the community groups that would

23   be part of any range of a number of programs

24   that I speak of.

25        Q.    So those are broader presentations

Page 89

1    where you may touch on the issue of opioids?

2         A.    Yes.

3         Q.    But have you ever given, formal or

4    informal, a presentation that is focused on the

5    problem of opioids, that is the central,

6    principal or only topic?

7                MR. GALLUCCI:  Object to form.

8         A.    I think that -- I think that would

9    be the -- the syringe service program is one

10   that sticks in my head.

11        Q.    Can you think of any other?

12        A.    Not right now.

13        Q.    Do you have a work e-mail address?

14        A.    I do.

15        Q.    What is it?

16        A.    It's Tallan@ccb, as in boy, h.net.

17        Q.    Do you have any other work e-mail

18   addresses?

19        A.    No.

20        Q.    Have you had any other work e-mail

21   addresses for your work with the Cuyahoga County

22   Board of Health?

23        A.    No.

24        Q.    This is the only work e-mail address

25   you've ever had?

Page 90

1        A.    Yes.

2        Q.    Do you use any personal e-mail

3    address in connection with your work?

4        A.    No.

5        Q.    Never?

6        A.    Never.

7              MR. GALLUCCI:  Object to form.

8        Q.    So every e-mail that you've ever

9    sent in connection with your work for the

10   Cuyahoga County Board of Health has been from

11   the Tallen@ccbh.net address?

12       A.    Yes, that I can recall.

13       Q.    Do you have a work-issued cell

14   phone?

15       A.    I do.

16       Q.    When was it first issued to you?

17       A.    I've had a work-issued cell phone,

18   you know, for a long time.  I can't recall.

19   I've had it for a long time.

20       Q.    Can you be more specific?

21       A.    No.  I'd have to go back and think

22   about it.  I don't remember when I first got it.

23   But, you know, obviously phone, sunset, you

24   know, and that sort of thing.

25       Q.    More than five years ago?

Page 91

1        A.      Yes.

2        Q.      More than ten years ago?

3        A.      I can't recall if it was that long

4   ago.

5        Q.      And do you use that cell phone,

6   then, to conduct your work?

7        A.      Yes.

8        Q.      What phone number is that currently?

9        A.      216-640-6003.

10       Q.      Have you had other phone numbers

11  associated with your work-issued cell phone?

12       A.      I've had that one for a long time.

13  I may have had another number, but it's been a

14  while.  And I'm trying to remember.  Yes, I had

15  to have another number, one more at least that I

16  can recall.

17       Q.      What was the other number?

18       A.      I don't remember.

19       Q.      When did you have that other number?

20       A.      I can't recall specifically when I

21  would have changed to -- I think it was a

22  carrier.  I think we had like a carrier change,

23  and so the number changed, but I don't remember

24  specifically when that was.

25       Q.      But that was another number for a

1    work-issued cell phone that you used for your

2    work on behalf of the Cuyahoga County Board of

3    Health?

4         A.    Yes.

5         Q.    Are those the only two numbers

6    you've had?

7         A.    Those are the two that I can recall.

8         Q.    And you use the phone to have

9    communications -- conversations with people?

10        A.    Yes.

11        Q.    Do you also use the text messaging

12   feature of the phone?

13        A.    Yes.

14        Q.    Do you use the text messaging

15   feature to conduct work on behalf of the

16   Cuyahoga County Board of Health?

17        A.    Sometimes, yes.

18        Q.    In what circumstances?

19        A.    I don't know.  When someone asks me

20   a quick question or something like that.

21        Q.    Do you also use your phone to send

22   and read e-mails?

23        A.    Yes.

24        Q.    Do you have a work-issued laptop?

25        A.    I do.

1      Q.    And how long have you had that

2   laptop?

3      A.    A few years.

4      Q.    And before that, did you have an

5   earlier laptop that had been issued by the

6   Cuyahoga County Board of Health?

7      A.    I think so.  I can't recall how long

8   I've had a laptop.  Several years.

9      Q.    Besides cell phones and laptops,

10  have you had any other devices that were issued

11  to you by the Cuyahoga County Board of Health to

12  assist you in doing your work?

13     A.    I don't think so, no.

14     Q.    Prior to today have you ever

15  undertaken to review your files to identify

16  documents that may be relevant in the lawsuit?

17     A.    Personally, no.

18     Q.    Has someone else done it for you?

19     A.    Our IT people came and collected

20  everything, our equipment.

21     Q.    Who is "our IT people" when you use

22  that phrase?

23     A.    Ken Uhlik, U-h-l-i-k.

24     Q.    Anyone else?

25     A.    No, I don't believe so.

1     Q.    And is Mr. Uhlik an employee of the

2  Cuyahoga County Board of Health?

3     A.    Yes.

4     Q.    And what did Mr. Uhlik do?

5     A.    I don't know what he does.  He had

6  equipment and he collected the information.  I

7  gave him my equipment and I -- he went to work.

8     Q.    Do you know what criteria he used

9  for what to copy from your files?

10    A.    No.

11    Q.    Separate from what he did, did you

12  undertake any review of any of your electronic

13  files to find documents that may be relevant to

14  this lawsuit?

15    A.    No.

16    Q.    Did you undertake any review of any

17  hard copy documents that you have?

18    A.    Only in my discussions with the

19  lawyers that I mentioned prior.

20    Q.    What does that mean?

21        MR. GALLUCCI:  You can answer to the

22  extent you are answering his question outside of

23  conversations that you had with the lawyers.

24  He's not asking for any conversation you --

25    Q.    I'm not asking about your

1    conversations.  What I am asking, has there ever

2    been a time when you reviewed your hard copy

3    files to see if you have documents that might be

4    relevant to this lawsuit?

5        A.    No.

6        Q.    Never?

7        A.    Never.

8        Q.    And have you at any time prior to

9    today undertaken to review departmental files or

10   Cuyahoga County Board of Health files that may

11   not be specific to you that are -- that might be

12   relevant to the issues in this lawsuit?

13       A.    No.

14       Q.    You mentioned earlier these daily

15   reports.  If you wanted to get a copy of your

16   daily report for an earlier time period, where

17   would you go?

18       A.    We'd have to talk to our IT people.

19       Q.    Mr. Uhlik or someone else?

20       A.    It might be Mr. Uhlik, I think, and

21   maybe, perhaps Chris Kippes, K-i-p-p-e-s.

22       Q.    Have there been occasions where

23   you've had to go look at earlier daily reports?

24       A.    Individual reports?

25       Q.    Yes.

Page 96

1        A.     Not that I can recall.

2        Q.     What about how your time was coded

3    for a period of time, even if it wasn't for just

4    a day?

5        A.     Yes.  So we provide statistical

6    reports to communities, and those are -- those

7    are aggregated, you know, in terms of

8    categories, that sort of thing.

9        Q.     Aggregated across personnel?

10       A.     Yeah.

11       Q.     And who prepares those reports?

12       A.     Chris Kippes.

13       Q.     Do you know what he does to prepare

14   those reports?

15       A.     Not specifically, no.

16       Q.     Have there been times when you've

17   had to go back and look at your earlier time for

18   some reason?

19       A.     Not that I can recall.

20       Q.     So every day you will fill out the

21   daily report?

22       A.     Yes.

23       Q.     And how do you do that?

24       A.     I -- so we have codes.  I mentioned

25   earlier we have codes.  And so most of us in

1   general administration -- you know, I go in and

2   out of meetings and discussions all day, and so

3   there are a number of things that may happen in

4   our environmental health service area where I am

5   doing general program administration or I'm

6   doing program development or assistance, and so

7   I will use that general code as sort of a

8   catchall because I could be in and out of lots

9   of discussions in any given day.  So

10  individually in program areas people may use

11  other codes.  So what I do is, at the end of the

12  day, almost daily -- at the very end of the day

13  I will enumerate that information.

14       Q.   Do the reports that Chris Kippes

15  prepares --

16       A.   Excuse me.  Kippes.

17       Q.   Kippes.

18       A.   He would appreciate that.

19       Q.   Have the reports that Mr. Kippes has

20  prepared and shared with communities shown time

21  spent by Cuyahoga County Board of Health

22  personnel on opioid-related issues?

23       A.   I think I'd have to check with him

24  on that.

25       Q.   Okay.  What is the code or what are

1    the codes that relate to opioids?

2         A.    I don't know.  I don't use them.  I

3    use general administration codes.

4         Q.    Are you able to identify any code

5    that relates to opioids?

6         A.    Not me, no.

7         Q.    Who would know?

8         A.    Vince Caraffi, April Vince, and -- I

9    would think would know.

10        Q.    Has the work of the Cuyahoga County

11   Opiate Task Force made a difference in the

12   opioid problem in Cuyahoga County?

13        A.    I think it's been very important.

14        Q.    Why has it been very important?

15        A.    I think that it's an opportunity --

16   what the Board of Health does I think -- in my

17   view I think what we do very well is we serve as

18   a good facilitation role, so we facilitate a lot

19   of collaboratives.  So teen pregnancy

20   prevention.  We have collaboratives around the

21   work of HIV and Ryan White.  Things like bed

22   bugs, things like rabies response.  We have lots

23   of community groups that meet together, and what

24   we've learned is that cross-sector interaction

25   is essential to try to combat what are

Page 99

1    multi-factorial problems.

2              The work of the opiate task force,

3    it involves -- it involves the work of the

4    county, the Alcohol, Drug Addiction and Mental

5    Health Services Board, the hospital, justice

6    affairs, the U.S. Attorney's Office, the medical

7    examiners, people and families that have lost

8    people to addiction, which is very powerful,

9    very powerful to have them part of the group.

10             That helped us understand the scope

11   of the outbreak, how it has -- earlier I

12   described -- earlier I described sort of this --

13   this connection between how we had prescription

14   opiates -- and then we hear stories from

15   families and some of the data from the medical

16   examiners shows this prescription opioid

17   problem, people going into treatment, people --

18   people relapsing and then overdosing with

19   deaths, or people that no longer have access to

20   opiates.

21             We heard about these pill parties

22   from high schools and the like that were also

23   feeding into this discussion.

24             And then the idea of that transition

25   from prescription opioids to this illicit

1   heroin, fentanyl, carfentanil, that transition,

2   which then connects into the syringe service

3   program work of trying to do harm reduction to

4   mitigate the problems.

5               And those discussions take place in

6   those meetings, and stories that we've heard,

7   and also in newspapers, about the scope of the

8   problem, tragic stories.

9               And then, of course, then hearing

10  from the different systems within the county

11  around -- with adoption, and Child and Family

12  Services stories, and then stories from the jail

13  about addiction and folks in re-entry,

14  challenges that they're facing so that folks are

15  in the best foot to be able to -- you know, to

16  contribute to society when they get out of jail.

17  So all of those are really important contexts to

18  understand.  And, also, then hearing from the

19  police about what's happening on the street.

20              Another piece that comes to mind in

21  you asking that is our work around the naloxone

22  distribution, which is part of the work that we

23  do at the health department.  So we have

24  on-site -- we have, like, a location where the

25  Project DAWN program that distributes naloxone

1   is on-site, and so that -- we meet with families

2   that come in that may have someone who's

3   addicted that lives with them, and they

4   distribute naloxone.

5              We also were charged -- local health

6   departments are charged around the state of Ohio

7   to distribute naloxone to police departments,

8   which was a big, important development to try to

9   make sure that we had that life-saving tool

10  available everywhere.  And so that's another

11  important piece of discussion that takes place

12  around naloxone distribution, naloxone saves,

13  where they're occurring.

14             So the dialogue is very rich; the

15  collaboration, I think, is essential.

16     Q.    Has the work of the Cuyahoga County

17  Opiate Task Force reduced the opioid problem in

18  Cuyahoga County?

19             MR. GALLUCCI:  Object to form.

20     A.    I think it's a very, very -- a

21  problem with a huge number of tentacles.  I

22  think that we believe our work has been

23  important to begin to help turn a corner.  I

24  think the problem is still huge.  I don't think

25  there's a bigger problem right now because of

1   the many tentacles and the cascade effects on

2   families that have lost people to opioid

3   addiction, and then the effect on kids, and then

4   the cascading effect within the jails.  I think

5   it's -- it has many tentacles, and I believe

6   we're making a difference, but there's still a

7   lot of work to do.  This isn't going to go away

8   overnight.

9        Q.    You referenced "our work on naloxone

10  distribution"?

11       A.    Yes.

12       Q.    Who is "our"?

13       A.    So, in our office, Vince Caraffi

14  would be the coordinator, and April Vince would

15  be involved with the naloxone distribution,

16  working with the Project DAWN group that

17  coordinates naloxone distribution for a lot of

18  places in the county.

19       Q.    So Vince Caraffi and April Vince, as

20  employees of the Cuyahoga County Board of

21  Health, have worked with Project DAWN to

22  increase the availability of naloxone?

23       A.    Yes.

24       Q.    Beyond that work, has the Cuyahoga

25  County Board of Health done any work on naloxone

1  distribution?

2      A.    I had mentioned the police

3  departments, that we distributed to police

4  departments.

5      Q.    Who is "we"?

6      A.    That would be Vince Caraffi and

7  April Vince.  So they coordinate with police

8  departments that can -- because we receive -- we

9  have funds to distribute naloxone, and so they

10  come and connect with us on what they need, and

11  as long as the naloxone is available, we

12  distribute it to them based on their needs.

13      Q.    So is the Cuyahoga County Board of

14  Health distributing naloxone?

15      A.    Yes.

16      Q.    And where does the Cuyahoga County

17  Board of Health get the naloxone?

18      A.    We receive naloxone through the

19  state health department.

20      Q.    And where does the Cuyahoga County

21  Board of Health distribute the naloxone that it

22  receives from the Ohio State Department of

23  Health?

24      A.    We distribute the naloxone through

25  our -- we have periodically a location on-site

1   where Project DAWN will do -- they'll meet with

2   families that are -- have members who are

3   addicted, and they'll speak with the families,

4   educate them and distribute the naloxone.  And

5   then we have -- work with the police departments

6   to distribute it to them as well.

7        Q.    Does the Cuyahoga County Board of

8   Health get the naloxone from any other source

9   besides the Ohio State Department of Health?

10       A.    Not that I'm aware of.

11       Q.    When the Cuyahoga County Board of

12  Health gets the naloxone from the Ohio State

13  Department of Health, does it pay for it?

14       A.    What I don't know is if we're

15  getting it shipped to us from the state or we --

16  they give us money and we buy it.  I think it

17  gets shipped to us from the state, but I'd have

18  to check with Vince.  I'm not involved in that

19  part of the work.

20       Q.    I thought you said earlier we had

21  funds to distribute naloxone.

22       A.    Yes.

23       Q.    Does the Cuyahoga County Board of

24  Health spend money to purchase naloxone?

25       A.    In thinking about it, I don't know

1    if we spend the money directly or it gets

2    shipped to us.  But we also have staff time

3    allocated to distribute the naloxone.  People

4    have to do that.  So that's money.  Staff time

5    is money.

6         Q.    Is it accurate to say that, sitting

7    here today, you don't know whether the Cuyahoga

8    County Board of Health pays any money for the

9    naloxone that it receives from the Ohio State

10   Department of Health?

11             MR. GALLUCCI:  Object to form.

12        A.    Yes.

13        Q.    And who would know definitively

14   whether the Cuyahoga County Board of Health pays

15   any money for naloxone?

16        A.    That would be Vince Caraffi or April

17   Vince.

18        Q.    And you said that the Cuyahoga

19   County Board of Health has periodically been a

20   location where people can get naloxone?

21        A.    Yes.

22        Q.    Are you familiar with the details of

23   that program?

24        A.    No.

25        Q.    Who is?

1          A.     Vince Caraffi and April Vince.

2          Q.     Do you know anything more about how

3    the Cuyahoga County Board of Health arranges to

4    be a location for the distribution of naloxone?

5          A.     No.

6          Q.     Earlier you referenced a connection

7    between the use of prescription opioids and the

8    use of illegal opioids?

9          A.     Yes.

10         Q.     And at another point you referenced

11   a transition from prescription opioids to

12   illicit opioids?

13         A.     Yeah.  I think that -- yes.

14         Q.     And I'd like to understand the basis

15   for your understanding.  You said stories and

16   you said data and you said what you heard about

17   pill parties?

18         A.     Yes.

19         Q.     Are those your sources?

20         A.     Yes.  And I would also add through

21   the opiate task force, where a number of those

22   discussions took place.

23         Q.     Those are your four sources?

24         A.     Yes.

25         Q.     What have you personally heard about

Page 107

1  pill parties?

2       A.    That -- heard stories about high

3  school kids going into their family's medicine

4  cabinets and bringing the drugs and -- at a

5  party and they get shared.

6       Q.    Where have you heard these stories?

7       A.    From the task force and from my

8  staff.

9       Q.    Who on your staff?

10      A.    Vince Caraffi and April Vince.

11      Q.    Anyone else?

12      A.    No.

13      Q.    And what pills are the high school

14  kids grabbing from their family medicine cabinet

15  and sharing at these parties?

16      A.    I don't know.

17      Q.    Have you been to a pill party?

18            MR. GALLUCCI:  Objection.

19      A.    No.

20      Q.    Have you talked to anyone who has

21  been to a pill party?

22      A.    No.

23      Q.    And if you've heard about these from

24  Mr. Caraffi or Ms. Vince, what is the basis for

25  their understanding about what high school kids

Page 108

1    are doing at pill parties with pills they've

2    gotten from their family medicine cabinet?

3              MR. GALLUCCI:  Object to form.

4         A.    I believe the discussions at, as I

5    mentioned earlier, the opioid task force; that

6    that's a place where a lot of discussion occurs

7    among community partners, and they're sharing

8    what the experiences are of the partner

9    agencies.

10        Q.    As far as you know, has Mr. Caraffi

11   attended a pill party?

12             MR. GALLUCCI:  Object to form.

13        A.    I don't know if he has.

14        Q.    How about Ms. Vince?

15             MR. GALLUCCI:  Object to form.

16        A.    I wouldn't know.

17        Q.    As far as you know, has Mr. Caraffi

18   talked to anyone who has attended a pill party?

19             MR. GALLUCCI:  Object to form.

20        A.    I don't know.

21        Q.    And as far as you know, has

22   Ms. Vince talked to anyone who attended a pill

23   party?

24        A.    I don't know.

25        Q.    So your understanding of these pill

1    parties, as you've described them, comes from

2    what you've heard from Mr. Caraffi and

3    Ms. Vince?

4         A.    Yes.  And as I mentioned, also, the

5    discussions that the -- I recall that it was

6    mentioned at one of the -- one of the task force

7    meetings.

8         Q.    You recall pill parties being

9    discussed at one --

10        A.    That I can recall, yeah.

11        Q.    -- meeting?

12             Do you remember it coming up at more

13   than one meeting?

14             MR. GALLUCCI:  Object to form.

15        A.    I can't recall beyond that.

16        Q.    And when was the meeting where you

17   remember someone describing these pill parties?

18        A.    It's been a while.  I don't know the

19   date specifically.

20        Q.    Were there any materials distributed

21   about this pill party topic?

22        A.    Not that I can recall.

23        Q.    Were there any slides or visuals

24   about it?

25        A.    No.

1        Q.    And who was the person who mentioned

2    it at the meeting?

3        A.    I don't remember.

4              MR. GALLUCCI:  Object to form.

5        Q.    Even if you don't remember the

6    particular individual, what was the affiliation

7    of the person who mentioned the pill parties at

8    this meeting?

9              MR. GALLUCCI:  Object to form.

10       A.    I don't remember.

11       Q.    Do you remember any details that

12   this person described or provided about these

13   pill parties?

14       A.    Nothing beyond what I've told you.

15       Q.    You also mentioned hearing stories

16   about the connection between prescription

17   opioids and illegal opioids or transitioning

18   from using prescription opioids to using illegal

19   opioids, correct?

20             MR. GALLUCCI:  Object to form.

21       A.    Yes.

22       Q.    What stories have you heard?

23       A.    In discussions at the task force and

24   discussions with -- well -- and I would say you

25   could call it a story.  I would also call it

1   from an expert, from Dr. Gilson, the medical

2   examiner, his experiences, from his data showing

3   some of the transition.  And, also, there's been

4   lots of news and reports from -- and discussions

5   with public health partners from around the

6   state.  I think that there's been -- there's

7   been a lot of discussions that have been similar

8   about the pathway that we've talked about in the

9   opiate task force with partners and other people

10  in the public health field.

11        Q.   So can you identify for me any

12  particular individuals who have provided these

13  stories besides Dr. Gilson?

14        A.   I also think -- they are stories,

15  but I want to say I think they're professional

16  opinions that are important.  It's not like

17  reading a fictional novel.  These people are

18  living the problem.  And I think that's an

19  important distinction in what you're saying.

20  And so Dr. Gilson is a good example.

21             So there are general discussions

22  among public health partners around the country

23  and around Ohio that just share stories.  And so

24  I don't remember the exact thing that one person

25  said or didn't say, but these are examples where

1   people will say that we're finding the same

2   thing happening here.

3        Q.    So I'd like to identify any

4   individual besides Dr. Gilson who you have heard

5   talk about the transition from prescription

6   opioid use to illicit opioid use.

7             MR. GALLUCCI:  Object to form.

8        Q.    Can you identify any individual

9   besides Dr. Gilson?

10       A.    I think I can't identify word for

11  word what someone would have said.

12       Q.    I'm not asking word for word.  I'm

13  asking for the names of particular people who

14  have talked about this topic.

15       A.    I'm just trying to think of who

16  would have said it.  It was in some public

17  health meetings.  I'm trying to identify the

18  individual that would have said it specifically.

19  There's been general discussions, and so I

20  can't -- I don't want to take anybody out of

21  context.  It would be inappropriate.  That would

22  be my answer.  I don't want to take anybody out

23  of context.  It would be inappropriate.

24       Q.    Even if you can't remember the names

25  of particular individuals, what were the

1    affiliations of these professionals from whom

2    you've heard something about a transition from

3    prescription opioid use to illegal opioid use?

4              MR. GALLUCCI:  Object to form.

5         A.   So the people in the public health

6    field, from medical examiners, people from the

7    opiate task force, and I think I mentioned, you

8    know, the opiate task force had membership from

9    the U.S. Attorney's Office, from the county

10   prosecutors, from -- and this isn't an

11   exhaustive list, by the way.  This is just what

12   I can remember -- Alcohol, Drug Addiction and

13   Mental Health Services Board, the police

14   departments, the addiction service agencies,

15   those sort of things.

16        Q.   So those are the kinds of --

17        A.   Yes.

18        Q.   -- entities or groups who are

19   participating in these conversations?

20        A.   Yes.

21        Q.   Okay.  But I'd like to be more

22   specific.  I'd like to know exactly who told you

23   about this transition concept.  You mentioned

24   Dr. Gilson.  I asked you who else.  You said I

25   can't remember the names of anyone else.  I'm

Page 114

1    trying to understand, okay, can you think of

2    someone in particular, even if you don't know

3    their name but you can remember their

4    affiliation.  I'm not asking about all the

5    groups that participate in all these public

6    health discussions.

7            So besides Dr. Gilson, can you

8    identify by name or description or affiliation

9    anyone you talked to about the concept of there

10   being a transition from prescription opioid use

11   to illicit opioid use?

12           MR. GALLUCCI:  Object to form.

13       A.    I think I've mentioned that I feel

14   like it would be not the proper context and so I

15   can't specifically say what one individual would

16   have said.  It wouldn't be appropriate to take

17   them out of context because I can't recall

18   specifically what they would have said.

19       Q.    And you also said that you had heard

20   about this concept from -- at Cuyahoga County

21   Opiate Task Force meetings, correct?

22           MR. GALLUCCI:  Object to form.

23       A.    Um-hum.

24       Q.    Same thing.  For all the meetings

25   you've attended, can you identify anyone by

Page 115

1   name, by description or by affiliation who you

2   talked to about this concept of a transition

3   from prescription opioid use to illicit opioid

4   use?

5             MR. GALLUCCI:  Object to form.

6        A.   No.

7        Q.   So what has Dr. Gilson said to you

8   about this concept of a transition?

9        A.   Dr. Gilson has talked publicly about

10  this.  He's talked at the task force.  He's

11  talked in lots of places about the context.

12       Q.   And what has he specifically said

13  about a connection between using prescription

14  opioids and using illicit drugs?

15            MR. GALLUCCI:  Object to form.

16       A.   I think I described it earlier, the

17  connection.  Do you want me to repeat what I

18  said earlier?

19       Q.   I'd like your best recitation of

20  your understanding of what Dr. Gilson has said

21  about the connection.

22            MR. GALLUCCI:  Object to form.

23       A.   As I mentioned, I think my

24  recitation reflects as an expert, and as

25  mentioned in discussions in the task force, the

1    idea that folks became addicted to opioids, that

2    there were a lot of prescription opioids

3    available, and that -- and in becoming addicted,

4    people either ran out of their opioids, their

5    prescription opioids, and then went into

6    treatment, or actually ran out and then ended up

7    seeking on the street illicit forms, like

8    heroin, fentanyl and carfentanil; or they went

9    into treatment and they had a relapse and went

10   on the street and they had overdoses, and, in

11   some cases, many cases, fatalities.

12              And so that's the connection, that

13   continuum of people running out of access to

14   prescription opioids for any number of reasons;

15   treatment, addiction, treatment, relapse, or --

16   and then the cascade of health and social

17   problems.

18       Q.    So if I understand you correctly,

19   your understanding from what Dr. Gilson has

20   said --

21       A.    And I mentioned also the task force

22   discussions.

23       Q.    If I understand you correctly, you

24   understood -- understand Dr. Gilson to have said

25   that people have become addicted to prescription

1    opioids because lots were available.  When the

2    prescription opioids ran out and they couldn't

3    get more prescription opioids, they either

4    started using illicit drugs or they went into

5    treatment, then had a relapse, and either

6    overdosed or sought out illicit drugs.  Is that

7    an accurate statement of what you've heard from

8    Dr. Gilson?

9              MR. GALLUCCI:  Object to form.

10        A.    I think it relates back to reports

11   and information from Dr. Gilson from the -- the

12   task force discussions, and from public reports

13   about -- about -- that I feel sort of validate

14   that.  It's a combination of those.

15        Q.    Sir, I'm trying to take this a piece

16   at a time.

17        A.    In my view -- I don't mean to

18   interrupt.  I'm sorry.  In my view, just -- but

19   I'd like to -- is I don't think that they can be

20   separated because I think these pieces are all

21   interrelated.

22        Q.    You identified four sources.  You

23   identified what you had heard about pill

24   parties, and you've told me everything you

25   remember about that, correct?

1    A.    Yeah.  And I mentioned with pill

2  parties that that information came from the task

3  force, it came from a number of sources.  It

4  wasn't from any single source.  And I would say

5  that the information I'm providing you is not

6  dissimilar to that, it's from multiple sources.

7    Q.    And you also mentioned stories, and

8  I asked you for details, and you then said,

9  well, it's not just stories, it's professional

10  opinions, and you identified what Dr. Gilson had

11  said.  And then I asked you whether you had

12  heard this from anyone else you could identify

13  by name, description or affiliation, and you

14  said no.  Correct?

15    A.    But I said there were lots of

16  different affiliations.  We talked about that.

17  We talked about the members of the task force

18  and the different -- you had asked then can you

19  name them by sector essentially, and I provided

20  you a list of those sectors.

21    Q.    That was people from all those

22  fields?

23    A.    Yes.

24    Q.    But you're not able to identify

25  someone by name or I don't remember so and so's

1    name but I remember he or she was with such and

2    such a group.  The one person you remember is

3    Dr. Gilson, okay.  So now I'm asking you, what

4    has Dr. Gilson said as you understand it?  And

5    you described this series going from an

6    addiction to a prescription opioid, to running

7    out, not being able to get a prescription

8    opioid, and then using illicit drugs.

9         A.    So the context of those discussions

10   are related to this larger picture with the --

11   with the task force.  I'm trying to, you know,

12   think about this in the sense that it --

13   Dr. Gilson has a lot of data that he can present

14   based on post-mortem about what's happening and

15   when it happened on his website, as there's lots

16   of publicly available slides.  And so the

17   discussion would be a range of Dr. Gilson

18   providing that information and then people

19   relating stories and experiences from their

20   fields about how that relates back to this

21   cascade that, in my view, is well understood now

22   based on public reports.

23        Q.    But my questions, sir, are focused

24   on what you've heard from Dr. Gilson, not what

25   you've heard from other sources, not what you've

Page 120

1   heard from other people on the task force, not

2   what you've heard from other people outside the

3   task force, just what you've heard from

4   Dr. Gilson.

5           A.    Okay.

6           Q.    So did I describe accurately what

7   you think you've heard from Dr. Gilson, which is

8   that people get addicted to prescription

9   opioids, then they can't get prescription

10  opioids so they start using illicit drugs, and

11  then they may have an overdose?

12              MR. GALLUCCI:  Object to form.

13          A.    I can't say -- what I can't say is

14  specifically, in that whole piece, which -- how

15  much of that is attributable specifically to

16  Dr. Gilson, because it's larger -- it's part of

17  a larger context of discussion.

18          Q.    All right.  But have you heard that

19  theory of connection from Dr. Gilson?

20              MR. GALLUCCI:  Object to form.

21          A.    No, not directly where he -- this is

22  part of a larger discussion, I think, where --

23  where the opiate task force and people are

24  discussing these things and people are offering,

25  you know, their experiences from -- you know,

1   from their various sectors, and I think the

2   intertwined nature of this requires that type of

3   interaction.  Dr. Gilson is part of that.  The

4   other sectors are part of it as well.

5       Q.   Okay.  And you identified a few

6   sources that are the basis for your

7   understanding.  I'm focusing on Dr. Gilson.  So

8   what do -- what has Dr. Gilson said to you or to

9   others that you're aware of that forms the --

10  that forms your understanding here?

11          MR. GALLUCCI:  Object to form.

12      A.   I can't speak to what Dr. Gilson

13  would have said to others.

14      Q.   What did he say to you or in front

15  of you?

16          MR. GALLUCCI:  Object to form.

17      A.   I would say that he talked in -- as

18  I mentioned, in the opiate task force meetings

19  with a range of partners describing his

20  experiences in the context of their experiences,

21  and that collective discussion is where I heard

22  these things, and he was part of it.

23      Q.   And what data or information is

24  Dr. Gilson relying on?

25          MR. GALLUCCI:  Object to form.

1        A.     Dr. Gilson has data from -- the

2   medical examiner's website is the range of data

3   that he's been using and that's the data that

4   we've been tracking.

5        Q.     Have you looked at the data itself?

6        A.     On Dr. Gilson's website?

7        Q.     Yes.

8        A.     Yes.

9        Q.     And have you looked at the sources

10  of that data?

11       A.     The sources of the data are from the

12  medical examiner's office, as far as I'm aware.

13       Q.     And what is the data?

14       A.     There's data on there that shows --

15  he collects data from -- so there are data on

16  there now around naloxone saves around the

17  community and where that's occurred, and so he

18  has those data.  He has data that shows the

19  toxicology data from folks post-mortem that he

20  collects.  He has data on, you know, the rates

21  of -- and numbers around fatalities.  He has

22  numbers on a range of -- a range of substances

23  that he tracks and their occurrence and how

24  that's cascaded over time.

25       Q.     When was the last time that you

1    looked at the medical examiner's website?

2         A.    Let's see.  I don't know.  Maybe a

3    month ago maybe.

4         Q.    And when you went to the medical

5    examiner's website a month ago or so, did you

6    look at the data that was available on the

7    website?

8         A.    I looked at -- there's a section

9    that has the current, sort of, scope of the

10   problem, and so I go to that section and look it

11   up.

12        Q.    And what data is on that website

13   showing a connection between the use of

14   prescription opioids and the use of illegal

15   opioids?

16              MR. GALLUCCI:  Object to form.

17        A.    The context is the -- there's data

18   that shows the -- all opioids and then there's

19   data that also shows them broken out by the type

20   of opioid.  You know, there's like an opioid

21   complex, and then there's one that breaks out

22   individual things like -- breaks out individual

23   things like heroin or carfentanil or fentanyl.

24        Q.    As drugs found in the decedent's

25   body after a fatal overdose?

Page 124

1              MR. GALLUCCI:  Object to form.

2         A.    I think you'd have to ask Dr. Gilson

3   about that specifically.

4         Q.    So is your understanding informed by

5   any specific data you've seen on the medical

6   examiner's website?

7         A.    Can you repeat that again?

8         Q.    Yeah.

9               You've described what you've heard.

10        A.    Yeah.

11        Q.    Including what you've heard from

12   Dr. Gilson.

13        A.    Um-hum.

14        Q.    But you can't point to anything

15   specific that Dr. Gilson has said as distinct

16   from what you've heard from others at the opiate

17   task force.  I asked you what was the basis for

18   what Dr. Gilson was saying, and you said data,

19   the data is on the website.

20        A.    Yeah.

21        Q.    Have you looked at specific data on

22   the medical examiner's website that purports to

23   identify or prove a connection between

24   prescription opioid use and illegal opioid use?

25              MR. GALLUCCI:  Object to form.

1        A.     I don't know specifically if that's

2    on the site.

3               THE WITNESS:  Can I get another

4    glass of water?

5               MR. KEYES:  Of course.

6        Q.     Can you provide any more specificity

7    about what you've heard from Dr. Gilson, not

8    from someone else but what you've heard from Dr.

9    Gilson, about the connection between

10   prescription opioid use and illegal drug use?

11              MR. GALLUCCI:  Object to form.

12       A.     No.

13       Q.     And earlier when you talked about

14   this connection, you also said that one source

15   of your information was data, right?  Remember

16   you said stories, data, what you heard about

17   pill parties, and what you heard at meetings of

18   the Cuyahoga Opiate Task Force.  Do you remember

19   that?

20       A.     Yeah.

21       Q.     So what data are you pointing to?

22       A.     Well, I think that the experiences

23   that people have from law enforcement; from not

24   only the medical examiner's office, from the

25   addiction service agencies, from the information

1  shared by hospital systems is important data

2  points.  They may not be data analyzed in what

3  people might think is a traditional sense, but

4  they are points that help us to understand the

5  evolution of things.

6       Q.    So you've identified some data

7  points; that is, law enforcement, medical

8  examiner's office, addiction service agencies

9  and hospital systems.

10      A.    There may be more, but those are

11  just examples.

12      Q.    Okay.  What data have they gathered

13  that shows or purports to show a connection

14  between using prescription opioids and using

15  illegal drugs?

16           MR. GALLUCCI:  Object to form.

17      A.    I think you'd have to ask them.

18      Q.    Okay.  Can you cite any data for

19  that purported connection?

20           MR. GALLUCCI:  Object to form.

21      A.    No.

22      Q.    So regarding the possibility of a

23  connection between prescription opioid use and

24  illegal opioid use, can you point to any data

25  that shows or purports to show a connection?

1              MR. GALLUCCI:  Object to form.

2       A.    Not specifically, no.

3       Q.    And can you point to anyone specific

4  who has talked to you about such a connection

5  besides Dr. Gilson?

6              MR. GALLUCCI:  Object to form.

7       A.    I think I mentioned earlier that --

8  I did mention earlier that the opiate task force

9  participants have shared those -- shared that

10 information.

11      Q.    Can you point to anyone specifically

12 besides Dr. Gilson as saying or purporting to

13 show that there's a connection between

14 prescription opioid use and illegal drug use?

15             MR. GALLUCCI:  Object to form.

16      A.    As I mentioned earlier, I spoke

17 about sectors and the different sectors that

18 would describe those stories.

19      Q.    Can you point to anyone by name,

20 specific description or specific affiliation who

21 has said or purported to show that there's a

22 connection between prescription opioid use and

23 illegal drug use?

24             MR. GALLUCCI:  Object to form.

25      A.    I think, as I said earlier, that it

Page 128

1    wouldn't be appropriate to -- without having the

2    exact statement of what somebody would have

3    said, to attribute it to an individual.

4         Q.    So is it accurate to say that what

5    you said earlier about there being a connection

6    between prescription opioid use and illicit drug

7    use is based on what Dr. Gilson has said, what

8    other people whose names and affiliations you

9    don't remember said at meetings of the opiate

10   task force --

11        A.    I think it's also been discussed in

12   the media.

13        Q.    -- and what you've read in the media

14   and what you've heard about pill parties?

15             MR. GALLUCCI:  Object to form.

16        A.    Yeah.  The other people are a range

17   of people from sectors that have been -- where

18   this work and problem has influenced them and

19   it's in their sphere.  So that would be the --

20   that group would be it.

21        Q.    Can you identify a specific

22   conversation you've had with any one of those

23   people in any one of those sectors about this

24   topic?

25             MR. GALLUCCI:  Object to form.

1      A.    Not in the specific details of the

2  discussion.

3      Q.    Well, can you identify anyone from

4  any of those sectors that you've talked to about

5  the concept of there being a connection?

6           MR. GALLUCCI:  Object to form.

7      A.    I can't recall the specific

8  conversations.

9      Q.    But I'm not asking whether you

10  recall the specific conversations.  Can you

11  identify any particular person from any of those

12  sectors with whom you've talked about a possible

13  connection between prescription opioid use and

14  illegal drug use?

15           MR. GALLUCCI:  Object to form.

16      A.    I can't recall the specifics.

17      Q.    You keep saying "specifics."  I'm

18  not asking for the specifics of a conversation.

19  I'm asking you, can you identify any particular

20  person from any of those sectors with whom

21  you've spoken about the idea of a connection

22  between prescription opioid use and illegal drug

23  use?

24           MR. GALLUCCI:  Object to form.

25      A.    Since I can't recall the specifics

Page 130

1    of the conversation, I can't state a person, no.

2    It's because I can't recall the specifics of the

3    conversation, it would be inappropriate to take

4    them out of context because I don't have the

5    specifics.

6         Q.    You also mentioned news reports.

7    What news reports are you talking about?

8         A.    It's all over the media.

9         Q.    Can you point to any specific

10   article?

11        A.    Lots of news outlets.  I've seen it

12   in lots of national news outlets, national

13   papers, local papers mostly, and those are

14   reports from all over the country.

15        Q.    Can you point to a specific news

16   article?

17        A.    No, I can't report the name of an

18   article written on a certain date by an

19   individual and the title of the article and the

20   context.  It's part of a larger complex of

21   information.  No, I can't.

22        Q.    Can you point to a specific reporter

23   or journalist who wrote the news reports that

24   you're thinking of?

25             MR. GALLUCCI:  Object to form.

Page 131

1      A.     No, I can't.

2      Q.     If I said to you, "Mr. Allan, can

3  you prove that there is a connection between

4  using prescription opioids and using illegal

5  drugs," can you prove it?  Have you ever studied

6  that?

7              MR. GALLUCCI:  Object to form.

8      A.     Can I prove it?  I don't think

9  that's for me to prove.

10     Q.     Okay.  And if I said, "To your

11  knowledge, who has proved it," who would you

12  point to --

13             MR. GALLUCCI:  Object to form.

14     Q.     -- by name?

15     A.     I don't think that's for me to

16  determine.

17     Q.     And if I said, "Mr. Allan, even if

18  you can't point to someone else who's proved it,

19  can you point to someone who thinks they've

20  proved it," can you identify anyone by name?

21             MR. GALLUCCI:  Object to form.

22     A.     I don't know what people think.  I

23  wouldn't presume to think that I would know

24  people's rationale and their approaches and

25  their thoughts about -- specifically about

1   something like that.

2        Q.    I'm not asking you to guess what

3   others think.  I'm saying, can you point to

4   someone who you know thinks they've proved a

5   connection between prescription opioid use and

6   illegal drug use?

7              MR. GALLUCCI:  Object to form.

8        A.    I can't think of anyone right now.

9        Q.    Okay.  So earlier when you said that

10  there was a transition from prescription opioid

11  use to illegal drug use, have you identified

12  everything you're basing that statement on?

13             MR. GALLUCCI:  Object to form.

14       A.    Could you repeat, have I what?

15       Q.    Earlier you said there was a

16  transition from prescription opioid use to

17  illegal drug use?

18       A.    Yes.

19       Q.    Have you identified everything

20  you're basing that statement on?

21             MR. GALLUCCI:  Object to form.

22       A.    I'm identifying everything that I

23  can recall that I would base that statement on.

24       Q.    Every source of information, whether

25  it be a particular publication, a particular set

1    of data, a particular person, a particular

2    comment or presentation.  Can you think of

3    anything else that informs what you said was a

4    transition from using prescription opioids to

5    using illegal drugs?

6              MR. GALLUCCI:  Object to form.

7         A.    Not that I can recall right now.

8         Q.    And it's the same for your statement

9    earlier that there's a connection between using

10   prescription opioids and using illegal drugs?

11             MR. GALLUCCI:  Object to form.

12        A.    I think it would be the same, that

13   not that I can recall right now.

14        Q.    And is the same true for your

15   earlier statement that there is a continuum from

16   prescription opioids to illegal drugs?

17             MR. GALLUCCI:  Object to form.

18        A.    Yes.

19        Q.    Have you ever communicated with

20   anyone on the city council about the problem

21   with opioids?

22        A.    You're talking about the City of

23   Cleveland?

24        Q.    Yes, sir.

25        A.    No.

1     Q.    Have you spoken with anyone in the

2  county executive's office about the problem of

3  opioids in the community?

4     A.    I think I have maybe once

5  mentioned -- just talked about the task force in

6  the executive's office.

7     Q.    And when you say you mentioned the

8  task force, are you talking about the Cuyahoga

9  County Opiate Task Force?

10    A.    Yes.

11    Q.    You said you may have mentioned it

12 once.  To whom?

13    A.    I mentioned it in a meeting of

14 people at the county.  I'm trying to think of

15 who was all there.  I don't know everybody that

16 was present, but it was just that the Board of

17 Health is facilitating the task force.  It was

18 in passing, not unlike the discussions that I

19 mentioned I have in communities where I talk

20 about lots of public health topics.

21    Q.    What do you remember about that

22 conversation where you may have talked about the

23 problem with opioids in the community?

24    A.    Only that it was -- that our role

25 was, you know, in facilitating the task force --

1    that there were -- I think I talked about the

2    sectors, but it was very general.  It was very

3    brief.

4         Q.    Have you had any conversations with

5    any elected official for the City of Cleveland

6    or Cuyahoga County or the State of Ohio about

7    the problem of opioids in Cleveland or Cuyahoga

8    County?

9              MR. GALLUCCI:  Object to form.

10        A.    I think in that particular

11   discussion, it was a range of topics.  I'm

12   trying to think of who was present.  I don't

13   recall if there specifically was -- beyond -- as

14   I mentioned, it was a brief conversation.  I

15   can't recall specifically if there was an

16   elected official in the room when I mentioned

17   that.  I'm trying to remember.  I don't

18   remember.

19        Q.    And separate from that instance, was

20   there any other time where you talked about the

21   problem of opioids with any elected official

22   from the City of Cleveland, from Cuyahoga

23   County, or the State of Ohio?

24             MR. GALLUCCI:  Object to form.

25        A.    I can't recall if there were elected

1    officials in the room when I gave my -- and I

2    mentioned earlier that I do community

3    presentations on a range of our programs.  I

4    don't know if there were ever elected officials

5    present in those meetings or not, but it would

6    have been in the sense of overview of the, you

7    know, task force, but I can't recall beyond

8    that.

9         Q.    Have you ever been prescribed an

10   opioid?

11              MR. GALLUCCI:  Object to form.

12        A.    Not that I'm aware of.

13        Q.    Have you ever taken a prescription

14   opioid?

15              MR. GALLUCCI:  Objection.

16              I'm going to instruct you not to

17   answer.

18        Q.    Do you agree that prescription

19   opioids can serve a legitimate purpose in

20   addressing the medical condition or needs of a

21   patient?

22              MR. GALLUCCI:  Object to form.

23        A.    I think since I'm not in

24   pharmacology or medicine, I don't know that I

25   can make that determination.

1        Q.    Is it your view that prescription

2   opioids are never appropriate for the medical

3   treatment of a patient?

4              MR. GALLUCCI:  Object to form.

5        A.    I don't -- as I said, I'm not in

6   medicine or pharmacology.  I don't think I'm

7   qualified to make that determination.

8        Q.    You are the health commissioner

9   for --

10       A.    Of the Cuyahoga County Board of

11  Health.

12       Q.    -- the Cuyahoga County Board of

13  Health, correct?

14       A.    I am.

15       Q.    And you have participated in at

16  least some meetings of the Cuyahoga County

17  Opiate Task Force?

18       A.    Yes.

19       Q.    And are you saying that you don't

20  have a view as to whether prescription opioids

21  can ever be appropriate for the treatment of a

22  patient?

23             MR. GALLUCCI:  Object to form.

24       A.    I would say prescription opioids or

25  any medication I don't think I'm in a position

Page 138

1    to make a determination about because I'm not in

2    medicine or pharmacology, to make a

3    determination of what people need and when they

4    need it and how much they need.  So I don't feel

5    that that's my role.

6         Q.    I'm not asking about a particular

7    person or particular medical condition.  I'm

8    asking, are there circumstances where a

9    prescription opioid is medically appropriate

10   treatment for a patient?

11             MR. GALLUCCI:  Object to form.

12        A.    I'm not -- I'm not qualified to make

13   that determination.

14        Q.    Can there be instances where it is

15   appropriate to prescribe an opioid to assist a

16   patient in managing pain?

17             MR. GALLUCCI:  Object to form.

18        A.    I'm not qualified to make that

19   determination.

20        Q.    So you can't -- you can't say one

21   way or the other whether it's -- whether there's

22   any set of circumstances where it's appropriate

23   to prescribe an opioid to assist a patient's

24   pain?

25             MR. GALLUCCI:  Object to form.

1      A.    I think that's hypothetical, and I'm

2  not a physician and I'm not a pharmacologist, so

3  I don't believe that I am qualified to make that

4  determination.

5      Q.    So, in your view, only a physician

6  or a pharmacologist could make a determination

7  as to whether it's ever appropriate to prescribe

8  an opioid to assist a patient in managing pain?

9           MR. GALLUCCI:  Object to form.

10     A.    There may be other sectors, but I'm

11  just saying I'm not qualified to do that.

12     Q.    What is the difference between an

13  opiate and an opioid, if you know?

14     A.    I don't.

15     Q.    Do you know if there is a difference

16  between an opiate and an opioid?

17          MR. GALLUCCI:  Object to form.

18     A.    No.

19     Q.    In your experience, are the terms

20  "opiate" and "opioid" used interchangeably?

21     A.    I don't know.

22     Q.    Do you know how many people have

23  died from an overdose on opioids in Cuyahoga

24  County?

25     A.    Only in general terms.

Page 140

1          Q.     What does that mean, "in general

2     terms"?

3          A.     I know what I know from the medical

4     examiner's website.

5          Q.     And do you have any knowledge other

6     than what you would get from that website?

7          A.     That would be the source that I

8     would receive my information.

9          Q.     Is that the only source?

10          A.     It's the source I can recall right

11     now that I have went to before.

12          Q.     Is it the same for the number of

13     deaths in the City of Cleveland?

14          A.     Yes.

15          Q.     Do you know the number of deaths

16     from an overdose on opioids in Summit County?

17          A.     No.

18          Q.     Or any other municipality in Ohio?

19          A.     Not specifically, no.

20          Q.     Or across the state of Ohio?

21          A.     No, I don't have those numbers.

22          Q.     Of the number of deaths in Cuyahoga

23     County that you would see on the medical

24     examiner's website, do you know the number of

25     decedents who used prescription opioids?

1          A.     No.

2          Q.     Do you know the number of decedents

3     who used illegal opioids?

4                 MR. GALLUCCI:  Object to form.

5          A.     No.

6          Q.     Do you know the number who used both

7     prescription opioids and illegal opioids?

8                 MR. GALLUCCI:  Object to form.

9          A.     No.

10         Q.     Do you know the number of overdoses

11    on opioids in Cuyahoga County?

12         A.     Only to the extent that it's in the

13    thousands, many thousands.

14         Q.     And would you also go to the medical

15    examiner's website for that?

16         A.     Yes, sir.

17         Q.     Why would you go to the medical

18    examiner's website for the number of overdoses

19    on opioids?

20         A.     Because I believe there's data

21    available there, collection of data to -- that

22    may indicate information there.

23         Q.     Do you know the number of overdoses

24    in Cuyahoga County resulting from an overdose on

25    an illegal opioid?

Page 142

1                    MR. GALLUCCI:  Object to form.

2          A.    No.  Specifically I can't speak to

3     that.

4          Q.    Do you know the number of overdoses

5     in Cuyahoga County resulting from the use of a

6     prescription opioid?

7                    MR. GALLUCCI:  Object to form.

8          A.    No.

9          Q.    Do you know the number of overdoses

10    either on a -- resulting from either the use of

11    a prescription opioid or an illegal opioid for

12    the City of Cleveland?

13         A.    No.

14                   MR. GALLUCCI:  Object to form.

15         Q.    How about for any other municipality

16    in Ohio?

17                   MR. GALLUCCI:  Object to form.

18         A.    No.

19         Q.    How about across the state of Ohio?

20         A.    No.

21                   MR. GALLUCCI:  Object to form.

22         Q.    Do you know the number of people who

23    are addicted to opioids in Cuyahoga County?

24         A.    No.

25         Q.    How about in the city of Cleveland?

1       A.      No.

2       Q.      How about another municipality in

3  Ohio?

4       A.      No.

5       Q.      How about across the state of Ohio?

6       A.      No.

7       Q.      Did you learn about opioids in your

8  coursework in getting your Master's in Public

9  Health?

10      A.      No.

11      Q.      Was there any discussion of opioids

12 in that coursework?

13      A.      That was in 1992.  No, there was

14 not.

15      Q.      Have you ever done any professional

16 writing on opioids?

17      A.      No.

18      Q.      Have you done any professional

19 writing on drug abuse?

20      A.      No.

21      Q.      Have you done any professional

22 writing on drug addiction?

23      A.      No.

24      Q.      Have you done any professional

25 writing on drug overdoses?

Page 144

1        A.     No.

2        Q.     Have you done any writing at all on

3   opioids?

4               MR. GALLUCCI:  Object to form.

5        A.     No, I don't believe so.

6        Q.     Have you done any writing at all on

7   drug abuse?

8        A.     No.

9        Q.     Have you done any writing at all on

10  drug addiction?

11       A.     No.

12       Q.     Have you done any writing at all on

13  drug overdoses?

14              MR. GALLUCCI:  Object to form.

15       A.     I don't believe so, no.

16       Q.     Have you taught any course on

17  opioids?

18       A.     No.

19       Q.     Or opioid use?

20       A.     No.

21       Q.     Have you taught any course about

22  drug abuse?

23       A.     No.

24       Q.     Have you taught any course about

25  drug addiction?

1      A.    No.

2      Q.    Have you taught any course about

3  drug overdoses?

4      A.    No.

5      Q.    Have you given any lecture on

6  opioids or opioid use?

7      A.    I think I mentioned earlier that I

8  give lots of talks and may have mentioned it in

9  talks to students as part of a larger context,

10  not specifically like an opiate-related

11  presentation but part of a larger context of

12  things that we do.

13     Q.    So you may have spoken publicly

14  about the work of the Cuyahoga County Board of

15  Health that touches on the work of the opiate

16  task force?

17     A.    Yeah, to students.

18     Q.    But separate from touching on the

19  work of the opiate task force, have you ever

20  given a lecture where the topic of the lecture

21  is opioids or the use of opioids?

22     A.    No.

23     Q.    How about drug abuse?

24          MR. GALLUCCI:  Object to form.

25     A.    No.

Page 146

1      Q.    How about drug addiction?

2            MR. GALLUCCI:  Object to form.

3      A.    No.

4      Q.    How about drug overdoses?

5            MR. GALLUCCI:  Object to form.

6      A.    No.

7      Q.    What is OARRS?

8            MR. GALLUCCI:  Object to form.

9      A.    I don't know the name of the

10  acronym, but it's a system that the state

11  uses -- I only know it in general terms.  Beyond

12  what I tell, that's all I know about OARRS.

13  It's a system that the state uses to monitor

14  prescription opioids around the state.  I don't

15  know any more than that about OARRS.

16     Q.    When you say "the state," you mean

17  the state of Ohio?

18     A.    Yes.

19     Q.    And what information is in the

20  system?

21           MR. GALLUCCI:  Object to form.

22     A.    Beyond what I told you, as I

23  mentioned, I can't speak to it.

24     Q.    Do you know what -- do you know all

25  of the data that's in the system?

Page 147

1      A.    No.

2      Q.    Do you know any of the data that's

3   in the system?

4      A.    Only beyond what I mentioned -- it's

5   prescription opioids distribution.

6      Q.    Is there data -- is the data in

7   OARRS limited to opioid -- prescription opioids?

8            MR. GALLUCCI:  Object to form.

9      A.    I don't know.

10      Q.    Is there data in OARRS about

11   prescriptions for drugs other than opioids?

12            MR. GALLUCCI:  Object to form.

13      A.    I don't know.

14      Q.    Who has access to the data that is

15   in OARRS?

16            MR. GALLUCCI:  Object to form.

17      A.    I don't know the universe of

18   everybody that has access to OARRS.

19      Q.    You don't know everybody who has

20   access.  Do you know anybody who does have

21   access?

22      A.    I believe some of our staff may, but

23   I don't know for sure.  You'd have to ask them.

24      Q.    Who on your staff do you think may

25   have access to OARRS?

1        A.    It's possible that Vince Caraffi

2   perhaps may have access to OARRS.  There may be

3   others, but I'm not aware.

4        Q.    Do you know of anyone, outside of

5   the Cuyahoga County Board of Health staff, who

6   has access to the data in OARRS?

7        A.    I don't know those people, no.

8        Q.    Do you know how data is put into

9   OARRS?

10       A.    I don't.

11             MR. GALLUCCI:  Object to form.

12       Q.    Do you know how any user can use

13  OARRS to monitor prescriptions for opioids?

14       A.    No, I don't.

15             -   -   -   -   -

16             (Thereupon, Allan Deposition Exhibit

17             1, Resume - Terry Allan, Beginning

18             Bates Number CUYAH-01437729 - Marked

19             "Confidential," was marked for

20             purposes of identification.)

21             -   -   -   -   -

22       Q.    Showing you what has been marked as

23  Allan Number 1, this is Bates numbers

24  CUYAH_14317729 through 731.  Is this your resume

25  or CV?

1        A.    Yes.

2        Q.    When did you prepare this resume or

3   CV?

4        A.    I don't know what version of this

5   this is.  I periodically update it.  I probably

6   have been preparing -- I've prepared one --

7   first started doing it probably -- I don't

8   know -- a long time ago, and from time to time

9   I'll update it.  So I'm not sure how current

10  this is.  This is -- yes, it's my CV.

11       Q.    And what is your purpose of

12  preparing a resume or CV?

13       A.    Sometimes for things I'm involved

14  in, groups or participating on advisory boards

15  and things like that, they'll require a CV.  Or

16  on grants, working with academia, they may

17  require a CV to participate.

18       Q.    Does your CV mention any work

19  relating to opioids?

20       A.    No.  I don't see anything mentioned

21  in there.

22       Q.    Does your CV mention any work

23  relating to the problem of opioids in Cleveland

24  or Cuyahoga County?

25       A.    No.

Page 150

1    Q.    Is the information in Allan Exhibit

2  Number 1 accurate?

3    A.    It would be accurate based on the --

4  I guess the time that this was pulled or -- I

5  don't know if it's been updated anymore, but

6  it's generally probably accurate, yes.

7    Q.    In other words, it may be incomplete

8  if there's been something since you prepared it?

9    A.    Yes.  Something could come off,

10  something could go on, because of, you know,

11  advisory group, sunsets or something.

12    Q.    But is the information accurate?

13    A.    Yes.

14    Q.    And is there anything that you think

15  makes this resume or CV materially incomplete?

16           MR. GALLUCCI:  Object to form.

17    A.    Not that I can see.

18    Q.    Does the Cuyahoga County Board of

19  Health prepare annual reports?

20    A.    Yes.

21    Q.    Does it prepare an annual report

22  every year?

23    A.    Yes.

24    Q.    Why?

25    A.    We require -- we report back to our

1  communities, and it's a state requirement that

2  we report out to our communities annually.

3      Q.    And when you say "our communities,"

4  what do you mean?

5      A.    We serve -- I think I mentioned

6  early on in this discussion that we serve 58

7  communities now in Cuyahoga County, and so we

8  report out to them.

9      Q.    And those are 58 townships and

10  villages within the boundaries of Cuyahoga

11  County?

12      A.    As well as cities, yes.

13      Q.    So it's 58 cities, townships and

14  villages within the boundaries of Cuyahoga

15  County?

16      A.    Yes.  And there also, of course,

17  would be data in there that would relate back to

18  programs that are regional.  I think I mentioned

19  earlier we have some regional programs, so there

20  may be data that's in those reports because we

21  feature different programs from time to time in

22  the reports.  So there may be data in there that

23  speaks to some of those regional programs.

24      Q.    Who is responsible at the Cuyahoga

25  County Board of Health for preparing the annual

1  report?

2       A.    It's usually done by a group

3  coordinated by our communications officer.

4       Q.    Who is the communications officer

5  currently?

6       A.    Kevin Brennan.

7       Q.    For how long has Kevin Brennan had

8  that position?

9       A.    Probably at least five years, I

10 guess.

11      Q.    Who had that position before

12 Mr. Brennan?

13      A.    We created it, so there would have

14 been nobody in that position prior.

15      Q.    So before there was a communications

16 officer, who organized the group that prepared

17 the annual report?

18      A.    It would have been the group of

19 directors I mentioned earlier would have come

20 together to work on the report.

21      Q.    And is there an approval process?

22      A.    Yes.

23      Q.    What is the approval process for

24 finalizing the annual report before it's issued?

25      A.    It's not like a stamp of approval

1   like that.  What happens is the group puts

2   together the report, then they circulate it to

3   the individual service areas, to the directors,

4   who review it for accuracy.

5       Q.    And then the director for each

6   service area has an opportunity to make

7   corrections?

8       A.    Yes.

9       Q.    And are those corrections

10  incorporated?

11      A.    I would expect so.

12      Q.    And then once the annual report has

13  been reviewed for accuracy by each service area

14  director, is the annual report submitted to the

15  board itself for approval?

16      A.    Well, the board will receive the

17  annual report, but it's not like -- again, like

18  a stamp of approval.  That doesn't occur.

19      Q.    Does the board itself review the

20  annual report before it is finalized and issued?

21      A.    Yes, generally they do.

22      Q.    And so the board itself has an

23  opportunity to review the annual report for

24  accuracy?

25      A.    No, they wouldn't.  They would rely

1   on me to do that and our staff.

2         Q.    Why would they rely on you?

3         A.    Because they don't run the programs;

4   we do.  That's not their role.

5         Q.    What is the board's role?

6         A.    The board's role is oversight, to

7   hire people, to fire people, to oversee

8   personnel actions, and to approve receipt of

9   funds and similar type things.

10        Q.    Is the board involved in deciding

11  whether to accept a grant and the requirements

12  that come from a grant?

13        A.    That would be a recommendation that

14  happens through the directors and through me as

15  the health commissioner, and we move the

16  resolutions forward if we were going to accept

17  different funds.  And then the board would hear

18  the explanation provided by the directors, and,

19  if necessary, we would provide context, and then

20  they would vote as to whether we would accept it

21  or not.

22        Q.    Do you currently report to the board

23  itself?

24        A.    I do.

25        Q.    Have you always reported to the

1   board as the health commissioner?

2        A.    I reported to the board as health

3   commissioner since I became health commissioner

4   15 years ago, yes.

5        Q.    And do any of the other staff

6   employed by the Cuyahoga County Board of Health

7   report directly to the board?

8        A.    The only other person would be --

9   it's kind of in a quasi role.  Our

10  administrative counsel works with me as the

11  health commissioner and our staff and also works

12  with the board, so that's the only other person

13  kind of in between, you know.

14       Q.    And is it fair to say that everybody

15  else who works as an employee of the Cuyahoga

16  County Board of Health reports up to you

17  directly or indirectly?

18       A.    When you say -- so they would report

19  indirectly through their service area directors

20  and then the directors would report to me, yes.

21       Q.    Okay.  So is it fair to say that --

22  all of the staff of the Cuyahoga County Board of

23  Health either report directly to you, or they

24  report indirectly, through their service area

25  directors, to you?

1      A.    Yeah.  I mean, there's a lot of

2   stuff out there that we do since there's 44

3   programs.  So, you know, I can't know everything

4   that everybody does, right, because it would be

5   impossible, but -- so -- but yeah, people do

6   report up.

7      Q.    I just want to make sure I have a

8   clear record.  Is it accurate to say that all of

9   the employees of the Cuyahoga County Board of

10  Health report either directly to you or

11  indirectly to you through their service area

12  directors?

13     A.    Yes.

14     Q.    Has that always been the case since

15  you became health commissioner in 2004?

16     A.    Yes, as far as I can recall.

17           MR. KEYES:  This might be a good

18  stopping point for lunch.

19           MR. GALLUCCI:  Okay.

20           THE VIDEOGRAPHER:  Off the record,

21  12:05.

22

23           (Luncheon recess taken.)

24

25

Page 157

1            THE VIDEOGRAPHER:   On the record,

2    12:52.

3                 -   -   -   -   -

4            (Thereupon, Allan Deposition Exhibit

5            2, Plaintiffs The County of

6            Cuyahoga, Ohio and the State of Ohio

7            Ex Rel. Prosecuting Attorney of

8            Cuyahoga County, Michael C.

9            O'Malley's Second Supplemental

10           Responses and Objections to

11           Distributor Defendants'

12           Interrogatory No. 18 Pursuant to the

13           Court's November 21, 2018 Order, was

14           marked for purposes of

15           identification.)

16                 -   -   -   -   -

17            AFTERNOON SESSION

18    CONTINUED EXAMINATION OF TERRENCE M. ALLAN

19   BY MR. KEYES:

20      Q.   Mr. Allan, I'm handing you what has

21   been marked as Allan Exhibit Number 2.  This

22   document is titled "Plaintiffs the County of

23   Cuyahoga, Ohio and the State of Ohio Ex Rel.

24   Prosecuting Attorney of Cuyahoga County Michael

25   C. O'Malley's Second Supplemental Responses and

Page 158

1    Objections to Distributor Defendants'

2    Interrogatory No. 18 Pursuant to the Court's

3    November 21st, 2018 Order."

4              Do you see that?

5        A.    Yes.

6        Q.    And if you would turn towards the

7    end to page 12 of this Allan Exhibit 2, do you

8    see the date is November 30th, 2018?

9        A.    Yes.

10       Q.    Have you seen this document before?

11       A.    No.

12       Q.    Would you turn to page 6?  Are you

13   on page 6?

14       A.    Yes.

15       Q.    Do you see interrogatory number 18

16   says, "Specify each category of injury for which

17   you claim damages in the litigation and provide

18   a computation of damages for each category of

19   injury alleged"?

20       A.    I'm sorry.  I'm missing where you're

21   at.

22       Q.    The top of the page.

23       A.    Okay.  You're up here (indicating)?

24       Q.    Yes.

25       A.    I was looking down here

Page 159

1    (indicating).  Okay.  Sure.

2         Q.    Interrogatory number 18 says,

3    "Specify each category of injury for which you

4    claim damages in the litigation and provide a

5    computation of damages for each category of

6    injury alleged."

7         A.    Okay.

8         Q.    Do you see that?

9         A.    Yes.

10        Q.    And do you see that the response

11   starts on page 6 and carries over to page 7?

12        A.    Okay.

13        Q.    If you would turn your attention to

14   the bottom of page 7 --

15        A.    Okay.

16        Q.    -- there's a paragraph that begins,

17   "Plaintiff's computation."

18              Do you see that?

19        A.    Yes.

20        Q.    It says, "Plaintiff's computation,

21   based on Plaintiff's preliminary review of its

22   records, and is an estimate as of Plaintiff's

23   damages as of the date of this response, is

24   provided in Exhibit 2.  In addition to the

25   damages identified in Exhibit 2, Plaintiff also

Page 160

1    seeks the following."  And then the first bullet

2    point says, "Past and ongoing lost tax revenue

3    in the amount of approximately 850 million

4    dollars."

5              Do you see that?

6    A.    Yes.

7    Q.    Do you know how the 850 million

8    dollars of claimed lost tax revenue was arrived

9    at?

10   A.    No.

11   Q.    Do you know how much of that 850

12   million is past lost tax revenue?

13   A.    No.

14   Q.    Do you know how much of that 850

15   million dollars is ongoing lost tax revenue?

16   A.    No.

17   Q.    Do you know what type of tax revenue

18   is included in this figure?

19   A.    No.

20   Q.    Would you turn to the last page of

21   this exhibit, other than the verification?

22   A.    Okay.  This one here (indicating)?

23   Q.    Yes.  Do you see the chart?

24   A.    Okay.

25   Q.    This is the Exhibit 2 that was

Page 161

1    referenced in the answer I just read.

2         A.    Okay.

3         Q.    Have you seen this chart before?

4         A.    No.

5         Q.    Do you know how any of these figures

6    were calculated?

7         A.    No.

8         Q.    Do you know what types of costs are

9    included in any of the line items for any of the

10   divisions for any of the years?

11        A.    I do not.

12        Q.    Do you know how ongoing

13   department-related costs was derived?

14        A.    No.

15        Q.    Would you turn to page 7?  I read

16   part of page 7.

17             MR. GALLUCCI:  Counsel, there's two

18   page 7s.

19        A.    The front one.  Is there one in the

20   back?

21             MR. GALLUCCI:  You also have -- I

22   believe it's probably Exhibit --

23             MR. KEYES:  Fair enough.  There's a

24   page 7 of Exhibit 1 within the document.

25        Q.    So going from the beginning --

Page 162

1          A.     Okay.

2          Q.     -- if you're back on page 7, this is

3     the continuation of the response.

4          A.     It's like this one (indicating)?

5          Q.     It's the continuation of the

6     response to interrogatory number 18.

7          A.     Okay.

8          Q.     And if you turn to the next page, it

9     continues on page 8.

10         A.     Okay.

11         Q.     And continues on page 9.

12         A.     Um-hum.

13         Q.     Okay.  So page 9.  And then at the

14    bottom of page 9 it says, "Additionally,

15    Plaintiff identifies the following persons with

16    knowledge of such damages."  And there's a list

17    of people on pages 10 and 11.

18               Do you see that list?

19         A.     Yes.

20         Q.     And do you see that you are the last

21    name listed?

22         A.     Yes.  On page 11, yeah.

23         Q.     So you are listed as having

24    knowledge of the damages described in this

25    interrogatory number 18.  What knowledge do you

Page 163

1    have about Cuyahoga County's damages in this

2    case?

3              MR. GALLUCCI:  Object to form.

4         A.    Nothing related to anything in this

5    document that I can speak to.

6         Q.    Do you -- would you read to yourself

7    the listing of bullet points on pages 7, 8 and

8    9?

9         A.    Do you want just starting at the

10   bottom of page 7?

11        Q.    Yes.  It says, "Plaintiff also seeks

12   the following," and then there's a series of

13   bullet points on page 7, page 8 and page 9.

14        A.    Okay.

15        Q.    And then after you've read that,

16   tell me if you have knowledge of any damages in

17   any of those categories.

18             MR. GALLUCCI:  Object to form.

19        Q.    Do you have knowledge of Cuyahoga

20   County's damages in any of those categories?

21        A.    No.

22             MR. GALLUCCI:  Object to form.

23        Q.    Are you able to quantify or measure

24   Cuyahoga County's damages in any of those

25   categories that are listed on those pages?

Page 164

1        A.    No.

2        Q.    Are you able to identify the type of

3   expense or cost as opposed to measure it?

4              MR. GALLUCCI:  Object to form.

5        Q.    Again, for anything listed on pages

6   7, 8 and 9.

7        A.    I personally cannot.

8                -   -   -   -   -

9              (Thereupon, Allan Deposition Exhibit

10             3, Plaintiffs the County of

11             Cuyahoga, Ohio and the State of Ohio

12             Ex Rel. Prosecuting Attorney of

13             Cuyahoga County, Michael C.

14             O'Malley's Second Amended Responses

15             and Objections to Manufacturer

16             Defendants' First Set of

17             Interrogatories, was marked for

18             purposes of identification.)

19               -   -   -   -   -

20       Q.    Showing you what has been marked as

21  Allan Exhibit Number 2 --

22             MR. GALLUCCI:  It should be 3.

23       Q.    I'm sorry.  3.  I'm showing you

24  what's been marked as Allan Exhibit Number 3.

25  This is titled "Plaintiffs the County of

1   Cuyahoga, Ohio and the State of Ohio Ex Rel.

2   Prosecuting Attorney of Cuyahoga County, Michael

3   C. O'Malley's Second Amended Responses and

4   Objections to Manufacturer Defendants' First Set

5   of Interrogatories."

6            Do you see that?

7       A.   Yes.

8       Q.   If you would turn to the last page,

9   you'll see this document is dated August 17th,

10  2018.

11      A.   Yes.

12      Q.   Please turn your attention to page

13  15 of Allen Exhibit 3.  Are you on page 15?

14      A.   Yes.

15      Q.   Do you see interrogatory number 4 at

16  the top of the page?

17      A.   Um-hum.

18      Q.   It says, "Describe each cost,

19  expenditure, damage, loss or harm for which

20  Plaintiffs seek equitable or monetary relief,

21  including any penalty or fine from each

22  Defendant."  And then do you see the response to

23  interrogatory number 4 starts on page 15 and

24  continues through page 18?

25      A.   Yes.

Page 166

1      Q.    Staying on page 18, one of the

2   categories is the second bullet point at the top

3   of page 18.

4      A.    Yes.

5      Q.    It says, "Cuyahoga County Board of

6   Health educational programs and treatment

7   programs."

8            Do you see that?

9      A.    Yes.

10     Q.    What educational programs are

11  included in this bullet point, if you know?

12     A.    I don't know.

13     Q.    What treatment programs are included

14  in this bullet point, if you know?

15     A.    I don't know.

16     Q.    Do you know what programs are

17  included in this bullet point?

18     A.    No.

19     Q.    Do you know what programs run by the

20  Cuyahoga County Board of Health are being

21  included in the damages claimed by Cuyahoga

22  County?

23     A.    I do not.

24            -   -   -   -   -

25            (Thereupon, Allan Deposition Exhibit

Page 167

1              4, Cuyahoga County Board of Health

2              2010 Annual Report, was marked for

3              purposes of identification.)

4                 -   -   -   -   -

5         Q.    Showing you what has been marked as

6    Allan Exhibit 4, what is Allan Exhibit 4?

7         A.    It says it's the Cuyahoga County

8    Board of Health's 2010 annual report.

9         Q.    And we printed this color copy of

10   the Cuyahoga County Board of Health 2010 annual

11   report from the website.  Would you page through

12   quickly and tell me if this looks to be, in

13   fact, the 2010 annual report?

14        A.    I haven't seen the report in

15   probably eight years, but it appears to be the

16   report.

17        Q.    Can you turn to the second page of

18   this Allan Exhibit 4?

19        A.    Okay.

20        Q.    It has a photograph of the members

21   of the board?

22        A.    Yes.

23        Q.    And it shows six people, the five

24   members plus you.  Are you considered to be a

25   member of the board?

1        A.    I'm the secretary -- considered to

2   be secretary of the board.

3        Q.    Does the board ever vote on issues?

4        A.    On resolutions to accept funds.

5   They vote on personnel actions.  They vote on

6   new ordinances and things that may relate to

7   programmatic activity.  Those are the types of

8   things they vote on.

9        Q.    And who prepares the resolutions

10  that the board votes on?

11       A.    Usually the resolutions will come

12  from the individual service areas I mentioned,

13  environmental health and prevention and wellness

14  and epidemiology, surveillance, informatics.

15  Those service areas will generate resolutions,

16  and they'll come to administration, where

17  they're collated and reviewed, and we then

18  prepare them for the board.

19       Q.    You mentioned individual service

20  areas?

21       A.    Yes.

22       Q.    How many different individual

23  service areas does the Cuyahoga County Board of

24  Health have now?

25       A.    Four now.

Page 169

1      Q.      What are they?

2      A.      Administration, prevention and

3   wellness, environmental health, and

4   epidemiology, surveillance and informatics.

5      Q.      And what is the bailiwick of

6   administration?

7           MR. GALLUCCI:  Object to form.

8      A.      Administration handles --

9   administration handles grants, handles human

10  resources, performance management, any fiscal

11  grants or otherwise, and also legal.

12     Q.      What is the area of responsibility

13  for epidemiology, surveillance and informatics?

14          MR. GALLUCCI:  Object to form.

15     A.      I know we discussed these earlier.

16  I will give you examples of the programs from

17  each of them if that's appropriate.  I don't

18  know that I'll be exhaustive of all 44, and I

19  may miss some, but I'll do my best.

20     Q.      Well, I don't need a comprehensive

21  list of the programs, but what is the unifying

22  element that puts programs or services within

23  the epidemiology, surveillance and informatics

24  service area?

25          MR. GALLUCCI:  Object to form.

1      A.    Usually they are involved in working

2    in data, they do emergency preparedness work,

3    and they look at databases internally and do

4    some types of data analysis in certain

5    instances.

6      Q.    Has the epidemiology, surveillance

7    and informatics service area gathered any data

8    regarding opioid use?

9            MR. GALLUCCI:  Object to form.

10     A.    I believe that the only thing I'm

11    aware of, because most of the data was crunched

12    through the medical examiner's office, as I

13    mentioned earlier, that epidemiology,

14    surveillance and informatics may get alerts from

15    the state about where there have been like --

16    there have been overdoses that have occurred at

17    rates other than what they might expect, and so

18    they may -- epidemiology, surveillance and

19    informatics staff get those alerts and are then

20    looking to see if are there clusters, like are

21    they all in one zip code or one neighborhood, to

22    see if there are clusters that may require some

23    intervention with law enforcement or something.

24    That's happened on a few occasions.  But they do

25    not, to my knowledge, crunch a lot of data

Page 171

1    because the data is being -- because in this

2    case a lot of the data is being generated

3    through the medical examiner's office.

4         Q.    When the Cuyahoga County Board of

5    Health receives these alerts from the state

6    about where overdoses are occurring, what does

7    that epidemiology, surveillance and informatics

8    service area do with those reports?

9         A.    We call them ESI, if that's easier,

10   but ESI would get a report from the state, and

11   they are able to look into EpiCenter, which is a

12   database that they can look for -- look to see

13   if there's any clustering around those reports.

14        Q.    Does the Cuyahoga County Board of

15   Health maintain EpiCenter?

16        A.    I think we have access to EpiCenter

17   through the state health department.  It's

18   not -- I think it's not our physical site.

19        Q.    Who maintains EpiCenter?

20             MR. GALLUCCI:  Object to form.

21        A.    The Ohio Department of Health.

22        Q.    Does ESI do anything with the alerts

23   that it receives from the state about where

24   overdoses are occurring?

25             MR. GALLUCCI:  Object to form.

Page 172

1       A.    They -- as I mentioned, they will

2    look at the data to see if there's any

3    clustering in some discrete manner to identify

4    whether there are clusters of overdoses where

5    there may need to be intervention from law

6    enforcement or others about specific areas of

7    risk.

8       Q.    Separate from these alerts, does the

9    ESI service area maintain any data regarding

10   opioid use?

11      A.    Not to my knowledge.

12      Q.    How about opioid abuse or misuse?

13            MR. GALLUCCI:  Object to form.

14      A.    Not to my knowledge.

15      Q.    How about opioid addiction?

16            MR. GALLUCCI:  Object to form.

17      A.    Not to my knowledge.

18      Q.    How about opioid overdoses?

19      A.    Not to my knowledge.

20      Q.    How about the problem of opioids in

21   the community?

22            MR. GALLUCCI:  Object to form.

23      A.    Not to my knowledge.

24      Q.    What is the area of responsibility

25   for the prevention and wellness service area?

1          A.    So they have a broad range of

2    vaccine-preventible services, home visiting

3    programs, chronic disease prevention programs,

4    things along those lines.  That's sort of a

5    broad view.

6          Q.    And what is the area of

7    responsibility of the environmental health

8    service area?

9          A.    Environmental health is involved --

10   that's where the opiate task force resides, and

11   other environmental type programs, including

12   control of vector-borne diseases, water, food

13   protection, those types of programs.

14         Q.    Why is the Cuyahoga County Opiate

15   Task Force housed in the environmental health

16   service area rather than the prevention and

17   wellness service area?

18         A.    I'm trying to recall why that would

19   have -- when that would have occurred, the

20   decision on that.  I think at the time, as I

21   recall, they were based on staff that were doing

22   injury prevention work.  Vince Caraffi was doing

23   injury prevention work in the community, and

24   this fit in the injury prevention realm, and he

25   had an interest to be involved in the work.

Page 174

1    That's my only recollection of how that -- how

2    that process occurred.

3         Q.    If you were starting a task force

4    today, given the area of responsibility for the

5    environmental health service area and the area

6    of responsibility for the prevention and

7    wellness service area, where would you put the

8    Cuyahoga County Opiate Task Force?

9              MR. GALLUCCI:  Object to form.

10        A.    I think I'd have to think about that

11   a while based on the scope of where things are

12   right now in the community and think of -- I

13   would think there may be a foot in several

14   service areas going forward.  I don't know that

15   I would -- I would assign it, you know,

16   specifically, or we would -- I would put it more

17   as a management team decision.  We might -- we'd

18   have to reflect on that and see if we might need

19   to, rather then centralize, decentralize it.  We

20   have programs, like lead poisoning, for

21   instance, that are not centralized necessarily.

22   So I'd have to think about it.

23        Q.    What is the purpose of the annual

24   report?

25             MR. GALLUCCI:  Object to form.

1       A.     You asked earlier.  The purpose of

2    the annual report is to make sure that we're

3    providing information to our -- our communities,

4    the general public, because these are all online

5    on our website, so they know the -- usually it's

6    a snapshot of our current activities, referring

7    people back to the website for more information,

8    understanding the finances and the types of

9    things that we do.

10       Q.     You earlier described the group of

11    service directors who would work together to

12    prepare the annual report.  Are they the ones

13    who decide what to include in the annual report,

14    what topics to address?

15       A.     So there is a -- there was a period

16    of time, I think going back five years -- maybe

17    it's a little longer.  I mentioned we had a -- I

18    can't remember the exact date when he was hired,

19    when Kevin Brennan became our communications

20    officer.  He began to coordinate a group, and

21    the idea has been, even then and before, to

22    feature different things in the report, because

23    since we have 44 programs, we can't have a page

24    for each program.  So we would -- one year

25    versus another year we could feature different

1  programs because we can't include all of them in

2  a report.

3      Q.    Is the idea of the annual report to

4  provide information about the issues of greatest

5  significance over the past year?

6          MR. GALLUCCI:  Object to form.

7      A.    I think the view of the annual

8  report or the purpose of the annual report is to

9  provide -- as I mentioned, feature different

10  programs and also refer -- it may include, but

11  certainly won't be exhaustive, because

12  there's -- there's any number of things that we

13  can describe that may be of significance, and

14  so, you know, it would never be exhaustive, but

15  it does include sort of a selection of programs.

16      Q.    Please turn to page 9 of Allan

17  Exhibit 4.  Are you on page 9?

18      A.    Yes, sir.

19      Q.    The title of page 9 is

20  "Unintentional Prescription Drug Poisonings and

21  unused Medications."

22          Do you see that?

23      A.    Yes.

24      Q.    It says, "According to the Ohio

25  Department of Health, recent statistics show an

1    alarming trend in Ohio, an increase in

2    prescription drug abuse and overdose."

3             Do you see that?

4    A.    Yes.

5    Q.    Where did the Cuyahoga County Board

6    of Health staff find these statistics about an

7    alarming trend in Ohio involving prescription

8    drug abuse and overdose?

9             MR. GALLUCCI:  Object to form.

10   A.    I don't know where -- I didn't

11   develop this page so I can't say specifically

12   where they got the source.

13   Q.    And two sentences later it says,

14   "This campaign" -- or it says, "A new education

15   and awareness campaign was recently launched by

16   the Ohio Department of Health to address this

17   trend.  This campaign, Prescription for

18   Prevention:  Stop the Epidemic, includes the

19   development of public service announcements,

20   fact sheets, and brochures for communities and

21   agencies to utilize in addressing the problem."

22            Do you see that?

23   A.    Yes.

24   Q.    Did Cuyahoga County Board of Health

25   participate in that campaign called

Page 178

1    "Prescription for Prevention:  Stop the

2    Epidemic"?

3         A.    I don't recall to what degree we did

4    participate or did not.  I don't remember.

5              And what year is this?

6         Q.    2010.

7         A.    2010.  I can't recall.

8         Q.    Did you personally participate in

9    the campaign sponsored by the Ohio Department of

10   Health called "Prescription for Prevention:

11   Stop the Epidemic"?

12        A.    No, not personally.

13        Q.    If you go to the next paragraph, it

14   says, "Cuyahoga County is one of the top five

15   counties in Ohio for reported prescription drug

16   overdoses."

17              Do you see that?

18        A.    Yes.

19        Q.    And was that your experience as

20   health commissioner at the time?

21              MR. GALLUCCI:  Object to form.

22        A.    I don't recall personally whether

23   that was where we stood in 2010, eight years

24   ago.  I don't personally recall.

25        Q.    And then the next sentence says, "In

1  order to increase efforts to combat this growing

2  public health problem, the Cuyahoga County

3  Prescription for Prevention Coalition was formed

4  in June 2010."

5          Did you participate in the formation

6  of the Cuyahoga County Prescription for

7  Prevention Coalition?

8      A.    No.

9      Q.    Who did from the Cuyahoga County

10  Board of Health?

11          MR. GALLUCCI:  Object to form.

12      A.    I don't know specifically.

13      Q.    Do you have a general sense of who

14  from the Cuyahoga County Board of Health

15  participated in the formation of the Cuyahoga

16  County Prescription for Prevention Coalition?

17          MR. GALLUCCI:  Object to form.

18      A.    No.  I don't know if anyone did at

19  this stage or not.  I don't know either way.

20      Q.    Would you look at the next sentence?

21      A.    Okay.

22      Q.    The next sentence says, "The

23  Cuyahoga County Board of Health is an active

24  member of this coalition, along with numerous

25  other collaborative partners."

Page 180

1          Do you see that language?

2      A.    I do, yeah.

3      Q.    Was the Cuyahoga County Board of

4   Health an active member of the Cuyahoga County

5   Prescription for Prevention Coalition in 2010?

6      A.    Well, based on this sentence, I

7   would presume then that Vince was a member.

8      Q.    Do you know, sitting here today,

9   which personnel from the Cuyahoga County Board

10  of Health participated in that coalition?

11     A.    No.

12     Q.    Who would know?

13     A.    Vince Caraffi.

14     Q.    Did the Cuyahoga County Prescription

15  for Prevention Coalition later become known as

16  the Cuyahoga County Opiate Task Force?

17     A.    I don't know if that's what the

18  transition was.

19     Q.    This reports that Cuyahoga County is

20  one of the top five counties in Ohio in 2010 for

21  reported prescription drug overdoses.  Where did

22  that statistic come from?

23          MR. GALLUCCI:  Object to form.

24     A.    I don't know.  I didn't create this

25  page.

Page 181

1          Q.     Do you have any basis for

2   disagreeing with or disputing that statistic;

3   namely, that Cuyahoga County in 2010 was one of

4   the top five counties in Ohio for reported

5   prescription drug overdoses?

6               MR. GALLUCCI:  Object to form.

7          A.     I don't have a basis for making a

8   determination either way based on where I sit

9   here today.

10          Q.     What, if anything, did you do to get

11   involved with the Cuyahoga County Prescription

12   for Prevention Coalition at any time?

13               MR. GALLUCCI:  Object to form.

14          A.     I don't recall specifically at that

15   time having a role in 2010.  I don't recall that

16   I had a role then.

17          Q.     You don't recall having a role in

18   2010, correct?

19          A.     Yes.  As I mentioned in previous

20   testimony, I would from time to time attend the

21   task force meetings.

22          Q.     What role did you have in the

23   Cuyahoga County Prescription for Prevention

24   Coalition after June of 2010?

25               MR. GALLUCCI:  Object to form.

1        A.    All I can recall is that I would

2   from time to time go into the meetings and --

3   into the task force meetings, and I'm not sure

4   of when the name changed, presuming that's --

5   the name change occurred from the one listed.  I

6   would go from time to time into the meetings,

7   but don't recall my level of participation, if

8   any, at that -- at this time, back in 2010.

9        Q.    Was prescription drug abuse and

10  overdose a public health problem for Cleveland,

11  the City of Cleveland, in 2010?

12            MR. GALLUCCI:  Object to form.

13       A.    I think there was awareness that

14  there was a problem.

15       Q.    And was prescription drug abuse and

16  overdose a public health problem in Cuyahoga

17  County in 2010?

18            MR. GALLUCCI:  Object to form.

19       A.    I think there was awareness as well,

20  like Cleveland, that there was a problem.

21       Q.    Awareness that it was a public

22  health problem?

23            MR. GALLUCCI:  Object to form.

24       A.    Yes.

25       Q.    So you have explained there was an

Page 183

```
 1   awareness.  Was there awareness in 2010 that

 2   prescription drug abuse and overdose was a

 3   public health problem in Cuyahoga County?

 4              MR. GALLUCCI:  Object to form.

 5        A.    The report details that it was an

 6   issue, but I can't speak to the scope of it, as

 7   I mentioned earlier.

 8        Q.    I'm not asking about the scope of

 9   it.  Was there awareness in 2010 that

10   prescription drug abuse and overdose was a

11   public health problem in Cuyahoga County?

12              MR. GALLUCCI:  Object to form.

13        A.    Yes.

14        Q.    In 2010 did Cuyahoga County have

15   other public health problems?

16              MR. GALLUCCI:  Object to form.

17        A.    Yes.

18        Q.    What were they?

19        A.    Well, we had longstanding issues

20   around -- in the community around -- issues

21   around inequity in health outcomes related to

22   things like chronic disease, like obesity,

23   asthma, heart disease, that have been

24   longstanding.  We were responding, as noted on

25   page 11.
```

1          There was some activity that

2    occurred during this time frame, within, sort

3    of, several years, issues around H1N1 influenza,

4    which was the novel flu that we were involved in

5    around prevention.

6          We also saw -- as noted, we started

7    to see activity coming from southern Ohio around

8    bed bugs.

9          Some of those are listed there.

10   There are probably others that we were involved

11   in at the time that are not in the report

12   because we couldn't cover everything obviously.

13   But those are the types of problems that we deal

14   with.  Also, trying to increase childhood

15   vaccines to prevent child vaccine-preventible

16   disease.  And lead poisoning has been a

17   longstanding problem.  Those are some of the

18   problems but not certainly all of them.

19        Q.    And so you were giving me a list of

20   the other public health problems that Cuyahoga

21   County was facing in 2010?

22        A.    Some of them, yes.

23                -   -   -   -   -

24              (Thereupon, Allan Deposition Exhibit

25              5, Cuyahoga County Board of Health

1                    2012 Annual Report, was marked for

2                    purposes of identification.)

3                -   -   -   -   -

4        Q.     Showing you what has been marked as

5    Allan Exhibit 5, this is the Cuyahoga County

6    Board of Health annual report for 2012.

7        A.     Okay.

8        Q.     This was also printed from the Board

9    of Health website.  Actually, I stand corrected.

10   Yes, it was.

11                   Would you turn to page 5, or 4, I

12   guess, at the top of the page?

13       A.     You're talking about the numbers

14   down here (indicating)?

15       Q.     Yes.  The top is page 4.  The bottom

16   is page 5.

17       A.     Okay.

18       Q.     And this says the annual message.

19   Do you see the annual message?

20       A.     Yes.

21       Q.     Who prepares the annual message

22   portion of the annual report?

23       A.     Usually feedback from our -- me and

24   some of our directors usually.

25       Q.     In the second paragraph of the

1    annual message it says, "The sluggish economic

2    recovery from the Great Recession continued to

3    present fiscal challenges as the demand

4    increased for safety net services and other

5    programs that support the children and families

6    of Cuyahoga County."

7              What is the reference to the Great

8    Recession?

9         A.    That was just the -- excuse me, the

10   economic downturn that happened several years

11   earlier that had an impact on local -- local

12   availability of tax dollars and other resources

13   that affected public and private institutions

14   and communities, and that had a net effect and

15   caused a lot of challenges with public health as

16   well.

17        Q.    Did the Great Recession have a

18   positive or a negative impact on availability of

19   tax dollars?

20             MR. GALLUCCI:  Object to form.

21        A.    Negative.

22        Q.    How so?

23             MR. GALLUCCI:  Object to form.

24        A.    There was less money to go around to

25   provide services.

1          Q.     And did the Great Recession cause

2      the tax revenues to decrease during that period?

3                MR. GALLUCCI:  Object to form.

4          A.     The Great Recession meant that there

5      would not be as many resources, in a general

6      sense, available, and also meant then that we

7      might not be able to do as much as we'd like to

8      do because we didn't have the funds to do it.

9          Q.     Did the Great Recession have a

10     negative impact on the income tax dollars that

11     were available?

12               MR. GALLUCCI:  Object to form.

13         A.     For us, we receive per capita

14     dollars from communities through property tax,

15     as I mentioned earlier, and so I think the

16     impact would be that if we needed additional

17     resources, we knew that our communities at that

18     particular time didn't have a lot of resources

19     and so we had to make decisions about requesting

20     additional resources because we knew that

21     communities were strapped.  So it affected our

22     ability to maybe gain resources that we needed

23     for programs.

24         Q.     So the Great Recession reduced the

25     availability of tax dollars?

Page 188

1      A.     Yes.

2             MR. GALLUCCI:  Object to form.

3      Q.     Including tax dollars that came from

4   property taxes?

5      A.     Which is our primary source of --

6   that is the source where we get tax money.

7      Q.     And is that because property values

8   went down during the Great Recession?

9             MR. GALLUCCI:  Object to form.

10     A.     I can't speak to that specifically.

11   What I know is the -- that our ability to

12   request funds that we needed, perhaps additional

13   funds for purposes, would have been hampered

14   because the cities were -- cities were in tough

15   financial positions for many years after the

16   recession.

17     Q.     In the next paragraph you referenced

18   "major public health issues like diabetes,

19   asthma, and obesity."

20            Do you see that?

21     A.     Yes.

22     Q.     And it says, "While opening the door

23   to more targeted and effective community

24   interventions that move the needle on these

25   epidemics."

1          Do you see that?

2     A.     Yes.

3     Q.     Was diabetes an epidemic in Cuyahoga

4  County in 2012?

5     A.     Well, I think that diabetes --

6  chronic disease, the complex of the diabetes,

7  asthma, obesity have been longstanding problems

8  for many decades in the United States, and in

9  Cuyahoga County, in Cleveland, and in Ohio.

10    Q.     Was diabetes a --

11    A.     Just one of -- 75 percent of all of

12  our healthcare expenditures are to treat chronic

13  disease, and that has been that way for quite

14  some time.

15    Q.     So this describes diabetes as being

16  a major public health issue, correct?

17    A.     Yes.

18    Q.     It also describes it as an epidemic,

19  correct?

20    A.     Yeah.  I think in this context

21  epidemic could be used as sort of a general term

22  and less of a technical, specific term.  They're

23  problems.

24    Q.     It says, "Major public health issues

25  like diabetes, asthma and obesity, while opening

Page 190

1    the door to more targeted and effective

2    community interventions that move the needle on

3    these epidemics."

4                Did I read it correctly?

5                MR. GALLUCCI:  Object to form.

6       A.    Yes.

7       Q.    And "these" is reflecting back on

8    diabetes, asthma and obesity, correct?

9                MR. GALLUCCI:  Object to form.

10      A.    Yes.

11      Q.    And so when it says "these

12   epidemics," it's talking about the diabetes

13   epidemic, correct?

14               MR. GALLUCCI:  Object to form.

15      A.    What I'm saying, I'm not disagreeing

16   with you on that point.  My point is that

17   epidemics can be used in the context of problems

18   as sort of community problems.  That's all I'm

19   saying.  To me it's an interchangeable word and

20   can be used when describing in public narrative

21   documents it's a public program.  That was my

22   only point.

23      Q.    Okay.  Do I understand you correctly

24   to say that the reference to epidemic means

25   public health problem?

Page 191

1          A.     It can mean -- to an epidemiologist

2     it means something different than it would mean

3     to someone on the street, so we -- it can be

4     used, I think, in different contexts.

5          Q.     But you're saying epidemic and

6     public health problem can be used

7     interchangeably?

8                 MR. GALLUCCI:  Object to form.

9          A.     I would say they have been used --

10    they have been used in different contexts

11    interchangeably.

12         Q.     In this context, where the Cuyahoga

13    County Board of Health is issuing its annual

14    message to its funders in the community, when it

15    was referring to "these epidemics," it is

16    referring to diabetes, asthma and obesity,

17    correct?

18                MR. GALLUCCI:  Object to form.

19         A.     Yes.

20         Q.     So it is -- it is describing

21    diabetes as an epidemic, correct?

22                MR. GALLUCCI:  Object to form.

23         A.     As an epidemic or a public health

24    problem, yes.

25         Q.     In 2012, correct?

1        A.    Yes.  And as I mentioned, diabetes

2    and asthma and obesity have been problems,

3    longstanding problems, you know, in Cuyahoga

4    County, Ohio, and the country.  They still are.

5        Q.    Have they been longstanding

6    epidemics, public health epidemics?

7               MR. GALLUCCI:  Object to form.

8        A.    Yes.

9               -   -   -   -   -

10              (Thereupon, Allan Deposition Exhibit

11              6, Cuyahoga County Board of Health

12              2015 Annual Report, was marked for

13              purposes of identification.)

14              -   -   -   -   -

15       Q.    Showing you what has been marked as

16   Allan Exhibit Number 6, this is the 2015 annual

17   report for the Cuyahoga County Board of Health,

18   correct?

19       A.    Yes.

20       Q.    Would you turn to page 2 of this

21   annual report?  Are you there?

22       A.    Yes.

23       Q.    This is the message from the board

24   to community partners for the 2015 annual

25   report, correct?

Page 193

1      A.     Um-hum.

2      Q.     Would you look at the last bullet

3  point, which is on the top right of the page?

4  Do you see that?

5      A.     That "work with community partners

6  to address public health problems like infant

7  mortality and child lead poisoning," that one?

8      Q.     Yes.  Do you see that bullet point?

9      A.     Yes.

10     Q.     It references the infant mortality

11  public health problem.  Do you see that?  Yes?

12     A.     Yes.

13     Q.     Is infant mortality also an epidemic

14  in Cuyahoga County?

15            MR. GALLUCCI:  Object to form.

16     A.     As I stated here, it's listed as a

17  public health problem.  I think this kind of,

18  actually, from my standpoint reinforces the idea

19  of epidemic and public health problem being used

20  in different contexts for different purposes.

21     Q.     So was infant mortality a -- an

22  epidemic in 2015?

23            MR. GALLUCCI:  Object to form.

24     A.     I would say that infant mortality is

25  a longstanding problem, on the order of 150

1  babies died.  The big problem is longstanding

2  racial disparity.  African-American infants die

3  at much higher rates and have for a long time.

4  Infant mortality is a big problem.  The

5  disparity is an even bigger problem.

6       Q.    Earlier we saw in the 2012 report

7  the description of diabetes, asthma and obesity

8  as epidemics, right?

9       A.    Yeah.

10      Q.    Is infant mortality an epidemic?

11            MR. GALLUCCI:  Object to form.

12      A.    I think I just described the answer.

13  I just answered that question, didn't I?

14      Q.    No.  You said it was a public health

15  problem and this letter says it's a public

16  health problem.  I'm trying to understand why

17  the Board of Health describes some problems as

18  problems and some problems as epidemics.  And so

19  since the Board of Health described diabetes,

20  asthma and obesity as an epidemic, I'm trying to

21  understand, using that term of "epidemic," does

22  infant -- was infant mortality an epidemic?

23            MR. GALLUCCI:  Object to form.

24      A.    I think -- and I think at least I

25  felt like I did, maybe I didn't, but I felt like

1  I explained that, for me, that terms can be used

2  -- sometimes you refer to it as a problem or an

3  epidemic and sometimes it's really the scope

4  that may have a determination as to whether it

5  is or not, but it can be used in a general, sort

6  of, John Q/Joan Q public sense of the word

7  "epidemic" or "problem," and sometimes

8  interchangeably.  So it's a public health

9  problem.

10      Q.    And does it -- did it count as an

11  epidemic in 2015?

12            MR. GALLUCCI:  Object to form.

13      A.    I don't know that it's like -- that

14  doesn't, sort of, compute for me in -- like we

15  don't count, well, you have something in a

16  public health problem bucket and something in an

17  epidemic bucket.  We don't distinguish that way.

18      Q.    You don't distinguish between a

19  public health problem and a public health

20  epidemic?

21      A.    We don't -- we don't have, you know,

22  review groups that say, okay, this is in the

23  problem bucket and this is in the epidemic.  We

24  don't look at it that way.

25      Q.    If it's called an epidemic, is it a

1    public health problem?

2              MR. GALLUCCI:  Object to form.

3         A.    Yeah.  Yes, it is.

4         Q.    If it's a public health problem, is

5    it an epidemic?

6              MR. GALLUCCI:  Object to form.

7         A.    Maybe.

8         Q.    So tell me when --

9         A.    This is me.  You know, these are

10   words from, you know, a few years back.

11        Q.    Well, they're words from the

12   Cuyahoga County Board of Health annual reports,

13   and you're the health commissioner for the

14   Cuyahoga County Board of Health.

15        A.    I'm aware of that.

16        Q.    So I'm trying to understand why the

17   Cuyahoga County Board of Health described

18   diabetes, asthma and obesity as epidemics but

19   then described infant mortality and childhood

20   lead poisoning as problems.

21             MR. GALLUCCI:  Object to form.

22        A.    And I described to you that words

23   like "epidemic" and "problem" can be used in

24   different -- can be used -- sometimes people use

25   them in a general sense for the public and -- as

Page 197

1    a problem, and in the eyes of the public, my

2    view is that they would see the words and not

3    really see a difference.  That's all I'm saying.

4    And I've repeated that several times, I think.

5         Q.    Right.  But then you said that

6    public health problems -- an epidemic is a

7    public health problem?

8              MR. GALLUCCI:  Object to form.

9         A.    Yes.

10        Q.    Are you saying that a public health

11   problem is an epidemic?

12             MR. GALLUCCI:  Object to form.

13        A.    I would say not necessarily.

14        Q.    How about infant mortality in 2015?

15             MR. GALLUCCI:  Object to form.

16        A.    You asked me that already.  You

17   asked me if infant mortality was an epidemic,

18   and I told you -- if you look back at the

19   record, I told you that it was -- in my view, it

20   was a public health problem.

21        Q.    Not an epidemic?

22             MR. GALLUCCI:  Object to form.

23        A.    Yes.  That's the way I would

24   characterize it.

25        Q.    And childhood lead poisoning was a

198 of 312

1   public health problem in 2015?

2              MR. GALLUCCI:  Object to form.

3        A.    Yes.

4        Q.    But not an epidemic?

5              MR. GALLUCCI:  Object to form.

6        A.    I'd have to think about that.

7        Q.    Why would you have to think about

8   it?

9        A.    Because I would have to think about

10  scope and then I'd have to look at statewide

11  data.  I'd have to look at our historical trends

12  to see where the trend line was going.  I'd have

13  to really think about it.  I feel like my words

14  are being mixed -- that's what I feel like --

15  inappropriately.  That's how I feel.

16       Q.    I'm not trying to mix your words.

17  I'm trying to make sense of the words that the

18  Cuyahoga County Board of Health has used,

19  because it describes some problems as problems,

20  it describes some problems as epidemics, and I'm

21  trying to figure out what criteria or standards

22  does the Board of Health use in its

23  communications to the entire community in

24  deciding whether to call something a public

25  health problem or an epidemic.  Can you explain

1    that?

2              MR. GALLUCCI:  Objection.  Form.

3    He's answered it several times.

4              THE WITNESS:  Can I get a glass of

5    water?

6              MR. GALLUCCI:  Yes.

7              MR. KEYES:  Sure.

8              THE WITNESS:  I have a cold.

9              MR. KEYES:  Of course.

10        Q.    Mr. Allan, it's fine to say, "I

11   don't know" if you don't know, but I'm asking

12   you questions as the health commissioner

13   throughout this time frame, trying to understand

14   why the Board of Health uses the word "epidemic"

15   to describe three problems, diabetes, asthma and

16   obesity, but then did not use -- and you appear

17   reluctant to use the word "epidemic" for the

18   public health problems of infant mortality and

19   childhood lead poisoning.  What's the

20   difference?

21             MR. GALLUCCI:  Object to form.  He's

22   answered several times.

23        A.    So what does that mean I'm supposed

24   to do?

25        Q.    You can answer.

1          MR. GALLUCCI:  You can answer,

2    again, for close to the tenth time.

3          A.    Okay.  As I said, I think that the

4    terms in writing to the general public can be

5    used -- sometimes you might use epidemic, you

6    might say public health problem, and I don't

7    think there's -- what I'm telling you is I don't

8    think there's magic on how those words are used

9    to describe in narrative to the general public.

10   That's what I'm saying, that we don't sit in a

11   room and say, well, let's use this term with

12   general public in this general context and this

13   one in another.  We're trying to make the report

14   understandable as best we can.  That's all I'm

15   saying.

16         Q.    Would you go back to Allan Exhibit

17   5, which is the 2012 annual report?

18         A.    Okay.

19         Q.    And would you turn to page 18?  Are

20   you on page 18?

21         A.    Yes, sir.  Excuse me.  That means

22   the top of page 19, right?  Is that what page 18

23   means?

24         Q.    It does, yes.  And there should be a

25   page 18 right up there.

Page 201

1          A.     I see it now.  Thank you.

2          Q.     Sure.

3                 Page 18 is titled "Opiate Abuse

4    Epidemic," correct?

5          A.     Yes.

6          Q.     So this is describing the opiate

7    abuse problem in Cuyahoga County as an epidemic,

8    right?

9          A.     Okay.

10         Q.     Yes?

11         A.     Now, this would -- I mean, I think

12   this follows my point earlier, is -- yes, that's

13   what it says.

14         Q.     That's what it says, so this annual

15   report says that Cuyahoga County is facing a

16   diabetes epidemic, an asthma epidemic, an

17   obesity epidemic and an opiate abuse epidemic,

18   right?

19         A.     Where do you read that?  Let me see

20   here.  I have to read it.

21         Q.     I showed you the language earlier.

22   You can look at it again on page 4.

23         A.     I thought you were talking about

24   this paragraph.

25         Q.     It says, "Opiate Abuse Epidemic" at

1   the top.

2          A.    It does, yeah.

3          Q.    So --

4          A.    So --

5          Q.    -- combining both what we discussed

6   on page 4 of this report and what you're now

7   seeing on page 18 of this report, I'm just

8   saying, do you agree that this annual report is

9   talking about a diabetes epidemic, an asthma

10  epidemic, an obesity epidemic and an opiate

11  abuse epidemic?

12         A.    What I'm saying is I would put this

13  in the same -- what I'm saying is I would put

14  this in the same context as the word with public

15  health problem, is that you could put this in

16  with infant mortality and lead poisoning and

17  that the terms were being used in the general

18  lay sense.  That's all I'm saying.  An epidemic,

19  public health problem.  I'm missing -- I must be

20  missing something.

21         Q.    Would you look at the lower half of

22  that page, which is page 19?

23         A.    Okay.

24         Q.    And do you see next to the photo it

25  says, "CCBH is proud to have come together with

Page 203

1    numerous community partners to raise public

2    awareness, promote community action and

3    implement educational programs about the dangers

4    and devastating effects of prescription opioid

5    abuse"?

6              Do you see that?

7         A.    Yes.

8         Q.    "Examples of our involvement

9    include," and "our" is a reference to Cuyahoga

10   County Board of Health?

11        A.    Yes.

12        Q.    One of the examples is the charter

13   member of the Cuyahoga County Prescription for

14   Prevention Coalition.  Do you see that?

15        A.    Yes.

16        Q.    Are you able to tell me what the

17   Cuyahoga County Board of Health did as a charter

18   member of the Cuyahoga County Prescription for

19   Prevention Coalition?

20        A.    Not specifically, no.

21        Q.    It says that the Board of Health was

22   a "Partner in Operation Medicine Cabinet, a

23   biannual event which allows residents to safely

24   dispose of unwanted and expired medications."

25              Do you see that?

Page 204

1      A.    Yes, I do.

2      Q.    What did the Board of Health do as a

3  partner in Operation Medicine Cabinet?

4      A.    That I recall, we helped -- there

5  were cities -- and I think the state law

6  enforcement level in some cities that were

7  coming together, and they would collect --

8  they'd have places where people had, like, their

9  prescriptions that were not finished, you know,

10  in their medicine cabinets or whatever -- they

11  could bring them -- they didn't want people,

12  obviously, flushing stuff down the toilet

13  because it would go to the lake and that's the

14  water supply, obviously.  So they would come

15  together and do collections like they do for

16  household hazardous waste, that sort of thing.

17      Q.    What did the Board of Health do as a

18  partner in Operation Medicine Cabinet?

19      A.    We would have probably helped to

20  promote it, I presume.

21      Q.    You said "would have" and you say

22  "presume."  Do you know what the Board of Health

23  did?

24      A.    No.  I can say that I just -- I'm

25  going to presume that that was what our role is.

Page 205

1    I can't speak to it exactly.

2         Q.    This says that the Board of Health

3    was an "advocate for the formation of a

4    countywide death review committee that would

5    compile, present and interpret data related to

6    accidental and intentional overdose deaths."

7              What did the Board of Health do to

8    advocate for that?

9         A.    So we had been for 20 years -- we

10   had been the -- over 20 years probably we had a

11   child fatality review committee working with the

12   medical examiner's office to look at child

13   fatalities between birth and 18 years, and so

14   given that experience, it would have helped to

15   inform the idea of poison death review in the

16   same vein.

17             MR. GALLUCCI:  Not to interrupt,

18   people are texting -- I guess on the phone they

19   cannot hear, and I think the videographer is

20   aware of it.

21             THE VIDEOGRAPHER:  Off the record at

22   1:46.

23                  (Recess had.)

24             THE VIDEOGRAPHER:  On the record,

25   1:59.

Page 206

1    BY MR. KEYES:

2         Q.    Mr. Allan, prior to the break --

3              MR. GALLUCCI:  Andy, if I can, real

4    quickly, we did just take a break with regards

5    to two things.

6              One is we took a break because we

7    lost the telephone feed, and as I understand it,

8    the policy at Tucker Ellis is that the

9    videographer is not allowed to dial in, so we

10   did have to wait for IT to come back and redial

11   us in so we could reconnect.

12             Secondarily, we were originally set

13   up today with adjacent conference rooms, and we

14   were meeting talking with our client out in the

15   hallway just because you can hear between the

16   rooms, so going forward we need to make sure we

17   don't have adjacent conference rooms just so

18   that voices can't be heard between the two

19   rooms.

20             Thank you.

21        Q.    Mr. Allan, prior to the break we

22   were reviewing Allan Exhibit Number 5 and we

23   were on page 19.  Do you have page 19 in front

24   of you?

25        A.    Yes.  As I recall, we were talking

Page 207

1   about the poison death review committee when we

2   broke last.

3        Q.    Yes.  This says that the Cuyahoga

4   County Board of Health was an advocate for the

5   formation of a countywide poison death review

6   committee.  Was such a review committee

7   established?

8              MR. GALLUCCI:  Object to form.

9        A.    I don't know that it was formally

10  established.  I don't know that it was.

11       Q.    Was a poison death review committee

12  ever convened?

13             MR. GALLUCCI:  Object to form.

14       A.    I don't know that it was ever

15  convened.

16       Q.    Does it seem odd to you that the

17  Cuyahoga County Board of Health would be

18  advertising in its annual report that it was

19  involved in advocating for the formation of a

20  countywide poison death review committee if such

21  a committee had never been created or convened?

22             MR. GALLUCCI:  Object to form.

23       A.    No.

24       Q.    No?

25       A.    No.  We advocate for lots of things.

1      Q.     This document also says that the

2   Board of Health was an organizer of the opiate

3   epidemic across the Life Span Regional

4   Conference in 2012.  What was the Board of

5   Health's role in organizing that opiate epidemic

6   conference?

7      A.     I don't know specifically.  That

8   would be a question for Vince Caraffi, who would

9   have likely been the person involved with

10  organizing it.

11     Q.     Where was that conference held?

12     A.     I do not know.

13     Q.     What time of year was it held?

14     A.     I do not know.

15     Q.     Did you attend it?

16     A.     I don't believe I did.

17     Q.     Did anyone from the Cuyahoga County

18  Board of Health present at that conference?

19     A.     I don't know.

20     Q.     Are you able to tell me anything

21  about what the Board of Health did as an

22  organizer of this opiate epidemic regional

23  conference in 2012?

24     A.     No.

25     Q.     This also says that the Cuyahoga

Page 209

1    County Board of Health is a "respected community

2    educator in the areas of opiate abuse and proper

3    disposal of prescription medications," correct?

4         A.    Yes, that's what it says.

5         Q.    What community education did the

6    Cuyahoga County Board of Health do in the area

7    of opiate abuse?

8              MR. GALLUCCI:  Object to form.

9         A.    I can't speak to specifically what

10   that piece was relative to opioid abuse.  I can

11   speak myself to the prescription medication

12   disposal piece.  I would refer that to Vince

13   Caraffi or April Vince at our agency to answer

14   that.  Actually, back then I'm not sure whether

15   April was in that role.  So I don't know.

16        Q.    So you would refer us to Mr. Caraffi

17   to understand what role the Cuyahoga County

18   Board of Health had in community education in

19   the area of opiate abuse?

20        A.    Specifically, yes.

21        Q.    And if I asked you that question

22   generally, are you able generally to tell me

23   what the Board of Health's role was in community

24   education in the area of opiate abuse?

25              MR. GALLUCCI:  Object to form.

Page 210

1          A.    I don't really want to speculate

2     about what that means.  I would defer to Vince

3     Caraffi, who was intimately involved.

4                    -    -    -    -    -

5               (Thereupon, Allan Deposition Exhibit

6               7, Cuyahoga County Board of Health

7               Annual Report 2016, was marked for

8               purposes of identification.)

9                    -    -    -    -    -

10         Q.    Showing you what has been marked as

11    Allan Exhibit 7, this is a copy of the Cuyahoga

12    County Board of Health annual report for 2016.

13              Do you see that?

14         A.    Yes.

15         Q.    Were you involved in the preparation

16    of this annual report?

17         A.    As I mentioned earlier, we have a

18    team coordinated through our communications

19    officer that would propose topics and then

20    develop some context for the topics, and then

21    the leadership team would review and be involved

22    in the message from the board, and then the --

23    it looks like in this one I specifically signed

24    on on this one, and then the topics would come

25    forward, be drafted, and then there would be an

Page 211

1    opportunity to review it before it went to the

2    public.

3        Q.    Would you turn to page 16 of this

4    2016 annual report?

5        A.    Um-hum.

6        Q.    Are you there?

7        A.    Yes.

8        Q.    The first line of this section,

9    which is titled "Naloxone and Law Enforcement,"

10   says, "The heroin epidemic continues to grow."

11            Do you see that?

12       A.    Yes.

13       Q.    The heroin epidemic was growing in

14   2016?

15            MR. GALLUCCI:  Object to form.

16       A.    There was heroin.  Clearly heroin

17   was a -- was an issue certainly then.

18       Q.    And it had been an issue for many,

19   many years prior to 2016, right?

20            MR. GALLUCCI:  Object to form.

21       A.    I can't speak to that.

22       Q.    Sitting here today, do you know when

23   the heroin epidemic began?

24            MR. GALLUCCI:  Object to form.

25       A.    I do not.

1          Q.     Do you know what years were the

2     worst years of the heroin epidemic?

3               MR. GALLUCCI:  Object to form.

4          A.     It's still going on, but I can't

5     speak to what the worst years were right here.

6          Q.     Has the heroin epidemic gotten

7     better or worse since 2016?

8               MR. GALLUCCI:  Object to form.

9          A.     I think what we've seen is more the

10    different types of opiates, illicit opiates.

11    We've seen -- you know, we saw carfentanil and

12    fentanyl.  It describes that cascade that I

13    described earlier with prescription opiates and

14    movement to illicit forms.

15         Q.     Did you say you think what we've

16    seen is more different types of illicit opiates?

17         A.     Yes.  In recent -- this is like

18    right now, you know, in this last couple years.

19         Q.     What is an illicit opiate?

20              MR. GALLUCCI:  Object to form.

21         A.     It's not a -- it's -- I would

22    classify -- I guess it would be something like

23    street accesses.

24         Q.     An illegal drug?

25              MR. GALLUCCI:  Object to form.

Page 213

1       A.    Well, it wouldn't be -- I guess

2  fentanyl is not -- I don't think fentanyl is

3  illegal.  I think in the form it was in was

4  illegal, but -- so it is -- so I guess it is

5  illegal in that form.

6       Q.    Turn to page 17 of Allan Exhibit 6.

7  Are you there?

8       A.    Yes.

9       Q.    And there's a discussion of Project

10 DAWN.  Do you see that?

11      A.    Um-hum.

12      Q.    And in the middle of the page it

13 lists the Project DAWN partners?

14      A.    Um-hum.  Yes.

15      Q.    What was the role of the Alcohol,

16 Drug Addiction and Mental Health Services Board

17 in Project DAWN?

18            MR. GALLUCCI:  Object to form.

19      A.    I can't speak to that specifically,

20 but -- they might have been a partner in the

21 process, but I can't speak to that specifically.

22 You'd have to ask them.

23      Q.    This lists them as a partner,

24 correct?

25      A.    It does here.

1          Q.    Do you know what qualified them as a

2    partner?

3          A.    I do not.

4          Q.    This lists Cuyahoga County

5    administration as a Project DAWN partner.  What

6    did the Cuyahoga County administration do in

7    Project DAWN?

8          A.    I can't speak to their specific

9    role.

10         Q.    This lists MetroHealth as a Project

11   DAWN partner.  What was MetroHealth's role or

12   what did it do in connection with Project DAWN?

13         A.    I think Metro -- I believe Metro --

14   my recollection is that Metro was kind of a

15   coordinator for Project DAWN; still serves in

16   that role.

17         Q.    This also lists the Ohio Department

18   of Health as a Project DAWN partner.  What did

19   the Ohio Department of Health do with Project

20   DAWN?

21              MR. GALLUCCI:  Object to form.

22         A.    I believe the Ohio Department of

23   Health made -- made available Project DAWN kits

24   to -- to communities.

25         Q.    In this section, "Naloxone and Law

Page 215

1    Enforcement," is there any reference to abuse or

2    overdoses from prescription opioids?

3                    MR. GALLUCCI:  Object to form.

4         A.    It speaks about drug overdoses, and

5    I think in the first sentence it talks about

6    heroin, and then it says, "continues to grow,"

7    and then it says, "and emergency calls about

8    drug overdoses," which have reference to

9    prescription opioids.

10        Q.    Where are you?

11        A.    The first -- on page 16, the first

12   line.

13        Q.    The first line says, "The heroin

14   epidemic continues to grow" --

15        A.    "And" --

16        Q.    -- "and emergency calls about drug

17   overdoses are, unfortunately, becoming more

18   common"?

19        A.    Yes.  And so I'm saying that that

20   could refer back to my point I made early on

21   about this continuum of prescription drug --

22   prescription opiates and then the movement to

23   illicit forms over time.  But I don't think one

24   exists separate from the other.  These things

25   are intertwined.

Page 216

1      Q.    Does this say "prescription opioid"

2  anywhere on this page?

3      A.    It says, "drug overdoses."  I don't

4  see "prescription opioid" on this page, no.

5      Q.    How about on page 17?

6      A.    I do not see the words "prescription

7  opioid" on page 17.

8               -   -   -   -   -

9            (Thereupon, Allan Deposition Exhibit

10            8, Cuyahoga County Board of Health

11            Annual Report 2017, was marked for

12            purposes of identification.)

13               -   -   -   -   -

14      Q.    Showing you what has been marked as

15  Allan Exhibit 8, this is the Cuyahoga County

16  Board of Health annual report for 2017, correct?

17      A.    Yes.

18      Q.    Does this reference prescription

19  opioids anywhere?

20      A.    I don't know.  I have -- need some

21  time to read it.

22            MR. GALLUCCI:  Take as much time as

23  you need to review the document.

24            THE WITNESS:  Okay.

25      Q.    Well, while you're looking, tell me

1    if it mentions prescription opioids, illicit

2    opioids or drug abuse.

3        A.    Okay.

4              No.  I don't see them mentioned in

5    here.

6        Q.    Who made the decision that the issue

7    of opioids in the community was not worthy of a

8    mention in the 2017 annual report for the

9    Cuyahoga County Board of Health?

10             MR. GALLUCCI:  Object to form.

11       A.    As I mentioned previously, the idea

12   is to feature different aspects of what we do in

13   our annual report, so one year a program could

14   be in, the next year it might not be in.  We try

15   to feature the range of 44 programs that we have

16   so that the community can get a sense of the

17   different things that we do, and staff like to

18   see their different types of work featured in

19   the report.  And so that is part of the

20   decision-making process in how these reports are

21   put together.

22       Q.    But that's a decision on what topics

23   to feature, correct?

24       A.    Yes.

25       Q.    What explains not mentioning opioids

Page 218

1    or a problem with opioids anywhere in the 2017

2    annual report?

3                 MR. GALLUCCI:  Object to form.

4         A.    I think in my view I answered that

5    by saying that the decision would have been to

6    feature some different programs that had not

7    been featured perhaps previously.

8         Q.    Does the Cuyahoga County Board of

9    Health have a website?

10        A.    Yes, we do.

11        Q.    What is the website address?

12        A.    Www.ccb -- as in boy -- h.net.

13        Q.    And what is your role in deciding

14   what is put on the Cuyahoga County Board of

15   Health website?

16        A.    We have -- there's sort of like a

17   web team of people that make sure that all the

18   service area -- the service area programs are on

19   the site, and so -- and then the program

20   managers make a decision and the people in the

21   individual programs make decisions on the

22   content for what's on the site.

23        Q.    Are you a member of that web team?

24        A.    No.

25        Q.    Who is on that web team?

1        A.    I don't know exactly everybody.

2   People from our IT department and our

3   communications officer.  But I don't know, like,

4   exactly everybody that's on the web team.

5        Q.    Is the purpose of the website to

6   communicate information?

7        A.    Yes.

8        Q.    To whom?

9        A.    To the public.

10        Q.    Is the purpose to communicate

11   accurate information to the public?

12        A.    To the degree possible, we provide

13   accurate information.

14        Q.    And what steps are taken by the

15   Cuyahoga County Board of Health to ensure that

16   the information that it is communicating on the

17   website is accurate?

18        A.    It's going to be reviewed by the

19   people in the individual programs for content.

20        Q.    And so would you expect that -- each

21   program manager to have vetted and confirmed the

22   accuracy of information relating to his or her

23   program?

24        A.    I would expect that they would.

25        Q.    Does the Cuyahoga County Board of

1    Health have a part of the website that addresses

2    the Cuyahoga County Opiate Task Force?

3         A.    I don't know.

4         Q.    Has the Cuyahoga County Board of

5    Health ever had a portion of the website that

6    addresses the Cuyahoga County Opiate Task Force?

7              MR. GALLUCCI:  Object to the form.

8         A.    I would defer that question to -- I

9    would say my communications officer would have

10   to answer that.  I can't answer that.

11        Q.    Have you personally studied the

12   contributing factors that led to the problem

13   with opioids in Cuyahoga County?

14        A.    Personally studied, no.

15        Q.    Have you gathered any information

16   about the contributing factors that led to a

17   problem with opioids in Cuyahoga County?

18             MR. GALLUCCI:  Object to form.

19        A.    Personally, no.

20        Q.    Has anyone from the Cuyahoga County

21   Board of Health studied the contributing factors

22   that led to the problem with opioids in Cuyahoga

23   County?

24             MR. GALLUCCI:  Object to form.

25        A.    I know that our participants on the

Page 221

1    opioid task force have been involved.  I believe

2    they've been involved in discussions around

3    contributing factors.

4         Q.    What have the participants in the

5    opiate task force done to look into the

6    contributing factors that led to the problem

7    with opioids?

8              MR. GALLUCCI:  Object to form.

9         A.    I can't speak to the specifics of

10   what they've done.

11        Q.    What have they done generally?

12        A.    They discuss it.  As I've mentioned

13   earlier, they have discussions about the scope

14   of the problem and some of the details and

15   community concerns.

16        Q.    What work has the Cuyahoga County

17   Opiate Task Force done to identify and

18   understand the contributing factors that led to

19   the problem with opioids?

20             MR. GALLUCCI:  Object to form.

21        A.    They've provided a forum for

22   dialogue.

23        Q.    And has that dialogue yielded

24   information?

25        A.    The dialogue helps people to make

Page 222

1  determinations on how to better do their work.

2                 -   -   -   -   -

3                 (Thereupon, Allan Deposition Exhibit

4                 9, Cuyahoga County Board of Health

5                 Website Printout, was marked for

6                 purposes of identification.)

7                 -   -   -   -   -

8       Q.    Showing you what has been marked as

9  Allan Exhibit Number 9 -- do you have Allan

10  Exhibit Number 9 in front of you?

11      A.    I do.

12      Q.    Do you see that this is a printout

13  from the Cuyahoga County Board of Health

14  website?

15      A.    Yes.

16      Q.    From the section that is titled

17  "Opiates"?

18      A.    Yes.

19      Q.    And which program manager or

20  managers is responsible for ensuring the

21  accuracy of the information in this part of the

22  website?

23             MR. GALLUCCI:  Object to form.

24      A.    It would be Vince Caraffi as a

25  supervisor and April Vince as a program manager,

1   and they would be -- we are in the midst of the

2   process of updates for the whole website, but

3   they would be responsible in part of that

4   process.

5        Q.    What is the reason for updating the

6   whole website?

7        A.    We have -- so we migrated to a

8   different platform a while back, so now we have

9   a new carrier over the last couple years, and so

10  in the process of migrating to a new carrier, we

11  wanted to have a process that's being

12  coordinated by our communications officer to

13  update all the program material.  And so that's

14  a process.  There's a lot of material.  And

15  material then -- not only working with our web

16  team, but our contractor needs to then go in and

17  be revised and updated, and that takes time.

18  It's going to take probably a few years to get

19  through all the pages.

20       Q.    Do you expect that if information is

21  on this website describing -- or relating to

22  opioids, that the information is accurate?

23       A.    I expect the information on the

24  website is as up to date as we're able to keep

25  it based on the range of responsibilities and

Page 224

1    working with our contractor.

2          Q.    And do you expect the information

3    that's on this website relating to opioids to be

4    founded in fact or evidence?

5                MR. GALLUCCI:  Object to form.

6          A.    I think the information on there is

7    to the best of our knowledge at the time, and

8    I'm not sure -- it says here that this was

9    pulled --

10         Q.    Yesterday.

11         A.    It says "12-16-18" at the bottom.

12   That's not -- I'm sorry.  It is yesterday.  I

13   apologize.

14                Yeah.  So I don't know, again,

15   whether they've gotten to the update on this

16   page or not.

17         Q.    But separate from doing an update

18   because of a move from one website host to

19   another, do you expect the information that's

20   put on the Cuyahoga County Board of Health

21   website regarding opiates to be founded in fact

22   and evidence?

23                MR. GALLUCCI:  Object to form.

24         A.    I would expect the information on

25   the website for all our programs to be as

Page 225

1    accurate as we are able to know at that time.

2         Q.    But I asked you about accuracy

3    before and you said yes, to the degree possible.

4    I'm not asking about accuracy now.  I'm asking

5    about, do you expect it to have a foundation in

6    fact or evidence?

7              MR. GALLUCCI:  Object to form.

8         A.    I would expect that it would be the

9    best information that we have.

10        Q.    Would you turn to -- if you page

11   through, I think it's page 6.

12        A.    Okay.

13             MR. GALLUCCI:  What's at the top of

14   it?

15             MR. KEYES:  The first two words are

16   "Grade fentanyl."

17        Q.    Are you on that page?

18        A.    Yes.

19        Q.    There's a section that's titled

20   "Contributing Factors."

21             Do you see that section?

22        A.    Yes.

23        Q.    It says, "There are several

24   contributing factors that led to this epidemic."

25             Do you see that?

Page 226

1          A.    Yes.

2          Q.    Is this one of those sections that

3    you would expect to be accurate to the degree

4    possible?

5          A.    I think all the information, not

6    specifically this section -- I think across the

7    website we do the best we can to keep it

8    updated.

9          Q.    And this is also information that

10   you would expect to have a foundation in fact

11   and evidence to the extent possible, correct?

12              MR. GALLUCCI:  Object to form.

13         A.    I would go back to my original

14   statement.  The whole website -- it isn't

15   specific to any individual section.  As a whole,

16   we do the best we can to be as accurate as

17   possible and update it as frequently as we can,

18   but I know that that's still a process, as I

19   mentioned, we're in the middle of doing.

20         Q.    And this section titled

21   "Contributing Factors" is not subject to any

22   special set of rules, correct?  It's not exempt

23   from your general expectation that the

24   information on the website will be accurate and

25   grounded in fact and evidence, correct?

Page 227

```
1             MR. GALLUCCI:  Object to form.

2        A.    I would say that, as I mentioned

3   earlier, that this -- I can't speak to where in

4   our process of updating that I described

5   earlier -- we're going through all our updates.

6   I don't know where this page is and this content

7   is in that order of action for revision.

8        Q.    But that's not my question.  My

9   question was about the website.  You said yes,

10  to the degree possible, it should be accurate.

11       A.    Um-hum.

12       Q.    Is that a yes?

13       A.    Yes.

14       Q.    And you also said that, to the

15  degree possible, the statements on the website

16  should be grounded in fact and evidence, right?

17            MR. GALLUCCI:  Object to form.

18       A.    You said that.

19       Q.    Did you agree with me?

20            MR. GALLUCCI:  Object to form.

21            He's given several answers not

22  agreeing with you.

23       Q.    So the statements on the website

24  don't need to be grounded in fact or evidence?

25            MR. GALLUCCI:  Object to form.
```

1          He's given you the same answer

2    several times.  This is the fifth time now we're

3    going over it.

4          Q.    Does the website need to be grounded

5    in fact and evidence?

6              MR. GALLUCCI:  Object to form.

7          A.    We have been -- we do the best we

8    can to provide as accurate information as we

9    can.  We have gone through, as I said, a change

10   of web providers, and we have 44 programs, so

11   we've got to update those, we've got to move

12   methodically through a process to get those

13   updates.  And that's a process.  We do the best

14   we can to be accurate to the degree possible.

15        Q.    Does this -- does the section of the

16   website on opiates have any special rules or is

17   it also bound by your expectation that it be as

18   accurate to the degree possible?

19              MR. GALLUCCI:  Object to form.

20        A.    It is -- part of the rest of the

21   programs would have the same -- would be the

22   same for everybody to do the best they could to

23   provide as accurate information as they could.

24        Q.    Then under this section titled

25   "Contributing Factors," it says, "There are

Page 229

1   several contributing factors that led to this

2   epidemic."  The first one is "Changes made to

3   clinic pain management guidelines during the

4   late 1990s."

5              Do you see that?

6        A.   Yes.

7        Q.   What do you know about changes made

8   to clinic pain management guidelines during the

9   late 1990s?

10       A.   I can't speak to that personally.

11       Q.   How were changes made to clinic pain

12  management guidelines during the late 1990s a

13  contributing factor?

14             MR. GALLUCCI:  Object to form.

15       A.   I don't know specifically about

16  that.

17       Q.   What do you know about marketing

18  medications directly to the consumer?

19       A.   I can't speak to that either.

20       Q.   How was marketing medications

21  directly to the consumer a contributing factor

22  that led to the opioid problem?

23             MR. GALLUCCI:  Object to form.

24       A.   I can't speak to that.

25       Q.   What do you know about

1    overprescribing of high potency pain medication?

2         A.     I have a personal story to share

3    that I know about.

4              My personal story is when I went to

5    the endodontist to have a root canal and -- I

6    went into the root canal, and when they were

7    finishing with the work, the endodontist asked

8    me if I wanted a prescription for pain, and I

9    said no, I'd be fine.  And we kept talking and

10   he was finishing up, wrapping up the work, and

11   then he asked me again if I wanted a

12   prescription for pain.  And I said, "What is it?

13   Is it an opioid?"

14             And he said, "Yes."

15             I said, "I don't want it."

16             So then we finally wrapped up and

17   were finishing things up, and he says, "You

18   know, it's a Friday and it's going to be a long

19   weekend.  You know, sometimes people have pain

20   over the weekend."  He says, "I'll just give it

21   to you and put it in.  We'll do this."

22             And I finally turned to him, which

23   is -- I thought was a little much, and I said,

24   "I don't want it."

25             And so he said, "Okay," and we

1  finished up.  And as the visit finished up, I

2  got my packet of information, I paid my co-pay

3  or whatever it was, and I got back out to the

4  car and the prescription was in there.

5           And so, for me, that meant that it

6  was a systemic issue, it was part of the system.

7  It wasn't, in my mind, that individual dentist,

8  but it was a systemic issue.

9           And so that's my only concern about

10  -- or that would be my reference point that's

11  personal.

12      Q.   Did you believe that it was

13  medically unnecessary to prescribe an opioid for

14  your pain in that instance?

15           MR. GALLUCCI:  Object to form.

16      A.   I know that I asked -- I didn't want

17  it, and it was part of the system to provide it,

18  and it was -- that's my view, my personal view.

19  After three objections it shouldn't have been in

20  my packet.

21      Q.   And did you believe that this -- was

22  it a dentist or an endodontist?

23      A.   Endodontist.

24      Q.   Did you believe that this

25  endodontist was pushing prescription opioids on

Page 232

1   you?

2        A.    I believe that it was part of the

3   system.  He was a nice guy.  He did a good job.

4   It turned out I didn't have any pain.  I just

5   think it was already part of the process, I

6   think, and he was onto the next person when he

7   was finished with me to do the next job.

8        Q.    Did you believe that this

9   endodontist was pushing prescription opioids on

10  you?

11            MR. GALLUCCI:  Object to form.

12       A.    I think I just answered that

13  question.

14       Q.    You said it's part of the system.

15  You said it's part of the process.  I'm not

16  asking whether it's part of the system or part

17  of the process.  I'm asking, do you think he was

18  pushing prescription opioids on you?

19            MR. GALLUCCI:  Object to form.

20       A.    I don't think -- I don't think it

21  was an individual endodontist or dentist issue.

22  I think -- I think it was part of the larger

23  system, that there were a lot of opioids out

24  there and it was part of the larger system.

25  That's what I think.

1      Q.    When was this?

2      A.    A few years ago.

3      Q.    Can you be more precise?

4      A.    A few years.  I can't be more

5  precise.  It's been a few.

6      Q.    What is the basis for your belief

7  that what this endodontist was doing was part of

8  a system?

9      A.    Because it was already in the packet

10  and it was always going to be in the packet --

11  that's why -- the prescription.

12      Q.    And what is your basis for saying,

13  "It was always going to be in the packet"?

14      A.    It was part of the discharge

15  process.  That was my view.

16      Q.    So are you saying that what the

17  endodontist in his office was doing was part of

18  the system for that office or some system that

19  went beyond this endodontist's practice?

20      A.    I believe it was larger personally.

21      Q.    Why?

22      A.    Just because I have a hard time

23  believing that it would be unique.  That's my

24  personal view.

25      Q.    What's your basis for thinking it

Page 234

1    went beyond that particular endodontist?

2            MR. GALLUCCI:  Object to form.

3        A.    Because of the scope of the problem

4    we were having in the community.  That's why.

5        Q.    Had you heard of problems before

6    this episode of endodontists prescribing opioids

7    to patients who refused them?

8        A.    I had not.  I hadn't been to an

9    endodontist, so that was my first experience.

10       Q.    This was your first experience with

11   an endodontist?

12       A.    That I can recall, yes.

13       Q.    Had you heard reports of dentists

14   prescribing opioids to patients who didn't want

15   them?

16       A.    Not personally.

17       Q.    So prior to this experience with

18   this endodontist, had you heard from anyone

19   about any dentist or endodontist or anyone else

20   in a dental-related practice prescribing opioids

21   to a patient who said he or she didn't want

22   them?

23       A.    No.

24       Q.    Has it happened to you since then?

25       A.    I haven't been back to the

Page 235

1    endodontist.

2         Q.    So I take it it hasn't happened to

3    you since then, correct?

4         A.    No, it has not.

5         Q.    So this episode that you're

6    describing is one episode?

7         A.    Yes.

8         Q.    Have you talked to others who

9    described the same experience?

10        A.    Only casually, yes.

11        Q.    Who have you talked to who said they

12   had the same experience?

13              MR. GALLUCCI:  Object to form.

14        A.    Just in casual conversations with

15   people, people I know.

16        Q.    Which people you know?

17        A.    Standing around at, you know,

18   something -- you know, maybe waiting to pick up

19   my kid at school or something.  But just general

20   conversations.  I can't speak to the specifics

21   of their cases.

22        Q.    But can you identify any of these

23   people by name?

24        A.    No.

25        Q.    Can you provide any more detail

Page 236

1    about these general conversations you had with

2    them?

3         A.    No.  Just that it was more like I

4    had a similar experience kind of thing.

5         Q.    Can you provide any detail at all

6    about any of their experiences?

7         A.    No, I cannot.

8         Q.    So what is your basis for believing

9    that what happened to you on this one occasion

10   is part of a system that goes beyond you and

11   beyond this endodontist's practice?

12              MR. GALLUCCI:  Object to form.

13        A.    I think my answer to that question

14   that I answered before is that because it was in

15   the packet, and in the context of what was

16   happening in the larger community, it felt like

17   it was a bigger problem.

18        Q.    I understand.  I'm trying to

19   understand the basis for your belief that what

20   happened to you one time with one endodontist is

21   a systemic issue if it only happened one time to

22   you and you're not familiar with the details of

23   it happening to anyone else.  What is the basis

24   for your believing that this is a systemic

25   issue, to use your phrase?

Page 237

1                  MR. GALLUCCI:  Object to form.

2          A.    I would -- my view is because it was

3    a few years back and it was such a -- it was a

4    big community problem, and it just seemed to me

5    to be significant in that regard, that it was --

6    given the problem we were having in the

7    community.  That was my view.

8          Q.    Do you believe that your view that

9    this was a systemic issue is a well-informed

10   opinion?

11         A.    It's mine.

12         Q.    It is your opinion?

13         A.    Yes, that's right.

14         Q.    Do you believe it's a well-informed

15   opinion?

16                MR. GALLUCCI:  Object to form.

17         A.    I believe in the context of what was

18   happening in the community, that my personal

19   view is that it didn't feel like it was unique.

20   That was my view.

21         Q.    My question is whether you believe

22   your opinion is a well-informed opinion, not

23   whether it was your opinion but whether it was a

24   well-informed opinion.

25                MR. GALLUCCI:  Object to form.

Page 238

1        A.     I think it made sense to me in the

2    context of what I was hearing happening in the

3    community, and it made sense to me.

4        Q.     But you said before --

5        A.     Well informed is for someone else to

6    figure out.

7        Q.     You said before that prior to this

8    happening to you with this particular

9    endodontist, no one had ever told you that they

10   had had a similar experience with an endodontist

11   or dentist.

12       A.     I had never asked.  I had never even

13   struck up a conversation with anybody about it,

14   even casually or whatever, until that time.  So

15   it's not like I went around asking people prior

16   to that.

17       Q.     But no one had told you they had an

18   issue with an endodontist or dentist prescribing

19   an opioid when the patient didn't want it,

20   right?

21       A.     No.

22       Q.     This is the first time it ever

23   crossed your radar screen --

24              MR. GALLUCCI:  Object to form.

25       Q.     -- right?

Page 239

1        A.     Yes, that's true.

2        Q.     And yet when this was the first time

3   it crossed your radar screen, you concluded that

4   this was part of a systemic issue, right?

5               MR. GALLUCCI:  Object to form.

6        A.     It felt like it was to me.

7        Q.     But you're describing a feeling and

8   I'm trying to understand the basis for your

9   belief.

10              MR. GALLUCCI:  Object to form.

11              Asked and answered.

12       A.     I think this is the third time I

13  answered this.  It was in the packet when I

14  left.  I believe I've answered it, too, multiple

15  times.  I'm not sure where we're going with it.

16       Q.     What is the name of the endodontist

17  who --

18       A.     I don't know.  I'd have to go back

19  and dig it up.  It's been several years.

20       Q.     Where is the endodontist's practice?

21       A.     In Westlake, Ohio.

22       Q.     Do you know the address or the

23  neighborhood where --

24       A.     Somewhere near Dover and Detroit.

25       Q.     How did you come to see this

1    endodontist?

2         A.    I don't know.  I don't remember how

3    I got referred.

4         Q.    Is that endodontist still

5    practicing?

6         A.    I don't know.

7         Q.    Did you report your concern about

8    what this endodontist was doing with respect to

9    prescribing prescription opioids that you didn't

10   want?

11        A.    To whom?

12        Q.    Did you report him to any

13   professional association?

14        A.    No.

15        Q.    Did you report him to any law

16   enforcement agency?

17        A.    No.

18        Q.    Did you report him to anyone in the

19   Cuyahoga County Opiate Task Force?

20        A.    I believe I shared it with Vince,

21   the experience.

22        Q.    What did Vince Caraffi tell you?

23              MR. GALLUCCI:  Object to form.

24        A.    I don't remember specifically what

25   he told me, but -- I can't remember specifically

Page 241

1    what he would have told me.  It's been several

2    years.

3         Q.    What did he tell you generally?

4         A.    I don't want to speculate about

5    that.

6         Q.    Did you report what this endodontist

7    had done to any other regulatory body?

8         A.    How would I know anything about

9    that?  I don't understand the question.  You

10   asked me if I would report what the endodontist

11   had done to any other regulatory body.

12        Q.    Yes.  Did you report what this

13   endodontist had done --

14        A.    Oh.

15        Q.    -- in your personal experience to

16   any other regulatory body?

17        A.    No.

18        Q.    Or any group or individual other

19   than Vince Caraffi?

20        A.    No.

21        Q.    You felt what he did was

22   inappropriate?

23        A.    Yes.

24        Q.    Why didn't you report him to

25   someone?

Page 242

1        A.    Because I thought it was a larger

2   system issue.

3        Q.    Why isn't that all the more reason

4   to report it to someone?

5              MR. GALLUCCI:  Object to form.

6        A.    I didn't report it to anyone.

7        Q.    Why not?

8        A.    Because I thought it was bigger than

9   the dentist.

10       Q.    I understand you didn't report it.

11  I understand you didn't report it because you

12  thought it was bigger than the dentist.  I'm

13  still trying to understand your logic.

14       A.    Because --

15       Q.    Why would you not report it if it

16  was bigger than the endodontist?

17             MR. GALLUCCI:  Object to form.

18       A.    Because I thought it was a system

19  issue, which we were in the process of working

20  on as a community.

21       Q.    Who's "we"?

22       A.    The opiate task force.

23       Q.    What did the Cuyahoga County Opiate

24  Task Force do to explore whether there was a

25  systematic issue relating to dentists or

Page 243

1    endodontists prescribing opioids that their

2    patients didn't want?

3                MR. GALLUCCI:  Object to form.

4         A.    I can't describe with specificity

5    what they were doing than what I described

6    earlier as working in collaboration on the

7    context of the whole problem because it has lots

8    of tentacles.

9         Q.    Sitting here today, are you aware of

10   anything that the Cuyahoga County Opiate Task

11   Force did to address what you think is a

12   systemic issue with dentists or endodontists

13   prescribing opioids to patients who don't want

14   them?

15        A.    No.

16        Q.    This list on page -- Allan Exhibit 9

17   also says that, "HCAHPS/Press Ganey Scores

18   (patient satisfaction surveys) that affected

19   hospital reimbursement" is a contributing factor

20   that led to the opioid problem.

21              Do you see that?

22        A.    Yes.

23        Q.    What do you know about whether and

24   how HCAHPS/Press Ganey scores affected hospital

25   reimbursement and were a contributing factor

Page 244

1    that led to the opioid problem?

2         A.    I can't speak to that.

3         Q.    Do you know anything about that?

4         A.    No.

5         Q.    What is HCAHPS?

6         A.    I don't know.

7         Q.    What is a Press Ganey score?

8         A.    I don't know.

9         Q.    This list also says,

10   "Abuse-deterrent formulations of medications

11   that may have inadvertently shifted abuse

12   towards heroin" is another contributing factor

13   that led to the problem with opioids.

14              Do you see that?

15        A.    Yes.

16        Q.    What do you know about that

17   contributing factor?

18        A.    I can't speak to that.

19        Q.    Do you know how that led to the

20   epidemic?

21        A.    No.

22              MR. GALLUCCI:  Object to form.

23        Q.    This list also identifies "Mass

24   incarceration for non-violent, drug-related

25   crimes" as a contributing factor that led to the

Page 245

1    opioid problem.

2              Do you see that?

3         A.    Yes.

4         Q.    What do you know about that

5    contributing factor?

6         A.    I can't speak to that.

7         Q.    Can you explain how that factor

8    contributed to an opioid epidemic?

9              MR. GALLUCCI:  Object to form.

10        A.    No.

11        Q.    It also lists the "lack of treatment

12   availability" as a contributing factor.

13             Do you see that?

14        A.    Yes.

15        Q.    What do you know about that factor?

16        A.    Generally, that there weren't --

17   hearing from the Alcohol, Drug Addiction and

18   Mental Health Services Board, from some of the

19   task force workers, that there was a lack of

20   availability of treatment locations in the

21   general sense.

22        Q.    What do you mean, "in the general

23   sense"?

24        A.    Meaning like they just didn't have

25   enough -- the discussion at the time, as I

1    recall, was related to in-patient beds and

2    in-patient care and the lack of ability to do

3    that.

4         Q.    The last factor listed here is

5    "Stigma viewing drug addiction as a moral

6    failing" as a contributing factor that led to

7    the opioid problem.  What do you know about that

8    factor?

9         A.    That also was discussed, I think, in

10   -- in the context of the opioid task force.

11   People are afraid -- the discussions, as I

12   recall, were people are afraid -- and in

13   discussions with my staff -- I mentioned April

14   Vince and Vince Caraffi, but in those

15   discussions, it was about how people are afraid

16   -- they're ashamed to report the addiction about

17   them or their family members, and that ends up

18   being a barrier.  And, also, in their

19   interactions with -- with people, whether it's

20   their job or whatever it may be, stigma can

21   serve as a barrier to seek treatment and sort of

22   confound the problem.

23        Q.    Do you have any factual basis for

24   disputing that this list of factors are indeed

25   factors that contributed to the problem of

Page 247

1    opioids?

2         A.    Can you repeat that again?  I'm

3    sorry.

4         Q.    Sure.

5               Do you have any factual basis for

6    disputing that this list of factors are indeed

7    the factors that led to the problem with opioids

8    in Cuyahoga County?

9               MR. GALLUCCI:  Object to form.

10        A.    No.

11        Q.    Do you have any factual basis for

12   saying that this list is incomplete and that it

13   missed another factor that led to the problem

14   with opioids in Cuyahoga County?

15              MR. GALLUCCI:  Object to form.

16        A.    No, I can't speak to that.

17                -   -   -   -   -

18              (Thereupon, Allan Deposition Exhibit

19              10, E-Mail String Beginning Bates

20              Number CUYAH_002350842 - Marked

21              "Confidential," was marked for

22              purposes of identification.)

23                -   -   -   -   -

24        Q.    Showing you what has been marked as

25   Allan Exhibit 10, this is a series of e-mails

Page 248

1    that are Bates numbered CUYAH 2350842 through

2    843.

3              Do you see that this is three

4    separate e-mails, Mr. Allan, the first one from

5    Hugh Shannon to Matt Carroll, the second one

6    from Matt Carroll to you?

7         A.    Yes.

8         Q.    And the third one from you to

9    unidentified recipients?

10             MR. GALLUCCI:  Did you say from you

11   or from Hugh?

12             MR. KEYES:  From you.

13             MR. GALLUCCI:  It looks like the

14   third one is from Hugh, based on this signature

15   at the bottom.

16             MR. KEYES:  Yeah.  I'm sorry.

17        Q.    So the earliest of the three e-mails

18   is from Hugh Shannon, it looks like, to Matt

19   Carroll at the bottom of the page.

20             MR. GALLUCCI:  I would just note

21   that we don't have anything indicating it's to

22   Matt Carroll despite -- Matt Carroll forwarded

23   it on to Terry, but it doesn't seem to indicate

24   who Hugh Shannon drafted the original e-mail to.

25        Q.    Do you see three separate e-mails,

1   Mr. Allan?

2          A.    Yeah.  I see -- I see Hugh something

3   down here, and then I see Matt Carroll --

4          Q.    Forwarding it to you?

5          A.    Yeah, one line, and then I see my

6   response.

7          Q.    And who is your response to?

8          A.    I don't know.  It doesn't say here.

9   There's no name, you know, so I don't know.

10         Q.    Do you remember this exchange?

11         A.    I do not.

12         Q.    So the e-mail at the top of the page

13  is from you; the subject is "Heroin Overdose

14  Deaths"?

15         A.    Yes.

16         Q.    This is an e-mail you sent on August

17  24th, 2012, correct?

18         A.    Yes.  That's what it says.

19         Q.    You say, "Hugh called me last week."

20  Is that Hugh Shannon?

21         A.    Yes.

22         Q.    Hugh Shannon is the administrator

23  for the Cuyahoga County Medical Examiner's

24  Office?

25         A.    Yes.

Page 250

1    Q.    What did you discuss in that call?

2    A.    I don't remember.  It says here --

3          MR. GALLUCCI:  Object to form.

4    A.    You know, I don't recall the call

5    specifically.  It's been six years.

6    Q.    Okay.  So without looking at a

7    document to refresh your recollection, what do

8    you remember about that conversation?

9    A.    I don't recall the conversation.

10   Q.    What do you remember him telling

11   you?

12   A.    I don't remember.

13   Q.    The next line says, "Told him we can

14   help with mapping, outreach, etc."  Who is the

15   "we" in that sentence?

16   A.    Probably there are -- our department

17   epidemiology, surveillance and informatics

18   folks, because they do mapping.  That would be

19   my assumption.

20   Q.    Then you say, "We think this is

21   related to the whole prescription drug misuse

22   deal."

23         Do you see that?

24   A.    Yes, I do.

25   Q.    Who is the "we" in that sentence?

1          A.    It would be -- what likely I would

2     have done is to connect back with -- with our

3     staff, maybe Vince at the time, to give me some

4     context, because on individual programs often

5     I've got to go to the folks that are involved

6     with the program to get context to respond to

7     inquiries.

8          Q.    You say, "We think this is related

9     to the whole prescription drug misuse deal."

10    What did you mean by "the whole prescription

11    drug misuse deal"?

12         A.    For context, I have to go back and

13    read Hugh's response -- or Hugh's e-mail, so if

14    you give me some time to do that, I might be

15    able to answer that.

16         Q.    Sure.

17              MR. GALLUCCI:  While waiting, I'll

18    point out, the "Ex Ex" at the top, we did

19    reproduce this with names identified.  There was

20    previously an issue where, when it came across,

21    they came across that way, so there's a

22    subsequent production that does have the

23    recipients identified.

24              MR. KEYES:  Okay.  Thank you.

25         A.    I think what I was referring to in

Page 252

1    this context was the whole cascade that I had

2    described from -- moving from, you know, there

3    being a prescription drug problem, that then

4    this continuum around prescription drugs and

5    heroin and other street-related opioids.  That's

6    my recollection.

7        Q.    So your e-mail is responding to what

8    was in Hugh Shannon's e-mail on the bottom half

9    of the page?

10       A.    Yes.

11       Q.    And in his e-mail Mr. Shannon

12   reports the escalating number of heroin overdose

13   deaths in 2012, correct?

14               MR. GALLUCCI:  Object to form.

15       A.    Yes.

16       Q.    And --

17               MR. GALLUCCI:  I'm sorry.  Where are

18   you getting the 2012?  I assume you're reading

19   from the first line of Hugh Shannon's e-mail.

20               MR. KEYES:  It says August 24th,

21   2012.

22               MR. GALLUCCI:  But he doesn't -- the

23   statement that it's in 2012?

24       Q.    Well, he's reporting the escalating

25   number of heroin overdose deaths in his e-mail

Page 253

1    dated August 24th, 2012, right?

2         A.    Yes.

3         Q.    And then he reports that Cuyahoga

4    County is on pace for 150 heroin-related

5    overdose deaths in 2012, right?

6         A.    Okay.  I see it here now, yes.

7         Q.    And then he compares that with 107

8    all of last year --

9         A.    Um-hum.

10        Q.    -- right?

11        A.    Yes.

12        Q.    And he's saying that 107 last year,

13   meaning 2011, represented a threefold increase

14   since 2007, correct?

15        A.    Yes.

16        Q.    So there were 37 heroin-related

17   deaths in 2007, 107 in 2011, and he's reporting

18   that Cuyahoga County is on pace for 150

19   heroin-related overdose deaths in 2012, correct?

20        A.    Yes.

21        Q.    And then Mr. Shannon says that he

22   found only New York, LA County, Wayne County

23   (Detroit) and Cook County (Chicago) have more

24   reported overdose deaths in the past several

25   years, right?

1      A.    Yes.

2      Q.    He says, "It is possible by the end

3  of this year Cleveland (Cuyahoga County) could

4  have the highest per capita rate of overdose

5  deaths in the nation," right?

6      A.    Yes.

7      Q.    "As well as one of the highest

8  aggregate amounts (top 5) in the entire United

9  States," right?

10      A.    Yes.

11      Q.    And what he's talking about are

12  heroin overdoses, correct?

13      A.    Yes.

14      Q.    Does he mention prescription opioid

15  overdoses anywhere in his e-mail?

16      A.    No.

17      Q.    So Mr. Shannon sends an e-mail that

18  is talking about heroin overdose deaths, and

19  Matt Carroll forwards it to you.  What is Matt

20  Carroll's position?

21      A.    He works in the executive's office.

22      Q.    What was his specific position at

23  the time?

24      A.    2012?  Let me think.  I believe he

25  was -- 2012?  I believe he was the chief of

Page 255

1    staff, I think, at the time.

2         Q.    He forwarded this e-mail, and he

3    says, "This topic seems like your baby."  What

4    did you understand him to mean when he said

5    "this topic," meaning heroin overdose deaths,

6    "seems like your baby"?

7         A.    I just think he meant, in practical

8    terms, that this is something that might -- the

9    Board of Health might have an involvement in.

10        Q.    And so when you read Mr. Shannon's

11   e-mail describing the escalating number of

12   heroin overdose deaths, you then reported that

13   you think it's related to the whole prescription

14   drug misuse deal?

15        A.    Yes.

16        Q.    Which is what you described earlier

17   as the transition from using prescription

18   opioids to using illegal opioids?

19             MR. GALLUCCI:  Object to form.

20        A.    I described it as sort of this

21   continuum, yes.

22        Q.    But you described it as people using

23   prescription opioids, then not being able to get

24   prescription opioids, and then turning to

25   illegal opioids, right?

Page 256

1                    MR. GALLUCCI:  Object to form.

2          A.    Yes.

3          Q.    And did you have any different basis

4    for understanding that connection or transition

5    than you described earlier today?

6                    MR. GALLUCCI:  Object to form.

7          A.    Can you help me understand?

8          Q.    Yes.

9                    You told me earlier what your basis

10   is for believing that there is this connection

11   between prescription opioid use and illicit

12   opioid use.

13         A.    Okay.

14         Q.    You told me everything that you can

15   point to that is the basis for your

16   understanding, correct?

17                    MR. GALLUCCI:  Object to form.

18         A.    Yes.

19         Q.    You are describing a similar belief

20   back in August of 2012 in this e-mail, correct?

21         A.    Yes.

22         Q.    Did you have anything else that

23   formed that belief back in 2012 that's different

24   than what you explained today?

25         A.    I think I would have gotten feedback

Page 257

1    back in 2012 in talking with Vince, who would

2    have been involved, which is where I would have

3    gotten my context from.  As I mentioned, I

4    usually go to the program people to gather

5    context.  It's been six years.  So that's the

6    best I can speak to at the moment with this

7    response.

8          Q.    You said in the e-mail, "Docs used

9    to treat pain liberally with opiates."

10         A.    Again, that would have come from

11   feedback from my discussions with Vince.

12         Q.    So your basis for making that

13   statement is speaking with Mr. Caraffi?

14         A.    Yes.  So if it was whatever topic it

15   is is that I'm dealing with, I go to the program

16   person to provide context back for a response.

17         Q.    Other than talking to Mr. Caraffi,

18   did you have any basis for saying, "Docs used to

19   treat pain liberally with opiates"?

20         A.    That would have been where I got the

21   context.

22         Q.    Right.  But I'm asking whether you

23   had any other source of information besides what

24   Mr. Caraffi told you as the basis for saying,

25   "docs used to treat pain liberally with

1    opiates"?

2              MR. GALLUCCI:  Object to form.

3         A.    That would have been my source.

4    Vince would have been the source.  And my -- my

5    sense is that it would have been from feedback

6    that he had through the task force.

7         Q.    Then you say, "Over the last couple

8    of years, given the trend on misuse, they

9    stopped cold."

10             Do you see that?

11        A.    Yes.

12        Q.    Are you referring to docs when you

13   say, "They stopped cold"?

14        A.    Yes.  That would have been the

15   context.

16        Q.    And are you referring to docs

17   stopping cold and not treating pain with

18   opiates?

19        A.    Yes.

20        Q.    What is your basis for understanding

21   back in August of 2012 that, over the prior

22   couple years, doctors stopped treating pain with

23   opiates?

24        A.    Similarly, that would have been in

25   conversations with Vince Caraffi, and he would

1  have learned those in his interactions with the

2  task force, or whatever the name was at the

3  time.

4          Q.    Did you have any other basis for

5  believing that or making that statement other

6  than what Mr. Caraffi told you?

7          A.    No.

8          Q.    Then you said, "No one is treating

9  pain."  Is that also a statement based on what

10  Mr. Caraffi told you?

11          A.    And the interactions that he would

12  have gained from interactions with the task

13  force.

14          Q.    But you're basing it on what you

15  learned from Mr. Caraffi?

16          A.    Yes.

17          Q.    You're not basing it on your own

18  interactions with someone else?

19          A.    That's correct.

20          Q.    Then you say, "People are turning to

21  heroin, as it's much cheaper on the street."

22                Do you see that?

23          A.    Yes.

24          Q.    What is your basis for that

25  statement?

Page 260

1        A.    Well, we heard -- and I know I heard

2   from Vince and also from people that are

3   involved in the task force, that heroin is

4   cheap, and that was -- also we heard about that

5   in the newspapers, too, certainly, but I would

6   have heard it from Vince as well.

7        Q.    So seeing this exchange, can you

8   point to any other source of information that is

9   the basis for your belief that people who used

10  prescription opioids couldn't get them and then

11  turned to unlawful drugs?

12       A.    Not other than what I've told you.

13       Q.    Do you have any role in preparing

14  the annual reports for the Cuyahoga County

15  Opiate Task Force?

16       A.    No.

17       Q.    Do you receive them?

18       A.    I do, yes.

19       Q.    Do you read them?

20       A.    I'm sure I have.

21                  -   -   -   -   -

22              (Thereupon, Allan Deposition Exhibit

23              11, Cuyahoga County Opiate Task

24              Force Report 2014, was marked for

25              purposes of identification.)

Page 261

1              -   -   -   -   -

2        Q.    This is Allan Exhibit Number 11.  Do

3   you have that exhibit in front of you?

4        A.    Yes.

5        Q.    Is this the Cuyahoga County Opiate

6   Task Force report for 2014?

7        A.    Yes.

8        Q.    Once you received this report, what

9   did you do with it?

10       A.    I'm sure that -- I'm sure I reviewed

11  it, but it would have been, you know, after it

12  was completed I'm sure.

13       Q.    Would you turn to page 7 of this

14  annual report?  Are you on page 7?

15       A.    Yes.

16       Q.    There's a discussion of the shift

17  towards heroin.  Do you see that at the top of

18  the page?

19       A.    Yes.

20       Q.    And there's a section that says,

21  "The shift toward heroin is due to a number of

22  factors."  There are three bullet points.

23             Do you see that?

24       A.    Yes.

25       Q.    The first bullet point is

Page 262

1    "Increasing availability throughout Ohio."

2            Do you see that?

3     A.    Yes.

4     Q.    The second one is "The shutdown of

5    southern Ohio pill mills."

6            Do you see that?

7     A.    Yes.

8     Q.    The third one is "More hospitals

9    adopting proper prescribing guidelines."

10           Do you see that?

11    A.    Yes.

12    Q.    What do you know about the

13   increasing availability of heroin throughout

14   Ohio in 2014?

15    A.    Only real general terms, what might

16   have been said in the news, but I can't speak to

17   it specifically.

18    Q.    Do you have any basis for disputing

19   the proposition that heroin had increasing

20   availability throughout Ohio in 2014?

21    A.    No.

22    Q.    What do you know about the shutdown

23   of southern Ohio pill mills in 2014?

24    A.    I have no knowledge of that.

25    Q.    Do you have any basis for

1    disagreeing with the proposition that the

2    shutdown of southern Ohio pill mills was a

3    factor in the shift towards the use of heroin?

4                MR. GALLUCCI:  Object to form.

5         A.    I don't know either way about it.  I

6    don't know -- I don't know about it either way,

7    I guess.

8         Q.    What do you know about more

9    hospitals adopting proper prescribing

10   guidelines?

11        A.    I don't know anything about that.  I

12   can't speak to that.

13        Q.    Do you have any basis for disputing

14   the proposition that the shift toward heroin was

15   due, in part, to more hospitals adopting proper

16   prescribing guidelines?

17                MR. GALLUCCI:  Object to form.

18        A.    No.

19        Q.    Excuse me?

20        A.    No.

21                   -   -   -   -   -

22                (Thereupon, Allan Deposition Exhibit

23                12, E-Mail String Beginning Bates

24                Number CUYAH_001635636 - Marked

25                "Confidential," was marked for

Page 264

1              purposes of identification.)

2                  -   -   -   -   -

3        Q.    Showing you what has been marked as

4    Allan Exhibit Number 12, this document is a

5    series of e-mails with the Bates numbers

6    CUYAH 1635636 through 38.  Do you see this is a

7    series of e-mails?

8        A.    Yes.

9        Q.    And do you see that Joan Papp is

10   reaching out to you about how the Cuyahoga

11   County Board of Health could assist in making

12   naloxone more available?

13       A.    Yes.

14       Q.    In the middle of the first page of

15   Allan Exhibit 12, there is an e-mail from you

16   dated September 11th, 2012.

17             Do you see that e-mail?

18       A.    Yes.

19       Q.    You say, "Dr. Papp, thanks for your

20   message.  I have recently become familiar with

21   Project DAWN, and would be very interested in

22   working with you.  We have a countywide task

23   force looking at the heroin issue."

24             Do you see that?

25       A.    Yes.

Page 265

1          Q.     Were you referring to the Cuyahoga

2     County Opiate Task Force?

3          A.     Yes.

4          Q.     And were you -- if you look at the

5     prior e-mail from Dr. Papp, she is describing

6     increases in heroin-related deaths right in the

7     first paragraph of her e-mail?

8                 MR. GALLUCCI:  Object to form.

9          A.     She says about the growing number of

10    opiate-related overdoses and deaths in the first

11    paragraph, right.

12         Q.     Then she says, "In 2011 the Cuyahoga

13    County Medical Examiner reported 189 percent

14    increase in heroin-related deaths from 2007"?

15         A.     Yes.

16         Q.     And she reports "The deaths from

17    heroin overdose in 2012 are expected to surpass

18    this"?

19         A.     Yes.

20         Q.     So she was focused on heroin

21    overdoses and deaths from heroin overdoses,

22    correct?

23                MR. GALLUCCI:  Object to form.

24         A.     I think she speaks in the first

25    sentence about opiate-related overdoses and

Page 266

1   deaths in non-specific terms, and then at the

2   end of the sentence she speaks to heroin

3   specifically.

4        Q.    Does she mention prescription

5   opioids in that first paragraph?

6        A.    No.  It looks like she does in the

7   next section.

8              MR. GALLUCCI:  If you're not done

9   with your answer, go ahead.

10       A.    I'm just looking at the rest of the

11  e-mail now.  It says in the next paragraph, "In

12  the emergency department we can quickly

13  resuscitate overdose victims with the drug

14  naloxone.  It is a pure opiate antagonist" --

15             THE COURT REPORTER:  If you could

16  slow down.

17             THE WITNESS:  Oh, I'm sorry.  I'll

18  go a little slower.  I'm sorry.

19       A.    "It is a pure opiate antagonist

20  which rapidly and completely reverses the

21  effects of all opiate drugs."  And then she

22  lists a range of prescription opiates.

23       Q.    So she's describing what naloxone

24  is?

25       A.    Yes, and how it works.

Page 267

1        Q.    And she describes it as a pure

2   opiate antagonist, right?

3        A.    Yes.

4        Q.    That completely reverses the effect

5   of all opiate drugs, right?

6        A.    Um-hum.

7        Q.    Including prescription drugs?

8        A.    Right, and heroin.

9        Q.    Does she say anything in that

10  paragraph about what experience the emergency

11  department is having regarding overdoses from

12  prescription opioids?

13       A.    Not in that paragraph.

14       Q.    Does she reference anywhere in her

15  e-mail the emergency department's experience

16  with overdoses from the use of prescription

17  opioids?

18            MR. GALLUCCI:  Object to form.

19       A.    No.

20       Q.    What she mentions are overdoses from

21  heroin, correct?

22            MR. GALLUCCI:  Object to form.

23       A.    You mean in the other two paragraphs

24  specifically?

25       Q.    Yes, in her e-mail.

1          MR. GALLUCCI:  For clarification,

2   you're saying the entire e-mail or just the two

3   paragraphs he asked about?

4          MR. KEYES:  Let's take them one at a

5   time.

6      Q.     Does she mention anything about

7   overdoses from prescription opioids in the first

8   paragraph of her e-mail?

9      A.     No.  She just speaks generally about

10  opioid-related overdoses and deaths.

11     Q.     And then talks about heroin-related

12  deaths?

13     A.     Yes.

14     Q.     And deaths from heroin overdoses,

15  correct?

16     A.     Yes.

17     Q.     Does she mention anything about

18  overdoses from prescription opioids in the

19  second paragraph of her e-mail?

20     A.     No.  She just mentions what -- in

21  what context naloxone is effective and describes

22  them on both prescription opioids and heroin.

23     Q.     And does she mention anything about

24  overdoses from prescription opioids in the third

25  or fourth paragraphs of her e-mail?

Page 269

1      A.    No.

2      Q.    Does she mention anything about

3   overdoses from prescription opioids anywhere in

4   her e-mail to you?

5            MR. GALLUCCI:  Object to form.

6      A.    Not specifically.

7            -   -   -   -   -

8            (Thereupon, Allan Deposition Exhibit

9            13, E-Mail String Beginning Bates

10           Number CUYAH_014232916 - Marked

11           "Confidential," was marked for

12           purposes of identification.)

13           -   -   -   -   -

14     Q.    Showing you what has been marked as

15   Allan Exhibit Number 13, this is a series of

16   e-mails, Bates numbers CUYAH 14232916 through

17   920.

18           Would you turn to the second page of

19   Allan Exhibit 13?

20     A.    Um-hum.

21     Q.    Do you see there's an e-mail from

22   you to Vince Caraffi, Chris Kippes and Allisyn

23   Leppla on October 27th, 2015?

24     A.    Yes.

25     Q.    You say, "So I was at the dentist

1    yesterday and given the persistent push to

2    prescribe me narcotics after a root canal, which

3    I kept refusing.  I can't help but think that

4    the pharmaceutical industry might be

5    incentivizing docs or dentists who write scripts

6    for narcotics.  Have anyone looked into this,

7    and specifically into endodontist and

8    orthodontic practices and their prescribing

9    practices.  Vince?  Just wondering."

10            Did I read that correctly?

11       A.    Yes.

12       Q.    When you said "scripts," were you

13   referring to prescriptions?

14       A.    Yes.

15       Q.    What was your basis for thinking

16   that the pharmaceutical industry may be

17   incentivizing docs or dentists to write

18   prescriptions for narcotics based entirely on

19   this endodontist giving you a prescription

20   opioid that you said you didn't want?

21       A.    I think we talked about this

22   earlier.  I described earlier my sense that when

23   I finished, after multiple requests not to

24   receive it, that it was already part of the

25   system, and that would have been the basis for

Page 271

1    it after I reflected on it, and when we had our

2    exchange previously about that.  And so that

3    would be -- I wouldn't have anything different

4    to say about what -- than what I said before.

5         Q.    Would you turn to the first page of

6    this exhibit?  Mr. Caraffi responds to your

7    e-mail, correct?

8         A.    Yes.

9         Q.    He says, "Terry, what you

10   experienced yesterday is still the norm

11   unfortunately.  I know that the Press Ganey

12   scores/hospital satisfaction surveys play a

13   large role in the overprescribing or push that

14   you mentioned in your e-mail."

15             Do you see that?

16        A.    Yes.

17        Q.    Does that jog a memory as to what

18   Press Ganey scores are?

19        A.    As it was mentioned in one of the

20   documents that we -- you showed me, the pain --

21   sort of the patient satisfaction scores.  That's

22   the only context I have.

23        Q.    So did you understand Mr. Caraffi to

24   be confirming that dentists were overprescribing

25   or pushing prescription opioids in order to get

1    better Press Ganey scores or hospital

2    satisfaction survey scores?

3         A.    What I understood was that basically

4    questions about pain were part of the process.

5    That's what I understood.

6         Q.    And what is the consequence of

7    questions about pain being part of the process?

8         A.    If people are still in pain when

9    they -- after they are seen, that they will

10   state their satisfaction -- they would have more

11   a negative -- more of a negative experience

12   relative to pain on finishing a visit.

13        Q.    So if patients were complaining

14   about pain and the pain wasn't addressed to the

15   satisfaction of the patient, the patient would

16   give lower scores to that physician?

17             MR. GALLUCCI:  Object to form.

18        A.    That would be the presumption.

19        Q.    And did you understand Mr. Caraffi

20   to be saying that dynamic led to prescribers

21   prescribing more opioids to their patients?

22        A.    Yes.

23        Q.    Did you have any follow-up

24   conversations with Mr. Caraffi about that

25   concept?

Page 273

1          A.     Not that I can recall specifically,

2     no.

3          Q.     Did the Cuyahoga County Opiate Task

4     Force look at the dynamic of prescribers

5     prescribing more opioids to their patients in

6     order to get good or higher Press Ganey scores

7     or higher hospital satisfaction survey scores?

8          A.     I don't know.

9          Q.     Did the Cuyahoga County Board of

10    Health look at that dynamic separate from the

11    Cuyahoga County Opiate Task Force?

12         A.     Not that I'm aware of, no.

13                MR. KEYES:  Okay.  Can we take a

14    ten-minute break?

15                THE VIDEOGRAPHER:  Off the record,

16    3:18.

17                     (Recess had.)

18                THE VIDEOGRAPHER:  On the record,

19    3:41.

20                     -   -   -   -   -

21                (Thereupon, Allan Deposition Exhibit

22                14, E-Mail String Beginning Bates

23                Number CUYAH_014270428 - Marked

24                "Confidential," was marked for

25                purposes of identification.)

1                          -    -    -    -    -

2    BY MR. KEYES:

3         Q.    Mr. Allan, I've handed you what has

4    been marked as Allan Exhibit 14.  This is Bates

5    number CUYAH 14270428 through 49.  The first

6    page is a series of two e-mails.  The one at the

7    top is from you dated October 6, 2016.

8              Do you see that?

9         A.    Yes.

10        Q.    You write, "Sounds like a data hup,"

11   h-u-p, "concept to me."  Is that a typo?

12        A.    Yes.

13        Q.    What is hup supposed to be?

14        A.    It's supposed to be, I think, hub,

15   turned upside down.

16        Q.    What did you mean when you said, "It

17   sounds like a data hub concept"?

18        A.    I'd have to go back and -- let me

19   look at the context.  Is this somehow connected

20   to this, from the e-mail (indicating)?

21        Q.    Yes.

22        A.    Is this an attachment?

23        Q.    Yes, it was an attachment to the

24   e-mail.

25        A.    Okay.  Can I take a look at this?

Page 275

1          Q.    Of course.

2          A.    Okay.

3          Q.    Who is Joe Mazzola?

4          A.    He is the health commissioner for

5    Franklin County Health Department in Ohio.

6          Q.    And do you have an understanding as

7    to why Mr. Mazzola sent you this example?

8          A.    Maybe he was interested in -- I

9    would presume, in this concept, I think

10   particularly of number two, so the idea that

11   creating, sort of, a place where you could begin

12   to track for early event detection.  So I'll

13   give you an example.

14              In public health, after 9/11 health

15   departments became very involved in emergency

16   preparedness response, and so part of that

17   process gave us access to databases on

18   over-the-counter meds like cold medicine and

19   that sort of thing, and you could give us access

20   to a database from the state and feds so that

21   you could look at a period of time where there

22   was a run on cold medicine as a predictor or

23   like cold or flu symptoms as a predictor for the

24   beginning of flu season.  So the idea is that

25   integrated data from a range of pharmacies

Page 276

1    around that sort of information and it would

2    help us as an early detection process.

3              So what Joe was getting at, I think,

4    in this context, was could we create a data

5    sharing and monitoring program that might help

6    with early detection of -- you know, you begin

7    to combine data from law enforcement with

8    hospital data on emergency department

9    admissions, and based on a chief complaint that

10   may relate to a drug overdose, for instance,

11   combine that with data from the medical

12   examiner's office, from public health data that

13   may be available around naloxone utilization.

14             So the idea of integrating data sets

15   for predictive purposes is -- my guess is what

16   Joe was referring to, and that's why I used the

17   term "data hub" to at least speak to it.

18        Q.   Mr. Mazzola was proposing the idea

19   of developing a data repository database to

20   track heroin, correct?

21        A.   I don't know that he says that in

22   the e-mail.  Let's see.

23        Q.   Do you see he has two numbered

24   points?

25        A.   Yes.  It looks like he cut and

Page 277

1   pasted this from the document from what I saw on

2   page -- it looks like he cut and pasted this

3   from this particular document.  I think it was

4   page 20, I believe.

5        Q.   Do you see he has two numbered

6   points in his e-mail to you?

7        A.   Yes.

8        Q.   And number 2 says, "Enhanced data

9   monitoring and sharing - develop a data

10  repository database to track heroin."

11            Do you see that?

12       A.   Yes.  And it is from page 20 of the

13  attachment I see.

14            MR. GALLUCCI:  Object to form.

15       Q.   Did -- did the Cuyahoga County Board

16  of Health work with any other boards of health

17  to develop a data -- repository database to

18  track heroin?

19       A.    This -- so the idea of more

20  generally -- the idea of looking at multiple

21  data sources actually was discussed at the most

22  recent opioid summit that they held at the

23  Cleveland Clinic just a few months ago.  And the

24  idea of just trying to integrate the data sets

25  is not simple.  So it's -- it was just in

1   concept talked about.  So that would involve

2   integrating a range of the data sets that I

3   described, and it takes time because of HIPAA,

4   things you folks understand better than I, a

5   whole range of approvals and the like.  So

6   it's -- to me, these things are still in

7   conceptual stages.

8           Q.    So even though he proposed it in

9   October of 2016, it's still in the conceptual

10  stage, as you would describe it?

11          A.    That's how I would describe it, yes.

12          Q.    What professional organizations are

13  you a member of within Ohio as a health

14  commissioner?

15          A.    I'm a member of the Association of

16  Ohio Health Commissioners.

17          Q.    And what does the Association of

18  Ohio Health Commissioners do?

19          A.    We have annual meetings where we

20  talk about a range of different topics.  We

21  have -- there are weekly newsletters on a range

22  of topics that -- that health departments -- you

23  know, with information that's interesting to

24  health departments or of interest to health

25  departments.  And there is -- they do work

Page 279

1   around setting a -- legislative priorities, that

2   sort of thing.

3          Q.   Do you attend the annual meeting?

4          A.   I do.

5          Q.   Every year?

6          A.   Almost every year.  I think I've

7   only missed maybe one or so.

8          Q.   And do you receive the weekly

9   newsletters?

10         A.   Yes.

11         Q.   Do you read them when you get them?

12         A.   I review the newsletters, and if

13  there are topics that are of interest, I send

14  them out to staff and directors to review if it

15  relates to their individual programs.

16         Q.   How do you receive these weekly

17  newsletters?

18         A.   Electronically.

19         Q.   By e-mail?

20         A.   Yes.

21         Q.   To your e-mail address at the

22  Cuyahoga County Board of Health?

23         A.   Yes.

24         Q.   And if you forward them to others at

25  the Board of Health, do you forward it by

Page 280

1   e-mail?

2        A.    Yes.

3        Q.    What is the newsletter called?

4        A.    I think it's just the AOHC

5   Newsletter.

6        Q.    And after you review the portions

7   that are of interest to you, and perhaps forward

8   it to others at the Cuyahoga County Board of

9   Health, what do you do with the newsletter?

10       A.    It's in my -- I don't do anything

11  else with it.  If there's information that needs

12  to be acted upon, people act upon it.

13       Q.    Then is it in your e-mail?

14       A.    Yeah.  It should be in my e-mail.

15       Q.    Should it still be in your e-mail

16  today?

17       A.    Probably.

18       Q.    Do you use folders to organize your

19  e-mail?

20       A.    Sometimes.

21       Q.    Do you use a folder to organize the

22  weekly newsletters that you receive from the

23  Association of Ohio Health Commissioners?

24       A.    No.

25       Q.    No?

Page 281

1           A.    No.  I can just search my e-mails if

2   I need something by the name or whatever.

3           Q.    If you wanted to find these

4   newsletters, what search term or terms would you

5   use?

6           A.    I'd probably use AOHC Newsletter.  I

7   might use the name of one of the senders from

8   the association to search.

9           Q.    What are the typical senders of the

10  newsletter?

11          A.    Beth Bickford is one.

12          Q.    Any others?

13          A.    Penny -- what's Penny's last name?

14  I can't think of her last name at the moment.

15  Just the two of them is usually the ones that

16  send them.

17          Q.    What is Beth Bickford's position

18  with AOHC?

19          A.    She's the executive director.

20          Q.    What is Penny last name unknown's

21  position with AOHC?

22          A.    She is a -- like a support staff

23  person.

24          Q.    She's support staff to Ms. Bickford?

25          A.    Yes.

Page 282

1      Q.    What work do you do in connection

2   with AOHC other than attend the annual meeting

3   and receive the weekly newsletters?

4      A.    I used to be -- many years ago I was

5   on the board, but I cycled off quite a few years

6   back.

7      Q.    What period of time were you on the

8   board of AOHC?

9      A.    I would have to go back and look.

10  It's actually on my resume I think.  If I can go

11  back and look at that.  Do you want me to look

12  on --

13     Q.    No.  If it's on your resume, we can

14  find it later.

15           What -- does the AOHC have

16  committees?

17     A.    They have a -- yeah.  They've had

18  several committees for different purposes.  They

19  have one around public affairs.  They have one

20  that we are on around public health futures

21  committee, looking at like -- there are some

22  mandates around accreditation that affect local

23  public health.  There are some looking at

24  mechanisms around trying to fund some essential

25  services.  And so I was part of that process.

1          Q.     Has AOHC ever had any committees

2     that focus on the problem of opioids in Ohio?

3          A.     There was -- there are not any

4     committees, but I remember before at one of the

5     meetings we pulled together -- it's been a

6     number of years -- at the meeting a group of

7     people that were just interested came together

8     to talk a little bit about what was happening

9     with syringe service programs around the state

10    and other opioid-related issues, just an

11    informal dialogue.

12         Q.     When was that meeting?

13         A.     It's been a few years.  I don't

14    remember exactly when it was.

15         Q.     Did you attend the meeting?

16         A.     Yes.

17         Q.     Does AOHC have any task forces or

18    working groups separate from committees?

19         A.     I don't think so.  I've been out of

20    the loop on the details, like, for a few years,

21    but I don't think so.

22         Q.     Is there any standing group of

23    people associated with AOHC who are focused on

24    the problem of opioids in Ohio?

25         A.     No standing group that I can recall.

Page 284

1          MR. KEYES:  I have no further

2    questions at this time.  Thank you.

3          THE WITNESS:  Thank you.

4        EXAMINATION OF TERRENCE M. ALLAN

5    BY MS. JAMES:

6        Q.    Hi, Mr. Allan.

7        A.    Hello.

8        Q.    Erica James.  I'm here representing

9    Janssen Pharmaceuticals and Johnson & Johnson

10   today.  I'm going to have a few questions for

11   you.  Mr. Keyes was very thorough so I'm going

12   to try not to duplicate too much.

13       A.    Okay.

14       Q.    I did have one question about the

15   funding for the Cuyahoga County Board of Health.

16            Does the Cuyahoga Board of Health

17   receive any direct funding through Medicaid?

18       A.    Direct funding through Medicaid?  We

19   receive money from Medicaid for, I think right

20   now, three programs, the -- for our

21   vaccine-preventible diseases through our family

22   planning clinic, and for our -- we do dental

23   sealants in school systems, and so we're

24   reimbursed.  We have, I think, agreed-upon

25   contracts with those with a range of managed

1    care agencies and private insurers.  We've -- I

2    think those are the places right now, but they

3    would be -- I don't know if that's direct, but

4    that's the Medicaid money that we get.

5              There also is Medicaid money that

6    comes to fund -- to do lead risk assessments in

7    the homes of kids who have been poisoned, and

8    that comes through the state health department,

9    so it's through Ohio Medicaid, but the state

10   health department is where the contract is held.

11       Q.    And I know I asked the direct

12   question.  Is there any indirect Medicaid money

13   that you're aware of that would go towards

14   funding towards opiate programming?

15             MR. GALLUCCI:  Object to form.

16       A.    Not that I'm aware of right now.

17       Q.    Okay.  Mr. Allan, I'm going to ask

18   you to look back at a couple of exhibits that

19   you've already looked at today, Exhibits 9 and

20   11 -- I'm sorry, Exhibit 9, to start off.

21       A.    Okay.

22             MS. JAMES:  And I'd like to mark

23   this as Exhibit 15, which is going to be the

24   Cuyahoga County Opiate Task Force report from

25   2016, and that's Bates range CUYAH_000018265

1    through 277.

2                         -    -    -    -    -

3                    (Thereupon, Allan Deposition Exhibit

4                    15, Cuyahoga County Opiate Task

5                    Force Report 2016, Beginning Bates

6                    Number CUYAH_000018265, was marked

7                    for purposes of identification.)

8                         -    -    -    -    -

9         Q.    And I believe earlier you were

10   looking at page 9 of Exhibit 9.  If you could

11   turn back there.  And I hope my memory serves.

12        A.    Okay.  9 I think is the combined

13   sewer overflow page, probably not that one.

14        Q.    Okay.  Thank you.  Page 6.

15        A.    This is the contributing factor

16   page.

17        Q.    Yes.  Okay.

18                    Now, in Exhibit 15, if I could get

19   you to look at the third page of that document.

20   If you could look, please, at the right-hand

21   side, the second column, towards the bottom

22   there's a section there that is titled "How did

23   this happen?"

24                    Do you see that?

25        A.    Yes.

Page 287

1          Q.    And then below that, "There are

2    several contributing factors that led to this

3    epidemic."

4               Did I read that correctly?

5          A.    You're on 15, right?

6          Q.    Yes, sir, Exhibit 15.

7          A.    Sorry.  Excuse me.

8          Q.    So I was asking, there in the

9    right-hand column towards the bottom, under the

10   section "How did this happen, there are several

11   contributing factors that led to this epidemic."

12              Did I read that correctly?

13         A.    Yes.

14         Q.    And can you confirm for me, are the

15   bullet points that are listed in that section of

16   Exhibit 15, identical to those that are listed

17   in Exhibit 9, taken from the Cuyahoga County

18   Board of Health website?

19         A.    Yes.

20         Q.    Okay.  And so would it be fair to

21   say that at least that portion of the Cuyahoga

22   County Board of Health website was adopted from

23   the 2016 Cuyahoga County Opiate Task Force

24   report?

25              MR. GALLUCCI:  Object to form.

1      A.    I don't know if it's -- for me, it's

2   like a chicken and egg thing.  I don't know what

3   came first, you know.  I don't know if it was

4   from this report and then it went to the

5   website, because we've been updating.  I'm not

6   sure how old the content is on the website.  So

7   I'm not sure.

8      Q.    Okay.  Is it your understanding that

9   if the language is included within the 2016

10  Cuyahoga County Opiate Task Force report, that

11  language has been adopted by the opiate task

12  force?

13             MR. GALLUCCI:  Object to form.

14      A.    I don't know the answer to that

15  question because I don't know -- they don't

16  really have a formal -- it's not like -- there's

17  not like a board, you know, that would, like,

18  adopt something.  So I don't know if -- I don't

19  know that they formally adopt anything.  It was

20  included in the report, but I can't speak to

21  whether it was a formal adoption, like a board

22  would adopt a policy or something.

23      Q.    What do you consider the

24  significance of information being included

25  within an opiate task force report to be?

1        A.    I think it's considerations for --

2    for our partners and the public in the context

3    of an evolving problem, large community problem,

4    and it relates back, just like a lot of reports,

5    information of current activities, and it looks

6    like there's information on some funding that

7    people have received for different purposes and

8    some of the partner agencies and the list of

9    activities that the partner agencies do, which

10   is, I think, pretty common in a lot of end

11   reports that are in these type of

12   collaboratives.

13       Q.    Sure.  And I'd like you to turn your

14   attention back to that section we were just

15   looking at there on page 2 -- I'm sorry, 3, at

16   the second half.  And I'm now going to ask you

17   to also take a look at what's been marked as

18   Exhibit 11, please, which is the 2014 Cuyahoga

19   County Opiate Task Force report.

20       A.    Do I need to keep Exhibit 9?

21       Q.    No.  We can set aside Exhibit 9.

22   We've identified them as the same, so we can set

23   that one aside.

24       A.    Thank you.

25       Q.    Okay.  Sir, if you could please turn

Page 290

1    to page 2 of Exhibit 11.  So if you'll look

2    there towards the bottom half of the page,

3    you'll see the section where it says,

4    "Contributing factors that led to this epidemic

5    include."

6            Did I read that correctly?

7        A.    Yes, ma'am.

8        Q.    And can we agree that the epidemic

9    that's being referred to is the opioid epidemic?

10           MR. GALLUCCI:  Object to form.

11       A.    They're talking about the opioid

12   problem, yes.

13       Q.    Okay.  So now there are several

14   bullet points listed underneath that section as

15   well, and these are not quite identical, and so

16   I want to talk to you a little bit about the

17   differences.

18       A.    Okay.

19       Q.    Okay.  So if we look there, the

20   first bullet is "Changes made to clinical pain

21   management guidelines during the late 1990s."

22   And I believe you've already been asked and

23   indicated that you cannot speak to that; is that

24   correct?

25       A.    Yes, ma'am.

1        Q.    So then the second bullet point in

2   Exhibit 11 states, "Improper storage and

3   disposal of unused medication."

4             Did I read that correctly?

5        A.    Yes.

6        Q.    And so the medication that, I guess,

7   they would be referring to in this context,

8   would that be prescription opioids?

9             MR. GALLUCCI:  Object to form.

10       A.    I -- in this section it's going to

11  be unused medication more generally.  At these

12  pickup locations it could be prescription

13  opioids, it could be any other unused medication

14  that people may have in their medicine cabinet

15  that they want to get rid of because it's no

16  longer being used, it could be expired, it could

17  be lots of reasons.  And so they want people to

18  collect those and bring them in for disposal.

19       Q.    And would this have been the

20  potential source of the pills that were ending

21  up at the pill parties that you were discussing

22  earlier?

23             MR. GALLUCCI:  Object to form.

24       A.    It's possible.

25       Q.    And so do you have any information

1   about why it is that improper storage and

2   disposal of unused medication was no longer

3   listed as a contributing factor for the opioid

4   epidemic in the 2016 task force report?

5            MR. GALLUCCI:  Object to form.

6        A.   No, I don't.  I don't know why it's

7   not on the list.  I know I visited a number of

8   city halls and in every city hall is sort of a

9   mailbox -- next to the police department a

10  mailbox structure that's, like, kind of

11  reinforced that it's for unused meds disposal,

12  so there are now -- at just about every city

13  hall you could go up to the front entrance by

14  the police department and there's a container

15  for unused meds.  It's pretty -- available

16  pretty widely, and I think it's kind of

17  incorporated as a basic program, which is a good

18  thing.

19       Q.   So in your opinion and experience,

20  was improper storage and disposal of unused

21  medication a contributing factor to the opioid

22  epidemic?

23            MR. GALLUCCI:  Object to form.

24       A.   Improper storage and disposal?  I

25  think that there were a lot of opioids

1    available, very widely available, and apparently

2    along with lots of other prescriptions that

3    people have on their shelves that are old.  If

4    you open medicine cabinets, there's lots of old

5    stuff we were finding and hearing stories from

6    the collaborative, and so it's a risk factor I'm

7    sure that they wanted to try to mitigate.

8         Q.   Now, the next bullet in Exhibit 11

9    is "Marketing medications directly to

10   consumers"; is that right?

11        A.   Yes.

12        Q.   I'm going to ask you a little bit

13   more about that shortly.

14             The next bullet point there is

15   "overprescribing."  Do you see that there?

16        A.   Yes.

17        Q.   And it looks like that was

18   encompassed within the list in Exhibit 15, where

19   they indicate "overprescribing of high potency

20   pain medications"; is that right?

21             MR. GALLUCCI:  Object to form.

22        A.   Yes.  That's what it says on Exhibit

23   15.

24        Q.   And do you have any knowledge or

25   information about why that change in language

Page 294

1    came about between 2014 and 2016?

2         A.    I do not.  I didn't draft either

3    document, so I can't speak to that.

4         Q.    Are the task force reports ever

5    discussed at any of the task force meetings that

6    you've attended?

7         A.    I'm trying to remember if they were

8    ever discussed at a meeting I was at.  I don't

9    recall that the meetings I attended had specific

10   discussion of the annual reports.  I remember

11   partner agencies discussing activities and

12   current events at the parts that I would have

13   attended.

14        Q.    Now, the next bullet listed in

15   Exhibit 11, "Substance abuse and underlying

16   mental health issues."

17              Did I read that correctly?

18        A.    Yes.

19        Q.    And, in your experience, have you

20   found preexisting substance abuse to contribute

21   to individuals going on to abuse opiate

22   medications?

23              MR. GALLUCCI:  Object to form.

24        A.    I'm not qualified, as not being a

25   behavioral health person or a substance abuse

Page 295

1    professional, to make that judgment.

2         Q.    And I know I substituted in

3    medication.  I am going to reask this.  I

4    imagine the answer may be the same.  Have you

5    found substance abuse to be a contributing

6    factor to abuse of opioids generally?

7              MR. GALLUCCI:  Object to form.

8         A.    Again, it would be the same answer,

9    that I'm not qualified to make that

10   determination.

11        Q.    And what about whether underlying

12   mental health issues contribute to individuals

13   going on to abuse opiates?

14             MR. GALLUCCI:  Object to form.

15        A.    I would have the same answer, that

16   I'm not qualified to make that determination.

17        Q.    Has any employee of the Cuyahoga

18   County Board of Health done any investigation

19   into a relationship between substance abuse and

20   opioid abuse?

21             MR. GALLUCCI:  Object to form.

22        A.    I can't answer that specifically if

23   they have.  I'm not aware that they have, only

24   that they've been part of the dialogue of the --

25   of the opiate task force.

Page 296

1      Q.    And what dialogue are you aware of

2  that has taken place with the opiate task force

3  regarding substance abuse and opioid use?

4      A.    I can't speak specifically to any

5  dialogue along those lines specifically that

6  I've observed myself.

7      Q.    And are you aware of whether any

8  employee of the Cuyahoga County Board of Health

9  has undergone any investigation of the link

10  between mental health issues and opioid abuse?

11      A.    No, I'm not.

12      Q.    Are you aware of any conversations

13  that have taken place in the context of the

14  opioid task force regarding mental health issues

15  and opioid use?

16      A.    No.

17      Q.    Have you ever been present at the

18  opioid task force for any conversations where it

19  was discussed that they no longer believed that

20  substance abuse or underlying mental health

21  issues were contributing factors to the opioid

22  crisis?

23          MR. GALLUCCI:  Object to form.

24      A.    No.

25      Q.    And then the last bullet point there

Page 297

1    in Exhibit 11, "Widespread diversion of

2    medication, such as doctor shopping, illegal

3    online pharmacies and the establishment and

4    recent closure of pill mills."

5              Did I read that correctly?

6    A.    Yes.

7    Q.    And what's your understanding of

8    what doctor shopping is?

9    A.    I've heard the term, but I -- I'm

10   not familiar with it other than I heard it.

11   Q.    What is your familiarity with

12   illegal online pharmacies?

13             MR. GALLUCCI:  Object to form.

14   A.    I have no familiarity with illegal

15   online pharmacies.

16   Q.    Are you familiar with the term "pill

17   mills"?

18   A.    Not unlike doctor shopping, I've

19   heard the term but I don't know much about it.

20   Q.    And so can you personally speak to

21   whether doctor shopping, illegal online

22   pharmacies or the establishment and closure of

23   pill mills contributed to the opioid epidemic?

24   A.    No.

25   Q.    Have you ever been present at any

1   conversations at an opioid task force meeting

2   where it was discussed that these things, doctor

3   shopping, illegal online pharmacies and pill

4   mills, were not a cause of the opioid epidemic?

5              MR. GALLUCCI:  Object to form.

6       A.    No.

7       Q.    And do you have any understanding of

8   why it is that these are included as a potential

9   contributing factor to the opioid epidemic in

10  2014 but not included in the 2016 report?

11      A.    I do not.

12      Q.    Now, I know that you briefly spoke

13  earlier to the marketing of medications directly

14  to consumers.  I just wanted to ask you a little

15  bit more about that general concept.

16              Can you identify any manufacturers

17  of any prescription opioid medications?

18      A.    No, not specifically.  No, I can't.

19      Q.    Have you personally ever viewed any

20  of the marketing materials of any manufacturer

21  of an opioid medication?

22      A.    No.

23      Q.    Do you have any personal knowledge

24  about how manufacturers of opioids marketed

25  their prescription opioid products?

1      A.    No.

2      Q.    Do you have any understanding of how

3  prescription opioids move from the manufacturers

4  through the chain of distribution to patients?

5      A.    No.

6      Q.    In coming across this -- strike

7  that.

8            Do you have any knowledge about the

9  information that would have been relied upon by

10  the opioid task force in making that statement,

11  "marketing medications direct to consumers,"

12  when it was included in either the 2014 or 2016

13  reports?

14            MR. GALLUCCI:  Object to form.

15      A.    No.

16            MS. JAMES:  I have no further

17  questions.

18            THE WITNESS:  Thank you, ma'am.

19            EXAMINATION OF TERRENCE M. ALLAN

20  BY MR. MOYLAN:

21      Q.    Mr. Allan, my name is Daniel Moylan

22  and I represent the CVS defendants in this case.

23      A.    Okay.

24      Q.    Have you ever heard of a company

25  called CVS Indiana, LLC?

1        A.     No.   The only CVS I know is the drug

2    store up the street.

3        Q.     So that's a no?

4        A.     Yes, it's -- yes, it is a no.

5        Q.     Okay.  And have you ever heard of a

6    company called CVS Rx Services, Inc.?

7        A.     No.  I don't think so.

8        Q.     Okay.  Do you have any understanding

9    of what their business is?

10       A.     No, I don't know any details about

11   their business.

12       Q.     Are you aware that they're

13   defendants in this case?

14       A.     No.

15       Q.     Have you ever had any personal

16   communication with CVS entities in your work as

17   the health commissioner for the Cuyahoga County

18   Board of Health?

19            MR. GALLUCCI:  Object to form.

20       A.     So this is -- can I ask a question?

21   Is this CVS drug stores kind of thing?  So you

22   said CVS.  You didn't say --

23       Q.     Any CVS entities.

24       A.     I remember a while -- it's been a

25   number of years.  Our epidemiology and

Page 301

1    surveillance group was trying to connect around,

2    like, flu vaccine, and looking at availability

3    of flu vaccine, trying to find a way to build

4    like a community-wide database to say, you know,

5    we want people to be vaccinated, we don't care

6    where they get vaccinated for flu.  So we wanted

7    to build a database to look at flu availability

8    that we could make available to the public and

9    try to get local pharmacy data published, so if

10   one entity was out in the community, they could

11   go to others to be able to get vaccinated.  But

12   that was a number of years ago, and then I think

13   we tried to work up through some regional

14   office, but that was the extent of it.

15            Q.    Do you have any recollection of when

16   that contact was going on?

17            A.    It might have been -- it's been

18   quite a few years.  It's been quite a few years.

19   I can't speak to exactly when.

20            Q.    Could you estimate before ten years?

21            A.    I can't say with any reliability,

22   but I -- beyond that.

23            Q.    Okay.  With respect to the programs

24   and services that the Board of Health has with

25   respect to opioids, has there ever been any

Page 302

1    contact, to your knowledge, with CVS entities

2    concerning those programs and services?

3         A.    Around opioids?

4         Q.    Correct.

5         A.    To my knowledge, no.

6         Q.    So you're not aware of any Cuyahoga

7    County Board of Health employees who have

8    communicated with CVS entities as part of the

9    programs and services about opioids?

10        A.    Not that I'm aware of personally.

11        Q.    In addition to CVS, are you aware

12   that any other national pharmacy chains are also

13   defendants in this case?

14        A.    No.  I don't have any specifics

15   about the case at all.

16        Q.    Okay.  So you're not aware, then,

17   that Walmart is a defendant in the case?

18        A.    No, I'm not aware.

19        Q.    And you're not aware that Rite-Aid

20   is a defendant?

21        A.    No.

22        Q.    You're not aware that Walgreens is a

23   defendant?

24        A.    No.

25        Q.    Okay.  For each of those I'll have

1    some similar questions.

2              With respect to Walmart {sic}, has

3    the Board of Health, to your knowledge, ever had

4    communications with anyone from Rite-Aid

5    concerning programs or services that the Board

6    of Health has concerning opioids?

7         A.    No, not to my knowledge.

8         Q.    Okay.  Same question for -- for

9    Walgreens.  Has anyone with the staff of the

10   Board of Health had communications with

11   Walgreens concerning programs or services around

12   opioids?

13        A.    Not to my knowledge.

14        Q.    Okay.  And I may have mixed myself

15   up, but with respect to Walmart, has anybody,

16   any staff with the Board of Health, had

17   communications with Walmart regarding programs

18   or services that are implemented by the Board of

19   Health on opioids?

20        A.    Not to my knowledge.

21        Q.    With respect to the national retail

22   pharmacy chains that I've mentioned, do you have

23   any understanding of why they've been sued in

24   this case?

25              MR. GALLUCCI:  Object to form.

Page 304

1       A.    No.  I can't speak to any specifics.

2   I wouldn't speculate.

3       Q.    So I'm assuming that you're not able

4   to describe the nature of the claims against any

5   of those national retail pharmacy chains?

6       A.    I am not.

7       Q.    So you're not aware that none of

8   them is sued in their role as retail pharmacies?

9             MR. GALLUCCI:  Object to form.

10      A.    No, I'm not aware.

11      Q.    Are you aware that there are no

12  individual pharmacists that are named as

13  defendants in this litigation?

14      A.    No.

15            MR. GALLUCCI:  Object to form.

16      Q.    And are you aware that there are no

17  doctors who are named as defendants in this

18  litigation?

19            MR. GALLUCCI:  Object to form.

20      A.    No.

21      Q.    Do you agree with the decision that

22  doctors are not included in this litigation as

23  defendants?

24            MR. GALLUCCI:  Object to form.

25      A.    I don't know enough to -- about the

1   case to make a -- make a conclusion about that.

2              MR. MOYLAN:  That's all the

3   questions I have.  Thank you.

4              MR. GALLUCCI:  Anybody else?

5   Anybody else have any further questions?

6              MR. KEYES:  Do you have questions?

7              MR. GALLUCCI:  I have no questions.

8              MR. KEYES:  Thank you, Mr. Allan.

9              THE WITNESS:  Thank you.

10             THE VIDEOGRAPHER:  Off the record,

11  4:22.

12

13         (Deposition concluded at 4:22 p.m.)

14                   - - - - -

15

16

17

18

19

20

21

22

23

24

25

Page 306

1    Whereupon, counsel was requested to give

2    instruction regarding the witness' review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to

7    the applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2   The State of Ohio,    )

 3                         ) SS:

 4   County of Cuyahoga.   )

 5

 6             I, Renee L. Pellegrino, a Notary Public

 7   within and for the State of Ohio, duly

 8   commissioned and qualified, do hereby certify

 9   that the within named witness, TERRENCE M. ALLAN,

10   was by me first duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the cause

12   aforesaid; that the testimony then given by the

13   above referenced witness was by me reduced to

14   stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above referenced witness.

18             I do further certify that this

19   deposition was taken at the time and place in the

20   foregoing caption specified and was completed

21   without adjournment.

22

23

24

25
```

Page 308

1          I do further certify that I am not a

2     relative, counsel or attorney for either party,

3     or otherwise interested in the event of this

4     action.

5          IN WITNESS WHEREOF, I have hereunto set

6     my hand and affixed my seal of office at

7     Cleveland, Ohio, on this 20th day of December, 2018.

8

9

10

11

12          <%2227,Signature%>

13     Renee L. Pellegrino, Notary Public

14     within and for the State of Ohio

15

16     My commission expires October 12, 2020.

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

December 20, 2018

To: FRANK L. GALLUCCI, III

Case Name: In Re: National Prescription Opiate Litigation v.

Veritext Reference Number: 3168782

Witness:  Terrence M. Allan Deposition Date:  12/17/2018

Dear Sir/Madam:

The deposition transcript taken in the above-referenced matter, with the reading and signing having not been expressly waived, has been completed and is available for review and signature.  Please call our office to make arrangements for a convenient location to accomplish this or if you prefer a certified transcript can be purchased.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

```
 1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 3168782
 3       CASE NAME: In Re: National Prescription Opiate Litigation v.
         DATE OF DEPOSITION: 12/17/2018
 4       WITNESS' NAME: Terrence M. Allan

 5            In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
 6       my testimony or it has been read to me.

 7            I have made no changes to the testimony
         as transcribed by the court reporter.
 8
         _____        _____
 9       Date                        Terrence M. Allan

10            Sworn to and subscribed before me, a
         Notary Public in and for the State and County,
11       the referenced witness did personally appear
         and acknowledge that:
12
              They have read the transcript;
13            They signed the foregoing Sworn
              Statement; and
14            Their execution of this Statement is of
              their free act and deed.
15
              I have affixed my name and official seal
16
         this _____ day of_____, 20_____.
17
                         _____
18                       Notary Public

19                       _____
                         Commission Expiration Date
20

21

22

23

24

25
```

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 3168782
 3    CASE NAME: In Re: National Prescription Opiate Litigation v.
      DATE OF DEPOSITION: 12/17/2018
 4    WITNESS' NAME: Terrence M. Allan

 5           In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.

 7           I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).

 9           I request that these changes be entered
      as part of the record of my testimony.
10
             I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.

13    _____         _____
      Date                          Terrence M. Allan
14
             Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:

17           They have read the transcript;
             They have listed all of their corrections
18           in the appended Errata Sheet;
             They signed the foregoing Sworn
19           Statement; and
             Their execution of this Statement is of
20           their free act and deed.

21           I have affixed my name and official seal

22    this _____ day of_____, 20_____.

23           _____
             Notary Public
24
             _____
25           Commission Expiration Date
```

```
1                        ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 12/17/2018

3       PAGE/LINE(S) /        CHANGE        /REASON

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19
        _____     _____
20      Date                        Terrence M. Allan

21      SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22      DAY OF _____, 20_____ .

23                _____
                  Notary Public
24
                  _____
25                Commission Expiration Date
```