```
 1         IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT        :  1:17-MD-2804
 8   RELATES TO ALL CASES :
                          :  Hon. Dan A.
 9                        :  Polster

10   _____

      SUPREME COURT OF THE STATE OF NEW YORK
11             COUNTY OF NEW YORK
12   IN RE OPIOID        :  Index No. 400000/2017
     LITIGATION          :  Suffolk County
13   _____
           CIRCUIT COURT OF COOK COUNTY
14             COOK COUNTY, ILLINOIS
15   THE PEOPLE OF THE   :  Case No. 2017L 013180
     STATE OF ILLINOIS,  :  Consolidated with
16   AND COOK COUNTY     :  2018L 3908(JERSEY COUNTY)
     ILLINOIS            :  2018L 2943(KANE COUNTY)
17                       :  2018L 2916(MACON COUNTY)
            V.           :  2018L 2948(MCHENRY
18                       :  COUNTY)
                         :  2018L 3728(LAKE COUNTY)
19   PURDUE PHARMA, L.P. :  2018L 3909(UNION COUNTY)
     ET AL.              :

20
                    -  -  -
21              JENNIFER ALTIER
            Thursday, August 2, 2018
22                  -  -  -
23   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2              Videotaped deposition of

 3    JENNIFER ALTIER, taken pursuant to

 4    notice, was held at the law offices of

 5    Carella Byrne Cecchi Olstein Brody & Agnello,

 6    PC, 5 Becker Farm Road, Roseland, New Jersey

 7    07068, beginning at 9:05 a.m., on the above

 8    date, before Amanda Dee Maslynsky-Miller, a

 9    Certified Realtime Reporter.

10

11                    -  -  -

12

13

14

15


             GOLKOW LITIGATION SERVICES

16       877.370.3377 ph| 917.591.5672 fax

                 deps@golkow.com

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES:
 2
 3          ROBBINS GELLER RUDMAN & DOWD LLP
            BY:  AELISH MARIE BAIG, ESQUIRE
 4          BY:  MATTHEW S. MELAMED, ESQUIRE
            Post Montgomery Center
 5          One Montgomery Street
            Suite 1800
 6          San Francisco, California 94104
            (415) 288-4545
 7          aelishb@rgrdlaw.com
            Mmelamed@rgrdlaw.com
 8          Representing the Plaintiffs
 9
10
            KIRKLAND & ELLIS LLP
11          BY:  MARTIN L. ROTH, ESQUIRE
            BY:  ZACHARY A. CUILLO, ESQUIRE
12          300 North LaSalle
            Chicago, Illinois 60654
13          (312) 862-2000
            martin.roth@kirkland.com
14          Zac.ciullo@kirkland.com
            Representing Allergan Finance, LLC
15
16
17          JONES DAY
            BY: BRANDY HUTTON RANJAN, ESQUIRE
18          325 John H. McConnell Boulevard
            Suite 600
19          Columbus, Ohio 43215
            (614) 469-3939
20          branjan@jonesday.com
            Representing Walmart, Inc.
21
22
23
24
```

```
 1   APPEARANCES:  (Continued)

 2

 3          WILLIAMS & CONNOLLY LLP
            BY:  ANDREW C. MCBRIDE, ESQUIRE
 4          725 Twelfth Street NW
            Washington, D.C. 20005
 5          (202) 434-5000
            amcbride@wc.com
 6          Representing Cardinal Health

 7

 8          ALLEGAERT BERGER & VOGEL
            BY: LAUREN J. PINCUS, ESQUIRE
 9          111 Broadway
            20th Floor
10          New York, New York  10006
            (212) 616-7057
11          lpincus@abv.com
            Representing Rochester Drug Cooperative

12

13   VIA TELECONFERENCE:

14

            REED SMITH LLP
15          BY: ANNE E. ROLLINS, ESQUIRE
            Three Logan Square, 1717 Arch Street
16          Suite 3100
            Philadelphia, Pennsylvania  19103
17          (215) 851-8100
            arollins@reedsmith.com
18          Representing AmerisourceBergen

19

20          MARCUS & SHAPIRA LLP
            BY: ZACHARY FENSTEMAKER, ESQUIRE
21          One Oxford Centre
            35th Floor
22          Pittsburgh, Pennsylvania  15219
            (412) 338-3345
23          Fenstemaker@marcus-shapira.com
            Representing HBC Service Company

24
```

```
 1    APPEARANCES:   (Continued)

 2

 3         SIMMONS HANLY CONROY LLC
           BY: JAYNE CONROY, ESQUIRE
 4         112 Madison Avenue
           7th Floor
 5         New York, New York  10016
           (212) 784-6400
 6         JConroy@simmonsfirm.com
           Representing Plaintiffs
 7

 8

 9         JACKSON KELLY PLLC
           BY: DOUGLAS J. CROUSE, ESQUIRE
10         500 Lee Street East
           Suite 1600
11         Charleston, West Virginia  25301
           (304) 340-1347
12         dcrouse@jacksonkelly.com
           Representing Miami-Luken
13

14

15

           ARNOLD & PORTER KAYE SCHOLER LLP
16         BY: JOANNA PERSIO, ESQUIRE
           601 Massachusetts Ave, NW
17         Washington, D.C.  20001
           (202) 942-5000
18         joanna.persio@arnoldporter.com
           Representing Endo Pharmaceuticals
19

20

21

22

23

24
```

```
 1    APPEARANCES: (Continued)

 2

 3         MORGAN, LEWIS & BOCKIUS LLP
           BY: TINOS DIAMANTATOS, ESQUIRE
 4         77 West Wacker Drive
           Chicago, Illinois  60601
 5         (312) 324-1000
           tinos.diamantatos@morganlewis.com
 6         Representing Teva Pharmaceuticals, Inc.,
           Cephalon, Inc., Watson Laboratories,
 7         Actavis LLC, and Actavis Pharma, Inc.

 8

 9

10

11    ALSO PRESENT:
      David Lane, Videographer
12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    -  -  -
 2                I N D E X
 3                    -  -  -
 4
    Testimony of:   JENNIFER ALTIER
 5
 6      By Ms. Baig                      11
        By Mr. Roth                      366
 7      By Ms. Pincus                    371
 8                    -  -  -
              E X H I B I T S
 9                    -  -  -
10  NO.           DESCRIPTION                PAGE
11  Allergan-Altier
    Exhibit-1    Actavis 799203-9214        82
12
    Allergan-Altier
13  Exhibit-2    Allergan MDL01610520-1060  99
14  Allergan-Altier
    Exhibit-3    Actavis 0815204-5206       133
15
    Allergan-Altier
16  Exhibit-4    Actavis 0319280-9282       154
17  Allergan-Altier
    Exhibit-5    Actavis 0300588            167
18
    Allergan-Altier
19  Exhibit-6    Actavis 431150-1182        178
20  Allergan-Altier
    Exhibit-7    Actavis 255710-5713        201
21
    Allergan-Altier
22  Exhibit-8    Actavis 0252398-2421       205
23  Allergan-Altier
    Exhibit-9    Actavis 0389758-9800       211
24
```

```
 1                    -   -   -
                E X H I B I T S
 2                    -   -   -
 3    NO.            DESCRIPTION                    PAGE
 4    Allergan-Altier
      Exhibit-10   Actavis 0501884-1893       232
 5
      Allergan-Altier
 6    Exhibit-11   Actavis 0672638-2645       237
 7    Allergan-Altier
      Exhibit-12   Actavis 0192957-3028       245
 8
      Allergan-Altier
 9    Exhibit-13   Actavis 0413235-3321       252
10    Allergan-Altier
      Exhibit-14   Actavis 0685080-5122       269
11
      Allergan-Altier
12    Exhibit-15   Actavis 0821336-1339       280
13    Allergan-Altier
      Exhibit-16   Actavis 0977980-7998       292
14
      Allergan-Altier
15    Exhibit-17   Actavis 0357036-7057       296
16    Allergan-Altier
      Exhibit-18   Actavis 0361608-1653       311
17
      Allergan-Altier
18    Exhibit-19   Actavis 0956746-6747       315
19    Allergan-Altier
      Exhibit-20   Actavis 0264936-4949       320
20
      Allergan-Altier
21    Exhibit-21   Actavis 0264950-5018       332
22    Allergan-Altier
      Exhibit-22   Actavis 0335906-5914       341
23
      Allergan-Altier
24    Exhibit-23   Actavis 0282841-2843       344
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5    Direction to Witness Not to Answer

 6    Page    Line        Page Line          Page Line

 7    149     7

 8    151     19

 9

10    Request for Production of Documents

11    Page Line     Page Line     Page Line

12    None

13

14

15    Stipulations

16    Page Line     Page Line     Page Line

17    10      1

18

19

20    Question Marked

21    Page Line     Page Line     Page Line

22    None

23

24
```

```
1                    -  -  -

2              (It is hereby stipulated and

3         agreed by and among counsel that

4         sealing, filing and certification

5         are waived; and that all

6         objections, except as to the form

7         of the question, will be reserved

8         until the time of trial.)

9                    -  -  -

10             VIDEO TECHNICIAN:  We are

11        now on the record.  My name is

12        Henry Marte, I'm a videographer

13        with Golkow Litigation Services.

14        Today's date is August 2nd, 2018,

15        and the time is 9:05 a.m.

16             This videotape deposition is

17        being held in Roseland, New Jersey

18        in the matter of National

19        Prescription Opiate Litigation.

20        The deponent today is Jennifer

21        Altier.

22             Counsel will be noted on the

23        stenographic record.  The court

24        reporter is Amanda Miller and will
```

```
 1          now administer the oath to the

 2          witness.

 3                    -  -  -

 4               JENNIFER ALTIER, after

 5          having been duly sworn, was

 6          examined and testified as follows:

 7                    -  -  -

 8               EXAMINATION

 9                    -  -  -

10   BY MS. BAIG:

11          Q.    Good morning, Ms. Altier.

12          A.    Good morning.

13          Q.    Am I pronouncing your name

14   correctly?

15          A.    Altier.

16          Q.    Altier.

17               We met briefly off the

18   record, but I'm Aelish Baig.  I'll be

19   taking your deposition today.

20               Can you please state your

21   full name and address for the record?

22          A.    Yes.  Jennifer Altier.  29

23   Barnsdale Road in Madison, New Jersey.

24          Q.    And you are represented here
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    today by whom?

 2            A.    My colleagues here.

 3            Q.    Okay.  And have you ever had

 4    your deposition taken before?

 5            A.    I have not.

 6            Q.    Are you familiar with the

 7    deposition protocol?

 8            A.    Yes.

 9            Q.    So you understand that I'll

10    be asking you questions, you'll do your

11    best to answer the questions; it's

12    important that we not speak over each

13    other so that we can have a clear record

14    taken down?

15            A.    Yes.

16            Q.    What did you do to prepare

17    for today's deposition?

18            A.    I met with my attorneys.

19            Q.    Okay.  For approximately how

20    long?

21            A.    The better part of

22    yesterday.

23            Q.    Did you have any prior

24    meetings?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    No.

 2            Q.    Any prior calls about the

 3    deposition?

 4            A.    I'm sorry, we met once prior

 5    to that, briefly.

 6            Q.    Okay.  Did you search for

 7    any documents in preparation for today's

 8    deposition?

 9            A.    I did not.

10            Q.    Were you -- you saw the

11    deposition notice; is that right?

12            A.    The subpoena?  Yes.

13            Q.    Do you recall that the

14    deposition notice requested that you

15    produce documents?

16            A.    Yes.

17            Q.    Okay.  And --

18            A.    I had none to produce.

19            Q.    You had none, okay.

20                  Are you familiar with the

21    complaints in this action?

22            A.    Generally.

23            Q.    Okay.  And what's your

24    understanding of what this case is about?
```

1      A.      An investigation into

2  pharmaceutical activities promoting

3  opioids.

4      Q.      Could you walk us through

5  your education at the undergrad level or

6  higher?

7      A.      Sure.  I went to college at

8  Miami University in Ohio.  I earned a

9  degree in political science and mass

10  communications.  And then I went to

11  Columbia University Business School where

12  I earned my MBA.

13      Q.      And can you briefly walk us

14  through your work history after you

15  received your MBA?

16      A.      Sure.  After I received my

17  MBA, I believe I was -- started at

18  Pharmacia, then went to Roche, then to

19  Actavis, then to Perrigo.  And I'm now

20  with Amneal.  All in marketing-related

21  roles.

22      Q.      And did you have any

23  pharmaceutical experience before you

24  received your MBA?

```
1              A.    I worked for a

   pharmaceutical advertising agency for

3  eight years.

4              Q.    What company was that?

5              A.    It's CommonHealth.

6  CommonHealth.

7              Q.    And did you have any prior

8  work experience before CommonHealth?

9              A.    That was my first job.

10             Q.    What year did you get -- did

11 you receive your MBA?

12             A.    2004.

13             Q.    And so you worked at

14 CommonHealth advertising for what years?

15             A.    1992 to 2000.  Then I went

16 to a company called R-centric, 2000 to

17 2001.  Then I went to Pharmacia, 2001 to

18 2003, I think.  Then Roche, 2003 to --

19 2004 to 2006 as a full-time employee, and

20 I consulted for Roche, 2006 to 2010.

21 Then in 2010, I went to Actavis until

22 about 2013, '14.  And then I left and

23 went to Perrigo.  And then left Perrigo

24 at the end of last year and started with
```

Highly Confidential - Subject to Further Confidentiality Review

1   Impax as a consultant, February of this

2   year.  And then just started last Monday

3   as an employee -- after the Impax/Amneal

4   merger, I'm now with Amneal.

5        Q.    What was your highest

6   position at CommonHealth advertising?

7        A.    The vice president account

8   group supervisor.

9        Q.    And were you working, in

10  that capacity, with any opioid drugs?

11       A.    No.

12       Q.    And what was your highest

13  position at Pharmacia?

14       A.    Let me think back.  Was I

15  working -- at some point at the agency, I

16  believe I worked on Fioricet with

17  codeine, which may fall into that

18  category.

19       Q.    Do you know whether that was

20  a Schedule II or Schedule III drug?

21       A.    I don't recall.  Just trying

22  to be -- full disclosure.  That was a

23  long time ago.

24       Q.    I appreciate it.

```
 1              A.    True opioid marketing was

 2    fairly limited until my time at Actavis.

 3              Q.    So at Pharmacia, you did not

 4    work with any opioid drugs?

 5              A.    No.

 6              Q.    And what was your highest

 7    position at Pharmacia?

 8              A.    Director of medical

 9    association channels.

10              Q.    And what other positions did

11    you hold at Pharmacia?

12              A.    That was it.

13              Q.    And what were your

14    responsibilities in that position?

15              A.    I worked a project where we

16    worked with medical associations on an

17    e-business venture.

18              Q.    Medical associations such

19    as?

20              A.    The California Academy of

21    Family Physicians, The American

22    Osteopathic Association.

23              Q.    Any others that you recall?

24              A.    There were about 12 or 14.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Basically, primary-care type

 2    organizations.  There was Geriatrics

 3    Society.

 4          Q.    Can you list the ones that

 5    you recall?

 6          A.    The Illinois Academy of

 7    Family Physicians, The American

 8    Gastroenterology Society.  Those were the

 9    leading ones.

10          Q.    And what was the nature of

11    your work with those associations at

12    Pharmacia?

13          A.    Sure.  We offered a portal

14    where they could come on and get

15    educational information about areas that

16    Pharmacia had.  So, you know, generally

17    around the Cox-2s and Celebrex.

18          Q.    So you would provide the

19    associations with education about the

20    drugs that you were working with at

21    Pharmacia; is that right?

22                MR. ROTH:  Object to the

23          form.

24                THE WITNESS:  If memory
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              serves me right, it was more of

2              a -- it was either education about

3              the drugs or just the disease

4              state.

5    BY MS. BAIG:

6              Q.    And what were the drugs that

7    you were working on at Pharmacia?

8              A.    I was in the e-business

9    group, primarily supporting the Cox-2s;

10   so Celebrex and Bextra.

11             Q.    No opioids, correct?

12             A.    Correct.

13             Q.    And your next job was at

14   Roche?

15             A.    Correct.

16             Q.    And what was -- what were

17   your positions at Roche?

18             A.    I was the director of

19   medical education.

20             Q.    Was that your only position

21   there?

22             A.    It was, as a full-time

23   employee.

24             Q.    You worked there as a
```

Highly Confidential - Subject to Further Confidentiality Review

1    part-time employee as well?

2         A.    In 2006, I left and came

3    back as a consultant.

4         Q.    Well, what were the nature

5    of your responsibilities as director of

6    medical education at Roche?

7         A.    Sure.  I created the medical

8    education department there.

9         Q.    And what exactly did that

10   involve?

11        A.    That involved the hiring of

12   four managers, I believe it was, medical

13   education managers; two medical education

14   coordinators who were responsible for

15   supporting medical education activities

16   on behalf of the company.

17        Q.    And can you describe what

18   you mean by "medical education

19   activities"?

20        A.    Continuing medical

21   education.  So CME grants that were

22   awarded to academic institutions to put

23   on educational programs.

24        Q.    And in that capacity, did

Highly Confidential - Subject to Further Confidentiality Review

1    you also work with certain medical

2    associations like you did at Pharmacia?

3         A.    Personally, none that I

4    recall.

5         Q.    And what about your team;

6    did your team work with medical

7    associations?

8         A.    Perhaps they may have given

9    grants out, but I don't recall.  A lot of

10   my time there was building the

11   department.  And when it actually

12   launched, for personal reasons, my

13   daughter was born, so I left the company.

14        Q.    At Roche you didn't work on

15   any opioid drugs; is that right?

16        A.    That's right.

17        Q.    What drugs did you work on

18   there?

19        A.    Primarily, I remember Boniva

20   for osteoporosis.

21        Q.    Can you walk us through

22   generally what the medical education

23   department did with respect to CME grants

24   at Roche?

```
 1              MR. ROTH:  Object to the

 2         form.  Lacks foundation.  Calls

 3         for speculation.

 4              THE WITNESS:  Can you

 5         rephrase the question?  What

 6         exactly?

 7   BY MS. BAIG:

 8         Q.    Sure.  You testified that

 9   you created a medical education

10   department and that one of the

11   responsibilities of that department was

12   to implement or design or give out CME

13   grants; is that right?

14         A.    Uh-huh.

15         Q.    Can you walk us through

16   generally what you mean by that?

17              MR. ROTH:  Same objections.

18              THE WITNESS:  Grants would

19         be submitted to the company and

20         they would go through an

21         evaluation process for funding.

22   BY MS. BAIG:

23         Q.    And these would be grants

24   for what exactly?  For studies of certain
```

Highly Confidential - Subject to Further Confidentiality Review

1  drugs or --

2          A.    Educational programs.

3          Q.    Okay.  What types of

4  educational programs?

5          A.    Any continuing medical

6  education program.

7          Q.    And how did you -- were you

8  the person that was in charge of

9  selecting which ones to fund and which

10  ones not to fund?

11          A.    As I said, at this time -- I

12  left the company, by the time the

13  department was up and running.  So, no, I

14  was not.

15          Q.    Your next position after

16  Roche was at Actavis; is that right?

17          A.    That's right.

18          Q.    And you were there from 2010

19  to 2014.

20                And what drugs were you

21  working with while you were at Actavis?

22                MR. ROTH:  Object to the

23          form.

24                THE WITNESS:  Sure.  What

Highly Confidential - Subject to Further Confidentiality Review

```
1              drugs was I --
2   BY MS. BAIG:
3          Q.    Involved with.
4          A.    Involved with as a marketing
5   director?
6          Q.    Yes.
7          A.    I started working on Kadian.
8   And we had a drug in development called
9   MoxDuo, which was never approved.
10             Following the Watson merger,
11  I stayed with Actavis and worked on kind
12  of a whole host of products.
13         Q.    What additional products did
14  you work on after the Watson merger?
15         A.    I worked on Androderm.  The
16  OC business.  Those are the two that jump
17  out.
18         Q.    What's the OC business?
19         A.    Oral contraceptive.
20                   -  -  -
21             (Whereupon, a discussion off
22         the record occurred.)
23                   -  -  -
24  BY MS. BAIG:
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And what were your positions

2     at Actavis?

3          A.     I was marketing director, as

4     a consultant.

5          Q.     So you were a consultant

6     while you were marketing director?

7          A.     Right.  I was not a

8     full-time employee.

9          Q.     Okay.  And was that your

10    position for all four years at Actavis?

11         A.     Correct.

12         Q.     And did you work on any

13    other drugs besides the ones that you've

14    just mentioned while you were at Actavis?

15              MR. ROTH:  Object to the

16         form.

17              THE WITNESS:  I'm sure to a

18         certain extent I sat in meetings

19         and advised on other drugs.  But

20         those were my primary

21         responsibilities.

22    BY MS. BAIG:

23         Q.     Can you describe your

24    responsibilities as marketing director at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Actavis?

 2          A.    Sure.  Basically,

 3    responsible for creating promotional

 4    tactics for the products I supported.

 5          Q.    And did you lead a team, as

 6    marketing director?

 7          A.    No.  We were pretty -- a

 8    slim organization.  So the majority of

 9    the time I was at Actavis, I was the

10    marketing department.  At a later date,

11    we were able to hire someone else.  So we

12    were a team of two.

13          Q.    And as marketing director,

14    did you have occasion to train the sales

15    staff?

16                MR. ROTH:  Object to the

17          form.

18                THE WITNESS:  Training the

19          sales department was not my

20          responsibility.

21    BY MS. BAIG:

22          Q.    Did you have responsibility

23    for designing training materials for the

24    sales staff?
```

1        A.      No.  When I started, there

2    was a training module already in place

3    for them.

4        Q.      Did you have input into that

5    training module?

6        A.      I started a year after the

7    sales force.  So, no, it was already in

8    place.

9        Q.      And what sales force are you

10   referring to?

11       A.      The Kadian sales force.

12       Q.      And how large was the Kadian

13   sales force?

14       A.      I believe when I started, it

15   had 18 reps.  And it expanded, I don't

16   know the number offhand, but I'd say,

17   perhaps, 48 at its highest.  A very small

18   organization.

19       Q.      When you say "very small

20   organization," you mean the Actavis --

21   which organization are you referring to?

22       A.      I guess as a sales

23   organization, it wasn't one of these, you

24   know, big companies where you see

1    hundreds and hundreds and hundreds of

2    reps.

3          Q.    Which organization are you

4    referring to, Actavis or Actavis

5    Elizabeth or which --

6          A.    Oh, I guess --

7               MR. ROTH:  Objection to

8          form.  And asked and answered.

9               You can clarify, if you

10         understand it.

11              THE WITNESS:  When I started

12         at Actavis, it was Actavis,

13         pre-Watson.  So the original

14         Actavis.

15   BY MS. BAIG:

16         Q.    Was that the same as Actavis

17   Elizabeth?

18         A.    From a legal entity

19   standpoint, I don't know.  But I believe

20   so.

21         Q.    What did you all refer to it

22   as when you worked there?

23         A.    Actavis.

24         Q.    And who did you report to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    while you were at Actavis?

 2         A.    Nathalie Leitch.

 3         Q.    And do you know who Nathalie

 4    Leitch reported to?

 5         A.    Terry Fullem.

 6         Q.    What was Nathalie Leitch's

 7    position?

 8         A.    I don't recall her title.

 9         Q.    And how about Terry Fullem?

10         A.    Again, I don't recall his

11    exact title.

12         Q.    Do you recall what

13    department Nathalie Leitch was in?

14         A.    I know she had some

15    responsibility for generic products as

16    well.  Kadian was our only branded

17    product at Actavis.

18         Q.    Was Nathalie Leitch in a

19    marketing department?

20              MR. ROTH:  Object to the

21         form.

22              THE WITNESS:  No.  No, she

23         was not.

24    BY MS. BAIG:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    What type of department was

2  she in?

3      A.    I'm not an expert to talk

4  about what her functions were as a

5  generic.

6            When I came in, she was

7  responsible for Kadian.  But then I came

8  in to assist.

9      Q.    So when you came in to

10  assist, you were reporting to her and she

11  was responsible for both Kadian and for

12  generic products; is that right?

13           MR. ROTH:  Object to form.

14           Lacks foundation.  Calls for

15           speculation.  Mischaracterizes her

16           testimony.

17           THE WITNESS:  Yeah, I

18           don't -- I don't feel comfortable

19           talking about what Nathalie's

20           responsibilities were, outside of

21           what I dealt with her on.

22  BY MS. BAIG:

23      Q.    Did you work with her on a

24  daily basis?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.     No.

2              Q.     You reported to her, though?

3              A.     Right.

4              Q.     So how often did you work

5      with her?

6              A.     I guess it depended on how

7      much we had going on.

8              Q.     Did you work with her on a

9      weekly basis?

10             A.     Yes.

11             Q.     Were you in meetings with

12     her regularly?

13             A.     Yes.

14             Q.     Do you have a general idea

15     of what she was working on?

16                    MR. ROTH:  Object to form.

17                    THE WITNESS:  I wouldn't

18             want to mischaracterize.

19     BY MS. BAIG:

20             Q.     When she worked with you,

21     what was she working on?

22             A.     Oh.  Fine.  Well, we worked

23     on the marketing of Kadian.

24             Q.     And did you also work on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   marketing of generics?

 2          A.    I did not.  Other than when

 3   Kadian went generic.  And I may have

 4   advised on some other generic.

 5               But my responsibilities and

 6   my expertise is in branded marketing.  I

 7   don't have any expertise in generic

 8   marketing.

 9          Q.    But you may have advised, I

10   think you said, on certain generic

11   issues?

12               MR. ROTH:  Object to the

13          form.  Mischaracterizes testimony.

14               THE WITNESS:  No, if I said

15          that, that's not what I meant.

16               I may have been in meetings

17          for generic products, but that was

18          not my area of expertise.

19   BY MS. BAIG:

20          Q.    Were you in meetings for

21   generic opioids?

22               MR. ROTH:  Same objection.

23               THE WITNESS:  Perhaps.

24   BY MS. BAIG:
```

1    Q.    You don't recall any?

2    A.    Not off the top of my head,

3    no.

4    Q.    Do you recall being in

5    meetings or having discussions about

6    oxymorphone?

7    A.    I recall that for a short

8    period of time our sales force may have

9    helped promote the availability of that.

10    Q.    The Kadian sales force

11    helped promote the availability of

12    oxymorphone?

13    A.    I believe so.

14    Q.    Do you remember being

15    involved with any other generic opioids?

16    A.    Just generic Kadian.

17    Q.    So your understanding is

18    that Nathalie Leitch reported to Terry

19    Fullem?

20    A.    Correct.

21    Q.    And Terry Fullem worked in

22    what department?

23    A.    Sort of headed up commercial

24    operations, if I'm not mistaken.

1    Q.    Commercial operations for

2    Actavis?

3    A.    Yes, that was the company.

4    But, again, I don't want to say don't

5    quote me on his title, but I don't recall

6    what his title is.

7    Q.    And Terry Fullem reported to

8    who?

9    A.    I believe he reported to

10   Doug Boothe.

11   Q.    And Doug Boothe, do you know

12   what his position was?

13   A.    I believe he was CEO.

14   Q.    And he was the CEO of what

15   company?

16   A.    Actavis.

17   Q.    And who did he report to?

18   A.    I don't know, whoever the

19   chairman of the board was, I guess.

20   Q.    Did you ever work on a drug

21   called Norco?

22   A.    No, not that I recall.

23   Q.    Do you know who did work on

24   the drug called Norco?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    I don't recall ever hearing
 2   about Norco.
 3           Q.    Do you understand that you
 4   were selected as a custodian for whom
 5   documents were produced in this
 6   litigation?
 7                 MR. ROTH:  Object to the
 8           form.  Lacks foundation.
 9                 THE WITNESS:  You'll have to
10           explain what that means.
11   BY MS. BAIG:
12           Q.    Do you understand that your
13   files, some of your work files, have been
14   produced as part of this litigation?
15           A.    I do.
16           Q.    And did anybody -- did you
17   have any input as to what types of files
18   that you would have had at Actavis that
19   would be relevant to this action?
20           A.    I don't understand the
21   question.  Did I have any input?
22           Q.    In terms of which of your
23   files would be produced in this action.
24           A.    All of my files, to my
```

```
1   understanding, were produced.

2          Q.    Did you see the documents

3   that were produced in this action from

4   your files?

5              MR. ROTH:  Every document in

6          her files?  I don't understand the

7          question.

8              MS. BAIG:  That were

9          produced in this action, yes.

10             MR. ROTH:  Did we show her

11         her entire file we produced?

12             MS. BAIG:  I'm asking her if

13         she saw the entire file that was

14         produced, yes.

15             MR. ROTH:  Lacks foundation.

16         Calls for speculation.

17             THE WITNESS:  I don't know

18         if I've seen the entire file.

19             MS. BAIG:  Do you know if

20         she's seen the entire file of

21         documents produced?

22             MR. ROTH:  I don't.  I'm

23         sure during her work she did.  We

24         produced thousands of documents.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          I don't think she's seen thousands

 2          of documents.

 3               THE WITNESS:  Not recently.

 4               MR. ROTH:  And thousands is

 5          probably an understatement,

 6          frankly.

 7   BY MS. BAIG:

 8          Q.    Did you ever use personal

 9   computers or devices for work purposes?

10          A.    I don't recall.

11          Q.    Do you know if there were

12   any personal computers or other devices

13   searched for purposes of turning over

14   responsive documents?

15          A.    My home computer?

16          Q.    Yes.

17          A.    I wouldn't own that anymore,

18   the one I used back then.

19          Q.    What year, to your

20   recollection, was the Watson merger?

21          A.    2012, I believe.

22          Q.    And did that impact your

23   position or reporting structure at all?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     How so?

2     A.     I was the only member of the

3  original team, I believe, who stayed --

4  or at least my core team, who stayed with

5  the company after the Watson merger.

6     Q.     So prior to the Watson

7  merger, who was on your core team?

8     A.     So I reported to Nathalie,

9  reported to Terry.  We had the sales

10  force.  And then toward the end of my

11  tenure there, there was a woman named

12  Lisa Miller who was on the marketing

13  team.

14     Q.     So the sales force was on

15  your core team.

16          Is that the sales force of

17  18 people that you mentioned earlier?

18          MR. ROTH:  Object to the

19      form.

20  BY MS. BAIG:

21     Q.     About 18 people that you

22  mentioned earlier?

23     A.     Right.  I don't remember the

24  number.  It was larger by that point.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Watson terminated them at the end of

 2    2012.

 3            Q.    Did the sales force report

 4    to you?

 5            A.    No.

 6            Q.    Who did they report to?

 7            A.    They were a contract sales

 8    force that reported up through inVentiv.

 9            Q.    And who at inVentiv oversaw

10    that sales force?

11            A.    I don't know.  I just know

12    the people I worked with.

13            Q.    Who did you work with at

14    inVentiv?

15            A.    The primary contacts, the

16    heads of sales were Mike Shepherd,  Mark

17    Killion, and then later on Chris Hepp and

18    Patrick Lanahan.

19            Q.    And what was inVentiv?

20            A.    A contract sales force

21    organization.

22            Q.    So was your entire sales

23    force, were they all inVentiv employees?

24            A.    Yes.
```

```
 1            Q.    And that team was

 2    responsible for marketing Kadian as well

 3    as generic opioids?

 4                  MR. ROTH:  Object to the

 5            form.  Lacks foundation.

 6            Mischaracterizes the record.

 7                  MS. BAIG:  It's a question.

 8            No speaking objections, counsel.

 9                  MR. ROTH:  It's not a

10            speaking objection.

11                  MS. BAIG:  It's in the

12            deposition protocol.

13                  MR. ROTH:  It's the basis

14            for my objection.

15    BY MS. BAIG:

16            Q.    Did the sales team that we.

17                  We're -- that we been

18    talking about, the inVentiv sales team,

19    were they responsible for marketing

20    Kadian and generic opioids?

21                  MR. ROTH:  Object to the

22            form.

23                  THE WITNESS:  They were

24            responsible for promoting.  I was
```

Highly Confidential - Subject to Further Confidentiality Review

1          responsible for marketing, they

2          were responsible for promoting

3          Kadian almost exclusively; except

4          when Kadian went generic, they

5          were responsible for the promotion

6          of Kadian generic, and as I

7          mentioned, for a short time

8          period, the generic oxymorphone.

9     BY MS. BAIG:

10         Q.    And that team, I believe you

11    said, grew from 18 to about what, do you

12    know?

13         A.    I mentioned I don't remember

14    the ceiling number.

15         Q.    Do you know if it doubled in

16    size or tripled in size, or if it just

17    grew slightly from 18?

18         A.    My best guess, recollection,

19    is about 48.

20         Q.    48?

21         A.    Uh-huh.

22         Q.    And what time frame was it

23    about 48 employees?

24         A.    That, I don't recall.

 1          Q.     Some time in the 2010 to

 2    2014 time frame?

 3          A.     Oh, no.  They were

 4    terminated by 2012.  So some time between

 5    2010 and 2012.

 6          Q.     And what happened with the

 7    marketing of Kadian in 2012 when the

 8    sales force was terminated?

 9          A.     Right.  Watson debated what

10    to do with it for a while.  But,

11    basically, no longer promoted it, the

12    promotion wound down.

13          Q.     And how about, what happened

14    with marketing of the generic as of 2012,

15    when that sales force was terminated?

16          A.     Well, they weren't marketing

17    the generic, so there was no marketing,

18    as far as I'm aware.

19          Q.     Well, the promotion of the

20    generics?

21          A.     That's what I mean.  I don't

22    know.  There was no more sales force.

23          Q.     Were there any mergers --

24    were there any other mergers, other than

1    the Watson merger, that you recall during

2    your tenure?

3         A.    Yes.

4         Q.    What other mergers?

5         A.    They went through a merger

6    with Warner Chilcott, Forest, and I left

7    after that.

8         Q.    When you say "they" went

9    through a merger with Warner Chilcott,

10   who are you referring to?

11        A.    Actavis.

12        Q.    So Actavis merged with

13   Warner Chilcott in what year, do you

14   recall?

15        A.    I don't recall the year.  It

16   was after the Watson merger.

17        Q.    And subsequently went

18   through a merger with Forest Labs?

19        A.    (Witness nods.)

20        Q.    And how did the Warner

21   Chilcott merger impact your position or

22   responsibilities, if at all?

23        A.    It didn't.

24        Q.    And how did the Forest Labs

Highly Confidential - Subject to Further Confidentiality Review

```
 1    merger impact your position or

 2    responsibilities, if at all?

 3          A.    It was about that time I was

 4    leaving, so --

 5          Q.    Did you have any work

 6    involvement with Fentanyl products, any

 7    Fentanyl product?

 8          A.    Not that I recall.

 9          Q.    Are you aware that there was

10    a Fentanyl product that was offered by

11    Actavis?

12          A.    What was its name?

13          Q.    I don't know.  I'm asking

14    you.

15          A.    Then I guess not.

16          Q.    Are you aware of a Fentanyl

17    patch that was offered by Actavis?

18          A.    No.  I believe I heard about

19    it, in terms of Alpharma, but not

20    Actavis.

21          Q.    What did you hear about the

22    Fentanyl patch in terms of Alpharma?

23          A.    That they had it.

24          Q.    And Actavis -- what's your
```

```
 1    understanding of the relationship between

 2    Actavis and Alpharma?  Is it that Actavis

 3    purchased Alpharma in about 2008?

 4                MR. ROTH:  Objection to

 5          form.  Lacks foundation.  Calls

 6          for speculation.

 7                THE WITNESS:  That was

 8          before the time I started.  I

 9          don't know the history.

10    BY MS. BAIG:

11          Q.    So you have no understanding

12    of the relationship between Alpharma and

13    Actavis at all?

14          A.    Only that there was one.  I

15    don't know if it was a merger, an

16    acquisition.

17          Q.    And is it your understanding

18    that the Fentanyl product was an Alpharma

19    product?

20                MR. ROTH:  Object to the

21          form.  Lacks foundation.  Calls

22          for speculation.

23                THE WITNESS:  I really don't

24          have much information about that
```

```
 1            patch.

 2   BY MS. BAIG:

 3            Q.     About that -- what patch?

 4            A.     Did you call it a patch?

 5            Q.     Fentanyl patch.

 6            A.     Okay, yes.

 7            Q.     Did you work both on the

 8   generic oxymorphone and the oxymorphone

 9   HCL extended-release tablets?

10                  MR. ROTH:  Object to the

11            form.  Mischaracterizes her

12            testimony.

13                  MS. BAIG:  It doesn't

14            mischaracterize any testimony.

15            It's just a question.

16   BY MS. BAIG:

17            Q.     Did you work on both of

18   those?

19                  MR. ROTH:  There's an

20            assumption in there.

21                  MS. BAIG:  There's no

22            assumption.

23   BY MS. BAIG:

24            Q.     Did you work on oxymorphone
```

1    HCL extended-release tablets at all while

2    you were at Actavis?

3          A.    To the best of my

4    recollection, I didn't work on either of

5    those products.  We may have had our

6    sales force assist in the promotion.

7                And, to be honest, I

8    couldn't tell you the difference between

9    those two products you just mentioned and

10   which one we were promoting.  It was for

11   a very short period of time.

12         Q.    What do you mean by "short

13   period of time"?

14         A.    I don't recall the period of

15   time, but our primary responsibility was

16   Kadian.

17         Q.    I understand that your

18   primary responsibility was Kadian.

19                But your sales force also

20   promoted generic oxymorphone; is that

21   right?

22                MR. ROTH:  Object to the

23         form.

24                THE WITNESS:  Yeah, and I

Highly Confidential - Subject to Further Confidentiality Review

1    want to make sure I'm

2    characterizing this correctly.

3         They promoted the

4    availability, I believe, of -- I

5    believe it was two strengths,

6    because the branded supplier had

7    either a recall or a supply issue

8    or something.

9         So the extent of our

10    promotion was that it was still

11    available, the physicians were

12    prescribing that strength, the

13    patients would still be able to

14    get it at the pharmacy.

15         So to the extent that that

16    was the promotion, it was more

17    around the availability.

18  BY MS. BAIG:

19       Q.   And did the sales force also

20  promote the availability of oxymorphone

21  hydrochloride extended-release tablets?

22       A.   I would have to look back at

23  the promotional materials to determine

24  which product it was.

```
 1          Q.     Okay.  We'll get there.

 2          A.     I see.

 3          Q.     In your capacity as medical

 4   director at Actavis --

 5          A.     I was marketing director.

 6          Q.     Sorry.

 7                 -- marketing director at

 8   Actavis, did you work with a medical

 9   education department at Actavis?

10          A.     No.

11          Q.     Are you aware of a medical

12   education department at Actavis?

13          A.     No.

14          Q.     Is it your understanding

15   that Actavis had no medical education

16   department?

17          A.     That's correct.  We didn't

18   do any medical education activities.

19   Kadian was at the very end of its

20   lifecycle, it was about to go off patent.

21   This was not a large marketing or

22   educational initiative.  You know, we

23   were maintaining a sales force to

24   maintain the share that we had.
```

1    Q.    What was Kadian's lifecycle

2    that you just referred to?

3    A.    We were at the end of it, we

4    were about to go off patent.

5    Q.    What was the lifecycle,

6    though?  What were the years --

7    A.    I don't understand your

8    question.

9    Q.    -- of the lifecycle?

10    A.    I don't recall when it was

11    launched.  I just know the patent, I

12    believe, expired shortly around the time

13    I joined in 2010.  And then the generic

14    was introduced some time between 2010 and

15    2012.

16    Q.    All right.  So you're not

17    aware of any medical education program at

18    Actavis, is that right, during your

19    tenure?

20           MR. ROTH:  Object to the

21        form.

22           THE WITNESS:  That's

23        correct.

24    BY MS. BAIG:

1    Q.    Are you aware of a medical

2  education program at Allergan?

3              MR. ROTH:  Object to the

4         form.  Lacks foundation.  Vague.

5              THE WITNESS:  I didn't work

6         for Allergan.

7  BY MS. BAIG:

8    Q.    Are you aware of a medical

9  education department at Allergan during

10 your tenure at Actavis?

11             MR. ROTH:  Same objections.

12             THE WITNESS:  You're asking

13        about two different companies.  I

14        was at Actavis, I was never at

15        Allergan.  So I have no awareness

16        of anything at Allergan.

17 BY MS. BAIG:

18   Q.    So as marketing director at

19 Actavis, is it your testimony that you

20 never worked with any Allergan employees?

21             MR. ROTH:  Objection.  Asked

22        and answered.  Lacks foundation.

23             MS. BAIG:  It wasn't asked

24        and answered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ROTH:  Calls for

 2       speculation.

 3              MS. BAIG:  This is a whole

 4       new question.

 5              THE WITNESS:  That is my

 6       understanding, yes.

 7  BY MS. BAIG:

 8       Q.   Do you have any

 9  understanding of the relationship between

10  Allergan and Actavis or what that

11  relationship was during your tenure?

12       A.   I don't believe the Allergan

13  merger happened until after I left.

14              And, again, I was never

15  really with the company.  I was a

16  consultant.  But the last merger I can

17  recall it going through while I was

18  consulting there was Forest.

19       Q.   Do you know what PR firms

20  Actavis worked with?

21       A.   I don't recall.

22       Q.   You don't recall any of

23  them?

24       A.   I don't recall if there were
```

1    any.

2            Q.    Okay.  You never worked with

3    any PR firms when you were at Actavis?

4            A.    We may have started talking

5    to some, in terms of the MoxDuo launch,

6    but that would be the extent of it.

7            Q.    Do you know which firms you

8    talked to in connection with MoxDuo?

9            A.    I don't recall.

10           Q.    Do you know what department

11   was responsible for drug lobbying at

12   Actavis?

13           A.    No, I don't.

14           Q.    You never worked with

15   anybody who was part of a drug lobbying

16   division at Actavis while you were there?

17           A.    Not that I recall, no.

18           Q.    During your tenure at

19   Allergan, were you -- at Actavis, were

20   you ever aware of a reluctance by

21   prescribers to prescribe opioid pain

22   medications?

23                 MR. ROTH:  Object to the

24           form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I'm not sure I

 2          understand the question.

 3   BY MS. BAIG:

 4          Q.    When you worked at Actavis,

 5   were you aware that there was a

 6   reluctance by some prescribers to

 7   prescribe opioids?

 8                MR. ROTH:  Same objection.

 9                THE WITNESS:  Yeah, I'm not

10          sure how I would even answer that.

11                I think generally each

12          healthcare professional needs to

13          make their own decision about what

14          they feel is the proper treatment

15          path for their patient.

16   BY MS. BAIG:

17          Q.    So as the marketing director

18   at Actavis for an opioid, you never had

19   discussions with anyone on your team

20   about a general reluctance by prescribers

21   in terms of prescribing opioids?

22                MR. ROTH:  Object to the

23          form.

24                THE WITNESS:  Yeah, I can't
```

Highly Confidential - Subject to Further Confidentiality Review

1     say that I never had a

2     conversation about that, no.

3  BY MS. BAIG:

4        Q.   But you don't recall it

5  being an issue, ever?

6             MR. ROTH:  Same objection.

7             THE WITNESS:  I mean,

8        looking back, you know, it's hard

9        to remember exactly what was

10       discussed years ago.  I'm not

11       saying it didn't happen, I don't

12       recall.

13 BY MS. BAIG:

14       Q.   Do you remember being aware

15 that there were prescribers who had

16 certain concerns or fears about the

17 addictive or abusive properties of

18 certain opioids?

19            MR. ROTH:  Object to the

20       form.

21            THE WITNESS:  I don't

22       remember having that discussion

23       with any physician in particular.

24       But I'm sure --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. BAIG:

 2         Q.    Well, that wasn't my

 3    question.

 4         A.    Okay.

 5         Q.    My question is, were you

 6    aware that that was an issue for

 7    prescribers, generally?

 8              MR. ROTH:  Object to the

 9         form.  Let her finish, because she

10         was going to answer your question,

11         I think.

12              But go on.

13              THE WITNESS:  I was going to

14         answer the question.

15              I believe your question is,

16         was I aware that there were

17         concerns about prescribing

18         opioids.  Is that correct?

19    BY MS. BAIG:

20         Q.    Yes.

21         A.    Again, as with any drug,

22    there are always concerns with

23    prescribing for any medication.  So of

24    course.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    So you're not aware of any

 2    heightened concern for opioids over any

 3    other drug?

 4                    MR. ROTH:  Object to the

 5              form.  Vague.

 6    BY MS. BAIG:

 7              Q.    If you're not, then say

 8    you're not.

 9                    I'm just curious because,

10    you know, it's widely reported that

11    there's an opioid epidemic.  So are you

12    aware that there have been concerns about

13    the prescribing of opioids, and were you

14    aware of that at the time that you worked

15    at Actavis?

16                    MR. ROTH:  Object to the

17              form.

18                    THE WITNESS:  There's all

19              sorts of objections about the

20              question.

21                    But it was something,

22              obviously, as a controlled

23              substance, that we took seriously,

24              yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. BAIG:

 2          Q.    Okay.  And did you have

 3    discussions with any members of your team

 4    about how to address the prescribers'

 5    fears or concerns about prescribing

 6    opioid drugs?

 7               MR. ROTH:  Object to the

 8          form.

 9               THE WITNESS:  Sure.  All of

10          our promotional materials, we were

11          sure to include all of the safety

12          information that goes along with

13          opioids.  Obviously, you know,

14          there's a serious need to treat

15          pain, but there's also a serious

16          need to treat it appropriately and

17          safely and within the FDA

18          guidelines.

19          So we made sure that all of

20          our marketing materials were fair

21          balanced so that they could

22          provide that safety message along

23          with the efficacy message.

24    BY MS. BAIG:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And did you participate in

2    any medical advisory boards in addressing

3    these types of concerns?

4    A.    We did not have advisory

5    boards on that particular -- for Kadian,

6    we didn't have advisory boards.  Again,

7    end of product lifecycle, just sort of

8    maintaining.

9          The best of my recollection,

10   we had one advisory board prior to what

11   we anticipated was going to be the launch

12   of MoxDuo.  I believe that probably

13   happened in May of 2012, just prior to

14   the complete response letter being

15   received for MoxDuo.

16   Q.    And MoxDuo was an opioid

17   drug that Actavis was intending to

18   launch, but it did not receive FDA

19   approval; is that right?

20         MR. ROTH:  Object to the

21         form.

22         THE WITNESS:  That's right.

23   BY MS. BAIG:

24   Q.    And do you recall who was on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that medical advisory board?

 2          A.    The physicians?

 3          Q.    Yes.

 4          A.    I don't.

 5          Q.    Do you recall whether Dr.

 6    Perry Fine was on that medical advisory

 7    board?

 8          A.    His name is familiar.

 9          Q.    Do you recall having -- do

10    you know who Dr. Perry Fine is?

11          A.    Like I said, his name is

12    familiar.  So I guess I wouldn't be

13    surprised to learn if he was on the

14    advisory board.

15          Q.    And do you recall why MoxDuo

16    was not approved by the FDA?

17          A.    I don't recall the issues

18    that they had with the product.  But I

19    just know it was never brought to market.

20          Q.    But you were involved in

21    preparing the launch documents for

22    MoxDuo; is that right?

23          A.    Correct.

24          Q.    And you don't recall any of
```

Highly Confidential - Subject to Further Confidentiality Review

1    the issues that the FDA had with it

2    before declining to approve it?

3                    MR. ROTH:  Objection.  Asked

4            and answered.

5                    THE WITNESS:  Yeah, I don't

6            recall.  I just remember that it

7            was not -- it was not on an

8            approvable track.

9    BY MS. BAIG:

10           Q.    Were you involved in any of

11   the FDA discussions or correspondence

12   regarding MoxDuo?

13           A.    I was not.

14           Q.    Who would have been involved

15   in that?

16           A.    I can only speculate.

17   Regulatory.

18           Q.    What's the name of the

19   department?

20           A.    Regulatory.

21           Q.    Okay.  And who was in charge

22   of the regulatory department at Actavis

23   when you were there?

24           A.    I believe it would have been

```
 1    Terri Nataline.

 2         Q.    Did Actavis track or measure

 3    the impact of its marketing efforts in

 4    changing doctors' perceptions and

 5    prescribing of their opioid drugs?

 6              MR. ROTH:  Objection to

 7         form.

 8              THE WITNESS:  I don't

 9         believe we did much tracking at

10         all at Kadian.  Like I said, we

11         had a very limited budget.  And I

12         don't recall measuring any -- any

13         promotion that we did.

14    BY MS. BAIG:

15         Q.    Do you know whether Actavis

16    has a department that tracks that sort of

17    information?

18              MR. ROTH:  Same objection.

19              THE WITNESS:  Not that I

20         recall.  Like I said, we were a

21         pretty lean organization.  And

22         Kadian was the only branded

23         product.  So this was not an

24         organization that was really built
```

1          around having the same kind of

2          departments you'd have at branded

3          organizations.

4    BY MS. BAIG:

5          Q.    So did you have a way of

6    providing your sales team with certain

7    targets, in terms of physicians to

8    contact?

9          A.    Yes, they had a target list.

10         Q.    And who generated that

11   target list?

12         A.    That, I don't recall.

13         Q.    Do you know what department

14   generated that target list?

15         A.    I would imagine somehow the

16   sales department.

17         Q.    And who was in charge of

18   that department when you were there?

19              MR. ROTH:  Object to the

20         form.

21              THE WITNESS:  Yeah, I don't

22         know who would have -- who would

23         have had access to the target list

24         or who would have had that data.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Someone at Actavis.
 2  BY MS. BAIG:
 3           Q.    Someone at Actavis, is that
 4  the best that you can --
 5           A.    That's the best of my
 6  recollection.  That would make sense to
 7  me logically, but I wasn't involved in
 8  developing the target list.
 9                 Like I said, I believe
10  promotions started in 2009 and I didn't
11  start until 2010, so that was already
12  established by the time I came on board.
13           Q.    The target list didn't
14  change as time went on?
15           A.    If it did, I was not
16  involved in that.
17           Q.    So you're not aware of how
18  those target lists are developed at all?
19           A.    I'm not aware of how they
20  were developed there.
21           Q.    Are you aware of what
22  department develops them?
23           A.    Like I said, it wasn't a
24  traditional branded organization.  So my
```

Highly Confidential - Subject to Further Confidentiality Review

1   assumption is, you know, whoever the team

2   was back in 2009 that worked with the

3   target list developed it.

4          Q.     And do you know how they

5   developed it?

6          A.     No.  Because I was not

7   involved in that process.

8          Q.     Okay.  So you have no

9   understanding of how they would develop

10  targets of high-prescribing physicians,

11  for example?

12         A.     I can speculate, based on,

13  you know, what would make sense.  But I

14  wasn't involved.

15         Q.     Well, based on your years of

16  experience in this field, what is your

17  understanding of how those target lists

18  are developed generally?

19         A.     I was going to say, is that

20  appropriate for me to speculate?  I could

21  be wrong, I could be right.

22         Q.     Based on your many years of

23  experience in this field, what is your

24  understanding of how those target lists

```
 1    are generally developed?

 2              MR. ROTH:  Object to the

 3         form.  Calls for speculation.

 4              You can answer if you can.

 5              THE WITNESS:  Not having

 6         any, you know, core knowledge of

 7         how the target list was created,

 8         my assumption would be it was a

 9         product that was inherited from

10         another company, you would look at

11         who was already prescribing the

12         product.  And since the strategy

13         was to maintain the share, you

14         would call on those same

15         prescribers.

16    BY MS. BAIG:

17         Q.    And you would call on the

18    highest prescribers, right?

19              MR. ROTH:  Object to the

20         form.  Lacks foundation.  Vague.

21              THE WITNESS:

22         Hypothetically, sure.

23    BY MS. BAIG:

24         Q.    You don't recall ever being
```

```
1    involved or seeing sales rep training

2    manuals telling them to call on

3    highest-prescribing targets?

4              MR. ROTH:  Same objection.

5         You're still talking generally?

6              MS. BAIG:  No, I'm talking

7         about her recollection.

8              MR. ROTH:  Where?

9              MS. BAIG:  At Actavis.

10             MR. ROTH:  The record is

11        confusing.

12             THE WITNESS:  I recall -- I

13        recall nothing about Actavis.

14             But, I mean, you just

15        wouldn't say that.  You would say,

16        here is your target list and they

17        would be able to, you know, manage

18        their own business and call on who

19        they thought were the appropriate

20        targets.

21   BY MS. BAIG:

22        Q.    Oh.  No one would tell the

23   sales reps to call on high-prescribing

24   targets?
```

1          A.     I think that would -- that

2     would be who they were given.  So if

3     those were the targets --

4          Q.     So the sales reps would be

5     instructed to call on the

6     higher-prescribing targets; is that

7     right?

8               MR. ROTH:  Object to the

9          form.

10               THE WITNESS:  Like I said,

11          that's not my role in the company

12          to determine.

13     BY MS. BAIG:

14          Q.     And you had -- you never had

15     any experience at Actavis that leads you

16     to believe that your sales reps were told

17     to call on the highest-prescribing

18     targets?

19               MR. ROTH:  Objection to

20          form.

21     BY MS. BAIG:

22          Q.     You never heard about that?

23          A.     Not in that -- in that

24     language.  You would say, here is your

```
 1   target list.  Presumably could you say

 2   those were the highest-volume prescribers

 3   based on the targets provided?

 4   Hypothetically, sure.

 5            I guess -- you're asking me

 6   to make a fact about something I wasn't

 7   involved in, so I'm just hesitant to put

 8   a statement on that.

 9            Q.    You never saw any training

10   manuals or any e-mails or any documents,

11   while you were there, that would have

12   suggested to you that your sales team was

13   instructed to call on the

14   highest-prescribing targets; is that

15   right?

16            MR. ROTH:  Objection to

17       form.

18            THE WITNESS:  I guess it's

19       just sort of -- it's just not

20       how -- here is your target list;

21       you're not saying, here are the

22       highest-volume prescribers.  Maybe

23       it's semantics.

24   BY MS. BAIG:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Maybe it is semantics.

 2                Are you aware of what data

 3   Actavis would have tracked which would

 4   have allowed it to know who were the

 5   highest-prescribing targets?

 6                MR. ROTH:  Objection.  Lacks

 7          foundation.  Calls for

 8          speculation.

 9                MS. BAIG:  The question is

10          "are you aware," it can't lack --

11                MR. ROTH:  You're asking

12          about a topic --

13                MS. BAIG:  -- foundation.

14                MR. ROTH:  -- she said she

15          didn't know about.

16                MS. BAIG:  I'm going to

17          object to your repeated objections

18          peppering the record and wasting

19          time and coaching the witness.

20                MR. ROTH:  They're not

21          coaching, they're the basis for my

22          objection.

23                MS. BAIG:  You can object to

24          form.
```

```
 1              MR. ROTH:  That's not what
 2         the protocol says.
 3              You can answer.
 4              MS. BAIG:  The protocol says
 5         no speaking objections.
 6              MR. ROTH:  Lacks foundation
 7         is not a speaking objection.
 8              MS. BAIG:  Asking if she's
 9         aware cannot lack foundation.
10              MR. ROTH:  I also said it
11         calls for speculation.  Let's not
12         waste time debating.
13              MS. BAIG:  Let's not waste
14         time debating.
15              MR. ROTH:  I've made my
16         objection.
17              You can answer.
18              THE WITNESS:  I apologize,
19         what was the question?
20              MS. BAIG:  Can you go back
21         to the question?
22              THE WITNESS:  Am I aware of
23         what data Actavis would have
24         tracked?  I don't recall if it was
```

Highly Confidential - Subject to Further Confidentiality Review

1        IMS or another company.

2    BY MS. BAIG:

3        Q.    What other companies are you

4    aware of, apart from IMS, that tracked

5    the data, that type of data?

6        A.    I believe there's one,

7    Symphony; or it used to be called

8    Symphony.

9        Q.    And are you aware that

10   Actavis worked with IMS to track

11   high-prescribing target data?

12       A.    I don't recall which company

13   was used to track any data.

14       Q.    Are you aware that Actavis

15   worked with any company at all to track

16   high-prescribing data?

17       A.    I don't recall which

18   company.

19       Q.    But are you aware that they

20   worked with a company to do that?

21            MR. ROTH:  Object to the

22       form.

23            THE WITNESS:  Again, I

24       presume they did, yes.

```
 1    BY MS. BAIG:

 2         Q.    But you never knew what

 3    company it was?

 4         A.    Not that I recall, no.

 5         Q.    So Symphony is a company.

 6               What is your understanding

 7    of what Symphony did?

 8         A.    I believe they're an IMS

 9    competitor.  Again, that's not really my

10    area.  I just kind of hear about it.

11         Q.    And what type of data does

12    IMS track?

13               MR. ROTH:  Objection.  Lacks

14         foundation.  Calls for

15         speculation.

16               THE WITNESS:  Yeah, I was

17         going to say, you could probably

18         go to their website to learn more.

19               But IMS, I believe, tracks,

20         depending on what you purchase,

21         prescription-level data.

22    BY MS. BAIG:

23         Q.    What do you mean by

24    "prescription-level data"?
```

1    A.    What prescribers are

2    prescribing certain products.

3         Q.    Okay.  And did you ever see

4    any IMS reports while you were at

5    Actavis?

6         A.    I don't recall specifically.

7    I'm sure it's a possibility.

8         Q.    So you're not aware, either

9    way, whether Actavis actually purchased

10   data from IMS or not; is that right?

11        A.    Right.  I don't know if they

12   worked with IMS.

13        Q.    Who would be aware of that?

14        A.    Perhaps Nathalie.

15        Q.    Anyone else that you can

16   think of?

17        A.    The sales heads.

18        Q.    Who were the sales heads for

19   Kadian?

20        A.    The same gentlemen I listed

21   before.

22        Q.    I don't recall the sales

23   heads.

24        A.    Mike Shepherd, Mark Killion,

Highly Confidential - Subject to Further Confidentiality Review

```
1    Patrick Lanahan, Chris Hepp.

2         Q.    Okay.   Those are the

3    inVentiv employees, okay.

4               Are you aware of any speaker

5    programs that Actavis had with respect to

6    any of its opioid drugs?

7         A.    Yeah, again, small company,

8    small budget, no speaker programs.

9         Q.    Who at Actavis would have

10   decided where and how to spend the budget

11   for opioid medications, for marketing

12   opioid medications?

13        A.    I would submit a marketing

14   proposal, and then Nathalie or Terry

15   would decide what made sense.

16               But, again, I knew that

17   those kind of programs were not really in

18   the realm of financial feasibility, given

19   the lifecycle.

20        Q.    So you were responsible for

21   submitting the marketing budget to

22   Nathalie Leitch?

23        A.    Uh-huh.

24        Q.    And what -- roughly, what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     was your marketing budget?

 2               MR. ROTH:  Object to the

 3          form.

 4               THE WITNESS:  I don't recall

 5          specifically.  But I don't even

 6          know that we had a budget.  It was

 7          sort of more like we needed to do

 8          something, so we did it.  And we

 9          basically did the bare bones of

10          what we needed to do.

11               I believe our promotional

12          materials consisted of a detail

13          aid, another collateral piece and

14          co-pay cards.  And that was pretty

15          much the extent of our promotion.

16     BY MS. BAIG:

17          Q.    What's a detail aid?

18          A.    The brochure that

19     representatives use to educate physicians

20     when they're in their office.

21          Q.    And what other collateral

22     piece are you referring to?

23          A.    I believe we had a

24     conversion guide and co-pay cards.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    What's a conversion guide?

2            A.    That was an educational

3    piece to instruct physicians if they --

4    if a patient was on a medication and the

5    physician was interested in switching

6    them to Kadian.

7            Q.    And do you remember roughly

8    what the dollar amount was for your

9    marketing budget for opioid medications?

10           A.    I do not.

11           Q.    Do you remember if it was

12   less than $100 million?

13           A.    Yes.

14           Q.    So give me your best

15   guesstimate of what the marketing budget

16   was for opioid drugs while you were at

17   Actavis.

18           A.    $200,000.  I mean, and that

19   is a pie-in-the-sky guess.  But very,

20   very small, relative.

21           Q.    $200,000 per year?

22           A.    I mean, yeah.  We did not

23   have a lot of money.

24           Q.    So does that include what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you paid inVentiv to pay the sales force?

 2          A.    No.  That would be a

 3   sales -- that's not a marketing.  I'm

 4   talking just my budget for marketing

 5   programs.

 6          Q.    So your budget for marketing

 7   programs doesn't include the sales reps

 8   going out to meet with doctors?

 9          A.    I don't -- the sales force,

10   the sales salaries, did not come out of

11   my budget.  I don't know how much that

12   was.

13          Q.    So what came out of your

14   budget?

15          A.    The promotional materials.

16          Q.    And who would have designed

17   the budget for the sales reps and their

18   activities?

19          A.    I suppose Nathalie and

20   Terry.

21          Q.    And do you know what the

22   rough amount of that budget was?

23          A.    I do not.

24          Q.    Do you know what
```

Highly Confidential - Subject to Further Confidentiality Review

1   geographical area the inVentiv sales reps

2   covered for Kadian and any other opioid

3   drugs?

4          A.    The United States.  We

5   obviously had white space areas, but --

6          Q.    What do you mean by "white

7   space areas"?

8          A.    Spaces where we didn't have

9   reps due to, you know, population just

10  not justifying it.  Like Montana.  I

11  don't know, can't say that there was a

12  rep there.

13         Q.    So there was no rep in

14  Montana?

15         A.    I can't say yes or no.  That

16  was a hypothetical example.

17         Q.    Do you remember any of the

18  white space areas?

19         A.    No.

20         Q.    Is it your understanding

21  that Kadian was promoted as an

22  extended-release drug?

23         A.    Yes.

24         Q.    And did Actavis

Highly Confidential - Subject to Further Confidentiality Review

```
 1    independently study the length of time

 2    that a single dose of its

 3    extended-release opioid, such as Kadian,

 4    lasted?

 5              MR. ROTH:  Object to the

 6         form.  Lacks foundation.  Calls

 7         for speculation.

 8              THE WITNESS:  I'm not aware

 9         of any clinical studies that

10         Actavis was doing.  I don't

11         believe there were any done during

12         my tenure.

13    BY MS. BAIG:

14         Q.    So in designing the

15    marketing materials, how did you get the

16    information about the drug that you would

17    use to include in your marketing

18    materials?

19         A.    From our prescribing

20    information.

21         Q.    What do you mean by "from

22    your prescribing information"?

23         A.    The label of the product.

24         Q.    Just the label?  You didn't
```

```
1    get any information, separate and apart

2    from what's on the label, to use in your

3    marketing materials?

4         A.    Yeah, I mean, I joined

5    Actavis in 2010.  So we had just received

6    a warning letter.  So our detail aids

7    were -- I like to refer to them as a

8    colorful PI.  It was pretty much the

9    label.

10            There may have been, you

11   know, another supporting reference here

12   or there that tied into the PI.  But if

13   you look at our promotional pieces, it

14   was a very benign, conservative marketing

15   campaign that was based on the

16   prescribing information.

17            MS. BAIG:  I think I'm going

18      to shift to a new area.

19            THE WITNESS:  Sure.

20            MS. BAIG:  Do you need a

21      break or are you good?

22            THE WITNESS:  I'm fine, if

23      you're fine.

24            MS. BAIG:  Okay.  Let's
```

```
 1          carry on.

 2                      -  -  -

 3                  (Whereupon, a discussion off

 4          the record occurred.)

 5                      -  -  -

 6                  MS. BAIG:  I'd like to have

 7          this first document marked as

 8          Exhibit-1.  It's Bates stamp

 9          Actavis 799203 through 799214.

10                      -  -  -

11                  (Whereupon, Allergan-Altier

12          Exhibit-1, Actavis 799203-9214,

13          was marked for identification.)

14                      -  -  -

15                  (Whereupon, a discussion off

16          the record occurred.)

17                      -  -  -

18   BY MS. BAIG:

19          Q.    All right.  For the record,

20   this is a letter titled, Warning Letter

21   from the FDA to Doug Boothe, the chief

22   executive officer at Actavis.

23                  Is this the warning letter

24   that you were just referring to?
```

1          A.    I believe it is.

2          Q.    And you've seen this letter

3    before?

4          A.    I'm sure I have.

5          Q.    And in what context?

6          A.    So this was delivered

7    February 18th, 2010.  I joined in the

8    summer of 2010.  My job was to create

9    materials that -- because these were no

10   longer able to be used.

11              So my understanding is this

12   warning letter was reflective of the

13   Alpharma materials that Actavis was

14   using.

15         Q.    How long had Actavis been

16   using the Alpharma materials?

17         A.    I don't know.  I don't

18   believe they had been promoting the

19   product all that long prior to this.

20         Q.    What's your understanding of

21   what the procedure was at Actavis when a

22   warning letter like this was received?

23              MR. ROTH:  Object to the

24              form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I can't

 2           comment, since this was received

 3           before I started.

 4   BY MS. BAIG:

 5           Q.    So you have no understanding

 6   of what procedure was used at Actavis for

 7   the receipt of any types of warning

 8   letters like this from the FDA?

 9           A.    No, no.

10           Q.    So as a result of this

11   warning letter, is it -- what actions

12   were taken, to your knowledge?

13                MR. ROTH:  Object to form.

14           Lacks foundation.  Calls for

15           speculation.

16                THE WITNESS:  What I was

17           told, although I wasn't there for

18           it, was the objecting materials

19           were pulled.  There was corrective

20           action.  And then when I came in,

21           new materials were created.

22   BY MS. BAIG:

23           Q.    And you were responsible for

24   creating the new materials?
```

```
 1              A.    Yes.

 2              Q.    And is it your understanding

 3    that Kadian was approved for moderate to

 4    severe pain only when continuous,

 5    around-the-clock opioid analgesic was

 6    needed for an extended period of time?

 7              A.    That's the indication as

 8    listed in the warning letter, yes.

 9              Q.    And Kadian was not intended

10    for use as a PRN analgesic, correct?

11              A.    That's correct.

12              Q.    And does that mean as -- use

13    on an as-needed basis?

14              A.    That's correct.

15              Q.    And Kadian was also not

16    indicated for pain in the immediate

17    postoperative period; is that right?

18              A.    That's what it says here,

19    yes.

20              Q.    And it was not indicated for

21    mild pain; is that right?

22              A.    That's what it says here,

23    yes.

24              Q.    And is it your understanding
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   of this warning letter, and please take a

 2   moment to read it, if you need to, that

 3   the FDA was finding that the promotional

 4   materials that Actavis was then using for

 5   Kadian were misleading?

 6               MR. ROTH:  Objection to

 7         form.  Lacks foundation.  Calls

 8         for speculation.  Calls for a

 9         legal conclusion.

10               THE WITNESS:  I'm sorry?

11   BY MS. BAIG:

12         Q.    Do you want me to read the

13   question back?

14         A.    Sure.

15         Q.    Is it your understanding of

16   this warning letter that the FDA was

17   finding that the promotional materials

18   that Actavis was then using for Kadian

19   were misleading?

20               MR. ROTH:  Same objections.

21               THE WITNESS:  I don't know

22         if I can characterize it as

23         misleading.  I just know that they

24         had objections that we had to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          correct.

 2   BY MS. BAIG:

 3          Q.    Can I direct you to Page 3

 4   of the warning letter?

 5              Do you see the section that

 6   says, Omission and minimization of risk

 7   information?

 8          A.    I do.

 9          Q.    And do you see the first

10   sentence that says, Promotional materials

11   are misleading if they fail to reveal

12   facts that are material in light of

13   representations made or with respect to

14   consequences that may result from the use

15   of the drug as recommended or suggested

16   in the materials?

17          A.    I do.

18          Q.    And if you turn to the next

19   page, Page 4, do you see right before the

20   next heading, it states, The overall

21   effect of these presentations minimizes

22   the risks associated with Kadian and

23   misleadingly suggests that Kadian is

24   safer than has been demonstrated?
```

1    A.    Uh-huh.

2    Q.    Okay.  So is it your

3 understanding of this FDA letter that the

4 FDA was telling Actavis that certain of

5 its marketing materials were misleading?

6         MR. ROTH:  Objection.  Calls

7         for a legal conclusion.  Object to

8         the form.  Calls for speculation.

9         THE WITNESS:  I can say that

10        the FDA felt that the overall

11        effect was that the presentation

12        minimizes the risks associated

13        with Kadian and misleadingly

14        suggests that Kadian is safer than

15        has been demonstrated.

16 BY MS. BAIG:

17   Q.    And do you see the next

18 heading that says, Broadening of

19 indication and failure to state full

20 indication?

21   A.    Yes.

22   Q.    And do you see that it says

23 there, again, that, Promotional materials

24 are misleading if they imply that a drug

Highly Confidential - Subject to Further Confidentiality Review

1    product is indicated for use in a broader

2    range of conditions or patients than has

3    been demonstrated by substantial evidence

4    or substantial clinical experience?

5         A.    Yes.

6         Q.    And the FDA goes on to state

7    there that, The comparison detailer and

8    co-pay assistance program brochure failed

9    to include the complete approved

10   indication for Kadian and present broad

11   claims about the drug's use in treating

12   pain, therefore implying that Kadian is

13   appropriate for use in a broader range of

14   patients than it is approved to treat.

15            Do you see that?

16        A.    I do.

17        Q.    And do you see that it goes

18   on to list the specific examples of

19   marketing -- of statements in marketing

20   materials which it is finding to be

21   misleading?

22        A.    I do.

23            MR. ROTH:  Object to the

24        form.

```
 1                    THE WITNESS:  Sorry.

 2                    MR. ROTH:  Mischaracterizes

 3          the document.

 4   BY MS. BAIG:

 5          Q.    And those examples include,

 6   1, Allowing for less breakthrough pain

 7   and more consistent pain relief for

 8   patients.

 9                    Do you see that?

10          A.    I do.

11          Q.    So is it your understanding

12   that the FDA is basically stating here

13   that any statements about Kadian allowing

14   for less breakthrough pain and more

15   consistent pain relief for patients were

16   misleading?

17                    MR. ROTH:  Object to the

18          form.  Calls for a legal

19          conclusion.  Lacks foundation.

20          Mischaracterizes the document.

21                    THE WITNESS:  Other than

22          reading it, I have no other legal

23          expertise to add to it.

24   BY MS. BAIG:
```

1      Q.    I'm not asking for legal

2  expertise.

3      A.    If you're -- if I --

4      Q.    I'm asking --

5      A.    -- can read that sentence,

6  yes, I can --

7      Q.    I'm asking if your

8  understanding of this document is that

9  the FDA was suggesting that these

10  statements that are bulleted here on Page

11  4 were used by Actavis in promotional

12  materials and were misleading?  Is that

13  your read of this document?

14           MR. ROTH:  Same objection.

15       Asked and answered.

16           THE WITNESS:  Based on

17       what's in the letter here, the FDA

18       said that, yes.

19  BY MS. BAIG:

20      Q.    Can you turn to Page 5,

21  please?

22           And do you see that there

23  are three bulleted statements that were

24  used in Actavis materials?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     I do.

2          Q.     And they relate to chronic

3    pain and pain management?

4          A.     Yes.

5          Q.     And that the FDA finds, with

6    respect to those three statements, that,

7    The totality of these presentations and

8    the co-pay assistance program brochure

9    suggest that patients with broader types

10   of chronic pain than the drug is

11   indicated for are appropriate candidates

12   for Kadian therapy, when this is not the

13   case.

14               Do you see that?

15         A.     I see that.

16               MR. ROTH:  Object to the

17         form.  Mischaracterizes.

18   BY MS. BAIG:

19         Q.     And so is it your

20   understanding that going forward, Actavis

21   was going to avoid using these types of

22   statements in marketing materials?

23               MR. ROTH:  Object to the

24         form.
```

```
 1                  THE WITNESS:  I don't know

 2          what the response was from Actavis

 3          to the FDA about this.

 4   BY MS. BAIG:

 5          Q.    Did anybody ever tell you to

 6   avoid using these types of statements?

 7          A.    That was what our PRC

 8   committee was for.  So I would put

 9   together marketing materials, it would go

10   through legal and regulatory review, and

11   anything that was objected to would be

12   pulled out at that time.

13          Q.    What's the PRC committee?

14          A.    Promotional review

15   committee.

16          Q.    And who was on that

17   committee?

18          A.    A lawyer and regulatory

19   representative.

20          Q.    Who, exactly, do you recall

21   being on that committee?

22          A.    The lawyer was Beth Selnick

23   Kaufman.  And regulatory was Joanne

24   Stabolt.
```

1     Q.    Anybody else?

2     A.    Those were the two main

3  reviewers I remember.

4     Q.    And the PRC committee was in

5  what division at Actavis?

6     A.    Well, it was a broad -- so

7  Joanne was from regulatory and Beth was

8  from legal.

9     Q.    And who was the head of

10 regulatory?

11    A.    I believe it was Terry

12 Natalin.

13    Q.    So Joanne reported to Terry

14 Natalin?

15    A.    That's my understanding.

16    Q.    Were there only two people

17 on that promotional review committee, to

18 your knowledge?

19    A.    Only two people -- only one

20 from each department needed to be, so

21 yes.

22    Q.    Were you given any specific

23 instructions with respect to this FDA

24 warning letter in terms of your

Highly Confidential - Subject to Further Confidentiality Review

1    responsibilities for designing marketing

2    materials?

3            A.    Basically, like I said, we

4    went -- we took a very conservative

5    approach, and as I say, made the colorful

6    PI.  Our detail pieces were really just

7    reflective of the information that was in

8    the PI, sticking with the label,

9    remaining within the FDA guidelines.

10           Q.    Do you recall that the FDA

11   stated that claims that imply that Kadian

12   is superior to both MS Contin and Avinza,

13   A-V-I-N-Z-A, because Kadian's dosage

14   strength availability offers fewer

15   barriers to prescribing --

16           A.    Could you let me know what

17   page you're on, please?

18           Q.    Sure.  Yes.  Page 9, sorry.

19   First full paragraph.

20           A.    Okay.

21           Q.    If you'd read that first

22   paragraph.

23                 Was it your understanding

24   that the FDA was stating that certain

Highly Confidential - Subject to Further Confidentiality Review

```
 1    additional claims about there being fewer

 2    barriers to prescribing were misleading?

 3              MR. ROTH:  Object to the

 4         form.  Mischaracterizes the

 5         document.

 6              THE WITNESS:  Based on the

 7         sentence written here in the

 8         letter, yes.

 9    BY MS. BAIG:

10         Q.    And do you see, a couple of

11    sentences down, it states, However, FDA

12    is unaware of any substantial evidence or

13    substantial clinical experience to

14    support the claim that the above dosing

15    characteristics allow Kadian to have

16    fewer barriers to prescribing, the

17    meaning of which is not clear, as

18    compared to other extended-release

19    morphine products.

20              Do you see that?

21         A.    I do.

22         Q.    Are you aware of any

23    clinical studies that supported that

24    statement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Not to my knowledge.

 2                   MR. ROTH:  Object to the

 3            form of the last question.

 4     BY MS. BAIG:

 5            Q.     Can you turn to the next

 6     page, please?

 7                   Do you see the first full

 8     sentence states, Although Kadian may help

 9     treat patients' moderate to severe pain,

10     we are not aware of substantial evidence

11     or substantial clinical experience

12     demonstrating that the magnitude of the

13     effect the drug has in alleviating pain,

14     taken together with any drug-related side

15     effects patients may experience, such as

16     the common adverse events of drowsiness,

17     dizziness, constipation and nausea,

18     result in an overall positive impact on a

19     patient's work, physical and mental

20     functioning, daily activities or

21     enjoyment of life.

22                   Do you see that?

23            A.     I do.

24            Q.     Are you aware of any
```

```
 1   substantial evidence or substantial

 2   clinical experience that would have

 3   supported those claims?

 4              MR. ROTH:  Objection to

 5         form.  Lacks foundation.  Calls

 6         for speculation.

 7              THE WITNESS:  No.  I didn't

 8         work on the material.  So, no, I'm

 9         not.

10   BY MS. BAIG:

11         Q.    And so you see under the

12   conclusion and requested action, it

13   states, For the reasons discussed above,

14   the comparison detailer and co-pay

15   assistance program brochure misbrand

16   Kadian in violation -- and it states the

17   law.

18              Do you see that?

19         A.    I do.

20         Q.    And so you were -- correct

21   me if I'm misstating your testimony, but

22   I believe you said that you were then

23   brought in to come in and develop new

24   marketing materials after this letter; is
```

```
 1    that right?

 2         A.    That's right.

 3              MS. BAIG:  All right.  Let's

 4         have this document marked.

 5              This is Exhibit-2.

 6              THE WITNESS:  A little light

 7         reading.

 8              MS. BAIG:  Little light

 9         reading.  This is a big document,

10         but we're going to just look at

11         certain parts of it.

12                   -  -  -

13              (Whereupon, Allergan-Altier

14         Exhibit-2, Allergan

15         MDL01610520-1060, was marked for

16         identification.)

17                   -  -  -

18              MR. ROTH:  It's an e-mail

19         with two giant attachments.

20    BY MS. BAIG:

21         Q.    So the document is Bates

22    stamped Allergan MDL01610520 through

23    01611060.

24              Just take a moment to
```

1    acquaint yourself with the document,

2    please.

3            A.    Can I take these apart or --

4            Q.    Yeah, just put it on the

5    end.  We just have to keep it in order,

6    that's all.

7            A.    Okay.  I'm trying to figure

8    out where one begins and one ends.

9                  MR. ROTH:  I'll help you.

10           There's an e-mail at the top, and

11           then it looks like there's the big

12           training manual behind it.

13                 THE WITNESS:  But are there

14           two?  Like, there's one --

15                 MR. ROTH:  I think it's just

16           one attachment that's 345 pages.

17                 THE WITNESS:  It says, Here

18           are both documents.  I'm trying to

19           figure out which one --

20                 MR. ROTH:  There are two,

21           you're right.

22   BY MS. BAIG:

23           Q.    So there's an e-mail

24   document on top.  And then the first

1    attachment appears to be something

2    called, The Kadian Learning System.  And

3    then if you --

4           A.    I got the break.  Okay.  Got

5    it.

6           Q.    Then at Bates stamp page

7    01610714, there's a second attachment,

8    which is entitled, Kadian Learning

9    Systems.

10          Do you see that?

11          A.    Yep.  I've got them all.

12          Q.    Have you had an opportunity

13   to look over the e-mail?

14          A.    Let me read it.

15          Okay.

16          Q.    Do you have a -- have you

17   seen these documents before?

18          A.    I assume I have, since I'm

19   on the e-mail, yes.

20          Q.    And you saw them in the

21   regular course of your business at

22   Actavis?

23          A.    These appear to be training

24   modules that the sales reps would have

1    received.  So I wouldn't have seen them,

2    but --

3         Q.    But you see that they were

4    attached to this e-mail that was sent to

5    you, correct?

6         A.    Yes.

7         Q.    Right.  So you've seen these

8    documents in the regular course of your

9    business before?

10             MR. ROTH:  Object to the

11             form.  Asked and answered.

12             THE WITNESS:  I don't know

13             how you define "regular course."

14             It looks like I first saw them

15             when we were transitioning to the

16             new Watson/Actavis, and they

17             wanted to run them through their

18             PRC process.

19             And it looks like we were

20             trying to scrounge them up and

21             find if we had references on file

22             for them.

23    BY MS. BAIG:

24         Q.    And that was in or about

```
 1    2000 -- January 15th of 2013?

 2         A.    Right.

 3         Q.    Have you seen these

 4    documents since then?

 5         A.    No.  I haven't been studying

 6    up on my Kadian.

 7         Q.    So what is your

 8    understanding of what these attachments

 9    were?

10         A.    My understanding is this

11    looks like what a rep would have received

12    upon joining the company, to learn about

13    Kadian and the pain environment.

14         Q.    And is one of these versions

15    an initial version and the second one is

16    a revised version?  Or what's your

17    understanding of the relationship between

18    the two attachments?

19         A.    Based on the e-mail, as well

20    as what's written on here, it appears

21    that there's not a date on the Alpharma

22    one; but the second one, called, Kadian

23    Learning Systems, looks like it was

24    produced by Alpharma.
```

1    I'm looking for a date and I

2    don't see anything, unless I'm not

3    interpreting the code.  But that would

4    have been prior, I assume, to Actavis's

5    acquisition.

6              And then The Kadian Learning

7    System appears to be updated from that,

8    completed on July 1st, 2010.

9         Q.    Just to clarify the record,

10   these documents were produced, actually,

11   by Allergan in this litigation; produced

12   in this litigation by Allergan.  They are

13   Bates stamped Allergan at the bottom.

14             But what you're referring to

15   is that the second document has an

16   Alpharma notation on the first page?

17        A.    Right.

18        Q.    And the first document has

19   an Actavis Elizabeth notation on the

20   first page.

21        A.    Right.

22        Q.    Do you see that?

23        A.    Uh-huh.

24        Q.    So is it your understanding

1    that the first -- is it fair to call

2    these training manuals?

3           A.    That's what they're calling

4    them here, yes.

5           Q.    So the first attached

6    training manual was a revision of the

7    second attached training manual?

8                 MR. ROTH:  By "first" you're

9           referring to the Kadian training

10          manual PDF, which is the first

11          attachment?

12                MS. BAIG:  The first

13          attachment.

14                MR. ROTH:  And the second is

15          the Alpharma final PDF, the second

16          attachment?

17                MS. BAIG:  Yes.

18                THE WITNESS:  Based on

19          what's written here in the e-mail,

20          it says the Actavis module, the

21          first attached document, was

22          created based on the Alpharma

23          module, second attached document.

24    BY MS. BAIG:

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    And is that your
2    understanding of what happened with these
3    documents?
4         A.    That was my understanding
5    back in 2013, yes.
6         Q.    And who would have been
7    responsible for revising the first
8    document into the second document?
9         A.    I don't know.  I probably
10   just started when this was complete on
11   July 1st.  So I don't know.
12        Q.    And who, typically, had
13   responsibility for creating training
14   manuals for opioids?
15        A.    It would have been the sales
16   training department.  But Actavis didn't
17   have one, and that's why I don't know who
18   did it.
19        Q.    Who was Lisa Miller?
20        A.    Lisa Miller was the other
21   woman I mentioned who joined our
22   marketing team.
23        Q.    And what was her position?
24        A.    I don't recall her title.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Let's see.  Is it on here anywhere?  But

 2    she was in marketing with me.

 3            Q.    Was she -- did she report to

 4    you?

 5            A.    Yes.

 6            Q.    And when did she join,

 7    about?

 8            A.    That's a great question.  I

 9    don't recall.

10            Q.    And what did she do, to your

11    knowledge, in the marketing department?

12    What were her responsibilities?

13            A.    Sure.  Assisted me,

14    especially as, you know, the workload

15    became heavier with prelaunch activities

16    related to MoxDuo.

17            Q.    Do you recall how much this

18    training manual changed from the original

19    Alpharma training manual?

20                  MR. ROTH:  Object to the

21            form.

22                  THE WITNESS:  I've never

23            read either one of them.  I can

24            just look at the size and say the
```

```
 1          Actavis one is significantly

 2          smaller.

 3   BY MS. BAIG:

 4          Q.    But you don't know generally

 5   how they changed -- how it changed?

 6          A.    No, no.

 7          Q.    So let's look at the Actavis

 8   one.

 9               Do you see on Page 8 there's

10   a section that says, Pain signal

11   transmission?

12          A.    Yes.

13          Q.    So do you see that in this

14   training manual, the first sentence --

15   couple of sentences of that section say,

16   What is pain?  The most commonly used

17   definition of pain is any sensation the

18   patient perceives to be uncomfortable.

19               Do you see that?

20          A.    Yes.

21          Q.    Do you see on Page 28, in

22   the Actavis training manual, there is a

23   section entitled, Barriers to effective

24   pain control?
```

1      A.    Yes.

2      Q.    And it lists four bullet

3   points.  One says, Fear of addiction.

4   One says, Lack of education about pain

5   and pain control.  One says, Opioid

6   phobia.  And one says, Fear of legal or

7   regulatory action.

8           Do you see those?

9      A.    I do.

10      Q.    Do you recall having

11   discussions, in your capacity at Actavis,

12   regarding fear of addiction being a

13   barrier to effective pain control?

14           MR. ROTH:  Object to the

15       form.

16           THE WITNESS:  No.  These

17       would have been for background

18       use, not to be used in promotion.

19           I think that's -- yeah,

20       internal and training purposes

21       only, not to be distributed.

22   BY MS. BAIG:

23      Q.    Training of whom?

24      A.    The sales representatives.

```
 1            Q.    Right.  Okay.

 2            Do you remember having any

 3   communications, in your capacity as

 4   marketing director, regarding opioid

 5   phobia?

 6            MR. ROTH:  Object to the

 7        form.

 8            THE WITNESS:  No.

 9   BY MS. BAIG:

10            Q.    You don't remember ever

11   having any communications regarding the

12   term "opioid phobia"?

13            MR. ROTH:  Asked and

14        answered.

15            THE WITNESS:  No.  Because

16        that's not in our label, so that

17        wouldn't have been communicated to

18        the sales force as a directive to

19        promote.

20   BY MS. BAIG:

21            Q.    But it is included in this

22   training manual that went to the sales

23   force, correct?

24            A.    Right.  So training manuals
```

1    are designed so that when a

2    representative walks into an office, they

3    are educated.  They are also trained what

4    they can speak on, and that's very

5    narrow.  This gives them a background.

6            Q.    Can you turn to Page 74 of

7    that document?  It's Bates stamped

8    Allergan MDL01610595.

9            A.    Yes.

10           Q.    Do you see where it says in

11   this training manual, quote, There

12   remains no question that opioids

13   effectively reduce the severity of most

14   types of CBP?

15           A.    Yes.

16           Q.    And CBP stands for chronic

17   benign pain; is that right?

18           A.    That's my understanding from

19   the heading.

20           Q.    And "chronic benign pain"

21   refers to chronic noncancer pain; is that

22   your understanding?

23                 MR. ROTH:  Object to the

24           form.  Lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. BAIG:

 2        Q.    What's your understanding of

 3   what "chronic benign pain" means?

 4        A.    I would have to -- I would

 5   have to look it up.

 6        Q.    You don't know?

 7        A.    Not chronic nonbenign pain.

 8   It's a --

 9        Q.    Is it your understanding

10   that "benign" means noncancerous?

11             MR. ROTH:  Same objection.

12        Asked and answered.

13             THE WITNESS:  I believe

14        that's the case, yes.

15   BY MS. BAIG:

16        Q.    Were you aware, while you

17   were at Actavis, of any clinical studies

18   that supported that opioids effectively

19   reduced the severity of most types of

20   chronic benign pain?

21             MR. ROTH:  Objection.  Lacks

22        foundation.  Calls for

23        speculation.  Form.

24             THE WITNESS:  I can say that
```

```
 1            opioids have been approved by the

 2            FDA to be safe and effective for

 3            treating pain.  So the FDA has

 4            determined that that's true.

 5   BY MS. BAIG:

 6            Q.    Well, here we're talking

 7   about chronic benign pain.

 8            A.    Right.  So any product --

 9            Q.    So my question to you is,

10   are you aware of any clinical studies

11   that support that opioids effectively

12   reduce the severity of most types of

13   chronic benign pain?

14                 MR. ROTH:  Objection.  Asked

15            and answered.  Lacks foundation.

16                 MS. BAIG:  It's been asked,

17            but it hasn't been answered.

18                 MR. ROTH:  She gave you an

19            answer.  You don't like it.

20                 She can answer again the way

21            she feels appropriate.

22                 THE WITNESS:  Any clinical

23            study that supports the approval

24            of any opioid by the FDA would
```

Highly Confidential - Subject to Further Confidentiality Review

1       fall into this category.

2   BY MS. BAIG:

3       Q.    And are you aware of studies

4   that support that opioids effectively

5   reduce the severity of most types of

6   chronic benign pain?

7               MR. ROTH:  Objection.  Asked

8           and answered.  Lacks foundation.

9           Calls for speculation.

10  BY MS. BAIG:

11      Q.    As you sit here today, are

12  you aware of those studies that support

13  this statement?

14              MR. ROTH:  Same objections.

15              THE WITNESS:  Only to the

16          extent that they're included in

17          the labels of the particular

18          products that are approved.  So,

19          no, I'm not familiar with every

20          product's studies and that kind of

21          thing.

22  BY MS. BAIG:

23      Q.    Are you familiar with any

24  studies that support this statement?

```
 1              MR. ROTH:  Same objections.
 2         Asked and answered.  I think this
 3         is badgering her at this point.
 4              MS. BAIG:  This is not
 5         badgering.  I'm just trying to get
 6         an answer to this question.
 7    BY MS. BAIG:
 8         Q.   As you sit here, are you
 9    personally aware of any studies that
10    support that opioids effectively reduce
11    the severity of most types of chronic
12    benign pain?
13              MR. ROTH:  Same objections.
14              THE WITNESS:  I know that
15         there were studies in the Kadian
16         label, and every label of every
17         opioid product, that supported
18         that, yes.  I can't give you any
19         more information than that.
20    BY MS. BAIG:
21         Q.   So how do you know?
22         A.   How do I know what?
23         Q.   How do you know -- what
24    studies were they?
```

```
 1              A.    I don't know their names.  I

 2    know that they are included in our label

 3    that was approved by the FDA.

 4              Q.    Did you ever see the

 5    studies?

 6              A.    Did I ever read the studies?

 7              Q.    Did you ever see them?

 8              MR. ROTH:  Object to the

 9         form.

10              THE WITNESS:  Did I ever see

11         the article --

12    BY MS. BAIG:

13              Q.    You just stated that you

14    were aware of the studies.

15              Did you ever see them?

16              MR. ROTH:  Object to the

17         form.

18              THE WITNESS:  I saw what was

19         listed in our prescribing

20         information.

21    BY MS. BAIG:

22              Q.    Do you recall there being

23    any studies there that supported that

24    opioids effectively reduce the severity
```

 1    of most types of chronic benign pain?

 2          A.    The foundation of our label

 3    is based on clinical studies, that's how

 4    a drug gets approved.

 5          Q.    For chronic benign pain?

 6          A.    That was our indication.

 7          Q.    Are you aware of any studies

 8    that support that?

 9          A.    I truly don't know how to

10    answer the question, other than what I've

11    been answering.

12          Q.    You're saying that there

13    were studies?

14          A.    I'm saying, by definition, a

15    drug is approved based on clinical

16    studies.  There had to have been studies.

17          Q.    But are you aware of what

18    they are, is my question.  Do you know

19    which studies?  Who did the studies?

20    Have you ever seen the actual studies?

21               MR. ROTH:  Objection.  Asked

22          and answered.

23               THE WITNESS:  At the time I

24          was working on the product, I had

1       seen the studies.

2   BY MS. BAIG:

3       Q.    You had?

4       A.    Could I name them?

5       Q.    Who gave you the studies?

6       A.    They're listed in the

7   prescribing information of the product.

8       Q.    Did you actually see the

9   studies, though, the reports, the

10  articles?

11      A.    If an article was published,

12  yes, I saw the articles.

13      Q.    Do you have any recollection

14  of them?

15            MR. ROTH:  Object to the

16      form.  Asked and answered.

17            THE WITNESS:  No.

18  BY MS. BAIG:

19      Q.    No.

20            If I wanted to get them, do

21  you know who I would ask, at Actavis, to

22  receive them?

23      A.    All you would have to do is

24  go online and look at the Kadian PI and

```
 1    pull them.

 2            Q.    And pull the studies?

 3            A.    Uh-huh.

 4            Q.    That support this statement?

 5            A.    Our indication supports that

 6    statement.  So the FDA has supported

 7    that.

 8            Q.    Okay.  Do you see the next

 9    page, Page 76, please?

10            Do you see there's a section

11    that's called, Substance abuse?

12            A.    Yes.

13            Q.    And it says, Substance abuse

14    will be seen in a few patients in every

15    chronic benign pain practice.  Perhaps

16    largely because patients attempting to

17    obtain opioids will eventually end up at

18    a pain management practice.

19            Do you see that?

20            A.    I do.

21            Q.    And do you see how it goes

22    on, However, despite the continued

23    unscientific beliefs of some clinicians,

24    there is no evidence that simply taking
```

1    opioids for a period of time will cause

2    substance abuse or addiction.  It appears

3    likely that most substance-abusing

4    patients in pain management practices had

5    an abuse problem before entering the

6    practice.  This topic is so important and

7    so much misinformation exists that it is

8    discussed separately in Chapter 6.

9              Do you see that?

10        A.    I do.

11        Q.    Are you aware of any data

12   that supports that only a few patients in

13   every chronic benign pain practice

14   suffer -- hang on.

15              Are you aware of any data

16   that supports that substance abuse will

17   be seen in a few patients in every

18   chronic benign pain practice, perhaps

19   largely because patients attempting to

20   obtain opioids will eventually end up at

21   a pain management practice?

22              MR. ROTH:  Objection to

23         form.  Lacks foundation.  Calls

24         for speculation.

 1   BY MS. BAIG:

 2        Q.    Are you aware of the data

 3   that supports that, if there is any?

 4             MR. ROTH:  Same objections.

 5             THE WITNESS:  I don't know

 6        what the reference is for that.

 7   BY MS. BAIG:

 8        Q.    Okay.  And the next

 9   sentence, However, despite the continued

10   unscientific beliefs of some clinicians,

11   there is no evidence that simply taking

12   opioids for a period of time will cause

13   substance abuse or addiction.

14             Are you aware of the data

15   that supports that statement?

16             MR. ROTH:  Objection to

17        form.  Lacks foundation.  Calls

18        for speculation.

19             THE WITNESS:  I don't know

20        what the reference is for that

21        statement.

22   BY MS. BAIG:

23        Q.    And for the third sentence,

24   It appears likely that most

1  substance-abusing patients in pain

2  management practices had an abuse problem

3  before entering the practice, are you

4  aware of any data that supports that

5  statement?

6        A.    I don't know what the

7  reference is for that.

8        Q.    And so -- and you're not

9  aware of who actually drafted this sales

10 training manual?

11       A.    That's correct.

12             MR. ROTH:  Can we take a

13       quick break?  I'm told there's

14       someone trying to dial in.

15             MS. BAIG:  I think we should

16       just get through this document

17       first.

18             MR. ROTH:  How much longer

19       do you have?  There's --

20             MS. BAIG:  Less than two

21       minutes.

22             MR. ROTH:  Totally fine.

23             MS. BAIG:  Maybe four

24       minutes.

```
 1              MR. ROTH:  It can even be

 2         six.

 3    BY MS. BAIG:

 4         Q.    All right.  Do you see the

 5    next page, Page 77?

 6         A.    Uh-huh.

 7         Q.    Actually, let's go back to

 8    Page 76, at the bottom.

 9              Do you see the statement

10    that states, Educating clinicians about

11    these guidelines will help to ease their

12    fears of prescribing for patients with

13    chronic benign pain?

14         A.    I do.

15         Q.    And was it your

16    understanding that the sales reps were to

17    educate clinicians about the guidelines?

18              MR. ROTH:  Objection.

19         Mischaracterizes the document.

20         Objection to form.

21              MS. BAIG:  Let me restate

22         that question.

23    BY MS. BAIG:

24         Q.    Was it your understanding
```

Highly Confidential - Subject to Further Confidentiality Review

1  that the sales reps were to educate

2  clinicians about the guidelines so as to

3  ease prescribers' fears of prescribing

4  opioids for patients with chronic benign

5  pain?

6                 MR. ROTH:  Objection.  Form.

7                 THE WITNESS:  The only

8          direction sales reps would have

9          been given regarding education was

10         what was in our -- what was in our

11         promotional materials.

12  BY MS. BAIG:

13         Q.    And the sales reps were also

14  given this training manual, correct?

15         A.    As background use, not to be

16  distributed.

17         Q.    Not to be distributed to

18  prescribers?

19         A.    Right.

20         Q.    But it was distributed to --

21         A.    It was for their background.

22         Q.    Correct.  But it was --

23  understood.

24                 But it was distributed to

1    the sales team, correct?

2          A.    Right.

3          Q.    And the next page, it

4    states, Three national guidelines have

5    been published concerning the use of

6    opioids in chronic benign pain.

7               It goes on to state, The

8    American Academy of Pain Medicine and

9    American Pain Society have published a

10   consensus statement, quote, The use of

11   opioids for the treatment of chronic

12   pain.

13         A.    Uh-huh.

14         Q.    Are you aware of the

15   consensus statement that was issued by

16   the American Academy of Pain Medicine and

17   American Pain Society?

18         A.    I don't believe that was

19   something we used in our promotional

20   materials.

21         Q.    No.  But it's referenced

22   here in this sales manual.

23               So my question is --

24         A.    No, I was saying --

1      Q.     -- are you aware --

2      A.     -- you're saying am I

3    personally aware of it?  No, because I

4    don't think we used it in our promotional

5    materials.

6      Q.     Have you ever heard of the

7    American Academy of Pain Medicine?

8      A.     I have.

9      Q.     And what do you know about

10   the American Academy of Pain Medicine?

11     A.     Just that they're a medical

12   society.

13     Q.     And have you ever had an

14   occasion to work with the American

15   Academy of Pain Medicine?

16     A.     I don't believe so.

17     Q.     So you've never talked with

18   anybody from the American Academy of Pain

19   Medicine?

20     A.     I'm trying to remember.  I

21   remember we had initial conversations

22   with several organizations leading up to

23   the MoxDuo launch.  But, again, we didn't

24   launch MoxDuo, so we didn't have any --

1    anything more than an initial meeting.

2              I don't recall if APM was on

3    that list or not.

4         Q.    And do you know if anybody

5    else from Actavis communicated with the

6    American Academy of Pain Medicine?

7         A.    Perhaps our medical

8    director.

9         Q.    Who was that, again?

10        A.    Jeanette Barrett.

11        Q.    And what department is she

12   in?

13        A.    Medical.

14        Q.    That's the full name of the

15   department?

16        A.    It might have been medical

17   affairs.

18        Q.    And how large is that

19   department?

20        A.    At the time, I believe she

21   was the only person in it, or she may

22   have brought on people as it grew.  I

23   don't recall.

24        Q.    And I have the same line of

Highly Confidential — Subject to Further Confidentiality Review

1    questions with respect to the American

2    Pain Society, the next organization

3    that's listed there.

4              Have you had any

5    communications with the American Pain

6    Society, ever?

7         A.    It would be similar.  I'm

8    trying to recall.

9              This might have been a

10   society that Jeanette and I attended a

11   corporate advisory meeting for.  I recall

12   doing one for one of the organizations.

13   It could have been APS.

14        Q.    Do you recall what the

15   corporate advisory meeting was about?

16        A.    Not specifically.  Normally

17   those, when you attend, it's, you know,

18   representatives from a multitude of

19   pharmaceutical companies listening to the

20   goals of the society, the programs they

21   are going to produce, that kind of thing.

22        Q.    Have you been to a number of

23   those meetings?

24        A.    I'm trying to remember if

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I've been to -- let's see.

 2              I attended an introductory

 3    meeting, we're not on the council yet,

 4    but for the American Academy of

 5    Neurology, earlier this year.

 6         Q.    And before this year, have

 7    you attended any of those meetings?

 8         A.    Not that I can recall.

 9         Q.    Apart from the one that you

10    may have attended with Jeanette Barrett;

11    is that right?

12         A.    Correct.

13         Q.    And that would have been in

14    your capacity as marketing director at

15    Actavis; is that right?

16         A.    Correct.

17         Q.    The next paragraph starts

18    with, The Federation of State Medical

19    Boards.

20              Do you see that?

21         A.    No -- oh, yes.

22         Q.    And it states, The

23    Federation of State Medical Boards has

24    developed model guidelines for the use of
```

1    controlled substances for the treatment

2    of pain which has, in turn, been adopted

3    by numerous state medical boards.

4                 Do you see that?

5         A.    Uh-huh.

6         Q.    Have you ever had any

7    communications with The Federation of

8    State Medical Boards?

9         A.    Not to my knowledge, no.

10        Q.    You've never attended any

11   meetings with them?

12        A.    No.

13        Q.    Are you aware of those model

14   guidelines?

15        A.    No.

16        Q.    You've never reviewed them?

17        A.    No.

18        Q.    Can you turn to Page 86,

19   please?

20                 Do you see in the last

21   paragraph -- well, in the section that's

22   entitled, Definitions of Substance Abuse

23   and Dependence, do you see that?

24        A.    What page is that on?

Highly Confidential — Subject to Further Confidentiality Review

```
1        Q.     The prior page has the

2    heading.

3        A.     Yes.

4        Q.     And do you see on Page 86,

5    in the last paragraph, it says, Physical

6    withdrawal generally, but not always,

7    resolves within five to eight days and is

8    not considered life-threatening?

9        A.     Yes.

10       Q.     Are you aware of any

11   clinical studies that support that

12   statement?

13            MR. ROTH:  Objection to

14         form.  Lack of foundation.  Calls

15         for speculation.

16            THE WITNESS:  I don't know

17         the reference for that statement.

18   BY MS. BAIG:

19       Q.     Okay.  The next sentence

20   states, Nonetheless, these withdrawal

21   symptoms are uncomfortable and unpleasant

22   and management of the symptoms is

23   desirable.

24            Are you aware of any
```

```
 1    clinical studies that support or explain

 2    how to manage those symptoms?

 3                    MR. ROTH:  Same objections.

 4                    THE WITNESS:  I'm not aware

 5           of the reference for that

 6           statement.

 7                    MS. BAIG:  Okay.  I have no

 8           further questions about this

 9           document.  So if now is a good

10           time to take a break?

11                    MR. ROTH:  Yes.

12                    MS. BAIG:  How much time

13           would you like?

14                    MR. ROTH:  Five minutes.  Is

15           that okay?

16                    MS. BAIG:  Sure.

17                    VIDEO TECHNICIAN:  The time

18           is 10:59 a.m.  Going off the

19           record.

20                      -  -  -

21                    (Whereupon, a brief recess

22           was taken.)

23                      -  -  -

24                    VIDEO TECHNICIAN:  We are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          back on the record.  The time is

 2          11:15.

 3                  MS. BAIG:  I'd like to have

 4          this next document marked as the

 5          next in order.  It's Bates stamped

 6          Actavis 0815204 through 0815206.

 7          It's an e-mail string.  It begins

 8          as an e-mail string from Nathalie

 9          Leitch to Jennifer Altier.

10                      -  -  -

11                  (Whereupon, Allergan-Altier

12          Exhibit-3, Actavis 0815204-5206,

13          was marked for identification.)

14                      -  -  -

15   BY MS. BAIG:

16          Q.   If you'd just take a moment

17   to review the document, please.

18                  Have you had a chance to

19   look at the document?

20          A.   I haven't read it completely

21   but I get the gist of it.

22          Q.   Do you recall receiving this

23   document in the regular course of your

24   business at Actavis?
```

 1        A.    Not offhand.  But clearly I

 2   did.

 3        Q.    Okay.  And this is a weekly

 4   update entitled, Weekly Update, dated

 5   August 26th, 2011; is that right?

 6        A.    That's the subject of the

 7   e-mail.

 8        Q.    Okay.

 9        A.    I believe that references

10   more the initial e-mail than the content

11   that followed.

12        Q.    And at the bottom of the

13   first page, you see other recipients on

14   the e-mail string are Doug Boothe,

15   Terrence Fullem and Bruce Sullivan?

16        A.    Yes.

17        Q.    And Doug Boothe, I believe

18   you testified, was the CEO?

19        A.    Correct.

20        Q.    And Terrence Fullem, again,

21   what was his position?

22        A.    He reported to Doug.

23        Q.    And his position was --

24        A.    I forget titles, but picture

1    it as me, Nathalie, Terry and Doug.

2         Q.    So he's in a marketing

3    capacity?

4         A.    No.  He was more overall.  I

5    think I categorized it as commercial

6    operations.  I honestly don't remember

7    what his title was.

8         Q.    And who is Bruce Sullivan?

9         A.    Bruce was -- I don't recall

10   his exact -- sort of a project planner --

11   that's not right.

12             I'm going to have to say I

13   don't recall.  He was a member of the

14   team.  I don't remember his exact

15   function.

16        Q.    And do you remember what was

17   happening at the time of this e-mail or,

18   generally speaking, what you all were

19   talking about?

20             MR. ROTH:  Object to the

21        form.

22             THE WITNESS:  Do you have

23        anything specifically you want me

24        to respond to?

```
 1   BY MS. BAIG:

 2        Q.    Not yet.

 3              Just generally do you

 4   understand the gist of the e-mails?

 5        A.    Well, it sounds like Doug

 6   was talking to Nathalie that, scripts

 7   were potentially declining or -- so he

 8   just wanted to see what we were doing.

 9        Q.    Prescriptions for what?

10        A.    For Kadian.

11        Q.    So at the bottom of the

12   first page, do you see where it says,

13   from Nathalie to Doug, The unit sales out

14   from wholesalers to retailers does show a

15   loss of momentum?

16        A.    Correct.

17        Q.    It goes on to state, This is

18   seasonal, to some degree.

19        A.    Right.  So this was August,

20   so a lot of people go on vacation, that

21   kind of thing.

22        Q.    So is there any -- is there

23   any other reason that there would be a

24   seasonal impact on prescriptions for
```

```
 1    Kadian, or any other opioid drugs?

 2            A.    Not that I'm aware of no.

 3                  MS. RANJAN:  Object to the

 4            form of the last question.

 5    BY MS. BAIG:

 6            Q.    The last two sentences on

 7    this page state -- or the last paragraph

 8    states, The team's objective coming out

 9    of the NSM was to maintain target, TRX --

10    is that prescriptions?

11            A.    I'm sorry, where are you?

12            Q.    Last paragraph.

13                  MR. ROTH:  Bottom of the

14            page.

15                  THE WITNESS:  Team's

16            objective, okay.

17    BY MS. BAIG:

18            Q.    It states, The team's

19    objective coming out of the NSM was to

20    maintain target TRX at the post Embeda

21    recall level.

22                  What is NSM?

23            A.    National sales meeting.

24            Q.    And what is the national
```

1  sales meeting?

2          A.    In our case, once a year, we

3  would get the sales team together to have

4  a meeting with them.

5          Q.    The sales teams from where?

6          A.    All across the country,

7  every representative.

8          Q.    For what drugs?

9          A.    This would have been for

10  Kadian.

11          Q.    So is there -- I'm confused.

12  I thought you testified earlier that

13  there was just one sales team, it was

14  between 18 and 48 people.

15              So which sales teams is this

16  referring to?

17          A.    Only one.  We only had one.

18          Q.    So for the national sales

19  meeting, who attended that?

20          A.    That sales force.

21          Q.    The inVentiv sales force of

22  18 to 48 people, varying at different

23  times?

24          A.    Uh-huh.

1    Q.    And where was the national

2  sales meeting generally held?

3    A.    It varied.  Most times in

4  Florida somewhere.

5    Q.    And it goes on to state --

6  oh, wait.

7          What does TRX stand for?

8  Does that stand for prescriptions?

9    A.    Total prescriptions, as

10  opposed to --

11    Q.    Total prescriptions?

12    A.    Yes.

13    Q.    And what does that mean,

14  maintain target total prescriptions at

15  the post Embeda level?

16    A.    I'm assuming we had a target

17  TRX level that we wanted to maintain.  So

18  that's what it refers to.

19    Q.    What's a post Embeda recall?

20    A.    Embeda was recalled off the

21  market, so that created a potential

22  opportunity for more Kadian

23  prescriptions.  Doctors would have to

24  make a choice with their Embeda patients

```
 1   what product to now put them on.

 2        Q.    Who had the Embeda product?

 3        A.    Gosh.  Who did Alpharma

 4   become?

 5        Q.    Was it King?

 6        A.    It must have been King.

 7        Q.    So does this suggest that

 8   the targets for the sales reps was

 9   increased when Embeda was recalled, and

10   here what they're being told is to

11   maintain that increased level?

12             MR. ROTH:  Objection.  Lacks

13        foundation.  Calls for

14        speculation.

15             THE WITNESS:  Yeah, I don't

16        recall.  It just says that we're

17        trying to maintain the target

18        level.  It goes to say what that

19        was.

20   BY MS. BAIG:

21        Q.    So when it states, This

22   meant targets needed to write an average

23   of 13 -- of 1,306 Kadian prescriptions

24   per day --
```

```
1           A.     Uh-huh.

2           Q.     -- for the four months

3    ending August.

4           A.     Uh-huh.

5           Q.     Who needs to write the 1,306

6    Kadian prescriptions per day?

7                  MR. ROTH:  Objection.  Lacks

8           foundation.  Calls for

9           speculation.

10                 THE WITNESS:  My assumption,

11          by reading this, is the cumulative

12          physicians on our target list.

13   BY MS. BAIG:

14          Q.     So this is sort of a sales

15   goal, a goal for your sales staff to

16   meet?

17          A.     That's my interpretation,

18   yes.

19          Q.     Okay.  And it's cumulative,

20   it's for the entire sales staff, but is

21   it broken down for each sales rep, that

22   they need to have their target

23   prescribers write a certain number of

24   prescriptions per day?
```

```
 1            A.    I don't recall how that was

 2    done.

 3            Q.    Who would have worked with

 4    the sales team in order to set those

 5    goals?

 6            A.    Potentially, Nathalie.

 7            Q.    Anybody else?

 8            A.    Potentially the sales heads.

 9            Q.    The ones you identified

10    before?

11            A.    Yep.

12            Q.    But you did not do that?

13            A.    No.

14            Q.    Do you see the next

15    paragraph, it states, We added new

16    high-volume generic MS writers to each of

17    the territories at the end of July?

18            A.    Uh-huh.

19            Q.    And it goes on to state, The

20    response from these writers to our

21    message has been positive so far.  We're

22    looking to this segment to drive growth

23    over the coming months.

24                  So does this suggest that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you're adding high-volume generic

 2    prescription writer doctors to the

 3    targets for the sales reps?

 4              MR. ROTH:  Objection.  Form.

 5         Lacks foundation.  Calls for

 6         speculation.

 7              You can answer.

 8              THE WITNESS:  I believe what

 9         it says is that we added new --

10         new high-volume generic MS

11         writers.  So it was specific to

12         that drug, yes.

13    BY MS. BAIG:

14         Q.    What is -- can you just say

15    what this means in lay person's terms?

16    What is meant by "generic MS writers"?

17         A.    I believe it refers to

18    generic MS-Contin, but I can't be sure.

19         Q.    And what is generic

20    MS-Contin?

21         A.    A drug.

22         Q.    Is it an opioid?

23         A.    I believe so.

24         Q.    So here you're giving your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sales team high-volume generic opioid

 2    prescribers to target; is that correct?

 3              MR. ROTH:  Objection to

 4         form.  Lacks foundation.  Calls

 5         for speculation.

 6              THE WITNESS:  It appears

 7         that high writers of that generic

 8         product were added to the list so

 9         that they could be educated about

10         our product.

11    BY MS. BAIG:

12         Q.    In order to drive segment

13    growth, correct?

14              MR. ROTH:  Object to the

15         form.

16    BY MS. BAIG:

17         Q.    Or in order to drive growth?

18              MR. ROTH:  Same objection.

19              THE WITNESS:  That's what

20         the statement says.

21    BY MS. BAIG:

22         Q.    Okay.  Do you see the next

23    paragraph, it states, Again, our focus

24    once again is on the high-volume generic
```

```
 1    MS writers?

 2         A.    The next paragraph?

 3               Oh, yes, okay.

 4         Q.    Do you see that?

 5         A.    Yes.

 6         Q.    And it states that you're

 7    adding new territories.

 8               Do you recall what new

 9    territories were being added?

10         A.    No.  But that would be what

11    I alluded to, that we went from 18 to a

12    certain more number.

13         Q.    Do you know whether Ohio was

14    among those territories?

15         A.    I don't.

16         Q.    Where would those

17    territories be identified?

18         A.    I don't know.

19         Q.    If you still worked at

20    Actavis and you wanted to know what

21    territories your sales reps were going

22    to, would you have a way of finding out

23    that information?

24         A.    Sure.  I would go to the
```

1    sales heads.

2         Q.    Okay.  Do you see the third

3    paragraph down, it says, The direct mail

4    and e-mail campaigns roll out next week.

5    Main messages here are long history of

6    safe and efficacious use, favorable

7    formulary position, and co-pay program.

8              Do you see that?

9         A.    I do.

10        Q.    Are you aware of the

11   clinical studies that support that

12   there's a long history of safe and

13   efficacious use?

14             MR. ROTH:  Objection.  Form.

15        Asked and answered.

16             THE WITNESS:  Same answer as

17        before.

18   BY MS. BAIG:

19        Q.    What was it?  Are you aware

20   of those clinical studies?

21        A.    As they are included in our

22   PI, yes.

23        Q.    Are you, as you sit here

24   today, aware of the clinical studies that

```
 1    support that there is a long history of

 2    safe and efficacious use for Kadian?

 3             MR. ROTH:  Objection.  Form.

 4         Lacks foundation.  Calls for

 5         speculation.  Asked and answered,

 6         like five times.

 7             THE WITNESS:  I don't

 8         understand how -- I'm aware that

 9         there are studies in our

10         prescribing information that if I

11         even went to Kadian.com, I could

12         find out the information.

13    BY MS. BAIG:

14         Q.    All right.  But you can't

15    tell me what those studies are as you sit

16    here right now; is that right?

17             MR. ROTH:  Same objections.

18             THE WITNESS:  I was not a

19         physician in the clinical study,

20         no.  I'm not a physician.

21    BY MS. BAIG:

22         Q.    Okay.  Do you see the next

23    paragraph?

24         A.    Uh-huh.  I do.
```

1    Q.    Do you see here it says, We

2    have looked at speakers programs?

3    A.    Uh-huh.

4    Q.    And have made the decision

5    not to pursue?

6    A.    Correct.

7    Q.    And then it states, Legal

8    and regulatory have been strongly

9    opposed, plus the cost/benefit very

10   uncertain, given the complete lack of

11   clinical data for Kadian.

12         Do you see that?

13   A.    I do.  I know what that's

14   referencing.  The word that's missing

15   there is a complete lack of new clinical

16   data.  We would have nothing new for the

17   speakers to speak about if we did a

18   speakers program.

19   Q.    Nothing new from when?

20   A.    Nothing new from the -- as

21   far as I knew, at the approval.  So,

22   therefore, when she goes on to say,

23   generating prescriber interest in a

24   Kadian program would be challenging,

```
 1    given what we are able to talk about, we

 2    had nothing new since the product was

 3    approved.

 4          Q.    Why were legal and

 5    regulatory strongly opposed to using

 6    speakers programs?

 7              MR. ROTH:  I'm going to

 8          object and instruct you not to

 9          answer anything that would reveal

10          privileged communications from

11          your legal department.

12              If you can answer that

13          without revealing privileged

14          communications, feel free.  But I

15          think that probably calls for

16          most, if not all, privileged

17          communications in response.

18              THE WITNESS:  Correct.

19    BY MS. BAIG:

20          Q.    Did you ever hear from

21    anybody, other than a lawyer at Actavis,

22    as to why they were opposed to using

23    speakers programs?

24              MR. ROTH:  And, again, I'm
```

1          going to caution you.  If you

2          heard from a nonlawyer about

3          legal's opposition and legal's

4          reasons, that's privileged, don't

5          reveal that.  If some nonlawyer

6          told you some nonlegal reason for

7          being opposed to speakers bureaus,

8          feel free to say.

9                THE WITNESS:  Other than

10         legal, I think cost was just the

11         only other issue.

12    BY MS. BAIG:

13         Q.   Did you ever hear anything

14    from the regulatory department regarding

15    why they were not going to use speakers

16    programs at this particular juncture?

17                MR. ROTH:  And, again, to

18         the extent that the regulatory

19         group was relying on legal advice,

20         you should not reveal that.  I'll

21         instruct you not to answer that.

22                But if regulatory had some

23         other conversations that didn't

24         relate to legal issues, you can

1        reveal that.

2             MS. BAIG:  Are you asking --

3        how is this witness supposed to

4        know what regulatory is relying on

5        if they tell her something?

6             MR. ROTH:  Well, if it came

7        from legal and it has to do --

8             MS. BAIG:  How does she know

9        that?

10            MR. ROTH:  Then she can't

11       answer the question.

12            MS. BAIG:  The objection

13       lacks foundation.

14            MR. ROTH:  I guess she can't

15       answer the question.

16            MS. BAIG:  Are you

17       instructing her not to answer the

18       question?

19            MR. ROTH:  I'm instructing

20       her not to reveal legal advice

21       about why legal and regulatory

22       were opposed.

23            THE WITNESS:  I'll just

24       confirm I have nothing additional

1        to add.

2    BY MS. BAIG:

3        Q.    Okay.  So you see the

4    sentence that says, Legal and regulatory

5    have been strongly opposed, plus the

6    cost/benefit very uncertain given the

7    complete lack of clinical data for

8    Kadian.  Generating prescriber interest

9    in a Kadian program would be very

10   challenging, given what we are able to

11   talk about.

12             Was it your understanding

13   that generating prescriber interest in

14   Kadian was very challenging, given what

15   you were able to talk about at that time

16   in terms of marketing?

17       A.    In terms of a speaker

18   program, I'm dealing with this in my

19   current job, it's very difficult to get

20   physicians to commit their personal time,

21   you know, away from their families, away

22   from their practice, you know, to come

23   out and listen to a speaker program in

24   general.

1    There has to be, you know,

2  some new news, some important

3  information, some educational need that

4  program is fulfilling to get them away

5  from their families or their practice or

6  that sort of thing.

7    So that's what that is

8  referring to.

9    Q.    And a little further down,

10  it states, We are losing momentum here.

11    Is that -- is that a

12  reference to losing sales momentum with

13  Kadian?

14    A.    I can't speak to -- I don't

15  know what was in the attachment that he's

16  referring to.

17    Q.    And where it says, What can

18  we do to re-establish our script level

19  over 26,000 a week, is it your

20  understanding that that's a sales goal, a

21  sales target from a sales team?

22    A.    It's my understanding that

23  at one point that was our script level,

24  and it is no longer, evidently.

1          Q.    And the last line says, At

2     the end of the day, is this purely a

3     brute force direct detail item?

4               What's your understanding of

5     what that means?

6          A.    I thought you were going to

7     ask me that, because I'm like, I don't

8     know what that means.

9               Perhaps referring to, is it

10    a sales force -- but I can't say for

11    certain what that means.

12         Q.    All right.

13              MS. BAIG:  Let's have this

14         next document marked as the next

15         in order, please.  It's Bates

16         stamped Actavis 0319280 through

17         Actavis 0319282.

18                   -  -  -

19              (Whereupon, Allergan-Altier

20         Exhibit-4, Actavis 0319280-9282,

21         was marked for identification.)

22                   -  -  -

23    BY MS. BAIG:

24         Q.    This is Exhibit-4.  This is

1    an e-mail string between yourself and

2    Nathalie Leitch, the top of which is

3    dated February 23rd, 2012.  It states,

4    Proposal for message/concept testing.

5              Do you see that?

6         A.    Uh-huh.  Yes, I'm sorry.

7         Q.    And do you see on the first

8    page it lists a number of drugs?

9         A.    Yes.

10        Q.    Oxycodone; Oxycodone

11   Acetaminophen; Tapentadol, which is

12   Nucynta, it says in parenthesis;

13   oxymorphone; morphine sulfate; Oxycodone

14   Ibuprofen; codeine sulfate; and

15   hydromorphone.

16             Do you see that?

17        A.    Uh-huh.

18        Q.    And are those all Actavis

19   drugs?

20             MR. ROTH:  Object to the

21        form.

22             THE WITNESS:  I couldn't

23        comment if those are all Actavis

24        drugs or not.

1    BY MS. BAIG:

2         Q.    You don't know whether those

3    are Actavis generic drugs?

4         A.    I wasn't involved in

5    generics.  I didn't know their product

6    line.

7         Q.    Well, do you know if

8    hydromorphone was an Actavis drug?

9         A.    I don't.  They might have --

10        Q.    Haven't we already talked

11   about hydromorphone?

12        A.    No.  Oxymorphone, I

13   thought -- Oxycodone, I thought we talked

14   about.

15        Q.    Do you know if Oxycodone is

16   an Actavis drug?

17             MR. ROTH:  Object to the

18        form.  Asked and answered.

19             THE WITNESS:  Yeah, I'll

20        just -- I'm not comfortable saying

21        what the generic pipeline looked

22        like.

23   BY MS. BAIG:

24        Q.    But you did receive this

```
 1    e-mail in your regular course of

 2    business, right?

 3           A.    I understand these are

 4    products.  I don't know if they were

 5    Actavis products.

 6           Q.    Are they products that

 7    Actavis was tracking data for?

 8           A.    No.

 9           Q.    Do you see the first

10    sentence that says, According to the

11    three months of data that I have

12    received --

13           A.    Uh-huh.

14           Q.    -- 24 months data will be

15    available February 29th and including the

16    following product strength -- and then it

17    lists the drugs?

18           A.    Uh-huh.

19           Q.    And then it goes on to

20    state, The following specialty groups

21    account for 65 percent of prescriptions

22    for the above products.

23           A.    Right.

24           Q.    Do you see that?
```

1      A.    Yes.

2      Q.    So is it fair to say that

3   Actavis was tracking data for these

4   products?

5           MR. ROTH:  And if you need

6       to look at the whole string.

7           THE WITNESS:  Can I do --  I

8       don't know whether -- just give me

9       a second.

10          It appears we're trying to

11      determine what specialty groups

12      prescribe pain products in the

13      interest of market research.

14   BY MS. BAIG:

15      Q.    And the specialty groups

16   identified as being high prescribers of

17   pain products are family practice,

18   internal medicine, anesthesiology,

19   emergency medicine and orthopedics,

20   correct?

21      A.    That's what's listed in the

22   e-mail, yes.

23      Q.    So is it your understanding

24   that Actavis was tracking data for these

1    products?

2            MR. ROTH:  Object to the

3        form.  Lacks foundation.  Calls

4        for speculation.

5            THE WITNESS:  Yeah, I can

6        only comment that the

7        information that is in this

8        e-mail, that it said that these

9        specialties prescribed the

10       majority of these products.

11   BY MS. BAIG:

12           Q.    So they were at least

13   tracking -- somebody at Actavis was at

14   least tracking the data that is in this

15   e-mail?

16           A.    Correct.

17           Q.    All right.  And do you see

18   the next paragraph, it states, If you

19   think we should cast the net even wider,

20   I would consider adding general surgeons

21   and PM&R to the mix, and even neurology,

22   OB/GYN, dentistry and plastic surgery.

23           Do you see that?

24           A.    I do.

1          Q.    And is this suggesting that

2    these practices ought to be targeted at

3    Actavis?

4                MR. ROTH:  Object to the

5                form.  Completely mischaracterizes

6                the document.  You didn't read the

7                last sentence of the paragraph.

8                MS. BAIG:  I'm going to

9                object to your speaking

10               objections.

11               MR. ROTH:  How many

12               respondents will be involved?

13               MS. BAIG:  You're making

14               speaking objections to coach the

15               witness.  And if we need to get

16               the court on the line, then we

17               will do that.

18               But you're not able to do

19               that.  You can object to the form.

20               MR. ROTH:  I'm going to

21               object to form and say you're

22               mischaracterizing the document.

23               MS. BAIG:  I'm just reading

24               the document.

 1         MR. ROTH:  And omitting the

 2     last sentence of the same

 3     paragraph.

 4         MS. BAIG:  You're coaching

 5     the witness.

 6         MR. ROTH:  I am not coaching

 7     the witness.

 8         MS. BAIG:  You are coaching

 9     the witness.  These are speaking

10     objections.  And you're not

11     entitled to make them, per the

12     deposition protocol and the local

13     rules.

14         MR. ROTH:  Ask your

15     question.  I'll make my

16     objections.

17         MS. BAIG:  I already asked

18     my question.

19         Can we go back to the

20     question, please?

21  BY MS. BAIG:

22     Q.   Is this suggesting that

23  these practices ought to be targeted at

24  Actavis?

```
 1              MR. ROTH:  Objection to

 2         form.  Mischaracterizes the

 3         document.

 4              MS. BAIG:  It doesn't

 5         mischaracterize the document.

 6              THE WITNESS:  It does --

 7              MS. BAIG:  It's asking about

 8         the document.

 9              THE WITNESS:  If I can

10         clarify.

11              It's not suggesting that we

12         are targeting these specialties,

13         it is suggesting that we reach out

14         to them for market research

15         activity.

16    BY MS. BAIG:

17         Q.    Where does it say that?

18         A.    That's what the whole thing

19    is about.  Proposal for message/concept

20    testing.  It's from a market research

21    vendor, Diane Donald, at Campbell

22    Alliance.  She's asking what specialties

23    we want to talk to about our messaging

24    and concepts.  And that's the response.
```

1    Q.    And so did you do the

2  concept testing?

3    A.    This was for MoxDuo.  I know

4  we did market research for MoxDuo;

5  potentially, yes, we did, with this

6  vendor.

7    Q.    And did you do any market

8  research for opioid drugs in these

9  general areas, to your knowledge?

10          MR. ROTH:  Object to the

11      form.

12  BY MS. BAIG:

13    Q.    Family practice, internal

14  medicine, anesthesiology, emergency

15  medicine and orthopedics.

16    A.    I don't know who the

17  ultimate audience was.  But the focus

18  would have been the messages and concepts

19  from MoxDuo, not those products.

20    Q.    Did you do any market

21  research for opioid drugs in these

22  general areas, to your knowledge?

23    A.    Which drugs are you

24  referring to?

Highly Confidential – Subject to Further Confidentiality Review

```
 1            Q.    Any opioid drugs at Actavis.

 2                  MR. ROTH:  Object to the

 3            form.  Vague.

 4                  THE WITNESS:  Our market

 5            research would have been focused

 6            on Kadian and MoxDuo.

 7   BY MS. BAIG:

 8            Q.    Those are the only two drugs

 9   at Actavis, to your knowledge, for which

10   they did any market research?

11            A.    Those were the only two we

12   were interested in.

13            Q.    So the answer is?

14            A.    I mean, to my recollection,

15   those were the only two that we initiated

16   any market research on.

17            Q.    You didn't do any market

18   research for any of your generic drugs?

19            A.    I wouldn't have been

20   involved in that.

21            Q.    So you don't know the answer

22   to that?

23            A.    Right.  Correct.

24            Q.    And do you see here in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    next paragraph, second-to-last paragraph,
 2    it states, again, Targeting high-volume
 3    prescribers of opioids?
 4          A.    Which paragraph?
 5          Q.    Second-to-last.
 6          A.    Intern -- oh, I think --
 7    yes.
 8                MR. ROTH:  Object to the
 9                form.
10                THE WITNESS:  I see the
11                sentence, I think we should
12                absolutely include PCPs who are
13                high-volume prescribers of opioids
14                for the market research
15                initiative.
16    BY MS. BAIG:
17          Q.    It doesn't say for the
18    market research initiative, does it?
19          A.    No.  But that's what we're
20    talking about in this message.
21          Q.    Do you see the last sentence
22    there that says, Let's set the inclusion
23    criteria aggressively in terms of opioid
24    prescriptions written per month?
```

```
 1            A.    Yes.

 2            Q.    And what is that referring

 3     to, to your understanding?

 4            A.    That's just good market

 5     research.  We would want physicians

 6     involved in market research activity that

 7     actually prescribe the products, not, you

 8     know, a family practice that didn't

 9     prescribe the products.

10            Q.    That are high-volume

11     prescribers, correct?

12            A.    Sure.  I mean, market

13     research is blinded.  The company wasn't

14     involved, so --

15            Q.    Who did your market

16     research?

17            A.    Campbell Alliance.  Market

18     research is always a third-party

19     activity.

20            Q.    Do you know whether Campbell

21     Alliance did your market research for

22     opioid drugs?

23            A.    If they did this project,

24     they did.
```

1    Q.    Do you know whether Campbell

2  Alliance did any market research for any

3  other opioid drugs other than MoxDuo?

4    A.    I don't.

5         MS. BAIG:  Let's have the

6         next document marked as Exhibit-5.

7              -  -  -

8         (Whereupon, Allergan-Altier

9         Exhibit-5, Actavis 0300588, was

10        marked for identification.)

11             -  -  -

12        MS. BAIG:  It's Bates

13        stamped Actavis 0300588.

14  BY MS. BAIG:

15   Q.    This is an e-mail string

16  dated April 27th, 2012, from you to Joe

17  Stoffer and Lisa Miller.

18        Do you see that?

19   A.    I do.

20   Q.    And did you receive this

21  document in the regular course of your

22  business at Actavis?

23   A.    Yes, I did.

24   Q.    And who is Joe Stoffer?

```
 1            A.    He was a consultant we

 2    brought on.  I don't even recall his

 3    role.  I believe -- I can't even remember

 4    who knew him or who brought him into the

 5    organization.

 6            Q.    Do you know who he worked

 7    for?

 8            A.    No.  I mean --

 9            Q.    Do you know what capacity he

10    worked at Actavis?

11            A.     It was for a very short

12    time.  I mean, he advised us, obviously.

13    He -- it appears he knew people at pain

14    societies.

15            Q.    Was he a lobbyist?

16            A.    No.

17            Q.    He just knew people at pain

18    societies?

19            A.    At the medical associations.

20            Q.    Like the American Pain

21    Foundation?

22            A.    Correct.

23            Q.    Why would you need to bring

24    somebody in as a consultant who knew
```

```
 1   people at the American Pain Foundation?

 2          A.    I don't believe that was the

 3   only reason we did.  But as I'm reading

 4   this, you know, I'm curious if he had

 5   contacts there that could facilitate an

 6   introduction for us.

 7                You know, as of April 2012,

 8   we had not had any dealings with them.

 9          Q.    Meaning you had not had any

10   dealings with them?

11                MR. ROTH:  Object to the

12          form.

13                THE WITNESS:  I personally

14          had not.  And I believe the

15          organization did not either.

16   BY MS. BAIG:

17          Q.    How do you know that?

18          A.    Because we were trying to

19   reach them, and no one in the

20   organization knew them.

21          Q.    But you don't have a way of

22   knowing whether or not the organization

23   had contributed to funding to them, or do

24   you?  Do you know the answer to that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    To my knowledge, we had not.

 2            Q.    And do you see that there

 3    is -- so Joe Stoffer, you brought in, in

 4    order to help you because he had

 5    connections at the American Pain

 6    Foundation; is that right?

 7                  MR. ROTH:  Objection to

 8         form.

 9                  THE WITNESS:  This is --

10    BY MS. BAIG:

11            Q.    Why did you bring Joe

12    Stoffer in?

13            A.    I have no -- I honestly

14    can't remember.  I believe our time with

15    him was very limited.  You know, here he

16    is in April; we got the complete response

17    in June; he probably worked with us for a

18    month or two.  And --

19            Q.    You got what complete

20    response?

21            A.    For MoxDuo.

22            Q.    The complete response from

23    the FDA?

24            A.    Yes.
```

1    Q.    So what was it that you

2    needed to work with the American Pain

3    Foundation on before getting the complete

4    response?

5    A.    These were the meetings I

6    alluded to before, that we had some

7    initial meetings with some medical

8    associations, you know, to initiate

9    relationships.

10    But then we got the complete

11    response letter, and we didn't move

12    forward with anything.

13    Q.    And do you see down at the

14    bottom of the document it references

15    American Pain Society?

16    A.    Uh-huh.

17    Q.    Who was the American Pain

18    Society contact referenced here, do you

19    know?

20    A.    I don't know who the contact

21    person was.

22    Q.    Do you recall anybody at

23    American Pain Society that Actavis was

24    dealing with?

1          A.    I don't.  Our dealings were

2    so minimal.

3          Q.    And who is Kathy Chissia?

4          A.    It must have been someone

5    that Joe knew.

6          Q.    Who would have had contacts

7    at the American Pain Society?

8          A.    Presumably.

9          Q.    Do you remember anything

10   about your communications with the

11   American Pain -- with either one of those

12   organizations that you haven't already

13   told me?

14         A.    No.

15         Q.    Was Stoffer a frequent

16   presenter at American Pain Society, do

17   you know?

18              MR. ROTH:  Objection to

19         form.  Lacks foundation.

20              THE WITNESS:  I can't even

21         remember who he is, so I don't

22         know.

23   BY MS. BAIG:

24         Q.    Is there anybody at Actavis

1  that had more communications with Joe

2  Stoffer than you would have?

3         A.    I wish I could remember.

4  I'm sorry.

5         Q.    If you wanted to know, who

6  would you ask at Actavis?

7         A.    That's a great question.  I

8  can't remember who even knew him to bring

9  him in.

10         Q.    At your tenure at Actavis,

11  did you have any communications with the

12  Healthcare Distributor Association?

13         A.    I'm not even sure I know who

14  that is.  Had, Healthcare --

15         Q.    Had.

16         A.    No, I'm not familiar with

17  that.

18         Q.    It was formerly known as

19  Healthcare Distribution Management

20  Association.

21         A.    HDMA, that doesn't sound

22  familiar either.

23         Q.    Formerly National Wholesale

24  Drug Association?

Highly Confidential – Subject to Further Confidentiality Review

```
 1              A.     National Wholesale Drug --
    no.
 2
 3              Q.     How about had Research
    Foundation?
 4
 5              A.     No.
 6              Q.     Center for Healthcare Supply
    Chain Research?
 7
 8              A.     No.
 9              Q.     The National Association for
    Chain Drugstores?
10
11              A.     I've heard of it.  I don't
    believe we had -- or I had any contact
12
    with them.
13
14              Q.     Anybody from your division
    have contact with them?
15
16              A.     Not that I'm aware of.
17              Q.     How about the Federation of
    State Medical Boards?
18
19              A.     No.
20              Q.     The Alliance for Patient
    Access?
21
22              A.     No.
23              Q.     Are you aware of these
    organizations?
24
```

```
1        A.      Not the last few you

2   mentioned.

3        Q.      You have not heard of them

4   at all?

5        A.      The Alliance of -- no.

6        Q.      The U.S. Pain Foundation?

7        A.      The U.S. Pain Foundation,

8   that one does not ring a bell.

9        Q.      Have you heard of the

10  American Geriatric Society?

11       A.      Yes.

12       Q.      And have you had

13  communications with them?

14       A.      Related to my job at

15  Pharmacia with the Cox-2s but not related

16  to anything at Actavis.

17       Q.      Okay.  Are you aware of any

18  communications between Actavis and the

19  American Geriatric Society?

20       A.      I'm not.

21       Q.      Are you aware of any

22  communications between Actavis and

23  Pharmaceutical Research and Manufacturers

24  of America?
```

1    A.    If I'm thinking of the right

2  organization, I believe we were probably

3  a member of it.

4    Q.    That's the organization

5  called PhRMA, P-H-R-M-A?

6    A.    Yes.

7    Q.    And as a member of PhRMA,

8  P-H-R-M-A, did you attend -- did you

9  attend any meetings as a member of PhRMA?

10   A.    No.  We just followed their

11 guidelines.

12   Q.    Do you remember

13 communicating with anybody from PhRMA?

14   A.    I personally didn't.

15   Q.    Are you aware of anybody at

16 Actavis communicating with PhRMA?

17   A.    I'm sure Actavis had a

18 communication with PhRMA, but I don't

19 know who that would have been.

20   Q.    Do you know what department

21 that would have been?

22   A.    It probably would have been

23 as high as Doug.

24   Q.    Doug Boothe?

1        A.      Yes.

2        Q.      Are you familiar with an

3    organization called the Pain Care Forum?

4        A.      I don't believe so.

5        Q.      How about The Cares

6    Alliance?

7        A.      No, it doesn't sound

8    familiar.

9        Q.      The Chronic Pain Association

10   of America?

11       A.      Also not familiar.

12       Q.      How about The Center for

13   Practical Bioethics?

14       A.      No.  Sorry.

15       Q.      And how about an

16   organization called STATS?

17       A.      No.

18       Q.      Never heard of them?

19       A.      I don't know what that

20   stands for.

21              MR. ROTH:  It's a sports

22         statistics.

23   BY MS. BAIG:

24       Q.      STATS, S-T-A-T-S.

```
 1              Never heard of them?

 2      A.    No.

 3              MS. BAIG:  Let's have this

 4         next document be attached as

 5         Exhibit-6.

 6                  -  -  -

 7              (Whereupon, Allergan-Altier

 8         Exhibit-6, Actavis 431150-1182,

 9         was marked for identification.)

10                  -  -  -

11              MS. BAIG:  It's Bates

12         stamped Actavis 431150 to 431182.

13   BY MS. BAIG:

14      Q.    It starts as an e-mail

15   string from you to Kelly Gibbs, Steven

16   Rothschild and Andrea Owen.  And it's

17   dated June 5th, 2012.

18              Can you tell me who Kelly

19   Gibbs is?

20      A.    I believe all three of them

21   worked at the advertising agency we were

22   using for MoxDuo.

23      Q.    What advertising agency was

24   that?
```

```
1          A.    That's a great question.  I

2    was hoping their e-mail addresses would

3    be on there, so I would remember the

4    name.

5          Q.    Was it Genesis Associates?

6          A.    No.  They were not an

7    advertising agency.  They conducted the

8    advisory board.

9          Q.    What is Genesis Associates?

10         A.    A group that ran the

11   advisory board, the company.

12         Q.    It's a company that --

13         A.    Facilitated the advisory

14   board for us, recruited the physicians,

15   did all that.

16         Q.    And do you see the

17   transcript that's attached here?

18         A.    I do.

19         Q.    And it appears to be the

20   transcript -- or at least a portion of

21   the transcript from an advisory board on

22   MoxDuo; is that right?

23         A.    I'll check the date.

24               The date would line up, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And if you page through, and
2   I might be able to give you a specific
3   page, does this reflect -- refresh your
4   recollection that Dr. Perry Fine was a
5   member of this advisory board?
6        A.    I see on the first page of
7   the transcript, at the bottom, he's
8   quoted.  So he was there.
9        Q.    And who would have selected
10  Dr. Fine to be a member of the advisory
11  board?
12       A.    Genesis Associates.
13       Q.    And who would have
14  communicated to Genesis about what -- the
15  needs of the advisory board?
16       A.    The objectives?  That would
17  have been us.
18       Q.    That would have been you?
19       A.    Uh-huh.
20       Q.    And so did you communicate
21  with Genesis regarding the needs of this
22  advisory board?
23       A.    I imagine I did, yes.
24       Q.    And what would you have told

1    them?

2         A.    I don't recall what the

3    objectives were.

4         Q.    And would they have provided

5    you a list of the physicians that were

6    going to participate before the advisory

7    board?

8         A.    Yes.  I would have known who

9    was attending prior to .

10        Q.    And you attended the

11   advisory board as well, correct?

12        A.    I did.

13        Q.    And was one of the issues

14   during this advisory board whether or not

15   to -- to target the chronic pain market

16   for MoxDuo?

17             MR. ROTH:  Object to the

18        form.

19             THE WITNESS:  I don't

20        recall.

21   BY MS. BAIG:

22        Q.    Well, what's your

23   understanding of why this advisory board

24   was set up?

1       A.    I remember, from my

2  standpoint, we were, I believe,

3  presenting creative concepts and messages

4  that we were going to use in promotion.

5  And we were getting feedback based on

6  those.

7       Q.    And Perry, Dr. Perry Fine

8  participated, correct?

9       A.    He did.

10      Q.    As did Dr. Long, Dr. Hertz,

11  Dr. Orth, Dr. Kahana; is that right?

12      A.    I don't know.  Where do you

13  see those names?

14      Q.    In the first several pages.

15      A.    Yes, they are all listed

16  there.

17      Q.    If you turn to the page

18  Bates stamped Actavis 431156.

19          And it appears towards the

20  bottom that you're talking about how to

21  promote MoxDuo; is that right?

22         MR. ROTH:  Object to form.

23         THE WITNESS:  Dr. Kahana is

24     making a statement, uh-huh.

```
 1    BY MS. BAIG:

 2          Q.    And do you see where it

 3    states, four lines from the bottom, So

 4    the question is how to promote this

 5    without asking, what is the better way to

 6    do it?  And the answer is simple.  Just

 7    do what Purdue did, is go out to primary

 8    care and infect them.

 9                Do you see that?

10          A.    I do.

11          Q.    And do you see the next

12    sentence says, And if you have a couple

13    of centers of orthopedic surgeons,

14    plastic surgeons, transexual surgeons and

15    all of the rest, then you can work with

16    these selective groups and do that as

17    part of the projects.

18                Do you see that?

19          A.    I do.

20          Q.    And then do you see a little

21    further down, there's a statement by Dr.

22    Kahana?

23          A.    Uh-huh.

24          Q.    A continued statement by Dr.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Kahana?

2         A.    Uh-huh.  Yes, sorry.

3         Q.    And it states that, Now the

4    reality is that medicine is practiced in

5    the United States by primary care and

6    that's what carries weight.  And even

7    though specialty care may make more money

8    and think they have more clout and think

9    they have more influence in this, at the

10   end of the day, in terms of the weight of

11   the impact that they have on the

12   healthcare system, it goes back to

13   primary care.  So if you want to make a

14   big boom and a splash in sales and all

15   that, go to the source.

16              Do you see that?

17        A.    Yes.

18        Q.    Okay.  And so is your

19   understanding of what Dr. Kahana is

20   suggesting that you go to primary care in

21   order to promote MoxDuo?

22              MR. ROTH:  Object to the

23        form.

24              THE WITNESS:  That's what he

1          seems to be recommending.  And I

2          don't know that we would have done

3          that or not.  It's all sort of

4          hypothetical, since MoxDuo was

5          never launched.

6     BY MS. BAIG:

7          Q.    I understand that.

8                It wasn't launched because

9     the FDA said it was too dangerous, right?

10               MR. ROTH:  Object to the

11         form.

12               THE WITNESS:  I don't know

13         what was in the complete response

14         letter.  I don't think they made a

15         comment like it was too dangerous.

16         I think they needed more

17         information.

18    BY MS. BAIG:

19         Q.    You don't know whether or

20    not -- do you know whether the FDA made a

21    comment that the risks outweighed the

22    benefits?

23         A.    I don't know if that was in

24    there.

1      Q.    Okay.  But you also don't

2  know whether it was just rejected because

3  they needed more information?

4      A.    Right.  It's all --

5      Q.    You don't know why it was

6  rejected?

7      A.    Right.  It's all kind of a

8  moot point.

9      Q.    Okay.  So can you turn to

10  Page Actavis 0431166?

11      A.    Uh-huh.

12      Q.    Actually, let's turn a few

13  pages later, to 431169.

14           And you see at the top

15  there's a comment, which is a continued

16  comment of Dr. Barrett -- sorry, of Dr.

17  Fine and he states, at the top of Page

18  431169, I think that one of the biggest

19  complaints, and this is from the people

20  who are really saber rattling about

21  opioids in any setting, is that there has

22  been an apparent, in their word, in their

23  point of view, an apparent effort to

24  soft-sell the harms associated with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioids and oversell the benefits.

 2              Do you see that?

 3         A.    I do.

 4         Q.    Do you remember there being

 5    discussions at Actavis about this

 6    so-called saber rattling?

 7              MR. ROTH:  Object to the

 8         form.  Lacks foundation.

 9              THE WITNESS:  Actually, when

10         you read that I wasn't even sure

11         what that meant, saber rattling.

12    BY MS. BAIG:

13         Q.    So you don't recall any

14    discussions or --

15         A.    Not about that term, no.

16         Q.    And do you see, several

17    lines down, there's a comment by Dr. Long

18    stating that in the -- that in the

19    proposed materials for MoxDuo, it states,

20    You don't mention anything about

21    dependency or addiction potential.

22              Do you see that?

23         A.    I do.

24         Q.    Do you remember there being
```

1    disagreement in this session about how to

2    move forward with marketing should the

3    drug get approved?

4              MR. ROTH:  Object to the

5         form.

6              THE WITNESS:  I remember

7         there being conversation.  And I'm

8         sure there were differing

9         opinions.

10   BY MS. BAIG:

11        Q.    Did you ever have occasion

12   to communicate with pharmacies about the

13   marketing of any opioids?

14        A.    Myself personally, I don't

15   recall speaking with any pharmacies.

16        Q.    How about your -- are you

17   aware of Actavis, any Actavis people,

18   speaking with pharmacies about promoting

19   opioids?

20        A.    In what context?

21        Q.    In any context.

22        A.    I mean, I know our

23   representatives made pharmacy calls to

24   make sure the products were on the

1  shelves.  And I'm sure our trade group

2  had corporate relationships with

3  pharmacies.

4        Q.    So that would be your sales

5  representatives who are making the calls

6  to the pharmacies?

7        A.    To the retail pharmacies,

8  the stores, like, you know, Walgreens

9  down the street, yes, those would be our

10  sales reps.

11        Q.    And did you have scripts for

12  what the sales reps were supposed to be

13  saying to the pharmacies when they called

14  them?

15        A.    It would be the same

16  training they received to speak to

17  physicians, all healthcare professionals.

18        Q.    Were there actual scripts?

19        A.    No.

20        Q.    Do you recall that sales

21  staff had to reach out to pharmacies to

22  encourage them to stock new dosages of

23  Kadian at some point?

24                MR. ROTH:  Object to the

```
 1          form.

 2                THE WITNESS:  I don't

 3          recall.  I mean, sales

 4          representatives wouldn't encourage

 5          the -- the pharmacist is going to

 6          do what they want to do.

 7                The sales representative

 8          would just check to make sure, you

 9          know, that the product was on the

10          shelf, they didn't have any

11          problems with ordering, that sort

12          of thing.

13   BY MS. BAIG:

14          Q.    They wouldn't encourage it?

15          A.    I don't know how they would.

16   I don't know why the pharmacist would

17   listen to a sales rep telling them what

18   to order.

19          Q.    Well, who gave the direction

20   to the sales reps to call the pharmacies?

21          A.    To call on the pharmacies?

22          Q.    Yes.

23          A.    That was in their sales call

24   plan.
```

1    Q.    And where are those sales

2  call plans?

3    A.    Their target lists?  I don't

4  know.

5    Q.    So it would be the

6  pharmacist that would be on their target

7  list, is that it?

8    A.    I don't -- again, sales

9  management would know better.  I don't

10  think they were assigned certain

11  pharmacies.  But, you know, any good

12  sales representative, for any company,

13  wants to make sure the pharmacies in

14  their area are well stocked with their

15  product.

16    Q.    And who trained the sales

17  reps on what to say to the pharmacies

18  when they got there?

19    A.    I guess that would have been

20  part of their initial training.

21         I guess I'm uncomfortable

22  talking about this, because I wasn't

23  involved in the sales training.

24    Q.    I'm not sure I understand

1    your answer.

2              I think you said it both

3    ways.  Did you say I would have been

4    involved and then you weren't involved?

5         A.    No.  I said I'm

6    uncomfortable commenting on who would

7    have said it, because I don't know.  I

8    never attended a sales training.  I never

9    went through sales training.  I don't

10   know who delivered those messages.

11        Q.    You didn't train any of the

12   sales reps?

13        A.    Just on marketing materials

14   only.

15        Q.    You didn't train any of the

16   sales reps as to anything that they were

17   supposed to talk to the pharmacists

18   about?

19        A.    Not specifically.  I just --

20   I would train them on the marketing

21   materials that they could use with any

22   healthcare professional.

23        Q.    And were you the actual

24   person running the training sessions?

```
 1           A.    I don't know that I ran

 2    them.  I participated in them.

 3           Q.    How many -- well, was there

 4    somebody more senior to you also

 5    participating in them?

 6                 MR. ROTH:  Object to the

 7           form.

 8                 THE WITNESS:  I was going to

 9           say, I'm the only person in the

10           marketing --

11    BY MS. BAIG:

12           Q.    Who else --

13           A.    -- department, so.

14           Q.    Who else would attend?

15           A.    Their sales manager would

16    have been there.

17           Q.    The sales managers from

18    inVentiv?

19           A.    Uh-huh.

20           Q.    And you.

21                 And anybody else from

22    Actavis, or just you?

23           A.    I don't recall.

24           Q.    So you were involved in
```

```
 1    their sales training, then, correct?

 2              MR. ROTH:  Objection.  Asked

 3         and answered.

 4              MS. BAIG:  It's been

 5         answered both ways.  I just need

 6         clarification.

 7              MR. ROTH:  That's fine.

 8              THE WITNESS:  Sure.  I'm

 9         actually trying to envision a

10         sales training, and I can't.

11              So my best recollection is

12         that it would be a typical

13         marketing function, I would

14         present the marketing materials

15         that they were to use in their

16         sales promotion.

17    BY MS. BAIG:

18         Q.   And would you be the person

19    to tell them what they can and cannot

20    say?

21              MR. ROTH:  Object to the

22         form.

23              THE WITNESS:  There would be

24         compliance training.  There would
```

1    be a lot of other trainings that

2    they would go through that would

3    explain what they can and cannot

4    say.

5           As an extension of that, I

6    would provide them with the detail

7    pieces and say that they were to

8    say these messages that were in

9    the approved detail pieces.

10   BY MS. BAIG:

11          Q.   Okay.  Who, other than

12   you -- who, in addition to you, would

13   provide sales reps with information about

14   what they can and cannot say to their

15   targets?

16          A.   That would probably be --

17   the inVentiv team would have to answer

18   that.

19          Q.   InVentiv would answer that?

20          A.   Uh-huh.

21          Q.   How would inVentiv know how

22   to answer that, because you had told

23   them?

24          A.   No.  InVentiv could answer

1    that question.  They were inVentiv

2    employees.  And however they coordinated

3    the compliance training and all that, I'm

4    just not familiar with it.

5         Q.    Right.  How does inVentiv

6    know what to tell sales reps from

7    Actavis?  Does inVentiv get its

8    information from Actavis?  Right?

9              MR. ROTH:  Objection.  Lacks

10             foundation.  Calls for

11             speculation.

12             THE WITNESS:  Yeah, I

13             guess --

14   BY MS. BAIG:

15        Q.    Is that correct or not?

16        A.    No.  I'm telling you all I

17   know.  I don't know what the process was,

18   you know, because it started before I got

19   there.

20             So somewhere along the line,

21   Actavis and inVentiv met and determined

22   who was going to do what.  I don't know

23   who did what.

24        Q.    When you were there --

```
 1          A.    I came in, I gave my

 2   marketing presentation, and I left.  So I

 3   don't know.

 4          Q.    When you were there, did you

 5   have communications with inVentiv about

 6   what should be told to the sales reps

 7   about how they should be talking to

 8   prescribers about opioids?

 9               MR. ROTH:  Object to the

10          form.

11               THE WITNESS:  Only as it

12          pertained to the promotional

13          pieces I was presenting.

14   BY MS. BAIG:

15          Q.    Right.  As to the

16   promotional pieces, it was your job to

17   talk to inVentiv about the promotional

18   pieces that the sales force could then go

19   out to prescribers and talk about; is

20   that right?

21          A.    I guess -- I'm drawing -- I

22   would train a sales representative; I

23   didn't train inVentiv, the company.  So I

24   trained our sales representatives.
```

```
 1                   InVentiv is a massive

 2     company with many, many people.  So I

 3     just want to make sure -- I'm not talking

 4     to inVentiv management.  I'm talking to

 5     the sales reps who served on behalf of

 6     Actavis.

 7          Q.    So it would be you in a

 8     room -- in a room with a group of sales

 9     reps?

10          A.    Right.

11          Q.    Communicating to them what

12     the promotional message was?

13          A.    Correct.

14          Q.    Okay.  So it's not inVentiv

15     or somebody from inVentiv that is

16     communicating to the sales reps what the

17     promotional message is, it's you that's

18     communicating to the sales rep what the

19     promotional message is; is that correct?

20               MR. ROTH:  Objection to the

21          form.

22               THE WITNESS:  Yes.

23     BY MS. BAIG:

24          Q.    Okay.  And would you
```

1  communicate to the sales staff that they

2  should offer pharmacies, retail

3  pharmacies stocking incentives?

4         MR. ROTH:  Object to the

5     form.

6         THE WITNESS:  That wasn't my

7     area.

8  BY MS. BAIG:

9     Q.    That wasn't your area?

10    A.    No.  And I don't believe we

11 had any stocking incentives.  That's --

12 if I'm thinking of the right thing,

13 that's usually associated with a launch

14 product, and we were at the end of our

15 lifecycle.  We didn't do any pharmacy

16 promotions.

17    Q.    Well, how about the new

18 Kadian strengths?

19    A.    At the end.  I believe, if

20 my timeline is right, they were launched

21 about the time Watson was coming in.  So

22 they were launched, and we didn't really

23 do much with them.

24    Q.    Were they launched because

```
 1    the existing Kadian strengths were moving

 2    to generic?

 3            A.    I believe so, yes.

 4            Q.    And so were there incentives

 5    that were offered to retail pharmacies to

 6    incentivize them to offer the new

 7    additional strengths of Kadian?

 8            A.    I don't --

 9            MR. ROTH:  Object to the

10         form.

11            THE WITNESS:  Sorry.

12         I don't know.  That would

13         have been handled by trade.

14    BY MS. BAIG:

15            Q.    By trade?

16            A.    Uh-huh.

17            Q.    What is trade?

18            A.    Trade, I believe his name

19    was Ara Aprahamian.

20            MS. BAIG:  Can we mark this

21         document Exhibit-10 -- I mean it's

22         Tab 10.  Exhibit-7, please.  Bates

23         stamp Actavis 255710 through

24         255713.
```

```
 1                    -  -  -

 2              (Whereupon, Allergan-Altier

 3        Exhibit-7, Actavis 255710-5713,

 4        was marked for identification.)

 5                    -  -  -

 6              MS. PERSIO:  For those of us

 7        on the phone, if you're not

 8        reading the full Bates stamp,

 9        Could you please read the full

10        Bates stamp?

11              MS. BAIG:  It's -- I think

12        I'm reading the full Bates stamp.

13        Actavis 0255710 to Actavis

14        0255713.

15              MS. PERSIO:  And that has

16        all the zeros?

17              MS. BAIG:  It does.

18              MS. PERSIO:  Okay.  Thank

19        you.

20  BY MS. BAIG:

21        Q.    On the first page, do you

22  see there's an e-mail, halfway down, from

23  you to Tom and Kristin?

24        A.    Correct.
```

1        Q.    Who is Tom and Kristin?

2        A.    They worked at our

3  advertising agency for Kadian.

4        Q.    Do you see that you're

5  telling them, We have an urgent need for

6  a tactic announcing our offering of new

7  strengths of Kadian?

8        A.    I do.

9        Q.    Does this refresh your

10  recollection about this process a little

11  bit?

12        A.    Not really.  Do I have time

13  to read through the e-mail?

14        Q.    Sure.

15        A.    So this was from Mara.

16        Q.    Do you see halfway down on

17  the second page, it says, Retail pharmacy

18  stocking incentives?

19        A.    Sorry, on the second page?

20        Yes.

21        Q.    Does that refresh your

22  recollection that Actavis was offering

23  retail pharmacies stocking incentives for

24  new strengths for Kadian?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. ROTH:  Object to the
 2         form.
 3   BY MS. BAIG:
 4         Q.    Or new dosages for Kadian?
 5         A.    Only to the extent it's
 6   listed here.  I don't remember any more
 7   information about the incentives.
 8         Q.    You don't remember anything
 9   else about it?
10         A.    No.
11         Q.    Do you remember that there
12   were flyers that were created to leave
13   with the pharmacies announcing the new
14   strengths of Kadian?
15         A.    I don't know -- let's see.
16   It says, The PDF will be e-mailed to
17   wholesalers.
18         Q.    Do you recall whether or not
19   Actavis reached out to pharmacies with
20   respect to any of its generic opioids?
21                MR. ROTH:  Object to the
22         form.
23                THE WITNESS:  I don't --
24                MR. ROTH:  Lacks foundation.
```

```
1         Calls for speculation.

2              THE WITNESS:  I wouldn't

3         really have been involved in

4         generics.

5              MS. BAIG:  It can't really

6         lack foundation if I ask her, do

7         you know.

8   BY MS. BAIG:

9         Q.    Go ahead.

10        A.    I wouldn't have been

11  involved in most of the generic stuff, so

12  no.

13        Q.    You didn't have any

14  involvement in any generic stuff?

15        A.    I don't want to say I didn't

16  have any involvement in anything, just in

17  case, again, something comes up.  But

18  that was not my role in the company.

19        Q.    Do you know who ValueCentric

20  is?

21        A.    No.  Is it on the e-mail?

22        Q.    No, it's not.

23        A.    Oh, okay.

24              No, sorry.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    You've never heard of

2    ValueCentric pharmacy data?

3          A.    ValueCentric pharmacy data.

4                What kind of data does it

5    provide?

6          Q.    I don't know.  I'm asking

7    you.

8          A.    Oh, sorry.  ValueTrak rings

9    a bell.  Is that the same thing?

10         Q.    I see -- or I think I've

11   seen a reference to ValueCentric

12   unblinding pharmacy data.

13               Do you know what that refers

14   to?

15         A.    I don't.  I'm sorry.

16         Q.    All right.

17               MS. BAIG:  Let's attach this

18         document as Exhibit-8, please.

19                    -  -  -

20               (Whereupon, Allergan-Altier

21         Exhibit-8, Actavis 0252398-2421,

22         was marked for identification.)

23                    -  -  -

24               MS. BAIG:  The document is
```

1          Bates stamped Actavis 0252398

2          through Actavis 0252421.

3   BY MS. BAIG:

4          Q.     And it appears to be a long

5   e-mail string with an attachment.  And

6   the top e-mail is dated August 20th, 2012

7   and it's from Jennifer Altier, and the

8   subject is ValueCentric pharmacy data.

9              Do you see that?

10         A.     Are you asking me?

11         Q.     Yes.

12         A.     I thought you were talking

13  to the people on the phone.

14             Yes.  I'm looking through

15  it.

16         Q.     Do you see the first

17  sentence of the first page says -- from

18  you, states, Please find below the quote

19  from ValueCentric to unblind the pharmacy

20  data for all 12 SKUs of Kadian.  I think

21  the cost ($10,000 setup fee and $4,000

22  per month for unblinding the pharmacy

23  data) is well worth it for the ABMs to

24  know which pharmacies are stocking the

1    new strengths (as well as the current

2    strengths).

3              Do you see that?

4         A.    I do.

5         Q.    So did Actavis actually pay

6    ValueCentric for this unblinding of

7    pharmacy data?

8         A.    I don't recall.  I'm

9    flipping through this here.  This is

10   ValueTrak data, so that is what I

11   remembered.

12        Q.    You referred to it as

13   ValueTrak, even though it's called

14   ValueCentric on this particular e-mail?

15        A.    ValueCentric is the company

16   and ValueTrak is the product.

17        Q.    Got it.

18        A.    According to this.

19        Q.    Do you see the second

20   paragraph says, ValueCentric is drafting

21   the amendment to our contract now.

22        A.    Uh-huh.

23        Q.    Does that refresh your

24   recollection that Actavis did actually

Highly Confidential — Subject to Further Confidentiality Review

1  have a contract with ValueCentric?

2          MR. ROTH:  Object to the

3      form.

4          THE WITNESS:  They may have,

5      and I may have not been involved

6      in the data that they received.

7  BY MS. BAIG:

8      Q.   Do you understand what's

9  referred to as the unblinding of pharmacy

10  data for all 12 SKUs of Kadian?

11     A.    I believe what it means is

12  instead of us just seeing that -- I

13  believe it would identify what pharmacies

14  were stocking the products by name.

15     Q.    And that would be used,

16  then, for your sales reps to target

17  certain pharmacies?

18     A.    I think it would be more

19  used for -- if they were educating a

20  physician about the new strengths, they

21  could say, you know, local pharmacies

22  have it in stock.  Because that's always

23  a concern with physicians, they don't

24  want to write a product if the patient

```
 1   isn't going to be able to fill the

 2   prescription.

 3        Q.    Can you turn to Actavis

 4   0252421?  I think it's the last page.

 5             And there's a market

 6   visibility console example.

 7        A.    I'm sorry, on the slides?

 8        Q.    Yes.

 9        A.    Yes.  Okay.

10        Q.    What is this?  Do you have

11   an understanding of what this is?

12        A.    It looks like, if we

13   purchased the console product, if I'm --

14   I don't know what the console is.  It

15   looks like a dashboard they could

16   provide.

17        Q.    To show what?

18        A.    To show the --

19             MR. ROTH:  Object to the

20        form.  Lacks foundation.  Calls

21        for speculation.

22             THE WITNESS:  To show the

23        information that's presented in

24        the page.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. BAIG:

 2          Q.    Market penetration?

 3          A.    Yes.

 4          Q.    And it could show you this

 5    information for the top 1 percent of

 6    stores?

 7                MR. ROTH:  Object to the

 8          form.  Lacks foundation.  Calls

 9          for speculation.

10    BY MS. BAIG:

11          Q.    It's the middle, second row

12    box.  Including Walgreens, Connecticut

13    CVS pharmacy.

14          A.    Yeah, I don't --

15                MS. RANJAN:  Object to the

16          form.

17                THE WITNESS:  This is an

18          example of dummy data.  I don't

19          know what they would have actually

20          presented.

21    BY MS. BAIG:

22          Q.    You never saw any reports

23    like this from ValueCentric before?

24          A.    It looks pretty slick.  I
```

1   don't recall this.

2              MS. BAIG:  Let's have the

3         next document marked as Exhibit-9.

4         It's a document that's Bates

5         stamped Actavis 0389758 to

6         0389800.

7                    -  -  -

8              (Whereupon, Allergan-Altier

9         Exhibit-9, Actavis 0389758-9800,

10        was marked for identification.)

11                   -  -  -

12  BY MS. BAIG:

13        Q.    It's an e-mail.  It begins

14  as an e-mail string from you to Lisa

15  Miller, subject is, presentations and

16  objection handler.

17        A.    Yes.

18        Q.    And then it says, NSM

19  objection handling tool.

20             NSM is national sales

21  meeting, correct?

22        A.    Correct.

23        Q.    So was this an objection

24  handling tool that you handed out to all

1    the sales reps at the national sales

2    meeting?

3            A.    Yes, I believe so.

4            Q.    And this was supposed to

5    train the sales reps as to what it was

6    that they were supposed to talk to

7    pharmacies about; is that right?

8                MR. ROTH:  Objection to

9            form.

10                THE WITNESS:  I don't

11            believe it was focused on

12            pharmacists.  It would probably be

13            focused on healthcare

14            professionals.

15    BY MS. BAIG:

16            Q.    So this was to train the

17    sales reps with respect to all healthcare

18    professionals, not just pharmacies?

19            A.    Uh-huh.

20            Q.    Okay.

21            A.    Yes.

22            Q.    And if you turn to the

23    PowerPoint, Page 3 of the PowerPoint --

24    well, Page 1 of the PowerPoint has a

1    heading that says, Kadian marketing

2    update, with your name, Jennifer Altier.

3           A.    That's not what mine says.

4           Q.    And then September 13th,

5    2012.

6           A.    Mine says --

7           Q.    It's Bates stamped Actavis

8    0389769.

9           A.    Mine says something

10   different.

11                MR. ROTH:  We're looking at

12          a different PowerPoint.  Mine,

13          too.

14                THE WITNESS:  Mine says, New

15          strengths launched.

16                MR. ROTH:  I think they are

17          different presentations.

18                MS. BAIG:  What Bates stamp

19          number are you looking at?

20                MR. ROTH:  389763.

21                MS. BAIG:  No, I'm on

22          389769.

23                      -   -   -

24                (Whereupon, a discussion off

1          the record occurred.)

2                    -  -  -

3    BY MS. BAIG:

4          Q.    It says, Marketing update,

5    your name, Jennifer Altier, and then

6    September 13th, 2012, correct?

7          A.    Correct.

8          Q.    Did you draft this document?

9          A.    I believe so.

10         Q.    And you provided this

11   document to sales reps; is that right?

12         A.    I did.  I presented the

13   information in it.

14         Q.    And the prior document that

15   you were on, that I skipped over,

16   entitled, Kadian new strengths launch,

17   also has your name on it, Jennifer Altier

18   and dated September 13th, 2012, correct?

19         A.    Correct.

20         Q.    And did you draft that

21   document as well?

22         A.    I believe so.

23         Q.    Okay.  And you presented it

24   to sales reps at the national sales

1    meeting?

2          A.    I believe so.

3          Q.    Okay.  And do you see on

4    Page 3 of the second document, which is

5    Actavis 0389771 --

6          A.    Yes.

7          Q.    -- you have market research

8    feedback?

9                Do you see that?

10         A.    I do.

11         Q.    And is this market research

12   feedback with respect to Kadian, correct?

13         A.    Correct.

14         Q.    So what market -- market

15   research feedback was done with respect

16   to Kadian that informed this slide?

17         A.    I don't know, because the

18   other one we looked at was from MoxDuo.

19   So I don't know the background for this

20   one, or I can't recall the background for

21   this one.

22               But it seems that, based on

23   my headline, we did a recent market

24   research survey, called-on physicians, so

1    these are physicians the reps were

2    calling on; and these are the perceptions

3    of our product, Kadian, that were listed

4    back to us.

5                So I assume the question

6    was, you know, what are your perceptions

7    of Kadian?  And these were the attributes

8    that were listed.

9          Q.    And who conducted that

10   market research survey?

11         A.    That, I don't know.

12         Q.    How did you get the

13   information?

14         A.    I knew at the time.  I can't

15   tell you today.

16         Q.    You don't recall?

17         A.    Right.

18         Q.    And would there be a report?

19   Would it have been a third party that

20   would have conducted it?

21         A.    Absolutely.

22         Q.    So who were the third

23   parties that you generally worked with to

24   do these market surveys?

```
 1              A.    Let's see.  What's the date?

 2              I don't know if we were

 3    working with Campbell Alliance at this

 4    time.  There was another group out of

 5    Colorado, I don't remember their name,

 6    like, LPG or something like that.  It

 7    could have been somebody else.

 8              But it definitely would have

 9    been a third-party market research group.

10       Q.    And so would there be a

11    separate document that sets forth the

12    market research that you would have

13    received to aid you in putting together

14    this material for the sales reps?

15       A.    There could have been --

16    there would have been a report produced.

17       Q.    There would have been a

18    report from either Campbell Alliance or

19    LPG or --

20       A.    XYZ, I don't remember.

21       Q.    -- anyone you used?

22       A.    Yes.

23       Q.    If you wanted to figure out

24    which entity was used to do this market
```

```
 1    research, who would you ask at Actavis?

 2          A.    Me.

 3          Q.    Well, you're not at Actavis

 4    anymore.

 5          A.    Oh, gosh.  Nobody.

 6          Q.    If you wanted to know today,

 7    who would you ask?

 8          A.    I would -- there's nobody

 9    left that's --

10          Q.    You don't recall.

11                But it should be in your

12    e-mail, then?

13          A.    Probably, yes.

14          Q.    And was it your

15    understanding, then, when you drafted

16    this, that there were -- that

17    prescribers' perceptions were there that

18    Kadian had a low abuse potential?

19          A.    That's what they reported

20    back to us.  That was their perception.

21          Q.    That's what you understood

22    from another organization that they

23    reported to them, correct?  Is that

24    right?
```

```
1            A.     Yes.

2            Q.     And that there was 12- to

3    24-hour pain control?

4                   MR. ROTH:  Object to the

5            form.

6                   THE WITNESS:  Based on

7            what's listed here, that's what

8            the physicians told us, that was

9            their perception of Kadian.

10   BY MS. BAIG:

11           Q.     Okay.  And is that accurate

12   for Kadian, that there was 12 to 24 hours

13   of pain control?

14           A.     I don't recall off the top

15   of my head if that was a claim.  That was

16   just their perception.

17           Q.     You don't recall whether or

18   not Kadian was effective for 12 to 24

19   hours?

20           A.     I'd have to look back at our

21   detail pieces.

22           Q.     Do you see the next page, it

23   says, What's new with Kadian?

24           A.     Uh-huh.
```

1    Q.    And it states, in the second

2    bullet, Much has changed in the

3    long-acting opioid environment since this

4    data was initially released, so it is

5    important to remind healthcare

6    professionals about the Kadian profile.

7              What is that referring to?

8    A.    I'd have to look at what was

9    in the detail piece.  It would be the

10   data that's in our detail aid.

11   Q.    Well, if I wanted to see the

12   detail aid, what would I look for?  What

13   is the name of that document?

14   A.    Detail aid.

15   Q.    It will just say, detail

16   aid, Kadian, with this date on it?

17   A.    (Witness nods.)

18              I'm sorry, it's in this

19   presentation.

20   Q.    Where is it?

21   A.    Bunch of pages.  Page by

22   page, it goes through --

23   Q.    Oh, I see it.  Okay.

24   A.    So there's clinical data,

1    6A.

2           Q.    What page are you looking

3    at?

4           A.    84; clinical data, Page 85,

5    6B.

6           Q.    This is a detail aid that is

7    created by whom?

8           A.    By the marketing department,

9    and then put through the promotional

10   review committee for legal and regulatory

11   review.

12          Q.    So this is created -- the

13   detail aid was created by you?

14          A.    Correct.

15          Q.    But there's nothing on the

16   detail aid that states who provided --

17   who did the study for you; is that right?

18               MR. ROTH:  Object to the

19          form.

20   BY MS. BAIG:

21          Q.    Or would that be in here?

22               MR. ROTH:  Lacks foundation.

23               THE WITNESS:  This is from

24          our prescribing information.

```
 1   BY MS. BAIG:

 2          Q.    So you put together this

 3   detail aid based on prescribing

 4   information that you received from who?

 5   IMS?

 6                MR. ROTH:  Object to the

 7          form.

 8                THE WITNESS:  I don't

 9          think --

10   BY MS. BAIG:

11          Q.    From who?

12          A.    Maybe I'm -- maybe I'm

13   misjudging your understanding of

14   prescribing information.

15                So prescribing information

16   is the package insert, the label that is

17   attached to our product.

18          Q.    Okay.

19          A.    That is our Bible.

20          Q.    No, I was thinking of

21   prescribing data.

22          A.    Because you keep asking me

23   what are the studies?  What are the

24   studies?  It's what is in our label.  And
```

1    that's what I'm referring to.  I don't

2    mean to frustrate you.

3         Q.    So you just take the label

4    and you provide --

5         A.    Correct.

6         Q.    -- you create the marketing

7    information from the label?

8         A.    Correct.

9         Q.    Using only the label?

10        A.    Correct.  The label is

11   referred to as prescribing information, a

12   PI, package insert.  Those are all

13   synonymous.

14        Q.    Okay.  So if you go to the

15   second-to-last page of this document, it

16   says, Objection handling for pharmacists.

17        A.    Yes.

18        Q.    So this is a document that's

19   provided to the sales reps in order to

20   help train them?

21        A.    It was presented to them,

22   yes.

23        Q.    In terms of their

24   discussions with pharmacists?

1          A.      Uh-huh.

2          Q.      And is this, sort of, the

3    script that they're supposed to be using

4    when they talk to pharmacists?

5                  MR. ROTH:  Object to the

6          form.

7                  THE WITNESS:  These were the

8          talking points, the training, yes.

9    BY MS. BAIG:

10         Q.      Okay.  What is Technekes?

11         A.      That was our telemarketing

12   firm.

13         Q.      And what involvement did

14   they have with opioids -- with opioids at

15   Actavis?

16         A.      They supplemented our field

17   sales force efforts.  So, for example,

18   white space, if we didn't have a physical

19   rep in the territory, they would make

20   phone calls to that office.

21         Q.      And it's spelled Technekes,

22   T-E-C-H-N-E-K-E-S.

23         A.      Yeah.

24         Q.      And who oversaw Technekes,

1    from Actavis?

2           A.    I did.

3           Q.    Was this part of -- but

4    Technekes was not part of your budget?

5           A.    Yes, they would have been.

6           Q.    So they were a part of the

7    $200,00?

8           A.    I said don't quote me on

9    $200,000.  I was just putting it in

10   context of it wasn't $100 million.

11          Q.    But Technekes --

12          A.    Correct.

13          Q.    Technekes --

14          A.    Would have been a part of

15   the marketing budget.

16          Q.    And how many sales -- what

17   do you call the people through Technekes?

18   Sales reps?

19          A.    Sales representatives.

20                I don't recall.  Perhaps two

21   to four.

22          Q.    Full time?

23          A.    I believe they were FTE,

24   yes.

1    Q.    What is "FTE"?

2    A.    Full-time equivalent.

3    Q.    And who would train the

4    sales reps that came to you through

5    Technekes?

6    A.    They would go through our

7    sales rep training.  So they received the

8    same training as a physical field rep.

9    Q.    So they would have been at

10   the national sales meeting?

11   A.    I don't know that for sure.

12   They did attend our sales meetings.  I

13   don't know if they were on board at the

14   time of this sales meeting.

15   Q.    Okay.  So you trained them?

16        MR. ROTH:  Object to the

17        form.

18        THE WITNESS:  They went

19        through sales training.  I would

20        have presented the marketing

21        pieces, sales training, long

22        agenda.  I would have been

23        responsible for the marketing

24        piece.

```
1    BY MS. BAIG:

2         Q.    And who is Anda?

3         A.    Anda?

4         Q.    Yes.

5         A.    ANDA is a new drug

6    application.

7               Oh, Anda is a -- down in

8    Florida.  I think Watson owned them.

9    They were a pharmacy distributor.

10              I'm not exactly sure.  I

11   remember doing a program with them.

12        Q.    I see something here, and I

13   could attach it, but it might -- it might

14   not be too much to it.

15              But it says, I see you have

16   engaged Anda to contact pharmacies.

17              Is Anda another organization

18   like Technekes?

19        A.    No, Anda is like a -- I

20   don't think they're a wholesaler.

21   They're -- maybe a pharmacy distributor.

22   We did a small project with them.  I

23   don't really recall.

24        Q.    So Technekes is telesales?
```

1      A.    Correct.

2      Q.    And Anda is?

3      A.    TBD.

4      Q.    Can you talk to me a little

5    bit about the negotiations that you would

6    have with pharmacies, in terms of

7    stocking?

8      A.    No.  I wasn't involved in

9    that.

10      Q.    But you would receive

11   information about it; is that right?

12      A.    Correct.

13      Q.    So what is your general

14   understanding of how that process worked?

15      A.    Our contracting department

16   would speak with pharmacies.

17      Q.    About proactive stocking?

18      A.    I imagine.

19          MR. ROTH:  Object to the

20          form.  Lacks foundation.  Calls

21          for speculation.

22   BY MS. BAIG:

23      Q.    About stocking?

24      A.    It's not my area.  I don't

1    really know what they talked about.

2           Q.    Who is Ara Aprahamian?

3           A.    I referenced him earlier.

4    He was our -- I referred to him as our

5    trade person.  I don't know what his

6    exact title is.

7           Q.    What division?

8           A.    I think you have this

9    mischaracterization of our organization.

10   Like, he was the trade person.  I was the

11   marketing person.  We didn't have this

12   massive organization.  So he was trade.

13          Q.    So he would be the person

14   that would be negotiating, for example,

15   with Walmart regarding stocking of

16   opioids?

17          A.    I believe so.

18                MS. RANJAN:  Object to the

19          form.

20                THE WITNESS:  I believe so.

21   BY MS. BAIG:

22          Q.    And who would provide target

23   pharmacies?  You would get that

24   information and then provide it, or

Highly Confidential - Subject to Further Confidentiality Review

```
 1    how -- how would Actavis communicate what

 2    pharmacies ought to be targeted?

 3                 MR. ROTH:  Objection.  Lacks

 4           foundation.

 5                 THE WITNESS:  This would

 6           have to be confirmed by sales, but

 7           my understanding was that was up

 8           to the reps.

 9    BY MS. BAIG:

10           Q.    The sales reps would decide

11    what pharmacies to target?

12           A.    That's my understanding.

13    But, again, that's not my expert -- my

14    area.

15                 MR. ROTH:  Can we go off the

16           record for a second?

17                 MS. BAIG:  Sure.

18                 VIDEO TECHNICIAN:  The time

19           is 12:42 p.m.  Off the record.

20                     -  -  -

21                 (Whereupon, a brief recess

22           was taken.)

23                     -  -  -

24                 VIDEO TECHNICIAN:  The time
```

```
1          is 12:45 p.m.  We are back on the

2          record.

3   BY MS. BAIG:

4          Q.    What are e-mail blast

5   campaigns?

6          A.    Generally, they were just

7   marketing materials that would be

8   delivered via e-mail.

9          Q.    To whom?

10         A.    It could be physicians, it

11  could -- anybody you could buy a list for

12  of e-mail addresses.

13         Q.    Who would you buy that list

14  from?

15         A.    Generally, whomever the

16  vendor was that we were working with on

17  the campaign.

18         Q.    Who were the vendors that

19  you worked with, with respect to the

20  opioids?

21         A.    I don't recall.  I mean,

22  sometimes companies would come to you and

23  offer that service, or we would prepare

24  it and our advertising agency would
```

```
 1    procure a list.  It all depended.

 2            Q.    You don't recall any of

 3    them?

 4            A.    No.

 5            Q.    Do you know who Practical

 6    Pain Management is?

 7            A.    I believe it was a medical

 8    journal.

 9            Q.    I'm sorry?

10            A.    I believe it's a medical

11    journal.

12            Q.    All right.

13                  MS. BAIG:  Let's mark this

14            as the next exhibit, 9.  It's

15            Bates stamped Actavis 0501884

16            to --

17                  MR. ROTH:  You've got a 9,

18            so we're on 10.

19                  MS. BAIG:  Sorry, we're on

20            Exhibit-10.  To Actavis 0501893.

21                          -  -  -

22                  (Whereupon, Allergan-Altier

23            Exhibit-10, Actavis 0501884-1893,

24            was marked for identification.)
```

```
 1                    -  -  -

 2   BY MS. BAIG:

 3        Q.    This is an e-mail from you

 4   to Nathalie Leitch --

 5        A.    Uh-huh.

 6        Q.    -- on August 12th, 2011.

 7              Do you see that?

 8        A.    I do.

 9        Q.    And it's referring to a

10   Kadian e-mail blast.

11        A.    Uh-huh.

12        Q.    What was this?

13        A.    I don't know.  I'll have to

14   read through it.

15        Q.    Take a look.

16        A.    Oh, gosh.  Nice copy.

17        Q.    I know.  That's how it was

18   produced, though.  It's just the first

19   page that's blurred.

20        A.    It looks like a five-wave

21   campaign of marketing messages to be

22   e-mailed out.

23        Q.    To be e-mailed out to whom?

24        A.    I would assume physicians.
```

1      Q.      And did you create these

2  marketing materials?

3      A.      Yes.

4      Q.      You did?

5      A.      Not me personally, but an

6  advertising agency on our behalf, yes.

7      Q.      So you worked with the

8  advertising agency to create them?

9      A.      Correct.

10     Q.      Can you tell, from looking

11 at these materials now, what advertising

12 agency you worked with?

13     A.      For Kadian, it would have

14 been Zuchelli & Johnson.

15     Q.      How do you spell that?

16     A.      Z-U-C-H-E-L-L-I and Johnson.

17 Unless this company Vertical Health,

18 here, created them.

19             Most likely what may have

20 happened is Zuchelli & Johnson would have

21 created the files, we would have put them

22 through our legal/regulatory review and

23 then provided them to Vertical Health to

24 e-mail out.

```
1          Q.    What is Vertical Health?

2          A.    That's a great question.  I

3    don't recall.  Obviously, a company that

4    we worked with to e-mail these out.

5          Q.    Why did you need to do that?

6          A.    Why did I need to work

7    with --

8          Q.    Why didn't Actavis just send

9    the e-mails out itself?  Do you know --

10         A.    We didn't have e-mail

11   addresses for physicians.

12         Q.    I see.  So you contracted

13   with Vertical Health to get the messages

14   out to the --

15         A.    Uh-huh.

16         Q.    -- e-mail addresses for the

17   physicians?

18         A.    That's my assumption, yeah.

19         Q.    What is Tegra Analytics?

20         A.    Tegra Analytics was a

21   company we worked with that would, I

22   guess, do analytics for us.

23               How can I explain what they

24   do?  They're really smart people.  They
```

1   look at data, so I know -- say we were

2   doing the territory expansion, they would

3   propose, here are the areas where you

4   should, you know, divide the territories,

5   if you're going from 18 to 30; based on

6   the data you have, this is where those

7   territories should be located.  I think

8   they also analyzed sales data.

9          Q.    And did you work directly

10  with Tegra Analytics?

11         A.    I did not.  I obviously was

12  on calls with them, though.

13         Q.    Who worked most directly

14  with Tegra Analytics?

15         A.    I believe Nathalie managed

16  them.

17         Q.    And would they provide to

18  you telemarketing targets?

19         A.    Perhaps.  I mean, we

20  wouldn't get the data from them, but they

21  may have analyzed the data and said, you

22  know, these targets fall out of your

23  territory, out of where your field

24  coverage is, and here is your white

1    space, so --

2              MS. BAIG:  Let's have this

3         document marked as Exhibit-11.

4                   -  -  -

5              (Whereupon, Allergan-Altier

6         Exhibit-11, Actavis 0672638-2645,

7         was marked for identification.)

8                   -  -  -

9              MS. BAIG:  And you see this

10        document is Bates stamped Actavis

11        0672638 --

12             THE WITNESS:  So this would

13        have been --

14             MS. BAIG:  -- through --

15        hang on -- Actavis 0672645.

16             And it begins as an e-mail

17        string from Matthew Hutcheson to

18        Jennifer Altier, July -- January

19        7th, 2013.  Subject, telemarketing

20        targets.

21   BY MS. BAIG:

22        Q.    Is Matt Hutcheson the

23   contact at Tegra Analytics?

24        A.    Yes.

1    Q.    And you communicated

2    directly with him regarding analytics

3    that they were performing for Actavis

4    opioids?

5    A.    Right.  If I'm reading the

6    context of this, this is January 2013, so

7    Watson had just let the sales force go.

8    Technekes was theoretically still on

9    contract and we were trying to figure

10   out, I guess, if we could maybe just

11   continue telesales for Kadian.

12   Q.    And you see here in the

13   e-mail, halfway down, from you to him,

14   you state, Our telemarketing team had

15   additional bandwidths to add more targets

16   to their call list.  Could you please

17   send us the next names that would be on

18   the list, with the following breakdown?

19   Do you see that?

20   A.    Uh-huh.

21   Q.    And you have two breakdowns.

22   One, the next 1,000 generic morphine

23   sulfate ER writers that are not sales

24   team targets.

1              Correct?

2      A.      Uh-huh.

3      Q.      And you have the next 1,000

4   Kadian writers that are not sales team

5   targets.

6              Correct?

7      A.      Yes.

8              And you know what, just -- I

9   don't know if I'm allowed to do this, but

10  before, in the previous message when we

11  were talking about generic MS and I made

12  up -- I said it was MS-Contin.  I believe

13  it was probably generic morphine sulfate

14  is what that was referring to.

15             So, I'm sorry, I interrupted

16  your question.

17     Q.      So here you're getting 1,000

18  generic morphine sulfate extended release

19  writers that the telemarketing team can

20  target, and you're getting that from

21  Tegra Analytics, correct?

22     A.      Yes.  It sounds like he's

23  pulling that data for us, yes.

24     Q.      And you're also getting a

1    thousand Kadian writers that were not, at

2    that point, sales team targets so that

3    your sales team could target them,

4    correct?

5         A.    It looks like so that the

6    Technekes team could target them, yes.

7         Q.    Which was part of your sales

8    team, right?

9         A.    Telesales.

10        Q.    Telesales.

11             Do you see on Page Actavis

12   0672643, halfway down, it says, Technekes

13   has had the following physicians state

14   that they have Kadian reps.  I'm

15   wondering if we can verify that we are no

16   longer calling on them.  Perhaps they

17   were drops.

18             Do you see that?

19        A.    I do.

20        Q.    Okay.  Can you tell me what

21   that's referring to?  Were there certain

22   targets that would be dropped for some

23   reason?

24        A.    Sure.  If we realign the

1   territories and that was no longer being

2   covered by somebody, that sort of thing.

3           So, basically, what was

4   happening here is Technekes called the

5   office and the doctor said, oh, I have a

6   rep that comes and sees me, and we didn't

7   want both.  So the protocol was they

8   would tell us.  I wanted to verify that a

9   rep actually was calling on them.

10          Q.    And the list that's

11  attached, is that the sample target list?

12          A.    Kadian telesales listing,

13  supplemental.

14          I'll have to read the e-mail

15  to see what this might refer to.  Based

16  on -- if this is correct, there's a

17  message that says, Please see the

18  attached target list going to Aaron at

19  Technekes.

20          So perhaps this was

21  Technekes's target list.

22          Q.    And do you see at the top of

23  the very first page, it says, Kadian

24  telesales listing, supplemental, January

```
 1    7th, 2013.  And it says, Next 1,100

 2    generic morphine sulfate ER and next

 3    1,100 Kadian writers, correct?

 4          A.    Uh-huh.

 5          Q.    So it appears that these

 6    were the next 1,100 for your telesales

 7    team to then target, correct?

 8          A.    Okay.

 9                MR. ROTH:  Object to the

10          form.

11    BY MS. BAIG:

12          Q.    Would you agree?

13          A.    Based on what he's writing,

14    we did the next 1,100 to account for

15    potential overlaps.  Yes.  So I asked for

16    1,000, he gave me 1,100.

17          Q.    And these are names of

18    targets for your sales teams?

19                MR. ROTH:  Object to the

20          form.

21    BY MS. BAIG:

22          Q.    Is that right?

23          A.    These --

24          Q.    For your telesales teams?
```

1          A.     These appear to be a list of

2     targets for telesales, yes.

3          Q.     Do you know what a negative

4     call disposition is?

5          A.     No.

6          Q.     If somebody is talking to

7     you about targets with a negative call

8     that dispositioned, do you know what that

9     means?

10               MR. ROTH:  Object to the

11          form.  Asked and answered.

12               THE WITNESS:  Yeah, I don't.

13     BY MS. BAIG:

14          Q.     Would there be any reason

15     that any targets would be removed from a

16     call list like the one we just looked at?

17          A.     For field sales or

18     telesales?

19          Q.     Either.

20          A.     If they asked not to be

21     called on.

22          Q.     Any other reason that you

23     can think of?

24          A.     We always said, moved, died

1    or retired; if they moved out of the

2    area, if they died or they retired, they

3    would be removed.

4         Q.    Was anybody ever removed, to

5    your knowledge, for suspicious sales,

6    suspicious orders?

7              MR. ROTH:  Object to the

8         form.  Lacks foundation.  Calls

9         for speculation.

10             THE WITNESS:  Who would be

11        placing orders?  We don't call

12        physicians --

13   BY MS. BAIG:

14        Q.    Let's say you're going to

15   target a physician.

16        A.    Right.

17        Q.    To your knowledge, was any

18   physician ever removed from one of these

19   lists because it had a suspicious

20   prescribing?

21             MR. ROTH:  Objection.  Form.

22        Lacks foundation.  Calls for

23        speculation.

24             THE WITNESS:  I don't even

1          know how we would know -- I mean,

2          suspicious prescribing.

3   BY MS. BAIG:

4          Q.    So you've never -- you've

5   never heard of any targets being removed

6   from the list, other than for the reasons

7   that you just gave me?

8          A.    Those were the most common

9   reasons I had heard of, yes.

10         Q.    Can you think of any other

11  reasons?

12         A.    I'm sure there are others,

13  but nothing comes to mind.

14               MS. BAIG:  Let's have this

15         document marked as Exhibit-12,

16         please.  Bates stamped Actavis

17         0192957 through 0193028.

18                   -  -  -

19               (Whereupon, Allergan-Altier

20         Exhibit-12, Actavis 0192957-3028,

21         was marked for identification.)

22                   -  -  -

23               MS. BAIG:  It begins as an

24         e-mail string from Jennifer Altier

Highly Confidential — Subject to Further Confidentiality Review

```
 1          to Nathalie Leitch, dated August

 2          13th, 2013.

 3    BY MS. BAIG:

 4          Q.    Just take a moment to

 5    acquaint yourself with the document.

 6          A.    Okay.

 7          Q.    If you look at the

 8    PowerPoint on the third page, is this the

 9    launch document that you created for the

10    new strengths of Kadian?

11               MR. ROTH:  Which PowerPoint

12          are you talking about and what's

13          the Bates number?

14               MS. BAIG:  The first page

15          of -- it's the third page of the

16          document.

17               MR. ROTH:  The one that

18          says -- okay.  192960?

19               MS. BAIG:  Correct.

20               THE WITNESS:  It appears

21          this was given by Mike Shepherd.

22    BY MS. BAIG:

23          Q.    He is the marketing director

24    for Kadian?
```

1          A.     Yeah, no.  He was the sales

2    director.

3          Q.     Because you were the

4    marketing director for Kadian?

5          A.     Correct.

6          Q.     Okay.  So that's an error on

7    the first page?

8          A.     It seems like it.  Maybe I

9    was supposed to give it and then it

10   changed, and we just threw his name on it

11   and didn't change the title.

12         Q.     Did you help draft this

13   document?

14         A.     It appears to be something I

15   would work on, yes.

16         Q.     And this was the new

17   strengths launch.

18                So what was this used for?

19         A.     This was to introduce the

20   new strengths to the field.

21         Q.     To the field.

22                By "the field," you mean by

23   the sales reps?

24         A.     Yes.

 1          Q.    So was this a document that

 2    was provided to the sales reps?

 3                MR. ROTH:  Objection.  Form.

 4          Mischaracterizes the document.

 5                THE WITNESS:  It appears it

 6          references a cancelled meeting.

 7          This was around the time that the

 8          Watson merger was happening, and I

 9          know that meetings were cancelled.

10                And when I read Nathalie's

11          e-mail, she's asking, would you

12          happen to have any agenda draft

13          materials available from the

14          cancelled meeting?

15                So I don't know for sure if

16          this was given or not.

17    BY MS. BAIG:

18          Q.    Would there have been a new

19    strengths launch document, though,

20    provided to the sales reps?

21                MR. ROTH:  Objection.  Form.

22                THE WITNESS:  Would there

23          have been, I'm sorry, what?

24    BY MS. BAIG:

```
 1          Q.    A launch document like this

 2   presented to the sales reps?

 3          A.    It would have been

 4   presented, it wouldn't have been

 5   provided.  Everything would have been

 6   stamped for internal purposes only.

 7          Q.    So they wouldn't get a copy

 8   of it?  The sales reps would not receive

 9   a copy?

10          A.    Not normally.  It was not

11   normally approved to get distributed to

12   the sales force, no.

13          Q.    You would just present it to

14   them via PowerPoint?

15          A.    Uh-huh.

16          Q.    Can you turn to Bates stamp

17   page Actavis 0192973?

18          A.    Is that in the PowerPoint?

19          Q.    It is, yes.  It's Page 3 of

20   the PowerPoint, I believe.

21          A.    Got it.

22          Q.    At the top, it says, New

23   strength recommendations.

24          A.    Correct.
```

```
1          Q.    And so was the strategy to

2    target top existing prescribers initially

3    with current strengths along with the

4    addition of new strengths?

5               MR. ROTH:  Object to the

6          form.

7               THE WITNESS:  Based on

8          what's here, yes.

9    BY MS. BAIG:

10         Q.    And to look for new

11   prescriber audiences?

12         A.    It says, Expand to a new

13   prescriber audience, look for new

14   prescribers.

15         Q.    Prescriber --

16         A.    Niches.

17               And the goal was to develop

18   a medically compelling story prior to

19   reaching new prescribers; is that right.

20               MR. ROTH:  Object to the

21         form.  Mischaracterizes the

22         document.

23   BY MS. BAIG:

24         Q.    Well, does the sentence say,
```

1    Develop a medically compelling story

2    prior to reaching new prescribers?

3           A.    I think what that would

4    refer to is you can't go in to someone

5    who's never prescribed Kadian and say,

6    hey, we have new strengths.  They're not

7    going to care, because they've never

8    written it.

9                 So you have to talk about

10   the medical data before you can talk

11   about new strengths.

12          Q.    You have to provide them

13   with a medically compelling story,

14   correct?

15                MR. ROTH:  Object to the

16          form.

17   BY MS. BAIG:

18          Q.    Well, is that what the

19   document says, Develop a medically

20   compelling story?

21          A.    It does.

22          Q.    Okay.  And does it also

23   state that new strengths will be launched

24   the week of September 10th?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It does.

 2          Q.    And that's 2012, correct?

 3          A.    Yes.

 4          Q.    Okay.  And it further states

 5   that pharmacy stocking strategy would

 6   need to be a key priority, correct?

 7          A.    I'm sorry, I lost my page

 8   here.  It was slide number what?

 9          Q.    Slide number 3.

10          MR. ROTH:  973 is the Bates

11          stamp.

12          THE WITNESS:  Got it.  Okay.

13          Yes.

14   BY MS. BAIG:

15          Q.    Do you know why this meeting

16   was cancelled?

17          A.    Watson did not want to spend

18   any more money on the sales force, with

19   their plans to terminate it.

20          MS. BAIG:  Let's have this

21          document marked as Exhibit-13.

22          It's Actavis 0413235 to 0413321.

23                  -  -  -

24          (Whereupon, Allergan-Altier
```

```
 1          Exhibit-13, Actavis 0413235-3321,

 2          was marked for identification.)

 3                    - - -

 4   BY MS. BAIG:

 5          Q.    It's an e-mail from Mark

 6   Killion to you, dated July 10th, 2012,

 7   attaching a Kadian training meeting

 8   marketing presentation, correct?

 9          A.    I don't believe it's a

10   marketing presentation.  But -- it's

11   called marketing -- one of them is called

12   marketing presentation.  The other one is

13   called training meeting, Somerset.

14          Q.    So there's two attachments,

15   two PowerPoints, right?

16          A.    Correct.  I believe so.  Let

17   me -- let me find --

18          Q.    Take a look at it.

19          A.    -- where one starts and --

20   okay.

21                Yes.

22          Q.    And what was the Kadian

23   training meeting in Somerset in October

24   of 2011?  Do you recall?
```

1    A.    Somerset was, I believe,

2  inVentiv's headquarters.  So perhaps we

3  were training new reps.

4    Q.    Where is Somerset?

5    A.    New Jersey.

6    Q.    And if you turn to Page 5 of

7  that first attachment, it says, LAO

8  formulary status for top 25 U.S.

9  commercial health plans.

10            Do you see that?

11    A.    I do.

12    Q.    What is -- what does LAO

13  stand for?

14    A.    Long-acting opioid.

15    Q.    So here is the formulary

16  status for long-acting opioids.

17            And it shows -- what does

18  this show?

19    A.    It shows formulary status

20  for those products.

21    Q.    So, for example, for United

22  Health Group, which is Number 1 -- so

23  these are all the top 25 U.S. commercial

24  health plans, right?

1      A.      Uh-huh.

2      Q.      So we take the top one,

3  United Health Group, and what is Kadian's

4  formulary status?

5      A.      Not covered.

6      Q.      It's not covered.  Okay.

7              And what is tier 2 in a

8  formulary status?  What does that mean?

9      A.      So tier 1 is generic.  Tier

10  2 is preferred.  Tier 3 is on formulary.

11  And, I mean, this is -- you know, back in

12  the dark ages.

13              Now there's, like, tier 8s

14  and all this.  But at this time, tier 1

15  was generic, tier 2 was preferred, tier 3

16  was covered.  They don't even go into

17  tier 4, so then it would just be not

18  covered.

19      Q.      And what was the goal?  I

20  mean, what would your preference be for

21  your company's drugs?

22              MR. ROTH:  Object to the

23          form.

24  BY MS. BAIG:

1    Q.    Tier 1?

2    A.    It would depend on your

3    strategy.  Only generics would be tier 1.

4    If you were willing to pay for, you know,

5    privileged or higher tiering, you got

6    tiering.

7    Q.    So, for example, for Aetna,

8    Kadian is listed as tier 2, correct?

9    A.    Correct.

10    Q.    And would that be the result

11    of negotiations between Actavis and

12    Aetna?

13        MR. ROTH:  Objection.  Form.

14        Lacks foundation.  Calls for

15        speculation.

16        THE WITNESS:  That could

17        have been any number of reasons;

18        contracting between Actavis and

19        Aetna, previous dealings with

20        Alpharma and Aetna, just because

21        Aetna liked it, the medical

22        director on the staff liked it.

23        There's a number of reasons.

24    BY MS. BAIG:

1      Q.     Could it also be because

2    Actavis is paying more to be at a higher

3    tier level?

4           MR. ROTH:  Objection to

5        form.  Calls for speculation.

6           THE WITNESS:  That's a

7        potential.  This is not my area of

8        expertise.  I've never been

9        involved in managed care

10        contracting.

11   BY MS. BAIG:

12      Q.     So where would you get this

13   information from when you're creating a

14   presentation like this?

15      A.     There are companies that

16   provide this information.  MMIT is a big

17   one.

18      Q.     Which one?

19      A.     MMIT.

20      Q.     Do you know what that stands

21   for?  Do you know?

22      A.     Managed Markets Information

23   something.

24      Q.     And where would you get this

1    information, from what department at

2    Actavis, or what person?

3         A.    Whoever was handling managed

4    care.  I don't -- I don't know that we

5    had anybody at this time -- oh, here.

6    I'm sorry, it's at the bottom.

7              Fingertip Formulary.  And

8    that's an online tool.  So that's just

9    publicly available.

10             And the AIS directory of

11   health plans, 2001 -- 2011.

12        Q.    So this information was

13   publicly available and you just pulled it

14   and put it in the PowerPoint?

15        A.    I didn't put this particular

16   PowerPoint together.  I put the other one

17   together.

18        Q.    Okay.  And do you see on

19   Page 17, there's a slide that's titled,

20   Kadian Territory Expansion?

21        A.    Uh-huh.  I do.

22        Q.    And are the shaded areas,

23   are those the areas where you were

24   expanding, or do you know?

1           A.    I'm looking.  I'm trying to

2    look at the code here.

3                 I believe so.  So the code

4    there, the legend, seems to correspond to

5    the territories that are listed on the

6    side.

7           Q.    So does that mean what's

8    white was your existing territories?

9                 MR. ROTH:  Object to form.

10                THE WITNESS:  No.  I don't

11           believe you can make that

12           assumption, because I don't

13           believe that these new territories

14           meant we were now covering the

15           entire United States.

16    BY MS. BAIG:

17          Q.    So this chart does not

18    reflect -- does not show your existing

19    territories; is that correct?

20          A.    Correct.  Correct.

21          Q.    And who would make the

22    decision as to the territory expansion?

23          A.    Who would make the decision?

24    Ultimately, I guess, Terry Fullem, with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    input from Nathalie and the sales team.

 2         Q.    Can you turn to Page 18?

 3               It starts, Background, and

 4    it talks about --

 5         A.    Oh, 18 in that same

 6    presentation?

 7         Q.    It's Actavis 0413298.

 8         A.    Oh, okay.  I was on -- so

 9    you're in a different presentation now?

10         Q.    Yes.

11         A.    Page 18?

12         Q.    Yes.

13               MR. ROTH:  Page 18 of the

14         second presentation.

15               THE WITNESS:  Background.

16    BY MS. BAIG:

17         Q.    It's Actavis 0413298.

18         A.    Yep.

19         Q.    Okay.  And you have

20    background and it states, Telephone

21    interviews with pain medicine specialists

22    were conducted from December 10th to the

23    24th, 2010.

24               Do you see that?
```

1      A.    Yes.  I'm just flipping

2    back.  If you note the page before, these

3    are, again, market research results.  So

4    this would have been conducted by a third

5    party.

6            Q.    Does it say here who

7    conducted the market research?

8            A.    It does not.

9            Q.    The title of this one is,

10   Marketing Overview, right?

11           A.    Yes.  I'm sorry, the slide

12   17, it says, Market research results.

13           Q.    Got it.  Okay.

14                 So Slide 18, you've got the

15   background.  So you didn't generally put

16   who conducted the market research in

17   here?

18           A.    No.

19           Q.    But it would have been a

20   third party?

21           A.    Correct.

22           Q.    Possibly Campbell Alliance

23   or LPG?

24           A.    Correct.

```
1              Q.      And it appears that they
2    contacted 29 physicians; is that right?
3              A.      Correct.
4              Q.      What does loyalist mean?
5              A.      They were Kadian
6    prescribers.
7              Q.      Competitors mean they were
8    prescribing a competitive drug?
9              A.      Correct.
10             Q.      What are spreaders?
11             A.      Both, they prescribe both.
12             Q.      Oh, okay.  And this was a
13   study that was done on morphine sulfate
14   extended-release capsules, correct?
15                  MR. ROTH:  Object to the
16             form.
17                  THE WITNESS:  I don't think
18             so, based on the --
19   BY MS. BAIG:
20             Q.      I'm just looking at the top
21   right corner.
22             A.      Top right where?
23             Q.      On that same page.
24             A.      Telephone interviews with
```

1    pain medicine specialists were

2    conducted --

3            Q.    The top right in small

4    print.

5            A.    That's our logo, Kadian.

6            Q.    And then morphine sulfate.

7            A.    That's what Kadian is.

8            Q.    Yes, okay.

9                  On the next page, it says,

10   Physicians prefer to write branded

11   products.

12           A.    Uh-huh.

13           Q.    Why was that?  Do you know?

14           A.    I don't know.  No, they

15   didn't -- there's no probing here.

16           Q.    That's not a general

17   proposition, but specific to this?

18           A.    That was based on the 29

19   physicians.

20           Q.    And so based on that study

21   of 29 physicians, one of the findings, as

22   reported here, anyway, was that OxyContin

23   overwhelmingly has the most potential for

24   abuse; is that right?

```
 1              A.    That was --

 2                    MR. ROTH:  Objection to the

 3              form.

 4                    THE WITNESS:  According to

 5              the bullet there, the new

 6              formulation of OxyContin is

 7              perceived to be better, but

 8              physicians are still learning

 9              about it.  So that was -- that was

10              their perception.

11    BY MS. BAIG:

12              Q.    So their perception was that

13    OxyContin overwhelmingly has the most

14    potential for abuse?

15              A.    According to the 29 doctors,

16    yes.

17              Q.    On Slide 22, do you see that

18    it says, All doctors are concerned with

19    safety, abuse potential and diversion?

20              A.    Yes.

21              Q.    Do you recall what you

22    trained the sales reps to say with

23    respect to Kadian, regarding safety

24    abuse, potential diversion?
```

```
 1          A.     Yes.

 2                 MR. ROTH:  Object to the

 3          form.

 4                 THE WITNESS:  I'm sorry.

 5                 They had to deliver all the

 6          safety information that was

 7          included in the detail aids.

 8   BY MS. BAIG:

 9          Q.     Were these marketing studies

10   or were these -- what do you call this

11   document?

12          A.     Market research.

13          Q.     Market research study.

14                 You paid a third-party

15   entity to conduct it, correct?

16          A.     Correct.

17          Q.     And did that come out of

18   your budget?

19          A.     Yes.

20          Q.     It came out of the marketing

21   budget?

22          A.     It would, yes.

23          Q.     And on Page 33, do you see

24   there's a heading -- or on 32, there's a
```

1    section called, Objection Handling?

2         A.    Yes.

3         Q.    So is this the marketing

4    research part that essentially advises

5    you on how to handle objections?

6         A.    This has nothing to do with

7    market research.  This would have been

8    prepared by us.

9         Q.    So you prepared this based

10   on the information that you got from the

11   market research study?

12              MR. ROTH:  Object to the

13         form.

14              THE WITNESS:  Or just

15         information we had in general.

16   BY MS. BAIG:

17        Q.    Based on -- okay.

18              And on Page 40, profile 3 --

19        A.    Yes.

20        Q.    -- it says, Dr. Evil is a

21   low-volume prescriber of Kadian.

22              Do you see that?

23        A.    I do.

24        Q.    Did you prepare that slide?

1          A.    I don't recall.

2          Q.    It goes on to state, He

3    serves a low-income population of

4    patients and feels that generic morphine

5    sulfate is the best option for them.

6          A.    Uh-huh.

7          Q.    He has not been called on by

8    a Kadian representative in over two

9    years.

10               Why would he have been

11   referred to as Dr. Evil?

12         A.    I think we were just picking

13   names.  There's -- you know, Dr. No was

14   the previous one.  Dr. Blofeld -- these

15   were just meant to be made-up names.  I

16   think -- God, what's the movie?

17               MR. ROTH:  Austin Powers.

18               THE WITNESS:  Austin Powers

19        was popular that year.

20   BY MS. BAIG:

21         Q.    Are you familiar with The

22   Journal of Pain?

23         A.    No.  If there is one, I'll

24   believe you.  But, usually, there's

Highly Confidential - Subject to Further Confidentality Review

```
1    Journal of Pain Management, Journal of

2    Pain Medicine.  Just The Journal of Pain,

3    I'm not --

4           Q.    Put out by the American Pain

5    Society?

6           A.    Okay.  I'm not super

7    familiar.  But I'll take your word for

8    it.

9           Q.    There's one called Clinical

10   Guidelines for the Use of Chronic Opioid

11   Therapy.

12              Are you familiar with that?

13   A.    No.

14              MS. BAIG:  Let's have this

15          document marked as Exhibit-14.

16              MR. ROTH:  Before we do

17          that, can we go off for a second?

18              VIDEO TECHNICIAN:  The time

19          is 1:25 p.m.  Off the record.

20                   -  -  -

21              (Whereupon, a luncheon

22          recess was taken.)

23                   -  -  -

24              VIDEO TECHNICIAN:  The time
```

```
1              is 2:22 p.m.  Back on the record.

2                   MS. BAIG:  I'd like to have

3              the next document marked as

4              Exhibit-14, please.

5                        -   -   -

6                   (Whereupon, Allergan-Altier

7              Exhibit-14, Actavis 0685080-5122,

8              was marked for identification.)

9                        -   -   -

10                  MS. BAIG:  This is a

11             document that's Bates stamped

12             Actavis 0685080 to Actavis

13             0685122.

14     BY MS. BAIG:

15             Q.    It starts with an e-mail

16     string from Lisa Miller to you, Jennifer

17     Altier, on October 25th, 2012.

18                  Do you see that?

19             A.    Yes.

20             Q.    Okay.  And the subject is

21     Chou and update.  Chou, 2009, opioid

22     treatment guidelines are shown as

23     attached.

24                  Do you see that?
```

```
 1          A.    Yes.  I'm just reading what

 2   I wrote down here.

 3          Q.    Do you know what Chou stands

 4   for?  C-H-O-U.

 5          A.    I believe it's the author of

 6   the article attached.  Yeah, it's the

 7   lead author.

 8          Q.    And the article attached is

 9   an article entitled, Opioid Treatment

10   Guidelines, Clinical Guidelines for the

11   Use of Chronic Opioid Therapy in Chronic

12   Noncancer Pain.

13              Do you see that?

14          A.    I do.

15          Q.    And that's an article that

16   was published by The Journal of Pain in

17   February of 2009.

18              Do you see that?

19          A.    I do.

20          Q.    The funding came from the

21   American Pain Society, do you see that,

22   in the very bottom --

23          A.    Yes.

24          Q.    -- quarter?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    2009.

2    Q.    It says, Funding from the

3 American Pain Society?

4         MR. ROTH:  Okay.

5 BY MS. BAIG:

6    Q.    Well, it says, This article

7 is based on research conducted at the

8 Oregon Evidence-Based Practice Center

9 with funding from the American Pain

10 Society, APS.

11         Do you see that?

12    A.    I do.

13    Q.    Now, do you recall why it

14 was that you were being sent this

15 article?

16    A.    It looks like we were using

17 it as a reference for the statement in

18 bold that I have there.

19    Q.    The statement, In patients

20 who are opioid naive or have modest

21 previous opioid exposure, opioids should

22 be started at a low dose and titrated

23 slowly to decrease risk of opioid-related

24 adverse effects.

```
 1                     Is that the statement?

 2          A.      Correct.

 3          Q.      So you were looking for

 4   support for that, and you found it in the

 5   Pain Society funded article --

 6                  MR. ROTH:   Object to form.

 7   BY MS. BAIG:

 8          Q.      -- called Opioid Treatment

 9   Guidelines?

10          A.      I don't know that I found

11   it.  I seemed to be looking for it.

12          Q.      You were looking for it.

13   Okay.

14                  And who is Ivan Shaw?

15          A.      He was a part of the medical

16   team supporting the prelaunch for MoxDuo.

17          Q.      What department was Ivan

18   Shaw in?

19          A.      Medical affairs.

20          Q.      And is that the team that

21   you would typically reach out to if you

22   needed support for something that you

23   were going to use in a marketing

24   material?
```

```
 1                   MR. ROTH:  Object to the

 2            form.

 3                   THE WITNESS:  I mean, there

 4            are a lot of resources.  If I were

 5            looking for medical information, I

 6            would go to medical affairs.

 7    BY MS. BAIG:

 8            Q.    And do you see, on the first

 9    page of the article, the list of authors?

10            A.    I do.

11            Q.    And do you see Perry Fine is

12    listed there?

13            A.    Yes.

14            Q.    And are any of the other --

15    do you see that Russell K. Portenoy is

16    also listed there?

17            A.    I do.

18            Q.    And Perry Fine was on the

19    medical advisory board that we discussed

20    earlier, right?

21            A.    Correct.

22                   MR. ROTH:  Object to the

23            form.

24    BY MS. BAIG:
```

1     Q.    Are any of the other people

2    that are listed here, do you recognize

3    them as being on medical advisory boards

4    at Allergan?

5             MR. ROTH:  Object to the

6          form.

7             THE WITNESS:  I wasn't at

8          Allergan.  I was at Actavis.

9             None of the other names, off

10         the top of my head, are familiar,

11         no.

12   BY MS. BAIG:

13     Q.    Did you have any other

14   communications with Perry Fine, other

15   than the medical advisory board that we

16   already talked about?

17     A.    Not that I recall, no.

18     Q.    How about Russell Portenoy?

19     A.    No, not that I recall.

20     Q.    Do you recall using this

21   article for any other purposes?

22     A.    No.  It looks like we wanted

23   it for the MoxDuo detail aid; but since

24   that product wasn't launched, we didn't

1    use it.

2           Q.    Are you familiar with any

3    speakers bureaus run by Actavis?

4           A.    We did none, no.

5           Q.    If you go to Page Actavis

6    0685100, you'll see there's a reference

7    to -- you see there's another reference

8    to Perry Fine there?

9           A.    I do.

10          Q.    And it indicates that he was

11   serving on advisory boards related to

12   opioid analgesics for Alpharma, Cephalon,

13   Endo Pharmaceuticals, GlaxoSmithKline,

14   Lilly, Merck, NIH, Ortho-McNeil, J&J,

15   Purdue Pharma and Wyeth.

16                Do you see that?

17          A.    I do.

18          Q.    And do you see further down

19   there's a reference to Jeremy Adler?

20          A.    Yes.

21          Q.    And he's identified as

22   serving on speakers bureaus for Alpharma,

23   Elan, Endo, Pfizer and Victory

24   Pharmaceutical Companies.

1    Do you see that?

2    A.    I do.

3    Q.    Did you ever have any

4    communications with Jeremy Adler?

5    A.    No, not that I recall.

6    Q.    And do you see the next one

7    is Pamela Davies, on the next page?

8    A.    Yes.

9    Q.    And it's indicated there

10   that she receives honorarium patients

11   from Alpharma and Endo Pharmaceuticals

12   for work as a clinical advisor.

13   Do you see that?

14   A.    I do.

15   Q.    And the last name on that

16   page, Jeffrey Fooden.

17   A.    Uh-huh.

18   Q.    And do you see there that it

19   indicates that he was on speakers bureaus

20   for advisory boards for Abbott, Alpharma,

21   Calloway Labs, Janssen and PriCara?

22   A.    I do.

23   Q.    Did you have any

24   communication with either of those

```
 1    individuals?

 2         A.    No, not that I recall.

 3         Q.    Do you know if this

 4    article -- what it was used to support in

 5    terms of Kadian marketing?

 6              MR. ROTH:  Object to the

 7         form.

 8              THE WITNESS:  I don't know

 9         that it was used for Kadian at

10         all.

11              My -- you know, this is

12         2012.  We were, you know, winding

13         down operations at this point.  I

14         don't know that it was used at

15         all.

16    BY MS. BAIG:

17         Q.    You don't know whether it

18    was or it was not, right?

19         A.    Right.  My assumption was

20    that it was actually pulled for MoxDuo

21    just because Ivan was involved in it.

22              But I don't know.  I don't

23    know what it was used for.

24         Q.    If you'd turn to Actavis
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    0685103.

 2         A.    Yes.

 3         Q.    And you see Russell Portenoy

 4    is listed there?

 5         A.    Yes.

 6         Q.    And it's indicated that he

 7    has consulting agreements with an

 8    extensive list of pharmaceutical

 9    companies?

10         A.    Yes.

11         Q.    And then further down it has

12    Nox H. Todd?

13         A.    Yes.

14         Q.    And you see there there's

15    consulting payments indicated from

16    Johnson & Johnson, Alpharma and others?

17         A.    Yes.

18         Q.    So other than the advisory

19    board for MoxDuo, did you have any other

20    participation with any other advisory

21    boards?

22         A.    No.

23         Q.    Are you aware of any other

24    advisory boards for any of the opioid
```

1    drugs at Actavis?

2          A.    No.

3               MR. ROTH:  Object to the

4          form.  Asked and answered.

5               THE WITNESS:  Sorry, no.

6    BY MS. BAIG:

7          Q.    So you're not aware of any

8    Kadian advisory board?

9               MR. ROTH:  Objection.  Asked

10         and answered.

11              THE WITNESS:  I'm not.

12   BY MS. BAIG:

13         Q.    Are you aware of whether any

14   Kadian advisory board was ever

15   considered?

16         A.    I believe a host of programs

17   and tactics were considered, and an

18   advisory board could have possibly been

19   considered.

20         Q.    Okay.

21              MS. BAIG:  So this document

22         we'll have marked as Exhibit-15.

23         And it's Bates stamped Actavis

24         0821336 through 0821339.

```
 1                    -  -  -

 2              (Whereupon, Allergan-Altier

 3         Exhibit-15, Actavis 0821336-1339,

 4         was marked for identification.)

 5                    -  -  -

 6   BY MS. BAIG:

 7         Q.    The title is, Actavis U.S.

 8   Kadian Advisory Board, 2011.  Submitted

 9   to Jennifer Altier, marketing director,

10   it says on the front cover.

11              Do you see that?

12         A.    I do.

13         Q.    And this was, as noted on

14   the front cover, submitted to you by

15   Genesis Associates?

16         A.    Yes.

17         Q.    And do you see on the first

18   page, it states, Project scope and

19   objectives?

20         A.    Yes.

21         Q.    And it states that, Actavis

22   has solicited the support of Genesis

23   Associates, Inc., in the development of a

24   Kadian advisory board to be convened,
```

1    ideally, in August or September of 2011.

2         A.    Yes.

3         Q.    Do you see that?

4         A.    I do.

5         Q.    Does this refresh your

6    recollection that there was an advisory

7    board, or at least one contemplated for

8    Kadian?

9              MR. ROTH:  Objection.  Form.

10         Mischaracterizes the document.

11              THE WITNESS:  This says that

12         there was a proposal submitted.  I

13         don't believe this was ever held.

14   BY MS. BAIG:

15         Q.    Okay.  So it was something

16   that was maybe considered?

17         A.    Yes.

18         Q.    Okay.  And it states that,

19   the third paragraph, that, The proposed

20   meeting is a one-day, 8:00 a.m. to 4:00

21   p.m., with 12 key experts in pain

22   management.

23              Do you see that?

24         A.    I do.

1    Q.    And amongst some of the
2    advisors identified there are Scott
3    Fishman.
4          Do you see that?
5    A.    I see that name.
6    Q.    And, to your knowledge, did
7    this advisory board ever take place?
8    A.    I'm just looking.  I'm
9    looking at the venue in Jersey City.  I
10   remember a Hoboken meeting, but I don't
11   recall what it was.  I'm thinking that
12   was the MoxDuo advisory board, but I
13   could be getting my locations mixed up.
14   Q.    Well, you see the first
15   page, the title says, Kadian Advisory
16   Board?
17   A.    No, no, I know.  I'm just
18   trying to remember if there was -- if
19   this came to be.  I don't recall.
20   Q.    You don't recall --
21   A.    I don't recall if it got
22   past the proposal stage.
23   Q.    So do you see on the second
24   page of the document, not counting the

1    title page, it says, Fees and payment

2    terms?

3              A.    Yes.

4              Q.    And it provides preliminary

5    estimates of total costs.

6              A.    Yes.

7              Q.    Do you see that?

8              A.    I do.

9              Q.    And it states that, Budget

10   assumptions include honorarium, hotel and

11   travel expenses for 12 consultants.

12             A.    Correct.

13             Q.    At $3,000 honorarium and

14   chair honorarium of $3,500?

15             A.    Yes.

16             Q.    So you don't recall, one way

17   or another, as to whether or not this

18   Kadian advisory board actually took place

19   or not?

20                  MR. ROTH:  Object to the

21             form.  Asked and answered.

22                  THE WITNESS:  I know that

23             sounds crazy, I don't.  I don't

24             believe we would have had one for

```
1              Kadian.  I don't recall ever

2              holding a meeting for Kadian like

3              this.

4    BY MS. BAIG:

5         Q.   If it did take place, who

6    else would have been involved?

7              MR. ROTH:  Objection.  Calls

8              for speculation.  Form.

9              THE WITNESS:  Based on who

10             attended the MoxDuo meeting, I

11             would say Nathalie would have been

12             there.

13   BY MS. BAIG:

14        Q.   Was Nathalie at the MoxDuo

15   meeting?

16        A.   I believe -- yes.

17        Q.   So it would just be -- if it

18   had gone forward, it would likely have

19   been you, Nathalie and --

20        A.   Nathalie, yes.

21        Q.   -- and the medical advisors

22   who --

23        A.   I don't know if they were on

24   board in 2011 at that time.
```

1      Q.    No.  I meant the clinicians

2   identified on the first page.

3      A.    Oh, I'm sorry.  Yes.

4      Q.    In your capacity as

5   marketing director, did you receive

6   adverse reports?

7      A.    No.

8      Q.    You never received any

9   adverse incident reports?

10      A.    That would have been

11   pharmacovigilance.

12      Q.    And who headed the

13   pharmacovigilance department?

14      A.    I don't know.  I believe it

15   falls under regulatory, but I'm not sure.

16      Q.    Do you know anybody that was

17   in the pharmacovigilance department when

18   you were there?

19      A.    I don't.

20      Q.    You never had any occasion

21   to talk with anybody from

22   pharmacovigilance?

23      A.    Not that I'm aware of, no.

24      Q.    And you never had any

```
 1    occasion to see any adverse reports?

 2              MR. ROTH:  Object to the

 3         form.

 4              THE WITNESS:  No.

 5    BY MS. BAIG:

 6         Q.    Did you ever have -- did you

 7    ever receive any information about

 8    adverse reports?

 9              MR. ROTH:  Object to form.

10              THE WITNESS:  Specifically,

11         any reports that came in --

12    BY MS. BAIG:

13         Q.    Or generally.

14              You testified that you

15    didn't ever actually see the reports --

16         A.    Right.  Right.

17         Q.    -- or talk with anybody from

18    the pharmacovigilance department.

19         A.    Right.

20         Q.    But my question now is a

21    little bit broader.

22              Did you ever receive any

23    summary information or any information

24    about adverse reports?
```

1    A.    Not that I recall.

2    Q.    Who is Cardinal Health

3    Specialty Pharmaceutical Services?

4    A.    I believe they are a major

5    wholesaler.

6    Q.    So just -- that's the same

7    as Cardinal Health?

8    A.    It's a subsidiary, I

9    believe.

10    Q.    And did you work directly

11    with Cardinal Health at all?

12    A.    Every once in a while they

13    would offer marketing programs to us,

14    based on, you know, business.  So a very

15    tertiary role with their marketing team.

16    Q.    So their marketing team

17    would reach out directly to you, or how

18    would that work?

19    A.    No.  It would come through a

20    trade.

21    Q.    So can you give me an

22    example of how that happened in the past

23    when you were there?

24    A.    Sure.  They would run

1    programs where you would earn a certain

2    amount of points, you know, earn three

3    marketing points and you could do --

4    select from different programs they had

5    for marketing.

6              So Ara, in trade, would

7    alert me, hey, we have three marketing

8    points, what would you like to do.

9         Q.    So the person whose name is

10   Ara in the trade department would alert

11   you that Cardinal --

12        A.    Cardinal was offering --

13        Q.    Three marketing points?

14        A.    That we had earned three

15   marketing points with Cardinal.  So we

16   could send an e-mail blast or a flyer or

17   that kind of thing.

18        Q.    Oh, I see.  And how do you

19   go about earning the marketing points?

20        A.    I don't know the specifics

21   of that.

22        Q.    Generally.

23        A.    We sell product through

24   Cardinal.

```
1          Q.    So is it like a rebate?
2               MR. ROTH:  Object to the
3          form.  Lacks foundation.  Calls
4          for speculation.
5               MR. McBRIDE:  Object to
6          form.
7               THE WITNESS:  I don't know.
8          I don't believe it's a rebate.
9    BY MS. BAIG:
10         Q.    So if you sell a certain
11   amount of product, in return you're
12   awarded a certain number of points?
13         A.    I don't know that.
14              MR. McBRIDE:  Objection.
15   BY MS. BAIG:
16         Q.    Is that your general
17   understanding of how it works?
18         A.    I don't know how we earn the
19   points.  I would just get an e-mail
20   saying we've earned points.
21         Q.    And you would get that from
22   Ara in the trade department?
23         A.    Right.
24         Q.    Do you know how he learned
```

1    that you received the points?

2          A.    Through Cardinal.

3          Q.    And what would you do with

4    those points, as a marketing director?

5          A.    Like I said, a flyer, an

6    e-mail campaign, those kinds of things.

7          Q.    So what would happen?  If

8    you had three marketing points that could

9    be used for purposes of a flyer, what

10   does that mean?  You could then --

11         A.    A Kadian flyer would go out

12   to --

13         Q.    To who?

14         A.    That's a great question.  It

15   was physicians, perhaps, or pharmacists,

16   depending on the program.

17         Q.    And who would send -- so

18   Cardinal would send it out for you?

19         A.    Yes.

20         Q.    Did you receive similar

21   sorts of points from any other

22   distributors?

23               MR. ROTH:  Object to the

24         form.

```
 1    BY MS. BAIG:
 2          Q.    For example,
 3    AmerisourceBergen?
 4          A.    I don't recall.
 5          Q.    Or from McKesson?
 6          A.    I don't recall points from
 7    them either.
 8          Q.    And where would the
 9    information be regarding how you can earn
10    points from Cardinal Health?  Would that
11    be in a contract --
12          A.    I don't know.
13          Q.    -- that Actavis has with
14    Cardinal Health?
15          A.    I don't know.
16          Q.    You've never -- you've never
17    seen any information about how Actavis
18    can earn points from Cardinal Health?
19          A.    No.  I don't recall seeing
20    that, no.
21               MS. BAIG:  Let's have this
22          document marked as the next
23          exhibit.  It's going to be Exhibit
24          Number 16.
```

```
 1                     -  -  -

 2                 (Whereupon, Allergan-Altier

 3            Exhibit-16, Actavis 0977980-7998,

 4            was marked for identification.)

 5                     -  -  -

 6                 MS. BAIG:  This document is

 7            Bates stamped Actavis 0977980

 8            through 0977998.

 9   BY MS. BAIG:

10            Q.    And if you turn to the

11   second page, do you see it begins, Dear

12   Erica, and it's dated April 20th, 2011?

13            A.    Yes.

14            Q.    And in the first full

15   paragraph, under customer service, it

16   states, Actavis contracts all customer

17   service support for Kadian to a

18   third-party vendor, Cardinal Health

19   Specialty Pharmaceutical Services,

20   Cardinal SPS.

21                 Do you see that?

22            A.    I do.

23            Q.    It goes on to state that,

24   Cardinal SPS provides a dedicated phone
```

1    and fax line for Kadian customers to

2    phone in purchase orders and general

3    inquiries.  Kadian customers that

4    Cardinal SPS interacts with are primarily

5    wholesalers and distributors.

6             Do you see that?

7        A.    I do.

8        Q.    Okay.  And do you think it's

9    through this sort of contract that the

10   points would be negotiated and awarded?

11            MR. ROTH:  Objection to

12            form.  Lacks foundation.  Calls

13            for speculation.

14            MR. McBRIDE:  Objection.

15   BY MS. BAIG:

16       Q.    Do you know?

17       A.    I don't have any idea, no.

18       Q.    Okay.  Do you know who Erica

19   is?

20       A.    No.  It doesn't -- the

21   e-mail says Erica Barillo, but I don't

22   know -- it doesn't say where she's

23   located.

24       Q.    Did you ever do any training

```
 1   for -- with your sales reps regarding

 2   adverse event reporting?

 3              MR. ROTH:  Object to the

 4         form.

 5              THE WITNESS:  I know there

 6         was always training, in terms of

 7         if they were made aware of an

 8         adverse event, there was a phone

 9         number to call, which was the

10         pharmacovigilance line.  And there

11         was training around the timing

12         that that had to be done by.

13   BY MS. BAIG:

14         Q.    Were you part of training

15   the sales reps in that area?

16         A.    No, I was not responsible

17   for that.

18         Q.    Who did that?

19         A.    I don't know.  It looks like

20   it was -- there were sign-off sheets

21   here.  It just says inVentiv commercial

22   services, healthcare compliance training

23   roster.  I don't know who conducted the

24   training.
```

1              But these were the sign-in

2     sheets that showed that the training was

3     conducted.  And the details about that

4     training is in the PowerPoint attached.

5          Q.   So in the first page of that

6     PowerPoint, it says, inVentiv healthcare

7     compliance training interactions with

8     healthcare professionals.  And then it

9     says, Actavis.

10             Do you see that?

11         A.   Not yet.

12             The first page of this

13    PowerPoint?

14             MR. ROTH:  What Bates stamp

15        are you on?

16    BY MS. BAIG:

17         Q.   Actavis 0977986.

18         A.   Oh, the first one.

19             So right there it says it

20    was presented by Tricia Glover and Scott

21    Miller, who, I believe, were at inVentiv.

22         Q.   And did you work with Tricia

23    Glover and Scott Miller at all?

24         A.   I don't think I know them.

```
1        Q.    Have you ever seen this
2   document before?
3        A.    It doesn't look familiar.
4   But I used to say they all look the same.
5   Everybody's AE product complaints are
6   essentially the same.
7             MS. BAIG:  Can we have this
8             document marked as Exhibit-17?
9                    -  -  -
10            (Whereupon, Allergan-Altier
11            Exhibit-17, Actavis 0357036-7057,
12            was marked for identification.)
13                   -  -  -
14            MS. BAIG:  The document is
15            Bates stamped Actavis 0357036 to
16            Actavis 0357057.  It starts as an
17            e-mail string from Nathalie Leitch
18            to Jennifer Altier, dated July
19            22nd, 2011.
20   BY MS. BAIG:
21        Q.    And it appears to attach a
22   PowerPoint entitled, Introduction of
23   oxymorphone hydrochloride
24   Extended-Release Tablets.
```

1    A.    Yes.

2    Q.    And it states it's a sales

3    training class.

4          Do you see that?

5    A.    I do.

6    Q.    Do you recall this sales

7    training class?

8    A.    I believe this, so this was

9    put together by David Myers, who was the

10   generic marketing person.

11         And I believe this was

12   developed with -- our sales force briefly

13   helped create awareness about the

14   product, that it was available.

15   Q.    What was David Myers's

16   position?

17   A.    He was in the generic

18   marketing group.  It says he was senior

19   manager, products and communications.

20   Q.    Did he report to Nathalie

21   Leitch?

22   A.    No.  I think he would have

23   reported to Jinping McCormick, who headed

24   up generic marketing.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How do you spell Jin --

2    A.    It's a woman.

3    J-I-N-P-I-N-G, Jinping.

4    Q.    And where does Nathalie

5    Leitch fit in that -- in that report

6    line?

7    A.    She didn't.

8          MR. ROTH:  Object to the

9          form.

10         THE WITNESS:  She wasn't in

11         marketing for generics.

12   BY MS. BAIG:

13   Q.    Oh, okay.  I thought you

14   told me Nathalie Leitch was responsible

15   for generic products earlier?

16   A.    She had responsibility for

17   generic products, but I don't believe the

18   marketing of them.

19   Q.    So what responsibility did

20   she have for generic products?

21   A.    That's why I said I couldn't

22   really comment what she did.  I believe

23   she handled the injectables, but I don't

24   know to what -- I can't, with any degree

1    of accuracy, convey what her

2    responsibilities were for them.

3          Q.    So she did not handle

4    marketing for generics?

5          A.    No, I don't believe she did.

6          Q.    That would be Jinping

7    McCormick?

8          A.    Yes.

9          Q.    And David Myers?

10         A.    David Myers reported to her.

11         Q.    Anybody else?

12         A.    There were other people.  I

13   just don't remember who right now.  There

14   might have been one or two others.

15   Rachel Galiant.  I think she and David

16   split the products.

17         Q.    So Rachel Galiant and David

18   Myers split the products in the generic

19   marketing unit and both reported to

20   Jinping McCormick; is that correct?

21         A.    I believe so.

22         Q.    And did you have occasion to

23   work with Rachel Galiant and David Myers?

24         A.    Not very often at all.

1  David, obviously, put this slide

2  presentation together for us.

3         Q.    And this is an oxymorphone

4  sales training, correct?

5         A.    Correct.

6         Q.    So it's a generic drug sales

7  training, correct?

8         A.    It was about a generic

9  product, yes.

10        Q.    Okay.  And do you see in the

11 second e-mail, halfway down, it says, Hi

12 Ara, the attached slide deck is approved

13 for use in Monday's presentation to the

14 Kadian sales team.

15            Do you see that?

16        A.    I do.

17        Q.    So this slide deck was

18 provided or presented to the Kadian sales

19 team, correct?

20        A.    Yes.

21        Q.    And oxymorphone was the

22 generic for Opana ER; is that right?

23            MR. ROTH:  Object to the

24            form.

```
1              THE WITNESS:  Yes.

2         According to the presentation,

3         it's AB rated to Opana ER.

4    BY MS. BAIG:

5         Q.    And are you aware whether

6    Opana ER was subsequently pulled from the

7    market?

8         A.    I don't know if it was

9    subsequently pulled.  It's just at this

10   point in time, Endo had discontinued the

11   7.5 and 15 mg strengths.

12        Q.    Do you know why?

13        A.    It just says, Endo did not

14   withdraw these strengths due to safety

15   reasons.

16        Q.    Do you know whether Opana ER

17   was later withdrawn from the market by

18   the FDA?

19        A.    I don't.

20        Q.    You don't know one way or

21   another?

22        A.    No.

23        Q.    Do you see on the page

24   entitled, Key Messages, which is Actavis
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    057042 --

2           A.    Yes.

3           Q.    -- and it provides an

4    example script --

5           A.    Uh-huh.

6           Q.    -- for the Kadian sales

7    force to use when introducing Actavis's

8    generic oxymorphone?

9           A.    Exactly.

10          Q.    And at the end it states,

11   Please -- as part of the script to the

12   doctor, Please consider prescribing these

13   generic strengths for the appropriate

14   patients.

15               Do you see that?

16               MR. ROTH:  Object to the

17          form.

18               THE WITNESS:  I do.

19   BY MS. BAIG:

20          Q.    And the next page is a sell

21   sheet, it says, front and back?

22          A.    Yes.

23          Q.    Is that something that's

24   left with the doctors by the sales force?
```

1    A.    If it was designed to --

2  it's designed to be used with the

3  doctors.  If it was designed to be left,

4  I can't tell from this.

5    Q.    Well, what is a sell sheet?

6         MR. ROTH:  Object to the

7         form.  Lacks foundation.  Calls

8         for speculation.

9         THE WITNESS:  They would use

10        it to present the information to

11        the doctor.

12  BY MS. BAIG:

13    Q.    Meaning they would --

14    A.    It says, Please see attached

15  for full prescribing information.  If the

16  full PI was attached, the full

17  prescribing information was attached, it

18  would be appropriate as a leave-behind.

19    Q.    So this was likely a

20  leave-behind?

21    A.    It could have been, yes.

22    Q.    And then do you see on the

23  next page that's identified marketing

24  support --

```
1          A.    Yes.

2          Q.    -- it discusses a two-wave

3    direct mail campaign to the top 10,000

4    prescribing doctors.

5                Do you see that?

6          A.    I do.

7          Q.    And it also references

8    journal advertising?

9          A.    I do.

10         Q.    And an e-mail campaign,

11   correct?

12         A.    Yes.

13         Q.    So is it your understanding

14   that the sales reps were being told about

15   the direct mail campaign, the general

16   advertising and the e-mail campaign for

17   oxymorphone here?

18               MR. ROTH:  Object to the

19         form.  Lacks foundation.  Calls

20         for speculation.

21               THE WITNESS:  Yes.  If it

22         was in the slide presentation,

23         they were informed that that was

24         happening.
```

```
 1   BY MS. BAIG:

 2         Q.    And then after that, it

 3   shows, if you flip through the next few

 4   pages, that the Kadian sales force was

 5   provided with the indications and usage,

 6   as well as the oxymorphone boxed

 7   warning --

 8         A.    They were trained on the

 9   safety information.

10         Q.    -- and the safety

11   information of oxymorphone, correct?

12         A.    Yes.

13         Q.    And then they were given a

14   list of dos in terms of what to discuss

15   regarding the generic product

16   availability; is that right?

17         A.    Dos?

18               MR. ROTH:  Object to the

19         form of the question.

20   BY MS. BAIG:

21         Q.    It's on page Actavis 05 --

22   sorry.  0357051.

23         A.    They were given dos, and

24   then on the next page don'ts.
```

1    Q.    Right.  So they were given

2    dos and don'ts with respect to the

3    generic --

4         A.    Yes.

5         Q.    -- oxymorphone, which is the

6    generic product for Opana ER, correct?

7         A.    Correct.

8         Q.    And these are dos in terms

9    of what they should discuss or mention

10   with prescribers?

11        A.    Correct.

12        Q.    And then where you see

13   compensation and incentives, it's at Page

14   Actavis 0357054 -- do you see that?

15        A.    I do.

16        Q.    And it states, A team award,

17   an individual award -- and an individual

18   award.

19             Do you see that?

20        A.    I do.

21        Q.    And it states, The top

22   regional team with the highest cumulative

23   prescription written for the period of

24   August through October 2011.

1          Is that suggesting that the

2    top regional team will receive an award?

3          A.    Yes.

4          Q.    And each member of the team

5    would win $500?

6          A.    That's what the bullet says,

7    yes.

8          Q.    And for the individual

9    awards, it suggests that each individual

10   award is $1,000; is that right?

11         A.    That's right.

12         Q.    So according to this, the

13   Kadian sales force would be receiving

14   awards if they achieved the highest

15   cumulative prescriptions written for the

16   generic oxymorphone, correct?

17              MR. ROTH:  Objection.  Lacks

18         foundation.  Calls for

19         speculation.

20              THE WITNESS:  I'm sorry,

21         could you repeat the question?

22   BY MS. BAIG:

23         Q.    So according to this, the

24   Kadian sales force would be receiving

1    awards if they achieved the highest

2    cumulative prescriptions written for the

3    generic oxymorphone, correct?

4              MR. ROTH:  Object to the

5         form.  Lacks foundation.  Calls

6         for speculation.

7              THE WITNESS:  Members of the

8         team, yes.

9    BY MS. BAIG:

10        Q.    Yes, okay.

11             The next page is called,

12   Prescription Data.  It says, Average

13   monthly --

14        A.    TRX.

15        Q.    TRX.  What does TRX stand

16   for?

17        A.    Total prescriptions.

18        Q.    Total.

19             And are these sales targets

20   for the Kadian sales force team?

21        A.    No.  It appears that's

22   historical data.

23        Q.    Okay.  And that's historical

24   data that would just be tracked by

```
 1    Actavis, correct?

 2         A.    I imagine so.  I don't know

 3    what the source is.

 4         Q.    But you wouldn't need an

 5    outside vendor to track -- is this data

 6    for the Actavis sales team?

 7              MR. ROTH:  Objection to the

 8         form.  Lacks foundation.  Calls

 9         for speculation.

10    BY MS. BAIG:

11         Q.    What does this slide show,

12    to your knowledge?

13         A.    I can't tell by the slide.

14    The average monthly TRX, just of the

15    strengths.

16         Q.    So it says, Average monthly

17    total prescriptions.

18              Right?

19         A.    Uh-huh.

20         Q.    And then it says, January

21    through March 2011, average total

22    prescriptions.

23              Right?

24         A.    Right.
```

1    Q.    And then it lists, for 15

2    milligrams, the average total

3    prescriptions from January through March

4    of 2011 were 5,760, right?

5    A.    I think what you're asking

6    is, is that just Actavis or the total

7    market; I don't know.

8    Q.    What is KGC, do you know?

9    A.    KGC.  I'm sorry, I don't.

10    Q.    Qualitative -- there's a

11    document I see called, KGC, Kadian

12    long-acting opioid decision-making

13    process, qualitative research review

14    interviews prepared for Actavis.

15        Do you know what that is?

16    A.    It sounds like a market

17    research study, but I couldn't be sure.

18        MS. BAIG:  Let's have this

19        document marked as Exhibit-17.

20        It's Actavis 0361608 through

21        Actavis 0361653.  And it begins as

22        an e-mail from Nathalie Leitch to

23        you, dated June 28th, 2011.

24            -  -  -

```
1              (Whereupon, Allergan-Altier

2         Exhibit-18, Actavis 0361608-1653,

3         was marked for identification.)

4                   -   -   -

5    BY MS. BAIG:

6         Q.    It states under,

7    attachments, October 30th, Kadian final

8    report.

9              Do you see that?

10        A.    I do.  This is the company I

11   mentioned, I think I called them LPG.

12   It's KGC.

13        Q.    Okay.  Do you know what KGC

14   stands for?

15        A.    I don't.

16        Q.    So this was what type of

17   company?

18        A.    A market research vendor.

19        Q.    And thumbing through this,

20   do you have a notion of what document

21   this is, what market research project

22   this was?

23        A.    Based on the project

24   objectives listed on, I don't know, the
```

1    third page, this could have been the 29

2    physicians, it seems like kind of a

3    coincidental number, that we talked about

4    earlier.

5         Q.    Okay.  So this was the study

6    that was performed to determine what

7    prescribers' opinions were with respect

8    to the use of Kadian?

9              MR. ROTH:  Object to the

10             form.

11   BY MS. BAIG:

12        Q.    Where they interviewed, the

13   29 physicians?

14        A.    It appears to be the report

15   that that was based on, yes.

16        Q.    And do you see in the

17   executive overview, on Actavis 0361615,

18   it states, Physicians are mostly

19   satisfied with Kadian because they

20   believe Kadian is a safe, efficacious,

21   clean drug?

22        A.    I do.

23        Q.    What actions were taken as a

24   result of this study, do you know, with

```
 1    respect to marketing?

 2              MR. ROTH:  Object to the

 3         form.

 4              THE WITNESS:  The results

 5         were presented at the sales

 6         meeting that you saw.

 7    BY MS. BAIG:

 8         Q.   Okay.  And so, for example,

 9    on the next page, it says, Kadian has no

10    known current messaging or position

11    strategy.

12         A.   Uh-huh.

13         Q.   How was that communicated to

14    sales reps?

15         A.   I don't remember what the

16    slide said.  It might have said that

17    exact thing, or not said that at all.  I

18    don't recall if we shared that.  I'd have

19    to look back.

20         Q.   Is that a message that you

21    would communicate to sales reps to have

22    them step up their messaging to

23    prescribers?

24              MR. ROTH:  Objection to the
```

1          form.  Calls for speculation.

2                  THE WITNESS:  No.  It would

3          be more, I would say, a reflection

4          on marketing, in terms of

5          messaging.

6                  But, like I said, especially

7          after the warning letter, colorful

8          PI, very benign, conservative

9          message strategy.  So I'm not

10         surprised that that comes back.

11   BY MS. BAIG:

12         Q.    So this is one year after

13   the FDA warning letter, correct?

14         A.    Yes.

15         Q.    And this was presented to --

16   just presented to or actually provided to

17   sales reps, do you know?

18         A.    This document itself would

19   have just been provided to, say, myself

20   and Nathalie.

21         Q.    And no one else?

22         A.    No.  We were the main

23   contacts for the market research.

24                 MS. BAIG:  Let's have the

```
 1          next document marked as

 2          Exhibit-19, please.

 3                    -  -  -

 4                (Whereupon, Allergan-Altier

 5          Exhibit-19, Actavis 0956746-6747,

 6          was marked for identification.)

 7                    -  -  -

 8                MS. BAIG:  This is just a

 9          two-page document, Bates stamped

10          Actavis 0965746 to Actavis

11          0965747.  And it's a field contact

12          form.

13   BY MS. BAIG:

14          Q.    What's a field contact form?

15                MR. ROTH:  Object to the

16          form.  Lacks foundation.  Calls

17          for speculation.

18                THE WITNESS:  I don't know.

19          It must have been something the

20          sales force used.

21   BY MS. BAIG:

22          Q.    You've never seen a field

23   contact form before?

24          A.    I have not.
```

1      Q.    Do you know who Kristie

2   Robinson is?

3      A.    I can just assume she was

4   the area manager, based on the form.

5      Q.    So she would be an inVentiv

6   employee?

7      A.    I believe so.

8      Q.    And how about Chris Hepp?

9      A.    Yes, so he was the regional

10  director.

11     Q.    So he was an inVentiv

12  employee?

13     A.    I believe, yes.

14     Q.    And their territory is

15  indicated as Phoenix, correct?

16     A.    Yes.

17     Q.    And it appears that this is

18  a document that provides sales reps with

19  observations on their performance.

20           Would you agree?

21           MR. ROTH:  Object to the

22       form.  Lacks foundation.  Calls

23       for speculation.

24           THE WITNESS:  Based on what

Highly Confidential — Subject to Further Confidentiality Review

```
 1          I'm reading, yes.

 2    BY MS. BAIG:

 3          Q.    And do you see on the last

 4    page, there's a section called,

 5    Developmental opportunities/action plan?

 6          A.    Yes.

 7          Q.    And it's stated there

 8    that -- it's stated there to, quote,

 9    Limit your generic oxymorphone calls only

10    on the highest-prescribing Opana ER

11    targets.

12                Do you see that?

13          A.    I do.

14          Q.    And that -- below it states,

15    Regional director signature, Chris Hepp.

16          A.    Uh-huh.

17          Q.    And do you see on the first

18    page, it says, Kadian sales results.  And

19    it lists $337,865?

20          A.    Yes.

21          Q.    That's for the current

22    month, then, June 2011, correct?

23                MR. ROTH:  Object to the

24          form.  Lacks foundation.  Calls
```

1          for speculation.

2     BY MS. BAIG:

3          Q.    Is that your read of the

4     document?

5          A.    Just based on reading it,

6     yes.

7          Q.    And in the bullet right

8     underneath that, it says, Kristie, your

9     Kadian sales continue to outpace that of

10    the region and the nation.

11              Do you see that?

12         A.    I do.

13         Q.    Is your read of this that

14    Kristie was a Kadian sales rep?

15         A.    Yeah.  I'm confused why they

16    have her as an area manager.  But based

17    on that, I would say -- she's the number

18    one area business manager in the country.

19    But she's in the sales organization,

20    clearly.

21         Q.    And by "sales organization,"

22    you mean inVentiv?

23         A.    Correct.

24         Q.    So is your read that she's

```
 1    responsible for sales in her territory,

 2    which is Phoenix?

 3                    MR. ROTH:  Object to the

 4            form.  Lacks foundation.

 5                    THE WITNESS:  Based on this

 6            sheet, yes.

 7    BY MS. BAIG:

 8            Q.    And she's being told to

 9    limit generic oxymorphone calls only to

10    high-prescribing Opana ER targets at the

11    end, correct?

12                    MR. ROTH:  Object to the

13            form.  Lacks foundation. Calls for

14            speculation.  Asked and answered.

15                    THE WITNESS:  I mean, that

16            would make sense, since the only

17            information we were providing was

18            that it was available.  If they

19            weren't prescribing Opana, they

20            wouldn't care that it was

21            available.

22    BY MS. BAIG:

23            Q.    But it doesn't say that in

24    this document, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No.

 2               MS. BAIG:  Let's have the

 3          next document marked as

 4          Exhibit-20, please.

 5                    -  -  -

 6               (Whereupon, Allergan-Altier

 7          Exhibit-20, Actavis 0264936-4949,

 8          was marked for identification.)

 9                    -  -  -

10               MS. BAIG:  It's Bates

11          stamped Actavis 0264936 to Actavis

12          0264949.

13  BY MS. BAIG:

14          Q.    And it's from Mark Killion

15  to yourself on July 10th, 2012.

16               Do you see that?

17          A.    I do.

18          Q.    It's an e-mail attaching a

19  PowerPoint.

20               Do you see that?

21          A.    Uh-huh.

22          Q.    And the PowerPoint is

23  entitled, Pain Market Overview.

24               Do you see that?
```

Highly Confidential – Subject to Further Confidentiality Review

1      A.     I do.

2      Q.     And it states there was a

3  training class October 19th to 20, 2011

4  with inVentiv Health.

5             Do you see that?

6      A.     I do.

7      Q.     Do you recall this training

8  class?

9      A.     Not offhand, no.

10     Q.     And this would have been a

11  training class for sales reps, opioid

12  sales reps?

13     A.     Presumably.

14     Q.     This would have been a

15  training for Kadian sales reps, correct?

16     A.     Presumably, yes.

17     Q.     Well, were there any other

18  sales reps that would receive this

19  training?

20     A.     No.  I just don't know who

21  the target audience was.  But presumably

22  it's Kadian sales reps.

23     Q.     Well, Mark Killion's

24  position was what, again?

1      A.    He was the Midwest region

2    business director.

3      Q.    In sales?

4      A.    Yes.

5      Q.    And do you -- why would he

6    be sending you this document, do you

7    know?

8      A.    I don't know.

9      Q.    Would he be the person to

10   create this document for you to use to

11   train the sales reps?

12         MR. ROTH:  Objection to

13         form.

14         THE WITNESS:  I don't

15         recall.

16   BY MS. BAIG:

17     Q.    Did you create this

18   document?

19     A.    I don't believe I did, no.

20     Q.    But you received this

21   document in the regular course of your

22   business, correct?

23     A.    Correct.

24     Q.    And do you see under the

Highly Confidential - Subject to Further Confidentiality Review

1    overview, it says, Definition of pain,

2    types of pain, goals of pain management,

3    pain management practitioners, and

4    chronic pain treatment?

5          Do you see that?

6    A.    I do.

7    Q.    And then on the next page,

8    the question is -- the caption is, What

9    is pain?

10         Do you see that?

11   A.    I do.

12   Q.    And do you see the first

13   bullet that says, The most commonly used

14   definition of pain is, quote, any

15   sensation the patient perceives to be

16   uncomfortable, end quote.

17         Do you see that?

18   A.    Yes.

19   Q.    And this, I think we said,

20   document was sent to you in 2012, right?

21   A.    Right.  So --

22   Q.    So it's two years after the

23   FDA warning letter?

24   A.    Right.

```
1                    MR. ROTH:  Objection to

2          form.

3                    THE WITNESS:  And long after

4          the training class.

5   BY MS. BAIG:

6          Q.    The training class was July

7   6th, 2010, correct?

8          A.    It says October 19 to 20,

9   2011.

10         Q.    Okay.  October 2011.

11                Still after the FDA warning

12  letter, right?

13         A.    Yes.

14         Q.    Do you see on Page 11 of the

15  PowerPoint, it says, Long-acting opioid

16  agents?

17         A.    Yes.

18         Q.    And of the products listed,

19  which ones are Actavis products?

20                MR. ROTH:  Objection to

21         form.

22                THE WITNESS:  The ones I'm

23         familiar, that are Actavis

24         products, Kadian.
```

```
 1   BY MS. BAIG:

 2        Q.    What about Avinza?

 3        A.    I believe that was a

 4   competitive product.

 5        Q.    And then Opana ER is also

 6   listed, correct?

 7        A.    Correct.

 8        Q.    And Actavis had a generic

 9   product for Opana ER, oxymorphone,

10   correct?

11             MR. ROTH:  Object to the

12        form.

13             THE WITNESS:  Correct.

14   BY MS. BAIG:

15        Q.    And OxyContin is also

16   listed, correct?

17        A.    It is.

18        Q.    Did Actavis have a generic

19   product for OxyContin, oxycodone?

20             MR. ROTH:  Object to the

21        form.  Lacks foundation.  Calls

22        for speculation.

23             THE WITNESS:  I don't

24        remember.
```

1    BY MS. BAIG:

2        Q.    And Duragesic is also

3    listed?

4        A.    Yes.

5        Q.    Do you know if Actavis also

6    had a generic product for Duragesic in

7    the form of a Fentanyl patch?

8            MR. ROTH:  Objection.  Calls

9        for speculation.

10           THE WITNESS:  I don't know.

11   BY MS. BAIG:

12       Q.    You don't know.

13           And do you see on the next

14   page, it identifies pain management

15   practitioners?

16       A.    Yes.

17       Q.    And it lists

18   anesthesiologists, physical medicine and

19   rehabilitation, medical oncologists,

20   neurologists, neurosurgeons, orthopedic

21   surgeons, rheumatologists, primary

22   care/internal medicine, nurse

23   practitioners/physicians assistants, and

24   nurses, hyphen, day-to-day contact with

```
 1   patients.
 2              Do you see that?
 3        A.    I do.
 4        Q.    And were these targets for
 5   the sales reps?
 6              MR. ROTH:  Object to the
 7         form.
 8              THE WITNESS:  Not all of
 9         them.  They would have been just
10         for background use.  These are
11         specialties that treat pain in
12         general.
13   BY MS. BAIG:
14        Q.    So these are potential
15   targets, then?
16              MR. ROTH:  Object to the
17         form.  Asked and answered.
18              THE WITNESS:  Not
19         necessarily.
20   BY MS. BAIG:
21        Q.    Is there anything in here
22   that suggests to the sales reps that they
23   should not contact these types of
24   providers on these sheets?
```

```
 1                    MR. ROTH:  Object to the

 2          form.

 3                    THE WITNESS:  They wouldn't

 4          have been on their target list.

 5   BY MS. BAIG:

 6          Q.    Do you see the last page

 7   says, Barriers to effective pain control?

 8          A.    Yes.

 9          Q.    And the first bullet says,

10   Fear of addiction?

11          A.    Yes.

12          Q.    Does this refresh your

13   recollection that fear of addiction was

14   being contemplated as a barrier to

15   effective pain control at Actavis when

16   you were there?

17                    MR. ROTH:  Objection, form.

18          Lacks foundation.

19                    THE WITNESS:  Yeah, it

20          doesn't bring up any discussions

21          we've had.  But I see it's listed

22          here.

23   BY MS. BAIG:

24          Q.    And, Opioid phobia, do you
```

1    see that?

2           A.     Uh-huh.

3           Q.     Opioid phobia was also

4    considered a barrier to effective pain

5    control at Actavis when you were there.

6                  Do you see that?

7           MR. ROTH:  Objection to

8           form.  Lacks foundation.  Calls

9           for speculation.

10                 THE WITNESS:  Yeah, I'm not

11          exactly sure what that refers to.

12          Is that related to fear of

13          addiction, they are afraid to take

14          opioids?

15   BY MS. BAIG:

16          Q.     Opioid phobia?

17          A.     Uh-huh.

18          Q.     Well, do you recall it being

19   discussed by Dr. Perry Fine in the

20   medical advisory board that you were

21   involved in that we just went through the

22   transcript of?

23          A.     No.

24                 MR. ROTH:  Object to the

```
 1          form.
 2     BY MS. BAIG:
 3          Q.    You don't remember opioid
 4     phobia being raised there?
 5          A.    No.
 6          Q.    You don't remember opioid
 7     phobia ever being raised at Actavis when
 8     you were there?
 9          A.    No, that's why I'm asking.
10                Is it related to a patient's
11     fear of being addicted to opioids?
12          Q.    Well, it's -- you know, I
13     could ask you the same questions --
14          A.    Okay.  I'm sorry.
15          Q.    -- in this PowerPoint
16     presentation that was given to you.
17          A.    I can't comment any more
18     than what's on the slide.
19          Q.    So you don't understand what
20     opioid phobia means or why it's on this
21     slide --
22          A.    Right.
23          Q.    -- that was presented to
24     your sales force?
```

1            You don't know?

2        A.    I don't recall us talking

3   about it.

4        Q.    No idea?

5        A.    I have an idea, somebody who

6   is afraid of opioids.  But I can't give

7   you any more context.

8        Q.    You don't know why it was

9   identified on this slide that was

10  presented to your sales reps?

11       A.    Right.  It certainly wasn't

12  a major portion.

13       Q.    Well, you don't know either

14  way, because you don't really recall it,

15  right?

16       A.    Right.  I guess, I'm just

17  extrapolating I would recall it if we

18  talked about it a lot.

19            MS. BAIG:  Let's have this

20            document marked as the next in

21            line, please.  It's Actavis

22            0264950 through 0265018.  It

23            starts with another e-mail from

24            Mark Killion to yourself on July

```
 1           10th, 2012.  Exhibit-21, please.

 2                       -  -  -

 3               (Whereupon, Allergan-Altier

 4           Exhibit-21, Actavis 0264950-5018,

 5           was marked for identification.)

 6                       -  -  -

 7   BY MS. BAIG:

 8        Q.    And it states there's an

 9   attachment, objection handling message

10   PowerPoint --

11        A.    Yes.

12        Q.    -- and Kadian promotional

13   training slides.

14               Do you see that?

15        A.    I do.

16        Q.    Did you receive these

17   documents in the regular course of your

18   business at Actavis?

19        A.    I did.

20        Q.    Do you recall for what

21   purpose?

22        A.    No.

23        Q.    Were these presentations

24   also that were prepared and presented to
```

```
 1   sales reps?

 2           A.    It appears --

 3                 MR. ROTH:  Object to the

 4         form.  Lacks foundation.

 5                 THE WITNESS:  Sorry.

 6                 It appears to be.

 7   BY MS. BAIG:

 8         Q.    And it provides suggestions

 9   for the sales reps on how to address

10   doctors' questions; is that right?

11                 MR. ROTH:  Object to the

12         form.

13   BY MS. BAIG:

14         Q.    I'm looking at Page 2.

15         A.    I don't know if it provides

16   suggestions.  It provides training on how

17   to respond.

18         Q.    And then, for example, on

19   that page, it says, They can say

20   something like, why don't you use Kadian?

21                 Correct?

22         A.    Why don't you use Kadian

23   first line.

24         Q.    What does that mean, "first
```

1    line"?

2         A.    As your first agent of

3    choice.

4         Q.    So the sales reps are being

5    taught to ask the physicians that,

6    correct?

7              MR. ROTH:  Object to the

8         form.

9              THE WITNESS:  That's what it

10        says here on the slide.

11   BY MS. BAIG:

12        Q.    Okay.  And do you see where

13   it lists side effects on the next couple

14   of slides?

15        A.    Yes.

16        Q.    And it lists excessive

17   drowsiness, nausea and vomiting,

18   constipation.

19              Do you see that?

20        A.    Correct.

21        Q.    Is there anything on those

22   slides about addiction?

23        A.    This is direct from our

24   label.

```
 1              Q.     Is there anything on the

 2    slides listing side effects that

 3    identifies addiction?

 4                     MR. ROTH:  Objection.  Form.

 5              You're asking just about Slides 3

 6              and 4?

 7                     MS. BAIG:  I am, yes.  The

 8              slides with the heading, Side

 9              Effects.

10                     THE WITNESS:  I don't see

11              anything about addiction on these

12              slides.

13    BY MS. BAIG:

14              Q.     Okay.

15              A.     It may come later in the

16    presentation.

17              Q.     Do you see on the next --

18    the next two slides have headings called,

19    Efficacy?

20              A.     Yes.  Oh, I see, yes.

21              Q.     And on Slide 6, do you see

22    where it says, in the third bullet,

23    Kadian does not have a ceiling or a

24    recommended maximal dose, especially in
```

1    patients with chronic pain of malignancy?

2         A.    Yes.   That's from the label.

3         Q.    In such cases, the total

4    dose of Kadian should be advanced until

5    the desired therapeutic endpoint is

6    reached or clinically significant

7    opioid-related adverse reactions

8    intervene.

9              Do you see that?

10        A.    Again, that's the FDA

11   language from the label.

12        Q.    So there was no recommended

13   maximum dose?

14        A.    Correct.

15             The abuse warning you were

16   looking at is on Page 12, the boxed

17   warning.

18        Q.    Did you see something on

19   this slide that mentions addiction?

20        A.    I'm sorry, I thought you

21   said abuse.

22        Q.    No, I said addiction.

23             There's nothing on this

24   slide either that says anything about

```
1    addiction, correct?

2              MR. ROTH:  Objection to

3         form.

4              THE WITNESS:  This was the

5         boxed warning from the label, from

6         the FDA.

7    BY MS. BAIG:

8         Q.    I know.

9              Is there anything on here

10   that says anything about addiction?

11             MR. ROTH:  Objection.  Form.

12             THE WITNESS:  Not on that

13        slide, no.

14   BY MS. BAIG:

15        Q.    Do you see on Slide 13,

16   where it says, Kadian bolded warning?

17        A.    Yes.

18        Q.    And it says, Kadian capsules

19   are to be swallowed whole and not to be

20   chewed, crushed or dissolved.

21        A.    Uh-huh.

22        Q.    It goes on to state, Taking

23   chewed, crushed or dissolved Kadian

24   capsules leads to rapid release and
```

```
 1    absorption of a potentially fatal

 2    overdose of morphine.

 3              Do you see that?

 4         A.   I do.

 5         Q.   Was there a recommendation

 6    that they be -- that they be taken with

 7    applesauce, that you recall?

 8              MR. ROTH:  Objection to

 9         form.

10              THE WITNESS:  I'm trying --

11         I know a product I worked on in my

12         past, you could sprinkle it over

13         applesauce.  I don't recall if it

14         was Kadian.

15              If it's in the label, that

16         would have been permissible.

17              I'm looking at Page 11 on

18         the detailed piece -- or the

19         presentation.  Kadian did allow

20         for sprinkle dosing over

21         applesauce.

22    BY MS. BAIG:

23         Q.   Sprinkle dosing over

24    applesauce on Slide 11, correct?
```

1      A.      Uh-huh.

2      Q.      Do you know why that was?

3      A.      The FDA said it was a

4   permissible -- it was in our label.

5              I mean, the rationale here

6   is, Capsule can be opened and the

7   contents sprinkled on applesauce for

8   patients who have difficulty swallowing.

9      Q.      Didn't the label say that

10  you have to take whole?

11     A.      No.  This is from the label,

12  I believe.  It says, Safety

13  considerations from the label.  Kadian

14  capsules are to be swallowed whole or the

15  contents of the capsule sprinkled on the

16  applesauce.  The pellets in the capsules

17  are not to be chewed, crushed or

18  dissolved, due to the rapid risk of

19  release and absorption of a potentially

20  fatal overdose of morphine.

21     Q.      Then do you see on Slide 35,

22  there's a slide on generic morphine

23  sulfate?

24              MR. ROTH:  In the second

1        presentation now?

2            MS. BAIG:  Just a few pages

3        further.

4            THE WITNESS:  Yep.

5            MS. BAIG:  On Page 35.

6   BY MS. BAIG:

7        Q.    And generic -- so this

8   entire presentation was going to the

9   Kadian sales force, correct?

10       A.    Correct.

11       Q.    Including this slide on

12  generic morphine sulfate?

13       A.    Uh-huh.

14       Q.    Who is Ed Tykot?

15       A.    I think it's Ed Tykot.

16       Q.    Tykot?

17       A.    Who is Ed Tykot?

18            The name is familiar, but I

19  don't recall.

20       Q.    Was he at Watson, do you

21  know?

22       A.    Maybe.

23       Q.    Did you work with Ed Tykot

24  that you recall, or no?

1     A.     If I'm thinking of the right

2  person, he might have been in business

3  development for Watson.

4     Q.     Do you remember a

5  presentation called, Pain Franchise

6  Business Case, from March of 2013?

7     A.     March of -- I'd have to take

8  a look at it.

9     Q.     Do you know what SWOT is.

10  S-W-O-T?

11     A.     Sure.  Strength, weaknesses,

12  opportunities and threats.

13     Q.     Who is Betty DeSantis?

14     A.     Is it an older document?

15     Q.     2011.

16     A.     Perhaps Betty worked at our

17  original telemarketing company, TMS.

18          MS. BAIG:  Let's have this

19          document marked as Exhibit-22.

20               -  -  -

21          (Whereupon, Allergan-Altier

22          Exhibit-22, Actavis 0335906-5914,

23          was marked for identification.)

24               -  -  -

```
 1                MS. BAIG:  This is Bates

 2           stamped Actavis 0335906 through

 3           Actavis 0335914.  It starts as an

 4           e-mail from you to Betty DeSantis,

 5           cc to Nathalie Leitch, dated

 6           November 17, 2011, subject is, New

 7           script and letter.  Attachments

 8           are, PMS generic Kadian

 9           telescript.  It looks like two

10           versions of it.

11     BY MS. BAIG:

12           Q.    Was this a script that was

13     provided to your sales reps?

14           A.    No.  This was provided to

15     the TMS telemarketing reps.

16           Q.    Okay.  So they are sales

17     reps, but they are just doing it by

18     telephone, correct?

19           A.    This was a little bit of a

20     different model.  So whereas Technekes,

21     you know, were trained by our sales force

22     and that, they went through training, but

23     they were script based.

24           Q.    Okay.  And these were Kadian
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    sales reps, correct?

2                 MR. ROTH:  Object to the

3           form.

4                 THE WITNESS:  They were TMS

5           employees that worked as

6           telemarketers for us.

7    BY MS. BAIG:

8           Q.   Okay.  So they were -- they

9    were marketing both Kadian and generic

10   drugs, correct?

11                MR. ROTH:  Object to the

12          form.  Mischaracterizes the

13          document.

14                THE WITNESS:  As far as I

15          knew, for the company, they were

16          marketing Kadian.

17   BY MS. BAIG:

18          Q.   Do you see in the

19   attachments on the first page, it's --

20   the document is identified as, TMS

21   generic Kadian telescript?

22          A.   Right.  So it was Kadian.

23   Kadian had gone generic.

24          Q.   Got it.
```

```
 1              When did Kadian go generic,

 2   do you remember?

 3        A.    That's a great question.

 4   Obviously, after November 17th, 2011.

 5        Q.    Is this -- would these same

 6   telesales reps be marketing the new

 7   dosages for Kadian that were released?

 8        A.    I believe this predates the

 9   new dosages.  And I don't recall if they

10   were still on board at the time.

11        Q.    Is it your understanding

12   that this script was actually provided to

13   the telesales reps?

14        A.    Yes.

15              MS. BAIG:  Let's have the

16         next document marked as

17         Exhibit-23.

18                  -  -  -

19              (Whereupon, Allergan-Altier

20         Exhibit-23, Actavis 0282841-2843,

21         was marked for identification.)

22                  -  -  -

23              MS. BAIG:  It's Bates

24         stamped Actavis 0282841 through
```

```
 1             0282843.

 2   BY MS. BAIG:

 3        Q.    And it's an e-mail string

 4   that starts with an e-mail from Patrick

 5   McClenahan to you, Jennifer Altier?

 6        A.    Yes.

 7        Q.    Sent June 11th, 2012.

 8              And you see the subject is,

 9   Speaker request for the west area?

10        A.    Uh-huh.

11              I'm just reading the whole

12   thing so I can get some context.

13        Q.    Sure.

14              In the meantime, do you know

15   who Patrick McClenahan is?

16        A.    Yes.  He was one of the

17   region business directors.

18        Q.    Sales director?

19        A.    Yes.

20        Q.    Do you know what region?

21   West area?

22        A.    No.  Patrick was Gulf Coast,

23   I want to say.

24        Q.    Which included what?
```

1    A.    Like Florida area, Florida

2  Gulf.

3    Q.    Do you know who the sales

4  director was for the Ohio area?

5    A.    Mark Killion was Midwest.

6  So I would think it was him.

7    Q.    Do you see there's an

8  indication that they need east area west

9  speakers?

10    A.    Yes.

11    Q.    Do you know what this is

12  about?

13    A.    Based on the timing and the

14  fact that we were doing speaker requests,

15  it would have been if MoxDuo launched.

16  We were looking for a speaker request --

17  or speakers that would have participated

18  in a speakers bureau.  But that never

19  came to pass.

20    Q.    You never did a speakers

21  bureau for MoxDuo?

22    A.    No, because it was never

23  approved.

24    MS. BAIG:  I don't think I

```
 1          have much more.  Do you need a

 2          break or do you just want to --

 3                  THE WITNESS:  I'm okay.

 4                  MR. ROTH:  Just plow

 5          through.

 6                      -  -  -

 7                  (Whereupon, a discussion off

 8          the record occurred.)

 9                      -  -  -

10   BY MS. BAIG:

11          Q.    Do you know who at Actavis

12   would have tracked marketing spend and

13   return on investment?

14                  MR. ROTH:  Object to the

15          form.

16                  THE WITNESS:  Theoretically,

17          that would have been in my

18          department.  I don't recall any

19          ROI analysis that we conducted off

20          the top of my head.

21   BY MS. BAIG:

22          Q.    So you would -- if it were

23   done, it would have been you who would

24   have done the tracking of marketing spend
```

```
 1   and return on investment?

 2          A.    I wouldn't --

 3                MR. ROTH:  Object to the

 4          form.  Vague.

 5                THE WITNESS:  I wouldn't

 6          have known how to track that.  I

 7          assume we would have used some

 8          sort of outside vendor.

 9   BY MS. BAIG:

10          Q.    Okay.  Do you know who that

11   vendor is?

12          A.    No.

13          Q.    Did you ever see any

14   documents showing marketing spend and

15   return on investment?

16          A.    Not that I recall.

17          Q.    And you were never told

18   about any such documents?

19          A.    I can't say that I was or

20   wasn't.  We had very limited resources,

21   so we just kind of concentrated on

22   executing what we could.  I don't know

23   that we measured a lot.

24          Q.    But you don't know either
```

```
1   way?
2           A.    I can't recall either way,
3   yes.
4           Q.    Are you aware of any
5   physicians ever being removed as targets
6   for writing too many opioid
7   prescriptions?
8               MR. ROTH:  Object to the
9           form.
10              THE WITNESS:  I don't
11          recall.  I'm not aware.
12  BY MS. BAIG:
13          Q.    Do you recall ever having
14  any communications with anyone at Actavis
15  about potentially removing physicians
16  from target lists for writing too many
17  opioid prescriptions?
18          A.    Not that I recall.
19          Q.    You never had any
20  communications with anybody at Actavis
21  about that?
22              MR. ROTH:  Objection.  Form.
23          Mischaracterizes her testimony.
24  BY MS. BAIG:
```

1    Q.    That you can recall.

2    A.    That wouldn't really be my

3 area, to remove someone from a target

4 list.  That would be sales.

5    Q.    Have you heard of the APS

6 journal?

7    A.    The American Pain Society

8 journal?

9    Q.    Uh-huh.

10    A.    I presume so, sure.  I've

11 heard of the APS, not their journal.  But

12 I assume they have a journal.

13    Q.    Did you ever -- did you ever

14 use it or subscribe to it or use it in

15 the capacity of your work at Actavis?

16    A.    Yeah, I don't know if I

17 received it.  A lot of times they put you

18 on comp lists and you received them.  But

19 not that I recall.

20    Q.    So you might have received,

21 it but you don't remember?

22    A.    Right.

23    Q.    How about the Clinical

24 Journal of Pain?

1      A.    All -- they would all get

2  lumped together.  I don't recall.

3      Q.    You don't recall which

4  journals you received and which ones you

5  didn't?

6      A.    Right.

7      Q.    Do you recall ever having

8  any communications with folks who were

9  writing those journals?

10     A.    Who were writing the

11  articles for the journals?  Like the

12  physicians?

13     Q.    Yes.

14     A.    Not that I recall, no.

15     Q.    Are you aware of what

16  incentives were offered to sales reps for

17  meeting certain quotas or targets?

18     A.    No, I wasn't involved in the

19  IC plan.

20     Q.    In the what?

21     A.    The IC plan, the incentive

22  compensation plan.

23     Q.    Okay.  Who designed that

24  plan?

1    A.    I would presume Nathalie was

2    involved, perhaps with the sales

3    managers.

4    Q.    And so you never heard

5    anything about what incentives were

6    provided to sales reps for meeting goals?

7    A.    If I did, I don't recall.

8    Q.    Were the sales reps required

9    to keep notes or records of their

10   detailing trips?

11           MR. ROTH:  Object to the

12           form.  Lacks foundation.  Calls

13           for speculation.

14           THE WITNESS:  Yeah, I also

15           don't know what their reporting

16           structure was after a sales call.

17           I assume they had an SFA system.

18           I don't know what they logged in.

19   BY MS. BAIG:

20   Q.    What's SFA?

21   A.    Sales force automation

22   system.

23   Q.    So you assume that they had

24   a sales force automation system in which

1    they would keep notes or records of their

2    meetings with physicians?

3           A.    I don't know -- I don't know

4    that they kept notes.  But maybe, like, I

5    met with this person on this date kind of

6    thing.

7           Q.    Have you ever seen those at

8    Actavis?

9           A.    No.

10          Q.    Or at inVentiv?

11          A.    No.

12          Q.    Who would have those

13   records, inVentiv or Actavis?

14          A.    I don't know.

15          Q.    So if you haven't seen them,

16   then you don't know whether they were

17   limited only to their meeting with the

18   physicians and the dates or whether they

19   had more substantive information?  You

20   don't know either way; is that right?

21          A.    Correct, correct.

22          Q.    Did Allergan have a contract

23   with IMS, do you know?

24          A.    I didn't work for Allergan.

1    Q.    Did Actavis have a contract

2  with IMS?

3    A.    I don't know.

4    Q.    Did you ever receive any IMS

5  data?

6    A.    I don't recall.  If it was

7  IMS -- any company, I don't recall.  If I

8  saw sales data, I don't recall where it

9  came from, what company was the vendor.

10    Q.    Did you generally receive

11  sales data tracking market share for the

12  drugs, the opioid drugs?

13        MR. ROTH:  Objection to

14        form.

15        THE WITNESS:  I had access

16        to that information.

17  BY MS. BAIG:

18    Q.    How did you have access?

19    A.    I'm trying to remember.

20        I just remember, like, I

21  would -- I would be aware of what our

22  market share was, so I had to have access

23  to it somehow.

24    Q.    So was it a program that you

1    could access and pull up data, or was it

2    an e-mail that you received on a regular

3    basis, or a set of documents that you

4    received on a regular basis?  How did you

5    have access to that information?

6            A.    It's a great question.  I

7    don't recall any portal system that I

8    would log into for that data, so

9    presumably we received an e-mail on it

10   periodically.

11           Q.    From whom?

12           A.    Yeah, I'm pulling out of the

13   clouds here.  I don't recall how I got

14   the data.

15           Q.    So you got market share

16   sales data, but you don't remember what

17   it looked like, who sent it to you, or

18   who created it?

19           A.    Very good.

20           Q.    Do you remember how often

21   you got it?

22           A.    No.

23           Q.    What did you use it for?

24           A.    Monitoring how we were doing

```
 1    from a business perspective.

 2            Q.    And who would you discuss it

 3    with?

 4            A.    Most likely, Nathalie.

 5            Q.    Did the sales materials and

 6    instructions that were provided to the

 7    sales reps, did they vary based on the

 8    geographic area that the sales reps were

 9    working in?

10            A.    No.

11                  MR. ROTH:  Objection.  Calls

12            for speculation.

13                  THE WITNESS:  No.

14            Everything was national.

15    BY MS. BAIG:

16            Q.    Do you know whether there

17    were specific populations that were

18    targeted at all?

19                  MS. RANJAN:  Objection.

20    BY MS. BAIG:

21            Q.    Do you recall any specific

22    populations being targeted for sales of

23    opioids?

24                  MS. RANJAN:  Objection to
```

```
 1            the form of the question.

 2                 MR. ROTH:  Object to the

 3            form.

 4                 THE WITNESS:  Yeah, specific

 5            physicians, specific -- when you

 6            say "specific populations," I

 7            don't know what you're asking.

 8    BY MS. BAIG:

 9            Q.    Do you know whether Actavis

10    specifically targeted marketing opioids

11    to the elderly?

12            A.    No.  We targeted physicians,

13    not patients.

14            Q.    Did you target physicians

15    who treated certain types of patients?

16    You were aware of what physicians were

17    treating what types of -- had what types

18    of practices, right?

19                 MR. ROTH:  Object to the

20            form.

21                 THE WITNESS:  I don't know

22            how we would know their patient

23            population.

24    BY MS. BAIG:
```

1      Q.    Who put together the target

2   lists?

3      A.    That, I don't know.  But

4   that would have been based on, you know,

5   prescription data, not patient

6   populations.  Because we wouldn't know --

7      Q.    Who would put together the

8   target list, inVentiv or Actavis?

9      A.    I don't know.  That was done

10  before I got there.

11     Q.    Don't you think it changed

12  over the course of four years?

13     A.    I wasn't involved, so I

14  don't know.

15     Q.    So what department would you

16  think would have been responsible for

17  putting together target lists for your

18  sales efforts?

19     A.    Yeah, I think we talked

20  about this before.  It would have been

21  maybe a combination of Nathalie and the

22  sales team.

23     Q.    So Nathalie and inVentiv?

24     A.    Nathalie.

```
 1              MR. ROTH:   There's an H in

 2        her name.

 3   BY MS. BAIG:

 4        Q.    Did you work with the

 5   American Geriatric Society at all?

 6        A.    Not at Actavis.

 7        Q.    Are you aware of anybody at

 8   Actavis working with the American

 9   Geriatric Society at all?

10        A.    No, I'm not.

11        Q.    Do you remember any

12   discussions at Actavis about targeting

13   veterans?

14        A.    No.

15        Q.    Are you aware of the 2009

16   publication distributed by the American

17   Pain Foundation called Exit Wounds?

18        A.    No, I'm not.

19        Q.    You never saw it?

20        A.    I don't recall even hearing

21   about it.

22        Q.    Do you have any

23   understanding of Actavis's

24   responsibilities under state and federal
```

```
 1    law with respect to The Controlled

 2    Substances Act?

 3              MR. ROTH:  Object to the

 4         form.

 5              THE WITNESS:  That wasn't

 6         really my area to --

 7    BY MS. BAIG:

 8         Q.    So your answer is no?

 9         A.    No.

10              MR. ROTH:  Object to the

11         form.  Lacks foundation.  She said

12         no.

13    BY MS. BAIG:

14         Q.    Who would have been -- who

15    would have been in charge of making sure

16    that Actavis was complying with its --

17    with The Controlled Substances Act, the

18    requirements under The Controlled

19    Substances Act to report suspicious

20    sales?

21              MR. ROTH:  Objection.  Lacks

22         foundation.  Objection.  Form.

23              THE WITNESS:  I don't know

24         enough about it to answer that
```

1          question.

2     BY MS. BAIG:

3          Q.    Were you aware that Actavis

4     had an obligation to report suspicious

5     sales?

6               MR. ROTH:  Same objections.

7               THE WITNESS:  Yeah, I don't

8          recall being aware of -- being

9          informed about suspicious sales

10         and who would report that.

11    BY MS. BAIG:

12         Q.    Were you aware that Actavis

13    had that obligation, or no?

14              MR. ROTH:  Same objections.

15              THE WITNESS:  I can't say

16         for sure -- for certain what I was

17         aware of at that time.

18    BY MS. BAIG:

19         Q.    Because you don't remember?

20         A.    Yes.

21         Q.    Are you aware of any

22    policies and procedures to ensure that

23    Actavis was reporting and halting

24    suspicious sales?

```
1              MR. ROTH:  Objection.  Lacks
2         foundation.  Calls for
3         speculation.  Form.
4              THE WITNESS:  I wasn't
5         familiar with those procedures.
6    BY MS. BAIG:
7         Q.   And you don't know whether
8    they existed or not, do you?
9              MR. ROTH:  Same objections.
10             THE WITNESS:  I can't say
11        for certain.
12   BY MS. BAIG:
13        Q.   Are you aware of any rebate
14   or chargeback programs in connection with
15   the sales and distribution data?
16        A.   In connection with sales and
17   distribution data?
18             MR. ROTH:  Objection.
19   BY MS. BAIG:
20        Q.   Sorry.  Sales and
21   distribution.
22             MR. ROTH:  Object to the
23        form.
24             THE WITNESS:  I'm reading
```

```
 1              your question.  Sorry.

 2                   Only in the general sense.

 3          I understand that they happened

 4          for managed care contracts, but

 5          not in -- in any specificity to

 6          Actavis.

 7   BY MS. BAIG:

 8          Q.    Managed care contracts with

 9   who?

10          A.    Managed care organizations.

11          Q.    Such as?

12          A.    Aetna, United Healthcare.

13          Q.    And your understanding is

14   that there are rebate or chargeback

15   programs.

16                   Do you have any general

17   knowledge of how those work?

18          A.    You pretty much know exactly

19   what I know.  I know that rebates are

20   involved with managed care, but I don't

21   know how they work.

22          Q.    Who would know that at

23   Actavis?

24          A.    I'm not sure who handled
```

```
 1   managed care contracts at Actavis.

 2         Q.    Is it a separate department?

 3         A.    Separate from mine, yes.

 4         Q.    Is it its own department?

 5         A.    That's what -- I don't know

 6   where it resided.

 7         Q.    Do you know anything about

 8   Actavis's lobby efforts with respect to

 9   drug regulation?

10         A.    I do not.

11         Q.    Did you ever hear anything

12   about that?

13         A.    No.

14         Q.    Do you know whether there's

15   a department that exists?

16         A.    I did not.

17         Q.    Are you aware that Allergan

18   transacts business in Ohio -- that

19   Actavis transacts business in Ohio?

20              MR. ROTH:  Object to the

21         form.

22              THE WITNESS:  Can you be

23         more specific about "transacts

24         business"?
```

1    BY MS. BAIG:

2         Q.    Well, do you know whether

3    there was a sales rep in Ohio?

4         A.    I assume there was, yes.

5         Q.    Are you aware that Actavis

6    sells opioids in Ohio?

7              MR. ROTH:  Object to the

8         form.  Vague as to time frame and

9         who you're talking about.

10   BY MS. BAIG:

11        Q.    When you were there.

12        A.    And by "sell opioids,"

13   promote opioids to physicians?

14        Q.    Yes.

15        A.    So if we had a sales rep

16   there, yes, they were promoting opioids

17   to physicians.

18        Q.    Do you know who that sales

19   rep was?

20        A.    No.

21        Q.    If you wanted to find out

22   who that sales rep was, who would you go

23   to?

24        A.    I would probably call one of

1    the sales directors.

2            MS. BAIG:  I have no further

3        questions.  Thank you.

4            THE WITNESS:  Thank you.

5            MR. ROTH:  Can we take a

6        short break, so I can consult with

7        co-counsel, and then we'll come

8        back on?

9            VIDEO TECHNICIAN:  The time

10       is 4:04 p.m.  Off the record.

11               -  -  -

12           (Whereupon, a brief recess

13       was taken.)

14               -  -  -

15           VIDEO TECHNICIAN:  We are

16       back on the record.  The time is

17       4:16 p.m.

18               -  -  -

19               EXAMINATION

20               -  -  -

21   BY MR. ROTH:

22       Q.   Ms. Altier, you testified

23   earlier that you joined Actavis in the

24   summer of 2010; is that correct?

1    A.    That's correct.

2    Q.    Why were you hired?

3    A.    I was hired because Actavis

4  had just received a warning letter,

5  earlier that year, on the promotional

6  materials they were using, and I was

7  brought in to create new materials.

8    Q.    What process did you go

9  through to revise the company's

10 promotional materials for Kadian?

11   A.    Sure.  We created materials

12 that were based exclusively on the

13 product label, approved by the FDA.  I

14 like to -- I always used to like to call

15 it a colorful PI.

16         We created those materials,

17 we submitted them through our promotional

18 review committee process, which consisted

19 of legal and regulatory review, to make

20 sure that we were compliant.  And those

21 materials were produced and given to the

22 sales force.

23   Q.    And how would you describe

24 the marketing materials you produced for

1    Kadian?

2          A.    Let's see.  Benign,

3    conservative, very straightforward,

4    modeled after the label.

5          Q.    What interaction did you

6    have with the inVentiv sales reps during

7    your tenure at Actavis while the inVentiv

8    contract was still ongoing?

9          A.    Sure.  My role was marketing

10   director, I would present the marketing

11   materials to them.

12         Q.    And how would you describe

13   the inVentiv sales reps' promotion of

14   Kadian?

15         A.    Again, you know, they were

16   trained on what -- the safety and the

17   efficacy of the product; they stuck to

18   the materials that they were given, which

19   was, basically, you know, a colorful

20   version of the PI; instructed to provide

21   appropriate safety that was in the

22   materials with every detail.

23         Q.    Did Actavis ever hire a

24   speakers bureau for Kadian?

```
 1          A.      No.

 2          Q.      Did Actavis ever sponsor a

 3   continuing medical education seminars

 4   related to Kadian?

 5          A.      No.

 6          Q.      Did Actavis ever fund

 7   clinical or other scientific studies for

 8   the purpose of promoting Kadian?

 9          A.      Not during my tenure, no.

10          Q.      Did Actavis ever hire key

11   opinion leaders for the purposes of

12   promoting Kadian?

13          A.      No.

14          Q.      Did Actavis ever engage pain

15   advocacy or other patient advocacy

16   organizations for the purposes of

17   promoting Kadian?

18          A.      No.

19          Q.      Why did Actavis adopt such a

20   benign and conservative marketing

21   strategy for Kadian?

22          A.      We were at the end of our

23   product lifecycle.  Generic competition

24   was imminent.  Our goal was to maintain
```

1  product share.

2         Q.    When did Actavis stop

3  detailing physicians and pharmacies for

4  Kadian in person?

5         A.    The merger with Watson, the

6  Watson management made the decision to

7  let the sales force go at the end of

8  2012.

9         Q.    We saw some documents and

10  heard testimony today related to MoxDuo.

11             Do you remember that?

12         A.    I do.

13         Q.    Was MoxDuo ever marketed or

14  sold?

15         A.    It was not.

16         Q.    And why not?

17         A.    It was not approved by the

18  FDA.

19             MR. ROTH:  That's all I have

20         for now.

21             MS. BAIG:  I have nothing

22         further.

23                   -  -  -

24                 EXAMINATION

```
 1                    -  -  -

 2   BY MS. PINCUS:

 3          Q.    Ms. Altier --

 4                VIDEO TECHNICIAN:  So you

 5          probably do want to come because

 6          you need a microphone.

 7                    -  -  -

 8                (Whereupon, a discussion off

 9          the record occurred.)

10                    -  -  -

11   BY MS. PINCUS:

12          Q.    Good afternoon, Ms. Altier.

13   My name is Lauren Pincus, and I'm here on

14   behalf of Rochester Drug Cooperative.

15                I realize it's been a long

16   day, so I'll try and be brief.

17          A.    Thank you.

18          Q.    Are you familiar with

19   Rochester Drug Cooperative?

20          A.    No.

21          Q.    Do you recall having any

22   dealings with Rochester Drug Cooperative

23   during your time at Actavis?

24          A.    No, not that I recall.
```

```
 1              MS. PINCUS:  No further

 2         questions.

 3              MR. ROTH:  Does anyone on

 4         the phone have any questions for

 5         the witness?

 6              MR. DIAMANTATOS:  Yes.  This

 7         is Tinos Diamantatos, from Morgan

 8         Lewis on behalf of the Teva

 9         defendants.

10                   -  -  -

11              (Whereupon, a discussion off

12         the record occurred.)

13                   -  -  -

14    BY MR. DIAMANTATOS:

15         Q.    Can you hear me now?

16         A.    Yes.

17         Q.    Terrific.

18              Ms. Altier, how are you?

19    Nice to meet you --

20              MS. BAIG:  Have you

21         cross-noticed this deposition?

22         Who is taking questions now,

23         exactly.

24              MR. DIAMANTATOS:  I can't
```

```
 1          hear the questioner, whoever just

 2          said that.  Can you repeat that?

 3                MS. BAIG:  Can you please

 4          restate who is taking questions

 5          now?

 6                MR. DIAMANTATOS:  Sure.

 7          First name is Tinos, T-I-N-O-S,

 8          last name, Diamantatos,

 9          D-I-A-M-A-N-T-A-T-O-S.  I'm with

10          Morgan Lewis and Bockius on behalf

11          of Teva defendants Cephalon and

12          the acquired entities.  And I

13          e-mailed the address yesterday

14          stating that I would be appearing

15          on behalf of those entities for

16          today's purposes.

17                MS. BAIG:  And have you

18          cross-noticed this deposition?

19                MR. ROTH:  They don't need

20          to if they're just following up on

21          generic issues which they're

22          defending.

23                MS. BAIG:  Have you

24          cross-noticed this deposition?
```

1           MR. DIAMANTATOS:  I have

2      not.

3           MS. BAIG:  Okay.  I would

4      object to the extent that it's in

5      violation of the protocol.

6           But go ahead.

7           MR. DIAMANTATOS:  I've

8      reviewed the protocol, and I don't

9      think any of my questions or my

10      questioning of the witness is in

11      violation of the protocol, just

12      for the record.

13           MS. BAIG:  Okay.  Go ahead.

14           MR. DIAMANTATOS:  May I

15      proceed?  Thank you.

16  BY MR. DIAMANTATOS:

17      Q.    Ms. Altier, you can't see me

18  but nice to meet you.

19      A.    Nice to meet you.

20      Q.    My name is Tinos, I

21  represent Teva Pharmaceuticals and some

22  related entities.

23           I only have a few brief

24  questions for you, based on some of the

1    questioning this morning.  If you can't

2    hear me or it's not coming through on the

3    phone, please let me know.

4               But I'll keep it brief,

5    okay?

6         A.    Okay.

7         Q.    You testified earlier this

8    morning that for a short period of time,

9    the Kadian sales force helped promote the

10   availability of oxymorphone.

11              Do you recall that?

12        A.    I do.

13        Q.    And we also saw an exhibit,

14   I believe it was marked as Exhibit Number

15   17, 1-7, which was a slide deck regarding

16   oxymorphone.

17              What do you recall about the

18   Kadian sales team's involvement?

19        A.    I believe the question was,

20   what do I recall about the Kadian sales

21   team's involvement?

22              Their involvement was to

23   inform physicians that the strengths of

24   the 7.5 and the 15 were still available,

1    even though the brand had pulled their

2    version of that drug.

3           Q.    Anything beyond that, that

4    you recall?

5           A.    No.

6           Q.    You also mentioned that when

7    Kadian went to generic, the inVentiv's

8    team promoted the Kadian generic.

9                 Can you please explain what

10   you meant by that?

11          A.    Sure.  I guess, they just --

12   they continued promoting Kadian the way

13   they were, but an additional message was

14   that there was a generic version

15   available for their patients.

16          Q.    And apart from the instances

17   that we saw regarding oxymorphone and

18   generic Kadian, are you aware of inVentiv

19   promoting products other than Kadian?

20          A.    I am not.

21                MR. DIAMANTATOS:  We're

22          reserving the right to ask further

23          questions if the need arises.  I

24          have no further questions for the

1    witness at this time.

2         MS. BAIG:  I have nothing

3    further.

4         VIDEO TECHNICIAN:  This

5    marks the end of today's

6    deposition.  The time is 4:24 p.m.

7    Off the record.

8              -  -  -

9         (Whereupon, the deposition

10   concluded at 4:24 p.m.)

11             -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                        CERTIFICATE

2

3

4               I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10

            Amanda Maslynsky-Miller

11          Certified Realtime Reporter

            Dated:  August 6, 2018

12

13

14

15

16

17               (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              -   -   -   -   -   -

                  E R R A T A

 2              -   -   -   -   -   -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6        REASON:  _____

 7    _____  _____  _____

 8        REASON:  _____

 9    _____  _____  _____

10        REASON:  _____

11    _____  _____  _____

12        REASON:  _____

13    _____  _____  _____

14        REASON:  _____

15                 _____

16        REASON:  _____

17    _____  _____  _____

18        REASON:  _____

19    _____  _____  _____

20        REASON:  _____

21    _____  _____  _____

22        REASON:  _____

23    _____  _____  _____

24        REASON:  _____
```

```
 1         ACKNOWLEDGMENT OF DEPONENT

 2

              I,_____, do

 3    hereby certify that I have read the
      foregoing pages,  1 - 377, and that the

 4    same is a correct transcription of the
      answers given by me to the questions

 5    therein propounded, except for the
      corrections or changes in form or

 6    substance, if any, noted in the attached
      Errata Sheet.

 7

 8    _____

       JENNIFER ALTIER              DATE

 9

10

      Subscribed and sworn

11    to before me this
      _____ day of _____, 20____.

12

      My commission expires:_____

13

14    _____

      Notary Public

15

16

17

18

19

20

21

22

23

24
```

```
1                        LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____    _____

4      _____  _____    _____

5      _____  _____    _____

6      _____  _____    _____

7      _____  _____    _____

8      _____  _____    _____

9      _____  _____    _____

10     _____  _____    _____

11     _____  _____    _____

12     _____  _____    _____

13     _____  _____    _____

14     _____  _____    _____

15     _____  _____    _____

16     _____  _____    _____

17     _____  _____    _____

18     _____  _____    _____

19     _____  _____    _____

20     _____  _____    _____

21     _____  _____    _____

22     _____  _____    _____

23     _____  _____    _____

24     _____  _____    _____
```