Page 1

1             IN THE UNITED STATES DISTRICT COURT

2               NORTHEASTERN DISTRICT OF OHIO

3                     EASTERN DIVISION

4   IN RE NATIONAL PRESCRIPTION

5   OPIATE LITIGATION                    MDL No. 2804

6

7   This document relates to:        Case
                                     No. 17-md-2804
8   The County of Cuyahoga v.
    Purdue Pharma, L.P., et al.,      Judge Dan Aaron
9   Case No. 18-OP-45090              Polster
10  City of Cleveland, Ohio vs.
    Purdue Pharma, L.P., et al.
11  Case No. 18-OP-45132
12  The County of Summit, Ohio, et al.,
    v. Purdue Pharma L.P., et al.,
13  Case No. 1:18-OP-45004 (N.D. Ohio)
14
15          The videotaped deposition of DEMETRA
16  ASHLEY, called for examination pursuant to the
17  Rules of Civil Procedure for the United States
18  District Courts pertaining to the taking of
19  depositions, taken at 10 South Wacker Drive,
20  Suite 4000, Chicago, Illinois, on the 15th day of
21  March, 2019, at the hour of 9:16 a.m.
22
23
24  Reported by:  Gina M. Luordo, CSR, RPR, CRR
25  License No.:  084-004143

```
 1       APPEARANCES:
 2           NAPOLI SHKOLNIK
             BY:  MR. HUNTER J. SHKOLNIK
 3               MS. WENDY MITCHELL (via telephone)
             360 Lexington Avenue, 11th Floor
 4           New York, New York  10017
             (212) 397-1000
 5           sshkolnik@napolilaw.com
             wmithcell@napolilaw.com
 6               Representing Cuyahoga County;
 7
             GREENE KETCCHUM BAILEY FARRELL & TWEEL,
 8               LLP
             BY:  MR. PAUL FARERLL, JR. (via telephone)
 9           419 111th Street
             Huntington, West Virgina  25707
10           (304) 525-9115
                 Representing the Plaintiffs;
11
12           REED SMITH LLP
             BY:  MR. ROBERT A. NICHOLAS
13               MR. JOSEPH MAHADY
             1301 K Street, N.W.
14           Suite 1000 - East Tower
             Washington, DC  20005
15           (202) 414-9226
             rnicholas@reedsmith.com
16           jmahady@reedsmith.com
                 Representing AmerisourceBergen Drug
17               Corporation;
18
             DECHERT, LLP
19           BY:  MS. MELANIE MACKAY
             35 West Wacker Drive, Suite 3400
20           Chicago, Illinois  60601-1634
             (312) 646-5800
21           melanie.mackay@dechert.com
                 Representing Purdue Pharma, L.P.;
22
23
24
25
```

```
 1        APPEARANCES (continued):
 2            JONES DAY
             BY:  MR. NEAL J. STEPHENS
 3           1755 Embarcadero Road,
             Palo Alto, California 94303
 4           (650) 759-3939
             nstephens@jonesday.com
 5                - and -
             JONES DAY
 6           BY:  MR. PATRICK J. BEISSELL
                  (via telephone)
 7           77 West Wacker Drive
             Chicago, Illinois  60601
 8           (312) 269-4066
             pbeissell@jonesday.com
 9               Representing Walmart, Inc;
10
             COVINGTON & BURLING LLP
11           BY:  MR. CHRISTOPHER K. EPPICH
             1999 Avenue of the Stars
12           Los Angeles, California  90067-4643
             (424) 332-4764
13           ceppich@cov.com
                 Representing McKesson Corporation;
14
15           ARNOLD & PORTER
             BY:  MR. JOSHUA M. DAVIS
16                (via telephone)
             601 Massachussetts Avenue, N.W.
17           Washington, D.C.  200001
             (202) 942-5000
18           joshua.davis@arnoldporter.com
                 Representing Endo Health Solutions,
19               Inc. and Endo Pharmaceuticals, Inc.
20
             O'MELVENY & MYERS, LLP
21           BY:  MS. AMY R. LUCAS (via telephone)
             1999 Avenue of the Stars, 7th Floor
22           Los Angeles, California  90067
             (310) 246-6784
23           alucas@omm.com
                 Representing Johnson & Johnson and
24               Janssen;
25
```

```
 1       APPEARANCES (continued):
 2            MORGAN, LEWIS & BOCKIUS LLP
              BY:  MR. SCOTT T. SCHUTTE
 3            77 West Wacker Drive
              Chicago, Illinois  60601-5094
 4            (312) 324-1773
              sschute@morganlewis.com
 5                 Representing Rite Aid of Maryland
 6
              MORGAN, LEWIS & BOCKIUS, LLP
 7            BY:  MS. MAUREEN K. BARBER (via telephone)
              One Oxford Centre, 32nd Floor
 8            Pittsburgh, Pennsylvania  15219-6401
              (412) 560-7463
 9            maureen.barber@morganlewis.com
                   Representing Teva Pharm;
10
11            WILLIAMS & CONNOLLY LLP
              BY:  MS. COLLEEN MCNAMARA
12                 MS. JENNIFER WICHT
              725 Twelfth Street, N.W.
13            Washington, D.C.  20005
              (202) 434-5186
14            cmcnamara@wc.com
                   Representing Cardinal Health, Inc.;
15
16            ZUCKERMAN SPAEDER, LLP
              BY:  MR. PAUL B. HYNES, JR.
17            1800 M Street, N.W., Suite 1000
              Washington, D.C.  20036
18            (202) 778-1800
              jhynes@zuckerman.com
19                 Representing CVS Indiana, LLC and CVS
                   Rx Services, Inc.;
20
21            KIRKLAND & ELLIS LLP
              BY:  MS. ERICA B. ZOLNER
22            300 North LaSalle Street
              Chicago, Illinois  60654
23            (312) 862-3247
              erica.zolner@kirkland.com
24                 Representing Allergan Finance, LLC;
25
```

```
 1        APPEARANCES (continued):
 2             ROPES & GRAY
               BY:  MR. WILLIAM DAVISON
 3             Prudential Tower, 800 Boylston Street
               Boston, Massachusetts  02199
 4             (617) 951-7000
               william.davison@ropesgray.com
 5                  Representing Mallinckrodt and SpecGx,
                    LLC;
 6
 7             BARNES & THORNBURG LLP
               BY:  MR. WILLIAM A. HAHN
 8             11 South Meridian Street
               Indianapolis, Indiana  46204-3535
 9             (317) 236-1313
               william.hahn@btlaw.com
10                  Representing H.D. Smith;
11
               MARCUS & SHAPIRA LLP
12             BY:  MR. JOSHUA A. KOBRIN
               One Oxford Centre, 35th Floor
13             301 Grant Street
               Pittsburgh, Pennsylvania  15219-6401
14             (412) 338-5208
               kobrin@marcus-shapira.com
15                  Representing HBC;
16
               BARTLIT BECK LLP
17             BY:  MR. KASPAR STOFFELMAYR
               54 West Hubbard Street
18             Chicago, Illinois  60654
               (312) 494-4434
19             kaspar.stoffelmayr@bartlitbeck.com
                    Representing Walgreen Co. and
20                  Walgreen Eastern Co., Inc.;
21
22
23
24
25
```

```
 1       APPEARANCES (continued):
 2           FOX ROTHSCHILD, LLP
             BY:  MR. ZACHARY MARTIN
 3           Stone Manor Corporate Center
             2700 Kelly Road, Suite 300
 4           Warrington, Pennsylvania  18976
             (215) 918-3680
 5           zmartin@foxrothschild.com
                  Representing Prescription Supply,
 6                Inc.;
 7
             FOLEY & LARDNER, LLP
 8           BY:  MS. KRISTINA MATIC (via telephone)
             777 East Wisconsin Avenue
 9           Milwaukee, Wisconsin  53202-5306
             (414) 297-5913
10           kmatic@foley.com
                  Representing Anda;
11
12           CAVITCH, FAMILO & DURKIN
             BY:  MR. ERIC J. WEISS (via telephone)
13           Twentieth Floor, 1300 East 9th Street
             Cleveland, Ohio  44114
14           (216) 621-7860
             eweiss@cavitch.com
15                Representing Discount Drug Mart;
16
             UNITED STATES ATTORNEY'S OFFICE
17           BY:  MS. RENEE A. BACCHUS
             801 West Superior Avenue, Suite 400
18           Cleveland, Ohio  44113-1852
             (216) 622-3707
19           renee.bacchus@usdoj.gov
                  Representing the U.S. Department of
20                Justice.
21
     ALSO PRSENT:
22   Mr. James R. Bennett - U.S. Department of Justice,
     United States Attorney's Office
23   Ms. Mariama C. Spears - U.S. Department of Justice,
     Drug Enforcement Administration
24   Mr. Robert E. Chandler - U.S. Department of
     Justice, Civil Division
25   Mr. Ben Stanton - Videographer
```

Page 7

1                        I N D E X

2    WITNESS                         EXAMINATION

3    DEMETRA ASHLEY

4        By Mr. Nicholas                 10

5        By Ms. Zolner                   144

6        By Mr. Schutte                  231

7        By Mr. Shkolnik                 255

8        By Mr. Schutte (further)        327

9

10                     E X H I B I T S

11   NUMBER          IDENTIFICATION           PAGE

12   Exhibit 1       Correspondence Dated      11

13                   December 10, 2018

14   Exhibit 2       LinkedIn Profile          14

15   Exhibit 3       21 C.F.R. Section 1301.74   25

16   Exhibit 4       E-mail Dated 2/24/2010    38

17                   Bates US-DEA-00006177

18   Exhibit 5       Correspondence Dated      44

19                   December 27, 2007

20   Exhibit 6       E-mail Chain with         47

21                   Attachment Bates US-DEA0

22                   00008469-00008488

23   Exhibit 7       E-mail Chain Bates        52

24                   PPLPC019001324952-

25                   19001324954

Page 8

1                         E X H I B I T S

2    NUMBER            IDENTIFICATION                PAGE

3    Exhibit 8         Correspondence Dated June 1,    61

4                      2011 Bates ABDCMDL00284393-

5                      00284408

6    Exhibit 9         E-mail Chain with               78

7                      Attachment Bates US-DEA-

8                      00008563-00008583

9    Exhibit 10        Statement of Demetra            82

10                     Ashley

11   Exhibit 11        Report to Congressional         91

12                     Requestors

13   Exhibit 12        E-mail Chain Bates              94

14                     US-DEA-00008424-00008427

15   Exhibit 13        E-mail Chain Bates             100

16                     US-DEA-00009579

17   Exhibit 14        E-mail Dated August 30,        105

18                     2017 Bates his-MDL-00580082-

19                     00580083

20   Exhibit 15        Correspondence Dated June 15,  110

21                     2018 Bates ABDCMDL00269679-

22                     00269680

23   Exhibit 16        Correspondence Dated           110

24                     February 6, 2018 Bates

25                     MCKMDL00561146-00561147

Page 9

1                    E X H I B I T S

2    NUMBER              IDENTIFICATION                    PAGE

3    Exhibit 17    View Rule                              119

4    Exhibit 18    E-mail Chain Bates                     123

5                  US-DEA-00023153

6    Exhibit 19    Hearing Transcripts                    137

7    Exhibit 20    E-mail Chain with                      173

8                  Attachment Bates US-DEA-

9                  00005925-00005931

10   Exhibit 21    E-mail Chain with                      183

11                 Attachment Bates US-DEA-

12                 00005918-00005924

13   Exhibit 22    E-mail Chain with                      195

14                 Attachment Bates US-DEA-

15                 00005911-00005917

16   Exhibit 23    E-mail Chain Bates                     211

17                 US-DEA-00006056-00006058

18   Exhibit 24    E-mail Chain Bates                     220

19                 US-DEA-00006183-00006184

20   Exhibit 25    Power Point                            232

21   Exhibit 26    Memorandum Bates US-DEA-               265

22                 00000001-00000141

23

24

25

Page 10

1        THE VIDEOGRAPHER:  We are now on the record.

2   My name is Ben Stanson representing Veritext.  The

3   date today is March 15, 2019, and the time is

4   9:28 a.m.  This deposition is being held at Reed

5   Smith located at 10 South Wacker Drive in Chicago,

6   Illinois and is being taken by counsel for the

7   defendants.  The caption of this case is the

8   National Prescription Opiate Litigation pending in

9   the U.S. District Court, Northern District of Ohio,

10  Eastern Division, MDL No. 2804.

11           The name of the witness is Demetra Ashley.

12  Appearances will be noted on the stenographic

13  record.  Our court reporter is Gina Luordo

14  representing Veritext.  Will you please swear in

15  the witness.

16                          (Whereupon, the witness was

17                           sworn.)

18                     DEMETRA ASHLEY,

19  having been first duly sworn, was examined and

20  testified as follows:

21                     EXAMINATION

22  BY MR. NICHOLAS:

23      Q.   Good morning, Ms. Ashley.

24      A.   Good morning.

25      Q.   My name is Bob Nicholas.  I represent

Page 11

1   AmerisourceBergen.  Several people will be asking

2   you questions today in this deposition.  I'm the

3   first person who's going to be questioning you, and

4   so I just want you to know that I'm not the only

5   one who is going to be questioning you.

6           Do you understand that the Department of

7   Justice has authorized you to testify on certain

8   topics related to your work at the DEA?

9       A.   Yes.

10      Q.   I'm going to show you the authorization

11  letter that the DEA issued just to know whether

12  you've seen the letter before.

13      MR. NICHOLAS:  Can we mark this as Ashley 1,

14  please.

15                        (Whereupon, ASHLEY Deposition

16                        Exhibit No. 1 was marked for

17                        identification.)

18      THE WITNESS:  Yes, I've seen it.

19  BY MR. NICHOLAS:

20      Q.   Thank you.

21           Did you review the letter in preparation

22  for today's testimony?

23      A.   Yes.

24      Q.   Have you ever testified at a deposition

25  before?

Page 12

1     A.   Yes.

2     Q.   When was that?

3     A.   It was internal to DEA.  I don't remember

4   the year.  I don't recall.

5     Q.   Like more than 10 years ago or --

6     A.   Probably, yes.

7     Q.   Okay.  Have you ever testified in a trial

8   before?

9     A.   Yes.

10     Q.   Just very generally, how many?

11     A.   Two.

12     Q.   Okay.  And just in general terms, what

13   were they about?

14     A.   One was about a physician and some

15   diversion, and the second one, I believe it was a

16   pharmacy and diversion.

17     Q.   Okay.  Do you remember where those trials

18   took place?

19     A.   Detroit field division.

20     Q.   Okay.  And was this back before 2004?

21     A.   Yes.

22     Q.   Have you been retained to act as an expert

23   in this matter?

24     A.   Yes.

25     Q.   Okay.  And who retained you?

Page 13

1     A.    Purdue Pharma.

2     Q.    And since you learned that you would be

3 deposed as a fact witness in this case, have you

4 done any substantive expert work in the case?

5     A.    No.

6     Q.    And since you learned that you will be

7 deposed as a fact witness in this case, have you

8 done any substantive communicating with Purdue?

9     A.    No.

10     Q.    Tell us what you did to prepare for your

11 testimony today.

12     A.    Yesterday I met with attorneys here

13 representing the government, and they just went

14 over what I could speak about and what I couldn't

15 speak about.  So we went over this letter.

16     Q.    Okay.

17     A.    That was it.

18     Q.    Are those the only attorneys that you met

19 in connection with preparing for the deposition?

20     A.    Yes.

21     Q.    This is a standard question in

22 depositions, so I'll ask it.  Approximately how

23 many hours did you spend preparing for the

24 deposition yesterday?

25     A.    Yesterday I'd say five hours maybe.

Page 14

1      Q.   I'm going to mark as Exhibit 2 -- I want

2   to mark as Exhibit 2 your LinkedIn profile, okay?

3      A.   Okay.

4                     (Whereupon, ASHLEY Deposition

5                     Exhibit No. 2 was marked for

6                     identification.)

7   BY MR. NICHOLAS:

8      Q.   My only question, I think, on this is is

9   this your LinkedIn profile?

10      A.   Yes, it is.

11      Q.   And is it accurate to the best of your

12   knowledge?

13      A.   Yes.

14      Q.   Now, I want to ask you to go back further

15   than this goes because this takes us back to --

16   your profile goes back to 2004 in terms of your

17   employment history, but have you -- you've been

18   working with the DEA before that, right?

19      A.   Yes.

20      Q.   How long have you been with the DEA?  How

21   long were you with the DEA during the course of

22   your career?

23      A.   36 years.

24      Q.   Okay.  Can you tell us where you started?

25   What was your first job at the DEA?

1      A.    I hired on in the Chicago field division

2    in the Chicago office downtown as a student aide,

3    and I was a student aide for -- I don't know.  I

4    was in college -- a few years.  And then I was a

5    secretary for about a year, maybe a little longer,

6    and I became a diversion investigator in 1987.

7      Q.    In Chicago?

8      A.    No.  My first posted duty -- well,

9    temporary was the Washington field division.  My

10   assigned first posted duty was the Detroit field

11   division, and that was in 1988 when I got to

12   Detroit.

13     Q.    Okay.  How long were you in Detroit?

14     A.    Nine years.

15     Q.    And tell me what was your title?

16     A.    Diversion investigator.

17     Q.    What did you do?

18     A.    I conducted investigations of civil -- of

19   a civil nature, criminal and administrative.  I was

20   a field investigator going into registrants,

21   helping them with compliance and also detecting

22   violations and pursuing those as, you know,

23   whichever category they fell into, civil

24   administrative or criminal.

25     Q.    Okay.  What was your next job at the DEA?

1     A.   Then I moved to the Chicago field

2   division, and I was still a diversion investigator,

3   and that was in 1996.  And I was an investigator,

4   and I did the same -- I had the same duties as

5   following up on investigations, ensuring

6   compliance, some training, that sort of thing.  And

7   I became a group supervisor in 1998 still in the

8   Chicago division.  I managed two diversion groups

9   and one registration group, and I did that from

10   1998 until 2004.

11     Q.   You said you managed two diversion groups

12   and one registration?

13     A.   Registration, yeah.  Those were the

14   technicians that processed the licenses for the

15   Chicago field division.

16     Q.   What was involved with managing the

17   diversion group?

18     A.   I was overseeing investigations and

19   regulatory, scheduled investigations, engaging with

20   registrants, ensuring compliance and also detecting

21   diversion and violations.

22     Q.   And what was your scope?  I mean, what was

23   the territory?

24     A.   My territory was just the Chicago area,

25   metropolitan area, you know, suburbs as a group

 1   supervisor.  I'm sorry.  I also had the Springfield
 2   office in Illinois.  So my two groups were one
 3   group in the Chicago area and the second group in
 4   Springfield, Illinois.
 5       Q.   Okay.  And then your next job at the DEA
 6   was what?
 7       A.   Then I went to Washington, D.C. for
 8   headquarters, and that was in 2004.  And I was --
 9   they call it staff coordinators.  I worked in the
10   policy section, and that was helping to draft
11   policy, providing clarification to registrants in
12   the policy liaison section.  And from there, I was
13   in the policy section about a year and a half, and
14   then I was promoted to the associate section chief
15   also in headquarters, and that was in the drug and
16   chemical evaluation section.
17           And I was responsible for the
18   regulatory -- all regulatory matters around the
19   country, kind of national -- it was sort of a
20   national -- I guess I would speak with all the
21   groups around the country and sort of get it into
22   one concise sort of, I guess -- I don't know what's
23   the word I'm looking for.  Where they are all on
24   the same page sort of thing.  So I was like
25   regulatory providing information from headquarters

1   making sure that the -- around the country they

2   were being consistent with what our priorities

3   were.

4        Q.    In that -- in that part of the job, were

5   you communicating with people within the DEA around

6   the country?

7        A.    Within DEA, yes.

8        Q.    I see.  Did you deal with quotas during

9   that period of time when you were in the D.C.

10  office?  Was that part of your --

11       A.    I did not.  Not at that time.

12       Q.    So I think we're up to 1987 if I'm -- it

13  if I haven't completely lost track.

14       A.    We jumped to 2004.

15       Q.    Did I say 1987?  Sorry about that.  Ignore

16  me.

17            You took me all the way to 2004.  Tell me

18  what happened in 2004.

19       A.    2004, that's when I was a staff

20  coordinator, and then I think it was 2006 promoted

21  to the associate section chief.  So I was in

22  headquarters from '04 to '07.

23       Q.    So what I should have said is you've taken

24  us to 2007.  In 2007, where did you go next?

25       A.    Then I went back to the Chicago field

Page 19

1   division.  I was the diversion program manager, and

2   in that position, I had a five-state area of

3   responsibility.  It was Illinois, Indiana, North

4   Dakota, Minnesota and Wisconsin.

5       Q.   Okay.  Tell me in general terms what your

6   responsibilities were in that position.

7       A.   So I was responsible for the investigative

8   groups throughout the division throughout the five

9   states.  So in the end -- I think in the beginning,

10  we had about eight groups.  By the end, we had 13

11  groups.  So it was all matters regulatory,

12  criminal, civil, training, resources, budget, all

13  matters related to the functions of the diversion

14  control section in the Chicago field division.

15      Q.   Is it correct that you were closely

16  involved with enforcing suspicious order monitoring

17  requirements of the Controlled Substances Act while

18  in this role?

19      A.   Say that again.

20      Q.   Sure.  Is it correct that you were closely

21  involved with enforcing suspicious order monitor

22  requirements of the Controlled Substances Act while

23  you were in this job?

24      A.   I was involved with that, yes.

25      Q.   Okay.  And were you aware of the DEA's

Page 20

1   suspicious order monitoring policies during this

2   period of time?

3       A.   Yes.

4       MR. SHKOLNIK:  Objection to when you say this

5   period of time.

6   BY MR. NICHOLAS:

7       Q.   2007 to 2015 is what I'm talking about.

8       A.   Yes.

9       Q.   Okay.  Now, in 2015, where did you go from

10  there within the DEA?

11      A.   In 2015, I went back to headquarters.  I

12  was promoted to a senior executive management

13  position.  So I went back to the Office of

14  Diversion Control in headquarters in Arlington,

15  Virginia.

16      Q.   Okay.  And what were your responsibilities

17  in this new senior position?

18      A.   So I was responsible for all functions of

19  the Office of Diversion Control.  So that would be

20  adequate resources, investigations, training,

21  budget, the growth, the strategy and just

22  coordinating nationally, well, actually globally,

23  to ensure that investigators were on focus with

24  DEA's mission and Office of Diversion strategy.

25      Q.   Who did you report to in that role?

1     A.    Louis Milione.

2     Q.    Did you report to Joseph Rannazzisi for

3  any period of time?

4     A.    No, I did not.

5     Q.    And during that period of time, were you

6  aware of the DEA's suspicious order monitoring

7  policies?

8     A.    Yes.

9     Q.    I am going to ask you one question about

10  your LinkedIn page and only one, which is on your

11  LinkedIn page, you said you increased public and

12  industry engagement by more than 500 percent to

13  expand the agency's presence and improve

14  compliance.  Can you just explain that?  What did

15  you mean?

16     A.    So one of the things that Lou and I

17  discussed when we -- we both reported at the same

18  time is that we wanted to have, you know, more

19  training, lots of engagement because we felt

20  that -- well, actually not we felt that.  We were

21  told by industry that they weren't engaging with

22  DEA enough.  They needed clarification and policy.

23  So we felt that we should do a lot more of that, so

24  that was one of the initiatives we placed out to

25  the field and asked them to, you know, just do more

Page 22

1    engagement.

2         MR. SHKOLNIK:  Once again, my objection is to

3    time frame.  Can you just --

4         MR. NICHOLAS:  I'm talking about the time

5    period when Ms. Ashley was at -- was in her senior

6    position from roughly 2015 to 2018.

7         MR. SHKOLNIK:  I understand.  There should be

8    clarity.  Objection to form just so it's clear.

9         MR. NICHOLAS:  Okay.  That's fine.

10   BY MR. NICHOLAS:

11        Q.  You said that you and Mr. Milione came in

12   at the same time.  Who did each of you replace?

13        A.  Joseph Rannazzisi.

14        Q.  You both came in to replace Mr. Rannazzisi

15   in combination?

16        A.  Yes.

17        Q.  And during your time in this role in this

18   senior role when you and Mr. Milione were there,

19   was there a shift in how the DEA worked with its

20   registrants?

21        MR. SHKOLNIK:  Objection.

22   BY MR. NICHOLAS:

23        Q.  You can go ahead.

24        A.  I believe so, yes.

25        MR. SHKOLNIK:  Just note my objection.  Is the

1  witness speaking on behalf of DEA, or is this a

2  personal opinion?  I'm directing that to DEA

3  counsel.

4      MR. NICHOLAS:  Let me just -- we're not going

5  to have speaking objections.

6      MR. SHKOLNIK:  I'm allowed to make that

7  objection.  I'm asking counsel very clearly is the

8  witness testifying as a policy voice for this

9  agency, or is the witness giving an opinion of her

10  own?  We were given certain limitations in this

11  deposition as to what we would be allowed to do and

12  what the witness would be allowed to do.

13      MS. BACCHUS:  On behalf of the government, the

14  witness is here to testify in her factual capacity.

15  She is not the representative of DEA.  She can

16  testify to what her personal knowledge is and what

17  she performed -- duties she performed on behalf of

18  DEA, but she is not here to speak as a 30(b)(6)

19  witness on DEA policy, and that can go forward.

20          That will be our standing objections.  If

21  there are any questions asked regarding DEA itself,

22  she can testify to what she did as a fact witness.

23      MR. SHKOLNIK:  Thank you.

24  BY MR. NICHOLAS:

25      Q.  You just said that you believed you saw a

1    shift in how the DEA worked with registrants.  Can

2    you describe what that shift was?

3        A.   When we began as -- relatively soon after

4    we reported, we were getting meeting requests from

5    industry, and in those requests, industry

6    individuals would say to us we have not been able

7    to have these meetings and have these discussions.

8    So that's my knowledge.

9        Q.   Thank you.

10        Do you know what -- during what period of

11   time Mr. Rannazzisi held the senior position that

12   you and Mr. Milione replaced him for?

13        A.   I don't know for certain.

14        Q.   Okay.  If I said it was from 2007 to 2015,

15   does that sound right?

16        A.   For sure he was there at that time.

17        Q.   Okay.  And during that time, he was a

18   deputy assistant administrator of the Office of

19   Diversion Control --

20        A.   That's correct.

21        Q.   -- in the DEA?  Thank you.

22        Okay.  During your time at the DEA, did

23   you become familiar with the regulation relating to

24   identification and reporting of suspicious orders?

25        A.   Yes.

Page 25

1      Q.   And would that be -- was that -- is that

2   21 CFR Section 1301.74?

3      A.   It's in 1301.  I can't speak to which

4   section, but it's in 1301.

5      Q.   I'm going to give you the thing so you can

6   look at it.

7      MR. NICHOLAS:  Can we mark as Ashley 3, please,

8   the next exhibit.

9                          (Whereupon, ASHLEY Deposition

10                         Exhibit No. 3 was marked for

11                         identification.)

12  BY MR. NICHOLAS:

13     Q.   So Ms. Ashley, I've handed you a copy of

14  21 CFR Section 1301.74.  Do you recognize it --

15     A.   Yes.

16     Q.   -- as the regulation?

17     A.   Yes.

18     Q.   And I'm going to direct you probably most

19  specifically to Section B.  Is this section -- does

20  this section pertain to requirements directed to

21  distributors?

22     A.   Yes.

23     Q.   And distributors are registrants; is that

24  correct?

25     A.   Correct.

Page 26

1      Q.    If you look at Section B of this

2  regulation, does the regulation tell registrants,

3  specifically distributors, how to identify

4  suspicious orders?

5      A.    I guess my answer would be somewhat, yes.

6      Q.    Okay.  Is there an element of subjectivity

7  to it?

8      A.    Yes.

9      Q.    Does the regulation explain how to

10  identify an order of, quote, unusual size?

11      A.    How to do it?  Yes.

12      Q.    Does -- how does it do that?

13      A.    When it says to identify orders deviating

14  from -- substantially from a normal pattern, that

15  would make it unusual.  That's my opinion.

16      Q.    Does the regulation tell -- provide

17  guidance as to what constitutes an order of unusual

18  size?

19      A.    No.

20      Q.    Does the regulation provide guidance as to

21  what constitutes an order of unusual frequency?

22      A.    No.

23      Q.    Does the regulation provide guidance as to

24  what constitutes an order that deviates

25  substantially from normal ordering pattern?

Page 27

1      A.    I would have to say in general, yeah, it

2   does.

3      Q.    How does it do that?

4      A.    By saying it's deviating from the normal

5   pattern.

6      Q.    Okay.  And does it explain what that

7   means?

8      A.    You would need to know what was normal, so

9   I think so.

10      Q.    And would normal vary from case to case?

11      A.    Yes.

12      Q.    And situation to situation?

13      A.    Yes.

14      Q.    Does the regulation say what type of

15   reports are supposed to be submitted?

16      A.    The type?

17      Q.    Well, what they're supposed to look like,

18   what's supposed to be in them.

19      A.    The regulation does not say that.

20      Q.    Does the regulation say anything about

21   whether a registrant can ship an order that it has

22   reported as suspicious?

23      A.    It doesn't say if they should ship it.  Is

24   that what your question was?  Should they tell them

25   whether or not to ship it?  Is that what you're

Page 28

1   asking me?

2        Q.    Yeah.

3        A.    It does not.

4        Q.    Okay.  Now, during the time that you were

5   at the DEA, was this regulation ever changed?

6        A.    No.

7        Q.    To your knowledge, has the regulation ever

8   changed since it was promulgated in 1971?

9        MS. BACCHUS:  Objection.

10  BY MR. NICHOLAS:

11       Q.    If you know.

12       A.    I don't think so.

13       Q.    I would like to ask you a few questions

14  about pre-2005 if we can go all the way back then.

15  When you were a diversion investigator prior to

16  2005, do you recall that -- do you recall

17  registrants reporting suspicious orders to the DEA

18  field offices where you worked?

19       A.    Yes.

20       Q.    And at that time prior to 2005, do you

21  recall that those were called excessive purchase

22  reports?

23       MR. SHKOLNIK:  Objection to form.

24  BY MR. NICHOLAS:

25       Q.    Go ahead.

Page 29

1      A.    Yes.

2      Q.    Do you recall how often those reports were

3  submitted?

4      A.    No.

5      Q.    Were they submitted on a monthly basis?

6      MR. SHKOLNIK:  Objection.

7      THE WITNESS:  I don't know.  No.  I mean, I

8  don't know for sure.

9  BY MR. NICHOLAS:

10     Q.    Okay.  Do you remember what information

11  those reports contained?

12     A.    Somewhat, yes.

13     Q.    Can you tell me at all if you remember

14  what was in those reports?

15     A.    For the most part, they were line items of

16  transactions made by the distributors' sales and

17  the line items, computer-generated line items.

18     Q.    Now, did you have an understanding then as

19  to whether the orders listed on those reports had

20  been shipped?

21     A.    For the most part, I recall that they had,

22  yeah.

23     Q.    And back then, was that the standard

24  practice in the industry?

25     MR. SHKOLNIK:  Objection to form.

1      THE WITNESS:  I can't say that that was the

2   standard at the time.

3   BY MR. NICHOLAS:

4      Q.   Maybe that's a bad question.  Was that --

5   let me try it this way.

6           Was that -- in your personal experience

7   back then, was that typical of what you saw when

8   you got these excessive purchase reports, they were

9   reporting on orders that had been shipped?

10      MR. SHKOLNIK:  Objection.  Asked and answered.

11      THE WITNESS:  I believe so.  That's the best I

12   can say.

13   BY MR. NICHOLAS:

14      Q.   Okay.  Do you know why the registrants,

15   the distributors were submitting this particular

16   type of report?

17      A.   Yeah, required by regulation.

18      Q.   Okay.  And so in other words, what you

19   understood -- am I correct that your understanding

20   is that the distributors were submitting these

21   excessive purchase reports in order to meet their

22   obligations with their suspicious order reporting

23   obligations under 1301.74?

24      MR. SHKOLNIK:  Objection.

25      MS. BACCHUS:  Objection to form.

1       MR. SHKOLNIK:  Form.

2    BY MR. NICHOLAS:

3       Q.   You can answer.

4       A.   Yes.

5       Q.   Thank you.

6            Did you, while working in the field prior

7    to 2005, ever tell any registrant -- when I say

8    registrant, I probably should just say distributor.

9    It will probably be easier right?  I'll try to

10   remember to do that.

11           Did you, while working in the field

12   through 2004, ever tell any distributor that these

13   reports were insufficient to comply with the

14   regulation?

15      A.   Yes.

16      Q.   Who did you tell that to?

17      A.   I don't -- I couldn't recall a specific

18   name.

19      Q.   Okay.  And was that because of a specific

20   instance, a specific circumstance?

21      A.   Lots of circumstances.  We frequently got

22   excessive order reports and frequently had

23   questions about them because we felt that they were

24   not sufficient to -- we couldn't determine from

25   what they sent in exactly was excessive about it,

1  so we frequently made phone calls to the

2  registrants.

3      Q.   Okay.  And when you made those, what

4  was -- how did that work itself out?  You would

5  call the distributor or the registrant and have a

6  conversation.  Then what would happen?

7      MR. SHKOLNIK:  Objection.  This is --

8  objection.  This is going into investigation.  We

9  were told this was not allowed.

10  BY MR. NICHOLAS:

11      Q.   You can go ahead.

12      A.   The gist of the conversations would be we

13  received line items of sales transactions, and it's

14  labeled excessive purchase.  So how do we know?  I

15  mean, there's nothing identifying that it's

16  actually excessive.  So it was more of us trying to

17  get an understanding of what are you sending us.

18      Q.   Before 2005, had the DEA, to your

19  knowledge, issued any written policies or

20  guidelines to distributors regarding the suspicious

21  order requirements?

22      MR. SHKOLNIK:  Objection.  Form.

23      THE WITNESS:  I'm not certain.

24  BY MR. NICHOLAS:

25      Q.   Go ahead.

Page 33

1      A.    I'm not certain of that.

2      Q.    Before 2005, did the DEA have any internal

3   policies providing guidance as to what the DEA was

4   supposed to do with the excessive purchase reports?

5      MS. BACCHUS:  Objection to form.

6      THE WITNESS:  I don't recall.  I was just going

7   to say it was likely.

8   BY MR. NICHOLAS:

9      Q.    Okay.  All right.  I'm going to switch

10  topics and ask you a few questions about the

11  registration of new pharmacies prior to 2005, okay?

12          As a diversion investigator, did you

13  participate in the registration of new pharmacies?

14     MS. BACCHUS:  Objection.  Scope.

15  BY MR. NICHOLAS:

16     Q.    Go ahead.

17     A.    No.

18     MR. SHKOLNIK:  For the record, we were given

19  specific areas that were allowed to be covered, and

20  plaintiffs relied upon that.  We prepared for that.

21  And for the witnesses to be allowed to go outside

22  the scope is really, putting it nicely, unfortunate

23  and I think inappropriate.  We would ask the

24  government to please restrict the scope that you

25  limited us to.

1      MS. BACCHUS:  If you'd give me an opportunity,

2    I'm objecting on the grounds of scope.  She is not

3    authorized to testify today about registrations.

4    If you look at her Touhy authorization, it was not

5    about registrations.

6      MR. NICHOLAS:  Well, I think what I'm trying to

7    do here is talk to her about her -- I believe this

8    falls within the scope of her employment history.

9    I want to know if it falls within the scope of her

10   employment history.  If it doesn't, it doesn't.

11     MS. BACCHUS:  Well, you can ask her if she --

12   she can testify regarding her general employment

13   history, but not as to registration and what she

14   did in regards to that because that's not within

15   the scope of what she is authorized to testify to.

16   She can testify to what her general history was.

17     MR. NICHOLAS:  Okay.  I promise I'm not going

18   to argue with you about this a whole bunch because

19   time is ticking away.  The only thing I'll say is

20   that I believe in her prior testimony here today,

21   Ms. Ashley said that she supervised people who --

22   she supervised people who dealt with the

23   registration of pharmacies.  So to the extent that

24   she did that, I would like to be able to ask her

25   about that.

1    MS. BACCHUS:  No, that's not within her

2    authorization.  A request was not regarding

3    registration and talking about that.  If you go

4    back to the Touhy request, that was not part of the

5    request itself.

6    MR. NICHOLAS:  Okay.  If you're instructing her

7    not to answer, I'm going to move along.

8    MS. BACCHUS: Yes, I am.  I am.

9    BY MR. NICHOLAS:

10    Q.   Okay.  Let's jump to March of 2007.  In

11    2007, you returned to Chicago as the -- as a -- as

12    the diversion program manager; is that correct?

13    A.   Yes.

14    Q.   And in that connection -- in that job, you

15    were responsible for dealing with the diversion

16    program in five states?

17    A.   Uh-huh.

18    Q.   And around that time, around 2007, did the

19    DEA tell distributors at some point in that time

20    frame that excessive purchase reports would no

21    longer comply with their suspicious order reporting

22    requirements?

23    MS. BACCHUS:  Objection to form.

24    MR. SHKOLNIK:  Objection to form.

25

1   BY MR. NICHOLAS:

2        Q.   You can go ahead.

3        A.   I don't recall if that was 2007.

4        Q.   Do you recall it happening at some point?

5        A.   Your question was not submit excessive

6   purchase reports?

7        Q.   Did the DEA tell distributors that they --

8   that excessive purchase reports would no longer

9   serve to meet the requirements under the

10  regulation?

11       MR. SHKOLNIK:  Objection to form.

12       MS. BACCHUS:  Objection.  Form.

13       THE WITNESS:  The manner in which they were

14  submitted, DEA did tell registrants in notification

15  to registrants that the manner it had been

16  submitted would change.

17  BY MR. NICHOLAS:

18       Q.   Do you remember when that was?

19       A.   I thought it was before.  Maybe 2006.

20       Q.   Okay.  And in 2006 or 2007, did the DEA

21  communicate to distributors that they should not

22  ship orders that they reported to the DEA as

23  suspicious?

24       MS. BACCHUS:  Objection.  Form.

25       THE WITNESS:  Should not?

Page 37

1   BY MR. NICHOLAS:

2       Q.   Let me say it again.

3       A.   Yes, please.

4       Q.   In or around 2006, 2007, did the DEA

5   communicate to distributors that they should not

6   ship orders that they reported to the DEA as

7   suspicious?

8       MS. BACCHUS:  Objection to form.

9       MR. SHKOLNIK:  Objection.  Form.

10      THE WITNESS:  I do not recall that.

11  BY MR. NICHOLAS:

12      Q.   Do you recall whether at any point the DEA

13  told or instructed distributors that they should no

14  longer ship orders that were reported as

15  suspicious?

16      MR. SHKOLNIK:  Objection to form.

17      MS. BACCHUS:  Objection.  Form.

18      THE WITNESS:  I do recall conversations about

19  it, yeah.  I won't call it a conversation.  A

20  presentation.

21  BY MR. NICHOLAS:

22      Q.   A presentation?

23      A.   Yeah.

24      Q.   Okay.  What was the presentation that you

25  recall?

1      A.   It was one -- you know what, I don't want

2   to guess.  I just remember --

3      Q.   Don't guess.

4           Okay.  Do you recall that you, yourself

5   were unclear as to this issue of whether

6   distributors should not ship orders that they had

7   reported as suspicious?

8      MR. SHKOLNIK:  Objection.  Form.

9      THE WITNESS:  I never felt unclear.  I never

10  felt unclear.

11     MR. NICHOLAS:  Can we mark the next exhibit,

12  please.

13                      (Whereupon, ASHLEY Deposition

14                       Exhibit No. 4 was marked for

15                       identification.)

16  BY MR. NICHOLAS:

17     Q.   This is an e-mail to Barbara Boockholdt

18  from you dated February 24th of 2010, and it's CC

19  to Delores Williams.  Let me just, first of all,

20  ask you who Barbara Boockholdt is.  I know she was

21  with the DEA at this time.

22     A.   Barbara Boockholdt is a diversion

23  investigator.  At the time she was a section chief

24  in the regulatory section in headquarters.

25     Q.   And who is Delores Williams?

Page 39

1      A.    Delores Williams was a group supervisor in

2    the Merrillville office under the Chicago field

3    division.

4      Q.    So when you wrote this e-mail in 2010, you

5    were in Chicago, correct?

6      A.    Yes.

7      Q.    So at that time you were the diversion

8    program manager for five states, right?

9      A.    Yes.

10     Q.    I'm going to direct your attention to the

11   second paragraph, and I'll read it out loud for the

12   record.  You write to Barbara Boockholdt about

13   Kroger's submission of an excessive movement

14   report.  Your second paragraph reads as follows:

15   My second concern is the sentence, quote, when the

16   registrant reports a customer whose order they

17   determine to be suspicious, that the customer's

18   order cannot be fulfilled, unquote, are you asking

19   that the field contact registrants and tell the

20   registrant that they cannot fill an order based

21   solely on our review of a suspicious order report,

22   question mark, question mark.  On what authority do

23   we have to tell a registrant that they cannot fill

24   an order absent an investigation and clear

25   violations?

Page 40

1          Having read that, do you recall now that

2     at this point in time, you were not clear as to

3     whether there was authority to tell distributors

4     that they could not ship suspicious orders?

5          MR. SHKOLNIK:  Objection.  Form.

6     BY MR. NICHOLAS:

7          Q.   Go ahead.

8          A.   Well, actually, at that time I was

9     fielding -- I was sort of pulling Barbara out of

10    it.  It was more to the contrary.  I've always felt

11    in my time as a diversion investigator that it is

12    an expectation that a registrant wouldn't ship an

13    order that they identified as suspicious.  It's

14    the -- ultimately the registrant's decision to

15    ship, so it's not DEA's.  That's my -- in my

16    practice as a diversion investigator to instruct a

17    registrant, it's the registrant's discretion

18    whether or not they're going to ship.  It is the

19    expectation that if they identify it as suspicious

20    that they wouldn't, but they have to make the call.

21         Q.   So it correct that in your view, it was an

22    expectation, but not a requirement?

23         MR. SHKOLNIK:  Objection to form.  Misstating

24    the witness's testimony.

25         MR. NICHOLAS:  Well, she can tell me whether

1   it's correct or incorrect.

2        THE WITNESS:  Expectation and not a

3   requirement?  No.  The requirement was that they

4   make the decision.

5   BY MR. NICHOLAS:

6        Q.   Okay.

7        A.   That was the requirement.

8        Q.   Okay.  Prior to 2007, did the DEA work

9   with distributors to review and approve suspicious

10  order monitoring programs?

11       MS. BACCHUS:  Objection to form.

12  BY MR. NICHOLAS:

13       Q.   Prior to 2007.

14       A.   Prior to 2007, I was in headquarters.  Did

15  they work with registrants?

16       Q.   Yeah.

17       A.   I don't know if I can speak on behalf of

18  the agency.  I can say that I did.

19       Q.   You did?

20       A.   Yeah.

21       Q.   Okay.  Was there a point in time when the

22  DEA adopted a policy, if you want to call it that,

23  of ceasing to approve or endorse any specific

24  system for suspicious order reporting systems?

25       MS. BACCHUS:  Objection to form.

Page 42

1      THE WITNESS:  So we never did approve them or

2   endorse the systems.  What we did was have

3   discussions with the registrants and sort of just

4   discussed with them if their system was effective,

5   but we never approved.

6   BY MR. NICHOLAS:

7      Q.   Are you aware of whether the DEA approved

8   AmerisourceBergen's system in the late '90s system

9   of reporting?

10      A.   I'm not aware.

11      Q.   Now, when you say that the DEA never

12   endorsed or approved any system, did the DEA work

13   with registrants in connection with their systems?

14      MS. BACCHUS:  Objection to form.

15   BY MR. NICHOLAS:

16      Q.   I should say did you.  Did you?

17      A.   Did I?  Yes.  I mean, you know, you go to

18   a registrant's location, and they show you what

19   their system is, and you have a discussion about

20   whether or not it's effective or if you feel that

21   it's effective.  You may make some suggestions that

22   would help them, you know, just to ensure

23   compliance, but there was never, you know, I

24   approve the system.  It's just a discussion.

25      Q.   Did those sorts of discussions cease

Page 43

1   sometime after 2007?

2       A.   Me personally, no.

3       Q.   You continued to work with distributors

4   and registrants?

5       A.   After 2003?

6       Q.   Yes.

7       A.   I'm trying to think where was I.

8       Q.   You were in Chicago.

9       A.   I was in Chicago.  No, I always had those

10  discussions.

11      Q.   Okay.  I'm going to dig out a document.

12  Just give me a second.

13      MR. NICHOLAS:  Can we go off the record just so

14  I can ask one question.

15      THE VIDEOGRAPHER:  We're off the record at

16  10:13 a.m.

17                      (Whereupon, a discussion was

18                       had off the record.)

19      THE VIDEOGRAPHER:  We are back on the record at

20  10:14 a.m.

21      MR. NICHOLAS:  I'd like to mark this as the

22  next exhibit in this deposition, and I confess I

23  have forgotten the number.  Is it No. 4?  5.

24  Ashley 5.

25

Page 44

1              (Whereupon, ASHLEY Deposition

2              Exhibit No. 5 was marked for

3              identification.)

4  BY MR. NICHOLAS:

5      Q.   What I've marked is a copy of a letter

6  dated December 27, 2007 over the signature of

7  Joseph T. Rannazzisi, deputy assistant

8  administrator, Office of Diversion Control.  It

9  begins dear registrant, and then there's text.

10 Have you seen this letter before?

11     A.   Yes.

12     Q.   Okay.  How would you describe -- what's

13 the letter?  What is it?

14     A.   It's -- it goes to the registrant.  It

15 provides just sort of guidance to registrants on

16 how they should report, when they should report

17 suspicious orders.

18     Q.   Was this a requirement, or was it -- were

19 these requirements, or was this guidance?

20     MS. BACCHUS:  Objection.  Form.

21     THE WITNESS:  It says requires.

22 BY MR. NICHOLAS:

23     Q.   Okay.  I'd like to direct you to the

24 second paragraph, the middle of the paragraph where

25 the -- and I'll read from the middle of the

Page 45

1    paragraph to the end if that's okay.

2         A.   Okay.

3         Q.   The regulation clearly indicates that it

4    is the sole responsibility of the registrant to

5    design and operate such a system.  Accordingly, DEA

6    does not approve or otherwise endorse any specific

7    system for reporting suspicious orders.  Past

8    communications with DEA, whether implicit or

9    explicit, that could be construed as approval of a

10   particular system for reporting suspicious orders

11   should no longer be taken to mean that DEA approves

12   a specific system.

13           Do you see that?

14        A.   Yeah.

15        Q.   Okay.  Now that you've read this, does it

16   refresh your memory as to whether prior to this

17   letter there were instances where the DEA did give

18   its approval of a particular system?

19        MR. SHKOLNIK:  Objection to form.

20        MS. BACCHUS:  Objection to form.

21   BY MR. NICHOLAS:

22        Q.   I'm just asking.

23        A.   I was not aware after even reading this

24   the DEA ever approved systems for order.  Not in my

25   experience.

1      Q.   During your tenure in the Office of

2   Diversion --

3      MR. NICHOLAS:  Can somebody go back on mute,

4   please.  Thank you.

5   BY MR. NICHOLAS:

6      Q.   Next topic.  During your tenure in the

7   Office of Diversion Control, did you believe it was

8   important to communicate with distributors?

9      A.   Yes.

10     Q.   And does that include -- does that

11  communication -- strike that.

12          And does that include communicating with

13  distributors to make sure that they understand what

14  the DEA's expectations are?

15     A.   Yes.

16     Q.   Are you aware that the DEA has been

17  criticized for its failure to communicate with the

18  distributor community?

19     A.   Yes.

20     Q.   And are you aware that members of Congress

21  have openly criticized the DEA's lack of

22  communication with the registrant distributor

23  community in relation to the opioid epidemic?

24     MR. SHKOLNIK:  Objection.  Form.

25     THE WITNESS:  The tail end, the end relations

Page 47

1   of the opioid epidemic, but the beginning -- the

2   criticism, I'm aware of that.

3   BY MR. NICHOLAS:

4        Q.   When you became the deputy assistant

5   administrator at DEA headquarters in 2015, was part

6   of your mission to improve that relationship

7   between the DEA and the distributors?

8        A.   Yes.

9        Q.   Now, we've mentioned Lou -- is it Milione

10   or --

11       A.   Milione.

12       Q.   You pronounce the E?

13       A.   Yeah, he does.

14       Q.   We've mentioned him, but who is

15   Mr. Milione, and what was his role at the DEA as of

16   January 2016?

17       A.   January 2016 Lou Milione was the assistant

18   administrator for the diversion control division.

19       MR. NICHOLAS:  I'd like to mark the next

20   exhibit, please, as Ashley 6.

21                        (Whereupon, ASHLEY Deposition

22                        Exhibit No. 6 was marked for

23                        identification.)

24   BY MR. NICHOLAS:

25       Q.   So what I've handed you are really two

1   documents.  The first is a covering e-mail from

2   Matthew Strait at the DEA to Mr. Milione with CC to

3   Gary Owen and Christopher Scheuler, and the

4   attachment is something headed DEA Communication

5   With Registrants.  The attachment is dated

6   September 29, 2015.  The covering e-mail is dated

7   January 8, 2016.  I just have a few questions about

8   this.

9            You can see in this e-mail chain that

10  Mr. Strait is sending the attachment to

11  Mr. Milione, and he says Lou, as -- Mr. Milione's

12  first name is Lou?

13       A.   Yes.

14       Q.   As discussed here are the TP, which I'm

15  going to speculate is talking points?

16       A.   Correct.

17       Q.   Documents that we prepared for Jack's last

18  hearing that pertain to the issues that may be

19  raised during the January 27th hearing.

20            Do you see that?

21       A.   Yes.

22       Q.   So it looks like Mr. Milione was about to

23  testify somewhere, and he was being provided with

24  documents, you know, talking points, correct?

25       A.   Yes.

 1       MS. BACCHUS:  Objection.

 2    BY MR. NICHOLAS:

 3       Q.   Let's look at the talking points.  So in

 4    the talking points provided to Mr. Milione, there's

 5    a question posed, and the question is I have heard

 6    many complaints from manufacturers and distributors

 7    that DEA continually fails to adequately

 8    communicate with them.  Would you agree with me

 9    that DEA has fallen short in its communications --

10    in its communication responsibilities with

11    registrants and that DEA can do better in serving

12    those with whom they regulate?

13           Do you see that?

14       A.   Yes.

15       Q.   And then the first part of the talking

16    point, proposed talking point response was we've

17    heard from various members of Congress regarding

18    this issue, and Acting Administrator Rosenberg and

19    I have made some important changes within the

20    Office of Diversion Control, the program office

21    that has direct regulatory oversight of our

22    1.6 million registrants.

23           So I guess my question to you is what were

24    the important changes within the Office of

25    Diversion Control that's being referred to in these

Page 50

1   talking points, if you know?

2      A.    So at the time I was there in headquarters

3   working for Lou, and the changes were that we were

4   accepting meetings in the headquarters office from

5   registrants.  We gave a directive out to the field

6   to increase their engagement.  We turned back on a

7   few initiatives that had been turned off.  Well, I

8   don't want to say that had been turned off.  They

9   weren't given as much attention, I'd say that, and

10  engagement with registrants.

11     Q.   Under Mr. Rannazzisi's tenure, was he not

12  accepting meetings at headquarters with

13  distributors?

14     MS. BACCHUS:  Objection.

15     THE WITNESS:  I don't exactly know.  I wasn't

16  there.  I can tell you those are complaints we got.

17  BY MR. NICHOLAS:

18     Q.   And when you say that you either turned

19  back on or gave more much more priority to some

20  initiatives, were those initiatives ones that had

21  been either turned off or deprioritized by under

22  the prior regime?

23     MR. SHKOLNIK:  Objection to form.

24     MS. BACCHUS:  Objection.

25     MR. SHKOLNIK:  Misstates testimony.

1      MR. NICHOLAS:  I'm asking.  I'm not stating

2  anything.

3  BY MR. NICHOLAS:

4      Q.   Go ahead.

5      A.   I don't want to say that he deprioritized

6  it, but there were -- I'll just give you an

7  example.  There were meetings that registrants

8  would request, and they weren't -- they weren't

9  happening as often, and so we just directed our

10  liaison of policy section to accept the meetings.

11  So it just made it a priority.

12      Q.   Did you see a change?

13      A.   Yes.

14      Q.   Do you recall giving a presentation in

15  October of 2016 to NASCSA?

16      A.   National Association of Chain Pharmacies

17  and Distributors?

18      Q.   I'm not sure that's what the acronym

19  stands for.  Hold on one second.

20      MR. MAHADY:  National Association of State

21  Controlled Substance Authorities?

22      THE WITNESS:  I don't recall.  I don't recall.

23  BY MR. NICHOLAS:

24      Q.   Do you recall giving a presentation in New

25  Orleans?

1      A.    Yes.

2      Q.    Okay.  I think that's the one we're

3   talking about.

4      A.    That helps, yes.

5      Q.    If I say it was in October of 2016, does

6   that sound about right?

7      A.    Probably.

8      Q.    And it was to this group, this NASCSA

9   group?

10     A.    Yeah.

11     MR. NICHOLAS:  Let's mark as the next exhibit,

12  please, as Exhibit 7, Ashley 7 this next document.

13                        (Whereupon, ASHLEY Deposition

14                        Exhibit No. 7 was marked for

15                        identification.)

16     MR. SHKOLNIK:  I want to note an objection.

17  Late last night Purdue Pharma turned over or

18  produced for the first time a PowerPoint

19  presentation for October 2016, and I can only

20  assume this is the document you're going into next.

21  It's not?  Well, we'll bring that issue up later at

22  a break.

23     MR. NICHOLAS:  Okay.

24     MS. BACCHUS:  We haven't gotten the document.

25     MR. NICHOLAS:  I'm sorry.

Page 53

1    BY MR. NICHOLAS:

2        Q.   Now, Ms. Ashley, what I've given you is a

3    document, I believe, was produced in this

4    litigation by Purdue in which there's a series of

5    e-mails, but the one -- I'm not interested in the

6    e-mails that talk about the dinner plans and how

7    much the person loves New Orleans restaurants and

8    stuff like that.  I'm only interested in the one

9    from David Haddox to Kathleen Konka dated

10   October 19, 2016, and it's regarding -- the subject

11   is Re DEA update from NASCSA meeting.

12            And I apologize.  That's not even the

13   e-mail I want you to read.  Let's start that again.

14   Go back further.  What I want you to take a look

15   at, the only thing I need you to look at is -- it's

16   from David Haddox to group, a bunch of people.  I'm

17   not sure --

18       MR. SHKOLNIK:  Can you tell us the time?

19       MR. NICHOLAS:  Yes.  This one is from David

20   Haddox.  It's dated October 19, 2016 at 4:56 p.m.

21   BY MR. NICHOLAS:

22       Q.   The subject is DEA update from NASCSA

23   meeting.  And the only reason I'm showing this to

24   you is because I want to remind you, perhaps, of

25   what you said in the meeting.

1    A.    Okay.

2    Q.    This summarizes what you said in the

3    meeting.  You can tell me whether it's accurate or

4    not.  The writer, Mr. Haddox says this morning I

5    attended a presentation by Demetra Ashley,

6    associate deputy assistant administrator, DEA.

7    Some interesting information.  And I'm going to

8    direct you -- I'm going to direct you actually to

9    No. 4.

10          No. 4 reads -- he has numbered

11   paragraphs 1, 2, 3, 4, 5, 6 and so forth.  And

12   No. 4 reads distributor initiative, slide 16, A,

13   this is a program started in 2005 put on hold and

14   restarting now.

15          Do you remember -- what do you remember

16   about this, about the distributor initiative?

17   A.    Again, that it started in 2005.  I

18   remember that it's an opportunity to speak with

19   distributors and to show them their information

20   that they report to our folks and have an informal

21   dialogue on how DEA views their transactions and

22   have a discussion with them about how they view it.

23   We have a discussion about the global issue with

24   the opiate epidemic, and it's just an informal

25   discussion of the business practices of that

Page 55

1    particular distributor.

2        Q.    Would you agree that it sounds like a

3    pretty healthy and good thing to do?

4        MS. BACCHUS:  Objection.

5        MR. SHKOLNIK:  Objection.

6        THE WITNESS:  I agree it's an effective

7    initiative, yes.

8    BY MR. NICHOLAS:

9        Q.    And it was put on hold for 11 years?

10       A.    No.  There's a gap there.  It started in

11   2005.  It was put on hold -- I'm told from my at

12   the time section chief that it was put on hold in

13   about 2013.

14       Q.    2013?

15       A.    Yeah.  Yeah, it was put on hold.

16       Q.    Why?

17       A.    Resources, just having enough of her

18   staff, and this is a conversation I had with my

19   section chief at the time, that they had a lot on

20   their plate at the time, a lot of initiatives, and

21   they just didn't have the staff to support it at

22   the time.

23       Q.    So it was on hold, in your recollection,

24   for the three years from 2013 to 2016?

25       A.    Yeah, and that's a guess, but around that

Page 56

```
 1   time.
 2        Q.   Now, if you look at No. 1 in Mr. Haddox's
 3   list of things that you talked about, he writes she
 4   made frequent references to, quote, different
 5   management, unquote, at DEA implying a very
 6   different philosophy and approach than has existed
 7   in the recent past.
 8             Is that an accurate statement description
 9   by him?
10        A.   Yeah, I guess I agree with that.
11        Q.   Finally, can you look at No. -- can you
12   look at subparagraph 9, the last thing under
13   Mr. Haddox's e-mail.  He writes she stated an NPRM
14   regarding suspicious order monitoring may appear in
15   the Federal Register in the spring of 2017.  She
16   said DEA has been had been interacting with
17   registrants to enable them to propose a reasonable
18   rule.
19             Do you see that?
20        A.   Yes.
21        Q.   Okay.  Did you say that at the meeting, or
22   do you recall reporting about that?
23        A.   I don't recall, but it's likely.
24        Q.   Is it true?
25        A.   Is this true?  The statement as it's
```

Page 57

1   written, no.

2        Q.   What's untrue about it?

3        A.   I likely said that we were working on a

4   suspicious order monitoring.  Appearing in spring

5   of 2017, I don't recall that.

6        Q.   Let me just ask you as of this date at

7   least, the day he wrote this e-mail, which is

8   October of 2016, was the DEA working on possible

9   changes to the suspicious order monitoring

10  regulation?

11       A.   Yes.

12       Q.   When did the DEA begin working on possible

13  changes to the suspicious order monitoring

14  regulation?

15       A.   So I wouldn't -- I guess I'm not clear on

16  where to begin.  The discussions?

17       Q.   Yeah.

18       A.   The discussions would have been early

19  2016.

20       MR. NICHOLAS:  Let's take a break.  On the

21  theory we've gone more than an hour, let's take a

22  break.

23       THE VIDEOGRAPHER:  We're off the record at

24  10:38 a.m.

25

Page 58

1                    (Whereupon, a short break was

2                    taken.)

3      THE VIDEOGRAPHER:  We are back on the record at

4    10:59 a.m.

5    BY MR. NICHOLAS:

6      Q.  During the course of your time -- let me

7    start again by saying back on the record.  Hi.

8    Let's keep going.

9          During the course of your time at the DEA,

10   did the DEA communicate with industry groups or

11   trade associations such as HDMA?

12     MS. BACCHUS:  Objection.  Scope.

13     THE WITNESS:  I did, yes.

14   BY MR. NICHOLAS:

15     Q.  Was HDMA the industry group for the

16   distributors?

17     A.  Yes.

18     Q.  Did it later come to be referred to as

19   HDA?

20     A.  Yes.

21     Q.  Have you spoken at HDMA conferences?

22     A.  I don't recall.

23     Q.  At any time during your tenure at the DEA,

24   did you learn that the distributors were confused

25   about their suspicious order regulations and wanted

Page 59

1    more guidance from the DEA?

2         A.    I can say in speaking with distributors,

3    they expressed that they wanted more clarification.

4         Q.    And so you heard that directly from the

5    distributors?

6         A.    Yes.

7         Q.    Okay.  Did you also hear it from HDA, if

8    you remember?

9         A.    I have to ask a question.  Is John Gray --

10        Q.    Yes.

11        A.    Yes.  Yes.

12        Q.    So just for the record, I'm being terrible

13   about this.  We should do this properly.  Do you

14   know who John Gray is?

15        A.    Yes.

16        Q.    Is he the head of HDMA, now HDA?

17        A.    He was when I was with DEA.

18        Q.    And you communicated with him?

19        A.    Yes.

20        Q.    And he expressed concerns to you about the

21   distributors seeking more clarification or clarity

22   as to the suspicious order reporting requirements?

23        A.    Yes.

24        Q.    How often would you do that, would you

25   say?

                                                        Page 60

1       A.   I don't recall exactly.  I spoke with him

2    a few times.

3       Q.   Do you remember -- what was it -- if you

4    remember, what was it that he was saying they were

5    confused or needed clarification about?

6       A.   They wanted specific clarification on when

7    and when not to ship.  They wanted, in my opinion,

8    DEA to make the call on when they should and should

9    not ship.  John just expressed that DEA wasn't

10   being clear, and I expressed back I felt that we

11   were clear.

12      Q.   Okay.  What is the earliest that you

13   recall hearing that the distributors wanted more

14   clarification?

15      MR. NICHOLAS:  Let's go off the record.

16      THE VIDEOGRAPHER:  We're off the record at

17   11:03 a.m.

18                        (Whereupon, a short break was

19                         taken.)

20      THE VIDEOGRAPHER:  We're back on the record at

21   11:04 a.m.

22   BY MR. NICHOLAS:

23      Q.   Do you know or remember when you first

24   started hearing from John Gray on these issues?

25      MS. BACCHUS:  Objection.  Vague.  What issues?

1      MR. NICHOLAS:  I'll clarify.

2   BY MR. NICHOLAS:

3      Q.   Do you recall when you first started

4   hearing from John Gray that the distributors were

5   looking for more clarity in connection with the

6   suspicious order monitoring requirements?

7      A.   The first time I can recall was in

8   February of 2016 when we held a -- DEA hosted a

9   meeting with registrant organizations and HDA was

10  one of them.  So there were several organizations

11  that were present, and I think that's the first

12  time I met John Gray.  I don't recall, but I think

13  it was.

14     Q.   Do you recall Mr. Gray also communicating

15  that the distributors were seeking clarification as

16  to what constituted a suspicious order?

17     A.   Yes.

18     MR. NICHOLAS:  I'd like to mark as the next

19  exhibit Ashley 8.

20                      (Whereupon, ASHLEY Deposition

21                      Exhibit No. 8 was marked for

22                      identification.)

23  BY MR. NICHOLAS:

24     Q.   Ashley 8 is a letter with an attachment.

25  The letter is from Mr. Gray, John Gray, to Michelle

Page 62

1    Leonhart at the DEA.  It's dated June 1, 2011, and

2    it attaches a summary of a meeting that was held

3    between the DEA and HDMA on December 7th of 2010.

4           Do you recall -- have a recollection of

5    this document?

6        A.   I do not.

7        Q.   Okay.  Do you see that the document is

8    sent to Ms. Leonhart and CC to Joseph Rannazzisi

9    and Kathy Gallagher?

10       A.   Yes.

11       Q.   Who is -- what was Kathy Gallagher's role

12   at this period of time on June 1, 2011?

13       A.   She was in headquarters as the acting

14   section chief of liaison and policy.

15       Q.   So am I correct that this letter from John

16   Gray -- I should ask you also who is Michelle

17   Leonhart?

18       A.   Michelle Leonhart was the administrator

19   for DEA.  I believe she retired in 2015.

20       Q.   Okay.  So am I correct that this letter

21   was really going to the top brass at DEA?

22       MS. BACCHUS:  Objection.

23   BY MR. NICHOLAS:

24       Q.   To leadership?

25       A.   Yeah.  That's Michelle Leonhart.

Page 63

1      Q.   And Mr. Rannazzisi and Ms. Gallagher, they
2  were all sort of in senior leadership roles?
3      A.   Yes.
4      Q.   Now, Ms. Leonhart encloses a document, and
5  I'm not going to subject you to the whole document,
6  but I am going to ask you a few questions about
7  what's inside it if that's okay.  If you look at
8  the summary of the DEA HDMA meeting itself, the
9  first page of it, and you go to the section that's
10  headed -- well, let's start with the first sentence
11  of the introduction just so we know what we're
12  looking at here.
13          This was a meeting that was requested by
14  HDMA of the DEA.  Can you see that from the first
15  sentence of the letter?
16      A.   Yes.
17      Q.   And now let's go to the key HDMA
18  discussion points and look at the second full
19  paragraph.  It says HDMA pointed out that while
20  much of the DEA guidance on controlled substance
21  suspicious order monitoring indicates wholesale
22  distributors' legal responsibilities, its practical
23  value is more limited.  It then goes -- do you see
24  that?
25      A.   I see that.

1      Q.   It then goes on to say for example, the

2   current regulatory guidance indicates that, quote,

3   suspicious orders include orders of unusual size,

4   orders deviating substantially from a normal

5   pattern and orders of unusual frequency.  This

6   certainly identifies appropriate themes on which

7   the wholesale distributor should base their

8   suspicious orders monitoring programs, but it is

9   also very subjective.

10           Do you agree with that?

11      A.   I agree that it's subject to the

12   distributor, yes.

13      Q.   And that it's subjective?

14      MR. SHKOLNIK:  Objection to form.

15      MS. BACCHUS:  Is there a question?

16      MR. NICHOLAS:  Yeah.

17   BY MR. NICHOLAS:

18      Q.   Do you also agree that there is

19   subjectivity -- well, strike that.

20           Do you agree with the next sentence that

21   says patterns can vary greatly or over time or even

22   with a single customer?

23      A.   I agree with that, yes.

24      Q.   Now, at this point, this is 2010.  You're

25   in Chicago, correct?

1     A.   Yes.

2     Q.   Okay.  So you're -- so you're in a

3  supervisory position, but you're in the field.

4  You're not in headquarters?

5     A.   Correct.

6     Q.   Did headquarters ever inform its

7  leadership in the field like you that the

8  distributors had raised these concerns?

9     MS. BACCHUS:  Objection.  Form.

10     THE WITNESS:  I don't recall directly from

11  headquarters.  We were engaging -- myself, I was

12  engaging with the distributors in my division.

13  BY MR. NICHOLAS:

14     Q.   So you were aware of these kinds of

15  concerns from the distributors already?

16     A.   I wouldn't say it that way.  I would just

17  say that I had several discussions with

18  distributors about their suspicious order

19  monitoring.

20     Q.   Well, then let me ask you were you aware

21  of the concerns, specific concerns raised in the

22  paragraph I just read to you?

23     MR. SHKOLNIK:  Objection.

24     MS. BACCHUS:  Objection.  Asked and answered.

25

Page 66

1   BY MR. NICHOLAS:

2       Q.   Were you aware of them from the

3   distributors?

4       MR. SHKOLNIK:  Objection.  Asked and answered

5   line by line.

6       THE WITNESS:  So I would have to say no, not

7   these specific things.

8   BY MR. NICHOLAS:

9       Q.   Okay.  Would it have been helpful for you

10  to hear this from leadership that the distributors

11  were raising these specific things?

12      MR. SHKOLNIK:  Objection.  Outside the scope.

13      MS. BACCHUS:  Objection.  Calls for

14  speculation.

15      THE WITNESS:  I would have to say I don't

16  recall.  They -- we had several trainings, so I

17  don't recall.

18  BY MR. NICHOLAS:

19      Q.   Well, is this the kind of information that

20  it's helpful for you to know?

21      A.   Yes.

22      Q.   If you go to the next page, HDMA

23  recommendations, it says that HDMA encouraged DEA

24  to take the following steps, and there are four

25  bullet points.  I'm only going to ask you about

Page 67

1    three of them.  Let's start with the first one.

2            The first bullet point reads provide

3    better clarifications in writing and with the

4    opportunity for public comment of wholesale

5    distributors' responsibilities for suspicious

6    orders monitoring.  HDMA emphasized the need for

7    more specificity on what constitutes a suspicious

8    order and on DEA's expectations for what wholesale

9    distributors must do to monitor, identify and

10   report.

11       A.   I'm sorry.  I'm not on the same page as

12   you.

13       Q.   I'm sorry.  It's Page 2 of the summary.

14       A.   Okay.

15       Q.   We can take a step back.

16       A.   I have it.

17       Q.   It's four bullet points in the middle.  Do

18   you see that?  These are HDMA recommendations, and

19   it says HDMA encouraged DEA to take the following

20   steps.  I'll read it again.  I'll read the first

21   paragraph -- the first bullet point again.

22            The first bullet point is, and I should

23   say -- I should be clearer about this.  It says

24   HDMA encouraged DEA to take the following specific

25   steps.  First bullet point, provide better

Page 68

1    clarifications in writing and with the opportunity

2    for public comment of wholesale distributors'

3    responsibilities for suspicious orders monitoring.

4    HDMA emphasized the need for more specificity on

5    what constitutes a, quote, suspicious order and on

6    DEA's expectations for what wholesale distributors

7    must do to monitor, identify and report.  Do you

8    see that?

9         A.   Yes.

10        Q.   Now, let's start with this one.  To your

11   knowledge, has the DEA acted on this specific step?

12        MR. SHKOLNIK:  Objection.  This is -- sorry.

13        MS. BACCHUS:  Objection.  She can't testify on

14   behalf of DEA.  She can testify about her personal

15   knowledge to the extent she knows.

16        MR. NICHOLAS:  Okay.

17        MR. SHKOLNIK:  And objection.  The problem here

18   is the DEA's response is listed on this letter, and

19   you're asking for her opinion and her recollection,

20   and that's inappropriate.  It's outside the scope

21   of what we were told were the limitations.

22   BY MR. NICHOLAS:

23        Q.   To your knowledge, has the DEA acted with

24   regard to this specific step that was requested by

25   HDMA?

Page 69

1      A.    Has DEA acted on providing better

2   clarification for suspicious order monitoring?

3      Q.    Better clarifications in writing and with

4   the opportunity for public comment.

5      A.    Yes.

6      Q.    In what format has the DEA provided

7   written clarification of the suspicious order

8   monitoring requirement?

9      MS. BACCHUS:  Again, objection to scope.  She

10   can't testify on behalf of DEA.

11      MR. NICHOLAS:  I'm just asking about her

12   personal knowledge.

13      THE WITNESS:  In my personal knowledge, you're

14   saying providing in writing.  I was -- I understood

15   the question as has DEA acted on it, which would

16   be, you know, the discussions, the meeting and

17   engagement with registrants and that sort of thing.

18   So I was encompassing all of it, not just in

19   writing.

20   BY MR. NICHOLAS:

21      Q.    To your knowledge, your personal

22   knowledge, has any further writing, written

23   clarification been issued from 2010 until today

24   from the DEA?

25      MR. SHKOLNIK:  Objection.

1       THE WITNESS:  From my personal knowledge and

2    management over the policy and liaison section, I

3    know there were letters drafted and responding to

4    industry questions on suspicious orders.  So there

5    were written communications.

6    BY MR. NICHOLAS:

7       Q.   Has the DEA, in your personal knowledge,

8    provided any additional written definition of what

9    a suspicious order is?

10      MR. SHKOLNIK:  Objection.

11      THE WITNESS:  Published publicly, no.

12   BY MR. NICHOLAS:

13      Q.   Published anywhere?

14      A.   No.

15      Q.   To your personal knowledge, has the DEA

16   been giving consideration to doing this for a

17   period of time?

18      MS. BACCHUS:  Objection.

19      THE WITNESS:  The period of time to my

20   knowledge, yeah, beginning 2015.

21   BY MR. NICHOLAS:

22      Q.   So to your personal knowledge, since 2015,

23   DEA has been giving consideration to providing an

24   additional definition of a suspicious order?

25      A.   Yes.

1      Q.   And that that definition has not yet been
2   forthcoming; is that correct?
3        MR. SHKOLNIK:  Objection.
4        MS. BACCHUS:  Objection.
5        THE WITNESS:  I don't believe so.
6   BY MR. NICHOLAS:
7      Q.   Okay.  And according to this document,
8   HDA, speaking for -- on behalf of its constituent
9   distributors, was asking for written clarification
10  of the definition of a suspicious order as early as
11  2010.
12       MR. SHKOLNIK:  Objection.
13       MS. BACCHUS:  Objection.
14  BY MR. NICHOLAS:
15     Q.   Is that right?
16       MS. BACCHUS:  The witness said she hasn't seen
17  the document.
18       THE WITNESS:  This document, I've never seen
19  it.
20  BY MR. NICHOLAS:
21     Q.   But looking at it, does it appear --
22     A.    It appears looking at the document, yes.
23     Q.   Okay.  Let's go to the second point, the
24  second bullet point.  HDA asked that the DEA update
25  the, quote, letters to industry provided in 2006

Page 72

1   and 2007.  Do you see that?

2        A.   Yes.

3        Q.   And those letters to industry, are

4   those -- to your understanding, would that be a

5   reference to the letters that Mr. Rannazzisi wrote,

6   the dear registrant letters in 2006 and 2007?

7        A.   Yes.

8        MS. BACCHUS:  Objection.  Vague.

9        THE WITNESS:  Yes.

10  BY MR. NICHOLAS:

11       Q.   To your knowledge, were there updated

12  letters to industry provided after 2007?

13       A.   I don't recall that.

14       Q.   Let's look at the -- hold on.  So you

15  don't recall -- so sitting here today, you don't

16  recall any such letters; is that right?

17       MR. SHKOLNIK:  Objection to form.

18       MS. BACCHUS:  Objection.

19       THE WITNESS:  The dear registrant letters of

20  this type, I don't.

21  BY MR. NICHOLAS:

22       Q.   Okay.  Let's go to bullet point 4, provide

23  wholesale distributors -- the bullet point reads as

24  follows.  This is the fourth specific step that HDA

25  is encouraging DEA to take.  It reads provide

Page 73

1   wholesale distributors with an indication of when,

2   based on the DEA analysis of automation of reports

3   and consolidated orders system, parentheses, ARCOS,

4   or other data, there is reason to believe a

5   customer's order may be considered suspicious.

6   HDMA noted its understanding that this request

7   previously made in a letter from HDMA dated July 7,

8   2010 has been under consideration within the DEA.

9          So in this letter, so in this bullet

10  point, HDA appears to be or is asking for the DEA

11  to provide it with information from the ARCOS data;

12  is that correct?

13      MS. BACCHUS:  Objection.

14      THE WITNESS:  Yes.

15      MS. BACCHUS:  That's beyond the scope of what

16  she's authorized to testify.  She's not allowed to

17  testify about the ARCOS database.

18      MR. NICHOLAS:  I'm not asking her -- I don't

19  want her to testify about the database.  I just

20  want to know whether in this -- whether it appears

21  from this correspondence that HDA was asking for

22  ARCOS-related information.

23      MR. SHKOLNIK:  Note my objection, a similar

24  objection.  It's outside the scope of what this

25  witness is supposed to be testifying about.

1   BY MR. NICHOLAS:

2       Q.   You can go ahead and answer to the best of

3   your knowledge.

4       A.   To the best of my knowledge, this letter,

5   that's their request, HDA's request, yes.

6       Q.   Now, to your knowledge, without describing

7   anything about the ARCOS database, did DEA ever

8   take a step in response to bullet point No. 4?

9       MR. SHKOLNIK:  Objection.

10      MS. BACCHUS:  Objection.

11      MR. SHKOLNIK:  The witness is not supposed to

12  be testifying to DEA's actions.

13  BY MR. NICHOLAS:

14      Q.   You can answer.

15      A.   I don't know if they took steps to respond

16  to this bullet point.

17      Q.   Not to your knowledge?

18      A.   Not to my knowledge.

19      MR. SHKOLNIK:  Objection to form.

20  BY MR. NICHOLAS:

21      Q.   Okay.  The only other thing I need to ask

22  you about this document, Ms. Ashley, is I just want

23  you to take a look at the rest of the document.

24  I'm not going to ask you to read it.  I just want

25  you to page through it.  There's a part of -- the

1  rest of this summary of the meeting with DEA is

2  comprised of questions that HDA submitted to the

3  DEA that it was hoping to have answered, and I'm

4  not going to ask you about any of the specific

5  questions.

6          Can you just page through to see that

7  there were a number of pages of questions?  In

8  fact, there were 12 pages of questions, which HDA

9  submitted to the DEA.  Do you see that?

10     A.   I do.

11     Q.   Now we can go to the next document.  Do

12  you know -- you haven't seen this document before,

13  so you haven't seen these questions before, so --

14  but I'll ask anyway.

15          Do you know whether the DEA ever responded

16  to these questions?

17     MS. BACCHUS:  Objection.

18     MR. SHKOLNIK:  Objection.

19     THE WITNESS:  I don't know.

20  BY MR. NICHOLAS:

21     Q.   Were you ever consulted about responding

22  to these questions?

23     MS. BACCHUS:  Objection.  That's vague.  Which

24  document are we talking about?

25

1    BY MR. NICHOLAS:

2         Q.    The questions that we just looked at, the

3    series of questions in the exhibit we were just

4    looking at.

5         MR. SHKOLNIK:  Note my objection.

6         MS. BACCHUS:  I'm sorry.  She has to review the

7    whole questions then if you want her to find out if

8    she responded to any of the questions.

9         MR. NICHOLAS:  Okay.  I appreciate the

10   objection.  I'm going to respect it, and I'm going

11   to move on to the next.

12        MR. SHKOLNIK:  Are you withdrawing the question

13   so it's clear on the record?

14        MR. NICHOLAS:  I've already said what I'm going

15   to say about it.

16        MR. SHKOLNIK:  Well, then it's an open

17   question.  It has to be answered.  Either withdraw

18   it or let her answer.

19        MR. NICHOLAS:  I'm going to just move on.

20        MR. SHKOLNIK:  No.  You can't leave an open

21   question.  You have to withdraw it, or she answers

22   it.  You can move on all you want.  Just say

23   withdraw it.  It's not a --

24        MR. NICHOLAS:  I'm going to move on from the

25   last question.

1      MR. SHKOLNIK:  Do we need to go to a special

2   master?  Are you leaving an open question on the

3   record?  Either the witness answers it or you

4   withdraw it.

5      MR. NICHOLAS:  I'm actually going to withdraw

6   it, but is there a rule that says that?

7      MR. SHKOLNIK:  Yeah.

8      MR. NICHOLAS:  What is the rule?

9      MR. SHKOLNIK:  Are you withdrawing it?

10      MR. NICHOLAS:  No.  What's the rule?

11      MR. SHKOLNIK:  Are you withdrawing it?

12      MR. NICHOLAS:  I'll tell you what.  I'll tell

13   you what.  I'm going to withdraw it.  What is the

14   rule?

15      MR. SHKOLNIK:  Thank you.

16      MR. NICHOLAS:  What's the rule?

17      MR. SHKOLNIK:  That when you pose a question,

18   you have to have an answer.

19      MR. NICHOLAS:  So there's no rule.  I've got

20   it.  You just wanted me to do that.  I did it for

21   you.

22   BY MR. NICHOLAS:

23      Q.   Let's go to -- let's go to the next

24   document.

25      MR. NICHOLAS:  We'll make this Ashley 9.

Page 78

1                         (Whereupon, ASHLEY Deposition

2                         Exhibit No. 9 was marked for

3                         identification.)

4    BY MR. NICHOLAS:

5        Q.   Take a minute to look at this document.

6    This is a document which you have seen, I believe.

7    What I've given you is, working from front to back,

8    an e-mail to you from Louis Milione sent on

9    June 22nd of 2016.  The subject is follow-up from

10   HDA board meeting -- forward of a follow-up from an

11   HDA board meeting, and there are two attachments to

12   this e-mail to you from 2016.  One is final final

13   questions from DEA -- for DEA 6/1/11, and the

14   second attachment is final HDMA questions for DEA

15   discussion on 7/13/31.  Excuse me, 7/31/13.

16           And Mr. Milione has forwarded to you an

17   e-mail from John Gray to Mr. Milione that Mr. Gray

18   sent on June 22, 2016 in which Mr. Gray references

19   a meeting that was recently held where Mr. Milione

20   addressed HDA's board of directors.  Do you see

21   that?

22       A.   Yes.

23       Q.   And then in that same e-mail, Mr. Gray

24   attaches documents that are five years and three

25   years old respectively, and what Mr. Gray says is

1    per our discussion, here are the documents I

2    referenced during the meeting.  These documents are

3    now five and three years old respectively, but we

4    are submitting them for your information as an

5    example of previous efforts to develop a better

6    understanding of DEA's expectations about

7    suspicious order monitoring and to ask for guidance

8    when there are questions -- when there were

9    questions about situations that arose in day-to-day

10   operations.

11         While the receipt of these questions was

12   acknowledged by DEA staff, parentheses, Kathy

13   Gallagher, we never received a response to any of

14   the questions or scenarios addressed in the

15   correspondence.  The attached 2013 questions were

16   supposed to serve as a sort of agenda for a meeting

17   with the Office For Diversion Control, but that

18   meeting was cancelled with relatively little

19   notice.  And then Mr. Milione wrote to you I

20   haven't read these yet, referring to the questions

21   in the attachments, but can we look at them and get

22   something out if appropriate?

23         Do you remember this?

24   A.   I don't remember it.

25   Q.   Okay.  Are you surprised that neither

1   Ms. Gallagher nor anyone else at the DEA responded

2   to these questions over the course of three and

3   five years?

4        MS. BACCHUS:  Objection.

5        MR. SHKOLNIK:  Objection to form.

6        THE WITNESS:  My personal opinion, yeah, I'm

7   surprised.

8   BY MR. NICHOLAS:

9        Q.   What happened with this?  Did you -- did

10   you work to draft answers to these questions?

11        A.   I don't remember specifically.

12        Q.   Do you know whether these questions were

13   ever answered?

14        A.   I don't remember, no.  I don't.

15        Q.   Do you know whether DEA ever responded to

16   these questions in any way, whether written or

17   verbal?

18        MS. BACCHUS:  Objection.  She can answer to her

19   personal knowledge.

20   BY MR. NICHOLAS:

21        Q.   Yeah, only from your personal knowledge.

22        A.   I'm sorry.  Could you repeat that?

23        Q.   Do you know if there was any response ever

24   provided to these questions provided by the DEA

25   whether written or verbal?

Page 81

1      A.   I know that we were responsive to John

2   Gray, so verbally I'm certain we spoke to him.  I

3   don't recall if we wrote, if there was anything in

4   writing.

5      Q.   Do you know why not?

6      MS. BACCHUS:  Objection.

7      THE WITNESS:  I don't recall --

8      MR. SHKOLNIK:  Objection.  Misstatement.

9      THE WITNESS:  -- if it happened.

10  BY MR. NICHOLAS:

11     Q.   Now, we just reviewed a document which

12  shows that HDA was seeking more written guidance as

13  early as 2010, right?

14     A.   Yes.

15     Q.   And they were also asking for new dear

16  registrant letters from the DEA that would provide

17  more guidance and explanation, right?

18     A.   Yes.

19     Q.   And to your knowledge, they never got

20  those things, right?

21     MR. SHKOLNIK:  Objection.

22     MS. BACCHUS:  Objection.  Mischaracterizes her

23  testimony.

24  BY MR. NICHOLAS:

25     Q.   Go on.  To your knowledge.

Page 82

1      A.   To my knowledge, I would have to say no, I

2   don't know.

3      Q.   Now, you had the pleasure of testifying

4   before Congress in 2017; is that right?

5      A.   Yes.

6      Q.   And you had a prepared statement in

7   connection with that testimony, right?

8      A.   Yes.

9      Q.   I've never seen anyone cross their eyes on

10  camera before.

11     A.   Bad habit.

12     Q.   I'm going to mark as the next exhibit your

13  prepared statement.

14                        (Whereupon, ASHLEY Deposition

15                        Exhibit No. 10 was marked for

16                        identification.)

17  BY MR. NICHOLAS:

18     Q.   You probably have a memory of this.  I'm

19  actually only going to ask you about what you said

20  at the very end.  If you go to the last page,

21  Page 8, just before the conclusion, I'm going to

22  read, if you don't mind, the paragraph that's

23  written just before the conclusion.  You wrote and

24  submitted to Congress the following:

25          As we move forward, we recognize the

1   importance of working with registrants, dash, not

2   just at workshops and conferences, dash, but in

3   writing that they can count on, dash, to provide

4   them all the information and especially the

5   certainty that they need to be in full compliance,

6   comma, as they want to be -- as they want to be and

7   as we expect them to be.

8           Do you see that?

9       A.   Yes.

10      Q.   Let's just break down that paragraph.

11          Why is it so important to work with

12  registrants?

13      A.   It helps to ensure compliance.  It's part

14  of DEA's, Office of Diversion Control, mission to

15  secure an -- ensure an adequate supply of controls

16  and also to detect diversion.  So in order to do

17  that effectively, you have to engage with the

18  registrants.

19      Q.   And why is written guidance to registrants

20  so important?

21      MR. SHKOLNIK:  Objection.  Speaking on behalf

22  of DEA or her personal opinion?

23      MR. NICHOLAS:  I'm asking about a statement

24  that Ms. Ashley made to Congress.  She can speak

25  personally if you'd like.

1     MR. SHKOLNIK:  No.  I'm asking is it personal

2  or DEA just so it's clear?

3     MS. BACCHUS:  Well, she's only authorized to

4  testify on her personal knowledge on her own

5  behalf, not on behalf of DEA.  That's a standing

6  objection that she can't speak on behalf of DEA.

7  BY MR. NICHOLAS:

8     Q.   Okay.  I'll restate the question, but

9  first I'll ask you what was your position at the

10 time that you gave this testimony?

11    A.   I was acting assistant administrator.

12    Q.   Now, why was it important -- strike that.

13         Why is written guidance to registrants so

14 important?

15    MR. SHKOLNIK:  Objection.  Same objection.

16 Personal?

17 BY MR. NICHOLAS:

18    Q.   Go ahead.

19    A.   For me personally, it creates a reference

20 document for the registrant to use as they work to

21 ensure compliance.  So it's a reference for them.

22    Q.   And if theres's not a reference document,

23 in your personal experience, does that create

24 ambiguity?

25    A.   I don't know because I don't know if

1   there's not a reference document.  So I'm not sure

2   if I understand the question.

3        Q.   Well --

4        A.   Reference documents specific to what?

5        Q.   Was the DEA -- now, to your knowledge, the

6   DEA at this time and previously was working to

7   create additional written guidance for the

8   distributor community, correct?

9        A.   Correct.

10       Q.   And to your knowledge, it was doing that

11  why?

12       A.    It was doing it because registrants and

13  DEA wanted to work together to provide more

14  clarification.

15       Q.   And why was that?

16       MS. BACCHUS:  Objection.  Vague.

17  BY MR. NICHOLAS:

18       Q.   In your opinion.

19       MR. SHKOLNIK:  Objection to form.

20       THE WITNESS:  In my opinion, because we were

21  getting the conversation in our engagements with

22  registrants that they were not clear, so we were

23  working with them to make it more clear for them to

24  help them to be in compliance.

25

1  BY MR. NICHOLAS:

2      Q.   Do you believe there was a need for

3  further written guidance?

4      MR. SHKOLNIK:  Objection.

5      MS. BACCHUS:  Objection.  Calls for opinion.

6      THE WITNESS:  Personally I thought the existent

7  regulation was clear.

8  BY MR. NICHOLAS:

9      Q.   You wrote and submitted to Congress

10  that -- about the importance of working with

11  registrants, and I don't want to read the whole

12  thing again.  I'm just going to the last part to

13  say to provide them all the information and

14  especially the certainty that they need to be in

15  full compliance, comma, as they want to be and as

16  we expect them to be.

17          In your experience, in your personal

18  experience, did the registrants, i.e., the

19  distributors, want to be in full compliance?

20      A.   For the most part, yes.

21      Q.   Okay.  Let's go back and talk for a few

22  minutes about the suspicious order regulation as it

23  still currently exists, CFR 1301.74, Subsection B.

24  This is Ashley 3.

25          Now, as we discussed, you're familiar with

Page 87

1    this regulation, correct?

2         A.   Yes.

3         Q.   And it first came out in 1971; is that

4    right?

5         A.   I believe so, yes.

6         Q.   And this is the regulation that addresses

7    the responsibilities of the distributors to

8    identify and report suspicious orders; is that

9    right?

10        A.   Yes.

11        Q.   And it says that registrants, quote, shall

12   design and operate a system to disclose the

13   registrant's suspicious orders of controlled

14   substances, correct?

15        A.   Yes.

16        Q.   Do you -- are you able to -- from your

17   experience both in the field and in headquarters,

18   are you able to define for the distributors or tell

19   them or have you been able to tell them what

20   constitutes a legally compliant system?

21        MS. BACCHUS:  Objection to form.

22        MR. SHKOLNIK:  Objection to form.  Outside the

23   scope.

24   BY MR. NICHOLAS:

25        Q.   Go ahead.

1      A.   No.  That was never my role.

2      Q.   To your knowledge, is there a particular

3   formula or algorithm that is required for a legally

4   compliant system?

5      A.   To my knowledge --

6      MS. BACCHUS:  Same objection.

7      MR. SHKOLNIK:  Objection.

8   BY MR. NICHOLAS:

9      Q.   Go ahead.

10     A.   To my knowledge, there is not.

11     Q.   To your knowledge, does a legally

12   compliant system need to be automated?

13     A.   No, it does not.

14     Q.   Does it need to be manual, i.e., the

15   opposite of automated?

16     MS. BACCHUS:  Objection.  Vague.

17     THE WITNESS:  It's not specific.  There's no

18   direction on how to do it.

19   BY MR. NICHOLAS:

20     Q.   Are there particular methods of

21   investigation that are required in order for a

22   system to be legally compliant?

23     A.   Yes.

24     Q.   What are they?

25     A.   The method would be to -- as it's outlined

1    in the regulation, to take a look at the order,

2    make a determination if it's deviating from what's

3    usual.  I mean, how you do it, it can be manual or

4    automatic, but it's just that it needs to be done.

5        Q.   And the criteria that determines whether

6    it deviates from pattern or too large or anything

7    else is criteria that is to be set by the

8    distributors?

9        A.   Correct.

10       Q.   And so it's within their discretion; is

11   that correct?

12       A.   That's correct.

13       Q.   And is it correct that the distributors

14   must define their own parameters for a suspicious

15   order?

16       A.   There's some regulation requirement that

17   it be effective.  So other than that, it's their

18   discretion, but it just must be effective.

19       Q.   And whether a system is effective is in

20   itself a subjective determination; isn't that

21   correct?

22       A.   Yes, I would agree with that.

23       Q.   Okay.  Are you aware that the United

24   States Government Accountability Office, the GAO,

25   issued a report in June of 2015 that stated that

Page 90

1    distributors wanted more guidance and regular

2    communications with the DEA regarding suspicious

3    order monitoring and guidance?

4        A.   I am aware of the report.  That specific

5    statement, I can say I don't recall, but I did read

6    the report.

7        Q.   Well, I was paraphrasing, obviously.

8        A.   Yeah.

9        Q.   Was my paraphrase accurate?

10       A.   I believe so.

11       MR. SHKOLNIK:  Objection.  Form.

12   BY MR. NICHOLAS:

13       Q.   You can go ahead.

14       MS. BACCHUS:  If you know.

15       THE WITNESS:  Yeah.  I mean, I'm certain, but I

16   believe it's in there.  I'm not -- I believe it's

17   in there.  I read the report in 2015.

18   BY MR. NICHOLAS:

19       Q.   What is the GAO?  What is the Government

20   Accountability Office?

21       A.   They're oversight to ensure that

22   government agencies are, you know, focused in

23   performing their duties and their mission.

24       Q.   Were you interviewed in connection with

25   their preparation, with GAO's preparation of that

Page 91

1    report?

2         A.   I was not, no.

3         MR. NICHOLAS:  Let's mark the report.  This is

4    Ashley 11.

5                        (Whereupon, ASHLEY Deposition

6                        Exhibit No. 11 was marked for

7                        identification.)

8    BY MR. NICHOLAS:

9         Q.   All right.  If you look at the very --

10   let's see.  If you look at the very first page

11   after the cover page on the inside, there's a

12   little column that says GAO highlights.  Do you see

13   that?

14        A.   Yes.

15        Q.   It says why GAO did this study.

16        MR. SHKOLNIK:  I'm sorry.  Which page?

17        MR. NICHOLAS:  It's -- it's the inside.  It's

18   the other side of the cover.

19   BY MR. NICHOLAS:

20        Q.   You'll see that it says -- there's a

21   column on the left side that says why GAO did this

22   study, and it says in the second paragraph GAO was

23   asked to review registrants' and other's

24   interactions with DEA, and then it goes on to say

25   more.  And then there's -- under that, there's a

Page 92

1   heading that says what GAO recommends, and it says

2   GAO recommends DEA take three actions to improve

3   communication with and guidance for registrants

4   about the CSA roles and responsibilities.  DEA

5   described actions that it planned to take to

6   implement GAO's recommendations.  However, GAO

7   identified additional actions GAO should take to

8   fully implement their recommendations.

9          Do you see that?

10    A.    Yes.

11    Q.    So let's turn to the recommendations

12   themselves.

13    MS. BACCHUS:  I'm going to object to this

14   document and her answering any questions regarding

15   this GAO report.  It's outside of the scope of her

16   Touhy authorization.

17    MR. NICHOLAS:  So I would reference in response

18   to that -- we'll go off the record for a minute.

19    THE VIDEOGRAPHER:  Off the record at 11:54 a.m.

20                    (Whereupon, a short break was

21                    taken.)

22    THE VIDEOGRAPHER:  We're back on the record at

23   12:07 p.m.

24    MR. NICHOLAS:  I've considered the objection,

25   and the government has made a representation to me

1  that another witness or other witnesses have been

2  designated to testify about the GAO report.  So on

3  that representation, I will not ask any questions

4  about -- won't ask any further questions about the

5  report.

6  BY MR. NICHOLAS:

7      Q.   Now, we've spent some time already talking

8  about the fact that the DEA has considered and is

9  considering modifying the suspicious order

10 regulation, the written regulation, right?

11     A.   Right.

12     MR. SHKOLNIK:  Objection to form.

13 BY MR. NICHOLAS:

14     Q.   Go ahead.

15     A.   Yes.

16     Q.   Was this process under way, this

17 consideration under way when you first joined

18 headquarters in 2015?

19     A.   I don't know.

20     Q.   Who at the DEA is in charge of the process

21 of considering revision to the suspicious order

22 monitoring regulation?

23     A.   It begins with the administrator, and then

24 after that, it would be the assistant administrator

25 for the diversion control division.

Page 94

1      MR. NICHOLAS:  Can we mark the next exhibit,

2    please.

3                         (Whereupon, ASHLEY Deposition

4                         Exhibit No. 12 was marked for

5                         identification.)

6    BY MR. NICHOLAS:

7      Q.   Ms. Ashley, I've asked you to take a look

8    at the next exhibit, which is Ashley 12.  And for

9    the record, this is a document, which, among

10   others, the government told us they wanted to claw

11   back.  They told us this morning.  We'll reserve

12   our rights as to it, but on a positive note, we

13   were able to work with the government to redact

14   portions of the document.  So we're going to be

15   using the redacted version of the document.  We'll

16   reserve our rights to discuss the document further

17   at a future time, but in order to have the

18   deposition move forward, we'll just use this

19   document, and that will -- that's what we'll do.

20            What I've given you, Ms. Ashley, is an

21   e-mail stream, which ends with an e-mail from

22   Mr. Milione to Imelda Paredes and John Scherbenske.

23   These are all DEA people writing to each other, but

24   it contains a stream of e-mails that begins on

25   September 30, 2015 at 12:39 a.m. with an e-mail --

1    I'm sorry.  I'm not even right about that.  It

2    doesn't have it.  It begins with an e-mail from you

3    to Imelda Parades, who, I guess, her nickname is

4    Mimi?

5        A.   Mimi.

6        Q.   You wrote to her sometime before

7    September 30, 2015 because that's when the next

8    e-mail is, and you wrote to Ms. Paredes and said

9    hi, Mimi.  I hope you're doing well.  In regards to

10   the CC suspicious order document, dash, have you

11   reviewed it, do you have any notes, response,

12   communication with CC on their document?  If so,

13   would you please share it, slash, them with me.

14   Thank you.

15        Does this document refresh your memory as

16   to whether at least as of this date of

17   September 30, 2015 or a little earlier, the DEA was

18   giving consideration to written revisions to the

19   suspicious order monitoring regulation we've been

20   talking about?

21       MR. SHKOLNIK:  Objection.

22       THE WITNESS:  So this document refreshes my

23   memory that chief counsel had drafted a suspicious

24   order document, and it was provided to me.

25

1    BY MR. NICHOLAS:

2        Q.   Okay.  And then Ms. Mimi writes you back

3    and says hi there.  The suspicious order rule that

4    they drafted, yes, but it's handwritten.  I can

5    type them up onto the document and send it to you.

6    At the moment, I'm working on registration

7    renewals, which I will copy you on when I send back

8    to ODW.  Do you see that?

9        A.   Yes.

10       Q.   Tell us what Mimi's position was.  What

11   was her role at DEA?

12       A.   Mimi was in the executive staff under

13   Mr. Rannazzisi.  I believe her title was program

14   executive or something to that effect.  I'm not

15   sure, but she worked directly for Mr. Rannazzisi on

16   his executive staff.

17       Q.   Okay.  And if you page forward, there's

18   some very nice back and forth between you and Mimi

19   in which you're being nice about her leave and

20   everything like that, which is nice, and -- but

21   let's fast forward up in this e-mail chain, I

22   think, all the way to -- all the way to the e-mail

23   on the page that's marked DEA-840008425.

24           And it's the e-mail at the bottom of the

25   page from Mimi to you dated Thursday, October 1,

1   2015 at 3:21 p.m., and she writes to you okay,

2   well, then I'm going to clean up the comments and

3   make them a little more thorough since now I assume

4   the rule is going forward, question mark.

5   Remember, we will need to come up with a reason why

6   we changed our minds, period.  Parentheses, in a

7   recent Congressional response on a GAO audit, Lou

8   had decided to say we do not need suspicious order

9   guidance, slash, rule, close, parentheses, period.

10  Do you want to also get Judge Mulrooney's comments

11  on the rule?  He saw it a while ago and provided

12  oral comments, but I don't think anything in

13  writing?

14          I'm not going to ask you anything about

15  the substantive comments that were going on with

16  the drafting of the new rule.  I will ask you this:

17  Was there a change in the position at the DEA with

18  regard to the need for a new suspicious order

19  guidance or rule?

20      MR. SHKOLNIK:  Objection.

21      MS. BACCHUS:  Objection.

22      MR. SHKOLNIK:  Speaking for the DEA.

23  BY MR. NICHOLAS:

24      Q.   To your knowledge.

25      A.   Change in the position as to whether or

Page 98

 1  not we need one?

 2       Q.   Yeah.

 3       A.   I'd say there was a change in what

 4  Mr. Milione stated, which I was aware of, versus

 5  you know, as time went on.  So yeah, I would say

 6  yes.

 7       Q.   Okay.  And what were you aware of with

 8  regard to Mr. Milione's change of view?

 9       A.   When he first reported in 2015, he was

10  having discussions on the Hill, and there were

11  questions, you know, from Congress about DEA's

12  engagement with registrants and clarification on

13  the suspicious order.  At the time Mr. Milione and

14  myself felt that the current rule was sufficient,

15  and we may not need to change it.  Maybe we would

16  continue to engage and continue to have

17  conversations, and that would make the difference

18  and maybe a rule wasn't necessary, a new rule.

19       Q.   Okay.  So why was there this change back

20  to we need a new rule?

21       A.   Well, after, you know, lots of discussion,

22  I guess we felt comfortable that it wouldn't be so

23  much of a change if we were to put some additional

24  language to what existed.  It wasn't anything

25  major, so we felt that okay, we could add some more

1   of our thoughts into the regulation.

2       Q.   And the purpose, in your mind, of adding

3   more thoughts, more of your thoughts to the

4   regulation would be to provide further guidance to

5   the distributors; is that correct?

6       MR. SHKOLNIK:  Objection.

7       MS. BACCHUS:  Objection.  Form.

8       THE WITNESS:  It would be further

9   clarification, yes.

10  BY MR. NICHOLAS:

11      Q.   For the distributors?

12      A.   For all registrants who order, yeah, and

13  distribute.

14      Q.   And is that work -- well, do you know

15  whether that work is still ongoing?

16      A.   I don't know for certain.

17      Q.   And when I say that work, I mean the work

18  to revise the regulation.  You don't know whether

19  that's --

20      A.   As of March of 2018, it was.  I haven't

21  had a conversation with anybody about it since then

22  at DEA.

23      Q.   Let's go to the next exhibit.  I've just

24  been told to make the same speech, so I'm going to

25  do it.  This next document, which we can mark as

Page 100

1    Ashley 13, is a document which -- another document

2    which the government told us this morning they

3    would like to claw back.  We had a productive and

4    amicable discussion about how we might be able to

5    use the document in a redacted form.  We do reserve

6    our rights to discuss it more later, but we will

7    use the redacted document for purposes of this

8    deposition.

9        MR. SHKOLNIK:  For the record, I would --

10   plaintiff was not included in the amicable

11   discussion as to what was the agreed redaction.  So

12   I think that's something at the lunch break we

13   should be talking about.  Defense counsel may be

14   happy with those areas redacted, but I think I

15   should have been included in that conversation.

16                        (Whereupon, ASHLEY Deposition

17                        Exhibit No. 13 was marked for

18                        identification.)

19   BY MR. NICHOLAS:

20       Q.   Can you take a look at Ashley 13.  It is a

21   one-page document, and it is an e-mail to you,

22   Ms. Ashley, from Mr. Milione dated November 27,

23   2016.  The subject is forward, colon, regs, and it

24   encloses or it forwards a message from Mr. Milione

25   to Chuck Rosenberg with a CC to BenAry, Michael

1  BenAry and with a CC to Louis Milione.  He CC'd

2  himself, I guess, and a CC also to Robert

3  Patterson.

4        So I should ask you, for the record, who

5  Chuck Rosenberg is?

6     A.   Chuck Rosenberg was the acting

7  administrator for DEA at the time.

8     Q.   So he was Mr. Milione's boss?

9     A.   Yes.

10    Q.   Mr. Milione's e-mail to Mr. Rosenberg says

11 we need to put together a draft of the suspicious

12 order regs, which will take some time and then get

13 that to OLP when that draft is in pretty good

14 shape.  We've been getting general input from

15 industry and the field and hope to put a draft reg

16 together that is clearer and helps distributors be

17 more effective.  Our reg drafters, slash, policy

18 analysts and diversion are a bit crushed right now

19 with other priority regs.

20        We are in the process of hiring additional

21 reg drafters, slash, policy analysts, which should

22 alleviate some of the workload issues.  My goal is

23 to get a draft suspicious order reg done internally

24 early in 2017.  Happy to talk if you want to

25 tonight or whenever is convenient.

1          Do you know from your own personal

2     knowledge whether a draft suspicious order reg was

3     done internally early in 2017?

4          A.   There was a draft in 2017.  I don't know

5     how early it was, but there was a draft.

6          Q.   Did you see the draft?

7          A.   Yes.

8          Q.   Did you comment on the draft?

9          A.   Yes.

10         Q.   Was the draft revised after that?

11         A.   Oh, yes.

12         Q.   When is the last time you saw a draft of

13    this proposed new reg or revised reg?

14         A.   I would be guessing.  It would be early

15    2018.

16         Q.   And do you know -- we've covered this, but

17    I want to make sure for the record it's clear.  Do

18    you know what has become of that draft, the most

19    recent draft?  Do you know what the status is?

20         A.   I do not.

21         Q.   Okay.  Now, Mr. Milione, in forwarding

22    this message to you, says FYI, period, will need to

23    make this a priority in the new year, period.  Not

24    sure why he questioned -- I think maybe it's a

25    typo.  It means why the question from Chuck and

1  hope to discuss with him to find out.

2          To your knowledge, did -- strike that.

3          Do you know why in your personal

4  interactions with Mr. Milione or your job, you

5  know, as you understood it, why Mr. Milione was

6  telling you that we'll need to make this a priority

7  in the new year?

8      A.   Do I know why he phrased it that way?  It

9  was an important issue for us.

10     Q.   Why was it an important issue for you?

11     A.   Because we had been engaging with

12  registrants, and they were telling us that they

13  needed or wanted more clarification.

14     Q.   Did DEA make this a priority in the new

15  year?

16     MS. BACCHUS:  Objection.  Form.  Scope.

17  BY MR. NICHOLAS:

18     Q.   If you know.  In your personal knowledge,

19  did DEA make this a priority in the new year?

20     A.   In my personal knowledge, yes.

21     Q.   But the reg wasn't completed; is that

22  correct?

23     A.   It was not completed.

24     Q.   And evidently it's still not completed; is

25  that correct?

1       MS. BACCHUS:  Objection.

2       THE WITNESS:  I don't know.

3   BY MR. NICHOLAS:

4       Q.   Now, you said that this was important and

5   appropriately a priority because the registrants

6   were seeking further -- you know, were seeking it;

7   is that right?

8       A.   Yes.

9       MR. SHKOLNIK:  Objection to form.

10  BY MR. NICHOLAS:

11      Q.   And is it right that the reason you cared

12  that the registrants were seeking it is that you

13  wanted to put them in a position to be more

14  effective?

15      MR. SHKOLNIK:  Objection.  Form.

16      MS. BACCHUS:  Objection.  Form.

17      MR. SHKOLNIK:  DEA's position?  Her personal

18  opinion?

19      MR. NICHOLAS:  I'm asking her personal opinion.

20      MR. SHKOLNIK:  Okay.  Then the question should

21  so state that.

22      MR. NICHOLAS:  Okay.  It's stated.

23      THE WITNESS:  In my personal opinion and

24  engagements with the registrants, I felt that we

25  weren't understanding each other.  I was clear on

Page 105

1   the regulation, and they said they were not.  So we

2   needed -- we needed to meet and resolve it.  So

3   that's why it was a priority for me.

4   BY MR. NICHOLAS:

5       Q.   Do you recall attending a meeting on

6   August 30, 2017 with HDA?

7       A.   Not specifically.

8       Q.   The meeting would have been or was at the

9   invitation of the DEA.  Patrick Kelly and Ruth

10  Miller of HDA met with DEA diversion control

11  division staff.  Does this ring any bells?  I'm

12  just reading it.

13      A.   It's not.  It's not, but it's not unusual.

14      Q.   Okay.  Well, let's just mark this as the

15  next exhibit, Ashley 14.

16                      (Whereupon, ASHLEY Deposition

17                      Exhibit No. 14 was marked for

18                      identification.)

19  BY MR. NICHOLAS:

20      Q.   So what I'm giving you or what I've given

21  you is an e-mail from Ruth Miller of HDA.  It was

22  sent on August 30, 2017 to regulatory affairs

23  committee, legal committee.  So this may be an

24  internal HDA document that was produced in this

25  litigation, and the reason I'm asking you about it,

Page 106

1   in part, is because you're mentioned in the e-mail,

2   and you're mentioned as having attended briefly

3   portions of the meeting.

4           So taking a look at this, I guess I'll

5   start out by asking you whether this refreshes your

6   memory as to --

7       A.   Yes.

8       Q.   It does?

9       A.   Yes.

10      Q.   What do you remember about this meeting?

11      A.   What I remember is we were working with

12  DOJ on the Reform Regulation Reduction Act, and so

13  part of that was speaking with industry about the

14  regulations and trying to get their assessment on

15  if they were to -- if the regulations were, you

16  know, too burdensome.  So we had a series of

17  conversations with the different registrant

18  communities about that subject.

19      Q.   And the regulation that was being

20  discussed here was the regulation we've been

21  talking about today; is that right?

22      A.   No.  It was all DEA regulations.

23      Q.   Okay.  Go to -- well, this document says

24  that acting assistant administrator, Demetra Ashley

25  attended briefly, but the core of the conversation

```
                                        Page 107
 1   was with Mike Lewis, chief of the regulatory
 2   drafting section and two other staff.
 3            So Mr. Lewis, did you know Mr. Lewis?
 4       A.   Yes.
 5       Q.   He was the person who drafted the regs?
 6       A.   He was the section chief of the regulatory
 7   drafting section, so he had a staff of about
 8   20 individuals that drafted regulations.
 9       MR. SHKOLNIK:  I'm sorry.  Which paragraph are
10   you on?
11       MR. NICHOLAS:  Paragraph 1.  I just read from
12   Paragraph 1.
13   BY MR. NICHOLAS:
14       Q.   But now I'm going to go down to the second
15   to the last paragraph, which is headed gray is good
16   in quotes and accountability in quotes.  The
17   paragraph reads, and this is, again, an HDA person,
18   Ruth Miller reporting on the meeting, we gained a
19   little insight into Mr. Lewis's perspectives about
20   how regulations should be written.  While he
21   expressed concern that some of the DEA regulations
22   have remained unchanged since 1971, he also
23   expressed that based on his experience in the field
24   for DEA, quote, gray is good, unquote, meaning that
25   overly defining requirements can create its own
```

Page 108

1  problems.

2        HDA pointed out that while flexibility is

3  necessary, it is also essential that the agency

4  establish parameters so that the registrants can

5  understand when they have strayed outside.

6  Mr. Lewis also expressed his view that the agency

7  should clearly convey each -- should clearly convey

8  each registrant's, quote, accountability, unquote,

9  so that registrants understand and can accept their

10  responsibilities.

11        I was interested in this phrase gray is

12  good.  In your experience at DEA and thinking in

13  particular about the regulation we've been talking

14  about, the suspicious order monitoring

15  regulation --

16     MR. SHKOLNIK:  Objection.

17  BY MR. NICHOLAS:

18     Q.   -- is gray is good an accurate way to

19  describe the approach that the agency has taken to

20  explaining registrants' obligations under the CSA

21  relating to the distribution of controlled

22  substances?

23     MR. SHKOLNIK:  Objection.

24     MS. BACCHUS:  Objection.  Calls for --

25     MR. SHKOLNIK:  Is it her opinion, the agency's

Page 109

1   opinion, or is it just someone's interpretation of

2   the HDA's opinion?

3   BY MR. NICHOLAS:

4       Q.   Let me ask you your opinion.  Let me just

5   talk to you about this, you, personally, all right?

6   Do you have a reaction -- do you have a view as to

7   whether gray is good is a good way to go about

8   drafting the regulations --

9       MS. BACCHUS:  Same objection.

10      MR. SHKOLNIK:  Objection.

11  BY MR. NICHOLAS:

12      Q.   -- in question?

13      A.   You know, I don't know what he's talking

14  about.  Reaction?  When I read gray is good, I

15  thought about the gray market, the retail

16  pharmacies that are not part of the chains.  That's

17  what I thought about when I saw it.  So I wasn't

18  thinking gray as in vague.  So I don't know what he

19  meant.

20      Q.   Okay.

21      MR. NICHOLAS:  Let's go off the record.

22      THE VIDEOGRAPHER:  We're off the record at

23  12:35 p.m.

24                      (Whereupon, a discussion was

25                       had off the record.)

1                    (Whereupon, ASHLEY Deposition

2                    Exhibit No. 15 and 16 were

3                    marked for identification.)

4        THE VIDEOGRAPHER:  We are back on the record at

5    12:37 p.m.

6    BY MR. NICHOLAS:

7        Q.   So I've just handed out -- I've just

8    marked two exhibits, Ashley 15 and Ashley 16.

9    Ashley 15 is a letter from Kevin Nicholson, vice

10   president of public policy and regulatory affairs

11   of the National Association of Chain Drug Stores.

12   Is that the drug stores trade association?

13       A.   Yes.

14       Q.   And it's a letter to you dated

15   February 6th of 2018?

16       A.   Yes.

17       Q.   And then the next letter I gave you is

18   your answer your response to that letter, which is

19   dated -- maybe, maybe not.  Let's see.  Is the

20   DEA's response.  The letter was written to you, but

21   the DEA responded.  James Arnold responded to

22   Mr. Nicholson.  Do you see that?

23       A.   Yes.

24       Q.   So do you recall receiving this letter

25   from NACDS?

Page 111

1        A.    Not specifically, no.

2        Q.    Okay.  Can you take a look at the letter.

3   You see that the letter in the first paragraph

4   references a court decision called Masters

5   Pharmaceutical, Inc. v. Drug Enforcement

6   Administration, parentheses, close quote, Masters?

7        A.    Yes.

8        Q.    You've heard of the Masters decision?

9        A.    Yes.

10       Q.    And you see that the NACDS was asking for

11   DEA to promulgate regulations to affected

12   registrants regarding their suspicious order

13   monitoring regulatory obligations in light of the

14   Masters decision.  Do you see that?

15       A.    Yes.

16       Q.    And in the letter, Mr. Nicholson says we

17   are concerned -- this is the last paragraph of the

18   first page.  We are concerned that the D.C. Circuit

19   may have interpreted the suspicious reporting

20   requirement under 21 CFR Section 13.01.74(b)

21   differently than DEA has interpreted the regulation

22   in the past or intended to do so in the future.

23   Moreover, DEA field division offices across the

24   country may each have their own interpretation of

25   the Masters decision, which could significantly

Page 112

1   affect enforcement of this regulation.

2           Do you see that?

3       A.   Yes.

4       Q.   And then on the second page, Mr. Nicholson

5   submits two specific questions.  His first question

6   is, one, whether all orders identified as orders of

7   interest must now be reported to DEA as suspicious,

8   and two, is there a middle ground the DEA perceives

9   may exist that permits both statistically-driven

10  threshold systems and order of interest systems

11  such that registrants operating the latter system

12  need not prematurely or automatically deem an order

13  as suspicious when the order is merely flagged for

14  further review.

15          And then in the last paragraph,

16  Mr. Nicholson asks that the DEA address these

17  questions so that Mr. Nicholson, in effect, is

18  asking for the answer to those two questions, and

19  then he's also asking for the promulgation of

20  regulations in light of Masters.  He's got

21  specific -- this is a letter which is asking for

22  pretty specific things, correct?

23      MS. BACCHUS:  Objection.  The letter speaks for

24  itself.

25      THE WITNESS:  I agree that they're two

Page 113

```
 1    questions.
 2    BY MR. NICHOLAS:
 3         Q.   And they're specific?
 4         MR. SHKOLNIK:  Objection.
 5    BY MR. NICHOLAS:
 6         Q.   They're specific questions?
 7         MR. SHKOLNIK:  Objection to form.
 8         THE WITNESS:  I agree that there are two
 9    specific questions on this letter.
10    BY MR. NICHOLAS:
11         Q.   And do you also agree that asking for the
12    DEA to promulgate regulations to affected
13    registrants regarding their suspicious order
14    monitoring regulations, regulatory obligations in
15    light of Masters, that's also a clear request.
16    It's a specific request?
17         MR. SHKOLNIK:  Objection to form.
18         MS. BACCHUS:  Objection.
19         THE WITNESS:  Where did you just read from?
20    BY MR. NICHOLAS:
21         Q.   The first paragraph.
22         A.   Yes, that's a request.
23         Q.   Okay.  Now, what did you do with the
24    letter when you received it?
25         A.   I don't recall.
```

1      Q.   Did you talk to -- do you recall whether

2   you called Mr. Nicholson?

3      A.   No.

4      Q.   Have you ever spoken to him before?

5      A.   Yes.

6      Q.   You knew him previously from --

7      A.   Yes.

8      Q.   -- dealing with this trade organization?

9      A.   Yes.

10      Q.   Do you recall whether you did anything

11   related to responding to this letter?

12      A.   I don't recall.

13      Q.   Do you recall speaking with anyone about

14   this letter at any time?

15      A.   I -- I don't remember.

16      Q.   Okay.  Let's look at Mr. -- let's look at

17   the response that Mr. Nicholson received.

18      A.   Okay.

19      Q.   You can take a minute to look at it.

20      A.   Okay.

21      Q.   Now, you've just read the response from

22   Mr. Arnold.  Who is Mr. Arnold, James Arnold who

23   responded to this letter that was written to you?

24      A.   Jim Arnold, at the time, was the section

25   chief of the policy and liaison section.

1      Q.   Do you have any recollection as to how it

2   came to be that Mr. Arnold is the person who

3   responded to this letter?

4      A.   Yes.  I mean, recollection of it, no.

5   It's just standard because he's the section chief

6   of the section that drafts responses.

7      Q.   Okay.  Do you recall reviewing the

8   response before it went out?

9      A.   No.  I was retired by that time.

10     Q.   Okay.  Reading the response, does the

11  response provide an answer to either question that

12  Mr. Nicholson asked?

13     MR. SHKOLNIK:  Objection.  Outside the scope.

14  The witness wasn't there.  It wouldn't be from her

15  own knowledge of what was going on.

16     MS. BACCHUS:  Same objection.  She can only

17  testify to what's stated in the letter itself.  I

18  think everybody can read it and interpret it for

19  themselves.

20     MR. NICHOLAS:  I'm only asking her to testify

21  about what's stated in the letter.  I agree.

22  BY MR. NICHOLAS:

23     Q.   Does the letter -- does the letter written

24  back to Mr. Nicholson answer the two questions that

25  were posed?

Page 116

1      A.    Not specifically.

2      Q.    Does the letter mention Masters at all,

3   the letter back?

4      A.    It does not.

5      MS. BACCHUS:  Same objection.

6      MR. SHKOLNIK:  Objection.  Outside the scope of

7   this witness.

8   BY MR. NICHOLAS:

9      Q.    Now, on the first page of the letter,

10  Mr. Arnold does on the last -- take a look at the

11  last paragraph that begins with the word finally,

12  and it says finally, the DEA has proposed to revise

13  its regulations relating to suspicious orders of

14  controlled substances.  The proposed rule defines

15  the term suspicious order and specifies the

16  procedures a registrant must follow upon receiving

17  such orders.

18         Do you see that?

19     A.    Yes.

20     Q.    So Mr. Arnold was telling Mr. Nicholson

21  that in June of 2018, there was a proposed rule

22  being discussed at DEA that would define the term

23  suspicious order and specify the procedures a

24  registrant must follow upon receiving such orders,

25  right?

Page 117

1      MR. SHKOLNIK:  Objection.

2      MS. BACCHUS:  Objection.  Outside of the scope.

3   BY MR. NICHOLAS:

4      Q.  That's what he wrote?

5      MR. SHKOLNIK:  Objection.  This witness wasn't

6   at DEA, and you're asking for interpretations.

7      MR. NICHOLAS:  No, I'm not.  I'm just asking

8   what the letter says.

9      MR. SHKOLNIK:  And she wasn't there.  She's

10  here as a witness.

11     MR. NICHOLAS:  I'm just asking her to read the

12  letter.

13  BY MR. NICHOLAS:

14     Q.  Go ahead.  You can answer.

15     MS. BACCHUS:  Same objection.

16     THE WITNESS:  If you're reading straight from

17  the letter, yeah, I read the same thing you do.

18  BY MR. NICHOLAS:

19     Q.  Okay.  And were you aware at -- were you

20  aware of the fact at any point of the fact that the

21  proposed rule that was being discussed at DEA when

22  you were still there would define the term

23  suspicious order and specify the procedures a

24  registrant must follow upon receiving such orders?

25     A.  I wouldn't agree to that language, no.

1      Q.   Well, I'm saying were you aware that this

2    was what the proposed rule was going to do?

3      MR. SHKOLNIK:  Objection.  Asked and answered.

4    She disagreed with you.

5      MR. NICHOLAS:  I didn't understand the answer.

6    BY MR. NICHOLAS:

7      Q.   Go ahead.

8      A.   I was aware that DEA was drafting a new

9    regulation.  Defining the term, I wouldn't -- I

10   would say further defined.

11     Q.   Further defined.  So your recollection is

12   that the new proposed rule was going to further

13   define suspicious order?

14     A.   Existing.

15     MS. BACCHUS:  I'm going to object to discussing

16   what the proposed rule was going to do or not.  It

17   was a draft.

18     THE WITNESS:  Right.  That's true.  It was a

19   draft.

20   BY MR. NICHOLAS:

21     Q.   And it's still a draft because nothing has

22   come out yet?

23     MS. BACCHUS:  Objection.  Asked and answered.

24     MR. SHKOLNIK:  Objection.  This is going into

25   the workings of the DEA --

```
                                                Page 119

 1      THE WITNESS:  I don't know.

 2      MR. SHKOLNIK:  -- that we're not supposed to be

 3   covering.

 4      MR. NICHOLAS:  I think we'll probably -- give

 5   me one second.  We may be ready for our lunch

 6   break.  Let's look at one more document because

 7   it's referenced in the document we just looked at.

 8   This is Ashley 17.

 9                         (Whereupon, ASHLEY Deposition

10                         Exhibit No. 17 was marked for

11                         identification.)

12   BY MR. NICHOLAS:

13      Q.   Now, if you take a look at Ashley 17 and

14   then look back at Ashley 16, and in that paragraph

15   you were looking at at the bottom of the page where

16   Mr. Arnold of the DEA is writing back to

17   Mr. Nicholson and he's saying, and we just read

18   this in the final paragraph of the first page,

19   finally, the DEA is proposed to revise its

20   regulations relating to suspicious orders of

21   controlled substances.  The proposed rule defines

22   the term suspicious order and specifies the

23   procedures a registrant must follow upon receiving

24   such orders.  You can monitor the progress of the

25   suspicious orders of controlled substances proposed
```

Page 120

1   rule on the unified agenda located at

2   www.regulations.gov.  The above-stated proposed

3   rule has been assigned regulatory identification

4   number, parentheses, RIN 1117-AB47.

5           Do you see that?

6       A.   Yes.

7       Q.   So it turns out you can actually go to the

8   internet and track what's going on with proposed

9   rules at the DEA, correct?

10      A.   Yes.

11      Q.   Okay.  And the document I just gave you,

12  the new one, which is Ashley 17, is a snapshot of

13  that web page where you can go to track the

14  proposed rule.  Do you see that?

15      A.   Yes.

16      Q.   And it has the same RIN number.  If you

17  look at the RIN number, RIN, it says 1117-AB47.

18          Do you see that?

19      A.   Yes.

20      Q.   Okay.  And it says -- so we're talking

21  about the proposed rule in question, the proposed

22  rule that was having to do with suspicious order

23  ordering monitoring programs, correct?

24      A.   Yes.

25      Q.   And it says on publication ID spring 2018.

Page 121

1   Do you see that?

2       A.   Yes.

3       Q.   So I will confess I don't know whether

4   that means that this document was printed out, a

5   snapshot as of -- I take it back.  I do know.  If

6   you look at the date in the top left-hand corner of

7   this document, it says 3/8/2019.

8            So this is a snapshot of what was going on

9   as of March 8, 2019.

10      A.   Okay.

11      Q.   And it says abstract, colon, the Drug

12  Enforcement Administration is proposing to revise

13  its regulations relating to suspicious orders of

14  controlled substances.  The proposed rule defines

15  the term suspicious order and specifies the

16  procedures a registrant must follow upon receiving

17  such orders.

18           Do you see that?

19      A.   Yes.

20      Q.   And do you see that underneath that, it

21  says priority, colon, and then it says substantive,

22  comma, nonsignificant?  Do you see that?

23      A.   I see that.

24      Q.   Okay.  Based on your work -- based on your

25  experience when you were at the DEA, do you know

1   what that meant, priority substantive, comma,

2   nonsignificant?

3      A.   Based on my experience, when it is noted

4   nonsignificant, it was the emphasis on, say, the

5   urgency of the public interest.  Like if there were

6   a rule that needed to go in place immediately

7   because of some threat to the public, it would be

8   deemed significant.  If it's nonsignificant, it's

9   just a regular drafting that we need to get done.

10  Not that it's not a priority, but it's not as

11  urgent as some others may be.

12     Q.   We have reviewed documents today this

13  morning that show that HDA was asking for revision

14  of the regulation in question, the regulation

15  pertaining to suspicious order monitoring all the

16  way back to 2010.  Do you remember that?

17     A.   Yes.

18     Q.   And here as of 2019, no such regulation,

19  revised regulation has been forthcoming; is that

20  correct?

21     MS. BACCHUS:  Objection to form.  This is if

22  you know.

23     MR. SHKOLNIK:  Objection.

24  BY MR. NICHOLAS:

25     Q.   Is that correct?

```
                                           Page 123
 1      A.   To my knowledge, there's not a new
 2  regulation.
 3      MR. NICHOLAS:  Okay.  We can take a lunch
 4  break.
 5      THE VIDEOGRAPHER:  We are off the record at
 6  12:56 p.m.
 7                         (Whereupon, a lunch break was
 8                         taken.)
 9      THE VIDEOGRAPHER:  We are back on the record at
10  1:53 p.m.
11      MR. NICHOLAS:  I'd like to mark the next
12  exhibit, please, which I think may be Ashley 18.
13                         (Whereupon, ASHLEY Deposition
14                         Exhibit No. 18 was marked for
15                         identification.)
16  BY MR. NICHOLAS:
17      Q.   Ms. Ashley, good afternoon.  I've handed
18  you Ashley 18, which is -- which shows two e-mails.
19  The most recent e-mail is an e-mail from Matthew
20  Strait to Mary Brandenberger at the DEA as well as
21  Katherine Pfaff at the DEA and Barbara Carreno at
22  the DEA with a CC to Sean Mitchell at the DEA, and
23  it encloses a -- it encloses an e-mail that
24  Mr. Strait sent to you and several other people,
25  which, you know, attaches a press announcement
```

Page 124

1    that, I believe, either -- may have come from the

2    DEA itself.

3              So let's take this from the bottom.  I

4    don't need to ask you a lot of questions about

5    this, but do you recall receiving -- well, first of

6    all, who is Matthew Strait?

7        A.   Matthew Strait at the time was -- let me

8    see, February of '18.  Yeah, he reported directly

9    to me.  He was more of the public information

10   person for diversion.

11       Q.   And he was sending you this press release?

12       A.   Yes.

13       Q.   And the press release is about the DEA

14   launching a new tool to assist drug manufacturers

15   and distributors with their regulatory obligations

16   under the Controlled Substances Act.  Do you see

17   that in the first sentence?

18       A.   Yes.

19       Q.   And that new tool had to do with making

20   ARCOS information available to the distributors; is

21   that right?

22       A.   Correct.

23       MS. BACCHUS:  Objection.  Beyond the scope of

24   what she's authorized to testify to.

25

Page 125

1   BY MR. NICHOLAS:

2       Q.   Well, the document --

3       MR. NICHOLAS:  Are you instructing her not to

4   answer?

5       MS. BACCHUS:  I am.  If you're going to ask her

6   any questions about the ARCOS system, yes.

7   BY MR. NICHOLAS:

8       Q.   Well, let's take it one question at a

9   time.  So far I think what I've asked you is

10  whether the new tool or the new thing that was

11  released was -- to the distributors was access to

12  certain ARCOS information, correct?

13      A.   Yes.

14      Q.   And I think I can ask you whether that is,

15  in fact, what happened in 2018, that the DEA worked

16  out a way to have more -- to have some ARCOS

17  information released to the distributors?

18      MS. BACCHUS:  I'm going to object to the form

19  of the question.  If you know.

20      MR. SHKOLNIK:  Objection.  Outside the scope.

21  BY MR. NICHOLAS:

22      Q.   Go ahead.

23      A.   This notifications states that it's

24  providing access to more information to

25  registrants, yes, it does.

Page 126

1      Q.   More information from the ARCOS data?

2      A.   From ARCOS data.

3      Q.   Can you just explain what -- to the best

4  of your personal knowledge, what it was that was

5  being made available that previously had not been

6  made available to distributors?

7      MR. SHKOLNIK:  Objection.  We were given

8  limitations on this witness to talk about anything

9  regarding ARCOS, and I think this is far field.

10  You said it's just about this e-mail and

11  notification.  Now we're going into the details of

12  ARCOS.

13      MR. NICHOLAS:  Let's just -- we can keep the

14  clock running, but let's just go off the record for

15  one second.  You can run the clock if you want.

16  Okay.  We can go back on the record.

17  BY MR. NICHOLAS:

18      Q.   This press release was issued when you

19  were still with the DEA; is that right?

20      A.   Yes.

21      Q.   And it pertains to information being made

22  available to manufacturers and distributors; is

23  that right?

24      A.   Yes.

25      Q.   And you were with the Office of Diversion

Page 127

1   Control during this time period; is that right?

2       A.   Yes.

3       Q.   And you were communicating with

4   manufacturers and distributors about issues related

5   to their respective programs; is that correct?

6       A.   Yes.

7       Q.   And you were communicating with

8   manufacturers and distributors with regard to

9   issues relating to combatting the ongoing opioid

10  crisis; is that correct?

11      A.   Yes.

12      Q.   Okay.  And this new information that was

13  being made available was a tool to assist the

14  manufacturers and the distributors in helping to

15  combat the ongoing opioid crisis; is that correct?

16      A.   Yes.

17      Q.   And you had discussed -- is it correct

18  that you had discussed this new tool with the

19  manufacturers and the distributors?

20      A.   Not this tool specifically, no.

21      Q.   You're saying you never talked to

22  manufacturers and distributors about ARCOS data?

23      MR. SHKOLNIK:  Objection.

24      THE WITNESS:  Yes, I have.

25

Page 128

1   BY MR. NICHOLAS:

2        Q.   You have?

3        A.   Yes.  I'm thinking technically of the tool

4   itself, the database.

5        Q.   Okay.  So you have communicated with

6   manufacturers and distributors over the years about

7   the ARCOS database; is that right?

8        A.   Yes.

9        Q.   And in those communications, they've

10  expressed a desire to have access to the ARCOS

11  database; is that right?

12       A.   Yes.

13       MR. SHKOLNIK:  Objection to form.

14       THE WITNESS:  Yes.

15  BY MR. NICHOLAS:

16       Q.   And until this 2018 time period, they did

17  not have access to the ARCOS database; is that

18  right?

19       A.   They had access to some information, not

20  all that they wanted, but yes, they did have some.

21       Q.   Very limited; is that correct?

22       A.   I wouldn't describe it as very limited.  I

23  wouldn't describe it that way.

24       Q.   But what was released in 2018 provided

25  them with more information than they had had

1    previously, correct?

2        MR. SHKOLNIK:  Objection.  Outside the scope --

3    BY MR. NICHOLAS:

4        Q.   You can go ahead.

5        MR. SHKOLNIK:  -- of the Touhy.

6        THE WITNESS:  That's correct.

7    BY MR. NICHOLAS:

8        Q.   I would like to go ahead and inquire into

9    this, and I'm just going to direct you to -- I'm

10   now -- I'm talking to your counsel.

11       MR. NICHOLAS:  If you look at your letter, the

12   Touhy letter to Ms. Ashley No. 5, your personal

13   recollection regarding your interactions with

14   manufacturers and distributors of opioids during

15   your tenure at the Office of Diversion Control --

16       MS. BACCHUS:  Yes.

17       MR. NICHOLAS:  -- I think the questions I just

18   asked make it pretty clear that Ms. Ashley was

19   talking to -- was communicating with manufacturers

20   and distributors while she was in the job described

21   here about ARCOS -- about the ARCOS data and

22   specifically the request for more -- for access to

23   more of the ARCOS data so that they could -- so

24   they could enhance their ability to work with the

25   requirements, the suspicious order monitoring

1    requirements.

2         MS. BACCHUS:  The issue, as I see it, in terms

3    of what she's authorized to testify regarding, she

4    can talk about that they wanted information from

5    the ARCOS, but she cannot discuss what's in the

6    ARCOS database, why they weren't given information

7    from the ARCOS database, that type of information.

8         MR. NICHOLAS:  I won't ask her why they weren't

9    given it previously.  I would like to be able to

10   ask her just rudimentary questions about what's in

11   it, what's the information.  I'm not going to ask

12   her why over the years you refused to or you

13   declined to provide that access, but I do want to

14   be able to say what's the data, what's in it.

15        MS. BACCHUS:  I don't think she can testify to

16   that.  To the extent what was in it was

17   communicated to the registrants, she can talk about

18   that, but in terms of what other information, she

19   can not speak to.

20        MR. NICHOLAS:  Okay.  Then I'm going to take it

21   one question at time.

22        MS. BACCHUS:  All right.

23        MR. NICHOLAS:  And let me try it this way.

24   BY MR. NICHOLAS:

25        Q.   In order to try to abide by your counsel's

Page 131

1   limiting instruction, I'm going to ask you

2   questions where -- if this is information that was

3   discussed with or shared with the manufacturers and

4   distributors between you and them, you and they, I

5   would like you to answer the question.

6        MR. SHKOLNIK:  Objection to form.

7        MR. NICHOLAS:  Object to what?

8        MR. SHKOLNIK:  I thought that was a question.

9   You wanted her to answer the last question.

10       MR. NICHOLAS:  I have no idea what you're

11  saying.

12       MR. SHKOLNIK:  You had a question pending and

13  now --

14       MR. NICHOLAS:  She and I understood each other,

15  so that's probably more important.

16  BY MR. NICHOLAS:

17       Q.   Ms. Ashley, are you familiar with ARCOS

18  data?

19       A.   Yes.

20       Q.   Okay.  And have you seen ARCOS reports

21  before?

22       A.   Yes.

23       MR. SHKOLNIK:  Objection.  We were given

24  instructions to limit -- we could not ask about

25  ARCOS and what's in it and what is available, and

1    we did not have the opportunity to prepare for that

2    because of the limitations placed by the

3    government.  And now to let the distributor counsel

4    inquire into the specifics, have you seen what's in

5    ARCOS before, are you familiar with the data,

6    that's going into the heart of it.  And we're

7    asking for instruction that the witness not be

8    allowed or that we come back on another day for

9    this issue where we've had an opportunity to

10   prepare for it.

11       MR. NICHOLAS:  Okay.  I'm going to keep going.

12   I think --

13       MS. BACCHUS:  I'm sorry.  Can I, for the

14   record, just say that the witness is authorized to

15   answer as to what she communicated to the

16   registrants about ARCOS, but she cannot discuss the

17   specifics of the information that is in ARCOS

18   unless it is something that she shared specifically

19   with the registrants.

20   BY MR. NICHOLAS:

21       Q.   Did you share with the registrants or with

22   registrants at any time the fact that ARCOS data

23   includes in it the name of the distributor?

24       MR. SHKOLNIK:  Objection.

25       THE WITNESS:  The name of the distributor that

1    I'm speaking to or in general?

2    BY MR. NICHOLAS:

3        Q.    No.

4        A.    The name of any distributor?

5        Q.    Yeah.  Does ARCOS data report --

6        MR. SHKOLNIK:  Same objection.

7    BY MR. NICHOLAS:

8        Q.    -- the name of the distributor?  Did you

9    share that information with the distributors?

10       A.    It's likely, yes.

11       Q.    Did you share with the distributors the

12   fact that ARCOS data contains within it the name of

13   the pharmacy at issue in question?

14       A.    Yes.

15       MR. SHKOLNIK:  Objection.

16       MS. BACCHUS:  Objection.  Vague.

17       MR. NICHOLAS:  She said yes.

18   BY MR. NICHOLAS:

19       Q.    Did you share with -- did you share with

20   the distributors the fact that ARCOS data contains

21   within it the date of the sale being reported?

22       MR. SHKOLNIK:  Objection.

23       THE WITNESS:  So I guess I have a question.  In

24   the course of a discussion, did we talk about those

25   things?

1   BY MR. NICHOLAS:

2       Q.   Yeah.

3       A.   Yes.

4       Q.   In the course of a discussion or

5   otherwise, did you share with the manufacturers and

6   distributors or one or the other or both the fact

7   that ARCOS data contains the type of opioid that's

8   being distributed?

9       MR. SHKOLNIK:  Objection.  Same objection.

10      THE WITNESS:  Yes.

11  BY MR. NICHOLAS:

12      Q.   Did you share with manufacturers and

13  distributors in the course of discussions or

14  conversations or communications the fact that ARCOS

15  data contains within it the strength of the opioid

16  being distributed?

17      MR. SHKOLNIK:  Objection.  What was the purpose

18  of providing us a limitation?

19      THE WITNESS:  I can't say specifically that

20  thing, but maybe.

21  BY MR. NICHOLAS:

22      Q.   And lastly, did you share with the

23  registrants with whom you had conversations over

24  the years about ARCOS data the fact that ARCOS data

25  contained the amount of opioids distributed that

1  were being --

2      MR. SHKOLNIK:  Objection.  Outside the scope.

3      THE WITNESS:  I would say yes.

4  BY MR. NICHOLAS:

5      Q.   And based on your knowledge and your

6  experience in your job, various jobs, prior to

7  2018, this information that we just went through

8  was only available to the DEA; is that correct?

9      MR. SHKOLNIK:  Objection.

10     MS. BACCHUS:  Objection.  Form.

11     THE WITNESS:  I would say no.

12 BY MR. NICHOLAS:

13     Q.   Is it correct that it was all available to

14 the DEA?

15     MS. BACCHUS:  Objection.  Vague.

16     MR. SHKOLNIK:  Objection.  Outside.

17     THE WITNESS:  This information?

18 BY MR. NICHOLAS:

19     Q.   Yes.

20     A.   Yes.

21     Q.   Okay.  And the thing I'll ask you about

22 this document, Ashley 18, in the press release from

23 the DEA, there's a statement which reads as

24 follows:  It's a little more than halfway down the

25 page.  It starts with the word manufacturer, and

Page 136

1    the sentence reads manufacturers and distributors

2    have consistently expressed a desire for assistance

3    from DEA in fulfilling these obligations and have

4    requested ARCOS information to help them make

5    informed decisions about whether new customers are

6    purchasing excessive quantities of controlled

7    substances.

8            Based on your experience working at the

9    DEA; is that a true statement?

10       A.   Yes, that is.

11       Q.   And that is something which the

12   distributors have been asking for since at least

13   2010, correct?

14       MR. SHKOLNIK:  Objection.

15       MS. BACCHUS:  Objection to form of the

16   question.

17       THE WITNESS:  In my personal experience,

18   they've asked for it.

19   BY MR. NICHOLAS:

20       Q.   You don't want me to go back and do the

21   same segments of the questions I asked before, do

22   you?

23            All right.  Just two more areas, and then

24   I think we're going to be done.

25            Are you familiar with the Ensuring Patient

Page 137

1   Access and Effective Drug Enforcement Act?

2       A.   Yes.

3       Q.   Do you recall or know that the act was

4   signed into law in April of 2016?

5       A.   Yes, I recall.

6       Q.   Do you recall -- we talked before about

7   how you had the experience of being able to testify

8   before Congress, right?

9       A.   Yes.

10      Q.   Do you recall testifying before Congress

11  and being asked some questions by Senator Cruz

12  having to do with the Ensuring Patient Access and

13  Effective Drug Enforcement Act?

14      A.   I remember him asking questions, not

15  specifically what the question was.

16      Q.   Do you remember -- I'm going to read you

17  his question and your answer.  I tell you what.

18  Let's introduce your testimony for -- just so we

19  have it on record.  I'm not going to make us look

20  through it, okay, but let's do it just so we have a

21  complete record.  Next exhibit is Ashley 19.

22                    (Whereupon, ASHLEY Deposition

23                    Exhibit No. 19 was marked for

24                    identification.)

25

Page 138

1   BY MR. NICHOLAS:

2       Q.   You can just take a look through it and

3   tell me if it appears to be an accurate transcript

4   of your testimony.  Page 8 is where you're

5   introduced, by the way, and then it proceeds from

6   there.

7       A.   Yes, this appears to be a copy of my

8   testimony.

9       Q.   Okay.  I'm going to take the liberty of

10  reading a few questions and answers.  I have the

11  page numbers, but I'm just going to read them to

12  you.  If you remember them, great.  If not, just

13  tell me, okay?

14      A.   Okay.

15      Q.   So on Page 25 of this document, Ms. --

16  Senator Cruz --

17      MS. BACCHUS:  Can you give her a minute to get

18  to the page?

19      THE WITNESS:  I'm sorry.

20      MR. NICHOLAS:  Absolutely.

21  BY MR. NICHOLAS:

22      Q.   You can look if you want.  It's Page 25.

23  It's about two-thirds of the way down or a little

24  more.  Right after you say yes, sir, there's a

25  question from Senator Cruz, and the question is and

                                                    Page 139

1    the DEA supported the legislation and the version

2    that actually passed, question mark, and your

3    answer was yes, sir.

4             Do you see that?

5         MR. SHKOLNIK:  Objection.

6         MS. BACCHUS:  Objection.

7         MR. SHKOLNIK:  Objection.  Improper use of

8    prior testimony.

9         MS. BACCHUS:  Can I get a reference to what

10   legislation we're talking about?

11        MR. NICHOLAS:  We're talking about the Ensuring

12   Patient Access and Effective Drug Enforcement Act.

13        MR. SHKOLNIK:  Objection to form.

14   BY MR. NICHOLAS:

15        Q.   My only question is do you recall being

16   asked this question and giving this answer?

17        A.   Do I recall --

18        MR. SHKOLNIK:  Objection.  Improper use of

19   prior testimony.

20        THE WITNESS:  -- being asked specifically?  No.

21   I recall that Senator Cruz did question me.  I

22   don't remember the questions.

23   BY MR. NICHOLAS:

24        Q.   Okay.  Do you remember that he -- I'll try

25   to do this differently then.  Do you remember that

1    he invited you, on behalf of the DEA, to submit any

2    additional language or changes you wanted to make

3    to the proposed legislation?

4         A.    Not specifically Senator Cruz, but yeah.

5         Q.    You do remember that?

6         A.    Yeah.

7         Q.    And did the DEA do that, submit --

8         A.    Yes.

9         Q.    Submit its changes?

10        A.    Yes.

11        Q.    And did the DEA support the legislation on

12   the version that actually passed?

13        A.    We agreed to it.  I wouldn't say supported

14   it.

15        Q.    Okay, but you didn't object to it?

16        A.    Yes, we did object to it.

17        Q.    In the end?

18        A.    In the end, I mean, we did not.

19        MR. SHKOLNIK:  Objection to that conversation.

20   Object to form.

21   BY MR. NICHOLAS:

22        Q.    Ultimately --

23        MR. SHKOLNIK:  Objection to form.

24   BY MR. NICHOLAS:

25        Q.    -- at the end of the process when the

Page 141

1   legislation was passed, when it was about to be

2   passed, did the DEA assent to it?

3       MR. SHKOLNIK:  Objection to form.

4       MS. BACCHUS:  I have to object here.  To the

5   extent that this requires the internal

6   deliberations, you cannot answer.

7       THE WITNESS:  Okay.

8   BY MR. NICHOLAS:

9       Q.   Did the DEA support the legislation and

10  the version of the legislation that actually

11  passed?

12      MR. SHKOLNIK:  Objection.

13      MS. BACCHUS:  Scope.

14      MR. SHKOLNIK:  Form.  Scope.

15      THE WITNESS:  I'd say we agreed to it.

16  BY MR. NICHOLAS:

17      Q.   Okay.  Last set of questions, and then

18  someone else can ask you some questions.

19          Are you familiar with the annual

20  production quota?

21      MS. BACCHUS:  Objection.

22      MR. SHKOLNIK:  Objection.  Outside the scope.

23      MS. BACCHUS:  She cannot testify to quotas.

24  That was not part of her Touhy authorization.

25      THE WITNESS:  Answer the question?

Page 142

1   BY MR. NICHOLAS:

2       Q.   You've been instructed not to answer.

3       MS. BACCHUS:  I've instructed you not to answer

4   any questions regarding quotas.

5       MR. NICHOLAS:  Can I ask a foundational

6   question to see if I can change your mind at all?

7   It's just a foundational question.

8       MS. BACCHUS:  You can ask it.  I don't know

9   that it's going to change my mind.  If you look at

10  the Touhy authorization, there's nothing about

11  quotas.

12  BY MR. NICHOLAS:

13      Q.   The question is during the course of your

14  employment with the DEA, did you ever work -- did

15  your work ever involve working with annual

16  production quotas?

17      MS. BACCHUS:  I'm going to object to that and

18  instruct her not to answer.

19      MR. NICHOLAS:  Okay.  Rather than take issue

20  for the next half hour and bicker back and forth,

21  I'm just going to make a record of the fact that we

22  think she should be allowed to talk about this

23  because it's within the scope of the Touhy

24  permissive instructions because it has to do with

25  her prior -- it may, if she answers yes, have to do

1   with what she's done in her employment at DEA,

2   which I know I am allowed to inquire about.

3           So that's my basis for objecting to your

4   objection.  If you're going to stick by your guns

5   and still instruct her not to answer, there's

6   nothing I can do.

7      MS. BACCHUS:  Well, to the extent that you have

8   asked her what her general duties entailed, she can

9   tell you yes, if her general duties entailed it.

10  To the extent of getting into the details of quotas

11  and what she may have advised or had not advised,

12  what she had done with respect to quotas, we would

13  object that that is outside the scope of the Touhy

14  authorization.  As you can review it, the

15  authorization was regarding suspicious orders.

16  There was no request for her to testify regarding

17  quotas, and so it has not been evaluated.  So we

18  would stand on it.

19     MR. SHKOLNIK:  I agree.

20     MR. NICHOLAS:  You've been instructed not to

21  answer by your counsel.  I'm going to respect the

22  instruction, obviously.  So I've appreciated the

23  time you've given me, Ms. Ashley, to talk.  And

24  since I'm pretty sure I haven't taken all that much

25  time, to the extent we have time left over at the

Page 144

1    end, I'm going to reserve whatever is left over so

2    that I can ask some questions at the end, okay?

3    Thank you very much.

4        THE VIDEOGRAPHER:  We're off the record at

5    2:19 p.m.

6                        (Whereupon, a short break was

7                         taken.)

8        THE VIDEOGRAPHER:  We're back on the record at

9    2:26 p.m.

10                       EXAMINATION

11   BY MS. ZOLNER:

12       Q.   Hi, Ms. Ashley.  My name is Erica Zolner,

13   and I represent one of the manufacturers in this

14   action.  I'm going to ask you some questions now on

15   behalf of my client.

16           We talked this morning about Exhibit 3,

17   which is the Controlled Substances Act.  If you

18   could pull that back out of your big pile of

19   documents, I'm going to ask you a few more

20   questions about that document.  Just let me know

21   when you're there.

22       A.   I'm there.

23       Q.   Great.  We're, again, going to talk

24   specifically about Section B of Section 1301.74 of

25   the Controlled Substances Act.  You testified

Page 145

1   earlier this morning about this statute based on

2   your over 35 years of experience at DEA.  Do you

3   recall that?

4       A.   Yes.

5       Q.   And I seem to recall you saying that this

6   statute has not changed since 1971; is that right?

7       MS. BACCHUS:  Objection.  Mischaracterization.

8       THE WITNESS:  I don't recall it changing.

9   BY MS. ZOLNER:

10      Q.   Do you see the word suspicious in

11  Section B?

12      A.   Yes.

13      Q.   What is a suspicious order based on your

14  experience for a manufacturer?

15      A.   In my experience, a suspicious order is

16  one that would sort of raise a flag with the

17  distributor or the person who's coordinating the

18  transaction that it's not the norm, the routine for

19  that particular customer.

20      Q.   Is suspicious defined anywhere in the

21  Controlled Substances Act?

22      A.   No.

23      Q.   Is a suspicious order different for a

24  manufacturer versus a distributor?

25      A.   No, not suspicious.  If it's suspicious,

1   it's just suspicious.

2       Q.   Okay.  And to your knowledge, as you're

3   sitting here now, you're not aware of any

4   additional definition of suspicious in the

5   Controlled Substances Act; is that correct?

6       MR. SHKOLNIK:  Objection to form.

7       THE WITNESS:  In the Controlled Substances Act,

8   no.

9   BY MS. ZOLNER:

10      Q.   Are you aware of a definition anywhere

11  other than in the Controlled Substances Act that is

12  relied on the DEA?

13      A.   Yeah.  There was policy guidance

14  published.  I don't remember which year, but there

15  was policy guidance published in the Federal

16  Register.

17      Q.   Other than the Federal Register, are you

18  aware of any other definitional phrasing --

19      A.   No.

20      Q.   -- for suspicious?

21           What about unusual in Section B, what is

22  meant by unusual size?

23      A.   It would be different from the norm of the

24  size that that particular customer typically

25  orders.

1      Q.   Different from the norm.  So how much of a

2   deviation would make it unusual?

3      A.   That would be determined by the

4   distributor or the manufacturer.

5      Q.   So is there any threshold for determining

6   whether a deviation is unusual?

7      A.   Not that the DEA sets, no.

8      Q.   Based on your experience, would you agree

9   that there might be situations where an order is of

10  an unusual size, but the order is not suspicious?

11     A.   Yes.

12     MR. SHKOLNIK:  Objection.  Outside the scope.

13     THE WITNESS:  Is it possible?  Yes.

14  BY MS. ZOLNER:

15     Q.   Could you give me some examples of when

16  that might be the case?

17     MS. BACCHUS:  Objection.

18     MR. SHKOLNIK:  Objection.

19     MS. BACCHUS:  If you know.

20     THE WITNESS:  It might be the case, for

21  example, if there were some natural disaster where

22  that particular manufacturer/distributor lost their

23  supply -- not the manufacturer.  I'm sorry.  If the

24  retail pharmacy lost their supply of inventory and

25  they needed to reorder, but they needed to reorder

Page 148

```
 1    in bulk because they lost everything.
 2    BY MS. ZOLNER:
 3        Q.   Can you think of other examples?
 4        A.   If somehow I have experience where there
 5    is an incentive to purchase more, maybe end of year
 6    sale or something to that effect.
 7        Q.   Any other examples?
 8        A.   Not that I can think of.
 9        Q.   Are there other examples that you just
10    can't think of?
11        A.   Likely, yes.
12        MR. SHKOLNIK:  Objection to form.
13    BY MS. ZOLNER:
14        Q.   Likely, yes?
15        A.   Yes.
16        Q.   In Section B towards the end of Section B,
17    it says the registrant shall inform the field
18    division office of the administration in his area
19    of suspicious orders when discovered by the
20    registrant.  Next sentence, suspicious orders
21    include orders of unusual size, orders deviating
22    substantially from a normal pattern and orders of
23    unusual frequency.
24            What do you interpret normal pattern to
25    mean in that sentence?
```

Page 149

1      MR. SHKOLNIK:  Objection.  Are you asking her

2    for DEA's interpretation on that or this witness

3    personally?

4      MS. ZOLNER:  There's a standing objection on

5    this issue.

6      MR. SHKOLNIK:  I can make my objection to every

7    question.

8      MS. ZOLNER:  I would ask that you please

9    refrain from speaking objections.

10     MR. SHKOLNIK:  You can ask me all you want.

11   Are you asking for a personal, or are you -- is

12   this question personal or DEA?  So the form of the

13   objection is very clear.

14   BY MS. ZOLNER:

15     Q.   You can answer the question.

16     A.   In my personal opinion, for a known

17   customer to place an order that's different from

18   what they normally place would be outside of the

19   normal pattern.

20     Q.   What about deviating substantially in that

21   last sentence that I just read, what does that mean

22   to you based on your experience at DEA?

23     A.   Based on my experience, if there is,

24   again, a known customer and if it's much larger

25   even than -- you know, much more larger than --

1    just enough to raise some sort of suspicion.  So

2    it's just, I guess, the magnitude of the deviation.

3        Q.   Is deviating substantially defined

4    anywhere that you're aware of?

5        A.   Other than the guidance document that was

6    published, I don't know.

7        Q.   Are you --

8        A.   Not that I'm aware of.

9        Q.   Are you referring again to that Federal

10   Register document that you just referred to

11   earlier?

12       A.   Yes.

13       Q.   Do you agree that there might be

14   situations where an order deviates substantially

15   from a normal pattern and is not suspicious?

16       MS. BACCHUS:  Objection.  Calls for

17   speculation.  You can answer.

18       THE WITNESS:  Yeah, that could happen.

19   BY MS. ZOLNER:

20       Q.   To your knowledge, what is meant by

21   unusual frequency in the last sentence?

22       A.   For a known customer to place an order

23   typically sooner than they normally would.

24       Q.   In your experience, would you agree that

25   there might be situations when an order of unusual

Page 151

1    frequency is not suspicious?

2        A.   Yes, I would agree to that.

3        Q.   Are there any other factors other than the

4    factors enumerated here that must be considered

5    when determining whether an order is suspicious?

6        MR. SHKOLNIK:  Objection.  Form.  Outside the

7    scope unless you're asking for personal opinion.

8        MS. BACCHUS:  Objection.

9        THE WITNESS:  In my personal opinion, yes.

10   BY MS. ZOLNER:

11       Q.   What are those factors?

12       A.   I wouldn't be able to name them all.  It

13   could be lots of things.  It could be the location

14   of the customer.  It could be the population that

15   the customer supplies.  It could be a lot of

16   different things.  I wouldn't be able to name them

17   all.

18       Q.   Based on your experience, why haven't

19   those factors that you just described been added to

20   the Controlled Substances Act?

21       MR. SHKOLNIK:  Objection.  Outside the scope.

22   Policy.

23       MS. BACCHUS:  Objection.  She can't speak to

24   what DEA would or would not do.

25

Page 152

1    BY MS. ZOLNER:

2         Q.   To your knowledge, are you aware of any

3    other place where DEA has defined any of the terms

4    other than the Federal Register for terms that are

5    used in Section B?

6         MR. SHKOLNIK:  Objection.

7         MS. BACCHUS:  Objection.  Asked and answered.

8         MR. SHKOLNIK:  Asked and answered.

9         THE WITNESS:  Other than the Controlled

10   Substances Act and the Code of Federal Regulations

11   and the guidance document?

12   BY MS. ZOLNER:

13        Q.   Yes.

14        A.   In policy letters.

15        Q.   Other than policy letters, any other

16   sources?

17        MR. SHKOLNIK:  Objection.  Form.

18        THE WITNESS:  I don't know.

19   BY MS. ZOLNER:

20        Q.   You're familiar with the term controlled

21   substances, right?  We've been talking a lot about

22   the Controlled Substances Act this morning.  Based

23   on your knowledge, are prescription opioids

24   controlled substances?

25        A.   Prescription opioids, yes, they are.

1      Q.   Are you familiar with the phrase closed

2   system of distribution?

3      A.   Yes.

4      Q.   What does that mean?

5      A.   It means from development of the drug,

6   manufacturing of the drug, that DEA maintains

7   control in that system from registrant to

8   registrant until it exits to the ultimate user.

9      Q.   Did you say DEA maintains?

10      A.   Maintains authority over the transactions

11   of the controlled substance until it exits.

12      Q.   Until it exits, what do you mean by that?

13      A.   When it's given to the ultimate user,

14   prescribed to the ultimate user.

15      Q.   So it's your testimony that DEA would

16   maintain control over the drug in a controlled

17   system of distribution?

18      MS. BACCHUS:  Objection.  Mischaracterization.

19      THE WITNESS:  No.  No.

20   BY MS. ZOLNER:

21      Q.   I misunderstood your testimony.

22      A.   I'm thinking physical control as in having

23   possession of it, no.  I mean, that they would have

24   regulatory authority over the transactions with its

25   regulatory control.  It's the paperwork, the

1    invoices and the documents that would show where

2    the controlled substances are going.

3         Q.   Are there different categories of

4    registrants under DEA regulations?

5         A.   Yes.

6         Q.   Can you give me some examples?

7         A.   I'm sorry.  Let me clarify.  Do you mean

8    business activity when you say category?

9         Q.   I meant in terms of registrants, you have

10   pharmacies, right?

11        A.   Uh-huh.  That's a business activity.

12        Q.   I'm sorry?

13        A.   I'm sorry.  That would be the business

14   activity, pharmacies, manufacturers, the type of

15   business that they --

16        Q.   Exactly.  The kind of business that a

17   particular registrant engages in, there can be

18   different categories of registrants engaged in

19   different categories of business, correct?

20        A.   Correct.

21        Q.   Manufacturers --

22        A.   Yes.

23        Q.   -- manufacture substances.  Distributors

24   distribute them.  Is everyone involved in the

25   production or sale of controlled substances playing

1    a different role in the closed system in your view?

2        MR. SHKOLNIK:  Objection to form and outside

3    the scope unless it's her personal opinion.

4        THE WITNESS:  I don't think I'm clear on the

5    question.  The role would be to operate in

6    compliance with the Controlled Substances Act, so

7    they may all have the same role.

8    BY MS. ZOLNER:

9        Q.   But the different categories of

10   registrants that we just discussed, they have

11   different business activities, right?  We just

12   described that?

13       A.   Correct.

14       Q.   So with respect to those different

15   business activities, those different business

16   activities require different responsibilities

17   depending on what kind of a registrant you are,

18   right?

19       A.   Yes.

20       Q.   Just so you know with the court reporter,

21   nods are very difficult to record.

22       A.   Oh.

23       Q.   That's the only reason why I paused.

24            Do manufacturers have the same visibility,

25   based on your knowledge, into sales to pharmacies

Page 156

1   as distributors?

2        A.   Sometimes, yes.

3        Q.   Do they always have the same visibility

4   into sales to pharmacies as distributors?

5        MR. SHKOLNIK:  Objection to form.

6        THE WITNESS:  I don't know.

7   BY MS. ZOLNER:

8        Q.   You said sometimes, yes.  Could you

9   explain and clarify what you meant by that?

10       A.   When I say sometimes, yes, it's only if

11  the distributor provides it, and I know that

12  sometimes they do.

13       Q.   Okay.  So if I'm understanding your

14  testimony, if the distributor shares information

15  about a pharmacy customer with a manufacturer, then

16  the manufacturer has transparency into sales to

17  that pharmacy?

18       A.   Yes.

19       Q.   Do distributors have the same visibility

20  into sales to patients as pharmacies?

21       MR. SHKOLNIK:  Objection to form.

22       MS. BACCHUS:  Based on your knowledge.

23       THE WITNESS:  Again, sometimes.

24  BY MS. ZOLNER:

25       Q.   Sometimes.  Would that be similar to

1    the --

2        A.    Yeah.

3        Q.    -- way we just described when a

4    manufacturer would have visibility into a pharmacy?

5    That would only occur, as we just discussed, if the

6    distributor provided that information to the

7    manufacturer, right?

8        MR. SHKOLNIK:  Objection.  Form.

9        MS. BACCHUS:  Objection.

10       MR. SHKOLNIK:  Speculation.

11       THE WITNESS:  If the retail pharmacy provides

12   the information to the distributor, they would have

13   it.

14   BY MS. ZOLNER:

15       Q.    Right.  So to take the next example

16   whether distributors would have the same visibility

17   into sales to patients as pharmacies, that

18   visibility would only occur if the pharmacies

19   provided that information, right?

20       MR. SHKOLNIK:  Objection to form.

21       THE WITNESS:  That's the one way I know of,

22   yes.

23   BY MS. ZOLNER:

24       Q.    Is each participant in the closed system

25   of distribution, to your knowledge, responsible for

Page 158

1   knowing their own customers?

2       A.   Yes.

3       Q.   Does each participant in the closed system

4   of distribution have corresponding responsibility

5   for their direct sales of controlled substances?

6       A.   Yes.

7       Q.   Have you ever heard of the phrase know

8   your customer's customer?

9       A.   Yes.

10      Q.   What does that mean?

11      A.    It means if you have a customer that

12  you're supplying to that you want to make sure that

13  they are making sales to legitimate customers, that

14  they are a legitimate business and they have

15  customers supporting the business that they want

16  from you.

17      Q.    It means -- I'm just looking at your

18  testimony.  I want to make sure I understand it.

19  It means if you have a customer that you're

20  supplying to, you want to make sure that they're

21  making sales to legitimate customers, but does that

22  require you to know all of the details about -- for

23  instance, if you are supplying prescription drugs

24  to a distributor, does that require you to know all

25  of the details of the distributor's customer base?

1       MR. SHKOLNIK:  Objection.  You're asking for

2   DEA's position and the law here.  Objection to

3   form, first of all.  Objection to asking for a

4   position of the DEA.

5       MS. ZOLNER:  I would again respectfully ask

6   that you refrain from speaking objections.  I'll

7   say it every time so the record is clear.  Form

8   objections and objection to --

9       MR. SHKOLNIK:  I'm allowed at least 10 words.

10  That's the rule.  I've done enough of these.

11      MS. ZOLNER:  If you're comfortable taking that

12  position.  I would again just request no speaking

13  objections respectfully.

14      MS. BACCHUS:  Can I ask that you slow down a

15  little bit.

16      MS. ZOLNER:  Sure.  You know, it's funny.  I'm

17  making a big effort to slow down, so I'll make even

18  more of an effort to slow it down.

19  BY MS. ZOLNER:

20      Q.   Okay.  Going back to know your customer's

21  customer, to your knowledge, is there any language

22  in the Controlled Substances Act that states that a

23  manufacturer is required to know its customer's

24  customer?

25      A.   In the Controlled Substances Act, no.

Page 160

1      Q.   Is that phrase anywhere in the CSA to your

2   knowledge?

3      A.   To my knowledge, no.

4      Q.   To your knowledge, is there any language

5   in the Code of Federal Regulations that states that

6   a manufacturer is required to know its customer's

7   customer?

8      MR. SHKOLNIK:  Objection.  Form.

9      THE WITNESS:  I have to say I'm not sure to

10   that one.

11   BY MS. ZOLNER:

12      Q.   You just don't know one way or another?

13      A.   Correct.

14      MR. SHKOLNIK:  Objection to form.

15   BY MS. ZOLNER:

16      Q.   As you sit here today, are you aware of

17   any statute that requires a manufacturer to know

18   its customer's customer?

19      A.   No, I am not aware of a statute that says

20   that.

21      Q.   What about a regulation?

22      A.   No, I'm not aware of a regulation that

23   says that.

24      Q.   What about a formal notice that's been

25   promulgated by DEA?

                                                      Page 161

1       MR. SHKOLNIK:  Objection to form.

2       THE WITNESS:  I'd have to say I don't know.

3  BY MS. ZOLNER:

4       Q.   Are you aware of any correspondence from

5  DEA to manufacturers explaining that manufacturers

6  are responsible for knowing their customer's

7  customer?

8       A.   I can't recall any.

9       Q.   So to your knowledge, where is this phrase

10  know your customer's customer coming from?

11       A.   My recollection is it comes from Federal

12  Register notices after final orders.  I remember

13  reading them in final orders.

14       Q.   You recall the language know your

15  customer's customer being formally written in final

16  orders?  Is that your testimony?

17       A.    I remember those terms being used.

18       MR. SHKOLNIK:  Objection to form.

19       THE WITNESS:  Exactly how they were used, I

20  don't remember, but I do remember those terms being

21  used.

22  BY MS. ZOLNER:

23       Q.   In your opinion, how is a manufacturer

24  expected to know its customer's customer?

25       MS. BACCHUS:  Objection.  You can answer if you

                                        Page 162

1   have an opinion.

2       THE WITNESS:  My opinion is in exercising due

3   diligence -- you're speaking from a manufacturer

4   knowing its customer's customer?  That was the

5   question?

6   BY MS. ZOLNER:

7       Q.   Correct.

8       A.   If they're supplying to a customer, which

9   is the distributor, in my opinion, in exercising

10  due diligence, you want to know that the

11  distributor is distributing to customers that are

12  real and that can support the amount of controlled

13  substances that the distributor has ordered.

14      Q.   Based on your experience, did DEA provide

15  guidance as to how a manufacturer was supposed to

16  engage in due diligence on a distributor's

17  customers?

18      MR. SHKOLNIK:  I'm sorry.  Objection to form.

19      THE WITNESS:  Yes.  There were policy and final

20  order documents that laid those things out.

21  BY MS. ZOLNER:

22      Q.   Which policy and final --

23      A.   I don't recall.

24      THE COURT REPORTER:  I'm sorry.  One more time,

25  please.

1    BY MS. ZOLNER:

2        Q.   Again, it gets tricky because we write

3    everything that we're both saying down.

4             Which policy and final order documents are

5    you referring to?

6        A.   I just recall reading many over the years.

7    I couldn't specifically pull out a name.

8        Q.   Did you personally write any policy or

9    final order documents where you described how a

10   manufacturer should attempt to know its customer's

11   customer?

12       A.   No.

13       Q.   As you sit here today, are you aware of

14   any specific final order documents where the

15   process for how a manufacturer was expected to know

16   its customer's customer was described?

17       MR. SHKOLNIK:  Objection to form.

18       THE WITNESS:  I don't recall the name of one.

19   BY MS. ZOLNER:

20       Q.   Are you aware of any descriptive document

21   that has ever been promulgated by DEA that

22   describes how due diligence should work around

23   knowing a customer's customer?

24       A.   I'm going to say I don't recall.

25       Q.   Do you know if DEA ever informed

1    manufacturers formally that they were required to

2    know their customer's customer?

3        A.   Did they ever require it?  Not to my

4    knowledge, no.

5        Q.   Earlier today you saw two different --

6    actually, I think you only saw the 2007 dear

7    registrant letter that was signed by

8    Mr. Rannazzisi.  Do you remember that letter?

9        A.   Yes.

10       Q.   I don't think we need to pull that out,

11   but maybe we should.  I'll get you a number so you

12   can find it in your pile more easily.

13       MR. SHKOLNIK:  5.

14       MS. ZOLNER:  Is it 5?  Thank you.

15   BY MS. ZOLNER:

16       Q.   Do you know if this letter, and take a

17   minute to look over the letter, does it mention an

18   obligation for manufacturers to know your

19   customer's customer?

20       A.   No, it doesn't state that in this letter.

21       Q.   I think you testified earlier this morning

22   that there has been no additional dear registrant

23   letter promulgated by DEA since the letter you're

24   looking at, Exhibit 5; is that right?

25       MR. SHKOLNIK:  Objection.  Form.  Misstates

Page 165

1    prior testimony.

2         THE WITNESS:  You're speaking specific to

3    suspicious orders as when a dear registrant letter

4    had gone out regarding suspicious orders?

5    BY MS. ZOLNER:

6         Q.   Correct.

7         A.   No, not to my knowledge.  No.

8         Q.   Are you aware of any manufacturer

9    initiative where DEA explained the concept of know

10   your customer's customer to manufacturers?

11        A.   A manufacturer's initiative, no, I'm not

12   aware of that.

13        Q.   Let's put Exhibit 5 aside.  I'm switching

14   to a new topic.

15             Are you familiar with the term chargeback

16   data?

17        A.   I'm familiar with it, yes.

18        Q.   What does that mean?

19        A.   To me, it means it's the data that is

20   shared back to the manufacturer from the

21   distributor after making a purchase.  The

22   distributors receive some sort of incentive to

23   provide the information data of who their customers

24   are back to the manufacturer.

25        Q.   Okay.  I want to take apart what you just

Page 166

1   said and make sure I understand it.

2          Is data always shared back between

3   distributors and manufacturers --

4       MR. SHKOLNIK:  Objection to form.

5   BY MS. ZOLNER:

6       Q.   -- related to a distributor's customers?

7       MS. BACCHUS:  Objection to form.

8       MR. SHKOLNIK:  Objection.

9       MS. BACCHUS:  If you know.

10      THE WITNESS:  I don't know.

11  BY MS. ZOLNER:

12      Q.   You don't know if that data is always

13  shared?

14      A.   I don't know if it always is.

15      Q.   You said -- you used the word incentive,

16  and you said distributors receive some sort of

17  incentive to provide the information or data back

18  to the manufacturer.

19          What did you mean by that term incentive?

20      A.   So in my knowledge, it was some -- it was

21  incentives, maybe a discount.  I guess I just used

22  the word discount.  That's what my knowledge is.

23      Q.   Incentive, in your experience, equates to

24  discount?

25      A.   Yeah.

1      Q.   To the best of your understanding, does

2   chargeback data play any role in suspicious order

3   monitoring?

4      A.   I guess I'm not clear.  On behalf of the

5   DEA, you mean is that something that we would use

6   or the distributor?  Would it play a role in what

7   they do?

8      Q.   Based on your experience --

9      A.   In my experience -- I'm sorry.

10     Q.   Sure.  Let me try again.

11          Based on your experience with DEA, did DEA

12  view chargeback data as playing any kind of a role

13  in suspicious order monitoring?

14     MS. BACCHUS:  Objection to form.

15     MR. SHKOLNIK:  Objection to form.

16     MS. BACCHUS:  She can't answer about what DEA

17  did.  She can tell you what her knowledge is.

18     THE WITNESS:  In my experience, chargeback data

19  was used in suspicious order monitoring information

20  by registrant.

21  BY MS. ZOLNER:

22     Q.   How?

23     A.   In my experience, they use it in order to

24  determine where they sell controlled substances.

25     Q.   In your view and in your experience, is

1  there any limitation to what kind of information

2  chargeback data can provide?

3      A.   No, I don't know that.

4      Q.   You don't know?

5      A.   No.

6      Q.   In your experience, is chargeback data

7  typically submitted to a manufacturer by a

8  distributor?

9      MR. SHKOLNIK:  Objection.  Objection to form.

10     MS. BACCHUS:  If you know, you can answer.

11     THE WITNESS:  In my experience, it was provided

12  back to the manufacturer from the distributor.

13  BY MS. ZOLNER:

14     Q.   Do you know if that data was provided to

15  the manufacturer after the product shipped?

16     A.   To my knowledge, it was after the product

17  shipped.

18     Q.   Do you know if manufacturers receive

19  chargeback data from all distributors?

20     A.   I do not know.

21     Q.   You don't know one way or another?

22     A.   If all manufacturers receive chargeback

23  data from all distributors, no, I do not know that.

24     Q.   Do you know if chargeback data is only

25  shared if manufacturers and distributors have a

Page 169

1   chargeback agreement in place?

2        MR. SHKOLNIK:  Objection to form.

3        THE WITNESS:  I don't know that.

4   BY MS. ZOLNER:

5        Q.   You don't know one way or another?

6        A.   I do not.

7        Q.   Do you know anything about chargeback

8   agreements?

9        MR. SHKOLNIK:  Objection.

10       THE WITNESS:  No.

11  BY MS. ZOLNER:

12       Q.   No?

13            Do you know if manufacturers would only

14  receive chargeback data from distributors if

15  manufacturers have agreed to pay a chargeback?

16       MR. SHKOLNIK:  Objection to form.

17       THE WITNESS:  I don't know that.

18  BY MS. ZOLNER:

19       Q.   Did you say I don't know that?

20       A.   I don't know that.

21       Q.   And I assume that you also don't know if

22  manufacturers always have chargeback agreements in

23  place for every product; is that right?

24       MS. FRANKLIN:  Objection.  Form.

25       THE WITNESS:  I don't know that.

Page 170

1    BY MS. ZOLNER:

2        Q.    I'm sorry.  Your voice dropped.

3        A.    I'm sorry.  I don't know that.

4        Q.    Do you know if chargeback data submitted

5    by a distributor would only contain the

6    distributor's downstream sales?

7        A.    No, I don't know that.

8        Q.    You don't know that one way or the other?

9        A.    I don't know.

10       Q.    So you don't know if the distributor would

11   be providing information on sales by other

12   distributors or not?

13       MS. BACCHUS:  Objection.  Asked and answered.

14       MR. SHKOLNIK:  Objection to form.  Speculative.

15       THE WITNESS:  I don't know that.  I don't know

16   that.

17   BY MS. ZOLNER:

18       Q.    Do you know if chargeback data that would

19   be submitted by a distributor would only contain

20   sales of the specific manufacturer's product?

21       MR. SHKOLNIK:  Objection to form.  Speculative.

22       THE WITNESS:  I don't know.

23   BY MS. ZOLNER:

24       Q.    You don't know that.

25            Do you know if manufacturers, assuming

1   they get chargeback data, do you know if they can

2   only get chargeback data for products with their

3   own NDC codes?

4        A.   I don't know that.

5        Q.   Do you know -- do you know if chargeback

6   data only contains information on a number of units

7   for which a distributor is seeking a chargeback?

8        A.   No, I don't know that.

9        MR. SHKOLNIK:  Objection.  Form.

10  BY MS. ZOLNER:

11       Q.   No, I don't know that?

12       A.   No, I don't know that.

13       Q.   I'm sorry.  I'm not trying to repeat what

14  you said.  I'm just making sure I'm hearing you

15  accurately.

16            Are you aware of any instance, based on

17  your 35 years with DEA, where DEA informed

18  registrants that they should monitor chargeback

19  data?

20       MR. SHKOLNIK:  Objection to the extent you're

21  asking outside of her personal knowledge.

22       THE WITNESS:  Can I ask you a question?  Can we

23  break?  I need to ask you a question.

24       MS. BACCHUS:  About privilege?

25       THE WITNESS:  Yeah.

Page 172

1       MS. BACCHUS:  Do you mind if we go off the

2    record?

3       MS. ZOLNER:  No.  Absolutely.

4       THE VIDEOGRAPHER:  We are off the record at

5    2:57 p.m.

6                        (Whereupon, a short break was

7                        taken.)

8       THE VIDEOGRAPHER:  We're back on the record at

9    3:00 p.m.

10      MS. BACCHUS:  To the extent that you have

11   knowledge outside of privileged information that

12   was involved in your communications with any of the

13   third parties, you may answer, but you may not

14   disclose any privileged communications.

15      THE WITNESS:  Okay.

16   BY MS. ZOLNER:

17      Q.   I think I can withdraw the question and

18   maybe try to give you a question that's easier to

19   answer.

20           Are you aware, as you sit here today, of

21   an instance in which DEA informed all registrants

22   that they should monitor chargeback data?

23      MR. SHKOLNIK:  Objection to form.

24      THE WITNESS:  I am not.

25

1    BY MS. ZOLNER:

2        Q.   Are you aware of any instance in which DEA

3    informed manufacturers that there was a legal

4    obligation to monitor chargeback data?

5        A.   I wouldn't want to say DEA.  I'm aware

6    that I have not.

7        Q.   Understanding your caveat there, are you

8    aware of anyone else at DEA ever communicating to

9    manufacturers that there was a legal obligation to

10   monitor chargeback data?

11       MR. SHKOLNIK:  Objection.

12       THE WITNESS:  I am not.

13   BY MS. ZOLNER:

14       Q.   Thank you.

15            I'm going to show you a new document now.

16                      (Whereupon, ASHLEY Deposition

17                      Exhibit No. 20 was marked for

18                      identification.)

19   BY MS. ZOLNER:

20       Q.   Ms. Ashley, I'm going to ask you about the

21   page that has a Bates number in the lower

22   right-hand corner of 5926 as well as the document

23   that starts on this page with the Bates number

24   5928.

25       A.   Okay.

Page 174

1    Q.    Have you seen this document before?

2    A.    I don't recall.

3    Q.    What are OD policy letters?

4    A.    So if it's from the Office of Diversion

5    Control, typically if they have a response to a

6    registrant that they feel affects the national

7    diversion control program, they'll send a copy of

8    the letter out to all of diversion.

9    Q.    Okay.  And when you say that they'll send

10   a copy of the letter out to all of diversion, do

11   you mean that a copy of the letter goes to all of

12   the internal diversion employees within DEA?

13   A.    Just the diversion control staff.

14   Q.    Understood.  And to your knowledge, what

15   is the purpose of submitting that policy letter to

16   the diversion control staff?

17   A.    It's to help all divisions to be

18   consistent when we engage with registrants.

19   Q.    Does OD stand for Office of Diversion?

20   A.    Yes.

21   Q.    And it says here that this letter was sent

22   to all diversion program managers, group

23   supervisors and senior diversion investigators.

24   Are those the diversion control staff?

25   A.    Yes.

1     Q.   Who sent the Office of Diversion policy

2   letters?

3     A.   Here it was Deirdre McDowell.  She was the

4   program analyst in the Office of Diversion in

5   headquarters.

6     Q.   Did various people send out these letters

7   whenever these communications occurred?

8     A.   Various people in the policy section.

9     Q.   Was Deirdre McDonnell in DEA headquarters?

10    A.   Yes.

11    Q.   She was in the Office of Diversion

12  Control, the liaison and policy section at DEA

13  headquarters?

14    A.   Yes.

15    Q.   Do you know how often these letters were

16  issued?

17    A.   I don't.  I don't.

18    Q.   Did you read these letters when they hit

19  your inbox?

20    A.   Yes.

21    Q.   And I see your name with a name -- a last

22  name that starts with A.  You're at the top of the

23  food chain on the page labeled 5925.  Do you see

24  your name there?

25    A.   Yes.

Page 176

1        Q.    So do you have any reason to believe you
2    didn't receive this communication?
3        A.    I have no reason to believe I did not.
4        Q.    Were these letters shared with diversion
5    investigators?
6        A.    Yes.
7        Q.    In this letter, it says to share this
8    information with the diversion investigators in
9    your group, right?
10       A.    Yes.
11       Q.    Was it your practice to do so?
12       A.    Yes.
13       Q.    Did you ever assist in drafting letters
14   like the letter that's contained in Exhibit 5 --
15   Exhibit 20?
16       A.    Yes.
17       Q.    Could you look at the page that begins
18   with the Bates number 5931 in the lower right-hand
19   corner?  Was this a letter -- do you understand to
20   this to be a letter from Allscript Pharmacy, Inc.?
21       A.    Yes, I do.
22       Q.    Did you understand Allscript Pharmacy,
23   Inc. to be drafting this letter requesting for
24   verification of controlled substances -- substance
25   dispensing practices at its pharmacy?

1    A.   Let me read it.

2    Q.   I'm reading the first line after to whom

3  it may concern.

4    A.   Yes.

5    Q.   Did you understand this letter to contain

6  information about the doctors and clinics that

7  Allscript serves?

8    A.   Do I understand the letter -- I'm sorry.

9  Could you repeat the question?

10    Q.   Sure.  Did you understand this letter to

11  contain information about the doctors and the

12  clinics that Allscript Pharmacy works with?

13    MR. SHKOLNIK:  Objection to form.

14    MS. BACCHUS:  Can we have a time frame that

15  you're talking about?

16  BY MS. ZOLNER:

17    Q.   At the time this letter was sent in 2008.

18    A.   As I read this letter here today, I

19  understand it to speak about these physicians, yes.

20    Q.   Do you see where the author of this

21  letter, Lucas Stahl, says below is a breakdown of

22  our average daily use by units for a few

23  medications?  It's right before the --

24    A.   I see it, yes.

25    Q.   And then after four different medications

1    are listed, it says I hope that this information is

2    helpful in our appeal for an increase in our

3    ordering limits for some of these medications.  Did

4    I read that correctly?

5         A.   Yes.

6         Q.   Did you understand Allscript to be asking

7    for an increase to its ordering limits?

8         MR. SHKOLNIK:  Objection.

9         THE WITNESS:  In this letter, that's my

10   understanding, yes.

11   BY MS. ZOLNER:

12        Q.   Allscript then forwarded this letter to

13   the DEA on March the 21st, 2008, right?

14        MS. BACCHUS:  Objection.  Form.  If you know.

15        MR. SHKOLNIK:  Note my objection.  I thought we

16   were not supposed to go into individual actions by

17   DEA, which appears to be what we're doing here.

18   BY MS. ZOLNER:

19        Q.   I'm on Page 5930.

20        A.   Okay.  Okay.  Do you have a question?

21        Q.   Sure.  Do you see where it says Harvard

22   Drug Group, in an attempt to raise our limits on

23   certain controlled substances, requested this

24   letter be sent to their office and the local Drug

25   Enforcement Agency.  Do you see that?

Page 179

1      A.    Yes.

2      Q.    Based on your experience, what is your

3   understanding as to why a pharmacy would send a

4   letter like this to DEA requesting an increase in

5   daily ordering limits?

6      MS. BACCHUS:  Objection.  Calls for

7   speculation.  If you know, you can answer based on

8   your personal knowledge.

9      THE WITNESS:  From my personal knowledge, no, I

10  do not know why they would do that.

11  BY MS. ZOLNER:

12     Q.    Do you think the pharmacy was looking for

13  guidance on how to comply with the Controlled

14  Substances Act?

15     MS. BACCHUS:  Objection.  Calls for

16  speculation.

17     MR. SHKOLNIK:  I'm sorry.  Objection to form.

18     THE WITNESS:  Do I think they were looking for

19  guidance?

20     MR. SHKOLNIK:  Objection.  Speculation.  I'm

21  sorry.

22     THE WITNESS:  Reading this here, no, I wouldn't

23  say they were looking for guidance.  They were

24  looking for an increase.

25

Page 180

1    BY MS. ZOLNER:

2        Q.   Okay.  I know we talked this morning about

3    the fact that registrants were often asking for

4    additional guidance from DEA on how to comply with

5    the Controlled Substances Act.  Do you recall

6    testifying on those issues?

7        A.   Yes.

8        Q.   And I think you testified that again and

9    again registrants were asking questions and seeking

10   clarifications from DEA, right?

11       A.   In my personal interactions, yes.  Yes.

12       Q.   So have you seen letters like the letter

13   we're looking at now in Exhibit 20 during your

14   tenure at DEA where pharmacies were asking for

15   increases in their limits?

16       MR. SHKOLNIK:  Objection to form.

17       THE WITNESS:  No.  I mean, no, I don't recall

18   seeing a letter of this sort.  No.

19   BY MS. ZOLNER:

20       Q.   On May the 14th, 2008, the DOJ responded

21   to the Allscript letter, and that response starts

22   at 5928 on Exhibit 20.  Let me know when you're

23   there.

24       A.   I am.

25       Q.   I'm just going to ask you about the first

Page 181

1   paragraph.  Do you see where it says the Harvard

2   Drug Group requested that you submit a letter to

3   DEA to substantiate your request to them to raise

4   your purchase limits on certain controlled

5   substances?  Please be advised that DEA does not

6   set limits on what a distributor may sell to a

7   pharmacy.  Consequently, requests for sales

8   increases of controlled substances are solely the

9   consideration of the distributor.

10          Did I read that correctly?

11      A.   Yes.

12      Q.   Do you know if the DEA ever informed the

13  Harvard Drug Group whether Allscript's explanation

14  for its controlled substance demand was accurate?

15      MS. BACCHUS:  Objection.  Form.  You can answer

16  if you know.

17      THE WITNESS:  I do not know.

18  BY MS. ZOLNER:

19      Q.   If you look on the next page, there's some

20  bolded language on 5929, and the first bolded

21  sentence says the decision to ship controlled

22  substances to a particular customer rests with the

23  supplier.  Do you see that?

24      A.   Yes.

25      Q.   Is it your understanding that DEA would

1   not provide input about whether increasing order

2   limits would be acceptable?

3        A.   In my experience, no, we would not.

4        Q.   Like you testified this morning, those

5   decisions are exclusively left up to the supplier,

6   right?

7        A.   Yes.

8        MS. BACCHUS:  Objection.  Asked and answered.

9        MR. SHKOLNIK:  Objection to form.

10  BY MS. ZOLNER:

11       Q.   Would you say that was DEA's policy, in

12  your experience, to leave those sorts of decisions

13  on controlled substances up to a particular

14  customer?

15       MR. SHKOLNIK:  Objection to form.

16       MS. BACCHUS:  Objection to form.

17  BY MS. ZOLNER:

18       Q.   To a particular supplier.

19       MS. BACCHUS:  Same objection.

20       MR. SHKOLNIK:  Same.

21       THE WITNESS:  Was it policy?  Yes, it is.

22  BY MS. ZOLNER:

23       Q.   Okay.  Let's put that aside.

24

25

```
                                              Page 183

 1                      (Whereupon, ASHLEY Deposition

 2                      Exhibit No. 21 was marked for

 3                      identification.)

 4     BY MS. ZOLNER:

 5          Q.   This is Exhibit 21.  Ms. Ashley, is this

 6     another OD policy letter?

 7          A.   Yes.

 8          Q.   If you could turn to the page with 5923 in

 9     the corner, this is a letter that was written to

10     the Martinsville -- this is a letter that was

11     written from the Martinsville Family Pharmacy, Inc.

12     to Donetta Spears at DEA, and you received this

13     letter, correct?

14          A.   Did I receive it?  You mean in -- if I'm

15     in the top there, yeah, I would have.

16          Q.   Yes.  So if we turn back to --

17          A.   Yes, I did.

18          Q.   Great.  So just for the record, if we turn

19     back to the first page of Exhibit 21, again, you're

20     at the very top of the recipient list, Ashley,

21     comma, Demetra, right?  So you received this letter

22     from the Martinsville Family Pharmacy?

23          MS. BACCHUS:  Objection.  Asked and answered.

24     You can answer.

25          THE WITNESS:  I don't recall specifically, but
```

Page 184

1   yes, I have no reason to believe I didn't.

2   BY MS. ZOLNER:

3       Q.   If you could turn your attention to the

4   second paragraph that starts on Tuesday,

5   December 11th, it says on Tuesday, December 11th, I

6   was alerted by a representative of Cardinal Health,

7   our wholesaler that we would not be able to

8   purchase scheduled drugs, those substances which

9   are regulated by the DEA, the Drug Enforcement

10  Agency.  Though an official reason was not given,

11  it was noted that the pharmacy was on a list of

12  pharmacies which were being watched by the DEA, and

13  due to a close review of Cardinal Health's

14  practices, these actions were required.  Officials

15  at Cardinal felt they were being forced to limit

16  the sales of controlled substances, comma,

17  particularly to the pharmacies on this list.

18          Did I read that right?

19      A.   Yes.

20      Q.   Do you know what list is being referred to

21  here?

22      A.   No.

23      Q.   If you look on Page 5924, I'm looking

24  specifically at the very last paragraph.  It says I

25  now ask for your assistance.  If there is anything

Page 185

1    that I need to do or can do to resolve whatever

2    grievance that the DEA may have with my business,

3    please let me know.

4           Did I read that correctly?

5       A.   Yes.

6       Q.   And then the very last sentence before

7    Robert Pratt, the pharmacist and owner signs off,

8    is I simply need to know what I should be doing

9    differently.

10          Did I read that correctly?

11      A.   Yes.

12      Q.   Was this type of request where a

13   registrant was asking for guidance from DEA about

14   how to comply with rules, were these routine

15   requests in your view?

16      MR. SHKOLNIK:  Objection.  Form.

17      MS. BACCHUS:  Objection.  Vague.

18      THE WITNESS:  This specific type I'd have to

19   say I don't know.  Registrants always ask

20   questions.

21   BY MS. ZOLNER:

22      Q.   Registrants always ask questions?

23      A.   Sure.

24      Q.   And a question like this, this wasn't

25   unusual in your view, right?

Page 186

1       MS. BACCHUS:  Objection.  Form.

2       THE WITNESS:  No, it wasn't unusual in my view.

3   BY MS. ZOLNER:

4       Q.   How often would you estimate that these

5   types of requests for guidance came in by

6   registrants?

7       MS. BACCHUS:  Objection.  Asked and answered.

8       MR. SHKOLNIK:  Objection.

9       THE WITNESS:  It would be hard for me to guess.

10  I don't know how often.

11  BY MS. ZOLNER:

12      Q.   More than three times a month?

13      MR. SHKOLNIK:  Objection.  Speculation.

14      THE WITNESS:  Yes.

15  BY MS. ZOLNER:

16      Q.   More than 10 times a month?

17      A.   I don't know.

18      Q.   They were frequent?

19      A.   Yes.

20      Q.   As you sit here today, can you provide any

21  kind of an estimate on frequency?

22      MS. BACCHUS:  Objection.  Asked and answered.

23  You can answer.

24      THE WITNESS:  I would say more than three, less

25  than 10.  That would be my estimate.

Page 187

1    BY MS. ZOLNER:

2        Q.   And I know we talked earlier this morning

3    about the shift in leadership in early 2015.  You

4    talked earlier this morning about the fact that you

5    and Mr. Milione set out to start setting up

6    meetings with registrants, answering

7    more questions.

8            As you sit here today, do you think that

9    the questions coming in from registrants were more

10   frequent prior to when you started setting up those

11   meetings and sitting down with registrants to

12   answer questions about how to comply?

13       A.   I wouldn't be able to judge that.  I don't

14   know.

15       Q.   If you could now look at Exhibit 21, if

16   you could turn to the response that came in from

17   DEA, it starts on Page 5921.  You can take a minute

18   to look over this letter, and then I'll ask you a

19   few questions about it.

20       A.   Okay.

21       Q.   You've had a chance to review the letter?

22       A.   Yes, the response.

23       Q.   Does the letter inform the Martinsville

24   Family Pharmacy that they are, indeed, on a list of

25   pharmacies which are being watched by the DEA?

Page 188

1      A.   No, it does not.

2      Q.   Does the letter tell the Martinsville

3  Family Pharmacy they are not on a list of

4  pharmacies which were being watched by the DEA?

5      MS. BACCHUS:  Objection.  If you know.

6      THE WITNESS:  No.

7  BY MS. ZOLNER:

8      Q.   No, it doesn't say anything about that?

9      MS. BACCHUS:  Objection.  Asked and answered.

10     THE WITNESS:  No.

11  BY MS. ZOLNER:

12     Q.   Does the letter say anything about a list

13  of pharmacies that are being watched?

14     MS. ZOLNER:  Can someone on the phone please go

15  on mute?  We are getting a lot of interference.

16  BY MS. ZOLNER:

17     Q.   I'll go back to my question.  Does the

18  letter say anything about a list of pharmacies

19  which were being watched by the DEA?

20     MR. SHKOLNIK:  Objection to form.

21     THE WITNESS:  It does not.

22  BY MS. ZOLNER:

23     Q.   It does not?

24     MR. SHKOLNIK:  Form.

25     THE WITNESS:  No.

Page 189

1   BY MS. ZOLNER:

2       Q.   Does the letter make any suggestions about

3   what the Martinsville Family Pharmacy can do

4   differently to avoid being watched by the DEA?

5       MS. BACCHUS:  Objection.

6       MR. SHKOLNIK:  Object to form.

7       THE WITNESS:  Could you repeat that?

8   BY MS. ZOLNER:

9       Q.   Sure.  Does the letter make any

10  suggestions about things the Martinsville Family

11  Pharmacy can do differently to avoid being watched

12  by DEA?

13      MR. SHKOLNIK:  Objection to form.

14      THE WITNESS:  In my opinion, yes.

15  BY MS. ZOLNER:

16      Q.   What?

17      A.   Establishing a suspicious order monitoring

18  program.

19      Q.   Where do you see that?

20      A.   On Page 2.

21      Q.   Could you tell me exactly where you're

22  looking on Page 2 and what you're referring to as

23  Page 2?  Is it Page 5922?

24      A.   I'm sorry.  5922.

25      Q.   Thank you.

Page 190

1      A.    In furtherance of 21 USC 823.

2      Q.    Okay.  So just for the record, you're

3  referring to the first full paragraph on 5922,

4  which starts in furtherance of 21 USC Section

5  823(a)(1), right?

6      A.    Yeah.

7      Q.    Okay.  What in that paragraph do you

8  contend provides guidance to the Martinsville

9  Family Pharmacy on what they need to do

10  differently?

11      A.    Let me take that back.  You said what they

12  would need to do differently.  I understood the

13  question as what guidance did it provide to them

14  that would help them ensure compliance with the

15  Controlled Substances Act.  I read too much into

16  the question, so I'll take back what I said.

17      Q.    Okay.  So just for purposes of

18  clarification, does this letter say anything at all

19  about what the Martinsville Family Pharmacy should

20  do with respect to its business practices?

21      MR. SHKOLNIK:  Objection to form.

22      THE WITNESS:  Now I'm back to what -- my

23  original thought.  What they should do in respect

24  to their business practices, in my opinion, is

25  ensure that they have an adequate system to

```
                                         Page 191
 1   determine if orders are suspicious.
 2   BY MS. ZOLNER:
 3       Q.   And you're referring again to the
 4   paragraph on Page 5922, that first full paragraph
 5   that says the registrant shall design and operate a
 6   system to disclose to the registrant suspicious
 7   orders of controlled substances.  The registrant
 8   shall inform -- sorry about the interruption.  We
 9   have a lot of people who are very interested in
10   what you have to say, Ms. Ashley.
11       A.   Okay.
12       Q.   So I'm looking now at the paragraph that
13   you have pointed out to me.  Does this paragraph
14   say anything at all about how the Martinsville
15   Family Pharmacy should design its suspicious order
16   monitoring system?
17       A.   How they should design the system, no, it
18   does not.
19       Q.   Does it say anything other than what was
20   in that original regulation that we looked at in
21   Exhibit 3 earlier today?
22       A.   It does not, no.
23       Q.   This language is the same language as we
24   looked at in Exhibit 3 with the Controlled
25   Substances Act language, correct?
```

 1      A.   Yes.

 2      MR. SHKOLNIK:  Objection.  Form.

 3      MS. BACCHUS:  Objection.  Asked and answered.

 4  BY MS. ZOLNER:

 5      Q.   I'm sorry.  I didn't hear your answer.

 6      A.   Yes.

 7      Q.   Does the letter state whether any

 8  distributor identified the Martinsville Family

 9  Pharmacy as one of the pharmacies to which they had

10  chosen to restrict selling controlled substances?

11      A.   No, it does not.

12      Q.   We're looking at Page 5922, and the second

13  to last paragraph which begins distributors need to

14  know to whom they are selling controlled substances

15  and clearly know their customer's business

16  practices in order to determine whether or not to

17  ship controlled substances, there's some bolded

18  language, and then it cites back to 21 CFR

19  Section 1301.74(b).  The next sentence says since

20  it is not the role of DEA --

21      MR. SHKOLNIK:  Could we go slower --

22      MS. ZOLNER:  Yes.

23      MS. BACCHUS:  -- so we can find out where you

24  are?  I'm sorry.  Which paragraph?  Which page?

25      MS. ZOLNER:  I am on Page 5922.  I'm in the

Page 193

1   second to last paragraph before the closing you may

2   obtain additional information paragraph.

3       MR. SHKOLNIK:  Thank you.

4   BY MS. ZOLNER:

5       Q.   Ms. Ashley, I would specifically like to

6   ask you about the last sentence in the second to

7   last paragraph, which is since it is not the role

8   of DEA to determine to whom a distributor should

9   ship controlled substances, you are encouraged to

10  reach out to your distributor to further discuss

11  this matter.  Did I read that correctly?

12      A.   Yes.

13      Q.   What does that mean to you it is not the

14  role of DEA to determine to whom a distributor

15  should ship controlled substances?

16      MR. SHKOLNIK:  Objection for DEA's position on

17  something.

18      THE WITNESS:  What it means to me is that the

19  distributor would make the determination of whether

20  or not to ship to that customer.

21  BY MS. ZOLNER:

22      Q.   In other words, the DEA is not going to

23  make a decision on when a shipment should or should

24  not be sent?

25      MS. BACCHUS:  Objection to form.

Page 194

1      MR. SHKOLNIK:  Objection to form.

2      THE WITNESS:  That's my experience and

3  understanding, yes.

4  BY MS. ZOLNER:

5      Q.   In your opinion, was DEA leaving a lot of

6  discretion to the distributor?

7      MS. BACCHUS:  Objection.  You can answer if you

8  have an opinion.

9      THE WITNESS:  DEA was leaving all discretion to

10  the distributor --

11  BY MS. ZOLNER:

12      Q.   All discretion?

13      A.   -- to make the decision to ship or not

14  ship.

15      Q.   And I sort of stepped over your testimony

16  there.  So could you just say what you said again?

17  I interrupted you.

18      A.   DEA was leaving all discretion to the

19  distributor whether or not to ship to a customer.

20  It's their decision.

21      Q.   In all instances?

22      A.   Yes.

23      Q.   You can put that letter aside.  I'm going

24  to show you another policy letter.

25

Page 195

1              (Whereupon, ASHLEY Deposition

2              Exhibit No. 22 was marked for

3              identification.)

4   BY MS. ZOLNER:

5       Q.   Ms. Ashley, I'm going to start on 5916,

6   which is the first page of a letter from the NCPA

7   to Joe Rannazzisi dated March 7, 2008.  Just for

8   purposes of the record, the NCPA is identified as

9   the National Community Pharmacists Association.

10          Are you on the same page with me?

11      A.   Yes.

12      Q.   Do you see in the first paragraph where it

13  says the National Community Pharmacists Association

14  represents more than 23,000 independent community

15  pharmacies and their 75 licensed pharmacists and

16  300,000 additional employees across the United

17  States?

18      A.   Yes.

19      Q.   If you move on to the third -- do you have

20  familiarity with the National Community of

21  Pharmacists Association?

22      A.   I don't recall them specifically, no.

23      Q.   Okay.  In the -- but again, this is

24  another OD policy letter, correct?

25      A.   Yes.

Page 196

1      Q.   And you received this letter along with

2   other recipients in the diversion group, correct?

3      A.   Yes.

4      Q.   Do you have any reason to assume that you

5   wouldn't have read this letter?

6      A.   No, I have no reason to assume that.

7      Q.   Okay.  If you could look in the third

8   paragraph which begins we write, and I'll read that

9   paragraph to you so we all know where I am.  We

10  write to express our concern that recent efforts by

11  DEA aimed at pharmaceutical wholesalers and

12  distributors to combat the illicit distribution of

13  controlled substances have had unintended

14  consequences and are harming patient care.  The DEA

15  policies result in restricting or preventing

16  pharmacies from obtaining medications for patients

17  with legitimate pain needs.

18           Did I read that correctly?

19      A.   Yes.

20      Q.   In your view and in your experience with

21  DEA, are DEA policies intended to prevent patients

22  from getting medically necessary medication?

23      A.   No.

24      MS. BACCHUS:  Objection.

25      THE WITNESS:  Sorry.  No.

Page 197

1    BY MS. ZOLNER:

2        Q.   If the NCPA believed that the DEA's

3    policies were being implemented in a way that would

4    prevent patients from getting medically necessary

5    medication, would that be a concern to you?

6        MR. SHKOLNIK:  Objection.

7        MS. BACCHUS:  Objection.  Calls for

8    speculation.

9        THE WITNESS:  Personally, yes, I would be

10   concerned.

11   BY MS. ZOLNER:

12       Q.   And in your role with DEA and specifically

13   with diversion, you were responsible for being

14   concerned if medically necessary treatments were

15   not going to patients, right?

16       MS. BACCHUS:  Objection to form.

17       MR. SHKOLNIK:  Objection to form.

18       THE WITNESS:  Correct.  It's part of our

19   mission.

20   BY MS. ZOLNER:

21       Q.   Could you explain what you mean by that?

22       A.   Part of the mission of the Office of

23   Diversion Control is to ensure an adequate supply

24   of controlled substances are available to meet

25   legitimate medical need.

Page 198

1        Q.    So you would agree it would be worth

2    ensuring that DEA's policies weren't preventing

3    patients from obtaining medically necessary

4    medication?

5        MR. SHKOLNIK:  Objection.  DEA's policy now?

6        MS. BACCHUS:  Objection.

7        MR. SHKOLNIK:  This is so far outside of what

8    you said this witness is allowed to testify to.

9        THE WITNESS:  It's my understanding of DEA's

10   mission is to ensure.

11   BY MS. ZOLNER:

12       Q.    I want to make sure I understand that.

13   It's your understanding that it's DEA's mission to

14   ensure that medically necessary medication goes to

15   patients, correct?

16       A.    Yes.

17       Q.    To your knowledge, did DEA ever

18   investigate the issue raised in this letter?

19       MR. SHKOLNIK:  Objection to form.

20       MS. BACCHUS:  Objection.  If you know.

21       THE WITNESS:  An investigation?  I can tell you

22   I've had personal conversations.

23   BY MS. ZOLNER:

24       Q.    With the NCPA?

25       A.    Not NCPA.  With industry.  I don't know

Page 199

1    specifically them, but with industry.

2        Q.    Okay.  Did you have any discussions with

3    anyone at the NCPA after you received this letter?

4        A.    I did not, no.

5        Q.    When you say that you've had conversations

6    with industry, what do you mean by that?

7        A.    In my career as a diversion investigator,

8    I have had conversations with industry about --

9    it's been brought to my attention that distributors

10   would set arbitrary thresholds.  I've had those

11   conversations over the years.

12       Q.    I think I understand what you mean, but

13   let me just see if I can unpack that.

14       MR. SHKOLNIK:  Was the witness done, or did you

15   just interrupt?

16   BY MS. ZOLNER:

17       Q.    I'm sorry.  Were you finished?  I didn't

18   mean to interrupt you.

19       A.    Yes.

20       Q.    Okay.  I thought you were.  I try to be

21   careful about that.  Thank you.

22            Let me make sure I can unpack what you

23   just said.  You said in my career as a diversion

24   investigator, I have had conversations with

25   industry after it's been brought to my attention

```
 1   that distributors are setting arbitrary thresholds.
 2        MR. SHKOLNIK:  And she said --
 3   BY MS. ZOLNER:
 4        Q.   I've had --
 5        MS. ZOLNER:  I'm sorry.  Could you please stop
 6   interrupting me?
 7        MR. SHKOLNIK:  You're misreading.
 8   BY MS. ZOLNER:
 9        Q.   I've had those conversations over the
10   years.  Are you explaining that in an effort to
11   carry out DEA's mission to make sure medically
12   necessary prescriptions go to patients, you've had
13   conversations with distributors to make sure
14   thresholds are not being arbitrarily set to limit
15   medically necessary prescriptions from making it
16   into the hands of patients?
17        MR. SHKOLNIK:  Objection to form.
18        THE WITNESS:  No.
19        MR. SHKOLNIK:  Misreading what the witness
20   said.
21   BY MS. ZOLNER:
22        Q.   I'm not trying to misread or misinterpret
23   what you said.  I'm asking you to explain it to me.
24        MS. BACCHUS:  I have an objection here.  I
25   think we're getting a little far field.  Are we
```

Page 201

1   talking about the opioids?  Are we just talking

2   about in general?  Are we talking about quotas?  I

3   want to make sure we stay within the Touhy

4   authorization.

5        MS. ZOLNER:  Ms. Ashley said that she had

6   conversations over the years to make sure she was

7   carrying out DEA's mission to make sure medically

8   necessary prescriptions were going to patients, and

9   I'm just exploring what she meant by that.

10       THE WITNESS:  So in the course of my duties

11  and --

12       MR. SHKOLNIK:  Objection to form.

13       THE WITNESS:  -- conversations with

14  registrants, I have had registrants raise to me

15  that distributors, and I guess I would be speaking

16  about retail pharmacies.  I can't bring up a

17  specific conversation, but I know I've had these

18  conversations where retail pharmacies would bring

19  to my attention that arbitrary thresholds were set

20  by distributors, and they were not able to get the

21  supplies that they needed.

22  BY MS. ZOLNER:

23       Q.   Understood.  Thank you for that

24  clarification.

25            And just to close the loop on that, after

```
 1   those instances were brought to your attention, did
 2   you work with pharmacies or distributors to make
 3   sure that those threshold levels were changed?
 4        MR. SHKOLNIK:  Objection.  Form.
 5        THE WITNESS:  Specifically changing thresholds,
 6   no.
 7   BY MS. ZOLNER:
 8        Q.   What did you do?
 9        A.   I would speak with distributors, and it
10   wouldn't -- I don't want to make it appear that it
11   was based on the conversation I had with one
12   retailer.  I went back to what they said to that
13   distributor.  It's in various conversations with
14   different registrants.  I would explain to the
15   retail pharmacies that DEA is not part of that role
16   to set the threshold.  I would explain to the
17   distributors that they are in -- that DEA does not
18   set those limits on the customers that they supply
19   to.  So it would be separate conversations, not
20   addressing specific concerns with the -- from
21   registrant to the next registrant on behalf of
22   another registrant.
23        Q.   And no specific changes to thresholds
24   either?
25        MR. SHKOLNIK:  Objection to form.
```

Page 203

1       THE WITNESS:  No.

2   BY MS. ZOLNER:

3       Q.   Did you say no?

4       A.   No.

5       Q.   Okay.  Let's look at this letter again.

6   If you could now look at the fifth paragraph from

7   the top or the second from the bottom.  It has

8   bolded italicized language that begins in the face.

9       A.   Uh-huh.

10       Q.   Do you see where I am?  It says in the

11   face of such sweeping nonspecific directives and

12   also recent DEA closures of wholesale distribution

13   centers in Florida and Washington, it is no

14   surprise that our members report overly broad,

15   uneven and punitive actions by various wholesalers.

16           Did I read that correctly?

17       A.   Yes.

18       Q.   Were you aware of any other instances

19   where registrants were complaining of the DEA

20   directives being nonspecific?

21       A.   I'm not sure what you mean by any other

22   circumstance.

23       Q.   Sure.  So the NCPA is complaining about

24   nonspecific directives in that paragraph.  Do you

25   see that language?

Page 204

1      A.   Yes.

2      Q.   Are you aware of any other instances where

3   registrants were complaining about these kinds of

4   nonspecific directives?

5      MR. SHKOLNIK:  Objection to form.

6      THE WITNESS:  I am aware of registrants

7   complaining about nonspecific directives, but other

8   than this one, I don't know because I don't even

9   recall this one.  I know that they've made those

10  complaints.

11  BY MS. ZOLNER:

12     Q.   And you're talking about some of the

13  complaints that we've talked about earlier in the

14  day directions needing to be more clear?

15     MR. SHKOLNIK:  Objection to form.  Misstating.

16     THE WITNESS:  No.  I'm talking about specific

17  to this issue of the arbitrary thresholds, what

18  he's suggesting in this letter.

19  BY MS. ZOLNER:

20     Q.   Okay.  If you could flip over to

21  Page 1597, do you see in the middle of the page a

22  sentence that begins we did request?

23     A.   Yes.

24     Q.   It says we did request that DEA hold a

25  meeting with wholesalers, consumer groups and

Page 205

1    community pharmacies so that all parties can

2    clearly understand the expectations of DEA and can

3    make every reasonable effort to comply.  However,

4    that request was flatly refused by DEA.  We were

5    disappointed that the agency is not willing to

6    engage in dialogue with the stakeholders that are

7    being affected by its actions and renew this

8    request for a meeting as soon as possible.

9             Did I read that correctly?

10       A.    Yes.

11       Q.    Were you aware of the request by the NCPA

12   for a meeting?

13       A.    No.

14       Q.    Were you aware that this request was

15   refused by the DEA?

16       MS. BACCHUS:  Objection.  Assumes facts not in

17   evidence.

18       THE WITNESS:  No.

19   BY MS. ZOLNER:

20       Q.    Based on your review of the letter, is it

21   your understanding that the NCPA was asking for a

22   meeting so they could better understand the DEA

23   expectations?

24       MR. SHKOLNIK:  Objection.  Speculation what

25   they were thinking.

1      THE WITNESS:  I'm sorry.  Would you repeat

2   that?

3   BY MS. ZOLNER:

4      Q.   Sure.  Based on your review of the letter,

5   is it your understanding that the NCPA was asking

6   for a meeting so they could better understand DEA

7   expectations?

8      MR. SHKOLNIK:  Same objection.

9      MS. BACCHUS:  Objection.

10      THE WITNESS:  Yes.  From my reading of the

11   letter, that's what they stated, yes.

12   BY MS. ZOLNER:

13      Q.   Did the DEA send a response to this

14   letter?

15      MS. BACCHUS:  If you know.

16      THE WITNESS:  This appears to be the response.

17   BY MS. ZOLNER:

18      Q.   Right.  I was trying to help you out by

19   telling you it's attached to Exhibit 21.  I think

20   this is -- Exhibit 22.  Pardon me.

21          So Ms. Ashley, I think you're referring to

22   the document that's part of Exhibit 22 Bates

23   numbered first page 5914.  Is that accurate?

24      A.   Yes.

25      Q.   Can you take a look at that response

Page 207

1   briefly?

2        A.   Okay.

3        Q.   You've finished reviewing it?

4             Did the DEA attempt to set up a meeting

5   after sending this letter to your knowledge?

6        MS. BACCHUS:  Objection.  Form.  You can answer

7   if you know.

8        THE WITNESS:  I don't know.

9   BY MS. ZOLNER:

10       Q.   Is there any mention of the NCPA's request

11  for a meeting in the letter?

12       A.   I did not see that, no.

13       Q.   Do you know if the DEA addressed the issue

14  of whether it was targeting community pharmacies

15  rather than community and chain pharmacies in this

16  letter?

17       MR. SHKOLNIK:  Objection.

18       THE WITNESS:  No.

19       MR. SHKOLNIK:  Asking to speak for the DEA and

20  what their intention was with this letter, and I

21  think, once again, we were supposing to be

22  directing these witnesses not to be speaking for

23  the DEA.

24       MS. ZOLNER:  My question was directly and

25  specifically to Ms. Ashley.  In fact, it started

Page 208

1    with do you know.  And again, I would ask for you

2    to refrain from speaking objections.  I believe

3    that's the fifth time I've said that during the

4    course of the deposition.

5         MR. SHKOLNIK:  Six times.

6         MS. ZOLNER:  Thank you for the clarification.

7    BY MS. ZOLNER:

8         Q.   I don't know if I had a question pending,

9    but I'll --

10        A.   I think your question was did I know.  No.

11        Q.   Okay.  Thank you.

12             Do you know if DEA addressed any of the

13   concerns raised by the NCPA?

14        A.   I don't know.

15        Q.   Was there any outreach, to your knowledge,

16   to find out what was considered to be nonspecific

17   or unclear to the registrant?

18        A.   Any outreach, I don't know.

19        Q.   To your knowledge, was there any meeting

20   with the registrants in this letter to try to

21   provide additional clarification?

22        A.   I don't know.

23        MR. SHKOLNIK:  Objection.

24   BY MS. ZOLNER:

25        Q.   Are you aware of a meeting?

Page 209

1      A.   I am not.

2      Q.   In this letter, if you turn to Page 2,

3    which is Bates numbered 5915 for the record, the

4    last -- the second to last sentence in this letter

5    says DEA understands the concerns that the NCPA has

6    raised, but is unable to require anything more

7    concerning this matter than what is stated in the

8    Controlled Substances Act and its implementing

9    regulations.

10          Do you see that?

11     A.   Yes.

12     Q.   Did I read that correctly?

13     A.   Yes.

14     Q.   Is it your understanding that this means

15   DEA cannot require anything more than what is

16   stated in the CSA and its implementing regulations?

17     MS. BACCHUS:  Objection.  If you have an

18   understanding, you can answer.

19     THE WITNESS:  That's how I understand this

20   sentence, yes.

21   BY MS. ZOLNER:

22     Q.   Do you think that that sentence is

23   accurate?

24     MS. BACCHUS:  Objection.

25     MR. SHKOLNIK:  Objection.  Asking for DEA's

Page 210

1    position and accuracy of a DEA position.

2    BY MS. ZOLNER:

3        Q.   Based on your experience in your over

4    35 years of tenure with DEA, do you think that

5    sentence is accurate?

6        MR. SHKOLNIK:   Objection.   You're asking for

7    interpretation of a DEA statement.

8        MS. BACCHUS:   You can answer based on your

9    opinion, your personal opinion if you have one.

10       THE WITNESS:   Accurate is not the word I would

11   use.   Accurate?   Let me see.   In my personal

12   opinion, I believe that DEA could have a

13   conversation with NCPA, I guess, would be my

14   response.

15   BY MS. ZOLNER:

16       Q.   But as you sit here today, you're not

17   aware of any such --

18       A.   I'm not aware that there was one.

19       Q.   And in this letter, this letter that went

20   to you, it says DEA understands the concerns that

21   the NCPA has raised, but is unable to require

22   anything more concerning this matter than what is

23   stated in the Controlled Substances Act and its

24   implementing regulations.

25            Based on your 35 plus years of experience

Page 211

1   with DEA, do you think that's true?

2        MR. SHKOLNIK:  Objection to form.

3        MS. BACCHUS:  Asked and answered.

4        MR. SHKOLNIK:  This letter was not directed to

5   this witness.  You're misstating it, and you're

6   asking for an interpretation of what the DEA wrote,

7   which is outside the scope.

8        MS. BACCHUS:  I would object again on the

9   grounds of mischaracterization.

10  BY MS. ZOLNER:

11       Q.   You can answer the question.

12       A.   I would have to say I don't know.  I don't

13  know.

14       Q.   You don't know one way or another if

15  that's accurate?

16       MR. SHKOLNIK:  Objection to form.

17       THE WITNESS:  Yeah.  I don't know if it's

18  accurate.

19  BY MS. ZOLNER:

20       Q.   You can -- would you like a break?

21       A.   No.  I'm good.  Keep moving.

22                      (Whereupon, ASHLEY Deposition

23                      Exhibit No. 23 was marked for

24                      identification.)

25

Page 212

1    BY MS. ZOLNER:

2         Q.   Ms. Ashley, this is Exhibit No. 23.  Have

3    you seen this document before?

4         A.   It appears that I have.  I don't recall

5    specifically, but my name is on it.

6         Q.   I'm going to ask you about the middle

7    e-mail in the chain first, and I think you were

8    identifying for the record that you were copied on

9    this document, right, copied on Exhibit 23?

10        A.   Yes.

11        Q.   This was an e-mail from Scott Garriott to

12   James Portner copying you and Timothy Lenzi,

13   correct?

14        A.   Yes.

15        Q.   Who is Scott Garriott?

16        A.   Scott Garriott is a diversion investigator

17   in the Springfield resident office, Springfield,

18   Illinois.

19        Q.   Springfield, Illinois.  Who is James

20   Portner?

21        A.   James Portner is a group supervisor in the

22   Chicago field division.  At the time in 2009, he

23   was Scott Garriott's supervisor.

24        Q.   What about Timothy Lenzi?

25        A.   Tim Lenzi is another diversion

Page 213

1    investigator in the Chicago field division.

2         Q.   If you look on the second page, which is

3    Bates numbered 6057, the first full sentence says

4    what I took away from the meeting was Smith is

5    trying to comply with the suspicious order

6    requirement of the regulation.

7              Did I read that correctly?

8         A.   Yes.

9         Q.   And then if you drop down two sentences,

10   the next sentence again begins with the all capital

11   Smith, Smith noted.  I'm going to the next Smith

12   sentence.  Smith admitted there has been

13   difficulties in implementing other aspects of the

14   suspicious order system.  In part, this is due to a

15   lack of direction as to what DEA defines as due

16   diligence, including conflicting examples provided

17   by DEA representatives at a DEA conference and what

18   knowing your customer really encompasses.

19             Did I read that correctly?

20        A.   Yes.

21        Q.   What was your understanding at DEA as to

22   how due diligence was being defined?

23        A.   Are you speaking back in this 2009

24   circumstance or just my understanding in general?

25        Q.   Your understanding in general first.

Page 214

1       MR. SHKOLNIK:  Objection.

2       THE WITNESS:  My understanding in general is

3  that a registrant, a distributor in this case,

4  would look at all the information that they

5  obtained from a customer in order to determine if

6  they should be a customer and if they should supply

7  them with controlled substances.

8  BY MS. ZOLNER:

9       Q.   Okay.  Do you know if that's -- and I know

10  we just talked about due diligence.  Generally due

11  diligence, you clarified if I was asking about due

12  diligence at the time this document was created in

13  the 2009 time frame.

14            Is there a different way that you would

15  define due diligence as of the 2009 time period?

16       A.   A different way?

17       MR. SHKOLNIK:  Objection to form.

18       THE WITNESS:  No.  I think what's already

19  published is...

20  BY MS. ZOLNER:

21       Q.   Do you know if due diligence is codified

22  anywhere?

23       A.   No.

24       Q.   Is it part of the definition of the

25  Controlled Substances Act?

Page 215

1      A.   Due diligence is it?  I don't -- I don't

2   know if it's in the Controlled Substances Act.  I

3   believe it is, but if it's defined there, I don't

4   know.

5      Q.   Do you want to go back and look at

6   Exhibit 3?  Would that help?

7      A.   Oh, under the suspicious order.  I'm

8   thinking of CSA, the Controlled Substances Act.

9   That's the regulation, not the act --

10      Q.   Okay.

11      A.   -- that you showed me.

12      Q.   So if we look at the act under Exhibit 3,

13   is due diligence part of the Controlled Substances

14   Act?

15      MS. BACCHUS:  Excuse me.  Exhibit 3 is not the

16   act.

17      MS. ZOLNER:  I'm sorry.  You're right.

18   BY MS. ZOLNER:

19      Q.   Is it explained in the federal regulation,

20   Exhibit 3?

21      MR. SHKOLNIK:  Objection to form.  This has now

22   become a conversation.  There's no question.

23      THE WITNESS:  Is due diligence explained in the

24   what?  I'm sorry.

25

Page 216

1   BY MS. ZOLNER:

2       Q.   In the federal regulation.

3       MR. SHKOLNIK:  Objection to form.

4       THE WITNESS:  No.

5   BY MS. ZOLNER:

6       Q.   From your perspective when we look back at

7   Exhibit 23, what does knowing your customer mean in

8   this sentence?

9       MS. BACCHUS:  Objection.  If you know.

10      MR. SHKOLNIK:  Objection.  This is asking about

11  a specific inquiry from a specific registrant and

12  her interpretation.

13      MS. ZOLNER:  Your speaking objection is noted.

14      MR. SHKOLNIK:  Thank you.  Is that eight?

15      THE WITNESS:  Are you asking me what this

16  investigator meant when he used the term here?  I'm

17  not --

18  BY MS. ZOLNER:

19      Q.   Yes.  From your perspective, what does

20  know your customer mean in this sentence?  What

21  would it require?

22      MS. BACCHUS:  Same objection to form.  Whether

23  you have personal knowledge.  If you do, you can

24  answer.

25      THE WITNESS:  It wouldn't be from me recalling.

Page 217

1    It would be from me reading this in front of me

2    today, and my opinion would be that H.D. Smith was

3    not clear on what know your customer means.

4    BY MS. ZOLNER:

5        Q.   Do you know if DEA provided any guidance

6    to Smith about what that term means?

7        MS. BACCHUS:  Objection.  Vague.

8        THE WITNESS:  Provided guidance?  I'm aware of

9    discussions between Scott Garriott and H.D. Smith.

10   When you say provided guidance, I'm not sure if you

11   just mean discussions.  I'm aware of that.

12   BY MS. ZOLNER:

13       Q.   But you're not aware of any guidance that

14   was provided?

15       MR. SHKOLNIK:  Objection about --

16       MS. BACCHUS:  Objection.  Asked and answered.

17       MR. SHKOLNIK:  Objection to inquiry into a

18   specific investigation regarding H.D. Smith and

19   what an investigator spoke about and what guidance

20   they gave.

21   BY MS. ZOLNER:

22       Q.   I'm sorry.  Was this, in your view, an

23   investigation?

24       A.   I recall an investigation, yes.

25       Q.   So I just want to understand your

Page 218

1   testimony.  Is it your testimony that this e-mail

2   is describing an investigation of H.D. Smith and

3   H.D. Smith's request for guidance during the

4   occurrence of that investigation?

5       A.   No, it's not my understanding that this

6   e-mail is describing an investigation.

7       Q.   Okay.

8       MS. BACCHUS:  To the extent it is describing an

9   investigation, she's not authorized to talk about

10  it.

11      MS. ZOLNER:  Understood.  And that's why I was

12  trying to clarify because this was a document that

13  was produced by DEA.  It was not my understanding

14  that it was an investigation.  Plaintiff's counsel

15  made that objection, and I wanted to make sure I

16  wasn't going into territory where I shouldn't be

17  asking questions.

18  BY MS. ZOLNER:

19      Q.   So to your knowledge, this was not an

20  investigation of H.D. Smith.  This was a request

21  from H.D. Smith asking for additional guidance; is

22  that correct?

23      A.   No.  To my knowledge, this is a summary of

24  a meeting that Scott Garriott and Tim Lenzi

25  attended.  These are their notes.

1      Q.   And during -- in this summary of this

2   meeting, is it accurate to say that H.D. Smith was

3   complaining that it was getting conflicting

4   guidance from DEA?

5      A.   From reading this, this was Scott

6   Garriott's impression, yes.

7      Q.   Okay.  Did you ever have discussions with

8   anyone at DEA regarding registrant reports of

9   conflicting guidance or conflicting examples being

10  given by DEA representatives?

11     A.   Did I have discussions with anyone --

12     Q.   Yes.

13     A.   -- at DEA that registrants felt they were

14  getting conflicting guidance?

15     Q.   Exactly.

16     MR. SHKOLNIK:  Objection to form.

17     THE WITNESS:  Yes.

18  BY MS. ZOLNER:

19     Q.   To your knowledge, did DEA do any

20  follow-up to find out whether there were

21  conflicting examples provided by DEA

22  representatives at the DEA conference that was

23  referenced in this e-mail?

24     MS. BACCHUS:  Objection.  Vague.

25     THE WITNESS:  I do not know.

Page 220

1    BY MS. ZOLNER:

2        Q.   You don't one way or another?

3        A.   I do not.

4        Q.   You can put this aside.

5        MS. ZOLNER:  Do you know how long I've been

6    going?

7        THE VIDEOGRAPHER:  About an hour and a half

8    total.

9        MR. SHKOLNIK:  If we could take a stretch right

10   now, please, before we get to the next document.

11       MS. ZOLNER:  Sure.  Can we take a quick break?

12       THE WITNESS:  Sure.

13       THE VIDEOGRAPHER:  We are off the record at

14   3:56 p.m.

15                        (Whereupon, a short break was

16                        taken.)

17       THE VIDEOGRAPHER:  We are back on the record at

18   4:14 p.m.

19                        (Whereupon, ASHLEY Deposition

20                        Exhibit No. 24 was marked for

21                        identification.)

22   BY MS. ZOLNER:

23       Q.   Ms. Ashley, I am going to hand you what is

24   Exhibit 24.  I'm just going to ask you about the

25   top e-mail to you from Roxanne Peterson.

```
                                             Page 221
 1      A.    Okay.

 2      Q.    You've had a chance to read it?

 3      A.    Yes.

 4      Q.    So Roxanne Peterson, who is Roxanne

 5   Peterson?

 6      A.    Roxanne Peterson is a diversion

 7   investigator in the Merrillville resident office

 8   today.  At the time she was a group supervisor in

 9   the -- I think she was in Indianapolis 2010.  No.

10   Maybe she was in the Chicago division.  No.  She

11   was in Indianapolis.

12      Q.    Where is Merrillville?

13      A.    Merrillville resident office,

14   Merrillville, Indiana.

15      Q.    Did you work with Roxanne Peterson when

16   she worked as a diversion investigator in the

17   Merrillville office?

18      A.    Yes.

19      Q.    And she sent you this e-mail on November

20   the 2nd, 2010.  The subject is Re diversion

21   investigator opportunity, correct?

22      A.    Yes.

23      Q.    Roxanne writes at least with DEA, we

24   learned that you don't have to do a blessed thing,

25   and you'll still have a job.  If I've learned
```

1   nothing else from being in Indy, it is that.  Here

2   all these 20 plus years I did my job because I

3   thought I had to, and here all along I didn't.  I

4   could have done nothing and still got promoted.

5   While I am always a day late and dollar short,

6   thanks anyway.

7           Did I read that correctly?

8       A.   Yes.

9       Q.   Do you know what Roxanne meant by at least

10  with DEA, we've learned that you don't have to do a

11  blessed thing and you'll still have a job?

12      A.   I wouldn't interpret it any further.  I

13  think she meant what she said.

14      Q.   Was Roxanne Peterson a friend of yours?

15      A.   She is a friend of mine, yes.

16      Q.   Was she frustrated with her experience as

17  a diversion employee with DEA?

18      MR. SHKOLNIK:  Objection.

19      MS. BACCHUS:  Objection.  Calls for

20  speculation.

21      THE WITNESS:  From what I recall from this

22  circumstance, yes, she was very frustrated.

23  BY MS. ZOLNER:

24      Q.   What did she tell you?

25      A.   At the time --

1      MR.  SHKOLNIK:  Objection.

2      MS.  BACCHUS:  Objection.

3      THE  WITNESS:  I have to ask you a question.

4      MS.  BACCHUS:  One second.  Objection.  This is

5   outside the scope of her Touhy authorization, and I

6   don't believe that she is authorized to testify

7   about that.

8      MS.  ZOLNER:  Are you instructing her not to

9   testify on this document?

10     MS.  BACCHUS:  Yes, I am.

11  BY MS.  ZOLNER:

12     Q.  I assume you're taking your counsel's

13  advice?

14     A.  Yes.

15     Q.  If you could look in your pile of

16  documents at Exhibit No. 7, this was a document

17  that Mr. Nicholas explored with you this morning,

18  and I would like you to look at the page with the

19  Bates number 4953.  There's a longer number, but

20  I'm just reading the last four digits.

21     MR.  SHKOLNIK:  Was that No. 7 you said?

22     MS.  ZOLNER:  It was Exhibit 7, yes.

23  BY MS.  ZOLNER:

24     Q.  You let me know when you get there.

25     A.  Okay.

1      Q.   And I'm going to ask you a couple

2   questions about the second page.  The last four

3   numbers are 4953, but before we get there, when you

4   acted as diversion program manager in the diversion

5   control division of DEA, how many diversion

6   investigators were in your department?

7      A.   I'm sorry.  In which role?  I'm sorry.

8      Q.   When you were working as a diversion

9   program manager.

10     A.   I recall there being 48.

11     Q.   What about at the time when you made this

12  presentation as associate deputy assistant

13  administrator of DEA Office of Diversion Control in

14  October of 2016, do you recall how many diversion

15  investigators you had at the time?

16     A.   So at this time I was deputy assistant

17  administrator.  If we're speaking about direct

18  reports, there were five.

19     Q.   Five?  Let me ask you about a specific

20  item that's on this summary on Exhibit 7.  Do you

21  see where it has No. 2(i) for context, there are

22  now approximately 500 diversion investigators, and

23  then in parentheses, it says positions allotted

24  equals approximately 600?

25     A.   Uh-huh.

Page 225

1      Q.   Does that mean there was room to add 100

2   additional diversion investigators?

3      A.   Yes.

4      Q.   Does that refresh your recollection as to

5   the number of diversion investigators as of October

6   of 2016?

7      A.   Yes.

8      Q.   Was 500 diversion investigators a bigger

9   number or a smaller number than in years past?

10     A.   500 investigators, to my knowledge, it's

11  pretty consistent.  We pretty much flexed around

12  500.

13     Q.   Do you have an understanding as to why --

14  do you have an understanding as to what it means to

15  say positions allotted equals 600, approximately

16  600?

17     MS. BACCHUS:  Objection.  This is beyond the

18  scope of what she's authorized to testify to.  I'm

19  going to instruct her not to answer unless you can

20  tell me what provision --

21     MS. ZOLNER:  Sure.  The reason I'm asking this

22  question, this, to me, is -- under the Touhy

23  authorization that was marked earlier as Exhibit 1,

24  this goes to No. 2, your general duties in your

25  former position as the acting assistant

Page 226

1    administrator for the Office of Diversion Control.

2    This is summarizing a presentation that she made in

3    that role in giving information about the number of

4    investigators.

5          It also goes to her personal recollection

6    of advice that was given to manufacturers and

7    distributors of opioids during her tenure in this

8    office because this presentation talks a lot about

9    the registrant update, which was an update given to

10   manufacturers and distributors.

11     MS. BACCHUS:  In response to that, I have to

12   first say that this is a summary prepared by

13   someone else, not her summary.  She has not

14   testified that she made these statements as is

15   written there.  And second, regarding her general

16   duties, if she says she supervises the

17   investigators or she had an X number of

18   investigators, she's already given you what her

19   general duties are.  In terms of just talking about

20   talking points of how many investigators are around

21   and there, that's not part of her general duties.

22     MS. ZOLNER:  I think it also goes to her

23   general employment history with the DEA, which is

24   No. 1, but if you're instructing her not to answer

25   that question, I'd like some clarification in terms

1    of what you will allow me to ask her in terms of

2    the size and recruitment of investigators during

3    her tenure with DEA.

4         MS. BACCHUS:  Well, I don't think that she can

5    answer in terms of size and recruitments.  If you

6    want to know if she was responsible for hiring,

7    that's a question you can ask her, but in terms of

8    her addressing this particular document, I don't

9    think it's been established that this is exactly

10   what she said.

11        MS. ZOLNER:  I was actually asking her if this

12   comported with her recollection.  How about if we

13   do this.  I'll -- let me ask her a couple more

14   questions, and then if you have objections, I'm

15   sure you'll let me know.

16   BY MS. ZOLNER:

17        Q.   Just to take a step back, I think you

18   testified that 500 diversion investigators was at

19   or around the number of diversion investigators

20   that were working in the Office of Diversion

21   Control during your tenure with the DEA.  Is that

22   accurate?

23        A.   Yes, for a number of years I'd say.  Yes.

24        Q.   In your employment history with DEA, did

25   you have knowledge as to whether there was budget

Page 228

1  for hiring of additional diversion investigators?

2      A.   Did I have knowledge of -- there were

3  periods when I did, yes.

4      Q.   And do you know if DEA had the budget to

5  hire an increased number of diversion

6  investigators?

7      MS. BACCHUS:  Objection.  Vague.

8      THE WITNESS:  I know that it changed year to

9  year.

10  BY MS. ZOLNER:

11     Q.   To your knowledge based on your employment

12  history with the DEA, was it difficult to hire

13  diversion investigators?

14     A.   In my opinion, yes.

15     Q.   Why?

16     A.   It was difficult because of the

17  requirements, background investigations, budgetary

18  constraints, the relocation policy.  There are

19  various reasons.  Sometimes folks just didn't want

20  to move when we hired, and we need them in specific

21  areas.  So it was a challenge, yes.

22     Q.   Based on your experience and your opinion,

23  did DEA do enough to recruit and hire additional

24  diversion investigators?

25     MR. SHKOLNIK:  Objection.

Page 229

1      MS. BACCHUS:  Objection.  I'm going to instruct

2  her not to answer.  That's not within the scope of

3  the Touhy authorizations.

4  BY MS. ZOLNER:

5      Q.   Are you going to take your counsel's

6  advice?

7      A.   Yes.

8      Q.   Based on your employment history and your

9  supervising authority, do you know why there was a

10  delta between the number of diversion investigators

11  and the positions allotted in 2016 meaning a delta

12  between the 500 diversion investigators and the 600

13  positions allotted?

14      MS. BACCHUS:  Objection.  That's beyond the

15  scope of the Touhy authorization.  I'm instructing

16  the witness not to answer.

17      THE WITNESS:  I'm not going to answer.

18  BY MS. ZOLNER:

19      Q.   You're taking your counsel's advice?

20      A.   Yes.

21      Q.   When it comes to combatting diversion,

22  have you ever heard it said in your experience with

23  DEA that DEA wanted to arrest its way out of the

24  problem?

25      MR. SHKOLNIK:  Objection.

Page 230

1       MS. BACCHUS:  Objection.

2       THE WITNESS:  No.

3  BY MS. ZOLNER:

4       Q.   You haven't heard that phrase before?

5       A.   I've heard a similar phrase, not that one.

6       Q.   What phrase have you heard that's similar?

7       A.   DEA cannot arrest their way out of the

8  problem.

9       Q.   In your experience, did you think that DEA

10  was trying to arrest its way out of the problem of

11  diversion?

12      MS. BACCHUS:  Objection.  That's beyond the

13  scope of the Touhy authorization.  I'm going to

14  instruct the witness not to answer.

15  BY MS. ZOLNER:

16      Q.   You're going to take your counsel's

17  advice?

18      A.   Yes.

19      Q.   I know that seems formulaic, but it's part

20  of what I'm required to do.

21      MS. ZOLNER:  Well, I disagree with whether

22  these are issues that are within the scope of the

23  Touhy request, but it doesn't make any sense to

24  take up your time or your counsel's time debating

25  these things on the record.  I'll reserve all

Page 231

1    rights not just with respect to the topics that I

2    was not allowed to explore today, but also with

3    respect to a number of documents that you don't

4    know anything about that were clawed back prior to

5    your deposition today.  Those documents were clawed

6    back last week, and there have been additional

7    documents.

8            So I'll turn this over to other counsel

9    who will continue the questioning again just

10   reserving rights to explore those at another time

11   if and when necessary.  Thank you.  Thanks for your

12   time.

13       THE VIDEOGRAPHER:  We are off the record at

14   4:27 p.m.

15                          (Whereupon, a short break was

16                          taken.)

17       THE VIDEOGRAPHER:  We are back on the record at

18   4:31 p.m.

19       MR. SCHUTTE:  Good afternoon, Ms. Ashley.  My

20   name is Scott Schutte.  I represent Rite Aid.

21                      EXAMINATION

22   BY MR. SCHUTTE:

23       Q.   And let me apologize in advance because in

24   the interest of time, I'm going to be sort of

25   jumping around from topic to topic hopefully to

Page 232

1    move through things rather quickly.

2                        (Whereupon, ASHLEY Deposition

3                        Exhibit No. 25 was marked for

4                        identification.)

5    BY MR. SCHUTTE:

6        Q.   First topic I want to ask you about is

7    let's start with a document we've marked as

8    Exhibit 24, which was produced in native format by

9    the DEA, DEA 1429.  First page has the title Office

10   of Diversion Investigator.

11       MR. SHKOLNIK:  I don't think I have an exhibit.

12   BY MR. SCHUTTE:

13       Q.   Let me start that over.

14            Ms. Ashley, we've marked as Exhibit 25 a

15   document that was produced by the DEA in native

16   format, DEA 1429.  It's a PowerPoint dated

17   November 14, 2014 with your name in the lower left

18   corner.  Do you see that?

19       A.   Yes.

20       Q.   Do you have any recollection of the

21   audience to whom this PowerPoint was given?

22       A.   I don't.  I was hoping it would be on

23   here, but I don't recall.

24       Q.   Okay.  If you'll turn to the second page

25   of Exhibit 25, which is a document or, excuse me, a

Page 233

1   page that's titled Mission, do you see that?

2       A.   Yes.

3       Q.   It says the mission of the Office of

4   Diversion Control is to prevent, detect and

5   investigate the diversion of pharmaceutical

6   controlled substances and listed chemicals for

7   legitimate channels of distribution while ensuring

8   an adequate and uninterrupted supply of controlled

9   substances to meet legitimate medical commercial

10  and scientific needs.

11           Do you see that?

12      A.   Yes.

13      Q.   Did I read that correctly?

14      A.   Yes.

15      Q.   And is that, as of November 14, 2014, what

16  you personally understood to be the mission of the

17  Office of Diversion Control?

18      A.   Yes.

19      Q.   Now, when Ms. Zolner was asking you some

20  questions a few minutes ago about that Martinsville

21  pharmacy, you made a reference to the mission of

22  the Office of Diversion Control?

23      A.   Yes.

24      Q.   Is this Page 2 of Exhibit 25 the same

25  mission you were referring to there?

Page 234

1      A.   Yes.

2      Q.   Will you agree, based on your 35 years of

3  experience at the DEA, that what the Office of

4  Diversion Control is attempting to do is, on one

5  hand, minimize the amount of diversion that occurs

6  while at the same time ensuring that folks who need

7  opioids or other controlled substance can get them?

8      A.   I agree with that.

9      Q.   Would you also agree that to the extent

10 that diversion efforts are, I think to use your

11 words, arbitrary, which I think was the term you

12 used in connection with the Martinsville Pharmacy

13 testimony.  To the extent that the efforts at

14 diversion control are increased, that could have an

15 effect of making opioids available to fewer folks

16 who need them?

17      MR. SHKOLNIK:  Objection to form.

18      MS. BACCHUS:  I'm going to object to form.

19      MR. SHKOLNIK:  And personal opinion.

20      THE WITNESS:  Yeah, it's my personal opinion,

21 but I do not agree that they are restrictive enough

22 that it wouldn't allow for persons to get

23 controlled substances if they need it.

24 BY MR. SCHUTTE:

25      Q.   Perhaps I misunderstood your testimony

1     about the Martinsville document.  I understood your

2     testimony to be that there would be a concern on

3     your part, I'm not asking for the DEA, concern on

4     your part if a distributor was using suspicious

5     monitoring practices that were arbitrary or so

6     restrictive that made it impossible for their

7     customers to be able to get the controlled

8     substances that they needed to distribute to their

9     customers.

10          Did I misunderstand your testimony?

11     A.   Yes.  What I was attempting to convey is

12     that I would be concerned that a registrant felt

13     that way.  I don't believe that the regulations

14     restrict so much that they would not allow

15     controlled substance, but I would be concerned that

16     a registrant felt that way.

17     Q.   And I think, perhaps, my questions aren't

18     clear, so let me try this again.

19          We looked at the mission, which is

20     balancing the need to minimize diversion with the

21     need to make sure that folks who need controlled

22     substances can get them.  In your experience at the

23     DEA for 35 years, was it your concern that if

24     either the DEA or the registrants who were trying

25     to comply with the DEA regulations became so

1    restrictive in an effort to avoid diversion, that

2    it could impact the amount of controlled substances

3    could get to the people who actually needed them?

4         A.   Would I be concerned if they did?

5         Q.   Yes.

6         A.   If they did, I would be concerned, yes.

7         Q.   In your experience, did you ever see that

8    happen?

9         A.   No.

10        Q.   You testified earlier today -- I'm

11   changing subjects now.

12             You testified earlier today that when you

13   came to headquarters, I think, in 2015 and began

14   working with -- working at headquarters, that there

15   were some initiatives.  I don't think you agreed

16   they had been put on hold, that had been

17   deprioritized compared to other things that you and

18   Mr. Milione then undertook to prioritize again.

19             Do you recall that testimony?

20        A.   Yes, I do.

21        Q.   And one of those initiatives that you

22   talked about was the distributor initiative?

23        A.   Did I?

24        Q.   I believe.

25        A.   I don't recall.  Did we talk about

Page 237

1    distributors?

2         Q.   I believe you used that as an example of

3    one of the things that had been de-emphasized that

4    you then put an emphasis on when you came to D.C.

5    at the headquarters in 2015.

6         MR. SHKOLNIK:  Objection.  Form.

7         THE WITNESS:  I don't recall if we were talking

8    about the distributor initiative.

9    BY MR. SCHUTTE:

10        Q.   Let me ask it this way.  Can you give us

11   the examples that you can recall, as you sit here

12   today, of initiatives that you said had been

13   de-emphasized that you and Mr. Milione emphasized

14   again starting in 2015?

15        A.   I'm thinking about the meetings and having

16   registrants come in and speak to -- we would call

17   them meet and greets.  That was just our internal

18   name for them.  Registrants would reach out to the

19   front office, and I recall this from working in the

20   policy and liaison section, and I was part of the

21   section that would host the meetings when I was in

22   headquarters from 2004 to 2007.  Then I left and

23   went to the field.

24             When I returned, I was told by the staff

25   that was present that those meetings had stopped.

Page 238

1  They weren't having them, that they weren't doing

2  the meet and greets like we used to.  So that's my

3  example.

4      Q.   Are there any other examples that you can

5  think of, as you sit here today, of initiatives

6  that had been de-emphasized that you and

7  Mr. Milione began to emphasize again in 2015?

8      A.   Yes.  The distributor initiative is an

9  initiative that was put on hold or not being done

10  at the time, yeah.  Now I remember we did talk

11  about that.  We did talk about it.

12      Q.   You're making me doubt my note-taking

13  ability.  Of course, I was way at the end of the

14  table.

15          So you listed the renewed efforts to

16  comply with requests for meet and greets.  You

17  talked about the distributor initiatives.  Were

18  there any other initiatives that had been

19  de-emphasized that you began to emphasize again in

20  2015?

21      A.   I can't think of one at this time.

22      Q.   Okay.  Thank you.

23          I believe you also testified today that

24  the distributor initiative had been, to your

25  knowledge, de-emphasized somewhere in the ballpark

Page 239

1  of 2013.  Do you recall that?

2       A.    Yeah.   Yeah.

3       Q.    Prior to the point that the distributor

4  initiative was de-emphasized, who was that

5  distributor initiative targeted at?  What types of

6  distributors?

7       A.    They were speaking to -- the idea was to

8  speak to all distributors.  So it wasn't

9  distributors for -- primarily at the top of the

10  list would be those who distributed Schedule II

11  controlled substances, narcotic controlled

12  substances, but the goal was to visit all

13  distributors of controlled substances.

14       Q.    Did you -- did you know whether the DEA

15  succeeded in speaking to all distributors before

16  the distributor initiative was put on hold in 2013?

17       A.    I know that they had not by March of 2018.

18       Q.    Do you recall whether Rite Aid was a

19  distributor who had been spoken to by the DEA

20  before the distributor initiative was put on hold

21  in 2013?

22       A.    I don't know.

23       Q.    Do you know whether Walmart was such a

24  distributor?

25       A.    I don't know.

Page 240

1      Q.   What about CVS?

2      A.   I don't know.

3      Q.   And what about Walgreens?

4      A.   I don't know.

5      Q.   Okay.  Thank you.

6           I want to change topics again and talk

7      about a subject we've been talking about much of

8      the day, which is the implementing regulation.

9           As I understood your testimony,

10     Ms. Ashley, your testimony is that the CSA and the

11     implementing regulation was clear to you throughout

12     your tenure at DEA?

13     A.   I felt comfortable, yes.

14     Q.   Is it also fair -- my understanding of

15     your testimony, is it a fair summary that

16     throughout your tenure at DEA, you understood that

17     distributors were asking DEA for guidance because

18     the implementing regulations was not crystal clear

19     to them?

20     A.   Correct.  They did express that.

21     Q.   And while you were at DEA, and let's focus

22     on the time period between 2007 and the time you

23     retired in March of 2018, did you consider it to be

24     within the scope of your job either when you were

25     supervising diversion investigators or when you

Page 241

1  were in headquarters to try to help distributors

2  understand what their obligations were under the

3  implementing regulations?

4      A.   I did consider that to be within the scope

5  of my job.

6      Q.   And did you try to do that whenever you

7  could?

8      A.   Yes, I did.

9      Q.   Okay.  Now, if I could ask you to pull out

10 of your pile of documents Exhibit 4, which is

11 something we looked at earlier today.  That's that

12 e-mail about Kroger.

13     MR. SCHUTTE:  Can we go off record for a moment

14 while we identify that?

15     THE VIDEOGRAPHER:  We're off the record at

16 4:44 p.m.

17                      (Whereupon, a short break was

18                      taken.)

19     THE VIDEOGRAPHER:  We're back on the record at

20 4:44 p.m.

21 BY MR. SCHUTTE:

22     Q.   Ms. Ashley, now that you have Exhibit 4 in

23 front of you, and I know counsel asked some

24 questions about this earlier today, your testimony

25 is that as of February 24th of 2010 when you wrote

1  this e-mail asking Ms. Boockholdt whether, quote,

2  you are -- are you asking that the field contact

3  registrants and tell the registrant that they

4  cannot fill an order based solely in our review of

5  a suspicious order report, end quote, is it your

6  testimony that when you asked that question, you

7  knew what the answer to that question was?

8      MR. SHKOLNIK:  Objection to the form.

9      THE WITNESS:  I had a personal understanding of

10  what the answer was, yes.

11  BY MR. SCHUTTE:

12      Q.   And your personal understanding was what?

13      A.   That we do not tell registrants that they

14  cannot ship an order, especially solely on a

15  suspicious order report and no other information.

16      Q.   Because I think as you told Ms. Zolner a

17  few minutes ago, the decision to ship or not ship

18  is solely in the discretion of the distributor?

19      A.   Yes.

20      Q.   Why were you asking the question then to

21  headquarters?

22      A.   I was -- I don't recall this specifically,

23  but the way I'm reading it is I'm prodding Barbara

24  to respond to tell me did something change.

25      Q.   And did you get a response to this e-mail

Page 243

1   that you recall?

2       A.   I don't recall.

3       Q.   Was part of the reason that you wrote this

4   because -- this e-mail marked as Exhibit 4 because

5   you had concerns that there was a disconnect

6   between headquarters and the field as to what the

7   regulation was?

8       MR. SHKOLNIK:  Objection to form.

9       MS. BACCHUS:  Objection.  Form.

10      THE WITNESS:  I don't know if that -- I can't

11  say that that is what I was thinking.

12  BY MR. SCHUTTE:

13      Q.   Is it possible that's what you were

14  thinking?

15      MR. SHKOLNIK:  Objection.

16      MS. BACCHUS:  Objection.  Form.

17      MR. SHKOLNIK:  Speculative.

18      MS. BACCHUS:  Asked and answered.

19      THE WITNESS:  Is it possible?  I have to say I

20  don't think so.  I wanted to know what she thought.

21  BY MR. SCHUTTE:

22      Q.   So was it in your head when you wrote this

23  e-mail on February 24th of 2010 that it could be

24  the case that Ms. Boockholdt had a different

25  understanding of the reg than you did?

1      A.   That's what I was trying to elicit from

2    her, you know, do you have a different

3    understanding than me.

4      Q.   But you don't recall what her response

5    was?

6      A.   I don't.

7      Q.   And again, at this time you had already

8    understood that distributors had questions about

9    what the directive was under the regulation?

10     A.   Yes.

11     Q.   Okay.  And then on the last sentence in

12   that same paragraph where you asked Ms. Boockholdt

13   the question on what authority do we have to tell a

14   registrant that they cannot fill an order absent an

15   investigation and clear violations, first,

16   Ms. Ashley, did you get an answer to that question?

17     A.   I do not recall getting an answer.

18     Q.   Second is why -- did you have a personal

19   opinion as of February 24th of 2010 as to whether

20   the DEA had authority to tell a registrant that

21   they cannot fill an order absent an investigation

22   and clear violation?

23     A.   No.  My question was yeah, would we have

24   that authority.  Wait a minute.  Let me read this

25   again.  What I'm thinking here, in order for DEA to

1    tell a registrant that they cannot ship an order,

2    there would have to be some sort of investigation

3    or we would have identified a violation.

4    Otherwise, the discretion to ship is solely on the

5    registrants.

6         Q.   And were you asking that question of

7    Ms. Boockholdt on February 24, 2010 because you

8    were not sure what her answer would be to that

9    question?

10        MR. SHKOLNIK:  Objection.

11        MS. BACCHUS:  Objection.  Form.

12        MR. SHKOLNIK:  Speculation.

13   BY MR. SCHUTTE:

14        Q.   Let me rephrase the question.

15             When I asked about the prior sentence, you

16   said you were, I hope I'm not mischaracterizing

17   your testimony, prodding her to answer so you

18   understood her position.  Do I have that right?

19        A.   I would agree with that.

20        Q.   Is that what you were also doing with this

21   last question?  You were prodding Ms. Boockholdt to

22   tell you what the answer was so you made sure that

23   you were on the same page as headquarters?

24        MS. BACCHUS:  Objection.  Form.

25        MR. SHKOLNIK:  Objection.  Speculation.

1      THE WITNESS:  I would agree that I was prodding

2   her.

3   BY MR. SCHUTTE:

4      Q.   I'm going to change subjects slightly here

5   and talk about a different aspect of the

6   implementing regulation.  As I've understood your

7   testimony today, distributors, in your view, have

8   to look at a variety of factors in making a

9   decision whether or not to ship, and I believe you

10   said that it can vary from situation to situation

11   what it means -- let me pull out my document here

12   what it would mean for an order to be unusual size.

13   I believe I've understood your testimony to be that

14   that varies from situation to situation?

15      A.   Yes.

16      Q.   Similarly, whether an order deviates

17   substantially from a normal pattern would vary from

18   situation to situation?

19      A.   Yes.

20      Q.   And orders of unusual frequency would vary

21   from situation to situation?

22      A.   Yes.

23      Q.   And all of these would be based on factors

24   that were specific to that distributor and the

25   facts the distributor was looking at?

1      A.    Yes.

2      Q.    Would one of the factors that the

3  distributor should take into account is the

4  customer that's placing the order?

5      A.    Yes.

6      Q.    And how, in your view, as a 35-year

7  employee of DEA would a distributor take into

8  account its customer in determining whether an

9  order was suspicious?

10      A.    They -- in my experience, what the

11  distributor does is they get very specific

12  information from their customer like their tax ID

13  number, their location, the orders that they may

14  want from the distributor, what they want to be

15  supplied.  The location is a big factor.  It tells

16  the population.  So they ask very specific

17  questions who their customer base is.

18      Q.    When you say who their customer base is,

19  do you mean the -- go ahead.  What do you mean by

20  their customer base?

21      A.    The -- say the retail pharmacy's customer

22  base.

23      Q.    Now, you understand -- I think I've told

24  you I represent Rite Aid.

25      A.    Uh-huh.

Page 248

1     Q.   That's a yes?

2     A.   Yes.

3     Q.   Thank you.

4          And you understand or is it your

5    understanding that Rite Aid distributes only to

6    Rite Aid pharmacies?

7     A.   That's what I recall.

8     Q.   Do you understand that Rite Aid does not

9    distribute to internet pharmacies or pharmacies

10   that aren't affiliated with Rite Aid?

11        MR. SHKOLNIK:  Objection.

12        MS. BACCHUS:  Objection.  If you know.

13        THE WITNESS:  I don't know that for certain.

14   BY MR. SCHUTTE:

15    Q.   If it were the case that while during the

16   time period that Rite Aid was distributing

17   controlled substances that Rite Aid only

18   distributed to its own pharmacies, is that a factor

19   that would be appropriate for Rite Aid to take into

20   account when determining whether an order was

21   suspicious or not?

22        MR. SHKOLNIK:  Objection to form.

23        THE WITNESS:  It's one of the factors, sure.

24   Yes.

25

Page 249

1    BY MR. SCHUTTE:

2         Q.   And that would also be true -- if the same

3    base of the hypothetical was true for CVS and

4    Walmart and Walgreens, would you also agree that

5    the fact that these entities only shipped to their

6    own pharmacies is a factor that should be taken

7    into consideration when determining whether an

8    order is suspicious?

9         A.   Yes, I believe that's a factor.

10        Q.   And it's also a factor that can be taken

11   into consideration in making a determination

12   whether to ship an order?

13        A.   Yes.

14        Q.   You testified at some length this morning

15   that when you came to D.C. in, I think it was,

16   September of 2015.  Do I have that right?

17        A.   Yes.

18        Q.   With Mr. Milione, that there was a change

19   in philosophy about interactions between DEA and

20   distributors.  Do I have that right?

21        A.   Yes.

22        Q.   What was the reason for that change?

23        A.   One of the reasons was pretty soon after

24   we arrived, we were getting, you know, phone calls

25   e-mails from the registrant community hoping to

Page 250

1    meet with us and them, the registrant community

2    stating to us that they had not had much

3    engagement.  So they were speaking to us directly.

4    So that was a reason.

5       Q.   But in prior years, I believe it was your

6    testimony that when those overtures were made, they

7    were not -- the answer was not yes.  It was no,

8    we're not going to meet with you?

9       MS. BACCHUS:  Objection.

10      MR. SCHUTTE:  That's a fair objection.  Let me

11   withdraw the question.

12   BY MR. SCHUTTE:

13      Q.   What I'm asking you now is not really,

14   Ms. Ashley, what you experienced in terms of

15   questions being asked.  I'm asking why it is that

16   you and Mr. Milione decided to meet with

17   distributors when they asked to meet with you when

18   that was not always true in the past?  Why did you

19   do it?  What did you hope to accomplish?

20      A.   We felt that if we communicated better, we

21   could understand each other better, and it would

22   help us to ensure that registrants are in

23   compliance with the controlled substances.

24      Q.   It would also ensure that DEA was meeting

25   its mission, which was, on one hand, to get

Page 251

1  controlled substances to the folks who need them,

2  but at the same time, minimizing diversion?

3      MR. SHKOLNIK:  Objection to form.

4      MS. BACCHUS:  Objection.  Form.

5      THE WITNESS:  I would say it would help to

6  accomplish DEA -- yeah, I would, DEA's mission,

7  yes.

8  BY MR. SCHUTTE:

9      Q.   And would you agree with me that

10  communications between the Office of Diversion

11  Control and distributors could help the

12  distributors be more effective in minimizing

13  diversion?

14      A.   It would help them better understand our

15  regulations, which would, in turn, help minimize

16  diversion.

17      Q.   You testified earlier today that it was in

18  the discretion of the distributors to make the

19  decision whether an order was suspicious and

20  whether to ship, correct?

21      A.   Yes.

22      Q.   Are other aspects of a distributor's

23  efforts to comply with the suspicious order

24  monitoring system also discretionary?  For example,

25  the level of recordkeeping done by a distributor,

Page 252

1   is that something that's discretionary?

2       A.   The level of recordkeeping as -- I'm

3   sorry.  Only specific to suspicious orders what

4   records they keep?

5       Q.   Let's start with that.  Is how the records

6   are kept in connection with suspicious order

7   something that's left to the discretion of

8   distributors just as the decision as to whether an

9   order is suspicious or whether an order should be

10  shipped?

11      A.   How the records are kept are left to the

12  discretion of the distributor, yes.

13      Q.   Is the documentation of a distributor

14  suspicious order monitoring system how it's -- how

15  it is set up and how it's implemented also

16  something that is in the discretion of the

17  distributors?

18      A.   Yes.

19      MR. SCHUTTE:  Can we go off the record for like

20  two minutes so I can consult with my cocounsel, and

21  I may be finished.

22      THE VIDEOGRAPHER:  We're off the record at

23  4:56 p.m.

24                      (Whereupon, a short break was

25                       taken.)

1      THE VIDEOGRAPHER:  We're back on the record at

2   5:01 p.m.

3   BY MR. SCHUTTE:

4      Q.   Ms. Ashley, thank you for your patience.

5   I just have a couple more questions.

6           I was asking a series of questions a

7   moment ago about whether things like recordkeeping

8   and documentation of suspicious order monitoring

9   are in the discretion of the distributors, and you

10  said yes.  I want to ask the same questions about

11  whether -- how a distributor conducts its due

12  diligence to determine whether an order is

13  suspicious.

14          Is that something that's in the discretion

15  of the distributor?

16     A.   How they conduct --

17     Q.   The due diligence.

18     A.   Yeah.

19     Q.   And is how they document -- strike that

20  and start over.

21          Is how a distributor documents the due

22  diligence it conducts, is that also something

23  that's in the discretion of the distributor?

24     A.   How they document it?  Okay.  Ask the

25  question again.

Page 254

1     Q.   Yes, ma'am.  Is how a distributor

2   documents the due diligence it conducts something

3   that's in the discretion of the distributor?

4     A.    How they document it?  How they do it, I'd

5   have to say, yes.

6     Q.   Okay.

7     MR. SCHUTTE:  How much time do we have on the

8   record?

9     THE VIDEOGRAPHER:  You've been on for

10  25 minutes.

11    MR. SCHUTTE:  Total.

12    THE VIDEOGRAPHER:  Total is five hours and 22

13  minutes.

14    MR. SCHUTTE:  So I believe that the defendants

15  have used five hours and 22 minutes, so we'll

16  reserve the additional hour and eight minutes for

17  redirect after plaintiff is finished.  Thank you

18  for your time.

19    MR. SHKOLNIK:  We have to go off.  I need to

20  switch and get documents.  If you don't mind, we'll

21  just take 10 minutes.

22    THE VIDEOGRAPHER:  We're off the record at

23  5:02 p.m.

24                        (Whereupon, a short break was

25                        taken.)

Page 255

1      THE VIDEOGRAPHER:  We're back on the record at

2   5:19 p.m.

3                       EXAMINATION

4   BY MR. SHKOLNIK:

5      Q.   Is it Mrs. Ashley or Ms. Ashley?

6      A.   Ms. Ashley.

7      Q.   I introduced myself before.  My name is

8   Hunter Shkolnik.  I'm here as a representative of

9   what we call the Plaintiffs Executive Committee in

10  this litigation.  I'm also counsel for Cuyahoga

11  County, which is the first trial, one of the first

12  trials that are going to go forward at the end of

13  the year involving the opioid litigation.

14          I'll try to go through this as quickly as

15  possible.  I'm usually -- I can get too fast

16  sometimes.  I'm going to take it easy and hopefully

17  get you out of here in less than the time I'm

18  allotted.

19          You were asked some questions just a

20  little while ago by counsel for what I would

21  call -- they refer to themselves as the pharmacies,

22  but I'm referring to them as the chain distributor

23  pharmacies in this case, Rite Aid, Walmart,

24  Walgreens and the like.  And they asked you

25  questions if they didn't sell to internet on the

Page 256

1   internet, if they only distributed to themselves,

2   are these things that should be taken into

3   consideration as part of their due diligence, and I

4   think your answer was well, certainly.  Am I

5   correct?

6        MR. SCHUTTE:  Object to form.

7        THE WITNESS:  I think my answer was yes.

8   BY MR. SHKOLNIK:

9        Q.   And the mere fact that they don't sell on

10  the internet or they distribute it to themselves

11  does not relieve them for any of the obligations

12  that they have under the Controlled Substances Act

13  and the regulation promulgated thereunder.  Fair

14  statement?

15       MS. ZOLNER:  Object to the form.

16       THE WITNESS:  That's correct.  It doesn't

17  alleviate any obligations.

18  BY MR. SHKOLNIK:

19       Q.   And in fact, unlike a distributor, for

20  example, the McKessons, the Cardinal Healths,

21  AmerisourceBergens who don't own the pharmacy,

22  there is no plausible argument that you don't know

23  what's happening at your pharmacy level if you're

24  actually a chain pharmacy distributor.  Fair

25  statement?

```
                                        Page 257

 1       MS. BACCHUS:  Object to form.

 2   BY MR. SHKOLNIK:

 3       Q.   Do you want me to read that back?

 4       A.   Sure.

 5       Q.   Unlike distributors, for example,

 6   McKesson, Cardinal Health, AmerisourceBergen that

 7   don't own their own pharmacies, there is no

 8   plausible argument that these chain pharmacy

 9   distributors can have that they don't know what is

10   going on at the pharmacy level.  Is that a fair

11   statement?

12       MS. BACCHUS:  Same objection.  Object to form.

13       THE WITNESS:  It's my opinion that they would

14   know exactly what's going on with their company.

15   BY MR. SHKOLNIK:

16       Q.   And I'm just asking about your opinion,

17   and I'm going to phrase my questions that way.

18            In your opinion, as a chain pharmacy

19   distributor, they would have certain obligations to

20   utilize the knowledge at the pharmacy level to help

21   them make decisions regarding due diligence up the

22   chain in distributions.  Fair statement?

23       MS. BACCHUS:  Objection.  Form.

24       MR. DAVISON:  Objection.

25       THE WITNESS:  It's fair that they have the same
```

Page 258

1   obligation, and they would have the information

2   available to them.

3   BY MR. SHKOLNIK:

4       Q.   And you were asked questions, I think

5   quite extensively, by counsel earlier about

6   something known as or they refer to as visibility.

7   Someone may not have visibility either downstream

8   or upstream depending upon where they are in this

9   closed system, correct?

10      A.   They may not, correct.

11      Q.   On the other hand, you were asked

12  questions about chargeback data and purchasing

13  sales data.  That would be a way to ensure

14  visibility either upstream or downstream depending

15  upon where you were in the closed chain?

16      MS. ZOLNER:  Object to form.

17      MS. BACCHUS:  Objection to form.

18      THE WITNESS:  Depending on -- I'm sorry.

19  Repeat that.

20  BY MR. SHKOLNIK:

21      Q.   If someone is purchasing sales data from

22  the pharmacy level or distribution information,

23  that is just a method to increase visibility at the

24  different levels of the distribution chain,

25  correct?

1    MS. ZOLNER: Objection. Form. Foundation.

2    Vague.

3    THE WITNESS: I agree with that.

4    BY MR. SHKOLNIK:

5    Q.   And would you agree -- and I'm asking for

6    your personal opinion on this after 30 years in

7    this field. Would you agree with me that it's the

8    possession of the knowledge, you know, knowing who

9    was buying the pills, where the pills are going,

10   how they're being distributed, if you possess that

11   knowledge, it doesn't make a difference if you're a

12   manufacturer, a distributor or a pharmacy if you

13   possess the knowledge that will allow you to

14   determine whether or not suspicious orders are

15   being filled? It's your obligation under the

16   Controlled Substances Act to act on that. Fair

17   statement?

18   MR. NICHOLAS: Objection to the form.

19   MS. ZOLNER: Objection. Calls for a legal

20   conclusion.

21   MR. STEPHENS: Object to form.

22   BY MR. SHKOLNIK:

23   Q.   I'm asking for your personal opinion.

24   A.   Personally that would be my expectation.

25   Q.   And in fact, over the years that you were

1   with the DEA, and I'm not asking about any

2   investigations you were involved in, you became

3   aware, did you not, that many of the chain

4   pharmacies were the subject of investigations and

5   also settlements with the DEA because they didn't

6   appropriately fulfill their obligations under the

7   control substances act, correct?

8       MS. BACCHUS:  Objection.  Form.

9       MR. HYNES:  Objection.

10      THE WITNESS:  I am aware of that.

11  BY MR. SHKOLNIK:

12      Q.   I mean, for example, Walgreens,

13  $80 million fine because they did not comply with

14  their obligations under the act.  You're aware of

15  that, correct?

16      MR. STOFFELMAYR:  Objection to the form.  It

17  was not a fine.  It was a settlement.

18      THE WITNESS:  I'm aware of the investigation,

19  yes.

20  BY MR. SHKOLNIK:

21      Q.   And you're aware they that were -- they

22  decided to settle with the DEA for $80 million,

23  correct?

24      A.   I am aware of that.

25      Q.   And you're aware that the agency did an

Page 261

1    extensive investigation, and there was litigation

2    regarding their actions of not complying with the

3    Controlled Substances Act?

4        MR. STOFFELMAYR:  I would object to the form

5    and also object that at this point, this is well

6    beyond the scope of what's within the Touhy letter

7    as to a specific investigation.

8        MS. BACCHUS:  And I will object that she cannot

9    testify regarding any specific investigations.  To

10   the extent that the matter is public knowledge, she

11   may testify if she knows.

12       THE WITNESS:  No.

13   BY MR. SHKOLNIK:

14       Q.  Did you know that publicly that there was

15   an investigation of Walgreens, and they settled

16   because of violations of the Controlled Substances

17   Act in monitoring suspicious orders?

18       A.  Yes, I did know that.

19       MR. STOFFELMAYR:  Objection to the form.  Calls

20   for speculation.

21   BY MR. SHKOLNIK:

22       Q.  Do you know that McKesson has had

23   settlements for violations of the Controlled

24   Substances Act for failing to honor their

25   obligations under the act?  Are you aware of that?

1      MR. EPPICH:  Object to the form.  Misstates the

2   evidence.

3   BY MR. SHKOLNIK:

4      Q.   Publicly aware.

5      A.   Publicly aware.

6      MR. EPPICH:  Object to the form.

7   BY MR. SHKOLNIK:

8      Q.   If I was to list all of the big

9   distributors, we're talking AmerisourceBergen,

10   we're talking Cardinal Health, we're talking

11   McKesson, Walgreens, they're all -- they were all

12   subject to settlements with the DEA because the

13   DEA, and I'm asking for public information, because

14   the DEA found they all violated the Controlled

15   Substances Act, correct?

16      MR. NICHOLAS:  Object to the form.  Lack of

17   foundation.

18      MS. BACCHUS:  I would object to the form and

19   foundation as well.

20      MR. EPPICH:  I just want to make clear on the

21   record that one objection is the same objection for

22   all?

23      MR. SHKOLNIK:  Absolutely.

24      MR. EPPICH:  Thanks.

25

1  BY MR. SHKOLNIK:

2      Q.   Am I right?

3      A.   I am publicly aware of those -- all of

4  those cases from public information.

5      Q.   And let's talk about Purdue Pharma in

6  particular.  You're aware publicly, are you not,

7  that they actually plead guilty to felonies with

8  respect to the manner in which they marketed their

9  drug, OxyContin?  You're aware of that publicly.

10  Isn't that a fair statement?

11      MS. ZOLNER:  Objection.  Form.  Objection.

12  Scope.

13      MS. MACKAY:  Same.

14      THE WITNESS:  I have knowledge from public

15  information of the Purdue investigation.

16  BY MR. SHKOLNIK:

17      Q.   Executives plead guilty and the company

18  plead guilty to a felony.  I'm sorry.  The

19  executives plead guilty to felonies, correct?

20      MS. BACCHUS:  I'm going to object on the

21  grounds of Touhy.  This is getting a little bit

22  beyond the scope of the Touhy.

23  BY MR. SHKOLNIK:

24      Q.   All right.  So let me just jump ahead

25  then.  I'm going to mark as Exhibit No. 26 what

Page 264

1  I --

2      MR. SHKOLNIK:  Just for all counsel, I have a

3  full copy of a document.  It's about 140 pages, but

4  I'm only using seven pages of it.  I'm going to

5  mark the big document, and I'm going to make copies

6  of the seven pages I'm using.  And if anybody needs

7  the rest, you can have it.

8      MR. EPPICH:  Can you read off the Bates number

9  for us?

10      MR. SHKOLNIK:  I will.

11      MR. EPPICH:  Thank you.

12      MR. SHKOLNIK:  The Bates US-DEA-00000001, and I

13  didn't -- we didn't show it because it's been

14  redacted as a claw-back document already.

15      MR. NICHOLAS:  Could you clarify what you mean

16  when you say it was clawed back, but redacted?

17      MR. SHKOLNIK:  I'm saying it's been redacted by

18  DEA.

19      MS. ZOLNER:  Do you have a copy of that

20  document?

21      MR. SHKOLNIK:  It's coming.

22      MS. BACCHUS:  I'm sorry.  You said this has

23  been clawed back?

24      MR. SHKOLNIK:  Not clawed back.  It's been

25  redacted by DEA.

Page 265

1      MR. EPPICH:  Sorry.  Was that redaction today,

2  or is that --

3      MR. HYNES:  It's been redacted when it was

4  produced originally.

5      MR. SHKOLNIK:  It was produced with the

6  redaction.

7                          (Whereupon, ASHLEY Deposition

8                          Exhibit No. 26 was marked for

9                          identification.)

10  BY MR. SHKOLNIK:

11      Q.   I've just handed you what's been marked as

12  Exhibit 26 here.  It's a document dated November 5,

13  2012, and let me just zoom it in here so the jury

14  will be able to see it.  And you'll hear me say

15  things like the jury will be able to see it because

16  this can get presented at trial.  This document is

17  something entitled a memorandum, subject, briefing

18  with Actavis Elizabeth, LLC 2012.

19           When you were at DEA, were you aware that

20  there were briefings being done with manufacturers

21  as well as with distributors?

22      A.   I don't recall manufacturers.  I'm certain

23  of distributors.

24      Q.   Here we have what we see is written is a

25  distributor briefing with Actavis Elizabeth, and it

Page 266

1   says it's written to a Mr. Joseph Rannazzisi,

2   deputy assistant administrator, Office of Diversion

3   Control.

4         Can you tell the jury who Mr. Rannazzisi

5   was in relation -- who he was and where he was in

6   relation to you at DEA over the years?

7       MS. ZOLNER:  Objection.  Form.

8       THE WITNESS:  In 2012 Mr. Rannazzisi was the

9   deputy assistant administrator for the Office of

10  Diversion Control in headquarters Arlington,

11  Virginia.  I was in the Chicago field division.  I

12  never reported directly to Mr. Rannazzisi, but I

13  was always under the diversion umbrella.

14  BY MR. SHKOLNIK:

15      Q.   And at some point, did you move up into a

16  similar position of what Mr. Rannazzisi was?

17      A.   Yes.

18      Q.   And was that after his retirement from the

19  agency?

20      A.   Yes.

21      Q.   And just briefly, if you could tell the

22  Court and jury, during the years that

23  Mr. Rannazzisi was in the position as deputy

24  assistant administrator for Office of Diversion

25  Control, did you have a chance to observe the work

Page 267

1  that he was doing on behalf of DEA?

2      MS. ZOLNER:  Objection.  Form.

3      THE WITNESS:  Specifically, I mean, some --

4  have I seen him -- I've seen him do presentations?

5  I mean, I'm not sure.

6  BY MR. SHKOLNIK:

7      Q.   I guess let me rephrase.  I'll phrase it

8  differently then.

9          Mr. Rannazzisi was involved in overseeing

10  many aspects of the diversion control office of the

11  DEA, correct?

12      A.   Yes.

13      MS. ZOLNER:  Objection.  Form.  Objection.

14  Vague.

15  BY MR. SHKOLNIK:

16      Q.   And he was also involved with -- in fact,

17  he was the one who authored various letters to the

18  registrants, one of which we saw here today, a

19  December, I think it was, 2007 letter?

20      A.   Yes.

21      Q.   And he also wrote a couple other ones that

22  went out to registrants, did he not?

23      MS. ZOLNER:  Objection to form.

24      THE WITNESS:  Yes.

25

Page 268

1   BY MR. SHKOLNIK:

2       Q.   And specifically those letters to the

3   registrant, what was the purpose of those type of

4   letters to the registrant, from your knowledge

5   being out in the field during those years, when

6   Mr. Rannazzisi, did it?

7       MR. NICHOLAS:  Object to the form.

8       MR. EPPICH:  Objection.  Foundation.

9       MR. NICHOLAS:  No foundation.

10  BY MR. SHKOLNIK:

11      Q.   If you know.

12      A.   My knowledge from receiving the letters

13  and reading them myself was to have the registrants

14  understand DEA's expectation.

15      Q.   Was there problems going on around 2005,

16  2006, 2007, to your knowledge, that the DEA was

17  observing with respect to opioid and developing

18  epidemic?

19      MS. ZOLNER:  Objection.  Form.

20  BY MR. SHKOLNIK:

21      Q.   Your own personal knowledge.

22      MS. ZOLNER:  Objection.  Form.  Objection.

23  Compound.

24      MS. BACCHUS:  Objection.  It's a vague

25  question.

1      THE WITNESS:  In my personal experience as an

2  investigator, yeah, there was -- there were issues

3  with a rise in abuse of controlled substances.

4  BY MR. SHKOLNIK:

5      Q.   Was there -- from your observation, did

6  the DEA begin to be very concerned and wanted to

7  take some action around that time to see if steps

8  could be taken to try to curb back the problem that

9  was developing?

10      MS. ZOLNER:  Objection.  Form.  Objection.

11  Vague.  Objection.  Foundation.

12      THE WITNESS:  In my experience, that was always

13  the case.  I mean, yeah.

14  BY MR. SHKOLNIK:

15      Q.   That's a good question.  I guess I should

16  have asked that first.

17          While you were with the DEA, what was --

18  you know, from your personal perspective, what was

19  your belief of what you were doing out there in

20  terms of trying to or not trying to avert an opioid

21  epidemic that was developing?

22      MS. BACCHUS:  Objection.  Form.  You can

23  answer.

24      THE WITNESS:  My understanding of my

25  responsibility was to engage with the registrant

Page 270

1    communities, oversee and ensure compliance with the

2    Controlled Substances Act to do the things and

3    address them depending on what they were to ensure

4    that there weren't abuses, misuses and also to

5    ensure that adequate supply was available for those

6    that needed it.

7    BY MR. SHKOLNIK:

8        Q.   You were asked questions about the

9    adequate supply, and that was certainly part of

10   what you believed your job was to do, make sure

11   there was adequate supply, correct?

12       A.   Yes.

13       Q.   Was there a perception -- did you have a

14   perception over the years that there appeared to be

15   developing a disregard for the obligations under

16   the Controlled Substances Act by some of the

17   registrants as this epidemic was developing?

18       MS. ZOLNER:  Objection.  Form.  Objection.

19   Vague.

20       THE WITNESS:  I can say that I encountered

21   circumstances where there was disregard, but it --

22   not always.

23   BY MR. SHKOLNIK:

24       Q.   But there were times where -- did you,

25   from your observation of what was happening over

Page 271

1  the years, observe that some of the larger

2  registrants may have been failing to abide by their

3  requirements to prevent diversion?

4      MS. ZOLNER:  Objection.  Form.

5  BY MR. SHKOLNIK:

6      Q.   Just generally speaking.

7      MS. ZOLNER:  Objection.  Form.  Objection.

8  Vague.

9      MS. MCNAMARA:  Objection.  Foundation.

10  Objection to time.

11      THE WITNESS:  In my career, yes, I have

12  experience with registrants not operating in

13  compliance with the Controlled Substances Act.

14  BY MR. SHKOLNIK:

15      Q.   From your perspective, was part of your

16  job to do your best to see if you could try to get

17  these registrants to follow the rules and do their

18  job in terms of compliance with the Controlled

19  Substances Act?

20      MS. ZOLNER:  Objection.  Form.  Objection.

21  Vague.

22      THE WITNESS:  Part of my job responsibility was

23  to bring the registrant into compliance, yes.

24  BY MR. SHKOLNIK:

25      Q.   And certainly the letters issued by

Page 272

1    Mr. Rannazzisi was one way that you observed DEA as

2    a whole trying to get industry, when I say

3    industry, the registrants, into compliance and to

4    follow the rules?

5         MR. NICHOLAS:  Object to the form.

6         MS. MCNAMARA:  Objection to form.

7         MR. NICHOLAS:  Lack of foundation.

8         MS. BACCHUS:  I object to the form of the

9    question.

10        THE WITNESS:  Should I answer?

11   BY MR. SHKOLNIK:

12        Q.   Yes.

13        A.   That's my understanding of the purpose of

14   the letter.

15        Q.   This letter we have here is not one of

16   the -- this document here, Exhibit No. 26, is not

17   one of those Rannazzisi letters.  Have you ever

18   seen, during the course of your time with DEA,

19   memorandums that were written sort of to the file

20   to the agency describing meetings with registrants?

21        A.   Have I?  Yes.

22        Q.   And we're looking here -- this one talks

23   about it's a briefing -- it's sort of a briefing

24   memo following a meeting with this company,

25   Actavis.  Do you know who Actavis was?

Page 273

1       A.    I've heard of them, yes.

2       Q.    They were a registrant, were they not?

3       A.    Yes, a DEA registrant.  Yes.

4       Q.    And here it says that on September 12,

5    2012, a meeting was held in Arlington, Virginia at

6    Drug Enforcement Administration headquarters

7    between DEA, Actavis, LLC, and it identifies who

8    the representatives were there.

9           When meetings occurred, was there a

10   practice, from your understanding, that DEA people

11   would want to document it so you know what

12   transpired during the meeting so in the future, you

13   could have a record?

14      MS. ZOLNER:  Objection.  Form.  Objection.

15   Vague.  Objection.  Vague as to time frame.

16   Objection.  Foundation.

17      MR. SHKOLNIK:  That's a lot.

18   BY MR. SHKOLNIK:

19      Q.    You can still answer it.  It was still a

20   good question.

21      A.    Yes, that was a practice.

22      Q.    And here we have a document that

23   references that there was this meeting on

24   September 12th, and the purpose of the meeting --

25   and I'm going to highlight it here.  The purpose of

1    the meeting was to address manufacturing and

2    distribution practices of controlled substances by

3    Actavis.

4            From your experience, was it a practice of

5    DEA to meet with not just distributors, but also

6    meet with manufacturers at times to try to help

7    them understand their obligations and what they

8    should and should not be doing?

9        MS. ZOLNER:  Objection.  Form.

10       THE WITNESS:  DEA investigators in general

11   meeting with manufacturers?

12   BY MR. SHKOLNIK:

13       Q.   No.  We're talking about headquarters.

14       A.   At headquarters?

15       MS. ZOLNER:  Objection.  Foundation.

16       THE WITNESS:  If we're talking about me

17   personally in that time period --

18   BY MR. SHKOLNIK:

19       Q.   Not you personally.

20       A.   Did DEA meet with manufacturers?  I would

21   have to say yes.

22       Q.   And here we have an example of it.  They

23   had an actual meeting with a manufacturer, and for

24   the purpose -- the purpose of it was to address

25   manufacturing distribution practices of controlled

Page 275

1   substances by Actavis concentrating on Oxycodone

2   15 milligram and 30 milligrams.

3          Are you -- do you know what Oxycodone 15

4   milligram and 30-milligram tablets are from your

5   experience in the field?

6      MS. ZOLNER:  Objection.  Form.

7      THE WITNESS:  Yes.  I know that they're

8   Schedule II controlled substance.

9   BY MR. SHKOLNIK:

10     Q.   And those would be drugs -- those are

11  opioids that were -- that would be governed by the

12  Controlled Substances Act, correct?

13     A.   Correct.

14     Q.   And if we go down into this document, it

15  says that SC -- do you know what SC means?

16     MR. EPPICH:  Objection.  Foundation.

17     THE WITNESS:  Yes.

18  BY MR. SHKOLNIK:

19     Q.   Can you tell the Court and jury what SC

20  means.

21     MR. EPPICH:  Objection.  Foundation.

22     THE WITNESS:  Staff coordinator.

23  BY MR. SHKOLNIK:

24     Q.   Levin opened the meeting by stating its

25  purpose was both educational and informative.

Page 276

1          From your experience over the years you

2    were with DEA in Washington, did you find that

3    there were occasions where DEA would want to meet

4    with registrants like manufacturers for the

5    purposes of educating them and giving them

6    information from the DEA?

7        MS. ZOLNER:  Objection.  Form.

8        THE WITNESS:  Yes.

9    BY MR. SHKOLNIK:

10       Q.   Was that a good thing?

11       A.   Yes.

12       Q.   Was that a way that -- from your

13   understanding, that DEA was trying to make sure

14   that the registrants did the right thing?

15       MS. ZOLNER:  Objection.  Form.  Objection.

16   Foundation.

17       MS. BACCHUS:  Objection to the form of the

18   question.

19       THE WITNESS:  That was one way, yes.

20   BY MR. SHKOLNIK:

21       Q.   And it says SC Levin stated he would

22   discuss Actavis's responsibility under the

23   Controlled Substances Act, their suspicious order

24   monitoring system, their procedures concerning due

25   diligence knowing their customers, who their

                                                    Page 277

1   customers sell to, graphs depicting the pharmacies

2   where products were ultimately dispensed.  You were

3   asked -- first of all, did I read that correctly?

4       A.   Yes.

5       Q.   Now, you were asked whether or not there's

6   ever been any writing -- let me withdraw that.

7            You were asked by counsel for Actavis --

8   I'm sorry.  Was it Allergan or Actavis -- whether

9   or not there's ever been a writing about

10  manufacturers being told by -- let me rephrase it.

11           You were asked questions by counsel for

12  manufacturers here today as to whether or not there

13  was ever any type of writings to manufacturers that

14  they should know their customer's customers.  And I

15  know you weren't shown any documents by counsel,

16  but would you agree with me from your understanding

17  and just generally speaking, not speaking for the

18  DEA, would this be an example of the DEA actually

19  sitting down with a manufacturer and talking to

20  them about knowing your customer's customer?

21      MS. ZOLNER:  Objection.  Form.  Objection.

22  Foundation.

23      MR. EPPICH:  Objection.  This is also outside

24  the scope.  She was not at this meeting.  This is

25  going well beyond her personal knowledge.

1      MR. SHKOLNIK:  I agree.  I would never have

2   brought up the customer's customer issue if I were

3   you.

4      MS. BACCHUS:  I'm going to object on the

5   grounds of form.

6   BY MR. SHKOLNIK:

7      Q.   Is this an example of DEA -- I'm saying

8   just generally speaking from your understanding,

9   would you look at this and say wow, that is someone

10   at DEA actually telling a manufacturer you've got

11   to know your customer's customer?

12      MS. ZOLNER:  Objection.  Form.  Objection.

13   Foundation.

14      THE WITNESS:  Reading this document, it states

15   that it states they should know who their customers

16   sell to.

17   BY MR. SHKOLNIK:

18      Q.   And this wasn't a -- from your

19   understanding in 2012, this wasn't a new thing that

20   you need to know your customer and your customer's

21   customer.  I mean, that's how you would determine

22   whether or not there's suspicious orders

23   downstream, correct?

24      MS. ZOLNER:  Objection.  Form.  Objection.

25   Foundation.  Objection.  Compound.  Objection.

1    Vague.

2        THE WITNESS:  My experience is it's used to

3    determine whether or not a distributor would use it

4    to determine -- or a manufacturer if you should be

5    my customer.  It would be part of their approval

6    process.

7    BY MR. SHKOLNIK:

8        Q.   From your understanding, is that part of

9    the whole goal of the Controlled Substances Act?

10   You want to make sure that before you start passing

11   the pills, shipping the pills, whether you're a

12   manufacturer, distributor, you want to make sure

13   the person you're distributing to or giving them to

14   downstream should even have those pills or if it's

15   suspicious, correct?

16       MS. ZOLNER:  Objection.  Form.  Objection

17   vague.  Objection.  Foundation.

18       THE WITNESS:  That it is a legitimate business.

19   That's my experience.

20   BY MR. SHKOLNIK:

21       Q.   And then he goes on to say Levin stated he

22   would be primarily focusing on distribution of

23   Oxycodone 15 milligrams or 30 milligrams.  Turn the

24   page, and I'll ask you a few more questions.

25              Now, if we turn to the second page of

Page 280

1   Exhibit No. 26, I'm going to go to the top of the

2   second page, and it's the section that starts with

3   Ms. Baron stated that Actavis is just beginning to

4   review their sales through chargeback system.

5            Counsel for the manufacturers asked you

6   about chargeback systems.  Generally speaking, what

7   is your knowledge about chargeback systems?

8       MS. BACCHUS:  Objection.  Asked and answered.

9   BY MR. SHKOLNIK:

10      Q.   If you know.

11      MS. BACCHUS:  To the extent that you have

12  nonprivileged knowledge, you may answer that

13  question, but the objection stands.  It's been

14  asked and answered.

15      THE WITNESS:  I don't have any nonprivileged

16  knowledge.

17  BY MR. SHKOLNIK:

18      Q.   I'm just going to go above.  It says UPS

19  Supply Chain uses their own DEA registration and

20  reports purchases and sales directly to ARCOS.

21  Ms. Baron explained their chargeback system.  The

22  system enables Actavis to see who their customers

23  are selling their products to and what they are

24  purchasing.

25            Generally speaking, was that your

                                                    Page 281

1    understanding of what a chargeback system would --

2    the visibility that a chargeback system would give

3    to a manufacturer?

4         MS. ZOLNER:  Objection.  Form.  Objection.

5    Asked and answered.  The witness has said she

6    doesn't have any nonprivileged knowledge.

7         MS. BACCHUS:  Objection.  Asked and answered.

8    BY MR. SHKOLNIK:

9         Q.   You can answer.

10        A.    This is my understanding as it's written.

11        Q.   And as it's written, it's saying the

12   system enables the manufacturer to see who their

13   customers are selling their products to and what

14   they are purchasing.

15             Now, from your general understanding, is

16   that something that should be utilized as part of a

17   suspicious order monitoring system from your

18   understanding?

19        MS. ZOLNER:  Objection.  Form.  Objection.

20   Foundation.  Objection.  Vague.  And objection.

21   Asked and answered.

22        MR. SHKOLNIK:  It's called cross.

23        THE WITNESS:  It's my expectation that having

24   that information, it would be utilized.

25

Page 282

1   BY MR. SHKOLNIK:

2       Q.   And that, from your understanding, would

3   be any company that has that kind of information.

4   It's information that should be utilized in a

5   suspicious order monitoring order system, correct?

6       MR. NICHOLAS:  Object to the form.

7       MS. ZOLNER:  Objection.

8       THE WITNESS:  It's my expectation that it would

9   be.

10  BY MR. SHKOLNIK:

11      Q.   And then it goes on to say she had been

12  visited by UPS Supply Chain and been able to review

13  their suspicious monitoring system.  U.S. Supply

14  Chain has a staff which monitors any suspicious

15  orders of controlled substances.  Value Centric is

16  a firm who stores sales data for Actavis, which

17  they can review.  Recently Ms. Baron has gone to

18  visit large volume customers such as Cardinal,

19  McKesson and AmerisourceBergen.  SC Levin mentioned

20  Ms. Baron's significance of knowing your customers.

21          Now, did I read that section correctly?

22      A.   Yes.

23      Q.   Basically from your general understanding

24  over the 30 years you were with DEA, this is

25  what -- this is an -- this is what you would

Page 283

1    understand to mean visibility and due diligence.

2    Is that a fair statement?

3        MS. ZOLNER:  Objection.  Form.  Objection.

4    Foundation.  Objection.  Vague.  Objection.

5    Misstates prior testimony.

6        MS. BACCHUS:  Objection to the form of the

7    question.

8        THE WITNESS:  I agree that this gives

9    visibility, yeah.

10   BY MR. SHKOLNIK:

11       Q.   And it says SC Levin stated that the

12   United States, U.S., consumes more legitimately

13   manufactured controlled drugs than any other

14   country.  SC Levin mentioned 97 percent of

15   hydrocodone that is manufactured is prescribed and

16   dispensed in the United States.

17            Was that your general understanding back

18   when you were at the DEA?

19       MS. ZOLNER:  Objection.  Foundation.

20       MS. BACCHUS:  Objection.  Foundation.

21   BY MR. SHKOLNIK:

22       Q.   If you had an understanding.

23       A.   Yes, this is a statement that I seen,

24   yeah, and understand from my career.

25       Q.   And SC Levin explained the dramatic

Page 284

1   increase of prescription drug abuse which has

2   increased by 400 percent over the past 10 years.

3           Was that your understanding of what

4   happened over the 10 years prior to 2012 while you

5   were working out in the field for the DEA?  Was

6   that your general understanding?

7       MR. NICHOLAS:  Objection.  Outside the scope of

8   the Touhy letter.

9       MS. BACCHUS:  Yeah.  I have to agree with that

10  objection.  This is getting outside of the scope of

11  her Touhy authorization regarding her

12  communications and what constitutes a suspicious

13  order.

14      MR. SHKOLNIK:  Can she answer it?

15      MS. BACCHUS:  No.

16      MR. SHKOLNIK:  I tried.

17  BY MR. SHKOLNIK:

18      Q.   Now, it also goes on to say SC Levin

19  presented a PowerPoint presentation exemplifying

20  the common characteristic issues associated with

21  distribution and manufacturing practices by

22  manufacturers and distributors of controlled

23  substances.

24          First, did I read that correctly?

25      A.   Yes.

1      Q.   Is this -- from your experience over the

2  years, is this something that DEA, the people you

3  work with at DEA, including yourself, this type of

4  things you did when you worked with the

5  distributors and the manufacturers?  You tried to

6  help them understand the common characteristics and

7  issues associated with distribution and

8  manufacturing practices and distribute --

9  distribution of controlled substances.  You tried

10  to help them, correct?

11      MS. ZOLNER:  Objection.  Form.  Objection

12  foundation.  Objection.  Compound.  Objection.

13  Vague.

14      MS. BACCHUS:  I object to form, and I object on

15  the grounds of vagueness.

16  BY MR. SHKOLNIK:

17      Q.   You can answer.

18      A.   So yes, in my career, that was -- that's

19  what I did, tried to help registrants remain in

20  compliance with the Controlled Substances Act.

21      Q.   And just generally speaking, reading this

22  sentence that SC Levin presented a PowerPoint

23  presenting -- presentation exemplifying the common

24  characteristics and issues associated with the

25  distribution and manufacturing practices by

Page 286

1    manufacturers and distributors of controlled

2    substances, and SC Levin stressed the importance of

3    manufacturers' due diligence requirements knowing

4    one's customers and detection of suspicious orders.

5              First, did I read that correctly?

6         A.    Yes.

7         Q.    Reading this, from your general experience

8    being a DEA professional for 30 years, is this the

9    type of practice that DEA would follow in working

10   with the distributors and the manufacturers?

11        MS. ZOLNER:  Objection.  Form.

12        THE WITNESS:  Yes, explaining the requirements.

13   Yes.

14   BY MR. SHKOLNIK:

15        Q.    You didn't tell them how to do their job,

16   did you?

17        A.    No.

18        MS. ZOLNER:  Objection.  Form.

19   BY MR. SHKOLNIK:

20        Q.    Am I correct?

21        A.    No.

22        Q.    You didn't tell them how to make their

23   suspicious monitoring system, did you?

24        MS. BACCHUS:  Objection.

25        THE WITNESS:  We did not tell them how to make

1    their suspicious monitoring system.

2    BY MR. SHKOLNIK:

3        Q.   You didn't tell them how to do their due

4    diligence, did you?

5        A.   Not how to do it.

6        Q.   But you told them they had to do due

7    diligence, correct?

8        A.   That is correct.

9        Q.   And it was their job to know it and know

10   how to do it, correct?

11       MS. BACCHUS:  Objection.  Form.  You could

12   answer.

13   BY MR. SHKOLNIK:

14       Q.   From your understanding.

15       A.   We would tell them they had to do it.  It

16   was a requirement.

17       Q.   And you told them they had to develop a

18   system to determine whether or not they were

19   shipping or not shipping suspicious orders.  You

20   told them that was their obligation to do generally

21   speaking, correct?

22       MR. NICHOLAS:  Object to the form.  Testimony

23   in the form of a question.  Go ahead.

24       MR. EPPICH:  Object to the time.  Vague.  No

25   time.

1      THE WITNESS:  Yes, we did, or yes, I did talk

2   to registrants about developing their systems for a

3   suspicious order monitoring.

4   BY MR. SHKOLNIK:

5      Q.   You didn't go into their offices and say

6   this is what we're going to make and this is how

7   you're going to do it.  You said you've got to

8   figure out how to do it, registrant, whether you're

9   a distributor or manufacturer, correct?

10      MR. NICHOLAS:  Object to the form.

11      THE WITNESS:  That's correct.

12   BY MR. SHKOLNIK:

13      Q.   And it was their obligation to follow the

14   law and implement that system, correct?

15      MS. BACCHUS:  Objection.

16      THE WITNESS:  It was their requirement, yes.

17   BY MR. SHKOLNIK:

18      Q.   And when you see here that SC Levin was

19   stressing the importance of manufacturers' due

20   diligence, knowing one's customers and detecting

21   suspicious orders, that type of sentence is not

22   surprising to you because that's what you were

23   doing over the 30 years you were with DEA, wasn't

24   it?

25      MR. NICHOLAS:  Object to the form.  Lack of

Page 289

1   foundation.  Testimony in the form of a question.

2        MS. BACCHUS:  I object to the form of the

3   question.

4        MS. ZOLNER:  Objection.  Leading.

5   BY MR. SHKOLNIK:

6        Q.   You can answer.

7        A.   That sentence does not surprise me, no.

8        Q.   That's really the right thing to do, from

9   your perspective, as a DEA professional for

10  30 years, correct?

11       MS. ZOLNER:  Objection.  Form.  Objection.

12  Foundation.  Objection.  Vague.

13       MS. BACCHUS:  And she --

14       MR. NICHOLAS:  These questions are incredibly

15  leading.

16       MR. SHKOLNIK:  I'm crossing the witness.  I'm

17  allowed to.

18       MR. NICHOLAS:  Is she a hostile witness?

19       MR. SHKOLNIK:  You put a witness up.

20       MR. NICHOLAS:  Is she a --

21       MR. SHKOLNIK:  By the way, there's a ruling on

22  this whole issue from the special master.  You

23  weren't there.  We're allowed to lead the

24  witnesses.

25       MR. NICHOLAS:  Does everyone in the room agree

Page 290

1    with that?

2        MS. MCNAMARA:  No.  We were supposed to

3    minimize the leading.

4        MS. ZOLNER:  That was my understanding.

5        MR. SHKOLNIK:  Go ahead and minimize.  You guys

6    did a good job of it.  Let's go.  I'm not going to

7    waste my time.

8    BY MR. SHKOLNIK:

9        Q.   We had a question, I think, that they

10   didn't like.  I read that section, and I said from

11   your perspective, what he's describing there, SM

12   Levin, SL Levin, from your perspective as a DEA

13   professional for over 30 years, what he's

14   describing there is the right thing to do from a

15   DEA professional standpoint from your -- from your

16   perspective, correct?

17       MS. ZOLNER:  Objection.  Form.  Objection.

18   Foundation.  Objection.  Vague.

19       MS. BACCHUS:  I'm going to object on the

20   grounds of form.  If you have a personal opinion,

21   then you may answer that question, but the

22   objection stands.

23       THE WITNESS:  It's my opinion that -- and my

24   experience that DEA -- well, my experience that

25   this is not unusual and that it was our

1    responsibility to work with registrants to

2    understand due diligence.

3    BY MR. SHKOLNIK:

4        Q.    There were questions like a couple hours

5    today about -- and you were shown a number of

6    letters and exhibits that talked about the trade

7    organization on behalf of distributors writing to

8    DEA addressing concerns that there was lack of

9    communication.  Is that a fair statement of what

10   was presented today to you?

11       A.    I agree that was presented today.

12       Q.    From your standpoint, during the years you

13   were there, were you seeing a lack of communication

14   with distributors and manufacturers as a general

15   proposition?

16       A.    In my field division?

17       MS. MCNAMARA:  Objection to form.

18   BY MR. SHKOLNIK:

19       Q.    From what you saw.

20       A.    My experience is that we engaged a lot,

21   and I'm speaking from the Chicago field division.

22       Q.    This would be an example of engaging a

23   manufacturer at the headquarters level just from

24   your understanding, correct?

25       A.    Yes.

1      MS. ZOLNER:  Objection to form.

2   BY MR. SHKOLNIK:

3      Q.   That was 2012 according to this letter,

4   correct?

5      A.   Yes.

6      Q.   Now, if we just go down, there's a list of

7   items that were specifically reviewed, and one was

8   the knowing your customer.  We talked about that

9   already.  Am I correct?

10     A.   Yes.

11     Q.   And then he also -- very interesting he

12  talked to them about recent news articles regarding

13  actions taken against CVS pharmacies, Cardinal and

14  Walgreens.

15          From your perspective, would it be

16  surprising that when you're sitting down with one

17  of the registrants and you're trying to help give

18  them guidance and help that you would want to talk

19  to them about actions that DEA has taken recently

20  and changes that may have been implemented because

21  of those actions?  From your perspective, is that

22  something that would not be surprising to do?

23     MS. ZOLNER: Objection.  Form.  Objection.

24  Foundation.  Objection.  Vague.  And objection.

25  Calls for speculation.

1      MS. BACCHUS:  Objection on the grounds of form

2   as well as speculation.  You can answer if you

3   know.

4      THE WITNESS:  I'm going to -- I'm not clear on

5   the question.

6   BY MR. SHKOLNIK:

7      Q.   I'll rephrase the question.

8           From your perspective, if you're meeting

9   with the distributor or manufacturer or registrant

10  and you're trying to give them guidance on what to

11  do or what not to do in terms of their suspicious

12  order monitoring systems, would it be surprising

13  that you would want to discuss with them recent

14  actions DEA took against other registrants so they

15  would have an understanding?

16     MS. ZOLNER:  Objection.  Form.  Objection.

17  Foundation.  Objection.  Calls for speculation.

18     MS. BACCHUS:  Same objection.

19     THE WITNESS:  For me, it was not a practice to

20  do it in a one-on-one basis with the registrant.

21  It was more of a practice to do if I were

22  presenting in front of a group.

23  BY MR. SHKOLNIK:

24     Q.   And over the years, have you presented to

25  groups on behalf of DEA?

Page 294

1     A.   Yes.

2     Q.   And did you talk about prior

3  investigations and resolutions with other

4  registrants to the larger group so they would

5  understand?

6     MS. ZOLNER:  Objection.  Form.  Objection.

7  Vague.

8     THE WITNESS:  Cases that have been adjudicated,

9  yes.

10  BY MR. SHKOLNIK:

11     Q.   Just generally speaking, if you'd tell the

12  Court and jury why you would want to do that as a

13  DEA professional when you were doing those

14  presentations.

15     MS. ZOLNER:  Objection.  Form.  Objection.

16  Vague.

17     MS. BACCHUS:  Objection.  Vague.

18     THE WITNESS:  I would do that to provide

19  examples to have them understand what the

20  violations were to help them to avoid pitfalls to

21  just have them -- to help to explain DEA's

22  expectation of that registrant.

23  BY MR. SHKOLNIK:

24     Q.   And from your perspective, was that

25  something you did over the years, or was there a

Page 295

1  certain period of time you did that?

2     A.   My entire career.

3     Q.   And why did you feel that that would be

4  important to do that, to do those kind of

5  presentations to registrants or their trade

6  associations?

7     MS. ZOLNER:  Objection.  Form.

8     MS. BACCHUS:  Objection.  Vague.

9     MR. EPPICH:  Objection.  Misstates testimony.

10 BY MR. SHKOLNIK:

11    Q.   You can answer if you can.

12    A.   Because those registrants had similar

13 business activities and the same responsibilities

14 under the CSA.  So I wanted to provide to them

15 examples of pitfalls and try to help them stay away

16 from those.

17    Q.   And you did that because you were a DEA

18 professional in the diversion division over

19 30 years, correct?

20    MS. BACCHUS:  Objection.  Asked and answered.

21    THE WITNESS:  Yes.  I felt responsible to do

22 that, part of my responsibilities.

23 BY MR. SHKOLNIK:

24    Q.   Now, while you were in the field, it was

25 Chicago.  Was that the field office?

Page 296

1     A.   I was in three offices, Washington field

2   division, Detroit field division and Chicago field

3   division.

4     Q.   So would Detroit and Chicago, would that

5   be considered the Midwest region of the country?

6     A.   Yes.

7     Q.   When you were in the Midwest region, did

8   you ever become aware that there was migration of

9   pills from the south up into the -- up into the

10  middle part of the country?  Did that become

11  something you became aware of as a DEA

12  investigator?

13    MR. NICHOLAS:  Objection.  Outside the scope of

14  the Touhy letter.

15    MS. BACCHUS:  I would agree with that.

16    MS. MCNAMARA:  Objection.  Form.  Foundation.

17    MS. BACCHUS:  I agree it's beyond the scope,

18  and I also agree to the form of the question.

19  BY MR. SHKOLNIK:

20    Q.   Let me ask this question.  Are you -- have

21  you ever heard of a phrase or a term migration of

22  pills in the area of diversion?

23    MR. NICHOLAS:  Objection.  This is outside the

24  scope of the Touhy letter.

25    MS. BACCHUS:  Yeah, I object on the grounds it

1   is outside the scope of the Touhy request.  No, do

2   not answer.

3   BY MR. SHKOLNIK:

4        Q.   Go to the next page if we could.  Now,

5   when you were having meetings when you were out in

6   the field, you would have discussions with

7   registrants.  Did you ever have -- did you ever

8   talk to them about how they may go about

9   determining whether or not there's suspicious

10  activity in some of their customers?  Was that a

11  topic you would talk to them about?

12       MS. ZOLNER:  Objection.  Form.  Objection.

13  Foundation.  Objection.  Vague.

14       THE WITNESS:  I recall having discussions about

15  suspicious order monitoring systems at various

16  registrants.

17  BY MR. SHKOLNIK:

18       Q.   Now, here we have a section in this

19  letter, and it says SC Levin showed graphs of

20  OxyContin shipped by UPS Supply Chain to

21  distributors and to distributors' customers.

22            That sentence that I just -- first of all,

23  did I read that correctly?

24       A.   Yes.

25       Q.   That's basically describing knowing your

Page 298

1    customer's customer in another way, is it not?

2        MS. BACCHUS:  Objection.

3    BY MR. SHKOLNIK:

4        Q.   Is that your understanding?

5        MS. BACCHUS:  Objection to form.

6    BY MR. SHKOLNIK:

7        Q.   Personal understanding.

8        MS. ZOLNER:  Objection.  Form.

9        THE WITNESS:  To distributors and to the

10   distributor's customers, yeah.  That's the

11   customer's customer.

12   BY MR. SHKOLNIK:

13       Q.   And here we have -- it goes on to say that

14   SC Levin advised Ms. Baron that Actavis should send

15   someone from their compliance team to visit

16   pharmacies who were receiving their products in

17   south Florida in order for them to witness long

18   lines at pain clinics, out-of-state licensing

19   plates, questionable clients, security guards in

20   the parking lots and signs stating cash payment

21   only.

22            First, did I read that correctly?

23       A.   Yes.

24       Q.   Now, just your understanding, personal

25   understanding, not DEA's, what's written here when

1    someone goes to look at a pharmacy, when you're

2    telling a registrant to go look at a pharmacy and

3    look for things such as long lines at pain clinics,

4    out-of-state license plate, questionable clients,

5    security guards, cash payment, from your personal

6    perspective, what would that be?  What is the

7    significance of those items?

8        MS. ZOLNER:  Objection.  Form.  Objection.

9    Compound.  Objection.  Vague.

10       MS. BACCHUS:  Objection on the grounds that

11   it's vague.

12       THE WITNESS:  The significance is to help them

13   determine if they have a customer that's running a

14   legitimate business or if they want to move forward

15   with continuing having them as their customer.

16       MS. MCNAMARA:  Excuse me.  Can we go off the

17   record for a second.

18       THE VIDEOGRAPHER:  We're off the record at

19   6:04 p.m.

20                      (Whereupon, a short break was

21                      taken.)

22       THE VIDEOGRAPHER:  We're back on the record at

23   6:34 p.m.

24   BY MR. SHKOLNIK:

25       Q.   Ms. Ashley, I'm just going to continue

                                              Page 300

1    where we left off.  If we go back to the letter,

2    the next line is SC Levin, Chief Boockholdt.  Do

3    you know who Chief Boockholdt was?  Did you

4    ever meet --

5         A.   Oh, yeah, Barbara Boockholdt.

6         Q.   Who was that?

7         A.   She was the section chief of the -- it was

8    the regulatory section headquarters in D.C.

9         Q.   So based on this from your understanding

10   of what we're seeing here is there wasn't just SC

11   Levin, but there was actually another -- there was

12   different portions of the different people from the

13   DEA at this meeting with this manufacturer?

14        A.   Yes.

15        MR. DAVISON:  Object to form.  Foundation.

16   Lacks foundation.

17   BY MR. SHKOLNIK:

18        Q.   SC Levin and Chief Boockholdt stressed to

19   Ms. Baron and other Actavis representatives to get

20   to know their customers, visit distribution sites,

21   visit customers of those distributors, check on

22   customer suspicious ordering monitoring, review due

23   diligence files and obtain printouts of pharmacies

24   or practitioners who were receiving Actavis

25   products.

Page 301

1          First, did I read that correctly?

2      A.   Yes.

3      Q.   Now, from your experience as a 30-year

4  veteran in the DEA, an interaction like we're

5  reading here where a distributor -- I'm sorry, a

6  manufacturer is being told, you know, that they

7  should know their customers, visit distribution

8  sites, visit customers of distributors, check on

9  customers' suspicious ordering systems, review due

10  diligence files, obtain printouts of pharmacies or

11  practitioners who are receiving Actavis or

12  manufacturer products.

13          From your perspective, just generally

14  speaking, not speaking for the DEA, would you

15  consider that to be the type of working with

16  registrants to help them understand what their job

17  is, what their obligations are under the Controlled

18  Substances Act?

19      MS. ZOLNER:  Objection to form.

20      THE WITNESS:  This would be a normal part of a

21  conversation for me in my career --

22  BY MR. SHKOLNIK:

23      Q.   I mean --

24      A.    -- with a registrant.

25      Q.   I think you hit what my next question was

Page 302

1    going to be.

2          Is this surprising that somebody from DEA

3    was having a conversation and going through such

4    details with a registrant from your perspective?

5        MS. BACCHUS:   Objection.

6        MR. DAVISON:   Object to form.

7        THE WITNESS:   This statement does not surprise

8    me.

9    BY MR. SHKOLNIK:

10       Q.   From your perspective, is that what you

11   believed as a DEA -- member of the DEA in the

12   diversion division that that was what you should be

13   doing when you're working with registrants,

14   manufacturers or distributors?

15       A.   I felt it was my responsibility, yes.

16       Q.   And you took that responsibility very

17   seriously over your 30 years with the Drug

18   Enforcement Agency, correct?

19       A.   I took that responsibility seriously, yes.

20       Q.   And just so I understand from your

21   perspective, if there's any suggestion that

22   professionals like yourself were not trying to do

23   your best to prevent diversion, what is your

24   position on that?  Do you believe the DEA was not

25   trying to do their best over the years you were

Page 303

1   there?

2        MR. MAHADY:  Object to form.

3        MR. DAVISON:  Objection to form.

4        MS. BACCHUS:  Objection to form.

5        THE WITNESS:  I believe the mission of DEA was

6   to ensure compliance with the Controlled Substances

7   Act, and I believe that's what the diversion

8   control division worked toward.

9   BY MR. SHKOLNIK:

10       Q.   And yourself, is that what you tried do as

11  best as you could over the 30 years you were there?

12       A.   I did, yes, in my 30-year career.

13       Q.   And while you were doing your job over

14  that 30-year career, you actually went up through

15  the ranks of DEA, did you not?

16       A.   That's correct, yes.

17       Q.   I mean, the fact that you were at the

18  field and then asked to go to Washington and then

19  go up into headquarters, does that happen with

20  everybody in DEA?  Is that everybody's progression?

21       A.   That's not everyone's progression,

22  correct.

23       Q.   And in terms of the -- and I'm not trying

24  to say it inappropriately, but in terms of the

25  pecking order, you went up pretty high up into DEA,

Page 304

1    didn't you?

2         A.    That's correct.

3         MR. DAVISON:  Objection to form.

4    BY MR. SHKOLNIK:

5         Q.    And when you retired -- let me say when

6    you were in headquarters and you held -- I don't

7    want to misstate the position.  It was assistant

8    director of diversion?

9         A.    It was -- my last position was acting

10   assistant administrator.

11        Q.    Where is that in terms of DEA in terms of

12   hierarchy at DEA?

13        A.    In DEA -- excuse me.  In DEA, there's the

14   administrator.  Then there's the deputy

15   administrator, and then there were seven

16   individuals at my level, acting assistant

17   administrators, and we controlled -- we managed

18   seven separate divisions.

19        Q.    And how many people were under your

20   supervision when you reached the highest level at

21   DEA?

22        A.    Under my management, it was about 1,500

23   globally.

24        Q.    Now, I'm going to go on a little bit

25   further.  Ms. Baron stated Actavis only recently

Page 305

1   begun looking at the pharmacies that purchased

2   their products and wants to be involved in working

3   to resolve this problem.  SC Levin stated that if

4   their customers refused to provide them with sales

5   information, Actavis should consider cutting them

6   off.

7          Did I read that correctly?

8      A.   Yes.

9      Q.   Now, just from your perspective --

10     MR. SHKOLNIK:  And I'm asking Ms. Ashley's

11  position on this, not DEA.

12  BY MR. SHKOLNIK:

13     Q.   -- is this the type of recommendation that

14  you would suggest to a registrant when you were

15  having a meeting with them over the years you were

16  there?

17     MS. ZOLNER:  Objection.  Form.  Objection.

18  Foundation.

19     THE WITNESS:  I may not have used that

20  language, something similar maybe.

21  BY MR. SHKOLNIK:

22     Q.   If you have a customer, if a registrant

23  has a customer who doesn't want to be forthcoming

24  with information, from your perspective, is that of

25  any significance?

Page 306

1       MS. ZOLNER:  Objection.  Form.

2       MR. EPPICH:  Objection.  Form.

3       THE WITNESS:  It's significant if the customer

4    is not being forthcoming with all their business

5    practices.

6    BY MR. SHKOLNIK:

7       Q.   And why would that be?

8       A.   Because you need that information to

9    determine if it's legitimate.

10      Q.   I'm going to turn to Page 4.  Now, I'm

11   going to turn to the middle of that first paragraph

12   on Page 4.  SC Levin asked representatives from

13   Actavis to take a serious look at their quota

14   request, review their suspicious order monitoring

15   system, visit their customers to review their

16   customers -- I'm sorry.  Review their -- I'm sorry.

17   Visit their customers to review their suspicious

18   order monitoring system as well as their due

19   diligence files and ask to see customers' top

20   customers for Actavis products and contact their

21   local DEA office with any questions.

22           Did I read that correctly?

23      A.   Yes.

24      Q.   Did I say that correctly after I stumbled

25   twice?

1     A.   Yes.

2     Q.   And now, in reading that, from your

3  perspective, and this is your personal perspective,

4  Ms. Ashley, is that consistent with the practices

5  that you saw at DEA while you were there working?

6     MS. ZOLNER:  Objection.  Foundation.

7     THE WITNESS:  This is consistent with

8  statements I would have made.

9  BY MR. SHKOLNIK:

10     Q.   And I'm going to read the next area.  SC

11  Levin mentioned that salespeople -- I'm sorry.  I

12  skipped.

13         Ms. Baron stated that their sales force

14  has been informed to keep management abreast of

15  what is going on in the field.  SC Levin mentioned

16  that salespeople are generally on commission and

17  may not be subjective when it comes to their

18  accounts' purchasing suspicious or unusual orders

19  of controlled substances.

20         First, did I read that correctly?

21     A.   Yes.

22     Q.   From your experience at DEA over the

23  30 years, are statements such as salespeople are

24  generally on commission and may not be objective

25  when it comes to their accounts' purchasing

1  suspicious or unusual orders of controlled

2  substances, is that the type of discussions that

3  would sometimes occur at DEA when talking to

4  registrants?

5      MR. MAHADY:  Objection.  Form.  Objection.

6  Foundation.

7      MS. BACCHUS:  Objection.  Form and foundation,

8  if you know.

9      THE WITNESS:  I don't know.

10  BY MR. SHKOLNIK:

11     Q.   Let me go down to the second to last

12  paragraph.  SC Levin explained that the purpose of

13  this meeting was to inform, educate and provide

14  pertinent ARCOS data, discuss national trends and

15  discuss the pain management epidemic in Florida

16  involving Oxycodone.  DEA is seeking to partner

17  with drug distributors and manufacturers in

18  resolving this problem.

19          First, did I read that accurately?

20     A.   Yes.

21     Q.   From your perspective back over the years

22  that you were at DEA, did you feel that DEA wanted

23  to partner with the registrant distributors and

24  manufacturers to try to resolve the epidemic as it

25  was developing?

Page 309

1        MR. MAHADY:  Object to form.

2        MR. DAVISON:  Object to form.

3        THE WITNESS:  I would say work with them, yes.

4    BY MR. SHKOLNIK:

5        Q.   And SC Levin asked if there were any

6    questions.  There were none, and you -- first of

7    all, did I read that correctly?

8        A.   Yes.

9        Q.   From your perspective at DEA over the

10   years, when you had your meetings with registrants,

11   whether it's a manufacturer, distributor or a

12   pharmacy or a big box chain pharmacy, whatever it

13   is, would you also say to them, you know, do you

14   have any questions for us, and did you try to

15   answer the questions when they were posed?

16       MS. ZOLNER:  Objection.  Form.

17       THE WITNESS:  Yes.

18   BY MR. SHKOLNIK:

19       Q.   Why would you do that?

20       A.   I wanted to make sure they had an

21   understanding of what we spoke about, if they had

22   any follow-up questions.  I wanted to make sure we

23   were clear.

24       Q.   And you were asked a lot of questions

25   earlier today about whether or not, from your

Page 310

1    understanding, the DEA tried to help registrants

2    understand what they can do in terms of due

3    diligence, and you were specifically asked about

4    whether or not the reg itself outlined what was

5    supposed to be done.

6              Do you recall those questions?

7         A.   I do.

8         Q.   Now, I'm correct in stating that the

9    statute and reg does not tell them how to do their

10   job, the registrants, correct?

11        A.   That's correct.

12        Q.   It is the law, and it is the regulations

13   that they must follow.  Fair statement?

14        MR. MAHADY:  Objection.  Form.

15        THE WITNESS:  That's a fair statement.

16   BY MR. SHKOLNIK:

17        Q.   That was your understanding over all the

18   years you were there because they were promulgated

19   long before you started?

20        A.   That's correct.

21        Q.   And they were still in place to the day

22   you left, correct?

23        A.   That's correct.

24        Q.   I mean, there's no question the industry

25   wanted DEA to change the regs.  Fair statement.

```
                                                  Page 311

 1       MR. MAHADY:  Objection to form.

 2       THE WITNESS:  That's my experience, yes.

 3   BY MR. SHKOLNIK:

 4       Q.   And over the last few years you were

 5   there, their trade organization spent a lot of time

 6   trying to work with DEA to change the regs,

 7   correct?

 8       MS. ZOLNER:  Objection.  Form.  Objection.

 9   Vague.

10       MR. EPPICH:  Objection.  Foundation.

11       MS. BACCHUS:  Objection.  Form.

12       MR. SHKOLNIK:  Foundation?  You guys used the

13   documents.

14       THE WITNESS:  There was communication, correct.

15   BY MR. SHKOLNIK:

16       Q.   And irrespective of the agency, from your

17   perspective, the agency was considering changes,

18   working on drafts, suggesting a timeline to

19   promulgate them or not.  The registrants over that

20   period of time, all this period of time, and I'm

21   saying from when that first letter in 2010 to the

22   last communication when you left in 2018, those

23   registrants still had the same obligations to

24   comply with the CSA and the existing regulations.

25   Fair statement?
```

Page 312

1      MR. MAHADY:  Objection.  Form.

2      THE WITNESS:  Yes, they had the obligation to

3  comply with the existing regulation.  Yes.

4  BY MR. SHKOLNIK:

5      Q.   Even if they wanted to change them, until

6  they were changed, the law is the law, and the

7  regulation is the regulation, correct?

8      MR. MAHADY:  Objection.  Form.

9      THE WITNESS:  Yes.  The law was the law in

10  place, yes.

11  BY MR. SHKOLNIK:

12      Q.   And correct me if I'm wrong.  The

13  obligation -- I'm sorry.  The decision to ship an

14  order, a suspicious order or not suspicious order,

15  that wasn't the DEA making that decision at any

16  time under the CSA or the regulation, correct?

17      A.   That is correct.

18      Q.   From your perspective, whose obligation

19  was it to ship or not ship?

20      MS. BACCHUS:  Objection.  Asked and answered.

21      MR. MAHADY:  Objection.  Form.

22  BY MR. SHKOLNIK:

23      Q.   You can answer.

24      A.   It was the seller.

25      Q.   I'm not going to go through all this, but

1   also attached to this Exhibit 26 at the back of the

2   presentation was a three-page additional document

3   entitled suggested questions a distributorship

4   should ask prior to delivering controlled

5   substances.  Did you have a chance to turn to it?

6        A.   Yes.

7        Q.   That was the heading.  Am I correct?  I

8   read that right?

9        A.   Yes.

10       Q.   And if I'm not mistaken, this is -- the

11   DEA was actually giving this manufacturer on

12   this -- at this meeting a set of questions that

13   they could possibly ask in order to do their job,

14   their due diligence job, correct?

15       MR. KOBRIN:  Objection.  Outside the scope.

16       MS. BACCHUS:  Objection.  Foundation.

17       THE WITNESS:  The question again?

18   BY MR. SHKOLNIK:

19       Q.   The question is from what we can see in

20   this document, DEA was actually giving a three-page

21   suggested list of questions to help a distributor

22   or a manufacturer perform its due diligence.  Is

23   that a fair statement?

24       MS. BACCHUS:  Same objection.

25       MR. KOBRIN:  Same objection.

```
                                            Page 314
 1      THE WITNESS:  Yes.  Based on the title, I would
 2  say yes.
 3  BY MR. SHKOLNIK:
 4      Q.    There were suggestions here today that DEA
 5  didn't do anything and didn't give them any
 6  guidance and didn't help these distributors and
 7  just didn't answer -- basically didn't pick up the
 8  phone and talk to them.  Is that a fair statement,
 9  from your perspective, for the 30 years you were at
10  DEA?
11      MR. MAHADY:  Objection to form.
12      MS. MCNAMARA:  Objection to form.
13      MS. ZOLNER:  Objection.  Vague.
14      THE WITNESS:  My experience personally, no,
15  that was not my experience.
16  BY MR. SHKOLNIK:
17      Q.    They showed you three letters, three
18  letters from pharmacies across the United States
19  today.  Withdraw that.
20          The list of questions is not intended to
21  be all-inclusive, nor should it be interpreted that
22  every situation or registrant activity is covered.
23  This questionnaire is provided to assist the
24  distributor to formulate a better understanding of
25  who their customers are and whether or not they
```

Page 315

1  should sell to them controlled substances.

2          Did I read that correctly?

3      A.   Yes.

4      Q.   Was that your understanding of what the

5  obligations were of each of these registrants that

6  are named as defendants in this case --

7      MR. NICHOLAS:  Object to --

8      MS. BACCHUS:  Objection to form.

9  BY MR. SHKOLNIK:

10     Q.   -- from your personal perspective?

11     A.   From my personal experience, yes, it was

12  the registrant's discretion and responsibility.

13     Q.   It is incumbent upon you, the

14  distributors, to ensure that sales of your

15  customers are for legitimate purposes.

16          Did I read that correctly?

17     A.   Yes.

18     Q.   Was that your understanding of the

19  obligations for all the years you were there at

20  DEA?

21     A.   Yes, this is my understanding.

22     Q.   It is further incumbent upon you to

23  identify illicit or suspicious activities which may

24  result in the diversion of controlled substances.

25          Did I read that correctly?

Page 316

1      A.   Yes.

2      MR. NICHOLAS:  Object to the form.

3  BY MR. SHKOLNIK:

4      Q.   Was that your understanding as well?

5      MR. NICHOLAS:  Object to the form.

6      THE WITNESS:  My understanding was to have

7  systems in place to detect suspicious activities.

8  BY MR. SHKOLNIK:

9      Q.   And that was to prevent diversion,

10  correct?

11      A.   To prevent diversion, correct.

12      Q.   And so now, I'm not going to go through

13  all the questions here, but correct me if I'm

14  wrong.  There's a list of questions that you

15  possibly would want to do if it was a pharmacy,

16  correct, if you were doing due diligence on a

17  pharmacy?

18      MS. ZOLNER:  Objection.  Form.

19      THE WITNESS:  Yes, that's what it states here.

20  Yes.

21  BY MR. SHKOLNIK:

22      Q.   And there's another one if you're speaking

23  to practitioners, doctors, I guess, correct?

24      A.   Yes, that's what it states.  Yes.

25      Q.   And once again, the document that was

1   shown to this manufacturer on that day,

2   September 12, 2012 said if you have any additional

3   questions, concerns or issues beyond what has been

4   presented, it is strongly recommended you contact

5   your local DEA office.

6           Was that your understanding -- first of

7   all, did I read that correctly?

8       A.   Yes.

9       Q.   Was that your understanding of the

10  practices at DEA during the 30 years you were

11  there?

12      MS. BACCHUS:  Objection.  Foundation.

13      MS. MCNAMARA:  Objection.  Form.

14      MS. BACCHUS:  Form and vague.

15      THE WITNESS:  That was my practice, yes.

16  BY MR. SHKOLNIK:

17      Q.   And now -- the Controlled Substances Act,

18  would I be correct in stating that it was enacted

19  to protect the public from the danger of diversion

20  related to opioids or any controlled substance?

21      MR. NICHOLAS:  Object to the form.

22      MS. MCNAMARA:  Object to the form.  Foundation.

23      MS. ZOLNER:  Scope.

24  BY MR. SHKOLNIK:

25      Q.   Was that your understanding?

1      A.    Repeat that.

2      Q.    I'll try it again.

3            Was it your understanding that the

4   Controlled Substances Act was meant to protect the

5   public from potential diversion of controlled

6   substances?

7      MR. NICHOLAS:  Objection.  I believe this is

8   outside the scope of the Touhy letter.

9      MS. BACCHUS:  I agree.  Objection.  No, you

10  will not answer.  It's outside the scope of the

11  Touhy letter.

12  BY MR. SHKOLNIK:

13     Q.    You were asked questions about the

14  government's resources -- you were asked questions

15  about government resources and how many employees

16  were there and how many field officers and whether

17  or not you were properly staffed.  I mean, you were

18  asked those questions earlier, were you not?

19     A.    Yes.

20     Q.    I think the suggestion was that maybe you

21  didn't have -- DEA didn't have enough people to do

22  their job.  Was that your understanding?  DEA

23  couldn't do their job?

24     MS. ZOLNER:  Objection.

25     MS. BACCHUS:  Objection.

1      MS. ZOLNER:  These were all questions that I

2   was told I could not explore.

3      MR. SHKOLNIK:  I thought you did ask.

4      MS. ZOLNER:  No.

5      MS. BACCHUS:  She asked them, and I told her

6   they were outside the scope.

7      MR. SHKOLNIK:  I'm glad.  I thought I wrote

8   down answers.  Maybe I made up the answers, and

9   they were good.  Believe me.

10  BY MR. SHKOLNIK:

11     Q.   I'm just going to -- I'm just going to ask

12  a couple follow-up, and I'll be done.

13          From your perspective, what is diversion

14  from your understanding?

15     A.   Diversion is when -- from an

16  investigator's perspective is when the controlled

17  substances goes to a place where it's not intended.

18     Q.   Would excessive -- from your perspective,

19  would excessive amount of pills going out into the

20  communities or being distributed as a result of

21  diversion, what is the -- what does that cause?

22  What is the significance of that?

23     MR. NICHOLAS:  Objection.  Outside the scope of

24  the Touhy letter.

25

Page 320

1   BY MR. SHKOLNIK:

2       Q.   From your perspective, why were you doing

3   your job to try to prevent diversion?  What was --

4   I'm just trying to get your perspective on it.

5       A.   To prevent diversion, it's to protect the

6   public to prevent misuse, abuse of controlled

7   substances and to make sure that the controlled

8   substances go to the right place, the place they

9   were intended to go.

10      Q.   If an excessive amount of pills that go

11  out into the marketplace that are to the point

12  where they're going to where they're not intended

13  to go, what is the significance of that from your

14  perspective?

15      MR. NICHOLAS:  Objection.  Outside the scope of

16  the Touhy letter.

17      MS. BACCHUS:  I agree.  Objection.  Outside the

18  scope.  You're not to answer that question.

19  BY MR. SHKOLNIK:

20      Q.   When you first started going this morning,

21  counsel asked you whether or not you were retained

22  as an expert for anybody in this case, and I think

23  your answer was yes, and it was Purdue.  Am I

24  correct?

25      A.   Yes.

1    Q.   When did that occur?

2    MS. MACKAY:  Objection.  This is -- it's on the

3  record that the witness has been retained by

4  Purdue, but she is a nontestifying --

5    MR. SHKOLNIK:  So what?

6    MS. MACKAY:  -- expert consultant under

7  Rule 26.  This type of questioning is not permitted

8  and is privileged.

9    MR. SHKOLNIK:  Well, do you --

10    MS. MACKAY:  I'm not finished.

11    MR. SHKOLNIK:  I'm sorry.

12    MS. MACKAY:  This is Purdue's privilege that we

13  are asserting, and I would instruct the witness not

14  to answer.

15    MR. SHKOLNIK:  Okay.  We can get Special Master

16  Cohen if you'd like, but for a DEA officer, Kyle

17  Wright, the exact same issue came up, and he

18  allowed us to ask when was the person retained, who

19  retained you, did anyone else try to retain you,

20  when they did that.  I'm not going into specifics,

21  and we're allowed to do that, and there's already

22  an order in place.  If you want to get him back on,

23  I'm sure he would like to disrupt his dinner.

24    MS. MACKAY:  I've read the Wright transcript.

25  I'm aware that some questions were permitted.  Some

Page 322

1    were not permitted, but we're not going to waive

2    the privilege or any objection, so we stand by it.

3    I would offer maybe one suggestion procedurally so

4    we only have to call one time.  If maybe you would

5    want to run through all your questions, I could

6    just object, and then we could run them all by him.

7        MR. SHKOLNIK:  Okay.  Sure.

8    BY MR. SHKOLNIK:

9        Q.   When were you retained by Purdue?

10       MS. MACKAY:  So again, for the record, I object

11   that it's privileged, and I instruct the witness

12   not to answer.

13   BY MR. SHKOLNIK:

14       Q.   For how long have you been a retained

15   expert for Purdue?

16       MS. MACKAY:  I object as to privilege, and I

17   instruct the witness not to answer.

18   BY MR. SHKOLNIK:

19       Q.   Have you had any meetings with anyone at

20   Purdue other than with their outside counsel?

21       MS. MACKAY:  Again, I object.  It's privileged,

22   and I instruct the witness not to answer.

23   BY MR. SHKOLNIK:

24       Q.   Have you been retained by any other

25   manufacturers or distributors to be an expert in

1   any capacity?

2        MS. MACKAY:  That would not be my objection to

3   assert, but I --

4        MR. SHKOLNIK:  You don't have an objection to

5   that?

6        MS. MACKAY:  I do have an objection to that

7   question, but it's not my privilege to assert.  I

8   would suggest that her counsel, perhaps, advise her

9   not to answer that question.

10        MS. BACCHUS:  I'm not going to advise you not

11   to answer.  What I am going to say is I that object

12   on the grounds that that question was asked and

13   answered before.

14        MR. SHKOLNIK:  I didn't hear it earlier.  I'm

15   sorry.

16   BY MR. SHKOLNIK:

17        Q.   Were you -- have you been retained by any

18   other entity, whether it's a manufacturer or

19   distributor, with respect to giving expert opinions

20   first in this litigation?

21        A.   No.

22        MS. MACKAY:  I would renew my objection.  I

23   assume you're asking about other than Purdue?

24        MR. SHKOLNIK:  Yeah.  That's why I said other.

25        THE WITNESS:  In this litigation, no.

Page 324

1    BY MR. SHKOLNIK:

2        Q.    Have you been retained by any

3    manufacturers or distributors as an expert with

4    respect to the Controlled Substances Act other than

5    Purdue and not in this litigation?

6        A.    No.

7        Q.    Have you been consulted by any other

8    manufacturers or distributors to determine whether

9    or not you would be an expert for them on any of

10   the issues relating to Controlled Substances Act,

11   diversion or the type of claims being made here?

12       MS. MACKAY:  Other than Purdue?

13       MR. SHKOLNIK:  Other than Purdue.

14       MS. BACCHUS:  Objection to the form of the

15   question.  Did you mean consulted or contacted?

16   I'm sorry.

17   BY MR. SHKOLNIK:

18       Q.    Consulted or contacted, either/or.

19       A.    Contacted, yes.

20       Q.    And could you tell us the names of the

21   people who contacted you to be an expert?

22       A.    I won't remember them all.

23       Q.    That's all right.

24       A.    I can tell you the ones I do remember.

25       Q.    Sure.

Page 325

1      A.   I remember Reed Smith.  I'm drawing a

2  blank on the names.  I can say there have been

3  several.  I don't remember all the firms.

4      Q.   Are you considering retention by those

5  other manufacturers or distributors in this

6  litigation?

7      A.   No.

8      Q.   You've rejected the overtures; fair

9  statement?

10     A.   Yes, fair statement.

11     Q.   Is that because you're under retainer for

12 Purdue?

13     MS. MACKAY:  Objection.  To the extent that

14 calls for a privileged response, I would instruct

15 the witness not to answer.

16 BY MR. SHKOLNIK:

17     Q.   You can answer that.  She can't instruct

18 you not to answer it.

19     MS. MACKAY:  I can instruct to the extent that

20 it's going to reveal privileged information.  That

21 is a privilege that belongs to Purdue, and I would

22 instruct the witness not to answer.

23     MR. SHKOLNIK:  You can't.

24     MS. MACKAY:  Maybe you just want to rephrase

25 your question.

Page 326

1      MR. SHKOLNIK:  No.  My question was very good.

2      MS. MACKAY:  Well, I beg to differ.

3  BY MR. SHKOLNIK:

4      Q.  Did you reject the overtures to be hired

5  as an expert by other manufacturers, I'll start

6  with other manufacturers, because you're under

7  retainer with Purdue?

8      MS. MACKAY:  I would just renew my same

9  objections and instruct the witness not to answer

10  that question to the extent it would reveal the

11  privilege.

12  BY MR. SHKOLNIK:

13      Q.  You're allowed to answer that.

14      MS. BACCHUS:  The government takes no position.

15  That's not our fight.

16      THE WITNESS:  Okay.  Repeat the question one

17  more time.  Did I --

18  BY MR. SHKOLNIK:

19      Q.  I can rephrase it.

20          Why did you reject retention by other

21  manufacturers in this case?

22      A.  Because I'm busy with other clients.

23      Q.  That was easy.

24      MR. SHKOLNIK:  Thank for all your time, and I

25  have no further questions.

Page 327

1      MR. NICHOLAS:  We need 10 minutes to decide

2    what, if any, other questions we have.

3      THE VIDEOGRAPHER:  We are off the record at

4    7:02 p.m.

5                        (Whereupon, a short break was

6                        taken.)

7      THE VIDEOGRAPHER:  We are back on the record at

8    7:16 p.m.

9      MR. SCHUTTE:  Good evening, Ms. Ashley.  I know

10    it's been a long day, so I'll be quick.

11                    FURTHER EXAMINATION

12    BY MR. SCHUTTE:

13      Q.   My first question is on Exhibit 26, which

14    is a document that Mr. Shkolnik asked you a series

15    of questions about.  It's the memo about the

16    Actavis meeting.

17          My first question is just to confirm for

18    the record you were not in attendance at the

19    meeting that's described in this memo, correct?

20      A.   That's correct.

21      Q.   And isn't it also correct that you had not

22    seen this document before today?

23      A.   I don't recall ever seeing it, correct.

24      Q.   Thank you.  You can put that aside.

25          My second question for you, ma'am, is that

1    Mr. Shkolnik asked you questions about whether you

2    were contacted by any of the defendants, other

3    registrants about being retained.  I'll ask the

4    same question.  Were you contacted by any city or

5    state, county government or lawyer for a government

6    to represent or to consult with them with respect

7    to this litigation?

8        A.   Not directly, no.

9        Q.   Were you contacted indirectly?

10       A.   Indirectly, yes.

11       Q.   Can you tell us about that?

12       A.   It was a colleague that contacted me, a

13   former colleague contacted me and wanted to put

14   together a conversation between myself and one of

15   the plaintiff attorneys to see if I could be a

16   consultant.

17       Q.   And who was that colleague?

18       A.   Now I'm drawing a blank on his name.  Oh,

19   God.  He's a retired DEA agent, and now I can't

20   think of his name.  I'm drawing a blank, but I do

21   know him.  I just can't think of his name right

22   now.

23       Q.   And what was your response?

24       A.   I did not.

25       Q.   What was the reason you did not?

1      MS. MACKAY:  I would just again object to the

2    extent this answer calls for privileged information

3    and instruct the witness not to answer to that

4    extent.

5      MR. SCHUTTE:  I'll withdraw the question.

6    BY MR. SCHUTTE:

7      Q.   My last line of questions is regarding

8    Mr. Shkolnik's questions to you about whether

9    during your career at DEA you encountered

10   registrants that were not complying with the

11   requirements of the CSA and the implementing regs.

12   Do you recall that?

13     A.   Yes.

14     Q.   In your, frankly, remarkable career of

15   rising from a secretary all the way up to an

16   executive at DEA, isn't it the case, Ms. Ashley,

17   that the vast majority of registrants with whom you

18   dealt were trying to comply with the CSA and the

19   implementing regs?

20     MS. BACCHUS:  Objection.  Asked and answered.

21   You can answer.

22     THE WITNESS:  I agree with that, yes.

23   BY MR. SCHUTTE:

24     Q.   And isn't it correct that when the

25   registrants were contacting you about asking for

Page 330

1   more guidance, they were asking for guidance to

2   help them comply with the regulation; isn't that

3   correct?

4       MS. BACCHUS:  Objection.  Asked and answered.

5   You can answer.

6       THE WITNESS:  I agree with that.

7       MR. SCHUTTE:  That's all we have.  Thank you

8   very much for your time.

9       MS. BACCHUS:  Before we go off the record, I

10  just need to make a clarification that the

11  government does not represent Ms. Ashley in her

12  personal capacity.  We are here to protect the

13  government's information.  I think there was some

14  reference about being her personal counsel.  Thank

15  you.

16      MR. SCHUTTE:  Thank you for your time and

17  patience.

18      THE VIDEOGRAPHER:  We are off the record.  We

19  are off the record at 7:20 p.m.

20      MS. BACCHUS:  She will not waive signature.

21  She wants to read it.

22          (FURTHER DEPONENT SAITH NAUGHT.)

23

24

25

Page 331

1   STATE OF ILLINOIS  )

2                      )   SS:

3   COUNTY OF C O O K  )

4         I, GINA M. LUORDO, a notary public within

5   and for the County of Cook County and State of

6   Illinois, do hereby certify that heretofore,

7   to-wit, on March 15, 2019, personally appeared

8   before me, at 10 South Wacker Drive, Suite 4000,

9   Chicago, Illinois, DEMETRA ASHLEY, in a cause now

10  pending and undetermined in the United States

11  District Court of Cook County, Northeastern

12  District of Ohio, In Re National Prescription

13  Opiate Litigation.

14        I further certify that the said DEMETRA

15  ASHLEY was first duly sworn to testify the truth,

16  the whole truth and nothing but the truth in the

17  cause aforesaid; that the testimony then given by

18  said witness was reported stenographically by me in

19  the presence of the said witness, and afterwards

20  reduced to typewriting by Computer-Aided

21  Transcription, and the foregoing is a true and

22  correct transcript of the testimony so given by

23  said witness as aforesaid.

24        I further certify that the signature to

25  the foregoing deposition was not waived by counsel

Page 332

1    for the respective parties.

2         I further certify that the taking of this

3    deposition was pursuant to notice and that there

4    were present at the deposition the attorneys

5    hereinbefore mentioned.

6         I further certify that I am not counsel

7    for nor in any way related to the parties to this

8    suit, nor am I in any way interested in the outcome

9    thereof.

10        IN TESTIMONY WHEREOF:  I have hereunto set

11   my hand and affixed my notarial seal this 20th day

12   of March, 2019.

13

14

15

16

17

18        NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19        LIC. NO. 084-004143

20

21

22

23

24

25

```
                                                    Page 333
 1                   Veritext Legal Solutions
                        1100 Superior Ave
 2                          Suite 1820
                     Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
     March 20, 2019
 5
     To: RENEE A. BACCHUS
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3251436
 8
     Witness:  Demetra Ashley      Deposition Date:  3/15/2019
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3251436
3   CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 3/15/2019
4   WITNESS' NAME: Demetra Ashley
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____        _____
9   Date                          Demetra Ashley
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

1                  DEPOSITION REVIEW

              CERTIFICATION OF WITNESS

2

    ASSIGNMENT REFERENCE NO: 3251436

3    CASE NAME: In Re: National Prescription Opiate Litigation v.

    DATE OF DEPOSITION: 3/15/2019

4    WITNESS' NAME: Demetra Ashley

5        In accordance with the Rules of Civil

    Procedure, I have read the entire transcript of

6    my testimony or it has been read to me.

7        I have listed my changes on the attached

    Errata Sheet, listing page and line numbers as

8    well as the reason(s) for the change(s).

9        I request that these changes be entered

    as part of the record of my testimony.

10

        I have executed the Errata Sheet, as well

11    as this Certificate, and request and authorize

    that both be appended to the transcript of my

12    testimony and be incorporated therein.

13    _____        _____

    Date                Demetra Ashley

14

        Sworn to and subscribed before me, a

15    Notary Public in and for the State and County,

    the referenced witness did personally appear

16    and acknowledge that:

17        They have read the transcript;

        They have listed all of their corrections

18        in the appended Errata Sheet;

        They signed the foregoing Sworn

19        Statement; and

        Their execution of this Statement is of

20        their free act and deed.

21        I have affixed my name and official seal

22    this _____ day of_____, 20____.

23        _____

        Notary Public

24

        _____

25        Commission Expiration Date

Page 336

1                    ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2               ASSIGNMENT NO: 3/15/2019
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                       Demetra Ashley
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24

                     _____
25                   Commission Expiration Date

[& - 2007]                                                                    Page 1

| **&** |
|---|
| **&** 2:7 3:10,15,20 3:23 4:2,6,11,21 5:2,7,11 6:7,12 |

| **0** |
|---|
| **00000001** 264:12 |
| **00000001-0000...** 9:22 |
| **00005911-0000...** 9:15 |
| **00005918-0000...** 9:12 |
| **00005925-0000...** 9:9 |
| **00006056-0000...** 9:17 |
| **00006177** 7:17 |
| **00006183-0000...** 9:19 |
| **00008424-0000...** 8:14 |
| **00008469-0000...** 7:22 |
| **00008563-0000...** 8:8 |
| **00009579** 8:16 |
| **00023153** 9:5 |
| **00269680** 8:22 |
| **00284408** 8:5 |
| **00580082** 8:18 |
| **00580083** 8:19 |
| **02199** 5:3 |
| **04** 18:22 |
| **07** 18:22 |
| **084-004143** 1:25 332:19 |

| **1** |
|---|
| **1** 7:12 8:3 11:13 11:16 54:11 56:2 62:1,12 96:25 |

107:11,12 190:5 225:23 226:24
**1,500** 304:22
**1.6** 49:22
**10** 1:19 7:4,13 8:9 10:5 12:5 82:15 159:9 186:16,25 254:21 284:2,4 327:1 331:8
**100** 8:15 225:1
**1000** 2:14 4:17
**10017** 2:4
**105** 8:17
**10:13** 43:16
**10:14** 43:20
**10:38** 57:24
**10:59** 58:4
**11** 5:8 7:12 8:11 55:9 91:4,6
**110** 8:20,23
**1100** 333:1
**1117** 120:4,17
**111th** 2:9
**119** 9:3
**11:03** 60:17
**11:04** 60:21
**11:54** 92:19
**11th** 2:3 184:5,5
**12** 8:13 75:8 94:4 94:8 273:4 317:2
**123** 9:4
**12:07** 92:23
**12:35** 109:23
**12:37** 110:5
**12:39** 94:25
**12:56** 123:6
**12th** 273:24
**13** 8:15 19:10 100:1,17,20
**13.01.74** 111:20

**1300** 6:13
**1301** 2:13 25:3,4
**1301.74** 7:15 25:2 30:23 86:23 144:24 192:19
**1301.74.** 25:14
**137** 9:6
**14** 7:14 8:17 105:15,17 232:17 233:15
**140** 264:3
**1429** 232:9,16
**144** 7:5
**14th** 180:20
**15** 8:20,20 10:3 110:2,8,9 275:2,3 279:23 331:7
**15219-6401** 4:8 5:13
**1597** 204:21
**15th** 1:20
**16** 8:23 54:12 110:2,8 119:14
**17** 1:7 9:3 119:8 119:10,13 120:12
**173** 9:7
**1755** 3:3
**18** 1:9,11 9:4 123:12,14,18 124:8 135:22
**1800** 4:17
**1820** 333:2
**183** 9:10
**18976** 6:4
**19** 9:6 53:10,20 137:21,23
**19001324954** 7:25
**195** 9:13
**1971** 28:8 87:3 107:22 145:6

**1987** 15:6 18:12,15
**1988** 15:11
**1996** 16:3
**1998** 16:7,10
**1999** 3:11,21
**1:18** 1:13
**1:53** 123:10

| **2** |
|---|
| **2** 7:14 14:1,2,5 54:11 67:13 189:20,22,23 209:2 224:21 225:24 233:24 |

**2/24/2010** 7:16
**20** 9:7 107:8 173:17 176:15 180:13,22 222:2 333:4 334:16 335:22 336:22
**200001** 3:17
**20005** 2:14 4:13
**2003** 43:5
**20036** 4:17
**2004** 12:20 14:16 16:10 17:8 18:14 18:17,18,19 31:12 237:22
**2005** 28:14,16,20 31:7 32:18 33:2 33:11 54:13,17 55:11 268:15
**2006** 18:20 36:19 36:20 37:4 71:25 72:6 268:16
**2007** 7:19 18:24,24 20:7 24:14 35:10 35:11,18 36:3,20 37:4 41:8,13,14 43:1 44:6 72:1,6 72:12 164:6 237:22 240:22

**[2007 - 412]**

267:19 268:16
**2008**   177:17
178:13 180:20
195:7
**2009**   212:22
213:23 214:13,15
**2010**   38:18 39:4
62:3 64:24 69:23
71:11 73:8 81:13
122:16 136:13
221:9,20 241:25
243:23 244:19
245:7 311:21
**2011**   8:4 62:1,12
**2012**   265:13,18
266:8 273:5
278:19 284:4
292:3 317:2
**2013**   55:13,14,24
79:15 239:1,16,21
**2014**   232:17
233:15
**2015**   20:7,9,11
22:6 24:14 47:5
48:6 62:19 70:20
70:22 89:25 90:17
93:18 94:25 95:7
95:17 97:1 98:9
187:3 236:13
237:5,14 238:7,20
249:16
**2016**   47:16,17 48:7
51:15 52:5,19
53:10,20 55:24
57:8,19 61:8 78:9
78:12,18 100:23
137:4 224:14
225:6 229:11
**2017**   8:18 56:15
57:5 82:4 101:24
102:3,4 105:6,22

**2018**   7:13 8:21,24
22:6 99:20 102:15
110:15 116:21
120:25 125:15
128:16,24 135:7
239:17 240:23
311:22
**2019**   1:21 10:3
121:9 122:18
331:7 332:12
333:4
**202**   2:15 3:17 4:13
4:18
**20th**   332:11
**21**   7:15 9:10 25:2
25:14 111:20
183:2,5,19 187:15
190:1,4 192:18
206:19
**211**   9:16
**212**   2:4
**215**   6:4
**216**   6:14,18
**216-523-1313**
333:3
**21st**   178:13
**22**   9:13 78:18
195:2 206:20,22
254:12,15
**220**   9:18
**22nd**   78:9
**23**   9:16 211:23
212:2,9 216:7
**23,000**   195:14
**231**   7:6
**232**   9:20
**236-1313**   5:9
**24**   9:18 220:20,24
232:8 245:7
**246-6784**   3:22

**24th**   38:18 241:25
243:23 244:19
**25**   7:15 9:20
138:15,22 232:3
232:14,25 233:24
254:10
**255**   7:7
**25707**   2:9
**26**   9:21 263:25
265:8,12 272:16
280:1 313:1 321:7
327:13
**265**   9:21
**269-4066**   3:8
**27**   7:19 44:6
100:22
**2700**   6:3
**27th**   48:19
**2804**   1:5,7 10:10
**29**   48:6
**297-5913**   6:9
**2:19**   144:5
**2:26**   144:9
**2:57**   172:5
**2nd**   221:20

### 3

**3**   7:15 25:7,10
54:11 86:24
144:16 191:21,24
215:6,12,15,20
**3/15/2019**   333:8
334:3 335:3 336:2
**3/8/2019**   121:7
**30**   8:17 23:18
94:25 95:7,17
105:6,22 259:6
275:2,4 279:23
282:24 286:8
288:23 289:10
290:13 295:19
301:3 302:17

303:11,12,14
307:23 314:9
317:10
**300**   4:22 6:3
**300,000**   195:16
**301**   5:13
**304**   2:10
**310**   3:22
**312**   2:20 3:8 4:4
4:23 5:18
**317**   5:9
**324-1773**   4:4
**3251436**   333:7
334:2 335:2
**327**   7:8
**32nd**   4:7
**332-4764**   3:12
**338-5208**   5:14
**3400**   2:19
**35**   2:19 145:2
171:17 210:4,25
234:2 235:23
247:6
**35th**   5:12
**36**   14:23
**360**   2:3
**38**   7:16
**397-1000**   2:4
**3:00**   172:9
**3:21**   97:1
**3:56**   220:14

### 4

**4**   7:16 38:14 43:23
54:9,10,11,12
72:22 74:8 241:10
241:22 243:4
306:10,12
**400**   6:17 284:2
**4000**   1:20 331:8
**412**   4:8 5:14

[414 - accomplish]

| | | | |
|---|---|---|---|
| **414** 6:9 | **192:**12,25 | **7/31/13** 78:15 | **9th** 6:13 |
| **414-9226** 2:15 | **5923** 183:8 | **725** 4:12 | **a** |
| **419** 2:9 | **5924** 184:23 | **75** 195:15 | **a.m.** 1:21 10:4 |
| **424** 3:12 | **5925** 175:23 | **759-3939** 3:4 | 43:16,20 57:24 |
| **434-5186** 4:13 | **5926** 173:22 | **77** 3:7 4:3 | 58:4 60:17,21 |
| **44** 7:18 | **5928** 173:24 | **777** 6:8 | 92:19 94:25 |
| **44113-1852** 6:18 | 180:22 | **778-1800** 4:18 | **aaron** 1:8 |
| **44114** 6:13 333:2 | **5929** 181:20 | **78** 8:6 | **ab47** 120:4,17 |
| **45004** 1:13 | **5930** 178:19 | **7832** 332:17 | **abdcmdl00269679** |
| **45090** 1:9 | **5931** 176:18 | **7:02** 327:4 | 8:21 |
| **45132** 1:11 | **5:01** 253:2 | **7:16** 327:8 | **abdcmdl00284393** |
| **46204-3535** 5:8 | **5:02** 254:23 | **7:20** 330:19 | 8:4 |
| **47** 7:20 | **5:19** 255:2 | **7th** 3:21 62:3 | **abide** 130:25 |
| **48** 224:10 | **6** | **8** | 271:2 |
| **494-4434** 5:18 | **6** 7:20 8:24 23:18 | **8** 8:3 48:7 61:19 | **ability** 129:24 |
| **4953** 223:19 224:3 | 47:20,22 54:11 | 61:21,24 82:21 | 238:13 |
| **4:14** 220:18 | **6/1/11** 78:13 | 121:9 138:4 | **able** 24:6 34:24 |
| **4:27** 231:14 | **600** 224:24 225:15 | **80** 260:13,22 | 87:16,18,19 94:13 |
| **4:31** 231:18 | 225:16 229:12 | **800** 5:3 | 100:4 130:9,14 |
| **4:44** 241:16,20 | **601** 3:16 | **801** 6:17 | 137:7 151:12,16 |
| **4:56** 53:20 252:23 | **6057** 213:3 | **82** 8:9 | 184:7 187:13 |
| **5** | **60601** 3:7 | **823** 190:1,5 | 201:20 235:7 |
| **5** 7:18 43:23,24 | **60601-1634** 2:20 | **840008425** 96:23 | 265:14,15 282:12 |
| 44:2 54:11 129:12 | **60601-5094** 4:3 | **862-3247** 4:23 | **abreast** 307:14 |
| 164:13,14,24 | **60654** 4:22 5:18 | **9** | **absent** 39:24 |
| 165:13 176:14 | **61** 8:3 | **9** 8:6 56:12 77:25 | 244:14,21 |
| 265:12 | **617** 5:4 | 78:2 | **absolutely** 138:20 |
| **500** 21:12 224:22 | **621-7860** 6:14 | **90067** 3:22 | 172:3 262:23 |
| 225:8,10,12 | **622-3707** 6:18 | **90067-4643** 3:12 | **abstract** 121:11 |
| 227:18 229:12 | **646-5800** 2:20 | **90s** 42:8 | **abuse** 269:3 284:1 |
| **52** 7:23 | **650** 3:4 | **91** 8:11 | 320:6 |
| **525-9115** 2:10 | **6:04** 299:19 | **918-3680** 6:4 | **abuses** 270:4 |
| **53202-5306** 6:9 | **6:34** 299:23 | **94** 8:13 | **accept** 51:10 108:9 |
| **54** 5:17 | **6th** 110:15 | **942-5000** 3:17 | **acceptable** 182:2 |
| **560-7463** 4:8 | **7** | **94303** 3:3 | **accepting** 50:4,12 |
| **5914** 206:23 | **7** 7:23 52:12,12,14 | **951-7000** 5:4 | **access** 125:11,24 |
| **5915** 209:3 | 73:7 195:7 223:16 | **97** 283:14 | 128:10,17,19 |
| **5916** 195:5 | 223:21,22 224:20 | **9:16** 1:21 | 129:22 130:13 |
| **5921** 187:17 | **7/13/31** 78:15 | **9:28** 10:4 | 137:1,12 139:12 |
| **5922** 189:23,24 | | | **accomplish** 250:19 |
| 190:3 191:4 | | | 251:6 |

**account** 247:3,8
248:20
**accountability**
89:24 90:20
107:16 108:8
**accounts** 307:18
307:25
**accuracy** 210:1
**accurate** 14:11
54:3 56:8 90:9
108:18 138:3
181:14 206:23
209:23 210:5,10
210:11 211:15,18
219:2 227:22
**accurately** 171:15
308:19
**acknowledge**
334:11 335:16
**acknowledged**
79:12
**acronym** 51:18
**act** 12:22 19:17,22
106:12 124:16
137:1,3,13 139:12
144:17,25 145:21
146:5,7,11 151:20
152:10,22 155:6
159:22,25 179:14
180:5 190:15
191:25 209:8
210:23 214:25
215:2,8,9,12,14,16
256:12 259:16,16
260:7,14 261:3,17
261:24,25 262:15
270:2,16 271:13
271:19 275:12
276:23 279:9
285:20 301:18
303:7 317:17

318:4 324:4,10
334:14 335:20
**actavis** 265:18,25
272:25,25 273:7
274:3 275:1 277:7
277:8 280:3,22
282:16 298:14
300:19,24 301:11
304:25 305:5
306:13,20 327:16
**actavis's** 276:22
**acted** 68:11,23
69:1,15 224:4
**acting** 49:18 62:13
84:11 101:6
106:24 225:25
304:9,16
**action** 144:14
269:7
**actions** 74:12 92:2
92:5,7 178:16
184:14 203:15
205:7 261:2
292:13,19,21
293:14
**activities** 155:11
155:15,16 295:13
315:23 316:7
**activity** 154:8,11
154:14 297:10
314:22
**actual** 274:23
**add** 98:25 225:1
**added** 151:19
**adding** 99:2
**additional** 70:8,24
85:7 92:7 98:23
101:20 140:2
146:4 164:22
180:4 193:2
195:16 208:21

218:21 225:2
228:1,23 231:6
254:16 313:2
317:2
**address** 112:16
270:3 274:1,24
333:15
**addressed** 78:20
79:14 207:13
208:12
**addresses** 87:6
**addressing** 202:20
227:8 291:8
**adequate** 20:20
83:15 190:25
197:23 233:8
270:5,9,11
**adequately** 49:7
**adjudicated** 294:8
**administration**
6:23 111:6 121:12
148:18 273:6
**administrative**
15:19,24
**administrator**
24:18 44:8 47:5
47:18 49:18 54:6
62:18 84:11 93:23
93:24 101:7
106:24 224:13,17
226:1 266:2,9,24
304:10,14,15
**administrators**
304:17
**admitted** 213:12
**adopted** 41:22
**advance** 231:23
**advice** 223:13
226:6 229:6,19
230:17

**advise** 323:8,10
**advised** 143:11,11
181:5 298:14
**affairs** 105:22
110:10
**affect** 112:1
**affiliated** 248:10
**affixed** 332:11
334:15 335:21
**aforesaid** 331:17
331:23
**afternoon** 123:17
231:19
**agencies** 90:22
**agency** 23:9 41:18
108:3,6,19 178:25
184:10 205:5
260:25 266:19
272:20 302:18
311:16,17
**agency's** 21:13
108:25
**agenda** 79:16
120:1
**agent** 328:19
**ago** 12:5 97:11
233:20 242:17
253:7 255:20
**agree** 49:8 55:2,6
56:10 64:10,11,18
64:20,23 89:22
112:25 113:8,11
115:21 117:25
143:19 147:8
150:13,24 151:2
198:1 234:2,8,9,21
245:19 246:1
249:4 251:9 259:3
259:5,7 277:16
278:1 283:8 284:9
289:25 291:11

296:15,17,18
318:9 320:17
329:22 330:6
**agreed** 100:11
140:13 141:15
169:15 236:15
**agreement** 169:1
**agreements** 169:8
169:22
**ahead** 22:23 28:25
32:11,25 33:16
36:2 40:7 51:4
74:2 84:18 87:25
88:9 90:13 93:14
117:14 118:7
125:22 129:4,8
247:19 263:24
287:23 290:5
**aid** 4:5 231:20
239:18 247:24
248:5,6,8,10,16,17
248:19 255:23
**aide** 15:2,3
**aided** 331:20
**aimed** 196:11
**al** 1:8,10,12,12
**alerted** 184:6
**algorithm** 88:3
**allergan** 4:24
277:8
**alleviate** 101:22
256:17
**allotted** 224:23
225:15 229:11,13
255:18
**allow** 227:1
234:22 235:14
259:13
**allowed** 23:6,11
23:12 32:9 33:19
33:21 73:16 132:8

142:22 143:2
159:9 198:8 231:2
289:17,23 321:18
321:21 326:13
**allscript** 176:20,22
177:7,12 178:6,12
180:21
**allscript's** 181:13
**alto** 3:3
**alucas** 3:23
**ambiguity** 84:24
**amerisourceberg...**
2:16 11:1 257:6
262:9 282:19
**amerisourceberg...**
42:8
**amerisourceberg...**
256:21
**amicable** 100:4,10
**amount** 134:25
162:12 234:5
236:2 319:19
320:10
**amy** 3:21
**analysis** 73:2
**analyst** 175:4
**analysts** 101:18,21
**anda** 6:10
**angeles** 3:12,22
**announcement**
123:25
**annual** 141:19
142:15
**answer** 26:5 31:3
35:7 74:2,14
76:18 77:18 80:18
110:18 112:18
115:11,24 117:14
118:5 125:4 131:5
131:9 132:15
137:17 139:3,16

141:6,25 142:2,3
142:18 143:5,21
149:15 150:17
161:25 167:16
168:10 172:13,19
179:7 181:15
183:24 186:23
187:12 192:5
194:7 207:6
209:18 210:8
211:11 216:24
225:19 226:24
227:5 229:2,16,17
230:14 242:7,10
244:16,17 245:8
245:17,22 250:7
256:4,7 269:23
272:10 273:19
280:12 281:9
284:14 285:17
287:12 289:6
290:21 293:2
295:11 297:2
309:15 312:23
314:7 318:10
320:18,23 321:14
322:12,17,22
323:9,11 325:15
325:17,18,22
326:9,13 329:2,3
329:21 330:5
**answered** 30:10
65:24 66:4 75:3
76:17 80:13 118:3
118:23 152:7,8
170:13 182:8
183:23 186:7,22
188:9 192:3 211:3
217:16 243:18
280:8,14 281:5,7
281:21 295:20

312:20 323:13
329:20 330:4
**answering** 92:14
187:6
**answers** 76:21
77:3 80:10 138:10
142:25 319:8,8
**anybody** 99:21
264:6 320:22
**anyway** 75:14
222:6
**apart** 165:25
**apologize** 53:12
231:23
**appeal** 178:2
**appear** 56:14
71:21 202:10
334:11 335:15
**appearances** 2:1
3:1 4:1 5:1 6:1
10:12
**appeared** 270:14
331:7
**appearing** 57:4
**appears** 71:22
73:10,20 138:3,7
178:17 206:16
212:4
**appended** 335:11
335:18
**appreciate** 76:9
**appreciated**
143:22
**approach** 56:6
108:19
**appropriate** 64:6
79:22 248:19
**appropriately**
104:5 260:6
**approval** 45:9,18
279:5

**approve** 41:9,23
42:1,24 45:6
**approved** 42:5,7
42:12 45:24
**approves** 45:11
**approximately**
13:22 224:22,24
225:15
**april** 137:4
**arbitrarily** 200:14
**arbitrary** 199:10
200:1 201:19
204:17 234:11
235:5
**arcos** 73:3,11,17
73:22 74:7 124:20
125:6,12,16 126:1
126:2,9,12 127:22
128:7,10,17
129:21,21,23
130:5,6,7 131:17
131:20,25 132:5
132:16,17,22
133:5,12,20 134:7
134:14,24,24
136:4 280:20
308:14
**area** 16:24,25 17:3
19:2 148:18
296:22 307:10
**areas** 33:19
100:14 136:23
228:21
**argue** 34:18
**argument** 256:22
257:8
**arlington** 20:14
266:10 273:5
**arnold** 3:15
110:21 114:22,22
114:22,24 115:2

116:10,20 119:16
**arnoldporter.com**
3:18
**arose** 79:9
**arrest** 229:23
230:7,10
**arrived** 249:24
**articles** 292:12
**ashley** 1:16 7:3
8:10 10:11,18,23
11:13,15 14:4
22:5 25:7,9,13
34:21 38:13 43:24
44:1 47:20,21
52:12,13 53:2
54:5 61:19,20,24
74:22 77:25 78:1
82:14 83:24 86:24
91:4,5 94:3,7,8,20
100:1,16,20,22
105:15,16 106:24
110:1,8,8,9 119:8
119:9,13,14
120:12 123:12,13
123:17,18 129:12
129:18 131:17
135:22 137:21,22
143:23 144:12
173:16,20 183:1,5
183:20 191:10
193:5 195:1,5
201:5 206:21
207:25 211:22
212:2 220:19,23
231:19 232:2,14
240:10 241:22
244:16 250:14
253:4 255:5,5,6
265:7 299:25
307:4 327:9
329:16 330:11

331:9,15 333:8
334:4,9 335:4,13
336:20
**ashley's** 305:10
**aside** 165:13
182:23 194:23
220:4 327:24
**asked** 21:25 23:21
30:10 65:24 66:4
71:24 91:23 94:7
115:12 118:3,23
125:9 129:18
136:18,21 137:11
139:16,20 143:8
152:7,8 170:13
182:8 183:23
186:7,22 188:9
192:3 211:3
217:16 241:23
242:6 243:18
244:12 245:15
250:15,17 255:19
255:24 258:4,11
269:16 270:8
277:3,5,7,11 280:5
280:8,14 281:5,7
281:21 295:20
303:18 306:12
309:5,24 310:3
312:20 318:13,14
318:18 319:5
320:21 323:12
327:14 328:1
329:20 330:4
**asking** 11:1 23:7
28:1 39:18 45:22
51:1 68:19 69:11
71:9 73:10,18,21
81:15 83:23 84:1
104:19 105:25
106:5 111:10

112:18,19,21
113:11 115:20
117:6,7,11 122:13
132:7 136:12
137:14 149:1,11
151:7 159:1,3
171:21 178:6
180:3,9,14 185:13
200:23 205:21
206:5 207:19
209:25 210:6
211:6 214:11
216:10,15 218:17
218:21 225:21
227:11 233:19
235:3 240:17
242:1,2,20 245:6
250:13,15 253:6
257:16 259:5,23
260:1 262:13
305:10 323:23
329:25 330:1
**asks** 112:16
**aspect** 246:5
**aspects** 213:13
251:22 267:10
**assent** 141:2
**assert** 323:3,7
**asserting** 321:13
**assessment** 106:14
**assigned** 15:10
120:3
**assignment** 334:2
335:2 336:2
**assist** 124:14
127:13 176:13
314:23
**assistance** 136:2
184:25
**assistant** 24:18
44:7 47:4,17 54:6

84:11 93:24
106:24 224:12,16
225:25 266:2,9,24
304:7,10,16
**associate** 17:14
18:21 54:6 224:12
**associated** 284:20
285:7,24
**association** 51:16
51:20 110:11,12
195:9,13,21
**associations** 58:11
295:6
**assume** 52:20 97:3
169:21 196:4,6
223:12 323:23
**assumes** 205:16
**assuming** 170:25
**attached** 79:15
206:19 313:1
335:7
**attaches** 62:2
78:24 123:25
**attachment** 7:21
8:7 9:8,11,14 48:4
48:5,10 61:24
78:14
**attachments** 78:11
79:21
**attempt** 163:10
178:22 207:4
**attempting** 234:4
235:11
**attendance** 327:18
**attended** 54:5
106:2,25 218:25
**attending** 105:5
**attention** 39:10
50:9 184:3 199:9
199:25 201:19
202:1

**attorney's** 6:16,22
**attorneys** 13:12,18
328:15 332:4
**audience** 232:21
**audit** 97:7
**august** 8:17 105:6
105:22
**author** 177:20
**authored** 267:17
**authorities** 51:21
**authority** 39:22
40:3 153:10,24
229:9 244:13,20
244:24
**authorization**
11:10 34:4 35:2
92:16 141:24
142:10 143:14,15
201:4 223:5
225:23 229:15
230:13 284:11
**authorizations**
229:3
**authorize** 335:11
**authorized** 11:7
34:3,15 73:16
84:3 124:24 130:3
132:14 218:9
223:6 225:18
**automated** 88:12
88:15
**automatic** 89:4
**automatically**
112:12
**automation** 73:2
**available** 124:20
126:5,6,22 127:13
131:25 135:8,13
197:24 234:15
258:2 270:5

**ave** 333:1
**avenue** 2:3 3:11,16
3:21 6:8,17
**average** 177:22
**avert** 269:20
**avoid** 189:4,11
236:1 294:20
**aware** 19:25 21:6
42:7,10 45:23
46:16,20 47:2
65:14,20 66:2
89:23 90:4 98:4,7
117:19,20 118:1,8
146:3,10,18 150:4
150:8 152:2
160:16,19,22
161:4 163:13,20
165:8,12 171:16
172:20 173:2,5,8
203:18 204:2,6
205:11,14 208:25
210:17,18 217:8
217:11,13 260:3
260:10,14,18,21
260:24,25 261:25
262:4,5 263:3,6,9
265:19 296:8,11
321:25

**b**

**b** 4:16,21 7:10 8:1
9:1 23:18 25:19
26:1 86:23 111:20
144:24 145:11
146:21 148:16,16
152:5 192:19
**bacchus** 6:17
23:13 28:9 30:25
33:5,14 34:1,11
35:1,8,23 36:12,24
37:8,17 41:11,25
42:14 44:20 45:20

49:1 50:14,24
52:24 55:4 58:12
60:25 62:22 64:15
65:9,24 66:13
68:13 69:9 70:18
71:4,13,16 72:8,18
73:13,15 74:10
75:17,23 76:6
80:4,18 81:6,22
84:3 85:16 86:5
87:21 88:6,16
90:14 92:13 97:21
99:7 103:16 104:1
104:16 108:24
109:9 112:23
113:18 115:16
116:5 117:2,15
118:15,23 122:21
124:23 125:5,18
129:16 130:2,15
130:22 132:13
133:16 135:10,15
136:15 138:17
139:6,9 141:4,13
141:21,23 142:3,8
142:17 143:7
145:7 147:17,19
150:16 151:8,23
152:7 153:18
156:22 157:9
159:14 161:25
166:7,9 167:14,16
168:10 170:13
171:24 172:1,10
177:14 178:14
179:6,15 181:15
182:8,16,19
183:23 185:17
186:1,7,22 188:5,9
189:5 192:3,23
193:25 194:7

196:24 197:7,16
198:6,20 200:24
205:16 206:9,15
207:6 209:17,24
210:8 211:3,8
215:15 216:9,22
217:7,16 218:8
219:24 222:19
223:2,4,10 225:17
226:11 227:4
228:7 229:1,14
230:1,12 234:18
243:9,16,18
245:11,24 248:12
250:9 251:4 257:1
257:12,23 258:17
260:8 261:8
262:18 263:20
264:22 268:24
269:22 272:8
276:17 278:4
280:8,11 281:7
283:6,20 284:9,15
285:14 286:24
287:11 288:15
289:2,13 290:19
293:1,18 294:17
295:8,20 296:15
296:17,25 298:2,5
299:10 302:5
303:4 308:7
311:11 312:20
313:16,24 315:8
317:12,14 318:9
318:25 319:5
320:17 323:10
324:14 326:14
329:20 330:4,9,20
333:5
**back**  12:20 14:14
14:15,16 18:25

20:11,13 28:14
29:23 30:7 35:4
43:19 46:3 50:6
50:19 53:14 58:3
58:7 60:10,20
67:15 78:7 86:21
92:22 94:11 96:2
96:7,18 98:19
100:3 110:4
115:24 116:3
119:14,16 121:5
122:16 123:9
126:16 132:8
136:20 142:20
144:8,18 159:20
165:20,24 166:2
166:17 168:12
172:8 183:16,19
188:17 190:11,16
190:22 192:18
202:12 213:23
215:5 216:6
220:17 227:17
231:4,6,17 241:19
253:1 255:1 257:3
264:14,16,23,24
269:8 283:17
299:22 300:1
308:21 313:1
321:22 327:7
333:15
**background**
228:17
**bad**  30:4 82:11
**bailey**  2:7
**balancing**  235:20
**ballpark**  238:25
**barbara**  38:17,20
38:22 39:12 40:9
123:21 242:23
300:5

**barber**  4:7
**barnes**  5:7
**baron**  280:3,21
282:17 298:14
300:19 304:25
307:13
**baron's**  282:20
**bartlit**  5:16
**bartlitbeck.com**
5:19
**base**  64:7 158:25
247:17,18,20,22
249:3
**based**  39:20 73:2
107:23 121:24,24
122:3 135:5 136:8
145:1,13 147:8
149:22,23 151:18
152:22 155:25
156:22 162:14
167:8,11 171:16
179:2,7 202:11
205:20 206:4
210:3,8,25 228:11
228:22 229:8
234:2 242:4
246:23 300:9
314:1
**basically**  282:23
297:25 314:7
**basis**  29:5 143:3
293:20
**bates**  7:17,21,23
8:4,7,13,15,18,21
8:24 9:4,8,11,14
9:16,18,21 173:21
173:23 176:18
206:22 209:3
213:3 223:19
264:8,12

**beck**  5:16
**beg**  326:2
**began**  24:3 236:13
238:7,19
**beginning**  19:9
47:1 70:20 280:3
**begins**  44:9 93:23
94:24 95:2 116:11
176:17 192:13
196:8 203:8
204:22 213:10
**begun**  305:1
**behalf**  23:1,13,17
41:17 68:14 69:10
71:8 83:21 84:5,5
84:6 140:1 144:15
167:4 202:21
267:1 291:7
293:25
**beissell**  3:6
**belief**  269:19
**believe**  12:15
22:24 30:11 34:7
34:20 46:7 53:3
62:19 71:5 73:4
78:6 86:2 87:5
90:10,16,16 96:13
124:1 176:1,3
184:1 208:2
210:12 215:3
223:6 235:13
236:24 237:2
238:23 246:9,13
249:9 250:5
254:14 302:24
303:5,7 318:7
319:9
**believed**  23:25
197:2 270:10
302:11

**bells** 105:11
**belongs** 325:21
**ben** 6:25 10:2
**benary** 100:25
  101:1
**bennett** 6:22
**best** 14:11 30:11
  74:2,4 126:3
  167:1 271:16
  302:23,25 303:11
**better** 49:11 67:3
  67:25 69:1,3 79:5
  205:22 206:6
  250:20,21 251:14
  314:24
**beyond** 73:15
  124:23 225:17
  229:14 230:12
  261:6 263:22
  277:25 296:17
  317:3
**bicker** 142:20
**big** 144:18 159:17
  247:15 262:8
  264:5 309:12
**bigger** 225:8
**bit** 101:18 159:15
  263:21 304:24
**blank** 325:2
  328:18,20
**blessed** 221:24
  222:11
**board** 78:10,11,20
**bob** 10:25
**bockius** 4:2,6
**bolded** 181:20,20
  192:17 203:8
**boockholdt** 38:17
  38:20,22 39:12
  242:1 243:24
  244:12 245:7,21

300:2,3,5,18
**boss** 101:8
**boston** 5:3
**bottom** 96:24
  119:15 124:3
  203:7
**box** 309:12
**boylston** 5:3
**brandenberger**
  123:20
**brass** 62:21
**break** 52:22 57:20
  57:22 58:1 60:18
  83:10 92:20
  100:12 119:6
  123:4,7 144:6
  171:23 172:6
  211:20 220:11,15
  231:15 241:17
  252:24 254:24
  299:20 327:5
**breakdown**
  177:21
**briefing** 265:17,25
  272:23,23
**briefings** 265:20
**briefly** 106:2,25
  207:1 266:21
**bring** 52:21
  201:16,18 271:23
**broad** 203:14
**brought** 199:9,25
  202:1 278:2
**btlaw.com** 5:9
**budget** 19:12
  20:21 227:25
  228:4
**budgetary** 228:17
**bulk** 148:1
**bullet** 66:25 67:2
  67:17,21,22,25

71:24 72:22,23
  73:9 74:8,16
**bunch** 34:18 53:16
**burdensome**
  106:16
**burling** 3:10
**business** 54:25
  154:8,11,13,15,16
  154:19 155:11,15
  155:15 158:14,15
  185:2 190:20,24
  192:15 279:18
  295:13 299:14
  306:4
**busy** 326:22
**buying** 259:9

## c

**c** 6:23 331:3
**c.f.r.** 7:15
**ca** 333:25
**california** 3:3,12
  3:22
**call** 17:9 32:5
  37:19 40:20 41:22
  60:8 237:16 255:9
  255:21 322:4
**called** 1:16 28:21
  111:4 114:2
  281:22
**calls** 32:1 66:13
  86:5 108:24
  150:16 179:6,15
  197:7 222:19
  249:24 259:19
  261:19 292:25
  293:17 325:14
  329:2
**camera** 82:10
**cancelled** 79:18
**capacity** 23:14
  323:1 330:12

**capital** 213:10
**caption** 10:7
**cardinal** 4:14
  184:6,13,15
  256:20 257:6
  262:10 282:18
  292:13
**care** 196:14
**cared** 104:11
**career** 14:22 199:7
  199:23 271:11
  283:24 285:18
  295:2 301:21
  303:12,14 329:9
  329:14
**careful** 199:21
**carreno** 123:21
**carry** 200:11
**carrying** 201:7
**case** 1:7,9,11,13
  10:7 13:3,4,7
  27:10,10 147:16
  147:20 214:3
  243:24 248:15
  255:23 269:13
  315:6 320:22
  326:21 329:16
  333:6 334:3 335:3
**cases** 263:4 294:8
**cash** 298:20 299:5
**categories** 154:3
  154:18,19 155:9
**category** 15:23
  154:8
**cause** 319:21
  331:9,17
**caveat** 173:7
**cavitch** 6:12
**cavitch.com** 6:14
**cc** 38:18 48:2 62:8
  95:10,12 100:25

**[cc - clinics]**

101:1,2 123:22

cc'd 101:1

cease 42:25

ceasing 41:23

center 6:3

centers 203:13

centre 4:7 5:12

centric 282:15

ceppich 3:13

certain 11:7 23:10
24:13 32:23 33:1
81:2 90:15 99:16
125:12 178:23
181:4 248:13
257:19 265:22
295:1

certainly 64:6
256:4 270:9
271:25

certainty 83:5
86:14

certificate 335:11

certification 334:1
335:1

certify 331:6,14
331:24 332:2,6

cfr 25:2,14 86:23
111:20 192:18

chain 7:20,23 8:6
8:13,15 9:4,7,10
9:13,16,18 48:9
51:16 96:21
110:11 175:23
207:15 212:7
255:22 256:24
257:8,18,22
258:15,24 260:3
280:19 282:12,14
297:20 309:12

chains 109:16

challenge 228:21

chance 187:21
221:2 266:25
313:5

chandler 6:24

change 36:16
51:12 97:17,25
98:3,8,15,19,23
142:6,9 240:6
242:24 246:4
249:18,22 310:25
311:6 312:5
333:13,14 335:8
336:3

changed 28:5,8
97:6 145:6 202:3
228:8 312:6

changes 49:19,24
50:3 57:9,13
140:2,9 202:23
292:20 311:17
333:12 334:7
335:7,9

changing 145:8
202:5 236:11

channels 233:7

characteristic
284:20

characteristics
285:6,24

charge 93:20

chargeback
165:15 167:2,12
167:18 168:2,6,19
168:22,24 169:1,7
169:14,15,22
170:4,18 171:1,2,5
171:7,18 172:22
173:4,10 258:12
280:4,6,7,21 281:1
281:2

check 300:21
301:8

chemical 17:16

chemicals 233:6

chicago 1:20 2:20
3:7 4:3,22 5:18
10:5 15:1,2,7 16:1
16:8,15,24 17:3
18:25 19:14 35:11
39:2,5 43:8,9
64:25 212:22
213:1 221:10
266:11 291:21
295:25 296:2,4
331:9

chief 17:14 18:21
38:23 55:12,19
62:14 95:23 107:1
107:6 114:25
115:5 300:2,3,7,18

chosen 192:10

christopher 3:11
48:3

chuck 100:25
101:5,6 102:25

circuit 111:18

circumstance
31:20 203:22
213:24 222:22

circumstances
31:21 270:21

cites 192:18

city 1:10 328:4

civil 1:17 6:24
15:18,19,23 19:12
334:5 335:5

claims 324:11

clarification 17:11
21:22 59:3,21
60:5,6,14 61:15
69:2,7,23 71:9

85:14 98:12 99:9
103:13 190:18
201:24 208:6,21
226:25 330:10

clarifications 67:3
68:1 69:3 180:10

clarified 214:11

clarify 61:1 154:7
156:9 218:12
264:15

clarity 22:8 59:21
61:5

claw 94:10 100:3
264:14

clawed 231:4,5
264:16,23,24

clean 97:2

clear 22:8 39:24
40:2 57:15 60:10
60:11 76:13 84:2
85:22,23 86:7
102:17 104:25
113:15 129:18
149:13 155:4
159:7 167:4
204:14 217:3
235:18 240:11,18
244:15,22 262:20
293:4 309:23

clearer 67:23
101:16

clearly 23:7 45:3
108:7,7 192:15
205:2

cleveland 1:10
6:13,18 333:2

client 144:15

clients 298:19
299:4 326:22

clinics 177:6,12
298:18 299:3

clock  126:14,15
close  97:9 111:6
  184:13 201:25
closed  153:1 155:1
  157:24 158:3
  258:9,15
closely  19:15,20
closing  193:1
closures  203:12
cmcnamara  4:14
cocounsel  252:20
code  152:10 160:5
codes  171:3
codified  214:21
cohen  321:16
colleague  328:12
  328:13,17
colleen  4:11
college  15:4
colon  100:23
  121:11,21
column  91:12,21
combat  127:15
  196:12
combatting  127:9
  229:21
combination
  22:15
come  58:18 97:5
  118:22 124:1
  132:8 237:16
comes  161:11
  229:21 307:17,25
comfortable  98:22
  159:11 240:13
coming  161:10
  187:9 264:21
comma  83:6 86:15
  121:22 122:1
  183:21 184:16

comment  67:4
  68:2 69:4 102:8
comments  97:2,10
  97:12,15
commercial  233:9
commission
  307:16,24 334:19
  335:25 336:25
committee  105:23
  105:23 255:9
common  284:20
  285:6,23
communicate
  36:21 37:5 46:8
  46:17 49:8 58:10
communicated
  59:18 128:5
  130:17 132:15
  250:20
communicating
  13:8 18:5 46:12
  61:14 127:3,7
  129:19 173:8
communication
  46:11,22 48:4
  49:10 92:3 95:12
  176:2 291:9,13
  311:14,22
communications
  45:8 49:9 70:5
  90:2 128:9 134:14
  172:12,14 175:7
  251:10 284:12
communities
  106:18 270:1
  319:20
community  46:18
  46:23 85:8 195:9
  195:13,14,20
  205:1 207:14,15
  249:25 250:1

company  257:14
  263:17 272:24
  282:3
compared  236:17
complaining
  203:19,23 204:3,7
  219:3
complaints  49:6
  50:16 204:10,13
complete  137:21
completed  103:21
  103:23,24 333:15
completely  18:13
compliance  15:21
  16:6,20 21:14
  42:23 83:5,13
  84:21 85:24 86:15
  86:19 155:6
  190:14 250:23
  270:1 271:13,18
  271:23 272:3
  285:20 298:15
  303:6
compliant  87:20
  88:4,12,22
comply  31:13
  35:21 179:13
  180:4 185:14
  187:12 205:3
  213:5 235:25
  238:16 251:23
  260:13 311:24
  312:3 329:18
  330:2
complying  261:2
  329:10
comported  227:12
compound  268:23
  278:25 285:12
  299:9

comprised  75:2
computer  29:17
  331:20
concentrating
  275:1
concept  165:9
concern  39:15
  107:21 177:3
  196:10 197:5
  235:2,3,23
concerned  111:17
  111:18 197:10,14
  235:12,15 236:4,6
  269:6
concerning  209:7
  210:22 276:24
concerns  59:20
  65:8,15,21,21
  202:20 208:13
  209:5 210:20
  243:5 291:8 317:3
concise  17:22
conclusion  82:21
  82:23 259:20
conduct  253:16
conducted  15:18
conducts  253:11
  253:22 254:2
conference  213:17
  219:22
conferences  58:21
  83:2
confess  43:22
  121:3
confirm  327:17
conflicting  213:16
  219:3,9,9,14,21
confused  58:24
  60:5
congress  46:20
  49:17 82:4,24

83:24 86:9 98:11
137:8,10
**congressional** 8:11
97:7
**connection** 13:19
35:14 42:13 61:5
82:7 90:24 234:12
252:6
**connolly** 4:11
**consequences**
196:14
**consequently**
181:7
**consider** 240:23
241:4 301:15
305:5
**consideration**
70:16,23 73:8
93:17 95:18 181:9
249:7,11 256:3
**considered** 73:5
92:24 93:8 151:4
208:16 296:5
**considering** 93:9
93:21 311:17
325:4
**consistent** 18:2
174:18 225:11
307:4,7
**consistently** 136:2
**consolidated** 73:3
**constituent** 71:8
**constituted** 61:16
**constitutes** 26:17
26:21,24 67:7
68:5 87:20 284:12
**constraints** 228:18
**construed** 45:9
**consult** 252:20
328:6

**consultant** 321:6
328:16
**consulted** 75:21
324:7,15,18
**consumer** 204:25
**consumes** 283:12
**contact** 39:19
242:2 306:20
317:4
**contacted** 324:15
324:18,19,21
328:2,4,9,12,13
**contacting** 329:25
**contain** 170:5,19
177:5,11
**contained** 29:11
134:25 176:14
**contains** 94:24
133:12,20 134:7
134:15 171:6
**contend** 190:8
**context** 224:21
**continually** 49:7
**continue** 98:16,16
231:9 299:25
**continued** 3:1 4:1
5:1 6:1 43:3
**continuing** 299:15
**contrary** 40:10
**control** 19:14
20:14,19 24:19
44:8 46:7 47:18
49:20,25 79:17
83:14 93:25
105:10 127:1
129:15 153:7,16
153:22,25 174:5,7
174:13,16,24
175:12 197:23
224:5,13 226:1
227:21 233:4,17

233:22 234:4,14
251:11 260:7
266:3,10,25
267:10 303:8
**controlled** 19:17
19:22 51:21 63:20
87:13 108:21
116:14 119:21,25
121:14 124:16
136:6 144:17,25
145:21 146:5,7,11
151:20 152:9,20
152:22,24 153:11
153:16 154:2,25
155:6 158:5
159:22,25 162:12
167:24 176:24
178:23 179:13
180:5 181:4,8,14
181:21 182:13
184:16 190:15
191:7,24 192:10
192:14,17 193:9
193:15 196:13
197:24 209:8
210:23 214:7,25
215:2,8,13 233:6,8
234:7,23 235:7,15
235:21 236:2
239:11,11,13
248:17 250:23
251:1 256:12
259:16 261:3,16
261:23 262:14
269:3 270:2,16
271:13,18 274:2
274:25 275:8,12
276:23 279:9
282:15 283:13
284:22 285:9,20
286:1 301:17

303:6 304:17
307:19 308:1
313:4 315:1,24
317:17,20 318:4,5
319:16 320:6,7
324:4,10
**controls** 83:15
**convenient** 101:25
**conversation** 32:6
37:19 55:18 85:21
99:21 100:15
106:25 140:19
201:17 202:11
210:13 215:22
301:21 302:3
328:14
**conversations**
32:12 37:18 98:17
106:17 134:14,23
198:22 199:5,8,11
199:24 200:9,13
201:6,13,18
202:13,19
**convey** 108:7,7
235:11
**cook** 331:5,11
332:18
**coordinating**
20:22 145:17
**coordinator** 18:20
275:22
**coordinators** 17:9
**copied** 212:8,9
**copies** 264:5
**copy** 25:13 44:5
96:7 138:7 174:7
174:10,11 264:3
264:19
**copying** 212:12
**core** 106:25

**corner** 121:6
173:22 176:19
183:9 232:18
**corporate** 6:3
**corporation** 2:17
3:13
**correct** 19:15,20
24:20 25:24,25
30:19 35:12 39:5
40:21 41:1 48:16
48:24 62:15,20
64:25 65:5 71:2
73:12 85:8,9 87:1
87:14 89:9,11,12
89:13,21 99:5
103:22,25 112:22
120:9,23 122:20
122:25 124:22
125:12 127:5,10
127:15,17 128:21
129:1,6 135:8,13
136:13 146:5
154:19,20 155:13
160:13 162:7
165:6 183:13
191:25 195:24
196:2 197:18
198:15 212:13
218:22 221:21
240:20 251:20
256:5,16 258:9,10
258:25 260:7,15
260:23 262:15
263:19 267:11
270:11 275:12,13
278:23 279:15
282:5 285:10
286:20 287:7,8,10
287:21 288:9,11
288:14 289:10
290:16 291:24

292:4,9 295:19
302:18 303:16,22
304:2 310:8,10,11
310:20,22,23
311:7,14 312:7,12
312:16,17 313:7
313:14 316:10,11
316:13,16,23
317:18 320:24
327:19,20,21,23
329:24 330:3
331:22
**corrections** 333:12
335:17
**correctly** 178:4
181:10 185:4,10
193:11 196:18
203:16 205:9
209:12 213:7,19
222:7 233:13
277:3 282:21
284:24 286:5
297:23 298:22
301:1 305:7
306:22,24 307:20
309:7 315:2,16,25
317:7
**correspondence**
7:12,18 8:3,20,23
73:21 79:15 161:4
**corresponding**
158:4
**counsel** 10:6 23:3
23:7 95:23 100:13
129:10 132:3
143:21 218:14
231:8 241:23
255:10,20 258:5
264:2 277:7,11,15
280:5 320:21
322:20 323:8

330:14 331:25
332:6
**counsel's** 130:25
223:12 229:5,19
230:16,24
**count** 83:3
**country** 17:19,21
18:1,6 111:24
283:14 296:5,10
**county** 1:8,12 2:6
255:11 328:5
331:3,5,5,11
332:18 334:10
335:15
**couple** 224:1
227:13 253:5
267:21 291:4
319:12
**course** 14:21 58:6
58:9 80:2 133:24
134:4,13 142:13
201:10 208:4
238:13 272:18
**court** 1:1 10:9,13
111:4 155:20
162:24 266:22
275:19 294:12
331:11 334:7
**courts** 1:18
**cov.com** 3:13
**cover** 91:11,18
**covered** 33:19
102:16 314:22
**covering** 48:1,6
119:3
**covington** 3:10
**create** 84:23 85:7
107:25
**created** 214:12
**creates** 84:19

**criminal** 15:19,24
19:12
**crisis** 127:10,15
**criteria** 89:5,7
**criticism** 47:2
**criticized** 46:17,21
**cross** 82:9 281:22
**crossing** 289:16
**crr** 1:24
**crushed** 101:18
**cruz** 137:11
138:16,25 139:21
140:4
**crystal** 240:18
**csa** 92:4 108:20
160:1 209:16
215:8 240:10
295:14 311:24
312:16 329:11,18
**csr** 1:24
**curb** 269:8
**current** 64:2 98:14
**currently** 86:23
**customer** 39:16
64:22 145:19
146:24 149:17,24
150:22 151:14,15
156:15 158:8,11
158:19,25 159:21
159:24 160:7,18
161:7,10,15,24
162:4,8 163:11,16
163:23 164:2,19
165:10 181:22
182:14 193:20
194:19 213:18
214:5,6 216:7,20
217:3 247:4,8,12
247:17,18,20,21
277:20 278:2,11
278:20,21 279:5

292:8 298:1,11
299:13,15 300:22
305:22,23 306:3
**customer's** 39:17
73:5 158:8 159:20
159:23 160:6,18
161:6,10,15,24
162:4 163:10,16
163:23 164:2,19
165:10 192:15
277:14,20 278:2
278:11,20 298:1
298:11
**customers** 136:5
158:1,13,15,21
162:11,17 165:23
166:6 202:18
235:7,9 276:25
277:1,14 278:15
280:22 281:13
282:18,20 286:4
288:20 297:10,21
298:10 300:20,21
301:7,8,9 305:4
306:15,16,17,19
306:20 314:25
315:15
**cutting** 305:5
**cuyahoga** 1:8 2:6
255:10
**cvs** 4:19,19 240:1
249:3 292:13

**d**

**d** 7:1
**d.c.** 3:17 4:13,17
17:7 18:9 111:18
237:4 249:15
300:8
**daily** 177:22 179:5
**dakota** 19:4

**dan** 1:8
**danger** 317:19
**dash** 83:1,2,3
95:10
**data** 73:4,11 126:1
126:2 127:22
129:21,23 130:14
131:18 132:5,22
133:5,12,20 134:7
134:15,24,24
165:16,19,23
166:2,12,17 167:2
167:12,18 168:2,6
168:14,19,23,24
169:14 170:4,18
171:1,2,6,19
172:22 173:4,10
258:12,13,21
282:16 308:14
**database** 73:17,19
74:7 128:4,7,11,17
130:6,7
**date** 10:3 57:6
95:16 121:6
133:21 333:8
334:3,9,19 335:3
335:13,25 336:20
336:25
**dated** 7:12,16,18
8:3,17,20,23 38:18
44:6 48:5,6 53:9
53:20 62:1 73:7
96:25 100:22
110:14,19 195:7
232:16 265:12
**david** 53:9,16,19
**davis** 3:15
**davison** 5:2
257:24 300:15
302:6 303:3 304:3
309:2

**day** 1:20 3:2,5
57:7 79:9,9 132:8
204:14 222:5
240:8 310:21
317:1 327:10
332:11 334:16
335:22 336:22
**days** 333:18
**dc** 2:14
**de** 237:3,13 238:6
238:19,25 239:4
**dea** 7:17 8:7,14,16
9:5,8,11,14,17,19
9:21 11:8,11 12:3
14:18,20,21,25
15:25 17:5 18:5,7
20:10 21:22 22:19
23:1,2,15,18,19,21
24:1,21,22 28:5,17
32:18 33:2,3
35:19 36:7,14,20
36:22 37:4,6,12
38:21 41:8,22
42:7,11,12 45:5,8
45:11,17,24 46:16
47:5,7,15 48:2,4
49:7,9,11 53:11,22
54:6,21 56:5,16
57:8,12 58:9,10,23
59:1,17 60:8,9
61:8 62:1,3,19,21
63:8,14,20 66:23
67:19,24 68:11,14
68:23 69:1,6,10,15
69:24 70:7,15,23
71:24 72:25 73:2
73:8,10 74:7 75:1
75:3,9,15 78:13,13
78:14 79:12 80:1
80:15,24 81:16
83:22 84:2,5,6

85:5,6,13 90:2
91:24 92:2,4 93:8
93:20 94:23 95:17
96:11,23 97:17,22
99:22 101:7
103:14,19 105:9
105:10 106:22
107:21,24 108:12
110:21 111:11,21
111:23 112:7,8,16
113:12 116:12,22
117:6,21 118:8,25
119:16,19 120:9
121:25 123:20,21
123:22,22 124:2
124:13 125:15
126:19 135:8,14
135:23 136:3,9
139:1 140:1,7,11
141:2,9 142:14
143:1 145:2
146:12 147:7
149:12,22 151:24
152:3 153:6,9,15
154:4 159:4
160:25 161:5
162:14 163:21,25
164:23 165:9
167:5,11,11,16
171:17,17 172:21
173:2,5,8 174:12
175:9,12 178:13
178:17 179:4
180:4,10,14 181:3
181:5,12,25
183:12 184:9,12
185:2,13 187:17
187:25 188:4,19
189:4,12 192:20
193:8,14,22 194:5
194:9,18 196:11

196:14,21,21
197:12 198:17
202:15,17 203:12
203:19 204:24
205:2,4,15,22
206:6,13 207:4,13
207:19,23 208:12
209:5,15 210:1,4,7
210:12,20 211:1,6
213:15,17,17,21
217:5 218:13
219:4,8,10,13,19
219:21,22 221:23
222:10,17 224:5
224:13 226:23
227:3,21,24 228:4
228:12,23 229:23
229:23 230:7,9
232:9,9,15,16
234:3 235:3,23,24
235:25 239:14,19
240:12,16,17,21
244:20,25 247:7
249:19 250:24
251:6 260:1,5,22
262:12,13,14
264:12,18,25
265:19 266:6
267:1,11 268:16
269:6,17 272:1,18
273:3,7,10 274:5
274:10,20 276:2,3
276:6,13 277:18
277:18 278:7,10
280:19 282:24
283:18 284:5
285:2,3 286:8,9
288:23 289:9
290:12,15,24
291:8 292:19
293:14,25 294:13

295:17 296:11
300:13 301:4,14
302:2,11,11,24
303:5,15,20,25
304:11,12,13,13
304:21 305:11
306:21 307:5,22
308:3,16,22,22
309:9 310:1,25
311:6 312:15
313:11,20 314:4
314:10 315:20
317:5,10 318:21
318:22 321:16
328:19 329:9,16
**dea's** 19:25 20:24
21:6 40:15 46:14
46:21 67:8 68:6
68:18 74:12 79:6
83:14 98:11
104:17 110:20
149:2 159:2
182:11 193:16
197:2 198:2,5,9,13
200:11 201:7
209:25 251:6
268:14 294:21
298:25
**dea0** 7:21
**deal** 18:8
**dealing** 35:15
114:8
**dealt** 34:22 329:18
**dear** 44:9 72:6,19
81:15 164:6,22
165:3 333:10
**debating** 230:24
**december** 7:13,19
44:6 62:3 184:5,5
267:19

**dechert** 2:18
**dechert.com** 2:21
**decide** 327:1
**decided** 97:8
250:16 260:22
**decision** 40:14
41:4 111:4,8,14,25
181:21 193:23
194:13,20 242:17
246:9 251:19
252:8 312:13,15
**decisions** 136:5
182:5,12 257:21
**declined** 130:13
**deed** 334:14
335:20
**deem** 112:12
**deemed** 122:8
333:19
**defendants** 10:7
254:14 315:6
328:2
**defense** 100:13
**define** 87:18 89:14
116:22 117:22
118:13 214:15
**defined** 118:10,11
145:20 150:3
152:3 213:22
215:3
**defines** 116:14
119:21 121:14
213:15
**defining** 107:25
118:9
**definition** 70:8,24
71:1,10 146:4,10
214:24
**definitional**
146:18

**deirdre** 175:3,9
**deliberations**
141:6
**delivering** 313:4
**delores** 38:19,25
39:1
**delta** 229:10,11
**demand** 181:14
**demetra** 1:15 7:3
8:9 10:11,18 54:5
106:24 183:21
331:9,14 333:8
334:4,9 335:4,13
336:20
**department** 6:19
6:22,23,24 11:6
224:6 333:22
**depending** 155:17
258:8,14,18 270:3
**depicting** 277:1
**deponent** 330:22
**deposed** 13:3,7
**deposition** 1:15
10:4 11:2,15,24
13:19,24 14:4
23:11 25:9 38:13
43:22 44:1 47:21
52:13 61:20 78:1
82:14 91:5 94:3
94:18 100:8,16
105:16 110:1
119:9 123:13
137:22 173:16
183:1 195:1 208:4
211:22 220:19
231:5 232:2 265:7
331:25 332:3,4
333:8,11 334:1,3
335:1,3
**depositions** 1:19
13:22

**deprioritized**
50:21 51:5 236:17
**deputy** 24:18 44:7
47:4 54:6 224:12
224:16 266:2,9,23
304:14
**describe** 24:2
44:12 108:19
128:22,23
**described** 92:5
129:20 151:19
155:12 157:3
163:9,16 327:19
**describes** 163:22
**describing** 74:6
218:2,6,8 272:20
290:11,14 297:25
**description** 56:8
**descriptive** 163:20
**design** 45:5 87:12
191:5,15,17
**designated** 93:2
**desire** 128:10
136:2
**details** 126:11
143:10 158:22,25
302:4
**detect** 83:16 233:4
316:7
**detecting** 15:21
16:20 288:20
**detection** 286:4
**determination**
89:2,20 193:19
249:11
**determine** 31:24
39:17 167:24
191:1 192:16
193:8,14 214:5
253:12 259:14
278:21 279:3,4

287:18 299:13
306:9 324:8
**determined** 147:3
**determines** 89:5
**determining** 147:5
151:5 247:8
248:20 249:7
297:9
**detroit** 12:19
15:10,12,13 296:2
296:4
**develop** 79:5
287:17
**developing** 268:17
269:9,21 270:15
270:17 288:2
308:25
**development**
153:5
**deviates** 26:24
89:6 150:14
246:16
**deviating** 26:13
27:4 64:4 89:2
148:21 149:20
150:3
**deviation** 147:2,6
150:2
**dialogue** 54:21
205:6
**differ** 326:2
**difference** 98:17
259:11
**different** 56:4,6
106:17 145:23
146:23 147:1
149:17 151:16
154:3,18,19 155:1
155:9,11,14,15,16
164:5 177:25
202:14 214:14,16

243:24 244:2
246:5 258:24
300:12,12
**differently** 111:21
139:25 185:9
189:4,11 190:10
190:12 267:8
**difficult** 155:21
228:12,16
**difficulties** 213:13
**dig** 43:11
**digits** 223:20
**diligence** 162:3,10
162:16 163:22
213:16,22 214:10
214:11,12,15,21
215:1,13,23
253:12,17,22
254:2 256:3
257:21 276:25
283:1 286:3 287:4
287:7 288:20
291:2 300:23
301:10 306:19
310:3 313:14,22
316:16
**dinner** 53:6
321:23
**direct** 25:18 39:10
44:23 49:21 54:8
54:8 129:9 158:5
224:17
**directed** 25:20
51:9 211:4
**directing** 23:2
207:22
**direction** 88:18
213:15
**directions** 204:14
**directive** 50:5
244:9

**directives** 203:11
203:20,24 204:4,7
**directly** 59:4
65:10 96:15 124:8
207:24 250:3
266:12 280:20
328:8
**director** 304:8
**directors** 78:20
**disagree** 230:21
**disagreed** 118:4
**disappointed**
205:5
**disaster** 147:21
**disclose** 87:12
172:14 191:6
**disconnect** 243:5
**discount** 6:15
166:21,22,24
**discovered** 148:19
**discretion** 40:17
89:10,18 194:6,9
194:12,18 242:18
245:4 251:18
252:7,12,16 253:9
253:14,23 254:3
315:12
**discretionary**
251:24 252:1
**discuss** 94:16
100:6 103:1 130:5
132:16 193:10
276:22 293:13
308:14,15
**discussed** 21:17
42:4 48:14 86:25
106:20 116:22
117:21 127:17,18
131:3 155:10
157:5

**discussing**  118:15
**discussion**  42:19
  42:24 43:17 54:22
  54:23,25 63:18
  78:15 79:1 98:21
  100:4,11 109:24
  133:24 134:4
**discussions**  24:7
  42:3,25 43:10
  57:16,18 65:17
  69:16 98:10
  134:13 199:2
  217:9,11 219:7,11
  297:6,14 308:2
**dispensed**  277:2
  283:16
**dispensing**  176:25
**disregard**  270:15
  270:21
**disrupt**  321:23
**distribute**  99:13
  154:24 235:8
  248:9 256:10
  285:8
**distributed**  134:8
  134:16,25 239:10
  248:18 256:1
  259:10 319:20
**distributes**  248:5
**distributing**
  162:11 248:16
  279:13
**distribution**
  108:21 153:2,17
  157:25 158:4
  196:12 203:12
  233:7 258:22,24
  274:2,25 279:22
  284:21 285:7,9,25
  300:20 301:7

**distributions**
  257:22
**distributor**  31:8
  31:12 32:5 46:18
  46:22 54:12,16
  55:1 64:7,12 85:8
  132:3,23,25 133:4
  133:8 145:17,24
  147:4,22 156:11
  156:14 157:6,12
  158:24 162:9,11
  162:13 165:21
  167:6 168:8,12
  170:5,10,19 171:7
  181:6,9 192:8
  193:8,10,14,19
  194:6,10,19
  202:13 214:3
  235:4 236:22
  237:8 238:8,17,24
  239:3,5,16,19,20
  239:24 242:18
  246:24,25 247:3,7
  247:11,14 251:25
  252:12,13 253:11
  253:15,21,23
  254:1,3 255:22
  256:19,24 257:19
  259:12 265:25
  279:3,12 288:9
  293:9 301:5
  309:11 313:21
  314:24 323:19
**distributor's**
  158:25 162:16
  166:6 170:6
  251:22 298:10
**distributors**  25:21
  25:23 26:3 29:16
  30:15,20 32:20
  35:19 36:7,21

  37:5,13 38:6 40:3
  41:9 43:3 46:8,13
  47:7 49:6 50:13
  51:17 54:19 58:16
  58:24 59:2,5,21
  60:13 61:4,15
  63:22 65:8,12,15
  65:18 66:3,10
  67:5,9 68:2,6 71:9
  72:23 73:1 86:19
  87:7,18 89:8,13
  90:1 99:5,11
  101:16 124:15,20
  125:11,17 126:6
  126:22 127:4,8,14
  127:19,22 128:6
  129:14,20 131:4
  133:9,11,20 134:6
  134:13 136:1,12
  154:23 156:1,4,19
  157:16 165:22
  166:3,16 168:19
  168:23,25 169:14
  170:12 192:13
  196:12 199:9
  200:1,13 201:15
  201:20 202:2,9,17
  226:7,10 237:1
  239:6,8,9,13,15
  240:17 241:1
  244:8 246:7
  249:20 250:17
  251:11,12,18
  252:8,17 253:9
  257:5,9 262:9
  265:21,23 274:5
  284:22 285:5
  286:1,10 291:7,14
  297:21,21 298:9
  300:21 301:8
  302:14 308:17,23

  314:6 315:14
  322:25 324:3,8
  325:5
**distributorship**
  313:3
**district**  1:1,2,18
  10:9,9 331:11,12
**diversion**  12:15,16
  15:6,16 16:2,8,11
  16:17,21 19:1,13
  20:14,19,24 24:19
  28:15 33:12 35:12
  35:15 38:22 39:7
  40:11,16 44:8
  46:2,7 47:18
  49:20,25 79:17
  83:14,16 93:25
  101:18 105:10
  124:10 126:25
  129:15 174:4,7,8
  174:10,12,13,16
  174:19,22,23,24
  175:1,4,11 176:4,8
  196:2 197:13,23
  199:7,23 212:16
  212:25 221:6,16
  221:20 222:17
  224:4,4,5,8,13,14
  224:22 225:2,5,8
  226:1 227:18,19
  227:20 228:1,5,13
  228:24 229:10,12
  229:21 230:11
  232:10 233:4,5,17
  233:22 234:4,5,10
  234:14 235:20
  236:1 240:25
  251:2,10,13,16
  266:2,10,13,24
  267:10 271:3
  295:18 296:22

302:12,23 303:7
304:8 315:24
316:9,11 317:19
318:5 319:13,15
319:21 320:3,5
324:11
**division** 1:3 6:24
10:10 12:19 15:1
15:9,11 16:2,8,15
19:1,8,14 39:3
47:18 65:12 93:25
105:11 111:23
148:18 212:22
213:1 221:10
224:5 266:11
291:16,21 295:18
296:2,2,3 302:12
303:8
**divisions** 174:17
304:18
**doctors** 177:6,11
316:23
**document** 1:7
43:11 52:12,20,24
53:3 62:5,7 63:4,5
71:7,17,18,22
74:22,23 75:11,12
75:24 77:24 78:5
78:6 81:11 84:20
84:22 85:1 92:14
94:9,14,15,16,19
95:10,12,15,22,24
96:5 99:25 100:1
100:1,5,7,21
105:24 106:23
119:6,7 120:11
121:4,7 125:2
135:22 138:15
144:20 150:5,10
152:11 163:20
173:15,22 174:1

206:22 212:3,9
214:12 218:12
220:10 223:9,16
227:8 232:7,15,25
235:1 246:11
253:19,24 254:4
264:3,5,14,20
265:12,16 272:16
273:11,22 275:14
278:14 313:2,20
316:25 327:14,22
**documentation**
252:13 253:8
**documents** 48:1
48:17,24 78:24
79:1,2 85:4
122:12 144:19
154:1 162:20
163:4,9,14 223:16
231:3,5,7 241:10
253:21 254:2,20
277:15 311:13
**doing** 70:16 85:10
85:12 95:9 178:17
185:8 238:1
245:20 267:1
269:19 274:8
288:23 294:13
302:13 303:13
316:16 320:2
**doj** 106:12 180:20
**dollar** 222:5
**donetta** 183:12
**doubt** 238:12
**downstream**
170:6 258:7,14
278:23 279:14
**downtown** 15:2
**draft** 17:10 80:10
101:11,13,15,23
102:2,4,5,6,8,10

102:12,18,19
118:17,19,21
**drafted** 70:3 95:23
96:4 107:5,8
**drafters** 101:17,21
**drafting** 97:16
107:2,7 109:8
118:8 122:9
176:13,23
**drafts** 115:6
311:18
**dramatic** 283:25
**drawing** 325:1
328:18,20
**drive** 1:19 2:19 3:7
4:3 10:5 331:8
**driven** 112:9
**drop** 213:9
**dropped** 170:2
**drug** 2:16 6:15,23
17:15 110:11,12
111:5 121:11
124:14 137:1,13
139:12 153:5,6,16
178:22,24 181:2
181:13 184:9
263:9 273:6 284:1
302:17 308:17
**drugs** 158:23
184:8 275:10
283:13
**due** 162:2,10,16
163:22 184:13
213:14,15,22
214:10,10,11,15
214:21 215:1,13
215:23 253:11,17
253:21 254:2
256:3 257:21
276:24 283:1
286:3 287:3,6

288:19 291:2
300:22 301:9
306:18 310:2
313:14,22 316:16
**duly** 10:19 331:15
**durkin** 6:12
**duties** 16:4 23:17
90:23 143:8,9
201:10 225:24
226:16,19,21
**duty** 15:8,10

**e**

**e** 6:24 7:1,10,16,20
7:23 8:1,6,13,15
8:17 9:1,4,7,10,13
9:16,18 38:17
39:4 47:12 48:1,6
48:9 53:5,6,13
56:13 57:7 78:8
78:12,17,23 94:21
94:21,24,25 95:2,8
96:21,22,24
100:21 101:10
105:21 106:1
123:18,19,19,23
126:10 212:7,11
218:1,6 219:23
220:25 221:19
241:12 242:1,25
243:4,23 249:25
**earlier** 95:17
145:1 150:11
164:5,21 187:2,4
191:21 204:13
225:23 236:10,12
241:11,24 251:17
258:5 309:25
318:18 323:14
**earliest** 60:12
**early** 57:18 71:10
81:13 101:24

102:3,5,14 187:3
easier  31:9 172:18
easily  164:12
east  2:14 6:8,13
eastern  1:3 5:20
  10:10
easy  255:16
  326:23
educate  308:13
educating  276:5
educational
  275:25
effect  96:14
  112:17 148:6
  234:15
effective  42:4,20
  42:21 55:6 89:17
  89:18,19 101:17
  104:14 137:1,13
  139:12 251:12
effectively  83:17
effort  159:17,18
  200:10 205:3
  236:1
efforts  79:5
  196:10 234:10,13
  238:15 251:23
eight  19:10 216:14
  254:16
either  50:18,21
  76:17 77:3 115:11
  124:1 202:24
  235:24 240:24
  258:7,14 324:18
element  26:6
elicit  244:1
elizabeth  265:18
  265:25
ellis  4:21
email  333:17

embarcadero  3:3
emphasis  122:4
  237:4
emphasize  238:7
  238:19
emphasized  67:6
  68:4 237:3,13,13
  238:6,19,25 239:4
employee  222:17
  247:7
employees  174:12
  195:16 318:15
employment  14:17
  34:8,10,12 142:14
  143:1 226:23
  227:24 228:11
  229:8
enable  56:17
enables  280:22
  281:12
enacted  317:18
enclosed  333:11
encloses  63:4
  100:24 123:23,23
encompasses
  213:18
encompassing
  69:18
encountered
  270:20 329:9
encouraged  66:23
  67:19,24 193:9
encouraging  72:25
endo  3:18,19
endorse  41:23
  42:2 45:6
endorsed  42:12
ends  94:21
enforcement  6:23
  111:5 112:1
  121:12 137:1,13

139:12 178:25
  184:9 273:6
  302:18
enforcing  19:16
  19:21
engage  83:17
  98:16 162:16
  174:18 205:6
  269:25
engaged  154:18
  291:20
engagement  21:12
  21:19 22:1 50:6
  50:10 69:17 98:12
  250:3
engagements
  85:21 104:24
engages  154:17
engaging  16:19
  21:21 65:11,12
  103:11 291:22
enhance  129:24
ensure  20:23
  42:22 83:13,15
  84:21 90:21
  190:14,25 197:23
  198:10,14 250:22
  250:24 258:13
  270:1,3,5 303:6
  315:14
ensuring  16:5,20
  136:25 137:12
  139:11 198:2
  233:7 234:6
entailed  143:8,9
entered  335:9
entire  295:2 334:5
  335:5
entities  249:5
entitled  265:17
  313:3

entity  323:18
enumerated  151:4
epidemic  46:23
  47:1 54:24 268:18
  269:21 270:17
  308:15,24
eppich  3:11 262:1
  262:6,20,24 264:8
  264:11 265:1
  268:8 275:16,21
  277:23 287:24
  295:9 306:2
  311:10
equals  224:24
  225:15
equates  166:23
eric  6:12
erica  4:21 144:12
erica.zolner  4:23
errata  333:13,18
  335:7,10,18 336:1
especially  83:4
  86:14 242:14
essential  108:3
establish  108:4
established  227:9
establishing
  189:17
estimate  186:4,21
  186:25
et  1:8,10,12,12
evaluated  143:17
evaluation  17:16
evening  327:9
everybody  115:18
  303:20
everybody's
  303:20
everyone's  303:21
evidence  205:17
  262:2

evidently   103:24
eweiss   6:14
exact   321:17
exactly   31:25
  50:15 60:1 154:16
  161:19 189:21
  219:15 227:9
  257:14
examination   1:16
  7:2 10:21 144:10
  231:21 255:3
  327:11
examined   10:19
example   51:7 64:1
  79:5 147:21
  157:15 237:2
  238:3 251:24
  256:20 257:5
  260:12 274:22
  277:18 278:7
  291:22
examples   147:15
  148:3,7,9 154:6
  213:16 219:9,21
  237:11 238:4
  294:19 295:15
excessive   28:21
  30:8,21 31:22,25
  32:14,16 33:4
  35:20 36:5,8
  39:13 136:6
  319:18,19 320:10
exclusively   182:5
excuse   78:15
  215:15 232:25
  299:16 304:13
executed   335:10
execution   334:14
  335:19
executive   20:12
  96:12,14,16 255:9

329:16
executives   263:17
  263:19
exemplifying
  284:19 285:23
exercising   162:2,9
exhibit   7:12,14,15
  7:16,18,20,23 8:3
  8:6,9,11,13,15,17
  8:20,23 9:3,4,6,7
  9:10,13,16,18,20
  9:21 11:16 14:1,2
  14:5 25:8,10
  38:11,14 43:22
  44:2 47:20,22
  52:11,12,14 61:19
  61:21 76:3 78:2
  82:12,15 91:6
  94:1,4,8 99:23
  100:17 105:15,17
  110:2 119:10
  123:12,14 137:21
  137:23 144:16
  164:24 165:13
  173:17 176:14,15
  180:13,22 183:2,5
  183:19 187:15
  191:21,24 195:2
  206:19,20,22
  211:23 212:2,9
  215:6,12,15,20
  216:7 220:20,24
  223:16,22 224:20
  225:23 232:3,8,11
  232:14,25 233:24
  241:10,22 243:4
  263:25 265:8,12
  272:16 280:1
  313:1 327:13
exhibits   110:8
  291:6

exist   112:9
existed   56:6 98:24
existent   86:6
existing   118:14
  311:24 312:3
exists   86:23
exits   153:8,11,12
expand   21:13
expect   83:7 86:16
expectation   40:12
  40:19,22 41:2
  259:24 268:14
  281:23 282:8
  294:22
expectations
  46:14 67:8 68:6
  79:6 205:2,23
  206:7
expected   161:24
  163:15
experience   30:6
  45:25 84:23 86:17
  86:18 87:17
  107:23 108:12
  121:25 122:3
  135:6 136:8,17
  137:7 145:2,14,15
  147:8 148:4
  149:22,23 150:24
  151:18 162:14
  166:23 167:8,9,11
  167:18,23,25
  168:6,11 179:2
  182:3,12 194:2
  196:20 210:3,25
  222:16 228:22
  229:22 230:9
  234:3 235:22
  236:7 247:10
  269:1,12 271:12
  274:4 275:5 276:1

279:2,19 285:1
  286:7 290:24,24
  291:20 301:3
  307:22 311:2
  314:14,15 315:11
experienced
  250:14
expert   12:22 13:4
  320:22 321:6
  322:15,25 323:19
  324:3,9,21 326:5
expiration   334:19
  335:25 336:25
explain   21:14 26:9
  27:6 126:3 156:9
  197:21 200:23
  202:14,16 294:21
explained   165:9
  215:19,23 280:21
  283:25 308:12
explaining   108:20
  161:5 200:10
  286:12
explanation   81:17
  181:13
explicit   45:9
explore   231:2,10
  319:2
explored   223:17
exploring   201:9
express   196:10
  240:20
expressed   59:3,20
  60:9,10 107:21,23
  108:6 128:10
  136:2
extensive   261:1
extensively   258:5
extent   34:23 68:15
  130:16 141:5
  143:7,10,25

171:20 172:10
218:8 234:9,13
261:10 280:11
325:13,19 326:10
329:2,4
**eyes** 82:9

**f**

**face** 203:8,11
**fact** 13:3,7 23:22
75:8 93:8 117:20
117:20 125:15
132:22 133:12,20
134:6,14,24
142:21 180:3
187:4 207:25
249:5 256:9,19
259:25 267:16
303:17
**factor** 247:15
248:18 249:6,9,10
**factors** 151:3,4,11
151:19 246:8,23
247:2 248:23
**facts** 205:16
246:25
**factual** 23:14
**failing** 261:24
271:2
**fails** 49:7
**failure** 46:17
**fair** 240:14,15
250:10 256:13,24
257:10,22,25
259:16 263:10
283:2 291:9
310:13,15,25
311:25 313:23
314:8 325:8,10
**fallen** 49:9
**falls** 34:8,9

**familiar** 24:23
86:25 131:17
132:5 136:25
141:19 152:20
153:1 165:15,17
**familiarity** 195:20
**familo** 6:12
**family** 183:11,22
187:24 188:3
189:3,10 190:9,19
191:15 192:8
**far** 125:9 126:9
198:7 200:25
**farerll** 2:8
**farrell** 2:7
**fast** 96:21 255:15
**february** 8:24
38:18 61:8 110:15
124:8 241:25
243:23 244:19
245:7
**federal** 56:15
146:15,17 150:9
152:4,10 160:5
161:11 215:19
216:2
**feel** 42:20 174:6
295:3 308:22
**fell** 15:23
**felonies** 263:7,19
**felony** 263:18
**felt** 21:19,20,23
31:23 38:9,10
40:10 60:10 98:14
98:22,25 104:24
184:15 219:13
235:12,16 240:13
250:20 295:21
302:15
**fewer** 234:15

**field** 12:19 15:1,9
15:10,20 16:1,15
18:25 19:14 21:25
28:18 31:6,11
39:2,19 50:5 65:3
65:7 87:17 101:15
107:23 111:23
126:9 148:17
200:25 212:22
213:1 237:23
242:2 243:6 259:7
266:11 268:5
275:5 284:5
291:16,21 295:24
295:25 296:1,2,2
297:6 303:18
307:15 318:16
**fielding** 40:9
**fifth** 203:6 208:3
**fight** 326:15
**figure** 288:8
**file** 272:19
**files** 300:23 301:10
306:19
**fill** 39:20,23 242:4
244:14,21
**filled** 259:15
**final** 78:12,12,14
119:18 161:12,13
161:15 162:19,22
163:4,9,14
**finally** 56:11
116:11,12 119:19
**finance** 4:24
**find** 76:7 103:1
164:12 192:23
208:16 219:20
276:2 333:11
**fine** 22:9 260:13
260:17

**finished** 199:17
207:3 252:21
254:17 321:10
**firm** 282:16
**firms** 325:3
**first** 10:19 11:3
14:25 15:8,10
38:19 48:1,12
49:15 52:18 60:23
61:3,7,11 63:9,10
63:14 67:1,2,20,21
67:22,25 84:9
87:3 91:10 93:17
98:9 111:3,18
112:5 113:21
116:9 119:18
124:5,17 159:3
177:2 180:25
181:20 183:19
190:3 191:4 195:6
195:12 206:23
212:7 213:3,25
226:12 232:6,9
244:15 255:11,11
269:16 277:3
284:24 286:5
297:22 298:22
301:1 306:11
307:20 308:19
309:6 311:21
317:6 320:20
323:20 327:13,17
331:15
**five** 13:25 19:2,8
35:16 39:8 78:24
79:3 80:3 224:18
224:19 254:12,15
**flag** 145:16
**flagged** 112:13
**flatly** 205:4

flexed  225:11
flexibility  108:2
flip  204:20
floor  2:3 3:21 4:7
  5:12 6:13
florida  203:13
  298:17 308:15
focus  20:23 240:21
focused  90:22
focusing  279:22
foley  6:7
foley.com  6:10
folks  54:20 228:19
  234:6,15 235:21
  251:1
follow  78:9,10
  116:16,24 117:24
  119:23 121:16
  219:20 271:17
  272:4 286:9
  288:13 309:22
  310:13 319:12
following  16:5
  66:24 67:19,24
  82:24 272:24
follows  10:20
  39:14 72:24
  135:24
food  175:23
force  307:13
forced  184:15
foregoing  331:21
  331:25 334:13
  335:18
forgotten  43:23
form  22:8 28:23
  29:25 30:25 31:1
  32:22 33:5 35:23
  35:24 36:11,12,24
  37:8,9,16,17 38:8
  40:5,23 41:11,25

42:14 44:20 45:19
45:20 46:24 50:23
64:14 65:9 72:17
74:19 80:5 85:19
87:21,22 90:11
93:12 99:7 100:5
103:16 104:9,15
104:16 113:7,17
122:21 125:18
128:13 131:6
135:10 136:15
139:13 140:20,23
141:3,14 146:6
148:12 149:12
151:6 152:17
155:2 156:5,21
157:8,20 159:3,7
160:8,14 161:1,18
162:18 163:17
164:25 166:4,7
167:14,15 168:9
169:2,16,24
170:14,21 171:9
172:23 177:13
178:14 179:17
180:16 181:15
182:9,15,16
185:16 186:1
188:20,24 189:6
189:13 190:21
192:2 193:25
194:1 197:16,17
198:19 200:17
201:12 202:4,25
204:5,15 207:6
211:2,16 214:17
215:21 216:3,22
219:16 234:17,18
237:6 242:8 243:8
243:9,16 245:11
245:24 248:22

251:3,4 256:6,15
257:1,12,23
258:16,17 259:1
259:18,21 260:8
260:16 261:4,19
262:1,6,16,18
263:11 266:7
267:2,13,23 268:7
268:19,22 269:10
269:22 270:18
271:4,7,20 272:5,6
272:8 273:14
274:9 275:6 276:7
276:15,17 277:21
278:5,12,24
279:16 281:4,19
282:6 283:3,6
285:11,14 286:11
286:18 287:11,22
287:23 288:10,25
289:1,2,11 290:17
290:20 291:17
292:1,23 293:1,16
294:6,15 295:7
296:16,18 297:12
298:5,8 299:8
300:15 301:19
302:6 303:2,3,4
304:3 305:17
306:1,2 308:5,7
309:1,2,16 310:14
311:1,8,11 312:1,8
312:21 314:11,12
315:8 316:2,5,18
317:13,14,21,22
324:14
formal  160:24
formally  161:15
  164:1
format  69:6 232:8
  232:16

former  225:25
  328:13
formula  88:3
formulaic  230:19
formulate  314:24
forth  54:11 96:18
  142:20
forthcoming  71:2
  122:19 305:23
  306:4
forward  23:19
  78:10 82:25 94:18
  96:17,21 97:4
  100:23 255:12
  299:14 333:15
forwarded  78:16
  178:12
forwarding
  102:21
forwards  100:24
found  262:14
foundation  259:1
  262:17,19 268:8,9
  269:11 271:9
  272:7 273:16
  274:15 275:16,21
  276:16 277:22
  278:13,25 279:17
  281:20 283:4,19
  283:20 285:12
  289:1,12 290:18
  292:24 293:17
  296:16 297:13
  300:15,16 305:18
  307:6 308:6,7
  311:10,12 313:16
  317:12,22
foundational
  142:5,7
four  66:24 67:17
  177:25 223:20

224:2
**fourth** 72:24
**fox** 6:2
**foxrothschild.com**
6:5
**frame** 22:3 35:20
177:14 214:13
273:15
**franklin** 169:24
**frankly** 329:14
**free** 334:14 335:20
**frequency** 26:21
64:5 148:23
150:21 151:1
186:21 246:20
**frequent** 56:4
186:18 187:10
**frequently** 31:21
31:22 32:1
**friend** 222:14,15
**front** 78:7 217:1
237:19 241:23
293:22
**frustrated** 222:16
222:22
**fulfill** 260:6
**fulfilled** 39:18
**fulfilling** 136:3
**full** 63:18 83:5
86:15,19 190:3
191:4 213:3 264:3
**fully** 92:8
**functions** 19:13
20:18
**funny** 159:16
**further** 7:8 14:14
53:14 69:22 86:3
93:4 94:16 99:4,8
104:6 112:14
118:10,11,12
193:10 222:12

304:25 315:22
326:25 327:11
330:22 331:14,24
332:2,6
**furtherance** 190:1
190:4
**future** 94:17
111:22 273:12
**fyi** 102:22

**g**

**gained** 107:18
**gallagher** 62:9
63:1 79:13 80:1
**gallagher's** 62:11
**gao** 89:24 90:19
91:12,15,21,22
92:1,2,6,7,15 93:2
97:7
**gao's** 90:25 92:6
**gap** 55:10
**garriott** 212:11,15
212:16 217:9
218:24
**garriott's** 212:23
219:6
**gary** 48:3
**general** 12:12 19:5
27:1 34:12,16
101:14 133:1
143:8,9 201:2
213:24,25 214:2
225:24 226:15,19
226:21,23 274:10
281:15 282:23
283:17 284:6
286:7 291:14
**generally** 12:10
214:10 271:6
277:17 278:8
280:6,25 285:21
287:20 294:11

301:13 307:16,24
**generated** 29:17
**getting** 24:4 85:21
101:14 143:10
188:15 196:22
197:4 200:25
219:3,14 244:17
249:24 263:21
284:10
**gina** 1:24 10:13
331:4
**gist** 32:12
**give** 25:5 34:1
43:12 45:17 51:6
119:4 138:17
147:15 154:6
172:18 237:10
281:2 292:17
293:10 314:5
**given** 23:10 33:18
50:9 53:2 78:7
94:20 105:20
126:7 130:6,9
131:23 143:23
153:13 184:10
219:10 226:6,9,18
232:21 331:17,22
**gives** 283:8
**giving** 23:9 51:14
51:24 70:16,23
95:18 105:20
139:16 226:3
276:5 279:13
313:11,20 323:19
**glad** 319:7
**global** 54:23
**globally** 20:22
304:23
**go** 14:14 18:24
20:9 22:23 23:19
28:14,25 32:11,25

33:16,21 35:3
36:2 40:7 42:17
43:13 46:3 51:4
53:14 60:15 63:9
63:17 66:22 71:23
72:22 74:2 75:11
77:1,23,23 81:25
82:20 84:18 86:21
87:25 88:9 90:13
92:18 93:14 99:23
106:23 107:14
109:7,21 117:14
118:7 120:7,13
122:6 125:22
126:14,16 129:4,8
136:20 172:1
178:16 188:14,17
192:21 200:12
215:5 241:13
247:19 252:19
254:19 255:12,14
275:14 280:1,18
287:23 288:5
290:5,6 292:6
297:4,8 299:2,16
300:1 303:18,19
304:24 308:11
312:25 316:12
320:8,9,10,13
330:9
**goal** 101:22
239:12 279:9
**god** 328:19
**goes** 14:15,16
44:14 63:23 64:1
91:24 174:11
198:14 225:24
226:5,22 279:21
282:11 284:18
298:13 299:1
319:17

**going** 11:3,5,10
14:1 15:20 21:9
23:4 25:5,18 32:8
33:6,9 34:17 35:7
39:10 40:18 43:11
48:15 52:20 54:7
54:8 58:8 62:21
63:5,6 66:25
74:24 75:4 76:10
76:10,14,19,24
77:5,13 82:12,19
82:21 86:12 92:13
94:14 97:2,4,14,15
99:24 107:14
115:15 118:2,12
118:15,16,24
120:8 121:8 125:5
125:18 126:11
129:9 130:11,20
131:1 132:6,11,11
136:24 137:16,19
138:9,11 142:9,17
142:21 143:4,21
144:1,14,19,23
154:2 159:20
163:24 173:15,20
180:25 193:22
194:23 195:5
197:15 201:8
212:6 213:11
218:16 220:6,23
220:24 224:1
225:19 229:1,5,17
230:13,16 231:24
234:18 246:4
250:8 255:12,16
257:10,14,17
259:9 263:20,25
264:4,5 268:15
273:25 277:25
278:4 280:1,18

288:6,7 290:6,19
293:4 299:25
302:1,3 304:24
306:10,11 307:10
307:15 312:25
316:12 319:11,11
319:19 320:12,20
321:20 322:1
323:10,11 325:20
**good** 10:23,24
55:3 101:13
107:15,24 108:12
108:18 109:7,7,14
123:17 211:21
231:19 269:15
273:20 276:10
290:6 319:9 326:1
327:9
**gotten** 52:24
**governed** 275:11
**government** 13:3
23:13 33:24 89:24
90:19,22 92:25
94:10,13 100:2
132:3 318:15
326:14 328:5,5
330:11
**government's**
318:14 330:13
**grant** 5:13
**graphs** 277:1
297:19
**gray** 5:2 59:9,14
60:24 61:4,12,14
61:25,25 62:16
78:17,17,18,23,25
81:2 107:15,24
108:11,18 109:7
109:14,15,18
**great** 138:12
144:23 183:18

**greatly** 64:21
**greene** 2:7
**greets** 237:17
238:2,16
**grievance** 185:2
**ground** 112:8
**grounds** 34:2
211:9 263:21
278:5 285:15
290:20 293:1
296:25 299:10
323:12
**group** 16:7,9,17
16:25 17:3,3 39:1
52:8,9 53:16
58:15 174:22
176:9 178:22
181:2,13 196:2
212:21 221:8
293:22 294:4
**groups** 16:8,11
17:2,21 19:8,10,11
58:10 204:25
293:25
**growth** 20:21
**guards** 298:19
299:5
**guess** 17:20,22
26:5 38:2,3 49:23
55:25 56:10 57:15
95:3 98:22 101:2
106:4 133:23
150:2 166:21
167:4 186:9
201:15 210:13
267:7 269:15
316:23
**guessing** 102:14
**guidance** 26:17,20
26:23 33:3 44:15
44:19 59:1 63:20

64:2 79:7 81:12
81:17 83:19 84:13
85:7 86:3 90:1,3
92:3 97:9,19 99:4
146:13,15 150:5
152:11 162:15
179:13,19,23
180:4 185:13
186:5 190:8,13
217:5,8,10,13,19
218:3,21 219:4,9
219:14 240:17
292:18 293:10
314:6 330:1,1
**guidelines** 32:20
**guilty** 263:7,17,18
263:19
**guns** 143:4
**guys** 290:5 311:12

**h**

**h** 7:10 8:1 9:1
**h.d.** 5:10 217:2,9
217:18 218:2,3,20
218:21 219:2
**habit** 82:11
**haddox** 53:9,16,20
54:4
**haddox's** 56:2,13
**hahn** 5:7
**half** 17:13 142:20
220:7
**halfway** 135:24
**hand** 121:6 173:22
176:18 220:23
234:5 250:25
258:11 332:11
**handed** 25:13
47:25 110:7
123:17 265:11
**hands** 200:16

**[handwritten - identified]**

handwritten  96:4

happen  32:6
150:18 236:8
303:19

happened  18:18
80:9 81:9 125:15
284:4

happening  36:4
51:9 256:23
270:25

happy  100:14
101:24

hard  186:9

harming  196:14

harvard  178:21
181:1,13

hbc  5:15

hda  58:19 59:7,16
61:9 71:8,24
72:24 73:10,21
75:2,8 78:10,11
81:12 105:6,10,21
105:24 107:17
108:2 122:13

hda's  74:5 78:20
109:2

hdma  58:11,15,21
59:16 62:3 63:8
63:14,17,19 66:22
66:23 67:6,18,19
67:24 68:4,25
73:6,7 78:14

head  59:16 243:22

headed  48:4 63:10
107:15

heading  92:1
313:7

headquarters  17:8
17:15,25 18:22
20:11,14 38:24
41:14 47:5 50:2,4

50:12 62:13 65:4
65:6,11 87:17
93:18 175:5,9,13
236:13,14 237:5
237:22 241:1
242:21 243:6
245:23 266:10
273:6 274:13,14
291:23 300:8
303:19 304:6

health  3:18 4:14
184:6 257:6
262:10

health's  184:13

healths  256:20

healthy  55:3

hear  59:7 66:10
192:5 265:14
323:14

heard  49:5,17 59:4
111:8 158:7
229:22 230:4,5,6
273:1 296:21

hearing  9:6 48:18
48:19 60:13,24
61:4 171:14

heart  132:6

held  10:4 24:11
61:8 62:2 78:19
273:5 304:6

help  42:22 85:24
136:4 174:17
190:14 206:18
215:6 241:1
250:22 251:5,11
251:14,15 257:20
274:6 285:6,10,19
292:17,18 294:20
294:21 295:15
299:12 301:16
310:1 313:21

314:6 330:2

helpful  66:9,20
178:2

helping  15:21
17:10 127:14

helps  52:4 83:13
101:16

hereinbefore
332:5

heretofore  331:6

hereunto  332:10

hi  58:7 95:9 96:3
144:12

hierarchy  304:12

high  303:25

highest  304:20

highlight  273:25

highlights  91:12

hill  98:10

hire  228:5,12,23

hired  15:1 228:20
326:4

hiring  101:20
227:6 228:1

history  14:17 34:8
34:10,13,16
226:23 227:24
228:12 229:8

hit  175:18 301:25

hold  51:19 54:13
55:9,11,12,15,23
72:14 204:24
236:16 238:9
239:16,20

honor  261:24

hope  95:9 101:15
103:1 178:1
245:16 250:19

hopefully  231:25
255:16

hoping  75:3
232:22 249:25

host  237:21

hosted  61:8

hostile  289:18

hour  1:21 57:21
142:20 220:7
254:16

hours  13:23,25
254:12,15 291:4

hubbard  5:17

huh  35:17 154:11
203:9 224:25
247:25

hunter  2:2 255:8

huntington  2:9

hydrocodone
283:15

hynes  4:16 260:9
265:3

hypothetical
249:3

**i**

i.e.  86:18 88:14

idea  131:10 239:7

identification  7:11
8:2 9:2 11:17 14:6
24:24 25:11 38:15
44:3 47:23 52:15
61:22 78:3 82:16
91:7 94:5 100:18
105:18 110:3
119:11 120:3
123:15 137:24
173:18 183:3
195:3 211:24
220:21 232:4
265:9

identified  40:13
92:7 112:6 192:8
195:8 245:3

**identifies** 64:6
273:7
**identify** 26:3,10
26:13 40:19 67:9
68:7 87:8 241:14
315:23
**identifying** 32:15
212:8
**ignore** 18:15
**ii** 239:10 275:8
**illicit** 196:12
315:23
**illinois** 1:20 2:20
3:7 4:3,22 5:18
10:6 17:2,4 19:3
212:18,19 331:1,6
331:9 332:18
**imelda** 94:22 95:3
**immediately** 122:6
**impact** 236:2
**implement** 92:6,8
288:14
**implemented**
197:3 252:15
292:20
**implementing**
209:8,16 210:24
213:13 240:8,11
240:18 241:3
246:6 329:11,19
**implicit** 45:8
**implying** 56:5
**importance** 83:1
86:10 286:2
288:19
**important** 46:8
49:19,24 83:11,20
84:12,14 103:9,10
104:4 131:15
295:4

**impossible** 235:6
**impression** 219:6
**improper** 139:7
139:18
**improve** 21:13
47:6 92:2
**inappropriate**
33:23 68:20
**inappropriately**
303:24
**inbox** 175:19
**incentive** 148:5
165:22 166:15,17
166:19,23
**incentives** 166:21
**include** 46:10,12
64:3 148:21
**included** 100:10
100:15 333:13
**includes** 132:23
**including** 213:16
285:3
**inclusive** 314:21
**incorporated**
335:12
**incorrect** 41:1
**increase** 50:6
178:2,7 179:4,24
258:23 284:1
**increased** 21:11
228:5 234:14
284:2
**increases** 180:15
181:8
**increasing** 182:1
**incredibly** 289:14
**incumbent** 315:13
315:22
**independent**
195:14

**indiana** 4:19 5:8
19:3 221:14
**indianapolis** 5:8
221:9,11
**indicates** 45:3
63:21 64:2
**indicating** 333:13
**indication** 73:1
**indirectly** 328:9
328:10
**individual** 178:16
**individuals** 24:6
107:8 304:16
**industry** 21:12,21
24:5,5 29:24
58:10,15 70:4
71:25 72:3,12
101:15 106:13
198:25 199:1,6,8
199:25 272:2,3
310:24
**indy** 222:1
**inform** 65:6
148:17 187:23
191:8 308:13
**informal** 54:20,24
**information** 17:25
29:10 54:7,19
66:19 73:11,22
79:4 83:4 86:13
124:9,20 125:12
125:17,24 126:1
126:21 127:12
128:19,25 130:4,6
130:7,11,18 131:2
132:17 133:9
135:7,17 136:4
156:14 157:6,12
157:19 165:23
166:17 167:19
168:1 170:11

171:6 172:11
176:8 177:6,11
178:1 193:2 214:4
226:3 242:15
247:12 258:1,22
262:13 263:4,15
276:6 281:24
282:3,4 305:5,24
306:8 325:20
329:2 330:13
**informative**
275:25
**informed** 136:5
163:25 171:17
172:21 173:3
181:12 307:14
**initiative** 54:12,16
55:7 165:9,11
236:22 237:8
238:8,9,24 239:4,5
239:16,20
**initiatives** 21:24
50:7,20,20 55:20
236:15,21 237:12
238:5,17,18
**input** 101:14
182:1
**inquire** 129:8
132:4 143:2
**inquiry** 216:11
217:17
**inside** 63:7 91:11
91:17
**insight** 107:19
**instance** 31:20
158:23 171:16
172:21 173:2
**instances** 45:17
194:21 202:1
203:18 204:2

**instruct** 40:16
142:18 143:5
225:19 229:1
230:14 321:13
322:11,17,22
325:14,17,19,22
326:9 329:3
**instructed** 37:13
142:2,3 143:20
**instructing** 35:6
125:3 223:8
226:24 229:15
**instruction** 131:1
132:7 143:22
**instructions**
131:24 142:24
**insufficient** 31:13
**intended** 111:22
196:21 314:20
319:17 320:9,12
**intention** 207:20
**interacting** 56:16
**interaction** 301:4
**interactions** 91:24
103:4 129:13
180:11 249:19
**interest** 112:7,10
122:5 231:24
**interested** 53:5,8
108:11 191:9
332:8
**interesting** 54:7
292:11
**interference**
188:15
**internal** 12:3 33:2
105:24 141:5
174:12 237:17
**internally** 101:23
102:3

**internet** 120:8
248:9 255:25
256:1,10
**interpret** 115:18
148:24 222:12
**interpretation**
109:1 111:24
149:2 210:7 211:6
216:12
**interpretations**
117:6
**interpreted**
111:19,21 314:21
**interrupt** 199:15
199:18
**interrupted**
194:17
**interrupting** 200:6
**interruption** 191:8
**interviewed** 90:24
**introduce** 137:18
**introduced** 138:5
255:7
**introduction**
63:11
**inventory** 147:24
**investigate** 198:18
233:5
**investigation** 32:8
39:24 88:21
198:21 217:18,23
217:24 218:2,4,6,9
218:14,20 244:15
244:21 245:2
260:18 261:1,7,15
263:15
**investigations**
15:18 16:5,18,19
20:20 228:17
260:2,4 261:9
294:3

**investigative** 19:7
**investigator** 15:6
15:16,20 16:2,3
28:15 33:12 38:23
40:11,16 199:7,24
212:16 213:1
216:16 217:19
221:7,16,21
232:10 269:2
296:12
**investigator's**
319:16
**investigators**
20:23 174:23
176:5,8 224:6,15
224:22 225:2,5,8
225:10 226:4,17
226:18,20 227:2
227:18,19 228:1,6
228:13,24 229:10
229:12 240:25
274:10
**invitation** 105:9
**invited** 140:1
**invoices** 154:1
**involve** 142:15
**involved** 16:16
19:16,21,24
154:24 172:12
260:2 267:9,16
305:2
**involving** 255:13
308:16
**irrespective**
311:16
**issue** 38:5 49:18
52:21 54:23 103:9
103:10 130:2
132:9 133:13
142:19 149:5
198:18 204:17

207:13 278:2
289:22 321:17
**issued** 11:11 32:19
69:23 89:25
126:18 175:16
271:25
**issues** 48:18 60:24
60:25 101:22
127:4,9 180:6
230:22 269:2
284:20 285:7,24
317:3 324:10
**italicized** 203:8
**item** 224:20
**items** 29:15,17,17
32:13 292:7 299:7

---

**j**

**j** 2:2 3:2,6 6:12
**jack's** 48:17
**james** 6:22 110:21
114:22 212:12,19
212:21
**janssen** 3:24
**january** 47:16,17
48:7,19
**jennifer** 4:12
**jhynes** 4:18
**jim** 114:24
**jmahady** 2:16
**job** 14:25 15:25
17:5 18:4 19:23
35:14 103:4
129:20 135:6
221:25 222:2,11
240:24 241:5
270:10 271:16,18
271:22 286:15
287:9 290:6
301:16 303:13
310:10 313:13,14
318:22,23 320:3

**jobs** 135:6
**joe** 195:7
**john** 59:9,14 60:9
  60:24 61:4,12,25
  62:15 78:17 81:1
  94:22
**johnson** 3:23,23
**joined** 93:17
**jones** 3:2,5
**jonesday.com** 3:4
  3:8
**joseph** 2:13 21:2
  22:13 44:7 62:8
  266:1
**joshua** 3:15 5:12
**joshua.davis** 3:18
**jr** 2:8 4:16
**judge** 1:8 97:10
  187:13
**july** 73:7
**jump** 35:10
  263:24
**jumped** 18:14
**jumping** 231:25
**june** 8:3,20 62:1
  62:12 78:9,18
  89:25 116:21
**jury** 265:13,15
  266:4,22 275:19
  294:12
**justice** 6:20,22,23
  6:24 11:7

**k**

**k** 2:13 3:11 4:7
  331:3
**kaspar** 5:17
**kaspar.stoffelma...**
  5:19
**katherine** 123:21
**kathleen** 53:9

**kathy** 62:9,11
  79:12
**keep** 58:8 126:13
  132:11 211:21
  252:4 307:14
**kelly** 6:3 105:9
**kept** 252:6,11
**ketcchum** 2:7
**kevin** 110:9
**key** 63:17
**kind** 17:19 66:19
  154:16 155:17
  167:12 168:1
  186:21 282:3
  295:4
**kinds** 65:14 204:3
**kirkland** 4:21
**kirkland.com** 4:23
**kmatic** 6:10
**knew** 114:6 242:7
**know** 11:4,11 15:3
  15:22 16:25 17:22
  21:18,25 24:10,13
  27:8 28:11 29:7,8
  30:14 32:14 34:9
  38:1,20 41:17
  42:17,22,23 48:24
  50:1,15 59:14
  60:23 63:11 66:20
  69:16 70:3 73:20
  74:15 75:12,15,19
  80:12,15,23 81:1,5
  82:2 84:25,25
  90:14,22 93:19
  98:5,11,21 99:14
  99:16,18 102:1,4
  102:16,18,19
  103:3,5,8,18 104:2
  104:6 106:16
  107:3 109:13,13
  109:18 119:1

121:3,5,25 122:22
123:25 125:19
137:3 142:8 143:2
144:20 147:19
149:25 150:6
152:18 155:20
156:6,11 157:21
158:7,22,24
159:16,20,23
160:6,12,17 161:2
161:10,14,24
162:10 163:10,15
163:25 164:2,16
164:18 165:9
166:9,10,12,14
168:3,4,10,14,18
168:20,21,23,24
169:3,5,7,13,17,19
169:20,21,25
170:3,4,7,8,9,10
170:15,15,18,22
170:24,25 171:1,4
171:5,5,8,11,12
175:15 178:14
179:7,10 180:2,22
181:12,16,17
184:20 185:3,8,19
186:10,17 187:2
187:14 188:5
192:14,15 196:9
198:20,25 201:17
204:8,9 206:15
207:7,8,13 208:1,8
208:10,12,14,18
208:22 211:12,13
211:14,17 214:9,9
214:21 215:2,4
216:9,20 217:3,5
219:25 220:5
222:9 223:24
227:6,15 228:4,8

229:9 230:19
231:4 239:14,17
239:22,23,25
240:2,4 241:23
243:10,20 244:2
248:12,13 249:24
256:22 257:9,14
259:8 261:14,18
261:22 268:11
269:18 272:25
273:11 275:3,7,15
277:14,15 278:11
278:15,20 280:10
287:9,9 293:3
300:3,20 301:6,7
308:8,9 309:13
327:9 328:21
**knowing** 158:1
  161:6 162:4
  163:23 213:18
  216:7 259:8
  276:25 277:20
  282:20 286:3
  288:20 292:8
  297:25
**knowledge** 14:12
  23:16 24:8 28:7
  32:19 68:11,15,23
  69:12,13,21,22
  70:1,7,15,20,22
  72:11 74:3,4,6,17
  74:18 80:19,21
  81:19,25 82:1
  84:4 85:5,10 88:2
  88:5,10,11 97:24
  102:2 103:2,18,20
  115:15 123:1
  126:4 135:5 146:2
  150:20 152:2,23
  155:25 156:22
  157:25 159:21

160:2,3,4 161:9
164:4 165:7
166:20,22 167:17
168:16 171:21
172:11 174:14
179:8,9 198:17
207:5 208:15,19
216:23 218:19,23
219:19 225:10
227:25 228:2,11
238:25 257:20
259:8,11,13
261:10 263:14
268:4,12,16,21
277:25 280:7,12
280:16 281:6
**known** 149:16,24
150:22 258:6
**knows** 68:15
261:11
**kobrin** 5:12,14
313:15,25
**konka** 53:9
**kristina** 6:8
**kroger** 241:12
**kroger's** 39:13
**kyle** 321:16

**l**

**l.p.** 1:8,10,12 2:21
**labeled** 32:14
175:23
**lack** 46:21 213:15
262:16 272:7
288:25 291:8,13
**lacks** 300:16
**laid** 162:20
**language** 98:24
117:25 140:2
159:21 160:4
161:14 181:20
191:23,23,25

192:18 203:8,25
305:20
**lardner** 6:7
**large** 89:6 282:18
**larger** 149:24,25
271:1 294:4
**lasalle** 4:22
**lastly** 134:22
**late** 42:8 52:17
222:5
**launching** 124:14
**law** 137:4 159:2
288:14 310:12
312:6,6,9,9
**lawyer** 328:5
**lead** 289:23
**leadership** 62:24
63:2 65:7 66:10
187:3
**leading** 289:4,15
290:3
**learn** 58:24
**learned** 13:2,6
221:24,25 222:10
**leave** 76:20 96:19
182:12
**leaving** 77:2 194:5
194:9,18
**left** 91:21 121:6
143:25 144:1
182:5 232:17
237:22 252:7,11
300:1 310:22
311:22
**legal** 63:22 105:23
173:3,9 259:19
333:1 336:1
**legally** 87:20 88:3
88:11,22
**legislation** 139:1
139:10 140:3,11

141:1,9,10
**legitimate** 158:13
158:14,21 196:17
197:25 233:7,9
279:18 299:14
306:9 315:15
**legitimately**
283:12
**length** 249:14
**lenzi** 212:12,24,25
218:24
**leonhart** 62:1,8,17
62:18,25 63:4
**letter** 11:11,12,21
13:15 44:5,10,13
45:17 61:24,25
62:15,20 63:15
68:18 73:7,9 74:4
110:9,14,17,18,20
110:24 111:2,3,16
112:21,23 113:9
113:24 114:11,14
114:23 115:3,17
115:21,23,23
116:2,3,9 117:8,12
117:17 129:11,12
164:7,8,16,17,20
164:23,23 165:3
174:8,10,11,15,21
176:7,14,19,20,23
177:5,8,10,17,18
177:21 178:9,12
178:24 179:4
180:12,18,21
181:2 183:6,9,10
183:13,21 187:18
187:21,23 188:2
188:12,18 189:2,9
190:18 192:7
194:23,24 195:6
195:24 196:1,5

198:18 199:3
203:5 204:18
205:20 206:4,11
206:14 207:5,11
207:16,20 208:20
209:2,4 210:19,19
211:4 261:6
267:19 272:14,15
284:8 292:3
296:14,24 297:19
300:1 311:21
318:8,11 319:24
320:16 333:19
**letters** 70:3 71:25
72:3,5,6,12,16,19
81:16 152:14,15
174:3 175:2,6,15
175:18 176:4,13
180:12 267:17
268:2,4,12 271:25
272:17 291:6
314:17,18
**level** 251:25 252:2
256:23 257:10,20
258:22 291:23
304:16,20
**levels** 202:3
258:24
**levin** 275:24
276:21 279:21
282:19 283:11,14
283:25 284:18
285:22 286:2
288:18 290:12,12
297:19 298:14
300:2,11,18 305:3
306:12 307:11,15
308:12 309:5
**lewis** 4:2,6 107:1,3
107:3 108:6

**lewis's** 107:19
**lexington** 2:3
**liaison** 17:12
  51:10 62:14 70:2
  114:25 175:12
  237:20
**liberty** 138:9
**lic** 332:19
**license** 1:25 299:4
**licensed** 195:15
**licenses** 16:14
**licensing** 298:18
**light** 111:13
  112:20 113:15
**limit** 131:24
  184:15 200:14
**limitation** 134:18
  168:1
**limitations** 23:10
  68:21 126:8 132:2
**limited** 33:25
  63:23 128:21,22
**limiting** 131:1
**limits** 178:3,7,22
  179:5 180:15
  181:4,6 182:2
  202:18
**line** 29:15,17,17
  32:13 66:5,5
  177:2 300:2 329:7
  333:13 335:7
  336:3
**lines** 298:18 299:3
**linkedin** 7:14 14:2
  14:9 21:10,11
**list** 56:3 183:20
  184:11,17,20
  187:24 188:3,12
  188:18 239:10
  262:8 292:6
  313:21 314:20

316:14
**listed** 29:19 68:18
  178:1 233:6
  238:15 335:7,17
**listing** 335:7
**litigation** 1:5 10:8
  53:4 105:25
  255:10,13 261:1
  323:20,25 324:5
  325:6 328:7
  331:13 333:6
  334:3 335:3
**little** 15:5 79:18
  91:12 95:17 97:3
  107:19 135:24
  138:23 159:15
  200:25 255:20
  263:21 304:24
**llc** 4:19,24 5:5
  265:18 273:7
**llp** 2:8,12,18 3:10
  3:20 4:2,6,11,16
  4:21 5:7,11,16 6:2
  6:7
**local** 178:24
  306:21 317:5
**located** 10:5 120:1
**location** 42:18
  151:13 247:13,15
**long** 14:20,21
  15:13 220:5
  298:17 299:3
  310:19 322:14
  327:10
**longer** 15:5 35:21
  36:8 37:14 45:11
  223:19
**look** 25:6 26:1
  27:17 34:4 49:3
  53:14,15 56:2,11
  56:12 63:7,18

72:14 74:23 78:5
79:21 89:1 91:9
91:10 94:7 100:20
106:4 111:2
114:16,16,19
116:10 119:6,13
119:14 120:17
121:6 129:11
137:19 138:2,22
142:9 164:17
176:17 181:19
184:23 187:15,18
196:7 203:5,6
206:25 213:2
214:4 215:5,12
216:6 223:15,18
246:8 278:9 299:1
299:2,3 306:13
**looked** 76:2 119:7
  191:20,24 235:19
  241:11
**looking** 17:23 61:5
  63:12 71:21,22
  76:4 119:15
  158:17 164:24
  179:12,18,23,24
  180:13 184:23
  189:22 191:12
  192:12 246:25
  272:22 305:1
**looks** 48:22
**loop** 201:25
**los** 3:12,22
**lost** 18:13 147:22
  147:24 148:1
**lot** 21:23 55:19,20
  124:4 151:15
  152:21 188:15
  191:9 194:5 226:8
  273:17 291:20
  309:24 311:5

**lots** 21:19 31:21
  98:21 151:13
  298:20
**lou** 21:16 47:9,17
  48:11,12 50:3
  97:7
**loud** 39:11
**louis** 21:1 78:8
  101:1
**loves** 53:7
**lower** 173:21
  176:18 232:17
**lucas** 3:21 177:21
**lunch** 100:12
  119:5 123:3,7
**luordo** 1:24 10:13
  331:4

---

**m**

**m** 1:24 3:15 4:17
  331:4
**ma'am** 254:1
  327:25
**mackay** 2:19
  263:13 321:2,6,10
  321:12,24 322:10
  322:16,21 323:2,6
  323:22 324:12
  325:13,19,24
  326:2,8 329:1
**madam** 333:10
**magnitude** 150:2
**mahady** 2:13
  51:20 303:2 308:5
  309:1 310:14
  311:1 312:1,8,21
  314:11
**mail** 7:16,20,23
  8:6,13,15,17 9:4,7
  9:10,13,16,18
  38:17 39:4 48:1,6
  48:9 53:13 56:13

57:7 78:8,12,17,23
94:21,21,25 95:2,8
96:21,22,24
100:21 101:10
105:21 106:1
123:19,19,23
126:10 212:7,11
218:1,6 219:23
220:25 221:19
241:12 242:1,25
243:4,23
**mails** 53:5,6 94:24
123:18 249:25
**maintain** 153:16
**maintains** 153:6,9
153:10
**major** 98:25
**majority** 329:17
**making** 18:1
124:19 158:13,21
159:17 165:21
171:14 200:15
234:15 238:12
246:8 249:11
312:15
**mallinckrodt** 5:5
**managed** 16:8,11
304:17
**management**
20:12 56:5 70:2
304:22 307:14
308:15
**manager** 19:1
35:12 39:8 224:4
224:9
**managers** 174:22
**managing** 16:16
**manner** 36:13,15
263:8
**manor** 6:3

**manual** 88:14 89:3
**manufacture**
154:23
**manufactured**
283:13,15
**manufacturer**
135:25 145:14,24
147:4,22,23
156:15,16 157:4,7
159:23 160:6,17
161:23 162:3,15
163:10,15 165:8
165:20,24 166:18
168:7,12,15
259:12 274:23
277:19 278:10
279:4,12 281:3,12
288:9 291:23
293:9 300:13
301:6,12 309:11
313:11,22 317:1
323:18
**manufacturer's**
165:11 170:20
**manufacturers**
49:6 124:14
126:22 127:4,8,14
127:19,22 128:6
129:14,19 131:3
134:5,12 136:1
144:13 154:14,21
155:24 161:5,5
164:1,18 165:10
166:3 168:18,22
168:25 169:13,15
169:22 170:25
173:3,9 226:6,10
265:20,22 274:6
274:11,20 276:4
277:10,12,13
280:5 284:22

285:5 286:1,3,10
288:19 291:14
302:14 308:17,24
322:25 324:3,8
325:5 326:5,6,21
**manufacturing**
153:6 274:1,25
284:21 285:8,25
**march** 1:21 10:3
35:10 99:20 121:9
178:13 195:7
239:17 240:23
331:7 332:12
333:4
**marcus** 5:11,14
**mariama** 6:23
**mark** 11:13 14:1,2
25:7 38:11 39:22
39:22 43:21 47:19
52:11 61:18 82:12
91:3 94:1 97:4
99:25 105:14
123:11 139:2
263:25 264:5
**marked** 11:16
14:5 25:10 38:14
44:2,5 47:22
52:15 61:21 78:2
82:15 91:6 94:4
96:23 100:17
105:17 110:3,8
119:10 123:14
137:23 173:17
183:2 195:2
211:23 220:20
225:23 232:3,7,14
243:4 265:8,11
**market** 109:15
**marketed** 263:8
**marketplace**
320:11

**mart** 6:15
**martin** 6:2
**martinsville**
183:10,11,22
187:23 188:2
189:3,10 190:8,19
191:14 192:8
233:20 234:12
235:1
**mary** 123:20
**maryland** 4:5
**massachusetts** 5:3
**massachussetts**
3:16
**master** 77:2
289:22 321:15
**masters** 111:4,6,8
111:14,25 112:20
113:15 116:2
**matic** 6:8
**matter** 12:23
193:11 209:7
210:22 261:10
**matters** 17:18
19:11,13
**matthew** 48:2
123:19 124:6,7
**maureen** 4:7
**maureen.barber**
4:9
**mcdonnell** 175:9
**mcdowell** 175:3
**mckesson** 3:13
257:6 261:22
262:11 282:19
**mckessons** 256:20
**mckmdl005611...**
8:25
**mcnamara** 4:11
271:9 272:6 290:2
291:17 296:16

299:16 314:12
317:13,22
**md** 1:7
**mdl** 1:5 8:18 10:10
**mean** 16:22 21:15
29:7 32:15 42:17
45:11 89:3 90:15
99:17 115:4
140:18 148:25
149:21 153:4,12
153:23 154:7
158:10 165:18
166:19 167:5
174:11 180:17
183:14 193:13
197:21 199:6,12
199:18 203:21
216:7,20 217:11
225:1 246:12
247:19,19 260:12
264:15 267:3,5
269:13 278:21
283:1 301:23
303:17 310:24
318:17 324:15
**meaning** 107:24
229:11
**means** 27:7 102:25
121:4 153:5
158:11,17,19
165:19 193:18
209:14 217:3,6
225:14 246:11
275:15,20
**meant** 109:19
122:1 146:22
150:20 154:9
156:9 201:9
216:16 222:9,13
318:4

**medical** 197:25
233:9
**medically** 196:22
197:4,14 198:3,14
200:11,15 201:7
**medication** 196:22
197:5 198:4,14
**medications**
177:23,25 178:3
196:16
**meet** 30:21 36:9
105:2 197:24
233:9 237:17
238:2,16 250:1,8
250:16,17 274:5,6
274:20 276:3
300:4
**meeting** 24:4
53:11,23,25 54:3
56:21 61:9 62:2
63:8,13 69:16
75:1 78:10,11,19
79:2,16,18 105:5,8
106:3,10 107:18
204:25 205:8,12
205:22 206:6
207:4,11 208:19
208:25 213:4
218:24 219:2
250:24 272:24
273:5,12,23,24
274:1,11,23
275:24 277:24
293:8 300:13
305:15 308:13
313:12 327:16,19
**meetings** 24:7
50:4,12 51:7,10
187:6,11 237:15
237:21,25 272:20
273:9 297:5

309:10 322:19
**melanie** 2:19
**melanie.mackay**
2:21
**member** 302:11
**members** 46:20
49:17 203:14
**memo** 272:24
327:15,19
**memorandum**
9:21 265:17
**memorandums**
272:19
**memory** 45:16
82:18 95:15,23
106:6
**mention** 116:2
164:17 207:10
**mentioned** 47:9,14
106:1,2 282:19
283:14 307:11,15
332:5
**mere** 256:9
**merely** 112:13
**meridian** 5:8
**merrillville** 39:2
221:7,12,13,14,17
**message** 100:24
102:22
**met** 13:12,18
61:12 105:10
**method** 88:25
258:23
**methods** 88:20
**metropolitan**
16:25
**michael** 100:25
**michelle** 61:25
62:16,18,25
**middle** 44:24,25
67:17 112:8

204:21 212:6
296:10 306:11
**midwest** 296:5,7
333:17 336:1
**migration** 296:8
296:21
**mike** 107:1
**milione** 21:1 22:11
22:18 24:12 47:9
47:11,15,17 48:2
48:11,22 49:4
78:8,16,17,19
79:19 94:22 98:4
98:13 100:22,24
101:1 102:21
103:4,5 187:5
236:18 237:13
238:7 249:18
250:16
**milione's** 48:11
98:8 101:8,10
**miller** 105:10,21
107:18
**milligram** 275:2,4
275:4
**milligrams** 275:2
279:23,23
**million** 49:22
260:13,22
**milwaukee** 6:9
**mimi** 95:4,5,9 96:2
96:12,18,25
**mimi's** 96:10
**mind** 82:22 99:2
142:6,9 172:1
254:20
**minds** 97:6
**mine** 222:15
**minimize** 234:5
235:20 251:15
290:3,5

minimizing 251:2
251:12
minnesota 19:4
minute 78:5 92:18
114:19 138:17
164:17 187:17
244:24
minutes 86:22
233:20 242:17
252:20 254:10,13
254:15,16,21
327:1
mischaracterizat...
145:7 153:18
211:9
mischaracterizes
81:22
mischaracterizing
245:16
misinterpret
200:22
misread 200:22
misreading 200:7
200:19
mission 20:24 47:6
83:14 90:23
197:19,22 198:10
198:13 200:11
201:7 233:1,3,16
233:21,25 235:19
250:25 251:6
303:5
misstate 304:7
misstatement 81:8
misstates 50:25
164:25 262:1
283:5 295:9
misstating 40:23
204:15 211:5
mistaken 313:10

misunderstand
235:10
misunderstood
153:21 234:25
misuse 320:6
misuses 270:4
mitchell 2:3
123:22
modifying 93:9
moment 96:6
241:13 253:7
monitor 19:21
67:9 68:7 119:24
171:18 172:22
173:4,10
monitoring 19:16
20:1 21:6 41:10
56:14 57:4,9,13
61:6 63:21 64:8
65:19 67:6 68:3
69:2,8 79:7 90:3
93:22 95:19
108:14 111:13
113:14 120:23
122:15 129:25
167:3,13,19
189:17 191:16
235:5 251:24
252:14 253:8
261:17 276:24
281:17 282:5,13
286:23 287:1
288:3 293:12
297:15 300:22
306:14,18
monitors 282:14
month 186:12,16
monthly 29:5
morgan 4:2,6
morganlewis.com
4:4,9

morning 10:23,24
54:4 94:11 100:2
122:13 144:16
145:1 152:22
164:21 180:2
182:4 187:2,4
223:17 249:14
320:20
move 35:7 76:11
76:19,22,24 82:25
94:18 195:19
228:20 232:1
266:15 299:14
moved 16:1
movement 39:13
moving 211:21
mulrooney's 97:10
mute 46:3 188:15
myers 3:20

**n**

n 7:1
n.d. 1:13
n.w. 2:13 3:16
4:12,17
nacds 110:25
111:10
name 10:2,11,25
31:18 48:12
132:23,25 133:4,8
133:12 144:12
151:12,16 163:7
163:18 175:21,21
175:22,24 212:5
231:20 232:17
237:18 255:7
328:18,20,21
333:6 334:3,4,15
335:3,4,21
named 315:6
names 324:20
325:2

napoli 2:2
napolilaw.com 2:5
2:5
narcotic 239:11
nascsa 51:15 52:8
53:11,22
national 1:4 10:8
17:19,20 51:16,20
110:11 174:6
195:9,13,20
308:14 331:12
333:6 334:3 335:3
nationally 20:22
native 232:8,15
natural 147:21
nature 15:19
naught 330:22
ncpa 195:6,8
197:2 198:24,25
199:3 203:23
205:11,21 206:5
208:13 209:5
210:13,21
ncpa's 207:10
ndc 171:3
neal 3:2
necessary 98:18
108:3 196:22
197:4,14 198:3,14
200:12,15 201:8
231:11
need 27:8 53:15
67:6 68:4 74:21
77:1 83:5 86:2,14
88:12,14 97:5,8,18
98:1,15,20 101:11
102:22 103:6
112:12 122:9
124:4 164:10
171:23 185:1,8
190:9,12 192:13

197:25 228:20
234:6,16,23
235:20,21,21
251:1 254:19
278:20 306:8
327:1 330:10
**needed** 21:22 60:5
103:13 105:2,2
122:6 147:25,25
201:21 235:8
236:3 270:6
**needing** 204:14
**needs** 89:4 196:17
233:10 264:6
**neither** 79:25
**never** 38:9,9 42:1
42:5,11,23 71:18
79:13 81:19 82:9
88:1 127:21
266:12 278:1
**new** 2:4,4 20:17
33:11,13 51:24
53:7 81:15 97:16
97:18 98:18,20
102:13,23 103:7
103:14,19 118:8
118:12 120:12
123:1 124:14,19
125:10,10 127:12
127:18 136:5
165:14 173:15
278:19
**news** 292:12
**nice** 96:18,19,20
**nicely** 33:22
**nicholas** 2:12 7:4
10:22,25 11:13,19
14:7 20:6 22:4,9
22:10,22 23:4,24
25:7,12 28:10,24
29:9 30:3,13 31:2

32:10,24 33:8,15
34:6,17 35:6,9
36:1,17 37:1,11,21
38:11,16 40:6,25
41:5,12 42:6,15
43:13,21 44:4,22
45:21 46:3,5 47:3
47:19,24 49:2
50:17 51:1,3,23
52:11,23,25 53:1
53:19,21 55:8
57:20 58:5,14
60:15,22 61:1,2,18
61:23 62:23 64:16
64:17 65:13 66:1
66:8,18 68:16,22
69:11,20 70:6,12
70:21 71:6,14,20
72:10,21 73:18
74:1,13,20 75:20
76:1,9,14,19,24
77:5,8,10,12,16,19
77:22,25 78:4
80:8,20 81:10,24
82:17 83:23 84:7
84:17 85:17 86:1
86:8 87:24 88:8
88:19 90:12,18
91:3,8,17,19 92:17
92:24 93:6,13
94:1,6 96:1 97:23
99:10 100:19
103:17 104:3,10
104:19,22 105:4
105:19 107:11,13
108:17 109:3,11
109:21 110:6
113:2,5,10,20
115:20,22 116:8
117:3,7,11,13,18
118:5,6,20 119:4

119:12 122:24
123:3,11,16 125:1
125:3,7,21 126:13
126:17 128:1,15
129:3,7,11,17
130:8,20,23,24
131:7,10,14,16
132:11,20 133:2,7
133:17,18 134:1
134:11,21 135:4
135:12,18 136:19
138:1,20,21
139:11,14,23
140:21,24 141:8
141:16 142:1,5,12
142:19 143:20
223:17 259:18
262:16 264:15
268:7,9 272:5,7
282:6 284:7
287:22 288:10,25
289:14,18,20,25
296:13,23 315:7
316:2,5 317:21
318:7 319:23
320:15 327:1
**nicholson** 110:9
110:22 111:16
112:4,16,17 114:2
114:17 115:12,24
116:20 119:17
**nickname** 95:3
**night** 52:17
**nine** 15:14
**nods** 155:21
**nonprivileged**
280:12,15 281:6
**nonsignificant**
121:22 122:2,4,8
**nonspecific** 203:11
203:20,24 204:4,7

208:16
**nontestifying**
321:4
**norm** 145:18
146:23 147:1
**normal** 26:14,25
27:4,8,10 64:4
148:22,24 149:19
150:15 246:17
301:20
**normally** 149:18
150:23
**north** 4:22 19:3
**northeastern** 1:2
331:11
**northern** 10:9
**notarial** 332:11
**notarized** 333:14
**notary** 331:4
332:18 333:25
334:10,18 335:15
335:23 336:23
**note** 22:25 52:16
73:23 76:5 94:12
178:15 238:12
333:12
**noted** 10:12 73:6
122:3 184:11
213:11 216:13
**notes** 95:11 218:25
**notice** 79:19
160:24 332:3
**notices** 161:12
**notification** 36:14
126:11
**notifications**
125:23
**november** 100:22
221:19 232:17
233:15 265:12

| | | | |
|---|---|---|---|
| **nprm** 56:13 | 322:10,16,21 | 125:20 126:7 | 202:4,25 204:5,15 |
| **nstephens** 3:4 | 323:11 329:1 | 127:23 128:13 | 205:16,24 206:8,9 |
| **number** 7:11 8:2 | **objecting** 34:2 | 129:2 131:6,23 | 207:6,17 208:23 |
| 9:2 43:23 75:7 | 143:3 | 132:24 133:6,15 | 209:17,24,25 |
| 120:4,16,17 | **objection** 20:4 | 133:16,22 134:9,9 | 210:6 211:2,16 |
| 164:11 171:6 | 22:2,8,21,25 23:7 | 134:17 135:2,9,10 | 214:1,17 215:21 |
| 173:21,23 176:18 | 28:9,23 29:6,25 | 135:15,16 136:14 | 216:3,9,10,13,22 |
| 223:19,19 225:5,9 | 30:10,24,25 32:7,8 | 136:15 139:5,6,7 | 217:7,15,16,17 |
| 225:9 226:3,17 | 32:22 33:5,14 | 139:13,18 140:19 | 218:15 219:16,24 |
| 227:19,23 228:5 | 35:23,24 36:11,12 | 140:23 141:3,12 | 222:18,19 223:1,2 |
| 229:10 231:3 | 36:24 37:8,9,16,17 | 141:21,22 143:4 | 223:4 225:17 |
| 247:13 264:8 | 38:8 40:5,23 | 145:7 146:6 | 228:7,25 229:1,14 |
| 291:5 333:7,13 | 41:11,25 42:14 | 147:12,17,18 | 229:25 230:1,12 |
| **numbered** 54:10 | 44:20 45:19,20 | 148:12 149:1,4,6 | 234:17 237:6 |
| 206:23 209:3 | 46:24 49:1 50:14 | 149:13 150:16 | 242:8 243:8,9,15 |
| 213:3 | 50:23,24 52:16 | 151:6,8,21,23 | 243:16 245:10,11 |
| **numbers** 138:11 | 55:4,5 58:12 | 152:6,7,17 153:18 | 245:24,25 248:11 |
| 224:3 335:7 | 60:25 62:22 64:14 | 155:2 156:5,21 | 248:12,22 250:9 |
| | 65:9,23,24 66:4,12 | 157:8,9,20 159:1,2 | 250:10 251:3,4 |
| **o** | 66:13 68:12,13,17 | 159:3,8 160:8,14 | 257:12,23,24 |
| | 69:9,25 70:10,18 | 161:1,18,25 | 258:17 259:1,18 |
| **o** 331:3,3 | 71:3,4,12,13 72:8 | 162:18 163:17 | 259:19 260:8,9,16 |
| **o'melveny** 3:20 | 72:17,18 73:13,23 | 164:25 166:4,7,8 | 261:19 262:21,21 |
| **object** 92:13 | 73:24 74:9,10,19 | 167:14,15 168:9,9 | 263:11,11 266:7 |
| 118:15 125:18 | 75:17,18,23 76:5 | 169:2,9,16,24 | 267:2,13,13,23 |
| 131:7 140:15,16 | 76:10 80:4,5,18 | 170:13,14,21 | 268:8,19,22,22,24 |
| 140:20 141:4 | 81:6,8,21,22 83:21 | 171:9,20 172:23 | 269:10,10,11,22 |
| 142:17 143:13 | 84:6,15,15 85:16 | 173:11 177:13 | 270:18,18 271:4,7 |
| 189:6 211:8 | 85:19 86:4,5 | 178:8,14,15 179:6 | 271:7,9,10,20,20 |
| 234:18 256:6,15 | 87:21,22 88:6,7,16 | 179:15,17,20 | 272:6 273:14,14 |
| 257:1,12 258:16 | 90:11 92:24 93:12 | 180:16 181:15 | 273:15,16 274:9 |
| 259:21 261:4,5,8 | 95:21 97:20,21 | 182:8,9,15,16,19 | 274:15 275:6,16 |
| 262:1,6,16,18 | 99:6,7 103:16 | 183:23 185:16,17 | 275:21 276:7,15 |
| 263:20 268:7 | 104:1,9,15,16 | 186:1,7,8,13,22 | 276:15,17 277:21 |
| 272:5,8 278:4 | 108:16,23,24 | 188:5,9,20 189:5 | 277:21,23 278:12 |
| 282:6 285:14,14 | 109:9,10 112:23 | 189:13 190:21 | 278:12,24,24,25 |
| 287:22,24 288:10 | 113:4,7,17,18 | 192:2,3 193:16,25 | 278:25 279:16,16 |
| 288:25 289:2 | 115:13,16 116:5,6 | 194:1,7 196:24 | 279:17 280:8,13 |
| 290:19 296:25 | 117:1,2,5,15 118:3 | 197:6,7,16,17 | 281:4,4,7,19,19,20 |
| 300:15 302:6 | 118:23,24 122:21 | 198:5,6,19,20 | 281:20 282:7 |
| 303:2 309:1,2 | 122:23 124:23 | 200:17,24 201:12 | 283:3,3,4,4,6,19 |
| 315:7 316:2,5 | | | |
| 317:21,22 322:6 | | | |

**[objection - okay]**

283:20 284:7,10
285:11,11,12,12
286:11,18,24
287:11 288:15
289:4,11,11,12
290:17,17,18,22
291:17 292:1,23
292:23,24,24
293:1,16,16,17,18
294:6,6,15,15,17
295:7,8,9,20
296:13,16,23
297:12,12,13
298:2,5,8 299:8,8
299:9,10 301:19
302:5 303:3,4
304:3 305:17,17
306:1,2 307:6
308:5,5,7 309:16
310:14 311:1,8,8
311:10,11 312:1,8
312:20,21 313:15
313:16,24,25
314:11,12,13
315:8 316:18
317:12,13 318:7,9
318:24,25 319:23
320:15,17 321:2
322:2 323:2,4,6,22
324:14 325:13
329:20 330:4
**objections** 23:5,20
149:9 159:6,8,13
208:2 227:14
326:9
**objective** 307:24
**obligation** 164:18
173:4,9 258:1
259:15 287:20
288:13 312:2,13
312:18

**obligations** 30:22
30:23 108:20
111:13 113:14
124:15 136:3
241:2 256:11,17
257:19 260:6,14
261:25 270:15
274:7 301:17
311:23 315:5,19
**observation** 269:5
270:25
**observe** 266:25
271:1
**observed** 272:1
**observing** 268:17
**obtain** 193:2
300:23 301:10
**obtained** 214:5
**obtaining** 196:16
198:3
**obviously** 90:7
143:22
**occasions** 276:3
**occur** 157:5,18
308:3 321:1
**occurred** 175:7
273:9
**occurrence** 218:4
**occurs** 234:5
**october** 51:15 52:5
52:19 53:10,20
57:8 96:25 224:14
225:5
**od** 174:3,19 183:6
195:24
**odw** 96:8
**offer** 322:3
**office** 6:16,22 15:2
17:2 18:10 20:13
20:19,24 24:18
39:2 44:8 46:1,7

49:20,20,24 50:4
79:17 83:14 89:24
90:20 126:25
129:15 148:18
174:4,19 175:1,4
175:11 178:24
197:22 212:17
221:7,13,17
224:13 226:1,8
227:20 232:9
233:3,17,22 234:3
237:19 251:10
266:2,9,24 267:10
295:25 306:21
317:5
**officer** 321:16
**officers** 318:16
**offices** 28:18
111:23 288:5
296:1
**official** 184:10
334:15 335:21
**officials** 184:14
**oh** 102:11 155:22
215:7 300:5
328:18
**ohio** 1:2,10,12,13
6:13,18 10:9
331:12 333:2
**okay** 12:7,12,17
12:20,25 13:16
14:2,3,24 15:13,25
17:5 19:5,25 20:9
20:16 22:9 24:14
24:17,22 26:6
27:6 28:4 29:10
30:14,18 31:19
32:3 33:9,11
34:17 35:6,10
36:20 37:24 38:4
41:6,8,21 43:11

44:12,23 45:1,2,15
52:2,23 54:1
56:21 59:7 60:12
62:7,20 63:7 65:2
66:9 67:14 68:16
71:7,23 72:22
74:21 76:9 79:25
84:8 86:21 89:23
96:2,17 97:1 98:7
98:19,25 102:21
104:20,22 105:14
106:23 109:20
111:2 113:23
114:16,18,20
115:7,10 117:19
120:11,20 121:10
121:24 123:3
126:16 127:12
128:5 130:20
131:20 132:11
135:21 137:20
138:9,13,14
139:24 140:15
141:7,17 142:19
144:2 146:2
156:13 159:20
165:25 172:15
173:25 174:9
178:20,20 180:2
182:23 187:20
190:2,7,17 191:11
195:23 196:7
199:2,20 203:5
204:20 207:2
208:11 214:9
215:10 218:7
219:7 221:1
223:25 232:24
238:22 240:5
241:9 244:11
253:24 254:6

321:15 322:7
326:16
**old** 78:25 79:3
**olp** 101:13
**omm.com** 3:23
**once** 22:2 207:21
316:25
**one's** 286:4 288:20
**ones** 50:20 267:21
324:24
**ongoing** 99:15
127:9,15
**op** 1:9,11,13
**open** 76:16,20
77:2
**opened** 275:24
**openly** 46:21
**operate** 45:5 87:12
155:5 191:5
**operating** 112:11
271:12
**operations** 79:10
**opiate** 1:5 10:8
54:24 331:13
333:6 334:3 335:3
**opinion** 23:2,9
26:15 60:7 68:19
80:6 83:22 85:18
85:20 86:5 104:18
104:19,23 108:25
109:1,2,4 149:16
151:7,9 155:3
161:23 162:1,2,9
189:14 190:24
194:5,8 210:9,9,12
217:2 228:14,22
234:19,20 244:19
257:13,16,18
259:6,23 290:20
290:23

**opinions** 323:19
**opioids** 129:14
**opioid** 46:23 47:1
127:9,15 134:7,15
255:13 268:17
269:20
**opioids** 134:25
152:23,25 201:1
226:7 234:7,15
275:11 317:20
**opportunity** 34:1
54:18 67:4 68:1
69:4 132:1,9
221:21
**opposite** 88:15
**oral** 97:12
**order** 19:16,21
20:1 21:6 26:10
26:17,21,24 27:21
30:21,22 31:22
32:21 35:21 39:16
39:18,20,21,24
40:13 41:10,24
45:24 56:14 57:4
57:9,13 58:25
59:22 61:6,16
63:21 65:18 67:8
68:5 69:2,7 70:9
70:24 71:10 73:5
79:7 83:16 86:22
88:21 89:1,15
90:3 93:9,21
94:17 95:10,19,24
96:3 97:8,18
98:13 99:12
101:12,23 102:2
108:14 111:12
112:10,12,13
113:13 116:15,23
117:23 118:13
119:22 120:22

121:15 122:15
129:25 130:25
145:13,15,23
147:9,10 149:17
150:14,22,25
151:5 162:20
163:4,9,14 167:2
167:13,19,23
182:1 189:17
191:15 192:16
213:5,14 214:5
215:7 242:4,5,14
242:15 244:14,21
244:25 245:1
246:12,16 247:4,9
248:20 249:8,12
251:19,23 252:6,9
252:9,14 253:8,12
276:23 281:17
282:5,5 284:13
288:3 293:12
297:15 298:17
303:25 306:14,18
312:14,14,14
313:13 321:22
**ordered** 162:13
**ordering** 26:25
120:23 178:3,7
179:5 300:22
301:9
**orders** 24:24 26:4
26:13 28:17 29:19
30:9 36:22 37:6
37:14 38:6 40:4
44:17 45:7,10
64:3,3,4,5,8 67:6
68:3 70:4 73:3
87:8,13 112:6,6
116:13,17,24
117:24 119:20,24
119:25 121:13,17

143:15 146:25
148:19,20,21,21
148:22 161:12,13
161:16 165:3,4
191:1,7 246:20
247:13 252:3
259:14 261:17
278:22 282:15
286:4 287:19
288:21 307:18
308:1
**organization**
114:8 291:7 311:5
**organizations** 61:9
61:10
**original** 190:23
191:20
**originally** 265:4
**orleans** 51:25 53:7
**outcome** 332:8
**outlined** 88:25
310:4
**outreach** 208:15
208:18
**outside** 33:21
66:12 68:20 73:24
87:22 92:15 108:5
115:13 116:6
117:2 125:20
129:2 135:2,16
141:22 143:13
147:12 149:18
151:6,21 155:2
171:21 172:11
198:7 211:7 223:5
277:23 284:7,10
296:13,23 297:1
313:15 318:8,10
319:6,23 320:15
320:17 322:20

**overly** 107:25
203:14
**oversee** 270:1
**overseeing** 16:18
267:9
**oversight** 49:21
90:21
**overtures** 250:6
325:8 326:4
**owen** 48:3
**owner** 185:7
**oxford** 4:7 5:12
**oxycodone** 275:1,3
279:23 308:16
**oxycontin** 263:9
297:20

**p**

**p.m.** 53:20 92:23
97:1 109:23 110:5
123:6,10 144:5,9
172:5,9 220:14,18
231:14,18 241:16
241:20 252:23
253:2 254:23
255:2 299:19,23
327:4,8 330:19
**page** 7:11 8:2 9:2
17:24 21:10,11
63:9 66:22 67:11
67:13 74:25 75:6
82:20,21 91:10,11
91:16 96:17,23,25
100:21 111:18
112:4 116:9
119:15,18 120:13
135:25 138:4,11
138:15,18,22
173:21,23 175:23
176:17 178:19
181:19 183:8,19
184:23 187:17

189:20,22,23,23
191:4 192:12,24
192:25 195:6,10
204:21,21 206:23
209:2 213:2
223:18 224:2
232:9,24 233:1,24
245:23 279:24,25
280:2 297:4
306:10,12 313:2
313:20 333:13,15
335:7 336:3
**pages** 75:7,8 264:3
264:4,6
**pain** 196:17
298:18 299:3
308:15
**palo** 3:3
**paperwork** 153:25
**parades** 95:3
**paragraph** 39:11
39:14 44:24,24
45:1 63:19 65:22
67:21 82:22 83:10
91:22 107:9,11,12
107:15,17 111:3
111:17 112:15
113:21 116:11
119:14,18 181:1
184:4,24 190:3,7
191:4,4,12,13
192:13,24 193:1,2
193:7 195:12
196:8,9 203:6,24
244:12 306:11
308:12
**paragraphs** 54:11
**parameters** 89:14
108:4
**paraphrase** 90:9

**paraphrasing** 90:7
**pardon** 206:20
**paredes** 94:22
95:8
**parentheses** 73:3
79:12 97:6,9
111:6 120:4
224:23
**parking** 298:20
**part** 18:4,10 29:15
29:21 35:4 47:5
49:15 74:25 83:13
86:12,20 106:1,13
109:16 141:24
197:18,22 202:15
206:22 213:14
214:24 215:13
226:21 230:19
235:3,4 237:20
243:3 256:3 270:9
271:15,22 279:5,8
281:16 295:22
296:10 301:20
335:9
**participant** 157:24
158:3
**participate** 33:13
**particular** 30:15
45:10,18 55:1
88:2,20 108:13
145:19 146:24
147:22 154:17
181:22 182:13,18
227:8 263:6
**particularly**
184:17
**parties** 172:13
205:1 332:1,7
**partner** 308:16,23
**passed** 139:2
140:12 141:1,2,11

**passing** 279:10
**patience** 253:4
330:17
**patient** 136:25
137:12 139:12
196:14
**patients** 156:20
157:17 196:16,21
197:4,15 198:3,15
200:12,16 201:8
**patrick** 3:6 105:9
**pattern** 26:14,25
27:5 64:5 89:6
148:22,24 149:19
150:15 246:17
**patterns** 64:21
**patterson** 101:3
**paul** 2:8 4:16
**paused** 155:23
**pay** 169:15
**payment** 298:20
299:5
**pbeissell** 3:8
**pecking** 303:25
**pending** 10:8
131:12 208:8
331:10
**pennsylvania** 4:8
5:13 6:4
**people** 11:1 18:5
34:21,22 53:16
94:23 123:24
175:6,8 191:9
236:3 273:10
285:2 300:12
304:19 318:21
324:21
**perceives** 112:8
**percent** 21:12
283:14 284:2

**perception** 270:13
270:14
**perform** 313:22
**performed** 23:17
23:17
**performing** 90:23
**period** 18:9 20:2,5
21:3,5 22:5 24:10
62:12 70:17,19
97:6,9 102:22,23
127:1 128:16
214:15 240:22
248:16 274:17
295:1 311:20,20
**periods** 228:3
**permissive** 142:24
**permits** 112:9
**permitted** 321:7
321:25 322:1
**person** 11:3 53:7
107:5,17 115:2
124:10 145:17
279:13 321:18
**personal** 23:2,16
30:6 68:14 69:12
69:13,21 70:1,7,15
70:22 80:6,19,21
83:22 84:1,4,16,23
86:17 102:1 103:3
103:18,20 104:17
104:19,23 126:4
129:12 136:17
149:11,12,16
151:7,9 155:3
171:21 179:8,9
180:11 198:22
210:9,11 216:23
226:5 234:19,20
242:9,12 244:18
259:6,23 268:21
269:1,18 277:25

290:20 298:7,24
299:5 307:3
315:10,11 330:12
330:14
**personally** 43:2
83:25 84:19 86:6
109:5 149:3 163:8
197:9 233:16
259:24 274:17,19
314:14 331:7
334:11 335:15
**persons** 234:22
**perspective** 216:6
216:19 269:18
271:15 289:9
290:11,12,16
292:15,21 293:8
294:24 299:6
301:13 302:4,10
302:21 305:9,24
307:3,3 308:21
309:9 311:17
312:18 314:9
315:10 319:13,16
319:18 320:2,4,14
**perspectives**
107:19
**pertain** 25:20
48:18
**pertaining** 1:18
122:15
**pertains** 126:21
**pertinent** 308:14
**peterson** 220:25
221:4,5,6,15
222:14
**pfaff** 123:21
**pharm** 4:9
**pharma** 1:8,10,12
2:21 13:1 52:17
263:5

**pharmaceutical**
111:5 196:11
233:5
**pharmaceuticals**
3:19
**pharmacies** 33:11
33:13 34:23 51:16
109:16 154:10,14
155:25 156:4,20
157:17,18 180:14
184:12,17 187:25
188:4,13,18 192:9
195:15 196:16
201:16,18 202:2
202:15 205:1
207:14,15 248:6,9
248:9,18 249:6
255:21,23 257:7
260:4 277:1
292:13 298:16
300:23 301:10
305:1 314:18
**pharmacist** 185:7
**pharmacists** 195:9
195:13,15,21
**pharmacy** 12:16
133:13 147:24
156:15,17 157:4
157:11 176:20,22
176:25 177:12
179:3,12 181:7
183:11,22 184:11
187:24 188:3
189:3,11 190:9,19
191:15 192:9
233:21 234:12
256:21,23,24
257:8,10,18,20
258:22 259:12
299:1,2 309:12,12
316:15,17

**pharmacy's**
247:21
**philosophy** 56:6
249:19
**phone** 32:1 188:14
249:24 314:8
333:3
**phrase** 108:11
153:1 158:7 160:1
161:9 230:4,5,6
257:17 267:7
296:21
**phrased** 103:8
**phrasing** 146:18
**physical** 153:22
**physician** 12:14
**physicians** 177:19
**pick** 314:7
**pile** 144:18 164:12
223:15 241:10
**pills** 259:9,9
279:11,11,14
296:9,22 319:19
320:10
**pitfalls** 294:20
295:15
**pittsburgh** 4:8
5:13
**place** 12:18 122:6
149:17,18 150:22
152:3 169:1,23
310:21 312:10
316:7 319:17
320:8,8 321:22
**placed** 21:24
132:2
**placing** 247:4
**plaintiff** 100:10
254:17 328:15
**plaintiff's** 218:14

**plaintiffs** 2:10
33:20 255:9
**planned** 92:5
**plans** 53:6
**plate** 55:20 299:4
**plates** 298:19
**plausible** 256:22
257:8
**play** 167:2,6
**playing** 154:25
167:12
**plead** 263:7,17,18
263:19
**please** 10:14 11:14
25:7 33:24 37:3
38:12 46:4 47:20
52:12 94:2 95:13
123:12 149:8
162:25 181:5
185:3 188:14
200:5 220:10
333:11,11
**pleasure** 82:3
**plus** 210:25 222:2
**point** 9:20 35:19
36:4 37:12 40:2
41:21 49:16,16
64:24 67:2,21,22
67:25 71:23,24
72:22,23 73:10
74:8,16 117:20
239:3 261:5
266:15 320:11
**pointed** 63:19
108:2 191:13
**points** 48:15,24
49:3,4 50:1 63:18
66:25 67:17
226:20
**policies** 20:1 21:7
32:19 33:3 196:15

196:21 197:3
198:2
**policy** 17:10,11,12
17:13 21:22 23:8
23:19 41:22 51:10
62:14 70:2 101:17
101:21 110:10
114:25 146:13,15
151:22 152:14,15
162:19,22 163:4,8
174:3,15 175:1,8
175:12 182:11,21
183:6 194:24
195:24 198:5
228:18 237:20
**polster** 1:9
**population** 151:14
247:16
**porter** 3:15
**portions** 94:14
106:3 300:12
**portner** 212:12,20
212:21
**pose** 77:17
**posed** 49:5 115:25
309:15
**position** 19:2,6
20:13,17 22:6
24:11 65:3 84:9
96:10 97:17,25
104:13,17 159:2,4
159:12 193:16
210:1,1 225:25
245:18 266:16,23
302:24 304:7,9
305:11 326:14
**positions** 224:23
225:15 229:11,13
**positive** 94:12
**possess** 259:10,13

**possession** 153:23
259:8
**possible** 57:8,12
147:13 205:8
243:13,19 255:15
**possibly** 313:13
316:15
**posted** 15:8,10
**potential** 318:5
**power** 9:20
**powerpoint** 52:18
232:16,21 284:19
285:22
**pplpc01900132...**
7:24
**practical** 63:22
**practice** 29:24
40:16 176:11
273:10,21 274:4
286:9 293:19,21
317:15
**practices** 54:25
176:25 184:14
190:20,24 192:16
235:5 274:2,25
284:21 285:8,25
306:5 307:4
317:10
**practitioners**
300:24 301:11
316:23
**pratt** 185:7
**pre** 28:14
**prematurely**
112:12
**preparation** 11:21
90:25,25
**prepare** 13:10
132:1,10
**prepared** 33:20
48:17 82:6,13

226:12
**preparing** 13:19
13:23
**prescribed** 153:14
283:15
**prescription** 1:4
6:5 10:8 152:23
152:25 158:23
284:1 331:12
333:6 334:3 335:3
**prescriptions**
200:12,15 201:8
**presence** 21:13
331:19
**present** 61:11
237:25 332:4
**presentation**
37:20,22,24 51:14
51:24 52:19 54:5
224:12 226:2,8
284:19 285:23
313:2
**presentations**
267:4 294:14
295:5
**presented** 265:16
284:19 285:22
291:10,11 293:24
317:4
**presenting** 285:23
293:22
**president** 110:10
**press** 123:25
124:11,13 126:18
135:22
**pretty** 55:3 101:13
112:22 129:18
143:24 225:11,11
249:23 303:25
**prevent** 196:21
197:4 233:4 271:3

[prevent - public]                                                                                     Page 41

302:23 316:9,11
320:3,5,6
**preventing** 196:15
198:2
**previous** 79:5
**previously** 73:7
85:6 114:6 126:5
129:1 130:9
**primarily** 239:9
279:22
**printed** 121:4
**printouts** 300:23
301:10
**prior** 28:15,20
31:6 33:11 34:20
41:8,13,14 45:16
50:22 135:6 139:8
139:19 142:25
165:1 187:10
231:4 239:3
245:15 250:5
283:5 284:4 294:2
313:4
**priorities** 18:2
**prioritize** 236:18
**priority** 50:19
51:11 101:19
102:23 103:6,14
103:19 104:5
105:3 121:21
122:1,10
**privilege** 171:24
321:12 322:2,16
323:7 325:21
326:11
**privileged** 172:11
172:14 321:8
322:11,21 325:14
325:20 329:2
**probably** 12:6
25:18 31:8,9 52:7

82:18 119:4
131:15
**problem** 68:17
229:24 230:8,10
269:8 305:3
308:18
**problems** 108:1
268:15
**procedurally**
322:3
**procedure** 1:17
334:5 335:5
**procedures** 116:16
116:23 117:23
119:23 121:16
276:24
**proceeds** 138:5
**process** 93:16,20
101:20 140:25
163:15 279:6
**processed** 16:14
**prodding** 242:23
245:17,21 246:1
**produced** 52:18
53:3 105:24
218:13 232:8,15
265:4,5
**product** 168:15,16
169:23 170:20
**production** 141:20
142:16 154:25
333:15,17,22
**productive** 100:3
**products** 171:2
277:2 280:23
281:13 298:16
300:25 301:12
305:2 306:20
**professional** 286:8
289:9 290:13,15
294:13 295:18

**professionals**
302:22
**profile** 7:14 14:2,9
14:16
**program** 19:1
35:12,16 39:8
49:20 54:13 96:13
174:7,22 175:4
189:18 224:4,9
**programs** 41:10
64:8 120:23 127:5
**progress** 119:24
**progression**
303:20,21
**promise** 34:17
**promoted** 17:14
18:20 20:12 222:4
**promulgate**
111:11 113:12
311:19
**promulgated** 28:8
160:25 163:21
164:23 256:13
310:18
**promulgation**
112:19
**pronounce** 47:12
**properly** 59:13
318:17
**propose** 56:17
**proposed** 49:16
102:13 116:12,14
116:21 117:21
118:2,12,16
119:19,21,25
120:2,8,14,21,21
121:14 140:3
**proposing** 121:12
**proposition**
291:15

**protect** 317:19
318:4 320:5
330:12
**provide** 26:16,20
26:23 67:2,25
72:22,25 73:11
81:16 83:3 85:13
86:13 99:4 115:11
130:13 162:14
165:23 166:17
168:2 182:1
186:20 190:13
208:21 294:18
295:14 305:4
308:13
**provided** 48:23
49:4 69:6 70:8
71:25 72:12 80:24
80:24 95:24 97:11
128:24 157:6,19
168:11,14 213:16
217:5,8,10,14
219:21 314:23
**provides** 44:15
156:11 157:11
190:8
**providing** 17:11
17:25 33:3 69:1
69:14 70:23
125:24 134:18
170:11
**provision** 225:20
**prsent** 6:21
**prudential** 5:3
**public** 21:11 67:4
68:2 69:4 110:10
122:5,7 124:9
261:10 262:13
263:4,14 317:19
318:5 320:6 331:4
332:18 334:10,18

335:15,23 336:23
**publication**
120:25
**publicly** 70:11
261:14 262:4,5
263:3,6,9
**published** 70:11
70:13 146:14,15
150:6 214:19
**pull** 144:18 163:7
164:10 241:9
246:11
**pulling** 40:9
**punitive** 203:15
**purchase** 28:21
30:8,21 32:14
33:4 35:20 36:6,8
148:5 165:21
181:4 184:8
**purchased** 305:1
**purchases** 280:20
**purchasing** 136:6
258:12,21 280:24
281:14 307:18,25
**purdue** 1:8,10,12
2:21 13:1,8 52:17
53:4 263:5,15
320:23 321:4
322:9,15,20
323:23 324:5,12
324:13 325:12,21
326:7
**purdue's** 321:12
**purpose** 99:2
134:17 174:15
268:3 272:13
273:24,25 274:24
274:24 275:25
308:12
**purposes** 100:7
190:17 195:8

276:5 315:15
**pursuant** 1:16
332:3
**pursuing** 15:22
**put** 54:13 55:9,11
55:12,15 98:23
101:11,15 104:13
165:13 182:23
194:23 220:4
236:16 237:4
238:9 239:16,20
289:19 327:24
328:13
**putting** 33:22

**q**

**quantities** 136:6
**question** 13:21
14:8 21:9 27:24
30:4 36:5 39:22
39:22 43:14 49:5
49:5,23 59:9
64:15 69:15 76:12
76:17,21,25 77:2
77:17 84:8 85:2
97:4 102:25
104:20 109:12
112:5 115:11
120:21 122:14
125:8,19 130:21
131:5,8,9,12
133:13,23 136:16
137:15,17 138:25
138:25 139:2,15
139:16,21 141:25
142:6,7,13 149:7
149:12,15 155:5
162:5 171:22,23
172:17,18 177:9
178:20 185:24
188:17 190:13,16
207:24 208:8,10

211:11 215:22
223:3 225:22
226:25 227:7
242:6,7,20 244:13
244:16,23 245:6,9
245:14,21 250:11
253:25 268:25
269:15 272:9
273:20 276:18
280:13 283:7
287:23 289:1,3
290:9,21 293:5,7
296:18,20 301:25
310:24 313:17,19
320:18 323:7,9,12
324:15 325:25
326:1,10,16
327:13,17,25
328:4 329:5
**questionable**
298:19 299:4
**questioned** 102:24
**questioning** 11:3,5
231:9 321:7
**questionnaire**
314:23
**questions** 11:2
23:21 28:13 31:23
33:10 48:7 63:6
70:4 75:2,5,7,8,13
75:16,22 76:2,3,7
76:8 78:13,14
79:8,9,11,14,15,20
80:2,10,12,16,24
92:14 93:3,4
98:11 112:5,17,18
113:1,6,9 115:24
124:4 125:6
129:17 130:10
131:2 136:21
137:11,14 138:10

139:22 141:17,18
142:4 144:2,14,20
180:9 185:20,22
187:7,9,12,19
218:17 224:2
227:14 233:20
235:17 241:24
244:8 247:17
250:15 253:5,6,10
255:19,25 257:17
258:4,12 270:8
277:11 279:24
289:14 291:4
306:21 309:6,14
309:15,22,24
310:6 313:3,12,21
314:20 316:13,14
317:3 318:13,14
318:18 319:1
321:25 322:5
326:25 327:2,15
328:1 329:7,8
**quick** 220:11
327:10
**quickly** 232:1
255:14
**quite** 258:5
**quota** 141:20
306:13
**quotas** 18:8
141:23 142:4,11
142:16 143:10,12
143:17 201:2
**quote** 26:10 39:15
56:4 64:2 68:5
71:25 87:11
107:24 108:8
111:6 242:1,5
**quotes** 107:16,16

**[r - record]** Page 43

| | | | |
|---|---|---|---|
| **r** | 222:7 233:13 | 336:3 | 183:14 |
| **r** 3:21 6:22 | 244:24 257:3 | **reasonable** 56:17 | **received** 32:13 |
| **raise** 145:16 150:1 | 264:8 277:3 | 205:3 | 79:13 113:24 |
| 178:22 181:3 | 282:21 284:24 | **reasons** 228:19 | 114:17 183:12,21 |
| 201:14 | 286:5 290:10 | 249:23 | 196:1 199:3 |
| **raised** 48:19 65:8 | 297:23 298:22 | **recall** 12:4 28:16 | **receiving** 110:24 |
| 65:21 198:18 | 301:1 305:7 | 28:16,21 29:2,21 | 116:16,24 117:24 |
| 208:13 209:6 | 306:22 307:10,20 | 31:17 33:6 36:3,4 | 119:23 121:16 |
| 210:21 | 308:19 309:7 | 37:10,12,18,25 | 124:5 268:12 |
| **raising** 66:11 | 313:8 315:2,16,25 | 38:4 40:1 51:14 | 298:16 300:24 |
| **ranks** 303:15 | 317:7 321:24 | 51:22,22,24 56:22 | 301:11 |
| **rannazzisi** 21:2 | 330:21 334:5,6,12 | 56:23 57:5 58:22 | **recipient** 183:20 |
| 22:13,14 24:11 | 335:5,6,17 | 60:1,13 61:3,7,12 | **recipients** 196:2 |
| 44:7 62:8 63:1 | **reading** 45:23 | 61:14 62:4 65:10 | **recognize** 25:14 |
| 72:5 96:13,15 | 105:12 115:10 | 66:16,17 72:13,15 | 82:25 |
| 164:8 195:7 266:1 | 117:16 138:10 | 72:16 81:3,7 90:5 | **recollection** 55:23 |
| 266:4,8,12,16,23 | 161:13 163:6 | 105:5 110:24 | 62:4 68:19 115:1 |
| 267:9 268:6 272:1 | 177:2 179:22 | 113:25 114:1,10 | 115:4 118:11 |
| 272:17 | 206:10 217:1 | 114:12,13 115:7 | 129:13 161:11 |
| **rannazzisi's** 50:11 | 219:5 223:20 | 124:5 137:3,5,6,10 | 225:4 226:5 |
| **reach** 193:10 | 242:23 268:13 | 139:15,17,21 | 227:12 232:20 |
| 237:18 | 278:14 285:21 | 145:3,5,8 161:8,14 | **recommendation** |
| **reached** 304:20 | 286:7 301:5 307:2 | 162:23 163:6,18 | 305:13 |
| **reaction** 109:6,14 | 333:19 | 163:24 174:2 | **recommendations** |
| **read** 39:11 40:1 | **reads** 39:14 54:10 | 180:5,17 183:25 | 66:23 67:18 92:6 |
| 44:25 45:15 53:13 | 54:12 67:2 72:23 | 195:22 204:9 | 92:8,11 |
| 65:22 67:20,20 | 72:25 107:17 | 212:4 217:24 | **recommended** |
| 74:24 79:20 82:22 | 135:23 136:1 | 222:21 224:10,14 | 317:4 |
| 86:11 90:5,17 | **ready** 119:5 | 232:23 236:19,25 | **recommends** 92:1 |
| 107:11 109:14 | **real** 162:12 | 237:7,11,19 239:1 | 92:2 |
| 113:19 114:21 | **really** 33:22 47:25 | 239:18 242:22 | **record** 10:1,13 |
| 115:18 117:11,17 | 62:21 213:18 | 243:1,2 244:4,17 | 33:18 39:12 43:13 |
| 119:17 137:16 | 250:13 289:8 | 248:7 265:22 | 43:15,18,19 57:23 |
| 138:11 149:21 | **reason** 53:23 73:4 | 297:14 310:6 | 58:3,7 59:12 |
| 175:18 177:1,18 | 97:5 104:11 | 327:23 329:12 | 60:15,16,20 76:13 |
| 178:4 181:10 | 105:25 155:23 | **recalling** 216:25 | 77:3 92:18,19,22 |
| 184:18 185:4,10 | 176:1,3 184:1,10 | **receipt** 79:11 | 94:9 100:9 101:4 |
| 190:15 193:11 | 196:4,6 225:21 | 333:18 | 102:17 109:21,22 |
| 196:5,8,18 203:16 | 243:3 249:22 | **receive** 165:22 | 109:25 110:4 |
| 205:9 209:12 | 250:4 328:25 | 166:16 168:18,22 | 123:5,9 126:14,16 |
| 213:7,19 221:2 | 333:14 335:8 | 169:14 176:2 | 132:14 137:19,21 |

142:21 144:4,8
155:21 159:7
172:2,4,8 183:18
190:2 195:8 209:3
212:8 220:13,17
230:25 231:13,17
241:13,15,19
252:19,22 253:1
254:8,22 255:1
262:21 273:13
299:17,18,22
321:3 322:10
327:3,7,18 330:9
330:18,19 335:9
**recordkeeping**
251:25 252:2
253:7
**records** 252:4,5,11
**recruit** 228:23
**recruitment** 227:2
**recruitments**
227:5
**redact** 94:13
**redacted** 94:15
100:5,7,14 264:14
264:16,17,25
265:3
**redaction** 100:11
265:1,6
**redirect** 254:17
**reduced** 331:20
**reduction** 106:12
**reed** 2:12 10:4
325:1
**reedsmith.com**
2:15,16
**refer** 255:21 258:6
**reference** 72:5
84:19,21,22 85:1,4
92:17 139:9
233:21 330:14

333:7 334:2 335:2
**referenced** 79:2
119:7 219:23
334:11 335:15
**references** 56:4
78:18 111:4
273:23
**referred** 49:25
58:18 150:10
184:20
**referring** 79:20
150:9 163:5
189:22 190:3
191:3 206:21
233:25 255:22
**reform** 106:12
**refrain** 149:9
159:6 208:2
**refresh** 45:16
95:15 225:4
**refreshes** 95:22
106:5
**refused** 130:12
205:4,15 305:4
**reg** 101:15,17,21
101:23 102:2,13
102:13 103:21
243:25 310:4,9
**regard** 68:24
97:18 98:8 127:8
**regarding** 23:21
32:20 34:12 35:2
49:17 53:10 56:14
90:2 92:14 111:12
113:13 126:9
129:13 130:3
142:4 143:15,16
165:4 217:18
219:8 226:15
257:21 261:2,9
284:11 292:12

329:7
**regards** 34:14
95:9
**regime** 50:22
**region** 296:5,7
**register** 56:15
146:16,17 150:10
152:4 161:12
**registrant** 27:21
31:7,8 32:5 39:16
39:20,23 40:12,17
44:9,14 45:4
46:22 61:9 72:6
72:19 81:16 84:20
106:17 116:16,24
117:24 119:23
121:16 148:17,20
153:7,8 154:17
155:17 164:7,22
165:3 167:20
174:6 185:13
191:5,6,7 202:21
202:21,22 208:17
214:3 216:11
219:8 226:9
235:12,16 242:3
244:14,20 245:1
249:25 250:1
268:3,4 269:25
271:23 273:2,3
288:8 293:9,20
294:22 299:2
301:24 302:4
305:14,22 308:23
314:22
**registrant's** 40:14
40:17 42:18 87:13
108:8 315:12
**registrants** 15:20
16:20 17:11 22:20
24:1 25:23 26:2

28:17 30:14 32:2
36:14,15 39:19
41:15 42:3,13
43:4 44:15 48:5
49:11,22 50:5,10
51:7 56:17 69:17
83:1,12,18,19
84:13 85:12,22
86:11,18 87:11
91:23 92:3 98:12
99:12 103:12
104:5,12,24 108:4
108:9,20 111:12
112:11 113:13
125:25 130:17
132:16,19,21,22
134:23 154:4,9,18
155:10 171:18
172:21 174:18
180:3,9 185:19,22
186:6 187:6,9,11
201:14,14 202:14
203:19 204:3,6
208:20 219:13
235:24 237:16,18
242:3,13 245:5
250:22 267:18,22
268:13 270:17
271:2,12,17 272:3
272:20 276:4,14
285:19 288:2
291:1 292:17
293:14 294:4
295:5,12 297:7,16
301:16 302:13
308:4 309:10
310:1,10 311:19
311:23 315:5
328:3 329:10,17
329:25

**registration** 16:9
16:12,13 33:11,13
34:13,23 35:3
96:6 280:19
**registrations** 34:3
34:5
**regs** 100:23
101:12,19 107:5
310:25 311:6
329:11,19
**regular** 90:1 122:9
**regulate** 49:12
**regulated** 184:9
**regulation** 24:23
25:16 26:2,2,9,16
26:20,23 27:14,19
27:20 28:5,7
30:17 31:14 36:10
45:3 57:10,14
86:7,22 87:1,6
89:1,16 93:10,10
93:22 95:19 99:1
99:4,18 105:1
106:12,19,20
108:13,15 111:21
112:1 118:9
122:14,14,18,19
123:2 160:21,22
191:20 213:6
215:9,19 216:2
240:8,11 243:7
244:9 246:6
256:13 312:3,7,7
312:16 330:2
**regulations** 58:25
106:14,15,22
107:8,20,21 109:8
111:11 112:20
113:12,14 116:13
119:20 121:13
152:10 154:4

160:5 209:9,16
210:24 235:13,25
240:18 241:3
251:15 310:12
311:24
**regulatory** 16:19
17:18,18,25 19:11
38:24 49:21 64:2
105:22 107:1,6
110:10 111:13
113:14 120:3
124:15 153:24,25
300:8
**reject** 326:4,20
**rejected** 325:8
**related** 11:8 19:13
73:22 114:11
127:4 166:6
317:20 332:7
**relates** 1:7
**relating** 24:23
108:21 116:13
119:20 121:13
127:9 324:10
**relation** 46:23
266:5,6
**relations** 46:25
**relationship** 47:6
**relatively** 24:3
79:18
**release** 124:11,13
126:18 135:22
**released** 125:11,17
128:24
**relied** 33:20
146:12
**relieve** 256:11
**relocation** 228:18
**remain** 285:19
**remained** 107:22

**remarkable**
329:14
**remember** 12:3,17
29:10,13 31:10
36:18 38:2 54:15
54:15,18 59:8
60:3,4,23 79:23,24
80:11,14 97:5
106:10,11 114:15
122:16 137:14,16
138:12 139:22,24
139:25 140:5
146:14 161:12,17
161:20,20 164:8
238:10 324:22,24
325:1,3
**remind** 53:24
**renee** 6:17 333:5
**renee.bacchus**
6:19
**renew** 205:7
323:22 326:8
**renewals** 96:7
**renewed** 238:15
**reorder** 147:25,25
**repeat** 80:22
171:13 177:9
189:7 206:1
258:19 318:1
326:16
**rephrase** 245:14
267:7 277:10
293:7 325:24
326:19
**replace** 22:12,14
**replaced** 24:12
**report** 8:11 20:25
21:2 30:16 39:14
39:21 44:16,16
54:20 67:10 68:7
87:8 89:25 90:4,6

90:17 91:1,3
92:15 93:2,5
133:5 203:14
242:5,15
**reported** 1:24
21:17 24:4 27:22
36:22 37:6,14
38:7 98:9 112:7
124:8 133:21
266:12 331:18
**reporter** 10:13
155:20 162:24
334:7
**reporting** 24:24
28:17 30:9,22
35:21 41:24 42:9
45:7,10 56:22
59:22 107:18
111:19
**reports** 27:15
28:22 29:2,11,14
29:19 30:8,21
31:13,22 33:4
35:20 36:6,8
39:16 73:2 131:20
219:8 224:18
280:20
**represent** 10:25
144:13 231:20
247:24 328:6
330:11
**representation**
92:25 93:3
**representative**
23:15 184:6 255:8
**representatives**
213:17 219:10,22
273:8 300:19
306:12
**representing** 2:6
2:10,16,21 3:9,13

3:18,23 4:5,9,14
4:19,24 5:5,10,15
5:19 6:5,10,15,19
10:2,14 13:13
**represents** 195:14
**request** 35:2,4,5
51:8 73:6 74:5,5
113:15,16,22
129:22 143:16
159:12 181:3
185:12 204:22,24
205:4,8,11,14
207:10 218:3,20
230:23 297:1
306:14 335:9,11
**requested** 63:13
68:24 136:4
178:23 181:2
**requesting** 176:23
179:4
**requestors** 8:12
**requests** 24:4,5
181:7 185:15
186:5 238:16
**require** 155:16
158:22,24 164:3
209:6,15 210:21
216:21
**required** 30:17
88:3,21 159:23
160:6 164:1
184:14 230:20
333:25
**requirement**
40:22 41:3,3,7
44:18 69:8 89:16
111:20 213:6
287:16 288:16
**requirements**
19:17,22 25:20
32:21 35:22 36:9

44:19 59:22 61:6
107:25 129:25
130:1 228:17
271:3 286:3,12
329:11
**requires** 44:21
141:5 160:17
**reserve** 94:11,16
100:5 144:1
230:25 254:16
**reserving** 231:10
**resident** 212:17
221:7,13
**resolutions** 294:3
**resolve** 105:2
185:1 305:3
308:24
**resolving** 308:18
**resources** 19:12
20:20 55:17
318:14,15
**respect** 76:10
143:12,21 155:14
190:20,23 231:1,3
263:8 268:17
323:19 324:4
328:6
**respectfully** 159:5
159:13
**respective** 127:5
332:1
**respectively** 78:25
79:3
**respond** 74:15
242:24
**responded** 75:15
76:8 80:1,15
110:21,21 114:23
115:3 180:20
**responding** 70:3
75:21 114:11

**response** 49:16
68:18 74:8 79:13
80:23 92:17 95:11
97:7 110:18,20
114:17,21 115:8
115:10,11 174:5
180:21 187:16,22
206:13,16,25
210:14 226:11
242:25 244:4
325:14 328:23
**responses** 115:6
**responsibilities**
19:6 20:16 49:10
63:22 67:5 68:3
87:7 92:4 108:10
155:16 295:13,22
**responsibility**
19:3 45:4 158:4
269:25 271:22
276:22 291:1
302:15,16,19
315:12
**responsible** 17:17
19:7 20:18 35:15
157:25 161:6
197:13 227:6
295:21
**responsive** 81:1
**rest** 74:23 75:1
264:7
**restarting** 54:14
**restate** 84:8
**restaurants** 53:7
**restrict** 33:24
192:10 235:14
**restricting** 196:15
**restrictive** 234:21
235:6 236:1
**rests** 181:22

**result** 196:15
315:24 319:20
**retail** 109:15
147:24 157:11
201:16,18 202:15
247:21
**retailer** 202:12
**retain** 321:19
**retained** 12:22,25
320:21 321:3,18
321:19 322:9,14
322:24 323:17
324:2 328:3
**retainer** 325:11
326:7
**retention** 325:4
326:20
**retired** 62:19
115:9 240:23
304:5 328:19
**retirement** 266:18
**returned** 35:11
237:24 333:18
**reveal** 325:20
326:10
**review** 11:21
39:21 41:9 76:6
91:23 112:14
143:14 184:13
187:21 205:20
206:4 242:4 280:4
282:12,17 300:22
301:9 306:14,15
306:16,17 333:12
334:1 335:1
**reviewed** 81:11
95:11 122:12
292:7
**reviewing** 115:7
207:3

**revise** 99:18
116:12 119:19
121:12
**revised** 102:10,13
122:19
**revision** 93:21
122:19
**revisions** 95:18
**right** 14:18 24:15
31:9 33:9 39:8
52:6 71:15 72:16
81:13,17,20 82:4,7
87:4,9 91:9 93:10
93:11 95:1 101:18
104:7,11 106:21
109:5 116:25
118:18 124:21
126:19,23 127:1
128:7,11,18
130:22 136:23
137:8 138:24
145:6 152:21
154:10 155:11,18
157:7,15,19
164:24 169:23
173:22 176:9,18
177:23 178:13
180:10 182:6
183:21 184:18
185:25 190:5
197:15 206:18
212:9 215:17
220:9 245:18
249:16,20 263:2
263:24 276:14
289:8 290:14
313:8 320:8
324:23 328:21
**rights** 94:12,16
100:6 231:1,10

**rin** 120:4,16,17,17
**ring** 105:11
**rise** 269:3
**rising** 329:15
**rite** 4:5 231:20
239:18 247:24
248:5,6,8,10,16,17
248:19 255:23
**rnicholas** 2:15
**road** 3:3 6:3
**robert** 2:12 6:24
101:2 185:7
**role** 19:18 20:25
22:17,18 47:15
62:11 88:1 96:11
155:1,5,7 167:2,6
167:12 192:20
193:7,14 197:12
202:15 224:7
226:3
**roles** 63:2 92:4
**room** 225:1
289:25
**ropes** 5:2
**ropesgray.com**
5:4
**rosenberg** 49:18
100:25 101:5,6,10
**rothschild** 6:2
**roughly** 22:6
**routine** 145:18
185:14
**roxanne** 220:25
221:4,4,6,15,23
222:9,14
**rpr** 1:24
**rudimentary**
130:10
**rule** 9:3 56:18 77:6
77:8,10,14,16,19
96:3 97:4,9,11,16

97:19 98:14,18,18
98:20 116:14,21
117:21 118:2,12
118:16 119:21
120:1,3,14,21,22
121:14 122:6
159:10 321:7
**rules** 1:17 120:9
185:14 271:17
272:4 334:5 335:5
**ruling** 289:21
**run** 126:15 322:5
322:6
**running** 126:14
299:13
**ruth** 105:9,21
107:18
**rx** 4:19

**s**

**s** 7:10 8:1 9:1
333:15 335:8,8
336:3
**saith** 330:22
**sale** 133:21 148:6
154:25
**sales** 29:16 32:13
155:25 156:4,16
156:20 157:17
158:5,13,21 170:6
170:11,20 181:7
184:16 258:13,21
280:4,20 282:16
305:4 307:13
315:14
**salespeople** 307:11
307:16,23
**saw** 23:25 30:7
97:11 102:12
109:17 164:5,6
267:18 291:19
307:5

**saying** 27:4 58:7
60:4 69:14 118:1
119:17 127:21
131:11 145:5
163:3 264:17
278:7 281:11
311:21
**says** 26:13 44:21
48:11 54:4 63:19
64:21 66:23 67:19
67:23 77:6 78:25
87:11 91:12,15,20
91:21,22 92:1,1
96:3 101:10
102:22 106:23
111:16 116:12
117:8 120:17,20
120:25 121:7,11
121:21,21 148:17
160:19,23 174:21
176:7 177:21
178:1,21 181:1,21
184:5,24 191:5
192:19 195:13
203:10 204:24
209:5 210:20
213:3 224:23
226:16 233:3
266:1 273:4
275:15 276:21
280:18 283:11
297:19
**sc** 275:15,15,19
276:21 282:19
283:11,14,25
284:18 285:22
286:2 288:18
297:19 298:14
300:2,10,18 305:3
306:12 307:10,15
308:12 309:5

**scenarios** 79:14

**schedule** 239:10
275:8

**scheduled** 16:19
184:8

**scherbenske** 94:22

**scheuler** 48:3

**schutte** 4:2 7:6,8
231:19,20,22
232:5,12 234:24
237:9 241:13,21
242:11 243:12,21
245:13 246:3
248:14 249:1
250:10,12 251:8
252:19 253:3
254:7,11,14 256:6
327:9,12 329:5,6
329:23 330:7,16

**scientific** 233:10

**scope** 16:22 33:14
33:22,24 34:2,8,9
34:15 58:12 66:12
68:20 69:9 73:15
73:24 87:23 92:15
103:16 115:13
116:6 117:2
124:23 125:20
129:2 135:2
141:13,14,22
142:23 143:13
147:12 151:7,21
155:3 211:7 223:5
225:18 229:2,15
230:13,22 240:24
241:4 261:6
263:12,22 277:24
284:7,10 296:13
296:17,24 297:1
313:15 317:23
318:8,10 319:6,23

320:15,18

**scott** 4:2 212:11,15
212:16,23 217:9
218:24 219:5
231:20

**seal** 332:11 334:15
335:21

**sean** 123:22

**second** 12:15 17:3
39:11,14,15 43:12
44:24 51:19 63:18
71:23,24 78:14
91:22 107:14
112:4 119:5
126:15 184:4
192:12 193:1,6
203:7 209:4 213:2
223:4 224:2
226:15 232:24
244:18 279:25
280:2 299:17
308:11 327:25

**secretary** 15:5
329:15

**section** 7:15 17:10
17:12,13,14,16
18:21 19:14 25:2
25:4,14,19,19,20
26:1 38:23,24
51:10 55:12,19
62:14 63:9 70:2
107:2,6,7 111:20
114:24,25 115:5,6
144:24,24 145:11
146:21 148:16,16
152:5 175:8,12
190:4 192:19
237:20,21 280:2
282:21 290:10
297:18 300:7,8

**secure** 83:15

**security** 298:19
299:5

**see** 18:8 45:13
48:9,20 49:13
51:12 56:19 62:7
63:14,23,25 67:18
68:8 72:1 75:6,9
78:20 83:8 91:10
91:12,20 92:9
96:8 102:6 110:19
110:22 111:3,10
111:14 112:2
116:18 120:5,14
120:18 121:1,18
121:20,22,23
124:8,16 130:2
139:4 142:6
145:10 175:21,23
177:20,24 178:21
178:25 181:1,23
189:19 195:12
199:13 203:10,25
204:21 207:12
209:10 210:11
224:21 232:18
233:1,11 236:7
265:14,15,24
269:7 271:16
280:22 281:12
288:18 306:19
313:19 328:15

**seeing** 180:18
291:13 300:10
327:23

**seeking** 59:21
61:15 81:12 104:6
104:6,12 171:7
180:9 308:16

**seen** 11:12,18
44:10 71:16,18

75:12,13 78:6
82:9 131:20 132:4
174:1 180:12
212:3 267:4,4
272:18 283:23
327:22

**segments** 136:21

**sell** 167:24 181:6
255:25 256:9
277:1 278:16
315:1

**seller** 312:24

**selling** 192:10,14
280:23 281:13

**senator** 137:11
138:16,25 139:21
140:4

**send** 96:5,7 174:7
174:9 175:6 179:3
206:13 298:14

**sending** 32:17
48:10 124:11
207:5

**senior** 20:12,17
22:5,18 24:11
63:2 174:23

**sense** 230:23

**sent** 31:25 62:8
78:8,18 105:22
123:24 174:21
175:1 177:17
178:24 193:24
221:19

**sentence** 39:15
63:10,15 64:20
124:17 136:1
148:20,25 149:21
150:21 181:21
185:6 192:19
193:6 204:22
209:4,20,22 210:5

213:3,10,12 216:8
216:20 244:11
245:15 285:22
288:21 289:7
297:22
sentences  213:9
separate  202:19
304:18
september  48:6
94:25 95:7,17
249:16 273:4,24
317:2
series  53:4 76:3
106:16 253:6
327:14
serious  306:13
seriously  302:17
302:19
serve  36:9 79:16
serves  177:7
services  4:19
serving  49:11
set  89:7 141:17
181:6 187:5
199:10 200:14
201:19 202:16,18
207:4 252:15
313:12 332:10
sets  147:7
setting  187:5,10
200:1
settle  260:22
settled  261:15
settlement  260:17
settlements  260:5
261:23 262:12
seven  264:4,6
304:15,18
shape  101:14
shapira  5:11

shapira.com  5:14
share  95:13
132:21 133:9,11
133:19,19 134:5
134:12,22 176:7
shared  131:3
132:18 165:20
166:2,13 168:25
176:4
shares  156:14
sheet  333:13 335:7
335:10,18 336:1
shift  22:19 24:1,2
187:3
ship  27:21,23,25
36:22 37:6,14
38:6 40:4,12,15,18
60:7,9 181:21
192:17 193:9,15
193:20 194:13,14
194:19 242:14,17
242:17 245:1,4
246:9 249:12
251:20 312:13,19
312:19
shipment  193:23
shipped  29:20
30:9 168:15,17
249:5 252:10
297:20
shipping  279:11
287:19,19
shkolnik  2:2,2 7:7
20:4 22:2,7,21,25
23:6,23 28:23
29:6,25 30:10,24
31:1 32:7,22
33:18 35:24 36:11
37:9,16 38:8 40:5
40:23 45:19 46:24
50:23,25 52:16

53:18 55:5 64:14
65:23 66:4,12
68:12,17 69:25
70:10 71:3,12
72:17 73:23 74:9
74:11,19 75:18
76:5,12,16,20 77:1
77:7,9,11,15,17
80:5 81:8,21
83:21 84:1,15
85:19 86:4 87:22
88:7 90:11 91:16
93:12 95:21 97:20
97:22 99:6 100:9
104:9,15,17,20
107:9 108:16,23
108:25 109:10
113:4,7,17 115:13
116:6 117:1,5,9
118:3,24 119:2
122:23 125:20
126:7 127:23
128:13 129:2,5
131:6,8,12,23
132:24 133:6,15
133:22 134:9,17
135:2,9,16 136:14
139:5,7,13,18
140:19,23 141:3
141:12,14,22
143:19 146:6
147:12,18 148:12
149:1,6,10 151:6
151:21 152:6,8,17
155:2 156:5,21
157:8,10,20 159:1
159:9 160:8,14
161:1,18 162:18
163:17 164:13,25
166:4,8 167:15
168:9 169:2,9,16

170:14,21 171:9
171:20 172:23
173:11 177:13
178:8,15 179:17
179:20 180:16
182:9,15,20
185:16 186:8,13
188:20,24 189:6
189:13 190:21
192:2,21 193:3,16
194:1 197:6,17
198:5,7,19 199:14
200:2,7,17,19
201:12 202:4,25
204:5,15 205:24
206:8 207:17,19
208:5,23 209:25
210:6 211:2,4,16
214:1,17 215:21
216:3,10,14
217:15,17 219:16
220:9 222:18
223:1,21 228:25
229:25 232:11
234:17,19 237:6
242:8 243:8,15,17
245:10,12,25
248:11,22 251:3
254:19 255:4,8
256:8,18 257:2,15
258:3,20 259:4,22
260:11,20 261:13
261:21 262:3,7,23
263:1,16,23 264:2
264:10,12,17,21
264:24 265:5,10
266:14 267:6,15
268:1,10,20 269:4
269:14 270:7,23
271:5,14,24
272:11 273:17,18

274:12,18 275:9
275:18,23 276:9
276:20 278:1,6,17
279:7,20 280:9,17
281:8,22 282:1,10
283:10,21 284:14
284:16,17 285:16
286:14,19 287:2
287:13 288:4,12
288:17 289:5,16
289:19,21 290:5,8
291:3,18 292:2
293:6,23 294:10
294:23 295:10,23
296:19 297:3,17
298:3,6,12 299:24
300:17 301:22
302:9 303:9 304:4
305:10,12,21
306:6 307:9
308:10 309:4,18
310:16 311:3,12
311:15 312:4,11
312:22 313:18
314:3,16 315:9
316:3,8,21 317:16
317:24 318:12
319:3,7,10 320:1
320:19 321:5,9,11
321:15 322:7,8,13
322:18,23 323:4
323:14,16,24
324:1,13,17
325:16,23 326:1,3
326:12,18,24
327:14 328:1
**shkolnik's** 329:8
**short** 49:9 58:1
60:18 92:20 144:6
172:6 220:15
222:5 231:15

241:17 252:24
254:24 299:20
327:5
**show** 11:10 42:18
54:19 122:13
154:1 173:15
194:24 264:13
**showed** 215:11
297:19 314:17
**showing** 53:23
**shown** 277:15
291:5 317:1
333:16
**shows** 81:12
123:18
**side** 91:18,21
**signature** 44:6
330:20 331:24
332:17 333:14
**signed** 137:4 164:7
334:13 335:18
**significance**
282:20 299:7,12
305:25 319:22
320:13
**significant** 122:8
306:3
**significantly**
111:25
**signing** 333:19
**signs** 185:7 298:20
**similar** 73:23
156:25 230:5,6
266:16 295:12
305:20
**similarly** 246:16
**simply** 185:8
**sincerely** 333:21
**single** 64:22
**sir** 138:24 139:3
333:10

**sit** 160:16 163:13
172:20 186:20
187:8 210:16
237:11 238:5
**sites** 300:20 301:8
**sitting** 72:15 146:3
187:11 277:19
292:16
**situation** 27:12,12
246:10,10,14,14
246:18,18,21,21
314:22
**situations** 79:9
147:9 150:14,25
**six** 208:5
**size** 26:10,18 64:3
146:22,24 147:10
148:21 227:2,5
246:12
**skipped** 307:12
**sl** 290:12
**slash** 95:13 97:9
101:17,21
**slide** 54:12
**slightly** 246:4
**slow** 159:14,17,18
**slower** 192:21
**sm** 290:11
**smaller** 225:9
**smith** 2:12 5:10
10:5 213:4,11,11
213:11,12 217:2,6
217:9,18 218:2,20
218:21 219:2
325:1
**smith's** 218:3
**snapshot** 120:12
121:5,8
**sole** 45:4
**solely** 39:21 181:8
242:4,14,18 245:4

**solutions** 3:18
333:1 336:1
**somebody** 46:3
302:2
**someone's** 109:1
**somewhat** 26:5
29:12
**soon** 24:3 205:8
249:23
**sooner** 150:23
**sorry** 17:1 18:15
52:25 67:11,13
68:12 76:6 80:22
91:16 95:1 107:9
132:13 138:19
147:23 154:7,12
154:13 162:18,24
167:9 170:2,3
171:13 177:8
179:17,21 189:24
191:8 192:5,24
196:25 199:17
200:5 206:1
215:17,24 217:22
224:7,7 252:3
258:18 263:18
264:22 265:1
277:8 301:5
306:16,16 307:11
312:13 321:11
323:15 324:16
**sort** 16:6 17:19,21
17:22,24 40:9
42:3 44:15 63:2
69:17 79:16
145:16 150:1
165:22 166:16
180:18 194:15
231:24 245:2
272:19,23

**sorts** 42:25 182:12
**sound** 24:15 52:6
**sounds** 55:2
**sources** 152:16
**south** 1:19 5:8
  10:5 296:9 298:17
  331:8
**spaeder** 4:16
**speak** 13:14,15
  17:20 23:18 25:3
  41:17 54:18 83:24
  84:6 130:19
  151:23 177:19
  202:9 207:19
  237:16 239:8
**speaking** 23:1,5
  59:2 71:8 83:21
  97:22 106:13
  114:13 133:1
  149:9 159:6,12
  162:3 165:2
  201:15 207:22
  208:2 213:23
  216:13 224:17
  239:7,15 250:3
  271:6 277:17,17
  278:8 280:6,25
  285:21 287:21
  291:21 294:11
  301:14,14 316:22
**speaks** 112:23
**spears** 6:23 183:12
**specgx** 5:5
**special** 77:1
  289:22 321:15
**specific** 31:17,19
  31:20 33:19 41:23
  45:6,12 60:6
  65:21 66:7,11
  67:24 68:11,24
  72:24 75:4 85:4

88:17 90:4 112:5
  112:21,22 113:3,6
  113:9,16 163:14
  165:2 170:20
  185:18 201:17
  202:20,23 204:16
  216:11,11 217:18
  224:19 228:20
  246:24 247:11,16
  252:3 261:7,9
**specifically** 25:19
  26:3 80:11 105:7
  111:1 116:1
  127:20 129:22
  132:18 134:19
  137:15 139:20
  140:4 144:24
  163:7 183:25
  184:24 193:5
  195:22 197:12
  199:1 202:5
  207:25 212:5
  242:22 267:3
  268:2 292:7 310:3
**specificity** 67:7
  68:4
**specifics** 132:4,17
  321:20
**specifies** 116:15
  119:22 121:15
**specify** 116:23
  117:23
**speculate** 48:15
**speculation** 66:14
  150:17 157:10
  179:7,16,20
  186:13 197:8
  205:24 222:20
  245:12,25 261:20
  292:25 293:2,17

**speculative** 170:14
  170:21 243:17
**speech** 99:24
**spend** 13:23
**spent** 93:7 311:5
**spoke** 60:1 81:2
  217:19 309:21
**spoken** 58:21
  114:4 239:19
**spring** 56:15 57:4
  120:25
**springfield** 17:1,4
  212:17,17,19
**ss** 331:2
**sschute** 4:4
**sshkolnik** 2:5
**staff** 17:9 18:19
  55:18,21 79:12
  96:12,16 105:11
  107:2,7 174:13,16
  174:24 237:24
  275:22 282:14
**staffed** 318:17
**stahl** 177:21
**stakeholders**
  205:6
**stand** 143:18
  174:19 322:2
**standard** 13:21
  29:23 30:2 115:5
**standing** 23:20
  84:5 149:4
**standpoint** 290:15
  291:12
**stands** 51:19
  280:13 290:22
**stanson** 10:2
**stanton** 6:25
**stars** 3:11,21
**start** 53:13 58:7
  63:10 67:1 68:10

106:5 187:5 195:5
  232:7,13 252:5
  253:20 279:10
  326:5
**started** 14:24
  54:13,17 55:10
  60:24 61:3 187:10
  207:25 310:19
  320:20
**starting** 237:14
**starts** 135:25
  173:23 175:22
  180:21 184:4
  187:17 190:4
  280:2
**state** 19:2 51:20
  104:21 164:20
  192:7 298:18
  299:4 328:5 331:1
  331:5 334:10
  335:15
**stated** 56:13 89:25
  98:4 104:22
  115:17,21 120:2
  206:11 209:7,16
  210:23 276:21
  279:21 280:3
  283:11 304:25
  305:3 307:13
**statement** 8:9 56:8
  56:25 82:6,13
  83:23 90:5 135:23
  136:9 210:7
  256:14,25 257:11
  257:22 259:17
  263:10 283:2,23
  291:9 302:7
  310:13,15,25
  311:25 313:23
  314:8 325:9,10
  334:13,14 335:19

335:19
statements 226:14
307:8,23
states 1:1,17 6:16
6:22 19:9 35:16
39:8 89:24 125:23
159:22 160:5
195:17 278:14,15
283:12,16 314:18
316:19,24 331:10
stating 51:1 250:2
275:24 298:20
310:8 317:18
statistically 112:9
status 102:19
statute 145:1,6
160:17,19 310:9
stay 201:3 295:15
stenographic
10:12
stenographically
331:18
step 67:15 68:11
68:24 72:24 74:8
227:17
stephens 3:2
259:21
stepped 194:15
steps 66:24 67:20
67:25 74:15 269:7
stick 143:4
stoffelmayr 5:17
260:16 261:4,19
stone 6:3
stop 200:5
stopped 237:25
stores 110:11,12
282:16
straight 117:16
strait 48:2,10
123:20,24 124:6,7

strategy 20:21,24
strayed 108:5
stream 94:21,24
street 2:9,13 4:12
4:17,22 5:3,8,13
5:17 6:13
strength 134:15
stressed 286:2
300:18
stressing 288:19
stretch 220:9
strike 46:11 64:19
84:12 103:2
253:19
strongly 317:4
student 15:2,3
study 91:15,22
stuff 53:8
stumbled 306:24
subject 53:10,22
63:5 64:11 78:9
100:23 106:18
221:20 240:7
260:4 262:12
265:17
subjective 64:9,13
89:20 307:17
subjectivity 26:6
64:19
subjects 236:11
246:4
submission 39:13
submit 36:5 140:1
140:7,9 181:2
submits 112:5
submitted 27:15
29:3,5 36:14,16
75:2,9 82:24 86:9
168:7 170:4,19
submitting 30:15
30:20 79:4 174:15

subparagraph
56:12
subscribed 334:10
335:14 336:21
subsection 86:23
substance 51:21
63:20 153:11
176:24 181:14
234:7 235:15
275:8 317:20
substances 19:17
19:22 87:14
108:22 116:14
119:21,25 121:14
124:16 136:7
144:17,25 145:21
146:5,7,11 151:20
152:10,21,22,24
154:2,23,25 155:6
158:5 159:22,25
162:13 167:24
176:24 178:23
179:14 180:5
181:5,8,22 182:13
184:8,16 190:15
191:7,25 192:10
192:14,17 193:9
193:15 196:13
197:24 209:8
210:23 214:7,25
215:2,8,13 233:6,9
234:23 235:8,22
236:2 239:11,12
239:13 248:17
250:23 251:1
256:12 259:16
260:7 261:3,16,24
262:15 269:3
270:2,16 271:13
271:19 274:2
275:1,12 276:23

279:9 282:15
284:23 285:9,20
286:2 301:18
303:6 307:19
308:2 313:5 315:1
315:24 317:17
318:4,6 319:17
320:7,8 324:4,10
substantially
26:14,25 64:4
148:22 149:20
150:3,14 246:17
substantiate 181:3
substantive 13:4,8
97:15 121:21
122:1
suburbs 16:25
succeeded 239:15
sufficient 31:24
98:14
suggest 305:14
323:8
suggested 313:3
313:21
suggesting 204:18
311:18
suggestion 302:21
318:20 322:3
suggestions 42:21
189:2,10 314:4
suit 332:8
suite 1:20 2:14,19
4:17 6:3,17 331:8
333:2
summarizes 54:2
summarizing
226:2
summary 62:2
63:8 67:13 75:1
218:23 219:1
224:20 226:12,13

[summary - tail]                                                                    Page 53

240:15
summit 1:12
superior 6:17
  333:1
supervised 34:21
  34:22
supervises 226:16
supervising 229:9
  240:25
supervision
  304:20
supervisor 16:7
  17:1 39:1 212:21
  212:23 221:8
supervisors
  174:23
supervisory 65:3
supplied 247:15
supplier 181:23
  182:5,18
supplies 151:15
  201:21
supply 6:5 83:15
  147:23,24 197:23
  202:18 214:6
  233:8 270:5,9,11
  280:19 282:12,13
  297:20
supplying 158:12
  158:20,23 162:8
support 55:21
  140:11 141:9
  162:12
supported 139:1
  140:13
supporting 158:15
supposed 27:15,17
  27:18 33:4 73:25
  74:11 79:16 119:2
  162:15 178:16
  290:2 310:5

supposing 207:21
sure 18:1 19:20
  24:16 29:8 46:13
  51:18 53:17 85:1
  96:15 102:17,24
  143:24 158:12,18
  158:20 159:16
  160:9 166:1
  167:10 171:14
  177:10 178:21
  185:23 189:9
  198:12 199:22
  200:11,13 201:3,6
  201:7 202:3
  203:21,23 206:4
  217:10 218:15
  220:11,12 225:21
  227:15 235:21
  245:8,22 248:23
  257:4 267:5
  270:10 276:13
  279:10,12 309:20
  309:22 320:7
  321:23 322:7
  324:25
surprise 203:14
  289:7 302:7
surprised 79:25
  80:7
surprising 288:22
  292:16,22 293:12
  302:2
suspicion 150:1
suspicious 19:16
  19:21 20:1 21:6
  24:24 26:4 27:22
  28:17 30:22 32:20
  35:21 36:23 37:7
  37:15 38:7 39:17
  39:21 40:4,13,19
  41:9,24 44:17

45:7,10 56:14
57:4,9,13 58:25
59:22 61:6,16
63:21 64:3,8
65:18 67:5,7 68:3
68:5 69:2,7 70:4,9
70:24 71:10 73:5
79:7 86:22 87:8
87:13 89:14 90:2
93:9,21 95:10,19
95:23 96:3 97:8
97:18 98:13
101:11,23 102:2
108:14 111:12,19
112:7,13 113:13
116:13,15,23
117:23 118:13
119:20,22,25
120:22 121:13,15
122:15 129:25
143:15 145:10,13
145:15,20,23,25
145:25 146:1,4,20
147:10 148:19,20
150:15 151:1,5
165:3,4 167:2,13
167:19 189:17
191:1,6,15 213:5
213:14 215:7
235:4 242:5,15
247:9 248:21
249:8 251:19,23
252:3,6,9,14 253:8
253:13 259:14
261:17 276:23
278:22 279:15
281:17 282:5,13
282:14 284:12
286:4,23 287:1,19
288:3,21 293:11
297:9,15 300:22

301:9 306:14,17
307:18 308:1
312:14,14 315:23
316:7
swear 10:14
sweeping 203:11
switch 33:9 254:20
switching 165:13
sworn 10:17,19
331:15 334:10,13
335:14,18 336:21
system 41:24 42:4
42:8,8,12,19,24
45:5,7,10,12,18
73:3 87:12,20
88:4,12,22 89:19
112:11 125:6
153:2,7,17 155:1
157:24 158:3
190:25 191:6,16
191:17 213:14
251:24 252:14
258:9 276:24
280:4,21,22 281:1
281:2,12,17 282:5
282:13 286:23
287:1,18 288:14
306:15,18
systems 41:24
42:2,13 45:24
112:10,10 280:6,7
288:2 293:12
297:15 301:9
316:7

|     t     |
| t 4:2 7:10 8:1 9:1 |
| 44:7 |
| table 238:14 |
| tablets 275:4 |
| tail 46:25 |

| | | | |
|---|---|---|---|
| **take**  53:14 57:20 | 314:8 | 138:3,13 143:9 | **testified**  10:20 |
| 57:21 66:24 67:15 | **talked**  56:3 127:21 | 167:17 188:2 | 11:24 12:7 144:25 |
| 67:19,24 72:25 | 137:6 144:16 | 189:21 198:21 | 164:21 180:8 |
| 74:8,23 78:5 89:1 | 180:2 187:2,4 | 222:24 225:20 | 182:4 226:14 |
| 92:2,5,7 94:7 | 204:13 214:10 | 242:3,13,24 | 227:18 236:10,12 |
| 100:20 101:12 | 236:22 238:17 | 244:13,20 245:1 | 238:23 249:14 |
| 111:2 114:19 | 291:6 292:8,12 | 245:22 266:4,21 | 251:17 |
| 116:10 119:13 | **talking**  20:7 22:4 | 275:19 286:15,22 | **testify**  11:7 23:14 |
| 121:5 123:3 124:3 | 35:3 48:15,24 | 286:25 287:3,15 | 23:16,22 34:3,12 |
| 125:8 130:20 | 49:3,4,15,16 50:1 | 294:11 310:9 | 34:15,16 48:23 |
| 138:2,9 142:19 | 52:3 75:24 93:7 | 324:20,24 328:11 | 68:13,14 69:10 |
| 157:15 164:16 | 95:20 100:13 | **telling**  103:6,12 | 73:16,17,19 84:4 |
| 165:25 187:17 | 106:21 108:13 | 116:20 206:19 | 93:2 115:17,20 |
| 190:11,16 206:25 | 109:13 120:20 | 278:10 299:2 | 124:24 130:3,15 |
| 220:9,11 227:17 | 129:10,19 139:10 | **tells**  247:15 | 137:7 141:23 |
| 229:5 230:16,24 | 139:11 152:21 | **temporary**  15:9 | 143:16 198:8 |
| 247:3,7 248:19 | 177:15 201:1,1,2 | **tenure**  46:1,6 | 223:6,9 225:18 |
| 254:21 255:16 | 204:12,16 226:19 | 50:11 58:23 | 261:9,11 331:15 |
| 269:7 306:13 | 226:20 237:7 | 129:15 180:14 | **testifying**  23:8 |
| **taken**  1:19 10:6 | 240:7 262:9,10,10 | 210:4 226:7 227:3 | 73:25 74:12 82:3 |
| 18:23 45:11 58:2 | 274:13,16 277:19 | 227:21 240:12,16 | 137:10 180:6 |
| 60:19 92:21 | 308:3 | **term**  116:15,22 | **testimony**  11:22 |
| 108:19 123:8 | **talks**  226:8 272:22 | 117:22 118:9 | 13:11 34:20 40:24 |
| 143:24 144:7 | **targeted**  239:5 | 119:22 121:15 | 50:25 81:23 82:7 |
| 172:7 220:16 | **targeting**  207:14 | 152:20 165:15 | 84:10 137:18 |
| 231:16 241:18 | **tax**  247:12 | 166:19 216:16 | 138:4,8 139:8,19 |
| 249:6,10 252:25 | **team**  298:15 | 217:6 234:11 | 153:15,21 156:14 |
| 254:25 256:2 | **technically**  128:3 | 296:21 | 158:18 161:16 |
| 269:8 292:13,19 | **technicians**  16:14 | **terms**  12:12 14:16 | 165:1 194:15 |
| 299:21 327:6 | **telephone**  2:3,8 | 19:5 130:2,18 | 218:1,1 234:13,25 |
| **takes**  14:15 326:14 | 3:6,16,21 4:7 6:8 | 152:3,4 154:9 | 235:2,10 236:19 |
| **talk**  34:7 53:6 | 6:12 | 161:17,20 226:19 | 240:9,10,15 |
| 86:21 101:24 | **tell**  13:10 14:24 | 226:25 227:1,5,7 | 241:24 242:6 |
| 109:5 114:1 126:8 | 15:15 18:17 19:5 | 250:14 269:20 | 245:17 246:7,13 |
| 130:4,17 133:24 | 26:2,16 27:24 | 271:18 293:11 | 250:6 283:5 |
| 142:22 143:23 | 29:13 31:7,12,16 | 303:23,24 304:11 | 287:22 289:1 |
| 144:23 218:9 | 35:19 36:7,14 | 304:11 310:2 | 295:9 331:17,22 |
| 236:25 238:10,11 | 39:19,23 40:3,25 | **terrible**  59:12 | 332:10 334:6,7 |
| 240:6 246:5 263:5 | 50:16 53:18 54:3 | **territory**  16:23,24 | 335:6,9,12 |
| 288:1 292:18 | 77:12,12 87:18,19 | 218:16 | **teva**  4:9 |
| 294:2 297:8,11 | 96:10 137:17 | | |

**[text - today]**

**text**  44:9
**thank**  11:20 23:23
  24:9,21 31:5 46:4
  77:15 95:14 144:3
  164:14 173:14
  189:25 193:3
  199:21 201:23
  208:6,11 216:14
  231:11 238:22
  240:5 248:3 253:4
  254:17 264:11
  326:24 327:24
  330:7,14,16
**thanks**  222:6
  231:11 262:24
**themes**  64:6
**theory**  57:21
**thereof**  332:9
**theres's**  84:22
**thereunder**  256:13
**thing**  16:6 17:24
  25:5 34:19 53:15
  55:3 56:12 69:17
  74:21 86:12
  117:17 125:10
  134:20 135:21
  221:24 222:11
  276:10,14 278:19
  289:8 290:14
**things**  21:16 56:3
  66:7,11 81:20
  112:22 133:25
  151:13,16 162:20
  189:10 230:25
  232:1 236:17
  237:3 253:7 256:2
  265:15 270:2
  285:4 299:3
**think**  14:8 18:12
  18:20 19:9 27:9
  28:12 33:23 34:6

43:7 52:2 61:11
61:12 96:22 97:12
100:12,14 102:24
115:18 119:4
123:12 125:9,14
126:9 129:17
130:15 132:12
136:24 142:22
148:3,8,10 155:4
164:6,10,21
172:17 179:12,18
180:8 187:8
199:12 200:25
206:19,21 207:21
208:10 209:22
210:4 211:1 212:7
214:18 221:9
222:13 226:22
227:4,9,17 230:9
232:11 234:10,11
235:17 236:13,15
238:5,21 242:16
243:20 247:23
249:15 256:4,7
258:4 267:19
290:9 301:25
318:20 320:22
328:20,21 330:13
**thinking**  108:12
  109:18 128:3
  153:22 205:25
  215:8 237:15
  243:11,14 244:25
**third**  172:13
  195:19 196:7
**thirds**  138:23
**thirty**  333:18
**thornburg**  5:7
**thorough**  97:3
**thought**  36:19
  86:6 109:15,17

131:8 178:15
190:23 199:20
222:3 243:20
319:3,7
**thoughts**  99:1,3,3
**threat**  122:7
**three**  55:24 67:1
  78:24 79:3 80:2
  92:2 186:12,24
  296:1 313:2,20
  314:17,17
**threshold**  112:10
  147:5 202:3,16
**thresholds**  199:10
  200:1,14 201:19
  202:5,23 204:17
**thursday**  96:25
**ticking**  34:19
**tim**  212:25 218:24
**time**  10:3 18:9,11
  20:2,5 21:3,5,18
  22:3,4,12,17 24:11
  24:16,17,22 28:4
  28:20 30:2 34:19
  35:18,19 38:21,23
  39:7 40:2,8,11
  41:21 50:2 52:18
  53:18 55:12,19,20
  55:22 56:1 58:6,9
  58:23 61:7,12
  62:12 64:21 70:17
  70:19 84:10 85:6
  93:7 94:17 98:5
  98:13 101:7,12
  102:12 114:14,24
  115:9 124:7 125:9
  127:1 128:16
  130:21 132:22
  143:23,25,25
  159:7 162:24
  177:14,17 208:3

212:22 214:12,13
214:15 221:8
222:25 224:11,15
224:16 230:24,24
231:10,12,24
234:6 238:10,21
240:22,22 244:7
248:16 251:2
254:7,18 255:17
269:7 271:10
272:18 273:15
274:17 287:24,25
290:7 295:1 311:5
311:10,20 312:16
322:4 326:17,24
330:8,16
**timeline**  311:18
**times**  60:2 186:12
  186:16 208:5
  270:24 274:6
**timothy**  212:12,24
**title**  15:15 96:13
  232:9 314:1
**titled**  233:1
**today**  10:3 11:2
  13:11 34:3,20
  69:23 72:15
  106:21 122:12
  160:16 163:13
  164:5 172:20
  177:18 186:20
  187:8 191:21
  210:16 217:2
  221:8 231:2,5
  236:10,12 237:12
  238:5,23 241:11
  241:24 246:7
  251:17 265:1
  267:18 277:12
  291:5,10,11
  309:25 314:4,19

327:22
today's 11:22
told 21:21 32:9
37:13 55:11 68:21
94:10,11 99:24
100:2 237:24
242:16 247:23
277:10 287:6,17
287:20 301:6
319:2,5
tonight 101:25
tool 124:14,19
125:10 127:13,18
127:20 128:3
top 62:21 121:6
175:22 183:15,20
203:7 220:25
239:9 280:1
306:19
topic 46:6 165:14
231:25,25 232:6
297:11
topics 11:8 33:10
231:1 240:6
total 220:8 254:11
254:12
touhy 34:4 35:4
92:16 129:5,12
141:24 142:10,23
143:13 201:3
223:5 225:22
229:3,15 230:13
230:23 261:6
263:21,22 284:8
284:11 296:14,24
297:1 318:8,11
319:24 320:16
tower 2:14 5:3
tp 48:14
track 18:13 120:8
120:13

trade 58:11
110:12 114:8
291:6 295:5 311:5
training 16:6
19:12 20:20 21:19
trainings 66:16
transaction
145:18
transactions 29:16
32:13 54:21
153:10,24
transcribed 334:7
transcript 138:3
321:24 331:22
333:11,12 334:5
334:12 335:5,11
335:17
transcription
331:21
transcripts 9:6
transparency
156:16
transpired 273:12
treatments 197:14
trends 308:14
trial 12:7 255:11
265:16
trials 12:17 255:12
tricky 163:2
tried 284:16 285:5
285:9,19 303:10
310:1
true 56:24,25
118:18 136:9
211:1 249:2,3
250:18 331:21
truth 331:15,16,16
try 30:5 31:9
130:23,25 139:24
167:10 172:18
199:20 208:20

235:18 241:1,6
255:14 269:8
271:16 274:6
295:15 308:24
309:14 318:2
320:3 321:19
trying 32:16 34:6
43:7 106:14
171:13 200:22
206:18 213:5
218:12 230:10
235:24 244:1
269:20,20 272:2
276:13 292:17
293:10 302:22,25
303:23 311:6
320:4 329:18
tuesday 184:4,5
turn 92:11 183:8
183:16,18 184:3
187:16 209:2
231:8 232:24
251:15 279:23,25
306:10,11 313:5
turned 50:6,7,8,18
50:21 52:17
turns 120:7
tweel 2:7
twelfth 4:12
twentieth 6:13
twice 306:25
two 12:11 16:8,11
17:2 47:25 78:11
107:2 110:8 112:5
112:8,18,25 113:8
115:24 123:18
136:23 138:23
164:5 213:9
252:20
type 27:14,16
30:16 72:20 96:5

130:7 134:7
154:14 185:12,18
268:3 277:13
285:3 286:9
288:21 301:15
305:13 308:2
321:7 324:11
types 186:5 239:5
typewriting
331:20
typical 30:7
typically 146:24
150:23 168:7
174:5
typo 102:25

**u**

u.s. 6:19,22,23,24
10:9 282:13
283:12
uh 35:17 154:11
203:9 224:25
247:25
ultimate 153:8,13
153:14
ultimately 40:14
140:22 277:2
umbrella 266:13
unable 209:6
210:21
unchanged 107:22
unclear 38:5,9,10
208:17
underneath
121:20
understand 11:6
22:7 46:13 85:2
108:5,9 118:5
158:18 166:1
176:19,22 177:5,8
177:10,19 178:6
198:12 199:12

205:2,22 206:6
209:19 217:25
241:2 247:23
248:4,8 250:21
251:14 268:14
274:7 283:1,24
285:6 291:2 294:5
294:19 301:16
302:20 310:2
**understanding**
29:18 30:19 32:17
72:4 73:6 79:6
104:25 156:13
167:1 173:7
178:10 179:3
181:25 194:3
198:9,13 205:21
206:5 209:14,18
213:21,24,25
214:2 218:5,13
225:13,14 240:14
242:9,12 243:25
244:3 248:5
269:24 272:13
273:10 276:13
277:16 278:8,19
279:8 281:1,10,15
281:18 282:2,23
283:17,22 284:3,6
287:14 290:4
291:24 293:15
298:4,7,24,25
300:9 309:21
310:1,17 314:24
315:4,18,21 316:4
316:6 317:6,9,25
318:3,22 319:14
**understands** 209:5
210:20
**understood** 30:19
69:14 103:5

131:14 174:14
190:12 201:23
218:11 233:16
235:1 240:9,16
244:8 245:18
246:6,13
**undertook** 236:18
**undetermined**
331:10
**uneven** 203:15
**unfortunate** 33:22
**unified** 120:1
**unintended**
196:13
**uninterrupted**
233:8
**united** 1:1,17 6:16
6:22 89:23 195:16
283:12,16 314:18
331:10
**units** 171:6 177:22
**unpack** 199:13,22
**unquote** 39:18
56:5 107:24 108:8
**untrue** 57:2
**unusual** 26:10,15
26:17,21 64:3,5
105:13 146:21,22
147:2,6,10 148:21
148:23 150:21,25
185:25 186:2
246:12,20 290:25
307:18 308:1
**update** 53:11,22
71:24 226:9,9
**updated** 72:11
**ups** 280:18 282:12
297:20
**upstream** 258:8
258:14

**urgency** 122:5
**urgent** 122:11
**usc** 190:1,4
**usdoj.gov** 6:19
**use** 84:20 94:18
100:5,7 139:7,18
167:5,23 177:22
210:11 234:10
279:3
**user** 153:8,13,14
**uses** 280:19
**usual** 89:3
**usually** 255:15
**utilize** 257:20
**utilized** 281:16,24
282:4

**v**

**v** 1:8,12 111:5
333:6 334:3 335:3
**vague** 60:25 72:8
75:23 85:16 88:16
109:18 133:16
135:15 185:17
217:7 219:24
228:7 259:2
267:14 268:24
269:11 270:19
271:8,21 273:15
273:15 279:1,17
281:20 283:4
285:13 287:24
289:12 290:18
292:24 294:7,16
294:17 295:8
297:13 299:9,11
311:9 314:13
317:14
**vagueness** 285:15
**value** 63:23
282:15

**varies** 246:14
**variety** 246:8
**various** 49:17
135:6 175:6,8
202:13 203:15
228:19 267:17
297:15
**vary** 27:10 64:21
246:10,17,20
**vast** 329:17
**verbal** 80:17,25
**verbally** 81:2
**verification**
176:24
**veritext** 10:2,14
333:1,7 336:1
**veritext.com.**
333:17
**version** 94:15
139:1 140:12
141:10
**versus** 98:4 145:24
**veteran** 301:4
**vice** 110:9
**videographer** 6:25
10:1 43:15,19
57:23 58:3 60:16
60:20 92:19,22
109:22 110:4
123:5,9 144:4,8
172:4,8 220:7,13
220:17 231:13,17
241:15,19 252:22
253:1 254:9,12,22
255:1 299:18,22
327:3,7 330:18
**videotaped** 1:15
**view** 9:3 40:21
54:22 98:8 108:6
109:6 155:1
167:12,25 185:15

185:25 186:2
196:20 217:22
246:7 247:6
**views**  54:21
**violated**  262:14
**violation**  244:22
245:3
**violations**  15:22
16:21 39:25
244:15 261:16,23
294:20
**virgina**  2:9
**virginia**  20:15
266:11 273:5
**visibility**  155:24
156:3,19 157:4,16
157:18 258:6,7,14
258:23 281:2
283:1,9
**visit**  239:12
282:18 298:15
300:20,21 301:7,8
306:15,17
**visited**  282:12
**voice**  23:8 170:2
**volume**  282:18
**vs**  1:10

**w**

**wacker**  1:19 2:19
3:7 4:3 10:5 331:8
**wait**  244:24
**waive**  322:1
330:20
**waived**  331:25
333:19
**walgreen**  5:19,20
**walgreens**  240:3
249:4 255:24
260:12 261:15
262:11 292:14

**walmart**  3:9
239:23 249:4
255:23
**want**  11:4 14:1,14
34:9 38:1 41:22
50:8 51:5 52:16
53:13,14,24 73:19
73:20 74:22,24
76:7,22 83:6,6
86:11,15,19 97:10
101:24 102:17
126:15 130:13
136:20 138:22
149:10 158:12,15
158:18,20 162:10
165:25 173:5
198:12 201:3
202:10 215:5
217:25 227:6
228:19 232:6
240:6 247:14,14
253:10 257:3
262:20 273:11
276:3 279:10,12
292:18 293:13
294:12 299:14
304:7 305:23
316:15 321:22
322:5 325:24
**wanted**  21:18
58:25 59:3 60:6,7
60:13 77:20 85:13
90:1 94:10 103:13
104:13 128:20
130:4 131:9 140:2
218:15 229:23
243:20 269:6
295:14 308:22
309:20,22 310:25
312:5 328:13

**wants**  305:2
330:21
**warrington**  6:4
**washington**  2:14
3:17 4:13,17 15:9
17:7 203:13 276:2
296:1 303:18
**waste**  290:7
**watched**  184:12
187:25 188:4,13
188:19 189:4,11
**way**  18:17 28:14
30:5 65:16 80:16
93:16,17 96:22,22
103:8 108:18
109:7 122:16
125:16 128:23
130:23 138:5,23
157:3,21 160:12
168:21 169:5
170:8 197:3
211:14 214:14,16
220:2 229:23
230:7,10 235:13
235:16 237:10
238:13 242:23
257:17 258:13
272:1 276:12,19
289:21 298:1
329:15 332:7,8
**wc.com**  4:14
**we've**  47:9,14
49:16 57:21 93:7
95:19 101:14
102:16 106:20
108:13 132:9
152:21 204:13
222:10 232:7,14
240:7
**web**  120:13

**week**  231:6
**weiss**  6:12
**wendy**  2:3
**went**  13:13,15
17:7 18:25 20:11
20:13 98:5 115:8
135:7 202:12
210:19 237:23
267:22 303:14,25
**west**  2:9,19 3:7 4:3
5:17 6:17
**whereof**  332:10
**whichever**  15:23
**wholesale**  63:21
64:7 67:4,8 68:2,6
72:23 73:1 203:12
**wholesaler**  184:7
**wholesalers**
196:11 203:15
204:25
**wicht**  4:12
**william**  5:2,7
**william.davison**
5:4
**william.hahn**  5:9
**williams**  4:11
38:19,25 39:1
**willing**  205:5
**wisconsin**  6:8,9
19:4
**wit**  331:7
**withdraw**  76:17
76:21,23 77:4,5,13
172:17 250:11
277:6 314:19
329:5
**withdrawing**
76:12 77:9,11
**witness**  7:2 10:11
10:15,16 11:18
13:3,7 23:1,8,9,12

**[witness - written]**

23:14,19,22 29:7
30:1,11 32:23
33:6 36:13,25
37:10,18 38:9
41:2 42:1 44:21
46:25 50:15 51:22
55:6 58:13 65:10
66:6,15 69:13
70:1,11,19 71:5,16
71:18 72:9,19
73:14,25 74:11
75:19 77:3 80:6
81:7,9 85:20 86:6
88:17 90:15 93:1
95:22 99:8 104:2
104:23 112:25
113:8,19 115:14
116:7 117:5,10,16
118:18 119:1
126:8 127:24
128:14 129:6
132:7,14,25
133:23 134:10,19
135:3,11,17
136:17 138:19
139:20 141:7,15
141:25 145:8
146:7 147:13,20
149:2 150:18
151:9 152:9,18
153:19 155:4
156:6,23 157:11
157:21 160:9
161:2,19 162:2,19
163:18 165:2
166:10 167:18
168:11 169:3,10
169:17,25 170:15
170:22 171:22,25
172:15,24 173:12
178:9 179:9,18,22

180:17 181:17
182:21 183:25
185:18 186:2,9,14
186:24 188:6,10
188:21,25 189:7
189:14 190:22
193:18 194:2,9
196:25 197:9,18
198:8,9,21 199:14
200:18,19 201:10
201:13 202:5
203:1 204:6,16
205:18 206:1,10
206:16 207:8,18
209:19 210:10
211:5,17 214:2,18
215:23 216:4,15
216:25 217:8
219:17,25 220:12
222:21 223:3
228:8 229:16,17
230:2,14 234:20
237:7 242:9
243:10,19 246:1
248:13,23 251:5
256:7,16 257:13
257:25 258:18
259:3 260:10,18
261:12 263:14
266:8 267:3,24
269:1,12,24
270:20 271:11,22
272:10 274:10,16
275:7,17,22 276:8
276:19 278:14
279:2,18 280:15
281:5,23 282:8
283:8 286:12,25
288:1,11,16
289:16,18,19
290:23 293:4,19

294:8,18 295:21
297:14 298:9,17
299:12 301:20
302:7 303:5
305:19 306:3
307:7 308:9 309:3
309:17 310:15
311:2,14 312:2,9
313:17 314:1,14
316:6,19 317:15
321:3,13 322:11
322:17,22 323:25
325:15,22 326:9
326:16 329:3,22
330:6 331:18,19
331:23 333:8,11
334:1,4,11 335:1,4
335:15
**witness's** 40:24
**witnesses** 33:21
93:1 207:22
289:24
**witness'** 333:14
**wmithcell** 2:5
**word** 17:23 116:11
135:25 145:10
166:15,22 210:10
**words** 30:18 159:9
193:22 234:11
**work** 11:8 13:4
32:4 41:8,15
42:12 43:3 80:10
83:11 84:20 85:13
94:13 99:14,15,17
99:17 121:24
129:24 142:14,15
163:22 202:2
221:15 266:25
285:3 291:1 309:3
311:6

**worked** 17:9 22:19
24:1 28:18 96:15
125:15 221:16
285:4 303:8
**working** 14:18
31:6,11 50:3 57:3
57:8,12 78:7 83:1
85:6,23 86:10
96:6 106:11 136:8
142:15 224:8
227:20 236:14,14
237:19 284:5
286:9 301:15
302:13 305:2
307:5 311:18
**workings** 118:25
**workload** 101:22
**works** 177:12
**workshops** 83:2
**worth** 198:1
**wow** 278:9
**wright** 321:17,24
**write** 39:12 163:2
163:8 196:8,10
**writer** 54:4
**writes** 56:3,13
96:2 97:1 221:23
**writing** 67:3 68:1
69:3,14,19,22 81:4
83:3 94:23 97:13
119:16 277:6,9
291:7
**writings** 277:13
**written** 32:19 57:1
69:7,22 70:5,8
71:9 80:16,25
81:12 82:23 83:19
84:13 85:7 86:3
93:10 95:18
107:20 110:20
114:23 115:23

161:15 183:9,11
226:15 265:24
266:1 272:19
281:10,11 298:25
**wrong** 312:12
316:14
**wrote** 39:4 57:7
72:5 79:19 81:3
82:23 86:9 95:6,8
117:4 211:6
241:25 243:3,22
267:21 319:7
**www.regulation...**
120:2

**x**

**x** 7:1,10 8:1 9:1
226:17

**y**

**yeah** 16:13 27:1
28:2 29:22 30:17
37:19,23 41:16,20
45:14 47:13 52:10
55:15,15,25 56:10
57:17 62:25 64:16
70:20 77:7 80:6
80:21 90:8,15
98:2,5 99:12
117:17 124:8
133:5 134:2 140:4
140:6 146:13
150:18 157:2
166:25 171:25
183:15 190:6
211:17 234:20
238:10 239:2,2
244:23 251:6
253:18 269:2,13
283:9,24 284:9
296:25 298:10
300:5 323:24

**year** 12:4 15:5
17:13 102:23
103:7,15,19
146:14 148:5
228:8,9 247:6
255:13 301:3
303:12,14
**years** 12:5 14:23
15:4,14 55:9,24
78:24,25 79:3
80:3 128:6 130:12
134:24 145:2
163:6 171:17
199:11 200:10
201:6 210:4,25
222:2 225:9
227:23 234:2
235:23 250:5
259:6,25 266:6,22
268:5 270:14
271:1 276:1
282:24 284:2,4
285:2 286:8
288:23 289:10
290:13 291:12
293:24 294:25
295:19 302:17,25
303:11 305:15
307:23 308:21
309:10 310:18
311:4 314:9
315:19 317:10
**yesterday** 13:12
13:24,25
**york** 2:4,4

**z**

**zachary** 6:2
**zmartin** 6:5
**zolner** 4:21 7:5
144:11,12 145:9
146:9 147:14

148:2,13 149:4,8
149:14 150:19
151:10 152:1,12
152:19 153:20
155:8 156:7,24
157:14,23 159:5
159:11,16,19
160:11,15 161:3
161:22 162:6,21
163:1,19 164:14
164:15 165:5
166:5,11 167:21
168:13 169:4,11
169:18 170:1,17
170:23 171:10
172:3,16 173:1,13
173:19 177:16
178:11,18 179:11
180:1,19 181:18
182:10,17,22
183:4 184:2
185:21 186:3,11
186:15 187:1
188:7,11,14,16,22
189:1,8,15 191:2
192:4,22,25 193:4
193:21 194:4,11
195:4 197:1,11,20
198:11,23 199:16
200:3,5,8,21 201:5
201:22 202:7
203:2 204:11,19
205:19 206:3,12
206:17 207:9,24
208:6,7,24 209:21
210:2,15 211:10
211:19 212:1
214:8,20 215:17
215:18 216:1,5,13
216:18 217:4,12
217:21 218:11,18

219:18 220:1,5,11
220:22 222:23
223:8,11,22,23
225:21 226:22
227:11,16 228:10
229:4,18 230:3,15
230:21 233:19
242:16 256:15
258:16 259:1,19
263:11 264:19
266:7 267:2,13,23
268:19,22 269:10
270:18 271:4,7,20
273:14 274:9,15
275:6 276:7,15
277:21 278:12,24
279:16 281:4,19
282:7 283:3,19
285:11 286:11,18
289:4,11 290:4,17
292:1,23 293:16
294:6,15 295:7
297:12 298:8
299:8 301:19
305:17 306:1
307:6 309:16
311:8 314:13
316:18 317:23
318:24 319:1,4
**zoom** 265:13
**zuckerman** 4:16
**zuckerman.com**
4:18

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.