Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
                           -   -   -
 3
     IN RE:  NATIONAL            : HON. DAN A.
 4   PRESCRIPTION OPIATE         : POLSTER
     LITIGATION                  :
 5                               :
     APPLIES TO ALL CASES        : NO.
 6                               : 1:17-MD-2804
 7             - HIGHLY CONFIDENTIAL -
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 8                       -   -   -
                     JANUARY 24, 2019
 9                       -   -   -
10              Videotaped sworn deposition of
11         CHRISTINE BAEDER, taken pursuant to
12         notice, was held at GOLKOW LITIGATION
13         SERVICES, One Liberty Place, 1650 Market
14         Street, Philadelphia, Pennsylvania,
15         beginning at 9:09 a.m., on the above
16         date, before Margaret M. Reihl, a
17         Registered Professional Reporter,
18         Certified Shorthand Reporter, Certified
19         Realtime Reporter, and Notary Public.
20
                           -   -   -
21
              GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2

      WAGSTAFF & CARTMELL LLP
 3    BY:   JONATHAN P. KIEFFER, ESQUIRE
            BRIAN J. MADDEN, ESQUIRE
 4          KATHLEEN HUDNALL, PARALEGAL
      4740 Grand Avenue, Suite 300
 5    Kansas City, Missouri  64112
      (816) 701-1132
 6    jkieffer@wcllp.com
      bmadden@wcllp.com
 7    Representing the Plaintiffs
 8

 9    MORGAN, LEWIS & BOCKIUS, LLP
      BY:   REBECCA J. HILLYER, ESQUIRE
10    1701 Market Street
      Philadelphia, Pennsylvania 19103-2921
11    (215) 963-5160
      rebecca.hillyer@morganlewis.com
12    Representing the Defendant Teva and
      the witness
13

14

15    PIETRAGALLO GORDON ALFANO
      BOSICK & RASPANTI, LLP
16    BY:   DOUGLAS E. ROBERTS, ESQUIRE
      1818 Market Street, Suite 3402
17    Philadelphia, Pennsylvania  19103
      (215) 988-1431
18    der@pietragallo.com
      Representing Cardinal Health
19

20

      JONES DAY
21    BY:   CHRISTOPHER MARKHAM, ESQUIRE
      100 High Street
22    21st Floor
      Boston, Massachusetts  02110-1781
23    (617) 449-6890
      cmarkham@jonesday.com
24    Representing Walmart
```

Highly Confidential - Subject to Further Confidentiality Review

1    ALSO PRESENT:

2

     Carolyn M. Hazard, Litigation Counsel

3    Endo

4    Bill Geigert, Videographer

5    Bradley Smith, Trial Technician

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    APPEARANCES VIA TELECONFERENCE AND STREAM
 2
      ARNOLD & PORTER KAYE SCHOLER LLP
 3    BY:  WILSON D. MUDGE, ESQUIRE
      601 Massachusetts Ave, NW
 4    Washington, DC  20001-3743
      (202) 942-5404
 5    wilson.mudge@arnoldporter.com
      Representing the Defendants, Endo
 6    Health Solutions; Endo
      Pharmaceuticals, Inc.; Par
 7    Pharmaceutical Companies, Inc. f/k/a
      Par Pharmaceutical Holdings, Inc.
 8
 9
      COVINGTON & BURLING LLP
10    BY:  ALEXANDRA WIDAS, ESQUIRE
      One CityCenter, 850 Tenth Street, NW
11    Washington, DC 20001-4956
      (202) 662-5877
12    awidas@cov.com
      Representing McKesson
13
14
      REED SMITH LLP
15    BY:  SHANA E. RUSSO, ESQUIRE
      136 Main Street, Suite 250
16    Princeton Forrestal Village
      Princeton, New Jersey 08540
17    (609) 987-0050
      srubbo@reedsmith.com
18    Representing the Defendant AmerisourceBergen
19
20                        - - -
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 I N D E X
 2    WITNESS                              PAGE
      CHRISTINE BAEDER
 3            By Mr. Kieffer          12, 423, 430
              By Mr. Madden                    372
 4            By Ms. Hillyer             415, 430
 5                    _ _ _
 6               E X H I B I T S
 7    NO.        DESCRIPTION               PAGE
 8    Teva-
      Baeder-1  File Provided Natively
 9              Teva, Our Business Units
                Templates to be completed
10              and put into the kit
                [TEVA_MDL_A_09644157]       32
11
      Teva-
12    Baeder-2  Performance Management
                Evaluation for Christine
13              Baeder for 2013
                [TEVA_MDL_A_13618546
14              through 8552]               97
15    Teva-
      Baeder-3  E-mail dated 1/31/14
16              Subject, Topco Update
                for Israel
17              [TEVA_MDL_A_12363196]      154
18    Teva-
      Baeder-4  E-mails dated 2/6/07
19              Subject, Re:  Israel
                list for RABid
20              [TEVA_MDL_A_12121972
                and TEVA_MDL_A_12121974]   160
21
      Teva-
22    Baeder-5  File Provided Natively
                All Products Charts
23              [TEVA_MDL_A21121974]       160
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      E X H I B I T S
 2   NO.          DESCRIPTION                    PAGE
 3   Teva-
     Baeder-6   File Produced Natively
 4              Slide deck, NACDS P&T
                Conference
 5              August 27-30, 2011
                [TEVA_MDL_A_12280545]           165
 6
     Teva-
 7   Baeder-7   E-mail string, top
                one dated 1/21/09
 8              [TEVA_MDL_A_13558196
                through 8198]                   180
 9
     Teva-
10   Baeder-8   E-mail dated 5/31/11
                Subject, PhV Internal
11              Audit report - Final
                with attachment
12              [TEVA_MDL_A_13580697
                through 0760]                   187
13
     Teva-
14   Baeder-9   E-mail dated 3/12/09
                Subject, PFG Packet -
15              Today's Market S&OP
                (March 12)
16              [TEVA_MDL_A_12172071
                through 2072]                   189
17
     Teva-
18   Baeder-10 File Provided Natively
                Market Planning Sales
19              and Ops Planning Meeting
                [TEVA_MDL_A_12172072]           189
20
     Teva-
21   Baeder-11 Generic Products
                Purchase Agreement
22              [TEVA_MDL_A_02988415
                through 8452]                   192
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2   NO.         DESCRIPTION                    PAGE
 3   Teva-
     Baeder-12 Group Purchasing
 4             Agreement dated 1/1/14
               [TEVA_MDL_A_03450003
 5             through 0052]               197
 6
     Teva-
 7   Baeder-13 E-mail dated 12/5/16
               Subject, Teva/ABC
 8             Agreement Discussion
               [TEVA_MDL_A_12706786
 9             through 6787]              199
10   Teva-
     Baeder-14 Generic Products
11             Purchase Agreement
               dated 1/1/17
12             [TEVA_MDL_A_06604089
               through 4137]             205
13
     Teva-
14   Baeder-15 Cardinal Health Supplier
               Agreement dated 10/9/17
15             [TEVA_MDL_A_03464523
               through 4538]             208
16
     Teva-
17   Baeder-16 Master Distribution
               Services Agreement
18             dated 2/1/17
               [TEVA_MDL_A_03464712
19             through 4770]             210
20   Teva-
     Baeder-17 Amendment No. 3 to
21             Master Distribution
               Services Agreement
22             dated 2/22/18
               [TEVA_MDL_A_03465968
23             through 5974]             212
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2    NO.        DESCRIPTION                      PAGE
 3    Teva-
      Baeder-18 Teva Opioid Market
 4              Share Calculation:
                All Opioids
 5              [TEVA_MDL_A_00455086
                through 5094]                      224
 6
      Teva-
 7    Baeder-19 Determination That A
                Public Health Emergency
 8              Exists dated 10/26/17
                [no Bates]                         234
 9
      Teva-
10    Baeder-20 E-mail dated 9/27/17
                Subject, Government
11              Affairs: Opioid Workgroup
                [TEVA_MLD_A_13481057
12              through 1058]                      237
13    Teva-
      Baeder-21 E-mail string, top
14              one dated 10/5/16
                Subject, RE: DEA Mandate
15              Opioid Reduction
                [TEVA_MDL_A_09641638
16              through 1641]                      258
17    Teva-
      Baeder-22 E-mails dated 6/12/13
18              Subject, FW: June 5-6
                Sales Meeting Complete
19              Slide Deck, with attached
                Slide deck
20              [TEVA_MDL_A_12352355
                through 2356]                      263
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2    NO.        DESCRIPTION                    PAGE
 3    Teva-
      Baeder-23 E-mail string, top one
 4              dated 10/16/15
                Subject, RE: PO# 1031374
 5              for the OXYCODONE product
                TEVA_MDL_A_02063729
 6              through 3733]                    291
 7    Teva-
      Baeder-24 E-mails dated 10/16/15
 8              Subject, RE: Publix
                [TEVA_MDL_A_03479607
 9              through 9608]                    307
10    Teva-
      Baeder-25 E-mails dated 10/16/15
11              Subject, RE: PO#1031374
                for the OXYCODONE product
12              [TEVA_MDL_A_01056272
                through 6278]                    310
13
      Teva-
14    Baeder-26 E-mail string, top one
                dated 10/16/15
15              Subject, FW: PO#1031374
                for the OXYCODONE product
16              [TEVA_MDL_A_01056328
                through 6334]                    316
17
      Teva-
18    Baeder-27 E-mail string, top one
                dated 10/16/15
19              Subject, FW: PO#1031374
                for the OXYCODONE product
20              [TEVA_MDL-A_01466124
                through 6127]                    321
21
      Teva-
22    Baeder-28 E-mail string, top one
                dated 10/16/15 Subject,
23              RE: PO#1031374 for the
                OXYCODONE product [TEVA_MDL_A_
24              01056360 through 6365]           328
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    E X H I B I T S
2    NO.         DESCRIPTION                    PAGE
3    Teva-
     Baeder-29 Notes, 10:10 call returning
4              Jen King's call
               [TEVA_MDL_A_02063728]           331
5
     Teva-
6    Baeder-30 E-mail string, top one
               dated 10/16/15
7              Subject, FW: PO#1031374
               for the OXYCODONE product
8              [TEVA_MDL_A_01466128
               through 6132]                    338
9
     Teva-
10   Baeder-31 E-mail string, top
               one dated 10/16/15
11             Subject, RE: PO#1031374
               for the OXYCODONE product
12             [TEVA_MDL_A_01056299
               through 6304]                    341
13
     Teva-
14   Baeder-32 E-mail string, top
               one dated 10/28/15
15             Subject, RE: Publix
               Anda weekly call
16             [TEVA_MDL_A_01462200
               through 2203]                    344
17
     Teva-
18   Baeder-33 E-mail string, top one
               dated 10/29/15
19             Subject, FW: Publix SOM
               Issues
20             [TEVA_MDL_A_01466151
               through 6154]                    355
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S
 2   NO.        DESCRIPTION                    PAGE
 3   Teva-
     Baeder-34  E-mail string, top one
 4              dated 10/29/15
                Subject, Re: Publix
 5              Oxycodone Order
                [TEVA_MDL_A_01466156
 6              through 6159]              359
 7   Teva-
     Baeder-35  E-mail dated 10/30/15
 8              Subject, Another Publix
                Heads Up
 9              [TEVA_MDL_A_01462220]      364
10   Teva-
     Baeder-36  File Provided Natively
11              Slide deck, Core Leadership
                In Abuse Deterrence,
12              Vantrela ER Strategic
                Launch Plan 12/19/13
13              [TEVA_MDL_A_08771331]      384
14   Teva-
     Baeder-37  E-mail dated 10/26/17
15              Subject, Trump Declaration
                on Opioids
16              [TEVA_MDL_A_12714027]      388
17   Teva-
     Baeder-38  The President's Commission
18              on Combating Drug Addiction
                and the Opioid Crisis
19              [no Bates]                 391
20   Teva-
     Baeder-39  E-mail string, top one
21              dated 9/17/15
                Subject, FW: Teleconference
22              re: Teva response to CDC
                guidelines on chronic pain
23              [TEVA_MDL_A_03550269
                through 0275]             397
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE VIDEOGRAPHER:  We're now on
 2          the record.  My name is David Lane,
 3          videographer for Golkow Litigation
 4          Services.  Today's date is January 24th,
 5          2019.  Our time is 9:09 a.m.  This
 6          deposition is taking place in
 7          Philadelphia, Pennsylvania in the matter
 8          of National Prescription Opiate
 9          Litigation MDL.
10                Our deponent today is Christine
11          Baeder.  Counsel will be noted on the
12          stenographic record.
13                Our court reporter today is Peg
14          Reihl who will now swear in our witness.
15                ... CHRISTINE BAEDER, having been
16          duly sworn as a witness, was examined
17          and testified as follows:
18                THE VIDEOGRAPHER:  Please begin.
19    BY MR. KIEFFER:
20          Q.    Good morning, ma'am.
21          A.    Good morning.
22          Q.    Would you state your full name
23    for the record, please.
24          A.    Christine Baeder.
```

1    Q.    Ms. Baeder, my name is John

2    Kieffer, we met briefly before we went on the

3    record today.  I'm a lawyer, I represent

4    plaintiffs nationwide in the matter of In Re:

5    National Prescription Opiate Litigation, which

6    is a lawsuit that's filed in the Northern

7    District of Ohio against Teva Pharmaceuticals

8    and others, and we're here today to take your

9    deposition in connection with that case.

10             Is that your understanding of why

11   you're here as well?

12        A.    Yes.

13        Q.    You understand that the court

14   reporter just swore you in?

15        A.    Yes.

16        Q.    You understand that is the same

17   oath to tell the truth that you'll take if you

18   end up testifying as a witness in the trial of

19   this case?

20        A.    Yes.

21        Q.    You understand as well that your

22   testimony today is being videotaped?

23        A.    Yes.

24        Q.    One of the reasons for that is in

Highly Confidential - Subject to Further Confidentiality Review

1    the event the case is tried and you're not

2    present at trial, we may elect to play all or

3    part of your testimony to the jury.

4                    You understand that?

5        A.     Yes.

6        Q.     You are here today voluntarily,

7    correct?  By that I mean perhaps you're not

8    crazy about being here, but you weren't

9    subpoenaed, you were asked to come, and you

10   complied with that request?

11       A.     Yes, I was asked by my company.

12   I don't know if there was a subpoena or not.

13       Q.     Okay, fair enough.

14                  If your company asks you to

15   testify at the eventual trial of this case,

16   which is set in Cleveland, Ohio, will you

17   endeavor to accommodate that request, if you

18   can?

19       A.     Yes.

20       Q.     And the reason I ask is that at

21   trial if the jury has to watch your videotape, I

22   want them to understand that it's not because

23   you weren't willing to come.  Sometimes juries

24   get frustrated with videotapes and they take it

Highly Confidential - Subject to Further Confidentiality Review

1     out on the person who hit play, so I just want

2     to make it clear that you're willing to come if

3     asked, okay?

4              A.     Yes.

5              Q.     All right.  Thank you.

6                     Have you given a deposition

7     before?

8              A.     Yes.

9              Q.     About how many times?

10             A.     Two.

11             Q.     Approximately when were your

12    depositions taken?

13             A.     Yesterday.

14             Q.     Okay.  Where at?

15             A.     Across the street.

16             Q.     Okay.  Here in Philadelphia?

17             A.     Yes.

18             Q.     All right.  And did the subject

19    matter of your deposition concern issues

20    relating to your employment?

21             A.     Yes.

22             Q.     And you're currently employed by

23    Teva Pharmaceuticals, correct?

24             A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Okay.  What was the litigation

2    that required you to give a deposition

3    yesterday?

4        A.      Opioid litigation for the state

5    of Oklahoma.

6        Q.      Opioid litigation for the state

7    of Oklahoma.

8                And then you said you'd given a

9    second deposition as well?

10       A.      Yes.

11       Q.      And when was that?

12       A.      A long time ago, maybe 2005 or

13   '06.

14       Q.      And who were you employed by at

15   the time of that deposition?

16       A.      Sandoz.

17       Q.      And did that litigation concern

18   issues related to your employer, Sandoz?

19       A.      It did.

20       Q.      What were the issues in that

21   case?

22       A.      WAC, WAC pricing.

23       Q.      And WACC stands for wholesale

24   average cost?

1          A.     Yes.

2          Q.     Anything more specific than that

3    that you're able to tell us?

4          A.     No, that was what the litigation

5    was about.  At that point in time I had no

6    responsibility in pricing, so my deposition was

7    short and relative to some very specific

8    documents.

9          Q.     I see.

10                Okay.  Have you ever testified in

11   trial in a courtroom?

12         A.     No.

13         Q.     Well, if you've given

14   depositions, then you have some idea of how

15   we'll proceed.  Every lawyer does things a

16   little bit differently, and a lot of us do a lot

17   of the things the same.  So kind of let me give

18   you the ground rules that you may have heard

19   before from others.

20                This is a verbal format, meaning

21   it's my job to try to ask a clear question that

22   makes sense that you can answer, and assuming I

23   do that, it's your job to give a verbal answer

24   if you have information to provide.

Highly Confidential - Subject to Further Confidentiality Review

1                    You understand that?

2        A.     Yes.

3        Q.     Okay.  And by a verbal answer I

4    mean a yes or a no or some kind of a narrative

5    response or explanation.

6                    You understand that as well?

7        A.     Yes.

8        Q.     And I don't mean to be tedious

9    about this, but, for example, if from time to

10   time throughout the day you may say uh-huh or

11   uh-uh, which most of us do, especially as the

12   day gets long, I may stop you and I may say was

13   that a yes, was that a no.  If I do that, I'm

14   not meaning to be rude or abrupt, I'm just doing

15   my best to try to get a clear record of your

16   testimony, okay?

17       A.     Yes.

18       Q.     Sometimes my questions can get a

19   little long, and sometimes it may be clear to

20   you where I'm going with that question.  Even if

21   it is, resist any temptation you might have to

22   jump in with your answer.  Try to let me finish

23   my question before you answer, and, likewise,

24   I'll try to let you complete your answer before

Highly Confidential - Subject to Further Confidentiality Review

```
 1   I begin the next question, okay?

 2          A.     Yes.

 3          Q.     If we talk on top of each other,

 4   it makes it difficult for the court reporter,

 5   okay?

 6          A.     Yes.

 7          Q.     If for any reason I ask you a

 8   question today that you don't understand or you

 9   have difficulty with, will you draw that to my

10   attention so I can try to ask it differently in

11   a way that does make sense to you?

12          A.     Yes.

13          Q.     And by the same token, if I ask

14   you a question and you answer it without

15   protest, I'm going to assume that you understood

16   it the way I asked; is that fair?

17          A.     Yes.

18          Q.     Okay.  We will take breaks

19   throughout the day.  We'll try to take them at

20   relatively scheduled intervals.  I suspect if I

21   don't call for a break at a fairly regular

22   interval, your lawyer will, but if you find that

23   you need a break at some interval other than

24   we're suggesting, you let us know and we'll try
```

1    to accommodate you, so long as we're not in the

2    middle of a question or line of questions, okay?

3         A.    Yes.

4         Q.    All right.  Thank you.

5               You are represented by counsel

6    here today?

7         A.    Yes.

8         Q.    And who is that?

9         A.    Morgan Lewis.

10        Q.    Okay.  Anyone other than Morgan

11   Lewis?

12        A.    I don't think so.

13        Q.    Okay.  That's the one law firm

14   that you're aware that you're represented by?

15        A.    Yes.

16        Q.    Okay.  What did you do to prepare

17   for today's deposition?

18        A.    What did I do to prepare for

19   today's deposition?

20              I met with my attorneys for one

21   day to prepare for this and the Oklahoma

22   deposition.

23        Q.    Okay.  You met with your

24   attorneys for one full like eight-hour day?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Somewhere between six and eight

2    hours.

3          Q.      And that was to prepare for the

4    two cases, this particular opioid litigation as

5    well as the opioid litigation filed by the state

6    of Oklahoma?

7          A.      Correct.

8          Q.      All right.  And when was that

9    meeting?

10         A.      Tuesday.

11         Q.      Of this week?

12         A.      Yes.

13         Q.      Okay.  Did you look at any

14   documents in preparation for your testimony?

15         A.      Yes.

16         Q.      Okay.  In general, what were --

17   what was the nature of the documents that you

18   looked at, the subject matters?

19              MS. HILLYER:  You can answer that

20         very generally.

21              THE WITNESS:  Opioid subject

22         matter.

23   BY MR. KIEFFER:

24         Q.      You don't recall any specific

1    documents?

2                    MS. HILLYER:  I don't want her to

3            get into privilege of what documents she

4            looked at specifically.  If you want to

5            ask her about specific documents, you

6            can do that but...

7                    MR. KIEFFER:  Okay.  Well, I

8            think it's pretty clear I'm entitled to

9            know if she looked at specific things in

10           preparation for her deposition.  I'm

11           entitled to know that.  I don't think we

12           need to spend a bunch of time on that.

13           You'd instruct her not answer those

14           sorts of questions?

15                   MS. HILLYER:  I'm saying she can

16           answer -- she can give a little more

17           specification of the categories of types

18           of documents she looked at.

19                   THE WITNESS:  So I --

20   BY MR. KIEFFER:

21           Q.    Just to be clear, if your counsel

22   directed you to specific paragraphs and you had

23   discussions about the details of documents, I

24   don't want to know any of that.  But if there

Highly Confidential - Subject to Further Confidentiality Review

1    are categories of documents, subject matters

2    they involved that you reviewed to prepare for

3    today, I do want to know about that.

4            A.      Primarily e-mail documents --

5            Q.      Okay.

6            A.      -- or PowerPoint documents that

7    were attachments to e-mail primarily.

8            Q.      Okay.  On the PowerPoints that

9    were attachments to e-mails, what were some of

10   the subject matters that were covered by those

11   PowerPoints?

12           A.      I remember one executive S&OP

13   deck.

14           Q.      Okay.

15           A.      I remember -- that's really the

16   only deck I remember.

17           Q.      Okay.  You said an executive --

18   and I may have misheard, did you say SNOP?

19           A.      S and, ampersand OP.

20           Q.      Okay.  Thank you.  And what does

21   that stand for?

22           A.      It's the executive sales and

23   operations planning meeting.

24           Q.      And this was a meeting in some

1    particular location?

2         A.     It's an ongoing cadence of

3    meetings.

4         Q.     Got it, okay.  And you said you

5    reviewed some e-mail communications.

6              Generally, who were the

7    individuals that the e-mails involved, other

8    than you?

9         A.     It ran the gamut.  Most of the

10   e-mails actually had, you know, 50 people on the

11   to line.

12        Q.     Anyone in particular that

13   featured prominently in some of those e-mails?

14             MS. HILLYER:  Objection to form.

15             THE WITNESS:  There were some

16        e-mails -- I would say two groups, sales

17        and marketing commercial and its subset

18        of groups and operations and their

19        subsets of groups, depending on the

20        subject matter.

21   BY MR. KIEFFER:

22        Q.     Okay.  Why don't you run through

23   us, if you will, briefly but completely your

24   employment history post college -- strike that.

1    Let me back up even further.

2                   You're a college graduate?

3         A.     I am a college graduate.

4         Q.     What's the highest level of

5    college education you have?  Is it a BS, a BA?

6         A.     I have a completed BS and I have

7    an in-process MBA.

8         Q.     Okay.  And your completed BS,

9    what is that -- what field of study is that in?

10        A.     Chemistry and biology.

11        Q.     And where did you get that?

12        A.     Wright State University is where

13   I graduated from.

14        Q.     All right.  And you got an MBA in

15   process you said?

16        A.     I do.

17        Q.     Okay.  And then give us, if you

18   would, a brief but complete rundown on your

19   employment history post college.

20                   MS. HILLYER:  Objection to form,

21        calls for a narrative.

22                   THE WITNESS:  I'm not great with

23        years, but my first job post college was

24        at a small company called Isotech that

Highly Confidential - Subject to Further Confidentiality Review

1        made isotopically labeled primarily

2        organic compounds, and they were bought

3        by Sigma-Aldrich, which is a much larger

4        chemical company.

5            And around the time of the

6        acquisition, I left there.  I think I

7        was there a total of two, maybe three

8        years.  I don't remember.

9            And then I went to Organon

10       Pharmaceuticals.  I was a field sales

11       rep for anesthesia calling primarily on

12       hospitals and children's hospitals.

13           I went from that job

14       responsibility, my husband took a

15       different job, so we moved from Ohio to

16       New Jersey, and I took a job in 2002

17       with Sandoz in customer service for

18       generic pharmaceuticals.  I stayed in

19       customer service in gradually increasing

20       roles of responsibility till 2007ish,

21       when I took a product management job at

22       Sandoz.  And then I left Sandoz in 2008

23       and went to Teva.

24           At Teva my first job

Highly Confidential - Subject to Further Confidentiality Review

1    responsibility was new --

2    commercialization of new product

3    launches for generics.  I did that for

4    about a year.  I took a leadership role

5    in customer service after about a year.

6    I stayed in that role, and that role

7    also expanded, so I went from a director

8    to a senior director for about four

9    years, maybe five years.

10          And then I -- I was promoted to

11   be the head of customer operations and

12   marketing operations for US generics.  I

13   did that for two years.

14          And then Teva made a large

15   acquisition of Actavis causing somewhat

16   of a restructure, and I, in large part,

17   kept my role and my reporting structure

18   changed, and I became the senior vice

19   president at that time.  I did that for

20   about two years.

21          And then Teva -- Teva had a new

22   global CEO at the end of 2017.  He did a

23   leadership restructure, which had some

24   downstream changes, implications as

Highly Confidential - Subject to Further Confidentiality Review

```
 1             well, and so my reporting structure
 2             changed at that point in time.  And then
 3             four or five months later Maureen
 4             Cavanaugh, who was the COO of US
 5             generics left the company, and they
 6             combined her and my role.
 7        Q.     And you are currently chief
 8   operations officer, correct?
 9        A.     For US generics, yes.
10        Q.     US generics of Teva?
11        A.     Yes.
12        Q.     All right.  Going back to your
13   employment with did you say Organon Pharma?
14        A.     Organon.
15        Q.     Approximately when did you
16   commence employment with that company?
17        A.     We moved in 2002.  I did it for
18   about a year.  So 2000 or 2001.
19        Q.     Okay.  So fair to say since 2000
20   or 2001, your professional career has been spent
21   in the pharmaceutical industry?
22        A.     Yes.
23        Q.     Okay.  Was Isotech a pharma
24   company?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.       Isotech was a provider to defense

2    companies and pharmaceutical companies.

3        Q.       Okay.  So it had -- it certainly

4    had a pharmaceutical component to it?

5        A.       More of a research component.

6    They certainly didn't make -- the chemicals that

7    Isotech makes are extraordinarily expensive,

8    could be a million dollars for 2 grams, so

9    they're not something that's used in

10   commercialization.  It's high R&D.

11       Q.       Okay, I understand.  You were

12   at -- at Organon you were a field sales rep as

13   it relates to anesthesia products, did you say?

14       A.       Correct.

15       Q.       And then at Sandoz, your initial

16   responsibilities involved customer service?

17       A.       Correct.

18       Q.       What was the nature of those

19   customer service responsibilities?

20       A.       There was various facets.  There

21   was answering the phone and trying to direct

22   patients to information they were seeking.  For

23   example, I'm allergic to red dye number 10, can

24   you tell me does this drug have red dye number

Highly Confidential - Subject to Further Confidentiality Review

1    10 in it.

2              It also had a component of

3    account service, which would be dealing with a

4    major customer that was prob -- most of the time

5    was assigned to you and you would help with

6    order entry, tracking orders, back order

7    communication, that type of logistics.

8         Q.    Okay.  And then you said in about

9    2007, you transitioned to a product management

10   role?

11        A.    I did.

12        Q.    And what sorts of products were

13   you responsible for managing?

14        A.    At Sandoz at that time, at Teva

15   as well, but at Sandoz at that time products

16   were simply broken up by the alphabet.  So I

17   don't remember, I think I had A to F, but I

18   could have had A to G, I don't know, but it was

19   some division of the alphabet that that is how

20   products are grouped.

21        Q.    Okay.  You said at Sandoz as well

22   as at Teva?

23        A.    Teva does that as well.

24        Q.    Okay.  And so does that, for

1    example, include branded and generic products so

2    long as the name of the drug begins with the

3    letter of the alphabet that's under your area of

4    responsibility?

5         A.    No.

6              MS. HILLYER:  Sorry, we're

7         talking about Teva or Sandoz?

8              MR. KIEFFER:  Well, thank you.

9    BY MR. KIEFFER:

10        Q.    Let's go back to Sandoz.  I don't

11   want to get ahead of myself.

12             So the products that you were

13   responsible for managing at Sandoz were products

14   based upon a group of letters of the alphabet,

15   right?

16        A.    Correct.

17        Q.    And you said A to?

18        A.    I think A to F.

19        Q.    Okay.  I won't hold you to it,

20   but roughly A to F?

21        A.    Yeah.

22        Q.    So those products at Sandoz that

23   you were responsible for managing, did that

24   include both branded and generic products?

1           A.     So, no, it was generic products,

2     and it was based on the letter of the alphabet

3     that the generic compound started with.

4           Q.     Okay.  Fair enough.

5                  So to the extent there might have

6     been opioid medications that began with the

7     letter of the alphabet within your area of

8     responsibility, you would have been responsible

9     for managing those generic products?

10          A.     Yes.

11          Q.     At Teva were you in a product

12    management role?

13          A.     No.

14          Q.     Okay.  Not ever?

15          A.     No, not a traditional product

16    management role, no.

17          Q.     Okay.

18                 MR. KIEFFER:  Can we pull up

19          document 1651.

20                 (Document marked for

21          identification as Teva-Baeder Deposition

22          Exhibit No. 1.)

23    BY MR. KIEFFER:

24          Q.     Ma'am, what we just handed you, I

Highly Confidential - Subject to Further Confidentiality Review

1   identified as document 1651.  We have marked it

2   as Exhibit Number 1 to your deposition.  It is a

3   PowerPoint that we received from Teva's internal

4   files in this case.  The cover of it says "Teva

5   Our Business Units," and then the second page of

6   it has an organizational chart, and it says "US

7   Generics - Our Structure," if I could turn you

8   to that.

9          A.     Yes.

10         Q.     All right.  Now, at the top line

11  there, there's a gentleman identified by the

12  name of Andrew Boyer identified as president and

13  CEO of North America Generics, correct?

14         A.     Correct.

15         Q.     Okay.  And we took Mr. Boyer's

16  deposition last week.  He's no longer with Teva,

17  correct?

18         A.     Correct.

19         Q.     All right.  Who's in that top

20  line spot today?

21         A.     That role doesn't exist anymore,

22  as it did then.  They have now combined the

23  brand and generic business and consolidated that

24  role, and the president and CEO, I'm not sure

Highly Confidential - Subject to Further Confidentiality Review

1  that's his title, but of North America is

2  Brendan O'Grady.

3          Q.      Brendan O'Grady?

4          A.      Yes.

5          Q.      Okay.  And I won't hold you

6  precisely to his title.

7          A.      Yes.

8          Q.      But in terms of how this chart is

9  structured, we would put his name in there

10 today?

11         A.      Yes.

12         Q.      But the chart would look a little

13 bit different because today Mr. O'Grady, the

14 generics and the branded side of the

15 organization have been combined, and he has

16 oversight for all of that?

17         A.      Correct.

18         Q.      Okay.  Do you have any

19 responsibility with respect to branded products

20 today?

21         A.      My decision-making responsibility

22 is around generics.  I do have teams, customer

23 service does process orders for both brand and

24 generics.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Anything other than

2  customer service processing orders for both

3  branded and generics that would cause your

4  responsibilities to touch on the branded side of

5  the organization?

6    A.    We touch and consult from time to

7  time on other matters.

8         For example, Teva has -- Teva's

9  largest historic brand was Copaxone, it was

10 going generic, or it was a threat of generic

11 competition, and the generic business did work

12 to try to inform model assumptions of the impact

13 to the company.  So there are other from time to

14 time touch points, but the only standing

15 responsibility is within customer service and

16 also a very small amount in pricing.

17        My pricing team is responsible

18 for pricing decision-making in generics, and

19 they actually key it into the system for brands.

20 They don't calculate it, they don't decide it,

21 but they have an administrative function

22 associated, probably 2% of their time or less.

23    Q.    Okay, thank you, that's helpful.

24        The Copaxone example that you

1    gave us, that was just an example to illustrate

2    the larger point you were trying to make, right?

3         A.    Yes.

4         Q.    You weren't suggesting Copaxone

5    is the only instance where that sort of let me

6    just call it cross-functional communication has

7    taken place, right?

8         A.    No, absolutely not.

9         Q.    Okay.  And I do understand

10   there's differences between generic medications

11   and branded medications, and there's differences

12   in the two sides of the organization, but it's

13   true, is it not, again, as a general matter, we

14   may get into specific drugs later, as a general

15   matter, it's true there is some communication

16   back and forth as needed from time to time, some

17   collaboration back and forth as needed from time

18   to time, it's not as if those two sides of the

19   organization, brand and generic are totally

20   siloed from one another?

21              MS. HILLYER:  Objection to form.

22              THE WITNESS:  So I don't think

23         they would -- they're not totally

24         siloed, I agree with that.  They are

Highly Confidential - Subject to Further Confidentiality Review

1      dramatically siloed, so -- and it would

2      really depend on what chapter of Teva's

3      history you're speaking about.  When we

4      had a CEO for generics and a CEO for

5      brands, that would inform and be an

6      appropriate assumption that things were

7      more siloed than they are now, when we

8      have a CEO of both businesses, so you

9      have a more combined leadership team.

10  BY MR. KIEFFER:

11      Q.      Fair enough.  And I'm not going

12  to spend a lot of time on this.  I just want to

13  make sure I kind of understand the lay of the

14  land.

15          You've heard the phrase Chinese

16  wall?

17      A.      Yes.

18      Q.      And I don't mean anything

19  pejorative by that, I think I can still say

20  that?

21      A.      Yes, yes.

22      Q.      It's not as if there's some

23  Chinese wall at Teva, where there's no

24  communication between the folks on the brand

1    side and the generic side, true?

2              MS. HILLYER:  Objection to form.

3              THE WITNESS:  So there is no, you

4         know, compliance driven or business

5         entity reason that we cannot communicate

6         when appropriately.

7    BY MR. KIEFFER:

8         Q.    And if there were significant

9    initiatives or significant developments on the

10   brand side that could impact the generic

11   business, it would be natural for there to be

12   some communication across the organization,

13   interested parties across the organization about

14   that and, conversely, if there was something

15   significant going on or planned on the generic

16   side that could potentially impact the branded

17   side of the business, there very well might be

18   communication across the organization among

19   interested parties about that as well?

20             MS. HILLYER:  Objection, vague

21        and compound.

22             THE WITNESS:  I think your

23        question is did we talk if there was a

24        decision made on one side of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1              business that could impact the other

 2              side.  Predominantly, we would talk if

 3              there was a decision to be made on the

 4              generic side that would impact the brand

 5              side, because the generic business is a

 6              portfolio business, not a product by

 7              product business.  On the brand side

 8              there are -- it's much more product

 9              focused.

10   BY MR. KIEFFER:

11        Q.    Okay.  And is, again -- and I do

12   realize we're speaking in generalities.

13        A.    Yeah.

14        Q.    Sometimes that's helpful,

15   sometimes it gets too general to be meaningful.

16   So if it gets too general to be meaningful, you

17   tell me.

18              You mentioned that the generic

19   business is a portfolio business, but, again,

20   recognizing that not everybody on our jury may

21   use that word every day, a portfolio is a

22   grouping of products, right?

23        A.    Correct.

24        Q.    And does the generic business
```

Highly Confidential - Subject to Further Confidentiality Review

1    tend to be more of a portfolio business because

2    of the nature of the customer, the immediate

3    customers that Teva has on the generic side?

4                    MS. HILLYER:  Objection to form.

5                    THE WITNESS:  I don't know how to

6            answer that.  Let me give -- provide

7            some information and see if it answers

8            your question.

9                    Teva has around 1,200 products.

10           I think we've had up to 1,500 generic

11           products, and right now we have

12           somewhere between 1,100 and 1,200

13           products.

14   BY MR. KIEFFER:

15           Q.    Generic products?

16           A.    Generic products.

17           Q.    Thank you.

18           A.    So the nature of the business is

19   quite different because you have a relatively,

20   relative to the brand side of the business,

21   small amount of individuals that are responsible

22   for the sales of a very large amount of

23   products.

24           Q.    And a substantial part, and we

1    will get into some of this in a bit more detail

2    later in the day, but a substantial part of

3    Teva's generic sales is concentrated among a

4    relatively small number of very large customers,

5    correct?

6              MS. HILLYER:  Objection to form.

7              THE WITNESS:  The US generic

8         marketplace is quite consolidated as far

9         as market share, and there are three

10        very large buying groups.  They're

11        actually not one customer.  They're made

12        up of multiple customers, but there are

13        three dominant retail GPOs is how we

14        refer to them.

15   BY MR. KIEFFER:

16        Q.    Retail?

17        A.    GPOs, group purchasing

18   organizations.

19        Q.    Okay.  Is one of those an

20   enterprise that goes by the name Walgreens Boots

21   Alliance?

22        A.    Yes, we refer to that as WBAD.

23        Q.    That's come up in other

24   depositions.

Highly Confidential - Subject to Further Confidentiality Review

1            And just for the benefit of our

2   jury, briefly, what is WBAD?  And that's

3   spelled -- that's an acronym W-B-A-D, right?

4            A.     Yes.

5            Q.     All right.

6            A.     What is it?  I can tell you how

7   it functions.

8            Q.     That's more helpful.

9            A.     Right.  It is a buying group

10  that's based in Switzerland that's made up of

11  Walgreens, AmerisourceBergen and Express

12  Scripts, the mail order pharmacy, and there's

13  some other smaller customers that have now been

14  acquired and are part of their buying power,

15  those are the three large arms, and they work

16  with manufacturers to negotiate pricing and

17  availability.

18           Q.     Okay.  Pricing and availability

19  for I'm going to call it their members, for lack

20  of a better term, for Walgreens, for

21  AmerisourceBergen, for Express Scripts and for

22  the downstream customers of those three, right?

23           A.     Yes.

24                  MS. HILLYER:  Objection to form.

```
 1    BY MR. KIEFFER:

 2            Q.     So they presumably have some

 3    amount of leverage, for lack of a better word,

 4    in negotiating prices?

 5                   MS. HILLYER:  Objection to form.

 6    BY MR. KIEFFER:

 7            Q.     Because of their size?

 8            A.     Depending on the molecule and the

 9    competition in the marketplace, they would

10    certainly have more leverage than someone who

11    represents a very small market share.

12            Q.     Couple things about that, thank

13    you.

14                   You used the term molecule?

15            A.     Yes.

16            Q.     When you use the term molecule,

17    are you tending to refer to what a layman might

18    call a particular drug?

19            A.     Yes, but, typically, decisions on

20    procurement are made in drug family.  So I may

21    offer seven strengths of atorvastatin, which is

22    generic Lipitor, it's more the norm that the --

23    if WBAD was going to make a procurement

24    decision, they would make it across all of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    strengths than to award two strengths to Teva

2    and two strengths to Mylan or, so to speak, so

3    that's why I tend to use molecule, because

4    product to me is a specific NDC code, which is a

5    molecule, a strength and a bottle count.

6           Q.    Got it.

7                 You made reference in your prior

8    answer a moment ago that WBAD might have more

9    leverage, I think you're using my term, to

10   negotiate pricing than would someone who had a

11   lesser market share or words to that effect,

12   right?

13          A.    So, historically, in generics,

14   pricing has been correlated to volume, concepts

15   that are somewhat familiar in economics, which

16   is the more you buy, the better price that you

17   get.  It's not always the case.  There are

18   certainly exceptions, but, historically, that is

19   relatively true.

20          Q.    Okay.  Fair enough.

21                And because WBAD is a group that

22   buys a lot of volume of generic medicines,

23   typically, they get better prices than folks who

24   buy lesser volumes, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Typically, that's true.

 2              Q.      All right.  You use the term

 3    market share.

 4                      What is, approximately, WBAD's

 5    current share of the generic market currently?

 6                      MS. HILLYER:  Objection to the

 7              extent it calls for speculation.

 8                      THE WITNESS:  I don't know their

 9              market share for the generic

10              marketplace.

11    BY MR. KIEFFER:

12              Q.      Okay.

13              A.      Their market share for Teva

14    fluctuates between -- depending on how the

15    calculation is done, you know, 22 to 28 share.

16              Q.      22% to 28%?

17              A.      22 to 28%.

18              Q.      A big part of your business, in

19    other words?

20              A.      Yes.

21                      MS. HILLYER:  Objection to form.

22    BY MR. KIEFFER:

23              Q.      Now, you mentioned a couple

24    minutes ago there were three dominant retail
```

Highly Confidential - Subject to Further Confidentiality Review

1    group purchasing organizations or GPOs, right?

2         A.    Correct.

3         Q.    WBAD is one, right?

4         A.    Correct.

5         Q.    Who are the next two?

6         A.    Red Oak Sourcing.

7         Q.    Red Oak Sourcing?

8         A.    Yes, which is made up of CVS

9    Caremark, Cardinal Health and many ancillary

10   smaller companies, Omnicare, they support the

11   Target pharmacy, and to be very clear, from my

12   perspective, I'm not always -- I don't always

13   retain whether they've purchased that smaller

14   company or if it's joined the alliance or

15   whatever.  They represent their buying

16   interest --

17        Q.    Fair enough.

18        A.    -- for whatever corporate

19   structure they have.

20        Q.    Okay.  I got it.  Okay.

21              And is Red Oak Sourcing

22   essentially number two of the three dominant

23   retail GPOs?

24              MS. HILLYER:  Objection to form.

1            THE WITNESS:  Red Oak Sourcing is

2       number one for Teva.

3  BY MR. KIEFFER:

4       Q.     Is number one for Teva, okay,

5  thank you.

6            And approximately how much of

7  Teva's market share does Red Oak Sourcing make

8  up?

9       A.     30 to 34%.

10      Q.     Okay.  And who is the third

11  large, dominant group purchasing organization,

12  from Teva's perspective?

13      A.     Clarus One.

14      Q.     Clarus One.  Can you spell that

15  for us?

16      A.     C-l-a-r-u-s and then the word one

17  spelled out.

18      Q.     And who does Clarus One

19  represent?

20      A.     McKesson and Walmart, the piece

21  of Rite Aid that was not sold to Walgreens and

22  various other smaller firms.

23      Q.     Okay.  Is Clarus One a relatively

24  new name?

```
 1                    MS. HILLYER:  Objection to form.

 2                    THE WITNESS:  Two years, maybe

 3          three years.

 4   BY MR. KIEFFER:

 5          Q.    Okay.  I haven't seen that as

 6   much.  I've seen certainly references to

 7   McKesson and Walmart, that's why I asked.

 8                    Approximately how much of Teva's

 9   market share is represented by Clarus One?

10          A.    Maybe -- so let me just caveat

11   that market shares are never -- never static.

12          Q.    I understand.

13          A.    So they just lost a piece of Rite

14   Aid's business when Rite Aid chose to sell part

15   of their business to Walgreens, so they're

16   always in flux.  So maybe 16 to 20%.

17          Q.    Okay.  Fair enough.  No, I

18   understand these things fluctuate quite a bit.

19                    So I have --

20                    MR. MUDGE:  Excuse me.  While

21          you're paused.  This is Will Mudge for

22          the Endo and Par defendants.  I'm sorry

23          to interrupt.  I joined late and I don't

24          want to be here observing without having
```

Highly Confidential - Subject to Further Confidentiality Review

1       announced myself.

2              MR. KIEFFER:  Oh, all right.

3       Thank you.

4              MS. WIDAS:  Also, one other.

5       There was trouble with the dial-in.

6       This is Alexandra Widas from Covington

7       for McKesson.  Apologies.

8              MR. KIEFFER:  Okay, thank you.

9   BY MR. KIEFFER:

10         Q.     I'm not going to promise my math

11  is perfect, but I roughly totaled up the

12  percentages that you gave us for those three big

13  retail GPOs, and if my math is right, it looks

14  like combined they represent anywhere from maybe

15  68 to 82% of Teva's market share.

16             Does that generally sound correct

17  to you?

18         A.     That seems reasonable to me.

19         Q.     Okay.  Thank you.

20         A.     I would have said 75 to 85.

21         Q.     Fair enough.  And I didn't mean

22  to take you off on a tangent.  That probably

23  gets rid of questions I had to ask you later in

24  the day.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Okay.

 2              Q.      Let's turn, if we can, though, to

 3      Exhibit Number 1 before I leave it, that's the

 4      organizational chart.

 5                      MS. HILLYER:  John, just a

 6              question on Exhibit 1, was this attached

 7              to an e-mail, do you know, just for sake

 8              of completeness?

 9                      MR. KIEFFER:  I think it is -- I

10              don't know.  I can give you -- I can

11              give you the Bates number --

12                      MS. HILLYER:  I see the Bates.

13                      MR. KIEFFER:  -- for the native.

14                      MS. HILLYER:  Okay, I mean, I

15              have that.

16                      MR. KIEFFER:  I don't know the

17              answer off the top of my head.

18                      MS. HILLYER:  Okay.

19                      MR. KIEFFER:  All right.  We did

20              mark it with Mr. Boyer.  That doesn't

21              answer your question but...

22                      MS. HILLYER:  It's okay.

23                      MR. KIEFFER:  It's been out

24              there.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KIEFFER:

2         Q.    Okay.  Before I leave this, so

3    Mr. Boyer has left.  Mr. -- I'm sorry, his name

4    again, Grayson, what's the new CEO's name?

5         A.    Brendan O'Grady.

6         Q.    Sorry, Brendan O'Grady, okay.  So

7    we can slide him in there at the top line.  He's

8    got responsibility for branding and generics

9    now, correct?

10         A.    Yes.

11         Q.    All right.  Now, your title is no

12    longer SVP of customer and marketing, right,

13    your current title is chief operations officer

14    for US generics, right?

15         A.    Correct.

16         Q.    Do you appear at the same place

17    on the organizational chart?

18              MS. HILLYER:  Objection to form.

19              THE WITNESS:  It's a completely

20         different structure.  I report in to the

21         CEO, so from that perspective I do, but

22         the whole structure has been redone

23         because branded and generics are

24         together.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KIEFFER:

2          Q.    Okay.  I got it.

3                But you do report directly to the

4    current CEO?

5          A.    Correct.

6          Q.    And you did when Mr. Boyer was

7    the CEO as well?

8          A.    Yes, since 2016.

9          Q.    Since 2016 until there was a

10   restructuring done, right?

11         A.    From 2016 I reported to Andy, and

12   then from 2018 I report to Brendan.

13         Q.    Okay.  And when you say "Andy,"

14   you mean Mr. Boyer, right?

15         A.    Mm-hmm.

16         Q.    Okay.  And when you started

17   reporting directly to Mr. Boyer, was that

18   immediately following the acquisition by Teva of

19   Actavis?

20         A.    Yes, it was upon the close of the

21   acquisition.

22         Q.    You work for -- your direct

23   employer is Teva USA?

24         A.    Yes.

1          Q.     Okay.  I want to focus for a

2    moment on your responsibilities from, let's say,

3    2016 until today, okay?

4          A.     Okay.

5          Q.     Can you provide the jury with an

6    overview of the various I'm going to call them

7    operational areas or functional units or

8    departments, whatever is the right terminology,

9    provide us with a description of what those are

10   and then give us a little bit of detail about

11   the actual nature of the work that happens in

12   those areas?

13              MS. HILLYER:  Objection to the

14          form to the extent it's different across

15          that time frame.

16   BY MR. KIEFFER:

17         Q.     And to the point of counsel's

18   objection, if it is different across that time

19   frame, I'd like you to tell us that.  So if it's

20   easier for you to go 2016, 2017, 2018, whatever

21   makes sense, okay?

22         A.     Okay.  So 2016 to 2018 were

23   somewhat static.  This org chart is not correct.

24   So perhaps it was a draft or -- I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1   But Jennifer King reported to Rick Rogerson.

2          Q.     Okay.  Let me stop you there and

3   just ask you, who is Jennifer King?

4          A.     Jennifer King is in charge of --

5   well, Rick Rogerson was in charge of, but she

6   worked on his team coordinating the

7   commercialization of new product launches.

8          Q.     Okay.  And did she ultimately

9   then fall under your area of responsibility?

10         A.     She did, and this could be later,

11  like later we split it apart, so I don't exactly

12  know what time frame this is.

13         Q.     Okay.  Fair enough.  Go ahead.

14         A.     So Rick Rogerson had two main

15  responsibilities, which is coordination of data

16  analytics, which would include the use of IMS

17  data.  It would include internal calculations

18  relative to forecasting in a one-year bucket, as

19  well as other data requests that might come up

20  from time to time.  And Jen King focused on --

21  who worked for Rick Rogerson for at least a

22  large part of this period, she focused on if we

23  launch a new product, making sure that -- how

24  much product are we going to have in the

1   warehouse on the day it launches, coordinating

2   with pricing on, although not a decision-maker

3   on pricing, she would coordinate with pricing on

4   what pricing we were going to offer to the

5   marketplace, provide information to the sales

6   team on, you know, our supply position things of

7   that Nate.

8                   Michelle Osmian had the customer

9   service function, which would involve the

10  customer service functions that we discussed

11  earlier, helping customers place orders,

12  answering questions about product availability,

13  back order timing, tracking, you know, what

14  other questions there may be.  Like, can have a

15  reprint of an invoice, that type of thing.  She

16  also handles our customer inventory strategy,

17  which includes if we are constrained on

18  inventory, which is very, very common in the

19  generic business, who gets that inventory, how

20  do you appropriately spread the inventory around

21  between customers.

22                   Kevin Galownia is responsible

23  from 2016 and still to this day for all generic

24  pricing, obviously in coordination with myself,

Highly Confidential - Subject to Further Confidentiality Review

1   but he recommends pricing for new products.

2   He's responsible for responding to price

3   challenges from our customers, which are

4   extraordinarily common in the generic business.

5                   And then Napoleon Clark is the VP

6   of marketing.  He has two functions underneath

7   him.  One is institutional marketing, which is

8   coordinating product strategy for products that

9   are primarily institutional, primarily actually

10  injectable is kind of how we divide that, and

11  with a couple of exceptions.

12                  And then also he has the -- what

13  we term the retail product management team,

14  which oversees the bulk of the 1,200 products

15  that we have.  They do things like interfacing

16  with operations when there is a supply issue.

17  They keep generally abreast of changes in

18  labeling that are required by the FDA.  They

19  don't execute and they're not an expert on the

20  label, but they play a key role in how those

21  changes may reflect -- impact our supply

22  availability.

23                  They also make -- make

24  recommendations on -- in the budgeting forecast

Highly Confidential - Subject to Further Confidentiality Review

1    on products, you know, are they profitable, are

2    they not profitable, do we think the price will

3    continue to erode, do we think there will be

4    more and more competition, and then they would

5    take that information, interface with operations

6    and say, you know, this is a nice product for

7    us, but we anticipate that we will no longer

8    make money in two years, is there anything that

9    we can do from a cost of goods standpoint, they

10   help coordinate those efforts.

11              I think that's my whole team.

12        Q.    Okay.  Now, the response you just

13   gave us, was that generally tied to 2016 or the

14   period 2016 through 2018?

15        A.    I would say 2016 to 2018, in a

16   general way.  This Jen King, Rick Rogerson

17   breakout aside.

18        Q.    Fair enough.

19              And so you went through and you

20   described for us some of the folks that are

21   shown on that organizational chart, Exhibit

22   Number 1, their areas of responsibility and some

23   of the detail or semi-detail level activities

24   and tasks.  All of those things combined then

1    would essentially describe your role?

2              A.    Correct.

3              Q.    Anything else about your role

4    separate and apart from the general descriptions

5    you just gave us over the last few minutes?

6                    MS. HILLYER:  Objection to form.

7    BY MR. KIEFFER:

8              Q.    It wasn't a great question.

9                    Do you have other roles and

10   responsibilities within the organization other

11   than the description that you gave us over the

12   last few minutes pertaining to the folks who

13   report up to you?

14             A.    I have a --

15                   MS. HILLYER:  Sorry, again,

16             currently or 2016 to 2018?

17   BY MR. KIEFFER:

18             Q.    Yeah, 2016 to 2018.

19             A.    2016 to 2018, I had -- my team

20   does as well, but probably more I have a

21   responsibility to interface with customers at a

22   senior level, and I have a responsibility to

23   interface and support the sales team, Mark

24   Falkin's role at a senior level, and that would

Highly Confidential - Subject to Further Confidentiality Review

1    involve questions that are more strategic.  So

2    for a particular molecule, there's a shortage on

3    the market, do we want to give more product to

4    customer A versus customer B, those types of

5    things.

6            Q.    All right.  Let me follow up on a

7    couple things that you just said about some of

8    these folks to make sure that I'm clear.

9            You were discussing the general

10   duties of Mr. Rogerson and Ms. King and you used

11   the term data analytics, correct?

12           A.    Correct.

13           Q.    One of the things you said was

14   they may use IMS data; is that right?

15           A.    Correct.

16           Q.    IMS data is relatively

17   well-recognized data in the industry that

18   provides things like sales of particular

19   products by manufacturers or purchasers of

20   particular products by certain customers?

21           MS. HILLYER:  Objection to form.

22   BY MR. KIEFFER:

23           Q.    As two examples?

24           A.    I'm trying to think if I've ever

Highly Confidential - Subject to Further Confidentiality Review

1    seen customer data.  IMS data on the generic

2    side has a lot more restrictions than IMS data

3    on the brand side is my understanding.  I've

4    never used it on the brand side, but on the

5    generic side, I don't know that customer data is

6    easily attained.  It's not something that I

7    remember looking at in any detail.

8              We do, however, get market size

9    information, how many tablets of X drug were

10   sold, competitive information.  These are the

11   six or seven companies that may be selling this

12   drug, and then you can see TRx, which is total

13   prescriptions.  You can see NRx, which is new

14   prescriptions.  And you can see sort of total

15   number of units in the market and total number

16   of tablets in the market.

17             Q.    Okay, fair enough.

18             As it relates to the functions

19   handled by Mr. Rogerson and his group, including

20   Ms. King, you also mentioned they may use

21   internal data for forecasting, at least on maybe

22   a one-year time horizon?

23             A.    Absolutely.

24             Q.    Okay.  This internal data, as an

1  example, would be looking at customer purchase

2  histories?

3          A.      Certainly that data would be

4  available to them.  I don't know that that's

5  specifically what they did, because they didn't

6  have customer specific responsibilities.  They

7  had sort of Teva holistic responsibilities.  So,

8  generally, they would use total purchases by all

9  customers as a trend.  There may have been times

10 where they used customer specific data.  It was

11 data available.

12          Q.    Okay.  Data available, so, for

13 example, if Mr. Rogerson or Ms. King or others

14 within Teva wanted to know what a particular

15 customer had purchased a year ago during the

16 same month or the same quarter of a particular

17 product in a size and strength, that information

18 is available?

19          A.      Yes.

20          Q.    Okay.  When you were discussing

21 Ms. Osmian, you said one of the things that she

22 focuses on is product availability, right?

23          A.      Correct.

24          Q.      Backorder times?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes.   Her and -- just to be

2     clear, her and Napoleon somewhat share that.

3     She handles the customer interface of that

4     information.   He handles the internal interface

5     of that information.

6          Q.      All right.   Thank you.

7                  And another thing you mentioned

8     Ms. Osmian sometimes handles is customer

9     inventory strategy?

10         A.      Yes.

11         Q.      And I think in that regard, you

12    mentioned shortages, and you said shortages in

13    the generic business are common, right?

14         A.      Backorders are common.

15         Q.      And in that circumstance, one of

16    the things that has to be determined by Teva or

17    maybe somebody like Ms. Osmian is which

18    customers get how much of what product if

19    there's a shortage, right?

20         A.      Correct.

21         Q.      When shortages of a particular

22    product occur, are there circumstances where

23    Teva may buy that product from another

24    manufacturer in order to meet a customer demand

1    or some sort of obligation to a customer?

2         A.    I think that would be a truly

3    exceptional situation.  I can't say it never

4    happens because I'm -- I'm sort of arm's length

5    involved in divestments, and I do know that

6    sometimes when there is a divestment, which is

7    part of an acquisition and an FDC action, that

8    if -- if we thought -- those things happen

9    typically because the acquired company and Teva

10   both manufacture or have a ANDA, abbreviated new

11   drug application for a drug.  There are

12   assumptions sometimes that we'll both be on the

13   market by "X" date and something happens,

14   operationally or in R&D or whatever, and we

15   can't be.  There are situations that I don't

16   have a lot of detail on where there is a

17   negotiation with the other party to be able to

18   continue to market, but that's relatively

19   exceptional.

20        Q.    Let me follow up briefly, and

21   then we'll move on.

22             Depending on time today, there

23   are documents that have been produced from

24   Teva's files that appear to indicate that there

Highly Confidential - Subject to Further Confidentiality Review

1    were occasions when Teva bought product from

2    companies like Mallinckrodt and Purdue.  If, in

3    fact, that's the case, is that the kind of --

4           A.    We --

5                 MS. HILLYER:  Hold on one second.

6    BY MR. KIEFFER:

7           Q.    Is that the kind of situation,

8    generally speaking, that you just described or

9    something else?

10                MS. HILLYER:  Objection to form.

11                THE WITNESS:  We do source

12          product from other manufacturers.  It's

13          typically not in response to backorder.

14          It's typically a longer term supply

15          agreement.

16   BY MR. KIEFFER:

17          Q.    Okay.  Thank you.  I think I kind

18   of took the long way around the barn.

19          A.    Sorry.

20          Q.    No, it's not you, I think it's

21   me.  Let me follow up on what you just said

22   then.

23                When you say we do source product

24   from other manufacturers and it is typically

Highly Confidential - Subject to Further Confidentiality Review

1   part of a longer term supply agreement; did I

2   say that correctly?

3          A.    Yes.

4          Q.    Can you describe what you --

5   describe the nature of how that works?

6                MS. HILLYER:  Objection to form.

7                THE WITNESS:  It takes various

8          forms, but we do have -- we do have

9          manufacturing that's done on our behalf

10         by other firms.  Sometimes it's our

11         intellectual property.  Sometimes it may

12         be a company that has intellectual

13         property.  So by that they have an ANDA,

14         an abbreviated new drug application, and

15         they have a means to manufacture but

16         they don't have commercial experience,

17         or they don't believe that their

18         commercial experience would drive

19         success, and then they may choose to

20         partner with Teva.

21                And sometimes supply from other

22         companies is a result of patent

23         litigation or other settlements.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KIEFFER:

2         Q.    Okay.  Are you done, or are you

3    pausing?

4         A.    I'm done.

5         Q.    Okay, thank you.

6               And I wasn't meaning to be

7    critical by that.  Your answer is very complete.

8    I just want to make sure I let you finish it.

9               Okay.  So you said sometimes

10   manufacturing is done for Teva by other firms,

11   right?

12        A.    Correct.

13        Q.    Let me start there.

14               Is one situation where another

15   company might be manufacturing a Teva product so

16   you say sometimes it's Teva's IP, Teva's

17   intellectual property, right?

18        A.    Correct.

19        Q.    Okay.  So in that circumstance,

20   would another company be manufacturing a

21   particular product to Teva's specifications and

22   then effectively putting Teva's name on it?

23               MS. HILLYER:  Objection to form.

24               THE WITNESS:  If it's Teva's

```
 1              ANDA, if we own the ANDA, by default,

 2              there are specifications implied.  I

 3              don't have the detail on who in a

 4              forward world, maintains those

 5              specifications, and I'm guessing it's

 6              different relationship by relationship,

 7              who goes back to the FDA to negotiate if

 8              there needs to be a change in X, Y or Z,

 9              but, fundamentally, at its base case,

10              our ANDA our intellectual property and

11              they're manufacturing on our behalf.

12      BY MR. KIEFFER:

13              Q.    Okay.  And then you said there

14      may be circumstances in other instances where

15      other companies have the ANDA?

16              A.    Yes.

17              Q.    So there it's -- in that

18      circumstance, it's their intellectual property,

19      their IP, right?

20              A.    Yes.

21              Q.    And they may have the capacity to

22      manufacture the drug, but for various reasons,

23      they may choose to partner with Teva?

24              A.    Yes.
```

1    Q.    And you said they may not have

2    commercial experience might be one reason?

3    A.    Yes.

4    Q.    They may not have the customer

5    base or they may not be able to bring the demand

6    to the table for the particular product that

7    they can supply that Teva can.  Would that be

8    another reason?

9    A.    I don't know it's about bringing

10   the demand.  I don't know that we bring demand.

11   It's more about perhaps they don't have

12   contracts with customers and they would be

13   starting, you know, a process that's very long,

14   could be multiple years to negotiate contracts,

15   and they would prefer to get into the market

16   faster.  I mean, I don't know why they come to

17   Teva.

18          You know, there's -- and, by the

19   way, there's variations even of that

20   relationship, right.  They could own the ANDA

21   and not manufacture and we could manufacture.

22   They could own the ANDA -- you know, there's

23   relationships I can't think of a good example

24   right now, but I know that there's four or five

Highly Confidential - Subject to Further Confidentiality Review

1   people that are a part of the overall

2   relationship, so it can get quite complex.

3           Q.      Okay, fair enough.

4                   Your initial comment was you said

5   we do source products from other manufacturers,

6   right?

7           A.      Mm-hmm.

8           Q.      So I want to follow up on that

9   terminology.

10          A.      Okay.

11          Q.      In those instances -- and I

12  realize the circumstances vary and, presumably,

13  there's written agreements that govern all that,

14  right?

15          A.      Yes.

16          Q.      Okay.  As a general matter,

17  though, when Teva sources products from other

18  manufacturers, do the products ultimately bear

19  Teva's name?

20                  MS. HILLYER:  Objection to form.

21                  THE WITNESS:  Bear Teva's name?

22  BY MR. KIEFFER:

23          Q.      When Teva is sourcing them from

24  another manufacturer as opposed to maybe a

Highly Confidential - Subject to Further Confidentiality Review

 1    circumstance where Teva is manufacturing for

 2    somebody else?

 3         A.     So, typically, products sold out

 4    of the Teva warehouse, Teva USA, have a Teva or

 5    a Teva family label.

 6         Q.     When you say Teva or Teva family,

 7    what do you mean by "Teva family"?

 8         A.     We're a company of acquisition,

 9    so, you know, sometimes the -- to change a

10    label, to change just the print on a label

11    requires an FDA action and et cetera, et cetera.

12    So, certainly, day one post an acquisition, all

13    of the labels in the warehouse are not Teva, but

14    they're Teva family, they're Teva affiliates.

15         Q.     Understood, okay.

16                You used a phrase I want to

17    follow up on.  You said we're a company of

18    acquisition?  Yes?

19         A.     Yes, we had a lot of

20    acquisitions.

21         Q.     Okay.  For example, I'm not going

22    to pretend that this is all of them, but as a

23    couple, a few years ago Teva acquired a company

24    by the name of Cephalon; you know that name?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And then Teva obviously acquired

3  Actavis in 2016, right?

4    A.    Yes.

5    Q.    And insofar as you are aware,

6  based on -- I'm not asking you to speak for the

7  company, but based on your time at Teva and the

8  roles that you've had and the opportunities, the

9  window you've had into kind of business

10  strategy, does it appear to you that it is a

11  strategy of Teva to grow by acquisition, where

12  possible?

13          MS. HILLYER:  Objection to form.

14          THE WITNESS:  I am not part of

15      the acquisition strategy team, and I

16      think our CEO has very publicly said it

17      is not our current strategy.

18          I would take by results that it

19      was a piece of our strategy during those

20      decisions.

21  BY MR. KIEFFER:

22    Q.    Okay.  Thank you.

23          So when you say your CEO has said

24  publicly it is not a current strategy to grow by

1    acquisition, you mean now in 2019?

2           A.    Yes, yes.  2018.  He has been our

3    CEO for one year.

4           Q.    Okay.  Thank you.  But prior to

5    that, not trying to pin it on a month and year,

6    but at least through the -- at least through the

7    period of the Actavis acquisition, it was a

8    strategy of Teva's to grow by acquisition?

9                MS. HILLYER:  Objection to form.

10               THE WITNESS:  During my tenure at

11          Teva, we've done three relatively major

12          acquisitions that I can remember.  Barr,

13          Cephalon and Actavis.

14   BY MR. KIEFFER:

15          Q.    And you were there for all three?

16          A.    For all three.

17          Q.    All right.

18          A.    Barr sort of at the tail end.

19               MS. HILLYER:  John, we've been

20          going a little over an hour.

21               MR. KIEFFER:  Can I ask one or

22          two more questions on this topic, and

23          then I think I'm going to completely

24          shift gears.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HILLYER:  Okay.

 2                    MR. KIEFFER:  Thanks.

 3   BY MR. KIEFFER:

 4          Q.    Back to the -- back to your

 5   comment that we do source products from other

 6   manufacturers, I just want to kind of bring us

 7   full circle on that.  If there are documents

 8   that have been produced to us which appear to

 9   reflect that at certain points in time, Teva was

10   sourcing product from Mallinckrodt and Purdue,

11   do you have any reason to say, no, no, no,

12   that's not correct, I have personal knowledge

13   that that's something we at Teva never did?

14                    MS. HILLYER:  Objection to form.

15                    THE WITNESS:  Yeah, I don't have

16          a gut reaction that that wouldn't be

17          accurate.  I always -- I'm always

18          cautious.  Most supply agreements that I

19          have read are extraordinarily

20          complicated, so I never know if the

21          right word is sourcing or licensing.

22          They can be very complex arrangements.

23   BY MR. KIEFFER:

24          Q.    Yeah, and I'm really -- thank
```

Highly Confidential - Subject to Further Confidentiality Review

1    you.

2              I intended to use the word

3    sourcing as a layman, not in a strictly legal

4    sense, okay?

5         A.    Yeah.

6         Q.    So if there are documents

7    reflecting that at certain points in time, Teva

8    was sourcing certain products from companies

9    like Mallinckrodt and Purdue, that wouldn't

10   necessarily surprise you?

11             MS. HILLYER:  Objection to form.

12             THE WITNESS:  No.

13   BY MR. KIEFFER:

14        Q.    Do you have a specific memory of

15   any instances, not the details of them, but

16   just, in general, of Teva sourcing product from

17   Mallinckrodt or Purdue?

18        A.    I don't have any memory of

19   Mallinckrodt.  I am aware, because it affects

20   our supply availability, that there is a

21   specific agreement with Purdue, and we get, you

22   know, very specific quantities of product to

23   sell.

24        Q.    From Purdue?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    From Purdue.

2    Q.    And are those typically opioid

3    medications?

4          MS. HILLYER:  Objection to form.

5          THE WITNESS:  The one that I'm

6      aware of is an opioid medication.

7    BY MR. KIEFFER:

8    Q.    Okay.  Which one is that?

9    A.    It's Oxycodone ER.

10    Q.    Oxycodone ER?

11    A.    ER.

12    Q.    Extended-release?

13    A.    Mm-hmm.

14    Q.    Okay.  And then in terms of

15    sourcing product from other manufacturers, to

16    your knowledge, has Teva ever sourced product

17    from a company by the name Alvogen,

18    A-l-v-o-g-e-n?

19    A.    It wouldn't surprise me, but I

20    don't have any recollection.

21    Q.    Okay.  But that's a name you

22    know?

23    A.    Yes.

24          MR. KIEFFER:  Okay.  We can take

Highly Confidential - Subject to Further Confidentiality Review

1          a break.

2                    THE VIDEOGRAPHER:  Going off the

3          record at 10:14 a.m.

4                    (Brief recess.)

5                    THE VIDEOGRAPHER:  We're back on

6          the record at 10:32 a.m.

7     BY MR. KIEFFER:

8          Q.    Ms. Baeder, we are back on the

9     record after a break.  Are you ready to proceed?

10         A.    Yes.

11         Q.    Okay.  Before I completely shift

12    gears, let me just -- ma'am, before I totally

13    shift gears, let me briefly follow up on a

14    couple of issues that came up in our discussion

15    before the break.

16               You mentioned that Cardinal

17    Health is a member of one of the large three

18    retail buying groups, correct?

19         A.    Correct.

20         Q.    Is that Red Oak?

21         A.    Yes.

22         Q.    Does Cardinal Health actually buy

23    product from Teva?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1           Q.      Cardinal is sometimes, at least

2    colloquially, referred to as a distributor, have

3    you heard that before?

4           A.      A wholesaler.

5           Q.      Wholesaler?

6           A.      Yes.

7           Q.      But Cardinal is a customer of

8    Teva's who does actually buy product from Teva?

9           A.      Yes.

10          Q.      And then resells it to customers

11   of its own?

12          A.      Yes.

13          Q.      One of the people that reports up

14   to you is Napoleon Clark?

15          A.      Yes.

16          Q.      And his group is sales and

17   marketing; is that right?

18          A.      No, he does not have any sales

19   responsibility.

20          Q.      Okay, my mistake.  Tell me his

21   title.

22                  MS. HILLYER:  Currently?

23                  THE WITNESS:  VP of marketing

24           operations, I believe.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. KIEFFER:

2         Q.     That's his current title?

3         A.     Yes.

4         Q.     VP of marketing operations?

5         A.     I think that's been his title

6    since 2016.  I wouldn't swear, but I'm pretty

7    sure.

8         Q.     Thank you.  I thought I heard you

9    say before the break that one of the things that

10   Mr. Clark or his group might have some

11   responsibility for is keeping up with drug label

12   changes?

13        A.     It's not marketing operations'

14   responsibility to monitor label changes or

15   implement label changes.  However, any change in

16   the product, including label, can be a

17   disruption in the supply chain, and it is his

18   responsibility to understand if that will create

19   an availability issue for our forecasted

20   customer usage.

21        Q.     Okay.  For example, a

22   manufacturing issue where you've got to start

23   putting a new label on the product?

24        A.     Correct.
```

1        Q.      Okay.  And you said it is not

2    marketing operations' responsibility to monitor

3    label changes or implement them, correct?

4        A.      Correct.

5        Q.      Is there another area within Teva

6    where individuals do have that responsibility?

7        A.      Yes.

8        Q.      What is that?

9        A.      Broadly, it would be regulatory.

10   I believe there's actually a specific labeling

11   group, but I'm not -- I'm not clear on who sort

12   of monitors and then who executes.

13       Q.      And those are two different

14   functions, as far as you're concerned, the

15   monitoring of label changes and the execution of

16   labeling changes for Teva products?

17       A.      There are two different steps.  I

18   don't know if the same people do it or if it's

19   changed over time.  I don't know.

20       Q.      Okay.  And then do you know are

21   both of those steps, the monitoring of drug

22   labeling changes and the implementation or

23   execution of those labeling changes, are both of

24   those things done by the regulatory area?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      To the best of my knowledge, yes.

2      Q.      And who is currently in charge of

3   that regulatory area?

4      A.      For US generics?

5      Q.      Yes.

6      A.      Scott Tomsky.

7      Q.      And how about, let's say --

8      A.      I'm not sure that he oversees

9   labeling.  For a while it was split to a

10   different group and the person that I knew that

11   headed that group is no longer with Teva, and I

12   don't know how it's organized now.

13      Q.      What was that former group, and

14   what was the name of that individual?

15      A.      It was Jamie Werner, and she was

16   in charge of labeling.  I don't know her title.

17   She was a vice president, I believe.

18      Q.      Jamie Werner may have been a vice

19   president, I won't hold you to the title?

20      A.      Yes.

21      Q.      In charge of labeling?

22      A.      Yes.

23      Q.      For approximately what period of

24   time, 2016 to some point thereafter?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      I don't know when she left the

2    organization.  My memory is that she left by

3    2017.

4            Q.      Okay.  And was she in a larger

5    functional area, not regulatory, some other

6    area?

7            A.      She was part of regulatory, but

8    not part of specifically generic regulatory.

9            Q.      Regulatory that might have to do

10   with both?

11           A.      Yes.

12           Q.      Generic and branded?

13           A.      Yes.

14           Q.      Okay.

15           A.      That was my understanding.

16           Q.      All right.  And I'm sorry, did

17   you say Jamie Werner?

18           A.      My recollection is it's

19   W-e-r-n-e-r.

20           Q.      Okay.  And do you know where

21   Ms. Werner is today?

22           A.      I have no idea.

23           Q.      All right.  Once -- whoever has

24   responsibility and had responsibility, let's
```

1    say, from 2016 forward to monitor and implement

2    drug labeling changes at Teva, do they also --

3    does this same group have the responsibility for

4    making any communications to Teva's customers

5    about the labeling changes?

6              MS. HILLYER:  Objection to the

7         extent it calls for speculation.

8              THE WITNESS:  Yeah, I don't know

9         what that means exactly.

10   BY MR. KIEFFER:

11        Q.    Okay.

12        A.    We do provide -- we do provide

13   copies of our label, literally just the label,

14   like no changes, no commentary, nothing, upon

15   request.

16        Q.    Okay.  Let me give you an

17   example, and this is a pure hypothetical to try

18   to help me understand the issue and hopefully to

19   help us communicate about it, okay?

20        A.    Okay.

21        Q.    You're in charge of customer

22   service today, right?

23        A.    Correct.

24        Q.    And have been for a while?

1        A.      Yes.

2        Q.      Okay.  I'm assuming, but it may

3    not be a correct assumption, but I'm assuming

4    that when a company like Teva implements a

5    labeling change to a drug, it doesn't just slap

6    the new label on the drug and ship it out to its

7    customers without telling them something has

8    changed.

9             Do you think that's a safe

10   assumption?

11             MS. HILLYER:  Objection to form.

12             THE WITNESS:  It would be -- it

13        would depend on how you define label

14        change.

15   BY MR. KIEFFER:

16       Q.      Okay.

17       A.      So if we change the part number,

18   then we would absolutely communicate, and

19   certain changes in the product require changes

20   in the part number.  Not an expert on that, but,

21   for example, if you move from one ANDA to a

22   different ANDA, then you would need to typically

23   change the part number, and in those cases, we

24   absolutely proactively communicate.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    If there is a change in the
2    package insert, that is not something that we
3    would proactively communicate from commercial.
4           Q.      From commercial?
5           A.      Yes.
6           Q.      Okay.  Let me follow up on that,
7    if I can.
8                    You used the term part number a
9    couple of times.  Is that the same as like a SKU
10   number?
11          A.      Which is the same as NDC Code.
12          Q.      All the same?
13          A.      All the same.
14          Q.      It's how the customer identifies
15   a specific drug by dose, unit, strength, all
16   that and uses it to order, right?
17          A.      Yes, they use it to order.  It's
18   molecule, dose and count, how many pills are in
19   a package.
20          Q.      And if there is a labeling change
21   that would affect that number, you said that
22   Teva or at least from your area of the
23   organization would absolutely proactively
24   communicate that to the customer?
```

1           MS. HILLYER:  Objection to the

2      form, mischaracterizes her testimony.

3           THE WITNESS:  So if there is a

4      part number change, we have to

5      communicate; otherwise, they can't order

6      the product.

7  BY MR. KIEFFER:

8      Q.    Right.  The whole supply chain as

9  between Teva and its customers gets screwed up?

10     A.    Correct.

11     Q.    Okay.  So you have to do that,

12 and you do do that, right?

13     A.    Yes.

14     Q.    Okay.  Now, you said if there is

15 a change in the package insert, let me focus on

16 that.

17     A.    Yes.

18     Q.    So package insert, for example,

19 among other things, might include information

20 about indications for a drug, warnings about a

21 particular drug.

22     A.    Correct.

23     Q.    Those sorts of things?

24     A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HILLYER:  Objection to form.
 2    BY MR. KIEFFER:
 3          Q.      And if that sort of information
 4    were to change, I thought I understood your
 5    testimony to be, we don't proactively
 6    communicate that from commercial, I think was
 7    what you said?
 8                    MS. HILLYER:  Object to form.
 9                    THE WITNESS:  For certain not
10          from commercial.
11    BY MR. KIEFFER:
12          Q.      You said from certain?
13          A.      So the package insert travels
14    with the product.
15          Q.      Sure.
16          A.      So if it's chan -- it's on the
17    product.  So our customers are primarily retail
18    pharmacy and wholesale.  The product insert
19    travels with the product, so it's with the
20    product, so there's nothing to call out
21    proactively.
22                    When we set -- when we send setup
23    documents to a customer for a product, we
24    include a -- usually a PDF of the label with
```

Highly Confidential - Subject to Further Confidentiality Review

1    those documents.

2            Q.      When you do a setup on a product?

3            A.      Yes.

4            Q.      And that would include not just a

5    new product but an existing product that had had

6    a label change, for example, to the NDC number?

7            A.      Yes.

8            Q.      And in those instances, you

9    would -- you'd send out some communication to

10   the customer, right?

11           A.      Yes.

12           Q.      Is that usually like an e-mail,

13   or how does that come?

14           A.      It's setup documents are usually

15   provided by e-mail.

16           Q.      And the setup document would

17   reflect the new NDC number?

18           A.      Yes.

19           Q.      Would it show the old one as well

20   for comparison purposes?

21           A.      Not on the setup document.

22           Q.      Would there be some memo or

23   information saying NDC Number 1345 is now

24   changed to 2345 attached to your setup

1    documents?

2                    MS. HILLYER:  Objection,

3            objection to form.

4                    THE WITNESS:  They're separate

5            communications.  There would be a

6            communication that there's going to be

7            an NDC change, and then there would be a

8            set up document, which is a standard

9            form.  It's used across the industry,

10           and then each customer has additional

11           requirements.  Some customers ask for a

12           PDF of the label, some customers ask for

13           us to fill out, you know, a specific

14           form for their consumption, et cetera,

15           et cetera.

16   BY MR. KIEFFER:

17           Q.     Okay.  And the label that may go

18   as a PDF, the label for the product with the new

19   NDC number would show the new NDC number on it,

20   right?

21           A.     Correct.

22           Q.     Okay.  One that would actually be

23   on -- let's say, it's a bottle, it would

24   ultimately be on the bottle, right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.  We don't -- in general, we

2   don't provide the label on the bottle.  I think

3   there are some customers that do ask for that as

4   part of their setup.  I don't know which ones.

5          Q.     And you can provide it when

6   asked?

7          A.     Of course.

8          Q.     And that's the label that travels

9   with the bottle?

10          A.     Correct.

11          Q.     Okay.  And then insofar as any

12   changes, for example, to indications, to

13   warnings, whether those changes would appear on

14   the bottle or in a package insert, on the

15   commercial side, you don't specifically call

16   those out; is that right?

17          A.     No.

18          Q.     Now, commercial side, does that

19   include, for example, the regulatory area within

20   Teva, or do you know what they do?

21          A.     I don't know what regulatory

22   does, and, no, that is not part of the

23   commercial organization.

24          Q.     Okay.  So, presumably, by virtue

Highly Confidential - Subject to Further Confidentiality Review

1   of this communication that goes out when there

2   is an NDC number change, if someone within Teva

3   decided that they wanted to or that it was a

4   good idea to specifically flag customers to the

5   fact that there had been a change in product

6   indications, warnings, things that might go into

7   a package insert, there's at least a mechanism

8   through which that could be communicated?

9           MS. HILLYER:  Objection to form.

10          THE WITNESS:  I don't know what

11      we do.  I'm sure we do whatever is

12      required by the guidelines.

13  BY MR. KIEFFER:

14          Q.    And you could -- for example, if

15  someone within Teva wanted to communicate

16  labeling changes that had to do with things

17  other than an NDC number, for example,

18  indications or warnings or package insert

19  changes, they could communicate that information

20  in the same manner that you communicate labeling

21  changes that pertain to NDC numbers, right?

22          MS. HILLYER:  Objection to form

23      and calls for speculation.

24  BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Nothing that would prevent that,

 2     in other words?

 3              A.      No, we --

 4                      MS. HILLYER:  Same objection.

 5                      THE WITNESS:  We could

 6              communicate in a different way; however,

 7              the package insert travels with the

 8              product and is a form of communication.

 9     BY MR. KIEFFER:

10              Q.      No, and I understand that, and

11     I'm not disputing that with you.

12                      But the label with the new NDC

13     number, that also travels with the product,

14     right?

15              A.      It does, but they can't get the

16     bottle unless they know what it is before they

17     order.

18              Q.      For the first purchase of the --

19              A.      Yes.

20              Q.      -- new NDC number, right?

21              A.      Correct.

22              Q.      Okay.  All right.  You -- your

23     compensation comes from Teva USA, right?

24              A.      Correct.
```

1    Q.    A portion of that compensation is

2    salary, I assume?

3    A.    Yes.

4    Q.    Okay.  Some portion of your

5    compensation is what's referred to often as

6    incentive compensation?

7    A.    Yes.

8    Q.    What's the nature of the

9    incentive compensation that you receive?  I

10   don't necessarily need it in dollars, but based

11   on company performance?

12   A.    I receive a bonus.  Usually

13   there's four or five factors that cumulate into

14   my bonus calculation.  Company performance is

15   one, individual performance is another one, and

16   then I usually have some very specific goals

17   that are somehow monitored.

18   Q.    Okay.  And company performance

19   would be measured in terms of things like sales,

20   revenue, profitability, growth, those sorts of

21   things?

22           MS. HILLYER:  Objection to form.

23           THE WITNESS:  It varies year over

24       year.  Currently, it's earnings per

Highly Confidential - Subject to Further Confidentiality Review

1           share and cash flow.  Prior to that,

2           we've had goals that range from number

3           of generic launches, you know, percent

4           attainment of forecast, forecast

5           accuracy from a supply planning

6           perspective, you know, various different

7           things.

8    BY MR. KIEFFER:

9           Q.     Okay.  Currently, it is cash flow

10   and earnings per share?

11          A.     Currently it is cash flow and

12   earnings per share.

13          Q.     Okay.  And sales and revenue and

14   things like that have in the past been a

15   component of incentive compensation?

16          A.     Yes.

17          Q.     Okay.  And your compensation, the

18   portion of it that is incentive based is in the

19   neighborhood of 30 to 35%?

20          A.     It depends on the time frame.  I

21   think it was maybe 15% when I joined Teva.  I

22   don't really remember.  It was 20% for a

23   significant amount of years, then I think 35,

24   and now it's 50.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And does the -- and so the

2  portion of your compensation that --

3    A.    It's not my portion of my

4  compensation.  My bonus percentage is those

5  numbers that I provided.

6    Q.    Okay, thanks.  I got sloppy with

7  my question.  I want to make sure I'm following

8  you, and, again, I'm not going to get into

9  dollars unless we have to to understand it.

10    The incentive compensation we've

11  been referring to --

12    A.    Yes.

13    Q.    -- that's no portion of your

14  base, right?  Your base is a salary?

15    A.    Correct.

16    Q.    As contrasted from what one might

17  think of as really traditionally salespeople who

18  get a big chunk of their revenue by commission,

19  right?

20    A.    Yeah, I am not in any way

21  commission based.

22    Q.    Right, understood.

23    So you've got a base salary?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then you've got incentive

2  compensation on top of that, which would

3  typically take the form of a bonus?

4    A.    A bonus, correct.

5    Q.    And there's a percentage involved

6  in that, right?

7    A.    Yes.

8    Q.    And that percentage is --

9  whatever the percentage turns out to be, is it

10 applied to your base?

11    A.    It is applied to my base salary.

12    MS. HILLYER:  Objection to form.

13 BY MR. KIEFFER:

14    Q.    So, for example, purely using a

15 hypothetical number, if your base salary is

16 $100,000 and your incentive compensation is 20%,

17 and both you and the company hit all the targets

18 established for a particular year, you would get

19 a $20,000 bonus?

20    A.    I would get at least a $20,000

21 bonus.

22    Q.    Okay.  Maybe more?

23    A.    If we overachieve or if I

24 individually overachieve, it's possible that I

Highly Confidential - Subject to Further Confidentiality Review

1    could get more.

2              The bonus calculation and formula

3    has changed over the years too, of course, but,

4    in general, it has been possible to earn more

5    than your sort of -- that example, that straight

6    bonus calculation, it has been possible to earn

7    more than that.

8         Q.    I understand.

9              So without necessarily going back

10   over all the percentages, what you described for

11   us a moment ago is that in your time at Teva,

12   the bonus percentage that is applied to you has

13   increased over time.

14        A.    It has increased over time.

15   Bonus percentages at Teva I think for the whole

16   time I've been there have been directed by --

17   each title corresponds to a level which

18   corresponds to a set percentage.  I don't

19   think -- my understanding is that there's not

20   variation across people.  It's clearly by level.

21   If you're a level 12, you get X.  If you're a

22   level 20, you get X.

23        Q.    And that's the exactly where I

24   was going to go.

1          As you have progressed to more

2    and more senior levels within the organization,

3    the amount of incentive compensation that you

4    are relative to -- that you are eligible to

5    receive in percentage terms has gone up?

6          A.     Correct.

7          Q.     Maybe -- it sounds like maybe

8    it's more than doubled.  It was initially 15 to

9    20% and now it's 50%?

10         A.     Yes.

11         Q.     Okay.  And that same situation

12   would be true of others in senior management at

13   Teva as well, generally speaking?

14         A.     That's my understanding.

15         Q.     Okay.  Do you consider yourself

16   to be senior management?

17         A.     I consider myself to be senior

18   management in the US.

19         Q.     All right.  Let's pull up

20   document 02009.

21              (Document marked for

22              identification as  Teva-Baeder

23              Deposition Exhibit No. 2.)

24   BY MR. KIEFFER:

1          Q.      Ma'am, document 02009 we have

2     just marked as Exhibit Number 2 to your

3     deposition.  This is a performance evaluation

4     actually from 2013.  I don't want to spend a lot

5     of time going through year after year, but there

6     were a few things I wanted to ask you about in

7     this particular one, okay?

8          A.      Okay.

9          Q.      If you turn to the -- the first

10    page in terms of the way it was provided to us

11    has a Bates number at the bottom

12    TEVA_MDL_A_13618546.  So if you turn to the

13    second page of that document, at the very bottom

14    there's a box that says "Employee Comments."

15              Do you see that?

16         A.      Yeah, at the bottom.

17         Q.      Yeah.  And the last -- these are

18    your comments, right?

19         A.      Mm-hmm.

20         Q.      Is that "yes"?

21         A.      Yes.

22         Q.      The last sentence in that box

23    says, "All new product launches have been

24    executed flawlessly in terms of my area of

Highly Confidential - Subject to Further Confidentiality Review

1    responsibility - both brand and generic."

2              Do you see that?

3         A.    I do.

4         Q.    My specific question is what --

5    at least at the time, what did your area of

6    responsibility involve in terms of brand new

7    product launches?

8         A.    So, again, my customer service

9    team is involved in the order processing of all

10   Teva orders, whether brand or generic, so I

11   don't remember if we launched a product in 2013,

12   but if we did, then they would have had to

13   ensure that the orders came in in a timely way

14   or were released to the distribution center in a

15   timely way and then would have provided tracking

16   and customer communication or communication to

17   sales for sales to provide to customers on, you

18   know, all of your orders have been delivered,

19   you ordered 1,200 pieces, and we have now

20   delivered 1,200 pieces of this product.

21        Q.    Okay.  If a customer had a

22   question about a particular new product launch

23   on the branded side, would they potentially

24   direct that question to a member of your

Highly Confidential - Subject to Further Confidentiality Review

1    customer service team?

2          A.      If it was a logistical question.

3          Q.      Okay, logistical.

4          A.      So I placed order 12345, do you

5    see that in your system, when is it shipping,

6    can I have the tracking, can you reprint an

7    invoice, that logistical piece.

8          Q.      Okay.  And on the generic side,

9    let's assume there's a product on the brand side

10   that's coming off patent and Teva is going to

11   launch a generic product and it's the

12   first-to-file on that, you know what I'm

13   referring to?

14         A.      Yes.

15         Q.      What sorts of information would

16   folks on your customer service team potentially

17   provide to customers in that situation?

18              MS. HILLYER:  Objection to form.

19              THE WITNESS:  Customer service

20         team would provide the same types of

21         information, purchase order process, how

22         to order the product, you know, tracking

23         information, supply availability

24         information, et cetera.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KIEFFER:

2          Q.    Okay.  Okay.  Turn a couple pages

3    forward in that Exhibit Number 2, if you would.

4    The page number in the lower right-hand corner

5    is 13618549.  Let me know when you're there.

6          A.    Yes.

7          Q.    In the upper -- at the very top,

8    there's a box that says "Goal Description."

9          A.    Mm-hmm.

10         Q.    And the second line in that box

11   says, "Support Forecasting Improvement pilot and

12   implement recommendations and KPIs - both brand

13   and generic."

14               Do you see that?

15         A.    I do.

16               MS. HILLYER:  Just to be clear,

17         John, that's your underlining?

18               MR. KIEFFER:  It is, yeah.

19               MS. HILLYER:  Okay.

20               MR. KIEFFER:  Thank you.

21   BY MR. KIEFFER:

22         Q.    What's a KPI?

23         A.    A key performance indicator.

24         Q.    Okay.  And, specifically, what is

1    it that you or your group are doing in terms of

2    brand forecasting there?

3            A.      So my group in 2013 and '14

4    helped the brand team understand the supply

5    channel.  So, for example, when you launch a

6    product, brand or generic, you have to ship a

7    certain amount of product into the supply

8    channel that isn't necessarily immediately

9    dispensed.  It's sort of the safety stock in the

10   channel, if you will.  So we did a lot of work

11   specifically in support of the Copaxone

12   40-milligram on what that amount of product

13   should be.

14           Q.      Okay.  Amount of product, whether

15   you want to call it inventory on hand, that sort

16   of thing?

17                   MS. HILLYER:  Objection to form.

18                   THE WITNESS:  Yeah, so it would

19           be understanding what the inventory --

20           the appropriate inventory on hand for

21           Teva is provided the variation within

22           the forecast models of a product.

23   BY MR. KIEFFER:

24           Q.      Okay.

Highly Confidential - Subject to Further Confidentiality Review

1           A.      As well as a recommendation or

2    some thoughts around the appropriate product to

3    have in the customer channel to support the

4    launch of product.

5           Q.      In terms of forecasting that your

6    group, the customer service group might do to

7    support the branded side of the organization,

8    does your group do all of that forecasting, to

9    the extent the brand side needs it?

10          A.      Customer --

11                  MS. HILLYER:  Objection to form.

12                  THE WITNESS:  Yeah, so customer

13          service would not do this.  Michelle

14          might do this.  It is possible that the

15          leader might do this.  Most customer

16          service agents are -- they have more

17          administrative, repetitive jobs.  This

18          is much more managerial and strategic.

19          So, likely, in today's day and age, I

20          don't remember who did it in 2013, but

21          today it would be a Michelle or a

22          Napoleon or perhaps a Jen King that

23          would be involved in this.

24    BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      Thanks.  And I actually included

 2   too many details in my question.

 3            A.      Okay.

 4            Q.      Let me take the customer service

 5   piece out of it --

 6            A.      Okay.

 7            Q.      -- and ask it a little bit

 8   better.

 9                    To the extent that anyone on the

10   brand side of the organization needed

11   forecasting in terms of potential customer

12   needs, call them inventory needs or whatever the

13   right term is in connection with a branded

14   product, would it be folks in your portion of

15   the organization that would provide that

16   forecasting support to the branded side?

17                    MS. HILLYER:  Objection to the

18            extent it calls for speculation as to

19            what happens on the other side.

20                    THE WITNESS:  Yeah, so the brand

21            team does their own forecast.  We did,

22            of course, provide education and our

23            experience, and then they would use it,

24            ignore it.
```

1    BY MR. KIEFFER:

2        Q.    And when you say you would

3    provide education and our experience, what does

4    that mean specifically?

5        A.    So we would -- would provide

6    examples on the generic side of -- you know, if

7    we launch a generic product, we would assume

8    that they will order six weeks of customer

9    demand day one and that, ultimately, wholesale

10    will decide to hold, you know -- it would depend

11    on the product -- but 40 days of product on hand

12    in support of ensuring that they have product

13    available.

14        Q.    Okay.

15        A.    Some of that is very relevant.

16    Some of that is not relevant.  The demand -- you

17    know, wholesale and pharmacy, retail pharmacy

18    warehouse demand is different on a brand and a

19    generic launch.  They function very differently.

20    So some of it is relevant and some of it is not,

21    and, ultimately, especially in 2013, the brand

22    organization held the decision-making for those

23    products because they were in their P&L, so it

24    was their decision, but we would, of course, act

Highly Confidential - Subject to Further Confidentiality Review

1    as a consultant and provide our history and

2    experience to the extent that they found it

3    useful.

4         Q.    Okay.  You're familiar with a

5    couple of products that went by the name Actiq

6    and Fentora?

7         A.    I am.

8         Q.    Were both of those products sold

9    during your time with the organization?

10        A.    Yes.

11        Q.    Okay.  Those were branded opioid

12   products?

13        A.    Yes.

14        Q.    Did anyone -- at any point in

15   time since you came to work for Teva, did anyone

16   within your area of responsibility provide any

17   sort of data, analytics or support of any kind

18   regarding Actiq or Fentora?

19             MS. HILLYER:  Objection to form.

20             THE WITNESS:  Post Cephalon

21        integration, I have a dedicated --

22        small, two to three people depending on

23        the year, team in the inventory

24        management function, which sits under

1          Michelle but is not part of customer

2          service, it's sort of another piece of

3          her job, that would support analytics on

4          how much product we had for brand

5          products and how much product was in the

6          channel.

7     BY MR. KIEFFER:

8          Q.     How much product you had

9     in-house?

10          A.     In-house.

11          Q.     Okay.  And that would include

12     Actiq and Fentora?

13          A.     It would.

14          Q.     Okay.  And then you said and how

15     much product in the channel?

16          A.     How much product is -- on the

17     brand side of the organization, which is

18     different than the generics, product is sold

19     almost exclusively to wholesale and distributor,

20     and they have to provide their data back to us

21     on how much product they have in hand for

22     brands.

23          Q.     Okay.  So wholesaler and

24     distributor, just as a place holder name, can we

Highly Confidential - Subject to Further Confidentiality Review

1    say people like AmerisourceBergen and Cardinal?

2         A.    Yes, they're wholesalers.

3         Q.    I don't mean that's an exclusive

4    list?

5         A.    No.

6         Q.    Those are just two examples?

7         A.    Exactly.

8         Q.    So what you're describing is

9    after -- so Cephalon is a company that Teva

10   acquired, right?

11        A.    Correct.

12        Q.    Approximately when was that?

13        A.    2013.

14        Q.    Okay.  So post that integration,

15   you had a dedicated team, you said, of maybe

16   approximately three people?

17        A.    Two to three people.

18        Q.    Two to three people, and they

19   would provide information and support to the

20   brand side about brand products?

21             MS. HILLYER:  Objection to form.

22             THE WITNESS:  About inventory of

23        brand products and sort of these

24        logistical questions, did we ship, who

Highly Confidential - Subject to Further Confidentiality Review

```
1          did we ship, how much did we ship?
2    BY MR. KIEFFER:
3          Q.    Okay.  Inventory related
4    questions including products like Actiq and
5    Fentora, right?
6          A.    Correct.
7          Q.    How much of those products Teva
8    had on hand as one kind of bucket of
9    information, right?
10         A.    Yes.
11         Q.    How much product, for example,
12   wholesalers might have on hand?
13         A.    Correct.
14         Q.    Their ordering patterns, I mean,
15   how much they ordered, how often they ordered,
16   what size and strength they ordered, those sorts
17   of things?
18              MS. HILLYER:  Objection to form.
19              THE WITNESS:  They had access to
20         all of that data.
21   BY MR. KIEFFER:
22         Q.    Your people did?
23         A.    Yes.
24         Q.    Okay.  How about any sort of
```

Highly Confidential - Subject to Further Confidentiality Review

1    trending or comparisons, however they might be

2    done, week-to-week, month-to-month,

3    quarter-to-quarter, anything like that?

4              MS. HILLYER:  Objection to form.

5              THE WITNESS:  The data was

6         available.  To my knowledge, they didn't

7         do trending.  That sort of isn't their

8         role.  I can't say that they never did

9         it, but that wasn't their core job

10        responsibility.

11   BY MR. KIEFFER:

12        Q.    Okay, fair enough.

13              Your answer is saving us some

14   questions, believe it or not.  It was more

15   complete than my question.  So I didn't really

16   mean to ask did they do it, but the information

17   was available to do it if somebody had wanted to

18   do it?

19        A.    Yes.

20        Q.    All right.  And this -- the

21   information we're talking about for the moment

22   would be inventory on hand at certain customers,

23   for example, wholesalers of Actiq and Fentora as

24   well as customer purchase histories, things like

1    that, right?

2                    MS. HILLYER:  Objection to form.

3                    THE WITNESS:  Yes.

4    BY MR. KIEFFER:

5        Q.    And that information, I take it,

6    was more or less readily available or available

7    on demand if folks on the brand side wanted it?

8                    MS. HILLYER:  Objection to form

9            and calls for speculation.

10                   THE WITNESS:  Yeah, I don't know

11           readily available.  I mean, this was

12           their job, so, obviously, it was a

13           little harder than pushing a button, but

14           they could certainly get to that

15           information.

16   BY MR. KIEFFER:

17       Q.    Okay.  And if somebody on the

18   branded side or elsewhere in the organization

19   wanted to track, for example, those products,

20   Actiq and Fentora and look at ordering patterns

21   as among Teva's customers, that information was

22   at least readily available to do that sort of

23   analysis?

24                   MS. HILLYER:  Objection to form

Highly Confidential - Subject to Further Confidentiality Review

1           and to the extent it calls for

2           speculation.

3                   THE WITNESS:  If they ask for the

4           information, it could be made available.

5           I don't know readily.

6    BY MR. KIEFFER:

7           Q.     Sure.  And just to bring us full

8    circle, that information that we're talking

9    about is information that would have come from

10   your team, essentially on the generic side of

11   the business?

12          A.     It could have come from multiple

13   places in the organization.  My team did have

14   access to it as well.

15          Q.     Fair enough.  Okay.  Still on the

16   same exhibit, a little bit further down there's

17   a box that says "Employee Comments," and

18   immediately beneath that the first sentence says

19   "completed spring brand forecast project."

20                 Do you see that?

21          A.     No, but -- I got it.

22          Q.     We're also blowing it up on the

23   screen, if that helps.

24          A.     Okay, I've got it.

1    Q.    "Completed spring brand forecast

2    project."

3          What was that project?

4    A.    So spring -- spring was a

5    strategic initiative when Jeremy Levin was

6    appointed to be the CEO of global Teva.  He

7    identified somewhere north of 20 key areas for

8    development, and he -- he engaged leaders from

9    across all functions in Teva and put them on

10   working teams to try to make improvements in our

11   overall process.  It doesn't mean that you had

12   any experience in that area.  It was sort of by

13   design to bring people -- people's thought

14   processes to bear that responsibilities were not

15   their core function so that, you know, fresh set

16   of eyes type of mentality.

17   Q.    Okay.

18   A.    And I was on a -- I was on, I

19   think, three spring teams and one included

20   forecasting.

21   Q.    Okay.  And I'm just pretty

22   literal sometimes, maybe too literal, but just

23   to be clear, the reference to spring means

24   spring of the year; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I don't know what it meant.  It
2    was like fresh spring for Teva.
3          Q.     Okay.  So it was sort of a --
4          A.     Some consultant came up with that
5    name, I'm sure.
6          Q.     Okay.  I'm about to use word
7    gimmick, I didn't want to use that, but I was
8    reading it to mean there was a brand forecast
9    project conducted in the spring of the year
10   maybe regularly; that's not correct?
11         A.     No.
12         Q.     All right.  I'm with you.
13                Did it include forecasting for
14   all of Teva's branded products at that time?
15         A.     I really don't remember exactly
16   what we did.  What I do remember is that it
17   focused on the fact that the supply chain -- the
18   real focus was to optimize supply chain
19   performance, and your supply chain internally
20   always functions better the closer that your
21   sales match your projection, because that gives
22   the supply chain a chance to use techniques that
23   create efficiencies such as campaigning product.
24         Q.     Okay, understood, thank you.

Highly Confidential - Subject to Further Confidentiality Review

 1                    Moving on down, there is another

 2    box toward the bottom of the page that says

 3    "Goal Description."

 4                    You see what I'm referring to

 5    there?

 6          A.     Mm-hmm.

 7          Q.     The second line says "Successful

 8    launch of Top 5 generic launches in 2013."

 9                    Do you see that?

10          A.     I do.

11          Q.     And then beneath that -- well,

12    strike that.

13                    Do you recall what the top five

14    generic launches were in 2013?

15          A.     No.

16          Q.     All right.  Beneath that it says,

17    "Provide launch support to all key brand launch

18    teams - Copaxone 3tw, Hydrocodone ER."

19                    Do you see that?

20          A.     I do.

21          Q.     On Copaxone, remind us, what type

22    of a product is that?

23          A.     It's for multiple sclerosis, and

24    it's -- it has historically been Teva's flagship

Highly Confidential - Subject to Further Confidentiality Review

1    brand.

2           Q.     Okay.  What's 3tw stand for?

3           A.     Three times a week.  We never

4    launched it.  It was an investigation into

5    whether we should.

6           Q.     And then there's a reference

7    there to Hydrocodone ER?

8           A.     Correct.

9           Q.     That's an opioid medication,

10   right?

11          A.     It is.

12          Q.     This is an extended-release

13   version?

14          A.     Yes.

15          Q.     Is that -- in the way it's used

16   there, is that referring to a generic product or

17   a branded product?

18          A.     A branded product that didn't yet

19   have a name.

20          Q.     What was its name ultimately?

21          A.     I think it was Vantrela.

22          Q.     Was Vantrela launched?

23          A.     No.

24          Q.     Vantrela was -- the concept was

Highly Confidential - Subject to Further Confidentiality Review

1    an abuse deterrent opioid; is that right?

2          A.     That's my recollection.

3          Q.     Okay.  And do you know the

4    reasons why it didn't launch?

5          A.     I don't.  I was -- I do remember

6    coming to a workshop that was one day, maybe a

7    day and a half.  Other than that, I don't

8    remember.  I remember lots and lots of meetings

9    on Copaxone three times a week.

10         Q.     What's your best recollection of

11   the nature of the launch support that you or

12   your group would have provided with respect to

13   Vantrela?

14               MS. HILLYER:  Objection to form.

15               THE WITNESS:  I think it was me

16          and solely me.  There could have been

17          other people transiently involved, but

18          at the workshop, it was solely me from

19          on the generic side, and it was a

20          conversation about multiple things.

21               It was a conversation, I remember

22          they brought in a patient and a

23          physician who was very effective in

24          making the case that some pain patients

```
 1                are feeling extraordinarily victimized

 2                in trying to get treatment because of

 3                some of the stigmas associated in the

 4                press.  There was a discussion of the

 5                marketing model for Hydrocodone ER,

 6                which I'm guessing is why I was

 7                included, to see if there was a way that

 8                we could use a generic like, although

 9                not the same as generic selling

10                technique, where you could perhaps

11                partner with an insurance company or a

12                PBM, generics do not do that.  We

13                partner with retail pharmacy.

14                     But the similarity was that we

15                partner with pharmacy, and then there's

16                a substitution oftentimes to the generic

17                product.  So the concept here was

18                perhaps there was a way to partner with

19                a PBM or an insurance company and

20                because it would be abuse deterrent,

21                that they would, you know, encourage the

22                transition in a more automatic way.

23                Q.    Okay.  Let me ask you a couple

24          follow-up questions about the term abuse
```

Highly Confidential - Subject to Further Confidentiality Review

1    deterrent opioid, there are certain properties

2    of an abuse deterrent opioid like Vantrela that

3    are intended to deter abuse, right?

4         A.    Correct.

5         Q.    Without getting into, you know,

6    chemical nuances and molecular structure, what's

7    your understanding of what the abuse deterrent

8    characteristics of Vantrela were?

9         A.    I don't remember.

10             MS. HILLYER:  Objection to form

11        and to the extent it calls for

12        speculation.

13             THE WITNESS:  I don't remember.

14   BY MR. KIEFFER:

15        Q.    It's safe to say, at least by

16   virtue of this project, that by 2013, there was

17   at least some recognition that opioid

18   medications were subject to abuse, and there

19   might indeed be a market for an abuse deterrent

20   opioid product?

21             MS. HILLYER:  Objection to form.

22             THE WITNESS:  Yeah, I think that

23        Teva has, you know, put resources to

24        potential development of abuse deterrent

Highly Confidential - Subject to Further Confidentiality Review

1             drugs on both the brand and the generic

2             side.

3      BY MR. KIEFFER:

4             Q.     And they were at least putting

5      those resources forward back in 2013?

6             A.     Yes, to some extent.

7             Q.     You used the phrase a moment ago

8      generic like selling technique.

9                    Do you recall that?

10            A.     I do.

11            Q.     And then you gave an explanation

12     about a situation where Teva might partner, for

13     example, with a pharmacy and when a branded

14     product -- when a prescription for a branded

15     product was written, then some substitution

16     would take place at the pharmacy with a generic

17     product, right?

18            A.     Correct.

19            Q.     Let me put Vantrela to the side

20     for a moment, and let me just ask you about that

21     what you termed a generic like selling

22     technique.  That is a technique that Teva has

23     used in some circumstances to help sell product

24     on the generic side?

Highly Confidential - Subject to Further Confidentiality Review

1             MS. HILLYER:  Objection to form.

2             THE WITNESS:  The way the generic

3        industry works is generic manufacturers

4        partner with or sell to retail pharmacy

5        GPOs and wholesalers and provide

6        availability of an AB rated, generally

7        AB rated substitutable FDA approved

8        drug.

9   BY MR. KIEFFER:

10        Q.    Okay.  Are you done?

11        A.    I'm good.

12        Q.    Okay.  Fair enough.  No, I

13   understand that.

14             I'm honing in for the moment on

15   what you described as a generic like selling

16   technique.

17             When Teva, in your example, would

18   partner with a pharmacy to substitute a generic

19   drug for a branded drug that may have actually

20   been the one on the prescription, right?

21        A.    Yes.

22             MS. HILLYER:  Objection to form.

23   BY MR. KIEFFER:

24        Q.    The kind of partnership you're

1   describing would involve the pharmacy

2   substituting Teva's generic for the branded that

3   was the subject of the prescription versus some

4   other company's generic, right?

5                MS. HILLYER:  Objection to form

6           and mischaracterizes the testimony.

7                THE WITNESS:  Okay.  Can you do

8           the end of that question again?

9   BY MR. KIEFFER:

10               Q.    Yeah, let me try to ask it again.

11               The kind of partnership that you

12  were describing would involve the pharmacy

13  substituting Teva's generic product for the

14  branded one that had been the subject of the

15  prescription versus the pharmacy substituting

16  some other company's generic product for the

17  branded product, right?

18               MS. HILLYER:  Same objections.

19               THE WITNESS:  So I don't know

20          what happens at the pharmacy counter.

21          What I do know is that when we make a

22          generic product available for sale, we

23          provide pricing to usually a corporate

24          pharmacy entity or one of these large

Highly Confidential - Subject to Further Confidentiality Review

1            retail GPOs, and then they decide which

2            generic product they will stock, if

3            there are multiple.  It is rare for them

4            to stock more than one.

5    BY MR. KIEFFER:

6            Q.     Yeah, fair enough.

7                   There are documents -- when you

8    say you provide pricing to pharmacies and then

9    they will decide what generic to stock, you said

10   that, right?

11           A.     Yes, but not individual

12   pharmacies, not Walgreens on the corner, but

13   WBAD.

14           Q.     Understood.  When you -- when

15   Teva does that, it recognizes that the price it

16   offers to a buying group like WBAD for its

17   products is maybe not the exclusive one, but

18   it's an important decision criteria for WBAD as

19   to whether WBAD selects Teva's generic products

20   or somebody else's to be its generic substitute,

21   right?

22                  MS. HILLYER:  Objection to form

23           and to the extent it calls for

24           speculation and assumes facts not in

1           evidence.

2                     THE WITNESS:  So, again, I

3           don't -- I don't make those decisions.

4           I've never had that job, but price is an

5           important element of decision-making,

6           certainly not the only one.  I do have

7           experience where we've had lower price

8           and we don't get the business, so

9           there's multiple factors that they

10          digest.

11     BY MR. KIEFFER:

12          Q.     Let me ask -- sorry to interrupt.

13     Let me ask you a more basic question.

14                     When we took Mr. Boyer's

15     deposition last week, I was asking him some

16     similar questions, and somewhere in the exchange

17     he said that, at least in his mind, the two most

18     important sort of marketing aspects to the

19     generic business were price and consistency of

20     supply, not to say there's not others, but he

21     repeatedly made that point.  Now, his testimony

22     will speak for itself.  I'm just asking you to

23     assume for the moment he said that.

24                     Do you agree with that?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. HILLYER:  Objection to form
2          and assumes facts not in evidence.
3                    THE WITNESS:  In a very general
4          sense, I think that's true.  There are
5          drugs where that's not the case, but the
6          80/20 rule probably would apply.
7    BY MR. KIEFFER:
8          Q.    Okay.  Price is a big component,
9    true?
10                   MS. HILLYER:  Objection.
11                   THE WITNESS:  Yes.
12   BY MR. KIEFFER:
13         Q.    That's sort of, as you said
14   earlier, maybe economics 101; lower price often
15   means higher volumes?
16                   MS. HILLYER:  Objection to form.
17                   THE WITNESS:  It can mean.
18   BY MR. KIEFFER:
19         Q.    Or higher volumes brought
20   translate to lower price at which the product
21   sold, right?
22         A.    In a general sense, yes.
23         Q.    Okay.  And Teva, again, in a
24   general sense, with some of its big customers
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   like WBAD offers various incentives to encourage

2   higher volumes of purchases, right?

3                  MS. HILLYER:  Objection to form.

4                  THE WITNESS:  Higher volumes of

5         purchases.

6   BY MR. KIEFFER:

7         Q.     Rebates, things like that?

8         A.     So in the generic industry,

9   rebates are considered part of price.  So your

10  pricing is generally informed by the volume of

11  business that is in question, not always, that's

12  changed a bit over time, but in a general sense.

13        Q.     Okay.  Okay.  So before we get

14  too specific, let me stay a little bit general,

15  there is -- obviously, there's a marketing and

16  sales function or arm on the branded side,

17  correct?

18        A.     Correct.

19        Q.     And there's a marketing and sales

20  function on the generic side, also correct?

21        A.     Correct.

22        Q.     Okay.  Those two sides of the

23  organization may have different marketing and

24  sales tools in their respective tool kits; is
```

Highly Confidential - Subject to Further Confidentiality Review

1    that also true?

2           A.     Yes, it's a completely different

3    business model.

4           Q.     Different business model insofar

5    as marketing and sales?

6           A.     Yes.

7           Q.     Okay.  I want to focus on the

8    tools in the marketing -- I want to focus on the

9    tools in the sales and marketing tool kit on the

10   generic side for a moment, okay?

11          A.     Okay.

12          Q.     One of those tools is price,

13   correct?

14          A.     Correct.

15          Q.     Price can be simple or it can be

16   complicated, right?

17          A.     More often than not complicated.

18          Q.     Yeah, sophisticated formulas,

19   pricing models, rebates, right?

20                 MS. HILLYER:  Objection to form.

21                 THE WITNESS:  Pricing is

22          complicated.

23   BY MR. KIEFFER:

24          Q.     Okay.  But one of the reasons

Highly Confidential - Subject to Further Confidentiality Review

```
1    pricing is complicated is, on the generic side,

2    you have limited marketing and sales tools in

3    the tool kit to work for -- to work with, and so

4    to the extent pricing is one, you want to do as

5    much with that tool as you can?

6                    MS. HILLYER:  Objection.

7    BY MR. KIEFFER:

8          Q.    Be as creative and flexible as

9    possible?

10                   MS. HILLYER:  Objection to form.

11                   THE WITNESS:  I've honestly never

12        thought about why our pricing is so

13        complicated.  It's just been complicated

14        my entire career, but pricing is an

15        important element.

16   BY MR. KIEFFER:

17         Q.    Of marketing and sales on the

18   generic side?

19         A.    Correct.

20         Q.    Okay.  Let me focus on supply for

21   a second, okay.

22                   Fair to say that for the very

23   large customers -- I'm going to focus -- strike

24   that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Let's focus for the moment on the
 2   very large customers, the three retail buying
 3   groups we talked about, okay?
 4           A.     Correct.
 5           Q.     Is it fair to say that
 6   consistency of supply is a very important factor
 7   to at least those three customers?
 8                    MS. HILLYER:  Objection to form
 9           and calls for speculation.
10                    THE WITNESS:  Those customers do
11           not like backorders, so I can say that.
12   BY MR. KIEFFER:
13           Q.     They don't like backorders, they
14   don't like things that would interrupt their
15   expected supply of Teva's products?
16                    MS. HILLYER:  Same objection.
17                    THE WITNESS:  Agree.
18   BY MR. KIEFFER:
19           Q.     Okay.  And another marketing and
20   sales tool in the Teva tool kit on the generic
21   side is Teva's ability to be consistent and
22   perform well in terms of supplying its
23   customers, true?
24                    MS. HILLYER:  Objection to form.
```

1           THE WITNESS:  It is a tool if we

2      are providing product at a consistent,

3      predictable pattern.

4  BY MR. KIEFFER:

5      Q.     Okay.

6      A.     Teva has not always done that.

7  Teva has had notoriously poor supply in certain

8  years, but it is a tool when it is -- that is

9  the case.

10      Q.     Okay.  Notoriously poor supply in

11  certain years you said?

12      A.     Mm-hmm.

13      Q.     Notoriously poor supply of what

14  products in what certain years?

15      A.     Host of products.  So industry

16  standard on time and full, which is a metric to

17  measure your supply consistency, which is

18  essentially a variation, there's multiple ways

19  you can calculate it, but it's the number of

20  units ordered versus the number of units that

21  are ultimately shipped, usually with some

22  adjustment around whether the order was valid or

23  not, because there can be order errors, there

24  can be orders that we can't ship, maybe it

Highly Confidential - Subject to Further Confidentiality Review

1    wasn't on contract, so you don't get to order

2    it, et cetera, et cetera.

3                    Industry standard would be 95%.

4    You could argue 97, 95, something.  We've had

5    years where our service level is 60%.  To get to

6    a service level of 60%, you have to be missing

7    on at least 50% of your products.

8          Q.    On the whole, let's say over the

9    last five years, is it your opinion and belief

10   that on the generic side, Teva has performed

11   well in terms of delivering its customers'

12   supply expectations?

13                 MS. HILLYER:  Objection to form

14        and calls for opinion.

15                 THE WITNESS:  We have performed

16        at less than the 95% that is the

17        customer standard.

18   BY MR. KIEFFER:

19         Q.    Okay.  Teva has marketed to its

20   customers at different points in time that it

21   does bring to the table as a strength

22   consistency of product supply?

23                 MS. HILLYER:  Objection to form.

24                 THE WITNESS:  During certain

Highly Confidential - Subject to Further Confidentiality Review

1          points of time, Teva has been able to

2          say that that's a strength.

3    BY MR. KIEFFER:

4          Q.    Okay.  There are, and, again,

5    we'll probably get into some documents on this

6    later, there are -- there's a term that's used

7    sometimes called failure to supply or FTS,

8    right?

9          A.    Correct.

10         Q.    Are those some form of monetary

11   penalty that Teva may incur if it is unable to

12   meet agreed to supply parameters with certain of

13   its customers?

14         A.    Yes.

15         Q.    Okay.  Teva has agreements in

16   place with a number of customers and certainly a

17   number of the big ones to supply certain

18   products in certain amounts on certain

19   schedules?

20              MS. HILLYER:  Objection to form.

21              THE WITNESS:  Teva has agreements

22         that include failure to supply terms.

23         They're different by customer.  They

24         have different construction.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. KIEFFER:

2         Q.    Okay.  But the big concept is if

3    Teva doesn't meet whatever commitment it made to

4    a particular customer in terms of its ability to

5    supply a particular product or quantities on

6    particular intervals, it may incur some monetary

7    penalty, whether that's a rebate or some other

8    form of compensation to the customer?

9              MS. HILLYER:  Objection to form.

10             THE WITNESS:  Yeah, there's all

11        kinds of construction, but, yes, there

12        is a penalty piece.

13   BY MR. KIEFFER:

14        Q.    Okay.  So we talked about the

15   fact that there's differences in the branded

16   side sales and marketing operation and the

17   generic side sales and marketing operation,

18   right?

19        A.    Yes.

20        Q.    And we talked about the fact that

21   pricing and ability to supply are a couple of

22   tools in the marketing and sales tool kit on the

23   generic side, right?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  What other tools in the

2    marketing and sales or promotional tool kit on

3    the generic side does Teva have available?

4                 MS. HILLYER:  Objection to form.

5                 THE WITNESS:  So we don't have a

6          lot of promotional tools.  We provide

7          availability information, we provide a

8          price, and we try to negotiate a

9          construct of a framework with a customer

10         that makes us relatively easy to do

11         business with.  But that's really all we

12         have from a promotional perspective.

13   BY MR. KIEFFER:

14         Q.     Okay.  On the third thing that

15   you mentioned, you said we try to have a

16   construct of a framework with a customer that

17   makes us relatively easy to do business with,

18   right?

19         A.     Yes.

20         Q.     Boiling it down, one message Teva

21   tries to communicate to its customers is that

22   you try to avoid red tape, wherever possible,

23   right?

24                 MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I actually think

 2           that most of our customers would say

 3           that we have the most red tape of any

 4           organization, but what we do say is that

 5           we're a professional organization, we

 6           may not always be the easiest to do

 7           business with, but it's easier to do

 8           business with us and buy 800 drugs than

 9           it is to deal with 800 suppliers.

10    BY MR. KIEFFER:

11           Q.    One stop shopping is the idea,

12    right?

13           A.    Yes.

14           Q.    Okay.  And the 800 drugs, that's

15    a hypothetical, right?

16           A.    Hypothetical.

17           Q.    Okay.  But that's Teva's -- not

18    800, you gave me a closer number earlier, 1,100

19    to 1,200 today?

20           A.    About 1,200, yes.

21           Q.    1,500 several years ago?

22                 MS. HILLYER:  Objection to form.

23                 THE WITNESS:  I think that's

24           right.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KIEFFER:

2          Q.     That's -- and, again, I realize

3    we're talking approximations here.

4          A.     Yes.

5          Q.     That's Teva's portfolio?

6          A.     Yes.

7          Q.     Does Teva have --

8          A.     On the generic side.

9          Q.     Thank you.  That is Teva's --

10   approximately 11 to 1,200 drugs today, 1,500

11   drugs several years ago, that describes Teva's

12   product portfolio on the generic side?

13         A.     Correct.

14         Q.     Does Teva have the largest

15   generic product portfolio of any generic

16   manufacturer in the country?

17                MS. HILLYER:  Objection to form.

18                THE WITNESS:  I would think so.

19         I don't know.  We do have the largest

20         generic market share.

21   BY MR. KIEFFER:

22         Q.     Right.  And what is that

23   currently?

24         A.     I think it's around 12.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    12%?

2    A.    It was as high as 16 at one point

3  in time.

4    Q.    Okay.  But as far as you are

5  aware currently in 2019, Teva does have the

6  largest generic market share of any drug

7  manufacturer in the United States?

8    A.    That is my understanding.  I

9  don't know if we offer the most number of --

10  it's just not something I've looked at recently.

11    Q.    Okay.  Let me ask a couple more

12  questions, and we're probably close to a break.

13          MS. HILLYER:  Yeah, I'm needing

14      one.

15          MR. KIEFFER:  Five minutes or

16      less.

17          MS. HILLYER:  Maybe less, maybe

18      two.

19          MR. KIEFFER:  I'll do what I can.

20  BY MR. KIEFFER:

21    Q.    The -- there are documents that

22  have been produced by Teva in this case and

23  marked as exhibits in other depositions that

24  make reference to Teva taking steps to keep its

Highly Confidential - Subject to Further Confidentiality Review

1    product primary at a customer location.

2                    Are you familiar with that

3    terminology?

4                    MS. HILLYER:  Objection to form.

5                    THE WITNESS:  Yes, in a loose

6            sense.  It has different meanings with

7            different customers.

8    BY MR. KIEFFER:

9            Q.    Early in the deposition, I think

10   you used the term defend our product or defend a

11   price.

12                    Do you know what I'm talking

13   about?

14           A.    Correct, yeah.

15           Q.    Teva will offer certain customers

16   price incentives, for example, to stock only

17   Teva's generic and no one else's, right?

18                    MS. HILLYER:  Objection to form.

19                    THE WITNESS:  It doesn't --

20           doesn't work maybe that simply.

21   BY MR. KIEFFER:

22           Q.    Okay.

23           A.    For example, a wholesaler by

24   definition typically stocks multiple generic

1    products.  They have a product that they

2    consider primary.  This is in a general sense,

3    again, every customer is different, where they

4    have a lot of volume, and then they have

5    secondary positions in their formulary where

6    their volume would be smaller.  And that -- how

7    they construct their programs and why they have

8    primary, the reason they have secondary, at

9    least one reason is in case the primary runs out

10   of stock.  They have other financial reasons to

11   have multiple secondaries that I don't -- I wish

12   I did, but I do not understand.

13   BY MR. KIEFFER:

14          Q.     If a Teva product is primary in a

15   large customer, that typically will translate

16   into a substantial volume of product sales for

17   Teva, as opposed to a situation where it is not

18   primary, where it's secondary or in some other

19   position, right?

20                MS. HILLYER:  Objection to form.

21                THE WITNESS:  In a general sense,

22          that's correct.  There are certain

23          secondary awards where you get very

24          significant volume.  It depends.  But in

Highly Confidential - Subject to Further Confidentiality Review

1    a general sense, that's correct.

2  BY MR. KIEFFER:

3    Q.    Okay.  Teva from time to time

4  offers incentives that have gone by names like a

5  customer loyalty reward or rebate in exchange

6  for keeping a product in a primary position with

7  a customer, right?

8        MS. HILLYER:  Objection to form.

9        THE WITNESS:  Certainly,

10       that's -- that's possible.  I don't hear

11       that as a per product.  Typically,

12       loyalty rebates are on a portfolio of

13       products.  I can't say that that was

14       always the case.

15  BY MR. KIEFFER:

16    Q.    Okay.  We'll -- and I'm trying to

17  speed us along so we can take the break.  If we

18  have the time, maybe we'll look at an exhibit

19  later, but an exhibit was marked with a witness

20  last week, it was a customer -- an offer of a

21  customer loyalty rebate to AmerisourceBergen,

22  whereby Teva would pay AmerisourceBergen

23  $250,000, I think the period of time was from

24  late September to December 31 of the particular

Highly Confidential - Subject to Further Confidentiality Review

1    year to keep a specific opioid product primary

2    in its formulary.

3              Are you aware of situations like

4    that having happened?

5         A.    It's possible.

6              MS. HILLYER:  Objection to form.

7              THE WITNESS:  It's possible.

8              MS. HILLYER:  And assumes facts

9         not in evidence.

10   BY MR. KIEFFER:

11        Q.    Okay.  It wouldn't surprise you?

12             MS. HILLYER:  Objection to form.

13             THE WITNESS:  No, it wouldn't

14        surprise me, but it's important to note

15        that we look at those things as a price

16        decline.  They're all -- all value

17        that's on a product specific is an

18        element of pricing.

19   BY MR. KIEFFER:

20        Q.    Sure.

21             It's a -- the example I just gave

22   is a price decline, but the idea is you're

23   securing a primary position that hopefully

24   will --

```
 1              A.      Maintain.

 2              Q.      -- maintain volume, right?  Yes?

 3                      MS. HILLYER:  Objection to form.

 4   BY MR. KIEFFER:

 5              Q.      Sorry, you just nodded.

 6              A.      Yes, correct.

 7                      MR. KIEFFER:  Let's take a break.

 8                      THE VIDEOGRAPHER:  Going off the

 9         record at 11:36 a.m.

10                      (Brief recess.)

11                      THE VIDEOGRAPHER:  Back on the

12         record at 11:50 a.m.

13   BY MR. KIEFFER:

14              Q.      Ma'am, we're back on the record

15         after a short break.

16                      Are you ready to proceed?

17              A.      Yes.

18              Q.      All right.  Let me turn your

19   attention back to the exhibit we were looking at

20   for a moment.  That is Exhibit 2.  I'm on the

21   page that ends in 551 in the bottom right-hand

22   corner.  There's a box in about the middle of

23   the page that says "Employee Comments," and I'll

24   have our tech blow it up so it's easier to read.
```

1       Do you see what I'm referring to

2  there?

3       A.    Yes.

4       Q.    First sentence says, "I often act

5  as the voice of the customer with internal

6  discussions outside of customer service."

7       Did I read that correctly?

8       A.    Correct.

9       Q.    You may advocate for a customer's

10 interest internally within the organization; is

11 that a different way to say it?

12            MS. HILLYER:  Objection to form.

13            THE WITNESS:  Yeah, I don't know

14       that I agree with advocate.  I educate.

15       I don't always agree with the customer's

16       point of view, but I will -- I will

17       provide insight into what their point of

18       view and then also digest that

19       internally with people that aren't

20       customer facing.

21 BY MR. KIEFFER:

22       Q.    Okay.  And that term "customer

23 facing," are you -- is your role -- part of your

24 role customer facing?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I do speak to customers, yes.

2          Q.      Okay.  I think you said earlier

3    at a high level?

4          A.      Yes.

5          Q.      So, for example, just for ease of

6    reference, some of the people we -- some of the

7    organizations that we've discussed earlier

8    today, AmerisourceBergen, WBAD, Cardinal, do you

9    interface with representatives of those

10   organizations?

11         A.      My interaction with customers at

12   this point in time is primarily focused on

13   senior people in the procurement organizations,

14   which would be the retail GPOs, not the

15   individual customer members.

16         Q.      Okay.  The three GPOs we talked

17   about earlier?

18         A.      Correct.

19         Q.      And you would be interfacing with

20   people at a very senior level in those

21   organizations?

22         A.      Correct.

23         Q.      The next sentence here under

24   "Employee Comment" says, "I presented to a full

```
 1    room of management in Israel on the dynamics of

 2    the US market and need for supply and quality."

 3              Do you see what I just read?

 4         A.   Yes.

 5         Q.   Let me break that down and ask

 6    you some questions about it.

 7              The reference to Israel, Teva's

 8    global headquarters is in Israel; is that

 9    correct?

10              MS. HILLYER:  Objection to form.

11              THE WITNESS:  Teva has a

12         headquarters in Israel, correct.

13    BY MR. KIEFFER:

14         Q.   Okay.  Is it your understanding

15    that is the -- kind of the global head of the

16    company that goes by the name of Teva?

17              MS. HILLYER:  Objection to form.

18              THE WITNESS:  The global CEO sits

19         in Israel.

20    BY MR. KIEFFER:

21         Q.   And who is the global CEO?

22         A.   Kåre Schultz.

23         Q.   Can you spell that?

24         A.   K-a-r-e, with a little circle on
```

Highly Confidential - Subject to Further Confidentiality Review

1    the a, and Schultz is S-c-h-u-l-t-z, I believe.

2         Q.    This comment "I presented to a

3    full room of management in Israel on the

4    dynamics of the US market and need for supply

5    and quality," I assume that would have been in

6    2013 since this is a 2013 year-end performance

7    appraisal we're talking about?

8         A.    That would be my assumption as

9    well.

10        Q.    Okay.  Let me focus in on this.

11   What took you to Israel in 2013?

12        A.    So my memory of this comment is

13   that I did a presentation at a manufacturing

14   facility, the Jerusalem manufacturing facility,

15   as a motivational and developmental opportunity

16   for the management in that manufacturing

17   facility to understand how the US market works

18   in a very macro sense and why -- from a supply

19   perspective, why consistency of supply is very

20   important and quality in our marketplace.

21        Q.    Okay.  And the -- your reference

22   to a full room of management, about how many

23   people were in attendance?

24                   MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  My memory is the
 2           table was about this size, and it was a
 3           relatively full room, so I don't know,
 4           30.
 5   BY MR. KIEFFER:
 6           Q.     Okay.  And these would have been
 7   management with Teva in Israel?
 8           A.     They would have been -- they
 9   would have been management in the operations in
10   Jerusalem.
11           Q.     Okay.  At a Jerusalem facility?
12           A.     At the Jerusalem manufacturing
13   facility.
14           Q.     Okay.  And Teva's Jerusalem
15   manufacturing facility, did it in 2013 or has it
16   at any time manufactured Teva products for the
17   US market?
18                   MS. HILLYER:  Objection to the
19           extent it calls for speculation.
20                   THE WITNESS:  Jerusalem
21           manufacturing facility did provide
22           products to the -- to Teva USA for sale.
23   BY MR. KIEFFER:
24           Q.     During a -- you said did, so that
```

1    sounds like past tense?

2          A.    Jerusalem has been publicly

3    announced is a site that is closing as part of

4    the corporate restructure.

5          Q.    You say it is closing?

6          A.    It is closing.

7          Q.    Has not closed yet?

8          A.    No, it has not closed yet.

9          Q.    Okay.  What other -- let's strike

10   that.

11                For approximately what period of

12   years has the Jerusalem facility provided --

13   manufactured product and provided it to Teva

14   USA?

15                MS. HILLYER:  Objection to the

16          extent it calls for speculation.

17                THE WITNESS:  I don't know.

18   BY MR. KIEFFER:

19          Q.    Let me stop and ask you a better

20   question.

21          A.    Yeah.

22          Q.    You undoubtedly don't know what

23   happened before you came, right?

24          A.    Correct.

```
1            Q.      Since you came to Teva, do you

2   know did the Jerusalem facility manufacture

3   product and supply it to Teva USA during the

4   period that you've been with the company, at

5   least until the announcement of the site

6   closure?

7                    MS. HILLYER:  Same objections,

8          calls for speculation.

9                    THE WITNESS:  So there were

10         products manufactured in Jerusalem that

11         were shipped to Teva USA.

12  BY MR. KIEFFER:

13           Q.      And for about what period of

14  years?

15                   MS. HILLYER:  Same objection, to

16         the extent it calls for speculation.

17                   THE WITNESS:  More than one year,

18         but I don't know.

19  BY MR. KIEFFER:

20           Q.      You don't know all the specifics?

21           A.      Yeah.

22           Q.      Okay.  Teva has multiple

23  manufacturing sites in Israel, correct?

24                   MS. HILLYER:  Objection to the
```

1          extent it calls for speculation.

2                THE WITNESS:  Yeah, I'm not on

3          the global operations side of the

4          business, so I don't -- I don't know.

5          There are other manufacturing sites in

6          Israel.  I don't know to the extent that

7          they supplied the US or don't supply the

8          US.

9     BY MR. KIEFFER:

10          Q.    Do you know how many are in what

11    locations?

12          A.    I know of one other, which is

13    Kfar Saba, and that's all that I -- I know there

14    are more, but I don't know anything more

15    specific.

16          Q.    Okay.  Beyond the Jerusalem site

17    and the other one you mentioned, if there are

18    others, I just want to close the loop on this,

19    if there are other -- Teva manufacturing

20    facilities in Israel, you don't personally know

21    how many or where they're located, right?

22          A.    Correct.

23          Q.    Okay.  And I would assume, then,

24    you don't know what products they make or don't

Highly Confidential - Subject to Further Confidentiality Review

1    make?

2           A.      Correct.

3           Q.      Okay.  Have -- to your knowledge,

4    of the Teva manufacturing facilities located in

5    Israel, have any of those supplied opioid

6    products at any point in time to Teva USA?

7           A.      To my knowledge, no.

8           Q.      Okay.  And then as it relates to

9    all of the various other sites, to the extent

10   there are manufacturing sites in Israel, whether

11   or not any of those sites have made any opioid

12   products for Teva USA, you don't know that one

13   way or the other, correct?

14          A.      I don't know.

15                  MS. HILLYER:  Objection, calls

16          for speculation.

17   BY MR. KIEFFER:

18          Q.      Do not know?

19          A.      I do not know.

20          Q.      Okay.  And who do you believe

21   within Teva might have the answer to that?

22                  MS. HILLYER:  Objection, calls

23          for speculation.

24                  THE WITNESS:  The operations

Highly Confidential - Subject to Further Confidentiality Review

1           teams at Teva are responsible for site

2           of manufacture.

3   BY MR. KIEFFER:

4           Q.      Site of manufacture?

5           A.      Yes.

6           Q.      And the operations team -- you

7    said the operations teams at Teva are

8    responsible for site of manufacture, correct?

9           A.      Correct.

10          Q.      The operations teams that you

11   referenced in that answer, is that a US team?

12          A.      There's a -- there's a US

13   component that's responsible for US supply

14   chain.

15          Q.      Okay.  Let me ask the question a

16   little differently.

17                  If we just focus on opioids that

18   Teva has manufactured that have been sold or

19   distributed in the United States --

20          A.      Yes.

21          Q.      -- the decision about where those

22   opioids get made, is that exclusively a Teva USA

23   decision, is it a Teva Israel decision, is it

24   some sort of collaborative decision?

Highly Confidential - Subject to Further Confidentiality Review

1             MS. HILLYER:  Hold on.  Objection

2         to form and calls for speculation.

3             THE WITNESS:  So, first of all, I

4         have no idea and no experience with how

5         those decisions were made for Cephalon

6         or Actavis, no idea.

7    BY MR. KIEFFER:

8         Q.    Okay.

9         A.    For Teva USA, generally they're

10   made, my understanding is by the US supply

11   chain.  However, I don't know how those

12   responsibilities then are carved out.  I'm not

13   in those meetings.  It's not part of my

14   responsibility, so I wouldn't want to speculate.

15        Q.    Okay.  Do you know whether Teva

16   USA has exclusive decision-making authority

17   about the site of manufacture for all products

18   that Teva sells within the United States?

19             MS. HILLYER:  Objection to form

20        and calls for speculation.  She

21        testified she doesn't know about that.

22             THE WITNESS:  Yeah, I don't know.

23   BY MR. KIEFFER:

24        Q.    Don't know either way?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     I don't.  I don't know either

 2   way.

 3                     MR. KIEFFER:  Let's pull up

 4             document 2021, if we can.

 5                     (Document marked for

 6             identification as  Teva-Baeder

 7             Deposition Exhibit No. 3.)

 8                     MS. HILLYER:  This is 3?

 9                     MR. KIEFFER:  Yeah, thank you.

10   BY MR. KIEFFER:

11              Q.     Ma'am, we have just handed you --

12   bear with me, let me keep my housekeeping

13   straight.

14                     We have just handed you what

15   we've marked as Exhibit Number 3.  It bears a

16   Bates number in the lower right-hand corner of

17   TEVA_MDL_A_12363196.  It is an e-mail dated

18   January 31st of 2014 from Bryan Bart to you and

19   some other folks.

20                     Do you see what I'm referring to?

21              A.     Yes.

22              Q.     Okay.  And the subject line is

23   "Topco Update for Israel."

24                     Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes.

2          Q.    First of all, who is Topco?

3          A.    Topco is a conglomerate of

4  primarily grocery stores that buy drugs, much

5  smaller market share, but similar structure as a

6  retail GPO.

7          Q.    Okay.  Who is Bryan Bart?

8          A.    He works on my team at this point

9  in time -- what year was this?

10         Q.    2014.

11         A.    He was in the product management

12  group.

13         Q.    But on your team?

14         A.    Yes.

15         Q.    And then the other folks just

16  briefly, Christine Boerner, if I said that

17  right, who is she and where does she work?

18         A.    US supply chain.  She is no

19  longer with the organization.

20         Q.    Robert Lees?

21         A.    US supply chain.

22         Q.    Robert Hunsinger?

23         A.    Product management.

24         Q.    In the US?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes.

2     Q.     Angela --

3     A.     Amento.

4     Q.     -- Amento?

5     A.     Product management US.

6     Q.     Okay.  I'm going to say this

7  wrong probably but Gilad Shadur.

8     A.     US finance.

9     Q.     And Paul Butts?

10     A.     Supply chain, but I think -- US

11  supply chain but a different piece of US supply

12  chain.

13     Q.     Okay.  The attachments here

14  reference pending bids as of it looks like

15  12/8/14, and then it says market planners,

16  right?

17     A.     Yes.

18     Q.     Okay.  And for the record, there

19  is a spreadsheet that is attached to this.  I'm

20  not going to take the time necessar -- well,

21  it's too cumbersome to print.  We could display

22  it on the screen.  I'm not going to do that

23  unless any of my questions make you think that

24  you want me to, in which case I'm happy to.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    We'll mark the -- we'll just indicate that

 2    electronically we'll append the spreadsheet to

 3    this exhibit, and it was produced natively as

 4    TEVA_MDL_A_12363197.

 5                 MS. HILLYER:  So I'll just put an

 6          objection on the record, she doesn't

 7          have the whole picture here.

 8                 MR. KIEFFER:  Yeah, and if I need

 9          to pull it up, I can.  I think it's

10          probably a waste of time, but I'm happy

11          to if we need to.

12    BY MR. KIEFFER:

13          Q.    It says here, ma'am, in the text,

14    "Per our meeting today, all of these were bid

15    with 4/1/2014 supply start - except paroxetine -

16    we did not bid the paroxetine due to concerns

17    around the ongoing supply."

18                 Do you see that?

19          A.    Yes.

20          Q.    And then it states, "Bob and I

21    will complete a review today to validate the

22    other pending bids vs. these items

23    specifically."

24                 You see that as well?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      And then it says, "As a heads-up

3    for this group.  Bob has an existing

4    distribution of the pending full line bids every

5    time there is an update.  It includes the detail

6    of volume and commitment on pending full lines.

7    I attached the latest as a reference."

8                Do you see that as well?

9        A.      Yes.

10       Q.      And then there are some drugs

11   referenced in a table below that.

12               Do you see that also?

13       A.      Yes.

14       Q.      Why is the status of this Topco

15   bid, this Topco update being provided to Israel?

16               MS. HILLYER:  Objection to the

17            extent it calls for speculation.

18               THE WITNESS:  So market planning,

19            which is US supply chain, is responsible

20            for the interaction with the

21            manufacturing sites, and we have to

22            update them as to things that are

23            currently pending versus closed.

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KIEFFER:

 2        Q.    Okay.  So if this Topco update is

 3   being provided to Israel, would that suggest to

 4   you that some of the products or all the

 5   products that were the subject of this bid might

 6   be products that would be manufactured in

 7   Israel?

 8             MS. HILLYER:  Objection to form.

 9             THE WITNESS:  Yeah, I don't

10        remember where these products are made,

11        but we would provide updates on whether

12        bids are open or closed or still

13        pending, and then market planning would

14        do what market planning does, which I'm

15        not a market planner.

16   BY MR. KIEFFER:

17        Q.    You would provide bids -- you

18   would provide information on whether bids were

19   open or closed or still pending, correct?

20        A.    Correct.

21        Q.    And you'd provide that updated

22   information to Israel from time to time?

23        A.    No, to US supply chain.

24        Q.    To US supply chain.
```

Highly Confidential - Subject to Further Confidentiality Review

1           And then they, in turn, from time

2    to time would update Teva in Israel?

3           A.     I don't know what they would do.

4                  MS. HILLYER:  Objection to form.

5    BY MR. KIEFFER:

6           Q.     But you know that's happened --

7    you've seen that happen before?

8                  MS. HILLYER:  Objection to form.

9                  THE WITNESS:  I've never been in

10           the room.  They digest the information

11           and then do with it as they need to to

12           do their job.

13                 MR. KIEFFER:  Okay.  Let's pull

14           up 2014, if we can.

15                 (Documents marked for

16           identification as Teva-Baeder Deposition

17           Exhibit Nos. 4 and 5.)

18    BY MR. KIEFFER:

19           Q.     Ma'am, we have marked as -- we

20    have marked as Exhibits 4 and 5 a couple of

21    documents.  Exhibit 4 is a one-page e-mail.  It

22    bears a number in the lower right corner of

23    TEVA_MDL_A_12121972, and it attaches a

24    spreadsheet that we have marked as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

```
1    Number 5.  It bears a Bates number of
2    TEVA_MDL_A_12121974.
3              Let me ask you first about
4    Exhibit 4.  This is an e-mail from Bryan Bart to
5    Richard Tremonte at Teva USA.
6              Do you know who Richard Tremonte
7    is?
8         A.    I do know Richard Tremonte, but I
9    did not work with him at Teva.
10        Q.    Okay.  What was his position?
11        A.    I don't know.  I wasn't at Teva
12   then.
13        Q.    Okay.  But you know him?
14        A.    I know him from -- he -- we
15   worked together later at Sandoz.
16        Q.    I see.  And lower on the string
17   here you will see over the right, there's a lady
18   by the name of Maureen Cavanaugh listed?
19        A.    Yes.
20        Q.    Okay.  She's no longer with the
21   company, right?
22        A.    Correct.
23        Q.    What was her position when she
24   left?
```

1        A.      She was the COO of generics when

2    she left the company.

3        Q.      Okay.  And when she left the

4    company, did you report to her?

5        A.      Yes -- no, not when she left the

6    company.  I reported to her until 2016.

7        Q.      Okay.  And so she was your boss

8    at least until 2016?

9        A.      Until 2016.

10        Q.      Okay.  This e-mail at the bottom

11    of the page states, "Bryan, Israel now wants a

12    priority list similar to what we did for SV."

13            Do you see that?

14        A.      Yes.

15        Q.      Do you know what SV is?

16            MS. HILLYER:  Objection to the

17            extent it calls for speculation.  She

18            was not on this e-mail, and it was --

19            predates her time at the company.

20    BY MR. KIEFFER:

21        Q.      Do you know what SV refers to,

22    just based on your familiarity with the

23    organization and your time there?

24        A.      SV stands for Sellersville.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Stands for what?

2      A.      Sellersville.

3      Q.      And what is Sellersville?

4      A.      It's a manufacturing facility in

5   Pennsylvania.

6      Q.      Okay.  So read differently, this

7   would say, Bryan, Israel now wants a priority

8   list similar to what we did for Sellersville,

9   which is the Pennsylvania manufacturing

10  facility?

11     A.      Used to be a Teva manufacturing

12  facility in Pennsylvania.

13     Q.      Is it any longer?

14     A.      No.

15     Q.      What happened?

16             MS. HILLYER:  Objection to form.

17             THE WITNESS:  It was sold.

18  BY MR. KIEFFER:

19     Q.      Okay.  In approximately when?

20             MS. HILLYER:  Objection to the

21        extent it calls for speculation.

22             THE WITNESS:  Yeah, I don't

23        remember, more than four years ago.

24  BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  But while you were at the

2    company?

3    A.    Yes.

4    Q.    Okay.  And the products that were

5    formerly manufactured at Teva's Sellersville

6    facility, where was the manufacturing of those

7    products transferred to?

8           MS. HILLYER:  Objection to the

9       extent it calls for speculation.

10           THE WITNESS:  Yeah, I would have

11       to go product by product to answer that

12       question.

13  BY MR. KIEFFER:

14    Q.    Okay.

15    A.    They were transferred within the

16  network or transferred to a contract

17  manufacturing organization.

18    Q.    Okay.  And do you know whether

19  the production of any Teva products formerly

20  manufactured at the Sellersville facility,

21  whether some of that manufacturing started

22  taking place in Israel after the Sellersville

23  facility was closed?

24           MS. HILLYER:  Objection, calls

1           for speculation.

2                THE WITNESS:  I don't know.

3    BY MR. KIEFFER:

4           Q.    Do you know whether anyone with

5    Teva in Israel had a say in the decision about

6    where the Sellersville -- the previous

7    Sellersville manufacturing would take place

8    after the closure of the Sellersville site?

9                MS. HILLYER:  Objection, calls

10          for speculation.

11               THE WITNESS:  I do not know.

12               MR. KIEFFER:  Let's pull up

13          Exhibit 2019, if we can.

14               (Document marked for

15          identification as  Teva-Baeder

16          Deposition Exhibit No. 6.)

17   BY MR. KIEFFER:

18          Q.    Ma'am, we've marked as Exhibit 6

19   a document that begins with Bates number

20   TEVA_MDL_A_12280545.  It is a slide deck.  The

21   first page of which says Teva NACDS P&T

22   Conference, August 27th through 30th, 2011.

23               Do you see that?

24          A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. HILLYER:  Again, John, was
2          this an attachment to an e-mail?
3                    MR. KIEFFER:  I honestly don't
4          know.
5                    MS. HILLYER:  So I'll just object
6          on the record that we don't have the
7          full context to the extent this was
8          attached to an e-mail.
9                    MR. KIEFFER:  Okay, fair enough.
10         I mean, I can tell you, obviously, it
11         was produced to us by Teva.
12                   MS. HILLYER:  Yeah, I mean, I see
13         the Bates.
14                   MR. KIEFFER:  And I can tell you
15         we certainly did not deliberately
16         separate e-mails from PowerPoints, but I
17         can't tell you at this moment if it was
18         attached or not.
19                   MS. HILLYER:  That's fine.  I
20         just think it helps give the witness
21         context --
22                   MR. KIEFFER:  Sure.  I
23         understand.
24                   MS. HILLYER:  -- and foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

1            MR. KIEFFER:  Yeah, I would

2       typically include it if I had it, but I

3       can't vouch for the fact that it wasn't.

4            MS. HILLYER:  No, I understand.

5   BY MR. KIEFFER:

6       Q.    Okay.  Ma'am, NACDS stands for

7   National Association of Trained -- let me back

8   up.  I'm getting in a hurry here to try to get

9   us through some of this.

10           NACDS stands for the National

11  Association of Chain Drug Stores, correct?

12      A.    Yes.

13      Q.    All right.  What's the P&T

14  conference?

15      A.    To the best of my knowledge, it's

16  pharmacy and technology.

17      Q.    All right.  Did you from time to

18  time participate in activities of the NACDS?

19      A.    I typically attend this meeting,

20  which now has another name, but it's still this

21  same time frame annually, and there's another

22  NACDS meeting and executive forum that's

23  typically around Easter that I also attend.

24      Q.    Okay.  So you would typically go

1    to the NACDS pharmacy and technology conference?

2          A.     Yes, it has another name now, but

3    yes.

4          Q.     Fair enough.  You think it's

5    likely you did in 2011?

6          A.     It's likely, although I don't

7    remember.

8          Q.     Okay, fair enough.

9                 Let me -- there's just a few

10   select things I want to ask you about.  This

11   PowerPoint does have page numbers.  It is

12   double-sided, which made it easier for us to

13   carry, but more clumsy maybe for you to have to

14   work with, but if you turn to page 92.

15                And let me ask a threshold

16   question before I ask you about page 92.  This

17   slide deck with the cover that talks about the

18   National Association of Chain Drug Stores

19   Pharmacy & Technology Conference, it's got the

20   Teva logo throughout.  Is it safe to assume this

21   is the kind of information that someone from

22   Teva likely would have presented at some point

23   during that conference?

24                MS. HILLYER:  Objection, calls

Highly Confidential - Subject to Further Confidentiality Review

1              for speculation.

2                   THE WITNESS:  Yeah, I don't know.

3              The meeting times are typically -- they

4              vary and sometimes you have a half an

5              hour.  So although you may have

6              information, you may not get to present

7              it, or the customer may have more

8              pressing matters that they want to use

9              their time for.

10  BY MR. KIEFFER:

11        Q.    Understood.  So let me ask a

12  different question.  This is clearly a Teva

13  prepared document, right?

14                   MS. HILLYER:  Objection to form.

15  BY MR. KIEFFER:

16        Q.    Appears to be?

17        A.    Appears to be.

18        Q.    Okay.  Appears to be a document

19  that someone at Teva created with the idea they

20  would try to present some or all of it at this

21  National Association of Chain Drug Stores

22  Pharmacy & Technology Conference, fair?

23                   MS. HILLYER:  Objection, calls

24              for speculation and lack of foundation.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  So it appears to be

2          a Teva prepared document.  The intent, I

3          don't know.  It could have been preread

4          for management.  I don't know.

5      BY MR. KIEFFER:

6          Q.     Okay.  Page 92 --

7          A.     It is organized a little

8      strangely, if it was going to be presented,

9      because you would never have multiple customers

10     in the same presentation deck.

11         Q.     Let me follow up on that.  So,

12     typically, if information of this sort was to be

13     presented to a customer, you would endeavor to

14     segregate the information out on a customer

15     specific basis?

16         A.     Absolutely.

17         Q.     Okay.

18         A.     It's extremely confidential and

19     not something that you would want -- our

20     customers would be very unhappy, with every

21     reason to be, if we shared their information

22     with someone else.

23         Q.     Sure.  Okay.  I don't want to

24     give us off on some speculative path, it won't

1  be fruitful.  But, I mean, one possibility is

2  someone or several someones at Teva prepared

3  this, they prepared it as sort of a group

4  presentation, and then it was subdivided out

5  before it was presented to the individual

6  customers; that's a possibility?

7              MS. HILLYER:  Objection, calls

8        for speculation.

9              THE WITNESS:  Yeah, I don't know.

10             MS. HILLYER:  Lack of foundation.

11  BY MR. KIEFFER:

12       Q.    Okay, fair enough.

13             Let's focus on page 92 that's got

14  a heading there "AmerisourceBergen."

15             You see that?

16       A.    Yes.

17       Q.    And then it says "Sales and

18  Marketing Activities," right?

19       A.    Yes.

20       Q.    And I am assuming this references

21  is generic sales and marketing activities, is

22  that what it appears to reference to you as

23  well?

24             MS. HILLYER:  Objection, calls

Highly Confidential - Subject to Further Confidentiality Review

1          for speculation and lack of foundation.

2          There's no evidence that she knows

3          anything about this document.

4                    THE WITNESS:  Yeah, I don't know.

5     BY MR. KIEFFER:

6          Q.     The next to the last bullet says

7     "Hosted ABC," and ABC is shorthand for

8     AmerisourceBergen, right?

9          A.     Correct.

10         Q.     "Hosted ABC in Israel in

11    October 2010."

12                 You see that?

13         A.     Yes.

14         Q.     Okay.  Were you aware that

15    happened?

16         A.     Yes.

17         Q.     Did you participate in that?

18         A.     I don't think so.

19         Q.     Okay.  Folks from Teva USA from

20    time to time would invite or would host certain

21    of Teva's large US customers to meetings and

22    events in Israel, correct?

23                 MS. HILLYER:  Objection, vague.

24                 THE WITNESS:  I have attended

1          meetings with customers in Israel two or

2          three times.

3    BY MR. KIEFFER:

4          Q.    Okay.  Tell us your best memory

5    of the customers that you have attended meetings

6    with in Israel two or three times and

7    approximately what year, if you're able?

8                MS. HILLYER:  Objection to form.

9                THE WITNESS:  I really don't

10         remember the year.  I haven't done it

11         for -- I don't remember doing it post

12         the Actavis acquisition, so that would

13         put you pre-2016.  I remember taking

14         Anda, which is a distribution company

15         that Teva now owns, but at that point

16         did not.  I remember attending a trip

17         with Walmart.  I feel like there's

18         another one, but I'm drawing a blank.

19         Q.    Okay.  And when you would attend

20    these meetings with these -- these were existing

21    customers, right?

22         A.    These were existing customers.

23         Q.    Okay.  When you would attend

24    these meetings in Israel with these large

Highly Confidential - Subject to Further Confidentiality Review

1    existing customers, about how long was the trip?

2                    MS. HILLYER:  Objection to form.

3                    THE WITNESS:  It varied, you

4            know, three -- two days to five days is

5            as specific as I can be.

6    BY MR. KIEFFER:

7            Q.    Okay.  And what were some of the

8    activities that were undertaken in Israel once

9    you were there?

10                   MS. HILLYER:  Objection to form.

11           I mean, you're vague and it's compound.

12           You're talking about different meetings,

13           different times and calls for

14           speculation.  She said she doesn't

15           remember the details.

16                   THE WITNESS:  I don't remember

17           the details.  What are you asking me

18           specifically?

19    BY MR. KIEFFER:

20           Q.    Well, for example, you mentioned

21    you recall being involved in trips with Anda and

22    Walmart to Israel, right?

23           A.    I do.

24           Q.    Okay.  In terms of the time that

Highly Confidential - Subject to Further Confidentiality Review

1    was spent in Israel, generally speaking, what

2    sorts of activities did you all engage in?  For

3    example, were they purely pleasure, sight-seeing

4    trips?  Were there business meetings?  Were

5    there plant tours, all of the above?  What sorts

6    of things did you do?

7              MS. HILLYER:  Objection to form,

8         vague, compound, calls for speculation.

9              THE WITNESS:  So the trips were

10         different for each customer.  With Anda

11         specifically, we spent a large amount of

12         time touring a new distribution center

13         that Teva had in Israel, doesn't

14         distribute any product to the US or have

15         anything to do with the US, but it had

16         some distribution -- my memory is it had

17         some distribution technology that was

18         interesting to people that are in the

19         distribution business.

20              With Walmart, I specifically

21         remember touring a API manufacturing

22         site because that was interesting to

23         them and something that they were trying

24         to understand, and then there was, of

```
 1              course, some sight-seeing that I

 2              remember.

 3   BY MR. KIEFFER:

 4         Q.    Okay.  API stands for active

 5   pharmaceutical ingredient?

 6         A.    Correct.

 7         Q.    And really rough layman's terms,

 8   that can be kind of the raw materials that go

 9   into a finished drug product?

10         A.    It's the chemical that makes the

11   drug have impact, so to speak.

12         Q.    Do you recall the specific API or

13   APIs that were made at this site?

14         A.    I do not.

15         Q.    The trips that you were a part of

16   with Anda and Walmart, do you recall whether

17   Teva proposed those trips or the customer

18   proposed those trips?

19              MS. HILLYER:  Objection to form.

20              THE WITNESS:  I don't remember,

21         and my role, you know, was not -- was

22         not relationship building at that point

23         in time.

24   BY MR. KIEFFER:
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Okay.  Thank you.  I failed to

2   ask you a question.  I'm assuming it wasn't just

3   you and representatives of these two customer

4   organizations on this trip; there were others

5   from Teva?

6       A.      Correct.

7       Q.      Others from Teva USA?

8       A.      All from Teva USA.

9       Q.      Anyone from Teva in Israel?

10      A.      No.

11      Q.      Anyone from Teva in Israel meet

12  with Anda or Walmart in connection with either

13  of these trips?

14              MS. HILLYER:  Objection to the

15          extent it calls for speculation.

16              THE WITNESS:  I don't recall

17          that.

18  BY MR. KIEFFER:

19      Q.      You don't recall whether that

20  happened or not?

21      A.      Yeah, I don't recall that that

22  happened.

23      Q.      Okay.  And this is described here

24  as a sales and marketing activity.

Highly Confidential - Subject to Further Confidentiality Review

1                    You see that?

2          A.     Yes.

3                    MS. HILLYER:  Objection to form.

4    BY MR. KIEFFER:

5          Q.     You agree with that

6    characterization?

7                    MS. HILLYER:  Objection to form.

8          Still lacks foundation.

9                    THE WITNESS:  Yeah, I mean,

10         you're spending time with your customer

11         so --

12   BY MR. KIEFFER:

13         Q.     Sure.

14         A.     I mean, I guess in the most

15   general sense.

16         Q.     Okay.  Turn if you would to page

17   112.  Page 112 at the top references a company

18   by the name of Medco.

19                    Do you see that?

20         A.     Yes.

21         Q.     Who is Medco?

22         A.     Medco was a mail order pharmacy.

23         Q.     Okay.  Kind of like Express

24   Scripts that you mentioned earlier?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yes.

 2              Q.     Okay.  And the last bullet here

 3     says "Hosted Medco in Israel during

 4     October 2010."

 5                     Do you see that?

 6              A.     Yes.

 7              Q.     Do you recall if you were part of

 8     that trip?

 9              A.     I was not part of that trip.

10              Q.     Turn to page 128, if you would.

11                     Page 128 has Walgreens' name at

12     the top.

13                     You see that?

14              A.     Yes.

15              Q.     And, again, the last bullet on

16     page 128 says "Hosted Walgreens in Israel in

17     October 2009."

18                     Do you know if you were part of

19     that trip?

20              A.     I was not.

21              Q.     Do you know if anybody from your

22     team was a part of that trip?

23              A.     My team at that time?

24              Q.     Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No, would have been too junior.

2    Q.    How about Medco, any idea if any

3    part of your team would have participated in

4    that?

5    A.    Doubtful.

6    Q.    Don't know one way or the other,

7    but you think it's doubtful?

8    A.    Yeah.

9    MR. KIEFFER:  Pull up document

10   2015, if you would.

11   (Document marked for

12   identification as Teva-Baeder Deposition

13   Exhibit No. 7.)

14   BY MR. KIEFFER:

15   Q.    Ma'am, we've marked as Exhibit

16   Number 7 a document that bears a Bates number of

17   TEVA_MDL_A_13558196.  This was produced to us

18   from Teva's internal files.  I just have a

19   couple of questions for you.

20   Earlier in the deposition you

21   mentioned that in your time at Teva, there had

22   been three acquisitions by Teva of other

23   companies, the first company by the name of

24   Barr, the second Cephalon and the third Actavis,

Highly Confidential - Subject to Further Confidentiality Review

```
1    correct?

2           A.      Correct.

3           Q.      At the bottom of the page, there

4    is an e-mail from a gentleman by the name of

5    Dennis Miley to a Jim Coy.

6                   Do you know either of those

7    individuals?  Do you know who they are?

8           A.      Jim Coy I know.

9           Q.      And is Jim Coy still with the

10   company?

11          A.      No.

12          Q.      What was his position when he

13   left?

14          A.      I don't know the answer to that.

15   He held positions in integration of systems and

16   supply chain.  I'm not sure what his position

17   was when he left.

18          Q.      Okay.  And this e-mail is dated

19   January 21 of 2009.  Would your answer be the

20   same for that time period as well?

21          A.      Yes.

22          Q.      Okay.  This says, "Jim, HQ has

23   asked that Ann Beggs, Barr IT support for ARGUS

24   safety database, attend a meeting in Dresden on
```

1    migration of safety data."

2              Do you see that?

3         A.    Yes.

4         Q.    Ann's boss at Barr wants to know

5    if it's okay to bill to the Israel integration

6    budget.  Israel wants advice on how to respond.

7              Do you see that as well?

8         A.    Yes.

9         Q.    Were you involved in any way in

10   the integration of Barr into Teva in connection

11   with that acquisition?

12             MS. HILLYER:  Objection to the

13        extent she's not on this document, and

14        there's lack of foundation as to this

15        document.

16   BY MR. KIEFFER:

17        Q.    At the moment I'm just asking not

18   with reference to the document, just with

19   reference to the acquisition.

20        A.    My involvement was very limited,

21   and it only had to do with like putting the

22   order systems together so that a customer could

23   place an order for Barr items on the Teva

24   system, so it was very technical in nature.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    ITish?

 2               MS. HILLYER:  Objection to form.

 3               THE WITNESS:  Business but

 4        ensuring that IT understood the business

 5        requirement would probably be more

 6        accurate.

 7   BY MR. KIEFFER:

 8          Q.    I understand.  Did you understand

 9   at the time that there was something called the

10   Israel integration budget?

11               MS. HILLYER:  Objection to form.

12               THE WITNESS:  I did not.

13   BY MR. KIEFFER:

14          Q.    Did not?

15          A.    I did not.  I had no access to

16   budgets until much later in my career.

17          Q.    In the e-mail above, middle line

18   there it says, "In regards to Israel - Daniel

19   may be able to shed some light in regards to

20   this matter - he is my counterpart for the Globe

21   and is in Israel."

22               Do you see that?

23          A.    Yes.

24          Q.    The individual that appears to be
```

1     referenced is a Daniel Solomon.

2                    Do you know who that person is?

3                    MS. HILLYER:  Objection to form.

4                    THE WITNESS:  I do.  I worked

5          with Daniel.

6     BY MR. KIEFFER:

7          Q.     Okay.  What is Daniel's -- is

8     Daniel still with Teva in Israel?

9          A.     Daniel is with Teva USA.

10         Q.     He was with Teva USA?

11         A.     And Daniel is no longer a Teva

12    employee.

13         Q.     Okay.  How did you work with

14    Daniel, in what respect?

15         A.     Daniel held a role in sales to

16    institutional markets in the capacity that I

17    worked with Daniel.  I don't know what his roles

18    were before that.

19         Q.     Institutional markets being what

20    specifically?

21         A.     Hospitals, so specifically

22    injectable products.

23         Q.     Okay.  You were -- I'm going to

24    skip forward here, and we may come back to this

```
 1   topic in more detail later, but the Actavis

 2   acquisition, you were on the integration team

 3   for that, correct?

 4          A.     Yes.

 5          Q.     Okay.  Generally speaking, what

 6   was the nature of your duties on the Actavis

 7   integration team?

 8                 MS. HILLYER:  Objection to form.

 9                 THE WITNESS:  For the Actavis

10          integration activities, I was involved

11          in the integration of the commercial

12          team, so selecting employees, designing

13          org structure and then working on high

14          level plans that were implemented by

15          other people on my team as to system

16          integration, data integration, getting

17          all the information in one place so

18          people could do their jobs.

19   BY MR. KIEFFER:

20          Q.     Okay.  As it relates to the

21   Actavis acquisition and your work on that

22   integration team, did any of your work involve

23   or touch Teva people or operations in Israel?

24                 MS. HILLYER:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    THE WITNESS:  No.  No, I can't
2          think of any, no.
3    BY MR. KIEFFER:
4          Q.     In your area?
5          A.     Yeah, not in my area, no.
6          Q.     Are you aware of any others in
7    other areas, or you just don't know?
8                    MS. HILLYER:  Objection, calls
9          for speculation.
10                   THE WITNESS:  Yeah, I wouldn't --
11         yeah, I wouldn't speak for anyone else,
12         but all of my interfaces across all the
13         functions were US based.
14   BY MR. KIEFFER:
15         Q.     Okay.  Do you know whether there
16   was an Israel integration budget in connection
17   with the Actavis integration?
18                   MS. HILLYER:  Objection to form
19         and calls for speculation.
20                   THE WITNESS:  There were
21         integration budgets.  I have no idea if
22         they were -- or even what's meant by
23         Israel.
24   BY MR. KIEFFER:
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Pull up document 2018.

2              (Document marked for

3        identification as Teva-Baeder Deposition

4        Exhibit No. 8.)

5   BY MR. KIEFFER:

6        Q.    Ma'am, Exhibit 8 is a document

7   from Teva's files.  It is -- it begins with

8   Bates number TEVA_MDL_A_13580697, and it runs

9   for a number of pages.  I just have a couple of

10  brief questions for you about it.  This appears

11  to be an e-mail from a gentleman named Eric

12  Elbaz to Joyce Godshall.  Mr. Elbaz's signature

13  line indicates he's validation officer,

14  compliance team for Teva global drug safety and

15  pharmacovigilance, and he has an address in

16  Israel.

17              Do you see that?

18       A.    I do.

19       Q.    Have you ever had any

20  interactions with Mr. Elbaz or Ms. Godshall?

21       A.    I don't know any of the people on

22  this page.

23       Q.    Okay, fair enough.

24              Let's turn, if you would, to page

Highly Confidential - Subject to Further Confidentiality Review

1   7 of the document, and it has a Bates number

2   that ends in 704.  There's some background

3   information there at the top.  The second

4   paragraph states in the first sentence, "Teva

5   pharmacovigilance is headquartered at the main

6   site in Israel."

7                Do you see that?

8        A.     Yes.

9        Q.     Were you aware of that?

10               MS. HILLYER:  Objection to the

11          extent it calls for speculation and lack

12          of foundation.  She is not on this

13          e-mail.  She knows nothing about it, and

14          she hasn't had a chance to look at the

15          document, and there's no foundation that

16          she had anything to do with the

17          exhibit attached to the -- or to the

18          attachment to the e-mail.

19               THE WITNESS:  So I can read that

20          on the paper, but I don't know anything

21          about that.

22   BY MR. KIEFFER:

23        Q.     Yeah, so prior to today if you

24   had been told that Teva pharmacovigilance is

1   headquartered at the main site in Israel, would

2   you have known whether that was a true statement

3   or not?

4           A.      I would not.  I don't even know

5   what main site in Israel really means.

6           Q.      Okay.  If individuals from Teva

7   in Israel have come to the United States and

8   have audited Teva's DEA compliance function here

9   in the states, do you know anything about that?

10          A.      I don't.

11          Q.      Today is the first you heard of

12  that?

13                  MS. HILLYER:  Objection --

14                  THE WITNESS:  Yes.

15                  MS. HILLYER:  -- assumes facts

16          not in evidence.

17                  MR. KIEFFER:  Pull up document

18          2017.

19                  (Documents marked for

20          identification as Teva-Baeder Deposition

21          Exhibit Nos. 9 and 10.)

22  BY MR. KIEFFER:

23          Q.      All right.  We just marked,

24  ma'am, as Exhibits 9 and 10, an e-mail and an

1    attached slide deck.  The e-mail, which is

2    Exhibit 9, is from a Jody Hecker to a number of

3    people, including you and it says, "Hello,

4    please find the PFG packet for today's Market

5    S&OP discussion," and then Exhibit 10 is the

6    referenced packet.

7              Exhibit 9 bears a Bates number of

8    TEVA_MDL_A_12172071, and Exhibit 10 has a

9    beginning Bates number of TEVA_MDL_A_12172072.

10             You generally see what I'm

11   referring to?

12        A.    Yes.

13        Q.    Okay.  What is the market

14   planning sales and ops planning meeting?  In

15   general, what is that?

16        A.    Sales and operations planning is

17   actually a series of meetings, where you try to

18   align things that are happening commercial.  For

19   example, this is how many units of product X we

20   think we can sell with operational plans.  This

21   is how many units of product X that we think we

22   can produce.

23        Q.    And these meetings, these sales

24   and ops planning meetings, they take place on

1    some sort of a regularly scheduled basis?

2           A.    They do.  It's shifted

3    dramatically over the years, but there has

4    always been sometimes a more disciplined and

5    sometimes a looser cadence of S&OP meetings.

6           Q.    Okay.  And do you typically

7    attend those?

8           A.    At various points in my career I

9    have typically attended those.  At present I

10   only attend the executive S&OP meeting.

11          Q.    And the meetings that we are

12   discussing, the market planning sales and ops

13   planning meetings, are those attended just by

14   individuals from the generic side of Teva, or

15   are there representatives from the branded side

16   as well that participate?

17          A.    Historically, and in general, the

18   S&OP cycle has been split.  I don't know what

19   they do on the branded side of the business.  I

20   don't know if there's mirror meetings or not,

21   but the meetings that I've attended have been

22   primarily, if not exclusively, generic.

23                MR. KIEFFER:  Pull up 2023.

24                MS. HILLYER:  Are we done with

Highly Confidential - Subject to Further Confidentiality Review

```
 1              these two?
 2                   MR. KIEFFER:  Yes.
 3                   (Document marked for
 4              identification as Teva-Baeder Deposition
 5              Exhibit No. 11.)
 6  BY MR. KIEFFER:
 7         Q.    Ma'am, we have marked as Exhibit
 8  2023 a document that bears a Bates number
 9  TEVA_MDL_A_02988415.  That's the beginning Bates
10  number.
11                   MS. HILLYER:  John, you're saying
12              it's Exhibit 2023.
13                   MR. KIEFFER:  I'm sorry.
14                   MS. HILLYER:  I just want to make
15              it -- it gets a little confusing with
16              your numbers.
17                   MR. KIEFFER:  Yeah, I know.  Let
18              me back up.
19                   MS. HILLYER:  Eleven?
20  BY MR. KIEFFER:
21         Q.    Yeah, we've marked, ma'am, as
22  Exhibit 11 a document with a Bates number that
23  says TEVA_MDL_A_02988415.  It's entitled
24  "Generic Products Purchase Agreement."
```

Highly Confidential - Subject to Further Confidentiality Review

1          You see what I'm referring to?

2          A.     Yes.

3          Q.     Okay.  On the first page of it,

4    it references that it is an agreement between

5    Teva Pharmaceuticals USA and Discount Drug Mart

6    in the first paragraph on the first page.

7          Do you see that?

8          A.     Yes.

9          Q.     And in the first whereas

10   paragraph references that the members acting as

11   a group of retailers are utilizing the services

12   of Topco Associates, right?

13         A.     Yes.

14         Q.     And Topco was the company that we

15   saw in that earlier e-mail that was the subject

16   of an update to some folks in Israel, right?

17         MS. HILLYER:  Objection to form.

18         THE WITNESS:  There was an e-mail

19   relative to Topco.

20   BY MR. KIEFFER:

21         Q.     Okay.  Let me ask you, I don't

22   know that we're going to get into the weeds of

23   this agreement.  If you -- this agreement was

24   executed over on page 16 by Maureen Cavanaugh.

Highly Confidential - Subject to Further Confidentiality Review

1    Her title at the time, senior vice president and

2    chief operating officer, North America Generics.

3              You see that?

4         A.    Yes.

5         Q.    You are familiar with these types

6    of purchase agreements, right?

7              MS. HILLYER:  Objection to form.

8              THE WITNESS:  Yeah, I'm generally

9         familiar.

10   BY MR. KIEFFER:

11        Q.    I mean, you've executed some

12   similar agreements at different points in time

13   yourself, right?

14             MS. HILLYER:  Objection, vague.

15             THE WITNESS:  I have executed

16        purchase agreements with Teva USA

17        customers, yes.

18   BY MR. KIEFFER:

19        Q.    In general, what is a Generic

20   Product Purchase Agreement?

21             MS. HILLYER:  Objection.

22   BY MR. KIEFFER:

23        Q.    As Teva uses that document?

24             MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  So there's

 2           typically a set of the terms and

 3           conditions under which we sell product

 4           to a customer.

 5    BY MR. KIEFFER:

 6           Q.    Typically, a large customer?

 7                   MS. HILLYER:  Objection to form.

 8                   THE WITNESS:  Typically, all

 9           customers.  There may be some

10           exceptions, but most sales have to have

11           some type of back document.

12    BY MR. KIEFFER:

13           Q.    Okay.  So you think every

14    customer that Teva --

15           A.    Maybe some exceptions, but yes.

16           Q.    Okay.  If you would turn to page

17    3 of that agreement, Section 3.4 is called a

18    "New Product Direct Award Rebate."

19                   Do you see that?

20           A.    Yes.

21           Q.    I don't want to take the time to

22    go through all the legal minutiae, but are you

23    generally familiar with the type of rebate

24    that's being described there?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HILLYER:  Objection, calls

2     for a legal conclusion and lack of

3     foundation and vague.

4          THE WITNESS:  I'm not intimately

5     familiar with this customer and their

6     buying arrangement, but I am familiar

7     with new product award rebates, so to

8     the extent that it's the same, I would

9     have to read the whole document and

10     understand.

11  BY MR. KIEFFER:

12     Q.    The new product award rebates

13  that you're familiar with, is it fair to say

14  that's a price related incentive that Teva may

15  offer a particular customer?

16          MS. HILLYER:  Objection to form.

17          THE WITNESS:  It's a value

18     incentive that we may offer.

19  BY MR. KIEFFER:

20     Q.    It's -- as we talked about at

21  some length before, that's an example of one of

22  these marketing and sales tools in the tool kit

23  on the generic side of the business?

24          MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Pricing is an
 2          element of marketing.
 3                    MR. KIEFFER:  Pull up document
 4          2000.
 5                    (Document marked for
 6          identification as Teva-Baeder Deposition
 7          Exhibit No. 12.)
 8   BY MR. KIEFFER:
 9          Q.     Ma'am, we've marked as Exhibit 12
10   a document bears starting Bates number in the
11   lower right-hand corner of TEVA_MDL_A_03450003,
12   and on the first page it is called a "Group
13   Purchasing Agreement," correct?
14          A.     Yes, yes.
15          Q.     This one, if you turn over, it's
16   hard to read because the print is small, it
17   looks like it's page 9 of the document, and the
18   Bates number in the lower right corner ends with
19   011?
20          A.     Yes.
21          Q.     That was also executed on behalf
22   of Teva USA by Maureen Cavanaugh?
23          A.     Yes.
24          Q.     And this is a Group Purchasing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Agreement, according to what's stated on the
 2    first page, with Walgreens Boots Alliance
 3    Development, correct?
 4            A.      Correct.
 5            Q.      That's the group that goes by the
 6    name WBAD?
 7            A.      Correct.
 8            Q.      All right.  And this one has a
 9    term it looks like of January 1st, 2014, right?
10                    MS. HILLYER:  Objection, lack of
11            foundation.
12                    THE WITNESS:  Yeah, I'd have
13            to --
14    BY MR. KIEFFER:
15            Q.      Let me ask it differently.  The
16    first paragraph indicates it's entered into on
17    January 21st, 2014, right?
18                    MS. HILLYER:  Same objection.
19            There's no foundation for her on this
20            document.
21                    THE WITNESS:  Correct.  The first
22            sentence says January 1st.  The
23            signatures, though, are after.
24    BY MR. KIEFFER:
```

1    Q.    And you have seen Group Purchase

2 Agreements with the WBAD group before?

3              MS. HILLYER:  Objection to form.

4              THE WITNESS:  I have seen Group

5        Purchasing Agreements for WBAD, yes.

6 BY MR. KIEFFER:

7    Q.    Were you involved in 2014 in

8 negotiating the Group Purchase Agreement for

9 WBAD?

10    A.    I don't remember.  It would not

11 have been my core job responsibility in 2014.

12    Q.    Okay.

13              MS. HILLYER:  Do you want to --

14        we've been at an hour.  Do you want to

15        do one more or do you want to take a

16        break?  I don't know where you are.

17              MR. KIEFFER:  I've probably got

18        five minutes on this topic to kind of

19        end it up, if that's okay.

20              MS. HILLYER:  Yeah.

21              (Document marked for

22        identification as Teva-Baeder Deposition

23        Exhibit No. 13.)

24 BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Ma'am, we've marked as Exhibit 13

 2    an e-mail string from a Heather Odenwelder at

 3    AmerisourceBergen to several people, including

 4    you, dated December 5 of 2016, and the subject

 5    is "Teva/ABC Agreement Discussion."

 6              Do you see that?

 7         A.      Yes.

 8         Q.      Do you know Heather Odenwelder?

 9         A.      I do.

10         Q.      And who is she?

11         A.      She is a -- she's a member of the

12    ABC local management team.

13         Q.      Okay.  And I'm not going to read

14    all this, but she indicates in the first

15    paragraph they're attaching some red line

16    responses from AmerisourceBergen to what she

17    refers to as both US agreements.

18              Do you see that?

19         A.      I do.

20         Q.      And then at the very last line

21    states, "Is there an update on the WBAD

22    negotiations regarding the VIR and loyalty

23    rebate?"

24              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I do.

2      Q.      And what is VIR?

3      A.      Volume incentive rebate.

4      Q.      Okay.  And what is a volume

5  incentive rebate in the context -- not

6  specifically to this agreement, but in the

7  context of a company like AmerisourceBergen,

8  given just kind of their presence in the market?

9              MS. HILLYER:  Objection to form.

10             THE WITNESS:  Well, the VIR is

11         with the purchasing agent, which is

12         WBAD, and it is a defined levels of

13         rebate based on total either volume or

14         value of purchases.

15  BY MR. KIEFFER:

16     Q.      Okay.  And the defined levels of

17  rebate often would take the form of -- my terms

18  may be imprecise, so bear with me, a tiered

19  structure or a sliding scale.  So, for example,

20  as the customer, in this example WBAD hit

21  increasing levels of volume, correspondingly,

22  they might have increasingly levels of rebate.

23             Am I generally correct?

24             MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1                THE WITNESS:  So volumes then of

2          rebates have tiered.  If you buy X, your

3          rebate is Y.  If you buy Z, your rebate

4          is A.  It can be value, can be volume,

5          can be other things.

6   BY MR. KIEFFER:

7          Q.     Okay.  By "value" you mean price

8   or price in the aggregate?

9          A.     I mean sales, how much -- how

10  much revenue.

11         Q.     If you get a sales target of a

12  certain amount of money, your rebate will be a

13  certain amount of money.  If you hit a sales

14  target of a higher amount of money, your rebate

15  may be higher?

16              MS. HILLYER:  Objection to form.

17  BY MR. KIEFFER:

18         Q.     Is that the general concept?

19         A.     Maybe to be more precise, if your

20  invoice value is calculated on whatever basis is

21  denoted in the contract, which are very complex

22  formulas, then yes.

23         Q.     And the value incentive rebate,

24  is that a tool that is fairly commonly used at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Teva with at least some of the larger -- some of

 2    its larger companies -- customers?

 3                    MS. HILLYER:  Objection, vague.

 4                    THE WITNESS:  We have volume

 5           incentive rebates with some key

 6           customers.

 7    BY MR. KIEFFER:

 8           Q.    Okay.  And loyalty rebates, what

 9    is a loyalty rebate?

10           A.    It's another rebate usually

11    applied to some portfolio of the business.

12           Q.    Meaning if you continue to buy

13    from Teva or you continue to buy -- strike that.

14                 A loyalty rebate is a situation

15    where if a customer continues to buy a certain

16    portion of Teva's product portfolio or keep that

17    product primary, they may get a specific rebate?

18                    MS. HILLYER:  Objection to form.

19                    THE WITNESS:  Yeah, I wouldn't

20           characterize it that way.  It's usually

21           there is a list of products and if you

22           continue -- if you buy or continue to

23           buy from that list of products and

24           attain a certain valuation, then you
```

Highly Confidential - Subject to Further Confidentiality Review

1          would get a rebate.

2    BY MR. KIEFFER:

3          Q.     Okay.  And does Teva employ

4    loyalty rebates with a number of its large

5    customers?

6                 MS. HILLYER:  Objection to form.

7                 THE WITNESS:  Some large

8          customers.  Over time it's changed but,

9          yes, some large customers.

10   BY MR. KIEFFER:

11         Q.     And the two types of rebates

12   we're talking about, just in the context of this

13   exhibit, a volume incentive rebate and a loyalty

14   rebate, those are marketing and sales tools on

15   the generic side of the business?

16                MS. HILLYER:  Objection to form.

17                THE WITNESS:  They're an element

18         of pricing.

19   BY MR. KIEFFER:

20         Q.     Which, as I think we talk --

21         A.     And pricing is a piece of

22   marketing.

23                MR. KIEFFER:  Can you pull up

24         2002.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Document marked for

 2              identification as  Teva-Baeder

 3              Deposition Exhibit No. 14.)

 4    BY MR. KIEFFER:

 5              Q.    Ma'am, we have handed you Exhibit

 6    14.

 7                    Exhibit 14 is a document that

 8    bears a Bates number TEVA_MDL_A_06604089, and it

 9    also bears the title of "Generic Products

10    Purchase Agreement."

11              A.    Mm-hmm.

12              Q.    This one is dated January 1st,

13    2017 between Teva USA and Walgreen Company.

14                    Do you see that?

15              A.    Yes.

16              Q.    And this one over on looks like

17    page 15 of the document page that ends in page

18    number 103 is also signed by Maureen Cavanaugh.

19                    Do you see that?

20              A.    Yes.

21              Q.    In 2017 do you know whether you

22    would have been involved in assisting in the

23    negotiation of a Generic Products Purchase

24    Agreement with Walgreens?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      It's likely.

 2              Q.      That you had some input into the

 3    agreement that we're looking at right now?

 4              A.      Yes.

 5              Q.      Okay.  Do you know specifically

 6    what?

 7              A.      No.

 8              Q.      Okay.  Would it have to do with

 9    incentives, rebates, upcharges, any specific

10    portion of the agreement?

11                     MS. HILLYER:  Objection to form.

12                     THE WITNESS:  I would typically

13              be involved in logistical sections and

14              pricing sections.

15                     Rebates in 2017 was handled in

16              large part by John Wodarczyk who

17              reported to Maureen directly.

18    BY MR. KIEFFER:

19              Q.      Okay.  When you said you might

20    have been involved in the logistical sections,

21    would that have to do with supply?

22              A.      Yes.

23              Q.      Would it also have to do with the

24    issue of failure to supply or failure to supply
```

Highly Confidential - Subject to Further Confidentiality Review

1    penalties?

2           A.      It could, yes.

3                   MS. HILLYER:  Are you close to

4           your five?

5                   MR. KIEFFER:  I am.

6                   MS. HILLYER:  Okay.  Because it's

7           been like seven or eight.  The witness

8           and I are getting hungry.

9                   THE WITNESS:  Yeah, I'm getting

10          hungry.

11                  MR. KIEFFER:  I'm getting close.

12          Just trying to reach a logical landing

13          spot.

14                  MS. HILLYER:  Yeah, let's do like

15          two more minutes or maybe one more

16          document, but we can always pick this up

17          after lunch.

18                  MR. KIEFFER:  That's okay.  We

19          can break right now.  It's not a big

20          deal.

21                  MS. HILLYER:  Okay.  Why don't we

22          do that.

23                  THE VIDEOGRAPHER:  Going off the

24          record.  The time is 12:57 p.m.

```
 1                      (Luncheon recess.)

 2                      THE VIDEOGRAPHER:  Back on the

 3              record at 1:52 p.m.

 4     BY MR. KIEFFER:

 5         Q.    Ma'am, we are back on the record

 6     after a break.

 7                      Are you ready to proceed?

 8         A.    Yes.

 9         Q.    Let me --

10                      MR. KIEFFER:  Pull up 2003 for

11              me.

12                      (Document marked for

13              identification as Teva-Baeder Deposition

14              Exhibit No. 15.)

15     BY MR. KIEFFER:

16         Q.    Ma'am, we have just marked as

17     Exhibit 15 a document it begins with a Teva

18     Bates number in the lower right-hand corner of

19     03464523.  It's entitled "Cardinal Health

20     Supplier Agreement."

21                      Do you see that?

22         A.    Yes.

23         Q.    This document on the first page

24     is dated October 9 of 2017.  It's between Teva
```

Highly Confidential - Subject to Further Confidentiality Review

1    Pharmaceuticals USA and Cardinal Health, and

2    over on the third page of the document, it

3    appears to have been signed by you, correct?

4           A.    Yes.

5           Q.    Okay.  Again, as with the others,

6    I don't want to spend a lot of time on this.  It

7    would certainly appear, by the face of this

8    document, that you had a hand in the negotiation

9    of it?

10          A.    Yes.

11          Q.    Okay.  On the first page under

12   paragraph 1b there's a heading that says

13   "Preferred Program Rebate."

14          A.    Yes.

15          Q.    First sentence states, "Supplier

16   agrees to provide Cardinal Health a rebate equal

17   to 30% of the Net Sales of products sold by

18   Cardinal Health through Preferred Programs."

19                Did I read that correctly?

20          A.    Yes.

21          Q.    Would you have been involved in

22   negotiating that preferred program rebate?

23          A.    Yes.

24          Q.    And, again, as we discussed with

Highly Confidential - Subject to Further Confidentiality Review

1    similar concepts before the break, a preferred

2    program rebate relates to pricing, and pricing

3    is one of the tools that you have from a sales

4    and marketing standpoint on the generic side of

5    the business when you are attempting to secure

6    customer relationships and preserve or increase

7    customer sales, right?

8                   MS. HILLYER:  Objection to form.

9                   THE WITNESS:  Pricing is a part

10          of a negotiation, yes.

11                  MR. KIEFFER:  Pull up 2018.  No,

12          sorry, that's not right.  How about 205.

13                  (Document marked for

14          identification as Teva-Baeder Deposition

15          Exhibit No. 16.)

16   BY MR. KIEFFER:

17          Q.    Ma'am, we've handed you Exhibit

18   16.  That was 2005.  We've handed you Exhibit

19   16.  That is a document with a beginning Bates

20   number of TEVA_MDL_A_03464712.  It is entitled

21   "Master Distribution Services Agreement," and

22   it's between Teva Pharmaceuticals USA and

23   AmerisourceBergen.

24                  You see that in the first

Highly Confidential - Subject to Further Confidentiality Review

1    paragraph?

2         A.    Yes.

3         Q.    What is a Master Distribution

4    Services Agreement?

5         A.    It's an agreement by which

6    certain terms of sale are defined by the

7    customer.

8         Q.    Okay.  Different type of a

9    customer agreement, right, than some of them

10   we've looked at previously?

11            MS. HILLYER:  Objection to form.

12            THE WITNESS:  They're all

13         different, and every customer has its

14         own definition but...

15   BY MR. KIEFFER:

16        Q.    All right.  This one we don't

17   necessarily have to take the time to look, it is

18   executed by Maureen Cavanaugh on page 28 of the

19   agreement.

20            My question for you is this is

21   dated February 1, 2017.  Do you think you likely

22   would have been involved in the negotiation of

23   this?

24        A.    Yes.

1    Q.    Again, what parts, if you know,

2    might you have been involved in negotiating?

3              MS. HILLYER:  Objection to form.

4         You want her to look through the 28

5         pages or --

6              THE WITNESS:  Yeah, I'd have to

7         read it.

8    BY MR. KIEFFER:

9         Q.    That's fine.  I just thought if

10   there were certain portions of these sorts of

11   customer agreements that you were always

12   involved in and certain portions that you never

13   were involved in, it might be a quick way to do

14   it, but I'm not going to make you take the time

15   to read it.

16             MR. KIEFFER:  Pull up 2007, if

17        you would.

18             (Document marked for

19        identification as Teva-Baeder Deposition

20        Exhibit No. 17.)

21   BY MR. KIEFFER:

22        Q.    Ma'am, we've handed you Exhibit

23   17.  Exhibit 17 is entitled "Amendment No. 3 to

24   Master Distribution Services Agreement."  It's

1    referencing the agreement that was effective

2    February 1, 2017.  This amendment is effective

3    February 22 of 2018, and it's signed by you on

4    the second page, correct?

5         A.    Yes.

6         Q.    Clearly, it would appear you were

7    involved in the negotiation of this amendment to

8    the AmerisourceBergen Master Services Agreement,

9    right?

10        A.    I don't remember this being a

11   negotiation.  I remember this more being a

12   request from the customer.

13        Q.    Okay.  And the request

14   essentially is what, boiled down?

15        A.    To remove Oncology Supply from

16   the list of excluded customers.

17        Q.    Do you remember the reason for

18   that?

19        A.    It had to do with their internal

20   business unit organization, to the best of my

21   knowledge.

22        Q.    By the date of this agreement,

23   February 2018, had you pretty much become the

24   designated signatory for these types of

1    agreements on behalf of Teva?

2                    MS. HILLYER:  Objection to form,

3            vague as to "these types" and "pretty

4            much."

5                    THE WITNESS:  Yeah, I started to

6            -- I signed documents throughout my

7            career and probably increased in 2018,

8            probably around April.

9    BY MR. KIEFFER:

10            Q.    And by 2018 Ms. Cavanaugh had

11   left Teva; is that correct?

12            A.    Not in February.

13            Q.    Okay.  When?

14            A.    I think in April.

15            Q.    Okay.  And then thereafter you

16   assumed the title of chief operations officer

17   for US generics, right?

18            A.    Correct.

19            Q.    All right.  In the time that

20   you've been at Teva, are you able to identify

21   for us the various opioid medications that Teva

22   has produced on the generic side?  And I don't

23   necessarily mean all the different bottle sizes

24   and things like that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I'm generally familiar with what

 2    is in our product catalog.  I would not be

 3    familiar year by year, volume by volume, but in

 4    a general way.

 5          Q.     And that's perfectly fair.

 6    That's really all I was asking for.  It's not

 7    meant to be some exhaustive memory test, but in

 8    terms of your general familiarity with Teva's

 9    product catalog as it relates to opioid

10    medications since you've been at the company,

11    what do you recall the medications are that Teva

12    has produced?

13                MS. HILLYER:  Objection to form.

14                THE WITNESS:  Yeah, I don't know

15          that I can make a list, and my comments

16          would be limited to Teva USA, so I'm not

17          as familiar with the Actavis portfolio.

18    BY MR. KIEFFER:

19          Q.     Okay.

20          A.     Tramadol, APAP with codeine,

21    oxycodone, hydrocodone, morphine.  Those are the

22    ones that come to mind.

23          Q.     Follow up briefly on that.

24                 Did I understand from your
```

Highly Confidential - Subject to Further Confidentiality Review

1    earlier testimony, oxycodone that Teva produces

2    it produces pursuant or it sells that pursuant

3    to some sort of an agreement with Purdue?

4                   MS. HILLYER:  Objection to form.

5                   THE WITNESS:  Yeah, I don't know

6           the definition.  Teva USA does sell

7           oxycodone.

8    BY MR. KIEFFER:

9           Q.    Okay.  And do you know whether

10   the oxycodone that Teva USA sells is actually

11   produced by Purdue?

12          A.    Yes.

13          Q.    It is?

14          A.    Yes.

15          Q.    But it is -- it comes out with

16   the Teva USA label on it?

17          A.    Products sold by Teva USA have a

18   Teva or Teva company family label, yes.

19          Q.    It doesn't say Purdue?

20          A.    It likely does say Purdue

21   somewhere.

22          Q.    Okay.

23          A.    But probably more in the

24   manufactured by or something.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Okay.  In the products that you

2    just identified for me, those were all generic

3    products?

4        A.      Yes, they're all generic

5    products.

6        Q.      On the branded side we discussed

7    earlier since you've been at Teva, you are

8    familiar that products by the name of Actiq and

9    Fentora were also sold?

10       A.      Yes.

11       Q.      Okay.  Those are fentanyl-based

12   products?

13       A.      Yes.

14       Q.      Okay.  Has -- in the time that

15   you've been at Teva, has Teva produced a generic

16   fentanyl patch?

17       A.      Not speaking for Actavis, because

18   I don't know.  Teva did market a generic

19   fentanyl patch for a period of time.  We did not

20   produce it is my memory.

21       Q.      Okay.  And that's fair.  So your

22   answer excluded anything about Actavis because

23   you don't know those details?

24       A.      I don't know those details.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.  You said Teva did market a

2  generic fentanyl patch for a period of time that

3  you did not produce?

4      A.      That's my recollection, yes.

5      Q.      Do you recall approximately what

6  that time period was?

7      A.      It was before 2016, but I

8  couldn't say when.

9      Q.      Okay.  Do you recall who produced

10  that generic fentanyl patch?

11      A.      If I heard it, I would recognize

12  it, but, no, I can't think of it.

13      Q.      It doesn't come to mind at the

14  moment?

15      A.      No.

16      Q.      Actiq involved a fentanyl what's

17  sometimes been called a lollipop or a sucker or

18  a lozenge, are you familiar with what I'm

19  referring to?

20              MS. HILLYER:  Objection to form.

21              THE WITNESS:  I'm familiar with

22      Actiq.

23  BY MR. KIEFFER:

24      Q.      In the time that you've been at

1    Teva, has Teva produced a generic fentanyl-based

2    lollipop or sucker or lozenge product?

3                    MS. HILLYER:  Objection to form.

4                    THE WITNESS:  Teva has produced a

5        generic fentanyl lozenge.

6    BY MR. KIEFFER:

7        Q.    You said Teva has produced a

8    generic fentanyl lozenge.  Do they today?

9        A.    Yes.

10       Q.    Okay.  And do you recall

11   approximately when Teva began producing a

12   generic fentanyl lozenge?

13       A.    Post 2013, prior to 2018 is the

14   best I can do.

15       Q.    Post 2013 and prior to 2018, Teva

16   produced a generic fentanyl lozenge?

17       A.    Yes.

18       Q.    What happened in 2018?

19       A.    It was last year.

20       Q.    Okay.  But as far as you know,

21   Teva is still producing this generic fentanyl

22   lozenge?

23       A.    Yes.

24       Q.    And do you know, is it

1    essentially intended to be the generic

2    equivalent of Actiq?

3            A.    It's an authorized generic of

4    Actiq.

5            Q.    Okay.  All right.  Let me back up

6    and shift gears a little bit.  There's some

7    general questions I had about Teva that I meant

8    to cover.

9                  Teva is one of the world's

10   largest pharmaceutical companies, correct?

11                 MS. HILLYER:  Objection to form.

12                 THE WITNESS:  Yes.

13   BY MR. KIEFFER:

14           Q.    It is the world's leading

15   supplier of generic medications also, correct?

16           A.    That is my understanding.

17           Q.    And, currently, it's the largest

18   generic drug company in the United States?

19                 MS. HILLYER:  Objection to form.

20                 THE WITNESS:  That is our

21            understanding.

22   BY MR. KIEFFER:

23           Q.    Okay.  Documents and PowerPoints

24   produced in this case from Teva's files indicate

1  that in 2016 the company -- overall company

2  revenues were $21.9 billion.

3           Is that consistent with your

4  general understanding?

5           MS. HILLYER:  Objection to form.

6           THE WITNESS:  For global?

7  BY MR. KIEFFER:

8       Q.    Yes.

9       A.    Yes.

10      Q.    Documents that have been produced

11  in this case from Teva's files indicate that in

12  2016, globally Teva produced about 120 billion

13  tablets annually.

14           Is that consistent with your

15  general understanding?

16           MS. HILLYER:  You're saying

17       globally and then you're saying Teva.

18       You mean Teva USA?

19           MR. KIEFFER:  Teva USA, Teva

20       Limited, any company that goes by the

21       name of Teva worldwide.

22           MS. HILLYER:  Okay.  So objection

23       to form and to the extent it calls for

24       speculation.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  Yeah, I don't know

2        the number of tablets that we produced.

3    BY MR. KIEFFER:

4        Q.    Have you heard numbers like that

5    before?

6            MS. HILLYER:  Objection to form.

7            THE WITNESS:  I don't focus on

8        the global business.  I focus on the US

9        business.

10   BY MR. KIEFFER:

11       Q.    If Teva has put out information

12   in PowerPoints indicating that worldwide

13   products that go out under the Teva name

14   represent about 120 billion tablets, would

15   you -- would that surprise you?

16           MS. HILLYER:  Objection to form

17       and lack of foundation.

18           THE WITNESS:  I don't know.

19           MS. HILLYER:  Calls for

20       speculation.

21   BY MR. KIEFFER:

22       Q.    Teva in materials that have been

23   produced to us in this case sometimes refers to

24   itself as the world's largest medicine cabinet

Highly Confidential - Subject to Further Confidentiality Review

1    generic, specialty and over-the-counter.

2                    Have you seen those kinds of

3    terms or messaging used before in your time at

4    Teva?

5                    MS. HILLYER:  Objection to form.

6                    THE WITNESS:  I have seen that,

7          yes.

8    BY MR. KIEFFER:

9          Q.     Okay.  In documents that have

10   been produced to us from Teva, statements are

11   made that one in six prescriptions in the US is

12   filled with a Teva medicine.

13                   Is that information you're

14   familiar with?

15                   MS. HILLYER:  Objection to form

16         and lack of foundation.

17                   THE WITNESS:  That is a statistic

18         that at one time was presented, yes.

19   BY MR. KIEFFER:

20         Q.     You've heard that before?

21         A.     Yes.

22         Q.     Have you also heard that more

23   prescriptions in this country are filled with a

24   Teva generic than with any other company's

Highly Confidential - Subject to Further Confidentiality Review

1    generic?

2                    MS. HILLYER:  Objection to form.

3                    THE WITNESS:  I don't know that

4         I've heard specifically that.

5    BY MR. KIEFFER:

6         Q.    Okay.  Teva is the largest

7    manufacturer in the US of generic opioids?

8                    MS. HILLYER:  Objection to form.

9                    THE WITNESS:  I don't know that

10        to be true.

11   BY MR. KIEFFER:

12        Q.    You don't know one way or the

13   other?

14        A.    I do not.

15                   MR. KIEFFER:  Can we pull up

16        document 00306D.

17                   (Document marked for

18        identification as Teva-Baeder Deposition

19        Exhibit No. 18.)

20   BY MR. KIEFFER:

21        Q.    Ma'am, we just marked as Exhibit

22   18 a document that was furnished to us from

23   Teva.  It is -- it has a number in the lower

24   right-hand corner 00455086.  It is entitled

Highly Confidential - Subject to Further Confidentiality Review

```
1    "Teva Opioid Market Share Calculation: All

2    Opioids."

3                  You see the title there that I'm

4    referring to?

5          A.    I do.

6          Q.    The left-hand column, the top row

7    is entitled "Teva opioid script volume."

8                  You see that?

9          A.    Yes.

10          Q.    And that means prescriptions,

11   right?

12                  MS. HILLYER:  Sorry, again, do

13          you have -- is this an attachment to an

14          e-mail; do you know?

15                  MR. KIEFFER:  It's been produced

16          to us in the case.  I don't know if it

17          was attached to an e-mail.

18                  MS. HILLYER:  Objection on the

19          record to the extent this was part of a

20          broader set of documents that we don't

21          have here.

22   BY MR. KIEFFER:

23          Q.    The reference to script is

24   shorthand for prescription, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Yes.

 2            Q.     Okay.  That document sets forth

 3   some prescription numbers of Teva opioids from

 4   2012 to 2016 ranging from 12, almost 13 million

 5   in 2012 to a little over -- well, almost

 6   31 million in 2016.

 7                   Do you see that as well?

 8            A.     Yes.

 9            Q.     Okay.  Are you familiar with the

10   fact that in 2016 in excess of 30 million

11   prescriptions for opioids in the US were filled

12   with a Teva opioid product?

13                   MS. HILLYER:  Objection to form,

14            lack of foundation, assumes facts not in

15            evidence.  There's no indication that

16            she knows anything about this document.

17                   THE WITNESS:  Yeah, I've never

18            seen this document, nor do I think I've

19            ever seen that number.

20   BY MR. KIEFFER:

21            Q.     Okay.  And whether you've seen

22   the document or seen the number, does the number

23   sound out of line to you based upon your many

24   years at the company?
```

1              MS. HILLYER:  Objection to form.

2              THE WITNESS:  I don't know that I

3         had an opinion on what that number

4         should be.

5    BY MR. KIEFFER:

6         Q.    If you look at the second line

7    there it says "Teva opioid script share

8    (relative to total market)," and it looks like

9    from 2015 to 2016 Teva's share of the market

10   went from 6% to 14%, according to this document.

11             Do you see that?

12        A.    Yes.

13        Q.    Is it your belief that that

14   increase is likely attributable to the

15   acquisition by Teva of Actavis?

16             MS. HILLYER:  Same objections,

17        lack of foundation, calls for

18        speculation and assumes facts not in

19        evidence.

20             THE WITNESS:  We did close the

21        acquisition in 2016, but I -- I don't

22        think I can attribute a specific number

23        to that.

24   BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Earlier you referenced Teva's
 2   market share in the US, I think, with reference
 3   to the entire generic portfolio?
 4            A.     Correct.
 5            Q.     Right?
 6                   Was it your experience at Teva
 7   that Teva's market share of the entire generic
 8   portfolio in the US increased fairly
 9   substantially as a result of the Actavis
10   acquisition?
11            A.     It absolutely --
12                   MS. HILLYER:  Objection to form.
13                   THE WITNESS:  It did not.
14   BY MR. KIEFFER:
15            Q.     It did not?
16            A.     It did not.
17            Q.     Okay.  Well, were you aware that
18   Actavis had a significant opioid portfolio?
19                   MS. HILLYER:  Objection to form,
20          vague as to what significant is.
21                   THE WITNESS:  Teva -- I am aware
22          that Actavis had opioid products.
23   BY MR. KIEFFER:
24            Q.     Okay.  Did Actavis have a larger
```

1    portfolio of opioid products than Teva?

2              MS. HILLYER:  Objection.  Are you

3         talking about generics?

4              MR. KIEFFER:  Yeah, let's focus

5         on generics for the moment.

6              THE WITNESS:  I don't -- I don't

7         think I've ever compared the number of

8         opioids or the volumes Actavis to Teva.

9    BY MR. KIEFFER:

10         Q.    So you have no idea?

11         A.    I have no idea.  I know that

12   Actavis had opioid products, some that Teva also

13   had and some that Teva did not have.

14         Q.    Okay.  So if I were to ask you as

15   the chief operating officer of Teva USA generics

16   whether Teva was the number one manufacturer of

17   generic opioids in this country, the number two,

18   the number five or the number 25, would you have

19   any idea?

20              MS. HILLYER:  Vague, objection.

21              THE WITNESS:  No, I would not

22         have -- I would not know for

23         manufacturing.

24   BY MR. KIEFFER:

1      Q.      Manufacturing versus what, sales?

2      A.      I would have -- I would have an

3  idea with sales, but I couldn't tell you a

4  number, whether it's one or 25.

5      Q.      No idea in that range?

6      A.      Well, I don't think we're the

7  smallest.

8      Q.      Okay.  Do you recognize that

9  you're one of the largest, if not the largest?

10          MS. HILLYER:  Objection to form

11          and assumes facts not in evidence.

12          THE WITNESS:  Again, I don't know

13          what number we are in -- when I review

14          market share data, I look at generics

15          holistically.

16  BY MR. KIEFFER:

17      Q.      If the data reflects that during

18  the period of 2012 to 2016, Teva supplied

19  literally billions of tablets and capsules and

20  other dose units of generic opioids to the US

21  market, would that surprise you?

22          MS. HILLYER:  Objection to form

23          and calls for an opinion and assumes

24          facts not in evidence.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yeah, I don't know
 2           what the number is, but --
 3   BY MR. KIEFFER:
 4           Q.    Wouldn't surprise you if it was
 5   in the billions?
 6           A.    I wouldn't be surprised.
 7                    MS. HILLYER:  Same objections.
 8   BY MR. KIEFFER:
 9           Q.    I'm sorry.  I didn't hear your
10   answer.
11           A.    I wouldn't be surprised.
12           Q.    Okay.  A substantial percentage
13   of the dispensed opioid prescriptions from
14   retail pharmacies in United States are generic
15   opioids, true?
16                    MS. HILLYER:  Objection to form,
17           vague as to what "substantial" means.
18                    THE WITNESS:  I've never looked
19           at -- again, I don't review the generic
20           marketplace in segments, so I don't --
21           and I have certainly never looked at the
22           brand segments of opioids, so I really
23           have no fundamental gut reaction to
24           generic versus brand split on a market
```

Highly Confidential - Subject to Further Confidentiality Review

1        basis.

2    BY MR. KIEFFER:

3        Q.    Okay.  We talked earlier about

4    this.  IMS data, right?

5        A.    Yes.

6        Q.    There's something called the IMS

7    National Prescription Drug Audit; you're

8    familiar with that?

9        A.    Yes.

10       Q.    If the IMS National Prescription

11   Drug Audit reflects that in 2016, approximately

12   96% of all filled opioid prescriptions in the US

13   were filled with a generic opioid, would that

14   surprise you?  Would you say, no, based on my

15   experience, that can't possibly be right?

16            MS. HILLYER:  Objection to form

17        and assumes facts not in evidence.

18            THE WITNESS:  I don't know that I

19        would be surprised.

20   BY MR. KIEFFER:

21       Q.    Ma'am, do you believe that a

22   public health emergency exists in the United

23   States and that there is a crisis affecting the

24   country as a consequence of opioid abuse and

Highly Confidential - Subject to Further Confidentiality Review

1    addiction?

2                    MS. HILLYER:  Objection to form

3              and calls for an opinion.

4                    THE WITNESS:  I am aware that

5              there is a problem with opioids that is

6              now being addressed by agencies such as

7              the CDC and the FDA and other agencies.

8    BY MR. KIEFFER:

9         Q.    Okay.  And thank you for the

10   answer.  My question is just slightly different.

11   Let me ask it again.

12                    Do you believe that a public

13   health emergency exists nationwide and that

14   there is a crisis affecting the country as a

15   consequence of opioid abuse and addiction?

16                    MS. HILLYER:  Same objection.

17                    THE WITNESS:  I don't think that

18              I have the expertise to decide if

19              there's a public health emergency.

20   BY MR. KIEFFER:

21        Q.    You don't have an opinion on that

22   one way or the other?

23        A.    I do not.  It is certainly

24   something that I am aware of, something that's

Highly Confidential - Subject to Further Confidentiality Review

1    in the press, and it's something that there are,

2    you know, regulatory and government agencies

3    discussing.

4            Q.    Okay.

5                  MR. KIEFFER:  Can you pull up

6            document 1700.

7                  (Document marked for

8            identification as Teva-Baeder Deposition

9            Exhibit No. 19.)

10   BY MR. KIEFFER:

11           Q.    Ma'am, we just marked as Exhibit

12   19 a document from the Department of Health and

13   Human Services.  It's entitled "Determination

14   That a Public Health Emergency Exists," dated

15   October 26, 2017 signed by Eric D. Hargan,

16   acting secretary, and it states, "As a result of

17   the consequences of the opioid crisis affecting

18   our Nation, on this date and after consultation

19   with public health officials as necessary, I,

20   Eric D. Hargan, Acting Secretary of Health and

21   Human Services, pursuant to the authority vested

22   in me under section 319 of the Public Health

23   Service Act, do hereby determine that a public

24   health emergency exists nationwide."

1              Do you see what I just read?

2         A.    I do.

3         Q.    Were you aware that this

4    determination had been made in 2017 by the then

5    acting secretary of the Department of Health and

6    Human Services?

7              MS. HILLYER:  Objection, lack of

8         foundation.

9              THE WITNESS:  I was not.

10   BY MR. KIEFFER:

11        Q.    You were not?

12        A.    I was not.

13        Q.    Today is the first time you've --

14   certainly today is the first time you've seen

15   this document?

16        A.    To my knowledge, to my

17   recollection.

18        Q.    And today, to your recollection,

19   is the first time that you learned that, in

20   fact, a public -- a determination that a public

21   health emergency exists as a consequence of the

22   opioid crisis was made by the Department of

23   Health and Human Services back in October of

24   2017?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HILLYER:  Objection to form.

 2                    THE WITNESS:  Yes.

 3    BY MR. KIEFFER:

 4           Q.    As the chief -- as the current

 5    chief operating officer of Teva US generics, do

 6    you think it's important to remain abreast of

 7    significant developments in the public policy

 8    arena, such as this determination by the

 9    Department of Health and Human Services that

10    there was a public -- was and is a public health

11    emergency as a consequence of the opioid crisis?

12                    MS. HILLYER:  Objection to form.

13                    THE WITNESS:  I think it's

14           important to stay generally aware of

15           issues surrounding generic

16           pharmaceutical business, yes.

17    BY MR. KIEFFER:

18           Q.    And, certainly, a determination

19    by the Department of Health and Human Services

20    that there is a public health emergency as a

21    result of one -- as a result of opioid products

22    and abuse of those products, particularly since

23    Teva makes some of those products as a part of

24    its portfolio, that would be an important issue
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for folks at Teva to be aware of; we can agree

 2    on that?

 3                    MS. HILLYER:  Objection to form.

 4                    THE WITNESS:  I think that the

 5            discussion of the opioid crisis, as

 6            referred to in this document, is

 7            something that Teva should be aware of,

 8            yes.

 9    BY MR. KIEFFER:

10            Q.    You believe there's an opioid

11    epidemic in the United States?

12                    MS. HILLYER:  Objection to form.

13                    THE WITNESS:  There's certainly

14            an opioid problem.  Epidemic is -- I'm

15            not an epidemiologist.

16                    MR. KIEFFER:  Pull up document

17            1738.

18                    (Document marked for

19            identification as Teva-Baeder Deposition

20            Exhibit No. 20.)

21    BY MR. KIEFFER:

22            Q.    Ma'am, we've just marked as

23    Exhibit 20 a document with a number in the lower

24    right-hand corner TEVA 13481057.  This is an
```

1    e-mail from a lady by the name of Shannon

2    Dzubin, if I said that correctly, to a number of

3    people.  The subject is government affairs

4    opioid work group, and it's dated October 4,

5    2017.

6             Do you see that?

7        A.    I do.

8        Q.    And there is a list there of

9    required attendees.  There's a handful of

10    people, and it looks like one of them is you

11    also, correct?

12        A.    Yes.

13        Q.    All right.  And the message

14    states, "Good afternoon, we have been asked by

15    Peterburg to review the US opioid epidemic and

16    consider Teva response options."

17             You see that as well?

18        A.    I do.

19        Q.    Who is Shannon Dzubin?

20        A.    She was in the government affairs

21    group at the time.

22        Q.    And, in addition to you, there's

23    various other folks that are identified as

24    required attendees, one was Ms. Cavanaugh, who

Highly Confidential - Subject to Further Confidentiality Review

1    essentially had your title before she left,

2    right?

3          A.    Yes.

4          Q.    And then Mr. Boyer who at the

5    time was the president and CEO of Teva North

6    America?

7          A.    Yes.

8          Q.    A gentleman by the name of

9    Matthew Day.  Who is Mr. Day?

10         A.    I don't know him.

11         Q.    Okay.  Were you part of a work

12   group related to opioids?

13               MS. HILLYER:  Objection to form.

14               THE WITNESS:  I could have been.

15         I don't specifically recall.

16   BY MR. KIEFFER:

17         Q.    Okay.  So this is -- to orient us

18   in time, this is not quite, I guess, a year and

19   a half ago in October of 2017, if you were part

20   of a opioid work group within Teva, you don't

21   recall one way or the other today whether you

22   were?

23         A.    I don't.  It was very common for

24   Maureen and I to split duties, so it's very rare

1    that we would both be in attendance.

2              Q.    Okay.  This states "We have been

3    asked by Peterburg to review the US opioid

4    epidemic and consider Teva response options."

5                    Who or what is Peterburg?

6              A.    Peterburg was our -- I don't

7    exactly know the timing.  He was either, A, a

8    member of the board or, B, the interim CEO.

9              Q.    And did Mr. Peterburg have a

10   first name?

11             A.    Yitzhak.

12             Q.    Yitzhak.

13                   And where was Mr. Peterburg

14   based?

15             A.    I think he lived in New York, but

16   I'm not certain.  I didn't interact with him

17   often.

18             Q.    Okay.  Do you know if he was

19   based in the US versus Israel?

20                   MS. HILLYER:  Objection, calls

21        for speculation.

22                   THE WITNESS:  I don't know.  All

23        of my meetings that he was in attendance

24        were in the US.

```
 1    BY MR. KIEFFER:

 2           Q.     Okay.  And this Mr. Peterburg you

 3    said at the time would have either been a member

 4    of the board or the interim CEO?

 5           A.     Correct.

 6           Q.     Okay.  And it appears from this

 7    message that he asked the various individuals on

 8    this e-mail to make this review of the US opioid

 9    epidemic and consider Teva response options,

10    right?

11                  MS. HILLYER:  Objection to form.

12                  THE WITNESS:  Yes.

13    BY MR. KIEFFER:

14           Q.     Did you have input into any

15    discussion or recommendation of Teva's response

16    options to the US opioid epidemic?

17                  MS. HILLYER:  I just want to

18           counsel the -- advise the witness not to

19           disclose anything that could be

20           privileged.  There's a lot of lawyers on

21           here, so I don't want to disclose

22           attorney-client privilege, but I think

23           you can answer his question yes or no.

24                  THE WITNESS:  Yeah, I don't
```

1          remember.  As I stated earlier, I don't

2          remember this meeting, and I don't

3          remember specific work plans around

4          opioids in 2017 relative to the generic

5          portfolio.

6     BY MR. KIEFFER:

7          Q.     Okay.  You don't remember

8     anything basically related to this?

9          A.     I don't.

10         Q.     Okay.  Do you know if Teva came

11    up with any response options to the US opioid

12    epidemic at least as it's stated here in this

13    e-mail?

14              MS. HILLYER:  Same cautioning in

15         terms of attorney-client privilege.

16              THE WITNESS:  And, honestly, I

17         don't, I don't remember.

18    BY MR. KIEFFER:

19         Q.     Don't know whether Teva did

20    anything and, if so, what it did?

21         A.     Yeah, I don't know.

22         Q.     Let me ask you about a couple of

23    other things.

24              Are you aware that recently the

Highly Confidential - Subject to Further Confidentiality Review

1    National Safety Council released data from a new

2    study showing for the first time ever Americans

3    are more likely to die from opioid overdose than

4    in a car crash?

5              MS. HILLYER:  Objection, assumes

6         facts not in evidence.

7              THE WITNESS:  I'm not familiar

8         with the National Safety Council or any

9         findings thereof.

10   BY MR. KIEFFER:

11        Q.    You mentioned earlier the CDC.

12   That's shorthand for the Centers for Disease

13   Control and Prevention?

14        A.    Yes.

15        Q.    Are you aware that the CDC has

16   reported that from 1999 to 2017, almost 218,000

17   people died from overdoses related to

18   prescription opioids and that opioid -- and that

19   overdose deaths involving prescription opioids

20   were five times higher in 2017 than in 1999?

21              MS. HILLYER:  Objection to form.

22              THE WITNESS:  I was not aware of

23         those statistics.

24   BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you aware that the CDC has

2    reported that from July 2016 through September

3    of 2017, so a period of a little more than a

4    year, the Midwestern region of the US saw an

5    increase in opioid overdoses of 70%?

6                   MS. HILLYER:  Objection to form.

7                   THE WITNESS:  I was not aware.

8    BY MR. KIEFFER:

9          Q.    And that region, Midwestern

10   region typically would include the state of

11   Ohio?

12                  MS. HILLYER:  Objection, vague

13         and lack --

14                  THE WITNESS:  Yeah, I don't know.

15                  MS. HILLYER:  Calls for

16         speculation, lack of foundation.

17   BY MR. KIEFFER:

18         Q.    Did I understand you to say

19   earlier you actually -- for your -- at some

20   point in your tenure with Teva, you moved from

21   Ohio to New Jersey?

22         A.    I lived in Ohio prior to my

23   tenure with Teva.

24         Q.    Okay, all right.  Thank you.

```
 1    Where in Ohio?

 2           A.     I've lived on the east side of

 3    Cleveland in the suburbans, and I've lived in

 4    the Dayton area.

 5           Q.     Okay.  Are you aware that the CDC

 6    reported in a 2018 surveillance report that in

 7    2017 over 17% of the population filled at least

 8    one prescription for an opioid?

 9           A.     I was not --

10                  MS. HILLYER:  Objection to form.

11                  THE WITNESS:  Not aware of that

12           statistic.

13    BY MR. KIEFFER:

14           Q.     In view of the fact that a

15    public health emergen -- among other things, in

16    view of the fact that a public health emergency

17    has been declared as a result of the opioid

18    crisis, would you agree that a company like Teva

19    who makes and sells prescription opioids should

20    never put profits ahead of safety?

21                  MS. HILLYER:  Objection to form

22           and calls for an opinion.

23                  THE WITNESS:  Teva -- Teva sells

24           FDA approved products to be used by
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              healthcare practitioners to treat

2              patient need, and, certainly, that's

3              something to be taken seriously and

4              something that requires a lot of focus

5              on compliance and adherence to

6              guidelines and regulations.

7    BY MR. KIEFFER:

8         Q.    Okay.  And I appreciate that, but

9    my question, I think, had a different focus.

10             My question is in view of the

11   fact that the U.S. government through the

12   Department of Health and Human Services has

13   declared a public health emergency as a result

14   of the opioid crisis, would you agree that a

15   company like Teva that makes opioids should

16   never do anything that represents putting

17   profits ahead of safety?

18             MS. HILLYER:  Same objections.

19             THE WITNESS:  In general, Teva

20             should be compliant with all guidelines

21             and regulations, and anywhere where

22             there's a safety regulation, that should

23             be put ahead of profit.

24   BY MR. KIEFFER:
```

```
 1              Q.      In terms of Teva's product --
 2    strike that.
 3                      You're aware of the fact that
 4    opioids can be abused in ways that lead to
 5    addiction?
 6                      MS. HILLYER:  Objection,
 7              mischaracterizes testimony.
 8                      THE WITNESS:  I am aware that
 9              opioid products are DEA scheduled
10              products, and my understanding, although
11              somewhat layman, of DEA scheduling is
12              that that is correlated to risk of
13              abuse.
14    BY MR. KIEFFER:
15              Q.      Okay.  Among -- and, again, I'm
16    not looking for a precise number, but in terms
17    of Teva's overall generic portfolio, about what
18    percent of that portfolio involves drugs that
19    are DEA scheduled drugs?
20              A.      Opioids or DEA schedule?
21              Q.      I'm sorry?
22              A.      Opioids or DEA schedule?
23              Q.      Well, DEA scheduled to begin
24    with.
```

Highly Confidential - Subject to Further Confidentiality Review

1              MS. HILLYER:  All DEA scheduling,

2       not just II?

3  BY MR. KIEFFER:

4       Q.    Let's start all DEA scheduling

5  and then we'll go from there.

6       A.    Percent of products, maybe, maybe

7  20%, maybe 30.  I'm not -- I would have to look

8  at numbers to give you a more precise answer.

9       Q.    And opioids are typically a DEA

10 Schedule II, right?

11             MS. HILLYER:  Objection to form.

12             THE WITNESS:  Tramadol is not.

13 BY MR. KIEFFER:

14      Q.    Okay.  What's tramadol?

15      A.    I think it's a IV, might be a

16 III.

17      Q.    What about DEA Schedule II

18 products, approximately what percent of Teva's

19 portfolio are Schedule IIs?

20      A.    Maybe 10, maybe 15.  Again, I

21 would want to check before I gave you a specific

22 number.

23             MS. HILLYER:  Sorry.  Again,

24       you're just talking about Schedule II,

1        not just opioid Schedule IIs, right?

2                MR. KIEFFER:  Correct.

3                THE WITNESS:  Teva has a

4        significant amount of ADHD drugs as well

5        that are Schedule II.

6    BY MR. KIEFFER:

7        Q.     And Schedule IIs are subject to

8    different requirements; are they not?

9                MS. HILLYER:  Objection, vague.

10               THE WITNESS:  Yeah, in terms of?

11   BY MR. KIEFFER:

12       Q.     Well, the company has certain

13   obligations under federal law to conduct

14   surveillance for things like suspicious orders?

15       A.     Yes.

16       Q.     And Teva doesn't have that

17   obligation for non -- certainly non-DEA

18   scheduled drugs, right?

19       A.     I don't know that that's wholly

20   accurate.  I think there is also some, and I

21   don't know where the regulation comes from, but

22   I do know that we also have compliance programs

23   around so-called lifestyle drugs, which may or

24   may not be scheduled.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  We talked about the fact

2     that a public health emergency was declared in

3     October of 2017.

4               Were you personally aware that

5     there was a problem in this country with opioid

6     abuse, addiction and sometimes death prior to

7     2017?

8               MS. HILLYER:  Objection to form.

9               THE WITNESS:  I was -- I'm

10          generally aware that there was a

11          problem.  I couldn't pinpoint for you

12          when that became present in my knowledge

13          base.

14     BY MR. KIEFFER:

15          Q.     It's -- I'm sorry, go ahead.

16          A.     Before 2017, but I don't know

17     when.

18          Q.     Okay.  It's a problem that's been

19     going on for a while, true?

20               MS. HILLYER:  Objection to form.

21               THE WITNESS:  The opioid problem

22          has been going on for a while.

23     BY MR. KIEFFER:

24          Q.     Certainly since before 2016, for

Highly Confidential - Subject to Further Confidentiality Review

1    example?

2                    MS. HILLYER:  Objection to form.

3                    THE WITNESS:  I don't remember

4        when it became a common public

5        conversation, I really don't remember.

6    BY MR. KIEFFER:

7        Q.    Did you testify earlier that you

8    don't know whether Teva's share of the US opioid

9    market increased as a result of the Actavis

10   acquisition?

11       A.    I would have to look at numbers

12   to speak on market share on any segment.  On any

13   segment of the business, I typically look at

14   market share numbers in a holistic fashion.

15       Q.    Okay.  So you wouldn't know if

16   Teva's share of the US opioid market increased

17   as a result of the Actavis acquisition?

18       A.    No.

19       Q.    If the data -- we saw the data

20   earlier that Teva produced that indicates that

21   in terms of prescription volume, Teva's market

22   share went from about 6% in 2015 to about 14% in

23   2016.

24                    Do you recall that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      That's what the document stated,

2   yes.

3                  MS. HILLYER:  Objection.

4   BY MR. KIEFFER:

5          Q.      In your -- strike that.

6                  Remind us, when did you begin at

7   Teva, what year?

8          A.      2008, I believe.

9          Q.      In any of the time that you've

10  been at Teva since 2008, do you recall being a

11  part of any discussions or meetings at Teva

12  where consideration was given to implementing

13  any self-imposed production quotas on opioids?

14                 MS. HILLYER:  Objection to form,

15         vague.

16                 THE WITNESS:  I do not remember

17         any discussions about self-imposed.

18  BY MR. KIEFFER:

19         Q.      And --

20         A.      Outside of capacity.

21         Q.      And, to your knowledge, in the

22  time that you've been at Teva, Teva has never

23  implemented any self-imposed production quotas

24  designed to reduce the volume of opioid

Highly Confidential - Subject to Further Confidentiality Review

```
 1    medications it produces?

 2                    MS. HILLYER:  Objection to form.

 3                    THE WITNESS:  I'm sorry.  Can you

 4         say that again.

 5    BY MR. KIEFFER:

 6         Q.    In your time at Teva, it's true,

 7    is it not, Teva has never implemented any

 8    self-imposed production quotas for reasons like

 9    public safety on the amount of opioid

10    medications it produces?

11                    MS. HILLYER:  Objection to form.

12                    THE WITNESS:  Teva has not

13         stopped producing products -- I'm trying

14         to say this the right way -- for reasons

15         of public safety relative to the opioid

16         crisis.  We certainly have stopped

17         producing products for quality concerns

18         or other public health issues.

19    BY MR. KIEFFER:

20         Q.    Understood.  But not because of

21    the opioid crisis?

22         A.    Correct.

23         Q.    And Teva has not voluntarily

24    taken the initiative whether it's -- apart from
```

Highly Confidential - Subject to Further Confidentiality Review

1   the fact it hasn't stopped producing opioids,

2   Teva has not voluntarily at any point in time

3   implemented any sort of self-imposed production

4   decreases on the amount of opioids it produces

5   in response to the opioid epidemic?

6               MS. HILLYER:  Objection to form.

7               THE WITNESS:  So Teva's

8         production of opioids product by

9         product, some have declined and some

10        products we have stopped manufacturing,

11        but I would not say that it is a fair

12        characterization to say that we did that

13        in response to a concern with public

14        health around opioids.

15   BY MR. KIEFFER:

16        Q.     You did it for other business

17   reasons, not reasons having to do with public

18   health concerns around opioids, correct?

19               MS. HILLYER:  Objection to form.

20               THE WITNESS:  There could be

21        public health concerns but not specific

22        to sort of this opioid addiction issue.

23   BY MR. KIEFFER:

24        Q.     Okay.  Product quality,

1    manufacturing hiccups, those sorts of things?

2         A.    Exactly, exactly.

3         Q.    Ordinary course of business stuff

4    that happens from time to time?

5         A.    Yes.

6         Q.    All right.  You were on the

7    implementation team for the acquisition of

8    Actavis, right?

9         A.    I was.

10        Q.    Do you recall being a part of any

11   discussions in the lead up to or the

12   implementation of that acquisition where anyone

13   at Teva considered the possibility of simply not

14   acquiring the Actavis generic opioid portfolio?

15              MS. HILLYER:  Objection to form.

16              THE WITNESS:  Just to be very

17         clear, I was on the Actavis integration

18         team.  I was not on the Actavis

19         acquisition team, so I was not part of

20         the acquisition strategy discussions.

21   BY MR. KIEFFER:

22        Q.    Okay.  And I meant to say

23   implementation team.  I misspoke, so thanks for

24   correcting me.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You were on the Actavis

 2    implementation team?

 3          A.      Correct.

 4          Q.      Okay.

 5                    MS. HILLYER:  You're still both

 6          saying different words.  Do you mean

 7          implementation or integration?

 8                    THE WITNESS:  Integration.

 9                    MS. HILLYER:  You said

10          implementation the first time, and then

11          she said integration, and then you said

12          I meant to say implementation.

13                    MR. KIEFFER:  And somewhere in

14          there she said acquisition.

15                    MS. HILLYER:  Right, but I think

16          she was saying integration, not

17          implementation.

18    BY MR. KIEFFER:

19          Q.      All right.  Let me clean it up.

20                    You were on the integration team

21    for Teva when it acquired Actavis, right?

22          A.      Correct.

23          Q.      During any of these integration

24    activities or anything that would have touched
```

Highly Confidential - Subject to Further Confidentiality Review

1    on your area in the organization in the lead up

2    to the acquisition, do you recall any

3    discussions about whether Teva ought to consider

4    perhaps not acquiring the Actavis portfolio of

5    opioid medications?

6            A.      I was not part of a team that

7    gave recommendations on product selection from

8    the acquisition.

9            Q.      And you don't recall hearing any

10   discussions about any topic like that from

11   anybody, right?

12           A.      No, no discussions that I was a

13   part of.

14           Q.      Has the DEA in recent years put

15   certain quotas on manufacturers like Teva

16   reducing the amount of certain opioid

17   medications they can produce?

18           A.      My understanding, which is

19   probably somewhat limited because I don't

20   interact directly with the DEA, is that we apply

21   for quota of API, and we apply for quota to

22   manufacture or move product around and that

23   those quotas have been reduced as far as the

24   overall marketplace.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.     Okay.  Reduced by DEA?

2        A.     Yes.

3        Q.     DEA is turning the spigot down in

4   kind of simple layman's terms?

5               MS. HILLYER:  Objection to form.

6               THE WITNESS:  Yes, they've announ

7               -- there was an announcement at least at

8               one point that they would reduce quota

9               grants relative to opioids.

10              MR. KIEFFER:  Can you pull up

11              document 1732.

12              (Document marked for

13              identification as Teva-Baeder Deposition

14              Exhibit No. 21.)

15   BY MR. KIEFFER:

16        Q.     Ma'am, we've just handed you what

17   we've marked as Exhibit 21, an e-mail string.

18   It appears to begin at the bottom of a page

19   marked TEVA_MDL_A_09641638.  It's an e-mail from

20   Andrew Boyer to several different people,

21   including you, dated October 5, 2016.

22               Do you see that?

23        A.     Yes.

24        Q.     And, actually, I think I
```

1    misspoke.  Let me clean that up.

2              The string actually begins at the

3    very bottom of the page with an e-mail from a

4    Jeffrey Zerillo to Andrew Boyer, you and several

5    other individuals, right?

6         A.    Correct.

7         Q.    And the subject line is "DEA

8    Mandate Opioid Reduction."

9              Do you see that?

10        A.    Yes.

11        Q.    And Mr. Zerillo states, "This

12   could have a huge impact on us?"

13             Do you see that?

14        A.    Yes.

15        Q.    And then if you turn the page,

16   he's attached a press release that says "DEA

17   Reduces Amount of Opioid Controlled Substances

18   to be Manufactured in 2017."

19             Do you see that?

20        A.    Yes.

21        Q.    And it's got a date line of

22   Washington, DC.  The first sentence states, "The

23   United States Drug Enforcement Administration

24   (DEA) has reduced the amount of almost every

Highly Confidential - Subject to Further Confidentiality Review

1    Schedule II opiate and opioid medication that

2    may be manufactured in the United States in 2017

3    by 25 percent or more, according to a Final

4    Order being published in the Federal Register

5    tomorrow and available for public inspection

6    today here."

7              Do you see that?

8         A.    Yes.

9         Q.    And that press release appears to

10   be what Mr. Zerillo is referring to when he says

11   "This could have a huge impact on us?"  Right?

12        A.    Yes.

13        Q.    And then Mr. Boyer above that

14   responds and he says "Agreed.  Christine, we

15   will need to look at where we have FTS

16   exposure."

17             Do you see that?

18        A.    Yes.

19        Q.    And that's what we talked about

20   earlier, the potential failure to supply

21   penalties?

22        A.    Yes.

23        Q.    Mr. Zerillo up above writes back

24   and says, "Once we get our quota for 2017 which

Highly Confidential - Subject to Further Confidentiality Review

1    will be soon we can access the impact if any.

2    This is an industry wide slash so we may be able

3    to capitalize if we get our quota based on

4    historical sales.  If they spoon feed us quota

5    that could be another story but the smaller

6    players will suffer the most."

7                    Do you see that?

8         A.     Yes.

9         Q.     Describe your understanding of

10   what he is communicating there?

11                    MS. HILLYER:  Objection to the

12            extent it calls for speculation.

13                    THE WITNESS:  He is stating that

14            we'll get our quota grant and then we

15            can do an analysis of our current

16            customer forecast versus what quota is

17            granted, and then we can do a GAAP

18            analysis to see where we might be short

19            product by product or customer by

20            customer.

21   BY MR. KIEFFER:

22        Q.     And he mentions here that if Teva

23   gets its quota based on historical sales, Teva

24   may be -- actually be able to capitalize on this

Highly Confidential - Subject to Further Confidentiality Review

1   quota reduction by the DEA, correct?

2            MS. HILLYER:  Objection to form.

3            THE WITNESS:  Well, Jeff Zerillo

4        is not a commercial individual.  He's a

5        supply chain person, but -- so, yes, he

6        does say that.  However, if we have a

7        current forecast and we're going to have

8        less supply, there's no way to increase.

9        So even if other people don't get their

10       quota, which I think is what he's

11       suggesting, there's no way to increase.

12  BY MR. KIEFFER:

13       Q.    Okay.  But he's also saying he

14  thinks in his opinion the smaller players will

15  suffer the most, right?

16       A.    That's his opinion.

17       Q.    And Teva is not one of the

18  smaller players, right?

19            MS. HILLYER:  Objection to form.

20            THE WITNESS:  Yeah, but I don't

21       know if there's any basis for that.  I

22       don't have any experience with that.

23            MR. KIEFFER:  Pull up 01889.

24            (Document marked for

1          identification as Teva-Baeder Deposition

2          Exhibit No. 22.)

3    BY MR. KIEFFER:

4          Q.     Ma'am, we've just handed you what

5    we have marked as Exhibit Number 22.  Exhibit 22

6    begins with an e-mail with a page number

7    TEVA_MDL_A_12352355, and it attaches a slide

8    deck that was produced under Teva Number

9    12352356.

10          I've got just a few questions for

11   you about a few of the things in that exhibit,

12   okay?

13          A.     Okay.

14          Q.     All right.  Exhibit 22, which is

15   the cover e-mail at the bottom of the page,

16   includes an e-mail from a Michelle Belli dated

17   June 12, 2013 to a number of people, including

18   you, right?

19          A.     Yes.

20          Q.     And the subject is "June 5-6

21   Sales Meeting Complete Slide Deck."

22          And it says "Attached is the

23   complete slide deck for the sales meeting held

24   on June 5-6."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Do you see that?

 2         A.      Yes.

 3         Q.      If you turn the page, there is a

 4    cover page and it says "Teva US Generics Sales

 5    Meeting, Orlando, Florida, Wednesday June 5,

 6    2013."

 7                   Do you see the cover there?

 8         A.      Yes.

 9         Q.      Did you attend that meeting?

10         A.      Likely.

11         Q.      Typically, this would be

12    something that you would do?

13         A.      Yes.

14         Q.      Okay.  There are, I will tell

15    you -- I got a couple things I want to ask you

16    first, but there are some presentation materials

17    in here that have your name on them.  If there's

18    a part of this slide deck that's got your name

19    on it, is it likely you were the presenter of

20    that information?

21                   MS. HILLYER:  Objection to form.

22                   THE WITNESS:  Myself or myself

23         and a team member.

24    BY MR. KIEFFER:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Yourself or yourself and a team?

 2            A.     Yes.

 3            Q.     But you would have been involved

 4     in presenting the material?

 5            A.     Yes.

 6            Q.     Okay.

 7                   MS. HILLYER:  Do you want to give

 8            her a few minutes to just look through

 9            it?

10                   MR. KIEFFER:  Yeah, she can fan

11            through it.  I mean, I'm not -- I'm

12            certainly not going to ask her about

13            every page.  There's vasts amounts of

14            the information I'm not going to ask her

15            about, but, yeah, we'll go off the

16            record and take a break while she does

17            that?

18                   MS. HILLYER:  Either way.

19                   MR. KIEFFER:  Let's go off the

20            record, give her a minute to look

21            through.

22                   THE VIDEOGRAPHER:  Going off the

23            record at 2:54 p.m.

24                   (Brief recess.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  We're back on

 2          the record at 3:07 p.m.

 3   BY MR. KIEFFER:

 4          Q.    Ma'am, we're back on the record

 5   after a break.

 6                 Are you ready to proceed?

 7          A.    Yes.

 8          Q.    Okay.  When we broke, we were

 9   discussing Exhibit 22, which was a slide deck

10   that had to do with the US generics sales

11   meeting in Orlando, Florida on June 5th, 2013.

12                 Have you had a chance to briefly

13   look through that slide deck?

14          A.    Yes.

15          Q.    Okay.  I'm only going to ask you

16   about a few pages.

17                 You and/or members of your staff

18   were presenters at that meeting?

19          A.    Yes.

20          Q.    Okay.  Turn to page 22, if you

21   would.

22                 Page 22 has some information, the

23   heading is "Walgreens/Alliance Boots/ABC

24   Strategic Alliances."
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2          A.     Yes.

3          Q.     Now, it doesn't appear, at least

4     from the way this slide deck is organized, that

5     this was necessarily part of your presentation.

6                 Is that true?

7                 MS. HILLYER:  Objection to form.

8                 THE WITNESS:  Likely.

9     BY MR. KIEFFER:

10         Q.     Okay.  I just want to ask you

11    about a couple statements on here.

12                The third bullet states,

13    "March 31, 2013, Teva and Walgreens/WBAD agreed

14    to a 5 year strategic partnership agreement in

15    US with the goal to develop a global agreement

16    within 90 days."

17                Is that something you were aware

18    of in 2013?

19         A.     Yes.

20         Q.     The next bullet states, through

21    the strategic rebate program we have the

22    opportunity to grow our business with Walgreens

23    in the US over $2 billion during the 5 year

24    agreement from the current $460 million run

1    rate.

2                    Do you see that as well?

3          A.      Yes.

4          Q.      And you were aware of that target

5    and that goal in 2013?

6          A.      Aspiration.

7          Q.      Aspiration?

8          A.      Yes.

9          Q.      Okay.  And that would be the

10   generic side of the business, correct?

11         A.      Correct.

12         Q.      Turn to page 23, if you would.

13                 Page 23 is a chart, it's

14   entitled -- or graphic, it's entitled "Customer

15   segmentation," and there's a triangular diagram

16   and kind of captions to the side.  This says

17   Tier 1, Tier 2 and Tier 3, correct?

18         A.      Yes.

19         Q.      All right.  Tier 1 states it has

20   some company names in the tier.  And it says,

21   "88% of overall generic market" and "74% of Teva

22   generic unit volume," right?

23         A.      Yes.

24         Q.      I want to make sure I'm

1    understanding this correctly.  The reference to

2    "88% of overall generic market," do you know

3    whether that is in dollars or volume of product

4    sold or what it is?

5            A.    I do not.

6            Q.    And "74% of Teva generic unit

7    volume," that sounds like it's product units,

8    right?

9            A.    Correct.

10           Q.    Okay.  And the companies that are

11   listed there in Tier 1, do you know as of 2013,

12   was that a complete list?

13               MS. HILLYER:  Objection to form.

14   BY MR. KIEFFER:

15           Q.    And let me try to be more

16   specific.

17               I don't interpret that as these

18   are just a few examples of Tier 1 companies.  I

19   interpret that as more or less being a complete

20   list of the Tier 1 companies, but I want to know

21   if my interpretation is correct or incorrect?

22               MS. HILLYER:  Objection to form,

23        lack of foundation.

24               THE WITNESS:  Those were the Tier

Highly Confidential - Subject to Further Confidentiality Review

```
 1            1 customers, to the best of my memory.

 2   BY MR. KIEFFER:

 3            Q.      How about Tier 2, is the same

 4   thing true; as far as you know, those are the

 5   Tier 2 companies?

 6            A.      I wouldn't have a memory of what

 7   was defined as Tier 2 or Tier 3.

 8            Q.      Okay.  But, according to this

 9   document at least, if we look at the reference

10   to overall generic market, Tier 1 and Tier 2

11   combined look like they are about 97% of the

12   overall generic market and about 81% of Teva's

13   generic unit volume, right?

14                 MS. HILLYER:  Objection to form.

15                 THE WITNESS:  So I didn't prepare

16       the slide.

17   BY MR. KIEFFER:

18            Q.      Right.

19            A.      And I would not agree with that,

20   because, for example, the U.S. government via

21   the VA and the DOD is not here, and they're a

22   significant procurer.  So this perhaps is retail

23   segment.  I don't know.

24            Q.      So, for example, the Department
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of Defense is a big customer?

 2           A.     They are.

 3           Q.     Of Teva's?

 4           A.     And also the VA.

 5           Q.     What was the other one?  I'm

 6    sorry.

 7           A.     The VA, the veterans.

 8           Q.     The VA, okay.

 9                  Turn if you would to page 55.

10    Page 55 contains a chart that says "Current

11    Upside Products."

12                  Do you see that?

13           A.     I do.

14           Q.     What's your understanding of what

15    the term "current upside products" refers to?

16                  MS. HILLYER:  Objection to the

17           extent it calls for speculation and lack

18           of foundation.

19                  THE WITNESS:  These are products

20           that we're trying to obtain a target

21           market share.  I don't know from this

22           context whether it's relative to value

23           or units.  I don't know.  And over the

24           years we've done it in different ways,
```

Highly Confidential - Subject to Further Confidentiality Review

1           so I don't know.

2     BY MR. KIEFFER:

3           Q.     If you turn to the page

4     immediately after -- it looks like it's

5     immediately after 76, it's page 77.  I'm not

6     sure the page number came through.  That looks

7     like it begins your portion of the presentation;

8     is that correct?

9           A.     Yeah, mine or Michelle's, yes.

10          Q.     Okay.  Page 80 is a slide

11    entitled "Enhanced DEA Compliance."

12                 Do you see that?

13          A.     I do.

14          Q.     There is a reference there to

15    "Item descriptions on DEA 222 forms."  What is a

16    DEA 222 form?

17          A.     It's a form that accompanies a

18    manual purchase order for a Class II drug.

19          Q.     Okay.  Let me back up a step and

20    ask you to what extent, if at all, were your job

21    responsibilities in 2013 involved with DEA

22    compliance or suspicious order monitoring?

23                 MS. HILLYER:  Objection to form.

24                 THE WITNESS:  So the commercial

Highly Confidential - Subject to Further Confidentiality Review

1        team, as I've described, customer

2        service did enter orders, process orders

3        and answer questions to customers

4        relative to backorders and supply.  That

5        would be true for DEA substances as

6        well.  We did not have responsibility

7        for suspicious order monitoring.

8   BY MR. KIEFFER:

9        Q.      In any respect?

10        A.      So by -- so it's changed over the

11   years.  When I started with Teva in 2008, 2009,

12   the commercial organization was involved in

13   facilitating discussions or getting information

14   in support of the sales order monitoring

15   process.

16                By 2013 post the Cephalon

17   integration, the process had evolved, and we

18   were still involved in facilitating, for

19   example, finding out at a customer who the

20   appropriate party was for a discussion and

21   always were involved in sort of the overall

22   relationship with a customer, but we were --

23   continued to not be the decision-maker and

24   became farther removed from the actual secondary

Highly Confidential - Subject to Further Confidentiality Review

1  set of questions, if you will.  I don't know how

2  else to phrase it.

3          Q.      And when you say "we," you're

4  referring to the customer service aspect that

5  falls under your responsibility?

6          A.      Correct.

7          Q.      Okay.  And the time frame in the

8  last part of you answer you referenced was

9  sometime after 2013?

10         A.      Sometime after 2013.

11         Q.      Okay.  So let's --

12         A.      And it's continued to evolve, and

13 we've become -- customer service has become even

14 less and less involved.  Again, we were never

15 the decision-maker, but we did used to

16 facilitate information exchanged more than we do

17 in the present day.

18         Q.      Information exchange in the form

19 of data and information versus like

20 conversations?

21         A.      Or if there was a specific

22 conversation.

23         Q.      Okay.  Page 82 of this slide deck

24 looks like it begins an operational update from

1    you or at least it has your name on it, right?

2         A.    Yes.

3         Q.    You believe you provided that

4    operational update?

5         A.    Yes.

6         Q.    Okay.  Take a look at page 87 of

7    the slide deck, if you would.

8               Are you there?

9         A.    Getting there.  Yes.

10        Q.    All right.  Page 87, kind of the

11   heading above the three numbered items states,

12   "Increased vigilance of customers ordering to

13   forecast."

14              You see what I just read?

15        A.    Yes.

16        Q.    Does this in any respect touch

17   upon the subject matter of any sort of

18   suspicious order monitoring?

19        A.    No.  This speaks to the demand

20   shaping of the overall commercial department

21   relative to the whole portfolio and has more to

22   do with operational efficiency and

23   predictability to our supply chain.  The

24   suspicious order monitoring program would run in

Highly Confidential - Subject to Further Confidentiality Review

1  addition to this and separate from this with

2  different management and different protocols.

3       Q.     Okay.  Item number 1 states "We

4  will question any significant over order - 90%

5  turn out to be errors."

6            You see what I just read?

7       A.     Correct.

8       Q.     By "over order," what do you

9  mean?

10      A.     So small customers, especially at

11  this time, tended to still order via e-mail or

12  other paper, and they would frequently miskey,

13  so they wanted to order 1,000 and they would

14  order 10,000.

15      Q.     And your reference here to

16  questioning any significant over orders, would

17  that include customer orders that might get

18  flagged as potentially suspicious by the

19  suspicious order monitoring system?

20      A.     There was a separate work stream.

21  So it would have gotten questioned first by me

22  from our team as this looks like an error.

23  Subsequent to that, the suspicious order

24  monitoring would flag however they flagged.

1    Q.    Item 2, "Questions have led to

2 customer conversations, where customers were

3 speculating."

4              What are you attempting to

5 communicate?

6    A.    So in the generic business,

7 having inventory when there's a shortage in the

8 marketplace of inventory is an advantage for

9 customers.  So if there's a whisper that, you

10 know, Mylan, company X is going to have a

11 problem providing their customers with their

12 full forecast of generic Lipitor, you will see

13 other companies that produce generic Lipitor

14 getting correspondingly large, unforecasted

15 orders.

16    Q.    Okay.  So speculation in the

17 market?

18    A.    Yes.

19    Q.    Item 3 states, "Our goal is to

20 ship all orders, but ensure the forecast is

21 correct going forward, and only hold/cancel

22 excessive orders that we cannot supply without

23 creating backorders for other customers."

24              Did I read that correctly?

```
 1          A.      That is correct.

 2          Q.      Okay.  The statement here "our

 3   goal," whose goal is that?  Is that your area,

 4   the company's goal?

 5          A.      It's the commercial team's goal.

 6          Q.      Okay.  Commercial team's goal is

 7   all orders that come in -- all orders that come

 8   into the company from customers, you will ship

 9   if you can without creating backorders for other

10   customers?

11               MS. HILLYER:  Objection to form.

12               THE WITNESS:  So we will ship all

13          orders that we can that are not

14          excessive and do not create problems for

15          our overall supply chain, so creating

16          backorders.

17               But, again, this -- this is a

18          process that's applied to every -- by

19          the way every brand and generic product

20          that we sell, and the SOMS process runs

21          completely independently and separate

22          from this.

23   BY MR. KIEFFER:

24          Q.      Okay.  Do you -- does Teva track
```

1    backorders internally with metrics?

2         A.    Yes.

3         Q.    You have percentages you try to

4    hit or percentages you try to stay beneath in

5    terms of backorders?

6         A.    Yes.

7         Q.    Customers on the whole don't like

8    backorders or order delays?

9              MS. HILLYER:  Objection to form.

10             THE WITNESS:  Well, we track

11        against adjusted orders.  So if an order

12        is excessive and beyond our commitment,

13        then that wouldn't calculate into our

14        metrics.

15   BY MR. KIEFFER:

16        Q.    Do you have an understanding -- I

17   understand you are not in the SOMS -- SOMS is an

18   acronym that stands for suspicious order

19   monitoring, right?

20        A.    Correct.

21        Q.    Okay.  Is SOMS a part of the DEA

22   compliance function?

23        A.    That's my understanding, yes.

24             MS. HILLYER:  Are we done with

Highly Confidential - Subject to Further Confidentiality Review

1          22?

2                    MR. KIEFFER:  We are for now,

3          yeah.  Thank you.

4    BY MR. KIEFFER:

5          Q.    Now, you're not in the DEA

6    compliance department, right?

7          A.    No.

8          Q.    You deal with those folks from

9    time to time?

10         A.    From time to time.

11         Q.    In your time at Teva, have you

12   gained at least some sort of a general

13   understanding of what some of Teva's obligations

14   may be to monitor for suspicious orders?

15                   MS. HILLYER:  Objection to form

16         and to the extent it calls for a legal

17         conclusion.

18                   THE WITNESS:  I have been -- I

19         have been trained from time to time on

20         the functional responsibilities that I

21         have relative to our compliance

22         obligations.

23   BY MR. KIEFFER:

24         Q.    Okay.  You recognize the sale of

Highly Confidential - Subject to Further Confidentiality Review

1  opioid narcotic drugs in America is regulated by

2  law and specifically the DEA enforces that?

3           MS. HILLYER:  Objection to form.

4           THE WITNESS:  Yes.

5  BY MR. KIEFFER:

6      Q.    Opioid drugs like the ones that

7  Teva sells are controlled substances, we talked

8  about that earlier, right?

9      A.    Yes, opioids are a subset of the

10 controlled substances we sell.

11     Q.    Okay.  Do you understand in

12 general, and I'm not asking about the specific

13 legal requirements, but do you understand in

14 general that distributors of opioid drugs and

15 manufacturers of opioid drugs have a

16 responsibility under the law to try to do

17 everything they reasonably can to try to prevent

18 diversion of the drugs that they are

19 manufacturing and selling?

20          MS. HILLYER:  Objection to form

21       and to the extent it calls for a legal

22       conclusion.

23          THE WITNESS:  I do understand

24       that diversion of any pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

1          product is a problem.

2    BY MR. KIEFFER:

3          Q.     Is what?

4          A.     Is a problem.

5          Q.     Okay.  And do you have an

6    understanding that if the DEA finds that a

7    manufacturer, a seller or a distributor of

8    opioids is not taking sufficient steps, in the

9    DEA's view, to prevent diversion, they can take

10   away the company's registration to sell or

11   distribute opioids?

12               MS. HILLYER:  Same objection.

13               THE WITNESS:  Yes, I'm generally

14         aware of that.

15   BY MR. KIEFFER:

16         Q.     You understand, again, in

17   general, that manufacturers and distributors of

18   opioids are required to have certain controls in

19   place in their organization to help prevent the

20   diversion or abuse of opioids?

21               MS. HILLYER:  Same objection.

22               THE WITNESS:  Yes.

23   BY MR. KIEFFER:

24         Q.     And are you aware generally that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the DEA regulations require all distributors to

 2    report suspicious orders of controlled

 3    substances to the DEA?

 4              MS. HILLYER:  Same objection to

 5         form and to the extent it calls for a

 6         legal conclusion.

 7              THE WITNESS:  Yes, I'm aware that

 8         we from time to time report orders to

 9         the DEA.

10    BY MR. KIEFFER:

11         Q.    From time to time are required to

12    make reports?

13         A.    Yes.

14         Q.    Okay.  There is -- we established

15    earlier there's a DEA compliance department; is

16    that right?

17         A.    There is.

18         Q.    Okay.  At certain points in time

19    that department has had a woman in charge by the

20    name of Colleen McGinn.

21              Do you know Ms. McGinn?

22         A.    I do.

23         Q.    Is she still with the company?

24         A.    Yes.
```

 1          Q.     And is she still in DEA

 2   compliance?

 3          A.     Yes.

 4          Q.     At different points in time, a

 5   gentleman by the name of Joe Tomkiewicz was

 6   manager of the suspicious order monitoring

 7   function at Teva.

 8                 Are you aware of that as well?

 9          A.     Yes.

10          Q.     And you've -- have you had cause

11   to interact with Mr. Tomkiewicz from time to

12   time?

13          A.     Occasionally, yes.

14          Q.     Okay.  We've used the phrase

15   suspicious orders.

16                 Do you have an understanding that

17   suspicious orders, as it's used in this context,

18   in general, refers to orders that may be of an

19   unusual size or pattern or frequency so as to

20   raise some sort of a concern?

21                 MS. HILLYER:  Objection to form

22          and to the extent it calls for a legal

23          conclusion on the DEA guidelines or

24          requirements.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  My understanding is

2              perhaps a little more limited, but that

3              all of the orders are monitored by a set

4              of algorithms that commercial is not and

5              should not be privy to, and the

6              suspicious order monitoring team looks

7              for certain patterns or trends, and then

8              orders are flagged.

9      BY MR. KIEFFER:

10             Q.    Okay.  And is it fair to say that

11     at least at Teva, the suspicious order

12     monitoring team is really the subject matter

13     experts in that area, what orders perhaps should

14     be flagged as suspicious, and then if orders are

15     flagged as suspicious what steps ought to be

16     taken from there to determine the next steps to

17     take?

18                   MS. HILLYER:  Objection to form.

19                   THE WITNESS:  The DEA compliance

20             team is the -- is the decision-maker on

21             all of those regulations.

22     BY MR. KIEFFER:

23             Q.    And one of the reason is -- one

24     of the reasons is that DEA compliance department

Highly Confidential - Subject to Further Confidentiality Review

1    is the one with the expertise?

2                    MS. HILLYER:  Objection to form.

3                    THE WITNESS:  Yes.

4    BY MR. KIEFFER:

5         Q.    Do you have an understanding,

6    again, in general, recognizing you're not part

7    of the DEA compliance department, do you have an

8    understanding, in general, that if your company

9    determines that one of your customers has a

10   suspicious order, the company has an obligation

11   to stop that order from being shipped so that it

12   won't potentially be diverted out into the

13   community?

14                   MS. HILLYER:  Objection to form

15          and to the extent it calls for a legal

16          conclusion and calls for speculation.

17                   THE WITNESS:  I have an

18          understanding that there are times that

19          we need to report orders.

20   BY MR. KIEFFER:

21        Q.    Stop orders, do not ship orders

22   and report orders, you are aware there are

23   circumstances where --

24        A.    We don't ship orders, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. HILLYER:  Same objection.
2    BY MR. KIEFFER:
3         Q.     And my question got a little
4    sloppy, so let me try to ask it again.
5                    You are aware that there are
6    circumstances where suspicious orders are
7    flagged within the DEA compliance department,
8    and as a result of that, the orders are to be
9    stopped, not shipped and if suspicious, reported
10   to the DEA?
11                   MS. HILLYER:  Same objections.
12                   THE WITNESS:  Yes.
13   BY MR. KIEFFER:
14        Q.     If -- I am assuming by virtue of
15   your previous testimony, you have not at any
16   point in time undertaken to do any kind of a
17   review yourself to try to determine the
18   sufficiency of Teva's suspicious order
19   monitoring system, right?
20                   MS. HILLYER:  Objection to form.
21                   THE WITNESS:  Can you say that
22        again.
23   BY MR. KIEFFER:
24        Q.     Yeah.  I am assuming, but I want
```

1   you to correct me if I'm wrong, you, yourself at

2   no point in time have ever undertaken any sort

3   of review to try to determine the sufficiency of

4   Teva's suspicious order monitoring system?

5                    MS. HILLYER:  Same objection.

6                    THE WITNESS:  I don't -- I don't

7            recall ever analyzing -- I wouldn't even

8            know how to analyze the system that we

9            have in place.

10                    I have provided data, market data

11           and otherwise to that group.

12   BY MR. KIEFFER:

13           Q.    Okay.  If there has been evidence

14   previously in this litigation indicating that as

15   of 2012, Teva had never made a single report to

16   the DEA of a suspicious order related to

17   opioids, are you aware of that?

18                    MS. HILLYER:  Objection to form.

19                    THE WITNESS:  I am not.

20   BY MR. KIEFFER:

21           Q.    You are not aware of that?

22           A.    I am not.

23           Q.    Okay.  If that is what the

24   evidence indicates, does that surprise you?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. HILLYER:  Objection to form.

2    BY MR. KIEFFER:

3         Q.     Or do you have any basis to form

4    any thoughts about that one way or the other?

5              MS. HILLYER:  Objection, calls

6         for an opinion.

7              THE WITNESS:  Yeah, I don't.  I

8         don't know how many reports we make.  I

9         have no -- none of that information.

10   BY MR. KIEFFER:

11        Q.     If documents have been produced

12   in this case from Teva's internal files

13   indicating that in October of 2014, Teva

14   received information that the Medicare Payments

15   Advisory Commission had issued a research report

16   which, among other things, found that

17   approximately 10% of all opioid prescriptions

18   were for legitimate use, is that anything that

19   you have ever heard of before today?

20             MS. HILLYER:  Objection to form.

21             THE WITNESS:  No.

22   BY MR. KIEFFER:

23        Q.     There was a situation that arose

24   in 2015 regarding some orders for opioids from

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Teva that were destined for a customer by the

 2    name of Publix, P-u-b-l-i-x.

 3                    Do you recall that situation?

 4                    MS. HILLYER:  Objection to form.

 5                    THE WITNESS:  I do generally,

 6         yes.

 7    BY MR. KIEFFER:

 8         Q.    Publix is a grocery chain, right?

 9         A.    Correct.

10         Q.    Okay.  And they're a customer of

11    Teva's?

12         A.    They are.

13         Q.    Okay.  And they are a grocery

14    chain with pharmacies, right?

15         A.    Yes.

16         Q.    Okay.  And Teva sells opioid

17    narcotic products to Publix?

18         A.    Yes.

19         Q.    I want to ask you about a few

20    documents related to that set of circumstances.

21                    MR. KIEFFER:  Can we pull up

22         document 863.

23                    (Document marked for

24         identification as Teva-Baeder Deposition
```

Highly Confidential - Subject to Further Confidentiality Review

1              Exhibit No. 23.)

2    BY MR. KIEFFER:

3         Q.    Ma'am, I've just handed you

4    Exhibit 23.  That's an e-mail string with a

5    Bates number in the lower right corner of the

6    first page 02063729, and like some e-mail

7    strings, you kind of have to read it backwards.

8              Let's just start at the back, not

9    the very last page, but the page that ends 3732.

10        A.    Okay.

11        Q.    There's an e-mail at the bottom

12   from a gentleman named Dan Baker to someone

13   named Dawn Ward dated October 15, 2015.

14             Do you know those individuals?

15        A.    Yes.

16        Q.    Who are they?

17        A.    They're customer service

18   representatives.

19        Q.    Okay.  So they would ultimately

20   have reported to you at the time?

21        A.    To people that reported to me.

22        Q.    Okay.  And the subject looks like

23   it's identified to a purchase order number; is

24   that right?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      And that's for an oxycodone

3   product?

4       A.      I would assume from the e-mail.

5       Q.      Okay.  And Mr. Baker's question

6   is, "can you tell me if this product is going to

7   be warehoused in Ohio please?"

8               Do you see the question?

9       A.      Yes.

10      Q.      And in the e-mail above it,

11  Ms. Ward responds and says, "Hi Dan, yes, this

12  order is to be shipped and warehoused in Ohio.

13  I've attached a copy of the order that has the

14  shipping address."

15              You see that as well?

16      A.      I do.

17      Q.      Okay.  And it says, "Thank you,

18  Dawn Ward, Buyer."

19              And why does it say "buyer" under

20  Dawn Ward's name?

21      A.      I'm assuming that was her title.

22      Q.      Okay.  All right.

23      A.      Dawn, I believe worked at Anda at

24  the time.  Anda was not a Teva company in 2015.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In 2015 was Anda a distributor --

2    A.    Yes.

3    Q.    -- of Teva's products?

4    A.    Of the market's products,

5    including Teva's.

6    Q.    Many people's products including

7    Teva, right?

8    A.    Correct.

9    Q.    Okay.  And then reading further

10   on up in the spring -- excuse me.

11        Reading further up in the string,

12   Mr. Baker writes back to Ms. Ward and says,

13   "Dawn, our DEA team is asking for the following:

14   We need the following from Publix:"  The first

15   bullet, "a list of their top 10 stories by

16   oxycodone tablet volume."  Second bullet "a

17   breakdown by SKU of their oxycodone ER and IR

18   volume at each of the 10 stores," and bullet

19   number three, "A list of the top 5 prescribers,

20   including DEA number, at each of the 10

21   locations."

22        Do you see that?

23   A.    I do.

24   Q.    Do you know why that sort of

Highly Confidential - Subject to Further Confidentiality Review

1    information was being asked for?

2           A.      I would assume that the SOMS team

3    requested that data.

4           Q.      Then there's a response or

5    there's another person joins the string above

6    that message from Mr. -- from Dan Baker, and

7    this appears to be someone named Jocelyn Baker?

8           A.      Yes.

9           Q.      And who is Jocelyn Baker?

10          A.      Jocelyn Baker works in the sales

11   team.

12          Q.      Okay.  And did she report to you

13   at that time?

14          A.      She did not.

15          Q.      Okay.  And she is responding to

16   Mr. Baker, and then she adds a number of other

17   people by carbon copy, right?

18          A.      Yes.

19          Q.      Okay.  Who is Nisha Patel?

20          A.      She worked in the pricing

21   organization.

22          Q.      Would she have reported to you?

23          A.      Yes -- what date is this?

24          Q.      2015, October.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Yes.

 2            Q.     Okay.  There's a Joseph

 3    Tomkiewicz, right?

 4            A.     Yes.

 5            Q.     He was the manager of the

 6    suspicious order monitoring function at that

 7    point?

 8            A.     Correct.

 9            Q.     Marianne Geiger, her title at the

10    time would have been what?

11            A.     Customer service manager,

12    perhaps.

13            Q.     Above you?

14            A.     What?

15            Q.     Was she above you or beneath you

16    at that point?

17            A.     She worked in my organization.

18            Q.     Okay.  So she would have reported

19    to you?

20            A.     She would have reported to

21    Michelle.

22            Q.     Who would have reported to you?

23            A.     Yes.

24            Q.     Michelle Osmian, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     Okay.  Then there's a -- it looks

3    like a Redet Tefera, I probably didn't say that

4    right.

5        A.     Redet, and she reported to

6    someone in pricing who reported to me.

7        Q.     Okay.  And then Jennifer King,

8    and what was Ms. King's role at the time, and

9    who did she report to?

10       A.     Jennifer King I believe reported

11   to me at the time, and she was in charge of the

12   commercialization of new products.

13       Q.     Okay.  So Ms. Baker has added a

14   number of other folks to this conversation,

15   right?

16       A.     Yes.

17       Q.     And she writes, "Joe, Publix is

18   an established customer who sells some of our

19   other controls."

20              You interpret that as controlled

21   substances?

22              MS. HILLYER:  Objection to form.

23              THE WITNESS:  Yes.

24   BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    "Is this really required?  Also,
2  will you require this from my other 2 retailers
3  (Walmart and Thrifty White) who have accepted
4  our offer on this product?  This was not
5  presented to them in advance and may put this
6  award at risk.  Again they are an established
7  customer selling controls and have had to issues
8  to date.  Please advise."
9           Do you see that?
10    A.    I do.
11    Q.    Ms. Baker seems to be at least if
12  not pushing back, certainly challenging this
13  request which she interprets I guess as coming
14  from Mr. Tomkiewicz for information from Publix?
15           MS. HILLYER:  Objection to form.
16           THE WITNESS:  I mean, she's
17        asking questions about this request, and
18        if -- you know, I take the second
19        sentence to mean if she needs to be
20        proactive in adding -- getting data from
21        other customers as well.
22  BY MR. KIEFFER:
23    Q.    Okay.  And her comment here in
24  the first -- second sentence "is this really

1    required," I mean, she's basically saying do we

2    really have to do this?

3           A.      Yeah.

4                   MS. HILLYER:  Objection, calls

5           for speculation as to what Ms. Baker

6           said or meant.

7    BY MR. KIEFFER:

8           Q.      Okay.  Mr. Tomkiewicz if you turn

9    kind of forward in the packet, Mr. Tomkiewicz

10   writes back copying the group and he says,

11   "Jocelyn, there are several red flags with

12   this."

13                  1. This is high-strength

14   oxycodone ultimately going to Florida, a

15   well-established hot spot for oxycodone abuse in

16   the US.

17                  2. The total quantities in the

18   Publix forecast put them significantly above

19   their peers as far as size and class of trade

20   are concerned."

21                  3. The breakdown by strength,

22   with an emphasis on 40mg does not appear to be

23   normal for a retail pharmacy.  I would expect

24   the breakdown to be closer to that of Thrifty

1    White, where the emphasis is on lower

2    strengths."

3              Do you see where I am so far?

4        A.    Yes.

5        Q.    Continuing on he says, "While red

6    flag #1 is always going to be in place, this

7    places greater emphasis on our due diligence

8    regarding #2 and #3, and we must be prudent in

9    documenting our results in great detail,

10   including maintaining all of our correspondence

11   regarding this launch - and not just regarding

12   Publix.

13             I had informed Michelle early

14   yesterday afternoon that we were going to be

15   discussing Publix (and one other customer, whose

16   forecast numbers were much closer to what can be

17   considered normal, but still slightly outside of

18   that range) during the meeting next Tuesday,

19   along with presenting information that we will

20   require before we can ship to Publix.

21   Unfortunately, the timetable has obviously been

22   accelerated due to this order."

23             You see where I'm reading from?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  As far as Publix being an

2    established customer, please remember that

3    Cardinal, McKesson, Walgreens and CVS are also

4    established customers, all of whom have had

5    serious DEA penalties due to the handling of

6    oxycodone in the state of Florida.

7              For Walmart and Thrifty White,

8    their forecast numbers put them solidly into

9    what we can consider normal, so unless they

10   order far in excess of their forecast, no order

11   for them should be held for further information,

12   nor should further information be requested of

13   them due to this launch.

14             Had my group been informed of

15   this launch prior to actually receiving orders,

16   we may have been able to clear these red flags

17   before any order had been placed.

18   Unfortunately, this was not the case, and we

19   have been forced to hold this order.  We do not

20   take the holding of a newly launched product

21   lightly, and are only holding this because of

22   the these serious red flags.  Once these red

23   flags have been cleared we will be able to

24   ship."

Highly Confidential - Subject to Further Confidentiality Review

1               Do you see what I just read?

2       A.      Yes.

3       Q.      Let me touch on a couple

4  highlights.  First of all, fair to say

5  Mr. Tomkiewicz in this e-mail appears to

6  communicate that he feels pretty strongly about

7  these red flags and the need to hold this order

8  up, at least at this point in time?

9               MS. HILLYER:  Objection, calls

10          for speculation as to what

11          Mr. Tomkiewicz meant or intended.

12              THE WITNESS:  I don't know how he

13          felt.  He clearly lays out three points

14          of concern.

15  BY MR. KIEFFER:

16      Q.      All right.  There is reference

17  made in here to a product launch or a new

18  product launch.

19              Was the Oxycodone product that

20  was being held pertaining to Publix, was it part

21  of a new product launch?

22      A.      Yes.

23      Q.      What was that new production

24  launch?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Oxycodone.

2          Q.      Oxycodone in a particular --

3    extended release, immediate release?

4          A.      My memory is it was ER.

5          Q.      ER, okay.  In particular dosages?

6          A.      It would have been the whole

7    product family.

8          Q.      Okay.  And if it was a new

9    launch, do you know was it a product that Teva

10   had been first-to-file on or a new launch in

11   some other sense?

12         A.      Yeah, my memory is as part of a

13   settlement, so that's not considered a

14   first-to-file.

15         Q.      Okay.  Understood.  Is there

16   heightened sensitivity, at least within your

17   portion of the organization, about orders that

18   might be held that are connected to a product

19   launch?

20               MS. HILLYER:  Objection to form,

21         vague.

22               THE WITNESS:  It is important to

23         our customers that on a new product

24         launch that we deliver product when we

Highly Confidential - Subject to Further Confidentiality Review

 1          say we're going to deliver product so...

 2     BY MR. KIEFFER:

 3          Q.     That's particularly important in

 4     a new product launch?

 5          A.     Typically, yes, because they

 6     don't have any product on their shelf.  If it's

 7     an ongoing or repeat order, typically, they have

 8     some amount of safety stock.

 9          Q.     Okay.  All right.  Well, after

10     Mr. Tomkiewicz's e-mail that we just looked at,

11     if you continue to read forward, the e-mail that

12     begins on the bottom of the first page of

13     Exhibit 23 is from Karin Shanahan to you carbon

14     copying Colleen McGinn, right?

15          A.     Mm-hmm.

16          Q.     Okay.  And this -- all right.

17     And who is Karin Shanahan?

18          A.     I believe she was a senior vice

19     president of supply chain or supply chain and

20     operations.

21          Q.     Okay.  And do you know did she --

22     did Ms. McGinn report to her?

23          A.     She reported within that

24     organization.  I don't know if it was directly

1    to Karin or not.

2         Q.    Okay.  And Ms. McGinn, at the

3    time, I think you said your understanding was

4    she was head of the DEA compliance function?

5         A.    I think she was director or

6    senior director at the time.

7         Q.    And Mr. Tomkiewicz would have

8    reported to Ms. McGinn?

9         A.    Yes.

10        Q.    Okay.  So at least with this

11   e-mail where Ms. Shanahan weighs in to you, more

12   senior people on the DEA compliance side of the

13   organization are joining the conversation,

14   right?

15        A.    Correct.

16        Q.    Okay.  And Ms. Shanahan writes,

17   "Christine, I understand you have some concerns

18   regarding our suspicious order monitoring

19   program.  As you know, our SOM program is

20   designed to ensure that Teva is not subjected to

21   penalties up to and including rescinding of our

22   DEA licenses.  Please feel free to set up some

23   time for the 3 of us to discuss, Karin."

24                Do you see what I just read?

1          A.      I do.

2          Q.      Obviously, if there was a penalty

3    that Teva was subjected to that could include

4    rescinding of DEA licenses, that could be a very

5    serious situation for the company, right?

6                  MS. HILLYER:  Objection to form.

7                  THE WITNESS:  Certainly would not

8          want to have our DEA license suspended.

9    BY MR. KIEFFER:

10         Q.      You then write back, Karin, thank

11   you for reaching out.  I am happy to discuss and

12   think the program is imperative, my concern was

13   about the statement that Publix is diverting

14   product.  I think on new launches where we do

15   not have established history to compare to, we

16   need a more collaborative approach to ensure

17   that we are making responsible decisions.

18                 We are gathering information on

19   historic purchases by Publix on other products

20   this year to ensure the market share that they

21   Publix has communicated to Teva relative to the

22   Oxy is not higher than market share on other

23   noncontrol products.  We will be presenting that

24   data to the group for discussion.  As I am sure

1    you would agree -- as I am sure you would agree

2    reaction we need to gather information and

3    partner with our customers, without an

4    accusatory tone to ensure responsible

5    decision-making.

6                    In the future for these types of

7    sensitive products we can provide IMS and

8    customer historic market share in advance of the

9    launch to help make things easier if it is

10   helpful, but looking at customers of "like size"

11   as was described to me can be very misleading as

12   it does not take into account the complexities

13   in the channel.

14                   We will send the information

15   either later today or Monday, and we can discuss

16   at that point?  I know schedules are crazy?  And

17   then you ask, Monday or Tuesday better?

18                   Did I read that correctly?

19        A.    Yes.

20        Q.    And then Ms. Shanahan at the top

21   indicates to you that Monday is better for her,

22   right?

23        A.    Yes.

24        Q.    Okay.  Let me just ask you, was

Highly Confidential - Subject to Further Confidentiality Review

1    this exchange at this point in time becoming

2    tense?

3                    MS. HILLYER:  Objection to form.

4                    THE WITNESS:  My interaction with

5            Karin was not tense.  My team's

6            interaction with Joe was tense and had

7            been reported to me as tense.

8    BY MR. KIEFFER:

9            Q.    Okay.  All right.

10           A.    Karin and I had no conflict.

11           Q.    Okay.

12                   MR. KIEFFER:  Can you pull up

13           document 912.

14                   (Document marked for

15           identification as Teva-Baeder Deposition

16           Exhibit No. 24.)

17   BY MR. KIEFFER:

18           Q.    Ma'am, document 912 is an e-mail

19   string with a number in the bottom corner

20   TEVA_MDL_A_03479607.  It is a somewhat

21   continuation -- it's a continuation of the topic

22   by various other involved parties.

23                   Let me direct your attention to

24   the bottom of the first page of Exhibit -- I'm

```
1    sorry -- I think I said 912 and misspoke.

2                    MS. HILLYER:  Twenty-four.

3                    MR. KIEFFER:  Yeah, 24, thank

4         you.

5    BY MR. KIEFFER:

6         Q.    All right.  Clean that up.

7               Exhibit 24 is an e-mail chain

8    with the Bates number I mentioned a moment ago.

9               Let me direct your attention to

10   the bottom of the first page of that, if I may.

11   It's an e-mail from Mr. Tomkiewicz to Colleen

12   McGinn.

13              You see that?

14        A.    Yes.

15        Q.    And the subject is "Publix," and

16   it says "Importance: High," right?

17        A.    Yes.

18        Q.    He says, "FYI, I just got a call

19   from Jen King and Christine Baeder about the

20   Publix Oxy issue.  They are adamant that there

21   is no issue with us selling this oxycodone to

22   Publix because the IMS data shows that the

23   forecast matches what they dispense.  I started

24   explaining the forecast numbers and mix of SKUs
```

Highly Confidential - Subject to Further Confidentiality Review

1    appearing to be outside of normal, but they

2    Christine didn't want to hear it.  Bottom line,

3    they want to have a call with us and Karin

4    Shanahan."  And then he responds "thanks."

5              You see that?

6         A.    Yes.

7         Q.    Let me ask you about a couple of

8    things.

9              You recall having a call with

10   Mr. Tomkiewicz and Jen King about this issue?

11        A.    I do not.

12        Q.    Mr. Tomkiewicz's characterization

13   here that you two were adamant that there was no

14   issue with Teva selling this oxycodone to

15   Publix, do you have any reason to take issue

16   with his characterization of your position?

17             MS. HILLYER:  Objection to form.

18             THE WITNESS:  I don't remember

19        the call, so I can't comment on that.

20   BY MR. KIEFFER:

21        Q.    Okay.  Then there's a response

22   from Ms. McGinn that really discusses sort of

23   scheduling of follow-up discussion of the issue,

24   right?

```
1              A.     Correct.

2                     MR. KIEFFER:  Okay.  Pull up

3              document 907.

4                     (Document marked for

5              identification as Teva-Baeder Deposition

6              Exhibit No. 25.)

7    BY MR. KIEFFER:

8              Q.     Ma'am, we've handed you Exhibit

9    25.  Exhibit 25 is an e-mail chain with a

10   beginning number at the bottom, it's Teva

11   document 01056272.

12                    Let me ask you, if you would,

13   turn over to page 3 of the e-mail chain.

14             A.     Yes.

15             Q.     And there's an e-mail from you to

16   Karin Shanahan, which begins "thank you for

17   reaching out."

18                    Do you see that?

19             A.     Yes.

20             Q.     We discussed that just a moment

21   ago, right?

22             A.     Yes.

23             Q.     Okay.  And then the e-mail above

24   that is Ms. McGinn's response to you, right?
```

```
1        A.     Yes.

2        Q.     Okay.  And Ms. McGinn writes, "Hi

3   Christine, I'm happy to meet with you to discuss

4   and I know you are aware of the importance of an

5   effective SOM program.

6              That being said, at no point in

7   time did we suggest that Publix was diverting

8   product.  If that was the case, we would report

9   the order as suspicious immediately.  Joe asked

10  to gather more information from the customer as

11  is routine when conducting due diligence

12  investigations - requesting that information is

13  not symbolic of accusing anyone of diversion.

14  Every DEA registrant should be familiar with SOM

15  requirements and accustomed to answering

16  questions related to this product in

17  particular."

18             Ms. McGinn goes on to state, "IMS

19  data and market share is helpful, but Joe has

20  requested the following from Publix:"  And then

21  she reiterates the information that

22  Mr. Tomkiewicz had asked for previously.

23             She goes on to state, "In all

24  fairness, he has made similar requests in the
```

1    past from other customers without push back and

2    such requests are few and far between.  Joe is

3    our SME for SOM" -- let me pause there.  SME, do

4    you interpret that as subject matter expert?

5            A.    Yes.

6            Q.    For suspicious order monitoring?

7            A.    Yes.

8            Q.    "And has testified in court cases

9    as such to defend his employer's program in the

10   past.  He is well aware of the justification

11   needed to release an order.  Comparing customers

12   to those of 'like size' is an industry standard

13   and sound practice for initial review of an

14   order.  If there are other factors that need to

15   be taken into consideration, it would absolutely

16   be helpful to know.

17             We obviously don't want to hold

18   this order any longer than we have to.  I can

19   meet with you today or Monday to discuss."

20             You see what I read there?

21           A.    Yes.

22           Q.    Do you recall this exchange?

23           A.    I do.

24           Q.    Okay.  Ms. McGinn seems to be

1    taking a fairly firm position in the requests

2    and the needs of her department at least at that

3    point in time?

4           A.     Correct.

5           Q.     And then above that it appears

6    Mr. McGinn writes to Mr. Tomkiewicz and asks do

7    you want me to reach out to Publix directly or

8    do you want CS to reach out?  That's customer

9    service, right?

10          A.     I would assume.  I don't know.

11          Q.     And then Mr. Tomkiewicz responds,

12   "I'm always more than happy to be the one to

13   contact the customer directly - less chance of a

14   translation error that way."

15                 Do you see that as well?

16          A.     Yes.

17          Q.     And then Ms. McGinn responds a

18   bit later and says, "FYI - Christine preferred

19   they contact Publix to get the information.  I

20   actually told her that we could reach out to

21   avoid confusion or she could have her people do

22   it if she wanted to ensure the customer

23   relationship was intact.  She is having her

24   people contact them today and hopefully we'll

Highly Confidential - Subject to Further Confidentiality Review

 1    have all the information to review on Monday."

 2              Do you see that?

 3    A.    I do.

 4    Q.    Okay.  Fair to say you did -- as

 5    it relates to this particular issue with Publix

 6    at this point in time, you did not want the DEA

 7    compliance, suspicious order monitoring people

 8    reaching out to your customer?

 9              MS. HILLYER:  Objection,

10         mischaracterizes the document.

11              THE WITNESS:  So in some e-mails

12         that we haven't read, my concern was the

13         tone in which the data was being

14         requested from my team.  So I was told

15         by my team that we could not ship the

16         order because Publix may be diverting,

17         and I'm always okay with gathering more

18         data so that the SOMS team can do their

19         job, but there's a tone in which we

20         should approach our customers until we

21         know there's a problem, and it's a

22         respectful tone, and I did not feel

23         that, based on what my team was telling

24         me, that that tone was in place.

Highly Confidential - Subject to Further Confidentiality Review

1          My memory is that I -- that

2          Jocelyn or someone, not me directly,

3          contacted Publix, explained the

4          situation to their procurement people

5          and got the appropriate names for their

6          SOMS contact people, and then I know we

7          provided data, and I don't know what

8          happened to the orders.

9     BY MR. KIEFFER:

10          Q.     In some of the e-mails we've read

11    through, regardless of what the impression of

12    your initial team members were in talking to DEA

13    compliance, Ms. McGinn expressed that, at least

14    in her view, no one from her area at that point

15    in time had accused Publix of diverting product,

16    right?

17          MS. HILLYER:  Objection to form.

18          THE WITNESS:  That's her

19          position.  That was not my team's

20          position.

21          MR. KIEFFER:  All right.  Pull up

22          document 01790.

23          (Document marked for

24          identification as Teva-Baeder Deposition

Highly Confidential - Subject to Further Confidentiality Review

1          Exhibit No. 26.)

2     BY MR. KIEFFER:

3          Q.     Ma'am, we've just marked as

4     Exhibit 26 a Teva document number 01056328.  It

5     is -- there's some continuation of the issue

6     here.

7               Take a look with me, if you

8     would, at the second page of that exhibit.  At

9     the bottom of the page there is an e-mail from

10    Mr. Tomkiewicz to Jocelyn Baker copying several

11    other folks.

12               Do you see that?

13         A.     Yes.

14         Q.     It begins, "Jocelyn, for this

15    quarter, their peers, based on similar class of

16    trade and size (based on purchases of Teva

17    product) are," and then he provides information

18    in a list there.

19               Do you see that?

20         A.     Yes.

21         Q.     Okay.  He goes on then to say,

22    Publix is size-wise at the top of this group;

23    however, they are also nowhere near the size of

24    the smallest of the next group up.  Even taking

1  into account the size difference between Publix

2  and Winn-Dixie doesn't explain the forecast

3  numbers I received.  Kroger and Walmart are both

4  in a larger size group, and Meijer, Supervalu

5  and Giant Eagle are all smaller.  It may seem

6  odd that Kaiser and Cigna would be considered

7  peers; however, they both service the same

8  patient profile and can be reasonably expected

9  to have similar usage profiles resulting in

10  similar volume, and I undertook a significant

11  data analysis several years ago that bore this

12  out.

13                Unfortunately, the problem isn't

14  the size of this order, but the overall volume

15  they expect, especially compared to their peers.

16  If we were to cut this order down to a smaller

17  volume so that we could start shipping, that

18  could be misconstrued as either attempting to

19  circumvent our Suspicious Order Monitoring

20  Program, or could even be used as evidence of

21  some sort of conspiracy to divert oxycodone,

22  which while obviously we know there's no

23  conspiracy to divert oxycodone here at Teva, we

24  must remain diligent in our DEA-mandated efforts

1   to prevent diversion of all controlled

2   substances.

3              If you think it would be helpful

4   for you and I to sit down with Publix

5   face-to-face to explain our concerns, I would

6   enjoy meeting with them, and I think they would

7   find our request rather reasonable.  After all,

8   we're only asking for data on approximately 1%

9   of their locations."

10             Do you see what I just read?

11        A.    Yes.

12        Q.    So above that, if you turn back a

13  page to page 2 of the string, the next e-mail on

14  that chain -- I'm sorry is the name Redet?

15        A.    Redet.

16        Q.    Redet.  Redet forwards this on to

17  Kevin Galownia and Sean Silver.  What were their

18  jobs at the time?

19        A.    They were all in pricing.

20        Q.    She writes "Part 2 lol."

21             You see that?

22        A.    Yes.

23        Q.    LOL seems to be shorthand for

24  laughing out loud?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    Any idea why she'd say something

3   like that?

4        A.    No.

5        Q.    Okay.  Over something at least on

6   its face appears to maybe be a fairly serious

7   matter?

8              MS. HILLYER:  Objection to form.

9              THE WITNESS:  I have no idea what

10        she's commenting on.

11  BY MR. KIEFFER:

12       Q.    And then Mr. Galownia forwards it

13  on up to you and Maureen Cavanaugh and says

14  "FYI," right?

15       A.    Yes.

16       Q.    Okay.  You recall reading through

17  this at the time and wondering what Redet found

18  so humorous in all of this?

19             MS. HILLYER:  Objection to form.

20             THE WITNESS:  I don't know that

21        she found it humorous.  I don't know

22        what she's commenting on.  If I read it,

23        I would have read the substance that was

24        written to Jocelyn.
```

```
 1    BY MR. KIEFFER:

 2            Q.    All right.  You then respond to

 3    Mr. Tomkiewicz, copying a number of others, and

 4    you say, Joe, we are pulling information now to

 5    compare Publix representative market share on

 6    this product vs. other noncontrolled products

 7    comparing both to total IMS data by product to

 8    ensure that this product is in line with their

 9    typical pharmacy size purchasing in support of a

10    launch.  We will share that data with your team

11    later today or Monday, and then can meet to

12    discuss the appropriate next steps with this

13    customer/order based on take information.

14            Did I read that correctly?

15            A.    Yes.

16            Q.    And then Mr. Tomkiewicz above

17    forwards this all to Ms. McGinn, and he says, "I

18    find Redet's response below interesting.  Seems

19    to put a spin on how seriously they take this."

20    And then in quotes he has her comment "Part 2

21    lol," right?

22            A.    Yes.

23            Q.    Certainly appears that

24    Mr. Tomkiewicz interpreted some of this as
```

Highly Confidential - Subject to Further Confidentiality Review

1    perhaps some of the folks in your area not

2    taking this issue all that seriously?

3              MS. HILLYER:  Objection, calls

4         for speculation.

5              THE WITNESS:  I don't know, and I

6         didn't -- I didn't know he had a

7         concern.  It wasn't brought to me.

8              MR. KIEFFER:  Pull up document

9         849.

10             (Document marked for

11        identification as Teva-Baeder Deposition

12        Exhibit No. 27.)

13   BY MR. KIEFFER:

14        Q.    Ma'am, we've marked as Exhibit 27

15   a continuation of a discussion of this Publix

16   issue.  A lot of the e-mail string in 849 is

17   duplicative of what we've already read -- I'm

18   sorry -- in Exhibit 27 is duplicative of what

19   we've already read.

20             Exhibit 27 begins with a Bates

21   number of 01466124.

22             Let me direct your attention to

23   the e-mail at the very top of Exhibit 27 on the

24   first page from Colleen McGinn to Karin

Highly Confidential - Subject to Further Confidentiality Review

```
1    Shanahan, all right?

2         A.     Yes.

3         Q.     It states, "Karin, we have an

4    issue with an order Publix placed for Oxycodone.

5    The order was held in the system for further

6    investigation because it's off the charts in

7    comparison to other customers of the same size.

8               Joe has asked for follow-up

9    information to conduct his investigation.  He

10   cannot make a decision to ship or not until he

11   gets that information.

12              Apparently Christine Baeder

13   berated him today for making accusations of

14   'criminal activity' by the customer.  In Joe's

15   words, he hasn't received verbal abuse like that

16   in years.  Christine is demanding that the order

17   be released and wants a meeting with you today

18   or Monday at the latest.

19              I'm not very happy about my

20   people being verbally abused for doing their job

21   and bullying them into releasing an order is a

22   slippery slope."

23              Do you see what I just read?

24        A.     Yes.
```

1          Q.     You recall receiving this e-mail

2     from Ms. McGinn at the time?

3               MS. HILLYER:  Objection.

4               THE WITNESS:  I didn't receive

5          the e-mail.

6     BY MR. KIEFFER:

7          Q.     Oh, right, I'm sorry.  Strike

8     that question.

9               The reference here in the third

10    paragraph, "apparently Christine Baeder berated

11    him," him being Mr. Tomkiewicz, "today for

12    making accusations of 'criminal activity' by the

13    customer.  In Joe's words, he hasn't received

14    verbal abuse like that in years."

15              My question for you is you

16    disagree with that characterization of the

17    conversation you had with Mr. Tomkiewicz?

18         A.     I don't remember speaking to Mr.

19    Tomkiewicz about this matter.  I do remember the

20    matter.  I do remember the e-mails, and there

21    were no discussions between Colleen or Karin and

22    myself relative to berating or any of that.

23         Q.     Okay.  But you don't recall the

24    discussion that's being referenced here with Mr.

Highly Confidential - Subject to Further Confidentiality Review

1    Tomkiewicz?

2         A.    I do not.

3         Q.    And if Mr. Tomkiewicz has

4    testified in this litigation that he stands by

5    all of this characterization, you don't have a

6    memory one way or the other to agree or disagree

7    with that; is that true?

8              MS. HILLYER:  Objection, assumes

9         facts not in evidence.

10              THE WITNESS:  I don't have a

11         memory.

12   BY MR. KIEFFER:

13        Q.    Okay.

14        A.    What I can say on this e-mail is

15   there's other mischaracterizations of what I

16   said, because it said I'm demanding a meeting

17   Monday or Tuesday.  In my e-mail to Karin, that

18   is in one of these things, I clearly say, I know

19   schedules are crazy, do you want to meet Monday

20   or Tuesday.  So there's already sort of shades

21   of gray of differences.

22        Q.    Okay.  Apart from that issue, the

23   statement here "Christine is demanding that the

24   order be released," do you recall in your

Highly Confidential - Subject to Further Confidentiality Review

1    conversation -- you don't recall anything about

2    the conversation with Mr. Tomkiewicz that's

3    referenced here, right?

4         A.    No.

5         Q.    So if you demanded in that

6    conversation that the order be released, again,

7    you can't speak to that today because you don't

8    have a memory of the conversation, right?

9         A.    I don't have memory.  However,

10   what I do remember very clearly is that my

11   objection wasn't to the request for the data.

12   It was to the tone of the request of the data.

13            I think it's important that as

14   manufacturers that we work with our customers to

15   ensure a secure supply chain, and that requires

16   a collaborative tone until we have a reason not

17   to have a collaborative tone.

18        Q.    Okay.  And, again, what you've

19   characterized as the tone of the data request,

20   this is what you understood to be a tone of

21   Mr. Tomkiewicz to a member of your staff in the

22   initial conversation?

23        A.    Yes.

24        Q.    And you weren't a part of that,

1    right?

2              A.     I was not.

3              Q.     So all you're hearing is what

4    other people are kind of telling you about that

5    discussion, right?

6              A.     The same as Colleen and Karin,

7    correct.

8              Q.     Okay.  And apart from tone, this

9    statement "Christine is demanding that the order

10   be released," that at least raises a separate

11   issue from tone, right?  One is the customer is

12   being asked for information and a member of your

13   staff apparently didn't like the tone in which

14   the request was made, that's a separate issue

15   from insisting that the subject order be

16   released, right?

17                  MS. HILLYER:  Objection to form.

18                  THE WITNESS:  So, to be very

19          clear, commercial has no decision-making

20          relative to releasing orders that are --

21          that have hit our internal flags for

22          suspicious order monitoring.

23   BY MR. KIEFFER:

24              Q.     Okay.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     And I'm not the most senior

2     person in this interaction, Karin is.

3          Q.     Okay.  Commercial has no

4     decision-making with -- you said commercial has

5     no decision-making with respect to releasing

6     orders from suspicious order monitoring?

7          A.     Correct.

8          Q.     Commercial certainly has the

9     ability to weigh in with an opinion or a desired

10    course of outcome; does it not?

11               MS. HILLYER:  Objection to form.

12               THE WITNESS:  Commercial provided

13          data, which I say clearly several times,

14          and Colleen says data is helpful, it's

15          not the ultimate solution, but it is

16          helpful on, you know, market share and

17          information that I may have that they

18          may not be privy to.  My understanding

19          is then they have to digest that

20          information along with whatever other

21          data they need to digest to make the

22          decision that they think is appropriate,

23          and, ultimately, it is their decision.

24               MR. KIEFFER:  Pull up 01809.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 (Document marked for

 2            identification as Teva-Baeder Deposition

 3            Exhibit No. 28.)

 4   BY MR. KIEFFER:

 5            Q.    Okay, ma'am, we've handed you

 6   Exhibit 28.  It's a Teva document with a

 7   beginning number in the lower right-hand corner

 8   of 01056360.

 9                 Mr. Tomkiewicz -- let me direct

10   your attention to the bottom of the first page,

11   if I may, okay.

12                 Mr. Tomkiewicz writes to

13   Ms. McGinn, the first sentence of his e-mail is

14   in quotes, "my concern was about the statement

15   that Publix is diverting product."

16                 Do you see that?

17            A.    Yes.

18            Q.    He's actually quoting an earlier

19   statement of yours in an e-mail, right?

20            A.    I have no way to know if that's

21   accurate or not.  That is what he's representing

22   it as.

23            Q.    Okay.  You don't know if you

24   wrote that in one of the other e-mails?
```

1    A.    Oh, I would have been concerned

2    if we had said that Publix was diverting

3    product, so it's reasonable that I would have

4    said that.

5        Q.    Okay.  He says, "No such

6    statement was made.  She clearly said that

7    merely asking them for data was accusing them of

8    diverting."

9            Do you see that?

10       A.    I do.

11       Q.    Do you know whether Jocelyn on

12   your staff made such a statement?

13       A.    I don't.  I don't know, and I

14   don't think it was in her e-mail.  I don't

15   remember having any conversations with Jocelyn

16   outside of the e-mail on this.

17       Q.    Okay.  Ms. McGinn writes back to

18   Mr. Tomkiewicz there about the middle of the

19   page.  She says, "I know.  Karin is going to

20   support whatever your advice is.  I do not feel

21   that IMS data is going to help.  Clearly she

22   heard what she wanted to hear."

23            Do you see that?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Do you understand that to be a

2  reference to you, the "she heard what she wanted

3  to hear"?

4            MS. HILLYER:  Objection to form,

5       calls for speculation.

6            THE WITNESS:  I don't know if

7       it's myself or Jocelyn.

8  BY MR. KIEFFER:

9      Q.     Okay.  And then --

10     A.     In Colleen's e-mail to me that we

11  read out loud she said all data is helpful, that

12  it may not be enough, they made need additional

13  data, but all data -- I'm paraphrasing, but all

14  data is helpful.

15     Q.     Okay.  Then if you read on up in

16  the string, the e-mail from Mr. Tomkiewicz to

17  Ms. McGinn, the subject line still has to do

18  with this purchase order for oxycodone product,

19  and then there's an attachment.  It says

20  10/16/2015 Christine Baeder phone call.

21            Do you see that?

22     A.     I do.

23     Q.     And he writes, "Yep, IMS is just

24  going to show what they dispensed, which doesn't

```
 1    show to whom, and for whom they dispensed.  I've

 2    attached my notes from the call; they're

 3    minimal, but she was talking rather fast."

 4                   Do you see that?

 5         A.    I do.

 6         Q.    You understand that to be a

 7    reference to you?

 8                   MS. HILLYER:  Objection to form,

 9         calls for speculation.

10                   THE WITNESS:  Yes.

11                   MR. KIEFFER:  Okay.  Pull up

12         document 862.

13                   (Document marked for

14         identification as Teva-Baeder Deposition

15         Exhibit No. 29.)

16    BY MR. KIEFFER:

17         Q.    Ma'am, we just marked as Exhibit

18    29 a document with a Teva number in the lower

19    right-hand corner 02063728.

20                   These are the call notes that Mr.

21    Tomkiewicz was referencing.  The top line says,

22    "10:10 call returning Jen King's call."

23                   Do you see that?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And, again, Ms. King reports to

2  you, right?

3        A.    Yes.

4        Q.    And it says "Anda Publix," right?

5        A.    Yes.

6        Q.    We discussed that earlier.  Anda

7  is the distributor here, and the particular

8  order at issue was bound for Publix, right?

9        A.    That's a little fuzzy to me,

10  because the data is for Publix, but the order

11  from Don Ward was from Anda, so I'm not

12  completely sure.  Publix may have been sourcing

13  the product through Anda.

14        Q.    Okay.  Continuing on it says,

15  "Jen was looking at numbers.  Jen said that to

16  her the numbers 'look fine'."

17          Do you see that?

18        A.    Yes.

19        Q.    "However, numbers are based

20  entirely on IMS dispensing info.  Started to

21  explain that would be expected, but was cut off

22  when Christine Baeder joined the call on

23  speakerphone."

24          Again, this is a call you don't

Highly Confidential - Subject to Further Confidentiality Review

1    have a memory of?

2         A.    I don't.

3         Q.    He says, "Christine Baeder,

4    berated, unprofessional, didn't want to hear

5    anything I said.  She said asking for data was

6    accusing the customer of doing illegal activity.

7    I offered to meet with the customer.  Christine

8    said under no circumstances would that happen.

9    Christine said that I report to TGO, and TGO was

10   informed, so there was no need to inform DEA

11   compliance of the launch."

12            Do you see what I just read?

13        A.    I do.

14        Q.    What's TGO?

15        A.    Teva global operations.

16        Q.    And this statement Christine said

17   I report to Teva global operations, did you at

18   the time report to Teva global operations?

19        A.    No, I don't read that sentence to

20   mean that.

21        Q.    Mr. Tomkiewicz did?

22        A.    I think that means Joe does, yes.

23        Q.    So was DEA compliance not

24   informed of this product launch, is that --

1    A.    So that was an underlying point

2  of the friction, because what Joe -- he even

3  says in one of these e-mails, which I won't find

4  the time to -- won't take the time to find, but

5  that had they known the product was launching,

6  that we could have been more proactive in

7  setting up some guidelines for review, and I

8  think that would have probably been helpful to

9  them.

10    Q.    All right.

11    A.    And I speak to TGO management

12  five times a day, several different people.  So,

13  clearly, there was a failure in process that TGO

14  management didn't inform and give the SOMS group

15  the appropriate amount of notice to do the

16  diligence they needed to do.

17         That said, I recommend in one of

18  these e-mails to Karin that going forward,

19  despite the fact that I would still believe that

20  the TGO management should communicate

21  effectively to their organization, I did suggest

22  that we set up a process go forward for

23  commercial launches of this nature so that the

24  SOMS team has however much time they need to and

Highly Confidential - Subject to Further Confidentiality Review

1    can be as proactive as possible, which isn't

2    always possible, around supporting the review.

3         Q.    Mr. Tomkiewicz goes on to write

4    here, "Christine said Publix has 0.8% percent

5    overall market share and we (Teva) are trying to

6    capture generic oxycodone market share."

7              Do you see that?

8         A.    Yes.

9         Q.    Was Teva at the time trying to

10   capture generic oxycodone market share?

11        A.    We were launching the product.

12        Q.    Do you know whether -- do you

13   have a recollection that Publix had a little

14   less than 1% of the overall market share?

15        A.    That would be consistent with

16   Publix's market share on other products, opioid

17   or non-opioid.

18        Q.    Does this sound like something

19   that you might have said?

20              MS. HILLYER:  Objection to form.

21              THE WITNESS:  It's very possible

22        and probable that I would have said that

23        Publix is 0.8% market share.

24   BY MR. KIEFFER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And that Teva was trying to

2  capture oxycodone market share?

3    A.    Trying to launch a product.

4    Q.    Right.  And the holding of this

5  order was a concern in relation to that issue?

6         MS. HILLYER:  Objection to form.

7         THE WITNESS:  The holding of the

8         order -- it would have been a point of

9         friction.

10 BY MR. KIEFFER:

11   Q.    Reading on, "Christine said that

12 Publix's forecast closely matched IMS dispensing

13 data, and that was good enough for them and

14 should be good enough for me as well."

15        Do you see that?

16   A.    Yes.

17   Q.    "I asked if I can get the IMS

18 data, as I explained that the more data we have

19 the better.  She agreed.  I asked if the IMS

20 data contains prescriber information; Christine

21 said it does not, and that prescriber

22 information would cost 'millions and millions'."

23        Do you see that?

24   A.    Yes.

```
 1              Q.     And, again, you don't have any
 2    memory of this call, right?
 3              A.     I don't.
 4                     MS. HILLYER:  Are we still on the
 5         Publix?
 6                     MR. KIEFFER:  Yes.
 7                     MS. HILLYER:  How many more on
 8         that?
 9                     MR. KIEFFER:  A few.
10                     MS. HILLYER:  We've been going
11         about an hour and 15.
12                     MR. KIEFFER:  We can take a
13         break.
14                     MS. HILLYER:  Okay.
15                     THE VIDEOGRAPHER:  Going off the
16         record at 4:21 p.m.
17                     (Brief recess.)
18                     THE VIDEOGRAPHER:  Back on the
19         record, the time is 4:37 p.m.
20    BY MR. KIEFFER:
21              Q.     Ma'am, we're back after a break.
22                     Are you ready to proceed?
23              A.     Yes.
24                     MR. KIEFFER:  Can you pull up 850
```

Highly Confidential - Subject to Further Confidentiality Review

1           for me.

2                   (Document marked for

3           identification as Teva-Baeder Deposition

4           Exhibit No. 30.)

5                   THE VIDEOGRAPHER:  Going off

6           record, 4:37.

7                   (Pause.)

8                   THE VIDEOGRAPHER:  Back on the

9           record at 4:38 p.m.

10   BY MR. KIEFFER:

11           Q.      Okay, Ms. Baeder, we just handed

12   you Exhibit 30.  Do you have that in front of

13   you?

14           A.      Yes.

15           Q.      That's a continuation via e-mail

16   of the discussion of this Publix issue.

17           A.      Yes.

18           Q.      The e-mail chain has a number in

19   the lower right-hand corner of the first page of

20   01466128.  I just have to ask you -- well, I'm

21   just going to cover a very brief portion of this

22   because the vast majority of the rest of it

23   we've already discussed.

24                   On the first page there is at the

1    top an e-mail from Colleen McGinn to Karin

2    Shanahan, and it forwards with a note, Mr.

3    Tomkiewicz's previous e-mail to Jocelyn Baker

4    with that additional detail that we reviewed

5    before the break.

6                    Do you see that?

7         A.    Yes.

8         Q.    Okay.  And Ms. McGinn states,

9    "More information in response to questions from

10   customer service.  Joe offered to meet with

11   Publix to discuss but Christine has refused to

12   let him talk to them."

13                   Do you see what I just read?

14        A.    Yes.

15        Q.    Again, if Mr. Tomkiewicz has

16   indicated that in his conversation with you, you

17   refused to let him meet with Publix, you don't

18   have a memory of that conversation, right?

19        A.    I don't, but that's not

20   surprising to me.

21        Q.    What's not surprising to you?

22        A.    I had a concern with Joe's tone

23   in approaching the issue.  I would have been

24   absolutely happy to have Colleen talk to them.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  You say you had a concern

2  with Joe's tone in approaching the issue.  Joe's

3  tone as somebody in your department

4  characterized or described it to you, right?

5    A.    Correct.

6    Q.    Okay.  So it's certainly very

7  possible you might have refused to let Mr.

8  Tomkiewicz meet with Publix?

9          MS. HILLYER:  Objection to form.

10         THE WITNESS:  My strong

11      preference would have been for Colleen

12      to take that role.

13  BY MR. KIEFFER:

14    Q.    Okay.  Did you at any point have

15  an understanding as to why Mr. Tomkiewicz was

16  brought on at Teva?

17         MS. HILLYER:  Objection, calls

18      for speculation.

19         THE WITNESS:  I wasn't part of

20      the staffing or decision-making around

21      SOMS in any way.

22  BY MR. KIEFFER:

23    Q.    Okay.  So to the extent there's

24  been other evidence in the case that the prior

1    system before Mr. Tomkiewicz came was

2    rudimentary, had been criticized in a Teva

3    internal audit and that by 2012 Teva had never

4    made a suspicious order report, and those were

5    some of the reasons why Mr. Tomkiewicz was

6    brought on, you wouldn't have any information

7    about those topics?

8              MS. HILLYER:  Hold on.  Objection

9         to form, assumes facts not in evidence

10        and mischaracterizes documents and

11        testimony.

12             THE WITNESS:  I have had no

13        decision-making around SOMS and no

14        knowledge of reports made or not made.

15             I do know that Colleen joined

16        Teva as part of the Cephalon

17        integration, and there was more training

18        and improvements or changes to our

19        program at that time.

20             MR. KIEFFER:  Pull up 01791.

21             (Document marked for

22        identification as  Teva-Baeder

23        Deposition Exhibit No. 31.)

24    BY MR. KIEFFER:

1          Q.      Ma'am, we've just handed you

2    Exhibit 31.  This is a Teva document with a

3    number on the first page 01056299.  It's a

4    further continuation of the Publix issue.

5                 Toward the bottom of the first

6    page, the e-mail from Ms. McGinn to you we have

7    looked at a few minutes ago, where Ms. McGinn

8    indicates she's happy to meet with you and

9    discuss the situation, and she provides some

10   other details, right?

11         A.      Correct.

12         Q.      And then Ms. McGinn apparently

13   forwards that up to Mr. Tomkiewicz and says "My

14   response Part 3" about two-thirds of the way

15   down the first page.

16         A.      Yes.

17         Q.      You see that?

18                 And then Mr. Tomkiewicz responds

19   back, "It's very nice to see support.  Thanks

20   again - it's appreciated."

21                 You see that as well?

22         A.      I do.

23         Q.      And then Ms. McGinn responds,

24   "Again, sorry you were verbally abused so early

Highly Confidential - Subject to Further Confidentiality Review

1    on a Friday morning but thanks for handling

2    professionally.  We will get this straightened

3    out."

4              Do you see that?

5        A.    I do.

6        Q.    Ms. McGinn certainly seemed to be

7    of the impression, at least based on her

8    involvement, that you had been in some way

9    verbally abusive to Mr. Tomkiewicz.

10             Would you agree?

11             MS. HILLYER:  Objection, calls

12        for speculation.

13             THE WITNESS:  I don't know if she

14        thought that.

15   BY MR. KIEFFER:

16       Q.    And, again, the conversation that

17   they're referencing is the same one we've talked

18   about several times that you don't have a memory

19   of, right?

20       A.    I do not have a memory of, nor

21   was Colleen in that conversation.

22       Q.    True, right, okay.

23             MR. KIEFFER:  All right.  Can you

24        pull up 908 for me.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Document marked for

 2         identification as Teva-Baeder Deposition

 3         Exhibit No. 32.)

 4              THE VIDEOGRAPHER:  Going off the

 5         record, 4:44 p.m.

 6              (Pause.)

 7              THE VIDEOGRAPHER:  Back on

 8         record, 4:44 p.m.

 9              (Document marked for

10         identification as  Teva-Baeder

11         Deposition Exhibit No. 32.)

12    BY MR. KIEFFER:

13         Q.    Ma'am, we have just handed you

14    what we've marked as Exhibit 32.  This document

15    has a number in the lower right corner.  It's a

16    Teva document 01462200.  Further continuation of

17    the discussion via e-mail of the Publix issue.

18    I want to ask you about a few things in here.

19              Beginning on the first page of

20    this e-mail, lower half of the page, Mr.

21    Tomkiewicz writes to Ms. McGinn concerning some

22    additional detail based on some research he's

23    done on the Publix issue.

24              You see generally what I'm
```

1    referring to?

2         A.    Yes.

3         Q.    He states, "Colleen, on

4    October 27, 2015, I received data concerning

5    oxycodone usage at Publix Super Market, Inc.

6    The data comprised of total dosage units

7    dispensed of all oxycodone tablet SKUs for the

8    month of September 2015 for their top ten

9    locations, along with a list of the top five

10   oxycodone prescribers for each location.  The

11   following is an analysis of the data received."

12              He states, "there were ten

13   locations listed," and he provides some numbers,

14   and he says, "All stores are located in the

15   state of Florida.  Location 3210 is located on

16   the campus of Moffitt Cancer Center.  All

17   3210-listed physicians are associated with MCC;

18   oxycodone products and quantities at 3210 appear

19   to be consistent with a large oncology practice.

20   The balance of the retail locations are typical

21   retail, located inside grocery stores."

22              Then he goes on to state,

23   "Oxycodone IR 30mg data was examined due to its

24   status as a highly sought-after product among

Highly Confidential - Subject to Further Confidentiality Review

```
 1   abusers, and due to its limited use in retail

 2   pharmacies."  And then he provides some further

 3   breakdown by location number.

 4             Do you see that?

 5   A.     Yes.

 6   Q.     And then he says, each location

 7   with the exception of 0537, oxycodone IR 30mg,

 8   the highest strength immediate release oxycodone

 9   was the top oxycodone product dispensed.  By

10   contrast, at the Moffitt Cancer Center, the top

11   oxycodone dispensed -- oxycodone product

12   dispensed was IR 5mg, the lowest strength

13   non-combination product available.

14             Do you see that as well?

15   A.     I do.

16   Q.     What he's communicating, broadly

17   speaking, is that this cancer center is

18   distributing the lowest strength oxycodone

19   product, whereas some of these retail locations

20   are dispensing much higher strength product and,

21   in particular, a product that's highly sought

22   after among abusers, right?

23   A.     He's -- I mean, he's representing

24   that the cancer centers highest dispensed is the
```

Highly Confidential - Subject to Further Confidentiality Review

1    5mg, I think and that the IR 30mg is the highest

2    dispensed in the data.

3              Q.      All right.  He goes on to state,

4    inquiries into the top prescribers at each

5    location uncovered the following information:

6    For Melbourne, Florida location 202, Dr. Ralph

7    Page, anecdotally appears to be a cash-only pain

8    clinic business ($140 up-front free) but he

9    holds no pain clinic license.

10             Do you see that?

11             A.      I do.

12             Q.      Dr. Mahmoud El-Tobgui, he is an

13   OB-GYN who is currently operating pain clinic.

14   Anecdotal evidence suggests that the pain clinic

15   is cash only ($200 up-front fee for the first

16   visit, $170 up-front subsequent visits).

17             Do you see that?

18             A.      Yes.

19             Q.      Dr. Thomas Vellef, he was

20   disciplined for abandoning a previous practice.

21   According to the Treasure Coast Palm, Vellef had

22   a previous practice that had "car loads" of

23   out-of-state patients.  His prior landlord

24   refused to renew office space lease due to the

1    appearance of running a pill mill.  There is

2    significant anecdotal evidence of pill mill

3    activity with his current practice.

4                    For Melbourne, Florida location

5    738, Dr. Mahmoud El-Tobgui, see above,

6    Dr. Thomas Vellef, see above and Dr. Scott

7    Hardoon.

8                    Do you see where I'm reading

9    from?

10        A.    Yes.

11        Q.    With respect to Dr. Hardoon, Mr.

12   Tomkiewicz writes, practice is a family-run

13   (father and brother) clinic whose pain clinic

14   license was revoked by the state.  There is

15   anecdotal evidence of a $600 cash fee to enroll

16   as a pain patient.  There is significant

17   anecdotal evidence that former pain patients

18   belonging to Dr. John Gayden (whose license was

19   relinquished due to overprescribing controlled

20   substances and trading prescriptions for sex

21   with underage patients) are now patients at his

22   clinic.

23                    Do you see where I'm reading

24   from?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    For Naples, Florida location 410,

3   Dr. Kevin Sheahan, his pain clinic practice is

4   located in Atlanta, Georgia, which is 628 miles

5   from this store.  He relinquished his Florida

6   license in 1998.

7          For North Port, Florida location

8   1287, Dr. Michael Mozzetti, he runs an urgent

9   care clinic that anecdotally doesn't take urgent

10  care or emergency patients.  There is

11  significant anecdotally evidence of pill mill

12  activity.

13         Dr. James Porcelli, according to

14  media reports, he abandoned his previous

15  practice in Naples earlier this year without

16  informing his patients or paying his staff.

17         You still see where I'm reading

18  from?

19   A.    Yes.

20   Q.    For Ocala, Florida location 477,

21  Dr. Naglaa Abdel-Al, her practice is either

22  78.3 miles (according to the DEA) or 40.8 miles

23  (according to Florida license) from the store.

24  She was disciplined in Arizona for abandoning an

Highly Confidential - Subject to Further Confidentiality Review

1  anesthetized patient in order to inject/abuse a

2  sedative resulting in her overdose.

3            For Ocala, Florida location 0419,

4  Dr. Quing MGaha, her office appears to be

5  116 miles from the store.  Let me know your

6  thoughts.  Thanks.

7            You see everything I just read?

8       A.    Yes.

9       Q.    Without focusing on any one of

10  the individuals or locations, that's, by any

11  characterization, concerning information, isn't

12  it?

13            MS. HILLYER:  Objection to form

14       and lack of foundation.

15            THE WITNESS:  So this is not my

16       subject matter, but, certainly, to a

17       layman it's concerning.

18  BY MR. KIEFFER:

19       Q.    To a layman, it sounds like about

20  the sketchiest cast of physician characters

21  handing out pain medications one could kind of

22  imagine, doesn't it?

23            MS. HILLYER:  Objection to form.

24            THE WITNESS:  To a layman, it

1          does not look like responsible behavior.

2     BY MR. KIEFFER:

3          Q.     Okay.  And assuming this is

4     accurate, and I understand this is something Mr.

5     Tomkiewicz is reporting by e-mail and you're not

6     in a position to vouch for whether his work is

7     accurate or not, right?

8          A.     I don't --

9               MS. HILLYER:  Objection to form.

10               THE WITNESS:  I have no reason to

11          assume that it's not.

12     BY MR. KIEFFER:

13          Q.     Right, fair enough.  Thank you.

14     That's where I was going.

15               Assuming that Mr. Tomkiewicz's

16     information as reported here is accurate, his

17     concerns about these orders being suspicious and

18     needing to be held and investigated further

19     would appear to be well-founded, at least at

20     this point; would you agree?

21               MS. HILLYER:  Objection to form.

22               THE WITNESS:  I would agree.

23     BY MR. KIEFFER:

24          Q.     Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    And I also assume that the data

2    that he received was from the customer.

3    Q.    From the customer Publix?

4    A.    Yes.

5    Q.    Okay.  Let me read on -- well,

6    strike that.

7         Your assumption that this

8    information -- all the information that I just

9    read about all these doctors you think he got

10   from Publix?

11   A.    No, but it said -- says in the

12   first paragraph the data comprised of total

13   dosage units dispensed was one of the requests.

14   Q.    Okay.

15   A.    As well as their top ten

16   locations, that was one of the data requests, as

17   well as the top five prescribers for each

18   location, that was part of the request for data

19   from the customer.

20   Q.    Okay.  And so you're assuming

21   that that came -- that information came from

22   Publix?

23   A.    Correct.

24   Q.    And then he took it from there?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. HILLYER:  Objection to form.

2              THE WITNESS:  Correct.

3    BY MR. KIEFFER:

4         Q.    Okay.  And just to be fair with

5    you, Mr. Tomkiewicz testified, and he testified

6    at least with respect to the detail on these

7    doctors and locations, he then did his own

8    research via Google, the DEA, state medical

9    boards, that kind of thing, all right?

10             MS. HILLYER:  There's no question

11         pending.

12             THE WITNESS:  Yeah.

13   BY MR. KIEFFER:

14        Q.    All right.  At the top of Exhibit

15   32, Mr. Tomkiewicz writes to Ms. McGinn, and

16   this is the very beginning of the exhibit,

17   Colleen, based on previous investigations, I

18   think it is highly likely that at a corporate

19   level, Publix is not aware of these issues.  We

20   should schedule a face-to-face meeting with the

21   relevant Publix stakeholders to discuss their

22   ongoing prescriber due diligence and related

23   diversion control efforts.

24             Because this primarily involves

Highly Confidential - Subject to Further Confidentiality Review

1   another company's (Alvogen) product, I am

2   comfortable releasing the product we currently

3   have on hold, provided Publix agrees not to

4   distribute our oxycodone products to these nine

5   locations until they have conducted a review of

6   diversion control efforts at these nine

7   locations and addressed our below concerns.

8              Do you see what I just read

9   there?

10          A.     I do.

11          Q.     Okay.  Do you understand his

12  reference to another company named Alvogen's

13  product?

14          A.     I do not.

15          Q.     You don't know anything about

16  that?

17          A.     I do not.

18          Q.     Do you know who Alvogen is?

19          A.     I do.

20          Q.     Do they make generic opioids?

21          A.     They make generic products.  I

22  don't know if they make opioids.

23          Q.     Do you know whether Teva has in

24  the past sourced generic opioids from Alvogen?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     I do not, off the top of my head,

2   no.

3               MR. KIEFFER:  All right.  Pull up

4        document 851.

5               (Document marked for

6        identification as Teva-Baeder Deposition

7        Exhibit No. 33.)

8   BY MR. KIEFFER:

9        Q.     Ma'am, we've just handed you

10  Exhibit 33.  That is a continuation of the

11  discussion about this Publix issue.  This

12  document has a Teva number in the lower

13  right-hand corner of the first page 01466151.  I

14  just want to ask you about the top portion of

15  the first page because we've reviewed the

16  remainder of the information.

17               This is an e-mail Ms. McGinn

18  writes to Karin Shanahan regarding Publix, and

19  she writes, Hi Karin, FYI - Joe received the

20  requested information from Publix and he found

21  some information that is a little concerning.

22  Of their top 10 stories ordering oxycodone 30mg,

23  all are in Florida.  One is located on the

24  campus of a cancer center and the usage is in
```

Highly Confidential - Subject to Further Confidentiality Review

1  line with a large oncology practice.  The other

2  nine are located in grocery stores and some of

3  the business practices of their top prescribers

4  are questionable.  Many seem to be cash only,

5  some have had their licenses revoked and others

6  have practices hundreds of miles from the store

7  location (see Joe's e-mail below for the

8  investigation results).

9         We are meeting with customer

10  service today to review the findings.  Our

11  suggestion is that Joe has a F2F meeting -- do

12  you interpret that as face-to-face?

13         A.    I do.

14         Q.    Our suggestion is that Joe has a

15  face-to-face meeting with the Publix compliance

16  people to review the data.  At that point, we

17  can release the order with the caveat that they

18  not to ship to these nine locations until

19  they've conducted a review of diversion control

20  efforts and addressed our concerns.  I don't

21  think our request is unreasonable given the

22  information we have and we have taken the steps

23  with another customer in the past.

24         I'm not sure how Christine is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    going to take the news, so I thought you should

 2    know in case Christine or Maureen calls you.  I

 3    heard they were having a hard time launching

 4    this product.  If you have any questions, let me

 5    know.  Thanks, Colleen.

 6                    You see everything I just read

 7    there?

 8            A.      I do.

 9            Q.      Do you -- first of all, her

10    statement in the second paragraph, "we are

11    meeting with customer service today to review

12    the finings," would that likely have included

13    you?

14                    MS. HILLYER:  Objection to form.

15                    THE WITNESS:  I don't know.  I

16            don't remember any phone calls on this

17            issue.

18    BY MR. KIEFFER:

19            Q.      Okay.  Do you have any memory of

20    any meeting with Ms. McGinn and/or members of

21    her staff about this issue?

22            A.      No.  I remember the issue, and I

23    don't remember any phone calls.

24            Q.      And no meetings as well?
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.     No, no meetings as well.

 2          Q.     Okay.  This suggestion that Joe,

 3   Mr. Tomkiewicz have a face-to-face meeting with

 4   the Publix compliance people to review this

 5   data, do you remember anything about that issue?

 6          A.     I do not.

 7          Q.     Do you remember a request being

 8   made of you or your staff that he be permitted

 9   to do that?

10          A.     I do not.

11          Q.     Do you know if such a meeting

12   ever took place?

13          A.     I do not.

14          Q.     This statement about "I'm not

15   sure how Christine is going to take the news,"

16   she goes on to say "I heard they were having a

17   hard time launching this product."  Do you have

18   a memory of having a difficult time launching

19   that particular oxycodone product?

20          A.     I do not.

21          Q.     One way or the other?

22          A.     No, no.

23          Q.     You don't remember it being easy,

24   don't remember it being hard?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      No.

2      Q.      Just no memory at all?

3      A.      No memory at all.

4      Q.      Blank slate?

5      A.      Blank slate.

6      Q.      All right.

7              (Document marked for

8          identification as Teva-Baeder Deposition

9          Exhibit No. 34.)

10  BY MR. KIEFFER:

11      Q.      Ms. Baeder, we've just handed you

12  Exhibit 34.  It's a further continuation of the

13  Publix oxycodone order issue.  This e-mail

14  string has a beginning number in the lower

15  right-hand corner of 01466156.  It begins

16  with -- bear with me here, let me direct your

17  attention to the first page of Exhibit 34, about

18  a third of the way down the page, there's an

19  e-mail from Colleen McGinn to you, Michelle

20  Osmian and Jennifer King with a copy to Mr.

21  Tomkiewicz regarding this Publix oxycodone

22  order.

23              Do you see that?

24      A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     There's some data there that's

2    been provided in earlier e-mails we looked at,

3    and if you turn the page, there's a chart that

4    appears to more formally summarize some of the

5    findings that Mr. Tomkiewicz came up with,

6    right?

7      A.     Yes, it looks consistent with

8    that.

9      Q.     Okay.  Underneath that chart,

10   looks like she's kind of cut and pasted Mr.

11   Tomkiewicz's earlier statement about he thinks

12   it's highly likely that at a corporate level

13   Publix is not aware of these issues, and then

14   she goes on to state, "we would like to schedule

15   a face-to-face meeting with the relevant Publix

16   stakeholders to discuss their ongoing prescriber

17   due diligence and related diversion control

18   efforts."

19               Do you see that?

20     A.     Yes.

21     Q.     You recall, have any recollection

22   of receiving this e-mail?

23     A.     No, not specifically.

24     Q.     And you don't have any

1    recollection of any discussion about whether a

2    face-to-face meeting with the stakeholders of

3    Publix would be scheduled to discuss Publix's

4    ongoing prescriber due diligence and related

5    diversion control efforts, true?

6              A.    No, I have no recollection.

7              Q.    All right.  If you turn back to

8    the first page of Exhibit 34, the e-mail at the

9    top from Colleen McGinn to Jennifer King,

10   Ms. King reported up to you at the time?

11             A.    Yes.

12             Q.    She states, we need to have the

13   face-to-face first for any of this to make sense

14   to Publix.  We would like to share the

15   information we found and encourage them to

16   review their SOM programs at these stores.

17                   Do you see that?

18             A.    Yes.

19             Q.    And that appears to be in

20   response to a question from Ms. King who wrote

21   "Just to clarify, you will release the product

22   with the letter certifying that Publix will not

23   distribute to these 9 stores even if the

24   face-to-face has not occurred at that time?  Or

Highly Confidential - Subject to Further Confidentiality Review

 1    will the face-to-face have occurred before you

 2    will release?"

 3                    Do you see that question?

 4          A.      I do.

 5          Q.      And so Ms. McGinn's response

 6    appears to be we need the letter certifying that

 7    they won't distribute to these 9 stores and we

 8    need to have the face-to-face with Publix before

 9    we can release the orders, right?

10                    MS. HILLYER:  Objection.

11                    THE WITNESS:  I wasn't privy to

12           the e-mail.

13    BY MR. KIEFFER:

14          Q.      But that's how you'd interpret

15    it?

16                    MS. HILLYER:  Objection to form.

17                    THE WITNESS:  Yes.

18    BY MR. KIEFFER:

19          Q.      I mean, it seems fairly clear,

20    right?

21                    MS. HILLYER:  Objection to form.

22                    THE WITNESS:  Yes.

23    BY MR. KIEFFER:

24          Q.      And, again, you don't have any

1    memory of this issue at all, right?

2         A.    I remember the issue.  I don't

3    remember -- this is after the data was received,

4    and this part I don't remember.

5         Q.    Okay.  And my question, because

6    I'm trying to get through things here, my

7    question was probably less precise than it

8    should have been.

9               You remember the issue with

10   Publix kind of at a macro level, right?

11        A.    Yes.

12        Q.    Okay.  So let me ask a more

13   precise question.  As it relates to a request by

14   DEA compliance, and specifically Ms. McGinn,

15   that before they were willing to release this

16   order to Publix, they wanted at least two

17   things, one, they wanted a letter from Publix

18   certifying that Publix would not distribute

19   Teva's oxycodone to these nine locations, that's

20   number one.

21               And number two, they wanted to

22   have a face to face meeting involving Teva DEA

23   compliance with folks from Publix in order to

24   explain the data and discuss Publix's ongoing

Highly Confidential - Subject to Further Confidentiality Review

1    prescriber due diligence and related diversion

2    control efforts, right?

3            A.      Correct.

4            Q.      And you don't have any memory of

5    those issues, any memory of any request by DEA

6    compliance at Teva for those two things, right?

7            A.      I do not.

8                    MR. KIEFFER:  Pull up 748.

9                    (Document marked for

10                   identification as Teva-Baeder Deposition

11                   Exhibit No. 35.)

12   BY MR. KIEFFER:

13           Q.      Ma'am, we have just handed you

14   Exhibit 35.  That's a one page e-mail with a

15   Teva number in the lower right-hand corner

16   01462220.  This is an e-mail from Mr. Tomkiewicz

17   to Colleen McGinn dated October 30th, 2015, and

18   the subject is "Another Publix Heads Up."

19                   Do you see that?

20           A.      Yes.

21           Q.      All right.  He states, "FYI, I

22   received a call from Michelle, Marianne, and

23   Darrell, regarding the currently held oxycodone

24   orders earmarked for Publix through Anda.  The

Highly Confidential - Subject to Further Confidentiality Review

1   initial question was whether the order could be

2   split so that Anda could receive an allotment

3   separate from what was noted as being for

4   Publix.  I told them that I had no problem with

5   that as long as Anda agreed that none of the

6   product would go to Publix until we gave them

7   the ok.

8               Unfortunately, Michelle was

9   rather adamant that we couldn't tell any of our

10  customers to restrict sales of any of our

11  product to any of their customers and indicated

12  that she would be appealing to Christine."

13              Do you see what I just read

14  there?

15       A.    I do.

16       Q.    Do you have any memory of this

17  issue?

18       A.    I do not.

19              MS. HILLYER:  Objection to form.

20  BY MR. KIEFFER:

21       Q.    I'm assuming, based upon our

22  discussion of earlier today about some of the

23  folks that report up to you as well as the

24  e-mails we've looked at regarding this Publix

Highly Confidential - Subject to Further Confidentiality Review

```
 1   issue, the Michelle referenced here is likely

 2   Michelle Osmian?

 3               MS. HILLYER:  Objection to form.

 4               THE WITNESS:  Yes.

 5   BY MR. KIEFFER:

 6        Q.     That's how you'd interpret it?

 7        A.     Yes.

 8        Q.     And the Marianne is Marianne

 9   Geiger?

10        A.     Yes.

11        Q.     And who's Darrell?

12        A.     Darrell Little.

13        Q.     And what was his role?

14        A.     He was part of Michelle's team.

15   He's had several roles over the years.  I don't

16   remember where he was then.

17        Q.     You know whether Michelle Osmian

18   would have communicated to Mr. Tomkiewicz in

19   connection with this Publix issue that we, Teva,

20   could not tell any of your customers to restrict

21   sales to any -- of any of your product to any of

22   their customers?

23               MS. HILLYER:  Objection, calls

24        for speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yeah, I don't know.
 2   BY MR. KIEFFER:
 3         Q.     Regardless, it looks like at
 4   least as of October 30th, 2015 with the various
 5   information in hand that was gathered as a
 6   result of Mr. Tomkiewicz's investigation, at
 7   least on the face of this e-mail, there was some
 8   urgency by folks in your part of the enterprise
 9   to get this Publix order released, true?
10                    MS. HILLYER:  Objection to form,
11              hold on, calls for speculation and
12              mischaracterizes the document.
13                    THE WITNESS:  I don't read it
14              that way.  I read that they're trying to
15              get Anda product outside of the demand
16              for Publix.
17   BY MR. KIEFFER:
18         Q.     All right.  And Mr. Tomkiewicz is
19   saying, that's okay with me, but I need
20   assurance basically that Anda is not going to
21   give it to Publix through the back door and it's
22   not going to end up in the hands of these nine
23   problem prescribers, right?
24                    MS. HILLYER:  Objection to form
```

1          and calls for speculation.  She is not

2          on this document.  She doesn't know what

3          Joe meant.

4                    MR. KIEFFER:  I understand that.

5   BY MR. KIEFFER:

6          Q.    And, ma'am, believe me, if you

7   look at this and tell me I have no idea what's

8   being communicated here, I'll accept that.  I

9   took it from your last answer that you felt like

10  you could kind of interpret the gist of the

11  exchange here, so with that in mind, is that --

12  what's your understanding of what Mr. Tomkiewicz

13  is communicating he's willing to do?

14                    MS. HILLYER:  Same objections.

15                    THE WITNESS:  I don't know what

16          Joe -- Joe is saying my team is asking

17          is there a way to get Anda product

18          outside of this issue with Publix.

19  BY MR. KIEFFER:

20          Q.    And it appears that in the first

21  paragraph Mr. Tomkiewicz addresses that and says

22  with respect to whether the order could be split

23  so that Anda could receive a separate allotment,

24  he says, I told them I had no problem with that

Highly Confidential - Subject to Further Confidentiality Review

1    as long as Anda agreed that none of the product

2    would go to Publix until we gave them the okay,

3    right?

4                    MS. HILLYER:  Objection to form.

5                    THE WITNESS:  That's what the

6           e-mail says.

7    BY MR. KIEFFER:

8           Q.    Okay.  And at least his report at

9    that point is that Michelle Osmian was rather

10   adamant that we couldn't tell any of our

11   customers to restrict sales of any of our

12   product to any of their customers, at least

13   that's what he's written here, right?

14          A.    That's what he's written.

15          Q.    Okay.  Do have a specific

16   recollection of telling Michelle Osmian or

17   anyone on your staff that you could not tell any

18   of your customers to restrict sales of any of

19   Teva's product to any of their customers?

20          A.    I do not.

21          Q.    Is it possible you told her that?

22                    MS. HILLYER:  Objection to form,

23          calls for speculation.

24                    THE WITNESS:  I don't remember

Highly Confidential - Subject to Further Confidentiality Review

1          doing that.

2     BY MR. KIEFFER:

3          Q.     Ma'am, did I understand you

4     earlier to say that you don't know what

5     ultimately was done with respect to this Publix

6     order that had raised red flags and suspicious

7     order monitoring and prompted this exchange that

8     we've gone through?  You don't know what

9     ultimately was done with that order; is that

10    right?

11              MS. HILLYER:  Objection to form.

12              THE WITNESS:  I may have known at

13         the time.  I don't recall now.

14    BY MR. KIEFFER:

15         Q.     Okay.  Do you -- you don't know

16    whether Mr. Tomkiewicz or DEA compliance ever

17    received the written assurance that they had

18    asked for that Publix would not distribute

19    product to the nine suspicious locations, right?

20              MS. HILLYER:  Objection to form.

21              THE WITNESS:  I don't recall.

22    BY MR. KIEFFER:

23         Q.     You don't know whether DEA

24    compliance ever got the face-to-face meeting

```
 1    that they had requested with stakeholders at

 2    Publix to discuss Publix's due diligence efforts

 3    and diversion prevention and control program,

 4    right?

 5                    MS. HILLYER:  Objection to form.

 6                    THE WITNESS:  I do not recall.

 7    BY MR. KIEFFER:

 8         Q.    Were you aware that no report was

 9    ever made by Teva to the DEA that these orders

10    were suspicious?

11                    MS. HILLYER:  Objection to form.

12                    THE WITNESS:  I have no

13             visibility nor have ever had visibility

14             to which orders trigger reporting to the

15             DEA.

16    BY MR. KIEFFER:

17         Q.    Okay.  So your answer is if Teva

18    made -- if Mr. Tomkiewicz testified that Teva

19    never made a report to the DEA of a suspicious

20    order in relation to these prescribers that were

21    associated with Publix, today is the first time

22    you've heard that?

23         A.    Yes.

24                    MS. HILLYER:  Objection to form.
```

1             MR. KIEFFER:  Let's take a break

2       for a minute, if we can.

3             THE WITNESS:  To my recollection.

4             THE VIDEOGRAPHER:  Going off the

5       record at 5:15 p.m.

6             (Brief recess.)

7             THE VIDEOGRAPHER:  Back on the

8       record, the time is 4:24 p.m. --

9       5:24 p.m.

10  BY MR. MADDEN:

11       Q.    Ms. Baeder, I'm Brian Madden.  I

12  also represent the plaintiffs in this

13  litigation.  You have in your stack an Exhibit

14  18.  Could you pull that out, please, or look on

15  the screen, if it's easier for you.

16       A.    Give me a minute.  I can't read

17  that without my glasses, and I can't read that

18  with my glasses.

19       Q.    Okay.  All right.  As I

20  understand it, in your current role and for most

21  of your role with Teva, you've worked with the

22  generic products, correct?

23       A.    Correct.

24       Q.    And you're familiar in that role

Highly Confidential - Subject to Further Confidentiality Review

1    with the generic Teva products that are opioids,

2    right?

3            A.      I am.

4            Q.      Okay.  So we --

5            A.      In a general sense, yes.

6            Q.      All right.  So we have this

7    document 18 that has this paragraph at the

8    bottom that says "Teva products include" and

9    then it lists a bunch of products.

10                   Do you see those?

11           A.      Yes.

12           Q.      All right.  Do you recognize all

13   of those products as being either current or at

14   some time Teva opioid products?

15                   MS. HILLYER:  Objection to form.

16                   THE WITNESS:  I don't recognize

17           them all, but I recognize the vast

18           majority, although some are not generic.

19   BY MR. MADDEN:

20           Q.      Okay.  Some of those are branded?

21           A.      Correct.

22           Q.      All right.  One of the listed

23   products is oxycodone you talked about earlier,

24   correct?

```
 1            A.       Correct.

 2            Q.       And I believe in your earlier

 3   testimony, you identified oxycodone as a product

 4   that was manufactured by Purdue but marketed by

 5   Teva, correct?

 6                     MS. HILLYER:  Objection to form.

 7                     THE WITNESS:  Oxycodone ER, yes.

 8   BY MR. MADDEN:

 9            Q.       All right.  If you know, can you

10   tell me the business reason that Purdue would

11   manufacture oxycodone ER to be marketed by Teva

12   to third party buyers?

13                     MS. HILLYER:  Objection, calls

14            for speculation as to Purdue.

15                     THE WITNESS:  Yeah, I don't know

16            why Purdue would do that.

17   BY MR. MADDEN:

18            Q.       Does Purdue sell directly to

19   buyers its oxycodone ER generic?

20                     MS. HILLYER:  Objection, calls

21            for speculation.

22   BY MR. MADDEN:

23            Q.       To your knowledge?

24            A.       To my knowledge, no, I don't
```

Highly Confidential - Subject to Further Confidentiality Review

1    know.

2            Q.    You don't know one way or the

3    other?

4            A.    Yeah, I don't know.

5            Q.    You talked about the quotas that

6    the DEA has put into effect in recent times with

7    regard to opioids, right?

8            A.    We talked about DEA quota, yes.

9            Q.    Right.  Does Purdue manufacture

10   oxycodone ER and market it through Teva to avoid

11   those quotas?

12               MS. HILLYER:  Objection, calls

13         for speculation.

14               THE WITNESS:  I have no idea

15         what's involved in the rules around

16         getting quota granted.  It's never been

17         part of my job responsibility.

18   BY MR. MADDEN:

19           Q.    So are you telling me, as you sit

20   here today, all you know is that oxycodone ER is

21   manufactured by Purdue but marketed by Teva to

22   third party buyers; that's the extent of your

23   knowledge?

24               MS. HILLYER:  Objection to form,

1          mischaracterizes her testimony.

2                    THE WITNESS:  I know that Purdue

3          manufactures product, ships it to Teva,

4          and we sell it to buyers, yes.

5    BY MR. MADDEN:

6          Q.    So the question is why does

7    Purdue use Teva to market to those buyers as

8    opposed to marketing directly to those buyers;

9    do you know the answer to that question?

10                   MS. HILLYER:  Objection, calls

11         for speculation and now asked and

12         answered I think at least twice before,

13         but you can answer again.

14                   THE WITNESS:  I don't know why

15         Purdue chose to do that.

16   BY MR. MADDEN:

17         Q.    All right.  In this list of Teva

18   marketed generic products that we're looking at,

19   I see in the top line buprenorphine.  Do you see

20   that?

21         A.    Yes.

22         Q.    What is that product?

23         A.    Straight buprenorphine I'm not as

24   familiar with.  Buprenorphine Naloxone is for

Highly Confidential - Subject to Further Confidentiality Review

1   the treatment of addiction, I think

2   buprenorphine is too, but I'm not positive.

3          Q.     Buprenorphine is indicated for

4   the treatment of addiction to narcotics,

5   correct?

6                 MS. HILLYER:  Objection to the

7          extent it calls for speculation.

8                 THE WITNESS:  Again, I'm not as

9          familiar with straight buprenorphine.

10         Buprenorphine Naloxone is definitely

11         indicated for that.

12  BY MR. MADDEN:

13         Q.     All right.  And is that a product

14  that Teva markets?

15         A.     Yes.

16         Q.     Okay.  So Teva markets generic

17  opioids and a product that's indicated for the

18  treatment of addiction to those opioids,

19  correct?

20                MS. HILLYER:  Objection to form.

21                THE WITNESS:  Teva markets a

22         product for the treatment of opioids,

23         prescription or otherwise.

24  BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      For the treatment of opioid

2    addiction?

3          A.      Opioid addiction, prescription or

4    otherwise.

5          Q.      All right.  How about Naloxone,

6    do you know what that product is?

7          A.      It's in the same family.

8          Q.      Okay.  Do you recognize Naloxone

9    as being a reversal agent for opioid overdose?

10              MS. HILLYER:  Objection to form.

11              THE WITNESS:  Naloxone is used in

12         the treatment of opioids.  I don't know

13         that I would have known that it was for

14         overdose.

15   BY MR. MADDEN:

16         Q.      All right.  Have you ever heard

17   the term Narcan?

18         A.      I have.

19         Q.      What's Narcan?

20         A.      Narcan is a spray that is used

21   for the treatment of overdose.

22         Q.      All right.  Does Teva market any

23   product such as Narcan?

24              MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  I don't -- I don't

2        think there is a generic Narcan yet.

3    BY MR. MADDEN:

4        Q.    So this Buprenorphine and

5    Naloxone sublingual tablets, can you tell me

6    what that is?

7        A.    That's used for the treatment of

8    opioid addiction, to my knowledge.  Again, I'm

9    not a doctor, and my job is not specific to

10   product indication, so I have sort of a layman's

11   knowledge.

12       Q.    All right.  The second line we

13   have a product listed call Naloxone sublingual

14   tablets.  I'll represent to you that Naloxone is

15   another name for Narcan.

16           Are you familiar with that?

17           MS. HILLYER:  Objection, assumes

18       facts not in evidence.

19           THE WITNESS:  In a layman's

20       sense.

21   BY MR. MADDEN:

22       Q.    All right.  Does that indicate to

23   you that Teva markets an opioid reversal agent

24   in Naloxone sublingual tablets?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HILLYER:  Objection.

2          THE WITNESS:  In a layman's

3     sense.  I'm not familiar with the drug

4     specifically.

5  BY MR. MADDEN:

6          Q.    So would you agree with me that

7  Teva, at least according to this list, markets

8  generic opioids and also markets opioid reversal

9  agents and opioid addiction treatments that are

10 generics?

11         MS. HILLYER:  Objection to form.

12         THE WITNESS:  Yes.

13 BY MR. MADDEN:

14         Q.    And do you know what market share

15 Teva has with regard to those opioid reversal

16 agents and opioid addiction treatments in the

17 generic market?

18         A.    It would change month over month.

19         Q.    Can you give me a ballpark?

20         A.    No.

21         Q.    Who were your buyers of those

22 reversal agents and opioid treatment agents?

23         A.    I could not tell you specifically

24 which customers buy which products.

1      Q.      There was a unbranded marketing

2  campaign called Pain Matters.  Are you familiar

3  with that?

4      A.      I have a very, very limited

5  knowledge.  I am aware there was an unbranded

6  campaign.

7      Q.      Did you have any role or

8  responsibility with regard to the Pain Matters

9  campaign?

10      A.      No.

11      Q.      Did you ever gain an

12  understanding or did anybody ever tell you that

13  the Pain Matters campaign supported the generic

14  portfolio?

15          MS. HILLYER:  Objection, assumes

16      facts not in evidence.

17          THE WITNESS:  No, I'm not

18      familiar with it in that level of

19      detail.

20  BY MR. MADDEN:

21      Q.      The Vantrela ER was an abuse

22  deterrent opioid, correct?

23      A.      That's my understanding.

24      Q.      Right.  And from your earlier

1    testimony, I understand that Vantrela never

2    launched, correct?

3           A.     That's correct.

4           Q.     I have a PowerPoint here where

5    you're listed as being on the core team for

6    Vantrela ER strategic launch plan.

7                  Do you have a memory of being on

8    that core team?

9                  MS. HILLYER:  Objection, assumes

10          facts not in evidence and

11          mischaracterizes the document.

12                 THE WITNESS:  I remember

13          attending one workshop relative to

14          Vantrela ER.

15   BY MR. MADDEN:

16          Q.     All right.  There's also

17   reference to a advocacy summit.

18                 Do you recall participating in an

19   advocacy summit in 2013?

20                 MS. HILLYER:  Objection, assumes

21          facts not in evidence.

22                 THE WITNESS:  Again, I remember

23          one workshop.  I don't know which of

24          those forums it may have been, and there

1          were patients that came in to speak

2          about their legitimate pain and the

3          stigmatization associated with pain

4          patients, that was -- that they were

5          experiencing.

6     BY MR. MADDEN:

7          Q.     What role, if any, did you play

8     with regard to the alliance?

9               MS. HILLYER:  Objection to form.

10          What alliance?

11               THE WITNESS:  I don't know what

12          the alliance is.

13    BY MR. MADDEN:

14          Q.     I'm trying to get your witness

15    out of here, and you're objecting because I'm

16    not going through documents with her.  Do you

17    want me to go through documents with her?

18               MS. HILLYER:  You have seven

19          hours, you can do with it what you want.

20          I just --

21               MR. MADDEN:  Let's pull up

22          exhibit -- document number 1781.

23               (Document marked for

24          identification as Teva-Baeder Deposition

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Exhibit No. 36.)

 2   BY MR. MADDEN:

 3        Q.     All right, Ms. Baeder, I'm going

 4   to hand you Exhibit 36, which has a beginning

 5   Bates number of TEVA_MDL_A_08771331.

 6              MS. HILLYER:  Brian, do you have

 7         the cover e-mail to this?

 8              MR. MADDEN:  I do not, but I can

 9         show you where her name appears in here.

10   BY MR. MADDEN:

11        Q.     So, Ms. Baeder, I'm going to

12   point your attention to page 7, please.

13              Do you see there that you're

14   listed as part of the core team for Vantrela ER

15   Governance Structure?

16        A.     I do.

17              MS. HILLYER:  Objection to form.

18   BY MR. MADDEN:

19        Q.     What did you do as a member of

20   the core team for Vantrela ER?

21              MS. HILLYER:  Objection to form.

22              THE WITNESS:  Again, I don't have

23         any recollection of any Vantrela ER

24         meetings with the exception of one --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              one or one and a half day workshop.
2    BY MR. MADDEN:
3         Q.    Let's go to page 16 in this
4    exhibit, please.
5              Do you see the slide that says
6    "'Pain Matters' Impact"?
7         A.    Yes.
8         Q.    All right.  And then it lists the
9    Discovery Channel with a bar graph that says
10   "Efforts are being made to find now ways to
11   manage chronic pain."
12             Do you see that languages?
13        A.    I do.
14        Q.    Do you have an understanding that
15   the Pain Matters campaign addressed chronic
16   pain?
17             MS. HILLYER:  Objection.  Assumes
18        facts not in evidence, calls for
19        speculation, lack of foundation.
20             THE WITNESS:  Yeah, I don't, I
21        don't.
22   BY MR. MADDEN:
23        Q.    What chronic pain products did
24   Teva market in December of 2013 when this
```

1    PowerPoint was put together?

2             MS. HILLYER:  Objection.  Are you

3        talking about brand or generic?

4             MR. MADDEN:  Both.

5    BY MR. MADDEN:

6        Q.    What chronic pain --

7        A.    I don't have an appreciation of

8    which generic drugs are indicated for chronic

9    pain, if any.

10       Q.    Can you tell me what Teva branded

11   products were indicated for chronic pain in

12   December of 2013?

13       A.    I can't.  I'm not an expert on

14   the indications of our drugs.

15       Q.    Okay.  Let's go to page 31 of

16   this exhibit, please.

17            You see this slide has a

18   reference to the Alliance to Prevent the Abuse

19   of Medicines?

20       A.    I do.

21       Q.    Did you have any role with regard

22   to the Alliance?

23       A.    Not that I recall.

24       Q.    All right.  The Alliance lists

1    partners that include Cardinal Health, CVS

2    Caremark, Prime Therapeutics.

3              Do you see that?

4         A.    I do.

5         Q.    Those were, in your reference,

6    customers on the generic side, correct?

7              MS. HILLYER:  Objection to form.

8              THE WITNESS:  They are customers

9         on the generic side.

10   BY MR. MADDEN:

11        Q.    And as a person who is at a high

12   level on the generic side, you were never made

13   aware of this Alliance?

14              MS. HILLYER:  Objection to the

15        form.

16              THE WITNESS:  In 2000 and

17        whenever this was, '13 --

18   BY MR. MADDEN:

19        Q.    Right.

20        A.    -- there was a brand CEO and a

21   generic CEO, and there was very imperfect

22   communication across.  So I may have been aware,

23   but I don't remember having any action items,

24   and I don't recall at this point if I was aware

Highly Confidential - Subject to Further Confidentiality Review

```
1   or not.
2          Q.    Did you ever attend any Alliance
3   meetings with your customers?
4               MS. HILLYER:  Objection to form.
5               THE WITNESS:  Not that I recall.
6   BY MR. MADDEN:
7          Q.    Do you know what the function of
8   the Alliance was with regard to Teva and its
9   customers?
10              MS. HILLYER:  Objection, calls
11         for speculation.
12              THE WITNESS:  No, I don't recall.
13              MR. MADDEN:  Let's go to document
14         1876.
15              (Document marked for
16              identification as Teva-Baeder Deposition
17              Exhibit No. 37.)
18  BY MR. MADDEN:
19         Q.    Mark it as Exhibit 37.  It has a
20  Bates number of TEVA_MDL_A_12714027.
21              Ms. Baeder, do you see this
22  e-mail from Dolly Judge to you and others dated
23  October 26, 2017?
24         A.    Yes.
```

1    Q.    All right.  What was Ms. Judge's

2    role with the company?

3    A.    She works in government affairs.

4    Q.    The subject is "Trump Declaration

5    on Opioids."

6          Do you see that?

7    A.    Yes.

8    Q.    It then goes on to say, "The

9    President issued his long-awaited emergency

10   declaration on the opioid epidemic today.  As

11   you will recall, the Christie Commission on

12   Opioid Abuse recommended the President declare a

13   state of emergency on the epidemic of opioid

14   abuse to highlight the importance of the issue

15   and to focus government resources at solutions

16   and treatment."

17          It then goes on in the next

18   paragraph to discuss the amount of money that

19   has been spent at the federal level and the

20   funding levels of $1 billion on the opioid

21   crisis since the president took office with

22   roughly $500 million for drug addiction response

23   efforts.

24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      Do you recall receiving this

3   e-mail?

4      A.      I don't specifically recall.  I

5   was aware of the Christie Commission.

6      Q.      All right.  Did Ms. Judge or

7   anyone else within the company forward to you

8   the Christie Commission findings or the

9   President's report?

10     A.      I don't specifically remember

11  that.

12     Q.      Okay.

13     A.      It's possible.

14     Q.      It's possible.

15             Because at this time in October

16  of 2017, what's your role with the company?

17     A.      October of 2017, senior vice

18  president of customer marketing operations.

19     Q.      Okay.  And as a senior vice

20  president, you oversaw the generic portfolio

21  that included opioids, right?

22     A.      I oversaw certain functions in

23  regard to the generic portfolio.

24     Q.      And Ms. Judge included you on

1    this e-mail regarding the Trump declaration on

2    opioids, right?

3             A.      Yes.

4             Q.      Let's go to document 6002,

5    paragraph 8.

6                     (Document marked for

7             identification as Teva-Baeder Deposition

8             Exhibit No. 38.)

9    BY MR. MADDEN:

10            Q.      All right, Ms. Baeder, I hand you

11   Exhibit 38.  This is a copy of the President's

12   Commission on Combating Drug Addiction and the

13   Opioid Crisis, which includes the Christie

14   report.

15                    Have you seen any part of this

16   before today?

17            A.      I believe I have read some

18   excerpts.

19            Q.      Okay.

20            A.      I certainly have not read it

21   cover to cover.

22            Q.      All right.  And I'm not going to

23   ask you about the whole document, but some

24   excerpts, to be fair.

Highly Confidential - Subject to Further Confidentiality Review

1                    So let's go to Appendix 3 in this

2     document, which is at page 115.  Appendix 3 is

3     the interim report prepared by Governor

4     Christie's group.

5                    Have you -- is this part of what

6     you had read before today?

7          A.     I would have to read it all to

8     see if there are excerpts that are familiar.

9          Q.     Let me ask you about some

10    specific pieces of this to see whether you're

11    aware of it.

12                    In the third paragraph of page

13    115, it says, according to the Centers for

14    Disease Control, the most recent data estimates

15    that 142 Americans die every day from a drug

16    overdose.  Our citizens are dying.  We must act

17    boldly to stop it.  The opioid epidemic we are

18    facing is unparalleled.  The average American

19    would likely be shocked to know that drug

20    overdoses now kill more people than gun

21    homicides and car crashes combined.

22                    Do you see that language?

23         A.     Yes.

24         Q.     Have you seen that language

Highly Confidential - Subject to Further Confidentiality Review

1   before today?

2               MS. HILLYER:  Objection to form.

3               THE WITNESS:  No.

4   BY MR. MADDEN:

5       Q.    Okay.  Let's go further down in

6   that paragraph.  About three-quarters of the way

7   down, there's a sentence that says, "In 2015,

8   nearly two-thirds of drug overdoses were linked

9   to opioids like Percocet, OxyContin, heroin and

10  fentanyl."

11              How about that information, were

12  you aware of that before today?

13              MS. HILLYER:  Objection to form.

14              THE WITNESS:  No.

15  BY MR. MADDEN:

16      Q.    Okay.  And then the last sentence

17  says, "In fact, in 2015, the amount of opioids

18  prescribed in the US was enough for every

19  American to be medicated around the clock for

20  three weeks."

21              How about that information?

22              MS. HILLYER:  Objection to form.

23              THE WITNESS:  No.

24  BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1           Q.      Okay.  Would you agree that Teva

2    as a marketer of generic opioids contributes to

3    that amount --

4                   MS. HILLYER:  Objection.

5    BY MR. MADDEN:

6           Q.      -- of opioids which are

7    prescribed to medicate every American around the

8    clock for three weeks?

9                   MS. HILLYER:  Objection to form.

10                  THE WITNESS:  Teva does not

11          prescribe drugs.

12   BY MR. MADDEN:

13          Q.      Right.  Teva markets the drugs

14   that get prescribed to Americans, correct?

15                  MS. HILLYER:  Objection to form.

16                  THE WITNESS:  Teva generics

17          supplies drugs as an option in the

18          supply chain.

19   BY MR. MADDEN:

20          Q.      Right.  So Teva's in the supply

21   chain for opioids, correct?

22          A.      Correct.

23          Q.      And that supply chain, at least

24   in 2015, contributed enough opioids to medicate

Highly Confidential - Subject to Further Confidentiality Review

1    every American around the clock for three weeks.

2                    Do you see that information?

3                    MS. HILLYER:  Objection to form

4         and mischaracterizes the document.

5                    THE WITNESS:  I see the sentence

6         in the paragraph.

7    BY MR. MADDEN:

8         Q.    And my question to you is has

9    anyone at Teva informed you about that

10   information that we see here in this government

11   report?

12        A.    Not that specific statistic, no.

13        Q.    Let's go down to the next

14   sentence in that fourth paragraph.  It says,

15   "Since 1999, the number of opioid overdoses in

16   America have quadrupled according to the CDC.

17   Not coincidentally, in that same period, the

18   amount of prescription opioids in America have

19   quadrupled as well."

20                    You see that language?

21        A.    I do.

22        Q.    That correlation between opioid

23   prescriptions and opioid overdoses, has that

24   been brought to your attention before today by

1    Teva?

2                    MS. HILLYER:  Objection to form.

3                    THE WITNESS:  No.

4    BY MR. MADDEN:

5         Q.    Okay.  Let's go in this same

6    document to pages 20 and 21.  Start at page 20.

7                    The commission listed

8    "Contributors to the Current Crisis," and if you

9    look at the third bullet point on page 20, the

10   commission lists "the opioid pharmaceutical

11   manufacturing and supply chain industry" as a

12   contributor to the current crisis.

13                   Have you seen this before today?

14        A.    No.

15        Q.    In the last paragraph there on

16   page 20 it says, "To this day, the opioid

17   pharmaceutical industry influences the nation's

18   response to the crisis.  For example, during the

19   comment phase of the guideline developed by the

20   Centers for Disease Control and Prevention (CDC)

21   for pain management, opposition of the guideline

22   was more common among organizations with funding

23   from opioid manufacturers than those without

24   funding from the life sciences industry."

Highly Confidential - Subject to Further Confidentiality Review

1                    Do you see that?

2        A.      I see that.

3        Q.      Are you aware of whether Teva

4   directly or indirectly attempted to influence

5   those CDC guidelines for pain management?

6                MS. HILLYER:  Objection, calls

7           for speculation.

8                THE WITNESS:  Yeah, I have no

9           idea.

10  BY MR. MADDEN:

11       Q.      Do you recall receiving any

12  information about that?

13       A.      I don't recall that.

14               MR. MADDEN:  Okay.  Let's look at

15          document 1786.

16               (Document marked for

17          identification as Teva-Baeder Deposition

18          Exhibit No. 39.)

19  BY MR. MADDEN:

20       Q.      Hand you Exhibit 39.  Exhibit 39

21  is an e-mail string that includes you regarding

22  Teva response to CDC guidelines on chronic pain.

23               Do you recall this e-mail string

24  in September of 2015?

Highly Confidential - Subject to Further Confidentiality Review

1           A.      I don't recall.

2           Q.      If we look at page 1, in the

3     middle of page 1, there's an e-mail from Penny

4     Levin dated September 16, 2015 to you and others

5     regarding a teleconference regarding Teva's

6     response to CDC guidelines on chronic pain.

7                   Do you recall participating in

8     that teleconference?

9           A.      I don't recall.

10          Q.      Who is Ms. Levin?

11          A.      I don't know.

12          Q.      Don't know.

13                  It then says, "All, please find

14    attached the draft letter the Alliance to

15    Prevent Abuse of Medicine is preparing to submit

16    to CDC."

17                  Do you see that language?

18          A.      I do.

19          Q.      And then we have the attachment

20    further back at Bates number 03550273, you see a

21    September 17, 2015 attachment from the Alliance

22    to Prevent the Abuse of Medicines?

23          A.      I'm sorry, could you direct me

24    again.

```
 1              Q.      Sure.  It's the last three pages.

 2              A.      This?

 3              Q.      Yes.

 4              A.      Okay.

 5              Q.      Have you seen this letter before

 6     today as the attachment that was forwarded to

 7     you?

 8                      MS. HILLYER:  Take a minute to

 9              look it over.

10                      THE WITNESS:  I don't recall

11              seeing it.

12     BY MR. MADDEN:

13              Q.      If you received an e-mail like

14     this that asked you to review a document, would

15     you typically review it?

16                      MS. HILLYER:  Objection to form,

17              mischaracterizes the document.

18                      THE WITNESS:  I don't know how to

19              answer that question.

20     BY MR. MADDEN:

21              Q.      Okay.  You don't know one way or

22     the other today whether you reviewed this

23     attachment; is that your answer?

24              A.      That is my answer.
```

1      Q.    Okay.  If we go to the attachment

2  letter, the proposed letter that was forwarded

3  to you and look at the second paragraph, the

4  second sentence in that paragraph says, "The

5  current trajectory of nonmedical abuse of

6  prescription opioids, and the diversion of these

7  important medicines from their intended purpose,

8  is unacceptable."

9            Further down in that paragraph it

10  lists some statistics, and then it says, "These

11  statistics are troubling and we believe this is

12  a public health epidemic that must be addressed

13  with viable solutions take curb abuse and

14  overdose, while ensuring that patients in

15  legitimate need of pain medication have

16  appropriate access."

17            Do you see that?

18      A.    I do.

19      Q.    So there you would agree with me

20  that this proposed letter sent -- that was

21  proposed to be sent to the CDC identified the

22  opioid crisis as a public health epidemic; would

23  you agree with that?

24            MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  I agree that that's

2      what the letter says, but I don't -- I'm

3      not familiar with the National Center

4      for Injury Prevention and Control or the

5      Alliance to Prevent the Abuse of

6      Medicines.  I don't have any

7      recollection of that.

8  BY MR. MADDEN:

9      Q.    But you would agree with me that

10 the President's commission identified your

11 industry as a contributor to the opioid crisis

12 and included reference to opposition to the CDC

13 guidelines, which is what we have here in this

14 e-mail that was sent to you, right?

15          MS. HILLYER:  Objection,

16     mischaracterizes the document and lack

17     of foundation as to that document.

18          THE WITNESS:  Yeah, I -- before I

19     could answer that, I would really need

20     to read this completely, as well as this

21     report completely.

22 BY MR. MADDEN:

23     Q.    Okay.  Well, let's go to page 2

24 of this letter, proposed letter, which is Bates

1    number 03550274, and about three-quarters of the

2    way down it says, "As you may know, the Alliance

3    has released a solutions framework and has been

4    in dialogue with policymakers about our

5    framework and how to build these foundational

6    elements into a comprehensive approach to

7    address prescription drug abuse.  The Alliance's

8    framework includes the following, and we hope to

9    have an opportunity to discuss these concepts

10   and others in more detail with you in the

11   context of opioid prescribing guidelines," and

12   then it lists some bullet points.  The third

13   bullet point is a "deployment of abuse deterrent

14   technology," right?

15            A.     Yes.

16            Q.     And Teva had been working on

17   abuse deterrent technology in the form of

18   Vantrela ER, right?

19            A.     Yes.

20            Q.     They didn't launch Vantrela ER,

21   did they?

22            A.     No.

23            Q.     And you were listed on the

24   PowerPoint as a core team member for Vantrela,

1    right?

2              MS. HILLYER:  Objection to form.

3              THE WITNESS:  I'm listed on a

4         PowerPoint, correct.

5    BY MR. MADDEN:

6         Q.    Right, and as a core -- well, you

7    were listed as a core team member, right?

8              MS. HILLYER:  Objection, lack of

9         foundation as to the document.  There

10        was no indication that she saw it,

11        received it, wrote it, that it was

12        final, anything.

13   BY MR. MADDEN:

14        Q.    Were you or were you not listed

15   as a core team member for Vantrela ER?

16             MS. HILLYER:  Same objections.

17   BY MR. MADDEN:

18        Q.    On that document we looked at?

19        A.    Again, I remember one workshop, a

20   day, a day and a half relative to Vantrela ER.

21        Q.    Okay.  So as a core team member

22   for the Vantrela ER product, which was designed

23   to address the opioid crisis, you went to a day

24   or a day and a half workshop; is that your

1    testimony?

2                    MS. HILLYER:  No,

3            mischaracterizes her testimony, assumes

4            facts not in evidence.

5    BY MR. MADDEN:

6            Q.     Did you do anything with regard

7    to Vantrela ER other than go to a day or day and

8    a half meeting?

9            A.     Not that I can recall now.

10           Q.     All right.  Let's -- if you will,

11   let's go back to the President's commission

12   report, page 6.  The top paragraph on page 6,

13   this is in Governor Christie's letter to the

14   president says, "You've met hundreds of parents

15   who have buried their children, so these numbers

16   are no longer simply statistics.  Instead, they

17   represent the injured student-athlete who

18   becomes addicted after first prescription,

19   ending her academic and athletic career, the

20   newborn infant who is red and screaming from

21   withdrawal pain, the grandparents using their

22   retirement savings to raise young kids when the

23   parents can't, the mom who just buried her only

24   son, and the addict who cycles in and out of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    jail, simply because without access to treatment

 2    he is unable to stay sober and meet the terms of

 3    his parole."

 4               You see that language?

 5    A.    I do.

 6    Q.    Do you personally know any of

 7    those stories?

 8               MS. HILLYER:  Objection to form.

 9    BY MR. MADDEN:

10    Q.    With regard to opioids?

11    A.    Directly?

12    Q.    Yes.

13    A.    No.

14    Q.    Have you heard of that indirectly

15    of families who are dealing with those issues

16    with regard to opioids?

17               MS. HILLYER:  Objection to form,

18          vague.

19               THE WITNESS:  I have heard

20          stories.

21    BY MR. MADDEN:

22    Q.    Okay.

23    A.    I don't specifically ask if, you

24    know -- if it's an opioid addiction.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  Well, sounds to me

2   like you grew up in Ohio, right?

3            MS. HILLYER:  Objection to form.

4            THE WITNESS:  I lived in Ohio

5        until I was four and then moved back to

6        Ohio when I was 16ish.

7   BY MR. MADDEN:

8    Q.    And you lived in the Dayton area

9   at some point?

10    A.    I lived in the Dayton area after

11   I graduated college.

12    Q.    Have you been back to Dayton in

13   the last ten years?

14    A.    No.

15    Q.    Do you understand Dayton is hard

16   hit by the opioid crisis?

17            MS. HILLYER:  Objection to form

18        and assumes facts not in evidence.

19            THE WITNESS:  I have no existing

20        relationship with Dayton or people in

21        Dayton.

22   BY MR. MADDEN:

23    Q.    Do you understand Ohio, in

24   general, is hard hit by the opioid crisis?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HILLYER:  Same objections.

 2                    THE WITNESS:  Yeah, I don't have

 3           any knowledge of relative impact state

 4           by state.

 5                    MR. MADDEN:  Let's go to page 7

 6           of the President's report.

 7   BY MR. MADDEN:

 8           Q.    At page 7, and I'll point you

 9   below the bullet point, first full paragraph,

10   the last sentence says, "We recommended that all

11   law enforcement officers across the country be

12   equipped with life-saving naloxone."

13           A.    I'm sorry.  I'm not following,

14   where are you?

15           Q.    I'm on page 7.

16           A.    Yes.

17           Q.    First full paragraph after the

18   bullet point.

19           A.    Our interim -- okay, okay.

20           Q.    So the last recommendation in

21   that paragraph is "We recommended that all law

22   enforcement officers across the country be

23   equipped with life-saving naloxone."

24                    Do you see that language?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      I do.

2              Q.      And we saw in the earlier

3    document that Teva markets a generic naloxone,

4    correct?

5                      MS. HILLYER:  Objection to form.

6                      THE WITNESS:  Teva sells generic

7              naloxone, yes.

8    BY MR. MADDEN:

9              Q.      And Teva sells generic naloxone

10   to whom, to your knowledge?

11                     MS. HILLYER:  Objection, asked

12             and answered and calls for speculation.

13             She testified she doesn't know.

14                     THE WITNESS:  Yeah, I cannot

15             speak to which customers buy which

16             products.  It changes all of the time.

17   BY MR. MADDEN:

18             Q.      But, as we discussed earlier,

19   naloxone is an opioid reversal agent that if

20   somebody is overdosing can help them survive.

21   You understand that, right?

22                     MS. HILLYER:  Objection, assumes

23             facts not in evidence and asked and

24             answered and calls for speculation.  She
```

```
 1              testified she doesn't know the details.

 2     BY MR. MADDEN:

 3              Q.      You told me as a layperson you

 4     understand that's what naloxone does, right?

 5              A.      I know that's what Narcan does.

 6                      MS. HILLYER:  Mischaracterizes

 7              her testimony.

 8     BY MR. MADDEN:

 9              Q.      Let me ask you this:  We clearly

10     have an opioid crisis in the country.  Teva

11     markets opioids.  Teva markets drugs to treat

12     opioid addiction, and Teva markets opioid

13     reversal agents like naloxone.  The President's

14     commission has recommended that all law

15     enforcement officers across the country be

16     equipped with life-saving naloxone.

17                      Has Teva ever discussed with you

18     providing that life-saving naloxone to law

19     enforcement free of charge?

20                      MS. HILLYER:  Objection to the

21              soliloquy on the record and objection to

22              form.

23                      THE WITNESS:  To specifically law

24              enforcement?
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MADDEN:

2         Q.    To anyone.

3              THE WITNESS:  That's privileged,

4         right?

5              MS. HILLYER:  So I'll instruct

6         the witness not to disclose

7         communications she may have had with

8         counsel.  If she can answer the question

9         without divulging privileged

10        communications, to the extent she's had

11        those, she can answer.  If she cannot,

12        then she should not answer the question.

13   BY MR. MADDEN:

14        Q.    I won't get into privilege with

15   you, but I want to ask you some background

16   questions.

17        A.    Okay.

18        Q.    So I agree with your counsel, you

19   should not tell me anything that you discussed

20   with lawyers, all right?

21        A.    Okay.

22        Q.    First question, had there been

23   meetings, to your knowledge, or in which you

24   participated regarding the subject of providing

Highly Confidential - Subject to Further Confidentiality Review

```
 1   naloxone free of charge to law enforcement or

 2   EMTs or anyone, have there been meetings?  I

 3   don't want to know what was said, I just want to

 4   know, have there been meetings?

 5            MS. HILLYER:  Hold on.  If there

 6        are privileged meetings, I don't want

 7        her talking about that either.

 8            MR. MADDEN:  I think I'm entitled

 9        to know whether there were meetings.  I

10        may not be entitled to know the subject

11        matter.

12            MS. HILLYER:  That is the subject

13        matter.  If you're not entitled to know

14        the subject matter, you're asking this

15        is the subject matter, did you have

16        meetings about that?  I'm going to

17        instruct her not to answer that.

18   BY MR. MADDEN:

19        Q.    Are you following your attorney's

20   instruction not to answer that question?

21        A.    Yes.

22        Q.    At these meetings -- well, strike

23   that.

24              Have you engaged in any
```

1    conversations with regard to the provision of

2    naloxone to law enforcement or healthcare

3    providers or anyone free of charge at which no

4    lawyers were present in those conversations?

5                MS. HILLYER:  Well, hold on.

6            That could have been at the direction of

7            counsel as well, so if you want to give

8            me a minute, we can go off the record

9            and I can discuss this with her, but,

10           again, if it's at the direction of

11           counsel, it's just as privileged.

12               MR. MADDEN:  I can ask the

13           question a different way then to

14           encompass the work product privilege

15           too.

16               MS. HILLYER:  Okay.

17   BY MR. MADDEN:

18           Q.    So, Ms. Baeder, have you been

19   involved in any conversations with regard to the

20   provision of naloxone free of charge in which,

21   A, no attorneys were involved in that

22   conversation or, B, no attorney told you to

23   engage in that conversation?

24               MS. HILLYER:  And if you need to

```
 1              discuss with me whether something

 2              crosses one of that lines, this is one

 3              of the times we can go off the record

 4              while a question is pending and discuss

 5              that so that you do not reveal

 6              attorney-client privilege.

 7                   THE WITNESS:  Yeah, maybe just to

 8              clarify.

 9                   MS. HILLYER:  Okay.  Let's go off

10              the record.

11                   MR. MADDEN:  Let's take a break.

12                   THE VIDEOGRAPHER:  Going off the

13              record at 6:04 p.m.

14                   (Brief recess.)

15                   THE VIDEOGRAPHER:  Back on the

16              record at 6:05 p.m.

17                   MS. HILLYER:  Do you want to just

18              read the question back.

19                   MR. MADDEN:  I think I can do it

20              off the screen here, so I'm going to

21              reask my question.

22     BY MR. MADDEN:

23              Q.    The question was so, Ms. Baeder,

24     have you been involved in any conversations with
```

1   regard to the provision of naloxone free of

2   charge in which, A, no attorneys were involved

3   in that conversation or, B, no attorney told you

4   to engage in that conversation?

5           A.     No.

6           Q.     So with regard to any

7   conversations that are responsive to that

8   question, are you going to refuse to answer on

9   the advice of counsel?

10              MS. HILLYER:  Her answer was not

11          irresponsive, so she answered no.

12              MR. MADDEN:  Right.  Good point.

13  BY MR. MADDEN:

14          Q.     So let me ask you this:  Have you

15  been involved in conversations with regard to

16  the provision of naloxone free of charge, yes or

17  no?

18              MS. HILLYER:  I'm going to --

19          you've asked this question.  I have

20          instructed her not to answer to the

21          extent it involves counsel.  You've

22          clarified that the only conversations --

23          that any conversation -- you've

24          clarified she has not had such

Highly Confidential - Subject to Further Confidentiality Review

```
 1              conversations that were not either with

 2              counsel or at the direction of counsel,

 3              so I mean I don't know why you want to

 4              keep pushing on the privilege issue,

 5              she's -- I'm instructing her not to

 6              answer any more on this.

 7   BY MR. MADDEN:

 8         Q.    And are you following your

 9   attorney's instruction not to answer that

10   question, Ms. Baeder?

11         A.    Yes.

12              MR. MADDEN:  Okay, that's all I

13              have.  Thank you.

14              MS. HILLYER:  Sorry, I didn't

15              realize we were totally at the end.  I

16              need to grab my computer.

17              THE VIDEOGRAPHER:  Going off the

18              record at 6:07 p.m.

19              (Brief recess.)

20              THE VIDEOGRAPHER:  We're back on

21              the record at 6:13 p.m.

22   BY MS. HILLYER:

23         Q.    Ms. Baeder, earlier during the

24   day if you had used the word promotion in the
```

```
 1    context of generics, can you explain what you

 2    mean?

 3          A.      Generics provides pricing and

 4    generic provides availability information.

 5          Q.      Do you believe that Teva promotes

 6    generic medications to physicians?

 7          A.      No.

 8          Q.      Why not?

 9          A.      The decision-maker in generic

10    procurement is not the physician.  It's the

11    officer at a corporate retail chain.

12          Q.      And is the same true for generic

13    opioid medications, Teva does not promote to

14    physicians?

15          A.      Correct, yes.

16          Q.      Does Teva promote generic

17    medications to patients?

18          A.      No.

19          Q.      Why not?

20          A.      The economics of the generic

21    products don't support the generally very

22    expensive interfaces to reach patients.

23          Q.      And is the same true for generic

24    opioid medications?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And you mentioned that as for

3  generics, Teva engages in product availability

4  and pricing type of marketing; is that right?

5    A.    Correct.

6    Q.    Is that different from what you

7  understand the brand side does in terms of

8  marketing?

9    A.    Yes.

10   Q.    Does Teva have a marketing budget

11 for its generic opioid medications?

12   A.    Not a specific budget for generic

13 opioids.

14   Q.    But does it have a marketing

15 budget for generics generally?

16   A.    It has a small marketing budget

17 for generics generally.

18   Q.    And what is that budget for?

19   A.    That budget is for support of

20 availability messaging, a limited number of

21 journal advertisements around availability

22 messaging, as well as coupons, programs for some

23 limited generic products where it's deemed

24 appropriate.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Does Teva USA provide any

 2      messages concerning safety or efficacy of its

 3      generic opioids?

 4              A.      No.

 5              Q.      To your knowledge, has it ever?

 6              A.      No, not to my knowledge.

 7              Q.      Does Teva USA sponsor any

 8      continuing medical education programs for

 9      generic opioids?

10              A.      Not to my knowledge.

11              Q.      Has it ever?

12              A.      No.

13              Q.      Does Teva USA's budget for

14      generics include sponsoring any pain-related

15      trade associations?

16              A.      Not to my knowledge.

17              Q.      Has it ever?

18              A.      No.

19              Q.      Has Teva USA ever sponsored any

20      key opinion leaders to conduct speaker or other

21      programs to a generic -- for its generic

22      opioids?

23              A.      Not to my knowledge.

24              Q.      Has it ever?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      No.
 2           Q.      Does Teva USA engage in any
 3    promotional activity for its generic opioid
 4    medications?
 5           A.      No.
 6           Q.      Do generic manufacturers create
 7    the market for generic opioids?
 8           A.      No.
 9           Q.      Do you believe that Teva has
10    always abided by any relevant guideline,
11    statutes and regulations?
12           A.      Yes.
13           Q.      Do you believe that Teva puts
14    safety above profit?
15           A.      Yes.
16           Q.      What percentage of the generic
17    portfolio consists of opioids products?
18           A.      Less than 5%.
19           Q.      Has it ever been more than that
20    since you've been there?
21           A.      Not to my recollection.
22           Q.      Even after the Actavis
23    acquisition?
24           A.      No.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Have you ever demanded that a --

2    any customer order be released by the SOM team?

3          A.      No.

4          Q.      Did you ever bully anyone in the

5    SOM team into releasing any order from any

6    customer?

7          A.      No.

8          Q.      Did you ever verbally abuse any

9    SOM people?

10         A.      Not that I remember.

11         Q.      Did you ever tell anyone on the

12   SOMS team -- and by "SOMS team" you understand I

13   mean the DEA compliance team or whatever the

14   title was at the time?

15         A.      Correct.

16         Q.      Did you ever tell anyone on that

17   team that they couldn't have certain

18   information?

19         A.      No.

20         Q.      Did you ever tell anyone on that

21   team that they couldn't get certain information

22   from a customer?

23         A.      No.

24         Q.      And who is the ultimate

1    decision-maker as to whether orders from a

2    customer can or cannot be released concerning

3    DEA compliance?

4         A.    The SOMS team or TGO management.

5         Q.    And to the extent there was any

6    friction, as I think that term was used earlier,

7    concerning Publix, as we looked at certain

8    exhibits earlier today, what was your

9    understanding of the reason for that?

10        A.    The tone in which the customer

11   was being characterized and approached.

12        Q.    Was there friction because it was

13   at the time of a launch?

14        A.    No.

15        Q.    Could you have stopped Joe

16   Tomkiewicz or anyone else from the DEA

17   compliance team from talking to a customer?

18        A.    No.

19        Q.    Do you believe that the Teva SOM

20   program has always adhered to any relevant

21   guidelines, regulations or statutes?

22        A.    Yes.

23        Q.    Was that true before the Cephalon

24   acquisition?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yes.

 2              Q.     Was that true after the Cephalon

 3   acquisition?

 4              A.     Yes.

 5              Q.     Was that true before the Actavis

 6   acquisition?

 7              A.     Yes.

 8              Q.     Was that true after the Actavis

 9   acquisition?

10              A.     Yes.

11              Q.     Were you a core team member for

12   Vantrela?

13              A.     I don't recall.

14              Q.     Could the PowerPoint have been

15   wrong?

16              A.     Yes.

17                     MS. HILLYER:  I have no further

18          questions at this time.

19                     THE VIDEOGRAPHER:  Going off the

20          record --

21                     MR. KIEFFER:  I have some

22          follow-up.

23                     MS. HILLYER:  He may have some

24          redirect.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KIEFFER:

2         Q.    Ms. Baeder, I've got a follow-up

3    to a few of those.

4              Your counsel asked you if you had

5    ever verbally abused any SOMS team member, and

6    your answer was not that I recall, correct?

7         A.    Correct.

8         Q.    All right.  Just to make sure

9    that things haven't gotten lost in the shuffle,

10   you recall from our fairly extended discussion

11   of e-mails, Mr. Tomkiewicz reported that, at

12   least in his view, he had been verbally abused

13   or berated by you in connection with a phone

14   call that you all had together, correct?

15             MS. HILLYER:  Objection to form.

16             THE WITNESS:  That is what the

17        e-mail states.

18   BY MR. KIEFFER:

19        Q.    Right, and that's the phone call

20   that you testified repeatedly earlier you don't

21   have any memory of one way or the other, right?

22        A.    I do not.

23        Q.    All right.  So if Mr. Tomkiewicz

24   testified under oath that, indeed, he was

Highly Confidential - Subject to Further Confidentiality Review

1    verbally abused and berated by you and you have

2    testified under oath repeatedly you just don't

3    have a memory of the phone call, that's kind of

4    the record we're left with, right?

5              MS. HILLYER:  Objection to form.

6              THE WITNESS:  Yeah, I don't

7         remember the phone call.

8    BY MR. KIEFFER:

9         Q.    All right.  Your counsel asked

10   you if you had ever demanded that any customer

11   order be released by the SOMS team.

12              Do you recall that question?

13        A.    Yes.

14        Q.    And you answered no, right?

15        A.    Yes.

16        Q.    Okay.  That's the same discussion

17   with Mr. Tomkiewicz on that same phone call that

18   we discussed earlier, right?

19              MS. HILLYER:  Objection to form.

20              THE WITNESS:  I don't remember

21        that piece exactly.

22   BY MR. KIEFFER:

23        Q.    Okay.  You don't recall

24   specifically whether you urged members of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    SOMS team to release an order to Publix or not,

 2    right, because you've only got a memory of the

 3    issue at a high level?

 4         A.    At a macro level, yes.

 5         Q.    Okay.  Your counsel asked you do

 6    generic manufacturers create the market for

 7    generic opioids, and your answer was no; am I

 8    correct?

 9         A.    Yes.

10         Q.    In fact, the market for generic

11    opioids was created by the brand opioid

12    manufacturers, wasn't it?

13              MS. HILLYER:  Objection, assumes

14         facts not in evidence.

15              THE WITNESS:  No, that would not

16         be my opinion.

17    BY MR. KIEFFER:

18         Q.    Well, when you launch a generic

19    opioid, typically, it's effectively a clone or

20    an equivalent of a branded product; is it not?

21              MS. HILLYER:  Objection to form.

22              THE WITNESS:  It's an FDA A/B

23         rated substitutable product, correct.

24    BY MR. KIEFFER:
```

1    Q.    Right, right, and people that buy

2    them from you, these wholesalers, these buying

3    groups, the WBADs, the Cardinals, the McKessons,

4    they're certainly already familiar with those

5    products from their experience of many years

6    with the same product on the branded side,

7    right?  You're not introducing a new mouse trap

8    to them; they already knew what oxycodone is,

9    right?

10             MS. HILLYER:  Objection to form.

11             THE WITNESS:  Yes.

12   BY MR. KIEFFER:

13   Q.    Okay.  Same thing with

14   prescribing doctors, right?  I mean, when Teva

15   introduced oxycodone, when it introduced, for

16   example, the generic Actiq lozenge -- the

17   generic version of the Actiq lozenge we talked

18   about earlier, you recall that discussion,

19   right?

20   A.    Yes.

21   Q.    Those weren't new products to

22   prescribing physicians, they were already aware

23   of them by virtue of experiences they'd had on

24   the branded side with equivalent products,

1    right?

2                    MS. HILLYER:  Objection to form.

3                    THE WITNESS:  Yes.

4    BY MR. KIEFFER:

5         Q.    Okay.  So to the extent that

6    promotional and marketing efforts by companies

7    who market branded opioids, including Teva,

8    create market awareness and propensities on the

9    part of prescribers to prescribe those

10   medications, folks who market FDA equivalent

11   generic medicine certainly benefit from those

12   efforts; do they not?

13                   MS. HILLYER:  Objection to form

14        and calls for an opinion.

15                   THE WITNESS:  Yeah, I -- I don't

16        know.

17   BY MR. KIEFFER:

18        Q.    You don't have to market generic

19   opioids at Teva on the generic side of the

20   business if the folks on the branded side have

21   already created and developed the market for the

22   FDA equivalent product, do you?

23                   MS. HILLYER:  Objection, assumes

24        facts not in evidence.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  I don't know
 2           that -- and I'm not an expert on brand
 3           marketing or promotion, but I --
 4           prescription pharmaceuticals meet a need
 5           of a patient as determined by a
 6           healthcare professional.
 7    BY MR. KIEFFER:
 8           Q.    Well, you would certainly hope
 9    so, right?
10                  MS. HILLYER:  Objection to form.
11                  THE WITNESS:  That would be my
12           opinion.
13    BY MR. KIEFFER:
14           Q.    All those doctors we went through
15    down in Florida and all those pill mills
16    certainly wouldn't fit that description that you
17    just gave to the jury now, would they?
18                  MS. HILLYER:  Objection to form
19           and calls for an opinion.
20                  THE WITNESS:  Right.
21    BY MR. KIEFFER:
22           Q.    Okay.  You agree?
23           A.    The appropriate use of
24    prescription pharmaceuticals meets a need of a
```

Highly Confidential - Subject to Further Confidentiality Review

1   patient as determined by a healthcare

2   professional.

3         Q.    Okay.  Fair enough, and I don't

4   think we actually disagree on that point.  But

5   my partner Mr. Madden over here spent a bit of

6   time going through the President's report on the

7   opioid crisis.

8         You recall that?

9         A.    Yes.

10        Q.    And there was a whole lot of

11   discussion and data in that report about the

12   inappropriate use of prescription opioids,

13   correct?

14         MS. HILLYER:  Objection to form

15      and mischaracterizes the document.

16         THE WITNESS:  Again, I'd have to

17      read the whole report.

18   BY MR. KIEFFER:

19        Q.    Okay.  Well, certainly there was

20   reference in there to things that did not appear

21   to be appropriate prescribing of opioids, right?

22         MS. HILLYER:  Objection,

23      mischaracterizes the document.

24         THE WITNESS:  Again, I'd really

```
 1              need to read the document to agree or

 2              not agree.

 3                   MR. KIEFFER:  Okay.  Those are

 4              all the questions I've got.  Thank you.

 5                   MS. HILLYER:  Just one quick

 6              follow-up, Ms. Baeder.  I'm sorry.

 7    BY MS. HILLYER:

 8         Q.   Is it possible that you and Mr.

 9    Tomkiewicz have different interpretations or

10    impressions of a conversation that you had or

11    interactions you may have had?

12         A.   Absolutely.

13                   MS. HILLYER:  Nothing further.

14    BY MR. KIEFFER:

15         Q.   I got to follow up on that.

16              If you've got no memory of your

17    phone call with Mr. Tomkiewicz, you've got no

18    interpretation or impression of that phone call,

19    correct, other than blank slate, right?

20                   MS. HILLYER:  Objection to form.

21                   THE WITNESS:  I would think that

22              if I bullied someone or berated someone,

23              that I would remember.

24    BY MR. KIEFFER:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Okay.  But be that as it may, you

 2    don't have any memory of the call?

 3              A.      I don't.

 4              MR. KIEFFER:  All right.  That's

 5         all I've got.  Ma'am, thank you for your

 6         time today.

 7              THE VIDEOGRAPHER:  This ends

 8         today's deposition.  We're going off the

 9         record at 6:26 p.m.

10              (Witness excused.)

11                        — — —

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T I O N

 2                   I, MARGARET M. REIHL, a

 3         Registered Professional Reporter,

 4         Certified Realtime Reporter, Certified

 5         Shorthand Reporter, Certified LiveNote

 6         Reporter and Notary Public, do hereby

 7         certify that the foregoing is a true and

 8         accurate transcript of the testimony as

 9         taken stenographically by and before me

10         at the time, place, and on the date

11         hereinbefore set forth.

12                   I DO FURTHER CERTIFY that I

13         am neither a relative nor employee nor

14         attorney nor counsel of any of the

15         parties to this action, and that I am

16         neither a relative nor employee of such

17         attorney or counsel, and that I am not

18         financially interested in the action.

19

20

21    -------------------------------

      Margaret M. Reihl, RPR, CRR, CLR

22    CSR #XI01497  Notary Public

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -   -   -   -

 2                     E  R  R  A  T  A

 3                    -   -   -   -   -   -

 4     PAGE   LINE   CHANGE

 5     _____  _____  _____

 6     REASON:  _____

 7     _____  _____  _____

 8     REASON:  _____

 9     _____  _____  _____

10     REASON:  _____

11     _____  _____  _____

12     REASON:  _____

13     _____  _____  _____

14     REASON:  _____

15     _____  _____  _____

16     REASON:  _____

17     _____  _____  _____

18     REASON:  _____

19     _____  _____  _____

20     REASON:  _____

21     _____  _____  _____

22     REASON:  _____

23     _____  _____  _____

24     REASON:  _____
```

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3              I, CHRISTINE BAEDER, do hereby

 4         certify that I have read the foregoing

 5         pages, and that the same is a correct

 6         transcription of the answers given by me

 7         to the questions therein propounded,

 8         except for the corrections or changes in

 9         form or substance, if any, noted in the

10         attached Errata Sheet.

11

12

13

       _____

14   CHRISTINE BAEDER          DATE

15

     Subscribed and sworn to before me this

16

     _____ day of _____, 2019.

17

     My commission expires:_____

18

19   _____

     Notary Public

20

21

22

23

24
```