Page 1

1           UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF OHIO
3               EASTERN DIVISION
4           ~~~~~~~~~~~~~~~~~~~~~
5   IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
    OPIATE LITIGATION
6                               Case No.
                                17-md-2804
7
                                Judge Dan Aaron
8                               Polster
9   This document relates to:
10  The County of Cuyahoga v. Purdue Pharma, et
    al., Case No. 17-OP-45004
11
    City of Cleveland, Ohio v. Purdue Pharma L.P.,
12  et al., Case No. 18-OP-45132
13  The County of Summit, Ohio, et al. v. Purdue
    Pharma L.P., et al., Case No. 18-OP-45090
14
            ~~~~~~~~~~~~~~~~~~~~~
15
16
            Videotaped Deposition of
17               HYLTON E. BAKER
18             December 19, 2018
                  9:08 a.m.
19
20                 Taken at:
21             Sheraton Suites Akron
           1989 Front Street - Portage Room
22             Cuyahoga Falls, Ohio
23
24
            Stephen J. DeBacco, RPR

Page 2

1 APPEARANCES:
2
   On behalf of the City of Akron and Summit
3 County:
4    Motley Rice LLC, by
      JAMES W LEDLIE, ESQ
5    CAROLINE RION, ESQ
      28 Bridgeside Boulevard
6    Mt Pleasant, South Carolina 29464
      (843) 216-9252
7    jledlie@motleyrice.com
      (843) 216-9168
8    crion@motleyrice.com
9
10 On behalf of McKesson Corporation:
11    Covington & Burling, by
      JENNIFER SAULINO, ESQ
12    One CityCenter
      850 Tenth Street Northwest
13    Washington, D C 20001-4956
      (202) 662-5305
14    jsaulino@cov.com
15    -and-
16    Covington & Burling LLP, by
      BRYANT E PULSIPHER, ESQ
17    One Front Street
      San Francisco, California 94111-5356
18    (415) 591-7055
      bpulsipher@cov.com
19
        ~ ~ ~ ~ ~
20
21
22
23
24
25

Page 3

1 APPEARANCES, Continued:
2
   On behalf of Endo Health Solutions, Inc ,
3 and Endo Pharmaceuticals, Inc :
4    Baker Hostetler, by
      RUTH E HARTMAN, ESQ
5    TERA N COLEMAN, ESQ
      Key Tower
6    127 Public Square, Suite 2000
      Cleveland, Ohio 44114-1214
7    (216) 861-7309
      rhartman@bakerlaw.com
8    (216) 861-7582
      tcoleman@bakerlaw.com
9
10 On behalf of Walmart, Inc :
11    Jones Day, by
      LISA B GATES, ESQ
12    North Point
      901 Lakeside Avenue
13    Cleveland, Ohio 44114-1190
      (216) 586-7154
14    lgates@jonesday.com
15
   On behalf of Walgreens, via
16 Teleconference:
17    Bartlit Beck LLP, by
      MATTHEW BREWER, ESQ
18    54 West Hubbard Street
      Chicago, Illinois 60654
19    (312) 494-4432
      batthew.brewer@bartlitbeck.com
20
        ~ ~ ~ ~ ~
21
   ALSO PRESENT:
22
      Kurt Henschel, Legal Videographer
23
        ~ ~ ~ ~ ~
24
25

Page 4

1        TRANSCRIPT INDEX
2
3 APPEARANCES.............................  2
4
5 INDEX OF EXHIBITS .......................  5
6
7 EXAMINATION OF HYLTON E. BAKER
8 By Ms. Saulino...........................  13
9 By Mr. Pulsipher.........................  265
10 By Ms. Hartman...........................  303
11 By Ms. Gates.............................  340
12
13 REPORTER'S CERTIFICATE...................  345
14
15 EXHIBIT CUSTODY
16 EXHIBITS RETAINED BY THE COURT REPORTER
17
18
19
20
21
22
23
24
25

Page 5

1        INDEX OF EXHIBITS
2 NUMBER      DESCRIPTION      MARKED
3 Exhibit 1 Cleveland Plain Dealer      134
      Article Titled "The Comeback
4    Drug; Police, Social Workers
      Fear Heroin 'Epidemic'"
5
   Exhibit 2 Document Titled "Drug Threat 163
6    Assessment, Summit County,
      Ohio," SUMMIT_000023567 to
7    00023648
8 Exhibit 3 Document Titled "2009 Annual 191
      Report," SUMMIT_000830645 to
9    000830682
10 Exhibit 4 11/1/2010 E-Mail from Hylton 193
      Baker Re: Heroin Epidemic in
11    Akron, OH, SUMMIT_001009696
      to 001009697
12
13 Exhibit 5 Summit County and City of   224
      Akron, Ohio Plaintiff First
14    Amended Responses and
      Objections To Distributor
15    Defendants' First Set of
      Interrogatories
16 Exhibit 6 12/15/2010 E-Mail Chain Re: 240
      HIDTA Information Sharing
17    Conference Call,
      SUMMIT_000076601 to
18    000076602
19 Exhibit 7 Summit County Drug Unit     245
      Confidential Investigative
20    Report, Case No DU-0517,
      SUMMIT_001839815 to
21    001839819
22 Exhibit 8 Summit County CENTAC        254
      Confidential Investigation
23    Report, Case No CT-0114,
      SUMMIT_001977600 to
24    001977604
25

2 (Pages 2 - 5)

**Page 6**

1 Exhibit 9  Summit County Drug Unit  259
  Confidential Investigative
2 Report, Case No  DU-0791,
  SUMMIT_001843287 to
3 001843291
4 Exhibit 10  Document Titled "Project  286
  Income Worksheet-Total
5 Budget Method,"
  SUMMIT_000024552
6
  Exhibit 11  Document Titled "Ohio Office  301
7 of Criminal Justice Services
  Quarterly Subgrant Report,"
8 SUMMIT_001010609 to
  001010613
9
  Exhibit 12  July 2012 E-Mail Chain Re:  305
10 Pharmaceutical Diversion
  Training, with Attachment,
11 SUMMIT_001008149 to
  001008157
12
  Exhibit 13  Document Titled "Ohio Office  319
13 of Criminal Justice Services
  Byrne Memorial Grant
14 Program, Area A: Law
  Enforcement Task Forces
15 Semi-Annual Performance
  Report," SUMMIT_000023798 to
16 000023805
17 Exhibit 14  Summit County Sheriff's  325
  Office 2003 Annual Report,
18 SUMMIT_001128847 to
  001128894
19
  Exhibit 15  Document First Heading  329
20 "Testimony of Captain Hylton
  Baker, Summit County Drug
21 Unit, SUMMIT_001461080 to
  001461085
22
  Exhibit 16  8/22/2012 E-Mail to Hylton  333
23 Baker Re: Meth labs,
  SUMMIT_001008145
24
25

**Page 8**

1 object  111
  object  111
2 object  111
3 object  112
  object  113
4 object  114
  object  115
5 object  116
  object  118
6 object  118
  object  118
  object  119
7 object  120
  object  120
8 object  121
  object  122
9 object  122
  object  122
10 object  127
  object  127
11 object  128
  object  128
12 object  129
  object  129
13 object  129
  object  131
14 object  132
  object  132
15 object  133
  object  136
16 object  136
  object  137
17 object  137
  object  138
18 object  138
  object  138
19 object  139
  object  139
20 object  139
  object  140
21 object  141
  object  143
22 object  144
  object  144
23 object  145
  object  145
24 object  145
  object  146
25 object  146

**Page 7**

1 INDEX OF VIDEO OBJECTION
2 OBJECT  PAGE
3 object  17
  object  35
4 object  42
  object  42
5 object  45
  object  52
6 object  54
  object  56
7 objection  57
  object  58
8 object  58
  object  63
9 object  64
  object  66
10 object  69
  object  70
11 object  70
  object  72
12 object  72
  object  72
13 object  73
  object  73
14 object  74
  object  74
15 objection  75
  objection  77
16 object  78
  object  78
17 object  79
  object  85
18 object  87
  object  91
19 object  92
  object  94
20 object  94
  object  98
21 object  101
  object  102
22 object  103
  object  103
23 object  106
  object  107
24 object  108
  object  108
25 object  109

**Page 9**

1 object  146
  object  146
2 object  147
  object  148
3 object  149
  object  151
4 object  152
  object  153
5 object  153
  object  154
6 object  155
  object  155
7 object  155
  object  156
8 object  157
  object  157
9 object  158
  object  159
10 object  159
  object  159
11 object  160
  objection  168
12 object  174
  object  176
13 object  178
  object  179
14 object  179
  object  179
15 object  180
  object  182
16 object  184
  object  186
17 object  187
  object  188
18 object  190
  object  190
19 objection  192
  objection  193
20 object  197
  object  197
21 object  199
  object  203
22 object  207
  object  207
23 object  209
  object  211
24 object  212
  object  212
25 object  215
  object  216

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 10

| | | |
|---|---|---|
| 1 | object | 218 |
| | object | 219 |
| 2 | object | 219 |
| | object | 219 |
| 3 | objection | 222 |
| | object | 222 |
| 4 | object | 223 |
| | object | 223 |
| 5 | object | 224 |
| | object | 227 |
| 6 | object | 229 |
| | object | 231 |
| 7 | object | 235 |
| | objection | 237 |
| 8 | object | 239 |
| | object | 239 |
| 9 | object | 242 |
| | object | 255 |
| 10 | objection | 262 |
| | object | 263 |
| 11 | object | 264 |
| | object | 264 |
| 12 | object | 268 |
| | object | 269 |
| 13 | object | 270 |
| | object | 271 |
| 14 | object | 273 |
| | object | 274 |
| 15 | object | 275 |
| | object | 276 |
| 16 | objection | 277 |
| | object | 281 |
| 17 | object | 282 |
| | object | 283 |
| 18 | object | 284 |
| | object | 285 |
| 19 | object | 288 |
| | object | 290 |
| 20 | object | 293 |
| | object | 294 |
| 21 | object | 298 |
| | objection | 298 |
| 22 | object | 300 |
| | object | 301 |
| 23 | object | 313 |
| | object | 313 |
| 24 | object | 322 |
| | object | 323 |
| 25 | object | 323 |

Page 11

| | | |
|---|---|---|
| 1 | object.................................... | 324 |
| | object.................................... | 337 |

Page 12

1                THE VIDEOGRAPHER:  We're on the
2    record at 9:08.  Today's date is December 19,
3    2018.  This is the matter of National
4    Prescription Opiate Litigation.  This
5    deposition is taking place in Cuyahoga Falls,
6    Ohio.
7                Will counsel please identify
8    themselves for the record.
9                MS. SAULINO:  Jennifer Saulino,
10   Covington & Burling, for McKesson.
11               MR. PULSIPHER:  Bryant Pulsipher,
12   Covington & Burling, for McKesson.
13               MS. HARTMAN:  Ruth Hartman, Baker &
14   Hostetler, for the Endo Defendants.
15               MS. COLEMAN:  Tera Coleman,
16   BakerHostetler, on behalf of the Endo
17   Defendants.
18               MS. GATES:  Lisa Gates, Jones Day,
19   for Walmart.
20               MR. LEDLIE:  James Ledlie, Motley
21   Rice for Summit County and the City of Akron.
22               MS. RION:  Caroline Rion, Motley
23   Rice, on behalf of the Plaintiffs Summit County
24   and Akron.
25               THE VIDEOGRAPHER:  By telephone?

Page 13

1                MR. BREWER:  You have Matt Brewer
2    from Walgreens from the firm Bartlit Beck.
3                HYLTON E. BAKER, of lawful age, called
4    for examination as provided by the Federal
5    Rules of Civil Procedure, being by me first
6    duly sworn, as hereinafter certified, deposed
7    and said as follows:
8                EXAMINATION OF HYLTON E. BAKER
9    BY MS. SAULINO:
10        Q.   Good morning, Captain Baker.
11        A.   Good morning.
12        Q.   As you just heard, my name is
13   Jennifer Saulino, and I'm with the law firm of
14   Covington & Burling, and we represent McKesson
15   Corporation, which is one of the defendants in
16   this action.
17               Could you please just state and
18   spell your full name for the record?
19        A.   Yes.  First name is Hylton,
20   H-y-l-t-o-n; middle initial E.; last name is
21   Baker, B-a-k-e-r.
22        Q.   And could you state your address
23   for the record, please?
24        A.   It is 3226 Wright, W-r-i-g-h-t,
25   Road Northwest, Uniontown, one word, Ohio

4 (Pages 10 - 13)

Page 14

1 44685.
2    Q.   And you are currently retired; is
3 that correct?
4    A.   That is correct.
5    Q.   Do you -- although you are retired
6 from the sheriff's department, are you working
7 in any other capacities right now?
8    A.   Yes, I am.
9    Q.   What are you doing?
10    A.   I work as a supervisor for Dunbar
11 Brinks.
12    Q.   And what do you do in that
13 capacity?
14    A.   I move money from one place to
15 another.
16    Q.   Okay.  As a supervisor, do you --
17 are you actually in the trucks, or do you sit
18 in an office?
19    A.   Both.
20    Q.   Both?  Okay.  And that's here in
21 Northeastern Ohio?
22    A.   Yes.
23    Q.   And you retired from the sheriff's
24 office in late 2012; is that right?
25    A.   I retired in November of 2012.

Page 15

1    Q.   You maintain contacts there still?
2    A.   Some.
3    Q.   And do you perform any work for the
4 sheriff's office as a contractor on a part-time
5 basis?
6    A.   I do not.
7    Q.   Or any kind of consulting, anything
8 like that?  I mean, any activities still with
9 the sheriff's office?
10    A.   Every now and then if they need a
11 speaker somewhere, I do that.  I still work as
12 a firearms instructor.
13    Q.   And that's for the qualification
14 sessions of the -- the --
15    A.   For the department --
16    Q.   -- department?  Yep.
17    A.   -- personnel.  Yes, ma'am.
18    Q.   Do you get paid for either of those
19 activities?
20    A.   I do not.
21       MS. SAULINO:  Can we go off the
22 record for a second?
23       THE VIDEOGRAPHER:  Off the record
24    (Off-the-record discussion.)
25       THE VIDEOGRAPHER:  On the record,

Page 16

1 9:12.
2 BY MS. SAULINO:
3    Q.   Okay.  So we were talking just a
4 moment ago about the activities that you
5 perform still with the sheriff's office.  You
6 said sometimes you're a speaker.  On what do
7 you speak?
8    A.   Drugs.
9    Q.   And is that here in Northeastern
10 Ohio or outside or both?
11    A.   Yeah, pretty much here.  I haven't
12 done it for a while now.
13    Q.   Okay.
14    A.   Getting kind of old, I guess.
15    Q.   I disagree.
16       Okay.  And do -- any other
17 activities with the sheriff's office in any
18 kind of professional capacity?  And setting
19 aside, like, retirement parties and those kinds
20 of things.
21    A.   Not -- not unless I'm called upon.
22    Q.   And are you sometimes called upon?
23    A.   I could be.
24    Q.   Have you been?
25    A.   Not in a while.

Page 17

1    Q.   When you say "a while," you mean --
2    A.   Since I retired.
3    Q.   Okay.  What could you be called
4 upon for?
5       MR. LEDLIE:  Object to the form.
6    A.   Any kind of an emergency.
7    Q.   So -- so they could bring you back
8 in to work as a member of the sheriff's office?
9 What -- what do you mean?
10    A.   As an -- it would be unpaid, if
11 that's what you're getting at.  I would --
12 yeah.
13    Q.   No.  I'm just wondering what you
14 mean by you could be called in an emergency.
15    A.   As a police officer --
16    Q.   As a police officer.
17    A.   -- in the state of Ohio.
18    Q.   Okay.
19    A.   Yes, ma'am.
20    Q.   And do you have to maintain any
21 kind of training or qualifications in order to
22 remain somebody that they could call in in an
23 emergency?
24    A.   Yes.
25    Q.   And do you do that?

5 (Pages 14 - 17)

Page 18

1    A.   Yes, I do.
2    Q.   So what is that?
3    A.   Depends on what the State mandates,
4 but every year we qualify and take whatever
5 training that the State mandates.
6    Q.   And is that -- what kind of
7 training is that?  Is that simply firearms, or
8 are there more?
9    A.   It's firearms.  It could be how to
10 deal with mental illness.  Any -- any topic
11 that the State deems they want us to have.
12   Q.   Since you retired, has --
13 have any -- has any of that training involved
14 drugs of any kind?
15   A.   Actually, I sat through a training
16 where they did have an update on drugs.
17   Q.   When was that, if you recall?
18   A.   A couple years ago.
19   Q.   What kind of an update was it?
20   A.   Basically, they kind of showed
21 everybody what some of the fentanyls looked
22 like and what the hazards were involved in
23 those.
24   Q.   To your recollection, it was
25 specific to fentanyl?

Page 19

1    A.   It was kind of generally what was
2 out there at the time.
3    Q.   And when you say --
4    A.   Things that they could run into --
5 officers on the street could run into.
6    Q.   All categories of drugs?
7    A.   You know, I don't recall.  I was
8 kind of interested in the fentanyls, and I
9 really didn't pay much attention to the other
10 because I lived it all.
11   Q.   And why were you interested in the
12 fentanyls?  Because it was new information,
13 or --
14   A.   Because some of it I hadn't seen.
15   Q.   Okay.  Do you recall any other kind
16 of training that you've received since you
17 retired that related to drugs?
18   A.   No.
19   Q.   And you said it's been a while
20 since you spoke on behalf of the sheriff's
21 office or for the sheriff's office.  Do you
22 recall about how many times you've done that
23 since you retired?
24   A.   On behalf of the sheriff's office,
25 probably a couple times.

Page 20

1    Q.   Have you done it -- when you say "a
2 couple," you mean two or three, or do you
3 mean --
4    A.   Yeah, probably two or three to
5 various groups around the community.
6    Q.   What kind of groups?
7    A.   Church groups, Boy Scouts.
8    Q.   And you say -- you said on behalf
9 of the sheriff's office.
10   A.   Uh-huh.
11   Q.   Have you -- have you done speaking
12 on drugs for other purposes since you retired?
13   A.   Yes.
14   Q.   And can you tell me about that?
15   A.   I used to do a gig for a professor
16 at Ursuline university on methamphetamines.
17   Q.   Teaching a class?
18   A.   Yes.
19   Q.   Was it a semester-long class or
20 just specific classes?
21   A.   Just a -- yeah, just one -- just
22 one class.
23   Q.   Anything else like that?
24   A.   No.
25   Q.   Have you been deposed before?

Page 21

1    A.   Pardon me?
2    Q.   Have you ever had a deposition
3 before?
4    A.   Yes.
5    Q.   How many times?
6    A.   Once.
7    Q.   And in what kind of case was that?
8    A.   It was in a -- a marijuana case.
9    Q.   And do you know where that was?
10   A.   It was in Akron.
11   Q.   In Akron?
12        You say "a marijuana case."  Was it
13 a civil case?
14   A.   Yes.
15   Q.   And do you know what the claim was?
16   A.   They were blaming us for the -- an
17 individual's death.
18   Q.   Do you know what the resolution was
19 of the case?
20   A.   It was thrown out, federal court.
21   Q.   So I suspect, given that, I know
22 the answer to this, but did you testify in
23 trial in that case?
24   A.   I did not.  Never went to trial.
25   Q.   Right.  Okay.

6 (Pages 18 - 21)

Page 22

1    A.    The original case I did not.  I
2 mean, there was an original case, and then
3 the -- the suit afterwards.
4    Q.    So there was an original criminal
5 case?
6    A.    Yes.
7    Q.    I see.  And then it -- and then it
8 was a suit afterwards, which was the civil case
9 you were deposed in?
10   A.    That's correct.
11   Q.    Okay.  Thank you for that
12 clarification.
13         So you're -- are you saying you
14 also did not testify at trial in the original
15 case?
16   A.    That is correct.
17   Q.    Okay.  Do you recall who the
18 parties were in that case?
19   A.    No.  No, I couldn't give you a name
20 right now.
21   Q.    And what topics did you testify
22 about in your deposition?
23   A.    The -- the witness -- the informant
24 that we utilized.
25   Q.    Can you explain that a little bit

Page 23

1 further?
2    A.    We had a case where we were buying
3 marijuana from a suspect.  The case was being
4 handled by one of the detectives on the unit.
5         He had an informant.  We made good
6 buys, made a good case.  The -- when the
7 individual was picked up, he made a declaration
8 that the uniformed officer never wrote down,
9 and, subsequently, they ended up putting our
10 informant on the stand.  He was a good
11 informant; he was a bad witness, and they won
12 the case.
13        The university was the
14 university -- Akron University student.  The
15 university had a zero tolerance policy, and
16 they kicked the guy out.
17        He went home to Pennsylvania, got a
18 job at an insurance company, had some kind of
19 problems.  I don't know.  Couldn't tell you
20 what.  And one day he got in his car and got on
21 the Pennsylvania Turnpike, pulled over
22 somewhere, and shot himself in the head, and it
23 was our fault.
24   Q.    Okay.  And so your testimony
25 pertained to what about the informant?  How he

Page 24

1 was cultivated, or what sort of --
2    A.    Whatever questions.  I can't recall
3 exactly what questions they asked me about him,
4 but, yeah.
5    Q.    Okay.  And you were -- were you
6 testifying in your capacity as a County
7 employee at the time?
8    A.    Yes.
9    Q.    Do you -- you said federal court.
10 Do you remember which court?
11   A.    It was Northeastern District of
12 Ohio here in Akron.
13   Q.    Okay.
14   A.    And I can't recall the judge's
15 name.  It was her first case.
16   Q.    And do you -- do you remember what
17 year?
18   A.    No.  It was a couple years before I
19 left.  I don't know exactly.  I couldn't tell
20 you exactly what year right now.
21   Q.    Do you remember roughly what year
22 the underlying criminal case was?
23   A.    It would have been just before that
24 case.
25   Q.    Okay.  Sometimes there's a delay.

Page 25

1 That's why I ask.
2    A.    Yeah.
3    Q.    Okay.  Well --
4    A.    A lot of water has gone over the
5 dam since then, you know.
6    Q.    Yes, I -- I do understand.
7         I know that you must have, but have
8 you testified in trial before?
9    A.    Yes, I have.
10   Q.    About how many times?
11   A.    Probably three or four times.
12   Q.    Oh, really.
13   A.    Uh-huh.
14   Q.    Only that?
15   A.    Yeah.  In my capacity, I was the
16 director most -- like not the individuals doing
17 the cases.  I'd testify in -- in pretrial
18 hearings and such, but not the actual trials.
19   Q.    Do you recall the subjects of the
20 trials, the subject matter of the trials that
21 you testified in?
22   A.    They were drug cases.
23   Q.    Any particular drugs that come to
24 mind?
25   A.    I know I testified in coke cases,

Page 26

1  testified in marijuana cases.  I testified in a
2  case involving a -- a guy running a -- a
3  massage parlor.
4      Q.   Was that a drug-related case?
5      A.   No.
6      Q.   Okay.  Prostitution?  Was it a
7  prostitution case?
8      A.   It was -- at the time it was a
9  Summit County case.  Summit County detective
10 bureau's case.
11     Q.   Sorry.  Maybe I asked the question
12 poorly.
13          You said it was about a massage
14 parlor.  What kind of criminal case was it?
15     A.   They were running an illegal -- you
16 could get whatever you wanted kind of massage.
17     Q.   Okay.  Do you recall ever having
18 testified in a case that involved opioids of
19 any form?
20     A.   I can't recall.
21     Q.   Well, you've done this before, but
22 I'm just going to go over a couple of ground
23 rules that you're already following.
24          So you understand that you are
25 testifying under oath today and that your

Page 27

1  testimony has the same effect as if you were
2  testifying under oath in a court?
3      A.   Yes.
4      Q.   Is there any reason that you can't
5  give complete and truthful testimony today?
6      A.   Not that I'm aware of.
7      Q.   Are you on any kind of medications
8  or have any illness that might affect your
9  memory?
10     A.   I am not.
11     Q.   I will be asking you a lot of
12 questions today, as you know, as will, I think,
13 a couple of my colleagues here.
14          If you do not understand a question
15 I ask you, I would ask you to let me know and I
16 will rephrase it.  But if you answer a question
17 that I've asked, I will assume that you've
18 understood it and are answering it to the best
19 of your ability.
20          Is that fair?
21     A.   Yes.
22     Q.   You can see that our court reporter
23 is typing everything that I say and everything
24 that you say, so I would ask that you wait
25 until I'm done asking a question before you

Page 28

1  answer it, and I will do my best to do the same
2  for you.
3          Is that fair?
4      A.   Yes.
5      Q.   And, also, if you have a yes-or-no
6  answer, if you could answer audibly rather than
7  shaking your head, the court reporter --
8      A.   Okay.
9      Q.   -- would appreciate it.
10          Your counsel may have objections,
11 but unless your counsel instructs you not to
12 answer a question, I will ask you to answer the
13 question.
14          MR. LEDLIE:  If it's -- if you can.
15          MS. SAULINO:  This is a very
16 standard rule of procedure.
17          MR. LEDLIE:  And I've sat in on a
18 deposition with you.  If he can answer without
19 guessing or speculating, by all means he will.
20     Q.   Okay.  Not really sure what the
21 instruction is there, but the Federal Rules
22 require that unless you are instructed not to
23 answer for a legitimate reason, then I will ask
24 you to answer the question.  Okay?
25     A.   Yes.

Page 29

1      Q.   And finally, if you need a break at
2  any point, just let me know.  I will take
3  breaks every so often, every hour or so, but if
4  you need a break, just let me know.  I'm happy
5  to let you have it.
6          The only qualification I might put
7  on that is if there's a question pending, I
8  might ask you -- ask you to answer it before we
9  take the break, but then we can take a break.
10 Okay?
11     A.   Yes.
12     Q.   Captain, what did you do to prepare
13 for today's deposition?
14     A.   I've retained counsel, and I've met
15 with counsel, I think -- this morning.  It's
16 been, like, four times.
17     Q.   And how long each time did you meet
18 with them?
19     A.   About an hour.
20     Q.   So only one hour each time, or were
21 there any of those times like a full day?
22     A.   No, no, never.
23     Q.   And when you say you met with
24 counsel, do you remember who you met with?
25     A.   Yes.  Gentleman here.

8 (Pages 26 - 29)

Page 30

1     Q.    Okay.  Anyone else?
2     A.    The lady here, yeah.
3     Q.    We're used to folks not remembering
4 our names, so don't worry about naming people.
5          And do you recall whether there was
6 anyone else in the room or on the phone while
7 you were preparing?
8     A.    The first time there were some
9 people in an outer office.  I couldn't tell you
10 who.
11     Q.    Were they a part of your session,
12 or they were just there in a different office?
13     A.    I believe they were with the
14 counsel at the time.
15     Q.    I see.  On video?
16     A.    No.
17     Q.    On the telephone?
18     A.    I -- they were in another room.  I
19 couldn't tell you what they were doing.
20     Q.    They were not interacting with you?
21     A.    They were not.
22     Q.    Okay.  And these roughly four
23 sessions, over what period of time?
24     A.    Couple months.
25     Q.    Did you review any documents while

Page 31

1 you were preparing?
2     A.    Yes.
3     Q.    Did you review the complaint in
4 this case?
5     A.    I have read it, yes.
6     Q.    You have read it, okay.
7          Did you read it before it was
8 filed?
9     A.    No.
10     Q.    Did you review the Plaintiff's
11 interrogatory responses?  Do you even know what
12 that means when I ask that question?
13     A.    Yeah, could you write it in
14 English?
15     Q.    If you don't know what that means,
16 I'll come back to it later.
17     A.    Okay.
18     Q.    Okay.  And did you review any
19 documents that were produced in this case?
20     A.    Yes.
21     Q.    Do you remember which ones?
22     A.    There was a -- an addendum to a
23 grant proposal that I wrote.
24     Q.    Anything else that you remember?
25     A.    Yeah.  A couple other small

Page 32

1 reports, but I don't recall which ones they
2 were.
3     Q.    Anything else?
4     A.    No.
5     Q.    Do you remember looking at any
6 e-mails?
7     A.    No.
8     Q.    Did any of the documents that you
9 reviewed refresh your recollection about events
10 that happened in the past?
11     A.    Yes.
12     Q.    Do you remember how?
13     A.    For example, the addendum that I
14 wrote talked about our first meeting with
15 fentanyl.
16     Q.    What do you mean when you say your
17 first meeting with fentanyl?
18     A.    The first time we encountered it
19 here in --
20     Q.    Oh.
21     A.    -- Summit County that we knew of.
22     Q.    Anything else that came -- that was
23 refreshed when you looked at documents?
24     A.    No.  Nothing that really stands
25 out.  Nothing that I hadn't known before.

Page 33

1     Q.    Did you review any documents that
2 were not produced in this case, to your
3 knowledge?
4     A.    To my knowledge, I have no idea.
5     Q.    Did you do anything else to
6 prepare, other than meet with counsel?
7     A.    No.
8     Q.    Did you look at anything on your
9 own?
10     A.    No.
11     Q.    Talk to anybody?
12     A.    No.
13     Q.    Have you talked to anybody else
14 that's been involved in this litigation about
15 their depositions?
16     A.    I have not.  Don't even know who
17 all's been deposed.
18     Q.    Now, I know you said that you read
19 the complaint in this lawsuit.  Are you
20 familiar with the general subject matter of
21 this lawsuit?
22     A.    I am familiar with what's in the
23 complaint.
24     Q.    What do you know about it?
25     A.    That a lot of very bad things

9 (Pages 30 - 33)

Page 34

1 happened.
2   Q.   And what makes you say that?
3   A.   From my reading of the complaint,
4 it is my opinion --
5   Q.   Well, sir, I'm just asking you what
6 makes you say that a lot of very bad things
7 happened.  You're basing that on your reading
8 of the complaint?
9   A.   Yes, yes.
10   Q.   When did you first become aware of
11 the lawsuit?
12   A.   Couple months ago.
13   Q.   How?
14   A.   I was contacted by the County's
15 counsel.
16   Q.   I'm sorry.  By the --
17   A.   County's counsel.
18   Q.   Oh, by the County's counsel.  Okay.
19      And was that because you were going
20 to be deposed?
21   A.   Yes.
22   Q.   You had not heard about the lawsuit
23 before that?
24   A.   I knew about the State's.  I did
25 not know the County was doing the same.

Page 35

1   Q.   So I take it you were not involved
2 in the decision to sue?
3   A.   No, ma'am.
4   Q.   And is it also true, then, that you
5 didn't provide any information that went into
6 the complaint when it was being drafted?
7   A.   That's correct, yeah.
8   Q.   Do you expect that you will testify
9 at trial in this case?
10   A.   I have no idea.
11   Q.   Has anyone told you one way or the
12 other?
13   A.   I get called, I get called.
14   Q.   And who else from Summit County do
15 you expect would testify at trial in this case?
16      MR. LEDLIE:  Object to the form of
17 the question.
18   A.   I would have no idea.
19   Q.   Other than through your work, do
20 you know anyone who has suffered an opioid
21 over- -- overdose?
22   A.   Personally, no.
23   Q.   Has anyone close to you suffered
24 from any kind of opioid use disorder?
25   A.   No one close to me that I know.

Page 36

1   Q.   Did you grow up in the Akron area?
2   A.   I grew up in Stow.
3   Q.   Where did you go to high school?
4   A.   Stow High School.
5   Q.   And did you go to college?
6   A.   For a few years.
7   Q.   Where did you go?
8   A.   Kent State.
9   Q.   And what did you study?
10   A.   I started out in anthropology and
11 switched over to law enforcement.
12   Q.   Kind of a big switch.
13   A.   It takes a long time to be an
14 archeologist.
15   Q.   Fair enough.
16      Did you graduate from Kent State?
17   A.   I did not.
18   Q.   And why did you leave?
19   A.   I got a job at Summit County
20 Sheriff's Office.
21   Q.   That's a good reason.
22      Did -- have you done any other
23 schooling, formalized schooling?  We'll get to
24 your specialized training in a moment.  But
25 anything -- any other college courses or

Page 37

1 training courses of that sort?
2   A.   No.
3   Q.   Okay.  I'd like to go through your
4 specialized training.
5      So you would have graduated from
6 the basic police officer's training academy?
7   A.   That is correct.
8   Q.   And when was that?
9   A.   I believe 1979.
10   Q.   And then I understand that there
11 was a basic and advanced narcotic
12 investigator's school conducted by the Ohio
13 attorney general's office; is that right?
14   A.   Probably a bunch of them, yes.
15   Q.   And did you attend them?
16   A.   I attended quite a few.
17   Q.   Okay.  Do you know about how many?
18   A.   I couldn't tell you.  I can tell
19 you there's a stack of documents of training
20 about that thick with schooling that I did.
21   Q.   Where is that stack of documents?
22   A.   The Summit County Sheriff's Office
23 training bureau.
24   Q.   So explain to me what you mean.
25 Your stack of documents, or what are you

10 (Pages 34 - 37)

Page 38

1 referring to there?
2     A.   Certificates of completion.
3     Q.   I see.  So you kept your
4 certificates of completion?
5     A.   They do, yes.
6     Q.   Who's they?
7     A.   The training bureau.
8     Q.   And it's your understanding that
9 they have a large stack of them somewhere?
10     A.   Yes.
11     Q.   Do you know where that is?
12     A.   It's in their offices.
13     Q.   Have you seen it?
14     A.   Uh-huh.
15     Q.   How recently?
16     A.   Oh, it's been a while.  Probably a
17 couple of months ago, because we were looking
18 for a document and we couldn't find it.
19     Q.   Why were you --
20     A.   In regard- --
21     Q.   Oh, go ahead.
22     A.   It was in regards to my
23 certification as a firearms instructor.
24     Q.   So it was not in relation to this
25 case?

Page 39

1     A.   No.
2     Q.   And it's your understanding that
3 they have -- they continue to keep those
4 certifications of yours in a file there
5 somewhere?
6     A.   Yes.  Any time we attend some kind
7 of training.
8     Q.   Did you ask those -- ask for those
9 certificates to be provided to counsel in this
10 case?
11     A.   No.
12     Q.   Do you know whether anyone else
13 did?
14     A.   I have no idea.
15     Q.   Were you asked at all about any
16 kinds of documents to be provided in this case?
17     A.   No, other than I was asked if I had
18 any.  I have one.  I have a copy of the
19 addendum that I wrote that I kept, because I
20 was kind of proud of that one.
21     Q.   Okay.  Anything else that you have
22 in your possession?
23     A.   No.
24     Q.   So is -- is it your belief that if
25 we got that stack of certificates, we would be

Page 40

1 able to see all of the training courses you
2 have taken?
3     A.   Yes.  Or at least whatever ones
4 they put in there.  Can't -- I can't tell you
5 for sure that every one is in there.
6     Q.   Do you have your own list of any
7 sort or a CV?
8     A.   No.
9     Q.   No?
10     A.   No.
11     Q.   Do you recall having graduated from
12 the basic narcotics investigation school by the
13 DEA?
14     A.   Yes.
15     Q.   And do you recall when that was?
16     A.   My best guess and speculation is
17 probably around 1986, '87, somewhere in there.
18     Q.   And is that the kind of thing that
19 you would then take again after several years,
20 or is that just a one-time --
21     A.   No, that would have been a one-time
22 deal.
23     Q.   Do you recall the complex analysis
24 of narcotics intelligence school by the Ohio
25 governor's Office of Criminal Justice Services?

Page 41

1     A.   Sounds familiar.
2     Q.   Okay.  About how -- if you -- if
3 you had to give an estimate, about how many
4 training courses in narcotics or drugs
5 investigation have you taken over the years?
6     A.   I would guess upwards of 30 or
7 better.
8     Q.   And maybe let's go at it from a
9 different direction.
10          Do you recall about how many a
11 year?
12     A.   No.  It would have varied.  I mean,
13 when the opportunity came, the opportunity
14 came, so I have no idea.
15     Q.   How many of them do you recall
16 having related to opioids?
17     A.   You know, I really don't know.  The
18 topic could have came up in any of them.  But
19 to be specific, I don't recall.
20     Q.   And more particularly, how many of
21 them do you recall having related to
22 prescription opioids?
23     A.   Well, obviously the DEA course
24 would have been -- involved that.  Complex
25 analysis one certainly would have been one.

11 (Pages 38 - 41)

Page 42

1 And after that, I can't tell you.  I have no --
2 no recall.
3     Q.   Do you remember the topic of
4 opioids having been a topic throughout your
5 career at these kinds of training courses?
6        MR. LEDLIE:  Object to the form of
7 the question.
8     A.   I mean, were they mentioned?  They
9 probably were.  I mean, prescription drugs.
10     Q.   Okay.  And just so that we're
11 framing this the same way, your career -- when
12 I say "your career," I mean starting in 1979
13 and moving forward.  You remember prescription
14 drugs having come out -- come up throughout
15 those years?
16     A.   Sure.
17     Q.   Do you remember specifically the
18 topic of drug addiction or diversion -- and
19 when I say "addiction," I mean for prescription
20 opioids -- or diversion coming up in these
21 courses throughout the years?
22        MR. LEDLIE:  Object to the form of
23 the question.
24     A.   In -- in trainings in regards to
25 diversion, obviously there would have been

Page 43

1 prescription opioids involved.
2     Q.   Do you know how many of those you
3 went to?
4     A.   I couldn't tell you.
5     Q.   And is there any particular time
6 period that you remember having attended those
7 diversion courses?
8     A.   No, I really can't tell you.
9     Q.   So you did basic police officer's
10 training in 1979, right?  I wrote that down
11 right?
12     A.   Somewhere in there, yes.  '79, '80,
13 yeah.
14     Q.   So when did you first join the
15 sheriff's office?
16     A.   In March of 1982.
17     Q.   So what did you do in between the
18 training and the -- joining the sheriff's
19 office?
20     A.   Let's see.  While I was going
21 through the basic academy, I worked.  I was a
22 security guard for the County of Summit and the
23 commissioners.  I also did a gig for an armored
24 car company called Armet, who are no longer in
25 business.

Page 44

1     Q.   How long was the training, the
2 initial basic training?
3     A.   I want to say somewhere between 280
4 and 400 hours.
5     Q.   So I'm just trying to understand
6 the time period there.  So you took that course
7 in '79 or '80 and started in March of '82 at
8 the sheriff's office?
9     A.   Yes.
10     Q.   But you had left Kent State because
11 you had a job at the sheriff's office, right?
12 Or wrong?
13     A.   Let me think.
14        Okay.  I've got -- I've got to try
15 and put years together now.
16     Q.   I know.  It was a long time ago.  I
17 appreciate it.
18     A.   All right.  I -- I left Kent.  When
19 I left Kent, I worked for the City of Stow, and
20 I became a reserve officer there.  And then,
21 during that time period is when I was at
22 the aca- -- I was able to do the academy.  And
23 then I worked all those other little odds-
24 and-end jobs.  And in 1982, I was hired by the
25 sheriff's office.

Page 45

1     Q.   Were you a reserve officer in Stow
2 that whole time that you just mentioned before
3 you started at the sheriff's office?
4     A.   When I -- after I graduated from
5 the sheriff's academy -- or the Ohio Peace
6 Officers Academy, I became a special with the
7 sheriff's office.
8     Q.   Oh, so I see.  So first --
9     A.   So, basically, it's a reserve with
10 the sheriff.
11     Q.   So you were a reserve first, but
12 then once you graduated, the title changed; is
13 that right?
14        MR. LEDLIE:  Object to the form of
15 the question.
16     Q.   I'm not trying to be confusing.
17 I'm trying to understand.  So if you could just
18 tell me.
19     A.   The ti- -- well, I went from the
20 police department in Stow to the sheriff's
21 office.
22     Q.   Okay.  Thank you.
23        What was your first position at the
24 sheriff's office?
25     A.   I was a jailer.

12 (Pages 42 - 45)

1    Q.   A jailer?
2    A.   Uh-huh.
3    Q.   What did that entail?
4    A.   Keeping people locked up.
5    Q.   How long did you have that
6 position?
7    A.   About a year.
8    Q.   And what did you move on to next?
9    A.   I moved into intake, into -- as a
10 booking officer.
11   Q.   And was that for all kinds of
12 crimes?
13   A.   Yes.
14   Q.   And how long were you an intake
15 booking officer?
16   A.   I don't know.  Maybe a year, year
17 and a half.
18   Q.   What came next?
19   A.   Scientific investigation unit.
20   Q.   What was that?
21   A.   Basically, we did photographs,
22 fingerprints, kept the files on all the cases.
23   Q.   Were you out doing testing in the
24 field, or were you working in a lab?
25   A.   A little of both.

1    Q.   Did you have any specialized
2 training for that position?
3    A.   I think I went to some fingerprint
4 schools.
5    Q.   What came next?
6    A.   I went to the detective bureau,
7 general assignment.
8    Q.   When was that?
9    A.   In 1985.
10   Q.   And when you say you went to the
11 detective bureau, does that mean that you
12 became a detective?
13   A.   Yes.
14   Q.   Did you have to take any further
15 training in order for that to happen?
16   A.   No.
17   Q.   Was there, like, a detective school
18 of any sort?
19   A.   No.
20   Q.   And was that a promotion?
21   A.   It was a -- I don't if you want to
22 call it a promotion.  I didn't make any more
23 money.  But it was a step up.  It was an
24 advancement.
25   Q.   And you said general at that point?

1    A.   Yes.
2    Q.   And what did that mean?
3    A.   That means whatever cases came down
4 the line, the supervisor of the unit handed you
5 a case; "Go get them."  Could have been a
6 burglary, could have been a rape, could have
7 been a homicide, could have been anything.
8    Q.   How long were you in the -- in that
9 position?
10   A.   About a year, year and a half.
11   Q.   Okay.  What came next?
12   A.   I moved into narcotics.
13   Q.   And so when was that?
14   A.   Probably sometime between '86, '87,
15 somewhere in there.
16   Q.   What was your position when you
17 moved into narcotics?
18   A.   I was an investigator.
19   Q.   And was the narcotics a part of the
20 detective bureau?
21   A.   Yes and no.  We were all housed in
22 the same area, but we specialized in narcotics
23 cases.
24   Q.   How many of you were there at the
25 time?

1    A.   Maybe three of us.
2    Q.   Do you remember who your supervisor
3 was?
4    A.   I do.  I'm kind of blank.  It will
5 come to me.
6    Q.   So you say you were specialized but
7 in some sense as a part of the detective
8 bureau?  Did I understand that correctly?
9    A.   Yes.
10   Q.   And how did that fit sort of in the
11 overall structure of the sheriff's department?
12   A.   Okay.  I'm not sure I understand
13 where you're going there.
14   Q.   I'm just trying to understand sort
15 of where the narcotics -- was it a narcotics
16 unit?
17   A.   Yes.
18   Q.   -- where the narcotics fit in in
19 the sort of overall structure.
20   A.   We were part of the investigative
21 bureau.
22   Q.   Okay.  And just so that I can get
23 an understanding of context, how big was the
24 investigative bureau?  How many officers?
25   A.   At the time I would guess there was

1 about 14, 15 of us.

2        My supervisor was Lieutenant

3 Scalise.

4    Q.   Nice work.

5        What was your next position?

6    A.   As a supervisor in the narcotics

7 unit.

8    Q.   Same unit, or had it changed at

9 that point?

10    A.   Personnel-wise there was different

11 people, but...

12    Q.   And when was that that you became a

13 supervisor?

14    A.   Somewhere around 1990.  I can't be

15 exactly sure.

16    Q.   Do you know what I mean when I say

17 CENTAC?

18    A.   Yes.

19    Q.   What is that?

20    A.   CENTAC was a specialized unit that

21 was funded by a grant by the State of Ohio to

22 do narcotics investigations.

23    Q.   When did it exist?

24    A.   Around that same time period,

25 19- -- late '80s, early '90s, and on through

1 until it -- it was actually disbanded somewhere

2 around 2000.

3    Q.   Were you a part of it?

4    A.   I worked with them, yes.

5    Q.   Okay.  Let me make sure I

6 understand.

7        Were they -- when you say they were

8 a specialized unit, were they separate from

9 your narcotics unit?

10    A.   Yes.

11    Q.   So both existed at the same time --

12    A.   Uh-huh.

13    Q.   -- the narcotics unit and CENTAC?

14    A.   Yes.

15    Q.   And you were, during that period of

16 time, in, and then became a supervisor of the

17 narcotics unit, right?

18    A.   That is correct.

19    Q.   And CENTAC had its own members and

20 supervisor?

21    A.   Yes.

22    Q.   Okay.  But you say you worked with

23 them?

24    A.   Yes.

25    Q.   How did that work?

1    A.   We were both doing drug cases, so

2 we would interact.

3    Q.   Were you housed in the same place?

4    A.   For a while, yes.

5    Q.   Can you explain?

6    A.   At the -- at the early beginnings,

7 we were -- the person running the CENTAC was

8 part of the detective bureau, and we were all

9 in the same area.

10        As they grew, they moved out.

11    Q.   I see.  Okay.  So at the beginning

12 of CENTAC, the person running CENTAC was

13 working right in your bureau with you?

14        MR. LEDLIE:  Object to the form of

15 the question.

16    A.   In --

17        MR. LEDLIE:  You can answer.

18    A.   It was in the investigative bureau,

19 yes.

20    Q.   But not in your narcotics unit?

21    A.   Correct.

22    Q.   Did they have a different mission

23 or objective than yours?

24    A.   I'm not sure what their mission

25 statement was exactly.  Couldn't tell you.

1    Q.   How did you split up cases?

2    A.   We did -- we took -- we did

3 whatever cases came down the line.  Someone

4 called in and we got an informant or something,

5 we did that.  If they got something going and

6 they needed some bodies, we helped them out.

7    Q.   So what I'm trying to ask is, why

8 two units if they did the same thing?  Was

9 there any difference between the two?

10    A.   I would assume -- and I'm

11 speculating here.  I can't tell you.  But, you

12 know, we got funding to do investigations.

13    Q.   So I'm not asking you to speculate.

14 I'm asking based on your experience having

15 worked in the narcotics unit at the same time

16 that CENTAC existed, and you told me that you

17 worked with them, what is your understanding of

18 the difference between the two units, if

19 anything?

20    A.   Probably the biggest thing was

21 personnel from various agencies.

22    Q.   Can you tell me more about that?

23    A.   Like the drug unit, similar to the

24 drug unit, agencies around the county could put

25 a man in there, and that enabled them to expand

Page 54

1 their -- their investigations, gave them
2 manpower.
3    Q.    Did you understand CENTAC to be a
4 multijurisdictional task force?
5    A.    Yes.
6    Q.    Okay.  And --
7    A.    That's why you got people from --
8 coming in from different jurisdiction- -- from
9 different agencies, different jurisdictions.
10    Q.    Do you know whether any federal
11 agencies were a part of CENTAC?
12    A.    There were, yes.
13    Q.    Do you -- which ones?
14    A.    I believe the FBI was there.  DEA
15 was there.  At one time or another, IRS.  ATF.
16 And I don't know if there were any others.
17    Q.    Did your narcotics unit contribute
18 manpower to CENTAC?
19    A.    Yes.
20    Q.    How many people?
21    A.    There were, what, three of us, four
22 of us maybe.
23    Q.    So you worked on CENTAC?
24        MR. LEDLIE:  Object to the form of
25 the question.

Page 55

1    A.    We worked with them.  Eventually,
2 we kind of combined down the road.
3    Q.    Okay.  So when did that happen?
4    A.    Well, it was a few years.  You know
5 what?  I can't give you an exact answer.  I
6 don't know.  I don't recall.  Everything just
7 kind of fused, and we went along our way, and
8 it just -- exact dates I don't know.
9    Q.    So just so that I make sure I
10 understand.  So for a period you were two
11 separate units; is that right?
12    A.    Yes.
13    Q.    And then after a period of time,
14 you became one unit?
15    A.    We were all working towards the
16 same goal.
17    Q.    Which was?
18    A.    To do narcotics investigations.
19    Q.    Fair enough.  But when you say you
20 were working towards the same goal, did you
21 have the same supervisory chain?
22    A.    Guys were in and out even in -- I
23 would -- to answer your question, yes, because
24 it was under the -- the guise of the sheriff's
25 office, so it would have been the supervisors

Page 56

1 of the -- of the sheriff's office.
2    Q.    Did the sheriff's office pay the
3 salaries, benefits, overtime of the officers
4 working for CENTAC?
5        MR. LEDLIE:  Object to the form of
6 the question.
7    A.    The sheriff's office paid the
8 salaries of the sheriff's personnel.
9    Q.    Including those who worked for
10 CENTAC?
11    A.    Pardon me?
12    Q.    Including those who worked for
13 CENTAC?
14    A.    The sheriff's office paid the
15 salaries of the sheriff's personnel.  If you
16 were not the sheriff's personnel, you weren't
17 paid by the sheriff.
18        So in other words, an officer from
19 Akron didn't get paid by the sheriff, or an
20 officer from any other jurisdictions around
21 here did not get paid by the sheriff.
22    Q.    Okay.  Was -- there sheriff's
23 personnel working specifically for CENTAC?
24    A.    Yes.
25    Q.    And those sheriff's personnel were

Page 57

1 paid by the sheriff's office?
2    A.    Yes.
3    Q.    Other than the narcotics unit,
4 which we've discussed, and CENTAC, were there
5 any other groups or divisions in the sheriff's
6 office that had responsibility for narcotics
7 enforcement during your time there?
8    A.    No.  I mean, if you were a patrol
9 officer and stopped a car and there were drugs
10 in the car, you obviously took action.  But
11 specifically, no.
12        MR. LEDLIE:  Is this a good spot
13 for our first break?  It's been an hour.
14        MS. SAULINO:  Sure.  That's fine.
15        THE VIDEOGRAPHER:  Off the record,
16 10:04.
17        (A recess was taken.)
18        THE VIDEOGRAPHER:  On the record at
19 10:20.
20 BY MS. SAULINO:
21    Q.    Okay.  Captain Baker, when we
22 broke, we were talking about the Summit County
23 Drug Unit and CENTAC in the late '80s through
24 the '90s.
25        MR. LEDLIE:  Objection.

15 (Pages 54 - 57)

Page 58

1    Q.   Do you recall that?
2         MR. LEDLIE:  Object to the form of
3  the question.  Misstates testimony.
4    A.   Yes.
5    Q.   Do you think we were talking about
6  something different?
7         MR. LEDLIE:  Object to the form of
8  the question.
9    A.   I'm not sure.
10   Q.   I don't mean to be in any way
11  misstating testimony.  I was just trying to,
12  like, get us back going again.  So if you think
13  I've misstated something, please just tell me.
14        Now, you became, as I understand
15  it, the commander of the Summit County Drug
16  Unit in 2001; is that right?
17   A.   Yes.
18   Q.   And is it correct that you were the
19  drug unit -- the Summit County Drug Unit's
20  first commander?
21   A.   Yes.
22   Q.   And how did your assign- --
23   A.   Well, not really.
24   Q.   Okay.
25   A.   They existed.  There was a sergeant

Page 59

1  up there at the time.
2    Q.   And were you a subordinate of the
3  sergeant?
4    A.   No.
5    Q.   So where were you at the time?
6    A.   At the time, I was working in the
7  corrections unit.
8    Q.   When did you go to the corrections
9  unit?
10   A.   Let's see.  Kind of back and forth,
11  so sometime in the mid-'90s.  Mid to late '90s.
12   Q.   Okay.  So stepping back.  So you
13  were in the predecessor drug unit, right?
14   A.   Yeah, kind of.  Like I say, we
15  were -- we were separate, but we infused back
16  and forth.  There was always -- there was
17  always a narcotics unit, there was CENTAC, and
18  the players kind of back and forth.
19   Q.   Okay.  And that was in the late
20  '80s and through the '90s?
21   A.   CENTAC existed up until the drug
22  unit came about.
23   Q.   Okay.  And you were a supervisor in
24  the narcotics unit around 1990?
25   A.   Yes.

Page 60

1    Q.   But that was a different narcotics
2  unit than the drug unit we're talking about
3  now, right?
4    A.   Correct.  They're two separate
5  units.
6    Q.   Okay.  Can you explain?  I don't
7  want to get it wrong, and so I'm just trying to
8  understand.
9    A.   All right.  Within the sheriff's
10  investigative unit, there was the detective
11  bureau, there was the narcotics unit.
12        As a separate entity that had
13  sheriff's personnel and other personnel from
14  around the county and the federal government,
15  there was CENTAC.  And they existed as their
16  own entity, but we both kind of merged in and
17  out of each other, depending on the case.
18   Q.   And during what period of time
19  was -- was this arrangement that you're talking
20  about now?
21   A.   From the time CENTAC was formed to
22  the time that they ended.
23   Q.   And during that period of time, you
24  officially, as far as titles go, became a
25  supervisor in the narcotics unit?

Page 61

1    A.   Yes.
2    Q.   But you were -- that was during the
3  period of time when you were also sort of
4  working with CENTAC; is that right?
5    A.   Yes.
6    Q.   Okay.  And then it sounds as
7  though, from your answer a few moments ago,
8  that somewhere in there you left the narcotics
9  unit.
10   A.   Yes.
11   Q.   Okay.  And you went to the
12  corrections unit?
13   A.   Yes.
14   Q.   Anywhere else?  When you left the
15  narcotics unit, before you came back to be the
16  commander of the drug unit, was there anywhere
17  else besides the corrections unit that you
18  went?
19   A.   I was with court services for a
20  while.
21   Q.   All right.  And I apologize if I've
22  already asked you this, but when did you -- do
23  you recall when you left the narcotics unit?
24   A.   Yeah, somewhere in mid to late
25  '90s.

16 (Pages 58 - 61)

Page 62

1     Q.    Mid to late --
2     A.    I can't recall exactly what -- what
3  the date was.
4     Q.    Okay.  And did you go first to
5  court services, or first to the corrections
6  unit?
7     A.    No, I went to corrections.
8     Q.    Okay.  And how long do you recall
9  having been there?
10    A.    Well, if I left there -- if I left
11  narcotics in, let's say, '95 and I ended up
12  back in narcotics again in 2001, between court
13  services and corrections, it would have been,
14  what, six years?
15    Q.    Why did you leave the narcotics
16  unit?
17    A.    I work at the whim of the sheriff.
18  He puts me where he wants me.
19    Q.    So it was not your choice?
20    A.    No.
21    Q.    Were you a supervisor?
22    A.    Yes.
23    Q.    In the -- the corrections unit that
24  you went to?
25    A.    Yes.

Page 63

1     Q.    And did you have -- were you told
2  anything by the sheriff as to why you were
3  reassigned?
4     A.    No.  They send me where they want
5  to.
6     Q.    Despite your relatively long
7  experience at that point in narcotics?
8          MR. LEDLIE:  Object to the form of
9  the question.
10    A.    Yeah.  The sheriff -- the sheriff
11  puts me wherever he needs me.
12    Q.    Did you ask to stay?
13    A.    No.  I do what I'm told.
14    Q.    Did you keep ties with the
15  narcotics unit during the time that you were
16  gone?
17    A.    I'm sure I spoke to some of them,
18  but I'm not -- I'm not sure exactly what --
19  what you mean by ties.  What they were doing, I
20  don't know what their specific cases were, if
21  that's what you're asking.  No idea.
22    Q.    Did you have an understanding of
23  what CENTAC was doing during that period of
24  time?
25    A.    They were working whatever cases

Page 64

1  they were working.
2     Q.    Fair enough.  But did you -- did
3  you have any understanding of what they were
4  doing?
5          MR. LEDLIE:  Object to the form of
6  the question.
7     A.    They were doing their cases.  I
8  don't -- I couldn't tell you what cases they
9  were doing.
10    Q.    Are you aware of allegations that
11  CENTAC was mismanaged?
12    A.    Yes.
13    Q.    And --
14    A.    That's why they were disbanded.
15    Q.    That's your understanding as to why
16  they were disbanded?
17    A.    Again, that's a decision of the
18  sheriff.
19    Q.    What did you know about it?
20    A.    I knew that the sheriff thought
21  that they had lost their way.
22    Q.    How did you know that?
23    A.    I was the commanding officer, and
24  they were moving me back into the drug unit.
25    Q.    Did anyone say anything to you?

Page 65

1     A.    As in directly, "Hey, we're going
2  to do this," no.
3     Q.    Indirectly?
4     A.    They were having a problem with
5  them.  They disbanded them.
6     Q.    And how did you know they were
7  having a problem with them?
8     A.    I don't know.  You have -- when
9  you're standing around the water cooler, do you
10  know there's a problem with somebody in your --
11  in your office?
12    Q.    That's exactly what I'm asking.  Do
13  you remember having --
14    A.    Yeah, that's -- I mean, nobody came
15  to me and said, hey, you know, they're doing
16  this or doing that.  It just -- it was kind of,
17  I don't know, a general knowledge, I guess, if
18  you will.
19    Q.    And what was the general knowledge?
20    A.    That they had kind of lost their
21  direction.
22    Q.    In what way?
23    A.    They were supposed to be focused on
24  narcotics cases, and they were kind of going
25  off grid, doing other cases.

17 (Pages 62 - 65)

1    Q.   And what was your understanding of
2 how they were going off grid?
3    A.   They weren't focusing on what they
4 were supposed to do, what they were designed to
5 do.
6    Q.   Which was what?
7    A.   Narcotics cases.
8    Q.   So they -- to your understanding,
9 they were not adequately focusing on drug
10 crimes?
11       MR. LEDLIE:  Object to the form of
12 the question.
13    A.   Yeah.  Like I said, they had gone
14 off on a tangent.
15    Q.   What kind of tangent, to your
16 understanding?
17    A.   They weren't doing drug cases.
18    Q.   Now, you -- you said that before
19 you became the commander of the Summit County
20 Drug Unit in 2001, you understood that the unit
21 had been formed but there was a sergeant?
22    A.   Yes.
23    Q.   And do you recall when the unit was
24 formed with a sergeant?
25    A.   Probably about 2- -- around 2000,

1 when the new sheriff came in.
2    Q.   So just to make sure I understand
3 the chronology, to your recollection the Summit
4 County Drug Unit was formed when the new
5 sheriff came in, prior to CENTAC being
6 disbanded?
7    A.   I -- I think there was a -- the
8 narcotics unit was there.  It was housed with
9 CENTAC at the time.
10       When CENTAC was disbanded, the
11 players became the Summit County Drug Unit.  So
12 it was a name change, and in some cases
13 personnel changes as well.
14    Q.   Which personnel changes, to your
15 recollection?
16    A.   Pardon me?
17    Q.   Which personnel changes that you
18 recall?
19    A.   The guy kind of running it was
20 moved out.
21    Q.   The guy running CENTAC?
22    A.   Yes.
23    Q.   Do you remember who that was?
24    A.   Larry Limbert.
25       They got rid of some of the

1 officers from some of the various
2 jurisdictions.
3    Q.   Do you remember any in particular?
4    A.   There was a guy from Copley, and I
5 can't recall his name.
6    Q.   And the new sheriff that you
7 referred to in 2000, was that Sheriff
8 Alexander?
9    A.   Yes.
10    Q.   Do you remember a FBI agent named
11 Keith Thornton?
12    A.   Yes.
13    Q.   And what was his role?
14    A.   Keith Thornton was part of the
15 administration.  He was an inspector, and I
16 reported to him.
17    Q.   Did you understand that it was his
18 job to restructure CENTAC?
19    A.   He was given that task.
20    Q.   And you say you reported to him?
21    A.   I did.
22    Q.   In your role as commander of the
23 new Summit County Drug Unit?
24    A.   Yes.
25    Q.   And did you work with him to

1 restructure CENTAC?
2    A.   I don't know that I worked with him
3 to "restructure it" restructure it.  I just
4 went to work, did my job, and they told me what
5 they were going to do.
6    Q.   Who told you?
7    A.   Keith.
8    Q.   And what do you recall him telling
9 you?
10    A.   Basically, that it was going to be
11 the drug unit, and that I was going to run
12 this, and we were going to do drug
13 investigations.
14    Q.   And do you recall that having been
15 in contrast to what CENTAC had been doing?
16       MR. LEDLIE:  Object to the form of
17 the question.
18    A.   Yeah, I believe I've already
19 answered that.  They were going off on a
20 tangent, not doing drug cases.
21    Q.   Did you understand -- did you have
22 any understanding that CENTAC had been misusing
23 its forfeiture powers?
24    A.   I have no clue about that.
25    Q.   Do you remember any specific

18 (Pages 66 - 69)

1 changes that Agent Thornton made?

2    A.   Well, he obviously changed the

3 name.  And we did drug cases.

4    Q.   Did the restructuring cause any

5 problems that you had to deal with?

6         MR. LEDLIE:  Object to the form of

7 the question.

8    A.   I didn't have any problems with

9 anybody.

10    Q.   What about, did you find that you

11 had lost any institutional knowledge from the

12 team?

13    A.   I don't think.

14    Q.   Were there any missing files?

15    A.   Not that I'm aware of.

16    Q.   Do you recall anything having been

17 scrapped or destroyed from CENTAC?

18    A.   No.  Nothing I can recall.

19    Q.   Were you operating, to your

20 understanding, under different rules than

21 CENTAC had been?

22         MR. LEDLIE:  Object to the form.

23    A.   We were doing drug cases and not

24 going off on any tangent, doing anything else.

25    Q.   When you came in as the commander,

1 I don't suppose you recall what month that was.

2    A.   No.  No, I can't recall.  It

3 wasn't -- it wasn't long after the sheriff was

4 sworn in, but I don't know.  I can't tell you.

5    Q.   Did you go through any kind of an

6 application process?

7    A.   No.

8    Q.   Interviews?

9    A.   No.

10    Q.   Did you tell anybody you were

11 interested in the position?

12    A.   I may have made mention to

13 Inspector Thornton.

14    Q.   And is that -- I'm sorry.  That's

15 the proper way to refer to him, Inspector

16 Thornton?

17    A.   Uh-huh.

18    Q.   Thank you.  So you recall having

19 talked to him before you were assigned as the

20 commander?

21    A.   Yeah.

22    Q.   And why were you talking with him?

23    A.   Because I wanted to be the

24 commander.

25    Q.   And at the time you were -- were

1 you in court services at the time?

2    A.   Either court services or

3 corrections.  Probably corrections at that

4 time.

5    Q.   What made you want to be the

6 commander at the newly formed Summit County

7 Drug Unit?

8    A.   We all have our niche.  It's drug

9 work.

10    Q.   Sure.  You'd done six years,

11 though, not in your niche, right?

12         MR. LEDLIE:  Object to the form.

13    A.   What's that?

14    Q.   You had been, for six years, out of

15 your niche, right?

16         MR. LEDLIE:  Object to the form of

17 the question.

18    A.   Right.

19    Q.   Why hadn't you tried to come back

20 sooner?

21         MR. LEDLIE:  Object to the form of

22 the question.

23    A.   Again, I work at the whim of the

24 sheriff, so he puts me where he wants me.

25    Q.   Well, but you, this time, inquired

1 about a position, right?

2    A.   New sheriff in town.

3    Q.   Am I to understand that the new

4 sheriff was more amenable to making changes

5 like that?

6         MR. LEDLIE:  Object to the form of

7 the question.

8    A.   Yeah, I -- I have no idea what his

9 mindset was or is.

10    Q.   So what is the relevance of the new

11 sheriff?

12    A.   It was a new face.

13    Q.   So you didn't feel that you could

14 ask to be returned to the drug unit before?

15         MR. LEDLIE:  Object to the form of

16 the question.

17    A.   Yeah, I have no -- I have no idea.

18 Wasn't my place.  I go where I'm told to go.

19    Q.   I -- I understand, and you've said

20 that several times, and I completely respect

21 that.  I'm just trying to figure out why this

22 time you thought it was okay to ask for the

23 position.

24    A.   Why not.

25    Q.   But you just hadn't thought "why

Page 74

1 not" prior to that?
2    A.   It was a new position coming open,
3 so why not throw your name in the hat.
4    Q.   Did you not want to work with
5 CENTAC?
6        MR. LEDLIE:  Object to the form of
7 the question.
8    A.   You know, I work -- my job was to
9 work as an investigator.  That's what I did.
10 So if there's an opportunity to be an
11 investigator, then I wanted to be an
12 investigator.
13    Q.   Did you not approve of what they
14 were doing?
15    A.   I -- I don't know.  I don't know
16 what they were doing at the time.
17    Q.   But you were not actively trying to
18 be a part of it, right?
19        MR. LEDLIE:  Object to the form of
20 the question.
21    A.   I was trying to be a part of
22 anything I could be a part of.
23    Q.   Sir, I do understand that, but you
24 did get to a point where you wanted to come
25 back to your niche, right?  You told me that a

Page 75

1 moment ago, right?
2        MR. LEDLIE:  Counsel, this has been
3 probed extensively.  This is not a form
4 objection.
5        MS. SAULINO:  Sir --
6        MR. LEDLIE:  This is an objection
7 to your conduct, and if you would like us to --
8        MS. SAULINO:  Sir, I will remind
9 you of the Judge's comments about the 15
10 seconds of commentary that's not --
11        MR. LEDLIE:  Please don't cut me
12 off.  If we need to --
13        MS. SAULINO:  Well, I'm cutting you
14 off because you --
15        MR. LEDLIE:  If we need to seek
16 protective order at this time, then we will.
17 He's answered your questions repeatedly.
18        MS. SAULINO:  Sir, I am perfectly
19 within my rights to ask these questions.  I'm
20 asking them politely, and I will continue to
21 ask the questions that I need to ask in order
22 to complete this deposition.
23        Please stop interrupting, please
24 stop making speeches on the record, and please
25 recall the Judge's commentary about that.

Page 76

1        Thank you.
2        MR. LEDLIE:  Counsel, under the
3 Federal Rules of Civil Procedure, you will not
4 berate this witness or seek --
5        MS. SAULINO:  I am in no way
6 berating this witness, sir.
7        MR. LEDLIE:  Ma'am, there's a
8 record here, and we'll --
9        MS. SAULINO:  Yes, there is.
10        MR. LEDLIE:  -- get a ruling on it.
11        MS. SAULINO:  Yes there is.  I am
12 in no way berating this witness.  We have a
13 videotape.
14        MR. LEDLIE:  He has -- you have
15 asked him extensively about this.
16        MS. SAULINO:  Okay.  Let's go off
17 the record.
18        MR. LEDLIE:  Let's get the Court.
19 Let's stay on the record.
20        MS. SAULINO:  I am not going to
21 waste my time listening to you make speeches.
22        MR. LEDLIE:  Ask your next
23 question.
24        MS. SAULINO:  Are you done?
25    Q.   Sir, I completely understand that

Page 77

1 you may not want to denigrate anyone
2 unnecessarily.
3        I'm just trying to understand,
4 during that period of time where CENTAC was
5 operating, and you were not working in what you
6 called your niche, the narcotics unit, why it
7 was you weren't trying to work there.  That's
8 all.
9    A.   I don't know.  I was moved.  I did
10 my job.
11    Q.   But the fact is that you, during
12 that period of time, weren't trying to work in
13 your niche, right?
14    A.   Pardon me?
15    Q.   You weren't trying to work in your
16 niche, right?  During the time that CENTAC was
17 operating towards the end of the '90s?
18        MS. RION:  Objection.
19 Mischaracterizes testimony.
20    A.   I'm not sure I -- I'm not sure I
21 get that.
22    Q.   Okay.  I'm just going back over
23 what we were just talking about.
24    A.   Right.
25    Q.   So that I make sure that I

20 (Pages 74 - 77)

Page 78

1 understand.
2          You developed a niche in narcotics.
3 It's where you were at the beginning; it's
4 where you came back to and stayed once you came
5 back, right?
6          MR. LEDLIE:  Object to the form.
7     A.   That's correct.
8     Q.   Okay.  For about a period of six
9 years or so, at the end of the 1990s, while
10 CENTAC was operating --
11     A.   Uh-huh.
12     Q.   -- you went elsewhere, right?
13     A.   Correct.
14     Q.   And you didn't do anything to try
15 to get back to CENTAC and the narcotics unit,
16 right?
17     A.   Correct.
18     Q.   And you're not willing to say any
19 more about why?
20          MR. LEDLIE:  Object to the form.
21          MS. RION:  Objection.
22     A.   I don't know.
23     Q.   You don't know?
24     A.   I don't know why.  They move me,
25 they move me.  That's all I can say.  I work at

Page 79

1 the whim of the sheriff.
2     Q.   But -- just to make sure that I
3 understand the record, but when there was a new
4 sheriff, you were comfortable asking for a
5 position back in your niche in narcotics,
6 right?
7          MR. LEDLIE:  Object to the form.
8     A.   Yeah, I believe I answered that;
9 that's what I did, yes.
10     Q.   Once you became the commander of
11 the Summit County Drug Unit, what were your
12 responsibilities?
13     A.   My job was to make sure that my
14 people had the equipment they needed, make sure
15 that we had the -- the personnel at whatever
16 time frames that were needed for whatever
17 investigations were going on.
18          I was the liaison between the heads
19 of all the departments and the drug unit.  I
20 reported directly to Inspector Thornton and/or
21 the sheriff.  I wrote grant requests.
22     Q.   And your understanding -- what was
23 your understanding of Inspector Thornton's
24 position with respect to the sort of
25 organization between the sheriff and you?  Were

Page 80

1 there others in there?
2     A.   He was my boss, and he was directly
3 under the sheriff.
4     Q.   And what were his responsibilities
5 with respect to the Summit County Drug Unit?
6     A.   I have no idea, other than he
7 oversaw what was going on, what I told him was
8 going on.
9     Q.   Did you have regular meetings with
10 him?
11     A.   Yes.
12     Q.   Did you provide regular reports to
13 him?
14     A.   I would let him know what was going
15 on, what investigation we had going on.
16     Q.   How?
17     A.   Usually by sitting down in his
18 office, word of mouth.
19     Q.   Were there any written reports of
20 any sort that you provided to him?
21     A.   Oh, I'm sure there was.
22     Q.   Any kind -- anything regular that
23 you recall?
24     A.   Anything regular?  No.
25     Q.   Like a weekly recap or something

Page 81

1 like that?
2     A.   No.
3     Q.   Was there any sort of regular
4 e-mail communication between you and him?
5     A.   No, not really.
6     Q.   So was it mainly in person or
7 telephone?
8     A.   In person, face-to-face, yeah, over
9 the phone.  Hey, we got this going on, we have
10 this going on.
11     Q.   And what about with respect to the
12 sheriff?  Did you report sort of through
13 Inspector Thornton to the sheriff, or was he
14 the one reporting to the sheriff about what you
15 were doing?
16     A.   Yeah, mostly I would report to
17 Inspector Thornton.  He would report to the
18 sheriff.  Sometimes I would report directly to
19 the sheriff.
20     Q.   Okay.  And so similar questions
21 with respect to the sheriff.  Was there any
22 kind of written -- regular written
23 communication?
24     A.   No.  No, that was a --
25     Q.   Was there e-mail or --

21 (Pages 78 - 81)

Page 82

1      A.   -- no, come into your office, and,
2  "Hey, by the way."
3      Q.   Do you recall how long Inspector
4  Thornton was in his position?
5      A.   He was there when I came on, and he
6  left just prior to when I left, so I would say
7  he probably left about a year before I did.
8      Q.   And when you say when you left, you
9  mean when you retired?
10     A.   Retired, yes, ma'am.
11     Q.   Do you recall who took his place?
12     A.   Nobody.
13     Q.   So -- so for that maybe year, was
14  it just you reporting directly to the sheriff?
15     A.   Yes.
16     Q.   In 2001, when you first started,
17  how many officers reported to you?
18     A.   Let me think.  There were three or
19  four from the SO.  There was an Akron.  There
20  was FBI, DEA.  There was ATF.  Cuyahoga Falls.
21     Q.   I can hear you thinking out loud.
22  Maybe we should just go through it step by
23  step, because it sounds like there were
24  different types of officers that were reporting
25  to you.  Is that fair?

Page 83

1      A.   Yes.
2      Q.   Okay.  So let's start with those
3  from the sheriff's office.  About how many of
4  those?  Three or four; is that right?
5      A.   Yes.
6      Q.   And then I think I heard you say
7  there was FBI?
8      A.   Yes.
9      Q.   So you had an FBI officer that was
10  detailed to you?
11     A.   An FBI agent, yes, ma'am.
12     Q.   And just one?
13     A.   Yes.
14     Q.   Okay.  And DEA?
15     A.   DEA, one.
16     Q.   One?  Okay.  And --
17     A.   ATF, one.
18     Q.   And then I think -- who else did
19  you say?
20     A.   Somebody from Cuyahoga Falls.
21     Q.   From the Cuyahoga Falls Police
22  Department?
23     A.   Police department, yes.  And Copley
24  switched out, put a different guy in.
25     Q.   Different than the one who had been

Page 84

1  on CENTAC?
2      A.   Yes.
3      Q.   So there was one from Copley?
4      A.   I -- yes.
5      Q.   Okay.
6      A.   They were there from the get-go.
7      Q.   What about --
8      A.   Barberton.
9      Q.   Pardon?
10     A.   Barberton had an officer.
11     Q.   Did the Akron Police Department
12  provide any?
13     A.   Yes, Akron had an officer there.
14  There was --
15     Q.   One from Akron?
16     A.   -- Akron University, one.
17     Q.   So wait, sorry.  One from Akron
18  police?
19     A.   Yes.
20     Q.   And then one from Akron University?
21     A.   Yes.
22     Q.   Okay.
23     A.   I believe that was the core group,
24  and then we kind of added as we went.
25     Q.   So that would have been in 2001 the

Page 85

1  core group?
2      A.   Yes.
3      Q.   And how many --
4      A.   From my recollection.
5      Q.   Sure.  And how many of those that
6  you just named were actually a part of the
7  sheriff's office budget, so were paid salaries
8  and overtime were paid by the sheriff's office?
9      A.   Just the sheriff's deputies.
10     Q.   So the -- so you plus the four?
11  Three or four?
12     A.   Yes.
13     Q.   And the rest were paid by their
14  respective jurisdictions?
15     A.   That is correct.
16     Q.   What about their technology and
17  their other equipment that they needed?  Who
18  paid for that?
19          MR. LEDLIE:  Object to the form.
20     A.   Like, vehicles we got, we got -- we
21  were able to get through grants, so the -- the
22  unit paid for that.  Their personal equipment,
23  most of that is their personal equipment they
24  brought with them.
25     Q.   All right.  And then, by the time

22 (Pages 82 - 85)

Page 86

1 you left, in 2012, how had the makeup of that
2 group changed, if at all?
3     A.   We had another DEA agent.
4     Q.   So two total?
5     A.   We had two total.  One of the very
6 few organizations across the country that had
7 more than one DEA agent in it.
8          We had -- we were on the verge of
9 merging with the Akron Police Department's
10 narcotics unit, which has already been --
11 that's been successfully completed about the
12 same time I left.
13          We had a customs guy for a while,
14 and then customs changed their mission when
15 they went to the border patrol.
16          I had a dog handler from
17 Reminderville.
18     Q.   From where?
19     A.   Huh?
20     Q.   Where was the dog handler from?
21     A.   Reminderville.
22     Q.   And a dog?
23     A.   Yeah.  Had two, actually.
24          Yeah, pretty much the makeup, as
25 far as the departments, was pretty much the

Page 87

1 same when I left.  A couple of guys in and out
2 from Reminderville, but other than that,
3 when -- when they were able to merge everybody,
4 we obviously became a pretty substantial group.
5     Q.   Was it still, as far as the
6 sheriff's office salaries and overtime and
7 benefits go, was it still, when you left, you
8 plus three or four sheriff's officers?
9     A.   Yes.
10     Q.   Okay.  So anyone else paid for by
11 the sheriff's office at that point?
12     A.   No.
13     Q.   But it sounds like the group had
14 gotten somewhat bigger even prior to the
15 merger; is that right?
16     A.   Yeah, a couple bodies here and
17 there.
18     Q.   A couple of bodies?  Okay.
19          So is that -- is it fair to say
20 that it was relatively consistently the same
21 size between 2001 and 2012, with a few bodies
22 maybe here or there at times; is that right?
23          MR. LEDLIE:  Object to the form of
24 the question.
25     A.   Yeah, I believe that's what I --

Page 88

1     Q.   That's -- that's the understanding
2 I can get from what you just said?
3     A.   Yes.
4     Q.   Okay.  And two dogs.
5          Okay.  And then you mentioned the
6 merger with the Akron Police Department
7 narcotics unit; is that right?
8     A.   Yes.
9     Q.   You recall that happening in 2012?
10     A.   The groundwork was being laid.
11     Q.   Okay.  Did you -- were you part of
12 the sort of impetus for that?
13     A.   Yes, we were trying to put that
14 together.
15     Q.   Was it your idea?
16     A.   My idea?  No.
17     Q.   Do you remember whose it was?
18     A.   No.
19     Q.   And did you personally do any work
20 towards making that happen?
21     A.   Yes.
22     Q.   What do you recall having done?
23     A.   We went out and searched locations.
24 Of course, during the interim, we were trying
25 to work together as much as we possibly could.

Page 89

1 And we were housed in the same -- in the same
2 building.  We were a doorway between each
3 other.
4     Q.   Let me -- let me just interrupt you
5 for a second.
6          MS. SAULINO:  Can we remind the
7 folks on the phone to be on mute, please?
8     Q.   I'm really sorry about that.
9 Please continue.
10     A.   Right.  I mean, we were housed a
11 doorway between each other, and we interacted
12 every day.
13     Q.   And that was even before the sort
14 of formal merger?  Is that --
15     A.   Yes.  We were --
16     Q.   When did --
17     A.   -- part of the HIDTA together as
18 well.
19     Q.   You were part of the HIDTA
20 together?
21     A.   Yes.
22     Q.   When was it that you were housed
23 together and working closely together every
24 day?
25     A.   Would have been -- actually, on

23 (Pages 86 - 89)

Page 90

1  9/11 we were moving from our offices to -- to
2  an office space where we were all -- all
3  together.
4      Q.   Oh.  That's what you were doing
5  that day?
6      A.   Yep.
7      Q.   Wow.
8      A.   For a short period of time,
9  anyways, and then I was moved on.
10     Q.   Yes.  I suspect you were rerouted
11 that day to other activities.
12     A.   Yes.
13     Q.   Okay.  But around that time is when
14 you moved offices?
15     A.   Uh-huh.
16     Q.   Okay.  Are you familiar with the
17 Ohio Task Force Commanders Association?
18     A.   Yes.
19     Q.   And were you a member of it?
20     A.   I was.
21     Q.   For how long?
22     A.   Let's see.  When did we form?  We
23 formed probably in the early 2000s, and I
24 remained a member until I retired.
25     Q.   Were you one of the founding

Page 91

1  members?
2      A.   Yes.
3      Q.   And I guess more specifically, were
4  you one of the people who decided that it
5  should be a group?
6          MR. LEDLIE:  Object to the form.
7      A.   That was kind of a joint venture
8  there.
9      Q.   With who?
10     A.   With the other task force
11 commanders.
12     Q.   And who were they?  Where were they
13 from and what did they do?
14     A.   All over the state.  They did the
15 same thing I did.
16     Q.   So narcotics task forces?
17     A.   Yes.
18     Q.   And what did you do as a part of
19 that organization?
20     A.   We provided data to the State as
21 far as all our various investigations, and kind
22 of give them a picture of what was kind of
23 going on all over the state.
24          We lobbied the legislature for a
25 permanent funding solution for all the task

Page 92

1  forces.
2      Q.   Was any of that specific to
3  opioids?
4      A.   The information that was reported,
5  some of it, yes.
6      Q.   What about the lobbying?
7      A.   That was funding so that we could
8  continue to keep our task forces running.
9      Q.   But was any of that lobbying
10 specific to task forces focused on opioids?
11         MR. LEDLIE:  Object to the form of
12 the question.
13     A.   It was to keep narcotics task
14 forces running.
15     Q.   Narcotics task forces in general?
16     A.   Narcotics task forces in general,
17 yes, ma'am.
18     Q.   And you said you would give data to
19 the State.  Who -- who or what entity at the
20 State?
21     A.   The Ohio Governor's Office of
22 Justice Services, also known as OCJS.
23     Q.   Now, I understand that you at some
24 point held a leadership role in the Ohio Task
25 Force Commanders Association?

Page 93

1      A.   Yes.  I was president.
2      Q.   Is there a short way of saying that
3  acronym?
4      A.   OTFCA.
5      Q.   OTFCA?  That what you say?  Okay.
6  That's what I was asking.
7          You were the president?
8      A.   Yes.
9      Q.   For what period of time?
10     A.   Two or three years.  Two or three
11 years.
12     Q.   And as the president of OTFCA, did
13 you take any action to focus OTFCA on opioid
14 enforcement?
15     A.   No.
16     Q.   And did you take any action, either
17 as the president or prior to being the
18 president, to focus OTFCA on prescription drug
19 trafficking?
20     A.   No.
21     Q.   When specifically were you
22 president?
23     A.   I don't recall exact dates.
24     Q.   Was it towards the end of your
25 career?

24 (Pages 90 - 93)

Page 94

1    A.   It would have been probably in the
2 mid to early, late 2000s.  So somewhere between
3 2005 and probably 2009, '10, somewhere in
4 there.
5    Q.   Okay.  And I'm realizing that I
6 missed a step in one of -- in my previous
7 question.
8         Did you ever take any action,
9 including before, during or after being
10 president of OTFCA, to focus OTFCA on
11 prescription drug trafficking?
12   A.   No.
13        MR. LEDLIE:  Object to the form of
14 the question.
15   Q.   Have you -- do you recall
16 prescription drug trafficking or enforcement
17 having been a focus of OTFCA's at anyone's
18 instigation?
19        MR. LEDLIE:  Object to the form of
20 the question.
21   A.   Our mission was to lead the state
22 in narcotics investigations.  Part of that was
23 education.  We provided pamphlets in regards to
24 prescription drugs for various programs and
25 public addresses.

Page 95

1    Q.   Okay.  That's helpful.  Thank you.
2         Anything beyond that that you
3 recall having been a particular focus of
4 OTFCA's on prescription drug trafficking?
5    A.   No.  I mean, other than just
6 information that we shared back and forth.
7    Q.   Among each other?
8    A.   Yes.
9    Q.   I understand you have had some
10 responsibility for speaking to the media on
11 behalf of the County?
12   A.   Yes.
13   Q.   And when was that?
14   A.   Various times throughout my career.
15   Q.   What about during the 2001 to 2012
16 period?
17   A.   Yeah, some.  At some point, the --
18 the sheriff's office had a -- a point man
19 for -- for their media information.
20   Q.   And so does that mean at that -- at
21 the point that they had a point man, you
22 stopped talking to the media?
23   A.   Right.
24   Q.   And do you remember when that was?
25   A.   Not offhand.

Page 96

1    Q.   Did your media-related
2 responsibilities involve anything related to
3 drug enforcement?
4    A.   It was all drug enforcement.
5    Q.   All drug enforcement?  Okay.  And
6 what about opioids specifically?
7    A.   I did talk to them about heroin one
8 time, I recall.
9    Q.   Do you remember when that was?
10   A.   No.
11   Q.   Other than that one time, do you
12 remember any other opioid-related media
13 responsibility?
14   A.   No, not really.  Other than -- I
15 mean, there may have been press releases put
16 out when we made cases or finish cases, it
17 could have contained that, but I can't tell you
18 specifics.
19   Q.   And would you have written those
20 press releases?
21   A.   Yes.
22   Q.   During what period of time would
23 you have been responsible for writing press
24 releases for narcotics cases?
25   A.   2001 until whenever they --

Page 97

1    Q.   Whenever the sheriff's office hired
2 a point man?
3    A.   Yes.
4    Q.   Okay.  And have you -- well, we've
5 already discussed to some extent that you have
6 made speeches and public presentations related
7 to narcotics, right?
8    A.   Yes.
9    Q.   Do you have notes or other
10 documents, like PowerPoint presentations or
11 anything like that, from any of your
12 presentations?
13   A.   Yeah.  I imagine there's some
14 someplace.
15   Q.   Where would they be?
16   A.   The PowerPoints are on an old
17 computer.  It's so old they can't even use the
18 current technology to show them, so.
19   Q.   And when you say "on an old
20 computer," one -- your personal computer?
21   A.   No.
22   Q.   Do you still have the computer?
23   A.   It's what -- it belongs to the drug
24 unit.
25   Q.   So they -- do you know if they

25 (Pages 94 - 97)

Page 98

1 still have it?
2        MR. LEDLIE:  Object to the form of
3 the question.
4      A.    It's there, yeah.
5      Q.    You know it's there?
6      A.    Uh-huh.
7      Q.    How do you know it's there?
8      A.    It's there because it's been in my
9 possession.  They just haven't been able to use
10 it, but it's -- I just haven't taken it back
11 and handed it to them.
12      Q.    Oh, I see.  So you -- you
13 physically have it.
14      A.    I have it.
15      Q.    Okay.  I apologize if I asked the
16 question in a confusing way.  That's -- that's
17 what I meant to ask.  You -- you still
18 physically have the computer?
19      A.    Yes.
20      Q.    But it is their computer?
21      A.    Correct.
22      Q.    And did anyone ask you if they
23 could search that computer in relation to this
24 litigation?
25      A.    No.

Page 99

1      Q.    What else related to Summit County
2 narcotics enforcement would be on that
3 computer?
4      A.    Nothing that I know of.
5      Q.    How long ago was it that you last
6 looked at it?
7      A.    Oh, I don't know.  Four or five
8 years.
9      Q.    So is it possible that there are
10 things on there that you're not remembering?
11      A.    It's always a possibility.
12      Q.    Okay.  What about printed copies of
13 notes or handwritten notes or other printed
14 copies of presentations that you've given?  Do
15 you know where those might be?
16      A.    The sheriff's office might have
17 a -- I used to have some with it.  I don't know
18 if they're there or not.
19      Q.    When you say "there," you mean at
20 home or in your old office?
21      A.    With the computer.
22      Q.    With the computer, okay.
23        And where is the computer
24 physically?
25      A.    At my home.

Page 100

1      Q.    At your home, okay.
2        Did you have any files where you
3 kept notes of the type that I've been asking
4 about that you left at the sheriff's office?
5      A.    There were all kinds of files
6 there, yeah.
7      Q.    Do you know what has become of
8 those?
9      A.    I have no clue.
10      Q.    Now, I -- I know from -- from some
11 research that you've given a number of public
12 statements about meth use; is that right?
13      A.    Yes.
14      Q.    Is it -- is it right that the
15 largest proportion of your public speeches have
16 been about meth?
17      A.    Yes.
18      Q.    And why is that?
19      A.    We were focused on that at the
20 time.  That's what the sheriff's office wanted
21 us to do.  And so we went about on a campaign
22 of public information and awareness.
23      Q.    When you say "at the time," what
24 time period are you talking about?
25      A.    Probably from 2002-ish on.

Page 101

1      Q.    Until you --
2      A.    There were a lot of meth labs here.
3      Q.    Until you retired?
4      A.    Yes.
5      Q.    Did you agree with that as -- as a
6 focus?
7      A.    I was told to do that, and that's
8 what we did.
9      Q.    I understand that, but now I'm
10 asking you whether you agreed with it or
11 whether you thought there should be a different
12 focus.
13      A.    I don't know.  At the time we were
14 well inundated with methamphetamine, and it was
15 an important thing to do.
16      Q.    Did you think that there was
17 anything more important than methamphetamine as
18 a focus?
19        MR. LEDLIE:  Object to the form of
20 the question.
21      A.    Our job was to enforce drug laws
22 and inform the public and keep them safe, and
23 that was a pressing fact, a pressing problem at
24 the time.
25      Q.    Meth was?

26 (Pages 98 - 101)

Page 102

1    A.    Yes.
2    Q.    Is it correct that you have made
3 fewer statements or presentations about
4 opioids?
5    A.    Yes.
6    Q.    Do you recall about how many
7 statements or presentations you've made about
8 opioids?
9    A.    Maybe a dozen, give or take.  I
10 don't know for sure.
11    Q.    Over what period of time?  The
12 whole time you were the commander?
13    A.    Yes.
14    Q.    Okay.  And just so I have an
15 understanding of context, that's out of how
16 many total statements or presentations?
17    A.    Yeah, I have no idea how many I
18 did.  I did a lot.
19    Q.    Is it hundreds?
20    A.    I couldn't -- I couldn't be
21 accurate.  I don't know for sure.  All I know
22 is I did a lot.
23    Q.    Do you have any idea of the volume
24 per year?
25        MR. LEDLIE:  Object to form.

Page 103

1    A.    It varied.
2    Q.    Per month?
3        MR. LEDLIE:  Object to the form of
4 the question.
5    A.    Yeah, I don't know.  I really --
6 really couldn't tell you.  I mean, some days I
7 did them every -- every day a week, and some
8 days I didn't.  I don't know.  I don't know.
9    Q.    A lot more than a dozen?
10        MR. LEDLIE:  Object to the form of
11 the question.
12    A.    Yes.
13    Q.    Okay.  Do you recall appearing on
14 an opioid panel at a conference in 2014?
15    A.    Yeah.  I don't know what the date
16 was, but I recall.
17    Q.    Where was that?
18        Let me ask the question --
19    A.    It was either children services
20 or --
21    Q.    I think I asked the question in
22 a -- in a vague way.  Was it specific to Summit
23 County, this conference?
24    A.    Yes.
25    Q.    Okay.  So it wasn't somewhere

Page 104

1 outside the state?
2    A.    Correct.
3    Q.    And do you recall what you talked
4 about?
5    A.    Yes.  I talked about the
6 prescription drug problem.
7    Q.    What specifically?
8    A.    With respect to opioids, the amount
9 of overdose deaths there were, the amount of
10 overdoses in general.
11    Q.    Did you have a prepared statement
12 for that?
13    A.    I had a slideshow.
14    Q.    Do you know where that slideshow is
15 now?
16    A.    Might still be on a stick.  I
17 can't -- I can't say for certain.
18    Q.    Do you know whether you have any
19 printouts of it?
20    A.    I don't recall having any.
21    Q.    When you say it might still be on a
22 stick, do you know whether that stick would be
23 physically in your possession or --
24    A.    Yes.
25    Q.    It would be?

Page 105

1    A.    Yes.
2    Q.    Okay.  And I take it no one has
3 asked you for such sticks?
4    A.    They have not.
5    Q.    Okay.  When you say that you talked
6 about overdose deaths and -- and other things
7 related to the prescription drug problem, were
8 you using statistics?
9    A.    I was using statistics, yes.
10    Q.    Where did you get those statistics?
11    A.    Some of them came from the
12 coroner's office.  Some of them came from the
13 Ohio Department of Health.  And probably
14 wherever else I could find something.
15    Q.    In preparing for that panel, did
16 you reach out to these offices and ask them for
17 statistics?
18    A.    The information, the statistics,
19 that came from the State is online.  Get that
20 anywhere.  And the coroner's office, obviously,
21 we had to make a call.
22    Q.    Do you recall having made any
23 statements about your views on the causes of
24 the opioid prescription drug problem?
25    A.    No.

27 (Pages 102 - 105)

Page 106

1    Q.   During your time -- well, let me
2  just make sure that -- that I have this 100
3  percent right.
4        From 2001 to 2012, you were the
5  commander of the Summit County Drug Unit; is
6  that right?
7    A.   That's correct.
8    Q.   So your position did not change
9  during that time period?
10   A.   It did not.
11   Q.   And for most of that time, you had
12 one individual, Inspector Thornton, between you
13 and the sheriff; is that right?
14   A.   Yes.
15   Q.   Except for the very end where it
16 was just a direct reporting line?
17   A.   Correct.
18   Q.   During that period of time, then,
19 are you the person most familiar with the
20 processes and procedures of the Summit County
21 Drug Unit?
22       MR. LEDLIE:  Object to the form of
23 the question.
24   A.   I ran it, so, yes.
25   Q.   During the period of time that you

Page 107

1  were the commander, did the Summit County Drug
2  Unit ever monitor the number of prescriptions
3  written in Summit County of any drug?
4    A.   Specifically and intentionally
5  monitor, no.
6    Q.   During your time as commander of
7  the Summit County Drug Unit, did the unit ever
8  monitor the volume of medications entering
9  Summit County legally?
10       MR. LEDLIE:  Object to the form of
11 the question.
12   A.   We wouldn't -- yeah, we wouldn't
13 have information to that.
14   Q.   You wouldn't have information about
15 that?
16   A.   No.
17   Q.   Did you ever try to get it?
18   A.   No.
19   Q.   During your career, did the
20 sheriff's office or the drug unit ever compare
21 the population of Summit County to the number
22 of prescription medications entering Summit
23 County?
24   A.   No, because we had no clue what was
25 coming in.

Page 108

1    Q.   Did you ever try to find out?
2    A.   I believe I answered that.  No.
3    Q.   And during your career, did the
4  sheriff's office or the Summit County Drug Unit
5  ever compare the population of any particular
6  city or township within Summit County to the
7  number of prescription medications entering
8  that city or township?
9        MR. LEDLIE:  Object to the form of
10 the question.
11   A.   I recall seeing some data one time
12 in regards to one of the operations in the
13 southern part of the -- the state that
14 indicated an extremely high level of
15 prescription opioids being distributed there.
16   Q.   Sir, my question was about Summit
17 County, and you seem to be referring to the
18 southern part of the state.
19   A.   Well --
20       MR. LEDLIE:  Object to the form of
21 the question.  He's trying to answer the
22 question.
23       MS. SAULINO:  Actually, he's not.
24 I'm trying to make sure that he understood my
25 question.

Page 109

1    Q.   You recall I asked about Summit
2  County in particular, sir?
3        MR. LEDLIE:  Ma'am, you asked about
4  any particular city.
5        MS. SAULINO:  In Summit County.
6    Q.   I can read my question back.  "And
7  during your career, did the sheriff's
8  office" --
9        MS. SAULINO:  I need to make it
10 stop scrolling.
11   Q.   "Did the sheriff's office" --
12       MS. SAULINO:  How do I make it stop
13 scrolling?  There we go.
14       I'll ask the court reporter to read
15 it.
16       (Record read.)
17       MR. LEDLIE:  Object to the form of
18 the question.
19   Q.   I'd ask you to answer that
20 question, sir.
21   A.   No.
22   Q.   Have you ever heard of OARRS?
23   A.   Yes.
24   Q.   And what is your understanding of
25 what OARRS is?

28 (Pages 106 - 109)

1    A.    OARRS is a database that shows
2 where patients are being prescribed and/or are
3 receiving medications from across the state.
4    Q.    When did you first hear about
5 OARRS?
6    A.    I don't remember the exact date
7 when that was.
8    Q.    Do you have a rough time period?
9    A.    Somewhere between 2001 and 2012.
10    Q.    And did you use OARRS as a part of
11 your work?
12    A.    Yes.
13    Q.    How often?
14    A.    Whenever we got a call.
15    Q.    What did you use it for?  What did
16 you do with it?
17    A.    When we got a call in regards to a
18 prescription case, we would look up the -- the
19 target to determine whether or not they were
20 legitimate or they were doctor shopping or
21 doctor hopping, whichever.
22    Q.    And what about OARRS would allow
23 you to make that determination?
24    A.    It would show us their
25 prescriptions.

1    Q.    Do you know who had access to
2 OARRS?
3    A.    Me and another officer in the
4 group.
5    Q.    And what about outside of law
6 enforcement?  Do you know whether anyone
7 outside of law enforcement had access to OARRS?
8    A.    My understanding was that
9 physicians had access and that pharmacists had
10 access to it.
11    Q.    Do you know -- did you ever have
12 any belief that pharmaceutical manufacturers
13 had access?
14        MR. LEDLIE:  Object to the form of
15 the question.
16    A.    I have no idea.
17    Q.    Based on your understanding of
18 OARRS, would you think that they would have?
19        MS. RION:  Object to the form.
20    A.    Yeah.  I don't know.
21    Q.    And what about pharmaceutical
22 distributors?  Did you ever have any
23 understanding as to whether they would have
24 access?
25        MS. RION:  Object to the form.

1    A.    I have no idea.  Couldn't tell you.
2    Q.    And you say that pharmacists had
3 access.  Do you know what type of access they
4 had?
5    A.    No.
6    Q.    Do you know what uses they were
7 allowed to put that information to?
8    A.    I do not.
9    Q.    And without access to OARRS, would
10 you have been able to make the determinations
11 that you just described you used OARRS for?
12        MR. LEDLIE:  Object to the form of
13 the question.
14    A.    It's hard to say.  It could have
15 taken a lot of legwork, possibly.
16    Q.    And when you say it could have
17 taken a lot of legwork, what kind of legwork?
18    A.    Visiting the various pharmacies,
19 see whether or not those individuals had gotten
20 prescriptions there.
21    Q.    And in doing so, you would need to
22 have the ability to inquire about an
23 individual's prescriptions, right?
24    A.    That would be part of the
25 investigation, yes.

1    Q.    So you'd need to be law enforcement
2 to do that, right?
3    A.    Yes.
4    Q.    Any private company or citizen
5 can't walk in and ask for that information,
6 right?
7    A.    I don't know what the various
8 pharmacies' policies are to that.  I couldn't
9 tell you.
10    Q.    Your -- it's your understanding
11 that you need to be a law enforcement officer
12 to get that information, right?
13        MR. LEDLIE:  Object to the form of
14 the question.  Asked and answered.
15    A.    Through our investigations, we were
16 able to do so.  Whether anybody else could, I
17 couldn't tell you.
18    Q.    Did you typically get a warrant to
19 get that kind of information?
20    A.    No.
21    Q.    Did you use a subpoena?
22    A.    No.
23    Q.    You just asked?
24    A.    You just ask.
25    Q.    Did you show your credentials or in

29 (Pages 110 - 113)

Page 114

1 other -- in any other ways provide information
2 that assured folks that you were law
3 enforcement when you were asking for that
4 information?
5     A.   We always do.
6     Q.    Did you have any formal training on
7 how to use OARRS?
8     A.   I don't recall ever sitting through
9 a class, a formal class.  I'm sure we had
10 some- -- I'm sure we got something, but I
11 couldn't tell you what.
12    Q.    You don't recall having sort of
13 just pecked around yourself to figure it out?
14    A.   No.
15    Q.    So you think you were somehow
16 trained?
17        MR. LEDLIE:  Object to the form.
18    A.   I'm sure there was some information
19 given to us.
20    Q.   Have you heard of ARCOS?
21    A.   I have.
22    Q.   Did you ever use ARCOS?
23    A.   No.
24    Q.   Why not?
25    A.   I first heard about it when I read

Page 115

1 the complaint.
2     Q.    Well, that would be a good reason.
3        And what is your understanding of
4 what ARCOS is?
5     A.   It's basically an OARRS for the
6 distributors and manufacturers.
7     Q.    When you -- when you say that, what
8 specifically is your understanding of what
9 information is contained in ARCOS?
10    A.    It should probably give them
11 information as to the type of drugs and
12 quantities that were sent out to various
13 locations.
14    Q.    Give who information?
15    A.    The people that have access to it.
16    Q.    And what is your understanding of
17 who has access to it?
18    A.    Manufacturers, distributors, the
19 DEA.
20    Q.    Is it -- is it your understanding
21 that manufacturers and distributors can search
22 ARCOS?
23        MR. LEDLIE:  Object to the form of
24 the question.
25    A.    It would be my understanding that

Page 116

1 that would be -- yes.
2     Q.    What is that based on?
3     A.    Based on the fact that it's similar
4 to OARRS, so that they would know where their
5 shipments were going and how much they sent
6 out.
7     Q.    Do you have any understanding
8 through any kind of formal sources --
9     A.   I do not.
10    Q.    -- the -- the answer to my
11 question?  No, you don't?
12    A.    Right.  No, you asked what my
13 understanding was.  That's my understanding.
14    Q.   Okay.  And your understanding is
15 based largely on reading the complaint and
16 speculating?
17    A.   That is correct.
18        MR. LEDLIE:  Object to the form of
19 the question.
20    Q.    Did you -- do you now have an
21 understanding that ARCOS is a database through
22 which distributors and manufacturers report
23 drug transactions to the DEA?
24    A.   Okay.  I'm not sure I quite
25 understand where you're going.  My

Page 117

1 understanding is that it is similar to OARRS so
2 that they can show where everything's going.
3 They use it between themselves and the DEA, and
4 I believe -- is that what you just asked me?
5     Q.    Well, no, I asked you something
6 different.
7        Is your understanding based on any
8 discussion with anybody?
9     A.   No.
10    Q.   Okay.  So it's really just reading
11 the complaint and sort of comparing it yourself
12 to OARRS?
13    A.   Yes.
14    Q.   But not ever having seen ARCOS?
15    A.   That's correct.
16    Q.   So I take it you never asked the
17 DEA for ARCOS data?
18    A.   Didn't even know it existed.
19    Q.   And they never mentioned to you
20 that they had such data?
21    A.   No.
22    Q.   Even though you had one and then
23 later two DEA agents as a part of your unit?
24    A.   They're investigators.  Go ahead.
25    Q.   They never mentioned to you they

30 (Pages 114 - 117)

Page 118

1 had access to ARCOS data?
2    A.   No.
3    Q.   If I told you that through ARCOS,
4 the DEA has the aggregate data of every opiate
5 transaction in the country, is that something
6 you would have liked to know when you were the
7 commander of the unit?
8        MR. LEDLIE:  Object to the form of
9 the question.
10    A.   I would imagine that would have
11 been maybe case specific.
12    Q.   If I told you that ARCOS was the
13 database that the DEA had -- through which the
14 DEA had aggregate data of every opiate
15 transaction in the country, is it something you
16 would have used while you were the commander of
17 the unit?
18        MR. LEDLIE:  Object to the form of
19 the question.
20    A.   Again, it would have been maybe
21 case specific.
22    Q.   But would you have used it?
23        MR. LEDLIE:  Object to the form.
24    A.   If we were working a large case,
25 yeah, it would have been probably some good

Page 119

1 data to have.
2    Q.   Did you ever, for any reason at any
3 point in your career with the sheriff's office,
4 reach out to distributors of pharmaceutical
5 products to ask them for any information
6 regarding pharmaceutical products coming into
7 your jurisdiction?
8    A.   No.
9    Q.   And the same question with respect
10 to manufacturers of pharmaceutical products.
11 Did you ever reach out to any of them to ask
12 them for any information about pharmaceutical
13 products coming into your jurisdiction?
14    A.   No.
15    Q.   And what about retail pharmacies in
16 general?  I'm not talking about specific
17 pharmacists here, but retail pharmacies.  Did
18 you ever reach out to them for any information
19 about pharmaceutical products coming into your
20 jurisdiction?
21        MR. LEDLIE:  Object to form of the
22 question.
23    A.   No.
24    Q.   Why didn't you do any of those
25 things?

Page 120

1    A.   Didn't find it necessary.
2    Q.   Why not?
3    A.   Our everyday, day-to- -- day-to-day
4 cases --
5    Q.   Can you ex- --
6    A.   -- wasn't --
7    Q.   Go ahead.
8    A.   It wasn't something that at any
9 period of time that we're -- needed to know, I
10 guess.
11    Q.   You didn't think that that
12 information would have been useful to you in
13 your job?
14        MR. LEDLIE:  Object to the form of
15 the question.
16    A.   It wasn't relevant to any of the
17 cases that we were working.
18    Q.   Through your work, did you ever
19 come to have an understanding of the
20 differences in volumes that pharmacies in
21 Summit County might have had of any particular
22 drugs?
23        MR. LEDLIE:  Object to the form.
24    A.   No.
25    Q.   It's not something that you sought

Page 121

1 out?
2    A.   No.
3    Q.   Are you generally aware that
4 between 1996 and 2012, more opioid
5 prescriptions were written by doctors in
6 general?
7    A.   I've read that, yeah.
8    Q.   Did you have any awareness of that
9 as a part of your job?
10    A.   You know, we -- whatever case came
11 down the pipe, we worked.  It didn't matter
12 what it was.
13    Q.   And are you aware that the DEA sets
14 quotas for each class of controlled substance
15 to ensure that there are sufficient drugs to
16 provide for the medical, scientific research,
17 and industrial needs of the U.S.?
18        MR. LEDLIE:  Object to the form of
19 the question.
20        You can answer.
21    A.   I became aware of that when I read
22 the complaint.  Yeah.  Prior to that, they -- I
23 didn't -- whatever the DEA does, I have no
24 idea.
25    Q.   If I represented to you that from

31 (Pages 118 - 121)

Page 122

1  1996 to 2015 the DEA increased opioid quotas
2  based on a determination that the estimated
3  medical need for opioids was increasing, would
4  you have any reason to doubt that?
5       MR. LEDLIE:  Object to the form of
6  the question.  He's a fact witness.
7    A.   I mean, again, I don't know what
8  the DEA does or how they work that, and that's
9  up to them.
10    Q.   Well, given that more opioids were
11  being prescribed from the mid-'90s through your
12  time period as the commander of the drug unit,
13  and the DEA was raising opioid quotas based on
14  medical need, is it fair that you would have
15  expected that the number of opioids dispensed
16  in Summit County would have increased over that
17  period of time?
18       MR. LEDLIE:  Object to the form of
19  the question.
20    A.   I don't know.  It depends on what
21  physicians were prescribing at the time.
22    Q.   Okay.  That's fair.  And it's not
23  something that you ever looked into as the
24  commander of the unit, right?
25       MR. LEDLIE:  Object to the form of

Page 123

1  the question.
2    A.   Yeah, I did not look into that.
3       MR. LEDLIE:  We've been going about
4  an hour and 15 minutes.  Is this a good time?
5       MS. SAULINO:  I'm happy to take a
6  break now.  It's a little after 11:30, I think,
7  if I'm reading the clock right.
8       MR. LEDLIE:  Yeah.  Yeah, you are.
9       MS. SAULINO:  So I wonder whether
10  you want to take a break now or whether you
11  want to go a little more and then do lunch,
12  or -- I leave it to you.
13       MR. LEDLIE:  I'd just as soon take
14  a break.  It's an hour and 15 minutes, and I'd
15  like to take a break.
16       MS. SAULINO:  Are you okay with a
17  little bit later lunch?
18       THE WITNESS:  No.  Take a break.
19       MS. SAULINO:  Right.  That's my
20  question.  Are you suggesting we have lunch
21  now, or are we going to take a break, come
22  back, and then leave again?  That's my
23  question.
24       MR. LEDLIE:  I can do lunch -- if
25  it's 11:30, I can do lunch now.  That's fine.

Page 124

1       MS. SAULINO:  Yeah, I don't know if
2  our lunch is here yet, so I'm not ready for a
3  lunch break.  So we're going to have to take a
4  break and come back then, so.
5       THE VIDEOGRAPHER:  Off the record,
6  11:34.
7       (A recess was taken.)
8       THE VIDEOGRAPHER:  We're on the
9  record, 11:50.
10  BY MS. SAULINO:
11    Q.   Through your experience and
12  training, have you developed an understanding
13  of which drugs are opioids and which drugs are
14  not?
15    A.   Yes.
16    Q.   And what is your understanding of
17  which drugs are opioids?
18    A.   There are opioids that contain
19  nothing but variations of the opium.  There are
20  semisynthetic opiates that are partially lab
21  created and partially opiates.  And there are
22  synthetic opiates which are completely lab
23  created.
24    Q.   Okay.  So forgive me.  I -- I wrote
25  some of this as quickly as I could, but some of

Page 125

1  it -- so -- so -- but let's go back through
2  this.
3       So you say that there are opiates
4  that contain --
5    A.   They're direct derivatives from
6  opium.
7    Q.   Direct -- and which would those be?
8    A.   Let me think.  Codeine is part of
9  the opium derivative.  It's a -- morphine is a
10  direct derivative of opium.  Heroin is a
11  derivative of morphine.  I want to say Vicodin.
12  The others I'm not terribly sure about.
13       Semisynth- -- semisynthetic ones,
14  which are partially derivatives or partially
15  lab created, I believe Dilaudid is a
16  semisynthetic one.  I want to say OxyContin is
17  semisynthetic.  I'm not certain for -- and
18  there are others that are completely lab
19  created that mimic the effects of opium.
20    Q.   And what is your understanding of
21  what some of those are?  Does fentanyl fall in
22  that category?
23    A.   Yeah, I believe fentanyl is
24  completely lab created.  Carfentanil is lab
25  created.

32 (Pages 122 - 125)

Page 126

1    Q.   Okay.  And what is your
2    understanding of some examples of drugs that
3    are not opioids at all?
4        A.   Cocaine.
5        Q.   Meth?
6        A.   Meth.
7        Q.   Marijuana?
8        A.   Marijuana.
9        Q.   Xanax?
10       A.   Pardon me?
11       Q.   Xanax?
12       A.   I'm not sure the makeup of Xanax.
13   Here's an old one for you.  Preludins,
14   barbiturates.
15       Q.   Benzodiazepines?
16       A.   Valiums?  Yeah, I don't think
17   they're opiums.
18       Q.   Okay.  Now, you also know that some
19   opioids are available by prescription and
20   others are not legal at all?
21       A.   In some cases -- all of them are
22   illegal, depending, but --
23       Q.   What do you mean by that?
24       A.   Well, if you've diverted it, then
25   it's not legal.

Page 127

1        Q.   Okay.  Fair enough.  But just sort
2    of as an -- as a general principle about
3    particular opiates, some of them are available
4    in legal form and some are never available in
5    legal form; is that right?
6            MR. LEDLIE:  Object to the form.
7        A.   Some are prescription available,
8    some are not, yes.
9        Q.   Right.  Like heroin is not legal,
10   right?  Sir, you have to answer verbally.
11       A.   Yes.
12       Q.   And -- and others can be available
13   by prescription, like some of those that you
14   named like codeine or morphine, right?
15       A.   They are available by prescription,
16   yes.
17       Q.   Now, do you understand that
18   prescription opioids are approved by the FDA
19   and the DEA?
20           MR. LEDLIE:  Object to the form.
21       A.   I don't know about the DEA.  The
22   FDA approves medications in this country, yes.
23       Q.   And you understand that they are
24   tested to make sure their benefits outweigh
25   their risks?

Page 128

1            MR. LEDLIE:  Object to the form.
2        A.   Yeah.  Not sure what all the FDA
3    does or how they go about their business.
4        Q.   You understand that prescription
5    opioids are regulated?
6        A.   Meaning?  When you say "regulated,"
7    you mean --
8        Q.   That there are regulations that
9    control their prescription and distribution?
10       A.   Yes.
11       Q.   And you understand that they are
12   prescribed by doctors to treat medical
13   conditions, right?
14       A.   Supposedly, yes.
15       Q.   Now, you understand that
16   non-prescription opioids are not produced,
17   distributed, or dispensed by licensed
18   manufacturers, distributors, or pharmacies,
19   right?
20           MS. RION:  Object to the form.
21       A.   To my knowledge.
22       Q.   And you understand that
23   non-prescription opioids are illegal to
24   produce, distribute, and possess, right?
25       A.   Yes.

Page 129

1        Q.   And you understand they are not
2    regulated in the sense that they're not
3    regulated for distribution, right?
4            MR. LEDLIE:  Object to the form.
5        A.   I mean, they're regulated.  They're
6    illegal.
7        Q.   They're illegal, right.  Okay.  And
8    they are banned by the DEA?
9        A.   They're banned by the government.
10   DEA is part of the government, if you want to
11   go that route, but --
12       Q.   Fair enough.  You understand that
13   they are more addictive than prescription
14   opioids?
15           MR. LEDLIE:  Object to the form.
16       A.   No.  They're all Schedule Is and
17   Schedule IIs, which means they're all very
18   addictive.
19       Q.   And you understand that there's a
20   very high potential for abuse with
21   non-prescription opioids, right?
22           MR. LEDLIE:  Object to the form.
23       A.   There is for any opioid.
24       Q.   And what is the basis of your
25   understanding?

33 (Pages 126 - 129)

1    A.   They're opioids.  They're Schedule
2 Is, Schedule IIs under the Controlled
3 Substances Act of 1970.  They were scheduled
4 that as a result of their ability to cause
5 addictions, or their high -- what's the word I
6 want to use -- high probability of addiction.
7    Q.   And what is the basis for the
8 statement that you just made?  How do you know
9 that?
10    A.   I was trained.
11    Q.   Okay.  Do you believe that there's
12 any kind of opioid epidemic or crisis in Summit
13 County?
14    A.   Yes.
15    Q.   And what is your definition of an
16 opioid epidemic or crisis?
17    A.   Have to think about how I want to
18 word this.  We have a situation where addicts
19 who have been exposed to opioids and are having
20 a difficult time getting them are turning to
21 other examples to get their fix.
22       In other words, they can't get the
23 scripts, and now they're going to the illegal
24 drugs, like heroin and such, in such a fashion
25 that our overdoses have climbed for several

1 years, numerous years, here in Summit County
2 alone, not to -- not to mention the rest of the
3 state.
4    Q.   So that is your view of what an
5 opioid epidemic or crisis is?
6    A.   Yeah.  It's a major problem because
7 there's too much out there.
8    Q.   So you are including both legal and
9 illegal --
10    A.   Yes.
11    Q.   -- as a part of your explanation,
12 right?
13    A.   That's correct.
14    Q.   When do you believe the opioid
15 epidemic began?
16       MR. LEDLIE:  Object to the form.
17    A.   I can't give you an exact year.  I
18 remember listening to some of the other
19 commanders in the southern end of the state
20 talk about the problems they were having in
21 regards to OxyContin whenever it hit the
22 street.  Whatever year that may have been, I
23 don't know.
24    Q.   You say you don't remember the
25 year.  Do you remember whether it was early in

1 your time?
2    A.   If I had to guess, which I'm
3 doing --
4       MR. LEDLIE:  I'm going to object to
5 the form of the question.
6    A.   Yeah.  Probably mid-ish, maybe, I
7 don't know.  Again, I can't -- I can't give you
8 a date.
9    Q.   When did you first become aware of
10 issues with opiates in your community?
11    A.   There's always been heroin here.
12    Q.   And when did you first formulate a
13 belief that Summit County had a problem with
14 opioids?
15       MR. LEDLIE:  Object to the form of
16 the question.
17    A.   I'm not sure I ever attributed,
18 specifically.  We always had a drug problem.
19 If you wanted it, you could find it.
20    Q.   Is it -- am I understanding
21 correctly that in your experience, in your long
22 experience working in narcotics and drug units
23 at Summit County, there have always been drugs
24 out there; it's just a matter of which drug it
25 was?

1    A.   Yeah.  Like I said, if you want it,
2 you could find it.
3    Q.   So during your years in law
4 enforcement in Summit County, have illicit
5 drugs ever not been a problem?
6    A.   It's always -- they're always
7 there.
8    Q.   In your mind, is there a
9 distinction between the opioid epidemic and the
10 prescription opioid epidemic?
11    A.   It's always been heroin out there
12 if you wanted it.  We didn't see a lot of it
13 after the OxyContins was introduced.  We
14 started -- during a period of time, it seemed
15 like there was a -- there became more heroin
16 available.  So they kind of run hand in hand.
17    Q.   You recall heroin having been a
18 problem even before you had focused on
19 prescription opioids, right?
20       MR. LEDLIE:  Object to the form of
21 the question.
22    A.   Yeah.
23    Q.   Yes?
24    A.   Yes.
25    Q.   And you know that, for instance,

34 (Pages 130 - 133)

Page 134

1 morphine has been available since -- for
2 decades now, right?
3     A.   It's been around a while, yes.
4     Q.   Do you recall it ever not being
5 around when you -- as -- as -- do you ever --
6 do you recall it ever not being around when you
7 were in law enforcement?
8     A.   No.  It's always been there.  Been
9 there since the Civil War.
10     Q.   Do you recall the rise of heroin
11 use in Northeast Ohio in the early 1990s?
12     A.   Specifically, no.  Things kind of
13 go in cycles, and they're up and down, and...
14         - - - - -
15         (Thereupon, Deposition Exhibit 1,
16         Cleveland Plain Dealer Article
17         Titled "The Comeback Drug; Police,
18         Social Workers Fear Heroin
19         'Epidemic'", was marked for purposes
20         of identification.)
21         - - - - -
22     Q.   All right.  Commander Baker, you've
23 been handed what has been marked as Baker
24 Exhibit 1.  This is an article from the
25 Cleveland Plain Dealer from 1992.  You were

Page 135

1 living in the area at the time, right?
2     A.   Yes.
3     Q.   And do you see -- let's see, one,
4 two, three -- it's technically the fourth
5 paragraph.  It starts "John and Mary."
6     A.   Okay.
7     Q.   You see it says, "John and Mary are
8 part of what is apparently a growing list of
9 heroin users.  Use of the narcotic in greater
10 Cleveland and in the United States is on the
11 rise, and there is a fear it may become the
12 drug of the '90s."
13     A.   Okay.
14     Q.   Does that refresh your recollection
15 at all?
16     A.   I don't remember reading this.
17     Q.   Do you remember that concept,
18 though, that the use of heroin was on the rise
19 in the early 1990s?
20     A.   In Cleveland?  I really didn't care
21 what was going on in Cleveland.
22     Q.   So you don't think that was
23 happening in Summit County?
24     A.   If I don't -- you know, I mean if I
25 don't recall this, I don't -- see, we didn't

Page 136

1 see very much heroin here.
2     Q.   When you say you didn't see very
3 much heroin here, what do you mean by that?
4     A.   It means we didn't do very many
5 heroin cases.
6         There was a large group before I
7 was even hired on to the sheriff's office that
8 they did during -- towards the end of the
9 Vietnam era, and that's one of the biggest
10 cases I can remember here.
11         When I started working drugs here,
12 I would say we didn't do heroin cases.  A
13 couple maybe.
14     Q.   You were more focused on meth at
15 the time, right?
16         MR. LEDLIE:  Object to the form of
17 the question.
18     A.   I was focused on whatever came down
19 the line.
20     Q.   Right.  But you told me earlier
21 meth was a big deal for a long time, right?
22         MR. LEDLIE:  Object to the form of
23 the question.
24     A.   We did a lot of meth cases.
25     Q.   Now, you mentioned earlier that

Page 137

1 it's your opinion that heroin's used after
2 folks can't get prescription opioids anymore;
3 is that right?
4         MR. LEDLIE:  Object to the form.
5     A.   Yes, that's what I said.
6     Q.   And look at the last paragraph on
7 this first page.  It starts "Crack addicts."
8         You see it says, "Crack addicts are
9 using heroin to help cope with the anxiety of
10 coming down from the euphoric but brief cocaine
11 high.  The problem arises when addicts opt
12 for the more potent heroin, eventually trading
13 a cocaine habit for a heroin habit."
14         Do you see that?
15     A.   Yes.
16     Q.   Is it your understanding, in your
17 long experience working with narcotics, that
18 people use heroin when they need something
19 else?
20         MR. LEDLIE:  Object to the form of
21 the question.
22     A.   Why people needs heroin, that's --
23 I have no clue.  That's up to them.
24         I can tell you we did a lot of
25 crack cases, and we didn't find any heroin

35 (Pages 134 - 137)

Page 138

1 there when we did them.
2    Q.   Okay.  So do you disagree with this
3 statement?
4        MR. LEDLIE:  Object to the form.
5    A.   This -- you know, this -- I don't
6 know who the individuals are.  I don't know who
7 the reporter is.  I mean, he got information
8 and he wrote it down.
9    Q.   I'm just asking if you disagree
10 with it.
11       MR. LEDLIE:  Object to form.
12    A.   I don't know the -- where it came
13 from, so I don't know whether -- what his
14 sources are, so --
15    Q.   That's not what I'm asking, sir.
16 I'm just asking --
17    A.   I understand, but I can't -- I
18 can't agree or disagree to something that I
19 have no clue about; that I don't know -- that I
20 don't know where the information came from.
21    Q.   So you don't have any knowledge of
22 the use of heroin in Northeastern Ohio in the
23 early 1990s?
24       MR. LEDLIE:  Object to the form of
25 the question.  Asked and answered.

Page 139

1    A.   Oh, I'm sure it was being used.  I
2 can't tell you how much.
3    Q.   Or why, right?
4        MR. LEDLIE:  Object to the form of
5 the question.
6    A.   People use drugs for different
7 reasons.  You know, who knows.
8    Q.   That's generally true, though,
9 right?
10       MR. LEDLIE:  Object to the form.
11    A.   I don't know.  I mean, you're --
12 you're asking me to get into people's minds
13 that I don't even know.  I don't know.
14    Q.   Fair enough.  So you -- I mean, and
15 that's generally true, that you can't get into
16 people's minds as to why they use drugs, right?
17    A.   Correct.
18    Q.   Or why they use heroin in
19 particular, right?
20    A.   Correct.
21    Q.   So your earlier statements would be
22 qualified with the fact that you're not willing
23 to get into people's minds, right?
24       MR. LEDLIE:  Object to the form of
25 the question.

Page 140

1    A.   I -- I don't know -- I'm not sure
2 exactly what it is you're -- you're asking, but
3 whether or not I agree with this written
4 report, this came from someone.  I have no
5 clue.  I don't know how he got --
6    Q.   Sir, that's not my question.
7    A.   -- his information.
8    Q.   That's not my question.
9        MR. LEDLIE:  He's trying to answer
10 your question, and you're cutting him off.
11 It's unacceptable.
12    Q.   Sir, I'm just trying to remind you
13 what my question is because we have limited
14 time, and I don't need you answering questions
15 I haven't asked, and I'm sure you don't want to
16 have to do that.
17       So the bottom line is that you are
18 not willing to speculate as to why people turn
19 to heroin, right?
20       MR. LEDLIE:  Object to the form of
21 the question.
22    A.   Why people use it is up to them.  I
23 don't know why.  I can't tell you.
24    Q.   And that is generally true, not
25 just with respect to Exhibit 1?  Which you can

Page 141

1 put aside because I'm not even asking about
2 that anymore.
3        MR. LEDLIE:  Object to the form of
4 the question.
5    Q.   Right?
6    A.   Correct.
7    Q.   Now, you also know that fentanyl
8 has been used in the United States for decades,
9 right?
10    A.   Yeah, I'm not sure exactly when it
11 came out, but...
12    Q.   It's been around awhile, right?
13    A.   Yeah.  Again, I'm not sure when it
14 came out, but I -- we saw some during my
15 tenure.
16    Q.   And you would agree with me that
17 law enforcement in Summit County has been aware
18 of prescription opioid misuse for many years,
19 right?
20    A.   Yes.
21    Q.   This was true in the early 2000s,
22 if not earlier, right?
23    A.   Prescription drugs have always been
24 abused, so I guess yes.
25    Q.   What about prescription opioids?

36 (Pages 138 - 141)

Page 142

1    A.   They're part of prescription drugs,
2 so, yes.
3    Q.   In your experience as a law
4 enforcement officer in Summit County, do you
5 remember a time when prescription opioids were
6 not misused?
7    A.   No.
8    Q.   Do you remember any particular time
9 seeing a rise in prescription opioid misuse?
10    A.   I'm sorry.  Again?
11    Q.   Do you remember any particular time
12 seeing a rise in prescription opioid misuse?
13 Or times?
14    A.   I think it's just changed from one
15 brand to another, I guess, if you will.  We saw
16 a lot of Dilaudids early on and then it kind of
17 tapered off, and then there was oxys and...
18    Q.   Can you give me any kind of time
19 frame on that?
20    A.   It ebbs and flows.  When I started,
21 we were buying Dilaudids all the time, so --
22    Q.   That would have been in the '80s?
23    A.   Yes.  Late -- mid to late '80s.
24 Then when OxyContins hit the scene, there were
25 oxys around, and...

Page 143

1    Q.   So you saw more of those, then?
2    A.   Yeah.  Dilaudids -- Dilaudids kind
3 of dropped off.  We didn't see those.
4 Barbiturate use kind of dropped off.  We didn't
5 see any more barbiturates.
6    Q.   Is drug diversion something that
7 you've been aware of as a part of your law
8 enforcement duties the whole time?
9    A.   Yes.
10    Q.   Yes?
11    A.   Yes.
12    Q.   And not just aware of; you've seen
13 it in Summit County?
14    A.   Yes.
15    Q.   The whole time you've worked
16 narcotics in Summit County?
17    A.   Uh-huh, yes.
18    Q.   Do you think that the government
19 officials in Summit County and in Ohio attacked
20 the problem you've identified with opioids as
21 quickly or as intensively as they should have?
22       MR. LEDLIE:  Object to the form of
23 the question.
24    A.   I don't know.  I can't speak for
25 them.  I'm not exactly sure of what all they

Page 144

1 did or when they did it, so my answer would be
2 I really don't know.
3    Q.   Well, okay.  Let's -- let's talk
4 specifically about the time period of 2001 to
5 2012, when you were the commander of the Summit
6 County Drug Unit, right?
7    A.   Correct.
8    Q.   As the commander of the Summit
9 County Drug Unit, did you feel like -- like
10 government officials attacked the problems that
11 you were seeing as intensively or as quickly as
12 they should have?
13       MR. LEDLIE:  Object to the form of
14 the question.
15    A.   I don't know.  I don't know what
16 our government here was doing.  We'd worked our
17 cases every day.  Whatever came down the line,
18 that's what we did.  I wasn't looking around to
19 see what the commissioner's office or what the
20 county council was doing towards anything.
21    Q.   Did you ever have any frustrations
22 in that regard?
23       MR. LEDLIE:  Object to the form.
24    A.   No.  I worked -- we worked our
25 cases and did our job.

Page 145

1    Q.   Okay.  You talked earlier about an
2 opioid epidemic or crisis.  Was there ever any
3 point when you felt like government officials
4 should have done something about that?
5       MR. LEDLIE:  Object to the form of
6 the question.
7    A.   I don't know.  Again, I'm a soldier
8 out on the front line.  We did what we did,
9 and, you know, if -- if government was going to
10 do something, whether it was education or
11 whatever it was going to do, that was up to
12 them, and I didn't care.
13    Q.   Was there any actor that you
14 thought wasn't acting quickly enough or
15 intensively enough --
16       MR. LEDLIE:  Object --
17    Q.   -- with respect to the opioid
18 crisis or problem that we talked about earlier?
19    A.   Yeah.  I never --
20       MR. LEDLIE:  Object to the form of
21 the question.
22    A.   -- never paid any mind to it.
23 Worked our cases and went on.
24    Q.   Would you agree that the Ohio Board
25 of Medicine and Board of Pharmacy have

37 (Pages 142 - 145)

Page 146

1 sometimes been too slow to investigate and
2 revoke licenses of bad actors?
3           MR. LEDLIE:  Object to the form of
4 the question.
5     A.   Yeah.  I don't know what their
6 process is and how they go about it, so I -- I
7 have no idea.
8     Q.   Do you think that they always
9 revoked licenses as quickly as you would have
10 wanted them to?
11           MR. LEDLIE:  Object to the form of
12 the question.
13     A.   Again, I really didn't pay any mind
14 to it.  We just came in, did our job every day,
15 and hopefully went home at night.
16     Q.   Are you aware of any bad doctors in
17 Summit County who continued to write
18 prescriptions or see patients after you knew
19 that they were bad doctors?
20           MR. LEDLIE:  Object to the form of
21 the question.
22     A.   We had some investigations, yes.
23     Q.   And did you ever try to get their
24 licenses revoked?
25           MR. LEDLIE:  Object.

Page 147

1     A.   Is -- you mean to go down and
2 petition the state board of pharmacy or
3 something like that?  No.
4     Q.   Did you ever provide information to
5 the Ohio Board of Medicine or the state board
6 of pharmacy about your investigations?
7     A.   Oh, I'm sure they knew.  They gave
8 us a lot of information that we used for our
9 investigations.
10    Q.   To your knowledge, has the drug
11 unit ever reached out to the board of medicine
12 about a doctor who was overprescribing
13 prescription opioids?
14    A.   When we worked the cases, I don't
15 know.  I did not personally do it, so I don't
16 know if it was done, if they -- if anybody
17 contacted them or not.
18    Q.   Well, as the supervisor of the
19 unit, you didn't know of anyone who -- who did
20 contact the board of medicine regarding
21 overprescribing of prescription opioids by any
22 doctor?
23           MR. LEDLIE:  Object to the form of
24 the question.
25    A.   One of my officers was very closely

Page 148

1 linked with someone from the Ohio Board of
2 Pharmacy, and as -- as far as getting
3 information, if she gave them that information
4 or not, I don't know.
5     Q.   Let me just make sure I understand
6 what you just said.  So one of your officers
7 was closely linked with the Ohio Board of
8 Pharmacy to get information for law
9 enforcement; is that right?
10           MR. LEDLIE:  Object to the form.
11    A.   They would provide -- yeah, they
12 would provide information to her, and we would
13 be able to do cases.
14    Q.   And you don't know whether the
15 information went the other direction, from her
16 to the Board of Pharmacy?
17    A.   I don't know.  I'm sure that in the
18 case of working the doctor, that that
19 information got there.  I did not personally
20 give it.
21    Q.   Okay.  Let me just make sure; there
22 are two separate boards here we're talking
23 about, the board of medicine for doctors and
24 the board of pharmacy for pharmacists.
25    A.   I'm talking about the board of

Page 149

1 pharmacy.
2     Q.   Okay.  Did anyone in your office
3 have a close connection with the board of
4 medicine?
5     A.   Not to my knowledge.
6     Q.   Why not?
7     A.   I don't know.
8     Q.   Is it not something you thought was
9 needed for your cases?
10           MR. LEDLIE:  Object to the form.
11    A.   Never even thought about the board
12 of medicine.
13    Q.   And with respect to the person on
14 your team who had close connections with the
15 board of pharmacy, was that established because
16 you caused it to be established?
17    A.   No.
18    Q.   How did that happen?
19    A.   Those connections came about before
20 I got there.
21    Q.   And who was it on your team?
22    A.   Carmen Ingram.
23    Q.   What was her position?
24    A.   She's my evidence officer.
25    Q.   What does that mean?

Page 150

1    A.   It means all the evidence that came
2 into the -- the group, she handled, secured,
3 destroyed when it was all over.
4    Q.   And what kinds of information do
5 you recall her having been -- having gotten
6 from the board of pharmacy?
7    A.   Well, they would come in -- they
8 would normally do investigations, and then they
9 would come in and go, "Hey, we got this
10 investigation, and it's in your jurisdiction,
11 and here's the case."
12    Q.   So the board of pharmacy would give
13 you investigations they had done?
14    A.   Yes.
15    Q.   And then your officers would follow
16 up on the investigation from a law enforcement
17 perspective?
18    A.   Yes.
19    Q.   And did that lead to any cases?
20    A.   Yes.
21    Q.   How many?
22    A.   I don't know.  I mean, we've -- we
23 did a lot of nurses.  As a result -- I don't
24 know; I couldn't even fathom a guess on how
25 many cases we got because of them.

Page 151

1    Q.   Are we talking more than 10?
2    A.   I'm sure, yes.
3    Q.   More than --
4    A.   Easily.
5    Q.   More than 50?
6        MR. LEDLIE:  Object to the form.
7    A.   I don't know.  I can't recall
8 exactly.
9    Q.   And over what period of time are
10 these cases that you're referring to?
11    A.   During my tenure.
12    Q.   So 2001 to 2012?
13    A.   Yes.
14    Q.   Did all of those cases get
15 prosecuted?
16    A.   If we made an arrest in the case,
17 which we most likely did because it was pretty
18 much done, it was a gimme, yeah.
19    Q.   Do you recall any that were not --
20 there were no arrests or prosecutions?
21    A.   No, I don't recall any.
22    Q.   And where would the records be from
23 the -- of the information from the board of
24 pharmacy that came to your unit?
25    A.   Case files.

Page 152

1    Q.   You said you did a lot of nurses.
2 Did you or your -- anyone in your unit have any
3 close connection with the board of nursing?
4    A.   No.
5    Q.   Do you know whether you got any
6 information from them?
7    A.   Not that I'm aware of.
8    Q.   Or gave any information to them?
9    A.   No, not that I'm aware of.
10    Q.   And so with respect to those nurses
11 that you're recalling that were a part of the
12 cases that were developed out of the board of
13 pharmacy information, do you know whether
14 anyone from your unit provided information to
15 the board of nursing for them to revoke the
16 licenses of those nurses?
17        MR. LEDLIE:  Object to the form of
18 the question.
19    A.   Yeah, I have no idea.  I would
20 assume, and I'm making speculation, that the
21 board of pharmacy probably told them.
22    Q.   Talking about any kind of drugs
23 now.  Have you ever had the experience, during
24 your time working narcotics in Summit County,
25 where you believed that laws and politics made

Page 153

1 it more difficult for the drug units to enforce
2 drug laws?
3        MR. LEDLIE:  Object to the form of
4 the question.
5    A.   No, not really.  Sometimes
6 penalties and things change, but we still went
7 out and did our job, so.
8    Q.   To be clear, I know that you went
9 out and did your job, but was there anything
10 that you felt like made it more difficult?
11        MR. LEDLIE:  Object to the form of
12 the question.
13    A.   They threw some hurdles in here now
14 and then, but, you know, you just learn how to
15 go around them or go over them and you keep on
16 going.
17    Q.   What kind of hurdles?
18    A.   Best example I can give you is in,
19 for example, a marijuana grow case --
20    Q.   Uh-huh.
21    A.   -- you know, there -- we used to go
22 out and do infrared scans on places, and then
23 all of a sudden we needed a warrant to go do
24 it.  So it added a little bit of paperwork.
25    Q.   You mentioned in a previous answer

39 (Pages 150 - 153)

Page 154

1 that there were some penalties that changed?
2     A.   Oh, yeah.  They -- they would
3 change all the time.
4     Q.   Was there anything in particular
5 you were referring to there?
6     A.   No, just the fact that sometimes
7 the degree of felony would -- would be changed,
8 and you'd have to have more of a drug to
9 elevate somebody.
10     Q.   And can you explain what you mean
11 by "elevate somebody"?
12     A.   In other words, maybe what used to
13 be a felony 1 became a felony 2, and if you
14 wanted to -- if you wanted to get them tied up
15 in a felony 1, you'd have to have more drug.
16     Q.   And a felony 1 is a higher penalty?
17     A.   Yes, it is.
18     Q.   Any particular drugs come to mind
19 when you are talking about this topic?
20     A.   I know they changed -- a couple
21 times crack cocaine got changed, marijuana got
22 changed, methamphetamine got changed.
23     Q.   Did you think those were good
24 changes?
25         MR. LEDLIE:  Object to the form of

Page 155

1 the question.
2     A.   As an investigator, no.  But, you
3 know, you -- you live by the law.
4     Q.   And as an investigator, why not?
5         MR. LEDLIE:  Object to the form of
6 the question.
7     A.   We're there to put these guys out
8 of business.  People want to make it a little
9 bit harder to put them out of business, then we
10 just have to work a little harder.  That's all.
11     Q.   Did you believe that Ohio law did
12 not sufficiently punish and deter fentanyl
13 traffickers during your time as the commander
14 of the drug unit?
15         MR. LEDLIE:  Object to the form of
16 the question.
17     A.   They got what they got.  It didn't
18 make any difference to us.  We're still going
19 to go out and do them.
20     Q.   You're aware, aren't you, that
21 recently the Ohio Senate considered a bill to
22 decrease the bulk amount of fentanyl, so
23 reducing the amount of fentanyl necessary to
24 reach the bulk amount?
25         MR. LEDLIE:  Object to the form of

Page 156

1 the question.  He's here as a...
2     A.   Yeah, I'm not aware of -- of that.
3 Again, it's just one of those things where
4 politics -- politicians do what they do, and we
5 follow up.
6     Q.   Are you generally of the belief
7 that harsher penalties would reduce trafficking
8 more?
9         MR. LEDLIE:  Object to the form of
10 the question.  He's here as a fact witness.
11 You're asking him multiple opinion questions.
12     A.   In my experience, when you clear
13 spots, somebody else steps in.  So it's just
14 going to continue.  It's all about money.
15     Q.   Can you explain to me what you mean
16 by that?
17     A.   It means the guys at the top are
18 raking in big bucks, and when one of those is
19 taken off the street, there's always somebody
20 that wants to step in and take over.
21     Q.   So in your experience, your long
22 experience, in the narcotics enforcement field
23 in Summit County, based on your experience, do
24 harsher penalties cut down on trafficking?
25     A.   For that individual, they do.  But,

Page 157

1 no.  It just continues.
2     Q.   What do you mean "for that
3 individual"?
4     A.   The individual that -- that you
5 just put away for a long time, yeah, he's not
6 trafficking at the moment, but somebody else
7 is.
8     Q.   So based on your experience, is it
9 the case that it's not your view, based on your
10 experience, that harsher penalties would have
11 helped?
12         MR. LEDLIE:  Object to the form of
13 the question.
14     A.   Could they have deterred someone?
15 Possibly.  I can't say for sure.  But again,
16 it's all -- it's all a game of opportunity and
17 money.
18     Q.   Did you know that Ohio passed a law
19 last August that increased the penalties for
20 certain fentanyl trafficking offenses?
21     A.   I did not.
22     Q.   Now that you do, is that something
23 that you would have liked to have happened
24 while you were the commander?
25         MR. LEDLIE:  Object to the form of

40 (Pages 154 - 157)

Page 158

1 the question.  Outside the scope of his
2 employment.
3     A.   Any time we got a law in our favor,
4 we're happy to have it.
5     Q.   So increased penalties would have
6 been a law in your favor?
7     A.   Yes.
8         MR. LEDLIE:  Object to the form of
9 the question.
10    Q.   How would it have helped?
11    A.   We'd have been able to put people
12 away longer and keep them off the street.
13    Q.   Talking about traffickers, as we've
14 been on that topic, in your experience, do
15 people who traffic in heroin also traffic in
16 other illegal drugs?
17    A.   In my experience, a lot of people
18 traffic in a lot of various drugs.
19    Q.   Are there any trends that you saw
20 throughout your 2001 to 2012 period as
21 commander?
22    A.   No.  It's all about opportunity.
23 It's all about money.
24    Q.   Is it your experience that those
25 who traffic in drugs, based on what you're

Page 159

1 saying, that it's all about experience and all
2 about money -- sorry -- opportunity and money;
3 I apologize.  In your experience, will drug
4 traffickers, if prevented from trafficking in
5 one drug, simply move to another?
6         MR. LEDLIE:  Object to the form of
7 the question.
8     A.   If they got cut off on one supply
9 and they had a supply of something else, I'm
10 sure they would.
11    Q.   Is there anything in your view that
12 stops the trafficking altogether, based on your
13 experience?
14        MR. LEDLIE:  Object to the form of
15 the question.
16    A.   Without being crude, if nobody
17 wants the drug, there aren't going to be any
18 traffickers.
19    Q.   Have you seen that happen during
20 your time as a narcotics officer in Summit
21 County?
22        MR. LEDLIE:  Object to the form of
23 the question.
24    A.   Yeah.  I've never seen anybody stop
25 trafficking other than when they got arrested.

Page 160

1     Q.   Are you aware of anything about
2 Summit County's infrastructure that presents it
3 as a prime area of opportunity for
4 transportation and distribution of illicit
5 drugs by trafficking organizations?
6         MR. LEDLIE:  Object to the form of
7 the question.  Outside the scope.  Calls for
8 opinion testimony.
9         MS. SAULINO:  Actually, I was
10 asking if he was aware of anything in his
11 experience, and there is no scope because he's
12 a fact witness, so.
13    A.   Yes.
14    Q.   What are you aware of?
15    A.   We're bis- -- we're bisected by
16 several major highways.  There are several
17 airports here.  We're sitting very nicely
18 between Detroit, New York, Chicago, and
19 Atlanta.  Stuff comes in here every day.  Stuff
20 goes out every day.
21    Q.   And when you say "stuff," what kind
22 of drugs are you talking about?
23    A.   Anything and everything, and money.
24    Q.   And how did you come to this
25 understanding?

Page 161

1     A.   Experience, training.
2     Q.   Seeing it happen?
3     A.   Yes.
4     Q.   You've, in fact, written and talked
5 about this phenomenon, right?
6     A.   Yes, I have.
7     Q.   And have identified Summit County
8 as having a unique infrastructure in that
9 regard, right?
10    A.   Yes.
11    Q.   Have you talked to lawmakers about
12 this infrastructure issue?
13    A.   Directly, no, like sitting at a
14 table; however, the information that you're
15 speaking of went to the governor's Office of
16 Criminal Justice Services.  They disseminate
17 information that task force commanders provide
18 to them to our legislature.  Whether or not
19 that got disseminated, I can't tell you.
20    Q.   And when you say the information
21 that I'm speaking of, what do you mean?
22    A.   You're talking about the addendum
23 to the grant that I wrote.
24    Q.   So I have seen that document, sir,
25 and I'll pull it out, but have --

41 (Pages 158 - 161)

Page 162

1    A.    Yeah.
2    Q.    I'm asking more generally of
3 your --
4    A.    Okay, yeah.  I saw it in your thing
5 there a few minutes ago, so -- and that
6 information also gets disseminated through
7 HIDTA and other places, so the federal
8 government has -- aware of it, I'm sure.
9    Q.    Okay.  Other than in the threat --
10 threat assessment, have you talked about this
11 phenomenon?
12    A.    In some of the classes that I've
13 given, yes.
14    Q.    And have you provided any views
15 anywhere on a -- on any way to fix this
16 infrastructure problem?
17    A.    No.
18    Q.    Do you think there is one?
19    A.    We haven't got enough people out
20 there.  We haven't got enough people out there.
21 You know, we're overwhelmed.
22    Q.    Have you asked for more people?
23    A.    Always ask for more people.
24    Q.    To whom?
25    A.    Hmm?

Page 163

1    Q.    Who do you ask?
2    A.    At the time, we would ask the
3 sheriff for some more bodies.
4    Q.    Have you asked the legislature?
5    A.    No.
6    Q.    Anyone besides the sheriff?
7    A.    No.
8    Q.    And when you say "at the time,"
9 what do you mean?
10    A.    During my tenure.
11    Q.    Did you receive more bodies?
12    A.    One.
13    Q.    Did the sheriff tell you why you
14 didn't get more?
15    A.    Budgetary issues.
16    Q.    Did you have any specific
17 understanding of that?
18    A.    Pardon me?
19    Q.    Do you have any specific
20 understanding of that or just generally
21 budgetary issues?
22    A.    Yeah.  We just didn't have the
23 money.
24            - - - - -
25        (Thereupon, Deposition Exhibit 2,

Page 164

1        Document Titled "Drug Threat
2        Assessment, Summit County, Ohio,"
3        SUMMIT_000023567 to 00023648, was
4        marked for purposes of
5        identification.)
6            - - - - -
7    Q.    Commander Baker, this is a document
8 that has been marked as Baker Exhibit 2.
9        I suspect the answer to this
10 question is yes, but do you recognize this
11 document?
12    A.    Yes.
13    Q.    And what is it?
14    A.    This is an addendum for a grant
15 application.
16    Q.    And you wrote this?
17    A.    Yes, ma'am.
18    Q.    It looks like this would have taken
19 quite a bit of work.
20    A.    (Witness nodding head.)
21    Q.    How long did it take you to write
22 it?
23    A.    A couple months.
24    Q.    It's fair to say you're a little
25 proud of this document, right?

Page 165

1    A.    Yes.
2    Q.    And why is that?
3    A.    I thought it was a pretty complete
4 document.
5    Q.    And this was from -- you wrote this
6 in 2005; is that right?
7        So I can tell you the date, I -- I
8 have tried to figure this out, and the date
9 that I see is at the top of the cover page.  So
10 maybe --
11    A.    Oh, okay.
12    Q.    -- you can help me.
13    A.    Yes.
14    Q.    Does that mean that it was written
15 in 2005 or it was written in 2004 for 2005?  Do
16 you remember?
17    A.    I believe it was 2005.
18    Q.    Okay.  And this was an addendum to
19 a grant application, you said?
20    A.    Yes.
21    Q.    What kind of grant?
22    A.    It was a grant from OCJS.  Would
23 have been a federal grant for monies to run the
24 drug unit.
25    Q.    And did you get the grant?

42 (Pages 162 - 165)

Page 166

1    A.    Yes.
2    Q.    How much was it for; do you
3 remember?
4    A.    Not specifically, no.
5    Q.    I want to go through some things in
6 this document, but before we do, was this
7 document accompanied by any kind of, like,
8 interview or testimony that you had to give?
9    A.    It was accompanied by the -- the --
10 the application for the grant.
11    Q.    Right, but then did you have to
12 talk to anybody in person?
13    A.    No.
14    Q.    And did anyone help you write this?
15    A.    No.
16    Q.    Did anyone review it after you
17 wrote it?
18    A.    Other than -- I mean, other than
19 people I might have asked for information that
20 went into it.
21    Q.    I see.  So you may have gotten data
22 or statistics from certain departments; is that
23 right?
24    A.    Yes.
25    Q.    But you're the one who actually

Page 167

1 wrote the words in here?
2    A.    Correct.
3    Q.    And did anyone review it after you
4 wrote it?
5    A.    I would have presented it to
6 Inspector Thornton.
7    Q.    Do you remember whether he had any
8 comments on it?
9    A.    No, I don't recall.
10    Q.    What about the sheriff?  Did you
11 talk to the --
12    A.    I think I probably would have given
13 him a copy as well.
14    Q.    And do you remember whether --
15    A.    "Thanks much."  Yeah.
16    Q.    Do you remember whether he had any
17 comments beyond thanks?
18    A.    No.
19    Q.    Did you share this report with
20 County officials?
21    A.    No.
22    Q.    Do you remember discussing it with
23 anyone, other than what we've just talked
24 about?
25    A.    No, not really.

Page 168

1    Q.    Okay.  If we turn to page 5,
2 there's a section that starts at the top of the
3 page called "Geography" --
4    A.    Uh-huh.
5    Q.    -- that goes for a couple of pages;
6 is that right?
7    A.    Yes.
8    Q.    So this is a longer and more
9 detailed version of the geography question I
10 was asking you a moment ago, right?
11        MR. LEDLIE:  Objection.
12    Q.    This is your view on the geography
13 of Summit County?
14    A.    Yes.
15    Q.    And so specifically, if you go to
16 the bottom of that first full -- that -- that
17 full paragraph that's on page 5 --
18    A.    Uh-huh.
19    Q.    -- you refer to a network of major
20 interstate highways, including I-71, I-76,
21 I-77, and I-80, are found in or near Summit
22 County, right?
23    A.    Yes.
24    Q.    And these highways also allow
25 access to other major highways, including I-70,

Page 169

1 I-75 and I-90, right?
2    A.    Yes.
3    Q.    And so you say here, "By location
4 alone, the Greater Summit County Ohio area
5 presents itself as a prime area of opportunity
6 for the transportation and distribution of
7 illicit drugs by drug trafficking
8 organizations," right?
9    A.    Yes.
10    Q.    You believed that in 2005, right?
11    A.    Yes.
12    Q.    You continue to believe that today?
13    A.    Yes.
14    Q.    And did you believe that before
15 2005?
16    A.    Yes.
17    Q.    For how long?
18    A.    From when I started back
19 again in -- in 2000, and we were working with
20 HIDTA.  You know, we had -- I had access to
21 more information, and I was able to probably
22 get that information, and go, "Oh, okay.  I see
23 how that works."
24    Q.    And that's how you started to put
25 those pieces together?

43 (Pages 166 - 169)

Page 170

1     A.    Yes.
2     Q.    Okay.  And then, if we turn to page
3  6, if we go to the -- we see that you talk
4  about the airports in Summit County in the
5  middle of the page, right?
6     A.    Yes.
7     Q.    And you even refer there to the
8  fact that -- that within 100 miles of Summit
9  County are an additional five airports with
10  international designations, including Detroit,
11  right?
12    A.    Yes.
13    Q.    And you identified Detroit as the
14  source city for the distribution of cocaine?
15    A.    Yes.
16    Q.    Including into Summit County,
17  right?
18    A.    Yes.
19    Q.    And that's something that you know
20  through your experience working narcotics in
21  Summit County, right?
22    A.    Yes.
23    Q.    Is that still true?
24    A.    Yes, very.
25    Q.    Very, you said?

Page 171

1     A.    (Witness nodding head.)
2     Q.    And then you say -- next you talk
3  about Summit County resting within 35 miles of
4  the Port of Cleveland, right?
5     A.    Yes.
6     Q.    And you talk about craft -- craft
7  on the Great Lakes, right?
8     A.    Correct.
9     Q.    And that the Great Lakes and the
10  St. Lawrence River provide thousands of miles
11  of shoreline, right?
12    A.    Yes.
13    Q.    And, again, that shoreline is more
14  opportunity for craft to come in carrying
15  illegal substances, right?
16    A.    That's correct.
17    Q.    And that's something that you saw?
18    A.    We -- we had information about
19  boats, yes.
20    Q.    And then, on page 7, you talk about
21  transportation and distribution of drugs in
22  inner city areas among students and street
23  gangs?
24       I'm looking specifically at the
25  first full paragraph on page 7.

Page 172

1     A.    Yes.
2     Q.    Okay.  And so is that a phenomenon
3  that you saw during your time as the commander
4  of the unit?
5     A.    Yes.
6     Q.    And what -- what were you seeing
7  there between the students and the street --
8  street gangs?
9     A.    Just there were a lot of
10  opportunistic groups.  Pretty much a lot of
11  them were just one street area nestled into
12  each other, and they were involved in the
13  trafficking of anything they could get their
14  hands on.
15    Q.    And did you -- it looks like you
16  attributed a significance to Summit County
17  having a state university with a transient and
18  student population of 23,000.  What -- what was
19  the significance of that?
20    A.    A lot of people in and out every
21  year.  So a lot of new faces, a lot of new
22  opportunities.
23    Q.    For the drug traffickers?
24    A.    Yes.
25    Q.    And you're referring specifically

Page 173

1  there to the University of Akron, right?
2     A.    That's correct.
3     Q.    Kent State is pretty close too,
4  right?
5     A.    Yep.  Doesn't sit in Summit County,
6  though.
7     Q.    Right.  But it's close by.  So that
8  would be another large university, right?
9     A.    It would be, yes.
10    Q.    Okay.  Now, in your report you talk
11  about some specific substances, right?
12    A.    Yes.
13    Q.    And if you turn to page 41, you see
14  you have a section here on heroin.
15    A.    Yes.
16    Q.    And you say, "Level of threat,
17  high," right?
18    A.    Yes.
19    Q.    Are you the one who gave that
20  designation?
21    A.    Yes.
22    Q.    And how did you make that judgment?
23    A.    Based on the information we may
24  have had at the time.
25    Q.    And so this was in 2005, so you

44 (Pages 170 - 173)

Page 174

1 believed that heroin was a high threat at the
2 time, right?
3     A.   Yes.
4     Q.   Do you still today?
5     A.   Absolutely.
6     Q.   And you say, "Heroin's local
7 availability, highly addictive properties, and
8 low cost combine to make it a high-level threat
9 to Summit County, Ohio," right?
10     A.   Yes.
11     Q.   Those are your words, right?
12     A.   They are.
13     Q.   And you say, "The availability and
14 abuse of heroin poses a significant threat to
15 Summit County.  All types of heroin are
16 available in Summit County, including Mexican
17 brown and black tar and Asian white," right?
18     A.   Yes.
19     Q.   What does that mean?
20     A.   Those are different forms of
21 heroin.
22     Q.   Does -- do they -- do the forms
23 tell you anything about where they've come
24 from?
25          MR. LEDLIE:  Object to the form.

Page 175

1     A.   Mexican brown normally comes from
2 Central America.  Asian heroin usually comes
3 out of Asia and Turkey and the Middle East.
4 And black tar is pretty much the same area,
5 just a different form.
6     Q.   Same area as?
7     A.   As the Asian.
8     Q.   And in your experience, how were
9 those forms of heroin getting to Summit County?
10     A.   Every way you can possibly imagine.
11     Q.   So can you give me some examples?
12     A.   They're smuggled in by body.
13 They're brought in by truck.  They're brought
14 in planes, and everything you can -- any way
15 you can get something in.
16     Q.   If you turn to page 42, at the very
17 bottom under "Transportation," you see that?
18     A.   Uh-huh.
19     Q.   You -- the sentence that starts and
20 then doesn't -- and then goes over to 43, "The
21 main source for heroin in Summit County is
22 Cleveland, Ohio."  You see that?
23     A.   Yes.
24     Q.   What was the basis for that
25 statement?

Page 176

1     A.   Our intelligence would show that
2 Asian white heroin would come in from New York,
3 come across over to Cleveland, and from
4 Cleveland it would be disseminated down.
5     Q.   Okay.  And then if you turn to page
6 44, that's where you begin your methamphetamine
7 section?
8     A.   Uh-huh.
9     Q.   Yes?
10     A.   Yes.
11     Q.   And you say, "Level of threat, very
12 high."
13     A.   Yes.
14     Q.   Is that to indicate that it was a
15 higher level of threat than heroin?
16     A.   We saw a lot more of it.
17     Q.   Other than seeing a lot more of it,
18 was there any other reason that it was listed
19 as very high?
20     A.   It took up a lot of our time.
21     Q.   Is that still true?
22          MR. LEDLIE:  Object to the form of
23 the question.
24     A.   I don't know whether -- you know,
25 what they're doing.  I know I can tell you that

Page 177

1 our lab sites are down, but they've been
2 replaced by crystal meth, and there's a lot of
3 it here.
4     Q.   And when you say "our lab sites are
5 down," you mean meth labs?
6     A.   Yes.
7     Q.   And what is the basis of your
8 knowledge for the lab sites being down and the
9 crystal -- and there being a lot of crystal
10 meth here?
11     A.   My having spoken to the current
12 commander of the drug unit.
13     Q.   Okay.  If you turn to page 62 for
14 me.
15     A.   6-2 or 5-2?
16     Q.   6-2.  Unless there's something on
17 5-2 you'd like to talk about.
18          You see you have a section on
19 pharmaceuticals here?
20     A.   Uh-huh.
21     Q.   And you say the level of threat is
22 very high, right?
23     A.   Yes.
24     Q.   Now, what made you say that the
25 level of threat for pharmaceuticals was very

45 (Pages 174 - 177)

1 high?
2     A.    I would assume we were probably
3 seeing a lot.
4     Q.    Do you recall specifically?
5     A.    No.
6     Q.    And this was 2005, right?
7     A.    Uh-huh.
8     Q.    So at least by 2005 you had
9 identified pharmaceuticals as a very high level
10 of threat, right?
11     A.    Yes.
12     Q.    And as we saw, heroin as a high
13 level of threat, right?
14     A.    Yes.
15     Q.    So at least by 2005 you were very
16 aware of opioid issues in Summit County, right?
17         MR. LEDLIE:  Object to the form of
18 the question.
19     A.    Through the information that I was
20 gathering for this, yes.
21     Q.    Well, this is your report, right?
22     A.    It is my report.
23     Q.    And you put things in here that you
24 were relying on, right?
25     A.    Yes.

1     Q.    Now, you say here, "The diversion
2 of narcotics and pain analgesics in Summit
3 County continues to increase," right?
4     A.    Yes.
5     Q.    If you say it continues to
6 increase, it must have started earlier, right?
7         MR. LEDLIE:  Object to the form.
8     A.    It would seem like probably every
9 year the -- the numbers went up.  Now, mind
10 you, if we got 5 of something one year and 10
11 the next year, there was a 100 percent
12 increase, and they --
13     Q.    Well, fair enough, sir.  But, I
14 mean --
15     A.    Yeah.
16     Q.    -- you're the one who said it was a
17 very high threat, right?
18         MR. LEDLIE:  Object to the form.
19     A.    Yes.
20     Q.    Okay.  And you see on the next
21 page, on 63 at the top, the beginning of the
22 first full paragraph --
23     A.    Uh-huh.
24     Q.    -- you see, "In a sampling."  Do
25 you see that?

1     A.    Yes.
2     Q.    It says, "In a sampling of data
3 from the Akron Police Department's narcotics
4 unit diversion division, during the first
5 quarter of 2004, the unit investigated 60 new
6 diversion cases, or one case every day and a
7 half," right?
8     A.    Okay.
9     Q.    Is it -- is that consistent with
10 your recollection of what you were seeing at
11 the time?
12     A.    That would've been information -- I
13 probably walked over there and said, "Hey, what
14 are you seeing?" and that's what they gave me.
15     Q.    Right, but you had diversion cases
16 in your unit too, right?
17     A.    Yes, we did.
18     Q.    And is this consistent with your
19 recollection of the kinds of things you were
20 facing at the time?
21         MR. LEDLIE:  Object to the form of
22 the question.
23     A.    Yeah, I'm not sure -- I mean, we
24 saw diversion cases, and they had a specific
25 unit dedicated to that, so that information

1 would have been a little easier for me to pick
2 up.
3     Q.    So Summit County saw some diversion
4 cases, but Akron had a dedicated diversion
5 unit?
6     A.    Yes.
7     Q.    And so was it your understanding
8 they handled more of the diversion cases?
9     A.    They had a unit that was designated
10 to do that, yes.
11     Q.    No --
12     A.    That was their whole job, so I'm
13 guessing they would have seen more.
14     Q.    Okay.  Do you have any recollection
15 of them having more diversion cases than your
16 unit?
17     A.    I mean, I don't know what the
18 numbers were, but, again, if you have a unit
19 that's designed to just specifically go do
20 that, then they probably would have had better
21 numbers than we had, just taking whatever calls
22 we got.
23     Q.    Sure.  I can make that logical
24 leap, too, but you were there, which is why I'm
25 asking you.

46 (Pages 178 - 181)

Page 182

1    MR. LEDLIE:  Object to the form of
2 the question.
3    A.   Yeah.  I don't -- I don't remember
4 what the numbers were.
5    Q.   Okay.  And so your reference here
6 is to the first quarter of 2004, right?  In
7 that first sentence?
8    A.   Yes.
9    Q.   Okay.  So some of the data that you
10 were using to compile this report was from
11 early 2004, right?
12    A.   Yes.
13    Q.   Okay.  And if you look at the end
14 of that paragraph where you're talking about
15 information you've received from the Summit
16 County Medical Examiner's Office.
17    A.   Okay.
18    Q.   Do you see that?  The same
19 paragraph.
20    A.   Yes.
21    Q.   You see that the last sentence
22 there says, "The report also indicates that in
23 cases where toxicology screens indicate the
24 cause of death was drug induced, the most
25 commonly found drug were, in ranking order,

Page 183

1 methadone, morphine/fentanyl, oxycodone, and
2 hydrocodone," right?
3    A.   Yes.
4    Q.   And is that consistent with your
5 recollection?
6    A.   If I got that information from
7 them, that's what I put down.
8    Q.   Okay.  I'm just asking what you
9 recall.
10    A.   Yeah, I don't exactly recall.  It's
11 been a long time.
12    Q.   Okay.  But you would rely on this
13 information?
14    A.   Yes.
15    Q.   If you turn to page 64, please.
16 You see you have a section on "Production"
17 here.
18    A.   Okay.
19    Q.   And you say, "Pharmaceuticals are
20 not normally produced in Summit County, but are
21 legitimately produced by medical companies and
22 then diverted through criminal acts," right?
23    A.   Yes.
24    Q.   You still believe that to be true,
25 right?

Page 184

1    MR. LEDLIE:  Object to the form of
2 the question.
3    A.   As the sentence reads, it -- yes.
4    Q.   That is a true statement, right?
5    A.   Yes.
6    Q.   And -- and then if you look further
7 down, you see you have a section on
8 distribution, right?
9    A.   Yes.
10    Q.   And it looks like you say here,
11 "Distribution of diverted pharmaceuticals in
12 Summit County is primarily through the
13 individuals involved in the diversion or the
14 theft of drugs," right?
15    A.   Yes.
16    Q.   "Pharmaceuticals are diverted in
17 several ways," right?
18    A.   Correct.
19    Q.   And then you have a listing that
20 starts on page 65?
21    A.   Yes.
22    Q.   And it looks like you have four
23 major categories there; is that right?
24    A.   Yes.
25    Q.   And the categories you list are

Page 185

1 doctor shopping, right?
2    A.   Yes.
3    Q.   Prescription fraud?
4    A.   Yes.
5    Q.   Theft?
6    A.   Yes.
7    Q.   And unscrupulous physicians?
8    A.   Yes.
9    Q.   And when you say "unscrupulous
10 physicians," it looks like you are referring
11 there to physicians who illegally prescribe
12 narcotics, right?
13    A.   Yes.
14    Q.   Each of these four major categories
15 that you've identified are illegal acts, right?
16    A.   Yes.
17    Q.   In your unscrupulous physicians
18 category, if you turn to page 66 --
19    A.   Yes.
20    Q.   -- you say, "Several physicians in
21 the Summit County area have been investigated
22 and charged with diverting pharmaceuticals,"
23 right?
24    A.   Yes.
25    Q.   Do you recall who you're referring

47 (Pages 182 - 185)

Page 186

1 to there?
2     A.    If I heard the names, I probably
3 would.  I can't recall offhand.
4     Q.    Do you recall whether all of those
5 who were investigated were, in fact, charged?
6     A.    Yeah, I think we got them all
7 eventually.  May have a taken a while, but we
8 did.
9     Q.    Am I right in thinking that
10 sometimes you investigate individuals who you
11 have a lot of reason to believe are guilty but
12 you just aren't able to bring a case?
13         MR. LEDLIE:  Object to the form of
14 the question.
15     A.    It happens.
16     Q.    Do you recall that having happened
17 with any of these unscrupulous physicians?
18     A.    No.  I think eventually we got them
19 all.
20     Q.    And you say, "In one notable case,
21 a doctor utilized more than 25 alias names to
22 obtain Percodan for his personal use.  The
23 doctor was arrested again in 2003 for more
24 diversion violations," right?
25     A.    Yes.

Page 187

1     Q.    Do you remember who that was?
2     A.    No, I can't remember his name.  I'm
3 the one that got him.
4     Q.    Do you know where we -- where we
5 could go to find the names of these physicians
6 you're referring to here?
7     A.    You'd have to dig through case
8 files or maybe court dockets for that year,
9 might be an easy way.  I don't know.  He was a
10 surgeon.
11     Q.    Did you keep any kind of a list
12 of -- of dirty doctors that you took down,
13 anything like that?
14     A.    No.
15     Q.    Do you know whether there were
16 any -- was anybody who kept sort of statistics
17 on that who might have a list?
18     A.    No, I couldn't -- I couldn't
19 even -- couldn't even guess.
20     Q.    Okay.  But you would agree with me
21 that doctors like these are a cause of the
22 opioid problem, right?
23         MR. LEDLIE:  Object to the form of
24 the question.
25     A.    They're in the mix.

Page 188

1     Q.    Who else would you say is in the
2 mix?
3     A.    Technically, everybody that's
4 involved with them.
5     Q.    The traffickers?
6     A.    The traffickers.
7     Q.    The people who take them illegally?
8     A.    People who take them.  Legitimate
9 doctors.
10     Q.    Legitimate doctors?
11     A.    Legitimate doctors.
12     Q.    Why do you say legitimate doctors?
13     A.    They write the scripts for them.
14     Q.    Legal scripts --
15     A.    Sometimes unbeknownst that the guys
16 are doctor shopping, maybe, or doctor hopping,
17 but they're still writing them.
18     Q.    Are you saying that there just
19 should be no prescriptions for opioids?
20         MR. LEDLIE:  Object to form.
21     A.    No.  I'm saying that since we have
22 tools like OARRS, they should be looking at
23 them and using it.
24     Q.    Are you aware of doctors who don't?
25     A.    There were for a long time.  I know

Page 189

1 the State made a big push, made a mandate that
2 they had to use it.  They had to force them to
3 use it.
4     Q.    So you would identify that as a
5 problem when they --
6     A.    Yes.
7     Q.    -- were not using it, but they
8 could have; is that right?
9     A.    Yes.
10     Q.    Anything else?
11     A.    If they're being over-manufactured.
12     Q.    You say "if."
13     A.    If they're being over-distributed.
14     Q.    Do you have any -- any evidence of
15 that?
16         MR. LEDLIE:  Could you please
17 let --
18     A.    I have not.
19         MR. LEDLIE:  -- him finish his
20 answer.
21     A.    You're asking me for my -- my
22 opinion, were you not?
23     Q.    No, sir.  I was asking what you
24 were aware of as the cause.  You were talking
25 about doctors you had investigated, but do you

48 (Pages 186 - 189)

Page 190

1 have any evidence of over-manufacturing at all?
2    A.   I don't.
3    Q.   Do you have any evidence of
4 over-distributing?
5         MR. LEDLIE:  Object to the form of
6 the question.
7    A.   Personally, no.
8    Q.   In your decades-long career as a
9 narcotics officer, you have no evidence of
10 that, right?
11        MR. LEDLIE:  Object to the form of
12 the question.
13    A.   I'm not involved with that.
14    Q.   You have no evidence of it, right?
15    A.   I have none.
16        MS. SAULINO:  Okay.  I think now
17 might be a time for a lunch break.
18        MR. LEDLIE:  Yeah, it's almost
19 1:10, so I agree.
20        THE VIDEOGRAPHER:  Off the record,
21 1:06.
22        (Luncheon recess.)
23        THE VIDEOGRAPHER:  We're on the
24 record, 1:53.
25              - - - - -

Page 191

1         (Thereupon, Deposition Exhibit 3,
2         Document Titled "2009 Annual
3         Report," SUMMIT_000830645 to
4         000830682, was marked for purposes
5         of identification.)
6              - - - - -
7 BY MS. SAULINO:
8    Q.   Commander Baker, you have just been
9 handed what has been marked as Baker Exhibit 3.
10        Do you recognize this document?
11    A.   Yes.
12    Q.   What is it?
13    A.   This is an annual report to my
14 supervisors and the board of directors of the
15 drug unit.
16    Q.   And what is the board of directors
17 of the drug unit?  What does that mean?
18    A.   That's the -- the heads of all the
19 departments that supply a man, and the
20 prosecutor's office.
21    Q.   Okay.  And did they have any
22 supervisory authority over you in the unit as
23 a -- as a -- as a board?
24    A.   I -- I report my activities to
25 them, and if they want to change something

Page 192

1 or -- they're there for trying to make a
2 purchase or -- of some equipment, to vote on
3 whether or not we should do that.
4    Q.   Okay.  And how -- did you do these
5 annual reports every year that you were a --
6 the commander of the unit?
7    A.   Yes.
8    Q.   Did you do them more frequently
9 than annually?
10    A.   I reported to OCJS on a quarterly
11 basis, and HIDTA -- HIDTA may have been
12 quarterly also.  I can't recall exactly.
13    Q.   So this Exhibit 3 has, on the very
14 first page, "Submitted by Captain Hylton E.
15 Baker, Commander."  That's you, right?
16    A.   That's me, yes.
17    Q.   But for any annual report submitted
18 between 2001 and 2012, they would be yours?
19    A.   Yes.
20    Q.   Okay.  And would you continue to
21 stand by anything that you wrote in any of
22 them --
23        MR. LEDLIE:  Object --
24    Q.   -- with respect to your views and
25 understanding at the time they were written?

Page 193

1    A.   Again, please?
2    Q.   So would you continue to stand by
3 anything that you wrote in -- in any one of
4 those with respect to your views and
5 understanding at the time that it was written?
6        MR. LEDLIE:  Objection to the form.
7    A.   At the time that it was written,
8 yeah.
9    Q.   Sorry.  You got interrupted.
10    A.   Oh, at the time it was written,
11 yes, I...
12    Q.   Okay.  You can put that one aside.
13              - - - - -
14        (Thereupon, Deposition Exhibit 4,
15         11/1/2010 E-Mail from Hylton Baker
16         Re: Heroin Epidemic in Akron, OH,
17         SUMMIT_001009696 to 001009697, was
18         marked for purposes of
19         identification.)
20              - - - - -
21    Q.   Captain Baker, you've just been
22 handed Baker Exhibit 4, which is an e-mail
23 chain, the top e-mail of which is from you to
24 crystal@neofill.com.  It's from November 1,
25 2010.  Do you see that?

49 (Pages 190 - 193)

Page 194

1    A.    Yes.
2    Q.    Do you recognize this e-mail?
3    A.    Okay.  It probably came in some
4 day, but go ahead.
5    Q.    I simply asked if you recognized
6 it.
7    A.    Yes.
8    Q.    And do you recall it having a -- do
9 you recall having sent it in 2010?
10   A.    No.
11   Q.    Do you recall anything about it?
12   A.    No.
13   Q.    Had you seen it before now?
14   A.    No.
15   Q.    Now that you have reviewed it, does
16 it look somewhat familiar to you?
17   A.    It has my name on it.  I'm assuming
18 I wrote it.
19   Q.    Yeah.  You have no reason to
20 believe that you didn't, right?
21   A.    Correct.
22   Q.    And you see here that you appear to
23 be responding to a citizen of Mogadore, Ohio,
24 who was writing about her concerns about issues
25 related to opioids.  Is that fair?

Page 195

1    A.    Yes.
2    Q.    Okay.  Now, you say here in your --
3 first you thank her for her concerns and you
4 express your condolences.  And then you say,
5 "As you are all too aware, pain medication,
6 addiction, and accidental overdose deaths are
7 at an all-time high."
8        Do you see that?
9    A.    Yes.
10   Q.    Were you referring to any
11 particular statistics when you wrote that
12 sentence?
13   A.    A specific statistic, I don't know.
14 Probably a culmination of information I had.
15   Q.    Nothing that you can identify
16 particularly?
17   A.    Particularly, no.
18   Q.    Okay.  And when did pain medication
19 addiction begin to rise?
20   A.    If you want a specific date, I
21 can't give you a specific date.  I don't know.
22   Q.    Okay.  Now, you say -- well, did
23 the drug unit -- what did the drug unit do in
24 response to the rise?
25   A.    The rise in?

Page 196

1    Q.    Pain medication addiction.
2    A.    Continue to do whatever cases came
3 down the path.
4    Q.    Anything more than that?
5    A.    No.
6    Q.    And why not?
7    A.    We were working the cases we had.
8 If we didn't get any information or
9 intelligence or somebody that could help us,
10 then we didn't go that direction.  We went in
11 whatever direction we were led.
12   Q.    You guys kept pretty busy, though,
13 right?
14   A.    Very.
15   Q.    Now, you say next, "Every day ad
16 agencies bombard us with how much easier life
17 can be with the right medications."
18   A.    Yes.
19   Q.    Were you referring to any
20 particular ad?
21   A.    Televisions commercials in general.
22   Q.    Any particular medication?
23   A.    No.  Every night you could turn the
24 television on: If this hurts, if that hurts,
25 tell your doctor you want this.  If this

Page 197

1 doesn't work, tell your doctor you want this.
2 That's it.
3    Q.    You specifically remember being --
4 seeing that in November of 2010?
5        MR. LEDLIE:  Object to the form of
6 the question.
7    A.    If I specifically remember, I don't
8 know.  Obviously I wrote it down there, so it
9 must have been.
10   Q.    Well, I'm just asking what you were
11 referring to, though.
12   A.    Like television commercials in
13 general for drugs.
14   Q.    Do you have an independent
15 recollection that you saw, as I think as you
16 just said, every night, television commercials
17 for drugs?
18       MR. LEDLIE:  Object to the form of
19 the question.
20   A.    I can remember turning the
21 television on and seeing drug commercials.
22   Q.    But you don't remember which ones?
23   A.    There was a lot of different ones.
24   Q.    Do you remember what the ads were
25 for?

50 (Pages 194 - 197)

Page 198

1    A.    They were selling drugs.
2    Q.    For any particular type of
3 condition?
4    A.    There were sleep aids.  There
5 were -- I remember in particular sleep aids.  I
6 know there were others, but I can't
7 specifically tell you what they were.
8    Q.    And did you discuss these ads with
9 anyone else inside the drug unit?
10    A.    No, not really.
11    Q.    What about in the sheriff's office
12 more broadly?
13    A.    No.  Nothing I can recall.
14    Q.    What about anybody in the Summit
15 County government?
16    A.    Summit County government, no.
17    Q.    Anybody at all that you recall?
18    A.    I'm sure I mentioned it in
19 presentations.
20    Q.    And did you or the drug unit
21 investigate these ads or ad agencies?
22    A.    No.
23    Q.    Why not?
24    A.    No reason to.
25    Q.    Because they weren't doing anything

Page 199

1 illegal?
2        MR. LEDLIE:  Object to the form of
3 the question.
4    A.    Because we had no reason to
5 investigate them.
6    Q.    You next wrote, "Pill mills and
7 doctors write prescriptions and hand them out
8 not unlike candy to trick-or-treaters," right?
9    A.    Okay.  Yes.
10    Q.    Were you referring to any
11 particular doctors or pill mills?
12    A.    Information that I got from other
13 commanders where they were having major
14 problems with those.
15    Q.    Were you having any major problems
16 with those?
17    A.    We had some bad doctors.
18    Q.    Any that you can remember the names
19 of?
20    A.    No, I can't remember his name.
21    Q.    You were thinking of one?
22    A.    One major one that I can recall,
23 but I just -- I can't remember his name.
24    Q.    And is this one that we have
25 discussed previously today?

Page 200

1    A.    Yes.
2    Q.    Are there -- is there a way to look
3 in case files to find his name?
4    A.    I don't know.  You'd have to search
5 case by case by case, probably.
6    Q.    Has anyone asked you to identify
7 the names of doctors that they should be
8 providing case files to us about?
9    A.    No.
10    Q.    Does the name John Wargo sound
11 familiar?
12    A.    That name sounds familiar.
13    Q.    Might that be the name of a doctor
14 that you investigated?
15    A.    I believe it is, yes.
16    Q.    Is it the same one that we're --
17 you're thinking of or a different one?
18    A.    Different one.
19    Q.    Different one, okay.
20        Were there any pill mills in Summit
21 County?
22    A.    Well, we had a doctor that I
23 believe Akron finally actually got.  The
24 intelligence was that if you had money, you
25 could walk in and get a script.  That would be

Page 201

1 a pill mill.
2    Q.    And who was that?
3    A.    Yeah, I can't -- that's the guy I
4 can't remember his name either.  I saw a lot of
5 names.  I don't remember names.
6    Q.    How many pill mills do you believe
7 there were in Summit County during your time as
8 the commander of the unit?
9    A.    I knew one, and the doctor was
10 eventually arrested.  Other than that, I
11 can't -- I can't give you an answer.
12    Q.    And you don't remember the name of
13 the --
14    A.    Personally.
15    Q.    You don't remember the name of the
16 doctor?
17    A.    No, I can't remember his name.
18    Q.    Where was the pill mill?
19    A.    In Akron.
20    Q.    Do you remember more specifically
21 than just Akron?
22    A.    It's off of Market Street.
23    Q.    Do you remember an address?
24    A.    No.
25    Q.    Do you remember roughly the block?

51 (Pages 198 - 201)

Page 202

1 Market Street runs for a while.
2     A.   Yes, it does.  It's going out
3 towards Fairlawn, out in the area of -- what's
4 out there?  The Two Turtles pet shop is out
5 there.  I think Trecaso's is out there that way
6 now, a restaurant.
7     Q.   What -- I'm sorry.  I missed the
8 name.
9     A.   Trecaso's.
10     Q.   Oh, Trecaso's.  Uh-huh.
11          Are you thinking of the plaza
12 that's across the street from St. Hilary's
13 Church?
14     A.   From where?
15     Q.   St Hilary's Church.  That plaza
16 there?
17     A.   Oh, I don't know.
18     Q.   Is Skyway near there?
19     A.   What's that?
20     Q.   Skyway near there?
21     A.   That doesn't ring any bells.
22     Q.   Okay.  You think it's closer in to
23 Akron from there?
24     A.   Yes.
25     Q.   A little bit closer in?

Page 203

1     A.   Yeah.  It's out -- it's out right
2 in that area by Two Turtles.
3     Q.   By Two Turtles?
4     A.   Uh-huh.
5     Q.   Okay.  And when do you think this
6 arrest happened, roughly?
7     A.   I don't recall.  I can't tell you.
8     Q.   Can you give us even a span of
9 years so that we can look --
10     A.   Boy, I -- I don't even know if I
11 can give you that.
12     Q.   Okay.  Do you know who might
13 remember?
14     A.   Probably Akron guys.  They got him,
15 I think, so...
16     Q.   And so that's the one pill mill
17 that you can identify.  And what makes you call
18 it a pill mill?
19          MR. LEDLIE:  Object to the form of
20 the question.
21     A.   Our intelligence was if you had the
22 cash, you could go in and get a script.
23     Q.   Okay.  So in your view that is a
24 pill mill?
25     A.   That's a pill mill.

Page 204

1     Q.   And you don't recall any other pill
2 mills during your time as the commander of the
3 unit?
4     A.   Nothing sticks out.
5     Q.   Now, in this sentence -- well, in
6 this paragraph you identify ad agencies, pill
7 mills, and doctors, right, as being problems?
8     A.   Yeah.
9     Q.   Okay.  You don't mention anywhere
10 in this paragraph manufacturers of
11 pharmaceutical medications, do you?
12     A.   In that paragraph, I do not, no.
13     Q.   And you don't mention anywhere in
14 that paragraph distributors of pharmaceutical
15 medications, do you?
16     A.   It does not mention that in that
17 paragraph, no.
18     Q.   And you don't mention anywhere in
19 that paragraph lawfully operating pharmacies,
20 commercial pharmacies, do you?
21     A.   It does not mention that.
22     Q.   And then you say in the next
23 paragraph, "We here in Summit County, as all
24 the counties in Ohio, as well as the greater
25 United States, are currently experiencing a

Page 205

1 surge in Mexican-based heroin," right?
2     A.   Yes.
3     Q.   Do you recall that?
4     A.   Yes.
5     Q.   The surge?
6     A.   What's that?
7     Q.   The surge that you referred to?
8     A.   Yes.
9     Q.   When did that surge begin?
10     A.   I can't give you an exact date when
11 all of a sudden there was a lot of heroin here,
12 but probably a year or two before, maybe.
13     Q.   So around maybe 2008?
14     A.   It could have been.
15     Q.   And how did you know that it was
16 Mexican-based?
17     A.   It was Mexican brown heroin.
18     Q.   And you say next, "Unfortunately,
19 this heroin is also stronger than the heroin we
20 observed in the past," right?
21     A.   Yes.
22     Q.   "And the stronger heroin has
23 certainly taken its toll all by itself, but we
24 have also seen that it is being mixed with or
25 abused alongside prescription drugs," right?

52 (Pages 202 - 205)

1    A.    Yes.

2    Q.    When did the heroin become
3  stronger?

4    A.    When it -- when we started -- when
5  the surge came in, it was a little bit purer
6  heroin than we used to see.

7    Q.    And what did the drug unit do about
8  this problem?

9    A.    It did investigations.

10    Q.    Anything else?

11    A.    That's it.

12    Q.    Did you discuss the topic with
13  the -- with anyone else in the sheriff's
14  office?

15    A.    No, not really.

16    Q.    What about --

17    A.    I mean --

18    Q.    -- anyone -- oh, go ahead.

19    A.    Other than -- you know, other than
20  they were seeing heroin or were making some
21  heroin cases.

22    Q.    What about anyone in the Summit
23  County government?  Did you discuss the topic
24  with anyone there?

25    A.    No.  Didn't deal with them.

1    Q.    You didn't deal with them?

2    A.    Not on a daily basis, no.

3    Q.    With anyone in the Ohio state
4  government, did you discuss this topic?

5        MR. LEDLIE:  Object to the form of
6  the question.

7    A.    I mean, we obviously made reports
8  that would have shown that we were doing some
9  heroin investigations.

10    Q.    Other than that?

11    A.    Other than that, no.  Other than
12  maybe some talk between commanders, "Hey, what
13  do you got going?  What are you seeing?"

14    Q.    Do your comments here indicate that
15  the stronger heroin made things worse?

16    A.    Sure.

17    Q.    And would you agree that stronger
18  heroin worsened the opioid epidemic?

19        MR. LEDLIE:  Object to the form of
20  the question.

21    A.    I don't know that it worsens it.
22  It adds a -- another level of danger.

23    Q.    Because it's more potent?

24    A.    Yes.

25    Q.    And does that mean it can kill

1  people more quickly?

2    A.    Yes.

3    Q.    When did the drug unit become aware
4  that heroin is mixed with prescription drugs?

5    A.    Well, I know we saw -- I'm not sure
6  the date.  It must have been around 2004 or
7  earlier we saw heroin taken in Stow that was
8  mixed with fentanyl.  And there were other
9  samples, I think, that we got back from the DEA
10  lab that had other substances in it as well.

11    Q.    Can you elaborate on that a bit?

12    A.    If we're doing a case that was
13  going to be a federal case, the evidence went
14  to the DEA laboratories.

15    Q.    Okay.

16    A.    And so the DEA laboratories
17  actually could analyze all the chemicals that
18  were in a specific batch of evidence and the --
19  and the weight of the actual chemicals.

20        The nice thing about that was if
21  you had a case that connected maybe to another
22  case on the other side of the country, those
23  chemicals and -- and their weights were almost
24  like a fingerprint, so you could kind of
25  connect distributors that way.

1        So the state's laboratory didn't do
2  that.  The state just told us whether or not it
3  was a drug.

4    Q.    And so -- so what do you recall
5  having seen from the DEA labs that was coming
6  back with the heroin?

7    A.    As I recall, there was -- there
8  were some other samples that had fentanyl in
9  them.

10    Q.    So it was fentanyl and heroin,
11  really, that you were seeing combined?

12    A.    Yes.

13    Q.    And what did the drug unit do about
14  this problem?

15    A.    We made cases.

16    Q.    And did you discuss it with anyone
17  in the sheriff's office, other than the folks
18  who were making cases?

19        MR. LEDLIE:  Object to the form of
20  the question.  Asked and answered.

21    A.    I obviously reported to my boss,
22  that, hey, we're making whatever cases we were
23  making at the time.  The board knew.

24    Q.    I'm sorry?

25    A.    The board knew what kind of cases

53 (Pages 206 - 209)

Page 210

1 we were doing. We gave them that information.
2     Q.    And did you discuss the problem
3 with anyone in Summit County government?
4     A.    No.
5     Q.    And anyone in state government?
6     A.    No, other than the annual -- my --
7 my reports that would go down to OCJS.
8     Q.    You then say, "Please know that we
9 here at the Summit County Drug Unit, as well as
10 task forces around the state and other
11 agencies, are working in a cohesive effort to
12 identify the sources of this heroin and disrupt
13 and dismantle the organizations that distribute
14 it within our communities."
15     A.    Uh-huh.
16     Q.    Yes?
17     A.    Yes.
18     Q.    What were -- what were you
19 referring to here?
20     A.    We were making cases; hopefully
21 being able to work our way up the ladders.
22     Q.    And you say you were working in a
23 cohesive effort -- effort to identify the
24 sources of this heroin?
25     A.    We were talking to each other.

Page 211

1     Q.    Other than talking to each other,
2 were -- what -- what else were you doing?
3     A.    Nothing.
4     Q.    What other actions did the drug
5 unit take to combat the opioid epidemic during
6 your tenure as commander?
7         MR. LEDLIE:  Object to the form of
8 the question.
9     A.    We just made cases.
10     Q.    Anything else?
11     A.    No.
12     Q.    Since you retired, is it your view
13 that the opioid epidemic has gotten better or
14 worse?
15     A.    Since I retired!  Well, we're still
16 seeing a lot of overdose deaths attributed to
17 opioids, so it hasn't really gotten any better.
18 It probably hasn't gotten any worse.
19     Q.    And when you say a lot of opioid
20 deaths attributed to opioids, you're including
21 heroin and fentanyl in that category, correct?
22     A.    Yes.
23     Q.    Okay.  You can put that one aside.
24 You've got a nice little pile there.
25         We've talked a few times today

Page 212

1 about drug trafficking.  What is your
2 definition of what drug trafficking is?
3     A.    Trafficking is the sale, barter,
4 exchange or gift of a drug.
5     Q.    Illegally?
6         MR. LEDLIE:  Object to the form of
7 the question.
8     Q.    Illegally?
9     A.    Sale, barter, or exchange makes it
10 illegal.
11     Q.    Well, are you including lawfully
12 licensed pharmacies as traffickers in your
13 view?
14     A.    If they are following under the
15 color of law, no.
16     Q.    Okay.  So lawful and licensed
17 pharmacies lawfully selling prescriptions that
18 have been prescribed for a patient are not
19 trafficking in drugs, right?
20     A.    Correct.
21     Q.    And manufacturers or distributors
22 that are operating under licenses from the
23 appropriate authorities are not trafficking in
24 drugs, right?
25         MR. LEDLIE:  Object to the form of

Page 213

1 the question.
2     A.    Under their lawful business, within
3 the scope of their business, as long as they're
4 in the lawful scope of their business.
5     Q.    Are you suggesting that you have
6 any evidence that --
7     A.    I'm not.  You're asking me what my
8 definition is, and I'm telling you what my
9 definition is, but if they're outside of the
10 scope of their lawful business, then they fall
11 into my definition.
12     Q.    Okay.  So -- fair enough.  I
13     So trafficking of drugs is -- I
14 think you provided me a whole list, including
15 selling and providing drugs illegally, right?
16 That's just what I'm asking you.
17     A.    And what I'm telling you is that a
18 legitimate transaction can turn illegal.  So --
19     Q.    Okay.  So let me just make sure I
20 understand.  So you've already agreed with me
21 that a lawfully licensed pharmacy that is
22 lawfully selling a prescription that has been
23 prescribed for a patient is not trafficking in
24 drugs, right?
25     A.    Correct.

54 (Pages 210 - 213)

Page 214

1    Q.    Okay.  As long as the entity is
2 operating lawfully within its license, you
3 don't consider them trafficking at that point,
4 right?
5    A.    Correct.
6    Q.    Okay.  Anything operating outside
7 of its license would be illegal, right?
8    A.    That would be correct.
9    Q.    So trafficking, by necessity,
10 requires illegal activity, right?
11    A.    Yes.
12    Q.    You would agree with me, wouldn't
13 you, that it is illegal to sell prescription
14 opioids to a person who has no prescription,
15 right?
16    A.    Yes.
17    Q.    And it is also illegal to smuggle
18 prescription opioids into a location like
19 Summit County without a license, right?
20    A.    Yes.
21    Q.    And, therefore, by the definitions
22 that you and I have been talking about,
23 licensed drug manufacturers, distributors, and
24 pharmacies that are lawfully doing business in
25 Summit County are not trafficking in

Page 215

1 prescription drugs as long as they are
2 operating under the terms of their lawful
3 license, right?
4        MR. LEDLIE:  Object to the form of
5 the question.
6    A.    As long as they're operating under
7 their -- within -- within the law, yes.
8    Q.    During your tenure as commander,
9 what portion of the drug unit's efforts were
10 devoted to investigations and crimes involving
11 marijuana?
12    A.    Are you -- you're asking me for a
13 percentage or --
14    Q.    A rough percentage.
15    A.    I have no idea.  Guys would go out
16 and get sources, and those sources would take
17 them wherever they take them, and if it was a
18 marijuana case, so be it.  If it was a coke
19 case, so be it.  If it was any other kind of
20 case, so be it.
21    Q.    You have previously referred to and
22 written about -- about meth, right?
23    A.    Yes.
24    Q.    During your tenure from 2001 to
25 2012, would you say that meth was involved in

Page 216

1 the largest proportion of your cases?
2        MR. LEDLIE:  Object to the form of
3 the question.
4    A.    Meth was high, but I think the
5 list -- the -- if I can recall correctly, coke
6 and marijuana took up a large amount of the
7 percentage of our cases.
8    Q.    So coke, marijuana, and meth would
9 be those that you recall having been sort of
10 the largest proportion?
11    A.    Yes.
12    Q.    And what about fentanyl and other
13 synthetic opioids?  Do you remember what
14 proportion they were?
15    A.    No, I really can't recall.
16    Q.    And do you recall the proportions
17 for prescription drugs in general?
18    A.    No, not really.  They were there,
19 but I don't remember the -- the percentages.
20    Q.    Okay.  And then further, for
21 prescription opioids, would you remember those
22 percentages?
23    A.    No.  We wouldn't have broken that
24 down.
25    Q.    Among the various drugs that we've

Page 217

1 just identified, can you describe any trends
2 that occurred over your tenure?
3    A.    Well, we saw -- early on, we saw
4 some LSD, and that went on for a short time,
5 and then it kind of disappeared.
6        Heroin was out there.  It wasn't a
7 big thing, and then we saw that come into the
8 picture.
9        Marijuana, cocaine always remained
10 pretty steady.  We obviously had a huge impact
11 here from methamphetamine.
12        As far as prescription drugs go, we
13 made cases.  I don't know that we had a big ebb
14 or not.  Like I say, we took everything as it
15 came in and ran with it, so I can't say for
16 certain how it ebbed and flowed.
17    Q.    How many doctors did the drug unit
18 investigate for drug diversion during your
19 entire tenure?
20    A.    Personally, I can remember two.  If
21 there were some others, I'm not -- I can't
22 recall.
23    Q.    How many pharmacists do you recall
24 having investigated for diversion during your
25 tenure?

55 (Pages 214 - 217)

Page 218

1     A.   I don't recall investigating any
2  pharmacists.
3     Q.   Any pharmacy technicians?
4     A.   No.  That would kind of stand out.
5  I couldn't recall that either.
6     Q.   You mentioned nurses earlier.  How
7  many nurses?
8     A.   Oh, we used to get them from
9  nursing homes all the time and some hospitals.
10  I don't know.  20 or so, maybe.  Best guess.
11     Q.   Any other health care professionals
12  that I haven't identified?
13     A.   None that I can recall.
14     Q.   And during your time as commander,
15  how many people do you remember having been
16  convicted of crimes related to prescription
17  pharmaceuticals?
18        MR. LEDLIE:  Object to the form of
19  the question.
20     A.   Yeah, I couldn't give you a guess.
21  I don't know.
22     Q.   And you said you recall two
23  doctors, right?
24     A.   Uh-huh.
25     Q.   Yes?

Page 219

1     A.   Yes.  I'm sorry.
2     Q.   And then maybe 20 nurses right?
3     A.   Correct.
4     Q.   So would the remainder, then, have
5  been abusers?
6     A.   Yes.
7     Q.   And are we talking hundreds?
8        MR. LEDLIE:  Object to the form of
9  the question.
10     A.   Well, again, I can't recall the
11  numbers of people we arrested.  I can't give
12  you a solid answer.
13     Q.   And abusers of drugs are criminals,
14  correct?
15        MR. LEDLIE:  Object to the form of
16  the question.
17     A.   In a technical sense, yes.
18     Q.   You convicted them, right?
19        MR. LEDLIE:  Object to the form.
20     A.   Yes.
21     Q.   And individuals who use lawful
22  prescription medication in an unlawful way are
23  committing a crime, correct?
24     A.   Correct.
25     Q.   How many of your drug unit officers

Page 220

1  were tasked primarily on cases involving
2  prescription opioids?
3     A.   No one was specifically tasked.
4     Q.   Is it fair to say the drug unit
5  never devoted a greater portion of its
6  resources to opioids over other illicit drugs?
7     A.   No.  I think it's fair to say that
8  whenever a case came in, we ran with it and
9  investigated it.
10     Q.   Okay.  But the largest portions of
11  the drugs that you were seeing were meth,
12  cocaine, and marijuana, right?
13     A.   Those would have made up the larger
14  part of our investigations, yes.
15     Q.   So they would have taken a larger
16  amount of your resources as well?
17     A.   It would what?
18     Q.   Have taken a larger amount of your
19  resources as well?
20     A.   Yes.
21     Q.   Earlier today we talked about the
22  fact that you have read the complaint, right,
23  in this case?
24     A.   Yes.
25     Q.   And did you look at the list of

Page 221

1  Defendants?
2     A.   Yes.
3     Q.   Do you recall there were 19
4  companies on that list?
5     A.   There was a pretty good list, yes.
6     Q.   And did -- did you recognize any of
7  the names?
8     A.   Yes.
9     Q.   Did you recognize all of them?
10     A.   No.  There were some that I think
11  were kind of new.
12     Q.   And are you aware of any
13  investigations by the sheriff's office or the
14  drug unit into any of the Defendants in this
15  case?
16     A.   No.
17     Q.   Prior to this case, did you ever
18  contact any of the Defendants in this case to
19  discuss the problems that Summit County was
20  facing with opioids?
21     A.   No.
22     Q.   And prior to this case, did you
23  ever contact any parent company of any of the
24  Defendants to discuss the problems that Summit
25  County was facing with opioids?

56 (Pages 218 - 221)

Page 222

1    A.    No.
2    Q.    Why didn't you ever contact them?
3    A.    Not my job. My job was to run the
4 investigative unit.
5    Q.    And the investigative unit was
6 specifically doing what?
7    A.    Investigating drug crimes.
8    Q.    And you never found it necessary to
9 contact any of the Defendants, right?
10    A.    Correct.
11        MR. LEDLIE:  Objection.
12        MS. RION:  Objection. Asked and
13 answered.
14    Q.    Looking back now, do you think it's
15 possible that they could have helped if you had
16 contacted them in 2005 when you wrote your
17 report?
18        MS. RION:  Object- --
19        MR. LEDLIE:  Object to the form of
20 the -- go ahead.
21        MS. RION:  Object to the form.
22    A.    Yeah, what could have happened in
23 2005, I have no idea.
24    Q.    Well, you recall the report that we
25 marked as -- I believe it's Exhibit 2. Might

Page 223

1 be 3.
2        MR. LEDLIE:  This one? Two.
3    Q.    Two. The addendum that you wrote.
4    A.    Okay.
5    Q.    The one that you are rightfully
6 proud of, right?
7    A.    Yes.
8    Q.    Do you think now that if you had
9 contacted any of the Defendants then that they
10 could have helped you with the problems that
11 you were identifying?
12        MR. LEDLIE:  Object to the form of
13 the question.
14    A.    I have no idea what they could have
15 done or would have done.
16    Q.    Because you didn't try, right?
17        MR. LEDLIE:  Object to the form.
18        MS. RION:  Objection.
19    A.    I did not try, no. I didn't call
20 Mexico either when they were sending all the
21 heroin up, so.
22    Q.    Well, I'll ask you again, sir, did
23 you have any evidence or any reason to believe
24 that any of the Defendants in this case were
25 doing anything illegal?

Page 224

1        MR. LEDLIE:  Object to the form of
2 the question.
3    Q.    Any evidence at all?
4    A.    No.
5        - - - - -
6        (Thereupon, Deposition Exhibit 5,
7        Summit County and City of Akron,
8        Ohio Plaintiff First Amended
9        Responses and Objections To
10        Distributor Defendants' First Set of
11        Interrogatories, was marked for
12        purposes of identification.)
13        - - - - -
14    Q.    Captain Baker, you've just been
15 handed what has been marked as Baker Exhibit 5,
16 and my first question for you is just, have you
17 ever seen this document before?
18    A.    No.
19    Q.    Okay. I can tell you that this is
20 a document that has been given to us in this
21 litigation answering some questions. It's a
22 part of the legal process where we have the
23 ability to ask questions, and your attorneys
24 respond to them, and then the same occurs the
25 other direction. Okay?

Page 225

1        Now, I'm going to ask you to turn
2 to page -- well, it starts on page 5, the very
3 bottom. And then I'm just going to ask you
4 whether anyone asked you to look at the answer
5 there.
6    A.    Okay.
7    Q.    So you see at the bottom,
8 Interrogatory 2?
9    A.    Yes.
10    Q.    "Identify each pharmacy within your
11 geographical boundaries that placed suspicious
12 orders for prescription opioids for each year
13 of the time frame."
14    A.    Okay.
15    Q.    And then there is a response that
16 goes for several pages. The list, though,
17 starts on page 8.
18        Is this the first time you're
19 seeing this?
20    A.    Yes.
21    Q.    Okay. So no one asked you to
22 comment on this before it was sent to us?
23    A.    No.
24    Q.    Okay. Looking at the list that
25 starts on the bottom of page 8 -- so -- well,

57 (Pages 222 - 225)

Page 226

1  it says just before the list, "Despite
2  Defendants' obligations to monitor and report
3  suspicious orders, the ARCOS database
4  identifies these pharmacies as having
5  suspicious orders for opioids within Summit
6  County, Ohio."
7          Do you see that?
8      A.  Yes.
9      Q.  Do you recognize any of these
10  pharmacies in this list on page 8 -- pages 8
11  and 9?  And there's two at the top of page 10.
12      A.  Yes.
13      Q.  And are you aware of any
14  investigations by the drug unit into any of the
15  people or companies on this list?
16      A.  I am not.
17      Q.  Any arrests either by you or by
18  Akron or anyone?
19      A.  Not that I'm aware of.
20      Q.  And I take it, then, no
21  prosecutions that you're aware of?
22      A.  No.
23      Q.  Okay.  And then if you look at page
24  10, you see there's a table that starts on page
25  10 and goes through page 11 and part of page

Page 227

1  12?
2      A.  Yes.
3      Q.  And it says, just above that,
4  "Further, Plaintiff identifies these pharmacies
5  as having the largest shipments of opioids."
6          Do you see that?
7      A.  Yes.
8      Q.  And do you know any of these
9  pharmacies or --
10      A.  Yes.
11      Q.  -- doctors?  Pharmacies.  You do.
12      A.  (Witness nodding head.)
13      Q.  Are you aware of any investigations
14  by the drug unit into any of the pharmacies on
15  this list?
16      A.  I am not.
17      Q.  Or by anyone?  Investigations by
18  anyone?
19          MR. LEDLIE:  Object to the form.
20      A.  I am not aware of anyone, no.
21      Q.  Have you turn to page 34.  You see
22  Interrogatory 8.  And you see it says,
23  "Identify all persons who wrongfully
24  manufactured, sold, possessed, used,
25  distributed, prescribed, or dispensed

Page 228

1  prescription opioids within your geographical
2  boundaries during this time frame."
3      A.  Okay.
4      Q.  Do you see that?
5      A.  Yes.
6      Q.  And as a part of this answer, if
7  you turn to page 36, the first full paragraph
8  on that page identifies a couple of
9  individuals.  It says, "An Akron area
10  physician, Adolph Harper, Jr., and three of his
11  employees, Adria Harper, Patricia Laughman and
12  Tequilla Berry."
13      A.  Yes.
14      Q.  Do you recognize those names?
15      A.  Harper I do.  That would be the
16  doctor that I was trying to remember.
17      Q.  So that's the doctor you referred
18  to earlier who was operating the pill mill?
19      A.  Yes.
20      Q.  Okay.  We found him.
21          And -- and these individuals, did
22  you have any knowledge of investigations of
23  them?  The others besides him?
24      A.  Those names don't sound familiar,
25  no.

Page 229

1      Q.  Okay.  And you see a little bit
2  further in that paragraph, it says, "In
3  December 2014, a former Copley Township family
4  medicine doctor named Brian Heim pled guilty to
5  conspiracy to distribute controlled substances
6  and 20 counts of distribution of controlled
7  substances."
8      A.  Yes.
9      Q.  Do you recognize that name?
10      A.  No.
11      Q.  So you don't know anything about
12  that investigation?
13      A.  I do not.
14      Q.  Do you believe that there were more
15  cases of drug diversion in Summit County than
16  just those cited in this paragraph?
17      A.  Oh, I'm sure there were.
18      Q.  Have they all been investigated and
19  prosecuted?
20      A.  Every case of drug diversion?  No.
21      Q.  Where would we find the names of
22  those that you suspected but didn't prosecute?
23          MR. LEDLIE:  Object to the form of
24  the question.
25      A.  If we had a case, then we would --

58 (Pages 226 - 229)

Page 230

1 we would have gone through it completely. To
2 suspect and not prosecute, I -- I don't have
3 that information. I don't have those names.
4    Q. Did you have case files on
5 individuals that you considered to be subjects,
6 you did some investigation, but you weren't
7 able to bring a case?
8    A. I don't recall having anybody under
9 suspicion that we didn't completely
10 investigate. I'm not sure I can answer your
11 question.
12    Q. Okay. And just to round out my
13 previous questions about this, that paragraph
14 that we were just looking at on page 36, no one
15 asked you to review that before it was sent to
16 us, right?
17    A. No.
18    Q. Okay. You can put that one aside.
19    We've talked a lot about what kinds
20 of cases your unit investigated and kind of
21 trends that you saw. I'd like to ask you some
22 specif-- some specifics about how you went
23 about investigating drug crimes.
24    Did the drug unit have policies or
25 standard procedures governing when to begin an

Page 231

1 investigation?
2    A. No.
3    Q. So how did you begin your
4 investigations?
5    A. Usually with intelligence or some
6 information that would come in. Patrol could
7 have stopped somebody that had drugs, and they
8 were very interested in helping themselves
9 along and we got sources from that.
10    Q. You say "they were very interested
11 in helping themselves along." You mean the
12 people who were stopped?
13    A. Yes.
14    Q. So they were interested in helping
15 themselves by providing information to the
16 police?
17    A. And assistance, yes.
18    Q. And in that way they were hoping
19 for lighter sentences?
20    MR. LEDLIE: Object to the form.
21    A. They would hope for that.
22    Q. Okay. So I stopped you in the
23 middle. How else would you start
24 investigations?
25    A. Usually pretty much that, or when

Page 232

1 we get some intelligence, we might go out and
2 set up some surveillances.
3    Q. When you say you got some
4 intelligence, how did you get that
5 intelligence?
6    A. We might get it through a phone
7 call. We might get it through another
8 government agency. There are a lot of
9 different ways intelligence comes in.
10    Q. Okay. So intelligence, a patrol
11 stop with a potential cooperator. Anything
12 else?
13    A. Pretty much it.
14    Q. And these -- the intelligence that
15 you were referring to, you said sometimes that
16 came from other government agencies?
17    A. Yes.
18    Q. How often did that happen?
19    A. Fairly often. We -- we got a lot
20 of intelligence from EPIC. In fact, we got in
21 a -- involved in a pretty good cocaine case as
22 a result of that.
23    We would get intelligence from guys
24 from the post office. We'd get intelligence
25 from DEA, from, you know, from their various

Page 233

1 branches. The airport stuff.
2    Q. When you say the post office, you
3 mean the postal inspectors?
4    A. Postal inspectors, sometimes the
5 postal carriers.
6    Q. Oh.
7    A. They see a lot.
8    Q. And they would contact you
9 directly?
10    A. They would usually call the
11 detective bureau, yeah, and then that would get
12 filtered to us.
13    Q. When you say the bureau, you mean
14 FBI?
15    A. Like the local detective bureau.
16    Q. Oh, the detective bureau.
17    A. Maybe Akron's detective bureau --
18    Q. Got it.
19    A. -- or -- yes.
20    Q. Okay. And how did you decide who
21 was responsible for investigating a case when
22 it came in?
23    A. Usually the call would come in, and
24 if there was somebody who wasn't totally busy
25 at the time, handle that, or if it wasn't in

59 (Pages 230 - 233)

Page 234

1 somebody's wheelhouse, we'd give it to them.
2    Q.    What kind of wheelhouses did people
3 have?
4    A.    For example, I had a detective who
5 was a -- a very good meth investigator, so if
6 we got a call about meth, it went to that
7 detective.
8    Q.    Anybody else come to mind as a sort
9 of specialist in that way?
10    A.    When we got stuff for
11 pharmaceuticals, usually Carmen was the go-to
12 person there.
13    Q.    And why was Carmen the go-to person
14 for pharmaceuticals?
15    A.    Previously she had -- before I got
16 there, had worked a lot of pharmaceutical
17 cases, apparently, and she was the connect with
18 the department of pharmacy.
19    Q.    And any other specialties?
20    A.    Everything else was kind of
21 geographical then.  You know, if information
22 was coming from Barberton, we'd probably get
23 the Barberton guy involved, or Cuyahoga Falls
24 or wherever.
25    Q.    How did you monitor the progress of

Page 235

1 an investigation?
2        MR. LEDLIE:  Object --
3    Q.    -- as the commander.
4        MR. LEDLIE:  Object to the form of
5 the question.
6    A.    Just check every day, see what's
7 going on, whether we needed to go out and
8 make -- if we were out making buys, if we were
9 doing surveillance, you know, how our manpower
10 was allotted.
11    Q.    So you checked in with your team
12 daily?
13    A.    Every day.
14    Q.    Did you have a standard morning
15 meeting, or how did you check in with them?
16    A.    We had some morning meetings.
17 Not -- not necessarily every day.  All depended
18 on what was going on, how things were moving
19 along.
20        But, yeah, just kind of seeing
21 where they were, whether or not we needed --
22 see how many buys we were going to schedule
23 that day.  How many surveillances we might need
24 to do that day, and how to divide the day up.
25 Kind of give you an idea how things were going.

Page 236

1    Q.    And at some point an investigation
2 turns in to an arrest, right?
3    A.    Yes.
4    Q.    How did you make that
5 determination?
6    A.    That was usually done by the case
7 officer.
8    Q.    Did -- did they have to clear it
9 with you before they made that decision?
10    A.    They would let me know what we're
11 going to do and hopefully what the arrest would
12 turn into.
13    Q.    Did you ever turn them down?
14    A.    To make an arrest --
15    Q.    Yes.
16    A.    -- in their case?  No.
17    Q.    And was there any kind of approval
18 chain through the prosecutor's office that you
19 had to go to before making an arrest?
20    A.    In the case of our federal cases,
21 we obviously were working with an AUSA, so
22 there was a lot of determination there from
23 them.
24        The local ones, not really.
25    Q.    So with the local ones you'd make

Page 237

1 the arrest and then bring the case to them?
2    A.    Yes.
3    Q.    But with the AUSAs, typically you
4 were working with them to decide when an arrest
5 was appropriate?
6        MR. LEDLIE:  Objection to form.
7    A.    Yeah, the -- the agent -- the case
8 agents would be, yes.
9    Q.    The case agents.  Fair enough.
10        Did you have any sort of standard
11 tracking document for your cases?
12    A.    As far as?
13    Q.    I'm looking for any records that we
14 might be able to see the kinds of cases that
15 you had?
16    A.    No.  They went in a case file.
17    Q.    Did you share information with the
18 City of Akron?
19    A.    I would share intelligence back and
20 forth.
21    Q.    Was that verbal or written or both?
22    A.    Mostly verbal.
23    Q.    Were there any formal written
24 reports of any sort?
25    A.    Probably the -- the -- the reports

60 (Pages 234 - 237)

1 that we would provide to HIDTA?

2    Q.   To HIDTA?

3    A.   Uh-huh.

4    Q.   Okay.  So those would also go to

5 the City of Akron?

6    A.   Yeah.  We were combi- -- we

7 combined to form the HIDTA group.

8    Q.   Are you familiar with the term

9 "suspicious order report"?

10    A.   Yes.

11    Q.   How are you familiar with it?

12    A.   From reading the case.

13    Q.   From reading the complaint?

14    A.   The complaint, yes.

15    Q.   Had you heard that term before you

16 read the complaint?

17    A.   I may have.

18    Q.   Was it something that you were

19 familiar with while you were working drug cases

20 in Summit County?

21    A.   I don't know that that would have

22 crossed my mind, no.

23    Q.   Are you now aware that distributors

24 are required to file suspicious order reports

25 with the Board of Pharmacy and the DEA?

1    A.   Yes.

2    Q.   And have you ever seen those

3 reports?

4    A.   I have not.

5    Q.   And so have you ever used them to

6 develop investigations or prosecutions?

7    A.   No.

8        MR. LEDLIE:  Object to the form of

9 the question.

10    Q.   Did the DEA or board of pharmacy

11 ever share them with you?

12    A.   No.

13    Q.   Any of your officers, to your

14 knowledge?

15    A.   To my knowledge, no.

16    Q.   Did you ever ask to see them?

17    A.   I didn't know they existed.

18    Q.   Now that you do, do you think they

19 would have been helpful in combatting

20 prescription drug diversion?

21        MR. LEDLIE:  Object to the form of

22 the question.

23    A.   I don't know.  It could have

24 possibly been something we could have used in

25 an investigation, but to say directly whether

1 it would be or not, I can't say.

2        MR. LEDLIE:  Can we follow your

3 protocol and break at the hour?  Because we've

4 been going an hour.

5        MS. SAULINO:  Your clock gets

6 faster and faster, my friend, but we can take a

7 break.

8        MR. LEDLIE:  I wrote it down.

9        THE VIDEOGRAPHER:  Off the record,

10 2:53.

11        (A recess was taken.)

12        THE VIDEOGRAPHER:  On the record

13 3:13.

14        - - - - -

15        (Thereupon, Deposition Exhibit 6,

16        12/15/2010 E-Mail Chain Re: HIDTA

17        Information Sharing Conference Call,

18        SUMMIT_000067601 to 000067602, was

19        marked for purposes of

20        identification.)

21        - - - - -

22 BY MS. SAULINO:

23    Q.   Captain Baker, you have just been

24 handed what has been marked as Baker Exhibit 6.

25 This is an e-mail from December 15, 2010, from

1 Commander John Burke to a group of people,

2 including you.  Your name is on the second line

3 in the "to's" there.

4    A.   Uh-huh.

5    Q.   Do you see that?

6    A.   Yes.

7    Q.   Who is Commander John Burke?

8    A.   He was head of one of the task

9 forces in Southern Ohio.

10    Q.   Okay.  So is this a -- one of your

11 fellow commanders in the -- name of the --

12    A.   OTFCA.

13    Q.   OTFCA, yes.

14    A.   Yes.

15    Q.   Okay.  And are these -- are all

16 these folks on the "to" line in OTFCA?

17    A.   No.

18    Q.   Okay.  Do you know what this group

19 is?  Is it --

20    A.   This is from the Ohio HIDTA.

21    Q.   Ohio HIDTA, okay.  Got it.

22        And so I guess, then, it follows

23 that the subject says, "HIDTA information

24 sharing conference call," that this is the

25 group that would have been involved in such a

61 (Pages 238 - 241)

Page 242

1 call?
2     A.    Some of these are people who are
3 with the HIDTA.  The majority of these people
4 are task force commanders or -- or in some way
5 connected to one of the task forces.
6     Q.    I see.  So this is a -- sort of a
7 an amalgamation of a couple of groups?
8     A.    Yes.
9     Q.    Okay.  And Commander Burke is
10 forwarding an e-mail from below that appears to
11 address the HIDTA information-sharing
12 conference call.  Is that -- is that -- was
13 that a regular thing that you would participate
14 in?
15     A.    A conference call?
16     Q.    A HIDTA information-sharing
17 conference call?
18        MR. LEDLIE:  Object to form.
19     A.    Me personally, no.
20     Q.    Someone from your unit?
21     A.    Unless one of the Akron guys went
22 there, I don't know, that was involved in it.
23     Q.    Okay.  And this forward, which
24 makes its way to you, is of some information
25 about a Florida legis- -- a Florida law.  And

Page 243

1 it says here, "Starting October 1, 2010,
2 Florida passed a new legislation preventing
3 pain clinics to prescribe and dispense more
4 than a 72-hour supply of painkillers.
5 Offenders and pain clinics are getting around
6 this legislation by referring customers to a
7 friendly pharmacy instead of dispensing the
8 pills from their location."
9        Do you see that?
10     A.    Yes.
11     Q.    Were you familiar with the concept
12 of a friendly pharmacy?  I guess, is that
13 something that you saw in Summit County is
14 what --
15     A.    If I got this, then obviously --
16     Q.    Yeah.  I'm not asking you about
17 what they're talking about here in Florida.
18 I'm more asking about whether that's something
19 you saw in Summit County.
20     A.    Personally, I can't say.
21     Q.    And then if you turn the page to --
22 to the top of the next page, that paragraph at
23 the very top of the next page says, "If a
24 patrol car stops a vehicle in Ohio and they
25 find pills that originated in Florida, North

Page 244

1 Florida HIDTA requests that the doctor's
2 information on the pill bottles be sent," and
3 then they provide a name and e-mail address.
4 "If they start to see a pattern or gain enough
5 complaints about a specific doctor, they will
6 likely open a case on that specific pain
7 clinic."
8        Do you see that?
9     A.    Yes.
10     Q.    And then that is the paragraph that
11 is referred to in the forward to you by John
12 Burke on the front page where he says, "Note
13 especially the paragraph that asks for traffic
14 stops in Ohio to be reported to the HIDTA in
15 Florida."
16        Is that something that you would
17 do?
18     A.    Share intelligence?
19     Q.    With Florida?
20     A.    Sure.
21     Q.    Do you recall having worked with
22 Florida?
23     A.    No.  I worked a cocaine case that
24 we worked in connection with a local
25 jurisdiction in Florida.

Page 245

1     Q.    But you didn't regularly work with
2 the Florida HIDTA or any other drug
3 organizations in Florida?
4     A.    No.  Unless they gleaned
5 intelligence that we gave -- that we gave to
6 the HIDTA.
7     Q.    And would it have been something
8 that you remember seeing, to see a -- a traffic
9 stop in Ohio where you were seeing pills from
10 Florida?
11     A.    I think I heard about them.  We
12 didn't see any.
13     Q.    But you do remember hearing about
14 them?
15     A.    I believe so, yes.
16     Q.    You can put that one aside.
17        - - - - -
18        (Thereupon, Deposition Exhibit 7,
19        Summit County Drug Unit Confidential
20        Investigative Report, Case No.
21        DU-0517, SUMMIT_001839815 to
22        001839819, was marked for purposes
23        of identification.)
24        - - - - -
25     Q.    Captain Baker, you have just been

62 (Pages 242 - 245)

Page 246

1  handed what has been marked as Baker Exhibit 7.
2      A.   Uh-huh.
3      Q.   What kind of a document is this?
4      A.   It's an incident report.
5      Q.   An incident report?
6      A.   Well, a confidential investigative
7  report, I mean, yeah.
8      Q.   And what is a confidential
9  investigation report?  Or investigative report?
10     A.   This is a -- report that an
11 investigator would write as to whatever they
12 happened to do in a particular case and a
13 particular incident.
14         If it was a long case, there could
15 be a big, long stack of these, because every
16 time they -- they do something particular to a
17 case, they write a report about it.
18     Q.   Okay.  And this is -- this is where
19 I was going with this.  So -- so this report
20 would not be the complete case file.  This is
21 one of the reports that would be in a case
22 file?
23     A.   Yes.
24     Q.   And just to make sure I understand
25 what you just said, if it was a long case,

Page 247

1  you'd see a stack of these types of reports?
2      A.   Right.
3      Q.   Okay.  And was there -- what were
4  the parameters for needing to write up
5  something in this form?
6      A.   Basically for anything you did
7  during a case.
8      Q.   So I see that this is a report from
9  a Susan M. Barker to you --
10     A.   Yes.
11     Q.   -- and Sergeant Johnson?
12     A.   Yes.
13     Q.   Who is Susan Barker?
14     A.   One of the detectives in the drug
15 unit.
16     Q.   And Sergeant Johns-- Johnston?
17     A.   He's a sergeant with the drug unit.
18     Q.   And these folks worked for you,
19 right?
20     A.   Yes.
21     Q.   And this was pretty early in the
22 tenure of the revamped drug unit that you were
23 the commander of, right?
24     A.   Yes.
25     Q.   And this appears to have been a

Page 248

1  report of Detective Marker- -- Barker's meeting
2  with a source, and then the source arranging to
3  meet with the subject, and then the subject
4  selling controlled substances to the source,
5  and then an arrest; is that right?
6      A.   Okay.  Without having totally read
7  it, that's what it appears to be.
8      Q.   Okay.  It says "Arrests" there on
9  the first page.  That's where I'm getting
10 arrest from.  Is that right?  Under "Date
11 Investigated," just at the very top there.
12 "Arrests:  Jeanne A. Kennedy."
13     A.   Yes.
14     Q.   Does that mean an arrest happened?
15     A.   Yes.
16     Q.   Okay.  So this seems to be a report
17 about a number of things that happened in this
18 case; am I right about that?
19     A.   I'm not sure what you mean by "a
20 lot of things."
21     Q.   I'm really just trying to get an
22 understanding of when these reports are written
23 and -- and how they're parceled out, you know,
24 what goes into a report, what then gets to --
25 goes into the next report rather than being a

Page 249

1  part of this report.  Does that --
2      A.   Yeah.  This -- and -- and this one,
3  for example, this may be the only thing, other
4  than evidence reports, because this person was
5  arrested.
6      Q.   Okay.  So it all happened on the
7  same day and it all goes in the same report?
8      A.   Yes.
9      Q.   Okay.  Thank you.
10         So it may be that there are case
11 files that just have one of these?
12     A.   Yes.
13     Q.   And then you say you might also
14 find evidence reports as in, like, things that
15 were seized and such?
16     A.   Yes.
17     Q.   Like the evidence that's listed on
18 the last page.
19     A.   On the last page, yes.
20     Q.   Yep.  Okay.  So you'd expect to see
21 those reports in the case file as well?
22     A.   Yeah.
23     Q.   And you see that this is a
24 confidential source making a controlled
25 narcotics purchase of oxy, right?

63 (Pages 246 - 249)

Page 250

1    A.   Yes.
2    Q.   And so it's fair to say that at
3 least as of March of 2002 your officers were
4 working opioid cases, correct?
5    A.   In this particular case, yes.
6    Q.   And -- and this is a case where --
7 would you say that Ms. Kennedy was trafficking
8 OxyContin?
9    A.   Yes.
10    Q.   Now, you see that on page 4 of 5,
11 if you look at the page numbers at the top, you
12 see under Paragraph 15, Detective Barker
13 recounts an interview of Jeanne Kennedy?
14    A.   Okay.
15    Q.   Am I right in -- in reading that,
16 that that's recounting an interview with Jeanne
17 Kennedy?
18    A.   Yes.
19    Q.   Okay.  And it says, third sentence
20 in, "Jeanne stated she had a valid prescription
21 for the OxyContin and the Adipex.  She stated
22 she would sell half of the OxyContin script
23 amount, approximately 65 pills each month,"
24 right?
25    A.   Yes.

Page 251

1    Q.   That's illegal, right?
2    A.   It is illegal.
3    Q.   And then if you look further down
4 in this paragraph summary, you see it says,
5 "Jeanne stated when she ran out of pills and
6 was unable to get a refill, she would purchase
7 the pills from several people she knew.  She
8 stated she had purchased 50 40mg OxyContin on
9 March 5th, 2002, from a B/M -- what is that?
10    A.   It's "black male."
11    Q.   -- "she knew for $11 per pill
12 during her lunch break," right?
13    A.   Right.
14    Q.   That is illegal as well, right?
15    A.   That is illegal, on both ends.
16    Q.   She -- "Jeanne stated she has sold
17 OxyContin to the source several times.  She
18 also stated she has sold OxyContin to other
19 people," right?
20    A.   Yes.
21    Q.   Do you know whether the drug unit
22 investigated this lead into this unidentified
23 black male from whom she purchased Oxy on her
24 lunch break?
25    A.   Let me see.  It looks like she was

Page 252

1 offered the ability to help herself out.
2 Whether she did or not, I don't know.
3    Q.   And can you --
4    A.   From this I can't glean that.
5    Q.   Can you explain to me how you know
6 that?
7    A.   If you look at No. 17 --
8    Q.   Uh-huh.
9    A.   -- it says that, "It was determined
10 that due to Jeanne's cooperation and her lack
11 of any criminal history, she would be released
12 back and allowed to return on March 7 for
13 processing."
14        So they're giving her a chance to
15 kind of think about, hey, you want to help
16 yourself out, we'll go after this other guy.
17 Whether that occurred or not, I don't know.
18 From here it doesn't tell me that.
19    Q.   So there's no way to know from a
20 report like this?
21    A.   Correct.
22    Q.   Would you expect to see a further
23 report in the case file one way or the other
24 about what she decided?
25    A.   Not necessarily.

Page 253

1    Q.   Okay.  Is there any way that we
2 could figure that out?
3    A.   Talk to Jeanne.  I don't know.
4    Q.   Is this the format that you recall
5 having the investigative reports having been in
6 during your tenure as the commander of the drug
7 unit?
8    A.   Yeah, pretty much.  I mean, at some
9 point there may not have been the little
10 picture thing on here, but generally they
11 followed this format.
12    Q.   And were -- were there any sort of
13 policies or standards about what information
14 was allowed to be put in here?
15    A.   Anything that was relative to the
16 case and relative to what they did.
17    Q.   And would you as the commander of
18 the unit rely on these reports if you were
19 reviewing the files?
20    A.   Yes.
21    Q.   You would expect the information in
22 them to have been accurate to the best of the
23 writer's knowledge at the time?
24    A.   Yes.
25    Q.   Now, we have seen some similar

64 (Pages 250 - 253)

Page 254

1 reports from prior years. I'll show you an
2 example.
3        MR. LEDLIE:  Are we done with this
4 one for now?
5        MS. SAULINO:  Yes.
6        - - - - -
7        (Thereupon, Deposition Exhibit 8,
8        Summit County CENTAC Confidential
9        Investigation Report, Case No.
10       CT-0114, SUMMIT_001977600 to
11       001977604, was marked for purposes
12       of identification.)
13       - - - - -
14    Q.  So now you have been handed,
15 Captain Baker, Baker Exhibit 8. This is a
16 report that we found in those that were
17 provided to us from October of 1997.
18 Am I right, based on our previous
19 conversation, that that is when you were not a
20 part of the drug unit?
21    A.  Right.
22    Q.  And did you ever, as a -- as the
23 commander of the drug unit, beginning again in
24 2001, have reason to look back at reports from
25 the time that you were not there?

Page 255

1    A.  No. Not unless a -- not unless we
2 were making a case on somebody who was already
3 a defendant prior. We may have utilized this
4 as information.
5    Q.  Okay. Well, that's -- and that's
6 fair enough. In that event, if you were -- if
7 you needed to look back at those reports from
8 the time that you were not there, would you
9 have similarly expected that the information
10 that is recorded in them was recorded
11 accurately, to the best of the writer's ability
12 at the time?
13       MR. LEDLIE:  Object to the form.
14    A.  I would hope it would have been.
15    Q.  That was the standard that you
16 under- -- expected the officers to work under?
17    A.  Yes.
18    Q.  And these were standard business
19 documents that were created in the course of
20 business of the drug unit?
21    A.  They're standard confidential
22 investigation reports, yes.
23    Q.  Okay. And here, just to round out
24 something we were talking about a moment ago,
25 this one says "arrest pending" on the front

Page 256

1 page.
2    A.  Uh-huh.
3    Q.  If we see that, does that mean that
4 the -- at least as of the time of the report
5 that we're looking at, the person was not
6 arrested?
7    A.  Correct.
8    Q.  Okay. And that was typical --
9    A.  Probably an ongoing case.
10    Q.  Okay. And that was typical if you
11 had an investigation going on but weren't ready
12 to arrest the person yet?
13    A.  Right, yes. At least how this
14 officer wrote it.
15    Q.  Do you happen to remember this
16 defendant, Richard Reitz?
17    A.  No.
18    Q.  Okay. You can put that one aside.
19       Are there any particular officers'
20 reports from that period of time while you were
21 not in the unit whose reports you would not
22 trust?
23    A.  No. I don't think anybody would
24 have put that down on paper that wasn't
25 information that wasn't true.

Page 257

1    Q.  May I ask what caused you to
2 hesitate?
3    A.  I was just trying to think back. A
4 lot of years to go back.
5    Q.  You and I have talked a couple of
6 times today about the concept of doctor
7 shopping. And that -- just so that you and I
8 are talking about the same, would you agree
9 with me that that refers to when a patient gets
10 many prescriptions from many doctors or
11 continues to visit doctors until he or she
12 finds a doctor who will prescribe to them?
13    A.  Yes.
14    Q.  Did the drug unit investigate any
15 instances of doctor shopping while you were the
16 commander?
17    A.  Oh, I'm sure they did.
18    Q.  Do you recall any names?
19    A.  I don't recall any specifics.
20    Q.  And do you recall how many,
21 approximately?
22    A.  No, no idea.
23    Q.  Do you know whether there were any
24 prosecutions?
25    A.  If there was an arrest, there was a

65 (Pages 254 - 257)

Page 258

1 prosecution.
2    Q.   And a conviction?
3    A.   Yeah.  We had a pretty good rate.
4    Q.   What was your rate?
5    A.   99.1 percent.
6    Q.   That is a pretty good rate.
7    A.   99.9 or whatever.  Yeah.  One guy.
8 One guy.
9    Q.   What kind of -- what kind of case
10 was the one guy?
11    A.   The one we went to court over and
12 were sued about.
13    Q.   The one we discussed at the very
14 beginning?
15    A.   That would be the case.
16    Q.   Okay.  Now, we've talked about
17 prescription fraud, right?  Or prescription
18 forgery?
19    A.   Yes.
20    Q.   And that's where a person either
21 physically forges a prescription or uses the
22 same prescription at multiple pharmacies; is
23 that right?
24    A.   That would be someone who either
25 forges a prescription or alters one to change

Page 259

1 the amount.
2    Q.   And did the drug unit investigate
3 any cases of pres- -- of suspected prescription
4 fraud --
5    A.   Yes.
6    Q.   -- or forgery?
7    A.   Yes.
8    Q.   Do you remember about how many?
9    A.   No.
10    Q.   Do you remember any particular
11 ones?
12    A.   The only one I can remember, no, it
13 wasn't at the drug unit at the time.  It was a
14 guy from Kent State who was writing scripts off
15 of a doctor from Nigeria for Ritalin.
16    Q.   And Ritalin is what kind of drug?
17    A.   It's a Schedule II stimulant.
18    Q.   It's an ADHD drug, right?  It's for
19 ADHD?
20    A.   Yes.
21    Q.   Lawfully?
22    A.   (Witness nodding head.)
23         - - - - -
24         (Thereupon, Deposition Exhibit 9,
25         Summit County Drug Unit Confidential

Page 260

1         Investigative Report, Case No.
2         DU-0791, SUMMIT_001843287 to
3         001843291, was marked for purposes
4         of identification.)
5         - - - - -
6    Q.   Captain Baker, you have been handed
7 what has been marked as Baker Exhibit 9.  This
8 is another confidential investigative report.
9 This one from May of 2003.  And the arrest is
10 of a Karen L. Dawson, LPN.
11    A.   Uh-huh.
12    Q.   So she's a nurse, right?
13    A.   Yes.
14    Q.   Do you remember this one?
15    A.   Not really.
16    Q.   And this refers to Detective Carmen
17 Ingram.  You referred to her earlier, right?
18    A.   Correct.
19    Q.   She's the one who -- she's the one
20 of your officers who typically was assigned the
21 opioid cases?
22    A.   Pharmaceutical cases.
23    Q.   The pharmaceutical cases.  Got it.
24 Okay.
25         And it -- it says here in the

Page 261

1 synopsis that Detective Ingram received a
2 telephone call from a Kimberly Hodgkiss at
3 Hartville Family Physicians?
4    A.   Yes.
5    Q.   And that the -- and Kimberly
6 Hodgkiss stated that Melinda Shadowitz, M.D.,
7 had provided Karen L. Dawson with Vico- --
8 Vicodin and Ritalin prescriptions, and then
9 had -- she learned that Karen Dawson had just
10 received the same prescriptions from another
11 doctor, right?
12    A.   Yes.
13    Q.   And then it further says Melinda
14 Shadowitz, M.D., further advised that Karen L.
15 Dawson had taken the prescriptions written by
16 her to two different pharmacies to be filled,
17 right?
18    A.   Yes.
19    Q.   So is that an example of doctor
20 shopping and prescription forgery?
21    A.   I would -- yeah, I would call it
22 more like doctor hopping, but -- because she's
23 already got a physician.
24    Q.   I see.  So -- so she already got
25 some prescriptions and went to get more from

Page 262

1 another doctor?
2    A.   Right.
3    Q.   So you personally would call that
4 doctor hopping?
5    A.   Yes.
6    Q.   Okay. And then the going to two
7 different pharmacies to be filled, that would
8 be prescription forgery?
9    A.   Yes. Oh, yeah. Well -- well, she
10 hasn't altered it. I would say the charges
11 that -- that are here, the deception to obtain
12 would be the charges.
13    Q.   Okay. Now, this looks like you got
14 this case because you got a tip from somebody,
15 right?
16    A.   Yes.
17    Q.   You'd agree with me that without
18 that tip, this would have been very hard to
19 detect, right?
20       MR. LEDLIE: Objection to form.
21    A.   It would have gone undetected --
22    Q.   It would have gone --
23    A.   -- probably.
24    Q.   -- undetected? Because this type
25 of crime is very difficult to detect, right?

Page 263

1    A.   Yes.
2    Q.   And you'd agree with me that you
3 were reliant in part on medical professionals
4 like the one here to report this kind of crime
5 to you, right?
6    A.   We were relying on any kind of
7 intel- -- intelligence we could get.
8    Q.   And that's because of the
9 difficulty in detecting these crimes, right?
10    A.   Right.
11       MR. LEDLIE: Object.
12    Q.   You can put that one aside.
13       So I think based on your previous
14 answer I know the answer to this already, but
15 did you ever have any unsuccessful prosecutions
16 of doctors or diverters?
17    A.   Not that I can recall.
18    Q.   It sounds like no, because you only
19 had the one and that was marijuana, right?
20    A.   Yes.
21    Q.   When you started to suspect that a
22 doctor was unlawfully prescribing medicine, did
23 you notify any of the Defendants in this case?
24    A.   I did not.
25    Q.   Do you know if anyone from the drug

Page 264

1 unit did?
2    A.   I have no idea.
3    Q.   And what about suspect pharmacies?
4 When you started to suspect a pharmacy was
5 filling illegitimate orders, did you notify any
6 of the Defendants in this case?
7    A.   I did not.
8    Q.   And do you know if anyone in the
9 drug unit did?
10    A.   I do not know.
11    Q.   You didn't direct them to, right?
12    A.   No.
13    Q.   You would agree with me, if you had
14 notified them, it's possible they would have
15 been able to take action?
16       MR. LEDLIE: Object to the form of
17 the question.
18    A.   I don't know whether they could
19 have taken action or not. Who knows.
20    Q.   Right, because since you didn't
21 report it to them, you don't know one way or
22 the other whether the distributor would have
23 stopped the distribution if you'd reported it
24 to them, right?
25       MR. LEDLIE: Object to the form of

Page 265

1 the question. Asked and answered.
2    A.   Yeah, I wouldn't know.
3       MS. SAULINO: We're just going to
4 take a brief break to switch questioners.
5       MR. LEDLIE: Okay.
6       THE VIDEOGRAPHER: Off the record,
7 3:43.
8    (Off-the-record discussion.)
9       THE VIDEOGRAPHER: On the record,
10 3:48.
11       EXAMINATION OF HYLTON E. BAKER
12 BY MR. PULSIPHER:
13    Q.   Hello, Captain Baker. I'm Bryant
14 Pulsipher. I work with Jennifer, and I have a
15 few more questions for you.
16    A.   Okay.
17    Q.   You mentioned before that one of
18 your responsibilities as commander related to
19 the budget; is that correct?
20    A.   I did the grant requests.
21    Q.   What -- what are some of the
22 requests you made in terms of grants?
23    A.   We requested money from the State
24 to help us buy equipment. Let's see. We
25 didn't take -- we didn't ask for any bond

67 (Pages 262 - 265)

Page 266

1 money, so -- yeah, mostly to get equipment,
2 cars and such.
3      We wrote requests to HIDTA for
4 equipment such as phones.  Again, vehicles.  I
5 wrote a request for monies to purchase a Title
6 III intercept equipment.  Just whatever we
7 could use to further our mission.
8      Q.   So were any of these requests
9 tailored specifically to any particular
10 investigation or any particular drug?
11      A.   No, not that I recall.  They were
12 all tailored to -- to meet our mission.
13      Q.   And when you say "meet our
14 mission," you mean all drug trafficking
15 investigations?
16      A.   Yeah.  Our mission was to dismantle
17 and disrupt major drug trafficking
18 organizations.
19      Q.   Is it fair to say that all of the
20 drug unit's expenditures from your time as
21 commander related to the entirety of that
22 mission?
23      A.   Yeah.
24      Q.   So if I were to ask you to name a
25 specific expense that related to opioids, for

Page 267

1 example, you would be unable to do that?
2      A.   There are -- I mean, I could -- I
3 could show that -- where somebody used funds to
4 buy drugs, specific drugs.
5      Q.   Do I recall correctly from your
6 previous answer that you did not request grant
7 funds for buy money?
8      A.   Correct.
9      Q.   So where would that money have come
10 from?
11      A.   That was -- I believe the County
12 had some kind of State funding.  We also
13 utilized seizures.
14      Q.   Can you explain what you mean by
15 seizures, please?
16      A.   If we did a case, and during the
17 execution of the search warrant of that case or
18 during the case we were able to seize funds, at
19 the end of that case, we could ask the courts
20 to turn that money over to us for use in
21 completing our mission.
22      Q.   Aside from buy money, how else did
23 you use the pro- -- proceeds from forfeitures?
24      A.   We used it for equipment.  We used
25 it for our everyday expenses that we needed.

Page 268

1 You know, when you're going out and making
2 buys, undercover wires, you need batteries and
3 such.
4      Q.   Okay.  So we've spoken about grant
5 money and forfeiture proceeds.  Are there any
6 other sources of funding you relied upon?
7           MR. LEDLIE:  Object to the form of
8 the question.
9      A.   Not that I recall.  That was our
10 basic source of income.
11      Q.   Did you rely on any funding from
12 the County?
13      A.   As far as?  I mean, they paid us,
14 obviously.
15      Q.   So the -- the salaries of sheriff's
16 deputies who are part of the drug unit were
17 paid from Summit County?
18      A.   The sheriff's deputies were paid by
19 the County, yes.
20      Q.   Are you aware of any other
21 expenditures within the drug unit's budget made
22 by the County?  Paid by the County, I mean?
23      A.   Probably space where we were
24 located.  Other than that, no.
25      Q.   So when you say "space," do you

Page 269

1 mean the rent, for example?
2      A.   Yes.
3      Q.   So if we were to add up all of the
4 salaries, benefits, overtime, and the rent from
5 your time as commander, that would be the total
6 amount of money that Summit County paid --
7           MR. LEDLIE:  Object --
8      Q.   -- for the drug unit?
9           MR. LEDLIE:  Object to the form of
10 the question.
11      A.   I don't know for sure it would be.
12      Q.   Well, we just spoke about those two
13 sources.  Are you wondering if there are others
14 that we haven't spoken about?
15      A.   Well, what I'm telling you is I put
16 in for grants from OCJS, and I wrote for grants
17 from HIDTA.  The County had money from other
18 sources, unaware -- that I'm unaware of.  I
19 don't know.  I'm not in that realm.  And we
20 used seizures.
21      Q.   I see, so it's possible that the
22 County relied on funding sources you're not
23 aware of.
24      A.   That is possible, yes.
25      Q.   I see.  Okay.  During your time as

68 (Pages 266 - 269)

1 commander, did the size of the drug unit's
2 budget depend on the number or type of
3 investigations the drug unit conducted?
4     A.   No.
5     Q.   Did the size of the budget depend
6 instead on the size of the grants the drug unit
7 received?
8         MR. LEDLIE:  Object to the form of
9 the question.
10     A.   Our budget was, yeah, whatever we
11 had.  Whatever we got.
12     Q.   Did you ever request an increase in
13 the amount of grant funding you received?
14     A.   From the State, it pretty much
15 stayed the same.  HIDTA, we always asked for
16 more.  We never got it, but we always asked.
17     Q.   Do you mean that every year you
18 asked for more?
19     A.   As far as I could recall, yeah, we
20 always tried to push the envelope.
21     Q.   What do you mean by "push the
22 envelope"?
23     A.   I mean request more -- more than we
24 got in the previous year.
25     Q.   You said you never got it?  Was the

1 budget -- I'm sorry -- was the amount you
2 received from HIDTA ever larger than the amount
3 from the previous year?
4     A.   I don't know.  I think it stayed
5 pretty much the same.  I mean, if we got
6 another guy and they added another phone, that
7 would have made it larger, but...
8     Q.   So is it fair to say that you never
9 requested an increase in grant funds due to the
10 rise of a particular type of drug in your
11 investigations?
12     A.   I did not.
13     Q.   So, then, it must also be true that
14 you never requested an increase in the drug
15 unit's budget because you needed more resources
16 to investigate opioid trafficking?
17         MR. LEDLIE:  Object to the form of
18 the question.
19     A.   Basically, I never requested more
20 money because I knew we weren't going to be
21 able to get it.
22     Q.   Did the drug unit have the
23 resources it needed during your time as
24 commander?
25     A.   I'm sorry?

1     Q.   Did the drug unit have the
2 resources it needed during your time as
3 commander?
4     A.   We worked off of what we had.  We
5 could always use more.  There's no question
6 about that.  But I think we did a pretty good
7 job with what we had.
8     Q.   You said, "We could always use
9 more.  There's no question about that."  What
10 would the more have been used for?
11     A.   You know, who knows.  More
12 investigations we did, the more directions we
13 could have gone.  It's hard to say.
14     Q.   So if the drug unit's budget had
15 doubled while you were commander, if you had
16 suddenly received twice as much money, what
17 would you have spent the money on?
18     A.   Again, that's kind of hard to say.
19 Depending on where our investigations were
20 going, if I could have got personnel, we could
21 have done that.  I don't know.  It's a -- it's
22 wherever -- wherever we can put it to good use.
23     Q.   You mentioned personnel.  Would
24 that have been detectives?
25     A.   Yes.

1     Q.   Any extra vehicles?
2     A.   If I got detectives, I need
3 vehicles for them.
4     Q.   Personal equipment for them?
5     A.   Their personal equipment came from
6 their departments.  Their own personal --
7     Q.   So no?
8     A.   -- had their own personal
9 equipment.
10     Q.   I'm sorry.  I'm sorry.  I
11 interrupted.  The answer was no -- no money
12 extra for personal equipment?
13     A.   No.
14     Q.   Any extra money for training?
15     A.   Absolutely.  Yeah.  That's one of
16 the things we did is allow people to go to
17 training.
18     Q.   Would you have directed any extra
19 money to efforts that relate specifically to
20 prescription opioids?
21         MR. LEDLIE:  Object to the form of
22 the question.
23     A.   I don't know.  That -- you know,
24 hindsight 20/20 and all that, I don't know.  I
25 mean, I could have directed it to whatever we

69 (Pages 270 - 273)

Page 274

1 were involved in at the time.
2    Q.    Can you think of a particular
3 expense or a particular use you would have
4 dedicated that money to that relates to
5 prescription opioids?
6    A.    Again, it's hard to say what we'd
7 have done.  Back then if I'd have had money and
8 I had personnel, could have added some people
9 to -- to be involved in diversion, perhaps.
10    Q.    I think you testified earlier that
11 you didn't have any detectives devoted
12 specifically to diversion; is that right?
13    A.    That is correct.
14    Q.    What makes you think that you would
15 have spent the extra money on detectives
16 devoted specifically to diversion, then, if you
17 had received more money?
18    A.    I don't know exactly that I would
19 have, but it's an option.
20    Q.    Understood.  Is there a time when
21 the drug unit's budget was particularly tight?
22    A.    Was what?
23    Q.    Particularly tight.
24        MR. LEDLIE:  Object to the form of
25 the question.

Page 275

1    A.    Not necessarily the drug unit's.
2    Q.    The sheriff's office?
3    A.    The sheriff's office.
4    Q.    When was that time?
5    A.    Probably around -- I would guess,
6 as far as I could remember, around 2009 up.
7 Somewhere in there.
8    Q.    Would it be fair to say that it was
9 connected to the financial crisis?
10        MR. LEDLIE:  Object to the form of
11 the question.
12    A.    You know, it could have been a
13 whole lot of different things.  I don't know.
14    Q.    Isn't it true that the sheriff's
15 office decreased the number of deputies
16 assigned to the drug unit in 2011?
17    A.    I don't remember losing anybody.
18    Q.    What documents would we consult if
19 we wanted to know exactly how much money the
20 drug unit spent between 2001 and 2012?
21    A.    You would have to go to the -- the
22 finance officer or the sheriff's office for
23 that.
24    Q.    Is there a particular person you
25 think we should speak to?

Page 276

1    A.    I don't know if she's still there,
2 but the person who was doing that at the time,
3 her name was Pam Murray.
4    Q.    And you would expect that those
5 documents would be in her file?
6        MR. LEDLIE:  Object to the form.
7    A.    I don't know for certain, but I
8 would assume.
9    Q.    What makes you think that she would
10 be the one to ask about the budget?
11    A.    She was the finance person that I
12 worked through.
13    Q.    Throughout your time at the drug
14 unit?
15    A.    Yes.
16    Q.    Was your successor Matt Paolino?
17    A.    Yes.
18    Q.    He also testified in a deposition
19 earlier this month, and he said that he
20 recalled the budget of the drug unit being
21 particularly tight around the time he was
22 starting.
23        Do you agree that the budget was
24 tight around the time you were ending and
25 then-Lieutenant Paolino was starting?

Page 277

1    A.    The County was under a no-hiring
2 freeze.  Yeah.  That would be tough.
3    Q.    Were any grant funds low, for
4 example?
5    A.    Well, if I didn't write that one, I
6 don't know.  I don't know.
7    Q.    Did the drug unit have two separate
8 accounts?  A forfeiture account and a project
9 income account?
10    A.    Yes.
11    Q.    Can you describe the difference
12 between those two accounts for me, please?
13    A.    Project income would have been
14 where the grant money went to.  Forfeitures
15 would have been the seizure money.
16    Q.    So it's not true that both were
17 used for seizure funds?
18        One of them, in other words, was
19 used for money received from grants.  The other
20 was used for the proceeds from forfeitures and
21 seizures; is that correct?
22        MR. LEDLIE:  Objection to the form
23 of the question.
24    A.    Right.  That's what I said.
25    Q.    Okay.  Did you ever ask for

70 (Pages 274 - 277)

Page 278

1 additional personnel from the sheriff during
2 your time as commander?
3     A.   Yes.
4     Q.   When was that?
5     A.   Oh, I don't know.  Anytime I could.
6     Q.   So more than once?
7     A.   Yes.
8     Q.   Every year?
9     A.   Quite possibly.
10    Q.   And what was the reason you
11 requested more personnel?
12    A.   The more investigators we have, the
13 more we can do.
14    Q.   Could you pull out the 2009 annual
15 report?
16        Is that Exhibit 3?
17    A.   Yes.
18    Q.   Turn to page 2.  This is the Bates
19 page ending 0647.  There's a section titled
20 "Grant Funding."
21    A.   Okay.
22    Q.   Do you see where it says, "The
23 Summit County Drug Unit is partially funded by
24 the Ohio Governor's Office of Criminal Justice
25 Services.  The Byrne Memorial JAG Grant award

Page 279

1 for 2009 was about $107,000.  The grant
2 application for 2010 in the amount of about
3 $140,000 has been approved."
4        Do you see that?
5     A.   Yes.
6     Q.   Did the drug unit always receive
7 money from the Byrne Memorial JAG Grant during
8 your time as commander?
9     A.   No.
10    Q.   During what years did it not
11 receive that grant?
12    A.   Have to think about when this went
13 into effect.  Every year there was a concern
14 whether or not Byrne would be funded by
15 congress.  And so every year we kind of scraped
16 by, if you will, and the State lobbied congress
17 to get those fundings -- that funding.
18        During my tenure as president of
19 the organization, the drug force commanders
20 association, we went to the state legislature
21 and were able to successfully get a funding
22 mechanism in place in the state of Ohio that
23 covered any drug task force that wanted it.
24 After that went into effect, we no longer got
25 Byrne money.  We got money from that particular

Page 280

1 funding mechanism.
2     Q.   So if you look back and compare --
3     A.   And I'm --
4     Q.   I'm sorry.
5     A.   I'm trying to remember when the
6 date was.  It was -- it was close to the end of
7 my tenure.
8     Q.   So if you look back at the
9 paragraph under "Grant Funding," midway through
10 it says, "The Summit County Drug Unit has also
11 been awarded funding in the amount of about
12 $190,000 through the Ohio Drug Law Enforcement
13 Fund.
14    A.   Okay.
15    Q.   Is that the fund you were just
16 describing?
17    A.   That was it.
18    Q.   So that second fund --
19    A.   '9 or -- yeah, '9 or '10.  That
20 would have been for '10, probably.
21    Q.   The second fund is the one that was
22 brought about by a legislative action in which
23 you and other task force commanders
24 participated?
25    A.   Yes.

Page 281

1     Q.   And it was never available before
2 2008?
3     A.   No, because it had to build.
4     Q.   So that means that before 2008, the
5 drug unit was funded solely by the Byrne or JAG
6 grant?
7        MR. LEDLIE:  Object to the form of
8 the question.
9     A.   Between that and -- and HIDTA
10 funds.
11    Q.   So do I understand correctly, then,
12 that there were three sources of funds:  HIDTA
13 funds, the Byrne JAG Grant, and the Drug --
14 Ohio Drug Law Enforcement Fund Grant?
15    A.   Okay.  So the -- the Byrne Memorial
16 Grant for 107 would have covered 2009.  So the
17 annual report, that means 2009 is over.  So
18 that's done.  So there would have been the Ohio
19 Drug Law Enforcement Fund and HIDTA funds.
20    Q.   Was there ever a year when the drug
21 unit received grant funds from the Drug Law
22 Enforcement Fund, HIDTA, and the Byrne JAG
23 Grant?
24    A.   No.  Once the -- once the Drug Law
25 Enforcement Fund went into effect, we didn't

71 (Pages 278 - 281)

Page 282

1 request Byrne funds.
2     Q.   Do you know whether the drug unit
3 currently requests or receives Byrne funds?
4         MR. LEDLIE:  Object to the form.
5     A.   I have no idea.
6     Q.   If you look back at the paragraph
7 we were just describing, it says, "The JAG
8 Grant award amount for 2009 was about $107,000.
9 The grant application for 2010 in the amount of
10 about $140,000 has been approved."
11         Do you know the reason for the
12 increase?
13     A.   Congress awarded more money.
14     Q.   Do you know why?
15     A.   I have no idea.
16     Q.   Did you have -- did you or any of
17 the other members of OTFCA have a specific type
18 of crime in mind when you requested more money
19 from the Ohio legislature?
20     A.   No.  Everybody is set up
21 differently.  Most everybody does narcotics
22 work.  Some of them do other crimes as well.
23 And I can't talk for them.
24     Q.   But as far as the drug unit, you
25 did not have a particular crime or drug in mind

Page 283

1 when you advocated for the adoption of the Drug
2 Law Enforcement Fund?
3     A.   No.
4         MR. LEDLIE:  Object to the form of
5 the question.
6     Q.   Are there any restrictions on how
7 grant funds are used within the drug unit?
8     A.   There are restrictions by the
9 government, for example, in the Byrne grants.
10 There's only some things you could use it for;
11 some things you couldn't use it for.  For
12 example, the Byrne grant, you couldn't pay
13 anybody's salary.  So we couldn't -- we
14 couldn't add people for that.
15         The Drug Law Enforcement Fund, use
16 it for whatever you need it for.
17     Q.   Do you remember any other
18 restrictions on the Byrne grant?
19     A.   Yeah, there were some, and I can't
20 recall what they were.  I know the important
21 one was we couldn't put any bodies on there,
22 but...
23     Q.   Were there any grants you or the
24 drug unit considered but decided not to apply
25 for?

Page 284

1     A.   No.  I know there were a couple of
2 specific HIDTA grants.  One I actually did put
3 in for and -- and was pretty much shot down.
4 But, no, that was pretty much the funding
5 sources that we used.
6     Q.   What grants did you just describe
7 as being shot down?  Do you know why?
8     A.   It was for a highway interdiction
9 program, and it was shot down because the HIDTA
10 group had their own highway interdiction
11 program.
12     Q.   So as you understand it, they
13 didn't want to spend the funds for the same
14 purpose by two entities?
15         MR. LEDLIE:  Object to the form.
16     A.   I have no idea why -- you know,
17 what their reasoning was.  All I know is I
18 didn't get it.
19     Q.   You mentioned before that the drug
20 unit receives the proceeds of civil or criminal
21 forfeitures, correct?
22     A.   Yes.
23     Q.   How often does it receive proceeds
24 from forfeitures?
25     A.   Who knows.  All depends on what

Page 285

1 cases there were and whether or not there were
2 seizures there and how long the court
3 proceedings took.
4     Q.   Approximately how much per year did
5 the drug unit receive in forfeiture proceeds?
6     A.   You know what?  Who knows.
7 That's -- some cases you get a lot of money
8 from.  Some cases you don't.  So, I mean, you
9 just never know.  You never know.  It would be
10 impossible to put a figure on that.
11     Q.   What's the largest amount you
12 remember per year.
13     A.   One year we took $2.8 million.
14     Q.   For the drug unit alone?
15     A.   No.  It was split up between a lot
16 of agencies.
17     Q.   A lot of agencies, meaning all
18 those who contributed officers to the drug
19 unit?
20         MR. LEDLIE:  Object to the form.
21     A.   And to other federal agencies.
22     Q.   Do you remember what year that was?
23     A.   It's probably somewhere between '9,
24 '10, somewhere in there.  I don't know.
25     Q.   Did the drug unit ever receive no

72 (Pages 282 - 285)

Page 286

1 forfeiture proceeds for a given year?
2    A.   Not that I can recall.
3    Q.   What's the smallest amount that you
4 recall for a given year?
5    A.   I don't know.  I couldn't tell you.
6         - - - - -
7         (Thereupon, Deposition Exhibit 10,
8         Document Titled "Project Income
9         Worksheet-Total Budget Method,"
10        SUMMIT_000024552, was marked for
11        purposes of identification.)
12        - - - - -
13   Q.   You've just been handed what's
14 marked as Baker 10.  Do you recognize that
15 document?
16   A.   Yes.
17   Q.   What is it?
18   A.   It's a project -- project income
19 worksheet.
20   Q.   Did you prepare this?
21   A.   What's that?
22   Q.   Did you prepare this document?
23   A.   It would have been done by myself
24 and Pam Murray.
25   Q.   If you look next to Item A, the

Page 287

1 total task force budget --
2    A.   Uh-huh.
3    Q.   -- it says about 4.1 million.
4    A.   Uh-huh.
5    Q.   Is that dollars?
6    A.   Yes.
7    Q.   That's an amount in dollars?
8    A.   Yes.
9    Q.   Is that the total budget of the
10 drug unit, including all of the salaries,
11 expenses of all of the officers and all of
12 their equipment, et cetera?
13   A.   Yes.
14   Q.   So that includes money paid by the
15 other agencies to those officers, for example?
16   A.   Right.  That would be, like, their
17 salaries and all the cars and all our
18 equipment.
19   Q.   The amount below that number,
20 190,000 or so, total project costs, do you see
21 that?
22   A.   Yes.
23   Q.   What does that mean?
24   A.   Got to think back on how this
25 worked.

Page 288

1         Okay.  That figure represents your
2 two lines from Line B, which was the OCJS was
3 the grant award, the local match was whatever
4 percentage the County had to match that, and
5 that gave you that number of the total
6 budget -- the total project costs.
7    Q.   So in this year there was no State
8 grant; is that correct?
9    A.   2009.  Right, this is a JAG grant,
10 J-A-G, JAG grant.
11   Q.   So does that mean that the federal
12 grant and the matching funds covered all the
13 drug unit's costs that year?
14        MR. LEDLIE:  Object to the form of
15 the question.
16   A.   I don't know.  The -- the grant's
17 what we were allocated and the County had their
18 percentage match, and that's what we ran off
19 of.
20   Q.   If you look at Item C, "Total
21 Forfeitures Received During Current Period."
22   A.   Uh-huh.
23   Q.   Approximately 1.2 million.
24   A.   Yes.
25   Q.   Does that -- does that amount show

Page 289

1 the amount of forfeiture proceeds the drug unit
2 received that year?
3    A.   I believe it does, yes.
4    Q.   How did the drug unit use the money
5 that year?
6    A.   God, I don't remember.  We --
7 investigations.  Also know that when
8 forfeitures came in, they could be used to
9 further investigations.  They could also be
10 split up between all of the agencies involved
11 in the task force.  Maybe a one-time, every
12 year kind of Merry Christmas thing, go buy
13 yourself a new squad car.  It's hard to say.
14   Q.   So it could be that forfeiture
15 proceeds were distributed to participants in
16 the drug unit?
17   A.   Some of it, yes.
18   Q.   And that would happen approximately
19 once per year?
20   A.   Yeah, pretty much.
21   Q.   Who decided how much was given to
22 whom?
23   A.   We would sit down if they had a
24 large amount to give out, and pretty much
25 everybody got --

73 (Pages 286 - 289)

Page 290

1   Q.   Who's --
2   A.   -- an equal share.
3   Q.   Who is "we" in your answer?
4   A.   Like myself, Pam Murray.
5   Q.   Was the drug unit board of
6 directors involved in that decision?
7   A.   They were the ones that got it.
8 That got the -- the monies.
9   Q.   I see.  You can set that aside.
10 Thank you.
11       Did the drug unit or its officers
12 ever administer naloxone or Narcan during your
13 tenure?
14   A.   No, sir.
15   Q.   Are you aware of any increased
16 training costs the drug unit incurred as a
17 result of the Defendants' actions in this case?
18       MR. LEDLIE:  Object to the form of
19 the question.
20   A.   I don't know that there were
21 increases.  I mean, we allowed people to go to
22 training whenever they could get training.
23   Q.   Did any of that training relate
24 specifically to prescription opioids?
25   A.   Not that I recall.

Page 291

1   Q.   If you could look back at Exhibit
2 10, I have one more question.
3       The forfeiture amount, the
4 approximately 1.2 million --
5   A.   Uh-huh.
6   Q.   -- is that a typical amount for
7 a -- for a given year?
8   A.   No.  That was a pretty good year.
9   Q.   It's a good year?
10   A.   Yeah.
11   Q.   A large amount, then?
12   A.   Yes.
13   Q.   Okay.
14   A.   Now, understand that could also
15 reflect values for vehicles or anything else,
16 too.
17   Q.   So it would include cash amounts
18 seized?
19   A.   What's that?
20   Q.   Would it include cash amounts
21 seized?
22   A.   It would, yes.
23   Q.   And the value of any vehicles
24 seized?
25   A.   Uh-huh.

Page 292

1   Q.   And other assets seized?
2   A.   Correct.
3   Q.   Did the drug unit have any
4 involvement in corrections during your time
5 as -- tenure?
6   A.   In corrections?
7   Q.   For example, did the drug unit ever
8 investigate any cases in the jail?
9   A.   Oh, yeah.
10   Q.   How many?
11   A.   I don't know.
12   Q.   Do you know what kind of drugs
13 those cases involved?
14   A.   Probably anything you can imagine.
15   Q.   Did the drug unit have any
16 increased involvement with the county jail as a
17 result of the opioid crisis?
18   A.   In what manner?
19   Q.   Did you conduct a larger number of
20 investigations in the jail because of the
21 opioid crisis?
22   A.   Oh, I don't know.  Whatever came
23 down came down, and that's what we worked.
24   Q.   You can't remember any specific
25 investigations relating to opioids in the jail?

Page 293

1   A.   I remember we did investigations
2 with stuff coming in, but I can't remember
3 exactly what it was.
4   Q.   So it's fair to say that you don't
5 recall an increase in the number of opioid
6 investigations in the jail?
7   A.   Yes.
8   Q.   Did the sheriff's office or the
9 drug unit participate in a DARE program?
10   A.   We did not.
11   Q.   Do you know if the drug unit or the
12 sheriff's office has a DARE program now?
13       MS. RION:  Object.
14   A.   Okay.  Let me clarify.  They had
15 DARE people.  They weren't involved in the
16 narcotics unit or the drug unit.
17   Q.   The sheriff's office?
18   A.   It was a separate -- yes.
19   Q.   So the sheriff's office maintains a
20 DARE program?
21   A.   Yes.
22   Q.   But that's not related to the drug
23 unit's activities?
24   A.   That would be correct.
25   Q.   Have any members of the drug unit

74 (Pages 290 - 293)

Page 294

1  spent time meeting with people to talk about
2  opioids?
3          MS. RION:  Object to the form.
4      A.  I don't know if they have or not.
5  I have been involved in talks personally, but
6  as to -- as far as those -- the people that are
7  there now, I have no clue.
8      Q.  During your tenure, did any drug
9  unit officers go into the community and speak
10 at events about opioids?
11     A.  Carmen may have.  If not her, it
12 would have been me.
13     Q.  But no one else?
14     A.  Most people were working
15 undercover.  Those aren't the people you want
16 out there in front of a whole lot of cameras
17 and such.
18     Q.  Okay.  Let's shift topics now and
19 talk about the drug unit's documents.
20     A.  The --
21     Q.  Documents and reports.
22     A.  Okay.
23     Q.  Did you receive a letter or e-mail
24 instructing you not to delete anything in
25 connection with this case?

Page 295

1      A.  I have not.
2      Q.  You mentioned before that you have
3  an old computer that belongs to the drug unit;
4  is that correct?
5      A.  Yes.
6      Q.  Did you keep anything else after
7  you retired, as far as documents or computers?
8      A.  I have a copy of this.
9          MR. LEDLIE:  No. 2.
10     Q.  Exhibit 2?
11     A.  Uh-huh.  I have some pens.
12     Q.  You mentioned, I think before, you
13 have a stick?
14     A.  Yes.
15     Q.  Is that something you kept from
16 your time at the drug unit?
17     A.  My personal one.
18     Q.  Does it have files from the drug
19 unit on it?
20     A.  I believe it might have a copy of a
21 slideshow.
22     Q.  And that's the one you testified
23 about earlier?
24     A.  Yes.
25     Q.  Anything else?

Page 296

1      A.  Some photos, perhaps.
2      Q.  Are those photos related to the
3  drug unit?
4      A.  Yes.
5      Q.  Do you remember what the photos
6  depict?
7      A.  Probably raids.
8      Q.  Investigations and raids on drug
9  cases?
10     A.  Yes.
11     Q.  Do you recall any -- whether any of
12 them relate to opioid investigations?
13     A.  No, I don't recall.
14     Q.  Did you use e-mail while you worked
15 at the sheriff's office?
16     A.  Pardon me?
17     Q.  You've -- you've -- you've seen
18 exhibits that --
19     A.  Yeah.
20     Q.  -- we've shown you that were
21 e-mails from your time at the sheriff's office.
22     A.  Right.
23     Q.  When did you start using e-mail at
24 the sheriff's office?
25     A.  Exact date I couldn't tell you.  I

Page 297

1  don't know.
2      Q.  Before 2010?
3      A.  Possibly.
4      Q.  Before 2005?
5      A.  Possible.  I don't...
6      Q.  So you had a sheriff's office
7  e-mail address; is that correct?
8      A.  Yes.
9      Q.  Did you have an e-mail address -- a
10 personal e-mail address that you used for work?
11     A.  Had a sheriff's office one.
12     Q.  Did -- did you have a HIDTA e-mail
13 address?
14     A.  I did not.
15     Q.  A DOJ or DEA e-mail address?
16     A.  No.
17     Q.  An e-mail address with OTFCA?
18     A.  No.
19     Q.  So your only e-mail address you
20 used for work was the Summit County Sheriff's
21 Office e-mail address?
22     A.  Correct.
23     Q.  Did the drug unit use computers
24 while you were there?
25     A.  Yes.

75 (Pages 294 - 297)

1    Q.    To keep files, case files on
2  computers?
3    A.    The case files are hard.
4    Q.    So the case files we were
5  discussing earlier and saw some examples of are
6  all in hard copy, as far as you know?
7    A.    As far as I know.
8    Q.    For example, in filing cabinets?
9    A.    Yes.
10    Q.    Does the drug unit keep -- or did
11  the drug unit, during your time as commander,
12  keep any of its case files in electronic
13  format?
14    A.    I'm sure guys had stuff on their
15  computers, but there was -- there was always a
16  hard copy.
17    Q.    How old are the drug unit's oldest
18  files?
19        MS. RION:  Object to the form.
20    A.    Drug unit was formed in 2001, so
21  they're back to 2001.
22    Q.    Does the drug unit keep any older
23  files from CENTAC or the sheriff's office
24  narcotic unit?
25        MS. RION:  Objection to form.

1    A.    There may be some there.
2    Q.    Do you know how far back those
3  files would go?
4    A.    No.
5    Q.    Has the drug unit ever deleted or
6  destroyed any of its files?
7    A.    Not that I'm aware of.
8    Q.    So you've mentioned a few reports
9  that you've prepared during your time.  One of
10  them was the addendum we've discussed in
11  Exhibit 2.
12        Are there others that you prep- --
13  prepared in connection with grants and
14  applications on a regular basis?
15    A.    There was grant every year.  This
16  is the only time we did that, so the rest of
17  them are just basic grant applications.
18    Q.    Is there a reason you prepared this
19  longer or larger report that year and not
20  others?
21    A.    Because the State asked for it.
22    Q.    In connection with the grant
23  application?
24    A.    Yes.
25    Q.    Did you prepare reports for HIDTA?

1    A.    Yes.
2    Q.    How often?
3    A.    I believe they may have been
4  quarterly.
5    Q.    Do you remember what they were
6  called, if they had a title at the top?
7    A.    No.  Just HIDTA report, I guess.  I
8  don't know.
9    Q.    Does the drug unit track any data,
10  as far as you know?
11        MR. LEDLIE:  Object to the form of
12  the question.
13    A.    I don't know what they're doing.
14    Q.    Did the drug unit track data during
15  your time as commander?
16    A.    Not really.  I mean, I kept
17  information to fill out the reports.
18    Q.    Where did you keep that
19  information?
20    A.    On a legal sheet.
21    Q.    What do you mean by that?
22    A.    Piece of paper.
23    Q.    You would write out your
24  information on a piece of paper for a quarter,
25  for example?

1    A.    Uh-huh.
2    Q.    Are those reports still at the drug
3  unit?
4    A.    I have no idea.
5    Q.    Were they kept in a particular
6  location during your time as commander?
7    A.    I had them in a -- in a file
8  drawer.
9    Q.    Do you know whether anybody ever
10  typed them up or put them in a spreadsheet, for
11  example?
12    A.    I mean, I obviously typed them up.
13  Yeah.  I have no idea.  Once we submitted them,
14  I have no clue what they did with them.
15    Q.    Is it possible those handwritten
16  reports were destroyed?
17        MR. LEDLIE:  Object to the form of
18  the question.
19    A.    Anything's possible.
20            - - - - -
21        (Thereupon, Deposition Exhibit 11,
22        Document Titled "Ohio Office of
23        Criminal Justice Services Quarterly
24        Subgrant Report," SUMMIT_001010609
25        to 001010613, was marked for

Page 302

1    purposes of identification.)
2         - - - - -
3    Q.    You've just been handed what's been
4 marked as Baker 11.  Do you recognize this
5 document?
6    A.    This would have been one of the
7 expenditure sheets provided to OCJS.
8    Q.    Did you help to prepare this sheet?
9    A.    No.
10    Q.    Who did?
11    A.    This is Pam Murray.
12    Q.    Do you know what the purpose of
13 this report is?
14    A.    I want to say that they send it to
15 the State so that the State knows and can
16 forward it on to the government that we're
17 spending their money.
18    Q.    Did the drug unit ever provide any
19 funding to Ohio HIDTA?
20    A.    No.
21    Q.    And the drug unit did receive some
22 funding from the HIDTA, correct?
23    A.    Right.  We got it in the form of
24 equipment, like phones, computers, things like
25 that.  We didn't get any cash.

Page 303

1         MR. PULSIPHER:  We can go off the
2 record.
3         THE VIDEOGRAPHER:  Off the record,
4 4:36.
5         (A recess was taken.)
6         THE VIDEOGRAPHER:  On the record
7 4:48.
8         EXAMINATION OF HYLTON E. BAKER
9 BY MS. HARTMAN:
10    Q.    Hi, Commander Baker, my name is
11 Ruth Hartman, and I represent the Endo
12 Defendants.
13         My first question is, did the drug
14 unit have any interaction with drug treatment
15 programs while you were chief?
16    A.    We had dialogue with the county
17 health department, not directly with any of
18 their programs.  And we had dialogue with -- I
19 can't think of the name of the -- the
20 organization out of the University of Akron on
21 things that were going on, what everybody saw.
22    Q.    When you said you have dialogue,
23 what do you mean by that?
24    A.    Sometimes we would do programs with
25 them, community awareness things.

Page 304

1    Q.    What type of community awareness
2 programs?
3    A.    Drug -- drug stuff.  A lot of it
4 was in -- a lot of it involved methamphetamine.
5    Q.    Okay.  And this was from 2001 to
6 2012?
7    A.    Yes.
8    Q.    And you had consistent contacts
9 with the county health department; is that
10 correct?
11    A.    Yes.
12    Q.    Okay.  And someone from the
13 University of Akron?
14    A.    Yes.  I think -- I believe -- I
15 believe the group was part of OSAMN.
16    Q.    Okay.  And how often would you have
17 dialogue with these entities?
18    A.    Sporadically.  It wasn't -- it
19 wasn't an ongoing thing.  I think we talked to
20 OSAMN maybe once or twice a year, if that.
21    Q.    Okay.  Does Summit County have a
22 drug court?
23    A.    At one time they did.  I don't know
24 if they still continue that or not.
25    Q.    Okay.  Did the drug unit ever make

Page 305

1 any referrals -- I'm sorry.  Did the drug unit
2 ever make any referrals to the drug court
3 during your tenure?
4    A.    We didn't refer anybody.  We sent
5 everybody through the system, and the system
6 worked them out.
7    Q.    Did you ever consider referring any
8 people to the drug court?
9    A.    No.
10    Q.    Why not?
11    A.    Our job was to put them in jail and
12 move along.
13    Q.    Okay.  I'd like to introduce
14 Exhibit 12.
15         - - - - -
16         (Thereupon, Deposition Exhibit 12,
17         July 2012 E-Mail Chain Re:
18         Pharmaceutical Diversion Training,
19         with Attachment, SUMMIT_001008149 to
20         001008157, was marked for purposes
21         of identification.)
22         - - - - -
23    Q.    Can you take a moment to review
24 this e-mail?
25         Do you recall receiving this e-mail

77 (Pages 302 - 305)

1  in July 2012?
2     A.    Pardon me?
3     Q.    Do you recall receiving this e-mail
4  in July of 2012?
5     A.    No.
6     Q.    Do you have any reason to believe
7  you didn't receive this e-mail?
8     A.    I just don't remember getting it.
9     Q.    Okay.  But it is likely that you
10  received it?  Your address is on --
11     A.    My address is on it.  Yeah, I
12  imagine.
13     Q.    Who is Commander John Burke?
14     A.    He was the commander of the Warren
15  County Drug Task Force.
16     Q.    Do you know why you would have
17  received this e-mail?
18     A.    He was -- they were putting on --
19  obviously putting on a seminar and bringing it
20  to our attention and everybody else's attention
21  if we wanted to send anybody down there.
22     Q.    Okay.  And the seminar is offered
23  by the National Association of Drug Diversion
24  Investigators; is that correct?
25     A.    That's what it indicates, yes.

1     Q.    Are you familiar with this entity?
2     A.    Yeah, I've heard of it.
3     Q.    Okay.  Are you a member of it?
4     A.    I am not.
5     Q.    Do you know what this entity does?
6     A.    No.
7     Q.    Is anyone else in the drug unit a
8  member, at least to your knowledge, while
9  during your tenure?
10     A.    During my tenure, no.
11     Q.    No?
12     A.    Not to my knowledge.
13     Q.    Are you a member of any other
14  national drug organizations that provide
15  education, educational programs?
16     A.    National, no.
17     Q.    Okay.  But in Ohio you are?
18     A.    I was until I retired.
19     Q.    Okay.  And besides the ones we've
20  already discussed today, are there any
21  others that haven't come up?
22     A.    Other than the -- I've got to think
23  of what the acronym for it is.  It's just --
24  basically just Ohio drug narcotics
25  investigators.

1     Q.    Okay.  And what does that group do?
2     A.    They're Ohio narcotics
3  investigators.
4     Q.    Do they hold meetings?
5     A.    Yeah, yeah.  It's just a -- you
6  know, it's like a fraternity, I guess.
7     Q.    Okay.  Do they have educational
8  programs?
9     A.    They do training things, yes.
10     Q.    Okay.  Well, I'd like to call your
11  attention to the flyer attached to the e-mail.
12            Do you know whether anyone from
13  your department attended this training in 2012?
14     A.    I don't recall if anyone did.
15     Q.    Would you have promoted this
16  training to members of the drug unit?
17     A.    I would have made them aware that
18  it was available.
19     Q.    How would you have done that?
20     A.    Probably in a meeting or walked by
21  and said, "Hey, by the way, I just got this
22  thing."
23     Q.    Well, let's look at the page that
24  ends with Bate No. 8150, the first page of
25  the -- the flyer.

1     A.    Okay.
2     Q.    The second paragraph says, "The
3  pharmaceutical drug abuse problem is probably
4  one of the most overlooked problems in our
5  society by law enforcement, prosecutors, and
6  judges."
7            Do you think that's an accurate
8  statement as of 2012, that the pharmaceutical
9  drug abuse problem was overlooked?
10     A.    Oh, I don't know.
11     Q.    You don't know?
12     A.    I mean, they're making their case
13  for their program.  I -- I -- I don't know.
14     Q.    But your unit had been aware of
15  pharmaceutical drug problems before 2012?
16     A.    Yes.
17     Q.    Okay.  Did you ever request copies
18  of the training provided in this program?
19     A.    No.
20     Q.    If we look at the list of contents
21  of the training, one of the bullet points
22  reads, "How to identify pills and use of NDC
23  codes of the pills as an investigative tool."
24            Do you know what an NDC code is?
25     A.    Other than the numbers that are

78 (Pages 306 - 309)

Page 310

1  stamped into a pill, no.
2      Q.    Okay.  Have you attended any
3  specific trainings during your tenure about
4  pharmaceutical diversion in law enforcement?
5      A.    I know I -- I did some back before,
6  while I was still in the narcotics unit --
7      Q.    And that's in the --
8      A.    -- during --
9      Q.    -- '90s?
10     A.    What's that?
11     Q.    In the '90s you attended?
12     A.    Yeah.
13     Q.    Okay.
14     A.    Other than -- but during my tenure,
15  I don't recall going -- specifically going to
16  any diversion schools.
17     Q.    Why not?
18     A.    I was pretty busy.
19     Q.    Do you encourage your investigators
20  to attend continuing education programs?
21     A.    Anytime they were interested in
22  going to a school, we tried to make that
23  happen.
24     Q.    Would they go to trainings at least
25  once or twice a year?

Page 311

1      A.    I don't know.  I mean, some of them
2  did.  Some of them didn't.  I couldn't tell you
3  who did what.
4      Q.    Did you keep a record of the
5  training that your officers attended?
6      A.    No.
7      Q.    Did you keep a record of the
8  trainings that you attended?
9      A.    My trainings are located in the
10  training bureau of the sheriff's office.
11     Q.    Is that only if you get a
12  certificate from the training?
13     A.    Right.
14     Q.    Okay.  But would there be other
15  trainings you attended for which you didn't
16  receive a certificate?
17     A.    I don't recall any that I didn't
18  receive any certificates for.
19     Q.    Okay.  So you usually receive a
20  certificate --
21     A.    Right.
22     Q.    -- with your training?  Okay.
23     A.    And if any of these guys went to
24  any schools, I'm sure their departments have
25  that information.

Page 312

1      Q.    Oh, so any training that any of
2  your officers participated in would be housed
3  in the -- the department, the head of
4  department you mentioned?
5      A.    Well, in their individual
6  departments.
7      Q.    Okay.
8      A.    People other than the sheriff's
9  office.
10     Q.    So there would be a record of the
11  training programs?
12     A.    Right.
13     Q.    Okay.
14     A.    I don't have it.
15     Q.    Right.  Did you keep a daily record
16  of your time on the job during your tenure of
17  how you spent your time?
18     A.    No.
19     Q.    Did anyone in your department fill
20  out a record of how he or she spent her day?
21     A.    No.
22     Q.    So no one in your department kept a
23  record of how much time they spent on opioid --
24  opioid-related investigations?
25     A.    No.

Page 313

1      Q.    Would there be a way to tell how
2  much time your department spent on opioid --
3  opioid-related investigations?
4          MR. LEDLIE:  Object to the form of
5  the question.
6      A.    I have no idea.
7      Q.    You have no idea?
8          I'd like to go back to Exhibit 3,
9  which we've looked at before.  It's the 2009
10  annual report.  Can we look at page 6, which is
11  Bates No. 830651.  You can see on that page it
12  says, "During 2009 Captain Baker provided 43
13  presentations throughout Ohio," correct?
14     A.    Uh-huh, yes.
15     Q.    So you must have a list somewhere
16  of the presentations you gave; is that correct?
17         MR. LEDLIE:  Object to the form of
18  the question.
19     A.    There probably -- if there's a
20  list -- there probably is -- you see there
21  underneath the -- that paragraph.  So if I did
22  them, they're probably in annual reports.
23     Q.    Okay.  Because, I mean, it says you
24  provided 43 presentations, but this is fewer
25  than 43; would you agree?

79 (Pages 310 - 313)

Page 314

1    A.   Yes.
2    Q.   So you kept track of the
3  presentations you made throughout the year; is
4  that correct?
5    A.   Yes.
6    Q.   Okay.  And for each presentation,
7  would you provide a PowerPoint?
8    A.   Yes.
9    Q.   So every time you gave a
10  presentation, you provided a PowerPoint --
11    A.   I gave --
12    Q.   -- to the audience?
13    A.   I gave one, if that -- that's what
14  you meant.
15    Q.   Okay.
16    A.   I mean, I had -- I projected one,
17  if that's what you're --
18    Q.   All right.  Were they the same
19  PowerPoint presentation?
20    A.   Yes.
21    Q.   So you don't have 43 different
22  PowerPoint presentations?
23    A.   No.
24    Q.   You just have one?
25    A.   One.

Page 315

1    Q.   Not more than one?
2    A.   I mean, there's the same one
3  updated every -- every so often.
4    Q.   Oh, you would update the PowerPoint
5  presentation?
6    A.   Yes.
7    Q.   Okay.  What were the main points in
8  that Power presentation?
9    A.   It was a meth presentation.
10    Q.   It was a meth presentation?
11    A.   Yes.
12    Q.   Okay.  Did you ever give a
13  presentation about opioids?
14    A.   Later, towards my tenure, I had a
15  general overview of what we saw that had
16  opioids in it.
17    Q.   Was that a PowerPoint presentation?
18    A.   Yes.
19    Q.   Do you know whether it was produced
20  in this litigation?
21    A.   To my knowl- -- I have no idea.
22    Q.   Can we turn the page, please, to
23  page 7?  The second item is "Controlled
24  Prescription Drugs, CPDs."  Do you see that?
25    A.   Uh-huh.

Page 316

1    Q.   It says, "In 2007, across the state
2  of Ohio, unintentional drug poisoning became
3  the leading cause of injury/death, surpassing
4  motor vehicle crashes and suicides."
5    A.   Yes.
6    Q.   And I think you testified before
7  this is still correct; this is what you believe
8  to be true in 2007?
9    A.   That information -- yeah, that
10  information would have come from the Ohio
11  Department of Health.
12    Q.   The Ohio Department of Health?
13  Okay.
14    A.   Uh-huh.
15    Q.   Can we look down at the -- next
16  page.  It says, "In 2009, the Summit County
17  Drug Unit, along with the Summit County
18  Sheriff's Office and other local agencies
19  participated in CPD removal programs across the
20  county, allowing residents to safely and
21  securely dispose of unused CPDs."
22         What's a removal program?
23    A.   Basically, they set up, like, a
24  mailbox in the lobbies of police departments
25  and other secure areas where people can come in

Page 317

1  and, no questions asked, throw unused
2  prescriptions into those, and then they're
3  collected and destroyed.
4    Q.   How long has the Summit County
5  sheriff's office conducted removal programs for
6  CPDs?
7    A.   I believe it's been ongoing since
8  2009.
9    Q.   Okay.  Did it start before 2009?
10    A.   The DEA instituted a program that
11  was a one-day take-back, and this is basically
12  kind of an offshoot of that program.
13    Q.   And what was your particular
14  involvement with this program?
15    A.   My evidence officer collected the
16  drugs for disposal.
17    Q.   Do you know how this program was
18  promoted in the community?
19    A.   I have no idea how they did it.
20    Q.   Did the promotion efforts come out
21  of your budget?
22    A.   No.
23    Q.   Do you know who paid for the
24  promotion efforts?
25    A.   I do not.

80 (Pages 314 - 317)

Page 318

1    Q.   I'd like to take you on to page 11
2  and 12.  Now, this -- these two pages contain a
3  lot of data, records of arrests for certain
4  types of drugs.
5    A.   Uh-huh.
6    Q.   Do you know where these numbers
7  came from?
8    A.   From the information that I kept on
9  a sheet.
10   Q.   Okay.  What kind of sheet did you
11 keep?
12   A.   I just kept a -- a log when --
13 anytime they made an arrest, I would mark what
14 it was.  For example, if they arrested someone
15 and they were Caucasian and they were --
16 whatever they were involved in.
17   Q.   Was it in an Excel spreadsheet?
18   A.   Huh?
19   Q.   Did you keep it --
20   A.   No, no.
21   Q.   So you just kept it in a Word
22 document?
23   A.   No.  It was on a piece of paper,
24 and then at the end of the year or whatever, I
25 added them all up and put them into that.

Page 319

1    Q.   Okay.  And how did you keep this --
2  did you have one file where you kept
3  statistics?
4    A.   Uh-huh.
5    Q.   Okay.  And where was that file
6  located?
7    A.   In my desk drawer.
8         MS. HARTMAN:  I'd like to introduce
9  Exhibit 13.
10        - - - - -
11        (Thereupon, Deposition Exhibit 13,
12        Document Titled "Ohio Office of
13        Criminal Justice Services Byrne
14        Memorial Grant Program, Area A: Law
15        Enforcement Task Forces Semi-Annual
16        Performance Report,"
17        SUMMIT_000023798 to 000023805, was
18        marked for purposes of
19        identification.)
20        - - - - -
21   Q.   Do you recognize this document?
22   A.   Yes.
23   Q.   Can you identify it?
24   A.   Yeah.  It's a semiannual report to
25 OCJS.

Page 320

1    Q.   And this is in connection with the
2  Byrne-funded projects?
3    A.   Yes.
4    Q.   Would you prepare this report?
5    A.   Yes.
6    Q.   And can you turn to the next page.
7  The report makes a distinction between
8  non-pharmaceutical drugs and pharmaceutical
9  drugs; is that correct?
10   A.   Where are you?
11   Q.   Page 2.  Well, I don't know if that
12 distinction is clear here, but this is a
13 non-pharmaceutical drugs reporting section; is
14 that correct?
15   A.   Okay, yes.
16   Q.   And here you also have numbers that
17 populate this chart.
18   A.   Yes.
19   Q.   Where did you get those numbers?
20   A.   From the --
21   Q.   From your notepad?
22   A.   Yes.
23   Q.   Okay.  And let's turn to page 6,
24 which ends the Bates No. 20- -- 23803.
25   A.   Okay.

Page 321

1    Q.   This says "Pharmaceutical Diversion
2  Questions," correct?
3    A.   Uh-huh.
4    Q.   So this grant you received had a
5  reporting requirement that included a
6  pharmaceutical diversion question component and
7  a non-pharmaceutical drug component; is that
8  correct?
9    A.   Yes.
10   Q.   Okay.  Did you have any
11 requirements as part of receiving funding for
12 this grant that you devote specific resources
13 to pharmaceutical diversion?
14   A.   No.
15   Q.   And this form was provided by the
16 grant funders; is that correct?
17   A.   The form?
18   Q.   Uh-huh.
19   A.   Yes.
20   Q.   Okay.  The first -- Question 10
21 says, "Describe how the task force addressed
22 pharmaceutical diversion."
23        And in response, it reads,
24 "Pharmaceutical diversion cases are handled as
25 they arise.  Cases are brought to the unit by

1 the Ohio Pharmacy Board and by referrals and
2 complaints.  One officer normally handles these
3 cases."
4      Did I read that correctly?
5      A.   Yes.
6      Q.   Okay.  Could you describe for me
7 how many pharmaceutical diversion cases did you
8 receive, like percentage-wise, from the Ohio
9 Pharmacy Board?
10     A.   I have no idea.
11     Q.   Was it 90 percent?
12     A.   You know, one day they'd call and
13 say, "Hey, we got something," and run with
14 that.  And, I mean, I don't -- I have no idea.
15     Q.   Would the majority of your
16 investigations for pharmaceutical diversions
17 arise as a result of a referral from the Ohio
18 Pharmacy Board?
19        MR. LEDLIE:  Object to the form of
20 the question.
21     A.   Yeah.  I'm not sure.  I can't tell
22 you -- that I could tell you.  Yeah.  I don't
23 know -- I don't know the exact breakdown, what
24 it would be.
25     Q.   And the next question indicates

1 that there are no full-time officers devoted to
2 pharmaceutical diversion, correct?
3      A.   That is correct.
4      Q.   But you have mentioned one officer
5 who spent time doing pharmaceutical diversions,
6 correct?
7      A.   Correct.
8      Q.   What percentage of her time was
9 spent on pharmaceutical diversion issues?
10        MS. RION:  Object to the form.
11     A.   Yeah.  I don't know that I could
12 tell you.  That's -- that's one of the -- if
13 somebody came along with the information of the
14 case, then, yeah, she would do that.  Other
15 than that, her time was basically spent working
16 the evidence.
17     Q.   On the non-pharmaceutical cases?
18     A.   Evidence on all cases.
19     Q.   Okay.  But would she -- you can't
20 estimate that 50 percent of her time was spent
21 on the pharmaceutical diversion cases?
22        MR. LEDLIE:  Object to the form of
23 the question.
24     A.   Yeah.  50 seems like a high number,
25 but I can't really tell you.  I have no idea.

1      Q.   So maybe 20 percent of her time?
2         MR. LEDLIE:  Object to the form of
3 the question.
4      A.   I don't know.  It would be just
5 purely speculation on my part.
6      Q.   Okay.  But 50 percent seems high?
7      A.   It seems high.
8      Q.   Okay.  Can we look at Question No.
9 17?
10     A.   Uh-huh.
11     Q.   Now, this is a chart, correct?
12     A.   Yes.
13     Q.   And it makes a distinction between
14 pharmaceutical drugs seized versus
15 pharmaceutical drugs diverted?
16     A.   Uh-huh.
17     Q.   Do you know what the difference is
18 here?
19     A.   Yes.
20     Q.   As you understood it?
21     A.   The seized drugs are the drugs we
22 have in hand.
23     Q.   Okay.
24     A.   And the diverted ones are the ones
25 that we knew, based on investigations that were

1 diverted.  We never had -- they were gone, and
2 we never got those.
3      Q.   Well, how would you estimate the
4 numbers that were actually diverted?
5      A.   For example, we could show -- we
6 could see that on -- on the OARRS report that a
7 lot of drugs were obtained by someone.  Those
8 are gone, and we can't -- we don't have those
9 in hand, but we know they're diverted.
10     Q.   Would you print out OARRS reports
11 as part of your -- an investigation?
12     A.   Did we print them or not?  We might
13 have.  I can't recall exactly.
14     Q.   If you printed the OARRS report,
15 where would you file it?
16     A.   In the case files.
17     Q.   In the case files.
18        MS. HARTMAN:  I'd like to introduce
19 Exhibit 13.  Oh, I'm sorry, 14.
20          - - - - -
21        (Thereupon, Deposition Exhibit 14,
22        Summit County Sheriff's Office 2003
23        Annual Report, SUMMIT_001128847 to
24        001128894, was marked for purposes
25        of identification.)

82 (Pages 322 - 325)

1            - - - - -
2    Q.   Oh, you know, sir I'm --
3    A.   There were two of them stuck
4 together here.
5    Q.   Can you identify this document?
6    A.   It's an annual report from 2003.
7    Q.   Did you have any role in creating
8 this annual report?
9    A.   This -- let me see.  I don't
10 believe I did.
11   Q.   I'd like to call your attention to
12 page -- I think it's 27.
13   A.   Okay.
14   Q.   Okay.  And there's a picture of
15 you, correct?
16   A.   A pretty good one of me.
17   Q.   Is this a narrative that you
18 drafted?
19   A.   I probably had a hand in it, yeah.
20   Q.   And it mentions 23 diversion cases,
21 correct?
22        I'm looking at page -- the top of
23 28.  I'm sorry.
24   A.   28.  Okay.
25   Q.   And the next paragraph references

1 controlled purchases or undercover work.
2    A.   Uh-huh.
3    Q.   Did your diversion cases involve
4 controlled purchases?
5    A.   Yes.
6    Q.   What percentage of your diversion
7 cases involved controlled purchases?
8    A.   Oh, I have no idea.  All depended
9 on what the case was.
10   Q.   How does your unit decide which
11 controlled buys to pursue?
12   A.   When an officer had a case and we
13 were able to make controlled purchases to
14 further that case, then we made them.
15   Q.   Would you ultimately make the
16 decision as to whether to authorize a
17 controlled purchase?
18   A.   Basically, it was the case officer
19 that decided whether or not to make the
20 purchases.  And we made a lot of them because
21 we're working our way up the ladders, up the
22 chains.
23   Q.   So a case officer, he or she
24 would -- would not have to clear it through you
25 before making a purchase -- controlled

1 purchase?
2    A.   Oh, yeah, they would.
3    Q.   Oh, they would have to clear it
4 through you?
5    A.   Yes.
6    Q.   Okay.  Did you ever turn down a
7 request for a controlled purchase?
8    A.   Not that I ever recall.
9    Q.   Do you know if any documentation is
10 associated with requests for controlled
11 purchases by the officers?
12   A.   Yeah.  There was a -- a form that
13 they had.
14   Q.   And they filled it out and turned
15 it in to you?
16   A.   Yes.
17   Q.   Okay.  Did you keep those forms
18 somewhere in your office?
19   A.   I -- I did.  I'm not sure where
20 they ended up.  Because they would take those
21 forms and record that in an inventory, an
22 expense log.
23   Q.   So you would use the request for
24 controlled purchases forms for your own expense
25 log for the department?

1    A.   For the drug unit.
2    Q.   That's correct?  That is correct?
3    A.   Yes.
4    Q.   That's accurate?  Okay.
5         Would an officer ever e-mail you a
6 request for money, or was it always through the
7 forms?
8    A.   No.  It was through the forms.
9    Q.   It was through the forms?
10   A.   Yes.
11   Q.   Okay.  So you did have a file with
12 those forms?
13   A.   Yes.
14        MS. HARTMAN:  Okay.  I'd like to
15 introduce Exhibit 15.
16            - - - - -
17        (Thereupon, Deposition Exhibit 15,
18        Document First Heading "Testimony of
19        Captain Hylton Baker, Summit County
20        Drug Unit, SUMMIT_001461080 to
21        001461085, was marked for purposes
22        of identification.)
23            - - - - -
24   Q.   Do you recognize this document?
25 And please take a moment to look at it.

83 (Pages 326 - 329)

Page 330

1    A.    Yes.
2    Q.    What is it?
3    A.    This was during our fight to get
4  permanent funding for the task forces.
5    Q.    Your fight to get permanent funding
6  for the task forces; is that from the Ohio
7  legislature?
8    A.    Yes.
9    Q.    Were you successful in that fight?
10    A.    Yes.
11    Q.    And when did you receive permanent
12  funding for the task forces?
13    A.    The document, that would -- when
14  did we get it, 2010 or 2009 is when we finally
15  got the money.  So the legislature would have
16  passed that probably in the prior year.
17    Q.    And at the -- so do you know the
18  date when this document was drafted?
19    A.    I don't recall.  It would have been
20  prior to 2010.
21    Q.    And this is testimony you provided?
22  Was it in front of the General Assembly of
23  Ohio?
24    A.    It was in -- in front of one of
25  the -- I believe the -- the safety committee of

Page 331

1  the legislature.
2    Q.    Is that the only time you've
3  delivered testimony to the legislature?
4    A.    No.
5    Q.    When else have you delivered
6  testimony?
7    A.    I also delivered testimony in
8  regards to methamphetamine.
9    Q.    And that was to the Ohio
10  legislature?
11    A.    Yes.  And I also spoke on Capitol
12  Hill.
13    Q.    In regard to what?
14    A.    Methamphetamine.
15    Q.    And what year was that?
16    A.    I don't know.  Maybe around 2006 or
17  so.
18    Q.    Did you prepare similar written
19  testimony in advance of providing that
20  testimony live?
21    A.    For the State, I believe I had
22  written -- yeah, they want written testimony,
23  so I had something there.
24        For the one in Capitol Hill, I did
25  not.

Page 332

1    Q.    Did you ever obtain a transcript of
2  your testimony for Capitol Hill?
3    A.    No.
4    Q.    Why not?
5    A.    I didn't know I could get one.
6    Q.    Well, you can go home tonight and
7  Google it, I'm sure, and it will come up.
8        All right.  In terms of the
9  information here, can we look at page -- you
10  don't have page numbers, but the Bates No.
11  1461083.
12    A.    All right.
13    Q.    Now, you talk about the efforts of
14  the task force throughout Ohio.
15    A.    Uh-huh.
16    Q.    About a third of the way down of
17  the first paragraph, it says, "During 2006
18  alone" --
19    A.    Uh-huh.
20    Q.    -- "more than 12,300 units of
21  pharmaceutical drugs were seized and over
22  1-" -- "133,600 were found to have been
23  diverted."
24    A.    Yes.
25    Q.    And that's collectively over --

Page 333

1  over the whole state of Ohio?
2    A.    That's correct.
3    Q.    Okay.  Now, we talked a little bit
4  more -- earlier about how cases are referred to
5  the drug unit, correct?
6    A.    Yes.
7    Q.    You might get a tip or a complaint;
8  is that correct?
9    A.    Yes.
10    Q.    Was there any kind of reporting
11  mechanism in place at the drug unit that lists
12  every tip or complaint you receive from the
13  public?
14    A.    No.  If something would come in,
15  somebody might write -- just write a little
16  memo, a note or something with their name on
17  it, or if somebody was there at the time, we
18  might just transfer the call right to them.
19    Q.    How did you decide which --
20        MS. HARTMAN:  I'd like to introduce
21  Exhibit 16.
22        - - - - -
23        (Thereupon, Deposition Exhibit 16,
24        8/22/2012 E-Mail to Hylton Baker Re:
25        Meth labs, SUMMIT_001008145, was

84 (Pages 330 - 333)

1    marked for purposes of
2    identification.)
3    - - - - -
4    Q.   How did you decide which complaints
5 to pursue?
6    A.   We looked at everything.  Other
7 than those things that were so far out of -- we
8 got calls from all kinds of people, so -- and
9 some of them you could tell were a little
10 outside the norm, and those kind of things you
11 just tried to do the best PR you could with
12 them.
13    Q.   Did you have any --
14    MS. HARTMAN:  Would you hand out --
15    Q.   Is this one of the types of
16 complaints that you received from the public?
17    A.   Okay.
18    Q.   So this is a complaint from the
19 public?
20    A.   Yes.
21    Q.   And how -- how would the -- is your
22 name on a website?  How would this individual
23 obtain your name, if you know?
24    A.   Yeah.  They could go -- probably go
25 to the sheriff's website, and they probably

1 listed everybody's -- has the head of each
2 bureau.
3    Q.   Do you know whether or not this
4 complaint was investigated?
5    A.   I'm sure it was.
6    Q.   May I ask why you're sure it was?
7    A.   We -- I -- I would have given it to
8 probably the person who was my main go-to for
9 meth.  There was a couple of them.  One or two
10 of them.  And so probably one of -- one of the
11 things that we did with these kind of things
12 was go do a knock and talk.  Which basically
13 means a couple of detectives went up to the
14 door and knocked and said, "Hi.  How are you?
15 We got a complaint that there's meth going on
16 in here.  Do you mind if we come in?"
17    You'd be surprised how many people
18 go, "Oh, yeah, come on in."
19    Q.   Do you know what percentage of your
20 investigations came from public complaints?
21    A.   No.  Probably not a large
22 percentage, because most of them involve guys
23 going out and getting informants and going from
24 there.
25    Q.   Or referrals, as you said before?

1    A.   Right.
2    Q.   From different agencies?
3    A.   Yes.
4    Q.   Okay.  Did you receive referrals
5 from agencies besides the Ohio Board of
6 Pharmaceuticals?
7    A.   We got referrals from various
8 government entities.  We got referrals from
9 other police departments.  We got referral -- I
10 mean, just about everybody you can imagine.
11    Q.   And I'm sorry if this is repeating
12 my question, but did you keep a list of all the
13 referrals you received or that came through the
14 drug unit?
15    A.   No.
16    Q.   No, you didn't keep a list of it?
17    A.   No.
18    Q.   Okay.  Why not?
19    A.   So hand the referral off to one of
20 the detectives, and they were able to take the
21 case, they made a case.  If not, they didn't.
22    Q.   Are you familiar with the Summit
23 County Medical Examiner's Office?
24    A.   Yes.
25    Q.   How often did you interact with the

1 Summit County Medical Examiner's Office in your
2 role as the captain of the drug unit?
3    A.   Not very often, unless I was
4 looking for some stats.
5    Q.   Would you ever receive weekly or
6 monthly reports from the Summit County Medical
7 Examiner's Office?
8    A.   No.
9    Q.   What would be a particular instance
10 in which you were looking for stats?
11    A.   Well, for example, I might -- if
12 I'm going to go talk someplace, I might want to
13 know, you know, what are -- what are -- what
14 are our death rates and what -- what kind of
15 drugs are you finding.
16    Q.   Would you ever talk to the Summit
17 County medical examiner in connection with an
18 ongoing investigation of the drug unit?
19    MR. LEDLIE:  Object to the form of
20 the question.
21    A.   I don't recall ever doing that
22 personally.  That doesn't mean that if one of
23 my investigators was involved in an overdose
24 case that they didn't.  I don't know.
25    Q.   During your time in the drug unit,

85 (Pages 334 - 337)

Page 338

1 did you have a relationship with the Summit
2 County Prosecutor's Office?
3    A.   Yes.
4    Q.   And what -- can you describe that
5 relationship?
6    A.   The prosecutor sat as -- had a
7 representative that sat as a board member of
8 the drug unit.
9    Q.   And was that the same person
10 throughout your time as head of the drug unit?
11    A.   Yes.
12    Q.   Okay.  And who was that person?
13    A.   Mary Ann Kovach.
14    Q.   And how often did you communicate
15 with her?
16    A.   Board meetings were once a month.
17 And other than that, depending on what cases
18 were going on, we might communicate, but it
19 wasn't a day-to-day thing.
20    Q.   Did you ever talk with her about
21 the opioid crisis or opioid epidemic in Summit
22 County?
23    A.   Not that I can recall.
24    Q.   Did you ever talk with anyone in
25 the Summit County Prosecutor's Office about

Page 339

1 opioid problems?
2    A.   No.  Not that I can recall, unless
3 it was a case.
4    Q.   Did you ever have any dealings with
5 the Cuyahoga County drug enforcement divisions?
6    A.   I think we caught them down here
7 poaching one time, but other than that no.
8    Q.   Poaching in terms of trying to find
9 officers?
10    A.   What's that?
11    Q.   Poaching in what sense?
12    A.   Basically they were doing an
13 investigation in our jurisdiction.
14    Q.   Oh, okay.
15    A.   Without telling us.
16    Q.   Did you ever talk about best
17 practices with them?
18    A.   No.  Really never talked to
19 Cleveland or anybody up there.
20    Q.   What about Franklin County?  Did
21 you ever talk to anyone in Franklin County?
22    A.   Franklin?  No.
23    Q.   Did you ever talk to any other drug
24 units in any other county in Ohio?
25    A.   I mean, as -- as commanders we

Page 340

1 would talk back and forth at our state
2 meetings, and every now and then somebody would
3 call somebody, "Hey, you know, I've seen this.
4 Have you seen this," or...
5    Q.   But there wasn't like a regular --
6    A.   Not a formal.
7    Q.   Not a formal type of communication.
8    Just give me one second.
9    MS. HARTMAN:  All right.  Those are
10 all the questions I have.  Thank you for your
11 time.
12    THE VIDEOGRAPHER:  Off the record,
13 5:31.
14    (A recess was taken.)
15    THE VIDEOGRAPHER:  On the record,
16 5:32.
17    EXAMINATION OF HYLTON E. BAKER
18 BY MS. GATES:
19    Q.   Hi, Mr. Baker.  I'm Lisa Gates.  We
20 met earlier.  I represent Walmart.  I just have
21 a couple of questions.
22    Are you aware that Summit County
23 has sued my client, Walmart, in this case?
24    A.   I saw your name in the complaint.
25    Q.   Are you also aware that the County

Page 341

1 has sued Walgreens, Rite Aid, and CVS?
2    A.   I saw those in the complaint also.
3    Q.   Do you have any personal knowledge
4 as to why Summit County has sued Walmart?
5    A.   Other than what I read in the
6 complaint, no.
7    Q.   What about Walgreens, Rite Aid, or
8 CVS?  Do you have any personal knowledge as to
9 why Summit County sued those entities?
10    A.   Other than what I saw in the
11 complaint, no.
12    Q.   I take it you can't point to any
13 specific conduct by Walmart relating to
14 prescription opioids that caused any monetary
15 losses to Summit County?
16    A.   During my tenure, I don't have any.
17    Q.   And is the same true for Walgreens,
18 Rite Aid, and CVS?
19    A.   Correct.
20    Q.   Are you familiar with the damages
21 that Summit County is seeking in this case?
22    A.   I know they're seeking damages.  I
23 don't know what they are and what the amounts
24 are.
25    Q.   Have you personally ever tried to

86 (Pages 338 - 341)

Page 342

1 quantify in dollars how much your department's
2 expenditures related to the opioids issues
3 generally?
4     A.    I have not.
5     Q.    What about illicit opioids?  Have
6 you ever tried to calculate those expenditures?
7     A.    No.
8     Q.    And is the same true for
9 prescription opioids?  You've never tried to
10 calculate?
11     A.    I have never, no.
12     Q.    Okay.  And I'd just like to confirm
13 my understanding of your prior testimony on a
14 couple of items, and then I'll finish up.
15          You're not educated as a medical
16 doctor, correct?
17     A.    That is correct.
18     Q.    And you're not an expert on pain
19 management?
20     A.    I am not.
21     Q.    You're not an expert on the causes
22 of drug addiction?
23     A.    I am not.
24     Q.    You don't have any training or
25 expertise in epidemiology?

Page 343

1     A.    I do not.
2     Q.    The same is true for pharmacology?
3     A.    I mean, I have some basic
4 pharmacology as a result of DEA academy.
5     Q.    Aside from your -- and the DEA
6 academy, was a training session?
7     A.    It was, yes.
8     Q.    For how long?
9     A.    Two weeks.
10     Q.    And would that be -- did that cover
11 pharmacy as well?
12     A.    No.
13     Q.    So you have no training or
14 expertise in pharmacy?
15     A.    I do not.
16          MS. GATES:  I don't have any other
17 questions.  Thank you very much.
18          MR. LEDLIE:  I don't have anything.
19          MS. SAULINO:  That means you're
20 done for the day, sir.
21          MR. LEDLIE:  Yes.
22          THE VIDEOGRAPHER:  Off the record,
23 5:35.
24     (Deposition concluded at 5:35 p.m.)
25          ~ ~ ~ ~ ~

Page 344

1     Whereupon, counsel was requested to give
2 instructions regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10 Counsel was requested to give instructions
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 345

1          REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3                      SS:
4 County of Cuyahoga.  )
5
6          I, Stephen J. DeBacco, a Notary
7 Public within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, HYLTON E. BAKER,
10 was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19          I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

87 (Pages 342 - 345)

Page 346

1      I do further certify that I am not
2 a relative, counsel or attorney for either
3 party, or otherwise interested in the event of
4 this action.
5      IN WITNESS WHEREOF, I have hereunto
6 set my hand and affixed my seal of office at
7 Cleveland, Ohio, on this 24th day of
8 December, 2018.
9
10
11
12
13
14   Stephen J. DeBacco, Notary Public
15   within and for the State of Ohio
16
17 My commission expires September 30, 2022.
18
19
20
21
22
23
24
25

Page 348

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3 ASSIGNMENT REFERENCE NO: 3155133
  CASE NAME: In Re: National Prescription Opiate Litigation v
  DATE OF DEPOSITION: 12/19/2018
4 WITNESS' NAME: Hylton E  Baker
5 In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7  I have made no changes to the testimony
  as transcribed by the court reporter
8
_____
9 Date        Hylton E  Baker
10   Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11 the referenced witness did personally appear
  and acknowledge that:
12
  They have read the transcript;
13   They signed the foregoing Sworn
      Statement; and
14   Their execution of this Statement is of
      their free act and deed
15
  I have affixed my name and official seal
16
  this _____ day of_____, 20____
17
  _____
18   Notary Public
19   _____
  Commission Expiration Date
20
21
22
23
24
25

Page 347

1      Veritext Legal Solutions
        1100 Superior Ave
2          Suite 1820
        Cleveland, Ohio 44114
3       Phone: 216-523-1313
4
  December 24, 2018
5
  To: Caroline Rion
6
  Case Name: In Re: National Prescription Opiate Litigation v
7
  Veritext Reference Number: 3155133
8
  Witness:  Hylton E  Baker        Deposition Date:  12/19/2018
9
10 Dear Sir/Madam:
11
  Enclosed please find a deposition transcript  Please have the witness
12
  review the transcript and note any changes or corrections on the
13
  included errata sheet, indicating the page, line number, change, and
14
  the reason for the change  Have the witness' signature notarized and
15
  forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext com
18
  If the errata is not returned within thirty days of your receipt of
19
  this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 349

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3 ASSIGNMENT REFERENCE NO: 3155133
  CASE NAME: In Re: National Prescription Opiate Litigation v
  DATE OF DEPOSITION: 12/19/2018
4 WITNESS' NAME: Hylton E  Baker
5 In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7  I have listed my changes on the attached
  Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s)
9  I request that these changes be entered
  as part of the record of my testimony
10
  I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
  that both be appended to the transcript of my
12 testimony and be incorporated therein
13 _____
  Date        Hylton E  Baker
14
  Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
  the referenced witness did personally appear
16 and acknowledge that:
17   They have read the transcript;
  They have listed all of their corrections
18    in the appended Errata Sheet;
  They signed the foregoing Sworn
19    Statement; and
  Their execution of this Statement is of
20    their free act and deed
21 I have affixed my name and official seal
22 this _____ day of_____, 20____
23 _____
  Notary Public
24
  _____
25   Commission Expiration Date

88 (Pages 346 - 349)

Page 350

1          ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 12/19/2018
3  PAGE/LINE(S) /      CHANGE      /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____    _____
20 Date          Hylton E. Baker
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
      Notary Public
24
   _____
25    Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

| & | | | |
|---|---|---|---|
| **&**   2:11,16 12:10 12:12,13 13:14 | | | |

**&**   2:11,16 12:10
  12:12,13 13:14

**0**

**000023567**   5:6
  164:3
**000023798**   6:15
  319:17
**000023805**   6:16
  319:17
**000024552**   6:5
  286:10
**000076601**   5:17
  240:18
**000076602**   5:18
  240:18
**00023648**   5:7
  164:3
**000830645**   5:8
  191:3
**000830682**   5:9
  191:4
**001008145**   6:23
  333:25
**001008149**   6:11
  305:19
**001008157**   6:11
  305:20
**001009696**   5:11
  193:17
**001009697**   5:11
  193:17
**001010609**   6:8
  301:24
**001010613**   6:8
  301:25
**001128847**   6:18
  325:23
**001128894**   6:18
  325:24

**001461080**   6:21
  329:20
**001461085**   6:21
  329:21
**001839815**   5:20
  245:21
**001839819**   5:21
  245:22
**001843287**   6:2
  260:2
**001843291**   6:3
  260:3
**001977600**   5:23
  254:10
**001977604**   5:24
  254:11
**0114**   5:23 254:10
**0517**   5:20 245:21
**0647**   278:19
**0791**   6:2 260:2

**1**

**1**   5:3 134:15,24
  140:25 154:13,15
  154:16 193:24
  243:1 332:22
**1.2**   288:23 291:4
**10**   6:4 94:3 151:1
  179:10 226:11,24
  226:25 280:19,20
  285:24 286:7,14
  291:2 321:20
**100**   106:2 170:8
  179:11
**101**   7:21
**102**   7:21
**103**   7:22,22
**106**   7:23
**107**   7:23 281:16
**107,000**   279:1
  282:8

**108**   7:24,24
**109**   7:25
**10:04**   57:16
**10:20**   57:19
**11**   6:6 226:25
  251:11 301:21
  302:4 318:1
**11/1/2010**   5:10
  193:15
**1100**   347:1
**111**   8:1,1,2
**112**   8:2
**113**   8:3
**114**   8:3
**11472**   346:13
**115**   8:4
**116**   8:4
**118**   8:5,5,6
**119**   8:6
**11:30**   123:6,25
**11:34**   124:6
**11:50**   124:9
**12**   6:9 227:1
  305:14,16 318:2
**12,300**   332:20
**12/15/2010**   5:16
  240:16
**12/19/2018**   347:8
  348:3 349:3 350:2
**120**   8:7,7
**121**   8:8
**122**   8:8,9,9
**127**   3:6 8:10,10
**128**   8:11,11
**129**   8:12,12,13
**13**   4:8 6:12 319:9
  319:11 325:19
**131**   8:13
**132**   8:14,14
**133**   8:15

**133,600**   332:22
**134**   5:3
**136**   8:15,16
**137**   8:16,17
**138**   8:17,18,18
**139**   8:19,19,20
**14**   6:17 50:1
  325:19,21
**140**   8:20
**140,000**   279:3
  282:10
**141**   8:21
**143**   8:21
**144**   8:22,22
**145**   8:23,23,24
**146**   8:24,25 9:1,1
**1461083**   332:11
**147**   9:2
**148**   9:2
**149**   9:3
**15**   6:19 50:1 75:9
  123:4,14 240:25
  250:12 329:15,17
**151**   9:3
**152**   9:4
**153**   9:4,5
**154**   9:5
**155**   9:6,6,7
**156**   9:7
**157**   9:8,8
**158**   9:9
**159**   9:9,10,10
**16**   6:22 333:21,23
**160**   9:11
**163**   5:5
**168**   9:11
**17**   1:6,10 7:3
  252:7 324:9
**174**   9:12
**176**   9:12

**[178 - 285]**

| | | | |
|---|---|---|---|
| **178**  9:13 | 295:9,10 299:11 | 281:16,17 282:8 | **227**  10:5 |
| **179**  9:13,14 | 320:11 | 288:9 313:9,12 | **229**  10:6 |
| **18**  1:12,13 | **2.8**  285:13 | 316:16 317:8,9 | **23**  326:20 |
| **180**  9:14 | **20**  218:10 219:2 | 330:14 | **23,000**  172:18 |
| **182**  9:15 | 229:6 320:24 | **2010**  193:25 194:9 | **231**  10:6 |
| **1820**  347:2 | 324:1 348:16 | 197:4 240:25 | **235**  10:7 |
| **184**  9:15 | 349:22 350:22 | 243:1 279:2 282:9 | **237**  10:7 |
| **186**  9:16 | **20/20**  273:24 | 297:2 330:14,20 | **23803**  320:24 |
| **187**  9:16 | **2000**  3:6 51:2 | **2011**  275:16 | **239**  10:8,8 |
| **188**  9:17 | 66:25 68:7 169:19 | **2012**  6:9 14:24,25 | **24**  347:4 |
| **19**  1:18 12:2 50:25 | **20001-4956**  2:13 | 86:1 87:21 88:9 | **240**  5:16 |
| 221:3 | **2000s**  90:23 94:2 | 95:15 106:4 110:9 | **242**  10:9 |
| **190**  9:17,18 | 141:21 | 121:4 144:5 | **245**  5:19 |
| **190,000**  280:12 | **2001**  58:16 62:12 | 151:12 158:20 | **24th**  346:7 |
| 287:20 | 66:20 82:16 84:25 | 192:18 215:25 | **25**  186:21 |
| **191**  5:8 | 87:21 95:15 96:25 | 275:20 304:6 | **254**  5:22 |
| **192**  9:18 | 106:4 110:9 144:4 | 305:17 306:1,4 | **255**  10:9 |
| **193**  5:10 9:19 | 151:12 158:20 | 308:13 309:8,15 | **259**  6:1 |
| **197**  9:19,20 | 192:18 215:24 | **2014**  103:14 229:3 | **262**  10:10 |
| **1970**  130:3 | 254:24 275:20 | **2015**  122:1 | **263**  10:10 |
| **1979**  37:9 42:12 | 298:20,21 304:5 | **2018**  1:18 12:3 | **264**  10:11,11 |
| 43:10 | **2002**  100:25 250:3 | 346:8 347:4 | **265**  4:9 |
| **1982**  43:16 44:24 | 251:9 | **202**  2:13 | **268**  10:12 |
| **1985**  47:9 | **2003**  6:17 186:23 | **2022**  346:17 | **269**  10:12 |
| **1986**  40:17 | 260:9 325:22 | **203**  9:21 | **27**  326:12 |
| **1989**  1:21 | 326:6 | **207**  9:21,22 | **270**  10:13 |
| **199**  9:20 | **2004**  165:15 180:5 | **209**  9:22 | **271**  10:13 |
| **1990**  50:14 59:24 | 182:6,11 208:6 | **211**  9:23 | **273**  10:14 |
| **1990s**  78:9 134:11 | **2005**  94:3 165:6,15 | **212**  9:23,24 | **274**  10:14 |
| 135:19 138:23 | 165:15,17 169:10 | **215**  9:24 | **275**  10:15 |
| **1992**  134:25 | 169:15 173:25 | **216**  3:7,8,13 9:25 | **276**  10:15 |
| **1996**  121:4 122:1 | 178:6,8,15 222:16 | **216-523-1313** | **277**  10:16 |
| **1997**  254:17 | 222:23 297:4 | 347:3 | **28**  2:5 326:23,24 |
| **1:06**  190:21 | **2006**  331:16 | **216-9168**  2:7 | **280**  44:3 |
| **1:10**  190:19 | 332:17 | **216-9252**  2:6 | **2804**  1:5,6 |
| **1:53**  190:24 | **2007**  316:1,8 | **218**  10:1 | **281**  10:16 |
| | **2008**  205:13 281:2 | **219**  10:1,2,2 | **282**  10:17 |
| **2** | 281:4 | **222**  10:3,3 | **283**  10:17 |
| **2**  4:3 5:5 66:25 | **2009**  5:8 94:3 | **223**  10:4,4 | **284**  10:18 |
| 154:13 163:25 | 191:2 275:6 | **224**  5:12 10:5 | **285**  10:18 |
| 164:8 222:25 | 278:14 279:1 | | |
| 225:8 278:18 | | | |

**286**   6:4
**288**   10:19
**290**   10:19
**293**   10:20
**294**   10:20
**29464**   2:6
**298**   10:21,21
**2:53**   240:10

**3**

**3**   5:8 191:1,9
   192:13 223:1
   278:16 313:8
**30**   41:6 346:17
**300**   10:22
**301**   6:6 10:22
**303**   4:10
**305**   6:9
**312**   3:19
**313**   10:23,23
**3155133**   347:7
   348:2 349:2
**319**   6:12
**322**   10:24
**3226**   13:24
**323**   10:24,25
**324**   11:1
**325**   6:17
**329**   6:19
**333**   6:22
**337**   11:1
**34**   227:21
**340**   4:11
**345**   4:13
**35**   7:3 171:3
**36**   228:7 230:14
**3:13**   240:13
**3:43**   265:7
**3:48**   265:10

**4**

**4**   5:10 193:14,22
   250:10
**4.1**   287:3
**400**   44:4
**40mg**   251:8
**41**   173:13
**415**   2:18
**42**   7:4,4 175:16
**43**   175:20 313:12
   313:24,25 314:21
**44**   176:6
**44114**   347:2
**44114-1190**   3:13
**44114-1214**   3:6
**44685**   14:1
**45**   7:5
**45004**   1:10
**45090**   1:13
**45132**   1:12
**494-4432**   3:19
**4:36**   303:4
**4:48**   303:7

**5**

**5**   4:5 5:12 168:1
   168:17 179:10
   224:6,15 225:2
   250:10
**5-2**   177:15,17
**50**   151:5 251:8
   323:20,24 324:6
**52**   7:5
**54**   3:18 7:6
**56**   7:6
**57**   7:7
**58**   7:7,8
**586-7154**   3:13
**591-7055**   2:18
**5:31**   340:13

**5:32**   340:16
**5:35**   343:23,24
**5th**   251:9

**6**

**6**   5:16 170:3
   240:15,24 313:10
   320:23
**6-2**   177:15,16
**60**   180:5
**60654**   3:18
**62**   177:13
**63**   7:8 179:21
**64**   7:9 183:15
**65**   184:20 250:23
**66**   7:9 185:18
**662-5305**   2:13
**69**   7:10

**7**

**7**   5:19 171:20,25
   245:18 246:1
   252:12 315:23
**70**   7:10,11 168:25
**71**   168:20
**72**   7:11,12,12
   243:4
**73**   7:13,13
**74**   7:14,14
**75**   7:15 169:1
**76**   168:20
**77**   7:15 168:21
**78**   7:16,16
**79**   7:17 43:12 44:7

**8**

**8**   5:22 225:17,25
   226:10,10 227:22
   254:7,15
**8/22/2012**   6:22
   333:24
**80**   43:12 44:7
   168:21

**80s**   50:25 57:23
   59:20 142:22,23
**8150**   308:24
**82**   44:7
**830651**   313:11
**843**   2:6,7
**85**   7:17
**850**   2:12
**86**   48:14
**861-7309**   3:7
**861-7582**   3:8
**87**   7:18 40:17
   48:14

**9**

**9**   6:1 226:11
   259:24 260:7
   280:19,19 285:23
**9/11**   90:1
**90**   169:1 322:11
**901**   3:12
**90s**   50:25 57:24
   59:11,11,20 61:25
   77:17 122:11
   135:12 310:9,11
**91**   7:18
**92**   7:19
**94**   7:19,20
**94111-5356**   2:17
**95**   62:11
**98**   7:20
**99.1**   258:5
**99.9**   258:7
**9:08**   1:18 12:2
**9:12**   16:1

**a**

**a.m.**   1:18
**aaron**   1:7
**ability**   27:19
   112:22 130:4
   224:23 252:1

255:11
**able** 40:1 44:22
85:21 87:3 98:9
112:10 113:16
148:13 158:11
169:21 186:12
210:21 230:7
237:14 264:15
267:18 271:21
279:21 327:13
336:20
**absolutely** 174:5
273:15
**abuse** 129:20
174:14 309:3,9
**abused** 141:24
205:25
**abusers** 219:5,13
**aca** 44:22
**academy** 37:6
43:21 44:22 45:5
45:6 343:4,6
**access** 111:1,7,9
111:10,13,24
112:3,3,9 115:15
115:17 118:1
168:25 169:20
**accidental** 195:6
**accompanied**
166:7,9
**account** 277:8,9
**accounts** 277:8,12
**accurate** 102:21
253:22 309:7
329:4
**accurately** 255:11
**acknowledge**
348:11 349:16
**acronym** 93:3
307:23

**act** 130:3 348:14
349:20
**acting** 145:14
**action** 13:16 57:10
93:13,16 94:8
264:15,19 280:22
346:4
**actions** 211:4
290:17
**actively** 74:17
**activities** 15:8,19
16:4,17 90:11
191:24 293:23
**activity** 214:10
**actor** 145:13
**actors** 146:2
**acts** 183:22 185:15
**actual** 25:18
208:19
**ad** 196:15,20
198:21 204:6
**add** 269:3 283:14
**added** 84:24
153:24 271:6
274:8 318:25
**addendum** 31:22
32:13 39:19
161:22 164:14
165:18 223:3
299:10
**addiction** 42:18,19
130:6 195:6,19
196:1 342:22
**addictions** 130:5
**addictive** 129:13
129:18 174:7
**addicts** 130:18
137:7,8,11
**additional** 170:9
278:1

**address** 13:22
201:23 242:11
244:3 297:7,9,10
297:13,15,17,19
297:21 306:10,11
347:15
**addressed** 321:21
**addresses** 94:25
**adds** 207:22
**adequately** 66:9
**adhd** 259:18,19
**adipex** 250:21
**adjournment**
345:22
**administer** 290:12
**administration**
68:15
**adolph** 228:10
**adoption** 283:1
**adria** 228:11
**ads** 197:24 198:8
198:21
**advance** 331:19
**advanced** 37:11
**advancement**
47:24
**advised** 261:14
**advocated** 283:1
**affect** 27:8
**affixed** 346:6
348:15 349:21
**aforesaid** 345:12
**age** 13:3
**agencies** 53:21,24
54:9,11 196:16
198:21 204:6
210:11 232:16
285:16,17,21
287:15 289:10
316:18 336:2,5

**agency** 232:8
**agent** 68:10 70:1
83:11 86:3,7
237:7
**agents** 117:23
237:8,9
**aggregate** 118:4
118:14
**ago** 16:4 18:18
34:12 38:17 44:16
61:7 75:1 99:5
162:5 168:10
255:24
**agree** 101:5
138:18 140:3
141:16 145:24
187:20 190:19
207:17 214:12
257:8 262:17
263:2 264:13
276:23 313:25
**agreed** 101:10
213:20
**ahead** 38:21
117:24 120:7
194:4 206:18
222:20
**aid** 341:1,7,18
**aids** 198:4,5
**airport** 233:1
**airports** 160:17
170:4,9
**akron** 1:21 2:2
5:11,13 12:21,24
21:10,11 23:14
24:12 36:1 56:19
82:19 84:11,13,15
84:16,17,20 86:9
88:6 173:1 180:3
181:4 193:16
200:23 201:19,21

202:23 203:14
224:7 226:18
228:9 237:18
238:5 242:21
303:20 304:13
**akron's** 233:17
**al** 1:10,12,13,13
**alexander** 68:8
**alias** 186:21
**all's** 33:17
**allegations** 64:10
**allocated** 288:17
**allotted** 235:10
**allow** 110:22
168:24 273:16
**allowed** 112:7
252:12 253:14
290:21
**allowing** 316:20
**alongside** 205:25
**altered** 262:10
**alters** 258:25
**altogether** 159:12
**amalgamation**
242:7
**amenable** 73:4
**amended** 5:13
224:8
**america** 175:2
**amount** 104:8,9
155:22,23,24
216:6 220:16,18
250:23 259:1
269:6 270:13
271:1,2 279:2
280:11 282:8,9
285:11 286:3
287:7,19 288:25
289:1,24 291:3,6
291:11

**amounts** 291:17
291:20 341:23
**analgesics** 179:2
**analysis** 40:23
41:25
**analyze** 208:17
**ann** 338:13
**annual** 5:8 6:15,17
191:2,13 192:5,17
210:6 278:14
281:17 313:10,22
319:15 325:23
326:6,8
**annually** 192:9
**answer** 21:22
27:16 28:1,6,6,12
28:12,18,23,24
29:8 52:17 55:5
55:23 61:7 108:21
109:19 116:10
121:20 127:10
140:9 144:1
153:25 164:9
189:20 201:11
219:12 225:4
228:6 230:10
263:14,14 267:6
273:11 290:3
**answered** 69:19
75:17 79:8 108:2
113:14 138:25
209:20 222:13
265:1
**answering** 27:18
140:14 224:21
**anthropology**
36:10
**anxiety** 137:9
**anybody** 33:11,13
70:9 71:10 113:16
117:8 147:16

159:24 166:12
187:16 198:14,17
230:8 234:8
256:23 275:17
301:9 305:4
306:21 339:19
**anybody's** 283:13
**anymore** 137:2
141:2
**anyone's** 94:17
**anything's** 301:19
**anytime** 278:5
310:21 318:13
**anyways** 90:9
**apologize** 61:21
98:15 159:3
**apparently** 135:8
234:17
**appear** 194:22
348:11 349:15
**appearances** 2:1
3:1 4:3
**appearing** 103:13
**appears** 242:10
247:25 248:7
**appended** 349:11
349:18
**applicable** 344:7
**application** 71:6
164:15 165:19
166:10 279:2
282:9 299:23
**applications**
299:14,17
**apply** 283:24
**appreciate** 28:9
44:17
**appropriate**
212:23 237:5
**approval** 236:17

**approve** 74:13
**approved** 127:18
279:3 282:10
**approves** 127:22
**approximately**
250:23 257:21
285:4 288:23
289:18 291:4
**archeologist** 36:14
**arcos** 114:20,22
115:4,9,22 116:21
117:14,17 118:1,3
118:12 226:3
**area** 6:14 36:1
48:22 52:9 135:1
160:3 169:4,5
172:11 175:4,6
185:21 202:3
203:2 228:9
319:14
**areas** 171:22
316:25
**arises** 137:11
**armet** 43:24
**armored** 43:23
**arrangement**
60:19
**arranging** 248:2
**arrest** 151:16
203:6 236:2,11,14
236:19 237:1,4
248:5,10,14
255:25 256:12
257:25 260:9
318:13
**arrested** 159:25
186:23 201:10
219:11 249:5
256:6 318:14
**arrests** 151:20
226:17 248:8,12

318:3
**article** 5:3 134:16
  134:24
**asia** 175:3
**asian** 174:17 175:2
  175:7 176:2
**aside** 16:19 141:1
  193:12 211:23
  230:18 245:16
  256:18 263:12
  267:22 290:9
  343:5
**asked** 24:3 26:11
  27:17 39:15,17
  61:22 76:15 98:15
  103:21 105:3
  109:1,3 113:14,23
  116:12 117:4,5,16
  138:25 140:15
  162:22 163:4
  166:19 194:5
  200:6 209:20
  222:12 225:4,21
  230:15 265:1
  270:15,16,18
  299:21 317:1
**asking** 27:11,25
  34:5 53:13,14
  63:21 65:12 75:20
  79:4 93:6 100:3
  101:10 114:3
  138:9,15,16
  139:12 140:2
  141:1 156:11
  160:10 162:2
  168:10 181:25
  183:8 189:21,23
  197:10 213:7,16
  215:12 243:16,18
**asks** 244:13

**assembly** 330:22
**assessment** 5:6
  162:10 164:2
**assets** 292:1
**assign** 58:22
**assigned** 71:19
  260:20 275:16
**assignment** 47:7
  348:2 349:2 350:2
**assistance** 231:17
**associated** 328:10
**association** 90:17
  92:25 279:20
  306:23
**assume** 27:17
  53:10 152:20
  178:2 276:8
**assuming** 194:17
**assured** 114:2
**atf** 54:15 82:20
  83:17
**atlanta** 160:19
**attached** 308:11
  349:7
**attachment** 6:10
  305:19
**attacked** 143:19
  144:10
**attend** 37:15 39:6
  310:20
**attended** 37:16
  43:6 308:13 310:2
  310:11 311:5,8,15
**attention** 19:9
  306:20,20 308:11
  326:11
**attorney** 37:13
  346:2
**attorneys** 224:23
**attributed** 132:17
  172:16 211:16,20

**audibly** 28:6
**audience** 314:12
**august** 157:19
**ausa** 236:21
**ausas** 237:3
**authorities** 212:23
**authority** 191:22
**authorize** 327:16
  349:11
**availability** 174:7
  174:13
**available** 126:19
  127:3,4,7,12,15
  133:16 134:1
  174:16 281:1
  308:18
**ave** 347:1
**avenue** 3:12
**award** 278:25
  282:8 288:3
**awarded** 280:11
  282:13
**aware** 27:6 34:10
  64:10 70:15 121:3
  121:13,21 132:9
  141:17 143:7,12
  146:16 152:7,9
  155:20 156:2
  160:1,10,14 162:8
  178:16 188:24
  189:24 195:5
  208:3 221:12
  226:13,19,21
  227:13,20 238:23
  268:20 269:23
  290:15 299:7
  308:17 309:14
  340:22,25
**awareness** 100:22
  121:8 303:25
  304:1

**awhile** 141:12

**b**

**b** 3:11 13:21 251:9
  288:2
**back** 17:7 31:16
  58:12 59:10,12,15
  59:18 61:15 62:12
  64:24 72:19 74:25
  77:22 78:4,5,15
  79:5 95:6 98:10
  109:6 123:22
  124:4 125:1
  169:18 208:9
  209:6 222:14
  237:19 252:12
  254:24 255:7
  257:3,4 274:7
  280:2,8 282:6
  287:24 291:1
  298:21 299:2
  310:5 313:8
  317:11 340:1
  347:15
**bad** 23:11 33:25
  34:6 146:2,16,19
  199:17
**baker** 1:17 3:4 4:7
  5:10 6:20,23
  12:13 13:3,8,10,21
  57:21 134:22,23
  164:7,8 191:8,9
  192:15 193:15,21
  193:22 224:14,15
  240:23,24 245:25
  246:1 254:15,15
  260:6,7 265:11,13
  286:14 302:4
  303:8,10 313:12
  329:19 333:24
  340:17,19 345:9
  347:8 348:4,9

349:4,13 350:20
**bakerhostetler**
12:16
**bakerlaw.com** 3:7
3:8
**banned** 129:8,9
**barberton** 84:8,10
234:22,23
**barbiturate** 143:4
**barbiturates**
126:14 143:5
**barker** 247:9,13
250:12
**barker's** 248:1
**barter** 212:3,9
**bartlit** 3:17 13:2
**bartlitbeck.com**
3:19
**based** 53:14
111:17 116:2,3,15
117:7 122:2,13
156:23 157:8,9
158:25 159:12
173:23 205:1,16
254:18 263:13
324:25
**basic** 37:6,11
40:12 43:9,21
44:2 268:10
299:17 343:3
**basically** 18:20
45:9 46:21 69:10
115:5 247:6
271:19 307:24
316:23 317:11
323:15 327:18
335:12 339:12
**basing** 34:7
**basis** 15:5 129:24
130:7 175:24
177:7 192:11

207:2 299:14
**batch** 208:18
**bate** 308:24
**bates** 278:18
313:11 320:24
332:10
**batteries** 268:2
**batthew.brewer**
3:19
**beck** 3:17 13:2
**began** 131:15
**beginning** 52:11
78:3 179:21
254:23 258:14
**beginnings** 52:6
**behalf** 2:2,10 3:2
3:10,15 12:16,23
19:20,24 20:8
95:11
**belief** 39:24
111:12 132:13
156:6
**believe** 30:13 37:9
54:14 69:18 79:8
84:23 87:25 108:2
117:4 125:15,23
130:11 131:14
155:11 165:17
169:12,14 183:24
186:11 194:20
200:15,23 201:6
222:25 223:23
229:14 245:15
267:11 289:3
295:20 300:3
304:14,15 306:6
316:7 317:7
326:10 330:25
331:21
**believed** 152:25
169:10 174:1

**bells** 202:21
**belongs** 97:23
295:3
**benefits** 56:3 87:7
127:24 269:4
**benzodiazepines**
126:15
**berate** 76:4
**berating** 76:6,12
**berry** 228:12
**best** 27:18 28:1
40:16 153:18
218:10 253:22
255:11 334:11
339:16
**better** 41:7 181:20
211:13,17
**beyond** 95:2
167:17
**big** 36:12 49:23
136:21 156:18
189:1 217:7,13
246:15
**bigger** 87:14
**biggest** 53:20
136:9
**bill** 155:21
**bis** 160:15
**bisected** 160:15
**bit** 22:25 123:17
153:24 155:9
164:19 202:25
206:5 208:11
229:1 333:3
**black** 174:17
175:4 251:10,23
**blaming** 21:16
**blank** 49:4
**block** 201:25
**board** 145:24,25
147:2,5,5,11,20

148:1,7,16,23,24
148:25 149:3,11
149:15 150:6,12
151:23 152:3,12
152:15,21 191:14
191:16,23 209:23
209:25 238:25
239:10 290:5
322:1,9,18 336:5
338:7,16
**boards** 148:22
**boats** 171:19
**bodies** 53:6 87:16
87:18,21 163:3,11
283:21
**body** 175:12
**bombard** 196:16
**bond** 265:25
**booking** 46:10,15
**border** 86:15
**boss** 80:2 209:21
**bottles** 244:2
**bottom** 140:17
168:16 175:17
225:3,7,25
**boulevard** 2:5
**boundaries** 225:11
228:2
**boy** 20:7 203:10
**bpulsipher** 2:18
**branches** 233:1
**brand** 142:15
**break** 29:1,4,9,9
57:13 123:6,10,14
123:15,18,21
124:3,4 190:17
240:3,7 251:12,24
265:4
**breakdown**
322:23

breaks 29:3
brewer 3:17 13:1
13:1
brian 229:4
bridgeside 2:5
brief 137:10 265:4
bring 17:7 186:12
230:7 237:1
bringing 306:19
brinks 14:11
broadly 198:12
broke 57:22
broken 216:23
brought 85:24
175:13,13 280:22
321:25
brown 174:17
175:1 205:17
bryant 2:16 12:11
265:13
bucks 156:18
budget 6:5 85:7
265:19 268:21
270:2,5,10 271:1
271:15 272:14
274:21 276:10,20
276:23 286:9
287:1,9 288:6
317:21
budgetary 163:15
163:21
build 281:3
building 89:2
bulk 155:22,24
bullet 309:21
bunch 37:14
bureau 37:23 38:7
47:6,11 48:20
49:8,21,24 52:8,13
52:18 60:11
233:11,13,15,16

233:17 311:10
335:2
bureau's 26:10
burglary 48:6
burke 241:1,7
242:9 244:12
306:13
burling 2:11,16
12:10,12 13:14
business 43:25
128:3 155:8,9
213:2,3,4,10
214:24 255:18,20
busy 196:12
233:24 310:18
buy 265:24 267:4
267:7,22 289:12
buying 23:2
142:21
buys 23:6 235:8
235:22 268:2
327:11
byrne 6:13 278:25
279:7,14,25 281:5
281:13,15,22
282:1,3 283:9,12
283:18 319:13
320:2

c

c 288:20
ca 347:25
cabinets 298:8
calculate 342:6,10
california 2:17
call 5:17 17:22
47:22 105:21
110:14,17 203:17
223:19 232:7
233:10,23 234:6
240:17 241:24
242:1,12,15,17

261:2,21 262:3
308:10 322:12
326:11 333:18
340:3
called 13:3 16:21
16:22 17:3,14
35:13,13 43:24
53:4 77:6 168:3
300:6
calls 160:7 181:21
334:8
cameras 294:16
campaign 100:21
candy 199:8
capacities 14:7
capacity 14:13
16:18 24:6 25:15
capitol 331:11,24
332:2
captain 6:20 13:10
29:12 57:21
192:14 193:21
224:14 240:23
245:25 254:15
260:6 265:13
313:12 329:19
337:2
caption 345:21
car 23:20 43:24
57:9,10 243:24
289:13
care 135:20
145:12 218:11
career 42:5,11,12
93:25 95:14
107:19 108:3
109:7 119:3 190:8
carfentanil 125:24
carmen 149:22
234:11,13 260:16
294:11

carolina 2:6
caroline 2:5 12:22
347:5
carriers 233:5
carrying 171:14
cars 266:2 287:17
case 1:6,10,12,13
5:20,23 6:2 21:7,8
21:12,13,19,23
22:1,2,5,8,15,18
23:2,3,6,12 24:15
24:22,24 26:2,4,7
26:9,10,14,18 31:4
31:19 33:2 35:9
35:15 38:25 39:10
39:16 48:5 60:17
110:18 118:11,21
118:24 121:10
148:18 150:11
151:16,25 153:19
157:9 180:6
186:12,20 187:7
200:3,5,5,5,8
208:12,13,21,22
215:18,19,20
220:8,23 221:15
221:17,18,22
223:24 229:20,25
230:4,7 232:21
233:21 236:6,16
236:20 237:1,7,9
237:16 238:12
244:6,23 245:20
246:12,14,17,20
246:21,25 247:7
248:18 249:10,21
250:5,6 252:23
253:16 254:9
255:2 256:9 258:9
258:15 260:1
262:14 263:23

[case - clock]

264:6 267:16,17
267:18,19 290:17
294:25 298:1,3,4
298:12 309:12
323:14 325:16,17
327:9,12,14,18,23
336:21,21 337:24
339:3 340:23
341:21 347:6
348:3 349:3
**cases** 25:17,22,25
26:1 46:22 48:3
48:23 52:1 53:1,3
63:20,25 64:7,8
65:24,25 66:7,17
67:12 69:20 70:3
70:23 96:16,16,24
120:4,17 126:21
136:5,10,12,24
137:25 144:17,25
145:23 147:14
148:13 149:9
150:19,25 151:10
151:14 152:12
180:6,15,24 181:4
181:8,15 182:23
196:2,7 206:21
209:15,18,22,25
210:20 211:9
216:1,7 217:13
220:1 229:15
230:20 234:17
236:20 237:11,14
238:19 250:4
259:3 260:21,22
260:23 285:1,7,8
292:8,13 296:9
321:24,25 322:3,7
323:17,18,21
326:20 327:3,7
333:4 338:17

**cash** 203:22
291:17,20 302:25
**categories** 19:6
184:23,25 185:14
**category** 125:22
185:18 211:21
**caucasian** 318:15
**caught** 339:6
**cause** 70:4 130:4
182:24 187:21
189:24 316:3
345:12
**caused** 149:16
257:1 341:14
**causes** 105:23
342:21
**centac** 5:22 50:17
50:20 51:13,19
52:7,12,12 53:16
54:3,11,18,23 56:4
56:10,13,23 57:4
57:23 59:17,21
60:15,21 61:4
63:23 64:11 67:5
67:9,10,21 68:18
69:1,15,22 70:17
70:21 74:5 77:4
77:16 78:10,15
84:1 254:8 298:23
**central** 175:2
**certain** 104:17
125:17 157:20
166:22 217:16
276:7 318:3
**certainly** 41:25
205:23
**certificate** 4:13
311:12,16,20
345:1 349:11
**certificates** 38:2,4
39:9,25 311:18

**certification** 38:23
348:1 349:1
**certifications** 39:4
**certified** 13:6
**certify** 345:8,19
346:1
**cetera** 287:12
**chain** 5:16 6:9
55:21 193:23
236:18 240:16
305:17
**chains** 327:22
**chance** 252:14
**change** 67:12
106:8 153:6 154:3
191:25 258:25
347:13,14 349:8
350:3
**changed** 45:12
50:8 70:2 86:2,14
142:14 154:1,7,20
154:21,22,22
**changes** 67:13,14
67:17 70:1 73:4
154:24 347:12
348:7 349:7,9
**charged** 185:22
186:5
**charges** 262:10,12
**chart** 320:17
324:11
**check** 235:6,15
**checked** 235:11
**chemicals** 208:17
208:19,23
**chicago** 3:18
160:18
**chief** 303:15
**children** 103:19
**choice** 62:19

**christmas** 289:12
**chronology** 67:3
**church** 20:7
202:13,15
**cited** 229:16
**citizen** 113:4
194:23
**city** 1:11 2:2 5:12
12:21 44:19 108:6
108:8 109:4
170:14 171:22
224:7 237:18
238:5
**citycenter** 2:12
**civil** 13:5 21:13
22:8 76:3 134:9
284:20 344:3,7
348:5 349:5
**claim** 21:15
**clarification** 22:12
**clarify** 293:14
**class** 20:17,19,22
114:9,9 121:14
**classes** 20:20
162:12
**clear** 153:8 156:12
236:8 320:12
327:24 328:3
**cleveland** 1:11 3:6
3:13 5:3 134:16
134:25 135:10,20
135:21 171:4
175:22 176:3,4
339:19 346:7
347:2
**client** 340:23
**climbed** 130:25
**clinic** 244:7
**clinics** 243:3,5
**clock** 123:7 240:5

**close** 35:23,25
149:3,14 152:3
173:3,7 280:6
**closely** 89:23
147:25 148:7
**closer** 202:22,25
**clue** 69:24 100:9
107:24 137:23
138:19 140:5
294:7 301:14
**cocaine** 126:4
137:10,13 154:21
170:14 217:9
220:12 232:21
244:23
**code** 309:24
**codeine** 125:8
127:14
**codes** 309:23
**cohesive** 210:11
210:23
**coke** 25:25 215:18
216:5,8
**coleman** 3:5 12:15
12:15
**colleagues** 27:13
**collected** 317:3,15
**collectively** 332:25
**college** 36:5,25
**color** 212:15
**combat** 211:5
**combatting**
239:19
**combi** 238:6
**combine** 174:8
**combined** 55:2
209:11 238:7
**come** 25:23 31:16
42:14,14 49:5
72:19 74:24 82:1
120:19 123:21

124:4 150:7,9
154:18 160:24
171:14 174:23
176:2,3 217:7
231:6 233:23
234:8 267:9
307:21 316:10,25
317:20 332:7
333:14 335:16,18
**comeback** 5:3
134:17
**comes** 160:19
175:1,2 232:9
**comfortable** 79:4
**coming** 42:20 54:8
74:2 107:25 119:6
119:13,19 137:10
209:5 234:22
293:2
**commander** 58:15
58:20 61:16 66:19
68:22 70:25 71:20
71:24 72:6 79:10
102:12 106:5
107:1,6 118:7,16
122:12,24 134:22
144:5,8 155:13
157:24 158:21
164:7 172:3
177:12 191:8
192:6,15 201:8
204:2 211:6 215:8
218:14 235:3
241:1,7 242:9
247:23 253:6,17
254:23 257:16
265:18 266:21
269:5 270:1
271:24 272:3,15
278:2 279:8
298:11 300:15

301:6 303:10
306:13,14
**commanders**
90:17 91:11 92:25
131:19 161:17
199:13 207:12
241:11 242:4
279:19 280:23
339:25
**commanding**
64:23
**comment** 225:22
**commentary**
75:10,25
**comments** 75:9
167:8,17 207:14
**commercial**
204:20
**commercials**
196:21 197:12,16
197:21
**commission**
346:17 348:19
349:25 350:25
**commissioned**
345:8
**commissioner's**
144:19
**commissioners**
43:23
**committee** 330:25
**committing**
219:23
**commonly** 182:25
**communicate**
338:14,18
**communication**
81:4,23 340:7
**communities**
210:14

**community** 20:5
132:10 294:9
303:25 304:1
317:18
**companies** 183:21
221:4 226:15
**company** 23:18
43:24 113:4
221:23
**compare** 107:20
108:5 280:2
**comparing** 117:11
**compile** 182:10
**complaint** 31:3
33:19,23 34:3,8
35:6 115:1 116:15
117:11 121:22
220:22 238:13,14
238:16 333:7,12
334:18 335:4,15
340:24 341:2,6,11
**complaints** 244:5
322:2 334:4,16
335:20
**complete** 27:5
75:22 165:3
246:20
**completed** 86:11
345:22 347:15
**completely** 73:20
76:25 124:22
125:18,24 230:1,9
**completing** 267:21
**completion** 38:2,4
**complex** 40:23
41:24
**component** 321:6
321:7
**computer** 97:17
97:20,20,22 98:18
98:20,23 99:3,21

99:22,23 295:3
**computers**   295:7
297:23 298:2,15
302:24
**concept**   135:17
243:11 257:6
**concern**   279:13
**concerns**   194:24
195:3
**concluded**   343:24
**condition**   198:3
**conditions**   128:13
**condolences**   195:4
**conduct**   75:7
292:19 341:13
**conducted**   37:12
270:3 317:5
**conference**   5:17
103:14,23 240:17
241:24 242:12,15
242:17
**confidential**   5:19
5:22 6:1 245:19
246:6,8 249:24
254:8 255:21
259:25 260:8
**confirm**   342:12
**confusing**   45:16
98:16
**congress**   279:15
279:16 282:13
**connect**   208:25
234:17
**connected**   208:21
242:5 275:9
**connection**   149:3
152:3 244:24
294:25 299:13,22
320:1 337:17
**connections**
149:14,19

**consider**   214:3
305:7
**considered**   155:21
230:5 283:24
**consistent**   180:9
180:18 183:4
304:8
**consistently**   87:20
**conspiracy**   229:5
**consult**   275:18
**consulting**   15:7
**contact**   147:20
221:18,23 222:2,9
233:8
**contacted**   34:14
147:17 222:16
223:9
**contacts**   15:1
304:8
**contain**   124:18
125:4 318:2
**contained**   96:17
115:9
**contents**   309:20
**context**   49:23
102:15
**continue**   39:3
75:20 89:9 92:8
156:14 169:12
192:20 193:2
196:2 304:24
**continued**   3:1
146:17
**continues**   157:1
179:3,5 257:11
**continuing**   310:20
**contractor**   15:4
**contrast**   69:15
**contribute**   54:17
**contributed**
285:18

**control**   128:9
**controlled**   121:14
130:2 229:5,6
248:4 249:24
315:23 327:1,4,7
327:11,13,17,25
328:7,10,24
**conversation**
254:19
**convicted**   218:16
219:18
**conviction**   258:2
**cooler**   65:9
**cooperation**
252:10
**cooperator**   232:11
**cope**   137:9
**copies**   99:12,14
309:17
**copley**   68:4 83:23
84:3 229:3
**copy**   39:18 167:13
295:8,20 298:6,16
**core**   84:23 85:1
**coroner's**   105:12
105:20
**corporation**   2:10
13:15
**correct**   14:3,4
22:10,16 35:7
37:7 51:18 52:21
58:18 60:4 78:7
78:13,17 85:15
98:21 102:2 104:2
106:7,17 116:17
117:15 131:13
139:17,20 141:6
144:7 167:2 171:8
171:16 173:2
184:18 194:21
211:21 212:20

213:25 214:5,8
219:3,14,23,24
222:10 250:4
252:21 256:7
260:18 265:19
267:8 274:13
277:21 284:21
288:8 292:2
293:24 295:4
297:7,22 302:22
304:10 306:24
313:13,16 314:4
316:7 320:9,14
321:2,8,16 323:2,3
323:6,7 324:11
326:15,21 329:2,2
333:2,5,8 341:19
342:16,17 345:17
**corrections**   59:7,8
61:12,17 62:5,7,13
62:23 72:3,3
292:4,6 347:12
349:17
**correctly**   49:8
132:21 216:5
267:5 281:11
322:4
**cost**   174:8
**costs**   287:20 288:6
288:13 290:16
**council**   144:20
**counsel**   12:7 28:10
28:11 29:14,15,24
30:14 33:6 34:15
34:17,18 39:9
75:2 76:2 344:1
344:10 346:2
**counties**   204:24
**country**   86:6
118:5,15 127:22
208:22

[counts - data]                                                                                              Page 12

**counts** 229:6
**county** 1:10,13 2:3
    5:6,12,19,22 6:1
    6:17,20 12:21,23
    24:6 26:9,9 32:21
    34:25 35:14 36:19
    37:22 43:22 53:24
    57:22 58:15,19
    60:14 66:19 67:4
    67:11 68:23 72:6
    79:11 80:5 95:11
    99:1 103:23 106:5
    106:20 107:1,3,7,9
    107:21,23 108:4,6
    108:17 109:2,5
    120:21 122:16
    130:13 131:1
    132:13,23 133:4
    135:23 141:17
    142:4 143:13,16
    143:19 144:6,9,20
    146:17 152:24
    156:23 159:21
    161:7 164:2
    167:20 168:13,22
    169:4 170:4,9,16
    170:21 171:3
    172:16 173:5
    174:9,15,16 175:9
    175:21 178:16
    179:3 181:3
    182:16 183:20
    184:12 185:21
    198:15,16 200:21
    201:7 204:23
    206:23 210:3,9
    214:19,25 221:19
    221:25 224:7
    226:6 229:15
    238:20 243:13,19
    245:19 254:8

259:25 267:11
268:12,17,19,22
268:22 269:6,17
269:22 277:1
278:23 280:10
288:4,17 292:16
297:20 303:16
304:9,21 306:15
316:16,17,20
317:4 325:22
329:19 336:23
337:1,6,17 338:2
338:22,25 339:5
339:20,21,24
340:22,25 341:4,9
341:15,21 345:4
348:10 349:15
**county's** 34:14,17
    34:18 160:2
**couple** 18:18
    19:25 20:2 24:18
    26:22 27:13 30:24
    31:25 34:12 38:17
    87:1,16,18 136:13
    154:20 164:23
    168:5 228:8 242:7
    257:5 284:1 335:9
    335:13 340:21
    342:14
**course** 41:23 44:6
    88:24 255:19
**courses** 36:25 37:1
    40:1 41:4 42:5,21
    43:7
**court** 1:1 4:16
    21:20 24:9,10
    27:2,22 28:7
    61:19 62:5,12
    72:1,2 76:18
    109:14 187:8
    258:11 285:2

304:22 305:2,8
348:7
**courts** 267:19
**cov.com** 2:14,18
**cover** 165:9
    343:10
**covered** 279:23
    281:16 288:12
**covington** 2:11,16
    12:10,12 13:14
**cpd** 316:19
**cpds** 315:24
    316:21 317:6
**crack** 137:7,8,25
    154:21
**craft** 171:6,6,14
**crashes** 316:4
**created** 124:21,23
    125:15,19,24,25
    255:19
**creating** 326:7
**credentials** 113:25
**crime** 219:23
    262:25 263:4
    282:18,25
**crimes** 46:12
    66:10 215:10
    218:16 222:7
    230:23 263:9
    282:22
**criminal** 6:7,13
    22:4 24:22 26:14
    40:25 161:16
    183:22 252:11
    278:24 284:20
    301:23 319:13
**criminals** 219:13
**crion** 2:8
**crisis** 130:12,16
    131:5 145:2,18
    275:9 292:17,21

338:21
**crossed** 238:22
**crude** 159:16
**crystal** 177:2,9,9
    193:24
**ct** 5:23 254:10
**culmination**
    195:14
**cultivated** 24:1
**current** 97:18
    177:11 288:21
**currently** 14:2
    204:25 282:3
**custody** 4:15
**customers** 243:6
**customs** 86:13,14
**cut** 75:11 156:24
    159:8
**cutting** 75:13
    140:10
**cuyahoga** 1:10,22
    12:5 82:20 83:20
    83:21 234:23
    339:5 345:4
**cv** 40:7
**cvs** 341:1,8,18
**cycles** 134:13

**d**

**d.c.** 2:13
**daily** 207:2 235:12
    312:15
**dam** 25:5
**damages** 341:20
    341:22
**dan** 1:7
**danger** 207:22
**dare** 293:9,12,15
    293:20
**data** 91:20 92:18
    108:11 117:17,20
    118:1,4,14 119:1

166:21 180:2
182:9 300:9,14
318:3
**database**  110:1
116:21 118:13
226:3
**date**  12:2 62:3
103:15 110:6
132:8 165:7,8
195:20,21 205:10
208:6 248:10
280:6 296:25
330:18 344:11
347:8 348:3,9,19
349:3,13,25
350:20,25
**dates**  55:8 93:23
**dawson**  260:10
261:7,9,15
**day**  3:11 12:18
23:20 29:21 89:12
89:24 90:5,11
103:7 120:3,3,3
144:17 146:14
160:19,20 180:6
194:4 196:15
235:6,13,17,23,24
235:24 249:7
312:20 317:11
322:12 338:19,19
343:20 346:7
348:16 349:22
350:22
**days**  103:6,8
347:18
**dea**  40:13 41:23
54:14 82:20 83:14
83:15 86:3,7
115:19 116:23
117:3,17,23 118:4
118:13,14 121:13

121:23 122:1,8,13
127:19,21 129:8
129:10 208:9,14
208:16 209:5
232:25 238:25
239:10 297:15
317:10 343:4,5
**deal**  18:10 40:22
70:5 136:21
206:25 207:1
**dealer**  5:3 134:16
134:25
**dealings**  339:4
**dear**  347:10
**death**  21:17
182:24 316:3
337:14
**deaths**  104:9
105:6 195:6
211:16,20
**debacco**  1:25
345:6 346:14
**decades**  134:2
141:8 190:8
**december**  1:18
12:2 229:3 240:25
346:8 347:4
**deception**  262:11
**decide**  233:20
237:4 327:10
333:19 334:4
**decided**  91:4
252:24 283:24
289:21 327:19
**decision**  35:2
64:17 236:9 290:6
327:16
**declaration**  23:7
**decrease**  155:22
**decreased**  275:15

**dedicated**  180:25
181:4 274:4
**deed**  348:14
349:20
**deemed**  347:19
**deems**  18:11
**defendant**  255:3
256:16
**defendants**  5:14
12:14,17 13:15
221:1,14,18,24
222:9 223:9,24
224:10 226:2
263:23 264:6
290:17 303:12
**definition**  130:15
212:2 213:8,9,11
**definitions**  214:21
**degree**  154:7
**delay**  24:25
**delete**  294:24
**deleted**  299:5
**delivered**  331:3,5
331:7
**delivery**  344:9,11
**denigrate**  77:1
**department**  14:6
15:15,16 45:20
49:11 83:22,23
84:11 88:6 105:13
234:18 303:17
304:9 308:13
312:3,4,19,22
313:2 316:11,12
328:25 347:22
**department's**  86:9
180:3 342:1
**departments**
79:19 86:25
166:22 191:19
273:6 311:24

312:6 316:24
336:9
**depend**  270:2,5
**depended**  235:17
327:8
**depending**  60:17
126:22 272:19
338:17
**depends**  18:3
122:20 284:25
**depict**  296:6
**deposed**  13:6
20:25 22:9 33:17
34:20
**deposition**  1:16
12:5 21:2 22:22
28:18 29:13 75:22
134:15 163:25
191:1 193:14
224:6 240:15
245:18 254:7
259:24 276:18
286:7 301:21
305:16 319:11
325:21 329:17
333:23 343:24
345:20 347:8,11
348:1,3 349:1,3
**depositions**  33:15
**deputies**  85:9
268:16,18 275:15
**derivative**  125:9
125:10,11
**derivatives**  125:5
125:14
**describe**  217:1
277:11 284:6
321:21 322:6
338:4
**described**  112:11

**describing** 280:16
282:7
**description** 5:2
**designated** 181:9
**designation**
173:20
**designations**
170:10
**designed** 66:4
181:19
**desk** 319:7
**despite** 63:6 226:1
**destroyed** 70:17
150:3 299:6
301:16 317:3
**detailed** 83:10
168:9
**detect** 262:19,25
**detecting** 263:9
**detective** 26:9
47:6,11,12,17
48:20 49:7 52:8
60:10 233:11,15
233:16,17 234:4,7
248:1 250:12
260:16 261:1
**detectives** 23:4
247:14 272:24
273:2 274:11,15
335:13 336:20
**deter** 155:12
**determination**
110:23 122:2
236:5,22
**determinations**
112:10
**determine** 110:19
**determined** 252:9
**deterred** 157:14
**detroit** 160:18
170:10,13

**develop** 239:6
**developed** 78:2
124:12 152:12
**devote** 321:12
**devoted** 215:10
220:5 274:11,16
323:1
**dialogue** 303:16
303:18,22 304:17
**difference** 53:9,18
155:18 277:11
324:17
**differences** 120:20
**different** 30:12
41:9 50:10 52:22
54:8,9,9 58:6 60:1
70:20 82:24 83:24
83:25 101:11
117:6 139:6
174:20 175:5
197:23 200:17,18
200:19 232:9
261:16 262:7
275:13 314:21
336:2
**differently** 282:21
**difficult** 130:20
153:1,10 262:25
**difficulty** 263:9
**dig** 187:7
**dilaudid** 125:15
**dilaudids** 142:16
142:21 143:2,2
**direct** 106:16
125:5,7,10 264:11
**directed** 273:18,25
**direction** 41:9
65:21 148:15
196:10,11 224:25
**directions** 272:12

**directly** 65:1
79:20 80:2 81:18
82:14 161:13
233:9 239:25
303:17
**director** 25:16
**directors** 191:14
191:16 290:6
**dirty** 187:12
**disagree** 16:15
138:2,9,18
**disappeared** 217:5
**disbanded** 51:1
64:14,16 65:5
67:6,10
**discuss** 198:8
206:12,23 207:4
209:16 210:2
221:19,24
**discussed** 57:4
97:5 199:25
258:13 299:10
307:20
**discussing** 167:22
298:5
**discussion** 15:24
117:8 265:8
**dismantle** 210:13
266:16
**disorder** 35:24
**dispense** 243:3
**dispensed** 122:15
128:17 227:25
**dispensing** 243:7
**disposal** 317:16
**dispose** 316:21
**disrupt** 210:12
266:17
**disseminate**
161:16

**disseminated**
161:19 162:6
176:4
**distinction** 133:9
320:7,12 324:13
**distribute** 128:24
210:13 229:5
**distributed** 108:15
128:17 189:13
227:25 289:15
**distributing** 190:4
**distribution** 128:9
129:3 160:4 169:6
170:14 171:21
184:8,11 229:6
264:23
**distributor** 5:14
224:10 264:22
**distributors**
111:22 115:6,18
115:21 116:22
119:4 128:18
204:14 208:25
212:21 214:23
238:23
**district** 1:1,2
24:11
**diversion** 6:10
42:18,20,25 43:7
143:6 179:1 180:4
180:6,15,24 181:3
181:4,8,15 184:13
186:24 217:18,24
229:15,20 239:20
274:9,12,16
305:18 306:23
310:4,16 321:1,6
321:13,22,24
322:7 323:2,9,21
326:20 327:3,6

**diversions** 322:16
323:5
**diverted** 126:24
183:22 184:11,16
324:15,24 325:1,4
325:9 332:23
**diverters** 263:16
**diverting** 185:22
**divide** 235:24
**division** 1:3 180:4
**divisions** 57:5
339:5
**dockets** 187:8
**doctor** 110:20,21
147:12,22 148:18
185:1 186:21,23
188:16,16 196:25
197:1 200:13,22
201:9,16 228:16
228:17 229:4
244:5 257:6,12,15
259:15 261:11,19
261:22 262:1,4
263:22 342:16
**doctor's** 244:1
**doctors** 121:5
128:12 146:16,19
148:23 187:12,21
188:9,10,11,12,24
189:25 199:7,11
199:17 200:7
204:7 217:17
218:23 227:11
257:10,11 263:16
**document** 1:9 5:5
5:8 6:4,6,12,19
38:18 161:24
164:1,7,11,25
165:4 166:6,7
191:2,10 224:17
224:20 237:11

246:3 286:8,15,22
301:22 302:5
318:22 319:12,21
326:5 329:18,24
330:13,18
**documentation**
328:9
**documents** 30:25
31:19 32:8,23
33:1 37:19,21,25
39:16 97:10
255:19 275:18
276:5 294:19,21
295:7
**dog** 86:16,20,22
**dogs** 88:4
**doing** 14:9 25:16
30:19 34:25 46:23
52:1 63:19,23
64:4,7,9 65:15,16
65:25 66:17 69:15
69:20 70:23,24
74:14,16 81:15
90:4 112:21 132:3
144:16,20 176:25
198:25 207:8
208:12 210:1
211:2 214:24
222:6 223:25
235:9 276:2
300:13 323:5
337:21 339:12
**doj** 297:15
**dollars** 287:5,7
342:1
**door** 335:14
**doorway** 89:2,11
**doubled** 272:15
**doubt** 122:4
**dozen** 102:9 103:9

**drafted** 35:6
326:18 330:18
**drawer** 301:8
319:7
**dropped** 143:3,4
**drug** 5:4,5,19 6:1
6:20 25:22 26:4
42:18 52:1 53:23
53:24 57:23 58:15
58:19,19 59:13,21
60:2 61:16 64:24
66:9,17,20 67:4,11
68:23 69:11,12,20
70:3,23 72:7,8
73:14 79:11,19
80:5 93:18 94:11
94:16 95:4 96:3,4
96:5 97:23 101:21
104:6 105:7,24
106:5,21 107:1,3,7
107:20 108:4
116:23 122:12
132:18,22,24
134:17 135:12
143:6 144:6,9
147:10 153:1,2
154:8,15 155:14
159:3,5,17 164:1
165:24 169:7
172:23 177:12
182:24,25 191:15
191:17 195:23,23
197:21 198:9,20
206:7 208:3 209:3
209:13 210:9
211:4 212:1,2,4
214:23 215:9
217:17,18 219:25
220:4 221:14
222:7 226:14
227:14 229:15,20

230:23,24 238:19
239:20 245:2,19
247:14,17,22
251:21 253:6
254:20,23 255:20
257:14 259:2,13
259:16,18,25
263:25 264:9
266:10,14,17,20
268:16,21 269:8
270:1,3,6 271:10
271:14,22 272:1
272:14 274:21
275:1,16,20
276:13,20 277:7
278:23 279:6,19
279:23 280:10,12
281:5,13,14,19,20
281:21,24 282:2
282:24,25 283:1,7
283:15,24 284:19
285:5,14,18,25
287:10 288:13
289:1,4,16 290:5
290:11,16 292:3,7
292:15 293:9,11
293:16,22,25
294:8,19 295:3,16
295:18 296:3,8
297:23 298:10,11
298:17,20,22
299:5 300:9,14
301:2 302:18,21
303:13,14 304:3,3
304:22,25 305:1,2
305:8 306:15,23
307:7,14,24
308:16 309:3,9,15
316:2,17 321:7
329:1,20 333:5,11
336:14 337:2,18

337:25 338:8,10
339:5,23 342:22
**drugs**  16:8 18:14
18:16 19:6,17
20:12 25:23 41:4
42:9,14 57:9
94:24 115:11
120:22 121:15
124:13,13,17
126:2 130:24
132:23 133:5
136:11 139:6,16
141:23 142:1
152:22 154:18
158:16,18,25
160:5,22 169:7
171:21 184:14
197:13,17 198:1
205:25 208:4
212:19,24 213:13
213:15,24 215:1
216:17,25 217:12
219:13 220:6,11
231:7 267:4,4
292:12 315:24
317:16 318:4
320:8,9,13 324:14
324:15,21,21
325:7 332:21
337:15
**du**  5:20 6:2 245:21
260:2
**due**  252:10 271:9
**duly**  13:6 345:7,10
**dunbar**  14:10
**duties**  143:8

**e**

**e**  1:17 2:16 3:4 4:7
5:10,16 6:9,22
13:3,8,20,21 32:6
81:4,25 192:14

193:15,22,23
194:2 240:16,25
242:10 244:3
265:11 294:23
296:14,21,23
297:7,9,10,12,15
297:17,19,21
303:8 305:17,24
305:25 306:3,7,17
308:11 329:5
333:24 340:17
345:9 347:8 348:4
348:9 349:4,13
350:20
**earlier**  136:20,25
139:21 141:22
145:1,18 179:6
208:7 218:6
220:21 228:18
260:17 274:10
276:19 295:23
298:5 333:4
340:20
**early**  50:25 52:6
90:23 94:2 131:25
134:11 135:19
138:23 141:21
142:16 182:11
217:3 247:21
**easier**  181:1
196:16
**easily**  151:4
**east**  175:3
**eastern**  1:3
**easy**  187:9
**ebb**  217:13
**ebbed**  217:16
**ebbs**  142:20
**educated**  342:15
**education**  94:23
145:10 307:15

310:20
**educational**
307:15 308:7
**effect**  27:1 279:13
279:24 281:25
**effects**  125:19
**effort**  210:11,23
210:23
**efforts**  215:9
273:19 317:20,24
332:13
**either**  15:18 72:2
93:16 103:19
201:4 218:5
223:20 226:17
258:20,24 346:2
**elaborate**  208:11
**electronic**  298:12
**elevate**  154:9,11
**else's**  306:20
**email**  347:17
**emergency**  17:6
17:14,23
**employee**  24:7
**employees**  228:11
**employment**  158:2
**enabled**  53:25
**enclosed**  347:11
**encountered**  32:18
**encourage**  310:19
**ended**  23:9 60:22
62:11 328:20
**endo**  3:2,3 12:14
12:16 303:11
**ends**  251:15
308:24 320:24
**enforce**  101:21
153:1
**enforcement**  6:14
36:11 57:7 93:14
94:16 96:3,4,5

99:2 111:6,7
113:1,11 114:3
133:4 134:7
141:17 142:4
143:8 148:9
150:16 156:22
280:12 281:14,19
281:22,25 283:2
283:15 309:5
310:4 319:15
339:5
**english**  31:14
**ensure**  121:15
**entail**  46:3
**entered**  349:9
**entering**  107:8,22
108:7
**entire**  217:19
348:5 349:5
**entirety**  266:21
**entities**  284:14
304:17 336:8
341:9
**entity**  60:12,16
92:19 214:1 307:1
307:5
**envelope**  270:20
270:22
**epic**  232:20
**epidemic**  5:4,10
130:12,16 131:5
131:15 133:9,10
134:19 145:2
193:16 207:18
211:5,13 338:21
**epidemiology**
342:25
**equal**  290:2
**equipment**  79:14
85:17,22,23 192:2
265:24 266:1,4,6

267:24 273:4,5,9
273:12 287:12,18
302:24
**era**  136:9
**errata**  347:13,18
349:7,10,18 350:1
**especially**  244:13
**esq**  2:4,5,11,16 3:4
3:5,11,17
**established**  149:15
149:16
**estimate**  41:3
323:20 325:3
**estimated**  122:2
**et**  1:10,12,13,13
287:12
**euphoric**  137:10
**event**  255:6 346:3
**events**  32:9 294:10
**eventually**  55:1
137:12 186:7,18
201:10
**everybody**  18:21
87:3 188:3 282:20
282:21 289:25
303:21 305:5
306:20 336:10
**everybody's**  335:1
**everyday**  120:3
267:25
**everything's**  117:2
**evidence**  149:24
150:1 189:14
190:1,3,9,14
208:13,18 213:6
223:23 224:3
249:4,14,17
317:15 323:16,18
**ex**  120:5
**exact**  55:5,8 93:23
110:6 131:17

205:10 296:25
322:23
**exactly**  24:3,19,20
50:15 52:25 62:2
63:18 65:12 140:2
141:10 143:25
151:8 183:10
192:12 274:18
275:19 293:3
325:13
**examination**  4:7
13:4,8 265:11
303:8 340:17
**examiner**  337:17
**examiner's**  182:16
336:23 337:1,7
**example**  32:13
153:18,19 234:4
249:3 254:2
261:19 267:1
269:1 277:4 283:9
283:12 287:15
292:7 298:8
300:25 301:11
318:14 325:5
337:11
**examples**  126:2
130:21 175:11
298:5
**excel**  318:17
**exchange**  212:4,9
**executed**  349:10
**execution**  267:17
348:14 349:19
**exhibit**  4:15 5:3,5
5:8,10,12,16,19,22
6:1,4,6,9,12,17,19
6:22 134:15,24
140:25 163:25
164:8 191:1,9
192:13 193:14,22

222:25 224:6,15
240:15,24 245:18
246:1 254:7,15
259:24 260:7
278:16 286:7
291:1 295:10
299:11 301:21
305:14,16 313:8
319:9,11 325:19
325:21 329:15,17
333:21,23
**exhibits**  4:5,16 5:1
296:18
**exist**  50:23
**existed**  51:11
53:16 58:25 59:21
60:15 117:18
239:17
**expand**  53:25
**expect**  35:8,15
249:20 252:22
253:21 276:4
**expected**  122:15
255:9,16
**expenditure**  302:7
**expenditures**
266:20 268:21
342:2,6
**expense**  266:25
274:3 328:22,24
**expenses**  267:25
287:11
**experience**  53:14
63:7 124:11
132:21,22 137:17
142:3 152:23
156:12,21,22,23
157:8,10 158:14
158:17,24 159:1,3
159:13 160:11
161:1 170:20

175:8
**experiencing**
204:25
**expert**  342:18,21
**expertise**  342:25
343:14
**expiration**  348:19
349:25 350:25
**expires**  346:17
**explain**  22:25
37:24 52:5 60:6
154:10 156:15
252:5 267:14
**explanation**
131:11
**exposed**  130:19
**express**  195:4
**extensively**  75:3
76:15
**extent**  97:5
**extra**  273:1,12,14
273:18 274:15
**extremely**  108:14

### f

**face**  73:12 81:8,8
**faces**  172:21
**facing**  180:20
221:20,25
**fact**  77:11 101:23
116:3 122:6
139:22 154:6
156:10 160:12
161:4 170:8 186:5
220:22 232:20
**fair**  27:20 28:3
36:15 55:19 64:2
82:25 87:19
122:14,22 127:1
129:12 139:14
164:24 179:13
194:25 213:12

220:4,7 237:9
250:2 255:6
266:19 271:8
275:8 293:4
**fairlawn** 202:3
**fairly** 232:19
**fall** 125:21 213:10
**falls** 1:22 12:5
82:20 83:20,21
234:23
**familiar** 33:20,22
41:1 90:16 106:19
194:16 200:11,12
228:24 238:8,11
238:19 243:11
307:1 336:22
341:20
**family** 229:3 261:3
**far** 60:24 86:25
87:5 91:21 148:2
217:12 237:12
268:13 270:19
275:6 282:24
294:6 295:7 298:6
298:7 299:2
300:10 334:7
**fashion** 130:24
**faster** 240:6,6
**fathom** 150:24
**fault** 23:23
**favor** 158:3,6
**fbi** 54:14 68:10
82:20 83:7,9,11
233:14
**fda** 127:18,22
128:2
**fear** 5:4 134:18
135:11
**federal** 13:4 21:20
24:9 28:21 54:10
60:14 76:3 162:7

165:23 208:13
236:20 285:21
288:11
**feel** 73:13 144:9
**fellow** 241:11
**felony** 154:7,13,13
154:15,16
**felt** 145:3 153:10
**fentanyl** 18:25
32:15,17 125:21
125:23 141:7
155:12,22,23
157:20 183:1
208:8 209:8,10
211:21 216:12
**fentanyls** 18:21
19:8,12
**fewer** 102:3
313:24
**field** 46:24 156:22
**fight** 330:3,5,9
**figure** 73:21
114:13 165:8
253:2 285:10
288:1
**file** 39:4 237:16
238:24 246:20,22
249:21 252:23
276:5 301:7 319:2
319:5 325:15
329:11
**filed** 31:8
**files** 46:22 70:14
100:2,5 151:25
187:8 200:3,8
230:4 249:11
253:19 295:18
298:1,1,3,4,12,18
298:23 299:3,6
325:16,17

**filing** 298:8
**fill** 300:17 312:19
**filled** 261:16 262:7
328:14
**filling** 264:5
**filtered** 233:12
**finally** 29:1 200:23
330:14
**finance** 275:22
276:11
**financial** 275:9
**find** 38:18 70:10
105:14 108:1
120:1 132:19
133:2 137:25
187:5 200:3
229:21 243:25
249:14 339:8
347:11
**finding** 337:15
**finds** 257:12
**fine** 57:14 123:25
**fingerprint** 47:3
208:24
**fingerprints** 46:22
**finish** 96:16
189:19 342:14
**firearms** 15:12
18:7,9 38:23
**firm** 13:2,13
**first** 5:13,14 6:19
13:5,19 24:15
30:8 32:14,17,18
34:10 43:14 45:8
45:11,23 57:13
58:20 62:4,5
82:16 110:4
114:25 132:9,12
137:7 168:16
171:25 179:22
180:4 182:6,7

192:14 195:3
224:8,10,16
225:18 228:7
248:9 303:13
308:24 321:20
329:18 332:17
345:10
**fit** 49:10,18
**five** 99:7 170:9
**fix** 130:21 162:15
**florida** 242:25,25
243:2,17,25 244:1
244:15,19,22,25
245:2,3,10
**flowed** 217:16
**flows** 142:20
**flyer** 308:11,25
**focus** 93:13,18
94:10,17 95:3
101:6,12,18
**focused** 65:23
92:10 100:19
133:18 136:14,18
**focusing** 66:3,9
**folks** 30:3 89:7
114:2 137:2
209:17 241:16
247:18
**follow** 150:15
156:5 240:2
**followed** 253:11
**following** 26:23
212:14
**follows** 13:7
241:22
**force** 54:4 90:17
91:10 92:25
161:17 189:2
242:4 279:19,23
280:23 287:1
289:11 306:15

321:21 332:14
**forces** 6:14 91:16
92:1,8,10,14,15,16
210:10 241:9
242:5 319:15
330:4,6,12
**foregoing** 345:16
345:21 348:13
349:18
**forfeiture** 69:23
268:5 277:8 285:5
286:1 289:1,14
291:3
**forfeitures** 267:23
277:14,20 284:21
284:24 288:21
289:8
**forgery** 258:18
259:6 261:20
262:8
**forges** 258:21,25
**forgive** 124:24
**form** 17:5 26:19
35:16 42:6,22
45:14 52:14 54:24
56:5 58:2,7 63:8
64:5 66:11 69:16
70:6,22 72:12,16
72:21 73:6,15
74:6,19 75:3 78:6
78:20 79:7 85:19
87:23 90:22 91:6
92:11 94:13,19
98:2 101:19
102:25 103:3,10
106:22 107:10
108:9,20 109:17
111:14,19,25
112:12 113:13
114:17 115:23
116:18 118:8,18

118:23 119:21
120:14,23 121:18
122:5,18,25 127:4
127:5,6,20 128:1
128:20 129:4,15
129:22 131:16
132:5,15 133:20
136:16,22 137:4
137:20 138:4,11
138:24 139:4,10
139:24 140:20
141:3 143:22
144:13,23 145:5
145:20 146:3,11
146:20 147:23
148:10 149:10
151:6 152:17
153:3,11 154:25
155:5,15,25 156:9
157:12,25 158:8
159:6,14,22 160:6
174:25 175:5
176:22 178:17
179:7,18 180:21
182:1 184:1
186:13 187:23
188:20 190:5,11
193:6 197:5,18
199:2 203:19
207:5,19 209:19
211:7 212:6,25
215:4 216:2
218:18 219:8,15
219:19 222:19,21
223:12,17 224:1
227:19 229:23
231:20 235:4
237:6 238:7 239:8
239:21 242:18
247:5 255:13
262:20 264:16,25

268:7 269:9 270:8
271:17 273:21
274:24 275:10
276:6 277:22
281:7 282:4 283:4
284:15 285:20
288:14 290:18
294:3 298:19,25
300:11 301:17
302:23 313:4,17
321:15,17 322:19
323:10,22 324:2
328:12 337:19
**formal** 89:14
114:6,9 116:8
237:23 340:6,7
**formalized** 36:23
**format** 253:4,11
298:13
**formed** 60:21
66:21,24 67:4
72:6 90:23 298:20
**former** 229:3
**forms** 174:20,22
175:9 328:17,21
328:24 329:7,8,9
329:12
**formulate** 132:12
**forth** 59:10,16,18
95:6 237:20 340:1
**forward** 42:13
242:23 244:11
302:16 347:15
**forwarding**
242:10
**found** 168:21
182:25 222:8
228:20 254:16
332:22
**founding** 90:25

**four** 25:11 29:16
30:22 54:21 82:19
83:4 85:10,11
87:8 99:7 184:22
185:14
**fourth** 135:4
**frame** 142:19
225:13 228:2
**frames** 79:16
**framing** 42:11
**francisco** 2:17
**franklin** 339:20,21
339:22
**fraternity** 308:6
**fraud** 185:3
258:17 259:4
**free** 348:14 349:20
**freeze** 277:2
**frequently** 192:8
**friend** 240:6
**friendly** 243:7,12
**front** 1:21 2:17
145:8 244:12
255:25 294:16
330:22,24
**frustrations**
144:21
**full** 13:18 29:21
168:16,17 171:25
179:22 228:7
323:1
**fund** 280:13,15,18
280:21 281:14,19
281:22,25 283:2
283:15
**funded** 50:21
278:23 279:14
281:5 320:2
**funders** 321:16
**funding** 53:12
91:25 92:7 267:12

268:6,11 269:22
270:13 278:20
279:17,21 280:1,9
280:11 284:4
302:19,22 321:11
330:4,5,12
**fundings** 279:17
**funds** 267:3,7,18
271:9 277:3,17
281:10,12,13,19
281:21 282:1,3
283:7 284:13
288:12
**further** 23:1 47:14
184:6 216:20
227:4 229:2 251:3
252:22 261:13,14
266:7 289:9
327:14 345:19
346:1
**fused** 55:7

**g**

**g** 13:24 288:10
**gain** 244:4
**game** 157:16
**gangs** 171:23
172:8
**gates** 3:11 4:11
12:18,18 340:18
340:19 343:16
**gathering** 178:20
**general** 33:20 47:7
47:25 65:17,19
92:15,16 104:10
119:16 121:6
127:2 196:21
197:13 216:17
315:15 330:22
**general's** 37:13
**generally** 19:1
121:3 139:8,15

140:24 156:6
162:2 163:20
253:10 342:3
**gentleman** 29:25
**geographical**
225:11 228:1
234:21
**geography** 168:3,9
168:12
**getting** 16:14
17:11 130:20
148:2 175:9 243:5
248:9 306:8
335:23
**gift** 212:4
**gig** 20:15 43:23
**gimme** 151:18
**give** 22:19 27:5
41:3 55:5 91:22
92:18 102:9
115:10,14 131:17
132:7 142:18
148:20 150:12
153:18 166:8
175:11 195:21
201:11 203:8,11
205:10 218:20
219:11 234:1
235:25 289:24
315:12 340:8
344:1,10
**given** 21:21 68:19
99:14 100:11
114:19 122:10
162:13 167:12
224:20 286:1,4
289:21 291:7
335:7 345:13,18
**giving** 252:14
**glean** 252:4

**gleaned** 245:4
**go** 15:21 26:22
36:3,5,7 37:3
38:21 41:8 48:5
59:8 60:24 62:4
71:5 73:18,18
76:16 82:22 84:6
87:7 109:13
117:24 120:7
123:11 125:1
128:3 129:11
134:13 146:6
147:1 150:9
153:15,21,23
155:19 166:5
168:15 169:22
170:3 181:19
187:5 194:4
196:10 203:22
206:18 210:7
215:15 217:12
222:20 232:1
234:11,13 235:7
236:19 238:4
252:16 257:4
273:16 275:21
289:12 290:21
294:9 299:3 303:1
310:24 313:8
332:6 334:24,24
335:8,12,18
337:12
**goal** 55:16,20
**god** 289:6
**goes** 160:20 168:5
175:20 225:16
226:25 248:24,25
249:7
**going** 26:22 34:19
43:20 49:13 53:5
58:12 65:1,24

66:2 69:5,10,11,12
69:19 70:24 76:20
77:22 79:17 80:7
80:8,14,15 81:9,10
91:23 116:5,25
117:2 123:3,21
124:3 130:23
132:4 135:21
145:9,11 153:16
155:18 156:14
159:17 202:2
207:13 208:13
225:1,3 235:7,18
235:22,25 236:11
240:4 246:19
256:11 262:6
265:3 268:1
271:20 272:20
303:21 310:15,15
310:22 335:15,23
335:23 337:12
338:18
**good** 13:10,11
23:5,6,10 36:21
57:12 115:2
118:25 123:4
154:23 221:5
232:21 234:5
258:3,6 272:6,22
291:8,9 326:16
**google** 332:7
**gotten** 87:14
112:19 150:5
166:21 211:13,17
211:18
**governing** 230:25
**government** 60:14
129:9,10 143:18
144:10,16 145:3,9
162:8 198:15,16
206:23 207:4

210:3,5 232:8,16
283:9 302:16
336:8
**governor's** 40:25
92:21 161:15
278:24
**graduate** 36:16
**graduated** 37:5
40:11 45:4,12
**grant** 6:13 31:23
50:21 79:21
161:23 164:14
165:19,21,22,23
165:25 166:10
265:20 267:6
268:4 270:13
271:9 277:3,14
278:20,25 279:1,7
279:11 280:9
281:6,13,14,16,21
281:23 282:8,9
283:7,12,18 288:3
288:8,9,10,12
299:15,17,22
319:14 321:4,12
321:16
**grant's** 288:16
**grants** 85:21
265:22 269:16,16
270:6 277:19
283:9,23 284:2,6
299:13
**great** 171:7,9
**greater** 135:9
169:4 204:24
220:5
**grew** 36:2 52:10
**grid** 65:25 66:2
**ground** 26:22
**groundwork**
88:10

**group** 84:23 85:1
86:2 87:4,13 91:5
111:4 136:6 150:2
238:7 241:1,18,25
284:10 304:15
308:1
**groups** 20:5,6,7
57:5 172:10 242:7
**grow** 36:1 153:19
**growing** 135:8
**guard** 43:22
**guess** 16:14 40:16
41:6 49:25 65:17
91:3 120:10 132:2
141:24 142:15
150:24 187:19
218:10,20 241:22
243:12 275:5
300:7 308:6
**guessing** 28:19
181:13
**guilty** 186:11
229:4
**guise** 55:24
**guy** 23:16 26:2
67:19,21 68:4
83:24 86:13 201:3
234:23 252:16
258:7,8,10 259:14
271:6
**guys** 55:22 87:1
155:7 156:17
188:15 196:12
203:14 215:15
232:23 242:21
298:14 311:23
335:22

**h**

**h** 13:20,24
**habit** 137:13,13

**half** 46:17 48:10
180:7 250:22
**hand** 133:16,16
199:7 324:22
325:9 326:19
334:14 336:19
346:6
**handed** 48:4 98:11
134:23 191:9
193:22 224:15
240:24 246:1
254:14 260:6
286:13 302:3
**handle** 233:25
**handled** 23:4
150:2 181:8
321:24
**handler** 86:16,20
**handles** 322:2
**hands** 172:14
**handwritten**
99:13 301:15
**happen** 47:15 55:3
88:20 149:18
159:19 161:2
232:18 256:15
289:18 310:23
**happened** 32:10
34:1,7 157:23
186:16 203:6
222:22 246:12
248:14,17 249:6
**happening** 88:9
135:23
**happens** 186:15
**happy** 29:4 123:5
158:4
**hard** 112:14
262:18 272:13,18
274:6 289:13
298:3,6,16

**harder** 155:9,10
**harper** 228:10,11
228:15
**harsher** 156:7,24
157:10
**hartman** 3:4 4:10
12:13,13 303:9,11
319:8 325:18
329:14 333:20
334:14 340:9
**hartville** 261:3
**hat** 74:3
**hazards** 18:22
**head** 23:22 28:7
164:20 171:1
227:12 241:8
259:22 312:3
335:1 338:10
**heading** 6:19
329:18
**heads** 79:18
191:18
**health** 3:2 105:13
218:11 303:17
304:9 316:11,12
**hear** 82:21 110:4
**heard** 13:12 34:22
83:6 109:22
114:20,25 186:2
238:15 245:11
307:2
**hearing** 245:13
**hearings** 25:18
**heim** 229:4
**held** 92:24
**hello** 265:13
**help** 137:9 165:12
166:14 196:9
252:1,15 265:24
302:8

**helped** 53:6
157:11 158:10
222:15 223:10
**helpful** 95:1
239:19
**helping** 231:8,11
231:14
**henschel** 3:22
**hereinafter** 13:6
**hereunto** 346:5
**heroin** 5:4,10 96:7
125:10 127:9
130:24 132:11
133:11,15,17
134:10,18 135:9
135:18 136:1,3,5
136:12 137:9,12
137:13,18,22,25
138:22 139:18
140:19 158:15
173:14 174:1,14
174:15,21 175:2,9
175:21 176:2,15
178:12 193:16
205:1,11,17,19,19
205:22 206:2,6,20
206:21 207:9,15
207:18 208:4,7
209:6,10 210:12
210:24 211:21
217:6 223:21
**heroin's** 137:1
174:6
**hesitate** 257:2
**hey** 65:1,15 81:9
82:2 150:9 180:13
207:12 209:22
252:15 308:21
322:13 340:3
**hi** 303:10 335:14
340:19

**hidta** 5:16 89:17
89:19 162:7
169:20 192:11,11
238:1,2,7 240:16
241:20,21,23
242:3,11,16 244:1
244:14 245:2,6
266:3 269:17
270:15 271:2
281:9,12,19,22
284:2,9 297:12
299:25 300:7
302:19,22
**high** 36:3,4 108:14
129:20 130:5,6
137:11 173:17
174:1,8 176:12,19
177:22 178:1,9,12
179:17 195:7
216:4 323:24
324:6,7
**higher** 154:16
176:15
**highly** 174:7
**highway** 284:8,10
**highways** 160:16
168:20,24,25
**hilary's** 202:12,15
**hill** 331:12,24
332:2
**hindsight** 273:24
**hired** 44:24 97:1
136:7
**hiring** 277:1
**history** 252:11
**hit** 131:21 142:24
**hmm** 162:25
**hodgkiss** 261:2,6
**hold** 308:4
**home** 23:17 99:20
99:25 100:1

146:15 332:6
**homes** 218:9
**homicide** 48:7
**hope** 231:21
255:14
**hopefully** 146:15
210:20 236:11
**hoping** 231:18
**hopping** 110:21
188:16 261:22
262:4
**hospitals** 218:9
**hostetler** 3:4 12:14
**hour** 29:3,19,20
57:13 123:4,14
240:3,4 243:4
**hours** 44:4
**housed** 48:21 52:3
67:8 89:1,10,22
312:2
**hubbard** 3:18
**huge** 217:10
**huh** 20:10 25:13
38:14 46:2 51:12
71:17 78:11 86:19
90:15 98:6 143:17
153:20 168:4,18
175:18 176:8
177:20 178:7
179:23 202:10
203:4 210:15
218:24 238:3
241:4 246:2 252:8
256:2 260:11
287:2,4 288:22
291:5,25 295:11
301:1 313:14
315:25 316:14
318:5,18 319:4
321:3,18 324:10
324:16 327:2

332:15,19
**hundreds** 102:19
219:7
**hurdles** 153:13,17
**hurts** 196:24,24
**hydrocodone**
183:2
**hylton** 1:17 4:7
5:10 6:20,22 13:3
13:8,19 192:14
193:15 265:11
303:8 329:19
333:24 340:17
345:9 347:8 348:4
348:9 349:4,13
350:20

**i**

**idea** 33:4 35:10,18
39:14 41:14 63:21
73:8,17 80:6
88:15,16 102:17
102:23 111:16
112:1 121:24
146:7 152:19
215:15 222:23
223:14 235:25
257:22 264:2
282:5,15 284:16
301:4,13 313:6,7
315:21 317:19
322:10,14 323:25
327:8
**identification**
134:20 164:5
191:5 193:19
224:12 240:20
245:23 254:12
260:4 286:11
302:1 305:21
319:19 325:25
329:22 334:2

**identified** 143:20
161:7 170:13
178:9 185:15
217:1 218:12
**identifies** 226:4
227:4 228:8
**identify** 12:7
189:4 195:15
200:6 203:17
204:6 210:12,23
225:10 227:23
309:22 319:23
326:5
**identifying** 223:11
**ii** 259:17
**iii** 266:6
**iis** 129:17 130:2
**illegal** 26:15
126:22 128:23
129:6,7 130:23
131:9 158:16
171:15 185:15
199:1 212:10
213:18 214:7,10
214:13,17 223:25
251:1,2,14,15
**illegally** 185:11
188:7 212:5,8
213:15
**illegitimate** 264:5
**illicit** 133:4 160:4
169:7 220:6 342:5
**illinois** 3:18
**illness** 18:10 27:8
**imagine** 97:13
118:10 175:10
292:14 306:12
336:10
**impact** 217:10
**impetus** 88:12

**important** 101:15
101:17 283:20
**impossible** 285:10
**incident** 246:4,5
246:13
**include** 291:17,20
**included** 321:5
347:13
**includes** 287:14
**including** 56:9,12
94:9 131:8 168:20
168:25 170:10,16
174:16 211:20
212:11 213:14
241:2 287:10
**income** 6:4 268:10
277:9,13 286:8,18
**incorporated**
349:12
**increase** 179:3,6
179:12 270:12
271:9,14 282:12
293:5
**increased** 122:1
122:16 157:19
158:5 290:15
292:16
**increases** 290:21
**increasing** 122:3
**incurred** 290:16
**independent**
197:14
**index** 4:1,5 5:1 7:1
**indicate** 176:14
182:23 207:14
**indicated** 108:14
**indicates** 182:22
306:25 322:25
**indicating** 347:13
**indirectly** 65:3

**individual** 23:7
106:12 156:25
157:3,4 312:5
334:22
**individual's** 21:17
112:23
**individuals** 25:16
112:19 138:6
184:13 186:10
219:21 228:9,21
230:5
**induced** 182:24
**industrial** 121:17
**inform** 101:22
**informant** 22:23
23:5,10,11,25 53:4
**informants** 335:23
**information** 5:16
19:12 35:5 92:4
95:6,19 100:22
105:18 107:13,14
112:7 113:5,12,19
114:1,4,18 115:9
115:11,14 119:5
119:12,18 120:12
138:7,20 140:7
147:4,8 148:3,3,8
148:12,15,19
150:4 151:23
152:6,8,13,14
161:14,17,20
162:6 166:19
169:21,22 171:18
173:23 178:19
180:12,25 182:15
183:6,13 195:14
196:8 199:12
210:1 230:3 231:6
231:15 234:21
237:17 240:17
241:23 242:11,16

242:24 244:2
253:13,21 255:4,9
256:25 300:17,19
300:24 311:25
316:9,10 318:8
323:13 332:9
**infrared** 153:22
**infrastructure**
160:2 161:8,12
162:16
**infused** 59:15
**ingram** 149:22
260:17 261:1
**initial** 13:20 44:2
**injury** 316:3
**inner** 171:22
**inquire** 112:22
**inquired** 72:25
**inside** 198:9
**inspector** 68:15
71:13,15 79:20,23
81:13,17 82:3
106:12 167:6
**inspectors** 233:3,4
**instance** 133:25
337:9
**instances** 257:15
**instigation** 94:18
**instituted** 317:10
**institutional** 70:11
**instructed** 28:22
**instructing** 294:24
**instruction** 28:21
**instructions** 344:2
344:10
**instructor** 15:12
38:23
**instructs** 28:11
**insurance** 23:18
**intake** 46:9,14

**intel** 263:7
**intelligence** 40:24
  176:1 196:9
  200:24 203:21
  231:5 232:1,4,5,9
  232:10,14,20,23
  232:24 237:19
  244:18 245:5
  263:7
**intensively** 143:21
  144:11 145:15
**intentionally**
  107:4
**interact** 52:2
  336:25
**interacted** 89:11
**interacting** 30:20
**interaction** 303:14
**intercept** 266:6
**interdiction** 284:8
  284:10
**interested** 19:8,11
  71:11 231:8,10,14
  310:21 346:3
**interim** 88:24
**international**
  170:10
**interrogatories**
  5:15 224:11
**interrogatory**
  31:11 225:8
  227:22
**interrupt** 89:4
**interrupted** 193:9
  273:11
**interrupting** 75:23
**interstate** 168:20
**interview** 166:8
  250:13,16
**interviews** 71:8

**introduce** 305:13
  319:8 325:18
  329:15 333:20
**introduced** 133:13
**inundated** 101:14
**inventory** 328:21
**investigate** 146:1
  186:10 198:21
  199:5 217:18
  230:10 257:14
  259:2 271:16
  292:8
**investigated** 180:5
  185:21 186:5
  189:25 200:14
  217:24 220:9
  229:18 230:20
  248:11 251:22
  335:4
**investigating**
  218:1 222:7
  230:23 233:21
**investigation** 5:22
  40:12 41:5 46:19
  80:15 112:25
  150:10,16 229:12
  230:6 231:1 235:1
  236:1 239:25
  246:9 254:9
  255:22 256:11
  266:10 325:11
  337:18 339:13
**investigations**
  50:22 53:12 54:1
  55:18 69:13 79:17
  91:21 94:22
  113:15 146:22
  147:6,9 150:8,13
  206:9 207:9
  215:10 220:14
  221:13 226:14

227:13,17 228:22
  231:4,24 239:6
  266:15 270:3
  271:11 272:12,19
  289:7,9 292:20,25
  293:1,6 296:8,12
  312:24 313:3
  322:16 324:25
  335:20
**investigative** 5:19
  6:1 49:20,24
  52:18 60:10 222:4
  222:5 245:20
  246:6,9 253:5
  260:1,8 309:23
**investigator** 48:18
  74:9,11,12 155:2,4
  234:5 246:11
**investigator's**
  37:12
**investigators**
  117:24 278:12
  306:24 307:25
  308:3 310:19
  337:23
**involve** 96:2 327:3
  335:22
**involved** 18:13,22
  26:18 33:14 35:1
  41:24 43:1 172:12
  184:13 188:4
  190:13 215:25
  232:21 234:23
  241:25 242:22
  274:1,9 289:10
  290:6 292:13
  293:15 294:5
  304:4 318:16
  327:7 337:23
**involvement** 292:4
  292:16 317:14

**involving** 26:2
  215:10 220:1
**irs** 54:15
**ish** 100:25 132:6
**issue** 161:12
**issues** 132:10
  163:15,21 178:16
  194:24 323:9
  342:2
**item** 286:25
  288:20 315:23
**items** 342:14

**j**

**j** 1:25 288:10
  345:6 346:14
**jag** 278:25 279:7
  281:5,13,22 282:7
  288:9,10
**jail** 292:8,16,20,25
  293:6 305:11
**jailer** 45:25 46:1
**james** 2:4 12:20
**jeanne** 248:12
  250:13,16,20
  251:5,16 253:3
**jeanne's** 252:10
**jennifer** 2:11 12:9
  13:13 265:14
**jledlie** 2:7
**job** 23:18 36:19
  44:11 68:18 69:4
  74:8 77:10 79:13
  101:21 120:13
  121:9 144:25
  146:14 153:7,9
  181:12 222:3,3
  272:7 305:11
  312:16
**jobs** 44:24
**john** 135:5,7
  200:10 241:1,7

[john - know]

244:11 306:13
**johns** 247:16
**johnson** 247:11
**johnston** 247:16
**join** 43:14
**joining** 43:18
**joint** 91:7
**jones** 3:11 12:18
**jonesday.com**
3:14
**jr** 228:10
**jsaulino** 2:14
**judge** 1:7
**judge's** 24:14 75:9
75:25
**judges** 309:6
**judgment** 173:22
**july** 6:9 305:17
306:1,4
**jurisdiction** 54:8
119:7,13,20
150:10 244:25
339:13
**jurisdictions** 54:9
56:20 68:2 85:14
**justice** 6:7,13
40:25 92:22
161:16 278:24
301:23 319:13

**k**

**k** 13:21
**karen** 260:10
261:7,9,14
**keep** 39:3 63:14
92:8,13 101:22
153:15 158:12
187:11 295:6
298:1,10,12,22
300:18 311:4,7
312:15 318:11,19
319:1 328:17

336:12,16
**keeping** 46:4
**keith** 68:11,14
69:7
**kennedy** 248:12
250:7,13,17
**kent** 36:8,16 44:10
44:18,19 173:3
259:14
**kept** 38:3 39:19
46:22 100:3
187:16 196:12
295:15 300:16
301:5 312:22
314:2 318:8,12,21
319:2
**key** 3:5
**kicked** 23:16
**kill** 207:25
**kimberly** 261:2,5
**kind** 15:7 16:14,18
17:6,21 18:6,14,19
18:20 19:1,8,15
20:6 21:7 23:18
26:14,16 27:7
35:24 36:12 39:6
39:20 40:18 49:4
55:2,7 59:10,14,18
60:16 65:16,20,24
66:15 67:19 71:5
80:22 81:22 84:24
91:7,21,22 112:17
113:19 116:8
130:12 133:16
134:12 142:16,18
143:2,4 152:22
153:17 160:21
165:21 166:7
187:11 208:24
209:25 215:19
217:5 218:4

221:11 230:20
234:2,20 235:20
235:25 236:17
246:3 252:15
258:9,9 259:16
263:4,6 267:12
272:18 279:15
289:12 292:12
317:12 318:10
333:10 334:10
335:11 337:14
**kinds** 16:19 39:16
42:5 46:11 100:5
150:4 180:19
230:19 237:14
334:8
**knew** 32:21 34:24
64:20 146:18
147:7 201:9
209:23,25 251:7
251:11 271:20
324:25
**knock** 335:12
**knocked** 335:14
**know** 19:7 21:9,15
21:18,21 23:19
24:19 25:5,7,25
27:12,15 29:2,4
31:11,15 33:16,18
33:24 34:25 35:20
35:25 37:17 38:11
39:12 41:17,17
43:2 44:16 46:16
50:16 53:12 54:10
54:16 55:4,6,8
63:20 64:19,22
65:6,8,10,15,17
69:2 71:4 74:8,15
74:15 77:9 78:22
78:23,24 80:14
97:25 98:5,7 99:4

99:7,15,17 100:7
100:10 101:13
102:10,21,21
103:5,8,8,15
104:14,18,22
111:1,6,11,20
112:3,6 113:7
116:4 117:18
118:6 120:9
121:10 122:7,20
124:1 126:18
127:21 130:8
131:23 132:7
133:25 135:24
138:5,6,6,12,13,19
138:20 139:7,11
139:13,13 140:1,5
140:23 141:7
143:24 144:2,15
144:15 145:7,9
146:5 147:15,16
147:19 148:4,14
148:17 149:7
150:22,24 151:7
152:5,13 153:8,14
153:21 154:20
155:3 157:18
162:21 169:20
170:19 176:24,24
176:25 181:17
187:4,9,15 188:25
195:13,21 197:8
198:6 200:4
202:17 203:10,12
205:15 206:19
207:21 208:5
210:8 217:13
218:10,21 227:8
229:11 232:25
234:21 235:9
236:10 238:21

239:17,23 241:18
242:22 248:23
251:21 252:2,5,17
252:19 253:3
257:23 263:14,25
264:8,10,18,21
265:2 268:1
269:11,19 271:4
272:11,21 273:23
273:23,24 274:18
275:12,13,19
276:1,7 277:6,6
278:5 282:2,11,14
283:20 284:1,7,16
284:17 285:6,9,9
285:24 286:5
288:16 289:7
290:20 292:11,12
292:22 293:11
294:4 297:1 298:6
298:7 299:2 300:8
300:10,13 301:9
302:12 304:23
306:16 307:5
308:6,12 309:10
309:11,13,24
310:5 311:1
315:19 317:17,23
318:6 320:11
322:12,23,23
323:11 324:4,17
325:9 326:2 328:9
330:17 331:16
332:5 334:23
335:3,19 337:13
337:13,24 340:3
341:22,23
**knowl** 315:21
**knowledge** 33:3,4
65:17,19 70:11
128:21 138:21

147:10 149:5
177:8 228:22
239:14,15 253:23
307:8,12 341:3,8
**known** 32:25
92:22
**knows** 139:7
264:19 272:11
284:25 285:6
302:15
**kovach** 338:13
**kurt** 3:22

**l**

**l** 13:20 260:10
261:7,14
**l.p.** 1:11,13
**lab** 46:24 124:20
124:22 125:15,18
125:24,24 177:1,4
177:8 208:10
**laboratories**
208:14,16
**laboratory** 209:1
**labs** 6:23 101:2
177:5 209:5
333:25
**lack** 252:10
**ladders** 210:21
327:21
**lady** 30:2
**laid** 88:10
**lakes** 171:7,9
**lakeside** 3:12
**large** 38:9 118:24
136:6 173:8 216:6
289:24 291:11
335:21
**largely** 116:15
**larger** 220:13,15
220:18 271:2,7
292:19 299:19

**largest** 100:15
216:1,10 220:10
227:5 285:11
**larry** 67:24
**late** 14:24 50:25
57:23 59:11,19
61:24 62:1 94:2
142:23,23
**laughman** 228:11
**law** 6:14 13:13
36:11 111:5,7
113:1,11 114:2
133:3 134:7
141:17 142:3
143:7 148:8
150:16 155:3,11
157:18 158:3,6
212:15 215:7
242:25 280:12
281:14,19,21,24
283:2,15 309:5
310:4 319:14
**lawful** 13:3 212:16
213:2,4,10 215:2
219:21
**lawfully** 204:19
212:11,17 213:21
213:22 214:2,24
259:21
**lawmakers** 161:11
**lawrence** 171:10
**laws** 101:21
152:25 153:2
**lawsuit** 33:19,21
34:11,22
**lead** 94:21 150:19
251:22
**leadership** 92:24
**leading** 316:3
**leap** 181:24

**learn** 153:14
**learned** 261:9
**leave** 36:18 62:15
123:12,22
**led** 196:11
**ledlie** 2:4 12:20,20
17:5 28:14,17
35:16 42:6,22
45:14 52:14,17
54:24 56:5 57:12
57:25 58:2,7 63:8
64:5 66:11 69:16
70:6,22 72:12,16
72:21 73:6,15
74:6,19 75:2,6,11
75:15 76:2,7,10,14
76:18,22 78:6,20
79:7 85:19 87:23
91:6 92:11 94:13
94:19 98:2 101:19
102:25 103:3,10
106:22 107:10
108:9,20 109:3,17
111:14 112:12
113:13 114:17
115:23 116:18
118:8,18,23
119:21 120:14,23
121:18 122:5,18
122:25 123:3,8,13
123:24 127:6,20
128:1 129:4,15,22
131:16 132:4,15
133:20 136:16,22
137:4,20 138:4,11
138:24 139:4,10
139:24 140:9,20
141:3 143:22
144:13,23 145:5
145:16,20 146:3
146:11,20,25

147:23 148:10
149:10 151:6
152:17 153:3,11
154:25 155:5,15
155:25 156:9
157:12,25 158:8
159:6,14,22 160:6
168:11 174:25
176:22 178:17
179:7,18 180:21
182:1 184:1
186:13 187:23
188:20 189:16,19
190:5,11,18
192:23 193:6
197:5,18 199:2
203:19 207:5,19
209:19 211:7
212:6,25 215:4
216:2 218:18
219:8,15,19
222:11,19 223:2
223:12,17 224:1
227:19 229:23
231:20 235:2,4
237:6 239:8,21
240:2,8 242:18
254:3 255:13
262:20 263:11
264:16,25 265:5
268:7 269:7,9
270:8 271:17
273:21 274:24
275:10 276:6
277:22 281:7
282:4 283:4
284:15 285:20
288:14 290:18
295:9 300:11
301:17 313:4,17
322:19 323:22

324:2 337:19
343:18,21
**left** 24:19 44:10,18
44:19 61:8,14,23
62:10,10 82:6,6,7
82:8 86:1,12 87:1
87:7 100:4
**legal** 3:22 126:20
126:25 127:4,5,9
131:8 188:14
224:22 300:20
347:1 350:1
**legally** 107:9
**legis** 242:25
**legislation** 243:2,6
**legislative** 280:22
**legislature** 91:24
161:18 163:4
279:20 282:19
330:7,15 331:1,3
331:10
**legitimate** 28:23
110:20 188:8,10
188:11,12 213:18
**legitimately**
183:21
**legwork** 112:15,17
112:17
**letter** 294:23
347:19
**level** 108:14
173:16 174:8
176:11,15 177:21
177:25 178:9,13
207:22
**lgates** 3:14
**liaison** 79:18
**license** 214:2,7,19
215:3
**licensed** 128:17
212:12,16 213:21

214:23
**licenses** 146:2,9,24
152:16 212:22
**lieutenant** 50:2
276:25
**life** 196:16
**lighter** 231:19
**liked** 118:6 157:23
**limbert** 67:24
**limited** 140:13
**line** 48:4 53:3
106:16 136:19
140:17 144:17
145:8 241:2,16
288:2 347:13
349:7 350:3
**lines** 288:2
**linked** 148:1,7
**lisa** 3:11 12:18
340:19
**list** 40:6 135:8
184:25 187:11,17
213:14 216:5
220:25 221:4,5
225:16,24 226:1
226:10,15 227:15
309:20 313:15,20
336:12,16
**listed** 176:18
249:17 335:1
349:7,17
**listening** 76:21
131:18
**listing** 184:19
349:7
**lists** 333:11
**litigation** 1:5 12:4
33:14 98:24
224:21 315:20
347:6 348:3 349:3

**little** 22:25 44:23
46:25 123:6,11,17
153:24 155:8,10
164:24 181:1
202:25 206:5
211:24 229:1
253:9 333:3,15
334:9
**live** 155:3 331:20
**lived** 19:10
**living** 135:1
**llc** 2:4
**llp** 2:16 3:17
**lobbied** 91:24
279:16
**lobbies** 316:24
**lobbying** 92:6,9
**local** 174:6 233:15
236:24,25 244:24
288:3 316:18
**located** 268:24
311:9 319:6
**location** 169:3
214:18 243:8
301:6
**locations** 88:23
115:13
**locked** 46:4
**log** 318:12 328:22
328:25
**logical** 181:23
**long** 20:19 29:17
36:13 44:1,16
46:5,14 48:8 62:8
63:6 71:3 82:3
90:21 99:5 132:21
136:21 137:17
156:21 157:5
164:21 169:17
183:11 188:25
190:8 213:3 214:1

215:1,6 246:14,15
246:25 285:2
317:4 343:8
**longer** 43:24
158:12 168:8
279:24 299:19
**look** 33:8 110:18
123:2 137:6
182:13 184:6
194:16 200:2
203:9 220:25
225:4 226:23
250:11 251:3
252:7 254:24
255:7 280:2,8
282:6 286:25
288:20 291:1
308:23 309:20
313:10 316:15
324:8 329:25
332:9
**looked** 18:21
32:23 99:6 122:23
313:9 334:6
**looking** 32:5 38:17
144:18 171:24
188:22 222:14
225:24 230:14
237:13 256:5
326:22 337:4,10
**looks** 164:18
172:15 184:10,22
185:10 251:25
262:13
**losing** 275:17
**losses** 341:15
**lost** 64:21 65:20
70:11
**lot** 25:4 27:11
33:25 34:6 101:2
102:18,22 103:9

112:15,17 133:12
136:24 137:24
142:16 147:8
150:23 152:1
158:17,18 172:9
172:10,20,21,21
176:16,17,20
177:2,9 178:3
186:11 197:23
201:4 205:11
211:16,19 230:19
232:8,19 233:7
234:16 236:22
248:20 257:4
275:13 285:7,15
285:17 294:16
304:3,4 318:3
325:7 327:20
**loud** 82:21
**low** 174:8 277:3
**lpn** 260:10
**lsd** 217:4
**lunch** 123:11,17
123:20,24,25
124:2,3 190:17
251:12,24
**luncheon** 190:22

**m**

**m** 247:9 251:9
**m.d.** 261:6,14
**ma'am** 15:17
17:19 35:3 76:7
82:10 83:11 92:17
109:3 164:17
**madam** 347:10
**mail** 5:10,16 6:9
6:22 81:4,25
193:15,22,23
194:2 240:16,25
242:10 244:3
294:23 296:14,23

297:7,9,10,12,15
297:17,19,21
305:17,24,25
306:3,7,17 308:11
329:5 333:24
**mailbox** 316:24
**mails** 32:6 296:21
**main** 175:21 315:7
335:8
**maintain** 15:1
17:20
**maintains** 293:19
**major** 131:6
160:16 168:19,25
184:23 185:14
199:13,15,22
266:17
**majority** 242:3
322:15
**makeup** 86:1,24
126:12
**making** 73:4 75:24
88:20 152:20
206:20 209:18,22
209:23 210:20
235:8 236:19
249:24 255:2
268:1 309:12
327:25
**male** 251:10,23
**man** 53:25 95:18
95:21 97:2 191:19
**management**
342:19
**mandate** 189:1
**mandates** 18:3,5
**manner** 292:18
**manpower** 54:2
54:18 235:9
**manufactured**
189:11 227:24

**manufacturers**
111:12 115:6,18
115:21 116:22
119:10 128:18
204:10 212:21
214:23
**manufacturing**
190:1
**march** 43:16 44:7
250:3 251:9
252:12
**marijuana** 21:8,12
23:3 26:1 126:7,8
153:19 154:21
215:11,18 216:6,8
217:9 220:12
263:19
**mark** 318:13
**marked** 5:2
134:19,23 164:4,8
191:4,9 193:18
222:25 224:11,15
240:19,24 245:22
246:1 254:11
260:3,7 286:10,14
301:25 302:4
305:20 319:18
325:24 329:21
334:1
**marker** 248:1
**market** 201:22
202:1
**mary** 135:5,7
338:13
**massage** 26:3,13
26:16
**match** 288:3,4,18
**matching** 288:12
**matt** 13:1 276:16
**matter** 12:3 25:20
33:20 121:11

132:24
**matthew**  3:17
**mckesson**  2:10
  12:10,12 13:14
**md**  1:6
**mdl**  1:5
**mean**  15:8 17:1,9
  17:14 20:2,3 22:2
  32:16 37:24 41:12
  42:8,9,12,19 47:11
  48:2 50:16 57:8
  58:10 63:19 65:14
  82:9 89:10 95:5
  95:20 96:15 99:19
  103:6 122:7
  126:23 128:7
  129:5 135:24
  136:3 138:7
  139:11,14 147:1
  149:25 150:22
  154:10 156:15
  157:2 161:21
  163:9 165:14
  166:18 174:19
  177:5 179:14
  180:23 181:17
  191:17 206:17
  207:7,25 231:11
  233:3,13 246:7
  248:14,19 253:8
  256:3 266:14
  267:2,14 268:13
  268:22 269:1
  270:17,21,23
  271:5 273:25
  285:8 287:23
  288:11 290:21
  300:16,21 301:12
  303:23 309:12
  311:1 313:23
  314:16 315:2

322:14 336:10
337:22 339:25
343:3
**meaning**  128:6
  285:17
**means**  28:19 31:12
  31:15 48:3 129:17
  136:4 150:1
  156:17 281:4,17
  335:13 343:19
**meant**  98:17
  314:14
**mechanism**
  279:22 280:1
  333:11
**media**  95:10,19,22
  96:1,12
**medical**  121:16
  122:3,14 128:12
  182:16 183:21
  263:3 336:23
  337:1,6,17 342:15
**medication**  195:5
  195:18 196:1,22
  219:22
**medications**  27:7
  107:8,22 108:7
  110:3 127:22
  196:17 204:11,15
**medicine**  145:25
  147:5,11,20
  148:23 149:4,12
  229:4 263:22
**meet**  29:17 33:6
  248:3 266:12,13
**meeting**  32:14,17
  235:15 248:1
  294:1 308:20
**meetings**  80:9
  235:16 308:4
  338:16 340:2

**melinda**  261:6,13
**member**  17:8
  90:19,24 307:3,8
  307:13 338:7
**members**  51:19
  91:1 282:17
  293:25 308:16
**memo**  333:16
**memorial**  6:13
  278:25 279:7
  281:15 319:14
**memory**  27:9
**mental**  18:10
**mention**  71:12
  131:2 204:9,13,16
  204:18,21
**mentioned**  42:8
  45:2 88:5 117:19
  117:25 136:25
  153:25 198:18
  218:6 265:17
  272:23 284:19
  295:2,12 299:8
  312:4 323:4
**mentions**  326:20
**merge**  87:3
**merged**  60:16
**merger**  87:15 88:6
  89:14
**merging**  86:9
**merry**  289:12
**met**  29:14,23,24
  340:20
**meth**  6:23 100:12
  100:16 101:2,25
  126:5,6 136:14,21
  136:24 177:2,5,10
  215:22,25 216:4,8
  220:11 234:5,6
  315:9,10 333:25
  335:9,15

**methadone**  183:1
**methamphetamine**
  101:14,17 154:22
  176:6 217:11
  304:4 331:8,14
**methamphetami...**
  20:16
**method**  6:5 286:9
**mexican**  174:16
  175:1 205:1,16,17
**mexico**  223:20
**mid**  59:11,11
  61:24 62:1 94:2
  122:11 132:6
  142:23
**middle**  13:20
  170:5 175:3
  231:23
**midway**  280:9
**midwest**  347:17
  350:1
**miles**  170:8 171:3
  171:10
**mill**  201:1,18
  203:16,18,24,25
  228:18
**million**  285:13
  287:3 288:23
  291:4
**mills**  199:6,11
  200:20 201:6
  204:2,7
**mimic**  125:19
**mind**  25:24 133:8
  145:22 146:13
  154:18 179:9
  234:8 238:22
  282:18,25 335:16
**minds**  139:12,16
  139:23

mindset 73:9
minutes 123:4,14
   162:5
mischaracterizes
   77:19
mismanaged
   64:11
missed 94:6 202:7
missing 70:14
mission 52:22,24
   86:14 94:21 266:7
   266:12,14,16,22
   267:21
misstated 58:13
misstates 58:3
misstating 58:11
misuse 141:18
   142:9,12
misused 142:6
misusing 69:22
mix 187:25 188:2
mixed 205:24
   208:4,8
mogadore 194:23
moment 16:4
   36:24 75:1 157:6
   168:10 255:24
   305:23 329:25
moments 61:7
monetary 341:14
money 14:14
   47:23 156:14
   157:17 158:23
   159:2,2 160:23
   163:23 200:24
   265:23 266:1
   267:7,9,20,22
   268:5 269:6,17
   271:20 272:16,17
   273:11,14,19
   274:4,7,15,17

275:19 277:14,15
   277:19 279:7,25
   279:25 282:13,18
   285:7 287:14
   289:4 302:17
   329:6 330:15
monies 165:23
   266:5 290:8
monitor 107:2,5,8
   226:2 234:25
month 71:1 103:2
   250:23 276:19
   338:16
monthly 337:6
months 30:24
   34:12 38:17
   164:23
morning 13:10,11
   29:15 235:14,16
morphine 125:9
   125:11 127:14
   134:1 183:1
motley 2:4 12:20
   12:22
motleyrice.com
   2:7,8
motor 316:4
mouth 80:18
move 14:14 46:8
   78:24,25 159:5
   305:12
moved 46:9 48:12
   48:17 52:10 67:20
   77:9 90:9,14
moving 42:13
   64:24 90:1 235:18
mt 2:6
multijurisdictional
   54:4
multiple 156:11
   258:22

murray 276:3
   286:24 290:4
   302:11
mute 89:7

**n**

n 3:5 13:20
naloxone 290:12
name 13:12,18,19
   13:20 22:19 24:15
   67:12 68:5 70:3
   74:3 187:2 194:17
   199:20,23 200:3
   200:10,12,13
   201:4,12,15,17
   202:8 229:9 241:2
   241:11 244:3
   266:24 276:3
   303:10,19 333:16
   334:22,23 340:24
   347:6 348:3,4,15
   349:3,4,21
named 68:10 85:6
   127:14 229:4
   345:9
names 30:4 186:2
   186:21 187:5
   199:18 200:7
   201:5,5 221:7
   228:14,24 229:21
   230:3 257:18
naming 30:4
narcan 290:12
narcotic 37:11
   135:9 298:24
narcotics 40:12,24
   41:4 48:12,17,19
   48:22 49:15,15,18
   50:6,22 51:9,13,17
   52:20 53:15 54:17
   55:18 57:3,6
   59:17,24 60:1,11

60:25 61:8,15,23
   62:11,12,15 63:7
   63:15 65:24 66:7
   67:8 77:6 78:2,15
   79:5 86:10 88:7
   91:16 92:13,15,16
   94:22 96:24 97:7
   99:2 132:22
   137:17 143:16
   152:24 156:22
   159:20 170:20
   179:2 180:3
   185:12 190:9
   249:25 282:21
   293:16 307:24
   308:2 310:6
narrative 326:17
national 1:5 12:3
   306:23 307:14,16
   347:6 348:3 349:3
ndc 309:22,24
near 168:21
   202:18,20
necessarily 235:17
   252:25 275:1
necessary 120:1
   155:23 222:8
necessity 214:9
need 15:10 29:1,4
   75:12,15,21 109:9
   112:21 113:1,11
   122:3,14 137:18
   140:14 235:23
   268:2 273:2
   283:16
needed 53:6 79:14
   79:16 85:17 120:9
   149:9 153:23
   235:7,21 255:7
   267:25 271:15,23
   272:2

**needing** 247:4

**needs** 63:11
121:17 137:22

**neofill.com.**
193:24

**nestled** 172:11

**network** 168:19

**never** 21:24 23:8
29:22 117:16,19
117:25 127:4
145:19,22 149:11
159:24 220:5
222:8 270:16,25
271:8,14,19 281:1
285:9,9 325:1,2
339:18 342:9,11

**new** 19:12 67:1,4
68:6,23 73:2,3,10
73:12 74:2 79:3
160:18 172:21,21
176:2 180:5
221:11 243:2
289:13

**newly** 72:6

**nice** 50:4 208:20
211:24

**nicely** 160:17

**niche** 72:8,11,15
74:25 77:6,13,16
78:2 79:5

**nigeria** 259:15

**night** 146:15
196:23 197:16

**nodding** 164:20
171:1 227:12
259:22

**non** 128:16,23
129:21 320:8,13
321:7 323:17

**norm** 334:10

**normally** 150:8
175:1 183:20
322:2

**north** 3:12 243:25

**northeast** 134:11

**northeastern**
14:21 16:9 24:11
138:22

**northern** 1:2

**northwest** 2:12
13:25

**notable** 186:20

**notarized** 347:14

**notary** 345:6
346:14 347:25
348:10,18 349:15
349:23 350:23

**note** 244:12
333:16 347:12

**notepad** 320:21

**notes** 97:9 99:13
99:13 100:3

**notified** 264:14

**notify** 263:23
264:5

**november** 14:25
193:24 197:4

**number** 5:2
100:11 107:2,21
108:7 122:15
248:17 270:2
275:15 287:19
288:5 292:19
293:5 323:24
347:7,13

**numbers** 179:9
181:18,21 182:4
219:11 250:11
309:25 318:6
320:16,19 325:4
332:10 349:7

**numerous** 131:1

**nurse** 260:12

**nurses** 150:23
152:1,10,16 218:6
218:7 219:2

**nursing** 152:3,15
218:9

**o**

**o** 13:20

**oarrs** 109:22,25
110:1,5,10,22
111:2,7,18 112:9
112:11 114:7
115:5 116:4 117:1
117:12 188:22
325:6,10,14

**oath** 26:25 27:2

**object** 7:2,3,3,4,4
7:5,5,6,6,7,8,8,9,9
7:10,10,11,11,12
7:12,13,13,14,14
7:16,16,17,17,18
7:18,19,19,20,20
7:21,21,22,22,23
7:23,24,24,25 8:1
8:1,2,2,3,3,4,4,5,5
8:6,6,7,7,8,8,9,9
8:10,10,11,11,12
8:12,13,13,14,14
8:15,15,16,16,17
8:17,18,18,19,19
8:20,20,21,21,22
8:22,23,23,24,24
8:25 9:1,1,2,2,3,3
9:4,4,5,5,6,6,7,7,8
9:8,9,9,10,10,11
9:12,12,13,13,14
9:14,15,15,16,16
9:17,17,18,18,19
9:20,20,21,21,22
9:22,23,23,24,24

9:25 10:1,1,2,2,3,4
10:4,5,5,6,6,7,8,8
10:9,9,10,11,11,12
10:12,13,13,14,14
10:15,15,16,17,17
10:18,18,19,19,20
10:20,21,22,22,23
10:23,24,24,25
11:1,1 17:5 35:16
42:6,22 45:14
52:14 54:24 56:5
58:2,7 63:8 64:5
66:11 69:16 70:6
70:22 72:12,16,21
73:6,15 74:6,19
78:6,20 79:7
85:19 87:23 91:6
92:11 94:13,19
98:2 101:19
102:25 103:3,10
106:22 107:10
108:9,20 109:17
111:14,19,25
112:12 113:13
114:17 115:23
116:18 118:8,18
118:23 119:21
120:14,23 121:18
122:5,18,25 127:6
127:20 128:1,20
129:4,15,22
131:16 132:4,15
133:20 136:16,22
137:4,20 138:4,11
138:24 139:4,10
139:24 140:20
141:3 143:22
144:13,23 145:5
145:16,20 146:3
146:11,20,25
147:23 148:10

149:10 151:6
152:17 153:3,11
154:25 155:5,15
155:25 156:9
157:12,25 158:8
159:6,14,22 160:6
174:25 176:22
178:17 179:7,18
180:21 182:1
184:1 186:13
187:23 188:20
190:5,11 192:23
197:5,18 199:2
203:19 207:5,19
209:19 211:7
212:6,25 215:4
216:2 218:18
219:8,15,19
222:18,19,21
223:12,17 224:1
227:19 229:23
231:20 235:2,4
239:8,21 242:18
255:13 263:11
264:16,25 268:7
269:7,9 270:8
271:17 273:21
274:24 275:10
276:6 281:7 282:4
283:4 284:15
285:20 288:14
290:18 293:13
294:3 298:19
300:11 301:17
313:4,17 322:19
323:10,22 324:2
337:19
**objection**  7:1,7,15
7:15 9:11,19 10:3
10:7,10,16,21
57:25 75:4,6

77:18 78:21
168:11 193:6
222:11,12 223:18
237:6 262:20
277:22 298:25
**objections**  5:14
28:10 224:9
**objective**  52:23
**obligations**  226:2
**observed**  205:20
**obtain**  186:22
262:11 332:1
334:23
**obtained**  325:7
**obviously**  41:23
42:25 57:10 70:2
87:4 105:20 197:8
207:7 209:21
217:10 236:21
243:15 268:14
301:12 306:19
**occurred**  217:2
252:17
**occurs**  224:24
**ocjs**  92:22 165:22
192:10 210:7
269:16 288:2
302:7 319:25
**october**  243:1
254:17
**odds**  44:23
**offenders**  243:5
**offenses**  157:20
**offered**  252:1
306:22
**offhand**  95:25
186:3
**office**  6:6,12,17
14:18,24 15:4,9
16:5,17 17:8
19:21,21,24 20:9

30:9,12 36:20
37:13,22 40:25
43:15,19 44:8,11
44:25 45:3,7,21,24
55:25 56:1,2,7,14
57:1,6 65:11
80:18 82:1 83:3
85:7,8 87:6,11
90:2 92:21 95:18
97:1 99:16,20
100:4,20 105:12
105:20 107:20
108:4 109:8,11
119:3 136:7
144:19 149:2
161:15 182:16
191:20 198:11
206:14 209:17
221:13 232:24
233:2 236:18
275:2,3,15,22
278:24 293:8,12
293:17,19 296:15
296:21,24 297:6
297:11,21 298:23
301:22 311:10
312:9 316:18
317:5 319:12
325:22 328:18
336:23 337:1,7
338:2,25 346:6
**officer**  17:15,16
23:8 44:20 45:1
46:10,15 56:18,20
57:9 64:23 83:9
84:10,13 111:3
113:11 142:4
149:24 159:20
190:9 236:7
256:14 275:22
317:15 322:2

323:4 327:12,18
327:23 329:5
**officer's**  37:6 43:9
**officers**  19:5 45:6
49:24 56:3 68:1
82:17,24 87:8
147:25 148:6
150:15 219:25
239:13 250:3
255:16 256:19
260:20 285:18
287:11,15 290:11
294:9 311:5 312:2
323:1 328:11
339:9
**offices**  38:12 90:1
90:14 105:16
**official**  348:15
349:21
**officially**  60:24
**officials**  143:19
144:10 145:3
167:20
**offshoot**  317:12
**oh**  5:11 25:12
32:20 34:18 38:16
38:21 45:8 80:21
90:4 98:12 99:7
139:1 147:7 154:2
165:11 169:22
193:10,16 202:10
202:17 206:18
218:8 229:17
233:6,16 257:17
262:9 278:5 292:9
292:22 309:10
312:1 315:4
325:19 326:2
327:8 328:2,3
335:18 339:14

**ohio** 1:2,11,13,22
3:6,13 5:6,13 6:6
6:12 12:6 13:25
14:21 16:10 17:17
24:12 37:12 40:24
45:5 50:21 90:17
92:21,24 105:13
134:11 138:22
143:19 145:24
147:5 148:1,7
155:11,21 157:18
164:2 169:4 174:9
175:22 194:23
204:24 207:3
224:8 226:6 241:9
241:20,21 243:24
244:14 245:9
278:24 279:22
280:12 281:14,18
282:19 301:22
302:19 307:17,24
308:2 313:13
316:2,10,12
319:12 322:1,8,17
330:6,23 331:9
332:14 333:1
336:5 339:24
345:2,7 346:7,15
347:2
**okay** 14:16,20
16:3,13,16 17:3,18
19:15 21:25 22:11
22:17 23:24 24:5
24:13,25 25:3
26:6,17 28:8,20,24
29:10 30:1,22
31:6,17,18 34:18
37:3,17 39:21
41:2 42:10 44:14
45:22 48:11 49:12
49:22 51:5,22

52:11 54:6 55:3
56:22 57:21 58:24
59:12,19,23 60:6
61:6,11 62:4,8
73:22 76:16 77:22
78:8 81:20 83:2
83:14,16 84:5,22
87:10,18 88:4,5,11
90:13,16 93:5
94:5 95:1 96:5
97:4 98:15 99:12
99:22 100:1
102:14 103:13,25
105:2,5 116:14,24
117:10 122:22
123:16 124:24
126:1,18 127:1
129:7 130:11
135:6,13 138:2
144:3 145:1
148:21 149:2
162:4,9 165:11,18
168:1 169:22
170:2 172:2
173:10 176:5
177:13 179:20
180:8 181:14
182:5,9,13,17
183:8,12,18
187:20 190:16
191:21 192:4,20
193:12 194:3
195:2,18,22 199:9
200:19 202:22
203:5,12,23 204:9
208:15 211:23
212:16 213:12,19
214:1,6 216:20
220:10 223:4
224:19,25 225:6
225:14,21,24

226:23 228:3,20
229:1 230:12,18
231:22 232:10
233:20 238:4
241:10,15,18,21
242:9,23 246:18
247:3 248:6,8,16
249:6,9,20 250:14
250:19 253:1
255:5,23 256:8,10
256:18 258:16
260:24 262:6,13
265:5,16 268:4
269:25 277:25
278:21 280:14
281:15 288:1
291:13 293:14
294:18,22 304:5
304:12,16,21,25
305:13 306:9,22
307:3,17,19 308:1
308:7,10 309:1,17
310:2,13 311:14
311:19,22 312:7
312:13 313:23
314:6,15 315:7,12
316:13 317:9
318:10 319:1,5
320:15,23,25
321:10,20 322:6
323:19 324:6,8,23
326:13,14,24
328:6,17 329:4,11
329:14 333:3
334:17 336:4,18
338:12 339:14
342:12
**old** 16:14 97:16,17
97:19 99:20
126:13 295:3
298:17

**older** 298:22
**oldest** 298:17
**once** 21:6 45:12
78:4 79:10 278:6
281:24,24 289:19
301:13 304:20
310:25 338:16
**ones** 31:21 32:1
40:3 54:13 125:13
197:22,23 236:24
236:25 259:11
290:7 307:19
324:24,24
**ongoing** 256:9
304:19 317:7
337:18
**online** 105:19
**op** 1:10,12,13
**open** 74:2 244:6
**operating** 70:19
77:5,17 78:10
204:19 212:22
214:2,6 215:2,6
228:18
**operations** 108:12
**opiate** 1:5 12:4
118:4,14 347:6
348:3 349:3
**opiates** 124:20,21
124:22 125:3
127:3 132:10
**opinion** 34:4 137:1
156:11 160:8
189:22
**opioid** 35:20,24
93:13 96:12
103:14 105:24
121:4 122:1,13
129:23 130:12,16
131:5,14 133:9,10
141:18 142:9,12

145:2,17 178:16
187:22 207:18
211:5,13,19 250:4
260:21 271:16
292:17,21 293:5
296:12 312:23,24
313:2,3 338:21,21
339:1
**opioids** 26:18
41:16,22 42:4,20
43:1 92:3,10 96:6
102:4,8 104:8
108:15 122:3,10
122:15 124:13,17
124:18 126:3,19
127:18 128:5,16
128:23 129:14,21
130:1,19 132:14
133:19 137:2
141:25 142:5
143:20 147:13,21
188:19 194:25
211:17,20 214:14
214:18 216:13,21
220:2,6 221:20,25
225:12 226:5
227:5 228:1
266:25 273:20
274:5 290:24
292:25 294:2,10
315:13,16 341:14
342:2,5,9
**opium** 124:19
125:6,9,10,19
**opiums** 126:17
**opportunistic**
172:10
**opportunities**
172:22
**opportunity** 41:13
41:13 74:10

157:16 158:22
159:2 160:3 169:5
171:14
**opt** 137:11
**option** 274:19
**order** 17:21 47:15
75:16,21 182:25
238:9,24
**orders** 225:12
226:3,5 264:5
**organization**
79:25 91:19
279:19 303:20
**organizations** 86:6
160:5 169:8
210:13 245:3
266:18 307:14
**original** 22:1,2,4
22:14
**originated** 243:25
**osamn** 304:15,20
**otfca** 93:4,5,12,13
93:18 94:10,10
241:12,13,16
282:17 297:17
**otfca's** 94:17 95:4
**outer** 30:9
**outside** 16:10
104:1 111:5,7
158:1 160:7 213:9
214:6 334:10
**outweigh** 127:24
**overall** 49:11,19
**overdose** 35:21
104:9 105:6 195:6
211:16 337:23
**overdoses** 104:10
130:25
**overlooked** 309:4
309:9

**overprescribing**
147:12,21
**oversaw** 80:7
**overtime** 56:3
85:8 87:6 269:4
**overview** 315:15
**overwhelmed**
162:21
**oxy** 249:25 251:23
**oxycodone** 183:1
**oxycontin** 125:16
131:21 250:8,21
250:22 251:8,17
251:18
**oxycontins** 133:13
142:24
**oxys** 142:17,25

**p**

**p.m.** 343:24
**page** 7:2 137:7
165:9 168:1,3,17
170:2,5 171:20,25
173:13 175:16
176:5 177:13
179:21 183:15
184:20 185:18
192:14 225:2,2,17
225:25 226:10,11
226:23,24,25,25
227:21 228:7,8
230:14 243:21,22
243:23 244:12
248:9 249:18,19
250:10,11 256:1
278:18,19 308:23
308:24 313:10,11
315:22,23 316:16
318:1 320:6,11,23
326:12,22 332:9
332:10 347:13,15
349:7 350:3

**pages** 168:5
225:16 226:10
318:2
**paid** 15:18 56:7,14
56:17,19,21 57:1
85:7,8,13,18,22
87:10 145:22
268:13,17,18,22
269:6 287:14
317:23
**pain** 179:2 195:5
195:18 196:1
243:3,5 244:6
342:18
**painkillers** 243:4
**pam** 276:3 286:24
290:4 302:11
**pamphlets** 94:23
**panel** 103:14
105:15
**paolino** 276:16,25
**paper** 256:24
300:22,24 318:23
**paperwork** 153:24
**paragraph** 135:5
137:6 168:17
171:25 179:22
182:14,19 204:6
204:10,12,14,17
204:19,23 228:7
229:2,16 230:13
243:22 244:10,13
250:12 251:4
280:9 282:6 309:2
313:21 326:25
332:17
**parameters** 247:4
**parceled** 248:23
**pardon** 21:1 56:11
67:16 77:14 84:9
126:10 163:18

296:16 306:2
**parent** 221:23
**parlor** 26:3,14
**part** 15:4 30:11
  48:19 49:7,20
  51:3 52:8 54:11
  68:14 74:18,21,22
  85:6 88:11 89:17
  89:19 91:18 94:22
  108:13,18 110:10
  112:24 117:23
  121:9 125:8
  129:10 131:11
  135:8 142:1 143:7
  152:11 220:14
  224:22 226:25
  228:6 249:1
  254:20 263:3
  268:16 304:15
  321:11 324:5
  325:11 349:9
**partially** 124:20
  124:21 125:14,14
  278:23
**participants**
  289:15
**participate** 242:13
  293:9
**participated**
  280:24 312:2
  316:19
**particular** 25:23
  43:5 68:3 95:3
  108:5 109:2,4
  120:21 127:3
  139:19 142:8,11
  154:4,18 195:11
  196:20,22 198:2,5
  199:11 246:12,13
  246:16 250:5
  256:19 259:10

266:9,10 271:10
  274:2,3 275:24
  279:25 282:25
  301:5 317:13
  337:9
**particularly** 41:20
  195:16,17 274:21
  274:23 276:21
**parties** 16:19
  22:18
**party** 346:3
**passed** 157:18
  243:2 330:16
**path** 196:3
**patient** 212:18
  213:23 257:9
**patients** 110:2
  146:18
**patricia** 228:11
**patrol** 57:8 86:15
  231:6 232:10
  243:24
**pattern** 244:4
**pay** 19:9 56:2
  146:13 283:12
**peace** 45:5
**pecked** 114:13
**penalties** 153:6
  154:1 156:7,24
  157:10,19 158:5
**penalty** 154:16
**pending** 29:7
  255:25
**pennsylvania**
  23:17,21
**pens** 295:11
**people** 30:4,9 46:4
  50:11 54:7,20
  79:14 91:4 115:15
  137:18,22 139:6
  140:18,22 155:8

158:11,15,17
  162:19,20,22,23
  166:19 172:20
  188:7,8 208:1
  218:15 219:11
  226:15 231:12
  234:2 241:1 242:2
  242:3 251:7,19
  273:16 274:8
  283:14 290:21
  293:15 294:1,6,14
  294:15 305:8
  312:8 316:25
  334:8 335:17
**people's** 139:12,16
  139:23
**percent** 106:3
  179:11 258:5
  322:11 323:20
  324:1,6
**percentage** 215:13
  215:14 216:7
  288:4,18 322:8
  323:8 327:6
  335:19,22
**percentages**
  216:19,22
**percodan** 186:22
**perfectly** 75:18
**perform** 15:3 16:5
**performance** 6:15
  319:16
**period** 30:23 43:6
  44:6,21 50:24
  51:15 55:10,13
  60:18,23 61:3
  63:23 77:4,12
  78:8 90:8 93:9
  95:16 96:22
  100:24 102:11
  106:9,18,25 110:8

120:9 122:12,17
  133:14 144:4
  151:9 158:20
  256:20 288:21
**permanent** 91:25
  330:4,5,11
**person** 52:7,12
  81:6,8 106:19
  149:13 166:12
  214:14 234:12,13
  249:4 256:5,12
  258:20 275:24
  276:2,11 335:8
  338:9,12
**personal** 85:22,23
  97:20 186:22
  273:4,5,6,8,12
  295:17 297:10
  341:3,8
**personally** 35:22
  88:19 147:15
  148:19 190:7
  201:14 217:20
  242:19 243:20
  262:3 294:5
  337:22 341:25
  348:11 349:15
**personnel** 15:17
  50:10 53:21 56:8
  56:15,16,23,25
  60:13,13 67:13,14
  67:17 79:15
  272:20,23 274:8
  278:1,11
**persons** 227:23
**perspective**
  150:17
**pertained** 23:25
**pet** 202:4
**petition** 147:2

**pharma** 1:10,11
1:13
**pharmaceutical**
6:10 111:12,21
119:4,6,10,12,19
204:11,14 234:16
260:22,23 305:18
309:3,8,15 310:4
320:8,8,13 321:1,6
321:7,13,22,24
322:7,16 323:2,5,9
323:17,21 324:14
324:15 332:21
**pharmaceuticals**
3:3 177:19,25
178:9 183:19
184:11,16 185:22
218:17 234:11,14
336:6
**pharmacies**
112:18 113:8
119:15,17 120:20
128:18 204:19,20
212:12,17 214:24
226:4,10 227:4,9
227:11,14 258:22
261:16 262:7
264:3
**pharmacists** 111:9
112:2 119:17
148:24 217:23
218:2
**pharmacology**
343:2,4
**pharmacy** 145:25
147:2,6 148:2,8,16
148:24 149:1,15
150:6,12 151:24
152:13,21 213:21
218:3 225:10
234:18 238:25

239:10 243:7,12
264:4 322:1,9,18
343:11,14
**phenomenon**
161:5 162:11
172:2
**phone** 30:6 81:9
89:7 232:6 271:6
347:3
**phones** 266:4
302:24
**photographs**
46:21
**photos** 296:1,2,5
**physically** 98:13
98:18 99:24
104:23 258:21
**physician** 228:10
261:23
**physicians** 111:9
122:21 185:7,10
185:11,17,20
186:17 187:5
261:3
**pick** 181:1
**picked** 23:7
**picture** 91:22
217:8 253:10
326:14
**piece** 300:22,24
318:23
**pieces** 169:25
**pile** 211:24
**pill** 199:6,11
200:20 201:1,6,18
203:16,18,24,25
204:1,6 228:18
244:2 251:11
310:1
**pills** 243:8,25
245:9 250:23

251:5,7 309:22,23
**pipe** 121:11
**place** 12:5 14:14
52:3 73:18 82:11
279:22 333:11
345:20
**placed** 225:11
**places** 153:22
162:7
**plain** 5:3 134:16
134:25
**plaintiff** 5:13
224:8 227:4
**plaintiff's** 31:10
**plaintiffs** 12:23
**planes** 175:14
**players** 59:18
67:11
**plaza** 202:11,15
**pleasant** 2:6
**please** 12:7 13:17
13:23 58:13 75:11
75:23,23,24 89:7,9
183:15 189:16
193:1 210:8
267:15 277:12
315:22 329:25
347:11,11
**pled** 229:4
**plus** 85:10 87:8
**poaching** 339:7,8
339:11
**point** 3:12 29:2
47:25 50:9 63:7
74:24 87:11 92:24
95:17,18,21,21
97:2 119:3 145:3
214:3 236:1 253:9
341:12
**points** 309:21
315:7

**poisoning** 316:2
**police** 5:4 17:15,16
37:6 43:9 45:20
83:21,23 84:11,18
86:9 88:6 134:17
180:3 231:16
316:24 336:9
**policies** 113:8
230:24 253:13
**policy** 23:15
**politely** 75:20
**politicians** 156:4
**politics** 152:25
156:4
**polster** 1:8
**poorly** 26:12
**populate** 320:17
**population** 107:21
108:5 172:18
**port** 171:4
**portage** 1:21
**portion** 215:9
220:5
**portions** 220:10
**poses** 174:14
**position** 45:23
46:6 47:2 48:9,16
50:5 71:11 73:1
73:23 74:2 79:5
79:24 82:4 106:8
149:23
**possess** 128:24
**possessed** 227:24
**possession** 39:22
98:9 104:23
**possibility** 99:11
**possible** 99:9
222:15 264:14
269:21,24 297:5
301:15,19

[possibly - problem]

possibly 88:25
112:15 157:15
175:10 239:24
278:9 297:3
post 232:24 233:2
postal 233:3,4,5
potent 137:12
207:23
potential 129:20
232:11
power 315:8
powerpoint 97:10
314:7,10,19,22
315:4,17
powerpoints
97:16
powers 69:23
pr 334:11
practices 339:17
predecessor 59:13
preludins 126:13
prep 299:12
prepare 29:12
33:6 286:20,22
299:25 302:8
320:4 331:18
prepared 104:11
299:9,13,18
preparing 30:7
31:1 105:15
pres 259:3
prescribe 185:11
243:3 257:12
prescribed 110:2
122:11 128:12
212:18 213:23
227:25
prescribing
122:21 263:22
prescription 1:5
12:4 41:22 42:9

42:13,19 43:1
93:18 94:11,16,24
95:4 104:6 105:7
105:24 107:22
108:7,15 110:18
126:19 127:7,13
127:15,18 128:4,9
128:16,23 129:13
129:21 133:10,19
137:2 141:18,23
141:25 142:1,5,9
142:12 147:13,21
185:3 205:25
208:4 213:22
214:13,14,18
215:1 216:17,21
217:12 218:16
219:22 220:2
225:12 228:1
239:20 250:20
258:17,17,21,22
258:25 259:3
261:20 262:8
273:20 274:5
290:24 315:24
341:14 342:9
347:6 348:3 349:3
prescriptions
107:2 110:25
112:20,23 121:5
146:18 188:19
199:7 212:17
257:10 261:8,10
261:15,25 317:2
presence 345:15
present 3:21
presentation
314:6,10,19 315:5
315:8,9,10,13,17
presentations 97:6
97:10,12 99:14

102:3,7,16 198:19
313:13,16,24
314:3,22
presented 167:5
presents 160:2
169:5
president 93:1,7
93:12,17,18,22
94:10 279:18
press 96:15,20,23
pressing 101:23
101:23
pretrial 25:17
pretty 16:11 86:24
86:25 87:4 151:17
165:3 172:10
173:3 175:4
196:12 217:10
221:5 231:25
232:13,21 247:21
253:8 258:3,6
270:14 271:5
272:6 284:3,4
289:20,24 291:8
310:18 326:16
prevented 159:4
preventing 243:2
previous 94:6
153:25 230:13
254:18 263:13
267:6 270:24
271:3
previously 199:25
215:21 234:15
primarily 184:12
220:1
prime 160:3 169:5
principle 127:2
print 325:10,12
printed 99:12,13
325:14

printouts 104:19
prior 67:5 74:1
82:6 87:14 93:17
121:22 221:17,22
254:1 255:3
330:16,20 342:13
private 113:4
pro 267:23
probability 130:6
probably 19:25
20:4 25:11 37:14
38:16 40:17 42:9
48:14 53:20 66:25
72:3 82:7 90:23
94:1,3 100:25
105:13 115:10
118:25 132:6
152:21 167:12
169:21 178:2
179:8 180:13
181:20 186:2
194:3 195:14
200:5 203:14
205:12 211:18
234:22 237:25
256:9 262:23
268:23 275:5
280:20 285:23
292:14 296:7
308:20 309:3
313:19,20,22
326:19 330:16
334:24,25 335:8
335:10,21
probed 75:3
problem 65:4,7,10
101:23 104:6
105:7,24 131:6
132:13,18 133:5
133:18 137:11
143:20 145:18

162:16 187:22
189:5 206:8
209:14 210:2
309:3,9
**problems**  23:19
70:5,8 131:20
144:10 199:14,15
204:7 221:19,24
223:10 309:4,15
339:1
**procedure**  13:5
28:16 76:3 344:7
348:5 349:5
**procedures**  106:20
230:25
**proceedings**  285:3
**proceeds**  267:23
268:5 277:20
284:20,23 285:5
286:1 289:1,15
**process**  71:6 146:6
224:22
**processes**  106:20
**processing**  252:13
**produce**  128:24
**produced**  31:19
33:2 128:16
183:20,21 315:19
**production**  183:16
347:15,17,22
**products**  119:5,6
119:10,13,19
**professional**  16:18
**professionals**
218:11 263:3
**professor**  20:15
**program**  6:14
284:9,11 293:9,12
293:20 309:13,18
316:22 317:10,12
317:14,17 319:14

**programs**  94:24
303:15,18,24
304:2 307:15
308:8 310:20
312:11 316:19
317:5
**progress**  234:25
**project**  6:4 277:8
277:13 286:8,18
286:18 287:20
288:6
**projected**  314:16
**projects**  320:2
**promoted**  308:15
317:18
**promotion**  47:20
47:22 317:20,24
**proper**  71:15
**properties**  174:7
**proportion**  100:15
216:1,10,14
**proportions**
216:16
**proposal**  31:23
**prosecute**  229:22
230:2
**prosecuted**  151:15
229:19
**prosecution**  258:1
**prosecutions**
151:20 226:21
239:6 257:24
263:15
**prosecutor**  338:6
**prosecutor's**
191:20 236:18
338:2,25
**prosecutors**  309:5
**prostitution**  26:6
26:7

**protective**  75:16
**protocol**  240:3
**proud**  39:20
164:25 223:6
**provide**  35:5
80:12 84:12 114:1
121:16 147:4
148:11,12 161:17
171:10 238:1
244:3 302:18
307:14 314:7
**provided**  13:4
39:9,16 80:20
91:20 94:23
152:14 162:14
213:14 254:17
261:7 302:7
309:18 313:12,24
314:10 321:15
330:21
**providing**  200:8
213:15 231:15
331:19
**public**  3:6 94:25
97:6 100:11,15,22
101:22 333:13
334:16,19 335:20
345:7 346:14
348:10,18 349:15
349:23 350:23
**pull**  161:25 278:14
**pulled**  23:21
**pulsipher**  2:16 4:9
12:11,11 265:12
265:14 303:1
**punish**  155:12
**purchase**  192:2
249:25 251:6
266:5 327:17,25
328:1,7

**purchased**  251:8
251:23
**purchases**  327:1,4
327:7,13,20
328:11,24
**purdue**  1:10,11,13
**purely**  324:5
**purer**  206:5
**purpose**  284:14
302:12
**purposes**  20:12
134:19 164:4
191:4 193:18
224:12 240:19
245:22 254:11
260:3 286:11
302:1 305:20
319:18 325:24
329:21 334:1
**pursuant**  344:3,6
**pursue**  327:11
334:5
**push**  189:1 270:20
270:21
**put**  29:6 40:4
44:15 53:24 83:24
88:13 96:15 112:7
141:1 155:7,9
157:5 158:11
169:24 178:23
183:7 193:12
211:23 230:18
245:16 253:14
256:18,24 263:12
269:15 272:22
283:21 284:2
285:10 301:10
305:11 318:25
**puts**  62:18 63:11
72:24

putting 23:9
306:18,19

**q**

qualification
15:13 29:6
qualifications
17:21
qualified 139:22
345:8
qualify 18:4
quantify 342:1
quantities 115:12
quarter 180:5
182:6 300:24
quarterly 6:7
192:10,12 300:4
301:23
question 26:11
27:14,16,25 28:12
28:13,24 29:7
31:12 35:17 42:7
42:23 45:15 52:15
54:25 55:23 56:6
58:3,8 63:9 64:6
66:12 69:17 70:7
72:17,22 73:7,16
74:7,20 76:23
87:24 92:12 94:7
94:14,20 98:3,16
101:20 103:4,11
103:18,21 106:23
107:11 108:10,16
108:21,22,25
109:6,18,20
111:15 112:13
113:14 115:24
116:11,19 118:9
118:19 119:9,22
120:15 121:19
122:6,19 123:1,20
123:23 132:5,16

133:21 136:17,23
137:21 138:25
139:5,25 140:6,8
140:10,13,21
141:4 143:23
144:14 145:6,21
146:4,12,21
147:24 152:18
153:4,12 155:1,6
155:16 156:1,10
157:13 158:1,9
159:7,15,23 160:7
164:10 168:9
176:23 178:18
180:22 182:2
184:2 186:14
187:24 190:6,12
197:6,19 199:3
203:20 207:6,20
209:20 211:8
212:7 213:1 215:5
216:3 218:19
219:9,16 223:13
224:2,16 229:24
230:11 235:5
239:9,22 264:17
265:1 268:8
269:10 270:9
271:18 272:5,9
273:22 274:25
275:11 277:23
281:8 283:5
288:15 290:19
291:2 300:12
301:18 303:13
313:5,18 321:6,20
322:20,25 323:23
324:3,8 336:12
337:20
questioners 265:4

questions 24:2,3
27:12 75:17,19,21
81:20 140:14
156:11 224:21,23
230:13 265:15
317:1 321:2
340:10,21 343:17
quickly 124:25
143:21 144:11
145:14 146:9
208:1
quite 37:16 116:24
164:19 278:9
quotas 121:14
122:1,13

**r**

r 13:21,24
raids 296:7,8
raising 122:13
raking 156:18
ran 106:24 217:15
220:8 251:5
288:18
ranking 182:25
rape 48:6
rate 258:3,4,6
rates 337:14
reach 105:16
119:4,11,18
155:24
reached 147:11
read 31:5,6,7
33:18 109:6,14,16
114:25 121:7,21
220:22 238:16
248:6 322:4 341:5
348:5,6,12 349:5,6
349:17
reading 34:3,7
116:15 117:10
123:7 135:16

238:12,13 250:15
347:19
reads 184:3
309:22 321:23
ready 124:2
256:11
realizing 94:5
really 19:9 25:12
28:20 32:24 41:17
43:8 58:23 81:5
89:8 96:14 103:5
103:6 117:10
135:20 144:2
146:13 153:5
167:25 198:10
206:15 209:11
211:17 216:15,18
236:24 248:21
260:15 300:16
323:25 339:18
realm 269:19
reason 27:4 28:23
36:21 115:2 119:2
122:4 176:18
186:11 194:19
198:24 199:4
223:23 254:24
278:10 282:11
299:18 306:6
347:14 349:8
350:3
reasoning 284:17
reasons 139:7
reassigned 63:3
recall 18:17 19:7
19:15,22 22:17
24:2,14 25:19
26:17,20 30:5
32:1 40:11,15,23
41:10,15,19,21
42:2 55:6 58:1

61:23 62:2,8
66:23 67:18 68:5
69:8,14 70:16,18
71:1,2,18 75:25
80:23 82:3,11
88:9,22 93:23
94:15 95:3 96:8
102:6 103:13,16
104:3,20 105:22
108:11 109:1
114:8,12 133:17
134:4,6,10 135:25
150:5 151:7,19,21
167:9 178:4 183:9
183:10 185:25
186:3,4,16 192:12
194:8,9,11 198:13
198:17 199:22
203:7 204:1 205:3
209:4,7 216:5,9,15
216:16 217:22,23
218:1,5,13,22
219:10 221:3
222:24 230:8
244:21 253:4
257:18,19,20
263:17 266:11
267:5 268:9
270:19 283:20
286:2,4 290:25
293:5 296:11,13
305:25 306:3
308:14 310:15
311:17 325:13
328:8 330:19
337:21 338:23
339:2
recalled  276:20
recalling  152:11
recap  80:25

receipt  347:18
receive  163:11
279:6,11 284:23
285:5,25 294:23
302:21 306:7
311:16,18,19
322:8 330:11
333:12 336:4
337:5
received  19:16
182:15 261:1,10
270:7,13 271:2
272:16 274:17
277:19 281:21
288:21 289:2
306:10,17 321:4
334:16 336:13
receives  282:3
284:20
receiving  110:3
305:25 306:3
321:11
recess  57:17 124:7
190:22 240:11
303:5 340:14
recognize  164:10
191:10 194:2
221:6,9 226:9
228:14 229:9
286:14 302:4
319:21 329:24
recognized  194:5
recollection  18:24
32:9 67:3,15 85:4
135:14 180:10,19
181:14 183:5
197:15
record  12:2,8
13:18,23 15:22,23
15:24,25 57:15,18
75:24 76:8,17,19

79:3 109:16 124:5
124:9 190:20,24
240:9,12 265:6,8,9
303:2,3,6 311:4,7
312:10,15,20,23
328:21 340:12,15
343:22 349:9
recorded  255:10
255:10
records  151:22
237:13 318:3
recounting  250:16
recounts  250:13
reduce  156:7
reduced  345:14
reducing  155:23
refer  71:15 168:19
170:7 305:4
reference  182:5
347:7 348:2 349:2
referenced  345:13
345:18 348:11
349:15
references  326:25
referral  322:17
336:9,19
referrals  305:1,2
322:1 335:25
336:4,7,8,13
referred  68:7
205:7 215:21
228:17 244:11
260:17 333:4
referring  38:1
108:17 151:10
154:5 172:25
185:10,25 187:6
195:10 196:19
197:11 199:10
210:19 232:15
243:6 305:7

refers  257:9
260:16
refill  251:6
reflect  291:15
refresh  32:9
135:14
refreshed  32:23
regard  38:20
144:22 161:9
331:13
regarding  119:6
147:20 344:2,11
regards  38:22
42:24 94:23
108:12 110:17
131:21 331:8
regular  80:9,12,22
80:24 81:3,22
242:13 299:14
340:5
regularly  245:1
regulated  128:5,6
129:2,3,5
regulations  128:8
reitz  256:16
relate  273:19
290:23 296:12
related  19:17 26:4
41:16,21 96:1,2,12
97:6 99:1 105:7
194:25 218:16
265:18 266:21,25
293:22 296:2
312:24 313:3
342:2
relates  1:9 274:4
relating  292:25
341:13
relation  38:24
98:23

relationship  338:1
338:5
relative  253:15,16
346:2
relatively  63:6
87:20
released  252:11
releases  96:15,20
96:24
relevance  73:10
relevant  120:16
reliant  263:3
relied  268:6
269:22
rely  183:12 253:18
268:11
relying  178:24
263:6
remain  17:22
remainder  219:4
remained  90:24
217:9
remember  24:10
24:16,21 29:24
31:21,24 32:5,12
42:3,13,17 43:6
49:2 65:13 67:23
68:3,10 69:25
88:17 95:24 96:9
96:12 110:6
131:18,24,25
135:16,17 136:10
142:5,8,11 165:16
166:3 167:7,14,16
167:22 182:3
187:1,2 197:3,7,20
197:22,24 198:5
199:18,20,23
201:4,5,12,15,17
201:20,23,25
203:13 216:13,19

216:21 217:20
218:15 228:16
245:8,13 256:15
259:8,10,12
260:14 275:6,17
280:5 283:17
285:12,22 289:6
292:24 293:1,2
296:5 300:5 306:8
remembering  30:3
99:10
remind  75:8 89:6
140:12
reminderville
86:17,21 87:2
removal  316:19,22
317:5
rent  269:1,4
repeatedly  75:17
repeating  336:11
rephrase  27:16
replaced  177:2
report  5:8,20,23
6:2,7,15,17 81:12
81:16,17,18
116:22 140:4
167:19 173:10
178:21,22 182:10
182:22 191:3,13
191:24 192:17
222:17,24 226:2
238:9 245:20
246:4,5,7,9,9,10
246:17,19 247:8
248:1,16,24,25
249:1,7 252:20,23
254:9,16 256:4
260:1,8 263:4
264:21 278:15
281:17 299:19
300:7 301:24

302:13 313:10
319:16,24 320:4,7
325:6,14,23 326:6
326:8
reported  68:16,20
79:20 82:17 92:4
192:10 209:21
244:14 264:23
reporter  4:16
27:22 28:7 109:14
138:7 348:7
reporter's  4:13
345:1
reporting  81:14
82:14,24 106:16
320:13 321:5
333:10
reports  32:1 80:12
80:19 192:5 207:7
210:7 237:24,25
238:24 239:3
246:21 247:1
248:22 249:4,14
249:21 253:5,18
254:1,24 255:7,22
256:20,21 294:21
299:8,25 300:17
301:2,16 313:22
325:10 337:6
represent  13:14
303:11 340:20
representative
338:7
represented
121:25
represents  288:1
request  266:5
267:6 270:12,23
282:1 309:17
328:7,23 329:6
349:9,11

requested  265:23
271:9,14,19
278:11 282:18
344:1,6,10
requests  79:21
244:1 265:20,22
266:3,8 282:3
328:10
require  28:22
required  238:24
347:25
requirement
321:5
requirements
321:11
requires  214:10
rerouted  90:10
research  100:11
121:16
reserve  44:20 45:1
45:9,11
residents  316:20
resolution  21:18
resources  220:6
220:16,19 271:15
271:23 272:2
321:12
respect  73:20
79:24 80:5 81:11
81:21 104:8 119:9
140:25 145:17
149:13 152:10
192:24 193:4
respective  85:14
respond  224:24
responding  194:23
response  195:24
225:15 321:23
responses  5:13
31:11 224:9

**responsibilities**
79:12 80:4 96:2
265:18
**responsibility**
57:6 95:10 96:13
**responsible**  96:23
233:21
**rest**  85:13 131:2
299:16
**restaurant**  202:6
**resting**  171:3
**restrictions**  283:6
283:8,18
**restructure**  68:18
69:1,3,3
**restructuring**  70:4
**result**  130:4
150:23 232:22
290:17 292:17
322:17 343:4
**retail**  119:15,17
**retained**  4:16
29:14
**retired**  14:2,5,23
14:25 17:2 18:12
19:17,23 20:12
82:9,10 90:24
101:3 211:12,15
295:7 307:18
**retirement**  16:19
**return**  252:12
**returned**  73:14
347:18
**revamped**  247:22
**review**  30:25 31:3
31:10,18 33:1
166:16 167:3
230:15 305:23
344:2,6 347:12
348:1 349:1

**reviewed**  32:9
194:15
**reviewing**  253:19
**revoke**  146:2
152:15
**revoked**  146:9,24
**rhartman**  3:7
**rice**  2:4 12:21,23
**richard**  256:16
**rid**  67:25
**right**  14:7,24
21:25 22:20 24:20
37:13 43:10,11
44:11,18 45:13
51:17 52:13 55:11
58:16 59:13 60:3
60:9 61:4,21
72:11,15,18 73:1
74:18,25 75:1
77:13,16,24 78:5
78:12,16 79:6
83:4 85:25 87:15
87:22 88:7 89:10
95:23 97:7 100:12
100:14 106:3,6,13
112:23 113:2,6,12
116:12 122:24
123:7,19 127:5,9
127:10,14 128:13
128:19,24 129:3,7
129:21 131:12
133:19 134:2,22
135:1 136:15,20
136:21 137:3
139:3,9,16,19,23
140:19 141:5,9,12
141:19,22 144:6
148:9 161:5,9
164:25 165:6
166:11,23 168:6
168:10,22 169:1,8

169:10 170:5,11
170:17,21 171:4,7
171:11,15 173:1,4
173:7,8,11,17
174:2,9,11,17
177:22 178:6,10
178:13,16,21,24
179:3,6,17 180:7
180:15,16 182:6
182:11 183:2,22
183:25 184:4,8,14
184:17,23 185:1
185:12,15,23
186:9,24 187:22
189:8 190:10,14
192:15 194:20
196:13,17 199:8
203:1 204:7 205:1
205:20,25 212:19
212:24 213:15,24
214:4,7,10,15,19
215:3,22 218:23
219:2,18 220:12
220:22 222:9
223:6,16 230:16
236:2 247:2,19,23
248:5,10,18
249:25 250:15,24
251:1,12,13,14,19
254:18,21 256:13
258:17,23 259:18
260:12,17 261:11
261:17 262:2,15
262:19,25 263:5,9
263:10,19 264:11
264:20,24 274:12
277:24 287:16
288:9 296:22
302:23 311:13,21
312:12,15 314:18
332:8,12 333:18

336:1 340:9
**rightfully**  223:5
**rights**  75:19
**ring**  202:21
**rion**  2:5 12:22,22
77:18 78:21
111:19,25 128:20
222:12,18,21
223:18 293:13
294:3 298:19,25
323:10 347:5
**rise**  134:10 135:11
135:18 142:9,12
195:19,24,25
271:10
**risks**  127:25
**ritalin**  259:15,16
261:8
**rite**  341:1,7,18
**river**  171:10
**road**  13:25 55:2
**role**  68:13,22
92:24 326:7 337:2
**room**  1:21 30:6,18
**rough**  110:8
215:14
**roughly**  24:21
30:22 201:25
203:6
**round**  230:12
255:23
**route**  129:11
**rpr**  1:25
**rule**  28:16
**rules**  13:5 26:23
28:21 70:20 76:3
344:3,7 348:5
349:5
**ruling**  76:10
**run**  19:4,5 69:11
133:16 165:23

222:3 322:13
**running** 26:2,15
52:7,12 67:19,21
92:8,14
**runs** 202:1
**ruth** 3:4 12:13
303:11

**s**

**s** 347:15 349:8,8
350:3
**safe** 101:22
**safely** 316:20
**safety** 330:25
**salaries** 56:3,8,15
85:7 87:6 268:15
269:4 287:10,17
**salary** 283:13
**sale** 212:3,9
**samples** 208:9
209:8
**sampling** 179:24
180:2
**san** 2:17
**sat** 18:15 28:17
338:6,7
**saulino** 2:11 4:8
12:9,9 13:9,13
15:21 16:2 28:15
57:14,20 75:5,8,13
75:18 76:5,9,11,16
76:20,24 89:6
108:23 109:5,9,12
123:5,9,16,19
124:1,10 160:9
190:16 191:7
240:5,22 254:5
265:3 343:19
**saw** 141:14 142:15
143:1 158:19
162:4 171:17
172:3 176:16

178:12 180:24
181:3 197:15
201:4 208:5,7
217:3,3,7 230:21
243:13,19 298:5
303:21 315:15
340:24 341:2,10
**saying** 22:13 93:2
159:1 188:18,21
**says** 135:7 137:8
180:2 182:22
226:1 227:3,22
228:9 229:2
241:23 243:1,23
244:12 248:8
250:19 251:4
252:9 255:25
260:25 261:13
278:22 280:10
282:7 287:3 309:2
313:12,23 316:1
316:16 321:1,21
332:17
**scalise** 50:3
**scans** 153:22
**scene** 142:24
**schedule** 129:16
129:17 130:1,2
235:22 259:17
**scheduled** 130:3
**school** 36:3,4
37:12 40:12,24
47:17 310:22
**schooling** 36:23,23
37:20
**schools** 47:4
310:16 311:24
**scientific** 46:19
121:16
**scope** 158:1 160:7
160:11 213:3,4,10

**scouts** 20:7
**scraped** 279:15
**scrapped** 70:17
**screens** 182:23
**script** 200:25
203:22 250:22
**scripts** 130:23
188:13,14 259:14
**scrolling** 109:10
109:13
**seal** 346:6 348:15
349:21
**search** 98:23
115:21 200:4
267:17
**searched** 88:23
**second** 15:22 89:5
241:2 280:18,21
309:2 315:23
340:8
**seconds** 75:10
**section** 168:2
173:14 176:7
177:18 183:16
184:7 278:19
320:13
**secure** 316:25
**secured** 150:2
**securely** 316:21
**security** 43:22
**see** 22:7 27:22
30:15 38:3 40:1
43:20 45:8 52:11
59:10 90:22 98:12
112:19 133:12
135:3,3,7,25 136:1
136:2 137:8,14
143:3,5 144:19
146:18 165:9
166:21 169:22
170:3 173:13

175:17,22 177:18
179:20,24,25
182:18,21 183:16
184:7 193:25
194:22 195:8
206:6 225:7 226:7
226:24 227:6,21
227:22 228:4
229:1 233:7 235:6
235:22 237:14
239:16 241:5
242:6 243:9 244:4
244:8 245:8,12
247:1,8 249:20,23
250:10,12 251:4
251:25 252:22
256:3 261:24
265:24 269:21,25
278:22 279:4
287:20 290:9
313:11,20 315:24
325:6 326:9
**seeing** 108:11
142:9,12 144:11
161:2 172:6
176:17 178:3
180:10,14 197:4
197:21 206:20
207:13 209:11
211:16 220:11
225:19 235:20
245:8,9
**seek** 75:15 76:4
**seeking** 341:21,22
**seen** 19:14 38:13
117:14 143:12
159:19,24 161:24
181:13 194:13
205:24 209:5
224:17 239:2
253:25 296:17

340:3,4
**seize** 267:18
**seized** 249:15
291:18,21,24
292:1 324:14,21
332:21
**seizure** 277:15,17
**seizures** 267:13,15
269:20 277:21
285:2
**sell** 214:13 250:22
**selling** 198:1
212:17 213:15,22
248:4
**semester** 20:19
**semi** 6:15 319:15
**semiannual**
319:24
**seminar** 306:19,22
**semisynth** 125:13
**semisynthetic**
124:20 125:13,16
125:17
**senate** 155:21
**send** 63:4 302:14
306:21
**sending** 223:20
**sense** 49:7 129:2
219:17 339:11
**sent** 115:12 116:5
194:9 225:22
230:15 244:2
305:4
**sentence** 175:19
182:7,21 184:3
195:12 204:5
250:19
**sentences** 231:19
**separate** 51:8
55:11 59:15 60:4
60:12 148:22

277:7 293:18
**september** 346:17
**sergeant** 58:25
59:3 66:21,24
247:11,16,17
**services** 6:7,13
40:25 61:19 62:5
62:13 72:1,2
92:22 103:19
161:16 278:25
301:23 319:13
**session** 30:11
343:6
**sessions** 15:14
30:23
**set** 5:14 224:10
232:2 282:20
290:9 316:23
346:6
**sets** 121:13
**setting** 16:18
**shadowitz** 261:6
261:14
**shaking** 28:7
**share** 167:19
237:17,19 239:11
244:18 290:2
**shared** 95:6
**sharing** 5:16
240:17 241:24
242:11,16
**sheet** 300:20 302:8
318:9,10 347:13
349:7,10,18 350:1
**sheets** 302:7
**sheraton** 1:21
**sheriff** 45:10
56:17,19,21 62:17
63:2,10,10 64:18
64:20 67:1,5 68:6
68:7 71:3 72:24

73:2,4,11 79:1,4
79:21,25 80:3
81:12,13,14,18,19
81:21 82:14
106:13 163:3,6,13
167:10 278:1
**sheriff's** 6:17 14:6
14:23 15:4,9 16:5
16:17 17:8 19:20
19:21,24 20:9
36:20 37:22 43:15
43:18 44:8,11,25
45:3,5,7,20,24
49:11 55:24 56:1
56:2,7,8,14,15,16
56:22,25 57:1,5
60:9,13 83:3 85:7
85:8,9 87:6,8,11
95:18 97:1 99:16
100:4,20 107:20
108:4 109:7,11
119:3 136:7
198:11 206:13
209:17 221:13
268:15,18 275:2,3
275:14,22 293:8
293:12,17,19
296:15,21,24
297:6,11,20
298:23 311:10
312:8 316:18
317:5 325:22
334:25
**shift** 294:18
**shipments** 116:5
227:5
**shop** 202:4
**shopping** 110:20
185:1 188:16
257:7,15 261:20

**shoreline** 171:11
171:13
**short** 90:8 93:2
217:4
**shot** 23:22 284:3,7
284:9
**show** 97:18 110:24
113:25 117:2
176:1 254:1 267:3
288:25 325:5
**showed** 18:20
**shown** 207:8
296:20 347:16
**shows** 110:1
**side** 208:22
**signature** 344:5
346:13 347:14
**signed** 348:13
349:18
**significance**
172:16,19
**significant** 174:14
**signing** 347:19
**similar** 53:23
81:20 116:3 117:1
253:25 331:18
**similarly** 255:9
**simply** 18:7 159:5
194:5
**sincerely** 347:21
**sir** 34:5 74:23 75:5
75:8,18 76:6,25
108:16 109:2,20
127:10 138:15
140:6,12 161:24
179:13 189:23
223:22 290:14
326:2 343:20
347:10
**sit** 14:17 173:5
289:23

sites  177:1,4,8
sitting  80:17 114:8
  160:17 161:13
situation  130:18
six  62:14 72:10,14
  78:8
size  87:21 270:1,5
  270:6
skyway  202:18,20
sleep  198:4,5
slideshow  104:13
  104:14 295:21
slow  146:1
small  31:25
smallest  286:3
smuggle  214:17
smuggled  175:12
social  5:4 134:18
society  309:5
sold  227:24 251:16
  251:18
soldier  145:7
solely  281:5
solid  219:12
solution  91:25
solutions  3:2
  347:1 350:1
somebody  17:22
  65:10 83:20 154:9
  154:11 156:13,19
  157:6 196:9 231:7
  233:24 255:2
  262:14 267:3
  323:13 333:15,17
  340:2,3
somebody's  234:1
someplace  97:14
  337:12
somewhat  87:14
  194:16

soon  123:13
sooner  72:20
sorry  26:11 34:16
  71:14 84:17 89:8
  142:10 159:2
  193:9 202:7
  209:24 219:1
  271:1,25 273:10
  273:10 280:4
  305:1 325:19
  326:23 336:11
sort  24:1 37:1 40:7
  47:18 49:10,14,19
  61:3 79:24 80:20
  81:3,12 88:12
  89:13 114:12
  117:11 127:1
  187:16 216:9
  234:8 237:10,24
  242:6 253:12
sought  120:25
sound  200:10
  228:24
sounds  41:1 61:6
  82:23 87:13
  200:12 263:18
source  170:14
  175:21 248:2,2,4
  249:24 251:17
  268:10
sources  116:8
  138:14 210:12,24
  215:16,16 231:9
  268:6 269:13,18
  269:22 281:12
  284:5
south  2:6
southern  108:13
  108:18 131:19
  241:9

space  90:2 268:23
  268:25
span  203:8
speak  16:7 143:24
  275:25 294:9
speaker  15:11
  16:6
speaking  20:11
  95:10 161:15,21
special  45:6
specialist  234:9
specialized  36:24
  37:4 47:1 48:22
  49:6 50:20 51:8
specialties  234:19
specif  230:22
specific  18:25
  20:20 41:19 63:20
  69:25 92:2,10
  103:22 118:11,21
  119:16 163:16,19
  173:11 180:24
  195:13,20,21
  208:18 244:5,6
  266:25 267:4
  282:17 284:2
  292:24 310:3
  321:12 341:13
specifically  42:17
  56:23 57:11 91:3
  93:21 96:6 104:7
  107:4 115:8
  132:18 134:12
  144:4 166:4
  168:15 171:24
  172:25 178:4
  181:19 197:3,7
  198:7 201:20
  220:3 222:6 266:9
  273:19 274:12,16
  290:24 310:15

specifics  96:18
  230:22 257:19
specified  345:21
speculate  53:13
  140:18
speculating  28:19
  53:11 116:16
speculation  40:16
  152:20 324:5
speeches  75:24
  76:21 97:6 100:15
spell  13:18
spend  284:13
spending  302:17
spent  272:17
  274:15 275:20
  294:1 312:17,20
  312:23 313:2
  323:5,9,15,20
split  53:1 285:15
  289:10
spoke  19:20 63:17
  269:12 331:11
spoken  177:11
  268:4 269:14
sporadically
  304:18
spot  57:12
spots  156:13
spreadsheet
  301:10 318:17
squad  289:13
square  3:6
ss  345:3
st  171:10 202:12
  202:15
stack  37:19,21,25
  38:9 39:25 246:15
  247:1
stamped  310:1

**stand** 23:10
192:21 193:2
218:4
**standard** 28:16
230:25 235:14
237:10 255:15,18
255:21
**standards** 253:13
**standing** 65:9
**stands** 32:24
**start** 83:2 231:23
244:4 296:23
317:9
**started** 36:10 44:7
45:3 82:16 133:14
136:11 142:20
169:18,24 179:6
206:4 263:21
264:4
**starting** 42:12
243:1 276:22,25
**starts** 135:5 137:7
168:2 175:19
184:20 225:2,17
225:25 226:24
**state** 13:17,22
17:17 18:3,5,11
36:8,16 44:10
50:21 91:14,20,23
92:19,20 94:21
104:1 105:19
108:13,18 110:3
131:3,19 147:2,5
172:17 173:3
189:1 207:3 209:2
210:5,10 259:14
265:23 267:12
270:14 279:16,20
279:22 288:7
299:21 302:15,15
316:1 331:21

333:1 340:1 345:2
345:7 346:15
348:10 349:15
**state's** 34:24 209:1
**stated** 250:20,21
251:5,8,16,18
261:6
**statement** 52:25
104:11 130:8
138:3 175:25
184:4 309:8
348:13,14 349:19
349:19
**statements** 100:12
102:3,7,16 105:23
139:21
**states** 1:1 135:10
141:8 204:25
**statistic** 195:13
**statistics** 105:8,9
105:10,17,18
166:22 187:16
195:11 319:3
**stats** 337:4,10
**stay** 63:12 76:19
**stayed** 78:4 270:15
271:4
**steady** 217:10
**stenotypy** 345:14
**step** 47:23 82:22
82:23 94:6 156:20
**stephen** 1:25
345:6 346:14
**stepping** 59:12
**steps** 156:13
**stick** 104:16,22,22
295:13
**sticks** 105:3 204:4
**stimulant** 259:17
**stop** 75:23,24
109:10,12 159:24

232:11 245:9
**stopped** 57:9
95:22 231:7,12,22
264:23
**stops** 159:12
243:24 244:14
**stow** 36:2,4 44:19
45:1,20 208:7
**street** 1:21 2:12,17
3:18 19:5 131:22
156:19 158:12
171:22 172:7,8,11
201:22 202:1,12
**stronger** 205:19
205:22 206:3
207:15,17
**structure** 49:11,19
**stuck** 326:3
**student** 23:14
172:18
**students** 171:22
172:7
**study** 36:9
**stuff** 160:19,19,21
233:1 234:10
293:2 298:14
304:3
**subgrant** 6:7
301:24
**subject** 25:20
33:20 241:23
248:3,3
**subjects** 25:19
230:5
**submitted** 192:14
192:17 301:13
**subordinate** 59:2
**subpoena** 113:21
**subscribed** 348:10
349:14 350:21

**subsequently** 23:9
**substance** 121:14
**substances** 130:3
171:15 173:11
208:10 229:5,7
248:4
**substantial** 87:4
**successful** 330:9
**successfully** 86:11
279:21
**successor** 276:16
**sudden** 153:23
205:11
**suddenly** 272:16
**sue** 35:2
**sued** 258:12
340:23 341:1,4,9
**suffered** 35:20,23
**sufficient** 121:15
**sufficiently** 155:12
**suggesting** 123:20
213:5
**suicides** 316:4
**suit** 22:3,8
**suite** 3:6 347:2
**suites** 1:21
**summary** 251:4
**summit** 1:13 2:2
5:6,6,8,11,12,17
5:19,20,22,23 6:1
6:2,5,8,11,15,17
6:18,20,21,23
12:21,23 26:9,9
32:21 35:14 36:19
37:22 43:22 57:22
58:15,19 66:19
67:3,11 68:23
72:6 79:11 80:5
99:1 103:22 106:5
106:20 107:1,3,7,9
107:21,22 108:4,6

108:16 109:1,5
120:21 122:16
130:12 131:1
132:13,23 133:4
135:23 141:17
142:4 143:13,16
143:19 144:5,8
146:17 152:24
156:23 159:20
160:2 161:7 164:2
164:3 168:13,21
169:4 170:4,8,16
170:21 171:3
172:16 173:5
174:9,15,16 175:9
175:21 178:16
179:2 181:3
182:15 183:20
184:12 185:21
191:3 193:17
198:14,16 200:20
201:7 204:23
206:22 210:3,9
214:19,25 221:19
221:24 224:7
226:5 229:15
238:20 240:18
243:13,19 245:19
245:21 254:8,10
259:25 260:2
268:17 269:6
278:23 280:10
286:10 297:20
301:24 304:21
305:19 316:16,17
317:4 319:17
325:22,23 329:19
329:20 333:25
336:22 337:1,6,16
338:1,21,25
340:22 341:4,9,15

341:21
**superior** 347:1
**supervisor** 14:10
14:16 48:4 49:2
50:2,6,13 51:16,20
59:23 60:25 62:21
147:18
**supervisors** 55:25
191:14
**supervisory** 55:21
191:22
**supply** 159:8,9
191:19 243:4
**suppose** 71:1
**supposed** 65:23
66:4
**supposedly** 128:14
**sure** 28:20 40:5
42:16 49:12 50:15
51:5 52:24 55:9
57:14 58:9 63:17
63:18 67:2 72:10
77:20,20,25 79:2
79:13,14 80:21
85:5 102:10,21
106:2 108:24
114:9,10,18
116:24 125:12
126:12 127:24
128:2 132:17
139:1 140:1,15
141:10,13 143:25
147:7 148:5,17,21
151:2 157:15
159:10 162:8
180:23 181:23
198:18 207:16
208:5 213:19
229:17 230:10
244:20 246:24
248:19 257:17

269:11 298:14
311:24 322:21
328:19 332:7
335:5,6
**surge** 205:1,5,7,9
206:5
**surgeon** 187:10
**surpassing** 316:3
**surprised** 335:17
**surveillance** 235:9
**surveillances**
232:2 235:23
**susan** 247:9,13
**suspect** 21:21 23:3
90:10 164:9 230:2
263:21 264:3,4
**suspected** 229:22
259:3
**suspicion** 230:9
**suspicious** 225:11
226:3,5 238:9,24
**switch** 36:12 265:4
**switched** 36:11
83:24
**sworn** 13:6 71:4
345:10 348:10,13
349:14,18 350:21
**synopsis** 261:1
**synthetic** 124:22
216:13
**system** 305:5,5

**t**

**t** 13:20,24
**table** 161:14
226:24
**tailored** 266:9,12
**take** 18:4 29:2,9,9
35:1 40:19 47:14
93:13,16 94:8
102:9 105:2
117:16 123:5,10

123:13,15,18,21
124:3 156:20
164:21 188:7,8
211:5 215:16,17
226:20 240:6
264:15 265:4,25
305:23 317:11
318:1 328:20
329:25 336:20
341:12
**taken** 1:20 40:2
41:5 57:17 98:10
112:15,17 124:7
156:19 164:18
186:7 205:23
208:7 220:15,18
240:11 261:15
264:19 303:5
340:14 345:20
**takes** 36:13
**talk** 33:11 96:7
131:20 144:3
166:12 167:11
170:3 171:2,6,20
173:10 177:17
207:12 253:3
282:23 294:1,19
332:13 335:12
337:12,16 338:20
338:24 339:16,21
339:23 340:1
**talked** 32:14 33:13
71:19 104:3,5
105:5 145:1,18
161:4,11 162:10
167:23 211:25
220:21 230:19
257:5 258:16
304:19 333:3
339:18

**talking** 16:3 57:22
58:5 60:2,19
71:22 77:23 95:22
100:24 119:16
148:22,25 151:1
152:22 154:19
158:13 160:22
161:22 182:14
189:24 210:25
211:1 214:22
219:7 243:17
255:24 257:8
**talks** 294:5
**tangent** 66:14,15
69:20 70:24
**tapered** 142:17
**tar** 174:17 175:4
**target** 110:19
**task** 6:14 54:4
68:19 90:17 91:10
91:16,25 92:8,10
92:13,15,16,24
161:17 210:10
241:8 242:4,5
279:23 280:23
287:1 289:11
306:15 319:15
321:21 330:4,6,12
332:14
**tasked** 220:1,3
**tcoleman** 3:8
**teaching** 20:17
**team** 70:12 149:14
149:21 235:11
**technical** 219:17
**technically** 135:4
188:3
**technicians** 218:3
**technology** 85:16
97:18

**teleconference**
3:16
**telephone** 12:25
30:17 81:7 261:2
**television** 196:24
197:12,16,21
**televisions** 196:21
**tell** 20:14 23:19
24:19 30:9,19
37:18,18 40:4
42:1 43:4,8 45:18
52:25 53:11,22
58:13 64:8 71:4
71:10 96:17 103:6
112:1 113:9,17
114:11 137:24
139:2 140:23
161:19 163:13
165:7 174:23
176:25 196:25
197:1 198:7 203:7
224:19 252:18
286:5 296:25
311:2 313:1
322:21,22 323:12
323:25 334:9
**telling** 69:8 213:8
213:17 269:15
339:15
**tenth** 2:12
**tenure** 141:15
151:11 163:10
211:6 215:8,24
217:2,19,25
247:22 253:6
279:18 280:7
290:13 292:5
294:8 305:3 307:9
307:10 310:3,14
312:16 315:14
341:16

**tequilla** 228:12
**tera** 3:5 12:15
**term** 238:8,15
**terms** 215:2
265:22 332:8
339:8
**terribly** 125:12
**tested** 127:24
**testified** 25:8,21
25:25 26:1,1,18
274:10 276:18
295:22 316:6
**testify** 21:22 22:14
22:21 25:17 35:8
35:15 345:10
**testifying** 24:6
26:25 27:2
**testimony** 6:20
23:24 27:1,5 58:3
58:11 77:19 160:8
166:8 329:18
330:21 331:3,6,7
331:19,20,22
332:2 342:13
345:13,17 348:6,7
349:6,9,12
**testing** 46:23
**thank** 22:11 45:22
71:18 76:1 95:1
195:3 249:9
290:10 340:10
343:17
**thanks** 167:15,17
**theft** 184:14 185:5
**thick** 37:20
**thing** 40:18 53:8
53:20 91:15
101:15 162:4
208:20 217:7
242:13 249:3
253:10 289:12

304:19 308:22
338:19
**things** 16:20 19:4
33:25 34:6 99:10
105:6 119:25
134:12 153:6
156:3 166:5
178:23 180:19
207:15 235:18,25
248:17,20 249:14
273:16 275:13
283:10,11 302:24
303:21,25 308:9
334:7,10 335:11
335:11
**think** 27:12 29:15
44:13 47:3 58:5
58:12 67:7 70:13
82:18 83:6,18
101:16 103:21
111:18 114:15
120:11 123:6
125:8 126:16
130:17 135:22
142:14 143:18
146:8 154:23
162:18 167:12
186:6,18 190:16
197:15 202:5,22
203:5,15 208:9
213:14 216:4
220:7 221:10
222:14 223:8
239:18 245:11
252:15 256:23
257:3 263:13
271:4 272:6 274:2
274:10,14 275:25
276:9 279:12
287:24 295:12
303:19 304:14,19

307:22 309:7
316:6 326:12
339:6
**thinking**  82:21
186:9 199:21
200:17 202:11
**third**  250:19
332:16
**thirty**  347:18
**thornton**  68:11,14
70:1 71:13,16
79:20 81:13,17
82:4 106:12 167:6
**thornton's**  79:23
**thought**  64:20
73:22,25 101:11
145:14 149:8,11
165:3
**thousands**  171:10
**threat**  5:5 162:9
162:10 164:1
173:16 174:1,8,14
176:11,15 177:21
177:25 178:10,13
179:17
**three**  20:2,4 25:11
49:1 54:21 82:18
83:4 85:11 87:8
93:10,10 135:4
228:10 281:12
**threw**  153:13
**throw**  74:3 317:1
**thrown**  21:20
**ti**  45:19
**tied**  154:14
**ties**  63:14,19
**tight**  274:21,23
276:21,24
**time**  15:4 19:2
24:7 26:8 29:17
29:20 30:8,14,23

32:18 36:13 39:6
40:20,21 43:5
44:6,16,21 45:2
48:25 49:25 50:24
51:11,16 53:15
54:15 55:13 57:7
59:1,5,6 60:18,21
60:22,23 61:3
63:15,24 67:9
71:25 72:1,4,25
73:22 74:16 75:16
76:21 77:4,12,16
79:16 85:25 86:12
90:8,13 93:9 96:8
96:11,22 100:20
100:23,24 101:13
101:24 102:11,12
106:1,9,11,18,25
107:6 108:11
110:8 120:9
122:12,17,21
123:4 130:20
132:1 133:14
135:1 136:15,21
140:14 142:5,8,11
142:18,21 143:8
143:15 144:4
151:9 152:24
154:3 155:13
157:5 158:3
159:20 163:2,8
172:3 173:24
174:2 176:20
180:11,20 183:11
188:25 190:17
192:25 193:5,7,10
195:7 201:7 204:2
209:23 217:4
218:9,14 225:13
225:18 228:2
233:25 246:16

253:23 254:25
255:8,12 256:4,20
259:13 266:20
269:5,25 271:23
272:2 274:1,20
275:4 276:2,13,21
276:24 278:2
279:8 289:11
292:4 294:1
295:16 296:21
298:11 299:9,16
300:15 301:6
304:23 312:16,17
312:23 313:2
314:9 323:1,5,8,15
323:20 324:1
331:2 333:17
337:25 338:10
339:7 340:11
345:20
**times**  19:22,25
21:5 25:10,11
29:16,21 73:20
87:22 95:14
142:13 154:21
211:25 251:17
257:6
**tip**  262:14,18
333:7,12
**title**  45:12 266:5
300:6
**titled**  5:3,5,8 6:4,6
6:12 134:17 164:1
191:2 278:19
286:8 301:22
319:12
**titles**  60:24
**to's**  241:3
**today**  26:25 27:5
27:12 169:12
174:4 199:25

211:25 220:21
257:6 307:20
**today's**  12:2 29:13
**told**  35:11 53:16
63:1,13 69:4,6
73:18 74:25 80:7
101:7 118:3,12
136:20 152:21
209:2
**tolerance**  23:15
**toll**  205:23
**tonight**  332:6
**tool**  309:23
**tools**  188:22
**top**  156:17 165:9
168:2 179:21
193:23 226:11
243:22,23 248:11
250:11 300:6
326:22
**topic**  18:10 41:18
42:3,4,18 154:19
158:14 206:12,23
207:4
**topics**  22:21
294:18
**total**  6:4 86:4,5
102:16 269:5
286:9 287:1,9,20
288:5,6,20
**totally**  233:24
248:6
**tough**  277:2
**tower**  3:5
**town**  73:2
**township**  108:6,8
229:3
**toxicology**  182:23
**track**  300:9,14
314:2

tracking 237:11
trading 137:12
traffic 158:15,15
  158:18,25 244:13
  245:8
traffickers 155:13
  158:13 159:4,18
  172:23 188:5,6
  212:12
trafficking 93:19
  94:11,16 95:4
  156:7,24 157:6,20
  159:4,12,25 160:5
  169:7 172:13
  212:1,2,3,19,23
  213:13,23 214:3,9
  214:25 250:7
  266:14,17 271:16
trained 114:16
  130:10
training 6:10
  17:21 18:5,7,13,15
  19:16 36:24 37:1
  37:4,6,19,23 38:7
  39:7 40:1 41:4
  42:5 43:10,18
  44:1,2 47:2,15
  114:6 124:12
  161:1 273:14,17
  290:16,22,22,23
  305:18 308:9,13
  308:16 309:18,21
  311:5,10,12,22
  312:1,11 342:24
  343:6,13
trainings 42:24
  310:3,24 311:8,9
  311:15
transaction 118:5
  118:15 213:18

transactions
  116:23
transcribed
  345:16 348:7
transcript 4:1
  332:1 344:3,6,9,11
  347:11,12 348:5
  348:12 349:5,11
  349:17
transcription
  345:17
transfer 333:18
transient 172:17
transportation
  160:4 169:6
  171:21 175:17
treat 128:12
treaters 199:8
treatment 303:14
trecaso's 202:5,9
  202:10
trends 158:19
  217:1 230:21
trial 21:23,24
  22:14 25:8 35:9
  35:15
trials 25:18,20,20
trick 199:8
tried 72:19 165:8
  270:20 310:22
  334:11 341:25
  342:6,9
truck 175:13
trucks 14:17
true 35:4 139:8,15
  140:24 141:21
  170:23 176:21
  183:24 184:4
  256:25 271:13
  275:14 277:16
  316:8 341:17

342:8 343:2
  345:16
trust 256:22
truth 345:11,11,12
truthful 27:5
try 44:14 78:14
  107:17 108:1
  146:23 223:16,19
trying 44:5 45:16
  45:17 49:14 53:7
  58:11 60:7 73:21
  74:17,21 77:3,7,12
  77:15 88:13,24
  108:21,24 140:9
  140:12 192:1
  228:16 248:21
  257:3 280:5 339:8
turkey 175:3
turn 140:18 168:1
  170:2 173:13
  175:16 176:5
  177:13 183:15
  185:18 196:23
  213:18 225:1
  227:21 228:7
  236:12,13 243:21
  267:20 278:18
  315:22 320:6,23
  328:6
turned 328:14
turning 130:20
  197:20
turnpike 23:21
turns 236:2
turtles 202:4
  203:2,3
twice 272:16
  304:20 310:25
two 20:2,4 53:8,9
  53:18 55:10 60:4
  86:4,5,23 88:4

93:10,10 117:23
  135:4 148:22
  202:4 203:2,3
  205:12 217:20
  218:22 223:2,3
  226:11 261:16
  262:6 269:12
  277:7,12 284:14
  288:2 318:2 326:3
  335:9 343:9
type 100:3 112:3
  115:11 198:2
  262:24 270:2
  271:10 282:17
  304:1 340:7
typed 301:10,12
types 82:24 174:15
  247:1 318:4
  334:15
typical 256:8,10
  291:6
typically 113:18
  237:3 260:20
typing 27:23

**u**

u.s. 121:17
uh 20:10 25:13
  38:14 46:2 51:12
  71:17 78:11 90:15
  98:6 143:17
  153:20 168:4,18
  175:18 176:8
  177:20 178:7
  179:23 202:10
  203:4 210:15
  218:24 238:3
  241:4 246:2 252:8
  256:2 260:11
  287:2,4 288:22
  291:5,25 295:11
  301:1 313:14

315:25 316:14
318:5 319:4 321:3
321:18 324:10,16
327:2 332:15,19
**ultimately** 327:15
**unable** 251:6
267:1
**unacceptable**
140:11
**unaware** 269:18
269:18
**unbeknownst**
188:15
**undercover** 268:2
294:15 327:1
**underlying** 24:22
**underneath**
313:21
**understand** 25:6
26:24 27:14 37:10
44:5 45:17 49:8
49:12,14 51:6
54:3 55:10 58:14
60:8 67:2 68:17
69:21 73:3,19
74:23 76:25 77:3
78:1 79:3 92:23
95:9 101:9 116:25
127:17,23 128:4
128:11,15,22
129:1,12,19
138:17 148:5
213:20 246:24
281:11 284:12
291:14
**understanding**
38:8 39:2 49:23
53:17 63:22 64:3
64:15 66:1,8,16
69:22 70:20 79:22
79:23 88:1 102:15

109:24 111:8,17
111:23 113:10
115:3,8,16,20,25
116:7,13,13,14,21
117:1,7 120:19
124:12,16 125:20
126:2 129:25
132:20 137:16
160:25 163:17,20
181:7 192:25
193:5 248:22
342:13
**understood** 27:18
66:20 108:24
274:20 324:20
**undetected** 262:21
262:24
**unfortunately**
205:18
**unidentified**
251:22
**uniformed** 23:8
**unintentional**
316:2
**uniontown** 13:25
**unique** 161:8
**unit** 5:19 6:1,21
23:4 46:19 48:4
49:16 50:7,8,20
51:8,9,13,17 52:20
53:15,23,24 54:17
55:14 57:3,23
58:16,19 59:7,9,13
59:17,22,24 60:2,2
60:10,11,25 61:9
61:12,15,16,17,23
62:6,16,23 63:15
64:24 66:20,20,23
67:4,8,11 68:23
69:11 72:7 73:14
77:6 78:15 79:11

79:19 80:5 85:22
86:10 88:7 97:24
106:5,21 107:2,7,7
107:20 108:4
117:23 118:7,17
122:12,24 144:6,9
147:11,19 151:24
152:2,14 155:14
165:24 172:4
177:12 180:4,5,16
180:25 181:5,9,16
181:18 191:15,17
191:22 192:6
195:23,23 198:9
198:20 201:8
204:3 206:7 208:3
209:13 210:9
211:5 217:17
219:25 220:4
221:14 222:4,5
226:14 227:14
230:20,24 242:20
245:19 247:15,17
247:22 251:21
253:7,18 254:20
254:23 255:20
256:21 257:14
259:2,13,25 264:1
264:9 268:16
269:8 270:3,6
271:22 272:1
275:16,20 276:14
276:20 277:7
278:23 279:6
280:10 281:5,21
282:2,24 283:7,24
284:20 285:5,14
285:19,25 287:10
289:1,4,16 290:5
290:11,16 292:3,7
292:15 293:9,11

293:16,16,25
294:9 295:3,16,19
296:3 297:23
298:10,11,20,22
298:24 299:5
300:9,14 301:3
302:18,21 303:14
304:25 305:1
307:7 308:16
309:14 310:6
316:17 321:25
327:10 329:1,20
333:5,11 336:14
337:2,18,25 338:8
338:10
**unit's** 58:19 215:9
266:20 268:21
270:1 271:15
272:14 274:21
275:1 288:13
293:23 294:19
298:17
**united** 1:1 135:10
141:8 204:25
**units** 53:8,18
55:11 60:5 132:22
153:1 332:20
339:24
**university** 20:16
23:13,14,14,15
84:16,20 172:17
173:1,8 303:20
304:13
**unlawful** 219:22
**unlawfully** 263:22
**unnecessarily**
77:2
**unpaid** 17:10
**unscrupulous**
185:7,9,17 186:17

**unsuccessful**
263:15

**unused**  316:21
317:1

**update**  18:16,19
315:4

**updated**  315:3

**upwards**  41:6

**ursuline**  20:16

**use**  35:24 97:17
98:9 100:12
110:10,15 113:21
114:7,22 117:3
130:6 134:11
135:9,18 137:18
138:22 139:6,16
139:18 140:22
143:4 186:22
189:2,3 219:21
266:7 267:20,23
272:5,8,22 274:3
283:10,11,15
289:4 296:14
297:23 309:22
328:23

**useful**  120:12

**users**  135:9

**uses**  112:6 258:21

**usually**  80:17
175:2 231:5,25
233:10,23 234:11
236:6 311:19

**utilized**  22:24
186:21 255:3
267:13

**v**

**v**  1:10,11,13 347:6
348:3 349:3

**vague**  103:22

**valid**  250:20

**valiums**  126:16

**value**  291:23

**values**  291:15

**variations**  124:19

**varied**  41:12 103:1

**various**  20:5 53:21
68:1 91:21 94:24
95:14 112:18
113:7 115:12
158:18 216:25
232:25 336:7

**vehicle**  243:24
316:4

**vehicles**  85:20
266:4 273:1,3
291:15,23

**venture**  91:7

**verbal**  237:21,22

**verbally**  127:10

**verge**  86:8

**veritext**  347:1,7
350:1

**veritext.com.**
347:17

**version**  168:9

**versus**  324:14

**vico**  261:7

**vicodin**  125:11
261:8

**video**  7:1 30:15

**videographer**  3:22
12:1,25 15:23,25
57:15,18 124:5,8
190:20,23 240:9
240:12 265:6,9
303:3,6 340:12,15
343:22

**videotape**  76:13

**videotaped**  1:16

**vietnam**  136:9

**view**  131:4 157:9
159:11 168:12
203:23 211:12
212:13

**views**  105:23
162:14 192:24
193:4

**violations**  186:24

**visit**  257:11

**visiting**  112:18

**volume**  102:23
107:8

**volumes**  120:20

**vote**  192:2

**w**

**w**  2:4 13:24

**wait**  27:24 84:17

**waived**  347:19

**walgreens**  3:15
13:2 341:1,7,17

**walk**  113:5 200:25

**walked**  180:13
308:20

**walmart**  3:10
12:19 340:20,23
341:4,13

**want**  18:11 44:3
47:21 60:7 63:4
72:5 74:4 77:1
123:10,11 125:11
125:16 129:10
130:6,17 133:1
140:15 155:8
166:5 191:25
195:20 196:25
197:1 252:15
284:13 294:15
302:14 331:22
337:12

**wanted**  26:16
71:23 74:11,24

**100:20 132:19
133:12 146:10
154:14,14 275:19
279:23 306:21

**wants**  62:18 72:24
156:20 159:17

**war**  134:9

**wargo**  200:10

**warrant**  113:18
153:23 267:17

**warren**  306:14

**washington**  2:13

**waste**  76:21

**water**  25:4 65:9

**way**  35:11 42:11
55:7 58:10 64:21
65:22 71:15 76:5
76:12 82:2 93:2
98:16 103:22
162:15 175:10,14
187:9 200:2 202:5
208:25 210:21
219:22 231:18
234:9 242:4,24
252:19,23 253:1
264:21 308:21
313:1 327:21
332:16

**ways**  114:1 184:17
232:9

**we've**  57:4 97:4
123:3 150:22
158:13 167:23
211:25 216:25
230:19 240:3
258:16 268:4
296:20 299:10
307:19 313:9

**website**  334:22,25

**week**  103:7

**weekly**  80:25
337:5
**weeks**  343:9
**weight**  208:19
**weights**  208:23
**went**  21:24 23:17
35:5 43:3 45:19
47:3,6,10 55:7
61:11,18 62:7,24
69:4 78:12 84:24
86:15 88:23
100:21 145:23
146:15 148:15
153:6,8 161:15
166:20 179:9
196:10 208:13
217:4 230:22
234:6 237:16
242:21 258:11
261:25 277:14
279:12,20,24
281:25 311:23
335:13
**west**  3:18
**wheelhouse**  234:1
**wheelhouses**
234:2
**whereof**  346:5
**whichever**  110:21
**whim**  62:17 72:23
79:1
**white**  174:17
176:2
**willing**  78:18
139:22 140:18
**wires**  268:2
**wise**  50:10 322:8
**witness**  22:23
23:11 76:4,6,12
122:6 123:18
156:10 160:12

164:20 171:1
227:12 259:22
345:9,14,15,18
346:5 347:8,11
348:1,4,11 349:1,4
349:15
**witness's**  344:2
**witness'**  347:14
**won**  23:11
**wonder**  123:9
**wondering**  17:13
269:13
**word**  13:25 80:18
130:5,18 318:21
**words**  56:18
130:22 154:12
167:1 174:11
277:18
**work**  14:10 15:3
15:11 17:8 35:19
50:4 51:25 62:17
68:25 69:4 72:9
72:23 74:4,8,9
77:7,12,15 78:25
88:19,25 110:11
120:18 122:8
155:10 164:19
197:1 210:21
245:1 255:16
265:14 282:22
297:10,20 327:1
**worked**  43:21
44:19,23 51:4,22
53:15,17 54:23
55:1 56:9,12 69:2
121:11 143:15
144:16,24,24
145:23 147:14
234:16 244:21,23
244:24 247:18
272:4 276:12

287:25 292:23
296:14 305:6
**workers**  5:4
134:18
**working**  14:6
46:24 52:13 55:15
55:20 56:4,23
59:6 61:4 63:25
64:1 77:5 89:23
118:24 120:17
132:22 136:11
137:17 148:18
152:24 169:19
170:20 196:7
210:11,22 236:21
237:4 238:19
250:4 294:14
323:15 327:21
**works**  169:23
**worksheet**  6:4
286:9,19
**worry**  30:4
**worse**  207:15
211:14,18
**worsened**  207:18
**worsens**  207:21
**would've**  180:12
**wow**  90:7
**wright**  13:24
**write**  31:13 146:17
164:21 166:14
188:13 199:7
246:11,17 247:4
277:5 300:23
333:15,15
**writer's**  253:23
255:11
**writing**  96:23
188:17 194:24
259:14

**written**  80:19
81:22,22 96:19
107:3 121:5 140:3
161:4 165:14,15
192:25 193:5,7,10
215:22 237:21,23
248:22 261:15
331:18,22,22
**wrong**  44:12 60:7
**wrongfully**  227:23
**wrote**  23:8 31:23
32:14 39:19 43:10
79:21 124:24
138:8 161:23
164:16 165:5
166:17 167:1,4
192:21 193:3
194:18 195:11
197:8 199:6
222:16 223:3
240:8 256:14
266:3,5 269:16

| x |
|---|
| **xanax**  126:9,11,12 |

| y |
|---|

**y**  13:20
**yeah**  16:11 17:12
20:4,21 24:4 25:2
25:15 30:2 31:13
31:25 35:7 43:13
59:14 61:24 63:10
65:14 66:13 69:18
71:21 73:8,17
79:8 81:8,16
86:23,24 87:16,25
95:17 97:13 98:4
100:6 102:17
103:5,15 107:12
111:20 118:25
121:7,22 123:2,8,8

124:1 125:23
126:16 128:2
131:6 132:6 133:1
133:22 141:10,13
143:2 145:19
146:5 148:11
151:18 152:19
154:2 156:2 157:5
159:24 162:1,4
163:22 167:15
179:15 180:23
182:3 183:10
186:6 190:18
193:8 194:19
201:3 203:1 204:8
218:20 222:22
233:11 235:20
237:7 238:6
243:16 246:7
249:2,22 253:8
258:3,7 261:21
262:9 265:2 266:1
266:16,23 270:10
270:19 273:15
277:2 280:19
283:19 289:20
291:10 292:9
296:19 301:13
306:11 307:2
308:5,5 310:12
316:9 319:24
322:21,22 323:11
323:14,24 326:19
328:2,12 331:22
334:24 335:18
**year**   18:4 24:17,20
24:21 41:11 46:7
46:16,16 48:10,10
82:7,13 102:24
131:17,22,25
172:21 179:9,10

179:11 187:8
192:5 205:12
225:12 270:17,24
271:3 278:8
279:13,15 281:20
285:4,12,13,22
286:1,4 288:7,13
289:2,5,12,19
291:7,8,9 299:15
299:19 304:20
310:25 314:3
318:24 330:16
331:15
**years**   18:18 24:18
36:6 40:19 41:5
42:15,21 44:15
55:4 62:14 72:10
72:14 78:9 93:10
93:11 99:8 131:1
131:1 133:3
141:18 203:9
254:1 257:4
279:10
**yep**   15:16 90:6
173:5 249:20
**york**   160:18 176:2

**z**

**zero**   23:15

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.