Page 368

1         IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF OHIO
3                EASTERN DIVISION
4

              ~~~~~~~~~~~~~~~~~~~~~
5
6    IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
     OPIATE LITIGATION
7                               Case No.  17-md-2804
8                               Judge Dan Aaron
     This document relates to:      Polster
9
10   The County of Cuyahoga v. Purdue
     Pharma L.P., et al.
11   Case No. 18-OP-45090
12   City of Cleveland, Ohio v. Purdue
     Pharma L.P., et al
13   Case No. 18-OP-45132
14   The County of Summit, Ohio, et al.
     v. Purdue Pharma L.P., et al.
15   Case No. 17-OP-45004
16          ~~~~~~~~~~~~~~~~~~~~~
17                Volume II
              Continued deposition of
18            LORI BAKER-STELLA
19

                 May 23, 2019
20                10:40 a.m.
21

               Taken at:
22            Ulmer & Berne
          1660 W. 2nd Street, Suite 1100
23            Cleveland, Ohio
24
25        Renee L. Pellegrino, RPR, CLR

```
 1   APPEARANCES:
 2   On behalf of Summit County and City of Akron:
         Motley Rice
 3       JAMES W. LEDLIE, ESQ.
         28 Bridgeside Boulevard
 4       Mt. Pleasant, South Carolina  29464
         (843) 216-9229
 5       jledlie@motleyrice.com
 6   On behalf of the City of Cleveland:
         Baron & Budd
 7       STERLING CLUFF, ESQ.
         15910 Ventura Boulevard
 8       Encino, California  91436
         (818) 839-2333
 9       scluff@baronbudd.com
10   On behalf of the United States Department of Justice
     and Drug Enforcement Administration:
11       United States Attorney's Office
         JAMES R. BENNETT, II, ESQ.
12       RENEE A. BACCHUS, ESQ.
         United States Courthouse
13       801 West Superior Avenue
         Suite 400
14       Cleveland, Ohio  44113
         (216) 622-3988
15       James.bennett4@usdoj.gov
         renee.bacchus@usdoj.gov
16
     On behalf of the U.S. Drug Enforcement
17   Administration:
         JOHN J. CIPRIANI, ESQ.
18       431 Howard Street
         Detroit, Michigan  48226
19       (313) 234-4002
         john.j.cipriani@usdoj.gov
20
     On behalf of Walmart, Inc.:
21       Jones Day
         CHRISTOPHER M. McLAUGHLIN, ESQ.
22       North Point, 901 Lakeside Avenue
         Cleveland, Ohio  44114-1190
23       (216) 586-3939
         cmmclaughlin@jonesday.com
24
25                       ~ ~ ~ ~ ~
```

```
 1   APPEARANCES, CONT'D:
 2   On behalf of CVS Indiana, LLC and CVS Rx Services,
     LLC:
 3       Zuckerman Spaeder LLP
         DANIEL P. MOYLAN, ESQ.
 4       100 East Pratt Street
         Suite 2440
 5       Baltimore, Maryland  21202-1031
         (410) 949-1159
 6       dmoylan@zuckerman.com
 7   On behalf of Endo Pharmaceuticals, Inc., Endo
     Health Solutions, Inc., Par Pharmaceuticals,
 8   Inc. and Par Pharmaceutical Companies, Inc.:
         Arnold & Porter
 9       WILSON D. MUDGE, ESQ.
         601 Massachusetts Avenue, NW
10       Washington, D.C.  20001-3743
         (202) 942-5743
11       wilson.mudge@arnoldporter.com
12   On behalf of McKesson Corporation:
         Covington & Burling LLP
13       BENJAMIN C. BLOCK, ESQ.
         STEPHEN RAIOLA, ESQ.
14       One CityCenter
         850 Tenth Street NW
15       Washington, D.C.  200001-4956
         (202) 662-5205
16       bblock@cov.com
         sraiola@cov.com
17
     On behalf of HBC Service Company:
18       (Via Telephone)
         Marcus & Shapira LLP
19       ERIN GIBSON ALLEN, ESQ.
         One Oxford Centre, 35th Floor
20       Pittsburgh, Pennsylvania  15219
         (412) 338-3344
21       allen@marcus-shapira.com
22   On behalf of Mallinckrodt, LLC:
         Ropes & Gray LLP
23       JOSH GOLDSTEIN, ESQ.
         800 Boylston Street
24       Boston, Massachusetts  02199
         (617) 951-7000
25       joshua.goldstein@ropesgray.com
```

```
                                                    Page 371
  1   APPEARANCES, CONT'D:
  2   On behalf of Janssen and Johnson & Johnson:
          Tucker Ellis
  3       RAYMOND KRNCEVIC, ESQ.
          950 Main Avenue, Suite 1100
  4       Cleveland, Ohio  44113
          (216) 696-4889
  5       raymond.krncevic@tuckerellis.com
             - and -
  6       (Via Telephone)
          O'Melveny & Myers
  7       MATT WALLACE, ESQ.
          400 South Hope Street
  8       18th Floor
          Los Angeles, California  90071
  9       (213) 430-6000
          mwallace@omm.com
 10
       On behalf of AmerisourceBergen Drug Corporation:
 11       Jackson Kelly
          SANDRA K. ZERRUSEN, ESQ.
 12       50 South Main Street
          Suite 201
 13       Akron, Ohio  44308
          (330) 252-9060
 14       skzerrusen@jacksonkelly.com
 15   On behalf of Rite-Aid of Maryland:
          (Via Telephone)
 16       Morgan Lewis
          JOHN P. LAVELLE, JR., ESQ.
 17       1701 Market Street
          Philadelphia, Pennsylvania  19103-2921
 18       (215) 963-4824
          john.lavelle@morganlewis.com
 19
      On behalf of Walgreens:
 20       (Via Telephone)
          Bartlit Beck
 21       ALEX J. HARRIS, ESQ.
          1801 Wewatta Street
 22       Suite 1200
          Denver, Colorado  80202
 23       (303) 592-3197
          alex.harris@bartlit-beck.com
 24
 25                      ~ ~ ~ ~ ~
```

Page 372

```
 1   APPEARANCES, CON'TD:
 2   On behalf of Henry Schein:
         (Via Telephone)
 3       Locke Lorde
         MADELEINE E. BRUNNER, ESQ.
 4       2200 Ross Avenue
         Suite 2800
 5       Dallas, Texas  75201
         (214) 740-8000
 6       maddie.brunner@lockelord
 7   ALSO PRESENT:
 8       Special Master David Cohen
 9
                         ~ ~ ~ ~ ~
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 373

1                    TRANSCRIPT INDEX

2

3   APPEARANCES ..................................369

4   INDEX OF EXHIBITS ...........................374

5   INDEX OF OBJECTIONS .........................375

6

7   EXAMINATION OF LORI BAKER-STELLA:

8   BY MR. BLOCK ................................378

9   BY MR. MOYLAN ...............................483

10

11  REPORTER'S CERTIFICATE ......................492

12

13  EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

Page 374

```
 1                    INDEX OF EXHIBITS
 2
 3    Number            Description            Marked
 4
 5    Exhibit 7    E-Mail String Dated December 9,   414
                   2016 Bates Numbered
 6                 SUMMIT_001233825
 7    Exhibit 8    E-Mail from Lori Baker-Stella to 417
                   P. Hunt and M. Paolino Dated
 8                 October 7, 2016 Bates Numbered
                   SUMMIT_0001-2503
 9
      Exhibit 9    E-Mail from Lori Baker-Stella to 427
10                 P. Hunt and M. Paolino Dated
                   August 25, 2014 Bates Numbered
11                 SUMMIT 001000737
12    Exhibit 10   E-Mail from Lori A. Baker-Stella 439
                   to M. Paolino and P. Hunt Dated
13                 July 1, 2015 Bates Numbered
                   SUMMIT 001002601
14
      Exhibit 11   E-Mail String Bates Numbered     446
15                 SUMMIT_001003326
16    Exhibit 12   E-Mail String Bates Numbered     455
                   SUMMIT_000037561
17
      Exhibit 13   E-Mail String Bates Numbered     467
18                 SUMMIT_001132316
19    Exhibit 14   E-Mail from Lori A. Baker-Stella 470
                   to M. Paolino and P. Hunt Dated
20                 April 5, 2017 Bates Numbered
                   SUMMIT_000074835
21
      Exhibit 15   E-Mail from Lori A. Baker-Stella 473
22                 Dated June 8, 2016 Beginning
                   Bates Number SUMMIT_001007719
23
24
25
```

```
 1                    INDEX OF OBJECTIONS
 2
```

```
 3   Objection ....................................381
     Objection ....................................381
 4   Objection ....................................391
     Objection ....................................392
 5   Objection ....................................394
     Objection ....................................395
 6   Objection ....................................396
     Objection ....................................397
 7   Objection ....................................398
     Objection ....................................398
 8   Objection ....................................399
     Objection ....................................399
 9   Objection ....................................400
     Objection ....................................400
10   Objection ....................................401
     Objection ....................................401
11   Objection ....................................401
     Objection ....................................402
12   Objection ....................................402
     Objection ....................................402
13   Objection ....................................403
     Objection ....................................403
14   Objection ....................................404
     Objection ....................................404
15   Objection ....................................404
     Objection ....................................405
16   Objection ....................................406
     Objection ....................................406
17   Objection ....................................407
     Objection ....................................409
18   Objection ....................................409
     Objection ....................................410
19   Objection ....................................410
     Objection ....................................411
20   Objection ....................................411
     Objection ....................................411
21   Objection ....................................411
     Objection ....................................411
22   Objection ....................................412
     Objection ....................................412
23   Objection ....................................413
     Objection ....................................413
24   Objection ....................................416
     Objection ....................................417
25   Objection ....................................419
```

1           INDEX OF OBJECTIONS, CONT'D

2

3    Objection ....................................420
     Objection ....................................421
4    Objection ....................................422
     Objection ....................................422
5    Objection ....................................424
     Objection ....................................426
6    Objection ....................................426
     Objection ....................................427
7    Objection ....................................428
     Objection ....................................431
8    Objection ....................................431
     Objection ....................................432
9    Objection ....................................434
     Objection ....................................434
10   Objection ....................................435
     Objection ....................................435
11   Objection ....................................436
     Objection ....................................437
12   Objection ....................................437
     Objection ....................................437
13   Objection ....................................438
     Objection ....................................438
14   Objection ....................................438
     Objection ....................................439
15   Objection ....................................440
     Objection ....................................441
16   Objection ....................................443
     Objection ....................................443
17   Objection ....................................449
     Objection ....................................451
18   Objection ....................................455
     Objection ....................................459
19   Objection ....................................459
     Objection ....................................460
20   Objection ....................................460
     Objection ....................................461
21   Objection ....................................462
     Objection ....................................462
22   Objection ....................................463
     Objection ....................................464
23   Objection ....................................467
     Objection ....................................468
24   Objection ....................................469
     Objection ....................................471
25   Objection ....................................472

Page 377

1               INDEX OF OBJECTIONS, CONT'D

2

3    Objection.....................................473

     Objection ...................................477

4    Objection ...................................478

     Objection ...................................478

5    Objection ...................................479

     Objection ...................................481

6    Objection ...................................481

     Objection ...................................483

7    Objection ...................................484

     Objection ...................................484

8    Objection ...................................485

     Objection ...................................485

9    Objection ...................................486

     Objection ...................................487

10   Objection ...................................488

     Objection ...................................489

11   Objection ...................................490

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR.  BLOCK:   We're  picking  up  the

2     continued  deposition  of  Detective  Baker-Stella.

3     All  counsel  that  were  present  at  the  continued

4     deposition  of  Detective  Leonard,  whether  in

5     person  or  on  the  phone,  are  still  here.   We've

6     been  joined  by  Sterling  Cluff  --  I  can't

7     remember  which  firm  you  are  at,  Sterling.

8          MR.  CLUFF:   From  Baron  &  Budd.   We

9     represent  the  City  of  Cleveland.   We're  also

10    representing  as  the  PEC,  in  addition  to

11    Mr.  Ledlie,  who  is  counsel  for  Summit.

12         MR.  BLOCK:   And  the  DOJ  DEA's  extern

13    couldn't  take  it  anymore  and  left.

14         Could  you  please  swear  the  witness?

15       LORI  BAKER-STELLA,  of  lawful  age,  called

16    for  examination,  as  provided  by  the  Federal

17    Rules  of  Civil  Procedure,  being  by  me  first

18    duly  sworn,  as  hereinafter  certified,  deposed

19    and  said  as  follows:

20         EXAMINATION  OF  LORI  BAKER-STELLA

21    BY  MR.  BLOCK:

22         Q.    Detective  Baker-Stella,  nice  to  see

23    you  again.

24         A.    Nice  to  see  you.

25         Q.    Thanks  for  coming  up  to  Cleveland.

Page 379

1    It makes it easier for us to get the three done

2    in a row.

3                 Did you do anything to prepare for

4    this portion of your deposition?

5          A.    I met with Mr. Ledlie yesterday and

6    on the phone with Bennett.

7          Q.    And how long was that meeting?

8          A.    A couple hours.

9          Q.    Did you do anything else?

10         A.    No.  Oh, yes.  I did review some of

11   my deposition.

12         Q.    Did you see anything you needed to

13   change or correct?

14         A.    No.  Just -- yeah.  There was one

15   thing when I said about pill mills and bad

16   doctors being hand in hand, they're about the

17   same.  And pill mills are -- we don't have many

18   of those and they're not really hand in hand

19   because pill mills are explained to me and how I

20   explain is where they're, you know, walking out

21   the door, there's a line and that, where bad

22   doctors, that's not always the case.  So I just

23   wanted to explain the difference between when I

24   said hand in hand.  That's all.

25         Q.    Anything else that you saw that

Page 380

1    needed to be clarified?

2          A.    If I think of it, I'll let you know.

3          Q.    But not that you can think of right

4    now?

5          A.    No.

6          Q.    And have you spoken with anyone

7    other than Mr. Ledlie and Mr. Bennett about this

8    case since we last saw you?

9          A.    No.  Just letting my supervisors

10   know that I was being recalled.  That's all.

11         Q.    Can you please tell us, Detective

12   Baker-Stella, how many investigations you have

13   worked on since you've been at the TDS?

14         A.    Quite a few; quite a few.

15         Q.    Is it more than a hundred?

16         A.    I would not say more than a hundred

17   since I've started.

18         Q.    Is it more than 50?

19         A.    That I've worked on?  I would -- it

20   would be just an estimated guess, honestly.  I

21   don't have the correct number.

22         Q.    What's your estimate?

23         A.    A lot.

24         Q.    Well, how many are you working on

25   right now?

Page 381

1        A.    Quite a few, yeah.  Quite a few.

2        Q.    Well, how many?

3        A.    Well, as I explained in -- prior

4   about how our unit works, that we work our cases

5   together, so that's why it's a lot, because

6   we're doing things on many, many cases.

7        Q.    But a lot, like are you working on

8   more than a dozen cases right now?

9        A.    Yes.  I would -- yes.

10        Q.    And do you do about a dozen or so a

11   year?

12             MR. LEDLIE:  Object to the form

13   Misstates testimony.

14             MR. BENNETT:  Objection.  Vague.

15             You can answer.

16        A.    When my -- I have a role there at

17   the TDS, and mine is like, on these cases,

18   surveillance and that kind of stuff, executing

19   the search warrants and evidence and all of

20   that, so doing all of that, we work many cases.

21        Q.    Do you have --

22        A.    I can't give you a number.

23        Q.    How many investigations have you

24   worked on at TDS where you've been the lead

25   investigator?

Page 382

1         A.      A handful.

2         Q.      So the majority of the work you've

3    done at TDS has been assisting a case where

4    someone else was the lead?

5         A.      Yes.

6         Q.      When is the first -- what's the

7    right term, lead investigator?

8         A.      Yeah, opening the case, lead

9    investigator.  I don't have an exact date, but

10   I'm sure once I, you know, started, there was a

11   case that I opened.  I can't tell you exactly

12   when.

13        Q.      Do you know whether you were the

14   lead investigator for a case before you went to

15   the training at Quantico?

16        A.      I don't remember because I don't

17   honestly remember what year I went to Quantico.

18        Q.      We may see something that might help

19   jog your memory on that.

20                Have you been the lead agent for a

21   case that involved an investigation into

22   something other than an opioid, so, for example,

23   steroids or cannabinoids?

24        A.      Yes.  Not lead investigator but co

25   on it, so I was second man.  Yeah, it was a

Page 383

1    steroid case.

2         Q.    How many -- is it like a three tier

3    thing, lead agent, co-lead agent, assist?

4         A.    No.  It would be -- how we open them

5    is, you know, the lead agent and then there's a

6    co-agent, so on that case -- and that was pretty

7    close to me coming to the unit.  I was the

8    co-agent on that.

9         Q.    How many investigations have you

10   been the co-agent on since you've been at TDS?

11        A.    Quite a few.  I don't know the exact

12   amount, but quite a few.

13        Q.    We're doing good, I think.  We're

14   doing well.

15              A handful of times you've been the

16   lead investigator?

17        A.    About.  Maybe more.

18        Q.    Fair enough.  I'm just trying to get

19   the -- I'm trying to -- I think the word is

20   taxonomy.  There's probably a better word that I

21   can't think of right now.  The breakdown.

22              So you got some where you're the

23   lead investigator?

24        A.    Um-hum.

25        Q.    And then there's some other universe

```
 1   where you're a co-lead?
 2        A.    Correct.
 3        Q.    And is there a third set where
 4   you're neither the lead nor the co-lead but
 5   you're still on the case?
 6        A.    Oh, absolutely.  Any case that is
 7   opened.
 8        Q.    So coming back to where you're the
 9   co-lead, do you have a sense as to how often
10   that is?
11        A.    Well, I work a lot with Patrick
12   Leonard, so a lot of cases, say, that I would
13   open, you know, I would put him as the co and
14   vice versa.
15        Q.    Are there any other agents that
16   you're the co with other than Detective Leonard?
17        A.    Yes.  I can give -- Agent Parkinson,
18   Tyler.
19        Q.    He's at DEA --
20        A.    Yes, he is.
21        Q.    -- if I remember from last time.
22        A.    Yes.
23        Q.    Anyone else?
24        A.    I believe -- she's retired, but Rene
25   Babic.  She was an agent that's retired.  I was
```

Page 385

1  a co on a few of hers.

2      Q.    Was she DEA?

3      A.    She was DEA, yes.

4      Q.    And now I just want any

5  investigation -- all of the investigations that

6  you worked on, whether lead, co-lead or just

7  assisting.  Do you know what percentage or

8  fraction of those involved something other than

9  opioids?

10     A.    Again, counterfeit of opioids, but

11 -- no.  They would be -- because that's what we

12 specialize in, so --

13     Q.    Well, you mentioned you've done a

14 steroid case at least.

15     A.    Well, that's -- any schedule drug II

16 to IV is what we investigate at the TDS.

17     Q.    I understand that, and I'm trying to

18 get a sense not all II to Vs are opioids.

19     A.    Correct.

20     Q.    So of the cases you've worked on,

21 what percentage involved schedules that are not

22 opioids?

23     A.    Okay.  A handful, you know, and,

24 again, those would fall under the steroid cases

25 that we've worked.

1    Q.    Have you worked on doctor shopping

2  investigations while at TDS?

3    A.    Yes.

4    Q.    Have you worked on any pill mill

5  investigations while at TDS?

6    A.    Search warrant on the pill mill

7  case.

8    Q.    How many?  Is that just one case?

9    A.    Yes.  That would just be the one

10  case that I assisted on the search warrant and

11  an arrest.

12    Q.    That case resulted in an arrest?

13    A.    It did.

14    Q.    Did it result in a conviction?

15    A.    It did.

16    Q.    Who was the target who --

17    A.    Dr. Harper.

18    Q.    Have you worked on any other pill

19  mill cases other than Dr. Harper?

20    A.    Not of my explanation as I gave of

21  what a pill mill doctor is.

22    Q.    And do you know how many doctor

23  shopping investigations you've worked on?

24    A.    Again, quite a few.  To give an

25  exact number, no.

Page 387

1     Q.   Have you worked on doctor shopping

2 investigations every year you've been at TDS?

3     A.   Yeah.  There's always a doctor

4 shopper case that's been worked, yeah.

5     Q.   And what about have you worked on

6 any investigations involving counterfeit pills?

7     A.   Yes.

8     Q.   How many?

9     A.   That I can -- not to be exact, but I

10 would say, again, three or four, but don't --

11 that's just a guess.

12     Q.   Have any of those resulted in

13 convictions?

14     A.   Yes.  Yes.  One has.  The other ones

15 are still being worked.

16     Q.   What was the name of the person or

17 persons that were convicted?

18     A.   ███ ███ ██████████ ████ █████ ██

19 ██████ ███████ █████ █████ ████ ███ ████████

20 ███████

21     Q.   How about -- let's see.  At TDS have

22 you worked on any cases involving theft of

23 prescription opioids?

24     A.   Yes.  We've had -- it's open.  We've

25 had reports and that that we've looked into on

Page 388

1    theft.

2         Q.    How many?

3         A.    Under DEA?

4         Q.    Yes.

5         A.    We have a few going.

6         Q.    Have you worked on investigations

7    involving prescription thefts every year that

8    you've been at TDS or is that a less frequent

9    occurrence than doctor shopping?

10        A.    We had the one conviction of the

11   theft of prescription pads, so --

12        Q.    That was Ms. ███?

13        A.    That's Ms. ███, correct.  That was

14   out of Summit County as well.

15        Q.    Was the Webb case one of the few

16   that you were thinking of?

17        A.    Yes.

18        Q.    And so back to my prior question.

19   Do you do more investigations of doctor shopping

20   than you do of thefts of prescription

21   medication?

22        A.    I would say more of investigating

23   doctors overprescribing.

24        Q.    Is that the most common type of

25   investigation that you work on?

1          A.    That I work on, yes.

2          Q.    Doctors overprescribing?

3          A.    Doctors overprescribing, yes.

4          Q.    Do you know how many of those

5    investigations you've worked on at TDS?

6          A.    A lot.  Again, numbers, not good,

7    but over a handful definitely.

8          Q.    Worked on a lot.  Have any of those

9    resulted in convictions?

10         A.    Well, the cases, they are, but

11   they're still open because they have fled the

12   country, yeah, so I guess they wouldn't be

13   convicted.

14              MR. BENNETT:  You should only

15   discuss cases that are convictions.  If it's an

16   active investigation that the suspect is not

17   around, you're not authorized to disclose that

18   information.

19         A.    I'm not authorized to disclose.

20         Q.    How many suspects who aren't around

21   are we talking about?

22         A.    A handful.

23         Q.    So you've worked on a lot of the

24   cases, and in a handful the suspect fled the

25   country.  Are there any that resulted in arrests

Page 390

1    of these doctor improper prescribing cases?

2              MR. BENNETT:  You can answer that

3    question yes or no.

4         A.    I don't know that information of

5    where the case -- the status of where it's at.

6    I'm sorry.

7         Q.    That's fine.

8              Have you worked on any cases

9    involving improper prescribing -- are these all

10   of doctors?

11        A.    Yes.  That's mostly what I focus on.

12        Q.    Have you worked on any case

13   involving a doctor improperly prescribing that's

14   resulted in a conviction?

15        A.    No.  They're still open.

16        Q.    When did you first start working on

17   doctor overprescribing cases?

18        A.    Immediately once -- I started

19   shadowing again, as I spoke before, with Tyler

20   Parkinson.  Yeah.  I was with him and working a

21   case with him as well.

22        Q.    You said that your focus is on

23   doctor overprescribing cases.  Are there others

24   at TDS who focus on doctor overprescribing cases

25   to your knowledge?

1        A.    As I explained, we work our cases a

2   lot together, because there's many aspects of

3   it.  So yeah, there's other agents as well that

4   work on these doctor shopper cases.

5        Q.    Who else at TDS focuses on doctor

6   shopping cases?

7             MR. BENNETT:  Objection.  Scope.

8        Q.    I'm sorry.  And I said doctor

9   shopper.  I meant to say doctor overprescribing

10  cases.

11            MR. BENNETT:  And I know this was an

12  issue before.  We have instructed the witnesses

13  that they're not authorized to disclose members

14  of the task force who are not publicly known, or

15  strength of forces, so to the extent that you're

16  asking for names of other task force officers

17  that are not part of Akron or Summit County or

18  Cleveland or Cuyahoga County, I'm going to

19  indicate the witness is not authorized, under

20  the scope of her authorization, to disclose the

21  names of those individuals.

22            SPECIAL MASTER COHEN:  You can

23  answer within those bounds.

24            MR. BLOCK:  And, Your Honor, we

25  don't agree that Touhy is a basis not to -- to

1    instruct a witness not to answer the question.

2    The confidentiality -- the protective order

3    should enable us to explore the extent to which

4    the TDS is working on overprescribing without

5    interfering with any --

6              MR. BENNETT:  And I think they can

7    ask about what TDS is doing --

8              SPECIAL MASTER COHEN:  Hold on.  The

9    question that you asked I think she can answer

10   within the bounds of what he described.  So

11   let's just go question by question.  I think you

12   can probably get everything you need.

13        Q.   Can you tell me who else at TDS

14   focuses on doctor overprescribing cases?

15             MR. BENNETT:  Objection.  Scope.

16             Same instruction.

17        Q.   I'll try to unpack it.

18             Is there anyone at TDS that's part

19   of the Akron Police Department that focuses on

20   doctor overprescribing?

21        A.   Yes.  Patrick Leonard.

22        Q.   How about Summit County?  Is there a

23   Summit County person?  You're the Summit County

24   person?

25        A.   I'm the Summit County person.

Page 393

1          Q.    How about from the City of
2     Cleveland?  Is there someone at TDS from the
3     City of Cleveland who focuses on overprescribing
4     cases?
5               A.    Yes.  Prince.
6          Q.    Is there someone from Cuyahoga
7     County at TDS who focuses on doctor
8     overprescribing cases?
9               MR. BENNETT:  You can answer that.
10              A.    Yes.  ████  ████████.  Don't ask me
11    how to spell it.  I just call him ████.
12         Q.    Are there others at TDS who focus on
13    doctor overprescribing cases, without giving me
14    their names?
15              A.    Yes.  We all do.  As a unit we work
16    them.
17         Q.    And perhaps I misunderstood your
18    testimony, but I understood you to say you
19    particularly focus on doctor prescribing cases
20    as opposed to the other kinds of diversion.  Did
21    I misunderstand that?
22              A.    That's what I focus on, but the
23    whole unit also focuses, so we all have our own
24    thing as we investigate.  You know, I do the
25    surveillance.

                                        Page 394

1        Q.    And do you consider Detective

2   Leonard to be focused like you on -- to the same

3   extent you are on doctor overprescribing cases

4   as opposed to other types of diversion?

5              MR. LEDLIE:  Object to the form.

6   Vague.

7              You can answer that.

8        A.    He also, you know, does doctor

9   shoppers as well as investigating the

10  physicians.

11       Q.    And how about Detective G?

12       A.    He is actually newer to the unit, so

13  he's just mostly assisting, so he's learning

14  everything right now.  So he's shadowing an

15  agent right now.

16       Q.    Are there any other types -- we

17  talked about doctor shopping, counterfeit pills,

18  prescription thefts and improper prescribing.

19  Are there any other types of diversion cases

20  that you've worked on at TDS?

21       A.    Those -- I think that would -- that

22  would pretty much nail it.

23       Q.    Let's get --

24       A.    Fictitious.  You did get the

25  fictitious.

```
 1        Q.    Maybe I did.  Maybe I didn't.  What
 2   do you mean by --
 3        A.    Fictitious prescriptions, that's
 4   where they're made up, they're counterfeit.
 5        Q.    Have you worked on those type of
 6   investigations?
 7        A.    Yes.  And that also goes back to
 8   like the ████  case and all that.
 9        Q.    How many of those investigations
10   have you worked on?
11        A.    Two to three.  I believe like two of
12   them that are still open working currently.
13        Q.    How long does it take you -- you've
14   worked on a lot of -- it sounds like you've
15   worked on a lot of improper prescribing
16   investigations, and most of them are still
17   pending; is that right?
18        A.    They are still being worked, yes.
19        Q.    So how long does it take to do an
20   improper prescribing investigation?
21             MR. BENNETT:  Objection.  Vague.
22             You can answer.
23        A.    You know, we go where -- as we
24   investigate, what we want to do is make sure
25   that we involve the different entities, like say
```

Page 396

1   the medical board and that kind of stuff, so

2   different things are being looked at of what --

3   that they can help us on, but, you know, the

4   process takes a while, yeah, as we're voting our

5   case, you know, because we're taking it

6   criminally and/or civilly, yeah.

7        Q.    The people that fled the country,

8   charges were brought against them?

9        A.    Um-hum.

10       Q.    I'm sorry.  I need a yes or no.

11             MR. BENNETT:  I'll object.

12             I'll indicate that to the extent the

13  indictment is non-public, has not been unsealed,

14  you are not authorized to disclose the existence

15  of a sealed indictment.  To the extent that it

16  is unsealed, you may answer the question.

17       Q.    Let me -- okay.  Can you answer

18  that, please?

19       A.    I can't because I don't know if it's

20  unsealed.

21       Q.    Well, whether there's a sealed or

22  unsealed indictment, from the time of the

23  investigation to an indictment, how long does

24  that take for an improper prescribing?

25       A.    It honestly varies.

Page 397

1          Q.    What's the range?

2          A.    If it's so blatant that -- as I

3  explained how a pill mill works of having people

4  out the door, I mean, that's going to move

5  because of the safety of our public and that's

6  always what we look at, the public safety.  That

7  would be much quicker than, you know, something

8  that's a little bit more involved and that would

9  take obviously longer.

10         Q.    So my understanding is that the

11  Dr. Harper investigation took at least four

12  years.  Does that sound right to you?

13              MR. LEDLIE:  Object to the form,

14  misstates testimony of another witness, and

15  foundation.

16         Q.    You may answer.

17         A.    That was -- that was prior to me

18  coming in.  ███████ ████ ████ ████ ████ ████ █

19  ██████████ ████ ████████ ████ ████████ ████ ████████

20  ██████ ██████████ ████ ████ ████ ████ ████████ ██████

21  ██████ ██████ ██████ ██████ ██████.

22         Q.    But Harper, in your view, is an

23  example of a blatant -- back to your prior

24  answer, he was blatant?

25         A.    Yes, he was blatant.

Page 398

1      Q.    And other doctors take longer to
2  investigate?
3           MR. LEDLIE:  Object to the form.
4           MR. BENNETT:  Objection.
5           You can answer.
6      A.    It honestly depends on, you know,
7  our investigation and each route that it takes
8  us to.
9      Q.    What's the range?  What's the
10  quickest you've ever done a doctor
11  overprescribing investigation?
12      A.    I honestly don't have an answer.  To
13  bring charges to or to --
14      Q.    Yes.  Let's say to bring charges to.
15      A.    I can't give you a time frame.  I
16  mean, this is only a guess.  ████ ████  ██████
17  ████████ ██████ █████ ██ ██ █████ ██████ ████████
18  ██████ ████████ ████ ██████ ██ ████████ ██████ ██████
19  ██████ █████ ██ ████.
20      Q.    Have you worked on any improper
21  prescribing investigations that have not
22  involved the medical board?
23      A.    For medical doctors?
24      Q.    Yes.
25      A.    I don't believe so, because that's

Page 399

1  always a link that, you know, we want to notify

2  them.

3       Q.    In the investigations that you've

4  worked on of doctors for overprescribing, has

5  the involvement of the medical board been at

6  TDS's initiation, TDS's reaching out to the

7  board?

8            MR. BENNETT:  Objection to scope.

9            You can answer.

10      A.    It goes both ways.

11      Q.    Which happens more frequently?

12            MR. LEDLIE:  Object to the form.

13            You may answer.

14      A.    I would say 50/50.  You know, we

15  work very well together with them, so -- I think

16  it's important for them to contact us, and as

17  it's important for us to contact them.

18      Q.    You've done improper prescribing

19  investigations where you've concluded that there

20  wasn't improper prescribing, correct?

21      A.    Um-hum.

22      Q.    I'm sorry.  I need a yes or no to

23  that just for the court reporter.

24            MR. BENNETT:  You can answer.

25      A.    I have, yeah.

```
                                        Page 400
 1        Q.    How often?  How many times?
 2        A.    Not very many.
 3        Q.    But more than one?
 4        A.    Yes.
 5        Q.    More than two?
 6              MR. BENNETT:  You can answer.
 7        Q.    More than -- sorry.  More than two?
 8        A.    It would be a guess.  Yes.
 9        Q.    You think more than two?
10        A.    Yes.
11        Q.    Do you think more than ten?
12        A.    I don't think so.
13        Q.    And do you recall how long the --
14   how long of an investigation did it take for you
15   to conclude that there was not -- you know, in
16   the ones where you concluded there wasn't
17   improper prescribing?
18              MR. LEDLIE:  Object to the form of
19   the question.
20              You may answer.
21              MR. BENNETT:  Objection.  Scope.
22              You can answer.
23        A.    Still the same amount of time I
24   believe goes into them because there's, you
25   know, things that we look at.  So, you know, we
```

Page 401

1   still have to do our part of investigating it,

2   so it's still going to take some time.  It's not

3   quick.

4        Q.    Have you ever worked on an improper

5   prescribing investigation that didn't involve

6   the use of an undercover -- yeah, of someone

7   going undercover?

8             MR. LEDLIE:  Objection.  Scope.

9             MR. BENNETT:  Objection.  Scope.

10            You can answer that question yes or

11  no only if you know.

12       A.    Can you ask it again, please?

13       Q.    Yes, absolutely.

14            Have you ever worked on one of these

15  improper prescribing investigations, of whether

16  a doctor is improperly prescribing, that did not

17  involve having someone go undercover?

18       A.    █

19       Q.    And if I followed that correctly,

20  some of the cases where you investigated a

21  doctor you thought was overprescribing,

22  concluded he or she wasn't, there was somebody

23  who went undercover to the doctor's office?

24            MR. BENNETT:  Objection.  Scope.

25            You can answer that question yes or

Page 402

1    no only.

2          A.    Yes.

3          Q.    In your investigations into doctors

4    for overprescribing, do you work with medical

5    experts?

6                MR. BENNETT:  Objection.  Scope.

7                You can answer.

8          A.    I personally?  No, I have not spoken

9    with one, but we do utilize them.

10         Q.    And just to go into that just a tiny

11   bit more, so you may not have directly dealt

12   with the expert but have there been

13   investigations of doctors overprescribing that

14   you've worked on where a medical expert has been

15   consulted even if it was someone else that

16   consulted the expert?

17               MR. BENNETT:  Objection.  Scope.

18               You can answer.

19         A.    Yes.

20         Q.    Have you ever worked on an

21   investigation of a doctor for improper

22   prescribing that didn't involve the consultation

23   by someone at TDS with a medical expert?

24               MR. BENNETT:  Objection.  Scope.

25               You can answer yes or no only.

Page 403

1      A.    I do not know that one.

2      Q.    To your understanding, is it pretty

3  common, in terms of investigations into doctors

4  for overprescribing, to have consultation with a

5  medical expert?

6            MR. BENNETT:  Objection.  Scope.

7  Objection.  Vague.

8            You can answer.

9      A.    Yes.

10     Q.    How many of the investigations that

11  you've worked on at TDS have been focused where

12  the investigation or the target of the

13  investigation is outside of Summit County?

14           MR. BENNETT:  You can answer.

15     A.    Quite a few.  Quite a few.

16     Q.    More than half?

17     A.    Yes.

18     Q.    Have you arrested anyone for doctor

19  shopping?

20           MR. BENNETT:  Objection.  Scope.

21           You are not authorized to disclose

22  non-public specific DEA activities and

23  investigations.  To the extent that the arrest

24  was made public due to the fact that the

25  individual was charged, you may answer; however,

Page 404

1    if the arrest has not been made public because

2    the suspect was not charged, you may not answer.

3              MR. LEDLIE:  And then are you

4    limiting this to TDS?  I just need to understand

5    it.  Vague.  I don't know if you're talking

6    about her time at TDS.

7              MR. BLOCK:  Yes, TDS.

8         Q.   Well, did you arrest anybody for

9    doctor shopping before you went to TDS?

10        A.   No.

11        Q.   Have you arrested anybody for doctor

12   shipping since you've been at TDS?

13        A.   No.

14             MR. BENNETT:  Objection.

15        Q.   Have you investigated anyone for

16   doctor shopping and concluded that they weren't

17   doctor shopping?

18             MR. BENNETT:  Objection.  Asked and

19   answered.

20        A.   Yes.

21        Q.   How many times has that happened?

22             MR. BENNETT:  Objection.  Scope.

23             You can answer.

24        A.   Again, there's so many cases, I

25   can't -- there has been.  I can't give you a

Page 405

```
 1   number.
 2         Q.     It's happened more than once?
 3         A.     Yes.
 4         Q.     Has it happened more than a dozen
 5   times?
 6               MR. BENNETT:  Objection.  Scope.
 7         A.     I don't know.
 8         Q.     You're not sure one way or the
 9   other?
10         A.     Yeah.
11         Q.     And in the doctor shopping
12   investigations that you've done where you
13   concluded the person wasn't doctor shopping, how
14   long did that take you -- how long did that
15   investigation take?
16               MR. BENNETT:  You can answer.
17         A.     Again, it varies of how long it
18   takes.  You know, once we follow our -- you
19   know, I can't get into techniques and everything
20   and -- you know, it shows that he's in the scope
21   of what he's allowed to do, then -- I mean, it
22   takes time.  It takes time.  Nothing is fast.
23         Q.     Are we talking years on doctor
24   shopping investigations?  Is it weeks, months,
25   years?  I'm trying to get at that.
```

```
                                            Page 406

 1              MR. LEDLIE:  Object to the form.

 2      Vague.

 3              MR. BENNETT:  Object to the form.

 4              MR. LEDLIE:  I don't know what we're

 5      talking about here.

 6              MR. BLOCK:  That doesn't really

 7      matter if you know.

 8         Q.    Do you understand, Detective

 9      Baker-Stella?  Doctor shopping investigations,

10      whether -- we're talking those take weeks,

11      months, years?  What are we talking about?

12         A.    Months, years, yeah.  I think I've

13      explained that, yeah.  They take a while.

14         Q.    Doctor shopping as opposed to

15      improper prescribing?

16         A.    We're back now to doctor shoppers?

17         Q.    Yes.  It does matter if you

18      understand.

19         A.    I'm sorry.  So doctor shoppers, no,

20      those do not take as long.  I apologize.  If you

21      want to repeat --

22         Q.    Yes.

23              My question is, in the cases that

24      you worked on where you investigated whether

25      someone was doctor shopping and you concluded
```

Page 407

1    they aren't, how long did that investigation

2    take to do that?

3            A.    That wraps up very quickly, within

4    weeks, very quickly.

5            Q.    Got it.

6                  Improper prescribing takes months or

7    years?

8            A.    Correct.

9            Q.    How long do the prescription forgery

10   investigations you worked on -- how long have

11   those taken?

12           A.    Those go as quickly.  We work those

13   quickly, and depending on just, again, not going

14   into techniques of -- you know, we follow where

15   they're being given out, issued, and then

16   filled, and so we're able to find that a lot

17   faster.  That would be much quicker of an

18   investigation.

19           Q.    So is it a matter of weeks, a couple

20   months?  When you say "much quicker," I'm trying

21   to get a little more precision around that, if

22   we can.

23                 MR. BENNETT:  Objection.  Form.

24                 You can answer.

25           A.    ██ ███ ████ ████ ███ ██ ███

Page 408

1  ███ ████ ████ ███ ████ ██ ████ ████ ███ ██

2  █████ ████ ██ █ ████ ████ ████ ████ ██ ████

3  ███ ████ ███ ███ ███ ███ ███ ██

4  █████ ████ ███ ██ ████ ██ ████ ███,

5  ████ ███ ████ ████ ███ ███.

6         Q.    And that's the type of investigation

7  that -- that's part of what led to Ms. ████s

8  arrest and conviction?

9         A.    Yes.

10         Q.    Do you remember how long the ████

11  case took?

12         A.    Quite a few months, yes.

13         Q.    From start of the investigation

14  to -- how long did it take from the start of the

15  investigation to charges being brought, if you

16  remember?

17         A.    I'd be guessing again.  Maybe three

18  months.  Maybe.  I want to say it could --

19  shorter, but -- I'm sorry.  Not good on

20  timelines.

21         Q.    Were you the lead investigator on

22  the ████case?

23         A.    I don't know if I was lead or if Pat

24  was.  We were working it together because it

25  opened as a Summit County case, and there was

1    also an Akron case, so we linked them together.

2          Q.    Why did the improper prescribing

3    cases take longer than the doctor shopping and

4    prescription forgery cases?

5                MR. BENNETT:  Objection.  Scope.

6                You're not authorized to disclose

7    the internal deliberative process of the

8    Department of Justice or confidential law

9    enforcement investigative techniques.  To the

10   extent you can answer the question without

11   disclosing that, you may answer.

12         A.    Why they do take longer is, you

13   know, we want to make sure -- we have to go our

14   certain routes to make sure that each thing is

15   being handled in -- you know, lawfully, so that

16   takes time rather than just looking up a

17   database to see what's going on.  There's so

18   much more -- they're so much more involved

19   cases.  That's why.

20         Q.    So they're more complicated?

21         A.    They are more complicated.

22         Q.    There are more gray areas?

23               MR. LEDLIE:  Object to the form.

24         Q.    Is that part of what it is?

25               MR. BENNETT:  Objection.  Scope.

Page 410

1              You can answer.

2        A.     We need to get more into -- involved

3    into the case to find out.  You can get reports.

4    We can do leads, follow-up, but we actually --

5    there's just -- they're more complicated.  You

6    know, we don't take it lightly, you know, when

7    someone has gone many years to be a physician

8    and that, so we want to make sure, you know,

9    everything is being done correctly, or if it's

10   being done incorrectly, then handle that as fast

11   as we can for the safety of the public.

12       Q.     It's fair to say at a very general

13   level for an overprescribing investigation,

14   you're trying to figure out whether this doctor

15   is prescribing medications to patients without a

16   medical basis for doing so?

17       A.     That's correct.

18       Q.     And so you have to figure out

19   whether the doctor is exercising medical

20   judgment or just not applying medical judgment

21   at all?

22              MR. BENNETT:  Objection.  Scope.

23              You can answer.

24       A.     Correct.

25       Q.     And would you agree that's difficult

Page 411

1   to do?

2               MR. BENNETT:  Objection.  Vague.

3               You can answer.

4        A.    It's not difficult to do, but we

5   have special investigative tools of how to get

6   that information.

7        Q.    And those tools, without getting

8   into what they are, apparently they take a while

9   to implement and apply and think about and

10  figure out whether they're giving you the

11  conclusion it's medical judgment versus

12  non-medical judgment?

13              MR. BENNETT:  Objection.  Form.

14              You can answer.

15       A.    Yes.

16       Q.    And at some level it requires the

17  input of a medical expert?

18              MR. LEDLIE:  Object to the form.

19              MR. BENNETT:  Objection.  Scope.

20              You can answer.

21       A.    Yes.

22       Q.    Have you worked on investigations at

23  TDS that are outside the state of Ohio?

24              MR. BENNETT:  Objection.  Scope.

25              You can answer that question yes or

Page 412

1   no only.

2        A.    Yes.

3        Q.    How frequently does that occur?

4              MR. BENNETT:  You can answer that.

5        A.    Recently it's been just within, but,

6   you know, we have had it happen but not anything

7   like most recent.

8        Q.    So like today the cases you're

9   working on are all within Ohio?

10             MR. BENNETT:  Objection.  Scope.

11             If you can answer that question yes

12  or no only.  And, also, objection, vague.

13       A.    As I say, we have a lot of cases, so

14  I'm trying to -- I'm trying to think.  I think

15  there's a few still outside.

16       Q.    Have you ever concluded that a

17  doctor was overprescribing based solely on

18  looking at how many prescriptions the doctor was

19  writing?

20             MR. BENNETT:  Objection.  Scope.

21             You can answer that question.

22             THE WITNESS:  We might get into

23  technique.

24             MR. BENNETT:  You can answer that

25  question yes or no only.  You are authorized to

Page 413

1   answer that question yes or no only if you can.

2        A.    That is a tool that we use.  That's

3   only one -- that's not one thing that I would

4   just focus in and say we're taking him.

5        Q.    And my question is, the number of

6   prescriptions alone isn't sufficient to reach a

7   judgment about whether there's overprescribing

8   or not?

9             MR. LEDLIE:  Object to the form.

10       Q.    Do you agree with that?

11            MR. BENNETT:  Objection.  Scope.

12            You can answer yes or no only.

13       A.    Yes.

14       Q.    Have you ever requested a search

15  warrant for a doctor based solely on the amount

16  of prescriptions that the doctor was writing?

17            MR. BENNETT:  You can answer that

18  question.

19       A.    I don't believe I have.

20                  -   -   -   -   -

21            (Thereupon, Baker-Stella Deposition

22            Exhibit 7, E-Mail String Dated

23            December 9, 2016 Bates Numbered

24            SUMMIT_001233825, was marked for

25            purposes of identification.)

Page 414

1                     -  -  -  -  -

2          Q.    Detective Baker-Stella, Exhibit 7 is

3   an e-mail from you to Joseph Black dated

4   December 9th, 2016.  It bears the Bates label

5   SUMMIT_001233825.

6               Have you seen this before?

7          A.    I remember this e-mail.

8          Q.    Who is Joseph Black?  Who's Joe

9   Black?

10         A.    Joe Black is a deputy assigned to

11  our patrol division.

12         Q.    When you say "our patrol division"

13  --

14         A.    Summit County Sheriff's Office

15  patrol division.

16         Q.    And in the first sentence he says

17  he -- of his e-mail to you, he says, "I have a

18  script case that started as an identity theft

19  case sent back to me to handle from DB."

20               Do you know what DB stands for?

21         A.    Yes.  That is our detective bureau.

22         Q.    And do you know whether this case

23  resulted in a conviction?

24         A.    Yes, it did.

25         Q.    And who was the person that was

Page 415

1    convicted?

2         A.    That was the ████case.

3         Q.    Was this e-mail the start of the

4    ████ case?

5         A.    Yeah.  He was reaching out to me to

6    help him, you know -- to start that because he

7    has -- you know, as I explained, not all cases

8    come to me, so our patrol division also

9    investigates, so with me doing what I do, he was

10   reaching out to get some advice on how to do it.

11        Q.    And at some point did this

12   investigation transfer from Detective Black to

13   you at TDS?

14        A.    Yes.  I did end up taking the case.

15        Q.    And it resulted in an arrest and a

16   conviction?

17        A.    Yes.

18        Q.    And am I correct that -- what was

19   Web's job?

20        A.    She worked at the front desk of a

21   doctor's office, and so she was, you know, using

22   the prescription pads of the doctor to write,

23   and this was the same case that Pat Leonard --

24   we worked together on.

25        Q.    So she stole the pad from the

Page 416

1    doctor, the doctor didn't know the pad had been

2    stolen?

3         A.    That is correct.

4              MR. BENNETT:  Objection.  Scope.

5              I would remind you that you're not

6    authorized to disclose non-public facts about

7    this case.  To the extent that this was

8    disclosed publicly through the sentencing, you

9    may answer.  You can answer questions about

10   information that's been disclosed publicly.  To

11   the extent you have confidential sources or

12   information you gained that wasn't disclosed

13   publicly, you're not authorized to disclose that

14   about cases even when they're publicly charged.

15   I'm just reminding you if you got source

16   information or did an interview that wasn't

17   later disclosed, then you're not authorized to

18   disclose that information.

19        A.    Could you please ask that question

20   again?

21        Q.    I think I can strike the question,

22   so you'll all be thrilled.

23                  -   -   -   -   -

24              (Thereupon, Baker-Stella Deposition

25              Exhibit 8, E-Mail from Lori

Page 417

1              Baker-Stella to P. Hunt and M.

2              Paolino Dated October 7, 2016 Bates

3              Numbered SUMMIT_000102503, was

4              marked for purposes of

5              identification.)

6                   -   -   -   -   -

7        Q.    I hand you what has been marked as

8   Exhibit Number 8.  This is an e-mail from you to

9   P. Hunt and M. Paolino.  It's dated October 7th,

10  2016 and bears the Bates label SUMMIT_000102503.

11             Have you seen this before, this

12  e-mail?

13             MR. BENNETT:  Hang on a second.

14  Objection.  Scope.  This is one of the records

15  which we have requested a clawback.  I

16  understand the Special Master has ruled on this,

17  but we reserve our rights to address that at a

18  later point to have this document clawed back.

19             With that, you can answer his

20  question.

21        Q.    Have you seen this e-mail before was

22  the question.

23        A.    I wrote it, so yes, I've seen it.

24        Q.    And did you prepare it in the

25  ordinary course of business in your duties as a

1    detective of the Summit County Sheriff's Office?

2        A.    Yes, as both TFO and Summit County

3    Sheriff's Office.

4        Q.    And back to Exhibit 7.  That's an

5    e-mail you received in the ordinary course of

6    business as a detective for the Summit County

7    Sheriff's Office?

8        A.    That is correct.

9        Q.    I should have asked you that before,

10   but back to number 8, the one you sent to Pat

11   Hunt.  That's Sergeant Hunt.  He's a sergeant at

12   the Summit County Sheriff's Office?

13       A.    Who is now retired, yes.

14       Q.    But at the time he was your direct

15   supervisor at the Summit County Sheriff's

16   Office; is that right?

17       A.    That is correct.

18       Q.    Paolino, that's captain -- was he a

19   captain at the time?

20       A.    He was a lieutenant at the time.

21   Let me see.  Oh, it doesn't say.  He could have

22   been just a lieutenant at the time.  He is now

23   currently a captain.

24       Q.    And you were sending them an update

25   on the cases you were working on?

```
                                           Page 419
 1        A.     Yes, that is correct.
 2        Q.     And how would you determine what --
 3   it looks to me like you're mentioning here --
 4   well, first you were investigating a ring of
 5   counterfeit scripts of --
 6        A.     █████████████
 7        Q.     -- ████████████████████  ██████████
 8        A.     That is correct.
 9        Q.     What does a ring of counterfeit
10   scripts mean?
11             MR. BENNETT:  Objection.  Scope.
12             You can answer.
13        A.     It's when you have multiple people
14   doing the same thing, so it's a ring, there's
15   multiple people doing it.
16        Q.     And counterfeit scripts, this would
17   be something like what Ms. Webb did, they were
18   writing fake prescriptions for
19   ████████████████████?
20        A.     That is correct.
21        Q.     And so that was one thing you were
22   working on in October of 2016.  And then there's
23   mention to taking down a target in Columbus.
24   That was a target related to the counterfeit
25   script ring?
```

1          MR. BENNETT:  Objection.  Scope.

2          You can answer yes or no only.

3      A.    Yes.

4      Q.    And then it also says, "This is also

5   linked to a case Sergeant Hunt assigned me from

6   one of our pharmacies in Green."  What does that

7   mean, that Sergeant Hunt assigned you a case?

8          MR. BENNETT:  You can answer that.

9      A.    It was also a fictitious script that

10  was given to one of the area pharmacies as well

11  of the exact same thing.  So that's what I meant

12  by rings.  They were in different locations

13  doing the exact same thing.

14     Q.    What does it mean that Sergeant Hunt

15  assigned you a case?

16         MR. BENNETT:  You can answer.

17     A.    This was in our jurisdiction, so

18  with this being a fictitious script, the patrol

19  officer may or may not have felt comfortable, so

20  it was given over to our drug unit and then

21  assigned to me because it was a drug --

22  prescription drug-related case.

23     Q.    Is that sort of the same thing that

24  happened with the Webb case in terms of the case

25  started at the sheriff's office and got assigned

Page 421

1   to you at TDS?

2          A.     Yes.

3          Q.     How frequently has that happened

4   since you've been at TDS, where you've gotten a

5   case assigned to you through the Summit County

6   Sheriff's Office?

7          A.     It happens occasionally.

8          Q.     But it's not the majority of cases

9   you're working on at TDS don't come to you

10  through Summit County Sheriff's Office; is that

11  right?

12         A.     That's correct.

13         Q.     Can you think of any other

14  investigations you've worked on other than the

15  Webb case and this counterfeit script ring that

16  came to you through the Summit County Sheriff's

17  Office?

18              MR. BENNETT:  Objection.  Scope.

19              You're not authorized to disclose

20  ongoing active investigations or non-public

21  investigations.

22              MR. BLOCK:  I would think the answer

23  could be given in a way that won't disclose

24  anything particular about investigations, just

25  are there others.

Page 422

1          MR. BENNETT:  If your question is

2    are there others from Summit County, that's a

3    yes or no question and you are authorized to

4    answer that question yes or no.

5          Q.    Are there others that you have in

6    mind?

7          A.    Yes.

8          Q.    How many?

9          MR. BENNETT:  You can answer that.

10         A.    Again, a handful.

11         Q.    Has there been an arrest in this

12    ████████████████████████  case?

13         MR. LEDLIE:  Objection.

14         Q.    Let me rephrase.

15         Has there been a conviction in the

16    ████████████████████████  case?

17         MR. BENNETT:  You can answer that

18    question yes or no.

19         A.    It's ongoing.

20         Q.    Do you know whether there's been an

21    arrest?

22         MR. BENNETT:  Objection.  Scope.

23         To the extent that the arrest is

24    public because there have been charges, you may

25    answer.  To the extent there are arrests that

Page 423

1   have not been made public, you may not answer.

2              Do you need to confer?

3              Can we confer?

4              SPECIAL MASTER COHEN:  Yes.

5                 (Recess had.)

6              MR. BENNETT:  Can you repeat your

7    question?

8              MR. BLOCK:  Maybe.

9        Q.    Has there been an arrest in the

10   ████████████████████  ██████  case?

11             MR. BENNETT:  So I have discussed

12   the case with the witness outside.  We have

13   authorized the witness to answer as it relates

14   to individuals who have been arrested and

15   publicly charged.  To the extent there may or

16   may not have been other individuals who have

17   been arrested but not charged, we are not

18   authorizing her to answer at this point.  And

19   it's my understanding that this is an ongoing

20   active investigation.  So with those

21   limitations, she can tell you whether there's

22   anybody she knows of who's been arrested and

23   charged in this case.

24        A.    If I may answer, yes.

25        Q.    ████████████████████, is that an

                                              Page 424

1    opioid?

2           A.    It has the ████████ in it, and then

3    the ████████████, what that is is an

4    ████████████████ so you take it both in one.

5           Q.    So that's one investigation that you

6    were telling your supervisors at Summit County

7    Sheriff's Office about in October 2016.  And

8    then the next paragraph says, "We're

9    investigating a ████████ ring."

10               Do you see that?

11          A.    Um-hum.

12          Q.    What is meant by a fentanyl ring?  I

13   don't want to get into the specifics of the

14   investigation, but are we talking about illicit

15   fentanyl?

16          A.    Yes.  Again, as I explained, what

17   ring was is where it's happening in multi

18   locations, so that's what -- how I explain

19   definition of a ring, multiple people.

20          Q.    At a very general level, what is

21   happening at multiple locations with the

22   fentanyl; people are stealing it, selling it,

23   dealing it?

24               MR.  BENNETT:  Objection.  Scope.

25               You are not authorized to disclose

Page 425

1   ongoing, active investigations.  To the extent

2   you can answer just generally what happens with

3   fentanyl rings in your experience, you may.  You

4   may not give any non-public information about an

5   ongoing active investigation.

6           A.    It is sold.

7           Q.    And this is fentanyl that's obtained

8   on the black market; is that right?

9                 MR. BENNETT:  Objection.

10                Same instructions about scope.  To

11  the extent that this is generally what happens,

12  you may answer.  You may not talk about a

13  specific ongoing, active investigation out of

14  Toledo.

15          A.    Can you say what you just said?

16          Q.    I said that it's being sold on the

17  black market.  I'm sorry.  The fentanyl is

18  obtained on the black market.

19          A.    Yes, that we have found.

20          Q.    And you go on to say that "We have

21  numerous other cases we are working.  Wanted to

22  give info on the most recent cases that is

23  accumulating many hours of OT."

24          A.    Overtime.

25          Q.    And did you have any criteria that

Page 426

1    you used in determining whether there was a case

2    you needed to alert Sergeant Hunt or

3    Lieutenant/Captain Paolino about?

4                MR. BENNETT:  You can answer that

5    question.

6         A.   I don't work at the office down

7    in -- down in our Akron drug unit, so I'd like

8    to update them on -- because they never see me,

9    so I just update them on stuff I'm working on

10   because it's kind of like out of sight, out of

11   mind.  I wanted them to know that I'm up there,

12   you know, working cases, as I'm supposed to.  So

13   it's just a courtesy to let them know what I'm

14   working on.

15        Q.   And at least at the time you sent

16   this e-mail, were these the two biggest cases

17   you were working on and that's why they were

18   related to the overtime?

19                MR. LEDLIE:  Object to form.

20                MR. BENNETT:  Objection.  Vague.

21        A.   Oh, at least --

22        Q.   These were the two biggest cases you

23   were working on at the time and that's why they

24   were accumulating overtime?

25                MR. BENNETT:  Objection.  Vague.

Page 427

1      A.    I was just honestly shooting out an

2   e-mail quickly to him, just, you know, what's

3   going on, because at that time I believe he

4   wanted me just to do a weekly check-in, so that

5   must have been the ones that were on my mind at

6   that time.

7      Q.    Those are the ones you were focused

8   on at the time you sent the e-mail?

9      A.    That's correct.

10                -    -    -    -    -

11            (Thereupon, Baker-Stella Deposition

12            Exhibit 9, E-Mail from Lori

13            Baker-Stella to P. Hunt and M.

14            Paolino Dated August 25, 2014 Bates

15            Numbered SUMMIT 001000737, was

16            marked for purposes of

17            identification.)

18                -    -    -    -    -

19      Q.    Exhibit Number 9, Detective

20   Baker-Stella, is another e-mail from you to

21   Sergeant Hunt and probably Lieutenant Paolino.

22   This one is dated August 25th, 2014, Bates

23   SUMMIT_001000737.

24            Do you recall sending this e-mail?

25            MR. BENNETT:  Objection.

Page 428

1               This is one of the documents that
2       the DEA is seeking to claw back.  We believe
3       that more information should be clawed back.  We
4       understand the Special Master's ruling on this
5       issue, but we reserve our rights to address it
6       at a later time and have more of this document
7       or this entire document clawed back.
8               With that, you can answer the
9       question.
10          Q.    Do you recall sending the e-mail is
11      the question.
12          A.    Yes.  Yes.
13          Q.    And you sent this in the ordinary
14      course of your duties as a Summit County
15      Sheriff's officer?
16          A.    Detective, yes.
17          Q.    Thank you.
18              And what was the purpose of sending
19      this to Sergeant Hunt and Lieutenant Paolino?
20          A.    Again, as I explained, just giving
21      them, you know, a weekly update or every two
22      week update on just -- so they didn't forget who
23      I was.
24          Q.    And they didn't forget who you were,
25      though, right?

Page 429

```
 1        A.    So they didn't forget.  You know,
 2   out of sight, out of mind kind of thing.
 3        Q.    And so the first -- I think the name
 4   has been redacted, but I just want to confirm,
 5   the first type of case that you reported on is
 6   an overprescribing case?
 7        A.    Dr. ████████
 8             MR. BENNETT:  That one she can --
 9        Q.    I'm sorry.  I don't have the final,
10   final version.
11             MR. BENNETT:  Here.  You can have my
12   copy.  That first one has been closed
13   (indicating).
14             MR. BLOCK:  Thank you, Mr. Bennett.
15        Q.    So Dr. ████████, that was an
16   overprescribing case?
17        A.    It is.
18        Q.    What was the ultimate -- how did
19   that one end?
20        A.    He actually ended his -- lost his
21   medical license, had to go through counseling
22   and had to pay a fine.
23        Q.    And do you recall how long that
24   investigation took?
25        A.    That took some time, yeah.
```

Page 430

1          Q.    Years?

2          A.    Gosh, I -- I'm terrible with time.

3   I can't say -- maybe under a year.  Yeah.  I'm

4   terrible with time.

5          Q.    That's all right.

6                Were you the lead agent on that

7   case?

8          A.    I was not.

9          Q.    Were you a co-lead?

10         A.    I was not.

11         Q.    But you were involved with the case?

12         A.    Absolutely.

13         Q.    And the next one is a steroids case.

14  Can we agree that doesn't involve opioids?

15         A.    That's correct.

16         Q.    But that --

17         A.    It's a scheduled drug, yeah, that we

18  investigate.

19         Q.    Were you the lead on that one, if

20  you know?

21                MR. BENNETT:  Objection.  Scope.

22  Calls for discussion on active investigations.

23  And, also, objection, vague.  I'm not sure the

24  witness, since she doesn't have the original

25  e-mail, knows even which case this is.

Page 431

1          Q.    Have you been the lead agent on any

2     steroids cases?

3               MR. BENNETT:  You can answer that

4     question.

5          A.    I believe I have.

6          Q.    And then there was a case that was

7     going to the grand jury, but it's redacted, so

8     does that mean that there was no -- do you know

9     whether that means there was no indictment or

10    just it's still pending?

11              MR. BENNETT:  Objection.

12              Matters that happen in front of the

13    grand jury are protected by Criminal Rule 6(e).

14    This officer would be prohibited to discuss what

15    has gone on in front of the grand jury.

16              To the extent that you can answer

17    without disclosing matters that have occurred

18    before the grand jury, if you know what case

19    this is, you can.

20         A.    I do not know what case this is.

21         Q.    The next one is the ████ ██████

22    case.  What did ████ ██████ do?

23         A.    That was one of my cases back when I

24    first started.  ████ ██████, I believe he stole

25    a prescription pad.  But again, that was back in

Page 432

1   2014.  I don't recall the specifics on that

2   case, but he was convicted and sentenced.

3          Q.     The next one, ███ ████, what

4   happened with ██ ████?

5          A.     ███ ████?  I'm not recalling -- I

6   mean, it says overprescribing, but I'm not

7   recalling that doctor in my memory.  I mean, I

8   know of the case within our unit, but I can't

9   remember what he actually was doing.

10         Q.     Do you remember working on that case

11  at all?

12         A.     Cleveland Heights.  Yeah, I'm sure I

13  was part of what I do in that surveillance.

14         Q.     Then the next one, with the name

15  redacted, says -- you highlight for Sergeant

16  Hunt and Lieutenant Paolino that "This is my

17  case I just opened."  Does that mean you at

18  least at the time were the lead investigator on

19  it?

20         A.     That's what that would mean.

21         Q.     And then it says, "IRS is on board

22  as well."  What does that mean?

23             MR. BENNETT:  Objection.  Scope.

24             This is involving an active and

25  pending investigation.  This witness is not

Page 433

1    authorized to answer.

2             To the extent you can answer

3    generally regarding IRS involvement, you may

4    answer.

5         Q.    Let me put this one aside.

6             In your time at TDS, have you worked

7    on any investigations in which the IRS has been

8    involved?

9             MR. BENNETT:  You can answer that

10   question.

11        A.    Yes, I have.

12        Q.    What kinds of investigations have

13   you worked on, type, doctor shopping versus

14   overprescribing versus the other ones, where the

15   IRS has been involved?

16            MR. BENNETT:  You can answer.

17        A.    It would be a physician

18   overprescribing case, so the IRS -- we work with

19   them as well, and then they look into like the

20   fraud of part of the case, how, as I explained

21   before, we use other agencies when we work a

22   case.

23        Q.    Have you worked on doctor

24   overprescribing investigations that have not

25   involved the IRS?

Page 434

1              MR. BENNETT:  You can answer that

2    question.

3        A.    Yes.

4        Q.    How frequent is the involvement of

5    the IRS in an -- in an overprescribing case is

6    that the norm or the exception --

7              MR. BENNETT:  Objection.  Form.

8        Q.    -- for the ones you've worked on?

9              MR. BENNETT:  You can answer.

10       A.    Honestly, they are so overwhelmed

11   with the amount of work that they have going on,

12   that a lot of times they just can't give us a

13   person to help work on the case, so if they did,

14   then, you know, they would also be on board with

15   us, but again, shortage is everywhere.

16       Q.    If it were up to you, if there were

17   unlimited resources, would you want to have the

18   IRS involved in all the overprescribing cases?

19             MR. BENNETT:  Objection.  Scope.

20             You can answer if you have a

21   personal opinion.

22       A.    Personally, my personal opinion is

23   the -- the more we work together with one

24   another in taking down a person that is not

25   doing what they're supposed to be doing, I'd say

Page 435

1    it makes the case stronger.  So that's my

2    personal opinion.

3         Q.    Back to Exhibit 9.  The

4    investigation that you were reporting on, the

5    one that you had just opened, it's redacted, so

6    that's an ongoing investigation?

7              MR. BENNETT:  Objection.

8              If you know which case this is.

9         A.    I'm not quite sure.

10        Q.    Well, I guess let me just ask it

11   more generally.  Do you have cases that you were

12   working on, doctor overprescribing cases that

13   you were working on in 2014 that you're still

14   working on today?

15             MR. BENNETT:  You can answer that

16   question.

17        A.    Yes.  They're still open.

18        Q.    I'm not getting into any specific

19   investigations, but the doctors in those cases

20   are still -- while the investigation is going

21   on, they're still writing prescriptions?

22             MR. BENNETT:  Objection.

23             You are not authorized to disclose

24   specific DEA investigations and activities.  To

25   the extent that you have publicly disclosed

Page 436

1    information that can answer that question, you

2    may.

3         A.    This doctor is not currently seeing

4    patients.

5         Q.    Do you know when that doctor stopped

6    seeing patients?

7              MR. BENNETT:  Objection.  Scope.

8              You are not authorized to disclose

9    information about specific DEA investigations

10   and activities.

11             MR. LEDLIE:  I don't think she

12   understands your instructions as to what she can

13   and can't answer.

14             MR. BENNETT:  Do you need to confer?

15   Do you need to talk to me?

16             THE WITNESS:  Yes.  We might as

17   well.

18        Q.    Let me ask a different question,

19   which is just, are there any doctors -- you have

20   some doctor investigations that you were working

21   on in 2014 that are still open today, right?

22             MR. BENNETT:  You can answer that

23   question.

24        A.    Yes.

25        Q.    And are any of those doctors still

```
 1    writing prescriptions today to your knowledge,
 2    just yes or no?
 3              MR. BENNETT:  Objection.  Scope.
 4              You can answer that question yes or
 5    no only.
 6         A.   I do not know because there are so
 7    many.
 8         Q.   It's certainly possible that some of
 9    those doctors are still writing prescriptions?
10              MR. LEDLIE:  Objection.  Calls for
11    speculation.
12              MR. BENNETT:  Join that objection.
13    Also scope objection.
14              You can answer.
15         A.   There could be.
16         Q.   Detective Baker-Stella, are you at
17    all involved in the decision about whether or
18    not DEA should revoke the registration of a
19    doctor?  Have you ever been involved in that
20    decision?
21              MR. BENNETT:  You can answer that
22    question.
23         A.   No, I have not.
24         Q.   Or whether the medical board should
25    revoke the license of a doctor, do you get
```

1   involved with that ever?

2            MR. LEDLIE:  Objection.  Vague.

3            You may answer.

4            MR. BENNETT:  Objection.  Vague.

5            But you can answer.

6       A.    No.  We have meetings.

7       Q.    No.  You have meetings.  What do you

8   mean by having meetings?

9       A.    There's multiple people in when

10  those decisions are made.  I'm not in on that.

11  There's meetings with those heads to --

12      Q.    Have you ever presented at any of --

13  do you go to those meetings?

14      A.    I do not.

15      Q.    Do you provide any sort of input for

16  those meetings?

17           MR. BENNETT:  Objection.  Scope.

18           You can answer that question yes or

19  no only.

20      A.    Only my surveillance information.

21      Q.    And these are meetings between the

22  medical board and who else?

23      A.    The case lead agent and the

24  supervisor and any AUSA that is assigned to the

25  case.

```
                                         Page 439

 1                   -   -   -   -   -

 2              (Thereupon, Baker-Stella Deposition

 3              Exhibit 10, E-Mail from Lori A.

 4              Baker-Stella to M. Paolino and P.

 5              Hunt Dated July 1, 2015 Bates

 6              Numbered Summit 001002601, was

 7              marked for purposes of

 8              identification.)

 9                   -   -   -   -   -

10       Q.    Exhibit 10, Detective Baker-Stella,

11   is an e-mail from you to Lieutenant Paolino and

12   Sergeant Hunt dated July 1st, 2015, Bates number

13   SUMMIT_001002601.

14              Do you recall sending this e-mail?

15              MR. BENNETT:  Objection.

16              This is a document that the DEA has

17   requested to claw back.  We understand the

18   Special Master's ruling in this matter in only

19   redacting a portion of it.  We reserve our

20   rights to at a future date address clawing back

21   this document or redacting more of this

22   document.

23              With that objection on the record,

24   you may answer the question that was asked.

25              MR. LEDLIE:  What was the question
```

Page 440

1    again, counselor?

2         Q.    Do you recall sending this e-mail?

3         A.    Yes.

4         Q.    This is an e-mail you sent in the

5    ordinary course of your duties as a Summit

6    County -- as a detective at the Summit County

7    Sheriff's Office?

8         A.    Summit County drug unit, yes.

9         Q.    And is the purpose of this e-mail

10   the same -- the same purpose in terms of sending

11   it to Sergeant Hunt and Captain Paolino as with

12   Exhibits, I think, 7, 8 and 9?

13        A.    Yes, they would be the same reason,

14   just an update.

15        Q.    In your update on the first case you

16   say, "This case unfortunately had to have FBI

17   included."

18             Do you see that?

19        A.    I do.

20        Q.    Not necessarily this specific case,

21   but why is it unfortunate to have the FBI

22   involved?

23             MR. BENNETT:  Objection.  Scope.

24             You are not authorized to express an

25   opinion that would require you to disclose

1  non-public facts or information you acquired in

2  the performance of your duties.  To the extent

3  that you have a personal opinion that is not

4  related to non-public facts or information, you

5  may give your personal opinion.

6         A.    I'd rather not give my personal

7  opinion.

8         Q.    You said it's unfortunate to have

9  the FBI involved.  So I'm wondering, why is

10 that?  Why?

11             MR. BENNETT:  Objection.  Same

12 instructions.

13        A.    My personal opinion is they're a

14 little bit slower on things, so it kind of slows

15 cases down.

16        Q.    During your time at TDS have you

17 been involved in investigations that have

18 included involvement from the FBI?

19             MR. BENNETT:  You can answer that.

20        A.    Yes.

21        Q.    And how much?  Let me -- sorry.  How

22 many times has that happened?

23        A.    Not as often as now, but it was

24 quite often.

25        Q.    It was?

Page 442

1        A.     It was quite often, I guess.  A
2    handful of times, yeah.  A few.  I can't give
3    numbers.  I'm not good at numbers because I
4    don't have all the cases in front of me.
5        Q.     Are there particular type or types
6    of investigations that you've worked on where
7    the FBI has gotten involved, doctor shopper
8    versus overprescribing versus counterfeit?
9             MR. BLOCK:  I think I can get an
10   answer to my question.
11            MR. BENNETT:  I'm sorry.  I didn't
12   hear the question.
13       Q.     Are there particular type or types
14   of investigations that you've worked on where
15   the FBI has gotten involved, by that I mean
16   doctor shopper for overprescribing?
17            MR. BENNETT:  You are authorized to
18   talk about general types of investigations but
19   not a specific investigation that's non-public.
20   So if you can talk about the types of cases,
21   that's acceptable.
22       A.     Physician investigations -- not
23   overprescribing, not doctor shoppers, of course
24   not.
25       Q.     Why do you say the FBI is slow or

Page 443

```
 1  tends to be slower?
 2              MR. LEDLIE:  Objection.
 3              MR. BENNETT:  Objection.
 4              Same instructions regarding
 5  opinions.  You can answer based on your personal
 6  opinion.
 7       A.    That was just my personal opinion.
 8  It just seems they are delayed at getting back
 9  to us sometimes.
10       Q.    There's a reference here to
11  Dr. Zwail.  Do you see that?
12       A.    Um-hum.
13       Q.    What happened with Dr. ███████
14       A.    Oh, I don't see ██████ on this one.
15              MR. LEDLIE:  Can I show the witness?
16              MR. BLOCK:  Please.
17              THE WITNESS:  I can answer because
18  that case is over?
19              MR. BENNETT:  It's my understanding
20  that if the case is over, you can answer.  If
21  the case is not over, if it's an active case,
22  you are not authorized to answer.  But I
23  understand it to be a case that has been
24  convicted and closed.
25       A.    Yes.  Dr. ██████ was the doctor that
```

Page 444

1   had his medical license revoked and had to pay a

2   penalty and then went through like counseling

3   and that kind of stuff.

4          Q.    Oh, okay.  I see.  Zewail or Zwail

5   is the same person?

6          A.    Correct.

7          Q.    This was a doctor, at least

8   according to Exhibit 9 -- it says, "Scripts for

9   sex."  What does that mean?  I think I know,

10  but --

11         A.    Yes.

12                MR. BENNETT:  You're allowed to

13  disclose public facts, facts that were disclosed

14  during the conviction and sentencing of

15  Dr. Zewail.  To the extent it's information that

16  was never made public, you are not authorized to

17  disclose that.

18         A.    I don't believe that was disclosed.

19                MR. LEDLIE:  Summit County is

20  joining the DEA and reserves all rights to ask

21  for further redactions of this before the

22  district court under law enforcement and officer

23  safety reasons.  Just for the record, that was

24  the last document.

25                SPECIAL MASTER COHEN:  Just so I'm

Page 445

1   on the same page literally, are we talking about

2   the one that begins, "Hello my favorite

3   supervisors"?

4            MR. BENNETT:  No.  "I just wanted to

5   update you on cases I'm working on.  The

6   chiropractic case is."  And I think one of our

7   big concerns is the third sentence in that

8   paragraph.

9            MR. LEDLIE:  The third sentence is

10  my concern.

11           MR. BENNETT:  And one of our biggest

12  concerns as well.

13           SPECIAL MASTER COHEN:  ███ ████ ██

14  ███ ███

15           MR. BENNETT:  ████ ████

16           MR. BLOCK:  May we proceed with the

17  deposition?

18           SPECIAL MASTER COHEN:  Go ahead.

19                -   -   -   -   -

20           (Thereupon, Baker-Stella Deposition

21           Exhibit 11, E-Mail String Bates

22           Numbered SUMMIT_001003326, was

23           marked for purposes of

24           identification.)

25                -   -   -   -   -

Page 446

1          Q.    So Exhibit Number 11, Detective

2   Baker-Stella, is an e-mail from Lieutenant

3   Paolino to you thanking you for an embedded

4   e-mail from you to him and Sergeant Hunt dated

5   June 19th, 2013.  It bears Bates number

6   SUMMIT_001003326.  The first question is, do you

7   recall having this e-mail exchange with

8   Lieutenant Paolino back in June of 2013?

9          A.    It definitely looks like one that I

10  sent.

11         Q.    And you would have sent that in the

12  ordinary course of your duties as a Summit

13  County Sheriff's Office detective, right?

14         A.    For the drug unit, yes.

15         Q.    For the drug unit, right.

16               And was Lieutenant Paolino new to

17  the drug unit in June of 2013?

18         A.    I can't remember.  I think he was

19  there the entire time I came on board.  I

20  believe.  Yeah.

21         Q.    You started --

22         A.    2013.

23         Q.    In February was it?

24         A.    Yes.

25         Q.    And in --

1           MR. BENNETT:  Counsel, I'm going to

2    interject an objection to this document.  To the

3    best of my knowledge, this is the first time

4    I've seen this document.  It was not one of the

5    ones that I saw at a previous deposition nor one

6    of the ones that you identified when you sent me

7    the list of documents you intended to use.  I do

8    believe that this contains information about

9    current cases and that this would be DEA and

10   Department of Justice information.  Since this

11   has not been vetted by the DEA, I do not know

12   what of 1 through 5 current cases are current

13   and active cases, although based on my

14   understanding of some of my meetings, some of

15   the things referenced on here are still active

16   and ongoing, and I would ask that 1 through 5 be

17   redacted until we can determine whether they are

18   closed cases or not.

19           SPECIAL MASTER COHEN:  Let me make a

20   suggestion.  We haven't taken a break yet.  It's

21   been a little over an hour.  Do you think you

22   can determine that in a five-minute break or

23   not?

24           MR. BENNETT:  I don't think in a

25   five-minute break we can determine that.

1          MR. BLOCK:  But there aren't any

2     names here, so I don't understand how it's going

3     to reveal -- and this wasn't -- to my knowledge,

4     it's never been clawed back, I assume because it

5     doesn't --

6          MR. BENNETT:  It could contain grand

7     jury information.  I don't know what these cases

8     are.  I have not looked at these.  That could be

9     grand jury information that would be privileged.

10          SPECIAL MASTER COHEN:  I know you

11     have a limited amount of time.  We can do one of

12     two things.  We can take a break now and I can

13     take a look at this, but probably until you go

14     through the process, I would have to agree with

15     the redaction.  The other thing that you can do

16     is just keep on going and I kind of study this

17     and try and get back with you.

18          MR. BENNETT:  There are also

19     techniques listed here.

20          SPECIAL MASTER COHEN:  I just need

21     to look at it.

22          MR. BLOCK:  Why don't we take the

23     break.

24          SPECIAL MASTER COHEN:  Five minutes.

25               (Recess had.)

 1          Q.    Detective Baker-Stella, have you
 2    ever been to a pill mill coordination meeting in
 3    your time at TDS?
 4          A.    I don't believe so.
 5          Q.    Have you attended a training on the
 6    heroin/fentanyl epidemic?
 7                MR. LEDLIE:  Objection.  Vague.
 8          A.    I -- if you had something to show
 9    me --
10          Q.    We'll come back --
11          A.    -- it might --
12          Q.    We'll come back to that.
13                Do you have an understanding of what
14    the heroin/fentanyl epidemic is?
15          A.    Yes.
16          Q.    What is that?
17          A.    It's what -- the epidemic is how --
18    you know, there's a lot going on, addiction, and
19    that they're using the fentanyl and heroin.
20          Q.    Is that something from your
21    knowledge is occurring today?
22          A.    It's still occurring.
23          Q.    I can't remember if I asked you.
24    Have you worked with the Ohio Board of Pharmacy
25    in any of the investigations that you've done at

Page 450

1    TDS?

2         A.    I have.

3         Q.    How many times?

4         A.    Again, a handful, handful of times.

5    We utilize them.  The aspect of how detailed

6    they're involved in our cases, I can't tell you,

7    but I know we have worked with them.

8         Q.    You can't tell me because you're not

9    allowed to or can't tell me because you don't

10   know?

11        A.    I can't tell you because I don't

12   remember how many they're involved with.

13        Q.    What types of cases -- is there a

14   certain type of case in which TDS works with the

15   Board of Pharmacy?

16        A.    More of your pharmacy -- pharmacist

17   investigations and pharmacy investigations,

18   yeah.

19        Q.    Have you worked on any pharmacist

20   investigations?

21        A.    I have.

22        Q.    How many?

23        A.    It would be a guess.  Two to three.

24        Q.    How about pharmacist investigations?

25              MR. LEDLIE:  Objection.  Just asked

Page 451

1   and answered.

2              MR. BLOCK:  No.  I asked about

3   pharmacies first.  Oh, I thought I did.  I tried

4   to ask a different question.  I'm sorry.  Thank

5   you, James.

6        Q.    Have you worked on any pharmacy

7   investigations?

8              MR. BENNETT:  You can answer that

9   question yes or no only.

10        A.    Yes.

11        Q.    How many?

12              MR. BENNETT:  You can answer that

13   question.

14        A.    A few.

15        Q.    And can you just describe at a very

16   general level what's the difference between a

17   pharmacist investigation and a pharmacy

18   investigation?

19              MR. BENNETT:  You can answer that.

20        A.    A pharmacist investigation would

21   be -- so he's not following protocol of what

22   they're -- of issuing -- say if there's a doctor

23   shopper, that kind of stuff, or if one is -- if

24   we're investigating a pharmacist for diverting

25   himself for own purposes, so taking the medicine

Page 452

1  from the pharmacy.

2      Q.    And then what's a pharmacy

3  investigation?

4      A.    That would be the pharmacy not also

5  following protocol on, say, the proper

6  procedures that they're supposed to be doing to

7  stop doctor shoppers or that kind of stuff, not

8  reporting suspicious pills and that kind of

9  stuff.

10     Q.    Have you ever worked on a pharmacist

11 investigation that resulted in a conviction?

12          MR. LEDLIE:  Pharmacist is the

13 question?

14          MR. BLOCK:  Yes.

15          MR. BENNETT:  You can answer that

16 question.

17     A.    I don't know if it's -- if it's

18 completed.  And there's one pending.  So they're

19 open.

20     Q.    Have you ever worked on a pharmacist

21 investigation that resulted in an arrest, just

22 yes or no?

23     A.    Yes.

24     Q.    Have you ever worked on a pharmacy

25 investigation that resulted in a conviction?

Page 453

1          MR. BENNETT:  You can answer that

2    question yes or no only.

3          MR. LEDLIE:  If you know.

4          MR. BENNETT:  If you know.

5      A.    The status of that case, I'm not

6    quite sure where it's at, so -- yeah, I don't

7    know.

8      Q.    Have you ever worked on a pharmacy

9    investigation that's resulted in an arrest?

10          MR. BENNETT:  You can answer that

11    question yes or no only.

12      A.    Yes.

13      Q.    Have you ever worked on a

14    pharmacy -- I'll come back to that one.

15          Can you hand me back 11 and we will

16    replace it?  So, for the record, Exhibit 11,

17    which I previously identified for the record,

18    has now been redacted in some respects by DEA

19    DOJ, but the same Bates number.  And I don't

20    remember if I got an answer to the question,

21    Detective Baker-Stella, of whether you recall

22    having this e-mail exchange with Lieutenant

23    Paolino that's reflected in Exhibit 11.

24          MR. BENNETT:  Before she answers,

25    the United States will be requesting that this

Page 454

1    document be clawed back and redacted as we've

2    provided here.  We'll be making that request to

3    the City of Akron -- I'm sorry, to Summit

4    County.

5             MR. LEDLIE:  Summit County will

6    honor that request.

7        A.    Do I remember writing this?

8        Q.    Yes.

9        A.    Yes.

10       Q.    And this was an e-mail you sent in

11   the ordinary course of your duties as a

12   detective at the Summit County Sheriff's Office

13   drug unit?

14       A.    Yes.

15       Q.    And the purpose of sending this

16   e-mail was the same as Exhibit 7 through 10 that

17   we've been discussing?

18       A.    Updating.

19       Q.    The steroid case -- I just want to

20   confirm, steroids are not opioids, right?

21       A.    That's correct.

22       Q.    And cannabinoids are not opioids?

23       A.    No.

24       Q.    They are not?

25       A.    Not opioids, unless they're mixed

Page 455

1  with it, yes.

2      Q.    So at least in 2013, in June, at

3  least two of the five cases that you were

4  working on did not involve opioids; is that

5  right?

6          MR. BENNETT:  Objection.

7      A.    ███████ ██ ██████ ███████ ███

██ ████████ █ ███████ ██ ██ ██ ██ ████ █████

██ █████ ██████ ███████ ██ ███ ██ ███

███ ██████████ ████

11                  -   -   -   -   -

12          (Thereupon, Baker-Stella Deposition

13          Exhibit 12, E-Mail String Bates

14          Numbered SUMMIT_000037561, was

15          marked for purposes of

16          identification.)

17                  -   -   -   -   -

18      Q.    Exhibit 12 is an e-mail from Captain

19  Paolino to Inspector Rhoades forwarding an

20  e-mail from Detective Baker-Stella to both --

21  I'm sorry, the e-mail from you is December 20th,

22  2017.  The Bates label is SUMMIT_000037561.  Do

23  you recall sending your note to Sergeant Hunt --

24  sorry, Captain Paolino?  And I don't know who

25  Stacy Milkey is.

Page 456

1          MR. BENNETT:  Objection.  This is a

2    document that I believe this is the first time

3    that I am seeing, it was not listed in the

4    documents previously requested to be clawed back

5    or documents identified by defense counsel as

6    being used today.  Upon review of this document,

7    we believe it contains confidential Department

8    of Justice information and will be seeking to

9    claw back and redact this document.

10          MR. LEDLIE:  In its entirety?

11          MR. BENNETT:  It looks like there's

12    information based on the Special Master's

13    previous rulings that will be allowed to remain

14    that I don't believe we will object to being

15    disclosed, but we will need to redact portions

16    of this as law enforcement sensitive and

17    potentially ongoing investigations.

18          MR. BLOCK:  Let me ask three

19    questions.  I don't think they have to do with

20    anything you might be worried about, reserving

21    all rights.

22      Q.    But my first question, do you know

23    who Stacy Milkey is?

24      A.    She's the secretary for the drug

25    unit, Summit County drug unit.

1       Q.    And the e-mail that you sent to

2   Sergeant Hunt, Ms. Milkey and Captain Paolino,

3   you sent that in the ordinary course of your

4   duties as a Summit County Sheriff's Office

5   detective?

6       A.    I do send them sometimes to her

7   because they don't get them and this way she

8   makes sure they end up on her desk.

9       Q.    But that's part of the ordinary

10  course of your duties is sending these updates?

11      A.    Yes.

12      Q.    And there's a reference to a log.

13  Do you see that in the first sentence?  Is that

14  your overtime log?

15      A.    The last week -- last week the log

16  was doing OARRS -- as in if I didn't do one last

17  week, I'm giving him my log of what I did, so I

18  was just updating him on what I didn't give him

19  last week.

20      Q.    I just wanted to know, just in

21  general terms, not about anybody specifically,

22  what's an OARRS investigation?

23      A.    A doctor shopper.  That would be an

24  OARRS investigation.

25      Q.    And then you attend -- it says,

Page 458

1    "Attended the last quarter opiates meeting."
2    What is that?
3         A.    I'm part of the opiates task force,
4    and that was -- they do quarterly meetings and I
5    attended that meeting.  We always make sure --
6    I'm the representative for Summit County to
7    attend those meetings, so I just updated them.
8         Q.    And then it says, "And the ADM
9    Board."  What's the ADM Board?
10        A.    It's the drug and mental health
11   board, so it's all connected.
12        Q.    Connected to the opiate task force?
13        A.    Yes.
14        Q.    And so without getting into the
15   specifics of how you use it, you use OARRS in
16   connection with your work at the TDS?
17        A.    Yes, I do.
18        Q.    And you use it in doctor shopping
19   cases?
20        A.    Yes, I do.
21        Q.    Do you use OARRS in any other kinds
22   of cases?
23        A.    Investigating physicians.
24        Q.    And am I correct that OARRS can give
25   you patient level information in terms of what

Page 459

1   individual patients are receiving from doctors?

2       A.    Yes, that is correct.

3       Q.    And is that level of information,

4   that patient level of information, something

5   that is necessary in terms of doing an

6   investigation into doctor shopping?

7           MR. LEDLIE:  Object to form.

8           MR. BENNETT:  Objection.  Vague.

9           You can answer.

10      A.    It's a tool that we use to start the

11  investigation on -- and, again, the OARRS whole

12  unit as a whole is only as good as the person

13  entering it, so it's just a tool that we use,

14  and then obviously I can't get into then how we

15  go and check to make sure that information is

16  correct, but we do.

17      Q.    Have you worked on any doctor

18  shopping investigations that did not involve use

19  of OARRS to some extent?

20      A.    Doctor shoppers, no, I have not.

21      Q.    Have you worked on any

22  overprescribing cases -- let me ask you this:

23  Have you worked on any overprescribing cases, so

24  doctors who are overprescribing, that involved

25  the use of OARRS in some way?

Page 460

```
 1            MR. BENNETT:  You can answer that.
 2      A.    Yes, I have.
 3      Q.    Have you worked on any
 4  overprescribing cases that didn't involve the
 5  use of OARRS?
 6      A.    I personally have not.  I always use
 7  OARRS.
 8      Q.    And can we agree that the patient
 9  level information -- not going into how you use
10  it, but the patient level information that you
11  can get from OARRS is valuable in terms of
12  investigating doctor overprescribing?
13            MR. LEDLIE:  Objection.  Vague.
14            MR. BENNETT:  Join the objection.
15      A.    You say it's vague?
16      Q.    No.  They did.
17      A.    Sorry.
18      Q.    I said is it valuable.
19      A.    Yes, it is valuable.
20      Q.    And can we agree that it would be
21  very difficult to reach a determination about
22  overprescribing without being able to get some
23  access to patient level data?
24      A.    Break that down.  That was
25  multiple --
```

Page 461

1          Q.     No, it wasn't.  All right.

2                 Can we agree that it would be

3    difficult to reach a determination about

4    overprescribing without having access to patient

5    level data?

6                 MR. LEDLIE:  Objection.  Vague.

7          A.     I would say it helps me.  It

8    definitely helps.  I would have to utilize some

9    other form of -- to get that information, but it

10   is definitely an asset.

11         Q.     Now, OARRS -- as I understand, OARRS

12   also has prescriber level data?

13         A.     It does.

14         Q.     And do you use prescriber level data

15   in doctor shopping investigations?

16         A.     The prescriber -- no, I do not.

17         Q.     Do you use prescriber level data in

18   doctor overprescribing investigations?

19         A.     It's one of the things we look at.

20         Q.     And can you think of a -- have there

21   been any doctor overprescribing investigations

22   that you've worked on where you didn't use

23   prescriber level data at least in part in the

24   investigation?

25                 MR. BENNETT:  You can answer yes or

Page 462

1  no.

2       A.     No, not that I'm aware of.

3       Q.     So we can agree that the prescriber

4  level data in OARRS is valuable to

5  overprescribing investigations?

6             MR. BENNETT:  Objection.  Vague.

7       A.     Yes.

8       Q.     I can't remember.  Do you use ARCOS

9  data, you personally, Detective Baker-Stella?

10      A.     I do not.

11      Q.     Do you know whether ARCOS data has

12  ever been used in any of the investigations that

13  you've worked on at TDS?

14      A.     ARCOS data has been used in cases

15  that we work within the unit.

16      Q.     And how is it used?  At a very

17  general level, what is it used for?

18            MR. BENNETT:  Objection.  Scope.

19            You can answer at a general level.

20      A.     I really don't have all the

21  knowledge on ARCOS, so I could not give you a

22  good answer on that.

23      Q.     In any overprescribing investigation

24  that you've worked on, have you -- do you know,

25  have you alerted any pharmacies to the fact that

Page 463

1   you think the doctor is overprescribing, like

2   warning we're not sure but we don't think you

3   should fill any more scripts for this person?

4              MR. BENNETT:  Objection.  Scope.

5              You're not authorized to disclose

6   non-public specific DEA activities and

7   investigations.  To the extent that you sent out

8   general warnings or there's publicly disclosed

9   information, you may answer.

10        A.    I cannot answer that.

11              MR. BLOCK:  Your Honor, then I need

12  a ruling on that objection.  To the extent it's

13  got any basis, it would appear to be -- I don't

14  understand -- Touhy, which we don't agree with,

15  and --

16              MR. BENNETT:  May I --

17              MR. BLOCK:  -- law enforcement

18  privilege is not -- you know, I'm just trying to

19  figure out do they warn the pharmacies that they

20  --

21              SPECIAL MASTER COHEN:  You guys have

22  to speak one at a time for the court reporter

23  and for me.

24              MR. BENNETT:  If you want to ask her

25  do they generally warn pharmacies, I would

Page 464

1  withdraw the objection.  That was not my

2  understanding.  The fact that in any case she

3  had a discussion with the pharmacy to say, hey,

4  look out for this particular doctor, would be

5  something that I would tell her she would not be

6  able to answer unless that's been made public.

7  But I don't know what her answer is going to be.

8  So if you're just asking do you generally warn

9  pharmacies, then I would withdraw my objection.

10      Q.    If you're investigating a doctor for

11  overprescribing, do you generally warn

12  pharmacies that the doctor may be, you know,

13  fishy?

14            MR. BENNETT:  Objection.  Form.

15            You can answer.

16      A.    Yes.

17      Q.    How do you warn the pharmacies that

18  the doctor may be -- there's an investigation,

19  you haven't decided whether he's

20  overprescribing?  How do you warn the

21  pharmacies --

22            THE WITNESS:  I'd like to speak with

23  you.

24                (Recess had.)

25            MR. BENNETT:  Counsel, thank you for

Page 465

1   the opportunity to speak to the witness in the

2   hallway.  I believe, after talking to her, that

3   she may not have understood your question about

4   generally sending out warnings.

5              MR. BLOCK:  Yes.

6              MR. BENNETT:  And I believe she

7   needs it reasked and she can answer it now that

8   we've had an opportunity to talk.

9              MR. BLOCK:  I blame your

10  instruction.

11             MR. BENNETT:  Everybody blames me,

12  and you'd be right to do so.

13       Q.    Detective Baker-Stella, I was trying

14  to figure out if you've got an investigation

15  going into a doctor who may or may not be

16  overprescribing, is it the common practice to

17  alert pharmacies that you all think there might

18  be something fishy going on with that doctor?

19       A.    ███ ██ ███ ███ █████  ███████

20       Q.    How about manufacturers; do you

21  alert manufacturers of prescription opioids that

22  you're investigating a doctor that you think

23  might be overprescribing?

24             MR. BENNETT:  Generally.

25             MR. BLOCK:  Generally.

Page 466

1        A.    That, actually, is a different
2   division within our unit.  I don't really have
3   that information.  I don't really investigate
4   those.
5        Q.    When you say it's a different unit,
6   what do you mean?
7        A.    Our diversion, our actual diversion
8   unit investigates the manufacturers.
9        Q.    And how about is it your general
10  practice to alert distributors of prescription
11  opioid medication when you're investigating a
12  physician who you think may be overprescribing?
13       A.    No.
14       Q.    Have you ever in your work at TDS --
15  do you know what a suspicious order report is?
16       A.    Yes.
17       Q.    In your work at TDS on any
18  investigation have you ever used a suspicious
19  order report?
20       A.    Not that I can recall.
21            MR. BLOCK:  Can we do them and then
22  you can redact them?
23            MR. BENNETT:  I'm okay with
24  substituting the exhibit as long as you're not
25  asking about any of the things that the Special

Page 467

1  Master has said we can redact, but I'm not sure

2  you know which ones we can and can't redact yet.

3              MR. BLOCK:  I do on these two, on

4  tab 14 and tab 15.

5              MR. BENNETT:  Let's see how we can

6  go.

7                    -   -   -   -   -

8              (Thereupon, Baker-Stella Deposition

9              Exhibit 13, E-Mail String Bates

10             Numbered SUMMIT_001132316, was

11             marked for purposes of

12             identification.)

13                   -   -   -   -   -

14       Q.    Exhibit Number 13 is an e-mail from

15  Carmen Ingram to you dated 1-19-2017,

16  SUMMIT_001132316, and I just wanted to -- do you

17  recall receiving this e-mail from Ms. Ingram?

18  Is it Detective Ingram?

19             MR. BENNETT:  Objection.

20             The United States has requested that

21  this document be clawed back.  We understand the

22  Special Master's ruling in this case.  We

23  reserve our rights to revisit at a later time

24  whether the entire document should be clawed

25  back or whether there should be additional

Page 468

1  redactions.

2            With that reservation of rights, you

3  can answer the question that was asked.

4       Q.    Which is do you recall getting the

5  e-mail -- sending the e-mail to Carmen and

6  getting her response?

7       A.    Just from seeing it here, you know,

8  it brought back that I wrote it, yes.

9       Q.    And you sent the information to the

10  folks at Summit County Sheriff's Office in the

11  ordinary course of your duties as a Summit

12  County Sheriff's Office detective?

13       A.    Yes.

14       Q.    And is it correct that you were

15  involved in the first confirmed carfentanil

16  arrest for the TDS?

17            MR. BENNETT:  Objection.  Scope.

18            To the extent that this is

19  non-public DEA investigations or activities, you

20  are not authorized to answer.  If this is a case

21  that has been charged and publicly disclosed,

22  then you may answer whether you've been involved

23  in it or not.

24            THE WITNESS:  I don't know if this

25  is completely over.

Page 469

1            MR. BENNETT:  Has it been charged

2    and publicly disclosed?

3            THE WITNESS:  It has been charged.

4            MR. BENNETT:  Then you can answer

5    whether you were involved.

6       A.    Yes, I was involved.

7       Q.    Have you worked on any cases

8    involving carfentanil that's manufactured by a

9    licensed manufacturer of carfentanil?

10           MR. BENNETT:  Objection.  Scope.

11           You can answer that question yes or

12   no only.

13      Q.    Let me try and ask it a different

14   way.

15           The carfentanil cases that you've

16   worked on, is this illicit carfentanil?

17           MR. BENNETT:  Objection.

18           Same instruction.

19      A.    Yes.

20      Q.    Thank you.

21                -   -   -   -   -

22           (Thereupon, Baker-Stella Deposition

23           Exhibit 14, E-Mail from Lori A.

24           Baker-Stella to M. Paolino and P.

25           Hunt Dated April 5, 2017 Bates

Page 470

1            Numbered SUMMIT_000074835, was

2            marked for purposes of

3            identification.)

4                  -   -   -   -   -

5      Q.    And Exhibit 14 is an e-mail from

6   Detective Baker-Stella to Captain Paolino and

7   Sergeant Hunt dated April 5th, 2017.  It bears

8   the Bates SUMMIT_000074835 and -- go ahead.

9            MR. BENNETT:  I was going to say

10  this is the document we discussed prior to going

11  on the record that there were additional

12  redactions that the Special Master said that we

13  could make.  I would ask that we make those

14  redactions.

15           MR. BLOCK:  I will work with you as

16  soon as we're done here -- we're redacting some

17  initials that are on here, I agree with you, and

18  we'll make sure we do that before the court

19  reporter leaves.

20           MR. BENNETT:  All right.

21           And then I also would indicate this

22  is a document we've requested that Summit County

23  claw back.  We understand the Special Master's

24  ruling on this issue, but reserve the right to

25  seek either additional redactions or the entire

Page 471

1  document be clawed back at a later point.

2           With that reservation, the detective

3  can answer your question.

4      Q.    The first one was, do you recall

5  sending this e-mail?

6      A.    Yes.

7      Q.    You sent it in the ordinary course

8  of your duties as a Summit County Sheriff's

9  Office detective?

10     A.    Yes, sir.

11     Q.    And the purpose of Exhibit 14 was

12  the same as the other ones, to update your

13  supervisors at the Summit County Sheriff's

14  Office what you've been working on?

15     A.    That's correct.

16     Q.    And am I correct that sometimes the

17  Summit County Sheriff's Office reports some

18  statistics publicly based on cases that you're

19  working on in terms of drugs seized or dollars,

20  things like that?

21          MR. LEDLIE:  Object to the form.

22  Foundation.

23     A.    I give them, yes, statistics.  What

24  they do with them, I don't know where they

25  report them.

Page 472

1          Q.    Do you know what type of case it was

2     that the FBI was also involved with, just

3     overprescribing, doctor shopping, something

4     different?

5                    MR. BENNETT:  Objection.  Scope.

6                    You are not authorized to disclose

7     the DEA activities or investigations that are

8     not public.  To the extent that this case has

9     not been made public, any details about the case

10    is outside the scope of your authorization and

11    you're not authorized to answer.

12                    MR. BLOCK:  Well, as I understand,

13    there's currently a civil suit related to the

14    case so there's something public.  I just want

15    to know what type of thing we're talking about.

16    I don't know if this is an opioid case or not,

17    so --

18         Q.    Do you know if it's an opioid case?

19    Can I ask that?

20                    MR. BENNETT:  You can answer that

21    question yes or no only.

22         A.    On the civil part of it?

23         Q.    Any part of it.

24         A.    Yes.

25         Q.    And what type of -- is it a

Page 473

1    diversion case?

2              MR. BENNETT:  Objection.  Scope.

3              You're not authorized to discuss

4    details of any specific non-public DEA

5    investigations or activities.

6         Q.    Are you able to answer my question?

7         A.    I don't believe I am.

8         Q.    And I may not even need -- actually,

9    I'll probably want to mark this one for the

10   record.

11              -   -   -   -   -

12              (Thereupon, Baker-Stella Deposition

13              Exhibit 15, E-Mail from Lori A.

14              Baker-Stella Dated June 8, 2016

15              Beginning Bates Number

16              SUMMIT_001007719, was marked for

17              purposes of identification.)

18              -   -   -   -   -

19         Q.    So Exhibit 15 is an e-mail with an

20   application for leave attached to it dated June

21   8, 2016.  It bears the Bates label

22   SUMMIT_001007719 through 7721.  I want to see if

23   this refreshes your recollection about a

24   heroin/fentanyl epidemic training.

25              My first question is whether you

Page 474

1   recall sending this e-mail to your supervisors

2   at the Summit County Sheriff's Office.

3        A.   I mean, again, it looks like the

4   reports that I had been sending.  It refreshes

5   my memory a little bit by you handing it to me.

6        Q.   Did you send it in the ordinary

7   course of your duties as a Summit County

8   Sheriff's Office detective?

9        A.   Yes.

10       Q.   In the update you mention that you

11  went to Quantico for diversion pharmaceutical

12  training?

13       A.   So that was back in 2016.  Yes.

14       Q.   Is that the Quantico training that

15  we talked about at your last deposition?

16       A.   Yes.

17       Q.   That's like the DEA course at

18  Quantico; is that right?

19       A.   Yes.

20       Q.   So looking at this e-mail from June

21  of 2016, does that help you remember when you

22  did that course?

23       A.   Yes.

24       Q.   You would have done it in May or

25  June of 2016; is that right?

Page 475

1      A.    Yes.  That would -- yes, because if

2   I'm updating here, it would have been real close

3   to this date.

4      Q.    And then there's a reference to

5   attending training in Columbus for a

6   heroin/fentanyl epidemic the DEA did.  Do you

7   remember attending that?

8      A.    I do.

9      Q.    Can you tell me the general subjects

10  that were discussed at the heroin/fentanyl

11  epidemic training?

12     A.    I mean, it was long ago, but I'm

13  sure of the areas in which, you know, it's the

14  hardest -- I mean, it's 2016.  I can't remember.

15  I'm just assuming.

16     Q.    Have you been to any other

17  heroin/fentanyl epidemic training since then?

18     A.    Not that I can honestly recall, but

19  again, I couldn't remember this one until you

20  gave it to me.  I just knew I attended it.

21     Q.    There's also a reference to a

22  training at OPOTA?

23     A.    That's Ohio Peace Officer Training

24  Academy.

25     Q.    For the Excel for public safety.

Page 476

1   Did you go to that training?

2         A.    Oh, yes.

3         Q.    What's that about?

4         A.    That's just learning the Excel

5   program and how to make it work for us and

6   organize and -- with all of our information and

7   data.

8               MR. BENNETT:  Counsel, are you

9   finished with that document?

10              MR. BLOCK:  I am.

11              MR. BENNETT:  So this is a document

12  the United States has seen before.  I know it

13  wasn't on your list, but I have seen it before.

14  We are going to request that Summit County claw

15  back and redact one line in this document.  It

16  is not a line you asked the witness about, but

17  for the record, we will be asking for that to be

18  clawed back and redacted and we'll provide a

19  substituted redacted version.

20              MR. BLOCK:  Just for purposes of

21  this deposition, without waiver of any of our

22  objections to the claw back, I'm fine if you

23  want to redact a line here when we finish and

24  the court reporter can -- so that we don't --

25  everybody reserving all rights, but it won't

Page 477

1  slow down getting the transcript around.

2           MR. BENNETT:  Sure.

3      Q.    Detective Baker-Stella, is there an

4  opioid epidemic today in Summit County?

5           MR. BENNETT:  Objection.  Vague.

6           You can answer if you know.

7      A.    My opinion?

8      Q.    Sure.  Your knowledge, either way,

9  however you want.

10     A.    I believe -- my opinion is when we

11 still have people dying of overdoses and that,

12 there's still an epidemic and there's the pills

13 still being out on the streets.

14     Q.    So when did that epidemic begin then

15 based on that opinion?

16     A.    I can only give you my opinion on

17 that of when I started in 2013, February 2013,

18 with this unit; you know, within that time, a

19 couple years, is when it really started hitting

20 hard.

21     Q.    Do you think the epidemic started at

22 some point while you've been at TDS so there was

23 no epidemic when you started at TDS?

24     A.    No.  I'm not saying that.  What I'm

25 saying is for me to -- that I -- I really didn't

Page 478

1  pay much attention because my -- I was elsewhere

2  and doing stuff, so this became a specialized

3  unit, which made me then focus on what was going

4  on with the epidemic going on with the opioids.

5  I'm in a specialized unit.

6      Q.   So do you have an understanding of

7  when the -- do you have an understanding of when

8  that epidemic started?

9           MR. LEDLIE:  Object to the form.

10          MR. BENNETT:  Objection.  Vague.

11     A.   My opinion?

12     Q.   Sure.

13     A.   My opinion would be -- my opinion

14  only based on when I worked with the TDS is

15  within that time of working with the TDS.

16     Q.   Does the epidemic include people who

17  are using illicit fentanyl?

18     A.   My opinion, yes.

19     Q.   And the epidemic includes people

20  that are using heroin?

21     A.   Opinion, yes.

22     Q.   And do you know, what are the

23  most -- is there diversion of prescription

24  opioids in Summit County today?

25     A.   Yes.

1      Q.    And do you know, what are the most

2    common forms of that diversion?  Do you have a

3    sense as to what occurs more, overprescribing

4    versus doctor shopping versus forgery?

5      A.    Again, my opinion of being in and

6    knowing what I know now -- ask the question

7    again.

8      Q.    Yes.

9             What are the most common forms of

10   diversion of prescription opioids in northeast

11   Ohio?

12     A.    I would say it started with the, you

13   know, prescription-based ones of your Oxys and

14   that.

15     Q.    I think I'm trying to ask you a

16   slightly different question.

17     A.    Okay.  I'm sorry.

18     Q.    What's happening -- is it more that

19   you've got people that are doctor shopping or

20   it's more that you've got doctors that are

21   overprescribing or it's more that there are

22   people forging prescriptions?  Is one of those

23   happening more than the other in Summit County?

24             MR. BENNETT:  Objection.  Form.

25     A.    We investigate all of that so it's

Page 480

1    still continuing.

2         Q.    Are you aware of any statistics

3    regarding the prevalence of diversion of

4    prescription opioids in Summit County?  Is that

5    something TDS keeps?

6         A.    I'm not aware of any.  That's not my

7    department.

8         Q.    Have you done any studies regarding

9    the prevalence of diversion of prescription

10   opioids in Summit County?

11        A.    I personally have not.

12        Q.    Have you done any investigation into

13   how common it is for a person to -- I'm sorry.

14             You're aware that there are people

15   in Summit County that are abusing prescription

16   opioids?

17        A.    Yes.

18        Q.    Have you done any research into how

19   common it is that the people who are abusing

20   prescription opioids first got the opioid from a

21   doctor in -- at some point got a valid

22   prescription for the opioid as opposed to they,

23   you know, got it from a friend or bought it on

24   the street?

25             MR. LEDLIE:  Objection.  Compound.

Page 481

1   Vague.

2           You may answer.

3       A.    My personal on that from

4   investigating and interviewing, my opinion is

5   yes, that's who I've spoken with, victims, that

6   have come to me as we speak.  You know, they

7   started by legitimate, you know, injury, that

8   they were prescribed, and then it started there.

9       Q.    You say "victims," but these are

10  people you're investigating for doctor shopping?

11      A.    No.  Like when I go to the opiate

12  task force and they will come up and talk to me,

13  victims of being addicts.

14      Q.    Do they tell you specifically which

15  doctor gave them which prescription for which

16  medication for what medical purpose?

17           MR. BENNETT:  Objection.  Form.

18      A.    No.

19      Q.    Do you keep notes of these

20  conversations?

21      A.    No.

22      Q.    How many of these conversations have

23  you had?

24      A.    I mean, people talk to me all the

25  time when -- they'll say, "Oh, hi, Deputy Baker.

Page 482

1   How are you?"

2        Q.    But I'm talking about particular

3   conversations where someone is telling you

4   they're abusing prescription opioids now because

5   at one point they got an actual prescription

6   from a physician.

7        A.    No.  Most of the time when they talk

8   to me, they're recovering addicts, so they're

9   not currently on it.  If they were, I would try

10  to steer them in the right direction of where

11  they need to go for help.

12       Q.    In terms of the number of those

13  conversations, how many of those have you had?

14       A.    When I go to the meetings, I talk to

15  people all the time.

16       Q.    Have you ever done any investigation

17  to confirm whether the person is telling you the

18  truth about whether they actually got a

19  prescription from a doctor versus borrowing it

20  from the brother or sister or cousin?

21       A.    No.  At that point they're not under

22  investigation.  This is just talking with them.

23  I'm just giving them, you know, positive

24  enforcement of they're doing a good job because,

25  you know, they're not currently doing that.

```
                                                Page 483

  1        Q.    Have there been any changes to the

  2  opioid epidemic that you've observed in Summit

  3  County over the time that you've been at the

  4  task force?

  5             MR. LEDLIE:  Objection.  Vague.

  6        A.    I believe we still have an issue.

  7  That's my own opinion.  There's still an issue.

  8        Q.    I was just getting to whether things

  9  had changed.

 10        A.    I don't -- yes.  Our morgues aren't

 11  as full.  We don't have, you know, other units

 12  coming in to house them while they're being

 13  processed.  So that's a change.

 14        Q.    That's a change for the better?

 15        A.    Yes.

 16             MR. BLOCK:  I'll yield the balance

 17  of my time to Mr. Moylan, which I fear, Dan, is

 18  five minutes.  Sorry.

 19             EXAMINATION OF LORI BAKER-STELLA

 20  BY MR. MOYLAN:

 21        Q.    Detective, I think you testified

 22  earlier that you can recall two to three

 23  investigations of pharmacies as distinct from

 24  pharmacists; is that correct?

 25        A.    Yes.
```

Page 484

1        Q.    And one of those investigations is
2   still active, correct?
3             MR. BENNETT:  You can answer if
4   there's one of those three that are active.
5        A.    Yes.
6        Q.    And is it correct that the other
7   investigation or investigations is closed or
8   they're closed?
9             MR. BENNETT:  You can answer that
10   question yes or no only.
11             MR. LEDLIE:  If you know.
12             MR. BENNETT:  If you know.
13        A.    I do not know.
14        Q.    So you're not aware of the outcome
15   of any other investigations than the one that's
16   currently active?
17        A.    That is correct.
18        Q.    And the one that's active, I think
19   you had mentioned that there was an arrest made
20   as part of that investigation; is that correct?
21             MR. LEDLIE:  Objection.  Misstates
22   testimony.
23             MR. BENNETT:  Objection.  Scope.
24             You're not authorized to disclose
25   non-public facts or information regarding

Page 485

1    ongoing, active investigations.

2         A.    Yeah.

3         Q.    So am I incorrect that you had

4    testified earlier that an arrest was made as

5    part of that active pharmacy investigation?

6              MR. BENNETT:  Objection.  Scope.

7              To the extent you remember what your

8    testimony was, you can answer regarding your

9    testimony.

10        A.    I don't remember my testimony on

11   that.

12        Q.    And so my recollection -- maybe it's

13   incorrect -- was that you had testified that an

14   arrest was made as part of that active pharmacy

15   investigation; is that correct?

16             MR. BENNETT:  Objection.  Asked and

17   answered.  Objection.  Form.

18             You're answering regarding what your

19   testimony was and not facts of the

20   investigation.

21        Q.    To ask it again, my recollection was

22   that you testified that an arrest was made as

23   part of the active pharmacy investigation.  Is

24   that correct?

25        A.    I don't remember.  If you could

Page 486

1  bring it up.

2       Q.    Was there an arrest made as part of

3  the active pharmacy investigation that you could

4  recall?

5              MR. BENNETT:  Objection.  Scope.

6              You're not authorized to disclose

7  facts or circumstances of an ongoing

8  investigation that have not been made public.

9  To the extent that there is public disclosure of

10  an arrest and charges, you may say that there

11  are arrests and charges, but you may not provide

12  non-public arrest information.

13              THE WITNESS:  Can I speak with you

14  just real quick?

15              MR. BENNETT:  Yes.

16                   (Recess had.)

17              MR. BENNETT:  So after speaking to

18  the witness, we have authorized her to disclose

19  certain information in response to your

20  question, and so I think she has an answer for

21  you in response to your question about an arrest

22  in one of the ongoing pharmacy cases.

23       A.    Yes.  In reference to that case, I'm

24  not quite sure if a warrant was issued and they

25  were actually arrested or if they fled the

1    country before the arrest.  I hope that helps.

2         Q.    It does.  Thank you.

3               I'm going to ask you to turn back to

4    Exhibit 7.  Look at that again briefly.  Do you

5    have that in front of you?

6         A.    I do, yes.

7         Q.    In the bottom paragraph from Joseph

8    Black, the second paragraph refers to a packet

9    from Walgreens in response to his subpoena.

10              Do you see that?

11        A.    I do.

12        Q.    Did you have any contact with the

13   Walgreens personnel in connection with that

14   subpoena?

15              MR. BENNETT:  Objection.  Scope.

16              You're not authorized to disclose

17   information regarding ongoing, active

18   investigations.  To the extent that this --

19              MR. BLOCK:  We already established

20   this was the Webb case, which has led to a

21   conviction.

22              MR. BENNETT:  Okay.  I didn't

23   remember that.  To the extent it's a publicly

24   disclosed fact, which counsel is representing is

25   the ███ case, then you may answer the question.

Page 488

1          A.     Yes, I did.

2          Q.     Do you remember who that was?

3          A.     No, I do not.

4          Q.     Do you believe that the information

5     that was received from Walgreens assisted in the

6     ████ investigation?

7          A.     Absolutely.

8          Q.     Would you agree that this is an

9     example of cooperation from a pharmacy in a law

10    enforcement investigation?

11         A.     Yes, I do.

12         Q.     If we could turn to Exhibit 8.  Do

13    you have that in front of you?

14         A.     I'm looking.  Yeah, 8.

15         Q.     The first paragraph, the first block

16    of text ends with the sentence that "The case

17    was assigned from one of our pharmacies in

18    Green."  Do you know which pharmacy that refers

19    to?

20         A.     I want to say it's -- I want to say

21    it's a ████████  ████████   ████  in ████████.

22         Q.     And the --

23                MR. BENNETT:  Objection.

24                I understand this to be an active

25    and ongoing case and I would move to strike that

Page 489

1   answer if the name of the person was -- or the

2   name of the pharmacy was a target of that

3   investigation.

4        Q.   Do you know if the name --

5             MR. BENNETT:  So she's saying it was

6   not a target of the investigation.

7        Q.   Was this an instance where the

8   pharmacist at the Walgreens came forward with

9   information related to the investigation?

10       A.   That is correct.

11            MR. BENNETT:  Objection.

12            You're not authorized to disclose

13  confidential sources.  To the extent that this

14  is not a confidential source, you can answer.

15       A.   Not a confidential source, and yes,

16  they did.

17       Q.   The last exhibit that I wanted to go

18  through with you is Exhibit 10.  Do you have

19  that in front of you?

20       A.   I do.

21       Q.   There's a reference in this e-mail

22  that you sent to awaiting a video from CVS to

23  charge a case for Franklin PD.  Can you recall,

24  did you receive that video from the CVS?

25            MR. BENNETT:  Objection.

Page 490

1          To the extent that this is

2   cooperation by CVS providing you their video,

3   you may answer.  To the extent this is some

4   other surveillance technique, you are not

5   authorized to answer.

6          A.    I do not recall if I received that.

7              MR. MOYLAN:  That's all the

8   questions I have.

9

10        (Deposition concluded at 1:04 p.m.)

11                    - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Whereupon, counsel was requested to give

2  instruction regarding the witness' review of

3  the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6  Transcript review was requested pursuant to

7  the applicable Rules of Civil Procedure.

8

9                  TRANSCRIPT DELIVERY:

10 Counsel was requested to give instruction

11 regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 492

1                REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                          ) SS:

4    County of Cuyahoga.   )

5

6            I, Renee L. Pellegrino, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, LORI BAKER-STELLA,

10   was by me first duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the cause

12   aforesaid; that the testimony then given by the

13   above referenced witness was by me reduced to

14   stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above referenced witness.

18           I do further certify that this

19   deposition was taken at the time and place in the

20   foregoing caption specified and was completed

21   without adjournment.

22

23

24

25

Page 493

1          I do further certify that I am not a

2     relative, counsel or attorney for either party,

3     or otherwise interested in the event of this

4     action.

5          IN WITNESS WHEREOF, I have hereunto set

6     my hand and affixed my seal of office at

7     Cleveland, Ohio, on this 29th day of May, 2019.

8

9

10

11     *Renee L. Pellegrino*

12

13     Renee L. Pellegrino, Notary Public

14     within and for the State of Ohio

15

16     My commission expires October 12, 2020.

17

18

19

20

21

22

23

24

25

```
                                              Page 494
 1                    Veritext Legal Solutions
                        1100 Superior Ave
 2                         Suite 1820
                      Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
     May 29, 2019
 5
     To: James Ledlie, Esq.
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3389778
 8
     Witness:  Lori Baker-Stella      Deposition Date:  5/23/2019
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 495

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3389778
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 5/23/2019
4   WITNESS' NAME: Lori Baker-Stella
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____        _____
9   Date                    Lori Baker-Stella
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17

                 _____
18               Notary Public
19               _____
                 Commission Expiration Date
20
21
22
23
24
25

Page 496

1                  DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

     ASSIGNMENT REFERENCE NO: 3389778
3    CASE NAME: In Re: National Prescription Opiate Litigation
     DATE OF DEPOSITION: 5/23/2019
4    WITNESS' NAME: Lori Baker-Stella
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9          I request that these changes be entered
     as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                     Lori Baker-Stella
14
           Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23         _____
                 Notary Public
24
           _____
25               Commission Expiration Date

Page 497

1                          ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                      ASSIGNMENT NO: 3389778
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____        _____
20     Date                    Lori Baker-Stella
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                     _____
                       Notary Public
24
                       _____
25                     Commission Expiration Date

**[& - 424]**                                                                     Page 1

| & |
| --- |
| **&** 368:22 369:6 370:8,12,18,22 371:2,6 378:8 |

| 0 |
| --- |
| **000037561** 374:16 455:14,22 |
| **000074835** 374:20 470:1,8 |
| **0001-2503** 374:8 |
| **000102503** 417:3 417:10 |
| **001000737** 374:11 427:15,23 |
| **001002601** 374:13 439:6,13 |
| **001003326** 374:15 445:22 446:6 |
| **001007719** 374:22 473:16,22 |
| **001132316** 374:18 467:10,16 |
| **001233825** 374:6 413:24 414:5 |
| **02199** 370:24 |

| 1 |
| --- |
| **1** 374:13 439:5 447:12,16 |
| **1-19-2017** 467:15 |
| **10** 374:12 439:3,10 454:16 489:18 |
| **100** 370:4 |
| **10:40** 368:20 |
| **11** 374:14 445:21 446:1 453:15,16 453:23 |
| **1100** 368:22 371:3 494:1 |
| **12** 374:16 455:13 455:18 493:16 |

**1200** 371:22
**13** 374:17 467:9,14
**14** 374:19 467:4 469:23 470:5 471:11
**15** 374:21 467:4 473:13,19
**15219** 370:20
**15910** 369:7
**1660** 368:22
**17** 368:7,15
**1701** 371:17
**18** 368:11,13
**1801** 371:21
**1820** 494:2
**18th** 371:8
**19103-2921** 371:17
**19th** 446:5
**1:04** 490:10
**1st** 439:12

| 2 |
| --- |
| **20** 495:16 496:22 497:22 |
| **200001-4956** 370:15 |
| **20001-3743** 370:10 |
| **201** 371:12 |
| **2013** 446:5,8,17,22 455:2 477:17,17 |
| **2014** 374:10 427:14,22 432:1 435:13 436:21 |
| **2015** 374:13 439:5 439:12 |
| **2016** 374:5,8,22 413:23 414:4 417:2,10 419:22 424:7 473:14,21 474:13,21,25 |

**475:14**
**2017** 374:20 455:22 469:25 470:7
**2019** 368:19 493:7 494:4
**202** 370:10,15
**2020** 493:16
**20th** 455:21
**21202-1031** 370:5
**213** 371:9
**214** 372:5
**215** 371:18
**216** 369:14,23 371:4
**216-523-1313** 494:3
**216-9229** 369:4
**2200** 372:4
**2227** 493:12
**23** 368:19
**234-4002** 369:19
**2440** 370:4
**25** 374:10 427:14
**252-9060** 371:13
**25th** 427:22
**28** 369:3
**2800** 372:4
**2804** 368:6,7
**29** 494:4
**29464** 369:4
**29th** 493:7
**2nd** 368:22

| 3 |
| --- |
| **303** 371:23 |
| **313** 369:19 |
| **330** 371:13 |
| **338-3344** 370:20 |
| **3389778** 494:7 495:2 496:2 497:2 |

**35th** 370:19
**369** 373:3
**374** 373:4
**375** 373:5
**378** 373:8
**381** 375:3,3
**391** 375:4
**392** 375:4
**394** 375:5
**395** 375:5
**396** 375:6
**397** 375:6
**398** 375:7,7
**399** 375:8,8

| 4 |
| --- |
| **400** 369:13 371:7 375:9,9 |
| **401** 375:10,10,11 |
| **402** 375:11,12,12 |
| **403** 375:13,13 |
| **404** 375:14,14,15 |
| **405** 375:15 |
| **406** 375:16,16 |
| **407** 375:17 |
| **409** 375:17,18 |
| **410** 370:5 375:18 375:19 |
| **411** 375:19,20,20 375:21,21 |
| **412** 370:20 375:22 375:22 |
| **413** 375:23,23 |
| **414** 374:5 |
| **416** 375:24 |
| **417** 374:7 375:24 |
| **419** 375:25 |
| **420** 376:3 |
| **421** 376:3 |
| **422** 376:4,4 |
| **424** 376:5 |

| | | | |
|---|---|---|---|
| **426** 376:5,6 | **473** 374:21 377:3 | **7721** 473:22 | **acceptable** 442:21 |
| **427** 374:9 376:6 | **477** 377:3 | **7th** 417:9 | **access** 460:23 |
| **428** 376:7 | **478** 377:4,4 | | 461:4 |
| **430-6000** 371:9 | **479** 377:5 | **8** | **accumulating** |
| **431** 369:18 376:7,8 | **481** 377:5,6 | **8** 374:7,22 416:25 | 425:23 426:24 |
| **432** 376:8 | **48226** 369:18 | 417:8 418:10 | **acknowledge** |
| **434** 376:9,9 | **483** 373:9 377:6 | 440:12 473:14,21 | 495:11 496:16 |
| **435** 376:10,10 | **484** 377:7,7 | 488:12,14 | **acquired** 441:1 |
| **436** 376:11 | **485** 377:8,8 | **800** 370:23 | **act** 495:14 496:20 |
| **437** 376:11,12,12 | **486** 377:9 | **801** 369:13 | **action** 493:4 |
| **438** 376:13,13,14 | **487** 377:9 | **80202** 371:22 | **active** 389:16 |
| **439** 374:12 376:14 | **488** 377:10 | **818** 369:8 | 421:20 423:20 |
| **440** 376:15 | **489** 377:10 | **839-2333** 369:8 | 425:1,5,13 430:22 |
| **441** 376:15 | **490** 377:11 | **843** 369:4 | 432:24 443:21 |
| **44113** 369:14 | **492** 373:11 | **850** 370:14 | 447:13,15 484:2,4 |
| 371:4 | **5** | **9** | 484:16,18 485:1,5 |
| **44114** 494:2 | **5** 374:20 447:12,16 | **9** 374:5,9 413:23 | 485:14,23 486:3 |
| **44114-1190** | 469:25 | 427:12,19 435:3 | 487:17 488:24 |
| 369:22 | **5/23/2019** 494:8 | 440:12 444:8 | **activities** 403:22 |
| **443** 376:16,16 | 495:3 496:3 | **90071** 371:8 | 435:24 436:10 |
| **44308** 371:13 | **50** 371:12 380:18 | **901** 369:22 | 463:6 468:19 |
| **446** 374:14 | **50/50** 399:14 | **91436** 369:8 | 472:7 473:5 |
| **449** 376:17 | **586-3939** 369:23 | **942-5743** 370:10 | **actual** 466:7 482:5 |
| **45004** 368:15 | **592-3197** 371:23 | **949-1159** 370:5 | **addiction** 449:18 |
| **45090** 368:11 | **5th** 470:7 | **950** 371:3 | **addicts** 481:13 |
| **451** 376:17 | **6** | **951-7000** 370:24 | 482:8 |
| **45132** 368:13 | **6** 431:13 | **963-4824** 371:18 | **addition** 378:10 |
| **455** 374:16 376:18 | **601** 370:9 | **9th** 414:4 | **additional** 467:25 |
| **459** 376:18,19 | **617** 370:24 | **a** | 470:11,25 |
| **460** 376:19,20 | **622-3988** 369:14 | **a.m.** 368:20 | **address** 417:17 |
| **461** 376:20 | **662-5205** 370:15 | **aaron** 368:8 | 428:5 439:20 |
| **462** 376:21,21 | **696-4889** 371:4 | **able** 407:16 | 494:15 |
| **463** 376:22 | **7** | 460:22 464:6 | **adjournment** |
| **464** 376:22 | **7** 374:5,8 413:22 | 473:6 | 492:21 |
| **467** 374:17 376:23 | 414:2 417:2 418:4 | **absolutely** 384:6 | **adm** 458:8,9 |
| **468** 376:23 | 440:12 454:16 | 401:13 430:12 | **administration** |
| **469** 376:24 | 487:4 | 488:7 | 369:10,17 |
| **470** 374:19 | **740-8000** 372:5 | **abusing** 480:15,19 | **advice** 415:10 |
| **471** 376:24 | **75201** 372:5 | 482:4 | **affixed** 493:6 |
| **472** 376:25 | | **academy** 475:24 | 495:15 496:21 |

aforesaid  492:12
age  378:15
agencies  398:17
  433:21
agent  382:20
  383:3,3,5,6,8,10
  384:17,25 394:15
  430:6 431:1
  438:23
agents  384:15
  391:3
ago  475:12
agree  391:25
  410:25 413:10
  430:14 448:14
  460:8,20 461:2
  462:3 463:14
  470:17 488:8
ahead  445:18
  470:8
aid  371:15 488:21
akron  369:2
  371:13 391:17
  392:19 409:1
  426:7 454:3
al  368:10,12,14,14
alert  426:2 465:17
  465:21 466:10
alerted  462:25
alex  371:21
alex.harris  371:23
allen  370:19,21
allowed  405:21
  444:12 450:9
  456:13
alongside  398:18
amerisourceberg...
  371:10
amount  383:12
  400:23 413:15
  434:11 448:11

angeles  371:8
answer  381:15
  390:2 391:23
  392:1,9 393:9
  394:7 395:22
  396:16,17 397:16
  397:24 398:5,12
  399:9,13,24 400:6
  400:20,22 401:10
  401:25 402:7,18
  402:25 403:8,14
  403:25 404:2,23
  405:16 407:24
  409:10,11 410:1
  410:23 411:3,14
  411:20,25 412:4
  412:11,21,24
  413:1,12,17 416:9
  416:9 417:19
  419:12 420:2,8,16
  421:22 422:4,9,17
  422:25 423:1,13
  423:18,24 425:2
  425:12 426:4
  428:8 431:3,16
  433:1,2,4,9,16
  434:1,9,20 435:15
  436:1,13,22 437:4
  437:14,21 438:3,5
  438:18 439:24
  441:19 442:10
  443:5,17,20,22
  451:8,12,19
  452:15 453:1,10
  453:20 459:9
  460:1 461:25
  462:19,22 463:9
  463:10 464:6,7,15
  465:7 468:3,20,22
  469:4,11 471:3
  472:11,20 473:6

477:6 481:2 484:3
  484:9 485:8
  486:20 487:25
  489:1,14 490:3,5
answered  404:19
  451:1 485:17
answering  485:18
answers  453:24
antihistamine
  424:4
anybody  404:8,11
  423:22 457:21
anymore  378:13
apologize  406:20
apparently  411:8
appear  463:13
  495:11 496:15
appearances
  369:1 370:1 371:1
  372:1 373:3
appended  496:11
  496:18
applicable  491:7
application  473:20
apply  411:9
applying  410:20
april  374:20
  469:25 470:7
arcos  462:8,11,14
  462:21
area  408:2 420:10
areas  408:4
  409:22 475:13
arnold  370:8
arnoldporter.com
  370:11
arrest  386:11,12
  403:23 404:1,8
  408:8 415:15
  422:11,21,23
  423:9 452:21

453:9 468:16
  484:19 485:4,14
  485:22 486:2,10
  486:12,21 487:1
arrested  403:18
  404:11 423:14,17
  423:22 486:25
arrests  389:25
  422:25 486:11
aside  433:5
asked  392:9
  404:18 418:9
  439:24 449:23
  450:25 451:2
  468:3 476:16
  485:16
asking  391:16
  464:8 466:25
  476:17
aspect  450:5
aspects  391:2
asset  461:10
assigned  414:10
  420:5,7,15,21,25
  421:5 438:24
  488:17
assignment  495:2
  496:2 497:2
assist  383:3
assisted  386:10
  488:5
assisting  382:3
  385:7 394:13
assume  448:4
assuming  475:15
attached  473:20
  496:7
attend  457:25
  458:7
attended  449:5
  458:1,5 475:20

attending   475:5,7
attention   478:1
attorney   493:2
attorney's   369:11
august   374:10
  427:14,22
ausa   438:24
authorization
  391:20 472:10
authorize   496:11
authorized   389:17
  389:19 391:13,19
  396:14 403:21
  409:6 412:25
  416:6,13,17
  421:19 422:3
  423:13 424:25
  433:1 435:23
  436:8 440:24
  442:17 443:22
  444:16 463:5
  468:20 472:6,11
  473:3 484:24
  486:6,18 487:16
  489:12 490:5
authorizing
  423:18
ave   494:1
avenue   369:13,22
  370:9 371:3 372:4
awaiting   489:22
aware   462:2 480:2
  480:6,14 484:14

**b**

babic   384:25
bacchus   369:12
back   384:8 388:18
  395:7 397:23
  406:16 414:19
  417:18 418:4,10
  428:2,3,7 431:23

431:25 435:3
439:17,20 443:8
446:8 448:4,17
449:10,12 453:14
453:15 454:1
456:4,9 467:21,25
468:8 470:23
471:1 474:13
476:15,18,22
487:3 494:15
bad   379:15,21
baker   368:18
  373:7 374:7,9,12
  374:19,21 378:2
  378:15,20,22
  380:12 406:9
  413:21 414:2
  416:24 417:1
  427:11,13,20
  437:16 439:2,4,10
  445:20 446:2
  449:1 453:21
  455:12,20 462:9
  465:13 467:8
  469:22,24 470:6
  473:12,14 477:3
  481:25 483:19
  492:9 494:8 495:4
  495:9 496:4,13
  497:20
balance   483:16
baltimore   370:5
baron   369:6 378:8
baronbudd.com
  369:9
bartlit   371:20,23
based   412:17
  413:15 443:5
  447:13 456:12
  471:18 477:15
  478:14 479:13

basis   391:25
  410:16 463:13
bates   374:5,8,10
  374:13,14,16,17
  374:20,22 413:23
  414:4 417:2,10
  427:14,22 439:5
  439:12 445:21
  446:5 453:19
  455:13,22 467:9
  469:25 470:8
  473:15,21
bblock   370:16
bears   414:4
  417:10 446:5
  470:7 473:21
beck   371:20
beck.com   371:23
beginning   374:22
  473:15
begins   445:2
behalf   369:2,6,10
  369:16,20 370:2,7
  370:12,17,22
  371:2,10,15,19
  372:2
believe   384:24
  395:11 398:25
  400:24 413:19
  427:3 428:2 431:5
  431:24 444:18
  446:20 447:8
  449:4 456:2,7,14
  465:2,6 473:7
  477:10 483:6
  488:4
benjamin   370:13
bennett   369:11
  379:6 380:7
  381:14 389:14
  390:2 391:7,11

392:6,15 393:9
395:21 396:11
398:4 399:8,24
400:6,21 401:9,24
402:6,17,24 403:6
403:14,20 404:14
404:18,22 405:6
405:16 406:3
407:23 409:5,25
410:22 411:2,13
411:19,24 412:4
412:10,20,24
413:11,17 416:4
417:13 419:11
420:1,8,16 421:18
422:1,9,17,22
423:6,11 424:24
425:9 426:4,20,25
427:25 429:8,11
429:14 430:21
431:3,11 432:23
433:9,16 434:1,7,9
434:19 435:7,15
435:22 436:7,14
436:22 437:3,12
437:21 438:4,17
439:15 440:23
441:11,19 442:11
442:17 443:3,19
444:12 445:4,11
445:15 447:1,24
448:6,18 451:8,12
451:19 452:15
453:1,4,10,24
455:6 456:1,11
459:8 460:1,14
461:25 462:6,18
463:4,16,24
464:14,25 465:6
465:11,24 466:23
467:5,19 468:17

469:1,4,10,17
470:9,20 472:5,20
473:2 476:8,11
477:2,5 478:10
479:24 481:17
484:3,9,12,23
485:6,16 486:5,15
486:17 487:15,22
488:23 489:5,11
489:25
**berne** 368:22
**best** 447:3
**better** 383:20
483:14
**big** 445:7
**biggest** 426:16,22
445:11
**bit** 397:8 402:11
441:14 474:5
**black** 414:3,8,9,10
415:12 425:8,17
425:18 487:8
**blame** 465:9
**blames** 465:11
**blatant** 397:2,23
397:24,25
**block** 370:13
373:8 378:1,12,21
391:24 404:7
406:6 421:22
423:8 429:14
442:9 443:16
445:16 448:1,22
451:2 452:14
456:18 463:11,17
465:5,9,25 466:21
467:3 470:15
472:12 476:10,20
483:16 487:19
488:15

**board** 396:1
398:18,22 399:5,7
432:21 434:14
437:24 438:22
446:19 449:24
450:15 458:9,9,11
**borrowing** 482:19
**boston** 370:24
**bottom** 487:7
**bought** 480:23
**boulevard** 369:3,7
**bounds** 391:23
392:10
**bowerman** 387:19
**boylston** 370:23
**break** 447:20,22
447:25 448:12,23
460:24
**breakdown**
383:21
**bridgeside** 369:3
**briefly** 487:4
**bring** 398:13,14
486:1
**brooks** 432:3,4,5
**brother** 482:20
**brought** 396:8
408:15 468:8
**brunner** 372:3
**budd** 369:6 378:8
**bureau** 414:21
**burling** 370:12
**business** 417:25
418:6

**c**

**c** 370:13
**ca** 494:25
**california** 369:8
371:8
**call** 393:11

**called** 378:15
**calls** 430:22
437:10
**cannabinoids**
382:23 454:22
**captain** 418:18,19
418:23 426:3
440:11 455:18,24
457:2 470:6
**caption** 492:20
**carfentanil** 468:15
469:8,9,15,16
**carmen** 467:15
468:5
**carolina** 369:4
**case** 368:7,11,13
368:15 379:22
380:8 382:3,8,11
382:14,21 383:1,6
384:5,6 385:14
386:7,8,10,12
387:4 388:15
390:5,12,21 395:8
396:5 408:11,22
408:25 409:1
410:3 414:18,19
414:22 415:2,4,14
415:23 416:7
420:5,7,15,22,24
420:24 421:5,15
422:12,16 423:10
423:12,23 426:1
429:5,6,16 430:7
430:11,13,25
431:6,18,20,22
432:2,8,10,17
433:18,20,22
434:5,13 435:1,8
438:23,25 440:15
440:16,20 443:18
443:20,21,21,23

445:6 450:14
453:5 454:19
464:2 467:22
468:20 472:1,8,9
472:14,16,18
473:1 486:23
487:20,25 488:16
488:25 489:23
494:6 495:3 496:3
**cases** 381:4,6,8,17
381:20 384:12
385:20,24 386:19
387:22 389:10,15
389:24 390:1,8,17
390:23,24 391:1,4
391:6,10 392:14
393:4,8,13,19
394:3,19 401:20
404:24 406:23
409:3,4,19 412:8
412:13 415:7
416:14 418:25
421:8 425:21,22
426:12,16,22
431:2,23 434:18
435:11,12,19
441:15 442:4,20
445:5 447:9,12,13
447:18 448:7
450:6,13 455:3
458:19,22 459:22
459:23 460:4
462:14 469:7,15
471:18 486:22
**cause** 492:11
**centre** 370:19
**certain** 408:2
409:14 450:14
486:19
**certainly** 437:8

certificate 373:11
492:1 496:11
certification 495:1
496:1
certified 378:18
certify 492:8,18
493:1
change 379:13
483:13,14 494:13
494:14 496:8
497:3
changed 483:9
changes 483:1
494:12 495:7
496:7,9
charge 489:23
charged 403:25
404:2 416:14
423:15,17,23
468:21 469:1,3
charges 396:8
398:13,14 408:15
422:24 486:10,11
check 427:4
459:15
chiropractic 445:6
christopher
369:21
cipriani 369:17
circumstances
486:7
city 368:12 369:2
369:6 378:9 393:1
393:3 454:3
citycenter 370:14
civil 378:17
472:13,22 491:3,7
495:5 496:5
civilly 396:6
clarified 380:1

claw 428:2 439:17
456:9 470:23
476:14,22
clawback 417:15
clawed 417:18
428:3,7 448:4
454:1 456:4
467:21,24 471:1
476:18
clawing 439:20
cleveland 368:12
368:23 369:6,14
369:22 371:4
378:9,25 391:18
393:2,3 432:12
493:7 494:2
close 383:7 475:2
closed 429:12
443:24 447:18
484:7,8
clr 368:25
cluff 369:7 378:6,8
cmmclaughlin
369:23
codeine 419:7,19
422:12,16 423:10
423:25 424:2
cohen 372:8
391:22 392:8
423:4 444:25
445:13,18 447:19
448:10,20,24
463:21
colorado 371:22
columbus 419:23
475:5
come 415:8 421:9
449:10,12 453:14
481:6,12
comfortable
420:19

coming 378:25
383:7 384:8
397:18 483:12
commission
493:16 495:19
496:25 497:25
commissioned
492:8
common 388:24
403:3 465:16
479:2,9 480:13,19
companies 370:8
company 370:17
completed 452:18
492:20 494:15
completely 468:25
complicated
409:20,21 410:5
compound 480:25
con'td 372:1
concern 445:10
concerns 445:7,12
conclude 400:15
concluded 399:19
400:16 401:22
404:16 405:13
406:25 412:16
490:10
conclusion 411:11
confer 423:2,3
436:14
confidential 409:8
416:11 456:7
489:13,14,15
confidentiality
392:2
confirm 429:4
454:20 482:17
confirmed 468:15
connected 458:11
458:12

connection 458:16
487:13
consider 394:1
consultation
402:22 403:4
consulted 402:15
402:16
cont'd 370:1 371:1
376:1 377:1
contact 399:16,17
487:12
contain 448:6
contains 447:8
456:7
continued 368:17
378:2,3
continuing 480:1
conversations
481:20,22 482:3
482:13
convicted 387:17
389:13 415:1
432:2 443:24
conviction 386:14
388:10 390:14
408:8 414:23
415:16 422:15
444:14 452:11,25
487:21
convictions 387:13
389:9,15
cooperation 488:9
490:2
coordination
449:2
copy 429:12
corporation
370:12 371:10
correct 379:13
380:21 384:2
385:19 388:13

[correct - deposition]

399:20 407:8
410:17,24 415:18
416:3 418:8,17
419:1,8,20 421:12
427:9 430:15
444:6 454:21
458:24 459:2,16
468:14 471:15,16
483:24 484:2,6,17
484:20 485:15,24
489:10 492:16
**corrections** 494:12
496:17
**correctly** 401:19
410:9
**counsel** 378:3,11
447:1 456:5
464:25 476:8
487:24 491:1,10
493:2
**counseling** 429:21
444:2
**counselor** 440:1
**counterfeit** 385:10
387:6,18 394:17
395:4 419:5,9,16
419:24 421:15
442:8
**country** 389:12,25
396:7 487:1
**county** 368:10,14
369:2 387:20
388:14 391:17,18
392:22,23,23,25
393:7 403:13
408:25 414:14
418:1,2,6,12,15
421:5,10,16 422:2
424:6 428:14
440:6,6,8 444:19
446:13 454:4,5,12

456:25 457:4
458:6 468:10,12
470:22 471:8,13
471:17 474:2,7
476:14 477:4
478:24 479:23
480:4,10,15 483:3
492:4 495:10
496:15
**couple** 379:8
407:19 477:19
**course** 417:25
418:5 428:14
440:5 442:23
446:12 454:11
457:3,10 468:11
471:7 474:7,17,22
**court** 368:1
373:13 399:23
444:22 463:22
470:18 476:24
495:7
**courtesy** 426:13
**courthouse** 369:12
**cousin** 482:20
**cov.com** 370:16,16
**covington** 370:12
**criminal** 431:13
**criminally** 396:6
**criteria** 425:25
**current** 447:9,12
447:12
**currently** 395:12
418:23 436:3
472:13 482:9,25
484:16
**custody** 373:13
**cuyahoga** 368:10
391:18 393:6
492:4

**cvs** 370:2,2 489:22
489:24 490:2

**d**

**d** 370:9
**d.c.** 370:10,15
**dallas** 372:5
**dan** 368:8 483:17
**daniel** 370:3
**data** 460:23 461:5
461:12,14,17,23
462:4,9,11,14
476:7
**database** 409:17
**date** 382:9 439:20
475:3 491:11
494:8 495:3,9,19
496:3,13,25
497:20,25
**dated** 374:5,7,10
374:12,19,22
413:22 414:3
417:2,9 427:14,22
439:5,12 446:4
467:15 469:25
470:7 473:14,20
**david** 372:8
**day** 369:21 493:7
495:16 496:22
497:22
**days** 494:18
**db** 414:19,20
**dea** 384:19 385:2,3
388:3 403:22
428:2 435:24
436:9 437:18
439:16 444:20
447:9,11 453:18
463:6 468:19
472:7 473:4
474:17 475:6

**dea's** 378:12
**dealing** 424:23
**dealt** 402:11
**dear** 494:10
**december** 374:5
413:23 414:4
455:21
**decided** 464:19
**decision** 437:17,20
**decisions** 438:10
**deed** 495:14
496:20
**deemed** 494:19
**defense** 456:5
**definitely** 389:7
446:9 461:8,10
**definition** 424:19
**delayed** 443:8
**deliberative** 409:7
**delivery** 491:9,11
**denver** 371:22
**department**
369:10 392:19
409:8 447:10
456:7 480:7
494:22
**depending** 407:13
**depends** 398:6
**deposed** 378:18
**deposition** 368:17
378:2,4 379:4,11
413:21 416:24
427:11 439:2
445:17,20 447:5
455:12 467:8
469:22 473:12
474:15 476:21
490:10 492:19
494:8,11 495:1,3
496:1,3

**deputy** 414:10
481:25
**describe** 451:15
**described** 392:10
**description** 374:3
**desk** 415:20 457:8
**detailed** 450:5
**details** 472:9
473:4
**detective** 378:2,4
378:22 380:11
384:16 394:1,11
406:8 414:2,21
415:12 418:1,6
427:19 428:16
437:16 439:10
440:6 446:1,13
449:1 453:21
454:12 455:20
465:13 467:18
468:12 470:6
471:2,9 474:8
477:3 483:21
**determination**
460:21 461:3
**determine** 419:2
447:17,22,25
**determining** 426:1
**detroit** 369:18
**difference** 379:23
451:16
**different** 395:25
396:2 408:4
420:12 436:18
451:4 466:1,5
469:13 472:4
479:16
**difficult** 410:25
411:4 460:21
461:3

**direct** 418:14
**direction** 482:10
**directly** 402:11
**disclose** 389:17,19
391:13,20 396:14
403:21 409:6
416:6,13,18
421:19,23 424:25
435:23 436:8
440:25 444:13,17
463:5 472:6
484:24 486:6,18
487:16 489:12
**disclosed** 416:8,10
416:12,17 435:25
444:13,18 456:15
463:8 468:21
469:2 487:24
**disclosing** 409:11
431:17
**disclosure** 486:9
**discuss** 389:15
431:14 473:3
**discussed** 423:11
470:10 475:10
**discussing** 454:17
**discussion** 430:22
464:3
**distinct** 483:23
**distributors**
466:10
**district** 368:1,2
444:22
**diversion** 393:20
394:4,19 466:7,7
473:1 474:11
478:23 479:2,10
480:3,9
**diverting** 451:24
**division** 368:3
414:11,12,15

415:8 466:2
**dmoylan** 370:6
**doctor** 386:1,21,22
387:1,3 388:9,19
390:1,13,17,23,24
391:4,5,8,9 392:14
392:20 393:7,13
393:19 394:3,8,17
398:10 401:16,21
402:21 403:18
404:9,11,16,17
405:11,13,23
406:9,14,16,19,25
409:3 410:14,19
412:17,18 413:15
413:16 415:22
416:1,1 432:7
433:13,23 435:12
436:3,5,20 437:19
437:25 442:7,16
442:23 443:25
444:7 451:22
452:7 457:23
458:18 459:6,17
459:20 460:12
461:15,18,21
463:1 464:4,10,12
464:18 465:15,18
465:22 472:3
479:4,19 480:21
481:10,15 482:19
**doctor's** 401:23
415:21
**doctors** 379:16,22
388:23 389:2,3
390:10 398:1,23
399:4 402:3,13
403:3 435:19
436:19,25 437:9
459:1,24 479:20

**document** 368:8
417:18 428:6,7
439:16,21,22
444:24 447:2,4
454:1 456:2,6,9
467:21,24 470:10
470:22 471:1
476:9,11,15
**documents** 428:1
447:7 456:4,5
**doing** 381:6,20
383:13,14 392:7
410:16 415:9
419:14,15 420:13
432:9 434:25,25
452:6 457:16
459:5 478:2
482:24,25
**doj** 378:12 453:19
**dollars** 471:19
**door** 379:21 397:4
**dozen** 381:8,10
405:4
**dr** 386:17,19
397:11 429:7,15
432:3,4,5 443:11
443:13,25 444:15
**drug** 369:10,16
371:10 385:15
420:20,21,22
426:7 430:17
440:8 446:14,15
446:17 454:13
456:24,25 458:10
**drugs** 471:19
**due** 403:24
**duly** 378:18 492:7
492:10
**duties** 417:25
428:14 440:5
441:2 446:12

454:11 457:4,10
468:11 471:8
474:7

**dying** 477:11

**e**

**e** 372:3 374:5,7,9
374:12,14,16,17
374:19,21 413:22
414:3,7,17 415:3
416:25 417:8,12
417:21 418:5
426:16 427:2,8,12
427:20,24 428:10
430:25 431:13
439:3,11,14 440:2
440:4,9 445:21
446:2,4,7 453:22
454:10,16 455:13
455:18,20,21
457:1 467:9,14,17
468:5,5 469:23
470:5 471:5
473:13,19 474:1
474:20 489:21

**earlier** 483:22
485:4

**easier** 379:1

**east** 370:4

**eastern** 368:3

**either** 470:25
477:8 493:2

**ellis** 371:2

**email** 494:17

**embedded** 446:3

**enable** 392:3

**encino** 369:8

**enclosed** 494:11

**ended** 429:20

**endo** 370:7,7

**ends** 488:16

**enforcement**
369:10,16 409:9
444:22 456:16
463:17 482:24
488:10

**entered** 496:9

**entering** 459:13

**entire** 428:7
446:19 467:24
470:25 495:5
496:5

**entirety** 456:10

**entities** 395:25

**epidemic** 449:6,14
449:17 473:24
475:6,11,17 477:4
477:12,14,21,23
478:4,8,16,19
483:2

**erin** 370:19

**errata** 494:13,18
496:7,10,18 497:1

**esq** 369:3,7,11,12
369:17,21 370:3,9
370:13,13,19,23
371:3,7,11,16,21
372:3 494:5

**established** 487:19

**estimate** 380:22

**estimated** 380:20

**et** 368:10,12,14,14

**event** 493:3

**everybody** 465:11
476:25

**evidence** 381:19
397:19

**exact** 382:9 383:11
386:25 387:9
420:11,13

**exactly** 382:11

**examination** 373:7
378:16,20 483:19

**example** 382:22
397:23 488:9

**excel** 475:25 476:4

**exception** 434:6

**exchange** 446:7
453:22

**executed** 397:19
496:10

**executing** 381:18

**execution** 495:14
496:19

**exercising** 410:19

**exhibit** 373:13
374:5,7,9,12,14,16
374:17,19,21
413:22 414:2
416:25 417:8
418:4 427:12,19
435:3 439:3,10
444:8 445:21
446:1 453:16,23
454:16 455:13,18
466:24 467:9,14
469:23 470:5
471:11 473:13,19
487:4 488:12
489:17,18

**exhibits** 373:4
374:1 440:12

**existence** 396:14

**experience** 425:3

**expert** 402:12,14
402:16,23 403:5
411:17

**experts** 402:5

**expiration** 495:19
496:25 497:25

**expires** 493:16

**explain** 379:20,23
424:18

**explained** 379:19
381:3 391:1 397:3
406:13 415:7
424:16 428:20
433:20

**explanation**
386:20

**explore** 392:3

**express** 440:24

**extent** 391:15
392:3 394:3
396:12,15 403:23
409:10 416:7,11
422:23,25 423:15
425:1,11 431:16
433:2 435:25
441:2 444:15
459:19 463:7,12
468:18 472:8
485:7 486:9
487:18,23 489:13
490:1,3

**extern** 378:12

**f**

**fact** 403:24 462:25
464:2 487:24

**facts** 416:6 441:1,4
444:13,13 484:25
485:19 486:7

**fair** 383:18 410:12

**fake** 419:18

**fall** 385:24

**fast** 405:22 410:10

**faster** 407:17
408:3

**favorite** 445:2

**fbi** 440:16,21
441:9,18 442:7,15
442:25 472:2

**fear** 483:17
**february** 446:23
  477:17
**federal** 378:16
**felt** 420:19
**fentanyl** 424:9,12
  424:15,22 425:3,7
  425:17 449:6,14
  449:19 473:24
  475:6,10,17
  478:17
**fictitious** 394:24
  394:25 395:3
  420:9,18
**figure** 410:14,18
  411:10 463:19
  465:14
**fill** 463:3
**filled** 407:16
**final** 429:9,10
**find** 407:16,25
  410:3 494:11
**fine** 390:7 429:22
  476:22
**finish** 476:23
**finished** 476:9
**firm** 378:7
**first** 378:17 382:6
  390:16 414:16
  419:4 429:3,5,12
  431:24 440:15
  446:6 447:3 451:3
  456:2,22 457:13
  468:15 471:4
  473:25 480:20
  488:15,15 492:10
**fishy** 464:13
  465:18
**five** 447:22,25
  448:24 455:3
  483:18

**fled** 389:11,24
  396:7 486:25
**floor** 370:19 371:8
**focus** 390:11,22,24
  393:12,19,22
  413:4 478:3
**focused** 394:2
  403:11 427:7
**focuses** 391:5
  392:14,19 393:3,7
  393:23
**folks** 468:10
**follow** 405:18
  407:14 410:4
**followed** 401:19
**following** 451:21
  452:5
**follows** 378:19
**force** 391:14,16
  458:3,12 481:12
  483:4
**forces** 391:15
**foregoing** 492:15
  492:20 495:13
  496:18
**forgery** 407:9
  409:4 479:4
**forget** 428:22,24
  429:1
**forging** 479:22
**form** 381:12 394:5
  397:13 398:3
  399:12 400:18
  406:1,3 407:23
  409:23 411:13,18
  413:9 426:19
  434:7 459:7 461:9
  464:14 471:21
  478:9 479:24
  481:17 485:17

**forms** 479:2,9
**forward** 489:8
  494:15
**forwarding** 455:19
**found** 425:19
**foundation** 397:15
  471:22
**four** 387:10
  397:11
**fraction** 385:8
**frame** 398:15
**franklin** 489:23
**fraud** 433:20
**free** 495:14 496:20
**frequent** 388:8
  434:4
**frequently** 399:11
  412:3 421:3
**friend** 480:23
**front** 415:20
  431:12,15 442:4
  487:5 488:13
  489:19
**full** 483:11
**further** 444:21
  492:18 493:1
**future** 439:20

**g**

**g** 393:11 394:11
**gained** 416:12
**general** 410:12
  424:20 442:18
  451:16 457:21
  462:17,19 463:8
  465:19 466:9
  475:9
**generally** 425:2,11
  433:3 435:11
  463:25 464:8,11
  465:4,24,25

**gerald** 387:19
**getting** 411:7
  435:18 443:8
  458:14 468:4,6
  477:1 483:8
**gibson** 370:19
**giogotti** 393:10
**give** 381:22 384:17
  386:24 398:15
  404:25 425:4,22
  434:12 441:5,6
  442:2 457:18
  458:24 462:21
  471:23 477:16
  491:1,10
**given** 407:15
  420:10,20 421:23
  492:12,17
**giving** 393:13
  411:10 428:20
  457:17 482:23
**go** 392:11 395:23
  401:17 402:10
  407:12 408:2
  409:13 425:20
  429:21 438:13
  445:18 448:13
  459:15 467:6
  470:8 476:1
  481:11 482:11,14
  489:17
**goes** 395:7 399:10
  400:24
**going** 388:5
  391:18 397:4
  401:2,7 407:13
  409:17 427:3
  431:7 434:11
  435:20 445:14
  447:1 448:2,16
  449:18 460:9

464:7 465:15,18
470:9,10 476:14
478:3,4 487:3
**goldstein** 370:23
**good** 383:13 389:6
408:19 442:3
459:12 462:22
482:24
**gosh** 430:2
**gotten** 421:4 442:7
442:15
**grand** 431:7,13,15
431:18 448:6,9
**gray** 370:22
409:22
**green** 420:6
488:18,21
**guess** 380:20
387:11 389:12
398:16 400:8
435:10 442:1
450:23
**guessing** 408:17
**guys** 463:21

**h**

**half** 403:16
**hallway** 465:2
**hand** 379:16,16,18
379:18,24,24
417:7 453:15
493:6
**handful** 382:1
383:15 385:23
389:7,22,24
422:10 442:2
450:4,4
**handing** 474:5
**handle** 410:10
414:19
**handled** 409:15

**hang** 417:13
**happen** 412:6
431:12
**happened** 404:21
405:2,4 420:24
421:3 432:4
441:22 443:13
**happening** 424:17
424:21 479:18,23
**happens** 399:11
421:7 425:2,11
**hard** 477:20
**hardest** 475:14
**harper** 386:17,19
397:11,22
**harris** 371:21
**hbc** 370:17
**heads** 438:11
**health** 370:7
458:10
**hear** 442:12
**heights** 432:12
**hello** 445:2
**help** 382:18 396:3
415:6 434:13
474:21 482:11
**helps** 461:7,8
487:1
**henry** 372:2
**hereinafter** 378:18
**hereunto** 493:5
**heroin** 449:6,14,19
473:24 475:6,10
475:17 478:20
**hey** 464:3
**hi** 481:25
**highlight** 432:15
**hit** 397:18
**hitting** 477:19
**hold** 392:8

**honestly** 380:20
382:17 396:25
398:6,12 427:1
434:10 475:18
**honor** 391:24
454:6 463:11
**hope** 371:7 487:1
**hour** 447:21
**hours** 379:8
425:23
**house** 483:12
**howard** 369:18
**hum** 383:24 396:9
399:21 424:11
443:12
**hundred** 380:15
380:16
**hunt** 374:7,10,12
374:19 417:1,9
418:11,11 420:5,7
420:14 426:2
427:13,21 428:19
432:16 439:5,12
440:11 446:4
455:23 457:2
469:25 470:7

**i**

**identification**
413:25 417:5
427:17 439:8
445:24 455:16
467:12 470:3
473:17
**identified** 447:6
453:17 456:5
**identity** 414:18
**ii** 368:17 369:11
385:15,18 455:7
**illicit** 424:14
469:16 478:17

**immediately**
390:18
**implement** 411:9
**important** 399:16
399:17
**improper** 390:1,9
394:18 395:15,20
396:24 398:20
399:18,20 400:17
401:4,15 402:21
406:15 407:6
409:2
**improperly**
390:13 401:16
**include** 478:16
**included** 440:17
441:18 494:13
**includes** 478:19
**incorporated**
496:12
**incorrect** 485:3,13
**incorrectly** 410:10
**index** 373:1,4,5
374:1 375:1 376:1
377:1
**indiana** 370:2
**indicate** 391:19
396:12 470:21
**indicating** 429:13
494:13
**indictment** 396:13
396:15,22,23
431:9
**individual** 403:25
459:1
**individuals** 391:21
423:14,16
**info** 425:22
**information**
389:18 390:4
411:6 416:10,12

416:16,18 425:4
428:3 436:1,9
438:20 441:1,4
444:15 447:8,10
448:7,9 456:8,12
458:25 459:3,4,15
460:9,10 461:9
463:9 466:3 468:9
476:6 484:25
486:12,19 487:17
488:4 489:9
**ingram** 467:15,17
467:18
**initials** 470:17
**initiation** 399:6
**injury** 481:7
**input** 411:17
438:15
**inspector** 455:19
**instance** 489:7
**instruct** 392:1
**instructed** 391:12
**instruction** 392:16
465:10 469:18
491:2,10
**instructions**
425:10 436:12
441:12 443:4
**intended** 447:7
**interested** 493:3
**interfering** 392:5
**interject** 447:2
**internal** 409:7
**interview** 416:16
**interviewing**
481:4
**interviews** 397:20
**investigate** 385:16
393:24 395:24
398:2 430:18
455:7,10 466:3

479:25
**investigated**
401:20 404:15
406:24
**investigates** 415:9
466:8
**investigating**
388:22 394:9
401:1 419:4 424:9
451:24 458:23
460:12 464:10
465:22 466:11
481:4,10
**investigation**
382:21 385:5
388:25 389:16
395:20 396:23
397:11 398:7,11
400:14 401:5
402:21 403:12,13
405:15 407:1,18
408:6,13,15
410:13 415:12
423:20 424:5,14
425:5,13 429:24
432:25 435:4,6,20
442:19 451:17,18
451:20 452:3,11
452:21,25 453:9
457:22,24 459:6
459:11 461:24
462:23 464:18
465:14 466:18
480:12 482:16,22
484:7,20 485:5,15
485:20,23 486:3,8
488:6,10 489:3,6,9
**investigations**
380:12 381:23
383:9 385:5 386:2
386:5,23 387:2,6

388:6,19 389:5
395:6,9,16 398:21
399:3,19 401:15
402:3,13 403:3,10
403:23 405:12,24
406:9 407:10
411:22 421:14,20
421:21,24 425:1
430:22 433:7,12
433:24 435:19,24
436:9,20 441:17
442:6,14,18,22
449:25 450:17,17
450:20,24 451:7
456:17 459:18
461:15,18,21
462:5,12 463:7
468:19 472:7
473:5 483:23
484:1,7,15 485:1
487:18
**investigative**
409:9 411:5
**investigator**
381:25 382:7,9,14
382:24 383:16,23
408:21 432:18
**involve** 395:25
401:5,17 402:22
430:14 455:4
459:18 460:4
**involved** 382:21
385:8,21 397:8
398:22 409:18
410:2 430:11
433:8,15,25
434:18 437:17,19
438:1 440:22
441:9,17 442:7,15
450:6,12 459:24
468:15,22 469:5,6

472:2
**involvement** 399:5
433:3 434:4
441:18
**involving** 387:6,22
388:7 390:9,13
432:24 469:8
**irs** 432:21 433:3,7
433:15,18,25
434:5,18
**issue** 391:12 428:5
470:24 483:6,7
**issued** 407:15
486:24
**issuing** 451:22
**iv** 385:16

| j |
| --- |

**j** 369:17 371:21
**jackson** 371:11
**jacksonkelly.com**
371:14
**james** 369:3,11
431:21,22,24
451:5 494:5
**james.bennett4**
369:15
**janssen** 371:2
**jledlie** 369:5
**job** 415:19 482:24
**joe** 414:8,10
**jog** 382:19
**john** 369:17
371:16 393:10
**john.j.cipriani**
369:19
**john.lavelle**
371:18
**johnson** 371:2,2
**join** 437:12 460:14
**joined** 378:6

[joining - lieutenant]

**joining** 444:20
**jones** 369:21
**jonesday.com**
369:23
**joseph** 414:3,8
487:7
**josh** 370:23
**joshua.goldstein**
370:25
**jr** 371:16
**judge** 368:8
**judgment** 410:20
410:20 411:11,12
413:7
**july** 374:13 439:5
439:12
**june** 374:22 446:5
446:8,17 455:2
473:14,20 474:20
474:25
**jurisdiction**
420:17
**jury** 431:7,13,15
431:18 448:7,9
**justice** 369:10
409:8 447:10
456:8

**k**

**k** 371:11
**k2** 455:8
**keep** 448:16
481:19
**keeps** 480:5
**kelly** 371:11
**kind** 381:18 396:1
398:19 426:10
429:2 441:14
444:3 448:16
451:23 452:7,8
**kinds** 393:20
433:12 458:21

**knew** 475:20
**know** 379:20
380:2,10 382:10
382:13 383:5,11
384:13 385:7,23
386:22 389:4
390:4 391:11
393:24 394:8
395:23 396:3,5,19
397:7 398:6 399:1
399:14 400:15,25
400:25 401:11
403:1 404:5 405:7
405:18,19,20
406:4,7 407:14
408:23 409:13,15
410:6,6,8 412:6
414:20,22 415:6,7
415:21 416:1
422:20 426:11,12
426:13 427:2
428:21 429:1
430:20 431:8,18
431:20 432:8
434:14 435:8
436:5 437:6 444:9
447:11 448:7,10
449:18 450:7,10
452:17 453:3,4,7
455:24 456:22
457:20 462:11,24
463:18 464:7,12
466:15 467:2
468:7,24 471:24
472:1,15,16,18
475:13 476:12
477:6,18 478:22
479:1,6,13 480:23
481:6,7 482:23,25
483:11 484:11,12
484:13 488:18

489:4
**knowing** 479:6
**knowledge** 390:25
437:1 447:3 448:3
449:21 462:21
477:8
**known** 391:14
**knows** 423:22
430:25
**krncevic** 371:3

**l**

**l** 368:25 492:6
493:13
**l.p.** 368:10,12,14
**label** 414:4 417:10
455:22 473:21
**lakeside** 369:22
**lavelle** 371:16
**law** 409:8 444:22
456:16 463:17
488:9
**lawful** 378:15
**lawfully** 409:15
**lead** 381:24 382:4
382:7,8,14,20,24
383:3,3,5,16,23
384:1,4,4,9 385:6
385:6 408:21,23
430:6,9,19 431:1
432:18 438:23
**leads** 410:4
**learning** 394:13
476:4
**leave** 473:20
**leaves** 470:19
**led** 408:7 487:20
**ledlie** 369:3
378:11 379:5
380:7 381:12
394:5 397:13
398:3 399:12

400:18 401:8
404:3 406:1,4
409:23 411:18
413:9 422:13
426:19 436:11
437:10 438:2
439:25 443:2,15
444:19 445:9
449:7 450:25
452:12 453:3
454:5 456:10
459:7 460:13
461:6 471:21
478:9 480:25
483:5 484:11,21
494:5
**left** 378:13
**legal** 494:1 497:1
**legitimate** 481:7
**leonard** 378:4
384:12,16 392:21
394:2 415:23
**letter** 494:19
**letting** 380:9
**level** 410:13
411:16 424:20
451:16 458:25
459:3,4 460:9,10
460:23 461:5,12
461:14,17,23
462:4,17,19
**lewis** 371:16
**license** 429:21
437:25 444:1
**licensed** 469:9
**lieutenant** 418:20
418:22 426:3
427:21 428:19
432:16 439:11
446:2,8,16 453:22

**lightly** 410:6
**limitations** 423:21
**limited** 448:11
**limiting** 404:4
**line** 379:21 476:15
  476:16,23 494:13
  496:7 497:3
**link** 399:1
**linked** 409:1 420:5
**list** 447:7 476:13
**listed** 448:19
  456:3 496:7,17
**listing** 496:7
**literally** 445:1
**litigation** 368:6
  494:6 495:3 496:3
**little** 397:8 407:21
  441:14 447:21
  474:5
**llc** 370:2,2,22
**llp** 370:3,12,18,22
**local** 407:25
**localized** 408:2
**locations** 408:5
  420:12 424:18,21
**locke** 372:3
**lockelord** 372:6
**log** 457:12,14,15
  457:17
**long** 379:7 395:13
  395:19 396:23
  397:21 400:13,14
  405:14,14,17
  406:20 407:1,9,10
  408:10,14 429:23
  466:24 475:12
**longer** 397:9 398:1
  408:5 409:3,12
**look** 397:6 400:25
  433:19 448:13,21
  461:19 464:4

**487**:4
**looked** 387:25
  396:2 448:8
**looking** 409:16
  412:18 474:20
  488:14
**looks** 419:3 446:9
  456:11 474:3
**lorde** 372:3
**lori** 368:18 373:7
  374:7,9,12,19,21
  378:15,20 416:25
  427:12 439:3
  469:23 473:13
  483:19 492:9
  494:8 495:4,9
  496:4,13 497:20
**los** 371:8
**lost** 429:20
**lot** 380:23 381:5,7
  384:11,12 389:6,8
  389:23 391:2
  395:14,15 407:16
  412:13 434:12
  449:18

**m**

**m** 369:21 374:7,10
  374:12,19 417:1,9
  427:13 439:4
  469:24
**madam** 494:10
**maddie.brunner**
  372:6
**madeleine** 372:3
**mail** 374:5,7,9,12
  374:14,16,17,19
  374:21 413:22
  414:3,7,17 415:3
  416:25 417:8,12
  417:21 418:5
  426:16 427:2,8,12

**427**:20,24 428:10
  430:25 439:3,11
  439:14 440:2,4,9
  445:21 446:2,4,7
  453:22 454:10,16
  455:13,18,20,21
  457:1 467:9,14,17
  468:5,5 469:23
  470:5 471:5
  473:13,19 474:1
  474:20 489:21
**main** 371:3,12
**majority** 382:2
  421:8
**making** 454:2
**mallinckrodt**
  370:22
**man** 382:25
  393:11
**manufactured**
  469:8
**manufacturer**
  469:9
**manufacturers**
  465:20,21 466:8
**marcus** 370:18,21
**mark** 473:9
**marked** 374:3
  413:24 417:4,7
  427:16 439:7
  445:23 455:15
  467:11 470:2
  473:16
**market** 371:17
  425:8,17,18
**maryland** 370:5
  371:15
**massachusetts**
  370:9,24
**master** 372:8
  391:22 392:8

**417**:16 423:4
  444:25 445:13,18
  447:19 448:10,20
  448:24 463:21
  467:1 470:12
**master's** 428:4
  439:18 456:12
  467:22 470:23
**matt** 371:7
**matter** 406:7,17
  407:19 439:18
**matters** 431:12,17
**mckesson** 370:12
**mclaughlin** 369:21
**md** 368:7
**mdl** 368:6
**mean** 395:2 397:4
  398:16 405:21
  419:10 420:7,14
  431:8 432:6,7,17
  432:20,22 438:8
  442:15 444:9
  466:6 474:3
  475:12,14 481:24
**means** 431:9
**meant** 391:9
  420:11 424:12
**medical** 396:1
  398:18,22,23
  399:5 402:4,14,23
  403:5 410:16,19
  410:20 411:11,12
  411:17 429:21
  437:24 438:22
  444:1 481:16
**medication** 388:21
  466:11 481:16
**medications**
  410:15
**medicine** 451:25

**meeting** 379:7
449:2 458:1,5
**meetings** 438:6,7,8
438:11,13,16,21
447:14 458:4,7
482:14
**members** 391:13
**memory** 382:19
432:7 474:5
**mental** 458:10
**mention** 419:23
474:10
**mentioned** 385:13
484:19
**mentioning** 419:3
**met** 379:5
**michigan** 369:18
**midwest** 494:17
497:1
**milkey** 455:25
456:23 457:2
**mill** 386:4,6,19,21
397:3 449:2
**mills** 379:15,17,19
**mind** 422:6 426:11
427:5 429:2
**mine** 381:17
**minute** 447:22,25
**minutes** 448:24
483:18
**misstates** 381:13
397:14 484:21
**misunderstand**
393:21
**misunderstood**
393:17
**mixed** 454:25
455:9
**months** 398:16
405:24 406:11,12
407:6,20 408:12

408:18
**morgan** 371:16
**morganlewis.com**
371:18
**morgues** 483:10
**motley** 369:2
**motleyrice.com**
369:5
**move** 397:4
488:25
**moylan** 370:3
373:9 483:17,20
490:7
**mt** 369:4
**mudge** 370:9
**multi** 424:17
**multiple** 419:13
419:15 424:19,21
438:9 460:25
**mwallace** 371:9
**myers** 371:6

**n**

**nail** 394:22
**name** 387:16
429:3 432:14
489:1,2,4 494:6
495:3,4,15 496:3,4
496:21
**named** 492:9
**names** 391:16,21
393:14 448:2
**national** 368:6
494:6 495:3 496:3
**necessarily** 440:20
**necessary** 459:5
**need** 392:12
396:10 399:22
404:4 410:2 423:2
436:14,15 448:20
456:15 463:11
473:8 482:11

**needed** 379:12
380:1 426:2
**needs** 465:7
**neither** 384:4
**never** 426:8
444:16 448:4
**new** 446:16
**newer** 394:12
**nice** 378:22,24
**non** 396:13 403:22
411:12 416:6
421:20 425:4
441:1,4 442:19
463:6 468:19
473:4 484:25
486:12
**norm** 434:6
**north** 369:22
**northeast** 479:10
**northern** 368:2
**notarized** 494:14
**notary** 492:6
493:13 494:25
495:10,18 496:15
496:23 497:23
**note** 455:23
494:12
**notes** 481:19
**notify** 399:1
**number** 374:3,22
380:21 381:22
386:25 405:1
413:5 417:8
418:10 427:19
439:12 446:1,5
453:19 467:14
473:15 482:12
494:7,13
**numbered** 374:5,8
374:10,13,14,16
374:17,20 413:23

417:3 427:15
439:6 445:22
455:14 467:10
470:1
**numbers** 389:6
442:3,3 496:7
**numerous** 425:21
**nw** 370:9,14

**o**

**o'melveny** 371:6
**oarrs** 457:16,22,24
458:15,21,24
459:11,19,25
460:5,7,11 461:11
461:11 462:4
**object** 381:12
394:5 396:11
397:13 398:3
399:12 400:18
406:1,3 409:23
411:18 413:9
426:19 456:14
459:7 471:21
478:9
**objection** 375:3,3
375:4,4,5,5,6,6,7,7
375:8,8,9,9,10,10
375:11,11,12,12
375:13,13,14,14
375:15,15,16,16
375:17,17,18,18
375:19,19,20,20
375:21,21,22,22
375:23,23,24,24
375:25 376:3,3,4,4
376:5,5,6,6,7,7,8,8
376:9,9,10,10,11
376:11,12,12,13
376:13,14,14,15
376:15,16,16,17
376:17,18,18,19

376:19,20,20,21
376:21,22,22,23
376:23,24,24,25
377:3,3,4,4,5,5,6,6
377:7,7,8,8,9,9,10
377:10,11 381:14
391:7 392:15
395:21 398:4
399:8 400:21
401:8,9,24 402:6
402:17,24 403:6,7
403:20 404:14,18
404:22 405:6
407:23 409:5,25
410:22 411:2,13
411:19,24 412:10
412:12,20 413:11
416:4 417:14
419:11 420:1
421:18 422:13,22
424:24 425:9
426:20,25 427:25
430:21,23 431:11
432:23 434:7,19
435:7,22 436:7
437:3,10,12,13
438:2,4,17 439:15
439:23 440:23
441:11 443:2,3
447:2 449:7
450:25 455:6
456:1 459:8
460:13,14 461:6
462:6,18 463:4,12
464:1,9,14 467:19
468:17 469:10,17
472:5 473:2 477:5
478:10 479:24
480:25 481:17
483:5 484:21,23
485:6,16,17 486:5

487:15 488:23
489:11,25
**objections**  373:5
375:1 376:1 377:1
476:22
**observed**  483:2
**obtained**  425:7,18
**obviously**  397:9
408:5 459:14
**occasionally**  421:7
**occur**  412:3
**occurred**  431:17
**occurrence**  388:9
**occurring**  449:21
449:22
**occurs**  479:3
**october**  374:8
417:2,9 419:22
424:7 493:16
**office**  369:11
401:23 414:14
415:21 418:1,3,7
418:12,16 420:25
421:6,10,17 424:7
426:6 440:7
446:13 454:12
457:4 468:10,12
471:9,14,17 474:2
474:8 493:6
**officer**  420:19
428:15 431:14
444:22 475:23
**officers**  391:16
**official**  495:15
496:21
**oh**  379:10 384:6
418:21 426:21
443:14 444:4
451:3 476:2
481:25

**ohio**  368:2,12,14
368:23 369:14,22
371:4,13 411:23
412:9 449:24
475:23 479:11
492:2,7 493:7,14
494:2
**okay**  385:23
396:17 444:4
466:23 479:17
487:22
**omm.com**  371:9
**once**  382:10
390:18 405:2,18
**ones**  387:14
400:16 427:5,7
433:14 434:8
447:5,6 467:2
471:12 479:13
**ongoing**  421:20
422:19 423:19
425:1,5,13 435:6
447:16 456:17
485:1 486:7,22
487:17 488:25
**op**  368:11,13,15
**open**  383:4 384:13
387:24 389:11
390:15 395:12
435:17 436:21
452:19
**opened**  382:11
384:7 408:25
432:17 435:5
**opening**  382:8
**opiate**  368:6
458:12 481:11
494:6 495:3 496:3
**opiates**  458:1,3
**opinion**  434:21,22
435:2 440:25

441:3,5,7,13 443:6
443:7 477:7,10,15
477:16 478:11,13
478:13,18,21
479:5 481:4 483:7
**opinions**  443:5
**opioid**  382:22
424:1 466:11
472:16,18 477:4
480:20,22 483:2
**opioids**  385:9,10
385:18,22 387:23
430:14 454:20,22
454:25 455:4
465:21 478:4,24
479:10 480:4,10
480:16,20 482:4
**opota**  475:22
**opportunity**  465:1
465:8
**opposed**  393:20
394:4 406:14
480:22
**order**  392:2
466:15,19
**ordinary**  417:25
418:5 428:13
440:5 446:12
454:11 457:3,9
468:11 471:7
474:6
**organize**  476:6
**original**  430:24
**ot**  425:23
**outcome**  484:14
**outside**  403:13
411:23 412:15
423:12 472:10
**overdoses**  477:11
**overprescribing**
388:23 389:2,3

390:17,23,24
391:9 392:4,14,20
393:3,8,13 394:3
398:11 399:4
401:21 402:4,13
403:4 410:13
412:17 413:7
429:6,16 432:6
433:14,18,24
434:5,18 435:12
442:8,16,23
459:22,23,24
460:4,12,22 461:4
461:18,21 462:5
462:23 463:1
464:11,20 465:16
465:23 466:12
472:3 479:3,21
**overtime** 425:24
426:18,24 457:14
**overwhelmed**
434:10
**oxford** 370:19
**oxys** 479:13

**p**

**p** 370:3 371:16
374:7,10,12,19
417:1,9 427:13
439:4 469:24
**p.m.** 490:10
**packet** 487:8
**pad** 415:25 416:1
431:25
**pads** 388:11
415:22
**page** 445:1 494:13
494:15 496:7
497:3
**paolino** 374:7,10
374:12,19 417:2,9
418:18 426:3

427:14,21 428:19
432:16 439:4,11
440:11 446:3,8,16
453:23 455:19,24
457:2 469:24
470:6
**par** 370:7,8
**paragraph** 424:8
445:8 487:7,8
488:15
**parkinson** 384:17
390:20
**part** 391:17
392:18 401:1
408:7 409:24
432:13 433:20
457:9 458:3
461:23 472:22,23
484:20 485:5,14
485:23 486:2
496:9
**particular** 421:24
442:5,13 464:4
482:2
**particularly**
393:19
**party** 493:2
**pat** 408:23 415:23
418:10
**patient** 458:25
459:4 460:8,10,23
461:4
**patients** 410:15
436:4,6 459:1
**patrick** 384:11
392:21
**patrol** 414:11,12
414:15 415:8
420:18
**pay** 429:22 444:1
478:1

**pd** 489:23
**peace** 475:23
**pec** 378:10
**pellegrino** 368:25
492:6 493:13
**penalty** 444:2
**pending** 395:17
431:10 432:25
452:18
**pennsylvania**
370:20 371:17
**people** 396:7
397:3 419:13,15
424:19,22 438:9
477:11 478:16,19
479:19,22 480:14
480:19 481:10,24
482:15
**percentage** 385:7
385:21
**performance**
441:2
**person** 378:5
387:16 392:23,24
392:25 405:13
414:25 434:13,24
444:5 459:12
463:3 480:13
482:17 489:1
**personal** 434:21
434:22 435:2
441:3,5,6,13 443:5
443:7 481:3
**personally** 402:8
434:22 460:6
462:9 480:11
495:11 496:15
**personnel** 487:13
**persons** 387:17
**pharma** 368:10,12
368:14

**pharmaceutical**
370:8 474:11
**pharmaceuticals**
370:7,7
**pharmacies** 420:6
420:10 451:3
462:25 463:19,25
464:9,12,17,21
465:17 483:23
488:17
**pharmacist**
450:16,19,24
451:17,20,24
452:10,12,20
489:8
**pharmacists**
483:24
**pharmacy** 449:24
450:15,16,17
451:6,17 452:1,2,4
452:24 453:8,14
464:3 485:5,14,23
486:3,22 488:9,18
488:21 489:2
**philadelphia**
371:17
**phone** 378:5 379:6
494:3
**physician** 410:7
433:17 442:22
466:12 482:6
**physicians** 394:10
458:23
**picking** 378:1
**pill** 379:15,17,19
386:4,6,18,21
397:3 449:2
**pills** 387:6 394:17
452:8 477:12
**pittsburgh** 370:20

place   492:19
pleasant   369:4
please   378:14
  380:11 396:18
  401:12 416:19
  443:16 494:11,11
point   369:22
  415:11 417:18
  423:18 471:1
  477:22 480:21
  482:5,21
police   392:19
polster   368:8
porter   370:8
portion   379:4
  439:19
portions   456:15
positive   482:23
possible   437:8
potentially   456:17
practice   465:16,19
  466:10
pratt   370:4
precision   407:21
prepare   379:3
  417:24
prescribed   481:8
prescriber   461:12
  461:14,16,17,23
  462:3
prescribing   390:1
  390:9,13 393:19
  394:18 395:15,20
  396:24 398:21
  399:18,20 400:17
  401:5,15,16
  402:22 406:15
  407:6 409:2
  410:15
prescription   368:6
  387:23 388:7,11

388:20 394:18
407:9 409:4
415:22 420:22
431:25 465:21
466:10 478:23
479:10,13 480:4,9
480:15,20,22
481:15 482:4,5,19
494:6 495:3 496:3
prescriptions
  395:3 408:4
  412:18 413:6,16
  419:18 435:21
  437:1,9 455:8
  479:22
presence   492:14
present   372:7
  378:3
presented   438:12
pretty   383:6
  394:22 403:2
prevalence   480:3
  480:9
previous   447:5
  456:13
previously   453:17
  456:4
prince   393:5
prior   381:3 388:18
  397:17,23 470:10
privilege   463:18
privileged   448:9
probably   383:20
  392:12 427:21
  448:13 473:9
procedure   378:17
  491:7 495:5 496:5
procedures   452:6
proceed   445:16
process   396:4
  409:7 448:14

processed   397:19
  483:13
production   494:15
  494:17,22
program   476:5
prohibited   431:14
promethazine
  419:6,7,19 422:12
  422:16 423:10,25
  424:3
proper   452:5
protected   431:13
protective   392:2
protocol   451:21
  452:5
provide   438:15
  476:18 486:11
provided   378:16
  454:2
providing   490:2
public   396:13
  397:5,6 403:22,24
  404:1 410:11
  416:6 421:20
  422:24 423:1
  425:4 441:1,4
  442:19 444:13,16
  463:6 464:6
  468:19 472:8,9,14
  473:4 475:25
  484:25 486:8,9,12
  492:6 493:13
  495:10,18 496:15
  496:23 497:23
publicly   391:14
  416:8,10,13,14
  423:15 435:25
  463:8 468:21
  469:2 471:18
  487:23

purdue   368:10,12
  368:14
purpose   428:18
  440:9,10 454:15
  471:11 481:16
purposes   413:25
  417:4 427:16
  439:7 445:23
  451:25 455:15
  467:11 470:2
  473:17 476:20
pursuant   491:3,6
put   384:13 433:5

q

qualified   492:8
quantico   382:15
  382:17 474:11,14
  474:18
quarter   458:1
quarterly   458:4
question   388:18
  390:3 392:1,9,11
  392:11 396:16
  400:19 401:10,25
  406:23 409:10
  411:25 412:11,21
  412:25 413:1,5,18
  416:19,21 417:20
  417:22 422:1,3,4
  422:18 423:7
  426:5 428:9,11
  431:4 433:10
  434:2 435:16
  436:1,18,23 437:4
  437:22 438:18
  439:24,25 442:10
  442:12 446:6
  451:4,9,13 452:13
  452:16 453:2,11
  453:20 456:22
  465:3 468:3

469:11 471:3
472:21 473:6,25
479:6,16 484:10
486:20,21 487:25
**questions** 416:9
456:19 490:8
**quick** 401:3
486:14
**quicker** 397:7
407:17,20
**quickest** 398:10
**quickly** 407:3,4,12
407:13 427:2
**quite** 380:14,14
381:1,1 383:11,12
386:24 397:20
403:15,15 408:12
435:9 441:24
442:1 453:6
486:24

**r**

**r** 369:11
**raiola** 370:13
**range** 397:1 398:9
**raymond** 371:3
**raymond.krncevic**
371:5
**reach** 413:6
460:21 461:3
**reaching** 399:6
415:5,10
**read** 495:5,6,12
496:5,6,17
**reading** 494:19
**real** 475:2 486:14
**really** 379:18
406:6 462:20
466:2,3 477:19,25
**reasked** 465:7
**reason** 440:13
494:14 496:8

**497:3**
**reasons** 444:23
**recall** 400:13
427:24 428:10
429:23 432:1
439:14 440:2
446:7 453:21
455:23 466:20
467:17 468:4
471:4 474:1
475:18 483:22
486:4 489:23
490:6
**recalled** 380:10
**recalling** 432:5,7
**receipt** 494:18
**receive** 489:24
**received** 418:5
488:5 490:6
**receiving** 459:1
467:17
**recess** 423:5
448:25 464:24
486:16
**recollection**
473:23 485:12,21
**record** 439:23
444:23 453:16,17
470:11 473:10
476:17 496:9
**records** 417:14
**recovering** 482:8
**redact** 456:9,15
466:22 467:1,2
476:15,23
**redacted** 429:4
431:7 432:15
435:5 447:17
453:18 454:1
476:18,19

**redacting** 439:19
439:21 470:16
**redaction** 448:15
**redactions** 444:21
468:1 470:12,14
470:25
**reduced** 492:13
**reference** 443:10
457:12 475:4,21
486:23 489:21
494:7 495:2 496:2
**referenced** 447:15
492:13,17 495:11
496:15
**refers** 487:8
488:18
**reflected** 453:23
**refreshes** 473:23
474:4
**regarding** 433:3
443:4 480:3,8
484:25 485:8,18
487:17 491:2,11
**registration**
437:18
**related** 419:24
420:22 426:18
441:4 472:13
489:9
**relates** 368:8
423:13
**relative** 493:2
**remain** 456:13
**remember** 378:7
382:16,17 384:21
408:10,16 414:7
432:9,10 446:18
449:23 450:12
453:20 454:7
462:8 474:21
475:7,14,19 485:7

**485:10,25 487:23**
488:2
**remind** 416:5
**reminding** 416:15
**rene** 384:24
**renee** 368:25
369:12 492:6
493:13
**renee.bacchus**
369:15
**repeat** 406:21
423:6
**rephrase** 422:14
**replace** 453:16
**report** 466:15,19
471:25
**reported** 429:5
**reporter** 373:13
399:23 463:22
470:19 476:24
495:7
**reporter's** 373:11
492:1
**reporting** 435:4
452:8
**reports** 387:25
410:3 471:17
474:4
**represent** 378:9
**representative**
458:6
**representing**
378:10 487:24
**request** 454:2,6
476:14 496:9,11
**requested** 413:14
417:15 439:17
456:4 467:20
470:22 491:1,6,10
**requesting** 453:25

require  440:25
required  494:25
requires  411:16
research  480:18
reservation  468:2
  471:2
reserve  417:17
  428:5 439:19
  467:23 470:24
reserves  444:20
reserving  456:20
  476:25
resources  434:17
respects  453:18
response  468:6
  486:19,21 487:9
result  386:14
resulted  386:12
  387:12 389:9,25
  390:14 414:23
  415:15 452:11,21
  452:25 453:9
retained  373:13
retired  384:24,25
  418:13
returned  494:18
reveal  448:3
review  379:10
  456:6 491:2,6
  494:12 495:1
  496:1
revisit  467:23
revoke  437:18,25
revoked  444:1
rhoades  455:19
rice  369:2
right  380:3,25
  381:8 382:7
  383:21 394:14,15
  395:17 397:12
  418:16 421:11

425:8 428:25
430:5 436:21
446:13,15 454:20
455:5 461:1
465:12 470:20,24
474:18,25 482:10
rights  417:17
  428:5 439:20
  444:20 456:21
  467:23 468:2
  476:25
ring  419:4,9,14,25
  421:15 424:9,12
  424:17,19
rings  420:12 425:3
rite  371:15 488:21
role  381:16
ropes  370:22
ropesgray.com
  370:25
ross  372:4
route  398:7
routes  409:14
row  379:2
rpr  368:25
rule  431:13
ruled  417:16
rules  378:17 491:3
  491:7 495:5 496:5
ruling  428:4
  439:18 463:12
  467:22 470:24
rulings  456:13
rx  370:2

**s**

s  494:15 496:8,8
  497:3
safety  397:5,6
  410:11 444:23
  475:25

sandra  371:11
saw  379:25 380:8
  447:5
saying  408:1
  477:24,25 489:5
says  414:16,17
  420:4 424:8 432:6
  432:15,21 444:8
  457:25 458:8
schedule  385:15
  455:7
scheduled  430:17
schedules  385:21
schein  372:2
scluff  369:9
scope  391:7,20
  392:15 399:8
  400:21 401:8,9,24
  402:6,17,24 403:6
  403:20 404:22
  405:6,20 409:5,25
  410:22 411:19,24
  412:10,20 413:11
  416:4 417:14
  419:11 420:1
  421:18 422:22
  424:24 425:10
  430:21 432:23
  434:19 436:7
  437:3,13 438:17
  440:23 462:18
  463:4 468:17
  469:10 472:5,10
  473:2 484:23
  485:6 486:5
  487:15
script  414:18
  419:25 420:9,18
  421:15
scripts  419:5,10
  419:16 444:8

463:3
seal  493:6 495:15
  496:21
sealed  396:15,21
search  381:19
  386:6,10 413:14
second  382:25
  417:13 487:8
secretary  456:24
see  378:22,24
  379:12 382:18
  387:21 409:17
  418:21 424:10
  426:8 440:18
  443:11,14 444:4
  457:13 467:5
  473:22 487:10
seeing  436:3,6
  456:3 468:7
seek  470:25
seeking  428:2
  456:8
seen  414:6 417:11
  417:21,23 447:4
  476:12,13
seized  471:19
selling  424:22
send  457:6 474:6
sending  418:24
  427:24 428:10,18
  439:14 440:2,10
  454:15 455:23
  457:10 465:4
  468:5 471:5 474:1
  474:4
sense  384:9 385:18
  479:3
sensitive  456:16
sent  414:19 418:10
  426:15 427:8
  428:13 440:4

446:10,11 447:6
454:10 457:1,3
463:7 468:9 471:7
489:22
**sentence** 414:16
445:7,9 457:13
488:16
**sentenced** 432:2
**sentencing** 416:8
444:14
**sergeant** 418:11
418:11 420:5,7,14
426:2 427:21
428:19 432:15
439:12 440:11
446:4 455:23
457:2 470:7
**service** 370:17
**services** 370:2
**set** 384:3 493:5
**sex** 444:9
**shadowing** 390:19
394:14
**shapira** 370:18
**shapira.com**
370:21
**sheet** 494:13 496:7
496:10,18 497:1
**sheriff's** 414:14
418:1,3,7,12,15
420:25 421:6,10
421:16 424:7
428:15 440:7
446:13 454:12
457:4 468:10,12
471:8,13,17 474:2
474:8
**shipping** 404:12
**shooting** 427:1
**shopper** 387:4
391:4,9 442:7,16

451:23 457:23
**shoppers** 394:9
406:16,19 442:23
452:7 459:20
**shopping** 386:1,23
387:1 388:9,19
391:6 394:17
403:19 404:9,16
404:17 405:11,13
405:24 406:9,14
406:25 409:3
433:13 458:18
459:6,18 461:15
472:3 479:4,19
481:10
**shortage** 434:15
**shorter** 408:19
**show** 443:15 449:8
**shown** 494:16
**shows** 405:20
**sight** 426:10 429:2
**signature** 491:5
493:12 494:14
**signed** 495:13
496:18
**signing** 494:19
**sincerely** 494:21
**sir** 471:10 494:10
**sister** 482:20
**six** 398:16
**skzerrusen** 371:14
**slightly** 479:16
**slow** 442:25 477:1
**slower** 441:14
443:1
**slows** 441:14
**sold** 425:6,16
**solely** 412:17
413:15
**solutions** 370:7
494:1 497:1

**somebody** 401:22
**soon** 470:16
**sorry** 390:6 391:8
396:10 399:22
400:7 406:19
408:19 425:17
429:9 441:21
442:11 451:4
454:3 455:21,24
460:17 479:17
480:13 483:18
**sort** 420:23 438:15
**sound** 397:12
**sounds** 395:14
**source** 416:15
489:14,15
**sources** 416:11
489:13
**south** 369:4 371:7
371:12
**spaeder** 370:3
**speak** 463:22
464:22 465:1
481:6 486:13
**speaking** 486:17
**special** 372:8
391:22 392:8
411:5 417:16
423:4 428:4
439:18 444:25
445:13,18 447:19
448:10,20,24
456:12 463:21
466:25 467:22
470:12,23
**specialize** 385:12
**specialized** 478:2
478:5
**specific** 403:22
425:13 435:18,24
436:9 440:20

**442:19** 463:6
473:4
**specifically** 457:21
481:14
**specifics** 424:13
432:1 458:15
**specified** 492:20
**speculation**
437:11
**spell** 393:11
**spice** 455:8
**spoke** 390:19
**spoken** 380:6
402:8 481:5
**sraiola** 370:16
**ss** 492:3
**stacy** 455:25
456:23
**stands** 414:20
**start** 390:16
408:13,14 415:3,6
459:10
**started** 380:17
382:10 390:18
414:18 420:25
431:24 446:21
477:17,19,21,23
478:8 479:12
481:7,8
**state** 411:23 492:2
492:7 493:14
495:10 496:15
**statement** 495:13
495:14 496:19,19
**states** 368:1
369:10,11,12
453:25 467:20
476:12
**statistics** 471:18
471:23 480:2

status  390:5 453:5
stealing  424:22
steer  482:10
stella  368:18 373:7
    374:7,9,12,19,21
    378:2,15,20,22
    380:12 406:9
    413:21 414:2
    416:24 417:1
    427:11,13,20
    437:16 439:2,4,10
    445:20 446:2
    449:1 453:21
    455:12,20 462:9
    465:13 467:8
    469:22,24 470:6
    473:12,14 477:3
    483:19 492:9
    494:8 495:4,9
    496:4,13 497:20
stenotypy  492:14
stephen  370:13
sterling  369:7
    378:6,7
steroid  383:1
    385:14,24 454:19
steroids  382:23
    430:13 431:2
    454:20
stole  415:25
    431:24
stolen  416:2
stop  452:7
stopped  436:5
street  368:22
    369:18 370:4,14
    370:23 371:7,12
    371:17,21 480:24
streets  477:13
strength  391:15

strike  416:21
    488:25
string  374:5,14,16
    374:17 413:22
    445:21 455:13
    467:9
stronger  435:1
studies  480:8
study  448:16
stuff  381:18 396:1
    398:19 426:9
    444:3 451:23
    452:7,9 478:2
subjects  475:9
subpoena  487:9
    487:14
subscribed  495:10
    496:14 497:21
substituted  476:19
substituting
    466:24
sufficient  413:6
suggestion  447:20
suit  472:13
suite  368:22
    369:13 370:4
    371:3,12,22 372:4
    494:2
summit  368:14
    369:2 374:6,8,11
    374:13,15,16,18
    374:20,22 378:11
    387:19 388:14
    391:17 392:22,23
    392:23,25 403:13
    408:25 413:24
    414:5,14 417:3,10
    418:1,2,6,12,15
    421:5,10,16 422:2
    424:6 427:15,23
    428:14 439:6,13

440:5,6,8 444:19
    445:22 446:6,12
    454:3,5,12 455:14
    455:22 456:25
    457:4 458:6
    467:10,16 468:10
    468:11 470:1,8,22
    471:8,13,17
    473:16,22 474:2,7
    476:14 477:4
    478:24 479:23
    480:4,10,15 483:2
superior  369:13
    494:1
supervisor  418:15
    438:24
supervisors  380:9
    424:6 445:3
    471:13 474:1
supposed  426:12
    434:25 452:6
sure  382:10
    395:24 397:20
    405:8 409:13,14
    410:8 430:23
    432:12 435:9
    453:6 457:8 458:5
    459:15 463:2
    467:1 470:18
    475:13 477:2,8
    478:12 486:24
surveillance
    381:18 393:25
    432:13 438:20
    490:4
suspect  389:16,24
    404:2
suspects  389:20
suspicious  452:8
    466:15,18

swear  378:14
sworn  378:18
    492:10 495:10,13
    496:14,18 497:21
syrup  419:7
    423:10

t

tab  467:4,4
tail  397:18
take  378:13
    395:13,19 396:24
    397:9,21 398:1
    400:14 401:2
    405:14,15 406:10
    406:13,20 407:2
    408:5,14 409:3,12
    410:6 411:8 424:4
    448:12,13,22
taken  368:21
    407:11 447:20
    492:19
takes  396:4 398:7
    405:18,22,22
    407:6 409:16
talk  425:12 436:15
    442:18,20 465:8
    481:12,24 482:7
    482:14
talked  394:17
    474:15
talking  389:21
    404:5 405:23
    406:5,10,11
    424:14 445:1
    465:2 472:15
    482:2,22
target  386:16
    403:12 408:1
    419:23,24 489:2,6
task  391:14,16
    458:3,12 481:12

483:4
**taxonomy** 383:20
**tds** 380:13 381:17
381:24 382:3
383:10 385:16
386:2,5 387:2,21
388:8 389:5
390:24 391:5
392:4,7,13,18
393:2,7,12 394:20
402:23 403:11
404:4,6,7,9,12
411:23 415:13
421:1,4,9 433:6
441:16 449:3
450:1,14 458:16
462:13 466:14,17
468:16 477:22,23
478:14,15 480:5
**tds's** 399:6,6
**technique** 412:23
490:4
**techniques** 405:19
407:14 409:9
448:19
**telephone** 370:18
371:6,15,20 372:2
**tell** 380:11 382:11
392:13 423:21
450:6,8,9,11 464:5
475:9 481:14
**telling** 424:6 482:3
482:17
**ten** 400:11
**tends** 443:1
**tenth** 370:14
**term** 382:7
**terms** 403:3
420:24 440:10
457:21 458:25
459:5 460:11

471:19 482:12
**terrible** 430:2,4
**testified** 483:21
485:4,13,22
**testify** 492:10
**testimony** 381:13
393:18 397:14
484:22 485:8,9,10
485:19 492:12,16
495:6,7 496:6,9,12
**texas** 372:5
**text** 488:16
**tfo** 418:2
**thank** 428:17
429:14 451:4
464:25 469:20
487:2
**thanking** 446:3
**thanks** 378:25
**theft** 387:22 388:1
388:11 414:18
**thefts** 388:7,20
394:18
**thing** 379:15 383:3
393:24 409:14
413:3 419:14,21
420:11,13,23
429:2 448:15
472:15
**things** 381:6 396:2
400:25 441:14
447:15 448:12
461:19 466:25
471:20 483:8
**think** 380:2,3
383:13,19,21
392:6,9,11 394:21
399:15 400:9,11
400:12 406:12
411:9 412:14,14
416:21 421:13,22

429:3 436:11
440:12 442:9
444:9 445:6
446:18 447:21,24
456:19 461:20
463:1,2 465:17,22
466:12 477:21
479:15 483:21
484:18 486:20
**thinking** 388:16
**third** 384:3 445:7
445:9
**thirty** 494:18
**thought** 401:21
451:3
**three** 379:1 383:2
387:10 395:11
408:17 450:23
456:18 483:22
484:4
**thrilled** 416:22
**tier** 383:2
**time** 384:21
396:22 398:15,17
400:23 401:2
404:6 405:22,22
409:16 418:14,19
418:20,22 426:15
426:23 427:3,6,8
428:6 429:25
430:2,4 432:18
433:6 441:16
446:19 447:3
448:11 449:3
456:2 463:22
467:23 477:18
478:15 481:25
482:7,15 483:3,17
492:19
**timelines** 408:20

**times** 383:15
400:1 404:21
405:5 434:12
441:22 442:2
450:3,4
**tiny** 402:10
**today** 412:8
435:14 436:21
437:1 449:21
456:6 477:4
478:24
**toledo** 425:14
**tool** 413:2 459:10
459:13
**tools** 411:5,7
**touhy** 391:25
463:14
**training** 382:15
449:5 473:24
474:12,14 475:5
475:11,17,22,23
476:1
**transcribed**
492:15 495:7
**transcript** 373:1
477:1 491:3,6,9,11
494:11,12 495:5
495:12 496:5,11
496:17
**transcription**
492:16
**transfer** 415:12
**tried** 451:3
**true** 492:16
**truth** 482:18
492:10,11,11
**try** 392:17 448:17
469:13 482:9
**trying** 383:18,19
385:17 405:25
407:20 410:14

412:14,14 463:18
465:13 479:15
**tucker**  371:2
**tuckerellis.com**
371:5
**turn**  487:3 488:12
**two**  395:11,11
400:5,7,9 426:16
426:22 428:21
448:12 450:23
455:3 467:3
483:22
**tyler**  384:18
390:19
**type**  388:24 395:5
408:6 429:5
433:13 442:5,13
450:14 472:1,15
472:25
**types**  394:4,16,19
442:5,13,18,20
450:13

**u**

**u.s.**  369:16
**ulmer**  368:22
**ultimate**  429:18
**um**  383:24 396:9
399:21 424:11
443:12
**undercover**  401:6
401:7,17,23
**understand**
385:17 404:4
406:8,18 417:16
428:4 439:17
443:23 448:2
461:11 463:14
467:21 470:23
472:12 488:24
**understanding**
397:10 403:2

423:19 443:19
447:14 449:13
464:2 478:6,7
**understands**
436:12
**understood**
393:18 465:3
**unfortunate**
440:21 441:8
**unfortunately**
440:16
**unit**  381:4 383:7
393:15,23 394:12
420:20 426:7
432:8 440:8
446:14,15,17
454:13 456:25,25
459:12 462:15
466:2,5,8 477:18
478:3,5
**united**  368:1
369:10,11,12
453:25 467:20
476:12
**units**  483:11
**universe**  383:25
**unlimited**  434:17
**unpack**  392:17
**unsealed**  396:13
396:16,20,22
**update**  418:24
426:8,9 428:21,22
440:14,15 445:5
471:12 474:10
**updated**  458:7
**updates**  457:10
**updating**  454:18
457:18 475:2
**usdoj.gov**  369:15
369:15,19

**use**  401:6 413:2
433:21 447:7
458:15,15,18,21
459:10,13,18,25
460:5,6,9 461:14
461:17,22 462:8
**utilize**  402:9 450:5
461:8

**v**

**v**  368:10,12,14
455:8 494:6
**vague**  381:14
394:6 395:21
403:7 404:5 406:2
411:2 412:12
426:20,25 430:23
438:2,4 449:7
459:8 460:13,15
461:6 462:6 477:5
478:10 481:1
483:5
**valid**  480:21
**valuable**  460:11
460:18,19 462:4
**varies**  396:25
405:17
**ventura**  369:7
**veritext**  494:1,7
497:1
**veritext.com.**
494:17
**versa**  384:14
**version**  429:10
476:19
**versus**  411:11
433:13,14 442:8,8
479:4,4 482:19
**vetted**  447:11
**vice**  384:14
**victims**  481:5,9,13

**video**  489:22,24
490:2
**view**  397:22
**volume**  368:17
**voting**  396:4
**vs**  385:18

**w**

**w**  368:22 369:3
**waived**  494:19
**waiver**  476:21
**walgreens**  371:19
487:9,13 488:5
489:8
**walking**  379:20
**wallace**  371:7
**walmart**  369:20
**want**  385:4 395:24
399:1 406:21
408:18 409:13
410:8 424:13
429:4 434:17
454:19 463:24
472:14 473:9,22
476:23 477:9
488:20,20
**wanted**  379:23
425:21 426:11
427:4 445:4
457:20 467:16
489:17
**warn**  463:19,25
464:8,11,17,20
**warning**  463:2
**warnings**  463:8
465:4
**warrant**  386:6,10
413:15 486:24
**warrants**  381:19
397:19
**washington**
370:10,15

way 405:8 421:23
  457:7 459:25
  469:14 477:8
ways 399:10
we've 378:5
  385:25 387:24,24
  387:25 454:1,17
  465:8 470:22
web's 415:19
webb 388:12,13
  388:15 395:8
  408:10,22 415:2,4
  419:17 420:24
  421:15 487:20,25
  488:6
webb's 408:7
week 428:22
  457:15,15,17,19
weekly 427:4
  428:21
weeks 405:24
  406:10 407:4,19
  408:3
went 382:14,17
  401:23 404:9
  444:2 474:11
west 369:13
wewatta 371:21
whereof 493:5
wilson 370:9
  431:21,22,24
wilson.mudge
  370:11
withdraw 464:1,9
witness 378:14
  391:19 392:1
  397:14 412:22
  423:12,13 430:24
  432:25 436:16
  443:15,17 464:22
  465:1 468:24

469:3 476:16
486:13,18 491:2
492:9,13,14,17
493:5 494:8,11
495:1,4,11 496:1,4
496:15
witnesses 391:12
witness' 494:14
wondering 441:9
word 383:19,20
work 381:4,20
  382:2 384:11
  388:25 389:1
  391:1,4 393:15
  399:15 402:4
  407:12 426:6
  433:18,21 434:11
  434:13,23 458:16
  462:15 466:14,17
  470:15 476:5
worked 380:13,19
  381:24 385:6,20
  385:25 386:1,4,18
  386:23 387:1,4,5
  387:15,22 388:6
  389:5,8,23 390:8
  390:12 394:20
  395:5,10,14,15,18
  398:20 399:4
  401:4,14 402:14
  402:20 403:11
  406:24 407:10
  411:22 415:20,24
  421:14 433:6,13
  433:23 434:8
  442:6,14 449:24
  450:7,19 451:6
  452:10,20,24
  453:8,13 459:17
  459:21,23 460:3
  461:22 462:13,24

469:7,16 478:14
working 380:24
  381:7 390:16,20
  392:4 395:12
  408:24 412:9
  418:25 419:22
  421:9 425:21
  426:9,12,14,17,23
  432:10 435:12,13
  435:14 436:20
  445:5 455:4
  471:14,19 478:15
works 381:4 397:3
  450:14
worried 456:20
wraps 407:3
write 415:22
writing 412:19
  413:16 419:18
  435:21 437:1,9
  454:7
wrote 417:23
  468:8

## y

yeah 379:14 381:1
  382:8,25 387:3,4
  389:12 390:20
  391:3 396:4,6
  399:25 401:6
  405:10 406:12,13
  415:5 429:25
  430:3,17 432:12
  442:2 446:20
  450:18 453:6
  485:2 488:14
year 381:11
  382:17 387:2
  388:7 430:3
years 397:12
  405:23,25 406:11
  406:12 407:7

410:7 430:1
477:19
yesterday 379:5
yield 483:16

## z

zerrusen 371:11
zewail 429:7,15
  444:4,15
zuckerman 370:3
zuckerman.com
  370:6
zwail 443:11,13,14
  443:25 444:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.