```
                                        Page 1

 1             UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4
 5           ~~~~~~~~~~~~~~~~~~~~~
 6
 7   IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
     OPIATE LITIGATION
 8                                    Case No.
                                      17-md-2804
 9
                                      Judge Dan Aaron
10                                    Polster
11   This document relates to:
12   The County of Summit, Ohio, et al. v. Purdue
     Pharma L.P., et al.
13
     Case No. 18-OP-45090 (N.D. Ohio)
14
15
             ~~~~~~~~~~~~~~~~~~~~~
16
             Videotaped Deposition of
17
             KENNETH R. BALL II
18
             November 7, 2018
19                9:04 a.m.
20
21
                 Taken at:
22
             Hilton Garden Inn
23           1307 East Market Street
                 Akron, Ohio
24
             Stephen J. DeBacco, RPR
25
```

Page 2

```
1  APPEARANCES:
2
       On behalf of the City of Akron, Summit
3  County, and the Witness:
4      Motley Rice LLC, by
         JAMES W  LEDLIE, ESQ
5        CAROLINE RION, ESQ
         28 Bridgeside Boulevard
6      Mt  Pleasant, South Carolina 29464
         (843) 216-9252
7      jledlie@motleyrice com
         (843) 216-9168
8      crion@motleyrice com
9      On behalf of McKesson Corporation:
10     Covington & Burling, by
         JENNIFER SAULINO, ESQ
11       One CityCenter
         850 Tenth Street Northwest
12       Washington, D C  20001-4956
         (202) 662-5305
13       jsaulino@cov com
14       -and-
15       Covington & Burling, by
         STEPHEN F  RAIOLA, ESQ
16       One CityCenter
         850 Tenth Street Northwest
17       Washington D C , 20001-4956
         202-662-5786
18       sraiola@cov com
19
20           ~ ~ ~ ~ ~
21
22
23
24
25
```

Page 3

```
1  APPEARANCES, Continued:
2      On behalf of Johnson & Johnson and
   Janssen Pharmaceuticals, Inc :
3
       Tucker Ellis, LLP, by
4      BRENDA A  SWEET, ESQ
       950 North Main Avenue, Suite 1100
5      Cleveland, Ohio 44113
       (216) 696-2493
6      brenda sweet@tuckerellis com
7
       On behalf of Endo Health Solutions, Inc ,
8  and Endo Pharmaceuticals, Inc , via
   Teleconference:
9
       Baker Hostetler, by
10     TERA N  COLEMAN, ESQ
       Key Tower
11     127 Public Square, Suite 2000
       Cleveland, Ohio 44114-1214
12     (216) 861-7582
       tcoleman@bakerlaw com
13
14     On behalf of Prescription Supply, Inc :
15     Pelini, Campbell & Williams, by
       KRISTEN E  CAMPBELL TRAUB, ESQ
16     Bretton Commons, Suite 400
       8040 Cleveland Avenue Northwest
17     North Canton, Ohio 44720
       (330) 305-6400
18     kec@pelini-law com
19
       On behalf of Walmart, Inc :
20
       Jones Day, by
21     LISA B  GATES, ESQ
       901 Lakeside Avenue
22     Cleveland, Ohio 44114-1190
       (216) 586-7154
23     lgates@jonesday com
24           ~ ~ ~ ~ ~
25
```

Page 4

```
1  APPEARANCES, Continued:
2      On behalf of Walgreens:
3      Bartlit Beck LLP, by
         MATTHEW BREWER, ESQ
4        54 West Hubbard Street
         Chicago, Illinois 60654
5        (312) 494-4432
         batthew brewer@bartlitbeck com
6
7      On behalf of Allergan Finance, LLC, via
   Veritext Virtual:
8
       Kirkland & Ellis LLP, by
9      TUCKER HUNTER, ESQ
       300 North LaSalle
10     Chicago, Illinois 60654
       (312) 862-3758
11     tucker hunter@kirkland com
12
       On behalf of Cardinal Health, Inc :
13
       Williams & Connolly LLP, by
14     MIRANDA PETERSEN, ESQ
       725 12th Street Northwest
15     Washington, D C  20005
       (202) 434-5686
16     mpetersen@wc com
17
       On behalf Endo Health Solutions, Inc ,
18  and Endo Pharmaceuticals, Inc :
19     Arnold & Porter, by
         JOHN D  LOMBARDO, ESQ
20       777 South Figueroa Street
         44th Floor
21     Los Angeles, California 90017-5844
         john lombardo@arnoldporter com
22
23           ~ ~ ~ ~ ~
24
25
```

Page 5

```
1  APPEARANCES, Continued:
2
       On behalf of AmerisourceBergen, via
3  Teleconference:
4      Reed Smith, LLP, by
         NICHOLAS R  RODRIGUEZ, ESQ.
5      Three Logan Square
       1717 Arch Street, Suite 3100
6      Philadelphia, Pennsylvania 19103
       (215) 241 7947
7      nrodriguez@reedsmith com
8            ~ ~ ~ ~ ~
9
10  ALSO PRESENT:
11     Richard Hand, Morgan, Lewis &
       Bockius, via Teleconference
12
       Shaun Crum, Legal Videographer
13
             ~ ~ ~ ~ ~
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1        TRANSCRIPT INDEX

2

3  APPEARANCES.............................  2

4

5  INDEX OF EXHIBITS ......................  7

6

7  EXAMINATION OF KENNETH R. BALL II

8  By Ms. Saulino...........................  15

9  By Mr. Lombardo..........................  331

10  By Mr. Ledlie:...........................  368

11  By Ms. Saulino..........................  375

12

13  REPORTER'S CERTIFICATE...................  385

14

15  EXHIBIT CUSTODY

16  EXHIBITS RETAINED BY THE COURT REPORTER

17

18

19

20

21

22

23

24

25

Page 7

1        INDEX OF EXHIBITS
2  NUMBER    DESCRIPTION    MARKED
3  Exhibit 1  8/30/2016 E-Mail from    73
        Michael Shearer Re: TFO
4       Assignments, AKRON_001127849
5  Exhibit 2  Document Titled "Overdose  98
       Information Between January
6       1st, 2016 at 0000 hrs - June
       3rd, 2018 at 2359 hrs"
7
    Exhibit 3  Document Titled "Overdose  99
8       Totals - Between 1/1/2016
       Through Yesterday at 2359
9       Hours"
10  Exhibit 4  July 2016 E-Mail Chain Re:  109
       Did I Miss A Release?,
11       AKRON_000325781 to 000325784
12  Exhibit 5  June 2015 E-Mail Chain Re:  118
       Threat and Strategy, with
13       Attached Document "Threat
       Assessment & Strategy
14       Program Year 2015,"
       AKRON_001139729 to 001139787
15
    Exhibit 6  Document Titled "Drug Threat  127
16       Assessment,"
       SUMMIT_000023567 to 23648
17
    Exhibit 7  Document Titled "Media  133
18       Release, January 25, 2006,
       Heroin Users Face
19       Potentially Fatal
       Ingredient,"
20       SUMMIT_000350711 to 350712
21  Exhibit 8  Akron Police Department 2004  136
       Annual Report
22
    Exhibit 9  3/15/2017 E-Mail from Paul  137
23       Calvaruso to Kenneth Ball
       Re: Staffing,
24       AKRON_001136994 to 001136995
25

Page 8

1  Exhibit 10  October 2016 E-Mail Chain  197
       Re: Opioid Action Group
2       Notes 101416, with
       Attachment, SUMMIT_000175900
3       to 175901
4  Exhibit 11  Summit County and City of  214
       Akron, Ohio Plaintiff First
5       Amended Responses and
       Objections to Distributor
6       Defendants' First Set of
       Interrogatories
7
    Exhibit 12  Document Titled "Media  231
8       Advisory, Akron, OH, August
       19, 2016," AKRON_000243705
9
    Exhibit 13  November 2015 E-Mail Chain  234
10       Re: Any Interest in Narcan
       for Patrol, AKRON_000373792
11
    Exhibit 14  March 2018 E-Mail Chain Re:  255
12       % of Non-Violent Safety
       Force Calls Related To
13       Opioid Addiction and Mental
       Health, AKRON_000236377 to
14       000236379
15  Exhibit 15  Document Titled "Akron  265
       Police Department 2009
16       Annual Report"
17  Exhibit 16  Document Titled "2018 Budget  268
       Plan, City of Akron, Ohio"
18
    Exhibit 17  Summit County and City of  279
19       Akron, Ohio Plaintiff's
       First Amended Responses and
20       Objections to Distributor
       Defendants' Third Set of
21       Interrogatories
22  Exhibit 18  Corrected Second Amended  301
       Complaint and Jury Demand
23
    Exhibit 19  8/4/2016 E-Mail from Erika  320
24       Wiles Re: Z1/Z4 Report,
       AKRON_001127875 to 001127879
25

Page 9

1  Exhibit 20  Document Titled "State Issue  330
       1: A Safe Harbor for Drug
2       Traffickers and Violent
       Offenders"
3
    Exhibit 21  January/February 2016 E-Mail  339
4       Chain Re: You're Invited:
       Summit County Opiate Meeting
5
    Exhibit 22  2016 E-Mail Chain Re: Heroin  343
6       Field Testing,
       AKRON_000321401 to 000321403
7
    Exhibit 23  3/22/2018 E-Mail Chain Re:  352
8       Da Nico Geter,
       AKRON_000325481
9
    Exhibit 24  Document Titled "Summit  359
10       County Drug Unit, Minutes of
       the January 24, 2018,"
11       SUMMIT_000119626
12  Exhibit 25  Document Titled "Ohio  362
       Department of Public Safety
13       Office of Criminal Justice
       Services Subgrant
14       Application Title Page,
       SUMMIT_000076854 to
15       000076879
16  Exhibit 26  Document Titled, "For  366
       Immediate Release, K9 Unit
17       Receives Narcan Kits from
       K9s of Valor Organization,"
18       AKRON_000323999
19
20
21
22
23
24
25

Page 10

| | | |
|---|---|---|
| 1 | INDEX OF VIDEO OBJECTION | |
| 2 | OBJECT | PAGE |
| 3 | object | 29 |
| | object | 31 |
| 4 | object | 65 |
| | object | 66 |
| 5 | object | 68 |
| | object | 69 |
| 6 | object | 88 |
| | object | 90 |
| 7 | object | 90 |
| | object | 90 |
| 8 | object | 91 |
| | object | 91 |
| 9 | object | 94 |
| | object | 94 |
| 10 | object | 95 |
| | object | 103 |
| 11 | object | 103 |
| | object | 108 |
| 12 | object | 108 |
| | object | 109 |
| 13 | object | 114 |
| | object | 114 |
| 14 | object | 115 |
| | object | 117 |
| 15 | object | 122 |
| | object | 123 |
| 16 | object | 124 |
| | object | 125 |
| 17 | object | 125 |
| | object | 126 |
| 18 | object | 126 |
| | object | 126 |
| 19 | object | 126 |
| | object | 127 |
| 20 | object | 127 |
| | object | 130 |
| 21 | object | 131 |
| | object | 132 |
| 22 | object | 133 |
| | objection | 134 |
| 23 | object | 139 |
| | object | 149 |
| 24 | object | 150 |
| | object | 155 |
| 25 | object | 155 |

Page 11

| | | |
|---|---|---|
| 1 | object | 155 |
| | object | 157 |
| 2 | object | 157 |
| | object | 159 |
| 3 | object | 161 |
| | object | 161 |
| 4 | object | 162 |
| | object | 164 |
| 5 | object | 185 |
| | object | 186 |
| 6 | object | 187 |
| | object | 195 |
| 7 | object | 205 |
| | object | 207 |
| 8 | object | 207 |
| | object | 208 |
| 9 | object | 209 |
| | object | 209 |
| 10 | object | 209 |
| | object | 210 |
| 11 | object | 211 |
| | object | 212 |
| 12 | object | 212 |
| | object | 216 |
| 13 | object | 217 |
| | object | 218 |
| 14 | object | 224 |
| | object | 224 |
| 15 | object | 226 |
| | objection | 226 |
| 16 | object | 227 |
| | object | 227 |
| 17 | object | 228 |
| | object | 228 |
| 18 | objection | 231 |
| | objection | 233 |
| 19 | object | 233 |
| | object | 238 |
| 20 | object | 238 |
| | object | 239 |
| 21 | object | 239 |
| | object | 241 |
| 22 | object | 244 |
| | object | 245 |
| 23 | objection | 246 |
| | objection | 248 |
| 24 | objection | 249 |
| | objection | 252 |
| 25 | object | 252 |

Page 12

| | | |
|---|---|---|
| 1 | object | 255 |
| | object | 259 |
| 2 | object | 265 |
| | object | 283 |
| 3 | object | 285 |
| | object | 285 |
| 4 | object | 287 |
| | object | 287 |
| 5 | object | 288 |
| | object | 292 |
| 6 | object | 293 |
| | object | 294 |
| 7 | object | 294 |
| | object | 294 |
| 8 | object | 294 |
| | object | 295 |
| 9 | object | 295 |
| | object | 296 |
| 10 | object | 296 |
| | object | 296 |
| 11 | object | 297 |
| | object | 298 |
| 12 | object | 298 |
| | object | 299 |
| 13 | object | 307 |
| | object | 307 |
| 14 | object | 310 |
| | object | 311 |
| 15 | objection | 311 |
| | object | 311 |
| 16 | object | 312 |
| | object | 313 |
| 17 | object | 314 |
| | object | 315 |
| 18 | object | 316 |
| | object | 316 |
| 19 | object | 316 |
| | object | 316 |
| 20 | object | 317 |
| | object | 318 |
| 21 | object | 318 |
| | object | 322 |
| 22 | object | 323 |
| | object | 323 |
| 23 | object | 324 |
| | object | 325 |
| 24 | objection | 328 |
| | object | 330 |
| 25 | object | 331 |

Page 13

| | | |
|---|---|---|
| 1 | object | 337 |
| | object | 339 |
| 2 | object | 346 |
| | object | 351 |
| 3 | object | 352 |
| | object | 352 |
| 4 | object | 355 |
| | object | 358 |
| 5 | object | 359 |
| | object | 359 |
| 6 | object | 364 |
| | object | 367 |
| 7 | object | 369 |
| | object | 370 |
| 8 | object | 371 |
| | object | 374 |
| 9 | object | 376 |
| | object | 376 |
| 10 | object | 377 |
| | object | 380 |
| 11 | object | 380 |
| | object | 381 |
| 12 | object | 381 |
| | object | 381 |
| 13 | object | 382 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

4 (Pages 10 - 13)

Page 14

1      THE VIDEOGRAPHER:  The date is
2  November 7, 2018.  We're on the record at
3  a.m.
4          This is the deposition of Kenneth
5  Ball, in the matter of In Re: National
6  Prescription Opiate Litigation in the United
7  States District Court, Northern District of
8  Ohio, Eastern Division.
9          Will counsel please state
10  appearances for the record.
11      MS. SAULINO:  Jennifer Saulino,
12  Covington & Burling, for McKesson.
13      MR. RAIOLA:  Stephen Raiola,
14  Covington & Burling, for McKesson.
15      MS. SWEET:  Brenda Sweet from
16  Tucker Ellis on behalf of Janssen
17  Pharmaceuticals, Inc.
18      MS. PETERSEN:  Miranda Petersen,
19  Williams & Connolly, on behalf of Cardinal
20  Health, Inc.
21      MS. CAMPBELL:  Kristin Campbell,
22  Pelini Campbell & Williams, Prescription
23  Supply, Inc.
24      MR. BREWER:  Matt Brewer from
25  Bartlit Beck on behalf Walgreens.

Page 15

1      LISA GATES:  Lisa Gates from Jones
2  Day on behalf of Walmart.
3      MR. LOMBARDO:  John Lombardo from
4  Arnold & Porter on behalf of the Endo
5  Defendants.
6      MR. LEDLIE:  James Ledlie from
7  Motley Rice on behalf of the City of Akron and
8  Summit County.
9      MS. RION:  Caroline Rion on behalf
10  of Akron and Summit County.
11      THE VIDEOGRAPHER:  Will counsel on
12  the phone please state appearances for the
13  record.
14      MR. RODRIGUEZ:  Nicholas Rodriguez
15  of Reed Smith on behalf of AmerisourceBergen.
16      THE VIDEOGRAPHER:  It says there's
17  Tucker Hunter on the line too?
18          Okay.  Will the court reporter
19  please swear in the witness.
20      KENNETH R. BALL II, of lawful age, called
21  for examination as provided by the Federal
22  Rules of Civil Procedure, being by me first
23  duly sworn, as hereinafter certified, deposed
24  and said as follows:
25      EXAMINATION OF KENNETH R. BALL II

Page 16

1  BY MS. SAULINO:
2      Q.   Good morning, Chief Ball.
3      A.   Good morning.
4      Q.   Before we get started, could you
5  just state and spell your full name for the
6  record?  I know it's not very hard to spell,
7  but it's something we do.  And then also give
8  us your address.
9      A.   Kenneth, K-e-n-n-e-t-h, Ray, R-a-y,
10  Ball, B-a-l-l, and I'm the Second.
11          My address is 76 Sand, S-a-n-d,
12  Run, R-u-n, Road.  That's in Akron, Ohio 44313.
13      Q.   Thank you.  As you just heard, my
14  name is Jennifer Saulino.  I'm with a law firm
15  called Covington & Burling, and we represent
16  McKesson Corporation in this matter.
17          Chief Ball, where are you currently
18  employed?
19      A.   With the City of Akron, the Akron
20  Police Department.
21      Q.   And have you been deposed before?
22      A.   I have.
23      Q.   How many times?
24      A.   I think it was one.
25      Q.   Do you know what kind of a case?

Page 17

1      A.   It was a wrongful death case.  I
2  was -- I was executor of the will of my
3  brother.
4      Q.   And no others that you can think
5  of?
6      A.   No.
7      Q.   And have you testified at trial
8  before?
9      A.   Yes, I have.
10      Q.   How many times?
11      A.   I would have no way to recall.
12      Q.   Okay.  Probably more than 20?
13      A.   Yes.
14      Q.   More than 50?
15      A.   At least.
16      Q.   More than 100?
17      A.   Probably not.
18      Q.   Okay.  And what types of cases?
19      A.   Variety.  From traffic up to
20  aggravated robberies or felonious assaults.
21      Q.   And have you testified in matters
22  involving opioid drugs?
23      A.   No, I haven't.
24      Q.   Any criminal cases?
25      A.   No.

5 (Pages 14 - 17)

Page 18

1    Q.   Okay.  All right.  Well, I know
2  that you're very familiar with some of this
3  from your trial testimony, but I want to go
4  over a few ground rules for today.
5         And the first is that you are
6  testifying under oath today.  It's the very
7  same oath that you would take in a courtroom,
8  and so you are obligated to tell the truth just
9  as you would be in a courtroom.
10        Is that all right?
11   A.   Yes.
12   Q.   I will do my very best to ask you
13  questions that you can understand.  If you
14  don't understand ask a -- if you don't
15  understand a question that I ask, I would ask
16  you to let me know, and I will try to clarify
17  it for you.
18        If you answer a question, I will
19  assume that you understood it and are answering
20  it truthfully and to the best of your ability.
21        Is that fair?
22   A.   Makes sense.
23   Q.   You understand that the court
24  reporter here is typing everything you and I
25  both say.  And so because of that we need to be

Page 19

1  careful not to talk over each other.  So I will
2  do my best to let you finish answering before I
3  ask another question, and I'd ask you to do the
4  same for me.
5    A.   Got it.
6    Q.   Your counsel may have objections to
7  my questions, which is perfectly fine and
8  normal.  Unless he specifically instructs you
9  not to answer a question, I will expect you to
10  answer the question.  Okay?
11   A.   Okay.
12   Q.   And finally, this is not a
13  marathon.  If at any point you need a break,
14  just tell me and we will take a break.  The
15  only exception to that is that if there's a
16  question pending, I may ask you to answer it
17  before we take the break, but, otherwise, you
18  can have a break anytime you want one.
19   A.   Okay.
20   Q.   Okay.  Is there any reason that you
21  would not be able to give truthful and complete
22  testimony today?  Any medications or other
23  conditions that would affect that?
24   A.   No.
25   Q.   Okay.  Chief Ball, what did you do

Page 20

1  to prepare for today's deposition?
2    A.   I read the complaint.  I have met
3  on a couple of occasions with the counsel.
4    Q.   How many times?
5    A.   Maybe four, including this morning,
6  briefly.
7    Q.   So this morning briefly?
8    A.   Uh-huh.
9    Q.   Yes?
10   A.   Yes.
11   Q.   Yeah.  The other ground rule is you
12  have to answer with -- with words.
13   A.   Okay.
14   Q.   Okay?
15        And so three other times beyond
16  this morning?
17   A.   I think so.
18   Q.   And roughly when were those?
19   A.   Last week, a couple weeks before
20  that.  And I think the first one that I
21  mentioned was not actually -- I think it was
22  a -- a more general of, these are the kind of
23  reports and the kind of information that have
24  been requested, and they have to be fulfilled,
25  or, you know, what's that process look like,

Page 21

1  those kind of things.
2    Q.   So you were, it sounds like, maybe
3  trying to respond to document requests?  Does
4  that sound right?
5        MR. LEDLIE:  And I would instruct
6  the answer -- instruct the witness not to
7  answer as to the contents of any conversations
8  that you had with counsel.  But if you can do
9  that -- answer her question without doing that,
10  go ahead.
11   Q.   I think that one was just an easy
12  yes or no, because I think that's what you were
13  saying; is that right?  That first meeting,
14  that you were gathering documents based on
15  requests?
16   A.   It was finding out about the
17  request for -- for documents.
18   Q.   Got it.  Okay.
19        So those other two meetings, how
20  long were they?
21   A.   A couple hours.
22   Q.   All day?
23   A.   No.
24   Q.   Half a day?
25   A.   No.

1     Q.   Just a couple hours?
2     A.   (Witness nodding head.)
3     Q.   Okay.  And who was present?
4     A.   Myself, James, and Caroline.
5     Q.   Anybody else?
6     A.   (Witness shaking head.)
7     Q.   Did you review any documents to
8  prepare?
9     A.   No.
10     Q.   Other than the complaint?
11     A.   What I mentioned previously, the
12  complaint.
13     Q.   Anything else come to mind?
14     A.   I read your -- I read the subpoena.
15  No.  Those were the documents that I reviewed.
16     Q.   Did you review any e-mails?
17     A.   No.
18     Q.   What about other court
19  related-documents like interrogatories?  Do you
20  even know what that is?
21     A.   No.
22     Q.   Okay.  Did you talk to anybody else
23  outside of your meetings with counsel about
24  this deposition, other than for scheduling
25  purposes?

1     A.   No.
2     Q.   And did you do any --
3     A.   I mean, other than people are
4  aware -- my staff is aware that I was deposed
5  today, but I haven't talked about, you know,
6  what would be the context of the conversation
7  this morning or anything like that.
8     Q.   Right.  Fair enough.  And that's
9  what I meant by scheduling, so.
10     A.   Right.  Okay.
11     Q.   Did you do any independent
12  research, like on the Internet?
13     A.   No.
14     Q.   Have you done at any point any
15  research on the opioid litigation that's going
16  on?
17     A.   No, I would -- I've not -- I
18  wouldn't say research.  I didn't purposely go
19  out and find material, but there has been --
20  I've read articles.  If I open up -- you know,
21  my home page is MSN, and there's an article, I
22  would read an article.  Or if the Beacon
23  Journal or other local news outlets would have
24  articles or stories, I would, you know, read
25  those and am familiar with it.  So just to that

1  extent.
2     Q.   Okay.  And when you say "the Beacon
3  Journal," you mean the Akron Beacon Journal?
4     A.   Yes, I do.
5     Q.   Which is the local paper?
6     A.   It is.
7     Q.   All right.  Well, then let me ask
8  you this.  As you sit here today, are you
9  familiar with the lawsuit that we are here for?
10     A.   Yes, I am.
11     Q.   And what do you know about it?
12     A.   I know that obviously we have had a
13  significant impact in Akron, Ohio, and I know
14  that it's much broader than that, with opioid
15  addiction.
16          I know the lawsuit is connecting
17  prescription -- or prescriptions for opioids to
18  this epidemic that's in our country right now;
19  that there's a relationship between the way
20  that the drugs were manufactured, marketed,
21  distributed that is -- has been a significant
22  contributor to what we see now and the troubles
23  that surround this issue.
24     Q.   And what led you to that
25  understanding?

1     A.   Well, I've -- I've been -- I would
2  say that, you know, from my perspective of
3  believing that there's a connection, it's my
4  personal experiences and what I've been exposed
5  to as a police officer in the city of Akron;
6  being at meetings and, you know, hearing --
7  hearing conversations about what the epidemic
8  looks like, what may be at the root of it, what
9  is at the root of it; I've seen presentations
10  from public health; I've been in larger
11  meetings where people from all different
12  perspectives -- children services, hospital
13  executives, Summit County Public Health, law
14  enforcement, fire and EMS -- where they have
15  all met and talked about the problem, how it's
16  evolved, how it's impacting our organizations,
17  our municipalities, what we can do to try to
18  have the biggest impact that we possibly can
19  with the resources that are available.
20          I've seen many times people speak
21  about their own personal circumstance.
22     Q.   You mean folks who had opioid users
23  in the family?
24     A.   Yes.
25     Q.   Okay.

Page 26

1      A.    And opioid users.
2      Q.    Okay.  And in all of these meetings
3  and -- and --
4          MR. LEDLIE:  Were you done with
5  your answer?
6          THE WITNESS:  No.  I could have --
7  okay.
8      A.    So those have -- there have been a
9  lot of interactions in those -- in those
10  meetings, and even outside in personal ways
11  where people would approach me because of my
12  position and want to talk about their
13  situation.
14          And there has been an overwhelm- --
15      Q.    Let me just clarify.  Again,
16  personal -- personal experiences in their
17  family or personal use?
18      A.    Yes.
19      Q.    Okay.
20      A.    About how they -- their loved one
21  or they had been -- you know, had become
22  involved with illicit drug use or addiction,
23  and heard many times over how it was
24  prescription medication -- legal prescription
25  medication that they believed was at the root

Page 27

1  of that issue or had a significant impact in
2  their lives, either through addiction or
3  through the death of a -- a loved one.
4      Q.    Okay.  You said "many times."  How
5  many times have you heard specifically that
6  prescription medications were at the root of
7  the death of someone?
8      A.    It's -- it's hard.  I don't want to
9  speculate.  That number has --  let's see.
10      Q.    How many times can you actually
11  recall?
12      A.    Can I specifically?  At least a
13  half dozen.  But I'm sure with not being able
14  to recall some of the specific circumstances,
15  that, you know, that that's happened with
16  regularity in -- in a much higher frequency.
17      Q.    And that's you hearing from other
18  people, right?
19      A.    Uh-huh.
20      Q.    Yes?
21      A.    Yes.  I'm sorry.
22      Q.    Not your own personal investigation
23  of whether prescription medications were the
24  cause of someone's addiction, right?
25      A.    Sure.  I have not done that

Page 28

1  investigation, so I wouldn't have a perspective
2  on that.
3      Q.    Okay.  And so you've never done
4  that kind of investigation, right?
5      A.    Right.
6      Q.    And in all of these meetings and
7  speeches that you mentioned a moment ago during
8  your answer, these were all local meetings?
9      A.    Yes.
10      Q.    Okay.  Did you have -- did you --
11  do you know whether any manufacturers of
12  prescription medications were invited to
13  participate in those meetings?
14      A.    I do not.
15      Q.    Do you know whether distributors of
16  prescription medications were invited to
17  participate in those meetings?
18      A.    I do not.
19      Q.    Do you know whether any national
20  pharmacy chains were invited to participate in
21  those meetings?
22      A.    I do not.
23      Q.    Okay.  And -- so again going
24  through that list, do you know whether you've
25  ever had any interaction with prescription drug

Page 29

1  manufacturers about the opioid issues that you
2  raised?
3      A.    I don't believe that I have.
4      Q.    None?
5      A.    Right.
6      Q.    And similarly, with respect to
7  distributors, have you had any interaction with
8  individuals who worked for distributors of
9  prescription medications with respect to the
10  opioid issues that you raised?
11      A.    I don't believe.  I don't think so.
12  I'm -- I don't think so.
13      Q.    Okay.  And have you had any
14  interaction with any national retail pharmacies
15  with respect to the opioid issues that you
16  raised?
17      A.    No, I haven't.
18      Q.    Okay.  So it's fair to say that you
19  have not raised with any of those entities, the
20  manufacturers, the distributors, or the retail
21  pharmacies, any of the concerns that you just
22  identified that you have heard about in these
23  many meetings?
24          MR. LEDLIE:  Object to the form of
25  the question.

8 (Pages 26 - 29)

1      You can answer the question.
2      A.   That's accurate.
3      Q.   Now, you mentioned that you
4 recently reviewed the complaint?
5      A.   Yes.
6      Q.   Was that the first time that you
7 had reviewed it?
8      A.   It was within the last week.
9      Q.   Is that the only time you've
10 reviewed it?
11      A.   Yes.
12      Q.   Did you -- so you did not review it
13 before it was filed?
14      A.   No, I did not.
15      Q.   Do you know whether you supplied
16 any information that was used in drafting the
17 complaint?
18      A.   I don't know.
19      Q.   When you looked at the complaint,
20 was there anything in there that struck you as
21 something you had supplied?
22      A.   I can't -- I don't -- I don't
23 recall.  I mean, not me personally.  It may
24 have come from one of the city entities, it
25 could have come from the police department, but

1 it wasn't generated by me.
2      Q.   Right.  I'm not asking you to
3 speculate about who might have supplied
4 information, simply whether you saw anything
5 you had supplied.
6      A.   No, I did not.
7      Q.   Having reviewed the complaint, did
8 you believe all of the statements in the
9 complaint were accurate?
10      A.   Yes.
11      Q.   Okay.  And your basis for that
12 was --
13      A.   To -- to the best of my knowledge.
14      Q.   And do you know whether anyone has
15 ever asked you for information to respond to
16 interrogatory responses?
17          MR. LEDLIE:  Object to the form of
18 the question.
19      Q.   Do you know what that means?
20      A.   No.
21      Q.   Okay.  Do you expect to testify at
22 the trial in this case?
23      A.   I would imagine.
24      Q.   Has anyone told you that you will
25 be?

1      A.   No.
2      Q.   Okay.  You're just assuming that
3 you would?
4      A.   Right.
5      Q.   And what do you expect your
6 testimony would include at trial?
7      A.   Just what my experiences have been,
8 what my knowledge is related to my specific
9 assignment as chief currently in Akron.
10      Q.   Who else from the City of Akron
11 would you expect to testify at the trial in
12 this case?
13      A.   I wouldn't know outside.  I would
14 imagine the -- the fire chief and a number of
15 individuals within the -- the fire department
16 that have position or knowledge.
17          Same thing within my department.
18 My department is large, so I would imagine
19 that -- that we would have somebody from
20 records, and somebody from Communications
21 Center, and somebody from budget, and somebody
22 from -- at least a person from narcotics unit,
23 street narcotics, is likely.
24          From the -- the City, I would just
25 be projecting, but I would imagine that the

1 City would also have a number of others that
2 would be testifying.
3      Q.   And what are you basing that answer
4 on?
5      A.   Just familiarity with the process
6 and people that have been gathering documents
7 and that kind of thing.
8      Q.   Who from records specifically would
9 you expect to testify at trial?
10      A.   I would imagine that it would
11 either be Pam Brown is the supervisor --
12 civilian supervisor in records, and Captain
13 Harding is the commander of the unit that
14 oversees records.  Captain Harding also
15 supervises our Communications Center, so I
16 would expect that he would be on that list.
17      Q.   Anyone else from the Communications
18 Center that you would expect?
19      A.   There's a fire supervisor.  I don't
20 know who the fire supervisor is by name.
21      Q.   And who from budget would you
22 expect to testify at trial?
23      A.   Andy Carey is an accountant who
24 works for us.  We also have --
25      Q.   I'm sorry.  Andy --

Page 34

1    A.   Carey.
2    Q.   Carey?  Okay.
3    A.   We also have three analysts that
4  work in our planning and research unit that are
5  responsible for putting together documents and
6  statistics and have done some analysis on
7  budget.
8         We have a captain who's in charge
9  of our services office, which is our -- the
10  office in the department that manages and works
11  with budget.
12    Q.   And who is that?
13    A.   Captain Schnee.
14    Q.   And tell me again what Andy Carey's
15  position is.
16    A.   He is an accountant, and he works
17  in our planning and research office.
18    Q.   Do you work directly with him on
19  budget issues?
20    A.   No.
21    Q.   And then you said -- I think you
22  said certainly the narcotics unit; is that
23  right?
24    A.   Yes.
25    Q.   Who from the narcotics unit?

Page 35

1    A.   Detective Leonard is on a DEA task
2  force, and they do prescription medication
3  investigations.
4    Q.   Anyone else?
5    A.   Potentially Captain Mike Shearer is
6  the commander of the narcotics and street
7  narcotics unit.
8         Lieutenant David Garro is the
9  lieutenant in charge of narcotics, and he's
10  also administrator for our Quick Response Team.
11    Q.   Okay.
12    A.   So I would imagine that would be a
13  logical person that you would want to speak to.
14    Q.   Have you heard, either from the
15  individuals themselves or from anyone else,
16  specifically that any of these individuals
17  expects to be testifying at trial?
18    A.   No.
19    Q.   Okay.
20    A.   I know that my deputy mayor was
21  deposed.  So his role is -- his role -- over
22  all safety forces, police and fire, so I would
23  imagine that his perspective might be important
24  as well.
25    Q.   Did you talk to the deputy mayor

Page 36

1  after his deposition?
2    A.   No.
3    Q.   Did anyone tell you about what
4  happened during his deposition?
5    A.   No.  I mean, I talked to the deputy
6  mayor after his deposition.  I did not talk to
7  the deputy mayor about his deposition.  So it
8  would have been normal business, but not about
9  his deposition.
10    Q.   Fair enough.  Thank you for that
11  clarification.
12         All right.  Chief Ball, where are
13  you from originally?
14    A.   Akron.
15    Q.   And where did you go to high
16  school?
17    A.   Went to two high schools.  I went
18  to Hudson High School for my first two years,
19  and then I went to Cuyahoga Valley Christian
20  Academy is where I'm a graduate of.
21    Q.   And then did you go to college?
22    A.   I did.
23    Q.   Where did you go?
24    A.   I went to Malone University in
25  Canton for -- for part of my education I went

Page 37

1  to the University of Akron.
2    Q.   What did you study?
3    A.   Finance.
4    Q.   And when did you graduate?
5    A.   I did not graduate.  I took a job
6  with the police department and didn't finish.
7    Q.   And so have you held any jobs
8  since -- since your college courses anywhere
9  other than the police department?
10    A.   Yes.
11    Q.   Where?
12    A.   I worked at a shop called Quality
13  Synthetic Rubber.  It was a rubber shop.  I
14  worked at that while I was going to school and
15  paying my way through school.
16    Q.   Sorry.  Let me -- let me rephrase
17  the question.  After school you started at the
18  police department.  Have you been there ever
19  since?
20    A.   Well, actually, I also worked at --
21  after I was -- I went straight from Quality
22  Synthetic Rubber to the Akron Police
23  Department, so I stopped going to school at the
24  same time as I started.  I was actually in --
25  scheduled for classes when I became an officer.

10 (Pages 34 - 37)

Page 38

1    Q.    Got it, okay. And at Quality
2 Synthetic Rubber, what were you doing?
3    A.    I was a mold operator.
4    Q.    Okay. Do you have any
5 certifications or technical degrees of any
6 sort?
7    A.    Police Executive Leadership
8 College.
9    Q.    Anything else?
10   A.    FBI National Academy.
11   Q.    Okay. Anything else?
12   A.    I mean, those are the two that are,
13 you know, more distinguished. I've got dozens
14 of certificates. I wouldn't be able to go back
15 and recount all those. I mean, it's
16 instructional skills taught in our police
17 academy, defensive tactics, a number of other
18 disciplines that I've taught in our department.
19 But it wouldn't be like -- it's normal for a
20 police officer. I've got all the
21 certifications that are -- that are required
22 and some that are not, that are elective.
23   Q.    Sure. Any, like, online coursework
24 after your time at University of Akron?
25   A.    No.

Page 39

1    Q.    And you said you studied finance.
2 Was that at both Malone and University of
3 Akron?
4    A.    Yes.
5    Q.    Any of it specific to opioids?
6    A.    No.
7    Q.    Or pharmaceuticals in any way?
8    A.    (Witness shaking head.)
9    Q.    No?
10   A.    No.
11   Q.    And when did you join the Akron
12 Police Department?
13   A.    1991.
14   Q.    You received training when you
15 joined?
16   A.    Yes, I did.
17   Q.    What kind of training?
18   A.    We had our OPOTA, basic academy,
19 which was put on by the Akron Police
20 Department. I think at that time it was 22
21 weeks of training in all of the -- the basics
22 that are required by the State of Ohio for
23 police officer certification, and then all of
24 things that are Akron specific or centric: our
25 rules and regulations, our policies and

Page 40

1 procedures, radio signals, all of the things
2 that would relate -- that would relate to -- to
3 being a police officer on the streets. And
4 defensive tactics and firearms and report
5 writing and investigations, interrogations,
6 interview, constitutional law. All of those
7 things that are required in that environment.
8    Q.    I'm sorry. You said that was 22
9 weeks; is that right?
10   A.    I believe it was 22 weeks at the
11 time that I went.
12   Q.    And what did you -- OPOTA basic
13 academy?
14   A.    OPOTA is the Ohio Police Officer
15 Training Academy. So individual academies have
16 to be certified by the State of Ohio in order
17 to graduate street-ready, certified police
18 officers.
19   Q.    And so did you do that training in
20 Akron, or did you have to go --
21   A.    I did it in Akron.
22   Q.    Okay.
23   A.    At that point in time, Akron would
24 hire employees without certification, and they
25 would train them. That model since changed

Page 41

1 where now we are hiring people and then they go
2 to an academy outside of Akron. But we are
3 reinstituting our own police academy this
4 ye- -- next year.
5    Q.    Do you recall whether any of that
6 training related to -- to drug crimes?
7    A.    I don't recall. I'm certain that
8 it did. I wouldn't be able to recall
9 specifically.
10   Q.    And so, I take it, you also don't
11 remember whether any of it related to opioids
12 or diversion of opioids?
13   A.    That would be right.
14   Q.    All right. I'd like to go through
15 your career with the Akron Police Department.
16   A.    Okay.
17   Q.    So let's start in 1991. You were
18 an officer?
19   A.    Patrol officer.
20   Q.    Patrol officer? Okay. How long
21 were you in that job?
22   A.    Four and a half years. I worked in
23 patrol on the 7:30 p.m. shift until 3:30 a.m.
24   Q.    And then what -- what did you do
25 next?

11 (Pages 38 - 41)

1     A.   I went to our midnight traffic unit
2  for about a year and a half.
3     Q.   And that was '95, '96?
4     A.   It would have been in -- yeah, I --
5  I don't -- I don't know the exact dates.
6     Q.   Okay.
7     A.   It would have been in, yeah,
8  mid-'95.
9     Q.   What came next?
10     A.   I was promoted to sergeant.  And --
11     Q.   When were you promoted to sergeant?
12     A.   1997.
13     Q.   Okay.  And so how did your job
14  change?
15     A.   I went back to patrol subdivision,
16  and I was assigned to midnight patrol shift,
17  which was 11:00 until 7:00 in the morning.
18     Q.   Okay.  What happened next?
19     A.   Was promoted to lieutenant three
20  years later.
21     Q.   So in 2000?
22     A.   I think it was -- I don't remember
23  if it was 2000.  I -- I was a sergeant on
24  midnights for three years, so it would have
25  been -- it could have been early 2001.

1     Q.   And as a lieutenant, were you still
2  assigned to a patrol unit, or were -- how did
3  that change your job?
4     A.   No.  I bid -- I was able to bid to
5  our investigative subdivision.  My assignment
6  was commander of our crimes against property
7  unit, which is burglaries, break-ins, financial
8  crimes, and our pawn unit.
9     Q.   I'm sorry.  Pawn -- oh, pawn unit.
10     A.   Pawn.
11     Q.   Okay.
12     A.   Those are detectives that
13  previously -- processes have changed with
14  computers and Internet, but they would go to
15  the pawn shops in the area and collect pawn
16  cards to be able to -- to compare those to
17  thefts and -- that we had and try to match up
18  items that had been stolen.
19     Q.   Okay.  And -- and how long -- well,
20  how long were you assigned to the crimes
21  against property -- is it a unit or -- okay.
22     A.   It is.  Crimes against property was
23  six years.
24     Q.   Six years.  Okay.
25         And then were you promoted again,

1  or did you switch as a lieutenant?
2     A.   I was promoted again.  I was --
3     Q.   Okay.
4     A.   -- promoted to captain, and I went
5  back to midnight patrol.
6     Q.   And you were promoted to captain
7  2006-ish?  Maybe 2007?
8     A.   Maybe 2007.
9     Q.   Okay.  So back to midnight patrol?
10     A.   Yeah.
11     Q.   And what does your job look like --
12  what did your job look like as a captain?
13     A.   I was commander of the midnight
14  patrol shift --
15     Q.   Okay.
16     A.   -- and was the highest-ranking
17  officer on duty from the hours of 11:00 to
18  in the morning, so I had collateral
19  responsibilities, they were kind of informal,
20  but over all operations of the police
21  department during those -- during those hours.
22         On that shift there were
23  approximately 45 to 50 police officers:  A
24  traffic unit of about probably five officers
25  and a sergeant; six sergeants assigned to the

1  patrol shift; a lieutenant assigned under me; a
2  major crimes unit on midnight shift that was a
3  lieutenant, a sergeant, and five detectives; I
4  don't know how many were assigned in the radio
5  room, but also in the radio room; crime scene
6  unit, we had a sergeant and five or six
7  detectives.
8     Q.   Okay.  Were any of those
9  individuals specifically assigned to
10  opioid-related crimes?
11     A.   No.
12     Q.   Any of them specifically assigned
13  to drug-related crimes?
14     A.   No.
15     Q.   And how long, then, were you on the
16  midnight 11:00 to 7:00 shift?
17     A.   Eight and a half years.
18     Q.   And then -- so then what happened
19  next?
20     A.   I bid to day shift patrol.
21     Q.   And did you get it?
22     A.   Yes.
23     Q.   And you remained a captain at that
24  point?
25     A.   I was a captain.  I was in charge

12 (Pages 42 - 45)

Page 46

1 of the day shift patrol unit, and then also had
2 a responsibility as a zone commander; so I had
3 geographical shift responsibility and then also
4 geographical responsibility for one of our
5 zones.  The city is divided into four zones, so
6 I had one of those zones.
7     Q.   Which zones?
8     A.   One.
9     Q.   Which is -- what is that?
10    A.   Downtown, University of Akron, near
11 west side.
12    Q.   So other than the -- the zone
13 responsibility that you just explained, how did
14 your job change between the midnight shift and
15 the day patrol?
16    A.   It didn't.
17    Q.   Okay.
18    A.   It was still supervising a shift of
19 officers.  Now, there are -- I didn't have
20 oversight over traffic or the radio room or
21 other responsibilities, because during the --
22 those day hours, those supervisors were
23 working.
24         So I was just responsible for my
25 shift, and that was commanding a lieutenant,

Page 47

1 six sergeants.  And day shift is a little bit
2 smaller because those are one-man cars that we
3 put out on the street during the day, so
4 approximately low to mid-30s number of
5 officers.
6     Q.   And was this your last role before
7 you became chief?
8     A.   No.
9     Q.   Okay.  So what came next?
10    A.   I became a deputy chief in 2015,
11 and was assigned to command the investigative
12 subdivision, which is our detective bureau,
13 crime scene unit, and antiviolence unit.
14         Detective bureau has major crimes
15 24 hours a day; crime scene unit 24 hours a
16 day; juvenile -- juvenile unit two shifts;
17 property unit, which is crimes against property
18 that I mentioned before; and then the
19 antiviolence bureau, which is narcotics, street
20 narcotics, gangs, and all of our task force
21 officers.
22    Q.   So those folks were reporting to
23 you?
24    A.   Yes.
25    Q.   Is that the first time you had

Page 48

1 specific supervisory responsibility over
2 narcotics?
3     A.   Yes.
4     Q.   And then what was your next job?
5     A.   Chief.
6     Q.   And when did you take that role?
7     A.   It was in the fall of 2017.  It
8 was, like, late August or early September.
9     Q.   How did that assignment come about?
10    A.   I was appointed by the mayor.
11    Q.   And why did the previous chief
12 leave?
13    A.   He resigned.
14    Q.   Do you know why?
15    A.   Yes, I do.
16    Q.   Can you tell me?
17    A.   There were allegations that were
18 made against him of actions that were not
19 befitting of his office and that were going to
20 compromise the -- the trust of the community,
21 and he submitted his resignation.
22    Q.   And were you appointed immediately,
23 or was there any kind of an interim time?
24    A.   I was appointed as an interim and
25 then was sworn in in December.

Page 49

1     Q.   And what, generally, are your
2 responsibilities as chief of police?
3     A.   Just to oversee the department.  To
4 make sure that we're meeting the needs of the
5 community, to interact.  My role as chief is
6 split between managing what happens within our
7 building and then making sure things outside of
8 the building work well, community
9 relationships, and so there's a lot that goes
10 on.
11    Q.   Do you handle -- handle the
12 budgeting for the department?
13    A.   No.
14    Q.   Do you have any involvement in it?
15    A.   Yes, I do.
16    Q.   What is your involvement?
17    A.   Pretty much kind of an overseer,
18 get -- I get our budget reports.  Typically,
19 we'll have meetings about budget
20 decision-making, and my deputy chiefs, my
21 captain in charge of services, and myself will
22 be involved in those meetings.  And we will
23 develop plans, priorities for the police
24 department that need to be prepared and
25 submitted to my boss, the deputy mayor, and

13 (Pages 46 - 49)

1 then ultimately go to budget and finance.
2     Q.    And when you say your boss, the
3 deputy mayor, you mean Deputy Mayor Brown?
4     A.    Yes.
5     Q.    So your budgeting plans are
6 submitted to Deputy Mayor Brown?
7     A.    Yes.
8     Q.    And then it's your understanding
9 they then go to a budgeting department?
10     A.    Uh-huh.  Finance.  Yes.  I'm sorry.
11     Q.    Do you have any understanding of
12 what happens to them while they are with Deputy
13 Mayor Brown's office?
14     A.    No.  I mean -- I know that
15 obviously he looks at them and -- and matches
16 them up with what -- what his ideas would be
17 and the way that he would prioritize, I'm sure,
18 because there are times that I get feedback
19 from him about maybe a particular issue.
20     Q.    What kind of feedback do you get
21 from him?
22     A.    I would just say -- I couldn't say
23 anything specific, but just generally.  If he
24 had a different opinion about whether or not an
25 item would be included, for example, if we were

1 going to spend monies on work area improvement,
2 maybe we wouldn't -- maybe it would be his
3 opinion that we would -- weren't prioritizing a
4 work area improvement.
5          And that's not even something
6 specific.  It's just -- again, probably just
7 generally, and I wouldn't be able to cite one
8 specific thing that drove that answer.
9     Q.    So how does the process work, then?
10 Do you, then, change your submission, or does
11 he change it before it goes to budget?
12          Do you understand what I'm asking?
13     A.    Yeah.  We would change -- we would
14 change it.
15     Q.    You would change it.  Okay.
16          So you would get feedback from him,
17 you would change it, and then resubmit?
18     A.    Yes.  I mean, actually, I wouldn't
19 be changing it either.  It would go back to the
20 services office and the captain.  I -- I don't
21 work on -- I don't work on the databases or the
22 report construction.  It just is the
23 information.
24     Q.    Do you provide any of that same
25 sort of feedback before it even gets to the

1 deputy mayor?  So when you get the priorities
2 and -- and budgeting plans from those who are
3 submitting them through you, do you provide
4 feedback that then gets incorporated?
5     A.    Yeah, there are times that I would,
6 but they wouldn't get to that -- they wouldn't
7 get to that process.  It would be sorted at my
8 level before it went any further.
9          So there might be -- there -- there
10 always is that, you know, analysis.  I meet
11 with my deputy chiefs about all of those
12 matters, and they may have gotten requests from
13 captains or lieutenants that we sort out before
14 we put together a final document or request.
15     Q.    How many people report to you?
16     A.    How many people am I responsible
17 for or directly, like, interact with me on a
18 daily basis?
19     Q.    Let's start with the first.  How
20 many people are you responsible for?
21     A.    441 or -42 police office- --
22 sworn -- sworn members of the Akron Police
23 Department, not counting civilians.
24     Q.    Okay.  Do the civilians also report
25 to you?

1     A.    I have authority as the chief of
2 police.  They don't re- -- they're under --
3 under the -- the authority of my office.
4          But that's the second part of that
5 question.  I don't have those employees
6 reporting directly to me.  We've got
7 subordinate supervisors at a number of levels.
8     Q.    Right.  Okay.  Sorry about that.
9          So including -- so you have 441 or
10 -42 police officers.  Is it that you're trying
11 to hire -- why is it that you're not quite sure
12 on the --
13     A.    Well, we've had a couple
14 resignations recently.  We just had an officer
15 that had left and came back, and, you know,
16 it's -- that's kind of fluid always.
17     Q.    Okay.
18     A.    And we are trying to hire.  We have
19 some officers that are in a police academy
20 right now that will be joining us in the
21 beginning of the year, and we are finishing up
22 a -- a hiring list for background
23 investigations and potential hire.  We're
24 planning on a new -- a new recruit test in
25 first quarter of 2019.  So the -- the numbers

Page 54

1 fluctuate.
2     Q.    So when they're at the police
3 academy, you don't count them as your
4 employees?
5     A.    They count against my budgeted
6 strength, but they're not technically an
7 employee of the Akron Police Department.
8     Q.    You have to pay for their training?
9     A.    We do pay for their training.
10     Q.    Okay.  And then how many civilians
11 work under you?  I'm looking for the total size
12 of the Akron Police Department.
13     A.    I don't know what the current
14 number is right now for civilian employees.
15 I -- I think we're approved for 47 or 43, and
16 we might have high 20s.
17     Q.    So is the total number of
18 individuals who are under your jurisdiction
19 roughly -- well, it sounds like you're approved
20 for close to 500; is that right?
21     A.    We also have reserve officers.
22     Q.    I knew I was missing something.
23     A.    It's about 5- -- it's about 550
24 currently with --
25     Q.    Okay.

Page 55

1     A.    -- reserve officers, civilian
2 employees, and sworn officers.
3     Q.    So how many reserve officers do you
4 have?
5     A.    I don't even know what the number
6 is.
7     Q.    And what do they do?
8     A.    They will -- they'll help out
9 with -- like, if we have a parade, an officer
10 could block an intersection.
11         They're required to volunteer 16
12 hours a month to keep their commission and --
13 and be employed as a reserve officer.  So
14 depending on what their prior experiences are,
15 one of them might come in for that reserve
16 time, and if they're a retired Akron police
17 officer they might come in and work at our
18 detective bureau desk where they can answer
19 phones and give information to the public.
20 Some of them actually come in and work in a
21 patrol car next to a sworn officer for a
22 regular tour of duty.
23         So there's a wide variety of things
24 that the reserve officers can do.  Mainly, they
25 help with 4th of July when we have 100,000

Page 56

1 people coming into the city for the events of
2 the day and the fireworks.  We need extra
3 people; they help to fill that out.
4     Q.    All right.  I'd like to turn to the
5 training that you've had throughout your
6 career.  I know that you've had a lot of it,
7 right?
8     A.    Uh-huh.
9     Q.    Is that a yes?
10     A.    Yes.
11     Q.    And so it sounds like you had --
12 initially, you had roughly 22 weeks; is that
13 right?
14     A.    Right.
15     Q.    And then, do you have regular
16 training every year for a period of time?
17     A.    We do.  We have in-service training
18 every year.
19     Q.    And how long is that?
20     A.    Used to be 40 hours a week -- I
21 mean 40 hours a year.  But that number was --
22 has been reduced at times, because of budgetary
23 and staffing issues, and so currently our
24 in-service is 16 hours this year.
25         It's been at different places.

Page 57

1 There were times when it was 24 hours, times
2 that it was 40.  All of it depended on staffing
3 and budget, and also depended on how much the
4 state was going to reimburse us for the
5 trainings.
6     Q.    And what does that training
7 involve, that in-service training?
8     A.    It's different every year.  Things
9 that are important and topical.  There are some
10 things that are consistent.  For example, first
11 aid, every two or three years you have to be
12 recertified on first aid, so that would be
13 included.  There are always legal updates.  But
14 then we decide on -- on things that are
15 important.
16         There's a certain amount of -- of
17 it that would be defensive tactics and fitness
18 training -- or not fitness training, but
19 defensive tactics.  And, you know, sometimes
20 it's been as -- constitutional policing, and
21 police procedural justice, and de-escalation,
22 bias in the police environment, and all kinds
23 of different topics.
24     Q.    Has it ever been focused on
25 opioids?

15 (Pages 54 - 57)

Page 58

1    A.   Not that I can -- I don't know for
2  sure.
3    Q.   What do you mean when you say, "I
4  don't know for sure"?
5    A.   I don't know if there was -- if
6  there was ever a module where they did, for
7  example, updating on what QRT -- QRT is and how
8  it functions and the way that it can connect
9  with patrol officers; things they need to do to
10  make sure that our process works smoothly.
11        I know that we've had training in
12  the administration of Narcan for all of our
13  officers.  That was not in an -- I don't
14  believe that was an in-service.  I think that
15  was an extra training that we had to add.
16        I believe that we've had training
17  for the officers about the handling of, you
18  know, drugs that they can come in contact with
19  that are opioids that could likely lead to harm
20  for the officers.  So awareness about what the
21  drugs and what their versions look like and the
22  vulnerabilities that they could create for
23  police officers.
24    Q.   Like physical handling like of
25  carfentanil or Fentanyl; is that right?

Page 59

1    A.   Correct.
2    Q.   Okay.  All right.  But -- but going
3  back to the -- to the in-service, you don't
4  remember specifically any focus on opioids?
5    A.   I do not.
6    Q.   And as chief you haven't caused a
7  focus on opioids at the in-service trainings,
8  right?
9    A.   Right.
10    Q.   What about drug-related crime in
11  general?  Has that ever been a focus of the
12  in-service trainings that you can recall?
13    A.   Not so specifically.  I don't
14  know -- I would not be able to go back
15  and know, off the top of my head or verbatim,
16  what those lists of trainings would have looked
17  like.
18    Q.   Okay.  Do you recall in-service
19  training on drug diversion?
20    A.   No.
21    Q.   What about drug addiction?
22    A.   I don't -- I don't know for sure.
23    Q.   Not that you can recall?
24    A.   Not that I recall.
25    Q.   Now, setting aside the in-service

Page 60

1  training, you started to mention there were
2  other kinds of trainings; is that right?
3    A.   Yes.
4    Q.   Okay.  And how often does that
5  happen in any year that you have additional
6  trainings that are not specifically in-service
7  trainings?
8    A.   For the -- for the range, we do
9  three times a year with all of our officers.
10    Q.   The firing range?
11    A.   Yes.
12    Q.   Okay.
13    A.   And then it would be not something
14  that is planned or predictable, but there's
15  roll call trainings, or if something is -- is
16  a -- you know, a hot issue, or something
17  that's -- that's new, or, you know, those
18  situations could be handled either in roll call
19  trainings or with training videos.
20    Q.   Okay.  Now, has the topic of opioid
21  drugs ever been one of those hot issues?
22    A.   I don't want to say specifically
23  and not know what definitively that answer is,
24  so I -- I don't know.
25    Q.   You don't recall it being one?

Page 61

1    A.   Yeah.  I don't know.  I was in --
2  when I was in the detective bureau, I wouldn't
3  have been familiar with the training that they
4  would -- the officers were getting in a roll
5  call environment.
6    Q.   You haven't personally participated
7  in a training?
8    A.   No, I have not.
9    Q.   Okay.  Now, you mentioned Narcan
10  training.  You do recall that?
11    A.   (Witness nodding head.)
12    Q.   That was recent, right?
13    A.   Couple years ago.
14    Q.   Okay.  And then you mentioned the
15  handling of certain drugs.  Do you remember
16  that as well?
17    A.   I do remember -- I mean, I don't
18  remember specifically.  I didn't have the
19  class.
20    Q.   Uh-huh.
21    A.   But I do remember that it being an
22  important issue and, you know, the discussions
23  of how do we get the information to officers,
24  what are the steps that we're taking to make
25  sure that our -- that our people are safe, what

16 (Pages 58 - 61)

Page 62

1 are the steps that we're making sure to --
2 taking to make sure that the people we come in
3 contact with are -- with are safe.
4 There were bulletins that were put
5 out by, you know, state law enforcement
6 agencies, maybe through OPOTA. I know that
7 HIDTA put out some training bulletins and
8 information as well.
9 Q. Did you -- did your department pay
10 for the Narcan training that your officers
11 received?
12 A. I don't remember if that was a
13 grant or if it was, you know, at our own
14 expense.
15 Q. Do you know how much it was?
16 A. No.
17 Q. And what about the training on
18 handling of drugs? Did your department pay for
19 that?
20 A. I don't know that either. I
21 believe -- I don't think that that was -- I
22 think that that would have been either roll
23 call training or training bulletins or video.
24 But --
25 Q. What --

Page 63

1 A. -- I don't know who paid for it.
2 Q. What do you mean when you say "roll
3 call training"?
4 A. Where a supervisor, at the
5 beginning of a shift, will conduct training for
6 the officers that are present that evening.
7 Typically, we'll do that three or four nights
8 in a row so that everybody on a shift can be
9 covered if they happen to be off on days,
10 that -- that we'll repeat that training for
11 those that would have missed it to make sure
12 that we have all of our uniform officers
13 covered.
14 Q. So how long would that kind of a
15 training last?
16 A. It -- it just depends. It could be
17 something as short as 10 minutes. It might
18 last 30, 45 minutes. But if it were longer
19 than that, it probably would be something that
20 we would have to add a class for, because that
21 would be too long to have the officers not --
22 not on the streets and responding to calls.
23 Q. And you don't specifically know
24 whether any of those things happened, right?
25 A. Right.

Page 64

1 Q. Have you ever personally served on
2 any task forces or -- task forces related to
3 drugs?
4 A. No.
5 Q. What about committees related to
6 drugs?
7 A. No.
8 Q. Has the Akron Police Department
9 participated in task forces related --
10 A. Yes.
11 Q. -- related to drugs?
12 A. Yes.
13 Q. Yes?
14 A. Yes.
15 Q. Which ones?
16 A. We have the DEA task force. We
17 have a -- an FBI safe streets task force. We
18 have the Summit County drug unit. We also
19 have -- I think those are the -- we have
20 Alcohol, Tobacco and Firearms.
21 Q. There is a task force from the ATF
22 here in Akron?
23 A. ATF works closely with our officers
24 on our gun violence reduction team. And there
25 is --

Page 65

1 Q. Is -- is that related to drug
2 crimes?
3 A. There's an -- there's an overlap.
4 I mean, specifically, it's their -- their
5 primary or their first responsibility is crimes
6 of violence and weapons offenses, but there's
7 an overlap that is so common between those --
8 those crimes.
9 Q. Okay. And when you say the Akron
10 Police Department participates in the task
11 forces that you named, what is the nature of
12 the police department's participation?
13 MR. LEDLIE: Object to the form of
14 the question.
15 You can answer.
16 A. We have officers that are full-time
17 employees of the Akron Police Department that
18 are assigned full-time to those task forces.
19 Q. How many officers are assigned to
20 the DEA task force?
21 A. I'm not certain.
22 Q. How many officers --
23 A. I think it's -- I think for the DEA
24 task force, I think it's one. Could be two.
25 Q. How many Akron police officers are

17 (Pages 62 - 65)

Page 66

1  assigned to the FBI task force?
2      A.    That is two.
3      Q.    How many Akron police officers are
4  assigned to the Summit County drug unit?
5      A.    I don't know for sure.
6      Q.    Do you have any idea?
7      A.    That's one or two.
8      Q.    And then how many Akron police
9  officers are assigned to the ATF task force?
10     A.    They're not -- I mentioned,
11  they're -- it's not -- they're not assigned
12  with a task force with the ATF.  It's kind of
13  our group and their group working together.
14     Q.    Who pays for those officers when
15  they're assigned to the task force?
16     A.    We pay for the officers.
17     Q.    Does the APD -- does the Akron
18  Police Department -- sorry -- contribute any
19  other funding to the task forces that you've
20  mentioned?
21     A.    They are housed in our facility.
22     Q.    Any staff, other than police
23  officers, contributed to the task force by the
24  Akron Police Department?
25          MR. LEDLIE:  Object to the form of

Page 67

1  the question.
2      A.    We have a full-time secretary in
3  our antiviolence bureau that does work for
4  officers in -- I would imagine there's some
5  overlap with her responsibilities, but nobody
6  else assigned full-time.
7      Q.    And other than housing them in the
8  facility and contributing officers, is there
9  any other financial support coming from the
10  Akron Police Department to the task forces that
11  you mentioned?
12     A.    I'm not certain.  I know obviously
13  we have equipment costs and we have other --
14  other management costs that are connected, but
15  I know that the -- the task forces will have
16  much greater accessibility to funding for
17  overtime and for special assignments, and we
18  take advantage of that.  That's what they --
19  they -- they contribute those things.
20     Q.    They bring that funding --
21     A.    Right.
22     Q.    -- to you, right?
23     A.    They bring funding and people and
24  oftentimes technology or equipment that we
25  would not be able to afford.

Page 68

1      Q.    You said that there would be
2  equipment and management support going from the
3  Akron Police Department to the task forces.
4  About how much money are we talking about
5  there?
6      A.    I have no idea.
7      Q.    Can you give me any idea what
8  you're talking about there?
9      A.    I don't know specifically how that
10  breakup is done, so that would -- if it would
11  be, you know, our radios, vehicles, weapons,
12  trainings.  I'm not certain how all of that --
13  all that works or all of it's funded.
14     Q.    The task forces -- the FBI doesn't
15  use your vehicles, right?
16          MR. LEDLIE:  Object to the form of
17  the question.
18     A.    No, I don't believe that the FBI
19  uses our vehicles.
20     Q.    Or the DEA?
21     A.    No, they would not.
22     Q.    Okay.  So that's -- you're not
23  suggesting that --
24     A.    No, I'm not.  I'm talking about our
25  officers that participate, I don't know if all

Page 69

1  of their equipment is funded by those
2  individual task force to the point where it
3  would go down to all of their equipment and all
4  of their necessities for their -- their work.
5      Q.    You just don't know one way or the
6  other?
7      A.    Right.
8          MR. LEDLIE:  Object to the form of
9  the question.
10     Q.    Who would know?
11     A.    Captain Shearer.
12     Q.    Have you served on the Summit
13  County drug unit personally?
14     A.    No.
15     Q.    You have not?
16     A.    No.
17     Q.    Do you have any regular interaction
18  with them as chief?
19          I'm asking about, like, a weekly
20  meeting or something like that.  Any kind of
21  regular --
22     A.    No.  I have a -- I have a board
23  meeting that I attend.  I'm on the -- the board
24  of directors for the Summit County drug unit,
25  so when my schedule allows, I'll go to that

18 (Pages 66 - 69)

Page 70

1 board meeting, and if I'm not able to, Captain
2 Shearer and Major Leeser would both attend that
3 as well.
4     Q.   How often does that board of
5 directors meet?
6     A.   I think quarterly.
7     Q.   And you're not always able to
8 attend?
9     A.   I'm not always able to attend.
10    Q.   Do you serve in any, or have you
11 served in any, capacity on the Ohio High
12 Intensity Drug Trafficking Area?
13    A.   Yes. I'm on the board.
14    Q.   And is that as chief?
15    A.   Yes.
16    Q.   Were you on the board before you
17 became chief?
18    A.   No.  I attended in his absence at
19 times on a couple of occasions.
20    Q.   And how often does that board meet?
21    A.   I think quarterly.  And then there
22 are special meetings if there's something to
23 vote on or something comes up, they could have
24 special meetings.
25    Q.   Okay.  I have the same question

Page 71

1 about the Northern Ohio Law Enforcement Task
2 Force.
3     A.   I'm -- I'm not on that.
4     Q.   You don't participate in that?
5     A.   No, I don't.
6     Q.   Do you know whether anyone at the
7 Akron Police Department does?
8     A.   I don't know.
9     Q.   Do you participate in any way in
10 the Summit County Opiate Task Force?
11    A.   I don't personally.  There's --
12 there's so many task forces and -- and org
13 groups and other things, so I don't want to say
14 definitively and mess up, you know, with
15 something that I don't have that kind of
16 familiar-- familiarity with.
17         I sat in one time for Mayor
18 Horrigan at one of those task forces.  I
19 believe it's the one that you just mentioned.
20 But I also don't know if that -- that might be
21 one that our narcotics commanders are on that
22 I'm -- I'm just not familiar with.  I've heard
23 of the Summit County Opioid Task Force.
24    Q.   You've heard of it?
25    A.   Yeah, I have.

Page 72

1     Q.   You just don't know specifically --
2     A.   Right.
3     Q.   -- how or when the Akron Police
4 Department participates?
5     A.   Right.
6         MR. LEDLIE:  And you all have done
7 a good job, but we started talking over one
8 another, so --
9         THE WITNESS:  Okay.
10        MR. LEDLIE:  -- please wait until
11 she finishes, and she'll wait until you finish
12 your answer.
13    Q.   Have you or do you participate in
14 any capacity in the U.S. attorney's heroin and
15 opioid task force?
16    A.   I do not.
17    Q.   Do you know whether anyone at the
18 Akron Police Department does?
19    A.   I don't know.
20    Q.   You don't know?
21    A.   (Witness shaking head.)
22        MR. LEDLIE:  Let's take a break.
23        MS. SAULINO:  Oh, time flies.  Yes,
24 we can take a break.
25        THE VIDEOGRAPHER:  Going off the

Page 73

1 record at 10:07 a.m.
2         (A recess was taken.)
3         THE VIDEOGRAPHER:  Back on the
4 record at 10:24 a.m.
5         - - - - -
6         (Thereupon, Deposition Exhibit 1,
7         8/30/2016 E-Mail from Michael
8         Shearer Re: TFO Assignments,
9         AKRON_001127849, was marked for
10        purposes of identification.)
11        - - - - -
12 BY MS. SAULINO:
13    Q.   Chief Ball, the court reporter has
14 just handed you what has been marked as
15 Exhibit 1.
16        MS. SAULINO:  We're starting at 1,
17 right?
18    Q.   Yes, Exhibit 1.
19        This is an e-mail chain from August
20 of 2016, and you are on the top e-mail in the
21 chain as a CC.  Do you see that?
22    A.   Yes, I do.
23    Q.   Do you recognize this e-mail?
24    A.   I don't recall it.  I
25 obviously know what it is.

19 (Pages 70 - 73)

Page 74

1    Q.    Okay.  So it says here -- so this
2  is Michael Shearer, who I believe you mentioned
3  earlier, right.
4    A.    Yes.
5    Q.    What was his position in 2016?
6    A.    Mike is the captain in charge of
7  our antiviolence bureau, and so he oversees
8  narcotics, street narcotics, and gangs.
9    Q.    And was he in 2016?
10   A.    Yes.
11   Q.    And, at the time, you were deputy
12 chief?
13   A.    Yes.
14   Q.    And what was Charles Brown's
15 position at the time?
16   A.    I don't know if -- I don't know
17 what his position could have been.  There was a
18 period of time where he was an assistant chief
19 of police, and then his current assignment, I
20 believe that -- I don't know when he
21 transitioned.
22   Q.    Okay.  And you see that Mr. -- so
23 Captain Shearer says, "Charles, I have 10
24 people assigned as TFO to other organizations."
25       Do you understand what TFO is?

Page 75

1    A.    Yes.
2    Q.    What does it mean?
3    A.    Task force officer.
4    Q.    Okay.  And then you see there's a
5  list of 10 names, and after them, agencies or
6  units, right?
7    A.    Right.
8    Q.    Now, I believe that you mentioned
9  Officer Leonard earlier.
10   A.    Yes.
11   Q.    How long has Officer Leonard been
12 assigned as a task force officer to the DEA?
13   A.    A long time.  I -- I don't know
14 when he first went.  It's definitely over 15
15 years.
16       THE VIDEOGRAPHER:  Excuse me.  I'm
17 sorry.  Can I please have you clip your
18 microphone on?
19       THE WITNESS:  Oh, I'm sorry.
20       THE VIDEOGRAPHER:  Thank you.
21   Q.    So more than 15 years you think?
22   A.    Probably more.  I think more than
23 20 years.
24   Q.    All right.  And do you know what
25 his responsibilities are?

Page 76

1    A.    He does -- he does prescription
2  medication investigations.
3    Q.    And do you know how he does his
4  job?
5    A.    Not entirely.  I mean, I know that
6  he works with that task force, and they use
7  databases that are generated now by the -- I
8  think it's the state or the federal government
9  that -- that requires those databases to be
10 maintained, and they look for irregularities in
11 prescribing or dispensing of prescription
12 medicines.
13   Q.    How did you come to that
14 understanding?
15   A.    Just -- just I guess through common
16 office exposures or department conversations
17 over the years.
18   Q.    Any specific conversations with
19 Officer Leonard?
20   A.    I don't think I've ever had a
21 specific conversation with him about his job
22 duties.
23   Q.    And as a task force officer, is he
24 still in your chain of reporting?
25   A.    Yes.

Page 77

1    Q.    Okay.  Does he also report to
2  someone at the DEA?
3    A.    Yes.
4    Q.    And do you know who that is?
5    A.    I don't.
6    Q.    Do you or does anyone who is in the
7  Akron Police Department give Officer Leonard
8  his assignments?
9    A.    I don't believe so.  I mean, there
10 could an occasion -- and Captain Shearer would
11 be better to speak to this -- where there might
12 be something, a complaint or some information
13 that would come in that Captain Shearer would
14 communicate with the supervisor of that task
15 force or through Pat Leonard to the supervisors
16 of that task force that might direct their work
17 specifically, but I'm not familiar or I'm
18 not -- you know, I don't have firsthand
19 knowledge of exactly the way that that would
20 work.
21   Q.    And you don't know specifically
22 whether that ever has happened, right?
23   A.    I don't know specifically.  My
24 expectation previously, if I was the deputy
25 chief in the investigative subdivision, when I

20 (Pages 74 - 77)

Page 78

1 was, if I would have gone to Mike Shearer and
2 said I'm getting this -- I'm getting this
3 information or the Akron Police Department has
4 got a tip or, you know, through reports or
5 follow-up that an officer had had on a -- on a
6 call for service, that this information came
7 in, can you have them look at it, I would -- my
8 expectation would be that the unit would -- I
9 don't know exactly how they would prioritize
10 that, but they would respond to my -- to my
11 request or my direct.
12      Q.   Did you ever make that kind of
13 request to Captain Shearer?
14      A.   No.
15      Q.   Do you know whether the current
16 deputy chief has ever made such a request to
17 Captain Shearer?
18      A.   I don't know.
19      Q.   All right. Mike Gilbride?
20      A.   Yes.
21      Q.   How long has he been assigned to
22 the DEA?
23      A.   I don't know.
24      Q.   Is he still?
25      A.   Yes.

Page 79

1      Q.   And do you know what his duties
2 are?
3      A.   He works -- Pat works
4 prescriptions, and I believe that Mike works on
5 other narcotics cases.
6      Q.   Rafe Caprez?
7      A.   Rafe Caprez is retired.
8      Q.   He is now retired?
9      A.   Yes.
10      Q.   When did that happen; do you know?
11      A.   I don't know specifically. Maybe a
12 couple years.
13      Q.   Sometime since August of 2016?
14      A.   Yeah.
15      Q.   And do you know whether he was
16 replaced?
17      A.   I don't know if he was replaced.
18          I know that our narcotics unit is
19 short, and it's always an -- an item of
20 contention and frustration, but we're short all
21 over the department, so.
22      Q.   Jim Palmer?
23      A.   Jim Palmer is retired.
24      Q.   Was he replaced, that you know of?
25      A.   I believe he was. I don't know for

Page 80

1 sure.
2      Q.   Do you know who currently is
3 assigned to the Summit County drug unit from
4 the Akron Police --
5      A.   I know that Jim -- I know that
6 Palmer was replaced on the Summit County drug
7 unit. I don't know then if that subsequent
8 vacancy in narcotics would have been filled.
9          Because we'll take somebody from
10 our narcotics division, they get experience,
11 they show proficiencies, build good
12 relationships, and when a vacancy comes up on
13 one of our task forces, one of the -- one of
14 the officers assigned to our narcotics division
15 will move into those task forces. We don't bid
16 it or fill it from outside of narcotics or
17 antiviolence unit. And then we'll fill that
18 subsequent vacancy that comes up in narcotics
19 if we have the staffing to be able to do that.
20          So I know that Jim Palmer's
21 assignment on Summit County drug unit, that was
22 filled. I don't know if his subsequent vacancy
23 in narcotics was filled.
24      Q.   All right. Now, Paul Siegferth?
25      A.   Paul Siegferth is no longer

Page 81

1 assigned to the U.S. Marshals task force.
2      Q.   And do you know what that acronym
3 stands for after U.S. Marshals?
4      A.   Northern Ohio -- Northern Ohio
5 Violent Fugitive Task Force. I'm surprised, I
6 mean, because I'm not very good at all the
7 letters.
8      Q.   All right. Shawn Brown, it says
9 FBI.
10      A.   Yes.
11      Q.   Is he still assigned to the FBI?
12      A.   Yes, he is.
13      Q.   And do you know how long he has
14 been assigned to the FBI?
15      A.   No, I don't. It's been a long
16 time.
17      Q.   Do you know what his duties are?
18      A.   He were -- is an investigative team
19 member for the FBI Safe Streets Task Force.
20      Q.   Safe Streets?
21      A.   Yes.
22      Q.   What does that mean?
23      A.   It just is a -- they give these
24 names -- the federal government typically gives
25 these names to -- and they'll run that program,

21 (Pages 78 - 81)

Page 82

1  and so when they do grant applications and they
2  get their funding, they use those -- they use
3  that name.
4      Q.  Do you know, though, what his
5  day-to-day job entails?
6      A.  Yeah, he was just an investigative
7  team member.  He will -- I don't know if -- if
8  they -- if they do case adoptions or if -- if
9  they -- they're responsible for their own
10 sources and for their own initiation of cases.
11 I'm not certain how that works with that task
12 force.
13     Q.  Do you know whether he has specific
14 responsibilities related to opioids?
15     A.  I do not.
16     Q.  Or any kind of drugs?
17     A.  I do not know specifically.
18     Q.  Sergeant Woodill?
19     A.  Sergeant Woodill, yes.
20     Q.  Is he still with the -- is he still
21 assigned to the FBI?
22     A.  Yes.
23     Q.  Do you know --
24     A.  This is a -- Sergeant Woodill,
25 Keith Meadows, Mark Hockman, Rick Wallace were

Page 83

1  all members of our gang unit.  The gang unit
2  was not able to be fully staffed, and so
3  there's been kind of a -- morphing with the
4  Federal -- the FBI's gang unit.
5          And I know that Keith Meadows now
6  works with Shawn Brown, and those two have
7  similar responsibilities on the task force.  I
8  think that Woodill, Hockman, and Wallace work
9  separately and have different responsibilities.
10     Q.  Related to gangs?
11     A.  Yes.
12     Q.  Seeing this list now, does this
13 refresh your recollection at all as to whether
14 there were any other officers assigned to task
15 forces?
16     A.  Yeah.  And I -- I do think that
17 Bryan Callahan may have been the officer that
18 replaced Jim Palmer in the Summit County drug
19 unit.  I mean, I don't -- 440 people, I don't
20 have recollection at all times about where
21 everybody is assigned in the department, but I
22 know that -- I know that Bryan Callahan had
23 been in narcotics, and I believe that he filled
24 the position vacated by Jim Palmer.
25     Q.  Any other names come to mind for

Page 84

1  any other task force members?
2      A.  No.  Captain Shearer would be the
3  one that would have an intimate knowledge and
4  clear understanding of what those duties are
5  and how they interact with -- or what they do
6  on a daily basis and then how they interact
7  with the police department if we have requests
8  and --
9      Q.  So Captain Shearer would be the one
10 to ask?
11     A.  Yeah.
12     Q.  All right.  I'd like to ask you
13 just a few questions about your career in law
14 enforcement.
15          Have you ever been sued as an
16 officer?
17     A.  (Witness nodding head.)
18     Q.  Yes?
19     A.  Yes.
20     Q.  What kind of a case?
21     A.  I had not been until became --
22 until I became chief of police, and now I've
23 been sued two or three times in the last year
24 because I'm attached now to -- to those
25 lawsuits.

Page 85

1          So personally, no, I had never -- I
2  had never been sued during the course of my
3  career, and now I have been.
4      Q.  So let me ask the question a
5  different way.  For any -- for any job
6  performance reasons --
7      A.  No.
8      Q.  -- were you ever sued?
9          But now, in your capacity as chief,
10 you have been; is that right?
11     A.  Correct.
12     Q.  Okay.  And have you ever been
13 disciplined?
14     A.  I've -- I don't remember if it was
15 a discipline or not.  I think I had a -- one
16 sustained complaint in my career.  That was not
17 filling out a citation on a traffic accident
18 that I reported on.
19          I may have been -- I may have lost
20 four hours for a missed court case on one
21 occasion.  I don't even know if that happens,
22 but I would -- I know that those are probably
23 the only two occasions that I've ever had to
24 respond on, potentially, a disciplinary matter.
25     Q.  Okay.  That's it?

22 (Pages 82 - 85)

Page 86

1    A.   Yeah.
2    Q.   Okay.  In your career in law
3 enforcement, have you developed an
4 understanding of what opioid drugs are?
5    A.   Somewhat, yes.
6    Q.   Okay.  And what about the
7 difference between opioid drugs and non-opioid
8 drugs?
9    A.   Certainly not an expert.
10    Q.   That's fair enough.  What is your
11 understanding of which drugs are opioids?
12    A.   You want a list?
13    Q.   Yes.
14    A.   OxyContin, all the -- the
15 painkillers, oxycodone, morphine.  You know,
16 there's a lot of different versions that are
17 similar -- similar drugs from individual
18 manufacturers that I'm not real -- not real
19 familiar with.  Percocet, Vicodin, heroin,
20 Fentanyl, carfentanil.  And I know there's
21 plenty more, but I haven't studied it or
22 anything.
23    Q.   Okay.  You would agree with me that
24 cocaine is not an opioid?
25    A.   No.  I mean, no, I don't believe it

Page 87

1 is.  No, I'm not disagreeing with you.
2    Q.   What about marijuana?
3    A.   It is not.
4    Q.   Xanax?
5    A.   Don't know for sure.  Don't believe
6 that it is.
7    Q.   Adderall?
8    A.   No.
9    Q.   It is not?
10    A.   It is not.
11    Q.   Benzodiazepines?
12    A.   Is not.
13    Q.   What about meth?
14    A.   Is not.
15    Q.   You understand that only some
16 opioids can be prescribed, right?
17    A.   Yes.
18    Q.   So there's only a segment of
19 opioids that are prescription opioids, right?
20    A.   Right.
21    Q.   And you understand that
22 prescription opioids include things like
23 Vicodin, right?
24    A.   Yes.
25    Q.   Percocet?

Page 88

1    A.   Yes.
2    Q.   And OxyContin?
3    A.   Yes.
4    Q.   Okay.  And you would agree with me
5 that non-prescription opioids include illegal
6 street drugs like heroin, right?
7    A.   Correct.
8        MR. LEDLIE:  Object to the form of
9 the question.
10    Q.   And Fentanyl?
11    A.   Yes.
12    Q.   And carfentanil?
13    A.   I thought Fentanyl had a legal --
14 but carfentanil, yeah.
15    Q.   Okay.  Fair enough.  Fentanyl can
16 have prescription, but it is -- it also can
17 have a --
18    A.   And carfentanil, just not for
19 humans.
20    Q.   Okay.  But Fentanyl can also have
21 an illegal street version, correct?
22    A.   We've seen that.
23    Q.   Yes.  And the basis for your
24 knowledge is your work as a police officer?
25    A.   Some of it, I think, and then some

Page 89

1 of it is familiarity that I -- that I would
2 have from reading the complaint and reading
3 articles and hearing others speak at times.
4    Q.   You don't have any medical
5 training, right?
6    A.   No, I don't.
7    Q.   Any personal experience with any of
8 the opioids?
9    A.   No.  I'm -- I'm -- I've been
10 prescribed a painkiller in my life.  I've got,
11 you know, a close friend, who's a pastor, whose
12 ministry was -- there was a significant
13 overlap, and part of his -- part of his calling
14 and -- was to help those who were addicted to
15 opiates in their recovery and their path toward
16 wholeness or health after that.  So I've got,
17 you know, that exposure, which is pretty
18 personal.  But I haven't had beyond that.
19    Q.   Okay.  So you would agree with me
20 that prescription opioids do have lawful uses,
21 right?
22    A.   Yes.
23    Q.   And non-prescription opioids have
24 no recognized lawful uses, right?
25    A.   Sure.

23 (Pages 86 - 89)

1      MR. LEDLIE:  Object to the form of
2  the question.
3      You can answer it.
4      A.   Sure.
5      Q.   They're illegal, right?
6      A.   Right.
7      Q.   And so there are real differences
8  between prescription and non-prescription
9  opioids, right?
10      MR. LEDLIE:  Object to the form of
11  the question.
12      A.   Right.
13      Q.   Other than the fact that they are
14  prescription or non-prescription, do you have
15  any understanding of why some opioids can be
16  prescribed?
17      A.   Yes.
18      Q.   What is your understanding?
19      A.   Pain management.
20      Q.   Let me -- let me be more clear.  Do
21  you have any understanding of the difference
22  between the two as why can -- some can be
23  described -- prescribed and why some cannot?
24      MR. LEDLIE:  Object to the form of
25  the question.

1      A.   No, I don't.
2      Q.   You understand that the FDA
3  approves prescription opioids?
4      A.   Yes.
5      Q.   And has determined that those
6  prescription opioids have medical benefits that
7  outweigh the risks in certain cases?
8      MR. LEDLIE:  Object to the form of
9  the question.
10      A.   Yes.
11      Q.   And you understand that the DEA has
12  determined that prescription opioids should be
13  obtainable through a prescription?
14      MR. LEDLIE:  Object to the form of
15  the question.
16      A.   I don't know that.  That the DEA --
17      Q.   Allows prescription opioids to be
18  prescribed.
19      A.   Sure.
20      Q.   You have mentioned abuse of opioids
21  today, including prescription opioids.  When
22  did you come to an understanding that
23  prescription opioids could be abused?
24      A.   I would say the -- probably the
25  first exposure was when I learned about

1  OxyContin.  I had never heard of it.  And I
2  believe when I was a sergeant on midnights in
3  the late '90s is when we -- I started to see an
4  influx of reports.  And those would be for the
5  theft of OxyContin.  And we had a series of
6  break-ins at local pharmacies, and OxyContin
7  was the drug that was being targeted in those
8  breaks-ins.  And so hearing it and becoming
9  familiar with that term, probably at that point
10  in time, late -- late '90s.
11      Q.   Are you aware that Akron ambulances
12  carry opioids today?
13      A.   I think that would make sense, if I
14  worked my way logically through it, that they
15  would carry them.
16      Q.   Why would that make sense?
17      A.   Because of the pain.  They've used
18  it -- using opioids in -- you know, for like
19  morphine, you'll see a movie where the medic
20  calls for morphine, and so I would imagine that
21  there's a similarity.
22      Q.   So it wouldn't surprise you to know
23  that that was true, right?
24      A.   No.  Right.
25      Q.   Because there are lawful and

1  necessary uses of opioids for pain, right?
2      A.   Right, as we discussed, yeah.
3      Q.   In the complaint that you read, and
4  in other documents that Akron has produced to
5  the Defendants in this action, there are
6  references to an opioid epidemic and an opioid
7  crisis.
8      Are you familiar with those terms?
9      A.   Yes.
10      Q.   And what do they mean to you?
11      A.   It means that there's been a
12  tremendous negative impact on our community.
13  And it's much broader than Akron.  It's pretty
14  much been in the entire United States where
15  addiction has increased dramatically, and the
16  effects of addiction are impacting communities
17  in so many different ways.  And, you know, the
18  most telling are those that -- overdose deaths
19  and the overdoses, and the demand on all
20  services to address those growing issues.
21      Q.   And you would agree with me that
22  those terms "opioid epidemic" and "opioid
23  crisis" refer to all opioids, including the
24  non-prescription, illegal kind, right?
25      A.   Yes.

24 (Pages 90 - 93)

Page 94

1        MR. LEDLIE:  Object to the form of
2  the question.
3        Q.    When did the epidemic begin in
4  Akron?
5        MR. LEDLIE:  Object to the form of
6  the question.
7        A.    I'm not -- I'm not certain that
8  somebody could quantify.  I know for us -- I
9  don't know for certain.  At that point in time,
10  I was patrol commander, so I didn't have the --
11  the same kind of access or wasn't involved in
12  the meetings that were describing it.
13        I do know that under the former
14  chief, there started to -- to be much more talk
15  about it.  It was a growing problem.  We
16  started to see more overdoses, we started to
17  see a significant number of deaths, and so the
18  department began to respond to that, figure out
19  ways that we could respond to it.
20        Probably in 2014, maybe.  I don't
21  know if those conversations started before
22  that.  I don't know when that -- when that
23  would have been, but I wouldn't be able to
24  quantify when an epidemic or -- started.
25        Q.    And what makes you say 2014?

Page 95

1        A.    I think 2014 may have been the year
2  that we first had committed resources for
3  overdose death investigations.
4        Q.    But as far as you know, there could
5  have been discussions before that?
6        A.    There could have been.
7        Q.    In 2014, you were not in a
8  position -- in a position that had specific
9  responsibility for opioid-related crimes --
10        A.    Right.
11        Q.    -- or incidences?
12        A.    That's correct.  And I also would
13  not have been in the executive meetings where
14  those kind of issues were discussed or decided.
15        Q.    You said you started to see a
16  significant number of deaths, you think, in
17  2014?
18        MR. LEDLIE:  Object to the form
19  of -- I'm sorry.  Object to the form of the
20  question.  Misstates testimony.
21        You can answer the question.
22        A.    Yes, I know that it was at least
23  2014.  I don't know about prior to that exactly
24  how -- how it had expressed and if it -- if the
25  numbers were starting to grow and cause

Page 96

1  concerns.
2        Q.    So it could have been earlier?
3        A.    It could have been.
4        Q.    And do you know whether there was
5  any particular incident that happened in 2014
6  that caused you to notice?
7        A.    Not anything that caused me to
8  notice personally.  I don't know what would
9  have happened to cause the department to
10  notice.
11        Q.    Do you recall when Fentanyl and
12  carfentanil became an issue in Akron?
13        A.    I remember when carfentanil did.
14        Q.    When was that?
15        A.    It was July 2016.
16        Q.    What do you have there in front of
17  you?
18        A.    I have a report that's generated
19  that keeps track of our numbers for overdoses
20  and overdose deaths.
21        And I have familiarity because this
22  spike has shown up on our report for, you know,
23  as long as I've been keeping track of this.
24        Q.    And is that a report that you
25  generated?

Page 97

1        A.    It's sent out by our planning and
2  research unit every single day.
3        Q.    So you get -- the -- the report
4  that you have in front of you is today's
5  report?
6        A.    This is from -- this is end of
7  month October 31, 2018.  It just is a
8  running -- you know, keeps the running totals.
9        Q.    Okay.  Could we mark that?  Will
10  you be able to get another one so that we're
11  not taking it away from you?
12        A.    Yeah.  I'm sure that we've gotten
13  these to you previously.  It just is a report
14  that's generated every day.  I happen to carry
15  the one that is most -- most current, but all
16  the historic information would be the same on
17  what we would put out.
18        Q.    Okay.  Can we mark this one?
19        A.    That's fine.
20        Q.    Okay.  I just wanted to make sure
21  that you had access to be able to print out
22  another one.  I don't want to keep you from
23  doing your job.
24        A.    No.
25        Q.    Okay.

Page 98

1    MR. LEDLIE: I didn't give that to
2 him, so he's got it somewhere else.
3    MS. SAULINO: Okay.
4    - - - - -
5    (Thereupon, Deposition Exhibit 2,
6    Document Titled "Overdose
7    Information Between January 1st,
8    2016 at 0000 hrs - June 3rd, 2018 at
9    2359 hrs", was marked for purposes
10    of identification.)
11    - - - - -
12    A.    So the answer would go back to July
13 of 2016.
14    Q.    Okay. And so you have in front of
15 you now Exhibit 2, which is the data that you
16 brought with you; is that right?
17    A.    Yes.
18    Q.    Okay. Did you bring anything else
19 with you?
20    A.    I have a copy of the subpoena.
21    MR. LEDLIE: Notice.
22    A.    Or the -- and there's a couple of
23 other -- this is a report that just has some of
24 the totals from 2016, 2017. It's another
25 running one, but I hadn't replaced this one

Page 99

1 recently, but it just was basically the yearly
2 totals for overdoses and overdose deaths.
3    Q.    Okay. Can we mark this one, too?
4    A.    Uh-huh.
5    Q.    Is that okay?
6    MR. LEDLIE: That's fine.
7    - - - - -
8    (Thereupon, Deposition Exhibit 3,
9    Document Titled "Overdose Totals -
10    Between 1/1/2016 Through Yesterday
11    at 2359 Hours", was marked for
12    purposes of identification.)
13    - - - - -
14    Q.    Okay. Anything else you have in
15 your stack there?
16    A.    Well, I -- this was accidentally --
17 this was a part of the packet that I carry with
18 me. This was just information about State
19 Issue 1, which was a ballot initiative
20 yesterday in the state of Ohio, so these were
21 some of the talking points for Issue 1.
22    Q.    What was Issue 1 about?
23    A.    Issue 1 was a -- was a State of
24 Ohio constitutional change that would alter
25 current sentencing for drug violations, and it

Page 100

1 was preferring drug treatment funding rather
2 than incarceration, and it would use monies
3 from reduced sentences for -- they were
4 unfunded, but they were going to -- they were
5 suggesting that money be used -- instead of
6 housing prisoners, that they be used for
7 treatment programs.
8    Q.    And this was something the Akron
9 Police Department supported?
10    A.    No.
11    Q.    No, okay.
12    A.    No.
13    Q.    So your talking points were against
14 Issue 1?
15    A.    Yes, it was.
16    Q.    Can I see your talking points?
17    Thank you.
18    A.    The issue took decision-making out
19 of the hands of prosecutors and judges and
20 mandated the way that persons will be treated
21 for offenses.
22    It would change all drug offenses
23 where there were less than 19 grams of an
24 illegal drug that were possessed to misdemeanor
25 charges, which basically would have created

Page 101

1 hundreds of more drug dealers because they
2 would have parsed out their amounts to, more
3 than likely, juveniles, who would have always
4 carried less than 19 grams, knowing that a
5 misdemeanor conviction with no -- no mandatory
6 sentencing would have been a pathway to even
7 greater drug usage. Much, much greater than
8 what we see now.
9    And it would have been a
10 constitutional change, which would have made it
11 very, very difficult to adjust if the policies
12 of that issue were not having the intended
13 impacts.
14    There was also a lot of mandates in
15 there that were unfunded that would have been
16 overwhelming to municipalities, especially our
17 municipality.
18    MS. SAULINO: Can we mark this, or
19 make a copy of it and mark it?
20    MR. LEDLIE: Let me just take a
21 look at that for one second.
22    MS. SAULINO: Yeah. If you read
23 the fact at the bottom, you'll see that it is,
24 in fact, relevant.
25    Q.    Do you need to keep a copy of that,

26 (Pages 98 - 101)

1 Chief Ball?

2    A.    Yes.

3    Q.    Okay.

4         MR. LEDLIE:  I don't know whether
5 this -- I don't know who the Prosecuting
6 Attorneys Ohio Association is and whether this
7 may be a attorney communication, and so I think
8 it's going to be subject to callback until I
9 can confirm that.

10   Q.    These are talking points that you
11 received in order to provide your opinions
12 about the issue?

13   A.    This -- I received those at -- at a
14 luncheon for -- not a luncheon, but a monthly
15 meeting that we have for Summit County chiefs
16 of police.  And I believe that there was a
17 Summit County judge that talked at that
18 particular meeting and had those talking
19 points.

20        MS. SAULINO:  If it was a judge
21 then it wouldn't be privileged.

22        MR. LEDLIE:  Do you know if it was
23 the judge that gave it to you?  Were there
24 attorneys there as well for the organization?

25        THE WITNESS:  I don't know.

1         MR. LEDLIE:  I just need to do some
2 due diligence on this.  I don't know where it
3 came from.

4         MS. SAULINO:  Sure.

5    Q.    The judge had access to this
6 document as well, right --

7         MR. LEDLIE:  Object to the form
8 of --

9    Q.    -- at the -- at the lunch?

10        MR. LEDLIE:  -- the question.

11   A.    I don't -- you know what?  And I'm
12 not -- it could have been sent out by the
13 prosecutor by e-mail.  I don't even -- it was
14 one of those two occasions that I received
15 that.

16   Q.    Sure.  It's got a red border around
17 it, right?

18   A.    Yes, it does.

19   Q.    Do you usually print your e-mails
20 in color?

21        MR. LEDLIE:  Object to the form of
22 the question.

23   A.    No.

24   Q.    Okay.  So it probably was a handout
25 that you received?

1    A.    That's likely.

2         MS. SAULINO:  Okay.  Are you going
3 to let me ask questions about it?

4         MR. LEDLIE:  Not until I determine
5 whether or not it's privileged.

6         MS. SAULINO:  Okay.  Can you do
7 that during the day today?

8         MR. LEDLIE:  I will make an attempt
9 to reach the Ohio Prosecuting Attorneys
10 Association.  There's a number on here.

11        MS. SAULINO:  Or you can
12 talk to your witness further about who was at
13 that lunch.  It sounds like it was not a
14 privileged communication.  So it would be
15 easier for everybody if we didn't have to come
16 back to ask questions about it.

17        MR. LEDLIE:  I'm not going to break
18 privilege until I know whether -- until I know
19 more about this.  I didn't understand --

20        MS. SAULINO:  I'm not asking you to
21 break a privilege.  It just doesn't sound in
22 any way privileged.

23        MR. LEDLIE:  Well, I understand
24 that that's your position, and I'll look into
25 it.

1         MS. SAULINO:  Okay.  Well, it would
2 be great if you could do that before the end of
3 the day so we don't all have to come back here.

4         MR. LEDLIE:  I will make an
5 attempt.

6    Q.    All right.  So I was asking you
7 about carfentanil and when that came to your
8 awareness, and you said July of 2016.  I think
9 that was right, right?

10   A.    Yes.

11   Q.    And by the way, if you need to --
12 part of the reason I marked those documents is
13 if you need to refer to them, that's totally
14 fine.  Just tell us which exhibit you're
15 referring to so that we're all on the same
16 page, so to speak.

17   A.    Okay.

18   Q.    Is that fair?

19   A.    Yes.

20   Q.    Okay.  And you were referring to a
21 spike that you see in your chart in July of
22 2016, right?

23   A.    Yes.

24   Q.    Do you actually recall what
25 happened that month, from your time as a police

27 (Pages 102 - 105)

1 officer?

2    A.   I mean, I -- I do.  The -- it was
3 very dramatic because of the significant
4 increase that -- that happened then.

5    Q.   What do you remember about it?

6    A.   Just it was shocking.

7    Q.   A lot of people died, right?

8    A.   Yes.  We had 33 people die that
9 month.

10    Q.   Did you personally have any calls
11 where you were involved?

12    A.   No.  I don't -- I don't go to calls
13 for service.  There was one occasion where I
14 went past a call because I heard it go out and
15 I was in proximity.  And there were two people
16 on that occasion that had died of overdose
17 deaths, and there was a third person that was
18 trapped under one of the bodies for multiple
19 days because she was unable to extricate
20 herself.

21       So that was a call that I happened
22 to stop by that -- but I'm not saying that that
23 was in July of 2016.  I don't know when that
24 was.  But I don't normally -- I don't respond
25 to calls for service.

1    Q.   And what basically does that chart
2 show that you're looking at in Exhibit -- 2?

3    A.   2.  It just shows the running
4 numbers of overdoses and overdose deaths for
5 that -- that particular month on the bottom of
6 it.  On the top of it is the historical
7 reference that goes back month by month to the
8 beginning of 2016.

9    Q.   Is it particular to any particular
10 type of drug?

11    A.   No.

12    Q.   Or all overdose deaths?

13    A.   It's overdose deaths.

14    Q.   Okay.  And so that's something that
15 you, as a department, track and send out daily?

16    A.   Yes.

17    Q.   Do you also receive any kind of
18 breakdown for any particular type of drug?

19    A.   No.

20    Q.   Now, you testified earlier that you
21 noticed in the late '90s that there was an
22 uptick in crimes related to OxyContin, right?

23    A.   Yes.

24    Q.   Okay.  So you'd agree with me that
25 certainly opioid problems had been going on in

1 Akron before 2014, right?

2       MR. LEDLIE:  Object to the form of
3 the question.

4       You can answer.

5    A.   Yeah, I think that's accurate.

6    Q.   And you mentioned earlier that you
7 thought there was a prescription form of
8 Fentanyl, right?

9    A.   Yes.

10    Q.   But you agreed with me that there
11 is also an illicit -- an illicit form of
12 Fentanyl, right?

13    A.   Correct.

14    Q.   And do you have an understanding of
15 whether the Fentanyl problems in Akron are
16 caused by the illicit form or the prescription
17 form?

18       MR. LEDLIE:  Object to the form of
19 the question.

20    A.   I don't know.  I mean, I am aware
21 of situations where the illegal forms of
22 Fentanyl have been a -- have been targeted by
23 investigators or arrests that we've made,
24 seizures that we've made, and I'm less familiar
25 with the prescription side of that, because

1 that specifically is the work of Detective
2 Leonard.

3    Q.   Well, you certainly would agree
4 with me, wouldn't you, that non-prescription
5 opioids are a key contributor to what you might
6 call the opioid epidemic?

7    A.   That's accurate.

8    Q.   Can you estimate what percent of
9 opioid problems in Akron relate to
10 non-prescription opioids as opposed to
11 prescription opioids?

12    A.   No.

13       MR. LEDLIE:  Object to the form of
14 the question.

15    A.   I wouldn't be able to estimate.

16       - - - - -

17       (Thereupon, Deposition Exhibit 4,
18       July 2016 E-Mail Chain Re: Did I
19       Miss A Release?, AKRON_000325781 to
20       000325784, was marked for purposes
21       of identification.)

22       - - - - -

23    Q.   Chief Ball, the court reporter has
24 just handed you what has been marked as
25 Exhibit 4.

28 (Pages 106 - 109)

Page 110

1    And this is an e-mail chain, which
2 you are not on, although it includes an article
3 in which you are quoted, I believe, when you
4 were a major.  And this is from July of 2016.
5 And I believe that this is the period of time
6 that you and I were discussing a moment ago
7 when carfentanil became a real problem.
8    A.   Uh-huh.
9    Q.   If you take a look at the article,
10 do you recall this article or this interview?
11    A.   Can I read -- can I read through
12 it?
13    Q.   Sure.  Yeah.  The e-mails are just
14 forwarding the article.
15    A.   Okay.
16    Q.   It's really the article that I'm
17 asking you about.
18    I really just want to ask you about
19 your quote that's about two-thirds of the way
20 down the page on that last page you're looking
21 at.  Do you see that?
22    A.   Yes, I do.  I'm right there right
23 now.  Okay.
24    Q.   Okay.  You were quoted as having
25 said that the police department is putting more

Page 111

1 resources in a short amount of time into the
2 investigation than any other situation that you
3 can recall, right?
4    A.   Right.
5    Q.   And this is in reference to what
6 the article is calling overdoses in -- 91
7 overdoses reported in Akron and attributing
8 them to carfentanil, right?
9    A.   Yes.
10    Q.   And the article says that
11 carfentanil is 10,000 times more pow- -- more
12 potent than morphine, right?
13    A.   That's what it says.
14    Q.   Okay.  Would you agree with that?
15    A.   That's what I've heard.
16    Q.   And when you say that the
17 department was putting more resources in a
18 short of -- amount of time into the
19 investigation, what did you mean?
20    A.   We diverted narcotics resources,
21 street narcotics resources, to these very
22 specific investigations that were related to
23 the carfentanil.  We also -- like,
24 reassignments within the police department for
25 temporary, which is the only thing that's

Page 112

1 allowable by our contract.  So we temporarily
2 reassigned some members within the -- in police
3 department to a -- to a team to work on the
4 problem, which is unusual, because, you know,
5 it's so difficult to move people around for us.
6    Q.   Okay.  And did you have a personal
7 role?
8    A.   I was familiar with the
9 decision-making that was going on, so I would
10 have been involved in those -- in those
11 meetings.  Jim Nice was, I would say, directing
12 the efforts at that time, the chief of police.
13 Probably assigned some of those
14 responsibilities to a subordinate employee, but
15 that's what I've been -- what I -- that's what
16 I would have been referencing here.
17    Q.   Okay.  But what was your personal
18 role in this July 2016 reallocation of
19 resources?
20    A.   I wouldn't have had a major role in
21 that.  I would have been familiar with the
22 process and if there -- I would imagine -- and
23 I don't even recall specifically, but typically
24 we would ask for recommendations from patrol
25 commanders.  Are there people that are

Page 113

1 interested?  Are there people that are doing a
2 good job?  Are there people that we can trust
3 to -- to put in this situation and ask for --
4 ask for very important work out of them?  Who
5 would best serve that?
6    So I -- and I don't recall
7 directly, but typically we would be just
8 involved in that decision-making process of
9 will this officer be a good fit?  Will we get
10 great work out of them?  And then deciding -- I
11 would imagine that we would have had
12 conversations about where can we take them
13 from?
14    You know, do we have a balance
15 of -- or do we have in any -- which
16 department -- which unit in the department
17 could be least affected by temporary transfers
18 of officers, so that it made sense,
19 organizationally, if we're taking resources
20 from some other job responsibility, that it was
21 least impacting for the police department.
22    Q.   Okay.  Did you personally have
23 involvement in that?
24    A.   I'm -- I would say I'm sure that I
25 would have.  I don't have specific recollection

29 (Pages 110 - 113)

Page 114

1 of exactly what that looked like or how it
2 worked.
3    Q.    All right.  So --
4    A.    But I know that's the process, and
5 it's very familiar, because we pretty much
6 handle major -- any major personnel issues with
7 this kind of a similar pattern.
8    Q.    And you -- and this major personnel
9 issue had to do with specifically carfentanil,
10 right?
11        MR. LEDLIE:  Object to the form of
12 the question.
13    A.    It had to do with the significant
14 number of overdoses -- spike in overdose
15 numbers and overdose deaths that we were
16 seeing.
17    Q.    In July of 2016?
18    A.    Yes.
19    Q.    Which you now know to have been
20 attributable to carfentanil, right?
21        MR. LEDLIE:  Object to the form of
22 the question.
23    A.    Carfentanil obviously was a factor
24 in that.
25    Q.    A major factor, right?

Page 115

1    A.    I -- I would say that it's safe to
2 say that.
3    Q.    And -- and the article says that
4 you had said that two people had been arrested
5 in connection with some of the recent
6 overdoses?  That was -- that's the next
7 paragraph.
8    A.    Right.
9    Q.    Who were those people?
10    A.    I don't -- I have no idea.
11    Q.    And do you know whether others were
12 arrested?
13    A.    That, I wouldn't be able to recall
14 either. I mean, I'm certain we've made -- you
15 know, we make multiple arrests every single
16 month for -- for -- on drug dealers or -- so I
17 wouldn't have been involved in the process or
18 ever typed a -- typed up an arrest report or
19 anything like that, so I don't have that kind
20 of recall or familiarity.
21    Q.    And you certainly would have
22 investigated more than just two people, right?
23        MR. LEDLIE:  Object to the form of
24 the question.
25    A.    Yeah.  Our investigation wouldn't

Page 116

1 have been limited to -- to two particular
2 people.
3    Q.    Where would we find out who was
4 investigated?
5    A.    Captain Shearer should have that
6 information.
7    Q.    In any particular kind of file?
8    A.    We keep a -- I don't know exactly
9 what his filing system is.  I do know that for
10 overdose deaths, we keep a database, and it
11 shows who the investigating -- who the
12 investigating detective is on a particular
13 case.
14    Q.    Who the detective is.  Does it show
15 who was investigated?
16    A.    It would if there was a suspect
17 that was known.  And it would also show if
18 there was an arrest that had been made.  And it
19 also shows, you know, the name, the age, the
20 other specifics of the victim.
21    Q.    And --
22    A.    Location.
23    Q.    And you'd agree with me, Chief
24 Ball, that there are times when you have a
25 suspect, but you're unable to bring charges

Page 117

1 even though you have great reason to believe
2 that they are the ones responsible, right?
3    A.    That happens.
4    Q.    And so we would be able to find
5 those names as well in the overdose deaths
6 file?
7        MR. LEDLIE:  Object to the form of
8 the question.
9    Q.    If they existed?
10    A.    It would -- it would be documented
11 on that report that I just talked about.
12    Q.    What -- does the report have a
13 name?
14    A.    It's just a database for the -- I
15 don't know if they have a name on it or not.
16 It certainly has a name.  They've got to look
17 it up every time they find it, but I don't -- I
18 don't know the name of the -- the document.
19 It's just the database that we keep on overdose
20 deaths.
21    Q.    And that database is kept by the
22 Akron Police Department?
23    A.    It is.  It's disseminated.  I don't
24 know who all it goes to, but I know that it's
25 gone to me as -- while I was a deputy chief and

30 (Pages 114 - 117)

Page 118

1 a chief, and it's updated whenever there's a
2 death.
3          - - - - -
4          (Thereupon, Deposition Exhibit 5,
5          June 2015 E-Mail Chain Re: Threat
6          and Strategy, with Attached Document
7          "Threat Assessment & Strategy
8          Program Year 2015," AKRON_001139729
9          to 001139787, was marked for
10         purposes of identification.)
11         - - - - -
12    Q.   Chief Ball, the court reporter has
13 just handed you what has been marked as
14 Exhibit 5, which is an e-mail and its
15 attachment.  And we will actually attach them
16 at some point during a break, the attachment to
17 the e-mail.
18         And this is an e-mail from a Derek
19 Siegle on Friday, June 12, 2015, that was then
20 forwarded by James Nice, and you were one of
21 the people on the CC line on June 23rd of 2015.
22 Do you see that?
23    A.   Yes.
24    Q.   Okay.  And the subject is, "Threat
25 and strategy," and Mr. Siegle says, "Here's the

Page 119

1 threat/strategy for 2015."
2         Are you familiar with this
3 document?
4    A.   No, I'm not.  I'm sure I would have
5 saw it, but I don't have -- it's not something
6 that would stand out with the hundreds of
7 documents that I see or reports that I -- I get
8 on a regular basis.
9    Q.   So this is not a document that you
10 use on a regular basis?
11    A.   No, it's not.
12    Q.   Okay.  And do you know why you were
13 receiving this?
14    A.   I'm sure that I received it because
15 I was the investigative subdivision commander.
16    Q.   Okay.  And the report itself, the
17 attachment, on the first page says, "Threat
18 assessment and strategy program year 2015, Ohio
19 High Intensity Drug Trafficking Area," right?
20    A.   Yes.
21    Q.   And it says Derek Siegle is the
22 executive director?
23    A.   Yes, he is.
24    Q.   And you know that to be true?
25    A.   Uh-huh.

Page 120

1    Q.   Is that still true?
2    A.   Yes, it is.
3    Q.   And so is it your understanding
4 that it's Mr. Siegle's responsibility to keep
5 statistics and create strategy assessments for
6 the Ohio High Intensity Drug Trafficking Area?
7    A.   I'm sure that it is.
8    Q.   If you turn to page 3, which is the
9 executive summary, do you see that?
10    A.   Yes.
11    Q.   If you look at the very last
12 sentence, you see that -- well, I'm sorry.  The
13 last two sentences on that page.
14         So it says, "Another new trend
15 coming to the Ohio HIDTA region is heroin being
16 sold in disguise of oxycodone pills.  The
17 heroin pills are coming from Mexican DTOs and
18 being produced by local DTOs."
19         Do you see that?
20    A.   Yes.
21    Q.   Do you understand what that means?
22    A.   Yes.
23    Q.   What does it mean?
24    A.   I think it's, like,
25 self-explanatory.  That there was a trend that

Page 121

1 was emerging at that point in time that drug
2 dealers were disguising their -- their product
3 in oxycodone pills, and that there was
4 information that HIDTA had that would lead them
5 to believe that some of it was coming from
6 Mexico.
7    Q.   Okay.  Do you know what "DTO"
8 means?
9    A.   Drug trade organization, I think.
10    Q.   I've heard drug trafficking
11 organization.
12    A.   Drug trafficking organization.
13    Q.   Okay.  You and I can use "DTO" and
14 understand each other?
15    A.   Yes.
16    Q.   Okay.  And by the way, it's okay
17 to -- to call that acronym HIDTA?
18    A.   That's correct.
19    Q.   Okay.  It's much easier than trying
20 to spell it out.
21         Okay.  And then if you look on that
22 same page, the very first sentence of the
23 second paragraph on that page, you see
24 there that sentence says, "In response to the
25 Ohio HIDTA drug threat survey 2015, all of the

31 (Pages 118 - 121)

Page 122

1  responding law enforcement officials surveyed
2  identified heroin provided by Mexican drug
3  trafficking organizations, DTOs, as the
4  greatest drug threat in their region."
5      A.   I do see that.
6      Q.   Okay.  And so you would agree with
7  me that for 2015, at least, HIDTA identified
8  heroin rather than prescription opioids as the
9  greatest threat to Akron, right?
10         MR. LEDLIE:  Object to the form of
11  the question.
12     A.   That's what the report says.
13     Q.   Okay.  And the report says that it
14  is citing all of the responding law enforcement
15  officials surveyed, right?
16     A.   Correct.
17     Q.   Were you one of those law
18  enforcement officials that were surveyed?
19     A.   I was not.  I'm certain that Akron
20  would have been represented.
21     Q.   Do you know who from Akron?
22     A.   No.  I would -- I would imagine
23  that the chief would have assigned that to
24  Captain Shearer or Lieutenant Garro to
25  complete.  It would go through his office.

Page 123

1         But that's what I typically do as
2  well.  I'll get a survey and send it to a
3  subordinate employee whose area of work that
4  more relates to, and they'll fill it out for
5  the -- on behalf of the department.
6      Q.   And you would believe that they
7  would answer accurately, correct?
8      A.   Yes.
9      Q.   Okay.  So you have no reason to
10  believe that this information is inaccurate,
11  right?
12     A.   I do not.
13     Q.   Can you recall a time at all during
14  your time on the Akron police force when heroin
15  has not been a greater issue in Akron than
16  prescription opioids?
17         MR. LEDLIE:  Object to the form of
18  the question.
19     A.   Can you restate that?
20     Q.   Has -- has heroin ever not been the
21  biggest problem?
22     A.   That's -- that's hard to -- to say
23  definitively.  We -- our exposure to heroin --
24  mine has been very -- I never made an arrest
25  for heroin in my entire career.  There was a

Page 124

1  little bit of an uptick in the -- the early
2  '90s, which was usual because it's not
3  something that I had ever seen.  So when it
4  started to surge again in the -- probably 2013,
5  2014, for me that was unusual to see that.
6      Q.   Have you ever known prescription
7  opioids to be a bigger problem in Akron than
8  heroin?
9         MR. LEDLIE:  Object to the form of
10  the question.
11     A.   From my perspective, again, it
12  would be hard to quantify that and say.  I
13  would say -- I -- I know that I've filled out
14  more -- or I've approved more reports and seen
15  officers work in patrol subdivision -- and this
16  would go back.  I'm not talking about -- I
17  wouldn't be able to -- to reference from 2014
18  and back or '15 and back, but that reports for
19  stolen prescriptions or reports that allege
20  stolen prescriptions or break-ins at
21  pharmacies, robberies at pharmacies, it is --
22  that number had been significant, as well.
23     Q.   Okay.  You don't know the answer to
24  my question --
25     A.   So I don't --

Page 125

1         MR. LEDLIE:  Object to the form of
2  the question.
3      Q.   You don't know the answer to my
4  question, right?
5         MR. LEDLIE:  Object to the form of
6  the question.
7      A.   I don't have a percentage or a
8  number.
9      Q.   During your time in law
10  enforcement, have you heard of Fentanyl-laced
11  cocaine and meth?
12     A.   Yes.
13     Q.   And would you agree that dealers
14  lacing drugs, including non-opioid drugs, with
15  Fentanyl or carfentanil is a problem in Akron?
16     A.   Yes.
17     Q.   About how common is that problem;
18  do you know?
19     A.   It's pretty common.  I know that --
20  that we've seen it with some regularity over
21  the last couple of years, especially.
22     Q.   And it's a problem because people
23  who are intending to buy cocaine end up
24  buying -- end up taking a much more potent
25  drug, right?

32 (Pages 122 - 125)

Page 126

1    MR. LEDLIE:  Object to the form of
2 the question.
3    A.   That would definitely present a
4 problem, and we have seen that.
5    Q.   And that increases the risk of
6 overdose?
7    MR. LEDLIE:  Object to the form of
8 the question.
9    A.   It would.
10    Q.   Given that this drug-lacing occurs,
11 would you agree that some people who overdose
12 on opioids have never intended to take an
13 opioid?
14    MR. LEDLIE:  Object to the form of
15 the question.
16    A.   I wouldn't be able to say with
17 certainty that that would or would not be, but
18 I think that certainly is plausible.
19    Q.   Right.  You agreed with me that
20 this lacing does occur, right?
21    A.   Yes, it does.
22    Q.   And that people take cocaine
23 intending to take cocaine, but they end up with
24 an opioid in their system, right?
25    MR. LEDLIE:  Object to the form of

Page 127

1 the question.
2    A.   That could happen.
3    Q.   Okay.  So it's -- I think, as you
4 said, certainly plausible that individuals who
5 end up overdosing on an opioid never intended
6 to take one, right?
7    MR. LEDLIE:  Object to the form of
8 the question.
9    A.   That could be the case.
10    Q.   All right.  We've talked about the
11 opioid epidemic and your understanding of it.
12    Do you believe that Akron faces a
13 prescription opioid epidemic?
14    MR. LEDLIE:  Object to the form of
15 the question.
16    A.   I do.
17    Q.   And when did that prescription
18 opioid epidemic begin, in your opinion?
19    A.   I believe that it -- that it
20 started in -- like I had mentioned before, in
21 the late '90s when we started to see a
22 significant number of -- of reports and other
23 interactions that suggested that.
24    - - - - -
25    (Thereupon, Deposition Exhibit 6,

Page 128

1    Document Titled "Drug Threat
2    Assessment," SUMMIT_000023567 to
3    23648, was marked for purposes of
4    identification.)
5    - - - - -
6    Q.   Chief Ball, the court reporter has
7 just handed you what has been marked as
8 Exhibit 6.
9    Yeah, you can put that other one
10 aside.
11    And the title of this document is
12 "Multi-Jurisdictional Law Enforcement Task
13 Force Addendum to 2005 Justice Assistant Grant
14 Application, Continued, Drug Threat Assessment,
15 Summit County, Ohio."  And it says it was
16 prepared by Captain Hylton E. Baker, Summit
17 County Sheriff's Office.
18    Do you see that?
19    A.   Yes.
20    Q.   Have you ever seen this document
21 before, to your recollection?
22    A.   I don't believe so.
23    Q.   Do you know who Captain Baker is?
24    A.   I know his name, and -- I don't
25 think I've ever met him, but I do -- the name

Page 129

1 is familiar.
2    Q.   So to your knowledge, you haven't
3 worked with him?
4    A.   No, I haven't.
5    Q.   And you didn't contribute to this
6 report?
7    A.   No, I would not have.
8    Q.   Okay.  And if you turn with me to
9 page 62, you see that it has a title
10 "Pharmaceuticals" there?
11    A.   Yes.
12    Q.   And you see that it says, "Level of
13 threat, very high"?
14    A.   Right.
15    Q.   And then it says, "The diversion of
16 narcotics and pain analgesics in Summit County
17 continues to increase," right?
18    A.   Yes.
19    Q.   And that the drugs of choice
20 include OxyContin, Vicodin, Percocet, morphine,
21 methadone, and Fentanyl?
22    A.   I do.
23    Q.   Okay.  And if you turn back to the
24 first page of the document, you see that this
25 document is from 2005, right?

33 (Pages 126 - 129)

Page 130

1    A.   Yes.
2    Q.   Okay.  So at least as of 2005, the
3  diversion of narcotics and pain analgesics in
4  Summit County was considered to be a threat,
5  right?
6    A.   That's what this says --
7    Q.   Okay.
8    A.   -- yes.
9    Q.   Okay.  And that's not inconsistent
10  with your understanding, right?
11    A.   Right.
12    Q.   And even though this is a Summit
13  County Sheriff's Office document, Akron is in
14  Summit County, right?
15    A.   It is.
16    Q.   Okay.  So there wouldn't be any
17  dramatic difference between Akron and Summit
18  County in this regard, right?
19        MR. LEDLIE:  Object to the form of
20  the question.
21    A.   There are differences because they
22  do not -- typically they're -- the Summit
23  County drug unit does do cases inside of Akron.
24  The makeup of the rest of the county is
25  dramatically different from a socioeconomic

Page 131

1  perspective.  So I don't know if Captain
2  Baker's report took into account and -- and
3  where all of his statistics came from -- come
4  from, but -- but there can be a dramatically
5  different environment within Akron than there
6  is in the rest of the county.
7    Q.   You wouldn't say, though, that in
8  2005 Akron didn't see any kind of a
9  pharmaceutical threat even though Summit County
10  did?
11    A.   No, I wouldn't say that.
12    Q.   Okay.  So it was something that
13  Akron and Summit County knew about in 2005,
14  right?
15        MR. LEDLIE:  Object to the form of
16  the question.
17    A.   Yes.
18        MS. SAULINO:  I'm told we've been
19  going a little over an hour, and I'm about to
20  start another section.  Do you want to break
21  now?
22        MR. LEDLIE:  Yeah.  It's a natural
23  spot.
24        MS. SAULINO:  Okay.
25        THE VIDEOGRAPHER:  Going off the

Page 132

1  record at 11:30 a.m.
2        (A recess was taken.)
3        THE VIDEOGRAPHER:  Back on the
4  record at 11:43 a.m.
5    Q.   Chief Ball, during your more than
6  25 years in law enforcement, have you ever
7  known a time when abuse of drugs has not been a
8  significant problem in your community?
9        MR. LEDLIE:  Object to the form of
10  the question.
11    A.   No.
12    Q.   And setting aside opioids, what
13  other drugs have been a problem in your
14  experience?
15    A.   Cocaine, crack cocaine,
16  methamphetamine, marijuana.
17    Q.   Any others come to mind right now?
18    A.   Not right to mind.
19    Q.   And how long have those other drugs
20  been a problem in Akron?  Since you started?
21    A.   Yes.
22    Q.   All of them?
23    A.   Yes.
24    Q.   You'd agree with me that heroin has
25  been around a long time, right?

Page 133

1    A.   Yes.
2    Q.   And it is just as addictive now as
3  it was when it was first released?
4        MR. LEDLIE:  Object to the form of
5  the question.
6    A.   I would imagine.
7    Q.   Do you know how long Fentanyl has
8  been around in your community?
9    A.   No.
10        - - - - -
11        (Thereupon, Deposition Exhibit 7,
12        Document Titled "Media Release,
13        January 25, 2006, Heroin Users Face
14        Potentially Fatal Ingredient,"
15        SUMMIT_000350711 to 350712, was
16        marked for purposes of
17        identification.)
18        - - - - -
19    Q.   The court reporter has just handed
20  you what has been marked as Exhibit 7, which is
21  Bates-stamped Summit 000350711.  And this is a
22  media release from Sheriff Drew Alexander on
23  January 25, 2006.
24        Do you see that?
25    A.   Yes, I do.

34 (Pages 130 - 133)

Page 134

1    Q.   And you see that this news release
2  references the fact that the sheriff, Sheriff
3  Alexander, was announcing that heroin, mixed
4  with a synthesized variant of Fentanyl, has
5  been found in Northeast Ohio?
6    A.   Yes.
7    Q.   Do you recall that?
8    A.   No.
9    Q.   You'd agree with me that this
10  suggests that Fentanyl was found to be a
11  problem in Northeast Ohio at least by January
12  of 2006, right?
13    A.   Yes.
14      MR. LEDLIE:  Objection.
15    A.   This report would suggest that, or
16  at least that it had been found.
17    Q.   Okay.  And you see at the end of
18  the first page, it says, "During the early
19  1990s, Fentanyl was found to be the cause of
20  numerous deaths among heroin users throughout
21  the eastern United States?
22    A.   I do see that.
23    Q.   The drug was marketed on the street
24  as "Tango and Cash"?
25    A.   Right.

Page 135

1    Q.   Do you remember that, Tango and
2  Cash?
3    A.   I do not.
4    Q.   Okay.  All right.  And -- and you
5  would have no reason to believe that Sheriff
6  Alexander would be sending a media release
7  about something that he was calling a problem
8  when it wasn't a problem, right?
9    A.   I wouldn't believe that to be the
10  case.
11    Q.   Do you know Sheriff Alexander?
12    A.   I do.
13    Q.   And do you think he was good at his
14  job?
15    A.   I think he was good at his job.
16    Q.   You can set that aside now.
17      Do you know how the volume of 911
18  calls today in Akron compares to the volume of
19  911 calls before 2014?
20    A.   I do not.
21    Q.   Do you know how the number of
22  arrests -- drug arrests today compares to the
23  number of drug arrests before 2014?
24    A.   I do not.
25        - - - - -

Page 136

1      (Thereupon, Deposition Exhibit 8,
2      Akron Police Department 2004 Annual
3      Report, was marked for purposes of
4      identification.)
5      - - - - -
6    Q.   Chief Ball, the court reporter has
7  just handed you what has been marked as Ball
8  Exhibit 8 -- or as Exhibit 8, which is the
9  Akron Police Department 2004 annual report.
10      It does not have a Bates stamp on
11  it.  I can represent to you that we got it off
12  the website.
13    A.   Okay.
14    Q.   Are you familiar with this
15  document, at least in general?
16    A.   In general.
17    Q.   Okay.  Did you have, to your
18  recollection, any involvement in preparing the
19  2004 version?
20    A.   I don't believe so.
21    Q.   And if you turn to page 28 of the
22  report -- the numbers are in the bottom left
23  corner.  You see that this list calls for
24  service at the top of the page?
25    A.   Right.

Page 137

1    Q.   And it says "2004 calls for
2  service," and the total was 221,009 calls for
3  service?
4    A.   Yes.
5    Q.   Does that sound about right to you?
6    A.   Yes.
7    Q.   Okay.
8      - - - - -
9      (Thereupon, Deposition Exhibit 9,
10      3/15/2017 E-Mail from Paul Calvaruso
11      to Kenneth Ball Re: Staffing,
12      AKRON_001136994 to 001136995, was
13      marked for purposes of
14      identification.)
15      - - - - -
16    Q.   The court reporter has just handed
17  you what has been marked as Exhibit 9, which is
18  an e-mail from Paul Calvaruso to yourself from
19  March 15, 2017, "Subject:  Staffing," and
20  Mr. Calvaruso says, "Ken, here's what I worked
21  up in patrol."
22      Do you see that?
23    A.   I do.
24    Q.   Do you recall this exchange?
25    A.   Yes, I do.

35 (Pages 134 - 137)

Page 138

1    Q.   Okay.
2    A.   Vaguely.
3    Q.   And -- go ahead.
4    A.   I do vaguely.  I was working on a
5  justification document at the time for staffing
6  for all of our supervisory positions in the
7  police department.
8    Q.   And -- and you see on the next
9  page, which is the attachment, about midway
10  through the first paragraph, there's a sentence
11  that begins "ironically."  Sort of starts in
12  the middle of a line.
13    A.   In the first paragraph?
14    Q.   Yes.  "Ironically, the number of
15  citizen" -- do you see that?  If you look where
16  I'm pointing it can give you an idea of where
17  you're looking.
18    A.   All right.
19    Q.   So, like, right -- if you go down
20  and over.
21    A.   All right.  All right.  I'm there.
22    Q.   You got it?
23    A.   Yeah.
24    Q.   Okay.  So you see that sentence
25  says, "Ironically, the number of

Page 139

1  citizen-generated calls for service in 2015 was
2  154,000, almost identical to the year 2000"?
3    A.   Yes, I do.
4    Q.   Okay.  So it looks like
5  Mr. Calvaruso is telling you that between 2000
6  and 2015, the number of calls was about the
7  same, right?
8      MR. LEDLIE:  Object to the form of
9  the question.
10    A.   That's -- that's what it says.
11    Q.   Okay.  And did you have any reason
12  to dispute that?
13    A.   Well, there -- there are different
14  ways that we calculate calls for service.  We
15  have tried to make sure that those calls were
16  representative of a workload, and so some of
17  the calls have been taken out of those numbers.
18      So, for example, if an officer goes
19  to the police department to finish paperwork,
20  that's called a Signal 18, which is a "to the
21  station."  So he's not going to have any
22  interaction with the public.  It's not going to
23  generate any totals.
24      Also lunches, Signal 1s, which are
25  personal.  Signal 2s, which are -- are meet a

Page 140

1  party if they don't qualify a certain way.
2      Those numbers have been -- have
3  been taken out so that there can be a greater
4  reflection of -- of workload.
5      So the number of 154,000 is
6  dramatically different than what -- for
7  example, you know, we're over 200,000 calls for
8  service in 2018, now.  I think about 240-,
9  250,000 has been the number for the last few
10  years.  So I don't know if the numbers that
11  Paul sent me had some of those other calls for
12  service that were -- that were taken out of
13  this for other specific reporting or
14  statistical purposes.
15    Q.   Okay.  You said that right now
16  you're at about 200,000 for not all -- not yet
17  all of 2018; is that right?
18    A.   Correct.
19    Q.   Okay.
20    A.   We're averaging about 20,000 calls
21  for service in 2018 per month.
22    Q.   And you said that 240,000 to
23  250,000 has been -- has been about the number
24  for the last few years?
25    A.   Yeah, I'm pretty certain.

Page 141

1    Q.   Do you know how many years?
2    A.   No.
3    Q.   Okay.  And then I think you were
4  explaining that different factors can go into
5  those numbers that changes them, even though
6  the numbers -- so they might not be comparable;
7  is that fair?
8    A.   Right, they might not be
9  comparable.  If they're not including all
10  the -- all the same types of calls or the -- or
11  all the designations that we have that would be
12  considered a call, then they wouldn't be
13  consistent.
14    Q.   Okay.  Well, who is Mr. Calvaruso?
15    A.   Paul was previously a captain in
16  the Akron Police Department in patrol
17  operations office.  And then he was -- he and I
18  were promoted to deputy chief at the same time
19  in 2015, and I was in charge of the
20  investigative subdivision; he was in charge of
21  the uniform subdivision.
22    Q.   And did you have any reason to
23  doubt what he wrote here in his attachment?
24    A.   No, I don't doubt anything he says.
25  Although, again, I'm uncertain as to -- to what

36 (Pages 138 - 141)

1 exactly that -- that total represents.
2    Q.   All right.  Well, why don't we look
3 at his explanation that follows that sentence.
4    A.   Okay.
5    Q.   He says, "However, in 2016 that
6 figure went up to 160,000.  There have been
7 significant changes to various aspects of our
8 operations between then and now.  We have
9 adopted a new alarm policy, technology has
10 improved, and we have become more automated,"
11 right?
12    A.   Right.
13    Q.   And then he says, "At the same
14 time, however, we have been confronted with an
15 opiate problem, which has placed more time
16 demands on our resources.  We have implemented
17 our formalized Park and Walk Program, et
18 cetera," right?
19    A.   Yes.
20    Q.   And then the beginning of the next
21 paragraph is -- he says, "For the sake of
22 simplicity, we will assume that those variables
23 balance out between how things were in 2000 and
24 how they currently exist today," right?
25    A.   Correct.

1    Q.   Okay.  So at least deputy chief
2 Calvaruso was saying that the numbers are
3 comparable, it's just that there are different
4 factors in them now because there's more
5 technology, but this now includes the opiate
6 problem, right?
7    A.   Right.
8    Q.   Okay.  So he's including the opiate
9 problem in these numbers?
10    A.   Yes.  But, again, I don't know
11 what -- if there's a variance in -- the
12 variance in number that -- you know, I don't
13 know if that's because they've extracted.  When
14 I get the totals now on my monthly dashboard,
15 I've got two numbers.  One is with those
16 numbers included, one is without those numbers
17 Without the lunches, without the stopping to
18 get gas, without the -- to the station to
19 complete paperwork.
20        So we have citizen-generated calls
21 for service, we have officer-generated calls
22 for service, and then we have calls for service
23 that don't -- that don't fit that are extracted
24 just for the sake of being efficient with our
25 numbers and really representing what our

1 workload is.
2    Q.   Okay.  He's being specific about
3 the fact that he's talking about
4 citizen-generated calls here, right?
5    A.   Okay.  I don't know.  I didn't --
6    Q.   In the "ironically" sentence there
7 where we started.
8    A.   Maybe it would be better if I took
9 the time to read through it so I could answer
10 your questions more --
11    Q.   Well, I'm just looking back at
12 that --
13    A.   -- more directly.
14    Q.   -- that very sentence that we
15 started with, "Ironically, the number of
16 citizen-generated calls for service in 2015."
17    A.   Okay.  So that would -- that could
18 describe -- or be the explanation as to why
19 that number is significantly less.  Because a
20 traffic stop that's initiated by an officer, a
21 suspicious person stop, he drives up in his
22 patrols and sees a -- a fight that's happening,
23 those are officer-generated calls for service.
24        So I'm -- the number I referenced
25 to you that was -- that was the 20,000 per

1 month now that we average and the typically
2 240,000, 250,000 calls for service include
3 officer-generated calls for service.
4    Q.   Okay.  And you'd agree with me that
5 he says here at the beginning of the second
6 paragraph, "For the sake of simplicity, we
7 assume those variables balance out between how
8 things were in 2000 and how they currently
9 exist today," right?  That's just --
10    A.   Right.
11    Q.   -- what he says, right?
12    A.   Yeah.
13    Q.   And you have no reason to believe
14 that Deputy Chief Paul Calvaruso was not
15 careful about his statement here, right?
16    A.   Right.
17    Q.   Okay.  Now, were you also putting
18 together a similar document at the same time?
19    A.   I was.  I was using information
20 from throughout the police department to work
21 on a document from a budget standpoint that
22 would justify every supervisor- -- supervisory
23 position in the -- in the police department,
24 because we had previously been authorized for
25 between 485 and 525 officers.  Being well below

Page 146

1 those numbers, it was important to right-size
2 the supervisory staff so that there wasn't a --
3 a small span of control, we didn't have
4 inefficiencies with supervisors, or we didn't
5 have officer jobs that weren't being worked
6 because we were top-heavy with management or
7 supervisory staff.
8    Q.   Okay.  So why were you working on
9 this budget document?  Did someone assign that
10 to you?
11    A.   Yes.
12    Q.   Who was that?
13    A.   The chief.
14    Q.   And was this -- was -- was working
15 on such budget documents a typical part of your
16 responsibilities as deputy chief?
17    A.   Yes.
18    Q.   And who were you providing it to?
19 The chief?
20    A.   Correct.  So that it could go to
21 the deputy mayor and the mayor and chief of
22 staff so they could -- and budget and finance
23 so they could make those determinations of what
24 our bottom-line numbers would be.
25    Q.   Do you recall what the outcome was?

Page 147

1    A.   I don't recall.  I know that we
2 had -- there were several positions that were
3 determined not to be an absolute priority
4 with -- with less numbers overall in the police
5 department, so we -- I had to prioritize those
6 altogether for sergeant, lieutenant, captain
7 within the entire police department.
8    Q.   Do you recall whether you got any
9 comments back from Deputy Mayor Brown?
10    A.   Well, at that point in time, he
11 wouldn't have been a deputy mayor.  He would
12 have been either a lieutenant in patrol --
13 well, let me just -- 2017, he would have been a
14 deputy mayor at that point in time.  No, I
15 would not have had that direct interaction.  He
16 would have had that with the chief.
17    Q.   So -- and -- so you don't know
18 whether it happened or not?
19    A.   If what happened?
20    Q.   That direct interaction happened?
21    A.   I do not know if that happened.
22    Q.   Okay.
23    A.   He could have dealt directly with
24 the mayor.  He could have dealt directly with
25 budget and finance.  I don't know what that

Page 148

1 process looked like for the chief at that point
2 in time.  But I do know the numbers that were
3 recommended were -- were accepted.
4         And I do know that I just completed
5 another evaluation of the entire police
6 department with a recent report submitted to
7 the deputy mayor and the mayor for staffing
8 plan for the Akron Police Department that is
9 requesting 222 officers.  This has 205 for
10 patrol.  My document from this year requests
11 222 officers.
12    Q.   Okay.  And you created that -- or
13 helped create that document?
14    A.   Yes.
15    Q.   And who did you submit it to?
16    A.   Deputy mayor.
17    Q.   Have you received any comments from
18 him?
19    A.   Not yet.  I mean, it might have
20 been in passing, like, you know, the number
21 of -- just, you know, in passing that he was
22 going to pass it along to the mayor, but we
23 didn't know exactly what our budgets would
24 allow.
25    Q.   But it is your understanding that

Page 149

1 Deputy Mayor Brown is involved in the budgeting
2 process, right?
3    A.   Yes.
4    Q.   And that he receives your budgets
5 and reviews them, right?
6    A.   Right.
7    Q.   And provides comments when he has
8 them, right?
9    A.   Yes.
10    Q.   Okay.  So it would surprise you to
11 hear that he believes he has no involvement in
12 the process.
13         MR. LEDLIE:  Object to the form of
14 the question.
15    Q.   That would surprise you?
16    A.   Yes.
17    Q.   In the second half of 2017, did you
18 have a significant decrease in fatalities in
19 northern Ohio due to drug overdoses?
20    A.   I don't believe that there was in
21 northern Ohio.  I do believe -- I do know that
22 there was in Akron, Ohio.
23    Q.   Okay.  Tell me --
24    A.   And it seemed like --
25    Q.   -- what you remember about that?

38 (Pages 146 - 149)

Page 150

1    A.   In August of 2017, there was a -- a
2  decline, and it was considerable and it was
3  consistent.  And we were kind of an -- an
4  anomaly, as far as that is concerned, from the
5  feedback that I would get from other law
6  enforcement agencies; that the problems
7  continue to be very straight-line for them,
8  whereas ours had had a significant drop-off.
9    Q.   And do you know, were you able to
10  attribute that drop-off to anything in
11  particular?
12    A.   We've speculated about it and had
13  conversations as to what could be involved, and
14  I think some of those are, you know, educated.
15  But I don't think that there would be any- --
16  that there's anything available to say that
17  absolutely there's a cause and effect and we
18  can put a percentage on it or we know that this
19  absolutely was responsible in this particular
20  way.
21    Q.   Fair enough.  I -- I know you can't
22  provide absolutes, but what has been your
23  educated speculation?
24         MR. LEDLIE:  Object to the form.
25         You can answer the question.

Page 151

1    A.   I think we saw the increase in meth
2  seizures in Akron, Ohio.  I believe that it was
3  likely a response from drug dealers.  Our
4  efforts for prosecuting drug dealers who are
5  responsible for sales that resulted in the
6  death of individuals, we had great success with
7  those prosecutions.  We had significant
8  sentences, had taken advantage of federal
9  prosecutions in some of those cases that
10  tripled some of the sentencing that was issued.
11  They got a lot of publicity.
12         There has been much, much talk
13  about this in the news and in other media forms
14  and with community meetings and leadership
15  groups.
16         I think from a -- an awareness
17  standpoint that our -- our environment changed
18  dramatically over those several years.  There
19  was a greater pressure on social services so
20  that treatment options would be available.
21         There were strategies that were
22  adopted by law enforcement, like Quick Response
23  Teams, where education and involvement at
24  the -- at -- you know, what were our first
25  opportunities are known to be, so the first

Page 152

1  opportunity that we were connecting with
2  families and those that were suffering from
3  addiction.  That probably had an impact.
4         I don't know.  There's many
5  different things that could have contributed to
6  that change.
7         Drug dealers not wanting to -- to
8  kill off their -- their clientele, so they
9  became more informed and more careful about
10  their mixtures of drugs or their use of the
11  most potent drugs of Fentanyl, carfentanil, may
12  have played a significant part in that.
13         It's -- it's -- I think that it's a
14  cocktail with all of those different things
15  having an impact treat- -- having an impact.
16  We had treatment opportunities and education
17  and -- it's multifaceted.
18    Q.   Okay.  Has that decrease continued
19  through this year?
20    A.   It has been pretty consistent.
21         We did see a little bit of an
22  uptick around -- when weather started to get a
23  little bit nicer in May of this year.  We've
24  had a little bit of an increase, and it's been
25  pretty consistent over the last several months.

Page 153

1         Oh, Narcan.  I didn't mention
2  Narcan before.  That obviously has had a
3  significant impact when the doses of Narcan
4  are -- you know, go from nothing to thousands
5  in short periods of time.  Availability of
6  Narcan for not only drug addicts, but loved
7  ones and -- and other people that are close and
8  attached to them, so we don't have the reports
9  if somebody has been Narcaned and they respond
10  to it immediately, there's less of an
11  inclination to call police in those -- in those
12  instances or call emergency services in those
13  instances.  So Narcan has -- I'm certain, had a
14  significant impact on it.
15    Q.   Okay.  So each of these factors
16  that you identified as being a part of, in your
17  view, the decrease in overdoses and fatalities,
18  you identified Narcan, you identified the
19  availability of treatment centers, you
20  identified education.  Each of these things,
21  did they -- did they start in 2017?
22    A.   No.  I think that obviously some of
23  them started in 2013, 2014, with our assigning
24  detectives to investigate those deaths.  The
25  publicity that it was getting started earlier

39 (Pages 150 - 153)

Page 154

1 than 2016; although, when the introduction of
2 carfentanil came, there was even more of an
3 emphasis on it.
4        But I'm sure that the work that we
5 do in diversion has had an impact.  I know that
6 we had instances where doctors were arrested as
7 well, and that got some publicity.  So I think
8 that -- and I'm familiar with that changes
9 in -- in prescribing tactics have changed, as
10 well, so that might have or that would have an
11 impact, too, that's hard to measure.
12        But, no, there were -- there were
13 awarenesses.  It just grew with the momentum
14 that -- that came with greater addiction and
15 more families being impacted and there being
16 bodies stacked up at the coroner's office, that
17 got a lot of attention.
18    Q.   Okay.  I'm not sure how that was
19 the answer to my question, but --
20    A.   Okay.  Then rephrase it, and I'll
21 be glad to answer you.
22    Q.   Well, it sounds to me as though you
23 were identifying a number of factors that
24 started -- that each sort of started at
25 different times.  Is that fair?

Page 155

1    A.   Yes.
2    Q.   Okay.  And is it fair to say that
3 if each of them had started earlier, we might
4 have seen this impact earlier?
5        MR. LEDLIE:  Object to the form of
6 the question.
7    A.   I think that that's fair.
8    Q.   Okay.  And so if more doctors, for
9 instance, had been arrested earlier, that might
10 have helped things sooner, right?
11        MR. LEDLIE:  Object to the form of
12 the question.
13    A.   I -- I think that's logical.
14    Q.   And if the higher sentences for --
15 and for prosecuting the -- those responsible
16 for deaths had happened earlier, that might
17 have had an impact earlier, right?
18    A.   We would like to think.
19    Q.   And if the availability of Narcan
20 had been -- had happened sooner, that would
21 have had an impact earlier, right?
22        MR. LEDLIE:  Object to the form of
23 the question.
24    A.   I think that it would, and if our
25 resources were unlimited or if our resources

Page 156

1 were greater than what they were, it would have
2 been -- we would have hoped to think that
3 that's what would have happened.
4    Q.   Did you ask for Narcan earlier?
5    A.   I didn't ask for Narcan earlier.
6    Q.   Okay.  Well, you just said if our
7 resources had been greater earlier.  I wanted
8 to know whether you had specifically asked for
9 something that you had been denied.
10    A.   Well, there's a -- there's a part
11 of our process that always includes do we have
12 the people and do we have the money?  Do we
13 have the equipment?  Do we have the technology?
14 Do we have the capacity?  In all those areas,
15 that's always a part of our decision-making
16 process.
17        So I'm certain that at the time
18 that Chief Nice was making those decisions,
19 that every single one of those con- -- every
20 single one of those conversations included, can
21 we afford it and do we have the people to do
22 something with this?
23    Q.   Well, you've been able to put all
24 of that together this year, right?  It sounds
25 like you've been able to keep the downturn at

Page 157

1 the -- at the lower levels, right?
2        MR. LEDLIE:  Object to the form.
3    A.   Well, it would be nice if I could
4 go out and take credit for that everyplace I go
5 and say it's a reflection of my leadership
6 or -- but I don't think that that -- may be
7 part of it, but I think that it's a -- you
8 know, there's so many other things that go into
9 it.
10    Q.   Okay.  And you say that you're
11 certain that Chief Nice was taking into
12 account, I think, many factors that you
13 identified in making his decisions about
14 resources?  How are you certain?
15    A.   I would have been -- I know that
16 that's the -- that's the process that when you
17 run the organization, that that's a constant.
18 It exists in every conversation we have.  Do we
19 have the --
20    Q.   Okay.
21    A.   -- the people to do it?  Go ahead.
22    Q.   But you didn't talk to Chief Nice
23 specifically about that, right?
24        MR. LEDLIE:  Object to the form of
25 the question.  He's answering the question.

40 (Pages 154 - 157)

Page 158

1 Please let him finish.
2     A.   Yeah, I don't remember talking to
3 Chief Nice specifically.  I do remember being
4 in meetings where it was discussed what would
5 be strategies for fighting the opioid epidemic
6 or trying to be impact- -- more impactful as a
7 law enforcement organization; recognizing the
8 need in the community; being completely
9 overwhelmed and, you know, affected, knowing
10 that we had more people dying of drug overdoses
11 than we had that were being killed in -- in --
12 in purposeful acts, which is typically what,
13 you know, law enforcement agency had been
14 dealing with prior to this issue.
15     Q.   Okay.  So you say you remember
16 being in meetings where it was discussed, and
17 then you stated a lot of things after that.
18 Tell me when these meetings were.
19     A.   I wouldn't be able to -- to recall.
20 And it could have happened in a -- it could
21 have happened in a morning staff meeting that's
22 held for the executive staff of the police
23 department.  It could have been in another
24 meeting that -- that Jim Nice may have had
25 with --

Page 159

1     Q.   Are you guessing right now?
2         MR. LEDLIE:  Object to the form of
3 the question.
4     A.   I don't know.  What's your
5 preference?  Do you want -- I can -- I don't
6 have that specific answer.  I can't say that I
7 met -- you know, we -- this group met with him
8 on this date at this time and -- and this was
9 the topic of conversation.
10        I mean, there's a generality
11 that -- that -- and a familiarity that I'll
12 have with our process and some familiarity that
13 I'll have with some of those meetings.
14        But I don't have that kind of
15 recall to be able to say it was, you know, this
16 specific and this was the topic of
17 conversation, these were the factors that were
18 important to that conversation, and this was
19 the decision that was made, and here's how we
20 executed it following that meeting.  That's not
21 within my -- that -- my ability to recall
22 that -- all that directly.
23     Q.   Okay.  I'm simply asking because
24 you said you remembered being in meetings, and
25 so I was asking about the meetings --

Page 160

1     A.   It -- it was a gen- --
2     Q.   -- you remembered being in?
3     A.   In a general sense.
4     Q.   Okay.  And do you remember when the
5 first of those meetings was?
6     A.   No, I don't.
7     Q.   Okay.
8     A.   Probably in, I would -- it would
9 have been when I became a deputy chief and I
10 was attending those meetings on a daily basis.
11 I mean, there were times when I was
12 a midnight shift commander, where in order to
13 stay connected with the police department and
14 wanting to be able to represent the officers
15 who work when all the decision-makers are not
16 there, that I would have stayed and I would
17 have come in for some of those meetings.  But I
18 couldn't do it on a regular basis because of my
19 schedule and the other demands that I have in
20 life away from the department.
21        So coming in for a 10:00 meeting is
22 really difficult when you get off work at
23 in the morning and you've got to be back at
24 work at 11:00 at night and --
25     Q.   Oh, I'm not contesting that, sir.

Page 161

1     A.   Okay.
2     Q.   But you did attend some of those
3 meetings during that time?
4     A.   Yes, I would have.
5     Q.   So that would have been, what, in
6 the mid-2000s?
7     A.   It would have been -- no.  It
8 didn't start until probably 2012 or 2013.
9     Q.   Okay.  And these meetings that you
10 are talking about to discuss allocation of
11 resources, it sounds as though you were saying
12 that you have finally figured out, at least
13 partly, the right mix of resources, right?
14        MR. LEDLIE:  Object to the form.
15     A.   We did the best that we could with
16 what we had.
17     Q.   Okay.  And if you had figured out
18 that right mix earlier, there might have been
19 an earlier effect on the extent of the opioid
20 epidemic, right?
21        MR. LEDLIE:  Object to the form of
22 the question.
23     A.   I think in hindsight, that would be
24 fair.
25     Q.   Now, you mentioned the availability

41 (Pages 158 - 161)

Page 162

1 of meth as one of the factors. Can you explain
2 that?
3     A.    We have seen a significant increase
4 in meth seizures in Summit County.
5     Q.    Okay. And does that indicate to
6 you, then, that there is more meth on the
7 streets?
8     A.    Safe to say.
9     Q.    Okay. And so are you then -- I'm
10 just trying to understand. So are you then
11 suggesting that -- it seems to you in your
12 experience that meth has become more prevalent
13 recently than other types of drugs?
14         MR. LEDLIE: Object to the form of
15 the question.
16     A.    I'm not certain. I don't have
17 those numbers. But I do know that, again, to
18 speculate that --
19         First of all, the -- the prices of
20 meth came down significantly and the influx of
21 it, and then the resources for it, there was an
22 environment previously where the meth was being
23 made in Akron.
24         We had an incredible -- we had a
25 meth investigation team. They were cland- --

Page 163

1 CLET, clandestine lab team, and they would go
2 out and disassemble -- they would have
3 specialized training, and they would
4 disassemble the -- the labs and do it in a way
5 that was safe for them, safe for the
6 environment. And we had a significant problem
7 with that in, you know, the past.
8         There was a change, and it became
9 much more readily available. The supply
10 increased, the prices went down, so that we
11 don't have that same issue now. People
12 aren't -- people aren't manufacturing meth in
13 Akron, Ohio, with the proclivity that they were
14 a few years ago.
15         So because it's readily available,
16 and maybe because drug dealers are responding
17 to it and "I don't want to get arrested for
18 Fentanyl or heroin or carfentanil because of
19 the ramifications that come with that," they
20 may have, you know, navigated to meth, with it
21 offering less threat to their business, less
22 threat to their customers, so that those
23 customers continue to return and -- and buy
24 drugs from them.
25     Q.    Right. So -- so in other words,

Page 164

1 you're seeing that meth has gone up and opioids
2 have gone down; is that fair?
3         MR. LEDLIE: Object to the form.
4     A.    I don't know for certain if opioids
5 have gone down or not. I think that they're --
6 by just looking at the numbers that we have for
7 overdoses, that would be the fact. I'm not
8 certain about where our seizures would relate
9 or where our arrests would relate period to
10 period to period.
11     Q.    Okay. And just to round out
12 another portion of the -- of your answer,
13 you -- you mentioned a couple of different
14 kinds of arrests. You mentioned arrests and
15 prosecutions of doctors, right?
16     A.    (Witness nodding head.)
17     Q.    Who were those doctors?
18     A.    I don't know.
19     Q.    Oh, you -- okay.
20         And what about the individuals who
21 got the increased sentences for the deaths?
22     A.    I wouldn't be able to give you
23 their -- their names.
24     Q.    You don't have their names?
25     A.    No.

Page 165

1     Q.    Any other arrests in particular
2 come to mind as having been important?
3     A.    There was a very large seizure made
4 by Summit County drug unit of a -- of a
5 Fentanyl case. This was in Boston -- Boston
6 Heights, which is just north of our
7 jurisdiction. That got a lot of attention
8 because of the number of people that were
9 involved with it and the extent.
10         There was another one that stands
11 out. It's recently been --
12     Q.    Sorry. When was --
13     A.    -- in the paper --
14     Q.    -- that one? Sorry, before you
15 move on, when was that one?
16     A.    I don't know. Maybe --
17     Q.    The Fentanyl?
18     A.    Maybe two years ago.
19     Q.    Okay.
20     A.    Could have been three years ago.
21     Q.    How many people were involved?
22     A.    I don't know. The familiarity that
23 I have is a -- is a -- maybe a brief summary
24 that was given to me at an executive meeting or
25 what I read in the newspaper, saw online.

42 (Pages 162 - 165)

Page 166

1    Q.   Okay.  You said it stood out
2  because of the number of people.  Do you have a
3  ballpark number of people?
4    A.   No, I don't.
5    Q.   More than five?
6    A.   Yeah, more than five.
7    Q.   More than ten?
8    A.   I don't know for sure.
9    Q.   Okay.  And then you were saying
10  there was another one?
11    A.   There was another one that involved
12  a couple in southwest Akron in Kenmore.  And it
13  stands out because of the amount of drugs that
14  they were selling, and then also the incredibly
15  extravagant lifestyle that it was able to
16  provide for them.
17       Our seizures were, you know, she
18  would -- she was laundering money through
19  purchases of very high-end shoes, handbags, and
20  other stuff.  She had a $700,000 bill one month
21  with just one high-end provider that did -- did
22  handbags and suitcase and other things.  So
23  it's -- it's --
24    Q.   Do you remember when that one was?
25    A.   A couple years ago.  We're in the

Page 167

1  middle of the -- I think they may have --
2  they're in the middle of the trial maybe now or
3  may have just recently be adjudicated.
4    Q.   Do you remember their names?
5    A.   No, I don't.
6    Q.   Okay.  But you think if we
7  looked -- if we looked it up, it would be a
8  recently adjudicated trial, even maybe now?
9    A.   Yeah.
10    Q.   Okay.  Any others stand out to you?
11    A.   No, not just off the cuff.
12    Q.   Okay.  I think I promised a break,
13  but, just, I have one follow-up question.
14       Where would we be able to get the
15  arrest information and names for the people
16  that we were --
17    A.   You can get it from our narcotics
18  unit.  Captain --
19    Q.   From the narcotics unit?
20    A.   Captain Shearer may not have it at
21  the -- you know, but he certainly would have
22  quick access if he didn't.  He would probably
23  be familiar with those cases.
24    Q.   Do you know -- and I know we can
25  ask Captain Shearer, but do you know whether

Page 168

1  they keep some sort of files for arrests for,
2  for instance, Fentanyl and those kind of -- for
3  opioids?
4    A.   I don't know if they keep it
5  separately.
6    Q.   You don't?  Do you know if they
7  have a filing system for who they arrest?
8    A.   I'm sure they do.
9    Q.   Okay.  But you don't --
10    A.   No.
11    Q.   -- know anything specific about it?
12    A.   I don't have that.
13    Q.   Okay.  And Captain Shearer would be
14  the best one to ask?
15    A.   He would be.  He or Lieutenant
16  Garro.
17    Q.   Okay.
18    A.   Captain Shearer has been the
19  commander of that unit for many years.
20    Q.   And you said the other one is
21  Lieutenant Garro?
22    A.   Lieutenant Garro.
23       MS. SAULINO:  Okay.  Now I promised
24  a break.
25       THE WITNESS:  Okay.

Page 169

1       MS. SAULINO:  So why don't we have
2  lunch, and then we'll come back, I hope.
3       THE VIDEOGRAPHER:  Going off the
4  record a 12:21 p.m.
5       (Luncheon recess.)
6       THE VIDEOGRAPHER:  Back on the
7  record at 1:17 p.m.
8  BY MS. SAULINO:
9    Q.   Chief Ball, thanks for coming back
10  after lunch.
11    A.   Did I have a choice?
12    Q.   I'll let your attorney answer that
13  question.
14    A.   I'm glad -- glad to be back.
15    Q.   So this morning you and I talked
16  briefly about what you have in front of you,
17  Exhibit 2, which is the -- as-of-October-31st
18  report --
19    A.   Okay.
20    Q.   -- for drug -- is that drug
21  overdose deaths?
22    A.   It's overdoses and deaths.
23    Q.   Overdoses and deaths.  Okay.
24       And, then, you and I also discussed
25  at one point a database that I think was for

43 (Pages 166 - 169)

Page 170

1 drug -- for overdose deaths, right?
2    A.    Right.
3    Q.    Is that right?
4    A.    Yes.
5    Q.    Does that report come from the same
6 database?  Are those two the same thing?  No?
7 Okay.  So can you tell me how many databases
8 would record drug-related incidents like
9 overdoses and deaths?
10    A.    No.  I mean, I do know about those
11 two specifically that we've talked about.
12 This -- and I don't even know if I would call
13 this a database.  This is just a report that's
14 updated daily by planning and research, adding
15 the numbers from the day before.
16    Q.    By "this" you mean Exhibit 2,
17 right?
18    A.    Exhibit 2.
19    Q.    Okay.  Go ahead.
20    A.    The database that records those
21 overdose deaths, that is something specifically
22 that I know that's generated whenever there's a
23 new death, the next name is added to it.  I
24 think it's an Excel spreadsheet that shows also
25 what it looked like in 2017, 2016.  Those

Page 171

1 numbers are kept in that database.
2        That's the one that includes
3 victim, identifiers for the victim, address of
4 the incident, which detective is assigned to
5 that investigation, if there's a suspect that's
6 known.  And I think that there is a -- last
7 column is -- or there's another column for
8 where it's at in the adjudication, if it's been
9 adjudicated, what the results were.  And I
10 think there may be also a line -- that's all I
11 know for sure.
12    Q.    Okay.  So for this death database,
13 for lack of a better term -- unless you have a
14 better term for it -- is there -- is there
15 someone in particular who maintains that?
16    A.    The detectives that do the overdose
17 death investigations are the ones who e-mail it
18 to -- e-mail it out.
19    Q.    Okay.  Well, so that was my next
20 question.  Does it then get periodically sent
21 around to people?
22    A.    Whenever there's an update, it gets
23 sent to me.
24    Q.    Okay.
25    A.    And I don't -- I don't have -- know

Page 172

1 for sure who's on that -- who's on that
2 distribution list.  I know when I was a deputy
3 chief, I would get that same thing.
4    Q.    And about -- I realize that it's
5 not regular, because it's whenever there's an
6 update, but about how often do you get a copy
7 of that spreadsheet?
8    A.    Just -- the last time may have been
9 three days ago.  I'm not -- it just was
10 whenever one occurs, so there's not been a --
11 there's not a predictability.
12    Q.    So each time there's a death --
13    A.    Yes.
14    Q.    -- then the spreadsheet is updated
15 and e-mailed out to everyone?
16    A.    Correct.
17    Q.    And by "everyone," it's -- so it's
18 you, the deputy chiefs.  Who else?
19    A.    I don't know for sure who's on the
20 distribu- -- distribution.  I've never paid
21 attention to that.
22    Q.    Okay.  And that -- we should be
23 able to find that in your e-mails?
24    A.    Uh-huh.
25    Q.    Yes?

Page 173

1    A.    Yes.
2    Q.    Do you print them out and write on
3 them at all or anything like that?
4    A.    I had at one point, because there
5 was -- I just, you know, kept a copy in my
6 planner so that I could speak about some of the
7 statistics, but it's not something that I have
8 formally or do with regularity.
9    Q.    The one that you kept in your
10 planner, do you still have it in your planner?
11    A.    No.  Like, the only -- a note that
12 I would write as I would -- if I pulled it up
13 and today was -- today was November 7th, I
14 would look at '17 and then write the number
15 for -- that we had at the same period of time
16 in '17, the number that we had for the same
17 period of time in '16.  So the only notes that
18 I ever put on them were those two bits of
19 information that have -- by having a printed
20 copy, I wouldn't have that number available, so
21 I would write it down there for a reference.
22    Q.    I see.  And do you still have that
23 document somewhere?
24    A.    I may have one in my planner.
25    Q.    Okay.  Did you provide it to

44 (Pages 170 - 173)

Page 174

1 counsel for production to us?
2    A.  I don't --
3         MR. LEDLIE:  Anything that's been
4 given to us has been produced.
5    A.  Yeah.  I mean --
6         MR. LEDLIE:  I can check.
7    A.  -- they have -- I know that they
8 have access to that database.  But a report
9 with, you know, 2018's report in October that
10 had 2017's number written on it, 2016's number,
11 I don't -- they wouldn't have had that.
12    Q.  Nobody asked you for your hardcopy
13 documents?
14    A.  I was asked for my hardcopy
15 documents.  I -- you know, that would have been
16 not something that -- that I thought about or
17 even was -- there wasn't any even investigative
18 notes on it or there wasn't anything about
19 process or -- it just would have been that very
20 basic information that I just described.
21    Q.  You indicated that this spreadsheet
22 goes back to 2016, to your recollection?
23    A.  Which spreadsheet?
24    Q.  The one we were just talking about.
25    A.  No.

Page 175

1    Q.  No?
2    A.  It goes back to the time that our
3 opioid overdose death investigations started.
4    Q.  Okay.  So when was that?
5    A.  So it might be 2014, maybe.
6    Q.  Okay.  So it has been continually
7 updated since that date, as far as you know?
8    A.  Yes.
9    Q.  So if we wanted to see every
10 overdose death investigation in Akron since
11 whenever it began, in potentially 2014, we'd be
12 able to see that on that spreadsheet?
13    A.  You would.
14    Q.  And you said it -- so the
15 investigating officer, the victim, the address
16 of the incident; is that right?
17    A.  Uh-huh.
18    Q.  Does it include the drugs that were
19 involved?
20    A.  I'm not -- I'm not certain if there
21 is a -- there's a -- on the -- the right-hand
22 side of the column, I don't know if there's a
23 toxicology on there or not.
24    Q.  Okay.  So if there was a toxicology
25 listed, then we --

Page 176

1    A.  I think that -- that the drug
2 that's suspected at the time of the preliminary
3 investigation is listed, but I'm -- I'm not 100
4 percent certain.
5    Q.  I see.  And that's fair.  There's a
6 distinction between what is suspected and
7 what's found in the toxicology report, right?
8    A.  Right.
9    Q.  So it may be that -- that what is
10 suspected is listed, to your recollection,
11 right?
12    A.  Uh-huh.
13    Q.  Yes?
14    A.  Yes.
15    Q.  And then it may also be that the
16 toxicology is listed later on further down the
17 row?
18    A.  It might be.
19    Q.  It might be, okay.
20         Any -- so -- so is there any other
21 information that you remember that's in that
22 spreadsheet?
23    A.  Not off the top of my head.
24    Q.  Okay.  What about adjudication?  Is
25 that indicated?

Page 177

1    A.  I mentioned that.
2    Q.  Oh, you did?  I apologize.
3    A.  Yeah.
4    Q.  Okay.  All right.
5    A.  And suspect information.  I don't
6 remember if I mentioned suspect information
7 specifically or not, but if there's suspect
8 information on it at that time or it becomes
9 available through the course of an
10 investigation, that would be added.  I know
11 that there's a -- there's a category there.
12    Q.  And for suspect information, does
13 that include identity and --
14    A.  Just name.
15    Q.  Name?  Okay.
16    A.  Yeah.
17    Q.  So you just got another one of
18 these three days ago?
19    A.  May have been.  Whenever the last
20 one.  I --
21    Q.  Recently.
22    A.  We've had one in November.  I
23 haven't checked my e-mail today to see.  I
24 would have an updated report.  I haven't been
25 able to check that yet.

45 (Pages 174 - 177)

1     Q.    Okay.  So you know you had one in
2 November, so sometime in the last couple of
3 days you would have received one?
4     A.    Yes.
5     Q.    Okay.  Do you know what the drug
6 involved in -- or what the suspected drug
7 involved in the one in November was?
8     A.    I don't know.
9     Q.    Now, Exhibit 2, is that a different
10 database?  Were those data -- where that data
11 comes from?
12     A.    Yes.  This comes from planning and
13 research.
14     Q.    Planning and research?  That's a
15 department?
16     A.    Yes.
17     Q.    Within the Akron Police Department?
18     A.    Yes.  Civilian employees that work
19 for the police department.
20     Q.    And what is -- what do they -- what
21 is their job?
22     A.    They -- they collect information.
23 They do crime analysis.  They help with a bunch
24 of different things within the police
25 department.  They keep -- they help us with --

1 like, for example, this chart, do the graphics
2 and many, many different functions.  Work on
3 crime trends and crime mapping, and help us to
4 collect information when there have been
5 requests for information from a council person
6 or a business owner, a zone commander, for
7 example.  They work with the zone commanders
8 frequently for requests of information that
9 come in about crime trends or hotspots.
10         And there's a -- an off -- there is
11 an assignment within that office that is
12 responsible for grant writing for the police
13 department that works in conjunction with the
14 city's grant writer to help to bring funds into
15 the -- the department.  And then Andy Carey,
16 who I mentioned earlier, he works out of that
17 office as well.
18     Q.    So where do -- where do they get
19 the data that they use for their crime trends
20 and crime mapping?
21     A.    From our CAD system.
22     Q.    From your what?
23     A.    CAD.
24     Q.    What is that?
25     A.    Computer-aided dispatch.

1     Q.    And what kind of information does
2 that store?
3     A.    It stores calls for service.  It
4 stores all of our incident reports, which are
5 called OIBRS, which is the standard for the
6 State of Ohio for incident -- incident report
7 writing.  We're able to use that to call
8 information based on, you know, a bunch of
9 different types of query.  We can do it by
10 address.  We can do it by crime type.  We can
11 do it by officers involved, suspect or victim
12 information.
13     Q.    Would that database also include
14 suspected drug in a drug case?
15     A.    I don't believe so.
16     Q.    Okay.  What about toxicology after
17 the fact?
18     A.    No.  That would be information that
19 would be generated in -- in narcotics, or if
20 there happened to be a -- it would be in
21 narcotics with the investigating detectives.
22     Q.    But it does indicate, for instance,
23 overdose.  That's how you get those charts,
24 right?
25     A.    Right.

1     Q.    So it does indicate the type of
2 call that -- that is --
3     A.    It would indicate the type of call.
4 It would show -- we would be able to pull up
5 the -- the overdose calls.
6     Q.    I see.  And does it also pull up,
7 you know, the identity of individuals --
8     A.    Yes.
9     Q.    -- involved?
10     A.    Yes, it could.
11     Q.    Both the victim and the other
12 individuals at the scene?
13     A.    Other individuals at the scene if
14 they're known or would be listed as ancillaries
15 on their report, so that is searchable.
16     Q.    In CAD?
17     A.    Yes.
18     Q.    Okay.  And do you get -- so you get
19 these charts that are represented in Exhibit 2.
20 Do you get other breakdowns from that system?
21     A.    We get -- they put out a report
22 month- -- monthly or quarterly for repeat call
23 locations.  So what are the top addresses in
24 each zone of the city that are generating the
25 most repeat calls for service, so as a function

Page 182

1 of management that you can figure out
2 strategies for those locations, find out if
3 they qualify for nuisance abatement or if they
4 can use our neighborhood response officers or
5 patrol officers or other resources in the
6 police department where they could specifically
7 direct resources that way to try to solve some
8 problems.
9     Q.   Okay.  Any other reports related to
10 any kind of drugs?
11     A.   Not from planning and research,
12 that I'm familiar with.
13     Q.   Okay.  Thank you for that
14 qualifier.
15         So we have the spreadsheet for
16 overdose deaths.  We have the chart that is
17 represented in Exhibit 2.  Do you get any other
18 kinds of reports related to drugs?
19     A.   I get an update from HIDTA when
20 they do their annual collection for seizures
21 and drug trends.
22     Q.   And what does that look like?  Is
23 that also a chart?
24     A.   It's a report.  It's multiple
25 pages, but it might be 30 pages, 40 pages.  It

Page 183

1 will show the type of seizures that are done in
2 each of the counties in Ohio.  There's a
3 breakdown by county in Ohio for different type
4 of search -- seizures.  They'll have marijuana
5 separated from crystal meth, separated from
6 heroin, separated from Fentanyl, and then other
7 categories.
8     Q.   Okay.  And that's yearly?
9     A.   I think that's an annual report.
10     Q.   Okay.  Anything -- any other kinds
11 of reports or charts or any kind of --
12     A.   No.
13     Q.   -- regular communication
14 regarding --
15     A.   Not that would be regular that I
16 can recall.
17     Q.   Okay.  And any other databases that
18 you're aware of that would include information
19 about drugs, either drug crimes or overdoses?
20     A.   I don't think so.
21     Q.   You also mentioned earlier that
22 you -- in the late '90s was when you became
23 aware -- aware of the increase in oxy thefts.
24 Do you recall that?
25     A.   Yes.

Page 184

1     Q.   How is it that you became aware?
2     A.   In my responsibilities as a
3 supervisor -- first-line supervisor, sergeant
4 on the midnight shift, I would get all the
5 reports that were submitted by officers who
6 were working for me on that evening, and I
7 would have to review those reports for content,
8 for accuracy, and for -- to make sure that they
9 met up with our department standards, policies
10 and procedures, and so I would sign off on
11 those.  You have to approve the report as a
12 first-line supervisor.
13     Q.   And so it was through seeing those
14 reports that you started to see the increases?
15     A.   Yes.
16     Q.   And who else gets those -- or got
17 those reports in the '90s?
18     A.   Any sergeant that was working in
19 patrol subdivision.
20     Q.   And then, did they go up the chain
21 from you?
22     A.   No.  They go to the record room,
23 and they're just -- at that point in time, they
24 were entered into -- they were manually entered
25 into our systems.  Now they're automatic,

Page 185

1 because they're computer-generated reports.
2     Q.   Do you recall discussing, with your
3 leadership at the time, that you were seeing
4 these increases?
5         MR. LEDLIE:  Object to the form of
6 the question.
7     A.   I don't recall specifically.  I do
8 know that there was a change in -- in awareness
9 about -- hadn't heard of OxyContin.  Hear of
10 OxyContin, and then start to see another
11 report, another report, another report, and,
12 you know, Percocet and some of the other
13 prescription medications, then, that were
14 frequently being reported as stolen or stolen,
15 it stood out.
16     Q.   Right.  And I -- and I just want to
17 understand.  I know it stood out to you.  Are
18 you aware that it stood out to others as well?
19     A.   Through -- yes.  I mean, through
20 casual conversations that I wouldn't be able to
21 pinpoint, you know, "I spoke to Sergeant
22 Jones," you know, "on this date about it."
23 But, yes, there was a growing familiarity
24 within the department that that was
25 problematic.

47 (Pages 182 - 185)

Page 186

1    Q.    Starting in the late 1990s?
2    A.    I think so.
3    Q.    Okay.  Have you ever sought a
4  budget allowance specific to anything caused by
5  opioids?
6    A.    Can you restate that?
7    Q.    Sure.  Have you ever -- have you
8  ever asked for any kind of a specific budget
9  allowance related to opioids in any way?
10        MR. LEDLIE:  Object to the form.
11    A.    No, other than people resources,
12  I've not had a financial request.
13    Q.    You say "other than people
14  resources."  Have you asked for specific people
15  resources related to opioids?
16    A.    Yes.
17    Q.    Tell me about that.
18    A.    The first two -- this wasn't me
19  asking at that point in time, but the -- the
20  first two detectives that were dedicated, they
21  were taking from our -- taken from our
22  narcotics or bid, in addition to our current --
23  the staffing at that time for narcotics, two
24  positions for opioid death investigations.
25        Then there was another point that

Page 187

1  was probably a couple years after that where
2  we -- the problem not only persisted, but grew
3  dramatically, and we had to add two more -- two
4  more people.  So we had full four -- four
5  full-time investigators that were working on
6  opioid overdose death cases.
7    Q.    And you didn't -- you were not the
8  person who asked for that budget increase?
9    A.    No.  That would have been Jim Nice
10  when he was chief.
11    Q.    Nice, okay.  You're aware of it,
12  though?
13    A.    I am aware of it.  And I'm aware
14  of -- I mentioned earlier this morning about
15  the temporary assignment that we had for a
16  number of officers within the police department
17  to be able to specifically go out and assist
18  with some of those investigations and work
19  on -- work on other investigations.
20    Q.    That was during the July 2016
21  carfentanil --
22    A.    It would have been after the --
23  after the July 2016 spike.
24    Q.    The carfentanil issue?
25        MR. LEDLIE:  Object to the form of

Page 188

1  the question.
2    A.    Yes, when carfentanil became known
3  to us.
4    Q.    And do you have any memory of
5  roughly when the -- first the two positions for
6  opioid death investigations were added, and
7  then the additional two?
8    A.    Not specifically.  I believe it was
9  shortly after that.  Shortly after July of
10  2016.
11    Q.    For the first two?
12    A.    For both of those decisions.
13    Q.    Okay.  Though there wasn't much
14  time in between?
15    A.    I don't -- I don't believe.  I
16  can't recall specifically.
17    Q.    And those individuals were
18  allocated for any kind of opioid death
19  investigation, right?  Not just prescription
20  opioids.
21    A.    Well, it wasn't for -- they weren't
22  actually working on the overdose death
23  investigations.  They were working on the
24  problem altogether.  So it was like a
25  short-term drug task force that was put

Page 189

1  together.
2    Q.    What was the name of that task
3  force?
4    A.    I don't remember if we had a
5  specific name for it or not.
6    Q.    And you say it was short-term.  Is
7  it still in place?
8    A.    No.
9    Q.    Do you know how long it was in
10  place?
11    A.    It was -- I think it was in place
12  for 90 days.  That's what our contract allows
13  us for temporary assignments, as long as
14  they're approved by the individual, approved by
15  administration, and approved by the union.
16    Q.    And do you know how much that costs
17  for four officers to be allocated like that for
18  90 days?
19    A.    Well, that team was -- was more
20  than four officers.  I forget exactly how it
21  was comprised.  But, I mean, an office- -- an
22  officer is, on average -- I mean, for -- just
23  for easy calculations, is approximately
24  $100,000 for a year, so about eight and a half
25  thousand dollars a month, and we had maybe --

Veritext Legal Solutions
www.veritext.com                                              888-391-3376

Page 190

1 maybe six -- six members that were assigned.
2   Q.   Okay.  But now I'm confused.  We
3 started out with me asking you whether you had
4 asked for budget allocations, and you said
5 there were -- that there were two positions
6 requested by Chief Nice for death
7 investigations, and then another two after
8 that.
9   A.   Okay.  So --
10   Q.   That's where I got to four.
11   A.   -- we had two originally that were
12 in 20- -- I think in '14 --
13   Q.   2014.
14   A.   -- that were assigned.
15   Q.   Okay.
16   A.   Those are perm- -- that's a
17 permanent assignment.
18   Q.   Okay.
19   A.   They have an assignment in
20 narcotics unit.
21   Q.   Okay.  And those are additional
22 officers.
23   A.   Those are officers that, you know,
24 still have those positions today.  That's their
25 full-time assignment.  It has been continuously

Page 191

1 since 2014.  They're assigned to our
2 antiviolence unit -- antiviolence bureau under
3 the narcotics unit.
4   Q.   Okay.  And they are specifically
5 assigned, under the narcotics unit, to do
6 opioid death investigations?
7   A.   Yes.
8   Q.   Is that --
9   A.   Yes.
10   Q.   -- yes?  Okay.
11       And were they new positions at the
12 time that they were created?
13   A.   They were new positions.
14   Q.   Okay.  So that's roughly $100,000 a
15 year?
16   A.   (Witness nodding head.)
17   Q.   For each.  So $200,000 a year?
18   A.   Right.
19   Q.   Okay.  And then, so that was
20 roughly 2014, to your recollection?
21   A.   Correct.
22   Q.   And then another two at some point?
23   A.   2016, those were permanent
24 positions that were added for opioid death
25 investigations.  And they're assigned under our

Page 192

1 street narcotics unit, because they work
2 different hours than narcotics.  Narcotics
3 works day-shift hours.  Street narcotics works
4 afternoon hours.  This gave us coverage for a
5 much broader period of time during each 24-hour
6 period.
7       Because if it were -- when we only
8 had two assigned, any call out that came, any
9 overdose death that came, it caused us to have
10 a call-in for either of those detectives that
11 were assigned.
12       So that was inefficient.  Each of
13 those call-ins is a minimum of four hours of
14 overtime that's paid, but we were having more
15 overdoses that were occurring.  There were
16 much -- many of those were outside of the hours
17 that those officers worked.  So we added two
18 positions in street narcotics so that we could
19 cover 16 hours out of the day.  It minimized
20 the number of call-ins and addressed the
21 growing number of investigations that were
22 necessary.  I mean, they, you know, jumped
23 dramatically in July of 2016.
24   Q.   But then they fell off again,
25 right?

Page 193

1   A.   Yes.  In August of 2017 there was a
2 considerable drop.
3   Q.   But you --
4   A.   And then --
5   Q.   -- you kept the officers, right?
6   A.   Yes.
7   Q.   Okay.
8   A.   We have kept -- those four officers
9 are currently assigned, but there's less of a
10 demand.  So the officers that are in the street
11 narcotics unit, they can do those call-ins, but
12 they're not burdened nearly as much, so we --
13 now we use them kind of an overlap.  They do
14 have street narcotics responsibilities in
15 addition to overdose death assignments.
16       And beyond those four officers,
17 altogether, we set up a temporary team in 2016
18 that I think was probably six to eight officers
19 that were only -- we were only able to move for
20 a 90-day period.  And they worked in addition
21 to all of our other resources that were -- that
22 were full-time assignments for narcotics
23 investigations.  They worked specifically
24 during a 90-day period.
25   Q.   Okay.  And those were in addition

49 (Pages 190 - 193)

Page 194

1 to the four that we've just discussed?
2    A.   Yes.
3    Q.   And after that 90-day period, they
4 went back to their --
5    A.   We had to send them back to their
6 assignments.
7    Q.   Okay.
8    A.   As a matter of fact, I'll go back.
9 You had a question earlier about any
10 significant arrests that stick out.  That group
11 did have a significant arrest, that temporary
12 team while we were there.  And it stands out
13 because it was a large seizure, which is, you
14 know, outside of what you typically see in a
15 patrol environment.  And I know the amount of
16 drugs that they got out of the trunk of this
17 car in the traffic stop they made was
18 significant.  And the suspect, when he ran from
19 the car, jumped off a bridge to get away from
20 the officers, and so that kind of stuck out,
21 too.
22        So to clarify that earlier answer,
23 that's one more that's in my mind now that I
24 remember.
25    Q.   Do you remember the name of the

Page 195

1 suspect?
2    A.   No, I don't.
3    Q.   Or anyone else involved in that?
4    A.   I remember that Sergeant Mike
5 Orrand was leading the team on a temporary
6 assignment, but I don't remember the other
7 members of that team or anything else that's
8 more specific.
9    Q.   All right.  So each of these
10 requests came before you were chief, right?
11    A.   Yes.
12    Q.   Since you've become chief, have you
13 requested any specific budget items related to
14 opioids?
15    A.   No.
16        MR. LEDLIE:  Object to the form.
17    A.   And I would -- you know, just to
18 make sure that my answer is thorough there, we
19 have requested, like, our -- our opioid
20 overdose death investigators have been --
21 become quite renowned in their field, and so
22 there have been a number of training and -- and
23 also opportunities other law enforcement uses
24 to take advantage of our expertise to host them
25 for training.  So from a budget standpoint, we

Page 196

1 have approved them for travel.  We have
2 approved them for training.  We have spent
3 money in those specific ways.
4    Q.   To other communities outside of
5 Akron?
6    A.   Yes.  They've spoken at law
7 enforcement conferences, I know, at the state
8 level and also at a national level, at the
9 request of the state attorney general and also
10 the federal attorney general.
11    Q.   All right.  But that -- those
12 budget items, their travel outside of Akron,
13 isn't for -- for something that would assist
14 Akron, right?  It's to assist other
15 communities.
16    A.   Right.  Some --
17    Q.   Okay.
18    A.   Well, they're training.  Sometimes
19 they've gone to training outside of the
20 department on their particular area, where they
21 would have learned more about investigation,
22 investigative technique or process, and that
23 would have been paid for by our budget.
24        But when they do go to speak, there
25 are times that we pay for it.  There are other

Page 197

1 times that other entities, like a host entity,
2 might pay for their travel.
3        But I just wanted to be clear about
4 that, that --
5    Q.   No.
6    A.   -- could be something else.
7    Q.   I appreciate that.
8        Who are these four officers?
9    A.   Tim Harvey and Mike Schmidt.
10 They're the ones who've been assigned there the
11 longest period of times out of narcotics.  And
12 from street narcotics, I can't recall the names
13 of those two officers.
14    Q.   Okay.  I have another document for
15 you.
16    A.   Okay.
17        - - - - -
18        (Thereupon, Deposition Exhibit 10,
19        October 2016 E-Mail Chain Re: Opioid
20        Action Group Notes 101416, with
21        Attachment, SUMMIT_000175900 to
22        175901, was marked for purposes of
23        identification.)
24        - - - - -
25    Q.   Chief Ball, you've been handed

50 (Pages 194 - 197)

Page 198

1  Exhibit 10.  And the first page is an e-mail
2  communication that you're not on; however, the
3  attachment refers to you.  And that's really
4  what I'm hoping to ask you about here.
5          The attachment -- and I gave you
6  the e-mail just so you can see where we got the
7  attachment from.
8      A.    Okay.
9      Q.    This is -- and the -- and we can
10  date it.  This is from October of 2016.  And it
11  appears to be notes from an opioid action group
12  from Wednesday, October 12, 2016.
13      A.    Okay.
14      Q.    And if you look at -- under "Action
15  Items," No. 1, you see it says, "Set members of
16  the opioid action group," and you appear to be
17  one of the members.
18      A.    Okay.  Can I get a minute to, like,
19  get context to this?
20      Q.    Yeah.  I'm just -- I have limited
21  time, and so that's why I'm telling you I'm not
22  asking you about the e-mail.
23      A.    Okay.
24      Q.    I'm asking you about the opioid --
25          MR. LEDLIE:  He's asking to review

Page 199

1  the document.  Are you going to ask him about
2  the document?
3          MS. SAULINO:  Excuse me.  Excuse
4  me.
5      Q.    I'm -- I'm asking you --
6          MR. LEDLIE:  This is conduct of a
7  deposition.
8          MS. SAULINO:  Excuse me, sir.
9  You're --
10          MR. LEDLIE:  I am going to allow
11  the witness --
12          MS. SAULINO:  Sir --
13          MR. LEDLIE:  -- to review the
14  document.
15          MS. SAULINO:  Sir, the court
16  reporter --
17          MR. LEDLIE:  Under the Federal --
18          MS. SAULINO:  -- also records us,
19  so I'm asking you to let me finish talking
20  before you talk.  The same thing that the two
21  of us are doing.  And all I'm --
22          MR. LEDLIE:  That is
23  understandable.
24          MS. SAULINO:  And all I'm saying is
25  I don't want to ask him about the e-mail and I

Page 200

1  don't want to waste my time with him reading an
2  e-mail that I'm not asking him about.  I'm
3  simply asking about the opioid action group.
4          MR. LEDLIE:  Which is what he's
5  reviewing, ma'am.  That's what's in front of
6  him.
7          MS. SAULINO:  And that's -- so
8  we're in agreement.  That's what I was asking
9  him to do.
10          MR. LEDLIE:  No, you were jumping
11  into a question.
12          MS. SAULINO:  No, sir, I was not.
13          MR. LEDLIE:  It's recorded.  We
14  don't need to waste time on this.
15          MS. SAULINO:  We don't, sir, which
16  you're doing right now, so I'd appreciate it if
17  you'd stop.
18          MR. LEDLIE:  I'm allowing the
19  witness to review the document.
20          MS. SAULINO:  Nope.  He's -- he's
21  good.
22  BY MS. SAULINO:
23      Q.    Whenever you're ready, Chief Ball.
24      A.    Okay.
25      Q.    All right.  So this document

Page 201

1  appears to be referring to an opioid action
2  group that you are listed as a set member of.
3  Do you have any idea what this is about?
4      A.    I believe that this is about Quick
5  Response Teams and the development of Quick
6  Response Team -- our Quick Response Team.
7      Q.    Okay.  Can you explain to me why
8  you say that?
9      A.    Because it talks about the Colerain
10  project, and the Colerain project, I believe,
11  is about Colerain was, I think, one of the
12  first to institute a quick response program.
13      Q.    Okay.  The Colerain project, you're
14  saying?
15      A.    Yes.
16      Q.    Okay.  And what is -- and so do you
17  remember this meeting from October 12, 2016?
18      A.    Not specifically.  I do remember
19  going to an event in Canton that was hosted in
20  Canton, where Colerain presented about their
21  Quick Response Teams, about some of the
22  benefits, some of the successes that they've
23  had, and it was just introducing the idea to
24  law enforcement in Northeastern Ohio.
25          And I did have a role in the

51 (Pages 198 - 201)

Page 202

1 development within the Akron Police Department,
2 how it would work, what it would look like, how
3 we were able to execute it with the resources
4 that we had in place. So from that, I have
5 that familiarity.
6    Q.   Okay. Do you know whether this
7 group ever met again?
8    A.   I don't know if this group ever met
9 again.
10    Q.   Okay.
11    A.   I do know that we developed a QRT
12 team, and we have it in place.
13    Q.   A Quick Response Team?
14    A.   Yes.
15    Q.   Okay. Now, you see not only were
16 you listed as a set member of the opioid action
17 group, but you were listed as an attendee as
18 well.
19    A.   Right. All right. Now, yes, I do
20 remember, because Chief Bunner is on here. He
21 was the -- I think the chief -- the prior fire
22 chief before Clarence Tucker was named fire
23 chief. And I do remember these meetings. We
24 had them over in fire's administrative building
25 and in their office with the people that are

Page 203

1 listed here.
2    Q.   Do you know whether this group
3 still exists?
4    A.   I do not believe that it does.
5    Q.   Okay.
6    A.   I think it was once QRT was stood
7 up, that that was the goal of the group, if I
8 recollect correctly.
9    Q.   Okay. So the goal of the group was
10 to get the Quick Response Team set up, and then
11 it didn't need to exist anymore?
12    A.   I believe so.
13    Q.   And what is your understanding of
14 what the Colerain project is?
15    A.   It was the development of the quick
16 response, which was a coordinated effort with
17 law enforcement, fire, and public health. And
18 each week after -- each week they look at the
19 overdose that -- overdose -- overdoses that
20 have occurred in our jurisdiction, and Colerain
21 obviously was their jurisdiction. And we set
22 up meetings with a representative from each of
23 those groups, fire, police, and community
24 health, to try to educate those that are
25 suffering from addiction, those have been

Page 204

1 impacted by it. We try to connect with --
2    Q.   I think you misunderstood my
3 question. I'm asking what the Colerain
4 project -- that that term, what that means.
5    A.   That is the reference, I believe,
6 to the -- to the QRT team establishment.
7    Q.   Okay. Is --
8    A.   I don't know if they were calling
9 it Quick Response Team or if that's something
10 that was -- that has kind of evolved and now
11 it's called Quick Response Team.
12    Q.   Is Colerain a location?
13    A.   Colerain -- yes.
14    Q.   Okay.
15    A.   It's a jurisdiction in Ohio.
16    Q.   So it was a place that had
17 established QRTs --
18    A.   Yes.
19    Q.   -- that you were copying.
20    A.   Right.
21    Q.   That's what I was asking.
22    A.   Didn't I say that before?
23    Q.   I was trying to understand --
24    A.   Okay.
25    Q.   -- what it was. Whether it was

Page 205

1 some sort of grant or -- I really --
2    A.   No.
3    Q.   -- was asking you what it was.
4    A.   It's -- Colerain is the
5 jurisdiction.
6    Q.   Okay. And separately, do you know
7 whether there was any sort of a grant
8 associated with it in any way?
9       MR. LEDLIE: Object to the form of
10 the question.
11    A.   I don't know.
12    Q.   You don't know, okay.
13       Earlier today we talked about the
14 complaint.
15    A.   Let me go back just to clarify.
16       I do know that we have got grant --
17 we have qualified for some grant funding, I
18 believe for support of our QRT or our -- not --
19 not -- it's not a Colerain project. I don't
20 know if Colerain did, but I think the City of
21 Akron has --
22    Q.   Okay.
23    A.   -- received some grant funding.
24    Q.   What do you know about that?
25    A.   That it helps to pay if -- if there

52 (Pages 202 - 205)

Page 206

1 are any -- we have officers that are involved
2 that may not be on duty, so it may pay for some
3 overtime costs that are associated.
4      I think that there was also monies
5 that were made available for a vehicle.  I
6 don't know if -- and beyond that it would be --
7 I -- if we could have taken -- taken advantage
8 for -- for funds for printing and materials
9 that we would present or for other things, I'm
10 sure that we would have tried to see if those
11 were available and taken advantage of them in
12 any way that we could have.
13     Q.   And do you know where that grant is
14 from?
15     A.   No.
16     Q.   Okay.  Do you know how much it's
17 for?
18     A.   No.
19     Q.   Do you know who would know?
20     A.   Yes.  Andy Carey would know.
21     Q.   Earlier today we talked about the
22 complaint.  You said you had reviewed it,
23 right?
24     A.   Yes.
25     Q.   You know there were 19 Defendants

Page 207

1 listed in the complaint?
2      A.   I believe there were a number that
3 were more than probably 10.  I didn't know
4 specifically.
5      Q.   Okay.  And do you know how they
6 were chosen?
7      A.   No, I do not.
8      Q.   Did you have any involvement in
9 choosing them?
10     A.   No, I did not.
11     Q.   Prior to this case, did you ever
12 contact any of the Defendants in this
13 litigation to discuss the problems that Akron
14 was facing with opioids?
15     A.   No.
16     Q.   And prior to this case, did you
17 ever contact any of the parent companies of the
18 Defendants in this litigation?
19     A.   No.
20          MR. LEDLIE:  Object to the form.
21     Q.   Why had you not contacted them?
22          MR. LEDLIE:  Object to the form.
23     A.   Wouldn't have -- that would not
24 have been within my purview.
25     Q.   But you told me earlier that you

Page 208

1 believed them to be partly responsible, right?
2      A.   I do, and I've come to understand
3 more about that.  My perspective is changing as
4 I'm -- as I become more exposed and more
5 educated about the issue, the greater issue.
6      Q.   So why haven't you reached out to
7 them to try to get them to help you figure out
8 a way forward?
9          MR. LEDLIE:  Object to the form.
10     A.   I have a police department of
11 455 -- or 440 people and 200,000 people that
12 live in the community, and, you know, my
13 responsibilities are just different.  That
14 wouldn't be at my level or something that --
15 that I would pursue.
16     Q.   Well, you've mentioned -- we've
17 talked a couple of times today about drug
18 diversion, right?
19     A.   Uh-huh.
20     Q.   Yes?
21     A.   Yes.
22     Q.   And, you know, you've said that
23 you, through your general knowledge, have come
24 to believe that the Defendants in this case are
25 somehow somewhat responsible for the opioid

Page 209

1 epidemic that your police department is
2 combatting, right?
3      A.   Correct.
4          MR. LEDLIE:  Object to the form.
5      Q.   Don't you think that contacting
6 some of these Defendants might have helped you
7 to get at the diversion issues that you've been
8 facing?
9          MR. LEDLIE:  Object to the form of
10 the question.
11     A.   It just is not something that would
12 fit.  We have other agen- -- it's a large
13 municipality.  There are other agencies, and
14 Summit County Public Health is involved, and
15 all of our treatment facilities and...
16     Q.   So who -- which agency would you
17 expect to contact the Defendants in this
18 lawsuit?
19          MR. LEDLIE:  Object to the form of
20 the question.
21     A.   I don't know for certain who would
22 have that responsibility or who that would fit
23 with.
24     Q.   Well, I mean, so you understand
25 that the City of Akron is suing these

53 (Pages 206 - 209)

Page 210

1 Defendants saying that they are partly
2 responsible for the opioid epidemic, right?
3     A.   Yeah.
4     Q.   And you've told me a number of
5 times that you're working on combatting the
6 opioid epidemic, right?
7     A.   Correct.
8     Q.   Isn't it typical to want to get to
9 the source of a problem in a police
10 investigation?
11         MR. LEDLIE:  Object to the form of
12 the question.  This is approaching badgering.
13 This conduct is not necessary.
14         MS. SAULINO:  Sir, I'm in no way
15 badgering him.  I'm asking about the basis of
16 this lawsuit.
17     A.   The -- I think that, from an
18 investigative standpoint, you do look for --
19 you do look for facts.  It's hard to equate,
20 without all of the information, without some of
21 the -- some of the -- some of the exposure to
22 what law enforcement's role is in that process,
23 and I think that we worked very diligently at
24 those things that were within our scope and in
25 our area of expertise to try to combat this

Page 211

1 problem.  It was something that was very
2 specific, prevalent in our environment.
3         To take it to a step where law
4 enforcement is contacting -- investigating,
5 contacting manufacturers of prescription
6 medications, that's not a fit.  It might sound
7 logical in hindsight to say, "Could you have
8 done this?  Should you have done this?"  But
9 that's not a role that would be -- you know,
10 that would be natural or normal in that
11 context.
12     Q.   Because it's too far removed from
13 the crimes you were investigating, right?
14         MR. LEDLIE:  Object to the form of
15 the question.
16     A.   No, I don't -- it's hard, I
17 can't -- again, my -- my area is law
18 enforcement.  I'm not trying to misrepresent my
19 perspective or to say something that feels good
20 or looks good in this environment.  I'm talking
21 about what is known to -- known to us.
22         And at that point in time, you
23 know, the scope of that, probably the --
24 probably the D- -- probably the DEA, federal
25 investigative -- investigative entities, it

Page 212

1 would be in -- I would imagine it would be
2 within their -- their line and their
3 jurisdiction.
4         For a local police chief, for a
5 local police department, those are boundaries
6 that are far beyond what we typically would be
7 involved with.
8     Q.   Did you ask the DEA to get
9 information for you from these entities?
10         MR. LEDLIE:  Object to the form of
11 the question.
12     A.   I did not personally.
13     Q.   You could have, though, right?
14         MR. LEDLIE:  Object to the form of
15 the question and the conduct.  It's been going
16 on for quite some time.
17         MS. SAULINO:  Sir, there is no
18 conduct.
19         MR. LEDLIE:  There is a conduct.
20         MS. SAULINO:  Sir, you're the one
21 who's raising your voice.  I am not.
22         MR. LEDLIE:  Whether I raise my
23 voice or not, this -- this conduct is
24 unacceptable.
25         MS. SAULINO:  Okay.  You're using

Page 213

1 up my time now.  I'd ask --
2         MR. LEDLIE:  No.
3         MS. SAULINO:  Okay.  Let's go off
4 the record.
5         MR. LEDLIE:  Go off the record.
6         THE VIDEOGRAPHER:  Going off the
7 record at 2:01 p.m.
8         (Off-the-record discussion.)
9         MR. LEDLIE:  We're going back on
10 the record.
11         THE VIDEOGRAPHER:  Back on the
12 record at 2:02 p.m.
13     Q.   All right.  Chief Ball, do you
14 believe that any of the Defendants have data
15 that would be useful in your investigations?
16     A.   I don't know.
17     Q.   And you haven't asked any of them
18 for it, right?
19     A.   Right.
20     Q.   And you, similarly, haven't asked
21 the DEA to get it for you, right?
22     A.   I have not.  I don't know what that
23 process looks like with our narcotics.  I don't
24 have regular interactions with the DEA or the
25 FBI or our task forces.

54 (Pages 210 - 213)

Page 214

1   Q.   We'd need to ask the task force
2  officers about that?
3      A.   The task force officers would be
4  familiar.  Captain Shearer would be familiar
5  with what those communications would have been
6  or what they would have looked like.  Detective
7  Leonard would be a good resource as well.
8          - - - - -
9          (Thereupon, Deposition Exhibit 11,
10          Summit County And City of Akron,
11          Ohio Plaintiff First Amended
12          Responses and Objections to
13          Distributor Defendants' First Set of
14          Interrogatories, was marked for
15          purposes of identification.)
16          - - - - -
17      Q.   Chief Ball, you've been handed a
18  document that has been marked as Exhibit 11.
19  And this is a document that has been provided
20  to us by the City of Akron's lawyers.
21          As I understand it from our
22  discussion earlier, you have not seen this
23  document before.  I am only going to be asking
24  you questions, at this point, about a chart
25  that appears on pages 45 and 46.  The

Page 215

1  introductory sentence to that chart is on page
2  44.
3      A.   Yeah, I may have -- may have -- I
4  don't know if -- if I've ever seen this before
5  or not.  I may have.
6      Q.   Okay.  That's fine.  If -- you
7  think you may have seen it before?
8      A.   I don't know.  I can't say for
9  sure.  You asked earlier about it, and the
10  interrogatory.  I don't know for sure.
11      Q.   It's fine if you now think that
12  you've seen it before.
13      A.   I can't say for sure.
14      Q.   Okay.  Do you recall having
15  reviewed something that looks like this?
16      A.   I don't know.  Go ahead.
17      Q.   Okay.  So I'm going to be asking
18  you about the chart that appears -- it starts
19  on the bottom of page 45.  The introductory
20  sentence to that chart is on page 44 in the
21  middle.
22          It says, "The following table
23  describes other examples of the efforts made to
24  address public health and safety hazards of the
25  opioid epidemic caused by the wrongful conduct

Page 216

1  of Distributor Defendants."
2          Do you see that?
3      A.   Yes.
4      Q.   Do you know who that's referring
5  to, Distributor Defendants?
6      A.   I saw that there was a list of
7  distributors and a list of manufacturers, I
8  believe.
9      Q.   Okay.  You don't know specifically
10  who that's referring to?
11      A.   I don't know them --
12          MR. LEDLIE:  Object to the form.
13      A.   I don't know them by name.
14      Q.   Do you know the names of any
15  pharmaceutical distributors?
16      A.   McKesson.
17      Q.   Okay.
18      A.   I can't remember -- I don't know
19  them all.  I saw it on your notebook.
20      Q.   Okay.  Other than that, do you know
21  the names of any pharmaceutical distributors?
22      A.   Purdue, maybe.
23      Q.   Do you know --
24      A.   I don't.
25      Q.   Okay.  Do you know that they're a

Page 217

1  manufacturer?
2      A.   What's that?
3      Q.   Purdue is a manufacturer?
4      A.   I don't know the differences
5  between the two.  No.  I didn't study a -- I
6  haven't studied any of the -- the documents to
7  know the differences between two or what each
8  one of their names would be or memorize the
9  list.
10      Q.   Okay.  Fair enough.  So actually,
11  this is a fair clarification.
12          Do you even know the difference
13  between a pharmaceutical manufacturer and a
14  pharmaceutical distributor?
15      A.   Yes.
16      Q.   You do?
17      A.   I would imagine, if a manufacturer
18  is somebody that produces the medication and a
19  distributor is somebody who puts it out there.
20      Q.   And do you know where the
21  distributors, quote, "put it out there"?
22      A.   To doctors, pharmacies.
23      Q.   Do you actually know?
24          MR. LEDLIE:  Object to the form.
25      A.   No, I don't know.  I wouldn't say

55 (Pages 214 - 217)

Page 218

1  that I knew that absolutely.
2      Q.   Okay.  So you don't know that
3  distributors -- whether distributors actually
4  distribute to doctors?
5          MR. LEDLIE:  Object to the form of
6  the question.
7      A.   No.  Through pharmacies.  I
8  don't -- I don't know for sure.
9      Q.   Okay.  Let's go back to the bottom
10  of page 45, which is the other examples of
11  efforts made to address public health and
12  safety hazards of the opioid epidemic caused by
13  the wrongful conduct of Distributor Defendants
14  in Akron, as alleged by the Plaintiffs in this
15  case.
16      A.   Were you on 45?
17      Q.   I'm looking at -- yeah.  So I was
18  just reading the introductory --
19      A.   Right.
20      Q.   -- sentence that's on 44, and then
21  45 where the Akron appears on the left-hand
22  side --
23      A.   Okay.
24      Q.   -- of the table.  Do you see that?
25      A.   Yes.

Page 219

1      Q.   Okay.  It says opioid-focused Quick
2  Response Team.  Now, I think you'd mentioned
3  that a minute ago.
4      A.   I did.
5      Q.   And when was that set up?  Sometime
6  after that meeting we were looking at?
7      A.   That would be right.
8      Q.   Okay.  So sometime in the last two
9  years?
10      A.   Yes.
11      Q.   And how many officers are involved
12  in that?
13      A.   Well, it changes -- it changes each
14  week.  We have one officer, one fire officer,
15  and one public health representative that go
16  out each week to visit the overdoses from the
17  prior week.
18          For us, that has to change.  It
19  changes -- David Garro, lieutenant in our
20  narcotics, is the administrator, and he will
21  schedule officers using neighborhood response
22  team, and it just depends who's scheduled to
23  work that day.  We try to minimize the overtime
24  that's necessary.  We have 12 neighborhood
25  response officers, so it could have been

Page 220

1  rotated between any one among those 12.  Or I
2  don't know if somebody has a preference for
3  that assignment and maybe so it doesn't -- all
4  12 may not have done it, if that be the case.
5  But that would be the maximum, probably, is the
6  lieutenant and the 12 NRT officers, and the
7  zone commanders who make those assignments.
8      Q.   Okay.  But not all 12 at one time,
9  right?
10      A.   No.  It's one -- one police
11  representative, one fire representative, one
12  from public health.
13      Q.   And the activity is to go out to
14  the overdoses of the previous week; is that --
15      A.   Yes.
16      Q.   -- right?
17      A.   To try to interact with the person
18  who overdosed, and if that person is not
19  available, they have information, literature,
20  education, for families or other people that
21  are close to that person.
22      Q.   Okay.  And you said earlier there's
23  grant money involved in that?
24      A.   Yes.
25      Q.   All right.  The next bullet is

Page 221

1  purchases of Narcan, drug testing kits, and
2  immunity hearing requirement forms.
3      A.   Yes.
4      Q.   Were you involved in that?
5      A.   No.
6      Q.   Okay.  And do you know whether the
7  Akron Police Department contributed money to
8  those activities?
9      A.   Yes.
10      Q.   Okay.  How much?
11      A.   I wasn't involved.  I didn't order
12  the -- I didn't order that or I wasn't involved
13  in the training, but I am familiar with
14  commitments that we made to each one of those
15  areas and the costs that were required of the
16  police department.
17      Q.   How much?
18      A.   I don't -- I don't know for sure.
19      Q.   Okay.  But you're familiar with it?
20      A.   I'm familiar that -- that those
21  processes took place, that we made purchases of
22  Narcan, that we bought drug testing kits, and
23  that we have printed immunity hearing
24  requirement forms that we pass out when the
25  circumstances call for.

56 (Pages 218 - 221)

Page 222

1    Q.    And where would we find out how
2    much was spent on this?
3    A.    Andy Carey or Captain Schnee would
4    be able to come up with that information.
5    Q.    Okay.  It says, "Increased police,
6    fire, EMS service calls for overdoses."  I
7    assume you're familiar with that?
8    A.    Familiar.
9    Q.    And how much has that cost the
10   Akron Police Department?
11   A.    I'm -- I'm not going to be able to
12   give you a number for any of the things that
13   are here.  I mean, it's -- we have -- Andy
14   Carey, Captain Schnee, Captain Harding, who's
15   in charge of our -- he oversees our technology
16   and services divisions, that information would
17   be collected by them.
18        I don't -- I'm not going to have a
19   number for any of those things in -- in my mind
20   or to write -- ready for recall.
21   Q.    Okay.  You didn't participate in
22   putting together this list?
23   A.    I may have -- I mean, I may have
24   participated in, like, how have we been
25   impacted and giving some general ideas, but I

Page 223

1    didn't -- I have not collected any of this
2    information.  That would be somebody other than
3    me who would put all that together.
4    Q.    And you, similarly, haven't
5    participated in putting together numbers of
6    amounts of money devoted to each of these?
7    A.    No, I haven't.
8    Q.    And that would be true for
9    everything in this bullet-pointed list on page
10   45?
11   A.    Yeah.  That would be true for
12   almost every expense that the Akron Police
13   Department has.  I mean, I've got a familiarity
14   in a sense, or if we're working specifically on
15   budgets, I'll be participatory, but I -- I
16   don't keep track of all those amounts.
17   Q.    Okay.  That's fair.
18        Just so that -- for completeness,
19   the chart actually also goes over to the next
20   page, and there's one more bullet there.  So I
21   just --
22   A.    Let me -- I'll look through the
23   bullets to make sure that there's not something
24   that -- I don't want to misspeak.  I know that
25   these -- that there has been work done to try

Page 224

1    to quantify this -- some of this information
2    the best that we could.  It's, like, very
3    expansive.
4    No.
5    Q.    And to your knowledge, did anyone
6    at the Akron Police Department reach out to any
7    of the Defendants to assist with any of these
8    efforts?
9        MR. LEDLIE:  Object to the form of
10   the question.
11   A.    Restate that.  Did anybody go --
12   Q.    At the Akron -- did anyone at the
13   Akron Police Department reach out to any of
14   Defendants in this litigation to assist with
15   any of these efforts on pages -- pages 45 and
16   the top of 46?
17   A.    I'm certain that they have not.
18   Q.    Okay.  You can put that one aside.
19        In your view, Chief Ball, did Akron
20   attack the opioid epidemic as quickly and
21   intensively as it should have?
22        MR. LEDLIE:  Object to the form of
23   the question.
24   A.    I think Akron used the -- the
25   resources that were available to us and worked

Page 225

1    within the limitations that exist with large
2    government to try to address the problem.  I
3    think anybody could look back and -- and say
4    that it wasn't enough and it wasn't soon
5    enough, and there could be some fair arguments
6    that were made on that.
7        But in the context of how we
8    operate, the limits of how we move personnel
9    around, the limited budgets that exist, and the
10   budget process for us that is set, you know,
11   well in advance, I think the work that we did
12   is something that the community can be proud
13   of.
14        It's had a significant impact not
15   only in our jurisdiction, but in other areas
16   where we have developed an expertise and an
17   experience that has been widely recognized, not
18   just in our area, but in Ohio and nationally.
19   And so I -- we did do a lot.  Somebody could
20   look back and be critical and say it wasn't
21   enough, it wasn't soon enough, but considering
22   the circumstances that existed in totality, I'm
23   proud of the work that we did.
24   Q.    Right.  And I -- and I think what
25   you're referring to, with the circumstances

57 (Pages 222 - 225)

Page 226

1 that existed in totality, is that it's much
2 easier to look back now, knowing what happened,
3 at information that was available earlier and
4 say now, "Well, maybe we should have acted
5 differently then," right?
6        MR. LEDLIE:  Object to the form of
7 the question.
8     A.   I think that those circumstances
9 exist in a lot of different ways at a lot of
10 different times and different topics.
11    Q.   Right.
12    A.   Yes.
13    Q.   I think you and I agree.
14    A.   Okay.
15    Q.   And so put more simply, in
16 hindsight, it is possible that Akron and others
17 might have acted quicker, knowing now what
18 became of the issue, right?
19        MS. RION:  Objection.  Calls for
20 speculation.
21    A.   I think that I just answered that
22 and said that probably anybody looks back and
23 you evaluate, and -- was there something more
24 that could have been done?  Realistically, when
25 you're going through it and when the

Page 227

1 limitations that exist, you're trying to figure
2 out, we need to have cars in districts that
3 answer 911 calls and other calls for service
4 coming in, and you have an emerging or growing
5 problem, it's always a balance of, well, what
6 resources do we pull from and -- and how do we
7 plan -- how do we plan for this and -- and
8 react to it without going far outside, because
9 there's not room in our budgets to be able
10 to -- to move nimbly.
11        So it's -- it's anybody can go back
12 and look and be critical.
13    Q.   Right.  You do the best you can
14 with the information you have at the time,
15 right?
16    A.   Sure, and the resources.
17    Q.   And what about other government
18 officials?  Do you think other government
19 officials attacked the opioid epidemic as
20 quickly as they could have?
21        MR. LEDLIE:  Object to the form.
22    Q.   Outside of -- outside of Akron?
23    A.   Do you want my opinion or --
24    Q.   I do.
25        MR. LEDLIE:  Object to the form of

Page 228

1 the question.
2     A.   It's hard to say.  You don't
3 know -- the exact same thing.  I can't project
4 my -- my limited view of things and be critical
5 of somebody without knowing all of the facts.
6 If they had rightly prioritized it, or I don't
7 know what -- what resources they had available,
8 what information they have available at the
9 time to be able to act on those things.
10        So it would be -- I think when you
11 end up with, you know, hundreds of thousands of
12 people that are dead, somebody -- we should be
13 looking back and saying, "What contributed to
14 this?  How did we get into this place?  And
15 what's my role?  Could I have done things
16 differently or better?"
17    Q.   And what more do you think Akron or
18 other government officials could have done?
19        MR. LEDLIE:  Object to the form of
20 the question.
21    Q.   Looking back now.
22        MR. LEDLIE:  Object to the form of
23 the question.
24    A.   I don't know what we could have
25 done differently.  I mean, Narcan, we didn't

Page 229

1 have Narcan in our cruisers as quickly as some
2 other jurisdictions, but there was a thought
3 process to that, because we have decentralized
4 EMS in the city.  So there are firehouses in --
5 in districts all over the city.  So when we
6 would get called to an overdose, there would be
7 Narcan on board on each of those occasions.
8        So trying to figure out, from a
9 budget standpoint, do we purchase new Narcan,
10 do we pay for training for 440 officers, that
11 time away from the shift for the training, the
12 resources necessary for those purchases, do we
13 make it, or are we, right now, properly covered
14 and safely covered with EMS?
15        And so there was not an immediate,
16 "Yeah, money is no object, and we've got plenty
17 of time for training, we've got plenty of
18 people for training."  We didn't.  When you
19 train an entire police department, you're
20 taking dozens of police officers off the
21 street.
22        So we did, then, with more
23 information becoming available and seeing how
24 it was affecting -- having an effect in other
25 jurisdictions, even though we have

58 (Pages 226 - 229)

1  decentralized EMS, we eventually went to Narcan
2  in every police car.
3      Could it have happened sooner?  It
4  probably could have happened a little bit
5  sooner.  But our thought processes is very wide
6  and has to take into consideration many, many
7  different things.
8      Q.  Did you ask for more money at the
9  time?
10     A.  I did not ask for more money at the
11 time.  I don't know exactly what that process
12 was.  I know that, you know, as a department,
13 we are constantly evaluating what opportunities
14 that exist.  We apply for grants with great
15 regularity.  We figure out ways that when there
16 are needs that we can work outside of our means
17 or take on other partners or take advantage of
18 some funds that are available that are
19 non-traditional, and have been very successful
20 with that.
21     So I would be very confident to say
22 that, yeah, our process was -- was doing that
23 at the time, looking for other resources.
24     Q.  Did you reach out to any of the
25 Defendants to ask for resources?

1      MR. LEDLIE:  Objection.
2      A.  I did -- I did not.  I don't know
3  if anybody within the department or the City
4  did.
5      Q.  What about for information that
6  would have helped you?
7      A.  I'm not aware.
8      Q.  Okay.  You brought up Narcan and
9  when that came into the cruisers.
10     A.  Yes.
11     - - - - -
12     (Thereupon, Deposition Exhibit 12,
13     Document Titled "Media Advisory,
14     Akron, OH, August 19, 2016,"
15     AKRON_000243705, was marked for
16     purposes of identification.)
17     - - - - -
18     Q.  Chief Ball, you've been handed
19 Exhibit 12, which is a media advisory from
20 August 19th of 2016 from Mayor Horrigan.
21     A.  Right.
22     Q.  Do you recognize this media
23 advisory?
24     A.  No.  I'm -- I'm sure that I saw it
25 previously.

1      Q.  You recognize the circumstances?
2      A.  Yes.
3      Q.  Okay.  And this is the media
4  advisory announcing that "The Akron police
5  personnel will be trained on how to
6  administer" -- I never remember how to say this
7  correctly -- naloxone?
8      A.  Yes.
9      Q.  Narcan, right?
10     A.  Right.
11     Q.  -- "Monday and Tuesday, August 22nd
12 and 23rd.  Once trained, the goal is for the
13 program to be fully implemented by the end of
14 August with every cruiser being equipped with
15 Narcan," right?
16     A.  Yes.
17     Q.  And the media advisory says here at
18 the last paragraph, "Akron Fire Department/EMS
19 has had Narcan as a part of their advanced life
20 support drugs for over 20 years," right?
21     A.  Yes.
22     Q.  And that the media advisory has a
23 quote from Mayor Horrigan saying,
24 "Statistically, EMS arrives before Akron Police
25 Department the vast majority of the time; yet

1  in those crucial first responder moments when
2  APD arrives first, I want our officers to be
3  able to save a life," right?
4      A.  Yes.
5      Q.  So you'd agree with me -- and I
6  understand your point about resources -- but
7  you'd agree with me that if the police officers
8  had had Narcan prior to August of 2016 in their
9  cruisers, more lives would have been saved?
10     MS. RION:  Objection.
11     A.  I can't say that, I mean,
12 unequivocally, but there's a possibility.
13 Officers have -- since we have had Narcan in
14 the car, officers have administered Narcan on a
15 number of occasions.
16     Q.  And you see that the mayor says,
17 "In many ways, this epidemic has been creeping
18 around the country and our region, specifically
19 our county, for the past three to five years.
20 However, no one could have predicted the
21 introduction of Fentanyl and carfentanil and
22 the damage they both caused," right?
23     A.  I see that.
24     Q.  Would you agree with that?
25     MR. LEDLIE:  Object to the form.

59 (Pages 230 - 233)

Page 234

```
1     A.   Yes.
2          MR. LEDLIE:  Can we take a break?
3  We've been going about an hour.  Courtesy break
4  for the restroom.
5          MS. SAULINO:  Sure.
6          THE VIDEOGRAPHER:  Going off the
7  record at 2:23 p.m.
8          (A recess was taken.)
9          THE VIDEOGRAPHER:  Back on the
10  record at 2:33 p.m.
11         - - - - -
12         (Thereupon, Deposition Exhibit 13,
13         November 2015 E-Mail Chain Re: Any
14         Interest in Narcan for Patrol,
15         AKRON_000373792, was marked for
16         purposes of identification.)
17         - - - - -
18  BY MS. SAULINO:
19     Q.   Chief Ball, you've been handed a
20  document that has been marked as Exhibit 13.
21  And this is an e-mail exchange.  The bottom
22  e-mail, you are on.  The top e-mail you are not
23  on, but it references a conversation with you.
24  Just let me know when you're ready.
25     A.   Okay.
```

Page 235

```
1     Q.   All right.  This is an e-mail
2  exchange from November of 2015, right?
3     A.   Yes.
4     Q.   And on the bottom e-mail, it looks
5  like a Jeff Mullins.  Who is Jeff Mullins?
6     A.   Jeff Mullins was a sergeant in our
7  training -- training bureau.
8     Q.   And Jeff Mullins is e-mailing
9  you -- well, is e-mailing Melissa Schnee.
10  That's the Sergeant Schnee you've referred to?
11     A.   She is.  She's in command of our
12  services office, and one of their joint
13  responsibilities is also training, and is a
14  major in DB.  I was also in that chain of
15  command.
16     Q.   A major in?
17     A.   The detective bureau.
18  Investigative subdivision.
19     Q.   DB is detective bureau?
20     A.   Yes.
21     Q.   Okay.  And also Paul Calvaruso is
22  on this e-mail, right?
23     A.   And he was the deputy chief in
24  charge of uniform.
25     Q.   Okay.  And this e-mail from
```

Page 236

```
1  Mr. Mullins says, "Reserve Officer John Nouse
2  e-mailed me that he is in contact with a group
3  who would like to provide Narcan and training
4  to APD officers for when we respond to heroin
5  overdoses.  Is there any department interested
6  in equipping our patrol officers with Narcan
7  and the training in its administration to an OD
8  victim?"  And then, "If yes, whom shall I tell
9  the group to contact?"
10          So that was the -- that was the
11  e-mail on November 19, 2015, right?
12     A.   Right.
13     Q.   And then the response from Ms. --
14  or from Sergeant Schnee -- Captain Schnee?
15  Sorry.
16     A.   Captain.
17     Q.   Captain Schnee to --
18     A.   Sergeant Schnee.
19     Q.   -- Sergeant Mullins -- thank you --
20  on November 20, 2015, says, "Jeff, I contacted
21  Major Ball about your e-mail, and he said that
22  this has been discussed before and the
23  consensus was that AFD gets there as quick or
24  quicker, so we weren't going to train or equip
25  our folks."
```

Page 237

```
1          Is that true?
2     A.   Yes.
3     Q.   Okay.
4     A.   I think we just talked about that
5  right before the break.
6     Q.   Well, you had referenced resources
7  as one of the reasons, and here it looks as
8  though a group was offering to provide the
9  Narcan and the training.
10     A.   I don't know if this group -- and
11  resources are more than just funds for -- funds
12  for the Narcan.  I don't know if this group was
13  offering to provide Narcan and training.  It
14  doesn't say for no -- no cost.
15     Q.   Well, did you ask that question?
16     A.   I'm sure that that was a part of
17  the conversation.
18     Q.   So if they had offered to
19  provide --
20     A.   Or I'm not -- I'll go back.  I'm
21  not sure that that was a part of the
22  conversation, but I knew that the conversations
23  leading up to that was the perspective of AFD
24  gets there as quick or quicker than we do.
25  It's not something that we need, and the
```

Page 238

1 training and the, you know, purchase of the
2 equipment, those things are prohibitive or
3 maybe not necessary because we have -- we have
4 fire departments all throughout the city.
5      Q.   Okay.  If the Narcan had been
6 provided and the training had been provided for
7 free by this group in November of 2015, then
8 you wouldn't have refused it?
9          MR. LEDLIE:  Object to the form.
10      A.   I can't -- I don't -- I don't
11 recall the exact details about this.  I do know
12 that there had been multiple conversations
13 about it.  That's why I was -- you know, the
14 conversation that I had with Captain Schnee
15 obviously reflected that.
16      Q.   So do you remember one way or the
17 other what the arrangement was going to be from
18 this group that is referenced by --
19      A.   I do not know if that was by cost
20 or if it was going to be provided for free.
21      Q.   Either way, you felt at the time
22 that it wasn't something that you wanted the
23 Akron Police Department to do?
24          MR. LEDLIE:  Object to the form of
25 the question.

Page 239

1      A.   I think that was -- those were
2 multiple conversations that we had.  That we
3 had a -- that we had resources in place with
4 AFD to address those issues.
5      Q.   Okay.  But you agreed with me
6 earlier that when the police department was
7 equipped with Narcan, the police have used it,
8 right?
9      A.   Yes.
10      Q.   And so it is -- it does follow that
11 lives were likely saved, right?
12          MR. LEDLIE:  Object to the form of
13 the question.
14      A.   I think that they have been saved.
15 Like we talked about earlier, I think in
16 retrospect, to look back, the answer is if you
17 could do more and have more available that the
18 answer is going to be, yeah, we could have or
19 at times we should have.
20      Q.   And so is this an example of in
21 hindsight you might have made a different
22 decision?
23          MR. LEDLIE:  Object to the form of
24 the question.  Calls for speculation.
25      A.   That particular decision at that

Page 240

1 point in time, it was not my decision to make.
2 It was -- it was Chief's Nice's decision.  I'm
3 sure I was a conduit to that message, but I
4 also wouldn't say that I disagreed with it at
5 the time with what was known to me.
6      Q.   Well, you say it was Chief Nice's
7 decision, but from Ms. -- from Captain Schnee's
8 e-mail to Sergeant Mullins here, it looks as
9 though your conversation with --
10      A.   I'm in her chain of command.  She
11 would have -- I'm sorry to speak over you.
12      Q.   That's okay.  It looks like your
13 conversation with Captain Schnee ended the
14 conversation.
15      A.   Right.  And she would have
16 contacted me because I'm in her chain of
17 command, and she would not have gone directly
18 to the chief for this.  So I'm certain that --
19 that this response was based on those prior
20 conversations or meetings that we had had about
21 that specific topic.
22      Q.   Including with Chief Nice -- Nice?
23      A.   Yes.
24      Q.   And if I represented to you that
25 Sergeant Mullins did believe it would be cost

Page 241

1 free, would that change any of your answers?
2      A.   I don't know for certain based on,
3 you know, the conversations at that point in
4 time, because there was a training component
5 and -- so I don't know for sure.
6      Q.   Okay.  If the training and Narcan
7 were covered, you still would have thought at
8 the time you didn't need Narcan in the cars,
9 right?
10          MR. LEDLIE:  Object to the form.
11      Q.   I'm just trying to understand.
12      A.   Okay.  I'm telling you that would
13 not have been my call, but I'm also saying that
14 I wouldn't have been -- with the information
15 that was there, the context of those
16 conversations, that I would have not been on
17 the other side of that decision-making, knowing
18 all that goes into it.
19          So that there still is a
20 requirement to train all the -- officers.
21 Is the -- was the Narcan going to be provided
22 first, or was it -- were the supplies going to
23 be replenished at no cost?  Is that something
24 that was going to be available?  What did the
25 training look like?  How long was the training?

61 (Pages 238 - 241)

Page 242

1 How -- how much was necessary for taking police
2 officers off the streets to get them up to
3 speed on that?  There's -- there's a lot of
4 different considerations with every one of
5 those decisions.
6     Q.   Do you know whether any of those
7 questions were asked?
8     A.   I would imagine that all of those
9 questions were a part of a conversation.
10    Q.   With who?
11    A.   With Chief Nice, with myself, with
12 Major Calvaruso.  Potentially, maybe Captain
13 Shearer may have been involved.  I'm -- I -- I
14 can't say with certainty.
15    Q.   Okay.  I'm just trying to
16 understand.
17    A.   Yeah.
18    Q.   I'm looking at this e-mail with
19 you, and as you and I just discussed, it looks
20 as though Captain Schnee is saying that having
21 talked to you, that was the end of the story.
22 You then explained to me a moment ago that
23 that's because you're in their direct chain of
24 command and that you would have had the
25 conversations above you.

Page 243

1         So I'm asking you, did those
2 questions get asked?
3     A.   I know that those -- well, I'm
4 certain that those questions did get asked.
5 That would have been a part of that meeting.
6 How is this -- what are the demands that are --
7 that are here?  What are the benefits that are
8 known in the weighing all those different
9 things.  That's a part of our regular process.
10    Q.   Okay.  Do you know if there are any
11 notes of that meeting?
12    A.   I do not know.
13    Q.   Do you know if there are any
14 e-mails about it?
15    A.   I do not know.
16    Q.   Do you know who was there?
17    A.   No.  I just told you the -- I
18 speculated that it would have been -- typically
19 those meetings would have been either a meeting
20 that the chief would have had with the deputy
21 chiefs and possibly a commander in narcotics;
22 or it could have been something that was
23 discussed at a morning meeting, which includes
24 the chief, the deputy chiefs, and unit
25 commanders that are captain above that worked

Page 244

1 during those -- those hours.  Also includes our
2 office of professional standards, lieutenants,
3 the chief's assistant, the public information
4 officer.  There's a morning meeting that's held
5 every day where topics like this can come up.
6     Q.   Do you know whether this topic came
7 up at one of those morning meetings?
8         MR. LEDLIE:  Object to the form of
9 the question.
10    A.   I do not know 100 percent.  I'm
11 certain that it came up during meetings.  That
12 would be my recollection and my familiarity.
13    Q.   Okay.  And so do you know what the
14 deciding factor was?
15    A.   Those things that I discussed
16 earlier.  Is it -- is it necessary in our
17 environment, with fire getting to the scenes as
18 quick or more quickly than we do?  Is it a --
19 is it a -- can we commit to the resources that
20 will be necessary from a training standpoint
21 and from, you know, what was the product going
22 to cost us?  And was it going to be continuing
23 cost down the road?  Or was it necessary?
24         You know, it would be better that
25 we have, for example, defibrillators in every

Page 245

1 car?  Somebody that we go to respond to an
2 emergency medical call, the police can get
3 there quicker than fire.  If we had automatic
4 defibrillators in every vehicle, it would be
5 beneficial.  The fact that we don't, you have
6 to -- how much does it cost?  Are they going to
7 pay for batteries?  Are we going to find a
8 grant for it?  Are we going to be able to train
9 our officers?
10        And I think certainly there's a
11 similarity in those instances where you say
12 that is it true that maybe you would have been
13 able to save somebody's life?  Yeah, that maybe
14 is true, but we can't put AEDs in every single
15 police cruiser.
16        Or if we've had them -- we've
17 gotten some in the past -- we haven't been able
18 to get follow-up grants for batteries and to
19 keep them operational or get updates on them.
20 So this would be similar to that.
21    Q.   In -- in what way?
22        MR. LEDLIE:  Object to the form.
23 Asked and answered.
24    A.   In the same way that I just -- I
25 just described.  It's -- there are resources

62 (Pages 242 - 245)

Page 246

1 that are necessary for those kind of decisions.
2 What -- what's the cost and what's the benefit?
3     Q.   Right.  And I'm just trying to get
4 to the heart of what the cost benefit analysis,
5 what the decision was here.  What -- what was
6 the cost --
7     A.   I think --
8     Q.   -- and what was the benefit that
9 was assessed?
10        MS. RION:  Objection.  Asked and
11 answered.
12     A.   Of whether or not that there was a
13 significant benefit that comes out with it --
14 from it, because it's already readily
15 accessible with EMS and fire officers.  We have
16 three hospitals that are centrally located in
17 the city where people are able to get to
18 quickly.  Was it a need to have it in the -- in
19 the cruisers as well?  What did it look like
20 and what were the -- what were the costs from a
21 financial standpoint and from a staffing
22 standpoint of training all of our officers in
23 Narcan deployment?
24     Q.   Okay.  If you look back with me at
25 Exhibit 12.  So this was about nine months

Page 247

1 later that this media advisory came out, right?
2     A.   Uh-huh.
3     Q.   Is that a yes?
4     A.   Yes.
5     Q.   Okay.  So what changed in nine
6 months?
7     A.   I think there was more information
8 that came in about it.  There was also --
9 there's constantly evaluation of our department
10 internally.  Are we doing -- what are we doing?
11 Could we be doing more?  What's available to
12 us?
13        I'm -- if I remember correctly,
14 there was a -- there was a donation of -- of
15 Narcan, and I think one of the public health
16 entities made that donation, if I recall
17 correctly.
18        And the -- the problem wasn't
19 abating at all, so -- as a matter of fact it
20 had gotten dramatically worse.  This is one
21 month after we had 33 overdose deaths in one
22 month in the city of Akron.
23     Q.   So it was the Fentanyl and
24 carfentanil that tipped it over the edge?
25     A.   Yeah.  It was the -- the result of

Page 248

1 those, you know, significant increase in number
2 of overdoses that we had.
3     Q.   As you sit here today, are there
4 any additional programs or resources that you
5 think are needed to combat the opioid crisis
6 that you don't have right now?
7     A.   That the Akron --
8        MR. LEDLIE:  Objection to the form
9 of the question.
10     A.   The Akron Police Department doesn't
11 have right now?
12     Q.   I'm asking you as the chief of the
13 Akron Police Department, so, yes.
14     A.   It has -- it's lessened to some
15 degree, obviously, with our calls for service.
16 But yeah, personnel has been an issue.  We
17 had -- this is not something that we were doing
18 at all six years ago, and then suddenly we had
19 multiple deaths every single month that
20 required investigation and changed the dynamic
21 of a patrol response from take a report to a
22 preliminary investigation for potentially a
23 homicide investigation.
24     Q.   So how many -- how many personnel?
25     A.   We would have to try to -- I don't

Page 249

1 know.  I can't say.  You know, we'd have to
2 look and see exactly what the responses
3 required, how many calls for service we went
4 on, how long those calls for service lasted.
5     Q.   I'm not asking about how many have
6 been involved.  I'm asking how many new
7 personnel do you need right now?
8        MS. RION:  Objection.  Asked and
9 answered.
10     Q.   To respond to the opioid crisis.
11     A.   I would have to do, you know, more
12 statistical analysis to kind of -- to try to
13 project that number.  And that's a problem that
14 is not completely static.  Fortunately for us,
15 it's on the decline, but it was on the decline,
16 and then picked back up for the last several
17 months.
18        So, I mean, it would take a very
19 deep dive to kind of project what that would
20 look like.  And it, you know, unfortunately,
21 hasn't been a part of our process because it's
22 not very realistic to think that we're going to
23 get numbers added to our minimum staffing
24 budgeted.
25     Q.   Have you asked the mayor's office

Page 250

1 for more personnel for the opioid crisis?
2     A.   I've asked the mayor's office for
3 more personnel.
4     Q.   How many people?
5     A.   I've asked for -- for the police
6 department to be staffed to 527 police
7 officers.
8     Q.   As opposed to what you -- what do
9 you currently have?
10    A.   We currently have a budgeted
11 strength of 455.  We currently have 441 or 442
12 officers.
13    Q.   Okay.  And so you've asked for 527
14 police officers.  And have you allocated them?
15    A.   Yes.
16    Q.   Where have you allocated them?
17    A.   I mean, I wouldn't be able to
18 recall.  There's a, you know, significant
19 number of those for patrol.  And then there are
20 other areas of the department that have been
21 understaffed with -- due to shortages that we
22 would like to add numbers back to that we have
23 got, you know, work demand that justifies that,
24 and I've -- I've done that in my -- my report.
25    Q.   Any for opioid-related?

Page 251

1     A.   Keeping the officers that we
2 currently have assigned in those areas and
3 adding to narcotics.
4     Q.   So how many would you add to
5 narcotics?
6     A.   I don't recall exactly what the
7 number is that's recommended.
8     Q.   Do you have a ballpark?
9     A.   No.  I mean, we -- the officers
10 that are assigned to the task force, like I
11 mentioned earlier, Bryan Callahan, who replaced
12 Jim Palmer, we weren't able to replace Bryan
13 Callahan's position in narcotics.  I think we
14 only currently have three or four narcotics
15 detectives assigned full-time that are not
16 attached to a task force.  Those are
17 insufficient numbers for us to continue to --
18 to do the work that's necessary.  Fortunately,
19 we work with partnerships, so we're able to
20 continue to get work done.  But ideally, we
21 would have at least double that number.
22    Q.   And that's narcotics as a whole,
23 not just opioids, right?
24    A.   Right.
25    Q.   Okay.  So specifically for opioids,

Page 252

1 how many officers would you add?
2     MS. RION:  Objection.  Asked and
3 answered.
4     A.   That we maintain what we have.
5     Q.   You would maintain what you have?
6     A.   Yes.
7     Q.   And where would we find this
8 request?
9     A.   I -- I presented a copy of the
10 report to my deputy mayor probably three weeks
11 ago.
12    Q.   Is it your understanding that the
13 deputy mayor has reviewed that report at some
14 point in the last three weeks?
15    A.   He mentioned that he had taken a
16 cursory look but hadn't had time to review it
17 in detail.
18    Q.   But it was your understanding he
19 would eventually review it in detail?
20    A.   Yeah.
21    MR. LEDLIE:  Object to the form.
22    Q.   If you were to get additional
23 funding for the department as a result of this
24 lawsuit, how would you spend it?
25    A.   It depends on if it -- if it came

Page 253

1 with guidelines, we would be certainly
2 respectful of those guidelines.  And if it
3 didn't, we would -- I would get input from
4 subordinate supervisors in the police
5 department about current needs.
6     We would look at calls for service.
7 We would look at all of those common statistics
8 that law enforcement would when they're
9 determining staffing and try to make fair
10 assignments within the police department that
11 we think are going to be beneficial to our
12 community and the organization.
13    Q.   Is there anything that comes to
14 mind right now?
15    A.   Well, narcotics is one.  Traffic,
16 patrol, burglary unit, training.
17    Q.   And again, when you say
18 "narcotics," you mean all narcotics, right?
19 Not just opioids?
20    A.   Right.
21    Q.   All right.  You've alluded to this,
22 but the Akron Police Department engages in a
23 great deal of activities that are not just
24 narcotic-related, correct?
25    A.   Yes.

64 (Pages 250 - 253)

Page 254

1    Q.    You respond to emergency calls,
2 right?
3    A.    Uh-huh.  Yes.
4    Q.    You investigate other crimes like
5 burglaries, right?
6    A.    Yes.
7    Q.    You prevent crimes, right?
8    A.    We hope we do.
9    Q.    You engage in public education?
10    A.    Absolutely.
11    Q.    You assist the courts and the
12 prosecutors?
13    A.    Yes.
14    Q.    Do you operate correctional
15 facilities, or is that a different department?
16    A.    We do not.
17    Q.    Okay.
18    A.    Summit County sheriff.
19    Q.    And for -- specifically for drug
20 crimes, as we've discussed, you perform all
21 types of drug-crime-related activities that are
22 not just for opioids, right?
23    A.    Yes.
24    Q.    So for instance, you respond to
25 calls relating to drug-related medical issues

Page 255

1 for other kinds of drugs, like meth and
2 cocaine, right?
3    A.    Yes, it is.
4    Q.    What percent of drug overdoses that
5 the Akron Police Department responds to would
6 you estimate relate to opioids?
7    A.    I have no idea.
8    Q.    What about prescription opioids?
9    A.    No idea.
10    Q.    Okay.  You'd agree with me that the
11 prescription opioid number would be less than
12 the overall opioid number, right?
13          MR. LEDLIE:  Object to the form of
14 the question.
15    A.    I would, yes, agree with that.
16    Q.    Do you know what percent of drug
17 investigations relate to opioids?
18    A.    I do not.
19    Q.    Do you know what percent of all
20 investigations are drug investigations?
21    A.    No.
22          - - - - -
23          (Thereupon, Deposition Exhibit 14,
24          March 2018 E-Mail Chain Re: % of
25          Non-Violent Safety Force Calls

Page 256

1          Related To Opioid Addiction and
2          Mental Health, AKRON_000236377 to
3          000236379, was marked for purposes
4          of identification.)
5          - - - - -
6    Q.    Chief Ball, you've been handed what
7 has been marked as Exhibit 14.  This is an
8 e-mail chain, which you are on at the middle of
9 the second page, but then the first page you
10 are not on.
11    A.    Okay.  If you asked a question,
12 I --
13    Q.    I had not asked a question yet.
14    A.    Okay.  All right.
15    Q.    So my question is, you see that
16 this is an e-mail chain from Russell Neal, who
17 appears to be the councilman from Ward 4?
18    A.    Yes.
19    Q.    Okay.  And it looks like as though
20 it is a question about the percent of
21 non-violent safety force calls related to
22 opioid addiction and mental health.
23    A.    Okay.
24    Q.    And you, on the -- the first
25 response to Councilman Neal copies you, and

Page 257

1 it's from Charles Brown.  Is that Deputy Mayor
2 Brown?
3    A.    Yes, it is.
4    Q.    Okay.  And he says he's copying you
5 and Chief Tucker so that they can -- so that
6 you can have someone start that work.  And
7 then, if you move forward, you see that Joseph
8 Natko provides a response to Chief Tucker,
9 providing some percentages.
10          Do you know who Joseph Natko is?
11    A.    He's a captain in Akron Fire.
12    Q.    Akron Fire?
13    A.    Yes.
14    Q.    Okay.  And he appears to say to
15 Chief Tucker, "Our reporting database doesn't
16 accurately differentiate between the violent
17 and non-violent category on these calls, but we
18 would request an APD presence due to their
19 nature.  We do capture the opioid, drug, and
20 mental health categories," and he then provides
21 the breakdown.
22          Do you see that?
23    A.    Yes.
24    Q.    And he says that the 2017 percent
25 of total volume for opioid/drug is -- calls is

65 (Pages 254 - 257)

Page 258

1  2.8 percent, right?
2      A.   Yes.
3      Q.   Do you have any reason to believe
4  that that's not correct?
5      A.   No.
6      Q.   Okay.
7      A.   But this is referring to fire
8  response.
9      Q.   Okay.  Do you think that the police
10  number is different?
11      A.   I have no idea what the police
12  number is.
13      Q.   Okay.  Do you know whether you
14  responded to this?
15      A.   I do not know.  If I would have, I
16  would have directed it to Captain Harding to
17  come up with numbers.  Planning and research
18  would have pulled those numbers.  I don't know
19  if it was something that -- typically, I would
20  respond to a -- an e-mail request from my boss.
21  But if there's not one attached, I don't have a
22  specific recollection of this.
23      Q.   Okay.  And then you would have
24  forwarded to Captain Harding?
25      A.   Yes.

Page 259

1      Q.   Do the police and fire have a
2  centralized dispatch?
3      A.   They do have a centralized
4  dispatch.
5      Q.   Okay.  So do you know, necessarily,
6  that these were just fire calls?
7      A.   Well, I know that that's what
8  Joseph Natko would be following up on.
9      Q.   Wouldn't the database be the same?
10      MR. LEDLIE:  Object to the form.
11      A.   No.  The information is -- is --
12  the information would come from our -- our CAD,
13  so it would be -- I would imagine it would be
14  different for them, the way that they would run
15  it.
16      Q.   Okay.  So to get the percentages
17  for the police department, we would use the
18  CAD?
19      A.   Yes.  Although, if there's a -- I
20  don't know what their policies are, the radio
21  room, for dispatch, of, you know, mental health
22  calls.  If there's an automatic -- if it's
23  automatically a fire officer is sent when
24  it's -- when it's categorized.  The same thing
25  for opioid drug overdoses, if it's automatic

Page 260

1  that there's a dual response and a dual
2  dispatch for that.
3      I mean, the information would be in
4  the same CAD, but I don't know if the way that
5  it was extracted, if -- if he would have done
6  it individually for fire calls or how -- if it
7  would have been based on the codes that they
8  use for the type of calls, and if those codes
9  are the same as the police would use for those
10  types of calls.  So I can't say definitively.
11      Q.   Okay.  Well, let me change the
12  question, and we don't even have to use those
13  numbers.
14      In your experience at the Akron
15  Police Department, is it fair to say that the
16  Akron Police Department spends a lot of time
17  and money on things that are not
18  opioid-related?
19      A.   Certainly.
20      Q.   Okay.  We've discussed task force
21  members, we've discussed the narcotics unit,
22  and we've discussed the individual officers
23  assigned for opioid-related crimes, right?
24      A.   Uh-huh, yes.
25      Q.   Okay.  Are there any other

Page 261

1  departments or divisions within the Akron
2  Police Department that would have
3  responsibility for opioids that we haven't
4  discussed yet?
5      A.   There are -- I mean, obviously
6  there -- it's not always clear and defined.
7  There's a patrol response to the original calls
8  for service that come in.  There's the NRTs
9  that work with the quick response times.
10      Q.   NRTs?
11      A.   Neighborhood response --
12      Q.   Oh, thank you.
13      A.   -- officers.  Our crime scene unit
14  that would go out when there is a call and
15  there's an overdose death involved.  They would
16  go out, and their responsibilities are
17  collecting evidence, photographs, other
18  documentations of the -- of the crime scene.
19      Q.   And this is a -- this is not a
20  specific crime scene unit for opioids; it's the
21  general crime scene unit, right?
22      A.   Yes, it is.
23      Q.   So they would go to any death?
24      A.   They would go to all.  They would
25  go to, you know, almost all major crimes.

66 (Pages 258 - 261)

Page 262

1    Q.    Okay.  What about -- do you have
2  now or have you, in your experience, had a unit
3  investigating drug diversion?
4    A.    Patrick Leonard, who works on the
5  task force, but that's it.
6    Q.    But other than Officer Leonard?
7  What is Off- -- what is --
8    A.    Patrick Leonard?
9    Q.    Yes.  What is his title?
10   A.    He is a detective.
11   Q.    He's a detective, okay.
12        If I get those wrong by the way, I
13  do not mean offense.  I'm trying to get them
14  right.
15   A.    We all have first names, too, so --
16   Q.    Okay.
17   A.    -- it's not a big deal for me.
18        And I think there have been some
19  times in -- where there's been -- if there has
20  been an overflow of work that Scotty Williams,
21  who's one of our narcotics detectives, may work
22  alongside Detective Leonard, but I'm not
23  certain.  His assignment typically is
24  forfeitures.  He does seizures and forfeitures,
25  but he has some other responsibilities with

Page 263

1  narcotics, too.
2    Q.    Okay.  So currently, of the 441 or
3  -42 officers you have, you have four -- four
4  that are currently -- setting aside the task
5  forces, you have four that are currently
6  assigned to opioids; is that right?
7    A.    Yes.
8    Q.    Okay.  And --
9    A.    Well, those -- and two of them are
10  assigned to narcotics, two of them are assigned
11  to street narcotics.  The ones that are
12  assigned to street narcotics, now that there
13  has been a lessening of numbers, their
14  responsibilities are now -- they have
15  co-responsibilities with street narcotics.
16        So now those extra two officers are
17  not working, in 2018, primarily on overdose
18  death investigations.  They do that and
19  additional duties with street narcotics.
20   Q.    Okay.  So two full-time with
21  overdose death investigations?
22   A.    Yes.
23   Q.    And then another two who provide
24  some support?
25   A.    Right.

Page 264

1    Q.    Okay.  And then those two also work
2  in street narcotics?
3    A.    Yes.
4    Q.    Okay.  And then you have the task
5  force officers, who we've discussed, right?
6    A.    Correct.
7    Q.    Okay.  All right.  So -- and
8  setting aside departments like the crime scene
9  unit, which would go to any kind of major crime
10  scene, are there any other specific positions
11  that I've missed asking you about that are
12  opioid-specific?
13   A.    No.
14   Q.    Okay.  I have seen mention in some
15  of the documents -- and I can show you if you'd
16  like -- of a diversion unit that existed in
17  2009.  Do you know what that's about?
18   A.    Oh, I would think that that would
19  be referring to Patrick Leonard's unit.
20   Q.    Okay.  Otherwise, you wouldn't know
21  about that?
22   A.    Right.
23   Q.    Do you think you would have known
24  if one had existed?
25   A.    No.

Page 265

1        MR. LEDLIE:  Object to the form.
2    A.    2009, I was on midnight patrol
3  shift, so there was probably a lot happening in
4  the department that I wasn't aware of because
5  of my assignment.  But I don't...
6    Q.    Okay.  I mean, I'm happy to show
7  you what I'm looking at.  I just -- it sounds
8  as though you think that it was Detective
9  Leonard?
10   A.    I don't know.  I could take a look
11  at what you have.
12   Q.    Sure.
13        MR. LEDLIE:  What year is that?
14        THE WITNESS:  2009 are you looking
15  for?
16        MS. SAULINO:  No, you don't have it
17  yet.
18        - - - - -
19        (Thereupon, Deposition Exhibit 15,
20        Document Titled "Akron Police
21        Department 2009 Annual Report", was
22        marked for purposes of
23        identification.)
24        - - - - -
25   Q.    All right.  You have been handed,

67 (Pages 262 - 265)

Page 266

1 Chief Ball, what has been marked as Exhibit 15,
2 and I'm looking specifically at page 12, where
3 there's a title that says "2009 Diversion
4 Unit." That's what I was referring to.
5      A.   That would be referring to the --
6 to Detective Leonard, his current assignment.
7      Q.   Okay. So, and just so we're clear,
8 what I handed you was the 2009 annual report
9 for the Akron Police Department?
10      A.   Yes.
11      Q.   Just so we're clear on the record,
12           Okay. So you think that's
13 referring to Detective Leonard?
14      A.   Yeah.
15      Q.   Okay. Great. That's all I have
16 with that one.
17           Do you recall how much money the
18 Akron Police Department spent last year?
19      A.   Our budget is slightly over $60
20 million. Well, our budget is slightly under
21 $60 million, but 2018 was the first year that
22 we started collecting proceeds from a tax levy
23 that was approved last fall, which adds between
24 $4 and $5.3 million into our budget for capital
25 improvements.

Page 267

1      Q.   So you would add that --
2      A.   57, 58 -- 57 to 58 million is our
3 budget, and then an additional $4 to $5 million
4 depending on tax collections from Issue 4.
5      Q.   And those $4 to $5 million?
6      A.   Were used for capital improvements,
7 for the most part.
8      Q.   Is there anything in particular
9 that -- are you building a new building or
10 something?
11      A.   Well, last year, 1.5 was used to
12 maintain staffing so there didn't have to be
13 any layoffs. And then we had -- a significant
14 amount went into purchase or replacement of
15 fleet vehicles. We had only had $300,000
16 budgeted for a number of years for fleet
17 vehicles. Our fleet is over 500 vehicles, and
18 we were in really dire straits with all of our
19 vehicles. So we had $1.6 to 1.8 million of
20 that Issue 4 money went for vehicle
21 replacement. One and a half went for salaries.
22 And then I forget what other major expenditures
23 that we had. Body-worn cameras. We had money
24 set aside for some workspace improvements in
25 the department. We had money set aside for

Page 268

1 improvement of our training bureau, facilities
2 for audiovisual.
3           We don't get fancy, new buildings.
4 The fire department's getting all the fancy,
5 new buildings.
6      Q.   Okay. And do you know how much of
7 your budget is dedicated to specific items?
8      A.   There's a chance that I might, but
9 with -- no, not with regularity.
10      Q.   Without looking at it?
11      A.   Right.
12      Q.   Okay.
13      A.   I mean, salaries and benefits,
14 obviously, are the biggest chunk of that.
15           - - - - -
16           (Thereupon, Deposition Exhibit 16,
17           Document Titled "2018 Budget Plan,
18           City of Akron, Ohio", was marked for
19           purposes of identification.)
20           - - - - -
21      Q.   Chief Ball, you have been handed
22 the -- what has been marked as Exhibit 16,
23 which it is my understanding is the City of
24 Akron 2018 budget plan.
25           And I only have the -- you have the

Page 269

1 whole thing, but I am only looking at the
2 police section, which starts on page 230.
3 Actually, the actual text starts on 231.
4           And if you -- yes. I think you
5 have it there. Where it says "Police
6 Department," and then "Kenneth R. Ball II,
7 Police Chief" at the top.
8      A.   Yes.
9      Q.   That's you, right?
10      A.   Yep.
11      Q.   Do you have any role in writing
12 this document?
13      A.   No.
14      Q.   Okay.
15      A.   I mean, I have -- I'm sorry to
16 speak over you again.
17      Q.   No, it's okay.
18      A.   I would have review of the
19 document, and I would have significant input
20 into the decision-making process that
21 ultimately gives this product, but I'm not the
22 author of the document or...
23      Q.   Who is the author of the document?
24      A.   Captain Schnee, I believe. And I
25 think she works with Andy Carey.

68 (Pages 266 - 269)

1    Q.   Okay.  And in looking at this
2  document, and if you go through, you see some
3  charts on pages 233 and 234, 235, 236, and 237.
4    A.   But this may not be -- I don't know
5  if this is generated by budget and finance or
6  if this is generated by Captain Schnee.  This
7  is different from what I've seen in the past.
8    Q.   Well, you anticipated my question.
9  That really was my question.  Is this what your
10  budget actually looks like?
11    A.   No.  I'm not familiar with some of
12  these breakdowns and graphs.
13    Q.   Okay.  This budget doesn't seem to
14  contain the kind of detail that you have
15  described about where your resources are going,
16  so is there another document where that's
17  contained?
18    A.   We have Issue 4 documents that talk
19  about the ways that we will spend those --
20  those monies.
21    Q.   Okay.  And do you have a -- each
22  year a budget document that is more detailed
23  than this that breaks things out by types of
24  units or those kinds of things?
25    A.   No.  I'm -- I don't -- not that I

1  have a familiarity with.  I've never done any
2  of the -- I've never done any of the -- the
3  documents for -- I believe that this was
4  probably generated from a report that we sent
5  to the City.  And, I mean, some of the language
6  is familiar here, but I've never seen it in
7  this form.
8    Q.   Okay.  And you think that that was
9  probably Captain Schnee who -- who generated
10  such a report?
11    A.   No.  Captain Schnee would have
12  generated the -- the one that -- that they're
13  working off of here.
14    Q.   Yes.  Sorry.  Yes.
15    A.   Yes.
16    Q.   That's what I was asking you.
17    A.   Right.
18    Q.   Okay.  And the budget, for
19  instance, that you just submitted to Deputy
20  Mayor Brown, how does that differ from what
21  we're looking at here?
22    A.   I didn't just submit a budget to
23  Deputy Mayor Brown.  I submitted a staffing
24  plan.
25    Q.   I see.  Okay.  How detailed is

1  that?
2    A.   Pretty detailed.  I mean, it talks
3  about different -- different theories that are
4  used for police staffing that are recognized in
5  the industry.  It uses those numbers to make
6  comparisons with the Akron PD -- PD.  There are
7  comparisons between Akron and the seven other
8  largest jurisdictions in the State of Ohio and
9  how we're staffed and deployed, and the same
10  thing for those jurisdictions.
11        There are projections about
12  anticipated retirements and other losses
13  that -- you know, analyzing our department as a
14  business that -- that would be projected so
15  that hiring can be planned and purposeful so
16  that we can achieve staffing goals that I've
17  set in that document.  I think it's about 20
18  pages long.
19        Calls for service by hour of the
20  day.  Figuring relief factors for police
21  officers.  How many do we need assigned so that
22  we can have the geographical and neighborhood
23  responsibilities that are important to
24  community policing.  Evaluating the time of
25  patrol officers, the time that they are

1  in-service, on a call for service, versus the
2  time that they have free for
3  community-related -- community-related and
4  self-initiated activity.  How important those
5  numbers are for our department to reflect a
6  community relations perspective that is a
7  priority for us organizationally.  There's a
8  lot of different components.
9    Q.   So that document would reflect your
10  current thinking about the specifics of
11  staffing that you just recited; is that right?
12    A.   Yes.
13    Q.   Okay.  I do not have that document,
14  so --
15    A.   Okay.
16    Q.   -- so we will not be able to talk
17  about it today.  But -- but if we were to look
18  at that, that's where we would find your
19  current thinking on staffing for the Akron
20  Police Department.  Is that fair?
21    A.   Yes.
22    Q.   If you just take a quick look with
23  me, just in case you know the answer to this,
24  and I'm not sure you will.  If you look at page
25  235 at the bottom, where it says, "Department

69 (Pages 270 - 273)

Page 274

1  sources and uses of funds by fund and category,
2  2018."
3      A.   Uh-huh.
4      Q.   You see it lists a general fund, a
5  special revenue fund, and a trust and agency
6  fund?
7      A.   Yes.
8      Q.   Do you know what the differences
9  are there?
10     A.   No.  I know what general -- what
11 our general fund is.  I don't know what special
12 revenue fund or trust and agency funds are.
13     Q.   What is the general fund?
14     A.   The general fund is the amount
15 that -- that typically is approved by the
16 administration, and county -- or city council
17 votes on and approves.
18     Q.   Okay.  And so these other monies --
19     A.   I have no idea how the funds are
20 broken down or -- we do receive other -- we
21 have other revenue sources.  You know, for
22 example, grant funding that would come in or
23 reimbursements from our federal agencies or
24 partners.
25     Q.   Actually, that was where I was

Page 275

1  going next.  Do you have an idea of how much
2  grant funding the Akron Police Department gets?
3      A.   No.  There's constantly a flux, and
4  we have multiple grants that are in place at
5  one -- we have some that are expiring, others
6  that we still have one year or two years to
7  work with, and I don't -- I don't have all of
8  that information memorized.
9      Q.   And do you know if any of those
10 grants provide funding for opioid-related
11 activities?
12     A.   I do believe that we have qualified
13 for some grants, but I don't know specifically.
14 As I mentioned previously, NR- -- NRT, some of
15 that was assisted with some of those monies.  I
16 don't know specifically what else we've got.
17     Q.   Who would know?
18     A.   Andy Carey or Captain Schnee.
19     Q.   And you mentioned reimbursements
20 from federal partners?
21     A.   (Witness nodding head.)
22     Q.   What is that?
23     A.   It's if our officers that work on
24 the task force have overtime hours and they're
25 working outside of their regularly scheduled

Page 276

1  shifts, that we get reimbursements.
2      Q.   I see.  So -- so you pay them for
3  their regular shifts.
4      A.   Yes.
5      Q.   But then over and above that, the
6  federal government pays them?
7      A.   Correct.
8      Q.   And how is the police department
9  funded?  We've talked about grants, but in
10 general, how is the police department funded?
11 Is that local tax money?
12     A.   Yes.
13     Q.   Okay.  What about -- is there state
14 funding?
15     A.   I don't know.  I know that I hear
16 with regularity the comments from political
17 leaders about state funding being decreased
18 dramatically.  It's been, if I recall
19 correctly, but maybe $10 million a year that
20 the City of Akron has lost because of changes
21 in policy at the state level, and less local
22 government funding being available.
23     Q.   But that's what you've heard from
24 political leaders in Akron?  Do you understand
25 that to be specific to money that went to the

Page 277

1  police, or is that a broader amount of --
2      A.   No.  I believe that there's a
3  certain percentage of that.  I know that,
4  obviously, we're funded through whatever
5  revenues the City collects, and their ability
6  to -- to maintain or -- or hire additional
7  officers are -- that's a part of the
8  conversation with some regularity.
9      Q.   I see.  So the -- the 10 million
10 that you were referring to is out of the larger
11 City of Akron pot?
12     A.   Yes.  Not 10 --
13     Q.   And then some percent- --
14     A.   Not $10 million annually for the
15 Akron Police Department.
16     Q.   That was my question.
17          Do you know whether you get federal
18 funding aside from the reimbursements we just
19 discussed?
20     A.   I don't know.
21     Q.   Okay.  Do you get money from
22 forfeitures?
23     A.   We get some monies from
24 forfeitures, yes.
25     Q.   And do you know how much?

70 (Pages 274 - 277)

Page 278

1    A.   No.  We -- there's -- there are
2  policies in place that determine, like, if a --
3  if a forfeiture is -- is made as a result of an
4  investigation for one of the task force, then
5  there's -- the way that those monies are
6  distributed is -- is defined.  Prosecutors get
7  a certain percentage of those forfeitures
8  because of the role that they play in the
9  process as well.  And there's a difference
10 every single year with exactly what those would
11 be, depending upon what they look like that
12 particular year.  If we hit -- if there was
13 something that was particularly large.
14    Q.   We've talked about grants.  Is
15 there anything else that contributes to the pot
16 of money that the Akron Police Department gets?
17    A.   Not that I'm aware of.  We get --
18 sometimes we have reimbursements from the State
19 of Ohio from OPOTA, which I mentioned earlier
20 is Ohio Police Officers Training Academy for
21 training.  If we do a certain amount of
22 in-service training, they'll pay us for those
23 hours, and the last two years we've not gotten
24 money from Ohio for training.
25    Q.   If we wanted to find out the

Page 279

1  breakdown of percentages of how each of these
2  different categories make up your total, would
3  we ask Captain Schnee?
4    A.   It would be Captain Schnee, or it
5  would be somebody from the off- -- the City of
6  Akron's office of budget and finance.
7    Q.   Okay.  And you've mentioned Andy
8  Carey a few times.  Is he one of those people?
9    A.   No.  He works for -- in our
10 building -- in our office of planning and
11 resource -- or planning and research.
12    Q.   I see.  Would he have
13 that information, or no?
14    A.   He may have.
15    Q.   He may have it?
16    A.   He may have that information.
17    Q.   Okay.
18            - - - - -
19         (Thereupon, Deposition Exhibit 17,
20         Summit County and City of Akron,
21         Ohio Plaintiff's First Amended
22         Responses and Objections to
23         Distributor Defendants' Third Set of
24         Interrogatories, was marked for
25         purposes of identification.)

Page 280

1            - - - - -
2    Q.   Chief Ball, you've been handed
3  Exhibit 17, which is another document that the
4  lawyers have provided to us, providing some
5  information and answers.
6         Do you know whether you've seen
7  this document before?
8    A.   I don't know.
9    Q.   Okay.  I'm going to be asking you
10 questions about a list that appears on page 15
11 and 16, the bullet-pointed list.  Do you see
12 that?
13    A.   I do.
14    Q.   Okay.  And the sentence that just
15 precedes that list says, "Plaintiffs'
16 categories of damages in this matter are
17 expected to include but are not limited to the
18 following," and then there's a list.
19    A.   I do see that.
20    Q.   Okay.  And if you look at the third
21 bullet point on the list, you see it says,
22 "Cost of training emergency and/or first
23 responders in the proper treatment of drug
24 overdoses"?
25    A.   Yes.

Page 281

1    Q.   And do you know how much was spent
2  on that?
3    A.   No.
4    Q.   And who would know that?
5    A.   It could be our -- we would have
6  to -- I don't know if those numbers have been
7  put together or not, so it would be either
8  planning and research or from our services
9  office, Captain -- Captain Schnee.
10    Q.   The next bullet says, "Costs
11 associated with providing police officers and
12 others with naloxone," which is Narcan, right?
13    A.   Yes.
14    Q.   Do you know how much was spent on
15 that?
16    A.   No.
17    Q.   And I think you mentioned earlier
18 you do believe there was a -- some sort of
19 grant involved in that, right?
20    A.   Yes.
21    Q.   Okay.  And you don't know what
22 the -- what the percentage was of grant money
23 that covered that?
24    A.   No.
25    Q.   Okay.  If you turn the page, the

71 (Pages 278 - 281)

1 bullet at the top of page 16 says, "Costs
2 associated with law enforcement and public
3 safety relating to the opioid epidemic,
4 including but not limited to attempts to stop
5 the flow of opioids into local communities, to
6 arrest and prosecute street-level dealers, to
7 prevent the current opioid epidemic from
8 spreading and worsening, and to deal with the
9 increased levels of crimes that have directly
10 resulted from the increased homeless and
11 drug-addicted population."
12       Do you know how much money was
13 spent on that?
14    A.   No.
15    Q.   Do you know who would, if anyone?
16    A.   I don't know if that's something
17 that -- that was a result of this action; if
18 his -- if it's been put together, calculated,
19 or not.
20    Q.   Okay.  If you look further down the
21 list, about a third of the way from the bottom
22 of the page up, so it's the fourth bullet from
23 the bottom.
24       Do you see where it says,
25 "Increased public safety services, including

1 but not limited to training, investigations,
2 staffing, jail expenses, dispatch services, and
3 task forces as a result of the opioid
4 epidemic"?
5    A.   I do.
6    Q.   And do you know how much that cost?
7    A.   No, I don't.
8    Q.   And so the task forces, those are
9 things that are provided to you, right?
10       MR. LEDLIE:  Object to the form.
11 Asked and answered.
12    A.   Well, the task -- we are
13 participants, and we've talked about that,
14 about, you know, the City's commitment,
15 salaries and benefits, and then the extra
16 things that they pay for and being able to
17 leverage our work, take advantage of their
18 personnel, their equipment, their expertise.
19    Q.   Right.  But their personnel, their
20 equipment, and their expertise is paid for by
21 them, right?
22    A.   We don't -- yes.
23    Q.   And then if you look at the second
24 bullet from the bottom, "Costs associated with
25 impact of opioid epidemic on Plaintiffs'

1 vehicle fleets," do you know how much that is?
2    A.   I do not.
3    Q.   And do you know what specifically
4 the impact of the opioid epidemic is on your
5 vehicle fleet?
6    A.   No.
7    Q.   Can you think of anything?
8    A.   I mean, you could -- I'm sure we
9 could go out and extrapolate the calls for
10 service and the average distance that we're
11 traveling for those calls of service.  We could
12 look at gas and maintenance and wear and tear.
13 How long is the vehicle on scene?  Is it
14 wintertime or summertime and the vehicle is
15 idling and running air conditioning or heating
16 and.
17       I mean, I -- I would imagine
18 that that could be done or I don't know if
19 it's -- if it's been done.  I certainly
20 wouldn't be able to throw out a number.
21    Q.   Okay.  You can put that aside.
22       We talked earlier about the --
23 we're done with that one.  We talked earlier
24 about the fact that a large portion of the
25 opioid epidemic is caused by non-prescription

1 opioids.
2       MR. LEDLIE:  Object to the form.
3    Q.   You remember we talked about that?
4    A.   I do.
5    Q.   Okay.  Sorry.  Are you looking for
6 something?
7    A.   No.
8    Q.   No?
9    A.   I'm sorry.
10    Q.   That's okay.
11       And do you have an understanding of
12 the sources of illegal drugs that are coming
13 into Akron?
14    A.   Some knowledge.
15    Q.   Okay.  What is your knowledge?
16    A.   For illegal drugs?
17    Q.   Yes, illegal drugs.
18       MR. LEDLIE:  Object to the form of
19 the question.
20    A.   We have issues from both Mexico and
21 China.  Those are more prevalent.  And I don't
22 know if those are the -- the only ones, but
23 those are the ones that have had the biggest
24 impact and most we're aware of and that we find
25 ourselves dealing with regularly.

72 (Pages 282 - 285)

Page 286

1    Q.   What are -- what is coming in from
2  Mexico and China?  And it may be two separate
3  things, so.
4    A.   I know from China it was Fentanyl
5  and other derivatives of Fentanyl, carfentanil
6  and other forms.
7        And from Mexico it's also Fentanyl.
8  And crystal meth and cocaine are more prominent
9  from Mexico.
10   Q.   And what about heroin?
11   A.   From Mexico.
12   Q.   From Mexico?
13   A.   For the most -- I -- I -- that just
14  is, I guess, maybe casual knowledge that I have
15  from being in meetings or reading reports.
16   Q.   And who is it that would know the
17  most about that?
18   A.   Probably Captain Shearer.
19   Q.   Captain Shearer?
20   A.   I mean, some of our task force
21  officers that actually work for -- on the FBI
22  task force or the DEA task force, I'm sure that
23  they've got even a greater intimacy.
24   Q.   Are there other sources of heroin
25  into Akron that you know about?

Page 287

1    A.   Not that I know about specifically.
2  I'm not -- I'm not aware altogether where it's
3  coming from.
4    Q.   And you would agree with me that
5  none of the Defendants in this action are being
6  identified by you as -- as shipping in illegal
7  substances like we were just talking about,
8  right?
9    A.   That's fair.
10   Q.   You would agree with me that none
11  of the Defendants in this action make those
12  illegal drugs, right?
13       MR. LEDLIE:  Object to the form of
14  the question.
15   A.   Not to my knowledge.
16   Q.   And they don't sell those illegal
17  drugs, right?
18   A.   Not to my knowledge.
19   Q.   And they don't transport them,
20  right?
21   A.   I don't believe so.
22   Q.   Are counterfeit prescription
23  opioids a problem that you've seen in Akron?
24       MR. LEDLIE:  Object to the form.
25  Asked and answered.

Page 288

1    A.   I don't know what to extent [sic].
2  I know that --
3        MS. SAULINO:  I've never asked that
4  question before.
5        MR. LEDLIE:  You did.  I can search
6  it for you if you'd like.
7        MS. SAULINO:  Counterfeit?  I've
8  never -- I literally never asked that question
9  before.
10   Q.   Let's try that again.
11       Are counterfeit prescription
12  opioids a problem you've seen in Akron?
13       MR. LEDLIE:  Object to the form.
14   A.   There have been occasion where I
15  think -- I'm not for certain if counterfeit
16  prescriptions have been an issue or not.
17       I know that at times we've had
18  illegal drugs that have been, you know -- yeah,
19  I guess it would be counterfeit.  They've been
20  pressed into pills to simulate -- simulate
21  legal prescriptions.
22   Q.   Okay.  So that -- so -- so other
23  than that, though --
24   A.   No.  I -- it's -- it's probably,
25  like, the second or third time I've ever even

Page 289

1  heard it mentioned.
2    Q.   And you are not alleging that any
3  of the Defendants in this action are the source
4  of these counterfeit opioids, right?
5    A.   Correct.
6    Q.   You and I have both used the term
7  "diversion" a number of times today.  What is
8  your understanding of what drug diversion is?
9    A.   The only familiar- -- familiarity
10  that I have with the term is our diversion
11  unit, which investigates illeg- -- illegal use
12  of legal prescription medications.
13   Q.   And what are the ways that you
14  understand that diversion can happen?
15   A.   You have an unscrupulous doctor or
16  other person that's qualified to dispense
17  that's not using an accepted standard of care,
18  that's profiting for different reasons.  And
19  there have been several stories that I've seen
20  for different things that motivate people.  But
21  they make -- write prescriptions for
22  non-medical-justifiable circumstances, or in
23  excess of what those justifiable medical
24  circumstances may be, or with a greater
25  regularity, or fraudulently to, you know, names

73 (Pages 286 - 289)

Page 290

1 that don't exist or patients that are
2 misrepresenting identity, or -- many different
3 ways that that can express itself.
4     Q.   Any other ways that you understand
5 diversion can happen?
6     A.   Not just off the top of my head.
7     Q.   Have you heard about forgery of
8 prescriptions?
9     A.   Uh-huh.
10     Q.   Yes?
11     A.   Yes, I have.
12     Q.   Pill mills?
13     A.   Yes.  I think -- I thought what I
14 was describing previously would have been a
15 pill mill.
16     Q.   I wasn't sure, so.
17     A.   Okay.
18     Q.   And what about resale by patients
19 who have been prescribed?
20     A.   Yes.
21     Q.   Theft?
22     A.   Yes.
23     Q.   And Internet pharmacies?
24     A.   Just a vague familiarity with that,
25 with maybe seeing something on an article or

Page 291

1 something.
2     Q.   Is that something that the Akron
3 Police Department has had much involvement in?
4     A.   I wouldn't know if that's something
5 that our diversion unit had worked on or not or
6 seen with any kind of regularity.
7     Q.   Have you personally investigated
8 diversion at any point?
9     A.   No.
10     Q.   Have you heard of drug trafficking
11 organizations trafficking prescription opioids
12 from another state or country into Akron?
13     A.   Not specifically, to my recall.
14     Q.   Have you heard of the term the
15 "blue highway"?
16     A.   No.
17     Q.   Heard about the "oxy express"?
18     A.   No.
19     Q.   Have you -- let me be more
20 specific.  Have you heard about prescription
21 drugs being trafficked and diverted from
22 Michigan to Ohio?
23     A.   No.
24     Q.   Do you believe that diversion is a
25 serious problem in Akron?

Page 292

1         MR. LEDLIE:  Object to the form.
2     A.   I wouldn't know how to quantify
3 that.  I mean, I would think that if you look
4 at the problem that we have with addiction and
5 the way that it manifests in so many different
6 other ways, that it would -- a reasonable
7 people -- a reasonable person would probably
8 say that, yes, it has been significant.
9         I know that, you know, it's kind of
10 shocking when a doctor gets arrested, and you
11 have familiarity either through a report or an
12 article that it's been hundreds of thousands of
13 pills or thousands of pills and hundreds of
14 patients, that, yeah, that means that there's a
15 significant problem.
16     Q.   Are you familiar with how those
17 cases are investigated?
18     A.   Not altogether.
19     Q.   Okay.
20     A.   I've never had an assignment in
21 narcotics or been intimate -- intimately
22 involved in a higher-level narcotics
23 investigation.
24     Q.   You would agree with me, though,
25 that a doctor prescribing opioids to a patient

Page 293

1 could be entirely legal, right?
2     A.   Sure.
3     Q.   Right.  And a patient bringing a
4 prescription for opioids to a pharmacy could be
5 entirely legal, right?
6     A.   A patient bringing a --
7     Q.   A prescription.
8     A.   Yes.
9     Q.   And so figuring out which of those
10 might be efforts at diversion is much more
11 complicated, right?
12         MR. LEDLIE:  Object to form.
13     A.   I would imagine.
14     Q.   Do you remember when you first
15 became aware that diversion was a problem?
16     A.   Probably not until maybe Detective
17 Leonard had that assignment.  Detective Leonard
18 and I were in the academy together, so we had a
19 relationship.
20         I don't think I had a significant
21 awareness maybe prior to his assignment that
22 that was something that we committed resources
23 to or would have been this sizable problem that
24 it was.  My exposure was kind of limited.
25     Q.   And do you know of anything that

74 (Pages 290 - 293)

Page 294

1  you or others at the Akron Police Department
2  could have done to combat diversion?
3      MR. LEDLIE:  Object to the form.
4      A.  No, I'm not aware.  I believe
5  there's a point in time where we had two
6  full-time detectives, but because of staffing
7  we were not able to -- to continue that.
8      Q.  Just to round that out, diversion
9  is a crime, right?
10      A.  Yes.
11      Q.  Now, you would agree with me,
12  wouldn't you, Chief Ball, that the Defendants
13  in this action can't control what happens to
14  pills when they leave their hands, right?
15      MR. LEDLIE:  Object to the form.
16  Calls for speculation.
17      A.  Sounds logical.
18      Q.  They certainly can't stop resales
19  of pills once the pills are dispensed, right?
20      MR. LEDLIE:  Object to the form.
21      A.  Correct.
22      Q.  They can't stop theft, right?
23      MR. LEDLIE:  Object to the form.
24      A.  Right.
25      Q.  And they can't stop pill sharing,

Page 295

1  right?
2      MR. LEDLIE:  Object to the form.
3      A.  Correct.
4      Q.  And you would agree with me that
5  the Defendants don't have any police power over
6  unlawful conduct, right?
7      A.  Right.
8      Q.  So they can't shut down pill mills,
9  right?
10      MR. LEDLIE:  Object to the form.
11      A.  I don't know.  I don't know.  I
12  don't know if there's a role that -- where
13  there are checks and balances, where there is
14  an accountability for increases in --
15  significant increases in orderings or
16  dispensing, and if there's an association or
17  just an awareness that's important for -- for
18  them to have, knowing the significance or
19  the -- potentially the impacts, negative
20  impacts, that could exist.
21      Q.  Not my question.  They were --
22      A.  Okay.
23      Q.  They can't literally go in and shut
24  down a business, right?
25      A.  Right.

Page 296

1      Q.  They can't stop drug trafficking,
2  right?
3      A.  Right.
4      Q.  They can't stop people from
5  counterfeiting pills, right?
6      A.  Right.
7      MR. LEDLIE:  Object to the form.
8      Q.  They can't take away doctors'
9  licenses, right?
10      A.  Right.
11      Q.  They can't take away pharmacists'
12  licenses, right?
13      MR. LEDLIE:  Object to the form.
14      A.  Correct.
15      Q.  You haven't personally ever shut
16  down a pill mill, right?
17      A.  No, I have not.
18      Q.  And you haven't personally ever
19  second-guessed a prescription, right?
20      MR. LEDLIE:  Object to the form.
21      A.  Right.
22      Q.  Have you ever personally detected a
23  prescription forgery?
24      A.  No.  I mean, I've personally
25  objected when I was in the emergency room with

Page 297

1  my son a week ago when they wanted to give him
2  a prescription for morphine for a muscle
3  soreness, but not in my capacity as a police
4  officer or investigator.
5      Q.  Okay.  Did you think there was
6  anything illegal about what they were doing?
7      A.  No.
8      Q.  You just didn't want your son to
9  have morphine, right?
10      A.  I just thought that it was odd that
11  it was even a suggestion at that moment that --
12  under the circumstances, for his very specific
13  circumstance.
14      Q.  That's fair.  That was a doctor or
15  a medical professional, right?
16      A.  Yes.
17      Q.  That wasn't a pharmaceutical
18  distributor, right?
19      A.  Right.
20      Q.  It wasn't a pharmaceutical
21  manufacturer, right?
22      MR. LEDLIE:  Object to the form.
23      A.  No.  I just wanted to be specific
24  because of the way the question was asked.
25      Q.  But you'd agree with me that

75 (Pages 294 - 297)

Page 298

1 detecting actual diversion is a hard thing to
2 do, right?
3        MR. LEDLIE:  Object to the form.
4    A.   I'm -- I'm not certain, because I
5 haven't been involved in those investigations.
6 I mean, there are times when information is
7 readily available, like through state
8 databases, that would make it much -- a much
9 easier task.  Like, I couldn't say for certain.
10   Q.   What state databases do you mean?
11   A.   That keep track of the
12 prescriptions that are issued for, you know,
13 patients to make sure that there's -- doctor
14 shopping isn't going on and other -- I think
15 that they track doctors and other prescribing
16 agents.  They track that.  They track the
17 patients.
18   Q.   And those are available to law
19 enforcement, right?
20   A.   Yes, they are.
21   Q.   To your knowledge, those are not
22 available to pharmaceutical manufacturers,
23 right?
24        MR. LEDLIE:  Object to the form.
25   A.   Not to my knowledge.

Page 299

1    Q.   And they are not available to
2 pharmaceutical distributors, right?
3    A.   I wouldn't imagine.  I don't know.
4    Q.   You would agree with me, though,
5 that there are -- is a balancing of patient
6 privacy that needs to be considered in those
7 kinds of -- in access to those kinds of
8 databases, right?
9        MR. LEDLIE:  Object to the form.
10   A.   I don't know for sure.  I would
11 imagine.
12   Q.   Specific patient information and --
13   A.   Yes.
14   Q.   -- prescription information?  You
15 agree?
16   A.   Yes, there are limits.
17   Q.   So there -- there would be limits
18 on outside companies having access, right?
19   A.   Right.
20        MR. LEDLIE:  Is this a good spot
21 for a break?
22        MS. SAULINO:  Sure.
23        THE VIDEOGRAPHER:  Going off the
24 record at 3:49 p.m.
25        (A recess was taken.)

Page 300

1        THE VIDEOGRAPHER:  Back on the
2 record at 4:04 p.m.
3 BY MS. SAULINO:
4    Q.   Chief Ball?
5    A.   Yes.
6    Q.   I've asked you this in smaller
7 sections before, but more generally, can you
8 identify any doctors who engaged in diversion
9 that you have known about since you joined the
10 Akron Police Department?
11   A.   I wouldn't be able to name one
12 specifically.
13   Q.   Okay.  The same question about
14 other kinds of prescribers, like nurse
15 practitioners?
16   A.   No.
17   Q.   No?  Any pharmacists?
18   A.   No.  I mean, I've read a coup- --
19 I've read some articles.  I saw one just last
20 week about a conviction that was made, but I
21 don't -- not specifically.
22   Q.   And these are articles that you've
23 read in the paper, not --
24   A.   Right.
25   Q.   -- not information you've

Page 301

1 received --
2    A.   Not an investigation that I led
3 or --
4    Q.   And not information you've received
5 in your capacity as chief of police?
6    A.   Not that I would have recall of or
7 a specific suspect.
8    Q.   Okay.  Can you identify any
9 pharmacies that engaged in diversion?
10   A.   I don't remember specifically.
11   Q.   Okay.  And I don't think this will
12 change your answer, but to be clear, I'm asking
13 both about those that have been prosecuted and
14 those that have been investigated but not
15 prosecuted.
16   A.   Yeah, I don't have that specific
17 information.
18   Q.   Do you have any way of estimating
19 how many -- how many individuals or entities
20 the Akron Police Department has investigated
21 for diversion in the last five years?
22   A.   No.  No.
23        - - - - -
24        (Thereupon, Deposition Exhibit 18,
25        Corrected Second Amended Complaint

76 (Pages 298 - 301)

Page 302

1    and Jury Demand, was marked for
2    purposes of identification.)
3         - - - - -
4    Q.  You've been handed Exhibit 18,
5 which is the complaint in this case.
6    A.  Okay.
7    Q.  And I'm -- I'm certainly not going
8 to ask you questions about all of it.  And
9 right now --
10    A.  You want to give me two -- two
11 hours to read it?
12    Q.  Yeah.  Well, you read it already.
13 You told me.
14    A.  Skimmed it.
15    Q.  No.  My question -- my questions
16 right now are about Paragraph 705, which is on
17 page 211.  Okay.  Are you there?
18    A.  Yes.
19    Q.  Paragraph 705, the first sentence
20 says, "Further, since 2014, at least three
21 prescribers in Summit County and a number of
22 employees working in health care settings in
23 Summit County were convicted of crimes
24 involving drug diversion."
25    A.  I see that.

Page 303

1    Q.  Do you know who those individuals
2 are?
3    A.  No, I don't.
4    Q.  Do you know whether the Akron
5 Police Department investigated them?
6    A.  I don't know that.
7        And when I answered your question
8 before, it was not in my personal knowledge,
9 but it certainly wasn't that those instances
10 hadn't occurred or those investigations did not
11 take place or arrests had not been made.  It
12 just was I didn't have a -- you know, a recall
13 of it or a familiarity.
14    Q.  I understand.
15        And if you could look at Paragraph
16 706, you'll see the first sentence there says,
17 "One doctor, for example, was convicted of
18 illegally distributing some 30,000 tablets of
19 oxycodone, OxyContin, and Opana from a Copley
20 Township office."
21    A.  I see that.
22    Q.  Do you know who that was?
23    A.  No.
24    Q.  Okay.  And if you look at Paragraph
25 707 on page 212, you see it says, "Similarly,

Page 304

1 an Akron physician and three employees were
2 indicted for a pattern of illegal prescribing
3 involving hundreds of thousands of doses of
4 OxyContin, Percocet, Opana, and other drugs,
5 conduct that continued even after the doctor
6 learned of fatal overdoses."
7    A.  I see that.
8    Q.  Do you know who that was?
9    A.  No.
10    Q.  Do you know who would?
11    A.  Detective Leonard.  I would imagine
12 that was a DEA case.  Or a -- you know, the
13 diversion unit.
14    Q.  Okay.  That's all I have with the
15 complaint right now.
16        If you could pull back out
17 Exhibit 11, which is one of those sets of
18 interrogatories.
19    A.  I'm sorry.  Okay.
20    Q.  Okay.  And if you turn to page
21 36 --
22    A.  Okay.
23    Q.  -- you see there's a paragraph that
24 begins just below the top of the page on 36,
25 which says, "Subject to and without waiving all

Page 305

1 objections, Plaintiff further answers as
2 follows:  Since 2014, at least four prescribers
3 in Summit County were convicted of crimes
4 involving drug diversion," and then there are
5 some names.  "An Akron area physician, Adolph
6 Harper, Jr., and three of his employees, Adria
7 Harper, Patricia Laughman, and Tequilla Barry
8 pled guilty in October 2014 for prescribing
9 hundreds of thousands of doses of prescription
10 opioids between 2009 and 2012."
11        And then it says, "In December 2014
12 a former Copley Township family medicine doctor
13 named Brian Heim pled guilty to conspiracy to
14 distribute controlled substances and 20 counts
15 of distribution of controlled substances."
16        Are you familiar with those cases?
17    A.  No.
18    Q.  Okay.  And can you tell me anything
19 about their investigation?
20    A.  No.
21    Q.  Do you know if anyone at the Akron
22 Police Department worked on them?
23    A.  I don't know.
24    Q.  Okay.  If you turn to page 8 of
25 that same document, Exhibit 2.  You see at the

77 (Pages 302 - 305)

Page 306

1 middle of that page, the paragraph begins,
2 "Despite Defendants' obligations to monitor and
3 report suspicious orders, the ARCOS database
4 identifies these pharmacies as having
5 suspicious orders for opioids within Summit
6 County, Ohio."
7     A.   I do see that.
8     Q.   Okay.  Do you know what that means?
9     A.   An allegation that there was a
10 responsibility with distributors.
11    Q.   Do you know what's -- what --
12    A.   I don't know what the ARCOS
13 stands -- database stands for.
14    Q.   Do you know what it does?
15    A.   No.
16    Q.   Do you know who maintains it?
17    A.   No.
18    Q.   Do you know who inside the Akron
19 Police Department might know?
20    A.   Detective Leonard.
21    Q.   Do you know if Detective Leonard or
22 anyone else in the Akron Police Department has
23 access to the ARCOS database?
24    A.   I don't know.
25    Q.   Do you know whether he uses it?

Page 307

1          MR. LEDLIE:  Object to the form.
2     A.   I don't know.
3     Q.   And have you ever seen this list of
4 pharmacies before?
5     A.   I don't think so.  I don't know for
6 sure.
7     Q.   Seeing that this list of pharmacies
8 has been identified by the ARCOS database as
9 having suspicious orders for opioids, is this
10 something that you would want the Akron Police
11 Department to investigate?
12    A.   Again, I don't know if that falls
13 within our purview or if that's something that
14 is better handled by the DEA.  I'm not exactly
15 sure what the -- you know, the confines of a --
16 of an investigation would look like or what
17 entities are best prepared to handle that very
18 specific type of investigation.
19    Q.   You're the chief of police, right?
20    A.   Yes.
21    Q.   So you can't tell me whether the
22 Akron Police Department should investigate
23 these pharmacies?
24         MR. LEDLIE:  Object to the form.
25    A.   That's what I just said when I

Page 308

1 answered that question.
2     Q.   I'm confused.  Why is it --
3     A.   Typic- --
4     Q.   Go ahead.
5     A.   Typically, that's not at a level
6 that the Akron Police Department would
7 investigate.  That would be the DEA or one of
8 our task force members.  You know, our
9 detectives are not regularly operating on that
10 level without support or participation from one
11 of our federal partners.
12    Q.   Is this something that you would
13 want the Akron Police Department to be able to
14 investigate?
15    A.   I don't even know what the scope of
16 that, if that's possible.  I would trust that
17 the people that are involved are knowledgeable;
18 that, you know, those steps would be taken; and
19 if there was a need for Akron Police Department
20 to be involved, it would be brought to our
21 attention.  I mean, this is -- we're talking
22 about, you know, a gigantic scope here, and I
23 don't have that kind of familiarity to say --
24 yeah, I'm not an expert in everything that
25 happens with the Akron Police Department.

Page 309

1     Q.   And I think you mentioned that this
2 is the kind of -- I may not have the word
3 right, but that these investigations would be
4 complicated; is that right?
5     A.   Yeah.
6     Q.   And how would they be complicated?
7     A.   Just with the number of -- the fact
8 that it's probably not just local.  There are
9 multi jurisdictions involved.  I don't know
10 where the manufacturers are located, where the
11 distributors are located.
12    Q.   I'm sorry.  How would the
13 manufacturers and distributors have anything to
14 do with these particular pharmacies needing to
15 be investigated?
16    A.   Again, that's -- that's an area
17 of -- of specialty, and -- and that has always
18 been working out of our office for diversion
19 and from our partner- -- federal partnership.
20    Q.   Okay.  But it's fair to say that
21 investigating a list of pharmacies for
22 suspicious orders is something that would be
23 complicated?
24    A.   Sure.
25    Q.   And that you would expect the DEA

78 (Pages 306 - 309)

Page 310

1  to do?
2        MR. LEDLIE:  Object to the form.
3     A.   I would -- I would expect that our
4  diversion unit would work on a case like this,
5  and that they work under and with the DEA.  So,
6  yes, that would be my expectation.
7     Q.   Now that you have this list, will
8  you take it to them and ask them to investigate
9  it?
10    A.   I don't know.  I probably -- I
11 think that I will definitely work to have a
12 better understanding of -- of how this has --
13 you know, works in our work environment and if
14 we're doing things that we need to and if the
15 task force is serving the needs of our
16 community well, and have some of those
17 conversations.  That would be, I think,
18 prudent.
19    Q.   Do you know where this list came
20 from?
21    A.   I do not.
22    Q.   Other than the ARCOS database?
23    A.   No.
24    Q.   And do you know whether the lawyers
25 who put this list together have ever even

Page 311

1  provided it to your task force officers?
2        MR. LEDLIE:  Object to the form.
3     A.   I don't know that.
4     Q.   Do you know when they got this
5  information?
6     A.   I do not.
7        MS. RION:  Objection.
8     Q.   Do you know what a suspicious order
9  report is?
10    A.   No.  I mean, I could -- I think it
11 probably is common sense, and there's
12 definitions that would -- probably are in place
13 that would identify those things, but I don't
14 have -- I've never had experience with one or I
15 haven't seen it listed before.
16    Q.   And if you had had access to a list
17 like this years ago, would you have used it?
18       MR. LEDLIE:  Object to the form.
19    A.   If I had access to a list years
20 ago, I -- I wouldn't have been in an assignment
21 where that would be something that would --
22 that would be where I would have had training
23 or familiarity or scope of my assignment to do
24 anything other than make a referral.
25    Q.   Okay.

Page 312

1     A.   And it would have been to the
2  diversion unit.
3     Q.   Do you know whether any Akron
4  police department is using suspicious order
5  reports for any reason?
6        MR. LEDLIE:  Object to the form.
7     A.   I don't know for certainty.  I
8  would imagine that, yeah, our diversion unit is
9  using them, but I don't --
10    Q.   But you don't know.
11    A.   I don't know.
12    Q.   And do you know -- I take it you
13 don't know how long they may have had access to
14 them?
15    A.   I don't.
16    Q.   Okay.  Now, earlier you mentioned a
17 database in Ohio that has information -- that
18 you understand has information about
19 prescriptions?
20    A.   (Witness nodding head.)
21    Q.   Do you know the name of that
22 database?
23    A.   No, I don't.
24    Q.   Okay.  And do you know how -- how
25 long officers have had access to that?

Page 313

1     A.   No.
2     Q.   Do you know who in your department
3  has access to that?
4     A.   Detective Leonard.
5     Q.   And you know that for sure?
6     A.   I would imagine.  That's his role,
7  his assignment with the police department.  So
8  I don't know if his -- if his bosses would as
9  well, or if that would be something that would
10 be exclusive to that task force.
11    Q.   Okay.  And you understand that
12 pharmacies only have very limited access to
13 that database?
14       MR. LEDLIE:  Object to the form.
15    A.   I don't know that.
16    Q.   You don't know one way or the
17 other?
18    A.   No.
19    Q.   Have you ever asked?
20    A.   No.
21    Q.   Do you know what the Ohio licensing
22 agency's role is in dealing with doctors or
23 pharmacists who --
24    A.   No.
25    Q.   -- have been accused of diversion?

79 (Pages 310 - 313)

Page 314

1     MR. LEDLIE:  Object to the form.
2     A.   No.
3     Q.   And have you ever contacted any of
4 the licensing agencies?
5     A.   I have not.
6     Q.   Do you know, even in talking with
7 your colleague, Detective Leonard, whether
8 there are any occasions where anyone within the
9 Akron Police Department suspected diversion but
10 didn't make a prosecution or arrest?
11     A.   I don't know.
12     Q.   If you look back at the very first
13 page of the complaint, so Exhibit 18 -- well,
14 not just the very first page, but -- all right.
15 And that's where you need to be.
16     In your review of the complaint, do
17 you see any of the Defendants that are illegal
18 drug traffickers?
19     A.   No.
20     Q.   And what about doctors that have
21 been accused of or prosecuted for diversion?
22     A.   No.
23     Q.   What about pill mill owners?
24     A.   No.
25     Q.   What about pharmacists that have

Page 315

1 engaged in diversion?
2     A.   No.
3     Q.   What about individuals who engaged
4 in theft or forgery?
5     A.   No.
6     Q.   None of those people are named as
7 Defendants, right?
8     A.   Right.
9     Q.   But you agree with me that all of
10 those types of people have contributed to the
11 opioid crisis?
12     MR. LEDLIE:  Object to the form of
13 the question.
14     A.   I do think that those people have,
15 that it's a very large, complex issue, and
16 that, you know, law enforcement specifically
17 has had a concentration and a focus and a
18 perspective that is narrow as it relates to the
19 problem in some ways.  It's different than
20 public health.  It's different than other
21 agencies who are impacted, children services.
22 And, so, yeah, from that perspective, and law
23 enforcement's familiarity and exposure, that's
24 a big part of it.
25     Q.   Okay.  But as we've just discussed,

Page 316

1 you'd agree with me that law enforcement has
2 access to information like databases that
3 contains -- that contain patient-related
4 information and prescription-related
5 information that private individuals don't
6 have, right?
7     MR. LEDLIE:  Object to the form.
8     A.   I believe so.
9     Q.   And private companies?
10     A.   Yes.
11     Q.   You don't have any reason to
12 believe that pharmaceutical manufacturers have
13 access to the ARCOS database that we were just
14 discussing, right?
15     MR. LEDLIE:  Object to the form.
16     A.   I don't.
17     Q.   Or pharmaceutical distributors?
18     MR. LEDLIE:  Object to the form.
19     A.   Not to my knowledge.
20     Q.   Or retail pharmacies?
21     A.   Correct.
22     MR. LEDLIE:  Object to the form.
23     Q.   Not to your knowledge?
24     A.   Not to my knowledge.
25     Q.   Are you aware of any system that

Page 317

1 would allow pharmaceutical distributors,
2 manufacturers, or retail pharmacies to know the
3 reasons why a doctor decided to prescribe an
4 opioid to a patient?
5     MR. LEDLIE:  Object to the form.
6     A.   I'm not familiar with that process.
7     Q.   Do you know if there's any way that
8 they would know that?
9     A.   No.  I don't believe -- I don't
10 know.
11     Q.   Can you imagine any way that that
12 could occur?
13     A.   No.
14     Q.   Do you know how many opiate
15 prescriptions were written in Akron in 2017?
16     A.   I do not.
17     Q.   Do you know if anyone tracks that
18 information?
19     A.   I would imagine that it's -- that
20 it's tracked by those resources that we just
21 talked about.
22     Q.   Do you know who has access to that
23 information?
24     A.   No, I don't.
25     Q.   Do you know whether the Akron

80 (Pages 314 - 317)

Page 318

1 Police Department does?
2    A.  I don't know.
3    Q.   Do you know how many prescription
4 opioids were consumed in Akron last year?
5        MR. LEDLIE:  Object to the form.
6    A.  No.
7    Q.   Do you know whether anyone in the
8 Akron Police Department does?
9    A.  I don't know.
10   Q.   Given the crisis that you've
11 described, why is it that the Akron Police
12 Department hasn't looked into these numbers?
13       MR. LEDLIE:  Object to the form.
14 Badgering.
15       You can answer.
16   A.  I don't --
17   Q.  Sir, I'm certainly not trying to
18 badger you.  I'm asking you a question.
19   A.  Oh, no, I don't have an answer to
20 that question.  I don't -- I don't know why
21 that is.  And the explanation may be that
22 that's a very specialized area of
23 investigation.
24       And with a department that is
25 large, there is, I think, a -- probably a

Page 319

1 tendency to trust that the people that have
2 those responsibilities are rightly managed and
3 that they're doing their work and that the work
4 is important, it's relevant to the issues that
5 we have.
6        And so they're, you know, like,
7 very, very specific questions about narcotics
8 investigations.  I could be asked very, very
9 specific questions about accident traffic
10 reconstruction, where I wouldn't have a
11 familiarity down to so much detail about what
12 happens in that unit.  Or even with, you know,
13 a homicide investigation, in some ways; not
14 privy to every suspect that is involved, and
15 familiar with some cases because it may have
16 gotten more attention in the media or more
17 conversation in a staff meeting.
18       But, you know, it's a big
19 department with a lot of different things
20 happening.
21   Q.  That's totally fair.
22       When you say that you were trusting
23 the people who have those responsibilities,
24 that they're rightly managed and that they're
25 doing their work, do you mean people within the

Page 320

1 department?
2    A.  Yes.
3    Q.  Okay, okay.
4    A.  And, you know, the other partners
5 that we have, like in the task forces,
6 obviously.
7    Q.  Like the DEA?
8    A.  Sure.
9    Q.  Okay.  And the FBI?
10   A.  (Witness nodding head.)
11   Q.  Yes?
12   A.  Correct.
13       - - - - -
14       (Thereupon, Deposition Exhibit 19,
15       8/4/2016 E-Mail from Erika Wiles Re:
16       Z1/Z4 Report, AKRON_001127875 to
17       001127879, was marked for purposes
18       of identification.)
19       - - - - -
20   Q.  Chief Ball, the court reporter has
21 just handed you what has been marked as Exhibit
22 19, which is an e-mail from August 4, 2016,
23 from Erika Wiles.  You are one of the many
24 addressees on this.  And I can tell you that we
25 found similar e-mails in the production to us.

Page 321

1        Do you know what this is?
2    A.   This is a daily report of a major
3 incident.  It goes out every single -- well,
4 every single business day, just as a rundown of
5 the major events from the last 24 hours.
6    Q.   And what is the purpose of this
7 report?
8    A.   So that information can be shared
9 division to division, so that upper-level
10 management can have a familiarity with the
11 major events, so that zone commanders and
12 neighborhood response officers, community
13 policing officers can all -- all have insight
14 into events that have -- will have occurred
15 over the last 24 hours that should get their
16 attention or that they may be required to
17 follow up on.
18   Q.  Okay.  And how is it that -- that
19 cases are picked to be included in this set?
20   A.  That is -- repeat that?
21   Q.  How is it that -- that incidents
22 are picked to be included in this set that --
23 that comes in the report?
24   A.   They are categorized, I believe, by
25 the CAD, and then if they are a certain coded

Page 322

1 type of response or level of crime, then
2 they're automatically included.
3          I -- I don't know if it's automatic
4 or if Erika Wiles, who works in our planning
5 and research unit, if she has a set criteria.
6 I don't think that she does this manually every
7 day.  This is -- so I would imagine it's --
8 it's pulled by call type or call response.
9     Q.    Okay.  But you don't know exactly?
10    A.    I don't know 100 percent.
11    Q.    If you look at the second to last
12 page of the document, the last page of the
13 actual e-mail --
14    A.    Uh-huh.
15    Q.    -- at the top there's a report of
16 an unintentional overdose.
17    A.    Right.
18    Q.    Is that the kind of incident that
19 is always included?
20          MR. LEDLIE:  Object to the form.
21    A.    Always included?
22          MS. SAULINO:  Sorry.  Can you --
23 whoever's on the phone, can you mute, please?
24    Q.    Okay.  Sorry.
25          Is that the type of incident that

Page 323

1 is always included in this report?
2          MR. LEDLIE:  Object to the form.
3    A.    I don't know if they always -- our
4 overdoses, especially if it -- there was a -- a
5 death as a result, they -- they're listed,
6 because sudden deaths, homicides, robberies,
7 ag. robberies, felonious assaults, burglaries,
8 breaking and enterings, significant felony
9 thefts, those would be the types of incidents
10 that were reported, in addition to overdose --
11 overdose deaths would be, you know, a sudden
12 death.
13    Q.    All right.  And you see where it
14 says, "James was found passed out in the
15 driver's seat"?
16    A.    I do.
17    Q.    And then it -- further on it says,
18 "He took Adderall and Percocet that were not
19 prescribed to him"?
20    A.    Yes.
21    Q.    Is that something that's fairly
22 common in drug overdoses?
23          MR. LEDLIE:  Object to the form.
24    A.    I would imagine that it's common.
25 I don't know if it's significant

Page 324

1 proportionally, but I know that it's -- it's
2 common.
3    Q.    Okay.  And these reports here that
4 we're looking at, do you know when they started
5 getting sent?
6    A.    I don't.
7    Q.    Okay.  We don't have any prior to
8 late 2011.  Were they being sent before then,
9 to your recollection?
10    A.    I don't know.
11    Q.    You don't know?  Okay.
12    A.    That's -- yeah, I don't know.
13    Q.    Okay.  All right.  So you just
14 don't know how common or uncommon it is that
15 the reports would include a mention of drugs --
16 prescription drugs that had not been prescribed
17 to the individual?
18    A.    Right.  I don't know how common
19 that would be.
20    Q.    Okay.  But it certainly was
21 something that happened in Akron, right?
22    A.    Yeah.
23    Q.    Quite a bit, right?
24          MR. LEDLIE:  Object to the form.
25    A.    Again, I don't know --

Page 325

1    Q.    Okay.
2    A.    I wouldn't see normally --
3 typically, it wouldn't be listed.
4          Familiarity that I have, that this
5 patient -- or this subject did not die.  I
6 don't think that every overdose we have is
7 listed in these reports.
8    Q.    Okay.
9    A.    Sudden deaths were -- all of those
10 would be.
11    Q.    And the databases that we discussed
12 earlier that track overdoses, they don't break
13 those overdoses down by whether drugs had been
14 taken by an individual who was not prescribed
15 them, right?
16    A.    Right, they do not.
17    Q.    Those statistics are just not kept,
18 right?
19          MR. LEDLIE:  Object to the form.
20    A.    Right.  They could do -- there are
21 some, like, secondary searches that they could
22 do that would include words pulled from a
23 narrative where they may be able to put some of
24 that together.  But they're not separated in
25 some of the other reports that are organized

Page 326

1 for the department.
2    Q.   And as you said, the narrative
3 wouldn't necessarily include that information,
4 right?
5    A.   It may not.
6    Q.   Okay.  So even if it might be true,
7 it might not be in the narrative?
8    A.   Possibly.
9    Q.   Okay.  When you all are preparing
10 an arrested individual for prosecution, do
11 you -- does your department participate in
12 creating any kind of, like, a prosecution memo?
13    A.   There's a supplemental arrest
14 report that's filled out, and that is a -- just
15 a brief narrative that goes to the -- goes to
16 the prosecutor's office so that at preliminary
17 hearing the following morning, there can be a
18 general synopsis of the events and some other
19 information, like probation, parole, warrants
20 on file, potential information that could lead
21 to fear of being a flight risk, so that the
22 prosecutors the following day are able to -- to
23 help to make bond recommendations and have just
24 a general idea of what the circumstances were.
25 That is specific for that purpose.  And then

Page 327

1 there are much broader, complete investigative
2 reports that are filled out.
3    Q.   Okay.  And where are those kept?
4    A.   Our record room.
5    Q.   But I don't -- what is the order in
6 which they're kept?  Are they kept by name?  By
7 number?
8    A.   I'm sure that they're -- that
9 they're accessible by each of those.  They
10 would be able to -- to pull those by arrest
11 numbers, by incident numbers, by suspect names.
12    Q.   And is it your understanding
13 there's a database that would keep all of that
14 information?
15    A.   I don't know how that's all
16 categorized.
17    Q.   Who would know?
18    A.   Pam Brown is our supervisor,
19 civilian supervisor in records.  Bryan Harding,
20 who is the captain who's in charge of those
21 areas.
22    Q.   And do you know whether diversion
23 cases that are investigated by the Akron Police
24 Department are kept in one set?
25    A.   I don't know.

Page 328

1       MR. LEDLIE:  Objection.
2    A.   I don't know.
3    Q.   Or kept track of in a database?
4    A.   Our -- our diversion unit,
5 narcotics -- all of our antiviolence,
6 narcotics, street narcotics, all the task
7 forces, diversion, those are -- that's a
8 separate building.  We don't work out of the
9 same building with those units, so there's --
10 you know, some of the processes they have, I'm
11 not absolute about or completely familiar with.
12       An incident report is required for
13 all of our arrests.  There would be situations
14 where there could be a continuing investigation
15 where it would be potentially compromising for
16 the investigation, potentially dangerous to a
17 source or somebody that's arrested if there's
18 not immediate prosecution with it.  And so
19 there are times when that information would not
20 follow the normal -- like, submit an incident
21 report because there's something else going on
22 with that particular case.  So I don't know how
23 they file or categorize them up at our other
24 building.
25       And the incident reports are all --

Page 329

1 they're all computer- -- on computer-generated,
2 but the supplemental reports I mentioned before
3 are -- those are one of the rare handwritten
4 reports that we have, so I don't know exactly
5 the way.
6       The others -- incident reports,
7 most of the reports that we do are stored
8 electronically.  The supplemental arrest
9 reports, I don't know if those are scanned or
10 if they're hardcopy kept.  I don't -- I'm not
11 familiar with that.
12       MS. SAULINO:  Okay, Chief Ball.  At
13 this time I don't have more questions for you.
14 I can't promise I won't have more questions for
15 you today, but right now I don't, but --
16       THE WITNESS:  Okay.
17       MS. SAULINO:  -- some of my
18 colleagues do.
19       THE WITNESS:  Okay.
20       MR. LOMBARDO:  Why don't we take a
21 short break so that we can get reconfigured.
22       MR LEDLIE:  That's fine.
23       THE VIDEOGRAPHER:  Going off the
24 record at 4:36.
25       (A recess was taken.)

83 (Pages 326 - 329)

Page 330

1        THE VIDEOGRAPHER:  Back on the
2  record at 4:43 p.m.
3            - - - - -
4        (Thereupon, Deposition Exhibit 20,
5        Document Titled "State Issue 1: A
6        Safe Harbor for Drug Traffickers and
7        Violent Offenders", was marked for
8        purposes of identification.)
9            - - - - -
10  BY MS. SAULINO:
11     Q.   Chief Ball, the court reporter has
12  just marked -- Exhibit 21?
13     A.   20.
14     Q.   20.  You recognize that document?
15     A.   I do.
16     Q.   And that is a set of talking points
17  that you received from the Ohio Prosecuting
18  Attorneys Association?
19        MR. LEDLIE:  Object to the form.
20     A.   I don't remember exactly where it
21  came from.  I think that there was a -- that it
22  was distributed.  Obviously it comes from the
23  Ohio Prosecuting Attorneys Association.
24  There's that -- that's on this document.  I
25  think it was presented at a meeting I was at

Page 331

1  for Summit County police chiefs by a local
2  judge.
3     Q.   Can you read that title on the top
4  of the document?
5     A.   "State Issue 1, a safe harbor for
6  drug traffickers and violent offenders."
7     Q.   Did you ever use these talking
8  points?
9     A.   No, I did not.
10     Q.   And why did you keep them?
11     A.   I just had them attached in case
12  the -- and I carried them in my notes in case I
13  was ever asked direct questions about that
14  particular topic so that I could have -- speak
15  with some understanding.
16     Q.   So you didn't disagree with them?
17        MR. LEDLIE:  Object to the form.
18     A.   I don't disagree with them.
19     EXAMINATION OF KENNETH R. BALL II
20  BY MR. LOMBARDO:
21     Q.   Hello, Chief Ball.
22     A.   Hi.
23     Q.   I'm glad to get the opportunity to
24  talk to you for a few minutes and not just sit
25  across the table.

Page 332

1        When we started the day, do you
2  recall that you provided a list of opioids,
3  types of opioids, that you're familiar with?
4     A.   Yes.
5     Q.   And I think you mentioned you're
6  some -- you're familiar with some of them from
7  your work with the Akron Police Department, and
8  some you are familiar with because you've read
9  about in articles, and you mentioned because
10  you had just read the complaint as well.  Do
11  you recall that?
12     A.   Yes.
13     Q.   Which of the opioids that you
14  listed are you familiar with from your work
15  with the Akron Police Department?
16     A.   OxyContin, oxycodone, Percocet,
17  Vicodin, heroin, Fentanyl, carfentanil.  That
18  probably is not a list that's completely
19  inclusive, but off the top of my head, those
20  are ones that I know that I've had experience
21  with in my job.
22     Q.   If you take a moment, will you --
23  are you able to think of any others, or is that
24  the best you can do at this point?
25     A.   Morphine.  I mean, I'm -- yeah.  I

Page 333

1  didn't study or -- that just is my familiarity
2  at first glance.
3     Q.   Who's responsible for setting the
4  training curriculum or the subjects of training
5  within the police department?
6     A.   Ohio gives the mandates for the
7  police officers training academy.  Ohio, each
8  year, the Ohio Police Officers Training
9  Academy, they would put out mandates per
10  required training for -- as a part of our
11  in-service, and then depending on how many
12  hours they were requiring and -- and how much
13  time we could make available, we would add --
14  like, I wouldn't call it electives, but we
15  would add other topics that were relevant for
16  the Akron Police Department, or a group of
17  either training leaders or department leaders
18  would -- would figure out that this could be
19  timely or beneficial or some of it is required.
20        Prosecutor's office may have "now
21  is the time that we need to do some legal
22  updates," or there was a change in this law or
23  application of this law.
24        So it's a lot of different people
25  have involvement in that process.

Page 334

1  Q.  For how many years have you had a
2  role in determining which training subjects to
3  add on as elective training?
4  A.  I hadn't had that role.  I'm sure
5  that my opinion has been considered for the
6  last three years.  Probably I wouldn't say I
7  had that role until I became chief of police
8  where it was definitive, and so...
9  Q.  And earlier, with respect to
10  opioids in particular, you mentioned training
11  relating to the use of Narcan.  Do you recall
12  that?
13  A.  Yes, I do.
14  Q.  And training with respect to the
15  physical handling of certain types of opioids?
16  A.  Yes.
17  Q.  Okay.  Beyond those two training
18  modules, why haven't you recommended other
19  training to include in the elective training
20  courses for police officers?
21  A.  I would not have had either a
22  familiarity with what that training would be
23  and how it could benefit us, or the department
24  was limited in the amount of time that we had
25  to train, and so there were some other

Page 335

1  important topics to cover as well.
2  Q.  So in considering which topics to
3  propose for elective training, you look at the
4  priorities of the department; is that right?
5  A.  That's a part of the process.
6  Q.  And you tend to select the topics
7  that you think are the most important and
8  timely that the officers should know about?
9  A.  Well, when you -- when you say
10  "you," are you referring to me, or are you
11  referring to the process?
12  Q.  To you in particular.
13  A.  To me in particular, it would be.
14  And this is the first year where I have had
15  that kind of influence or, you know, that
16  decision-making authority.
17  You defer to -- obviously, there's
18  a perspective that others in the department
19  have as well.  Training, it's important for our
20  training commander and the training staff to be
21  educated about, you know, new topics, or old
22  topics that need to be refreshed, and so it
23  would to be to considered -- to consider those
24  perspectives.
25  To include my familiarity that I

Page 336

1  would gain from reading, you know, Ohio
2  Association Chiefs of Police.  Sometimes
3  they'll send out training curriculum.  Other
4  periodicals that the department has membership
5  in, and I'll receive those and see if there's
6  something that's timely in there.
7  PoliceOne is a website that I
8  participate with, and they have a lot of
9  training recommendations, training articles.
10  International Association of Chiefs of Police,
11  they make recommendations.  The Ohio
12  Collaborative, which is a group of law
13  enforcement and non-law enforcement that make
14  recommendations to the governor about police
15  practices and police policy, they'll make
16  recommendations.  So I'm sensitive to all those
17  different things.
18  Q.  You take input from a lot of
19  sources on this?
20  A.  Yes.
21  Q.  But your goal, ultimately, is to
22  select training modules for elective training
23  that's going to be addressing the most
24  important and timely subjects for your
25  officers; is that right?

Page 337

1  MR. LEDLIE:  Object to the form.
2  A.  If that's within our means, yes.
3  Q.  Okay.  And you have not, since
4  you've had this role, proposed that opioids be
5  the topic of elective training for your
6  officers; is that right?
7  A.  That's correct.
8  Q.  You mentioned earlier that you were
9  prescribed an opioid for pain at some point; is
10  that right?
11  A.  Yes.
12  Q.  Do you recall what prescription
13  opioid that was?
14  A.  Oxycodone, maybe.  Percocet.  I
15  don't -- I know oxycodone at one point in time,
16  and I don't know at another point in time what
17  it would have been.
18  Q.  And did you -- did you take the
19  drug that was prescribed?
20  A.  A couple doses.
21  Q.  Okay.  And so you followed the
22  prescription; is that right?
23  A.  Well, yeah, I would have followed
24  the prescription, but it wasn't -- I never
25  exhausted a prescription that -- that I was

85 (Pages 334 - 337)

Page 338

1  given.
2    Q.    You never took an excess of the
3  dosage that was prescribed to you, correct?
4    A.    I never took an excess of the
5  dosage, nor did I ever finish out a
6  prescription.
7    Q.    And did you get pain relief from
8  the prescription drug that you took?
9    A.    I would imagine.  I mean, I -- yes.
10    Q.    And did you have any problems --
11  did you encounter any problems from the
12  prescription drug that you took?
13    A.    No.  I would have only taken a
14  prescription drug for maybe one or two days.
15    Q.    Okay.  And did you appreciate the
16  pain relief that you got from taking the
17  prescribed drug?
18    A.    Sure.
19    Q.    To your knowledge, has the
20  department ever investigated a case involving a
21  subject who was taking a prescription opioid --
22  opiate as prescribed by a medical professional?
23    A.    Have we ever investigated a case
24  where somebody was taking a medicine as
25  prescribed?  No, that wouldn't be a criminal

Page 339

1  offense, and it wouldn't cause there to be
2  involvement with the Akron Police Department.
3    Q.    Are you aware of any situations
4  where your department investigated an overdose
5  involving a subject who was taking a
6  prescription opioid in accordance with a
7  prescription from a medical professional?
8        MR. LEDLIE:  Object to the form.
9    A.    I -- I don't know that information.
10        - - - - -
11        (Thereupon, Deposition Exhibit 21,
12        January/February 2016 E-Mail Chain
13        Re: You're Invited: Summit County
14        Opiate Meeting, was marked for
15        purposes of identification.)
16        - - - - -
17    Q.    The court reporter has handed you
18  what he's marked as Exhibit 21, a series of
19  e-mails.  And if you look at the lower half of
20  the first page there, there's an e-mail from
21  Robert Fiatal on which you are one of the
22  recipients.  Do you see that?
23    A.    Yes, I do.
24    Q.    And is this an invitation from the
25  Ohio attorney general's office to a Summit

Page 340

1  County community opiate meeting?
2    A.    Yes, it is.
3    Q.    And do you recall this meeting?
4    A.    I don't.
5    Q.    Do you -- setting aside whether you
6  recall specifically attending the meeting, do
7  you recall that this meeting even occurred?
8    A.    I don't know.  That was almost
9  three years ago.
10    Q.    And so you wouldn't recall whether
11  anyone from your police department participated
12  in this meeting?
13    A.    I wouldn't know that for certain.
14        MR. BREWER:  What's the Bates
15  number on that?
16        MR. LOMBARDO:  I don't see any.
17    Q.    If you turn to the second page of
18  Exhibit -- Exhibit 21, you see at the top there
19  it says, "Dear Community Leader"?
20    A.    Yes.
21    Q.    And then it says, quote, "The
22  opiate epidemic and shift to heroin is causing
23  great concern throughout the State of Ohio."
24        Do you see that?
25    A.    I do.

Page 341

1    Q.    Do you understand what this is
2  referring to where it mentions a shift to
3  heroin?
4    A.    I think I do.
5    Q.    Okay.  What is your understanding
6  about a shift to heroin at this time in -- in
7  January of 2016?
8    A.    That when we first started to see
9  deaths that were -- that were connected with
10  the significant increase we had in 2014, those
11  were predominantly heroin -- cases where heroin
12  was used.
13    Q.    Okay.  And so it was a shift from
14  what type of drug?
15    A.    It was a shift from other opiates.
16    Q.    Okay.  So your understanding and
17  your recollection is that beginning in 2014,
18  there was a shift in overdoses that you were
19  seeing from other opiates to heroin; is that
20  right?
21    A.    I think -- yeah, I think that's
22  accurate.
23    Q.    Okay.  And what were the other
24  opiates that you were seeing before this shift
25  in 2014?

86 (Pages 338 - 341)

Page 342

1    A.    Some of the ones that I had
2  mentioned previously.  But I don't -- it wasn't
3  something that was, I think, on the conscience
4  of law enforcement at that point in time
5  because we weren't -- we weren't having heroin
6  deaths that were connected.  We weren't having
7  overdose deaths that were connected.  So we'd
8  got different attention and -- when we started
9  having bodies dropping.
10        So what it looked like before that,
11  I don't have great familiarity with what it
12  looked like before.  I think before that it
13  wasn't perceived in significant ways of being a
14  law enforcement issue.
15        Our officers wouldn't respond to
16  calls for service, typically, for an overdose
17  unless it was a person that was threatening
18  suicide or somebody that was found in a --
19  whoever found them, somebody close to them,
20  would have been unsure of what those
21  circumstances may have been and found somebody
22  that was unconsciousness or in some kind of
23  medical distress.  If it was just an overdose,
24  Akron police wouldn't have typically responded
25  to those calls.

Page 343

1            - - - - -
2        (Thereupon, Deposition Exhibit 22,
3        2016 E-Mail Chain Re: Heroin Field
4        Testing, AKRON_000321401 to
5        000321403, was marked for purposes
6        of identification.)
7            - - - - -
8    Q.    The court reporter has handed you
9  what he's marked as Exhibit 22, another string
10  of e-mails beginning with the Bates number
11  Akron 321401.  If you'll turn to the second to
12  last page of that e-mail string --
13    A.    Okay.
14    Q.    -- Exhibit 22.  You see an e-mail
15  there in the middle of the page from Steve Heim
16  to all police department?
17    A.    On the second page?
18    Q.    The second to last page.
19    A.    I see an e-mail from Steve Heim to
20  all police departments on the last page.
21    Q.    Okay.  I have another page on my
22  copy.  It's blank, but there's another page on
23  my copy.
24        In that e-mail is "all police
25  department" a distribution e-mail list in your

Page 344

1  police department?
2    A.    I have no idea.  I would imagine
3  that it is.  That's coming from -- no, I
4  don't -- I don't know about that distribution.
5    Q.    Okay.  And do you see where in the
6  first sentence of Detective Heim's e-mail he
7  writes, "As you all already know, Fentanyl is
8  being sold as heroin throughout the state, most
9  heavily in the Akron area."
10        Do you see that?
11    A.    I do see that.  And it's likely
12  that Steve Heim is -- that's "all police
13  department," so that's going to his police
14  department.  And then I think that it was
15  forwarded then from his chief of police to
16  other chiefs that are on the Summit County --
17  other members of chief -- chief of police from
18  Summit County.
19    Q.    And on the page before the page we
20  were just looking at, the one ending in Bates
21  402, do you see that Chief Nice sends the
22  e-mail to you and Paul Calvaruso?
23    A.    Yes.
24    Q.    Was it correct that Fentanyl was
25  being sold as heroin throughout the state and

Page 345

1  most heavily in the Akron area at this time?
2    A.    That's true.
3    Q.    And that began -- did that begin --
4  let me ask you, when did that begin?
5    A.    I don't know when that began.
6    Q.    And below there, he wrote, "The
7  introduction of carfentanil in the area
8  occurred over the July 4th weekend and has been
9  the cause of most of the overdose deaths since
10  then."
11        Do you see that?
12    A.    Where are you specifically
13  referring to?  Second page?
14    Q.    No.  The last page.  Steve Heim's
15  original e-mail in the second sentence, he
16  writes, "The introduction of carfentanil in the
17  area occurred over the July 4th weekend and has
18  been the cause of most of the overdose deaths
19  since then."
20        Do you see that?
21    A.    I do see that.
22    Q.    And we were talking earlier about
23  the introduction of carfentanil in July of
24  2016, right?
25    A.    Yes.

87 (Pages 342 - 345)

Page 346

1    Q.    And was it accurate that
2 carfentanil was the cause of most of the
3 overdose since -- overdose deaths since then?
4         MR. LEDLIE:  Object to the form of
5 the question.
6    A.    No, that's not accurate.
7    Q.    What's not accurate about that?
8    A.    That carfentanil was responsible
9 for most of the overdose deaths since then.  It
10 was very predominant for a short period of
11 time, and when we had a significant spike,
12 carfentanil was predominantly involved.
13        But since then there was a
14 significant fall-off of carfentanil.  I don't
15 know if -- I don't think that we're seeing it
16 with any kind of the same regularity as we did
17 during that period of time, during the summer
18 of 2016.
19    Q.    But was that statement by Detective
20 Heim accurate when he wrote it in July of 2016?
21    A.    Yes, that would have been accurate
22 at that time.
23    Q.    And your department did an
24 investigation into the overdoses and the
25 overdose deaths from carfentanil during July of

Page 347

1 2016; is that right?
2    A.    Yes, it is.
3    Q.    And what did that investigation
4 reveal about why the individuals took the
5 carfentanil?
6    A.    I don't know what the investigation
7 would have revealed about why those individuals
8 chose.
9    Q.    What -- do you recall whether the
10 investigation revealed anything about whether
11 the individuals who took carfentanil were
12 addicted to opiates?
13    A.    I don't know if that's a -- a
14 connection that was able to be made through
15 investigation.
16    Q.    And do you see in the paragraph
17 below there, there's a paragraph that starts
18 with, quote, "Just some info."
19    A.    I see that.
20    Q.    And in the -- the second sentence
21 of that paragraph, Detective Heim writes, "This
22 is 100 times stronger than Fentanyl, the
23 analgesic blamed for the increasing overdose
24 deaths."
25        Do you see that?

Page 348

1    A.    I do.
2    Q.    And was it accurate in July of 2016
3 that Fentanyl was the analgesic blamed for the
4 increase in overdose deaths?
5    A.    State that again.
6    Q.    Was it accurate when Detective Heim
7 wrote this in July of 2016, that Fentanyl was
8 the analgesic blamed for the increasing
9 overdose deaths?
10    A.    I think specifically in July of
11 2016, it was carfentanil that was responsible
12 for that significant spike.  Prior to that,
13 Fentanyl was something that we saw with
14 regularity.
15    Q.    Okay.  And so how long prior to
16 July of 2016 was Fentanyl the analgesic that
17 you were seeing as having responsibility for
18 increasing overdose deaths?
19    A.    I don't know that answer for
20 certain.
21    Q.    Was your department investigating
22 the causes of Fentanyl deaths prior to July of
23 2016?
24    A.    Yes.
25    Q.    And what did that investigation

Page 349

1 reveal about whether the individuals who
2 overdosed on Fentanyl had been addicted to
3 opiates?
4    A.    I don't have that specific
5 information about those individual
6 investigations.
7    Q.    Could you retrieve Exhibit 4 that
8 was marked earlier?
9         MR. LEDLIE:  Document title?  Just
10 so -- I'm trying to help him find it.
11        MR. LOMBARDO:  It looks like this.
12        THE WITNESS:  Sorry about that.
13    Q.    The stack is getting rather large.
14    A.    Yes.
15    Q.    You have a --
16    A.    I was going to put that binder back
17 on, but I didn't want to interrupt the process,
18 but.
19    Q.    Do you have Exhibit 4 in front of
20 you now?
21    A.    I do.
22    Q.    And the news story that's there
23 beginning on the second page of Exhibit 4,
24 that, again, relates to the spike in overdoses
25 that you saw in July of 2016 from the

Page 350

1 introduction of carfentanil; is that right?
2     A.   It is.
3     Q.   And the article references, "Since
4 July 5th," -- it's about four paragraphs down.
5     A.   I see it.
6     Q.   -- "91 overdoses have been reported
7 in the City of Akron."
8           Do you see that?
9     A.   I do.
10    Q.   Can you describe the investigation
11 that your department did into those overdoses?
12    A.   I -- I don't know specifically.
13 Again, I didn't have that kind of exposure to
14 know.
15          I know that when our officers would
16 arrive at the scene, they would start a
17 preliminary investiga- -- a preliminary
18 investigation based on whatever evidence was
19 available there.  Typically, that would involve
20 seizure of cell phones; interviewing any
21 witnesses that might be on scene; whether or
22 not there were prescription bottles, needles,
23 other drug paraphernalia.  And then that
24 investigation would likely then move to the
25 cell phones; who were the people that were in

Page 351

1 contact with them short- -- prior to their --
2 immediately prior to their death.  Text
3 messaging, potentially, that could have gone on
4 with drug dealers or other suppliers, and then
5 using that information to try to build a case.
6     Q.   And lower in that article, on the
7 next page, it states, "Chief Nice said it's
8 possible that carfentanil may be coming from
9 China."  And we talked about Fentanyl and
10 carfentanil coming from China, right?
11    A.   Right.
12    Q.   And do you recall whether it was
13 ultimately determined that the carfentanil
14 spike in July of 2016 originated in China?
15          MR. LEDLIE:  Object to the form of
16 the question.
17    A.   I don't know that we were able to
18 make that specific connection with our issue.
19 You know, I do know that it's -- that it's
20 known that China was a source for some of it
21 and a big problem.
22    Q.   And you're not able to say anything
23 about whether any of the 91 individuals who
24 overdosed on carfentanil in July of 2016 had a
25 history of addiction to opiates; is that right?

Page 352

1           MR. LEDLIE:  Object to the form of
2 the question.
3     A.   I would not know that.
4     Q.   Is that something that your
5 investigation would look into?
6           MR. LEDLIE:  Object to the form.
7     A.   I'm sure that the investigation
8 would consider all those facts.  It's always a
9 goal of a drug investigation to try to figure
10 out where the sources of the drugs may come
11 from and its next level, next level, next
12 level.
13    Q.   And so who -- sorry.  Who -- who --
14 who or what source would you look to for the
15 answer to that question?
16    A.   Detectives Harvey and Schmidt or
17 Captain Shearer, Lieutenant Garro.
18          - - - - -
19          (Thereupon, Deposition Exhibit 23,
20          3/22/2018 E-Mail Chain Re: Da Nico
21          Geter, AKRON_000325481, was marked
22          for purposes of identification.)
23          - - - - -
24    Q.   The court reporter has handed you
25 what he's marked as Exhibit 23.  It's a

Page 353

1 one-page e-mail string Bates-labeled Akron
2 325481.
3           Do you sometimes give quotes or
4 statements to the media on matters of public
5 interest?
6     A.   Yes.
7     Q.   And who's Rick Edwards?
8     A.   He's our public information
9 officer.
10    Q.   And what is Rick Edwards' role in
11 providing quotes to the media for you?
12    A.   That is one of his primary roles.
13    Q.   And do you approve the quotes or
14 statements that Rick Edwards provides to the
15 media on your behalf?
16    A.   Yeah, on most occasions, I -- I
17 believe on almost all those occasions, I would
18 give the -- I would provide the quote.
19    Q.   You would provide it to Rick?
20    A.   Yes.
21    Q.   And he would provide it to the
22 media?
23    A.   Correct.
24    Q.   Do you recall the case of Da Nico
25 Geter of Akron that's described in this Exhibit

89 (Pages 350 - 353)

Page 354

1  23?
2      A.   I recall this would be my statement
3  that I typed.  I remember that much.
4      Q.   You provided this statement?
5      A.   I did.
6      Q.   How much is 200 grams of -- of
7  carfentanil?
8      A.   200 grams?
9      Q.   Is that a lot of carfentanil?
10     A.   Yeah.
11     Q.   Can that do a lot of damage?
12     A.   Yeah, it would do a whole lot of
13 damage.
14     Q.   And in the quote that you provided,
15 you indicated 310 people have died as a result
16 of drug overdose in Akron since the start of
17 2016, right?
18     A.   Sure, that was accurate.
19     Q.   And that's from -- from all types
20 of drugs; is that right?
21     A.   From the start of 2016, yes, it
22 would have been.
23     Q.   And are you able to say how many of
24 the 310 people who died of a drug overdose
25 since the start of 2016 died from an overdose

Page 355

1  on opioids?
2      A.   I'm not able.
3      Q.   Okay.  And then you wrote, quote,
4  "Drug dealers like Da Nico Geter are largely
5  responsible."
6          Do you see that?
7      A.   I do.
8      Q.   And you gave that statement, right?
9      A.   Yes.
10     Q.   And you agree with that?
11     A.   I do.
12     Q.   They're largely responsible for the
13 310 deaths?
14         MR. LEDLIE:  Object to the form.
15     Q.   Is that right?
16     A.   Yeah.
17     Q.   Who else is responsible for 310
18 people that died as a result of drug overdose
19 since the start of 2016?
20     A.   That's a pretty broad question.  I
21 mean, it's hard to say that specifically, but
22 other enablers, other drug addicts that they
23 were with, you know, the providers of -- of
24 excessive or unnecessary prescriptions that can
25 lead to addiction.  There's a lot of different

Page 356

1  facets to this issue.
2          And there is a significant part of
3  it that is in the lane of the Akron Police
4  Department that deals with heroin or
5  carfentanil or Fentanyl.  Exactly what that
6  individual's story is or what exposures or
7  interactions that they have had, it's
8  individual.
9          I know that I've seen and heard
10 many, many people who talked about their
11 circumstances or the circumstances of a loved
12 one and what that path that -- looked like for
13 them, and the problem that we perceived and
14 what I would have perceived initially being the
15 result of personal choice and a lack of values
16 or a lack of discipline was not the totality of
17 this.
18         I know that people have talked
19 about their individual circumstances where
20 somebody was not involved in other addictive
21 behaviors, that was not a drug user in a -- in
22 a criminal way prior to overdose -- or prior to
23 exposure to prescription -- legal prescription
24 opioids -- opioid use.
25         I think it's a process that all of

Page 357

1  us, anybody who has a role, has to look at and
2  see the things that were done or not done that
3  could have contributed to this problem getting
4  to be at the level that it's at now.
5          Certainly drug dealers are not
6  doing anything to make our circumstances
7  better.  That's obvious.
8      Q.   Do you have any information about
9  any specific conduct that any individual
10 Defendant who's named in this complaint engaged
11 in that contributed to the opioid epidemic?
12     A.   Did you say specific knowledge or
13 personal knowledge?
14     Q.   Do you have -- do you have
15 knowledge of any specific conduct by any
16 individual Defendant named in this complaint
17 that contributed to the opioid epidemic?
18     A.   I have a familiarity from reports
19 that I've read or from the complaint that was
20 made about, you know, practices or policies
21 that I was unaware of previously, so I have
22 knowledge or a familiarity.  Is that what
23 you're asking?
24     Q.   Do you mean from reading the
25 complaint in this case?

90 (Pages 354 - 357)

Page 358

1          MR. LEDLIE:  Object to form.
2      A.    From the complaint and from hearing
3  speakers at different events, reading different
4  media articles, Internet articles.
5          Are you asking for my personal
6  experience or what I have knowledge of based on
7  learning from a pretty broad place and lots of
8  different influences?
9      Q.    Other than from reading the
10 complaint in this case, what specific Defendant
11 who's named in this case do you have knowledge
12 about specific conduct that it engaged in that
13 contributed to the opioid epidemic?
14     A.    I don't for a specific Defendant in
15 the case.
16     Q.    Other than anything that you might
17 have learned from reading the complaint, do you
18 have knowledge about any conduct by any
19 specific Defendant that led any individual to
20 take prescription opioids that were not
21 medically appropriate?
22     A.    Not specific to somebody named in
23 the complaint.
24     Q.    Or that led to any individual
25 overdosing?

Page 359

1      A.    Not that I'm aware of.
2      Q.    Or that led to any individual
3  taking illicit street drugs?
4          MR. LEDLIE:  Object to the form of
5  the question.
6      A.    Not that I'm aware of.
7      Q.    Has your department ever
8  investigated the activities of any sales
9  representative of any pharmaceutical
10 manufacturer?
11         MR. LEDLIE:  Object to the form of
12 the question.
13     A.    I don't know that answer.
14         - - - - -
15         (Thereupon, Deposition Exhibit 24,
16         Document Titled "Summit County Drug
17         Unit, Minutes of the January 24,
18         2018," SUMMIT_000119626, was marked
19         for purposes of identification.)
20         - - - - -
21     Q.    The court reporter has handed you
22 what he's marked as Exhibit 24.  It's titled
23 "Summit County Drug Unit Minutes of the January
24 24, 2018 Meeting."  It's Bates-stamped Summit
25 119626.

Page 360

1          Do you recognize this type of
2  document?
3      A.    Yes.
4      Q.    And are these meeting minutes from
5  a meeting that you attended for the Summit
6  County drug unit?
7      A.    It would have been if I'm listed,
8  yes.
9      Q.    Did the -- did the drug unit always
10 keep minutes of its meetings?
11     A.    I believe they have as long as I've
12 been associated.
13     Q.    And as someone who's associated, do
14 you receive copies of those minutes in the
15 ordinary course?
16     A.    Yes.
17     Q.    And do you keep copies of those
18 minutes?
19     A.    I do not.
20     Q.    Do you receive them -- how do you
21 receive them?
22     A.    I don't know if they send them out
23 by e-mail.  I don't think they send them out by
24 e-mail.  They'll have a copy of the minutes
25 when we -- when we go into the meeting, I

Page 361

1  believe.
2      Q.    So you get a paper copy and you --
3      A.    I get a paper copy when I arrive
4  for the meeting.
5      Q.    And then you discard it?
6      A.    Yes.
7      Q.    How long have you participated in
8  the Summit County drug unit on behalf of APD?
9      A.    Since I've been chief.  And there
10 were a couple instances prior to that where I
11 may have sat in for the -- where I did sit in
12 for the prior chief.
13     Q.    Okay.  If you turn to the second
14 page of these minutes, do you see a heading
15 labeled Roman III "Finances"?
16     A.    I do.
17     Q.    And it references, "Captain Paolino
18 reviewed the forfeiture and seizure reports,
19 along with transactions that occurred in the
20 federal forfeiture and project income accounts
21 from September 2017 through December 2017."
22         Do you see that?
23     A.    I do see that.
24     Q.    Do you know what the forfeiture and
25 seizure reports are?

91 (Pages 358 - 361)

Page 362

1    A.   They're just a -- just record
2  keeping for the forfeitures and seizures that
3  are made.
4    Q.   And what is the federal forfeiture
5  account that's listed there?
6    A.   I don't have full familiarity with
7  it.  I -- that's the -- the seizures that are
8  made, I don't know exactly how they
9  categorize -- categorize them.  It depends on
10  which entities are participatory in an
11  investigation.  And as I kind of talked about
12  this morning, those are -- there are specific
13  rules in place that divide -- or decide how
14  they will be divided.
15    Q.   And you're not acquainted with
16  those rules?
17    A.   No, I'm not.
18        - - - - -
19        (Thereupon, Deposition Exhibit 25,
20        Document Titled "Ohio Department of
21        Public Safety Office of Criminal
22        Justice Services Subgrant
23        Application Title Page,
24        SUMMIT_000076854 to 000076879, was
25        marked for purposes of

Page 363

1        identification.)
2        - - - - -
3    Q.   The court reporter has handed you
4  what he's marked as Exhibit 25.  It's a
5  document Bates-labeled Summit 76854.
6        Do you recognize this grant
7  application?
8    A.   No.
9    Q.   Would you have any -- would you
10  have had any involvement in preparing or
11  approving the grant application?
12    A.   No.
13    Q.   Will you turn to the page -- it
14  says page 3 of 10 in the lower left corner.
15    A.   Okay.
16    Q.   And do you see where it says,
17  "Problems statement, task force issues"?
18    A.   I do.
19    Q.   Do you see, "The distribution and
20  abuse of powder and crack cocaine posed the
21  greatest threat to Summit County due to the
22  drug's highly addictive nature, as well as its
23  association with violent crime"?
24        Do you see that?
25    A.   I do.

Page 364

1    Q.   And would you agree that that was
2  an accurate statement in 2010 when this grant
3  application was prepared?
4        MR. LEDLIE:  Object to the form.
5    A.   I would trust that those that were
6  intimate and participatory with drug
7  investigations would be able to make that
8  determination or those statements.
9    Q.   You don't have any basis to
10  disagree with that?
11    A.   I don't.  Although, it also lists
12  in there -- and this would be in trying to --
13  to recollect from my own experience -- the last
14  sentence there, "2009, a 200 percent increase
15  in one-pot cooks was observed."  So I -- I
16  would say that at that point in time
17  methamphetamine was as significant of an issue.
18    Q.   Will you turn to the page that
19  end- -- that has the Bates number ending in
20  6859 on the bottom.
21        Do you see the large paragraph in
22  the center of the page there, starts with,
23  quote, "And future federal forfeiture assets
24  that exceed $135,000 will be distributed to the
25  participating agencies of the SCDU at the time

Page 365

1  assets were seized.  For all other federal
2  forfeitures that are less than $135,000, they
3  will be deposited in the SCDU federal law
4  enforcement trust fund until there is a balance
5  of $540,000, one year's operating budget"?
6    A.   I see that.
7    Q.   And then continuing, "At the end of
8  each calendar year, any FLETF assets that are
9  in excess of $135,000, excluding the $540,000
10  balance, will be distributed to the
11  participating agencies of the SCDU, depending
12  on whether they are a full-time or a part-time
13  agency."
14        Do you see that?
15    A.   Yes, I do.
16    Q.   And APD is a participating agency
17  in SCDU; is that right?
18    A.   It is.
19    Q.   And does reading this refresh any
20  recollection that you have about how forfeiture
21  funds are distributed by SCDU?
22    A.   This is more specific information
23  than I've seen before.
24    Q.   Do you know whether forfeited funds
25  in the SCDU federal law enforcement trust fund

92 (Pages 362 - 365)

Page 366

1  have ever actually exceeded one year's
2  operating budget?
3      A.  I do not know that.
4          - - - - -
5          (Thereupon, Deposition Exhibit 26,
6          Document Titled, "For Immediate
7          Release, K9 Unit Receives Narcan
8          Kits from K9s of Valor
9          Organization," AKRON_000323999, was
10         marked for purposes of
11         identification.)
12         - - - - -
13     Q.  The court reporter is handing you
14  what he's marked as Exhibit 26.  It's a
15  one-page press release, it looks like, under
16  your name, Bates-labeled Akron 323999.
17         Do you recognize this Exhibit 26?
18     A.  I do.
19     Q.  And earlier you discussed grant
20  money for Narcan that was carried in your
21  patrol units; is that right?
22     A.  Uh-huh, yes.
23     Q.  And is this award of Narcan kits
24  and care packages donated by K9s for Valor, is
25  that related in any way to the grant that you

Page 367

1  were referencing earlier, or is this something
2  entirely separate?
3      A.  It's not.  That would be entirely
4  separate.  We get -- it's the one unit in the
5  police department where we get donations
6  frequently because people take a special
7  interest in the K9 unit.
8      Q.  Do you recall whether K9S For Valor
9  is the organization that was offering Narcan
10  kits that was turned away in 2015?
11         MR. LEDLIE:  Object to the form of
12  the question.
13     A.  It was on that report.  I don't
14  believe that that was the company that was
15  referenced.
16         MR. LOMBARDO:  Just take one minute
17  to review my notes.
18         MR. LEDLIE:  Oh, of course.
19         MR. LOMBARDO:  Okay.  That's all I
20  have for today.
21         MR. LEDLIE:  I'm going to have a
22  few questions, so we might as well take a
23  break.
24         MS. SAULINO:  Okay.
25         THE VIDEOGRAPHER:  Going off the

Page 368

1  record at 5:37 p.m.
2          (A recess was taken.)
3          THE VIDEOGRAPHER:  Back on the
4  record at 6:01 p.m.
5      EXAMINATION OF KENNETH R. BALL II
6  BY MR. LEDLIE:
7      Q.  Good evening, Chief Ball.
8      A.  Hi.
9      Q.  Has your knowledge of opioids
10  evolved over time?
11     A.  It has.
12     Q.  Can you tell me how?
13     A.  I've been exposed in -- in
14  different ways.  I think a lot of it has to do
15  with, you know, personal contacts that I've had
16  with individuals, or I've heard speakers at
17  different events in meetings or in other venues
18  that have talked about parts of this crisis
19  that I was not familiar with, my background
20  being law enforcement; responding to the
21  overdose calls that come in, trying to address
22  that from a police perspective.  What do we do?
23  How do we stem this and get better at it?
24         But the more I was exposed to
25  people and circumstances that were maybe

Page 369

1  outside of it, not everybody that has had an
2  issue with opioid addiction is somebody that
3  comes into contact with police officers.  That
4  was something that was not really -- it was not
5  something that I had great familiarity with,
6  that there were problems that were not in a
7  low -- low income area of Akron; that it was
8  exclusive to our residents; that it was
9  something that suburbs and other parts of our
10  community were dealing with as well.
11     Q.  Okay.  Based on your current
12  understanding of the opioid crisis, have you
13  learned information of any relationship between
14  prescription opioids and illicit opioids?
15         MS. SAULINO:  Object to form.
16     A.  I have, I believe.  Again, either
17  reading an article or hearing somebody talk
18  about the relationship that exists, and some,
19  like, staggering numbers that caught my
20  attention of people that move on to illicit
21  drugs.  The significant percentage of those
22  that had started with legal prescriptions was
23  far beyond what my knowledge would have been
24  earlier, or what I would have suspected, even.
25         So I would say, again, at first, I

93 (Pages 366 - 369)

Page 370

1 had a -- more of a familiarity with the law
2 enforcement side, more of this issue being
3 about -- about choice and about bad
4 decision-making, and then have come to
5 understand and learn about circumstances, and a
6 high number of circumstances, where there are
7 other contributing factors that are not seedy
8 or, you know, bad neighborhood kind of
9 connected.
10    Q.  I see.  And when -- timeline-wise,
11 when do you think you first learned of a
12 connection that you associated between
13 prescription opioid use and illicit opiate use?
14       MS. SAULINO:  Object to form.
15 Leading.
16    A.  Okay.  I don't -- I don't know if
17 there was -- I wouldn't point to a date or one
18 fact.  I think it's been an accumulation of
19 information or exposure that have reinforced,
20 maybe, from -- again, my -- my perspective,
21 admittedly, to start with, was one that was
22 it's about -- it's about decision-making, poor
23 choices.
24    Q.  Let me -- let me see if I could ask
25 a better question.

Page 371

1       Did you have this understanding of
2 the -- the large number of people that start
3 with prescription opiates before using an
4 illicit drug prior to the carfentanil spike in
5 20- -- in the summer of 2016?
6       MS. SAULINO:  Object to form.
7    A.  I would say, yeah, prior to that
8 point in time, that's when -- 2014, when this
9 unit was stood up, started to have more
10 familiarity with it and -- and heard others
11 talk about the way that addiction had impacted
12 their lives.
13       But there was, you know, an
14 exclamation point or 10 exclamation points that
15 were put on that issue after July 2016 for --
16 for me personally, and for my department, I
17 think, as well.
18    Q.  Okay.  In terms -- you were asked
19 some questions about how the opioid crisis has
20 impacted some staffing decisions in your
21 department and which officers may deal with
22 opioid crimes.  Do you remember some questions
23 about that?
24    A.  I do.
25    Q.  How many officers in your

Page 372

1 department serve on the patrol division?
2    A.  Close -- right around 200.
3    Q.  Okay.  Do officers on the patrol --
4    A.  And I'll -- when you say patrol
5 division, patrol -- the division is a
6 subdivision, so that would include other units,
7 not just patrol.  That would include traffic.
8 So some others units, so that number would be
9 slightly more than -- or more than 200.
10    Q.  Okay.  And do -- do these
11 individuals that serve in the -- would that be
12 the uniform division, then?
13    A.  Yes, uniform subdivision.
14    Q.  Do officers in the uniform
15 subdivision ever interact with individuals
16 committing crimes who are addicted to opiates?
17    A.  I think that everybody in patrol
18 deals with those individuals.  All of our
19 officers at points in time -- at some points in
20 time have been on overdose calls, but they also
21 are at other calls for services that are -- I
22 believe that are connected to the -- you know,
23 the crisis that we have with addiction.  Many
24 different forms of that.
25       For example, we talked earlier

Page 373

1 about some of the property crimes.  I know that
2 there's a connection for property crimes and
3 those that are motivated by drug addiction:
4 robberies, assaults, arguments that occur over
5 drugs, and you know, sharing drugs or not
6 sharing drugs.
7       Some of the break-ins at pharmacies
8 and home in- -- home invasions where
9 specifically they know that drugs are
10 available, it's actually a persons crime; or a
11 burglary at a home, that's when nobody is
12 present at the home and they're there to steal
13 things and not rob people.
14       So it expresses in so many
15 different -- so many different other capacities
16 other than just responding for a call for
17 service, for an overdose call for service or a
18 drug dealing or a drug arrest.
19       And we see it in oftentimes people
20 are arrested for other offenses, and then as a
21 part of that, there are -- there are either
22 drugs found on that individual or drug
23 paraphernalia, and that will be a part of the
24 interaction or interview that they would have
25 with an arresting officer, that "I was breaking

94 (Pages 370 - 373)

Page 374

1 into a store and this is the reason that I was,
2 because I was trying to find money for my next
3 drug purchase."
4      Q.    So the basis of your understanding
5 that there was a connection between these other
6 crimes and opiates was that it's part of the
7 investigation process that might come out?
8           MS. SAULINO:  Object to form.
9      A.    That's -- that's true, I think.  I
10 don't know what that percentage is, but I know
11 that it's something that is very common and
12 that all of our patrol officers would have been
13 exposed to at times.
14      Q.    Are you aware of a connect- -- of
15 any instances of violent crimes that had an
16 opiate connection?
17      A.    Yes.  Specifically where we've
18 had -- not specifically to where I could name a
19 suspect or a victim, but we have had robberies
20 that are connected to -- to opioids, assaults,
21 and other -- other crimes of violence, feuds
22 between drug dealers that operate in sales of
23 opioids.  So in many different forms.
24      Q.    And you have not personally
25 calculated those percentages, correct?

Page 375

1      A.    Right.
2           MR. LEDLIE:  You may have the
3 witness.
4           MS. SAULINO:  Thanks.
5           Just a few follow-up questions,
6 Chief Ball.
7      EXAMINATION OF KENNETH R. BALL II
8 BY MS. SAULINO:
9      Q.    I believe you mentioned, in
10 response to Counsel's question just now, that
11 your understanding of how individuals become
12 addicted to different kinds of opioids
13 originally was informed by your work in the
14 police department, right?
15      A.    Right.
16      Q.    But then more recently you've read
17 some articles and -- and -- and gone to some
18 speeches; is that right?
19      A.    Yeah, I think -- well, I think
20 probably similar to other people, or
21 especially something that -- some of it is
22 unique to law enforcement.  But there just has
23 been an inundation with information about
24 opioid abuse and the crisis and, you know, how
25 families are impacted by it.

Page 376

1      Q.    Okay.  And -- and you said, then,
2 that's where you learned about what you called
3 this large number of people who start with
4 prescription drugs and move on to illicit
5 drugs?
6      A.    True.
7      Q.    That was not through your work with
8 the police department, right?
9           MR. LEDLIE:  Object to the form of
10 the question.
11      A.    It -- if I was at a meeting where
12 that was discussed, I would have been there in
13 a capacity that was because of my employment
14 with the police department.
15      Q.    Okay.  You don't have any personal
16 experience knowing that that happened, right?
17           MR. LEDLIE:  Object to the form of
18 the question.
19      A.    Right.  That's not been my personal
20 experience.  I've not been -- I've not
21 investigated those cases or had a case that --
22 that I worked on or arrest that I made where
23 that information was given to me.
24      Q.    So that belief that you hold comes
25 from reading articles and other types of

Page 377

1 interactions that you've had outside of your
2 specific profession as a police officer, right?
3           MR. LEDLIE:  Object to the form of
4 the question.  Asked and answered.
5      A.    I --
6           MR. LEDLIE:  Misstates prior
7 testimony.
8      A.    I don't know if it's semantics, but
9 if I was at a community health meeting, I would
10 have been at a community health meeting as a
11 police officer.
12      Q.    Do you remember a community health
13 meeting where this was discussed?
14      A.    Yes, I do.
15      Q.    Okay.  Can you tell me who was
16 speaking?
17      A.    I can't recall.  I sat in for the
18 mayor on a large meeting that I know that he
19 was a -- he was a part of this particular
20 group.  It was -- it was held at the United Way
21 offices.  There were executives from Summa,
22 from Cleveland Clinic, Akron General, from
23 Summit County Public Health, from ADM.  There
24 were some business leaders.  There were, you
25 know, some others.  Probably about 25 people,

95 (Pages 374 - 377)

Page 378

1 maybe, in that meeting. And that's a board, I
2 think, that regularly convenes. I don't know
3 what -- what it's called, but learned a lot of
4 information in there.
5        And have been in other meetings as
6 well where I've heard community health leaders
7 talking about, you know, the way that they've
8 been impacted.
9        I've been at meetings with the
10 director of children's services bureau where
11 she's also spoke -- spoken, Julie Barnes.
12    Q.   Okay. I'm specifically asking you
13 about this information that you just conveyed
14 through counsel that you've come to this belief
15 that individuals -- a large number of
16 individuals have started with prescription
17 drugs and moved on to illicit drugs. Where did
18 you learn that, is what I'm asking you.
19    A.   It would have been at one of those
20 meetings that I've talked about or reading an
21 article about it, the connection that is made
22 between, you know, illicit drug use and a
23 connection or a percentage that's attached to
24 those that start or become addicted based on
25 prescription medication, legal.

Page 379

1    Q.   You don't know whether it was a
2 meeting or an article?
3    A.   I don't know for sure.
4    Q.   You don't know the basis for that
5 percentage?
6    A.   No, I don't.
7    Q.   You have no idea how -- how
8 reliable that percentage is?
9    A.   I wouldn't.
10    Q.   Okay.
11    A.   I would just say that -- yeah. I
12 mean, if I read it in an article, I don't know
13 what the -- I don't know what the source -- or
14 remember what source they were -- that they're
15 quoting, or if I heard it in a -- a meeting,
16 the same thing. I wasn't fact-finding.
17    Q.   Okay. So that's not something that
18 you have any expertise in, right?
19    A.   That's right.
20    Q.   Now, Counsel asked you about the
21 involvement of patrol officers interacting with
22 individuals who are addicted to opioids. Do
23 you recall that?
24    A.   Correct, yes.
25    Q.   Can you quantify how much officer

Page 380

1 time is involved with interaction with --
2 interacting with individuals with opioids?
3        MR. LEDLIE: Object to the form of
4 the question.
5    A.   We probably could, you know, give
6 it a good effort. I don't -- there's a lot
7 involved with it because of all of these other
8 ways that our patrol officers are connected.
9        It -- just again, it wouldn't just
10 be the overdose calls that come in or an
11 overdose -- overdose death investigation. It
12 would be a ton of collateral-type calls that
13 come in.
14    Q.   Sure. And can you, then, break
15 those out between legal and illegal drugs?
16    A.   I -- I don't have that information
17 right now.
18    Q.   Is there any way to do that?
19        MR. LEDLIE: Object to the form of
20 question.
21    A.   I'm not certain.
22    Q.   And you have no way of being able
23 to say whether any of these individuals, even
24 if they were using illegal drugs, had started
25 with legal drugs, right?

Page 381

1        MR. LEDLIE: Object to the form of
2 the question.
3    A.   Not from my personal knowledge.
4    Q.   You have no statistics that would
5 tell you that, right?
6        MR. LEDLIE: Object to the form.
7    A.   I mentioned that I had seen
8 statistics, but they're not my --
9    Q.   No. I mean inside the Akron Police
10 Department.
11    A.   No.
12    Q.   You -- you don't keep those kinds
13 of statistics?
14    A.   Correct.
15    Q.   You would have no way of knowing.
16        MR. LEDLIE: Object to the form of
17 the question.
18    A.   Right.
19    Q.   And the same question with respect
20 to violent crimes having an opioid connection.
21 You don't, sitting here today, have any
22 specific way of quantifying how many violent
23 crimes have an opioid connection?
24    A.   Sitting here today, no, I don't
25 have those statistics.

96 (Pages 378 - 381)

Page 382

1    Q.   Okay.  And who would we ask for
2 those?
3    A.   We would have to use planning and
4 research and do the queries that I've talked
5 about before.  If there's evidence, it collects
6 it on scene, that we could search for by name
7 of product, or if it was mentioned in a
8 narrative on an incident report, that's
9 something that we would look for.
10    Q.   Okay.  And you haven't done that
11 work, right?
12    A.   I have not.
13    Q.   Do you know whether anyone has
14 asked -- has been asked to do that?
15    A.   I don't know if that was asked
16 during this process or not.
17    Q.   And again, you wouldn't be able to
18 accurately quantify between legal and illegal
19 drugs even if you did have those statistics,
20 right?
21        MR. LEDLIE:  Object to the form of
22 the question.
23    A.   I don't know if we could do that.
24        MS. SAULINO:  Okay.  I have nothing
25 further for you now.

Page 383

1        THE WITNESS:  Okay.
2        MR. LEDLIE:  Anyone else?
3        (No response.)
4        MR. LEDLIE:  Let's go off the
5 record.
6        THE VIDEOGRAPHER:  Off the record
7 at 6:17 p.m.
8        (Deposition concluded at 6:17 p.m.)
9          ~ ~ ~ ~ ~
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 384

1 Whereupon, counsel was requested to give
2 instructions regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5        SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9        TRANSCRIPT DELIVERY:
10 Counsel was requested to give instructions
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 385

1        REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3              SS:
4 County of Cuyahoga.  )
5
6    I, Stephen J. DeBacco, a Notary
7 Public within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, KENNETH R. BALL
10 II, was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19        I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

97 (Pages 382 - 385)

Page 386

1        I do further certify that I am not
2    a relative, counsel or attorney for either
3    party, or otherwise interested in the event of
4    this action.
5        IN WITNESS WHEREOF, I have hereunto
6    set my hand and affixed my seal of office at
7    Cleveland, Ohio, on this 12th day of
8    November, 2018.
9
10
11
12
13
14       Stephen J. DeBacco, Notary Public
15       within and for the State of Ohio
16
17   My commission expires September 30, 2022.
18
19
20
21
22
23
24
25

Page 387

1              Veritext Legal Solutions
                1100 Superior Ave
2                  Suite 1820
                Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
     November 12, 2018
5
     To: Motley Rice LLC
6
     Case Name: In Re: National Prescription Opiate Litigation v
7
     Veritext Reference Number: 3068993
8
     Witness:  Kenneth R. Ball, II    Deposition Date:  11/7/2018
9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext com
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA

Page 388

1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3068993
3    CASE NAME: In Re: National Prescription Opiate Litigation v
     DATE OF DEPOSITION: 11/7/2018
4    WITNESS' NAME: Kenneth R  Ball, II
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me
7        I have made no changes to the testimony
     as transcribed by the court reporter
8
9    Date              Kenneth R  Ball, II
10       Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed
15
         I have affixed my name and official seal
16
     this _____ day of_____, 20____
17
18       Notary Public
19
         Commission Expiration Date
20
21
22
23
24
25

Page 389

1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3068993
3    CASE NAME: In Re: National Prescription Opiate Litigation v
     DATE OF DEPOSITION: 11/7/2018
4    WITNESS' NAME: Kenneth R  Ball, II
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me
7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s)
9        I request that these changes be entered
     as part of the record of my testimony
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein
13
     Date              Kenneth R  Ball, II
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed
21       I have affixed my name and official seal
22   this _____ day of_____, 20____
23
         Notary Public
24
         Commission Expiration Date
25

98 (Pages 386 - 389)

Page 390

1   ERRATA SHEET

  VERITEXT LEGAL SOLUTIONS MIDWEST

2   ASSIGNMENT NO: 11/7/2018

3 PAGE/LINE(S) /  CHANGE  /REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19

  _____  _____

20 Date   Kenneth R. Ball, II

21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22 DAY OF _____, 20_____ .

23  _____

   Notary Public

24

  _____

25  Commission Expiration Date

**&**

**&** 2:10,15 3:2,15
4:8,13,19 5:11
7:13 14:12,14,19
14:22 15:4 16:15
118:7

**0**

**0000** 7:6 98:8
**000023567** 7:16
128:2
**000076854** 9:14
362:24
**000076879** 9:15
362:24
**000119626** 9:11
359:18
**000175900** 8:2
197:21
**000236377** 8:13
256:2
**000236379** 8:14
256:3
**000243705** 8:8
231:15
**000321401** 9:6
343:4
**000321403** 9:6
343:5
**000323999** 9:18
366:9
**000325481** 9:8
352:21
**000325781** 7:11
109:19
**000325784** 7:11
109:20
**000350711** 7:20
133:15,21
**000373792** 8:10
234:15

**001127849** 7:4
73:9
**001127875** 8:24
320:16
**001127879** 8:24
320:17
**001136994** 7:24
137:12
**001136995** 7:24
137:12
**001139729** 7:14
118:8
**001139787** 7:14
118:9

**1**

**1** 7:3 9:1 73:6,15
73:16,18 99:19,21
99:22,23 100:14
198:15 330:5
331:5
**1.5** 267:11
**1.6** 267:19
**1.8** 267:19
**1/1/2016** 7:8 99:10
**10** 8:1 63:17 74:23
75:5 197:18 198:1
207:3 276:19
277:9,12,14
363:14 371:14
**10,000** 111:11
**100** 17:16 176:3
244:10 322:10
347:22
**100,000** 55:25
189:24 191:14
**101416** 8:2 197:20
**103** 10:10,11
**108** 10:11,12
**109** 7:10 10:12
**10:00** 160:21

**10:07** 73:1
**10:24** 73:4
**11** 8:4 214:9,18
304:17
**11/7/2018** 387:8
388:3 389:3 390:2
**1100** 3:4 387:1
**114** 10:13,13
**11472** 386:13
**115** 10:14
**117** 10:14
**118** 7:12
**119626** 359:25
**11:00** 42:17 44:17
45:16 160:24
**11:30** 132:1
**11:43** 132:4
**12** 8:7 118:19
198:12 201:17
219:24 220:1,4,6,8
231:12,19 246:25
266:2 387:4
**122** 10:15
**123** 10:15
**124** 10:16
**125** 10:16,17
**126** 10:17,18,18,19
**127** 3:11 7:15
10:19,20
**12:21** 169:4
**12th** 4:14 386:7
**13** 8:9 234:12,20
**130** 10:20
**1307** 1:23
**131** 10:21
**132** 10:21
**133** 7:17 10:22
**134** 10:22
**135,000** 364:24
365:2,9

**136** 7:21
**137** 7:22
**139** 10:23
**14** 8:11 190:12
255:23 256:7
**149** 10:23
**15** 6:8 8:15 75:14
75:21 124:18
137:19 265:19
266:1 280:10
**150** 10:24
**154,000** 139:2
140:5
**155** 10:24,25 11:1
**157** 11:1,2
**159** 11:2
**16** 8:17 55:11
56:24 173:17
192:19 268:16,22
280:11 282:1
**160,000** 142:6
**161** 11:3,3
**162** 11:4
**164** 11:4
**17** 1:8 8:18 173:14
173:16 279:19
280:3
**1717** 5:5
**175901** 8:3 197:22
**18** 1:13 8:22
139:20 301:24
302:4 314:13
**1820** 387:2
**185** 11:5
**186** 11:5
**187** 11:6
**19** 8:8,23 100:23
101:4 206:25
231:14 236:11
320:14,22

**[19103 - 23rd]**

**19103** 5:6
**195** 11:6
**197** 8:1
**1990s** 134:19
  186:1
**1991** 39:13 41:17
**1997** 42:12
**19th** 231:20
**1:17** 169:7
**1s** 139:24
**1st** 7:6 98:7

**2**

**2** 6:3 7:5 98:5,15
  107:2,3 169:17
  170:16,18 178:9
  181:19 182:17
  305:25
**2.8** 258:1
**20** 9:1 17:12 75:23
  190:12 232:20
  236:20 272:17
  305:14 330:4,13
  330:14 371:5
  388:16 389:22
  390:22
**20,000** 140:20
  144:25
**200** 354:6,8 364:14
  372:2,9
**200,000** 140:7,16
  191:17 208:11
**2000** 3:11 42:21,23
  139:2,5 142:23
  145:8
**20001-4956** 2:12
  2:17
**20005** 4:15
**2000s** 161:6
**2001** 42:25
**2004** 7:21 136:2,9
  136:19 137:1

**2005** 128:13
  129:25 130:2
  131:8,13
**2006** 7:18 44:7
  133:13,23 134:12
**2007** 44:7,8
**2009** 8:15 264:17
  265:2,14,21 266:3
  266:8 305:10
  364:14
**2010** 364:2
**2011** 324:8
**2012** 161:8 305:10
**2013** 124:4 153:23
  161:8
**2014** 94:20,25 95:1
  95:7,17,23 96:5
  108:1 124:5,17
  135:19,23 153:23
  175:5,11 190:13
  191:1,20 302:20
  305:2,8,11 341:10
  341:17,25 371:8
**2015** 7:12,14 8:9
  47:10 118:5,8,19
  118:21 119:1,18
  121:25 122:7
  139:1,6 141:19
  144:16 234:13
  235:2 236:11,20
  238:7 367:10
**2016** 7:6,10 8:1,8
  9:3,5 73:20 74:5,9
  79:13 96:15 98:8
  98:13,24 105:8,22
  106:23 107:8
  109:18 110:4
  112:18 114:17
  142:5 154:1
  170:25 174:22
  187:20,23 188:10

**191**:23 192:23
  193:17 197:19
  198:10,12 201:17
  231:14,20 233:8
  320:22 339:12
  341:7 343:3
  345:24 346:18,20
  347:1 348:2,7,11
  348:16,23 349:25
  351:14,24 354:17
  354:21,25 355:19
  371:5,15
**2016's** 174:10
**2017** 48:7 98:24
  137:19 147:13
  149:17 150:1
  153:21 170:25
  193:1 257:24
  317:15 361:21,21
**2017's** 174:10
**2018** 1:18 7:6 8:11
  8:17 9:10 14:2
  97:7 98:8 140:8
  140:17,21 255:24
  263:17 266:21
  268:17,24 274:2
  359:18,24 386:8
  387:1
**2018's** 174:9
**2019** 53:25
**202** 2:13 4:15
**202-662-5786** 2:18
**2022** 386:17
**205** 11:7 148:9
**207** 11:7,8
**208** 11:8
**209** 11:9,9,10
**20s** 54:16
**21** 9:3 330:12
  339:11,18 340:18

**210** 11:10
**211** 11:11 302:17
**212** 3:22 11:11,12
  303:25
**214** 8:4
**215** 5:6
**216** 3:5,12 11:12
**216-523-1313**
  387:3
**216-9168** 2:7
**216-9252** 2:6
**217** 11:13
**218** 11:13
**22** 9:5 39:20 40:8
  40:10 56:12 343:2
  343:9,14
**221,009** 137:2
**222** 148:9,11
**224** 11:14,14
**226** 11:15,15
**227** 11:16,16
**228** 11:17,17
**22nd** 232:11
**23** 9:7 352:19,25
  354:1
**230** 269:2
**231** 8:7 11:18
  269:3
**233** 11:18,19 270:3
**234** 8:9 270:3
**235** 270:3 273:25
**2359** 7:6,8 98:9
  99:11
**236** 270:3
**23648** 7:16 128:3
**237** 270:3
**238** 11:19,20
**239** 11:20,21
**23rd** 118:21
  232:12

**[24 - 4:36]**

**24** 9:9,10 47:15,15 57:1 192:5 321:5 321:15 359:15,17 359:22,24
**240** 140:8
**240,000** 140:22 145:2
**241** 5:6 11:21
**244** 11:22
**245** 11:22
**246** 11:23
**248** 11:23
**249** 11:24
**25** 7:18 9:12 132:6 133:13,23 362:19 363:4 377:25
**250,000** 140:9,23 145:2
**252** 11:24,25
**255** 8:11 12:1
**259** 12:1
**26** 9:16 366:5,14 366:17
**265** 8:15 12:2
**268** 8:17
**279** 8:18
**28** 2:5 136:21
**2804** 1:7,8
**283** 12:2
**285** 12:3,3
**287** 12:4,4
**288** 12:5
**29** 10:3
**292** 12:5
**293** 12:6
**294** 12:6,7,7,8
**29464** 2:6
**295** 12:8,9
**296** 12:9,10,10
**297** 12:11

**298** 12:11,12
**299** 12:12
**2:01** 213:7
**2:02** 213:12
**2:23** 234:7
**2:33** 234:10
**2s** 139:25

**3**

**3** 7:7 99:8 120:8 363:14
**3/15/2017** 7:22 137:10
**3/22/2018** 9:7 352:20
**30** 63:18 182:25 386:17
**30,000** 303:18
**300** 4:9
**300,000** 267:15
**301** 8:22
**305-6400** 3:17
**3068993** 387:7 388:2 389:2
**307** 12:13,13
**30s** 47:4
**31** 10:3 97:7
**310** 12:14 354:15 354:24 355:13,17
**3100** 5:5
**311** 12:14,15,15
**312** 4:5,10 12:16
**313** 12:16
**314** 12:17
**315** 12:17
**316** 12:18,18,19,19
**317** 12:20
**318** 12:20,21
**31st** 169:17
**320** 8:23
**321401** 343:11

**322** 12:21
**323** 12:22,22
**323999** 366:16
**324** 12:23
**325** 12:23
**325481** 353:2
**328** 12:24
**33** 106:8 247:21
**330** 3:17 9:1 12:24
**331** 6:9 12:25
**337** 13:1
**339** 9:3 13:1
**343** 9:5
**346** 13:2
**350712** 7:20 133:15
**351** 13:2
**352** 9:7 13:3,3
**355** 13:4
**358** 13:4
**359** 9:9 13:5,5
**36** 304:21,24
**362** 9:12
**364** 13:6
**366** 9:16
**367** 13:6
**368** 6:10
**369** 13:7
**370** 13:7
**371** 13:8
**374** 13:8
**375** 6:11
**376** 13:9,9
**377** 13:10
**380** 13:10,11
**381** 13:11,12,12
**382** 13:13
**385** 6:13
**3:30** 41:23
**3:49** 299:24

**3rd** 7:6 98:8

**4**

**4** 7:10 109:17,25 256:17 266:24 267:3,4,5,20 270:18 320:22 349:7,19,23
**40** 56:20,21 57:2 182:25
**400** 3:16
**402** 344:21
**42** 52:21 53:10 263:3
**43** 54:15
**434-5686** 4:15
**44** 215:2,20 218:20
**440** 83:19 208:11 229:10
**441** 52:21 53:9 250:11 263:2
**44113** 3:5
**44114** 387:2
**44114-1190** 3:22
**44114-1214** 3:11
**442** 250:11
**44313** 16:12
**44720** 3:17
**44th** 4:20
**45** 44:23 63:18 214:25 215:19 218:10,16,21 223:10 224:15
**45090** 1:13
**455** 208:11 250:11
**46** 214:25 224:16
**47** 54:15
**485** 145:25
**494-4432** 4:5
**4:04** 300:2
**4:36** 329:24

**[4:43 - accumulation]**                                                      Page 4

| | | | |
|---|---|---|---|
| **4:43** 330:2 | **707** 303:25 | **96** 42:3 | 380:22 382:17 |
| **4th** 55:25 345:8,17 | **725** 4:14 | **98** 7:5 | **absence** 70:18 |
| **5** | **73** 7:3 | **99** 7:7 | **absolute** 147:3 |
| **5** 7:12 54:23 118:4 | **76** 16:11 | **9:04** 1:19 | 328:11 |
| 118:14 267:3,5 | **76854** 363:5 | **a** | **absolutely** 150:17 |
| **5.3** 266:24 | **777** 4:20 | **a.m.** 1:19 14:3 | 150:19 218:1 |
| **50** 17:14 44:23 | **7947** 5:6 | 41:23 73:1,4 | 254:10 |
| **500** 54:20 267:17 | **7:00** 42:17 45:16 | 132:1,4 | **absolutes** 150:22 |
| **525** 145:25 | **7:30** 41:23 | **aaron** 1:9 | **abuse** 91:20 132:7 |
| **527** 250:6,13 | **7th** 173:13 | **abatement** 182:3 | 363:20 375:24 |
| **54** 4:4 | **8** | **abating** 247:19 | **abused** 91:23 |
| **540,000** 365:5,9 | **8** 7:21 136:1,8,8 | **ability** 18:20 | **academies** 40:15 |
| **550** 54:23 | 305:24 | 159:21 277:5 | **academy** 36:20 |
| **57** 267:2,2 | **8/30/2016** 7:3 73:7 | **able** 19:21 27:13 | 38:10,17 39:18 |
| **58** 267:2,2 | **8/4/2016** 8:23 | 38:14 41:8 43:4 | 40:13,15 41:2,3 |
| **586-7154** 3:22 | 320:15 | 43:16 51:7 59:14 | 53:19 54:3 278:20 |
| **5:37** 368:1 | **8040** 3:16 | 67:25 70:1,7,9 | 293:18 333:7,9 |
| **5th** 350:4 | **843** 2:6,7 | 80:19 83:2 94:23 | **accepted** 148:3 |
| **6** | **850** 2:12,17 | 97:10,21 109:15 | 289:17 |
| **6** 7:15 127:25 | **861-7582** 3:12 | 115:13 117:4 | **access** 94:11 97:21 |
| 128:8 | **862-3758** 4:10 | 124:17 126:16 | 103:5 167:22 |
| **60** 266:19,21 | **88** 10:6 | 150:9 156:23,25 | 174:8 299:7,18 |
| **60654** 4:4,10 | **9** | 158:19 159:15 | 306:23 311:16,19 |
| **62** 129:9 | **9** 7:22 137:9,17 | 160:14 164:22 | 312:13,25 313:3 |
| **65** 10:4 | **90** 10:6,7,7 189:12 | 166:15 167:14 | 313:12 316:2,13 |
| **66** 10:4 | 189:18 193:20,24 | 172:23 175:12 | 317:22 |
| **662-5305** 2:13 | 194:3 | 177:25 180:7 | **accessibility** 67:16 |
| **68** 10:5 | **90017-5844** 4:21 | 181:4 185:20 | **accessible** 246:15 |
| **6859** 364:20 | **901** 3:21 | 187:17 193:19 | 327:9 |
| **69** 10:5 | **90s** 92:3,10 107:21 | 202:3 222:4,11 | **accident** 85:17 |
| **696-2493** 3:5 | 124:2 127:21 | 227:9 228:9 233:3 | 319:9 |
| **6:01** 368:4 | 183:22 184:17 | 245:8,13,17 | **accidentally** 99:16 |
| **6:17** 383:7,8 | **91** 10:8,8 111:6 | 246:17 250:17 | **account** 131:2 |
| **7** | 350:6 351:23 | 251:12,19 273:16 | 157:12 362:5 |
| **7** 1:18 6:5 7:17 | **911** 135:17,19 | 283:16 284:20 | **accountability** |
| 14:2 133:11,20 | 227:3 | 294:7 300:11 | 295:14 |
| **700,000** 166:20 | **94** 10:9,9 | 308:13 325:23 | **accountant** 33:23 |
| **705** 302:16,19 | **95** 10:10 42:3,8 | 326:22 327:10 | 34:16 |
| **706** 303:16 | **950** 3:4 | 332:23 347:14 | **accounts** 361:20 |
| | | 351:17,22 354:23 | **accumulation** |
| | | 355:2 364:7 | 370:18 |

accuracy 184:8
accurate 30:2 31:9
  108:5 109:7
  341:22 346:1,6,7
  346:20,21 348:2,6
  354:18 364:2
accurately 123:7
  257:16 382:18
accused 313:25
  314:21
achieve 272:16
acknowledge
  388:11 389:16
acquainted 362:15
acronym 81:2
  121:17
act 228:9 388:14
  389:20
acted 226:4,17
action 8:1 93:5
  197:20 198:11,14
  198:16 200:3
  201:1 202:16
  282:17 287:5,11
  289:3 294:13
  386:4
actions 48:18
activities 221:8
  253:23 254:21
  275:11 359:8
activity 220:13
  273:4
acts 158:12
actual 269:3 298:1
  322:13
add 58:15 63:20
  187:3 250:22
  251:4 252:1 267:1
  333:13,15 334:3
added 170:23
  177:10 188:6

191:24 192:17
  249:23
addendum 128:13
adderall 87:7
  323:18
addicted 89:14
  282:11 347:12
  349:2 372:16
  375:12 378:24
  379:22
addiction 8:13
  24:15 26:22 27:2
  27:24 59:21 93:15
  93:16 152:3
  154:14 203:25
  256:1,22 292:4
  351:25 355:25
  369:2 371:11
  372:23 373:3
addictive 133:2
  356:20 363:22
addicts 153:6
  355:22
adding 170:14
  251:3
addition 186:22
  193:15,20,25
  323:10
additional 60:5
  188:7 190:21
  248:4 252:22
  263:19 267:3
  277:6
address 16:8,11
  93:20 171:3
  175:15 180:10
  215:24 218:11
  225:2 239:4
  368:21 387:15
addressed 192:20

addressees 320:24
addresses 181:23
addressing 336:23
adds 266:23
adjournment
  385:22
adjudicated 167:3
  167:8 171:9
adjudication
  171:8 176:24
adjust 101:11
adm 377:23
administer 232:6
administered
  233:14
administration
  58:12 189:15
  236:7 274:16
administrative
  202:24
administrator
  35:10 219:20
admittedly 370:21
adolph 305:5
adopted 142:9
  151:22
adoptions 82:8
adria 305:6
advance 225:11
advanced 232:19
advantage 67:18
  151:8 195:24
  206:7,11 230:17
  283:17
advisory 8:8
  231:13,19,23
  232:4,17,22 247:1
aeds 245:14
afd 236:23 237:23
  239:4

affect 19:23
affixed 386:6
  388:15 389:21
afford 67:25
  156:21
aforesaid 385:12
afternoon 192:4
ag 323:7
age 15:20 116:19
agen 209:12
agencies 62:6 75:5
  150:6 209:13
  274:23 314:4
  315:21 364:25
  365:11
agency 158:13
  209:16 274:5,12
  365:13,16
agency's 313:22
agents 298:16
aggravated 17:20
ago 28:7 61:13
  110:6 163:14
  165:18,20 166:25
  172:9 177:18
  219:3 242:22
  248:18 252:11
  297:1 311:17,20
  340:9
agree 86:23 88:4
  89:19 93:21
  107:24 109:3
  111:14 116:23
  122:6 125:13
  126:11 132:24
  134:9 145:4
  226:13 233:5,7,24
  255:10,15 287:4
  287:10 292:24
  294:11 295:4
  297:25 299:4,15

| | | | |
|---|---|---|---|
| 315:9 316:1 | 151:2 162:23 | 354:16 356:3 | 194:15 267:14 |
| 355:10 364:1 | 163:13 166:12 | 366:9,16 369:7 | 274:14 277:1 |
| **agreed** 108:10 | 175:10 178:17 | 377:22 381:9 | 278:21 334:24 |
| 126:19 239:5 | 196:5,12,14 202:1 | **akron's** 214:20 | **amounts** 101:2 |
| **agreement** 200:8 | 205:21 207:13 | 279:6 | 223:6,16 |
| **ahead** 21:10 138:3 | 209:25 214:10 | **al** 1:12,12 | **analgesic** 347:23 |
| 157:21 170:19 | 218:14,21 221:7 | **alarm** 142:9 | 348:3,8,16 |
| 215:16 308:4 | 222:10 223:12 | **alcohol** 64:20 | **analgesics** 129:16 |
| **aid** 57:11,12 | 224:6,12,13,19,24 | **alexander** 133:22 | 130:3 |
| **aided** 179:25 | 226:16 227:22 | 134:3 135:6,11 | **analysis** 34:6 |
| **air** 284:15 | 228:17 231:14,15 | **allegation** 306:9 | 52:10 178:23 |
| **akron** 1:23 2:2 7:4 | 232:4,18,24 | **allegations** 48:17 | 246:4 249:12 |
| 7:11,14,21,24 8:4 | 234:15 238:23 | **allege** 124:19 | **analysts** 34:3 |
| 8:8,8,10,13,15,17 | 247:22 248:7,10 | **alleged** 218:14 | **analyzing** 272:13 |
| 8:19,24 9:6,8,18 | 248:13 253:22 | **alleging** 289:2 | **ancillaries** 181:14 |
| 15:7,10 16:12,19 | 255:5 256:2 | **allergan** 4:7 | **andy** 33:23,25 |
| 16:19 24:3,13 | 257:11,12 260:14 | **allocated** 188:18 | 34:14 179:15 |
| 25:5 32:9,10 | 260:16 261:1 | 189:17 250:14,16 | 206:20 222:3,13 |
| 36:14 37:1,22 | 265:20 266:9,18 | **allocation** 161:10 | 269:25 275:18 |
| 38:24 39:3,11,19 | 268:18,24 272:6,7 | **allocations** 190:4 | 279:7 |
| 39:24 40:20,21,23 | 273:19 275:2 | **allow** 148:24 | **angeles** 4:21 |
| 41:2,15 46:10 | 276:20,24 277:11 | 199:10 317:1 | **announcing** 134:3 |
| 52:22 54:7,12 | 277:15 278:16 | **allowable** 112:1 | 232:4 |
| 55:16 64:8,22 | 279:20 285:13 | **allowance** 186:4,9 | **annual** 7:21 8:16 |
| 65:9,17,25 66:3,8 | 286:25 287:23 | **allowing** 200:18 | 136:2,9 182:20 |
| 66:17,24 67:10 | 288:12 291:2,12 | **allows** 69:25 91:17 | 183:9 265:21 |
| 68:3 71:7 72:3,18 | 291:25 294:1 | 189:12 | 266:8 |
| 73:9 77:7 78:3 | 300:10 301:20 | **alluded** 253:21 | **annually** 277:14 |
| 80:4 92:11 93:4 | 303:4 304:1 305:5 | **alongside** 262:22 | **anomaly** 150:4 |
| 93:13 94:4 96:12 | 305:21 306:18,22 | **alter** 99:24 | **answer** 18:18 19:9 |
| 100:8 108:1,15 | 307:10,22 308:6 | **altogether** 147:6 | 19:10,16 20:12 |
| 109:9,19 111:7 | 308:13,19,25 | 188:24 193:17 | 21:6,7,9 26:5 28:8 |
| 117:22 118:8 | 312:3 314:9 | 287:2 292:18 | 30:1 33:3 51:8 |
| 122:9,19,21 | 317:15,25 318:4,8 | **ambulances** 92:11 | 55:18 60:23 65:15 |
| 123:14,15 124:7 | 318:11 320:16 | **amended** 8:5,19 | 72:12 90:3 95:21 |
| 125:15 127:12 | 324:21 327:23 | 8:22 214:11 | 98:12 108:4 123:7 |
| 130:13,17,23 | 332:7,15 333:16 | 279:21 301:25 | 124:23 125:3 |
| 131:5,8,13 132:20 | 339:2 342:24 | **amerisourceberg...** | 144:9 150:25 |
| 135:18 136:2,9 | 343:4,11 344:9 | 5:2 15:15 | 154:19,21 159:6 |
| 137:12 141:16 | 345:1 350:7 | **amount** 57:16 | 164:12 169:12 |
| 148:8 149:22 | 352:21 353:1,25 | 111:1,18 166:13 | 194:22 195:18 |

227:3 239:16,18
273:23 301:12
318:15,19 348:19
352:15 359:13
**answered** 226:21
245:23 246:11
249:9 252:3
283:11 287:25
303:7 308:1 377:4
**answering** 18:19
19:2 157:25
**answers** 241:1
280:5 305:1
**anticipated** 270:8
272:12
**antiviolence** 47:13
47:19 67:3 74:7
80:17 191:2,2
328:5
**anybody** 22:5,22
224:11 225:3
226:22 227:11
231:3 357:1
**anymore** 203:11
**anytime** 19:18
**apd** 66:17 233:2
236:4 257:18
361:8 365:16
**apologize** 177:2
**appear** 198:16
388:11 389:15
**appearances** 2:1
3:1 4:1 5:1 6:3
14:10 15:12
**appears** 198:11
201:1 214:25
215:18 218:21
256:17 257:14
280:10
**appended** 389:11
389:18

**applicable** 384:7
**application** 9:14
128:14 333:23
362:23 363:7,11
364:3
**applications** 82:1
**apply** 230:14
**appointed** 48:10
48:22,24
**appreciate** 197:7
200:16 338:15
**approach** 26:11
**approaching**
210:12
**appropriate**
358:21
**approve** 184:11
353:13
**approved** 54:15
54:19 124:14
189:14,14,15
196:1,2 266:23
274:15
**approves** 91:3
274:17
**approving** 363:11
**approximately**
44:23 47:4 189:23
**arch** 5:5
**arcos** 306:3,12,23
307:8 310:22
316:13
**area** 43:15 51:1,4
70:12 119:19
120:6 123:3
196:20 210:25
211:17 225:18
305:5 309:16
318:22 344:9
345:1,7,17 369:7

**areas** 156:14
221:15 225:15
250:20 251:2
327:21
**arguments** 225:5
373:4
**arnold** 4:19 15:4
**arnoldporter.com**
4:21
**arrangement**
238:17
**arrest** 115:18
116:18 123:24
167:15 168:7
194:11 282:6
314:10 326:13
327:10 329:8
373:18 376:22
**arrested** 115:4,12
154:6 155:9
163:17 292:10
326:10 328:17
373:20
**arresting** 373:25
**arrests** 108:23
115:15 135:22,22
135:23 164:9,14
164:14 165:1
168:1 194:10
303:11 328:13
**arrive** 350:16
361:3
**arrives** 232:24
233:2
**article** 23:21,22
110:2,9,10,14,16
111:6,10 115:3
290:25 292:12
350:3 351:6
369:17 378:21
379:2,12

**articles** 23:20,24
89:3 300:19,22
332:9 336:9 358:4
358:4 375:17
376:25
**aside** 59:25 128:10
132:12 135:16
224:18 263:4
264:8 267:24,25
277:18 284:21
340:5
**asked** 31:15 156:8
174:12,14 186:8
186:14 187:8
190:4 213:17,20
215:9 242:7 243:2
243:4 245:23
246:10 249:8,25
250:2,5,13 252:2
256:11,13 283:11
287:25 288:3,8
297:24 300:6
313:19 319:8
331:13 371:18
377:4 379:20
382:14,14,15
**asking** 31:2 51:12
69:19 104:20
105:6 110:17
159:23,25 186:19
190:3 198:22,24
198:25 199:5,19
200:2,3,8 204:3,21
205:3 210:15
214:23 215:17
243:1 248:12
249:5,6 264:11
271:16 280:9
301:12 318:18
357:23 358:5
378:12,18

aspects 142:7
assaults 17:20
  323:7 373:4
  374:20
assessed 246:9
assessment 7:13
  7:16 118:7 119:18
  128:2,14
assessments 120:5
assets 364:23
  365:1,8
assign 146:9
assigned 42:16
  43:2,20 44:25
  45:1,4,9,12 47:11
  65:18,19 66:1,4,9
  66:11,15 67:6
  74:24 75:12 78:21
  80:3,14 81:1,11,14
  82:21 83:14,21
  112:13 122:23
  171:4 190:1,14
  191:1,5,25 192:8
  192:11 193:9
  197:10 251:2,10
  251:15 260:23
  263:6,10,10,12
  272:21
assigning 153:23
assignment 32:9
  43:5 48:9 74:19
  80:21 179:11
  187:15 190:17,19
  190:25 195:6
  220:3 262:23
  265:5 266:6
  292:20 293:17,21
  311:20,23 313:7
  388:2 389:2 390:2
assignments 7:4
  67:17 73:8 77:8

189:13 193:15,22
  194:6 220:7
  253:10
assist 187:17
  196:13,14 224:7
  224:14 254:11
assistant 74:18
  128:13 244:3
assisted 275:15
associated 205:8
  206:3 281:11
  282:2 283:24
  360:12,13 370:12
association 102:6
  104:10 295:16
  330:18,23 336:2
  336:10 363:23
assume 18:19
  142:22 145:7
  222:7
assuming 32:2
atf 64:21,23 66:9
  66:12
attach 118:15
attached 7:13
  84:24 118:6 153:8
  251:16 258:21
  331:11 378:23
  389:7
attachment 8:2
  118:15,16 119:17
  138:9 141:23
  197:21 198:3,5,7
attack 224:20
attacked 227:19
attempt 104:8
  105:5
attempts 282:4
attend 69:23 70:2
  70:8,9 161:2

attended 70:18
  360:5
attendee 202:17
attending 160:10
  340:6
attention 154:17
  165:7 172:21
  308:21 319:16
  321:16 342:8
  369:20
attorney 102:7
  169:12 196:9,10
  339:25 386:2
attorney's 72:14
attorneys 102:6,24
  104:9 330:18,23
attributable
  114:20
attribute 150:10
attributing 111:7
audiovisual 268:2
august 8:8 48:8
  73:19 79:13 150:1
  193:1 231:14,20
  232:11,14 233:8
  320:22
author 269:22,23
authority 53:1,3
  335:16
authorize 389:11
authorized 145:24
automated 142:10
automatic 184:25
  245:3 259:22,25
  322:3
automatically
  259:23 322:2
availability 153:5
  153:19 155:19
  161:25

available 25:19
  150:16 151:20
  163:9,15 173:20
  177:9 206:5,11
  220:19 224:25
  226:3 228:7,8
  229:23 230:18
  239:17 241:24
  247:11 276:22
  298:7,18,22 299:1
  333:13 350:19
  373:10
ave 387:1
avenue 3:4,16,21
average 145:1
  189:22 284:10
averaging 140:20
award 366:23
aware 23:4,4
  92:11 108:20
  183:18,23,23
  184:1 185:18
  187:11,13,13
  231:7 265:4
  278:17 285:24
  287:2 293:15
  294:4 316:25
  339:3 359:1,6
  374:14
awareness 58:20
  105:8 151:16
  185:8 293:21
  295:17
awarenesses
  154:13

**b**

b 3:21 16:10
back 38:14 42:15
  44:5,9 51:19
  53:15 59:3,14
  73:3 98:12 104:16

105:3 107:7
124:16,18,18
129:23 132:3
144:11 147:9
160:23 169:2,6,9
169:14 174:22
175:2 194:4,5,8
205:15 213:9,11
218:9 225:3,20
226:2,22 227:11
228:13,21 234:9
237:20 239:16
246:24 249:16
250:22 300:1
304:16 314:12
330:1 349:16
368:3 387:15
**background**  53:22
368:19
**bad**  370:3,8
**badger**  318:18
**badgering**  210:12
210:15 318:14
**baker**  3:9 128:16
128:23
**baker's**  131:2
**bakerlaw.com**
3:12
**balance**  113:14
142:23 145:7
227:5 365:4,10
**balances**  295:13
**balancing**  299:5
**ball**  1:17 6:7 7:23
14:5 15:20,25
16:2,10,17 19:25
36:12 73:13 102:1
109:23 116:24
118:12 128:6
132:5 136:6,7
137:11 169:9

197:25 200:23
213:13 214:17
224:19 231:18
234:19 236:21
256:6 266:1
268:21 269:6
280:2 294:12
300:4 320:20
329:12 330:11
331:19,21 368:5,7
375:6,7 385:9
387:8 388:4,9
389:4,13 390:20
**ballot**  99:19
**ballpark**  166:3
251:8
**barnes**  378:11
**barry**  305:7
**bartlit**  4:3 14:25
**bartlitbeck.com**
4:5
**based**  21:14 180:8
240:19 241:2
260:7 350:18
358:6 369:11
378:24
**basic**  39:18 40:12
174:20
**basically**  99:1
100:25 107:1
**basics**  39:21
**basing**  33:3
**basis**  31:11 52:18
84:6 88:23 119:8
119:10 160:10,18
210:15 364:9
374:4 379:4
**bates**  133:21
136:10 340:14
343:10 344:20
353:1 359:24

363:5 364:19
366:16
**batteries**  245:7,18
**batthew.brewer**
4:5
**beacon**  23:22 24:2
24:3
**beck**  4:3 14:25
**becoming**  92:8
229:23
**befitting**  48:19
**began**  94:18
175:11 345:3,5
**beginning**  53:21
63:5 107:8 142:20
145:5 341:17
343:10 349:23
**begins**  138:11
304:24 306:1
**behalf**  2:2,9 3:2,7
3:14,19 4:2,7,12
4:17 5:2 14:16,19
14:25 15:2,4,7,9
15:15 123:5
353:15 361:8
**behaviors**  356:21
**belief**  376:24
378:14
**believe**  29:3,11
31:8 40:10 58:14
58:16 62:21 68:18
71:19 74:2,20
75:8 77:9 79:4,25
83:23 86:25 87:5
92:2 102:16 110:3
110:5 117:1 121:5
123:6,10 127:12
127:19 128:22
135:5,9 136:20
145:13 149:20,21
151:2 180:15

188:8,15 201:4,10
203:4,12 204:5
205:18 207:2
208:24 213:14
216:8 240:25
258:3 269:24
271:3 275:12
277:2 281:18
287:21 291:24
294:4 316:8,12
317:9 321:24
353:17 360:11
361:1 367:14
369:16 372:22
375:9
**believed**  26:25
208:1
**believes**  149:11
**believing**  25:3
**beneficial**  245:5
253:11 333:19
**benefit**  246:2,4,8
246:13 334:23
**benefits**  91:6
201:22 243:7
268:13 283:15
**benzodiazepines**
87:11
**best**  18:12,20 19:2
31:13 113:5
161:15 168:14
224:2 227:13
307:17 332:24
**better**  77:11 144:8
171:13,14 228:16
244:24 307:14
310:12 357:7
368:23 370:25
**beyond**  20:15
89:18 193:16
206:6 212:6

334:17 369:23
**bias**  57:22
**bid**  43:4,4 45:20
  80:15 186:22
**big**  262:17 315:24
  319:18 351:21
**bigger**  124:7
**biggest**  25:18
  123:21 268:14
  285:23
**bill**  166:20
**binder**  349:16
**bit**  47:1 124:1
  152:21,23,24
  230:4 324:23
**bits**  173:18
**blamed**  347:23
  348:3,8
**blank**  343:22
**block**  55:10
**blue**  291:15
**board**  69:22,23
  70:1,4,13,16,20
  229:7 378:1
**bockius**  5:11
**bodies**  106:18
  154:16 342:9
**body**  267:23
**bond**  326:23
**border**  103:16
**boss**  49:25 50:2
  258:20
**bosses**  313:8
**boston**  165:5,5
**bottles**  350:22
**bottom**  101:23
  107:5 136:22
  146:24 215:19
  218:9 234:21
  235:4 273:25
  282:21,23 283:24

364:20
**bought**  221:22
**boulevard**  2:5
**boundaries**  212:5
**break**  19:13,14,17
  19:18 43:7 72:22
  72:24 92:6 104:17
  104:21 118:16
  124:20 131:20
  167:12 168:24
  234:2,3 237:5
  299:21 325:12
  329:21 367:23
  373:7 380:14
**breakdown**
  107:18 183:3
  257:21 279:1
**breakdowns**
  181:20 270:12
**breaking**  323:8
  373:25
**breaks**  92:8
  270:23
**breakup**  68:10
**brenda**  3:4 14:15
**brenda.sweet**  3:6
**bretton**  3:16
**brewer**  4:3 14:24
  14:24 340:14
**brian**  305:11
**bridge**  194:19
**bridgeside**  2:5
**brief**  165:23
  326:15
**briefly**  20:6,7
  169:16
**bring**  67:20,23
  98:18 116:25
  179:14
**bringing**  293:3,6

**broad**  355:20
  358:7
**broader**  24:14
  93:13 192:5 277:1
  327:1
**broken**  274:20
**brother**  17:3
**brought**  98:16
  231:8 308:20
**brown**  33:11 50:3
  50:6 81:8 83:6
  147:9 149:1 257:1
  257:2 271:20,23
  327:18
**brown's**  50:13
  74:14
**bryan**  83:17,22
  251:11,12 327:19
**budget**  8:17 32:21
  33:21 34:7,11,19
  49:18,19 50:1
  51:11 57:3 145:21
  146:9,15,22
  147:25 186:4,8
  187:8 190:4
  195:13,25 196:12
  196:23 225:10
  229:9 266:19,20
  266:24 267:3
  268:7,17,24 270:5
  270:10,13,22
  271:18,22 279:6
  365:5 366:2
**budgetary**  56:22
**budgeted**  54:5
  249:24 250:10
  267:16
**budgeting**  49:12
  50:5,9 52:2 149:1
**budgets**  148:23
  149:4 223:15

225:9 227:9
**build**  80:11 351:5
**building**  49:7,8
  202:24 267:9,9
  279:10 328:8,9,24
**buildings**  268:3,5
**bullet**  220:25
  223:9,20 280:11
  280:21 281:10
  282:1,22 283:24
**bulletins**  62:4,7,23
**bullets**  223:23
**bunch**  178:23
  180:8
**bunner**  202:20
**burdened**  193:12
**bureau**  47:12,14
  47:19 55:18 61:2
  67:3 74:7 191:2
  235:7,17,19 268:1
  378:10
**burglaries**  43:7
  254:5 323:7
**burglary**  253:16
  373:11
**burling**  2:10,15
  14:12,14 16:15
**business**  36:8
  163:21 179:6
  272:14 295:24
  321:4 377:24
**buy**  125:23 163:23
**buying**  125:24

|  c  |
| --- |

**ca**  387:25
**cad**  179:21,23
  181:16 259:12,18
  260:4 321:25
**calculate**  139:14
**calculated**  282:18
  374:25

[calculations - categories]

**calculations**
189:23
**calendar** 365:8
**california** 4:21
**call** 60:15,18 61:5
62:23 63:3 78:6
106:14,21 109:6
121:17 141:12
153:11,12 170:12
180:7 181:2,3,22
192:8,10,13,20
193:11 221:25
241:13 245:2
261:14 273:1
322:8,8 333:14
373:16,17
**callahan** 83:17,22
251:11
**callahan's** 251:13
**callback** 102:8
**called** 15:20 16:15
37:12 139:20
180:5 204:11
229:6 376:2 378:3
**calling** 89:13
111:6 135:7 204:8
**calls** 8:12 63:22
92:20 106:10,12
106:25 135:18,19
136:23 137:1,2
139:1,6,14,15,17
140:7,11,20
141:10 143:20,21
143:22 144:4,16
144:23 145:2,3
180:3 181:5,25
222:6 226:19
227:3,3 239:24
248:15 249:3,4
253:6 254:1,25
255:25 256:21

257:17,25 259:6
259:22 260:6,8,10
261:7 272:19
284:9,11 294:16
342:16,25 368:21
372:20,21 380:10
380:12
**calvaruso** 7:23
137:10,18,20
139:5 141:14
143:2 145:14
235:21 242:12
344:22
**cameras** 267:23
**campbell** 3:15,15
14:21,21,22
**canton** 3:17 36:25
201:19,20
**capacities** 373:15
**capacity** 70:11
72:14 85:9 156:14
297:3 301:5
376:13
**capital** 266:24
267:6
**caprez** 79:6,7
**captain** 33:12,14
34:8,13 35:5 44:4
44:6,12 45:23,25
49:21 51:20 69:11
70:1 74:6,23
77:10,13 78:13,17
84:2,9 116:5
122:24 128:16,23
131:1 141:15
147:6 167:18,20
167:25 168:13,18
214:4 222:3,14,14
236:14,16,17
238:14 240:7,13
242:12,20 243:25

257:11 258:16,24
269:24 270:6
271:9,11 275:18
279:3,4 281:9,9
286:18,19 327:20
352:17 361:17
**captains** 52:13
**caption** 385:21
**capture** 257:19
**car** 55:21 194:17
194:19 230:2
233:14 245:1
**cardinal** 4:12
14:19
**cards** 43:16
**care** 289:17
302:22 366:24
**career** 41:15 56:6
84:13 85:3,16
86:2 123:25
**careful** 19:1
145:15 152:9
**carey** 33:23 34:1,2
179:15 206:20
222:3,14 269:25
275:18 279:8
**carey's** 34:14
**carfentanil** 58:25
86:20 88:12,14,18
96:12,13 105:7
110:7 111:8,11,23
114:9,20,23
125:15 152:11
154:2 163:18
187:21,24 188:2
233:21 247:24
286:5 332:17
345:7,16,23 346:2
346:8,12,14,25
347:5,11 348:11
350:1 351:8,10,13

351:24 354:7,9
356:5 371:4
**carolina** 2:6
**caroline** 2:5 15:9
22:4
**carried** 101:4
331:12 366:20
**carry** 92:12,15
97:14 99:17
**cars** 47:2 227:2
241:8
**case** 1:8,13 16:25
17:1 31:22 32:12
82:8 84:20 85:20
116:13 127:9
135:10 165:5
180:14 207:11,16
208:24 218:15
220:4 273:23
302:5 304:12
310:4 328:22
331:11,12 338:20
338:23 351:5
353:24 357:25
358:10,11,15
376:21 387:6
388:3 389:3
**cases** 17:18,24
79:5 82:10 91:7
130:23 151:9
167:23 187:6
292:17 305:16
319:15 321:19
327:23 341:11
376:21
**cash** 134:24 135:2
**casual** 185:20
286:14
**categories** 183:7
257:20 279:2
280:16

categorize 328:23
362:9,9
categorized
259:24 321:24
327:16
category 177:11
257:17 274:1
caught 369:19
cause 27:24 95:25
96:9 134:19
150:17 339:1
345:9,18 346:2
385:12
caused 59:6 96:6,7
108:16 186:4
192:9 215:25
218:12 233:22
284:25
causes 348:22
causing 340:22
cc 73:21 118:21
cell 350:20,25
center 32:21 33:15
33:18 364:22
centers 153:19
centralized 259:2
259:3
centrally 246:16
centric 39:24
certain 41:7 57:16
61:15 65:21 67:12
68:12 82:11 91:7
94:7,9 115:14
122:19 140:1,25
153:13 156:17
157:11,14 162:16
164:4,8 175:20
176:4 209:21
224:17 240:18
241:2 243:4
244:11 262:23

277:3 278:7,21
288:15 298:4,9
321:25 334:15
340:13 348:20
380:21
certainly 34:22
86:9 107:25 109:3
115:21 117:16
126:18 127:4
167:21 245:10
253:1 260:19
284:19 294:18
302:7 303:9
318:17 324:20
357:5
certainty 126:17
242:14 312:7
certificate 6:13
385:1 389:11
certificates 38:14
certification 39:23
40:24 388:1 389:1
certifications 38:5
38:21
certified 15:23
40:16,17
certify 385:8,19
386:1
cetera 142:18
chain 7:10,12 8:1
8:9,11 9:4,5,7
73:19,21 76:24
109:18 110:1
118:5 184:20
197:19 234:13
235:14 240:10,16
242:23 255:24
256:8,16 339:12
343:3 352:20
chains 28:20

chance 268:8
change 42:14 43:3
46:14 51:10,11,13
51:14,15,17 99:24
100:22 101:10
152:6 163:8 185:8
219:18 241:1
260:11 301:12
333:22 387:13,14
389:8 390:3
changed 40:25
43:13 151:17
154:9 247:5
248:20
changes 141:5
142:7 154:8
219:13,13,19
276:20 387:12
388:7 389:7,9
changing 51:19
208:3
charge 34:8 35:9
45:25 49:21 74:6
141:19,20 222:15
235:24 327:20
charges 100:25
116:25
charles 74:14,23
257:1
chart 105:21
107:1 179:1
182:16,23 214:24
215:1,18,20
223:19
charts 180:23
181:19 183:11
270:3
check 174:6
177:25
checked 177:23

checks 295:13
chicago 4:4,10
chief 16:2,17
19:25 32:9,14
36:12 47:7,10
48:5,11 49:2,5
53:1 59:6 69:18
70:14,17 73:13
74:12,18 77:25
78:16 84:22 85:9
94:14 102:1
109:23 112:12
116:23 117:25
118:1,12 122:23
128:6 132:5 136:6
141:18 143:1
145:14 146:13,16
146:19,21 147:16
148:1 156:18
157:11,22 158:3
160:9 169:9 172:3
187:10 190:6
195:10,12 197:25
200:23 202:20,21
202:22,23 212:4
213:13 214:17
224:19 231:18
234:19 235:23
240:6,18,22
242:11 243:20,24
248:12 256:6
257:5,8,15 266:1
268:21 269:7
280:2 294:12
300:4 301:5
307:19 320:20
329:12 330:11
331:21 334:7
344:15,17,17,21
351:7 361:9,12
368:7 375:6

**chief's** 240:2 244:3
**chiefs** 49:20 52:11
  102:15 172:18
  243:21,24 331:1
  336:2,10 344:16
**children** 25:12
  315:21
**children's** 378:10
**china** 285:21
  286:2,4 351:9,10
  351:14,20
**choice** 129:19
  169:11 356:15
  370:3
**choices** 370:23
**choosing** 207:9
**chose** 347:8
**chosen** 207:6
**christian** 36:19
**chunk** 268:14
**circumstance**
  25:21 297:13
**circumstances**
  27:14 221:25
  225:22,25 226:8
  232:1 289:22,24
  297:12 326:24
  342:21 356:11,11
  356:19 357:6
  368:25 370:5,6
**citation** 85:17
**cite** 51:7
**citing** 122:14
**citizen** 138:15
  139:1 143:20
  144:4,16
**city** 2:2 8:4,17,18
  15:7 16:19 25:5
  30:24 32:10,24
  33:1 46:5 56:1
  181:24 205:20

209:25 214:10,20
  229:4,5 231:3
  238:4 246:17
  247:22 268:18,23
  271:5 274:16
  276:20 277:5,11
  279:5,20 350:7
**city's** 179:14
  283:14
**citycenter** 2:11,16
**civil** 15:22 384:3,7
  388:5 389:5
**civilian** 33:12
  54:14 55:1 178:18
  327:19
**civilians** 52:23,24
  54:10
**cland** 162:25
**clandestine** 163:1
**clarence** 202:22
**clarification** 36:11
  217:11
**clarify** 18:16
  26:15 194:22
  205:15
**class** 61:19 63:20
**classes** 37:25
**clear** 84:4 90:20
  197:3 261:6 266:7
  266:11 301:12
**clet** 163:1
**cleveland** 3:5,11
  3:16,22 377:22
  386:7 387:2
**clientele** 152:8
**clinic** 377:22
**clip** 75:17
**close** 54:20 89:11
  153:7 220:21
  342:19 372:2

**closely** 64:23
**cocaine** 86:24
  125:11,23 126:22
  126:23 132:15,15
  255:2 286:8
  363:20
**cocktail** 152:14
**coded** 321:25
**codes** 260:7,8
**coleman** 3:10
**colerain** 201:9,10
  201:11,13,20
  203:14,20 204:3
  204:12,13 205:4
  205:19,20
**collaborative**
  336:12
**collateral** 44:18
  380:12
**colleague** 314:7
**colleagues** 329:18
**collect** 43:15
  178:22 179:4
**collected** 222:17
  223:1
**collecting** 261:17
  266:22
**collection** 182:20
**collections** 267:4
**collects** 277:5
  382:5
**college** 36:21 37:8
  38:8
**color** 103:20
**column** 171:7,7
  175:22
**combat** 210:25
  248:5 294:2
**combatting** 209:2
  210:5

**come** 22:13 30:24
  30:25 48:9 55:15
  55:17,20 58:18
  62:2 76:13 77:13
  83:25 91:22
  104:15 105:3
  131:3 132:17
  160:17 163:19
  165:2 169:2 170:5
  179:9 208:2,23
  222:4 244:5
  258:17 259:12
  261:8 274:22
  352:10 368:21
  370:4 374:7
  378:14 380:10,13
**comes** 70:23 80:12
  80:18 178:11,12
  246:13 253:13
  321:23 330:22
  369:3 376:24
**coming** 56:1 67:9
  120:15,17 121:5
  160:21 169:9
  227:4 285:12
  286:1 287:3 344:3
  351:8,10
**command** 47:11
  235:11,15 240:10
  240:17 242:24
**commander** 33:13
  35:6 43:6 44:13
  46:2 94:10 119:15
  160:12 168:19
  179:6 243:21
  335:20
**commanders**
  71:21 112:25
  179:7 220:7
  243:25 321:11

commanding 46:25
comments 147:9 148:17 149:7 276:16
commission 55:12 386:17 388:19 389:25 390:25
commissioned 385:8
commit 244:19
commitment 283:14
commitments 221:14
committed 95:2 293:22
committees 64:5
committing 372:16
common 65:7 76:15 125:17,19 253:7 311:11 323:22,24 324:2 324:14,18 374:11
commons 3:16
communicate 77:14
communication 102:7 104:14 183:13 198:2
communications 32:20 33:15,17 214:5
communities 93:16 196:4,15 282:5
community 48:20 49:5,8 93:12 132:8 133:8 151:14 158:8

203:23 208:12 225:12 253:12 272:24 273:3,3,6 310:16 321:12 340:1,19 369:10 377:9,10,12 378:6
companies 207:17 299:18 316:9
company 367:14
comparable 141:6 141:9 143:3
compare 43:16
compares 135:18 135:22
comparisons 272:6,7
complaint 8:22 20:2 22:10,12 30:4,17,19 31:7,9 77:12 85:16 89:2 93:3 205:14 206:22 207:1 301:25 302:5 304:15 314:13,16 332:10 357:10,16 357:19,25 358:2 358:10,17,23
complete 19:21 122:25 143:19 327:1
completed 148:4 385:22 387:15
completely 158:8 249:14 328:11 332:18
completeness 223:18
complex 315:15
complicated 293:11 309:4,6,23

component 241:4
components 273:8
comprised 189:21
compromise 48:20
compromising 328:15
computer 179:25 185:1 329:1,1
computers 43:14
con 156:19
concentration 315:17
concern 340:23
concerned 150:4
concerns 29:21 96:1
concluded 383:8
conditioning 284:15
conditions 19:23
conduct 63:5 199:6 210:13 212:15,18,19,23 215:25 218:13 295:6 304:5 357:9 357:15 358:12,18
conduit 240:3
conferences 196:7
confident 230:21
confines 307:15
confirm 102:9
confronted 142:14
confused 190:2 308:2
conjunction 179:13
connect 58:8 204:1 374:14
connected 67:14 160:13 341:9 342:6,7 370:9

372:22 374:20 380:8
connecting 24:16 152:1
connection 25:3 115:5 347:14 351:18 370:12 373:2 374:5,16 378:21,23 381:20 381:23
connolly 4:13 14:19
conscience 342:3
consensus 236:23
consider 335:23 352:8
considerable 150:2 193:2
consideration 230:6
considerations 242:4
considered 130:4 141:12 299:6 334:5 335:23
considering 225:21 335:2
consistent 57:10 141:13 150:3 152:20,25
conspiracy 305:13
constant 157:17
constantly 230:13 247:9 275:3
constitutional 40:6 57:20 99:24 101:10
construction 51:22
consumed 318:4

**contact** 58:18 62:3
207:12,17 209:17
236:2,9 351:1
369:3
**contacted** 207:21
236:20 240:16
314:3
**contacting** 209:5
211:4,5
**contacts** 368:15
**contain** 270:14
316:3
**contained** 270:17
316:3
**contains** 316:3
**content** 184:7
**contention** 79:20
**contents** 21:7
**contesting** 160:25
**context** 23:6
198:19 211:11
225:7 241:15
**continually** 175:6
**continue** 150:7
163:23 251:17,20
294:7
**continued** 3:1 4:1
5:1 128:14 152:18
304:5
**continues** 129:17
**continuing** 244:22
328:14 365:7
**continuously**
190:25
**contract** 112:1
189:12
**contribute** 66:18
67:19 129:5
**contributed** 66:23
152:5 221:7
228:13 315:10
357:3,11,17

**contributes**
278:15
**contributing** 67:8
370:7
**contributor** 24:22
109:5
**control** 146:3
294:13
**controlled** 305:14
305:15
**convenes** 378:2
**conversation** 23:6
76:21 157:18
159:9,17,18
234:23 237:17,22
238:14 240:9,13
240:14 242:9
277:8 319:17
**conversations**
21:7 25:7 76:16
76:18 94:21
113:12 150:13
156:20 185:20
237:22 238:12
239:2 240:20
241:3,16 242:25
310:17
**conveyed** 378:13
**convicted** 302:23
303:17 305:3
**conviction** 101:5
300:20
**cooks** 364:15
**coordinated**
203:16
**copies** 256:25
360:14,17
**copley** 303:19
305:12

**copy** 98:20 101:19
101:25 172:6
173:5,20 252:9
343:22,23 360:24
361:2,3
**copying** 204:19
257:4
**corner** 136:23
363:14
**coroner's** 154:16
**corporation** 2:9
16:16
**correct** 59:1 85:11
88:7,21 95:12
108:13 121:18
122:16 123:7
140:18 142:25
146:20 172:16
191:21 209:3
210:7 253:24
258:4 264:6 276:7
289:5 294:21
295:3 296:14
316:21 320:12
337:7 338:3
344:24 353:23
374:25 379:24
381:14 385:17
**corrected** 8:22
301:25
**correctional**
254:14
**corrections** 387:12
389:17
**correctly** 203:8
232:7 247:13,17
276:19
**cost** 222:9 237:14
238:19 240:25
241:23 244:22,23
245:6 246:2,4,6

280:22 283:6
**costs** 67:13,14
189:16 206:3
221:15 246:20
281:10 282:1
283:24
**council** 179:5
274:16
**councilman**
256:17,25
**counsel** 14:9 15:11
19:6 20:3 21:8
22:23 174:1
378:14 379:20
384:1,10 386:2
**counsel's** 375:10
**count** 54:3,5
**counterfeit** 287:22
288:7,11,15,19
289:4
**counterfeiting**
296:5
**counties** 183:2
**counting** 52:23
**country** 24:18
233:18 291:12
**counts** 305:14
**county** 1:12 2:3
8:4,18 9:4,10 15:8
15:10 25:13 64:18
66:4 69:13,24
71:10,23 80:3,6,21
83:18 102:15,17
128:15,17 129:16
130:4,13,14,18,23
130:24 131:6,9,13
162:4 165:4 183:3
209:14 214:10
233:19 254:18
274:16 279:20
302:21,23 305:3

[county - day]                                                                                    Page 16

306:6 331:1
339:13 340:1
344:16,18 359:16
359:23 360:6
361:8 363:21
377:23 385:4
388:10 389:15
coup 300:18
couple 20:3,19
21:21 22:1 53:13
61:13 70:19 79:12
98:22 125:21
164:13 166:12,25
178:2 187:1
208:17 337:20
361:10
course 85:2 177:9
360:15 367:18
courses 37:8
334:20
coursework 38:23
court 1:1 6:16
14:7 15:18 18:23
22:18 73:13 85:20
109:23 118:12
128:6 133:19
136:6 137:16
199:15 320:20
330:11 339:17
343:8 352:24
359:21 363:3
366:13 388:7
courtesy 234:3
courtroom 18:7,9
courts 254:11
cov.com 2:13,18
cover 192:19
335:1
coverage 192:4
covered 63:9,13
229:13,14 241:7

281:23
covington 2:10,15
14:12,14 16:15
crack 132:15
363:20
create 58:22 120:5
148:13
created 100:25
148:12 191:12
creating 326:12
credit 157:4
creeping 233:17
crime 45:5 47:13
47:15 59:10
178:23 179:3,3,9
179:19,20 180:10
254:21 261:13,18
261:20,21 264:8,9
294:9 322:1
363:23 373:10
crimes 41:6 43:6,8
43:20,22 45:2,10
45:13 47:14,17
65:2,5,8 95:9
107:22 183:19
211:13 254:4,7,20
260:23 261:25
282:9 302:23
305:3 371:22
372:16 373:1,2
374:6,15,21
381:20,23
criminal 9:13
17:24 338:25
356:22 362:21
crion 2:8
crisis 93:7,23
248:5 249:10
250:1 315:11
318:10 368:18
369:12 371:19

372:23 375:24
criteria 322:5
critical 225:20
227:12 228:4
crucial 233:1
cruiser 232:14
245:15
cruisers 229:1
231:9 233:9
246:19
crum 5:12
crystal 183:5
286:8
cuff 167:11
current 54:13
74:19 78:15 97:15
99:25 186:22
253:5 266:6
273:10,19 282:7
369:11
currently 16:17
32:9 54:24 56:23
80:2 142:24 145:8
193:9 250:9,10,11
251:2,14 263:2,4,5
curriculum 333:4
336:3
cursory 252:16
custody 6:15
customers 163:22
163:23
cuyahoga 36:19
385:4

d

d 4:19 16:11
211:24
d.c. 2:12,17 4:15
da 9:8 352:20
353:24 355:4
daily 52:18 84:6
107:15 160:10

170:14 321:2
damage 233:22
354:11,13
damages 280:16
dan 1:9
dangerous 328:16
dashboard 143:14
data 98:15 178:10
178:10 179:19
213:14
database 116:10
117:14,19,21
169:25 170:6,13
170:20 171:1,12
174:8 178:10
180:13 257:15
259:9 306:3,13,23
307:8 310:22
312:17,22 313:13
316:13 327:13
328:3
databases 51:21
76:7,9 170:7
183:17 298:8,10
299:8 316:2
325:11
date 14:1 159:8
175:7 185:22
198:10 370:17
384:11 387:8
388:3,9,19 389:3
389:13,25 390:20
390:25
dates 42:5
david 35:8 219:19
day 3:20 15:2
21:22,24 45:20
46:1,15,22 47:1,3
47:15,16 56:2
82:5,5 97:2,14
104:7 105:3

170:15 192:3,19
193:20,24 194:3
219:23 244:5
272:20 321:4
322:7 326:22
332:1 386:7
388:16 389:22
390:22

**days** 63:9 106:19
172:9 177:18
178:3 189:12,18
338:14 387:18

**db** 235:14,19

**de** 57:21

**dea** 35:1 64:16
65:20,23 68:20
75:12 77:2 78:22
91:11,16 211:24
212:8 213:21,24
286:22 304:12
307:14 308:7
309:25 310:5
320:7

**dead** 228:12

**deal** 253:23
262:17 282:8
371:21

**dealers** 101:1
115:16 121:2
125:13 151:3,4
152:7 163:16
282:6 351:4 355:4
357:5 374:22

**dealing** 101:7
158:14 285:25
313:22 369:10
373:18

**deals** 356:4 372:18

**dealt** 147:23,24

**dear** 340:19
387:10

**death** 17:1 27:3,7
95:3 118:2 151:6
170:23 171:12,17
172:12 175:3,10
186:24 187:6
188:6,18,22 190:6
191:6,24 192:9
193:15 195:20
261:15,23 263:18
263:21 323:5,12
351:2 380:11

**deaths** 93:18
94:17 95:16 96:20
99:2 106:17 107:4
107:12,13 114:15
116:10 117:5,20
134:20 153:24
155:16 164:21
169:21,22,23
170:1,9,21 182:16
247:21 248:19
323:6,11 325:9
341:9 342:6,7
345:9,18 346:3,9
346:25 347:24
348:4,9,18,22
355:13

**debacco** 1:25
385:6 386:14

**december** 48:25
305:11 361:21

**decentralized**
229:3 230:1

**decide** 57:14
362:13

**decided** 95:14
317:3

**deciding** 113:10
244:14

**decision** 49:20
100:18 112:9

113:8 156:15
159:19 160:15
239:22,25 240:1,2
240:7 241:17
246:5 269:20
335:16 370:4,22

**decisions** 156:18
157:13 188:12
242:5 246:1
371:20

**decline** 150:2
249:15,15

**decrease** 149:18
152:18 153:17

**decreased** 276:17

**dedicated** 186:20
268:7

**deed** 388:14
389:20

**deemed** 387:19

**deep** 249:19

**defendant** 357:10
357:16 358:10,14
358:19

**defendants** 8:6,20
15:5 93:5 206:25
207:12,18 208:24
209:6,17 210:1
213:14 214:13
216:1,5 218:13
224:7,14 230:25
279:23 287:5,11
289:3 294:12
295:5 306:2
314:17 315:7

**defensive** 38:17
40:4 57:17,19

**defer** 335:17

**defibrillators**
244:25 245:4

**defined** 261:6
278:6

**definitely** 75:14
126:3 310:11

**definitions** 311:12

**definitive** 334:8

**definitively** 60:23
71:14 123:23
260:10

**degree** 248:15

**degrees** 38:5

**delivery** 384:9,11

**demand** 8:22
93:19 193:10
250:23 302:1

**demands** 142:16
160:19 243:6

**denied** 156:9

**department** 7:21
8:15 9:12 16:20
30:25 32:15,17,18
34:10 37:6,9,18,23
38:18 39:12,20
41:15 44:21 49:3
49:12,24 50:9
52:23 54:7,12
62:9,18 64:8
65:10,17 66:18,24
67:10 68:3 71:7
72:4,18 76:16
77:7 78:3 79:21
83:21 84:7 94:18
96:9 100:9 107:15
110:25 111:17,24
112:3 113:16,16
113:21 117:22
123:5 136:2,9
138:7 139:19
141:16 145:20,23
147:5,7 148:6,8
158:23 160:13,20

178:15,17,19,25
179:13,15 182:6
184:9 185:24
187:16 196:20
202:1 208:10
209:1 212:5 221:7
221:16 222:10
223:13 224:6,13
229:19 230:12
231:3 232:18,25
236:5 238:23
239:6 247:9
248:10,13 250:6
250:20 252:23
253:5,10,22
254:15 255:5
259:17 260:15,16
261:2 265:4,21
266:9,18 267:25
269:6 272:13
273:5,20,25 275:2
276:8,10 277:15
278:16 291:3
294:1 300:10
301:20 303:5
305:22 306:19,22
307:11,22 308:6
308:13,19,25
312:4 313:2,7
314:9 318:1,8,12
318:24 319:19
320:1 326:1,11
327:24 332:7,15
333:5,16,17
334:23 335:4,18
336:4 338:20
339:2,4 340:11
343:16,25 344:1
344:13,14 346:23
348:21 350:11
356:4 359:7

362:20 367:5
371:16,21 372:1
375:14 376:8,14
381:10 387:22
**department's**
65:12 268:4
**departments**
238:4 261:1 264:8
343:20
**depended** 57:2,3
**depending** 55:14
267:4 278:11
333:11 365:11
**depends** 63:16
219:22 252:25
362:9
**deployed** 272:9
**deployment**
246:23
**deposed** 15:23
16:21 23:4 35:21
**deposited** 365:3
**deposition** 1:16
14:4 20:1 22:24
36:1,4,6,7,9 73:6
98:5 99:8 109:17
118:4 127:25
133:11 136:1
137:9 197:18
199:7 214:9
231:12 234:12
255:23 265:19
268:16 279:19
301:24 320:14
330:4 339:11
343:2 352:19
359:15 362:19
366:5 383:8
385:20 387:8,11
388:1,3 389:1,3

**deputy** 35:20,25
36:5,7 47:10
49:20,25 50:3,3,6
50:12 52:1,11
74:11 77:24 78:16
117:25 141:18
143:1 145:14
146:16,21 147:9
147:11,14 148:7
148:16 149:1
160:9 172:2,18
235:23 243:20,24
252:10,13 257:1
271:19,23
**derek** 118:18
119:21
**derivatives** 286:5
**describe** 144:18
350:10
**described** 90:23
174:20 245:25
270:15 318:11
353:25
**describes** 215:23
**describing** 94:12
290:14
**description** 7:2
**designations**
141:11
**desk** 55:18
**despite** 306:2
**detail** 252:17,19
270:14 319:11
**detailed** 270:22
271:25 272:2
**details** 238:11
**detected** 296:22
**detecting** 298:1
**detective** 35:1
47:12,14 55:18
61:2 109:1 116:12

116:14 171:4
214:6 235:17,19
262:10,11,22
265:8 266:6,13
293:16,17 304:11
306:20,21 313:4
314:7 344:6
346:19 347:21
348:6
**detectives** 43:12
45:3,7 153:24
171:16 180:21
186:20 192:10
251:15 262:21
294:6 308:9
352:16
**determination**
364:8
**determinations**
146:23
**determine** 104:4
278:2
**determined** 91:5
91:12 147:3
351:13
**determining** 253:9
334:2
**develop** 49:23
**developed** 86:3
202:11 225:16
**development**
201:5 202:1
203:15
**devoted** 223:6
**die** 106:8 325:5
**died** 106:7,16
354:15,24,25
355:18
**differ** 271:20
**difference** 86:7
90:21 130:17

217:12 278:9
**differences** 90:7
130:21 217:4,7
274:8
**different** 25:11
50:24 56:25 57:8
57:23 83:9 85:5
86:16 93:17
130:25 131:5
139:13 140:6
141:4 143:3 152:5
152:14 154:25
164:13 178:9,24
179:2 180:9 183:3
192:2 208:13
226:9,10,10 230:7
239:21 242:4
243:8 254:15
258:10 259:14
270:7 272:3,3
273:8 279:2
289:18,20 290:2
292:5 315:19,20
319:19 333:24
336:17 342:8
355:25 358:3,3,8
368:14,17 372:24
373:15,15 374:23
375:12
**differentiate**
257:16
**differently** 226:5
228:16,25
**difficult** 101:11
112:5 160:22
**diligence** 103:2
**diligently** 210:23
**dire** 267:18
**direct** 77:16 78:11
147:15,20 182:7
242:23 331:13

**directed** 258:16
**directing** 112:11
**directly** 34:18
52:17 53:6 113:7
144:13 147:23,24
159:22 240:17
282:9
**director** 119:22
378:10
**directors** 69:24
70:5
**disagree** 331:16
331:18 364:10
**disagreed** 240:4
**disagreeing** 87:1
**disassemble** 163:2
163:4
**discard** 361:5
**disciplinary** 85:24
**discipline** 85:15
356:16
**disciplined** 85:13
**disciplines** 38:18
**discuss** 161:10
207:13
**discussed** 93:2
95:14 158:4,16
169:24 194:1
236:22 242:19
243:23 244:15
254:20 260:20,21
260:22 261:4
264:5 277:19
315:25 325:11
366:19 376:12
377:13
**discussing** 110:6
185:2 316:14
**discussion** 213:8
214:22

**discussions** 61:22
95:5
**disguise** 120:16
**disguising** 121:2
**dispatch** 179:25
259:2,4,21 260:2
283:2
**dispense** 289:16
**dispensed** 294:19
**dispensing** 76:11
295:16
**dispute** 139:12
**disseminated**
117:23
**distance** 284:10
**distinction** 176:6
**distinguished**
38:13
**distress** 342:23
**distribu** 172:20
**distribute** 218:4
305:14
**distributed** 24:21
278:6 330:22
364:24 365:10,21
**distributing**
303:18
**distribution** 172:2
172:20 305:15
343:25 344:4
363:19
**distributor** 8:5,20
214:13 216:1,5
217:14,19 218:13
279:23 297:18
**distributors** 28:15
29:7,8,20 216:7,15
216:21 217:21
218:3,3 299:2
306:10 309:11,13
316:17 317:1

**district** 1:1,2 14:7
14:7
**districts** 227:2
229:5
**dive** 249:19
**diversion** 41:12
59:19 129:15
130:3 154:5
208:18 209:7
262:3 264:16
266:3 289:7,8,10
289:14 290:5
291:5,8,24 293:10
293:15 294:2,8
298:1 300:8 301:9
301:21 302:24
304:13 305:4
309:18 310:4
312:2,8 313:25
314:9,21 315:1
327:22 328:4,7
**diverted** 111:20
291:21
**divide** 362:13
**divided** 46:5
362:14
**division** 1:3 14:8
80:10,14 321:9,9
372:1,5,5,12
**divisions** 222:16
261:1
**doctor** 289:15
292:10,25 297:14
298:13 303:17
304:5 305:12
317:3
**doctors** 154:6
155:8 164:15,17
217:22 218:4
296:8 298:15
300:8 313:22

[doctors - e]                                                                      Page 20

314:20
**document** 1:11 7:5
7:7,13,15,17 8:7
8:15,17 9:1,9,12
9:16 21:3 52:14
98:6 99:9 103:6
117:18 118:6
119:3,9 128:1,11
128:20 129:24,25
130:13 133:12
136:15 138:5
145:18,21 146:9
148:10,13 173:23
197:14 199:1,2,14
200:19,25 214:18
214:19,23 231:13
234:20 265:20
268:17 269:12,19
269:22,23 270:2
270:16,22 272:17
273:9,13 280:3,7
305:25 322:12
330:5,14,24 331:4
349:9 359:16
360:2 362:20
363:5 366:6
**documentations**
261:18
**documented**
117:10
**documents** 21:14
21:17 22:7,15,19
33:6 34:5 93:4
105:12 119:7
146:15 174:13,15
217:6 264:15
270:18 271:3
**doing** 21:9 38:2
97:23 113:1
199:21 200:16
230:22 247:10,10

247:11 248:17
297:6 310:14
319:3,25 357:6
**dollars** 189:25
**donated** 366:24
**donation** 247:14
247:16
**donations** 367:5
**dosage** 338:3,5
**doses** 153:3 304:3
305:9 337:20
**double** 251:21
**doubt** 141:23,24
**downtown** 46:10
**downturn** 156:25
**dozen** 27:13
**dozens** 38:13
229:20
**drafting** 30:16
**dramatic** 106:3
130:17
**dramatically**
93:15 130:25
131:4 140:6
151:18 187:3
192:23 247:20
276:18
**drew** 133:22
**driver's** 323:15
**drives** 144:21
**drop** 150:8,10
193:2
**dropping** 342:9
**drove** 51:8
**drug** 7:15 9:1,10
26:22 28:25 41:6
45:13 59:10,19,21
64:18 65:1 66:4
69:13,24 70:12
80:3,6,21 83:18
92:7 99:25 100:1

100:22,24 101:1,7
107:10,18 115:16
119:19 120:6
121:1,9,10,12,25
122:2,4 125:25
126:10 128:1,14
130:23 134:23
135:22,23 149:19
151:3,4 152:7
153:6 158:10
163:16 165:4
169:20,20 170:1,8
176:1 178:5,6
180:14,14 182:21
183:19 188:25
208:17 221:1,22
254:19,21,25
255:4,16,20
257:19,25 259:25
262:3 280:23
282:11 289:8
291:10 296:1
302:24 305:4
314:18 323:22
330:6 331:6
337:19 338:8,12
338:14,17 341:14
350:23 351:4
352:9 354:16,24
355:4,18,22
356:21 357:5
359:16,23 360:6,9
361:8 364:6 371:4
373:3,18,18,22
374:3,22 378:22
**drug's** 363:22
**drugs** 17:22 24:20
58:18,21 60:21
61:15 62:18 64:3
64:6,11 82:16
86:4,7,8,11,17

88:6 125:14,14
129:19 132:7,13
132:19 152:10,11
162:13 163:24
166:13 175:18
182:10,18 183:19
194:16 232:20
255:1 285:12,16
285:17 287:12,17
288:18 291:21
304:4 324:15,16
325:13 352:10
354:20 359:3
369:21 373:5,5,6,9
373:22 376:4,5
378:17,17 380:15
380:24,25 382:19
**dto** 121:7,13
**dtos** 120:17,18
122:3
**dual** 260:1,1
**due** 103:2 149:19
250:21 257:18
363:21
**duly** 15:23 385:7
385:10
**duties** 76:22 79:1
81:17 84:4 263:19
**duty** 44:17 55:22
206:2
**dying** 158:10
**dynamic** 248:20

| e |
| --- |

**e** 3:15 7:3,10,12,22
8:1,9,11,23 9:3,5,7
16:9,9 22:16 73:7
73:19,20,23
103:13,19 109:18
110:1,13 118:5,14
118:17,18 128:16
137:10,18 171:17

[e - epidemic]

171:18 172:15,23
177:23 197:19
198:1,6,22 199:25
200:2 234:13,21
234:22,22 235:1,4
235:8,9,22,25
236:2,11,21 240:8
242:18 243:14
255:24 256:8,16
258:20 320:15,22
320:25 322:13
339:12,19,20
343:3,10,12,14,19
343:24,25 344:6
344:22 345:15
352:20 353:1
360:23,24
**earlier** 74:3 75:9
96:2 107:20 108:6
153:25 155:3,4,9
155:16,17,21
156:4,5,7 161:18
161:19 179:16
183:21 187:14
194:9,22 205:13
206:21 207:25
214:22 215:9
220:22 226:3
239:6,15 244:16
251:11 278:19
281:17 284:22,23
312:16 325:12
334:9 337:8
345:22 349:8
366:19 367:1
369:24 372:25
**early** 42:25 48:8
124:1 134:18
**easier** 104:15
121:19 226:2
298:9

**east** 1:23
**eastern** 1:3 14:8
134:21
**easy** 21:11 189:23
**edge** 247:24
**educate** 203:24
**educated** 150:14
150:23 208:5
335:21
**education** 36:25
151:23 152:16
153:20 220:20
254:9
**edwards** 353:7,10
353:14
**effect** 150:17
161:19 229:24
**effects** 93:16
**efficient** 143:24
**effort** 203:16
380:6
**efforts** 112:12
151:4 215:23
218:11 224:8,15
293:10
**eight** 45:17 189:24
193:18
**either** 27:2 33:11
35:14 51:19 60:18
62:20,22 115:14
147:12 183:19
192:10 238:21
243:19 281:7
292:11 333:17
334:21 369:16
373:21 386:2
**elective** 38:22
334:3,19 335:3
336:22 337:5
**electives** 333:14

**electronically**
329:8
**ellis** 3:3 4:8 14:16
**email** 387:17
**emergency** 153:12
245:2 254:1
280:22 296:25
**emerging** 121:1
227:4
**emphasis** 154:3
**employed** 16:18
55:13
**employee** 54:7
112:14 123:3
**employees** 40:24
53:5 54:4,14 55:2
65:17 178:18
302:22 304:1
305:6
**employment**
376:13
**ems** 25:14 222:6
229:4,14 230:1
232:18,24 246:15
**enablers** 355:22
**enclosed** 387:11
**encounter** 338:11
**ended** 240:13
**endo** 3:7,8 4:17,18
15:4
**enforcement**
25:14 62:5 71:1
84:14 86:3 122:1
122:14,18 125:10
128:12 132:6
150:6 151:22
158:7,13 195:23
196:7 201:24
203:17 211:4,18
253:8 282:2
298:19 315:16

316:1 336:13,13
342:4,14 365:4,25
368:20 370:2
375:22
**enforcement's**
210:22 315:23
**engage** 254:9
**engaged** 300:8
301:9 315:1,3
357:10 358:12
**engages** 253:22
**entails** 82:5
**entered** 184:24,24
389:9
**enterings** 323:8
**entire** 93:14
123:25 147:7
148:5 229:19
388:5 389:5
**entirely** 76:5
293:1,5 367:2,3
**entities** 29:19
30:24 197:1
211:25 212:9
247:16 301:19
307:17 362:10
**entity** 197:1
**environment** 40:7
57:22 61:5 131:5
151:17 162:22
163:6 194:15
211:2,20 244:17
310:13
**epidemic** 24:18
25:7 93:6,22 94:3
94:24 109:6
127:11,13,18
158:5 161:20
209:1 210:2,6
215:25 218:12
224:20 227:19

[epidemic - experience]                                                              Page 22

233:17 282:3,7
283:4,25 284:4,25
340:22 357:11,17
358:13
equate  210:19
equip  236:24
equipment  67:13
67:24 68:2 69:1,3
156:13 238:2
283:18,20
equipped  232:14
239:7
equipping  236:6
erika  8:23 320:15
320:23 322:4
errata  387:13,18
389:7,10,18 390:1
escalation  57:21
especially  101:16
125:21 323:4
375:21
esq  2:4,5,11,16 3:4
3:10,15,21 4:3,9
4:14,19 5:4
established  204:17
establishment
204:6
estimate  109:8,15
255:6
estimating  301:18
et  1:12,12 142:17
evaluate  226:23
evaluating  230:13
272:24
evaluation  148:5
247:9
evening  63:6
184:6 368:7
event  201:19
386:3

events  56:1 321:5
321:11,14 326:18
358:3 368:17
eventually  230:1
252:19
everybody  63:8
83:21 104:15
369:1 372:17
everyplace  157:4
evidence  261:17
350:18 382:5
evolved  25:16
204:10 368:10
exact  42:5 228:3
238:11
exactly  77:19 78:9
95:23 114:1 116:8
142:1 148:23
189:20 230:11
249:2 251:6
278:10 307:14
322:9 329:4
330:20 356:5
362:8
examination  6:7
15:21,25 331:19
368:5 375:7
example  50:25
57:10 58:7 139:18
140:7 179:1,7
239:20 244:25
274:22 303:17
372:25
examples  215:23
218:10
exceed  364:24
exceeded  366:1
excel  170:24
exception  19:15
excess  289:23
338:2,4 365:9

excessive  355:24
exchange  137:24
234:21 235:2
exclamation
371:14,14
excluding  365:9
exclusive  313:10
369:8
excuse  75:16
199:3,3,8
execute  202:3
executed  159:20
389:10
execution  388:14
389:19
executive  38:7
95:13 119:22
120:9 158:22
165:24
executives  25:13
377:21
executor  17:2
exhausted  337:25
exhibit  6:15 7:3,5
7:7,10,12,15,17,21
7:22 8:1,4,7,9,11
8:15,17,18,22,23
9:1,3,5,7,9,12,16
73:6,15,18 98:5,15
99:8 105:14 107:2
109:17,25 118:4
118:14 127:25
128:8 133:11,20
136:1,8,8 137:9,17
169:17 170:16,18
178:9 181:19
182:17 197:18
198:1 214:9,18
231:12,19 234:12
234:20 246:25
255:23 256:7

265:19 266:1
268:16,22 279:19
280:3 301:24
302:4 304:17
305:25 314:13
320:14,21 330:4
330:12 339:11,18
340:18,18 343:2,9
343:14 349:7,19
349:23 352:19,25
353:25 359:15,22
362:19 363:4
366:5,14,17
exhibits  6:5,16 7:1
exist  142:24 145:9
203:11 225:1,9
226:9 227:1
230:14 290:1
295:20
existed  117:9
225:22 226:1
264:16,24
exists  157:18
203:3 369:18
expansive  224:3
expect  19:9 31:21
32:5,11 33:9,16,18
33:22 209:17
309:25 310:3
expectation  77:24
78:8 310:6
expected  280:17
expects  35:17
expenditures
267:22
expense  62:14
223:12
expenses  283:2
experience  80:10
89:7 132:14
162:12 225:17

260:14 262:2
311:14 332:20
358:6 364:13
376:16,20
**experiences**  25:4
26:16 32:7 55:14
**expert**  86:9 308:24
**expertise**  195:24
210:25 225:16
283:18,20 379:18
**expiration**  388:19
389:25 390:25
**expires**  386:17
**expiring**  275:5
**explain**  162:1
201:7
**explained**  46:13
242:22
**explaining**  141:4
**explanation**  142:3
144:18 318:21
**explanatory**
120:25
**exposed**  25:4
208:4 368:13,24
374:13
**exposure**  89:17
91:25 123:23
210:21 293:24
315:23 350:13
356:23 370:19
**exposures**  76:16
356:6
**express**  290:3
291:17
**expressed**  95:24
**expresses**  373:14
**extent**  24:1 161:19
165:9 288:1
**extra**  56:2 58:15
263:16 283:15

**extracted**  143:13
143:23 260:5
**extrapolate**  284:9
**extravagant**
166:15
**extricate**  106:19

**f**

**f**  2:16
**face**  7:18 133:13
**faces**  127:12
**facets**  356:1
**facilities**  209:15
254:15 268:1
**facility**  66:21 67:8
**facing**  207:14
209:8
**fact**  90:13 101:23
101:24 134:2
144:3 164:7
180:17 194:8
245:5 247:19
284:24 309:7
370:18 379:16
**factor**  114:23,25
244:14
**factors**  141:4
143:4 153:15
154:23 157:12
159:17 162:1
272:20 370:7
**facts**  210:19 228:5
352:8
**fair**  18:21 23:8
29:18 36:10 86:10
88:15 105:18
141:7 150:21
154:25 155:2,7
161:24 164:2
176:5 217:10,11
223:17 225:5
253:9 260:15

273:20 287:9
297:14 309:20
319:21
**fairly**  323:21
**fall**  48:7 266:23
346:14
**falls**  307:12
**familiar**  18:2
23:25 24:9 61:3
71:16,22 77:17
86:19 92:9 93:8
108:24 112:8,21
114:5 119:2 129:1
136:14 154:8
167:23 182:12
214:4,4 221:13,19
221:20 222:7,8
270:11 271:6
289:9 292:16
305:16 317:6
319:15 328:11
329:11 332:3,6,8
332:14 368:19
**familiarity**  33:5
71:16 89:1 96:21
115:20 159:11,12
165:22 185:23
202:5 223:13
244:12 271:1
289:9 290:24
292:11 303:13
308:23 311:23
315:23 319:11
321:10 325:4
333:1 334:22
335:25 342:11
357:18,22 362:6
369:5 370:1
371:10
**families**  152:2
154:15 220:20

375:25
**family**  25:23 26:17
305:12
**fancy**  268:3,4
**far**  95:4 150:4
175:7 211:12
212:6 227:8
369:23
**fatal**  7:19 133:14
304:6
**fatalities**  149:18
153:17
**fbi**  38:10 64:17
66:1 68:14,18
81:9,11,14,19
82:21 213:25
286:21 320:9
**fbi's**  83:4
**fda**  91:2
**fear**  326:21
**february**  9:3
339:12
**federal**  15:21 76:8
81:24 83:4 151:8
196:10 199:17
211:24 274:23
275:20 276:6
277:17 308:11
309:19 361:20
362:4 364:23
365:1,3,25
**feedback**  50:18,20
51:16,25 52:4
150:5
**feels**  211:19
**fell**  192:24
**felonious**  17:20
323:7
**felony**  323:8
**felt**  238:21

fentanyl  58:25
  86:20 88:10,13,15
  88:20 96:11 108:8
  108:12,15,22
  125:10,15 129:21
  133:7 134:4,10,19
  152:11 163:18
  165:5,17 168:2
  183:6 233:21
  247:23 286:4,5,7
  332:17 344:7,24
  347:22 348:3,7,13
  348:16,22 349:2
  351:3 356:5
feuds  374:21
fiatal  339:21
field  9:6 195:21
  343:3
fight  144:22
fighting  158:5
figueroa  4:20
figure  94:18 142:6
  182:1 208:7 227:1
  229:8 230:15
  333:18 352:9
figured  161:12,17
figuring  272:20
  293:9
file  116:7 117:6
  326:20 328:23
filed  30:13
files  168:1
filing  116:9 168:7
fill  56:3 80:16,17
  123:4
filled  80:8,22,23
  83:23 124:13
  326:14 327:2
filling  85:17
final  52:14

finally  19:12
  161:12
finance  4:7 37:3
  39:1 50:1,10
  146:22 147:25
  270:5 279:6
finances  361:15
financial  43:7 67:9
  186:12 246:21
find  23:19 116:3
  117:4,17 172:23
  182:2 222:1 245:7
  252:7 273:18
  278:25 285:24
  349:10 374:2
  387:11
finding  21:16
  379:16
fine  19:7 97:19
  99:6 105:14 215:6
  215:11 329:22
finish  19:2 37:6
  72:11 139:19
  158:1 199:19
  338:5
finishes  72:11
finishing  53:21
fire  25:14 32:14,15
  33:19,20 35:22
  202:21,22 203:17
  203:23 219:14
  220:11 222:6
  232:18 238:4
  244:17 245:3
  246:15 257:11,12
  258:7 259:1,6,23
  260:6 268:4
fire's  202:24
firearms  40:4
  64:20

firehouses  229:4
fireworks  56:2
firing  60:10
firm  16:14
first  8:4,6,19
  15:22 18:5 20:20
  21:13 30:6 36:18
  47:25 52:19 53:25
  57:10,12 65:5
  75:14 91:25 95:2
  119:17 121:22
  129:24 133:3
  134:18 138:10,13
  151:24,25 160:5
  162:19 184:3,12
  186:18,20 188:5
  188:11 198:1
  201:12 214:11,13
  233:1,2 241:22
  256:9,24 262:15
  266:21 279:21
  280:22 293:14
  302:19 303:16
  314:12,14 333:2
  335:14 339:20
  341:8 344:6
  369:25 370:11
  385:10
firsthand  77:18
fit  113:9 143:23
  209:12,22 211:6
fitness  57:17,18
five  44:24 45:3,6
  166:5,6 233:19
  301:21
fleet  267:15,16,17
  284:5
fleets  284:1
fletf  365:8
flies  72:23

flight  326:21
floor  4:20
flow  282:5
fluctuate  54:1
fluid  53:16
flux  275:3
focus  59:4,7,11
  315:17
focused  57:24
  219:1
folks  25:22 47:22
  236:25
follow  78:5 167:13
  239:10 245:18
  321:17 328:20
  375:5
followed  337:21
  337:23
following  159:20
  215:22 259:8
  280:18 326:17,22
follows  15:24
  142:3 305:2
force  8:12 35:2
  47:20 64:16,17,21
  65:20,24 66:1,9,12
  66:15,23 69:2
  71:2,10,23 72:15
  75:3,12 76:6,23
  77:15,16 81:1,5,19
  82:12 83:7 84:1
  123:14 128:13
  188:25 189:3
  214:1,3 251:10,16
  255:25 256:21
  260:20 262:5
  264:5 275:24
  278:4 286:20,22
  286:22 308:8
  310:15 311:1
  313:10 363:17

forces  35:22 64:2
64:2,9 65:11,18
66:19 67:10,15
68:3,14 71:12,18
80:13,15 83:15
213:25 263:5
283:3,8 320:5
328:7
foregoing  385:16
385:21 388:13
389:18
forfeited  365:24
forfeiture  278:3
361:18,20,24
362:4 364:23
365:20
forfeitures  262:24
262:24 277:22,24
278:7 362:2 365:2
forgery  290:7
296:23 315:4
forget  189:20
267:22
form  29:24 31:17
65:13 66:25 68:16
69:8 88:8 90:1,10
90:24 91:8,14
94:1,5 95:18,19
103:7,21 108:2,7
108:11,16,17,18
109:13 114:11,21
115:23 117:7
122:10 123:17
124:9 125:1,5
126:1,7,14,25
127:7,14 130:19
131:15 132:9
133:4 139:8
149:13 150:24
155:5,11,22 157:2
157:24 159:2

161:14,21 162:14
164:3 185:5
186:10 187:25
195:16 205:9
207:20,22 208:9
209:4,9,19 210:11
211:14 212:10,14
216:12 217:24
218:5 224:9,22
226:6 227:21,25
228:19,22 233:25
238:9,24 239:12
239:23 241:10
244:8 245:22
248:8 252:21
255:13 259:10
265:1 271:7
283:10 285:2,18
287:13,24 288:13
292:1 293:12
294:3,15,20,23
295:2,10 296:7,13
296:20 297:22
298:3,24 299:9
307:1,24 310:2
311:2,18 312:6
313:14 314:1
315:12 316:7,15
316:18,22 317:5
318:5,13 322:20
323:2,23 324:24
325:19 330:19
331:17 337:1
339:8 346:4
351:15 352:1,6
355:14 358:1
359:4,11 364:4
367:11 369:15
370:14 371:6
374:8 376:9,17
377:3 380:3,19

381:1,6,16 382:21
formalized  142:17
formally  173:8
former  94:13
305:12
forms  108:21
151:13 221:2,24
286:6 372:24
374:23
fortunately
249:14 251:18
forward  208:8
257:7 387:15
forwarded  118:20
258:24 344:15
forwarding
110:14
found  134:5,10,16
134:19 176:7
320:25 323:14
342:18,19,21
373:22
four  20:5 41:22
46:5 63:7 85:20
187:4,4 189:17,20
190:10 192:13
193:8,16 194:1
197:8 251:14
263:3,3,5 305:2
350:4
fourth  282:22
fraudulently
289:25
free  238:7,20
241:1 273:2
388:14 389:20
frequency  27:16
frequently  179:8
185:14 367:6
friday  118:19

friend  89:11
front  96:16 97:4
98:14 169:16
200:5 349:19
frustration  79:20
fugitive  81:5
fulfilled  20:24
full  16:5 65:16,18
67:2,6 187:4,5
190:25 193:22
251:15 263:20
294:6 362:6
365:12
fully  83:2 232:13
function  181:25
functions  58:8
179:2
fund  274:1,4,5,6
274:11,12,13,14
365:4,25
funded  68:13 69:1
276:9,10 277:4
funding  66:19
67:16,20,23 82:2
100:1 205:17,23
252:23 274:22
275:2,10 276:14
276:17,22 277:18
funds  179:14
206:8 230:18
237:11,11 274:1
274:12,19 365:21
365:24
further  52:8
104:12 176:16
282:20 302:20
305:1 323:17
382:25 385:19
386:1
future  364:23

[gain - greater]

**g**

**gain** 336:1
**gang** 83:1,1,4
**gangs** 47:20 74:8
  83:10
**garden** 1:22
**garro** 35:8 122:24
  168:16,21,22
  219:19 352:17
**gas** 143:18 284:12
**gates** 3:21 15:1,1
**gathering** 21:14
  33:6
**gen** 160:1
**general** 20:22
  59:11 136:15,16
  160:3 196:9,10
  208:23 222:25
  261:21 274:4,10
  274:11,13,14
  276:10 326:18,24
  377:22
**general's** 339:25
**generality** 159:10
**generally** 49:1
  50:23 51:7 300:7
**generate** 139:23
**generated** 31:1
  76:7 96:18,25
  97:14 139:1
  143:20,21 144:4
  144:16,23 145:3
  170:22 180:19
  185:1 270:5,6
  271:4,9,12 329:1
**generating** 181:24
**geographical** 46:3
  46:4 272:22
**geter** 9:8 352:21
  353:25 355:4

**getting** 61:4 78:2,2
  153:25 244:17
  268:4 324:5
  349:13 357:3
**gigantic** 308:22
**gilbride** 78:19
**give** 16:7 19:21
  55:19 68:7 77:7
  81:23 98:1 138:16
  164:22 222:12
  297:1 302:10
  353:3,18 380:5
  384:1,10
**given** 126:10
  165:24 174:4
  318:10 338:1
  376:23 385:13,18
**gives** 81:24 269:21
  333:6
**giving** 222:25
**glad** 154:21
  169:14,14 331:23
**glance** 333:2
**go** 18:3 21:10
  23:18 36:15,21,23
  38:14 40:20 41:1
  41:14 43:14 50:1
  50:9 51:19 59:14
  69:3,25 98:12
  106:12,14 122:25
  124:16 138:3,19
  141:4 146:20
  153:4 157:4,4,8,21
  163:1 170:19
  184:20,22 187:17
  194:8 196:24
  205:15 213:3,5
  215:16 218:9
  219:15 220:13
  224:11 227:11
  237:20 245:1

261:14,16,23,24
  261:25 264:9
  270:2 284:9
  295:23 308:4
  360:25 383:4
**goal** 203:7,9
  232:12 336:21
  352:9
**goals** 272:16
**goes** 49:9 51:11
  107:7 117:24
  139:18 174:22
  175:2 223:19
  241:18 321:3
  326:15,15
**going** 23:15 28:23
  37:14,23 48:19
  51:1 57:4 59:2
  68:2 72:25 100:4
  102:8 104:2,17
  107:25 112:9
  131:19,25 139:21
  139:22 148:22
  169:3 199:1,10
  201:19 212:15
  213:6,9 214:23
  215:17 222:11,18
  226:25 227:8
  234:3,6 236:24
  238:17,20 239:18
  241:21,22,24
  244:21,22 245:6,7
  245:8 249:22
  253:11 270:15
  275:1 280:9
  298:14 299:23
  302:7 328:21
  329:23 336:23
  344:13 349:16
  367:21,25

**good** 16:2,3 72:7
  80:11 81:6 113:2
  113:9 135:13,15
  200:21 211:19,20
  214:7 299:20
  368:7 380:6
**gotten** 52:12 97:12
  245:17 247:20
  278:23 319:16
**government** 76:8
  81:24 225:2
  227:17,18 228:18
  276:6,22
**governor** 336:14
**graduate** 36:20
  37:4,5 40:17
**grams** 100:23
  101:4 354:6,8
**grant** 62:13 82:1
  128:13 179:12,14
  205:1,7,16,17,23
  206:13 220:23
  245:8 274:22
  275:2 281:19,22
  363:6,11 364:2
  366:19,25
**grants** 230:14
  245:18 275:4,10
  275:13 276:9
  278:14
**graphics** 179:1
**graphs** 270:12
**great** 105:2 113:10
  117:1 151:6
  230:14 253:23
  266:15 340:23
  342:11 369:5
**greater** 67:16
  101:7,7 123:15
  140:3 151:19
  154:14 156:1,7

208:5 286:23
289:24
**greatest**   122:4,9
363:21
**grew**   154:13 187:2
**ground**   18:4 20:11
**group**   8:1 66:13
66:13 159:7
194:10 197:20
198:11,16 200:3
201:2 202:7,8,17
203:2,7,9 236:2,9
237:8,10,12 238:7
238:18 333:16
336:12 377:20
**groups**   71:13
151:15 203:23
**grow**   95:25
**growing**   93:20
94:15 185:23
192:21 227:4
**guess**   76:15
286:14 288:19
**guessed**   296:19
**guessing**   159:1
**guidelines**   253:1,2
**guilty**   305:8,13
**gun**   64:24

**h**

**h**   16:9
**half**   21:24 27:13
41:22 42:2 45:17
149:17 189:24
267:21 339:19
**hand**   5:11 175:21
218:21 386:6
**handbags**   166:19
166:22
**handed**   73:14
109:24 118:13
128:7 133:19

136:7 137:16
197:25 214:17
231:18 234:19
256:6 265:25
266:8 268:21
280:2 302:4
320:21 339:17
343:8 352:24
359:21 363:3
**handing**   366:13
**handle**   49:11,11
114:6 307:17
**handled**   60:18
307:14
**handling**   58:17,24
61:15 62:18
334:15
**handout**   103:24
**hands**   100:19
294:14
**handwritten**
329:3
**happed**   147:21
**happen**   60:5 63:9
79:10 97:14 127:2
289:14 290:5
**happened**   27:15
36:4 42:18 45:18
63:24 77:22 96:5
96:9 105:25 106:4
106:21 147:18,19
147:20 155:16,20
156:3 158:20,21
180:20 226:2
230:3,4 324:21
376:16
**happening**   144:22
265:3 319:20
**happens**   49:6
50:12 85:21 117:3
294:13 308:25

319:12
**happy**   265:6
**harbor**   9:1 330:6
331:5
**hard**   16:6 27:8
123:22 124:12
154:11 210:19
211:16 228:2
298:1 355:21
**hardcopy**   174:12
174:14 329:10
**harding**   33:13,14
222:14 258:16,24
327:19
**harm**   58:19
**harper**   305:6,7
**harvey**   197:9
352:16
**hazards**   215:24
218:12
**head**   22:2,6 39:8
59:15 61:11 72:21
84:17 164:16
176:23 191:16
275:21 290:6
312:20 320:10
332:19
**heading**   361:14
**health**   3:7 4:12,17
8:13 14:20 25:10
25:13 89:16
203:17,24 209:14
215:24 218:11
219:15 220:12
247:15 256:2,22
257:20 259:21
302:22 315:20
377:9,10,12,23
378:6
**hear**   149:11 185:9
276:15

**heard**   16:13 26:23
27:5 29:22 35:14
71:22,24 92:1
106:14 111:15
121:10 125:10
185:9 276:23
289:1 290:7
291:10,14,17,20
356:9 368:16
371:10 378:6
379:15
**hearing**   25:6,7
27:17 89:3 92:8
221:2,23 326:17
358:2 369:17
**heart**   246:4
**heating**   284:15
**heavily**   344:9
345:1
**heavy**   146:6
**heights**   165:6
**heim**   305:13
343:15,19 344:12
346:20 347:21
348:6
**heim's**   344:6
345:14
**held**   37:7 158:22
244:4 377:20
**hello**   331:21
**help**   55:8,25 56:3
89:14 178:23,25
179:3,14 208:7
326:23 349:10
**helped**   148:13
155:10 209:6
231:6
**helps**   205:25
**hereinafter**   15:23
**hereunto**   386:5

**heroin** 7:18 9:5
72:14 86:19 88:6
120:15,17 122:2,8
123:14,20,23,25
124:8 132:24
133:13 134:3,20
163:18 183:6
236:4 286:10,24
332:17 340:22
341:3,6,11,11,19
342:5 343:3 344:8
344:25 356:4
**hi** 331:22 368:8
**hidta** 62:7 120:15
121:4,17,25 122:7
182:19
**high** 36:15,17,18
54:16 70:11
119:19 120:6
129:13 166:19,21
370:6
**higher** 27:16
155:14 292:22
**highest** 44:16
**highly** 363:22
**highway** 291:15
**hilton** 1:22
**hindsight** 161:23
211:7 226:16
239:21
**hire** 40:24 53:11
53:18,23 277:6
**hiring** 41:1 53:22
272:15
**historic** 97:16
**historical** 107:6
**history** 351:25
**hit** 278:12
**hockman** 82:25
83:8

**hold** 376:24
**home** 23:21 373:8
373:8,11,12
**homeless** 282:10
**homicide** 248:23
319:13
**homicides** 323:6
**hope** 169:2 254:8
**hoped** 156:2
**hoping** 198:4
**horrigan** 71:18
231:20 232:23
**hospital** 25:12
**hospitals** 246:16
**host** 195:24 197:1
**hosted** 201:19
**hostetler** 3:9
**hot** 60:16,21
**hotspots** 179:9
**hour** 131:19 192:5
234:3 272:19
**hours** 7:9 21:21
22:1 44:17,21
46:22 47:15,15
55:12 56:20,21,24
57:1 85:20 99:11
192:2,3,4,13,16,19
244:1 275:24
278:23 302:11
321:5,15 333:12
**housed** 66:21
**housing** 67:7
100:6
**hrs** 7:6,6 98:8,9
**hubbard** 4:4
**hudson** 36:18
**huh** 20:8 27:19
50:10 56:8 61:20
99:4 110:8 119:25
172:24 175:17
176:12 208:19

247:2 254:3
260:24 274:3
290:9 322:14
366:22
**humans** 88:19
**hundreds** 101:1
119:6 228:11
292:12,13 304:3
305:9
**hunter** 4:9 15:17
**hylton** 128:16

**i**

**idea** 66:6 68:6,7
115:10 138:16
201:3,23 255:7,9
258:11 274:19
275:1 326:24
344:2 379:7
**ideally** 251:20
**ideas** 50:16 222:25
**identical** 139:2
**identification**
73:10 98:10 99:12
109:21 118:10
128:4 133:17
136:4 137:14
197:23 214:15
231:16 234:16
256:4 265:23
268:19 279:25
302:2 320:18
330:8 339:15
343:6 352:22
359:19 363:1
366:11
**identified** 29:22
122:2,7 153:16,18
153:18,20 157:13
287:6 307:8
**identifiers** 171:3

**identifies** 306:4
**identify** 300:8
301:8 311:13
**identifying** 154:23
**identity** 177:13
181:7 290:2
**idling** 284:15
**ii** 1:17 6:7 15:20
15:25 269:6
331:19 368:5
375:7 385:10
387:8 388:4,9
389:4,13 390:20
**iii** 361:15
**illeg** 289:11
**illegal** 88:5,21
90:5 93:24 100:24
108:21 285:12,16
285:17 287:6,12
287:16 288:18
289:11 297:6
304:2 314:17
380:15,24 382:18
**illegally** 303:18
**illicit** 26:22 108:11
108:11,16 359:3
369:14,20 370:13
371:4 376:4
378:17,22
**illinois** 4:4,10
**imagine** 31:23
32:14,18,25 33:10
35:12,23 67:4
92:20 112:22
113:11 122:22
133:6 212:1
217:17 242:8
259:13 284:17
293:13 299:3,11
304:11 312:8
313:6 317:11,19

322:7 323:24
338:9 344:2
**immediate** 9:16
229:15 328:18
366:6
**immediately** 48:22
153:10 351:2
**immunity** 221:2
221:23
**impact** 24:13
25:18 27:1 93:12
152:3,15,15 153:3
153:14 154:5,11
155:4,17,21 158:6
225:14 283:25
284:4 285:24
**impacted** 154:15
204:1 222:25
315:21 371:11,20
375:25 378:8
**impactful** 158:6
**impacting** 25:16
93:16 113:21
**impacts** 101:13
295:19,20
**implemented**
142:16 232:13
**important** 35:23
57:9,15 61:22
113:4 146:1
159:18 165:2
272:23 273:4
295:17 319:4
335:1,7,19 336:24
**improved** 142:10
**improvement** 51:1
51:4 268:1
**improvements**
266:25 267:6,24
**inaccurate** 123:10

**incarceration**
100:2
**incidences** 95:11
**incident** 96:5
171:4 175:16
180:4,6,6 321:3
322:18,25 327:11
328:12,20,25
329:6 382:8
**incidents** 170:8
321:21 323:9
**inclination** 153:11
**include** 32:6 87:22
88:5 129:20 145:2
175:18 177:13
180:13 183:18
280:17 324:15
325:22 326:3
334:19 335:25
372:6,7
**included** 50:25
57:13 143:16
156:20 321:19,22
322:2,19,21 323:1
387:13
**includes** 110:2
143:5 156:11
171:2 243:23
244:1
**including** 20:5
53:9 91:21 93:23
125:14 141:9
143:8 240:22
282:4,25
**inclusive** 332:19
**income** 361:20
369:7
**inconsistent** 130:9
**incorporated** 52:4
389:12

**increase** 106:4
129:17 151:1
152:24 162:3
183:23 187:8
248:1 341:10
348:4 364:14
**increased** 93:15
163:10 164:21
222:5 282:9,10,25
**increases** 126:5
184:14 185:4
295:14,15
**increasing** 347:23
348:8,18
**incredible** 162:24
**incredibly** 166:14
**independent** 23:11
**index** 6:1,5 7:1
10:1
**indicate** 162:5
180:22 181:1,3
**indicated** 174:21
176:25 354:15
**indicating** 387:13
**indicted** 304:2
**individual** 40:15
69:2 86:17 189:14
260:22 324:17
325:14 326:10
349:5 356:8,19
357:9,16 358:19
358:24 359:2
373:22
**individual's** 356:6
**individually** 260:6
**individuals** 29:8
32:15 35:15,16
45:9 54:18 127:4
151:6 164:20
181:7,12,13
188:17 301:19

303:1 315:3 316:5
347:4,7,11 349:1
351:23 368:16
372:11,15,18
375:11 378:15,16
379:22 380:2,23
**industry** 272:5
**inefficiencies**
146:4
**inefficient** 192:12
**influence** 335:15
**influences** 358:8
**influx** 92:4 162:20
**info** 347:18
**informal** 44:19
**information** 7:5
20:23 30:16 31:4
31:15 51:23 55:19
61:23 62:8 77:12
78:3,6 97:16 98:7
99:18 116:6 121:4
123:10 145:19
167:15 173:19
174:20 176:21
177:5,6,8,12
178:22 179:4,5,8
180:1,8,12,18
183:18 210:20
212:9 220:19
222:4,16 223:2
224:1 226:3
227:14 228:8
229:23 231:5
241:14 244:3
247:7 259:11,12
260:3 275:8
279:13,16 280:5
298:6 299:12,14
300:25 301:4,17
311:5 312:17,18
316:2,4,5 317:18

317:23 321:8
326:3,19,20
327:14 328:19
339:9 349:5 351:5
353:8 357:8
365:22 369:13
370:19 375:23
376:23 378:4,13
380:16
**informed** 152:9
375:13
**ingredient** 7:19
133:14
**initially** 56:12
356:14
**initiated** 144:20
273:4
**initiation** 82:10
**initiative** 99:19
**inn** 1:22
**input** 253:3
269:19 336:18
**ins** 43:7 92:6,8
124:20 192:13,20
193:11 373:7
**inside** 130:23
306:18 381:9
**insight** 321:13
**instance** 155:9
168:2 180:22
254:24 271:19
**instances** 153:12
153:13 154:6
245:11 303:9
361:10 374:15
**institute** 201:12
**instruct** 21:5,6
**instructional**
38:16
**instructions** 384:2
384:10

**instructs** 19:8
**insufficient** 251:17
**intended** 101:12
126:12 127:5
**intending** 125:23
126:23
**intensity** 70:12
119:19 120:6
**intensively** 224:21
**interact** 49:5
52:17 84:5,6
220:17 372:15
**interacting** 379:21
380:2
**interaction** 28:25
29:7,14 69:17
139:22 147:15,20
373:24 380:1
**interactions** 26:9
127:23 213:24
356:7 377:1
**interest** 8:10
234:14 353:5
367:7
**interested** 113:1
236:5 386:3
**interim** 48:23,24
**internally** 247:10
**international**
336:10
**internet** 23:12
43:14 290:23
358:4
**interrogations**
40:5
**interrogatories**
8:6,21 22:19
214:14 279:24
304:18
**interrogatory**
31:16 215:10

**interrupt** 349:17
**intersection** 55:10
**interview** 40:6
110:10 373:24
**interviewing**
350:19
**intimacy** 286:23
**intimate** 84:3
292:21 364:6
**intimately** 292:21
**introducing**
201:23
**introduction**
154:1 233:21
345:7,16,23 350:1
**introductory**
215:1,19 218:18
**inundation** 375:23
**invasions** 373:8
**investiga** 350:17
**investigate** 153:24
254:4 307:11,22
308:7,14 310:8
**investigated**
115:22 116:4,15
291:7 292:17
301:14,20 303:5
309:15 327:23
338:20,23 339:4
359:8 376:21
**investigates**
289:11
**investigating**
116:11,12 175:15
180:21 211:4,13
262:3 309:21
348:21
**investigation**
27:22 28:1,4
111:2,19 115:25
162:25 171:5

175:10 176:3
177:10 188:19
196:21 210:10
248:20,22,23
278:4 292:23
301:2 305:19
307:16,18 318:23
319:13 328:14,16
346:24 347:3,6,10
347:15 348:25
350:10,18,24
352:5,7,9 362:11
374:7 380:11
**investigations**
35:3 40:5 53:23
76:2 95:3 111:22
171:17 175:3
186:24 187:18,19
188:6,23 190:7
191:6,25 192:21
193:23 213:15
255:17,20,20
263:18,21 283:1
298:5 303:10
309:3 319:8 349:6
364:7
**investigative** 43:5
47:11 77:25 81:18
82:6 119:15
141:20 174:17
196:22 210:18
211:25,25 235:18
327:1
**investigator** 297:4
**investigators**
108:23 187:5
195:20
**invitation** 339:24
**invited** 9:4 28:12
28:16,20 339:13

**involve** 57:7
350:19
**involved** 26:22
49:22 94:11
106:11 112:10
113:8 115:17
149:1 150:13
165:9,21 166:11
175:19 178:6,7
180:11 181:9
195:3 206:1
209:14 212:7
219:11 220:23
221:4,11,12
242:13 249:6
261:15 281:19
292:22 298:5
308:17,20 309:9
319:14 346:12
356:20 380:1,7
**involvement** 49:14
49:16 113:23
136:18 149:11
151:23 207:8
291:3 333:25
339:2 363:10
379:21
**involving** 17:22
302:24 304:3
305:4 338:20
339:5
**ironically** 138:11
138:14,25 144:6
144:15
**irregularities**
76:10
**ish** 44:7
**issue** 9:1 24:23
27:1 50:19 60:16
61:22 96:12 99:19
99:21,22,23

100:14,18 101:12
102:12 114:9
123:15 158:14
163:11 187:24
208:5,5 226:18
248:16 267:4,20
270:18 288:16
315:15 330:5
331:5 342:14
351:18 356:1
364:17 369:2
370:2 371:15
**issued** 151:10
298:12
**issues** 29:1,10,15
34:19 56:23 60:21
93:20 95:14 114:6
209:7 239:4
254:25 285:20
319:4 363:17
**item** 50:25 79:19
**items** 43:18
195:13 196:12
198:15 268:7

**j**

**j** 1:25 385:6
386:14
**jail** 283:2
**james** 2:4 15:6
22:4 118:20
323:14
**janssen** 3:2 14:16
**january** 7:5,18 9:3
9:10 98:7 133:13
133:23 134:11
339:12 341:7
359:17,23
**jeff** 235:5,5,6,8
236:20
**jennifer** 2:11
14:11 16:14

**jim** 79:22,23 80:5
80:20 83:18,24
112:11 158:24
187:9 251:12
**jledlie** 2:7
**job** 37:5 41:21
42:13 43:3 44:11
44:12 46:14 48:4
72:7 76:4,21 82:5
85:5 97:23 113:2
113:20 135:14,15
178:21 332:21
**jobs** 37:7 146:5
**john** 4:19 15:3
236:1
**john.lombardo**
4:21
**johnson** 3:2,2
**join** 39:11
**joined** 39:15 300:9
**joining** 53:20
**joint** 235:12
**jones** 3:20 15:1
185:22
**jonesday.com**
3:23
**joseph** 257:7,10
259:8
**journal** 23:23 24:3
24:3
**jr** 305:6
**jsaulino** 2:13
**judge** 1:9 102:17
102:20,23 103:5
331:2
**judges** 100:19
**julie** 378:11
**july** 7:10 55:25
96:15 98:12 105:8
105:21 106:23
109:18 110:4

112:18 114:17
187:20,23 188:9
192:23 345:8,17
345:23 346:20,25
348:2,7,10,16,22
349:25 350:4
351:14,24 371:15
**jumped** 192:22
194:19
**jumping** 200:10
**june** 7:6,12 98:8
118:5,19,21
**jurisdiction** 54:18
165:7 203:20,21
204:15 205:5
212:3 225:15
**jurisdictional**
128:12
**jurisdictions**
229:2,25 272:8,10
309:9
**jury** 8:22 302:1
**justice** 9:13 57:21
128:13 362:22
**justifiable** 289:22
289:23
**justification** 138:5
**justifies** 250:23
**justify** 145:22
**juvenile** 47:16,16
**juveniles** 101:3

**k**

**k** 16:9
**k9** 9:16 366:7
367:7
**k9s** 9:17 366:8,24
367:8
**kec** 3:18
**keep** 55:12 97:22
101:25 116:8,10
117:19 120:4

156:25 168:1,4
178:25 223:16
245:19 298:11
327:13 331:10
360:10,17 381:12
**keeping**  96:23
251:1 362:2
**keeps**  96:19 97:8
**keith**  82:25 83:5
**ken**  137:20
**kenmore**  166:12
**kenneth**  1:17 6:7
7:23 14:4 15:20
15:25 16:9 137:11
269:6 331:19
368:5 375:7 385:9
387:8 388:4,9
389:4,13 390:20
**kept**  117:21 171:1
173:5,9 193:5,8
325:17 327:3,6,6
327:24 328:3
329:10
**key**  3:10 109:5
**kill**  152:8
**killed**  158:11
**kind**  16:25 20:22
20:23 21:1 28:4
33:7 39:17 44:19
48:23 49:17 50:20
53:16 63:14 66:12
69:20 71:15 78:12
82:16 83:3 84:20
93:24 94:11 95:14
107:17 114:7
115:19 116:7
131:8 150:3
159:14 168:2
180:1 182:10
183:11 186:8
188:18 193:13

194:20 204:10
246:1 249:12,19
264:9 270:14
291:6 292:9
293:24 308:23
309:2 322:18
326:12 335:15
342:22 346:16
350:13 362:11
370:8
**kinds**  57:22 60:2
164:14 182:18
183:10 255:1
270:24 299:7,7
300:14 375:12
381:12
**kirkland**  4:8
**kirkland.com**  4:11
**kits**  9:17 221:1,22
366:8,23 367:10
**knew**  54:22
131:13 218:1
237:22
**know**  16:6,25 18:1
18:16 20:25 22:20
23:5,20,24 24:11
24:12,13,16 25:2,6
26:21 27:15 28:11
28:15,19,24 30:15
30:18 31:14,19
32:13 33:20 35:20
38:13 42:5 45:4
48:14 50:14 52:10
53:15 54:13 55:5
56:6 57:19 58:1,4
58:5,11,18 59:14
59:15,22 60:16,17
60:23,24 61:1,22
62:5,6,13,15,20
63:1,23 66:5
67:12,15 68:9,11

68:25 69:5,10
71:6,8,14,20 72:1
72:17,19,20 73:25
74:16,16,20 75:13
75:24 76:3,5 77:4
77:18,21,23 78:4,9
78:15,18,23 79:1
79:10,11,15,17,18
79:24,25 80:2,5,5
80:7,20,22 81:2,13
81:17 82:4,7,13,17
82:23 83:5,22,22
85:21,22 86:15,20
87:5 89:11,17
91:16 92:18,22
93:17 94:8,9,13,21
94:22 95:4,22,23
96:4,8,22 97:8
102:4,5,22,25
103:2,11 104:18
104:18 106:23
108:20 112:4
113:14 114:4,19
115:11,15 116:8,9
116:19 117:15,18
117:24,24 119:12
119:24 121:7
122:21 124:13,23
125:3,18,19
128:23,24 131:1
133:7 135:11,17
135:21 140:7,10
141:1 143:10,12
143:13 144:5
147:1,17,21,25
148:2,4,20,21,23
149:21 150:9,14
150:18,21 151:24
152:4 153:4 154:5
156:8 157:8,15
158:9,13 159:4,7

159:15 162:17
163:7,20 164:4,18
165:16,22 166:8
166:17 167:21,24
167:24,25 168:4,6
168:11 170:10,12
170:22 171:11,25
172:2,19 173:5
174:7,9,15 175:7
175:22 177:10
178:1,5,8 180:8
181:7 185:8,12,17
185:21,22 189:9
189:16 190:23
192:22 194:14,15
195:17 196:7
202:6,8,11 203:2
204:8 205:6,11,12
205:16,20,24
206:6,13,16,19,19
206:20,25 207:3,5
208:12,22 209:21
211:9,23 213:16
213:22 215:4,8,10
215:16 216:4,9,11
216:13,14,18,20
216:23,25 217:4,7
217:12,20,23,25
218:2,8 220:2
221:6,18 223:24
225:10 228:3,7,11
228:24 230:11,12
230:12 231:2
234:24 237:10,12
238:1,11,13,19
241:2,3,5 242:6
243:3,10,12,13,15
243:16 244:6,10
244:13,21,24
248:1 249:1,1,11
249:20 250:18,23

**[know - leaders]**

Page 33

255:16,19 257:10
258:13,15,18
259:5,7,20,21
260:4 261:25
264:17,20 265:10
268:6 270:4
272:13 273:23
274:8,10,11,21
275:9,13,16,17
276:15,15 277:3
277:17,20,25
280:6,8 281:1,4,6
281:14,21 282:12
282:15,16 283:6
283:14 284:1,3,18
285:22 286:4,16
286:25 287:1
288:1,2,17,18
289:25 291:4
292:2,9,9 293:25
295:11,11,12
298:12 299:3,10
303:1,4,6,12,22
304:8,10,12
305:21,23 306:8
306:11,12,14,16
306:18,19,21,24
306:25 307:2,5,12
307:15 308:8,15
308:18,22 309:9
310:10,13,19,24
311:3,4,8 312:3,7
312:10,11,12,13
312:21,24 313:2,5
313:8,15,16,21
314:6,11 315:16
317:2,7,8,10,14,17
317:22,25 318:2,3
318:7,9,20 319:6
319:12,18 320:4
321:1 322:3,9,10

323:3,11,25 324:1
324:4,10,11,12,14
324:18,25 327:15
327:17,22,25
328:2,10,22 329:4
329:9 332:20
335:8,15,21 336:1
337:15,16 339:9
340:8,13 344:4,7
345:5 346:15
347:6,13 348:19
350:12,14,15
351:17,19,19
352:3 355:23
356:9,18 357:20
359:13 360:22
361:24 362:8
365:24 366:3
368:15 370:8,16
371:13 372:22
373:1,5,9 374:10
374:10 375:24
377:8,18,25 378:2
378:7,22 379:1,3,4
379:12,13 380:5
382:13,15,23
**knowing**  101:4
158:9 226:2,17
228:5 241:17
295:18 376:16
381:15
**knowledge**  31:13
32:8,16 77:19
84:3 88:24 129:2
208:23 224:5
285:14,15 286:14
287:15,18 298:21
298:25 303:8
316:19,23,24
338:19 357:12,13
357:15,22 358:6

358:11,18 368:9
369:23 381:3
**knowledgeable**
308:17
**known**  116:17
124:6 132:7
151:25 171:6
181:14 188:2
211:21,21 240:5
243:8 264:23
300:9 351:20
**kristen**  3:15
**kristin**  14:21

**l**

**l**  16:10,10
**l.p.**  1:12
**lab**  163:1
**labeled**  353:1
361:15 363:5
366:16
**labs**  163:4
**laced**  125:10
**lacing**  125:14
126:10,20
**lack**  171:13
356:15,16
**lakeside**  3:21
**lane**  356:3
**language**  271:5
**large**  32:18 165:3
194:13 209:12
225:1 278:13
284:24 315:15
318:25 349:13
364:21 371:2
376:3 377:18
378:15
**largely**  355:4,12
**larger**  25:10
277:10

**largest**  272:8
**lasalle**  4:9
**lasted**  249:4
**late**  48:8 92:3,10
92:10 107:21
127:21 183:22
186:1 324:8
**laughman**  305:7
**laundering**  166:18
**law**  16:14 25:13
40:6 62:5 71:1
84:13 86:2 122:1
122:14,17 125:9
128:12 132:6
150:5 151:22
158:7,13 195:23
196:6 201:24
203:17 210:22
211:3,17 253:8
282:2 298:18
315:16,22 316:1
333:22,23 336:12
336:13 342:4,14
365:3,25 368:20
370:1 375:22
**law.com**  3:18
**lawful**  15:20 89:20
89:24 92:25
**lawsuit**  24:9,16
209:18 210:16
252:24
**lawsuits**  84:25
**lawyers**  214:20
280:4 310:24
**layoffs**  267:13
**lead**  58:19 121:4
326:20 355:25
**leader**  340:19
**leaders**  276:17,24
333:17,17 377:24
378:6

Veritext Legal Solutions

www.veritext.com

888-391-3376

**leadership** 38:7
151:14 157:5
185:3
**leading** 195:5
237:23 370:15
**learn** 370:5 378:18
**learned** 91:25
196:21 304:6
358:17 369:13
370:11 376:2
378:3
**learning** 358:7
**leave** 48:12 294:14
**led** 24:24 301:2
358:19,24 359:2
**ledlie** 2:4 6:10
15:6,6 21:5 26:4
29:24 31:17 65:13
66:25 68:16 69:8
72:6,10,22 88:8
90:1,10,24 91:8,14
94:1,5 95:18 98:1
98:21 99:6 101:20
102:4,22 103:1,7
103:10,21 104:4,8
104:17,23 105:4
108:2,18 109:13
114:11,21 115:23
117:7 122:10
123:17 124:9
125:1,5 126:1,7,14
126:25 127:7,14
130:19 131:15,22
132:9 133:4
134:14 139:8
149:13 150:24
155:5,11,22 157:2
157:24 159:2
161:14,21 162:14
164:3 174:3,6
185:5 186:10

187:25 195:16
198:25 199:6,10
199:13,17,22
200:4,10,13,18
205:9 207:20,22
208:9 209:4,9,19
210:11 211:14
212:10,14,19,22
213:2,5,9 216:12
217:24 218:5
224:9,22 226:6
227:21,25 228:19
228:22 231:1
233:25 234:2
238:9,24 239:12
239:23 241:10
244:8 245:22
248:8 252:21
255:13 259:10
265:1,13 283:10
285:2,18 287:13
287:24 288:5,13
292:1 293:12
294:3,15,20,23
295:2,10 296:7,13
296:20 297:22
298:3,24 299:9,20
307:1,24 310:2
311:2,18 312:6
313:14 314:1
315:12 316:7,15
316:18,22 317:5
318:5,13 322:20
323:2,23 324:24
325:19 328:1
329:22 330:19
331:17 337:1
339:8 346:4 349:9
351:15 352:1,6
355:14 358:1
359:4,11 364:4

367:11,18,21
368:6 375:2 376:9
376:17 377:3,6
380:3,19 381:1,6
381:16 382:21
383:2,4
**leeser** 70:2
**left** 53:15 136:22
218:21 363:14
**legal** 5:12 26:24
57:13 88:13
288:21 289:12
293:1,5 333:21
356:23 369:22
378:25 380:15,25
382:18 387:1
390:1
**leonard** 35:1 75:9
75:11 76:19 77:7
77:15 109:2 214:7
262:4,6,8,22 265:9
266:6,13 293:17
293:17 304:11
306:20,21 313:4
314:7
**leonard's** 264:19
**lessened** 248:14
**lessening** 263:13
**letter** 387:19
**letters** 81:7
**level** 52:8 129:12
196:8,8 208:14
276:21 282:6
292:22 308:5,10
321:9 322:1
352:11,11,12
357:4
**levels** 53:7 157:1
282:9
**leverage** 283:17

**levy** 266:22
**lewis** 5:11
**lgates** 3:23
**licenses** 296:9,12
**licensing** 313:21
314:4
**lieutenant** 35:8,9
42:19 43:1 44:1
45:1,3 46:25
122:24 147:6,12
168:15,21,22
219:19 220:6
352:17
**lieutenants** 52:13
244:2
**life** 89:10 160:20
232:19 233:3
245:13
**lifestyle** 166:15
**limitations** 225:1
227:1
**limited** 116:1
198:20 225:9
228:4 280:17
282:4 283:1
293:24 313:12
334:24
**limits** 225:8
299:16,17
**line** 15:17 118:21
138:12 146:24
150:7 171:10
184:3,12 212:2
387:13 389:7
390:3
**lisa** 3:21 15:1,1
**list** 28:24 33:16
53:22 75:5 83:12
86:12 136:23
172:2 216:6,7
217:9 222:22

[list - mail] Page 35

223:9 280:10,11
280:15,18,21
282:21 307:3,7
309:21 310:7,19
310:25 311:16,19
332:2,18 343:25
**listed** 175:25
176:3,10,16
181:14 201:2
202:16,17 203:1
207:1 311:15
323:5 325:3,7
332:14 360:7
362:5 389:7,17
**listing** 389:7
**lists** 59:16 274:4
364:11
**literally** 288:8
295:23
**literature** 220:19
**litigation** 1:7 14:6
23:15 207:13,18
224:14 387:6
388:3 389:3
**little** 47:1 124:1
131:19 152:21,23
152:24 230:4
**live** 208:12
**lives** 27:2 233:9
239:11 371:12
**llc** 2:4 4:7 387:5
**llp** 3:3 4:3,8,13 5:4
**local** 23:23 24:5
28:8 92:6 120:18
212:4,5 276:11,21
282:5 309:8 331:1
**located** 246:16
309:10,11
**location** 116:22
204:12

**locations** 181:23
182:2
**logan** 5:5
**logical** 35:13
155:13 211:7
294:17
**logically** 92:14
**lombardo** 4:19 6:9
15:3,3 329:20
331:20 340:16
349:11 367:16,19
**long** 21:20 41:20
43:19,20 45:15
56:19 63:14,21
75:11,13 78:21
81:13,15 96:23
132:19,25 133:7
189:9,13 241:25
249:4 272:18
284:13 312:13,25
348:15 360:11
361:7
**longer** 63:18 80:25
**longest** 197:11
**look** 20:25 44:11
44:12 58:21 76:10
78:7 101:21
104:24 110:9
117:16 120:11
121:21 138:15
142:2 173:14
182:22 198:14
202:2 203:18
210:18,19 223:22
225:3,20 226:2
227:12 239:16
241:25 246:19,24
249:2,20 252:16
253:6,7 265:10
273:17,22,24
278:11 280:20

282:20 283:23
284:12 292:3
303:15,24 307:16
314:12 322:11
335:3 339:19
352:5,14 357:1
382:9
**looked** 30:19
59:16 114:1 148:1
167:7,7 170:25
214:6 318:12
342:10,12 356:12
**looking** 54:11
107:2 110:20
138:17 144:11
164:6 218:17
219:6 228:13,21
230:23 242:18
265:7,14 266:2
268:10 269:1
270:1 271:21
285:5 324:4
344:20
**looks** 25:8 50:15
139:4 211:20
213:23 215:15
226:22 235:4
237:7 240:8,12
242:19 256:19
270:10 349:11
366:15
**los** 4:21
**losses** 272:12
**lost** 85:19 276:20
**lot** 26:9 49:9 56:6
86:16 101:14
106:7 151:11
154:17 158:17
165:7 225:19
226:9,9 242:3
260:16 265:3

273:8 319:19
333:24 336:8,18
354:9,11,12
355:25 368:14
378:3 380:6
**lots** 358:7
**loved** 26:20 27:3
153:6 356:11
**low** 47:4 369:7,7
**lower** 157:1
339:19 351:6
363:14
**lunch** 103:9
104:13 169:2,10
**luncheon** 102:14
102:14 169:5
**lunches** 139:24
143:17

---

**m**

**ma'am** 200:5
**madam** 387:10
**mail** 7:3,10,12,22
8:1,9,11,23 9:3,5,7
73:7,19,20,23
103:13 109:18
110:1 118:5,14,17
118:18 137:10,18
171:17,18 177:23
197:19 198:1,6,22
199:25 200:2
234:13,21,22,22
235:1,4,22,25
236:11,21 240:8
242:18 255:24
256:8,16 258:20
320:15,22 322:13
339:12,20 343:3
343:12,14,19,24
343:25 344:6,22
345:15 352:20
353:1 360:23,24

**mailed** 172:15 236:2

**mailing** 235:8,9

**mails** 22:16 103:19 110:13 172:23 243:14 320:25 339:19 343:10

**main** 3:4

**maintain** 252:4,5 267:12 277:6

**maintained** 76:10

**maintains** 171:15 306:16

**maintenance** 284:12

**major** 45:2 47:14 70:2 110:4 112:20 114:6,6,8,25 235:14,16 236:21 242:12 261:25 264:9 267:22 321:2,5,11

**majority** 232:25

**makers** 160:15

**makeup** 130:24

**making** 49:7,20 62:1 100:18 112:9 113:8 156:15,18 157:13 241:17 269:20 335:16 370:4,22

**malone** 36:24 39:2

**man** 47:2

**managed** 319:2,24

**management** 67:14 68:2 90:19 146:6 182:1 321:10

**manages** 34:10

**managing** 49:6

**mandated** 100:20

**mandates** 101:14 333:6,9

**mandatory** 101:5

**manifests** 292:5

**manually** 184:24 322:6

**manufactured** 24:20

**manufacturer** 217:1,3,13,17 297:21 359:10

**manufacturers** 28:11 29:1,20 86:18 211:5 216:7 298:22 309:10,13 316:12 317:2

**manufacturing** 163:12

**mapping** 179:3,20

**marathon** 19:13

**march** 8:11 137:19 255:24

**marijuana** 87:2 132:16 183:4

**mark** 82:25 97:9 97:18 99:3 101:18 101:19

**marked** 7:2 73:9 73:14 98:9 99:11 105:12 109:20,24 118:9,13 128:3,7 133:16,20 136:3,7 137:13,17 197:22 214:14,18 231:15 234:15,20 256:3,7 265:22 266:1 268:18,22 279:24 302:1 320:17,21 330:7,12 339:14

339:18 343:5,9 349:8 352:21,25 359:18,22 362:25 363:4 366:10,14

**market** 1:23

**marketed** 24:20 134:23

**marshals** 81:1,3

**match** 43:17

**matches** 50:15

**material** 23:19

**materials** 206:8

**matt** 14:24

**matter** 14:5 16:16 85:24 194:8 247:19 280:16

**matters** 17:21 52:12 353:4

**matthew** 4:3

**maximum** 220:5

**mayor** 35:20,25 36:6,7 48:10 49:25 50:3,3,6,13 52:1 71:17 146:21 146:21 147:9,11 147:14,24 148:7,7 148:16,22 149:1 231:20 232:23 233:16 252:10,13 257:1 271:20,23 377:18

**mayor's** 249:25 250:2

**mckesson** 2:9 14:12,14 16:16 216:16

**md** 1:8

**mdl** 1:7

**meadows** 82:25 83:5

**mean** 23:3 24:3 25:22 30:23 36:5 38:12,15 50:3,14 51:18 56:21 58:3 61:17 63:2 65:4 75:2 76:5 77:9 81:6,22 83:19 86:25 93:10 106:2 108:20 111:19 115:14 120:23 148:19 159:10 160:11 170:10,16 174:5 185:19 189:21,22 192:22 209:24 222:13,23 223:13 228:25 233:11 249:18 250:17 251:9 253:18 260:3 261:5 262:13 265:6 268:13 269:15 271:5 272:2 284:8,17 286:20 292:3 296:24 298:6,10 300:18 308:21 311:10 319:25 332:25 338:9 355:21 357:24 379:12 381:9

**means** 31:19 93:11 120:21 121:8 204:4 230:16 292:14 306:8 337:2

**meant** 23:9

**measure** 154:11

**media** 7:17 8:7 133:12,22 135:6 151:13 231:13,19 231:22 232:3,17

[media - misrepresenting]                                                  Page 37

232:22 247:1
319:16 353:4,11
353:15,22 358:4
**medic** 92:19
**medical** 89:4 91:6
245:2 254:25
289:22,23 297:15
338:22 339:7
342:23
**medically** 358:21
**medication** 26:24
26:25 35:2 76:2
217:18 378:25
**medications** 19:22
27:6,23 28:12,16
29:9 185:13 211:6
289:12
**medicine** 305:12
338:24
**medicines** 76:12
**meet** 52:10 70:5
70:20 139:25
**meeting** 9:4 21:13
49:4 69:20,23
70:1 102:15,18
158:21,24 159:20
160:21 165:24
201:17 219:6
243:5,11,19,23
244:4 319:17
330:25 339:14
340:1,3,6,7,12
359:24 360:4,5,25
361:4 376:11
377:9,10,13,18
378:1 379:2,15
**meetings** 21:19
22:23 25:6,11
26:2,10 28:6,8,13
28:17,21 29:23
49:19,22 70:22,24

94:12 95:13
112:11 151:14
158:4,16,18
159:13,24,25
160:5,10,17 161:3
161:9 202:23
203:22 240:20
243:19 244:7,11
286:15 360:10
368:17 378:5,9,20
**melissa** 235:9
**member** 81:19
82:7 201:2 202:16
**members** 52:22
83:1 84:1 112:2
190:1 195:7
198:15,17 260:21
308:8 344:17
**membership**
336:4
**memo** 326:12
**memorize** 217:8
**memorized** 275:8
**memory** 188:4
**mental** 8:13 256:2
256:22 257:20
259:21
**mention** 60:1
153:1 264:14
324:15
**mentioned** 20:21
22:11 28:7 30:3
47:18 61:9,14
66:10,20 67:11
71:19 74:2 75:8
91:20 108:6
127:20 161:25
164:13,14 177:1,6
179:16 183:21
187:14 208:16
219:2 251:11

252:15 275:14,19
278:19 279:7
281:17 289:1
309:1 312:16
329:2 332:5,9
334:10 337:8
342:2 375:9 381:7
382:7
**mentions** 341:2
**mess** 71:14
**message** 240:3
**messaging** 351:3
**met** 20:2 25:15
128:25 159:7,7
184:9 202:7,8
**meth** 87:13 125:11
151:1 162:1,4,6,12
162:20,22,25
163:12,20 164:1
183:5 255:1 286:8
**methadone** 129:21
**methamphetamine**
132:16 364:17
**mexican** 120:17
122:2
**mexico** 121:6
285:20 286:2,7,9
286:11,12
**michael** 7:3 73:7
74:2
**michigan** 291:22
**microphone** 75:18
**mid** 42:8 47:4
161:6
**middle** 138:12
167:1,2 215:21
256:8 306:1
343:15
**midnight** 42:1,16
44:5,9,13 45:2,16
46:14 160:12

184:4 265:2
**midnights** 42:24
92:2
**midway** 138:9
**midwest** 387:17
390:1
**mike** 35:5 74:6
78:1,19 79:4
195:4 197:9
**mill** 290:15 296:16
314:23
**million** 266:20,21
266:24 267:2,3,5
267:19 276:19
277:9,14
**mills** 290:12 295:8
**mind** 22:13 83:25
132:17,18 165:2
194:23 222:19
253:14
**mine** 123:24
**minimize** 219:23
**minimized** 192:19
**minimum** 192:13
249:23
**ministry** 89:12
**minute** 198:18
219:3 367:16
**minutes** 9:10
63:17,18 331:24
359:17,23 360:4
360:10,14,18,24
361:14
**miranda** 4:14
14:18
**misdemeanor**
100:24 101:5
**misrepresent**
211:18
**misrepresenting**
290:2

missed  63:11
85:20 264:11
missing  54:22
misspeak  223:24
misstates  95:20
377:6
misunderstood
204:2
mix  161:13,18
mixed  134:3
mixtures  152:10
model  40:25
module  58:6
modules  334:18
336:22
mold  38:3
moment  28:7
110:6 242:22
297:11 332:22
moments  233:1
momentum
154:13
monday  232:11
money  68:4 100:5
156:12 166:18
196:3 220:23
221:7 223:6
229:16 230:8,10
260:17 266:17
267:20,23,25
276:11,25 277:21
278:16,24 281:22
282:12 366:20
374:2
monies  51:1 100:2
206:4 270:20
274:18 275:15
277:23 278:5
monitor  306:2
month  55:12 97:7
105:25 106:9

107:5,7,7 115:16
140:21 145:1
166:20 181:22
189:25 247:21,22
248:19
monthly  102:14
143:14 181:22
months  152:25
246:25 247:6
249:17
morgan  5:11
morning  16:2,3
20:5,7,16 23:7
42:17 44:18
158:21 160:23
169:15 187:14
243:23 244:4,7
326:17 362:12
morphine  86:15
92:19,20 111:12
129:20 297:2,9
332:25
morphing  83:3
motivate  289:20
motivated  373:3
motley  2:4 15:7
387:5
motleyrice.com
2:7,8
move  80:15 112:5
165:15 193:19
225:8 227:10
257:7 350:24
369:20 376:4
moved  378:17
movie  92:19
mpetersen  4:16
msn  23:21
mt  2:6
mullins  235:5,5,6
235:8 236:1,18,19

240:8,25
multi  128:12
309:9
multifaceted
152:17
multiple  106:18
115:15 182:24
238:12 239:2
248:19 275:4
municipalities
25:17 101:16
municipality
101:17 209:13
muscle  297:2
mute  322:23

**n**

n  3:10 16:9,9,11
16:12
n.d.  1:13
naloxone  232:7
281:12
name  16:5,14
33:20 82:3 116:19
117:13,15,16,18
128:24,25 170:23
177:14,15 189:2,5
194:25 216:13
300:11 312:21
327:6 366:16
374:18 382:6
387:6 388:3,4,15
389:3,4,21
named  65:11
202:22 305:13
315:6 357:10,16
358:11,22 385:9
names  75:5 81:24
81:25 83:25 117:5
164:23,24 167:4
167:15 197:12
216:14,21 217:8

262:15 289:25
305:5 327:11
narcan  8:10 9:17
58:12 61:9 62:10
153:1,2,3,6,13,18
155:19 156:4,5
221:1,22 228:25
229:1,7,9 230:1
231:8 232:9,15,19
233:8,13,14
234:14 236:3,6
237:9,12,13 238:5
239:7 241:6,8,21
246:23 247:15
281:12 334:11
366:7,20,23 367:9
narcaned  153:9
narcotic  253:24
narcotics  32:22,23
34:22,25 35:6,7,9
47:19,20 48:2
71:21 74:8,8 79:5
79:18 80:8,10,14
80:16,18,23 83:23
111:20,21 129:16
130:3 167:17,19
180:19,21 186:22
186:23 190:20
191:3,5 192:1,2,2
192:3,18 193:11
193:14,22 197:11
197:12 213:23
219:20 243:21
251:3,5,13,14,22
253:15,18,18
260:21 262:21
263:1,10,11,12,15
263:19 264:2
292:21,22 319:7
328:5,6,6

**narrative** 325:23 326:2,7,15 382:8
**narrow** 315:18
**national** 1:7 14:5 28:19 29:14 38:10 196:8 387:6 388:3 389:3
**nationally** 225:18
**natko** 257:8,10 259:8
**natural** 131:22 211:10
**nature** 65:11 257:19 363:22
**navigated** 163:20
**neal** 256:16,25
**near** 46:10
**nearly** 193:12
**necessarily** 259:5 326:3
**necessary** 93:1 192:22 210:13 219:24 229:12 238:3 242:1 244:16,20,23 246:1 251:18
**necessities** 69:4
**need** 18:25 19:13 49:24 56:2 58:9 101:25 103:1 105:11,13 158:8 200:14 203:11 214:1 227:2 237:25 241:8 246:18 249:7 272:21 308:19 310:14 314:15 333:21 335:22
**needed** 248:5
**needing** 309:14

**needles** 350:22
**needs** 49:4 230:16 253:5 299:6 310:15
**negative** 93:12 295:19
**neighborhood** 182:4 219:21,24 261:11 272:22 321:12 370:8
**never** 28:3 85:1,2 92:1 123:24 126:12 127:5 172:20 232:6 271:1,2,6 288:3,8 288:8 292:20 311:14 337:24 338:2,4
**new** 53:24,24 60:17 120:14 142:9 170:23 191:11,13 229:9 249:6 267:9 268:3 268:5 335:21
**news** 23:23 134:1 151:13 349:22
**newspaper** 165:25
**nice** 112:11 118:20 156:18 157:3,11 157:22 158:3,24 187:9,11 190:6 240:22,22 242:11 344:21 351:7
**nice's** 240:2,6
**nicer** 152:23
**nicholas** 5:4 15:14
**nico** 9:8 352:20 353:24 355:4
**night** 160:24
**nights** 63:7

**nimbly** 227:10
**nine** 246:25 247:5
**nodding** 22:2 61:11 84:17 164:16 191:16 275:21 312:20 320:10
**non** 8:12 86:7 88:5 89:23 90:8,14 93:24 109:4,10 125:14 230:19 255:25 256:21 257:17 284:25 289:22 336:13
**nope** 200:20
**normal** 19:8 36:8 38:19 211:10 328:20
**normally** 106:24 325:2
**north** 3:4,17 4:9 165:6
**northeast** 134:5 134:11
**northeastern** 201:24
**northern** 1:2 14:7 71:1 81:4,4 149:19,21
**northwest** 2:12,17 3:16 4:14
**notarized** 387:14
**notary** 385:6 386:14 387:25 388:10,18 389:15 389:23 390:23
**note** 173:11 387:12
**notebook** 216:19
**notes** 8:2 173:17 174:18 197:20

198:11 243:11 331:12 367:17
**notice** 96:6,8,10 98:21
**noticed** 107:21
**nouse** 236:1
**november** 1:18 8:9 14:2 173:13 177:22 178:2,7 234:13 235:2 236:11,20 238:7 386:8 387:4
**nr** 275:14
**nrodriguez** 5:7
**nrt** 220:6 275:14
**nrts** 261:8,10
**nuisance** 182:3
**number** 7:2 27:9 32:14 33:1 38:17 47:4 53:7 54:14 54:17 55:5 56:21 94:17 95:16 104:10 114:14 124:22 125:8 127:22 135:21,23 138:14,25 139:6 140:5,9,23 143:12 144:15,19,24 148:20 154:23 165:8 166:2,3 173:14,16,20 174:10,10 187:16 192:20,21 195:22 207:2 210:4 222:12,19 233:15 248:1 249:13 250:19 251:7,21 255:11,12 258:10 258:12 267:16 284:20 289:7 302:21 309:7

| | | | |
|---|---|---|---|
| 327:7 340:15<br>343:10 364:19<br>370:6 371:2 372:8<br>376:3 378:15<br>387:7,13<br>**numbers** 53:25<br>95:25 96:19 107:4<br>114:15 136:22<br>139:17 140:2,10<br>141:5,6 143:2,9,15<br>143:16,16,25<br>146:1,24 147:4<br>148:2 162:17<br>164:6 170:15<br>171:1 223:5<br>249:23 250:22<br>251:17 258:17,18<br>260:13 263:13<br>272:5 273:5 281:6<br>318:12 327:11,11<br>369:19 389:7<br>**numerous** 134:20<br>**nurse** 300:14<br><br>**o**<br><br>**oath** 18:6,7<br>**object** 10:2,3,3,4,4<br>10:5,5,6,6,7,7,8,8<br>10:9,9,10,10,11,11<br>10:12,12,13,13,14<br>10:14,15,15,16,16<br>10:17,17,18,18,19<br>10:19,19,20,20,21,21<br>10:22,23,23,24,24<br>10:25 11:1,1,2,2,3<br>11:3,4,4,5,5,6,6,7<br>11:7,8,8,9,9,10,10<br>11:11,11,12,12,13<br>11:13,14,14,15,16<br>11:16,17,17,19,19<br>11:20,20,21,21,22<br>11:22,25 12:1,1,2 | 12:2,3,3,4,4,5,5,6<br>12:6,7,7,8,8,9,9,10<br>12:10,11,11,12,12<br>12:13,13,14,14,15<br>12:16,16,17,17,18<br>12:18,19,19,20,20<br>12:21,21,22,22,23<br>12:23,24,25 13:1,1<br>13:2,2,3,3,4,4,5,5<br>13:6,6,7,7,8,8,9,9<br>13:10,10,11,11,12<br>13:12,13 29:24<br>31:17 65:13 66:25<br>68:16 69:8 88:8<br>90:1,10,24 91:8,14<br>94:1,5 95:18,19<br>103:7,21 108:2,18<br>109:13 114:11,21<br>115:23 117:7<br>122:10 123:17<br>124:9 125:1,5<br>126:1,7,14,25<br>127:7,14 130:19<br>131:15 132:9<br>133:4 139:8<br>149:13 150:24<br>155:5,11,22 157:2<br>157:24 159:2<br>161:14,21 162:14<br>164:3 185:5<br>186:10 187:25<br>195:16 205:9<br>207:20,22 208:9<br>209:4,9,19 210:11<br>211:14 212:10,14<br>216:12 217:24<br>218:5 224:9,22<br>226:6 227:21,25<br>228:19,22 229:16<br>233:25 238:9,24<br>239:12,23 241:10 | 244:8 245:22<br>252:21 255:13<br>259:10 265:1<br>283:10 285:2,18<br>287:13,24 288:13<br>292:1 293:12<br>294:3,15,20,23<br>295:2,10 296:7,13<br>296:20 297:22<br>298:3,24 299:9<br>307:1,24 310:2<br>311:2,18 312:6<br>313:14 314:1<br>315:12 316:7,15<br>316:18,22 317:5<br>318:5,13 322:20<br>323:2,23 324:24<br>325:19 330:19<br>331:17 337:1<br>339:8 346:4<br>351:15 352:1,6<br>355:14 358:1<br>359:4,11 364:4<br>367:11 369:15<br>370:14 371:6<br>374:8 376:9,17<br>377:3 380:3,19<br>381:1,6,16 382:21<br>**objected** 296:25<br>**objection** 10:1,22<br>11:15,18,18,23,23<br>11:24,24 12:15,24<br>134:14 226:19<br>231:1 233:10<br>246:10 248:8<br>249:8 252:2 311:7<br>328:1<br>**objections** 8:5,20<br>19:6 214:12<br>279:22 305:1 | **obligated** 18:8<br>**obligations** 306:2<br>**observed** 364:15<br>**obtainable** 91:13<br>**obvious** 357:7<br>**obviously** 24:12<br>50:15 67:12 73:25<br>114:23 153:2,22<br>203:21 238:15<br>248:15 261:5<br>268:14 277:4<br>320:6 330:22<br>335:17<br>**occasion** 77:10<br>85:21 106:13,16<br>288:14<br>**occasions** 20:3<br>70:19 85:23<br>103:14 229:7<br>233:15 314:8<br>353:16,17<br>**occur** 126:20<br>317:12 373:4<br>**occurred** 203:20<br>303:10 321:14<br>340:7 345:8,17<br>361:19<br>**occurring** 192:15<br>**occurs** 126:10<br>172:10<br>**october** 8:1 97:7<br>169:17 174:9<br>197:19 198:10,12<br>201:17 305:8<br>**od** 236:7<br>**odd** 297:10<br>**offenders** 9:2<br>330:7 331:6<br>**offense** 262:13<br>339:1 |

**offenses** 65:6
100:21,22 373:20
**offered** 237:18
**offering** 163:21
237:8,13 367:9
**office** 9:13 34:9,10
34:17 48:19 50:13
51:20 52:21 53:3
76:16 122:25
128:17 130:13
141:17 154:16
179:11,17 189:21
202:25 235:12
244:2 249:25
250:2 279:6,10
281:9 303:20
309:18 326:16
333:20 339:25
362:21 386:6
**officer** 25:5 37:25
38:20 39:23 40:3
40:14 41:18,19,20
44:17 53:14 55:9
55:13,17,21 75:3,9
75:11,12 76:19,23
77:7 78:5 83:17
84:16 88:24 106:1
113:9 139:18
143:21 144:20,23
145:3 146:5
175:15 189:22
219:14,14 236:1
244:4 259:23
262:6 297:4 353:9
373:25 377:2,11
379:25
**officers** 40:18
44:23,24 46:19
47:5,21 53:10,19
54:21 55:1,2,3,24
58:9,13,17,20,23

60:9 61:4,23
62:10 63:6,12,21
64:23 65:16,19,22
65:25 66:3,9,14,16
66:23 67:4,8
68:25 80:14 83:14
113:18 124:15
145:25 148:9,11
160:14 180:11
182:4,5 184:5
187:16 189:17,20
190:22,23 192:17
193:5,8,10,16,18
194:20 197:8,13
206:1 214:2,3
219:11,21,25
220:6 229:10,20
233:2,7,13,14
236:4,6 241:20
242:2 245:9
246:15,22 250:7
250:12,14 251:1,9
252:1 260:22
261:13 263:3,16
264:5 272:21,25
275:23 277:7
278:20 281:11
286:21 311:1
312:25 321:12,13
333:7,8 334:20
335:8 336:25
337:6 342:15
350:15 369:3
371:21,25 372:3
372:14,19 374:12
379:21 380:8
**offices** 377:21
**official** 388:15
389:21
**officials** 122:1,15
122:18 227:18,19

228:18
**oftentimes** 67:24
373:19
**oh** 8:8 43:9 72:23
75:19 153:1
160:25 164:19
177:2 231:14
261:12 264:18
318:19 367:18
**ohio** 1:2,12,13,23
3:5,11,17,22 8:4
8:17,19 9:12 14:8
16:12 24:13 39:22
40:14,16 70:11
71:1 81:4,4 99:20
99:24 102:6 104:9
119:18 120:6,15
121:25 128:15
134:5,11 149:19
149:21,22 151:2
163:13 180:6
183:2,3 201:24
204:15 214:11
225:18 268:18
272:8 278:19,20
278:24 279:21
291:22 306:6
312:17 313:21
330:17,23 333:6,7
333:8 336:1,11
339:25 340:23
362:20 385:2,7
386:7,15 387:2
**oibrs** 180:5
**okay** 15:18 17:12
17:18 18:1 19:10
19:11,19,20,25
20:13,14 21:18
22:3,22 23:10
24:2 25:25 26:2,7
26:19 27:4 28:3

28:10,23 29:13,18
31:11,21 32:2
34:2 35:11,19
38:1,4,11 40:22
41:16,20 42:6,13
42:18 43:11,19,21
43:24 44:3,9,15
45:8 46:17 47:9
51:15 52:24 53:8
53:17 54:10,25
59:2,18 60:4,12,20
61:9,14 65:9
68:22 70:25 72:9
74:1,22 75:4 77:1
85:12,25 86:2,6,23
88:4,15,20 89:19
97:9,18,20,25 98:3
98:14,18 99:3,5,14
100:11 102:3
103:24 104:2,6,11
105:1,17,20
107:14,24 110:15
110:23,24 111:14
112:6,17 113:22
118:24 119:12,16
121:7,13,16,16,19
121:21 122:6,13
123:9 124:23
127:3 129:8,23
130:2,7,9,16
131:12,24 134:17
135:4 136:13,17
137:7 138:1,24
139:4,11 140:15
140:19 141:3,14
142:4 143:1,8
144:2,5,17 145:4
145:17 146:8
147:22 148:12
149:10,23 152:18
153:15 154:18,20

| | | | |
|---|---|---|---|
| 155:2,8 156:6 | 244:13 246:24 | 367:19,24 369:11 | **opinion**  50:24 51:3 |
| 157:10,20 158:15 | 247:5 250:13 | 370:16 371:18 | 127:18 227:23 |
| 159:23 160:4,7 | 251:25 254:17 | 372:3,10 376:1,15 | 334:5 |
| 161:1,9,17 162:5,9 | 255:10 256:11,14 | 377:15 378:12 | **opinions**  102:11 |
| 164:11,19 165:19 | 256:19,23 257:4 | 379:10,17 382:1 | **opioid**  8:1,13 |
| 166:1,9 167:6,10 | 257:14 258:6,9,13 | 382:10,24 383:1 | 17:22 23:15 24:14 |
| 167:12 168:9,13 | 258:23 259:5,16 | **old**  335:21 | 25:22 26:1 29:1 |
| 168:17,23,25 | 260:11,20,25 | **once**  203:6 232:12 | 29:10,15 45:10 |
| 169:19,23 170:7 | 262:1,11,16 263:2 | 294:19 | 60:20 71:23 72:15 |
| 170:19 171:12,19 | 263:8,20 264:1,4,7 | **ones**  64:15 117:2 | 86:4,7,7,24 93:6,6 |
| 171:24 172:22 | 264:14,20 265:6 | 153:7 171:17 | 93:22,22 95:9 |
| 173:25 175:4,6,24 | 266:7,12,15 268:6 | 197:10 263:11 | 107:25 109:6,9 |
| 176:19,24 177:4 | 268:12 269:14,17 | 285:22,23 332:20 | 125:14 126:13,24 |
| 177:15 178:1,5 | 270:1,13,21 271:8 | 342:1 | 127:5,11,13,18 |
| 180:16 181:18 | 271:18,25 273:13 | **online**  38:23 | 158:5 161:19 |
| 182:9,13 183:8,10 | 273:15 274:18 | 165:25 | 175:3 186:24 |
| 183:17 186:3 | 276:13 277:21 | **op**  1:13 | 187:6 188:6,18 |
| 187:11 188:13 | 279:7,17 280:9,14 | **opana**  303:19 | 191:6,24 195:19 |
| 190:2,9,15,18,21 | 280:20 281:21,25 | 304:4 | 197:19 198:11,16 |
| 191:4,10,14,19 | 282:20 284:21 | **open**  23:20 | 198:24 200:3 |
| 193:7,25 194:7 | 285:5,10,15 | **operate**  225:8 | 201:1 202:16 |
| 196:17 197:14,16 | 288:22 290:17 | 254:14 374:22 | 208:25 210:2,6 |
| 198:8,13,18,23 | 292:19 295:22 | **operating**  308:9 | 215:25 218:12 |
| 200:24 201:7,13 | 297:5 300:13 | 365:5 366:2 | 219:1 224:20 |
| 201:16 202:6,10 | 301:8,11 302:6,17 | **operational** | 227:19 248:5 |
| 202:15 203:5,9 | 303:24 304:14,19 | 245:19 | 249:10 250:1,25 |
| 204:7,14,24 205:6 | 304:20,22 305:18 | **operations**  44:20 | 255:11,12 256:1 |
| 205:12,22 206:16 | 305:24 306:8 | 141:17 142:8 | 256:22 257:19,25 |
| 207:5 212:25 | 309:20 311:25 | **operator**  38:3 | 259:25 260:18,23 |
| 213:3 215:6,14,17 | 312:16,24 313:11 | **opiate**  1:7 9:4 14:6 | 264:12 275:10 |
| 216:9,17,20,25 | 315:25 320:3,3,9 | 71:10 142:15 | 282:3,7 283:3,25 |
| 217:10 218:2,9,23 | 321:18 322:9,24 | 143:5,8 317:14 | 284:4,25 315:11 |
| 219:1,8 220:8,22 | 324:3,7,11,13,20 | 338:22 339:14 | 317:4 337:9,13 |
| 221:6,10,19 222:5 | 325:1,8 326:6,9 | 340:1,22 370:13 | 338:21 339:6 |
| 222:21 223:17 | 327:3 329:12,16 | 374:16 387:6 | 356:24 357:11,17 |
| 224:18 226:14 | 329:19 334:17 | 388:3 389:3 | 358:13 369:2,12 |
| 231:8 232:3 | 337:3,21 338:15 | **opiates**  89:15 | 370:13 371:19,22 |
| 234:25 235:21,25 | 341:5,13,16,23 | 341:15,19,24 | 375:24 381:20,23 |
| 237:3 238:5 239:5 | 343:13,21 344:5 | 347:12 349:3 | **opioids**  24:17 39:5 |
| 240:12 241:6,12 | 348:15 355:3 | 351:25 371:3 | 41:11,12 57:25 |
| 242:15 243:10 | 361:13 363:15 | 372:16 374:6 | 58:19 59:4,7 |

[opioids - page]                                                                            Page 43

82:14 86:11 87:16
87:19,19,22 88:5
89:8,20,23 90:9,15
91:3,6,12,17,20,21
91:23 92:12,18
93:1,23 109:5,10
109:11 122:8
123:16 124:7
126:12 132:12
164:1,4 168:3
186:5,9,15 188:20
195:14 207:14
251:23,25 253:19
254:22 255:6,8,17
261:3,20 263:6
282:5 285:1
287:23 288:12
289:4 291:11
292:25 293:4
305:10 306:5
307:9 318:4 332:2
332:3,13 334:10
334:15 337:4
355:1 356:24
358:20 368:9
369:14,14 374:20
374:23 375:12
379:22 380:2
opota 39:18 40:12
40:14 62:6 278:19
opportunities
151:25 152:16
195:23 230:13
opportunity 152:1
331:23
opposed 109:10
250:8
options 151:20
order 40:16
102:11 160:12
221:11,12 311:8

312:4 327:5
orderings 295:15
orders 306:3,5
307:9 309:22
ordinary 360:15
org 71:12
organization 9:17
102:24 121:9,11
121:12 157:17
158:7 253:12
366:9 367:9
organizationally
113:19 273:7
organizations
25:16 74:24 122:3
291:11
organized 325:25
original 261:7
345:15
originally 36:13
190:11 375:13
originated 351:14
orrand 195:5
outcome 146:25
outlets 23:23
outside 22:23
26:10 32:13 41:2
49:7 80:16 192:16
194:14 196:4,12
196:19 227:8,22
227:22 230:16
275:25 299:18
369:1 377:1
outweigh 91:7
overall 147:4
255:12
overdose 7:5,7
93:18 95:3 96:20
98:6 99:2,9
106:16 107:4,12
107:13 114:14,15

116:10 117:5,19
126:6,11 169:21
170:1,21 171:16
175:3,10 180:23
181:5 182:16
187:6 188:22
192:9 193:15
195:20 203:19,19
229:6 247:21
261:15 263:17,21
322:16 323:10,11
325:6 339:4 342:7
342:16,23 345:9
345:18 346:3,3,9
346:25 347:23
348:4,9,18 354:16
354:24,25 355:18
356:22 368:21
372:20 373:17
380:10,11,11
overdosed 220:18
349:2 351:24
overdoses 93:19
94:16 96:19 99:2
107:4 111:6,7
114:14 115:6
149:19 153:17
158:10 164:7
169:22,23 170:9
183:19 192:15
203:19 219:16
220:14 222:6
236:5 248:2 255:4
259:25 280:24
304:6 323:4,22
325:12,13 341:18
346:24 349:24
350:6,11
overdosing 127:5
358:25

overflow 262:20
overlap 65:3,7
67:5 89:13 193:13
oversee 49:3
overseer 49:17
oversees 33:14
74:7 222:15
oversight 46:20
overtime 67:17
192:14 206:3
219:23 275:24
overwhelm 26:14
overwhelmed
158:9
overwhelming
101:16
owner 179:6
owners 314:23
oxy 183:23 291:17
oxycodone 86:15
120:16 121:3
303:19 332:16
337:14,15
oxycontin 86:14
88:2 92:1,5,6
107:22 129:20
185:9,10 303:19
304:4 332:16

p

p.m. 41:23 169:4,7
213:7,12 234:7,10
299:24 300:2
330:2 368:1,4
383:7,8
packages 366:24
packet 99:17
page 9:14 10:2
23:21 105:16
110:20,20 119:17
120:8,13 121:22
121:23 129:9,24

[page - pay]

Page 44

134:18 136:21,24
138:9 198:1 215:1
215:19,20 218:10
223:9,20 256:9,9
266:2 269:2
273:24 280:10
281:25 282:1,22
302:17 303:25
304:20,24 305:24
306:1 314:13,14
322:12,12 339:20
340:17 343:12,15
343:17,18,20,21
343:22 344:19,19
345:13,14 349:23
351:7 353:1
361:14 362:23
363:13,14 364:18
364:22 366:15
387:13,15 389:7
390:3
**pages** 182:25,25
182:25 214:25
224:15,15 270:3
272:18
**paid** 63:1 172:20
192:14 196:23
283:20
**pain** 90:19 92:17
93:1 129:16 130:3
337:9 338:7,16
**painkiller** 89:10
**painkillers** 86:15
**palmer** 79:22,23
80:6 83:18,24
251:12
**palmer's** 80:20
**pam** 33:11 327:18
**paolino** 361:17
**paper** 24:5 165:13
300:23 361:2,3

**paperwork** 139:19
143:19
**parade** 55:9
**paragraph** 115:7
121:23 138:10,13
142:21 145:6
232:18 302:16,19
303:15,24 304:23
306:1 347:16,17
347:21 364:21
**paragraphs** 350:4
**paraphernalia**
350:23 373:23
**parent** 207:17
**park** 142:17
**parole** 326:19
**parsed** 101:2
**part** 36:25 53:4
89:13,13 99:17
105:12 146:15
152:12 153:16
156:10,15 157:7
232:19 237:16,21
242:9 243:5,9
249:21 267:7
277:7 315:24
333:10 335:5
356:2 365:12
373:21,23 374:6
377:19 389:9
**participants**
283:13
**participate** 28:13
28:17,20 68:25
71:4,9 72:13
222:21 326:11
336:8
**participated** 61:6
64:9 222:24 223:5
340:11 361:7

**participates** 65:10
72:4
**participating**
364:25 365:11,16
**participation**
65:12 308:10
**participatory**
223:15 362:10
364:6
**particular** 50:19
96:5 102:18 107:5
107:9,9,18 116:1,7
116:12 150:11,19
165:1 171:15
196:20 239:25
267:8 278:12
309:14 328:22
331:14 334:10
335:12,13 377:19
**particularly**
278:13
**partly** 161:13
208:1 210:1
**partner** 309:19
**partners** 230:17
274:24 275:20
308:11 320:4
**partnership**
309:19
**partnerships**
251:19
**parts** 368:18 369:9
**party** 140:1 386:3
**pass** 148:22
221:24
**passed** 323:14
**passing** 148:20,21
**pastor** 89:11
**pat** 77:15 79:3
**path** 89:15 356:12

**pathway** 101:6
**patient** 292:25
293:3,6 299:5,12
316:3 317:4 325:5
**patients** 290:1,18
292:14 298:13,17
**patricia** 305:7
**patrick** 262:4,8
264:19
**patrol** 8:10 41:19
41:20,23 42:15,16
43:2 44:5,9,14
45:1,20 46:1,15
55:21 58:9 94:10
112:24 124:15
137:21 141:16
147:12 148:10
182:5 184:19
194:15 234:14
236:6 248:21
250:19 253:16
261:7 265:2
272:25 366:21
372:1,3,4,5,7,17
374:12 379:21
380:8
**patrols** 144:22
**pattern** 114:7
304:2
**paul** 7:22 80:24,25
137:10,18 140:11
141:15 145:14
235:21 344:22
**pawn** 43:8,9,9,10
43:15,15
**pay** 54:8,9 62:9,18
66:16 196:25
197:2 205:25
206:2 229:10
245:7 276:2
278:22 283:16

paying 37:15
pays 66:14 276:6
pd 272:6,6
pelini 3:15,18
  14:22
pending 19:16
pennsylvania 5:6
people 23:3 25:11
  25:20 26:11 27:18
  33:6 41:1 52:15
  52:16,20 56:1,3
  61:25 62:2 67:23
  74:24 83:19 106:7
  106:8,15 112:5,25
  113:1,2 115:4,9,22
  116:2 118:21
  125:22 126:11,22
  153:7 156:12,21
  157:21 158:10
  163:11,12 165:8
  165:21 166:2,3
  167:15 171:21
  186:11,13,14
  187:4 202:25
  208:11,11 220:20
  228:12 229:18
  246:17 250:4
  279:8 289:20
  292:7 296:4
  308:17 315:6,10
  315:14 319:1,23
  319:25 333:24
  350:25 354:15,24
  355:18 356:10,18
  367:6 368:25
  369:20 371:2
  373:13,19 375:20
  376:3 377:25
perceived 342:13
  356:13,14

percent 109:8
  176:4 244:10
  255:4,16,19
  256:20 257:24
  258:1 277:13
  322:10 364:14
percentage 125:7
  150:18 277:3
  278:7 281:22
  369:21 374:10
  378:23 379:5,8
percentages 257:9
  259:16 279:1
  374:25
percocet 86:19
  87:25 129:20
  185:12 304:4
  323:18 332:16
  337:14
perfectly 19:7
perform 254:20
performance 85:6
period 56:12
  74:18 110:5 164:9
  164:10,10 173:15
  173:17 192:5,6
  193:20,24 194:3
  197:11 346:10,17
periodically
  171:20
periodicals 336:4
periods 153:5
perm 190:16
permanent 190:17
  191:23
persisted 187:2
person 32:22
  35:13 106:17
  144:21 179:5
  187:8 220:17,18
  220:21 289:16

292:7 342:17
personal 25:4,21
  26:10,16,16,17
  27:22 89:7,18
  112:6,17 139:25
  303:8 356:15
  357:13 358:5
  368:15 376:15,19
  381:3
personally 30:23
  61:6 64:1 69:13
  71:11 85:1 96:8
  106:10 113:22
  212:12 291:7
  296:15,18,22,24
  371:16 374:24
  388:11 389:15
personnel 114:6,8
  225:8 232:5
  248:16,24 249:7
  250:1,3 283:18,19
persons 100:20
  373:10
perspective 25:2
  28:1 35:23 124:11
  131:1 208:3
  211:19 237:23
  273:6 315:18,22
  335:18 368:22
  370:20
perspectives 25:12
  335:24
petersen 4:14
  14:18,18
pharma 1:12
pharmaceutical
  131:9 216:15,21
  217:13,14 297:17
  297:20 298:22
  299:2 316:12,17
  317:1 359:9

pharmaceuticals
  3:2,8 4:18 14:17
  39:7 129:10
pharmacies 29:14
  29:21 92:6 124:21
  124:21 217:22
  218:7 290:23
  301:9 306:4 307:4
  307:7,23 309:14
  309:21 313:12
  316:20 317:2
  373:7
pharmacists
  296:11 300:17
  313:23 314:25
pharmacy 28:20
  293:4
philadelphia 5:6
phone 15:12
  322:23 387:3
phones 55:19
  350:20,25
photographs
  261:17
physical 58:24
  334:15
physician 304:1
  305:5
picked 249:16
  321:19,22
pill 290:12,15
  294:25 295:8
  296:16 314:23
pills 120:16,17
  121:3 288:20
  292:13,13 294:14
  294:19,19 296:5
pinpoint 185:21
place 189:7,10,11
  202:4,12 204:16
  221:21 228:14

239:3 275:4 278:2
303:11 311:12
358:7 362:13
385:20
**placed**  142:15
**places**  56:25
**plaintiff**  8:4
214:11 305:1
**plaintiff's**  8:19
279:21
**plaintiffs**  218:14
280:15 283:25
**plan**  8:17 148:8
227:7,7 268:17,24
271:24
**planned**  60:14
272:15
**planner**  173:6,10
173:10,24
**planning**  34:4,17
53:24 97:1 170:14
178:12,14 182:11
258:17 279:10,11
281:8 322:4 382:3
**plans**  49:23 50:5
52:2
**plausible**  126:18
127:4
**play**  278:8
**played**  152:12
**pleasant**  2:6
**please**  14:9 15:12
15:19 72:10 75:17
158:1 322:23
387:11,11
**pled**  305:8,13
**plenty**  86:21
229:16,17
**point**  19:13 23:14
40:23 45:24 69:2
92:9 94:9 118:16

121:1 147:10,14
148:1 169:25
173:4 184:23
186:19,25 191:22
211:22 214:24
233:6 240:1 241:3
252:14 280:21
291:8 294:5
332:24 337:9,15
337:16 342:4
364:16 370:17
371:8,14
**pointed**  223:9
280:11
**pointing**  138:16
**points**  99:21
100:13,16 102:10
102:19 330:16
331:8 371:14
372:19,19
**police**  7:21 8:15
16:20 25:5 30:25
35:22 37:6,9,18,22
38:7,16,20 39:12
39:19,23 40:3,14
40:17 41:3,15
44:20,23 49:2,23
52:21,22 53:2,10
53:19 54:2,7,12
55:16 57:21,22
58:23 64:8 65:10
65:12,17,25 66:3,8
66:18,22,24 67:10
68:3 71:7 72:3,18
74:19 77:7 78:3
80:4 84:7,22
88:24 100:9
102:16 105:25
110:25 111:24
112:2,12 113:21
117:22 123:14

136:2,9 138:7
139:19 141:16
145:20,23 147:4,7
148:5,8 153:11
158:22 160:13
178:17,19,24
179:12 182:6
187:16 202:1
203:23 208:10
209:1 210:9 212:4
212:5 220:10
221:7,16 222:5,10
223:12 224:6,13
229:19,20 230:2
232:4,24 233:7
238:23 239:6,7
242:1 245:2,15
248:10,13 250:5,6
250:14 253:4,10
253:22 255:5
258:9,11 259:1,17
260:9,15,16 261:2
265:20 266:9,18
269:2,5,7 272:4,20
273:20 275:2
276:8,10 277:1,15
278:16,20 281:11
291:3 294:1 295:5
297:3 300:10
301:5,20 303:5
305:22 306:19,22
307:10,19,22
308:6,13,19,25
312:4 313:7 314:9
318:1,8,11 327:23
331:1 332:7,15
333:5,7,8,16 334:7
334:20 336:2,10
336:14,15 339:2
340:11 342:24
343:16,20,24

344:1,12,13,15,17
356:3 367:5
368:22 369:3
375:14 376:8,14
377:2,11 381:9
**policeone**  336:7
**policies**  39:25
101:11 184:9
259:20 278:2
357:20
**policing**  57:20
272:24 321:13
**policy**  142:9
276:21 336:15
**political**  276:16,24
**polster**  1:10
**poor**  370:22
**population**  282:11
**porter**  4:19 15:4
**portion**  164:12
284:24
**posed**  363:20
**position**  26:12
32:16 34:15 74:5
74:15,17 83:24
95:8,8 104:24
145:23 251:13
**positions**  138:6
147:2 186:24
188:5 190:5,24
191:11,13,24
192:18 264:10
**possessed**  100:24
**possibility**  233:12
**possible**  226:16
308:16 351:8
**possibly**  25:18
243:21 326:8
**pot**  277:11 278:15
364:15

[potent - probably]

potent 111:12
125:24 152:11
potential 53:23
326:20
potentially 7:19
35:5 85:24 133:14
175:11 242:12
248:22 295:19
328:15,16 351:3
pow 111:11
powder 363:20
power 295:5
practices 336:15
357:20
practitioners
300:15
precedes 280:15
predictability
172:11
predictable 60:14
predicted 233:20
predominant
346:10
predominantly
341:11 346:12
preference 159:5
220:2
preferring 100:1
preliminary 176:2
248:22 326:16
350:17,17
prepare 20:1 22:8
prepared 49:24
128:16 307:17
364:3
preparing 136:18
326:9 363:10
prescribe 317:3
prescribed 87:16
89:10 90:16,23
91:18 290:19

323:19 324:16
325:14 337:9,19
338:3,17,22,25
prescribers
300:14 302:21
305:2
prescribing 76:11
154:9 292:25
298:15 304:2
305:8
prescription 1:7
3:14 14:6,22
24:17 26:24,24
27:6,23 28:12,16
28:25 29:9 35:2
76:1,11 87:19,22
88:5,16 89:20,23
90:8,8,14,14 91:3
91:6,12,13,17,21
91:23 93:24 108:7
108:16,25 109:4
109:10,11 122:8
123:16 124:6
127:13,17 185:13
188:19 211:5
255:8,11 284:25
287:22 288:11
289:12 291:11,20
293:4,7 296:19,23
297:2 299:14
305:9 316:4 318:3
324:16 337:12,22
337:24,25 338:6,8
338:12,14,21
339:6,7 350:22
356:23,23 358:20
369:14 370:13
371:3 376:4
378:16,25 387:6
388:3 389:3

prescriptions
24:17 79:4 124:19
124:20 288:16,21
289:21 290:8
298:12 312:19
317:15 355:24
369:22
presence 257:18
385:15
present 5:10 22:3
63:6 126:3 206:9
373:12
presentations 25:9
presented 201:20
252:9 330:25
press 366:15
pressed 288:20
pressure 151:19
pretty 49:17 89:17
93:13 114:5
125:19 140:25
152:20,25 272:2
355:20 358:7
prevalent 162:12
211:2 285:21
prevent 254:7
282:7
previous 48:11
220:14
previously 22:11
43:13 77:24 97:13
141:15 145:24
162:22 231:25
275:14 290:14
342:2 357:21
prices 162:19
163:10
primarily 263:17
primary 65:5
353:12

print 97:21 103:19
173:2
printed 173:19
221:23
printing 206:8
prior 55:14 95:23
158:14 202:21
207:11,16 219:17
233:8 240:19
293:21 324:7
348:12,15,22
351:1,2 356:22,22
361:10,12 371:4,7
377:6
priorities 49:23
52:1 335:4
prioritize 50:17
78:9 147:5
prioritized 228:6
prioritizing 51:3
priority 147:3
273:7
prisoners 100:6
privacy 299:6
private 316:5,9
privilege 104:18
104:21
privileged 102:21
104:5,14,22
privy 319:14
probably 17:12,17
44:24 51:6 63:19
75:22 85:22 91:24
92:9 94:20 103:24
112:13 124:4
152:3 160:8 161:8
167:22 187:1
193:18 207:3
211:23,24,24
220:5 226:22
230:4 252:10

265:3 271:4,9
286:18 288:24
292:7 293:16
309:8 310:10
311:11,12 318:25
332:18 334:6
375:20 377:25
380:5
**probation** 326:19
**problem** 25:15
94:15 110:7 112:4
123:21 124:7
125:15,17,22
126:4 132:8,13,20
134:11 135:7,8
142:15 143:6,9
163:6 187:2
188:24 210:9
211:1 225:2 227:5
247:18 249:13
287:23 288:12
291:25 292:4,15
293:15,23 315:19
351:21 356:13
357:3
**problematic**
185:25
**problems** 107:25
108:15 109:9
150:6 182:8
207:13 338:10,11
363:17 369:6
**procedural** 57:21
**procedure** 15:22
384:7 388:5 389:5
**procedures** 40:1
184:10
**proceeds** 266:22
**process** 20:25 33:5
51:9 52:7 58:10
112:22 113:8

114:4 115:17
148:1 149:2,12
156:11,16 157:16
159:12 174:19
196:22 210:22
213:23 225:10
229:3 230:11,22
243:9 249:21
269:20 278:9
317:6 333:25
335:5,11 349:17
356:25 374:7
382:16
**processes** 43:13
221:21 230:5
328:10
**proclivity** 163:13
**produced** 93:4
120:18 174:4
**produces** 217:18
**product** 121:2
244:21 269:21
382:7
**production** 174:1
320:25 387:15,17
387:22
**profession** 377:2
**professional** 244:2
297:15 338:22
339:7
**proficiencies**
80:11
**profiting** 289:18
**program** 7:14
81:25 118:8
119:18 142:17
201:12 232:13
**programs** 100:7
248:4
**prohibitive** 238:2

**project** 201:10,10
201:13 203:14
204:4 205:19
228:3 249:13,19
361:20
**projected** 272:14
**projecting** 32:25
**projections** 272:11
**prominent** 286:8
**promise** 329:14
**promised** 167:12
168:23
**promoted** 42:10
42:11,19 43:25
44:2,4,6 141:18
**proper** 280:23
**properly** 229:13
**property** 43:6,21
43:22 47:17,17
373:1,2
**proportionally**
324:1
**propose** 335:3
**proposed** 337:4
**prosecute** 282:6
**prosecuted** 301:13
301:15 314:21
**prosecuting** 102:5
104:9 151:4
155:15 330:17,23
**prosecution**
314:10 326:10,12
328:18
**prosecutions**
151:7,9 164:15
**prosecutor** 103:13
**prosecutor's**
326:16 333:20
**prosecutors**
100:19 254:12
278:6 326:22

**proud** 225:12,23
**provide** 51:24
52:3 102:11
150:22 166:16
173:25 236:3
237:8,13,19
263:23 275:10
353:18,19,21
**provided** 15:21
122:2 214:19
238:6,6,20 241:21
280:4 283:9 311:1
332:2 354:4,14
**provider** 166:21
**providers** 355:23
**provides** 149:7
257:8,20 353:14
**providing** 146:18
257:9 280:4
281:11 353:11
**proximity** 106:15
**prudent** 310:18
**public** 3:11 9:12
25:10,13 55:19
139:22 203:17
209:14 215:24
218:11 219:15
220:12 244:3
247:15 254:9
282:2,25 315:20
353:4,8 362:21
377:23 385:7
386:14 388:10,18
389:15,23 390:23
**publicity** 151:11
153:25 154:7
**pull** 181:4,6 227:6
304:16 327:10
**pulled** 173:12
258:18 322:8
325:22

purchase   229:9
238:1 267:14
374:3
purchases   166:19
221:1,21 229:12
purdue   1:12
216:22 217:3
purpose   321:6
326:25
purposeful   158:12
272:15
purposely   23:18
purposes   22:25
73:10 98:9 99:12
109:20 118:10
128:3 133:16
136:3 137:13
140:14 197:22
214:15 231:16
234:16 256:3
265:22 268:19
279:25 302:2
320:17 330:8
339:15 343:5
352:22 359:19
362:25 366:10
pursuant   384:3,6
pursue   208:15
purview   207:24
307:13
put   39:19 47:3
52:14 62:4,7
97:17 113:3 128:9
150:18 156:23
173:18 181:21
188:25 217:21
223:3 224:18
226:15 245:14
281:7 282:18
284:21 310:25
325:23 333:9

349:16 371:15
puts   217:19
putting   34:5
110:25 111:17
145:17 222:22
223:5

**q**

qrt   58:7,7 202:11
203:6 204:6
205:18
qrts   204:17
qualified   205:17
275:12 289:16
385:8
qualifier   182:14
qualify   140:1
182:3
quality   37:12,21
38:1
quantify   94:8,24
124:12 224:1
292:2 379:25
382:18
quantifying
381:22
quarter   53:25
quarterly   70:6,21
181:22
queries   382:4
query   180:9
question   18:15,18
19:3,9,10,16 21:9
29:25 30:1 31:18
37:17 53:5 65:14
67:1 68:17 69:9
70:25 85:4 88:9
90:2,11,25 91:9,15
94:2,6 95:20,21
103:10,22 108:3
108:19 109:14
114:12,22 115:24

117:8 122:11
123:18 124:10,24
125:2,4,6 126:2,8
126:15 127:1,8,15
130:20 131:16
132:10 133:5
139:9 149:14
150:25 154:19
155:6,12,23
157:25,25 159:3
161:22 162:15
167:13 169:13
171:20 185:6
188:1 194:9
200:11 204:3
205:10 209:10,20
210:12 211:15
212:11,15 218:6
224:10,23 226:7
228:1,20,23
237:15 238:25
239:13,24 244:9
248:9 255:14
256:11,13,15,20
260:12 270:8,9
277:16 285:19
287:14 288:4,8
295:21 297:24
300:13 302:15
303:7 308:1
315:13 318:18,20
346:5 351:16
352:2,15 355:20
359:5,12 367:12
370:25 375:10
376:10,18 377:4
380:4,20 381:2,17
381:19 382:22
questions   18:13
19:7 84:13 104:3
104:16 144:10

214:24 242:7,9
243:2,4 280:10
302:8,15 319:7,9
329:13,14 331:13
367:22 371:19,22
375:5
quick   35:10
151:22 167:22
201:4,5,6,12,21
202:13 203:10,15
204:9,11 219:1
236:23 237:24
244:18 261:9
273:22
quicker   226:17
236:24 237:24
245:3
quickly   224:20
227:20 229:1
244:18 246:18
quite   53:11 195:21
212:16 324:23
quote   110:19
217:21 232:23
340:21 347:18
353:18 354:14
355:3 364:23
quoted   110:3,24
quotes   353:3,11,13
quoting   379:15

**r**

r   1:17 5:4 6:7
15:20,25 16:9,12
269:6 331:19
368:5 375:7 385:9
387:8 388:4,9
389:4,13 390:20
radio   40:1 45:4,5
46:20 259:20
radios   68:11

**[rafe - reed]** Page 50

**rafe** 79:6,7
**raiola** 2:16 14:13
  14:13
**raise** 212:22
**raised** 29:2,10,16
  29:19
**raising** 212:21
**ramifications**
  163:19
**ran** 194:18
**range** 60:8,10
**ranking** 44:16
**rare** 329:3
**ray** 16:9
**reach** 104:9 224:6
  224:13 230:24
**reached** 208:6
**react** 227:8
**read** 20:2 22:14,14
  23:20,22,24 93:3
  101:22 110:11,11
  144:9 165:25
  300:18,19,23
  302:11,12 331:3
  332:8,10 357:19
  375:16 379:12
  388:5,6,12 389:5,6
  389:17
**readily** 163:9,15
  246:14 298:7
**reading** 89:2,2
  200:1 218:18
  286:15 336:1
  357:24 358:3,9,17
  365:19 369:17
  376:25 378:20
  387:19
**ready** 40:17
  200:23 222:20
  234:24

**real** 86:18,18 90:7
  110:7
**realistic** 249:22
**realistically**
  226:24
**realize** 172:4
**reallocation**
  112:18
**really** 110:16,18
  143:25 160:22
  198:3 205:1
  267:18 270:9
  369:4
**reason** 19:20
  105:12 117:1
  123:9 135:5
  139:11 141:22
  145:13 258:3
  312:5 316:11
  374:1 387:14
  389:8 390:3
**reasonable** 292:6
  292:7
**reasons** 85:6 237:7
  289:18 317:3
**reassigned** 112:2
**reassignments**
  111:24
**recall** 17:11 27:11
  27:14 30:23 41:5
  41:7,8 59:12,18,23
  59:24 60:25 61:10
  73:24 96:11
  105:24 110:10
  111:3 112:23
  113:6 115:13,20
  123:13 134:7
  137:24 146:25
  147:1,8 158:19
  159:15,21 183:16
  183:24 185:2,7

  188:16 197:12
  215:14 222:20
  238:11 247:16
  250:18 251:6
  266:17 276:18
  291:13 301:6
  303:12 332:2,11
  334:11 337:12
  340:3,6,7,10 347:9
  351:12 353:24
  354:2 367:8
  377:17 379:23
**receipt** 387:18
**receive** 107:17
  274:20 336:5
  360:14,20,21
**received** 39:14
  62:11 102:11,13
  103:14,25 119:14
  148:17 178:3
  205:23 301:1,4
  330:17
**receives** 9:17
  149:4 366:7
**receiving** 119:13
**recertified** 57:12
**recess** 73:2 132:2
  169:5 234:8
  299:25 329:25
  368:2
**recipients** 339:22
**recited** 273:11
**recognize** 73:23
  231:22 232:1
  330:14 360:1
  363:6 366:17
**recognized** 89:24
  225:17 272:4
**recognizing** 158:7
**recollect** 203:8
  364:13

**recollection** 83:13
  83:20 113:25
  128:21 136:18
  174:22 176:10
  191:20 244:12
  258:22 324:9
  341:17 365:20
**recommendations**
  112:24 326:23
  336:9,11,14,16
**recommended**
  148:3 251:7
  334:18
**reconfigured**
  329:21
**reconstruction**
  319:10
**record** 14:2,10
  15:13 16:6 73:1,4
  132:1,4 169:4,7
  170:8 184:22
  213:4,5,7,8,10,12
  234:7,10 266:11
  299:24 300:2
  327:4 329:24
  330:2 362:1 368:1
  368:4 383:5,6
  389:9
**recorded** 200:13
**records** 32:20 33:8
  33:12,14 170:20
  199:18 327:19
**recount** 38:15
**recovery** 89:15
**recruit** 53:24
**red** 103:16
**reduced** 56:22
  100:3 385:14
**reduction** 64:24
**reed** 5:4 15:15

**reedsmith.com**
  5:7
**refer**  93:23 105:13
**reference**  107:7
  111:5 124:17
  173:21 204:5
  387:7 388:2 389:2
**referenced**  144:24
  237:6 238:18
  367:15 385:13,18
  388:11 389:15
**references**  93:6
  134:2 234:23
  350:3 361:17
**referencing**
  112:16 367:1
**referral**  311:24
**referred**  235:10
**referring**  105:15
  105:20 201:1
  216:4,10 225:25
  258:7 264:19
  266:4,5,13 277:10
  335:10,11 341:2
  345:13
**refers**  198:3
**reflect**  273:5,9
**reflected**  238:15
**reflection**  140:4
  157:5
**refresh**  83:13
  365:19
**refreshed**  335:22
**refused**  238:8
**regard**  130:18
**regarding**  183:14
  384:2,11
**region**  120:15
  122:4 233:18
**regular**  55:22
  56:15 69:17,21

119:8,10 160:18
  172:5 183:13,15
  213:24 243:9
  276:3
**regularity**  27:16
  125:20 173:8
  230:15 268:9
  276:16 277:8
  289:25 291:6
  346:16 348:14
**regularly**  275:25
  285:25 308:9
  378:2
**regulations**  39:25
**reimburse**  57:4
**reimbursements**
  274:23 275:19
  276:1 277:18
  278:18
**reinforced**  370:19
**reinstituting**  41:3
**relate**  40:2,2 109:9
  164:8,9 255:6,17
**related**  8:12 22:19
  32:8 41:6,11
  45:10,13 59:10
  64:2,5,9,11 65:1
  82:14 83:10 95:9
  107:22 111:22
  170:8 182:9,18
  186:9,15 195:13
  250:25 253:24
  254:21,25 256:1
  256:21 260:18,23
  273:3,3 275:10
  316:3,4 366:25
**relates**  1:11 123:4
  315:18 349:24
**relating**  254:25
  282:3 334:11

**relations**  273:6
**relationship**  24:19
  293:19 369:13,18
**relationships**  49:9
  80:12
**relative**  386:2
**release**  7:10,18
  9:16 109:19
  133:12,22 134:1
  135:6 366:7,15
**released**  133:3
**relevant**  101:24
  319:4 333:15
**reliable**  379:8
**relief**  272:20 338:7
  338:16
**remained**  45:23
**remember**  41:11
  42:22 59:4 61:15
  61:17,18,21 62:12
  85:14 96:13 106:5
  135:1 149:25
  158:2,3,15 160:4
  166:24 167:4
  176:21 177:6
  189:4 194:24,25
  195:4,6 201:17,18
  202:20,23 216:18
  232:6 238:16
  247:13 285:3
  293:14 301:10
  330:20 354:3
  371:22 377:12
  379:14
**remembered**
  159:24 160:2
**removed**  211:12
**renowned**  195:21
**repeat**  63:10
  181:22,25 321:20

**rephrase**  37:16
  154:20
**replace**  251:12
**replaced**  79:16,17
  79:24 80:6 83:18
  98:25 251:11
**replacement**
  267:14,21
**replenished**
  241:23
**report**  7:21 8:16
  8:24 40:4 51:22
  52:15,24 77:1
  96:18,22,24 97:3,5
  97:13 98:23
  115:18 117:11,12
  119:16 122:12,13
  129:6 131:2
  134:15 136:3,9,22
  148:6 169:18
  170:5,13 174:8,9
  176:7 177:24
  180:6 181:15,21
  182:24 183:9
  184:11 185:11,11
  185:11 248:21
  250:24 252:10,13
  265:21 266:8
  271:4,10 292:11
  306:3 311:9
  320:16 321:2,7,23
  322:15 323:1
  326:14 328:12,21
  367:13 382:8
**reported**  85:18
  111:7 185:14
  323:10 350:6
**reporter**  6:16
  15:18 18:24 73:13
  109:23 118:12
  128:6 133:19

136:6 137:16
199:16 320:20
330:11 339:17
343:8 352:24
359:21 363:3
366:13 388:7
**reporter's** 6:13
385:1
**reporting** 47:22
53:6 76:24 140:13
257:15
**reports** 20:23
49:18 78:4 92:4
119:7 124:14,18
124:19 127:22
153:8 180:4 182:9
182:18 183:11
184:5,7,14,17
185:1 286:15
312:5 324:3,15
325:7,25 327:2
328:25 329:2,4,6,7
329:9 357:18
361:18,25
**represent** 16:15
136:11 160:14
**representative**
139:16 203:22
219:15 220:11,11
359:9
**represented**
122:20 181:19
182:17 240:24
**representing**
143:25
**represents** 142:1
**request** 21:17
52:14 78:11,13,16
186:12 196:9
252:8 257:18
258:20 389:9,11

**requested** 20:24
190:6 195:13,19
384:1,6,10
**requesting** 148:9
**requests** 21:3,15
52:12 84:7 148:10
179:5,8 195:10
**required** 38:21
39:22 40:7 55:11
221:15 248:20
249:3 321:16
328:12 333:10,19
387:25
**requirement**
221:2,24 241:20
**requires** 76:9
**requiring** 333:12
**resale** 290:18
**resales** 294:18
**research** 23:12,15
23:18 34:4,17
97:2 170:14
178:13,14 182:11
258:17 279:11
281:8 322:5 382:4
**reserve** 54:21 55:1
55:3,13,15,24
236:1
**residents** 369:8
**resignation** 48:21
**resignations** 53:14
**resigned** 48:13
**resource** 214:7
279:11
**resources** 25:19
95:2 111:1,17,20
111:21 112:19
113:19 142:16
155:25,25 156:7
157:14 161:11,13
162:21 182:5,7

186:11,14,15
193:21 202:3
224:25 227:6,16
228:7 229:12
230:23,25 233:6
237:6,11 239:3
244:19 245:25
248:4 270:15
293:22 317:20
**respect** 29:6,9,15
334:9,14 381:19
**respectful** 253:2
**respond** 21:3
31:15 78:10 85:24
94:18,19 106:24
153:9 236:4 245:1
249:10 254:1,24
258:20 342:15
**responded** 258:14
342:24
**responder** 233:1
**responders** 280:23
**responding** 63:22
122:1,14 163:16
368:20 373:16
**responds** 255:5
**response** 35:10
121:24 151:3,22
182:4 201:5,6,6,12
201:21 202:13
203:10,16 204:9
204:11 219:2,21
219:25 236:13
240:19 248:21
256:25 257:8
258:8 260:1 261:7
261:9,11 321:12
322:1,8 375:10
383:3
**responses** 8:5,19
31:16 214:12

249:2 279:22
**responsibilities**
44:19 46:21 49:2
67:5 75:25 82:14
83:7,9 112:14
146:16 184:2
193:14 208:13
235:13 261:16
262:25 263:14,15
272:23 319:2,23
**responsibility**
46:2,3,4,13 48:1
65:5 95:9 113:20
120:4 209:22
261:3 306:10
348:17
**responsible** 34:5
46:24 52:16,20
82:9 117:2 150:19
151:5 155:15
179:12 208:1,25
210:2 333:3 346:8
348:11 355:5,12
355:17
**rest** 130:24 131:6
**restate** 123:19
186:6 224:11
**restroom** 234:4
**resubmit** 51:17
**result** 247:25
252:23 278:3
282:17 283:3
323:5 354:15
355:18 356:15
**resulted** 151:5
282:10
**results** 171:9
**retail** 29:14,20
316:20 317:2
**retained** 6:16

**retired** 55:16 79:7
  79:8,23
**retirements**
  272:12
**retrieve** 349:7
**retrospect** 239:16
**return** 163:23
**returned** 387:18
**reveal** 347:4 349:1
**revealed** 347:7,10
**revenue** 274:5,12
  274:21
**revenues** 277:5
**review** 22:7,16
  30:12 184:7
  198:25 199:13
  200:19 252:16,19
  269:18 314:16
  367:17 384:2,6
  387:12 388:1
  389:1
**reviewed** 22:15
  30:4,7,10 31:7
  206:22 215:15
  252:13 361:18
**reviewing** 200:5
**reviews** 149:5
**rice** 2:4 15:7 387:5
**richard** 5:11
**rick** 82:25 353:7
  353:10,14,19
**right** 18:1,10 21:4
  21:13 23:8,10
  24:7,18 27:18,24
  28:4,5 29:5 31:2
  32:4 34:23 36:12
  40:9 41:13,14
  53:8,20 54:14,20
  56:4,7,13,14 58:25
  59:2,8,9 60:2
  61:12 63:24,25

67:21,22 68:15
69:7 72:2,5 73:17
74:3 75:6,7,24
77:22 78:19 80:24
81:8 84:12 85:10
87:16,19,20,23
88:6 89:5,21,24
90:5,6,9,12 92:23
92:24 93:1,2,24
95:10 98:16 103:6
103:17 105:6,9,9
105:22 106:7
107:22 108:1,8,12
110:22,22 111:3,4
111:8,12 114:3,10
114:20,25 115:8
115:22 117:2
119:19 122:9,15
123:11 125:4,25
126:19,20,24
127:6,10 129:14
129:17,25 130:5
130:10,11,14,18
131:14 132:17,18
132:25 134:12,25
135:4,8 136:25
137:5 138:18,19
138:21,21 139:7
140:15,17 141:8
142:2,11,12,18,24
143:6,7 144:4
145:9,10,11,15,16
146:1 149:2,5,6,8
155:10,17,21
156:24 157:1,23
159:1 161:13,13
161:18,20 163:25
164:15 170:1,2,3
170:17 175:16,21
176:7,8,11 177:4
180:24,25 185:16

188:19 191:18
192:25 193:5
195:9,10 196:11
196:14,16 200:16
200:25 202:19,19
204:20 206:23
208:1,18 209:2
210:2,6 211:13
212:13 213:13,18
213:19,21 218:19
219:7 220:9,16,25
225:24 226:5,11
226:18 227:13,15
229:13 231:21
232:9,10,15,20
233:3,22 235:1,2
235:22 236:11,12
237:5 239:8,11
240:15 241:9
246:3 247:1 248:6
248:11 249:7
251:23,24 253:14
253:18,20,21
254:2,5,7,22 255:2
255:12 256:14
258:1 260:23
261:21 262:14
263:6,25 264:5,7
264:22 265:25
268:11 269:9
271:17 273:11
281:12,19 283:9
283:19,21 287:8
287:12,17,20
289:4 293:1,3,5,11
294:9,14,19,22,24
295:1,6,7,9,24,25
296:2,3,5,6,9,10
296:12,16,19,21
297:9,15,18,19,21
298:2,19,23 299:2

299:8,18,19
300:24 302:9,16
304:15 307:19
309:3,4 314:14
315:7,8 316:6,14
322:17 323:13
324:13,18,21,23
325:15,16,18,20
326:4 329:15
335:4 336:25
337:6,10,22
341:20 345:24
347:1 350:1
351:10,11,25
354:17,20 355:8
355:15 365:17
366:21 372:2
375:1,14,15,18
376:8,16,19 377:2
379:18,19 380:17
380:25 381:5,18
382:11,20
**rightly** 228:6
  319:2,24
**rion** 2:5 15:9,9
  226:19 233:10
  246:10 249:8
  252:2 311:7
**risk** 126:5 326:21
**risks** 91:7
**road** 16:12 244:23
**rob** 373:13
**robberies** 17:20
  124:21 323:6,7
  373:4 374:19
**robert** 339:21
**rodriguez** 5:4
  15:14,14
**role** 35:21,21 47:6
  48:6 49:5 112:7
  112:18,20 201:25

210:22 211:9
228:15 269:11
278:8 295:12
313:6,22 334:2,4,7
337:4 353:10
357:1
**roles** 353:12
**roll** 60:15,18 61:4
62:22 63:2
**roman** 361:15
**room** 45:5,5 46:20
184:22 227:9
259:21 296:25
327:4
**root** 25:8,9 26:25
27:6
**rotated** 220:1
**roughly** 20:18
54:19 56:12 188:5
191:14,20
**round** 164:11
294:8
**row** 63:8 176:17
**rpr** 1:25
**rubber** 37:13,13
37:22 38:2
**rule** 20:11
**rules** 15:22 18:4
39:25 362:13,16
384:3,7 388:5
389:5
**run** 16:12 81:25
157:17 259:14
**rundown** 321:4
**running** 97:8,8
98:25 107:3
284:15
**russell** 256:16

**s**

**s** 16:11 387:15
389:8,8 390:3
**safe** 9:1 61:25 62:3
64:17 81:19,20
115:1 162:8 163:5
163:5 330:6 331:5
**safely** 229:14
**safety** 8:12 9:12
35:22 215:24
218:12 255:25
256:21 282:3,25
362:21
**sake** 142:21
143:24 145:6
**salaries** 267:21
268:13 283:15
**sales** 151:5 359:8
374:22
**sand** 16:11
**sat** 71:17 361:11
377:17
**saulino** 2:11 6:8
6:11 14:11,11
16:1,14 72:23
73:12,16 98:3
101:18,22 102:20
103:4 104:2,6,11
104:20 105:1
131:18,24 168:23
169:1,8 199:3,8,12
199:15,18,24
200:7,12,15,20,22
210:14 212:17,20
212:25 213:3
234:5,18 265:16
288:3,7 299:22
300:3 322:22
329:12,17 330:10
367:24 369:15
370:14 371:6

374:8 375:4,8
382:24
**save** 233:3 245:13
**saved** 233:9
239:11,14
**saw** 31:4 119:5
151:1 165:25
216:6,19 231:24
300:19 348:13
349:25
**saying** 21:13
106:22 143:2
161:11 166:9
199:24 201:14
210:1 228:13
232:23 241:13
242:20
**says** 15:16 74:1,23
81:8 111:10,13
115:3 118:25
119:17,21 120:14
121:24 122:12,13
128:15 129:12,15
130:6 134:18
137:1,20 138:25
139:10 141:24
142:5,13,21 145:5
145:11 198:15
215:22 219:1
222:5 232:17
233:16 236:1,20
257:4,24 266:3
269:5 273:25
280:15,21 281:10
282:1,24 302:20
303:16,25 304:25
305:11 323:14,17
340:19,21 363:14
363:16
**scanned** 329:9

**scdu** 364:25 365:3
365:11,17,21,25
**scene** 45:5 47:13
47:15 181:12,13
261:13,18,20,21
264:8,10 284:13
350:16,21 382:6
**scenes** 244:17
**schedule** 69:25
160:19 219:21
**scheduled** 37:25
219:22 275:25
**scheduling** 22:24
23:9
**schmidt** 197:9
352:16
**schnee** 34:13
222:3,14 235:9,10
236:14,14,17
238:14 240:13
242:20 269:24
270:6 271:9,11
275:18 279:3,4
281:9
**schnee's** 240:7
**school** 36:16,18
37:14,15,17,23
**schools** 36:17
**scope** 210:24
211:23 308:15,22
311:23
**scotty** 262:20
**seal** 386:6 388:15
389:21
**search** 183:4
288:5 382:6
**searchable** 181:15
**searches** 325:21
**seat** 323:15
**second** 8:22 16:10
53:4 101:21

[second - services]                                                Page 55

121:23 145:5
149:17 256:9
283:23 288:25
296:19 301:25
322:11 340:17
343:11,17,18
345:13,15 347:20
349:23 361:13
**secondary** 325:21
**secretary** 67:2
**section** 131:20
269:2
**sections** 300:7
**see** 24:12 27:9
73:21 74:22 75:4
92:3,19 94:16,17
95:15 100:16
101:8,23 105:21
110:21 118:22
119:7 120:9,12,19
121:23 122:5
124:5 127:21
128:18 129:9,12
129:24 131:8
133:24 134:1,17
134:22 136:23
137:22 138:8,15
138:24 152:21
173:22 175:9,12
176:5 177:23
181:6 184:14
185:10 194:14
198:6,15 202:15
206:10 216:2
218:24 233:16,23
249:2 256:15
257:7,23 270:2
271:25 274:4
276:2 277:9
279:12 280:11,19
280:21 282:24

302:25 303:16,21
303:25 304:7,23
305:25 306:7
314:17 323:13
325:2 336:5
339:22 340:16,18
340:24 341:8
343:14,19 344:5
344:10,11,21
345:11,20,21
347:16,19,25
350:5,8 355:6
357:2 361:14,22
361:23 363:16,19
363:24 364:21
365:6,14 370:10
370:24 373:19
**seedy** 370:7
**seeing** 83:12
114:16 164:1
184:13 185:3
229:23 290:25
307:7 341:19,24
346:15 348:17
**seen** 25:9,20 88:22
124:3,14 125:20
126:4 128:20
155:4 162:3
214:22 215:4,7,12
264:14 270:7
271:6 280:6
287:23 288:12
289:19 291:6
307:3 311:15
356:9 365:23
381:7
**sees** 144:22
**segment** 87:18
**seized** 365:1
**seizure** 165:3
194:13 350:20

361:18,25
**seizures** 108:24
151:2 162:4 164:8
166:17 182:20
183:1,4 262:24
362:2,7
**select** 335:6
336:22
**self** 120:25 273:4
**sell** 287:16
**selling** 166:14
**semantics** 377:8
**send** 107:15 123:2
194:5 336:3
360:22,23
**sending** 135:6
**sends** 344:21
**sense** 18:22 92:13
92:16 113:18
160:3 223:14
311:11
**sensitive** 336:16
**sent** 97:1 103:12
140:11 171:20,23
259:23 271:4
324:5,8
**sentence** 120:12
121:22,24 138:10
138:24 142:3
144:6,14 215:1,20
218:20 280:14
302:19 303:16
344:6 345:15
347:20 364:14
**sentences** 100:3
120:13 151:8
155:14 164:21
**sentencing** 99:25
101:6 151:10
**separate** 286:2
328:8 367:2,4

**separated** 183:5,5
183:6 325:24
**separately** 83:9
168:5 205:6
**september** 48:8
361:21 386:17
**sergeant** 42:10,11
42:23 44:25 45:3
45:6 82:18,19,24
92:2 147:6 184:3
184:18 185:21
195:4 235:6,10
236:14,18,19
240:8,25
**sergeants** 44:25
47:1
**series** 92:5 339:18
**serious** 291:25
**serve** 70:10 113:5
372:1,11
**served** 64:1 69:12
70:11
**service** 56:17,24
57:7 58:14 59:3,7
59:12,18,25 60:6
78:6 106:13,25
136:24 137:2,3
139:1,14 140:8,12
140:21 143:21,22
143:22 144:16,23
145:2,3 180:3
181:25 222:6
227:3 248:15
249:3,4 253:6
261:8 272:19
273:1,1 278:22
284:10,11 333:11
342:16 373:17,17
**services** 9:13
25:12 34:9 49:21
51:20 93:20

[services - skills]                                                                                    Page 56

151:19 153:12
222:16 235:12
281:8 282:25
283:2 315:21
362:22 372:21
378:10
**serving** 310:15
**set** 8:6,20 135:16
193:17 198:15
201:2 202:16
203:10,21 214:13
219:5 225:10
267:24,25 272:17
279:23 321:19,22
322:5 327:24
330:16 386:6
**sets** 304:17
**setting** 59:25
132:12 263:4
264:8 333:3 340:5
**settings** 302:22
**seven** 272:7
**shaking** 22:6 39:8
72:21
**shared** 321:8
**sharing** 294:25
373:5,6
**shaun** 5:12
**shawn** 81:8 83:6
**she'll** 72:11
**shearer** 7:3 35:5
69:11 70:2 73:8
74:2,23 77:10,13
78:1,13,17 84:2,9
116:5 122:24
167:20,25 168:13
168:18 214:4
242:13 286:18,19
352:17
**sheet** 387:13 389:7
389:10,18 390:1

**sheriff** 133:22
134:2,2 135:5,11
254:18
**sheriff's** 128:17
130:13
**shift** 41:23 42:16
44:14,22 45:1,2,16
45:20 46:1,3,14,18
46:25 47:1 63:5,8
160:12 184:4
192:3 229:11
265:3 340:22
341:2,6,13,15,18
341:24
**shifts** 47:16 276:1
276:3
**shipping** 287:6
**shocking** 106:6
292:10
**shoes** 166:19
**shop** 37:12,13
**shopping** 298:14
**shops** 43:15
**short** 63:17 79:19
79:20 111:1,18
153:5 188:25
189:6 329:21
346:10 351:1
**shortages** 250:21
**shortly** 188:9,9
**show** 80:11 107:2
116:14,17 181:4
183:1 264:15
265:6
**shown** 96:22
387:16
**shows** 107:3
116:11,19 170:24
**shut** 295:8,23
296:15

**sic** 288:1
**side** 46:11 108:25
175:22 218:22
241:17 370:2
**siegferth** 80:24,25
**siegle** 118:19,25
119:21
**siegle's** 120:4
**sign** 184:10
**signal** 139:20,24
139:25
**signals** 40:1
**signature** 384:5
386:13 387:14
**signed** 388:13
389:18
**significance**
295:18
**significant** 24:13
24:21 27:1 89:12
94:17 95:16 106:3
114:13 124:22
127:22 132:8
142:7 149:18
150:8 151:7
152:12 153:3,14
162:3 163:6
194:10,11,18
225:14 246:13
248:1 250:18
267:13 269:19
292:8,15 293:20
295:15 323:8,25
341:10 342:13
346:11,14 348:12
356:2 364:17
369:21
**significantly**
144:19 162:20
**signing** 387:19

**similar** 83:7 86:17
86:17 114:7
145:18 245:20
320:25 375:20
**similarity** 92:21
245:11
**similarly** 29:6
213:20 223:4
303:25
**simplicity** 142:22
145:6
**simply** 31:4
159:23 200:3
226:15
**simulate** 288:20
288:20
**sincerely** 387:21
**single** 97:2 115:15
156:19,20 245:14
248:19 278:10
321:3,4
**sir** 160:25 199:8
199:12,15 200:12
200:15 210:14
212:17,20 318:17
387:10
**sit** 24:8 248:3
331:24 361:11
**sitting** 381:21,24
**situation** 26:13
111:2 113:3
**situations** 60:18
108:21 328:13
339:3
**six** 43:23,24 44:25
45:6 47:1 190:1,1
193:18 248:18
**sizable** 293:23
**size** 54:11 146:1
**skills** 38:16

skimmed   302:14
slightly   266:19,20
  372:9
small   146:3
smaller   47:2 300:6
smith   5:4 15:15
smoothly   58:10
social   151:19
socioeconomic
  130:25
sold   120:16 344:8
  344:25
solutions   3:7 4:17
  387:1 390:1
solve   182:7
somebody   32:19
  32:20,21,21 80:9
  94:8 153:9 217:18
  217:19 220:2
  223:2 225:19
  228:5,12 245:1
  279:5 328:17
  338:24 342:18,19
  342:21 356:20
  358:22 369:2,17
somebody's
  245:13
someone's   27:24
somewhat   86:5
  208:25
son   297:1,8
soon   225:4,21
sooner   155:10,20
  230:3,5
soreness   297:3
sorry   27:21 33:25
  37:16 40:8 43:9
  50:10 53:8 66:18
  75:17,19 95:19
  120:12 165:12,14
  236:15 240:11

269:15 271:14
  285:5,9 304:19
  309:12 322:22,24
  349:12 352:13
sort   38:6 51:25
  52:13 138:11
  154:24 168:1
  205:1,7 281:18
sorted   52:7
sought   186:3
sound   21:4 104:21
  137:5 211:6
sounds   21:2 54:19
  56:11 104:13
  154:22 156:24
  161:11 265:7
  294:17
source   210:9
  289:3 328:17
  351:20 352:14
  379:13,14
sources   82:10
  274:1,21 285:12
  286:24 336:19
  352:10
south   2:6 4:20
southwest   166:12
span   146:3
speak   25:20 35:13
  77:11 89:3 105:16
  173:6 196:24
  240:11 269:16
  331:14
speakers   358:3
  368:16
speaking   377:16
special   67:17
  70:22,24 274:5,11
  367:6
specialized   163:3
  318:22

specialty   309:17
specific   27:14 32:8
  39:5,24 48:1
  50:23 51:6,8
  76:18,21 82:13
  95:8 111:22
  113:25 140:13
  144:2 159:6,16
  168:11 186:4,8,14
  189:5 195:8,13
  196:3 211:2
  240:21 258:22
  261:20 264:10,12
  268:7 276:25
  291:20 297:12,23
  299:12 301:7,16
  307:18 319:7,9
  326:25 349:4
  351:18 357:9,12
  357:15 358:10,12
  358:14,19,22
  362:12 365:22
  377:2 381:22
specifically   19:8
  27:5,12 33:8
  35:16 41:9 45:9
  45:12 59:4,13
  60:6,22 61:18
  63:23 65:4 68:9
  72:1 77:17,21,23
  79:11 82:17 109:1
  112:23 114:9
  156:8 157:23
  158:3 170:11,21
  177:7 182:6 185:7
  187:17 188:8,16
  191:4 193:23
  201:18 207:4
  216:9 223:14
  233:18 251:25
  254:19 266:2

275:13,16 284:3
  287:1 291:13
  300:12,21 301:10
  315:16 340:6
  345:12 348:10
  350:12 355:21
  373:9 374:17,18
  378:12
specifics   116:20
  273:10
specified   385:21
speculate   27:9
  31:3 162:18
speculated   150:12
  243:18
speculation
  150:23 226:20
  239:24 294:16
speeches   28:7
  375:18
speed   242:3
spell   16:5,6 121:20
spend   51:1 252:24
  270:19
spends   260:16
spent   196:2 222:2
  266:18 281:1,14
  282:13
spike   96:22 105:21
  114:14 187:23
  346:11 348:12
  349:24 351:14
  371:4
split   49:6
spoke   185:21
  378:11
spoken   196:6
  378:11
spot   131:23
  299:20

spreading  282:8
spreadsheet
    170:24 172:7,14
    174:21,23 175:12
    176:22 182:15
square  3:11 5:5
sraiola  2:18
ss  385:3
stack  99:15 349:13
stacked  154:16
staff  23:4 66:22
    146:2,7,22 158:21
    158:22 319:17
    335:20
staffed  83:2 250:6
    272:9
staffing  7:23 56:23
    57:2 80:19 137:11
    137:19 138:5
    148:7 186:23
    246:21 249:23
    253:9 267:12
    271:23 272:4,16
    273:11,19 283:2
    294:6 371:20
staggering  369:19
stamp  136:10
stamped  133:21
    359:24
stand  119:6
    167:10
standard  180:5
    289:17
standards  184:9
    244:2
standpoint  145:21
    151:17 195:25
    210:18 229:9
    244:20 246:21,22
stands  81:3 165:10
    166:13 194:12

306:13,13
start  41:17 52:19
    131:20 153:21
    161:8 185:10
    257:6 350:16
    354:16,21,25
    355:19 370:21
    371:2 376:3
    378:24
started  16:4 37:17
    37:24 60:1 72:7
    92:3 94:14,16,16
    94:21,24 95:15
    124:4 127:20,21
    132:20 144:7,15
    152:22 153:23,25
    154:24,24 155:3
    175:3 184:14
    190:3 266:22
    324:4 332:1 341:8
    342:8 369:22
    371:9 378:16
    380:24
starting  73:16
    95:25 186:1
starts  138:11
    215:18 269:2,3
    347:17 364:22
state  9:1 14:9
    15:12 16:5 39:22
    40:16 57:4 62:5
    76:8 99:18,20,23
    180:6 196:7,9
    272:8 276:13,17
    276:21 278:18
    291:12 298:7,10
    330:5 331:5
    340:23 344:8,25
    348:5 385:2,7
    386:15 388:10
    389:15

stated  158:17
statement  145:15
    346:19 354:2,4
    355:8 363:17
    364:2 388:13,14
    389:19,19
statements  31:8
    353:4,14 364:8
states  1:1 14:7
    93:14 134:21
    351:7
static  249:14
station  139:21
    143:18
statistical  140:14
    249:12
statistically
    232:24
statistics  34:6
    120:5 131:3 173:7
    253:7 325:17
    381:4,8,13,25
    382:19
stay  160:13
stayed  160:16
steal  373:12
stem  368:23
stenotypy  385:14
step  211:3
stephen  1:25 2:16
    14:13 385:6
    386:14
steps  61:24 62:1
    308:18
steve  343:15,19
    344:12 345:14
stick  194:10
stolen  43:18
    124:19,20 185:14
    185:14

stood  166:1
    185:15,17,18
    203:6 371:9
stop  106:22
    144:20,21 194:17
    200:17 282:4
    294:18,22,25
    296:1,4
stopped  37:23
stopping  143:17
store  180:2 374:1
stored  329:7
stores  180:3,4
stories  23:24
    289:19
story  242:21
    349:22 356:6
straight  37:21
    150:7
straits  267:18
strategies  151:21
    158:5 182:2
strategy  7:12,13
    118:6,7,25 119:1
    119:18 120:5
street  1:23 2:12,17
    4:4,14,20 5:5
    32:23 35:6 40:17
    47:3,19 74:8 88:6
    88:21 111:21
    134:23 192:1,3,18
    193:10,14 197:12
    229:21 263:11,12
    263:15,19 264:2
    282:6 328:6 359:3
streets  40:3 63:22
    64:17 81:19,20
    162:7 242:2
strength  54:6
    250:11

string  343:9,12
   353:1
stronger  347:22
struck  30:20
stuck  194:20
studied  39:1 86:21
   217:6
study  37:2 217:5
   333:1
stuff  166:20
subdivision  42:15
   43:5 47:12 77:25
   119:15 124:15
   141:20,21 184:19
   235:18 372:6,13
   372:15
subgrant  9:13
   362:22
subject  102:8
   118:24 137:19
   304:25 325:5
   338:21 339:5
subjects  333:4
   334:2 336:24
submission  51:10
submit  148:15
   271:22 328:20
submitted  48:21
   49:25 50:6 148:6
   184:5 271:19,23
submitting  52:3
subordinate  53:7
   112:14 123:3
   253:4
subpoena  22:14
   98:20
subscribed  388:10
   389:14 390:21
subsequent  80:7
   80:18,22

substances  287:7
   305:14,15
suburbs  369:9
success  151:6
successes  201:22
successful  230:19
sudden  323:6,11
   325:9
suddenly  248:18
sued  84:15,23 85:2
   85:8
suffering  152:2
   203:25
suggest  134:15
suggested  127:23
suggesting  68:23
   100:5 162:11
suggestion  297:11
suggests  134:10
suicide  342:18
suing  209:25
suitcase  166:22
suite  3:4,11,16 5:5
   387:2
summa  377:21
summary  120:9
   165:23
summer  346:17
   371:5
summertime
   284:14
summit  1:12 2:2
   7:16,20 8:2,4,18
   9:4,9,11,14 15:8
   15:10 25:13 64:18
   66:4 69:12,24
   71:10,23 80:3,6,21
   83:18 102:15,17
   128:2,15,16
   129:16 130:4,12
   130:14,17,22

131:9,13 133:15
   133:21 162:4
   165:4 197:21
   209:14 214:10
   254:18 279:20
   302:21,23 305:3
   306:5 331:1
   339:13,25 344:16
   344:18 359:16,18
   359:23,24 360:5
   361:8 362:24
   363:5,21 377:23
superior  387:1
supervises  33:15
supervising  46:18
supervisor  33:11
   33:12,19,20 63:4
   77:14 145:22
   184:3,3,12 327:18
   327:19
supervisors  46:22
   53:7 77:15 146:4
   253:4
supervisory  48:1
   138:6 145:22
   146:2,7
supplemental
   326:13 329:2,8
supplied  30:15,21
   31:3,5
suppliers  351:4
supplies  241:22
supply  3:14 14:23
   163:9
support  67:9 68:2
   205:18 232:20
   263:24 308:10
supported  100:9
sure  27:13,25
   38:23 49:4,7
   50:17 53:11 58:2

58:4,10 59:22
   61:25 62:1,2
   63:11 66:5 80:1
   87:5 89:25 90:4
   91:19 97:12,20
   103:4,16 110:13
   113:24 119:4,14
   120:7 139:15
   154:4,18 166:8
   168:8 171:11
   172:1,19 184:8
   186:7 195:18
   206:10 215:9,10
   215:13 218:8
   221:18 223:23
   227:16 231:24
   234:5 237:16,21
   240:3 241:5
   265:12 273:24
   284:8 286:22
   290:16 293:2
   298:13 299:10,22
   307:6,15 309:24
   313:5 320:8 327:8
   334:4 338:18
   352:7 354:18
   379:3 380:14
surge  124:4
surprise  92:22
   149:10,15
surprised  81:5
surround  24:23
survey  121:25
   123:2
surveyed  122:1,15
   122:18
suspect  116:16,25
   171:5 177:5,6,7,12
   180:11 194:18
   195:1 301:7
   319:14 327:11

[suspect - tera]                                                                    Page 60

374:19
**suspected** 176:2,6
  176:10 178:6
  180:14 314:9
  369:24
**suspicious** 144:21
  306:3,5 307:9
  309:22 311:8
  312:4
**sustained** 85:16
**swear** 15:19
**sweet** 3:4 14:15,15
**switch** 44:1
**sworn** 15:23 48:25
  52:22,22 55:2,21
  385:10 388:10,13
  389:14,18 390:21
**synopsis** 326:18
**synthesized** 134:4
**synthetic** 37:13,22
  38:2
**system** 116:9
  126:24 168:7
  179:21 181:20
  316:25
**systems** 184:25

**t**

**t** 16:9
**table** 215:22
  218:24 331:25
**tablets** 303:18
**tactics** 38:17 40:4
  57:17,19 154:9
**take** 18:7 19:14,17
  41:10 48:6 67:18
  72:22,24 80:9
  101:20 110:9
  113:12 126:12,22
  126:23 127:6
  157:4 195:24
  211:3 230:6,17,17

234:2 248:21
249:18 265:10
273:22 283:17
296:8,11 303:11
310:8 312:12
329:20 332:22
336:18 337:18
358:20 367:6,16
367:22
**taken** 1:21 73:2
  132:2 139:17
  140:3,12 151:8
  186:21 206:7,7,11
  234:8 252:15
  299:25 308:18
  325:14 329:25
  338:13 368:2
  385:20
**talk** 19:1 22:22
  26:12 35:25 36:6
  94:14 104:12
  151:12 157:22
  199:20 270:18
  273:16 331:24
  369:17 371:11
**talked** 23:5 25:15
  36:5 102:17
  117:11 127:10
  169:15 170:11
  205:13 206:21
  208:17 237:4
  239:15 242:21
  276:9 278:14
  283:13 284:22,23
  285:3 317:21
  351:9 356:10,18
  362:11 368:18
  372:25 378:20
  382:4
**talking** 68:4,8,24
  72:7 99:21 100:13

100:16 102:10,18
124:16 144:3
158:2 161:10
174:24 199:19
211:20 287:7
308:21 314:6
330:16 331:7
345:22 378:7
**talks** 201:9 272:2
**tango** 134:24
  135:1
**targeted** 92:7
  108:22
**task** 35:1 47:20
  64:2,2,9,16,17,21
  65:10,18,20,24
  66:1,9,12,15,19,23
  67:10,15 68:3,14
  69:2 71:1,10,12,18
  71:23 72:15 75:3
  75:12 76:6,23
  77:14,16 80:13,15
  81:1,5,19 82:11
  83:7,14 84:1
  128:12 188:25
  189:2 213:25
  214:1,3 251:10,16
  260:20 262:5
  263:4 264:4
  275:24 278:4
  283:3,8,12 286:20
  286:22,22 298:9
  308:8 310:15
  311:1 313:10
  320:5 328:6
  363:17
**taught** 38:16,18
**tax** 266:22 267:4
  276:11
**tcoleman** 3:12

**team** 35:10 64:24
  81:18 82:7 112:3
  162:25 163:1
  189:19 193:17
  194:12 195:5,7
  201:6,6 202:12,13
  203:10 204:6,9,11
  219:2,22
**teams** 151:23
  201:5,21
**tear** 284:12
**technical** 38:5
**technically** 54:6
**technique** 196:22
**technology** 67:24
  142:9 143:5
  156:13 222:15
**teleconference** 3:8
  5:3,11
**tell** 18:8 19:14
  34:14 36:3 48:16
  105:14 149:23
  158:18 170:7
  186:17 236:8
  305:18 307:21
  320:24 368:12
  377:15 381:5
**telling** 93:18 139:5
  198:21 241:12
**temporarily** 112:1
**temporary** 111:25
  113:17 187:15
  189:13 193:17
  194:11 195:5
**ten** 166:7
**tend** 335:6
**tendency** 319:1
**tenth** 2:12,17
**tequilla** 305:7
**tera** 3:10

**term**  92:9 171:13
  171:14 188:25
  189:6 204:4 289:6
  289:10 291:14
**terms**  93:8,22
  371:18
**test**  53:24
**testified**  17:7,21
  107:20
**testify**  31:21 32:11
  33:9,22 385:10
**testifying**  18:6
  33:2 35:17
**testimony**  18:3
  19:22 32:6 95:20
  377:7 385:13,17
  388:6,7 389:6,9,12
**testing**  9:6 221:1
  221:22 343:4
**text**  269:3 351:2
**tfo**  7:3 73:8 74:24
  74:25
**thank**  16:13 36:10
  75:20 100:17
  182:13 236:19
  261:12
**thanks**  169:9
  375:4
**theft**  92:5 290:21
  294:22 315:4
**thefts**  43:17
  183:23 323:9
**theories**  272:3
**thing**  32:17 33:7
  51:8 111:25 170:6
  172:3 199:20
  228:3 259:24
  269:1 272:10
  298:1 379:16
**things**  21:1 39:24
  40:1,7 49:7 55:23

57:8,10,14 58:9
  63:24 67:19 71:13
  87:22 142:23
  145:8 152:5,14
  153:20 155:10
  157:8 158:17
  166:22 178:24
  206:9 210:24
  222:12,19 228:4,9
  228:15 230:7
  238:2 243:9
  244:15 260:17
  270:23,24 283:9
  283:16 286:3
  289:20 310:14
  311:13 319:19
  336:17 357:2
  373:13
**think**  16:24 17:4
  20:17,20,21 21:11
  21:12 29:11,12
  34:21 39:20 42:22
  54:15 58:14 62:21
  62:22 64:19 65:23
  65:23,24 70:6,21
  75:21,22 76:8,20
  83:8,16 85:15
  88:25 92:13 95:1
  95:16 102:7 105:8
  108:5 120:24
  121:9 126:18
  127:3 128:25
  135:13,15 140:8
  141:3 150:14,15
  151:1,16 152:13
  153:22 154:7
  155:7,13,18,24
  156:2 157:6,7,12
  161:23 164:5
  167:1,6,12 169:25
  170:24 171:6,10

176:1 183:9,20
  186:2 189:11
  190:12 193:18
  201:11 202:21
  203:6 204:2
  205:20 206:4
  209:5 210:17,23
  215:7,11 219:2
  224:24 225:3,11
  225:24 226:8,13
  226:21 227:18
  228:10,17 237:4
  239:1,14,15
  245:10 246:7
  247:7,15 248:5
  249:22 251:13
  253:11 258:9
  262:18 264:18,23
  265:8 266:12
  269:4,25 271:8
  272:17 281:17
  284:7 288:15
  290:13 292:3
  293:20 297:5
  298:14 301:11
  307:5 309:1
  310:11,17 311:10
  315:14 318:25
  322:6 325:6
  330:21,25 332:5
  332:23 335:7
  341:4,21,21 342:3
  342:12 344:14
  346:15 348:10
  356:25 360:23
  368:14 370:11,18
  371:17 372:17
  374:9 375:19,19
  378:2
**thinking**  273:10
  273:19

**third**  8:20 106:17
  279:23 280:20
  282:21 288:25
**thirds**  110:19
**thirty**  387:18
**thorough**  195:18
**thought**  88:13
  108:7 174:16
  229:2 230:5 241:7
  290:13 297:10
**thousand**  189:25
**thousands**  153:4
  228:11 292:12,13
  304:3 305:9
**threat**  7:12,13,15
  118:5,7,24 119:1
  119:17 121:25
  122:4,9 128:1,14
  129:13 130:4
  131:9 163:21,22
  363:21
**threatening**
  342:17
**three**  5:5 20:15
  34:3 42:19,24
  57:11 60:9 63:7
  84:23 165:20
  172:9 177:18
  233:19 246:16
  251:14 252:10,14
  302:20 304:1
  305:6 334:6 340:9
**throw**  284:20
**tim**  197:9
**time**  30:6,9 37:24
  38:24 39:20 40:11
  40:23 47:25 48:23
  55:16 56:16 65:16
  65:18 67:2,6
  71:17 72:23 74:11
  74:15,18 75:13

81:16 92:10 94:9
105:25 110:5
111:1,18 112:12
117:17 121:1
123:13,14 125:9
132:7,25 138:5
141:18 142:14,15
144:9 145:18
147:10,14 148:2
153:5 156:17
159:8 161:3 172:8
172:12 173:15,17
175:2 176:2 177:8
184:23 185:3
186:19,23 187:5
188:14 190:25
191:12 192:5
193:22 198:21
200:1,14 211:22
212:16 213:1
220:8 227:14
228:9 229:11,17
230:9,11,23
232:25 238:21
240:1,5 241:4,8
251:15 252:16
260:16 263:20
272:24,25 273:2
288:25 294:5,6
329:13 333:13,21
334:24 337:15,16
341:6 342:4 345:1
346:11,17,22
364:16,25 365:12
365:12 368:10
371:8 372:19,20
380:1 385:20
**timeline**  370:10
**timely**  333:19
 335:8 336:6,24

**times**  16:23 17:10
20:4,15 25:20
26:23 27:4,5,10
50:18 52:5 56:22
57:1,1 60:9 70:19
83:20 84:23 89:3
111:11 116:24
154:25 160:11
196:25 197:1,11
208:17 210:5
226:10 239:19
261:9 262:19
279:8 288:17
289:7 298:6
328:19 347:22
374:13
**tip**  78:4
**tipped**  247:24
**title**  9:14 128:11
129:9 262:9 266:3
331:3 349:9
362:23
**titled**  7:5,7,15,17
8:7,15,17 9:1,9,12
9:16 98:6 99:9
128:1 133:12
231:13 265:20
268:17 330:5
359:16,22 362:20
366:6
**tobacco**  64:20
**today**  18:4,6 19:22
23:5 24:8 91:21
92:12 104:7
135:18,22 142:24
145:9 173:13,13
177:23 190:24
205:13 206:21
208:17 248:3
273:17 289:7
329:15 367:20

381:21,24
**today's**  20:1 97:4
**told**  31:24 131:18
207:25 210:4
243:17 302:13
**ton**  380:12
**top**  59:15 73:20
107:6 136:24
146:6 176:23
181:23 224:16
234:22 269:7
282:1 290:6
304:24 322:15
331:3 332:19
340:18
**topic**  60:20 159:9
159:16 240:21
244:6 331:14
337:5
**topical**  57:9
**topics**  57:23
226:10 244:5
333:15 335:1,2,6
335:21,22
**total**  54:11,17
137:2 142:1
257:25 279:2
**totality**  225:22
226:1 356:16
**totally**  105:13
319:21
**totals**  7:8 97:8
98:24 99:2,9
139:23 143:14
**tour**  55:22
**tower**  3:10
**township**  303:20
305:12
**toxicology**  175:23
175:24 176:7,16
180:16

**track**  96:19,23
107:15 223:16
298:11,15,16,16
325:12 328:3
**tracked**  317:20
**tracks**  317:17
**trade**  121:9
**traditional**  230:19
**traffic**  17:19 42:1
44:24 46:20 85:17
144:20 194:17
253:15 319:9
372:7
**trafficked**  291:21
**traffickers**  9:2
314:18 330:6
331:6
**trafficking**  70:12
119:19 120:6
121:10,12 122:3
291:10,11 296:1
**train**  40:25 229:19
236:24 241:20
245:8 334:25
**trained**  232:5,12
**training**  39:14,17
39:21 40:15,19
41:6 54:8,9 56:5
56:16,17 57:6,7,18
57:18 58:11,15,16
59:19 60:1,19
61:3,7,10 62:7,10
62:17,23,23 63:3,5
63:10,15 89:5
163:3 195:22,25
196:2,18,19
221:13 229:10,11
229:17,18 235:7,7
235:13 236:3,7
237:9,13 238:1,6
241:4,6,25,25

[training - uh]

244:20 246:22
253:16 268:1
278:20,21,22,24
280:22 283:1
311:22 333:4,4,7,8
333:10,17 334:2,3
334:10,14,17,19
334:19,22 335:3
335:19,20,20
336:3,9,9,22,22
337:5
**trainings**  57:5
59:7,12,16 60:2,6
60:7,15,19 68:12
**transactions**
361:19
**transcribed**
385:16 388:7
**transcript**  6:1
384:3,6,9,11
387:11,12 388:5
388:12 389:5,11
389:17
**transcription**
385:17
**transfers**  113:17
**transitioned**  74:21
**transport**  287:19
**trapped**  106:18
**traub**  3:15
**travel**  196:1,12
197:2
**traveling**  284:11
**treat**  152:15
**treated**  100:20
**treatment**  100:1,7
151:20 152:16
153:19 209:15
280:23
**tremendous**  93:12

**trend**  120:14,25
**trends**  179:3,9,19
182:21
**trial**  17:7 18:3
31:22 32:6,11
33:9,22 35:17
167:2,8
**tried**  139:15
206:10
**tripled**  151:10
**troubles**  24:22
**true**  92:23 119:24
120:1 223:8,11
237:1 245:12,14
326:6 345:2 374:9
376:6 385:16
**trunk**  194:16
**trust**  48:20 113:2
274:5,12 308:16
319:1 364:5 365:4
365:25
**trusting**  319:22
**truth**  18:8 385:11
385:11,12
**truthful**  19:21
**truthfully**  18:20
**try**  18:16 25:17
43:17 182:7
203:24 204:1
208:7 210:25
219:23 220:17
223:25 225:2
248:25 249:12
253:9 288:10
351:5 352:9
**trying**  21:3 53:10
53:18 121:19
158:6 162:10
204:23 211:18
227:1 229:8
241:11 242:15

246:3 262:13
318:17 349:10
364:12 368:21
374:2
**tucker**  3:3 4:9
14:16 15:17
202:22 257:5,8,15
**tucker.hunter**
4:11
**tuckerellis.com**
3:6
**tuesday**  232:11
**turn**  56:4 120:8
129:8,23 136:21
281:25 304:20
305:24 340:17
343:11 361:13
363:13 364:18
**turned**  367:10
**two**  21:19 36:17
36:18 38:12 47:16
57:11 65:24 66:2
66:7 83:6 84:23
85:23 90:22
103:14 106:15
110:19 115:4,22
116:1 120:13
143:15 165:18
170:6,11 173:18
186:18,20,23
187:3,3 188:5,7,11
190:5,7,11 191:22
192:8,17 197:13
199:20 217:5,7
219:8 263:9,10,16
263:20,23 264:1
275:6 278:23
286:2 294:5
302:10,10 334:17
338:14

**type**  107:10,18
180:10 181:1,3
183:1,3 260:8
307:18 322:1,8,25
341:14 360:1
380:12
**typed**  115:18,18
354:3
**types**  17:18 141:10
162:13 180:9
254:21 260:10
270:23 315:10
323:9 332:3
334:15 354:19
376:25
**typic**  308:3
**typical**  146:15
210:8
**typically**  49:18
63:7 81:24 112:23
113:7 123:1
130:22 145:1
158:12 194:14
212:6 243:18
258:19 262:23
274:15 308:5
325:3 342:16,24
350:19
**typing**  18:24

| u |
|---|

**u**  16:12
**u.s.**  72:14 81:1,3
**uh**  20:8 27:19
50:10 56:8 61:20
99:4 110:8 119:25
172:24 175:17
176:12 208:19
247:2 254:3
260:24 274:3
290:9 322:14
366:22

**ultimately**  50:1
269:21 336:21
351:13
**unable**  106:19
116:25
**unacceptable**
212:24
**unaware**  357:21
**uncertain**  141:25
**uncommon**  324:14
**unconsciousness**
342:22
**understaffed**
250:21
**understand**  18:13
18:14,15,23 51:12
74:25 87:15,21
91:2,11 104:19,23
120:21 121:14
162:10 185:17
204:23 208:2
209:24 214:21
233:6 241:11
242:16 276:24
289:14 290:4
303:14 312:18
313:11 341:1
370:5
**understandable**
199:23
**understanding**
24:25 50:8,11
76:14 84:4 86:4
86:11 90:15,18,21
91:22 108:14
120:3 127:11
130:10 148:25
203:13 252:12,18
268:23 285:11
289:8 310:12
327:12 331:15

341:5,16 369:12
371:1 374:4
375:11
**understood**  18:19
**unequivocally**
233:12
**unfortunately**
249:20
**unfunded**  100:4
101:15
**uniform**  63:12
141:21 235:24
372:12,13,14
**unintentional**
322:16
**union**  189:15
**unique**  375:22
**unit**  9:10,16 32:22
33:13 34:4,22,25
35:7 42:1 43:2,7,8
43:9,21 44:24
45:2,6 46:1 47:13
47:13,15,16,17
64:18 66:4 69:13
69:24 78:8 79:18
80:3,7,17,21 83:1
83:1,4,19 97:2
113:16 130:23
165:4 167:18,19
168:19 190:20
191:2,3,5 192:1
193:11 243:24
253:16 260:21
261:13,20,21
262:2 264:9,16,19
266:4 289:11
291:5 304:13
310:4 312:2,8
319:12 322:5
328:4 359:17,23
360:6,9 361:8

366:7 367:4,7
371:9
**united**  1:1 14:6
93:14 134:21
377:20
**units**  75:6 270:24
328:9 366:21
372:6,8
**university**  36:24
37:1 38:24 39:2
46:10
**unlawful**  295:6
**unlimited**  155:25
**unnecessary**
355:24
**unscrupulous**
289:15
**unsure**  342:20
**unusual**  112:4
124:5
**update**  171:22
172:6 182:19
**updated**  118:1
170:14 172:14
175:7 177:24
**updates**  57:13
245:19 333:22
**updating**  58:7
**upper**  321:9
**uptick**  107:22
124:1 152:22
**use**  26:17,22 68:15
76:6 82:2,2 100:2
119:10 121:13
152:10 179:19
180:7 182:4
193:13 259:17
260:8,9,12 289:11
331:7 334:11
356:24 370:13,13
378:22 382:3

**useful**  213:15
**user**  356:21
**users**  7:18 25:22
26:1 133:13
134:20
**uses**  68:19 89:20
89:24 93:1 195:23
272:5 274:1
306:25
**usual**  124:2
**usually**  103:19

**v**

**v**  1:12 387:6 388:3
389:3
**vacancy**  80:8,12
80:18,22
**vacated**  83:24
**vague**  290:24
**vaguely**  138:2,4
**valley**  36:19
**valor**  9:17 366:8
366:24 367:8
**values**  356:15
**variables**  142:22
145:7
**variance**  143:11
143:12
**variant**  134:4
**variety**  17:19
55:23
**various**  142:7
**vast**  232:25
**vehicle**  206:5
245:4 267:20
284:1,5,13,14
**vehicles**  68:11,15
68:19 267:15,17
267:17,19
**venues**  368:17
**verbatim**  59:15

veritext  4:7 387:1
  387:7 390:1
veritext.com.
  387:17
version  88:21
  136:19
versions  58:21
  86:16
versus  273:1
vicodin  86:19
  87:23 129:20
  332:17
victim  116:20
  171:3,3 175:15
  180:11 181:11
  236:8 374:19
video  10:1 62:23
videographer  5:12
  14:1 15:11,16
  72:25 73:3 75:16
  75:20 131:25
  132:3 169:3,6
  213:6,11 234:6,9
  299:23 300:1
  329:23 330:1
  367:25 368:3
  383:6
videos  60:19
videotaped  1:16
view  153:17
  224:19 228:4
violations  99:25
violence  64:24
  65:6 374:21
violent  8:12 9:2
  81:5 255:25
  256:21 257:16,17
  330:7 331:6
  363:23 374:15
  381:20,22

virtual  4:7
visit  219:16
voice  212:21,23
volume  135:17,18
  257:25
volunteer  55:11
vote  70:23
votes  274:17
vulnerabilities
  58:22

w

w  2:4
wait  72:10,11
waived  387:19
waiving  304:25
walgreens  4:2
  14:25
walk  142:17
wallace  82:25 83:8
walmart  3:19 15:2
want  18:3 19:18
  26:12 27:8 35:13
  60:22 71:13 86:12
  97:22 110:18
  131:20 159:5
  163:17 185:16
  199:25 200:1
  210:8 223:24
  227:23 233:2
  297:8 302:10
  307:10 308:13
  349:17
wanted  97:20
  156:7 175:9 197:3
  238:22 278:25
  297:1,23
wanting  152:7
  160:14
ward  256:17
warrants  326:19

washington  2:12
  2:17 4:15
waste  200:1,14
way  17:11 24:19
  37:15 39:7 50:17
  58:8 69:5 71:9
  77:19 85:5 92:14
  100:20 104:22
  105:11 110:19
  121:16 140:1
  150:20 163:4
  182:7 186:9 205:8
  206:12 208:8
  210:14 238:16,21
  245:21,24 259:14
  260:4 262:12
  278:5 282:21
  292:5 297:24
  301:18 313:16
  317:7,11 329:5
  356:22 366:25
  371:11 377:20
  378:7 380:18,22
  381:15,22
ways  26:10 93:17
  94:19 139:14
  196:3 226:9
  230:15 233:17
  270:19 289:13
  290:3,4 292:6
  315:19 319:13
  342:13 368:14
  380:8
wc.com  4:16
we've  53:6,13
  58:11,16 88:22
  97:12 108:23,24
  115:14 125:20
  127:10 131:18
  150:12 152:23
  170:11 177:22

194:1 208:16
  229:16,17 234:3
  245:16,16 254:20
  260:20,21,22
  264:5 275:16
  276:9 278:14,23
  283:13 288:17
  315:25 374:17
weapons  65:6
  68:11
wear  284:12
weather  152:22
website  136:12
  336:7
wednesday  198:12
week  20:19 30:8
  56:20 203:18,18
  219:14,16,17
  220:14 297:1
  300:20
weekend  345:8,17
weekly  69:19
weeks  20:19 39:21
  40:9,10 56:12
  252:10,14
weighing  243:8
went  36:17,17,19
  36:24,25 37:21
  40:11 42:1,15
  44:4 52:8 75:14
  106:14 142:6
  163:10 194:4
  230:1 249:3
  267:14,20,21
  276:25
west  4:4 46:11
whereof  386:5
who've  197:10
whoever's  322:23
wholeness  89:16

**wide**  55:23 230:5
**widely**  225:17
**wiles**  8:24 320:15
  320:23 322:4
**williams**  3:15 4:13
  14:19,22 262:20
**wintertime**  284:14
**wise**  370:10
**witness**  2:3 15:19
  21:6 22:2,6 26:6
  39:8 61:11 72:9
  72:21 75:19 84:17
  102:25 104:12
  164:16 168:25
  191:16 199:11
  200:19 265:14
  275:21 312:20
  320:10 329:16,19
  349:12 375:3
  383:1 385:9,14,15
  385:18 386:5
  387:8,11 388:1,4
  388:11 389:1,4,15
**witness's**  384:2
**witnesses**  350:21
**witness'**  387:14
**woodill**  82:18,19
  82:24 83:8
**word**  309:2
**words**  20:12
  163:25 325:22
**work**  34:4,18 49:8
  51:1,4,9,21,21
  54:11 55:17,20
  67:3 69:4 77:16
  77:20 83:8 88:24
  109:1 112:3 113:4
  113:10 123:3
  124:15 145:20
  154:4 160:15,22
  160:24 178:18

179:2,7 187:18,19
  192:1 202:2
  219:23 223:25
  225:11,23 230:16
  250:23 251:18,19
  251:20 257:6
  261:9 262:20,21
  264:1 275:7,23
  283:17 286:21
  310:4,5,11,13
  319:3,3,25 328:8
  332:7,14 375:13
  376:7 382:11
**worked**  29:8 37:12
  37:14,20 41:22
  92:14 114:2 129:3
  137:20 146:5
  192:17 193:20,23
  210:23 224:25
  243:25 291:5
  305:22 376:22
**working**  46:23
  66:13 138:4 146:8
  146:14 184:6,18
  187:5 188:22,23
  210:5 223:14
  263:17 271:13
  275:25 302:22
  309:18
**workload**  139:16
  140:4 144:1
**works**  33:24 34:10
  34:16 58:10 64:23
  68:13 76:6 79:3,3
  79:4 82:11 83:6
  179:13,16 192:3,3
  262:4 269:25
  279:9 310:13
  322:4
**workspace**  267:24

**worn**  267:23
**worse**  247:20
**worsening**  282:8
**write**  173:2,12,14
  173:21 222:20
  289:21
**writer**  179:14
**writes**  344:7
  345:16 347:21
**writing**  40:5
  179:12 180:7
  269:11
**written**  174:10
  317:15
**wrong**  262:12
**wrongful**  17:1
  215:25 218:13
**wrote**  141:23
  345:6 346:20
  348:7 355:3

**x**

**xanax**  87:4

**y**

**y**  16:9
**ye**  41:4
**yeah**  20:11 42:4,7
  44:10 51:13 52:5
  61:1 71:25 79:14
  82:6 83:16 84:11
  86:1 88:14 93:2
  97:12 101:22
  108:5 110:13
  115:25 128:9
  131:22 138:23
  140:25 145:12
  158:2 166:6 167:9
  174:5 177:3,16
  198:20 210:3
  215:3 218:17
  223:11 229:16

230:22 239:18
  242:17 245:13
  247:25 248:16
  252:20 266:14
  288:18 292:14
  301:16 302:12
  308:24 309:5
  312:8 315:22
  324:12,22 332:25
  337:23 341:21
  353:16 354:10,12
  355:16 371:7
  375:19 379:11
**year**  7:14 41:4
  42:2 53:21 56:16
  56:18,21,24 57:8
  60:5,9 84:23 95:1
  118:8 119:18
  139:2 148:10
  152:19,23 156:24
  189:24 191:15,17
  265:13 266:18,21
  267:11 270:22
  275:6 276:19
  278:10,12 318:4
  333:8 335:14
  365:8
**year's**  365:5 366:1
**yearly**  99:1 183:8
**years**  36:18 41:22
  42:20,24 43:23,24
  45:17 57:11 61:13
  75:15,21,23 76:17
  79:12 125:21
  132:6 140:10,24
  141:1 151:18
  163:14 165:18,20
  166:25 168:19
  187:1 219:9
  232:20 233:19
  248:18 267:16

275:6 278:23
301:21 311:17,19
334:1,6 340:9
**yep**  269:10
**yesterday**  7:8
99:10,20

**z**

**z1**  8:24 320:16
**z4**  8:24 320:16
**zone**  46:2,12 179:6
179:7 181:24
220:7 321:11
**zones**  46:5,5,6,7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.