## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE: NATIONAL      : HON DAN A
PRESCRIPTION OPIATE  : POLSTER
LITIGATION           : MDL NO  2804
                     :
APPLIES TO ALL CASES : NO
                     : 1:17-MD-2804
                     :

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

December 11, 2018

- - -

Videotaped deposition of
NANCY BARAN, taken pursuant to notice,
was held at the offices of Carella Byrne,
P C , 5 Becker Farm Road, Roseland, New
Jersey, beginning at 9:02 a m , on the
above date, before Michelle L  Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public

- - -

GOLKOW LITIGATION SERVICES
877 370 3377 ph | 917 591 5672 fax
deps@golkow com

## Page 2

1  APPEARANCES:
2
   ROBBINS GELLER RUDMAN & DOWD, LLP
3  BY:  DORY P  ANTULLIS, ESQ
        MARK J  DEARMAN, ESQ
4  120 East Palmetto Park Road
   Boca Raton, Florida 33432
5  (561) 750-3000
   dantullis@rgrdlaw com
6  mdearman@rgrdlaw com
   Representing the Plaintiffs
7
8  KIRKLAND & ELLIS, LLP
   BY:  JENNIFER G  LEVY, ESQ
9       KAITLYN COVERSTONE, ESQ
   300 North LaSalle Street
10 Chicago, Illinois 60654
   (312) 862-7184
11 jennifer levy@kirkland com
   kaitlyn coverstone@kirkland com
12 Representing the Defendant, Allergan
   Finance and the Witness
13
14 MORGAN LEWIS & BOCKIUS, LLP
   BY:  STEVEN A  LUXTON, ESQ
15 1111 Pennsylvania Avenue NW
   Washington, D C  20004
16 (202) 739-5452
   steven luxton@morganlewis com
17 Representing the Defendant, Teva
   Pharmaceuticals
18
19 ALLEGAERT, BERGER & VOGEL, LLP
   BY:  CHRISTOPHER ALLEGAERT, ESQ
20 111 Broadway, 20th Floor
   New York, New York 10006
21 (212) 616-7060
   callegaert@abv com
22 Representing the Defendant, Rochester
   Drug Co-Op
23
24

## Page 3

1  APPEARANCES:  (Cont'd )
2
3  JONES DAY
   BY:  CHRISTOPHER LOVRIEN, ESQ
4  555 South Flower Street, 50th Floor
   Los Angeles, California 90071
5  (213) 489-3939
   cjlovrien@jonesday com
6  Representing the Defendant, Walmart
7
   WILLIAMS & CONNOLLY, LLP
8  BY:  JOEL S  JOHNSON, ESQ
   725 12th Street, NW
9  Washington, D C  20005
   (202) 434-5148
10 jjohnson@wc com
   Representing the Defendant, Cardinal
11 Health
12
13 TELEPHONIC APPEARANCES:
14
   CLARK MICHIE, LLP
15 BY:  BRUCE W  CLARK, ESQ
   220 Alexander Street
16 Princeton, New Jersey 08540
   (609) 423-2144
17 bruce clark@clarkmichie com
   Representing the Defendant, Pernix
18
19 REED SMITH, LLP
   BY:  SARAH B  JOHANSEN, ESQ
20 355 South Grand Avenue, Suite 2900
   Los Angeles, California 90071
21 (213) 457-8135
   sjohansen@reedsmith com
22 Representing the Defendant,
   AmerisourceBergen Drug Corporation
23
24

## Page 4

1  TELEPHONIC APPEARANCES:  (Cont'd.)
2
   ARNOLD & PORTER KAYE SCHOLER, LLP
3  BY:  SEAN A. McCORMICK, ESQ.
   777 South Figueroa Street, 44th Floor
4  Los Angeles, California 90017
   (213) 243-4000
5  Sean.mccormick@arnoldporter.com
   Representing the Defendants, Endo
6  Health Solutions; Endo
   Pharmaceuticals, Inc.; Par
7  Pharmaceutical Companies, Inc. f/k/a
   Par Pharmaceutical Holdings, Inc.
8
9  COVINGTON & BURLING, LLP
   BY:  DEVON MOBLEY-RITTER, ESQ.
10 3000 El Camino Real
   Palo Alto, California 94306
11 (650) 632-4739
   Dmobleyritter@cov.com
12 Representing the Defendant, McKesson
   Corporation
13
14 ALSO PRESENT:
15
16 VIDEOTAPE TECHNICIAN
   Henry Marte
17
18
19
20
21
22
23
24

Page 5

```
1              - - -
2            I N D E X
3              - - -
4
   Testimony of:
5              NANCY BARAN
6     By Ms. Antullis        11
7
8
              - - -
9
           E X H I B I T S
10
              - - -
11
12    NO.      DESCRIPTION      PAGE
13    Allergan
      Baran-1   Notice of Deposition  16
14
      Allergan
15    Baran-2   LinkedIn Profile of  36
             Nancy Baran
16
      Allergan
17    Baran-3   E-mail Thread   71
             8/18/09
18           Subject, Suspicious
             Orders
19              ALLERGAN_MDL_02081243-45
20    Allergan
      Baran-4   Actavis Per4mas    117
21           For Nancy Baran
             2009-2012
22              ALLERGAN_MDL_SUPP_
             00001391-35
23
24
```

Page 6

```
1              - - -
2       E X H I B I T S (Cont'd.)
3              - - -
4
5     NO.      DESCRIPTION      PAGE
6     Allergan
      Baran-5   E-mail Thread   153
7           2/8/12
             Subject, Contact
8           Actavis.com
             ALLERGAN_MDL_00478433-35
9
      Allergan
10    Baran-6   E-mail Thread   181
             9/25/12
11           Subject, 2007 Letter
             ALLERGAN_MDL_03525593-95
12
      Allergan
13    Baran-7   E-mail Thread   233
             9/16/11
14           Subject, Advantage
             Logistics Orders
15              ALLERGAN_MDL_03427457-60
16    Allergan
      Baran-8   E-mail Thread   250
17           10/3/12
             Subject, SOM
18              ALLERGAN_MDL_03380592-93
19    Allergan
      Baran-9   E-mail Thread   260
20           2/11/09
             Subject, OmniCare
21           Finasteride
             02128037-38
22
23
24
```

Page 7

```
1              - - -
2       E X H I B I T S (Cont'd )
3              - - -
4
5     NO      DESCRIPTION      PAGE
6     Allergan
      Baran-10  Effective Controls  261
7           Against Diversion of
             Controlled Substances
8           Meeting with Actavis
             Elizabeth, LLC
9           9/12/12
             ALLERGAN_MDL_03302011-19
10
      Allergan
11    Baran-11  E-mail, 10/26/12  322
             Subject, SOM SOP and
12           Business Procedure
             ALLERGAN_MDL_03382709-19
13
      Allergan
14    Baran-12  E-mail, 10/19/12  325
             Subject, Partnership
15           Meeting ABC
             ACTAVIS1136380-96
16
      Allergan
17    Baran-13  E-mail Thread   339
             11/14/12
18           Subject, Suspicious
             Order Letters Update
19              ALLERGAN_MDL_01796473
20    Allergan
      Baran-14  E-mail Thread   352
21           1/6/16
             Subject, SOMS
22              ALLERGAN_MDL_02466960-64
23
24
```

Page 8

```
1              - - -
2       E X H I B I T S (Cont'd.)
3              - - -
4
5     NO.      DESCRIPTION      PAGE
6     Allergan
      Baran-15  E-mail Thread   357
7           3/3/14
             Subject, A Message from
8           Paul Bisaro and Bob
             Stewart
9           Acquired_Actavis_02236096-99
10    Allergan
      Baran-16  E-mail Thread   365
11           10/30/12
             Subject, New Business
12           Acquired_Actavis_00667914
13    Allergan
      Baran-17  E-mail Thread   374
14           2/10/12
             Subject, SOM Follow Up
15           From Cegedim
             Acquired_Actavis_01370513-18
16
17
18
19
20
21
22
23
24
```

Page 9

```
 1              - - -
 2       DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5   Direction to Witness Not to Answer
 6   PAGE  LINE
     None.
 7
 8   Request for Production of Documents
 9   PAGE  LINE
     None.
10
11   Stipulations
12   PAGE  LINE
     None.
13
14   Questions Marked
15   PAGE  LINE
     None.
16
17
18
19
20
21
22
23
24
```

Page 10

```
 1          THE VIDEOGRAPHER:  We are
 2   now on the record.  My name is
 3   Henry Marte, videographer with
 4   Golkow Litigation Services.
 5          Today's date is December 11,
 6   2018.  And the time is 9:02 a.m.
 7          This videotaped deposition
 8   is being held in Roseland, New
 9   Jersey, in the matter of National
10   Prescription Opiate Litigation.
11          The deponent today is Nancy
12   Baran.  All appearances will be
13   noted on the stenographic record.
14          Will the court reporter
15   please administer the oath to the
16   witness.
17              - - -
18          ... NANCY BARAN, having been
19   first duly sworn, was examined and
20   testified as follows:
21          THE VIDEOGRAPHER:  Counsel,
22   you may begin.
23              - - -
24          EXAMINATION
```

Page 11

```
 1              - - -
 2   BY MS. ANTULLIS:
 3       Q.   Good morning.
 4       A.   Good morning.
 5       Q.   Nice to meet you.
 6       A.   You as well.
 7       Q.   My name is Dory Antullis,
 8   from Robbins, Geller, Rudman & Dowd, I'm
 9   here for the plaintiffs.
10          Please state your full name
11   for the record.
12       A.   Nancy Baran.
13       Q.   Your address?
14
15
16       Q.   Are you currently employed?
17       A.   No, I'm not.
18       Q.   So you have no business
19   address; is that correct?
20       A.   That's correct.
21       Q.   Okay.  I'm just going to go
22   through.  Have you been deposed before?
23       A.   No.  This is the first time.
24       Q.   I'm just going to go through
```

Page 12

```
 1   some basic ground rules to help the
 2   conversation go more smoothly and make
 3   sure we get a clean record.
 4          I'm going to ask you a
 5   series of questions.  I ask that you
 6   allow me to finish the question before
 7   you respond.  If you don't understand a
 8   question, if I mumble or speak too
 9   quickly, something I'm guilty of, please
10   just ask me to rephrase the question or
11   say it louder.  If you don't understand
12   what I mean, ask me for clarification.
13          From time to time your
14   attorneys, Jenny or Steve, may object for
15   the record.  Unless they instruct you not
16   to answer the question, you can still
17   answer the question to the best of your
18   knowledge and ability.  We will take
19   breaks from time to time.  And if you
20   need to take a break, at any time just
21   let me know.  I only ask that you finish
22   any questions that we have pending at
23   that time and then we'll go ahead and
24   take a break if you need to.
```

## Page 13

1      A.   Sure.
2      Q.   Are you taking any
3  medication that would interfere with your
4  ability to testify fully and truthfully
5  today?
6      A.   No, I'm not.
7      Q.   Is there any other reason
8  that would interfere with your ability to
9  testify fully and truthfully today?
10     A.   No.
11     Q.   So the court reporter is
12  going to be taking down everything you
13  say.  When you answer questions and I
14  just -- I'm guilty of it.  When you
15  answer questions with yes or no, that
16  makes it much easier for her to -- that
17  makes a cleaner record.  So we ask that
18  you don't say or mm-hmm or unh-unh or
19  yeah or nod your head, even though you
20  are being videotaped --
21     A.   I will try that.
22     Q.   -- or try to enunciate a
23  response.  I will do my best to keep my
24  umms on a minimum.  And I make no

## Page 14

1  guarantees.
2      You'll see that I'm going to
3  be looking some -- on my screen, I've got
4  some questions that I want to remember to
5  ask you.  I'm also going to be fumbling
6  through documents.  Bear with me.
7      A.   Okay.
8      Q.   So do you have any questions
9  about what we've gone through so far?
10     A.   No, not at this time.
11     Q.   Okay.
12     MS. MOBLEY-RITTER:  Excuse
13  me.  Can I get the appearances for
14  those on the phone?
15     MS. LEVY:  This is Jennifer
16  Levy from Kirkland & Ellis for the
17  Allergan defendants.
18     MS. COVERSTONE:  This is
19  Kaitlyn Coverstone from Kirkland &
20  Ellis for the Allergan defendants.
21     MR. LUXTON:  Steven Luxton
22  from Morgan Lewis for the Teva
23  defendants.
24     MR. LOVRIEN:  Chris Lovrien

## Page 15

1  of Jones Day on behalf of Walmart.
2      MR. ALLEGAERT:  Chris
3  Allegaert of Allegaert Berger &
4  Vogel for Rochester Drug Co-op.
5      MR. JOHNSON:  Joel Johnson
6  of Williams & Connolly on behalf
7  of Cardinal Health.
8      MR. DEARMAN:  Mark Dearman,
9  Robbins Geller, on behalf of the
10  plaintiffs.
11     MS. ANTULLIS:  Who's on the
12  phone?
13     MS. MOBLEY-RITTER:  This is
14  Devon Mobley-Ritter of Covington
15  and Burling for McKesson.
16     MS. ANTULLIS:  Is that
17  everybody?
18     MR. McCORMICK:  Good
19  morning.  This is Sean McCormick
20  from Arnold & Porter for the Endo
21  and Par defendants.
22  BY MS. ANTULLIS:
23     Q.   I'm going to show you what
24  we're going to mark as Exhibit 1.

## Page 16

1      (Document marked for
2  identification as Exhibit
3  Baran-1.)
4  BY MS. ANTULLIS:
5      Q.   Tab 1.  Have you seen this
6  document before?
7      A.   Yes, this is -- no, I did
8  not.
9      Q.   Okay.
10     A.   This is not my invitation,
11  this isn't what I thought it was.  I'm
12  sorry.
13     MR. ALLEGAERT:  Could I ask
14  the witness to please keep her
15  voice up.  It's hard to hear down
16  here.
17     THE WITNESS:  Certainly.
18     MR. ALLEGAERT:  Thank you.
19  BY MS. ANTULLIS:
20     Q.   All right.  So you haven't
21  had an opportunity to review this yet?
22     A.   I have not seen this
23  document, no.
24     Q.   Do you understand that

Page 17

1   you're here to testify in -- to give
2   testimony in the case that's reflected in
3   the caption on that document?
4        A.   Yes.  I understand the
5   subject matter.  Yes.
6        Q.   And do you understand that
7   you've been sworn in under oath as if you
8   were in a court of law?
9        A.   Correct.
10       Q.   And what does that mean to
11  you?
12       A.   To testify with -- to the
13  best of my knowledge and honestly and
14  accurately.
15       Q.   And how -- if you -- how
16  were you invited to attend this
17  deposition?
18       A.   I was contacted by Teva's
19  attorneys, notified that I was being
20  invited to a deposition.  They notified
21  me, I think it was by e-mail.
22       Q.   Would that have been Steve
23  or someone else?
24       A.   Someone from his firm.

Page 18

1        Q.   Someone from his firm.  Do
2   you happen to remember who that was?
3        A.   Someone by the name of
4   Arcangelo.
5        Q.   Did you have any
6   conversations with Mr. Arcangelo
7   regarding the deposition?
8        A.   Yes, I did.
9        Q.   Do you remember how many
10  times you talked to him?
11       A.   By phone, two to three
12  times.
13       Q.   And do you remember how long
14  each of those conversations were?
15       A.   One or two were very, very
16  brief.  The third was a little bit more
17  in detail.
18       Q.   Have you met with any other
19  attorneys or any other people in your
20  preparation for this deposition?
21       A.   Yes, I have.
22       Q.   Okay.  How many times?
23       A.   One occasion.
24       Q.   And was that person or on

Page 19

1   the phone?
2        A.   In person.
3        Q.   And how many people were
4   there?
5        A.   Four.
6        Q.   And were those people
7   attorneys?
8        A.   Yes, they were.
9        Q.   Was anyone not an attorney?
10       A.   No.
11       Q.   How long did that meeting
12  last?
13       A.   A few hours.
14       Q.   A few hours?
15       A.   Yeah.  A better part of the
16  day.  I would say maybe six hours.  I
17  don't know.  Yeah, it was about six
18  hours.
19       Q.   And do you remember who
20  those people were?
21       A.   Yes.  And if you don't mind,
22  I -- having just met them, I didn't want
23  to mess any names up.  So I brought with
24  me a card.  So Arcangelo's last name for

Page 20

1   the record is Cella.  He is from Morgan
2   Lewis.  Steven, who's here today.  And
3   then our two attorneys that are sitting
4   on my left on the Allergan side were
5   present as well.
6        Q.   Okay.  Do any of the
7   attorneys sitting next to you represent
8   you?
9        A.   Yes, they do.  Both.
10       Q.   Both being Jennifer --
11       A.   Both firms.
12       Q.   Okay.  So that would be all
13  three attorneys sitting next to you?
14       A.   That's correct.
15       Q.   When you prepared for the
16  deposition, when you had the six-hour
17  meeting, did you review any documents?
18       A.   Yes.
19       Q.   Do you remember what the
20  context of those documents were?
21       A.   There were -- there were
22  different documents.  Some of them were
23  just e-mails discussing the subject
24  matter.

Page 21

1      Q.   Okay.  Do you remember how
2   many documents approximately?
3      A.   Not too many.  I would say
4   less -- less than 12, certainly.
5      Q.   Less than 12?
6      A.   Yeah.
7      Q.   Did any of those documents
8   help you refresh your memory about your
9   time at Actavis, Allergan and Teva?
10     A.   It did.  But to be honest
11  with you, in looking at them, it's almost
12  like it was yesterday.  They were very
13  familiar to me.
14     Q.   Okay.  Did you review any
15  other documents outside of documents that
16  you kept in the ordinary course of
17  business, such as news articles, journal
18  articles, court documents?
19     A.   The only thing I reviewed is
20  a copy of a presentation I had done on
21  the subject matter just to refresh
22  myself, because it's been seven years
23  since I managed this process.  And on
24  the -- if I get into the details, I

Page 22

1   wanted to make sure that there wasn't
2   anything pertinent that I forgot.  So I
3   did review a presentation that I had
4   prepared several years ago.  It was like
5   a status report.
6      Q.   Do you remember who that
7   presentation -- who you made that
8   presentation to?
9      A.   It was a presentation that I
10  would have done leading the SOM project
11  to our steering committee.
12     Q.   Okay.  So it would have been
13  a presentation you did during the course
14  of your employment --
15     A.   Yes.
16     Q.   -- with Actavis?
17     A.   Yes.
18     Q.   Okay.  Have you reviewed a
19  copy of the complaint that's been filed
20  in this litigation?
21     A.   No, I have not.  Is that
22  what this is?
23     Q.   Yeah.
24     A.   No.

Page 23

1      Q.   Has anyone summarized the
2   allegations for you?
3      A.   Yeah.  And that was the
4   benefit of the meeting with the
5   attorneys.  Telling me what I was here
6   for so I understood what this was all
7   about.
8      Q.   And that was the single
9   six-hour meeting that you referred to
10  earlier with the four attorneys?
11     A.   Yes.  And then the one phone
12  discussion.
13     Q.   With Arcangelo?
14     A.   Yes.
15     Q.   And that was the longer
16  phone conversation?
17     A.   And there was someone else
18  on the phone.  I apologize.  I don't
19  remember.  My focus was with Arcangelo,
20  because I was dealing with him on
21  logistics and my availability.  So I
22  don't recall who else was on the phone
23  call.  I know who was in the in-person
24  meeting.  The phone call, I apologize I

Page 24

1   don't remember outside of Arcangelo.
2      Q.   Okay.  Do you remember about
3   how long that one -- that phone call was?
4      A.   I would say less than an
5   hour.  About an hour.
6      Q.   Okay.  About an hour?
7      A.   Yeah.
8      Q.   Did you bring any documents
9   with you today --
10     A.   No, I didn't.
11     Q.   -- to the deposition?
12     A.   No.  I brought my little
13  cheat sheet, business cards so I have --
14     Q.   To help you remember?
15     A.   -- the last names.
16     Q.   Understood.  When you were
17  preparing for the deposition, did you
18  review any of your own personal paper or
19  electronic files?
20     A.   Just what I mentioned to you
21  earlier.
22     Q.   So you reviewed the
23  presentation through your own personal
24  files?

Page 25

1      A.  Yes.
2      Q.  Okay.  And you have not
3  brought that with you today; is that
4  correct?
5      A.  No.
6      Q.  Did you provide that
7  document to your attorneys?
8      A.  I did not, but that was one
9  of the documents they had, and that was
10  what we looked -- one of the documents we
11  looked at.  It wasn't anything new to
12  them.
13      Q.  So you looked at a copy of a
14  presentation that you had in your own
15  files that you then also saw from the
16  attorneys during your meeting with them;
17  is that correct?
18      A.  That's correct.
19      Q.  Okay.  Have you spoken with
20  any current employees at Actavis,
21  Allergan, Teva -- forgive me, I'm going
22  to -- I will start using Actavis to refer
23  to the entities that you worked for,
24  Actavis, Allergan and Teva.

Page 26

1      A.  I know.  It's confusing.
2      Q.  But for right now I'm going
3  to say, have you spoken with any current
4  or former employees at Actavis?
5      A.  I spoke with one employee.
6  It happened to be through a job
7  interview, and it just came up in
8  dialogue when we were talking about
9  scheduling and my availability.  I said,
10  "Oh, I'm invited to my first deposition."
11  Not even really knowing much about what
12  this was about.
13          And that was a former
14  employee of the company, but it's one I
15  really never even worked with.  I mean,
16  the type of employee you saw in the
17  hallway, you knew of him, he probably
18  knew of me.  But we really never worked
19  together.  So it just came up in the
20  context of a job interview when we were
21  talking about scheduling, but we didn't
22  talk about it at any -- in any detail.
23      Q.  Okay.  So do you remember
24  that person's name?

Page 27

1      A.  Yes.
2      Q.  And who was that?
3      A.  Dan Motto, M-O-T-T-O.
4      Q.  Dan Motto?
5      A.  Yes.
6      Q.  So am I understanding
7  correctly that you contacted Dan Motto to
8  discuss a job interview that you are
9  going to attend?
10      A.  No.  I found a job
11  opportunity, because I'm currently
12  searching.  I interviewed.  And during
13  the course of that five-hour interview
14  with seven different people from the
15  company, he was one of the meetings that
16  I met with.  And because he happened to
17  be a former employee.
18      Q.  I see.
19      A.  And we were talking about my
20  scheduling and availability, I just
21  mentioned it.  But he would be the only
22  former person linked to the company that
23  I would have even mentioned this to.
24      Q.  Okay.  So you are not

Page 28

1  currently in contact then with any -- any
2  current or former employees, other than
3  this one instance during a job interview;
4  is that correct?
5      A.  That's -- other than one
6  employee that referred me to the
7  position.  If that's relevant.
8      Q.  Who is the employee that
9  referred you to the position?
10      A.  Kathleen Carlson.  She was
11  in contracts.  She had done some work for
12  the company just on a consulting basis.
13  In the interim they needed some process
14  help.  And I believe they were seeking
15  her for this role and she was not
16  interested and she said I know a great
17  person that was outplaced as a result of
18  the Teva acquisition, as a synergy.  So
19  she referred me.  But that was the extent
20  of it.  You know, she passed me on as a
21  candidate.
22      Q.  Understood.  Are you
23  currently married?
24      A.  Yes.

1    Q.  Have you spoken about this
2  with your spouse, the deposition?
3    A.  Yes.  Not in any -- any
4  length.  We never really make a habit of
5  talking about work, but he knows
6  obviously where I am today and -- and why
7  I had to be, you know, out of the house.
8  So, yeah.
9    Q.  Have you spoken to anybody
10  else about the deposition?
11    A.  No one else other than my
12  kids who were tracking me and -- and
13  wondering like, where I was going on my
14  phone.  I very briefly had to say I am
15  going to do some work for a former
16  company that I was with.  But they
17  wouldn't really understand what a
18  deposition is, so...
19        That would be the extent of
20  it.
21    Q.  I'm laughing because I do
22  that to my mother all the time.
23    A.  Yeah.  Yeah, they -- they
24  stalk me a little bit.  So they know

1  where I am.
2    Q.  Are you familiar with the
3  defendants in this litigation?
4    A.  To -- to its entirety, no, I
5  am not.  I know that Actavis and Allergan
6  are, because that's why I'm here today.
7  Beyond that, I really do not know.
8    Q.  So let me ask you then.
9  Have you spoken with any current and
10  former -- current or former employees at
11  Purdue?
12    A.  No.  I don't even know if I
13  know anyone at Purdue.
14    Q.  Have you spoken with any
15  current or former employees at Janssen?
16    A.  That would be the same
17  answer.  No, I don't believe I even know
18  anyone at Janssen.
19    Q.  Have you spoken to any
20  current -- I'm sorry, I have to do this.
21    A.  That's okay.
22    Q.  Have you spoken with any
23  current or former employees at Endo?
24    A.  No.

1    Q.  Have you spoken with any
2  current or former employees at Insys?
3    A.  No.
4    Q.  Have you spoken with any
5  current or former employees at
6  Mallinckrodt?
7    A.  No.
8    Q.  Have you spoken with any
9  former or current employees of
10  AmerisourceBergen?
11    A.  No.
12    Q.  Have you spoken with any
13  current or former employees of Cardinal
14  Health?
15    A.  No.
16    Q.  Have you spoken with any
17  current or former employees of Walgreens?
18    A.  No.
19    Q.  Have you spoken with any
20  current or former employees of Walmart?
21    A.  No.
22    Q.  Have you spoken with any
23  current or former employees of Rite Aid?
24    A.  No.

1    Q.  Have you spoken with any
2  current or former employees of McKesson?
3    A.  No.
4    Q.  Do you have a relationship
5  with any current or former employees at
6  any of these entities I just listed?
7    A.  The only relationship I can
8  think of would be my sister-in-law who
9  used to work for Walgreens.  She managed
10  a local retail location.  She is not
11  currently with them.  And to be honest I
12  can't tell you the last time I even spoke
13  with her.  It's been a long time.  Like
14  more than a year.
15    Q.  So is it safe to assume that
16  you haven't spoken to her about the case
17  or the deposition?
18    A.  That is correct.
19    Q.  Okay.  Are you -- well,
20  first of all, what company were you
21  interviewing with, if you don't mind
22  sharing?
23    A.  Hikma Pharmaceuticals.
24    Q.  Hikma?

Page 33

1      A.   Hikma, H-I-K-M-A.
2      Q.   Thank you.  And what
3  position were you interviewing for at
4  Hikma?
5      A.   It was a confidential
6  position because there is still a person
7  in that role.  So, I don't know, is this
8  information going to be shared?  I don't
9  want to --
10     MS. LEVY:  Do you really
11  need that?
12     MS. ANTULLIS:  No --
13     THE WITNESS:  It was a very
14  similar role to what I used to do,
15  with some new and additional
16  responsibilities which represented
17  career growth to me.  I was able
18  to manage some of the contractual
19  aspects, some different things I
20  haven't done yet, on top of what
21  I've been doing my entire career.
22  So it -- it was an opportunity
23  that represented career growth.
24  BY MS. ANTULLIS:

Page 34

1      Q.   So what I am trying to get
2  at, and you're hinting at it here, is
3  what are your -- what would be your
4  responsibilities in that position, what
5  are you looking to do?
6      A.   In that role, I would have
7  similar responsibilities to what I built
8  my career around, which is managing the
9  order to cas -- order to cash, excuse me,
10  and the customer relations team.  In
11  addition to that, there was going to be
12  some additional roles in terms of
13  cleaning up some of their -- how do I
14  describe it?  This was new to me, this
15  was the new aspect of the role, so I just
16  want to make sure I state it clearly.
17     Where they had, you know,
18  contractual obligations to their customer
19  in terms of, you know, reviewing things
20  like returns is a good example.  I
21  typically didn't manage returns.  So that
22  would be a new element.  And there was a
23  couple other things in this role that
24  intrigued me because, A, I am very

Page 35

1  actively interested in gaining employment
2  again.  I don't like sitting home being a
3  stay-at-home mom.
4      But, B, the career
5  opportunity was everything I'm good at,
6  and -- and some new things.  So it was
7  career growth.  It's the best way to
8  describe it.
9      Q.   I understand.  Thank you.
10     Are you being -- are you
11  being reimbursed by anyone for your
12  expenses in connection with this
13  deposition?
14     A.   No.  While that would be
15  nice, that's not the case.
16     Q.   Are you being paid by anyone
17  for your time in connection with your
18  attendance at or preparation for this
19  deposition?
20     A.   No.
21     Q.   So I believe I am going to
22  show you Exhibit Number 2.
23     (Document marked for
24  identification as Exhibit

Page 36

1      Baran-2.)
2  BY MS. ANTULLIS:
3      Q.   So I will represent to you
4  that Exhibit 2 is a printout of your
5  LinkedIn profile that I was able to find
6  online.  I just want you to look through
7  it --
8      A.   Okay.
9      Q.   -- and tell me whether or
10  not you have any reason to believe that
11  this is not an accurate reflection of
12  your current LinkedIn profile.
13     A.   Having scanned it, it looks
14  to be pretty accurate.
15     Q.   So you believe that this is
16  an -- an accurate reflection of your
17  profile?
18     A.   Yeah.  That -- the format
19  looks a little different, but, yes.
20     Q.   Okay.  And does the
21  information contained therein reflect
22  your -- your professional career
23  development through July 2018?
24     A.   Yes, it would.

Page 37

1      Q.   Okay.  So I would like to go
2  through this with you.  Starting at the
3  back, your education, it says that you
4  went to, forgive me if I -- if I
5  pronounce this incorrectly, Ramapo
6  University; is that correct?
7      A.   Ramapo, correct.
8      Q.   Ramapo University.  What did
9  you study at Ramapo University?
10     A.   Business administration.
11     Q.   What does business
12 administration entail?
13     A.   Business management.
14     Q.   Okay.
15     A.   I mean beyond that, it's --
16 it's -- I mean how do you describe
17 business management, right?  That's
18 funny, I've never been asked that
19 question.  It's just general business on
20 how to be successful in the corporate
21 world and -- and how to be well rounded
22 and -- and all the basic criteria that
23 you take, you know, in college.
24     Q.   When did you -- and did you

Page 38

1  graduate from Ramapo University?
2      A.   Yes, I did.
3      Q.   And when was that?
4      A.   January 1990.
5      Q.   January 1990?
6      A.   Yes.
7      Q.   And did you -- what -- you
8  got a bachelor of science in business
9  administration?
10     A.   That's correct.
11     Q.   Was there a major, an area
12 of concentration involved in -- in your
13 degree?
14     A.   Management.
15     Q.   Management?
16     A.   Yeah.
17     Q.   Were there other areas of
18 concentration available at the
19 university?
20     A.   Oh, I'm sure there were
21 available, yeah.
22     Q.   So then, you went to
23 Cranfield University, Cranfield School of
24 Management; is that correct?

Page 39

1      A.   Yes.  That's a little
2  deceiving.  It's there to look -- make
3  myself to look enticing to future job
4  employers if we want to be honest.
5  It's -- it's not a -- I didn't go there
6  as a university as you might imagine.
7  Actavis, actually, was very good at
8  providing career development
9  opportunities in terms of developing
10 their employees, and I was able to travel
11 to England and spend a week and study in
12 a management program at Cranfield
13 University.  So it's not that I was there
14 a semester or a year or longer.  It was a
15 very brief period of time.
16     Q.   Do you remember when you
17 went?
18     A.   No, I do not.
19     Q.   Do you remember the
20 approximate time frame?  Was it -- let me
21 restate the question.  Was it early in
22 your time at Actavis?
23     A.   Yes.  It was within the
24 first four years.  I don't remember the

Page 40

1  exact time.  But it was definitely within
2  the first couple of years.
3      Q.   Okay.  And did Actavis pay
4  for it?
5      A.   Yes, they did.
6      Q.   And did that -- they paid
7  for your travel?
8      A.   Yes.
9      Q.   What did you study during
10 that week?
11     A.   You know, to be honest,
12 it's -- it's a little bit of a blur.  I
13 don't recall specifics but it was
14 teaching you different things about group
15 dynamics and working well as a team.
16 Beyond that, I don't -- I don't recall.
17 I know it was a good opportunity.  But I
18 don't remember a recall a lot of the
19 details.  I'm sorry.
20     Q.   No need to apologize.  Do
21 you remember if you got a certificate of
22 some kind?
23     A.   Yes, I got a certificate.
24 I'm not really sure what the certificate

Page 41

1  said, you know, other than probably you
2  completed this week session.  But beyond
3  that, I don't recall.  It was a paper
4  certificate.
5      Q.   My apologies.  Did you
6  receive other kinds of training while you
7  were at Actavis?
8      A.   Yes.
9      Q.   And were any of them
10  external trainings like the one that you
11  attended at Cranfield University,
12  external meaning external to --
13      A.   Yeah, the only thing that
14  I'm trying to recall for example American
15  Management Association had all kinds of
16  seminars.  I'm trying to -- I mean I know
17  I sent my team to some.  I'm trying to
18  remember if I did any external.  I went
19  to conferences.
20          Whether I went to any
21  external training, to be honest with you,
22  I don't -- I don't recall.
23      Q.   Do you remember what kinds
24  of conferences you attended while you

Page 42

1  were at Actavis?
2      A.   There was a conference that
3  I recall.  I'm not sure when.  It was run
4  by an organization, ICSA.  It was an
5  International Customer Serve Association.
6          I also went to a DEA
7  compliance meeting somewhere in the
8  Maryland/Washington area.  I don't recall
9  where that was.  Those are the two that I
10  remember.
11      Q.   And the DEA compliance
12  meeting, was the DEA compliance meeting a
13  conference?
14      A.   Yes.  It was a conference
15  run by what I would deem a vendor called
16  Cegedim Compliance Solutions.  And they
17  were really bringing the industry
18  together educating on the topic and you
19  know, regulations and all that.
20      Q.   Do you remember
21  approximately when that conference took
22  place?
23      A.   No, I do not.  I could
24  estimate within a few years.  But I don't

Page 43

1  remember exactly when it was.
2      Q.   Could you estimate within a
3  few years?
4      A.   Yeah.  So let's backtrack a
5  minute.  I started with Actavis in
6  January of -- what year are we in --
7  2008.  I think we were acquired by Watson
8  and became a combined company maybe
9  somewhere between four and five years
10  after that.  So maybe around 2012, the
11  fall.
12          So it would have been
13  roughly, I'm going to guesstimate 2010 to
14  '12.  But that's a guess, I'm sorry.
15      Q.   Thank you.  So next we're
16  going to go to your first job that you've
17  listed on the LinkedIn profile.
18  Datascope Corp., international
19  coordinator; is that correct?
20      A.   That's correct.
21      Q.   It says that you started in
22  1992 and worked there for two years in
23  Montvale, New Jersey.  Is that correct?
24      A.   Give me one moment.

Page 44

1      Q.   Sure.
2      A.   Because I didn't think it
3  was '92.  I thought it was '90.  Let's
4  see.  It's not on the last page.  That's
5  why.  So it wasn't '92.  I had a feeling
6  that was wrong.
7      Q.   Okay.
8      A.   It was 1991.  If I remember
9  correctly, October 7th was my start day.
10      Q.   Wow.
11      A.   I don't know why I remember
12  that.  But I -- but I do.
13      Q.   It was October 7th?
14      A.   1991.
15      Q.   Right.  That's what -- it
16  says 1991, 1992.
17      A.   Yes.
18      Q.   So as a domestic account
19  representative at Datascope, what were
20  your job duties?
21      A.   Just to step back a minute
22  to clarify.  When you mentioned that I
23  worked at Datascope from 1991 to 92, it
24  was much longer than that.  All the

Page 45

1   positions above that are with the same
2   company.  So that time period was just
3   one role within the company.  I spent
4   13 years there.
5       Q.   Right.  I am trying to
6   understand over time --
7       A.   Perfect.
8       Q.   -- what your -- what your
9   responsibilities were.
10      A.   Okay.
11      Q.   But were your
12  responsibilities consistent across the
13  13 years?
14      A.   No.  I had consistent
15  increasing responsibilities over that
16  period.  But now I'll go back and
17  apologize.  To answer your original
18  question, as a domestic account
19  representative, this was -- my first real
20  job out of college I was doing data
21  processing, order entry, customer
22  service, making sure the customers' needs
23  were met, making sure orders were
24  shipping properly and accurately.

Page 46

1       Q.   And when you say customer
2   needs, how would you define those needs?
3       A.   Making sure if they placed
4   an order, that the orders were processed
5   accurately, based on the terms and
6   conditions of the purchase order.  I
7   guess that's the best way to describe it.
8       Q.   What kind of company is
9   Datascope?
10      A.   So Datascope is no longer in
11  existence today.  But Datascope was a
12  medical device manufacturer.
13      Q.   Okay.  And so did your job
14  responsibilities change significantly
15  when you were promoted to international
16  coordinator?
17      A.   I wouldn't use the word
18  significantly.  It just shifted from a
19  domestic to an international, roles doing
20  very similar responsibilities.  And the
21  only difference, I would say, and would be
22  international was a little bit more
23  complex, so...
24      Q.   So it was more interesting?

Page 47

1       A.   Yes.  Exactly.
2       Q.   All right.  So then, it says
3   in 1994 you transitioned to manager of
4   global customer service and sales
5   support, and that you were in that role
6   for eight years; is that correct?
7       A.   That's correct.
8       Q.   Okay.  The first sentence
9   here, it says that you built the new
10  customer service department from the
11  ground up and spearheaded all phases of
12  org management and customer service.
13      A.   That's correct.
14      Q.   Can you tell me what
15  building the customer service department
16  from the ground up entailed?
17      A.   Okay.  So the company at the
18  time really had two business units.  They
19  had a cardiac assist division and they
20  had a patient monitoring division which
21  focused on different products.
22          At the time, prior to my
23  taking this role, the customer service
24  function was consolidated.  A decision

Page 48

1   was made that they wanted more focused
2   groups that would support the two
3   businesses independently.  And also
4   instead of in the corporate headquarter
5   locations, to be in their physical
6   buildings in their units.  So they split
7   the team.
8           The majority of the group,
9   based on location, all wanted to go to
10  the patient monitoring division which was
11  located in Paramus, New Jersey.  Very few
12  wanted to go to the cardiac division,
13  simply based on location, which was in
14  Fairfield, New Jersey, virtually in my
15  backdoor.
16          It was a great opportunity
17  for me.  To describe it as you requested,
18  I was given a blank sheet of paper and
19  said, "Here's your department, go build
20  it."  I was responsible for making
21  decisions on staffing, hiring, training,
22  making sure the processes were supporting
23  the business and the customers and so
24  forth.

1      Q.   Did you have a software
2  program or database that you used at
3  Datascope to help you manage and keep
4  track of customer orders?
5      A.   Yes, we did.  Yes.  That's
6  an easy answer.  I was just preparing for
7  the next question you may have about
8  which one it was.
9      Q.   Well, did you -- did you
10  implement the use of the software
11  program?
12      A.   It depended on when you
13  would ask that question.  Initially in
14  the early days, no, I did not.  But later
15  on in my career there, yes, I took an
16  active role in implementing an ERP
17  system.
18      Q.   That's part of -- you called
19  it an ERP system.  What does ERP stand
20  for?
21      A.   Enterprise resource
22  planning.  It's where the order-to-cash
23  activities take place.
24      Q.   Okay.  Does the ERP system

1  allow you to track sales?
2      A.   Sure, yes.
3      Q.   Does the ERP system allow
4  you to track customer returns?
5      A.   Yes.
6      Q.   Okay.
7      A.   But --
8      Q.   Sorry.
9      A.   It does, but I don't recall
10  if our returns were inhouse or
11  outsourced.  I'm sorry.  That was 15,
12  18 years ago.  I'm going to have to say
13  on that question, probably, yeah.
14      Q.   As part of your role as a
15  manager of global customer service and
16  sales support, did you have regular
17  meetings with company leadership?
18      A.   Yes.
19      Q.   And what sorts of things did
20  you discuss at those meetings?
21      A.   You know, business needs,
22  staffing.  You know, whether it be
23  meeting with human resources on employee
24  performance on how, you know -- coaching

1  and developing, building the team and
2  making sure they had the tools they need,
3  working with the technical groups, IT, on
4  making sure the teams had the right tools
5  they need to be successful.  It depended
6  on which area of the business you'd be
7  talking with, but sure, when you're in a
8  customer service role, it's normal course
9  of business to communicate with
10  management, so I would say the answer to
11  that would be yes.
12      Q.   Okay.  Thank you.  So you
13  stayed at Datascope through 2003; is that
14  correct?  2004, my apologies.
15      A.   Let me just verify that for
16  a moment.  That's correct.
17      Q.   And so it says that your
18  final role there, your -- your final
19  position was project manager ERP system
20  implementation?
21      A.   Yes.
22      Q.   Is that the implementation
23  that we were talking about a few minutes
24  ago?

1      A.   That's correct.
2      Q.   Okay.  So the -- in 2002, is
3  that when you brought a software
4  system -- you -- you implemented a
5  software system into the company's
6  customer service department?
7      A.   That's correct.
8      Q.   Okay.  As part of -- as part
9  of your role either as a project manager
10  or as the manager of global customer
11  service, did you ever discuss things
12  like -- did you ever discuss market share
13  with company leadership?
14      A.   No.  That would not have
15  been in my responsibilities, no.
16      Q.   Were there sales targets set
17  for -- were there sales -- sales targets
18  set for sales personnel at the company?
19      A.   Oh, I'm sure, absolutely.
20      Q.   Okay.  Were you aware of
21  what those sales targets were?
22      A.   No.  It did not impact my
23  role whatsoever.
24      Q.   Did you track revenue?

Page 53

1      A.  I did not, no.
2      Q.  Okay.  Let's go onto
3  Aircast.  It says that you were a senior
4  manager for global customer service.
5      A.  Yes.
6      Q.  2005 to 2007.  What were
7  your job duties at Aircast?
8      A.  So just to clarify on
9  record.  2005 to 2007 makes it look as
10  though I was there for two years.  I was
11  not, but when you have a resum , you play
12  with the months a little bit.  I was
13  there early in one year and -- and left
14  early in the other year.  So I was not
15  there two years.
16          Now, to answer your
17  question, which, I'm sorry, can you
18  repeat?
19      Q.  I asked -- I asked, while
20  you were at Aircast what were your
21  general job duties.
22      A.  Okay.  Job duties.  Aircast
23  was a medical device company as well.
24  And my job duties were very similar to my

Page 54

1  prior company although it was a much
2  smaller business, different product
3  lines.  But essentially the same thing,
4  managing the order to cash process.
5      Q.  Would you mind explaining to
6  me what the order to cash process is?
7      A.  Anything it takes to do
8  business in terms of making sure your
9  customer master data is set up properly,
10  you know, you're going to ship -- you're
11  going to send invoices to the correct
12  address.  You're going to ship to the
13  correct address.  Making sure that when
14  you get a purchase order in, that you're
15  following the terms and conditions as
16  stated in that purchase order.  In other
17  words -- you know, a customer can't come
18  in and ask for all kinds of crazy things
19  that you can't fulfill.  And -- and then
20  accept that purchase order, right.
21          So processing it.  Making
22  sure that the pricing the company is
23  stating is matching what the customer is
24  expected.  Dealing with any deviations or

Page 55

1  exceptions.  Working with the
2  distribution on the shipping process.
3  Dealing with anything that may result
4  from that.  Maybe something was shipped
5  to an incorrect address.  Anything that
6  would be included in that entire stretch,
7  that entire process.  Up to the point --
8  point when the invoice is sent out.
9          Not including any type of
10  receivables or collection activity.  That
11  was never in the scope of my
12  responsibility.
13      Q.  Okay.  So is it fair to say
14  that prior to your employment at Actavis,
15  you worked in customer service?
16      A.  Prior to my employment with
17  Actavis or Aircast?
18      Q.  Actavis.
19      A.  So you're back to Actavis.
20  So prior to Actavis?
21      Q.  Yes.
22      A.  I was -- I wouldn't say I
23  was in customer service.
24      Q.  Okay.

Page 56

1      A.  I was in a different line of
2  customer service.  But that's not
3  reflected even on -- on my profile.  I
4  was in retail.  You said prior to -- oh,
5  I'm -- I'm sorry, I apologize.  I
6  misunderstood the question.
7      Q.  My question was probably
8  unclear.
9      A.  I'm with the wrong company.
10          So you said prior to
11  Actavis --
12      Q.  Right.
13      A.  -- I thought you were saying
14  prior to Datascope.  My apologies.
15      Q.  So I apologize.  Let me ask
16  it differently.
17          From 1991, your first job at
18  Datascope, through 2007 --
19      A.  Yeah.
20      Q.  -- were you working
21  primarily in a customer service role?
22      A.  Yes.  Sorry, I didn't
23  understand your question originally.
24      Q.  And from -- from 1991

1   through 2007, were you working in
2   distribution management?
3       A.   Prior to -- what was the
4   year you were saying?
5       Q.   1991, just prior to your
6   employment with Actavis, so from your
7   first job in 1991 --
8       A.   Okay.
9       Q.   -- your first job listed on
10  your LinkedIn profile, from 1991, through
11  2007, were you working in the supply
12  chain --
13      A.   No, I wouldn't -- I would
14  never consider myself having worked in
15  supply chain and distribution.
16      Q.   Okay.
17      A.   Partnered with them, but,
18  no, that was not my responsibility.
19      Q.   Okay.  Would you -- would
20  you please describe -- you -- you said
21  that you partnered with distribution
22  management.  Can you explain what that
23  means, what the word "partnered" means in
24  that context?

1       A.   Sure.  When you work in a
2   customer service environment, you have to
3   partner with many cross-functional areas,
4   including those two, but not limited to.
5       So if you -- distribution as
6   an example.  When orders are passed to
7   distribution, if they have any questions
8   on fulfillment, let's just say the system
9   said there was inventory and it gets to
10  the distribution group and there isn't,
11  or -- anything that it takes to make them
12  successful on fulfilling the obligations
13  of what we're asking of them, you know,
14  working with them on different carrier
15  selection perhaps, some customers had
16  different carrier requirements.  So
17  anything it would take for them to
18  fulfill their obligation, we were -- we
19  were there to support and we partnered
20  together, because at the end of the day
21  our goal was the same, so...
22      The other -- the other group
23  was supply chain, to answer to that.
24  Supply chain is, you know, traditionally

1   responsible for, you know, building
2   inventory, whether it be building to
3   forecast or whatever mechanism the
4   company is using.
5       And, you know, sometimes if
6   an order came in, we may have to check
7   inventory to see if it's something that
8   we could fulfill or we may be on back
9   order.  And we would partner with groups
10  like that so that we had the proper
11  information to give our customers the
12  answers they needed, you know, in terms
13  of supply.  And that's pretty common in
14  whether it be medical devices, supply
15  chain, or many other industries, I'm
16  sure.
17      Q.   Thank you.
18      A.   Yeah.
19      Q.   So we're now going to talk
20  about your -- your time at
21  Actavis/Allergan/Teva.
22      A.   Mm-hmm.
23      Q.   We can go through the
24  LinkedIn profile, but I would like to

1   start with, just by asking you -- let me
2   see how I want to phrase this.
3       A.   I'll take a drink.
4       Q.   Take a drink.
5       What would you say your
6   career at Actavis -- what would you say
7   was the focus of your career at Actavis?
8       A.   Let's see.  The best way
9   to -- to describe that.  So in a company
10  you have many different cross-functional
11  areas.  And everybody has got their jobs
12  and their focus, right.
13      But to be a good partner, in
14  this case, manufacturer, you always have
15  to keep the customer's needs in mind.
16  And the customer means many different
17  things.
18      The customer could be
19  someone down the hall in another
20  department, was my customer.
21      The customer could be our
22  wholesalers, our distributors, our retail
23  chains.  Or the customer, at the end of
24  the day, is the patient.

Page 61

```
 1          If I were to describe my
 2  career in -- in a nutshell, I would say
 3  that I personally took ownership of
 4  making sure that the customer's voice was
 5  heard and the customer's needs were met.
 6  And that we always did the right thing,
 7  and we operated to the best of our
 8  ability.  I don't know.  It's the only
 9  way I can describe them.
10          I'm very passionate about
11  what I do.  And, you know, I put a lot of
12  myself into my role.
13      Q.  He's got horrible
14  handwriting.
15          So you started -- is it
16  correct to say that you started at
17  Actavis in 2008 as a director of customer
18  service?
19      A.  No, that would not be
20  correct.  I started out at Actavis, I
21  believe my first role was manager.  And
22  then I had several different progressions
23  throughout my career.  I think after
24  manager I went to team leader, senior
```

Page 62

```
 1  manager, director, and executive
 2  director.  I don't think there was
 3  another step before director.  I think
 4  there was five or so different titles
 5  over the course of what amounted to nine
 6  years.
 7      Q.  So I notice in your -- in
 8  your description under Actavis, director
 9  of customer service, it says that you
10  were an associate director at some point.
11  Does that help refresh your memory?
12      A.  Like I said, before director
13  I wasn't sure if there was another step,
14  but that's very likely.  Because that was
15  quite typical of the progression.
16      Q.  So when you started at
17  Actavis, what were your initial job
18  duties?
19      A.  So when I started at
20  Actavis, you know, we were a much smaller
21  company at the time.  I had a fairly
22  small team, but big enough to manage our
23  book of business.  And I was responsible
24  for, you know, very -- very much what I
```

Page 63

```
 1  described earlier.  Managing the order
 2  process, managing customer purchase
 3  orders, EDI transactions, shipments,
 4  anything, anything of that nature.  And I
 5  had a team that supported me.
 6      Q.  Did you have any involvement
 7  with the suspicious order monitoring
 8  program at that time?
 9          Hold on.  Let me -- let me
10  back up.
11      A.  Sure.
12      Q.  Was there a suspicious order
13  monitoring program at Actavis when you
14  started in 2008?
15      A.  Yes.
16      Q.  Did you have any involvement
17  with the suspicious order monitoring
18  program at Actavis in 2008?
19      A.  Yes.
20      Q.  What was your involvement
21  with the suspicious order monitoring
22  program in 2008?
23      A.  So specifically at that
24  time, my involvement -- and I want to
```

Page 64

```
 1  clarify, because it's different than what
 2  it was at a later point, basically
 3  involved executing the operational piece
 4  on the process that had been built and
 5  the procedures that were outlined before
 6  I came in.  I don't -- I can't take
 7  responsibility or ownership, or credit I
 8  think is the better word for that.  I
 9  was -- I executed.  That was my job.
10      Q.  And would you mind -- please
11  explain the process through which you
12  would execute the suspicious order
13  monitoring program?
14      A.  Okay.  So we -- we had a
15  report that would be generated that would
16  trigger to us anything of interest.  It
17  was never deemed that it was suspicious.
18  It was just an order, you know,
19  definitely worth looking at just to
20  review and, you know, to do our due
21  diligence to make sure that we could make
22  sense of it before it was authorized for
23  shipment.
24          So it was our job to do due
```

Page 65

```
 1    diligence, and we would have to work with
 2    different groups to do that.  So perhaps
 3    we had to, you know, work with contracts
 4    to say, hey, how come a customer is
 5    ordering product X, and they never have
 6    before, so it's coming up on the report,
 7    which was part of the design.  It was a
 8    new -- new controlled drug, they never
 9    ordered before.  That was an automatic
10    flag.
11            And it would be our job to
12    verify that that was legitimate, it was
13    something that was contracted, expected,
14    and then we would approve -- you know,
15    the order would be released.
16        Q.   By "our," do you mean the
17    customer service department?
18            MS. LEVY:  Objection to
19        form.  You can answer.
20    BY MS. ANTULLIS:
21        Q.   When you say -- I'll
22    rephrase it.  When you say it was our job
23    to -- I'll read it back.  Did you say due
24    diligence?
```

Page 66

```
 1            When you said, "It was our
 2    job to verify that that was legitimate,"
 3    who is "our"?
 4        A.   Okay.  "Our," my team,
 5    customer service.  We would do the leg
 6    work, and we didn't necessarily have all
 7    the answers.  But it was our job to make
 8    sure that we got them.  Does that make
 9    sense?
10        Q.   Thank you.  You stated that
11    there was a report that was generated.
12        A.   Yes.
13        Q.   Did you have -- what was the
14    name of that report?
15        A.   It was generated from QAD
16    which was our system at the time.  It had
17    some long fancy number like 75.3.7.9,
18    whatever.  I don't know the exact number
19    in terms of the title, I can't be certain
20    of the exact title.  But it was something
21    along the lines of suspicious order
22    monitoring report.  And I may not be
23    completely accurate on that.  It's been a
24    while.
```

Page 67

```
 1        Q.   What does QAD stand for?
 2        A.   I'm not sure what the
 3    acronym stands for.  QAD is another ERP
 4    system.  It's what we used in the earlier
 5    years at Actavis.
 6        Q.   So what -- how would a --
 7    how would a report be triggered?
 8        A.   Reports were triggered
 9    automatically out of the system.  They
10    didn't have -- it didn't rely on a person
11    to hit a button and print it.  They were
12    generated automatically several times
13    throughout the day.
14        Q.   So what would you do when
15    you received a purchase order or, what
16    would you -- who -- first of all, explain
17    to me the process.
18            When -- when a customer
19    places an order, who takes the order
20    down?  Or how does the customer place an
21    order?
22        A.   Okay.  The customer can
23    place an order in a number of different
24    ways.  One of the more common ways would
```

Page 68

```
 1    be they would place it electronically
 2    through EDI.  But we did have a lot of
 3    customers that also placed orders
 4    manually.
 5            Manually could mean one of
 6    two things.  Manual meaning just a
 7    hardcopy purchase order.  I mean, it
 8    wasn't too common at that time that they
 9    would use mail.  But fax was very common,
10    and e-mail not so much.  But fax was very
11    common.  And then -- and then EDI.  So it
12    was a combination of the two.
13        Q.   And then how would that
14    information make it into your QAD system?
15        A.   If -- one of two ways,
16    either electronic or manual.  So if it
17    was a manual purchase, it would be
18    manually entered.  If it was electronic
19    it would be uploaded automatically within
20    the system.
21        Q.   And then who did the manual
22    entering?
23        A.   My team.
24        Q.   And who did the electronic
```

Page 69

1 uploading?
2     A.  The system.
3     Q.   The system automatically.
4         Okay.  So you had the orders
5 that are entered into the QAD system; is
6 that correct?
7     A.  Yeah.
8     Q.   And then what -- what
9 criteria would be used to automatically
10 generate a suspicious order report or the
11 long form report?
12     A.   I'm sorry.  Can you clarify
13 the question?
14     Q.   So you said that the
15 reports, whose name you're not sure, but
16 I'm going to say --
17     A.   It's a number.
18     Q.   -- suspicious order report
19 with a number.  You said that it was
20 automatically generated from the QAD
21 system --
22     A.   Correct.
23     Q.   -- when information --
24 when -- it was automatically generated in

Page 70

1 the QAD system.
2         Was it automatically
3 generated when the purchase order
4 information was entered into the system?
5     A.   Yes.  It would have to be
6 afterwards.  So that's why it was several
7 times throughout the day.  Each report
8 would capture the orders that came prior
9 to it.
10     Q.   Okay.  And what -- what
11 flagged in the system that caused it to
12 enter a particular order onto this
13 report?
14     A.   So it's been quite some
15 time.  And I don't feel that I can speak
16 completely accurate to the logic behind
17 the report.  But I can speak to some.
18 There were different criteria.  So maybe
19 a customer was a first-time purchaser.
20         You know, sometimes it was a
21 new drug, you know, a new product launch.
22 Those would automatically be flagged as
23 new.  Maybe it was a new size, or perhaps
24 the purchase quantities, you know,

Page 71

1 exceeded whatever the threshold that was
2 set -- and I apologize, I don't recall
3 what that was -- based on historical
4 purchases.
5     Q.   I'm going to show you a
6 document that I will enter as Exhibit 3.
7         (Document marked for
8         identification as Exhibit
9         Baran-3.)
10         MS. ANTULLIS:  It's Tab
11 Number 9.
12 BY MS. ANTULLIS:
13     Q.   In the meantime, can I ask
14 you, did you review any -- did you review
15 any criteria in preparation for this
16 deposition?
17     A.   This criteria, no.
18     Q.   That we are discussing.
19     A.   No.
20     Q.   Did you review -- are you
21 familiar with the Controlled Substance
22 Act?
23     A.   Yes.
24     Q.   Did you review the

Page 72

1 Controlled Substance Act prior to this
2 deposition?
3     A.   No.  But I'm familiar with
4 it.  Yeah.
5     Q.   I'll give you a minute to
6 read it.
7     A.   Thank you.  I'm almost
8 there.  Bear with me.  I'm sorry.
9     Q.   Do you recall -- do you
10 recall this e-mail chain?
11     A.   I honestly don't recall it.
12 But it looks very accurate as something
13 that would have happened.
14     Q.   Do you have any reason to
15 believe that this was not you, Nancy
16 Baran?
17     A.   No.
18     Q.   Is this something that you
19 would have sent in the ordinary course of
20 your business?
21     A.   Yes, very possible.
22     Q.   Does the explanation on the
23 first page where you list a bullet point,
24 and it says, "An order appears in the

Page 73

1  suspicious order report if it meets the
2  following criteria," six bullet points.
3      A.  Six bullet points.
4      Q.  Does that refresh your
5  recollection as to what criteria
6  triggered a suspicious order report in
7  2009?
8      A.  Does that refresh?
9      Q.  Right.  You got --
10     A.  Yeah.
11     Q.  Right.
12     A.  Yes.  Yes.
13     Q.  Okay.  So let's go through
14  this for a minute.  I'd like to
15  understand Bullet Point Number 2.  You
16  say, "The 25 percent threshold will
17  increase to 40 percent for abuse-type
18  drugs."
19          What does that mean?
20     A.  So based on what I'm reading
21  here, I'm clearly detailing, I guess,
22  part of what the program was doing.  But
23  having not built it, I don't know if I
24  can speak to that at this point.  I don't

Page 74

1  know.  I don't know if I can answer that
2  question.
3      Q.  So you don't know what you
4  meant when you said the 25 percent
5  threshold will increase to 40 percent for
6  abuse-type drugs?
7      A.  I don't recall.  And if I
8  tried to give you an answer, I would be
9  making one up.
10     Q.  All right.
11         MS. LEVY:  Don't -- don't
12     guess or speculate.  She wants --
13     she wants you to answer what you
14     know.
15         THE WITNESS:  Yeah, I don't
16     know.
17  BY MS. ANTULLIS:
18     Q.  Pull -- pulling back then.
19  It says -- it says that, you know, if the
20  amount ordered by the customer is
21  25 percent over the customer's rolling
22  average, and it refers below for what
23  that means, that that would trigger a
24  suspicious order, right?

Page 75

1          Is that correct, is that
2  what it says?
3      A.  That's what it says.
4      Q.  Okay.  And then again it
5  says that the report is printed several
6  times a day, which you testified to
7  earlier.
8          When it says, and if you
9  were -- do you recall whether that
10  25 percent was a -- a threshold that was
11  applied against purchases that came in
12  daily?
13     A.  I apologize, but I don't
14  have any recollection of that, the
15  criteria behind it.
16     Q.  Higher up in the e-mail, you
17  say, "John, the quick answer to the first
18  part of your question is that we do have
19  a process in place to govern the ordering
20  of controlled drugs.  The longer question
21  is that I believe our process is not
22  current and that there are significant
23  room for improvement."
24          Do you remember what

Page 76

1  improvements you were thinking of when
2  you wrote that?
3      A.  Oh, absolutely.
4      Q.  Okay.  Would you share with
5  me what improvements you thought the
6  system needed?
7      A.  Sure.  Automation.  I mean I
8  was -- remember, I was the team that had
9  to execute on the operational piece, and
10  it was very manual and very
11  time-consuming, and, you know, we were --
12  it was -- it was burdensome.  I mean it
13  achieved our objective, but it was very
14  manual.  That's the -- the simplest way
15  to describe it.  Painful.
16          We got to our destination,
17  but it -- we took, you know, a very
18  manual route to get there.  I don't know
19  how to explain it any other way.
20     Q.  What was -- I'm trying to
21  understand what -- what was manual.
22          When you say manual, do you
23  mean that the review of the order report
24  and determination of suspicious orders

Page 77

1 was a manual process?
2     A.   Yes.  Well, that as well.  I
3 mean it took someone to look at the
4 report, stop on -- on every order,
5 question, meet, have discussions, you
6 know, document really, and -- and all
7 those steps.
8          It was -- you know, the
9 system gave its judgment and its opinion,
10 and, like, based on the criteria that
11 were set, but then the rest of the
12 process was manual.
13     Q.   Okay.  And again, the
14 criteria that were set by the system, do
15 you recall what those are?
16     A.   That's where I'm -- I'm very
17 grey.  It's been so many years.  I -- I
18 really don't feel that I could speak
19 accurately to the criteria that the
20 report was looking at.
21     Q.   Do you have any reason to
22 believe that -- that the explanation that
23 you've given in Exhibit 3 in this e-mail
24 is inaccurate?

Page 78

1     A.   Exhibit 3 -- oh, the whole
2 exhibit?
3     Q.   In the bullet point list.
4     A.   Oh.
5     Q.   In your explanation to
6 John --
7     A.   Okay.
8     Q.   -- it goes through the first
9 and then goes to the middle of the second
10 page.
11     A.   Yes.
12     Q.   Do you believe that to be an
13 accurate representation of what the
14 system -- the criteria of the system was
15 based on at the time you sent the e-mail?
16     A.   To the points that I recall,
17 yes.  In terms of the criteria and the
18 percentages and all that, if -- if I put
19 it there, it came from somewhere.  But I
20 wouldn't have recalled that if you asked
21 me.
22          You know, you can see one of
23 his questions was about making sure we're
24 shipping to licensed customers.  I mean,

Page 79

1 we had a lockdown process.  Nothing went
2 anywhere if the customers weren't
3 properly licensed.  Things were locked up
4 very tight, and there was -- there was no
5 gaps.  Customers had to have the proper
6 licensing.  They couldn't be expired.  So
7 that was one of his questions that I see
8 that he asked in here.
9     Q.   Right.  You -- you said that
10 the process was manual, and I asked you
11 whether it was manual with regard to
12 review of the -- the suspicious order
13 reports.  You indicated that that was --
14 I believe your phrasing was something
15 along the lines of yes, that was one
16 thing.
17          Was there something else
18 about the process that was manual in
19 2009?
20     A.   Yes.
21     Q.   Okay.  What else was manual
22 about the process in 2009?
23     A.   So let me take myself back
24 and think of some of the highlights in

Page 80

1 terms of manual.
2          The orders would be placed
3 on -- on hold, that was manual.  And then
4 once we did our due diligence, if -- if
5 we were satisfied with what we were
6 releasing, the order of release would be
7 manual.  Yeah, so, any of the -- the
8 keystrokes and the steps that you needed
9 to do to put the order on and off hold
10 were manual.
11     Q.   And when you say we placed
12 the order on hold, who is "we"?
13     A.   We, when I say -- when I
14 refer to "we," I meant my team.
15     Q.   Okay.  And my team is the
16 customer service department --
17     A.   Right.
18     Q.   -- or the customer service
19 team?
20     A.   That's correct.  No -- no
21 other team -- all of our order holds as
22 an example, if we have a -- maybe a
23 customer gets put on a credit hold,
24 someone in customer service does not have

Page 81

1   security access to release a credit hold,
2   much like the same, no other groups had
3   access to those holds.
4        Q.   Understood.  So you can put
5   that exhibit aside for -- for now, we may
6   come back to it later.
7        A.   Okay.
8        Q.   But I want to return to
9   Exhibit 2.
10       A.   Oh.
11       Q.   And just discuss.  So you've
12  listed three different, one, two, three.
13  You've listed your -- your time at
14  Actavis, Allergan, and Teva as three
15  different entries.  It says Actavis 2008
16  to 2013, Allergan 2008 to 2017, and Teva
17  2008 to 2017; is that correct?
18       A.   It's probably a little
19  confusing the way it reads.  I had a
20  resum  writer take my resum , and -- and
21  they did my LinkedIn profile.  And I
22  guess this is the way they thought it
23  should appear.
24       Q.   Understood.

Page 82

1        A.   But it's -- it's all one
2   company.
3        Q.   Do you remember when you --
4   when you began your employment at -- at
5   Actavis in 2008, which company hired you?
6        A.   When I began my employment
7   with Actavis, which company hired me?
8   Actavis.
9        Q.   Okay.  Is that -- do you
10  remember which Actavis?  Can you be more
11  specific?  Actavis Inc.?
12       A.   I don't know the -- the
13  legal entity name, Actavis Inc., LLC, I
14  don't know.
15       Q.   Okay.
16       A.   So, you know.
17       Q.   So at some point during your
18  employment at Actavis, Watson came in and
19  acquired the company.
20       A.   Correct.
21       Q.   Is that correct?
22       A.   Yes.
23       Q.   Did your job duties change
24  at that point?

Page 83

1        A.   Yes.  The -- the role not so
2   much but the -- the magnitude did.  I
3   mean the volume obviously.  So to explain
4   that, Watson had its customer service
5   group headquartered in California,
6   Irvine, California.  And the decision was
7   made that they wanted to have customer
8   service in a corporate location, which
9   the decision was Parsippany, New Jersey.
10       So I was given the
11  opportunity to build the new combined
12  team.  And when I say build, we had to
13  build it virtually from the ground up.
14  Actavis was a much smaller company at the
15  time and the customer service group for
16  Watson, I'm just going to take a guess,
17  maybe they had 15, 20 employees.  I
18  don't -- I don't remember the number
19  exactly.  Very seasoned.  I mean their
20  average years of service were probably
21  like 20 years, so a very seasoned team.
22  So it was my job to build a team in
23  Parsippany, New Jersey, to ensure that we
24  didn't skip a beat, that there was never

Page 84

1   any interruption to the customer, they
2   never felt the difference, and we did
3   just that.
4        But your original question,
5   did my role change, not really.  It's the
6   same job.
7        Q.   So in -- under your listing
8   for Teva Pharmaceuticals, it says, if you
9   look on Page 3 of 5, the third bullet
10  point, it says, "Acquired knowledge of
11  DEA" --
12       A.   I should correct that.
13  Yeah, I'm sorry, go ahead.  I didn't mean
14  to interrupt.
15       I just realized, I said -- I
16  said my role didn't really change.  In
17  some aspects it grew.  In some aspects it
18  did change.
19       Suspicious order monitoring
20  was an area that -- that did change
21  because Watson had its own function.  It
22  had a, you know, a larger compliance
23  group and people focused on suspicious
24  order monitoring outside of the customer

Page 85

1    service group.  So our role, although we
2    were still involved, we were still part
3    of any questioning or investigation they
4    had to do, we were a support mechanism,
5    but we were not the lead.  So there were
6    other -- a couple other areas such as
7    customer master data, for example.  You
8    know, in a smaller company like the
9    original Actavis, that was all part of my
10   team.  Now that we're part of this bigger
11   company, there was a group for that.  So
12   there were certain things that were
13   pulled out.  So I just wanted to clarify.
14   Because I think I originally said my role
15   was the same.  It was the same, but, you
16   know, in some respects different.
17        Q.   You anticipated one of my
18   later questions.
19        A.   Okay.
20        Q.   I appreciate that.  Thank
21   you.  That's very helpful information to
22   know.
23            So this is -- I'm -- I'm
24   asking about a description that you have

Page 86

1    written under your Teva entry.  And what
2    I would like to know is if the bullet
3    point I'll allowed -- I'm about to read
4    is specific to Teva or if this applied to
5    your job while you were at Actavis.
6            It says, "Acquired knowledge
7    of DEA and FDA regulations and building
8    new processes and procedures to ensure
9    full compliance and improve suspicious
10   order monitoring initiatives."
11           Did you acquire that
12   knowledge while you were at Actavis when
13   it was Actavis?
14        A.   Correct, yes.
15        Q.   Okay.  Prior to your time at
16   Actavis, had you ever worked with DEA
17   regulations?
18        A.   No, I had not.
19        Q.   Were you familiar with the
20   Controlled Substances Act prior to
21   your -- your time at Actavis?
22        A.   Not at all.
23        Q.   Okay.  How did you learn
24   about the Controlled Substances Act?

Page 87

1        A.   I threw myself into it.  And
2    I educated myself using people around me,
3    whether it be our attorneys helping me
4    understand the regulations, our
5    compliance officer.  Going to a DEA
6    conference.  Things as simple as reading
7    articles online.  I mean, I threw myself
8    into it and educated myself, yeah.
9        Q.   Did Actavis ever offer you
10   any training regarding the Controlled
11   Substance Act?
12        A.   The conference that I went
13   to would be a good example of that.
14        Q.   Did Actavis ever offer any
15   internal training regarding the
16   requirements in the Controlled Substance
17   Act?
18        A.   I don't know.  It depends on
19   how you define training.  If training is
20   sitting and meeting with a colleague and
21   reading it and understanding it and
22   having dialogue, to me that's training,
23   because I'm learning.  But it's not like,
24   okay, let's sign up for this course we

Page 88

1    have.  So it depends on how you define
2    training.
3        Q.   So did Actavis ever provide
4    a course on the Controlled Substance Act
5    with course materials and a presentation,
6    speaker?
7        A.   Not that I recall.
8        Q.   Okay.  I want to finish this
9    document, and then we'll take a break if
10   that's all right.
11           Who asked you -- did anybody
12   ask you when you joined Actavis to learn
13   about the Controlled Substance Act?
14        A.   Not immediately upon joining
15   Actavis.  That was not my original
16   charge.  But yes, my boss at the time,
17   you know, asked me.  He knew what he was
18   getting with me.  And I was proven at
19   that point.  And he wanted someone on the
20   project that was going to take it and run
21   with it and make sure that we were doing
22   all the things that we needed to do.  So
23   I was assigned the task by my boss.
24        Q.   And who was your boss?

Page 89

1      A.   Michael Perfetto.
2      Q.   And when you say assigned
3   the project, what do you mean by the
4   project?
5      A.   Just basically looking at
6   our process in terms of the regulation.
7   Finding ways to automate it.  I mean,
8   everything we did, and everything I do,
9   quite frankly, is always finding ways to
10  be better, and that was really the
11  objective of this.  You know, making sure
12  that we could enhance the systems that we
13  already had.
14     Q.   When did Michael Perfetto
15  assign you that project?
16     A.   So I could give you an
17  approximate time period.  I can't tell
18  you exactly when.  But, you know, in
19  driving here I was actually thinking
20  about that.  I said, I hope they don't
21  ask me dates because -- but I'm going to
22  say that it was perhaps the late spring
23  of 2011 --
24     Q.   Okay.

Page 90

1      A.   -- approximately.
2      Q.   If you look at Exhibit 3
3   again very quickly.  Do you have it in
4   front of you?
5      A.   Exhibit 3?
6      Q.   I believe so, yes.  It's an
7   e-mail.  It's dated in August of 2009.
8      A.   Okay.
9      Q.   Did you have any role with
10  the suspicious order monitoring program
11  in 2009 beyond the application of policy
12  that we discussed previously?
13     A.   If application of policy in
14  your definition is a way to reflect
15  operational execution, then yes.  Beyond
16  that I didn't have any -- any role, yeah.
17     Q.   And were you aware in 2009
18  of the requirements of the Controlled
19  Substance Act?
20     A.   Yes, but at a very high
21  level.  I knew -- in other words, I'm the
22  type when I'm doing something, I like to
23  know why I'm doing it.  You know, what's
24  this for?  So I was aware, you know, of

Page 91

1   it and the importance.  But I wouldn't
2   have considered myself an expert, I mean,
3   at that -- at that time.  Certainly aware
4   of it.
5      Q.   You said that your team was
6   responsible for reviewing the suspicious
7   order monitoring reports that were
8   generated by the QAD system, correct?
9      A.   Yes.
10     Q.   What criteria did you use to
11  review those reports to determine whether
12  the order could be released or was in
13  fact a suspicious order?
14     A.   So we had a very specific
15  set of criteria and guidelines that we
16  looked at.  But I would be speaking out
17  of turn trying to sit and recite what
18  those were.  Obviously because you can't
19  give a team a report, and say, here,
20  figure this out.
21          So we had guidelines.  I
22  don't recall the specifics.  I recall a
23  couple of examples, if that helps.
24          You know, sometimes, the new

Page 92

1   product, as I mentioned earlier, if
2   something was a new product.  First-time
3   buyer, there was a flag that was a
4   first-time buyer.  Well, there would be
5   certain steps that would have to be taken
6   to validate that.
7          Everything had, you know,
8   steps that had to be followed.  It was
9   pretty, pretty logical.
10     Q.   Were those guidelines
11  written?
12     A.   I don't recall.  I don't
13  recall.
14     Q.   Do you know, do you remember
15  who -- who explained -- did anybody
16  explain the guidelines to you?
17     A.   I hear buzzing.
18          Yes.  Who that would have
19  been, I mean, that is more than seven
20  years ago.  I don't recall that, sorry.
21     Q.   Do you recall how you first
22  became acquainted with the guidelines?
23     A.   The very first day that I --
24  you know, in taking responsibility for my

Page 93

1    team, and one of the, you know,
2    responsibilities was managing this report
3    that comes out several times a day.
4    That's the first I ever knew of it.
5    Until that, I wouldn't have even --
6    excuse me -- known a regulation or what a
7    C.F.R. even was, you know.  My first
8    exposure.
9        Q.   Do you know who at Actavis
10   might -- might know whether there were
11   written guidelines in 2008 when you
12   started?
13       A.   The guidelines that we
14   operated by?
15       Q.   Yes.
16       A.   The best person for that
17   probably should be me to be honest with
18   you.  But it's just a matter of my
19   remembering and recalling that.
20       Q.   Did you write the guidelines
21   or did you write the guidelines?
22       A.   No.
23       Q.   In 2008?
24       A.   No.  Because this was --

Page 94

1    this was happening before Nancy Baran
2    showed up.
3        Q.   So I want to go to the
4    project that you referenced that you said
5    Michael Perfetto assigned you a
6    project --
7        A.   Yes.
8        Q.   -- in or about 2011.
9        A.   Correct.
10       Q.   What did he ask you to do at
11   that time?
12       A.   It was essentially to, you
13   know, look at our systems, our processes,
14   our reports, our operational guidelines
15   and everything in terms of how it's, you
16   know -- not really how it's measuring up
17   to the regulation, because there was no
18   concern about compliance.  It was more
19   about how do we take it to the next step.
20   How do we even -- even more than we're
21   doing today?  And we did that.  We did
22   take it to the next step.
23       Q.   Okay.  I'm aware that people
24   are getting fidgety and want to take a

Page 95

1    break.  So I'm going to go ahead and let
2    that happen.
3        A.   Okay.
4        Q.   We'll come back to this very
5    quickly.  But I think let's go off the
6    record for now.
7            THE VIDEOGRAPHER:  The time
8    is 10:22 a.m.  Off the record.
9            (Short break.)
10           THE VIDEOGRAPHER:  We are
11   back on the record.  The time is
12   10:38 a.m.
13           MR. LUXTON:  Steve Luxton on
14   behalf of the Teva defendants.
15   Can we stipulate, Counsel, as to
16   the Teva defendants and the
17   Allergan defendants, since we both
18   also represent the witness, that
19   an objection for one of those
20   defendants is an objection for all
21   of the defendants?
22           MS. ANTULLIS:  Yes.
23           MR. LUXTON:  Thank you.
24   BY MS. ANTULLIS:

Page 96

1        Q.   So before we -- before we go
2    too far, I don't want to forget.  The
3    presentation that you looked at to
4    refresh your recollection prior to coming
5    to this deposition, you said that it was
6    the same as a -- as a document that your
7    counsel showed you during your six-hour
8    preparation session for the deposition;
9    is that correct?
10       A.   Yes.
11           MS. ANTULLIS:  Okay.  So,
12   Counsel, can -- will you agree to
13   provide the Bates number of that
14   document, so that we know what it
15   is that she was reviewing to
16   refresh her recollection?
17           MS. LEVY:  We'll discuss
18   that on a break and we'll let you
19   know.
20           MS. ANTULLIS:  Okay.
21   BY MS. ANTULLIS:
22       Q.   Let's go back to document --
23   Document 2, I believe.  Exhibit 2.
24           So, so very quickly, at some

Page 97

1  point Watson transitioned, Teva acquired
2  the company.
3      A.   Correct.
4      Q.   And -- and bought the
5  generics wing; is that correct?
6      A.   Yes.  That's correct.
7      Q.   So did your position
8  transfer then to Teva?
9          What -- what position did
10  you have at Teva?
11      A.   So there was a transition
12  period.  So, just to clarify.  From the
13  time the deal was announced, to the time
14  the transaction was actually closed, for
15  a variety of reasons of which I'm not
16  sure I even know, took much longer than
17  thought, so I don't know, there was maybe
18  a year period in between that.  So my
19  role, during that year, was to continue
20  managing my team, doing the day-to-day
21  business, and once we were at a point and
22  a juncture where we were allowed to share
23  information, there was a certain time,
24  and I don't know what that was.  Maybe it

Page 98

1  was when the deal closed.  I forget.
2          Once that happened, my role
3  quickly shifted to be one of
4  transitioning, because Teva had someone
5  in my role.  And clearly, you know, they
6  didn't need two people.  Unfortunate for
7  me, it's a company I would have certainly
8  retired with.  But you never take it
9  personal.  It's just the industry we're
10  in, and it's constantly consolidating.
11  So to answer your question, I did lose my
12  role, but I was there and -- and spent a
13  lot of time and energy to make sure I
14  transitioned things properly.  My team is
15  still intact today, and I wanted to leave
16  it in -- in good order.
17      Q.   Did you have any role with
18  the suspicious order monitoring processes
19  and procedures at Teva?
20      A.   No, I did not.
21      Q.   And when did you leave Teva?
22          MS. ANTULLIS:  I never say
23  it correctly.  I'm sorry.
24          MR. LUXTON:  That's all

Page 99

1  right.
2          THE WITNESS:  The beginning
3  of January 2017.
4  BY MS. ANTULLIS:
5      Q.   Okay.  And what was the term
6  that you used, off -- "offboarding"?
7      A.   I was a synergy.  Is that
8  what you mean?
9      Q.   No, it -- essentially you
10  were laid off; is that correct?
11      A.   Correct.
12      Q.   Is that the correct
13  terminology?
14      A.   Yes.
15      Q.   Okay.
16      A.   Involuntary.
17      Q.   Involuntary.
18      A.   Yeah.
19      Q.   All right.  And do you bear
20  any ill will towards any of the
21  defendants in the case?
22      A.   No.
23      Q.   Do you bill -- bear any ill
24  will to any of the plaintiffs in the

Page 100

1  case?
2          Do you know who the
3  plaintiffs are?
4      A.   I don't know who the
5  plaintiffs are.
6      Q.   So in 2000, February of 2018
7  you went to, I'm going to mispronounce
8  it, but Daiichi Sankyo?
9      A.   Yes.
10      Q.   Okay.  And it says that you
11  were strategy leadership and program
12  management, a contractor for six months.
13  What did that position -- what job duties
14  did that position entail?
15      A.   So this job was completely
16  out of the scope of anything I had done
17  my other 25 years of my career.  I don't
18  know if it was that they really needed
19  help or it was more of a favor from a
20  former colleague that -- that knew I was
21  sitting home and like anxious to get
22  back.
23          They had -- their company
24  was shifting their focus from an -- to an

Page 101

```
 1    oncology company.  And as part of that
 2    they had a lot of things that were going
 3    on.  They were restructuring their sales
 4    force.  So their HR team was extremely
 5    overburdened, highly stressed.
 6            The person that hired me
 7    happened to be my career coach that
 8    Actavis had hired for me years prior.  So
 9    once again she knew what she was getting
10    with me, she just needed a body to come
11    in and help manage their extra workload.
12    I was only really going to be there for
13    two months.  I ended up staying for six
14    months.  So, but it's totally outside of
15    the scope of anything else that I've ever
16    done.
17        Q.    Is it a medical device
18    company?
19        A.    They are pharmaceuticals.
20        Q.    They're a pharmaceutical
21    company?
22        A.    Yeah.
23        Q.    So then is it fair to say
24    that for approximately 24 years you
```

Page 102

```
 1    worked in the field of medical devices or
 2    pharmaceuticals?
 3        A.    Approximately 50 in percent
 4    each.
 5        Q.    50 percent in each.  Okay.
 6            I'm going to go through a
 7    list of questions that I don't want -- I
 8    want to remember not to ask you -- I
 9    don't want to forget to ask you.
10        A.    Okay.
11        Q.    So during what period of
12    your career did you work with opioids?
13        A.    Certainly not in medical
14    devices.  That would not have happened
15    until my -- my employment with Actavis.
16        Q.    Okay.  So you worked with
17    opioids through your career at Actavis,
18    Allergan, Teva and then not again after
19    that; is that correct?
20        A.    That's -- well, I don't even
21    know, to be honest with you, Daiichi's
22    product -- product mix, because that
23    didn't come into play in my role.  I
24    don't know if they have opioids or not.
```

Page 103

```
 1    I'm sorry.  So let's leave that as
 2    possibly with Daiichi.  But I don't know
 3    what their product mix is.
 4        Q.    That's fine.
 5            When you left Teva did you
 6    sign a nondisparaging agreement?
 7        A.    Like a separation agreement,
 8    if -- if that's what it's called.  Is
 9    that non -- yeah, I signed an agreement.
10        Q.    It could have a --
11        A.    I'm not sure of the title.
12        Q.    -- nondisparagement clause
13    or it could be a nondisparagement
14    agreement.
15            Did your -- did you sign a
16    separation agreement?
17        A.    A separation agreement.  I
18    don't know what the title was.
19        Q.    Do you know if the
20    separation agreement had a
21    nondisparagement provision?
22        A.    I don't know what that is,
23    so I'm not sure.
24        Q.    Okay.  Do you understand
```

Page 104

```
 1    that if it did have a nondisparagement
 2    provision if that would prevent you from
 3    testifying honestly today?
 4        A.    Could you repeat that
 5    question?
 6        Q.    Do you understand that if
 7    your separation agreement had a
 8    nondisparagement clause, that it wouldn't
 9    prevent you from testifying today?
10        MS. LEVY:  Object to form.
11    You can answer.
12        THE WITNESS:  I -- I guess I
13    don't understand it, because I
14    don't even understand any of the
15    terminology.  So, I'm -- I'm not
16    sure.
17    BY MS. ANTULLIS:
18        Q.    Is there anything about your
19    separation with Teva that prevents you
20    from testifying honestly and fully today?
21        A.    Oh.  Well, put that way,
22    that's -- thank you.  No.
23        Q.    Okay.  Have you ever been a
24    member of any pharmaceutical compliance
```

Page 105

1    organizations?
2        A.   No, I have not.
3        Q.   Have you ever been a member
4    of any industry trade groups or industry
5    working groups?
6        A.   Not a formal member, no.
7    And I've read articles from groups like
8    HDMA and all that, I -- but I wouldn't
9    say that I was a member, no.
10       Q.   Have you ever attended any
11   industry conferences with HDMA or --
12       A.   I attended a few industry
13   conferences.  I wouldn't say that I was a
14   very active participant.  But I did go
15   to, I believe it was an HDMA conference
16   and NCA -- NCDAS, I think it's called.  A
17   couple, you know, trade shows.  That
18   really wasn't very significant in my
19   role.
20       Q.   Do you know if Allergan
21   has -- Actavis has a record of the
22   conferences and trade shows you would
23   have attended during your employment?
24       A.   I doubt it, because it

Page 106

1    wasn't -- well, they would have had to
2    pay for me to go, so, sure.  Through
3    expense reports or something.  I'm sure
4    they would.
5        Q.   Did your boss have to
6    approve your attendance at these
7    conferences?
8        A.   Sure.  That would be a
9    normal course of business.  You wouldn't
10   just sign up for these and travel without
11   discussion and approval, yes.
12       Q.   So how would the approval
13   go?  Would you -- would you -- would it
14   be casual through an e-mail?
15       A.   I mean it -- it really
16   wasn't like that.  It was more of a --
17   you were kind of sign -- signed up along
18   with the rest of the group.  It was so
19   few times.  If I had to -- to guess on a
20   number, I may have been to a conference
21   or a trade show, I don't know, four
22   times.
23       Q.   Okay.
24       A.   Approximately.

Page 107

1        Q.   Do you remember generally
2    when those trade shows happened?  Were
3    they at the beginning of your career,
4    middle of your career, scattered
5    throughout?
6        A.   Before Watson, and I believe
7    I was at one with -- after Watson
8    acquired us.
9        Q.   Okay.
10       A.   Yeah.
11       Q.   Have you attended any
12   conferences related to compliance issues?
13       A.   Yes.
14       Q.   Do you remember -- do you
15   recall what conferences you attended that
16   related to compliance issues?
17       A.   That was the
18   Cegedim-Buzzeo-DEA compliance conference.
19       Q.   Okay.
20       A.   It was either in Baltimore
21   or Washington D.C., I don't recall.
22       Q.   Do you know if the training
23   that you received at that conference was
24   sponsored by any opioid manufacturer,

Page 108

1    distributor or pharmacy?
2        A.   I don't believe so.  I think
3    it was sponsored by this vendor.  I think
4    they were sponsoring themselves.
5        Q.   And were representatives
6    from other -- other pharmaceutical
7    manufacturers and distributors present at
8    the conference?
9        A.   Yes.
10       Q.   Do you remember which
11   entities were represented?
12       A.   I -- there were, I don't
13   know, I feel like there were a hundred or
14   two.  But I kind of went, listened,
15   learned, did my own thing.  Went out to
16   dinner, went home.  You know, I -- I
17   didn't really engage with any of them.  I
18   would say the only one person I recall
19   meeting and spending any time discussing
20   with, was someone from UPS supply chain
21   that was there and they supported us as
22   well.  So that would be the -- the only
23   person I can attest to being there.
24       Q.   So you say the UPS Supply

Page 109

1    Chain supported you?
2        A.   Mm-hmm.
3        Q.   What was the nature of their
4    relationship with Actavis?
5        A.   So UPS Supply Chain, so I'm
6    speaking pre -- pre-Watson.  UPS Supply
7    Chain was a third party distribution.
8        Q.   Okay.  And did they handle
9    both branded and generic drugs?
10       A.   That's correct.
11       Q.   And did they handle any
12   aspect of your suspicious order
13   monitoring program at any point during
14   your time at Actavis?
15       A.   I want to be careful how I
16   answer that, based on the way you phrased
17   the question.  You had asked me if they
18   handled any part of our suspicious order
19   monitoring.  So to answer it that way, I
20   would say no.
21       They did what was their own
22   suspicious order monitoring process.  We
23   had two independent processes that went
24   over on top of one another.

Page 110

1        Q.   Did those two independent
2    processes work together in a synergistic
3    fashion?
4        A.   No.  They were completely
5    independent.
6        Q.   Okay.  So -- so let's just
7    walk me through this.
8        Say a distributor places an
9    order for a controlled substance.  Who
10   fills that order?
11       A.   Well, the word "fills," to
12   me, I would define that as -- when I hear
13   fill, it means supply and ship, right?
14   So --
15       Q.   Who provides the drugs?
16       A.   Okay.  Provides the drugs to
17   me sounds the same.
18       Q.   Who manufactures the drug?
19       A.   Manufactures would be
20   Actavis.
21       Q.   Okay.  And when the -- when
22   the distributor places an order, do they
23   place the order with Actavis directly?
24       A.   That's correct.

Page 111

1        Q.   So do they place an order
2    with UPS?
3        A.   No, they don't.  The --
4        Q.   Okay.  So --
5        A.   There is only one exception
6    to that.
7        Q.   Okay.  What's the exception?
8        A.   Because of the logistical
9    piece, they never placed the order with
10   UPS.  But the 222 forms were, because the
11   hard copies needed to be in their
12   possession as the distribution arm, the
13   hard copies were sent there, and what
14   they would do is they would send us a
15   photocopy so that we could do our process
16   on the other end, but the original
17   documents had to be within their hands.
18       So, you know, I don't like
19   to describe it as they placed the order
20   with UPS, but they mailed the 222
21   document to UPS, if that makes sense.
22       Q.   And UPS would transmit that
23   document to you?
24       A.   Yes.

Page 112

1        Q.   To -- as you say to your
2    process?
3        A.   And it went through our
4    process like it -- like anything else
5    normally would.
6        Q.   So does that apply to both
7    branded and generic pharmaceuticals?
8        A.   The process -- first of all,
9    we weren't really a very big branded
10   company, I think, in terms of our
11   products.  But the answer would be yes.
12       Q.   Okay.  And so, when you say
13   "do our process," what does "our process"
14   entail?
15       A.   Our process is everything
16   that we spoke of earlier.  So we would
17   take that order from start to finish.
18   You know, even outside of suspicious
19   orders, we would validate all the normal
20   things that you would with an order.  Is
21   this customer valid?  Is it someone that
22   has open credit terms?  You know, where
23   are we shipping?  What are we shipping?
24   Are the prices matching?  Everything,

Page 113

1    including -- up to including the SOM
2    process.
3        Q.    So that order would be
4    passed through the SOM process -- the
5    SOMs process?
6        A.    Yes.
7        Q.    At what point does UPS get
8    notification of the order?
9        A.    So if an order advances from
10   our, Actavis's, system, then UPS will
11   gain access to it.  If it were on hold --
12       Q.    At that point -- let me
13   [just -- at that point in time, has it
14   already -- has the order already gone
15   through your SOM system?
16       A.    It would have to before UPS
17   would ever get their hands on it.
18       Q.    Okay.
19       A.    Yeah.
20       Q.    So then I'm sorry.
21   Continue.  So then after the order has
22   gone through the SOM system and you are
23   transmitting it to UPS.
24       A.    The SOM system, and any of

Page 114

1    the other order validation checks that it
2    had to go through, all of those would
3    take place upfront.  And UPS wouldn't
4    have visibility or any access to the
5    order unless it passed those criteria.
6    Then it would go to UPS.
7        Q.    And you said that UPS had a
8    SOMs program as well.
9        A.    Correct.  Mm-hmm.
10       Q.    So would they then run that
11   order through its own program?
12       A.    Yeah.  So 100 percent of the
13   same orders that we were evaluating on
14   our end would then transmit through UPS
15   and then they would run through their
16   mathematical algorithms and their
17   calculations.
18       Q.    And were there algorithms
19   and calculations different than used at
20   Actavis?
21       A.    Yes.  They were proprietary
22   and they were definitely different than
23   Actavis's.
24       Q.    And did the UPS system ever

Page 115

1    generate any -- we'll call them orders of
2    interest?
3        A.    Yes.
4        Q.    Okay.  Would you mind --
5    please explain what an order of interest
6    is.
7        A.    Yeah.  So, I always like to
8    use that term, we use the term OI, orders
9    of interest, as something that's being
10   evaluated.  When we refer to something as
11   a suspicious order, that means it was
12   deemed suspicious.  So an order of
13   interest, UPS could, much like an order
14   would pend on our system because it was
15   an order of interest, the same thing
16   could happen at UPS.  And they had their
17   set of processes that they would run
18   through.
19            And much like my team,
20   customer service, would have to do their
21   due diligence and review purchases,
22   sales, you know, understand, you know,
23   market conditions or whatever might be
24   driving that to make an informed

Page 116

1    decision, UPS would do the same thing.
2            Now, they would have to come
3    back to us for that justification.  And
4    they would push on us, just like we would
5    push on our own internal teams.  You
6    know, nothing went by without a good
7    explanation.  And they would hold the
8    order just like we would.
9        Q.    Do you recall if the UPS
10   SOMs system ever placed orders on -- ever
11   pended any orders that -- did the UPS
12   system ever pend any orders that came
13   from Actavis?
14       A.    Oh, absolutely.
15       Q.    Okay.  Did the Actavis
16   system -- do you recall if the Actavis
17   system also pended those same orders?
18       A.    That's a great question.
19   Because our -- because our two systems
20   were not running on the exact set of
21   criteria and formulas behind the scenes,
22   you would have to imagine, and it was
23   true, that we would have orders pend that
24   they didn't and just the same.  Sometimes

Page 117

1  they would have an order pend that we
2  didn't.  And on many occasions we would
3  both have the same order pend.
4      So it was not a mirror of
5  one another.
6      Q.   Okay.  We'll probably come
7  back to that later.  UPS, we'll come back
8  to that later.
9      A.   Good.
10     Q.   I'd like to move on to Tab
11 58 which, I believe, is Exhibit Number 4.
12         (Document marked for
13         identification as Exhibit
14         Baran-4)
15 BY MS. ANTULLIS:
16     Q.   I will only be asking you
17 questions about particular points in
18 here.  I'll represent to you that this
19 was part of your personnel file that was
20 produced to us in this case last week.
21     A.   Okay.
22     Q.   This particular document
23 contains what are called Actavis Per4ma.
24 Would you mind explaining to me what a

Page 118

1  Per4ma is?
2      A.   So every company, I have to
3  imagine, in one way, shape or form, sets
4  out to manage the performance of their
5  employees.  So you start out with a
6  certain, you know, expectations of your
7  employees and maybe you refer to them as
8  goals and objectives.  You know, what are
9  you looking to accomplish in a given
10 year.  And how did you achieve and what
11 were the results as compared to that.
12 You know --
13     Q.   So was this an annual
14 review --
15     A.   It was an annual --
16     Q.   -- that you -- that you did
17 of yourself?
18     A.   Yeah, so you would evaluate
19 yourself, and then your manager would
20 evaluate you on top of that.
21     Q.   Do you recall if you did
22 similar self-evaluations when -- after
23 the Watson acquisitions?
24     A.   Yes.  I'm pretty sure I

Page 119

1  should have had one most, if not all,
2  years.
3      Q.   Do you know what they would
4  have been called at that time?
5      A.   There was always different
6  terminology.  Pro4mas, Per4mas.  I don't
7  recall the name now.
8      Q.   Do you recall completing
9  one, something similar while you were --
10 after the -- after the Teva acquisition?
11     A.   I don't -- after the Teva
12 acquisition?  Based on the time they
13 happened, I don't know.  I don't think
14 so.
15     Q.   Other than your last year
16 then at Teva, do you recall completing
17 one of these every year for your
18 employment at Actavis?
19     A.   Every year as far as I'm
20 aware, because it's not like we had a
21 choice.  It was one of those chores, you
22 know, you had to do it.  Very tedious and
23 time consuming.  And I'd put a lot of
24 effort into mine because let's face it, I

Page 120

1  worked very hard throughout the year.
2  And you want your performance review to
3  accurately reflect that, so I typically
4  put a lot of time into it, which is why
5  this probably feels pretty heavy.
6      Q.   This is also several years.
7      A.   Oh, it is.  Okay.
8      Q.   So let's first turn to --
9  and at the bottom -- I'm sorry, I haven't
10 been reading Bates numbers.  At the
11 bottom it is ALLERGAN_MDL_SUPP_00001425.
12 So it's towards the back of the document.
13     A.   Would you repeat the last
14 digits.
15     Q.   1425.
16     A.   25.  Okay.
17     Q.   Do you recognize this
18 document?
19     A.   Certainly recognize the look
20 of it, yes.
21     Q.   On the following page, 1426,
22 on the bottom right-hand corner, there's
23 a signature there.
24     A.   Yeah.

Page 121

1     Q.   Is that your signature?
2     A.   Yes, it is.
3     Q.   If we go to 1431.  So in the
4  block in the middle on that page, there
5  is a title.  It says, "Efficiency."  And
6  then there are comments that follow.
7          Who -- who wrote the text
8  that starts with "consistently
9  identifying opportunities"?  Was that
10  you?
11     A.   If you don't mind, can I
12  take a minute to read?
13     Q.   Yeah.  Read that paragraph.
14     A.   Okay.  So I'm with you now.
15     Q.   So my question to you is
16  just regarding the second sentence.  It
17  says you reviewed a DEA suspicious
18  activity.  And this was in the year 2008
19  Per4ma, correct?
20     A.   Correct.
21     Q.   What did you do to report --
22  to improve the reporting of DEA
23  suspicious activity in -- in 2008?
24     A.   Okay.  So, what this is

Page 122

1  referring to, based on my recollection, I
2  believe what the issue was at the time
3  was over-the-counter products, which were
4  not controlled drugs, were somehow
5  polluting the report and just making it
6  busy and more to sift through.  So it
7  didn't impact the end result.  But it
8  was -- it was clutter and it just made
9  our job more difficult.  So -- from what
10  I recall, we -- we worked with IT to have
11  that removed.  And they were not even
12  related to controlled drugs.
13     Q.   So when you -- let's go back
14  to this, this report, the suspicious
15  order report that you talked about, that
16  we discussed earlier.  Was that a report
17  that spanned all drug classes?
18     A.   The way the report was
19  designed was, the intent was for
20  controlled drugs only.
21     Q.   So was that then just a
22  hiccup in the system?
23     A.   From what I recall --
24        MR. LUXTON:  Objection to

Page 123

1  form.
2        THE WITNESS:  Can I answer?
3  Okay.  Can I answer?  Okay.  I
4  don't get that whole process, so
5  tell me when I --
6        MS. LEVY:  You can -- you
7  can answer every question unless
8  we instruct you not to answer.
9  But just because the woman to your
10  right is typing down all of the
11  things that are being said --
12        THE WITNESS:  Okay.
13        MS. LEVY:  -- you just have
14  to wait for us to say the
15  objection, pause for a minute, and
16  then give your answer.
17        THE WITNESS:  Very good.
18  Thank you.
19        MS. LEVY:  So you may
20  answer.
21        THE WITNESS:  And I forgot
22  what the question was, so...
23        THE VIDEOGRAPHER:  Can
24  you -- can you raise your

Page 124

1  microphone up just a -- a few more
2  inches up?
3        THE WITNESS:  Sure.
4        THE VIDEOGRAPHER:  Thank
5  you.
6        THE WITNESS:  From what I
7  recall --
8        MS. LEVY:  Hold on.  Let her
9  rephrase the question for you.
10        THE WITNESS:  Yeah.
11  BY MS. ANTULLIS:
12     Q.   So you -- you stated that
13  over-the-counter products were displaying
14  on the suspicious order reports that you
15  were getting throughout the day --
16  throughout the day at that point in time,
17  correct?
18     A.   From what I recall, I
19  believe that was the case.  I believe
20  that was something that needed to be
21  removed.  It was an error in what was
22  coming through, based on the product
23  classification.
24     Q.   Okay.  So the system was

Page 125

1  then designed to, is it -- the system was
2  then designed to capture controlled
3  substances only, correct?
4      A.  Yes.  Based on all product
5  types, had a product classification, and
6  that drove what was included on the
7  report.
8      Q.  All right.  So now, we're
9  going to go to -- we're going to go to
10  document -- the section of the document
11  starting at ALLERGAN_MDL_1420, which is a
12  few pages in front of where we were.
13      So, do you recognize this?
14      A.  So far.  The format looks
15  familiar, yeah.
16      Q.  On the bottom of Page 1421
17  there's a signature there.  It says Nancy
18  Baran?
19      A.  Yeah.
20      Q.  Is that your signature?
21      A.  Yes, it is.
22      Q.  Okay.  So look at
23  Objective 2, the box on 1421.  There's a
24  large box here.  And it says Objective 2,

Page 126

1  "Develop customer service team."
2      Read the first full
3  paragraph.
4      A.  Okay.  Okay.  So I read the
5  first paragraph.
6      Q.  Okay.  So it says, the
7  second sentence starts, "Additionally
8  Nancy has engaged the group with cross
9  training with other departments."
10      Do you see that?
11      A.  Yes.
12      Q.  And it says, "It includes
13  several departments including but not
14  limited to sales and marketing, medical
15  affairs, regulatory compliance,"
16  parentheses says "recall, SOP and finance
17  covering AR credit and collections,
18  deductions" --
19      MR. DEARMAN:  Slow it down a
20  little bit.
21      MS. ANTULLIS:  I told you I
22  speak too fast.
23  BY MS. ANTULLIS:
24      Q.  -- "deductions, returns,

Page 127

1  chargebacks, rebates and Medicaid."
2      Is that correct?
3      A.  That's correct.
4      Q.  So are these all separate
5  departments within Actavis?
6      A.  They are all separate
7  departments.
8      Q.  Okay.  So there is a medical
9  affairs department?
10      A.  I mean some of them may be
11  combined.  Like chargebacks, rebates,
12  they -- they may fall in -- in one group,
13  but they are different processes, so...
14      Q.  So what group would
15  chargebacks and rebates -- chargebacks
16  and rebates fall into?
17      A.  I don't recall the exact
18  structure at that time.  It was under
19  finance somewhere.
20      Q.  Okay.  And then you -- so it
21  says then that you, you engaged a group
22  in cross training, correct?
23      A.  Mm-hmm.
24      Q.  So --

Page 128

1      A.  Yes.
2      Q.  -- can you explain from a --
3  from a -- actually strike that.
4      Did any of the cross
5  training include suspicious order
6  monitoring training?
7      A.  So this is really pertaining
8  to something completely outside of
9  suspicious order monitoring.  This was
10  really an intention to take a group that
11  is tasked with making sure we're meeting
12  customer needs, following corporate
13  guidelines and objectives and policies
14  and procedures, and putting all that
15  together and making sure both interests
16  are properly met.  And it's very
17  difficult to do that when you're dealing
18  with multiple cross-functional areas when
19  you don't really have an appreciation for
20  what they do.
21      So the only intent of this
22  program, and the word cross training, I
23  don't want you to be confused or misled.
24  You know, when you hear training, you

Page 129

```
 1    think I'm going to be trained so I can do
 2    a job and I can be an expert.  That's not
 3    what this was.
 4              Look at it more as creating
 5    an awareness, you know, what do some of
 6    these teams do.  What are their main
 7    objectives.  What's their purpose.  What
 8    are some of their challenges.  And the
 9    reason for that is so that we could
10    understand one another better, so that we
11    could operate more as a collective team.
12              You know, you need support
13    on a return.  There's information I may
14    have that can help you.  It just made for
15    better working relationships and
16    partnership across teams.  But it -- it
17    wasn't cross training like we never sat
18    down and said show me how to process a
19    chargeback.  It was really more of an
20    awareness.
21         Q.   Are there any written
22    materials that were produced as part of
23    this?
24         A.   No.  It was really just like
```

Page 130

```
 1    meet and greet.  Sit and talk and -- and
 2    chat.  Yeah.
 3         Q.   So, can you please explain
 4    what a chargeback is?
 5         A.   So that's not my area of
 6    expertise, but I'll -- and I've never
 7    managed chargebacks.
 8         Q.   Well, can you --
 9         A.   But I can --
10         Q.   -- to the best of your
11    understanding --
12         A.   To the best of my
13    understanding, what I can explain to you,
14    because that's something that is very far
15    removed from -- from my knowledge.  But a
16    chargeback, you know, I believe we sell
17    to wholesalers at like a WAC price, and
18    then if customers buy through them at a
19    contracted price that I think we've
20    agreed upon, I think there's chargebacks
21    that are processed.  That's -- that's as
22    much as I can tell you because that never
23    fell in the scope of -- of what I
24    managed, so...
```

Page 131

```
 1         Q.   Okay.  Can you tell me,
 2    did -- did the various departments at
 3    Actavis ever receive suspicious order
 4    monitoring training that you were aware
 5    of?
 6         A.   The various departments.  So
 7    when we say various departments,
 8    that's -- there's -- there's many
 9    departments.
10         Q.   What's -- let me -- let me
11    rephrase the question.
12         A.   And I don't think I'd be in
13    a position to speak to what training they
14    had.
15              MS. LEVY:  Let her finish
16         before you --
17              MS. ANTULLIS:  Sorry.
18    BY MS. ANTULLIS:
19         Q.   I'm -- I'm just going to
20    rephrase the question for you, because
21    that was -- that was broad and
22    open-ended.
23              Did you ever organize a
24    suspicious order monitoring training
```

Page 132

```
 1    within Actavis?
 2         A.   For any teams that touched
 3    the process, which would not be every
 4    area of the company.
 5         Q.   Okay.  So what teams would
 6    touch the process?
 7         A.   You know, teams that we
 8    relied on for support in terms of I --
 9    you know, IT was aware of, you know, what
10    we were doing.
11              I mean, and the training was
12    at different -- deeper dive with -- with
13    some areas than others, but --
14         Q.   Did you ever organize the
15    training with the sales and marketing
16    department?
17         A.   No.  No.  There was no
18    training for them.  They just had to give
19    us answers when we demanded them.
20         Q.   Okay.  And by -- so I'm
21    using -- by sales and marketing in this
22    context, are you -- are you understanding
23    me to mean the -- the salespeople
24    themselves, the sales, the people who
```

1    handle the -- the selling and marketing
2    of the drug directly?
3        A.    When you say sales, that's
4    what I think of, yeah.
5        Q.    The customer service
6    department at Actavis, did it fall under
7    a larger umbrella group?
8        A.    Yes, it did.
9        Q.    And what was the name of
10   that group?
11       A.    Sales and marketing.
12       Q.    Okay.  So within the sales
13   and marketing organization, the customer
14   service department was a -- its own
15   subentity, correct?
16       A.    That's correct.
17       Q.    The salespeople, did the
18   salespeople fall into a separate entity,
19   a separate subgroup under the same
20   umbrella?
21       A.    Yes.
22       Q.    And what was the name of
23   that?
24       A.    Sales.

1        Q.    Sales.  So did you ever
2    organize suspicious order monitoring
3    program for the sales team?
4        A.    I did not.
5        Q.    A training program?
6        A.    Yeah, I did not.  But I
7    can't say for sure what they would
8    have -- if anything.  You know, I can't
9    say that.  I did not, no.
10       Q.    And -- and the marketing,
11   the people who did, you know, marketing,
12   what department did they fall under?
13       A.    They fell -- they were in
14   their own separate umbrella under sales
15   and marketing blanket, yeah.
16       Q.    Did you ever design or give
17   a suspicious order monitoring training to
18   people in the marketing, the
19   sales/marketing section -- group?
20       A.    I don't like to refer to it
21   as training necessarily.  But they were
22   actively engaged.  They were part of the
23   project team in terms of guidance and,
24   you know, they played an active role at

1    reviewing and evaluating data, customer
2    data.
3        Q.    So who -- were the -- to
4    your knowledge, were the sales or
5    marketing groups aware of -- made aware
6    of the requirements of the Actavis
7    suspicious order monitoring program?
8            MR. LUXTON:  Objection to
9        form.
10   BY MS. ANTULLIS:
11       Q.    You can answer.
12       A.    Okay.  Thank you.  I mean,
13   they certainly were aware of I because if
14   something went on hold, they were
15   impacted because their order wasn't
16   shipping and they had to partner with us
17   to get us the information we needed.
18   They were aware of it.  You know, not to
19   the extent of, you know, what steps did
20   we take on every order, not at that level
21   of detail.  But they were certainly aware
22   of what the, you know, regulation was,
23   and what our obligation was as a
24   manufacturer.

1        Q.    Do you know if -- do you
2    know if anyone ever instructed them, ever
3    transmitted to them any -- do you know
4    if -- do you remember the guidance that
5    you told me about earlier that you
6    followed when you were evaluating a
7    suspicious order?  Do you know if that
8    guidance was ever transmitted to anybody
9    in the sales and marketing department's
10   teams?
11       A.    The guidance -- can you
12   define guidance, what do you mean?  Which
13   part of our conversation?
14       Q.    I'm referring to the
15   guidance, that you -- you called it
16   guidance earlier.  You said when the
17   reports were generated from the QAD
18   system, in evaluating the reports to
19   determine whether an order was suspicious
20   or not --
21       A.    Yeah.
22       Q.    -- you had guidance.  You
23   had received some sort of guidance as to
24   what criteria would be used to

Page 137

1    determine --
2        A.   Oh, okay.  Thank you.
3        Q.   To determine whether that
4    order was suspicious or not.
5           So I'm asking if you know
6    whether that guidance was ever
7    transmitted to anybody in the sales or
8    marketing department?
9        A.   I am not aware that it ever
10   would have been.  And I don't know why it
11   would have been, if that ever did take
12   place.  But I'm not aware of it, no.
13       Q.   Who -- did you ever
14   interact --
15       A.   It's kind of like giving
16   your secrets.  You know, you don't want
17   to show too many cards.  So I don't
18   believe we would have told them what our
19   system is looking for.  From a sales
20   standpoint, they don't need to know.  I
21   don't know.
22       Q.   Okay.  You used -- you used
23   the words "secrets."  So I'm just --
24       A.   Well, it's just like a

Page 138

1    customer --
2           MR. LUXTON:  Wait for the
3    question.
4    BY MS. ANTULLIS:
5        Q.   So would -- were the
6    requirement -- were the criteria that you
7    used to evaluate a suspicious order a
8    suspicious order contained -- were they
9    kept away from the sales and marketing
10   departments?
11       A.   To the best of my knowledge,
12   yes.  Yeah.
13       Q.   And was that a deliberate
14   choice?
15       A.   Yeah.  I mean, I don't -- I
16   don't know why they would need it.
17       Q.   Okay.  Did you ever interact
18   with people in the sales and marketing
19   groups?
20       A.   Yes, I did.
21       Q.   Okay.  Do you remember some
22   of the people that you interacted with,
23   their names?
24       A.   Yes.  Because it was very

Page 139

1    limited.  If I remember correctly, we
2    only had five salespeople.  So I could
3    try to remember some names if you'd like.
4        Q.   Yes.  Who were some of the
5    name of the salespeople?
6        A.   Michael Dorsey.  Thad Demos.
7    Lisa Pehlke, Steve Cohen, and Michael
8    Berryman.  I think that covers everybody.
9        Q.   Did you ever work with a
10   woman named Rachelle Galant?
11       A.   Yes.  Rachelle.
12       Q.   Rachelle.  I'm sorry?
13       A.   Very closely.
14       Q.   What department or team did
15   Rachelle Galant work for?
16       A.   Rachelle is in marketing.
17       Q.   Okay.  And when you say
18   marketing, are you referring to the
19   marketing group or are you referring to
20   the sales and marketing umbrella?
21       A.   She was in marketing.
22       Q.   Marketing group.  Okay.
23   That's all I have on that right now.  Was
24   Rachelle Galant ever trained in how to

Page 140

1    detect a suspicious order?
2        A.   Rachelle was instrumental
3    and very active in what the regulation
4    requirements were, what our processes
5    were, and she was an instrumental part in
6    helping us bring us to the next level.
7    And, you know, we can talk about that
8    when the time is right, in terms of all
9    of our efforts that we did.
10       Q.   Would Rachelle have trained
11   the people -- was Rachelle a supervisor
12   in the marketing department?
13       A.   I would not categorize her
14   as such.
15       Q.   What was her -- what was her
16   job title?
17       A.   I don't recall her exact --
18   it could be product manager, but I
19   don't -- I don't recall her exact title.
20       Q.   Did she manage any
21   employees?
22       A.   I can't say with certainty.
23   Maybe not initially, but she may have had
24   like a junior marketing analyst report to

1   her at some period.
2        Q.   Was Rachelle Galant ever
3   tasked with writing a standard operating
4   procedure for suspicious order
5   monitoring?
6        A.   Not for suspicious order
7   monitoring.  Well, no, I take that back.
8            Yes, she partnered on the
9   indirect side.  We had two parts of our
10  process.  And she was heavily involved in
11  helping draft and write these indirect
12  policies and procedures.
13       Q.   Do you know about when that
14  happened, when she wrote those
15  procedures?
16       A.   Somewhere later in 2011.
17       Q.   Do you know -- do you
18  happen --
19       A.   Early 2012.
20       Q.   -- to know why -- sorry.
21           Do you happen to know why
22  Rachelle Galant was given that task?
23       A.   So Rachelle was instrumental
24  from a marketing standpoint in helping

1   launch another initiative called
2   ValueTrak.  And it was a reporting
3   mechanism that we would -- we would pay
4   for to help slice and dice our data, the
5   best way to describe it.  And it's been
6   so long.  I forget the codes.  But let's
7   just say EDI transaction on an 0867.  I
8   don't remember the numbers.  But data in,
9   data out.  And looking at those indirect
10  sales at the wholesaler level.
11           So because she was working
12  on that project, she was definitely the
13  right person to help us on the initiative
14  of the suspicious order side.  But her
15  initiative was really in the second part
16  of our project, which was the indirect
17  piece, versus the direct sales to our
18  wholesalers and distributors.
19       Q.   Do you -- why was Rachelle
20  Galant looking at sales to wholesaler
21  customers, as part of her job function,
22  if you know?
23       A.   As part of her job function,
24  I almost feel like we want to ask her

1   that in terms of the marketing role.  But
2   if I can -- how would I describe -- I
3   would have to defer her job description
4   in answering that, to her.  Because I
5   think I would probably just mess it up.
6        Q.   So let's move on.  Back to
7   Exhibit -- what was it?  Four.  Yep.
8   Exhibit 4.
9            If you go to Page 1397.
10  It's about the fourth page in.  This
11  appears to be a compensation statement
12  for you, Nancy Baran, in 2011 fiscal
13  year; is that correct?
14       A.   Yes.
15       Q.   Does this reflect your
16  understanding of your base salary at that
17  time?
18       A.   Yes.
19       Q.   Okay.  Under -- under --
20  there's a subtitle here that says bonus
21  information.  It says, "Target bonus
22  percentage, target bonus award."
23       A.   Okay.
24       Q.   What is the target bonus

1   percentage a percentage of?
2        A.   Well, our bonus had -- which
3   I don't believe is uncommon -- was really
4   two components of it.  It was based on
5   individual performance and company
6   performance.
7            So let's just say the
8   company had a really poor year, you most
9   likely weren't going to be entitled to
10  100 percent of your bonus.  You may have
11  60 or 70 percent of your bonus.
12           On the flip side, if the
13  company did really well, you could
14  potentially get 125 percent of your
15  bonus.  So there is really two components
16  to our performance plan.
17       Q.   So was any portion of your
18  bonus related to your job performance?
19       A.   Yes.
20       Q.   And what were the criteria
21  for determining whether or not you had
22  excelled in your job performance
23  sufficient enough to warrant a bonus?
24       A.   Meeting your goals and

Page 145

1    objectives and general -- you know,
2    general performance, coming in, doing
3    your job, showing up, having a good
4    attitude, all those other things that
5    come along with being a good employee.
6         Q.   And was any part of your
7    bonus related to meeting targets for
8    sales of drugs?
9         A.   No.
10        Q.   Was any part of your bonus
11   tied to revenue?
12        A.   Other than the company.  The
13   company component of it, I would have to
14   say yes, because, yeah, the company
15   component is tied to revenue, right?
16        Q.   But no -- but is it correct
17   to say that no -- that your bonus was not
18   based on revenue specific to your job
19   function?
20        A.   Yeah, no.
21        MS. LEVY:  Can we clarify
22   the record?  Because I think
23   it's -- will you ask the question
24   again?

Page 146

1         MS. ANTULLIS:  Yes.
2         THE WITNESS:  Did I
3    misunderstand?
4         MS. LEVY:  No, you said
5    "yes, no."  I think we all sitting
6    in the room know what you mean.
7         MR. LUXTON:  You can just
8    say "correct."
9         THE WITNESS:  Maybe I --
10   maybe I can just --
11        MS. LEVY:  Well, let -- let
12   her ask it again.
13   BY MS. ANTULLIS:
14        Q.   Is it correct to say that
15   your -- your bonus was not based on
16   revenue that was generated -- that you
17   generated through your job function?
18        A.   It is correct my bonus was
19   not tied to revenue, yeah.
20        MS. LEVY:  Thank you.
21        THE WITNESS:  I've got to
22   listen more carefully.  I'm sorry.
23        MS. LEVY:  Both of you
24   should be careful of not to talk

Page 147

1    over each other for the clarity of
2    our record.
3         MS. ANTULLIS:  Sorry.
4    BY MS. ANTULLIS:
5         Q.   All right.  So you mentioned
6    ValueTrak a few minutes ago.  Are you
7    familiar with that system?
8         A.   I couldn't speak much to it,
9    no.
10        Q.   Okay.  Did you ever use --
11   did you ever use that system as part of
12   your job in customer service?
13        A.   No.  I've seen it.  I've
14   seen demos.  But no, I would not have
15   been a user.
16        Q.   And was that the system that
17   Actavis used to keep track of its sales
18   of prescription drugs?
19        A.   No.
20        Q.   What did ValueTrak track?
21        A.   I'm not even -- I'm not even
22   sure to what extent ValueTrak was
23   implemented, because then we were
24   acquired.  I think -- so it wasn't

Page 148

1    tracking our -- our sales.  I mean,
2    that -- that was I believe -- like I -- I
3    didn't really -- I wasn't part of like
4    looking at daily sales and where we are
5    to our goals and all that.  It really
6    didn't fall in what I cared about in my
7    role.  I don't believe that ValueTrak had
8    any role in that.  And as a matter of
9    fact, I don't believe it could have,
10   because it was one of those things, they
11   were adding on later and we would have
12   always had something to track sales.  So
13   that would have to answer my question.
14        Q.   So are you aware of any
15   other system that Actavis used to track
16   the sales of prescription drugs while you
17   were there?
18        A.   Not that I'm aware of.  I
19   don't know.
20        Q.   Do you know if Actavis has a
21   record of every order filled?
22        A.   Sure.  I don't know why they
23   wouldn't.  Yeah.
24        Q.   Do you -- do you know where

Page 149

1    that record would be maintained?
2        A.   Electronically.
3        Q.   Do you know if Actavis
4    tracks inventory?
5        A.   Yes.
6        Q.   And does it use a -- a
7    system to do that, did it use a system to
8    do that while you were there?
9        A.   Yes.  What those systems
10   were from a supply chain side, I don't
11   know, it may have been QAD as well.
12       Q.   Did customer service play
13   any role in maintaining supply?
14       A.   I would say yes to that.
15       Q.   What role did customer
16   service play in maintaining supply?
17       A.   We were the -- we were the
18   ones that communicated when we were -- I
19   mean, they could see on the supply chain
20   side when we were out of stock, right.
21   But we were the ones communicating with
22   customers on a daily basis.  And this has
23   nothing to do with controlled drugs.
24   This is across all drugs.  You may have a

Page 150

1    noncontrolled drug that is causing a lot
2    of pain with customers in the market
3    and -- and customers are highly
4    inconvenienced, patients, because they
5    can't access the drug.  So we were the
6    voice of the customer, and we would --
7    like sometimes it was like the one who
8    screamed the loudest.  Like, hey, we need
9    you guys to shift your -- your
10   priorities, because this one is killing
11   us.  You know, so we would communicate
12   about customer needs.
13       Q.   Okay.
14       A.   But to that extent, like we
15   didn't drive, you know, what their plans
16   should be, you know.
17       Q.   You -- you've used the term
18   customers, customer department, customer
19   service, you've used the word customers a
20   lot throughout the deposition so far.  So
21   I just want to clarify for the record
22   what you mean when you say customers.
23           What do you mean when you
24   use the term "customers"?

Page 151

1        A.   Well, in my role, customer
2    means many things.  But if you had to put
3    them in order of importance, the customer
4    is the patient.
5        Q.   Okay.
6        A.   But customer to me I would
7    break it into two categories.  Our
8    internal customers, those and other
9    departments surrounding us in the
10   company, that we also support in many
11   ways.
12           But the customer can be a
13   wholesaler.  They can be a distributor, a
14   retail chain.  But ultimately the
15   customer that every single one of us in
16   the supply chain is supporting is the
17   patient.
18       Q.   So the patient then, is a
19   customer; is that correct?
20       A.   Absolutely.
21       Q.   Are wholesalers customers?
22       A.   Yes.
23       Q.   Are pharmacies customers?
24       A.   Not directly that we do

Page 152

1    transactional data with them.  But they
2    are customers, because they are
3    purchasing our product, yes.
4        Q.   Are prescribers customers?
5        A.   Because I've never had any
6    involvement with prescribers, I've never
7    really thought about that.  But sure, if
8    prescribers are using -- are prescribing
9    our product, I guess you can consider
10   them customers.  They've never been a
11   customer in my focus though, so I never
12   really thought about -- thought about
13   prescribers.
14       Q.   Was maintaining strong
15   customer relationships a part of your job
16   function?
17       A.   Yes.
18       Q.   And what customer
19   relationships did you maintain, what --
20   with which customers did you maintain
21   relationships?
22       A.   Wholesalers, distributors,
23   retail chains.  In some aspects we would
24   deal with pharmacies, maybe they called,

Page 153

1    they had a question on ingredients.
2    Maybe you had a customer call and cry on
3    the phone because they couldn't get
4    access to a certain drug.  Or they
5    couldn't afford a certain drug, and we
6    would point them to certain programs that
7    might be able to help them.
8            So, you know, our service
9    spanned across all those groups.
10       Q.   Okay.  I'm going to
11   introduce a document into the record that
12   I'd like to ask you about.  It's Tab 20.
13   It may take him some time to do that.
14          (Document marked for
15          identification as Exhibit
16          Baran-5.)
17   BY MS. ANTULLIS:
18       Q.   This is Exhibit Number 5.
19   It's ALLERGAN_MDL_00478433 through 8435.
20          Sorry about that.
21       A.   Thank you.
22       Q.   So the e-mail -- this begins
23   on the bottom of Page 2.  It's an e-mail
24   chain.

Page 154

1        A.   Okay.
2        Q.   So the e-mail starts with a
3    woman named Maria Sakach, February 8,
4    2012.  And it says it's a comment or
5    query.  "Hello, I'm a pharmacist with
6    Publix in South Florida.  We order our
7    medications primarily from McKesson, and
8    one of the medications we order is the
9    Actavis brand of Oxycodone.  Recently we
10   have been unable to order any of this
11   medication because McKesson has stated
12   that the manufacturer is limiting the
13   amount that it is sending them."
14       A.   Okay.
15       Q.   So is this the kind of
16   contact then that you -- that you were
17   referring to from pharmacies asking about
18   supplier materials?
19       A.   Something like this would
20   happen.  And that would happen from the
21   patient too.
22       Q.   Okay.  So who did -- what is
23   InfoUS?  This says it's from -- there's a
24   from line and a to line.  And the to line

Page 155

1    says InfoUS.  Can you tell me what that
2    is?
3        A.   I believe that was the
4    e-mail identifier, which would be like
5    someone could go on the internet and hit,
6    ask me, contact me.  It was the -- the
7    general company access for someone that
8    doesn't normally have communications with
9    us.
10          Like if I wanted to contact
11   a random company, I would go on their
12   website and hit a button and that's where
13   I would land.
14       Q.   Understood.
15       A.   We didn't -- we didn't get a
16   tremendous amount of these so much.  I
17   mean you did, you had like product
18   complaints.  Like my pills have crushed
19   and, you know, that kind of stuff.
20       Q.   Okay.
21       A.   So -- marketing managed the
22   inbox because they were responsible for
23   the website, and they would triage
24   inquiries to appropriate groups.

Page 156

1        Q.   What department did David
2    Myers work with?
3        A.   Marketing.
4        Q.   Marketing.  Okay.  So --
5        A.   He managed the website.
6        Q.   So David, David Myers then
7    sends this to yourself, Rachelle Galant,
8    and Jinping -- Jinping McCormick?
9        A.   Correct.
10       Q.   Am I saying that correctly?
11       A.   Yes.
12       Q.   Okay.  Says, "Are there any
13   thoughts on how I should respond to the
14   e-mail below?"
15          Why would David Myers send
16   that to -- to you?
17       A.   If you don't mind can I take
18   a moment to read the whole chain to see
19   what this is?
20       Q.   Go ahead.  Actually, you
21   know, we're going to get to -- I'll let
22   you read the first page when we get to
23   it.
24       A.   Okay.

Page 157

```
 1        Q.   So go ahead and read the
 2   e-mail --
 3        A.   I'm just starting from the
 4   bottom --
 5           MS. LEVY:  You can read the
 6      e-mail if you're going to get
 7      asked questions about it.
 8           MS. ANTULLIS:  I'm going to
 9      let her read the whole e-mail, but
10      I want to go through it as we go.
11   BY MS. ANTULLIS:
12        Q.   So you can read the bottom.
13        A.   Okay.
14        Q.   Read the top.  And answer my
15   question.  And then we'll flip the page
16   and then you can read the first page.
17           MS. LEVY:  So I'm going to
18      instruct you to read the entire
19      document and then to answer
20      questions.  And not to answer
21      questions prior to that.
22           MS. ANTULLIS:  That's an
23      improper objection.  That's an
24      improper instruction.
```

Page 158

```
 1           MS. LEVY:  That's fine.
 2           MS. ANTULLIS:  I want to put
 3      that on the record.
 4           MS. LEVY:  Your objection to
 5      my objection is noted.
 6           THE WITNESS:  Okay.  I will
 7      be happy to comply.  Just give me
 8      one moment and I'll read this for
 9      you.
10   BY MS. ANTULLIS:
11        Q.   Hold on.  The problem is
12   it's an improper instruction.  So I will
13   let you read it because you've asked me
14   to let you read the entire document.  So
15   I'm going to let you do that.
16        A.   Okay.  I mean my goal is --
17        Q.   Because you have asked, not
18   because --
19        A.   My goal is to just make sure
20   that I answer properly.
21           Okay.  I'm comfortable.
22   Thank you for your patience.
23        Q.   So my question was, why
24   would David Myers forward this e-mail to
```

Page 159

```
 1   you?
 2        A.   Because we represented the
 3   customer and if we didn't -- first of
 4   all, his job was not to answer inquiries.
 5   His job was to pull them off the
 6   website --
 7        Q.   And why would he forward it
 8   to you?
 9           MS. LEVY:  Hang on.  Let her
10      finish her answer.  Please don't
11      interrupt her.
12           THE WITNESS:  He was
13      triaging them, and he would
14      forward it to me because it's my
15      job to make sure a customer of any
16      shape and form is answered.
17   BY MS. ANTULLIS:
18        Q.   Okay.
19        A.   It doesn't necessarily mean
20   when he sends it to me that I've got all
21   the answers.  But it's my job to make
22   sure that I find out what the answers
23   are.
24        Q.   What department is Jinping
```

Page 160

```
 1   McCormick in?
 2        A.   Jinping was the head of
 3   marketing.  So Rachelle and David
 4   reported to Jinping.
 5        Q.   So it went to -- from a
 6   marketing person to two marketing people
 7   and then yourself; is that correct?
 8        A.   Yeah.
 9        Q.   And if we turn the page.
10   Rachelle responds with a proposed --
11   proposed response that the market share
12   appears to be experiencing a shortage of
13   oxycodone, correct?
14        A.   Yes.
15        Q.   So then, your response
16   says -- in the first sentence, it says,
17   "We can't control nor do we know how
18   McKesson goes about allocating and
19   shipping quantities of oxy."  Correct?
20        A.   That's correct.
21        Q.   Okay.  So earlier, you said
22   that Rachelle Galant used a system called
23   ValueTrak to -- to -- to track the sales
24   of its -- of Actavis drugs to
```

Page 161

1    wholesalers' customers; is that correct?
2        A.   Yes.  To some extent.
3        Q.   Okay.
4        A.   It was -- you know, go
5    ahead.
6        Q.   So what did that system
7    allow you to track?
8        A.   So it looked at data down --
9    it really looked at three components.
10   I'm just going to try to make sure I get
11   them correctly.  The first one it looked
12   at was -- you know, is a customer
13   purchasing from multiple sources.
14       So for example, it's very
15   common for a pharmacy to have a primary
16   wholesaler and a backup, right.  Why
17   wouldn't you?  And sometimes maybe they
18   have three sources if they want to ensure
19   continuous supply.
20       But it would be very
21   suspicious to us based on our categories
22   we set up for one pharmacy to have
23   multiple sources.  So that was the first
24   element.

Page 162

1        The second one was
2    historical purchases.
3        And the third element was
4    comparing it to like customers.  That was
5    the intent of that program.
6        Q.   Okay.  So what data was
7    input into the ValueTrak system that
8    allowed it to track those three criteria?
9        A.   I'm going to try to answer
10   that question.  But technically in the
11   answers, like, I don't know codes and
12   the -- it was the data coming backup from
13   the wholesalers.  And there's like
14   quality 67 data.  I don't -- I don't
15   remember the numbers.  But it was data
16   coming back from the wholesalers.
17       Q.   Just before I forget to ask
18   this.  The second sentence, I believe it
19   says, "We know customers throw us under
20   the bus for not supplying."
21       A.   Oh, yeah.
22       Q.   Who are you referring to
23   when you use the word "customers" in that
24   statement?

Page 163

1        A.   In that specific statement,
2    when I use the word "customers" it's very
3    easy for me to answer.  And not to throw
4    Walgreens under the bus, but I'll use
5    them as an example just for purposes of
6    example.
7        Let's face it.  When you're
8    a -- and this is my opinion, and this
9    ties to what the e-mail is about.  When
10   you're a Walgreens pharmacist, and you
11   choose not to supply a patient walking in
12   for whatever reason -- I don't know how
13   they make that determination.  That's not
14   my job.  I have to imagine it's a lot
15   more difficult because you have that
16   patient and customer in front of you.
17       So regardless of whatever
18   criteria they use and what their policies
19   and procedures tell them to do, when they
20   should supply and when they shouldn't, I
21   don't know.  That's not for me to know.
22   But when they're telling a customer, they
23   aren't going to supply them, you know,
24   there would be times where we had supply.

Page 164

1    That wasn't an issue.  But they were
2    perhaps telling -- a pharmacy level was
3    telling a customer, oh, there's no
4    supply.  We're out of stock, the
5    manufacturer is not, you know, giving us
6    enough, simply to make that go away.
7        And what happened is then
8    that puts those calls back on us.  And we
9    would look at what we're supplying.
10       And unless at this point in
11   time -- and I can't say today.  This
12   e-mail could have happened at one of two
13   times.  It could have happened when our
14   supply was good, or it could have
15   happened when we were in a market
16   shortage.  You know, maybe another
17   manufacturer -- I'm just going to make
18   something up.  Maybe there were four
19   players in the market, and someone jumped
20   out so there were shortages.  That could
21   be the case.  Or the --
22       Q.   Can I just direct you to the
23   first e-mail --
24       A.   Yeah.

Page 165

1      Q.    -- the first sentence of the
2   e-mail that we just went through.  Just
3   go ahead and read it.
4      A.   I mean, that's exactly what
5   I'm saying.  I mean it's basically --
6      Q.   But in this situation --
7      A.   -- they're saying they can't
8   supply --
9         MS. LEVY:  You guys are
10        talking over each other.  Try to
11        listen to her specific question
12        and then answer that question.
13        THE WITNESS:  Okay.
14   BY MS. ANTULLIS:
15      Q.   All right.  So in this
16   situation, you say it comes down to the
17   fact that we're supplying numbers way
18   above normal, so to blame it on a market
19   shortage isn't really it.  In this
20   particular situation, is there supply
21   available?
22      A.   To answer that specific
23   question, based on that, this e-mail is
24   saying that there is product, yes, we are

Page 166

1   supplying, and for some reason they must
2   be choosing not to supply.  And that's --
3      Q.   Okay.  Thank you.
4      A.   -- not for us to say.  Yeah.
5      Q.   Okay.  So --
6      A.   I didn't want to get that
7   wrong.
8      Q.   Sorry.  So the indirect SOM
9   process implemented at Actavis, did that
10   exist prior -- was there an indirect
11   suspicious order monitoring program prior
12   to 2011 at Actavis?
13      A.   No.  Not on the indirect
14   side.
15      Q.   Okay.  Can you explain to me
16   why -- please explain -- why did Actavis
17   decide to institute an indirect
18   suspicious order monitoring program?
19      A.   As I mentioned earlier
20   today, you know, when I was assigned this
21   task, it was our goal to make sure that
22   we were doing everything possible to
23   protect the integrity of the supply chain
24   and to ensure and prevent diversion.  So

Page 167

1   we weren't satisfied with good.  We
2   wanted to be great.  And this effort was
3   our step to bring things, as I mentioned
4   earlier, to the next level.
5      Q.   Did you ever have any
6   conversations with the DEA regarding the
7   "Know Your Customer's Customer" guidance?
8      A.   Absolutely.
9      Q.   Okay.  When did you have
10   those conversations?
11      A.   I don't know the exact date,
12   but I will say it was probably -- it was
13   shortly before the Watson transaction
14   closed, which I think was in the fall of
15   2012.  So maybe this was September 2012.
16   But please don't quote me on that.
17      Q.   We'll get to it later in the
18   day.
19      A.   Okay.
20      Q.   We have documents --
21      A.   Okay.
22      Q.   -- that may help refresh
23   your recollection.
24      A.   Okay.  Yeah, there was a

Page 168

1   presentation that I prepared that has
2   hopefully been found in discovery
3   somewhere that would tell you the exact
4   date.
5      Q.   Okay.  So as of February of
6   2012, when this e-mail was written, were
7   you aware of any "Know Your Customer's
8   Customer" guidance?
9      A.   Can you repeat that?  I
10   don't know --
11      Q.   Have you ever heard the
12   phrase "Know Your Customer's Customer"
13   in -- by February of 2012?
14      A.   Yes.
15      Q.   Okay.  Had Actavis started
16   to implement any procedures or policies
17   to try to know your customer's customer
18   by February of 2012?
19      A.   Several.  Several
20   procedures.
21      Q.   Okay.  So when you got this,
22   if you remember, do you remember this
23   particular e-mail by any chance?  You
24   said there weren't that many of them?

Page 169

1    A.   This e-mail.
2    Q.   When you received it.  Do
3  you remember receiving it?
4    A.   I would say that there would
5  be potentially even a few others.  I mean
6  this didn't happen everyday.  But when I
7  see something like this, it doesn't -- it
8  doesn't surprise me.  So I --
9    Q.   So when you receive an
10  e-mail like this, this e-mail or an
11  e-mail like this, did you -- did you do
12  any investigation to determine why
13  McKesson might not be supplying that
14  particular pharmacy?
15    A.   So what you have to
16  understand, to answer that question, is
17  being a manufacturer of a product like
18  oxycodone, it was not uncommon -- we may
19  not get customers write on the website
20  very often, but it was not that uncommon
21  where you had customers calling --
22  customers defined in this case as
23  patients -- looking for oxycodone.
24        It was very difficult.  If

Page 170

1  you were to break down our role and what
2  some of the challenges were, I mean, you
3  were dealing with patients, you know,
4  crying on the phone, and we, as customer
5  service reps, had no differentiation of
6  knowing if this is truly a cancer
7  patient, for example, that's being turned
8  away at a pharmacy, or an addict that's
9  calling trying to find any way to get
10  drugs.  I mean, when you're on the phone
11  with somebody, you don't have that.
12        But all we could do is treat
13  every call and patient, customer, with
14  respect, and help them in the best
15  ability we can.
16        There were -- there were
17  certain occasions where you know, maybe
18  someone couldn't access a product, we saw
19  it was in the supply chain, and we would
20  work with -- we would pick up the phone
21  and call the wholesaler and say look, you
22  know, there is inventory sitting in this
23  location.  Let's figure out maybe why
24  there's a bottleneck getting it from that

Page 171

1  DC to the local pharmacy.  There would be
2  times where we would aid in that
3  investigation.
4        But to answer your original
5  question.  Every time we got a patient
6  calling us saying that, listen, the
7  pharmacy won't give me oxycodone, we did
8  not have the capacity to investigate
9  every patient.
10    Q.   Okay.  But in this
11  particular example, the customer is the
12  pharmacy, correct, Publix?  It's on
13  Page 2.
14    A.   Yes.
15    Q.   So the pharmacy then is
16  contacting you to state that it does not
17  have a supply of oxycodone, correct?
18    A.   Mm-hmm.
19    Q.   And your response to Michael
20  Perfetto, Rachelle Galant, David Myers
21  and the other people listed here is that
22  you're supplying numbers way above
23  normal, correct?  That's what that says?
24    A.   In other words, there's

Page 172

1  supply in the market.  In other words,
2  we're not in shortage.
3    Q.   Okay.  So now you're aware
4  then that there is supply in the market.
5  And this particular pharmacy is claiming
6  that McKesson is telling them they don't
7  have supply, right?
8    A.   Correct.
9    Q.   Did you conduct any
10  investigation to determine whether
11  McKesson was withholding supply from that
12  pharmacy?
13    A.   To answer your question, I
14  can't sit here and say that we never did.
15  But in terms of general practice, you
16  know, the wholesalers were making
17  determination on their customer and why
18  they were not shipping.  And it was not
19  our practice to question.  If they
20  decided there was someone they weren't
21  shipping to, we didn't tell them they
22  should.
23    Q.   Okay.  Thank you.  You can
24  put that aside for now.

Page 173

1      What is your understanding
2  of Actavis's responsibilities under
3  federal law with respect to the control
4  of the supply chain of opioids?
5      A.   Repeat that one more time.
6      Q.   What is your understanding
7  of Actavis responsibilities under federal
8  law with respect to the control of the
9  supply chain of opioids?
10     A.   I mean in short, the way I
11 would describe it is we were tasked and
12 our responsibility was to design and
13 operate a system that would detect,
14 manage, and monitor suspicious orders.
15 Detect -- design and operate a system.
16 It's a short description.
17     Q.   And so are you aware of --
18 you already say that you're familiar with
19 the Controlled Substances Act?
20     A.   Mm-hmm.
21     Q.   Is Actavis registered as --
22 is or was during your time, Actavis
23 registered as a manufacturer under the
24 Controlled Substances Act?

Page 174

1      A.   Yes, we were a manufacturer.
2      Q.   Okay.  So during your time
3  at Actavis, was the company required, by
4  the Controlled Substances Act, to provide
5  effective controls and procedures to
6  guard against diversion and theft of
7  controlled substances?
8      A.   Yes.
9      Q.   During your time at Actavis,
10 was the company required by the
11 Controlled Substances Act to report
12 suspicious orders of controlled
13 substances to the Drug Enforcement
14 Administration?
15     A.   Yes.
16     Q.   During your time at Actavis
17 were you aware of the Controlled
18 Substances Act reference to the
19 importance of a closed system?
20     A.   You know, I -- I remember
21 that terminology.  Closed system.  But
22 I'm trying to remember how it was used.
23     It read right in the
24 regulation, the closed system, but I'm

Page 175

1  sorry, it's been so long.  I forget how
2  that terminology was used, the closed
3  part of it.
4      Q.   Do you understand that the
5  purpose of the Controlled Substances Act
6  is to prevent the diversion of controlled
7  substances --
8      A.   Yes.
9      Q.   -- for -- okay.
10     I'm going to introduce
11 another record, another document into the
12 record.  It's --
13     THE VIDEOGRAPHER:  I have to
14 change --
15     MS. ANTULLIS:  Okay.
16     MS. LEVY:  Let's also have a
17 restroom break if it's a
18 convenient time.
19     THE VIDEOGRAPHER:  The time
20 is 11:52 a.m.  Going off the
21 record.
22     (Short break.)
23     THE VIDEOGRAPHER:  Okay.  We
24 are back on the record.  The time

Page 176

1  is 12:03 p.m.
2  BY MS. ANTULLIS:
3      Q.   I was going to give you an
4  exhibit.  While I'm looking for my
5  exhibit, can you tell me if you ever
6  participated in any working group,
7  internal working group at Actavis to
8  discuss -- internal working group at
9  Actavis involving the suspicious order
10 monitoring program?
11     A.   Yes.
12     Q.   Okay.  And do you know when
13 that working group -- when did you join
14 that working group?
15     A.   It was in the same -- around
16 the same time I took on the initiative to
17 enhance our processes.  So sometime
18 spring, late spring of 2011 maybe.
19     Q.   And did that working group
20 exist prior to your joining it?
21     A.   I couldn't answer that
22 question, because I wasn't involved, so I
23 don't know.
24     Q.   Who were the members of the

Page 177

1   working group while you were on it?
2       A.   Yeah, so I can name some
3   that I recall.
4           It's not necessarily going
5   to be all inclusive.  But first and
6   foremost, there was a steering committee,
7   senior executives that were driving the
8   importance of this initiative down into
9   the organization.
10          And I know my boss, Michael
11  Perfetto was one of those on the steering
12  committee.  And I believe there were,
13  like, one or two others.  I'm not sure
14  exactly who it was.  It may have been our
15  lawyer, Michael Clark.  I'm not certain
16  of that.  But we had a steering committee
17  nonetheless.
18          And then we had legal
19  participation to help us through and make
20  sure we were interpreting the regulations
21  and the guidelines properly.
22          We had our security person,
23  our DEA contact.  She is not from the
24  DEA.  She actually had a history, I

Page 178

1   think, working in the DEA.  But she was
2   in our security group.  If we needed to
3   make contact with the DEA for any reason,
4   she was the point person.  It wouldn't be
5   me calling them.
6           And then -- you know, then
7   you had, like, groups like mine in the
8   middle that were executing the processes.
9   So it wasn't a fairly wide group, but
10  there was representation from the key
11  areas.
12      Q.   And, so you testified that
13  there was a steering committee and that
14  Michael Perfetto was on the steering
15  committee.
16          Was the steering committee a
17  part of the internal working group?
18      A.   I wouldn't say they were a
19  part of the working group.  We had to
20  report back to them, so they knew it was
21  done.
22      Q.   Okay.  So it's a separate
23  group from the working group; is that
24  correct?

Page 179

1       A.   Yeah.  They sat on the top.
2   And they pushed down to make sure we were
3   doing what we were supposed to.  But they
4   weren't involved in the details in terms
5   of, you know, designing, right.  We were
6   accountable to them.
7       Q.   Do you remember the members
8   of the actual working group?
9       A.   Once again, I'll name a few
10  that I remember, because they were, you
11  know, instrumental in our success.  But I
12  will go on record saying that there may
13  be someone I'm going to miss because it's
14  been seven years.
15          So Rachelle Galant was
16  instrumental from marketing.  She was the
17  person that really helped us drive this
18  indirect initiative.  And of course
19  because she was involved, Jinping
20  McCormick supported and gave input as
21  well.  Umesh Solanki was our IT person
22  that took the solution that was built by
23  the consultant we hired.  And he was
24  responsible for integrating that into our

Page 180

1   systems.
2           He had a person named Wansun
3   Park, I think it was.  And Wansun, I
4   don't even know if he was an employee.
5   He may have been a consultant.  But he
6   partnered with Umesh.  The two of them
7   were really instrumental in taking the
8   solution that was turned over to us and
9   implementing it.
10          I'm trying to think who
11  else.
12          So John Duff was on the
13  legal staff.  And he was a really
14  valuable resource to us.  And off the top
15  of my head, those are some of the people
16  that were key.
17      Q.   Do you remember if Michael
18  Clark was a member of the working group?
19      A.   Yeah.  Yeah, I think I
20  mentioned him earlier.
21      Q.   Right.  I just wanted to
22  clarify.  Was there -- do you recall if
23  there was an industry working group
24  external to Actavis relating to

Page 181

1    suspicious order monitoring?
2        A.   Not that I'm aware of.
3        Q.   So I'm going to give you
4    what we're marking as Exhibit 6.
5            (Document marked for
6        identification as Exhibit
7        Baran-6.)
8            MS. ANTULLIS:  It's
9        ALLERGAN_MDL_03525593.
10           THE WITNESS:  Thank you.
11       Yes.
12   BY MS. ANTULLIS:
13       Q.   This appears to be -- first
14   of all, do you recognize this document,
15   this e-mail?
16       A.   Yes.
17       Q.   Do you recognize the e-mail?
18       A.   I don't recognize the
19   e-mail.
20       Q.   Do you remember sending this
21   letter -- the attached letter to Michael
22   Clark in or around September of 2012?
23       A.   I don't recall, but I'm not
24   saying that I didn't.

Page 182

1        Q.   Do you know -- is this
2    something that you would have done in the
3    normal course of business?
4        A.   Sure.  He may have needed a
5    copy and didn't have it at the time.
6        Q.   Do you have any reason to
7    believe that this was not an e-mail from
8    you to Michael Clark?
9        A.   No.
10       Q.   So let's -- yes, please flip
11   to the attachment, which I see you've
12   already done.  Do you recognize this
13   attached letter?
14       A.   Yes, I do.
15       Q.   Do you recall when the first
16   time -- do you recall when you first saw
17   this letter?
18       A.   I've read it so many times
19   on different occasions, but I don't
20   recall when the first time would have
21   been.  I don't even know if I could
22   guess.
23       Q.   Do you recall if it was
24   prior to September of 2012?

Page 183

1        A.   Oh, I imagine so.  But I
2    don't recall the date.
3        Q.   Do you remember reading this
4    letter during your initiation process
5    when you were initially hired?
6        A.   I am -- would venture to
7    guess, yes.  It was at that time that
8    I -- like I said, I've seen it on more
9    than one occasion.  So I would -- I can't
10   be certain that I read it at that exact
11   time of the initiation.  But it wouldn't
12   be outside of a realm of possibility
13   because it's -- yeah.
14       Q.   When you sent -- you sent
15   this letter to Michael Clark in September
16   of 2012.  Where would you have -- what
17   system or database or file would you have
18   gone to at Actavis to find this letter?
19   Would it have been in your own files?
20       A.   It could have been.  I'm not
21   sure where I would have gotten it from.
22   I may have had it for a year or I may
23   have just gotten it the day before and
24   forwarded it.  I don't know.

Page 184

1        Q.   Are you familiar with the
2    contents of this letter?
3        A.   Definitely familiar with it.
4    I'm going to admittedly say I'm rusty.  I
5    haven't even been working for two years.
6    My brain is probably not going to be able
7    to talk to it very much.  But yes, I'm
8    familiar with the fact that this letter
9    from 2007 existed.
10       Q.   Were you familiar with the
11   contents of this letter during your
12   employment at Actavis?
13       A.   Yes.
14       Q.   So in the -- in the second
15   full paragraph -- well, first of all
16   let's establish.  Is this a letter from
17   the Department of Justice to Actavis?  Is
18   that your understanding of what this is?
19       A.   To Actavis?  I don't know if
20   I could say that.  It could be something
21   that all manufacturers got.  I don't -- I
22   don't know that.  I mean, was it
23   specifically sent to Actavis or was it
24   more broadly distributed?  I don't know

Page 185

1  at this time.
2      Q.  So was the letter sent to
3  Actavis?
4      A.  Well, somehow we got it, but
5  I can't say seven years later how that
6  happened.  I don't remember.
7      Q.  Okay.  Are you -- is it your
8  understanding that Actavis -- is it your
9  understanding that the guidelines
10  provided in this letter are applicable to
11  Actavis's suspicious order monitoring
12  program?
13      A.  Sure.  We were maintaining
14  systems to detect suspicious order.  And
15  that's what this speaks to.  I mean, I
16  haven't read this in years.  And I can
17  read it in detail if you want to ask me
18  specific questions on the letter.
19      Q.  Sure.  Let's go to the
20  second paragraph.  It says, first
21  sentence, and we've already discussed
22  this, "In addition to, and not in lieu of
23  the general requirement under 21 U.S.C.
24  823 that manufactures and distributors

Page 186

1  maintain effective controls against
2  diversion, DEA regulations require all
3  manufacturers and distributors to report
4  suspicious orders of controlled
5  substances."
6      Did you understand that to
7  be a requirement that Actavis was bound
8  to follow?
9      A.  Yes.
10      Q.  Second sentence, "DEA" --
11  excuse me.
12      "Title 21 C.F.R. 1301.74(b)
13  specifically requires that a registrant
14  design and operate a system to disclose
15  to the registrant suspicious orders of
16  controlled substances."
17      Was it your understanding
18  that that was a requirement that Actavis
19  was bound to follow?
20      A.  Yes.  That was my
21  understanding.
22      Q.  It says the next page -- two
23  sentences later, it says, "Accordingly
24  the DEA does not approve or otherwise

Page 187

1  endorse any specific system for reporting
2  suspicious orders."
3      A.  Yes.  I definitely recall
4  that.
5      Q.  Okay.  So did you understand
6  that to be the case, that the DEA would
7  not endorse a system?
8      A.  Yes.  Because, you know, I
9  can't speak for any other manufacturers,
10  I don't know what they did.  But we were
11  always looking and striving to be better
12  and to get validation and they were not
13  willing -- you know, we were looking for
14  that stamp of approval.
15      Listen.  Look at what we're
16  doing, here is what we're doing.  If
17  there's something we're missing,
18  something that we need to do differently,
19  let us know.  Give us your validation
20  that this is what you mean in this vague
21  letter of yours.  And they were not
22  willing to do that.
23      Q.  Okay.  You used the word
24  "vague," you said vague letter.  Do you

Page 188

1  feel -- was it your belief while you were
2  working at Actavis that the requirements
3  of the CSA were vague?
4      A.  I -- I believe that the
5  direction from the DEA was vague.
6      Q.  Is it your under -- was it
7  your understanding while you were at
8  Actavis that the requirements of the
9  Controlled Substance Act were vague?
10      A.  Say that, I'm sorry, one
11  more time.
12      Q.  So I'm asking about the
13  Controlled Substances Act, not the --
14      A.  The act, okay.
15      Q.  -- not the letter.  Okay.
16  Per se.  I'm asking specifically about
17  the Controlled Substance Act.
18      Was it your understanding
19  that while you were at Actavis that the
20  requirements of the Controlled Substance
21  Act to -- to prevent diversion were
22  vague?
23      A.  I think they -- I would -- I
24  would define that as vague.  I mean,

1  yeah.  I would -- I would say yes.
2      Q.   Was it your understanding
3  while you were at Actavis that the --
4  that the parameters of a -- the
5  criteria -- was it your understanding
6  while you were at Actavis that the
7  criteria for a quote-unquote successful
8  suspicious order monitoring program were
9  vague?
10     A.   That's correct.  I mean, the
11  DEA never came out and said here is
12  exactly what you need to do.  They said,
13  here is what you need to do, up here.  So
14  yes, vague is a good description.
15     Q.   And I'm going to continue
16  down on the letter.  I'm going to go to
17  the third paragraph which you can read.
18     A.   Yes.
19     Q.   Okay.  So the first sentence
20  says, "The regulation requires" -- "also
21  requires that the registrant inform the
22  local DEA division office of suspicious
23  orders when discovered by the
24  registrant."

1      Is it your understanding
2  that that was a -- a requirement that
3  Actavis was bound to follow?
4      A.   Absolutely.
5      Q.   Was it your -- what was your
6  understanding of the term "when
7  discovered" while you were working at
8  Actavis?
9      A.   So "when discovered," the
10  way I would define that is not an order
11  of interest.  DEA doesn't want five
12  reports a day with a bunch of orders on
13  it.  That definition is an order that
14  would be deemed suspicious.  We've looked
15  at it.  We can't make sense of it.
16  There's no rhyme or reason.  Something
17  doesn't smell right.  That to me would --
18  would be this definition.  One -- an
19  order that we would cancel in its
20  entirety.
21     Q.   Was there a time frame in
22  which you had to provide a suspicious
23  order report to the DEA?
24     A.   I don't -- I don't recall

1  that.  And that wasn't my responsibility.
2  I didn't have the communication with
3  them, so I don't know if there was a
4  specific time frame.
5      Q.   So in the third -- third
6  paragraph it says, "The regulation
7  specifically states that suspicious
8  orders include orders of an unusual size,
9  orders deviating substantially from a
10  normal pattern, and orders of an unusual
11  frequency."
12      Is it your understanding
13  that -- are the -- the -- the three
14  prongs that are laid out there, are those
15  three prongs consistent with your
16  understanding of what criteria go into
17  determining whether an order is
18  suspicious or not?
19     A.   Absolutely.
20     Q.   Do you understand that --
21  those criteria to be disjunctive?
22     A.   Disjunctive, can you
23  describe disjunctive?
24     Q.   Well, let's read the next

1  sentence.  It says, "These criteria are
2  disjunctive and are not all-inclusive."
3         MS. LEVY:  Do you have a
4  question?
5         MS. ANTULLIS:  Yes.
6  BY MS. ANTULLIS:
7      Q.   So what is your
8  understanding of "disjunctive" and "not
9  all-inclusive"?
10     A.   To me, the way I would
11  describe that is that doesn't mean that's
12  all you have to do, right.  You still
13  have to be a responsible manufacturer.
14  You still have to know who you are
15  selling to.  Are they properly licensed.
16  Do they have the right vault storage, you
17  know.  Are they selling -- you know, is
18  someone coming to you and buying
19  99 percent controlled drugs only.  You
20  know, you still have to have other areas
21  of responsibility, not -- not just
22  limited to those three things.  That's
23  how I would describe that.
24     Q.   In 2012 you describe -- I'm

Page 193

1    sorry.  Forgive me.
2         In 2011 you said you began a
3    project to enhance the suspicious order
4    monitoring policies and procedures at
5    Actavis; is that correct?
6         A.   That's correct.
7         Q.   When you instituted --
8    what -- as part of the -- as part of that
9    project, did you look at those
10   requirements and try to determine how to
11   capture them through your -- how to
12   analyze them through your suspicious
13   order monitoring investigation?
14        A.   Absolutely.  There were key
15   components.
16        Q.   Okay.  Did you change the
17   way that you applied those criteria?
18        A.   Yes, because we had a
19   brand-new algorithm that was built, and
20   yeah, I would say yes.
21        Q.   Okay.  So without getting
22   into the details of the algorithm right
23   now.  We will address that later.  But
24   what is your understanding as to how

Page 194

1    Actavis's evaluation of those criteria
2    changed?
3         A.   Well, first of all, in terms
4    of how it changed, it made it more
5    automated and -- I'm not sure I
6    understand the question.  Can you
7    redefine the question?
8         Q.   So yeah, sure.  So I asked
9    you previously whether Actavis changed
10   the way it analyzed and -- and applied
11   the criteria listed here following the
12   2011 project enhancement that you
13   testified about earlier.  And I believe,
14   correct me if I'm wrong, but I believe
15   you said yes, that it did change.
16        A.   Yes.  Or it wouldn't have
17   been able to --
18        Q.   I'm trying to ascertain what
19   that change was.
20        A.   So what the change was after
21   the project.  We made sure there was
22   equal attention to the different
23   attributes, right, it wasn't just based
24   on historical purchases.  You know, we

Page 195

1    were -- the -- the algorithm captured
2    and -- and had a score -- first of all,
3    the algorithm is this formulaic equation
4    that's this long.  And I certainly can't
5    speak to that.  But there are documents
6    that should be on record that -- that
7    can.
8         And basically it just -- it
9    took all the different attributes and
10   weighted them and gave an order, a score,
11   kind of like matching it up to what the
12   DEA is -- is looking for.  And if it --
13   if it didn't meet the score it should, it
14   would spit out as -- as an order of
15   interest.
16        To answer your question, I
17   think more accurately, on like some of
18   the changes.  You know, the original
19   report, it gave us some level of detail
20   on where to start our investigation, but
21   it was a little bit more legwork.
22        You had to kind of figure
23   out like, why is this coming on here, you
24   know.  There was some level of detail,

Page 196

1    like it's a first-time customer, and all
2    that.  But the new process gave us a lot
3    more clarity on why it was failing, you
4    know, what aspects.  And it could be one
5    or it could be several.  And it really
6    just aided in our investigation and made
7    it a more efficient process, if that
8    answers your question.
9         Q.   Well, that's a lot of useful
10   information, and I do appreciate it.  But
11   I think I may not be asking the question
12   very clearly, so I'm going to try again.
13        I am trying to determine
14   whether Actavis's understanding of those
15   requirements changed over time while you
16   were at the company.
17        So did their understanding
18   of a suspicious order change over time?
19        A.   Did their understanding of a
20   suspicious order -- I don't believe so,
21   because I mean I feel strongly we were
22   doing it right all along.  We just
23   weren't doing -- we weren't operating
24   smart.  You know what I mean?

1    Q.   When you -- when you began
2  the new enhancement project in 2011, and
3  through 2012, did you seek guidance from
4  anyone on the requirements of a -- a --
5  you know, a suspicious order monitoring
6  program?
7    A.   Absolutely.  So when you --
8    Q.   Who did you -- let me --
9    A.   Yeah, go ahead.
10   Q.   Who did you reach out to for
11 guidance on what would -- what would
12 constitute a successful program?
13   A.   So, a little background.  I
14 mean 25 years leading customer service
15 teams doesn't automatically make me an
16 expert implementing and driving projects
17 of this nature.
18       So, you don't start out as a
19 subject matter expert.  But your goal is
20 you need to make yourself one.  And the
21 only way you can do that is by doing what
22 you just said, seeking guidance and
23 counsel from others.
24       So the answer is absolutely

1  yes.  In terms of who, I mean I'll give
2  you examples.  You know, our attorneys,
3  John Duff, Michael Clark.  You know, as I
4  stated earlier, I -- I started this
5  process, you know, looking at what a
6  C.F.R. was, and, you know, I'm pretty
7  proud of -- of where I took our company.
8  I didn't do it alone.  You know, if you
9  look at any of the documents that I'm
10 sure are out there somewhere, I had
11 really knowledgeable people supporting
12 this process.  And I would never have
13 been able to do it alone so...
14       Q.   Did you ever engage an
15 outside consultant to help you --
16       A.   Yes.
17       Q.   -- design a new suspicious
18 order monitoring --
19       A.   Absolutely.  We strived to
20 seek and find the best.
21       Q.   And who was or were those
22 outside consultants?
23       A.   Cegedim.  I believe their
24 full name was Cegedim Compliance

1  Solutions.
2    Q.   And were there any other
3  outside consultants besides Cegedim?
4    A.   Not that I recall.
5    Q.   When did you hire Cegedim?
6    A.   Best way to answer that
7  would -- I'm sure that our contract and
8  service agreement is on file somewhere.
9  And that would outline that rather than
10 me making a guess on dates.  I don't
11 recall the dates.  But there is a service
12 agreement and contract with them
13 outlining what they were doing for us.
14   Q.   Okay.  Let's go back to the
15 letter.  On the second page, first full
16 paragraph.
17   A.   First paragraph.
18   Q.   The first sentence says,
19 "Registrants that rely on rigid formulas
20 to define whether an order is suspicious
21 may be failing to detect suspicious
22 orders."
23       First was it your
24 understanding that Actavis was bound by

1  that -- that statement during your time
2  there?
3    A.   Yes.
4    Q.   What is your understanding
5  of what a rigid formula is?
6    A.   I guess the way I would
7  describe it is looking hard and fast at
8  very specific set of data, and the way --
9  the example that I know they provided,
10 and I think it's in this paragraph
11 somewhere, is you know, just comparing
12 purchases from today to yesterday or
13 today to last month.  That would be very
14 rigid.  That would be my description.
15   Q.   Okay.  What did Actavis do
16 to comply with the guidance provided in
17 this letter?
18   A.   So I would never consider --
19 our solution was not rigid, for sure.
20       I could be wrong.  I mean
21 there's documents that would support it
22 somewhere.  I'm 95 percent sure we were
23 using six months of rolling history.  So
24 we were looking at history over time.

Page 201

1      Q.   Were you looking at that
2  history over time in 2008?
3      A.   Yes.
4      Q.   Okay.
5      A.   Yeah.  Yeah.
6      Q.   So I'd like to go back to an
7  earlier exhibit that we looked at, if I
8  can find it.
9      A.   So can I -- can I clarify
10 something?
11     Q.   Sure.
12     A.   I don't even know if I was
13 employed in 2008.  Well, when did I
14 start?  January 2008.  So yes.  Based on
15 that answer, I don't take it back.  I
16 thought that was before I started.  I
17 don't think it was any different.  But...
18     Q.   We are going back to -- I
19 believe it's Exhibit Number 4, but I
20 could be wrong, because I have been
21 failing to mark my exhibits.
22         MS. LEVY:  Going back to 4.
23         MS. ANTULLIS:  So sorry.
24 BY MS. ANTULLIS:

Page 202

1      Q.   Yeah, it's the 8/18/2009
2  e-mail.
3      A.   Not the performance review?
4      Q.   No.  Is it Number 5?  Is it
5  three?
6      A.   It's hiding under there.
7  Sorry.  Got it.
8      Q.   Okay.  So again, I'm trying
9  to understand the criteria that are
10 listed in bullet points as they apply to
11 Actavis's suspicious order monitoring
12 program in 2009, this particular e-mail
13 is written.  It appears to state that if
14 the amount ordered by the customer is
15 over a certain percentage -- is a certain
16 percentage over the customer's rolling
17 average then it shows up on the report;
18 is that correct?  Is that a correct
19 understanding?
20     A.   I believe -- I believe so,
21 yes.
22     Q.   Okay.  So you have a method
23 for determining a six-month average,
24 customer average, correct, average order?

Page 203

1      A.   Yes.
2      Q.   And then if an order is
3  placed that's above -- a certain
4  percentage above that average, it's
5  flagged in the system as an order of
6  interest; is that correct?
7      A.   Yes.
8      Q.   Okay.  And then what steps
9  do you take -- did you take in 2009 to
10 determine whether that order of interest
11 was in fact suspicious?
12     A.   So --
13     Q.   Let me take that back.  What
14 criteria then did you look at?
15         Did you -- how did you
16 apply -- did you apply the guidance in
17 the 2007 letter to evaluating whether or
18 not an order of interest was suspicious?
19         MS. LEVY:  Object to the
20 form.  You can answer.
21         THE WITNESS:  Okay.  I think
22 this is similar to the question we
23 discussed earlier today.  And we
24 looked at our process involved,

Page 204

1  looked at -- every order wasn't
2  the same.  It looked at a number
3  of things, and I don't have any
4  kind of documentation to review or
5  to speak to.  But we had steps we
6  would take.
7          You know, is it a new
8  customer?  Is it a new product
9  award?  Is it a new product
10 launch?  Is there something going
11 on in the market?  There were four
12 manufacturers and something
13 happened, and one dropped out, so
14 of course you're going to see
15 increased demand.
16         You know, anything that
17 would have any logical explanation
18 to driving that.
19         And we would have to use
20 different resources to, you
21 know -- we didn't necessarily know
22 what was going on in the market.
23 We would have to consult different
24 groups to make sure that we were

Page 205

1        informed in every decision.
2            But every -- every
3        investigation may have taken a
4        different route depending on the
5        circumstances.
6    BY MS. ANTULLIS:
7        Q.   Once you decided that an
8    order was not -- that an order of
9    interest was not suspicious under the
10   criteria that you were applying, who at
11   Actavis had the authority to -- to
12   authorize -- had the authority to release
13   a pended order?
14       A.   Okay.  So nobody outside of
15   the customer service group had security
16   and that should be in some kind of
17   security document somewhere.  You
18   couldn't have other groups that could go
19   in and release an order.
20       Q.   Did you have a compliance
21   group at Actavis?
22       A.   We had our legal/compliance.
23   But they didn't have access to release
24   anything either.

Page 206

1        Can I go back to an earlier
2    question, because that triggers a
3    thought.  You said what are some of the
4    new -- new things that you did in the new
5    enhancements.
6        The -- I hear buzzing.
7        In the new process,
8    everything was online and electronic.
9    There was no paper copies.  If you
10   reviewed an order, your comments on your
11   investigation, what made you decide to
12   release that order were typed within the
13   system.  It had a -- what is the proper
14   word? -- document flow like it would
15   track who did what.  There's a term for
16   that.  I'm just not thinking of it.  You
17   can see at a given time, who released an
18   order, when and why.  That was an example
19   of some of the benefits of our
20   improvements.
21       Q.   And prior to the improvement
22   was there a system to track who released
23   an order and why?
24       A.   Behind the scenes, the IT

Page 207

1    group could see who touched it, you know,
2    from that standpoint, yes.  But you
3    didn't have that documented workflow
4    electronically, like with the comments
5    and all that, no.
6        Q.   So when you -- when you
7    conducted an investigation prior to the
8    enhancements, when you conducted an
9    investigation, were there particular
10   documents that you had to fill out?
11       A.   No, there were no documents.
12       Q.   Did you document the
13   investigation in any way?
14       A.   Yeah, and a lot of them
15   there were simplistic.  Documentation may
16   have been like a few words.  Some of them
17   were more complex depending on what the
18   investigation entailed.
19       But that would be documented
20   on the report that was generated.
21       Q.   When you say the report that
22   was generated, are you talking about the
23   suspicious order report?
24       A.   Yes.

Page 208

1        Q.   Were those reports with your
2    handwritten documentation?
3        A.   Yes.
4        Q.   Is that right?  Were those
5    reports with your handwritten
6    documentation in storage somewhere?
7        A.   They were -- they were paper
8    filed.
9        Q.   Do you know where the paper
10   files were located?
11       A.   Within the corporate
12   documentation within customer service.
13       Q.   Do you know who maintained
14   those paper files?
15       A.   We did.  I don't know for
16   what time period.  You know, every
17   document had certain time they had to be
18   stored.  And I don't know -- to be
19   honest, I don't recall.
20       Q.   Do you remember if every
21   investigation was documented?
22       A.   Like I said earlier, if you
23   had a report and you're releasing orders,
24   if you would look -- if you would look at

1    a line on the report, and it said
2    first-time buy, you couldn't just accept
3    that for what it was.  You would look at
4    it, you would research, you investigate,
5    you see we have a new contract.  Yes,
6    boom.
7          Well, given that, you know,
8    you did all the validation of what the
9    report was saying, but I'll be honest
10   with you, you didn't go in the report and
11   write an essay, well, I ran a report, I
12   verified.  You know, there was not a lot
13   of -- we didn't write down more than we
14   needed to.
15        Q.   Following the -- and is
16   "enhancement" the word that you use to
17   refer to the project in 2011 and 2012 to
18   change the suspicious order monitoring
19   program?
20        A.   I would definitely call it
21   an enhancement.  We were making it bigger
22   and better.
23        Q.   I'm just making sure I'm
24   using your terminology.

1         A.   Yes.
2         Q.   Following the suspicious
3    order monitoring enhancement, were
4    investigation files electronically filed?
5         A.   Yes.  Absolutely.
6         Q.   Were there more formulaic
7    investigatory documents?  Were there --
8    were there forms that had to be filled
9    out in conducting an investigation of an
10   order of interest prior -- post 2011?
11        A.   I don't recall forms, no.
12        Q.   What -- what requirements
13   were there for documentation related to a
14   suspicious order?
15        A.   There had to be an
16   explanation as to what conclusion that
17   person came to and what led them to
18   release the order.
19        Q.   And when is the last time
20   you saw any of your -- your own
21   handwritten investigation notes?
22        A.   I've been gone there
23   seven -- a long time.
24        Q.   Okay.  Do you recall the

1    last time you saw your handwritten notes?
2         A.   Years.  I don't know.  My
3    handwritten notes?
4         Q.   Mm-hmm.
5         A.   No, I don't.
6         Q.   Were there written
7    guidelines on what had to be recorded
8    when you were investigating an order of
9    interest prior to 2011?
10        A.   Written guidelines prior to
11   2011, there could have been, but not that
12   I recall.
13        Q.   Were there written
14   guidelines on what you had to record post
15   2011?
16        A.   I'm -- I haven't read it
17   in -- in seven years, but I have to
18   imagine we would have been pretty
19   thorough and that would have been in our
20   SOP.  But I could be wrong.  I haven't
21   seen the SOP in seven years so...
22        Q.   Okay.
23        A.   We did have a process, it
24   was pretty thorough.

1         Q.   So what would you say were
2    your, for lack of a better term, what
3    were the -- what were the pillars of your
4    role at Actavis?
5              MR. LUXTON:  Objection to
6         form.
7    BY MS. ANTULLIS:
8         Q.   Let me ask it a different
9    way.  What were your goals while you
10   worked at Actavis?
11        A.   My goals?
12        Q.   Yeah, what were your -- what
13   were your -- your --
14        A.   There was many goals --
15             MS. LEVY:  Hang on.  Let her
16        finish her question.
17   BY MS. ANTULLIS:
18        Q.   Was customer satisfaction
19   one of your goals?
20        A.   Sure.
21        Q.   Was compliance with federal
22   regulations one of your goals?
23        A.   Absolutely.
24        Q.   Was streamlining systems

Page 213

1    part of your goals?
2         A.   Absolutely.
3         Q.   Was creating collaboration,
4    cooperation among the teams part -- part
5    of your goals?
6         A.   Yes.
7         Q.   Okay.  Was making processes
8    faster and more effective part of your
9    goals?
10        A.   More effective and certainly
11   faster, but not, you know, risking
12   accuracy certainly.  I don't like the
13   word faster.
14        Q.   Okay.
15        A.   Efficient?  And accurate.
16        Q.   All right.  More
17   efficient --
18        A.   Yeah, I don't like the word
19   faster.
20        Q.   I -- I don't want to put
21   words in your mouth, so...
22        A.   Yeah.  Less manual.
23        Q.   Okay.  Did you ever -- did
24   you ever feel difficulty -- did you ever

Page 214

1    feel any tension in balancing those
2    goals?
3         A.   No.
4         Q.   Did you ever feel like any
5    of your goals were in conflict with --
6    with each other?
7         A.   No.
8         Q.   Okay.  Did you ever feel a
9    conflict between complying with federal
10   regulations and customer satisfaction?
11        A.   Oh absolutely no.
12        Q.   Okay.  What would you define
13   as a satisfied customer, what would you
14   define as a satisfied wholesaler
15   customer?
16        A.   So I mean, the way you're
17   phrasing that, to me, because my goal is
18   to satisfy a customer, it doesn't mean
19   that they get everything they want,
20   right?  It's to the best of my ability,
21   within my means, and within our
22   guidelines and everything that we have to
23   follow.  We want to meet the customer's
24   needs.  But that doesn't mean that you

Page 215

1    can step outside of it.  And I'll be the
2    first to -- if, for example, if a
3    customer calls and is rushing, rushing,
4    wants a shipment quick and it's on hold,
5    it's on hold.  And it will get released
6    when it gets released.  And that's my
7    position.
8         I never stood down to
9    anybody.  And I want to make you happy,
10   but I also have a job to do.  So I never
11   felt in conflict.  I always felt in
12   control.
13        Q.   Okay.  So did you feel --
14   did you ever feel pressure to ship an
15   order prior to fully investigating
16   whether or not it was suspicious?
17        A.   No.  I don't think pressure
18   is a good word, no.
19        Q.   So I would like to enter
20   another exhibit, if I can find it.
21        MS. ANTULLIS:  Actually,
22   I've just been told lunch is here.
23   Maybe this is a good time to take
24   a break so I don't waste your time

Page 216

1    looking for exhibits.
2         MS. LEVY:  Okay.
3         THE VIDEOGRAPHER:  The time
4    is 12:43 p.m.  Going off the
5    record.
6         (Lunch break.)
7         THE VIDEOGRAPHER:  We are
8    back on the record.  The time is
9    1:25 p.m.
10   BY MS. ANTULLIS:
11        Q.   Hi.  So I want to go through
12   a few questions for you first and then go
13   back to what we were discussing
14   previously.
15        A.   Okay.
16        Q.   At any point during your
17   tenure at Actavis, did the company have a
18   system to monitor publicly available data
19   regarding opioid sales from other
20   manufacturers?
21        A.   Did anytime during Actavis
22   did we have data available -- repeat the
23   other part?
24        Q.   To monitor sales from other

Page 217

1    opioid manufacturers?
2         A.   Not that I'm aware of.  No.
3         Q.   Did you have access to the
4    ARCOS data?
5         A.   I did not.
6         Q.   Did Actavis -- to your
7    knowledge did Actavis have access to
8    ARCOS data?
9         A.   I've heard of ARCOS referred
10   to a lot.  I'm not sure who had access to
11   it, but someone must have, because I've
12   heard discussions on it.
13        Q.   Do you -- do you know who
14   would know at Actavis whether or not they
15   had access to ARCOS data?
16        A.   I don't know.  I don't know.
17        Q.   You stated that one of the
18   criteria -- I believe, correct me if I'm
19   wrong, I believe you stated that one of
20   the criteria that you looked like --
21   looked at in determining whether or not
22   an order was suspicious was tracking, say
23   an indirect -- through your indirect SOP
24   once you had a procedure in place, you

Page 218

1    stated that one of the things that you
2    looked at in determining whether the
3    order was suspicious was -- was the
4    ordering pattern from the customer's
5    customer.  So if a customer ordered the
6    same amount of the same kind of drug from
7    three different manufacturers -- or three
8    different wholesalers, excuse me, that
9    was -- that was information that you were
10   able to track; is that correct?
11        A.   Yeah.  I don't believe I
12   used the word pattern.
13        Q.   Okay.
14        A.   It was more their sources.
15   Did they have multiple sources.
16        Q.   Okay.  So what -- what
17   information did you use to track whether
18   or not a customer's customer was ordering
19   from multiple sources?
20        A.   I personally did not.  That
21   would have been the side of the project
22   that Rachelle Galant helped to lead.
23        Q.   Okay.  And would that
24   information then have come from value --

Page 219

1    the ValueTrak system?
2         A.   I believe.  I'm almost
3    certain, but I can't be positive.  Yeah,
4    I believe so.
5         Q.   Did Cegedim provide any
6    data?
7         A.   Data, no.
8         Q.   Did Actavis purchase data
9    from a company called -- let's go through
10   them.
11             From IMS Health?
12        A.   Yes.  I can't speak much to
13   it, but yes.
14        Q.   Okay.  Did they purchase
15   data from Quintiles IMS?
16        A.   Possibly, but I would not be
17   the person to answer that.  That would
18   probably be Rachelle that would be able
19   to answer that.
20        Q.   Okay.  Did they -- did
21   Actavis purchase data from IQBIA?
22        A.   I don't know.  I feel like
23   that name is -- is one of the other
24   customers with a different name.  It

Page 220

1    sounds repetitive to me.  I don't know.
2    I -- the data wasn't handled in my area,
3    so I don't know the answer to that.
4         Q.   Okay.  I'm going to read off
5    a list of -- of vendors and I just want
6    you to tell me if any of them sound
7    familiar.  That's all I'm asking.
8         A.   That's easy enough.
9         Q.   Do they sound familiar to
10   you?
11        A.   Okay.
12        Q.   And if so, I'll ask further.
13   Okay?
14             Pharmaceutical Data
15   Services, Source Healthcare Analytics,
16   NDS Health Information Services,
17   Theraspan, Quintiles.  There's no IMS.
18   Okay.
19             Theraspan?
20        A.   Theraspan sounds familiar.
21   I don't know why.
22        Q.   Okay.
23        A.   But I -- I've heard them
24   before.

Page 221

1    Q.   SDI Health?
2    A.   No.
3    Q.   ArcLight?
4    A.   No.
5    Q.   ScriptLine?
6    A.   No.
7    Q.   PRA Health Services --
8  Health Science?
9    A.   No.
10   Q.   And I always mispronounce
11 this but I'll try, Wolters Kluwer?
12   A.   I've heard of them, but it
13 may be just because I've heard of them in
14 the industry.  I -- I've heard of them,
15 but that's all I know.
16   Q.   All right.  So do you know
17 what kind -- do you know what data
18 Actavis purchased from IMS Health?
19   A.   No.  That was strictly
20 handled through marketing.
21   Q.   Okay.  Can you -- do you
22 know why marketing purchased data from
23 IMS Health?
24   A.   I would not be the person to

Page 222

1  answer what they were using the data for.
2  The only thing I can say is, as far as
3  I'm aware, the data was based on our
4  product and nobody else's.
5       Yeah I don't know.  I really
6  wouldn't be the person to answer that
7  question.  That was really something
8  marketing would have handled.  I would
9  never have gotten into --
10   Q.   I'm just not sure I
11 understood the first part of your
12 response.  You said that data would have
13 been our product and not someone else's.
14 What are you referring to?
15   A.   Well, when you say -- I
16 guess if -- I'm not sure what you're
17 referring to.  So I know -- I know we
18 purchased data.  So for example,
19 sometimes some of the wholesalers, we
20 even have to pay a fee to get data on our
21 own information.  That is the extent of
22 what I know about how we get data.  Not
23 my area of expertise.  And I'm not afraid
24 to say that.

Page 223

1    Q.   Were you ever trained on how
2  to detect suspicious orders for
3  prescription medications distributed by
4  Actavis?
5    A.   Well, controlled drugs,
6  sure.  That was part of our process that
7  we were executing on.
8    Q.   And -- and by trained, is it
9  your understanding that the question is
10 asking for internal -- informal training?
11      Are you -- when you say
12 sure, are you responding to informal
13 training or --
14   A.   It was definitely informal.
15 Whether there was any formal documents
16 that we signed off on, I don't recall.
17 But certainly informal.
18   Q.   Did Actavis's sales
19 employees get a bonus for exceeding a
20 sales quota, if you know?
21   A.   I have no knowledge of any
22 of their compensation structure.
23   Q.   Did customer service
24 employees get a bonus for tracking

Page 224

1  suspicious orders?
2    A.   No.
3    Q.   Did they get a bonus for
4  reporting suspicious orders?
5    A.   No.
6    Q.   Did they receive any
7  performance incentives?
8    A.   No.
9    Q.   So the customer service,
10 nobody on the customer service team
11 received any performance incentive at
12 all; is that -- is that correct?
13   A.   We -- we received
14 performance incentives based on our
15 performance and the company's performance
16 that we talked about earlier.
17   Q.   Okay.
18   A.   But nothing tied to sales
19 plans or suspicious orders certainly.
20   Q.   Okay.  So -- so they -- so
21 then, is it correct to say that they did
22 receive performance incentives, but that
23 those incentives are not related to the
24 suspicious order monitoring program?

Page 225

1     A.   That's correct.
2     Q.   Okay.  Do you agree that the
3 profits of your company increased with
4 the volume of drugs supplied by -- by
5 Actavis to distributors?
6     A.   So if I can repeat the
7 question to make sure I understand what
8 you're saying.
9          Do I think that, as our
10 volume of products shipping increases,
11 our profit would increase?
12     Q.   Mm-hmm.
13     A.   One would think so.  Right?
14 Unless you're shipping at a loss.  I
15 don't know, if you're doing incremental
16 volume, I would imagine your profits
17 would increase, so...
18          MS. ANTULLIS:  I just want
19     to say.  There is some buzzing
20     going on and we've been hearing it
21     all morning.  And we think it
22     might be somebody who is on the
23     phone.  So maybe can you check to
24     make sure that your phone is on

Page 226

1 mute?
2          Thank you.  Sorry.
3          MR. ALLEGAERT:  If you
4     continue to have that problem you
5     can have everybody hang up and
6     dial up.
7          MS. ANTULLIS:  We may
8     discover it's us.
9 BY MS. ANTULLIS:
10     Q.   So distributors and
11 pharmacies were considered the direct
12 customers of Actavis, right?
13     A.   And wholesalers as well,
14 yes.
15     Q.   And wholesalers.
16     A.   Yes.  Retail chains.
17     Q.   Was it -- sorry.
18          So as part of your role as
19 director of customer service, was it your
20 job to make sure that Actavis's customers
21 were satisfied with their interactions
22 with Actavis?
23     A.   Yes.
24     Q.   Was the timely shipping of

Page 227

1 orders a component of keeping customers
2 satisfied?
3     A.   Sure.
4     Q.   Did you negotiate contracts
5 or pricing with customers?
6     A.   No, I did not.
7     Q.   Did you provide input to the
8 contracts department on negotiations with
9 customers?
10     A.   No, I did not.
11     Q.   Do you have any -- do you
12 know if there are any contracts with
13 distributors where your per unit price
14 reduces to volume discounts, rebates or
15 other financial arrangements?
16     A.   I really did not have any
17 involvement in the -- the details of the
18 contract.  So I couldn't say.
19     Q.   Okay.  Are you aware that
20 chargebacks were being offered to
21 distributors and wholesalers?
22     A.   Yeah.  Like -- like we
23 mentioned earlier, I -- I feel like
24 chargebacks is how business was done,

Page 228

1 because you sell to them at WAC.  I don't
2 know.  That's not my area.  But yes, I've
3 certainly heard of chargebacks.
4     Q.   Was there ever an
5 investigation into whether or not to use
6 chargeback data to track your customer's
7 customers?
8     A.   I'm not sure if it was
9 chargeback data, no, not that I'm aware
10 of.
11     Q.   Do you have preferred
12 distributors?
13     A.   Preferred?  I don't think
14 I've ever heard a term of preferred
15 versus nonpreferred, no.
16     Q.   Do -- do your distributor
17 companies provide any services to
18 Actavis?
19     A.   Services back to us?  Not
20 that I can think of.
21     Q.   You said earlier that you
22 purchased data regarding Actavis -- you
23 purchased Actavis data from distributors;
24 is that correct?

Page 229

1      A.   Yeah, I -- I could be wrong.
2  But I believe, to be able to see our own
3  data, I believe the wholesalers, and
4  maybe not all, but I believe they charge
5  you for it.
6      Q.   And what -- what data was
7  Actavis charged for?
8      A.   I'd be speaking out of turn
9  to -- to say which data that is.  I don't
10  know.
11      Q.   Was suspicious order
12  monitoring addressed in contracts with
13  distributors and wholesalers?
14      A.   Was it included in the
15  contract language initially?  I don't
16  know.  But as part of our
17  know-your-customer initiative and our
18  enhancements, yes, it was.
19          Whether that was linked to
20  the contract or not, I am unaware.  I
21  don't know.
22      Q.   Did you reevaluate the
23  contracts following these suspicious
24  order monitoring enhancements?

Page 230

1      A.   Oh, okay.  Reevaluate our
2  contracts.  I believe we may have, yes.
3      Q.   Would you reimburse a
4  customer if an order was canceled for --
5  you know, if a pended order was
6  determined to be suspicious, would you
7  then reimburse payment to the customer?
8      A.   No, because there would be
9  no payment to reimburse.  They wouldn't
10  have been invoiced.
11      Q.   Was there any written
12  standard operating procedure in 2008
13  relating to direct suspicious order
14  monitoring?
15      A.   I believe so, but I don't
16  recall what it was called, or I don't
17  recall the details.  I'm more familiar
18  with the later years.
19      Q.   And then, did you -- did you
20  assist in writing a standard -- does SOP
21  mean standard operating procedure?
22      A.   Correct.
23      Q.   And did you assist with
24  writing an SOP for direct suspicious

Page 231

1  order monitoring in or around 2011 or
2  2012?
3      A.   Yes.
4      Q.   Okay.  When you worked on
5  that SOP, did you look back to -- look
6  back for guidance on Actavis's prior
7  systems?
8          Let me -- let me rephrase
9  the question.
10          What investigation did you
11  do into Actavis earlier suspicious order
12  monitoring system when you began your
13  work on the SOP?
14      A.   Well, anytime you try to
15  improve any process, the way you approach
16  it is you look what you have, and you try
17  to create a roadmap on where you'd like
18  to be and take those gaps and fill them
19  in.  And that's what we did.  I mean,
20  there was things that we knew we wanted
21  to enhance and improve.  So of course
22  when you want to move forward you have to
23  look back to see where you're at.  So I
24  would say yes.

Page 232

1      Q.   So now I want to go back to
2  what we were discussing prior to our
3  lunch break, which was whether or not you
4  felt any pressure from customers to ship
5  orders while they're -- to ship pended
6  orders while they were under
7  investigation.
8      A.   So --
9          MS. LEVY:  She hasn't asked
10      you a question yet.
11  BY MS. ANTULLIS:
12      Q.   Yeah.
13      A.   I believe --
14      Q.   You already answered the
15  question.  So I'm just -- that's where
16  I'm going back to.
17      A.   Oh, to that topic.  Okay.
18  Good.
19      Q.   So I want to introduce some
20  exhibits and I want to discuss -- so the
21  first one is Tab 15, which is Exhibit 7,
22  ALLERGAN_MDL_03427457.
23          (Document marked for
24      identification as Exhibit

Page 233

1    Baran-7.)
2  BY MS. ANTULLIS:
3    Q.   So the only thing I'm going
4  to be asking you about is the top e-mail.
5    A.   If you don't mind, to make
6  sure that I have everything in context,
7  I'm going to read it from the back
8  forward.
9    Q.   I do mind.  Because nothing
10  else that I'm asking you about has
11  anything to do with the rest of the
12  e-mail.
13    A.   All right.  Let me read the
14  first paragraph first and then I'll feel
15  comfortable with that.
16    Q.   Read the first e-mail.
17    A.   Yeah.  Okay.
18    Q.   So I really only have two
19  questions for you on this.  The first one
20  is, is in the third paragraph you state,
21  "I don't want to hold up a sale, and I'm
22  not suggesting that we don't push this
23  through with the reason given."
24    I want to -- I just want

Page 234

1  to -- I want to -- what did you -- why
2  would you not want to hold up a sale of a
3  pharmaceutical drug?
4    A.   So at the end of the day, my
5  job is -- you want patients to get
6  products when it's needed.  But that
7  doesn't stop the fact that I have a job
8  to do.  So, basically, what I'm saying in
9  that sentence is, you know, I'm not
10  looking to cause a problem where there
11  isn't one, but we need to do what we need
12  to do.  I mean nothing was ever released
13  because we felt pressure.  I mean, I can
14  say that with certainty.  I mean, nobody
15  put pressure on us.  And I feel
16  comfortable with that.
17    Q.   Okay.  So the next -- the
18  next question I have is, in the final
19  large paragraph.  You say, "This is all
20  new to us so I'm sure we'll come up with
21  other scenarios like this that we have to
22  think about."
23    Do you see that statement?
24    A.   I'm going to read the rest

Page 235

1  of the message again, because I'm not
2  sure of the context of that, "This is all
3  new to us," if it's DE -- if it's -- it
4  may pertain to UPS's modified process.
5  I'm not sure.  I don't know.
6    Q.   Why don't you read the
7  paragraph --
8    A.   I don't recall.
9    Q.   -- immediately above it and
10  that might help.
11    A.   Okay.
12    MS. LEVY:  If you need to
13  read the entire e-mail in order to
14  be able to answer, you certainly
15  can do that.
16    THE WITNESS:  Okay.
17    MS. LEVY:  Whatever you need
18  to do to answer the question.
19    MS. ANTULLIS:  Again, I'm
20  going to put on the record that
21  that's an improper instruction.
22    THE WITNESS:  I'm ready for
23  your question.
24  BY MS. ANTULLIS:

Page 236

1    Q.   My question was, what is all
2  new to us?
3    A.   What is all new to us?  I
4  don't recall this scenario, so it's hard
5  for me to say with certainty.  But
6  reading the information above, it could
7  have to do with this -- it certainly is
8  not new with the UPS, because we had been
9  dealing with them and they had a
10  suspicious order monitoring system.  So
11  that's not that.
12    It may have been due to the
13  fact that for the first time ever, we had
14  a customer trying to order extra to hit
15  their own personal targets, that I'm not
16  aware of.  But that's what it appears to
17  me in here.  I can't read too much
18  further into it, because I really don't
19  recall this exact scenario.  But what I
20  can say is the -- you know, "this is new
21  to us" is certainly not suspicious order
22  monitoring.  That, I can say with
23  certainty.
24    Q.   So I'm going to read you the

Page 237

1    paragraph above that statement.  "I
2    obviously don't want to hold up a sale
3    and I am not suggesting we don't push
4    this through with the reason given.
5    However, I am suggesting that we put some
6    thought into this and make sure that we
7    would feel comfortable with this
8    explanation to the DEA if it ever came to
9    that.  Probably not, but we should treat
10   each situation as though it could.
11           "Let me know your thoughts,
12   I want to find ways to accept orders, not
13   reject them, but just want to make sure
14   we are within accepted procedures and
15   guidelines.  This is all new to us."
16           Within the context of the
17   above sentence, you have discussed
18   explanations is to the DEA, right?  The
19   e-mail appears to be a conversation
20   regarding an pended order for a drug that
21   is not at issue in the case.  And you are
22   trying to determine whether or not -- and
23   you read the entire e-mail, so you can
24   see in context you're trying to determine

Page 238

1    whether or not a pended order should be
2    released.  So you're looking for an
3    explanation as to whether that order
4    should be released.
5           Is that a correct
6    interpretation of what's happening in
7    this e-mail?
8           MS. LEVY:  Objection to
9    form.
10          You can answer.
11          THE WITNESS:  Answer?
12          With all that in between.  I
13   forget the question.  But --
14          MS. LEVY:  If you don't
15   understand, she can repeat the
16   question for you.
17          THE WITNESS:  Yeah, sorry.
18   Can you just say that again.
19   BY MS. ANTULLIS:
20      Q.   What is happening in this
21   e-mail chain?
22      A.   What is happening in this
23   e-mail chain, based on what I'm reading
24   and not being there, you know, eight --

Page 239

1    you know, nine years ago, it looks to me
2    that, first of all, in terms of my
3    comments on the DEA, I was never afraid
4    to push that in front of someone and say,
5    listen, my goal was, you know, we need to
6    be compliant.  And that statement there
7    is exactly the language I would always
8    use.
9           We always want to make sure
10   that we are within accepted policies and
11   procedures and guidelines.
12          When I say I'm not looking
13   to hold up an order, like, listen, I'm
14   not looking to be difficult.  But, you
15   know, we need to look at this, and we
16   need to look at every scenario as though
17   the DEA were standing right next to us
18   because we have an obligation.
19          And that's kind of my
20   description of the scenario.
21      Q.   I appreciate your
22   information.  But that didn't answer my
23   question.  My question is what is
24   happening in this e-mail chain?

Page 240

1           MS. LEVY:  Objection.  Asked
2    and answered.
3           You may answer again.
4           THE WITNESS:  There -- in
5    this e-mail chain, there's clearly
6    an order on hold, and the -- you
7    know, sometimes when orders are
8    investigated and there's due
9    diligence, it's black and it's
10   white.
11          Sometimes when there's a
12   scenario that comes up, that
13   you've never experienced before,
14   you're going to have different
15   areas push back on what's right
16   and wrong.  And there needs to be
17   someone in the middle that's
18   making sure we're still doing what
19   we're supposed to be doing and not
20   releasing anything until we're
21   satisfied.
22          So this is clearly one of
23   those discussions where there's a
24   debate, well, is that acceptable

Page 241

1      or not.
2   BY MS. ANTULLIS:
3      Q.   Okay.  Thank you.
4      A.   Yeah.
5      Q.   So looking at that top
6   e-mail chain again.  It says, that
7   sentence says, "I'm not" -- "I am
8   suggesting that we put some thought into
9   this and make sure that we would feel
10  comfortable with this explanation to the
11  DEA."
12          And then the next -- and
13  then the next paragraph, it says, "I want
14  to" -- "this is all new to us, so I'm
15  sure that we'll come up with other
16  scenarios like this that we have to think
17  about."
18          In the -- in the context of
19  that e-mail, okay, is it -- is it your --
20  is it your testimony that "all new to us"
21  does not relate to justifications for
22  DEA -- for the DEA?
23      A.   I think the way I would
24  describe "all new to us" is as -- as

Page 242

1   business evolves and you are following
2   your procedures, you know, to continue to
3   be compliant, you're undoubtedly going to
4   run into new business scenarios that --
5   you come up against a wall and you have
6   to say, you know, what's right and what's
7   wrong.  Like, is this acceptable and is
8   this not.  We may not have encountered
9   that scenario before.  And that's not a
10  surprise.  Right?  Every scenario is not
11  the same.  And every -- every order was
12  treated uniquely.  It wasn't a cookie --
13  copy and paste of the one before.  So...
14      Q.   All right.  So then is it
15  your testimony that "all new to us"
16  relates to the business situation at hand
17  and not to a new process for determining
18  whether or not an order is suspicious?
19      A.   So my testimony would be,
20  sitting in this chair today, seven,
21  eight years later from when I wrote this,
22  it's hard to be in my mind.  But looking
23  at it, what I would say is that this is
24  all new to us we're coming up with

Page 243

1   these different scenarios that we have to
2   interpret and, you know, very carefully
3   judge and measure.  So that's how, 2018,
4   I'm looking back at an e-mail seven,
5   eight years ago, I would interpret my
6   comments there.
7      Q.   And when you say judge and
8   measure, are you saying that you have to
9   judge and measure them for the DEA
10  justifications?
11      A.   Up against what the DEA is
12  looking for.
13      Q.   Okay.  Thank you.
14          Did you find, during your
15  course of employment at Actavis, that in
16  conducting some of these investigations
17  into pended orders, that people in other
18  departments were reluctant to provide
19  information?
20      A.   While I can't say I recall
21  any specifics, but it wouldn't surprise
22  me.  I mean, you know, sometimes people
23  aren't cooperative, and when you are
24  responsible and you own a process that

Page 244

1   ensures our compliance, that other group
2   may not have that same level of ownership
3   and accountability.  So my answer would
4   be, I don't know, but it wouldn't
5   surprise me that that would possibly
6   occur.
7      Q.   Did you ever feel that
8   people were nonresponsive to your request
9   for information?
10      A.   So, nonresponsive, you
11  can -- you can describe that in many
12  different ways.  Nonresponsive sometimes
13  just means slow, which yes, I would say
14  people were slow.  But if they were slow,
15  then they didn't -- the order didn't get
16  released.  So it was in their benefit not
17  to be nonresponsive.
18          But, yeah, in business
19  today, you always find people that are
20  nonresponsive unfortunately.  It didn't
21  change the outcome.  If they were
22  nonresponsive, we didn't get what we
23  wanted, nothing went anywhere, so...
24      Q.   So what would happen, if

Page 245

1  someone, a salesperson or somebody that
2  you reached out to information on a
3  suspicious -- on a pended order, what
4  would happen if they didn't get you
5  information within a certain, you know,
6  within a week?
7      A.  Well, quite frankly, I mean
8  we didn't have any number of days.  But I
9  don't really think anything ever went
10  extremely long -- long like that.
11  Ultimately we -- we -- first of all, we
12  were dealing with a sales force of I
13  think it was five people, so we didn't
14  have a lot of different personalities and
15  we didn't have 150 people that we were
16  trying to communicate with.  So that made
17  it fairly simplistic.  And they respected
18  our role.
19        So for the most part I would
20  say, you know, just from the sales
21  standpoint, they were responsive because
22  they wanted their customers' orders dealt
23  with.  But I can't sit here and testify
24  that there weren't scenarios where they

Page 246

1  were nonresponsive, because salespeople
2  are salespeople.  And sometimes they'll
3  respond when they want to respond.  So,
4  you know.
5      Q.  Did you ever have to cancel
6  an order because you failed to get
7  information within a certain amount of
8  time?
9      A.  Canceling an order because I
10  failed to get information?
11      Q.  Did you ever have to cancel
12  a pended order because you could not get
13  information at a reasonable --
14      A.  Could not get any
15  information isn't satisfactory though,
16  because then what if it were -- were
17  suspicious.  So to me that would be
18  unacceptable, so, no.
19      Q.  Okay.
20      A.  I mean, yeah, I mean you
21  can't just -- all right.  If you don't
22  answer, don't worry about it, because I'm
23  going to cancel it, like that didn't work
24  that way.

Page 247

1      Q.  Okay.  So if they are -- I
2  just want to make sure I understand your
3  testimony.
4      A.  Yeah.
5      Q.  If there were a pended
6  order, is it correct to say that you
7  would investigate the nature of that
8  order to conclusion prior to determining
9  whether or not to cancel or ship the
10  order?
11      A.  Yes.
12      Q.  Okay.  And -- and was
13  there -- was there a requirement -- was
14  there a written requirement at Actavis to
15  conduct an order in a certain period of
16  time?
17      A.  There may have been, you
18  would have to refer to our SOP.  I don't
19  recall.  I don't recall time frames.
20      Q.  Okay.
21      A.  But I also don't recall time
22  frames really being a business issue, to
23  be honest with you.  You know.
24      Q.  Do you remember what the

Page 248

1  average time would be for an
2  investigation into a pended order --
3  order?
4      A.  Well, so don't forget, a lot
5  of them were fairly simplistic because of
6  things like new product launches, or new
7  contract awards or, you know, we just
8  took on additional volume because another
9  competitor dropped out and the market is
10  changing.
11        So those -- those type of
12  things, maybe the first time you didn't
13  know about it, it took a little bit of
14  time.  But once you were aware, those
15  things were fairly quick.  Certainly
16  within the same business day.
17        But other scenarios, if it
18  involved, you know, asking questions from
19  three different departments, certainly it
20  didn't always happen in a day.  So it
21  could -- it could go a day, two days if
22  it needed to.
23        I don't really -- I may at
24  some point in time -- excuse my voice --

Page 249

```
 1    have run statistics and -- but I don't
 2    recall.  I don't recall a number to give
 3    you.
 4         Q.   So do you -- do you remember
 5    an investigation ever taking longer than
 6    a week?
 7         A.   I don't remember one.  But
 8    it's not that it wouldn't have been
 9    possible.
10         Q.   Do you ever remember an
11    investigation taking longer than a month?
12         A.   I don't remember one.  And I
13    would be very surprised.  There would
14    have to be some very unusual
15    circumstances for that.  But I don't -- I
16    don't recall.
17         Q.   Do you remember an
18    investigation ever taking longer than six
19    months?
20         A.   Oh gosh.  No.
21         Q.   So, again prior to the --
22    the enhancement, prior to 2011, was there
23    a particular -- I think I've already
24    asked these questions.
```

Page 250

```
 1         So I think I'm going to go
 2    ahead and introduce a document that I
 3    want to ask you questions about --
 4         A.   Sure.
 5         Q.   -- the document.  And if you
 6    need me to go back --
 7         A.   Okay.
 8         Q.   -- I will.
 9         So this is going to be
10    Tab 56.  This is Exhibit 8.
11         (Document marked for
12         identification as Exhibit
13         Baran-8.)
14    BY MS. ANTULLIS:
15         Q.   I've been looking at
16    documents far too long.  I believe the
17    e-mail chain starts on the second page
18    and continues to the first.
19         A.   It looks like a quick one.
20    Okay.  I'm good.
21         Q.   So this appears to be an
22    e-mail -- first of all, do you recognize
23    the document?
24         A.   Yes.
```

Page 251

```
 1         Q.   Do you remember this
 2    exchange?
 3         A.   Yes.
 4         Q.   In the first e-mail you
 5    appear to be e-mailing Michael Clark and
 6    others to ask -- to explain -- to discuss
 7    something called the 7.17.5 suspicious
 8    order report.  Is this the suspicious
 9    order report that you were referring to
10    earlier --
11         A.   Yes.
12         Q.   -- that was printed out
13    several times a day and that you
14    reviewed?
15         A.   Correct.
16         Q.   And is that the numerical
17    number that you were thinking, 7.17.5?
18         A.   Yes.
19         Q.   On the next page, who is
20    Noemi Rebeco?  Who is that?
21         A.   Noemi Rebeco, I'm not sure
22    of her exact title.  It may be listed
23    there.  She was essentially a supply
24    planner.  She was working in the
```

Page 252

```
 1    manufacturing plant.
 2         Q.   At Elizabeth?
 3         A.   Correct.
 4         Q.   So she asked you if it was
 5    possible to change the name of the report
 6    and still continue using the report,
 7    right?  So earlier on in the e-mail chain
 8    you're discussing discontinuing the use
 9    of the report with the implementation of
10    the new -- the enhanced suspicious order
11    monitoring program.  She's asking whether
12    or not it is possible to keep using the
13    report.
14         A.   Correct.
15         Q.   Because she believes it's
16    useful to her team.
17         MS. LEVY:  Object to the
18         form of the question.  You can
19         answer if you understand.
20    BY MS. ANTULLIS:
21         Q.   Is that your understanding
22    of what's happening in this e-mail
23    exchange?
24         A.   Yes.
```

Page 253

1      Q.   Okay.  She -- she says the
2   name could be changed to excess order
3   report or another name.
4          Do you have any
5   understanding of why she would change the
6   name to excess order report?
7      A.   I sure do.  I can explain
8   the whole scenario.
9      Q.   Okay.  Please do.
10     A.   So completely outside of
11  SOM, nothing to do with control drugs,
12  this is just all of our products across
13  the board, one of our weaknesses as a
14  company was we had poor inventory
15  management reports.  So for example, if
16  there was a product shortage or supply,
17  maybe driven by an issue with API being
18  unavailable, or the main API supplier
19  that's supplying everybody that
20  manufactures this drug, something
21  happened and it's not going to be
22  available, and we know that, and we're
23  all going to be driven into a backorder
24  for three months, right.  Or it could be

Page 254

1   any other scenario.  But I'll just use
2   that one as an example.
3          When those scenarios happen,
4   it's really important that we manage our
5   inventory very closely.  And we quite
6   often would use what we referred to the
7   term -- and you may come across it, the
8   word "allocation."
9          And allocation was nothing
10  more than taking that amount of product
11  that you have and making very conscious
12  business decisions on how you supplied
13  it, with the goal in mind of protecting
14  your customers that have been on
15  contract.  If a customer was on contract
16  and we've committed to sell them
17  100 units a month, you know, they're a
18  priority, versus some random customer
19  that's going to come in.  They've never
20  bought from us before, but they hear
21  there's a problem in the market.  They've
22  been with another supplier, and all of
23  the sudden they are going to try to order
24  that product though us, throw us into

Page 255

1   backorder, because we're getting this
2   artificial demand that we never had
3   before; and, therefore, it's impacting
4   our customers that it's our goal to keep
5   them whole and keep our commitment on
6   what we want to supply them to the best
7   of our ability.
8          So with that being said, we
9   never really had a good inventory
10  management system to make sure that
11  sneaky customers weren't coming in and
12  ordering because they heard in the market
13  there's going to be price increases or
14  because they heard in the market there's
15  going to be raw material issues.
16         So we had no mechanism to
17  prevent -- and like I said, this is
18  not -- this is not control drugs, this is
19  other drugs, to do that.
20         So because we had this
21  report, that would flag unusual purchases
22  on controls, you know, that report was
23  used by supply chain, for example, as
24  a -- we have nothing else, so this is

Page 256

1   good, this works for controls.  So they
2   were using it for another purpose in lieu
3   of what we were strongly in need of,
4   which was an inventory management report.
5   Two completely different things.
6          And it's really important
7   that you differentiate, because the topic
8   sometimes can get confusing.  You need to
9   draw a line in the sand.  They're two
10  different issues.  There's our efforts on
11  SOM and there's our efforts on inventory
12  management.
13     Q.   Okay.  So can I ask you to
14  go to the second page of this document.
15  Look at the subject line of the e-mail
16  and read that to me.
17     A.   Mm-hmm.
18     Q.   Can you read it out loud,
19  please.
20     A.   "SOM."
21     Q.   Did you ever use this
22  report, the suspicious order report, for
23  tracking suspicious orders, pended
24  orders?

Page 257

```
 1         A.   The suspicious order report
 2   was used for suspicious order monitoring,
 3   yes.
 4         Q.   Okay.  So I understand that
 5   the report was also then being used at
 6   the Elizabeth plant for inventory
 7   planning purposes; is that correct?
 8         A.   Yes.  It wasn't their end
 9   all, but it was -- it was their mechanism
10   to see if anything really outside of
11   normal ranges was coming on the radar.
12         Q.   Now, Noemi suggests to
13   change the name to excess order report.
14   Is that an accurate reflection of what
15   you see in the e-mail?
16         A.   Yes.  And the reason --
17         Q.   I'm not asking what the
18   reason is she's doing it.
19         A.   Yes.
20         Q.   I want to know whether or
21   not the suspicious order report shows
22   excess orders for control drugs.
23         A.   Excess orders -- well, it
24   shows other things.  It shows many
```

Page 258

```
 1   things.
 2         Q.   Does it show excess orders
 3   for control drugs?
 4         A.   Excess, if they're ordering
 5   above their typical historical usage, you
 6   can call that excess, yeah.
 7         Q.   Why would -- why would this
 8   be useful from an inventory planning
 9   perspective?  Would it be useful from an
10   inventory planning perspective?
11         A.   Because she's operating in a
12   different mindset of looking what's in
13   the pipeline.  And if something comes in,
14   and if it were to be released it would
15   set us in complete backorder, if it were
16   to be released.  The two are totally
17   different.
18         Q.   And I'm asking with regard
19   to the suspicious order monitoring
20   side -- use of the report.
21         A.   Yeah.
22         Q.   So I would like to go to the
23   top e-mail in the chain.
24         A.   Okay.
```

Page 259

```
 1         Q.   You say, "Given the criteria
 2   and logic that this report is built on,
 3   I'm very surprised that it's so valuable
 4   from an inventory and planning
 5   perspective."
 6              Can you please just explain
 7   to me what you mean by the criteria and
 8   logic that the report was built on?
 9         A.   Because it was only going
10   after a certain subset of products.  And
11   she's looking at the entire basket of
12   products for the entire company.  So it
13   was, to me, not really what she -- it
14   wasn't what she needed.  And that's
15   pretty -- pretty easily said.
16         Q.   Okay.  I'm going to
17   introduce another document in the record.
18   But maybe keep this one in front of you.
19         A.   Okay.
20         MS. ANTULLIS:  It is Tab 30.
21   Exhibit Number 9.  It's
22   ALLERGAN_MDL_2128037.
23         (Document marked for
24   identification as Exhibit
```

Page 260

```
 1   Baran-9.)
 2   BY MS. ANTULLIS:
 3         Q.   My first question is, is
 4   finasteride a controlled substance?
 5         A.   That was my first question
 6   when reading this.  I probably could have
 7   told you in the past, but my memory
 8   is lacking.  And without that
 9   information, the context of this e-mail
10   is very hard for me to determine.
11              So that was my question in
12   reading this too.  And if you were to ask
13   me seven years ago, I would spit an
14   answer out to you whether it was
15   controlled.  I just don't have them
16   memorized anymore, because that would be
17   nice to know so I could re-read this in
18   proper context.
19         Q.   Okay.  Why don't we put this
20   aside.  We'll come back to it.  I will
21   verify my understanding of finasteride.
22   And you can feel free to Google it during
23   the break if you'd like.  Okay?
24         A.   Good.
```

Page 261

1      Q.   I'm now going to go to Tab
2    26.
3          MS. ANTULLIS:  This is going
4    to be Exhibit 10.
5          ALLERGAN_MDL_03302011.
6          (Document marked for
7          identification as Exhibit
8          Baran-10.)
9    BY MS. ANTULLIS:
10     Q.   So do you recognize this
11   document?
12     A.   The begin -- the beginnings
13   of what I've seen so far, yes.
14     Q.   So I will represent to you
15   that this document was in your custodial
16   files, which means it was produced from
17   your -- your files at Actavis.
18         Do you remember having a
19   meeting with the Drug Enforcement
20   Administration in September of 2012?
21     A.   I vividly remember the
22   meeting.  The date I had mentioned
23   earlier I think in this testimony, I
24   estimated it was around September of

Page 262

1    2012.  But I didn't have the date
2    specific.
3      Q.   Did the Drug Enforcement
4    Administration make a presentation to you
5    during that meeting?
6      A.   We made a presentation --
7    oh, to them.  Yes, they -- they did.
8      Q.   Okay.
9      A.   I was more focused on our --
10   yeah.  Sorry.
11     Q.   The Drug Enforcement
12   Administration made a presentation to
13   you; is that correct?
14     A.   Correct.
15     Q.   And is it also correct to
16   say that you made a presentation to, you,
17   Actavis...
18         Correct -- is it correct to
19   say that Nancy Baran made a presentation
20   to the Drug Enforcement Administration
21   during that meeting?
22     A.   So I will say that during
23   that meeting, I spoke with a room of
24   maybe 20 people for probably close to two

Page 263

1    to three hours straight.  Whether I
2    actually put a presentation on the wall
3    or not, I don't recall.
4      Q.   Do you recall --
5      A.   It's possible.
6      Q.   Do you recall if you
7    designed a presentation for this meeting?
8      A.   Oh.  Oh, yeah, I would
9    have -- yeah, but I just don't know if I
10   displayed and actually demonstrated it or
11   used it for my own notes.  That's the
12   part I don't remember.
13     Q.   Do you recall -- do you
14   recall if you handed the presentation out
15   to other people who were in the -- who
16   were at the meeting?
17     A.   Without knowing if I gave
18   the presentation, I definitely don't
19   recall if I handed it out.
20     Q.   Okay.  But you are -- is
21   it -- is it correct to say that you
22   are -- you are clear that you did create
23   a presentation for this meeting?
24     A.   I know I created a lot of

Page 264

1    information based on what we were doing.
2    Whether I put it in a presentation
3    format, I don't remember.  But I'm sure
4    you'll tell me.
5      Q.   If you did create a
6    presentation, where would you have kept
7    it?
8      A.   If I did, it would have been
9    on my hard drive, my computer.
10     Q.   So looking at the document
11   in front of you.  Does this appear like
12   something you would have put together?
13     A.   Okay.  Give me one minute.
14     Q.   And you are free to flip
15   through the document of course, but it is
16   a 300-page document.
17     A.   Yeah, no, I just -- I just
18   need to get familiarized --
19     Q.   If you want to read -- if
20   you want to read the --
21         MS. LEVY:  I'd like for her
22   to read every page of it.
23         MS. ANTULLIS:  If she wants
24   to, she can --

Page 265

1        MS. LEVY:  That was a joke.
2        MS. ANTULLIS:  -- but we're
3    going to go off the record and we
4    can come back tomorrow.
5        I have no questions on the
6    cases.
7        THE WITNESS:  This is not my
8    presentation.
9    BY MS. ANTULLIS:
10       Q.   So does this look familiar
11   to you?
12       A.   Yes.
13       Q.   Without -- without asking
14   you any questions about the substance of
15   the presentation at this point in time,
16   does it look familiar to you?
17       A.   It's not -- no, it's not
18   what I expected.  So a lot of it does not
19   look familiar.  It doesn't look like
20   something -- not that it wouldn't have
21   been something I passed along, but not
22   something that I created for sure.  I
23   almost wonder if this is the DEA's
24   presentation to us.  I don't know.  I

Page 266

1    would have to spend a little time reading
2    all this.
3        But, you know, I can tell
4    based on the information that's in here,
5    this is not my presentation.
6        Q.   Okay.  So is it possible
7    that this is the presentation that the
8    DEA gave you at that meeting?
9        A.   That's what I'm thinking,
10   but I would want to look at it a few more
11   minutes.
12       Q.   I would like to
13   ask though --
14       A.   It's the title page that
15   confuses me, so...
16       Q.   Why does the title page
17   confuse you?
18       A.   Okay.  All right.  I'm --
19   I'm clear now.
20       So this is their
21   presentation, but it's their meeting with
22   Actavis Elizabeth which I wasn't thinking
23   was -- was us, but it was the entity we
24   were representing.

Page 267

1        So this is the DEA's
2    presentation.  So, sorry.
3        Q.   Okay.
4        A.   I'm with you now.
5        Q.   So do you recall whether you
6    reached out -- whether you, Actavis
7    reached out to the DEA to set up this
8    meeting?
9        A.   I remember the meeting very
10   vividly.  But, you know, driving here
11   today, thinking about all this and I was
12   like, oh, you know, I'm sure that meeting
13   in -- in -- with the DEA will come up.
14       And I'll -- I'll be honest,
15   I can't remember what the driver was.
16   I -- I will say, we did not call the
17   meeting, we were called to the meeting.
18   And the DEA calls you to go there, you
19   go.  That's all I remember.  I don't
20   remember the context of why we were
21   called.
22       Q.   Do you remember who from the
23   DEA called you to set up this meeting?
24       A.   No.

Page 268

1        Q.   Do you remember, was anybody
2    else from Actavis present at the meeting?
3        A.   Yes.
4        Q.   Can you please tell me who
5    else you remember being present at the
6    meeting?
7        A.   I almost feel like there
8    could be a fourth person, so I don't want
9    to say to you I have this down with
10   certainty.  But the ones I remember
11   vividly, it was myself, and I believe it
12   was John Duff and Michael Clark.  I don't
13   believe there was a fourth person but I
14   could be wrong.
15       Q.   Was this the first meeting
16   that you had with the DEA during your
17   employment at Actavis?
18       A.   First meeting I had,
19   correct.
20       Q.   Okay.  How many times did
21   you meet with the DEA during your time at
22   Actavis?
23       A.   Twice.
24       Q.   Was the second time in

1  October of 2012?
2      A.  That would make sense.  I
3  would say it's about a month, a couple
4  weeks after the initial meeting.  It was
5  a follow-up.  So that would make sense.
6      Q.  So do you recall the purpose
7  of this meeting with the DEA?
8      A.  So the -- the purpose and
9  the driver and the root cause of why we
10  were there, I don't really -- it's not
11  even that today I don't recall that.
12  I -- I don't even think I could tell you
13  seven, eight years ago what the reason
14  was we were there.
15          But when you're called to a
16  meeting with the DEA, you go.  Why they
17  were calling it, I don't know.  We
18  certainly didn't know ahead of time.
19  Based on the context of the meeting, you
20  know, I could tell you about that a
21  little bit.  But I don't know what the
22  real driver was, other than to educate us
23  on rolled up -- you know, some of our
24  rolled-up data.

1      Q.  So I have a couple of
2  questions to unpack but to make sure I
3  understand what you're saying.
4          My first question is what is
5  rolled-up data?
6      A.  Well, to -- rolled-up data
7  is probably a really poor description.
8  It was looking at hey, do you know where
9  your product is going, that kind of
10  context.
11      Q.  And was that data that you
12  provided to the DEA?
13      A.  No.  That was data the DEA
14  provided to us.
15      Q.  And you said -- you said
16  something about the context around which
17  this meeting occurred?
18      A.  Well, I mean, I --
19      Q.  Is that an accurate -- am
20  I -- am I accurately stating your
21  testimony?
22          You used the word context.
23      A.  Like I don't know -- when I
24  said context, I don't know the purpose.

1  Like I feel like they had a motivation
2  and they had a purpose.
3      Q.  Well, what did you believe
4  the context to be?
5      A.  But --
6      Q.  When you used the word
7  context, what did you believe the context
8  to be?
9      A.  I don't know.  Maybe context
10  isn't a good word.  I mean I know what
11  the discussions were when we got there,
12  but, you know, if -- if you were to have
13  the DEA describe in one sentence the
14  reason they brought us there, I don't
15  think I would have had that back then
16  versus now, you know.
17          They -- they may have been,
18  you know, taking the opportunity to
19  validate our compliance and what we were
20  doing, you know.  I'm sure they had a
21  couple different motives.
22      Q.  So you testified that you
23  vividly remember the meeting itself; is
24  that correct?

1      A.  Yeah.  And vividly may be a
2  strong word.  But I certainly remember
3  sitting there.  And I certainly remember
4  being asked all kinds of questions.  I
5  remember stepping them through our
6  process.  And I remember the feeling I
7  got when we left.
8      Q.  What was the feeling you got
9  when you left?
10      A.  The feeling I got when I
11  left was -- was kind of two different
12  things.  They were almost -- well, first
13  of all, they were like wow, like they
14  were very impressed with what we had done
15  already and the direction we were heading
16  in, which was our new initiative.
17          And I can't say with
18  certainty, but I got the impression that
19  like we were ahead of the curve, that
20  nobody else was doing that yet.
21          So the -- the impression I
22  got left with was they are like, you
23  know, wow, you guys are doing a great
24  job.

Page 273

```
 1        The second impression I got,
 2   I left with, and this is my only -- my
 3   personal opinion, nothing was verbally
 4   ever said, I almost feel like they were
 5   like disappointed, like damn, you know,
 6   like, I don't know, were they trying to
 7   get something on us or use us to get
 8   something on someone else.  I don't know.
 9   It was never clear to me, the purpose of
10   the meeting.  But I don't feel like they
11   got what they wanted, which I believe, in
12   my opinion, and I know nothing to
13   validate this, but that's why they came
14   back for a second smaller meeting.
15        They were still looking to
16   get something that they didn't get from
17   us.  So I don't really know what it was.
18   It was just -- it's the only way I can
19   describe it.  But they were very
20   impressed.  And I left -- to be honest
21   with you, I'm usually a pretty modest
22   person.  But I left pretty proud, because
23   I sat there with every confidence on
24   everything we had done and all the new
```

Page 274

```
 1   things that we were doing.  And, you
 2   know, I felt good about it.  And I felt
 3   really good when I saw how impressed they
 4   were.
 5        Q.   Do you remember any of the
 6   specific questions that they asked you
 7   during the meeting?
 8        A.   Specific questions, no.
 9   Just high level topics, you know, we
10   talked the indirect and the direct piece.
11   Specific questions, not really, other
12   than what I mentioned earlier, like, you
13   know, do you know where your product is
14   going, you know.
15        Q.   And what did you tell them
16   when they asked you do you know where
17   your product is going?
18        A.   Well, that's when we -- we
19   told them that based on our first line
20   initiative, yeah, we know where our
21   product is going, to our direct
22   customers.  We have full control over
23   that.  We have a tight process.
24        And in terms of where our
```

Page 275

```
 1   customers' customers are shipping it,
 2   that's something where we've created this
 3   initiative.  We're branching out to kind
 4   of get that data so that we could, you
 5   know, take a stronger role in the process
 6   and be better partners with our customers
 7   who, to that point, we had no reason to
 8   believe they weren't willing to be good
 9   partners with us.  You know, we had some
10   pretty good -- good meetings with them.
11   We sent some strong messages, saying
12   here's where we stand.  Here's what we're
13   doing.  Here's what you need to do as a
14   good partner.  And we didn't get anything
15   back that would ever have given me the
16   impression that they weren't fully on
17   board.
18        Q.   So, during the meeting --
19   first of all, how long was the meeting?
20        A.   I'm going to estimate three
21   hours.
22        Q.   And where did it occur?
23        A.   It was somewhere in
24   Washington, D.C.  I believe -- I believe
```

Page 276

```
 1   the DEA has a headquarters there.
 2        Q.   Okay.
 3        A.   So I believe that's where it
 4   was, yeah.
 5        Q.   Do you recall any
 6   discussions with Doug Boothe before or
 7   after the meeting that were you a part
 8   of?
 9        A.   It's very possible.  He
10   wouldn't be someone that I didn't talk
11   to.  Not that he'd be someone that I
12   talked to that frequently.  But none that
13   I recall specifically.
14        Q.   Do you recall him ever
15   expressing concern to you about this
16   meeting?
17        A.   Expressing concern?  You
18   know, I think, you know, one of the
19   things about Doug -- so for everybody
20   else's knowledge, Doug was my boss's
21   boss.  And much like my boss who had
22   every confidence in me, he knew what he
23   was getting and he knew that I deal
24   with -- you know, dig into the details,
```

Page 277

1    and when I do something, I do it all the
2    way.  Doug had that same level of
3    confidence in me.
4         You know, I'm sure he was
5    probably curious like, what the heck, why
6    are we being called to the DEA, you know,
7    because we didn't even know.
8         But I don't recall specific
9    conversations, no.
10        Q.   Okay.  Thank you.  Do you
11   recall a discussion of Florida --
12   Florida, oxycodone in Florida during this
13   DEA presentation?
14        A.   Specific to Florida, I mean,
15   over the course of business we had a lot
16   of discussions on Florida, because we --
17   you know, with licensing and all their
18   special requirements on documentation and
19   how the documents would be printed, so
20   Florida was one of those states that came
21   up a lot.  We had to make a lot of
22   customizations in terms of our documents
23   to be compliant, like, from a state
24   level.  So when you say Florida, that's

Page 278

1    what I think of.
2         Q.   In this presentation --
3         A.   In this presentation --
4         Q.   -- do you recall the DEA
5    discussing the oversupply of oxycodone in
6    Florida with you?
7         A.   I remember at some point in
8    some conversation somewhere, and it may
9    have been with the DEA, but I can't be
10   certain, that someone made a comment
11   about, you know, X percentage of drugs
12   are going into Florida or whatever.  But
13   I can't be certain what that comment was
14   or where it was taken.  So I'd have to
15   say no to you.  I don't know.
16        Q.   Okay.  I'm going to direct
17   you to --
18        A.   I know they gave us --
19        Q.   -- the back of this lengthy
20   presentation?
21        A.   I know they gave us all
22   kinds of charts and bar graphs and --
23        Q.   Mm-hmm.  So it starts on
24   ALLERGAN_MDL_03302237.

Page 279

1         A.   The last four digits, 2227?
2         Q.   2237.
3              MS. LEVY:  37.
4              THE WITNESS:  Mine is a
5         blank page.  My 2237 is virtually
6         a blank page.
7    BY MS. ANTULLIS:
8         Q.   It should say, "Actavis top
9    50 pharmacy sales, 2010-2012."
10        A.   Yes.  Okay.
11        Q.   If you look at it
12   horizontally.  Okay.
13             So let's flip to the first
14   page of that chart on the next page.  Do
15   you see at the bottom right corner where
16   it says, "Source:  ARCOS"?  Very, very
17   far bottom right.
18        A.   That's what ARCOS is, okay.
19        Q.   Do you see that listed
20   there, ARCOS?
21        A.   Yes.
22        Q.   Does that help you refresh
23   your understanding as to --
24        A.   What ARCOS is.

Page 280

1         Q.   -- what ARCOS data is?
2         A.   Yes.  It was a blank to me
3    before when you mentioned it.
4         Q.   So looking at this chart, it
5    says, "Top 50 pharmacies, sales of
6    oxycodone, 50 milligrams."  There's an
7    NDC code, in 2010.
8         A.   Yes.
9         Q.   And then it lists buyers by
10   their DEA number, county, city, state,
11   total, et cetera.
12             Do you have any
13   understanding of what this chart purports
14   to be tracking?
15        A.   Yes.
16        Q.   Okay.  What do you believe
17   this is?
18        A.   Well based on what I'm
19   looking at here, it's taking pharmacies
20   from across the country and classifying
21   them by rank and purchases using a
22   buyer's DEA number.
23        Q.   And is this -- to your
24   understanding, do you remember, is this

Page 281

1   oxycodone manufactured by Actavis?
2        A.   Based on that NDC, it looks
3   to me to be what was our NDC, yes.
4        Q.   Okay.  So do you have any
5   understanding of why the DEA was
6   presenting you with the lists of the top
7   pharmacies prescribing oxycodone
8   manufactured by Actavis?
9        A.   Sure.
10       Q.   So what was your
11   understanding of why they were presenting
12   these lists?
13       A.   So it kind of falls in line
14   to where we were taking our initiatives
15   to the next level.  And it also falls in
16   line to my comment earlier, that they
17   were impressed, because what we were
18   doing, had we been given longer for this
19   meeting, we would have been giving them
20   this data, right, because it's looking
21   at, you know, one pharmacy, and what
22   product they're getting of yours from
23   different sources.
24            But the one thing I will say

Page 282

1   is, now that I remember the term ARCOS,
2   the DEA -- and listen, I've been wrong
3   before, but we've discussed this so many
4   times.  The DEA is the only one sitting
5   with this data collectively rolled up
6   from not -- and when I say rolled up in
7   that term, I mean from Actavis, from
8   whoever the other companies are,
9   Mallinckrodt, Purdue, some of the names
10   that you mentioned earlier, where, you
11   know, we would never have visibility and
12   the true full picture to what a pharmacy
13   was getting at the end of the day.
14            What we could tell and what
15   our efforts were to make sure we knew
16   what was happening with our product.  But
17   that's the limit of our ability.
18            But the importance of the
19   topic is, listen, it doesn't matter if
20   they're getting one NDC of oxy 15.
21   Because they may also be getting two or
22   three others, and the collective picture
23   is what matters.
24            So to me that's a

Page 283

1   challenging question, is -- whether it be
2   Actavis or any other -- I can't speak for
3   any other manufacturers.  But those other
4   manufacturers, just the same, they don't
5   have our data.  I mean, we wouldn't share
6   data.  We wouldn't get together and say,
7   let's all see what pharmacy is getting
8   what so that we can make sure that any
9   one is not getting too much.  So it's --
10   it's complicated.
11            And unless you're sitting in
12   a spot where you have access to DEA
13   information completely rolled up --
14       Q.   So my question was whether
15   you had a sense of why the DEA was
16   presenting a list of the top 50
17   pharmacies prescribing
18   Actavis-manufactured oxycodone.
19            Is it your testimony --
20   please correct me.  Is it your testimony
21   that the DEA was showing you this
22   information to do a comparative analysis
23   between Actavis and other manufacturers'
24   sales of oxycodone?

Page 284

1       A.   I don't know if I could say
2   that.  That may have been the case.  But
3   not that I recall.  If I had to summarize
4   what I think it was about, it was
5   twofold.  Like creating an awareness, hey
6   look, look at this data.  And also what
7   are you guys doing?  Like, what's your
8   process?  It was really a twofold
9   meeting.
10            But I don't remember
11   anything to do about what your question
12   just was.
13       Q.   So are you saying that
14   Actavis didn't have any insight into the
15   other manufacturers' sales of oxycodone?
16       A.   At a customer level?  I mean
17   I can't imagine we would ever have any
18   data of another manufacturer at a
19   customer level.  I mean I don't think
20   that would ever happen.
21            Would we have data in terms
22   of overall units in the market and market
23   share -- possibly.  But, yeah, I don't
24   know.  I don't know which part of that

Page 285

1  question, where you were going.
2      Q.   Well, when you say customer
3  level, what are you -- what -- how are
4  you defining customer in that statement?
5      A.   I mean would we be sitting
6  there and would the DEA be sharing with
7  us --
8      Q.   No, my question is --
9      A.   -- all the other
10  manufacturers?
11      Q.   My question is --
12          MS. LEVY:  Make sure you're
13          listening really carefully to the
14          question that she's asking you.
15          THE WITNESS:  Yeah.  Yeah.
16  BY MS. ANTULLIS:
17      Q.   The question is what your
18  definition of customer is in your
19  statement when you said we don't have
20  customer level data on other
21  manufacturers' sales.
22      A.   Okay.  Thank you for the
23  clarification.
24          In that statement when I

Page 286

1  referred to customer, I was trying to
2  speak in the same terms of this report
3  you're showing me.  Customer is a DEA
4  registrant level.
5      Q.   Okay.  Were you familiar
6  with ARCOS data prior to this meeting?
7      A.   Familiar, you know, heard
8  the term.  But I did not utilize ARCOS
9  data.  I don't even know who, if anyone,
10  had access.  I don't know who had access
11  to ARCOS data.
12      Q.   Have you ever seen ARCOS
13  data?
14      A.   Well, if this is ARCOS data,
15  which it says it is, then this I've seen.
16  So, yes.
17      Q.   Outside of these reports,
18  have you ever seen anything from the DEA
19  showing ARCOS data?
20      A.   From the DEA outside of
21  this?  I don't recall being shared any
22  additional ARCOS data.
23      Q.   So I'm going to flip to
24  those colorful charts now.

Page 287

1      A.   Mm-hmm.
2      Q.   So I'm going to go to the
3  beginning of those colorful charts.
4  There's a little page here that
5  explains --
6          MR. LOVRIEN:  Can you direct
7          us to a page number?
8          MS. ANTULLIS:  2257 are the
9          last four digits.  So it should
10          have the colored lettering.
11  BY MS. ANTULLIS:
12      Q.   So please read that first
13  paragraph there.
14          It says, I'll just read it
15  into the record.  It says, "The following
16  charts and graphs have been compiled from
17  ARCOS reports your firm has previously
18  submitted to DEA.  The data was reviewed
19  and the purchases of a few of your
20  customers will be addressed during our
21  discussion."
22          Who at Actavis submits
23  information -- submits ARCOS -- who at
24  Actavis submits information to the DEA?

Page 288

1      A.   I do not recall.  I know it
2  wasn't me.  I believe -- I can't say,
3  because I would be guessing.  I don't
4  recall the person.
5      Q.   Do you know what -- okay.
6  Do you know what department would be
7  responsible for submitting ARCOS reports
8  to DEA?
9      A.   I don't -- I don't -- no.
10      Q.   Okay.  I'm going to go ahead
11  and flip to the next page.  So the next
12  page is a fun colored chart.  It's titled
13  UPS Supply Chain Top Customer Sales in
14  Dosage Units of Oxycodone 50 Milligrams.
15  Then there is that NDC number again.  Two
16  NDC numbers.
17      A.   Mm-hmm.
18      Q.   Do you recognize those NDC
19  numbers?
20      A.   Yes.
21      Q.   Okay.  Are those Actavis
22  products?
23      A.   Yes.  I believe -- I believe
24  they both are.

Page 289

1      Q.   Do you recall -- so you'll
2  remember from the previous page it said
3  that the DEA said they want -- they
4  wanted to discuss certain customers with
5  you during the meeting.
6          Do you recall whether any of
7  these customers were actually discussed
8  with you during that meeting, the ones
9  that are listed on the charts?
10         Do you recall discussing
11  Walgreens during that meeting?
12     A.   I don't -- I don't recall
13  any conversations ever pinpointed to one
14  customer or another, yeah.
15     Q.   Okay.  Do you recall looking
16  through these charts generally?
17     A.   Yes.
18     Q.   The colored charts?
19     A.   Yes.
20     Q.   Do you recall any discussion
21  regarding these colored charts?
22     A.   Yes.  I don't recall what --
23     Q.   Do you recall anything that
24  the DEA said to you regarding the colored

Page 290

1  charts?
2      A.   They went over the data and
3  they virtually said what we were seeing.
4      Q.   Okay.  So what did they say
5  we were seeing here?
6          What is your understanding
7  of what these charts reflect?
8      A.   It's just giving us a
9  picture, by product, by NDC, by customer
10  and by volume for a certain time period
11  so that we can visually have that
12  discussion.
13     Q.   Okay.  So what was the
14  discussion regarding the data that's
15  depicted in these charts?
16     A.   So the discussion once again
17  goes back to where the meeting started
18  and where we spent the bulk of our time.
19  I feel like this was like the end of the
20  meeting.  We took maybe -- let's say the
21  meeting was three hours.  We took the
22  first two hours.
23         So this was a very small
24  part of the meeting.  The -- the meeting

Page 291

1  was really focused on tell us about your
2  processes, what do you do, and then this
3  was kind of at the end from what I
4  recall.
5      Q.   So do you recall any
6  discussion regarding these charts in
7  particular?
8      A.   Not -- not deep discussions,
9  but discussions enough, you know, look at
10  the chart, turn the page, yeah.
11     Q.   Okay.  Do you recall any
12  action items that came out of this
13  meeting?
14     A.   I don't know if they were
15  action items designated from the DEA, but
16  certainly we walked away -- I mean we --
17  we looked at this as an opportunity --
18  and we didn't look at this meeting as
19  punishment.  We looked at this meeting as
20  an opportunity to make us better.
21         So we certainly walked away
22  with follow-up items, but I don't believe
23  those were like the DEA said, you know,
24  you need to go do this.  I think we

Page 292

1  walked away and made our own follow-up
2  items.
3      Q.   Okay.  So again I'll unpack
4  that a little bit.  So my first question
5  then, which I believe you've answered.
6  I'm going to ask it and make it clear on
7  the record.
8          Did the DEA ask you to do --
9  take any steps regarding your suspicious
10  order monitoring program following this
11  meeting?
12     A.   I do not recall any specific
13  steps the DEA said we want you to take.
14  I know we took steps.  But I don't recall
15  that coming from the DEA, as I recall it.
16     Q.   So you -- did you meet with
17  your colleagues from -- from Actavis who
18  were present at this meeting after the
19  meeting?
20     A.   At that very moment, like
21  that day or?
22     Q.   That night.
23     A.   I -- I don't believe so.
24  Not that I recall.  I may have gotten on

Page 293

1    a train right away.
2        Q.    Okay.
3        A.    But certainly we debriefed
4    on it at some point, whether it was
5    another day or another couple of days, I
6    don't -- I don't recall.
7        Q.    Did you memorialize the --
8    the contents of this meeting for any
9    superiors at Actavis?
10       A.    Oh I'm sure we did.  In what
11   context --
12       Q.    But did you?
13       A.    -- I don't know.
14       Q.    Did you?
15       A.    Did I?
16           I don't know if I would
17   have, or John or Michael.  I'm sure
18   someone came back and, you know, like I
19   would have come back and said to my boss
20   how the meeting went.  I'm sure they
21   would have done the same, but I don't
22   remember any formal nature of it.  I
23   don't -- I don't recall.
24       Q.    So you stated, you testified

Page 294

1    that -- that you all, and I don't want to
2    misstate your testimony.  I'm probably
3    going to here, so...
4           You all designed action
5    items following the meeting; is that
6    correct?
7        A.    There were action items that
8    came out as a result of this meeting that
9    we -- we took away, that listen, let's
10   take what we're seeing and figure out how
11   to make us better, yeah.
12       Q.    So what were some of those
13   things that you took away that would make
14   you better?
15       A.    Having discussions with our
16   wholesalers, you know, and meeting --
17       Q.    What would those discussions
18   be about?
19       A.    -- meeting with our
20   wholesalers.
21           First of all, we -- we met
22   with our key three wholesalers, McKesson,
23   Cardinal and AmerisourceBergen, at their
24   locations.

Page 295

1           We went over the regulation
2    to make sure we are all on the same page
3    and had the same understanding.  You
4    know, had dialogue about things like that
5    letter from 2007 and how vague it is and
6    how the DEA, even if you put together
7    this amazing system, still won't tell you
8    that it's -- that it's what it needs to
9    be.
10          You know, but we really
11   talked about the -- the regulation and
12   the focus of -- of those initial meetings
13   was us presenting, here just so you know,
14   Mr. Wholesaler 1, 2, and 3, here is what
15   we're doing and here is our expectation
16   of you.  That was really that intention.
17   And that was -- yeah, that's what I can
18   say.
19       Q.    Okay.
20       A.    I don't know the timing,
21   like I don't know when that occurred
22   though, to be honest.
23       MS. ANTULLIS:  How long --
24   how long have we been going?

Page 296

1           THE VIDEOGRAPHER:  This
2    session?  1 hour and 23 minutes.
3           MS. ANTULLIS:  Okay.  So I
4    think this is a good time to take
5    a break if everyone is amenable to
6    that.  I need some water.
7           THE VIDEOGRAPHER:  Okay.
8    Please remove your microphones.
9    The time is 2:49 p.m.  Off the
10   record.
11          (Short break.)
12          THE VIDEOGRAPHER:  We are
13   back on the record.  The time is
14   3:10 p.m.
15   BY MS. ANTULLIS:
16       Q.    Okay.  Hi.  Good afternoon.
17          At any point during your
18   employment at Actavis, were you the
19   senior person in charge of the suspicious
20   order monitoring program?
21       A.    Senior person in charge of
22   executing and driving the project.  But
23   ultimately, it was owned by our
24   compliance executives.  I mean, they were

1    the owners.  But I was managing it and
2    running it, so it depends on how you --
3        Q.   Who did you report -- did
4    you report to anybody regarding the
5    suspicious order monitoring program?
6        A.   I reported to Michael
7    Perfetto, and informally I reported and
8    worked with legal and compliance, John
9    Duff and Michael Clark.
10       Q.   Do you recall receiving
11   guidance or instructions from John Duff
12   and Michael Clark regarding the
13   suspicious order monitoring procedures
14   and policies?
15       A.   Guidance from them?
16       Q.   Mm-hmm.
17       A.   Sure.  They were part of the
18   project team.  So yes.  They would have
19   provided guidance.
20       Q.   Who at Actavis reported
21   suspicious orders to the DEA when they
22   were discovered?
23       A.   I can't be certain of that
24   answer.

1        Q.   Do you know what department
2    reported suspicious orders to the DEA
3    when they were discovered?
4        A.   I believe it may have been
5    our security group.  But I -- I can't
6    recall with certainty.
7        Q.   You discussed the security
8    group before.  What did the security
9    do -- what did the security group do?
10       A.   I'm not an expert on their
11   role and their job description.  But very
12   high level, they had a lot of different
13   responsibilities, in terms of plant
14   security.  You know, I don't really want
15   to speak to their roles.
16       Q.   But --
17       A.   I'd rather not, because I
18   may not get it accurate.
19       Q.   I understand.  But you've
20   used the term "the security team" several
21   times.  So I'm asking for what your
22   understanding is of what the security
23   team is generally, if you have an
24   understanding.

1        A.   So what I can say in terms
2    of this project, because they have many
3    elements to their job, right, which I
4    can't speak to.  But they were a part of
5    this initiative, that spanned across
6    different areas, right.  You had my team
7    that was managing the orders and the
8    reports coming in.  You had legal and
9    compliance.  And I could still visualize
10   you know, something that I wrote to this
11   effect, that provided the legal input and
12   insight and guided us on the regulation
13   and all that.  And then you had the
14   security -- I mean, I say -- it wasn't
15   like a huge department, I think it was
16   like one or two.  And ultimately it was
17   them, if I recall correctly, that was
18   responsible for reporting.  It's just
19   been so long.
20       Q.   Who were the people in the
21   security department?
22       A.   The only name I remember is
23   Kelly Smith.
24       Q.   Kelly Smith.  And was Kelly

1    Smith employed at Actavis the entire time
2    that you were there?
3        A.   I don't know -- I don't know
4    her employment dates.  I know for a
5    period of time that I was there.  Who
6    came first, who left first, I don't
7    recall.
8        Q.   Earlier you discussed a
9    security agreement, I believe in the
10   context of only specific departments
11   having access to the suspicious order
12   guidelines.
13          Do you recall that?
14       A.   No.  It wouldn't be having
15   access to guidelines.  What I was
16   referring to, if it's the conversation I
17   believe you're referring to, is the
18   ability to release orders.  That was
19   security driven just like entering an
20   order or releasing an order off credit
21   hold.  Every command in the system was
22   driven by a set of security criteria in
23   terms of who had access to that.
24       Q.   And that criteria -- is that

Page 301

1  criteria memorialized in writing?
2      A.  I'm sure it would have to
3  be.
4      Q.  How was the criteria
5  communicated to you?
6      A.  Communicated to you?  I
7  believe there was a system-generated
8  report that would show who had access to
9  different commands.  And even outside of
10  SOM, any functional area was responsible
11  to make sure that tasks and -- and
12  processes and what I would call commands
13  in the system were only accessed by those
14  that were authorized to do so.  And it
15  was -- there weren't -- it was very few.
16  Probably less than one hand that had that
17  access.
18      Q.  Okay.  So very few.  You
19  mean had access to --
20      A.  Yeah.
21      Q.  -- the suspicious order
22  reports?
23      A.  Oh not the reports.  No.  I
24  thought -- thought you were talking

Page 302

1  about -- you mentioned the security
2  earlier.  And when I think of security,
3  it's the mechanism and the ability to
4  touch an order and release an order.
5      Q.  Okay.
6      (Discussion off the record.)
7      THE VIDEOGRAPHER:  The time
8  is 3:16 p.m.  Off the record.
9      (Brief pause.)
10      THE VIDEOGRAPHER:  We are
11  back on the record.  The time is
12  3:22 p.m.
13  BY MS. ANTULLIS:
14      Q.  So prior to the break, we
15  were discussing the DEA suspicious order
16  notifications, so who notified the DEA
17  when there was a suspicious order.
18      You testified, I believe,
19  that the -- that the -- the security
20  department would have been the one to
21  notify the DEA of suspicious orders when
22  discovered; is that correct?
23      A.  Yes, to the best of my
24  knowledge.

Page 303

1      Q.  And was that -- was that the
2  case both before the security -- the SOM
3  enhancement and after?
4      A.  Yeah, I don't believe that
5  wouldn't have been any different, that
6  aspect.
7      Q.  What did you do when a
8  pended order was deemed to be suspicious?
9      A.  So I'll be honest with you,
10  I don't recall any specific customers or
11  orders or details along that nature.  And
12  although we had many that got close,
13  because we didn't have the information we
14  needed, but eventually we were able to
15  make sense of things.
16      I can't tell you any
17  specifics about orders that were
18  suspicious, or how many there even were
19  that were ultimately reported.
20      Q.  So do you recall any
21  situation that you were involved in where
22  a pended order was deemed suspicious
23  after investigation?
24      A.  I know there -- there was at

Page 304

1  least one.  How many more I don't recall.
2  But I don't know any details about it.
3  It's been too long.
4      Q.  Okay.  But is it -- so
5  you've testified that -- that you
6  remember at least one situation in which
7  a pended order was deemed suspicious,
8  that you were involved in?
9      A.  I believe -- I believe there
10  was one.
11      Q.  Do you remember who you
12  discussed that suspicious order with?
13      A.  Whatever the scenario was,
14  and I don't recall the specifics, it was
15  reported to the DEA.  What the ultimate
16  outcome was, in that specific scenario, I
17  don't remember.
18      Q.  Do you remember who -- who
19  that particular customer was?
20      A.  I -- I can't say for
21  certain, when an order was reported as
22  suspicious, who it would have been.  I
23  know there was -- there was one customer
24  that just comes to mind that was -- that

Page 305

1    may have been someone we reported.  But
2    if I say it, I may be wrong.
3        Q.   And so, during your time at
4    Actavis, and by your time at Actavis, I'm
5    referring to both 2008 through 2017.
6        A.   Mm-hmm.
7        Q.   Do you recall more than one
8    incident in which an order of interest
9    was investigated and deemed suspicious
10   that you were involved in?
11       A.   So my responsibility changed
12   for many of those years, so I wouldn't
13   have been necessarily part of that.  So
14   there may have been some.  But I don't
15   know.  So I can't speak for some years.
16       Q.   All right.  So are you
17   aware --
18       A.   In terms of what I'm aware,
19   I don't remember -- I don't remember a
20   number.
21       Q.   Do you remember if it was
22   more than one?
23       A.   I don't remember, no.
24       Q.   Do you remember if it was

Page 306

1    more than ten?
2        MR. LUXTON:  Objection.
3        MS. ANTULLIS:  What's the
4    objection?  I just don't -- I want
5    to understand if I can --
6        MR. LUXTON:  She said she
7    doesn't remember.  So, I mean, you
8    can keep asking her.  She says she
9    doesn't remember.  So that's the
10   objection.
11   BY MS. ANTULLIS:
12       Q.   Do you remember if it was
13   more than ten?
14       A.   Well, I don't remember it
15   being more than one, so I definitely
16   wouldn't remember it being more than ten.
17       Q.   So what would have been the
18   protocol prior to -- prior to the
19   enhancement in 2011 and 2012, what would
20   have been the protocol, or what was the
21   protocol when an order was deemed
22   suspicious?
23       A.   So very important, there was
24   never -- our process was such that maybe

Page 307

1    there was, you know, one line on the
2    order that was suspicious.  But maybe it
3    was a five or 50-line-item order.
4        If something were deemed
5    suspicious the entire order was canceled.
6    You know, we couldn't take the quantities
7    and reduce it to a point that made it not
8    suspicious.  You know, that's just not
9    how it worked.  So the entire order, to
10   answer your question, would have been
11   canceled and reported to the DEA.
12       Q.   And who -- who did you
13   report that suspicious order
14   determination to?
15       A.   Well, like I said earlier, I
16   believe it was our DEA security group.
17       Q.   So you believed then that
18   you reported directly to that group, and
19   that group then reported the order to the
20   DEA; is that correct?
21       A.   Yes.
22       Q.   And your department then was
23   responsible for canceling the order; is
24   that correct?

Page 308

1        A.   Yeah.  At that point, that
2    would be the limit of our ability, to
3    cancel the order.
4        Q.   Would you then notify the
5    customer that their order had been
6    canceled?
7        A.   Because I don't remember the
8    scenario of how many times it would have
9    happened, let alone when it happened.  I
10   don't recall the details of how the
11   customer would have been communicated.  I
12   would venture to guess it was handled in
13   a very sensitive, proper way.  But I
14   don't recall.
15       Q.   Do you recall what the
16   protocol -- was there any protocol
17   regarding communications with customers
18   following a canceled order?
19       A.   They would be notified the
20   order was canceled.
21       Q.   Was any investigation
22   required following a canceled order into
23   the customer who placed the order?
24       A.   Investigation -- what type

1   of investigation?
2       Q.  Were you required to
3   investigate the customer following a
4   canceled order?
5       A.  I only remember one
6   scenario.  And to be honest, whether it
7   was a suspicious scenario or not, we
8   had -- I remember one scenario with a
9   customer.  And we were told by the DEA to
10  continue business as normal.  I think
11  they were investigating them.  They were
12  on their radar, and they didn't want to
13  do anything unusual.
14          That's the only
15  customer-specific scenario that I
16  remember.  It turns out that that
17  customer was later -- we shut them down.
18  We decided we didn't want to do business
19  with them.
20      Q.  So then is it fair to say
21  that there was no clearly delineated
22  protocol for how to communicate with
23  customers following the cancellation of a
24  suspicious order?

1       A.  Well, because we weren't
2   deeming orders suspicious on a daily
3   basis, there wasn't an everyday protocol.
4   It wasn't something that happened every
5   day.  And the scenario may have been
6   different.  So we would have consulted
7   our internal experts who would consult
8   the DEA, and the scenario would have been
9   handled based on their instruction.
10      Q.  And who were those internal
11  experts that you would have consulted?
12      A.  Like I mentioned, our -- we
13  have a compliance officer, and our
14  security person, which is a former DEA.
15      Q.  Was there a group named DEA
16  affairs at Actavis at any point?
17      A.  Yes, but not during this
18  time period.
19      Q.  Okay.  So DEA affairs as a
20  group came into being after the 2011-2012
21  enhancement?
22      A.  That's correct.
23      Q.  How did you consult
24  compliance and security when you needed

1   information on how to approach a customer
2   following a pended order, a suspicious
3   order?
4       A.  Well, I have to say that
5   your question is talking about how we
6   approached the conversations.  But when I
7   said earlier this is not something that
8   happened often, I was estimating it was
9   once that we really had something that
10  was finally deemed suspicious.  So I
11  don't really have a lot to say more about
12  our protocol.  It was -- I really can't
13  say any more than I think I already have.
14      Q.  How would you -- did you
15  consult compliance and security for
16  guidance on issues related to the
17  suspicious order monitoring program?
18      A.  When, if needed, sure.  I
19  mean, I was in a role to lead something.
20  But that doesn't make you an expert, so
21  you have to leverage your resources when
22  you need them, yeah.
23      Q.  And how would you -- how
24  would you consult with them?  By what

1   method of communication would you consult
2   with them?
3       A.  Could be any -- any method.
4   It could be an e-mail.  It could be a
5   phone call.  It could be walking down the
6   hall and see them.
7       Q.  Did you ever e-mail
8   compliance for questions about
9   guidance -- for seeking guidance on
10  suspicious order monitoring issues?
11      A.  I don't recall specifics.
12  But it's possible.
13      Q.  Do you recall any phone
14  calls to compliance regarding suspicious
15  order monitoring issues?
16      A.  I don't recall specifics,
17  but it's very possible.  You know, I
18  don't -- I don't know details.
19      Q.  Do you recall e-mailing
20  security, the security department with
21  specific -- with the questions about the
22  suspicious order monitoring?
23      A.  My answer would be the same
24  for that.  It's possible.  I don't

Page 313

1    remember.
2        Q.   All right.  So is it -- is
3    it -- I just want to make sure I
4    understood your testimony.  From 2008 to
5    2011 you reported -- your protocol was to
6    report suspicious orders to security; is
7    that correct?
8        A.   The earlier years, to be
9    honest, before we made the enhancements,
10   I don't recall who it was.  I know that
11   the later years of that period was
12   security.  Who it was before that, I
13   don't recall.
14       Q.   So -- so you know then, so
15   as of -- is it as of 2012 the security
16   department is the team that you would
17   have notified if there were suspicious
18   order?  Is that correct?
19       A.   I'm going to estimate around
20   2011, '12.  But that's not to say that it
21   wasn't the same in 2010 or '9, I just
22   don't remember.
23       Q.   So you don't -- so right.
24   So then -- so then you do not remember

Page 314

1    who you would have notified prior to
2    2011; is that correct?
3        A.   I don't -- it's too long
4    ago.  I don't remember that.
5        Q.   Would you have been the only
6    person in the customer service department
7    who would have notified either security
8    or whomever else was responsible for
9    reporting the DEA orders?
10       A.   I -- yes.
11       Q.   So nobody else in the
12   customer service department would have
13   been responsible for contacting security
14   to tell them about a suspicious order?
15       A.   No.  They would be engaged
16   in the initial process and the leg work
17   and the due diligence.  But it wouldn't
18   have been left to them, no.
19       Q.   Okay.  Do you recall -- let
20   me just strike that question.
21            Did Actavis ever halt
22   shipments of opioids in quantities that
23   it knew could not be justified?
24            MR. LUXTON:  Objection.

Page 315

1            THE WITNESS:  What does that
2    mean?  Okay.  Did we halt
3    shipments of opioids that we knew
4    could not be justified?  Well,
5    that -- I mean, what you're saying
6    is a suspicious order.  That's the
7    same question as what we had
8    before.
9            And I don't recall, like I
10   said, if we had one order or a
11   few.  I don't remember.
12   BY MS. ANTULLIS:
13       Q.   Okay.  Following the
14   September 2012 meeting with the DEA, did
15   the DEA contact you again to request a
16   follow-up meeting?
17       A.   I don't recall who
18   specifically, but they did not contact me
19   personally.
20       Q.   Do you remember who they
21   contacted?
22       A.   No.
23       Q.   Did a meeting happen?
24       A.   Yes.

Page 316

1        Q.   Okay.  When did that meeting
2    happen?
3        A.   Like I said, it was
4    approximately, give or take a month after
5    the initial meeting, but I can't say with
6    certainty.
7        Q.   Who from Actavis was at that
8    meeting?  Hold on.
9            Were you at that meeting?
10       A.   Yes.
11       Q.   Who from Actavis besides you
12   were at that meeting?
13       A.   I can't say with certainty,
14   but I have a feeling it was certainly the
15   same audience that went to Washington a
16   month prior.
17            Beyond that, anyone
18   additional, I don't recall.  I almost
19   feel like it was a Part 2, the same
20   audience.
21       Q.   So that meeting, that
22   followed a month -- that occurred a month
23   after the September 2012 meeting, was it
24   with the same DEA officials?

Page 317

1     A.   I believe it was two
2  gentlemen.  I don't know their names.
3  And I am almost positive that they were
4  in the same audience as the original
5  meeting.  But it was only two versus what
6  was initially many.  It was a much
7  smaller meeting.
8     Q.   Do you recall the -- the
9  conversation that occurred at that
10 meeting?
11    A.   Not specifically.  It was
12 almost just a come back again and ask the
13 same questions, go through the same
14 things again.  But I don't remember
15 anything specific that was -- stood out
16 to me as the real purpose of that
17 meeting.
18    Q.   Were there any action items
19 that arose from that meeting?
20    A.   None that I'm aware.
21    Q.   What was your understanding
22 of what that meeting's purpose was?
23    A.   Once again we were asked for
24 a meeting and you don't say no.  You say

Page 318

1  sure.
2     Q.   So suspicious order
3  monitoring enhancement started in -- at
4  some point in 2011; is that correct?
5     A.   Correct.
6     Q.   When did it go active,
7  the -- the new program?
8     A.   I don't have that date in
9  front of me to say for sure.
10    Q.   Might it have been
11 approximately the end of 2012?
12    A.   I don't think it was that
13 late, no.  I mean, you had an
14 exhibitor -- exhibit earlier that spoke
15 about, hey, we just implemented this, we
16 want to shut it down.  So it had to be
17 around that same time period.
18        I -- I feel like the
19 project, in -- in its entirety was -- I
20 don't think it was that long.  But I
21 don't -- I don't know a go-live date.
22    Q.   I just want to ask you
23 some -- some general questions about the
24 policies, and then I'm going to show you

Page 319

1  a document and ask you some questions
2  about that related to the policies.
3     A.   Okay.
4     Q.   So you stated -- you
5  testified earlier that if there were a
6  suspicious order determined, you would
7  report that to the security department,
8  correct?
9     A.   Yes, but I also testified
10 that I was almost certain of that, but
11 not certain.  I --
12    Q.   Okay.
13    A.   That's -- that is my
14 recollection.
15    Q.   So were there any -- did you
16 report that, that suspicious order to any
17 other groups within Actavis?
18    A.   It wouldn't have been
19 something that we broadly -- broadly
20 announced.  Other groups?  No other
21 specific groups that I can think of other
22 than legal and compliance.
23    Q.   And what was the role of
24 the -- you testified earlier that there

Page 320

1  was a suspicious order monitoring
2  steering committee, correct?
3     A.   Yes.
4     Q.   And was that committee
5  implemented as part of the 2011
6  enhancements?
7     A.   Yes.  And they were --
8  essentially just sat there to ensure that
9  the effort -- the initiative was driven
10 and it was supported from top down.  That
11 was the concept.
12    Q.   Do you ever report any
13 orders of interest to the steering
14 committee?
15    A.   Once again, not remembering
16 how many, if any, you know, had one, or
17 whatever it was, it's hard for me to say
18 if we did report it to the steering
19 committee.
20    Q.   So just to clarify --
21    A.   But --
22    Q.   -- for -- for you --
23    A.   -- it probably wouldn't
24 surprise me if we did.

Page 321

1      Q.   Did you -- did you report
2  any orders of interest?  So I'm not
3  asking about --
4      A.   Orders of interest.
5      Q.   -- suspicious orders, I'm
6  asking about orders of interest.
7          Did you ever report orders
8  of interest to the steering committee?
9      A.   That really wasn't the
10  purpose of the steering committee to --
11  to put orders in front of them that
12  weren't deemed suspicious.  So --
13      Q.   So is that no?
14      A.   I don't -- I don't know --
15  it's an I don't know.  I don't know
16  whether we'd be -- yeah, I don't know.
17      Q.   Okay.  What was the purpose
18  of the steering committee?
19      A.   Steering committee was, as I
20  stated earlier, to provide support from
21  the top down regarding the initiative, to
22  ensure we had the resources we needed,
23  the funding to buy consultants.  And the
24  support more than anything else, so that

Page 322

1  whatever areas we needed support from, we
2  got it.  I mean that was their role.
3      Q.   And did -- did the
4  steering -- steering committee have any
5  role in investigating an order of
6  interest?
7      A.   That wasn't their function.
8      Q.   Did the steering committee
9  have any role in deciding whether or not
10  to report a suspicious order to the DEA?
11      A.   That too wasn't their
12  function.
13      Q.   Okay.  So I'm going to show
14  you another document now, if I can find
15  it.
16          MS. ANTULLIS:  It is
17      Number 55, sir.
18          (Document marked for
19      identification as Exhibit
20      Baran-11.)
21          MS. ANTULLIS:  So Exhibit 11
22      is ALLERGAN_MDL_03382709.
23          THE WITNESS:  Thank you.
24  BY MS. ANTULLIS:

Page 323

1      Q.   So Exhibit 11 appears to be
2  an e-mail with two attachments.  Can you
3  please look at these two attachments and
4  just tell me if they are familiar to you?
5      A.   Yes, they are.
6      Q.   And in your e-mail, the
7  cover page, please take a look at that.
8  The subject line says direct and indirect
9  SOPs Actavis.  And then it lists a file
10  name for the two attachments.
11          Do you see that?
12      A.   Correct.
13      Q.   So the first file name says
14  SOM SOP and business procedure direct
15  final.docx.  The second one says SOM SOP
16  and business procedure indirect
17  final.dox -- docx.
18          Is it your understanding
19  then, looking at this e-mail and looking
20  at the attachments, that this represents
21  the final standard operating procedures
22  that were written for the direct and
23  indirect suspicious order monitoring
24  program in 2012?

Page 324

1      A.   Based on what I'm seeing on
2  October 26th, I would say yes, but that
3  doesn't necessarily imply that the
4  procedure was never modified.
5      Q.   Okay.  But do you have any
6  reason to suspect that the attachments
7  are not representative of final drafts?
8      A.   I don't believe so.
9      Q.   So I want to -- I only want
10  to ask you one question about this, other
11  than what I've already asked you, which
12  is, on Page 2713, which is Page 4 of 5 of
13  the first attachment.
14      A.   Okay.
15      Q.   In Section 9, it's titled
16  reporting a suspicious order to the DEA.
17  Do you see that at the bottom?
18      A.   Yes.
19      Q.   Okay.  So 9.1 it says, "If
20  an order cannot be cleared of suspicion,
21  Actavis DEA affairs will alert the local
22  office of DEA by phone of the suspicious
23  order activity."
24      A.   Correct.

Page 325

1    Q.   Do you see that?
2    A.   Yes.
3    Q.   Is Actavis DEA affairs the
4  same thing as the security department?
5    A.   That was the role.  It's the
6  same, one and the same.
7    Q.   So they are the same entity?
8    A.   Yes.
9    Q.   Okay.  Thank you.  That was
10  my question.
11        Next.  There we go.  It's
12  Tab Number 39.  This is Exhibit 12.
13  Actavis 1136380.
14        (Document marked for
15        identification as Exhibit
16        Baran-12.)
17        MS. ANTULLIS:  Where is the
18  rest of the document?
19        MR. DEARMAN:  Where is the
20  rest of the document?
21        MS. ANTULLIS:  We're going
22  to have to come back to that.
23        No, actually, I'm sorry, but
24  you're handing me the wrong

Page 326

1  document.
2        MR. DEARMAN:  Okay.  You
3  asked for 39.
4        MS. ANTULLIS:  Did I?  My
5  apologies.  28.  Sorry, guys.
6        MR. DEARMAN:  It shows on
7  the realtime.  You shouldn't have
8  ordered the real-time if you
9  didn't want it.
10        MS. ANTULLIS:  I believe it.
11  It's because 39 is backwards
12  right here, you see?
13        MR. DEARMAN:  Did you read
14  the Bates range into the record?
15        MS. ANTULLIS:  I read that
16  Bates range into the record as
17  Exhibit 12.
18        MR. DEARMAN:  Okay.  You
19  did.  So I just want to make sure
20  we're not messing the exhibits up.
21        MS. ANTULLIS:  All right.
22  So this should be Exhibit 12.  And
23  that is Tab 28.
24        MR. DEARMAN:  All right.  So

Page 327

1  just state on the record that
2  Exhibit 12 is, and the Bates
3  range.
4        MS. ANTULLIS:  To clarify,
5  Exhibit 12 is a Bates range
6  starting at ACTAVIS_1136380.
7        It's still not the right
8  one.
9        MR. DEARMAN:  29.
10        MS. ANTULLIS:  28.
11  Sorry, guys.  Bear with us.
12        MS. LEVY:  Is that -- are
13  you going to keep this Exhibit 12?
14        MS. ANTULLIS:  I don't know.
15  I don't know what it is.
16  BY MS. ANTULLIS:
17    Q.   So you testified earlier
18  that following the meeting with the DEA
19  in September of 2012, you scheduled
20  meetings with the top three distributors,
21  correct?
22    A.   Yes.
23    Q.   And so those distributors
24  then would be AmerisourceBergen, Cardinal

Page 328

1  Health, and McKesson, correct?
2    A.   Yes.
3    Q.   And so did you in fact have
4  meetings with all three of those
5  distributors?
6    A.   Yes, we -- yes, we did.
7    Q.   So Exhibit 12 appears to be
8  an e-mail from you attaching a
9  presentation.  Does this -- do you
10  recognize this document?  Do you
11  recognize the e-mail?
12    A.   I recognize the document.
13  And the e-mail I just put my eyes on for
14  the first time so -- okay.
15    Q.   Okay.
16    A.   Yep.
17    Q.   Do you remember sending this
18  presentation to Michael Perfetto and
19  Michael Clark and John Duff and John
20  LaRocca?
21    A.   No, but I did.
22    Q.   Do you have any reason to
23  believe that you didn't send this in the
24  ordinary course of business?

1      A.   No.
2      Q.   So I want to go to the
3  presentation.  I am not going to ask
4  about much of it.  But there's -- there
5  are some convenient charts in the back
6  that I'd like to go over with you.  So
7  the first one starts at ACTAVIS_1136388.
8      A.   Yes.
9      Q.   So this appears to be a
10  responsibility tree related to the SOM
11  process; is that correct?
12      A.   Yes.
13      Q.   Is that your understanding?
14      So it begins with SOM
15  steering committee at the top.  And then
16  it has four branches.  One is legal and
17  regulatory, one is order monitoring, one
18  is know your customer, one is DEA
19  intelligence; is that correct?
20      A.   That's correct.
21      Q.   So do you fall -- does the
22  customer service team fall into one of
23  these prongs -- branches?
24      A.   We sit really in the two

1  middle categories.
2      Q.   Okay.  So --
3      A.   Definitely the order
4  monitoring piece for sure.
5      Q.   Okay.
6      A.   And can I read this just for
7  one minute.  It's just been a long time.
8  I want to refresh my memory on this.
9      MS. ANTULLIS:  We can -- do
10  you mind if we actually take a
11  break for a minute?
12      MR. DEARMAN:  While she's
13  reading this, I just want to talk
14  to you for a second.
15      MS. ANTULLIS:  We don't need
16  to take a break.  What?
17      MR. DEARMAN:  You take off
18  your thing.  You don't need to
19  take a break while she's reading.
20      MS. ANTULLIS:  Oh, all
21  right.  Go ahead.
22      THE WITNESS:  Yep, I only
23  need one minute.
24      THE VIDEOGRAPHER:  Do you

1  want to stay on the record?
2      MS. ANTULLIS:  Yeah, go
3  ahead.
4  BY MS. ANTULLIS:
5      Q.   Did you have a chance to
6  read that page?
7      A.   Well enough, yes.  Thank
8  you.
9      Q.   So does this page fairly
10  represent what you understand to be the
11  SOM reporting process following the 2012
12  enhancement?
13      A.   I wouldn't define it as a
14  reporting.  It wasn't a reporting
15  process.  It was a roles and
16  responsibilities more accurately stated.
17      Q.   So next I want to go to Page
18  10 to that presentation, which is Actavis
19  1136391.
20      A.   Yes.
21      Q.   Okay.  Now, I apologize, it
22  is hard to read.  I promise you that it
23  is better than the original copy I saw,
24  which was black and white and much, much

1  harder.  So let's just -- this appears to
2  be, like, a decision tree for the
3  indirect sales process in terms of how to
4  determine whether or not an order is
5  suspicious.  Is that your understanding
6  of what this page represents?
7      A.   Yes.
8      Q.   So, if you see the first
9  green box at the top, it says, "ValueTrak
10  data."
11      A.   Yes.
12      Q.   "Indirect sales, i.e.,
13  customer's customer data," correct?
14      A.   Correct.
15      Q.   Again, do you know what that
16  data contains?
17      A.   I know it could be easily
18  answered by the right person.  But I'm
19  not the right person.
20      Q.   And that -- would that
21  person be Rachelle Galant?
22      A.   Yes.
23      Q.   Okay.  And so if you look at
24  the top, the top orange arrow on your

Page 333

1   left, it says, "SOM steering committee
2   identifies criteria threshold for
3   customers of interest."
4       Do you see that?
5       A.   Yes.
6       Q.   Okay.  And on the right
7   arrow, orange, it says, "DEA
8   intelligence, advising/counseling,
9   identifies products of interest based on
10  DEA input and market conditions."
11      Do you see that?
12      A.   Okay.
13      Q.   Okay.  So the SOM steering
14  committee then, is it correct to say that
15  they gave you -- that they were to
16  provide guidance on what criteria would
17  establish a customer of interest?
18      A.   The only guidance that that
19  would really be applying to is at a very
20  high level what our approach was.  It was
21  a three-pronged approach that I spoke to
22  earlier, looking at how many different
23  sources a customer is buying from, their
24  historical purchases, and their purchases

Page 334

1   compared to like customers.
2       It was really just coming up
3   with that foundation.  It wasn't, you
4   know, anything deeper than that at that
5   level.
6       Q.   And do you have any
7   recollection -- well, first of all, if
8   you determined that a -- that there was a
9   customer of interest, would you
10  investigate that customer?
11      A.   Anything of interest would
12  be investigated, yes.
13      Q.   And if you deemed a customer
14  to be placing suspicious orders, if that
15  were the result of the investigation, who
16  would you, Nancy Baran, report that
17  information to?
18      A.   That's hard to say, because
19  it would probably be a combination.  And
20  it's one of those things, it hasn't
21  happened too often, so I don't recall.
22  But it would have probably been a
23  combination of the legal, compliance, and
24  the DEA person.  I mean, you have to

Page 335

1   realize we weren't 700 people.  It was
2   fairly simple and quick access to get to
3   someone you needed.  They weren't very
4   far removed.
5       Q.   Looking at this chart, do
6   you believe that this accurately
7   represents what the decision tree would
8   have been at that time of October of
9   2012?
10      A.   Yes.  However, I will go on
11  record stating that the indirect process
12  was something new.  Like I said, even the
13  DEA said I don't think anybody else was
14  doing it.  We were cutting edge.  It was
15  new.  And if we had continued this
16  process here, I'm sure it would have
17  changed five times.
18      So to answer your question,
19  this reflects it as you see it as of this
20  time.  Yeah.
21      Q.   Was the indirect suspicious
22  order monitoring process ever implemented
23  at Actavis prior to the Watson
24  acquisition?

Page 336

1       A.   Yes.
2       Q.   Okay.  During that time from
3   the time of implementation until the
4   Watson acquisition, did you ever deem a
5   customer to be of interest?
6       A.   That's the same answer as
7   before.  I don't recall.  I feel like
8   there may have been one.  There could
9   have been more.  But I don't remember.
10      Q.   Okay.  I'm going to go, just
11  very quickly, to -- well, actually, I can
12  just ask generally.  This presentation
13  was a presentation that you gave to
14  AmerisourceBergen; is that correct?
15      A.   I believe.  I lost track of
16  where we're at.
17      Q.   Look at the title pages.
18      A.   Yes, yes.
19      Q.   Look at the title pages.
20  6382.
21      Do you recall what you
22  discussed at that presentation?
23      A.   The primary focus of that
24  meeting was engaging in dialogue and

1    coming across strong but not harsh
2    because they weren't the enemy.  We had
3    no reason to believe they weren't
4    supported.  We were coming across to give
5    our message on, listen, here's the
6    regulation as we understand it.  Make
7    sure we're on the same page.  Here's what
8    we're doing, and we expect your ongoing
9    support in the process.  It was -- it was
10   that kind of meeting.
11       Q.   During that meeting, did
12   they explain their suspicious order
13   monitoring process to you?
14       A.   If they did, it would have
15   been very minimal.  I don't believe that
16   was the purpose of this meeting, and
17   there was time for that.  You know, I
18   don't recall.  I don't think we got into
19   details at this meeting.
20       Q.   Sitting here now, are you
21   aware of what AmerisourceBergen's
22   suspicious order monitoring process was
23   as of October 2012?
24       A.   Sitting here now, I can't

1    speak a lot to it because I transitioned
2    out of that role very quickly after this,
3    and it became removed from my
4    responsibilities, so...
5        Q.   Were you aware as of
6    October 2012 of what AmerisourceBergen's
7    SOM policies and procedures were?
8        A.   I believe that's the same
9    question.  I don't know their specific
10   policies.  We know they had a process,
11   but my answer is the same as before.
12       Q.   So -- so my question is
13   actually just, were you aware of their
14   process at that time.  I'm not asking
15   what the process was, I just want to know
16   if you were aware of it in October 2012.
17       A.   No.  Was I aware of it in
18   detail, no.
19       Q.   Okay.  So we're going to go
20   to another exhibit now.
21           MS. ANTULLIS:  I promise
22       it's Number 42.
23           (Document marked for
24       identification as Exhibit

1    Baran-13.)
2            MS. ANTULLIS:  Okay.  So
3        this is supposed to be Exhibit 13?
4            MR. LOVRIEN:  Yes.
5            MS. ANTULLIS:  And it's
6        ALLERGAN_MDL_01796473.
7            THE WITNESS:  Thank you.
8    BY MS. ANTULLIS:
9        Q.   I apologize.  This chart is
10   incredibly tiny.
11       A.   That's okay.
12       Q.   I don't actually have
13   questions about the chart though.
14       A.   Yeah, that's okay.  I mean I
15   know what the concept of what it was and
16   what the purpose was for it, so...
17       Q.   So then do you recognize
18   that chart?
19       A.   Yes.
20       Q.   Do you recognize this
21   e-mail, e-mail chain?
22       A.   Yes.
23       Q.   Do you remember sending the
24   top e-mail?

1        A.   I didn't read it yet.  I'm
2    sorry.  Okay.
3        Q.   Okay.  So the -- this e-mail
4    references suspicious order letters.  Can
5    you please explain to me what the
6    suspicious order letters were?
7        A.   To clarify, they were not
8    suspicious order letters.
9        Q.   Okay.  Can you look at
10   the --
11       A.   Yeah.
12       Q.   -- the subject of the
13   e-mail.  It says suspicious order
14   letters/update.
15       A.   Yeah, so it's -- suspicious
16   order letters may be misleading so I'll
17   explain what it was.  We sent our
18   customers a letter outlining the
19   expectations of our relationship and what
20   we expected of them.  And it was -- it
21   was a compliance agreement more than
22   anything else.  And we asked for them to
23   sign off on the fact they were agreeing,
24   agreeing to what we were expecting.

Page 341

1    Basically that's the only way I can
2    explain it.
3        Q.    And what were the
4    expectations that you outlined in that
5    letter?
6        A.    Following the -- the letter
7    of the regulations.  I mean it was as
8    simple as that.
9        Q.    So why did you send your
10   customers a -- a letter asking them to
11   follow the regulations?
12       A.    This was part of our "know
13   your customer" initiative.
14       Q.    Okay.  Were those letters
15   then sent out to all of your customers?
16       A.    Yes.  That were buying
17   control drugs.
18       Q.    Okay.  And how do you define
19   customer in the context of these letters?
20       A.    Anyone that we personally
21   were distributing to.
22       Q.    So who would that be?
23       A.    A whole list of --
24       Q.    Would that be -- would that

Page 342

1    be wholesalers?
2        A.    Yes.
3        Q.    Would that be distributors?
4        A.    Yes.
5        Q.    Would that be pharmacies?
6        A.    No.
7        Q.    Would it be prescribers or
8    patients?
9        A.    No.
10       Q.    So how many wholesaler
11   customers did you have as of 2012, did
12   Actavis have as of 2012?
13       A.    I don't recall the number.
14       Q.    Do you recall approximately?
15       A.    No.  I know our customer mix
16   never changed much, but I don't know a
17   number to give you.
18       Q.    Do you recall if it was more
19   than 100?
20       A.    I don't know a number.
21       Q.    All right.
22       A.    I mean --
23       Q.    Okay.
24       A.    It would be pretty easy to

Page 343

1    find that out.  But no, I don't have a
2    number to give.
3        Q.    Okay.  So let's read the --
4    the e-mail.  It says, "I think we should
5    come up with a plan as to how we will
6    follow up with these customers.  30
7    customers out of 48 that we're selling
8    controlled drugs to is not" --
9    "controlled drugs is not a great response
10   rate."
11              What response rate are
12   you -- are you talking about in that
13   e-mail?
14       A.    The documents being returned
15   back to us signed.
16       Q.    Okay.  So are you expressing
17   concern in this e-mail that customers are
18   not -- certain customers are not
19   returning the documents signed?
20       A.    Not as quickly as we would
21   have liked.  So we were following up.
22       Q.    Okay.  And then it says that
23   "two out of three of our top wholesalers
24   have not even responded," and in

Page 344

1    parentheses it says ABC and McKesson.
2              And then it says, "Our
3    largest chains, Walgreens and Walmart,
4    have not responded."
5              Do you see that?
6        A.    Yes.
7        Q.    Okay.  Did ABC ever respond
8    with the letter signed?
9        A.    I don't recall who
10   ultimately signed.  And then shortly
11   after this, as you can read in the
12   e-mail, I was transitioning and this role
13   was no longer mine.  And -- and I think
14   it even says it in here somewhere, that I
15   was looking to hand it over as clean and
16   as diligent as possible.  What would have
17   happened after that would not be for me
18   to know.
19       Q.    Do you recall when you
20   handed it over to the next person who
21   took over responsibility for this role,
22   whether the record was clean as you put
23   it?
24       A.    It was as clean as we got it

Page 345

1    by that point, but I don't know to what
2    extent, if it looked like this, or
3    something else.
4         Q.   Do you remember if there was
5    still outstanding letters that had not
6    been returned at that time?
7         A.   There may have been.  I
8    don't recall exactly.
9         Q.   Do you recall whether
10   McKesson ever sent -- returned a signed
11   letter?
12        A.   I don't recall.  I would
13   like to -- I have something to say on the
14   topic if I can shed some light.
15        Q.   Let me ask just two
16   questions that are related, and then you
17   can -- you can do that.
18        A.   Okay.
19        Q.   Was -- did Walgreens ever
20   return a signed letter to your knowledge?
21        A.   I have no way of remembering
22   or knowing that.  I don't -- don't --
23   know.
24        Q.   Did Walmart ever returned a

Page 346

1    signed letter to your knowledge?
2         A.   Same -- same answer.
3         Q.   Go ahead.
4         A.   So I guess the very simple
5    way I would describe this without making
6    our transcript 900 pages, and this is
7    just my opinion, it doesn't mean it's
8    fact, but, you know, even after our
9    meeting with the DEA, and having them
10   hear what our initiatives were on the
11   indirect side and how we were engaging in
12   all these -- all of these "know your
13   customer" activities, to make sure that,
14   You know, our partnership with companies,
15   we were both doing what we should be, and
16   we were -- we were held accountable in
17   protecting the integrity of the supply
18   chain and preventing diversion.  I mean
19   that's what we were there to do.
20        But when -- when I told you
21   earlier we left that meeting with the
22   impression like wow, here's -- I don't
23   think anybody -- I can't say for certain,
24   but I don't think anybody was doing this

Page 347

1    yet.
2         So I know I took a long
3    route to get there, but what I'm telling
4    you is, I don't think, in my opinion,
5    these wholesalers or Walmart or whomever
6    else you just mentioned, were
7    nonresponsive because they didn't want to
8    agree to what we were asking to, I think
9    it was like wow, you know, we -- we hold
10   our customers to signing off on
11   agreements, but we've never had a
12   manufacturer do that to us.  So it was
13   probably something new.  And as you can
14   imagine, when something is new, it
15   probably gets picked up and someone is
16   like, well, I don't know, who in the
17   organization should sign that.  And then
18   it goes on the next person's desk, and
19   then it sits there on two weeks because
20   they are traveling.  I mean I imagine
21   that the slow response, in my best, most
22   professional opinion, is because, A, this
23   was new, it's something that these
24   organizations had to take, absorb.

Page 348

1         I remember some of them say
2    okay, great, but I have to review this by
3    my legal, you know.
4         So it was really more of a
5    combination of it being new than them
6    wanting to reject us and be
7    nonresponsive.
8         I can't speak for why they
9    wouldn't have signed it like, that week.
10   That's not for me to speak to.  But I can
11   speak to why some of the reasons I think
12   it took a little -- little bit longer
13   than we would have hoped.
14        Q.   Okay.  And do you have any
15   independent knowledge as to why McKesson,
16   AmerisourceBergen, Walgreens or Walmart
17   may have been slow in responding?
18        A.   I think that's -- I think
19   that's in that explanation I just gave,
20   you know.
21        Q.   Well, you prefaced your
22   explanation by saying it was an opinion.
23   I'm ask -- I'm asking if you have any
24   independent knowledge.

Page 349

1    A.   My only knowledge would be
2  in -- in hearing back from them, some of
3  them said, you know, it's not like they
4  were like -- they never said we don't
5  want to sign this.  I never, ever heard
6  that.  It was well, it's with legal, or
7  it's with this person or it's with that
8  person.
9          But hopefully that answers
10 your question.
11   Q.   Did you ever contact anyone
12 at any of those four entities to ask
13 them, to inquire about the status of
14 the -- the letter?
15   A.   Me personally?  Or did --
16 did we?  I'm not sure where that ended
17 up.
18   Q.   Did you personally?
19   A.   I -- I don't recall for
20 sure.
21   Q.   Did you request that anybody
22 else in your department follow up with
23 one of those four listed customers
24 regarding the status of their letter?

Page 350

1    A.   Possible.  I don't recall.
2    Q.   Bear with me.
3          So you have testified that
4  your role changed when Watson acquired
5  Actavis; is that correct?
6    A.   Yes.
7    Q.   And you testified previously
8  that part of that role change was the
9  elimination of suspicious order
10 monitoring responsibilities from your --
11 your duties; is that correct?
12   A.   I -- based on my earlier
13 testimony, the way I described it was
14 ownership and managing that process was
15 to take and -- and move to a department
16 called DEA affairs.
17         But what I did mention in my
18 earlier testimony, I'm almost positive,
19 was that it didn't remove me entirely
20 from involvement.  If they had questions,
21 they would come to us and we were now --
22 we were now a support group.
23   Q.   And were you responsible for
24 investigating orders of interest when

Page 351

1  they were discovered --
2    A.   No.
3    Q.   -- at Watson?
4    A.   No.  We were not responsible
5  for the investigation.  We were
6  responsible for -- the investigation they
7  were doing, if they needed our
8  assistance, that was our responsibility.
9    Q.   What kind of assistance
10 would you provide?
11   A.   Anything -- anything that
12 would be asked of us to look into, you
13 know, if a customer is new, you know, who
14 are they?  Do we know who they are?  Do
15 we have a contract with them?  Anything
16 that would be asked of us.
17   Q.   Do you recall what -- was
18 there an SOP post-Watson that addressed
19 suspicious order monitoring activity?
20   A.   Oh, yeah.  Absolutely.
21   Q.   Do you recall what that
22 document would have been called?
23   A.   No.  No, I don't.
24   Q.   Do you recall what the

Page 352

1  procedures and policies were generally?
2    A.   Generally, it was
3  accomplishing the same objectives.  But I
4  can't speak any further to the policy.  I
5  was not the author.
6    Q.   I'm going to introduce
7  another document that may refresh your
8  recollection.  Let's see.
9          MS. ANTULLIS:  It is Tab 46.
10 It's going to be Exhibit 15 (sic).
11 ALLERGAN_MDL_02466960.
12         (Document marked for
13 identification as Exhibit
14 Baran-14.)
15         MR. LOVRIEN:  Did you say
16 that was 14?
17         MR. DEARMAN:  14.
18         MS. ANTULLIS:  Oh, it's 14.
19         MR. LOVRIEN:  It is 14.
20         MS. ANTULLIS:  You got the
21 sticker on me before I saw it
22 happen.
23 BY MS. ANTULLIS:
24   Q.   All right.  So I'll give you

Page 353

1    a chance to go through this for a minute.
2    I want to direct your attention first to
3    Page 4, the bottom of the document.
4        A.    Okay.
5        Q.    So this appears to be an
6    e-mail from you to Mary Woods, Sandra
7    Simmons, and Victoria Lepore.  Sorry if
8    I'm butchering her name.
9        A.    No, you're good.
10        Q.    And the subject is "SOMs."
11    Go to this e-mail -- first of all, is
12    this an e-mail that you would have sent
13    in the ordinary course of business?
14        A.    Sure.
15        Q.    It says, "Can someone please
16    send me copies of any relevant documents
17    speaking to our SOMs programs?  I'm
18    meeting with Teva.  I need to speak
19    accurately to all of this."
20        Do you remember making that
21    request?
22        A.    I don't remember.  But it
23    doesn't surprise me.
24        Q.    So what follows then from

Page 354

1    Victoria Lepore is what appears to be
2    written policy of some sort regarding
3    suspicious orders.  Please look at it and
4    tell me if this reflects your
5    understanding of what post-Watson SOM
6    activities entailed.
7        A.    So I can't do that unless I
8    read this entire document.  Because
9    there's a lot of information here.  We
10    can do one of two things.  I can tell you
11    that if they're sending this to me, this
12    is the process coming from the owners.
13    So I imagine -- I have no reason to
14    believe it wouldn't be.  But if you want
15    me to sit and say this is everything that
16    I know -- first of all, I didn't know a
17    lot, because it wasn't my area.
18        Q.    So, yeah, I think my
19    question is more, as of January 6, 2016,
20    would this have been -- would this have
21    been the policy then specific to Allergan
22    PLC?
23        A.    I would imagine so.  But I
24    would rather that answer come from the

Page 355

1    group that managed it at that time.
2        Q.    So you don't know then; is
3    that correct?
4        A.    Yeah, I mean, first of all,
5    I would have to read through all that
6    horrendous long e-mail.  I can speculate
7    with very good certainty as to why I may
8    have been asking.
9        We had an introductory
10    meeting, just really high level, hey,
11    here -- you know, here's my name, and
12    here's what I did at Actavis, kind of
13    thing.  And I tend to be the type that
14    likes to drill in details and understand.
15    And I was probably educating myself so
16    that I didn't look like an idiot, you
17    know, in terms of that process.  I was
18    probably just doing my homework is why I
19    was asking, because I wouldn't be asking
20    because I owned it, because I didn't own
21    the process.
22        Q.    Understood.
23        A.    Hopefully that answers your
24    question.

Page 356

1        Q.    Well enough.  Thank you.
2    Okay.  To your knowledge, did Actavis
3    make any public statements related to --
4    any public statements related to its duty
5    to report suspicious orders?
6        A.    I'm sorry.  I was
7    daydreaming for a moment.  Can you repeat
8    that?
9        Q.    It's getting late in the
10    day.  Did Actavis make any public
11    statements related to its duty to report
12    suspicious orders?
13        A.    So you're saying Actavis in
14    what time period?
15        Q.    I'm using Actavis to refer
16    to the entity that you worked for from
17    2008 through 2017.
18        A.    Okay.  So we're back --
19        Q.    2008 through 2017.
20        A.    Okay.  So --
21        Q.    I can ask specifically about
22    every company if you'd like.
23        A.    It's okay.  I don't know how
24    you would define a public statement, so I

Page 357

1    don't know.  What would be consistent of
2    a public statement?  Do we have a
3    billboard?  I mean, I don't know.  Help
4    me with that.
5        Q.   I will help you with that.
6    We've got another document.  It's
7    Exhibit 45.
8            MS. ANTULLIS:  Exhibit
9        Number 15.
10           ACQUIRED_ACTAVIS_02236096.
11           (Document marked for
12       identification as Exhibit
13       Baran-15.)
14   BY MS. ANTULLIS:
15       Q.   Do you recognize this e-mail
16   exchange?
17       A.   I -- I do now.  But it's
18   something I totally forgot about.
19       Q.   Okay.
20       A.   But I'd have to read it to
21   remember what the details were.
22       Q.   But you recognize it?
23       A.   Based on the person that
24   sent it, yeah.

Page 358

1        Q.   Okay.  And do you recognize
2    the attachment?
3        A.   Yes.
4        Q.   Okay.  So please go ahead
5    and read through the e-mail exchange.
6        A.   Okay.  So I haven't read the
7    entire letter in the back.  But I get the
8    gist of what it was doing at the time.
9        Q.   And I don't have specific
10   questions about the letter.
11       A.   Okay.
12       Q.   What I would like to know is
13   whether or not -- do you know whether or
14   not this campaign was ever implemented?
15       A.   Yes.
16       Q.   Okay.  Was this campaign
17   ever implemented?
18       A.   Yes, it was.
19       Q.   And how was it implemented?
20       A.   I wasn't involved with the
21   implementation, so I don't have the
22   details.  But I recall some aspects of
23   it.
24       Q.   Okay.  So I'm just going to

Page 359

1    ask you a few questions, and then we're
2    going to take a break and then we might
3    be close to finishing.
4            So do you know whether or
5    not Actavis belonged to the -- certain
6    trade organizations, any trade
7    organizations?
8        A.   It depends.  Do you define
9    that trade organization like HDMA or
10   NACDS?  That's a trade organization.
11       Q.   So do you know if Actavis
12   ever belonged to the Healthcare
13   Distribution Alliance?
14       A.   I'm not familiar with that.
15   So I don't know.
16       Q.   Okay.  If I called it the
17   HDA, would that make more sense?  Do you
18   know if Actavis ever --
19       A.   HDMA, but not HDA.
20       Q.   So we'll go with the
21   Healthcare Distribution Management
22   Association.  Do you know if Allergan
23   ever belonged to the HDMA?
24       A.   I don't know how HDMA works,

Page 360

1    if it's -- a corporation belongs to it or
2    if individuals belong to it.  I know that
3    I was not a personal member.  But I know
4    that there were employees who were.
5        Q.   Do you recall ever
6    participating in any webinars or any
7    other meetings related to the HDMA?
8        A.   We had a conference, like an
9    HDMA conference.
10       Q.   Do you recall a specific
11   conference that you attended?
12       A.   No, it was just like a
13   meeting where you meet with your
14   customers.  And from what I remember, I
15   think that was the one I mentioned
16   earlier.  I think I only went once.  It
17   was kind of like speed dating.
18           You know, it's just a chance
19   where all your customers are in one place
20   at the same time, and you have many
21   meetings.  It's not like you're there to
22   achieve any major objectives.  It's more
23   like get together, hey, what are the big
24   subjects, how are things going.

Page 361

1      They -- they joked and they
2  referred to it as speed dating.  I don't
3  know much more about HDMA than that.
4  Sorry.
5      Q.   You don't have to apologize.
6      Did you ever give a
7  presentation regarding suspicious order
8  monitoring issues to a conference?
9      A.   To a conference?  No, I
10  don't believe so.  I've only been to a
11  few conferences and they wouldn't have
12  been something that I presented.
13      Q.   Have you ever authored any
14  articles regarding suspicious order
15  monitoring?
16      A.   Articles, no.
17      Q.   Have you ever participated
18  on any panels regarding suspicious order
19  monitoring?
20      A.   No.
21      Q.   As part of your meetings
22  with AmerisourceBergen, Cardinal and
23  McKesson, following the September 2012
24  DEA conference, did you enter into any

Page 362

1  agreements with them regarding the duty
2  to prevent diversion?
3      A.   There were no agreements on
4  that topic that I'm aware of, no.
5      MS. ANTULLIS:  I think we're
6  going to go off the record now and
7  take a break.
8      THE VIDEOGRAPHER:  The time
9  is 4:28 p.m.  Off the record.
10      (Short break.)
11      THE VIDEOGRAPHER:  We are
12  back on the record.  The time is
13  4:40 p.m.
14  BY MS. ANTULLIS:
15      Q.   All right.  So I just have a
16  couple of follow-up questions for you,
17  and I will be done.
18      First question is, during
19  any of the breaks that we've taken today
20  have you discussed your testimony that
21  you've given with your attorneys?
22      A.   Not more than, you know,
23  you're doing a great job, you know, very
24  basic like that.  This is my first

Page 363

1  experience, so...
2      THE VIDEOGRAPHER:  Your
3  microphone is not on.
4      MS. ANTULLIS:  So sorry.
5  BY MS. ANTULLIS:
6      Q.   I just want to make sure I'm
7  understanding prior testimony.  So I'm
8  going to ask again -- and I apologize if
9  it seems repetitive.  Would there be a
10  record of every investigation you
11  performed of an order of interest?
12      A.   Yes.  But those records --
13  well let me step back.
14      Really, two different time
15  periods.  Which time period are you
16  referring to?
17      Q.   What are the two different
18  time periods?
19      A.   The original -- the original
20  process and the enhanced process.
21      Q.   Okay.  So is the original
22  process the process that was in place
23  from 2008 when you started and before and
24  through 2011?

Page 364

1      A.   Correct.
2      Q.   So for that original
3  process, would there be a record of every
4  investigation that you performed
5  regarding an order of interest?
6      A.   I really can't say if those
7  would even exist anymore.  I don't -- I
8  don't know.
9      Q.   So would you have created a
10  record of every investigation you
11  performed on an order of interest?
12      A.   Created, yes.  Existing
13  today, is what I thought the question
14  was.
15      Q.   Just whether -- whether it
16  existed -- whether you ever created one,
17  is the question I asked.
18      A.   Existed, yes.
19      Q.   Okay.  And for the second
20  time period, I presume is from 2011
21  through the Watson acquisition; is that
22  correct?
23      A.   Correct.
24      Q.   Okay.  So would there be a

1    record of every investigation you
2    performed on an order of interest during
3    the second time period?
4         A.   Yes.
5         MS. ANTULLIS:  Okay.  I'm
6    going to introduce.  Exhibit
7    Number -- what is it?  It's Tab
8    29.
9         MR. DEARMAN:  16.
10        MS. ANTULLIS:  16.  Exhibit
11   Number 16.
12        MR. DEARMAN:  Not doing my
13   job, am I?
14        MS. ANTULLIS:  Thank you.
15        (Document marked for
16   identification as Exhibit
17   Baran-16.)
18        MS. ANTULLIS:  It's
19   ACQUIRED_ACTAVIS_00667194.
20   29, my friend.  29.
21   BY MS. ANTULLIS:
22        Q.   It is a very short e-mail.
23        A.   Okay.
24        Q.   Okay.  So in the first

1    e-mail in this chain, you appear to be
2    discussing new business taken on by
3    McKesson, correct?
4         A.   Yes.
5         Q.   Which includes oxy
6    50 milligrams and 30 milligrams,
7    oxymorphone, et cetera.
8         A.   Yes.
9         Q.   You state, "I believe this
10   to be the business ABC was losing."
11        Was ABC AmerisourceBergen?
12        A.   Correct.
13        Q.   And do you remember what
14   business they were losing at that time?
15        A.   My recollection has -- and I
16   would never have remembered the customer
17   name, but it's here in writing, so that's
18   helpful, is ABC had done some due
19   diligence and had made a decision for
20   whatever reason that I can't speak to,
21   that they -- they were cutting off Topco.
22        And the reason that it came
23   across our desk is Topco then must have
24   went elsewhere to purchase what they

1    weren't getting from another wholesaler.
2         Q.   So how did you know that ABC
3    lost that -- for lack of a better word,
4    lost that business?
5         A.   It must have -- I can't say
6    for certain what the conversation was and
7    how it was communicated.  It must
8    have been communicated some way.  Because
9    it may have been quantities that would
10   have impacted their overall forecast.  So
11   they probably would have told us that,
12   hey, you know, we've shed a customer for
13   whatever reason.  You may not even have
14   known.  So our monthly usage on products
15   X, Y, and Z are going to go from this to
16   this.  And that's how it could have gone.
17   I can't put myself back in that moment in
18   time.  But that's how I would envision it
19   would have gone down.
20        Q.   So then -- then you say,
21   "The problem doesn't go away.  It just
22   shifts."
23        A.   Yes.
24        Q.   What problem are you

1    referring to in that -- in that sentence?
2         A.   The problem I would describe
3    is, you know, at the end of the day,
4    we're all in this together.  We all have
5    the same objectives.  But it's one thing
6    for a manufacturer to be communicating
7    with one of its customers, let's just say
8    a wholesaler, because they do business
9    together.  But, you know, is it realistic
10   to say -- I don't know.  I think you'd
11   have to ask a wholesaler.  If a
12   wholesaler makes a decision for whatever
13   reason not to sell to someone, maybe they
14   are just not comfortable in what their
15   warehouses look like.  I don't know.
16   Would they share that across the supply
17   chain so that all other wholesalers would
18   be in on it?  Highly, highly doubtful.
19   They're -- they're not working across one
20   another.
21        So the purpose of this
22   e-mail was, like, look, what we think
23   this customer deemed is a problem,
24   whatever their problem was, you know, we

Page 369

1  may need to somehow get some information
2  to McKesson, because McKesson may be
3  taking on something that they may not
4  wish to, and they may not be aware.
5      Q.    Okay.  So I want to make
6  sure I understand your testimony.  I
7  asked you what problem meant, the word
8  "problem" in the context, this sentence.
9      A.    Problem.
10     Q.    Is it your testimony that
11  the problem is whatever problem
12  Cardinal -- ABC had with this customer?
13     A.    No.  My definition of
14  problem would have been, you know,
15  information sharing from one competitor
16  to another.
17     Q.    Okay.  So then, do you
18  believe that this sentence saying, "This
19  problem doesn't go away.  It just
20  shifts," is related to the sharing of
21  information?
22     A.    Yeah.  I mean one customer
23  makes a determination for whatever logic
24  and due diligence they use to come up

Page 370

1  with it, and it -- you know, the customer
2  now is going to go elsewhere, and it
3  shifts the problem, and then you hope
4  that the next customer's due diligence is
5  just as sufficient to make the same
6  informed decision.
7          And I'm sure, I have no
8  reason to believe McKesson, you know, may
9  have ended up in that same direction, but
10  maybe not initially.  Maybe they wouldn't
11  have had --
12     Q.    So my --
13     A.    -- the information.
14     Q.    I don't actually think that
15  we're all that far apart from
16  understanding each other.
17     A.    Okay.
18     Q.    I don't.  And maybe my
19  questions are just not clear.
20          I'm just trying -- when you
21  say, "The problem doesn't just go away.
22  It just shifts," I'm trying to understand
23  what the word "problem" means.  And so
24  you explained it as the failure to

Page 371

1  properly communicate across entities,
2  right?  And you've also, in the context
3  of your sentences, explained it as the
4  problem at Topco, whatever that problem
5  was with that customer.
6          I'm trying to understand
7  what the correct definition of the word
8  is in this context that you were using.
9      A.    I'll try to explain that
10  better, hopefully.  If there's something
11  in the due diligence, and whatever that
12  may have been, that made a wholesaler
13  uncomfortable to supply for whatever
14  reason -- like I said, it could be that
15  they didn't like the way their warehouse
16  looked, or they didn't like the size of
17  their vault.  I don't know.  I can't
18  speak to the background.
19          But the problem is, is that
20  that's great, someone in their due
21  diligence made a decision that they don't
22  want this customer to get whatever the
23  product is.  But the problem shifts now,
24  because just like a patient that can't

Page 372

1  get a drug at one pharmacy, do you think
2  they give up?  They're going to go to
3  another one.
4          It's probably the same for
5  customers.  So that's kind of how I'm
6  loosely using the word.  The problem
7  doesn't shift.  You know -- they're
8  moving from one to another.
9      Q.    I think I understand well
10  enough.
11     A.    Does that make sense?
12     Q.    It does.  So the next
13  sentence you say, "This is where refusing
14  chargebacks may eventually need to come
15  in."
16          Earlier you testified in
17  your role in customer service, you didn't
18  have much, if anything, to do with
19  chargebacks; is that correct?
20     A.    Yeah, I -- that's correct.
21     Q.    Okay.  So in -- in this
22  sentence here where you say, "This is
23  where refusing chargebacks may eventually
24  need to come in," what did you mean?

Page 373

1      A.   So I did not administer.  It
2   was not my role.  But that was somebody's
3   concept at the time, I don't recall who,
4   of a reassurance to make sure, if there's
5   a customer out there we don't want buying
6   a certain product, and it could be any
7   product, even a noncontrol, a pretty easy
8   way of -- of administering that is cut
9   off chargebacks, because then the
10  wholesalers won't -- won't get paid and
11  then they'll -- they won't do business.
12  And that's how they will find out
13  something that maybe they didn't know,
14  You know.  I don't know.  I can't speak
15  to that concept, it wasn't mine, the
16  idea.  But it was a concept that existed
17  as a way of, you know, so we don't have
18  to be looking over our shoulder and
19  making sure we're catching this every
20  moment.  It was a foolproof of trying to
21  say, hey, this is one way to make sure
22  that they don't move to somebody else.
23      Q.   Do you remember if -- if
24  chargebacks were eventually refused to --

Page 374

1      A.   To anybody?
2      Q.   -- to anybody?
3      A.   It wouldn't be impossible or
4   unlikely, but not specifically that I'm
5   aware of.
6      Q.   Okay.  So I've just got one
7   more document and we're done.
8           MS. ANTULLIS:  It is Tab 21.
9           MR. DEARMAN:  17.
10          MS. ANTULLIS:  Exhibit 17 is
11  ACQUIRED_ACTAVIS_01370513.
12          (Document marked for
13  identification as Exhibit
14  Baran-17.)
15  BY MS. ANTULLIS:
16      Q.   So the first e-mail starts
17  on the second to last page I believe.
18  Third to last page.  It starts with,
19  "Good morning, Nancy."
20      A.   Okay.  So I've read the
21  initial e-mail to get a glean on what
22  this is about.  And if you have a lot of
23  questions, then I would want to read the
24  rest.  But maybe tell me what your

Page 375

1   question is first to save us all time.
2      Q.   Well, I have questions about
3   the context of that -- that beginning
4   e-mail.
5      A.   Oh.
6      Q.   I also want to know whether
7   the suggested program was ever
8   implemented.
9      A.   Okay.
10     Q.   I assume when I ask you that
11  question you're going to tell me you need
12  the rest -- to read the rest of the
13  e-mail.
14          So we can -- I can ask the
15  question and we can --
16     A.   No, I'm comfortable with
17  answering that question.
18     Q.   Okay.  All right.  So this
19  appears to be an e-mail from someone
20  named Robert Williamson with Cegedim.  Do
21  you remember him?
22     A.   Mm-hmm.  Yes, I do.
23     Q.   Okay.  Did you have frequent
24  communications with Robert Williamson?

Page 376

1      A.   I wouldn't call it frequent,
2   but he was like our partner with -- with
3   Cegedim and I believe, I'm almost
4   100 percent certain, he was the gentleman
5   that went with me to McKesson.  We were
6   doing this "know your customer" and --
7   and implementing this visit our customers
8   and roll out our project, tell, them, you
9   know, what we're doing, what our
10  expectations were.
11          And we had an opportunity to
12  hire someone to help us have all these
13  conversations meaning bringing an expert
14  with us in every single customer
15  conversation.  We're doing like a
16  train-the-trainer.  You know, help make
17  sure that I have the expertise I need to
18  be leading these discussions.  And that's
19  what his role was.
20     Q.   And so did a representative
21  of Cegedim come with you on your site
22  visit to Cardinal Health?
23     A.   I --
24     Q.   To any site visit to

Page 377

```
 1   Cardinal Health.
 2        A.   I can't be certain.  I think
 3   the only one may have been McKesson that
 4   I recall.
 5        Q.   Okay.  Okay.  So first of
 6   all, who is Paul Hamby?
 7        A.   He is just one of the bosses
 8   at -- at Cegedim.
 9        Q.   And Jonathan Kuhn?
10        A.   Jonathan Kuhn is the Ph.D.,
11   statistical guy, that wrote the
12   algorithms to our new model.
13        Q.   Who is Jason Owen?
14        A.   I don't know who he is.
15        Q.   Okay.  Before we look at the
16   context -- look at this document in
17   particular, you mentioned the algorithm
18   that Cegedim wrote.  Was that algorithm
19   written for your direct SOM?
20        A.   Yes.
21        Q.   Did they write an algorithm
22   for your indirect SOM?
23        A.   That's what this e-mail is
24   pertaining to.  They wanted to.
```

Page 378

```
 1        Q.   Were they ever hired to
 2   write an algorithm for your indirect SOM?
 3        A.   No.  They -- they heard of
 4   our great concept and loved what we were
 5   doing and they wanted to get in on it.
 6        Q.   Have you -- are you able to
 7   discuss the algorithm for the direct SOM?
 8   I'm not asking you to do so.  I'm just,
 9   are you able to?
10        A.   Very high level.  I can't
11   tell you mathematically and statistically
12   how it was designed.
13        Q.   Okay.  Who would be able to
14   do that?
15        A.   In terms of the actual
16   algorithm?  The only one that I'm aware
17   of would that be the one that wrote it.
18        Q.   And would that be Jonathan
19   Kuhn?
20        A.   Yeah, he's the expert.
21        Q.   So in this e-mail, as you
22   said, they are approaching you with an
23   idea for an indirect SOM algorithm or
24   process, right.
```

Page 379

```
 1        And Robert says, "I've been
 2   meaning to discuss with you the use of
 3   Actavis chargeback data in conjunction
 4   with the SOM program."
 5        He says, "From the outset I,
 6   we, Jonathan and I, have been intrigued
 7   by the so-called chargeback data.  From
 8   what we were able to glean during our
 9   on-site SOM discussions and with some
10   peripheral follow-up with other clients,
11   this data shows what Actavis products are
12   purchased from Actavis' customers'
13   customers."
14        A.   Mm-hmm.  Correct.
15        Q.   Is it your understanding
16   that Actavis -- that chargeback data
17   maintained by Actavis showed what Actavis
18   products were purchased from Actavis'
19   customers' customers?
20        A.   That area is a little grey
21   to me when you start talking about
22   chargebacks.  All I know, it was the data
23   that we were getting from the ValueTrak
24   system.  And what those feeds were coming
```

Page 380

```
 1   in, Rachelle Galant would be a very good
 2   person to ask to.  I would just be
 3   sitting here struggling.
 4        Q.   Okay.
 5        (Discussion off the record.)
 6            - - -
 7        EXAMINATION
 8            - - -
 9   BY MR. DEARMAN:
10        Q.   One question.
11        Would you be surprised to
12   hear that the data that was available was
13   prescriber level?
14        MS. LEVY:  Object to the
15   form.
16        THE WITNESS:  Okay.  And I
17   can still answer it once I think
18   about what that question was?
19        Would I be surprised to hear
20   that the data -- give me the end
21   of that.
22   BY MR. DEARMAN:
23        Q.   Is down to the prescriber
24   level.
```

Page 381

1      A.   Prescriber level?  I have
2   never heard of data -- well, I'm sure
3   there's data at a prescriber level.
4   Where it is and how to get to it, I
5   don't -- I don't know.
6      Q.   And my question is would you
7   be surprised that --
8         MS. LEVY:  That was more
9      than one question, my friend.
10  BY MR. DEARMAN:
11     Q.   And -- and would you be
12  surprised to hear that Actavis had access
13  to that data if they wanted it?
14        MS. LEVY:  Object to form.
15        THE WITNESS:  I can't answer
16     that question, yeah.
17  BY MR. DEARMAN:
18     Q.   Because you don't know?
19     A.   Yeah, we didn't -- I don't
20  recall prescriber information being
21  discussed on the radar.  We -- we led off
22  a big initiative with the indirect piece.
23  As you can see by this e-mail, when these
24  consultants caught wind of what we were

Page 382

1   doing, they wanted in on it because it
2   would grow their business.  They had tons
3   of clients that probably want the same
4   thing.  We did not pursue that, to answer
5   your question.  We did it on our own.
6         MS. ANTULLIS:  I'm done.
7         MS. LEVY:  I do not have
8   anything further.
9         MS. ANTULLIS:  Are there
10  questions from anyone on the
11  phone?  Anybody hang in there.
12        THE VIDEOGRAPHER:  This
13  marks the end of today's
14  deposition.  The time is 5:00 p.m.
15  Off the record.
16     (Excused.)
17     (Deposition concluded at
18  approximately 5:00 p.m.)
19
20
21
22
23
24

Page 383

1
2               CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6   deposition is a true record of the
   testimony given by the witness.
7
       It was requested before
8   completion of the deposition that the
   witness, NANCY BARAN, have the
9   opportunity to read and sign the
   deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  December 14, 2018
16
17
18     (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 384

1          INSTRUCTIONS TO WITNESS
2
3         Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8         After doing so, please sign
9   the errata sheet and date it.
10        You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 385

```
 1        - - - - - -
         E R R A T A
 2        - - - - - -
 3
 4    PAGE  LINE  CHANGE
 5    ____ ____ _____
 6       REASON: _____
 7
 8       ____ ____ _____
 9       REASON: _____
10       ____ ____ _____
11       REASON: _____
12       ____ ____ _____
13       REASON: _____
14       ____ ____ _____
15       REASON: _____
16       ____ ____ _____
17       REASON: _____
18       ____ ____ _____
19       REASON: _____
20       ____ ____ _____
21       REASON: _____
22       ____ ____ _____
23       REASON: _____
24       ____ ____ _____
         REASON: _____
```

Page 386

```
 1
 2         ACKNOWLEDGMENT OF DEPONENT
 3
 4       I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 1 - 387, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16    NANCY BARAN                    DATE
17
18
19    Subscribed and sworn
      to before me this
20    ____ day of _____, 20____.
21    My commission expires:_____
22
      _____
23    Notary Public
24
```

Page 387

```
 1         LAWYER'S NOTES
 2    PAGE  LINE
 3    ____ ____ _____
 4    ____ ____ _____
 5    ____ ____ _____
 6    ____ ____ _____
 7    ____ ____ _____
 8    ____ ____ _____
 9    ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14    ____ ____ _____
15    ____ ____ _____
16    ____ ____ _____
17    ____ ____ _____
18    ____ ____ _____
19    ____ ____ _____
20    ____ ____ _____
21    ____ ____ _____
22    ____ ____ _____
23    ____ ____ _____
24    ____ ____ _____
```