Page 1

1              UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4            ~~~~~~~~~~~~~~~~~~~~~
5  IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
   OPIATE LITIGATION
6                             Case No.
                              17-md-2804
7

                              Judge Dan Aaron
8                             Polster
9  This document relates to:
10 The County of Cuyahoga v. Purdue Pharma, et
   al., Case No. 17-OP-45004
11
   City of Cleveland, Ohio v. Purdue Pharma L.P.,
12 et al., Case No. 18-OP-45132
13 The County of Summit, Ohio, et al. v. Purdue
   Pharma L.P., et al., Case No. 18-OP-45090
14
             ~~~~~~~~~~~~~~~~~~~~~
15
16

             Videotaped Deposition of
17                SHANE BARKER
18             November 28, 2018
                  9:03 a.m.
19
20                 Taken at:
21            Sheraton Suites Akron
          1989 Front Street - Summit Room
22            Cuyahoga Falls, Ohio
23
24
             Stephen J. DeBacco, RPR
25

Page 2

1  APPEARANCES:
2
3  On behalf of the City of Akron and Summit
   County:
4      Motley Rice LLC, by
       TOPE O  LEYIMU, ESQ
5      JAMES W  LEDLIE, ESQ
       28 Bridgeside Boulevard
6      Mt  Pleasant, South Carolina 29464
       (843) 216-9107
7      tleyimu@motleyrice com
       (843) 216-9252
8      jledlie@motleyrice com
9
10 On behalf of McKesson Corporation:
11     Covington & Burling LLP, by
       LAURA FLAHIVE WU, ESQ
12     One CityCenter
       850 Tenth Street, Northwest
13     Washington, D C  20001-4956
       (202) 662-5982
14     lflahivewu@cov com
15     -and-
16     Covington & Burling, LLP, by
       RUSSELL M  SQUIRE, ESQ
17     The New York Times Building
       620 Eighth Avenue
18     New York, New York 10018-1405
       (212) 841-1105
19     rsquire@cov com
20         ~ ~ ~ ~ ~
21
22
23
24
25

Page 3

1  APPEARANCES, Continued:
2
3  On behalf Endo Health Solutions, Inc ,
   and Endo Pharmaceuticals, Inc , and Par
4  Pharmaceuticals:
5      Arnold & Porter, by
       SAMUEL N  LONERGAN, ESQ
6      250 West 55th Street
       New York, New York 10019-9710
7      (212) 836-7591
       samuel lonergan@arnoldporter com
8
9  On behalf of AmerisourceBergen Drug
   Corporation:
10
       Jackson Kelly, PLLC, by
11     SANDRA K  ZERRUSEN, ESQ
       50 South Main Street, Suite 201
12     Akron, Ohio 44308
       (330) 252-9060
13     skzerrusen@jacksonkelly com
14
   On behalf of Cardinal Health:
15
       Porter Wright Morris & Arthur, LLP,
16     by
       SARA C  SCHIAVONE, ESQ
17     41 South High Street
       Suite 2800-3200
18     Columbus, Ohio 43215-6194
       (614) 227-1994
19     sschiavone@porterwright com
20
   On behalf of Prescription Supply, Inc
21
       Pelini, Campbell & Williams, LLC, by
22     WILLIAM M  SHACKELFORD, ESQ
       Bretton Commons - Suite 400
23     8040 Cleveland Avenue Northwest
       North Canton, Ohio 44720
24     (330) 305-6400, ext  145
       wms@pelini-law com
25         ~ ~ ~ ~ ~

Page 4

1  APPEARANCES, Continued:
2
3  On behalf of Walmart, Inc :
4      Jones Day, by
       KRISTIN S M  MORRISON, ESQ
       North Point
5      901 Lakeside Avenue
       Cleveland, Ohio 44114-1190
6      (216) 586-7375
       kmorrison@jonesday com
7
8  On behalf of Cephalon, Inc ; Teva
   Pharmaceuticals USA, Inc ; Actavis, LLC;
9  Actavis Pharma, Inc  f/k/a Watson Pharma,
   Inc ; and Watson Laboratories, Inc , via
10 teleconference:
11     Morgan, Lewis & Bockius LLP, by
       LILY G  BECKER, ESQ
12     1701 Market Street
       Philadelphia, PA 19103-2921
13     (215) 963-5055
       lily becker@morganlewis com
14         ~ ~ ~ ~ ~
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          TRANSCRIPT INDEX
2
3  APPEARANCES..............................    2
4
5  INDEX OF EXHIBITS .......................    6
6
7  EXAMINATION OF SHANE BARKER
8  By Ms. Wu.................................    16
9  By Mr. Squire............................    167
10 By Ms. Wu.................................    237
11 By Mr. Lonergan..........................    308
12 By Ms. Morrison..........................    337
13
14 REPORTER'S CERTIFICATE...................    359
15
16 EXHIBIT CUSTODY
17 EXHIBITS RETAINED BY THE COURT REPORTER
18
19
20
21
22
23
24
25

Page 6

1        INDEX OF EXHIBITS
2   NUMBER       DESCRIPTION      MARKED
3   Exhibit 1   Document Titled "Summit     98
              County Jail Operations
4              Advisory Commission Report
              and Recommendations,"
5              SUMMIT_001773045to 001773066
6   Exhibit 2   Article Titled "Summit      123
              County Jail Commission Digs
7              Into Use of Force, Deputy
              Hiring, Training, Inmate
8              Mental Health"
9   Exhibit 3   Document Titled "Prisoner    139
              Transfer by Location," Dated
10             3/27/2018, SUMMIT_001845330
11   Exhibit 4   1/6/2016 E-Mail Chain Re:    150
              Requesting Information on
12             Incident at Summit County
              Jail, SUMMIT_001848870 to
13             001848871
14   Exhibit 5   October 2016 E-Mail Chain   156
              Re: NSAIDs Blog - Dr Norman
15             Johns, With Attachment,
              SUMMIT_001850873
16
17   Exhibit 6   Document Titled "Summit    164
              County Sheriff's Office
              Summit County Jail - Policy
18             and Procedure,"
              SUMMIT_001850134 to
19             001850140
20   Exhibit 7   July 2015 E-Mail Chain Re:   170
              Ohio State Board of Pharmacy
21             - Terminal Distributor of
              Dangerous Drugs License,
22             with Attachment,
              SUMMIT_001856529 to
23             001856543
24
25

Page 7

1   Exhibit 8   November 2015 E-Mail Chain   178
              Re: MAT Patient,
2             SUMMIT_001848508 to
              001848510
3
    Exhibit 9   6/22/2016 E-Mail from Pamela   188
4             DeBartolo Re: Suboxone at
              Glenwood, SUMMIT_001849352
5
    Exhibit 10   December 2015 E-Mail Chain   194
6             Re: Methadone
              Treatment/Inmate Housing,
7             SUMMIT_001848779 to
              001848780
8
    Exhibit 11   3/29/2017 E-Mail Chain,    208
9             SUMMIT_001853693 to
              001853695
10
    Exhibit 12   6/29/2016 E-Mail from John   218
11            Pennell Re: 90 Unit Six,
              SUMMIT_001849446
12
    Exhibit 13   August 2016 E-Mail Chain,   228
13             SUMMIT_001850085 to
              001850086
14
    Exhibit 14   Summit County Sheriff's    261
15            Office 2003 Annual Report,
              SUMMIT_001128847 to
16             001128894
17   Exhibit 15   Summit County Sheriff's    264
              Office 2004 Annual Report,
18            SUMMIT_001128895 to
              001128940
19
    Exhibit 16   Summit County Sheriff's    267
20            Office 2016 Annual Report,
              SUMMIT_000342376 to
21             000342433
22   Exhibit 17   Summit County Sheriff's    276
              Office 2015 Annual Report,
23            SUMMIT_000342318 to
              000342375
24
25

Page 8

1   Exhibit 18   September/October 2017     280
              E-Mail Chain Re:  Issuing
2             Narcan to Inmates Upon
              Release, SUMMIT_001858599 to
3             001858600
4   Exhibit 19   March 2014 E-Mail Chain Re:   284
              Oriana E-Mail,
5             SUMMIT_001859672 to
              001859673
6
    Exhibit 20   2016 E-Mail Chain Re: Narcan   291
7            Kits, SUMMIT_001849991 to
              001849993
8
    Exhibit 21   County of Summit 2018     293
9            Operating Budget,
              SUMMIT_000008414 to
10             000008692
11   Exhibit 22   Summit County and City of   303
              Akron, Ohio Plaintiff's
12            First Amended Responses and
              Objections to Distributor
13            Defendants' Third Set of
              Interrogatories
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1       INDEX OF VIDEO OBJECTION
2   OBJECT           PAGE
3   object           22
   object           38
4   object           39
   object           41
5   object           45
   object           47
6   object           48
   object           49
7   object           51
   object           59
8   object           61
   objection        63
9   object           64
   object           64
10   object          68
   object           69
11   object          70
   object           71
12   object          72
   object           72
13   object          76
   object           76
14   object          77
   object           78
15   object          81
   object           81
16   object          82
   object           83
17   object          83
   object           91
18   object          91
   object           92
19   object          94
   object           95
20   object          96
   object           98
21   object          101
   object           102
22   object          102
   object           103
23   object          104
   object           104
24   object          105
   object           105
25   object          105

Veritext Legal Solutions
www.veritext.com                                         888-391-3376

Page 10

| | | |
|---|---|---|
| 1 | object | 105 |
| | object | 105 |
| 2 | object | 106 |
| | object | 108 |
| 3 | object | 108 |
| | object | 109 |
| 4 | object | 109 |
| | object | 110 |
| 5 | objection | 110 |
| | object | 110 |
| 6 | object | 110 |
| | object | 112 |
| 7 | object | 112 |
| | object | 113 |
| 8 | object | 114 |
| | object | 116 |
| 9 | object | 117 |
| | object | 119 |
| 10 | object | 119 |
| | object | 120 |
| 11 | object | 121 |
| | object | 122 |
| 12 | object | 125 |
| | object | 125 |
| 13 | object | 128 |
| | object | 129 |
| 14 | object | 129 |
| | object | 129 |
| 15 | object | 133 |
| | object | 134 |
| 16 | object | 134 |
| | object | 135 |
| 17 | object | 135 |
| | object | 136 |
| 18 | object | 137 |
| | object | 138 |
| 19 | object | 138 |
| | object | 139 |
| 20 | object | 141 |
| | object | 142 |
| 21 | object | 144 |
| | object | 145 |
| 22 | objection | 145 |
| | object | 146 |
| 23 | object | 147 |
| | object | 147 |
| 24 | object | 147 |
| | object | 149 |
| 25 | object | 152 |

Page 11

| | | |
|---|---|---|
| 1 | object | 153 |
| | object | 154 |
| 2 | object | 154 |
| | object | 155 |
| 3 | object | 156 |
| | object | 157 |
| 4 | objection | 157 |
| | object | 159 |
| 5 | object | 161 |
| | object | 161 |
| 6 | object | 162 |
| | object | 162 |
| 7 | object | 163 |
| | object | 167 |
| 8 | object | 169 |
| | object | 169 |
| 9 | object | 169 |
| | object | 173 |
| 10 | object | 173 |
| | object | 173 |
| 11 | object | 175 |
| | object | 175 |
| 12 | object | 175 |
| | object | 177 |
| 13 | object | 177 |
| | object | 178 |
| 14 | object | 180 |
| | object | 181 |
| 15 | objection | 181 |
| | object | 181 |
| 16 | objection | 182 |
| | object | 186 |
| 17 | object | 187 |
| | object | 187 |
| 18 | object | 188 |
| | object | 188 |
| 19 | object | 189 |
| | object | 190 |
| 20 | object | 191 |
| | object | 192 |
| 21 | object | 194 |
| | object | 196 |
| 22 | object | 198 |
| | object | 199 |
| 23 | object | 200 |
| | object | 201 |
| 24 | object | 201 |
| | object | 203 |
| 25 | object | 204 |

Page 12

| | | |
|---|---|---|
| 1 | object | 204 |
| | object | 205 |
| 2 | object | 205 |
| | object | 206 |
| 3 | object | 206 |
| | object | 208 |
| 4 | object | 211 |
| | object | 212 |
| 5 | object | 212 |
| | object | 213 |
| 6 | object | 213 |
| | object | 214 |
| 7 | object | 214 |
| | object | 215 |
| 8 | object | 215 |
| | object | 215 |
| 9 | object | 221 |
| | object | 222 |
| 10 | object | 224 |
| | object | 226 |
| 11 | object | 227 |
| | object | 230 |
| 12 | object | 230 |
| | object | 231 |
| 13 | object | 232 |
| | object | 232 |
| 14 | object | 236 |
| | object | 239 |
| 15 | object | 240 |
| | object | 241 |
| 16 | object | 241 |
| | object | 242 |
| 17 | object | 242 |
| | object | 243 |
| 18 | object | 243 |
| | object | 247 |
| 19 | object | 248 |
| | object | 249 |
| 20 | object | 250 |
| | object | 253 |
| 21 | object | 254 |
| | object | 256 |
| 22 | object | 257 |
| | object | 259 |
| 23 | object | 259 |
| | object | 261 |
| 24 | object | 263 |
| | object | 267 |
| 25 | object | 267 |

Page 13

| | | |
|---|---|---|
| 1 | object | 269 |
| | object | 275 |
| 2 | object | 275 |
| | object | 277 |
| 3 | object | 278 |
| | object | 278 |
| 4 | object | 279 |
| | object | 280 |
| 5 | object | 282 |
| | object | 283 |
| 6 | object | 283 |
| | object | 288 |
| 7 | object | 288 |
| | object | 290 |
| 8 | object | 291 |
| | object | 293 |
| 9 | object | 294 |
| | object | 295 |
| 10 | object | 296 |
| | object | 298 |
| 11 | object | 298 |
| | object | 299 |
| 12 | object | 300 |
| | object | 301 |
| 13 | object | 304 |
| | object | 306 |
| 14 | object | 306 |
| | object | 306 |
| 15 | object | 307 |
| | object | 307 |
| 16 | object | 307 |
| | object | 309 |
| 17 | object | 310 |
| | object | 310 |
| 18 | object | 311 |
| | object | 311 |
| 19 | object | 312 |
| | object | 313 |
| 20 | object | 314 |
| | object | 315 |
| 21 | object | 317 |
| | object | 317 |
| 22 | object | 317 |
| | object | 318 |
| 23 | object | 318 |
| | object | 318 |
| 24 | object | 318 |
| | object | 319 |
| 25 | object | 322 |

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 14

| | |
|---|---|
| 1 object | 323 |
| object | 323 |
| 2 object | 325 |
| object | 328 |
| 3 object | 328 |
| object | 328 |
| 4 object | 329 |
| object | 329 |
| 5 objection | 329 |
| move to strike | 330 |
| 6 object | 330 |
| objection | 332 |
| 7 object | 334 |
| object | 334 |
| 8 object | 334 |
| object | 335 |
| 9 object | 335 |
| object | 336 |
| 10 object | 338 |
| object | 338 |
| 11 object | 339 |
| object | 341 |
| 12 object | 347 |
| object | 347 |
| 13 object | 349 |
| object | 349 |
| 14 object | 350 |
| object | 350 |
| 15 object | 351 |
| object | 351 |
| 16 objection | 352 |
| object | 353 |
| 17 object | 355 |
| object | 356 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 15

1        THE VIDEOGRAPHER:  The date is
2 November 28, 2018.  We're on the record at
3 a.m.
4        This is the deposition of Shane
5 Barker in the matter of In Re:  National
6 Prescription Opiate Litigation, in the United
7 States District Court, Northern District of
8 Ohio, Eastern Division.
9        Will Counsel please state
10 appearances for the record.
11        MR. LEDLIE:  This is James Ledlie
12 on behalf of the City of Akron and Summit
13 County.
14        MS. LEYIMU:  Tope Leyimu on behalf
15 of City of Akron and Summit County.
16        MS. ZERRUSEN:  Sandra Zerrusen from
17 Jackson Kelly on behalf of AmerisourceBergen
18 Drug Corporation.
19        MS. SCHIAVONE:  Sara Schiavone,
20 from Porter Wright on behalf of Cardinal
21 Health.
22        MR. SHACKELFORD:  Bill Shackelford
23 with Pelini Campbell & Williams on behalf of
24 Prescription Supply, Inc.
25        MS. MORRISON:  Kristin Morrison of

Page 16

1 Jones Day on behalf of Walmart.
2        MR. LONERGAN:  Sam Lonergan with
3 Arnold & Porter Kaye Scholer on behalf of Endo
4 and Par.
5        MR. SQUIRE:  Russell Squire from
6 Covington & Burling on behalf of McKesson.
7        MS. WU:  Laura Flahive Wu, also of
8 Covington, on behalf of McKesson.
9        THE VIDEOGRAPHER:  Will counsel on
10 the phone please state appearances for the
11 record.
12        MS. BECKER:  Lily Becker of Morgan
13 Lewis on behalf of the Teva defendants.
14        THE VIDEOGRAPHER:  Will the court
15 reporter please swear in the witness.
16        SHANE BARKER, of lawful age, called for
17 examination as provided by the Federal Rules of
18 Civil Procedure, being by me first duly sworn,
19 as hereinafter certified, deposed and said as
20 follows:
21        EXAMINATION OF SHANE BARKER
22 BY MS. WU:
23    Q.   Good morning, Captain Barker.
24    A.   Good morning.
25    Q.   Could you please state your full

Page 17

1 name for the record?
2    A.   Captain Shane Barker.
3    Q.   And what is your home address?
4    A.   1048 East Twinsburg Road,
5 Macedonia, Ohio 44065.
6    Q.   Have you testified in a deposition
7 before?
8    A.   Yes.
9    Q.   On how many occasions?
10    A.   Twice before.
11    Q.   When were those depositions?
12    A.   Fifteen, twenty years ago.  Been a
13 long time.
14    Q.   What was the nature of the first of
15 those depositions?
16    A.   They were civil matters.
17    Q.   Did they relate to your employment
18 for Summit County?
19    A.   No, actually, they did not.
20    Q.   What was the general subject matter
21 of those litigations?
22    A.   I used to be a member of the
23 National Ski Patrol at Boston Mills Ski Resort,
24 and there were some injury-related cases that I
25 testified on.

5 (Pages 14 - 17)

Page 18

1    Q.    They didn't have any relationship
2  to your work for Summit County?
3    A.    No.
4    Q.    Have you -- other than in those
5  depositions, have you ever testified under
6  oath?
7    A.    Yes.
8    Q.    In what types of proceedings?
9    A.    Criminal trial proceedings.
10    Q.    In about how many cases have you
11  provided testimony?
12    A.    More than 50.
13    Q.    What was the general nature of your
14  testimony in those criminal cases?
15    A.    If I was the charging deputy
16  involved in a criminal case that I made an
17  arrest on.  May have been a witness or may have
18  been a supervisor at the time of an incident.
19    Q.    When was the last time that you
20  provided testimony in a criminal case?
21    A.    Not real sure.  It's probably been
22  a couple years ago.
23    Q.    Was it during your tenure in the
24  corrections division?
25    A.    I don't think I've been to court

Page 19

1  since I've been in the corrections division.
2    Q.    When you provided testimony in
3  criminal matters, did you ever testify
4  concerning drug charges?
5    A.    Yes.
6    Q.    On how many occasions?
7    A.    I -- I don't recall.
8    Q.    More than 10?
9    A.    Probably more than 10, yes.
10    Q.    More than 20?
11    A.    Probably not that -- probably not
12  that many.
13    Q.    In the instances where you provided
14  testimony concerning drug charges, did you ever
15  provide testimony concerning law enforcement
16  encounters related to opioid drugs?
17    A.    I can't recall if I've been
18  involved in a -- a case that involved opioids,
19  to a specific case that I may have testified
20  in.
21    Q.    Do you recall any of the types of
22  drugs involved in the cases for which you've
23  provided testimony?
24    A.    I do, yeah.  Some of them I
25  remember.

Page 20

1    Q.    What were those drugs?
2    A.    There was some marijuana cases,
3  some cocaine cases, things like that.
4    Q.    Do you specifically recall
5  providing testimony concerning heroin?
6    A.    No, I do not.
7    Q.    Do you specifically recall
8  providing testimony concerning any prescription
9  drugs?
10    A.    I think I have on a couple
11  occasions.  Don't really remember exactly what
12  they were, but I know that there was some
13  pill-type cases that I was either -- usually it
14  was when -- it was in a supervisory capacity.
15    Q.    What do you recall about the
16  pill-type cases that you just referenced?
17    A.    Do you mean what the name of the
18  pill was or what type of pills?  Is that what
19  you're asking?
20    Q.    Do you recall the type of
21  prescription drugs involved in the pill-type
22  cases in which you've provided testimony?
23    A.    I believe I remember a couple about
24  oxycodone.
25    Q.    Do you have any understanding of

Page 21

1  whether oxycodone qualifies as an opioid drug?
2    A.    I do.
3    Q.    What is that understanding?
4    A.    It is an opioid-type drug.
5    Q.    In about what year did you provide
6  testimony -- last provide testimony concerning
7  oxycodone?
8    A.    It would probably have been
9  sometime before 2011, when I was a lieutenant.
10  Once I became a captain, I'm more of an
11  administrative position.
12    Q.    Can you describe the nature of the
13  case in which you provided testimony concerning
14  oxycodone?
15    A.    We had a case where we had some
16  pharmacies that were getting burglarized, and
17  they were stealing the oxycodone from the
18  pharmacy, and we caught the guys during the
19  burglary.  Actually, my deputies caught the
20  guys, and I was probably a lieutenant on the
21  scene at the time of the arrest.
22    Q.    Just for clarity, is that the same
23  case in which you testified in about -- before
24  2011?
25    A.    That would have probably been the

6 (Pages 18 - 21)

1  only time that I would have testified at --
2  yeah, for that.
3      Q.    Do you recall the approximate date
4  of the law enforcement encounter involving the
5  burglary of the pharmacy you just referenced?
6      A.    No.  It would have been prior to
7  2011.  That's when I was promoted and changed
8  job assignments.
9      Q.    Do you recall whether it was before
10  or after 2005?
11      A.    It would have been after 2005, yes.
12      Q.    Do you have any other approximate
13  date for that law enforcement encounter?
14          MR. LEDLIE:  Object to the form of
15  the question.  Calls for speculation.
16      A.    Sometime between -- I'm trying to
17  think.  So I was transferred to the patrol
18  division as a lieutenant in 2004 and was
19  promoted to captain, 2011, so it was probably
20  sometime in between 2010, 2011, something like
21  that.
22      Q.    All right.  Do you recall the name
23  of the pharmacy that was burglarized?
24      A.    No, I do not.
25      Q.    Could you describe your involvement

1  in the law enforcement encounter involving the
2  pharmacy burglary?
3      A.    So I was -- I was a lieutenant,
4  which means I was the, I guess, the second
5  level of supervision on the scene.  Would have
6  had deputies that would have made -- actually
7  responded to the call, and then a sergeant who
8  was -- act as the direct supervisor.  And then
9  I would have came to the scene; on bigger
10  calls, I would go if I was -- I mean, I was
11  actually in a patrol car, so I would be
12  listening to the radio, and I would go to the
13  scene and make sure that things were handled
14  appropriately.
15      Q.    What do you recall, if anything,
16  about the scene at the pharmacy burglary?
17      A.    After I had got there, I believe
18  they had two suspects that were in custody.
19  The scene, it was -- it was kind of a -- it was
20  kind of a simple one, because we got an alarm
21  drop, went to the scene, caught the guys a
22  little -- a little ways down the road, close to
23  where they were at.  They had the pills on
24  them, and the arrest was made.  Kind of -- kind
25  of a simple one.

1      Q.    And how did you determine that the
2  pills taken from the pharmacy were oxycodone?
3      A.    The labeling of the pill.
4      Q.    Following that law enforcement
5  encounter, what type of records did you have to
6  fill out in order to record the events?
7      A.    So me, as a lieutenant, only thing
8  I would have done was send an e-mail or -- or
9  put on the log that we had had an arrest that
10  night for a burglary with that type of -- with
11  that type of incident.  But I wouldn't have
12  filled out the reports.  The deputies on the
13  scene and the detectives that got called to it
14  would actually fill out all the appropriate
15  paperwork.
16      Q.    You mentioned that you testified in
17  a criminal proceeding related to this law
18  enforcement encounter, correct?
19      A.    Yes.
20      Q.    What was the nature of your
21  testimony at the criminal proceeding?
22      A.    Somewhat along these line -- line
23  of questioning that you're giving to me, what
24  was my role in it, did I actually see the
25  offense, and it was -- I just testified that I

1  was a supervisor on scene.
2      Q.    Following the pharmacy burglary,
3  did the sheriff's department undertake any
4  investigation of whether the burglarized
5  pharmacy had been involved in misconduct?
6      A.    No.  So this was a while -- while
7  back.  Like I said earlier, I think it was
8  pre-2010, 2011.  Certainly before 2011, because
9  I got transferred out.  But I do remember
10  getting calls from reporters on that, because
11  it seemed to be at that point in time in
12  history that we were starting to see more pills
13  on the street.  People were burglarizing homes,
14  people were burglarizing pharmacies to steal
15  those things.
16      Q.    In your law enforcement experience,
17  do you recall any other encounters in which you
18  responded to a call where a pharmacy was
19  burglarized for drugs?
20      A.    I don't specifically remember my
21  involvement in it.  So we would have -- we had
22  two lieutenants that worked in the patrol
23  bureau at that time.  I worked at the 4p to --
24  I'm sorry, 8p to 4:00 a.m. shift.  Back then,
25  we were having burglaries, but I don't remember

1  going to any other scene where we had that type
2  of incident.
3      Q.   Do you have a recollection of any
4  investigations involving the burglary of
5  prescription opioids?
6      A.   So I remember we -- it was kind of
7  a hot topic back then.  You know, I was in the
8  patrol bureau, so we were kind of the
9  first-line responders.  I know that our drug
10 unit and our detective bureau were looking into
11 things like that, but it was -- I wasn't
12 involved in that kind of stuff, so I really
13 couldn't speak of -- I know my agency was
14 conducting it; it's just I wasn't involved in
15 it.
16     Q.   We were talking about your
17 testimony at criminal proceedings.
18         Are there any other criminal
19 proceedings in which you provided testimony
20 related to an opioid drug?
21     A.   No.
22     Q.   Before we go any further, I just
23 want to talk a little bit about our ground
24 rules for today.
25         I'll be asking you questions, as

1  I've been doing so far.
2      A.   Uh-huh.
3      Q.   And this conversation will be
4  recorded by our court reporter.  To make sure
5  we have a nice clean record, I will ask that
6  you wait until I finish a question to have you
7  answer, and I will do my very best not to jump
8  in before you complete an answer.
9          Is that okay with you?
10     A.   Yeah.  Did I just answer
11 prematurely?
12     Q.   No, not at all.
13     A.   Oh, okay.  All right.
14     Q.   This is just standard operating
15 procedure.
16     A.   Got you, okay.
17     Q.   And you understand that you're
18 testifying under oath today?
19     A.   I do.
20     Q.   Is there any reason that you can't
21 provide truthful testimony as you sit here
22 today?
23     A.   No.
24     Q.   If you don't understand a question,
25 please ask me for clarification, okay?

1      A.   I will do that.
2      Q.   And if you need a break at any
3  time, just let me know.  And I just ask that
4  you answer the question before we go on a
5  break.
6      A.   Okay.
7      Q.   One exception to that is if you
8  have a question about privilege, in which case
9  you should ask to caucus with your counsel.
10     A.   Okay.
11     Q.   Captain Barker, where are you from
12 originally?
13     A.   Actually, I was born in Akron,
14 Ohio.  I'm from -- I lived in this area my
15 entire life.
16     Q.   What's the highest level of
17 education that you've attained?
18     A.   Some college.  I've got -- I went
19 through a flight school back in the 1990s to
20 become a commercial pilot.
21     Q.   What -- what college did you
22 attend?
23     A.   Kent State.
24     Q.   And for what period of time did you
25 attend Kent State?

1      A.   The fall of '86 through 1989,
2  probably.
3      Q.   Did you receive any degree from
4  Kent State?
5      A.   No.
6      Q.   Could you describe the nature of
7  your law enforcement training?
8      A.   I went -- went through the police
9  academy in 1992.  Graduated in 1993.  Became a
10 deputy sheriff in December of 1993, and then
11 became a full-time deputy sheriff in November
12 of 1994.
13     Q.   Following your studies at Kent
14 State, were you employed?
15     A.   Yes, I had a couple jobs.
16     Q.   What was the nature of your
17 employment?
18     A.   I sold airplanes for United Aero
19 Sales.  I sold alarms for Bickett-United
20 Security.  I flight instructed at Skypark in
21 Wadsworth.  So kind of a little bit of a lot of
22 things.
23     Q.   Following your law enforcement
24 training at the academy, what was your
25 employment?

1    A.    I was doing all three of those
2 things I just mentioned.  I didn't get hired as
3 a deputy for almost a year.
4    Q.    Who hired you as a deputy?
5    A.    Sheriff Troutman, Summit County
6 Sheriff's Office.
7    Q.    And what was your title at the time
8 you were hired?
9    A.    Deputy sheriff.
10    Q.    What was the nature of your
11 responsibilities in that role?
12    A.    When I first got hired in the
13 sheriff's office, I worked in the corrections
14 division for a couple years, and then I got
15 transferred to patrol as a deputy, until I was
16 promoted to sergeant in 1999.
17    Q.    What were the approximate dates of
18 your tenure as a deputy in the corrections
19 division?
20    A.    It would have been from 1994 until
21 about 1997, so just a little over three years,
22 as I recall.
23    Q.    What were your responsibilities in
24 the corrections division during the period 1994
25 to 1997?

1    A.    So we run a direct-supervision
2 jail.  It's a style of supervision.  And I was
3 a deputy that was responsible for 24 to 48
4 inmates actually in the pod, monitoring the --
5 supervising the inmates, making sure they were
6 fed and clothed and there was no fights and no
7 assaults going on, running the -- running
8 the -- we call them pods.  Running the daily
9 day -- the day-to-day activity on the shift I
10 was assigned to.
11    Q.    What was your -- where did you work
12 as a deputy?  Was it at the Summit County Jail?
13    A.    Yes, it was the Summit County Jail
14 on Crosier Street.
15    Q.    During this period, 1994 to 1997,
16 did you have any encounters with inmates
17 abusing drugs?
18    A.    Yes, we did.
19    Q.    What was the nature of those
20 encounters?
21    A.    So when you work inside the jail,
22 you're in there, you're shoulder to shoulder
23 with them, and you will, at some point -- as a
24 deputy, you don't ask about cases, but
25 sometimes they'll start to talk to you about

1 it.  And you want to maintain -- maintain that
2 rapport with the inmate, because you're able --
3 better able to do your job that way.  You can
4 kind of sense what's going on.
5    And they -- and they would talk
6 about their cases.  And back then, in the '90s,
7 it was cocaine, marijuana, crack cocaine,
8 those -- those types of things that we were
9 seeing back then.
10    Q.    Do you recall any of the inmates
11 reporting on charges related to a drug that
12 would qualify as an opioid, such as heroin?
13    A.    No, I don't remember that -- that
14 type of stuff back then.
15    Q.    Do you remember any conversations
16 with inmates during the same period, 1994 to
17 1997, related to prescription drugs?
18    A.    No, nothing like that back in that
19 time.
20    Q.    Again, staying in the period 1994
21 to 1997, do you recall any enforcement
22 encounters within the jail where an inmate was
23 using drugs while incarcerated?
24    A.    You mean actually at the jail?
25    Q.    Yes.

1    A.    No, I don't remember anything like
2 that.
3    Q.    You said that you left corrections,
4 your corrections post, in 1997; is that
5 correct?
6    A.    I think that's the year, yes.
7    Q.    What was your next -- your next
8 employment?
9    A.    So we -- we put in show of interest
10 to bid to go to a different assignment.  I
11 would have bid to go to the patrol bureau.
12    Q.    Did you, in fact, go to the patrol
13 bureau in 1997?
14    A.    Yes, I did.
15    Q.    What was your title when you were
16 assigned to patrol?
17    A.    Still a deputy sheriff, just
18 assigned to the patrol division.  Title didn't
19 change.
20    Q.    For what period did you serve as a
21 deputy in the patrol division?
22    A.    Up until I was promoted in October
23 of 1999 to the rank of sergeant, and then I
24 went back to the corrections division.
25    Q.    So what was -- what was the nature

9 (Pages 30 - 33)

Page 34

1  of your duties in -- as a deputy in patrol for
2  the period 1997 to 1999?
3      A.   I was usually assigned to the city
4  of Green, and I did work in Northfield for a
5  little while, did work at the airport.  But I
6  would say 80 percent of my time was in the city
7  of Green, and I responded to calls for service
8  in that city.
9      Q.   When you say calls for service,
10 what would that entail?
11     A.   Everything from, "I have an animal
12 in my house," to car crashes, to burglaries,
13 robberies, rapes, anything like that.  It's any
14 type of call for service that somebody needed
15 help with, I would go to.
16     Q.   During your patrol work for the
17 period 1997 to 1999, do you recall any
18 encounters involving drugs?
19     A.   Yes, I do.
20     Q.   About how many encounters do you
21 recall that involved drugs?
22     A.   You know, maybe a couple encounters
23 a -- a week.  I was working eight-hour shifts
24 back then, so five days a week.  One or two
25 during a week was -- seems to me about what it

Page 35

1  was.  A lot of -- a lot of the calls I took
2  were a lot of crashes.  77 runs through there,
3  so a lot of crashes, a lot of burglaries.
4          The drugs didn't seem to be that
5  prevalent then.  We might make a traffic stop
6  or come across a kid with some marijuana in his
7  pocket, but that's pretty much what it was.
8      Q.   To the best of your recollection,
9  what drugs did you encounter during your patrol
10 service for this period, '97 to 1999?
11     A.   It was almost always marijuana.
12     Q.   Are there any other drugs that you
13 recall encountering?
14     A.   Yeah, I mean, we come acrost crack
15 cocaine, which was the rock variety.  Those are
16 really the two that stick out to me.  And
17 anything that would have been more than that,
18 we would have -- we have a drug unit.  We would
19 have called them to the scene, let them handle
20 it.
21     Q.   What were the policies for handing
22 off a law enforcement encounter involving drugs
23 to the drug unit?
24     A.   We would run it -- we would let the
25 sergeant know what we had, and he would make

Page 36

1  the -- he or she would make the decision to
2  have the drug -- drug unit come to the scene
3  and take over.
4      Q.   Is -- do you know if that's still
5  the policy for the Summit County Sheriff's
6  Department?
7      A.   Yeah, I don't work patrol since
8  2011.  I'm sure that's still what they do.
9  Yeah, they -- they would call the drug unit if
10 it's something of a larger caliber.
11     Q.   Do you recall any law enforcement
12 encounters during this period, 1997 to 1999,
13 that involved a drug that would qualify as an
14 opioid?
15     A.   At -- yeah, I can't remember
16 anything like that back when I was actually a
17 road deputy.  I don't recall anything like
18 that.
19     Q.   How about any law enforcement
20 encounters during this same period that
21 involved prescription drugs?
22     A.   I don't recall anything like that.
23     Q.   Where did you go after you
24 completed your service in patrol in 1999?
25     A.   I was promoted to the rank of

Page 37

1  sergeant and then reassigned back to the
2  corrections division.
3      Q.   For what period did you serve in
4  the -- as a sergeant in the corrections
5  division?
6      A.   I think I was there for -- it was
7  definitely less than a year.  Probably
8  something around eight or nine months, and then
9  I went back out to patrol as a sergeant out in
10 patrol.
11     Q.   What was the nature of your role as
12 a sergeant in the corrections division in 1999?
13     A.   As a sergeant, you still respond to
14 calls for service if there's not a car --
15 another deputy available.
16          And then, as a sergeant, I --
17 whenever the deputies were taking calls, I
18 would just kind of go along, shadow them, make
19 sure they know what's going on.  If there was
20 anything serious, I'd be the one to call a
21 lieutenant or call the drug unit and let them
22 know we had a serious issue or call the
23 detective bureau if it was a serious-type
24 crime.  Basically supervising what the deputies
25 were doing on their day-to-day operations.

10 (Pages 34 - 37)

Page 38

1    Q.    When you were assigned to
2  corrections, were you physically located at the
3  Summit County Jail?
4    A.    Yeah, when I was assigned
5  to correct- -- yes, I always reported to the
6  Summit County Jail for work, yes.
7    Q.    And what was the -- what were the
8  nature of your responsibilities as a sergeant
9  assigned to the Summit County Jail in 1999?
10    A.    So as a sergeant, you're no longer
11  inside the pod with the inmates.  You have an
12  office on the east or west side of the jail,
13  and you supervise the deputies to make sure
14  that they're doing what they need to do to make
15  sure that the jail is a safe environment.
16    Q.    During your time at the jail in
17  1999, what do you recall about the -- the
18  number of inmates who were incarcerated due to
19  drug-related crimes?
20        MR. LEDLIE:  Object to the form.
21    A.    Don't know the exact number, but I
22  know that it -- it was a lot.  It was probably
23  the majority of the people had some
24  drug-related offense with another criminal
25  offense, if that makes sense.

Page 39

1    Q.    What do you mean by "another
2  criminal offense"?
3    A.    You know, you may have a burglary
4  charge or something like that, and then with
5  their burglary charges, when they were, you
6  know, patted down or brought into the jail,
7  they might have drugs on them, and there'd be
8  an additional charge for the drugs.
9    Q.    Do you have a recollection of what
10  types of drugs were used by the inmate
11  population in this period, 1999?
12        MR. LEDLIE:  Object to the form of
13  the question.  Vague.
14    A.    It was, again, marijuana and
15  cocaine was the stuff that was the most
16  prevalent back then.  Anything else, it would
17  have been very odd, so I would have remembered
18  that.
19    Q.    If we wanted to look to determine
20  what types of drugs were involved in law
21  enforcement encounters that brought inmates to
22  be incarcerated at the jail, where would we
23  look to find that information?
24    A.    You'd have to go through the old
25  reports, so -- and it would be -- it would be a

Page 40

1  lot of researching.  So when somebody's
2  arrested for a, say, drug abuse, a drug offense
3  in the state of Ohio, it is us- -- that's
4  how it -- it says drug abuse.  It doesn't
5  usually say what type of drug it was.  You'd
6  have to go into the body of the investigative
7  report and read through it and find out that it
8  was marijuana, cocaine, or some type of opiate.
9    Q.    And that's because the booking
10  records have the charge information, which is
11  not drug-specific, correct?
12    A.    That is correct, yes.
13    Q.    Is that how the booking records are
14  maintained today?
15    A.    It's a little different now.
16  It's -- it is more computerized, but, still,
17  the state charge is drug abuse.  You'd have to
18  actually read through the complaint from the
19  officer that brings the -- the suspect into the
20  jail or our reports that would -- it would be
21  in the body of the report, listed on the
22  property sheet, maybe, exactly what we had.
23        If we tagged it into evidence, we
24  would -- you know, we would go through, so
25  we -- we would do a field test on it.  We would

Page 41

1  look at the numbering on the pill, and then
2  that would be tagged into the property, but it
3  wouldn't be part of the charge, per se.
4    Q.    In the -- so you've described, I
5  think, two documents:  The first is the police
6  investigation report; is that correct?
7    A.    Yeah, actually it's called a
8  confid- -- confidential investigation.  It --
9  it's more of the -- of a narrative type, step
10  one, all the way through the -- to the bottom,
11  our deputies will write.  It's not the actual
12  incident report, which is more of a -- a
13  generalized, shorter report.
14    Q.    The con- -- who completes the
15  confidential investigation report?
16    A.    The arresting officer.
17    Q.    And where are those documents
18  filed?
19    A.    They're kept in a case file in
20  our -- our detective bureau.
21    Q.    Are there any requirements for the
22  level of detail an officer must include in
23  those reports?
24        MR. LEDLIE:  Object to the form of
25  the question.

11 (Pages 38 - 41)

Page 42

1     A.   So we have a policy on how it's
2  supposed to be written, but myself, as a
3  supervisor, when I read a report that's
4  generated by one of my staff, I like it -- I
5  direct my staff that if I pick this up as a
6  juror, I have to be able to read that and not
7  have any questions of to what happened at a
8  particular incident.  So I'm looking for a
9  essay format from -- I'll be looking for
10 details of the entire case.
11    Q.   The second document that you
12 referenced as including information about the
13 type of drug involved in a law enforcement
14 encounter was a corrections document; is that
15 correct?
16    A.   I think property sheet.
17    Q.   A property sheet.
18    A.   Yes.
19    Q.   What -- what is a property sheet?
20    A.   So I was -- it would be a -- a list
21 of whatever was taken that we seized into
22 property and put into our evidence room,
23 whether it's -- whatever that property would --
24 would be listed on there.  And if we didn't --
25 if the deputy didn't know at the time of the

Page 43

1  incident, they would put "unknown," and then at
2  a later date, whatever it was would be added
3  once it was tested to find out what exactly it
4  was.
5     Q.   Who completes the document called
6  the property sheet?
7     A.   Generally, it is the arresting
8  deputy if it's a smaller-type case.  But if
9  it's something large, we may bring out a
10 property officer from downtown to do it.
11    Q.   Where are the property sheets kept?
12    A.   In the property room with the --
13 the evidence that's seized, and then a copy is
14 also in our records and ID bureau.
15    Q.   Are the contents of the property
16 reports stored electronically?
17    A.   You mean the con- -- like the
18 actual -- the document or -- or the actual
19 items?
20    Q.   The document.
21    A.   They are now.  They haven't always
22 been that way.
23    Q.   When did the doc- -- sorry, the
24 property reports start to be store -- stored
25 electronically?

Page 44

1     A.   I was never involved in -- in that
2  until -- so I supervise ID and records now, and
3  we -- we do store things electronically.  But
4  when I got there as a captain in 2011, it was
5  already being done.  I don't know when we
6  started doing it.
7          When I worked patrol as a deputy
8  and a sergeant, lieutenant, we were handwriting
9  things, handwriting reports in the -- in a car.
10 We'd -- you'd put the clipboard on the steering
11 wheel and you'd write in the car.  So I don't
12 know when they changed over to the electronic
13 format.
14    Q.   Understood.  How about the
15 investigation report that you referenced
16 earlier?  Do you know if those -- the contents
17 of the investigation report is maintained
18 electronically?
19    A.   That report generally is not
20 maintained electronically, unless we were to
21 scan it in as a supervisor and scan it in to
22 e-mail to somebody, but it's usually kept with
23 the case file or with the arresting deputy.
24    Q.   Is there any other source of
25 information, electronic or hard -- hard copy,

Page 45

1  which would identify the type of drug involved
2  in a law enforcement encounter?
3          MR. LEDLIE:  Object to the form of
4  the question.
5     A.   I'm -- I'm sure there probably is.
6  I mean, we will pull stats and -- and farm them
7  for our own purposes, but those are the two
8  main things is the actual incident report, the
9  property sheet, and then -- and then the
10 investigative report.  Kind of an all -- all
11 one big encompassing documents for it.
12    Q.   Now, we were talking about 1999.
13    A.   Uh-huh.
14    Q.   You said that you left corrections
15 after a period -- your corrections assignment
16 after a period of months.  Where did you go
17 next?
18    A.   Then I went back onto the patrol
19 bureau.
20    Q.   How long did you serve as a
21 sergeant in the patrol bureau?
22    A.   Until I was promoted to the rank of
23 lieutenant in 2003, so I was out there for
24 probably under -- less than four years as a
25 sergeant.

12 (Pages 42 - 45)

Page 46

1    Q.   What was the nature of your duties
2 as a sergeant in patrol for the period 1999 to
3 2003?
4    A.   I would assist with calls for
5 service.  If there was not a car available, I
6 would take the call.  But generally I was there
7 to supervise the -- the deputy staff that
8 would -- that are -- that were taking the calls
9 for the day.  Anywhere from 10 to 12 deputies
10 per shift, I would supervise.  If they had a
11 problem, I would go to the scene, or I would go
12 to the scene on my own volition if I thought it
13 was going to be a call that required some
14 additional assistance.
15    Q.   What was the geographic -- what was
16 the geographic boundary of your assignment for
17 patrol during this period?
18    A.   As a sergeant or as a deputy?
19    Q.   As a sergeant, during the period
20 1999 to 2003.
21    A.   Okay.  So I would be responsible
22 for the whole county, from Akron-Canton Airport
23 at the south side, which is Green, all the way
24 up to Twinsburg Township and Northfield Center
25 Township.  So in the -- entire county.

Page 47

1    Q.   During the period 1999 to 2003,
2 when you served as a sergeant in patrol, do you
3 recall how many law enforcement encounters you
4 participated in that involved drugs?
5         MR. LEDLIE:  Object to the form of
6 the question.
7    A.   I don't know how many, but it
8 wasn't -- again, it's kind of still that same
9 time frame where the drugs are there, but it's
10 not as -- it's not as prevalent as it is right
11 now.
12    Q.   If we wanted to look at documents
13 in order to identify how many drug encounters
14 you participated in, where would we look?
15    A.   It would have to be the reports.
16 So when a -- when a supervisor comes to the
17 scene, generally, the supervisor name is
18 included in the body of the report somewhere.
19 At the time, it would have been, "Sergeant
20 Barker was on scene and advised," or something
21 along those lines.  So you would have to go and
22 pull all the reports from that time.
23         And then we would also have -- at
24 the end of every shift, we would submit what
25 was called a shift manager report so that our

Page 48

1 bosses downtown knew what was going on.  And we
2 would type that out, fax it, at the time.  Fax
3 it downtown.  And my name would be on that,
4 tell you what calls I was on.
5    Q.   Do you recall about how many calls
6 per week related to drug events?
7         MR. LEDLIE:  Object to the form of
8 the question.
9    A.   I -- I don't recall the numbers.
10 It was probably less than a quarter of the
11 calls.
12    Q.   You testified earlier that during
13 the period 1997 to 1999, you estimate that you
14 responded to one to two law enforcement calls a
15 week that involved drugs, correct?
16    A.   I did, yes.
17    Q.   During the period 1999 to 2003,
18 when you served as a sergeant -- sergeant for
19 patrol, did you respond to more or fewer law
20 enforcement calls involving drugs?
21    A.   So it would have been more, simply
22 because I would respond to the deputies' calls.
23 So if I have 10 or 12 deputies working on a
24 shift -- I worked afternoon shift back then --
25 if one or two of them had a drug-related arrest

Page 49

1 that night, I would usually respond to that.
2 So, consequently, I went to more because I was
3 supervising 10 or 12 deputies.
4    Q.   So the change in the number of drug
5 enforcement encounters in which you
6 participated was driven by the nature of your
7 role in the sheriff's department, not by the
8 overall number of drug events in Summit County?
9         MR. LEDLIE:  Object to the form of
10 the question.
11    A.   I would say that that sounds
12 accurate.
13    Q.   And do you have any recollection of
14 about how many drug encounters per week you
15 responded to?
16    A.   As a sergeant, I was probably going
17 to a couple a night.
18    Q.   Do you recall what types of drugs
19 were involved in those law enforcement
20 encounters, again during the period 1999 to
21 2003?
22    A.   It was -- the majority of it,
23 again, was marijuana and cocaine-type stuff.
24 That's -- that's what's sticking out with me.
25    Q.   Do you recall any law enforcement

13 (Pages 46 - 49)

1  encounters involving drugs that would qualify
2  as opioid drugs during that period, 1999 to
3  2003?
4      A.   No, my -- my first recollection
5  that we dealt with opioids as an agency would
6  have been after the time I was promoted to
7  lieutenant.
8      Q.   What is your first recollection of
9  dealing with opioids as an agency?
10     A.   We talked about the burglary
11 earlier of the pharmacy.  It would have been
12 that.  That was when we started getting phone
13 calls and the media started to get more
14 interested -- started to get interested in it
15 at that point in time.
16          I would receive calls, and they'd
17 want to talk to me about -- I remember giving a
18 phone interview to a reporter.  I don't
19 remember what -- I think it was a TV reporter,
20 but I don't remember which station it was, but
21 they were interested in -- because we had got
22 OxyContins, oxycodone.
23     Q.   Was that interview related to the
24 pharmacy burglary that you testified about
25 earlier today?

1      A.   Yes, it is.
2      Q.   What response, if any, did the
3  sheriff's department have to the OxyContin --
4  the new issue of OxyContin in the Summit area?
5          MR. LEDLIE:  Object to the form of
6  the question.
7      A.   You know, that was a -- it -- it
8  was new to us.  And at that point in time, I'm
9  a -- I'm a lieutenant.  You're considered
10 command-level staff, but I don't have -- I
11 don't have the executive authority to, you
12 know, direct a task force or something like
13 that.
14          But I just knew, at that point in
15 time -- you know, media doesn't generally call
16 a road cop and start talking about certain
17 things.  That's what sticks out is I started
18 getting phone calls.  And I think -- I think at
19 the time I was a lieutenant, I think I talked
20 to two reporters about OxyContins that were
21 being stolen.
22     Q.   Do you recall any other situations
23 in which you spoke with the media about
24 OxyContin?
25     A.   I think I did on two occasions.  I

1  would get my dispatcher call me and say, "We
2  have a reporter that wants to talk to you about
3  an arrest," and I believe it was two times that
4  I spoke to two different reporters about two
5  different thefts of medications.
6      Q.   When was the first event in which
7  you spoke to a reporter about a law enforcement
8  event involving OxyContin?
9      A.   It was the pharmacy burglary that
10 we were talking about earlier.
11     Q.   When was the second time that you
12 spoke to a reporter about a law enforcement
13 event involving OxyContin?
14     A.   It was sometime in -- in the same
15 time frame.  I remember there -- it was both --
16 both times, it was warm out.  I got -- had my
17 window down, so it was -- had to have been, you
18 know, above 50, I would -- I would think.
19          But it was -- it was -- they were
20 both somewhat back to back.  Maybe months in
21 between, two or three months in between.
22     Q.   Let's move to that second law
23 enforcement encounter --
24     A.   Okay.
25     Q.   -- involving OxyContin.  About when

1  did it occur?
2      A.   Again, it had to -- it had to have
3  been prior to 2011.  I want to say it was
4  probably '9 or '10, something like that.
5      Q.   What was the nature of the law
6  enforcement encounter involving OxyContin?
7      A.   We had another -- we had another
8  theft of OxyContin.  I -- but I don't remember
9  if it was from a pharmacy or not.  Being that
10 it was a theft of that, it probably was.  I
11 just -- I don't want to say something I don't
12 know for sure.  But it was -- it was a theft
13 of -- pills were starting to be stolen at this
14 point in time, and it's starting to -- it's
15 starting to get our attention.
16     Q.   What was the nature of your
17 involvement in that law -- second law
18 enforcement encounter involving OxyContin?
19     A.   I gave the interview to the
20 reporter, and I wasn't -- so during the second
21 one I'm talking about, I didn't go to the scene
22 of anything like that.  I just had information.
23 I was the lieutenant that was on duty that
24 night the reporter was wanting some answers to.
25     Q.   What was your involvement in the

Page 54

1  investigation of the burglary event?
2      A.   I really had no involvement in the
3  actual, for lack of a better term, the police
4  work of it.
5      Q.   What types of documents would
6  record the police work involved in that
7  OxyContin encounter?
8      A.   So you would have the initial --
9  the initial incident report.  You'd have the
10  confidential investigation from the deputies or
11  deputies [sic] that were involved.  You would
12  again have the property sheets.  You'd have our
13  CAD entries, which is computer-aided dispatch,
14  from our dispatch would have some type of notes
15  in -- in the -- the way the call went out over
16  your radio; you'd have documentation that way.
17          And anything that the -- you know,
18  any notes that the deputy would have taken that
19  they usually -- you know, on the scene when
20  you're just scratching stuff down, they would
21  have kept that in their own case file for when
22  they went to court.  So I think that's about
23  it.
24      Q.   How did the sheriff's -- sheriff's
25  department determine that it was OxyContin

Page 55

1  involved in the second burglary that you were
2  describing?
3      A.   The -- the stampings on -- on the
4  pills.
5      Q.   Do you know if the sheriff's
6  department undertook any chemical testing of
7  the pills in order to determine their actual
8  substance?
9      A.   We would -- we -- we may have field
10  tested something with what's -- it's called a
11  NIK kit.  It's a -- it's a small plastic bag
12  with some reagents in it, and you drop
13  something in there, and you look for the color.
14  We have since quit doing that because there was
15  glass vials in there that when you squeeze to
16  do the test, it would -- it was poking through
17  and -- and getting stuff on our deputies'
18  fingers.
19          So we may -- back then, we were
20  still doing the -- the NIK kit, which was field
21  testing, and -- and it would -- but it would
22  still -- would have been sent out to the BCI to
23  have it actually identified for sure, and then
24  we'd get a report back that says, "Yes, this is
25  exactly what you have."

Page 56

1      Q.   Where would the -- the drug testing
2  results from the NIK kit be recorded?
3      A.   It would -- it would be in the
4  narrative of the -- the deputy writing the
5  report.  So the deputy would test it.  It would
6  show up -- just, say, blue for whatever we're
7  looking for -- and the deputy would put in
8  there that, "I field tested this, and it -- and
9  it gave me a reaction consistent with cocaine,"
10  or whatever it was that we were looking for.
11      Q.   You mentioned a second way in which
12  the sheriff's department tested drugs, and that
13  was sending them out to BCI; is that right?
14      A.   Yes, that's correct.
15      Q.   What is BCI?
16      A.   Bureau of Criminal Investigations,
17  I think.  I have trouble with the acronym on
18  that now.  It's the state -- it's the state
19  agency that does evidence work for us.
20      Q.   In what circumstances does the
21  sheriff's department send drugs to BCI for
22  testing?
23      A.   Are we -- are you talking about
24  back in the '90s or what we do right now?
25      Q.   So let's -- we had been talking

Page 57

1  about the period, I believe, 2009 to 2011 with
2  this OxyContin encounter.
3      A.   Okay.
4      Q.   Let's stay there for the time
5  being.
6      A.   Okay.
7      Q.   So let me -- let me ask a cleaner
8  question.
9          During the period 2009 to 2011,
10  during -- under what circumstances would the
11  sheriff's department send a drug to BCI for
12  testing?
13      A.   So we would -- we would have sent
14  everything at that point in time.  So we would
15  still do the field -- we were still doing field
16  testing back then, to get our, you know,
17  probable cause to make the arrest.  And then we
18  still sent everything to BCI, so that when we
19  went to trial, we knew for sure exactly what it
20  was.  So it was still -- we were still using
21  BCI for them to run a test on it, come back
22  with an official determination, "This is --
23  this is what you have."
24      Q.   Was there a point in time that the
25  sheriff's department stopped sending all drugs

15 (Pages 54 - 57)

Page 58

1 to BCI for testing?
2     A.    Not that I know of.
3     Q.    You mentioned that there came a
4 point in time when the sheriff's department
5 discontinued using the NIK kit to test drugs,
6 correct?
7     A.    Correct. NIK is the brand name,
8 but it's basically a field test. You can test
9 in the field without having to have a lab.
10    Q.    When did the sheriff's department
11 discontinue use of the NIK kit?
12    A.    I'm going to say it's probably been
13 close to four or five years ago when we started
14 to see fentanyl. We didn't want our -- our
15 deputies getting dosed and having health
16 issues.
17    Q.    What was the sheriff's
18 department -- what was the sheriff's
19 department's particular concern about fentanyl?
20    A.    About fentanyl?
21    Q.    Yes.
22    A.    We didn't want our deputies getting
23 dosed and getting injured or -- or dying
24 because of what was -- what we were finding out
25 in the streets, you know, a few years back.

Page 59

1     Q.    When did the sheriff's department
2 first become concerned about fentanyl in the
3 Summit area?
4         MR. LEDLIE:  Object to the form of
5 the question. He's a fact witness. He's not a
6 30(b)(6) for the sheriff's department.
7     Q.    You can still --
8     A.    Still answer?
9     Q.    Yes, please.
10    A.    So I know specifically when I
11 became aware of it. As -- as a captain, I was
12 assigned to the corrections bureau, and we got
13 a letter in, and it had a patch that people get
14 and they put on their -- for medical treatment.
15 And it was being sent in through the mail for
16 the inmates to get. And one of our inmate
17 service workers who screens the mail found it.
18        So that was probably very early
19 2011, 2012. I start -- I personally had
20 knowledge that we were worried about it getting
21 in -- into the jail.
22    Q.    So you're describing your own
23 personal experience encountering fentanyl in
24 about 2011. What was the nature of your
25 employment for the sheriff's department at that

Page 60

1 time?
2     A.    I was a captain assigned as a shift
3 commander to the jail.
4         THE REPORTER:  Did you say "to the
5 jail"?
6         THE WITNESS:  Yes, I did. Sorry
7 about that.
8     Q.    How did you become aware of
9 fentanyl being sent into the Summit County
10 Jail?
11    A.    Because it was -- it was brought to
12 my attention that one of our inmate service
13 workers had found -- had found the -- the patch
14 stuck to a -- a letter sent to an inmate.
15    Q.    How did the correction staff
16 determine that the patch you referenced
17 contained the substance fentanyl?
18    A.    Not exactly sure how they knew, but
19 the person that -- that found something
20 suspicious stuck to the letter brought it to
21 her supervisor, and then we had it tested. And
22 I don't know how we had it tested. I would
23 assume that we sent it to BCI, but I do know
24 that it, in fact, was a fentanyl patch.
25    Q.    Prior to this incident in about

Page 61

1 2011, had you ever encountered fentanyl in your
2 law enforcement activities in Summit?
3     A.    No, I -- I never did personally.
4     Q.    Prior to this incident in about
5 2011, were you aware of any law enforcement
6 encounters involving fentanyl in Summit?
7         MR. LEDLIE:  Object to the form of
8 the question.
9     A.    No, I'm not -- I'm not -- that's
10 when I personally became aware of it.
11    Q.    Are there any other law enforcement
12 encounters involving fentanyl specifically,
13 that you recall?
14    A.    You know, I want to say that we --
15 we've had a couple instances of something
16 coming into the jail by way of the U.S. mail,
17 and -- and, consequently, we've -- we've
18 changed the way we -- we do things because of
19 that. But I know this one specifically because
20 I knew the lady that found it, and her father
21 used to work for us. That's how I remember
22 that specific incident.
23        But I know that we've had a couple
24 more attempts to get things in the -- into the
25 facility with sticking the fentanyl patches on

16 (Pages 58 - 61)

Page 62

1 the -- on the letters.
2     Q.    In the case that you described in
3 2011, were there any records that record the
4 incident of contraband, in that case fentanyl,
5 being sent into the jail?
6     A.    Yeah, we would have -- yes, we
7 would have written a report on it at that point
8 in time, and I also sent an e-mail to -- to
9 my boss at the time, who was Chief Gary James.
10 I sent him something that said this -- this was
11 found, to let him know what's going on. And a
12 report would have been generated, and we would
13 have sent it to either our detective bureau or
14 our drug unit to have -- have it investigated
15 who -- maybe who sent that in. And I don't
16 know the results of that.
17     Q.    What is the report that the
18 corrections division would have completed to
19 record the fentanyl being sent into the jail?
20     A.    So the deputies in the jail write
21 the exact same reports that the patrol deputies
22 do. They would have written the incident
23 report or the confidential -- confi- --
24 confidential investigation of exactly what
25 happens. So it's the same reporting process.

Page 63

1     Q.    And is that information kept
2 electronically, as well?
3     A.    At that point --
4         MR. LEDLIE:  Objection to the form
5 of the question.
6         Sorry.  You can answer.
7     A.    At that point in time, we would --
8 we would have -- how can I explain this? So
9 the guys on the road don't have access to a
10 computer -- computers back then. Even though
11 it's 2011, they would handwrite it. But the
12 deputies in the jail will sit down at a
13 computer, because we have access to that
14 equipment, and they will type the report
15 into -- it's OLEG, Ohio Law Enforcement
16 Gateway, I believe it's called, that stores all
17 of our reports electronically.
18         So they would have typed that
19 incident report on the format on the screen and
20 done it that way. And then would have typed
21 the confidential investigation, which is just a
22 blank format. It's a Word document that our
23 guys type for the investigative report, which
24 is a much more detailed description of the
25 event.

Page 64

1     Q.    Would the OLEG report for the 2011
2 incident involving fentanyl include the word
3 "fentanyl"?
4     A.    Most likely.
5     Q.    And would the investigation report,
6 the Word document you referenced, also
7 reference the specific drug fentanyl?
8         MR. LEDLIE:  Object to the form of
9 the question.
10     A.    Yes, it would -- it would list it
11 in there, but if the report is being written,
12 which 99 percent of the time it's written prior
13 to an actual BCI test, it would probably say
14 something like "suspected fentanyl." And
15 then -- and then the report from BCI would be
16 attached to that case file.
17     Q.    Would the BCI report be entered
18 into OLEG once it's received?
19     A.    I don't think so.
20     Q.    Would the BCI report be attached to
21 the investigation report, the Word document
22 that you mentioned?
23         MR. LEDLIE:  Object to the form of
24 the question.  Asked and answered.
25     A.    Yes, it should be with the case

Page 65

1 file that is maintained in the -- in the
2 detective bureau.  When they get the -- when
3 the report comes back from BCI, it should be
4 put in there so that when the case goes to
5 trial, we have an exact description of what we
6 have.
7     Q.    And is that case file maintained
8 electronically, in addition to the hard copy
9 file in the detective's bureau?
10     A.    I -- I don't think it is.  I don't
11 know that -- know that for sure.  I know that
12 years ago, when I was in operations, we
13 actually had a file room with the files in
14 there.
15     Q.    So to continue our march through
16 your employment, where we --
17     A.    Okay.
18     Q.    -- left off was back in 2003 when
19 you served as a sergeant on patrol.
20         When did you leave that post?
21     A.    I think I was promoted to -- well,
22 I know I was promoted.  I think it was August
23 of 2003 I became a lieutenant.
24     Q.    And how did the -- what was your
25 assignment as a lieutenant?

17 (Pages 62 - 65)

Page 66

1    A.   I went -- I was, again, returned to
2  corrections.  So when -- when we're promoted at
3  the jail, we're -- I'm sorry, at the sheriff's
4  office, we generally go back to the jail for
5  reassignment, for training purposes, and
6  learning how to do the -- do the job again.  So
7  I went -- I went back as a jail shift
8  commander, worked midnight shifts for 13
9  months.
10    Q.   What was the nature of your
11  responsibilities as a jail manager?
12    A.   So I would -- I would do the daily
13  schedule of the deputies that come in to work
14  every day.  I would do the sergeant schedule as
15  well, schedule them where they need to be,
16  approve days off, accept or deny inmates that
17  came into the jail.
18        You know, an off- -- an officer or
19  deputy would drop off an inmate with commitment
20  papers, and I would look at the paperwork and
21  say, "Yes, we can take this person," or, "No,
22  we can't take it."  Make sure that's happening.
23  Basically, when you're the lieutenant, you're
24  in charge of the entire jail for that shift.
25    Q.   In what circumstances would you

Page 67

1  turn away an inmate who was dropped off with
2  commitment papers?
3    A.   There's -- there's several reasons
4  we -- we may refuse a prisoner.  It may not be
5  an appropriate charge.  It may be something we
6  don't take, because we're -- we're kind of a
7  felony-only jail at this point in time.
8        If it's a minor misdemeanor, we're
9  not going to take.  If it's somebody that has a
10  medical condition that our nursing staff who's
11  on -- we have nursing staff in the building
12  24/7.  They would come down and talk to the
13  inmate, and -- and if it's something that we
14  can't handle, they would refuse that person for
15  that instance.
16        Usually, it's medical refusals or
17  an inappropriate charge that the refusal is
18  made for.
19    Q.   If you turn away an inmate, where
20  do they go?
21    A.   So if we turn an inmate away, let's
22  just say for a medical reason, the arresting
23  agency would take that -- they could do a
24  couple things.  They can go -- they can choose
25  to do a summons and release the inmate.

Page 68

1        But usually what they'll do is
2  they'll take the inmate to the -- to a hospital
3  to be checked out.  We would get a sheet from
4  the hospital that says this person's okay.
5  They would come back to our jail.  Our nursing
6  staff would look at the inmate, examine him in
7  again at the booking window and say, "Okay, we
8  can take them now."
9    Q.   Are they ever turned way to be sent
10  to another correctional facility?
11    A.   No.  I mean, we're a jail.  If it's
12  an appropriate charge and we can medically
13  handle their situation, we're going -- we're
14  going to take them.
15    Q.   What about an individual charged
16  with a misdemeanor who's inappropriately sent
17  to a Summit County facility; where are they
18  sent?
19        MR. LEDLIE:  Object to the form of
20  the question.
21    A.   We would send them back with the
22  arresting agency, and whatever they did with
23  them would be up to that agency.
24    Q.   During your experience as a jail
25  manager in the period 2003 to 2004, do you

Page 69

1  recall what proportion of the Summit County
2  inmate population had been charged with a
3  dru-- -- drug-related crime?
4    A.   Don't know the exact amount.  I
5  know that it was -- a lot of the cases that
6  came in were -- were drug related.
7    Q.   Do you have any estimate of the
8  proportion of inmates who were charged with a
9  drug-related offense?
10    A.   It was --
11        MR. LEDLIE:  Object to the form of
12  the question.
13    A.   It was probably over half.
14    Q.   If we wanted to check those
15  numbers, what documents would we consult?
16    A.   You would have to go through all
17  the bookings for that time period -- we do
18  about 14,000 bookings a year -- and find out
19  what that charges are.
20    Q.   Do you have a recollection of how
21  many -- of what proportion of the inmate
22  population, again for the period 2003 to 2004,
23  was charged with a crime related to an opioid
24  drug?
25    A.   No.  I would -- I would -- I would

18 (Pages 66 - 69)

Page 70

1  not know.  Again, because when they come in,
2  me, as a lieutenant at the time, would look at
3  the paperwork, and it would say "drug abuse,"
4  and it would probably list the -- the degree of
5  the felony, 1 through 5.  And if it was
6  something we took, we took it.  I didn't
7  usually look at the narrative and see exactly
8  what -- what they were found with.
9      Q.   If we wanted to determine which
10  proportion of the inmate population was charged
11  with a crime based on involvement with opioids,
12  where would we find that information?
13          MR. LEDLIE:  Object to the form of
14  the question.
15      A.   It would be in the original arrest
16  paperwork generated by either our deputy staff
17  or the arresting agency.  It would be --
18  probably be in the court documents.  And on a
19  rare occasion, we may put something in our
20  booking notes that says what the per- -- what
21  exactly the person had.  But that's not --
22  if -- if it's an appropriate charge of drug
23  abuse, felony 3, 4, 5, or whatever it may be,
24  that's what's in our book -- that's what --
25  that's what's in our booking stuff, not

Page 71

1  usually -- not always, but not usually the type
2  of drug that they had.
3      Q.   Again, for the period 2003 to 2004,
4  do you recall instances in which you were
5  called upon to deal with inmates who suffered
6  from addiction?
7      A.   I don't remember how many times
8  that that happened.  That would have -- you
9  know, I was a -- I was a lieutenant in the jail
10  in charge of, really, the security of it.
11  Their treatment of addictions and things like
12  that was really out of my realm of authority.
13      Q.   Do you have any knowledge of how
14  many of the inmates during the period -- or
15  what proportion of the inmat- -- inmates during
16  the period 2003 to 2004 suffered from
17  addiction?
18          MR. LEDLIE:  Object to the form of
19  the question.
20      A.   No, I -- I would not know how many
21  suffered from addiction.
22      Q.   Do you know of any documents that
23  we could look at in order to determine what
24  proportion of the inmate population suffered
25  from addiction?

Page 72

1          MR. LEDLIE:  Object to the form of
2  the question.
3      A.   I don't know that we maintain
4  anything that says this person is addicted to
5  whatever.  We would have -- we would have
6  documentation that says they're charged with
7  this offense, not to the -- what they're
8  addicted to.
9      Q.   You mentioned earlier that --
10          MR. LEDLIE:  We've been going a
11  little over an hour, so when we can take a
12  break and --
13          MS. WU:  Oh, sure.  Let me just
14  finish this question and then happy to take a
15  break.
16      Q.   You mentioned a few moments ago
17  that there are instances in which you turned
18  away an inmate who was brought to a Summit jail
19  facility.
20          Were there ever instances in which
21  you turned away an inmate because you were
22  unable to treat addiction issues?
23          MR. LEDLIE:  Object to the form of
24  the question.  Not a medical expert.
25      A.   So we would turn them away because

Page 73

1  the condition that they had, whatever it may
2  have been -- addiction wouldn't be an -- an
3  issue, because there can be addictions for a
4  lot of things.  And if it -- if we could keep
5  them healthy and safe in the jail, we're --
6  we're going to take them.
7          MS. WU:  Okay.  I'm happy to take a
8  break now.
9          THE WITNESS:  Okay.
10          THE VIDEOGRAPHER:  Off the record
11  at 10:03 a.m.
12          (A recess was taken.)
13          THE VIDEOGRAPHER:  Back on the
14  record at 10:27 a.m.
15  BY MS. WU:
16      Q.   Captain Barker, are you ready to
17  resume?
18      A.   Yes.
19      Q.   So prior to the break, we were
20  marching through your tenure with the sheriff's
21  department.  I believe that we left off in 2004
22  when you were a sergeant assigned as a jail
23  manager; is that right?
24      A.   2004?
25      Q.   Yes.

19 (Pages 70 - 73)

Page 74

1    A.   Actually, I was a lieutenant, as a
2  shift commander.
3    Q.   Oh, I'm sorry.
4    A.   That's okay.
5    Q.   Lieutenant and shift commander.
6    A.   Yeah.
7    Q.   Okay.  What was your next
8  assignment?
9    A.   Sometime in 2004 -- it was the
10  summertime, July, August -- I was transferred
11  back out to the patrol bureau as a -- as a
12  lieutenant.
13    Q.   How long did you serve as a
14  lieutenant on patrol?
15    A.   From the summer of 2004 until
16  January of 2011.
17    Q.   What was the nature of your
18  responsibility as a lieutenant on patrol?
19    A.   I was one of two lieutenants
20  assigned to the bureau.  I worked 8p to 4a, and
21  I was out on -- out on the road with the
22  sergeants and the deputies handling calls, and
23  supervised anything that needed to be taken
24  care of.
25    Q.   Did you have any specific

Page 75

1  responsibilities related to drug law
2  enforcement?
3    A.   No.  We were -- nothing -- nothing
4  specific.  We were patrol.  That's all we did.
5    Q.   Do you recall about -- during this
6  period, 2004 to 2011, do you recall about how
7  many law enforcement encounters you attended a
8  week that related to drugs?
9    A.   Not the exact number, but I would
10  say that I probably went to the scene of one or
11  two per shift, again working five days a week.
12    Q.   Is that an increase or a decrease
13  from the number of law enforcement encounters
14  involving drugs that you had participated in in
15  your previous stints on patrol?
16    A.   No, it seemed it was pretty
17  consistent.  Consistent then.
18    Q.   What were the types of drugs
19  involved in the law enforcement encounters in
20  which you participated during this period, 2004
21  to 2011?
22    A.   2004, early in my assignment as a
23  lieutenant out there, it was still seeing
24  marijuana and cocaine-type stuff.  And then as
25  I started to progress in the years, 2007, 2008,

Page 76

1  we're starting to see more pills on the road.
2    Q.   When you say pills, what particular
3  types of pills are you referencing?
4    A.   Oxycodone seems to be one always
5  sticking out in my mind, and we talked about
6  the burglaries and that type of stuff.
7    Q.   Where would we look to identify
8  events involving oxycodone during this period,
9  2007 to 2008, that you've just referenced?
10       MR. LEDLIE:  Object to the form of
11  the question.
12       You can answer.
13    A.   Not real sure where you could look
14  other than going through our incident reports
15  from that time frame.
16    Q.   Are there any other pills, other
17  than oxycodone, that you recall encountering
18  during this time period?
19    A.   I don't have any recollection of
20  other than that.
21    Q.   What was the nature of the law
22  enforcement encounters involving oxycodone
23  during this period, 2008 to 2009?
24       MR. LEDLIE:  Object to the form of
25  the question.

Page 77

1    A.   We were starting to see pills that
2  were being stolen, started to see more of that
3  on -- when I was assigned to the patrol
4  division as a lieutenant.
5    Q.   From what sources were pills -- and
6  I believe you mean oxycodone -- being stolen?
7    A.   They would get them from family
8  members.  They would steal them in the course
9  of a -- of a burglary, from pharmacies, things
10  were being taken.  A variety of places where
11  people would try to dig up the pills.
12    Q.   Were you personally involved in
13  investigating the reasons for an increase in
14  the number of law enforcement encounters
15  involving oxycodone during this period, 2008 to
16  2009?
17    A.   No, that wouldn't have been my
18  assignment.  It was to supervise the ongoing
19  situation on the road at the time.
20    Q.   Do you know if the Summit County
21  Sheriff's Department undertook any efforts to
22  investigate the reasons for the increase in the
23  number of law enforcement encounters involving
24  oxycodone during this period, 2008 to 2009?
25       MR. LEDLIE:  Object to the form of

20 (Pages 74 - 77)

Page 78

1 the question.
2     A.   I was never assigned to the -- the
3 drug unit, and I just -- other than hearing
4 things, I know that we were looking into it,
5 but I -- I was never involved in that type of
6 stuff.
7     Q.   When you say "we were looking into
8 it," what are you referencing?
9     A.   Looking into the -- the thefts of
10 the pills that we were coming acrost.
11     Q.   Who was responsible for
12 investigating the thefts of pills that you were
13 coming across?
14         MR. LEDLIE:  Object to the form of
15 the question.  Asked and answered.
16     A.   It would have been our detective
17 bureau and our drug unit.
18     Q.   Do you know the findings of those
19 investigations?
20     A.   No, I do not.
21     Q.   When you were involved in law
22 enforcement encounters involving oxycodone
23 during this period, 2008 to 2009, did you ever
24 ask the -- the individuals involved why they
25 stole the oxycodone?

Page 79

1     A.   No, I was -- wasn't really aware
2 what was happening at that -- at that time in
3 my career.
4     Q.   And when you say you weren't aware
5 what was happening at that time, what are you
6 referring to?
7     A.   I -- I was aware that pills were
8 being stolen, but I wasn't aware of the -- I
9 didn't have the knowledge I have now back then.
10     Q.   What's the knowledge that you have
11 now of prescription opioids that you didn't
12 have back in 2008, 2009?
13     A.   So in my routine now as -- as the
14 administrative captain of Summit County Jail,
15 I -- I do have a chance to talk to inmates on
16 occasion, and they will tell me that they were
17 st- -- starting to steal pills years ago
18 because they couldn't get them as readily as
19 they used to be able to get them from their
20 doctors and such.
21     Q.   On how many occasions has an inmate
22 described to you a motivation to steal pills,
23 to use your words, because they couldn't get
24 those as readily as they -- as they used to get
25 them from their doctors?

Page 80

1     A.   I don't know how many occasions.  I
2 just know that it's -- it's a lot.  In my --
3 the course of my -- been in -- been in the jail
4 since 2011.  In that time frame, I hear it a
5 lot.
6     Q.   Do you know -- could you describe
7 for me the last instance in which an inmate
8 described to you a motivation to steal pills
9 because he no longer was able to obtain
10 prescription drugs from a physician?
11     A.   So when -- maybe a year ago, I took
12 a -- so inmates will submit what's called a
13 "kite."  It's a request for assistance.  And
14 sometimes it will make it up to me, and I'll go
15 down and talk to them.  And just in the course
16 of it, they will say that -- they'll, you know,
17 relate to you that they were trying to get
18 pills or something and they couldn't do it, and
19 they were trying to get money for pills and
20 they would, you know, go burglarize or steal
21 something to get money for the pills.  It's
22 just -- it's a -- and it seems to be a
23 reoccurring theme.
24     Q.   So the -- what do you recall about
25 the instance in which an inmate described to

Page 81

1 you a desire to commit a crime to obtain drugs,
2 including oxycodone, a year ago?  What do you
3 recall about that conversation?
4         MR. LEDLIE:  Object to the form of
5 the question.
6     A.   Don't really remember the specifics
7 of the case.  I just know that this particular
8 inmate, we were talking about an issue he was
9 having in the jail.  I don't exactly know the
10 exact issue, but we began -- he would just tell
11 me that a lot of the stuff that led up to where
12 he was at was thefts, involved to get money
13 to -- for his habit.
14     Q.   Do you recall on what charge this
15 inmate, what charge brought that inmate to the
16 Summit County Corrections facility?
17     A.   No, I -- I didn't look it up.
18     Q.   Do you recall the name of the
19 inmate with whom you had this conversation?
20     A.   No, I don't.
21     Q.   Do you recall if you undertook any
22 investigation of whether that inmate, in fact,
23 had ever received a valid prescription for an
24 opioid drug?
25         MR. LEDLIE:  Object to the form of

21 (Pages 78 - 81)

Page 82

1 the question.
2     A.   I did not look into that.
3     Q.   Do you know if that individual
4 received any drug rehabilitation treatment
5 during his time at a Summit County Corrections
6 facility?
7         MR. LEDLIE:  Object to the form of
8 the question.
9     A.   No, I do not.
10    Q.   When is the last time, prior to
11 that, that an inmate described to you a
12 motivation to commit a criminal act due to a
13 inability to obtain opioids from a physician?
14    A.   I don't know the exact time frame,
15 but as my duties have changed in the jail and I
16 have, you know, less and less interaction with
17 the inmates, I get it from -- from -- I get
18 that information from staff.  And when I do
19 have the opportunity to talk to an inmate,
20 several of them in the last few years have told
21 me that this is what -- this is why they're in
22 the situation that they're in.
23    Q.   In the last five years, on how many
24 occasions has an inmate described to you a
25 motivation to commit a criminal act due to an

Page 83

1 inability to obtain prescription opioids from a
2 physician?
3         MR. LEDLIE:  Object to the form of
4 the question.
5     A.   I don't know the exact number, but
6 I know it's been several times I've heard that.
7     Q.   More than five?
8     A.   Yes.
9     Q.   More than 10?
10    A.   Yes.
11    Q.   More than 20?
12    A.   Probably not.
13    Q.   Do you have any information
14 concerning the number of inmates who have ever
15 received a valid prescription for an opioid
16 drug?
17        MR. LEDLIE:  Object to the form of
18 the question.  Outside the scope of his
19 employment.
20    A.   Yeah, I -- I would not know the
21 answer to that question.
22    Q.   If we wanted to determine the
23 medical history of an inmate in order to screen
24 for a history of prescription opioid use, do
25 you know where we could look for that

Page 84

1 information?
2     A.   I would think you would have to go
3 through their -- their medical records with
4 their physicians.
5     Q.   Do you have access to a database
6 called OARRS?
7     A.   No, I don't.
8     Q.   Do you know if any members of the
9 sheriff's department have access to a database
10 calls OARRS?
11    A.   I do not know.
12    Q.   So we were talking about the period
13 2004 to 2011.  What was the nature of the
14 change in your duties in 2011?
15    A.   In January 2011, I was promoted to
16 the rank of captain and reassigned to the
17 corrections division, where I've been since
18 then.
19    Q.   And what are the nature -- what is
20 the nature of your role as captain in the
21 corrections division?
22    A.   Currently, I'm the -- one of -- I'm
23 the administrative captain assigned to the
24 jail.  Contracted services, which would be
25 medical and mental health, food services,

Page 85

1 report to me.  I handle some of the
2 administrative duties with going to different
3 meetings, different boards I'm on.  It's
4 more -- much more of an administrative position
5 that I have now.
6     Q.   What are the boards on which you
7 serve?
8     A.   I'm a member of the Jail Oversight
9 Advisory Commission.
10        I'm a member of Ohio Jail Advisory
11 Board, and we meet once a quarter in Columbus.
12        When there's ADM Board meetings, I
13 sometimes act as the representative to that.
14        I'm on the Information -- I'm the
15 sheriff's representative to the Information
16 Technology Commission to the county.
17        That's about all I can remember
18 right now.  And whether -- whatever else they
19 may ask me to go to.
20    Q.   What is the nature of your
21 involvement with the ADM Board?
22    A.   The ADM Board supplies our mental
23 health.  They pay for our mental health
24 provider, who is Summit Psychological.  When
25 there's an ADM Board meeting, if I can't go,

22 (Pages 82 - 85)

Page 86

1 I'll send a representative, but I -- I go to
2 the meetings that talk about mental health
3 issues and drug-related issues throughout the
4 county.
5     Q.   Is it the case that the ADM Board
6 funds the mental health services provided by
7 the corrections division?
8     A.   They fund the mental health
9 services that are provided through Summit
10 Psychological Services, yes.
11     Q.   Do you have any responsibilities
12 for the budget for Summit County Corrections?
13     A.   No, I do not.
14     Q.   Who has those responsibilities?
15     A.   That would be our fiscal division
16 downtown, the fourth floor.  I believe Pam
17 Murray is in charge of that.
18     Q.   Do you provide Ms. Murray with any
19 information related to the needs of the
20 corrections division for budget purposes?
21     A.   Yes, I do.
22     Q.   What is the nature of your
23 responsibilities for providing budget
24 information to Ms. Murray?
25     A.   So once a year, we'll be asked for

Page 87

1 capital improvement, what -- what we need to
2 make the jail run more efficiently.  And I
3 will -- me and the other supervisors in the
4 jail will get her a list of things that we'd
5 like to see done -- done or brought into the
6 facility.
7     Q.   How do you identify the budgetary
8 needs for the corrections division?
9     A.   I don't really deal with the -- the
10 budget.  I'll ask for a personnel request and
11 it will be granted or denied.  Or I'll ask for
12 a piece of equipment, and it will be granted or
13 denied.  I don't really deal with the money
14 issues, per se.
15     Q.   When you make a request for
16 personnel or equipment, in what form do you
17 submit that request?
18     A.   Usually, it's -- it would be by
19 e-mail.
20     Q.   Is that an e-mail submitted to
21 Ms. Murray?
22     A.   Yes, and it may be submitted up to
23 my direct supervisor, as well.
24     Q.   Who's your direct supervisor?
25     A.   Inspector William Holland.

Page 88

1     Q.   What is Inspector Holland's role in
2 the sheriff's department?
3     A.   He's the actual jail commander, so
4 he has all the -- the ultimate authority over
5 the jail.
6     Q.   For what period of time have you
7 reported to Inspector Holland?
8     A.   It's been about two years.
9     Q.   Prior to that, to whom did you
10 report directly?
11     A.   Major Dale Soltis.
12     Q.   What was Major Dale Soltis's
13 position within the sheriff's department?
14     A.   He started out as the major that
15 was reporting to a chief at the time, Greg
16 Macko.  And then when Chief Macko retired two
17 years after taking the position, Major Soltis
18 took over as the jail commander, and I was his
19 administrative captain.
20     Q.   In your current role in
21 corrections, do you have any specific
22 responsibility for drug enforcement?
23     A.   No, I do not.
24     Q.   Do you have any specific
25 responsibilities for providing addiction

Page 89

1 treatment services?
2     A.   No, I do not.
3     Q.   Does anyone have those
4 responsibilities?
5     A.   That -- those types of things would
6 be through our detective bureau or the line
7 staff, if there's some type of narcotic issue
8 in the jail.  And then the mental health
9 services would handle the addiction issues.
10 But it's -- we don't do a lot of that.
11     Q.   Do you have responsibility --
12 oversight responsibility for the mental health
13 services provided within the corrections
14 system?
15     A.   Yes.
16     THE VIDEOGRAPHER:  Excuse me.  I'm
17 sorry.  Ms. Wu, I think you're covering your
18 microphone.
19     MS. WU:  Oh.
20     THE VIDEOGRAPHER:  Thank you.
21     Q.   What is the nature of your
22 responsib- -- oversight responsibility for the
23 mental health services provided within the
24 corrections system?
25     A.   So the mental health supervisor

23 (Pages 86 - 89)

Page 90

1 reports to me, and I kind of act as a
2 go-between, between her staff that's in the --
3 in the building, and the security staff, which
4 are the deputies in the building, and make sure
5 that they are both doing what they need to
6 complete their job assignments.
7      Q.   And the mental health supervisor
8 has direct responsibility for addiction
9 treatment within the correction facilities; is
10 that right?
11      A.   You know, I -- I really don't know
12 that it -- it's specifically her
13 responsibility.  I know that her people will
14 talk -- her staff will talk to the inmates
15 about it.  But I don't think that they actually
16 have specific programs.  We're not -- we're not
17 a treatment facility.
18      Q.   Is there anyone in the corrections
19 division who has responsibility for providing
20 addiction treatment services to inmates?
21      A.   No.  That's not the type of
22 facility, where -- we're not a residential
23 treatment facility.  That would be another
24 organization outside the jail.
25      Q.   To the extent that the corrections

Page 91

1 division provides addiction services, they're
2 provided by the mental health staff; is that
3 correct?
4           MR. LEDLIE:  Object to the form of
5 the question.
6      A.   Not exactly sure what the mental
7 health, when they talk to the inmates one on
8 one, what they provide them.  I just know that
9 they counsel them on numerous issues.
10      Q.   Currently, so in 2018, is there any
11 addiction treatment programming available to
12 Summit County inmates?
13           MR. LEDLIE:  Object to the form of
14 the question.
15      A.   There is a once-a-week Narcotics
16 Anonymous that we provide, and that's about it.
17      Q.   Who's responsible for providing
18 the -- or who actually provides the Narcotics
19 Anonymous programming?
20      A.   The mental health staff does it.
21      Q.   And you're responsible for
22 overseeing the mental health staff, correct?
23      A.   Yes.
24      Q.   When did the corrections division
25 start providing Narcotics Anonymous programming

Page 92

1 for inmates?
2      A.   That was -- it was there before I
3 got there as a captain, so I -- I don't know
4 how long -- how long ago that was.
5      Q.   Has the Narcotics Anonymous
6 programming been provided continuously during
7 your tenure in the corrections division?
8      A.   Yes.
9      Q.   Does the corrections division pay
10 for the Narcotics Anonymous programming
11 provided to inmates?
12           MR. LEDLIE:  Object to the form of
13 the question.
14      A.   Yeah, I'm not sure how the
15 budgetary issues work with that, who provides
16 that.
17      Q.   What staff provides the Narcotics
18 Anonymous programming to inmates?
19      A.   The mental health staff.
20      Q.   Is there any outside provider that
21 participants in the Narcotics Anonymous
22 programming?
23      A.   If -- if there is, I'm not aware of
24 it.
25      Q.   Do you have any -- in your current

Page 93

1 role, do you have any responsibilities for the
2 medical health care provided to inmates?
3      A.   The medical people re- -- report to
4 me.  I don't really have responsibility to the
5 inmates, but the mental -- I'm sorry, the
6 medical department reports to me.
7      Q.   Do you have oversight
8 responsibility for the medical department?
9      A.   Yes.
10      Q.   What is the nature of your
11 responsibility with regard to oversight of the
12 medical treatment of inmates?
13      A.   I will meet with the person that's
14 in charge of the contracted services.  Right
15 now, it's -- it's Advanced Correctional.  I'll
16 meet with her on a daily basis and make sure
17 things, much like the mental health, are
18 running smoothly, that they are getting the
19 support from the security staff to do their
20 job.
21      Q.   Does the medical staff provide
22 direct care to inmates within the corrections
23 system?
24      A.   Yes, they do.
25      Q.   Does the Summit corrections

24 (Pages 90 - 93)

Page 94

1 facilities maintain prescription
2 pharmaceuticals?
3     A.    Yes, they do.
4     Q.    Are you responsible for maintenance
5 of the pharmaceuticals on site?
6     A.    No.
7     Q.    Do you have any knowledge of what
8 pharmaceuticals are stocked on site?
9     A.    Not specifics.  I know broadly what
10 they -- what they have.
11     Q.    Broadly, what do they include?
12     A.    What the doctors would prescribe to
13 the inmates, blood pressure medications,
14 over-the-counter-type medications, those types
15 of things.
16     Q.    Does the pharm- -- pharmacy stock
17 maintained by the corrections division include
18 drugs that fall into the opioid category?
19         MR. LEDLIE:  Object to the form of
20 the question.
21     A.    I don't know enough about the
22 medications that they have to answer.
23     Q.    If we wanted to review the
24 inventory for medications maintained by the
25 corrections division, where would we look?

Page 95

1         MR. LEDLIE:  Object to the form of
2 the question.  Misstates testimony.
3     A.    You'd probably have to talk to the
4 medical provider.
5     Q.    And who's the med- -- medical
6 provider?
7     A.    Yes.  It would be Advanced
8 Correctional Health.
9     Q.    Does Advanced Medical -- does
10 Advanced Correctional Health maintain medical
11 records within the correctional facility?
12     A.    Yes, they do.
13     Q.    And do you have access to those
14 medical records?
15     A.    No, I do not.
16     Q.    Do you have access to the pharmacy
17 inventory records maintained by Advanced
18 Correctional Health?
19     A.    No, I do not.
20     Q.    Do you have any responsibility for
21 maintaining the pharmacy license maintained by
22 the corrections division?
23         MR. LEDLIE:  Object to the form of
24 the question.
25     A.    No, I do not.

Page 96

1     Q.    Are you aware if the pharm- -- if
2 the corrections division maintain a pharmacy
3 license for its facilities?
4     A.    Actually --
5         MR. LEDLIE:  Object to the form of
6 the question.
7     A.    -- I'm not aware of that.
8     Q.    You mentioned, a short while ago,
9 that you participate in a task force, which is
10 the Jail Advisory Committee; is that right?
11     A.    Yeah.  Let me get the acronym
12 right.  Jail Oversight Advisory Commission was
13 convened in November of 2017, and I was the
14 sheriff's representative to that commission.
15     Q.    What's the nature of that advisory
16 committee -- commission, that is.
17     A.    When we started meeting in November
18 or December of last year, we -- we had a
19 committee of 12 to 13 people that looked at the
20 entire operations of the jail.  We met about
21 every two weeks, and then we submitted a report
22 to the Summit County Council.  And then us, as
23 a sheriff's office, are implementing the
24 recommendations that we thought were
25 appropriate to the jail.

Page 97

1     Q.    What is the your understanding of
2 why the Jail Operations Advisory Commission was
3 convened?
4     A.    It was -- county council thought
5 that they needed somebody to come in and look
6 at our operations, because we had had --
7 recently had an in-custody death last September
8 of 2017.
9     Q.    Could you describe the events
10 surrounding the in-custody death in September
11 2017?
12     A.    I was out of town on -- on vacation
13 when it occurred, so I was not on scene.  I did
14 read the case file, so all the -- all the
15 knowledge I have is from what I read with -- in
16 the reports.
17     Q.    What is your knowledge of the
18 in-custody death that occurred in September
19 2017?
20     A.    An inmate was being moved from one
21 housing unit to the other.  He began a struggle
22 with our deputies.  And he -- I can't really
23 remember off the top of my head what the
24 coroner's report reported, but he had some type
25 of cardiac issue that led to his death.

25 (Pages 94 - 97)

1    Q.    Are you aware of any other
2 motivations for convening the Jail Operations
3 Advisory Commission?
4        MR. LEDLIE:  Object to the form of
5 the question.
6    A.    No, I -- other than my direct
7 involvement, I don't know what was -- reasons
8 for it.
9    Q.    Could I have -- so I'd like to mark
10 as Exhibit 1 a document identified as
11 SUMMIT_001773045.
12        - - - - -
13        (Thereupon, Deposition Exhibit 1,
14        Document Titled "Summit County Jail
15        Operations Advisory Commission
16        Report and Recommendations,"
17        SUMMIT_001773045to 001773066, was
18        marked for purposes of
19        identification.)
20        - - - - -
21    Q.    Captain Barker, are you familiar
22 with Exhibit 1?
23    A.    Yes, I am familiar with this.
24    Q.    What is it?
25    A.    This is the report that the Jail --

1 Jail Operations Advisory Commission submitted
2 to Summit County Council.
3    Q.    And this report was submitted in
4 August 2018, correct?
5    A.    That is correct.
6    Q.    Were you involved in the drafting
7 of this report?
8    A.    Yes, I did help with the draft of
9 this report.
10    Q.    Are there any particular aspects of
11 this report for which you had direct
12 responsibility?
13    A.    So we were broken up into three
14 subcommittees.  I was on the Use of Force &
15 Jail Conditions subcommittee, and this page 17
16 looks like real close to what I submitted as my
17 part to the -- the commission.
18    Q.    Is it correct that you served as
19 Sheriff Barry's designee to the commission?
20    A.    Yes, that's correct.
21    Q.    Did Sheriff Barry himself have any
22 direct involvement in the commission?
23    A.    Yes, he did.
24    Q.    How did you split responsibilities
25 with Sheriff Barry?

1    A.    He didn't really have any
2 responsibilities.  He -- he kind of gave that
3 all to me, but he did go to some of the
4 meetings, attend.  He did have input when
5 commission members had questions, and he did
6 submit statistics.  But he was more of a -- he
7 was in the audience.  He didn't actually sit
8 with the commission.  He wasn't empaneled.  He
9 gave that authority to me.
10    Q.    So if I could call your attention
11 to page 4 of the report, which -- and the Bates
12 number, which is the number at the very bottom,
13 ends 3048.
14    A.    Executive summary?
15    Q.    Correct.  If I can call your
16 attention to the second sentence, it reads,
17 "Due to limited financial resources, the opiate
18 crisis, and the increased state funding cuts,
19 operations at the jail have become increasingly
20 strained."
21        Do you see that, Captain Barker?
22    A.    I do see that.
23    Q.    Do you have an understanding of the
24 reference to opiate crisis?
25    A.    Yes, I'm somewhat familiar with

1 what they're talking about.
2    Q.    What's your understanding?
3    A.    That there has been a large spike
4 in the amount of prescription medications that
5 are being prescribed, and in the last seven,
6 eight, ten, twelve years, something like that,
7 there's been an increase, and we're starting to
8 see overdoses on it and related deaths to it.
9    Q.    Is it your understanding that the
10 reference to opiate crisis, as used here in
11 Exhibit 1, is limited to prescription
12 medications?
13        MR. LEDLIE:  Object to the form of
14 the question.
15    A.    It's -- I think it's related to all
16 opiates.
17    Q.    What is your understanding of the
18 class of drugs that falls into the description
19 of opiate as used here in Exhibit 1?
20    A.    Those -- from my understanding it's
21 those drugs that derived from poppy plant and
22 chemical compounds that relate to that, like
23 fentanyl.
24    Q.    What other drugs would fall into
25 the definition of opiate as used in Exhibit 1?

26 (Pages 98 - 101)

Page 102

1      MR. LEDLIE:  Object to the form of
2  the question.
3      A.   I don't know enough about the --
4  the medical and chemical technology to know all
5  the things that would be inside there.
6      Q.   As used in Exhibit 1, does "opiate
7  crisis" refer to opiates, including street
8  drugs?
9      MR. LEDLIE:  Object to the form of
10  the question.
11      A.   It refers to all of them.
12      Q.   It refers to prescription and
13  non-prescription drugs?
14      A.   Yes.
15      Q.   And you -- do you share the view
16  that there is an opiate crisis in Summit
17  County?
18      A.   I do.
19      Q.   How would you describe the opiate
20  crisis?
21      A.   In my capacity in administrative
22  captain at the jail and some of my time in
23  patrol, I started to see more and more of these
24  types of behaviors that were leading to
25  overdoses, people trying to bring opiate-type

Page 103

1  stuff into the facility.  It's just been an
2  on- -- ongoing battle the last ten years or so.
3      Q.   When do you believe the opiate
4  crisis began?
5      MR. LEDLIE:  Object to the form of
6  the question.
7      A.   I don't know.  Ten, twelve years
8  ago.
9      Q.   Was there ever a time that there
10  was not an opiate crisis in Summit County?
11      A.   Probably before the time frame that
12  I became a lieutenant out on the road.
13      Q.   And could you remind me what year
14  you became a lieutenant?
15      A.   Went out to the road as a
16  lieutenant from 2004 to 2011.
17      Q.   Was there ever a time, in your
18  experience, that heroin was not a problem in
19  Summit County?
20      A.   The time that I spent as a deputy
21  and sergeant and part of the time as a
22  lieutenant, we weren't seeing a lot of -- a lot
23  of that stuff on the street.
24      Q.   And during what time period are you
25  referencing your time as a deputy and sergeant?

Page 104

1      A.   From 1994 up until probably 2008,
2  2010, sometime in that time frame.
3      Q.   Has there ever been any other type
4  of drug crisis in Summit County?
5      MR. LEDLIE:  Object to the form of
6  the quest- -- the question, sorry.
7      A.   Not that I'm aware of.
8      Q.   In your opinion, has there ever
9  been a meth crisis in Summit County?
10      A.   No.
11      Q.   In your opinion, has there ever
12  been a crack or cocaine crisis in Summit
13  County?
14      A.   No.
15      MR. LEDLIE:  Object to the form of
16  the question.
17      Q.   So if we go back to the second
18  sentence, there's -- it says due to limited
19  financial resources.
20      How do you understand the reference
21  to limited financial resources?
22      A.   So 2009, we laid off substantial
23  amount of deputy staff, upwards of 40, probably
24  35 civilian staff in the jail.  And we really
25  haven't recovered from that, those layoffs.

Page 105

1      Q.   What caused the layoffs in 2009?
2      MR. LEDLIE:  Object to the form of
3  the question.
4      A.   I don't know enough about the --
5  the budget.  The money wasn't there.
6      Q.   Did the layoffs in 2009 have any
7  relationship to the opiate crisis identified
8  here in Exhibit 1?
9      MR. LEDLIE:  Object to the form of
10  the question.
11      A.   I don't know.
12      Q.   Was there an opiate crisis in
13  Summit County in 2009?
14      MR. LEDLIE:  Object to the form of
15  the question.
16      A.   I don't know the exact time frame
17  that it would have started.
18      Q.   How would we determine when the
19  opiate crisis in Summit County started?
20      MR. LEDLIE:  Object to the form of
21  the question.
22      A.   I -- I don't know.
23      Q.   Are there any documents that we
24  could consult in order to identify the onset of
25  the, quote-unquote, opiate crisis in Summit

27 (Pages 102 - 105)

Page 106

1 County?
2        MR. LEDLIE:  Object to the form of
3 the question.
4        You can answer.
5     A.    Start looking at the arrests.
6     Q.    What specific documents would we
7 need to consult in order to identify arrests
8 involving opioid drugs?
9     A.    Court documents.  Incident reports.
10     Q.    Are there -- have you looked at
11 those documents as the basis for forming your
12 opinion that there is an opiate crisis in
13 Summit County?
14     A.    It's part of what I looked at.
15 It's a small part of what I've lived for the
16 last ten years.
17     Q.    What else forms the basis of your
18 opinion that there is an opiate crisis in
19 Summit County?
20     A.    The way they see the inmate
21 population changing, the way I saw the
22 incidents on the road changing, what I see --
23 what I see and hear that my staff tells me is
24 changing.  It's been an ongoing -- can't figure
25 the word I'm looking for, but it's just -- it

Page 107

1 has been a change in the last 10 to 12 years.
2     Q.    What are the changes that you've
3 observed in terms of the inmate population?
4     A.    We're starting to -- we have been
5 seeing, for a long time, health-related issues
6 to withdrawal when they come into the jail.
7 They're being treated a lot more for -- when
8 they come to the jail, they -- they don't have
9 access to -- to the opiates, and they're going
10 through withdrawal symptoms, and it causes
11 them -- causes us -- we have to give them more
12 medical care.
13     Q.    Do you know what proportion of the
14 inmate population has manifested withdrawal
15 symptoms related to opioid use within the last
16 year?
17     A.    No, I do not.
18     Q.    Do you know what proportion of the
19 inmate population has manifested withdrawal
20 symptoms related to opioid use for any other
21 year?
22     A.    No, I do not.
23     Q.    If we wanted to obtain that
24 information, where would we look?
25     A.    Probably have to look through the

Page 108

1 medical records that the medical provider
2 keeps.
3     Q.    Are those individual patient files?
4     A.    Yes, they are.
5     Q.    If we wanted to know -- do you know
6 what proportion of the inmate population has
7 used opioid drugs within the last year?
8        MR. LEDLIE:  Object to the form of
9 the question.
10     A.    No, I just know it's a lot.
11     Q.    How do you know it's a lot?
12     A.    By talking to staff and talking to
13 inmates and going to meetings that we discuss
14 things like this, talking to other jail
15 commanders that I know.  It's just -- it's what
16 I deal with on a day-to-day basis.
17     Q.    Do you know what proportion of the
18 inmate population, for any other year, used
19 opioid drugs?
20        MR. LEDLIE:  Object to the form of
21 the question.
22     A.    No, I do not.
23     Q.    If we wanted to find that
24 information, where would we look?
25     A.    Have to be court documents and

Page 109

1 reports.
2     Q.    Are there specific documents that
3 we'd need to consult in order to identify the
4 type -- types of drugs used by inmates at the
5 Summit County correctional facilities?
6        MR. LEDLIE:  Object to the form of
7 the question.
8     A.    Have to look at the -- read the
9 narratives of the reports.
10     Q.    And which reports are you
11 referencing there?
12     A.    Incident reports that are generated
13 in the -- in the county.
14     Q.    Do you have knowledge of how -- of
15 what proportion of the Summit County inmate
16 population, during the last year, ever received
17 a valid prescription for an opioid drug?
18        MR. LEDLIE:  Object to the form of
19 the question.  He's not a medical expert.  He's
20 a fact witness.
21     A.    Yeah, I would not have that
22 information.
23     Q.    Do you have knowledge of what
24 proportion of the Summit County inmate
25 population ever received a valid prescription

Page 110

1 for an opioid drug for any year?
2        MR. LEDLIE:  Object to the form.
3 The same objection.
4    A.   No, I do not.
5    Q.   Do you know how we could obtain
6 that information if we wanted to check?
7        MR. LEDLIE:  The same objection.
8    A.   I do not know.
9    Q.   Why don't you track the number of
10 inmates who use opioid drugs?
11        MR. LEDLIE:  Object to the form of
12 the question.
13    A.   Because I'm responsible for the
14 security of the facility.  That's my -- that is
15 my responsibility.
16    Q.   Would it allow you to improve the
17 services at the corrections facilities if you
18 had a better understanding of the addiction
19 profile of the inmates in your facilities?
20        MR. LEDLIE:  Object to the form of
21 the question.  He's a fact witness.
22    A.   I don't know if it would or not.  I
23 have to maintain the security of the jail.
24    Q.   Does drug addiction of any kind
25 impact the security of your corrections

Page 111

1 facilities?
2    A.   Yes.
3    Q.   How so?
4    A.   Inmates -- inmates or somebody may
5 try to get those particular items inside the
6 jail, and it makes it -- makes it more
7 challenging to make sure that the jail is a
8 secure setting for staff and inmates.
9    Q.   Are there particular security
10 concerns related to opioid drugs that you have
11 encountered in the Summit County Corrections
12 facilities?
13    A.   Yes.
14    Q.   What are those?
15    A.   We're starting to see -- we have
16 been seeing opiates being smuggled into the
17 jail, and we've had to put equipment into place
18 to try to combat that.  We have seen inmates
19 that are coming in that are going through
20 withdrawal symptoms of opiate addiction, and it
21 causes our med- -- our medical staff to treat
22 them, and then, consequently, our security
23 staff has to go and deal with these incidents,
24 as opposed to actually doing their job of
25 supervising the inmates.  They're dealing with

Page 112

1 more of a medical -- medical issue because of
2 these things that we see now.  So it pulls my
3 staff away from their -- their main job of
4 securing the jail.
5    Q.   Do you know how many instances, in
6 the last year, an individual attempted to bring
7 drugs into a correctional facility?
8        MR. LEDLIE:  Object to the form of
9 the question.
10    A.   I have no where -- no way of
11 knowing the attempts of inmate, how many.
12    Q.   Do you know how -- in how many
13 instances an individual was caught attempting
14 to bring drugs into a correctional facility
15 within the last year?
16        MR. LEDLIE:  Object to the form of
17 the question.
18    A.   I don't know the exact number, but
19 I know it has happened.
20    Q.   Has it happened more than five
21 times?
22    A.   Yes.
23    Q.   Has it happened more than 10 times?
24    A.   Yes.
25    Q.   Has it happened more than 20 times?

Page 113

1    A.   I don't know.  It'd be total
2 speculation on my part now.
3    Q.   Do you track the number of times --
4 the number of incidents involving an attempt to
5 bring drugs into a Summit County Corrections
6 facility?
7    A.   If we become aware of the attempt
8 and we catch it, but it doesn't happen, we will
9 track that with a report that is generated.
10    Q.   What type of report is generated?
11    A.   An incident report.
12    Q.   Is there any aggregation of the
13 information included in those incident reports?
14        MR. LEDLIE:  Object to the form of
15 the question.
16    A.   I don't understand what you mean by
17 the aggregation of it.
18    Q.   Do you make any effort to track the
19 total number of instances in which drugs are
20 found to be attempted to be smuggled into a
21 corrections facility?
22    A.   We do.  We write the report when --
23 when we find it occurring, but I don't actually
24 keep, like, a log of, you know, how many times
25 we've done it and that we've discovered it.

29 (Pages 110 - 113)

Page 114

1    Q.    Would knowledge of the total number
2  of drug events -- drug attempts -- drug
3  smuggling attempts help you improve your
4  policies and procedures for maintaining the
5  security of corrections facilities?
6         MR. LEDLIE:  Object to the form of
7  the question.
8    A.    I don't know if it would improve it
9  at all.  I don't know if it would improve it.
10 I just know that we make every effort to keep
11 it outside of the facility.
12   Q.    What specific efforts have you
13 undertaken in order to keep drugs out of Summit
14 County Corrections facilities?
15   A.    We've done several things.  We've
16 increased staff training in the area of
17 pat-downs and detection of the stuff -- of that
18 type of items coming into the jail.  We now
19 change out female prisoners as soon as they
20 come into the jail, and we now take them to the
21 showers and change them out, which pulls my
22 staff away from doing other things.  We'll
23 change them, shower them, put them into jail
24 clothing.
25        August -- I believe it's August

Page 115

1  2017, we bought a piece of equipment that will
2  actually scan the inmate and let us know if
3  they have anything on them or concealed inside
4  of them, so we started using that.  So every
5  inmate goes through that when they're a new
6  inmate, or they come -- or they leave the jail
7  and come back.
8    Q.    What proportion of drug smuggling
9  of -- attempts in the last year have involved
10 an opioid drug?
11   A.    I don't know the -- the number, but
12 most of the times it's something related to
13 that.
14   Q.    When you say "it's something
15 related to that," what do you mean?
16   A.    It could be prescription or
17 non-prescription opioids.
18   Q.    Do you know what proportion of drug
19 smuggle attempts in the last year have involved
20 a prescription opioid drug?
21   A.    No.
22   Q.    If we wanted to know that, where
23 would we look?
24   A.    The incident reports, read the
25 narratives and find out what exactly was -- was

Page 116

1  discovered.
2    Q.    Do you know that information for
3  any other year for -- in which you've served
4  the corrections division?
5    A.    No, I do not.
6    Q.    So going back to Exhibit 1, again
7  we're in the second sentence.  It says,
8  "increased state funding cuts."
9         Do you have an understanding of the
10 increased state funding cuts referenced in
11 Exhibit 1?
12   A.    It is my understanding, personal
13 level, that the state no longer gives the local
14 government funding that it used to, to the
15 counties and the local municipalities, so the
16 funding has been reduced on a state level.
17   Q.    Do you know if the decrease in
18 funding in any way relates to the opiate crisis
19 also identified in Exhibit 1?
20        MR. LEDLIE:  Object to the form of
21 the question.
22   A.    I -- I don't know.
23   Q.    Are you aware of any indication
24 that the budget pressures described in
25 Exhibit 1 relate to the opiate crisis as

Page 117

1  referred to in Exhibit 1?
2         MR. LEDLIE:  Object to the form of
3  the question.  Asked and answered.
4    A.    I do not know.
5    Q.    So I'd like to ask you, Captain
6  Barker, to look at page 21 of this report,
7  which has the Bates stamp ending 3065.  We're
8  now looking at a section of the report titled
9  "Improving Inmate Services."
10        Are you with me, Captain Barker?
11   A.    Yes, ma'am, I am.
12   Q.    If we look on page 21, we see a
13 series of recommendations for improving inmate
14 services.  And I'd like to call your attention
15 to the second italicized section.  It reads,
16 "Recommendation.  Reinstitute services like
17 Narcotics Anonymous, Alcoholics Anonymous, et
18 cetera."
19        Do you see where I've read?
20   A.    Yes, I do.
21   Q.    During what period of time were the
22 Narcotics Anonymous services canceled at
23 corrections facilities in Summit County?
24   A.    So this -- this part of the report
25 was not written by the subcommittee that I was

30 (Pages 114 - 117)

Page 118

1  on, so I didn't have any input into this.
2          When the jail commission started, I
3  gave -- I personally gave every member a tour
4  and went through the services, and it was going
5  on at that time.  I think that somehow, in the
6  months that the report was written, they didn't
7  realize that we had that service, and they
8  thought we should bring it back.  Well, we
9  already have it.  The one we don't have is
10  Alcoholics Anonymous.  We don't have an AA
11  meeting.
12      Q.   Was there ever a period in time,
13  during which you have served at the corrections
14  division, that the Narcotics Anonymous program
15  was suspended?
16      A.   Not that I'm aware of.
17      Q.   During what period of time was the
18  Alcoholics Anonymous program suspended?
19      A.   I believe that happened in 2009
20  with the layoffs, the layoff of the staff.
21      Q.   Was the Alcoholics Anonymous
22  program ever reinstituted?
23      A.   No, it -- it was -- has not, as of
24  yet, been reinstituted.
25      Q.   Did you have responsibility for

Page 119

1  reviewing this report before it was issued?
2      A.   Yes, I did.
3      Q.   Other than Narcotics Anonymous, are
4  there any other drug treatment programs
5  currently offered to inmates at the Summit
6  corrections facilities?
7          MR. LEDLIE:  Object to the form of
8  the question.
9      A.   There are none that I know of.
10      Q.   Is the Narcotics Anonymous program
11  provided to inmates specific to opioids?
12          MR. LEDLIE:  Object to the form of
13  the question.
14      A.   I don't know what's covered in the
15  meetings.  I've never -- never sat on one.
16      Q.   Was Narcotics Anonymous programming
17  offered to inmates prior to the onset of the
18  opiate crisis you've identified in Exhibit 1?
19      A.   As far as I know, Narcotics
20  Anonymous has been going on for years.  I don't
21  know how far back it goes.
22      Q.   Also on page 21, if we now go to
23  the fourth italicized recommendation, it reads,
24  "Recommendation.  Increase focus on mental
25  health services and work with the Summit County

Page 120

1  criminal justice and mental health forum to
2  develop a plan for high utilizers."
3          Do you see where I've read?
4      A.   Yes.
5      Q.   Do you have an understanding of the
6  need to increase mental health services
7  identified on page 21?
8      A.   I have an idea of what this
9  subcommittee was -- was discussing.
10      Q.   What is your understanding?
11      A.   That -- their belief was that --
12  their belief was that we weren't providing --
13  are not providing enough mental health services
14  and that we should increase that.  It -- the
15  command staff, at the jail level, were looking
16  into it, and right now we think we're doing
17  as -- as best we can with what we have.
18      Q.   In your role as captain in the
19  corrections division, do you have
20  responsibility for the provision of mental
21  health services to Summit inmates?
22          MR. LEDLIE:  Object to the form of
23  the question.
24      A.   Yeah, I don't -- I don't provide
25  it.  I oversee the mental health services that

Page 121

1  are provided by Summit Psychological.
2      Q.   You have oversight responsibility
3  for the mental health services provided to
4  inmates, correct?
5      A.   Yes.
6      Q.   And do you agree with the -- this
7  recom- -- this indication that increased
8  medical services are required?
9      A.   Medical or mental health?
10      Q.   Excuse me.  Thank you, Captain
11  Barker.
12      A.   Sorry.
13      Q.   Do you in- -- agree with this
14  indication that an increase in mental health
15  services is required?
16          MR. LEDLIE:  Object to the form of
17  the question.
18      A.   I think any increase in service
19  that we can offer would be a good idea.
20      Q.   Is there a particular threshold for
21  services that you think is necessary?
22      A.   Outside the realm of my expertise.
23  I -- again, I'm in security of the jail.
24      Q.   Do mental health issues in the --
25  in the jail cause security concerns?

31 (Pages 118 - 121)

Page 122

1    A.    Yes.
2    Q.    In what way?
3    A.    We have to treat the inmates that
4  are going through whatever mental health issues
5  they may have, whatever -- it -- it just, it
6  pulls the staff that we have away from the job
7  of doing shakedowns, securing the jail. It's
8  making us -- it pulls staff away from other
9  assigned duties to deal with these issues.
10    Q.    Do you believe that there's a
11  relationship between the number of inmates who
12  suffer from mental health issue and the number
13  of inmates who suffer from drug addictions?
14        MR. LEDLIE:  Object to the form of
15  the question.  Outside the scope.
16    A.    I don't know anything about that.
17    Q.    Do you agree that opioid use and
18  mental health issues often overlap?
19    A.    Yes, I would agree with that.
20    Q.    Do you know what proportion of the
21  inmate population in Summit County in this year
22  has a diagnosed mental health issue?
23    A.    No, I do not.
24    Q.    If we wanted to determine that,
25  where would we -- where would we look?

Page 123

1    A.    Probably have to get with the
2  mental health provider at the jail and -- and
3  talk to them.
4    Q.    Are there any particular records
5  that we could review in order to determine
6  that?
7    A.    They -- they keep records on their
8  inmates that they treat.
9    Q.    So, Captain Barker, I'd like to
10  mark as Exhibit 2 a news article from the Akron
11  Beacon Journal titled, "Summit County Jail
12  Commission Digs Into Use of Force, Deputy
13  Hiring, Training, Inmate Mental Health."
14        - - - - -
15        (Thereupon, Deposition Exhibit 2,
16        Article Titled "Summit County Jail
17        Commission Digs Into Use of Force,
18        Deputy Hiring, Training, Inmate
19        Mental Health", was marked for
20        purposes of identification.)
21        - - - - -
22    Q.    Captain Barker, are you familiar
23  with Exhibit 2?
24    A.    Yes, I remember this.
25    Q.    Do you recall that you provided

Page 124

1  comments to -- for this news story?
2    A.    I do recall, yes.
3    Q.    If I can call your attention to
4  what's printed as the second page of the story,
5  page 2 of 3.
6    A.    Okay.
7    Q.    And the fifth paragraph on this
8  page, it reads, "He," meaning Captain Barker,
9  "and others around the table agreed that opioid
10  use and mental health issues often overlap, and
11  suicides at the jail have at times been
12  connected to addicts losing access to drugs."
13        Do you see where I've read?
14    A.    Yes, ma'am, I do.
15    Q.    Do you believe that mental health
16  issues overlap with the use of drugs in
17  addition to opioids?
18    A.    I do, because we are seeing more
19  inmates that are going through withdrawal, and
20  consequently, we're having more inmates on what
21  we call suicide precautions than years ago when
22  I worked in the jail at different levels in my
23  career.
24    Q.    Have you -- do you -- are you aware
25  of any overlap between mental health issues and

Page 125

1  use of drugs other than opioids?
2    A.    No, I'm not.
3    Q.    How many inmates are currently on
4  suicide watch at the Summit County Corrections
5  facilities?
6    A.    I wouldn't know the exact number.
7  I can only say that I happened to work
8  Thanksgiving Day, and we had eight people on
9  suicide precautions that day.
10    Q.    Of the eight people on suicide
11  precautions on Thanksgiving, do you know how
12  many of them are addicted to drugs?
13    A.    No.
14        MR. LEDLIE:  Object to the form of
15  the question.
16    Q.    Of the eight people on suicide
17  watch on Thanksgiving, do you know how many of
18  them have ever had an opioid drug?
19        MR. LEDLIE:  Object to the form of
20  the question.
21    A.    No, I don't.
22    Q.    Do you know that information for
23  any of the individuals who have been on suicide
24  watch in the Summit County facilities?
25    A.    Other than the one or two that may

32 (Pages 122 - 125)

1 have caused a -- an acute problem at the jail
2 that our staff had to get involved with, and in
3 later investigation we found out that they had
4 had an opiate issue, I wouldn't know the
5 amount.
6     Q.   Can you tell me more about the one
7 or two individuals that caused an acute problem
8 at the jail?
9     A.   So when they're on precautions and
10 they begin to act out, whatever it may be, they
11 don't like the rules that we've imposed on them
12 or the -- the suicide precautions that is
13 imposed on them, and it -- it develops into
14 maybe a use of force issue, an issue that we
15 have to have supervision on the scene to try
16 to, you know, quell the situation.
17         I've had a few times relate to me
18 that this person was going through withdrawal,
19 and it made them depressed and suicidal, and it
20 led to more -- more resources at the jail being
21 used to maintain the secure -- security of the
22 facility because this particular person's
23 actions.
24     Q.   You refer to one or two instances
25 where withdrawal had caused an acute problem at

1 the jail.  Could you identify about when those
2 instances occurred?
3     A.   We've had a couple this year.
4 There was several last year going on.  I --
5 I -- without having the documents in front of
6 me, I wouldn't know the dates and times that it
7 occurred.
8     Q.   What documents would you need to
9 review in order to know the dates and times
10 that withdrawal has caused acute issues within
11 a corrections facility?
12     A.   I'd have to go back and review the
13 shift commander logs for the year in question,
14 review the reports that would be hopefully
15 mentioned in the shift commander's log and go
16 read through those.  And then, if there's any
17 use of force, read the use of force report.
18     Q.   You testified that there were a
19 couple of instances in which an inmate
20 experiencing withdrawal caused acute issues at
21 the jail within the last year.  When is the
22 last time that occurred?
23     A.   I don't know for sure.
24     Q.   Do you recall any specific
25 instances in the last year when an inmate

1 experiencing withdrawal accused -- caused acute
2 issues within the jail facilities?
3         MR. LEDLIE:  Object to the form of
4 the question.
5     A.   No, I -- I couldn't give you the
6 exact dates and time.  I just know that when
7 things come up to me, that's the information
8 I'm getting from my line staff.
9     Q.   When is the last time that
10 information came up to you, to use your terms,
11 indicating that an inmate experiencing
12 withdrawal caused an acute issue within the
13 jail facility?
14     A.   Probably a couple months ago.
15     Q.   What was the nature of that
16 incident?
17     A.   It was an inmate that was having --
18 going through withdrawals and was in suicide
19 precautions and didn't like those precautions,
20 and acted up, and the deputy staff had to go
21 inside and either put them in a more restrained
22 situation or -- more restrained situation or
23 use force.
24     Q.   Do you know the nature of the
25 withdrawal that the inmate you're referencing

1 experienced?
2     A.   No.
3     Q.   Do you know to what drugs the
4 inmate was experiencing withdrawal?
5     A.   No.
6     Q.   Do you know if they were opioids?
7     A.   I don't know.
8     Q.   When was the last time before that
9 that there was a situation in which you were
10 told an inmate's withdrawal symptoms caused an
11 acute situation within the jail facility?
12         MR. LEDLIE:  Object to the form of
13 the question.
14     A.   I don't know the -- the last time.
15     Q.   So there's one instance within the
16 last year that you can recall in which the
17 withdrawal symptoms of an inmate caused an
18 acute situation within the jail facility?
19         MR. LEDLIE:  Object to the form of
20 the question.  Misstates testimony.
21     A.   It's been an ongoing issue.  I
22 don't know the exact dates and times for you.
23     Q.   Within the last year, how many
24 inmates have experienced withdrawal symptoms?
25         MR. LEDLIE:  Object to the form of

Page 130

1 the question.  Asked and answered.
2     A.   I don't know.
3     Q.   Where would we look to find that
4 information?
5     A.   Incident reports and with medical
6 and mental health records.
7     Q.   Is there anyone who tracks that
8 information?
9     A.   I don't know if there is or not.
10     Q.   Would --
11          THE WITNESS:  Actually, can I take
12 a break?
13          MS. WU:  I'm sorry?
14          THE WITNESS:  Can I take a break?
15          MS. WU:  Oh, yes.
16          THE WITNESS:  I don't mean to cut
17 you off, but --
18          MS. WU:  Oh, no, that's fine.
19          THE WITNESS:  -- kind of holding it
20 for a while.
21          MS. WU:  No, happy to do it.
22          THE VIDEOGRAPHER:  Off the record
23 11:32.
24          (A recess was taken.)
25          THE VIDEOGRAPHER:  Back on the

Page 131

1 record at 11:47 a.m.
2     Q.   Captain Barker, before the break,
3 we were looking at Exhibit 2.  I'd like to just
4 return to that document for a moment.
5          On the second page where we left
6 off, page 2 of 3, in the sixth paragraph, it
7 reads, quote, "'We used to have Alcoholics
8 Anonymous and Narcotics Anonymous, and now we
9 don't have the staff,'" end quote, "Barker
10 said."
11          Is it the case that the corrections
12 facilities suspended the provision of Narcotics
13 Anonymous?
14     A.   No.  I was wrong when I said that.
15     Q.   I'd like to move on to the broader
16 topic of jail operations in Summit County.
17          How many facilities does Summit
18 County Corrections have in its jurisdiction?
19     A.   We have two.
20     Q.   What are the two?
21     A.   We have the Crosier Street
22 facility, which is the main jail, and then we
23 have the Glenwood Jail facility.
24     Q.   How do you determine to which
25 facility an inmate would be sent?

Page 132

1     A.   It's all a classification issue.
2 It has to do with their charges, their
3 behavior, their past charges.
4     Q.   What inmates are sent to the Summit
5 County Jail?
6     A.   The inmates that are classified
7 appropriately for the Summit County Jail.
8     Q.   What are the classifications
9 required for an inmate to be housed at the
10 Summit County Jail?
11     A.   The ones that are more of a
12 security risk would be at the Summit County
13 Jail.
14     Q.   What qualifies an individual as a
15 security risk?
16     A.   There's numerous things.  There's
17 an algorithm that our classification deputies
18 use that I don't use, that -- I'm sorry, that I
19 don't -- I'm not familiar with.  It's going to
20 be what they're charged with, if they have a
21 violent history, if they're violent while
22 they're in jail, they're kept at -- because the
23 Crosier Street facility is a more secure
24 facility.
25     Q.   What is the capacity of the Crosier

Page 133

1 Street jail facility?
2     A.   So we -- we just increased it, and
3 I think it's 791.
4     Q.   During your tenure in corrections,
5 did the jail, the Crosier Street facility, ever
6 have a lower capacity?
7     A.   Yes.
8     Q.   When was that?
9     A.   When I first got hired in, we were
10 at 420, maybe.
11     Q.   And when were you hired in?
12     A.   In November of 1994 I became
13 full-time deputy sheriff.
14     Q.   What accounts for the increase in
15 capacity at the jail?
16          MR. LEDLIE:  Object to the form of
17 the question.
18     A.   We've added a west wing since the
19 jail was opened up, and we've added double
20 bunks since then.
21     Q.   What motivated the corrections
22 division to increase capacity from 420 to 791?
23     A.   Because we didn't have the capacity
24 to hold the inmates that we were holding.  We
25 were using cots, used our gymnasium at a couple

34 (Pages 130 - 133)

Page 134

1 times, until we increased the bed capacity.
2    Q.   Do you know what caused the
3 increased inmate population during the period
4 1994 to present?
5        MR. LEDLIE:  Object to the form of
6 the question.
7    A.   A lot of reasons.
8    Q.   What are those reasons?
9    A.   More arrests, crime going up, the
10 opiate crisis we're seeing.
11    Q.   Have the crime -- has the incidence
12 of crime in Summit County, in fact, increased
13 for the -- the period 1994 to 2018?
14    A.   You know, I haven't looked at the
15 exact FBI stats, but I can tell you that on
16 what I do, by managing the jail, I've seen that
17 our inmate population has increased.
18    Q.   Do you know if the number of felony
19 drug arrests in Summit County has increased
20 during the period 1994 to 2018?
21        MR. LEDLIE:  Object to the form of
22 the question.
23    A.   I do not know.
24    Q.   Do you know if the drug arrests
25 involving opioid drugs has increased during the

Page 135

1 period 1994 to 2018?
2    A.   Yes, I do.  It has picked up.
3    Q.   How do you know that?
4    A.   By working in the jail the length
5 of time that I have, by talking to the people
6 that are housed in the jail, and by talking to
7 people that work in the jail, including myself.
8 I've just seen it on the rise.
9    Q.   When did the rise in the number of
10 inmates charged with a crime involving opioids
11 come to your attention?
12        MR. LEDLIE:  Object to the form of
13 the question.  Asked and answered.
14    A.   It's -- I don't have a specific
15 date.  It's been an ongoing issue.
16    Q.   When did you first take note of an
17 increase in the inmate population based on
18 charges related to opioid drugs?
19        MR. LEDLIE:  Object to the form of
20 the question.
21    A.   It's just been something I've been
22 noticing in the last 10 years.  I can't
23 pinpoint it down to an exact date.
24    Q.   Was there a particular event that
25 brought the issue of increased inmate

Page 136

1 population based on interactions with opioids,
2 what brought it to your attention?
3        MR. LEDLIE:  Object to the form of
4 the question.
5    A.   No particular instance.  Just an
6 ongoing -- ongoing issues.
7    Q.   You mentioned a second corrections
8 facility, Glenwood, correct?
9    A.   Yes.
10    Q.   What inmates qualify for housing at
11 the Glenwood facility?
12    A.   So I've never worked at the
13 Glenwood Jail.  Those are the lower-level
14 offenders.
15    Q.   What do you mean by a lower --
16 lower-level offender?
17    A.   The security assessment --
18 assessment on them is lower than what it would
19 be at -- on a Crosier Street inmate.
20    Q.   Who's responsible for conducting
21 the security assessment necessary to determine
22 where an inmate will be housed?
23    A.   Our classification deputies do
24 that, and then the final approval would be with
25 the Glenwood Jail commander.

Page 137

1    Q.   Who's the Glenwood Jail commander?
2    A.   Currently it's captain Rick Armsey.
3    Q.   Do you have any responsibilities
4 for the classification of an inmate in order to
5 determine housing at the jail or the Glenwood
6 facility?
7    A.   No, I do not.
8    Q.   Do you have any responsibilities
9 related to oversight of the Glenwood facility?
10    A.   No, I do not.
11    Q.   Do you have any interaction with
12 the operations at the Glenwood facility?
13    A.   Not a lot.  If they need assistance
14 with manpower or they need a transport, we'll
15 help them out, but it's kind of its own
16 facility.
17    Q.   Is the only distinction between the
18 inmates housed in Glenwood and the main jail
19 facility their risk assessment?  Their security
20 risk assessment, that is?
21        MR. LEDLIE:  Object to the form of
22 the question.
23    A.   I don't know if that's the only
24 thing that's looked at.
25    Q.   Do you know of any other criteria

35 (Pages 134 - 137)

Page 138

1 used to determine whether an inmate -- inmate
2 will be housed at the jail or at the Glenwood
3 facility?
4     A.    They go through a medical and a
5 mental health screening to go over there, as
6 well.
7     Q.    What aspects of the medical and
8 mental health screening are used to identify an
9 inmate for residence at the Glenwood facility?
10        MR. LEDLIE: Object to the form of
11 the question.
12     A.    I don't know what the medical and
13 the mental health providers ask the inmates or
14 they look for.  I just know that they approve
15 them or disapprove them.
16     Q.    Are the services provided to
17 inmates at Glenwood different than the services
18 provided at the main jail?
19        MR. LEDLIE: Object to the form --
20 object to the form of the question.
21     A.    I don't know about the services at
22 Glenwood Jail.  I don't know.
23     Q.    Do you know if the Glenwood
24 facility offers inmates any additional
25 addiction treatment services?

Page 139

1        MR. LEDLIE: Object to the form of
2 the question.  Asked and answered.
3     A.    I do not know.
4     Q.    Captain Barker, I'd like to mark as
5 Exhibit 3 a document, which is identified a
6 SUMMIT_001845330.
7        - - - - -
8        (Thereupon, Deposition Exhibit 3,
9        Document Titled "Prisoner Transfer
10        by Location," Dated 3/27/2018,
11        SUMMIT_001845330, was marked for
12        purposes of identification.)
13        - - - - -
14     Q.    Captain Barker, are you familiar
15 with the document identified as Exhibit 3?
16     A.    Yes, I've seen this before.
17     Q.    What is Exhibit 3?
18     A.    This is the prisoner transport log
19 when we move somebody from our jail to Lorain
20 Correctional Facility.
21     Q.    Do you know why a prisoner was
22 transferred from the Summit jail to Lorain?
23     A.    Because they would have been
24 sentenced to prison.
25     Q.    So that was for long-term

Page 140

1 incarceration, correct?
2     A.    Correct.
3     Q.    Okay.  Now, if I can call your
4 attention to the first three entries, there's a
5 category for charges.  Do you see that?
6     A.    Yes, I do.
7     Q.    In the first entry, it reads,
8 "Aggravated possession of drugs (F5),
9 possession of drugs (meth) (F5), possessing
10 drug abuse instrument (M2), possessing drug
11 abuse incident (M2), driving under suspension
12 (M1)."
13        Do you see that?
14     A.    Yes, I do.
15     Q.    From what sources are the charge --
16 are the charges populated?
17     A.    It would only be speculation on my
18 part.  I've never seen this generated or how
19 it's generated.
20     Q.    Does the corrections division have
21 any responsibility for creating a transfer
22 log --
23     A.    No.
24     Q.    -- such as Exhibit 3?
25     A.    No, we do not do this.

Page 141

1     Q.    Who has responsibility for doing
2 that?
3     A.    This comes from our -- our court
4 and special services bureau.
5     Q.    What is the relationship between
6 the sheriff's department and the court and
7 special services bureau?
8     A.    They are a bureau within our
9 operations division, and they're the ones that
10 provide court security, and then they
11 transport -- among other things, they transport
12 inmates from our jail to a state facility.  But
13 they are deputy sheriffs.
14     Q.    So the special service- -- services
15 bureau falls within the jurisdiction of the
16 broader sheriff's department, correct?
17     A.    Yes, that's correct.
18     Q.    Are you familiar with the charge
19 categories, which are listed on Exhibit 3?
20     A.    Yes I am.
21     Q.    Do you use these same charge
22 categories in your work in the corrections
23 division?
24        MR. LEDLIE: Object to the form of
25 the question.

36 (Pages 138 - 141)

1     A.   I don't deal with -- personally
2  don't deal with that stuff enough to know.
3     Q.   Do you encounter charge categories
4  in documents that you use in the corrections
5  division?
6     A.   Yes.
7         MR. LEDLIE:  Object to the form.
8     Q.   In what cases do you review charge
9  categories?
10     A.   It may come across my desk if there
11  was a problem with an inmate, and the charges
12  would be attached to it.
13     Q.   How often does that happen?
14     A.   I don't know for sure, but, you
15  know, it happens a lot.
16     Q.   You'll see on Exhibit 3 in the
17  first charge that I read for the record, for
18  the second charge is "possession of drug (meth)
19  (F5)."  Do you know if the reference to meth
20  refers to methamphetamine?
21     A.   I think that's what that means.
22     Q.   Are you aware of any charge
23  categories that specify an opioid drug?
24     A.   I am not.
25     Q.   Are there instances in which Summit

1  County Corrections refers inmates to jails in
2  other jurisdictions?
3     A.   Yes.
4     Q.   What are those circumstances?
5     A.   If it's somebody that is a high
6  profile case, it could be a former employee, a
7  current -- a current employee, it could be
8  somebody that is related to somebody that works
9  at our facility, it could -- that we would --
10  we would house them in another county facility.
11     Q.   Have there ever been instances in
12  which you've needed to refer inmates to another
13  jurisdiction's facility due to overcrowding in
14  Summit?
15     A.   Yes.
16     Q.   On what occasions?
17     A.   For a couple years, as recently as,
18  I want to say 2017, we -- we subcontracted beds
19  out at the Geauga County Jail.
20     Q.   For what period of time did you
21  subcontract beds out to -- was it
22  Geauga County?
23     A.   Geauga.
24     Q.   Geauga County.
25     A.   Yeah.

1     Q.   Thank you.  For what period of time
2  did you --
3     A.   I can't spell it for you.
4     Q.   For what period of time did you
5  have that relationship with Geauga County?
6     A.   I don't know the exact dates.  It
7  was -- it was a couple years.
8     Q.   Was there an agreement in place to
9  fund the inmates that were sent out to Geauga
10  County?
11     A.   Yes.
12     Q.   Was it cheaper to house inmates in
13  Geauga County than in Summit?
14         MR. LEDLIE:  Object to the form of
15  the question.
16     A.   It's not my realm of expertise.
17     Q.   Were you involved in managing the
18  relationship between Summit corrections and
19  Geauga County Corrections?
20     A.   Only in the nature that I went and
21  visited the jail, Geauga County Jail, with
22  Major Soltis, and then we sent inmates up
23  there.  But I didn't -- didn't have a lot of
24  interaction with sending them up there.
25     Q.   Do you know if it was cheaper to

1  hire staff in Geauga County than in Summit
2  County?
3         MR. LEDLIE:  Object to the form of
4  the question.
5     A.   I don't know what they pay their
6  people.
7     Q.   Do you know what caused the
8  overcrowding in Summit that made it necessary
9  to forge a relationship with Geauga County?
10     A.   There's been a lot of issues.  The
11  inmate population is just climbing.
12     Q.   When did you first experience
13  overcrowding in the Summit County Jails?
14     A.   I think we've -- we've always
15  had -- we always have had an overcrowding
16  issue, and it -- it continues to climb.
17     Q.   Is it the fact that the
18  overcrowding issue predates the opiate crisis,
19  which was referenced in Exhibit 1, which we
20  looked at earlier today?
21         MR. LEDLIE:  Objection to the form
22  of the question.  Vague.
23     A.   Don't really know when the exact
24  date of overcrowding.  It's been an ongoing
25  issue.

37 (Pages 142 - 145)

1    Q.   Did you observe overcrowding in the
2  Summit County Corrections facilities prior to
3  2009?
4    A.   Yes.
5    Q.   How has the Summit County
6  Corrections division responded to the opiate
7  crisis that we've discussed today?
8        MR. LEDLIE:  Object to the form of
9  the question.  He's not here as a 30(b)(6) for
10  the county.  He's a fact witness.
11    A.   I don't know.
12    Q.   How have you personally responded
13  to the opiate crisis that we've discussed
14  today?
15    A.   It -- it continues to pull
16  resources from what we've always done in the
17  past to have to deal with inmates that are
18  in -- in the jail for that type of stuff and
19  are going through withdrawal because they can't
20  get it in the jail any- -- anymore, that --
21  they get it on the streets.  So it pulls our
22  staff to deal with those issues.
23    Q.   And you'd agree with me that you
24  don't know how many inmates in Summit
25  corrections facilities have experienced

1  withdrawal within the last year, correct?
2    A.   I cannot give you a number, no.
3    Q.   And you don't know if the inhibits
4  who have experienced withdrawal symptoms within
5  the last year, you don't know how many of them
6  have ingested any opioid drug, correct?
7        MR. LEDLIE:  Object to the form of
8  the question.
9    A.   I don't know the answer to that.
10    Q.   And it's the same for all other
11  years in which you've served the corrections
12  division, correct?
13        MR. LEDLIE:  Object to the form of
14  the question.
15    A.   I don't know.
16    Q.   In your experience in corrections,
17  have you ever encountered an inmate who was
18  charged with a crime related to the illegal
19  prescribing of drugs?
20        MR. LEDLIE:  Object to the form of
21  the question.
22    A.   I don't deal with the inmates one
23  on one a whole lot, so, no, I don't know.
24    Q.   In your experience in the sheriff's
25  department more broadly, have you ever

1  encountered an individual who was arrested for
2  the illegal prescription of drugs?
3    A.   I know that there's been several
4  arrests for that type of behavior.
5    Q.   What is your knowledge of those
6  arrests?
7    A.   It would have been people that were
8  either stealing them, selling them,
9  burglarizing to get money to buy them, people
10  that our drug unit may have arrested and
11  brought into the facility.
12    Q.   How have you become aware of
13  incidents in which individuals have been
14  arrested for the illegal prescription of drugs?
15    A.   Through talking with people that
16  work for my agency, work with me, reports that
17  have come across my desk.  It's the things that
18  I've -- that I've read that deal with my day --
19  day-to-day operations of the facility.
20    Q.   When is the last time you recall
21  encountering information related to an
22  individual arrested for illegally prescribing
23  drugs?
24    A.   I don't know when the last time is.
25    Q.   Can you recall any instance in

1  which you became aware of an individual
2  arrested for the illegal prescription of drugs?
3    A.   I know I've seen it.  I just don't
4  know when and whom it was.
5    Q.   Do you know how many times you've
6  seen it?
7    A.   I don't know how many times.
8    Q.   Captain Barker, do your employees
9  carry any drugs to treat inmates who are
10  experiencing overdoses?
11    A.   No, we do not.
12    Q.   Corrections staff don't carry
13  Narcan?
14    A.   The deputy staff does not carry
15  Narcan.
16    Q.   Is there -- are there any
17  individuals in the corrections facilities who
18  carry Narcan?
19    A.   Yes.
20    Q.   Who?
21    A.   The nurses that are -- that work
22  inside the jail.
23    Q.   The corrections division employs
24  nurses in order to treat inmates, correct?
25        MR. LEDLIE:  Object to the form of

Page 150

1  the question.
2      A.   No.
3      Q.   How are the nurses who treat
4  inmates employed?
5      A.   Through Ameri- -- Advanced
6  Correctional Healthcare, who's contracted with
7  the county for that health care.
8      Q.   But the nature of their employment
9  is to treat inmates within the corrections
10  facilities, correct?
11     A.   Yes.
12     Q.   Did the corrections division have
13  to approve having Narcan on site at corrections
14  facilities?
15     A.   I don't know if we approved that or
16  not.
17     Q.   Okay.  Captain Barker, I'd like to
18  mark as Exhibit 4 SUMMIT_001848870.
19          - - - - -
20          (Thereupon, Deposition Exhibit 4,
21          1/6/2016 E-Mail Chain Re: Requesting
22          Information on Incident at Summit
23          County Jail, SUMMIT_001848870 to
24          001848871, was marked for purposes
25          of identification.)

Page 151

1          - - - - -
2      Q.   Captain Barker, are you familiar
3  with Exhibit 4?
4      A.   Yes.
5      Q.   What is it?
6      A.   It's an e-mail that I wrote to
7  Major Soltis, who was the director of
8  corrections at the time.
9      Q.   I'd like to call your attention to
10  the second page of the e-mail chain, as printed
11  out, and it's the Bates stamp ending 8871.  The
12  very bottom e-mail in the chain is an e-mail
13  dated January 6, 2016, from Eric Ristow of WEWS
14  News.
15          Do you know Mr. Ristow?
16     A.   No, I don't.
17     Q.   Do you know his role at WEWS News?
18     A.   Other than by the signature stamp,
19  no.
20     Q.   His e-mail is addressed to a number
21  of individuals in the Summit County Sheriff's
22  Department, including Sheriff Barry, correct?
23     A.   That is -- yeah, I see Sheriff
24  Barry -- oh, his name is on there, yes.
25     Q.   And Mr. Ristow's e-mail reads,

Page 152

1  "WEWS is requesting information on a situation
2  at the Summit County Jail.  We're hearing
3  reports that a few inmates overdosed on heroin
4  and there was a request for Narcan."
5          Is that right?
6      A.   That's what it says.
7      Q.   In January 2016, did any staff in
8  the corrections division, including nurses,
9  carry Narcan?
10     A.   I don't know when they started
11  carrying it.  I know that I was asked about it
12  at some point in -- in time, and I confirmed
13  with the medical staff that they, in fact,
14  carried it.
15     Q.   Captain Barker, you are personally
16  responsible for overseeing contract services
17  for inmates, correct?
18     A.   Correct.
19     Q.   And that includes the provision of
20  medical care, correct?
21     A.   Correct.
22     Q.   And that would include the
23  provision of Narcan, correct?
24          MR. LEDLIE:  Object to the form of
25  the question.

Page 153

1      A.   No, I don't tell them what -- what
2  type of medications they can and can't carry.
3      Q.   Have you had been involved in any
4  discussions about the decision of whether or
5  not to make Narcan available on site in Summit
6  County Corrections facilities?
7      A.   I had been involved in a -- in a
8  few discussions, but nothing -- the ultimate
9  decision would not have been mine.
10     Q.   Who had the ultimate decision?
11     A.   The medical staff, if they felt
12  they needed to carry it, they carried it.  And
13  then Sheriff Barry also would have a -- have
14  input into that.
15     Q.   Did you have any input into the
16  decision whether or not to have Narcan
17  available in corrections facilities in Summit?
18          MR. LEDLIE:  Object to the form of
19  the question.
20     A.   It -- it's out of my realm of
21  expertise.  No.
22     Q.   You had no responsibility for
23  determining whether or not Narcan should be
24  provided by the medical health provision --
25  medical health professionals under your -- your

39 (Pages 150 - 153)

1  supervision, correct?

2      MR. LEDLIE:  Object to the form of

3  the question.

4      A.  No.

5      Q.  Now, if I can ask you to look at

6  the first page of this e-mail, there's an

7  e-mail from you to Dale Soltis dated January 6,

8  2016, correct?

9      A.  Yes.

10      Q.  What is the substance of your

11  e-mail to Mr. Soltis?

12      A.  It was -- I was letting him know

13  about an incident that I got a phone call late

14  at night, woke me up to deal with something

15  that a lieutenant had a -- needed a decision

16  made.

17      Q.  Was that something an overdose

18  death?

19      MR. LEDLIE:  Object to the form of

20  the question.

21      A.  I don't recall what it was.

22      Q.  If we wanted to look to identify

23  the overdose deaths referenced on this

24  Exhibit 4, what documents would we need to

25  consult?

1      MR. LEDLIE:  Object to the form of

2  the question.  Misstates -- there's no mention

3  of deaths here.  Misstates the document.

4      A.  I don't see anything like that in

5  here.

6      Q.  Do you see that there's a reference

7  to heroin overdoses in Exhibit 4?

8      A.  Are we still talking about this

9  front page, page 1?

10      Q.  I'm referring back.  It's actually

11  on the second page in the e-mail that we read a

12  few moments ago.

13      A.  I do see that written there, but

14  it's not from anybody in my agency.

15      Q.  Are you aware of any overdoses on

16  heroin that occurred in a Summit County

17  Corrections facility in January 2016?

18      A.  No, I'm not.

19      Q.  If we wanted to check whether or

20  not there were any overdoses of any kind that

21  occurred in a corrections facility in January

22  of 2016, where would we have to look?

23      A.  Look at the shift commander logs

24  and the incident reports.

25      Q.  Is there any systemic tracking of

1  overdoses that occur within a corrections

2  facility in Summit?

3      MR. LEDLIE:  Object to the form of

4  the question.

5      A.  I don't know.

6      Q.  Who would have responsibility for

7  tracking overdoses within corrections

8  facilities?

9      A.  I don't know.

10      Q.  Would that fall under the provision

11  of inmate services for which you have

12  supervisory -- have a supervisory role?

13      A.  No.

14      Q.  Do you know if anyone is

15  responsible for tracking overdoses in

16  corrections facilities?

17      A.  I don't know.

18      Q.  Captain Barker, I'd like to mark as

19  Exhibit 5 a document identified as

20  SUMMIT_001850873.

21          - - - - -

22      (Thereupon, Deposition Exhibit 5,

23      October 2016 E-Mail Chain Re: NSAIDs

24      Blog - Dr. Norman Johns, With

25      Attachment, SUMMIT_001850873, was

1      marked for purposes of

2      identification.)

3          - - - - -

4      Q.  Captain Barker, are you familiar

5  with Exhibit 5?

6      A.  Yes.

7      Q.  What is it?

8      A.  It's an e-mail from the CEO of our

9  medical provider.

10      Q.  And that's Advanced Correctional

11  Healthcare, correct?

12      A.  Yes.

13      Q.  And you have supervis- -- you have

14  supervisory responsibility for Advanced

15  Correctional Healthcare, correct?

16      MR. LEDLIE:  Object to the form of

17  the question.

18      A.  I -- they report to me.  I don't

19  direct their staff.

20      Q.  What is the nature of your

21  responsibilities with regard to Advanced

22  Correctional Healthcare?

23      MR. LEDLIE:  Objection to the form

24  of the question.

25      Go ahead.

40 (Pages 154 - 157)

1     A.    They report to me, and I make sure
2 that our security staff and their staff are
3 working together to get the medical needs taken
4 care of.
5     Q.    In the first paragraph of the
6 e-mail from Advanced Correctional Healthcare
7 dated October 20, 2016, the third sentence
8 reads, "What kills more people, opioids or
9 NSAIDs, non-steroidal anti-inflammatory drugs
10 such as ibuprofen or naproxen?  At first
11 glance, this may seem like a silly question.
12 The truth is the death rates from these two
13 classes of drugs are very close.  There are
14 approximately 16,000 to 20,000 deaths a year
15 from NSAIDs alone."
16       Have you -- do you see where I've
17 read?
18     A.    Yes.
19     Q.    Have you experienced any concerns
20 about overdoses from NSAIDs in Summit County
21 Corrections facilities?
22     A.    No, I have not.
23     Q.    Now, the top of this e-mail chain,
24 the Advanced Correctional Healthcare e-mail is
25 forwarded from Major Soltis to Theresa Cummins,

1 and you're copied on this e-mail, correct?
2     A.    That is correct.
3     Q.    Why would you receive this e-mail?
4     A.    He would have sent it to me just so
5 that I knew he was communicating with Theresa
6 Cummins.
7     Q.    And Major Soltis asks Ms. Cummins,
8 "Are we following the recommended protocol from
9 your boss?"  Do you see that?
10     A.    Yes.
11     Q.    Did either you or Major Soltis have
12 responsibility for the quality of health care
13 that Ms. Cummins and her department provide to
14 inmates?
15       MR. LEDLIE:  Object to the form of
16 the question.
17     A.    No.
18     Q.    Who has responsibility for
19 supervising the quality of medical care
20 provided to Summit County inmates?
21     A.    The medical provider.
22     Q.    Who is the medical provider?
23     A.    Advanced Correctional Healthcare.
24     Q.    The sheriff's department has no
25 responsibility whatsoever for those contracted

1 services?
2     A.    We don't even make -- no, we don't.
3     Q.    What responsibility, if any, do you
4 have for maintaining the contract with Advanced
5 Correctional Healthcare?
6     A.    We make sure that our staff is
7 facilitating them in doing their job.
8     Q.    Do you review the performance of
9 Advanced Correctional Healthcare?
10     A.    Yes.
11     Q.    And what does your review entail?
12     A.    I sit down with whoever the medical
13 director is.  Currently, it's Theresa Cummins.
14 We sit down once a month and go over the
15 services that they provide, and we talk pretty
16 much daily.
17     Q.    And what is the nature of your
18 discussion of the services provided by Advanced
19 Correctional Healthcare?
20     A.    It's never really a discussion
21 about the services that they provide.  It's
22 more about the interaction of her staff and the
23 sheriff's office staff.
24     Q.    Are there instances in which the
25 corrections staff have to manage the provision

1 of prescription drugs to inmates?
2     A.    No.
3     Q.    Are there any policies that pertain
4 to what pharmaceuticals may be obtained by an
5 inmate in a corrections facility?
6       MR. LEDLIE:  Object to the form.
7     A.    I don't know.
8     Q.    Is access to pharmaceutical drugs a
9 security issue relevant to your work in the
10 corrections division?
11     A.    Yes.
12     Q.    Do you have any responsibility for
13 overseeing access to pharmaceutical drugs
14 within corrections facilities?
15     A.    No.
16     Q.    Who has that responsibility?
17     A.    Advanced Correctional.
18     Q.    Does Advanced Correctional
19 Healthcare set the Summit County policies for
20 access to pharmaceuticals?
21       MR. LEDLIE:  Object to the form of
22 the question.
23     A.    They don't set our policies.
24       THE REPORTER:  They don't what?
25 I'm sorry.

41 (Pages 158 - 161)

Page 162

1       THE WITNESS:  I'm sorry.  They
2  don't set our policies.
3       THE REPORTER:  Thank you.
4    Q.  Who has responsibility for setting
5  Summit County policies for access to
6  pharmaceuticals of inmates?
7       MR. LEDLIE:  Object to the form of
8  the question.
9    A.  That's not what we do.
10   Q.  If an inmate arrives at the Summit
11 County Jail with a prescription for oxycodone,
12 what is the protocol in place for dealing with
13 that situation?
14      MR. LEDLIE:  Object to the form of
15 the question.
16   A.  I'm not sure what the medical staff
17 does in their dealings with those types of
18 medications.
19   Q.  At the time that an inmate arrives
20 at your facility, do the corrections staff
21 under your supervision have any
22 responsibilities for intake of drugs on the
23 person of -- arriving at the facility?
24   A.  No.
25   Q.  If an inmate arrives at a

Page 163

1  corrections facility indicating that he has a
2  prescription drug to which he must have access,
3  do your staff have any responsibility for
4  reviewing whether or not access to that
5  prescription medication is appropriate?
6    A.  No.
7    Q.  Do you have any responsibility for
8  referring that issue to medical staff on site?
9    A.  Yes.
10   Q.  What is the nature of that
11 responsibility?
12   A.  When somebody comes in that has
13 been arrested, and they have medication on
14 them, or they tell us, "We're on medication,"
15 we will call the nursing staff to the window,
16 and then they will take over that aspect of it
17 from there.
18   Q.  Is there any record kept of your
19 staff's involvement in handling prescription
20 medications?
21      MR. LEDLIE:  Object to the form.
22 Misstates testimony.
23   A.  No.
24   Q.  So I'd like to mark as Exhibit --
25      MS. WU:  Six?

Page 164

1       THE REPORTER:  Yes.
2    Q.  -- SUMMIT_001850134.
3       - - - - -
4       (Thereupon, Deposition Exhibit 6,
5       Document Titled "Summit County
6       Sheriff's Office Summit County Jail
7       - Policy and Procedure,"
8       SUMMIT_001850134 to 001850140, was
9       marked for purposes of
10      identification.)
11      - - - - -
12   Q.  Captain Barker, are you familiar
13 with Exhibit 6?
14   A.  Yes.
15   Q.  What is it?
16   A.  It's inmate medical services policy
17 on incoming medications.
18   Q.  Were you involved in preparing the
19 policy set forth in Exhibit 6?
20   A.  I don't recall being involved in
21 this one.
22   Q.  Do you know who was?
23   A.  I -- I do not.
24   Q.  Do you have any responsibility for
25 enforcing the policy set forth in Exhibit 6?

Page 165

1    A.  Yes.
2    Q.  What is your responsibility?
3    A.  If some of the policy in here that
4  we discovered was not followed, I would assign
5  the appropriate supervisor to take necessary
6  corrective action.
7    Q.  Do you have any other
8  responsibility?
9    A.  To make sure it's followed.
10   Q.  How do you ensure that the
11 prescription drug policy set forth in Exhibit 6
12 is followed within the corrections facilities?
13   A.  I make sure that the lieutenants
14 and the sergeants are supervising the deputies
15 appropriately and that the medical service
16 provider is also doing what they need to do.
17   Q.  How do you do that?
18   A.  I talk to all parties involved,
19 pretty much daily.
20   Q.  Under the policy set forth in
21 Exhibit 6, are inmates permitted to access
22 prescription opioid drugs?
23   A.  I'd have to read through all this
24 to -- to tell you that.  I haven't memorized
25 the policy.

42 (Pages 162 - 165)

Page 166

1    Q.    Do you -- do you know?
2    A.    I don't think I'm understanding
3  your question 100 percent.
4    Q.    Do you know if inmates resident in
5  a Summit County Corrections facility are able
6  to access prescription opioid drugs?
7    A.    They never have access.
8    Q.    If a doctor prescribes oxycodone to
9  an inmate at the Summit County Jail, under the
10 policy set forth in Exhibit 6, is the inmate
11 able to access oxycodone?
12   A.    If the doctor prescribes it and
13 they believe it's medically necessary, it -- it
14 would be admin- -- administered.
15   Q.    Do you believe that creates any
16 security risks within the corrections system?
17   A.    Yes.
18   Q.    What are those risks?
19   A.    Well, if they're not taking the
20 medication appropriately, it could get out into
21 the general population, so we have procedures
22 and policy in place to make sure that it is
23 administered to the inmate.
24   Q.    What are those policies and
25 procedures?

Page 167

1    A.    The inmate has to be watched taking
2  the medication.  Has to be -- the deputy has --
3  and the nurse has to see the medication put in
4  the mouth and swallowed, drink water, and then
5  we ask them to open their mouth and make sure
6  that the medication has been swallowed.
7    Q.    Have you ever recommended any other
8  policies in order to safeguard security within
9  your facilities that would restrict access to
10 prescription opioids?
11   MR. LEDLIE:  Object to the form of
12 the question.  Vague.
13   A.    No.
14   MS. WU:  It's now 12:30.  Do you
15 want to stop for lunch and then we can
16 reconvene?
17   THE WITNESS:  Oh, sure.
18   THE VIDEOGRAPHER:  Going off the
19 record at 12:30 p.m.
20      (Luncheon recess.)
21   THE VIDEOGRAPHER:  Back on the
22 record at 1:34 p.m.
23   EXAMINATION OF SHANE BARKER
24 BY MR. SQUIRE:
25   Q.    Captain Barker, I'm Russell Squire.

Page 168

1  I'm going to take over questioning for a little
2  while.  We met this morning before the
3  deposition started.
4    A.    Okay.
5    Q.    Turning back to Exhibit 6, which is
6  the document that we were talking about before,
7  in that first paragraph, on the first page, the
8  first sentence says, "In order to ensure the
9  continuity of health care and mental health
10 care, the facility health authority will govern
11 the admission of all incoming medications that
12 are either brought in by a newly booked inmate
13 at the time of incarceration, or when the
14 medication is brought to the facility by a
15 third party."
16      Do you see that?
17   A.    Yes, I do.
18   Q.    The facility health authority
19 that's referenced there, is that ACH?
20   A.    Yes.
21   Q.    Okay.  Prior to the implementation
22 of this written policy, was there an unwritten
23 policy with regard to the verification of
24 prescription drugs?
25   A.    No, we wouldn't have anything like

Page 169

1  an unwritten policy.
2    Q.    Was there any kind of informal
3  policy?
4    A.    No.
5    Q.    Okay.  Actually, just going back
6  briefly to Exhibit 6, so part -- prior to the
7  implementation of the written policy, was there
8  any efforts made to verify the authenticity of
9  prescriptions that were brought into the
10 jail --
11   MR. LEDLIE:  Object to the form.
12   Q.    -- for administration to inmates?
13   MR. LEDLIE:  Object to the form of
14 the question.
15   A.    We always verify.
16   Q.    And that was true even prior to the
17 policy?
18   A.    I -- I don't remember any time
19 prior to the policy.
20   Q.    So the entire time that you were at
21 corrections, your testimony is that
22 prescriptions were always verified in some way?
23   MR. LEDLIE:  Object to the form of
24 the question.
25   A.    Yes.

43 (Pages 166 - 169)

1    Q.   Do you know how that verification
2 was done?
3    A.   Not 100 percent.  That would be
4 something the medical staff would have to
5 ask -- or answer, I'm sorry.
6    Q.   So do you know if the verification
7 process changed over time at all?
8    A.   As far as I know, it has not
9 changed.
10    Q.   All right.  So showing you now what
11 will be marked as Exhibit 7.
12        - - - - -
13        (Thereupon, Deposition Exhibit 7,
14        July 2015 E-Mail Chain Re: Ohio
15        State Board of Pharmacy - Terminal
16        Distributor of Dangerous Drugs
17        License, with Attachment,
18        SUMMIT_001856529 to 001856543, was
19        marked for purposes of
20        identification.)
21        - - - - -
22    Q.   So Exhibit 7 is a document bearing
23 beginning Bates number SUMMIT_001856529.
24        Do you recognize this document?
25    A.   I see that it's addressed to me,

1 but I don't -- I don't remember ever reading
2 it.
3    Q.   This is an e-mail chain with an
4 attachment, correct?
5    A.   Yes, it is.
6    Q.   And in the latest e-mail in the
7 chain, at the top of the first page, you see
8 that that e-mail was copied to you?
9    A.   I do.
10    Q.   So looking at the first e-mail in
11 the chain, at the bottom of that first page, in
12 that document, Sheri Zapadka e-mails, and in
13 her e-mail, she writes, "The license for the
14 Summit County Jail Glenwood facility has been
15 made active.  Attached, please find a copy of
16 an inspection report and several other
17 informational documents, including information
18 on OARRS."
19        Do you see that?
20    A.   Yes.
21    Q.   Are you familiar with this license
22 that she's referring to?
23    A.   No, I -- I'm not.
24    Q.   So do you know what type of license
25 a correctional facility needs to have in order

1 to be able to administer prescriptions?
2    A.   No, I do not.
3    Q.   And in that reference to O-A-R-R-S,
4 which I'll pronounce OARRS, you testified
5 previously that you're not familiar with OARRS,
6 correct?
7    A.   That's correct, yes.
8    Q.   And in the next e-mail at the top
9 of the page, Pamela DeBartolo is writing, "An
10 annual inventory (in-house) of all controlled
11 substances at the facility must be completed,
12 and the MAR (medication administration record)
13 and receipts from Diamond pharmacy must be
14 maintained on site for at least 3 years."
15        Do you see that?
16    A.   Yes, I see that.
17    Q.   Now, who is Pamela DeBartolo?
18    A.   She's the previous -- previous
19 health administrator with ACH.
20    Q.   Previous meaning before Theresa
21 Cummins?
22    A.   Yes.
23    Q.   So she works for ACH?
24    A.   She used to.
25    Q.   She used to, okay.

1    A.   Yes.
2    Q.   Does the Summit County Jail
3 maintain medication administration records for
4 its inmates?
5        MR. LEDLIE:  Object to the form of
6 the question.
7    A.   I don't know how they maintain -- I
8 don't know how ACH maintains that.
9    Q.   So those records are created by
10 ACH?
11    A.   Yes.
12    Q.   And are they housed in the pharmacy
13 at the jail?
14        MR. LEDLIE:  Object to the form of
15 the question.  Which jail?
16    A.   I don't know what -- I don't know
17 where they house them.
18    Q.   Do you know if they are kept or
19 archived?
20    A.   I do not know that.
21    Q.   Are administrative -- sorry.  Are
22 medication administration records created for
23 every time a prescription medication is
24 administered to an inmate?
25        MR. LEDLIE:  Object to the form of

Page 174

1 the question.  Vague.
2     A.   I don't know.
3     Q.   Do you know if they're supposed to
4 be created every time a medication is
5 administered to an inmate?
6     A.   I don't know.
7     Q.   So you're not aware of any policy
8 with regard to the creation of medication
9 administration records?
10    A.   No.
11    Q.   What is Diamond Pharmacy?
12    A.   They are the company that delivers
13 the prescription medications to ACH.
14    Q.   Does the Summit County Jail keep
15 the receipts from Diamond Pharmacy for
16 medications that are delivered?
17    A.   I don't know.
18    Q.   Is there any policy about keeping
19 or archiving those receipts?
20    A.   I'm not familiar with any policy on
21 that.
22    Q.   Are you aware of any efforts to
23 collect medication administration records in
24 connection with this litigation?
25    A.   I'm not aware of that.

Page 175

1     Q.   Do you know if Diamond Pharmacy --
2 well, let me go back here a minute.
3         If attorneys for Summit County
4 wanted to collect medication administration
5 records, would they have to route that request
6 through you?
7         MR. LEDLIE:  Object to the form of
8 the question and to any conversations that --
9 with counsel.  I'll instruct him not to answer
10 as to any conversations with counsel, the
11 content of those.
12    Q.   So my question relates to the
13 Summit County Corrections process for handling
14 those kinds of requests, and the question is if
15 a request were made to collect those kinds of
16 records, would that request have to be routed
17 through you?
18        MR. LEDLIE:  Object to the form of
19 the question.
20    A.   I don't know if it would or not.
21    Q.   And for receipts from Diamond
22 Pharmacy, if a request to collect those kinds
23 of records were made, would that kind of
24 request have to be routed through you?
25        MR. LEDLIE:  Object to the form of

Page 176

1 the question.
2     A.   I don't know.
3     Q.   Are you aware of any effort to
4 collect receipts from Diamond Pharmacy in
5 collection -- in connection with this
6 litigation?
7     A.   I'm not aware of that.
8     Q.   Has or does Diamond Pharmacy supply
9 Narcan to Summit County Corrections?
10    A.   I don't know where they get it
11 from.
12    Q.   Does Diamond Pharmacy supply
13 Suboxone to Summit County Corrections?
14    A.   I don't know where they get it
15 from.
16    Q.   Does Diamond Pharmacy supply any
17 prescription opioids to Summit County
18 Corrections?
19    A.   I don't know.
20    Q.   Are you aware of any medical
21 incident resulting from an inmate being
22 administered an improper medi- -- medication
23 due to negligence on the part of Summit County
24 Corrections staff, including ACH?
25    A.   No, I'm not.

Page 177

1         MR. LEDLIE:  Object to the form of
2 the question.
3     Q.   You're aware that Summit County
4 Corrections has administered prescription
5 opioids to inmates in the past, correct?
6     A.   Yes.
7     Q.   Considering instances where opioids
8 have been prescribed and administered by the
9 jail pharmacy, do you think that there are
10 alternatives that the jail could have used
11 besides opioids that are prescribed?
12        MR. LEDLIE:  Object to the form of
13 the question.  Calls for a medical opinion.
14 Beyond the scope.
15    A.   I'm not a doctor.
16    Q.   So you have no basis to question
17 the administration of prescription opioids to
18 patients?
19    A.   Unless it's a security-related
20 issue, I'm not going to be involved in it.
21    Q.   So purely on the basis of medical
22 need, you have no basis to question the
23 administration of prescription opioids to
24 inmates?
25    A.   Yes, I would say that's accurate.

45 (Pages 174 - 177)

Page 178

1    Q.   Do you know if there have been any
2  changes over time in the Summit County Jail
3  pharmacies administration of prescription
4  opioids to inmates?
5         MR. LEDLIE:  Object to the form.
6    A.   No.
7         - - - - -
8         (Thereupon, Deposition Exhibit 8,
9         November 2015 E-Mail Chain Re: MAT
10        Patient, SUMMIT_001848508 to
11        001848510, was marked for purposes
12        of identification.)
13        - - - - -
14   Q.   Okay.  So looking at Exhibit 8,
15 which is a document with beginning Bates number
16 Summit_001848508, this is an e-mail chain,
17 correct?
18   A.   Yes, it is.
19   Q.   Do you recognize this document?
20   A.   Yes, I do.
21   Q.   At the bottom of the e-mail chain,
22 and this is on the second page, Jackie
23 Kautenberger asks Chris Csonka if the jail
24 could secure methadone and observe their client
25 taking methadone while she was in prison,

Page 179

1  correct?
2    A.   Yes, that's what she's asking.
3    Q.   And then, on the first page, at the
4  bottom -- or rather the second half of the
5  first page, Pamela DeBartolo indicates that the
6  prison should be able to assist, and indicates
7  that it would place her in a medical cell, take
8  her to a methadone clinic to obtain additional
9  prescriptions as needed, and lock the medicine
10 in the pharmacy with the other narcotics,
11 correct?
12   A.   Yes, that's correct.
13   Q.   And who is Jackie Kautenberger?
14   A.   I don't know who she is.
15   Q.   So looking back to that first
16 e-mail, on the second page, her signature line
17 says that she's the director of admissions for
18 the Community Health Center.
19        Are you familiar with the Community
20 Health Center?
21   A.   I'm familiar with the name, and
22 that's about it.
23   Q.   What's the -- what relationship
24 does the Community Health Center have with
25 Summit County Jail?

Page 180

1    A.   I don't know.
2    Q.   In what context are you familiar
3  with the Community Health Center?
4    A.   I know that it exists.  I don't
5  know their mission statement.
6    Q.   Do they provide services in the
7  Summit County Jail?
8    A.   Not --
9         MR. LEDLIE:  Object to the form of
10 the question.
11   A.   Not to my knowledge.
12   Q.   And who is Christopher Csonka?
13   A.   He is our former population control
14 coordinator.
15   Q.   Okay.  So getting back to the
16 e-mail chain, after the e-mail from Pamela
17 DeBartolo, at the top of the page, the final
18 e-mail in the chain is from Dale Soltis, and he
19 asks if there is an alternative way to have the
20 courts deal with this, as it involves manpower,
21 hours, specialized housing, and resources taken
22 away from our other duties, in addition to the
23 liability of handling the medications, right?
24   A.   That's what his e-mail says, yes.
25   Q.   What is the liability of handling

Page 181

1  the medications that he's referring to?
2         MR. LEDLIE:  Object to the form of
3  the question.
4    A.   I -- I don't know what his
5  intentions were when he wrote this e-mail, what
6  he was referring to.
7    Q.   You see that he copied you on the
8  e-mail?
9    A.   I do see that.
10   Q.   I'm not asking you what his
11 intentions were.  I'm asking what your
12 understanding is of what he's referring to when
13 he writes about the liability of handling the
14 medications.
15        MR. LEDLIE:  Objection.  Asked and
16 answered.
17   A.   I -- I don't know what he was
18 referring to when he -- when he wrote this.
19   Q.   So you were confused, when you
20 received this e-mail, about what it was talking
21 about?
22        MR. LEDLIE:  Object to the form of
23 the question.  Asked and answered.
24   A.   I receive a hundred e-mails a day.
25   Q.   How many e-mails a day do you

46 (Pages 178 - 181)

Page 182

1 receive from your supervisor?
2    A.   It varies.
3    Q.   Did you ask for clarification about
4 what he was referring to when he referred to
5 liability of handling the medications?
6    A.   No, because this is something he
7 handled and put me as a CC, as a courtesy to
8 let me know.  It was nothing -- there was no
9 reason for me to be involved.
10   Q.   Why would he have wanted you to
11 know as a courtesy?
12       MR. LEDLIE:  Objection.  Calls for
13 speculation.  And asked and answered.  And
14 conduct, at this point.  This is repetitive.
15 He's attempted to answer your question repeated
16 times, and you keep asking the same question.
17       MR. SQUIRE:  I'm just trying to get
18 at his understanding of what this is about.
19       MR. LEDLIE:  No, I understand, but
20 the conduct of a deposition, at this point
21 you've asked him the question; he's answered
22 your question.  You need to move on to another
23 question.
24   Q.   You oversee medical services for
25 inmates, correct?

Page 183

1    A.   Yes.
2    Q.   Do you think that the reason that
3 you were copied on your -- on this e-mail is in
4 connection with those responsibilities?
5    A.   Yes.
6    Q.   Why were individuals like the
7 inmate who's referred to in this e-mail chain
8 placed in special medical cells instead of the
9 a normal cell?
10   A.   We put them in those specialized
11 cells when they need specialized treatment.
12   Q.   What is a special medical cell?
13   A.   It's a cell that is inside the
14 dispensary, which is where the inmates get
15 health care, and it -- they're separated from
16 the general population.
17   Q.   Aside from its physical proximity
18 to where the medical services are administered
19 and its separateness from the other cells, is
20 there anything that makes special medical cells
21 distinct from other cells?
22   A.   They have positive airflow.  They
23 have a hospital-type bed.  They have
24 handicap-accessible facilities in -- actually
25 inside the cell.

Page 184

1    Q.   All right.  There is -- asking now
2 about the reference in Pamela DeBartolo's
3 e-mail on the second half of this first page,
4 there's a reference to keeping methadone locked
5 in the pharmacy, as they do other narcotics.
6       Is this how all prescriptions were
7 typically handled, that they were locked in the
8 pharmacy?
9    A.   Yes, any -- any prescription is
10 going to be locked inside the pharmacy,
11 correct.
12   Q.   And how long was that the case?  I
13 mean, going back how far?
14   A.   As far as I'm -- I'm aware.
15   Q.   Is medication always administered
16 to inmates in the medical area of the jail?
17   A.   No.
18   Q.   Is medication administered to
19 inmates in their cells?
20   A.   No.
21   Q.   Where does medication get
22 administered to inmates?
23   A.   So generally the nurses go to the
24 housing units, to the pods, and they administer
25 the medication through the pod door that has

Page 185

1 a -- a slide-through window underneath.  They
2 give the inmates the medication that way, and
3 the deputy is inside with the inmate.  The
4 inmate swallows the medication, and then the
5 nurse -- another inmate comes up and does it.
6 It's done on the housing units.
7    Q.   Are prisoners ever allowed to
8 administer medication to themselves?
9    A.   Not prescribed medications.
10   Q.   They're allowed to administer other
11 medications to themselves?
12   A.   They have the ability to buy some
13 over the counter on the commissary.
14   Q.   And when they buy those, they take
15 those back with them to their cells and can
16 take them in their cells?
17   A.   Yes.
18   Q.   Looking at Major Soltis's e-mail,
19 at the top of the first page, he's asking about
20 an alternative to the inmate going into the
21 Summit County Jail, correct?
22   A.   Yes, he is.
23   Q.   And the reason for this is because
24 of concern over the resources that it would
25 take if the inmate is admitted into Summit

47 (Pages 182 - 185)

Page 186

1 County Jail, right?
2         MR. LEDLIE:  Object to the form.
3     A.    That's what his e-mail says.
4     Q.    How common is it for corrections to
5 ask for alternatives when an inmate is supposed
6 to be booked into the jail?
7     A.    It's not an uncommon request.
8     Q.    Who typically makes that request?
9     A.    The director of corrections, in
10 this case.
11     Q.    Is it something that you ever do?
12     A.    I have, yes.
13     Q.    Have there been changes, over time,
14 in this process of asking for alternatives?
15     A.    No.  I think whoever is in the --
16 in the position at the time would -- when it --
17 when he or she knows it takes his -- takes
18 additional resources, they'll ask for an
19 alternative.
20         THE REPORTER:  Ask for a what?  I'm
21 sorry.
22         THE WITNESS:  An alternative.
23         THE REPORTER:  Thank you.
24     Q.    And the purpose of asking for these
25 alternatives is to avoid expending the

Page 187

1 resources that admitting the inmate into Summit
2 County Jail would take, correct?
3         MR. LEDLIE:  Object to the form of
4 the question.
5     A.    There would be -- there could be
6 numerous reasons to make those requests.
7     Q.    What are the reasons that the
8 requests generally are made?
9     A.    There's -- there's a lot of
10 reasons.  Having to put somebody into a medical
11 cell and then have that inmate supervised by
12 one staff member would be one reason.
13     Q.    The concern associated with that
14 reason is the resources that it would take to
15 use that approach that could be used elsewhere
16 if that inmate were not admitted, correct?
17     A.    Yes.
18     Q.    Is that underlying concern the
19 reason that these kinds of requests for
20 alternatives are made?
21         MR. LEDLIE:  Object to the form.
22 Asked and answered.
23     A.    One of the concerns.
24     Q.    What are the other concerns?
25     A.    I -- it could be numerous things.

Page 188

1 It could be something that pops up that we
2 haven't seen before.
3     Q.    Is this a common concern?
4         MR. LEDLIE:  Object to the form.
5 Vague.
6     A.    It's not an uncommon concern.
7     Q.    And when that concern is motivating
8 the request, the goal ultimately is to avoid
9 expending the extra resources that we'd --
10 would be taken from admitting the inmate, as
11 opposed to spending those resources, correct?
12         MR. LEDLIE:  Object --
13     A.    Yes.
14         MR. LEDLIE: -- to the form.
15         I'm sorry.
16         - - - - -
17         (Thereupon, Deposition Exhibit 9,
18         6/22/2016 E-Mail from Pamela
19         DeBartolo Re: Suboxone at Glenwood,
20         SUMMIT_001849352, was marked for
21         purposes of identification.)
22         - - - - -
23     Q.    So looking at what's been marked as
24 Exhibit 9, this is an e-mail with Bates number
25 SUMMIT_001849352.

Page 189

1         Do you recognize this e-mail?
2     A.    Yes, I do.
3     Q.    And in the e-mail, Pamela DeBartolo
4 writes, "Just as a quick reminder, please
5 notify all staff, deputies, and Oriana we are
6 not allowing Suboxone in the Glenwood facility,
7 as it is too dangerous.  If stopped abruptly,
8 the detainee must be monitoring closely."
9         Do you see that?
10     A.    Yes, I see it.
11     Q.    Do you remember Suboxone being
12 forbidden in Summit County correction
13 facilities because it was too dangerous?
14     A.    No.  This is just speaking about
15 the Glenwood facility.
16     Q.    Suboxone is permitted in Summit
17 County Jail?
18         MR. LEDLIE:  Object to the form.
19 Vague.
20     A.    I -- I don't have a list of the
21 medications that they allow.
22     Q.    In this e-mail, Pamela DeBartolo is
23 referring to the fact that Suboxone is
24 prohibited in the Glenwood facility, correct?
25     A.    Yes, that's what she's saying.

48 (Pages 186 - 189)

Page 190

1     Q.   Are you aware of a similar -- or
2  your testimony is that you're not aware of a
3  similar prohibition in the Summit County Jail?
4     A.   I am not aware of that prohibition,
5  correct.
6     Q.   Okay.  Do you know when this
7  prohibition in Glenwood went into effect?
8     A.   No, I do not.
9     Q.   When Pamela DeBartolo says that "If
10  Suboxone is stopped abruptly, the detainee must
11  be monitored closely," do you know -- what does
12  she mean by that?
13         MR. LEDLIE:  Object to the form.
14     A.   I don't know what she means by
15  that.
16     Q.   In your capacity as administrative
17  captain of Summit County Jail, are you familiar
18  with concerns relating to abruptly stopping
19  Suboxone that lead to the need to monitor
20  detainees closely?
21     A.   It's -- it's not within the realm
22  of my expertise.  I -- I'm not aware.
23     Q.   Your responsibilities relate to the
24  security of the jail, correct?
25     A.   Yes.

Page 191

1     Q.   So if you're not aware this
2  concern, then it's not a concern related to
3  security in the jail?
4         MR. LEDLIE:  Object to the form.
5     A.   No, it -- it could rise to a
6  security concern.
7     Q.   But it's not a potential security
8  concern that you're aware of?
9     A.   Unless it's brought to my attention
10  as being a security concern, I wouldn't be
11  aware of it.
12     Q.   But this particular concern has not
13  been brought to your attention as a security
14  concern; is that right?
15     A.   Not -- not that I recall.
16     Q.   Are you familiar with any concerns
17  regarding the use of Suboxone in Summit County
18  Jail?
19     A.   Other than it's like -- it's
20  prescribed medication.  I'm aware of the
21  general concern that we maintain control of the
22  medications.
23     Q.   Are you aware that Suboxone is used
24  to treat opioid addiction?
25     A.   Yes, I've heard that's what that is

Page 192

1  used for.
2     Q.   Does Summit County Jail offer other
3  medication-assisted treatment, such as
4  methadone or Vivitrol, for individuals
5  suffering from opioid withdrawal?
6     A.   We do offer Vivitrol.
7     Q.   Do you know how much -- do you know
8  if there are any costs to Summit County Jail
9  associated with offering Vivitrol to inmates?
10         MR. LEDLIE:  Object to the form of
11  the question.
12     A.   No, I am not.
13     Q.   Are you aware of any costs to
14  Summit County Jail in connection with provision
15  of Suboxone to inmates?
16     A.   No, I'm not.
17     Q.   So you're not aware of any costs to
18  Summit County Jail associated with providing
19  medical assistance treatment, MAT, to inmates
20  at Summit County Jail?
21     A.   I'm not aware if it is or is not.
22     Q.   Do you know if inmates have to pay
23  the costs of administration of Vivitrol or
24  Suboxone to them at Summit County Jail?
25     A.   I don't know.

Page 193

1     Q.   All right.  Let's --
2         MR. LEDLIE:  Before we move on from
3  9, would it be agreeable to redact this
4  inmate's name and -- and inmate number?  That
5  should have been redacted, and I don't think we
6  went into it.  I just, for the record, I don't
7  think that this individual's name and their
8  medical condition needs to be part of this
9  record.
10         MR. SQUIRE:  Can we reserve on
11  that, I guess, and get back to you?
12         MR. LEDLIE:  That's fair.
13         MR. SQUIRE:  Okay.
14     Q.   Let's turn back to what we had
15  previously marked as Exhibit 2.  Can you find
16  it there?  Which was -- this was the Akron
17  Beacon Journal article.
18         Looking at the second page of the
19  document --
20     A.   Okay.
21     Q.   Previously you had testified that
22  there's some overlap between inmates who have
23  mental health issues and inmates who have
24  opioid addiction issues, correct?
25     A.   I do recall that, yes.

49 (Pages 190 - 193)

Page 194

1     Q.   In the second paragraph of this
2  page, it says that "Deputies are often
3  providing psychotropic medication to between
4  100 and 125 inmates."
5        Do you see that?
6     A.   I see that.
7     Q.   Is it proper to issue psychotropic
8  drugs to people who may be drug addicts?
9        MR. LEDLIE:  Object to the form of
10  the question.  Calls for a medical opinion.
11     A.   I -- I don't know what's
12  appropriate.
13     Q.   Is that something that you've ever
14  inquired about?
15     A.   No.
16        MR. LEDLIE:  And just for the
17  record, the same issue with the inmate's name
18  in this.
19        MR. SQUIRE:  Okay.  We'll get back
20  to you.  Yep.
21        -  -  -  -  -
22        (Thereupon, Deposition Exhibit 10,
23        December 2015 E-Mail Chain Re:
24        Methadone Treatment/Inmate Housing,
25        SUMMIT_001848779 to 001848780, was

Page 195

1        marked for purposes of
2        identification.)
3        -  -  -  -  -
4     Q.   Okay.  Looking at Exhibit 10, this
5  is an e-mail chain with beginning Bates number
6  SUMMIT_001848779.
7        Do you recognize this document?
8     A.   Yes.
9     Q.   And is the incident -- or, rather
10  is the inmate being discuss in this document
11  the same inmate who was being discussed in
12  Exhibit 8?
13     A.   I don't -- I don't know if it is or
14  not.
15     Q.   So the -- the date of Exhibit 8,
16  that was November -- those are e-mails from
17  November of 2015, right?
18     A.   Yes, I see that.
19     Q.   And these e-mails are from December
20  of 2015, right?
21     A.   That's correct.
22     Q.   And just to clarify, my last
23  question referred to Exhibit 10.  You
24  understood that, right?
25     A.   As I recall, you asked if this was

Page 196

1  the same inmate referred to in this e-mail as
2  this e-mail.
3     Q.   Yeah, I just -- sorry.  I'm trying
4  to clear up the record because I said "this
5  e-mail," so --
6        MR. LEDLIE:  10 and 8.
7        MR. SQUIRE:  Yeah, exactly.
8        MR. LEDLIE:  Okay.
9     Q.   So the inmate in Exhibit 8 was
10  going to be sentenced to a 10-day sentence,
11  correct?
12     A.   Yes.
13     Q.   And you see that the -- in the top
14  e-mail on Exhibit 10, Judge Cook says, "We're
15  going to give her a split sentence so she would
16  only do five days at Summit County Jail."
17        Do you see that?
18     A.   Yes, I see that.
19     Q.   And she says, "So that will cut
20  down her day in SCJ by half -- her days in SCJ
21  by half."
22     A.   I see that.
23     Q.   Does that indicate to you that it's
24  the same incident?
25        MR. LEDLIE:  Object to the form.

Page 197

1     A.   Unless I'm missing something here.
2  I don't see a name in Exhibit 8, but I see a
3  name in Exhibit 10, so I -- I don't know if
4  it's the same.
5     Q.   Okay.  Looking at Exhibit 10, this
6  is an e-mail in which -- well, let's look
7  specifically at the first e-mail in the chain,
8  which is in the second half of that first page.
9     A.   Okay.
10     Q.   So Dale Soltis is asking a question
11  to several people, and you're copied on this
12  e-mail, right?
13     A.   Yes, I am copied on it.
14     Q.   And in the e-mail, Dale Soltis is
15  asking, "Should we accept the inmate for
16  methadone treatment, the inmate would need to
17  be housed" -- or, rather, Dale Soltis is
18  saying, "Should we accept the inmate for
19  methadone treatment, the inmate would need to
20  be housed in one of the two special needs cells
21  located adjacent to the medical offices,"
22  correct?
23     A.   Yes.
24     Q.   And he also says, "The need to
25  house those inmates on methadone and separated

50 (Pages 194 - 197)

Page 198

1  from the general population is due to the high
2  potential for abuse," correct?
3      A.   Yes, I see that.
4      Q.   Further down in the paragraph, he
5  states, "The housing of inmates in one of the
6  two medical cells off of the medical area would
7  also necessitate a deputy being assigned
8  full-time, 24/7, to that post, which causes
9  further stress on our staffing levels, as this
10  is not a current staff post full-time."
11          Do you see that?
12      A.   Yes.
13      Q.   And then he writes, "The housing of
14  the inmate in the medical area also places
15  additional stress upon the medical provider."
16          Do you see that?
17      A.   Yes.
18      Q.   Generally, Dale Soltis, in this
19  e-mail, is expressing concerns to court
20  officials with regard to the strain that
21  housing an inmate -- or with housing the
22  particular inmate being discussed would have on
23  the Summit County Jail, right?
24          MR. LEDLIE:  Object to the form.
25  The addressee -- it speaks for itself.

Page 199

1      A.   That's what it looks like, yes.
2      Q.   And in response, in the e-mail at
3  the top of the page, Judge Katarina Cook
4  writes, "We're going to give her a split
5  sentence so she would only do five days at
6  Summit County Jail, and then 18 days of house
7  arrest/scram."
8          Do you see that?
9      A.   Yes, I see that.
10      Q.   Do you know what SCRAM is there?
11  Do you know what that means?
12      A.   I do not.
13      Q.   So in response to Major Soltis's
14  e-mail expressing concerns, Judge Cook has cut
15  down on the amount of time that the inmate
16  would have to spend at Summit County Jail,
17  correct?
18          MR. LEDLIE:  Object to the form.
19  Calls for speculation.
20      A.   Yeah, I don't know what the -- I
21  don't know what it is.
22      Q.   You received this top e-mail,
23  correct?
24      A.   I did.
25      Q.   So when you received it, was it

Page 200

1  your understanding at that time that the
2  inmate's sentence at Summit County Jail was
3  being cut in response to Major Soltis's e-mail?
4          MR. LEDLIE:  Object to the form.
5  Calls for speculation.
6      A.   I don't know what I was thinking at
7  the time.
8          THE REPORTER:  Repeat, please.
9          THE WITNESS:  I'm sorry.
10      A.   I don't know what I was thinking at
11  the time.
12          THE WITNESS:  Sorry about that.
13  I'll try to be better.
14      Q.   One way for court officials to have
15  addressed the concerns expressed in Major
16  Soltis's e-mail would have been to cut the
17  amount of time that the inmate was going to
18  spend at Summit County Jail, correct?
19      A.   I don't know what the judge was
20  thinking.
21      Q.   So now, from a jail administration
22  perspective, Major Soltis has expressed
23  concerns about housing this inmate in his
24  e-mail, correct?
25      A.   He did, yes.

Page 201

1      Q.   And those concerns would be
2  alleviated by reducing the amount of time that
3  the inmate was going to spend at Summit County
4  Jail, correct?
5      A.   No.  They may have been mitigated,
6  but they weren't alleviated.
7      Q.   Were requests, like the one that
8  Major Soltis is making to Judge Cook and the
9  other recipients of this e-mail, from the court
10  system common?
11          MR. LEDLIE:  Object to the form.
12  Vague.
13      A.   I don't -- I don't know if it's
14  common or uncommon.
15      Q.   Does or do corrections officials
16  frequently work with court officials to try and
17  mitigate the burdens on the Summit County Jail?
18      A.   Yes, we do.
19      Q.   And in -- and does that often
20  involve requests to court officials to take
21  some action that will mitigate the burdens on
22  the Summit County Jail?
23          MR. LEDLIE:  Object to the form.
24      A.   Yes, that could one of the things
25  we would do.

51 (Pages 198 - 201)

1    Q.   Have you ever made a -- made
2  requests to court officials for an alternative
3  sentence that would mitigate the burdens on the
4  Summit County Jail?
5    A.   Personally, myself, I don't think I
6  have.  I may have directed somebody to do it.
7    Q.   Do you remember when the last time
8  you directed somebody to do it was?
9    A.   Not an exact date, but I think
10  probably in the last month, we would have asked
11  for -- for an inmate to be released from
12  custody because of a health -- health-related
13  issue.
14    Q.   Roughly how many times in the last
15  year have you made or have you directed
16  somebody to make that kind of request?
17    A.   Numerous times.  Don't know of an
18  exact answer.
19    Q.   More than 10?
20    A.   Yes.
21    Q.   More than 20?
22    A.   Probably.
23    Q.   More than 50?
24    A.   I wouldn't think more than 50, no.
25    Q.   More than 30?

1    A.   Probably.
2    Q.   In instances where you have
3  directed someone to make this kind of request
4  to court officials, how many -- how frequently
5  did the underlying offense relate to opioids?
6       MR. LEDLIE:  Object to the form.
7    A.   I wouldn't know the answer to that.
8    Q.   Do you direct people to make these
9  requests in circumstances other than when the
10  underlying offense relates to opioids?
11    A.   Yes, I do.  I do it when it becomes
12  a burden on our ability to maintain the safety
13  and security of the jail.
14    Q.   And so you have -- you don't have
15  an estimate as to what proportion of the times
16  that you've directed these incidents -- or,
17  sorry, that you've directed these requests to
18  be made, what proportion related to opioids?
19    A.   No, I do not.
20    Q.   When you have directed requests
21  like this to be made, how often is it because
22  of burdens associated with medical treatment
23  for opioid addiction?
24    A.   I don't know.
25    Q.   Is that a common reason for the

1  request?
2    A.   I don't know -- no, the reason is
3  that we -- it's stressing our staff levels to
4  maintain the safety and security of the jail,
5  with this -- with a particular inmate that we
6  make that request with.
7    Q.   How often is treatment for opioid
8  addiction the source of the burden that gives
9  rise to making a request to change a sentence?
10    A.   I don't know.
11       MR. LEDLIE:  Object to the form of
12  the question.
13    Q.   Looking at the e-mail from Major
14  Soltis, he says that this is not a current
15  staffed post full-time, referring to having a
16  deputy assigned to the medical area, correct?
17    A.   Yes, that's correct.
18    Q.   Why is that not a staffed post
19  full-time?
20    A.   Because they are not within our
21  general housing.  They're in the dispensary,
22  which we don't have open to inmates 24/7.  So
23  when there is an inmate that's actually housed
24  in there, they have to be supervised by a
25  deputy, so we try not to use them to -- so it

1  doesn't stress the manpower levels in the -- in
2  the facility.
3    Q.   So you're -- the need to have a
4  deputy assigned to the medical area only arises
5  when an inmate is in the medical area; is that
6  right?
7       MR. LEDLIE:  Object to the form of
8  the question.
9    A.   That's correct.
10    Q.   How often is there an inmate in the
11  medical area that requires a deputy to be
12  there?
13    A.   I -- I don't know.  It varies.
14    Q.   Is it more than half the time?
15    A.   No.
16    Q.   Is it more than 10 percent of the
17  time?
18    A.   It sound -- sounds like about 10
19  percent of the time.
20    Q.   Would you prefer to have sufficient
21  personnel to be able to staff a deputy in the
22  medical area full-time?
23       MR. LEDLIE:  Object to the form.
24  Calls for opinion.
25    A.   I -- I just want the jail staffed

Page 206

1 appropriately, and if that is a position we
2 need to have staffed, then we staff it.
3     Q.   Do you think that having the jail
4 staffed appropriately would require a deputy to
5 be staffed in the medical area full-time?
6         MR. LEDLIE:  Object to the form.
7     A.   No.
8     Q.   Do you think that the jail is
9 currently staffed appropriately?
10        MR. LEDLIE:  Object to the form of
11 the question.  Vague.
12    A.   It -- it depends.  It's a -- it's a
13 day-to-day issue.
14    Q.   Appropriate whether -- you're
15 saying whether the jail is staffed
16 appropriately is a day-to-day issue?
17    A.   I'm saying that issues arise daily,
18 hourly, that requires different burdens on our
19 staff, and we make the appropriate adjustments
20 to handle it.
21    Q.   But the personnel who work at the
22 jail does not change day to day, correct?
23    A.   No, it -- it changes -- it changes
24 day to day.
25    Q.   How does it change day to day?

Page 207

1     A.   Call-offs can do it.  Whether it's
2 a weekend or a holiday.  What time of day
3 changes our staffing level.  There's a lot of
4 variables that change our required staffing
5 levels.
6     Q.   Setting aside the required staffing
7 levels, I'm asking about the actual personnel
8 who work at the jail.  Does that change day to
9 day?
10    A.   I guess I'm not completely
11 understanding.  Do you -- I don't understand
12 the question.
13    Q.   The personnel who -- well, there
14 are deputies who work at the jail, correct?
15    A.   Correct.
16    Q.   The deputies who work at the jail
17 are those -- who those deputies are doesn't
18 change day to day, correct?
19    A.   It does, because they can be on
20 their day off.  We could have somebody from
21 another division coming in to work overtime,
22 which we allow that to happen.  So the staff,
23 from one day to another, can be a different
24 face than it was the day before.
25    Q.   Does -- are there days when, based

Page 208

1 on the changes in personnel at the jail, the
2 jail is not staffed appropriately?
3         MR. LEDLIE:  Object to the form of
4 the question.
5     A.   I don't know.  I'd have to look at
6 the shift-by-shift lineup.
7     Q.   Have you ever undertaken that
8 inquiry to determine whether there were days
9 that the jail was not staffed appropriately,
10 based on a shift-to-shift lineup?
11    A.   I -- yes, I have.
12        MR. LEDLIE:  Is this a good time
13 for a break?  We've been going more than an
14 hour.
15        MR. SQUIRE:  Yeah, we can take a
16 break, sure.
17        THE VIDEOGRAPHER:  Going off the
18 record at 2:26 p.m.
19        (A recess was taken.)
20        - - - - -
21        (Thereupon, Deposition Exhibit 11,
22        3/29/2017 E-Mail Chain,
23        SUMMIT_001853693 to 001853695, was
24        marked for purposes of
25        identification.)

Page 209

1        - - - - -
2        THE VIDEOGRAPHER:  Back on the
3 record at 2:37 p.m.
4     Q.   Captain Barker, please take a look
5 at what's been marked as Exhibit 11.
6     A.   Okay.
7     Q.   This is an e-mail chain bearing
8 beginning Bates number SUMMIT_001853693.
9         Do you recall this e-mail chain?
10    A.   Yes, I do.
11    Q.   Looking at the first e-mail in the
12 chain, on the second page, this e-mail from
13 Lisa Jones from -- rather, this is an e-mail
14 from Lisa Jones from the Summit County
15 Prosecutor's Office, right?
16    A.   Yes.
17    Q.   And she writes, "We are due to pick
18 up the above inmate on Friday, March 31st, from
19 NEOCC.  Ashlee from U.S. Marshal's Office-Akron
20 just called, and the defendant has been
21 admitted to the hospital with acute hepatitis."
22        Do you see that?
23    A.   Yes, I do.
24    Q.   And she goes on to write that "I'm
25 wondering if we still want to pick him up on

53 (Pages 206 - 209)

Page 210

1 Friday with his medical condition and let our
2 jail handle it or wait until he is finished
3 with his medical appointments."
4      Q.   Do you see that?
5      A.   Yes.
6      Q.   And then, further down, she writes,
7 "I advised her I would check with you first to
8 see what the jail wants to do."
9      Do you see that?
10     A.   Yes, I do.
11     Q.   And in the time next paragraph, do
12 you see that the inmate that they're talking
13 about, or the defendant, rather, that they're
14 talking about, was charged with possession of
15 heroin and possession of marijuana?
16     A.   Yes, I see that.
17     Q.   So then, going to the first page,
18 in the middle of the page, Frank Kalapodis
19 e-mails a number of recipients, including you,
20 and asks, "Someone look at this and advise me
21 ASAP."
22      Do you see that?
23     A.   Yes.
24     Q.   And then, at the top of the page,
25 Donna Nicholas from the Summit County Sheriff's

Page 211

1 Office writes, "The inmate needs to get his
2 medical issues cleared.  If he's brought here,
3 we will have to assume responsibility for the
4 medical bills incurred."
5      Do you see that?
6      A.   Yes.
7      Q.   So the Summit County Sheriff's
8 Department decided not to admit the inmate
9 until after his medical issues were cleared, in
10 order to avoid medical costs associated with
11 him, correct?
12      MR. LEDLIE:  Object to the form of
13 the question.
14     A.   I don't know if that's the result
15 of this e-mail.
16     Q.   Donna Nicholas was advocating that
17 the inmate not be admitted until after his
18 medical issues were cleared in order to avoid
19 the medical costs associated with it, correct?
20     A.   That's what she's saying in her
21 inmate -- in her e-mail, correct.
22     Q.   Was it common to make decisions as
23 to whether to accept an inmate based on
24 potential medical costs associated with that
25 inmate?

Page 212

1      MR. LEDLIE:  Object to the form.
2      A.   There are numerous reasons we would
3 reject an inmate.
4      Q.   My question is, was it common to
5 make decisions regarding booking based on
6 potential medical costs as a concern?
7      A.   Yes, that is a consideration.
8      Q.   And was it -- is it common for
9 Summit County Corrections, generally, to try to
10 avoid medical costs when it was possible to do
11 so?
12      MR. LEDLIE:  Object to the form.
13 Vague.
14     A.   One of the things we might do.
15     Q.   Who generally pays for inmate
16 medical care at the Summit County Jail?
17     A.   The medical provider.
18     Q.   Which is ACH?
19     A.   Yes.
20     Q.   So who pays ACH for its provision
21 of medical services at the Summit County Jail?
22     A.   The County of Summit.
23     Q.   Okay.  Does private insurance pick
24 up costs of inmate medical care?
25     A.   I don't know if they do or not.

Page 213

1      Q.   Some inmates are eligible for
2 Medicaid, correct?
3      A.   I'm sure that's the case, yes.
4      Q.   Does Medicaid pay for the cost of
5 medical care for those inmates who qualify for
6 Medicaid?
7      MR. LEDLIE:  Object to the form of
8 the question.
9      A.   I don't know if they do or not.
10     Q.   Medical care, as provided by ACH,
11 includes addiction treatment, right?
12     A.   I don't know if they provide that
13 or not.
14     Q.   If a -- if an inmate at the Summit
15 County Jail is suffering from drug addiction,
16 is there any way for them to get treatment for
17 that at the Summit County Jail?
18      MR. LEDLIE:  Object to the form of
19 the question.  Asked and answered.
20     A.   I -- I don't know what the
21 treatment protocol from ACH would be on that.
22     Q.   If a -- if a Summit County Jail
23 inmate has medical needs associated with drug
24 addiction, is that the kind of thing that you
25 think that ACH should treat?

54 (Pages 210 - 213)

1      MR. LEDLIE:  Object to the form.
2 He's here as a fact witness, not to offer his
3 opinions.
4      A.   I have no opinion on that.
5      Q.   All right.
6      MR. LEDLIE:  Just real quick, the
7 same issue.  This medical condition of this
8 inmate, I'd request that his name and inmate
9 number be redacted.
10      MR. SQUIRE:  Okay.
11      Q.   So Exhibit 11, this is
12 correspondence between Summit County
13 Corrections and the Summit County Prosecutor's
14 Office, correct?
15      A.   Yes.
16      Q.   And as we've said, this is an
17 e-mail where a request -- well, in this e-mail
18 a request wasn't made, but there was a
19 suggestion made on how to proceed with an
20 inmate in order to lessen the burden on Summit
21 County Corrections, right?
22      MR. LEDLIE:  Object to the form.
23 The document speaks for itself.
24      A.   I don't know what the result was of
25 this.  These are two captains talking to each

1 other.  I don't know what happened with those
2 discussions, right.
3      Q.   But that was the concern, and that
4 was the basis for the e-mail, right?
5      MR. LEDLIE:  Object to the form.
6      A.   That's what's in the e-mail, yes.
7      Q.   And previously we had looked at a
8 document where a request was made to officials
9 from the Summit County courts, right?
10      A.   Yes.
11      MR. LEDLIE:  Object to the form.
12      Q.   Were there other governmental
13 entities that Summit County sheriff -- let me
14 start over.
15      Were there other governmental
16 entities that Summit County Sheriff's Office
17 made requests to with the intention of reducing
18 the burden on Summit County jails?
19      MR. LEDLIE:  Object to the form.
20 He's not here as a 30(b)(6).
21      A.   I don't know if that's the case or
22 not.
23      Q.   So in your personal capacity, you
24 personally are not aware of other instances
25 where the Summit County Sheriff's Office made

1 requests to other governmental entities that
2 would reduce the burden on the Summit County
3 jails?
4      A.   I don't know if other people had
5 done that or not.
6      Q.   Okay.  All right.  You can put that
7 exhibit aside.
8      A.   Okay.
9      Q.   Have inmates in the Summit County
10 Jail smuggled drugs into the jail during your
11 tenure in the corrections division?
12      A.   Yes, it has happened before.
13      Q.   Which drugs have been smuggled in?
14      A.   I mean, I've seen marijuana.  I've
15 seen pills, and I've seen crack cocaine.  I've
16 seen a lot of different med- -- a lot of
17 different things come in the jail.
18      Q.   Okay.  How about heroin?
19      A.   Yes, I've seen heroin come in the
20 jail.
21      Q.   How have drugs been smuggled into
22 the Summit County Jail?
23      A.   Inside clothing, inside body
24 cavities, inside hair.
25      Q.   Have there been changes, over time,

1 in the methods used to smuggle drugs into the
2 jail?
3      A.   There is, but there's only so many
4 places they can bring it in.
5      Q.   What have you done in response to
6 drugs being smuggled into the Summit County
7 Jail?
8      A.   We've increased the staff training
9 with regards to detection and pat-down searches
10 and strip searches, if -- if we need to do
11 that.
12      We now shower females as soon as
13 they come in, change them out of their street
14 clothes, have them go to the shower, and put
15 them into a jail uniform.
16      And then every in- -- every new
17 inmate that comes in and every inmate that
18 leaves the jail and comes back into the jail
19 gets a scan with a SecurPASS body scanner.
20      Q.   Is there a reason that you only do
21 the showering protocol for female inmates?
22      A.   Physical differences.
23      Q.   Take a look at -- actually, before
24 I show you this document, what's the most
25 recent change that you made at the Summit

55 (Pages 214 - 217)

Page 218

1 County Jail in response to drug smuggling into
2 the jail?
3     A.  I think the most recent change we
4 made is the addition of the SecurPASS scanner.
5     Q.  And when was that adopted?
6     A.  I think it was August of 27 -- 2016
7 maybe.  2016.  About two years ago.  August
8 sometime.  It's either '16 or '17.
9         - - - - -
10        (Thereupon, Deposition Exhibit 12,
11        6/29/2016 E-Mail from John Pennell
12        Re: 90 Unit Six, SUMMIT_001849446,
13        was marked for purposes of
14        identification.)
15        - - - - -
16     Q.  Exhibit 12 is an e-mail with
17 beginning Bates number SUMMIT_00189446.  This
18 is an exhibit -- sorry.  This e-mail -- this
19 exhibit is an e-mail from John Pennell to Dale
20 Soltis, copying you and others, correct?
21     A.  Yes.
22     Q.  And in the e-mail, John Pennell
23 writes, "Deputy Jerome Hill informed me tonight
24 that he received information that inmates are
25 bringing heroin and prescription pills in by

Page 219

1 having the drugs in their anal cavity."
2        Do you see that?
3     A.  Yes, I do see that.
4     Q.  And then he goes on to say the
5 information he was provided specifically states
6 that the inmates doing this are charged with
7 PV.
8        Do you see that?
9     A.  Yes, I see that.
10     Q.  What does PV mean there?
11     A.  Parole violator.
12        MR. LEDLIE:  Before we go any
13 further, it -- this relates to an inmate that
14 has provided information.  This is a security
15 risk for this individual, and so I definitely
16 would like an answer today on whether or not we
17 can agree to redact that individual's name and
18 number.
19        MS. WU:  I think that's going to be
20 fine, and I think that, for the record, why
21 don't we designate this exhibit as highly
22 confidential so that we don't have any
23 immediate security incidents.
24        MR. LEDLIE:  I appreciate that.
25     Q.  So the inmates that are being

Page 220

1 referred to in this first paragraph who are
2 bringing the prescription drugs into the jail,
3 these are inmates who have been released on
4 parole?
5     A.  Parole, or it could also mean
6 probation.
7     Q.  Okay.
8     A.  That they were violated and sent
9 back to us.
10     Q.  And so later on in the paragraph,
11 John Pennell writes, "These inmates turned
12 themselves in and already had the drugs
13 hidden."
14        Do you see that?
15     A.  Yes.
16     Q.  So this -- is this referring to
17 inmates who are out on parole or probation, who
18 are voluntarily turning themselves in for
19 parole or probation violations with the
20 intention of coming back into the jail, because
21 they want to bring the drugs into the jail?
22     A.  That's what the inmate was --
23 that's what the sergeant was implying, yes.
24     Q.  Okay.  So you testified that the
25 smuggling of prescription pills -- I'm sorry.

Page 221

1 You testified about drugs.
2        Was the smuggling of prescription
3 pills specifically, into the prison, a common
4 problem?
5     A.  I wouldn't say it's a common
6 problem, but I'm saying it -- it certainly
7 exists.  It certainly happens.
8     Q.  In thinking about drugs that have
9 been smuggled or attempted to be smuggled into
10 judgment county jail in 2018, what is the most
11 common drug involved?
12        MR. LEDLIE:  Object to the form.
13     A.  Without looking at our reports and
14 our records, I wouldn't know.
15     Q.  Do you know what the most common
16 drug involved was in 2017?
17     A.  No.
18     Q.  Do you know what the most common
19 drug wa- -- drug was in 2016?
20     A.  No.
21     Q.  Do you know for any of the years
22 during your tenure at the corrections division?
23     A.  No, I do not.
24     Q.  You referred to reports that you
25 would have to review in order to make that

56 (Pages 218 - 221)

Page 222

1 determination.  Which reports would you look at
2 to find out that information?
3      A.   Our shift commander logs and
4 incident reports, and any confidential
5 investigations generated with those reports.
6      Q.   So if you were at the Summit County
7 Jail and you wanted to make that determination
8 by looking at those reports, what would the
9 process be for accessing and reviewing those
10 reports?
11      A.   I would go to my records and ID
12 bureau and ask the supervisor there to assign
13 one of her people to do a search of the
14 incidents for the given date time frame, and
15 they would have to read through those and find
16 out exactly what -- what type of contraband was
17 being found.
18      Q.   And is that a search that would be
19 done electronically, or it would be done
20 manually?
21          MR. LEDLIE:  Object to the form.
22      A.   I think it would be both.
23      Q.   Some of the records exist
24 electronically, but some of them only exist in
25 hard copy?

Page 223

1      A.   That is true, but when they go to
2 pull the report out of our record management
3 system, they're going to have to read through
4 the body of the report to find out what type of
5 contraband was found.
6      Q.   Understood.
7          Is prevention of smuggling a
8 priority for -- let me go back.
9          Is the prevention of drug smuggling
10 into the Summit County Jail a priority for the
11 Summit County Jail?
12      A.   Yes, very much so.
13      Q.   How many guards do you have
14 assigned to that?
15      A.   Every deputy that works in the
16 facility, myself included, is -- that is one of
17 our daily tasks.
18      Q.   And how many deputies work at the
19 jail?
20      A.   Do you mean total, or on a given
21 shift?
22      Q.   Let's do total first.
23      A.   I believe there's 180 assigned
24 there.
25      Q.   And how many on a given shift?

Page 224

1      A.   Day shift might have upwards of 40.
2      Q.   And so even though it's a priority
3 for all the deputies in the jail, there's still
4 some smuggling of prescription drugs that's
5 able to take place?
6          MR. LEDLIE:  Object to the form.
7      A.   We do the best we can to make sure
8 that doesn't occur.
9      Q.   Looking at Exhibit 12, the third
10 paragraph, there is a reference to Cuyahoga
11 County Jail using body scanners to stop drug
12 smuggling.  Do you see that?
13      A.   Yes, I see that.
14      Q.   Prior to this e-mail, were you
15 aware of Cuyahoga County Jail's use of body
16 scanners?
17      A.   I don't know if I was aware of
18 Cuy- -- Cuyahoga County per se, but I -- but I
19 was aware of some surrounding counties using a
20 body scanner.
21      Q.   When did you first become aware of
22 jails or prisons using body scanners?
23      A.   In the last couple years, three or
24 four years.
25      Q.   And I believe you testified earlier

Page 225

1 today that Summit County Jail now uses body
2 scanners?
3      A.   Yes, that's correct.
4      Q.   Is drug smuggling still a problem,
5 even after the introduction of body scanners?
6      A.   It's something we work at every day
7 to make sure it doesn't happen.
8      Q.   But it has happened since then?
9 Since they were introduced?
10      A.   We have found contraband on people
11 during the scan.
12      Q.   So you're not aware of anybody who
13 has gotten drugs past the scanners since you've
14 introduced the scanners?
15      A.   I -- I don't recall that report
16 coming across my desk.  It doesn't mean that
17 I -- I didn't miss something.
18      Q.   And your testimony was that you
19 introduced the scanners two years ago; is that
20 right?
21      A.   Yeah, I'm thinking that it would
22 have been -- it was in August of '17, because
23 this is in '16 that we would have -- yeah, I
24 think it was August of '17.  August of 2017.
25      Q.   When you became aware of the use of

57 (Pages 222 - 225)

Page 226

1 body scanners in other -- or, sorry.  You
2 testified that you were aware that other
3 counties were using these body -- body scanners
4 three or four years ago, right?
5        MR. LEDLIE:  Object to the form.
6    A.   I did testify to that, yes.
7    Q.   When was it first suggested that
8 Summit County use body scanners?
9    A.   I don't know how far back it was,
10 but it was an item that we were asking
11 administration of the sheriff's office and
12 county in general, we need to look into this
13 piece of equipment and -- and seriously
14 consider buying it.
15    Q.   And there was a delay between when
16 you first requested it and when the body
17 scanners were finally introduced?
18    A.   Yes, there was a delay.
19    Q.   Do you know what caused that delay?
20    A.   Getting approval.  It was a newer
21 technology that we wanted to be sure worked.
22 We went and visited some machines that were
23 working.  And then, of course, money issues are
24 always an issue.
25    Q.   Prior to the introduction of the

Page 227

1 body scanners, what costs were associated with
2 preventing smuggling of drugs into the jail?
3    A.   I -- I couldn't nail down the cost,
4 but I -- I can tell you that all of the staff,
5 civilian staff included, that's always foremost
6 on our mind because it makes the environment
7 or -- environment safer for the inmates and for
8 us, so it's -- it's always a consideration.
9    Q.   Were there monetary costs
10 associated with the efforts to prevent drug
11 smuggling in the Summit County Jail prior to
12 the introduction of the body scanners?
13        MR. LEDLIE:  Object to the form of
14 the question.  Asked and answered.
15    A.   We -- that is our -- one of our
16 number one priorities is to keep that kind of
17 stuff out of the facility.
18    Q.   So I understand that it's a
19 priority, and I understand that it's something
20 that you spent a lot of effort on.  I'm asking
21 specifically about monetary costs.
22        Were there monetary costs
23 associated with that effort prior to the
24 introduction of the body scanners?
25        MR. LEDLIE:  Object to the form of

Page 228

1 the question.  Asked and answered.
2    A.   It's not my area of expertise.  I
3 don't know what the monetary resources spent on
4 that would have been.
5        - - - - -
6        (Thereupon, Deposition Exhibit 13,
7        August 2016 E-Mail Chain,
8        SUMMIT_001850085 to 001850086, was
9        marked for purposes of
10        identification.)
11        - - - - -
12    Q.   You've got what's been marked as
13 Exhibit 13.  This is an e-mail chain with
14 beginning Bates number SUMMIT_001850085.  And
15 this is an e-mail chain with the subject line
16 "Ryan Gates," right?
17    A.   Yes, correct.
18    Q.   Take a look at the first e-mail in
19 the chain on the second page.  Colleen Sims
20 writes, "It was reported that Ryan Gates was
21 directly transferred to the halfway house from
22 the jail and tested positive for opiates and
23 fentanyl on July 12th."
24        Do you see that?
25    A.   Yes, I see that.

Page 229

1    Q.   Then, further up in the chain, Dale
2 Soltis writes, "Ryan Gates was at the Summit
3 County Jail from July 5th through July 12th.
4 Can your lab people advise if the tests could
5 have shown drug use prior to incarceration or
6 if he used while in the jail."
7        Do you see that?
8    A.   Yes.
9    Q.   And that question is sent to Pamela
10 DeBartolo, copying Brian Westover and you,
11 right?
12    A.   That's correct.
13    Q.   Further up in the chain, now this
14 is the second e-mail down from the beginning of
15 the document.  You sent an e-mail, and you
16 said, "I approved several last week.  Was this
17 one of them?"
18        Do you see that?
19    A.   I see it.
20    Q.   When you say "several," what are
21 you referring to?  Several what?
22    A.   I don't remember exactly what I
23 meant, but from the e-mail, it looks like I
24 approved some drug testing to be done.
25    Q.   Looking at the last e-mail in the

58 (Pages 226 - 229)

Page 230

1  chain, at the top of the first page, Pamela
2  DeBartolo writes, "Long story short," and then
3  describes how long heroin is detectable in
4  blood.
5       Do you see that?
6    A.  I see that, yes.
7    Q.  And the last paragraph, or the
8  third paragraph of that e-mail, she writes, "So
9  in short, it would not be able to detect heroin
10 use after seven days of incarceration.  I would
11 assume he was able to use while incarcerated."
12      Do you see that?
13   A.  Yes.
14   Q.  Was it common for inmates to use
15 heroin in the Summit County Jail?
16      MR. LEDLIE:  Object to the form of
17 the question.
18   A.  No.
19   Q.  Are you aware of other instances in
20 which inmates were able to use heroin in the
21 Summit County Jail?
22   A.  No.
23   Q.  Are you aware of instances in which
24 inmates abused prescription opioids in the
25 Summit County Jail?

Page 231

1    A.  A specific instance is not coming
2  to mind right now.
3    Q.  Are you aware of -- strike that.
4       So you can't identify -- well, let
5  me strike that.
6       MR. LEDLIE:  Just while you're
7  gathering your thoughts, the same request that
8  this be highly confidential because of the
9  person's identity.
10      MR. SQUIRE:  Okay.
11   Q.  So are you aware of whether any
12 inmate has abused prescription opioids in the
13 Summit County Jail?
14      MR. LEDLIE:  Object to the form of
15 the question.
16   A.  I don't know.
17   Q.  Did you investigate to determine
18 how the inmate who's being discussed in
19 Exhibit 13 obtained the heroin that he got?
20   A.  I did not.
21   Q.  Did anyone at the Summit County
22 Jail investigate that?
23   A.  I don't know if they did or not.  I
24 was cc'd, and somebody else in our chain of
25 command was dealing with it.  I don't know

Page 232

1  where it -- what came of it.
2    Q.  After you received this e-mail, you
3  didn't do any followup regarding this incident?
4    A.  I might have.  I can't recall.
5    Q.  Who would be responsible for
6  investigating how this inmate received the
7  heroin?
8    A.  It'd ultimately fall to the -- the
9  jail commander to assign somebody to do that.
10   Q.  So it would be an ad hoc
11 assignment; there wasn't somebody who -- whose
12 job description included investigating
13 incidents like this?
14      MR. LEDLIE:  Object to the form.
15   A.  It would depend on who was -- who
16 was -- who was given that task at that time.
17   Q.  But what I'm asking is, it would
18 have been assigned as an ad hoc assignment, not
19 as part of somebody's regular job duties?
20      MR. LEDLIE:  Object to the form of
21 the question.
22   A.  I don't know how the jail commander
23 would have assigned it.
24   Q.  In general, when it's been
25 discovered that drugs have been smuggled into

Page 233

1  the Summit County Jail, does corrections
2  investigate how that took place?
3    A.  On some of them we do, yes.
4    Q.  Why don't you investigate all of
5  them?
6    A.  Because sometimes it could be
7  assigned to the detective bureau to -- to
8  investigate.
9    Q.  Why are some assigned to the
10 detective bureau?
11   A.  Because the staffing levels in the
12 jail are such that ordering nine or ten guys
13 over a shift to cover our shift because we need
14 the staffing, and if it looks it's going to be
15 an in-depth, lengthy investigation, we'll
16 assign a detective to do it.
17   Q.  What are the factors that would
18 make an investigation more likely to be an
19 in-depth, lengthy investigation?
20   A.  There would be a lot of discretion
21 involved on the person that makes the
22 assignment of the investigation, whether it's
23 myself, the jail commander, or a shift
24 lieutenant could do it.  Just numerous factors:
25 The deputy that he has on staff during those

Page 234

1 days is -- assuming that it's able to conduct
2 an investigation, does he have the manpower. A
3 lot of considerations.
4    Q.   So a shift lieutenant could call up
5 the detective bureau and ask them to come over
6 to take over an investigation into drug
7 smuggling?
8    A.   Yes.
9    Q.   And that doesn't require any kind
10 of approval or oversight from someone higher on
11 the chain of command?
12    A.   No. The only thing that I would
13 expect is a -- some type of notification that
14 we did -- that they did that.
15    Q.   For the incidents that are
16 investigated directly by corrections, how do
17 those investigations take place?
18    A.   No different than any other
19 investigation. They try to interview the
20 people, gather the evidence, and if charges are
21 appropriate, file the charges.
22    Q.   When you say "file the charges,"
23 charges against whom?
24    A.   If we can find who -- if we can
25 find the person that may have had any of the

Page 235

1 contraband we find or anybody that tried to get
2 it into the facility, we'll make charges if
3 they're -- run it by the prosecutor and see if
4 we can get charges approved.
5    Q.   Have there ever been incidents in
6 which somebody who is not an inmate, a parolee,
7 or a person on probation from the jail was
8 convicted for smuggling drugs into the jail?
9    A.   Since I've been a captain in the
10 jail, since 2011, I don't think that's
11 occurred. That doesn't ring a bell with me.
12    Q.   Have you encountered people trying
13 to smuggle drugs into the jail through the
14 mail?
15    A.   We -- not me personally, but my
16 staff has encountered the -- the envelope. Not
17 the person.
18    Q.   Are there particular -- let me ask
19 it a different way.
20       Which drugs have been attempted to
21 be smuggled into the jail by mail?
22    A.   I know that fentanyl has been
23 attempted to be smuggled in through the --
24 through the mail system.
25    Q.   Are you aware of any drugs other

Page 236

1 than fentanyl?
2    A.   Not that I can recall right now.
3    Q.   What steps have you taken to
4 prevent the smuggling of drugs into the jail by
5 mail?
6    A.   We've -- we've given our inmate
7 service staff, who are the ones that screen the
8 mail when it comes in, we've given them
9 additional training to screen the mail, given
10 them different -- given them more precautions,
11 likes gloves and that kind of stuff, to -- when
12 they screen the mail. And then downstairs, the
13 security and the deputy staff also screens the
14 mail again before it's given to the inmate.
15    Q.   Are there any monetary costs
16 associated with the screening of the mail
17 that -- that Summit County Corrections does?
18       MR. LEDLIE:  Object to the form.
19 Asked and answered.
20    A.   I wouldn't know what those would
21 be.
22       MS. WU:  I think we're just going
23 to switch the mic.
24       Let us know if you want to take a
25 break.

Page 237

1       THE WITNESS:  When we get done.
2       EXAMINATION OF SHANE BARKER
3 BY MS. WU:
4    Q.   Good afternoon, Captain Barker.
5    A.   Hello again.
6    Q.   So earlier today you testified that
7 you believe that there's an opioid epidemic in
8 Summit County, correct?
9    A.   Yes.
10    Q.   What programs, if any, has the
11 Department of Corrections implemented in order
12 to address that opioid crisis?
13    A.   You mean on the state level?
14    Q.   The Summit Corrections Division,
15 specifically.
16    A.   We're not really a treatment
17 facility, so we -- you know, if we've done some
18 stuff outside, in the community, that I don't
19 know about, that may have happened, but that's
20 not what we do inside the ja- -- our jail.
21    Q.   Are there -- aside from inmate
22 treatment, are there any other changes that the
23 Summit County Corrections Division has
24 implemented in reaction to the opioid crisis
25 that you referenced earlier today?

60 (Pages 234 - 237)

Page 238

1   A.   Yes, there's been a lot of changes:
2   additional staff training, additional staff
3   assigned to handle suicidal-type inmates, which
4   happens when you're withdrawing from whatever
5   they may have taken.  We've added equipment,
6   we've -- and added staff where -- where we need
7   to put it at.  We've changed the way we
8   transport inmates to and from court, in and out
9   of the jail.  Made a lot of changes.
10   Q.   I'd like to ask you to walk me
11   through those changes that you've just
12   referenced.
13       What types of training has the
14   Summit Corrections Division implemented in
15   response to the opioid epidemic?
16   A.   We've done training where the
17   sergeants will get together with the security
18   staff and go over -- you know, practice
19   pat-down techniques.  We've trained in -- in
20   the body scanner.  We train -- it's -- when
21   I -- when we have new deputies hired in, they
22   get a -- it's part of their on-job training
23   program where they get trained on how to do
24   proper pat-downs, how to -- not necessarily
25   detect, but see -- watch inmate behaviors that

Page 239

1   they may be carrying something or may be on
2   something.  We've introduced training for that.
3   It's been an ongoing thing the last several
4   years.
5   Q.   Is any of the training that you
6   just described specific to opioids?
7       MR. LEDLIE:  Object to the form of
8   the question.
9   A.   It's specific to any type of
10   contraband.
11   Q.   When did you first implement the
12   training you described in order to look for
13   contraband?
14   A.   The scanner went in in August of
15   '17.  The staff had to be trained on that.  The
16   FTO, field training officer program, we put new
17   deputies through was always an evolving thing.
18   It's always updated, always changed.
19       The -- the pat-downs with the
20   deputies, several years ago we began, you know,
21   showing them videos of proper pat-downs,
22   showing them videos of themselves patting
23   people down so they can kind of critique
24   themselves.
25       The inmate service workers have

Page 240

1   been spoken to and given different equipment to
2   scan the mail that comes in.
3   Q.   Is the training to identify
4   contraband coming into the jail specific to
5   screening for potential opioid substances?
6       MR. LEDLIE:  Object to the form of
7   the question.
8   A.   We screen for everything.
9   Q.   So it's not specific to opioids?
10   A.   All of this stuff has increased in
11   the last several years because of what's going
12   on, and it -- it makes our staff have to work
13   that much harder, and it's happened in the last
14   seven, eight years that I've been there.
15   Q.   Other than the training, which has
16   focused on screening for contraband, is there
17   any other training, which the corrections
18   division has implemented in response to the
19   opioid crisis that you've referenced today?
20   A.   It's just a -- a different way of
21   life in the jail that my staff has to deal
22   with, that we're always looking for, you know,
23   pills they'll be getting in, any type of opioid
24   that people may have used and coming down off
25   of.  It's just changed the whole way we do

Page 241

1   business in the last several years.
2   Q.   Now, going back to the training
3   related to screening for contraband, what
4   costs, if any, has the corrections division
5   incurred in order to implement the trainings
6   you cited?
7       MR. LEDLIE:  Object to the form of
8   the question.  Asked and answered.
9   A.   I wouldn't know about the costs.
10   Q.   How would you go about monetizing
11   the costs of implementing the trainings you
12   described to screen for contraband?
13       MR. LEDLIE:  Object to the form of
14   the question.
15   A.   I wouldn't be the one doing that.
16   Q.   Did you have to request any
17   additional funding in order to implement the
18   training measures you described to screen for
19   contraband?
20   A.   We've been asking for additional
21   staff and additional training classes for the
22   last five to seven years since I've been in the
23   jail as a captain.  We're always asking for
24   additional training and/or staff.
25   Q.   Did you make any specific requests

61 (Pages 238 - 241)

1 for the trainings related to screening for
2 contraband?
3     A.   Yes.  The scanner's a good example.
4     Q.   Other than the scanner, is there
5 any other specific request that you made in
6 order to obtain funding -- funding to train
7 corrections staff to screen for contraband?
8         MR. LEDLIE:  Object to the form of
9 the question.
10    A.   We're -- we're always asking for
11 additional training.
12    Q.   Is there any -- have you ever
13 requested funding for training specific to
14 responding to the opioid crisis?
15        MR. LEDLIE:  Object to the form of
16 the question.  Asked and answered repeatedly at
17 this point.
18    A.   We always ask for training funds.
19    Q.   Have any of those been -- those
20 requests been specifically to obtain funds to
21 address the opioid crisis?
22    A.   We're asking for training funds all
23 the time.
24    Q.   So I'm going to read my question
25 again, just because I want the record to be

1 clear, so bear with me.
2         Have any of the funds you've
3 requested been specific -- specifically to
4 obtain funds to address the opioid crisis?
5     A.   We ask for training funds all of
6 the time.  I don't know the specificity of the
7 request.  It's -- our staff needs training.
8     Q.   So, no, none of the --
9         MR. LEDLIE:  Object to the form.
10    Q.   -- requests have been specific --
11        MR. LEDLIE:  Sorry.  Are you done?
12 I'll wait.  Before you -- are you done with
13 your question?  Because I cut you off.
14        MS. WU:  I wasn't.
15        MR. LEDLIE:  I apologize.
16        MS. WU:  So I was just going to --
17        MR. LEDLIE:  Yeah.
18    Q.   So none of your requests for
19 additional funding have been specific to your
20 response to the opioid crisis you've cited
21 today, correct?
22        MR. LEDLIE:  Object to the form of
23 the question.  Asked and answered.
24    A.   Always asking for training.  The
25 SecurPASS was specific to that.

1     Q.   The SecurPASS was specific to the
2 use of opioid drugs?
3     A.   Yes, because we were finding an
4 inordinate amount getting inside the facility,
5 because they were very small and hard to
6 detect.
7     Q.   Does the SecurPASS screen for
8 substances -- substances other than opioid
9 drugs?
10    A.   Yes.
11    Q.   A second category of response you
12 identified was responding to suicidal inmates.
13 What does that entail?
14    A.   So through my experience the last
15 few years in the jail and talking with mental
16 health and with medical, because I don't -- I'm
17 worried about the security of the jail, we're
18 getting a lot of inmates that are attempting,
19 have been successful, and make suicidal
20 threats.
21        So I'm told from -- and in my
22 training that I have gone to, that people that
23 are coming off opioids are depressed.  And
24 we're seeing a spike in how many people we are
25 monitoring for suicide precautions.

1     Q.   What are the suicide precautions
2 that you're referencing?
3     A.   They're put in a cell by themselves
4 without anything accept a -- a gown that is --
5 you can't tear or rip to make a noose, and a
6 blanket that's the same type of material.  And
7 then I have to assign a staff member to watch
8 that inmate for signs of life every 10 minutes.
9     Q.   Within the last year, how many
10 inmates in the corrections facilities you
11 manage have been put on suicide watch?  Or I
12 should say suicide precautions?
13    A.   It's more than I have ever seen,
14 but I don't have a number.
15    Q.   Is that number tracked?
16    A.   Probably not specifically tracked,
17 but we do maintain -- so they have to be
18 watched, they have to be seen every 10 minutes.
19 There's logs on that.  Those logs are scanned
20 in and -- and kept.
21    Q.   If we wanted to determine how many
22 inmates in the Summit system were put under
23 suicide precautions within the last year, what
24 documents would we need to consult?
25    A.   We'd need to go and look at the --

Page 246

1 the 10-minute -- we call them a 10-minute
2 observation log. Have to go look at those.
3    Q.   Are there any documents, which are
4 created when an inmate is put on -- under
5 suicide precautions?
6    A.   Generally, it's just the --
7 there'd be an entry in the shift commander and
8 on the pod log. The pod log is a running log
9 of what happened on the pod that day. And then
10 the shift commander log, they would enter in
11 that that inmate so-and-so was put into suicide
12 precautions, and then the 10-minute log would
13 be started.
14       And if there was any -- if we had
15 to, for instance, somebody didn't want to
16 remove their clothing and go into a suicide
17 gown and we had to assist them, we'd -- we'd
18 write a report on that.
19    Q.   Who determines whether an inmate is
20 put under suicide precautions?
21    A.   When they tell a deputy -- when
22 they make a certain statement to a deputy
23 after -- after they're asked a question, the
24 deputy will go ahead and put them in suicide
25 precautions. Or when they talk to their mental

Page 247

1 health worker that's at the jail and they make
2 comments to let us know, and then we'll put
3 them in.
4    Q.   Are there any policies or
5 procedures in place that guide corrections
6 staff as to when to -- to put an inmate under
7 suicide precautions?
8    A.   There is policy, and there is
9 training every year on that, but it is --
10 it's -- it's -- it usually happens a lot at the
11 booking window. We will ask them certain
12 questions, one of them being, "Do you feel like
13 harming yourself? Do you feel like killing
14 yourself?" And if we get "yes" to those
15 questions, they go in those precautions. Or
16 back on the pods, they would go into those
17 precautions.
18    Q.   Is any aspect of the protocol used
19 to screen inmates for suicide precautions based
20 on use of drugs?
21       MR. LEDLIE: Object to the form of
22 the question.
23    A.   I don't know how many that would
24 be.
25    Q.   Does your screening of inmates for

Page 248

1 potential suicide precautions include
2 consideration of whether an inmate has abused
3 drugs?
4       THE WITNESS: Am I still on over
5 there?
6    A.   It's -- it's a general question
7 that's asked. It's -- the question is, without
8 having it in front of me, "Do you feel
9 suicidal? Do you want to hurt yourself?" It's
10 kind of a general question.
11    Q.   Do you know what proportion of
12 inmates placed under suicide precautions within
13 the last year had abused drugs?
14    A.   No, I don't.
15    Q.   Do you know what proportion of
16 inmates placed under suicide precautions within
17 the last year had abused an opioid substance?
18       MR. LEDLIE: Object to the form of
19 the question.
20    A.   No, I do not.
21    Q.   Is that information recorded
22 anywhere?
23    A.   It -- it -- I -- I don't know. I'd
24 be speculating.
25    Q.   Do you know if the number of

Page 249

1 inmates placed under suicide precautions in the
2 last year is more or less than in the previous
3 year?
4    A.   It has been a growing problem for
5 the last several years. Whether we have more
6 this year than last year, I don't know. I just
7 know that we didn't have -- I -- I didn't see
8 this issue when I was there as a sergeant, a
9 deputy, and -- and a lieutenant. It's really
10 increased in the last several years.
11    Q.   Other than the opioid issues that
12 you've cited, are there any other factors that,
13 in your opinion, have increased the number of
14 inmate -- inmates requiring imposition of
15 suicide precautions?
16    A.   I don't know. I don't have that
17 type of training.
18    Q.   Have you ever stated the opinion
19 that the increase in inmates who have need for
20 suicide precautions is based on men- -- mental
21 health deficiencies in the jail?
22       MR. LEDLIE: Object to the form of
23 the question.
24    A.   I don't know if I'm -- said that or
25 not.

63 (Pages 246 - 249)

Page 250

1    Q.   Do you know what proportion of the
2  inmates who have been placed under suicide
3  precautions within the last year have a
4  diagnosed mental health issue?
5    A.   I would not have that information.
6    Q.   Is that information tracked?
7    A.   I don't know.
8    Q.   Do you know -- do you know what
9  amount of money the corrections division has
10  expended within the last year in order to fund
11  the cost of services for inmates under suicide
12  precautions?
13    A.   I do not.
14    Q.   How would we determine that?
15      MR. LEDLIE:  Object to the form.
16    A.   I don't -- I don't know where you
17  would go to get that information.
18    Q.   Another category of response you
19  identified was staffing.
20      What are the staffing measures that
21  the corrections division has implemented in
22  response to the opioid crisis we've discussed
23  today?
24    A.   So every day the shift commander
25  comes in and -- and starts his shift lineup,

Page 251

1  and will staff it appropriately, which usually
2  includes, using just an example, Monday we had
3  to order nine people over from the midnight
4  shift to the day shift to staff the jail.  And
5  the reason -- part of the reason we do that is
6  because we have so many suicide gowns now from
7  people that are depressed because they can't
8  get their -- their drug of choice anymore.
9      They're on suicide, and we have to
10  put additional staffing in place to watch them
11  every 10 minutes.  You can't run a pod and
12  watch a single, maybe even three or four
13  inmates, and run the pod effectively.
14    Q.   What's the basis for your opinion
15  that inmates placed under suicide precautions
16  are suicidal because they cannot obtain their,
17  in your words, drug of choice?
18    A.   Because I talk to the medical and
19  mental health professionals in the course of my
20  daily activities, walking through the jail,
21  talking to everybody, and always asking, "Why
22  are we seeing this increase?"  And that's the
23  information I'm being told by the medical and
24  mental health professionals.
25    Q.   When's the last time you were told

Page 252

1  that an inmate was placed under suicide
2  precautions because that inmate was suicidal
3  because he was not able to obtain his drug of
4  choice?
5    A.   I don't think I've heard that in
6  the -- in a couple months.  I just know that
7  when we sit down and talk -- I mean, we sit
8  down and talk as a -- as a staff, and one of
9  the things that's being brought up is the
10  excessive use of suicide precautions, and they
11  tell me that is a result of that.
12    Q.   Who -- who has told you that?
13    A.   It would be my mental health and my
14  medical staff inside the building.
15    Q.   Could you identify those personnel
16  by name?
17    A.   It would be Ruthann that's in
18  charge of the mental health, and Theresa that
19  was in charge of the medical.  And then, when
20  I've gone to ADM Board, I know that's something
21  that's spoken about.
22    Q.   Staying within your experience in
23  the corrections division, when is the last time
24  that someone reported to you that an inmate
25  needed to be placed under suicide precautions

Page 253

1  because he or she could not receive his drug of
2  choice?
3      MR. LEDLIE:  Object to the form.
4    A.   I don't know.  It's an ongoing --
5  it's an ongoing issue.
6    Q.   How many times within the last year
7  did you receive information that an inmate
8  needed to be placed under suicide precautions
9  because he or she could not receive his drug of
10  choice?
11    A.   I don't know how many times that
12  happened.
13    Q.   More than five?
14    A.   Yes.
15    Q.   More than ten?
16    A.   Yes.
17    Q.   More than 20?
18    A.   Just be guessing now.  Don't know.
19    Q.   All right.  Do you know what
20  proportion of instances, in which you were so
21  advised, the drug of choice was an opioid
22  substance?
23    A.   No, I do not.
24    Q.   Have you tracked that information
25  anywhere?

64 (Pages 250 - 253)

Page 254

1    A.   I have not.
2    Q.   Do you know the costs -- do you
3 have any idea what the cost has been, in
4 monetary terms, to the corrections division in
5 order to staff in response to the opioid crisis
6 that you've discussed today?
7        MR. LEDLIE:  Object to the form of
8 the question.  Vague.  And asked and answered.
9    A.   I would not have any of that
10 information.
11   Q.   Do you know what records we would
12 have to consult in order to make that
13 determination?
14   A.   No, I would not.
15   Q.   The fourth category of response
16 that you identified --
17        MR. LEDLIE:  Before we move to
18 another category, could I please have just 10
19 minutes?  It's been more than an hour.
20        MS. WU:  Certainly, yes.
21        THE VIDEOGRAPHER:  Going off the
22 record at 3:32 p.m.
23        (A recess was taken.)
24        THE VIDEOGRAPHER:  Back on the
25 record at 3:55 p.m.

Page 255

1 BY MS. WU:
2    Q.   Captain Barker, before we took a
3 break, we were talking about the correction
4 division's response to the opioid crisis that
5 you identified today, right?
6        We had gotten up to the fourth
7 category of response that you identified, and
8 which what -- which you referred to as
9 "transfer."  What does transfer entail?
10   A.   Could you give me the context?  Was
11 that the things -- I guess I don't remember
12 what I meant by "transfer."
13   Q.   Certainly.  Before the break, I'd
14 asked you in what ways the corrections division
15 had responded to the opioid crisis, that you
16 discussed earlier today.  Do you remember that?
17   A.   I do.
18   Q.   You identified four general
19 categories of response:  training, dealing with
20 suicidal inmates, staffing, and transfer was
21 number four.
22   A.   I was referring to maybe when
23 inmates are transferred to and from the jail,
24 to the courts, and back again.  It takes them
25 outside of the security, so we scan them again

Page 256

1 in the -- on the -- in the scanner.  Busy court
2 day, we may scan 80 to 100 on -- on the
3 machine.
4    Q.   And in what way has your
5 department's transfer actions changed in
6 response to the opioid crisis?
7    A.   So prior to that, the inmates would
8 leave the facility, go to court, they'd come
9 back in, and they would get a -- a physical
10 pat-down by the deputies, a hand pat-down.
11       Now they get that, and they get
12 sent through the body scanner, which takes
13 about -- it's about two minutes an inmate.  And
14 like I said, there's sometimes upwards of 100
15 inmates that have to go through it, so now we
16 have to staff that additionally
17 Monday through -- actually Monday through
18 Saturday.
19   Q.   Is that transfer -- and, more
20 specifically, screening policy specific to
21 screening for opi- -- opioid drugs?
22       MS. LEYIMU:  Object to the form.
23   A.   We got it because we were seeing an
24 increase in -- in those types of items being
25 attempted to be -- to be -- to get smuggled

Page 257

1 into the facility.
2    Q.   When did you first see that
3 attempt -- that increase in attempted smug- --
4 smuggling of opioid drugs?
5    A.   The increase was already starting
6 to tick up when I got there in 2011 as a
7 captain, and it continued to rise over the last
8 few years.
9    Q.   When did you implement these -- the
10 changes in transfer or screening policies that
11 you've described?
12   A.   That would have been August of
13 2017.
14   Q.   Why did it take at least six years
15 in order to implement those changes in your
16 policies?
17       MS. LEYIMU:  Object to the form.
18   A.   I don't know why it would have
19 taken that long.
20   Q.   Did you have any involvement in an
21 effort to change the transfer and screening
22 policies prior to 2017?
23   A.   Yes.  We were hearing, through
24 professional circles and conferences that we go
25 to, that there was a new technology

65 (Pages 254 - 257)

Page 258

1 specifically designed for this.  Several
2 companies manufactured it.  We went out and did
3 research on it, asked for it during several
4 budgetary cycles, and eventually received it in
5 August of '17.
6     Q.   When did you first submit a request
7 to receive the scanning technology?
8     A.   I don't know for sure, but I think
9 it was probably at least two budgetary cycles
10 before we got it.
11     Q.   Were you advised why you didn't
12 receive the funding before 2017?
13     A.   Not the reason.  Just no.
14     Q.   Other than the four categories of
15 response we've just discussed, are there any
16 other additional categories of response that
17 the corrections department has undertaken in
18 response to the opioid crisis you've discussed
19 today?
20     A.   You know, there -- there probably
21 is.  It's -- it's been an on- -- it's -- it's
22 an ongoing issue we've been dealing with for
23 the last several years.  We just didn't have
24 these types of issues when I was in corrections
25 in my previous assignments.  I'm wracking my

Page 259

1 brain trying to come up with more that we have
2 done, but we've -- it's an ongoing issue.  It's
3 a daily thing that we're trying to manage the
4 care of the inmates and keep that -- keep those
5 types of things out of the facility.
6     Q.   What, if any, addiction treatment
7 programs are currently provided to inmates in
8 Summit corrections facilities?
9         MS. LEYIMU:  Object to the form.
10 Asked and answered.
11     A.   What the mental health provides.
12     Q.   What are the services that the
13 mental health services program provides to
14 inmates?
15     A.   Well, they provide services one on
16 one with the inmates, and we still have the
17 Narcotics Anonymous being run.
18     Q.   Have the addiction treatment
19 services provided to inmates changed in any way
20 in response to the opioid epidemic that you've
21 referenced today?
22         MS. LEYIMU:  Object to the form.
23     A.   I -- I don't know about it -- I
24 can't answer that question with regards to --
25 to our facility.  We have been doing that for

Page 260

1 some time, and we continue to do it.
2     Q.   To your knowledge, has the
3 corrections division incurred any additional
4 costs associated with providing addiction
5 treatment services to inmates, based on the use
6 and abuse of opioid drugs?
7     A.   There is -- you know, my staff are
8 there delivering supervisory services.  The
9 mental health and the medical are providing
10 those services.  I don't know the dollar
11 amount, but it takes our staff's -- my staff a
12 lot of time to deal with those types of
13 situations.  They're being paid for their time.
14     Q.   How many staff members are involved
15 in providing addiction treatment services to
16 inmates within your facilities?
17     A.   None that would be sheriff's office
18 personnel.
19     Q.   What personnel is involved in
20 providing addiction treatment services?
21     A.   The mental health provider.  And I
22 don't know how many they use to do that.
23     Q.   Do you know what proportion of the
24 time -- what proportion of the mental health
25 provider's time is dedicated to providing

Page 261

1 addiction treatment services for opioid
2 addiction?
3         MS. LEYIMU:  Object to the form.
4     A.   I don't know how much time they put
5 in for that.
6     Q.   Do you know if they record their
7 time in a way that would allow us to determine
8 that?
9     A.   I don't know.
10     Q.   I'd like to mark as Exhibit 14
11 SUMMIT_001128847.
12         - - - - -
13         (Thereupon, Deposition Exhibit 14,
14         Summit County Sheriff's Office 2003
15         Annual Report, SUMMIT_001128847 to
16         001128894, was marked for purposes
17         of identification.)
18         - - - - -
19     Q.   Captain Barker, are you familiar
20 with Exhibit 14?
21     A.   Yes.  I've seen this before.
22     Q.   What is it?
23     A.   This is our yearly report that we
24 put out.
25     Q.   And is this the report for 2003?

66 (Pages 258 - 261)

Page 262

1    A.   Yes, it is.
2    Q.   Did you have a role in the
3 corrections division in 2003?
4    A.   I believe I was a jail lieutenant
5 at that time.
6    Q.   Would you have had any involvement
7 in preparing the annual report for 2003?
8    A.   Probably not back then, unless
9 there's a short little bio in here of me.  I
10 don't know.  I'd have to read through it.
11    Q.   Captain Barker, I'd like to call
12 your attention to page 36 of the report, which
13 is identified as -- with the Bates number
14 ending 8883.
15    A.   Okay.  8883?  I -- I have that.
16    Q.   Okay.  At the last paragraph on
17 that page, reads, "Summit County Jail mental
18 health unit provides mental health and chemical
19 dependency services to inmates in the jail
20 through a variety of programs, including mental
21 health assessment, referral for continuing
22 community services, individual counseling,
23 chemical dependency groups," and on from there.
24        Is this report consistent with your
25 recollection of the services provided to

Page 263

1 inmates as of 2003?
2    A.   Yes, I would think that was
3 accurate.
4    Q.   Do you know what the chemical
5 dependency groups involved?
6    A.   That's the -- from my
7 understanding, that's part of the -- excuse
8 me -- the Narcotics Anonymous.  A lot of these
9 programs have gone away since then.
10    Q.   Is it -- are chemical dependency
11 groups currently offered to inmates in the
12 Summit corrections facilities?
13    A.   I'm sorry.
14    Q.   No problem.
15    A.   Narcotics Anonymous is currently
16 offered.
17    Q.   Looking at Exhibit 14, were the
18 chemical dependency programs offered in 2003
19 offered at any cost to the sheriff's
20 department?
21        MS. LEYIMU:  Object to the form of
22 the question.
23    A.   I -- I wouldn't know anything about
24 the costs involved with that.
25    Q.   Who would know?

Page 264

1    A.   That would probably be our fiscal.
2    Q.   All right.  So I'd like to mark as
3 Exhibit 15 a document identified as
4 SUMMIT_001128895.
5        - - - - -
6        (Thereupon, Deposition Exhibit 15,
7        Summit County Sheriff's Office 2004
8        Annual Report, SUMMIT_001128895 to
9        001128940, was marked for purposes
10        of identification.)
11        - - - - -
12    Q.   Captain Barker, are you familiar
13 with Exhibit 15?
14    A.   Yes.  It's another yearly report.
15    Q.   And this is the bureau report for
16 2004, correct?
17    A.   Yes, 2004.
18    Q.   And you were employed as a
19 lieutenant in the corrections division as of
20 2004, correct?
21    A.   At some point in time that year, I
22 was transferred out to patrol.  I want to say
23 it was July or August of -- of that year.
24    Q.   You did serve in the corrections
25 division for a period during 2004, correct?

Page 265

1    A.   Yes, that's correct.
2    Q.   I'd like to call your attention to
3 page 37 of this document, which is identified
4 with the Bates ending 8931.  On this page, we
5 see a section related to inmate services.  It
6 says, "Inmate services provides a link to the
7 inmate with the community outside the facility.
8 They arrange necessary telephone calls for
9 inmates when no other means of communication is
10 available, notarize legal papers, and
11 coordinate the religious, recreational,
12 educational, and other programming (Alcoholics
13 Anonymous, Narcotics Anonymous, etc.) for the
14 inmates."
15        Is this consistent with your
16 recollection that both Alcoholics Anonymous and
17 Narcotics Anonymous programming was offered to
18 inmates as of 2004?
19    A.   Yes, I believe back then that was
20 what was offered.
21    Q.   When was the Narcotics Anonymous
22 program first instituted within the corrections
23 facilities?
24    A.   I -- I don't know.
25    Q.   Do you know who was responsible for

67 (Pages 262 - 265)

1 providing the Narcotics Anonymous programming?

2    A.   Back then it would -- it would be a

3 guess.  I don't know.

4    Q.   Do you know how the inmate services

5 within the corrections facilities are funded?

6    A.   No, I don't.

7    Q.   Do you know how many inmates

8 participated in the Narcotics Anonymous program

9 in 2004?

10    A.   It looks like there was probably

11 1,800.

12    Q.   Do you track that information

13 today?

14    A.   I don't know if we do or not.  I

15 haven't looked at a report lately.

16    Q.   Is it your responsibility to track

17 the number of inmates who receive addiction

18 treatment services?

19    A.   No.

20    Q.   Does anyone within the corrections

21 division have that responsibility?

22    A.   The report's not -- the report is

23 not generated from the corrections.  We give

24 the information to somebody in operations and

25 they generate this report.

1    Q.   And when you mean operations, do

2 you mean operations as a division within the

3 sheriff's department?

4    A.   Yes.  Anything that's not

5 corrections.

6    Q.   Now, during the day today, we've

7 talked a few times about Narcotics Anonymous,

8 and I'll admit I'm a little bit confused.

9        During what periods of time has

10 Narcotics Anonymous programming been offered to

11 inmates within the Summit corrections

12 facilities?

13        MS. LEYIMU:  Object to the form.

14    A.   As far as I know, it's always been

15 offered.

16    Q.   So I'd like to mark as Exhibit 16 a

17 document identified as SUMMIT_000342376.

18        - - - - -

19        (Thereupon, Deposition Exhibit 16,

20        Summit County Sheriff's Office 2016

21        Annual Report, SUMMIT_000342376 to

22        000342433, was marked for purposes

23        of identification.)

24        - - - - -

25    Q.   Captain Barker, are you familiar

1 with Exhibit 16?

2    A.   Yes, I am.

3    Q.   What is it?

4    A.   It is the 2016 annual report.

5    Q.   Now, if I can call your attention

6 to page 46, there's a description of inmate

7 services and laundry.

8        What is the inmate services

9 subdivision of the corrections department?

10    A.   They're the department that

11 provides special services to inmates.

12    Q.   Who's responsible for funding

13 inmate services?

14    A.   I don't know where that funding

15 comes from.

16    Q.   Do you have any oversight

17 responsibility for inmate services?

18    A.   Yes.  Inmate services, the

19 supervisor for them reports to me.

20    Q.   And what is the nature of your

21 supervisory responsibility for inmate services?

22    A.   She keeps me apprised of day-to-day

23 operations of all the services we provide to

24 the inmates.  If there's any problem, she

25 brings them to me.  If anything needs to be

1 solved, she'll bring it to me.  We talk daily

2 about those operations.

3    Q.   And when you say -- reference

4 "she," to whom are you referring?

5    A.   Rebecca McCutchen.

6    Q.   So here on page 46 of Exhibit 16,

7 in the first column, the second bullet reads,

8 "Overseeing the administration of all inmate

9 programs which are conducted on each housing

10 unit in the inmate classrooms.  These programs

11 include Narcotics Anonymous and Bible studies."

12        Do you see that?

13    A.   I see that.

14    Q.   Is the Narcotics Anonymous program

15 specific to opioid drugs?

16        MS. LEYIMU:  Object to the form.

17    A.   I don't know the content of

18 the meetings.

19    Q.   Is there -- does Ms. McCutchen have

20 any responsibility to report to you about the

21 Narcotics Anonymous program?

22    A.   So they schedule the Narcotics

23 Anonymous with the inmates, and then the mental

24 health staff conducts the meeting.  So if

25 there's any issues that may arise during those

68 (Pages 266 - 269)

Page 270

1 meetings, it's brought to me.
2    Q.   When was the last -- when is the
3 last time that an issue related to a Narcotics
4 Anonymous meeting was brought to your atten- --
5 attention?
6    A.   I -- I don't have any recollection
7 of any issues going on with that particular
8 program.
9    Q.   I'd like to call your attention,
10 Captain Barker, to page 49 of Exhibit 16.  And
11 in particular, I'd like to ask you to look at
12 the section titled "Behavioral Health
13 Services."  Do you see that?
14    A.   Yes, I see it.
15    Q.   It reads, "The Summit County Jail
16 mental health unit is provided by Summit
17 Psychological Associates, Inc., funded by the
18 ADM, Alcohol Drug Addiction and Mental Health
19 Services, Board of Summit County.  Summit
20 Psychological Associates, Inc., is a private
21 agency founded in 1984."
22        Is this information consistent with
23 your knowledge of the provision of mental
24 health services within the Summit jail system?
25    A.   Yes, it is.

Page 271

1    Q.   Do you have any knowledge of the
2 funding mechanism for the mental health
3 services, which are provided within the Summit
4 corrections system?
5    A.   I'm not exact -- you know, I don't
6 know where they get their money from.  They get
7 it from the ADM Board, who gets it from a tax
8 levy.
9    Q.   Do you have any involvement in
10 manning -- managing the finances for the
11 provision of mental health services within
12 Summit corrections?
13    A.   No, I have none of that.
14    Q.   Do you have any oversight
15 responsibility for the provision of mental
16 health services by Summit Psychological
17 Associates?
18    A.   Yes.  The supervisor reports
19 directly to me.
20    Q.   What is the nature of your
21 supervisory responsibility?
22    A.   She will bring any problem that
23 would arise when she's trying to provide mental
24 health, all the services they provide, provide
25 those to the inmates, and she runs into maybe

Page 272

1 a -- an issue with security that she can't
2 render those services.  So it's -- it's, again,
3 it's work- -- making sure that the security
4 staff and the mental health staff are working
5 properly to get those services out.
6    Q.   When you referred to -- referred to
7 she in that answer, to whom are you referring?
8    A.   Ruthann Paulus-Bland.
9    Q.   What's her role?
10    A.   She's a mental health coordinator.
11    Q.   How long has she served in that
12 role?
13    A.   Probably close to four years.
14    Q.   When is that last time that Ruthann
15 brought to your attention a problem with the
16 provision of mental health services?
17    A.   Her and I talk daily.  There is a
18 lot of -- because they provide so much -- so
19 many services now to inmates than they have in
20 the past, and with our staffing levels at the
21 jail being as low as they are, we can't always
22 get the inmates to the social worker on a
23 one-on-one basis, and she'll bring that to my
24 attention and see how we can work that out
25 and -- and get the -- get those services that

Page 273

1 they need.
2    Q.   When is the last time that Ruthann
3 brought a problem to your attention?
4    A.   Probably last week.
5    Q.   What was the nature of the problem
6 she described to you?
7    A.   She was having a problem with a
8 sergeant that wanted to put -- so she was
9 having a problem with a sergeant that wanted to
10 put the inmates in a lockup, which meant that
11 the inmate couldn't meet with the social
12 worker, and I had to go down there and make
13 compromises between security staff and the
14 mental health staff to get it -- to get it
15 worked out.
16    Q.   Looking back at Exhibit 16, and
17 looking at the second paragraph of the
18 behavioral health services section, it reports
19 that "The mental health staff is responsible
20 for conducting substance abuse assessments for
21 inmates."
22        What does the substance abuse
23 assessment entail?
24    A.   I'd never sat in and listened when
25 they talk to the inmates.  I don't know.

69 (Pages 270 - 273)

1     Q.   Do you -- I'm sorry.  I didn't mean
2  to step over you.
3     A.   That's all right.
4     Q.   Do you know what records, if any,
5  are kept, which record the results of the
6  substance abuse assessments performed on
7  inmates?
8     A.   I know they keep files on the
9  inmates that they speak to, but I don't know
10  the contents of those.
11     Q.   Do you have access to those files?
12     A.   No, I do not.
13     Q.   Now, if I can call your attention
14  to the third paragraph, staying in the
15  behavioral health services section, at the end,
16  it reads, "Additionally, the ADM Board is
17  funding a reentry coordinator to assist the
18  linkage of mentally ill and drug addicted
19  inmates to services once they have left the
20  jail.  As part of the grant for this position,
21  the ADM Board is providing funding for
22  injectable medication such as Vivitrol to treat
23  cravings for opiates and alcohol."
24        Are you aware of this program?
25     A.   I am -- ye- -- I am aware of it,

1  yes.
2     Q.   Do you have any oversight
3  responsibility for this program?
4     A.   Not for the program, per se, but if
5  there would be a problem with it that she's not
6  able or her staff's not able to get it to work
7  properly, they would bring it to me.  And I
8  have not heard any problems with the Vivitrol.
9     Q.   Do you know how many inmates are
10  participating in this program?
11     A.   I do not.
12     Q.   Do you know if that information is
13  tracked?
14     A.   I -- I don't know if it's tracked.
15     Q.   Exhibit 16 indicates that the
16  Vivitrol program is funded through a grant.
17  Does that mean that there's no expenditure for
18  the Department of Corrections to maintain this
19  program?
20        MS. LEYIMU:  Object to the form.
21     A.   I'm not sure what that means.
22     Q.   Are you aware of any financial
23  expenditure by the division of corrections to
24  fund this Vivitrol program?
25        MS. LEYIMU:  Object to the form.

1     A.   No, I'm not.
2     Q.   So I'd like to mark as Exhibit 17
3  as document identified as SUMMIT_000342318.
4        - - - - -
5        (Thereupon, Deposition Exhibit 17,
6        Summit County Sheriff's Office 2015
7        Annual Report, SUMMIT_000342318 to
8        000342375, was marked for purposes
9        of identification.)
10        - - - - -
11     Q.   Captain Barker, are you familiar
12  with Exhibit 17?
13     A.   Yes, I am.
14     Q.   What is it?
15     A.   Sheriff's office 2015 annual
16  report.
17     Q.   And what was your position in 2015?
18     A.   I was a captain assigned to the
19  jail.
20     Q.   And in that role, did you have
21  oversight responsibility for contracted
22  services?
23     A.   Yes, I did.
24     Q.   I'd like to ask you to look at page
25  46 of Exhibit 17, which is identified with the

1  Bates stamp ending 2363.
2     A.   Page 46.  Okay, I have it.
3     Q.   If I can call your attention to the
4  second paragraph on page 46, it reads, "In
5  August of 2009, due to budget constraints, the
6  staffing level for inmate services was cut from
7  17 employees.  Current staffing includes five
8  full-time and three part-time employees.  The
9  purpose of these employees is to ensure the
10  appropriately delivery of services and programs
11  to inmates in the jail."
12        Are you familiar with the budget
13  constraints identified in Exhibit 17?
14     A.   I'm familiar that there's a -- has
15  been budgetary constraints.  I'm just not sure
16  of the exact amounts.
17     Q.   Do you understand the source of the
18  budget constraints, which are referenced in
19  Exhibit 17?
20     A.   It would be the budget that we're
21  given through county council.
22     Q.   Are those constraints in any way
23  related to the opioid epidemic that you've
24  testified about today?
25        MS. LEYIMU:  Object to the form.

Page 278

1      A.   It's -- it -- like I said earlier,
2   it takes all of our -- takes all of my -- takes
3   a lot of my staff's time to screen inmates that
4   come and go from the jail, that we have to
5   shower female inmates as soon as they come in
6   the building now, and we're paying overtime to
7   have that done with the deputy staff.  So,
8   yeah, it's -- it's a big portion of it.
9      Q.   And it's -- it's your testimony
10  that the opioid crisis caused the layoffs that
11  are described in Exhibit 17, back in 2009?
12         MS. LEYIMU:  Object to the form.
13     A.   I don't know what the -- how the
14  budget was set.
15     Q.   Do you have any understanding of
16  what caused the staffing reduction in 2009,
17  which is referenced in Exhibit 17?
18     A.   It was a reduction in our funding.
19     Q.   Do you know what caused the
20  reduction in your funding?
21         MS. LEYIMU:  Object to the form.
22     A.   No, I don't.
23     Q.   Now, if I can ask you to look down
24  to the third bullet, it says, "Overseeing the
25  administration of all inmate programs."  It

Page 279

1   says, "Programs may be conducted in unit
2   classrooms, which allows for a more secured
3   environment and less inmate movement.  Due to
4   the staffing cutbacks, many of the inmate
5   programs have been eliminated, including, but
6   not limited to, gym, library, chapel,
7   Alcoholics Anonymous and Narcotics Anonymous."
8         Does this indicate that for the
9   period 2009 to 2015, Narcotics Anonymous was
10  not offered to inmates?
11         MS. LEYIMU:  Object to the form.
12     A.   No.  It is my understanding that
13  that has always been -- been offered.  This is
14  a large report.  I'm not saying it's wrong.
15  I'm just saying that sometimes information from
16  one division to another might not be 100
17  percent accurate.
18     Q.   Have you had any responsibility for
19  preparing the materials, which are set forth in
20  Exhibit 17?
21     A.   Very little.  I direct the staff
22  that is under me to get the information to the
23  appropriate person, and then I'm responsible
24  for a bio of myself every year.
25     Q.   Is it your testimony that the

Page 280

1   paragraph indicating that Narcotics Anonymous
2   was not provided to inmates is a mistake?
3      A.   I'm saying that from everything
4   I've -- I've worked with since we've -- been
5   back in the jail as a captain, we've always had
6   Narcotics Anonymous.
7      Q.   And would it surprise you to know
8   that this same sentence indicating that
9   Narcotics Anonymous was unavailable to inmates
10  appears in reports for the period 2009 through
11  2015?
12         MS. LEYIMU:  Object to the form.
13     A.   That would surprise me.
14     Q.   Do you have any involvement in
15  treatment programs for inmates who are released
16  into -- outside of the -- outside of
17  corrections facilities?
18     A.   No.  That's not really what we deal
19  with.
20     Q.   So I'd -- so I'd like to mark as
21  Exhibit 18 a document identified as
22  SUMMIT_001858599.
23              - - - - -
24         (Thereupon, Deposition Exhibit 18,
25          September/October 2017 E-Mail Chain

Page 281

1         Re:  Issuing Narcan to Inmates Upon
2         Release, SUMMIT_001858599 to
3         001858600, was marked for purposes
4         of identification.)
5              - - - - -
6      Q.   Captain Barker, are you familiar
7   with Exhibit 18?
8      A.   Yes, I am.
9      Q.   What is it?
10     A.   It's an e-mail between Captain
11  Nicholas and Jackie Pollard.
12     Q.   If we look at the very top, the
13  most recent e-mail reflected in Exhibit 18,
14  you'll see that it includes an e-mail from
15  Donna Nicholas to you; is that correct?
16     A.   That's correct.
17     Q.   So you've received this
18  correspondence previously?
19     A.   Yes.
20     Q.   Now, if I can call your attention
21  to the second page of this printed-out e-mail
22  chain, the page ending 8600, we see an e-mail
23  from Donna Nicholas to Jackie Pollard.  Is that
24  correct?
25     A.   Yes, that's correct.

71 (Pages 278 - 281)

1    Q.   The subject matter is "issuing
2  Narcan to inmates upon release," correct?
3    A.   Correct.
4    Q.   In the text of this e-mail,
5  Ms. Nicholas reports, "MH currently screens
6  approximately 30 to 35 inmates a week regarding
7  opiate use."
8        Is that consistent with your
9  experience?
10    A.   I really don't know how many they
11  screen.
12    Q.   Do you have access to that
13  information?
14    A.   I would have to go talk to mental
15  health and -- and find out if they would give
16  me those numbers.
17    Q.   Does it fall within your
18  responsibilities to track the number of inmates
19  who are screened for opiate use?
20        MS. LEYIMU:  Object to the form.
21    A.   Not specifically.
22    Q.   Further down in this e-mail, it's
23  the third to last paragraph, Ms. Nicholas
24  writes, "If the inmate is approved to receive
25  the Narcan kit, Ruthann would enter a hold in

1  the jail system management for the inmate to
2  receive the kit upon release."
3        Are you familiar with a program to
4  provide Narcan kits to inmates upon release?
5    A.   So this was a -- yes.  This was a
6  program we discussed back then, and it still
7  has not been instituted.
8    Q.   So there -- is it the case that
9  Narcan is not provided to inmates upon release?
10    A.   That is the case, yes.
11    Q.   How come the corrections division
12  has not adopted the recommendation to provide
13  Narcan to inmates upon release?
14        MS. LEYIMU:  Object to the form.
15    A.   I don't know all the reasons behind
16  the lack of a decision to do that.
17    Q.   Have you been involved in the
18  consideration of whether or not to provide
19  Narcan to inmates upon release?
20    A.   Yes.  It's been briefly discussed
21  in staff meetings and things such as that.
22    Q.   Do you have an opinion as to
23  whether or not Narcan should be provided to
24  inmates upon release?
25        MS. LEYIMU:  Object to the form of

1  the question.
2    A.   I don't have an opinion.
3    Q.   I'd like to mark as Exhibit 19
4  SUMMIT_001859672.
5        - - - - -
6        (Thereupon, Deposition Exhibit 19,
7        March 2014 E-Mail Chain Re: Oriana
8        E-Mail, SUMMIT_001859672 to
9        001859673, was marked for purposes
10        of identification.)
11        - - - - -
12    Q.   Captain Barker, are you familiar
13  with Exhibit 19?
14    A.   Yes, I am.
15    Q.   What is it?
16    A.   It's an e-mail from Lieutenant
17  Scott Cottle to myself about an incident at one
18  of the Oriana House facilities.
19    Q.   Which Oriana House facility is
20  referenced?
21    A.   750 West Market Street.
22    Q.   Is that -- is 750 West Market
23  Street part of the corrections department?
24    A.   No, it's not.
25    Q.   What was the nature of the

1  incident -- what is the nature of the incident
2  described in Exhibit 19?
3    A.   Looks like there was some type of
4  overdose at the 750 West Market Street
5  facility, and we sent a deputy over there to
6  assist with that emergency.
7    Q.   And would you agree that the
8  exchange that this e-mail reflects between you
9  and Greg Macko concerns the question of whether
10  or not it was your responsibility to respond to
11  that overdose incident; is that right?
12    A.   I -- I think that's what the
13  discussion was here, yes.
14    Q.   And if we look at the most recent
15  substantive e-mail in this chain, which is an
16  e-mail from Scott Cottle to you on March 4,
17  2014, Mr. Cottle writes, "I think they took the
18  ruling that Glenwood is part of SCJ to mean all
19  of Orianna."
20        Do you see that?
21    A.   I do see that.
22    Q.   Do you have an understanding of the
23  ruling referenced in that e-mail?
24    A.   So it was -- what this e-mail is
25  about is that there was an incident at one of

72 (Pages 282 - 285)

Page 286

1 Oriana House's facilities, and it wasn't one
2 that we provide security to like we do at the
3 Glenwood Jail.  And they had an incident there,
4 and they called the Akron Police Department.
5 Akron said it was ours because we -- we provide
6 security at Glenwood Jail, which we don't.  I'm
7 not exactly sure what this is, but I don't -- I
8 don't think it's a residential place.
9       But when somebody's calling for
10 help, it is in the county, we're -- you know,
11 we will go help.
12    Q.   What is the relationship between
13 Orianna and the Glenwood facility?
14    A.   They run the programming that's
15 provided at that facility.
16    Q.   Does Orianna have any relationship
17 to the programming provided at the Summit jail?
18    A.   They don't run any programming
19 at -- specifically at the jail, as far as I
20 know.  It's what they will do is they will come
21 over and screen inmates to go to their -- their
22 residential facilities.
23    Q.   Are you involved in coordinating
24 any services provided by Oriana House within
25 the corrections system?

Page 287

1    A.   Other than getting them the time to
2 meet with the inmates.  That's the level of my
3 interaction with regards to that.
4    Q.   How are inmates identified to
5 receive screening from Orianna?
6    A.   I'm not 100 percent sure how they
7 do that.  It has something to do with their
8 charges.
9    Q.   Do you have any knowledge of the
10 funding of the services that Orianna provides
11 inmates within the Summit corrections system?
12    A.   I'm not familiar with the funding
13 at all.
14    Q.   Are you involved in any of the
15 budget process to receive funds for the Summit
16 Psychological Associates services provided to
17 inmates?
18    A.   No, I have nothing to do with that.
19    Q.   Who is responsible for that budget
20 process?
21    A.   I don't know.
22    Q.   Captain Barker, does the Department
23 of Corrections have any training specific to
24 dealing with inmates suffering from opioid
25 addiction?

Page 288

1       MS. LEYIMU:  Object to the form.
2 Asked and answered.
3    A.   Other than the training that I
4 talked about earlier, which is stuff that we
5 provide to our staff.
6    Q.   And that's the screening training
7 that you discussed earlier today?
8    A.   Yes.
9    Q.   Have you personally received any
10 training specific to opioids in law
11 enforcement?
12       MS. LEYIMU:  Object to the form.
13    A.   I received the same training that
14 the security staff receives.
15    Q.   Have you received any other
16 training related to opioids?
17    A.   I go to ADM Board meetings.  I go
18 to American Jail Association conferences, and
19 there will be conferences and workshops on that
20 the -- on that topic that I will look in --
21 that I will attend.  So I do receive a little
22 more than the line staff would -- would
23 receive.
24    Q.   How often do you attend ADM Board
25 meetings?

Page 289

1    A.   It really depends on when they
2 schedule it, and my schedule.  It -- a few
3 times a year, and if I can't, I send a
4 repres- -- if I can't go, I send a
5 representative.
6    Q.   Is it correct that the ADM Board
7 meets quarterly?
8    A.   They do, but they have a lot of
9 other meetings besides that.
10    Q.   Fair enough.
11       What is the nature of your
12 involvement with the ADM Board?
13    A.   I'm the representative of the
14 sheriff's office to the ADM Board.
15    Q.   How long have you served in that
16 capacity?
17    A.   Probably for about five years.
18    Q.   To what extent has your involvement
19 with the ADM Board focused on issues related to
20 opioid drugs?
21    A.   That seems to be the topic that's
22 discussed an awful lot.  And I have met
23 people throughout that I've known outside of
24 work that have had family members and children
25 that have been -- have used opiates and have

73 (Pages 286 - 289)

Page 290

1 overdosed.  It's -- it seems to be the topic of
2 discussion on most meetings that we have.
3     Q.   What has been the nature of your
4 participation in -- with the ADM Board related
5 to opioid use and abuse in the Summit/Ak- --
6 Summit/Akron area?
7         MS. LEYIMU:  Object to the form.
8 You can answer.
9     A.   Other than attending, I don't
10 really get involved, because it's -- I deal
11 with the security of the -- of the jail.  It's
12 stuff that I learn that's happening elsewhere,
13 just besides the jail.
14     Q.   So it's mostly informational?
15     A.   Yes.
16     Q.   Have you ever received Narcan
17 training?
18     A.   I have not, no.
19     Q.   Have other -- other employees of
20 the corrections division been trained to
21 provide inmates with Narcan?
22     A.   Not that I'm aware of.
23     Q.   Captain Barker, are -- is Narcan
24 currently available within the corrections
25 system?

Page 291

1     A.   Yes.
2     Q.   Who is responsible for maintaining
3 Narcan on site?
4     A.   The medical provider has it.
5     Q.   When was Narcan first available
6 within the corrections facilities in Summit?
7     A.   It's been a few years.  I don't
8 know exactly how long.
9     Q.   Were you involved in the decision
10 to make Narcan available?
11     A.   No.
12     Q.   Who was responsible for that
13 decision?
14     A.   I believe that came from the
15 medical administrator.
16     Q.   Did the sheriff's department have
17 any direct responsibility for the decision to
18 provide Narcan within corrections facilities?
19         MS. LEYIMU:  Object to the form of
20 the question.
21     A.   Not that I'm aware of.
22     Q.   I'd like to mark as Exhibit 20
23 SUMMIT_001849991.
24         - - - - -
25         (Thereupon, Deposition Exhibit 20,

Page 292

1         2016 E-Mail Chain Re: Narcan Kits,
2         SUMMIT_001849991 to 001849993, was
3         marked for purposes of
4         identification.)
5         - - - - -
6     Q.   Captain Barker, are you familiar
7 with Exhibit 20?
8     A.   Yes, I'm familiar with it.
9     Q.   What is it?
10     A.   It's an e-mail between former Major
11 Soltis and our medical provider about the use
12 of Narcan in the jail.
13     Q.   Why were you included in this
14 e-mail correspondence?
15     A.   Because the medical reported to me
16 at the time.
17     Q.   But it's the case that you were not
18 involved in the decision about whether or not
19 to provide Narcan kits in the corrections
20 facilities; is that right?
21     A.   Sorry, I dropped --
22         Sorry.  Could you repeat that?
23     Q.   But it's the case that you were not
24 involved in the decision about whether or not
25 to provide Narcan kits in the corrections

Page 293

1 facilities; is that right?
2     A.   So the -- the context of -- of
3 this -- the Narcan had been on the medical
4 carts for the nurses to use in the facility.
5 This was -- this was a broader sense of
6 additional use throughout -- throughout the
7 facility.
8     Q.   Is it consistent with your
9 recollection that Narcan was first available
10 within the corrections system in October 2016?
11         MS. LEYIMU:  I'll object to the
12 form.
13     A.   I thought it was earlier than that,
14 but I don't know for sure.
15     Q.   I'd like to mark as Exhibit 21 a
16 document identified as SUMMIT_00008414.
17         - - - - -
18         (Thereupon, Deposition Exhibit 21,
19         County of Summit 2018 Operating
20         Budget, SUMMIT_000008414 to
21         000008692, was marked for purposes
22         of identification.)
23         - - - - -
24     Q.   Captain Barker, are you familiar
25 with Exhibit 21?

74 (Pages 290 - 293)

Page 294

1     A.    Yes.
2     Q.    What is it?
3     A.    It is the County of Summit 2018
4  operating budget.
5     Q.    I'd like to call your attention to
6  page 275 of this document, which is identified
7  with the Bates ending 8688.
8     A.    Okay. I see it.
9     Q.    And is it correct that this is the
10  portion of the budget for the jail program
11  within the sheriff's office?
12     A.    Yes, that's what it says.
13     Q.    Do you have any responsible for
14  preparing the budget information set forth in
15  this portion of Exhibit 21?
16     A.    No, I do not.
17     Q.    Do you have any familiarity with
18  the budget information set forth in this
19  section of Exhibit 21?
20     A.    No, I really don't.  I -- I get
21  deputy staff, and I schedule them.
22     Q.    Are you aware of any line item
23  included in this budget, which relates
24  specifically to opioid drugs?
25          MS. LEYIMU:  Object to the form.

Page 295

1     A.    I'm not.  I haven't reviewed it
2  enough.
3     Q.    Take your time.
4     A.    Okay.
5     Q.    Sure.
6     A.    I don't see a line item for that.
7     Q.    If I could call your attention to
8  the page marked with the Bates stamp ending
9  8691.  On this page, we see year-over-year
10  expenditures and budget for the sheriff's
11  department jail operations, correct?
12     A.    Yes.
13     Q.    Do you have any familiarity with
14  the department totals reported on this page?
15     A.    No.  This is kind of the first time
16  I ever looked at anything like this.
17     Q.    Would you agree with me that the --
18  that the budget amounts for the period 2015 to
19  2018 were relatively flat?
20          MS. LEYIMU:  Object to the form of
21  the question.
22     A.    That's what it appears on the
23  document.
24     Q.    Do you have any familiarity with
25  this budget information for years prior to

Page 296

1  2018?
2     A.    No.
3     Q.    And have you had any responsibility
4  for preparing budget information for any other
5  year?
6     A.    No, I have not.
7          THE WITNESS:  I'm sorry.  I'd like
8  to make this the last one if I can, but I've
9  got to take a break.
10          MS. WU:  Sure, certainly.
11          THE VIDEOGRAPHER:  Off the record
12  at 4:51 p.m.
13          (A recess was taken.)
14          THE VIDEOGRAPHER:  Back on the
15  record at 5:00 p.m.
16     Q.    Captain Barker, what's your
17  knowledge of the litigation for which you're
18  being deposed today?
19     A.    So the County is suing the opiate
20  manufacturers, the marketing of the opioids,
21  and the distribution of the opioids.
22     Q.    When did you first become familiar
23  with the subjects of this lawsuit?
24          MS. LEYIMU:  Object to the form of
25  the question.

Page 297

1          Sorry, go ahead.
2     A.    Probably just several weeks ago.
3     Q.    Did you have any involvement in the
4  decision of whether or not Summit County should
5  bring the claims in this lawsuit?
6     A.    No, none of that was my decision.
7     Q.    Did you have any involvement in
8  preparing the factual allegations set forth in
9  the complaint for this lawsuit?
10     A.    No, I had no input on that.
11     Q.    Other than lawyers for Summit
12  County, have you spoken with anyone else about
13  this lawsuit?
14     A.    I've spoken to my boss about it.
15  I've spoken to the sheriff briefly about it.
16  But nothing real concrete.
17     Q.    What's the nat- -- what has been
18  the nature of your conversations about this
19  lawsuit with the sheriff?
20     A.    He knows that I was being deposed
21  today and that I was called by the Defendants
22  to be a witness.
23     Q.    What's the nature of your other
24  conversations with colleagues within sheriff's
25  department about this lawsuit?

75 (Pages 294 - 297)

1          MS. LEYIMU:  Object to the form.
2     A.    Just to let them know that while
3  I'm doing this, they need to kind of pick up
4  the slack for me not being around.
5     Q.    Transactional nature?
6     A.    Yes.
7     Q.    Okay.  Have you been asked to
8  undertake any work to determine what amount of
9  damages is attributable to corrections work
10  related to the opioid epidemic we've discussed
11  today?
12          MS. LEYIMU:  Object to the form.
13     A.    I'm not asked for anything
14  specific, just been -- discussed statistics and
15  operating, how we operate within the jail.
16     Q.    What documents have you been asked
17  to collect in connection with this litigation?
18     A.    Not a lot on my part, but our
19  records and ID bureau has been asked for an
20  awful lot.  I haven't been asked for very much
21  at all.
22     Q.    What have -- what have you been
23  asked to collect for purposes of this
24  litigation?
25     A.    I think I've been asked about the

1  number of drug-related charges in the jail.  I
2  think I was asked about the Jail Oversight
3  Advisory Commission report, which we saw
4  earlier.  And the log of the scanner, where we
5  have positive finds on that.  I think that's
6  certainly the bulk of it.  Anything else I
7  think is -- I think that's about it.
8     Q.    In response to the inquiries you
9  just described, were you able to identify a
10  number of drug-related charges?
11     A.    I saw an e-mail from a population
12  control coordinator to the County's attorneys.
13          MS. LEYIMU:  Object to the form of
14  the question, and attorney-client privilege,
15  I'll instruct the client not to talk about
16  anything that you discussed with any attorneys.
17          THE WITNESS:  Okay.
18     Q.    Do you know if there are records
19  that would allow you to identify the number of
20  drug-related charges on which inmates have been
21  brought into custody?
22     A.    I would not know of any.
23     Q.    Were you asked to -- did you
24  receive a litigation hold notice for this case?
25     A.    I was aware -- I'm aware of one.

1     Q.    Were you instructed not to delete
2  documents or e-mails with potential relevance
3  to this case?
4     A.    Yes, I was.
5     Q.    About how many e-mails do you have
6  access to in your e-mail account?
7          MS. LEYIMU:  Object to the form of
8  the question.
9     A.    I was just scolded to get rid of
10  some of my e-mails.  About 11,000.
11     Q.    What is the date of the --
12  approximate date of the earliest e-mail, which
13  you are able to access?
14     A.    I think it goes back to 2004.
15     Q.    What is your current e-mail
16  address?
17     A.    srbarker@sheriff.summitoh.net, and
18  I think sbarker also goes to my account,
19  because we used to have a Susan Barker.
20  E-mails got confused, and now I have them both,
21  and she's no longer with us.
22     Q.    Okay.  When were you first issued
23  the -- your e-mail address,
24  srbarker@sheriff.summitoh.net?
25     A.    I remember using it as a sergeant,

1  so probably '99, 2000.
2     Q.    Was there ever a time when you used
3  any other e-mail address to communicate for
4  sheriff department business?
5     A.    No.
6     Q.    Are there any other forms of
7  electronic communication where you would record
8  information related to drug incidents in the
9  corrections facilities?
10          MS. LEYIMU:  Object to the form.
11     A.    Maybe some voicemails here and
12  there, but we try to do most things e-mail for
13  the tracking, accountability purposes.
14     Q.    Do you keep hard cop- -- copy
15  files?
16     A.    It -- it's pretty rare that I would
17  print up an e-mail.  I save it, and I get in
18  trouble for saving it.
19     Q.    Do you keep any other types of
20  documents in hard copy?
21     A.    On occasion, I'll keep a report
22  that I had -- had written after I scan it in.
23  Don't know why, but I -- I do.
24     Q.    Were you asked to collect hard copy
25  files for the purposes of this litigation?

76 (Pages 298 - 301)

Page 302

1    A.    Other than the stuff I spoke about
2 earlier, no.
3    Q.    What did you do to prepare for your
4 deposition today?
5    A.    I briefly reviewed the complaint.
6 I've had a couple meetings with the County
7 lawyers.  And read some e-mails that I thought
8 may be relevant that I've had saved, and that's
9 about it.
10    Q.    On how many occasions did you meet
11 with counsel to prepare for today's deposition?
12    A.    I'm going to guess it would
13 probably be five.  Five, maybe six separate
14 occasions.
15    Q.    For how long did you meet with
16 counsel on each of those five or six occasions?
17    A.    Most of the time it was under two
18 hours.  I think we had one that went four,
19 maybe.
20    Q.    Was there anyone other than counsel
21 for Summit present at those meetings?
22    A.    No.
23    Q.    I'd like to show you -- let's
24 see -- Exhibit 22, which is not Bates-stamped.
25 It's Summit County and City of Akron, Ohio

Page 303

1 Plaintiffs' First Amended Responses and
2 Objections to Distributor Defendants' Third Set
3 of Interrogatories.
4            - - - - -
5            (Thereupon, Deposition Exhibit 22,
6            Summit County and City of Akron,
7            Ohio Plaintiff's First Amended
8            Responses and Objections to
9            Distributor Defendants' Third Set of
10            Interrogatories, was marked for
11            purposes of identification.)
12            - - - - -
13    Q.    Captain Barker, are you familiar
14 with this document?
15    A.    I don't recall ever seeing this.
16    Q.    Okay.  I'd like to ask you to look
17 at page 14.  On page 14, there's an
18 interrogatory posed by the Distributor
19 Defendants, which reads, "Specify each category
20 of injury, for example increased costs of law
21 enforcement, fire, emergency services, et
22 cetera, for which you claim damages in the
23 litigation, and provide a computation of
24 damages for each category of injury alleged.
25 For each category of injury, identify all

Page 304

1 persons with knowledge about such damages."
2        Do you see that?
3    A.    I do.
4    Q.    Then, on the following page, page
5 15 of Exhibit 22, we see the response from
6 Summit and Akron.  That response carries over
7 to page 16 of Exhibit 22.
8        I'd like to ask you to look at page
9 16, and reading from the bottom of the page,
10 it's the fourth bullet from the bottom.  It
11 reads, "Increased public safety services,
12 including but not limited to training,
13 investigations, staffing, jail expenses,
14 dispatch services, and task forces as a result
15 of the opioid epidemic."
16        Do you see that?
17    A.    I do see that.
18    Q.    What are the jail expenses
19 referenced?
20        MS. LEYIMU:  Object to the form.
21        You can answer.
22    A.    There's -- there's nothing
23 specific, but everything that we've been doing
24 for the last five years, from the additional
25 pat-downs to having to order people over to

Page 305

1 watch suicide inmates, to the equipment
2 upgrades with the scanner we talked about, to
3 even myself helping out with -- with the
4 pat-downs because we know that these items
5 are -- are small and easily accessible into the
6 jail.
7        We have inmates that are going
8 through withdrawal, and that takes additional
9 time away from my staff when the medical staff
10 goes in there and examines somebody in the
11 cell, we got to have a deputy with them.
12 The -- the whole -- the whole operations has --
13 has been affected.
14        When I was in the jail as a
15 sergeant, even pretty much so as a lieutenant
16 and a deputy, that kind of stuff just wasn't
17 going on.  And the last -- since I've been in
18 the jail in 2011 as a captain, I -- everything
19 seems to be related to that.
20    Q.    Are you able to quantify the jail
21 expenses referenced in Exhibit 22?
22    A.    No, but I would say it's an awful
23 lot.  I -- I would have no way of quantifying
24 it.
25    Q.    What proportion of your overall

77 (Pages 302 - 305)

Page 306

1  jail expenses would you allocate to a response
2  to the opioid epidemic?
3       MS. LEYIMU:  Object to the form.
4       A.   Everything that we do has -- has
5  changed in the last several years, so a large
6  portion of it.  It takes us away from other
7  things that we -- we used to do and we no
8  longer can do.  And now we have to order staff
9  over to handle the situations that we have in
10  the jail.
11       Q.   When you say that everything that
12  you do has been changed by the op- -- opioid
13  epidemic, is it your testimony that all jail
14  expenses are attributable to the opioid
15  epidemic?
16       MS. LEYIMU:  Object to the form.
17       A.   I wouldn't -- I would never use
18  words like all and never -- I said never.  I
19  try not to do that.  I don't think it's all,
20  but I think it's a -- a large portion.
21       Q.   What portion do you believe is
22  attributable to the opioid epidemic?
23       MS. LEYIMU:  Object to the form.
24  Asked and answered.
25       A.   A lot of it.  I don't know.

Page 307

1       Q.   How would you attempt to quantify
2  the proportion of jail expenses attributable to
3  the opioid epidemic?
4       MS. LEYIMU:  Object to the form.
5       A.   I'm not -- I'm not a fiscal --
6  fiscal guy.  I wo- -- I wouldn't know where to
7  begin.
8       Q.   Do you believe it's possible to
9  undertake that exercise?
10       MS. LEYIMU:  Object to the form.
11       A.   I think somebody could probably do
12  it.  Probably not me.
13       Q.   And what information do you think
14  would be required in order to undertake that
15  analysis?
16       MS. LEYIMU:  Object to the form.
17  Calls for speculation.
18       A.   Somebody would have to know an
19  awful lot about the jail to do it, and I don't
20  know what all it would be, what would be
21  required.
22       MS. WU:  Thank you, Captain Barker.
23  I have -- I have no further questions, and I'll
24  pass the witness.
25       THE WITNESS:  You're welcome.

Page 308

1       EXAMINATION OF SHANE BARKER
2  BY MR. LONERGAN:
3       Q.   Good afternoon.  Good evening,
4  Captain Barker.
5       A.   Good evening.
6       Q.   I introduced myself this morning,
7  but I'm going to do it again since it's been a
8  long day.  My name is Sam Lonergan.  I'm an
9  attorney with the law firm of Arnold & Porter,
10  and I represent Endo and Par in this
11  litigation.
12       A.   Okay.
13       Q.   I don't have a lot of questions for
14  you, and I'm going to do my best to not cover
15  ground that's already been covered with you
16  today, but I can't promise there won't be any
17  duplication.
18       Earlier this afternoon, you were
19  talking about or testifying about suicide
20  precaution that the jail does when new inmates
21  arrive.  Do you recall that testimony?
22       A.   Yes, I do.
23       Q.   Is that also known as a suicide
24  watch?
25       A.   You could -- you could call it

Page 309

1  that.
2       Q.   And I believe you testified that
3  it's your belief that a number of inmates are
4  put on suicide watch when they enter your
5  prison because they can -- your term, cannot
6  get their drug of choice.  Do you recall that?
7       A.   I do recall that.
8       Q.   And I think you also said there are
9  other reasons that inmates will be put on
10  suicide watch, correct?
11       A.   Yes.
12       Q.   And as you sit here today, you're
13  not able to identify the proportions among
14  inmates who are put on suicide watch, meaning
15  you can't determine what proportion of inmates
16  are put on suicide watch because they cannot
17  get their drug of choice or for some other
18  reason, correct?
19       MS. LEYIMU:  Object to the form.
20       A.   No, I cannot.
21       Q.   With respect to inmates who are put
22  on suicide watch because they cannot get their
23  drug of choice, is it correct that you cannot
24  recall a single instance where an inmate was
25  put on suicide watch because he or she could

1 not gain access to an opioid product that they
2 had a legitimate prescription for?
3          MS. LEYIMU:  Object to the form of
4 the question.
5      A.    Again, I would not have that
6 information.
7      Q.    Earlier today, you were shown an
8 exhibit.  I think it was marked as Exhibit 6,
9 which I believe you testified set forth the
10 jail -- the prison's policy for prisoners'
11 access to prescription medications.  Do you
12 recall that?
13      A.    I do.  Can I look at it again?
14      Q.    Sure.  You have it in your pile?
15      A.    Yeah, I should.
16      Q.    Yeah, it's that one.
17      A.    Okay.  I'm with you.
18      Q.    And I believe you testified that
19 pursuant to the prison's policy, witnesses who
20 have legitimate prescriptions to opioids can
21 continue to have those opioid products
22 administered to them after they enter the
23 prison system.  Is that correct?
24          MS. LEYIMU:  Object to the form.
25      A.    I don't remember exactly how I

1 answered, but that's what is there.
2      Q.    And that's a fair characterization
3 of the policy, correct?
4      A.    Yes.
5      Q.    So isn't it fair to say that if a
6 witne- -- an inmate has a legitimate
7 prescription to an opioid, then they will never
8 fall into the category of inmates that you
9 described as people that cannot get their drug
10 of choice if their drug of choice is an opioid,
11 correct?
12          MS. LEYIMU:  Object to the form of
13 the question.
14      A.    No, I -- I wouldn't.
15      Q.    You wouldn't what?
16      A.    I -- I wouldn't characterize it
17 that day.  If they're -- if they're -- if it's
18 under a doctor's care and it's being
19 administered properly, they're not abusing it.
20      Q.    Okay.  So in that instance, you
21 can't think of an inmate who has a legitimate
22 prescription for an opioid who was put on
23 suicide watch in your prison because they
24 cannot get access to their opioid, correct?
25          MS. LEYIMU:  Object to the form.

1      A.    I wouldn't -- I wouldn't know that.
2      Q.    You wouldn't know if you can think
3 of an instance?
4      A.    No.  I just know that our incidence
5 of suicide watch, as you put it, has
6 substantially gone up.  And when I talk to the
7 professionals, this is one of the reasons that
8 is being talked about.  And when I've talked to
9 inmates on the occasion that I have, a few of
10 them have said that, "This is what I'm going
11 through."
12      Q.    And I understand that.  And I think
13 you were asked a lot about that earlier today,
14 and what I'm trying to do is ask you different
15 questions that focus on a different aspect of
16 this case.  So I'll just ask my question again.
17          Is it correct that you, as you sit
18 here today, cannot think of a single instance
19 where an inmate in your prison was put on
20 suicide watch because they could not access an
21 opioid for which they had a legitimate
22 prescription?
23          MS. LEYIMU:  Object to the form of
24 the question.
25      A.    I -- I don't have access to that

1 information.
2      Q.    So you can't think of an instance,
3 correct?
4          MS. LEYIMU:  Object to the form.
5      A.    I -- I don't have that information
6 in front of me.  I can't think of one.
7      Q.    Sir, earlier today -- much earlier
8 today; I think it was this morning, in fact --
9 you were -- you testified about your role as a
10 patrolman for the county.  Do you recall that?
11      A.    Yes.
12      Q.    And I believe you testified that
13 there were a number of instances where you went
14 on calls, and those calls in some way related
15 to opioids.  Do you recall that?
16      A.    Yes, I do.
17      Q.    Were those instances, were they
18 overdose situations?
19      A.    I believe the two that I spoke
20 about earlier were involving thefts that I
21 specifically mentioned that I -- I recall
22 because I was questioned about it by the media.
23      Q.    Those were the two pharmacy
24 instances?
25      A.    Yea- -- one was a pharmacy.  I'm

79 (Pages 310 - 313)

Page 314

1  not sure where the other one -- where the theft
2  occurred in the other one. I know that I was
3  questioned about it.
4      Q.  In your various roles as -- working
5  for the county patrol department, were those
6  the only two instances in which you made a call
7  that related to opioids?
8          MS. LEYIMU: Object to the form.
9      A.  You mean that I -- I talked to
10 somebody from the media about?
11     Q.  No, no. I mean where you actually
12 went out and made a call because you were doing
13 a patrol, a visit.
14     A.  You mean if I was dispatched to a
15 call?
16     Q.  A dispatch, yes.
17     A.  No. Our -- our patrol bureau
18 was -- was starting to see a lot of increases
19 before I was transferred out, of overdoses of
20 prescription medications.
21     Q.  And were you ever dispatched to a
22 situation where a person had overdosed on a
23 prescription medication?
24     A.  I'm sure I was, but I went to
25 thousands of calls.

Page 315

1      Q.  So you can't specifically recall
2  any instance where you were dispatched to a
3  situation where somebody had overdosed on a
4  prescription opioid, correct?
5      A.  I would be guessing. No.
6      Q.  Can you recall an instance where
7  you were dispatched to a situation where a
8  person had died as a result of taking an
9  opioid?
10     A.  No, because when I was on -- when I
11 would -- when I would be on scene and that, you
12 just didn't know until the autopsy would have
13 come out, the findings, later on down the road.
14     Q.  Can you recall an instance where
15 you were dispatched to a situation where a
16 person was taking an opioid for which they had
17 a legitimate prescription?
18         MS. LEYIMU: Object to the form.
19     A.  No, I -- I can't.
20     Q.  In connection with the various -- I
21 feel like -- what's the term I should be using?
22 I'm saying "call" and "dispatch calls."
23 What -- what do you call it when you go --
24     A.  It's -- it's a call, but it -- it
25 just sounded like I would have -- you know,

Page 316

1  making up the call. If I -- if my dispatcher's
2  on the radio issuing me a call, they're
3  dispatching me to it.
4      Q.  Okay. In connection with the
5  various calls that you made that in some way
6  related to opioids, did you ever participate in
7  investigations that occurred after you made
8  that call?
9      A.  No.
10     Q.  Who would have conducted those
11 investigations?
12     A.  I probably would have assigned it
13 to a deputy or sergeant of low rank, or I'd
14 have sent it up to our detective bureau or our
15 drug unit.
16     Q.  Would you have had any association
17 with those investigations after the call?
18     A.  Other than them interviewing me for
19 the initial what I did on scene, whether I just
20 responded or I directed some certain things to
21 be done. I would have had no role in the
22 investigation.
23     Q.  Do you have any knowledge of what
24 the goals are of an investigation that relates
25 to opioids?

Page 317

1          MS. LEYIMU: Object to the form.
2  Vague.
3      A.  They're like any other
4  investigation to find out who -- who broke what
5  laws and to enforce them.
6      Q.  Is one of the goals of those
7  investigations to determine the source of the
8  opioid?
9      A.  I'm not real familiar with what the
10 investigators do with those things.
11     Q.  So you don't know if -- if the
12 investigation would include trying to determine
13 the source of the opioid?
14         MS. LEYIMU: Object to the form.
15     A.  That's correct; I wouldn't know.
16     Q.  Is it fair to say that you also
17 wouldn't know if the investigation would
18 include trying to identify the manufacturer of
19 the opioid?
20         MS. LEYIMU: Object to the form.
21     A.  Yeah, I -- would not know that.
22     Q.  Is it fair to say that you also
23 don't know whether an investigation would
24 include attempting to identify the doctor who
25 prescribed an opioid?

80 (Pages 314 - 317)

Page 318

1     A.   I would not know that.
2     Q.   You understand -- and I believe you
3 already testified to this, but you understand
4 that opioids are approved by the FDA for
5 prescription by physicians, correct?
6          MS. LEYIMU:  Object to the form.
7     A.   I know that they are prescribed.
8     Q.   And you understand that there's a
9 legitimate -- legitimate medical purpose they
10 serve, correct?
11          MS. LEYIMU:  Object to the form.
12     A.   When it's done properly, yes.
13     Q.   As you sit here today, can you
14 recall any instance where you participated in
15 any way in an investigation that related to a
16 legitimately prescribed opioid?
17          MS. LEYIMU:  Object to the form.
18     A.   I've never been invest- -- I've
19 never been involved in an investigation such as
20 that.
21     Q.   And you can't recall an
22 investigation such as that, whether you
23 directly participated or not, correct?
24          MS. LEYIMU:  Object to the form.
25     A.   Correct.  I would have not

Page 319

1 participated.
2     Q.   Whether or not you participated,
3 let's set that aside, though.  But you cannot
4 recall an investigation that concerned a
5 legitimately prescribed opioid, whether you
6 participated in -- in it or not, correct?
7          MS. LEYIMU:  Object to the form of
8 the question.
9     A.   It's never been my -- I've never
10 been assigned to the detective bureau or the
11 drug unit.  I don't know what exactly their
12 cases entail.
13     Q.   Have you ever participated in any
14 way in an investigation of the marketing
15 practices of opioid manufacturers?
16     A.   No, I've never been involved in
17 that.
18     Q.   Have you ever participated in any
19 way in an investigation related to statements
20 that sales representatives for manufacturers
21 made to physicians?
22     A.   I wouldn't -- not been something I
23 would have been involved in.
24     Q.   Do you have any understanding of
25 the marketing practices that manufacturers of

Page 320

1 opioids have engaged in related to opioids?
2     A.   I know that they were not given
3 the -- maybe not -- the right information when
4 they were going to the doctors and trying to
5 sell these medications.
6     Q.   And how do you know that?
7     A.   From the stuff, the items that I
8 read in the last few years.
9     Q.   And what are those items?
10     A.   Everything from e-mails, ADM Board
11 meetings that I've attended, workshops at the
12 American Jail Association, the complaint that I
13 read.
14     Q.   What were those?  You said e-mails,
15 ADM Board.  What was the third item?
16     A.   Workshops at -- I'm a member of the
17 American Jail Association, and I go to
18 conferences, and they have workshops on this
19 type of epidemic that we're seeing throughout
20 the country.
21     Q.   Okay.  So it was e-mails, ADM
22 Board, workshops.  Was there anything else?
23     A.   The com- -- I read the complaint.
24 There was a little bit in there.
25     Q.   The complaint, all right.  Let's

Page 321

1 take one by one.
2          What e-mails are you referring to
3 that you've read that relate to the way
4 manufacturers market opioids?
5     A.   Wouldn't know the specific e-mails.
6 I just know that I've read things throughout
7 the course of my work at the jail and patrol
8 that this was the -- the kind of stuff that was
9 going on.  I can't pinpoint it specifically for
10 you.
11     Q.   Who were the authors of these
12 e-mails?
13     A.   I don't know.
14     Q.   Approximately when did you receive
15 these e-mails?
16     A.   Over the course of the last five,
17 six years.
18     Q.   How many e-mails?
19     A.   I don't know.
20     Q.   More than five?
21     A.   Probably not.
22     Q.   And I believe you testified that
23 this was a topic that was discussed at ADM
24 Board meetings, correct?
25     A.   Yes.

81 (Pages 318 - 321)

1    Q.    Who -- who discussed this?

2    A.    Whoever -- I mean, there's multiple

3  speakers at the ADM Board meeting.  Like I -- I

4  think I testified earlier, I'm just the

5  representative from the sheriff's office.

6  Don't get too involved in that.  But I know

7  that in discussions, whether it's after the

8  meeting with -- with people, during the

9  meeting, we would he- -- I would hear these

10  kinds of things discussed.

11    Q.    And I understand that there's a lot

12  of different people that speak at these

13  meetings, but -- and I want to focus

14  exclusively on the information that you

15  obtained from these meetings concerning

16  manufacturers' marketing of opioids.

17         Who specifically told you anything

18  about manufacturers' marketing of opioids?

19         MS. LEYIMU:  Object to the form.

20    A.    I don't recall who that would have

21  been.

22    Q.    Do you recall when that happened?

23    A.    At one of the quarterly meetings we

24  had at maybe -- on -- their office, I think, is

25  on Market Street.  I remember something about

1  there.

2    Q.    Okay.  So it happened once at a

3  quarterly meeting on Market Street?

4         MR. LEDLIE:  Object to the form.

5         MS. LEYIMU:  Object to the form of

6  the question.

7    Q.    Is that correct?

8    A.    I know that there was something

9  brought up about that.

10    Q.    And who brought it up?

11    A.    I don't remember the person.  It

12  was -- I was in a group, a group of people.

13    Q.    Okay.  Was it one meeting?

14    A.    That's the one that's standing out

15  to me right now, yeah.

16    Q.    Are there any others that you can

17  recall as you sit here today?

18    A.    There might have been, but I don't

19  recall.

20    Q.    Okay.  And do you recall

21  approximately when that meeting occurred?

22         MR. LEDLIE:  Object to the form.

23  Asked and answered twice.

24    A.    Couple years ago.

25    Q.    Three?

1    A.    Probably not that long.

2    Q.    Two?

3    A.    Probably about that.

4    Q.    Okay.  And I believe you said that

5  you learned this information also at workshops.

6  Do you recall that?

7    A.    I do recall going to workshops that

8  were -- you know, they would be titled like,

9  "The opiate epidemic:  What are we doing to

10  combat it?"  They'd put the catchy phrases on

11  it, and then I would go to a couple of those

12  workshops.  I didn't go to the American Jail

13  Association conference this year, but I went

14  in, like, 2015, 2016, 2017.

15    Q.    What specific workshops did you

16  attend in which they discussed the way

17  manufacturers market opioids?

18    A.    Again, it was -- there was a --

19  there was a class about -- a workshop about the

20  opiate epidemic and what we could do as a

21  correctional industry to -- to prevent it.  And

22  that was some of the things that they would put

23  a PowerPoint presentation and talk about that.

24  The specifics, I wouldn't have access to it.

25    Q.    So was it --

1    A.    I can't recall.

2    Q.    -- one workshop?

3         MR. LEDLIE:  Object to the form.

4    A.    It was at least one workshop.

5    Q.    You don't recall when it was?

6    A.    Let me see.  It was probably in

7  Dallas, which was 2015 or 2016.

8    Q.    And you don't recall the name of

9  the person who provided that information to

10  you?

11    A.    Nah.  It was some doctor.

12    Q.    What, if anything, did you do with

13  that information?

14    A.    I would take it back and, you know,

15  talk to my -- my staff about it, my

16  subordinates about it, and my superiors about

17  it in meetings we would have.  You know, let

18  everybody know that --

19         You learn some of these things from

20  your colleagues that go to these things.

21  Like -- like the scanner we have.  That's one

22  thing I -- I learned from one of the

23  conferences that, hey, this is something we

24  need to look into getting.  And it's just kind

25  of a network of people that talk about it.

Page 326

1    Q.    So the information I'm referring
2 to, though, is the information concerning the
3 way the manufacturers marketed opioids, okay?
4    A.    Uh-huh.  I did hear that.
5    Q.    And is it your testimony that after
6 one or some of these meetings you would come
7 back and provide that information to other
8 people in Summit County?
9    A.    What I would do is I would take
10 the -- the information that I was given during
11 these courses, which included that in some
12 PowerPoint presentation.  I remember seeing
13 that -- the dosages ticking up throughout the
14 years, and I brought that back and said, "This
15 is what's going on.  Let's kind of look out for
16 it, maybe change the way we do things."
17    Q.    Yeah, but let's focus specifically
18 on marketing practices.
19        Did you endeavor to disseminate
20 information in Summit County concerning the
21 marketing practices of opioid manufacturers?
22    A.    No.  I would deal more with the
23 introduction of that substance into the
24 correctional setting.  That's what I'm
25 concerned about.

Page 327

1    Q.    What do you mean by that?
2    A.    I don't want people bringing it
3 into -- into our jail.
4    Q.    You mean people bringing it into
5 your jail illicitly, correct?
6    A.    Trying to, yes, convey it into the
7 facility, yes.
8    Q.    Are you familiar with my client
9 Endo?
10    A.    No.
11    Q.    Are you familiar with my client
12 Par?
13    A.    No.
14    Q.    Are you familiar with Purdue?
15    A.    No.
16    Q.    Are you familiar with Janssen?
17    A.    No.
18    Q.    Are you familiar with Noramco?
19    A.    No.
20    Q.    Are you familiar with Teva?
21    A.    No.
22    Q.    Are you familiar with Allergan?
23    A.    No.
24    Q.    Are you familiar with Watson?
25    A.    No.

Page 328

1        MR. LEDLIE:  I'll stipulate that
2 he's not familiar with any of the Defendants in
3 this litigation.
4    Q.    Are you familiar with Actavis?
5        MR. LEDLIE:  Object to the form.
6    A.    No.
7    Q.    Are you familiar with Insys?
8        MR. LEDLIE:  Object to the form.
9    A.    No.
10    Q.    Are you familiar with Watson?
11        MS. LEYIMU:  Object to the form of
12 the question.
13    A.    No.
14    Q.    Do you understand what a
15 pharmaceutical wholesaler is?
16    A.    I believe they're the ones that
17 take the med- -- the opiates from the
18 manufacturer and get it out to the pharmacies.
19    Q.    When did you come to learn that?
20    A.    I learned that talking to my --
21        MR. LEDLIE:  Instruct the witness
22 not to answer to any conversations with
23 counsel.
24    Q.    Is the only way you know that
25 because you learned it from the lawyers in this

Page 329

1 case?
2        MS. LEYIMU:  Object to the form of
3 the question.
4    A.    Yes.
5    Q.    Are you familiar with Cardinal?
6    A.    No.
7    Q.    Are you familiar with McKesson?
8    A.    I have heard the name McKesson, but
9 I'm not familiar with them as a company.
10    Q.    Are you familiar with
11 AmerisourceBergen?
12    A.    No.
13    Q.    Do you have any personal knowledge
14 concerning any wrongdoings conducted by any of
15 these manufacturers or wholesalers?
16        MR. LEDLIE:  Object to the form of
17 the question.  Vague.  Compound.
18    A.    I have seen -- there's been fines
19 levied against certain companies.  I don't know
20 the companies off the top of my head or what
21 the fines would have been levied, but I know
22 that they -- they've been levied.
23    Q.    Do you have any other knowledge?
24        MR. LEDLIE:  The same objection.
25    A.    I have the knowledge that the way

Page 330

1 we do business at our facility has changed in
2 the last five or six years, and so there -- you
3 know, that's the knowledge that I have.
4        MR. LONERGAN:  I'm going to move to
5 strike your answer as nonresponsive.  And maybe
6 my question wasn't that good, and I'll just ask
7 a different one.
8    Q.   Outside of the fines that you
9 described a moment ago, do you have any
10 knowledge concerning the activities of any of
11 the Defendants that I just listed, that you
12 believe were somehow inappropriate, in
13 connection with opioids?
14        MR. LEDLIE:  Objection.  Asked and
15 answered.
16    A.   I would not have access to that --
17 I would not have access to that information.
18    Q.   So the answer is, "No, I don't have
19 any other information than that," correct?
20    A.   The answer is no.
21    Q.   Because this is an opioids
22 litigation, you've been asked a lot of
23 questions about opioids today.  And I believe
24 we've talked about -- you've talked about
25 heroin, you've talked about fentanyl, you've

Page 331

1 talked about prescription pills.  Do you recall
2 some or all of that?
3    A.   Yes, I do.
4    Q.   Are you familiar with the concept
5 of counterfeit prescription pills?
6    A.   I am, but I haven't heard that term
7 in a long time.
8    Q.   When was the first time you heard
9 it?
10    A.   Probably back in the police
11 academy.
12    Q.   Was that related to opioid
13 products?
14    A.   I think it was related to all
15 controlled substances.  Counterfeit controlled
16 substances is what I think I was taught years
17 ago.
18    Q.   Are you familiar with counterfeit
19 prescription opioids, pills?
20    A.   I've never heard it termed that
21 way, no.
22    Q.   Is that something that you concern
23 yourself with in running the Summit prisons?
24    A.   I concern myself with any opiates
25 or any contraband that gets inside the

Page 332

1 facility.
2    Q.   But as you sit here today, can you
3 recall an instance where you concerned yourself
4 with counterfeit prescription opioid pills?
5        MR. LEDLIE:  Objection.  Asked and
6 answered.
7    A.   No, I cannot.
8    Q.   Are you familiar with the term
9 "pill mill"?
10    A.   Yes.
11    Q.   And what do you understand that to
12 mean?
13    A.   I understand that to mean doctors
14 that were prescribing an inordinate amount of
15 opiates to patients.
16    Q.   And is it your understanding that
17 that prescribing was inappropriate?
18    A.   That is my understanding, yes.
19    Q.   Are you familiar with any pill
20 mills?
21    A.   Not personal knowledge, no.
22    Q.   Are you familiar with any pill
23 mills that exist in Summit County?
24    A.   No, that's not my area of -- I
25 don't work in that area.

Page 333

1    Q.   I understand.
2        Are you familiar with any pill
3 mills that existed in Summit County?
4    A.   No.
5    Q.   Are you familiar with any pill
6 mills that serviced any of the inmates who have
7 ended up in your prison?
8    A.   No, I'm not.
9    Q.   Has identifying pill mills ever
10 been something that the prison has attempted to
11 investigate?
12    A.   That wouldn't be something that we
13 would do in the corrections setting.
14    Q.   Are you aware of any instances
15 where anybody in the county has attempted to
16 investigate pill mills?
17    A.   I know our drug unit has.
18    Q.   What do you know about that?
19    A.   I know that they've made arrests
20 and shut them down, but I don't know the
21 details of the investigations.  That's not what
22 I do.
23    Q.   And when you say "shut them down,"
24 do you know how many were shut down?
25    A.   No, I don't.

84 (Pages 330 - 333)

Page 334

1    Q.   Do you know what they are -- what
2  the -- what the pill mill was?
3         MR. LEDLIE:  Object to the form.
4    Q.   The specifics of it?
5         MR. LEDLIE:  Object to the form.
6    A.   No, I do not.
7    Q.   Would that not have been something
8  that was important to you in determining
9  whether or not an inmate has a legitimate
10 prescription for opioids?
11        MR. LEDLIE:  Object to the form of
12 the question and beyond the scope as to the
13 legitimacy.  That's a medical question.
14   A.   No --
15   Q.   Exhibit 6 does require the prison
16 to determine whether or not an inmate has a
17 verified prescription for opioids, correct?
18   A.   I missed your -- your first part of
19 the statement.
20   Q.   Exhibit 6, which we were talking
21 about earlier --
22   A.   Oh, okay.
23   Q.   -- does require the prison to
24 determine whether or not a patient has a
25 verified prescription, correct?

Page 335

1         MR. LEDLIE:  Object to the form.
2  Misstates the document.
3    A.   Yes, it does.
4    Q.   And that includes determining
5  whether or not a patient has a verified
6  prescription for an opioid product, right?
7    A.   Yes, but that's not something -- I
8  don't do the verifications.
9    Q.   Who does the verifications?
10   A.   Our medical facility -- medical
11 staff.
12   Q.   And did you not think it was
13 important to let the medical staff know that
14 you were aware of pill mills that had been shut
15 down in Summit County and that they should be
16 on the lookout for prescriptions that may have
17 come from that pill mill?
18        MR. LEDLIE:  Object to the form of
19 the question.
20   A.   So those are -- those types of
21 discussions are -- have been ongoing for years
22 with the medical provider.
23   Q.   And have you had those discussions?
24   A.   Yes.
25   Q.   So you alerted the medical staff to

Page 336

1  the -- to the existence of the pill mills in
2  Summit County; is that correct?
3    A.   I wouldn't say alert.  I would say
4  that we've had -- it would be something in the
5  paper, and it's something that we're both --
6  the entities are both working to -- to combat,
7  and we would talk about it over -- you know, a
8  meeting in my office over a cup of coffee or
9  something like that.
10   Q.   Do you recall any instance where
11 you set out specifically to inform the medical
12 staff at the prison that there was a pill mill
13 that had recently been shut down?
14        MR. LEDLIE:  Object to the form of
15 the question.
16   A.   No, I do not.
17        MR. LONERGAN:  Why don't we go off
18 the record for two minutes, and -- might be
19 done.
20        THE VIDEOGRAPHER:  Going off the
21 record at 5:43 p.m.
22        (A recess was taken.)
23        THE VIDEOGRAPHER:  Back on the
24 record at 5:45 p.m.
25        EXAMINATION OF SHANE BARKER

Page 337

1  BY MS. MORRISON:
2    Q.   Good afternoon, Captain Barker.  My
3  name is Kristin Morrison.  I represent Walmart.
4         Are you aware that Summit County
5  has sued my climate -- my client, Walmart, in
6  this case?
7    A.   I am aware, yes.
8    Q.   And what is the source of your
9  knowledge about my client, Walmart, being sued
10 in this case?
11   A.   They were being sued because there
12 was a large amount of prescriptions that were
13 being filled, and it was -- it was a large
14 increase from the years before, and nobody said
15 anything about it.
16   Q.   Can you personally point to any
17 specific conduct by Walmart related to opioids
18 that caused any harm to Summit County?
19   A.   No, I cannot.
20   Q.   Okay.  Are you aware that Summit
21 County also has sued Walgreens in this lawsuit?
22   A.   Yes.
23   Q.   And what is the basis of your
24 knowledge about the suit against Walgreens?
25        MR. LEDLIE:  You can answer the

85 (Pages 334 - 337)

Page 338

1 question to the extent that you're not
2 divulging any attorney-client communications.
3      A.   That Walgreens also saw a -- saw a
4 spike in opiate prescriptions, and it didn't
5 set off any -- any -- any warning signs that
6 these were being given out at a -- at a large
7 pace, fast pace.
8      Q.   Can you personally point to any
9 specific conduct by Walgreens related to
10 opioids that caused harm to Summit County?
11      MR. LEDLIE:  Object to the form of
12 the question.  Asked and answered.
13      A.   No, I cannot.
14      Q.   Do you have any personal knowledge
15 as to why Summit County has sued Rite Aid in
16 this lawsuit?
17      A.   Because of the increased amount of
18 prescriptions that were sold through -- was it
19 Rite Aid?
20      Q.   Yes.
21      A.   Yes.
22      Q.   And can you personally point to any
23 specific conduct by Rite Aid that has caused
24 harm to Summit County related to opioids?
25      MR. LEDLIE:  Object to the form of

Page 339

1 the question.  Asked and answered.
2      A.   No, I cannot.
3      Q.   Do you have any personal knowledge
4 as to why Summit County has sued CVS in this
5 lawsuit?
6      A.   Because of the large amount of
7 prescriptions that they were filling and did
8 nothing about.
9      Q.   And can you personally point to any
10 specific conduct by CVS related to opioids that
11 caused harm to Summit County?
12      MR. LEDLIE:  Object to the form of
13 the question.
14      A.   No, I cannot.
15      Q.   And do you have any personal
16 knowledge as to why Summit County has sued HBC
17 Service Company in this lawsuit?
18      A.   No, I don't.
19      Q.   Do you know what HBV Service
20 Company is?
21      A.   I do not.
22      Q.   So you identified, I believe you
23 said it was a large amount of prescriptions
24 that have been filled by each of these
25 pharmacies that I've listed that did nothing

Page 340

1 about it.
2      What is the source or the basis for
3 your knowledge that there was a large amount of
4 prescriptions filled that these pharmacies did
5 nothing about, in your words?
6      A.   I would let my counsel answer that.
7      MR. LEDLIE:  Without revealing the
8 context of any attorney-client communications,
9 you can answer the question.
10      A.   I discussed it with my counsel.
11      Q.   So then your testimony is that the
12 source of your knowledge about what any of
13 these pharmacies that we discussed have done is
14 based on discussions with your counsel?
15      A.   It -- it's not my only knowledge.
16 I mean, I have seen what we deal with in -- in
17 the jail.  It's part of the knowledge that I
18 have.
19      Q.   And you said the source of your
20 knowledge is what you deal with in the jail.
21 What do you mean by that?
22      A.   I mean the way that we've had to
23 change the way that we operate the jail on a
24 day-to-day basis.
25      Q.   What about how you operate the jail

Page 341

1 on a day-to-day basis creates knowledge about
2 what pharmacies have been doing in Summit
3 County?
4      MR. LEDLIE:  Object to the form.
5      A.   From the discussions with my
6 counsel.
7      Q.   So then your testimony is the tie
8 between pharmacies and jail operations in
9 Summit County is based on discussions with your
10 counsel?
11      A.   It's part of it.
12      Q.   What other parts or sources of
13 knowledge do you have?
14      A.   Just living through what we've --
15 what we've been doing.  I mean, I don't -- I
16 can't pinpoint exactly what it is, but we've
17 been dealing with this for the last seven to
18 ten years.  It's kind of a -- an -- all kinds
19 of blanket knowledge that I have.
20      Q.   Do you have any sources of blanket
21 knowledge, you said, beyond sources you've
22 testified to earlier today in response to
23 questions from the other counsel?
24      A.   None that I can think of right now.
25      Q.   Okay.  Have you attended any

86 (Pages 338 - 341)

Page 342

1 meetings with any group that is suing the
2 opioid distributors or manufacturers in Summit
3 County?
4    A.   No.
5    Q.   Have you attended any meetings with
6 any group that is suing the pharmacies in
7 Summit County?
8    A.   No.
9    Q.   Have you talked to any other
10 government or individual who is suing the
11 distributors, manufacturers, or pharmacies in
12 Summit County?
13    A.   No, I have not.
14    Q.   What about outside of -- of Summit
15 County?
16    A.   No, I have not.
17    Q.   Now, you serve on the city council
18 for the City of Macedonia, correct?
19    A.   I do.
20    Q.   Okay.  And how long have you been a
21 city council member?
22    A.   I was appointed again in August.
23    Q.   August of 2018?
24    A.   Yes.
25    Q.   You say appointed again.  Did you

Page 343

1 previously serve on the city council?
2    A.   I did.  I served two four-year
3 terms between January of '05 and December of
4 '13, maybe.
5    Q.   What are your responsibilities on
6 city council, currently, in your term that
7 started in August of 2018?
8    A.   Assist in preparing the budget for
9 the city, vote on legislation that was brought
10 to us by the mayor or other council members,
11 basically setting the rules and regulations in
12 the City of Macedonia.
13    Q.   Do you have any responsibility for
14 security of the City of Macedonia?
15    A.   No, I do not.
16    Q.   So no law enforcement role with the
17 City of Macedonia specific to your council
18 role?
19    A.   No.  That would be a conflict to
20 me.  I would -- I would not do that.
21    Q.   Do you oversee any law enforcement
22 within the City of Macedonia?
23    A.   No.
24    Q.   Okay.  What about, did you have any
25 different responsibilities, other than what you

Page 344

1 just listed, when you were previously on the
2 city of council [sic]?
3    A.   I was chairman of the safety
4 commission, but I never got involved other
5 than, let's get the Macedonia officers this
6 training or let's buy this cruiser for them.  I
7 never got into their policymaking, never
8 brought my agency in to assist with any type of
9 enforcement in the city.  I tried to keep it
10 very -- keep both those roles very separate.
11    Q.   So what did you do as the chair of
12 safety that you did not see as a conflict with
13 your role with the sheriff's department?
14    A.   If the -- the chief would bring me
15 something that, hey, we need to get this patrol
16 car, I would go ahead and talk to my fellow
17 council members and say, "This is the patrol
18 car they want to get.  It seems like a pretty
19 good idea.  Let's do that."
20        If there was an ongoing issue and
21 they needed money for training.  Those are the
22 kind of things I dealt with.
23    Q.   You said an ongoing issue.  So
24 would someone bring issues for you to --
25 regarding safety in the City of Macedonia to

Page 345

1 your attention in that role?
2    A.   I think I had some traffic
3 complaints brought by citizens to me.  Then I
4 would take them to the chief.  I just -- I
5 don't do a lot with law enforcement in the City
6 of Macedonia.
7    Q.   Do you remember anything other than
8 traffic complaints that were brought to your
9 attention when you were the chair of the
10 safety?
11    A.   We have -- we have a -- we have a
12 shopping center complex, and I know that we
13 discussed some thefts that were taking place at
14 the local -- local stores there.
15    Q.   Did any of your roles or issues you
16 heard about at the City of Macedonia have to do
17 with drug use within the City of Macedonia?
18    A.   We did talk a couple times about
19 some hotels that were on State Route -- State
20 Route 8, that the police department was having
21 some problems with those.
22    Q.   And what issues dealing with hotels
23 were happening?
24    A.   They would get calls that they
25 would -- they would deem nuisance calls, and

87 (Pages 342 - 345)

1  they would want city council to enact some
2  legislation to make it more difficult to, I
3  guess, conduct business in hotels.  And I was
4  never a proponent of that, but it was discussed
5  with me.  We never took any action on it.
6      Q.   So what is the tieback to drugs
7  with hotels, that this came to your attention?
8      A.   The police department was making
9  some drug arrests in these hotels.
10     Q.   Okay.  And the -- and the nuisance
11 call, you said you wanted to make it harder to
12 do business in the hotels.  What do you mean by
13 that?
14     A.   So if we got -- if we would get a
15 call -- this was -- now, this was just proposed
16 legislation.  I don't think we ever enact- --
17 enacted it.  I don't think we ever took action
18 on it.
19         They -- they wanted to come up with
20 some type of rule that if we get called to a
21 residence or a business location more than a
22 certain amount of times, we would impose a
23 fine.  We never did that, but it was something
24 that was discussed.  I do -- do recall that.
25     Q.   What type of drugs were involved

1  that you recall?
2      A.   I don't remember.
3      Q.   Anything to do with opioid drugs?
4      A.   I don't know if they were or not.
5      Q.   Okay.  And what is the time frame
6  on this?
7      A.   It would have been my first -- one
8  of my -- been one of my first two terms on
9  counsel back in 2005 to -- 2013, I think I
10 was done.
11     Q.   So between 2005 and 2013, you were
12 aware of drug sales being conducted out of
13 hotels in the City of Macedonia?
14     A.   It was one of the things that
15 was -- was talked about, yes.
16     Q.   And were those illicit; they were
17 not prescription opioids --
18         MR. LEDLIE:  Object to the form.
19     Q.   -- to your knowledge?
20         MR. LEDLIE:  Sorry.  Object to the
21 form of the question.
22     A.   I -- I don't recall.
23     Q.   Does any of your knowledge about
24 opioids that you've discussed in this lawsuit
25 or in this deposition today come from your

1  service on city council for Macedonia?
2      A.   I -- I don't think it does.  I
3  don't think -- I -- I really try to keep those
4  two very, very separate.  You know, have I
5  picked up things here and there?  I suppose
6  it's possible, but I don't -- nothing with this
7  lawsuit relates, in my mind, to my tenure on
8  city council.
9      Q.   You testified earlier today about
10 burglaries from pharmacies, which I think you
11 thought were back in your time you were at the
12 sheriff's department.
13         Do you have any personal knowledge
14 about a burglary of any prescription opioids
15 coming from a Walmart?
16     A.   No, I don't remember the pharmacy
17 that it was.  I don't think it was a big store
18 like that, but I really can't recall.  I'd have
19 to dig up the report from then -- from then.
20     Q.   And where would you access that
21 report if you were to go look for it?
22     A.   I would go to my records and ID
23 bureau and ask them to -- dig it up and
24 maybe go to the radio room and ask them to pull
25 up something on the CAD related to that, in

1  that time frame.
2      Q.   Did you try to do that in relation
3  to this lawsuit?
4      A.   No.
5      Q.   Did anyone ask you to look for
6  pharmacy burglaries of prescription opioids in
7  regards to this lawsuit?
8          MR. LEDLIE:  Object to the form of
9  the question.
10     A.   That was never asked of me.
11     Q.   And so you said it didn't have to
12 do with a Walmart.  Fair to say they
13 wouldn't -- the burglaries from pharmacies
14 wouldn't have been from a CVS, a Walgreens, a
15 Rite Aid, a Giant Eagle, or any other Defendant
16 in this lawsuit, to your knowledge?
17         MR. LEDLIE:  Object to the form of
18 the question.
19     A.   I -- I really don't remember the --
20 the name of -- of the pharmacy.  I don't recall
21 it being one of the big vendors.
22     Q.   Okay.  Do you know what the term
23 "diversion" means with regard to prescription
24 opioids?
25     A.   No.

Page 350

1    Q.   Okay.  It's not a term you use in
2  the sheriff's department, diversion of opioids
3  or drugs?
4        MR. LEDLIE:  Object to the form of
5  the question.
6    A.   Could it mean something different
7  to me?
8    Q.   That's what I'm asking.
9    A.   I -- can you give me some context
10 to it?
11   Q.   I was asking, in your knowledge, do
12 you have any familiarity with the term?
13   A.   No.  We have a juvenile diversion
14 program.  It has nothing to do with opioids.
15   Q.   Okay.  And you testified earlier
16 today about inmates who used to receive pills
17 from doctors and were not able to get them as
18 readily anymore.  Do you recall that testimony?
19   A.   I do remember that, yes.
20   Q.   And were you referring to an
21 inability to receive prescription opioids under
22 a legitimate prescription?
23       MR. LEDLIE:  Object to the form of
24 the question.
25   A.   Yes.  When the state and the local

Page 351

1  governments begun -- began to crack down on the
2  doctors, yes, that's what I was referring to.
3    Q.   So you're referring to states and
4  local governments cracking down on doctors that
5  meant that inmates could no longer get
6  prescription opioids?
7    A.   I think that's what I was referring
8  to, yes.
9    Q.   Okay.  So is your testimony that
10 the inmates that you discussed the inability to
11 receive pills anymore were inmates who had
12 received prescriptions from doctors that had
13 been stopped in the ability to provide
14 prescriptions by state and local governments?
15       MR. LEDLIE:  Object to the form of
16 the question.  Compound.  Vague.  Confusing.
17   A.   I think that's what I -- what I was
18 getting at when I discussed these things with
19 inmates.  They've told me that they couldn't
20 get something from their doctors.
21   Q.   And now, your personal knowledge on
22 this is based on what you've heard from the
23 inmates, correct?
24       MR. LEDLIE:  Object to the form of
25 the question.  Asked and answered.  Misstates

Page 352

1  testimony.
2    A.   I spoke to the inmates before about
3  these things, yes.
4    Q.   Is it fair to say you do not know
5  what information any particular individual may
6  have received prior to using a prescription
7  opioid?
8    A.   Information in regards to what?
9    Q.   Any information about the opioid
10 prior to receiving a prescription for it?
11   A.   I wouldn't know what they've
12 discussed with their doctor.
13   Q.   You anticipated my next question.
14       You do not know what conversation
15 they may have had with their prescribing doctor
16 before the first time they received that
17 prescription?
18       MR. LEDLIE:  Objection.  Asked and
19 answered.
20   A.   I would not know that.
21   Q.   Do you know what conversations they
22 may have had with their pharmacist the first
23 time they filled a prescription for an opioid?
24   A.   No, I would not.
25   Q.   Do you know what additional

Page 353

1  conversations this person may have had with
2  their physician before receiving an opioid?
3    A.   I would not have that information.
4    Q.   Okay.  So fair to say you do not
5  know what any individual patient may have
6  understood about the risks of taking an opioid
7  under a prescription?
8        MR. LEDLIE:  Object to the form of
9  the question.
10   A.   I don't know what they would have
11 known.
12   Q.   Also fair to say you do not know
13 what any individual patient may have understood
14 about addiction to opioids prior to taking a
15 prescription opioid?
16   A.   I wouldn't have known what they
17 understand.
18       THE REPORTER:  Wouldn't have
19 known --
20       THE WITNESS:  I'm sorry.
21   A.   I wouldn't have known what they
22 understood.
23   Q.   Captain Barker, you're not an
24 expert on public health policy, correct?
25   A.   Correct.

89 (Pages 350 - 353)

Page 354

1    Q.    You're not a physician?
2    A.    No.
3    Q.    Other than any job-related training
4 you've discussed earlier today, you have no
5 medical training, correct?
6    A.    I do not.
7    Q.    You're not an expert on pain
8 management or the treatment of pain?
9    A.    No, I'm not.
10   Q.    Do you have any training or
11 exper- -- expertise in epidemiology?
12   A.    No.
13   Q.    Do you have any training or
14 expertise in pharmacology?
15   A.    No.
16   Q.    You're not a pharmacist?
17   A.    No.
18   Q.    Do you have any training or
19 expertise in toxicology?
20   A.    No.
21   Q.    Do you have any training or
22 expertise in the diagnosis or treatment of
23 mental health disorders?
24   A.    No.
25   Q.    Do you have any training or

Page 355

1 expertise in mental health?
2    A.    No, I don't.
3    Q.    You're not a psychologist or a
4 psychiatrist?
5    A.    No.
6    Q.    Do you have any training or
7 expertise in the diagnosis or treatment of
8 addiction or substance abuse?
9    A.    No, I don't.
10   Q.    You're not an expert on the causes
11 of addiction?
12   A.    No, I'm not.
13   Q.    You're not an expert on the
14 treatments of addiction?
15   A.    No, I'm not.
16   Q.    So you aren't qualified to diagnose
17 someone with an addiction or substance use
18 disorder, are you?
19   A.    I am --
20        MR. LEDLIE:  Object to the form of
21 the question.
22   A.    I am not.
23   Q.    Captain Barker, your wife is also
24 an employee of the sheriff's department,
25 correct?

Page 356

1    A.    Yes.
2    Q.    Okay.  And what is her role at the
3 sheriff's department?
4    A.    She's a deputy assigned to the
5 patrol division.
6    Q.    To the patrol division, you said?
7    A.    Yes, to the patrol division.
8    Q.    Does she have any role with
9 investigating drug crimes?
10   A.    She's not typically assigned to
11 that.  She's a patrol deputy that takes calls
12 and answers calls.
13   Q.    So she's not typically assigned to
14 that, but she has been assigned to drug
15 investigations, to your knowledge?
16        MR. LEDLIE:  Object to the form.
17 Foundation.
18   A.    I don't know for sure, other than
19 some minor drug violations.
20   Q.    How long has your wife been an
21 employee at the sheriff's department?
22   A.    Since September of 1999.
23   Q.    Have you discussed the opioid
24 crisis with your wife?
25   A.    Surprisingly, we talk very little

Page 357

1 about work.  We have not talked about this.
2        MS. MORRISON:  Give me a couple
3 minutes to confer with my co-counsel.
4        THE VIDEOGRAPHER:  Going off the
5 record at 6:03 p.m.
6        (A recess was taken.)
7        THE VIDEOGRAPHER:  Back on the
8 record at 6:06 p.m.
9        MS. WU:  Thank you, Captain Barker.
10 We have no further questions.
11        MR. LEDLIE:  And I don't have any
12 questions.  Thank you, Captain Barker, for your
13 service and for your time today.
14        THE WITNESS:  Okay.  Everybody have
15 a safe trip home.
16        THE VIDEOGRAPHER:  Off the record
17 at 6:06 p.m.
18        (Deposition concluded at 6:06 p.m.)
19        ~ ~ ~ ~ ~
20
21
22
23
24
25

90 (Pages 354 - 357)

Page 358

1  Whereupon, counsel was requested to give
2  instructions regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5        SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9        TRANSCRIPT DELIVERY:
10  Counsel was requested to give instructions
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 360

1        I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5        IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 3rd day of
8  December, 2018.
9
10
11
12
13
14        Stephen J. DeBacco, Notary Public
15        within and for the State of Ohio
16
17  My commission expires September 30, 2022.
18
19
20
21
22
23
24
25

Page 359

1        REPORTER'S CERTIFICATE
2  The State of Ohio,  )
3                      SS:
4  County of Cuyahoga.  )
5
6        I, Stephen J. DeBacco, a Notary
7  Public within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, SHANE BARKER,
10  was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19        I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

Page 361

1        Veritext Legal Solutions
          1100 Superior Ave
2            Suite 1820
          Cleveland, Ohio 44114
3        Phone: 216-523-1313
4
  December 3, 2018
5
  To: JAMES W LEDLIE
6
  Case Name: In Re: National Prescription Opiate Litigation v
7
  Veritext Reference Number: 3104521
8
  Witness: Shane Barker    Deposition Date: 11/28/2018
9
10  Dear Sir/Madam:
11
  Enclosed please find a deposition transcript  Please have the witness
12
  review the transcript and note any changes or corrections on the
13
  included errata sheet, indicating the page, line number, change, and
14
  the reason for the change  Have the witness' signature notarized and
15
  forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext com
18
  If the errata is not returned within thirty days of your receipt of
19
  this letter, the reading and signing will be deemed waived
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 362

1        DEPOSITION REVIEW
       CERTIFICATION OF WITNESS

2

    ASSIGNMENT REFERENCE NO: 3104521
3 CASE NAME: In Re: National Prescription Opiate Litigation v
   DATE OF DEPOSITION: 11/28/2018
4 WITNESS' NAME: Shane Barker
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7    I have made no changes to the testimony
   as transcribed by the court reporter
8

   _____
9 Date        Shane Barker
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13      They signed the foregoing Sworn
      Statement; and
14      Their execution of this Statement is of
      their free act and deed
15
      I have affixed my name and official seal
16
this _____ day of_____, 20____
17

18    _____
   Notary Public
19    _____
   Commission Expiration Date
20
21
22
23
24
25

Page 363

1        DEPOSITION REVIEW
       CERTIFICATION OF WITNESS

2

   ASSIGNMENT REFERENCE NO: 3104521
3 CASE NAME: In Re: National Prescription Opiate Litigation v
   DATE OF DEPOSITION: 11/28/2018
4 WITNESS' NAME: Shane Barker
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s)
9    I request that these changes be entered
   as part of the record of my testimony
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein
13    _____
   Date      Shane Barker
14
     Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17      They have read the transcript;
      They have listed all of their corrections
18      in the appended Errata Sheet;
      They signed the foregoing Sworn
19      Statement; and
      Their execution of this Statement is of
20    their free act and deed
21    I have affixed my name and official seal
22 this _____ day of_____, 20____
23
   _____
   Notary Public
24
   _____
25    Commission Expiration Date

Page 364

1        ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 11/28/2018
3 PAGE/LINE(S) /    CHANGE    /REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____

20 Date _____    Shane Barker
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23
   _____
   Notary Public
24
   _____
25    Commission Expiration Date

92 (Pages 362 - 364)

| & | | | |
|---|---|---|---|

**&**  2:11,16 3:5,15
3:21 4:11 15:23
16:3,6 99:14
308:9

**0**

**000008414**  8:9
293:20
**000008692**  8:10
293:21
**00008414**  293:16
**000342318**  7:23
276:3,7
**000342375**  7:23
276:8
**000342376**  7:20
267:17,21
**000342433**  7:21
267:22
**001128847**  7:15
261:11,15
**001128894**  7:16
261:16
**001128895**  7:18
264:4,8
**001128940**  7:18
264:9
**001773045**  98:11
**001773045to**  6:5
98:17
**001773066**  6:5
98:17
**001845330**  6:10
139:6,11
**001848508**  7:2
178:10,16
**001848510**  7:2
178:11
**001848779**  7:7
194:25 195:6

**001848780**  7:7
194:25
**001848870**  6:12
150:18,23
**001848871**  6:13
150:24
**001849352**  7:4
188:20,25
**001849446**  7:11
218:12
**001849991**  8:7
291:23 292:2
**001849993**  8:7
292:2
**001850085**  7:13
228:8,14
**001850086**  7:13
228:8
**001850134**  6:18
164:2,8
**001850140**  6:19
164:8
**001850873**  6:15
156:20,25
**001853693**  7:9
208:23 209:8
**001853695**  7:9
208:23
**001856529**  6:22
170:18,23
**001856543**  6:23
170:18
**001858599**  8:2
280:22 281:2
**001858600**  8:3
281:3
**001859672**  8:5
284:4,8
**001859673**  8:5
284:9

**00189446**  218:17
**05**  343:3

**1**

**1**  6:3 70:5 98:10
98:13,22 101:11
101:19,25 102:6
105:8 116:6,11,19
116:25 117:1
119:18 145:19
155:9
**1,800**  266:11
**1/6/2016**  6:11
150:21
**10**  7:5 19:8,9 46:9
48:23 49:3 53:4
83:9 107:1 112:23
135:22 194:22
195:4,23 196:6,10
196:14 197:3,5
202:19 205:16,18
245:8,18 246:1,1
246:12 251:11
254:18
**100**  166:3 170:3
194:4 256:2,14
279:16 287:6
**10018-1405**  2:18
**10019-9710**  3:6
**101**  9:21
**102**  9:22,22
**103**  9:23
**104**  9:23,24
**1048**  17:4
**105**  9:24,25 10:1,1
**106**  10:2
**108**  10:2,3
**109**  10:3,4
**10:03**  73:11
**10:27**  73:14
**11**  7:8 208:21
209:5 214:11

**11,000**  300:10
**11/28/2018**  361:8
362:3 363:3 364:2
**110**  10:4,5,5,6
**1100**  361:1
**112**  10:6,7
**113**  10:7
**114**  10:8
**11472**  360:13
**116**  10:8
**117**  10:9
**119**  10:9,10
**11:32**  130:23
**11:47**  131:1
**12**  7:10 46:9 48:23
49:3 96:19 107:1
218:10,16 224:9
**120**  10:10
**121**  10:11
**122**  10:11
**123**  6:6
**125**  10:12,12 194:4
**128**  10:13
**129**  10:13,14,14
**12:30**  167:14,19
**12th**  228:23 229:3
**13**  7:12 66:8 96:19
228:6,13 231:19
343:4
**133**  10:15
**134**  10:15,16
**135**  10:16,17
**136**  10:17
**137**  10:18
**138**  10:18,19
**139**  6:9 10:19
**14**  7:14 261:10,13
261:20 263:17
303:17,17
**14,000**  69:18

141   10:20
142   10:20
144   10:21
145   3:24 10:21,22
146   10:22
147   10:23,23,24
149   10:24
15   7:17 264:3,6,13
   304:5
150   6:11
152   10:25
153   11:1
154   11:1,2
155   11:2
156   6:14 11:3
157   11:3,4
159   11:4
16   5:8 7:19 218:8
   225:23 267:16,19
   268:1 269:6
   270:10 273:16
   275:15 304:7,9
16,000   158:14
161   11:5,5
162   11:6,6
163   11:7
164   6:16
167   5:9 11:7
169   11:8,8,9
17   1:6,10 7:22
   99:15 218:8
   225:22,24 239:15
   258:5 276:2,5,12
   276:25 277:7,13
   277:19 278:11,17
   279:20
170   6:20
1701   4:12
173   11:9,10,10
175   11:11,11,12

177   11:12,13
178   7:1 11:13
18   1:12,13 8:1
   199:6 280:21,24
   281:7,13
180   11:14 223:23
181   11:14,15,15
182   11:16
1820   361:2
186   11:16
187   11:17,17
188   7:3 11:18,18
189   11:19
19   8:4 284:3,6,13
   285:2
190   11:19
191   11:20
19103-2921   4:12
192   11:20
194   7:5 11:21
196   11:21
198   11:22
1984   270:21
1989   1:21 29:1
199   11:22
1990s   28:19
1992   29:9
1993   29:9,10
1994   29:12 30:20
   30:24 31:15 32:16
   32:20 104:1
   133:12 134:4,13
   134:20 135:1
1997   30:21,25
   31:15 32:17,21
   33:4,13 34:2,17
   36:12 48:13
1999   30:16 33:23
   34:2,17 35:10
   36:12,24 37:12
   38:9,17 39:11

45:12 46:2,20
47:1 48:13,17
49:20 50:2 356:22
1:34   167:22

**2**

2   5:3 6:6 123:10
   123:15,23 124:5
   131:3,6 193:15
20   8:6 19:10 83:11
   112:25 158:7
   202:21 253:17
   291:22,25 292:7
   362:16 363:22
   364:22
20,000   158:14
200   11:23
2000   301:1
20001-4956   2:13
2003   7:15 45:23
   46:3,20 47:1
   48:17 49:21 50:3
   65:18,23 68:25
   69:22 71:3,16
   261:14,25 262:3,7
   263:1,18
2004   7:17 22:18
   68:25 69:22 71:3
   71:16 73:21,24
   74:9,15 75:6,20,22
   84:13 103:16
   264:7,16,17,20,25
   265:18 266:9
   300:14
2005   22:10,11
   347:9,11
2007   75:25 76:9
2008   75:25 76:9,23
   77:15,24 78:23
   79:12 104:1
2009   57:1,9 76:23
   77:16,24 78:23

79:12 104:22
105:1,6,13 118:19
146:3 277:5
278:11,16 279:9
280:10
201   3:11 11:23,24
2010   22:20 25:8
   104:2
2011   21:9,24 22:7
   22:19,20 25:8,8
   36:8 44:4 53:3
   57:1,9 59:19,24
   61:1,5 62:3 63:11
   64:1 74:16 75:6
   75:21 80:4 84:13
   84:14,15 103:16
   235:10 257:6
   305:18
2012   59:19
2013   347:9,11
2014   8:4 284:7
   285:17
2015   6:20 7:1,5,22
   170:14 178:9
   194:23 195:17,20
   276:6,15,17 279:9
   280:11 295:18
   324:14 325:7
2016   6:14 7:12,20
   8:6 151:13 152:7
   154:8 155:17,22
   156:23 158:7
   218:6,7 221:19
   228:7 267:20
   268:4 292:1
   293:10 324:14
   325:7
2017   8:1 96:13
   97:8,11,19 115:1
   143:18 221:16
   225:24 257:13,22

258:12 280:25
324:14
**2018**   1:18 8:8 15:2
91:10 99:4 134:13
134:20 135:1
221:10 293:19
294:3 295:19
296:1 342:23
343:7 360:8 361:4
**202**   2:13
**2022**   360:17
**203**   11:24
**204**   11:25 12:1
**205**   12:1,2
**206**   12:2,3
**208**   7:8 12:3
**21**   8:8 117:6,12
119:22 120:7
293:15,18,25
294:15,19
**211**   12:4
**212**   2:18 3:7 12:4
12:5
**213**   12:5,6
**214**   12:6,7
**215**   4:13 12:7,8,8
**216**   4:6
**216-523-1313**
361:3
**216-9107**   2:6
**216-9252**   2:7
**218**   7:10
**22**   8:11 9:3 302:24
303:5 304:5,7
305:21
**221**   12:9
**222**   12:9
**224**   12:10
**226**   12:10
**227**   12:11,11

**227-1994**   3:18
**228**   7:12
**230**   12:12
**231**   12:12
**232**   12:13,13
**236**   12:14
**2363**   277:1
**237**   5:10
**239**   12:14
**24**   31:3
**24/7**   67:12 198:8
204:22
**240**   12:15
**241**   12:15,16
**242**   12:16,17
**243**   12:17,18
**247**   12:18
**248**   12:19
**249**   12:19
**250**   3:6 12:20
**252-9060**   3:12
**253**   12:20
**254**   12:21
**256**   12:21
**257**   12:22
**259**   12:22,23
**261**   7:14 12:23
**263**   12:24
**264**   7:17
**267**   7:19 12:24,25
**269**   13:1
**27**   218:6
**275**   13:1,2 294:6
**276**   7:22
**277**   13:2
**278**   13:3,3
**279**   13:4
**28**   1:18 2:5 15:2
**280**   8:1 13:4
**2800-3200**   3:17

**2804**   1:5,6
**282**   13:5
**283**   13:5,6
**284**   8:4
**288**   13:6,7
**290**   13:7
**291**   8:6 13:8
**293**   8:8 13:8
**294**   13:9
**29464**   2:6
**295**   13:9
**296**   13:10
**298**   13:10,11
**299**   13:11
**2:26**   208:18
**2:37**   209:3

**3**

**3**   6:9 70:23 124:5
131:6 139:5,8,15
139:17 140:24
141:19 142:16
172:14 361:4
**3/27/2018**   6:10
139:10
**3/29/2017**   7:8
208:22
**30**   59:6 146:9
202:25 215:20
282:6 360:17
**300**   13:12
**301**   13:12
**303**   8:11
**304**   13:13
**3048**   100:13
**305-6400**   3:24
**306**   13:13,14,14
**3065**   117:7
**307**   13:15,15,16
**308**   5:11
**309**   13:16

**310**   13:17,17
**3104521**   361:7
362:2 363:2
**311**   13:18,18
**312**   13:19
**313**   13:19
**314**   13:20
**315**   13:20
**317**   13:21,21,22
**318**   13:22,23,23,24
**319**   13:24
**31st**   209:18
**322**   13:25
**323**   14:1,1
**325**   14:2
**328**   14:2,3,3
**329**   14:4,4,5
**330**   3:12,24 14:5,6
**332**   14:6
**334**   14:7,7,8
**335**   14:8,9
**336**   14:9
**337**   5:12
**338**   14:10,10
**339**   14:11
**341**   14:11
**347**   14:12,12
**349**   14:13,13
**35**   104:24 282:6
**350**   14:14,14
**351**   14:15,15
**352**   14:16
**353**   14:16
**355**   14:17
**356**   14:17
**359**   5:14
**36**   262:12
**37**   265:3
**38**   9:3
**39**   9:4

**3:32** 254:22
**3:55** 254:25
**3rd** 360:7

**4**

**4** 6:11 70:23
100:11 150:18,20
151:3 154:24
155:7 285:16
**40** 104:23 224:1
**400** 3:22
**41** 3:17 9:4
**420** 133:10,22
**43215-6194** 3:18
**44065** 17:5
**44114** 361:2
**44114-1190** 4:5
**44308** 3:12
**44720** 3:23
**45** 9:5
**45004** 1:10
**45090** 1:13
**45132** 1:12
**46** 268:6 269:6
276:23 277:2,4
**47** 9:5
**48** 9:6 31:3
**49** 9:6 270:10
**4:00** 25:24
**4:51** 296:12
**4a** 74:20
**4p** 25:23

**5**

**5** 6:14 70:5,23
156:19,22 157:5
**50** 3:11 18:12
52:18 202:23,24
**51** 9:7
**55th** 3:6
**586-7375** 4:6

**59** 9:7
**5:00** 296:15
**5:43** 336:21
**5:45** 336:24
**5th** 229:3

**6**

**6** 5:5 6:16 59:6
146:9 151:13
154:7 164:4,13,19
164:25 165:11,21
166:10 168:5
169:6 215:20
310:8 334:15,20
**6/22/2016** 7:3
188:18
**6/29/2016** 7:10
218:11
**61** 9:8
**614** 3:18
**620** 2:17
**63** 9:8
**64** 9:9,9
**662-5982** 2:13
**68** 9:10
**69** 9:10
**6:03** 357:5
**6:06** 357:8,17,18

**7**

**7** 6:20 170:11,13
170:22
**70** 9:11
**71** 9:11
**72** 9:12,12
**750** 284:21,22
285:4
**76** 9:13,13
**77** 9:14 35:2
**78** 9:14
**791** 133:3,22

**8**

**8** 7:1 178:8,14
195:12,15 196:6,9
197:2 345:20
**80** 34:6 256:2
**8040** 3:23
**81** 9:15,15
**82** 9:16
**83** 9:16,17
**836-7591** 3:7
**841-1105** 2:18
**843** 2:6,7
**850** 2:12
**86** 29:1
**8600** 281:22
**8688** 294:7
**8691** 295:9
**8871** 151:11
**8883** 262:14,15
**8931** 265:4
**8p** 25:24 74:20

**9**

**9** 7:3 53:4 188:17
188:24 193:3
**90** 7:11 218:12
**901** 4:5
**90s** 32:6 56:24
**91** 9:17,18
**92** 9:18
**94** 9:19
**95** 9:19,20
**96** 9:20
**963-5055** 4:13
**97** 35:10
**98** 6:3 9:21
**99** 64:12 301:1
**9:03** 1:18

**a**

**a.m.** 1:18 15:3
25:24 73:11,14
131:1
**aa** 118:10
**aaron** 1:7
**ability** 185:12
203:12 351:13
**able** 32:2,3 42:6
79:19 80:9 166:5
166:11 172:1
179:6 205:21
224:5 230:9,11,20
234:1 252:3 275:6
275:6 299:9
300:13 305:20
309:13 350:17
**abruptly** 189:7
190:10,18
**abuse** 40:2,4,17
70:3,23 140:10,11
198:2 260:6
273:20,22 274:6
290:5 355:8
**abused** 230:24
231:12 248:2,13
248:17
**abusing** 31:17
311:19
**academy** 29:9,24
331:11
**accept** 66:16
197:15,18 211:23
245:4
**access** 63:9,13
84:5,9 95:13,16
107:9 124:12
161:8,13,20 162:5
163:2,4 165:21
166:6,7,11 167:9
274:11 282:12

300:6,13 310:1,11
311:24 312:20,25
324:24 330:16,17
348:20
**accessible**  183:24
305:5
**accessing**  222:9
**account**  300:6,18
**accountability**
301:13
**accounts**  133:14
**accurate**  49:12
177:25 263:3
279:17
**accused**  128:1
**ach**  168:19 172:19
172:23 173:8,10
174:13 176:24
212:18,20 213:10
213:21,25
**acknowledge**
362:11 363:16
**acronym**  56:17
96:11
**acrost**  35:14 78:10
**act**  23:8 82:12,25
85:13 90:1 126:10
362:14 363:20
**actavis**  4:8,9 328:4
**acted**  128:20
**action**  165:6
201:21 346:5,17
360:4
**actions**  126:23
256:5
**active**  171:15
**activities**  61:2
251:20 330:10
**activity**  31:9
**actual**  41:11 43:18
43:18 45:8 54:3

55:7 64:13 88:3
207:7
**acute**  126:1,7,25
127:10,20 128:1
128:12 129:11,18
209:21
**ad**  232:10,18
**added**  43:2 133:18
133:19 238:5,6
**addicted**  72:4,8
125:12 274:18
**addiction**  71:6,17
71:21,25 72:22
73:2 88:25 89:9
90:8,20 91:1,11
110:18,24 111:20
138:25 191:24
193:24 203:23
204:8 213:11,15
213:24 259:6,18
260:4,15,20 261:1
261:2 266:17
270:18 287:25
353:14 355:8,11
355:14,17
**addictions**  71:11
73:3 122:13
**addicts**  124:12
194:8
**addition**  65:8
124:17 180:22
218:4
**additional**  39:8
46:14 138:24
179:8 186:18
198:15 236:9
238:2,2 241:17,20
241:21,24 242:11
243:19 251:10
258:16 260:3
293:6 304:24

305:8 352:25
**additionally**
256:16 274:16
**address**  17:3
237:12 242:21
243:4 300:16,23
301:3 361:15
**addressed**  151:20
170:25 200:15
**addressee**  198:25
**adjacent**  197:21
**adjournment**
359:22
**adjustments**
206:19
**adm**  85:12,21,22
85:25 86:5 252:20
270:18 271:7
274:16,21 288:17
288:24 289:6,12
289:14,19 290:4
320:10,15,21
321:23 322:3
**admin**  166:14
**administer**  172:1
184:24 185:8,10
**administered**
166:14,23 173:24
174:5 176:22
177:4,8 183:18
184:15,18,22
310:22 311:19
**administration**
169:12 172:12
173:3,22 174:9,23
175:4 177:17,23
178:3 192:23
200:21 226:11
269:8 278:25
**administrative**
21:11 79:14 84:23

85:2,4 88:19
102:21 173:21
190:16
**administrator**
172:19 291:15
**admission**  168:11
**admissions**  179:17
**admit**  211:8 267:8
**admitted**  185:25
187:16 209:21
211:17
**admitting**  187:1
188:10
**adopted**  218:5
283:12
**advanced**  93:15
95:7,9,10,17 150:5
157:10,14,21
158:6,24 159:23
160:4,9,18 161:17
161:18
**advise**  210:20
229:4
**advised**  47:20
210:7 253:21
258:11
**advisory**  6:4 85:9
85:10 96:10,12,15
97:2 98:3,15 99:1
299:3
**advocating**  211:16
**aero**  29:18
**affixed**  360:6
362:15 363:21
**aforesaid**  359:12
**afternoon**  48:24
237:4 308:3,18
337:2
**age**  16:16
**agency**  26:13 50:5
50:9 56:19 67:23

68:22,23 70:17
148:16 155:14
270:21 344:8
**aggravated** 140:8
**aggregation**
113:12,17
**ago** 17:12 18:22
58:13 65:12 72:16
79:17 80:11 81:2
92:4 96:8 103:8
124:21 128:14
155:12 218:7
225:19 226:4
239:20 297:2
323:24 330:9
331:17
**agree** 121:6,13
122:17,19 146:23
219:17 285:7
295:17
**agreeable** 193:3
**agreed** 124:9
**agreement** 144:8
**ahead** 157:25
246:24 297:1
344:16
**aid** 338:15,19,23
349:15
**aided** 54:13
**airflow** 183:22
**airplanes** 29:18
**airport** 34:5 46:22
**ak** 290:5
**akron** 1:21 2:2
3:12 8:11 15:12
15:15 28:13 46:22
123:10 193:16
209:19 286:4,5
290:6 302:25
303:6 304:6

**al** 1:10,12,13,13
**alarm** 23:20
**alarms** 29:19
**alcohol** 270:18
274:23
**alcoholics** 117:17
118:10,18,21
131:7 265:12,16
279:7
**alert** 336:3
**alerted** 335:25
**algorithm** 132:17
**allegations** 297:8
**alleged** 303:24
**allergan** 327:22
**alleviated** 201:2,6
**allocate** 306:1
**allow** 110:16
189:21 207:22
261:7 299:19
**allowed** 185:7,10
**allowing** 189:6
**allows** 279:2
**alternative** 180:19
185:20 186:19,22
202:2
**alternatives**
177:10 186:5,14
186:25 187:20
**amended** 8:12
303:1,7
**ameri** 150:5
**american** 288:18
320:12,17 324:12
**amerisourceberg...**
3:9 15:17 329:11
**amount** 69:4
101:4 104:23
126:5 199:15
200:17 201:2
244:4 250:9

260:11 298:8
332:14 337:12
338:17 339:6,23
340:3 346:22
**amounts** 277:16
295:18
**anal** 219:1
**analysis** 307:15
**animal** 34:11
**annual** 7:15,17,20
7:22 172:10
261:15 262:7
264:8 267:21
268:4 276:7,15
**anonymous** 91:16
91:19,25 92:5,10
92:18,21 117:17
117:17,22 118:10
118:14,18,21
119:3,10,16,20
131:8,8,13 259:17
263:8,15 265:13
265:13,16,17,21
266:1,8 267:7,10
269:11,14,21,23
270:4 279:7,7,9
280:1,6,9
**answer** 27:7,8,10
28:4 59:8 63:6
76:12 83:21 94:22
106:4 147:9 170:5
175:9 182:15
202:18 203:7
219:16 259:24
272:7 290:8
304:21 328:22
330:5,18,20
337:25 340:6,9
**answered** 64:24
78:15 117:3 130:1
135:13 139:2

181:16,23 182:13
182:21 187:22
213:19 227:14
228:1 236:19
241:8 242:16
243:23 254:8
259:10 288:2
306:24 311:1
323:23 330:15
332:6 338:12
339:1 351:25
352:19
**answers** 53:24
356:12
**anti** 158:9
**anticipated** 352:13
**anybody** 155:14
225:12 235:1
333:15
**anymore** 146:20
251:8 350:18
351:11
**apologize** 243:15
**appear** 362:11
363:15
**appearances** 2:1
3:1 4:1 5:3 15:10
16:10
**appears** 280:10
295:22
**appended** 363:11
363:18
**applicable** 358:7
**appointed** 342:22
342:25
**appointments**
210:3
**appreciate** 219:24
**apprised** 268:22
**approach** 187:15

appropriate 24:14
67:5 68:12 70:22
96:25 163:5 165:5
194:12 206:14,19
234:21 279:23
appropriately
23:14 132:7
165:15 166:20
206:1,4,9,16 208:2
208:9 251:1
277:10
approval 136:24
226:20 234:10
approve 66:16
138:14 150:13
approved 150:15
229:16,24 235:4
282:24 318:4
approximate 22:3
22:12 30:17
300:12
approximately
158:14 282:6
321:14 323:21
archived 173:19
archiving 174:19
area 28:14 51:4
59:3 114:16
184:16 198:6,14
204:16 205:4,5,11
205:22 206:5
228:2 290:6
332:24,25
arises 205:4
armsey 137:2
arnold 3:5 16:3
308:9
arnoldporter.com
3:7
arrange 265:8

arrest 18:17 21:21
23:24 24:9 48:25
52:3 57:17 70:15
199:7
arrested 40:2
148:1,10,14,22
149:2 163:13
arresting 41:16
43:7 44:23 67:22
68:22 70:17
arrests 106:5,7
134:9,19,24 148:4
148:6 333:19
346:9
arrive 308:21
arrives 162:10,19
162:25
arriving 162:23
arthur 3:15
article 6:6 123:10
123:16 193:17
asap 210:21
ashlee 209:19
aside 183:17 207:6
216:7 237:21
319:3
asked 64:24 78:15
86:25 117:3 130:1
135:13 139:2
152:11 181:15,23
182:13,21 187:22
195:25 202:10
213:19 227:14
228:1 236:19
241:8 242:16
243:23 246:23
248:7 254:8
255:14 258:3
259:10 288:2
298:7,13,16,19,20
298:23,25 299:2

299:23 301:24
306:24 312:13
323:23 330:14,22
332:5 338:12
339:1 349:10
351:25 352:18
asking 20:19
26:25 179:2
181:10,11 182:16
184:1 185:19
186:14,24 197:10
197:15 207:7
226:10 227:20
232:17 241:20,23
242:10,22 243:24
251:21 350:8,11
asks 159:7 178:23
180:19 210:20
aspect 163:16
247:18 312:15
aspects 99:10
138:7
assaults 31:7
assessment 136:17
136:18,21 137:19
137:20 262:21
273:23
assessments
273:20 274:6
assign 165:4
222:12 232:9
233:16 245:7
assigned 31:10
33:16,18 34:3
38:1,4,9 59:12
60:2 73:22 74:20
77:3 78:2 84:23
122:9 198:7
204:16 205:4
223:14,23 232:18
232:23 233:7,9

238:3 276:18
316:12 319:10
356:4,10,13,14
assignment 33:10
45:15 46:16 65:25
74:8 75:22 77:18
232:11,18 233:22
362:2 363:2 364:2
assignments 22:8
90:6 258:25
assist 46:4 179:6
246:17 274:17
285:6 343:8 344:8
assistance 46:14
80:13 137:13
192:19
assisted 192:3
associated 187:13
192:9,18 203:22
211:10,19,24
213:23 227:1,10
227:23 236:16
260:4
associates 270:17
270:20 271:17
287:16
association 288:18
316:16 320:12,17
324:13
assume 60:23
211:3 230:11
assuming 234:1
attached 64:16,20
142:12 171:15
363:7
attachment 6:15
6:22 156:25
170:17 171:4
attained 28:17
attempt 113:4,7
257:3 307:1

**attempted** 112:6
113:20 182:15
221:9 235:20,23
256:25 257:3
333:10,15
**attempting** 112:13
244:18 317:24
**attempts** 61:24
112:11 114:2,3
115:9,19
**atten** 270:4
**attend** 28:22,25
100:4 288:21,24
324:16
**attended** 75:7
320:11 341:25
342:5
**attending** 290:9
**attention** 53:15
60:12 100:10,16
117:14 124:3
135:11 136:2
140:4 151:9 191:9
191:13 262:12
265:2 268:5 270:5
270:9 272:15,24
273:3 274:13
277:3 281:20
294:5 295:7 345:1
345:9 346:7
**attorney** 299:14
308:9 338:2 340:8
360:2
**attorneys** 175:3
299:12,16
**attributable** 298:9
306:14,22 307:2
**audience** 100:7
**august** 7:12 65:22
74:10 99:4 114:25
114:25 218:6,7

225:22,24,24
228:7 239:14
257:12 258:5
264:23 277:5
342:22,23 343:7
**authenticity** 169:8
**authority** 51:11
71:12 88:4 100:9
168:10,18
**authorize** 363:11
**authors** 321:11
**autopsy** 315:12
**available** 37:15
46:5 91:11 153:5
153:17 265:10
290:24 291:5,10
293:9
**ave** 361:1
**avenue** 2:17 3:23
4:5
**avoid** 186:25
188:8 211:10,18
212:10
**aware** 59:11 60:8
61:5,10 79:1,4,7,8
92:23 96:1,7 98:1
104:7 113:7
116:23 118:16
124:24 142:22
148:12 149:1
155:15 174:7,22
174:25 176:3,7,20
177:3 184:14
190:1,2,4,22 191:1
191:8,11,20,23
192:13,17,21
215:24 224:15,17
224:19,21 225:12
225:25 226:2
230:19,23 231:3
231:11 235:25

274:24,25 275:22
290:22 291:21
294:22 299:25,25
333:14 335:14
337:4,7,20 347:12
**awful** 289:22
298:20 305:22
307:19

**b**

**b** 59:6 146:9
215:20
**back** 25:7,24 26:7
28:19 32:6,9,14,18
33:24 34:24 36:16
37:1,9 39:16
45:18 48:24 52:20
52:20 55:19,24
56:24 57:16,21
58:25 63:10 65:3
65:18 66:4,7 68:5
68:21 73:13 74:11
79:9,12 104:17
115:7 116:6 118:8
119:21 127:12
130:25 155:10
167:21 168:5
169:5 175:2
179:15 180:15
184:13 185:15
193:11,14 194:19
209:2 217:18
220:9,20 223:8
226:9 241:2
247:16 254:24
255:24 256:9
262:8 265:19
266:2 273:16
278:11 280:5
283:6 296:14
300:14 325:14
326:7,14 331:10

336:23 347:9
348:11 357:7
361:15
**bag** 55:11
**barker** 1:17 5:7
15:5 16:16,21,23
17:2 28:11 47:20
73:16 98:21
100:21 117:6,10
121:11 123:9,22
124:8 131:2,9
139:4,14 149:8
150:17 151:2
152:15 156:18
157:4 164:12
167:23,25 209:4
237:2,4 255:2
261:19 262:11
264:12 267:25
270:10 276:11
281:6 284:12
287:22 290:23
292:6 293:24
296:16 300:19
303:13 307:22
308:1,4 336:25
337:2 353:23
355:23 357:9,12
359:9 361:8 362:4
362:9 363:4,13
364:20
**barry** 99:21,25
151:22,24 153:13
**barry's** 99:19
**based** 70:11
135:17 136:1
207:25 208:10
211:23 212:5
247:19 249:20
260:5 340:14
341:9 351:22

**basically** 37:24
58:8 66:23 343:11
**basis** 93:16 106:11
106:17 108:16
177:16,21,22
215:4 251:14
272:23 337:23
340:2,24 341:1
**bates** 100:11 117:7
151:11 170:23
178:15 188:24
195:5 209:8
218:17 228:14
262:13 265:4
277:1 294:7 295:8
302:24
**battle** 103:2
**bci** 55:22 56:13,15
56:21 57:11,18,21
58:1 60:23 64:13
64:15,17,20 65:3
**beacon** 123:11
193:17
**bear** 243:1
**bearing** 170:22
209:7
**becker** 4:11 16:12
16:12
**bed** 134:1 183:23
**beds** 143:18,21
**began** 81:10 97:21
103:4 239:20
351:1
**beginning** 170:23
178:15 195:5
209:8 218:17
228:14 229:14
**begun** 351:1
**behalf** 2:2,10 3:3,9
3:14,20 4:2,8
15:12,14,17,20,23

16:1,3,6,8,13
**behavior** 132:3
148:4
**behavioral** 270:12
273:18 274:15
**behaviors** 102:24
238:25
**belief** 120:11,12
309:3
**believe** 20:23
23:17 52:3 57:1
63:16 73:21 77:6
86:16 103:3
114:25 118:19
122:10 124:15
166:13,15 223:23
224:25 237:7
262:4 265:19
291:14 306:21
307:8 309:2 310:9
310:18 313:12,19
318:2 321:22
324:4 328:16
330:12,23 339:22
**bell** 235:11
**best** 27:7 35:8
120:17 224:7
308:14
**better** 32:3 54:3
110:18 200:13
**beyond** 177:14
334:12 341:21
**bible** 269:11
**bickett** 29:19
**bid** 33:10,11
**big** 45:11 278:8
348:17 349:21
**bigger** 23:9
**bill** 15:22
**bills** 211:4

**bio** 262:9 279:24
**bit** 26:23 29:21
267:8 320:24
**bland** 272:8
**blank** 63:22
**blanket** 245:6
341:19,20
**blog** 6:14 156:24
**blood** 94:13 230:4
**blue** 56:6
**board** 6:20 85:11
85:12,21,22,25
86:5 170:15
252:20 270:19
271:7 274:16,21
288:17,24 289:6
289:12,14,19
290:4 320:10,15
320:22 321:24
322:3
**boards** 85:3,6
**bockius** 4:11
**body** 40:6,21
47:18 216:23
217:19 223:4
224:11,15,20,22
225:1,5 226:1,3,3
226:8,16 227:1,12
227:24 238:20
256:12
**book** 70:24
**booked** 168:12
186:6
**booking** 40:9,13
68:7 70:20,25
212:5 247:11
**bookings** 69:17,18
**born** 28:13
**boss** 62:9 159:9
297:14

**bosses** 48:1
**boston** 17:23
**bottom** 41:10
100:12 151:12
171:11 178:21
179:4 304:9,10
**bought** 115:1
**boulevard** 2:5
**boundary** 46:16
**brain** 259:1
**brand** 58:7
**break** 28:2,5 72:12
72:15 73:8,19
130:12,14 131:2
208:13,16 236:25
255:3,13 296:9
**bretton** 3:22
**brian** 229:10
**bridgeside** 2:5
**briefly** 169:6
283:20 297:15
302:5
**bring** 43:9 102:25
112:6,14 113:5
118:8 217:4
220:21 269:1
271:22 272:23
275:7 297:5
344:14,24
**bringing** 218:25
220:2 327:2,4
**brings** 40:19
268:25
**broader** 131:15
141:16 293:5
**broadly** 94:9,11
147:25
**broke** 317:4
**broken** 99:13
**brought** 39:6,21
60:11,20 72:18

[brought - care]                                                                    Page 10

81:15 87:5 135:25
136:2 148:11
168:12,14 169:9
191:9,13 211:2
252:9 270:1,4
272:15 273:3
299:21 323:9,10
326:14 343:9
344:8 345:3,8
**budget** 8:9 86:12
86:20,23 87:10
105:5 116:24
277:5,12,18,20
278:14 287:15,19
293:20 294:4,10
294:14,18,23
295:10,18,25
296:4 343:8
**budgetary** 87:7
92:15 258:4,9
277:15
**building** 2:17
67:11 90:3,4
252:14 278:6
**bulk** 299:6
**bullet** 269:7
278:24 304:10
**bunks** 133:20
**burden** 203:12
204:8 214:20
215:18 216:2
**burdens** 201:17,21
202:3 203:22
206:18
**bureau** 25:23 26:8
26:10 33:11,13
37:23 41:20 43:14
45:19,21 56:16
59:12 62:13 65:2
65:9 74:11,20
78:17 89:6 141:4

141:7,8,15 222:12
233:7,10 234:5
264:15 298:19
314:17 316:14
319:10 348:23
**burglaries** 25:25
34:12 35:3 76:6
348:10 349:6,13
**burglarize** 80:20
**burglarized** 21:16
22:23 25:4,19
**burglarizing**
25:13,14 148:9
**burglary** 21:19
22:5 23:2,16
24:10 25:2 26:4
39:3,5 50:10,24
52:9 54:1 55:1
77:9 348:14
**burling** 2:11,16
16:6
**business** 241:1
301:4 330:1 346:3
346:12,21
**busy** 256:1
**buy** 148:9 185:12
185:14 344:6
**buying** 226:14

**c**

**c** 3:16
**ca** 361:25
**cad** 54:13 348:25
**caliber** 36:10
**call** 23:7 25:18
31:8 34:14 36:9
37:20,21,22 46:6
46:13 51:15 52:1
54:15 100:10,15
117:14 124:3,21
140:3 151:9
154:13 163:15

207:1 234:4 246:1
262:11 265:2
268:5 270:9
274:13 277:3
281:20 294:5
295:7 308:25
314:6,12,15
315:22,23,24
316:1,2,8,17
346:11,15
**called** 16:16 24:13
35:19 41:7 43:5
47:25 55:10 63:16
71:5 80:12 84:6
209:20 286:4
297:21 346:20
**calling** 286:9
**calls** 22:15 23:10
25:10 34:7,9 35:1
37:14,17 46:4,8
48:4,5,11,14,20,22
50:13,16 51:18
74:22 84:10
177:13 182:12
194:10 199:19
200:5 205:24
265:8 307:17
313:14,14 314:25
315:22 316:5
345:24,25 356:11
356:12
**campbell** 3:21
15:23
**canceled** 117:22
**canton** 3:23 46:22
**capacity** 20:14
102:21 132:25
133:6,15,22,23
134:1 190:16
215:23 289:16

**capital** 87:1
**captain** 16:23 17:2
21:10 22:19 28:11
44:4 59:11 60:2
73:16 79:14 84:16
84:20,23 88:19
92:3 98:21 100:21
102:22 117:5,10
120:18 121:10
123:9,22 124:8
131:2 137:2 139:4
139:14 149:8
150:17 151:2
152:15 156:18
157:4 164:12
167:25 190:17
209:4 235:9 237:4
241:23 255:2
257:7 261:19
262:11 264:12
267:25 270:10
276:11,18 280:5
281:6,10 284:12
287:22 290:23
292:6 293:24
296:16 303:13
305:18 307:22
308:4 337:2
353:23 355:23
357:9,12
**captains** 214:25
**caption** 359:21
**car** 23:11 34:12
37:14 44:9,11
46:5 344:16,18
**cardiac** 97:25
**cardinal** 3:14
15:20 329:5
**care** 74:24 93:2,22
107:12 150:7
152:20 158:4

159:12,19 168:9
168:10 183:15
212:16,24 213:5
213:10 259:4
311:18
**career** 79:3 124:23
**carolina** 2:6
**carried** 152:14
153:12
**carries** 304:6
**carry** 149:9,12,14
149:18 152:9
153:2,12
**carrying** 152:11
239:1
**carts** 293:4
**case** 1:6,10,12,13
18:16,20 19:18,19
21:13,15,23 28:8
41:19 42:10 43:8
44:23 54:21 62:2
62:4 64:16,25
65:4,7 81:7 86:5
97:14 131:11
143:6 184:12
186:10 213:3
215:21 283:8,10
292:17,23 299:24
300:3 312:16
329:1 337:6,10
361:6 362:3 363:3
**cases** 17:24 18:10
18:14 19:22 20:2
20:3,13,16,22
31:24 32:6 69:5
142:8 319:12
**catch** 113:8
**catchy** 324:10
**categories** 141:19
141:22 142:3,9,23
255:19 258:14,16

**category** 94:18
140:5 244:11
250:18 254:15,18
255:7 303:19,24
303:25 311:8
**caucus** 28:9
**caught** 21:18,19
23:21 112:13
**cause** 57:17
121:25 359:12
**caused** 105:1
126:1,7,25 127:10
127:20 128:1,12
129:10,17 134:2
145:7 226:19
278:10,16,19
337:18 338:10,23
339:11
**causes** 107:10,11
111:21 198:8
355:10
**cavities** 216:24
**cavity** 219:1
**cc** 182:7
**cc'd** 231:24
**cell** 179:7 183:9,12
183:13,25 187:11
245:3 305:11
**cells** 183:8,11,19
183:20,21 184:19
185:15,16 197:20
198:6
**center** 46:24
179:18,20,24
180:3 345:12
**ceo** 157:8
**cephalon** 4:8
**certain** 51:16
246:22 247:11
316:20 329:19
346:22

**certainly** 25:8
221:6,7 254:20
255:13 296:10
299:6
**certificate** 5:14
359:1 363:11
**certification** 362:1
363:1
**certified** 16:19
**certify** 359:8,19
360:1
**cetera** 117:18
303:22
**chain** 6:11,14,20
7:1,5,8,12 8:1,4,6
150:21 151:10,12
156:23 158:23
170:14 171:3,7,11
178:9,16,21
180:16,18 183:7
194:23 195:5
197:7 208:22
209:7,9,12 228:7
228:13,15,19
229:1,13 230:1
231:24 234:11
280:25 281:22
284:7 285:15
292:1
**chair** 344:11 345:9
**chairman** 344:3
**challenging** 111:7
**chance** 79:15
**change** 33:19 49:4
84:14 107:1
114:19,21,23
204:9 206:22,25
207:4,8,18 217:13
217:25 218:3
257:21 326:16
340:23 361:13,14

363:8 364:3
**changed** 22:7
44:12 61:18 82:15
170:7,9 238:7
239:18 240:25
256:5 259:19
306:5,12 330:1
**changes** 107:2
178:2 186:13
206:23,23 207:3
208:1 216:25
237:22 238:1,9,11
257:10,15 361:12
362:7 363:7,9
**changing** 106:21
106:22,24
**chapel** 279:6
**characterization**
311:2
**characterize**
311:16
**charge** 39:4,8
40:10,17 41:3
66:24 67:5,17
68:12 70:22 71:10
81:14,15 86:17
93:14 140:15
141:18,21 142:3,8
142:17,18,22
252:18,19
**charged** 68:15
69:2,8,23 70:10
72:6 132:20
135:10 147:18
210:14 219:6
**charges** 19:4,14
32:11 39:5 69:19
132:2,3 135:18
140:5,16 142:11
234:20,21,22,23
235:2,4 287:8

299:1,10,20
charging  18:15
cheaper  144:12,25
check  69:14 110:6
  155:19 210:7
checked  68:3
chemical  55:6
  101:22 102:4
  262:18,23 263:4
  263:10,18
chief  62:9 88:15
  88:16 344:14
  345:4
children  289:24
choice  251:8,17
  252:4 253:2,10,21
  309:6,17,23
  311:10,10
choose  67:24
chris  178:23
christopher
  180:12
circles  257:24
circumstances
  56:20 57:10 66:25
  143:4 203:9
cited  241:6 243:20
  249:12
citizens  345:3
city  1:11 2:2 8:11
  15:12,15 34:3,6,8
  302:25 303:6
  342:17,18,21
  343:1,6,9,12,14,17
  343:22 344:2,9,25
  345:5,16,17 346:1
  347:13 348:1,8
citycenter  2:12
civil  16:18 17:16
  358:3,7 362:5
  363:5

civilian  104:24
  227:5
claim  303:22
claims  297:5
clarification  27:25
  182:3
clarify  195:22
clarity  21:22
class  101:18
  324:19
classes  158:13
  241:21
classification
  132:1,17 136:23
  137:4
classifications
  132:8
classified  132:6
classrooms  269:10
  279:2
clean  27:5
cleaner  57:7
clear  196:4 243:1
cleared  211:2,9,18
cleveland  1:11
  3:23 4:5 360:7
  361:2
client  178:24
  299:14,15 327:8
  327:11 337:5,9
  338:2 340:8
climate  337:5
climb  145:16
climbing  145:11
clinic  179:8
clipboard  44:10
close  23:22 58:13
  99:16 158:13
  272:13
closely  189:8
  190:11,20

clothed  31:6
clothes  217:14
clothing  114:24
  216:23 246:16
cocaine  20:3 32:7
  32:7 35:15 39:15
  40:8 49:23 56:9
  75:24 104:12
  216:15
coffee  336:8
colleagues  297:24
  325:20
collect  174:23
  175:4,15,22 176:4
  298:17,23 301:24
collection  176:5
colleen  228:19
college  28:18,21
color  55:13
columbus  3:18
  85:11
column  269:7
com  320:23
combat  111:18
  324:10 336:6
come  35:6,14 36:2
  57:21 66:13 67:12
  68:5 70:1 97:5
  107:6,8 114:20
  115:6,7 128:7
  135:11 142:10
  148:17 216:17,19
  217:13 234:5
  256:8 259:1 278:4
  278:5 283:11
  286:20 315:13
  326:6 328:19
  335:17 346:19
  347:25
comes  47:16 65:3
  141:3 163:12

185:5 217:17,18
  236:8 240:2
  250:25 268:15
coming  61:16
  78:10,13 111:19
  114:18 207:21
  220:20 225:16
  231:1 240:4,24
  244:23 348:15
command  51:10
  120:15 231:25
  234:11
commander  60:3
  66:8 74:2,5 88:3
  88:18 127:13
  136:25 137:1
  155:23 222:3
  232:9,22 233:23
  246:7,10 250:24
commander's
  127:15
commanders
  108:15
comments  124:1
  247:2
commercial  28:20
commissary
  185:13
commission  6:4,6
  85:9,16 96:12,14
  96:16 97:2 98:3
  98:15 99:1,17,19
  99:22 100:5,8
  118:2 123:12,17
  299:3 344:4
  360:17 362:19
  363:25 364:25
commissioned
  359:8
commit  81:1 82:12
  82:25

commitment
66:19 67:2
committee 96:10
96:16,19
common 186:4
188:3 201:10,14
203:25 211:22
212:4,8 221:3,5,11
221:15,18 230:14
commons 3:22
communicate
301:3
communicating
159:5
communication
265:9 301:7
communications
338:2 340:8
community
179:18,19,24
180:3 237:18
262:22 265:7
companies 258:2
329:19,20
company 174:12
329:9 339:17,20
complaint 40:18
297:9 302:5
320:12,23,25
complaints 345:3
345:8
complete 27:8
90:6
completed 36:24
62:18 172:11
359:22 361:15
completely 207:10
completes 41:14
43:5
complex 345:12

compound 329:17
351:16
compounds
101:22
compromises
273:13
computation
303:23
computer 54:13
63:10,13
computerized
40:16
computers 63:10
con 41:14 43:17
concealed 115:3
concept 331:4
concern 58:19
185:24 187:13,18
188:3,6,7 191:2,2
191:6,8,10,12,14
191:21 212:6
215:3 331:22,24
concerned 59:2
319:4 326:25
332:3
concerning 19:4
19:14,15 20:5,8
21:6,13 83:14
322:15 326:2,20
329:14 330:10
concerns 111:10
121:25 158:19
187:23,24 190:18
191:16 198:19
199:14 200:15,23
201:1 285:9
concluded 357:18
concrete 297:16
condition 67:10
73:1 193:8 210:1
214:7

conditions 99:15
conduct 182:14,20
234:1 337:17
338:9,23 339:10
346:3
conducted 269:9
279:1 316:10
329:14 347:12
conducting 26:14
136:20 273:20
conducts 269:24
confer 357:3
conference 324:13
conferences
257:24 288:18,15
320:18 325:23
confi 62:23
confid 41:8
confidential 41:8
41:15 54:10 62:23
62:24 63:21
219:22 222:4
231:8
confirmed 152:12
conflict 343:19
344:12
confused 181:19
267:8 300:20
confusing 351:16
connected 124:12
connection 174:24
176:5 183:4
192:14 298:17
315:20 316:4
330:13
consequently 49:2
61:17 111:22
124:20
consider 226:14
consideration
212:7 227:8 248:2

283:18
considerations
234:3
considered 51:9
considering 177:7
consistent 56:9
75:17,17 262:24
265:15 270:22
282:8 293:8
constraints 277:5
277:13,15,18,22
consult 69:15
105:24 106:7
109:3 154:25
245:24 254:12
contained 60:17
content 175:11
269:17
contents 43:15
44:16 274:10
context 180:2
255:10 293:2
340:8 350:9
continue 65:15
260:1 310:21
continued 3:1 4:1
257:7
continues 145:16
146:15
continuing 262:21
continuity 168:9
continuously 92:6
contraband 62:4
222:16 223:5
225:10 235:1
239:10,13 240:4
240:16 241:3,12
241:19 242:2,7
331:25
contract 152:16
160:4

**contracted**  84:24
93:14 150:6
159:25 276:21
**control**  180:13
191:21 299:12
**controlled**  172:10
331:15,15
**convened**  96:13
97:3
**convening**  98:2
**conversation**  27:3
81:3,19 352:14
**conversations**
32:15 175:8,10
297:18,24 328:22
352:21 353:1
**convey**  327:6
**convicted**  235:8
**cook**  196:14 199:3
199:14 201:8
**coordinate**  265:11
**coordinating**
286:23
**coordinator**
180:14 272:10
274:17 299:12
**cop**  51:16 301:14
**copied**  159:1
171:8 181:7 183:3
197:11,13
**copy**  43:13 44:25
65:8 171:15
222:25 301:14,20
301:24
**copying**  218:20
229:10
**coroner's**  97:24
**corporation**  2:10
3:9 15:18
**correct**  24:18 33:5
38:5 40:11,12

41:6 42:15 48:15
56:14 58:6,7 91:3
91:22 99:4,5,18,20
100:15 121:4
136:8 140:1,2
141:16,17 147:1,6
147:12 149:24
150:10 151:22
152:17,18,20,21
152:23 154:1,8
157:11,15 159:1,2
171:4 172:6,7
177:5 178:15
179:1,11,12
182:25 184:11
185:21 187:2,16
188:11 189:24
190:5,24 193:24
195:21 196:11
197:22 198:2
199:17,23 200:18
200:24 201:4
204:16,17 205:9
206:22 207:14,15
207:18 211:11,19
211:21 213:2
214:14 218:20
225:3 228:17
229:12 237:8
243:21 264:16,20
264:25 265:1
281:15,16,24,25
282:2,3 289:6
294:9 295:11
309:10,18,23
310:23 311:3,11
311:24 312:17
313:3 315:4
317:15 318:5,10
318:23,25 319:6
321:24 323:7

327:5 330:19
334:17,25 336:2
342:18 351:23
353:24,25 354:5
355:25 359:17
**correction**  60:15
90:9 189:12 255:3
**correctional**  68:10
93:15 95:8,10,11
95:18 109:5 112:7
112:14 139:20
150:6 157:10,15
157:22 158:6,24
159:23 160:5,9,19
161:17,18 171:25
324:21 326:24
**corrections**  18:24
19:1 30:13,18,24
33:3,4,24 37:2,4
37:12 38:2 42:14
45:14,15 59:12
62:18 66:2 81:16
82:5 84:17,21
86:7,12,20 87:8
88:21 89:13,24
90:18,25 91:24
92:7,9 93:22,25
94:17,25 95:22
96:2 110:17,25
111:11 113:5,21
114:5,14 116:4
117:23 118:13
119:6 120:19
125:4 127:11
131:11,18 133:4
133:21 136:7
140:20 141:22
142:4 143:1
144:18,19 146:2,6
146:25 147:11,16
149:12,17,23

150:9,12,13 151:8
152:8 153:6,17
155:17,21 156:1,7
156:16 158:21
160:25 161:5,10
161:14 162:20
163:1 165:12
166:5,16 169:21
175:13 176:9,13
176:18,24 177:4
186:4,9 201:15
212:9 214:13,21
216:11 221:22
233:1 234:16
236:17 237:11,14
237:23 238:14
240:17 241:4
242:7 245:10
247:5 250:9,21
252:23 254:4
255:14 258:17,24
259:8 260:3 262:3
263:12 264:19,24
265:22 266:5,20
266:23 267:5,11
268:9 271:4,12
275:18,23 280:17
283:11 284:23
286:25 287:11,23
290:20,24 291:6
291:18 292:19,25
293:10 298:9
301:9 333:13
361:12 363:17
**corrective**  165:6
**correspondence**
214:12 281:18
292:14
**cost**  213:4 227:3
250:11 254:3
263:19

**costs** 192:8,13,17
192:23 211:10,19
211:24 212:6,10
212:24 227:1,9,21
227:22 236:15
241:4,9,11 254:2
260:4 263:24
303:20
**cots** 133:25
**cottle** 284:17
285:16,17
**council** 96:22 97:4
99:2 277:21
342:17,21 343:1,6
343:10,17 344:2
344:17 346:1
348:1,8
**counsel** 15:9 16:9
28:9 91:9 175:9
175:10 302:11,16
302:20 328:23
340:6,10,14 341:6
341:10,23 347:9
357:3 358:1,10
360:2
**counseling** 262:22
**counter** 94:14
185:13
**counterfeit** 331:5
331:15,18 332:4
**counties** 116:15
224:19 226:3
**country** 320:20
**county** 1:10,13 2:3
6:3,6,12,17,17
7:14,17,19,22 8:8
8:11 15:13,15
17:18 18:2 30:5
31:12,13 36:5
38:3,6,9 46:22,25
49:8 60:9 68:17

69:1 77:20 79:14
81:16 82:5 85:16
86:4,12 91:12
96:22 97:4 98:14
99:2 102:17
103:10,19 104:4,9
104:13 105:13,19
106:1,13,19 109:5
109:13,15,24
111:11 113:5
114:14 117:23
119:25 122:21
123:11,16 125:4
125:24 131:16,18
132:5,7,10,12
134:12,19 143:1
143:10,19,22,24
144:5,10,13,19,21
145:1,2,9,13 146:2
146:5,10 150:7,23
151:21 152:2
153:6 155:16
158:20 159:20
161:19 162:5,11
164:5,6 166:5,9
171:14 173:2
174:14 175:3,13
176:9,13,17,23
177:3 178:2
179:25 180:7
185:21 186:1
187:2 189:12,17
190:3,17 191:17
192:2,8,14,18,20
192:24 196:16
198:23 199:6,16
200:2,18 201:3,17
201:22 202:4
209:14 210:25
211:7 212:9,16,21
212:22 213:15,17

213:22 214:12,13
214:21 215:9,13
215:16,18,25
216:2,9,22 217:6
218:1 221:10
222:6 223:10,11
224:11,15,18
225:1 226:8,12
227:11 229:3
230:15,21,25
231:13,21 233:1
236:17 237:8,23
261:14 262:17
264:7 267:20
270:15,19 276:6
277:21 286:10
293:19 294:3
296:19 297:4,12
302:6,25 303:6
313:10 314:5
326:8,20 332:23
333:3,15 335:15
336:2 337:4,18,21
338:10,15,24
339:4,11,16 341:3
341:9 342:3,7,12
342:15 359:4
362:10 363:15
**county's** 299:12
**couple** 18:22
20:10,23 29:15
30:14 34:22 49:17
61:15,23 67:24
127:3,19 128:14
133:25 143:17
144:7 224:23
252:6 302:6
323:24 324:11
345:18 357:2
**course** 77:8 80:3
80:15 226:23

251:19 321:7,16
**courses** 326:11
**court** 1:1 5:17
15:7 16:14 18:25
27:4 54:22 70:18
106:9 108:25
141:3,6,10 198:19
200:14 201:9,16
201:20 202:2
203:4 238:8 256:1
256:8 362:7
**courtesy** 182:7,11
**courts** 180:20
215:9 255:24
**cov.com** 2:14,19
**cover** 233:13
308:14
**covered** 119:14
308:15
**covering** 89:17
**covington** 2:11,16
16:6,8
**crack** 32:7 35:14
104:12 216:15
351:1
**cracking** 351:4
**crashes** 34:12 35:2
35:3
**cravings** 274:23
**created** 173:9,22
174:4 246:4
**creates** 166:15
341:1
**creating** 140:21
**creation** 174:8
**crime** 37:24 69:3
69:23 70:11 81:1
134:9,11,12
135:10 147:18
**crimes** 38:19
356:9

**criminal** 18:9,14
18:16,20 19:3
24:17,21 26:17,18
38:24 39:2 56:16
82:12,25 120:1
**crisis** 100:18,24
101:11 102:7,16
102:20 103:4,10
104:4,9,12 105:7
105:12,19,25
106:12,18 116:18
116:25 119:18
134:18 145:18
146:7,13 237:12
237:24 240:19
242:14,21 243:4
243:20 250:22
254:5 255:4,15
256:6 258:18
278:10 356:24
**criteria** 137:25
**critique** 239:23
**crosier** 31:14
131:21 132:23,25
133:5 136:19
**cruiser** 344:6
**csonka** 178:23
180:12
**cummins** 158:25
159:6,7,13 160:13
172:21
**cup** 336:8
**current** 88:20
92:25 143:7,7
198:10 204:14
277:7 300:15
**currently** 84:22
91:10 119:5 125:3
137:2 160:13
206:9 259:7
263:11,15 282:5

290:24 343:6
**custody** 5:16
23:18 97:7,10,18
202:12 299:21
**cut** 130:16 196:19
199:14 200:3,16
243:13 277:6
**cutbacks** 279:4
**cuts** 100:18 116:8
116:10
**cuy** 224:18
**cuyahoga** 1:10,22
224:10,15,18
359:4
**cvs** 339:4,10
349:14
**cycles** 258:4,9

**d**

**d.c.** 2:13
**daily** 31:8 66:12
93:16 160:16
165:19 206:17
223:17 251:20
259:3 269:1
272:17
**dale** 88:11,12
154:7 180:18
197:10,14,17
198:18 218:19
229:1
**dallas** 325:7
**damages** 298:9
303:22,24 304:1
**dan** 1:7
**dangerous** 6:21
170:16 189:7,13
**database** 84:5,9
**date** 15:1 22:3,13
43:2 135:15,23
145:24 195:15
202:9 222:14

300:11,12 358:11
361:8 362:3,9,19
363:3,13,25
364:20,25
**dated** 6:9 139:10
151:13 154:7
158:7
**dates** 30:17 127:6
127:9 128:6
129:22 144:6
**day** 4:3 16:1 31:9
31:9,9 37:25,25
46:9 66:14 108:16
108:16 125:8,9
148:18,19,19
181:24,25 196:10
196:20 206:13,13
206:16,16,22,22
206:24,24,25,25
207:2,8,9,18,18,20
207:23,24 224:1
225:6 246:9
250:24 251:4
256:2 267:6
268:22,22 308:8
311:17 340:24,24
341:1,1 360:7
362:16 363:22
364:22
**days** 34:24 66:16
75:11 196:16,20
199:5,6 207:25
208:8 230:10
234:1 361:18
**deal** 71:5 87:9,13
108:16 111:23
122:9 142:1,2
146:17,22 147:22
148:18 154:14
180:20 240:21
260:12 280:18

290:10 326:22
340:16,20
**dealing** 50:9
111:25 162:12
231:25 255:19
258:22 287:24
341:17 345:22
**dealings** 162:17
**dealt** 50:5 344:22
**dear** 361:10
**death** 97:7,10,18
97:25 154:18
158:12
**deaths** 101:8
154:23 155:3
158:14
**debacco** 1:25
359:6 360:14
**debartolo** 7:4
172:9,17 179:5
180:17 188:19
189:3,22 190:9
229:10 230:2
**debartolo's** 184:2
**december** 7:5
29:10 96:18
194:23 195:19
343:3 360:8 361:4
**decided** 211:8
**decision** 36:1
153:4,9,10,16
154:15 283:16
291:9,13,17
292:18,24 297:4,6
**decisions** 211:22
212:5
**decrease** 75:12
116:17
**dedicated** 260:25
**deed** 362:14
363:20

**deem**  345:25
**deemed**  361:19
**defendant**  209:20
  210:13 349:15
**defendants**  8:13
  16:13 297:21
  303:2,9,19 328:2
  330:11
**deficiencies**
  249:21
**definitely**  37:7
  219:15
**definition**  101:25
**degree**  29:3 70:4
**delay**  226:15,18
  226:19
**delete**  300:1
**delivered**  174:16
**delivering**  260:8
**delivers**  174:12
**delivery**  277:10
  358:9,11
**denied**  87:11,13
**deny**  66:16
**department**  25:3
  36:6 49:7 51:3
  54:25 55:6 56:12
  56:21 57:11,25
  58:4,10,18 59:1,6
  59:25 73:21 77:21
  84:9 88:2,13 93:6
  93:8 141:6,16
  147:25 151:22
  159:13,24 211:8
  237:11 258:17
  263:20 267:3
  268:9,10 275:18
  284:23 286:4
  287:22 291:16
  295:11,14 297:25
  301:4 314:5

344:13 345:20
346:8 348:12
350:2 355:24
356:3,21 361:22
**department's**
  58:19 256:5
**depend**  232:15
**dependency**
  262:19,23 263:5
  263:10,18
**depends**  206:12
  289:1
**deposed**  16:19
  296:18 297:20
**deposition**  1:16
  15:4 17:6 98:13
  123:15 139:8
  150:20 156:22
  164:4 168:3
  170:13 178:8
  182:20 188:17
  194:22 208:21
  218:10 228:6
  261:13 264:6
  267:19 276:5
  280:24 284:6
  291:25 293:18
  302:4,11 303:5
  347:25 357:18
  359:20 361:8,11
  362:1,3 363:1,3
**depositions**  17:11
  17:15 18:5
**depressed**  126:19
  244:23 251:7
**depth**  233:15,19
**deputies**  21:19
  23:6 24:12 37:17
  37:24 38:13 41:11
  46:9 48:22,23
  49:3 54:10,11

55:17 58:15,22
62:20,21 63:12
66:13 74:22 90:4
97:22 132:17
136:23 165:14
189:5 194:2
207:14,16,17
223:18 224:3
238:21 239:17,20
256:10
**deputy**  6:7 18:15
  29:10,11 30:3,4,9
  30:15,18 31:3,12
  31:24 33:17,21
  34:1 36:17 37:15
  42:25 43:8 44:7
  44:23 46:7,18
  54:18 56:4,5,7
  66:19 70:16
  103:20,25 104:23
  123:12,18 128:20
  133:13 141:13
  149:14 167:2
  185:3 198:7
  204:16,25 205:4
  205:11,21 206:4
  218:23 223:15
  233:25 236:13
  246:21,22,24
  249:9 278:7 285:5
  294:21 305:11,16
  316:13 356:4,11
**derived**  101:21
**describe**  21:12
  22:25 29:6 80:6
  97:9 102:19
**described**  41:4
  62:2 79:22 80:8
  80:25 82:11,24
  116:24 239:6,12
  241:12,18 257:11

273:6 278:11
285:2 299:9 311:9
330:9
**describes**  230:3
**describing**  55:2
  59:22
**description**  6:2
  63:24 65:5 101:18
  232:12 268:6
**designate**  219:21
**designed**  258:1
**designee**  99:19
**desire**  81:1
**desk**  142:10
  148:17 225:16
**detail**  41:22
**detailed**  63:24
**details**  42:10
  333:21
**detainee**  189:8
  190:10
**detainees**  190:20
**detect**  230:9
  238:25 244:6
**detectable**  230:3
**detection**  114:17
  217:9
**detective**  26:10
  37:23 41:20 62:13
  65:2 78:16 89:6
  233:7,10,16 234:5
  316:14 319:10
**detective's**  65:9
**detectives**  24:13
**determination**
  57:22 222:1,7
  254:13
**determine**  24:1
  39:19 54:25 55:7
  60:16 70:9 71:23
  83:22 105:18

122:24 123:5
131:24 136:21
137:5 138:1 208:8
231:17 245:21
250:14 261:7
298:8 309:15
317:7,12 334:16
334:24
**determines** 246:19
**determining**
153:23 334:8
335:4
**develop** 120:2
**develops** 126:13
**diagnose** 355:16
**diagnosed** 122:22
250:4
**diagnosis** 354:22
355:7
**diamond** 172:13
174:11,15 175:1
175:21 176:4,8,12
176:16
**died** 315:8
**differences** 217:22
**different** 33:10
40:15 52:4,5 85:2
85:3 124:22
138:17 206:18
207:23 216:16,17
234:18 235:19
236:10 240:1,20
312:14,15 322:12
330:7 343:25
350:6
**difficult** 346:2
**dig** 77:11 348:19
348:23
**digs** 6:6 123:12,17
**direct** 23:8 31:1
42:5 51:12 87:23

87:24 90:8 93:22
98:6 99:11,22
157:19 203:8
279:21 291:17
**directed** 202:6,8
202:15 203:3,16
203:17,20 316:20
**directly** 88:10
228:21 234:16
271:19 318:23
**director** 151:7
160:13 179:17
186:9
**disapprove** 138:15
**discontinue** 58:11
**discontinued** 58:5
**discovered** 113:25
116:1 165:4
232:25
**discretion** 233:20
**discuss** 108:13
195:10
**discussed** 146:7,13
195:11 198:22
231:18 250:22
254:6 255:16
258:15,18 283:6
283:20 288:7
289:22 298:10,14
299:16 321:23
322:1,10 324:16
340:10,13 345:13
346:4,24 347:24
351:10,18 352:12
354:4 356:23
**discussing** 120:9
**discussion** 160:18
160:20 285:13
290:2
**discussions** 153:4
153:8 215:2 322:7

335:21,23 340:14
341:5,9
**disorder** 355:18
**disorders** 354:23
**dispatch** 54:13,14
304:14 314:16
315:22
**dispatched** 314:14
314:21 315:2,7,15
**dispatcher** 52:1
**dispatcher's** 316:1
**dispatching** 316:3
**dispensary** 183:14
204:21
**disseminate**
326:19
**distinct** 183:21
**distinction** 137:17
**distribution**
296:21
**distributor** 6:21
8:12 170:16 303:2
303:9,18
**distributors** 342:2
342:11
**district** 1:1,2 15:7
15:7
**diversion** 349:23
350:2,13
**division** 1:3 15:8
18:24 19:1 22:18
30:14,19,24 33:18
33:21,24 37:2,5,12
62:18 77:4 84:17
84:21 86:7,15,20
87:8 90:19 91:1
91:24 92:7,9
94:17,25 95:22
96:2 116:4 118:14
120:19 133:22
140:20 141:9,23

142:5 146:6
147:12 149:23
150:12 152:8
161:10 207:21
216:11 221:22
237:14,23 238:14
240:18 241:4
250:9,21 252:23
254:4 255:14
260:3 262:3
264:19,25 266:21
267:2 275:23
279:16 283:11
290:20 356:5,6,7
**division's** 255:4
**divulging** 338:2
**doc** 43:23
**doctor** 166:8,12
177:15 317:24
325:11 352:12,15
**doctor's** 311:18
**doctors** 79:20,25
94:12 320:4
332:13 350:17
351:2,4,12,20
**document** 1:9 6:3
6:9,16 42:11,14
43:5,18,20 63:22
64:6,21 98:10,14
131:4 139:5,9,15
155:3 156:19
164:5 168:6
170:22,24 171:12
178:15,19 193:19
195:7,10 214:23
215:8 217:24
229:15 264:3
265:3 267:17
276:3 280:21
293:16 294:6
295:23 303:14

335:2

**documentation**
54:16 72:6

**documents**  41:5
41:17 45:11 47:12
54:5 69:15 70:18
71:22 105:23
106:6,9,11 108:25
109:2 127:5,8
142:4 154:24
171:17 245:24
246:3 298:16
300:2 301:20

**doing**  27:1 30:1
37:25 38:14 44:6
55:14,20 57:15
90:5 111:24
114:22 120:16
122:7 141:1 160:7
165:16 219:6
241:15 259:25
298:3 304:23
314:12 324:9
341:2,15

**dollar**  260:10

**donna**  210:25
211:16 281:15,23

**door**  184:25

**dosages**  326:13

**dosed**  58:15,23

**double**  133:19

**downs**  114:17
238:24 239:19,21
304:25 305:4

**downstairs**  236:12

**downtown**  43:10
48:1,3 86:16

**dr**  6:14 156:24

**draft**  99:8

**drafting**  99:6

**drink**  167:4

**driven**  49:6

**driving**  140:11

**drop**  23:21 55:12
66:19

**dropped**  67:1
292:21

**dru**  69:3

**drug**  3:9 15:18
19:4,14 21:1,4
26:9,20 32:11
35:18,23 36:2,9
36:13 37:21 38:19
38:24 40:2,2,4,5
40:11,17 42:13
45:1 47:13 48:6
48:25 49:4,8,14
56:1 57:11 62:14
64:7 69:3,6,9,24
70:3,22 71:2 75:1
78:3,17 81:24
82:4 83:16 86:3
88:22 104:4
109:17 110:1,24
114:2,2,2 115:8,10
115:18,20 119:4
122:13 125:18
134:19,24 140:10
140:10 142:18,23
147:6 148:10
163:2 165:11
194:8 213:15,23
218:1 221:11,16
221:19,19 223:9
224:11 225:4
227:10 229:5,24
234:6 251:8,17
252:3 253:1,9,21
270:18 274:18
299:1,10,20 301:8
309:6,17,23 311:9

311:10 316:15
319:11 333:17
345:17 346:9
347:12 356:9,14
356:19

**drugs**  6:21 19:16
19:22 20:1,9,21
25:19 31:17 32:17
32:23 34:18,21
35:4,9,12,22 36:21
39:7,8,10,20 47:4
47:9 48:15,20
49:18 50:1,2
56:12,21 57:25
58:5 75:8,14,18
80:10 81:1 94:18
101:18,21,24
102:8,13 106:8
108:7,19 109:4
110:10 111:10
112:7,14 113:5,19
114:13 124:12,16
125:1,12 129:3
134:25 135:18
140:8,9 147:19
148:2,14,23 149:2
149:9 158:9,13
161:1,8,13 162:22
165:22 166:6
168:24 170:16
194:8 216:10,13
216:21 217:1,6
219:1 220:2,12,21
221:1,8 224:4
225:13 227:2
232:25 235:8,13
235:20,25 236:4
244:2,9 247:20
248:3,13 256:21
257:4 260:6
269:15 289:20

294:24 346:6,25
347:3 350:3

**due**  38:18 82:12
82:25 100:17
104:18 143:13
176:23 198:1
209:17 277:5
279:3

**duly**  16:18 359:7
359:10

**duplication**
308:17

**duties**  34:1 46:1
82:15 84:14 85:2
122:9 180:22
232:19

**duty**  53:23

**dying**  58:23

**e**

**e**  6:11,14,20 7:1,3
7:5,8,10,12 8:1,4,4
8:6 24:8 44:22
62:8 87:19,20
150:21 151:6,10
151:12,12,20,25
154:6,7,11 155:11
156:23 157:8
158:6,23,24 159:1
159:3 170:14
171:3,6,8,10,12,13
172:8 178:9,16,21
179:16 180:16,16
180:18,24 181:5,8
181:20,24,25
183:3,7 184:3
185:18 186:3
188:18,24 189:1,3
189:22 194:23
195:5,16,19 196:1
196:2,5,14 197:6,7
197:12,14 198:19

[e - epidemic]

199:2,14,22 200:3
200:16,24 201:9
204:13 208:22
209:7,9,11,12,13
210:19 211:15,21
214:17,17 215:4,6
218:11,16,18,19
218:22 224:14
228:7,13,15,18
229:14,15,23,25
230:8 232:2
280:25 281:10,13
281:14,21,22
282:4,22 284:7,8
284:16 285:8,15
285:16,23,24
292:1,10,14
299:11 300:2,5,6
300:10,12,15,20
300:23 301:3,12
301:17 302:7
320:10,14,21
321:2,5,12,15,18
eagle  349:15
earlier  25:7 44:16
48:12 50:11,25
52:10 72:9 145:20
224:25 237:6,25
255:16 278:1
288:4,7 293:13
299:4 302:2
308:18 310:7
312:13 313:7,7,20
322:4 334:21
341:22 348:9
350:15 354:4
earliest  300:12
early  59:18 75:22
easily  305:5
east  17:4 38:12

eastern  1:3 15:8
education  28:17
educational
265:12
effect  190:7
effectively  251:13
efficiently  87:2
effort  113:18
114:10 176:3
227:20,23 257:21
efforts  77:21
114:12 169:8
174:22 227:10
eight  34:23 37:8
101:6 125:8,10,16
240:14
eighth  2:17
either  20:13 62:13
70:16 128:21
148:8 159:11
168:12 218:8
360:2
electronic  44:12
44:25 301:7
electronically
43:16,25 44:3,18
44:20 63:2,17
65:8 222:19,24
eligible  213:1
eliminated  279:5
email  361:17
emergency  285:6
303:21
empaneled  100:8
employed  29:14
150:4 264:18
employee  143:6,7
355:24 356:21
employees  149:8
277:7,8,9 290:19

employment  17:17
29:17,25 33:8
59:25 65:16 83:19
150:8
employs  149:23
enact  346:1,16
enacted  346:17
enclosed  361:11
encompassing
45:11
encounter  22:4,13
23:1 24:5,18 35:9
35:22 42:14 45:2
52:23 53:6,18
54:7 57:2 142:3
encountered  61:1
111:11 147:17
148:1 235:12,16
encountering
35:13 59:23 76:17
148:21
encounters  19:16
25:17 31:16,20
32:22 34:18,20,22
36:12,20 39:21
47:3,13 49:5,14,20
50:1 61:6,12 75:7
75:13,19 76:22
77:14,23 78:22
endeavor  326:19
ended  333:7
endo  3:3,3 16:3
308:10 327:9
ends  100:13
enforce  317:5
enforcement
19:15 22:4,13
23:1 24:4,18
25:16 29:7,23
32:21 35:22 36:11
36:19 39:21 42:13

45:2 47:3 48:14
48:20 49:5,19,25
52:7,12,23 53:6,18
61:2,5,11 63:15
75:2,7,13,19 76:22
77:14,23 78:22
88:22 288:11
303:21 343:16,21
344:9 345:5
enforcing  164:25
engaged  320:1
ensure  165:10
168:8 277:9
entail  34:10
160:11 244:13
255:9 273:23
319:12
enter  246:10
282:25 309:4
310:22
entered  64:17
363:9
entire  28:15 42:10
46:25 66:24 96:20
169:20 362:5
363:5
entities  215:13,16
216:1 336:6
entries  54:13
140:4
entry  140:7 246:7
envelope  235:16
environment
38:15 227:6,7
279:3
epidemic  237:7
238:15 259:20
277:23 298:10
304:15 306:2,13
306:15,22 307:3
320:19 324:9,20

epidemiology
354:11
equipment 63:14
87:12,16 111:17
115:1 226:13
238:5 240:1 305:1
eric 151:13
errata 361:13,18
363:7,10,18 364:1
esq 2:4,5,11,16 3:5
3:11,16,22 4:4,11
essay 42:9
estimate 48:13
69:7 203:15
et 1:10,12,13,13
117:17 303:21
evening 308:3,5
event 52:6,8,13
54:1 63:25 135:24
360:3
events 24:6 48:6
49:8 76:8 97:9
114:2
eventually 258:4
everybody 251:21
325:18 357:14
evidence 40:23
42:22 43:13 56:19
234:20
evolving 239:17
exact 38:21 62:21
65:5 69:4 75:9
81:10 82:14 83:5
105:16 112:18
125:6 128:6
129:22 134:15
135:23 144:6
145:23 202:9,18
271:5 277:16
exactly 20:11
40:22 43:3 55:25

57:19 60:18 62:24
70:7,21 81:9 91:6
115:25 196:7
222:16 229:22
286:7 291:8
310:25 319:11
341:16
examination 5:7
16:17,21 167:23
237:2 308:1
336:25
examine 68:6
examines 305:10
example 242:3
251:2 303:20
exception 28:7
excessive 252:10
exchange 285:8
exclusively 322:14
excuse 89:16
121:10 263:7
executed 363:10
execution 362:14
363:19
executive 51:11
100:14
exercise 307:9
exhibit 5:16 6:3,6
6:9,11,14,16,20
7:1,3,5,8,10,12,14
7:17,19,22 8:1,4,6
8:8,11 98:10,13,22
101:11,19,25
102:6 105:8 116:6
116:11,19,25
117:1 119:18
123:10,15,23
131:3 139:5,8,15
139:17 140:24
141:19 142:16
145:19 150:18,20

151:3 154:24
155:7 156:19,22
157:5 163:24
164:4,13,19,25
165:11,21 166:10
168:5 169:6
170:11,13,22
178:8,14 188:17
188:24 193:15
194:22 195:4,12
195:15,23 196:9
196:14 197:2,3,5
208:21 209:5
214:11 216:7
218:10,16,18,19
219:21 224:9
228:6,13 231:19
261:10,13,20
263:17 264:3,6,13
267:16,19 268:1
269:6 270:10
273:16 275:15
276:2,5,12,25
277:13,19 278:11
278:17 279:20
280:21,24 281:7
281:13 284:3,6,13
285:2 291:22,25
292:7 293:15,18
293:25 294:15,19
302:24 303:5
304:5,7 305:21
310:8,8 334:15,20
exhibits 5:5,17 6:1
exist 222:23,24
332:23
existed 333:3
existence 336:1
exists 180:4 221:7
expect 234:13

expended 250:10
expending 186:25
188:9
expenditure
275:17,23
expenditures
295:10
expenses 304:13
304:18 305:21
306:1,14 307:2
exper 354:11
experience 25:16
59:23 68:24
103:18 145:12
147:16,24 244:14
252:22 282:9
experienced 129:1
129:24 146:25
147:4 158:19
experiencing
127:20 128:1,11
129:4 149:10
expert 72:24
109:19 353:24
354:7 355:10,13
expertise 121:22
144:16 153:21
190:22 228:2
354:11,14,19,22
355:1,7
expiration 362:19
363:25 364:25
expires 360:17
explain 63:8
expressed 200:15
200:22
expressing 198:19
199:14
ext 3:24
extent 90:25
289:18 338:1

**extra** 188:9

**f**

**f** 4:9
**f5** 140:8,9 142:19
**face** 207:24
**facilitating** 160:7
**facilities** 90:9 94:1
  96:3 109:5 110:17
  110:19 111:1,12
  114:5,14 117:23
  119:6 125:5,24
  128:2 131:12,17
  146:2,25 149:17
  150:10,14 153:6
  153:17 156:8,16
  158:21 161:14
  165:12 167:9
  183:24 189:13
  245:10 259:8
  260:16 263:12
  265:23 266:5
  267:12 280:17
  284:18 286:1,22
  291:6,18 292:20
  293:1 301:9
**facility** 61:25
  68:10,17 72:19
  81:16 82:6 87:6
  90:17,22,23 95:11
  103:1 110:14
  112:7,14 113:6,21
  114:11 126:22
  127:11 128:13
  129:11,18 131:22
  131:23,25 132:23
  132:24 133:1,5
  136:8,11 137:6,9
  137:12,16,19
  138:3,9,24 139:20
  141:12 143:9,10
  143:13 148:11,19

  155:17,21 156:2
  161:5 162:20,23
  163:1 166:5
  168:10,14,18
  171:14,25 172:11
  189:6,15,24 205:2
  223:16 227:17
  235:2 237:17
  244:4 256:8 257:1
  259:5,25 265:7
  284:19 285:5
  286:13,15 293:4,7
  327:7 330:1 332:1
  335:10
**fact** 33:12 59:5
  60:24 81:22
  109:20 110:21
  134:12 145:17
  146:10 152:13
  189:23 214:2
  313:8
**factors** 233:17,24
  249:12
**factual** 297:8
**fair** 193:12 289:10
  311:2,5 317:16,22
  349:12 352:4
  353:4,12
**fall** 29:1 94:18
  101:24 156:10
  232:8 282:17
  311:8
**falls** 1:22 101:18
  141:15
**familiar** 98:21,23
  100:25 123:22
  132:19 139:14
  141:18 151:2
  157:4 164:12
  171:21 172:5
  174:20 179:19,21

  180:2 190:17
  191:16 261:19
  264:12 267:25
  276:11 277:12,14
  281:6 283:3
  284:12 287:12
  292:6,8 293:24
  296:22 303:13
  317:9 327:8,11,14
  327:16,18,20,22
  327:24 328:2,4,7
  328:10 329:5,7,9
  329:10 331:4,18
  332:8,19,22 333:2
  333:5
**familiarity** 294:17
  295:13,24 350:12
**family** 77:7 289:24
**far** 27:1 119:19,21
  170:8 184:13,14
  226:9 267:14
  286:19
**farm** 45:6
**fast** 338:7
**father** 61:20
**fax** 48:2,2
**fbi** 134:15
**fda** 318:4
**fed** 31:6
**federal** 16:17
**feel** 247:12,13
  248:8 315:21
**fellow** 344:16
**felony** 67:7 70:5
  70:23 134:18
**felt** 153:11
**female** 114:19
  217:21 278:5
**females** 217:12
**fentanyl** 58:14,19
  58:20 59:2,23

  60:9,17,24 61:1,6
  61:12,25 62:4,19
  64:2,3,7,14 101:23
  228:23 235:22
  236:1 330:25
**fewer** 48:19
**field** 40:25 55:9,20
  56:8 57:15,15
  58:8,9 239:16
**fifteen** 17:12
**fifth** 124:7
**fights** 31:6
**figure** 106:24
**file** 41:19 44:23
  54:21 64:16 65:1
  65:7,9,13 97:14
  234:21,22
**filed** 41:18
**files** 65:13 108:3
  274:8,11 301:15
  301:25
**fill** 24:6,14
**filled** 24:12 337:13
  339:24 340:4
  352:23
**filling** 339:7
**final** 136:24
  180:17
**finally** 226:17
**finances** 271:10
**financial** 100:17
  104:19,21 275:22
**find** 39:23 40:7
  43:3 69:18 70:12
  108:23 113:23
  115:25 130:3
  171:15 193:15
  222:2,15 223:4
  234:24,25 235:1
  282:15 317:4
  361:11

**[finding - form]**

**finding** 58:24
244:3
**findings** 78:18
315:13
**finds** 299:5
**fine** 130:18 219:20
346:23
**fines** 329:18,21
330:8
**fingers** 55:18
**finish** 27:6 72:14
**finished** 210:2
**fire** 303:21
**firm** 308:9
**first** 8:12 16:18
17:14 26:9 30:12
41:5 50:4,8 52:6
59:2 133:9 135:16
140:4,7 142:17
145:12 154:6
158:5,10 168:7,7,8
171:7,10,11 179:3
179:5,15 184:3
185:19 197:7,8
209:11 210:7,17
220:1 223:22
224:21 226:7,16
228:18 230:1
239:11 257:2
258:6 265:22
269:7 291:5 293:9
295:15 296:22
300:22 303:1,7
331:8 334:18
347:7,8 352:16,22
359:10
**fiscal** 86:15 264:1
307:5,6
**five** 34:24 58:13
75:11 82:23 83:7
112:20 196:16

199:5 241:22
253:13 277:7
289:17 302:13,13
302:16 304:24
321:16,20 330:2
**flahive** 2:11 16:7
**flat** 295:19
**flight** 28:19 29:20
**floor** 86:16
**focus** 119:24
312:15 322:13
326:17
**focused** 240:16
289:19
**followed** 165:4,9
165:12
**following** 24:4
25:2 29:13,23
159:8 304:4
**follows** 16:20
**followup** 232:3
**food** 84:25
**forbidden** 189:12
**force** 6:7 51:12
96:9 99:14 123:12
123:17 126:14
127:17,17 128:23
**forces** 304:14
**foregoing** 359:16
359:21 362:13
363:18
**foremost** 227:5
**forge** 145:9
**form** 22:14 38:20
39:12 41:24 45:3
47:5 48:7 49:9
51:5 59:4 61:7
63:4 64:8,23
68:19 69:11 70:13
71:18 72:1,23
76:10,24 77:25

78:14 81:4,25
82:7 83:3,17
87:16 91:4,13
92:12 94:19 95:1
95:23 96:5 98:4
101:13 102:1,9
103:5 104:5,15
105:2,9,14,20
106:2 108:8,20
109:6,18 110:2,11
110:20 112:8,16
113:14 114:6
116:20 117:2
119:7,12 120:22
121:16 122:14
125:14,19 128:3
129:12,19,25
133:16 134:5,21
135:12,19 136:3
137:21 138:10,19
138:20 139:1
141:24 142:7
144:14 145:3,21
146:8 147:7,13,20
149:25 152:24
153:18 154:2,19
155:1 156:3
157:16,23 159:15
161:6,21 162:7,14
163:21 167:11
169:11,13,23
173:5,14,25 175:7
175:18,25 177:1
177:12 178:5
180:9 181:2,22
186:2 187:3,21
188:4,14 189:18
190:13 191:4
192:10 194:9
196:25 198:24
199:18 200:4

201:11,23 203:6
204:11 205:7,23
206:6,10 208:3
211:12 212:1,12
213:7,18 214:1,22
215:5,11,19
221:12 222:21
224:6 226:5
227:13,25 230:16
231:14 232:14,20
236:18 239:7
240:6 241:7,13
242:8,15 243:9,22
247:21 248:18
249:22 250:15
253:3 254:7
256:22 257:17
259:9,22 261:3
263:21 267:13
269:16 275:20,25
277:25 278:12,21
279:11 280:12
282:20 283:14,25
288:1,12 290:7
291:19 293:12
294:25 295:20
296:24 298:1,12
299:13 300:7
301:10 304:20
306:3,16,23 307:4
307:10,16 309:19
310:3,24 311:12
311:25 312:23
313:4 314:8
315:18 317:1,14
317:20 318:6,11
318:17,24 319:7
322:19 323:4,5,22
325:3 328:5,8,11
329:2,16 334:3,5
334:11 335:1,18

336:14 338:11,25
339:12 341:4
347:18,21 349:8
349:17 350:4,23
351:15,24 353:8
355:20 356:16
**format** 42:9 44:13
63:19,22
**former** 143:6
180:13 292:10
**forming** 106:11
**forms** 106:17
301:6
**forth** 164:19,25
165:11,20 166:10
279:19 294:14,18
297:8 310:9
**forum** 120:1
**forward** 361:15
**forwarded** 158:25
**found** 59:17 60:13
60:13,19 61:20
62:11 70:8 113:20
126:3 222:17
223:5 225:10
**foundation** 356:17
**founded** 270:21
**four** 45:24 58:13
224:24 226:4
251:12 255:18,21
258:14 272:13
302:18 343:2
**fourth** 86:16
119:23 254:15
255:6 304:10
**frame** 47:9 52:15
76:15 80:4 82:14
103:11 104:2
105:16 222:14
347:5 349:1

**frank** 210:18
**free** 362:14 363:20
**frequently** 201:16
203:4
**friday** 209:18
210:1
**front** 1:21 127:5
155:9 248:8 313:6
**fto** 239:16
**full** 16:25 29:11
133:13 198:8,10
204:15,19 205:22
206:5 277:8
**fund** 86:8 144:9
250:10 275:24
**funded** 266:5
270:17 275:16
**funding** 100:18
116:8,10,14,16,18
241:17 242:6,6,13
243:19 258:12
268:12,14 271:2
274:17,21 278:18
278:20 287:10,12
**funds** 86:6 242:18
242:20,22 243:2,4
243:5 287:15
**further** 26:22
198:4,9 210:6
219:13 229:1,13
282:22 307:23
357:10 359:19
360:1

|   g   |
|-------|

**g** 4:11
**gain** 310:1
**gary** 62:9
**gates** 228:16,20
229:2
**gateway** 63:16

**gather** 234:20
**gathering** 231:7
**geauga** 143:19,22
143:23,24 144:5,9
144:13,19,21
145:1,9
**general** 17:20
18:13 166:21
183:16 191:21
198:1 204:21
226:12 232:24
248:6,10 255:18
**generalized** 41:13
**generally** 43:7
44:19 46:6 47:17
51:15 66:4 184:23
187:8 198:18
212:9,15 246:6
**generate** 266:25
**generated** 42:4
62:12 70:16
109:12 113:9,10
140:18,19 222:5
266:23
**geographic** 46:15
46:16
**getting** 21:16
25:10 50:12 51:18
55:17 58:15,22,23
59:20 93:18 128:8
180:15 226:20
240:23 244:4,18
287:1 325:24
351:18
**giant** 349:15
**give** 107:11 128:5
147:2 185:2
196:15 199:4
255:10 266:23
282:15 350:9
357:2 358:1,10

**given** 222:14
223:20,25 232:16
236:6,8,9,10,14
240:1 277:21
320:2 326:10
338:6 359:13,18
**gives** 116:13 204:8
**giving** 24:23 50:17
**glance** 158:11
**glass** 55:15
**glenwood** 7:4
131:23 136:8,11
136:13,25 137:1,5
137:9,12,18 138:2
138:9,17,22,23
171:14 188:19
189:6,15,24 190:7
285:18 286:3,6,13
**gloves** 236:11
**go** 23:10,12 26:22
28:4 33:10,11,12
34:15 36:23 37:18
39:24 40:6,24
45:16 46:11,11
47:21 53:21 66:4
67:20,24 69:16
80:14,20 84:2
85:19,25 86:1
90:2 100:3 104:17
111:23 119:22
127:12,15 128:20
138:4,5 157:25
160:14 175:2
184:23 217:14
219:12 222:11
223:1,8 238:18
241:10 245:25
246:2,16,24
247:15,16 250:17
256:8,15 257:24
273:12 278:4

**[go - health]**

282:14 286:11,21
288:17,17 289:4
297:1 315:23
320:17 324:11,12
325:20 336:17
344:16 348:21,22
348:24
**goal** 188:8
**goals** 316:24 317:6
**goes** 65:4 115:5
119:21 209:24
219:4 300:14,18
305:10
**going** 26:1 31:7
32:4 37:19 46:13
48:1 49:16 58:12
62:11 67:9 68:13
68:14 72:10 73:6
76:14 85:2 107:9
108:13 111:19
116:6 118:4
119:20 122:4
124:19 126:18
127:4 128:18
132:19 134:9
146:19 167:18
168:1 169:5
177:20 184:10,13
185:20 196:10,15
199:4 200:17
201:3 208:13,17
210:17 219:19
223:3 233:14
236:22 240:11
241:2 242:24
243:16 254:21
270:7 302:12
305:7,17 308:7,14
312:10 320:4
321:9 324:7
326:15 330:4

336:20 357:4
**good** 16:23,24
121:19 208:12
237:4 242:3 308:3
308:3,5 330:6
337:2 344:19
**gotten** 225:13
255:6
**govern** 168:10
**government**
116:14 342:10
**governmental**
215:12,15 216:1
**governments**
351:1,4,14
**gown** 245:4
246:17
**gowns** 251:6
**graduated** 29:9
**grant** 274:20
275:16
**granted** 87:11,12
**green** 34:4,7 46:23
**greg** 88:15 285:9
**ground** 26:23
308:15
**group** 323:12,12
342:1,6
**groups** 262:23
263:5,11
**growing** 249:4
**guards** 223:13
**guess** 23:4 193:11
207:10 255:11
266:3 302:12
346:3
**guessing** 253:18
315:5
**guide** 247:5
**guy** 307:6

**guys** 21:18,20
23:21 63:9,23
233:12
**gym** 279:6
**gymnasium**
133:25

**h**

**habit** 81:13
**hair** 216:24
**half** 69:13 179:4
184:3 196:20,21
197:8 205:14
**halfway** 228:21
**hand** 256:10 360:6
**handicap** 183:24
**handing** 35:21
**handle** 35:19
67:14 68:13 85:1
89:9 206:20 210:2
238:3 306:9
**handled** 23:13
182:7 184:7
**handling** 74:22
163:19 175:13
180:23,25 181:13
182:5
**handwrite** 63:11
**handwriting** 44:8
44:9
**happen** 113:8
142:13 207:22
225:7
**happened** 42:7
71:8 112:19,20,23
112:25 118:19
125:7 215:1
216:12 225:8
237:19 240:13
246:9 253:12
322:22 323:2

**happening** 66:22
79:2,5 290:12
345:23
**happens** 62:25
142:15 221:7
238:4 247:10
**happy** 72:14 73:7
130:21
**hard** 44:25,25
65:8 222:25 244:5
301:14,20,24
**harder** 240:13
346:11
**harm** 337:18
338:10,24 339:11
**harming** 247:13
**hbc** 339:16
**hbv** 339:19
**head** 97:23 329:20
**health** 3:3,14 6:8
15:21 58:15 84:25
85:23,23 86:2,6,8
89:8,12,23,25 90:7
91:2,7,20,22 92:19
93:2,17 95:8,10,18
107:5 119:25
120:1,6,13,21,25
121:3,9,14,24
122:4,12,18,22
123:2,13,19
124:10,15,25
130:6 138:5,8,13
150:7 153:24,25
159:12 168:9,9,10
168:18 172:19
179:18,20,24
180:3 183:15
193:23 202:12,12
244:16 247:1
249:21 250:4
251:19,24 252:13

252:18 259:11,13
260:9,21,24
262:18,18,21
269:24 270:12,16
270:18,24 271:2
271:11,16,24
272:4,10,16
273:14,18,19
274:15 282:15
353:24 354:23
355:1
**healthcare** 150:6
157:11,15,22
158:6,24 159:23
160:5,9,19 161:19
**healthy** 73:5
**hear** 80:4 106:23
322:9 326:4
**heard** 83:6 191:25
252:5 275:8 329:8
331:6,8,20 345:16
351:22
**hearing** 78:3
152:2 257:23
**hello** 237:5
**help** 34:15 99:8
114:3 137:15
286:10,11
**helping** 305:3
**hepatitis** 209:21
**hereinafter** 16:19
**hereunto** 360:5
**heroin** 20:5 32:12
103:18 152:3
155:7,16 210:15
216:18,19 218:25
230:3,9,15,20
231:19 232:7
330:25
**hey** 325:23 344:15

**hidden** 220:13
**high** 3:17 120:2
143:5 198:1
**higher** 234:10
**highest** 28:16
**highly** 219:21
231:8
**hill** 218:23
**hire** 145:1
**hired** 30:2,4,8,12
133:9,11 238:21
**hiring** 6:7 123:13
123:18
**history** 25:12
83:23,24 132:21
**hoc** 232:10,18
**hold** 133:24
282:25 299:24
**holding** 130:19
133:24
**holiday** 207:2
**holland** 87:25 88:7
**holland's** 88:1
**home** 17:3 357:15
**homes** 25:13
**hopefully** 127:14
**hospital** 68:2,4
183:23 209:21
**hot** 26:7
**hotels** 345:19,22
346:3,7,9,12
347:13
**hour** 34:23 72:11
208:14 254:19
**hourly** 206:18
**hours** 180:21
302:18
**house** 34:12
143:10 144:12
172:10 173:17
197:25 199:6

228:21 284:18,19
286:24
**house's** 286:1
**housed** 132:9
135:6 136:22
137:18 138:2
173:12 197:17,20
204:23
**housing** 7:6 97:21
136:10 137:5
180:21 184:24
185:6 194:24
198:5,13,21,21
200:23 204:21
269:9
**huh** 27:2 45:13
326:4
**hundred** 181:24
**hurt** 248:9

**i**

**ibuprofen** 158:10
**idea** 120:8 121:19
254:3 344:19
**identification**
98:19 123:20
139:12 150:25
157:2 164:10
170:20 178:12
188:21 195:2
208:25 218:14
228:10 261:17
264:10 267:23
276:9 281:4
284:10 292:4
293:22 303:11
**identified** 55:23
98:10 105:7
116:19 119:18
120:7 139:5,15
156:19 244:12
250:19 254:16

255:5,7,18 262:13
264:3 265:3
267:17 276:3,25
277:13 280:21
287:4 293:16
294:6 339:22
**identify** 45:1
47:13 76:7 87:7
105:24 106:7
109:3 127:1 138:8
154:22 231:4
240:3 252:15
299:9,19 303:25
309:13 317:18,24
**identifying** 333:9
**identity** 231:9
**illegal** 147:18
148:2,14 149:2
**illegally** 148:22
**illicit** 347:16
**illicitly** 327:5
**immediate** 219:23
**impact** 110:25
**implement** 239:11
241:5,17 257:9,15
**implementation**
168:21 169:7
**implemented**
237:11,24 238:14
240:18 250:21
**implementing**
96:23 241:11
**implying** 220:23
**important** 334:8
335:13
**impose** 346:22
**imposed** 126:11
126:13
**imposition** 249:14
**improper** 176:22

improve  110:16
  114:3,8,9
improvement  87:1
improving  117:9
  117:13
inability  82:13
  83:1 350:21
  351:10
inappropriate
  67:17 330:12
  332:17
inappropriately
  68:16
incarcerated
  32:23 38:18 39:22
  230:11
incarceration
  140:1 168:13
  229:5 230:10
incidence  134:11
  312:4
incident  6:12
  18:18 24:11 26:2
  41:12 42:8 43:1
  45:8 54:9 60:25
  61:4,22 62:4,22
  63:19 64:2 76:14
  106:9 109:12
  113:11,13 115:24
  128:16 130:5
  140:11 150:22
  154:13 155:24
  176:21 195:9
  196:24 222:4
  232:3 284:17
  285:1,1,11,25
  286:3
incidents  106:22
  111:23 113:4
  148:13 203:16
  219:23 222:14

232:13 234:15
  235:5 301:8
include  41:22 64:2
  94:11,17 152:22
  248:1 269:11
  317:12,18,24
included  47:18
  113:13 223:16
  227:5 232:12
  292:13 294:23
  326:11 361:13
includes  152:19
  213:11 251:2
  277:7 281:14
  335:4
including  42:12
  81:2 102:7 135:7
  151:22 152:8
  171:17 176:24
  210:19 262:20
  279:5 304:12
incoming  164:17
  168:11
incorporated
  363:12
increase  75:12
  77:13,22 101:7
  119:24 120:6,14
  121:14,18 133:14
  133:22 135:17
  249:19 251:22
  256:24 257:3,5
  337:14
increased  100:18
  114:16 116:8,10
  121:7 133:2 134:1
  134:3,12,17,19,25
  135:25 217:8
  240:10 249:10,13
  303:20 304:11
  338:17

increases  314:18
increasingly
  100:19
incurred  211:4
  241:5 260:3
index  5:1,5 6:1 9:1
indicate  196:23
  279:8
indicates  179:5,6
  275:15
indicating  128:11
  163:1 280:1,8
  361:13
indication  116:23
  121:7,14
individual  68:15
  82:3 108:3 112:6
  112:13 132:14
  148:1,22 149:1
  219:15 262:22
  342:10 352:5
  353:5,13
individual's  193:7
  219:17
individuals  78:24
  125:23 126:7
  148:13 149:17
  151:21 183:6
  192:4
industry  324:21
inflammatory
  158:9
inform  336:11
informal  169:2
information  6:11
  39:23 40:10 42:12
  44:25 53:22 63:1
  70:12 82:18 83:13
  84:1 85:14,15
  86:19,24 107:24
  108:24 109:22

110:6 113:13
  116:2 125:22
  128:7,10 130:4,8
  148:21 150:22
  152:1 171:17
  218:24 219:5,14
  222:2 248:21
  250:5,6,17 251:23
  253:7,24 254:10
  266:12,24 270:22
  275:12 279:15,22
  282:13 294:14,18
  295:25 296:4
  301:8 307:13
  310:6 313:1,5
  320:3 322:14
  324:5 325:9,13
  326:1,2,7,10,20
  330:17,19 352:5,8
  352:9 353:3
informational
  171:17 290:14
informed  218:23
ingested  147:6
inhibits  147:3
initial  54:8,9
  316:19
injectable  274:22
injured  58:23
injury  17:24
  303:20,24,25
inmat  71:15
inmate  6:7 7:6
  32:2,22 39:10
  59:16 60:12,14
  66:19 67:1,13,19
  67:21,25 68:2,6
  69:2,21 70:10
  71:24 72:18,21
  79:21 80:7,25
  81:8,15,15,19,22

**[inmate - instituted]**

82:11,19,24 83:23
97:20 106:20
107:3,14,19 108:6
108:18 109:15,24
112:11 115:2,5,6
117:9,13 122:21
123:13,18 127:19
127:25 128:11,17
128:25 129:4,17
131:25 132:9
134:3,17 135:17
135:25 136:19,22
137:4 138:1,1,9
142:11 145:11
147:17 156:11
161:5 162:10,19
162:25 164:16
166:9,10,23 167:1
168:12 173:24
174:5 176:21
183:7 185:3,4,5,20
185:25 186:5
187:1,11,16
188:10 193:4
194:24 195:10,11
196:1,9 197:15,16
197:18,19 198:14
198:21,22 199:15
200:17,23 201:3
202:11 204:5,23
205:5,10 209:18
210:12 211:1,8,17
211:21,23,25
212:3,15,24
213:14,23 214:8,8
214:20 217:17,17
219:13 220:22
231:12,18 232:6
235:6 236:6,14
237:21 238:25
239:25 245:8

246:4,11,19 247:6
248:2 249:14
252:1,2,24 253:7
256:13 265:5,6,7
266:4 268:6,8,13
268:17,18,21
269:8,10 273:11
277:6 278:25
279:3,4 282:24
283:1 309:24
311:6,21 312:19
334:9,16
**inmate's**  129:10
193:4 194:17
200:2
**inmates**  8:2 31:4,5
31:16 32:10,16
38:11,18 39:21
59:16 66:16 69:8
71:5,14,15 79:15
80:12 82:17 83:14
90:14,20 91:7,12
92:1,11,18 93:2,5
93:12,22 94:13
108:13 109:4
110:10,19 111:4,4
111:8,18,25 119:5
119:11,17 120:21
121:4 122:3,11,13
123:8 124:19,20
125:3 129:24
132:4,6 133:24
135:10 136:10
137:18 138:13,17
138:24 141:12
143:1,12 144:9,12
144:22 146:17,24
147:22 149:9,24
150:4,9 152:3,17
159:14,20 161:1
162:6 165:21

166:4 169:12
173:4 177:5,24
178:4 182:25
183:14 184:16,19
184:22 185:2
192:9,15,19,22
193:22,23 194:4
197:25 198:5
204:22 213:1,5
216:9 217:21
218:24 219:6,25
220:3,11,17 227:7
230:14,20,24
238:3,8 244:12,18
245:10,22 247:19
247:25 248:12,16
249:1,14,19 250:2
250:11 251:13,15
255:20,23 256:7
256:15 259:4,7,14
259:16,19 260:5
260:16 262:19
263:1,11 265:9,14
265:18 266:7,17
267:11 268:11,24
269:23 271:25
272:19,22 273:10
273:21,25 274:7,9
274:19 275:9
277:11 278:3,5
279:10 280:2,9,15
281:1 282:2,6,18
283:4,9,13,19,24
286:21 287:2,4,11
287:17,24 290:21
299:20 305:1,7
308:20 309:3,9,14
309:15,21 311:8
312:9 333:6
350:16 351:5,10
351:11,19,23

352:2
**inordinate**  244:4
332:14
**input**  100:4 118:1
153:14,15 297:10
**inquired**  194:14
**inquiries**  299:8
**inquiry**  208:8
**inside**  31:21 38:11
102:5 111:5 115:3
128:21 149:22
183:13,25 184:10
185:3 216:23,23
216:24 237:20
244:4 252:14
331:25
**inspection**  171:16
**inspector**  87:25
88:1,7
**instance**  67:15
80:7,25 129:15
136:5 148:25
231:1 246:15
309:24 311:20
312:3,18 313:2
315:2,6,14 318:14
332:3 336:10
**instances**  19:13
61:15 71:4 72:17
72:20 112:5,13
113:19 126:24
127:2,19,25
142:25 143:11
160:24 177:7
203:2 215:24
230:19,23 253:20
313:13,17,24
314:6 333:14
**instituted**  265:22
283:7

| | | | |
|---|---|---|---|
| **instruct** 175:9 299:15 328:21 | **investigated** 62:14 234:16 | 233:21 260:14,19 263:5,24 283:17 | **issued** 119:1 300:22 |
| **instructed** 29:20 300:1 | **investigating** 77:13 78:12 232:6 | 286:23 287:14 290:10 291:9 | **issues** 58:16 72:22 86:3,3 87:14 89:9 |
| **instructions** 358:2 358:10 | 232:12 356:9 | 292:18,24 318:19 319:16,23 322:6 | 91:9 92:15 107:5 121:24 122:4,9,18 |
| **instrument** 140:10 | **investigation** 25:4 41:6,8,15 44:15,17 | 344:4 346:25 | 124:10,16,25 |
| **insurance** 212:23 | 54:1,10 62:24 | **involvement** 22:25 25:21 53:17,25 | 127:10,20 128:2 136:6 145:10 |
| **insys** 328:7 | 63:21 64:5,21 | 54:2 70:11 85:21 | 146:22 193:23,24 |
| **intake** 162:22 | 81:22 126:3 | 98:7 99:22 163:19 | 206:17 211:2,9,18 |
| **intention** 215:17 220:20 | 233:15,18,19,22 234:2,6,19 316:22 | 257:20 262:6 271:9 280:14 | 226:23 249:11 258:24 269:25 |
| **intentions** 181:5 181:11 | 316:24 317:4,12 317:17,23 318:15 | 289:12,18 297:3,7 | 270:7 289:19 344:24 345:15,22 |
| **interaction** 82:16 137:11 144:24 | 318:19,22 319:4 319:14,19 | **involves** 180:20 **involving** 22:4 | **issuing** 8:1 281:1 282:1 316:2 |
| 160:22 287:3 | **investigations** 26:4 56:16 78:19 | 23:1 26:4 34:18 35:22 48:20 50:1 | **it'd** 113:1 232:8 |
| **interactions** 136:1 | 222:5 234:17 | 52:8,13,25 53:6,18 | **italicized** 117:15 119:23 |
| **interest** 33:9 | 304:13 316:7,11 | 61:6,12 64:2 | **item** 226:10 |
| **interested** 50:14 50:14,21 360:3 | 316:17 317:7 333:21 356:15 | 75:14 76:8,22 77:15,23 78:22 | 294:22 295:6 320:15 |
| **interrogatories** 8:13 303:3,10 | **investigative** 40:6 45:10 63:23 | 106:8 113:4 134:25 135:10 | **items** 43:19 111:5 114:18 256:24 |
| **interrogatory** 303:18 | **investigators** 317:10 | 313:20 | 305:4 320:7,9 |
| **interview** 50:18,23 | **involve** 201:20 | **issue** 37:22 51:4 73:3 81:8,10 89:7 | **j** |
| 53:19 234:19 | **involved** 18:16 | 97:25 112:1 | **j** 1:25 359:6 360:14 |
| **interviewing** 316:18 | 19:18,18,22 20:21 25:5 26:12,14 | 122:12,22 126:4 126:14,14 128:12 | **ja** 237:20 |
| **introduced** 225:9 | 34:21 36:13,21 | 129:21 132:1 | **jackie** 178:22 |
| 225:14,19 226:17 239:2 308:6 | 39:20 42:13 44:1 45:1 47:4 48:15 | 135:15,25 145:16 163:8 177:20 | 179:13 281:11,23 |
| **introduction** 225:5 226:25 | 49:19 54:6,11 55:1 75:19 77:12 | 194:7,17 202:13 206:13,16 214:7 | **jackson** 3:10 15:17 |
| 227:12,24 326:23 | 78:5,21,24 81:12 | 226:24 249:8 | **jacksonkelly.com** 3:13 |
| **inventory** 94:24 95:17 172:10 | 99:6 115:9,19 126:2 144:17 | 250:4 253:5 258:22 259:2 | **jail** 6:3,6,12,17 |
| **invest** 318:18 | 153:3,7 164:18,20 | 270:3 272:1 | 31:2,12,13,21 32:22,24 38:3,6,9 |
| **investigate** 77:22 231:17,22 233:2,4 | 165:18 177:20 182:9 221:11,16 | 344:20,23 | 38:12,15,16 39:6 39:22 40:20 59:21 |
| 233:8 333:11,16 | | | |

60:3,5,10 61:16
62:5,19,20 63:12
66:3,4,7,11,17,24
67:7 68:5,11,24
71:9 72:18 73:5
73:22 79:14 80:3
81:9 82:15 84:24
85:8,10 87:2,4
88:3,5,18 89:8
90:24 96:10,12,20
96:25 97:2 98:2
98:14,25 99:1,15
100:19 102:22
104:24 107:6,8
108:14 110:23
111:6,7,17 112:4
114:18,20,23
115:6 118:2
120:15 121:23,25
122:7 123:2,11,16
124:11,22 126:1,8
126:20 127:1,21
128:2,13 129:11
129:18 131:16,22
131:23 132:5,7,10
132:13,22 133:1,5
133:15,19 134:16
135:4,6,7 136:13
136:25 137:1,5,18
138:2,18,22
139:19,22 141:12
143:19 144:21,21
146:18,20 149:22
150:23 152:2
162:11 164:6
166:9 169:10
171:14 173:2,13
173:15 174:14
177:9,10 178:2,23
179:25 180:7
184:16 185:21

186:1,6 187:2
189:17 190:3,17
190:24 191:3,18
192:2,8,14,18,20
192:24 196:16
198:23 199:6,16
200:2,18,21 201:4
201:17,22 202:4
203:13 204:4
205:25 206:3,8,15
206:22 207:8,14
207:16 208:1,2,9
210:2,8 212:16,21
213:15,17,22
216:10,10,17,20
216:22 217:2,7,15
217:18,18 218:1,2
220:2,20,21
221:10 222:7
223:10,11,19
224:3,11 225:1
227:2,11 228:22
229:3,6 230:15,21
230:25 231:13,22
232:9,22 233:1,12
233:23 235:7,8,10
235:13,21 236:4
237:20 238:9
240:4,21 241:23
244:15,17 247:1
249:21 251:4,20
255:23 262:4,17
262:19 270:15,24
272:21 274:20
276:19 277:11
278:4 280:5 283:1
286:3,6,17,19
288:18 290:11,13
292:12 294:10
295:11 298:15
299:1,2 304:13,18

305:6,14,18,20
306:1,10,13 307:2
307:19 308:20
310:10 320:12,17
321:7 324:12
327:3,5 340:17,20
340:23,25 341:8
**jail's** 224:15
**jails** 143:1 145:13
215:18 216:3
224:22
**james** 2:5 15:11
62:9 361:5
**janssen** 327:16
**january** 74:16
84:15 151:13
152:7 154:7
155:17,21 343:3
**jerome** 218:23
**jledlie** 2:8
**job** 22:8 32:3 66:6
90:6 93:20 111:24
112:3 122:6 160:7
232:12,19 238:22
354:3
**jobs** 29:15
**john** 7:10 218:11
218:19,22 220:11
**johns** 6:15 156:24
**jones** 4:3 16:1
209:13,14
**jonesday.com** 4:6
**journal** 123:11
193:17
**judge** 1:7 196:14
199:3,14 200:19
201:8
**judgment** 221:10
**july** 6:20 74:10
170:14 228:23
229:3,3 264:23

**jump** 27:7
**jurisdiction**
131:18 141:15
**jurisdiction's**
143:13
**jurisdictions**
143:2
**juror** 42:6
**justice** 120:1
**juvenile** 350:13

**k**

**k** 3:11 4:9
**kalapodis** 210:18
**katarina** 199:3
**kautenberger**
178:23 179:13
**kaye** 16:3
**keep** 73:4 113:24
114:10,13 123:7
174:14 182:16
227:16 259:4,4
274:8 301:14,19
301:21 344:9,10
348:3
**keeping** 174:18
184:4
**keeps** 108:2
268:22
**kelly** 3:10 15:17
**kent** 28:23,25 29:4
29:13
**kept** 41:19 43:11
44:22 54:21 63:1
132:22 163:18
173:18 245:20
274:5
**kid** 35:6
**killing** 247:13
**kills** 158:8
**kind** 23:19,20,24
23:24 26:6,8,12

29:21 32:4 37:18
45:10 47:8 67:6
90:1 100:2 110:24
130:19 137:15
155:20 169:2
175:23 202:16
203:3 213:24
227:16 234:9
236:11 239:23
248:10 295:15
298:3 305:16
321:8 325:24
326:15 341:18
344:22
**kinds** 175:14,15
175:22 187:19
322:10 341:18
**kit** 55:11,20 56:2
58:5,11 282:25
283:2
**kite** 80:13
**kits** 8:7 283:4
292:1,19,25
**kmorrison** 4:6
**knew** 48:1 51:14
57:19 60:18 61:20
159:5
**know** 20:12 26:7,9
26:13 28:3 34:22
35:25 36:4 37:19
37:22 38:21,22
39:3,6 40:24
42:25 44:5,12,16
47:7 51:7,12,15
52:18 53:12 54:17
54:19 55:5 57:16
58:2,25 59:10
60:22,23 61:14,19
61:23 62:11,16
65:11,11,11,22
66:18 69:4,5 70:1

71:9,20,22 72:3
77:20 78:4,18
80:1,2,6,16,20
81:7,9 82:3,14,16
83:5,6,20,25 84:8
84:11 90:11,11,13
91:8 92:3 94:9,21
98:7 102:3,4
103:7 105:4,11,16
105:22 107:13,18
108:5,5,10,11,15
108:17 110:5,8,22
112:5,12,18,19
113:1,24 114:8,9
114:10 115:2,11
115:18,22 116:2
116:17,22 117:4
119:9,14,19,21
122:16,20 125:6
125:11,17,22
126:4,16 127:6,9
127:23 128:6,24
129:3,6,7,14,22
130:2,9 134:2,14
134:18,23,24
135:3 137:23,25
138:12,14,21,22
138:23 139:3,21
142:2,14,15,19
144:6,25 145:5,7
145:23 146:11,24
147:3,5,9,15,23
148:3,24 149:3,4,5
149:7 150:15
151:15,17 152:10
152:11 154:12
156:5,9,14,17
161:7 164:22
166:1,4 170:1,6,8
171:24 173:7,8,16
173:16,18,20

174:2,3,6,17 175:1
175:20 176:2,10
176:14,19 178:1
179:14 180:1,4,5
181:4,17 182:8,11
190:6,11,14 192:7
192:7,22,25
194:11 195:13
197:3 199:10,11
199:20,21 200:6
200:10,19 201:13
202:17 203:7,24
204:2,10 205:13
208:5 211:14
212:25 213:9,12
213:20 214:24
215:1,21 216:4
221:14,15,18,21
224:17 226:9,19
228:3 231:16,23
231:25 232:22
235:22 236:20,24
237:17,19 238:18
239:20 240:22
241:9 243:6 247:2
247:23 248:11,15
248:23,25 249:6,7
249:16,24 250:1,7
250:8,8,16 252:6
252:20 253:4,11
253:18,19 254:2
254:11 257:18
258:8,20 259:23
260:7,10,22,23
261:4,6,9 262:10
263:4,23,25
265:24,25 266:3,4
266:7,14 267:14
268:14 269:17
271:5,6 273:25
274:4,8,9 275:9,12

275:14 278:13,19
280:7 282:10
283:15 286:10,20
287:21 291:8
293:14 298:2
299:18,22 301:23
305:4 306:25
307:6,18,20 312:1
312:2,4 314:2
315:12,25 317:11
317:15,17,21,23
318:1,7 319:11
320:2,6 321:5,6,13
321:19 322:6
323:8 324:8
325:14,17,18
328:24 329:19,21
330:3 333:17,18
333:19,20,24
334:1 335:13
336:7 339:19
345:12 347:4
348:4 349:22
352:4,11,14,20,21
352:25 353:5,10
353:12 356:18
**knowing** 112:11
**knowledge** 59:20
71:13 79:9,10
94:7 97:15,17
109:14,23 114:1
148:5 180:11
260:2 270:23
271:1 287:9
296:17 304:1
316:23 329:13,23
329:25 330:3,10
332:21 337:9,24
338:14 339:3,16
340:3,12,15,17,20
341:1,13,19,21

347:19,23 348:13
349:16 350:11
351:21 356:15
**known**  289:23
308:23 353:11,16
353:19,21
**knows**  186:17
297:20
**kristin**  4:4 15:25
337:3

**l**

**l.p.**  1:11,13
**lab**  58:9 229:4
**labeling**  24:3
**laboratories**  4:9
**lack**  54:3 283:16
**lady**  61:20
**laid**  104:22
**lakeside**  4:5
**large**  43:9 101:3
279:14 306:5,20
337:12,13 338:6
339:6,23 340:3
**larger**  36:10
**late**  154:13
**lately**  266:15
**latest**  171:6
**laundry**  268:7
**laura**  2:11 16:7
**law**  19:15 22:4,13
23:1 24:4,17
25:16 29:7,23
35:22 36:11,19
39:20 42:13 45:2
47:3 48:14,19
49:19,25 52:7,12
52:22 53:5,17,17
61:2,5,11 63:15
75:1,7,13,19 76:21
77:14,23 78:21
288:10 303:20

308:9 343:16,21
345:5
**law.com**  3:24
**lawful**  16:16
**laws**  317:5
**lawsuit**  296:23
297:5,9,13,19,25
337:21 338:16
339:5,17 347:24
348:7 349:3,7,16
**lawyers**  297:11
302:7 328:25
**layoff**  118:20
**layoffs**  104:25
105:1,6 118:20
278:10
**lead**  190:19
**leading**  102:24
**learn**  290:12
325:19 328:19
**learned**  324:5
325:22 328:20,25
**learning**  66:6
**leave**  65:20 115:6
256:8
**leaves**  217:18
**led**  81:11 97:25
126:20
**ledlie**  2:5 15:11,11
22:14 38:20 39:12
41:24 45:3 47:5
48:7 49:9 51:5
59:4 61:7 63:4
64:8,23 68:19
69:11 70:13 71:18
72:1,10,23 76:10
76:24 77:25 78:14
81:4,25 82:7 83:3
83:17 91:4,13
92:12 94:19 95:1
95:23 96:5 98:4

101:13 102:1,9
103:5 104:5,15
105:2,9,14,20
106:2 108:8,20
109:6,18 110:2,7
110:11,20 112:8
112:16 113:14
114:6 116:20
117:2 119:7,12
120:22 121:16
122:14 125:14,19
128:3 129:12,19
129:25 133:16
134:5,21 135:12
135:19 136:3
137:21 138:10,19
139:1 141:24
142:7 144:14
145:3,21 146:8
147:7,13,20
149:25 152:24
153:18 154:2,19
155:1 156:3
157:16,23 159:15
161:6,21 162:7,14
163:21 167:11
169:11,13,23
173:5,14,25 175:7
175:18,25 177:1
177:12 178:5
180:9 181:2,15,22
182:12,19 186:2
187:3,21 188:4,12
188:14 189:18
190:13 191:4
192:10 193:2,12
194:9,16 196:6,8
196:25 198:24
199:18 200:4
201:11,23 203:6
204:11 205:7,23

206:6,10 208:3,12
211:12 212:1,12
213:7,18 214:1,6
214:22 215:5,11
215:19 219:12,24
221:12 222:21
224:6 226:5
227:13,25 230:16
231:6,14 232:14
232:20 236:18
239:7 240:6 241:7
241:13 242:8,15
243:9,11,15,17,22
247:21 248:18
249:22 250:15
253:3 254:7,17
323:4,22 325:3
328:1,5,8,21
329:16,24 330:14
332:5 334:3,5,11
335:1,18 336:14
337:25 338:11,25
339:12 340:7
341:4 347:18,20
349:8,17 350:4,23
351:15,24 352:18
353:8 355:20
356:16 357:11
361:5
**left**  33:3 45:14
65:18 73:21 131:5
274:19
**legal**  265:10 361:1
364:1
**legislation**  343:9
346:2,16
**legitimacy**  334:13
**legitimate**  310:2
310:20 311:6,21
312:21 315:17
318:9,9 334:9

[legitimate - look]                                                                              Page 33

350:22
legitimately
  318:16 319:5
length  135:4
lengthy  233:15,19
lessen  214:20
letter  59:13 60:14
  60:20 361:19
letters  62:1
letting  154:12
level  23:5 28:16
  41:22 51:10
  116:13,16 120:15
  136:13,16 207:3
  237:13 277:6
  287:2
levels  124:22
  198:9 204:3 205:1
  207:5,7 233:11
  272:20
levied  329:19,21
  329:22
levy  271:8
lewis  4:11 16:13
leyimu  2:4 15:14
  15:14 256:22
  257:17 259:9,22
  261:3 263:21
  267:13 269:16
  275:20,25 277:25
  278:12,21 279:11
  280:12 282:20
  283:14,25 288:1
  288:12 290:7
  291:19 293:11
  294:25 295:20
  296:24 298:1,12
  299:13 300:7
  301:10 304:20
  306:3,16,23 307:4
  307:10,16 309:19

310:3,24 311:12
311:25 312:23
313:4 314:8
315:18 317:1,14
317:20 318:6,11
318:17,24 319:7
322:19 323:5
328:11 329:2
lflahivewu  2:14
liability  180:23,25
  181:13 182:5
library  279:6
license  6:21 95:21
  96:3 170:17
  171:13,21,24
lieutenant  21:9,20
  22:18 23:3 24:7
  37:21 44:8 45:23
  50:7 51:9,19
  53:23 65:23,25
  66:23 70:2 71:9
  74:1,5,12,14,18
  75:23 77:4 103:12
  103:14,16,22
  154:15 233:24
  234:4 249:9 262:4
  264:19 284:16
  305:15
lieutenants  25:22
  74:19 165:13
life  28:15 240:21
  245:8
likes  236:11
lily  4:11 16:12
lily.becker  4:13
limited  100:17
  101:11 104:18,21
  279:6 304:12
line  24:22,22 26:9
  89:6 128:8 179:16
  228:15 288:22

294:22 295:6
361:13 363:7
364:3
lines  47:21
lineup  208:6,10
  250:25
link  265:6
linkage  274:18
lisa  209:13,14
list  42:20 64:10
  70:4 87:4 189:20
listed  40:21 42:24
  141:19 330:11
  339:25 344:1
  363:7,17
listened  273:24
listening  23:12
listing  363:7
litigation  1:5 15:6
  174:24 176:6
  296:17 298:17,24
  299:24 301:25
  303:23 308:11
  328:3 330:22
  361:6 362:3 363:3
litigations  17:21
little  23:22,22
  26:23 29:21 30:21
  34:5 40:15 72:11
  168:1 262:9 267:8
  279:21 288:21
  320:24 356:25
lived  28:14 106:15
living  341:14
llc  2:4 3:21 4:8
llp  2:11,16 3:15
  4:11
local  116:13,15
  345:14,14 350:25
  351:4,14

located  38:2
  197:21
location  6:9
  139:10 346:21
lock  179:9
locked  184:4,7,10
lockup  273:10
log  24:9 113:24
  127:15 139:18
  140:22 246:2,8,8,8
  246:10,12 299:4
logs  127:13 155:23
  222:3 245:19,19
lonergan  3:5 5:11
  16:2,2 308:2,8
  330:4 336:17
long  17:13 45:20
  74:13 92:4,4
  107:5 139:25
  184:12 230:2,3
  257:19 272:11
  289:15 291:8
  302:15 308:8
  324:1 331:7
  342:20 356:20
longer  38:10 80:9
  116:13 300:21
  306:8 351:5
look  39:19,23 41:1
  47:12,14 55:13
  66:20 68:6 70:2,7
  71:23 76:7,13
  81:17 82:2 83:25
  94:25 97:5 107:24
  107:25 108:24
  109:8 115:23
  117:6,12 122:25
  130:3 138:14
  154:5,22 155:22
  155:23 197:6
  208:5 209:4

210:20 217:23
222:1 226:12
228:18 239:12
245:25 246:2
270:11 276:24
278:23 281:12
285:14 288:20
303:16 304:8
310:13 325:24
326:15 348:21
349:5
**looked**  96:19
106:10,14 134:14
137:24 145:20
215:7 266:15
295:16
**looking**  26:10 42:8
42:9 56:7,10 78:4
78:7,9 106:5,25
117:8 120:15
131:3 171:10
178:14 179:15
185:18 188:23
193:18 195:4
197:5 204:13
209:11 221:13
222:8 224:9
229:25 240:22
263:17 273:16,17
**lookout**  335:16
**looks**  99:16 199:1
229:23 233:14
266:10 285:3
**lorain**  139:19,22
**losing**  124:12
**lot**  29:21 35:1,1,2
35:3,3 38:22 40:1
69:5 73:4 80:2,5
81:11 89:10
103:22,22 107:7
108:10,11 134:7

137:13 142:15
144:23 145:10
147:23 187:9
207:3 216:16,16
227:20 233:20
234:3 238:1,9
244:18 247:10
260:12 263:8
272:18 278:3
289:8,22 298:18
298:20 305:23
306:25 307:19
308:13 312:13
314:18 322:11
330:22 345:5
**low**  272:21 316:13
**lower**  133:6
136:13,15,16,18
**lunch**  167:15
**luncheon**  167:20

## m

**m**  2:16 3:22
**m1**  140:12
**m2**  140:10,11
**ma'am**  117:11
124:14
**macedonia**  17:5
342:18 343:12,14
343:17,22 344:5
344:25 345:6,16
345:17 347:13
348:1
**machine**  256:3
**machines**  226:22
**macko**  88:16,16
285:9
**madam**  361:10
**mail**  6:11,14,20
7:1,3,5,8,10,12 8:1
8:4,4,6 24:8 44:22
59:15,17 61:16

62:8 87:19,20
150:21 151:6,10
151:12,12,20,25
154:6,7,11 155:11
156:23 157:8
158:6,23,24 159:1
159:3 170:14
171:3,6,8,10,13
172:8 178:9,16,21
179:16 180:16,16
180:18,24 181:5,8
181:20 183:3,7
184:3 185:18
186:3 188:18,24
189:1,3,22 194:23
195:5 196:1,2,5,14
197:6,7,12,14
198:19 199:2,14
199:22 200:3,16
200:24 201:9
204:13 208:22
209:7,9,11,12,13
211:15,21 214:17
214:17 215:4,6
218:11,16,18,19
218:22 224:14
228:7,13,15,18
229:14,15,23,25
230:8 232:2
235:14,21,24
236:5,8,9,12,14,16
240:2 280:25
281:10,13,14,21
281:22 282:4,22
284:7,8,16 285:8
285:15,16,23,24
292:1,10,14
299:11 300:6,12
300:15,23 301:3
301:12,17

**mails**  171:12
181:24,25 195:16
195:19 210:19
300:2,5,10,20
302:7 320:10,14
320:21 321:2,5,12
321:15,18
**main**  3:11 45:8
112:3 131:22
137:18 138:18
**maintain**  32:1,1
72:3 94:1 95:10
96:2 110:23
126:21 173:3,7
191:21 203:12
204:4 245:17
275:18
**maintained**  40:14
44:17,20 65:1,7
94:17,24 95:17,21
172:14
**maintaining**  95:21
114:4 160:4 291:2
**maintains**  173:8
**maintenance**  94:4
**major**  88:11,12,14
88:17 144:22
151:7 158:25
159:7,11 185:18
199:13 200:3,15
200:22 201:8
204:13 292:10
**majority**  38:23
49:22
**making**  31:5 122:8
201:8 204:9 272:3
316:1 346:8
**manage**  160:25
245:11 259:3
**management**
223:2 283:1 354:8

**manager**  47:25
66:11 68:25 73:23
**managing**  134:16
144:17 271:10
**manifested**  107:14
107:19
**manning**  271:10
**manpower**  137:14
180:20 205:1
234:2
**manually**  222:20
**manufactured**
258:2
**manufacturer**
317:18 328:18
**manufacturers**
296:20 319:15,20
319:25 321:4
322:16,18 324:17
326:3,21 329:15
342:2,11
**mar**  172:12
**march**  8:4 65:15
209:18 284:7
285:16
**marching**  73:20
**marijuana**  20:2
32:7 35:6,11
39:14 40:8 49:23
75:24 210:15
216:14
**mark**  98:9 123:10
139:4 150:18
156:18 163:24
261:10 264:2
267:16 276:2
280:20 284:3
291:22 293:15
**marked**  6:2 98:18
123:19 139:11
150:24 157:1

164:9 170:11,19
178:11 188:20,23
193:15 195:1
208:24 209:5
218:13 228:9,12
261:16 264:9
267:22 276:8
281:3 284:9 292:3
293:21 295:8
303:10 310:8
**market**  4:12
284:21,22 285:4
321:4 322:25
323:3 324:17
**marketed**  326:3
**marketing**  296:20
319:14,25 322:16
322:18 326:18,21
**marshal's**  209:19
**mat**  7:1 178:9
192:19
**material**  245:6
**materials**  279:19
**matter**  15:5 17:20
282:1
**matters**  17:16
19:3
**mayor**  343:10
**mccutchen**  269:5
269:19
**mckesson**  2:10
16:6,8 329:7,8
**md**  1:6
**mdl**  1:5
**mean**  20:17 23:10
32:24 35:14 39:1
43:17 45:6 68:11
77:6 113:16
115:15 130:16
136:15 184:13
190:12 216:14

219:10 220:5
223:20 225:16
237:13 252:7
267:1,2 274:1
275:17 285:18
314:9,11,14 322:2
327:1,4 332:12,13
340:16,21,22
341:15 346:12
350:6
**meaning**  124:8
172:20 309:14
**means**  23:4 142:21
190:14 199:11
265:9 275:21
349:23
**meant**  229:23
255:12 273:10
351:5
**measures**  241:18
250:20
**mechanism**  271:2
**med**  95:5 111:21
216:16 328:17
**medi**  176:22
**media**  50:13 51:15
51:23 313:22
314:10
**medicaid**  213:2,4
213:6
**medical**  59:14
67:10,16,22 72:24
83:23 84:3,25
93:2,3,6,8,12,21
95:4,5,9,10,14
102:4 107:12
108:1,1 109:19
111:21 112:1,1
121:8,9 130:5
138:4,7,12 152:13
152:20 153:11,24

153:25 157:9
158:3 159:19,21
159:22 160:12
162:16 163:8
164:16 165:15
170:4 176:20
177:13,21 179:7
182:24 183:8,12
183:18,20 184:16
187:10 192:19
193:8 194:10
197:21 198:6,6,14
198:15 203:22
204:16 205:4,5,11
205:22 206:5
210:1,3 211:2,4,9
211:10,18,19,24
212:6,10,16,17,21
212:24 213:5,10
213:23 214:7
244:16 251:18,23
252:14,19 260:9
291:4,15 292:11
292:15 293:3
305:9 318:9
334:13 335:10,10
335:13,22,25
336:11 354:5
**medically**  68:12
166:13
**medication**  163:5
163:13,14 166:20
167:2,3,6 168:14
172:12 173:3,22
173:23 174:4,8,23
175:4 176:22
184:15,18,21,25
185:2,4,8 191:20
192:3 194:3
274:22 314:23

medications 52:5
94:13,14,22,24
101:4,12 153:2
162:18 163:20
164:17 168:11
174:13,16 180:23
181:1,14 182:5
185:9,11 189:21
191:22 310:11
314:20 320:5
medicine 179:9
meet 85:11 93:13
93:16 273:11
287:2 302:10,15
meeting 85:25
96:17 118:11
269:24 270:4
322:3,8,9 323:3,13
323:21 336:8
meetings 85:3,12
86:2 100:4 108:13
119:15 269:18
270:1 283:21
288:17,25 289:9
290:2 302:6,21
320:11 321:24
322:13,15,23
325:17 326:6
342:1,5
meets 289:7
member 17:22
85:8,10 118:3
187:12 245:7
320:16 342:21
members 77:8
84:8 100:5 260:14
289:24 343:10
344:17
memorized 165:24
men 249:20

mental 6:8 84:25
85:22,23 86:2,6,8
89:8,12,23,25 90:7
91:2,6,20,22 92:19
93:5,17 119:24
120:1,6,13,20,25
121:3,9,14,24
122:4,12,18,22
123:2,13,19
124:10,15,25
130:6 138:5,8,13
168:9 193:23
244:15 246:25
249:20 250:4
251:19,24 252:13
252:18 259:11,13
260:9,21,24
262:17,18,20
269:23 270:16,18
270:23 271:2,11
271:15,23 272:4
272:10,16 273:14
273:19 282:14
354:23 355:1
mentally 274:18
mention 155:2
mentioned 24:16
30:2 56:11 58:3
64:22 72:9,16
96:8 127:15 136:7
313:21
met 96:20 168:2
289:22
meth 104:9 140:9
142:18,19
methadone 7:6
178:24,25 179:8
184:4 192:4
194:24 197:16,19
197:25

methamphetamine
142:20
methods 217:1
mh 282:5
mic 236:23
microphone 89:18
middle 210:18
midnight 66:8
251:3
midwest 361:17
364:1
mill 332:9 334:2
335:17 336:12
mills 17:23 332:20
332:23 333:3,6,9
333:16 335:14
336:1
mind 76:5 227:6
231:2 348:7
mine 153:9
minor 67:8 356:19
minute 175:2
246:1,1,12
minutes 245:8,18
251:11 254:19
256:13 336:18
357:3
misconduct 25:5
misdemeanor 67:8
68:16
missed 334:18
missing 197:1
mission 180:5
misstates 95:2
129:20 155:2,3
163:22 335:2
351:25
mistake 280:2
mitigate 201:17,21
202:3

mitigated 201:5
moment 131:4
330:9
moments 72:16
155:12
monday 251:2
256:17,17
monetary 227:9
227:21,22 228:3
236:15 254:4
monetizing 241:10
money 80:19,21
81:12 87:13 105:5
148:9 226:23
250:9 271:6
344:21
monitor 190:19
monitored 190:11
monitoring 31:4
189:8 244:25
month 160:14
202:10
months 37:8 45:16
52:20,21 66:9
118:6 128:14
252:6
morgan 4:11
16:12
morganlewis.com
4:13
morning 16:23,24
168:2 308:6 313:8
morris 3:15
morrison 4:4 5:12
15:25,25 337:1,3
357:2
motivated 133:21
motivating 188:7
motivation 79:22
80:8 82:12,25

**motivations** 98:2
**motley** 2:4
**motleyrice.com**
　2:7,8
**mouth** 167:4,5
**move** 14:5 52:22
　131:15 139:19
　182:22 193:2
　254:17 330:4
**moved** 97:20
**movement** 279:3
**mt** 2:6
**multiple** 322:2
**municipalities**
　116:15
**murray** 86:17,18
　86:24 87:21

**n**

**n** 3:5
**nah** 325:11
**nail** 227:3
**name** 17:1 20:17
　22:22 47:17 48:3
　58:7 81:18 151:24
　179:21 193:4,7
　194:17 197:2,3
　214:8 219:17
　252:16 308:8
　325:8 329:8 337:3
　349:20 361:6
　362:3,4,15 363:3,4
　363:21
**named** 359:9
**naproxen** 158:10
**narcan** 8:2,6
　149:13,15,18
　150:13 152:4,9,23
　153:5,16,23 176:9
　281:1 282:2,25
　283:4,9,13,19,23
　290:16,21,23

291:3,5,10,18
292:1,12,19,25
293:3,9
**narcotic** 89:7
**narcotics** 91:15,18
　91:25 92:5,10,17
　92:21 117:17,22
　118:14 119:3,10
　119:16,19 131:8
　131:12 179:10
　184:5 259:17
　263:8,15 265:13
　265:17,21 266:1,8
　267:7,10 269:11
　269:14,21,22
　270:3 279:7,9
　280:1,6,9
**narrative** 41:9
　56:4 70:7
**narratives** 109:9
　115:25
**nat** 297:17
**national** 1:5 15:5
　17:23 361:6 362:3
　363:3
**nature** 17:14
　18:13 21:12 24:20
　29:6,16 30:10
　31:19 33:25 37:11
　38:8 46:1 49:6
　53:5,16 59:24
　66:10 74:17 76:21
　84:13,19,20 85:20
　86:22 89:21 93:10
　96:15 128:15,24
　144:20 150:8
　157:20 160:17
　163:10 268:20
　271:20 273:5
　284:25 285:1
　289:11 290:3

297:18,23 298:5
**necessarily** 238:24
**necessary** 121:21
　136:21 145:8
　165:5 166:13
　265:8
**necessitate** 198:7
**need** 28:2 38:14
　66:15 87:1 90:5
　106:7 109:3 120:6
　127:8 137:13,14
　154:24 165:16
　177:22 182:22
　183:11 190:19
　197:16,19,24
　205:3 206:2
　217:10 226:12
　233:13 238:6
　245:24,25 249:19
　273:1 298:3
　325:24 344:15
**needed** 34:14
　74:23 97:5 143:12
　153:12 154:15
　179:9 252:25
　253:8 344:21
**needs** 86:19 87:8
　158:3 171:25
　193:8 197:20
　211:1 213:23
　243:7 268:25
**negligence** 176:23
**neocc** 209:19
**network** 325:25
**never** 44:1 61:3
　78:2,5 119:15,15
　136:12 140:18
　160:20 166:7
　273:24 306:17,18
　306:18 311:7
　318:18,19 319:9,9

319:16 331:20
344:4,7,7 346:4,5
346:23 349:10
**new** 2:17,18,18 3:6
　3:6 51:4,8 115:5
　217:16 238:21
　239:16 257:25
　308:20
**newer** 226:20
**newly** 168:12
**news** 123:10 124:1
　151:14,17
**nice** 27:5
**nicholas** 210:25
　211:16 281:11,15
　281:23 282:5,23
**night** 24:10 49:1
　49:17 53:24
　154:14
**nik** 55:11,20 56:2
　58:5,7,11
**nine** 37:8 233:12
　251:3
**non** 102:13 115:17
　158:9
**nonresponsive**
　330:5
**noose** 245:5
**noramco** 327:18
**normal** 183:9
**norman** 6:14
　156:24
**north** 3:23 4:4
**northern** 1:2 15:7
**northfield** 34:4
　46:24
**northwest** 2:12
　3:23
**notarize** 265:10
**notarized** 361:14

**notary** 359:6
360:14 361:25
362:10,18 363:15
363:23 364:23
**note** 135:16
361:12
**notes** 54:14,18
70:20
**notice** 299:24
**noticing** 135:22
**notification**
234:13
**notify** 189:5
**november** 1:18
7:1 15:2 29:11
96:13,17 133:12
178:9 195:16,17
**nsaids** 6:14 156:23
158:9,15,20
**nuisance** 345:25
346:10
**number** 6:2 38:18
38:21 49:4,8 75:9
75:13 77:14,23
83:5,14 100:12,12
110:9 112:18
113:3,4,19 114:1
115:11 122:11,12
125:6 134:18
135:9 147:2
151:20 170:23
178:15 188:24
193:4 195:5 209:8
210:19 214:9
218:17 219:18
227:16 228:14
245:14,15 248:25
249:13 255:21
262:13 266:17
282:18 299:1,10
299:19 309:3

313:13 361:7,13
**numbering** 41:1
**numbers** 48:9
69:15 282:16
363:7
**numerous** 91:9
132:16 187:6,25
202:17 212:2
233:24
**nurse** 167:3 185:5
**nurses** 149:21,24
150:3 152:8
184:23 293:4
**nursing** 67:10,11
68:5 163:15

**o**

**o** 2:4 172:3
**oarrs** 84:6,10
171:18 172:4,5
**oath** 18:6 27:18
**object** 9:2,3,3,4,4
9:5,5,6,6,7,7,8,9,9
9:10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,23,24,24
9:25 10:1,1,2,2,3,3
10:4,4,5,6,6,7,7,8
10:8,9,9,10,10,11
10:11,12,12,13,13
10:14,14,15,15,16
10:16,17,17,18,18
10:19,19,20,20,21
10:21,22,23,23,24
10:24,25 11:1,1,2
11:2,3,3,4,4,5,5,6,6
11:7,7,8,8,9,9,10
11:10,11,11,12,12
11:13,13,14,14,15

11:16,17,17,18,18
11:19,19,20,20,21
11:21,22,22,23,23
11:24,24,25 12:1,1
12:2,2,3,3,4,4,5,5
12:6,6,7,7,8,8,9,9
12:10,10,11,11,12
12:12,13,13,14,14
12:15,15,16,16,17
12:17,18,18,19,19
12:20,20,21,21,22
12:22,23,23,24,24
12:25 13:1,1,2,2,3
13:3,4,4,5,5,6,6,7
13:7,8,8,9,9,10,10
13:11,11,12,12,13
13:13,14,14,15,15
13:16,16,17,17,18
13:18,19,19,20,20
13:21,21,22,22,23
13:23,24,24,25
14:1,1,2,2,3,3,4,4
14:7,7,8,8,9,9,10
14:10,11,11,12,12
14:13,13,14,14,15
14:15,16,17,17
22:14 38:20 39:12
41:24 45:3 47:5
48:7 49:9 51:5
59:4 61:7 64:8,23
68:19 69:11 70:13
71:18 72:1,23
76:10,24 77:25
78:14 81:4,25
82:7 83:3,17 91:4
91:13 92:12 94:19
95:1,23 96:5 98:4
101:13 102:1,9
103:5 104:5,15
105:2,9,14,20
106:2 108:8,20

109:6,18 110:2,11
110:20 112:8,16
113:14 114:6
116:20 117:2
119:7,12 120:22
121:16 122:14
125:14,19 128:3
129:12,19,25
133:16 134:5,21
135:12,19 136:3
137:21 138:10,19
138:20 139:1
141:24 142:7
144:14 145:3
146:8 147:7,13,20
149:25 152:24
153:18 154:2,19
155:1 156:3
157:16 159:15
161:6,21 162:7,14
163:21 167:11
169:11,13,23
173:5,14,25 175:7
175:18,25 177:1
177:12 178:5
180:9 181:2,22
186:2 187:3,21
188:4,12 189:18
190:13 191:4
192:10 194:9
196:25 198:24
199:18 200:4
201:11,23 203:6
204:11 205:7,23
206:6,10 208:3
211:12 212:1,12
213:7,18 214:1,22
215:5,11,19
221:12 222:21
224:6 226:5
227:13,25 230:16

| | | | |
|---|---|---|---|
| 231:14 232:14,20 | 110:3,7 145:21 | **offenders** 136:14 | **ohio** 1:2,11,13,22 |
| 236:18 239:7 | 157:23 181:15 | **offense** 24:25 | 3:12,18,23 4:5 |
| 240:6 241:7,13 | 182:12 329:24 | 38:24,25 39:2 | 6:20 8:11 15:8 |
| 242:8,15 243:9,22 | 330:14 332:5 | 40:2 69:9 72:7 | 17:5 28:14 40:3 |
| 247:21 248:18 | 352:18 | 203:5,10 | 63:15 85:10 |
| 249:22 250:15 | **objections** 8:12 | **offer** 121:19 192:2 | 170:14 302:25 |
| 253:3 254:7 | 303:2,8 | 192:6 214:2 | 303:7 359:2,7 |
| 256:22 257:17 | **observation** 246:2 | **offered** 119:5,17 | 360:7,15 361:2 |
| 259:9,22 261:3 | **observe** 146:1 | 263:11,16,18,19 | **okay** 27:9,13,16 |
| 263:21 267:13 | 178:24 | 265:17,20 267:10 | 27:25 28:6,10 |
| 269:16 275:20,25 | **observed** 107:3 | 267:15 279:10,13 | 46:21 52:24 57:3 |
| 277:25 278:12,21 | **obtain** 80:9 81:1 | **offering** 192:9 | 57:6 65:17 68:4,7 |
| 279:11 280:12 | 82:13 83:1 107:23 | **offers** 138:24 | 73:7,9 74:4,7 |
| 282:20 283:14,25 | 110:5 179:8 242:6 | **office** 6:17 7:15,17 | 124:6 140:3 |
| 288:1,12 290:7 | 242:20 243:4 | 7:20,22 30:6,13 | 150:17 168:4,21 |
| 291:19 293:11 | 251:16 252:3 | 38:12 66:4 96:23 | 169:5 172:25 |
| 294:25 295:20 | **obtained** 161:4 | 160:23 164:6 | 178:14 180:15 |
| 296:24 298:1,12 | 231:19 322:15 | 209:15,19 211:1 | 190:6 193:13,20 |
| 299:13 300:7 | **occasion** 70:19 | 214:14 215:16,25 | 194:19 195:4 |
| 301:10 304:20 | 79:16 301:21 | 226:11 260:17 | 196:8 197:5,9 |
| 306:3,16,23 307:4 | 312:9 | 261:14 264:7 | 209:6 212:23 |
| 307:10,16 309:19 | **occasions** 17:9 | 267:20 276:6,15 | 214:10 216:6,8,18 |
| 310:3,24 311:12 | 19:6 20:11 51:25 | 289:14 294:11 | 220:7,24 231:10 |
| 311:25 312:23 | 79:21 80:1 82:24 | 322:5,24 336:8 | 262:15,16 277:2 |
| 313:4 314:8 | 143:16 302:10,14 | 360:6 | 294:8 295:4 298:7 |
| 315:18 317:1,14 | 302:16 | **officer** 40:19 | 299:17 300:22 |
| 317:20 318:6,11 | **occur** 53:1 156:1 | 41:16,22 43:10 | 303:16 308:12 |
| 318:17,24 319:7 | 224:8 | 66:18 239:16 | 310:17 311:20 |
| 322:19 323:4,5,22 | **occurred** 97:13,18 | **officers** 344:5 | 316:4 320:21 |
| 325:3 328:5,8,11 | 127:2,7,22 155:16 | **offices** 197:21 | 323:2,13,20 324:4 |
| 329:2,16 334:3,5 | 155:21 235:11 | **official** 57:22 | 326:3 334:22 |
| 334:11 335:1,18 | 314:2 316:7 | 362:15 363:21 | 337:20 341:25 |
| 336:14 338:11,25 | 323:21 | **officials** 198:20 | 342:20 343:24 |
| 339:12 341:4 | **occurring** 113:23 | 200:14 201:15,16 | 346:10 347:5 |
| 347:18,20 349:8 | **october** 6:14 8:1 | 201:20 202:2 | 349:22 350:1,15 |
| 349:17 350:4,23 | 33:22 156:23 | 203:4 215:8 | 351:9 353:4 356:2 |
| 351:15,24 353:8 | 158:7 280:25 | **offs** 207:1 | 357:14 |
| 355:20 356:16 | 293:10 | **oh** 27:13 72:13 | **old** 39:24 |
| **objection** 9:1,8 | **odd** 39:17 | 74:3 89:19 130:15 | **oleg** 63:15 64:1,18 |
| 10:5,22 11:4,15,16 | **offender** 136:16 | 130:18 151:24 | **once** 21:10 43:3 |
| 14:5,6,6,16 63:4 | | 167:17 334:22 | 64:18 85:11 86:25 |

91:15 160:14
274:19 323:2
**ones** 132:11 141:9
236:7 328:16
**ongoing** 77:18
103:2 106:24
129:21 135:15
136:6,6 145:24
239:3 253:4,5
258:22 259:2
335:21 344:20,23
**onset** 105:24
119:17
**op** 1:10,12,13
306:12
**open** 167:5 204:22
**opened** 133:19
**operate** 298:15
340:23,25
**operating** 8:9
27:14 293:19
294:4 298:15
**operations** 6:3
37:25 65:12 96:20
97:2,6 98:2,15
99:1 100:19
131:16 137:12
141:9 148:19
266:24 267:1,2
268:23 269:2
295:11 305:12
341:8
**opi** 256:21
**opiate** 1:5 15:6
40:8 100:17,24
101:10,19,25
102:6,16,19,25
103:3,10 105:7,12
105:19,25 106:12
106:18 111:20
116:18,25 119:18

126:4 134:10
145:18 146:6,13
282:7,19 296:19
324:9,20 338:4
361:6 362:3 363:3
**opiates** 101:16
102:7 107:9
111:16 228:22
274:23 289:25
328:17 331:24
332:15
**opinion** 104:8,11
106:12,18 177:13
194:10 205:24
214:4 249:13,18
251:14 283:22
284:2
**opinions** 214:3
**opioid** 19:16 21:1
21:4 26:20 32:12
36:14 50:2 69:23
81:24 83:15,24
94:18 106:8
107:15,20 108:7
108:19 109:17
110:1,10 111:10
115:10,20 122:17
124:9 125:18
134:25 135:18
142:23 147:6
165:22 166:6
191:24 192:5
193:24 203:23
204:7 237:7,12,24
238:15 240:5,19
240:23 242:14,21
243:4,20 244:2,8
248:17 249:11
250:22 253:21
254:5 255:4,15
256:6,21 257:4

258:18 259:20
260:6 261:1
269:15 277:23
278:10 287:24
289:20 290:5
294:24 298:10
304:15 306:2,12
306:14,22 307:3
310:1,21 311:7,10
311:22,24 312:21
315:4,9,16 317:8
317:13,19,25
318:16 319:5,15
326:21 331:12
332:4 335:6 342:2
347:3 352:7,9,23
353:2,6,15 356:23
**opioids** 19:18 26:5
50:5,9 70:11
79:11 82:13 83:1
115:17 119:11
124:17 125:1
129:6 135:10
136:1 158:8
167:10 176:17
177:5,7,11,17,23
178:4 203:5,10,18
230:24 231:12
239:6 240:9
244:23 288:10,16
296:20,21 310:20
313:15 314:7
316:6,25 318:4
320:1,1 321:4
322:16,18 324:17
326:3 330:13,21
330:23 331:19
334:10,17 337:17
338:10,24 339:10
347:17,24 348:14
349:6,24 350:2,14

350:21 351:6
353:14
**opportunity** 82:19
**opposed** 111:24
188:11
**order** 24:6 47:13
55:7 71:23 83:23
105:24 106:7
109:3 114:13
123:5 127:9 137:4
149:24 167:8
168:8 171:25
211:10,18 214:20
221:25 237:11
239:12 241:5,17
242:6 250:10
251:3 254:5,12
257:15 304:25
306:8 307:14
**ordering** 233:12
**organization**
90:24
**oriana** 8:4 189:5
284:7,18,19 286:1
286:24
**orianna** 285:19
286:13,16 287:5
287:10
**original** 70:15
**originally** 28:12
**outside** 83:18
90:24 92:20
114:11 121:22
122:15 237:18
255:25 265:7
280:16,16 289:23
330:8 342:14
**overall** 49:8
305:25
**overcrowding**
143:13 145:8,13

145:15,18,24
146:1
**overdose** 154:17
154:23 285:4,11
313:18
**overdosed** 152:3
290:1 314:22
315:3
**overdoses** 101:8
102:25 149:10
155:7,15,20 156:1
156:7,15 158:20
314:19
**overlap** 122:18
124:10,16,25
193:22
**oversee** 120:25
182:24 343:21
**overseeing** 91:22
152:16 161:13
269:8 278:24
**oversight** 85:8
89:12,22 93:7,11
96:12 121:2 137:9
234:10 268:16
271:14 275:2
276:21 299:2
**overtime** 207:21
278:6
**oxycodone** 20:24
21:1,7,14,17 24:2
50:22 76:4,8,17,22
77:6,15,24 78:22
78:25 81:2 162:11
166:8,11
**oxycontin** 51:3,4
51:24 52:8,13,25
53:6,8,18 54:7,25
57:2
**oxycontins** 50:22
51:20

**p**

**p.m.** 167:19,22
208:18 209:3
254:22,25 296:12
296:15 336:21,24
357:5,8,17,18
**pa** 4:12
**pace** 338:7,7
**page** 9:2 99:15
100:11 117:6,12
119:22 120:7
124:4,5,8 131:5,6
151:10 154:6
155:9,9,11 168:7
171:7,11 172:9
178:22 179:3,5,16
180:17 184:3
185:19 193:18
194:2 197:8 199:3
209:12 210:17,18
210:24 228:19
230:1 262:12,17
265:3,4 268:6
269:6 270:10
276:24 277:2,4
281:21,22 294:6
295:8,9,14 303:17
303:17 304:4,4,7,8
304:9 361:13,15
363:7 364:3
**paid** 260:13
**pain** 354:7,8
**pam** 86:16
**pamela** 7:3 172:9
172:17 179:5
180:16 184:2
188:18 189:3,22
190:9 229:9 230:1
**paper** 336:5
**papers** 66:20 67:2
265:10

**paperwork** 24:15
66:20 70:3,16
**par** 3:3 16:4
308:10 327:12
**paragraph** 124:7
131:6 158:5 168:7
194:1 198:4
210:11 220:1,10
224:10 230:7,8
262:16 273:17
274:14 277:4
280:1 282:23
**parole** 219:11
220:4,5,17,19
**parolee** 235:6
**part** 41:3 99:17
103:21 106:14,15
113:2 117:24
140:18 169:6
176:23 193:8
232:19 238:22
251:5 263:7
274:20 277:8
284:23 285:18
298:18 334:18
340:17 341:11
363:9
**participants** 92:21
**participate** 96:9
316:6
**participated** 47:4
47:14 49:6 75:14
75:20 266:8
318:14,23 319:1,2
319:6,13,18
**participating**
275:10
**participation**
290:4
**particular** 42:8
58:19 76:2 81:7

99:10 111:5,9
121:20 123:4
126:22 135:24
136:5 191:12
198:22 204:5
235:18 270:7,11
352:5
**parties** 165:18
**parts** 341:12
**party** 168:15
360:3
**pass** 307:24
**pat** 114:17 217:9
238:19,24 239:19
239:21 256:10,10
304:25 305:4
**patch** 59:13 60:13
60:16,24
**patches** 61:25
**patient** 7:1 108:3
178:10 334:24
335:5 353:5,13
**patients** 177:18
332:15
**patrol** 17:23 22:17
23:11 25:22 26:8
30:15 33:11,12,16
33:18,21 34:1,16
35:9 36:7,24 37:9
37:10 44:7 45:18
45:21 46:2,17
47:2 48:19 62:21
65:19 74:11,14,18
75:4,15 77:3
102:23 264:22
314:5,13,17 321:7
344:15,17 356:5,6
356:7,11
**patrolman** 313:10
**patted** 39:6

**patting** 239:22

**paulus** 272:8

**pay** 85:23 92:9
145:5 192:22
213:4

**paying** 278:6

**pays** 212:15,20

**pelini** 3:21,24
15:23

**pennell** 7:11
218:11,19,22
220:11

**people** 25:13,14
38:23 59:13 77:11
90:13 93:3 96:19
102:25 125:8,10
125:16 135:5,7
145:6 148:7,9,15
158:8 194:8
197:11 203:8
216:4 222:13
225:10 229:4
234:20 235:12
239:23 240:24
244:22,24 251:3,7
289:23 304:25
311:9 322:8,12
323:12 325:25
326:8 327:2,4

**percent** 34:6 64:12
166:3 170:3
205:16,19 279:17
287:6

**performance**
160:8

**performed** 274:6

**period** 28:24
30:24 31:15 32:16
32:20 33:20 34:2
34:17 35:10 36:12
36:20 37:3 39:11

45:15,16 46:2,17
46:19 47:1 48:13
48:17 49:20 50:2
57:1,9 68:25
69:17,22 71:3,14
71:16 75:6,20
76:8,18,23 77:15
77:24 78:23 84:12
88:6 103:24
117:21 118:12,17
134:3,13,20 135:1
143:20 144:1,4
264:25 279:9
280:10 295:18

**periods** 267:9

**permitted** 165:21
189:16

**person** 60:19
66:21 67:14 70:21
72:4 93:13 126:18
162:23 233:21
234:25 235:7,17
279:23 314:22
315:8,16 323:11
325:9 353:1

**person's** 68:4
126:22 231:9

**personal** 59:23
116:12 215:23
329:13 332:21
338:14 339:3,15
348:13 351:21

**personally** 59:19
61:3,10 77:12
118:3 142:1
146:12 152:15
202:5 215:24
235:15 288:9
337:16 338:8,22
339:9 362:11
363:15

**personnel** 87:10
87:16 205:21
206:21 207:7,13
208:1 252:15
260:18,19

**persons** 304:1

**perspective**
200:22

**pertain** 161:3

**pharm** 94:16 96:1

**pharma** 1:10,11
1:13 4:9,9

**pharmaceutical**
161:8,13 328:15

**pharmaceuticals**
3:3,4 4:8 94:2,5,8
161:4,20 162:6

**pharmacies** 21:16
25:14 77:9 178:3
328:18 339:25
340:4,13 341:2,8
342:6,11 348:10
349:13

**pharmacist**
352:22 354:16

**pharmacology**
354:14

**pharmacy** 6:20
21:18 22:5,23
23:2,16 24:2 25:2
25:5,18 50:11,24
52:9 53:9 94:16
95:16,21 96:2
170:15 172:13
173:12 174:11,15
175:1,22 176:4,8
176:12,16 177:9
179:10 184:5,8,10
313:23,25 348:16
349:6,20

**philadelphia** 4:12

**phone** 16:10 50:12
50:18 51:18
154:13 361:3

**phrases** 324:10

**physical** 183:17
217:22 256:9

**physically** 38:2

**physician** 80:10
82:13 83:2 353:2
354:1

**physicians** 84:4
318:5 319:21

**pick** 42:5 209:17
209:25 212:23
298:3

**picked** 135:2
348:5

**piece** 87:12 115:1
226:13

**pile** 310:14

**pill** 20:13,16,18,21
24:3 41:1 332:9
332:19,22 333:2,5
333:9,16 334:2
335:14,17 336:1
336:12

**pills** 20:18 23:23
24:2 25:12 53:13
55:4,7 76:1,2,3,16
77:1,5,11 78:10,12
79:7,17,22 80:8,18
80:19,21 216:15
218:25 220:25
221:3 240:23
331:1,5,19 332:4
350:16 351:11

**pilot** 28:20

**pinpoint** 135:23
321:9 341:16

place  111:17 144:8
    162:12 166:22
    179:7 224:5 233:2
    234:17 247:5
    251:10 286:8
    345:13 359:20
placed  183:8
    248:12,16 249:1
    250:2 251:15
    252:1,25 253:8
places  77:10
    198:14 217:4
plaintiff's  8:11
    303:7
plaintiffs  303:1
plan  120:2
plant  101:21
plastic  55:11
pleasant  2:6
please  15:9 16:10
    16:15,25 27:25
    59:9 171:15 189:4
    200:8 209:4
    254:18 361:11,11
pllc  3:10
pocket  35:7
pod  31:4 38:11
    184:25 246:8,8,9
    251:11,13
pods  31:8 184:24
    247:16
point  4:4 25:11
    31:23 50:15 51:8
    51:14 53:14 57:14
    57:24 58:4 62:7
    63:3,7 67:7
    152:12 182:14,20
    242:17 264:21
    337:16 338:8,22
    339:9

poking  55:16
police  29:8 41:5
    54:3,6 286:4
    331:10 345:20
    346:8
policies  35:21
    114:4 161:3,19,23
    162:2,5 166:24
    167:8 247:4
    257:10,16,22
policy  6:17 36:5
    42:1 164:7,16,19
    164:25 165:3,11
    165:20,25 166:10
    166:22 168:22,23
    169:1,3,7,17,19
    174:7,18,20 247:8
    256:20 310:10,19
    311:3 353:24
policymaking
    344:7
pollard  281:11,23
polster  1:8
poppy  101:21
pops  188:1
populated  140:16
population  39:11
    69:2,22 70:10
    71:24 106:21
    107:3,14,19 108:6
    108:18 109:16,25
    122:21 134:3,17
    135:17 136:1
    145:11 166:21
    180:13 183:16
    198:1 299:11
porter  3:5,15
    15:20 16:3 308:9
porterwright.com
    3:19

portion  278:8
    294:10,15 306:6
    306:20,21
posed  303:18
position  21:11
    85:4 88:13,17
    186:16 206:1
    274:20 276:17
positive  183:22
    228:22 299:5
possessing  140:9
    140:10
possession  140:8,9
    142:18 210:14,15
possible  212:10
    307:8 348:6
post  33:4 65:20
    198:8,10 204:15
    204:18
potential  191:7
    198:2 211:24
    212:6 240:5 248:1
    300:2
powerpoint
    324:23 326:12
practice  238:18
practices  319:15
    319:25 326:18,21
pre  25:8
precaution  308:20
precautions
    124:21 125:9,11
    126:9,12 128:19
    128:19 236:10
    244:25 245:1,12
    245:23 246:5,12
    246:20,25 247:7
    247:15,17,19
    248:1,12,16 249:1
    249:15,20 250:3
    250:12 251:15

252:2,10,25 253:8
predates  145:18
prefer  205:20
prematurely
    27:11
prepare  302:3,11
preparing  164:18
    262:7 279:19
    294:14 296:4
    297:8 343:8
prescribe  94:12
prescribed  101:5
    177:8,11 185:9
    191:20 317:25
    318:7,16 319:5
prescribes  166:8
    166:12
prescribing
    147:19 148:22
    332:14,17 352:15
prescription  1:5
    3:20 15:6,24 20:8
    20:21 26:5 32:17
    36:21 79:11 80:10
    81:23 83:1,15,24
    94:1 101:4,11
    102:12,13 109:17
    109:25 115:16,17
    115:20 148:2,14
    149:2 161:1
    162:11 163:2,5,19
    165:11,22 166:6
    167:10 168:24
    173:23 174:13
    176:17 177:4,17
    177:23 178:3
    184:9 218:25
    220:2,25 221:2
    224:4 230:24
    231:12 310:2,11
    311:7,22 312:22

314:20,23 315:4
315:17 318:5
331:1,5,19 332:4
334:10,17,25
335:6 347:17
348:14 349:6,23
350:21,22 351:6
352:6,10,17,23
353:7,15 361:6
362:3 363:3
**prescriptions**
169:9,22 172:1
179:9 184:6
310:20 335:16
337:12 338:4,18
339:7,23 340:4
351:12,14
**presence** 359:15
**present** 134:4
302:21
**presentation**
324:23 326:12
**pressure** 94:13
**pressures** 116:24
**pretty** 35:7 75:16
160:15 165:19
301:16 305:15
344:18
**prevalent** 35:5
39:16 47:10
**prevent** 227:10
236:4 324:21
**preventing** 227:2
**prevention** 223:7
223:9
**previous** 75:15
172:18,18,20
249:2 258:25
**previously** 172:5
193:15,21 215:7
281:18 343:1

344:1
**print** 301:17
**printed** 124:4
151:10 281:21
**prior** 22:6 53:3
60:25 61:4 64:12
73:19 82:10 88:9
119:17 146:2
168:21 169:6,16
169:19 224:14
226:25 227:11,23
229:5 256:7
257:22 295:25
352:6,10 353:14
**priorities** 227:16
**priority** 223:8,10
224:2 227:19
**prison** 139:24
178:25 179:6
221:3 309:5
310:23 311:23
312:19 333:7,10
334:15,23 336:12
**prison's** 310:10,19
**prisoner** 6:9 67:4
139:9,18,21
**prisoners** 114:19
185:7 310:10
**prisons** 224:22
331:23
**private** 212:23
270:20
**privilege** 28:8
299:14
**probable** 57:17
**probably** 18:21
19:9,11,11 21:8,20
21:25 22:19 29:2
37:7 38:22 45:5
45:24 48:10 49:16
53:4,10 58:12

59:18 64:13 69:13
70:4,18 75:10
83:12 95:3 103:11
104:1,23 107:25
123:1 128:14
202:10,22 203:1
245:16 258:9,20
262:8 264:1
266:10 272:13
273:4 289:17
297:2 301:1
302:13 307:11,12
316:12 321:21
324:1,3 325:6
331:10
**probation** 220:6
220:17,19 235:7
**problem** 46:11
103:18 126:1,7,25
142:11 221:4,6
225:4 249:4
263:14 268:24
271:22 272:15
273:3,5,7,9 275:5
**problems** 275:8
345:21
**procedure** 6:18
16:18 27:15 164:7
358:7 362:5 363:5
**procedures** 114:4
166:21,25 247:5
**proceed** 214:19
**proceeding** 24:17
24:21
**proceedings** 18:8
18:9 26:17,19
**process** 62:25
170:7 175:13
186:14 222:9
287:15,20

**product** 310:1
335:6
**production** 361:15
361:17,22
**products** 310:21
331:13
**professional**
257:24
**professionals**
153:25 251:19,24
312:7
**profile** 110:19
143:6
**program** 118:14
118:18,22 119:10
238:23 239:16
259:13 265:22
266:8 269:14,21
270:8 274:24
275:3,4,10,16,19
275:24 283:3,6
294:10 350:14
**programming**
91:11,19,25 92:6
92:10,18,22
119:16 265:12,17
266:1 267:10
286:14,17,18
**programs** 90:16
119:4 237:10
259:7 262:20
263:9,18 269:9,10
277:10 278:25
279:1,5 280:15
**progress** 75:25
**prohibited** 189:24
**prohibition** 190:3
190:4,7
**promise** 308:16
**promoted** 22:7,19
30:16 33:22 36:25

45:22 50:6 65:21
65:22 66:2 84:15
**pronounce**  172:4
**proper**  194:7
238:24 239:21
**properly**  272:5
275:7 311:19
318:12
**property**  40:22
41:2 42:16,17,19
42:22,23 43:6,10
43:11,12,15,24
45:9 54:12
**proponent**  346:4
**proportion**  69:1,8
69:21 70:10 71:15
71:24 107:13,18
108:6,17 109:15
109:24 115:8,18
122:20 203:15,18
248:11,15 250:1
253:20 260:23,24
305:25 307:2
309:15
**proportions**
309:13
**proposed**  346:15
**prosecutor**  235:3
**prosecutor's**
209:15 214:13
**protocol**  159:8
162:12 213:21
217:21 247:18
**provide**  19:15
21:5,6 27:21
86:18 91:8,16
93:21 120:24
141:10 159:13
160:15,21 180:6
213:12 259:15
268:23 271:23,24

271:24 272:18
283:4,12,18 286:2
286:5 288:5
290:21 291:18
292:19,25 303:23
326:7 351:13
**provided**  16:17
18:11,20 19:2,13
19:23 20:22 21:13
26:19 86:6,9
89:13,23 91:2
92:6,11 93:2
119:11 121:1,3
123:25 138:16,18
153:24 159:20
160:18 213:10
219:5,14 259:7,19
262:25 270:16
271:3 280:2 283:9
283:23 286:15,17
286:24 287:16
325:9
**provider**  85:24
92:20 95:4,6
108:1 123:2 157:9
159:21,22 165:16
198:15 212:17
260:21 291:4
292:11 335:22
**provider's**  260:25
**providers**  138:13
**provides**  91:1,18
92:15,17 259:11
259:13 262:18
265:6 268:11
287:10
**providing**  20:5,8
86:23 88:25 90:19
91:17,25 120:12
120:13 192:18
194:3 260:4,9,15

260:20,25 266:1
274:21
**provision**  120:20
131:12 152:19,23
153:24 156:10
160:25 192:14
212:20 270:23
271:11,15 272:16
**proximity**  183:17
**psychiatrist**  355:4
**psychological**
85:24 86:10 121:1
270:17,20 271:16
287:16
**psychologist**  355:3
**psychotropic**
194:3,7
**public**  304:11
353:24 359:7
360:14 362:10,18
363:15,23 364:23
**pull**  45:6 47:22
146:15 223:2
348:24
**pulls**  112:2 114:21
122:6,8 146:21
**purdue**  1:10,11,13
327:14
**purely**  177:21
**purpose**  186:24
277:9 318:9
**purposes**  45:7
66:5 86:20 98:18
123:20 139:12
150:24 157:1
164:9 170:19
178:11 188:21
195:1 208:24
218:13 228:9
261:16 264:9
267:22 276:8

281:3 284:9 292:3
293:21 298:23
301:13,25 303:11
**pursuant**  310:19
358:3,6
**put**  24:9 33:9
42:22 43:1 44:10
56:7 59:14 65:4
70:19 111:17
114:23 128:21
167:3 182:7
183:10 187:10
216:6 217:14
238:7 239:16
245:3,11,22 246:4
246:11,20,24
247:2,6 251:10
261:4,24 273:8,10
309:4,9,14,16,21
309:25 311:22
312:5,19 324:10
324:22
**pv**  219:7,10

**q**

**qualified**  355:16
359:8
**qualifies**  21:1
132:14
**qualify**  32:12
36:13 50:1 136:10
213:5
**quality**  159:12,19
**quantify**  305:20
307:1
**quantifying**
305:23
**quarter**  48:10
85:11
**quarterly**  289:7
322:23 323:3

**quell** 126:16
**quest** 104:6
**question** 22:15
27:6,24 28:4,8
39:13 41:25 45:4
47:6 48:8 49:10
51:6 57:8 59:5
61:8 63:5 64:9,24
68:20 69:12 70:14
71:19 72:2,14,24
76:11,25 78:1,15
81:5 82:1,8 83:4
83:18,21 91:5,14
92:13 94:20 95:2
95:24 96:6 98:5
101:14 102:2,10
103:6 104:6,16
105:3,10,15,21
106:3 108:9,21
109:7,19 110:12
110:21 112:9,17
113:15 114:7
116:21 117:3
119:8,13 120:23
121:17 122:15
125:15,20 127:13
128:4 129:13,20
130:1 133:17
134:6,22 135:13
135:20 136:4
137:22 138:11,20
139:2 141:25
144:15 145:4,22
146:9 147:8,14,21
150:1 152:25
153:19 154:3,20
155:2 156:4
157:17,24 158:11
159:16 161:22
162:8,15 166:3
167:12 169:14,24

173:6,15 174:1
175:8,12,14,19
176:1 177:2,13,16
177:22 180:10
181:3,23 182:15
182:16,21,22,23
187:4 192:11
194:10 195:23
197:10 204:12
205:8 206:11
207:12 208:4
211:13 212:4
213:8,19 227:14
228:1 229:9
230:17 231:15
232:21 239:8
240:7 241:8,14
242:9,16,24
243:13,23 246:23
247:22 248:6,7,10
248:19 249:23
254:8 259:24
263:22 284:1
285:9 291:20
295:21 296:25
299:14 300:8
310:4 311:13
312:16,24 319:8
323:6 328:12
329:3,17 330:6
334:12,13 335:19
336:15 338:1,12
339:1,13 340:9
347:21 349:9,18
350:5,24 351:16
351:25 352:13
353:9 355:21
**questioned** 313:22
314:3
**questioning** 24:23
168:1

**questions** 26:25
42:7 100:5 247:12
247:15 307:23
308:13 312:15
330:23 341:23
357:10,12
**quick** 189:4 214:6
**quit** 55:14
**quote** 105:25
131:7,9

**r**

**r** 172:3,3
**radio** 23:12 54:16
316:2 348:24
**rank** 33:23 36:25
45:22 84:16
316:13
**rapes** 34:13
**rapport** 32:2
**rare** 70:19 301:16
**rates** 158:12
**reaction** 56:9
237:24
**read** 40:7,18 42:3
42:6 97:14,15
109:8 115:24
117:19 120:3
124:13 127:16,17
142:17 148:18
155:11 158:17
165:23 222:15
223:3 242:24
262:10 302:7
320:8,13,23 321:3
321:6 362:5,6,12
363:5,6,17
**readily** 79:18,24
350:18
**reading** 171:1
304:9 361:19

**reads** 100:16
117:15 119:23
124:8 131:7 140:7
151:25 158:8
262:17 269:7
270:15 274:16
277:4 303:19
304:11
**ready** 73:16
**reagents** 55:12
**real** 18:21 76:13
99:16 214:6
297:16 317:9
**realize** 118:7
**really** 20:11 26:12
35:16 54:2 71:10
71:12 79:1 81:6
87:9,13 90:11
93:4 97:22 100:1
104:24 145:23
160:20 237:16
249:9 280:18
282:10 289:1
290:10 294:20
348:3,18 349:19
**realm** 71:12
121:22 144:16
153:20 190:21
**reason** 27:20
67:22 182:9 183:2
185:23 187:12,14
187:19 203:25
204:2 217:20
251:5,5 258:13
309:18 361:14
363:8 364:3
**reasons** 67:3 77:13
77:22 98:7 134:7
134:8 187:6,7,10
212:2 283:15
309:9 312:7

**reassigned** 37:1
84:16
**reassignment** 66:5
**rebecca** 269:5
**recall** 19:7,17,21
20:4,7,15,20 22:3
22:9,22 23:15
25:17 30:22 32:10
32:21 34:17,21
35:13 36:11,17,22
38:17 47:3 48:5,9
49:18,25 51:22
61:13 69:1 71:4
75:5,6 76:17
80:24 81:3,14,18
81:21 123:25
124:2 127:24
129:16 148:20,25
154:21 164:20
191:15 193:25
195:25 209:9
225:15 232:4
236:2 303:15
308:21 309:6,7,24
310:12 313:10,15
313:21 315:1,6,14
318:14,21 319:4
322:20,22 323:17
323:19,20 324:6,7
325:1,5,8 331:1
332:3 336:10
346:24 347:1,22
348:18 349:20
350:18
**receipt** 361:18
**receipts** 172:13
174:15,19 175:21
176:4
**receive** 29:3 50:16
159:3 181:24
182:1 253:1,7,9

258:7,12 266:17
282:24 283:2
287:5,15 288:21
288:23 299:24
321:14 350:16,21
351:11
**received** 64:18
81:23 82:4 83:15
109:16,25 181:20
199:22,25 218:24
232:2,6 258:4
281:17 288:9,13
288:15 290:16
351:12 352:6,16
**receives** 288:14
**receiving** 352:10
353:2
**recess** 73:12
130:24 167:20
208:19 254:23
296:13 336:22
357:6
**recipients** 201:9
210:19
**recognize** 170:24
178:19 189:1
195:7
**recollection** 26:3
35:8 39:9 49:13
50:4,8 69:20
76:19 262:25
265:16 270:6
293:9
**recom** 121:7
**recommendation**
117:16 119:23,24
283:12
**recommendations**
6:4 96:24 98:16
117:13

**recommended**
159:8 167:7
**reconvene** 167:16
**record** 15:2,10
16:11 17:1 24:6
27:5 54:6 62:3,19
73:10,14 130:22
131:1 142:17
163:18 167:19,22
172:12 193:6,9
194:17 196:4
208:18 209:3
219:20 223:2
242:25 254:22,25
261:6 274:5
296:11,15 301:7
336:18,21,24
357:5,8,16 363:9
**recorded** 27:4
56:2 248:21
**records** 24:5 40:10
40:13 43:14 44:2
62:3 84:3 95:11
95:14,17 108:1
123:4,7 130:6
173:3,9,22 174:9
174:23 175:5,16
175:23 221:14
222:11,23 254:11
274:4 298:19
299:18 348:22
**recovered** 104:25
**recreational**
265:11
**redact** 193:3
219:17
**redacted** 193:5
214:9
**reduce** 216:2
**reduced** 116:16
359:14

**reducing** 201:2
215:17
**reduction** 278:16
278:18,20
**reentry** 274:17
**refer** 102:7 126:24
143:12
**reference** 64:7
100:24 101:10
104:20 142:19
155:6 172:3 184:2
184:4 224:10
269:3 361:7 362:2
363:2
**referenced** 20:16
22:5 42:12 44:15
60:16 64:6 76:9
116:10 145:19
154:23 168:19
237:25 238:12
240:19 259:21
277:18 278:17
284:20 285:23
304:19 305:21
359:13,18 362:11
363:15
**referencing** 76:3
78:8 103:25
109:11 128:25
245:2
**referral** 262:21
**referred** 117:1
182:4 183:7
195:23 196:1
220:1 221:24
255:8 272:6,6
**referring** 79:6
155:10 163:8
171:22 181:1,6,12
181:18 182:4
189:23 204:15

220:16 229:21
255:22 269:4
272:7 321:2 326:1
350:20 351:2,3,7
**refers** 102:11,12
142:20 143:1
**reflected** 281:13
**reflects** 285:8
**refusal** 67:17
**refusals** 67:16
**refuse** 67:4,14
**regard** 93:11
157:21 168:23
174:8 198:20
349:23
**regarding** 191:17
212:5 232:3 282:6
344:25 358:2,11
**regards** 217:9
259:24 287:3
349:7 352:8
**regular** 232:19
**regulations** 343:11
**rehabilitation**
82:4
**reinstitute** 117:16
**reinstituted**
118:22,24
**reject** 212:3
**relate** 17:17 80:17
101:22 116:25
126:17 190:23
203:5 321:3
**related** 17:24
19:16 24:17 26:20
32:11,17 38:19,24
48:6,25 50:23
69:3,6,9,23 75:1,8
86:3,19 101:8,15
107:5,15,20
111:10 115:12,15

135:18 137:9
143:8 147:18
148:21 177:19
191:2 202:12
203:18 241:3
242:1 265:5 270:3
277:23 288:16
289:19 290:4
298:10 299:1,10
299:20 301:8
305:19 313:14
314:7 316:6
318:15 319:19
320:1 331:12,14
337:17 338:9,24
339:10 348:25
354:3
**relates** 1:9 116:18
175:12 203:10
219:13 294:23
316:24 348:7
**relating** 190:18
**relation** 349:2
**relationship** 18:1
105:7 122:11
141:5 144:5,18
145:9 179:23
286:12,16
**relative** 360:2
**relatively** 295:19
**release** 8:2 67:25
281:2 282:2 283:2
283:4,9,13,19,24
**released** 202:11
220:3 280:15
**relevance** 300:2
**relevant** 161:9
302:8
**religious** 265:11
**remember** 19:25
20:11,23 25:9,20

25:25 26:6 32:13
32:15 33:1 36:15
50:17,19,20 52:15
53:8 61:21 71:7
81:6 85:17 97:23
123:24 169:18
171:1 189:11
202:7 229:22
255:11,16 300:25
310:25 322:25
323:11 326:12
345:7 347:2
348:16 349:19
350:19
**remembered**
39:17
**remind** 103:13
**reminder** 189:4
**remove** 246:16
**render** 272:2
**reoccurring** 80:23
**repeat** 200:8
292:22
**repeated** 182:15
**repeatedly** 242:16
**repetitive** 182:14
**report** 6:4 7:15,17
7:20,22 40:7,21
41:6,12,13,15 42:3
44:15,17,19 45:8
45:10 47:18,25
54:9 55:24 56:5
62:7,12,17,23
63:14,19,23 64:1,5
64:11,15,17,20,21
65:3 85:1 88:10
93:3 96:21 97:24
98:16,25 99:3,7,9
99:11 100:11
113:9,10,11,22
117:6,8,24 118:6

119:1 127:17
157:18 158:1
171:16 223:2,4
225:15 246:18
261:15,23,25
262:7,12,24 264:8
264:14,15 266:15
266:22,25 267:21
268:4 269:20
276:7,16 279:14
299:3 301:21
348:19,21
**report's** 266:22
**reported** 38:5 88:7
97:24 228:20
252:24 292:15
295:14
**reporter** 5:17
16:15 27:4 50:18
50:19 52:2,7,12
53:20,24 60:4
161:24 162:3
164:1 186:20,23
200:8 353:18
362:7
**reporter's** 5:14
359:1
**reporters** 25:10
51:20 52:4
**reporting** 32:11
62:25 88:15
**reports** 24:12
39:25 40:20 41:23
43:16,24 44:9
47:15,22 62:21
63:17 76:14 90:1
93:6 97:16 106:9
109:1,9,10,12
113:13 115:24
127:14 130:5
148:16 152:3

155:24 221:13,24
222:1,4,5,8,10
268:19 271:18
273:18 280:10
282:5
**repres**  289:4
**represent**  308:10
337:3
**representative**
85:13,15 86:1
96:14 289:5,13
322:5
**representatives**
319:20
**request**  80:13
87:10,15,17 152:4
175:5,15,16,22,24
186:7,8 188:8
202:16 203:3
204:1,6,9 214:8,17
214:18 215:8
231:7 241:16
242:5 243:7 258:6
363:9,11
**requested**  226:16
242:13 243:3
358:1,6,10
**requesting**  6:11
150:21 152:1
**requests**  175:14
187:6,8,19 201:7
201:20 202:2
203:9,17,20
215:17 216:1
241:25 242:20
243:10,18
**require**  206:4
234:9 334:15,23
**required**  46:13
121:8,15 132:9
207:4,6 307:14,21

361:25
**requirements**
41:21
**requires**  205:11
206:18
**requiring**  249:14
**research**  258:3
**researching**  40:1
**reserve**  193:10
**residence**  138:9
346:21
**resident**  166:4
**residential**  90:22
286:8,22
**resort**  17:23
**resources**  100:17
104:19,21 126:20
146:16 180:21
185:24 186:18
187:1,14 188:9,11
228:3
**respect**  309:21
**respond**  37:13
48:19,22 49:1
285:10
**responded**  23:7
25:18 34:7 48:14
49:15 146:6,12
255:15 316:20
**responders**  26:9
**responding**  242:14
244:12
**response**  51:2
199:2,13 200:3
217:5 218:1
238:15 240:18
243:20 244:11
250:18,22 254:5
254:15 255:4,7,19
256:6 258:15,16
258:18 259:20

299:8 304:5,6
306:1 341:22
**responses**  8:12
303:1,8
**responsib**  89:22
**responsibilities**
30:11,23 38:8
66:11 75:1 86:11
86:14,23 88:25
89:4 93:1 99:24
100:2 137:3,8
157:21 162:22
183:4 190:23
282:18 343:5,25
**responsibility**
74:18 88:22 89:11
89:12,22 90:8,13
90:19 93:4,8,11
95:20 99:12
110:15 118:25
120:20 121:2
140:21 141:1
153:22 156:6
157:14 159:12,18
159:25 160:3
161:12,16 162:4
163:3,7,11 164:24
165:2,8 211:3
266:16,21 268:17
268:21 269:20
271:15,21 275:3
276:21 279:18
285:10 291:17
296:3 343:13
**responsible**  31:3
46:21 78:11 91:17
91:21 94:4 110:13
136:20 152:16
156:15 232:5
265:25 268:12
273:19 279:23

287:19 291:2,12
294:13
**restrained**  128:21
128:22
**restrict**  167:9
**result**  211:14
214:24 252:11
304:14 315:8
**resulting**  176:21
**results**  56:2 62:16
274:5
**resume**  73:17
**retained**  5:17
**retired**  88:16
**return**  131:4
**returned**  66:1
361:18
**revealing**  340:7
**review**  94:23
123:5 127:9,12,14
142:8 160:8,11
221:25 358:2,6
361:12 362:1
363:1
**reviewed**  295:1
302:5
**reviewing**  119:1
163:4 222:9
**rice**  2:4
**rick**  137:2
**rid**  300:9
**right**  22:22 27:13
47:10 56:13,24
73:23 85:18 90:10
93:14 96:10,12
120:16 152:5
170:10 180:23
184:1 186:1
191:14 193:1
195:17,20,24
197:12 198:23

205:6 209:15
213:11 214:5,21
215:2,4,9 216:6
225:20 226:4
228:16 229:11
231:2 236:2
253:19 255:5
264:2 274:3
285:11 292:20
293:1 320:3,25
323:15 335:6
341:24
**ring**  235:11
**rip**  245:5
**rise**  135:8,9 191:5
204:9 257:7
**risk**  132:12,15
137:19,20 219:15
**risks**  166:16,18
353:6
**ristow**  151:13,15
**ristow's**  151:25
**rite**  338:15,19,23
349:15
**road**  17:4 23:22
36:17 51:16 63:9
74:21 76:1 77:19
103:12,15 106:22
315:13
**robberies**  34:13
**rock**  35:15
**role**  24:24 30:11
37:11 49:7 84:20
88:1,20 93:1
120:18 151:17
156:12 262:2
272:9,12 276:20
313:9 316:21
343:16,18 344:13
345:1 356:2,8

**roles**  314:4 344:10
345:15
**room**  1:21 42:22
43:12 65:13
348:24
**roughly**  202:14
**route**  175:5
345:19,20
**routed**  175:16,24
**routine**  79:13
**rpr**  1:25
**rsquire**  2:19
**rule**  346:20
**rules**  16:17 26:24
126:11 343:11
358:3,7 362:5
363:5
**ruling**  285:18,23
**run**  31:1 35:24
57:21 87:2 235:3
251:11,13 259:17
286:14,18
**running**  31:7,7,8
93:18 246:8
331:23
**runs**  35:2 271:25
**russell**  2:16 16:5
167:25
**ruthann**  252:17
272:8,14 273:2
282:25
**ryan**  228:16,20
229:2

**s**

**s**  172:3 361:15
363:8,8 364:3
**s.m.**  4:4
**safe**  38:15 73:5
357:15
**safeguard**  167:8

**safer**  227:7
**safety**  203:12
204:4 304:11
344:3,12,25
345:10
**sales**  29:19 319:20
347:12
**sam**  16:2 308:8
**samuel**  3:5
**samuel.lonergan**
3:7
**sandra**  3:11 15:16
**sara**  3:16 15:19
**sat**  119:15 273:24
**saturday**  256:18
**save**  301:17
**saved**  302:8
**saving**  301:18
**saw**  106:21 299:3
299:11 338:3,3
**saying**  189:25
197:18 206:15,17
211:20 221:6
279:14,15 280:3
315:22
**says**  40:4 55:24
68:4 70:20 72:4,6
104:18 116:7
152:6 168:8
179:17 180:24
186:3 190:9 194:2
196:14,19 197:24
204:14 265:6
278:24 279:1
294:12
**sbarker**  300:18
**scan**  44:21,21
115:2 217:19
225:11 240:2
255:25 256:2
301:22

**scanned**  245:19
**scanner**  217:19
218:4 224:20
238:20 239:14
242:4 256:1,12
299:4 305:2
325:21
**scanner's**  242:3
**scanners**  224:11
224:16,22 225:2,5
225:13,14,19
226:1,3,8,17 227:1
227:12,24
**scanning**  258:7
**scene**  21:21 23:5,9
23:13,16,19,21
24:13 25:1 26:1
35:19 36:2 46:11
46:12 47:17,20
53:21 54:19 75:10
97:13 126:15
315:11 316:19
**schedule**  66:13,14
66:15 269:22
289:2,2 294:21
**schiavone**  3:16
15:19,19
**scholer**  16:3
**school**  28:19
**scj**  196:20,20
285:18
**scolded**  300:9
**scope**  83:18
122:15 177:14
334:12
**scott**  284:17
285:16
**scram**  199:7,10
**scratching**  54:20
**screen**  63:19 83:23
236:7,9,12 240:8

241:12,18 242:7
244:7 247:19
278:3 282:11
286:21
**screened** 282:19
**screening** 138:5,8
236:16 240:5,16
241:3 242:1
247:25 256:20,21
257:10,21 287:5
288:6
**screens** 59:17
236:13 282:5
**se** 41:3 87:14
224:18 275:4
**seal** 360:6 362:15
363:21
**search** 222:13,18
**searches** 217:9,10
**second** 23:4 42:11
52:11,22 53:17,20
55:1 56:11 100:16
104:17 116:7
117:15 124:4
131:5 136:7
142:18 151:10
155:11 178:22
179:4,16 184:3
193:18 194:1
197:8 209:12
228:19 229:14
244:11 269:7
273:17 277:4
281:21
**section** 117:8,15
265:5 270:12
273:18 274:15
294:19
**secure** 111:8
126:21 132:23
178:24

**secured** 279:2
**securing** 112:4
122:7
**security** 29:20
71:10 90:3 93:19
110:14,23,25
111:9,22 114:5
121:23,25 126:21
132:12,15 136:17
136:21 137:19
141:10 158:2
161:9 166:16
167:8 177:19
190:24 191:3,6,7
191:10,13 203:13
204:4 219:14,23
236:13 238:17
244:17 255:25
272:1,3 273:13
286:2,6 288:14
290:11 343:14
**securpass** 217:19
218:4 243:25
244:1,7
**see** 24:24 25:12
58:14 70:7 76:1
77:1,2 87:5
100:21,22 101:8
102:23 106:20,22
106:23 111:15
112:2 117:12,19
120:3 124:13
140:5,13 142:16
151:23 155:4,6,13
158:16 159:9
167:3 168:16
170:25 171:7,19
172:15,16 181:7,9
189:9,10 194:5,6
195:18 196:13,17
196:18,22 197:2,2

198:3,11,16 199:8
199:9 209:22
210:4,8,9,12,16,22
211:5 219:2,3,8,9
220:14 224:12,13
228:24,25 229:7
229:18,19 230:5,6
230:12 235:3
238:25 249:7
257:2 265:5
269:12,13 270:13
270:14 272:24
281:14,22 285:20
285:21 294:8
295:6,9 302:24
304:2,5,16,17
314:18 325:6
344:12
**seeing** 32:9 75:23
103:22 107:5
111:16 124:18
134:10 244:24
251:22 256:23
303:15 320:19
326:12
**seen** 111:18
134:16 135:8
139:16 140:18
149:3,6 188:2
216:14,15,15,16
216:19 245:13,18
261:21 329:18
340:16
**seized** 42:21 43:13
**sell** 320:5
**selling** 148:8
**send** 24:8 56:21
57:11 68:21 86:1
289:3,4
**sending** 56:13
57:25 144:24

**sense** 32:4 38:25
293:5
**sent** 55:22 57:13
57:18 59:15 60:9
60:14,23 62:5,8,10
62:13,15,19 68:9
68:16,18 131:25
132:4 144:9,22
159:4 220:8 229:9
229:15 256:12
285:5 316:14
**sentence** 100:16
104:18 116:7
158:7 168:8
196:10,15 199:5
200:2 202:3 204:9
280:8
**sentenced** 139:24
196:10
**separate** 302:13
344:10 348:4
**separated** 183:15
197:25
**separateness**
183:19
**september** 8:1
97:7,10,18 280:25
356:22 360:17
**sergeant** 23:7
30:16 33:23 35:25
37:1,4,9,12,13,16
38:8,10 44:8
45:21,25 46:2,18
46:19 47:2,19
48:18,18 49:16
65:19 66:14 73:22
103:21,25 220:23
249:8 273:8,9
300:25 305:15
316:13

**sergeants** 74:22
   165:14 238:17
**series** 117:13
**serious** 37:20,22
   37:23
**seriously** 226:13
**serve** 33:20 37:3
   45:20 74:13 85:7
   264:24 318:10
   342:17 343:1
**served** 47:2 48:18
   65:19 99:18 116:3
   118:13 147:11
   272:11 289:15
   343:2
**service** 34:7,9,14
   35:10 36:24 37:14
   46:5 59:17 60:12
   118:7 121:18
   141:14 165:15
   236:7 239:25
   339:17,19 348:1
   357:13
**serviced** 333:6
**services** 84:24,25
   86:6,9,10 89:1,9
   89:13,23 90:20
   91:1 93:14 110:17
   117:9,14,16,22
   118:4 119:25
   120:6,13,21,25
   121:3,8,15,21
   138:16,17,21,25
   141:4,7,14 152:16
   156:11 160:1,15
   160:18,21 164:16
   180:6 182:24
   183:18 212:21
   250:11 259:12,13
   259:15,19 260:5,8
   260:10,15,20

261:1 262:19,22
262:25 265:5,6
266:4,18 268:7,8
268:11,13,17,18
268:21,23 270:13
270:19,24 271:3
271:11,16,24
272:2,5,16,19,25
273:18 274:15,19
276:22 277:6,10
286:24 287:10,16
303:21 304:11,14
**set** 8:13 161:19,23
   162:2 164:19,25
   165:11,20 166:10
   278:14 279:19
   294:14,18 297:8
   303:2,9 310:9
   319:3 336:11
   338:5 360:6
**setting** 111:8
   162:4 207:6
   326:24 333:13
   343:11
**seven** 101:5
   230:10 240:14
   241:22 341:17
**shackelford** 3:22
   15:22,22
**shadow** 37:18
**shakedowns** 122:7
**shane** 1:17 5:7
   15:4 16:16,21
   17:2 167:23 237:2
   308:1 336:25
   359:9 361:8 362:4
   362:9 363:4,13
   364:20
**share** 102:15
**she'll** 269:1 272:23

**sheet** 40:22 42:16
   42:17,19 43:6
   45:9 68:3 361:13
   363:7,10,18 364:1
**sheets** 43:11 54:12
**sheraton** 1:21
**sheri** 171:12
**sheriff** 29:10,11
   30:5,9 33:17
   99:19,21,25
   133:13 151:22,23
   153:13 215:13
   297:15,19 301:4
**sheriff's** 6:17 7:14
   7:17,19,22 25:3
   30:6,13 36:5 49:7
   51:3 54:24,24
   55:5 56:12,21
   57:11,25 58:4,10
   58:17,18 59:1,6,25
   66:3 73:20 77:21
   84:9 85:15 88:2
   88:13 96:14,23
   141:6,16 147:24
   151:21 159:24
   160:23 164:6
   210:25 211:7
   215:16,25 226:11
   260:17 261:14
   263:19 264:7
   267:3,20 276:6,15
   289:14 291:16
   294:11 295:10
   297:24 322:5
   344:13 348:12
   350:2 355:24
   356:3,21
**sheriff.summito...**
   300:17,24
**sheriffs** 141:13

**shift** 25:24 31:9
   46:10 47:24,25
   48:24,24 60:2
   66:7,24 74:2,5
   75:11 127:13,15
   155:23 208:6,6,10
   208:10 222:3
   223:21,25 224:1
   233:13,13,23
   234:4 246:7,10
   250:24,25 251:4,4
**shifts** 34:23 66:8
**shopping** 345:12
**short** 96:8 230:2,9
   262:9
**shorter** 41:13
**shoulder** 31:22,22
**show** 33:9 56:6
   217:24 302:23
**shower** 114:23
   217:12,14 278:5
**showering** 217:21
**showers** 114:21
**showing** 170:10
   239:21,22
**shown** 229:5 310:7
   361:16
**shut** 333:20,23,24
   335:14 336:13
**sic** 54:11 344:2
**side** 38:12 46:23
**signature** 151:18
   179:16 358:5
   360:13 361:14
**signed** 362:13
   363:18
**signing** 361:19
**signs** 245:8 338:5
**silly** 158:11
**similar** 190:1,3

simple  23:20,25
simply  48:21
sims  228:19
sincerely  361:21
single  251:12
   309:24 312:18
sir  313:7 361:10
sit  27:21 63:12
   100:7 160:12,14
   252:7,7 309:12
   312:17 318:13
   323:17 332:2
site  94:5,8 150:13
   153:5 163:8
   172:14 291:3
situation  68:13
   77:19 82:22
   126:16 128:22,22
   129:9,11,18 152:1
   162:13 314:22
   315:3,7,15
situations  51:22
   260:13 306:9
   313:18
six  7:11 163:25
   218:12 257:14
   302:13,16 321:17
   330:2
sixth  131:6
ski  17:23,23
skypark  29:20
skzerrusen  3:13
slack  298:4
slide  185:1
small  55:11
   106:15 244:5
   305:5
smaller  43:8
smoothly  93:18
smug  257:3

smuggle  115:19
   217:1 235:13
smuggled  111:16
   113:20 216:10,13
   216:21 217:6
   221:9,9 232:25
   235:21,23 256:25
smuggling  114:3
   115:8 218:1
   220:25 221:2
   223:7,9 224:4,12
   225:4 227:2,11
   234:7 235:8 236:4
   257:4
social  272:22
   273:11
sold  29:18,19
   338:18
soltis  88:11,17
   144:22 151:7
   154:7,11 158:25
   159:7,11 180:18
   197:10,14,17
   198:18 200:22
   201:8 204:14
   218:20 229:2
   292:11
soltis's  88:12
   185:18 199:13
   200:3,16
solutions  3:3
   361:1 364:1
solved  269:1
somebody  34:14
   44:22 67:9 97:5
   111:4 139:19
   143:5,8,8 163:12
   187:10 202:6,8,16
   207:20 231:24
   232:9,11 235:6
   246:15 266:24

305:10 307:11,18
   314:10 315:3
somebody's  40:1
   232:19 286:9
somewhat  24:22
   52:20 100:25
soon  114:19
   217:12 278:5
sorry  25:24 43:23
   60:6 63:6 66:3
   74:3 89:17 93:5
   104:6 121:12
   130:13 132:18
   161:25 162:1
   170:5 173:21
   186:21 188:15
   196:3 200:9,12
   203:17 218:18
   220:25 226:1
   243:11 263:13
   274:1 292:21,22
   296:7 297:1
   347:20 353:20
sound  205:18
sounded  315:25
sounds  49:11
   205:18
source  44:24
   204:8 277:17
   317:7,13 337:8
   340:2,12,19
sources  77:5
   140:15 341:12,20
   341:21
south  2:6 3:11,17
   46:23
speak  26:13 274:9
   322:12
speakers  322:3
speaking  189:14

speaks  198:25
   214:23
special  141:4,7,14
   183:8,12,20
   197:20 268:11
specialized  180:21
   183:10,11
specific  19:19
   40:11 61:22 64:7
   74:25 75:4 88:21
   88:24 90:16 106:6
   109:2 114:12
   119:11 127:24
   135:14 231:1
   239:6,9 240:4,9
   241:25 242:5,13
   243:3,10,19,25
   244:1 256:20
   269:15 287:23
   288:10 298:14
   304:23 321:5
   324:15 337:17
   338:9,23 339:10
   343:17
specifically  20:4,7
   25:20 59:10 61:12
   61:19 90:12 197:7
   219:5 221:3
   227:21 237:15
   242:20 243:3
   245:16 256:20
   258:1 282:21
   286:19 294:24
   313:21 315:1
   321:9 322:17
   326:17 336:11
specificity  243:6
specifics  81:6 94:9
   324:24 334:4
specified  359:21

**specify** 142:23
303:19
**speculating**
248:24
**speculation** 22:15
113:2 140:17
182:13 199:19
200:5 307:17
**spell** 144:3
**spend** 199:16
200:18 201:3
**spending** 188:11
**spent** 103:20
227:20 228:3
**spike** 101:3 244:24
338:4
**split** 99:24 196:15
199:4
**spoke** 51:23 52:4,7
52:12 302:1
313:19 352:2
**spoken** 240:1
252:21 297:12,14
297:15
**squeeze** 55:15
**squire** 2:16 5:9
16:5,5 167:24,25
182:17 193:10,13
194:19 196:7
208:15 214:10
231:10
**srbarker** 300:17
300:24
**ss** 359:3
**sschiavone** 3:19
**st** 79:17
**staff** 42:4,5 46:7
51:10 60:15 67:10
67:11 68:6 70:16
82:18 89:7 90:2,3
90:14 91:2,20,22

92:17,19 93:19,21
104:23,24 106:23
108:12 111:8,21
111:23 112:3
114:16,22 118:20
120:15 122:6,8
126:2 128:8,20
131:9 145:1
146:22 149:12,14
152:7,13 153:11
157:19 158:2,2
160:6,22,23,25
162:16,20 163:3,8
163:15 170:4
176:24 187:12
189:5 198:10
204:3 205:21
206:2,19 207:22
217:8 227:4,5
233:25 235:16
236:7,13 238:2,2,6
238:18 239:15
240:12,21 241:21
241:24 242:7
243:7 245:7 247:6
251:1,4 252:8,14
254:5 256:16
260:7,11,14
269:24 272:4,4
273:13,14,19
278:7 279:21
283:21 288:5,14
288:22 294:21
305:9,9 306:8
325:15 335:11,13
335:25 336:12
**staff's** 163:19
260:11 275:6
278:3
**staffed** 204:15,18
205:25 206:2,4,5,9

206:15 208:2,9
**staffing** 198:9
207:3,4,6 233:11
233:14 250:19,20
251:10 255:20
272:20 277:6,7
278:16 279:4
304:13
**stamp** 117:7
151:11,18 277:1
295:8
**stamped** 302:24
**stampings** 55:3
**standard** 27:14
**standing** 323:14
**start** 31:25 43:24
51:16 59:19 91:25
106:5 215:14
**started** 44:6 50:12
50:13,14 51:17
58:13 75:25 77:2
88:14 96:17
102:23 105:17,19
115:4 118:2
152:10 168:3
246:13 343:7
**starting** 25:12
53:13,14,15 76:1
77:1 79:17 101:7
107:4 111:15
257:5 314:18
**starts** 250:25
**state** 6:20 15:9
16:10,25 28:23,25
29:4,14 40:3,17
56:18,18 100:18
116:8,10,13,16
141:12 170:15
237:13 345:19,19
350:25 351:14
359:2,7 360:15

362:10 363:15
**stated** 249:18
**statement** 180:5
246:22 334:19
362:13,14 363:19
363:19
**statements** 319:19
**states** 1:1 15:7
198:5 219:5 351:3
**station** 50:20
**statistics** 100:6
298:14
**stats** 45:6 134:15
**stay** 57:4
**staying** 32:20
252:22 274:14
**steal** 25:14 77:8
79:17,22 80:8,20
**stealing** 21:17
148:8
**steering** 44:10
**stenotypy** 359:14
**step** 41:9 274:2
**stephen** 1:25
359:6 360:14
**steps** 236:3
**steroidal** 158:9
**stick** 35:16
**sticking** 49:24
61:25 76:5
**sticks** 51:17
**stints** 75:15
**stipulate** 328:1
**stock** 94:16
**stocked** 94:8
**stole** 78:25
**stolen** 51:21 53:13
77:2,6 79:8
**stop** 35:5 167:15
224:11

stopped 57:25
189:7 190:10
351:13
stopping 190:18
store 43:24 44:3
348:17
stored 43:16,24
stores 63:16
345:14
story 124:1,4
230:2
strain 198:20
strained 100:20
street 1:21 2:12
3:6,11,17 4:12
25:13 31:14 102:7
103:23 131:21
132:23 133:1,5
136:19 217:13
284:21,23 285:4
322:25 323:3
streets 58:25
146:21
stress 198:9,15
205:1
stressing 204:3
strike 14:5 231:3,5
330:5
strip 217:10
struggle 97:21
stuck 60:14,20
studies 29:13
269:11
stuff 26:12 32:14
39:15 49:23 54:20
55:17 70:25 75:24
76:6 78:6 81:11
103:1,23 114:17
142:2 146:18
227:17 236:11
237:18 240:10

288:4 290:12
302:1 305:16
320:7 321:8
style 31:2
subcommittee
99:15 117:25
120:9
subcommittees
99:14
subcontract
143:21
subcontracted
143:18
subdivision 268:9
subject 17:20
228:15 282:1
subjects 296:23
submit 47:24
80:12 87:17 100:6
258:6
submitted 87:20
87:22 96:21 99:1
99:3,16
subordinates
325:16
suboxone 7:4
176:13 188:19
189:6,11,16,23
190:10,19 191:17
191:23 192:15,24
subscribed 362:10
363:14 364:21
substance 55:8
60:17 154:10
248:17 253:22
273:20,22 274:6
326:23 355:8,17
substances 172:11
240:5 244:8,8
331:15,16

substantial 104:22
substantially
312:6
substantive
285:15
successful 244:19
sued 337:5,9,11,21
338:15 339:4,16
suffer 122:12,13
suffered 71:5,16
71:21,24
suffering 192:5
213:15 287:24
sufficient 205:20
suggested 226:7
suggestion 214:19
suicidal 126:19
238:3 244:12,19
248:9 251:16
252:2 255:20
suicide 124:21
125:4,9,10,16,23
126:12 128:18
244:25 245:1,11
245:12,23 246:5
246:11,16,20,24
247:7,19 248:1,12
248:16 249:1,15
249:20 250:2,11
251:6,9,15 252:1
252:10,25 253:8
305:1 308:19,23
309:4,10,14,16,22
309:25 311:23
312:5,20
suicides 124:11
suing 296:19
342:1,6,10
suit 337:24
suite 3:11,17,22
361:2

suites 1:21
summary 100:14
summer 74:15
summertime
74:10
summit 1:13,21
2:2 6:3,5,6,10,12
6:12,15,16,17,18
6:22 7:2,4,7,9,11
7:13,14,15,17,18
7:19,20,22,23 8:2
8:5,7,8,9,11 15:12
15:15 17:18 18:2
30:5 31:12,13
36:5 38:3,6,9 49:8
51:4 59:3 60:9
61:2,6 68:17 69:1
72:18 77:20 79:14
81:16 82:5 85:24
86:9,12 91:12
93:25 96:22 98:11
98:14,17 99:2
102:16 103:10,19
104:4,9,12 105:13
105:19,25 106:13
106:19 109:5,15
109:24 111:11
113:5 114:13
117:23 119:5,25
120:21 121:1
122:21 123:11,16
125:4,24 131:16
131:17 132:4,7,10
132:12 134:12,19
139:6,11,22
142:25 143:14
144:13,18 145:1,8
145:13 146:2,5,24
150:18,22,23
151:21 152:2
153:5,17 155:16

156:2,20,25
158:20 159:20
161:19 162:5,10
164:2,5,6,8 166:5
166:9 170:18,23
171:14 173:2
174:14 175:3,13
176:9,13,17,23
177:3 178:2,10,16
179:25 180:7
185:21,25 187:1
188:20,25 189:12
189:16 190:3,17
191:17 192:2,8,14
192:18,20,24
194:25 195:6
196:16 198:23
199:6,16 200:2,18
201:3,17,22 202:4
208:23 209:8,14
210:25 211:7
212:9,16,21,22
213:14,17,22
214:12,13,20
215:9,13,16,18,25
216:2,9,22 217:6
217:25 218:12,17
222:6 223:10,11
225:1 226:8
227:11 228:8,14
229:2 230:15,21
230:25 231:13,21
233:1 236:17
237:8,14,23
238:14 245:22
259:8 261:11,14
261:15 262:17
263:12 264:4,7,8
267:11,17,20,21
270:15,16,19,19
270:24 271:3,12

271:16 276:3,6,7
280:22 281:2
284:4,8 286:17
287:11,15 290:5,6
291:6,23 292:2
293:16,19,20
294:3 297:4,11
302:21,25 303:6
304:6 326:8,20
331:23 332:23
333:3 335:15
336:2 337:4,18,20
338:10,15,24
339:4,11,16 341:2
341:9 342:2,7,12
342:14
**summons** 67:25
**superior** 361:1
**superiors** 325:16
**supervis** 157:13
**supervise** 38:13
44:2 46:7,10
77:18
**supervised** 74:23
187:11 204:24
**supervising** 31:5
37:24 49:3 111:25
159:19 165:14
**supervision** 23:5
31:1,2 126:15
154:1 162:21
**supervisor** 18:18
23:8 25:1 42:3
44:21 47:16,17
60:21 87:23,24
89:25 90:7 165:5
182:1 222:12
268:19 271:18
**supervisors** 87:3
**supervisory** 20:14
156:12,12 157:14

260:8 268:21
271:21
**supplies** 85:22
**supply** 3:20 15:24
176:8,12,16
**support** 93:19
**suppose** 348:5
**supposed** 42:2
174:3 186:5
**sure** 18:21 23:13
27:4 31:5 36:8
37:19 38:13,15
45:5 53:12 55:23
57:19 60:18 65:11
66:22 72:13 76:13
90:4 91:6 92:14
93:16 111:7
127:23 142:14
158:1 160:6
162:16 165:9,13
166:22 167:5,17
208:16 213:3
224:7 225:7
226:21 258:8
272:3 275:21
277:15 286:7
287:6 293:14
295:5 296:10
310:14 314:1,24
356:18
**surprise** 280:7,13
**surprisingly**
356:25
**surrounding**
97:10 224:19
**susan** 300:19
**suspect** 40:19
**suspected** 64:14
**suspects** 23:18
**suspended** 118:15
118:18 131:12

**suspension** 140:11
**suspicious** 60:20
**swallowed** 167:4,6
**swallows** 185:4
**swear** 16:15
**switch** 236:23
**sworn** 16:18
359:10 362:10,13
363:14,18 364:21
**symptoms** 107:10
107:15,20 111:20
129:10,17,24
147:4
**system** 89:14,24
93:23 166:16
201:10 223:3
235:24 245:22
270:24 271:4
283:1 286:25
287:11 290:25
293:10 310:23
**systemic** 155:25

**t**

**table** 124:9
**tagged** 40:23 41:2
**take** 36:3 46:6
66:21,22 67:6,9,23
68:2,8,14 72:11,14
73:6,7 114:20
130:11,14 135:16
163:16 165:5
168:1 179:7
185:14,16,25
187:2,14 201:20
208:15 209:4
217:23 224:5
228:18 234:6,17
236:24 257:14
295:3 296:9 321:1
325:14 326:9
328:17 345:4

**taken**  1:20 24:2
42:21 54:18 73:12
74:23 77:10
130:24 158:3
180:21 188:10
208:19 236:3
238:5 254:23
257:19 296:13
336:22 357:6
359:20
**takes**  186:17,17
255:24 256:12
260:11 278:2,2,2
305:8 306:6
356:11
**talk**  26:23 31:25
32:5 50:17 52:2
67:12 79:15 80:15
82:19 86:2 90:14
90:14 91:7 95:3
123:3 160:15
165:18 246:25
251:18 252:7,8
269:1 272:17
273:25 282:14
299:15 312:6
324:23 325:15,25
336:7 344:16
345:18 356:25
**talked**  50:10 51:19
76:5 267:7 288:4
305:2 312:8,8
314:9 330:24,24
330:25 331:1
342:9 347:15
357:1
**talking**  26:16
45:12 51:16 52:10
53:21 56:23,25
81:8 84:12 101:1
108:12,12,14

135:5,6 148:15
155:8 168:6
181:20 210:12,14
214:25 244:15
251:21 255:3
308:19 328:20
334:20
**task**  51:12 96:9
232:16 304:14
**tasks**  223:17
**taught**  331:16
**tax**  271:7
**tear**  245:5
**techniques**  238:19
**technology**  85:16
102:4 226:21
257:25 258:7
**teleconference**
4:10
**telephone**  265:8
**tell**  48:4 79:16
81:10 126:6
134:15 153:1
163:14 165:24
227:4 246:21
252:11
**tells**  106:23
**ten**  101:6 103:2,7
106:16 233:12
253:15 341:18
**tenth**  2:12
**tenure**  18:23
30:18 73:20 92:7
133:4 216:11
221:22 348:7
**term**  54:3 139:25
309:5 315:21
331:6 332:8 343:6
349:22 350:1,12
**termed**  331:20

**terminal**  6:21
170:15
**terms**  107:3
128:10 254:4
343:3 347:8
**test**  40:25 55:16
56:5 57:21 58:5,8
58:8 64:13
**tested**  43:3 55:10
56:8,12 60:21,22
228:22
**testified**  17:6,25
18:5 19:19 21:23
22:1 24:16,25
48:12 50:24
127:18 172:4
193:21 220:24
221:1 224:25
226:2 237:6
277:24 309:2
310:9,18 313:9,12
318:3 321:22
322:4 341:22
348:9 350:15
**testify**  19:3 226:6
359:10
**testifying**  27:18
308:19
**testimony**  18:11
18:14,20 19:2,14
19:15,23 20:5,8,22
21:6,6,13 24:21
26:17,19 27:21
95:2 129:20
163:22 169:21
190:2 225:18
278:9 279:25
306:13 308:21
326:5 340:11
341:7 350:18
351:9 352:1

359:13,17 362:6,7
363:6,9,12
**testing**  55:6,21
56:1,22 57:12,16
58:1 229:24
**tests**  229:4
**teva**  4:8 16:13
327:20
**text**  282:4
**thank**  89:20
121:10 144:1
162:3 186:23
307:22 357:9,12
**thanksgiving**
125:8,11,17
**theft**  53:8,10,12
314:1
**thefts**  52:5 78:9,12
81:12 313:20
345:13
**theme**  80:23
**theresa**  158:25
159:5 160:13
172:20 252:18
**thing**  24:7 137:24
213:24 234:12
239:3,17 259:3
325:22
**things**  20:3 23:13
25:15 26:11 29:22
30:2 32:8 44:3,9
45:8 51:17 61:18
61:24 67:24 71:11
73:4 77:9 78:4
87:4 89:5 93:17
94:15 102:5
108:14 112:2
114:15,22 128:7
132:16 141:11
148:17 187:25
201:24 212:14

216:17 252:9
255:11 259:5
283:21 301:12
306:7 316:20
317:10 321:6
322:10 324:22
325:19,20 326:16
344:22 347:14
348:5 351:18
352:3
**think** 18:25 20:10
22:17 25:7 33:6
37:6 41:5 42:16
50:19 51:18,18,19
51:25 52:18 54:22
56:17 64:19 65:10
65:21,22 84:2
89:17 90:15
101:15 118:5
120:16 121:18,21
133:3 142:21
145:14 166:2
177:9 183:2
186:15 193:5,7
202:5,9,24 206:3,8
213:25 218:3,6
219:19,20 222:22
225:24 235:10
236:22 252:5
258:8 263:2
285:12,17 286:8
298:25 299:2,5,7,7
300:14,18 302:18
306:19,20 307:11
307:13 309:8
310:8 311:21
312:2,12,18 313:2
313:6,8 322:4,24
331:14,16 335:12
341:24 345:2
346:16,17 347:9

348:2,3,10,17
351:7,17
**thinking** 200:6,10
200:20 221:8
225:21
**third** 8:13 158:7
168:15 224:9
230:8 274:14
278:24 282:23
303:2,9 320:15
**thirty** 361:18
**thought** 46:12
96:24 97:4 118:8
293:13 302:7
348:11
**thoughts** 231:7
**thousands** 314:25
**threats** 244:20
**three** 30:1,21
52:21 99:13 140:4
224:23 226:4
251:12 277:8
323:25
**threshold** 121:20
**tick** 257:6
**ticking** 326:13
**tie** 341:7
**tieback** 346:6
**time** 17:13 18:18
18:19 21:21 22:1
25:11,23 28:3,24
29:11 30:7 32:19
34:6 38:16 42:25
47:9,19,22 48:2
50:6,15 51:8,15,19
52:11,15 53:14
57:4,14,24 58:4
60:1 62:8,9 63:7
64:12 67:7 69:17
70:2 76:15,18
77:19 79:2,5 80:4

82:5,10,14 88:6,15
102:22 103:9,11
103:17,20,21,24
103:25 104:2
105:16 107:5
117:21 118:5,12
118:17 127:22
128:6,9 129:8,14
133:13 135:5
143:20 144:1,4
148:20,24 151:8
152:12 162:19
168:13 169:18,20
170:7 173:23
174:4 178:2
186:13,16 198:8
198:10 199:15
200:1,7,11,17
201:2 202:7
204:15,19 205:14
205:17,19,22
206:5 207:2
208:12 210:11
216:25 222:14
232:16 242:23
243:6 251:25
252:23 260:1,12
260:13,24,25
261:4,7 262:5
264:21 267:9
270:3 272:14
273:2 277:8,8
278:3 287:1
292:16 295:3,15
301:2 302:17
305:9 331:7,8
347:5 348:11
349:1 352:16,23
357:13 359:20
**times** 2:17 52:3,16
71:7 83:6 112:21

112:23,25 113:3
113:24 115:12
124:11 126:17
127:6,9 129:22
134:1 149:5,7
182:16 202:14,17
203:15 253:6,11
267:7 289:3
345:18 346:22
**title** 30:7 33:15,18
**titled** 6:3,6,9,16
98:14 117:8
123:11,16 139:9
164:5 270:12
324:8
**tleyimu** 2:7
**today** 26:24 27:18
27:22 40:14 50:25
145:20 146:7,14
219:16 225:1
237:6,25 240:19
243:21 250:23
254:6 255:5,16
258:19 259:21
266:13 267:6
277:24 288:7
296:18 297:21
298:11 302:4
308:16 309:12
310:7 312:13,18
313:7,8 318:13
323:17 330:23
332:2 341:22
347:25 348:9
350:16 354:4
357:13
**today's** 302:11
**told** 82:20 129:10
244:21 251:23,25
252:12 322:17
351:19

| | | | |
|---|---|---|---|
| tonight  218:23 | 243:5,7,24 244:22 | 89:1 90:9,17,20,23 | turning  168:5 |
| top  97:23 158:23 | 247:9 249:17 | 91:11 93:12 119:4 | 220:18 |
| 171:7 172:8 | 255:19 287:23 | 138:25 183:11 | tv  50:19 |
| 180:17 185:19 | 288:3,6,10,13,16 | 192:3,19 194:24 | twelve  101:6 103:7 |
| 196:13 199:3,22 | 290:17 304:12 | 197:16,19 203:22 | twenty  17:12 |
| 210:24 230:1 | 344:6,21 354:3,5 | 204:7 213:11,16 | twice  17:10 323:23 |
| 281:12 329:20 | 354:10,13,18,21 | 213:21 237:16,22 | twinsburg  17:4 |
| tope  2:4 15:14 | 354:25 355:6 | 259:6,18 260:5,15 | 46:24 |
| topic  26:7 131:16 | trainings  241:5,11 | 260:20 261:1 | two  23:18 25:22 |
| 288:20 289:21 | 242:1 | 266:18 280:15 | 34:24 35:16 41:5 |
| 290:1 321:23 | transactional | 354:8,22 355:7 | 45:7 48:14,25 |
| total  113:1,19 | 298:5 | treatments  355:14 | 51:20,25 52:3,4,4 |
| 114:1 223:20,22 | transcribed | trial  18:9 57:19 | 52:21 74:19 75:11 |
| totals  295:14 | 359:16 362:7 | 65:5 | 88:8,16 96:21 |
| tour  118:3 | transcript  5:1 | tried  235:1 344:9 | 125:25 126:7,24 |
| town  97:12 | 358:3,6,9,11 | trip  357:15 | 131:19,20 158:12 |
| township  46:24,25 | 361:11,12 362:5 | trouble  56:17 | 197:20 198:6 |
| toxicology  354:19 | 362:12 363:5,11 | 301:18 | 214:25 218:7 |
| track  110:9 113:3 | 363:17 | troutman  30:5 | 225:19 256:13 |
| 113:9,18 266:12 | transcription | true  169:16 223:1 | 258:9 302:17 |
| 266:16 282:18 | 359:17 | 359:16 | 313:19,23 314:6 |
| tracked  245:15,16 | transfer  6:9 139:9 | truth  158:12 | 324:2 336:18 |
| 250:6 253:24 | 140:21 255:9,9,12 | 359:11,11,12 | 343:2 347:8 348:4 |
| 275:13,14 | 255:20 256:5,19 | truthful  27:21 | type  20:13,16,18 |
| tracking  155:25 | 257:10,21 | try  77:11 111:5,18 | 20:20,21 21:4 |
| 156:7,15 301:13 | transferred  22:17 | 126:15 200:13 | 24:5,10,11 26:1 |
| tracks  130:7 | 25:9 30:15 74:10 | 201:16 204:25 | 32:14 34:14 37:23 |
| traffic  35:5 345:2 | 139:22 228:21 | 212:9 234:19 | 40:5,8 41:9 42:13 |
| 345:8 | 255:23 264:22 | 301:12 306:19 | 43:8 45:1 48:2 |
| train  238:20 242:6 | 314:19 | 348:3 349:2 | 49:23 54:14 63:14 |
| trained  238:19,23 | transport  137:14 | trying  22:16 80:17 | 63:23 71:1 75:24 |
| 239:15 290:20 | 139:18 141:11,11 | 80:19 102:25 | 76:6 78:5 89:7 |
| training  6:7 29:7 | 238:8 | 182:17 196:3 | 90:21 94:14 97:24 |
| 29:24 66:5 114:16 | treat  72:22 111:21 | 235:12 259:1,3 | 102:25 104:3 |
| 123:13,18 217:8 | 122:3 123:8 149:9 | 271:23 312:14 | 109:4 113:10 |
| 236:9 238:2,13,16 | 149:24 150:3,9 | 317:12,18 320:4 | 114:18 146:18 |
| 238:22 239:2,5,12 | 191:24 213:25 | 327:6 | 148:4 153:2 |
| 239:16 240:3,15 | 274:22 | turn  67:1,19,21 | 171:24 183:23 |
| 240:17 241:2,18 | treated  107:7 | 72:25 193:14 | 222:16 223:4 |
| 241:21,24 242:11 | treatment  7:6 | turned  68:9 72:17 | 234:13 238:3 |
| 242:13,18,22 | 59:14 71:11 82:4 | 72:21 220:11 | 239:9 240:23 |

245:6 249:17
285:3 320:19
344:8 346:20,25
**typed**  63:18,20
**types**  18:8 19:21
32:8 39:10,20
49:18 54:5 75:18
76:3 89:5 94:14
102:24 109:4
162:17 238:13
256:24 258:24
259:5 260:12
301:19 335:20
**typically**  184:7
186:8 356:10,13

**u**

**u.s.**  61:16 209:19
**uh**  27:2 45:13
326:4
**ultimate**  88:4
153:8,10
**ultimately**  188:8
232:8
**unable**  72:22
**unavailable**  280:9
**uncommon**  186:7
188:6 201:14
**underlying**  187:18
203:5,10
**underneath**  185:1
**understand**  27:17
27:24 104:20
113:16 182:19
207:11 227:18,19
277:17 312:12
318:2,3,8 322:11
328:14 332:11,13
333:1 353:17
**understanding**
20:25 21:3 97:1
100:23 101:2,9,17

101:20 110:18
116:9,12 120:5,10
166:2 181:12
182:18 200:1
207:11 263:7
278:15 279:12
285:22 319:24
332:16,18
**understood**  44:14
195:24 223:6
353:6,13,22
**undertake**  25:3
298:8 307:9,14
**undertaken**
114:13 208:7
258:17
**undertook**  55:6
77:21 81:21
**uniform**  217:15
**unit**  7:11 26:10
35:18,23 36:2,9
37:21 62:14 78:3
78:17 97:21
148:10 218:12
262:18 269:10
270:16 279:1
316:15 319:11
333:17
**united**  1:1 15:6
29:18,19
**units**  184:24 185:6
**unknown**  43:1
**unquote**  105:25
**unwritten**  168:22
169:1
**updated**  239:18
**upgrades**  305:2
**upwards**  104:23
224:1 256:14
**usa**  4:8

**use**  6:7 58:11
79:23 83:24 99:14
107:15,20 110:10
122:17 123:12,17
124:10,16 125:1
126:14 127:17,17
128:10,23 132:18
132:18 141:21
142:4 187:15
191:17 204:25
224:15 225:25
226:8 229:5
230:10,11,14,20
244:2 247:20
252:10 260:5,22
282:7,19 290:5
292:11 293:4,6
306:17 345:17
350:1 355:17
**uses**  225:1
**usually**  20:13 34:3
40:5 44:22 49:1
54:19 67:16 68:1
70:7 71:1,1 87:18
247:10 251:1
**utilizers**  120:2

**v**

**v**  1:10,11,13 361:6
362:3 363:3
**vacation**  97:12
**vague**  39:13
145:22 167:12
174:1 188:5
189:19 201:12
206:11 212:13
254:8 317:2
329:17 351:16
**valid**  81:23 83:15
109:17,25
**variables**  207:4

**varies**  182:2
205:13
**variety**  35:15
77:10 262:20
**various**  314:4
315:20 316:5
**vendors**  349:21
**verification**
168:23 170:1,6
**verifications**  335:8
335:9
**verified**  169:22
334:17,25 335:5
**verify**  169:8,15
**veritext**  361:1,7
364:1
**veritext.com.**
361:17
**vials**  55:15
**video**  9:1
**videographer**  15:1
16:9,14 73:10,13
89:16,20 130:22
130:25 167:18,21
208:17 209:2
254:21,24 296:11
296:14 336:20,23
357:4,7,16
**videos**  239:21,22
**videotaped**  1:16
**view**  102:15
**violated**  220:8
**violations**  220:19
356:19
**violator**  219:11
**violent**  132:21,21
**visit**  314:13
**visited**  144:21
226:22
**vivitrol**  192:4,6,9
192:23 274:22

275:8,16,24
**voicemails** 301:11
**volition** 46:12
**voluntarily** 220:18
**vote** 343:9

**w**

**w** 2:5 361:5
**wa** 221:19
**wadsworth** 29:21
**wait** 27:6 210:2
  243:12
**waived** 361:19
**walgreens** 337:21
  337:24 338:3,9
  349:14
**walk** 238:10
**walking** 251:20
**walmart** 4:2 16:1
  337:3,5,9,17
  348:15 349:12
**want** 26:23 32:1
  50:17 53:3,11
  58:14,22 61:14
  143:18 167:15
  205:25 209:25
  220:21 236:24
  242:25 246:15
  248:9 264:22
  322:13 327:2
  344:18 346:1
**wanted** 39:19
  47:12 69:14 70:9
  83:22 94:23
  107:23 108:5,23
  110:6 115:22
  122:24 154:22
  155:19 175:4
  182:10 222:7
  226:21 245:21
  273:8,9 346:11,19

**wanting** 53:24
**wants** 52:2 210:8
**warm** 52:16
**warning** 338:5
**washington** 2:13
**watch** 125:4,17,24
  238:25 245:7,11
  251:10,12 305:1
  308:24 309:4,10
  309:14,16,22,25
  311:23 312:5,20
**watched** 167:1
  245:18
**water** 167:4
**watson** 4:9,9
  327:24 328:10
**way** 32:3 41:10
  43:22 46:23 54:15
  54:16 56:11 61:16
  61:18 63:20 68:9
  106:20,21 112:10
  116:18 122:2
  169:22 180:19
  185:2 200:14
  213:16 235:19
  238:7 240:20,25
  256:4 259:19
  261:7 277:22
  305:23 313:14
  316:5 318:15
  319:14,19 321:3
  324:16 326:3,16
  328:24 329:25
  331:21 340:22,23
**ways** 23:22 255:14
**we've** 61:15,17,17
  61:23 72:10
  111:17 113:25,25
  114:15,15 126:11
  127:3 133:18,19
  145:14,14 146:7

146:13,16 208:13
  214:16 217:8
  236:6,6,8 237:17
  238:5,6,7,16,19
  239:2 241:20
  250:22 258:15,22
  259:2 267:6 280:4
  280:5 298:10
  304:23 330:24
  336:4 340:22
  341:14,15,16
**week** 34:23,24,25
  48:6,15 49:14
  75:8,11 91:15
  229:16 273:4
  282:6
**weekend** 207:2
**weeks** 96:21 297:2
**welcome** 307:25
**went** 23:21 28:18
  29:8,8 33:24 37:9
  45:18 49:2 54:15
  54:22 57:19 66:1
  66:7,7 75:10
  103:15 118:4
  144:20 190:7
  193:6 226:22
  239:14 258:2
  302:18 313:13
  314:12,24 324:13
**west** 3:6 38:12
  133:18 284:21,22
  285:4
**westover** 229:10
**wews** 151:13,17
  152:1
**whatsoever**
  159:25
**wheel** 44:11
**when's** 251:25

**whereof** 360:5
**wholesaler** 328:15
**wholesalers**
  329:15
**wife** 355:23
  356:20,24
**william** 3:22 87:25
**williams** 3:21
  15:23
**window** 52:17
  68:7 163:15 185:1
  247:11
**wing** 133:18
**withdrawal** 107:6
  107:10,14,19
  111:20 124:19
  126:18,25 127:10
  127:20 128:1,12
  128:25 129:4,10
  129:17,24 146:19
  147:1,4 192:5
  305:8
**withdrawals**
  128:18
**withdrawing**
  238:4
**witne** 311:6
**witness** 16:15
  18:17 59:5 60:6
  73:9 109:20
  110:21 130:11,14
  130:16,19 146:10
  162:1 167:17
  186:22 200:9,12
  214:2 237:1 248:4
  296:7 297:22
  299:17 307:24,25
  328:21 353:20
  357:14 359:9,14
  359:15,18 360:5
  361:8,11 362:1,4

362:11 363:1,4,15
**witness's**  358:2
**witnesses**  310:19
**witness'**  361:14
**wms**  3:24
**wo**  307:6
**woke**  154:14
**wondering**  209:25
**word**  63:22 64:2,6
64:21 106:25
**words**  79:23
251:17 306:18
340:5
**work**  18:2 31:11
31:21 34:4,5,16
36:7 38:6 54:4,6
56:19 61:21 66:13
92:15 119:25
125:7 135:7
141:22 148:16,16
149:21 161:9
201:16 206:21
207:8,14,16,21
223:18 225:6
240:12 272:3,24
275:6 289:24
298:8,9 321:7
332:25 357:1
**worked**  25:22,23
30:13 44:7 48:24
66:8 74:20 124:22
136:12 226:21
273:15 280:4
**worker**  247:1
272:22 273:12
**workers**  59:17
60:13 239:25
**working**  34:23
48:23 75:11 135:4
158:3 226:23
272:4 314:4 336:6

**works**  143:8
172:23 223:15
**workshop**  324:19
325:2,4
**workshops**  288:19
320:11,16,18,22
324:5,7,12,15
**worried**  59:20
244:17
**wracking**  258:25
**wright**  3:15 15:20
**write**  41:11 44:11
62:20 113:22
209:24 246:18
**writes**  171:13
181:13 189:4
198:13 199:4
209:17 210:6
211:1 218:23
220:11 228:20
229:2 230:2,8
282:24 285:17
**writing**  56:4 172:9
**written**  42:2 62:7
62:22 64:11,12
117:25 118:6
155:13 168:22
169:7 301:22
**wrong**  131:14
279:14
**wrongdoings**
329:14
**wrote**  151:6 181:5
181:18
**wu**  2:11 5:8,10
16:7,7,22 72:13
73:7,15 89:17,19
130:13,15,18,21
163:25 167:14
219:19 236:22
237:3 243:14,16

254:20 255:1
296:10 307:22
357:9

**y**

**ye**  274:25
**yea**  313:25
**yeah**  19:24 22:2
27:10 35:14 36:7
36:9,15 38:4 41:7
62:6 74:6 83:20
92:14 96:11
109:21 120:24
143:25 151:23
196:3,7 199:20
208:15 225:21,23
243:17 278:8
310:15,16 317:21
323:15 326:17
**year**  21:5 30:3
33:6 37:7 69:18
80:11 81:2 86:25
96:18 103:13
107:16,21 108:7
108:18 109:16
110:1 112:6,15
115:9,19 116:3
122:21 127:3,4,13
127:21,25 129:16
129:23 147:1,5
158:14 202:15
245:9,23 247:9
248:13,17 249:2,3
249:6,6 250:3,10
253:6 264:21,23
279:24 289:3
295:9,9 296:5
324:13 343:2
**yearly**  261:23
264:14
**years**  17:12 18:22
30:14,21 45:24

58:13,25 65:12
75:25 79:17 82:20
82:23 88:8,17
101:6 103:2,7
106:16 107:1
119:20 124:21
135:22 143:17
144:7 147:11
172:14 218:7
221:21 224:23,24
225:19 226:4
239:4,20 240:11
240:14 241:1,22
244:15 249:5,10
257:8,14 258:23
272:13 289:17
291:7 295:25
304:24 306:5
320:8 321:17
323:24 326:14
330:2 331:16
335:21 337:14
341:18
**yep**  194:20
**york**  2:17,18,18
3:6,6

**z**

**zapadka**  171:12
**zerrusen**  3:11
15:16,16

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.