Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4                     - - -

5    In Re National            :

     Prescription Opiate       :

6    Litigation                :

                               :   MDL No. 2804

7                               :

     This document relates     :   Case No. 17-md-2804

8    to:                       :

                               :   Judge Dan Aaron

9    The County of Summit,     :   Polster

     Ohio, et al., v. Purdue   :

10   Pharma L.P., et al.       :

     Case No. 1:18-OP-45090    :

11

12          Transcript of the video deposition of

13   Julie Barnes, a witness herein, called by the

14   Track One Defendants for examination under the

15   applicable rules of Federal Civil Court

16   Procedure, taken before me, Linda D. Riffle,

17   Registered Diplomate Reporter, Certified Realtime

18   Reporter, Certified Realtime Captioner, and

19   Notary Public in and for the State of Ohio,

20   pursuant to notice and agreement, at the Akron

21   Bar Association, 57 South Broadway Street, Akron,

22   Ohio, on Monday, December 3, 2018, beginning at

23   8:59 a.m. and concluding on the same day.

24

25

Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFFS SUMMIT COUNTY, THE
     CITY OF AKRON, AND THE WITNESS:
 3
 4       Jodi Westbrook Flowers, Esq
         Annie E  Kouba, Esq
         Anne McGinness Kearse, Esq
 5       Motley Rice LLC
         28 Bridgeside Boulevard
 6       Mt  Pleasant, South Carolina  29464
         (843) 216-9163
 7       Fax:  (843) 216-9027
         jflowers@motleyrice com
 8       (843) 216-9225
         akouba@motleyrice com
 9       (843) 216-9140
         akearse@motleyrice com
10
     ON BEHALF OF THE PLAINTIFF SUMMIT COUNTY CHILDREN
11   SERVICES:
12       Katerina C  Papas, Esq
         Deputy Executive Director and General Counsel
13       Jonathon D  Hart, Esq
         Legal Counsel/Risk Management Officer
14       Summit County Children Services
         246 South Arlington Street
15       Akron, Ohio  44306-1354
         (330) 379-2083
16       Fax:  (330) 379-1897
         kpapas@summitkids org
17       (330) 379-2041
         hartj@summitkids org
18
     ON BEHALF OF THE DEFENDANT WALMART:
19
20       Christopher Lomax, Esq
         Jones Day
21       600 Brickell Avenue
         Brickell World Plaza
22       Suite 3300
         Miami, Florida  33131
23       (305) 714-9700
         Fax:  (305) 714-9799
24       clomax@jonesday com
25
```

Page 4

```
 1   APPEARANCES (continued):
 2   ON BEHALF OF THE DEFENDANTS ENDO HEALTH
     SOLUTIONS, INC , ENDO PHARMACEUTICALS, PAR
 3   PHARMACEUTICALS, AND PAR PHARMACEUTICAL COMPANIES
 4       Heather A  Hosmer, Esq  (via telephone)
         Arnold & Porter Kaye Scholer
 5       601 Massachusetts Avenue
         Washington, D C  20001-3743
 6       (202) 942-6208
         Fax:  (202) 942-5999
 7       heather hosmer@arnoldporter com
 8   ON BEHALF OF THE DEFENDANT McKESSON CORPORATION:
 9       Michelle L  Yocum, Esq  (via telephone)
         Covington & Burling LLP
10       One CityCenter
         850 Tenth Street, NW
11       Washington, D C  20001-4956
         (202) 662-5103
12       myocum@cov com
13   ALSO PRESENT:
14       Shaun Crum, Videographer
15           - - -
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES (continued):
 2   ON BEHALF OF THE DEFENDANT CARDINAL HEALTH, INC :
 3       Sara C  Schiavone, Esq
         Porter, Wright, Morris & Arthur, LLP
 4       41 South High Street, Suites 2800-3200
         Columbus, Ohio  43215-6194
 5       (614) 227-1994
         Fax:  (614) 227-2100
 6       sschiavone@porterwright com
 7   ON BEHALF OF THE DEFENDANT RITE AID CORPORATION:
 8       Scott T  Schutte, Esq
         Morgan, Lewis & Bockius LLP
 9       77 West Wacker Drive
         Chicago, Illinois  60601-5094
10       (312) 324-1773
         Fax:  (312) 324-1001
11       sschutte@morganlweis com
12   ON BEHALF OF THE DEFENDANT INSYS THERAPEUTICS,
     INC :
13
14       Heidi A  Nadel, Esq
         Holland & Knight LLP
15       111 S W  Fifth Avenue
         2300 U S Bankcorp Tower
16       Portland, Oregon  97204
         (503) 517-2951
17       Fax:  (503) 241-8014
         heidi nadel@hklaw com
18   ON BEHALF OF THE DEFENDANT AMERISOURCEBERGEN DRUG
     CORPORATION:
19
20       Eric L  Alexander, Esq
         Lindsay A  DeFrancesco, Esq
         Reed Smith LLP
21       1301 K Street, Suite 1000 - East Tower
         Washington, D C  20005
22       (202) 414-9403
         Fax:  (202) 414-9299
23       ealexander@reedsmith com
         (202) 414-9286
24       ldefrancesco@reedsmith com
25
```

Page 5

```
 1           S T I P U L A T I O N S
 2               - - -
 3       It is stipulated by and among counsel
 4   for the respective parties that the video
 5   deposition of Julie Barnes, a witness herein,
 6   called by the Track One Defendants for
 7   examination under the applicable rules of Federal
 8   Civil Court Procedure, may be taken at this time
 9   by the Notary pursuant to notice and agreement;
10   that said video deposition may be reduced to
11   writing in stenotype by the Notary, whose notes
12   may thereafter be transcribed out of the presence
13   of the witness; that proof of the official
14   character and qualification of the court reporter
15   is waived; that the witness may sign the
16   transcript of their video deposition before a
17   Notary other than the Notary taking their video
18   deposition; said transcript of their video
19   deposition to have the same force and effect as
20   though the witness had signed the transcript of
21   their video deposition before the Notary taking
22   it.
23           - - -
24
25
```

2 (Pages 2 - 5)

Page 6

1        I N D E X
2        - - -
3  WITNESS                          PAGE
4  Julie Barnes
   Examination by Mr Alexander        29
5  Examination (continued)
   by Mr Alexander                   194
6  Examination by Ms Nadel           381
   Examination by Mr Schutte         388
7
        - - -
8
   EXHIBITS                         PAGE

   Exhibit 1   Summit County Children Services    198
10   Organizational Chart
     SUMMIT_000003847 through
11   SUMMIT_000003857
12 Exhibit 2   *** CONFIDENTIAL ***    238
     Judicial Symposium on Addiction
13   informations
     SUMMIT_001912538 through
14   SUMMIT_001912599
15 Exhibit 3   *** CONFIDENTIAL ***    273
     September 15, 2017, e-mails;
16   attachment
     SUMMIT_001011402, SUMMIT_001011403,
17   and SUMMIT_000143688 through
     SUMMIT_000143689
18
   Exhibit 4   *** CONFIDENTIAL ***    285
19   July 5, 2017, e-mails
     SUMMIT_001911463 and SUMMIT_001911464
20
   Exhibit 5   *** CONFIDENTIAL ***    303
21   March 21, 2018, e-mails
     SUMMIT_001911167
22
   Exhibit 6   Social Services Advisory Board    313
23   Meeting Minutes - July 25, 2017
     SUMMIT_000171798 through
24   SUMMIT_000171800
25

Page 7

1        I N D E X (continued)
2        - - -
3  EXHIBITS                         PAGE
4  Exhibit 7   Summit County Children Services 2016    321
     Annual Report
5    SUMMIT_000019809 through
     SUMMIT_000019812
6
   Exhibit 8   October 5 through 18, 2017, e-mails   331
7    SUMMIT_000106321 and SUMMIT_000106322
8  Exhibit 9   *** CONFIDENTIAL ***    340
     February 6 through 15, 2018, e-mails
9    SUMMIT_001910812 and SUMMIT_001910813
10 Exhibit 10  *** CONFIDENTIAL ***    344
     February 6 through 16, 2018, e-mails
11   SUMMIT_ 001912277 through
     SUMMIT_001912279
12
   Exhibit 11  *** CONFIDENTIAL ***    347
13   March 16, 2018, e-mails
     SUMMIT_001911169 through
14   SUMMIT_001911171
15 Exhibit 12  *** CONFIDENTIAL ***    350
     April 20, 2018, e-mails
16   SUMMIT_001910793 and SUMMIT_001910794
17 Exhibit 13  *** CONFIDENTIAL ***    355
     February 2 through 6, 2017, e-mails
18   SUMMIT_001911713 and SUMMIT_001911714
19 Exhibit 14  *** CONFIDENTIAL ***    360
     April 26, 2018, e-mails
20   SUMMIT_001636461 through
     SUMMIT_001636469; Summit County
21   Family and Children First Council
     Grant Summary Report Through 3/31/18
22
        - - -
23
24
25

Page 8

1        I N D E X (continued)
2        - - -
3  OBJECTIONS                    PAGE/LINE
4  By Ms. Flowers                   33/10
5  By Ms. Flowers                   34/2
6  By Ms. Flowers                   34/16
7  By Ms. Flowers                   35/9
8  By Ms. Flowers                   35/24
9  By Ms. Flowers                   36/8
10 By Ms. Flowers                   36/18
11 By Ms. Flowers                   36/23
12 By Ms. Flowers                   37/22
13 By Ms. Flowers                   39/2
14 By Ms. Flowers                   39/17
15 By Ms. Flowers                   39/21
16 By Ms. Flowers                   42/13
17 By Ms. Flowers                   43/7
18 By Ms. Flowers                   44/3
19 By Ms. Flowers                   44/17
20 By Ms. Flowers                   44/24
21 By Ms. Flowers                   45/10
22 By Ms. Flowers                   46/21
23 By Ms. Flowers                   47/3
24 By Ms. Flowers                   51/23
25 By Ms. Flowers                   52/11

Page 9

1        I N D E X (continued)
2        - - -
3  OBJECTIONS                    PAGE/LINE
4  By Ms. Flowers                   54/17
5  By Ms. Flowers                   54/22
6  By Ms. Flowers                   57/9
7  By Ms. Flowers                   57/21
8  By Ms. Flowers                   58/2
9  By Ms. Flowers                   59/6
10 By Ms. Flowers                   59/20
11 By Ms. Flowers                   60/13
12 By Ms. Flowers                   61/4
13 By Ms. Flowers                   61/12
14 By Ms. Flowers                   62/2
15 By Ms. Flowers                   62/14
16 By Ms. Flowers                   63/6
17 By Ms. Flowers                   64/2
18 By Ms. Flowers                   65/2
19 By Ms. Flowers                   65/25
20 By Ms. Flowers                   67/19
21 By Ms. Flowers                   68/5
22 By Ms. Flowers                   68/12
23 By Ms. Flowers                   68/21
24 By Ms. Flowers                   69/6
25 By Ms. Flowers                   69/23

3 (Pages 6 - 9)

| | | Page 10 |
|---|---|---|
| 1 | I N D E X (continued) | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 70/1 |
| 5 | By Ms. Flowers | 70/20 |
| 6 | By Ms. Flowers | 71/3 |
| 7 | By Ms. Flowers | 72/12 |
| 8 | By Ms. Flowers | 72/21 |
| 9 | By Ms. Flowers | 73/15 |
| 10 | By Ms. Flowers | 74/14 |
| 11 | By Ms. Flowers | 75/11 |
| 12 | By Ms. Flowers | 76/3 |
| 13 | By Ms. Flowers | 76/16 |
| 14 | By Ms. Flowers | 77/5 |
| 15 | By Ms. Flowers | 77/15 |
| 16 | By Ms. Flowers | 77/25 |
| 17 | By Ms. Flowers | 78/12 |
| 18 | By Ms. Flowers | 79/1 |
| 19 | By Ms. Flowers | 79/24 |
| 20 | By Ms. Flowers | 80/7 |
| 21 | By Ms. Flowers | 80/23 |
| 22 | By Ms. Flowers | 82/2 |
| 23 | By Ms. Flowers | 82/18 |
| 24 | By Ms. Flowers | 83/12 |
| 25 | By Ms. Flowers | 84/4 |

| | | Page 11 |
|---|---|---|
| 1 | I N D E X (continued) | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 84/15 |
| 5 | By Ms. Flowers | 84/25 |
| 6 | By Ms. Flowers | 86/9 |
| 7 | By Ms. Flowers | 86/12 |
| 8 | By Ms. Flowers | 86/21 |
| 9 | By Ms. Flowers | 87/4 |
| 10 | By Ms. Flowers | 88/6 |
| 11 | By Ms. Flowers | 89/8 |
| 12 | By Ms. Flowers | 92/25 |
| 13 | By Ms. Flowers | 95/9 |
| 14 | By Ms. Flowers | 96/14 |
| 15 | By Ms. Flowers | 97/9 |
| 16 | By Ms. Flowers | 97/21 |
| 17 | By Ms. Flowers | 98/8 |
| 18 | By Ms. Flowers | 98/19 |
| 19 | By Ms. Flowers | 100/17 |
| 20 | By Ms. Flowers | 102/11 |
| 21 | By Ms. Flowers | 102/20 |
| 22 | By Ms. Flowers | 103/11 |
| 23 | By Ms. Flowers | 104/2 |
| 24 | By Ms. Flowers | 105/7 |
| 25 | By Ms. Flowers | 106/1 |

| | | Page 12 |
|---|---|---|
| 1 | I N D E X (continued) | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 106/8 |
| 5 | By Ms. Flowers | 107/2 |
| 6 | By Ms. Flowers | 107/11 |
| 7 | By Ms. Flowers | 108/5 |
| 8 | By Ms. Flowers | 108/25 |
| 9 | By Ms. Flowers | 110/1 |
| 10 | By Ms. Flowers | 110/19 |
| 11 | By Ms. Flowers | 111/16 |
| 12 | By Ms. Flowers | 112/4 |
| 13 | By Ms. Flowers | 112/18 |
| 14 | By Ms. Flowers | 114/13 |
| 15 | By Ms. Flowers | 114/18 |
| 16 | By Ms. Flowers | 115/1 |
| 17 | By Ms. Flowers | 115/9 |
| 18 | By Ms. Flowers | 115/18 |
| 19 | By Ms. Flowers | 115/24 |
| 20 | By Ms. Flowers | 116/12 |
| 21 | By Ms. Flowers | 117/18 |
| 22 | By Ms. Flowers | 121/9 |
| 23 | By Ms. Flowers | 122/8 |
| 24 | By Ms. Flowers | 122/19 |
| 25 | By Ms. Flowers | 123/21 |

| | | Page 13 |
|---|---|---|
| 1 | I N D E X (continued) | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 124/8 |
| 5 | By Ms. Flowers | 125/4 |
| 6 | By Ms. Flowers | 125/17 |
| 7 | By Ms. Flowers | 126/15 |
| 8 | By Ms. Flowers | 126/25 |
| 9 | By Ms. Flowers | 127/11 |
| 10 | By Ms. Flowers | 129/2 |
| 11 | By Ms. Flowers | 129/14 |
| 12 | By Ms. Flowers | 130/8 |
| 13 | By Ms. Flowers | 131/4 |
| 14 | By Ms. Flowers | 131/14 |
| 15 | By Ms. Flowers | 132/5 |
| 16 | By Ms. Flowers | 132/16 |
| 17 | By Ms. Flowers | 132/22 |
| 18 | By Ms. Flowers | 133/5 |
| 19 | By Ms. Flowers | 133/23 |
| 20 | By Ms. Flowers | 134/19 |
| 21 | By Ms. Flowers | 135/13 |
| 22 | By Ms. Flowers | 135/21 |
| 23 | By Ms. Flowers | 138/3 |
| 24 | By Ms. Flowers | 138/6 |
| 25 | By Ms. Flowers | 138/24 |

Veritext Legal Solutions
www.veritext.com                                                                  888-391-3376

Page 14

I N D E X (continued)

- - -

| OBJECTIONS | PAGE/LINE |
|---|---|
| By Ms. Flowers | 140/21 |
| By Ms. Flowers | 141/17 |
| By Ms. Flowers | 142/1 |
| By Ms. Flowers | 142/13 |
| By Ms. Flowers | 143/4 |
| By Ms. Flowers | 143/15 |
| By Ms. Flowers | 144/4 |
| By Ms. Flowers | 145/1 |
| By Ms. Flowers | 145/19 |
| By Ms. Flowers | 146/7 |
| By Ms. Flowers | 146/15 |
| By Ms. Flowers | 148/2 |
| By Ms. Flowers | 150/2 |
| By Ms. Flowers | 151/3 |
| By Ms. Flowers | 151/19 |
| By Ms. Flowers | 152/15 |
| By Ms. Flowers | 153/18 |
| By Ms. Flowers | 154/15 |
| By Ms. Flowers | 155/4 |
| By Ms. Flowers | 155/16 |
| By Ms. Flowers | 155/22 |
| By Ms. Flowers | 157/15 |

Page 15

I N D E X (continued)

- - -

| OBJECTIONS | PAGE/LINE |
|---|---|
| By Ms. Flowers | 158/1 |
| By Ms. Flowers | 158/21 |
| By Ms. Flowers | 159/5 |
| By Ms. Flowers | 160/8 |
| By Ms. Flowers | 160/13 |
| By Ms. Flowers | 160/24 |
| By Ms. Flowers | 162/4 |
| By Ms. Flowers | 163/8 |
| By Ms. Flowers | 165/9 |
| By Ms. Flowers | 165/24 |
| By Ms. Flowers | 167/12 |
| By Ms. Flowers | 167/20 |
| By Ms. Flowers | 168/16 |
| By Ms. Flowers | 169/3 |
| By Ms. Flowers | 170/9 |
| By Ms. Flowers | 170/18 |
| By Ms. Flowers | 170/21 |
| By Ms. Flowers | 171/9 |
| By Ms. Flowers | 172/24 |
| By Ms. Flowers | 174/24 |
| By Ms. Flowers | 175/12 |
| By Ms. Flowers | 176/18 |

Page 16

I N D E X (continued)

- - -

| OBJECTIONS | PAGE/LINE |
|---|---|
| By Ms. Flowers | 177/6 |
| By Ms. Flowers | 178/13 |
| By Ms. Flowers | 180/4 |
| By Ms. Flowers | 180/20 |
| By Ms. Flowers | 181/24 |
| By Ms. Flowers | 184/14 |
| By Ms. Flowers | 185/22 |
| By Ms. Flowers | 186/9 |
| By Ms. Flowers | 187/2 |
| By Ms. Flowers | 188/13 |
| By Ms. Flowers | 188/24 |
| By Ms. Flowers | 189/7 |
| By Ms. Flowers | 189/14 |
| By Ms. Flowers | 190/13 |
| By Ms. Flowers | 190/22 |
| By Ms. Flowers | 191/15 |
| By Ms. Flowers | 191/22 |
| By Ms. Flowers | 192/5 |
| By Ms. Flowers | 192/22 |
| By Ms. Flowers | 202/4 |
| By Ms. Flowers | 202/23 |
| By Ms. Flowers | 203/16 |

Page 17

I N D E X (continued)

- - -

| OBJECTIONS | PAGE/LINE |
|---|---|
| By Ms. Flowers | 204/11 |
| By Ms. Flowers | 204/16 |
| By Ms. Flowers | 204/25 |
| By Ms. Flowers | 208/18 |
| By Ms. Flowers | 210/17 |
| By Ms. Flowers | 211/10 |
| By Ms. Flowers | 212/13 |
| By Ms. Flowers | 217/5 |
| By Ms. Flowers | 217/18 |
| By Ms. Flowers | 218/18 |
| By Ms. Flowers | 226/1 |
| By Ms. Flowers | 226/16 |
| By Ms. Flowers | 228/18 |
| By Ms. Flowers | 242/5 |
| By Ms. Flowers | 245/22 |
| By Ms. Flowers | 246/14 |
| By Ms. Flowers | 247/25 |
| By Ms. Flowers | 248/10 |
| By Ms. Flowers | 249/19 |
| By Ms. Flowers | 250/6 |
| By Ms. Flowers | 251/2 |
| By Ms. Flowers | 251/1 |

5 (Pages 14 - 17)

Page 18

|  | I N D E X (continued) | |
|---|---|---|
| 1 | | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 252/10 |
| 5 | By Ms. Flowers | 252/21 |
| 6 | By Ms. Flowers | 253/12 |
| 7 | By Ms. Flowers | 254/12 |
| 8 | By Ms. Flowers | 255/16 |
| 9 | By Ms. Flowers | 257/20 |
| 10 | By Ms. Flowers | 259/5 |
| 11 | By Ms. Flowers | 260/18 |
| 12 | By Ms. Flowers | 261/10 |
| 13 | By Ms. Flowers | 261/14 |
| 14 | By Ms. Flowers | 261/24 |
| 15 | By Ms. Flowers | 264/3 |
| 16 | By Ms. Flowers | 266/7 |
| 17 | By Ms. Flowers | 267/2 |
| 18 | By Ms. Flowers | 268/18 |
| 19 | By Ms. Flowers | 269/5 |
| 20 | By Ms. Flowers | 269/11 |
| 21 | By Ms. Flowers | 270/8 |
| 22 | By Ms. Flowers | 270/15 |
| 23 | By Ms. Flowers | 271/3 |
| 24 | By Ms. Flowers | 272/19 |
| 25 | By Ms. Flowers | 277/13 |

Page 20

|  | I N D E X (continued) | |
|---|---|---|
| 1 | | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 298/12 |
| 5 | By Ms. Flowers | 299/2 |
| 6 | By Ms. Flowers | 299/22 |
| 7 | By Ms. Flowers | 300/7 |
| 8 | By Ms. Flowers | 300/13 |
| 9 | By Ms. Flowers | 301/7 |
| 10 | By Ms. Flowers | 302/7 |
| 11 | By Ms. Flowers | 305/13 |
| 12 | By Ms. Flowers | 307/5 |
| 13 | By Ms. Flowers | 308/1 |
| 14 | By Ms. Flowers | 308/9 |
| 15 | By Ms. Flowers | 309/1 |
| 16 | By Ms. Flowers | 309/11 |
| 17 | By Ms. Flowers | 310/23 |
| 18 | By Ms. Flowers | 311/16 |
| 19 | By Ms. Flowers | 311/24 |
| 20 | By Ms. Flowers | 313/1 |
| 21 | By Ms. Flowers | 313/12 |
| 22 | By Ms. Flowers | 316/6 |
| 23 | By Ms. Flowers | 317/1 |
| 24 | By Ms. Flowers | 318/3 |
| 25 | By Ms. Flowers | 320/2 |

Page 19

|  | I N D E X (continued) | |
|---|---|---|
| 1 | | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 278/5 |
| 5 | By Ms. Flowers | 279/12 |
| 6 | By Ms. Flowers | 281/1 |
| 7 | By Ms. Flowers | 285/4 |
| 8 | By Ms. Flowers | 285/8 |
| 9 | By Ms. Flowers | 288/13 |
| 10 | By Ms. Flowers | 288/20 |
| 11 | By Ms. Flowers | 289/13 |
| 12 | By Ms. Flowers | 289/22 |
| 13 | By Ms. Flowers | 290/8 |
| 14 | By Ms. Flowers | 290/12 |
| 15 | By Ms. Flowers | 291/8 |
| 16 | By Ms. Flowers | 292/19 |
| 17 | By Ms. Flowers | 293/6 |
| 18 | By Ms. Flowers | 293/11 |
| 19 | By Ms. Flowers | 293/19 |
| 20 | By Ms. Flowers | 294/10 |
| 21 | By Ms. Flowers | 294/17 |
| 22 | By Ms. Flowers | 295/4 |
| 23 | By Ms. Flowers | 295/14 |
| 24 | By Ms. Flowers | 296/13 |
| 25 | By Ms. Flowers | 296/21 |

Page 21

|  | I N D E X (continued) | |
|---|---|---|
| 1 | | |
| 2 | - - - | |
| 3 | OBJECTIONS | PAGE/LINE |
| 4 | By Ms. Flowers | 320/5 |
| 5 | By Ms. Flowers | 320/17 |
| 6 | By Ms. Flowers | 322/7 |
| 7 | By Ms. Flowers | 323/1 |
| 8 | By Ms. Flowers | 324/14 |
| 9 | By Ms. Flowers | 326/23 |
| 10 | By Ms. Flowers | 327/20 |
| 11 | By Ms. Flowers | 328/3 |
| 12 | By Ms. Flowers | 328/10 |
| 13 | By Ms. Flowers | 328/17 |
| 14 | By Ms. Flowers | 329/3 |
| 15 | By Ms. Flowers | 329/18 |
| 16 | By Ms. Flowers | 330/2 |
| 17 | By Ms. Flowers | 330/10 |
| 18 | By Ms. Flowers | 330/15 |
| 19 | By Ms. Flowers | 331/14 |
| 20 | By Ms. Flowers | 334/7 |
| 21 | By Ms. Flowers | 334/12 |
| 22 | By Ms. Flowers | 334/19 |
| 23 | By Ms. Flowers | 335/10 |
| 24 | By Ms. Flowers | 336/14 |
| 25 | By Ms. Flowers | 336/23 |

6 (Pages 18 - 21)

Page 22

1          I N D E X (continued)
2                - - -
3     OBJECTIONS                    PAGE/LINE
4     By Ms. Flowers                337/16
5     By Ms. Flowers                338/5
6     By Ms. Flowers                338/13
7     By Ms. Flowers                338/16
8     By Ms. Flowers                339/12
9     By Ms. Flowers                339/22
10    By Ms. Flowers                341/4
11    By Ms. Flowers                341/15
12    By Ms. Flowers                342/3
13    By Ms. Flowers                342/11
14    By Ms. Flowers                342/19
15    By Ms. Flowers                343/4
16    By Ms. Flowers                343/15
17    By Ms. Flowers                344/2
18    By Ms. Flowers                345/13
19    By Ms. Flowers                345/21
20    By Ms. Flowers                346/6
21    By Ms. Flowers                346/14
22    By Ms. Flowers                347/17
23    By Ms. Flowers                349/1
24    By Ms. Flowers                352/19
25    By Ms. Flowers                353/24

Page 23

1          I N D E X (continued)
2                - - -
3     OBJECTIONS                    PAGE/LINE
4     By Ms. Flowers                355/2
5     By Ms. Flowers                355/7
6     By Ms. Flowers                358/12
7     By Ms. Flowers                359/9
8     By Ms. Flowers                359/22
9     By Ms. Flowers                361/24
10    By Ms. Flowers                362/6
11    By Ms. Flowers                362/23
12    By Ms. Flowers                363/5
13    By Ms. Flowers                363/14
14    By Ms. Flowers                363/22
15    By Ms. Flowers                364/17
16    By Ms. Flowers                364/24
17    By Ms. Flowers                368/19
18    By Ms. Flowers                369/5
19    By Ms. Flowers                369/12
20    By Ms. Flowers                369/24
21    By Ms. Flowers                370/14
22    By Ms. Flowers                371/12
23    By Ms. Flowers                372/14
24    By Ms. Flowers                374/16
25    By Ms. Flowers                375/17

Page 24

1          I N D E X (continued)
2                - - -
3     OBJECTIONS                    PAGE/LINE
4     By Ms. Flowers                376/9
5     By Ms. Flowers                376/24
6     By Ms. Flowers                378/2
7     By Ms. Flowers                379/6
8     By Ms. Flowers                379/24
9     By Ms. Flowers                380/8
10    By Ms. Flowers                380/14
11    By Ms. Flowers                382/6
12    By Ms. Flowers                383/24
13    By Ms. Flowers                384/9
14    By Ms. Flowers                384/17
15    By Ms. Flowers                385/4
16    By Ms. Flowers                385/13
17    By Ms. Flowers                385/18
18    By Ms. Flowers                386/4
19    By Ms. Flowers                386/24
20    By Ms. Flowers                387/7
21    By Ms. Flowers                387/22
22    By Ms. Flowers                389/21
23    By Ms. Flowers                390/2
24    By Ms. Flowers                390/16
25    By Ms. Flowers                391/14

Page 25

1          I N D E X (continued)
2                - - -
3     OBJECTIONS                    PAGE/LINE
4     By Ms. Flowers                391/19
5     By Ms. Flowers                392/18
6                - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
www.veritext.com                                              888-391-3376

Page 26

1    P R O C E E D I N G S
2          - - -
3       Monday, December 3, 2018
4          Morning Session
5          - - -
6       THE VIDEOGRAPHER:  The date is
7    December 3rd, 2018.  We are on the record at
8    8:59 a.m.  This is the deposition of Julie Barnes
9    in the matter of National Prescription Opiate
10   Litigation in the United States District Court,
11   Northern District of Ohio, Eastern Division.
12       Will counsel please state appearances
13   for the record.
14       MS. FLOWERS:  This is Jodi Flowers.  I'm
15   here on behalf of Summit County, City of Akron,
16   and the witness.
17       MS. KOUBA:  Annie Kouba.  I'm also here
18   on behalf of Summit County, City of Akron, and
19   the witness.
20       MS. KEARSE:  Anne Kearse, Motley Rice,
21   County of Summit, the City of Akron, and the
22   witness, as well as Children's Services.
23       MS. PAPAS:  Katerina Papas, in-house
24   counsel for Children's Services.
25       MR. HART:  Jon Hart, in-house counsel

Page 27

1    for Children's Services.
2        MR. LOMAX:  Chris Lomax of Jones Day on
3    behalf of Walmart.
4        MS. SCHIAVONE:  Sara Schiavone, Porter
5    Wright, on behalf of Cardinal Health.
6        MR. SCHUTTE:  Scott Schutte, Morgan
7    Lewis, on behalf of Rite Aid.
8        MS. NADEL:  Heidi Nadel, Holland &
9    Knight, on behalf of Insys Therapeusis.
10       MS. DeFRANCESCO:  Lindsay DeFrancesco,
11   Reed Smith, on behalf of AmerisourceBergen Drug
12   Corporation.
13       MR. ALEXANDER:  Eric -- excuse me.  Eric
14   Alexander for AmerisourceBergen Drug Corporation.
15       THE VIDEOGRAPHER:  Will the court
16   reporter please swear in the witness.
17       MS. KEARSE:  We need to get the people
18   on the phone.
19       THE VIDEOGRAPHER:  It says there's
20   nobody on there right now.
21       MS. KEARSE:  There's no one on the
22   phone?
23       THE VIDEOGRAPHER:  Right now, it's just
24   us.
25       MS. KEARSE:  Okay.  At a break or

Page 28

1    something, we'll just have to make sure nobody
2    has joined.
3        THE COURT REPORTER:  If you would raise
4    your right hand, please.
5        Do you solemnly swear or affirm the
6    testimony you give will be the truth, the whole
7    truth, and nothing but the truth?
8        MS. BARNES:  I do.
9        THE COURT REPORTER:  Thank you.
10          - - -

Page 29

1           JULIE BARNES,
2    of lawful age, being by me first duly placed
3    under oath, as prescribed by law, was examined
4    and testified as follows:
5             EXAMINATION
6    BY MR. ALEXANDER:
7        Q.  State your full name for the record,
8    please.
9        A.  Julie Barnes.
10       Q.  And what is your position, ma'am?
11       A.  I'm the executive director at Summit
12   County Children's Services.
13       Q.  What's your professional address?
14       A.  264 South Arlington Street in Akron,
15   Ohio 44306.
16       Q.  How long have you had the position as --
17   as executive director?
18       A.  I came to the agency as executive
19   director in December of 2013.
20       Q.  What was your immediately preceding
21   position?
22       A.  I was the executive director of Stark
23   County Job & Family Services.
24       Q.  How long did you have that position?
25       A.  Approximately six-and-a-half years.

8 (Pages 26 - 29)

Page 30

1    Q.  So going back to roughly 2006, 2007?
2    A.  2007, yes.
3    Q.  What was your prior position, ma'am?
4    A.  I was a midlevel administrator at Summit
5    County Children's Services over the foster care
6    and adoption departments.
7    Q.  How long did you have that position?
8    A.  I started that position in 2002.
9    Q.  And did you have any professional
10   employment before 2002?
11   A.  Yes, I did.
12   Q.  What was your immediately preceding
13   position?
14   A.  Immediately preceding, I worked for the
15   Ohio Department of Job and Family Services as a
16   technical assistance manager for the Cleveland
17   district office.
18   Q.  How long did you have that position?
19   A.  Just a couple of years.
20   Q.  From when to when?
21   A.  I don't know that I recall.  I think I
22   started in '99, and I left -- and I came to
23   Summit County Children's Services in 2002.
24   Q.  Okay.  So why don't we go back to your
25   professional education.  You graduated from

Page 31

1    college in what year?
2    A.  I graduated from Hiram College in 1985.
3    Q.  Did you have any professional
4    education -- I'm sorry -- any education after
5    that?
6    A.  After that?  Yes.  I have a master's
7    degree in education from Kent State University.
8    Q.  When did you get that degree?
9    A.  I believe it was completed in '93.
10   Q.  Did you work in between?
11   A.  Yes.  Uh-huh.
12   Q.  What were your jobs immediately after
13   Hiram?
14   A.  Immediately after Hiram, I worked for
15   Geauga County Job and Family Services in a number
16   of capacities.  I started there as a social
17   worker in the intake department.  So I did case
18   work, basically, for child welfare.  I was a
19   supervisor there, as well, over a number of
20   different areas.  And my final position with
21   Geauga County was as the director of social
22   services.
23   Q.  Okay.  And when did that end, that
24   position?
25   A.  When I left to go to Ohio Department of

Page 32

1    Job and Family Services, which I believe was in
2    '99.
3    Q.  Okay.  So roughly the 33 or so years
4    since college, you've been in the same general
5    field; is that right?
6    A.  That's correct, yes.
7    Q.  Do you hold any licenses?
8    A.  I hold a social work license, an LSW.
9    Q.  Okay.  What level is that for LSW?
10   A.  Just a -- a licensed social worker.
11   Q.  Okay.  Do you know why you're being
12   deposed today?
13   A.  Not -- I believe I have a general idea,
14   yes.
15   Q.  Can you give me your understanding of
16   why you're being deposed?
17   A.  To talk about what has happened in the
18   child welfare perspective related to the opiate
19   epidemic and how that has impacted our system and
20   the children and families that we serve.
21   Q.  Okay.  And there are a variety of
22   lawyers to your right.  Have you had meetings to
23   prepare for the deposition?
24   A.  I have had meetings with our counsel,
25   yes.

Page 33

1    Q.  How many meetings?
2    A.  A couple.
3    Q.  Do you know about how long total you
4    spent in the meetings?
5    A.  We spent several hours.  And, no,
6    really, that's -- that's it.
7    Q.  In connection with those meetings -- I'm
8    not asking exactly what they were -- but have you
9    reviewed any documents in the meetings?
10   MS. FLOWERS:  Objection.  Form.  And
11   object to -- I just want to caution the witness
12   to not go into any matters we discussed in the
13   preparation for your deposition.
14   THE WITNESS:  Okay.
15   MS. FLOWERS:  Beyond that, you can
16   answer his question.
17   THE WITNESS:  Yes, we did review
18   documents.  Uh-huh.
19   BY MR. ALEXANDER:
20   Q.  Were any of the documents documents
21   you've never seen before in your normal work
22   career?
23   A.  I don't believe so, no.
24   Q.  Were they all documents that you'd,
25   essentially, written or received in the course of

9 (Pages 30 - 33)

Page 34

1 your job as executive director?
2      MS. FLOWERS: Object to the form. Lack
3 of foundation.
4      THE WITNESS: I believe they were
5 documents that were related to documents we had
6 produced for discovery.
7 BY MR. ALEXANDER:
8    Q. Okay. And do you have an understanding
9 of what documents have been produced from your
10 group for discovery?
11    A. I have a general understanding, yes.
12    Q. Did you play any role in gathering or
13 preserving or helping with the production of
14 documents in connection with discovery in this
15 case?
16      MS. FLOWERS: Object to the form.
17      THE WITNESS: Just in terms of
18 oversight, primarily. I didn't personally gather
19 documents, no.
20 BY MR. ALEXANDER:
21    Q. Do you have an understanding as to how
22 far back the documents go that were produced --
23    A. I --
24    Q. -- from your group?
25    A. I believe documents were asked for as

Page 35

1 far back as 2006.
2    Q. And do you know how long documents are
3 that have been produced that have your name on
4 them, let's say?
5    A. Well, nothing prior to my start time
6 there in 2013, so probably not.
7    Q. You -- actually, nothing from 2013, '14,
8 '15 at all. Do you know why that would be?
9      MS. FLOWERS: Object to the form. Lack
10 of foundation.
11      THE WITNESS: I don't understand the
12 question.
13 BY MR. ALEXANDER:
14    Q. No document -- well, when you got the
15 position as executive director in 2013, you
16 started sending and receiving e-mails, correct?
17    A. Correct.
18    Q. And you generated documents and received
19 documents in the course of your work?
20    A. Correct.
21    Q. What sort of documents would you have
22 been creating since you took on this position as
23 executive director?
24      MS. FLOWERS: Object to the form.
25      THE WITNESS: Budget documents. I am

Page 36

1 responsible, of course, for our agency's budget
2 development. Documents I produce in terms of
3 documents for our board of trustees. Those kinds
4 of documents.
5 BY MR. ALEXANDER:
6    Q. What sort of documents do you receive,
7 typically, I guess, by attachments to e-mails?
8      MS. FLOWERS: Object to the form.
9      THE WITNESS: I -- I mean, it could be
10 anything from casework-specific documents to
11 agendas for meetings, and I'm . . .
12 BY MR. ALEXANDER:
13    Q. And the answers about the documents that
14 you would create or receive would be the same
15 categories of documents you should have been
16 creating or receiving since you took the
17 executive director position in 2013?
18      MS. FLOWERS: Object to the form.
19      THE WITNESS: Correct.
20 BY MR. ALEXANDER:
21    Q. As far as you know, all of those
22 documents should exist with your name on them?
23      MS. FLOWERS: Object to the form. Lack
24 of foundation.
25      THE WITNESS: They would exist if they

Page 37

1 have not been destroyed per the record
2 destruction schedule, yes.
3 BY MR. ALEXANDER:
4    Q. Do you know what the record destruction
5 schedule is?
6    A. I don't know it by heart, no.
7    Q. I mean, is it less than five years?
8    A. It depends on the document, frankly. So
9 it -- you know, it would -- each document has its
10 own retention schedule.
11    Q. Okay. Who would know the details of
12 retention for documents applicable to your group?
13    A. We have staff in the agency who are
14 responsible for creating the record destruction
15 schedule, but each person who holds a specific
16 document has the responsibility for maintaining
17 that document if they are the person of record,
18 so . . .
19    Q. So are there names or titles for people
20 who would be involved in the policies that you
21 referenced?
22      MS. FLOWERS: Object to the form.
23      THE WITNESS: For the policies?
24 BY MR. ALEXANDER:
25    Q. Yeah. Policies relating to retention of

10 (Pages 34 - 37)

1 the documents of various types that Summit County
2 Children's Services would be involved in creating
3 or maintaining.
4      A.  Yeah, I don't -- I don't know that we
5 have a policy outside of the schedule, no.
6      Q.  And does the schedule have a name?
7      A.  It's the record retention schedule.
8      Q.  Okay.  Is there somebody responsible for
9 making sure that that's followed within your
10 group or suspended because of whatever the legal
11 requirements might be?
12      A.  Every person who -- or, for example,
13 every department has specific documents that they
14 maintain as a department.  So they have staff
15 within their department that they identify.
16          I don't necessarily know who those
17 people are.  But, you know, that may be their
18 administrative assistant who goes through the
19 documents annually and destroys documents per the
20 record destruction schedule.
21      Q.  Within your regular scope of duties as
22 executive director, do you ever have a need to go
23 back to documents more than, let's say, two years
24 old to look at what a document was to give you
25 information on how things were in the past or

1 set -- look at some past policy or budget?
2      MS. FLOWERS:  Object to the form.
3      THE WITNESS:  Sometimes, yeah.  We may,
4 yes.
5 BY MR. ALEXANDER:
6      Q.  Do you ever have trouble finding
7 documents from two or three years ago?
8      A.  Not if they exist, no.
9      Q.  Are -- are there documents that you've
10 looked for that are only two years old that have
11 already been destroyed?
12      A.  I -- I don't really know, frankly.  I
13 can't recall that.
14      Q.  Do you know why there wouldn't be any
15 documents with your name on them before mid 2016
16 produced in this litigation?
17      MS. FLOWERS:  Object to the form.
18      THE WITNESS:  I don't know.
19 BY MR. ALEXANDER:
20      Q.  They should exist, right?
21      MS. FLOWERS:  Objection.
22      THE WITNESS:  They would exist to 2013
23 if they're still within the record retention
24 schedule, yes.
25 BY MR. ALEXANDER:

1      Q.  And back when you were director of
2 foster care and adoption at Summit County
3 Children's Service through May of 2017, you would
4 have had documents you were creating and
5 receiving back then too, right?
6      A.  That was --
7      MS. FLOWERS:  I'm sorry.  Could you --
8      THE WITNESS:  -- May of 2007 actually.
9 BY MR. ALEXANDER:
10      Q.  I'm sorry.  I misspoke.
11      A.  Yes.
12      Q.  I'll ask it again.
13      A.  Okay.
14      Q.  So I think we said that you were
15 director of foster care and adoption at Summit
16 County Children's Services from February 2002
17 through May of 2007; is that correct?
18      A.  That is correct.
19      Q.  And back when you had that position
20 through May of 2007, there would have been
21 documents that you were involved in creating and
22 receiving in the course of your typical duties,
23 correct?
24      A.  I'm sure there were, yes.
25      Q.  And did -- have you ever had an occasion

1 to look for any documents from that time frame,
2 like 2006, 2007 documents?
3      A.  I -- I don't recall looking for
4 documents that old, no.
5      Q.  And I'm sensitive to making sure we're
6 not talking --
7      MS. HOSMER:  Sorry to interrupt.  I just
8 wanted to let you know that -- this is Heather
9 Hosmer from Arnold & Porter representing ENDO
10 Health Solutions, ENDO Pharmaceuticals, Par
11 Pharmaceuticals, and Par Pharmaceutical
12 Companies.
13          I apologize for interrupting.  I'm
14 having technical difficulties connecting.
15      MS. FLOWERS:  Is there anybody else on
16 the phone?
17      MS. YOCUM:  Michelle Yocum from
18 Covington & Burling representing McKesson.
19      THE COURT REPORTER:  I'm sorry.  Could
20 you repeat that, please.
21      MS. YOCUM:  Sure.  Michelle Yocum from
22 Covington & Burling representing McKesson.
23      MS. FLOWERS:  Anyone else?
24      (No response.)
25 BY MR. ALEXANDER:

11 (Pages 38 - 41)

Page 42

1    Q.  Keeping in mind the advice of
2  plaintiffs' counsel earlier about conversations
3  with lawyers --
4    A.  Uh-huh.
5    Q.  -- what role did you have in connection
6  with the litigation in terms of preserving,
7  gathering, or producing any documents?
8    A.  Very little.
9    Q.  Can you explain what it was?
10    A.  I did not personally gather or produce
11  documents, so, no, I --
12    Q.  How do you know what's been produced?
13    MS. FLOWERS:  Object to the form.
14    THE WITNESS:  I -- I -- you know, I know
15  that there was a list of documents to produce.
16  My legal staff handled the production of
17  documents.  I -- I did not do that.
18  BY MR. ALEXANDER:
19    Q.  In preparation for the deposition --
20  again, I'm not asking about specific documents --
21  but did you see any documents with your name on
22  them before mid 2016?
23    A.  I don't know specifically if my name was
24  on any documents.  I -- like I said, budgets, I
25  know, were produced, for example, which, of

Page 43

1  course, I have oversight for budgets.  So that
2  would be an example.  I don't know that they have
3  my name on them, but those kinds of documents,
4  yes.
5    Q.  Meaning you saw some documents before
6  2016 in preparation for the deposition?
7    MS. FLOWERS:  Object to the form.
8    THE WITNESS:  Yeah, I don't understand
9  the 2016.  I -- I don't know where that's -- I
10  don't understand your question there.
11  BY MR. ALEXANDER:
12    Q.  Okay.  Well, it's just the question.
13  So --
14    A.  Okay.
15    Q.  -- did you, in preparing for the
16  deposition, look at any documents that were dated
17  from 2015 or earlier?
18    A.  I didn't personally look at any
19  documents that were produced.  My understanding
20  was we were asked to produce a list of documents;
21  we produced them.
22    Q.  I -- I was asking about the preparation
23  for the deposition.  You said you had --
24    A.  Yes.
25    Q.  -- multiple meetings with the

Page 44

1  plaintiff's counsel and you reviewed documents.
2    A.  Did I look at documents --
3    MS. FLOWERS:  Objection to the form.
4  Mischaracterization the testimony.
5    Give me just one second -- okay?
6    THE WITNESS:  Yeah.
7    MS. FLOWERS:  -- to get my objections
8  in.
9    THE WITNESS:  Okay.
10    MS. FLOWERS:  Thank you.
11    Sorry.  Go ahead.
12    THE WITNESS:  Go ahead.
13  BY MR. ALEXANDER:
14    Q.  In connection with those meetings and
15  review of documents, did you review documents
16  that were dated 2015 or earlier?
17    MS. FLOWERS:  Objection.
18    THE WITNESS:  I don't believe so, no.
19  BY MR. ALEXANDER:
20    Q.  Out of any of the documents that you
21  reviewed, did any of them refresh your
22  recollection as to things that you had forgotten
23  that you used to know?
24    MS. FLOWERS:  Objection.  Asked and
25  answered; calls for attorney-client privilege.

Page 45

1    With that caution, you can answer the
2  question.
3    THE WITNESS:  I -- I don't recall if
4  they refreshed my memory on anything in
5  particular, frankly.  I don't -- I don't know.
6  BY MR. ALEXANDER:
7    Q.  Did any of the documents you looked at
8  provide you information that you once had but no
9  longer could remember?
10    MS. FLOWERS:  Objection.  Asked and
11  answered.
12    THE WITNESS:  I -- I just don't remember
13  if they brought something to mind for me or not.
14  I mean, you know . . .
15  BY MR. ALEXANDER:
16    Q.  Let me just ask some specifics about --
17  about documents.  Do you maintain, like, a hard
18  copy file of any sort of subject matter-based
19  information?
20    A.  Well, some things.  Budgets is another
21  example.  I do keep hard copies of budgets, yes.
22    Q.  What else do you keep hard copies of
23  besides budgets?
24    A.  We keep hard copies of documents -- some
25  of the documents that go to our board, for

12 (Pages 42 - 45)

1    example.  So reports that I produce for the board
2    are generally maintained in a hard copy for some
3    time period until they are imaged.
4        Q.   Did you have anything to do with
5    producing anything from your hard copy files?
6        A.   I don't know if it was what was produced
7    from hard copy versus scanned and provided,
8    frankly.  I don't know.
9        Q.   Did somebody come and get your hard copy
10   files --
11       A.   I --
12       Q.   -- ever for production?
13       A.   The only thing I'm aware of that they
14   may have taken of a hard copy file was related to
15   the budgets.  I think -- I have the budgets filed
16   in my office in binders, and they took those and
17   scanned those, I believe, so . . .
18       Q.   Okay.  Among the various hard copy files
19   you maintain, the only one you know they took was
20   budgets?
21       MS. FLOWERS:  Objection.
22       THE WITNESS:  That's the only one I'm
23   aware of, yes.
24   BY MR. ALEXANDER:
25       Q.   You don't know one way or the other

1    whether they accessed any of your hard copy
2    files?
3        MS. FLOWERS:  Object to the form.  Asked
4    and answered.
5        THE WITNESS:  I'm not aware of anyone
6    accessing my hard copy files other than the
7    budgets.
8    BY MR. ALEXANDER:
9        Q.   Okay.  Are there departmental files that
10   are maintained?  Not just by individuals, like
11   e-mail folders.  Are there hard copy -- I mean, I
12   assume there are case files that are maintained,
13   right?
14       A.   Case files are maintained, yes.  And
15   departments, you know, there's data reports and
16   things like that.  But, again, I don't know
17   what -- if people keep those in hard copy.  They
18   keep them, generally, according to what our
19   schedule says.
20       Q.   Is there somebody who would know about
21   the details of what's maintained in hard
22   copies --
23       A.   Every individual --
24       Q.   -- besides --
25       A.   -- probably --

1        Q.   I wasn't done.  I didn't really go over
2    the ground rules of deposition, but just like
3    counsel for plaintiff said, try not to speak over
4    her when she's giving her objections; if you
5    could just wait until my question is done --
6        A.   I apologize.  Yes.
7        Q.   -- I will try to do the same thing with
8    your answer.
9        A.   Okay.
10       Q.   Because the court reporter to my left,
11   your right, types down everything everyone says.
12   And it's hard to type down when multiple people
13   are talking at the same time.  Even if it's a
14   "yes" or "I understand," it makes a choppy
15   record.
16       A.   Okay.
17       Q.   At the end of the day, we want to make
18   sure that what is on the written record, even
19   though there's a video record, represents what
20   you can actually remember and think and know.
21       Does that make sense?
22       A.   It does.  And I apologize.  I just feel
23   like you asked me the same question, and I don't
24   know how to answer it a different way.
25       Q.   Okay.  Have you ever been deposed

1    before?
2        A.   Yes.  Uh-huh.
3        Q.   In what context?
4        A.   I was deposed for a malpractice --
5    medical malpractice lawsuit for an employee some
6    years ago, for a case -- lawsuit in the late
7    '90s, and for a case -- a lawsuit in Stark
8    County, I don't know, ten years ago or so.
9        Q.   And was that also med- -- medical
10   malpractice, the Stark County case?
11       A.   The Stark County -- there were two Stark
12   County cases.  One was a medical malpractice for
13   an employee.  The other one was related to record
14   retention schedule.
15       Q.   What do you mean?
16       A.   We were -- the agency and several
17   government agencies were sued by an individual
18   who was requesting records that, basically, they
19   were attempting to identify if you had records
20   that you couldn't produce so that they could
21   request damages.  So it was dismissed after -- I
22   believe we had the deposition, but then the case
23   was dismissed.
24       Q.   Have you ever testified under oath other
25   than those two depositions?

13 (Pages 46 - 49)

Page 50

1    A.  Well, I testified quite a bit when I was
2  a caseworker for Children's Services.
3    Q.  On individual cases?
4    A.  Yes.
5    Q.  Okay.  So I - I can give you a little
6  more of the background.  I'm sure you really know
7  this, but you have to answer out loud, with real
8  words, where you can.  Head nods and shakes are
9  subject to interpretation, and that's not really
10  the court reporter's job.  Just putting down
11  actual words.
12       If you need breaks, we'll take breaks.
13  In general, some of these have gone roughly an
14  hour between breaks, some of them have gone
15  longer.  It's really up to the witness and
16  anybody else's needs, maybe bladder, you know,
17  emergencies, that sort of thing.
18       If you don't understand my questions,
19  let me know.  I will try to fix them.
20       If there's an objection as to form and
21  you can answer it because you understand the
22  question, go ahead and do that anyway.
23       Does that make sense?
24    A.  Yes.
25    Q.  Okay.  Going back to where we are --

Page 51

1  were.  Is there -- is there somebody within -- do
2  you just call it Children's Services?  How do you
3  refer to your group?
4    A.  Children's Services, uh-huh.
5    Q.  Is there somebody within Children's
6  Services who is most knowledgeable about where
7  hard copy files are maintained and how they're
8  maintained?
9    A.  We have staff in our records department,
10  so our supervisor or department director over
11  records would primarily be the people or persons
12  who would know where records are or how they're
13  stored.
14    Q.  And who is that currently?
15    A.  The records supervisor is Tim Davidson,
16  and the department director who has records as
17  part of her other duties is Elizabeth Mangon.
18    Q.  We talked about case files.  Case files
19  have to be maintained for many years, right?
20  They're not subject to a one- or two- or
21  three-year retention policy, correct?
22    A.  That's right.
23       MS. FLOWERS:  Object to the form.
24  BY MR. ALEXANDER:
25    Q.  Do you know how long those have to be

Page 52

1  maintained?
2    A.  Case records are maintained permanently.
3    Q.  Are there other records you're aware of
4  that are required to be maintained permanently?
5    A.  There are some.  I don't know that I
6  know which ones they are off the top of my head
7  without looking at the schedule.
8    Q.  Is it typical that you have at least a
9  five-year retention policy for other types of
10  documents?
11       MS. FLOWERS:  Object to the form.
12       THE WITNESS:  It depends on the
13  document.  I -- I don't -- I wouldn't want to say
14  it's typical, so I don't -- I don't know.
15  BY MR. ALEXANDER:
16    Q.  Are there any documents you're aware of
17  where you have less than a five-year retention
18  policy?
19    A.  Yes.
20    Q.  What documents?
21    A.  Correspondence, for example, is a
22  shorter time period.  Transient documents are --
23  you know, some documents are strictly based on
24  administrative value of maintaining them.  So
25  they don't need to be maintained if they're no

Page 53

1  longer of administrative value.
2    Q.  What about e-mails?  You said you've had
3  e-mails since you returned to Summit County in
4  2013, correct?
5    A.  Sure.  Yes.
6    Q.  Did you also have e-mails back in your
7  prior stint there?
8    A.  Yes.  Uh-huh.
9    Q.  And when you came back, did you have
10  access to your old e-mails or you started anew?
11    A.  I did not have access to my old e-mails,
12  and as far as I would understand, they would no
13  longer exist.
14    Q.  Do you know what your e-mail retention
15  policy is?
16    A.  E-mail isn't really a specific document,
17  is my understanding.  It is just a forum for
18  communication.  So it would really depend on
19  whether it met the criteria of a specific type of
20  correspondence.  A policy would have different
21  retention rates or schedules.  But e-mail in and
22  of itself isn't listed as a specific item.  So it
23  is typically a transient form of communication
24  that once it is of -- no longer of administrative
25  value, it would no longer be retained.

14 (Pages 50 - 53)

Page 54

1    Q.  What about your own e-mails?  How far
2  back do they go that you can access?
3    A.  If they're retained, I can access
4  whatever is -- is there.  I mean, they go back as
5  long as I retain them.
6    Q.  And do you have some sort of filing
7  system where you have subfolders by topic and
8  you --
9    A.  Sure.  Yes.
10    Q.  -- save important e-mails?
11    A.  Uh-huh.
12    Q.  And how far back do those go?
13    A.  If they're in a folder, they'll go back
14  as far as I keep them, so . . .
15    Q.  And do you have things from 2013 in your
16  folders?
17      MS. FLOWERS:  Objection.
18      THE WITNESS:  I don't know.
19  BY MR. ALEXANDER:
20    Q.  Did anybody look at your subfolders in
21  gathering documents --
22      MS. FLOWERS:  Objection.
23  BY MR. ALEXANDER:
24    Q.  -- to produce in the litigation as far
25  as you know?

Page 55

1    A.  I -- I don't know.  I believe if you
2  look at e-mail, the subfolders are part of that,
3  so yeah.
4    Q.  Do you know what the specific
5  allegations are against any of the defendants in
6  this case?
7    A.  I don't know that I would say I know
8  specific allegations.
9    Q.  Do you know the names of any of the
10  defendants?
11    A.  Yes.  I am aware of some of them, yes.
12    Q.  Which ones do you know?
13    A.  Purdue Pharma would be one.  Janssen
14  Pharmaceuticals, Teva, Rite Aid, Walmart, CVS,
15  Walgreens, you know, to name a few, I guess,
16  but --
17    Q.  Are there others --
18    A.  -- I don't know all of them.
19    Q.  Have you had any personal interaction
20  with any of the defendants you named relating to
21  anything about this case?
22    A.  No, I have not.
23    Q.  I'm not asking you about where you go to
24  fill your prescriptions or --
25    A.  No.

Page 56

1    Q.  -- personal medical issues.
2    A.  I had to think about that.  But, no, I
3  have not.
4    Q.  Okay.  Do you have any personal
5  knowledge of any interaction between Summit
6  County or any of its subdivisions, like
7  Children's Services, with any of the defendants?
8    A.  The county, no, I -- no, I don't.
9  Huh-uh.  No.
10    Q.  I'll do it in general.  So manufacturers
11  of prescription pharmaceuticals, the various ones
12  who are defendants in this case, do you know what
13  any of them are supposed to have done wrong?
14    A.  I mean, I have a general understanding
15  of what I think the issue is and, really, that's
16  been related to manufacturing and distributing
17  and marketing opioids irresponsibly.
18    Q.  Have you read any of the legal
19  complaints in this case, the things that are
20  filed with the court setting forth allegations of
21  the plaintiffs?
22    A.  I saw the complaint.  Yeah.  Uh-huh.
23    Q.  Okay.  When did you read the complaint?
24    A.  I -- I really haven't read the entire
25  complaint.  It's quite lengthy.

Page 57

1    Q.  Uh-huh.
2    A.  I have a copy of it.  I have glanced
3  very briefly at it.  So I'm not familiar with it
4  in detail.
5    Q.  Do you know if any of the allegations in
6  the complaint about the conduct of any of the
7  pharmaceutical manufacturing defendants are
8  accurate?
9      MS. FLOWERS:  Object to the form.
10      THE WITNESS:  I think that's the point
11  of the lawsuit.  I don't know that specifically.
12  BY MR. ALEXANDER:
13    Q.  That's what I'm asking you.  You're here
14  to be deposed on what you know and don't know.
15  And so some of the questions I'll be asking you,
16  just to make it, you know, clear is what things
17  you don't know, what things you can't say, where,
18  essentially, your knowledge ends.
19      Does that make sense?
20    A.  Sure.
21      MS. FLOWERS:  Objection.
22  BY MR. ALEXANDER:
23    Q.  Okay.  So in terms of the allegations in
24  the complaint against any of the drug
25  manufacturing defendants, you don't know if

15 (Pages 54 - 57)

Page 58

1 they're true or not --
2    MS. FLOWERS:  Objection --
3    MR. ALEXANDER:  -- correct?
4    MS. FLOWERS:  -- to the form and
5 object -- this is a fact witness.  This is not a
6 30(b)(6) witness.
7    Answer the question if you can.
8    THE WITNESS:  I don't know.
9 BY MR. ALEXANDER:
10   Q.   And so there's another category of
11 defendants you identified who would be retail
12 pharmacies, pharmacies where some patient might
13 go and receive a prescription drug pursuant to a
14 prescription written by a licensed health care
15 professional.
16    You mentioned some of those, correct?
17   A.   Correct.
18   Q.   Do you know what any of the allegations
19 are in the complaint about any of those
20 defendants?
21   A.   I think the allegations are the same;
22 that those distributors, as well as the
23 manufacturers, marketed and prescribed
24 medications irresponsibly.
25   Q.   You said "prescribed."

Page 59

1   A.   Uh-huh.
2   Q.   Do you know any conduct about any of
3 the -- any health care professional, physician or
4 otherwise, who ever prescribed a drug to any
5 patient in Summit County?
6    MS. FLOWERS:  Object to the form.
7    THE WITNESS:  I know there have been
8 issues related to doctors prescribing medications
9 illegally; that there were some articles in the
10 paper.  So, yes, there were a couple of issues,
11 really.
12 BY MR. ALEXANDER:
13   Q.   And do you know something other than
14 what you read in the paper?
15   A.   No.
16   Q.   Do you know why the health care
17 providers, the doctors, the clinics, the people
18 who were writing these excessive prescriptions
19 that you've described, haven't been sued?
20    MS. FLOWERS:  Objection.
21    THE WITNESS:  I think they have been.
22 BY MR. ALEXANDER:
23   Q.   In this case.  Why they're not sued in
24 this case.  Do you know?
25   A.   I mean, the doctors?  I -- maybe you

Page 60

1 need to say that again.  I'm sorry.
2   Q.   Sure.  So there are three categories of
3 defendants who have been sued.
4   A.   Yeah.
5   Q.   Manufacturers of prescription
6 pharmaceuticals; retail pharmacies; and then
7 distributors, wholesalers, kind of between the
8 two of them.
9   A.   Uh-huh.
10   Q.   In viewing that with those three, you
11 don't know the specific allegations against any
12 of those categories of defendants, correct?
13    MS. FLOWERS:  Object to the form.  Asked
14 and answered; misstates the witness's testimony.
15    THE WITNESS:  I -- I think I did answer
16 that, yes, that the -- those distributors and
17 manufacturers distributed and marketed opioid
18 prescription drugs irresponsibly by sending
19 messages about the safety of those drugs, for
20 example.
21 BY MR. ALEXANDER:
22   Q.   So my question was about the specific
23 allegations against all three, and you answered
24 about allegations in general against the
25 manufacturers.

Page 61

1    Do you know the specifics of any
2 allegations against the pharmaceutical
3 manufacturers?
4    MS. FLOWERS:  Objection.  Asked and
5 answered.
6    THE WITNESS:  I don't understand how
7 that question is different than the last one.
8 I'm sorry.
9 BY MR. ALEXANDER:
10   Q.   Do you know what the allegations are
11 against any distributor or wholesaler defendant?
12    MS. FLOWERS:  Same objection.
13    THE WITNESS:  I don't know how that's
14 different than the last question.  I am not
15 understanding your question, I guess.
16 BY MR. ALEXANDER:
17   Q.   So not a company that makes a drug --
18   A.   Okay.
19   Q.   -- and not a company that actually gives
20 it to a patient at a retail pharmacy --
21   A.   Okay.
22   Q.   -- but a company that is involved in
23 distributing drugs from manufacturers to retail
24 pharmacies.  Do you know anything about that type
25 of defendant, that -- that intermediary

16 (Pages 58 - 61)

Page 62

1  defendant?
2      MS. FLOWERS:  Objection.
3      THE WITNESS:  Only that it's the same
4  issue -- yes -- the same issue of irresponsibly
5  handling that distribution.
6  BY MR. ALEXANDER:
7      Q.  Based on your personal knowledge, do you
8  know whether any of the allegations are correct
9  or incorrect about any of these defendants in
10  regard to what you've described as your general
11  understanding about, essentially, excessive
12  prescriptions and marketing of prescription
13  opioids?
14      MS. FLOWERS:  Object to the form.  Asked
15  and answered.
16      THE WITNESS:  I don't work personally
17  with the manufacturers and distributors.  I mean,
18  what I know is what I hear related to why we've
19  had this epidemic that has impacted the community
20  and some of the reasons being that, you know,
21  people believe that the opioids were not
22  addictive, that they were safe, that that's what
23  they were told, and that's what they believed.
24  And then they used those prescriptions and had --
25  became addicted to them.

Page 63

1  BY MR. ALEXANDER:
2      Q.  So what you've just said, is that based
3  upon personal knowledge that you gathered, or is
4  that something you read somewhere like in a
5  newspaper or a legal complaint?
6      MS. FLOWERS:  Object to form.
7      THE WITNESS:  It -- I think I said that
8  that is not -- I don't have any direct dealings
9  with the distributors or manufacturers, so it's
10  not my personal knowledge.  It is what I know
11  from reading, from hearing things, from being
12  involved in the community in a variety of
13  different ways where those things are discussed.
14  BY MR. ALEXANDER:
15      Q.  Okay.  Are you talking about information
16  you gathered in your role as executive director
17  of Children's Services or just as a member of the
18  community?
19      A.  I would say both.
20      Q.  I want to focus on the first part.
21      A.  Okay.
22      Q.  As an executive director of Children's
23  Services, do you have any personal knowledge
24  about whether any conduct by any of the
25  defendants in relation to prescription opioids

Page 64

1  was appropriate or inappropriate?
2      MS. FLOWERS:  Object to the form.
3      THE WITNESS:  Yeah.  I'm not -- not
4  personally, other than, as I said, from a broad
5  perspective of what I know and hear from my role
6  in the community.
7  BY MR. ALEXANDER:
8      Q.  As part of your job, have you been
9  required to research or evaluate anything about
10  the specific behavior of any of the defendants in
11  this case?
12      A.  No, I don't believe so.
13      Q.  As part of your job, have you tried to
14  figure out the financial impact on Children's
15  Services of anything specifically related to the
16  use of prescription opioids?
17      A.  Yes.
18      Q.  I want to make sure we define terms here
19  for a second.  Because if you look through the
20  documents of yours that we -- we do have, you use
21  a couple different terms.  I want to make sure
22  that when we talk about them, we're -- we're
23  saying the same thing.
24      When you talk about substance abuse,
25  does that include alcohol, prescription drugs,

Page 65

1  illegal drugs, and other things?
2      MS. FLOWERS:  Object to the form.
3      THE WITNESS:  A substance use disorder
4  would include any type of addictive drug, yes --
5  BY MR. ALEXANDER:
6      Q.  And is --
7      A.  -- including alcohol.
8      Q.  And is that how it's used in your
9  documents, as far as you know, the documents of
10  Children's Services?
11      A.  Well, I mean, "substance use disorder,"
12  "substance abuse" is going to be used in a
13  variety of different ways.  It depends on the
14  context of the document specifically.
15      Q.  So what is an opioid?
16      A.  An opioid is a specific drug that is
17  primarily used for pain management.  Hydrocodone,
18  OxyContin, Percocet, Darvocet, morphine.  Those
19  types of drugs are the opiate types.
20      Q.  So you just said "opiate" in your
21  answer.  I asked about opioids.
22      A.  Opioids, yes.
23      Q.  So what's the difference between opioid
24  and opiate?
25      MS. FLOWERS:  Object to the form.

17 (Pages 62 - 65)

Page 66

1  BY MR. ALEXANDER:
2      Q.   As far as you know.
3      A.   Well, I think an opiate, specifically,
4  is a certain type.  An opioid is a more -- the
5  more general, broad perspective.
6      Q.   What's heroin?  Where does that fit into
7  the scheme that you've been describing?
8      A.   You know, heroin is a synthetic type of
9  drug that is an opiate, but not a prescription.
10     Q.   What about fentanyl or carfentanil?  Do
11  you know where those fit into this?
12     A.   Carfentanil is also a synthetic type of
13  drug or can be.  It can be a prescription drug.
14  I know there are definitely -- fentanyl can be
15  prescribed for pain management as well.
16  Carfentanil, my understanding, is really a pain
17  drug for large animals.
18     Q.   What about, like, fentanyl analogs?
19  Have you ever heard of that term?
20     A.   I have, yeah.
21     Q.   Okay.  And what's your understanding of
22  what that means?
23     A.   I don't know that I have a good
24  understanding of what it means other than there
25  are different types of fentanyls and different

Page 67

1  makeups and -- so, no, I --
2      Q.   Where does cocaine fit into this?  Is
3  that an opioid or opiate, as far as you're
4  concerned?
5      A.   Not to my knowledge, no.
6      Q.   Okay.  What about methamphetamine?  Is
7  that opioid or opiate or something else?
8      A.   No.
9      Q.   Something else?
10     A.   It's something else.  It's not an
11  opiate.
12     Q.   Okay.  Do you know anything about the
13  importation of heroin from other countries that
14  eventually makes its way into Summit County?  Any
15  personal knowledge about that at all?
16     A.   No.
17     Q.   Anything about data that would relate to
18  heroin usage trends within Summit County?
19         MS. FLOWERS:  Object to the form.
20         THE WITNESS:  Yeah, I don't really
21  understand the question.
22  BY MR. ALEXANDER:
23     Q.   Okay.  Do you -- in connection with your
24  job --
25     A.   Yeah.

Page 68

1      Q.   -- have you gained information about the
2  role of heroin in Summit County in terms of
3  either substance abuse or overdose deaths or any
4  other problem that affects Children's Services?
5         MS. FLOWERS:  Objection.
6         THE WITNESS:  Yeah.  I mean, heroin is a
7  drug that is used by some of the clients that we
8  serve, yes.
9  BY MR. ALEXANDER:
10     Q.   Is it one of the biggest problems in
11  terms of substance of abuse right now?
12         MS. FLOWERS:  Object to the form.  Lack
13  of foundation.
14         THE WITNESS:  It is a very big problem
15  for many of the clients that we serve, yes.
16  Uh-huh.
17  BY MR. ALEXANDER:
18     Q.   Has heroin been passed in the last year
19  or so by cocaine and methamphetamine with an
20  uptick in Summit County --
21         MS. FLOWERS:  Object to the form.
22  BY MR. ALEXANDER:
23     Q.   -- as far as you know?
24         MS. FLOWERS:  Lack of foundation.
25         THE WITNESS:  Passed by?  Say -- please

Page 69

1  say it again.
2  BY MR. ALEXANDER:
3      Q.   Has heroin, as a drug of abuse impacting
4  Children's Services, been passed by cocaine and
5  methamphetamine within the last year or so?
6         MS. FLOWERS:  Same objection.
7         THE WITNESS:  Heroin -- from my
8  perspective and what I've seen in my agency,
9  heroin surpassed cocaine at some point and was
10  a -- a primary issue for many of our clients.  We
11  have seen a resurgence of meth more recently.
12         I think much of that is really education
13  that's been done around use of opioids and heroin
14  and, you know, the many drug overdoses and deaths
15  that have occurred.  I think we're seeing many
16  clients that are switching to using meth because
17  they feel it's a more controlled substance that
18  they can manage better.
19  BY MR. ALEXANDER:
20     Q.   So let's go back a little bit.  So back
21  when you were with Summit County in the past, was
22  that during when cocaine was at its peak --
23         MS. FLOWERS:  Objection.
24  BY MR. ALEXANDER:
25     Q.   -- in the early to mid 2000s?

18 (Pages 66 - 69)

Page 70

1     MS. FLOWERS:  Object to the form.
2     THE WITNESS:  I don't remember exactly
3  when cocaine was at its peak.  That may be
4  accurate.  I just -- I don't remember the year
5  the cocaine peaked but --
6  BY MR. ALEXANDER:
7     Q.  Let me just ask in general.  Do you
8  remember a time when the -- the drug of abuse or
9  the substance of abuse that was having the
10  biggest impact on Children's Services was cocaine
11  and crack?  Was that during your time?
12     A.  Yes.  Uh-huh.
13     Q.  Okay.  And there were issues like
14  offspring of people who were addicted to cocaine
15  in various forms having additional Children's
16  Services needs affecting the entire range of
17  services provided by Children's Services,
18  correct?
19     A.  Yes.
20     MS. FLOWERS:  Object to the form.
21     THE WITNESS:  Uh-huh.  Yes.
22  BY MR. ALEXANDER:
23     Q.  And there were also adults who
24  interacted with Children's Services where their
25  needs were exacerbated or created because of

Page 71

1  addiction or even overdose to cocaine in various
2  forms, correct?
3     MS. FLOWERS:  Objection.  Form.
4     THE WITNESS:  Our clients?
5  BY MR. ALEXANDER:
6     Q.  Yes.
7     A.  Yes.  I mean, addiction has always been
8  an issue for many of the clients that we serve.
9  I think what we have seen more recently is that
10  the addiction has increased.  So roughly
11  estimating, I would say, you know, we've always
12  dealt with maybe a third of our population or a
13  quarter of our population having some type of
14  addiction issue, but they were often issues like
15  alcoholism and they were sometimes able to
16  function, sometimes able to manage their
17  parenting.
18     As we saw addiction change to opiates
19  and heroin, we see our clients struggling more
20  with their addiction.  So addiction has certainly
21  changed over time in my career.  I -- you know,
22  alcohol was the primary issue when I was a
23  caseworker.  Cocaine became an issue at some
24  point.  Opiates became an issue several years
25  ago.  So it has certainly changed over time.

Page 72

1     I would say in my 28-year career,
2  dealing with opiates has been one of the greatest
3  challenges that we've had with our clientele.
4     Q.  So going back to the 28 years, viewing
5  it kind of overall, tracking the substance of
6  abuse, what the trends are within that, which
7  ones are having the greatest impact and how they
8  might change how you provide children's services,
9  your budgetary needs, have always been a part of
10  your job?
11     A.  Yes.
12     MS. FLOWERS:  Object to the form.
13  BY MR. ALEXANDER:
14     Q.  And as you've moved into management and
15  pay attention to staffing needs and budget needs,
16  you have to track that in kind of a -- not just
17  anecdotal way but looking for data analysis and
18  more reliable ways to look at the drug of abuse
19  or substance of abuse that's impacting the
20  provision of children's services, correct?
21     MS. FLOWERS:  Object to the form.
22     THE WITNESS:  We -- if you're asking me
23  about tracking, I think is the question, we have
24  always had some trouble tracking substance abuse
25  or type of substances over the years, I mean,

Page 73

1  historically, because there are many places
2  throughout a case where substance use can become
3  an issue.
4     So it could be reported to us at day
5  one.  It could be something that's identified at
6  our disposition of the case.  It could be
7  something that is identified later in the case if
8  we're continuing to serve a family.  So there are
9  various points and places where addiction and
10  type of substance can become an issue.
11  BY MR. ALEXANDER:
12     Q.  Okay.  So it's been a challenge to
13  accurately track and do data analysis of the drug
14  of abuse over time, correct?
15     MS. FLOWERS:  Objection.  Misstates the
16  testimony.
17     THE WITNESS:  Yes, that is correct.
18  BY MR. ALEXANDER:
19     Q.  And over the last several years, there
20  have been efforts on a statewide basis, at least,
21  to try to improve the data, which has led to kind
22  of an increase of the estimate of drug of abuse
23  within Children's Services?  Clients of
24  Children's Services, not employees.
25     A.  There have been changes to the system

19 (Pages 70 - 73)

Page 74

1  over time to try and more accurately reflect
2  substance use and type of drug.
3      Q.  Like there's a caseworker blitz a couple
4  years ago with the SACWIS system to try to make
5  sure people were more systematic and thorough in
6  putting in drug of abuse or substance of abuse,
7  correct?
8      A.  Yes.
9      Q.  Okay.  And so before roughly 2016, the
10  data on which drug of abuse was at issue and how
11  often a drug of abuse or substance of abuse
12  played a role in a particular case was less
13  reliable?
14      MS. FLOWERS:  Object to the form.
15      THE WITNESS:  I don't know that I would
16  say it's less reliable.  I would say it was
17  harder to obtain.  So if you obtained substance
18  use through a particular field and it, you know,
19  had it listed in that particular field, that's
20  probably accurate data.
21      It's -- the issue is when we get into an
22  underrepresentation because we don't
23  necessarily -- we have to look in so many
24  multiple places to identify it.  So that's --
25  that's where I think often our data is not

Page 75

1  inaccurate, but it's underrepresented.
2  BY MR. ALEXANDER:
3      Q.  That's the word I was about to ask you
4  about.
5      A.  Yeah.
6      Q.  Before 2016 or so, when you were looking
7  at the incidents of substance abuse playing a
8  role in Children's Services' case and identifying
9  the specific substances that were at issue, that
10  would be underrepresented data?
11      MS. FLOWERS:  Object to the form.
12      THE WITNESS:  I would --
13  BY MR. ALEXANDER:
14      Q.  Or underestimated?
15      A.  Yeah, I -- I believe it's
16  underestimated.  Yes.
17      Q.  Okay.  And keeping that caveat in mind,
18  there have been, at different times over your
19  28-year careers, different drugs or groups of
20  drugs that were essentially the biggest concern,
21  the primary culprit from your perspective or that
22  of your colleagues, about what was driving
23  Children's Services' needs, correct?
24      A.  Correct.
25      Q.  And we talked about there was a time

Page 76

1  when that was cocaine, which included overdose
2  deaths, correct?
3      MS. FLOWERS:  Object to the form.
4      THE WITNESS:  I'm -- I'm sure -- I don't
5  remember the data around cocaine and overdose
6  deaths, so I -- you know, I -- I can't speak to
7  that really, I guess.
8  BY MR. ALEXANDER:
9      Q.  There would have been children who
10  entered foster care or had to go through the
11  system in one form or another because of
12  questions about the ability of their parents to
13  take care of them because of cocaine abuse,
14  correct?
15      A.  Correct.
16      MS. FLOWERS:  Objection.
17      THE WITNESS:  Yeah.
18  BY MR. ALEXANDER:
19      Q.  And that's still the case today,
20  unfortunately, correct?
21      A.  About cocaine?
22      Q.  Yes, ma'am.
23      A.  Yeah.  We still have some cocaine use
24  that we deal with, yes.
25      Q.  And, in fact, what we've been describing

Page 77

1  as the trend is that the impact of heroin peaked
2  around 2016.  And since then, heroin has dropped,
3  while cocaine and methamphetamine have come back
4  up; is that correct?
5      MS. FLOWERS:  Object to the form.  Lack
6  of foundation.
7      THE WITNESS:  I think we have seen meth
8  recurrence very recently.  I -- I mean, I can't
9  put a -- I can't pinpoint a time for you but,
10  primarily, I would say that's more this year.
11  That's more very recent.
12  BY MR. ALEXANDER:
13      Q.  And there was a time in the past when
14  meth was at its peak, correct, like mid 2000s?
15      MS. FLOWERS:  Object to the form.
16      THE WITNESS:  Uh-huh.  Yes, there was a
17  time when meth was at its peak, and it's probably
18  mid 2000s.  Yes.
19  BY MR. ALEXANDER:
20      Q.  Including the time when you had your
21  prior Summit County position as director of
22  foster care and adoption, correct?  That would
23  have been during that time period of 2002 to
24  2007?
25      MS. FLOWERS:  Object to the form.

20 (Pages 74 - 77)

1    THE WITNESS:  I don't remember the year.
2  I don't remember specifically if meth was, you
3  know, a primary issue in 2007 to --
4  BY MR. ALEXANDER:
5    Q.  But back then, even -- we can just go
6  2002 forward.  From 2002 through 2007, your
7  immediately prior stint with Summit County,
8  people within Children's Services were tracking
9  trends related to substance of abuse and the
10  impact specifically of cocaine or meth or
11  marijuana or alcohol, correct?
12    MS. FLOWERS:  Lack of foundation; form.
13    THE WITNESS:  Yes.  We've always tracked
14  some types of drugs and -- and, as I said, in
15  various places.  So yes.
16  BY MR. ALEXANDER:
17    Q.  And one of the trends over the last ten
18  years is that marijuana use has gone up, correct?
19    A.  I -- I think marijuana use has gone up
20  in the last, you know, ten years, yeah.
21    Q.  Alcohol has remained fairly constant,
22  marijuana has gone up, but the other drugs --
23  methamphetamine, cocaine, heroin -- those go up
24  and down depending on the particular year we're
25  talking about over the last ten years?

1    MS. FLOWERS:  Object to the form.
2    THE WITNESS:  Are you asking me?
3  BY MR. ALEXANDER:
4    Q.  Yes.
5    A.  That -- if marijuana -- if marijuana and
6  cocaine and meth have gone up and down --
7    Q.  I --
8    A.  -- is that the question?
9    Q.  It wasn't.  I can break them up.
10    A.  Okay.
11    Q.  Over the last ten years, has alcohol
12  use, according to the data you have with its
13  limitations, remained fairly constant that
14  there's a significant portion of your clients and
15  the parents of your clients who have alcohol as a
16  substance abuse -- substance of abuse?
17    A.  I don't know if it's remained constant
18  without really looking at -- at it.  I -- I don't
19  know that specifically.
20    Q.  It's always an issue, right?  You -- you
21  don't have a time period where alcohol has gone
22  away as an issue driving the need for children's
23  services?
24    MS. FLOWERS:  Object to the form.
25    THE WITNESS:  Alcohol has always been an

1  issue for some of our clients, yes.
2  BY MR. ALEXANDER:
3    Q.  And there's not been a time that you're
4  aware of where it's dropped down dramatically so
5  that it -- it's a -- much less of a problem than
6  it used to be?
7    MS. FLOWERS:  Objection.
8    THE WITNESS:  I don't -- I -- not to my
9  knowledge, no.
10  BY MR. ALEXANDER:
11    Q.  Okay.  And over the last ten years, your
12  understanding is that marijuana usage, not
13  necessarily causing problems, but in terms of
14  tracking of marijuana usage has gone up, correct?
15    A.  I believe so.
16    Q.  And there have been times when the other
17  drugs we've talked about or categories of
18  drugs -- heroin, cocaine, and methamphetamine --
19  which one is most common or of biggest concern
20  for Child- -- Children's Services depends on the
21  particular year because they're -- they have
22  different usage patterns?
23    MS. FLOWERS:  Object to the form.  Lack
24  of foundation.
25    THE WITNESS:  Well, I mean, I feel like

1  we answered this already, so I -- I guess I'll
2  try to say the same thing.  But I think that we
3  saw meth peak at some point, and then it did come
4  down.
5    And that then we saw opiates and heroin
6  really, I think, around 2015, as early as maybe
7  '14 we were starting to hear about it.  But,
8  really, at that -- that became an issue in around
9  2015, and '16 was really our primary time where
10  heroin and opiates were exploding in our
11  population.
12    So we saw more of that than we were
13  seeing, certainly, with meth.  We have seen a
14  resurgence of meth this year as well.
15  BY MR. ALEXANDER:
16    Q.  Have you also seen a resurgence of
17  cocaine over the last year?
18    A.  Not to my knowledge.
19    Q.  Do you get reports from an
20  epidemiologist employed by the county to give you
21  data on drug usage trends from time to time?
22    A.  From time to time, yes.
23    Q.  Do you remember getting a report that
24  talks about cocaine and meth are both on an
25  uptick in 2018?

21 (Pages 78 - 81)

Page 82

1    A.  No, I don't --
2        MS. FLOWERS:  Object to the form.  Lack
3    of foundation.
4        THE WITNESS:  I don't remember
5    specifically anything about cocaine being on an
6    uptick but . . .
7    BY MR. ALEXANDER:
8    Q.  And when we talk about any of these
9    drugs being a drug of abuse or a substance of
10   abuse impacting your clients or the -- the
11   children in your system, they can all --
12   whichever the drug is or the substance of abuse,
13   they can all affect the -- the clients in terms
14   of impacting child custody, child support, the
15   need for foster care, protective services, the
16   full range of services that your group provides,
17   correct?
18       MS. FLOWERS:  Object to the form.
19       THE WITNESS:  Substance abuse can
20   certainly impact our clients' ability to take
21   care of their children, depending on many other
22   factors, of course.  So, you know, there are
23   behavioral factors and environmental factors that
24   go into that, genetic factors that go into that.
25   So there's many reasons that substances can

Page 83

1    affect an individual in a different way.
2    BY MR. ALEXANDER:
3    Q.  Okay.  Let me ask it this way:
4    Children's Services provides a range of services,
5    correct?
6    A.  That's correct, yes.
7    Q.  And each service that Children's
8    Services provides can be impacted by a substance
9    of abuse, whether it be alcohol, or marijuana,
10   cocaine, heroin, methamphetamine, or something
11   else?
12       MS. FLOWERS:  Object to the form.
13       THE WITNESS:  Well, our clients might
14   need different services based on having a
15   substance use disorder.
16   BY MR. ALEXANDER:
17   Q.  Okay.  So let's go back to 2013 when you
18   took the executive director position because
19   maybe it will be helpful --
20   A.  Okay.
21   Q.  -- to just kind of walk through what's
22   gone on each of these last couple of years.
23   A.  Uh-huh.
24   Q.  You said that when you came in in 2013,
25   you were aware that the methamphetamine and

Page 84

1    cocaine use had been lower than it had been at
2    some of the peaks in the past.  Is that right so
3    far?
4        MS. FLOWERS:  Objection.
5        THE WITNESS:  I believe so, yes.
6    BY MR. ALEXANDER:
7    Q.  And I'm not just talking about use in
8    the community.  I mean use within your clients or
9    within the family units that affect your clients,
10   correct?
11   A.  I believe so.
12   Q.  And, therefore, it would impact the need
13   for children's services and the cost of
14   children's services.
15       MS. FLOWERS:  Object to form.
16       THE WITNESS:  The lack of -- or -- I
17   don't understand the question.
18   BY MR. ALEXANDER:
19   Q.  The use of cocaine and methamphetamine
20   or marijuana or alcohol that you're tracking over
21   time, part of the impact that you're tracking is
22   whether they affect your need for additional
23   staffing, the quality of services that you're
24   providing, the number of clients in the system?
25       MS. FLOWERS:  Object to the form.

Page 85

1    BY MR. ALEXANDER:
2    Q.  Correct so far?
3    A.  Not necessarily.  You know, I don't know
4    that we really did any cost analysis, for
5    example, on meth use.  I mean, it was certainly a
6    factor.  We knew we had clients that used meth,
7    just as at some point we had clients that used
8    cocaine.
9        As I said, we've always had clients that
10   have had substance use disorder.  I don't know
11   that we tracked it specifically around costs
12   related to those drugs.
13   BY MR. ALEXANDER:
14   Q.  Let's set aside cost.  When you say
15   "staffing," one of the things you pay attention
16   to as executive director is if you have
17   appropriate staffing both in terms of overall
18   levels and hiring at different positions to end
19   up with appropriate caseloads and quality of
20   services that could be provided; is that fair?
21   A.  Yes.  We staff according to the number
22   of cases that we're serving so we have -- can
23   maintain our caseloads at a manageable level.
24   Q.  You also track the number of cases that
25   are open at any given time to look at whether the

22 (Pages 82 - 85)

Page 86

1  staffing is appropriate, correct?
2      A.  Yes.  Uh-huh.
3      Q.  And within that, you also look at
4  whether there are particular drivers of the cases
5  or the needs of cases, whether they be, like,
6  substance of abuse or language barriers or other
7  factors that might affect the need for and amount
8  of services on a individual or overall basis --
9      MS. FLOWERS:  Object --
10  BY MR. ALEXANDER:
11      Q.  -- correct?
12      MS. FLOWERS:  Object to the form.
13      THE WITNESS:  That's correct.  Yes.
14  Uh-huh.
15  BY MR. ALEXANDER:
16      Q.  So there would have been analyses done
17  on, essentially, the different substances of
18  abuse that were driving Children's Services need,
19  not just starting in 2014, '15, or '16, but over
20  the years before that as well, correct?
21      MS. FLOWERS:  Object to the form.  Lack
22  of foundation.
23      THE WITNESS:  I don't know that there
24  were analyses conducted specifically related to
25  the use of meth or cocaine.  I don't know that.

Page 87

1  BY MR. ALEXANDER:
2      Q.  What about alcohol or drugs in general
3  or -- or marijuana?
4      MS. FLOWERS:  Object to the form.
5      THE WITNESS:  I don't know that there
6  were any specific analyses related to cost
7  conducted on those types of drugs.
8      You know, they may have increased
9  caseloads, so caseloads may -- we may have had
10  more cases, for example, which would have
11  required us to hire more staff or to alter our
12  services, for example.
13      So we -- we may -- we do things like
14  train staff specifically around a type of issue
15  that the clients may be having.  We may try to
16  put programs in place for our staff on a certain
17  type of issue.  So trainings related to heroin
18  and opiates, for example.  We've done a
19  substantial amount of that over the last few
20  years for staff so that they understand it
21  better.
22  BY MR. ALEXANDER:
23      Q.  And -- and I said for these questions
24  just for now I was -- I was setting aside costs.
25  The analyses that you were doing before, let's

Page 88

1  say, 2014 relating to other drugs or that people
2  within Children's Services were doing looked at
3  things like staffing needs and caseloads, how
4  they would be affected by the -- the substances
5  of abuse, correct?
6      MS. FLOWERS:  Object to the form.
7      THE WITNESS:  Yeah, I -- I don't know --
8  I feel like you asked me the same question, and I
9  don't know how to answer it differently.
10      We always look at whatever the issues
11  are that are impacting our clients when we're
12  doing our staffing needs and our program needs,
13  yes.
14  BY MR. ALEXANDER:
15      Q.  And there would have been programs
16  instituted before 2014 that tried to improve the
17  performance of children's services being provided
18  to clients to account for the different
19  substances of abuse and trends within substances
20  of abuse at any given time, correct?
21      A.  Correct.
22      Q.  And you said that in 2014 is when you
23  recall starting to notice that there was an
24  uptick in Children's Services' needs based upon
25  the use of heroin, opiates or opioids.  I'm not

Page 89

1  trying to characterize exactly which drug it was.
2      But is that right so far?
3      A.  Yes.
4      Q.  Okay.  And what was your assessment as
5  to within that, was that driven by heroin? was
6  that driven by illegally obtained drugs? or was
7  that driven by some other category of drugs?
8      MS. FLOWERS:  Object to the form.
9      THE WITNESS:  I don't know that I have
10  an answer for that.  I mean, I think we have
11  talked about opiates and heroin together.  They
12  seem to be very strongly linked for our clients.
13  Many started on an opiate of some kind that led
14  to heroin.  So I don't know that in our
15  conversations we really deciphered heroin from
16  the opiate specifically or a specific type.
17  BY MR. ALEXANDER:
18      Q.  Do you remember -- do you remember
19  having specific discussions in 2014 or before
20  about this issue of heroin, opiates, or opioids
21  impacting children's services in Summit County?
22      A.  Well, heroin certainly isn't a new
23  phenomenon.  I mean, it -- that's been, you know,
24  something that's been an issue since I've, you
25  know, been in child welfare.  I don't remember it

23 (Pages 86 - 89)

Page 90

1  being a problem specifically that was coming to
2  my attention until around 2014 and really --
3  real -- much more so in 2015.  I think we started
4  to hear about our clients using heroin and
5  opiates in 2014 is when those conversations
6  started to occur.  The problem really sort of hit
7  us in 2015.
8  BY MR. ALEXANDER:
9      Q.  The conversations from 2014 that you
10  just referenced --
11     A.  Uh-huh.
12     Q.  -- were they between you and other
13  people within Children's Services?
14     A.  Yes.
15     Q.  With whom?
16     A.  Caseworkers and supervisors and, you
17  know, various level of primarily social service
18  staff who were seeing issues with their clients
19  that were heroin related or opiate related, and
20  some of the struggles that they were having in
21  trying to find the right treatment and service
22  plan for those clients because they were really
23  struggling and very difficult to service.
24     Q.  So back in 2014 when you started having
25  these discussions with your colleagues, did you

Page 91

1  ask for there to be any sort of analyses done or
2  proposals put together to look at how to improve
3  the provision of children's services given this
4  change in drug use patterns?
5      A.  I know that I did start asking some of
6  those questions from our QI staff, for example,
7  maybe as early as 2014.  Uh-huh.
8      Q.  Who's QI?
9      A.  Quality improvement.  Yeah.
10     Q.  And who would be the folks in there that
11  you would have been having these discussions with
12  about initiating these sorts of analyses back in
13  2014?
14     A.  We had a analyst who worked in our
15  quality improvement department.  His name is
16  Kevin Brown.  But Kevin passed away, so -- but he
17  was, you know, our primary researcher and he did
18  all of our -- he pulled all the data for us and
19  did all of our research.  So Kevin Brown did
20  primarily all of the research for us until he
21  passed away.
22     Q.  When did he pass away?
23     A.  He passed away in -- I believe it was
24  December of 2017.
25     Q.  Before then, so going back to 2014, '15,

Page 92

1  '16, who was working with Kevin in QI on these
2  sorts of projects that you were initiating?
3      A.  We have a department director over our
4  quality improvement department.  It is currently
5  Elizabeth Mangon, I mentioned earlier, because
6  she's also over our records department.  And
7  prior to -- I don't know when she started because
8  it's been within the last couple of years.  We
9  had a prior director over quality improvement who
10  retired.
11     Q.  And who was the prior director from,
12  like, the 2014 time frame?
13     A.  Her name is Nealya Carter.  Again, I
14  don't know when Nealya Carter left and Liz took
15  over specifically.  It was probably after 2014.
16     Q.  Is that with an "N" or an "M" in her
17  first name?  I couldn't quite hear you.
18     A.  Nealya, you mean?  Nealya, N-e-a-l-y-a.
19     Q.  Okay.  So in addition to the initiatives
20  with Kevin Brown in QI, were there another --
21  were there other measures that you initiated or
22  discussions, at least, that you initiated about
23  ways to make things better or ways to assess what
24  the -- what the problem was, what its impact was?
25         MS. FLOWERS:  Object to the form.

Page 93

1         THE WITNESS:  There were many, many
2  conversations that were beginning to happen
3  community-wide.  I mean, so it really was not
4  just in the agency, but we were having community
5  discussions with law enforcement, with our mental
6  health board, with the medical examiner's office,
7  with the courts.
8         So there were many discussions that were
9  beginning to pop up throughout the community as
10  early as 2014 about, you know, what was happening
11  and what we were seeing as a community serving
12  clients with substance use disorder and
13  specifically opioid epidemic.
14  BY MR. ALEXANDER:
15     Q.  Including the statewide efforts, task
16  forces, that sort of thing initiated by the
17  governor?
18     A.  That's right, yes.
19     Q.  Do you remember participating in that or
20  at least seeing the output of some of those
21  statewide efforts back in 2014?
22     A.  I don't remember so much about statewide
23  efforts in '14.  I -- I do remember some
24  statewide efforts that occurred a little later
25  than that.  They were probably in '15 and '16.

24 (Pages 90 - 93)

Page 94

1 We have an association that has been very
2 involved from looking at this issue statewide and
3 started really trying to do some tracking of how
4 opiates were impacting our system as a whole
5 statewide has really been an issue statewide and
6 probably nationwide. So they were looking at it
7 from a statewide perspective.
8        There were some things certainly that
9 was going on, I think, you know, throughout other
10 administrations at the state level. The attorney
11 general's office did some work around this issue,
12 as well, I think, in 2016.
13    Q.  The organization you're talking about,
14 what was the name of it?
15    A.  Public Children's Services Association
16 of Ohio.
17    Q.  PCSAO?
18    A.  PCSAO. They are the directors
19 association for Children's Services.
20    Q.  And you've been involved with them going
21 back to 2013?
22    A.  Yes. I have been involved with them
23 long-term. I'm on their board, actually.
24    Q.  Okay. So we'll talk about the
25 coordination within counties and states and all

Page 95

1 of those sorts of things over the course of the
2 day. I want to go back to kind of the time frame
3 of where we are.
4        Were there -- were there other efforts,
5 whether it data collection analysis or looking at
6 ways to improve or assess the impact, any other
7 efforts that you initiated within your group back
8 in the 2014 time frame?
9        MS. FLOWERS: Object to the form.
10       THE WITNESS: We were part of a grant,
11 for example. It did not initiate in 2014, but it
12 was certainly ongoing in 2014. We had a federal
13 grant that started in 2012 that is the STARS
14 grant.
15       And if you ask me what that stands for,
16 I won't be able to repeat it. I apologize. It's
17 a very long acronym. But it is related to
18 substance abuse and not specific to opiates, but
19 it is for any type of substance abuse. So that
20 was one of the programs that we had implemented
21 and were continuing to work on throughout 2014
22 until it ended this July.
23 BY MR. ALEXANDER:
24    Q.  Okay. We'll go over that.
25    A.  Okay.

Page 96

1    Q.  We do have some information about STARS.
2    A.  Okay.
3    Q.  Not to be confused, but there's a whole
4 other thing called START.
5    A.  START. We have that as well, yes.
6    Q.  So let's go back to -- to where we were.
7 I was asking about initiatives that you started,
8 anything you set in motion back in 2014. Was
9 there anything else that -- that you started or
10 that you know came to pass because of efforts
11 that you took in 2014 in terms of analyses,
12 projects, changes to best practices, anything
13 like that?
14       MS. FLOWERS: Object to the form.
15       THE WITNESS: You know, I'm struggling
16 with the year. I don't -- you know, you're --
17 you're pinning it to 2014, and I don't know that
18 I can separate out what initiatives occurred in
19 '14 versus '15. So I'm not sure I can answer
20 that accurately.
21 BY MR. ALEXANDER:
22    Q.  Let me just maybe bracket it. Did your
23 ballot initiative pass last month?
24    A.  Our levy?
25    Q.  Yes.

Page 97

1    A.  Oh. Yes. Our levy passed last month.
2    Q.  Okay.
3    A.  Yes.
4    Q.  And that, itself, was a
5 close-to-two-year process of seeking to get it on
6 the ballot and to try to increase your levy to
7 make sure you have, essentially, the major source
8 of your funding going forward, correct?
9       MS. FLOWERS: Object to the form. Lack
10 of foundation.
11       THE WITNESS: Correct. It's been an
12 ongoing process, actually, for many years.
13 BY MR. ALEXANDER:
14    Q.  And there are a lot of moving pieces to
15 all of the budgeting --
16    A.  Yes.
17    Q.  -- state, federal, private, local
18 levies, correct?
19    A.  Yes.
20    Q.  They're --
21       MS. FLOWERS: Objection.
22 BY MR. ALEXANDER:
23    Q.  So I know that when we talk about
24 budgeting, it can be a long time frame until you
25 actually see that money is coming in through one

25 (Pages 94 - 97)

Page 98

1  of these and some of them involve renewals.  So I
2  want to go back to where we were.
3       Were there specific, like, budget
4  requests or efforts made to get additional
5  funding that were initiated back in 2014 or 2015
6  as -- as a result of these observations from 2014
7  that you described?
8       MS. FLOWERS:  Object to the form.
9       THE WITNESS:  Well, if I understand your
10  correct -- your question, I believe 2015 -- no --
11  it was 2016 we did a budget adjustment related to
12  placement because of things that had occurred,
13  really, in the prior year.
14  BY MR. ALEXANDER:
15       Q.  Okay.  Were there changes to best
16  practices that were initiated within Children's
17  Services as a result of these observations or
18  efforts from 2014?
19       MS. FLOWERS:  Object to the form.
20       THE WITNESS:  You know, there -- there
21  have been a lot of changes to best practices.
22  Again, I -- you're tying it to a specific time
23  period, so that's where I'm struggling to answer
24  your question.  I'm -- I'm trying to answer your
25  question.  I just don't really -- you're asking

Page 99

1  about specifically how do I tie it to '14, and
2  I'm not sure how to do that.
3       But we have done a lot of things in
4  terms of changing practice over several years
5  that started around 2014.  We made a lot of
6  changes to the STARS grant, for example, just in
7  how we implement that.  We did a lot of training
8  for our staff around substance use disorder and
9  opiates specifically.
10       We have a unit of staff who handles our
11  substance use disorder cases.  We've worked a lot
12  with that unit around, you know, their process,
13  their practices.  We've put in place trauma
14  screenings for children because we know that
15  children are very traumatized when they come from
16  homes with any substance use disorder.
17       We have put some screens in place where
18  we do a substance use screening at the beginning
19  of the case on all of our cases.  We have put
20  some in-home services in place for families who
21  are struggling to keep children safe in their own
22  home.  So we have people who go into the homes to
23  assist and support them.  We have a couple
24  different programs that do that.
25       So we've -- we're constantly looking at

Page 100

1  our practice and changing it and trying to react
2  to what we have been seeing.
3  BY MR. ALEXANDER:
4       Q.  Okay.  So I want to make sure we're on
5  the same page when we're talking about 2014
6  because that's when you said you -- although
7  heroin has always been an issue to some extent,
8  you noticed that there was an uptick of heroin
9  and potentially some other drugs that you're
10  lumping together in the opiate and opioid group.
11  That's what we're talking about for 2014.
12       So back then, was there ever a time when
13  you specifically recall you or your staff
14  identifying an uptick in the use of prescription
15  opioids by people who were actually prescribed
16  the opioid and obtained it legally?
17       MS. FLOWERS:  Object to the form.
18       THE WITNESS:  I -- we started trying to
19  run some reports in '14.  I know Kevin was
20  running some reports, and I don't know how good
21  the data is around type of drug in terms of, you
22  know, type of prescription drug.  But there --
23  there definitely were reports that were being
24  looked at as early as 2014.
25  BY MR. ALEXANDER:

Page 101

1       Q.  And you would have received those
2  reports from Kevin Brown back then?
3       A.  Some of them, yes.
4       Q.  So what I'm going to do is say -- so
5  I've given you kind of one category, which is an
6  impact on Children's Service from people who are
7  taking a prescription opioid that was obtained by
8  them legally through a prescription written for
9  them.  Does that make sense as a category?
10       A.  Yes.  Uh-huh.
11       Q.  Okay.  And then another category would
12  be people who obtain prescription opioids
13  illegally.  They steal it, they take somebody
14  else's, they get it on the street, whatever, but
15  they don't have a legal prescription to obtain it
16  legally and don't obtain it legally.  That's a
17  second category.  Does that make sense?
18       A.  Yes.
19       Q.  The third would be somebody who isn't
20  taking a prescription opioid at all, they're
21  taking an opiate:  heroin, an illegal street drug
22  like fentanyl analog obtained through the mail
23  from China, completely illegal opiates.  Does
24  that make sense as a third category?
25       A.  Yes.

26 (Pages 98 - 101)

1    Q.  Okay.  So we've been talking about some
2  of the things that you've observed and some of
3  the trends.  For the first category, have you
4  ever assessed that there's been an impact on
5  Children's Services in terms of the quality of
6  its services provided, its budgetary needs, its
7  staffing needs, anything like that, because of
8  that first category:  people who obtain a
9  prescription opioid legally on a prescription
10  written for them?
11        MS. FLOWERS:  Object to form.
12        THE WITNESS:  I don't know that we have
13  treated them -- those different categories
14  differently.
15  BY MR. ALEXANDER:
16    Q.  So you're certainly not in a position to
17  offer testimony as to a financial impact or any
18  other impact on Children's Services of that first
19  category, correct?
20        MS. FLOWERS:  Objection.
21        THE WITNESS:  The first category --
22        MS. FLOWERS:  Misstates --
23        THE WITNESS:  -- being heroin, is that
24  what you said?
25  BY MR. ALEXANDER:

1    Q.  No.  The first category being -- I'll
2  ask it again.
3    A.  Okay.
4    Q.  Sitting here today, you're not in a
5  position to offer testimony under oath about a
6  financial impact or an impact on Children's
7  Services because of the use of prescription
8  opioids by somebody who had a legal prescription
9  and obtained the prescription opioid legally
10  pursuant to that prescription, correct?
11        MS. FLOWERS:  Object to the form.
12  Misstates the witness's testimony.
13        THE WITNESS:  I don't have them
14  separated out that way, no.
15  BY MR. ALEXANDER:
16    Q.  So if -- if we're looking at that
17  specific part of it --
18    A.  Yes.
19    Q.  -- that category, the group one or
20  whatever we called it --
21    A.  Okay.
22    Q.  -- that one you can't talk about under
23  oath here is the financial impact or some
24  quantifiable or ascertainable impact on
25  Children's Services of that type of use of

1  prescription opioids, correct?
2        MS. FLOWERS:  Object to the form.  Lack
3  of foundation; misstates the witness's testimony.
4        THE WITNESS:  That's the same question
5  you asked me the last time, I think, unless -- is
6  there something different that I'm missing?
7  BY MR. ALEXANDER:
8    Q.  Do you want to have it read back?
9    A.  No.  I -- I mean, I just -- I'm asking
10  you if you're asking me something different
11  because I feel like I answered that, and I don't
12  know that I'm answering your question.
13    Q.  I want to make sure you just answer the
14  question that I asked.
15    A.  Okay.
16    Q.  I don't -- you know --
17    A.  So it is the same question?  Is that --
18    Q.  I want to make sure you answer it
19  directly given some of the discussion.
20    A.  Okay.
21    Q.  But, I mean, just so you know,
22  obviously, this is a question-answer format where
23  I ask questions, and you provide answers if you
24  understand them.
25        So if you need to have the question read

1  back or rephrased, I can do that.  Do you want to
2  have the question read back?
3    A.  Sure.
4        MR. ALEXANDER:  Okay.  Can you read back
5  the last question before the inquiry?
6        (Question read back as requested.)
7        MS. FLOWERS:  Object to the form.
8  Misstates the witness's testimony; and asked and
9  answered.
10        THE WITNESS:  I don't understand the
11  question.
12  BY MR. ALEXANDER:
13    Q.  So if the issue was talking about,
14  essentially, the financial impact on Summit
15  County through Children's Services because of the
16  use of prescription opioids -- you with me so
17  far?
18    A.  Uh-huh.
19    Q.  Okay.  That all you can say is that any
20  testimony that you can provide on the subject of
21  financial impact would not differentiate between
22  the impact of heroin and other completely
23  illegally obtained drugs versus illegally
24  obtained prescription drugs versus legally
25  obtained prescription drugs, correct?

27 (Pages 102 - 105)

1    MS. FLOWERS: Objection. Lack of
2 foundation; asked and answered.
3    THE WITNESS: The information that I
4 have would be all of those categories together.
5 BY MR. ALEXANDER:
6    Q.  And you're not aware of anything that's
7 differentiated between them, correct?
8    MS. FLOWERS: Objection.
9    THE WITNESS: Well, we can differentiate
10 between them in some places in the case.  So
11 there- -- therein lies the problem.  So it
12 depends on if it was put in as a drug type, which
13 there were not places, really, to put that until
14 more recently, or where it was put in in the case
15 and if it identified a drug type.
16 BY MR. ALEXANDER:
17    Q.  All right.
18    A.  Yes.
19    Q.  Keeping in mind those limitations on
20 data and what you've said --
21    A.  Yes.
22    Q.  -- sitting here today, can you provide
23 testimony as to the financial impact on Summit
24 County Children's Services of prescription
25 opioids obtained legally as opposed to all the

1 other types of illegal opiate use?
2    MS. FLOWERS: Objection.  Asked and
3 answered.
4    THE WITNESS: No.  I -- I can't do that
5 today.
6 BY MR. ALEXANDER:
7    Q.  Okay.  And you don't have any data
8 analysis undergoing -- or ongoing right now that
9 would allow you to provide that information,
10 correct?
11    MS. FLOWERS: Same objection.
12    THE WITNESS: I don't have a specific
13 data analysis going on.  There -- there are more
14 accurate ways of capturing drug type now that we
15 may be able to pull some different types of data
16 that's more recent, but that was a recent change
17 to the state system.
18 BY MR. ALEXANDER:
19    Q.  Over, essentially, the last two years,
20 SACWIS provides a little bit more --
21    A.  Yes.  Correct.
22    Q.  -- ability to identify a preferred drug
23 or drug of choice, correct?
24    A.  Correct.  Uh-huh.
25    Q.  And which means that looking before

1 2016, there's more uncertainty about what the
2 particular drug would be, whether it be a
3 prescription opioid, an illegal opiate,
4 marijuana, meth, alcohol, whatever, correct?
5    MS. FLOWERS: Object to the form.  Lack
6 of foundation.
7    THE WITNESS: Correct.
8 BY MR. ALEXANDER:
9    Q.  Okay.  And so I'm going to go down,
10 like, another more narrow thing than what we were
11 just talking about.
12    A.  Okay.
13    Q.  So bear with me.
14    You mentioned at the very start some of
15 the prescription drugs you're aware of that were
16 made by different manufacturers.
17    A.  Uh-huh.
18    Q.  Do you remember you named some?
19    A.  Uh-huh.  Yes.
20    Q.  You couldn't, then, do something where
21 you'd say, "Here's the -- the financial impact on
22 Summit County Children Services from specific
23 drugs or groups of drugs that were distributed
24 and obtained in a legal fashion," correct?
25    MS. FLOWERS: Form.  Asked and answered.

1    THE WITNESS: By type of -- specific
2 type of drug, no, I -- I don't think so.
3 BY MR. ALEXANDER:
4    Q.  Okay.  And certainly not by manufacturer
5 of drug, you couldn't do that?
6    A.  Definitely not.
7    Q.  And you couldn't do that by which
8 company distributed the drug, correct?
9    A.  No.
10    Q.  Meaning correct, you couldn't do that?
11    A.  Correct.
12    Q.  And you couldn't do it by which company
13 or chain or individual pharmacy dispensed a drug,
14 correct?
15    A.  No.  We -- we wouldn't necessarily know
16 that.
17    Q.  Okay.  So when you're talking about kind
18 of a financial impact or an impact on staffing
19 needs and budgeting needs and some of the other
20 measures that have been used to track the impact
21 of what you've variously described as heroin
22 crisis, opiate crisis, or opioid crisis, all of
23 that is lumping everything together, including
24 all the illegal -- all the illegal use of this
25 category of opiates, correct?

28 (Pages 106 - 109)

Page 110

1    MS. FLOWERS:  Objection to the form.
2    THE WITNESS:  Correct.
3    MS. FLOWERS:  We've been going --
4    MR. ALEXANDER:  Is now a good time for a
5  break?
6    THE WITNESS:  Sure.
7    THE VIDEOGRAPHER:  Off the record at
8  10:22 a.m.
9    (Recess taken.)
10    THE VIDEOGRAPHER:  Back on the record at
11  10:49 a.m.
12  BY MR. ALEXANDER:
13    Q.  Ms. Barnes, we're coming back from our
14  first break.  Is there any of your testimony thus
15  far you need to change or supplement in any way?
16    A.  I don't believe so.
17    Q.  Have you thought of anything else that
18  was responsive to my questions this morning?
19    MS. FLOWERS:  Objection.  Asked and
20  answered.
21    THE WITNESS:  No.  I mean, I don't -- I
22  don't think so.
23  BY MR. ALEXANDER:
24    Q.  Okay.  I'm going to -- before we lose
25  the trail of some of the things we talked about,

Page 111

1  I want to make sure that I'm clear on exactly
2  where you are on some of these issues.
3    You mentioned in the course of at least
4  one of your answers a concept that some people
5  might start with a prescription opioid, whether
6  written for them or not, and eventually move on
7  to other drugs of abuse.
8    Do you remember saying something along
9  those lines?
10    A.  Yes.
11    Q.  Okay.  Do you have any -- any data
12  within Children's Services where you've tracked
13  that, or is that just something that you
14  understand from press accounts or other
15  information?
16    MS. FLOWERS:  Object to the form.
17    THE WITNESS:  We have not tracked that
18  by individual client.  Really, that statement is
19  based on just the broader research out there
20  related to when people start with a prescription
21  drug and move to heroin.
22  BY MR. ALEXANDER:
23    Q.  When you say "the broader research," as
24  part of your job, are you reviewing scientific
25  literature relating to drug abuse trends and

Page 112

1  trends of how people end up as heroin users,
2  which -- what percent of them start out with
3  heroin as their first drug, that sort of thing?
4    MS. FLOWERS:  Object to form.
5    THE WITNESS:  As part of my job and just
6  personally, I read all kinds of things that talk
7  about the link between prescription drugs and
8  heroin use.
9  BY MR. ALEXANDER:
10    Q.  Is there some specific information from
11  within your job in terms as something that's
12  happened in Summit County that lets you say that
13  some percentage of people who interact with
14  Children's Services started with a prescription
15  opioid obtained legally on a prescription written
16  for them and then went on to heroin or other
17  illegal drugs?
18    MS. FLOWERS:  Object to form.
19    THE WITNESS:  We don't -- we don't know
20  that necessarily or track that specifically, so
21  no.
22  BY MR. ALEXANDER:
23    Q.  Do you know anything about the
24  percentage of people within your client
25  population who are heroin users that heroin was

Page 113

1  the first illegal drug they used or first opiate
2  drug they used?
3    A.  Well, we don't track that specifically
4  for our population, so I just assume it mirrors
5  the general population statistically for the link
6  between prescription drugs and heroin.
7    Q.  Is there some specific medical
8  literature or scientific literature you're
9  talking about, about this concept of gateway
10  drugs leading to heroin use?
11    A.  Well, I think there's a lot of
12  literature out there about that.  You know, I
13  know the American Medical Association has
14  produced some literature, but there's lots of
15  different literature out there around the link
16  between prescription drugs and heroin, yes.
17    Q.  So my question was:  Is there some
18  specific literature you're thinking of when you
19  talk about this concept of gateway drugs leading
20  to heroin use?
21    A.  The one that comes to my mind is --
22  specifically is the American Medical Association
23  literature.
24    Q.  Okay.  And you're --
25    A.  Yes.

29 (Pages 110 - 113)

Page 114

1    Q.  -- aware that about 20 percent of heroin
2  users use heroin as their first drug of abuse?
3      MS. FLOWERS: Object to the form. Lack
4  of foundation.
5      THE WITNESS: I don't know the
6  percentage who start specifically with heroin. I
7  was referring to the percentage that start with
8  prescription drugs to heroin.
9  BY MR. ALEXANDER:
10   Q.  Okay.  Well, if you're looking at the
11  people who are ultimately abusers of heroin who
12  might have the sorts of overdose and other
13  impacts that would affect Children's Services,
14  you might start with heroin and look back at how
15  they got there.  That's why you talked about
16  prescription opiates being the first drug,
17  correct?
18     MS. FLOWERS: Object to the form.
19     THE WITNESS: I don't know that we
20  always know how they got there, no.  I don't
21  know.
22  BY MR. ALEXANDER:
23   Q.  In fact, you usually don't know how they
24  got there?
25   A.  No, I don't --

Page 115

1      MS. FLOWERS: Object to form.
2      THE WITNESS: I -- I doubt that we know
3  specifically how someone got from -- if they
4  started with prescription to heroin, so no.
5  BY MR. ALEXANDER:
6   Q.  Or if they started with nicotine or
7  marijuana or something else and never used a
8  prescription opioid, correct?
9      MS. FLOWERS: Object to the form. Lack
10  of foundation.
11     THE WITNESS: I'm not aware of that
12  being linked to -- to heroin use, but --
13  BY MR. ALEXANDER:
14   Q.  Well, the strongest --
15   A.  -- nicotine or --
16   Q.  -- correlation with heroin is nicotine.
17   A.  Okay.  I'm not aware of that.
18     MS. FLOWERS: Objection.
19  BY MR. ALEXANDER:
20   Q.  Okay.  So in terms of the people in your
21  system who are heroin users, you're not going to
22  know the course of which drugs they took over
23  time to get to be heroin users, correct?
24     MS. FLOWERS: Object to form. Misstates
25  the testimony.

Page 116

1      THE WITNESS: We may know on some of
2  them, but I don't know that we know that
3  generally, no.  I don't think that's a -- I'm not
4  aware of that.
5  BY MR. ALEXANDER:
6   Q.  You said earlier that your impression
7  over time in your 28 years in the field is about
8  a quarter to a third of all your clients in
9  Children's Services are going to be abusers of
10  some type of substance.  Do you remember that
11  testimony?
12     MS. FLOWERS: Object to the form.
13     THE WITNESS: I remember saying
14  historically that we've always had a population,
15  which is probably roughly a quarter to a third of
16  our population, has always had some substance use
17  disorders.  More recently, that is a much higher
18  number.
19  BY MR. ALEXANDER:
20   Q.  And do you have some specific data or
21  documents that support those numbers, or is that
22  your general impression?
23   A.  Oh, no.  We have pulled some data around
24  substance use disorders specifically for more
25  recent years being -- so we could compare that to

Page 117

1  prior years.
2   Q.  Okay.  As we said, a comparison to years
3  before 2016 runs into some of the data
4  analysis -- or -- or data input issues from
5  SACWIS about drug of choice, correct?
6   A.  Well, I mean, again, it depends on how
7  you look at it.  So if you looked at the same
8  field in 2012 that you're looking at in 2016, you
9  would be getting consistent data there.
10   Q.  Assuming the input practices were the
11  same between the years?
12   A.  Yes.
13   Q.  And we know they weren't because there
14  was a caseworker blitz to try to address the
15  inconsistencies and input practices within all
16  the fields in SACWIS that related to drug use,
17  correct?
18     MS. FLOWERS: Object to the form.  Lack
19  of foundation.
20     THE WITNESS: The caseworker blitz was
21  very specific to asking the workers to put a
22  type -- drug type into a specific field so that
23  we could try to pull some data out of that field.
24  So that was one particular field.  So when I say,
25  you know, my knowledge about substance abuse

30 (Pages 114 - 117)

1  previously to substance abuse currently, that was
2  not pulled out of the same field that they did
3  the caseworker blitz for.
4  BY MR. ALEXANDER:
5     Q.  Okay.  So is there a specific field
6  within SACWIS over time that allows you to say
7  you have roughly a quarter to a third of your
8  clients that have some substance abuse issues?
9     A.  There are -- there are a variety of
10  different fields.  So what we've, I think, tried
11  to do is use something where we could get some
12  consistent comparison.
13        So I believe our comparison has been
14  related to the case plan.  We've actually looked
15  at it a couple different ways.  We've looked at
16  the case plan document that -- whether or not it
17  identified substance abuse as a reunification
18  factor, or in a general case plan whether
19  substance abuse was identified as a part of the
20  service plan.
21     Q.  And do you think that that supports
22  overall that there's been a trend of roughly a
23  quarter to a third of the clients have some sort
24  of substance abuse factoring in to the reason why
25  they're interacting with Children's Services?

1     A.  I think it showed that it was about a
2  quarter to a third around 2012, but it showed
3  around 2015 and '16 that it was closer to
4  50 percent, so . . .
5     Q.  And that there was -- if you look at the
6  way SACWIS data gets entered -- because they
7  capture it sequentially as you add data, correct?
8  Like, you can look at iterations of each file.
9     A.  I don't know what you mean, iterations
10  of a child, but there are --
11     Q.  Each file.
12     A.  -- it is captured sequentially, yes.
13     Q.  Okay.  So that we know that as a result
14  of the caseworker blitz in 2016, that these
15  percentages climbed significantly as data got
16  entered, including about 2015, correct?
17     A.  I think the caseworker blitz had an
18  impact on our staff's knowledge that they needed
19  to do a better job of capturing data around
20  substance use and type of substance.  So I think
21  it had an impact in terms of helping us to be
22  more accurate or put it into certain places.
23        I don't think the caseworker blitz
24  specifically really -- I don't know that we use
25  that data specifically for any, you know,

1  accurate -- with any accuracy.  I -- I don't
2  think so statewide it was successful in terms of
3  whether a county complied or they didn't comply
4  with putting it in.
5        So I think it's a place now where if we
6  looked in that -- it's the person characteristics
7  field.  And I think if we looked in the person
8  characteristics field, we might get more accurate
9  data out of the person characteristics field.
10        But that is just one field in SACWIS
11  that I don't think you can go back and look at
12  that in terms of comparison and be as accurate,
13  where I think the case plan, the reunification
14  case plan, is more accurate but, perhaps,
15  underrepresented.
16     Q.  Okay.  Can you just -- I think we
17  haven't said what it is.  Do you know what SACWIS
18  stands for?
19     A.  Statewide Automated Child Welfare
20  Information System.
21     Q.  And does your staff utilize that
22  database?
23     A.  Yes, they do.
24     Q.  They put information into it and run
25  reports or ask that reports be run out of it,

1  correct?
2     A.  That's correct.
3     Q.  Is there any information in SACWIS that
4  has the specifics for drug of choice when it
5  comes to a prescription drug that would allow
6  somebody to figure out which particular drug
7  they're using if it's a prescription opioid, how
8  they get that drug if it's a prescription opioid?
9        MS. FLOWERS:  Object to the form.
10        THE WITNESS:  Are you asking me how they
11  get the drug or if -- what drug they're -- I
12  don't understand the question.
13  BY MR. ALEXANDER:
14     Q.  It's actually both, but I can break it
15  up.
16     A.  That would be better.
17     Q.  In SACWIS, is there any information when
18  something is identified as the patient's drug of
19  choice is an opioid, that they would specify
20  which particular chemical or brand names they're
21  using?
22     A.  There are places in SACWIS that do that,
23  yes.
24     Q.  Okay.  And does it have the specifics
25  where you could see whose, like, particular drug

1 it is as opposed to a category of drug since some
2 of the prescription opioids are -- are fairly
3 similar and there are generic versions? Does it
4 have that level of consistent details where you
5 could actually say, "This person takes this
6 particular manufacturer's particular prescription
7 drug"?
8 MS. FLOWERS: Object to the form.
9 THE WITNESS: It doesn't have anything
10 related to manufacturers.
11 BY MR. ALEXANDER:
12 Q. Okay. And what about how somebody gets
13 the drug when their drug of choice is a
14 prescription opioid? Is that information in
15 SACWIS to see if they're getting it legally
16 through a prescription, stealing it from a family
17 member, getting it from the street, some other
18 way of getting it illegally?
19 MS. FLOWERS: Object to form.
20 THE WITNESS: There might be some cases
21 where we know where they got a drug, but I don't
22 think that is consistent in any way. So, you
23 know, if they're taking Suboxone, for example, we
24 might know that they're getting that from a
25 certain provider.

1 BY MR. ALEXANDER:
2 Q. Okay. And -- and that's specifically
3 because you're saying that there would be records
4 relating to getting a drug as part of a,
5 essentially, treatment for abuse?
6 A. Correct.
7 Q. Okay. So setting that aside, somebody
8 who is, essentially, at a methadone clinic would
9 be the kind of colloquial name for that where
10 somebody is actually taking and abusing an
11 opioid, is there going to be any consistent
12 information available in SACWIS that would allow
13 you to figure out how they're -- how they're
14 getting the drug?
15 A. No.
16 Q. And what about elsewhere in any data
17 that you have case files? Is there going to be
18 consistent information available on how somebody
19 is obtaining an opioid if that's the drug of
20 choice?
21 MS. FLOWERS: Object to the form.
22 THE WITNESS: There's no field, to my
23 knowledge, in SACWIS that allows us to put where
24 someone obtained a drug.
25 BY MR. ALEXANDER:

1 Q. I was thinking any -- anywhere in the
2 files that Summit County Children's Services
3 maintains, case files. Is there any information
4 that's maintained in a systematic and regular way
5 that would allow a reliable assessment of how
6 somebody is obtaining a prescription opioid if
7 that is their drug of choice?
8 MS. FLOWERS: Object to the form.
9 THE WITNESS: There's no consistent way,
10 to my knowledge, because I don't believe there's
11 any field that could put that in there. So if a
12 worker knew that, they might put it somewhere,
13 but that wouldn't be a consistent way of knowing.
14 BY MR. ALEXANDER:
15 Q. Okay. So we -- we were talking right
16 before the break about whether you could offer
17 certain testimony relating to an impact on
18 Children's Services, financial and otherwise, of
19 the different categories of opioids or opiates
20 based upon whether they were legally obtained or
21 whether they were prescription. Do you remember
22 that discussion?
23 A. Yes.
24 Q. Okay. And not only can you not offer
25 testimony that focuses specifically on

1 prescription opioids obtained legally, you don't
2 think that the Summit County data that's
3 available allows anybody to do that?
4 MS. FLOWERS: Object to the form. Lack
5 of foundation.
6 THE WITNESS: Can -- you'd have to
7 repeat that for me. I'm sorry.
8 BY MR. ALEXANDER:
9 Q. Do you want me to have that one read
10 back?
11 A. Or repeat it. Either way. I -- I just
12 need to understand it better.
13 Q. Sure.
14 MR. ALEXANDER: Can you read that one
15 back, please.
16 (Question read back as requested.)
17 MS. FLOWERS: Objection to the form.
18 Lack of foundation.
19 THE WITNESS: That -- that sounded like
20 a statement to me, so I need -- I guess I need to
21 understand the question specifically.
22 BY MR. ALEXANDER:
23 Q. Okay. I'll rephrase.
24 A. There were two parts. So maybe it's an
25 issue of I -- which -- it seemed like there were

32 (Pages 122 - 125)

1  two parts to the question.  So if you could break
2  it down for me in a question format, that would
3  help.
4      Q.  Sure.  I'll rephrase.
5      A.  Okay.
6      Q.  Given what you have acknowledged about
7  the limitations on data relating to how a client
8  obtains a prescription opioid if their drug of
9  abuse is a prescription opioid, you don't think
10 that anybody could do a reliable estimate of the
11 impact on Summit County Children's Services of
12 the use of prescription opioids obtained legally
13 pursuant to a prescription for the individual who
14 is abusing the drug?
15     MS. FLOWERS:  Object to the form.  Lack
16 of foundation.
17     THE WITNESS:  I don't think we have a
18 field where we can pull a specific drug, so,
19 therefore, we can't say this specific type of
20 drug had this specific impact.
21 BY MR. ALEXANDER:
22     Q.  Or all prescription opioids put together
23 in the category of prescription opioids obtained
24 legally pursuant to a prescription?
25     MS. FLOWERS:  Objection.

1      THE WITNESS:  We don't track that in
2  SACWIS.
3  BY MR. ALEXANDER:
4      Q.  Okay.  So you don't think that anybody
5  could offer a reliable opinion about damages
6  attributable to the use of prescription opioids
7  by somebody with a legal prescription for the
8  opioid taking it him- or herself and interacting
9  with Children's Services of Summit County,
10 correct?
11     MS. FLOWERS:  Object to the form.
12 Misstates the witness's testimony; asked and
13 answered; and calls for opinion.
14     THE WITNESS:  I think that's a legal
15 question that I don't know that I know how to
16 answer.  I think we can speak to the impact to
17 our system.  I think we can talk about the
18 numbers.  I think we can talk about, you know,
19 how many kids we serve, how many families we
20 serve that have an addiction that involves an
21 opioid.
22     So, yes, I -- I think there is some
23 connection, certainly, that can and should be
24 made about opioids with our population.  But if
25 you're asking me about specifically each type of

1  drug and which one, I can't speak to that.  That
2  is the only way I know how to answer that
3  question.
4  BY MR. ALEXANDER:
5      Q.  Well, in your answer, you just mentioned
6  opioids.  Were you --
7      A.  Yes.
8      Q.  -- counting heroin and illegal drugs as
9  part of what you're talking about with an impact
10 on Children's Services?
11     A.  I am, yes.
12     Q.  Okay.  All right.  So, remember, my
13 question is about prescription opioids obtained
14 legally and used legally by somebody who actually
15 has a prescription written by a licensed health
16 care professional and they obtain the drug from a
17 pharmacy or other licensed distributor, you know,
18 endpoint, and take it themselves.  You
19 understand?
20     A.  Yes.
21     Q.  Okay.  For that type of person
22 interacting with Children's Services of Summit
23 County, you can't say what the financial impact
24 is on -- or the impact on the delivery of
25 services by -- by Children's Services of Summit

1  County, correct?
2      MS. FLOWERS:  Objection.  Form and
3  foundation.
4      THE WITNESS:  I cannot break it down
5  that way, so that is correct --
6  BY MR. ALEXANDER:
7      Q.  And --
8      A.  -- yes.
9      Q.  And you have a good understanding of
10 what data exists through SACWIS and case files
11 and all the other data sources and records that
12 are maintained within Children's Services, don't
13 you?
14     MS. FLOWERS:  Object to the form.  Lack
15 of foundation.
16     THE WITNESS:  I have a good
17 understanding.  I'm not a SACWIS expert, that's
18 for sure.
19 BY MR. ALEXANDER:
20     Q.  Right.
21     A.  Uh-huh.
22     Q.  And based upon your understanding --
23 that's all I'm asking about.  Based upon your
24 understanding of the data sources and the sort of
25 data bases that are used to create the sorts of

33 (Pages 126 - 129)

Page 130

1  analyses that you've been requesting over the
2  five-and-a-half years that you've been executive
3  director, you don't think that that data allows
4  somebody to focus specifically on the impact of
5  prescription opioids dispensed pursuant to a
6  prescription to somebody who is entitled to
7  receive that prescription drug?
8         MS. FLOWERS:  Object to the form.  Asked
9  and answered.
10        THE WITNESS:  There are places in SACWIS
11 that have types of drugs, so we know there are
12 certain types of drugs that are listed.  I don't
13 know what the list is, so I can't answer that for
14 you.  But there are places in SACWIS that does
15 list type of drug.  So that's not how I have
16 analyzed data specifically.
17 BY MR. ALEXANDER:
18   Q.  I understand.  All the analyses that
19 you've asked for and received over the last
20 several years -- and we -- we have some of them
21 for at least the last two years --
22   A.  Okay.
23   Q.  -- have lumped everything together, if
24 you will.
25   A.  Yes.

Page 131

1    Q.  All opiates, opiates -- opioids, opiates
2  obtained legally, obtained illegally, all
3  combination of those, correct?
4         MS. FLOWERS:  Object to the form.
5         THE WITNESS:  I believe that's correct,
6  yes.
7  BY MR. ALEXANDER:
8    Q.  And what I'm asking you is:  Because
9  you -- you ask for reports to be run, you ask for
10 analyses to be done, you're aware of kind of what
11 your staff and the associated staff that does
12 analyses for you have the ability to generate,
13 correct?
14        MS. FLOWERS:  Lack of foundation.
15        THE WITNESS:  Within reason.  I don't
16 know that I can tell you everything they can
17 generate, no.
18 BY MR. ALEXANDER:
19   Q.  I'm not saying you're typing in the
20 computer search terms and the boolean operators
21 and all the specific stuff.  But in terms of,
22 like, "Hey, can you give me this data?  I'd like
23 to know how many open cases we have, what the
24 percentage is that lists some sort of substance
25 of abuse, the average stay."

Page 132

1         You -- you've asked for and received a
2  number of analyses that touch on some of the
3  issues we've been talking about, correct?
4    A.  Uh-huh.  Correct.
5         MS. FLOWERS:  Object to the form.
6         THE WITNESS:  Uh-huh.  Yes.
7  BY MR. ALEXANDER:
8    Q.  And you know that specifically when it
9  relates to SACWIS, that database as opposed to
10 other potential databases -- that database, it
11 just doesn't tell you how somebody obtains the
12 drug -- whether it's pursuant to a legal
13 prescription, whether they bought it on the
14 street -- correct?
15   A.  Correct.
16        MS. FLOWERS:  Asked and answered.
17 BY MR. ALEXANDER:
18   Q.  And you know that before 2016, there are
19 questions about the accuracy of the data in there
20 when it comes to drug of choice because it wasn't
21 always being entered consistently, correct?
22        MS. FLOWERS:  Object to the form.
23        THE WITNESS:  I don't think the accuracy
24 of the data is poor.  I think the thoroughness of
25 the data is what is questionable, so --

Page 133

1  BY MR. ALEXANDER:
2    Q.  The reliability of the data --
3    A.  Yes.
4    Q.  -- is questionable?
5         MS. FLOWERS:  Object to the form.
6         THE WITNESS:  That's not what I said,
7  no.
8  BY MR. ALEXANDER:
9    Q.  Well, that's -- I don't mean to be too
10 specific about terms, but --
11   A.  Okay.
12   Q.  -- accuracy versus reliability in terms
13 of whether you're within a narrow range, that's
14 accuracy.  Whether it's reliable is the issue,
15 right?  Whether the data in there, essentially,
16 consistently tracks drug of choice such that when
17 it says it's 42 percent, and of that X percent
18 was one particular drug, I'm not saying any of
19 the individual data points are entered
20 inaccurately but, overall, you can't generate
21 accurate prevalence or incidents data from
22 pre-2006 SACWIS?
23        MS. FLOWERS:  Object to the form.  Asked
24 and answered.
25        THE WITNESS:  The data that is there is

34 (Pages 130 - 133)

1 accurate.  So, you know, if we pulled a -- data
2 that said substance abuse was an issue for this
3 many families in their case plan, that's accurate
4 data.
5      Where the inaccuracy to the data comes
6 in is that someone might not have put it there.
7 They might have put it somewhere else.  So that
8 certainly could be a higher number.  I don't
9 think it would be a lower number.  So that's
10 where I think the -- the difference comes in.
11 BY MR. ALEXANDER:
12    Q.  And differentiating before 2016 in terms
13 of whether the drug of choice was marijuana or
14 alcohol or heroin or cocaine or something else,
15 that is also an issue in terms of whether the
16 data is robust enough to accurately capture what
17 was going on in the client population for that
18 time period, correct?
19      MS. FLOWERS:  Object to the form.  Asked
20 and answered.
21      THE WITNESS:  I believe the same
22 applies, yes.
23 BY MR. ALEXANDER:
24    Q.  Meaning if it's there, it's --
25    A.  It's accurate.

1    Q.  -- it's accurate for that record, but it
2 may not be captured for a percentage of the
3 files?
4    A.  Correct.  Uh-huh.
5    Q.  All right.  Are there other databases
6 that are utilized to track this sort of
7 information over the last five-and-a-half years
8 as you've been executive director other than
9 SACWIS?
10    A.  I don't believe so.
11    Q.  Okay.  And as we mentioned, there are
12 individual case files, correct?
13      MS. FLOWERS:  Object to the form.
14      THE WITNESS:  There are individual case
15 records in SACWIS, and then there is aggregate
16 data in SACWIS as well.
17 BY MR. ALEXANDER:
18    Q.  But Summit County has literally hard
19 copy or -- or case files that associate, here's
20 the record on a particular case, right?
21      MS. FLOWERS:  Object to the form.  Lack
22 of foundation.
23 BY MR. ALEXANDER:
24    Q.  Like, there's an activity log, there's
25 other various documents that make up what you

1 call somebody's case file?
2    A.  That's right.
3    Q.  And have you initiated any sort of data
4 projects where somebody went back to the actual
5 case files -- not the SACWIS, but back to the --
6 the case files to try to extract better or more
7 accurate information about drug use or the impact
8 of drug use or abuse on Children's Services?
9    A.  Yes.  We did do that in 2015.  The
10 former director of social services did a specific
11 hand count of cases where she went in to case
12 records for some time period in 2015 to identify
13 substance abuse issues consistently as well as
14 type of drug.
15    Q.  Did that project have a name?
16    A.  No.  It was just a research that she did
17 internally, so . . .
18    Q.  Who did the research?
19    A.  The former director of social services.
20 Her name was Sharon Geffken.
21    Q.  And was there a reason why this was
22 initiated, as far as you know?
23    A.  It was initiated because we knew that we
24 had a problem with opioids and were -- we were
25 really trying to get a better understanding of

1 the volume, and did not feel -- we felt that our
2 data that we could pull out of SACWIS was
3 under-representing the issue.  So she was trying
4 to get a better and more accurate look at how
5 opioids were impacting our children and families.
6 So she spent some time doing a research project
7 where she looked at case-specific information.
8    Q.  Did anybody else work on it or just her?
9    A.  Just her to my knowledge.  I -- I don't
10 know if she had any help with that.
11    Q.  Did you get some sort of report or
12 summary of the project after it was completed?
13    A.  She just told me the outcome of it at
14 the time, and I had her -- only recall, really, a
15 rough estimate on that.  But she looked at
16 substance abuse specifically and type of drug.
17 And I -- I think the substance abuse was around
18 50 percent and opioid use was around 40 percent,
19 so . . .
20    Q.  40 percent of the 50 percent?  So 20
21 percent?
22    A.  No.  I believe that was of the total,
23 so -- of our total -- the total population she
24 looked at.
25    Q.  So 80 percent of all substance abuse in

35 (Pages 134 - 137)

Page 138

1 this analysis in 2015 was opioids or opiates
2 or -- I'm just trying to figure out --
3     MS. FLOWERS: Objection. Misstates --
4     MR. ALEXANDER: -- which drug you're
5 talking about.
6     MS. FLOWERS: Objection. Misstates the
7 testimony.
8     THE WITNESS: No. That's not right. I
9 really don't recall. I -- I shouldn't guess.
10 BY MR. ALEXANDER:
11     Q. Was there a formal report written up?
12     A. No, I don't believe there was a formal
13 report, so . . .
14     Q. Just relayed to you orally?
15     A. I know it was relayed to me orally. If
16 it was any other format, I don't recall it being
17 in another format, so . . .
18     Q. Did anything happen with this, as far as
19 you know, like get presented at a board meeting
20 or go to somebody else up higher in the county
21 government chain, to the state, to the AG,
22 anything like that?
23     A. I --
24     MS. FLOWERS: Object to the form.
25     THE WITNESS: I -- we may have used her

Page 139

1 data. We provided some data to PCSAO, the Public
2 Children's Services Association of Ohio, that
3 year. That may have been provided to them as --
4 when we were trying as a state -- I think '15 was
5 the first year that, as a state, we were trying
6 to gather some data around substance use and the
7 percentage of opioids.
8     And I believe that's what was provided
9 to PCSAO in '15, was what Sharon Geffken did
10 through the hand count that she did that year.
11 BY MR. ALEXANDER:
12     Q. Was there any other data collected by
13 Ms. Geffken other than the percentage that
14 involved opioids -- percentage of open cases that
15 involved opioids?
16     A. That was her specific project, so I
17 don't think so.
18     Q. Was -- do you know if this was part of
19 the PCSAO opioid survey?
20     A. Well, that's why I was saying that may
21 be what -- why she did it, is that she was
22 submitting it to PCSAO.
23     Q. Okay. If you wanted to lay your hands
24 on any of the data that she generated from 2015,
25 Ms. Geffken, could you do that?

Page 140

1     A. If we had any data or reports that she
2 generated, those would have already been
3 provided, so . . .
4     Q. So I'm -- I'm not trying to hide the
5 ball on -- on documents. In terms of, like,
6 things with your name on them, June 2016 is when
7 they start. We don't have anything from your
8 plus -- first three-plus years. We don't have
9 produced, as far as I know, and I try to know,
10 the stuff from 2015, stuff from 2014. We just
11 don't have those documents produced yet.
12     And I know that you said you're not the
13 one who gathered all the documents, certainly,
14 made decisions on -- on what to produce. So when
15 I ask you about whether documents exist or not
16 and what you did and how it would be
17 memorialized, I'm not -- I honestly haven't seen
18 all of your documents. That's why I'm asking.
19     A. Okay.
20     Q. Does that make sense?
21     MS. FLOWERS: Objection to the colloquy.
22 BY MR. ALEXANDER:
23     Q. Do you understand?
24     A. I -- I think what you're saying is if I
25 provided something to my attorneys, they haven't

Page 141

1 given it to you. Is that what you're saying?
2     Q. I don't know if you provided something
3 to your attorneys --
4     A. Yeah.
5     Q. -- relating to your work in 2006, 2007,
6 2013, '14, '15. I don't know what you provided
7 them. But I only know what we have. So I'm
8 trying to understand which documents you think
9 exist from this time period.
10     So the hand count that Ms. Geffken
11 did -- am I saying her name right?
12     A. Yes. Uh-huh.
13     Q. -- you're not sure if it resulted in
14 some sort of formal written submission --
15 spreadsheet, something -- that went on to
16 somebody other than you, correct?
17     MS. FLOWERS: Object to the form.
18     THE WITNESS: I don't believe that was
19 presented in any kind of a report or spreadsheet
20 format, no.
21 BY MR. ALEXANDER:
22     Q. Would it have gone up to PCSAO or to
23 somebody on a statewide basis, it would have had
24 to have gone to them by e-mail and attaching some
25 sort of data, correct?

36 (Pages 138 - 141)

Page 142

1     MS. FLOWERS: Objection. Lack of
2 foundation.
3     THE WITNESS: It would have had to gone
4 to them in some format which would have probably
5 been through Ms. Geffken sending them something
6 in e-mail.
7 BY MR. ALEXANDER:
8    Q. Okay. So I think this came out of
9 asking you about any projects that looked at
10 actual case files. Is that how you refer to
11 them, "case files"?
12    A. Sure.
13     MS. FLOWERS: Objection.
14     THE WITNESS: Case record, case file.
15 BY MR. ALEXANDER:
16    Q. And so what about since 2015? Have you
17 or your staff been part of any kind of project of
18 pulling information out of individual case files
19 to generate some sort of children's services
20 over --
21     Let me ask it this way: Since 2015,
22 have you or your staff been involved in any
23 project where individual case files were analyzed
24 to gather data to present it to somebody --
25 internally, to the county, to the state, to some

Page 143

1 other entity or subdivision -- that looked at
2 anything relating to drug abuse, including abuse
3 of opioids or opiates?
4     MS. FLOWERS: Object to the form.
5     THE WITNESS: To my knowledge, that's
6 been aggregate data, not individual case record
7 data.
8 BY MR. ALEXANDER:
9    Q. And the aggregate data has come from
10 SACWIS?
11    A. Yes.
12    Q. And are you aware of any other databases
13 that have been utilized for any kind of analyses
14 relating to drug abuse other than SACWIS?
15     MS. FLOWERS: Objection. Asked and
16 answered.
17     THE WITNESS: No.
18 BY MR. ALEXANDER:
19    Q. You said before the break that it's your
20 impression that some patients have switched to
21 methamphetamine as a drug of abuse where they
22 used to use heroin because of public education
23 campaigns and the belief that methamphetamine
24 was -- would be easier to use in a stable and
25 predictable manner.

Page 144

1     I'm not trying to give your exact words,
2 but was that the gist of what you said before the
3 break?
4     MS. FLOWERS: Object to the form.
5     THE WITNESS: I think what I said was we
6 have seen more clients using meth, and certainly
7 the theory and conversations among professionals
8 in the community has been that some of our --
9 we've done a lot of education around the opioid
10 epidemic and the impact of opioid use being very
11 addictive. And we have provided a lot of
12 information about the number of deaths related to
13 opioid deaths to the community.
14     So we have educated the community about
15 the risks involved and, therefore, we're seeing
16 some switching to meth because they are able to
17 control better the risk of overdose and death.
18 BY MR. ALEXANDER:
19    Q. When you say "opioid deaths" in your
20 last answer, you're including heroin, fentanyl,
21 carfentanil, fentanyl analogs, correct?
22    A. Correct.
23    Q. You weren't talking about opioid deaths
24 related to a prescription medication, correct?
25    A. Well --

Page 145

1     MS. FLOWERS: Object to the form.
2     THE WITNESS: -- it would include those
3 as well.
4 BY MR. ALEXANDER:
5    Q. Have you ever seen data that tells you
6 specifically how many overdose deaths are just
7 related to prescription opioids?
8    A. I don't know if I have. I -- I don't
9 know -- you know, I've certainly seen data
10 from -- Summit County Public Health tracks some
11 data. I don't know if they track it that way, so
12 I really don't remember. I am -- I am thinking
13 more generally about those being lumped together,
14 yes.
15    Q. And in your thinking, you're also not
16 going -- drilling down to overdose of
17 prescription opioids that were obtained legally
18 by the person who took them, correct?
19     MS. FLOWERS: Objection. Asked and
20 answered.
21     THE WITNESS: I don't -- we don't track
22 that. I believe, certainly, that is tracked by
23 the medical examiner's office and other places
24 would have information about what caused the
25 death.

37 (Pages 142 - 145)

Page 146

1  BY MR. ALEXANDER:
2    Q.  Okay.  Is it your general understanding
3  that the vast majority of these overdose deaths
4  from this time period -- focusing on 2016 -- were
5  people taking heroin, fentanyl, carfentanil, and
6  combinations of those?
7        MS. FLOWERS:  Object to the form.
8        THE WITNESS:  Is it my job to --
9  BY MR. ALEXANDER:
10   Q.  Is it your understanding that the vast
11  majority of the deaths from the 2016 time frame
12  were -- of overdose were specifically overdoses
13  with heroin, fentanyl, fentanyl analogs, or
14  combinations of those?
15       MS. FLOWERS:  Objection.  Form and
16  foundation.
17       THE WITNESS:  I don't know that
18  breakdown, no.
19  BY MR. ALEXANDER:
20   Q.  So let's go back to what you said about
21  this recently observed shift or uptick of
22  methamphetamine use.
23   A.  Uh-huh.
24   Q.  Okay.  And has there been at the same
25  time, the same discussion about some people are

Page 147

1  switching to cocaine?
2    A.  You know, you said that before, and --
3  and I -- I don't remember how I answered that,
4  but I have, actually, heard some resurgence of
5  cocaine.  I think meth -- I've certainly heard
6  that being more prevalent, but I think we've
7  heard some more use of cocaine as well.  So I --
8  I might have to correct what I said earlier.
9    Q.  So the discussions that you're aware of
10  within the community of people who deal with drug
11  abuse or treatment of drug abuse has let you know
12  that there's been a resurgence of methamphetamine
13  and cocaine use, and that may have something to
14  do with people switching off of heroin; is that
15  correct?
16       MS. FLOWERS:  Objection to the form.
17       THE WITNESS:  I think that there --
18  there has been conversations that they believe
19  people are switching to drugs that they feel they
20  can control their risk of death, yes.
21  BY MR. ALEXANDER:
22   Q.  Have you been personally involved in any
23  of these discussions that you're talking about
24  about the thinking about whether people could
25  control methamphetamine better than heroin to

Page 148

1  minimize the chance of overdose?
2        MS. FLOWERS:  Objection.
3        THE WITNESS:  I have been part of many
4  conversations in community meetings where there
5  has been that discussion taking place, yes.
6  BY MR. ALEXANDER:
7    Q.  Are there specific community meetings or
8  speakers you can think of?
9    A.  I think that -- I can't name specific
10  community meetings.  Meetings with our court,
11  juvenile court, we've had those conversations.
12  Meetings with the director of our ADM board,
13  we've had those conversations.  Of -- the medical
14  examiner, I believe, made a statement about
15  seeing some resurgence of meth, so, yeah,
16  general.
17   Q.  What does "ADM" stand for?
18   A.  The -- it's the mental health agency.
19  Alcohol, addiction, and -- I don't remember.
20   Q.  You mostly just --
21   A.  It's the mental health one.
22   Q.  Okay.  So do you have any information
23  gathered from within Children's Services that
24  relates to this issue of why or how often people
25  are now using cocaine or methamphetamine when

Page 149

1  they may have previously been taking heroin or
2  some other opiate?
3    A.  Do I have data?  Is that the question?
4    Q.  Yeah.  Data or analyses, something that
5  comes from your group.
6    A.  No.
7    Q.  I mean, I understand -- this may be
8  hard, but, obviously, you hear a lot of things,
9  including the press and public meetings and from
10  other parts of the -- the Summit County
11  government, medical examiner's office.  So in my
12  questions, I'm trying to focus on what is it that
13  Children's Services, of which you're the
14  executive director, has actually generated or
15  analyzed or tracked.
16       Does that make sense, that distinction?
17   A.  Yes.
18   Q.  Okay.
19   A.  Uh-huh.
20   Q.  So when it comes to this sort of issue
21  of people switching a drug of choice
22  depending on kind of, like, what's available and
23  what they may believe they can use more safely
24  and effectively, is that the sort of thing that
25  Children's Services has tracked in any kind of

38 (Pages 146 - 149)

Page 150

1 systematic way?
2        MS. FLOWERS:  Objection.  Asked and
3 answered.
4        THE WITNESS:  We -- we track, as I've
5 said before, we -- meth is one of the things that
6 we track in terms of a drug type, and so that's
7 how we would know that.
8 BY MR. ALEXANDER:
9    Q.   Have you ever tracked specifically the
10 number of deaths related to any sort of opiate or
11 opioid that impacts the provision of children's
12 services?
13    A.   I don't know that we track specifically
14 the number of cases.  You know, again, that's
15 something Summit County Public Health does.  So
16 we don't track that; they do.
17    Q.   So -- so, for instance, so public health
18 or maybe the coroner's office might say, "Here's
19 how many people we understand died as a result of
20 an overdose, and that's based upon our assessment
21 of, you know, what we found on a tox screen or
22 other information to say that when they died,
23 they had heroin in their system," or they had PCP
24 in their system, or alcohol, or whatever.
25        You with me so far?

Page 151

1    A.   Uh-huh.
2    Q.   Okay.
3        MS. FLOWERS:  Objection.
4        THE WITNESS:  Yes.
5 BY MR. ALEXANDER:
6    Q.   Have you ever done something where you
7 looked at, like, that list of deaths for any
8 particular year or time period and
9 cross-referenced it with your clients to say, you
10 know, here is a case where somebody was in our
11 system as, like, somebody who owed child support
12 or somebody who was involved in a foster care
13 case or somebody who was involved in a custody
14 dispute, all -- all the various sorts of things
15 that might interact with to -- to look at how
16 often it is that people are dying as a result of
17 overdose and it, essentially, increases the case
18 burden of Children's Services?
19        MS. FLOWERS:  Objection to the form.
20        THE WITNESS:  The data that Summit
21 County Health produces doesn't have names
22 attached to it.  So we couldn't take their data
23 and compare it to ours.  I -- I don't know that
24 there's a field -- and -- and there may be, I
25 honestly don't know.  Again, I'm not a SACWIS

Page 152

1 expert -- about the death of clients and the
2 reason.
3        I certainly know that we've had a
4 substantial number of deaths that have occurred
5 that were opioid related on our caseloads.
6 Parents, many parents, have died of
7 opioid-related deaths, overdoses.
8 BY MR. ALEXANDER:
9    Q.   So that sort of analysis, looking at the
10 impact of deaths where somebody died with an
11 opioid or opiate in their system, and looking to
12 see what the impact has been on Children's
13 Services, to your knowledge, has not been done,
14 correct?
15        MS. FLOWERS:  Object to the form of the
16 question.  Misstates the testimony.
17        THE WITNESS:  You know, I guess I -- the
18 one thing I can say in terms of not necessarily a
19 true analysis, but certainly in terms of the
20 caseworkers, having discussions with the
21 caseworkers around their involvement with those
22 cases, I think there's clearly an impact to the
23 workforce, there's clearly an impact to the staff
24 in terms of their stress related to handling and
25 involving cases where their clients die.

Page 153

1        They -- it -- the secondary trauma issue
2 is a very real issue for our workforce.  I do
3 believe it has increased our turnover rate
4 recently.  We have seen our turnover in the last
5 couple of years higher, particularly at the young
6 and new casework level in intake, where they are
7 experiencing those caseloads that are dealing
8 with not only the deaths, but just generally the
9 very complex issues that come with dealing with
10 the cases involving opioids.
11 BY MR. ALEXANDER:
12    Q.   So we'll get to impact on your
13 employees --
14    A.   Okay.
15    Q.   -- and individual cases.  I was asking a
16 different and specific question.  I want to
17 return to my question.  Okay?
18        MS. FLOWERS:  Objection.  Counsel, your
19 question asked her about the impact for
20 Children's Services.
21        MR. ALEXANDER:  It asked about an
22 analysis.  So that was, like, a form objection.
23 Anything more than that is coaching.
24 BY MR. ALEXANDER:
25    Q.   But I'm asking you about --

39 (Pages 150 - 153)

Page 154

1　　　MS. FLOWERS: This witness doesn't need
2　any coaching, sir. You asked her about the
3　impact on Children's Services.
4　　　MR. ALEXANDER: Counsel, that's --
5　　　MS. FLOWERS: That's what she gave you.
6　　　MR. ALEXANDER: -- a misrepresentation.
7　BY MR. ALEXANDER:
8　　　Q. So let's go back. I was asking you
9　about analysis. Has there been an analysis of
10　the impact of deaths related to somebody who died
11　while taking or having recently taken such that
12　it might be detectable an opioid or opiate and
13　that that -- the impact of those deaths on
14　Children's Services? Has there been an analysis?
15　　　MS. FLOWERS: Objection. Asked and
16　answered.
17　　　THE WITNESS: Other than the connection
18　that I've made with what I've already said,
19　there's no specific analysis to did the death --
20　what did the death cost our agency. No.
21　BY MR. ALEXANDER:
22　　　Q. And you said that it would be hard
23　because you'd need to identify in some form or
24　fashion through, you know, Social Security number
25　or name or something the person who was -- died

Page 155

1　and found to have some sort of drug in their
2　system with the clients in your -- in your
3　system, correct?
4　　　MS. FLOWERS: Object to the form.
5　　　THE WITNESS: We can't cross-reference.
6　We know our clients that die, they know the --
7　all of the people in the community that die, but
8　I can't cross-reference based with their data.
9　BY MR. ALEXANDER:
10　　　Q. Okay. And so there hasn't been some
11　sort of analysis specifically on financial impact
12　on Children's Services or the clients of
13　Children's Services as a result of deaths
14　associated with opioid or opiate use, correct?
15　　　A. Not --
16　　　MS. FLOWERS: Object to the form.
17　Misstates the testimony.
18　　　THE WITNESS: Not deaths specifically.
19　BY MR. ALEXANDER:
20　　　Q. So it's correct, there has not been an
21　analysis like that?
22　　　MS. FLOWERS: Objection.
23　　　THE WITNESS: Correct.
24　BY MR. ALEXANDER:
25　　　Q. Now, you mentioned turnover of your

Page 156

1　staff.
2　　　A. Uh-huh.
3　　　Q. We have seen some discussion of turnover
4　in some of your documents, including that there's
5　been some efforts to increase hiring over the
6　last year or two.
7　　　A. Uh-huh.
8　　　Q. Are you aware of specific analyses of
9　turnover that tie them to issues with opioids, or
10　is that just your impression? Opioids or
11　opiates. I'm sorry.
12　　　THE WITNESS: I mean, I -- I -- it's
13　certainly more of an impression. We do
14　conversations with staff when they exit or their
15　supervisors have conversations with them when
16　they exit that they will share, generally, about,
17　you know, the reason that the staff left. Which,
18　generally, for our young staff who we -- in the
19　first year or so is related to the stress of the
20　job.
21　BY MR. ALEXANDER:
22　　　Q. So where would that be memorialized? Is
23　that just an individual kind of exit interview
24　memoranda or some other sort of document?
25　　　A. I mean, we -- we keep turnover

Page 157

1　statistics, of course. There are exit documents
2　done, if they do one, but the -- generally, the
3　information is coming directly from a supervisor
4　who's had a conversation with a worker about why
5　they're leaving.
6　　　Q. So we'll break it up to two parts.
7　Turnover statistics, those are maintained over
8　time, correct?
9　　　A. Correct.
10　　　Q. Okay. And we would see those to see if
11　there is some change in turnover in 2016, '17,
12　'18, compared to the years before that. Those
13　stats should all exist and be maintained for
14　historical reference, correct?
15　　　MS. FLOWERS: Object to the form.
16　　　THE WITNESS: Well, I don't know if they
17　did turnover documents prior to my being with the
18　agency, so I don't know that.
19　BY MR. ALEXANDER:
20　　　Q. You mean -- you mean since you came as
21　executive director?
22　　　A. Right.
23　　　Q. Okay. So just since you started back up
24　in 2013 to present, there would be turnover
25　statistics for every year?

40 (Pages 154 - 157)

Page 158

1      MS. FLOWERS: Objection. Lack of
2  foundation.
3      THE WITNESS: I don't know if there
4  would be for every year. I don't know.
5  BY MR. ALEXANDER:
6      Q. When do you think you started those
7  being maintained?
8      A. I -- I assume that we probably have done
9  them since 2013, but I don't know that we have
10  every year, so I just can't say that.
11      Q. Okay. So for -- in terms of the reason
12  why somebody might leave, whether they say it's
13  stressful because of just the general dealing
14  with children and these sorts of situations is --
15  is very stressful and very soul wrenching, or
16  whether they have some specific comment about,
17  you know, drug abuse or some other thing, where
18  would that be maintained? Just in individual
19  files, or would it be tracked collectively in
20  some way?
21      MS. FLOWERS: Object to form.
22      THE WITNESS: I don't know that it's
23  tracked anywhere.
24  BY MR. ALEXANDER:
25      Q. Okay. Are there individual exit memos?

Page 159

1      A. There would be -- if someone completed
2  an exit interview, there would be an exit
3  interview for that individual, yes.
4      Q. Are they supposed to do that?
5      MS. FLOWERS: Object to form.
6      THE WITNESS: Well, they ask them if
7  they would like to.
8  BY MR. ALEXANDER:
9      Q. Okay.
10      A. Yes.
11      Q. But what if the supervisor -- if it's
12  relayed orally, do they -- the supervisor who
13  does the exit interview, are they supposed to
14  write down here is what the person said about the
15  reason why they left?
16      A. No. The supervisor doesn't do an exit
17  interview. Our HR department does exit
18  interviews, not a supervisor.
19      Q. Okay. So when the HR personnel does an
20  exit interview and they're told, "I am leaving
21  because I was traumatized by seeing something in
22  the field, a child who overdosed on heroin," or,
23  you know, some other horror that they might
24  experience, is that memorialized in some form or
25  fashion?

Page 160

1      A. If they did an exit interview, there is
2  an exit interview document, yes.
3      Q. Do you know if there was some attempt to
4  look at exit interview documents for purposes of
5  production in discovery in this case to try to
6  tie it at all to anything about opioids or
7  opiates or drug abuse or substance abuse?
8      MS. FLOWERS: Objection. Asked and
9  answered.
10      THE WITNESS: I don't know.
11  BY MR. ALEXANDER:
12      Q. But those documents should exist, right?
13      MS. FLOWERS: Objection.
14      THE WITNESS: There would be exit
15  interview documents if they did an exit
16  interview, yes.
17  BY MR. ALEXANDER:
18      Q. Okay. And your basis of saying that you
19  think that your turnover has something to do with
20  that -- the heroin abuse makes doing the job
21  harder than it was before there was such a
22  prevalence of heroin abuse that was seen in 2016,
23  is that based on anything in particular?
24      MS. FLOWERS: Object to the form.
25      THE WITNESS: It's not based on the

Page 161

1  specific exit interviews, if -- if that's what
2  you mean. It's really based more generally on
3  the population of staff who talk about the stress
4  of dealing with very complex cases.
5      When opiate use is involved, it's --
6  it's the caseworkers who are talking about
7  their -- their client dying. I had a caseworker
8  who talked about having a client die and then,
9  within 24 hours, the spouse of that client died.
10      So, you know, they talk about the
11  stories and how those negatively impact them. I
12  mean, that caseworker was clearly -- she didn't
13  say, "I'm negatively impacted," and she didn't
14  leave the agency, but she was clearly very
15  distraught. And she was a very experienced
16  worker.
17      So I think, you know -- I believe that
18  these younger workers who don't have that same
19  level of experience when they're dealing with
20  some of these very complex issues, they are
21  really struggling with wanting to do the work.
22  So it is -- I think it has been a factor in
23  losing some of our newer staff in that intake
24  area, yes.
25  BY MR. ALEXANDER:

41 (Pages 158 - 161)

Page 162

1    Q.   And are there documents that talk about
2  this, other than just your impression about the
3  way it's gone overall?
4        MS. FLOWERS:  Object to the form.
5        THE WITNESS:  I'm not aware of a
6  document specifically that talks about a specific
7  type of case being the issue why someone left the
8  agency.
9  BY MR. ALEXANDER:
10   Q.   You mentioned the term "secondary
11 impact," meaning that the impact on the employees
12 of Children's Services of doing their job and
13 witnessing things that they experience in
14 connection with that, including abuse of children
15 and spouses and neglect of children, all of that
16 sort of thing -- is that what you're talking
17 about for secondary impact?
18   A.   Yes.  Secondary trauma is, you know, the
19 trauma that the worker or any first responder can
20 experience when they're dealing with traumatic
21 events of the clients or families that they're
22 serving.  And trying to process that and deal
23 with that can be very traumatic to that first
24 responder, whether it's our staff or law
25 enforcement or others.

Page 163

1    Q.   And do you think that that's had some
2  impact on Children's Services other than in
3  relation to turnover that you've been talking
4  about; that there's been some other kind of
5  downstream effect of more secondary impacts that
6  you attribute to increased heroin abuse peaking
7  in, like, 2016?
8        MS. FLOWERS:  Objection to the form.
9        THE WITNESS:  I think there's been a
10 tremendous impact on the entire workforce related
11 to the opiate epidemic.  I have personally talked
12 to supervisors and staff who have experienced
13 very significant trauma when they've lost a child
14 who may have, you know, got into a parents' drugs
15 and overdosed.  Some of them -- we've had some
16 die.  We've had parents who've died.  We have
17 parents who relapse.
18       So it's very hard on a worker if you're
19 working with a case and the family is doing well
20 and you're close to feeling like you can be able
21 to send this child back to live with their
22 family, and then the parent relapses, and they're
23 unable to make that reunification.  There's a
24 sense of failure that goes with that when someone
25 fails or someone dies or someone is harmed.  And

Page 164

1  relapse is very high.  Overdoses are very high.
2  So those have a very traumatic impact on -- on
3  the -- on the staff.
4        And we have really tried to help them
5  with that, do some things, do some trainings for
6  them on secondary trauma.  We have an employee
7  assistance program, for example.  So some of
8  those kinds of things to help to assist them with
9  that.
10 BY MR. ALEXANDER:
11   Q.   And those sorts of issues with secondary
12 impact and the need for training and counseling
13 of your own staff, was that also present before
14 you came back in 2013?
15   A.   You know, secondary trauma is not a --
16 not a new word, certainly.  There's always some
17 level of secondary trauma that can occur.  I
18 mean, you know, you could have secondary trauma
19 occur if a child on your caseload dies because of
20 abuse or neglect.  That's going to have a similar
21 impact for staff members.
22       I think what happened was the frequency
23 of those very traumatic events increased.  So,
24 therefore, the secondary trauma became a bigger
25 issue and a bigger problem for us.

Page 165

1    Q.   And -- and is that the sort of thing
2  where we see a similar trend to what we've seen
3  in the past where there are times when there's
4  more secondary trauma, like during the
5  methamphetamine epidemic or the cocaine epidemic
6  or during other times when things might be
7  particularly bad in terms of other drivers of
8  Children's Services needs?
9        MS. FLOWERS:  Objection to the form.
10       THE WITNESS:  I don't recall, when
11 cocaine was an issue and meth was an issue, that
12 we had the same level of overdoses and deaths
13 that were occurring.  They were -- they were
14 substantially different.
15 BY MR. ALEXANDER:
16   Q.   I'm asking about the secondary impact.
17 So I -- it's probably hard to measure secondary
18 impact over time.
19       You said that your impression is that
20 there was a time period where there was more
21 secondary impact during kind of the height of the
22 heroin epidemic in Summit County in 2016.  Am I
23 right so far?
24       MS. FLOWERS:  Objection.
25       THE WITNESS:  I'm not sure -- I'm not

42 (Pages 162 - 165)

Page 166

1  sure that's what I said, so I can try to repeat
2  it if you want.  But I think that we have seen a
3  higher level of secondary -- a more -- a higher
4  frequency of secondary trauma to our staff as a
5  result of the opiate epidemic.
6  BY MR. ALEXANDER:
7      Q.  And has there been some metric that you
8  use for that in terms of productivity?  Time off?
9  Anything other than turnover rate to measure the
10  increased frequency of secondary impact related
11  to heroin abuse?
12      A.  I don't know that there's a measure
13  other than really just processing with staff kind
14  of where they are and what they're struggling
15  with.
16         I think turnover's probably a very minor
17  part of it, really.  It's -- we have seen a
18  higher turnover.  I don't think that's the
19  biggest issue.
20         I think the bigger issue is really
21  making sure that people are -- people are okay to
22  be able to do the job and that their needs are
23  being met.  And there's no measure for that.
24  There's not a test that we give them that says,
25  "Are you stressed?"  We don't force those kinds

Page 167

1  of things on staff.
2         But we know when we hear them or see
3  them crying in their office that they're
4  experiencing stress.  So we have to sit down with
5  them and say, "What is the issue that you're
6  experiencing?  Why are you crying in your
7  office?"  And it is generally about their case
8  having some sort of a trauma -- traumatic issue
9  that has caused them some harm and pain.
10      Q.  And you're not saying all of the trauma
11  is because of heroin, are you?
12      MS. FLOWERS:  Objection.
13      THE WITNESS:  No.  I didn't -- I didn't
14  say that.
15  BY MR. ALEXANDER:
16      Q.  And there are reasons other than drug
17  abuse that might lead to changes in how -- kind
18  of how bad it is, how often you're seeing
19  secondary impacts, right?
20      MS. FLOWERS:  Object to the form.
21      THE WITNESS:  I haven't seen trends.  I
22  -- I think you did ask me that.  I haven't seen
23  trends where we've seen increase in secondary
24  trauma until more recently with the opiate
25  epidemic.  I have always seen secondary trauma

Page 168

1  and have been aware that it is an issue.
2         If someone has a child die, that's
3  clearly going to cause some secondary trauma for
4  them.  And children have died.  Caseloads have,
5  you know -- parents have died.  But what we've
6  seen is an increase in the frequency of that as a
7  result of the opiate epidemic.
8  BY MR. ALEXANDER:
9      Q.  So are there any documents or types of
10  documents that you could point to where this has
11  been discussed or analyzed over time to look at
12  increased death of children or parents using
13  children's services and how that might have an
14  effect on employee well-being, this sort of
15  secondary impact?
16      MS. FLOWERS:  Object to the form.  Asked
17  and answered.
18      THE WITNESS:  Again, I don't think -- we
19  don't have any documents that we fill out related
20  to that unless there's some specific incident in
21  the case file.  There's nothing that documents
22  secondary trauma.  It's a real issue, but it's
23  not analyzed and documented in a spreadsheet.
24  BY MR. ALEXANDER:
25      Q.  Is it also an issue that's increasingly

Page 169

1  the subject of awareness within the field of
2  professionals who do children's services?
3      MS. FLOWERS:  Object to the form.
4      THE WITNESS:  Could you say that again?
5  BY MR. ALEXANDER:
6      Q.  Sure.  Is there increasing awareness
7  about secondary impact and secondary trauma
8  within children's services?
9      A.  I believe there is, yes.
10      Q.  All right.  I mean, more broadly, like,
11  within health care professionals, there's more
12  attention now than there was 20 years ago to the
13  impacts on the mental well-being and maybe even
14  the functioning of health care workers by what
15  they experience in their job, correct?
16      A.  I -- can you -- you're going to have to
17  repeat that for me.
18      Q.  Sure.
19      A.  Sorry.
20      Q.  It's probably not necessary.  Why don't
21  we just go on.
22         In terms of the secondary impact and
23  this issue of tying it to the deaths of children
24  or adults who interact with Children's Services,
25  you mentioned something about case files.

43 (Pages 166 - 169)

1      Is there any way that the frequency of
2   deaths related to children's services
3   participants, from whatever reason, whether they
4   die because of drugs, because -- they die of
5   issues completely unrelated to drugs, illness,
6   abuse, whatever it might be -- is there some
7   tracking of that over time so you can say that
8   deaths have become a more frequent occurrence?
9      MS. FLOWERS: Object to the form.
10      THE WITNESS: You know, I -- I think I
11   said before I -- I assume there's a place in
12   SACWIS, if a parent dies, that you would put that
13   in there. Could they pull a report? I don't
14   honestly know the answer to that. I --
15   BY MR. ALEXANDER:
16      Q. But you haven't asked that an analysis
17   be done looking at the frequency of deaths --
18      MS. FLOWERS: Objection.
19   BY MR. ALEXANDER:
20      Q. -- out of your active case files?
21      MS. FLOWERS: Objection.
22      THE WITNESS: I have not --
23      MS. FLOWERS: Lack of foundation.
24      THE WITNESS: -- no.
25   BY MR. ALEXANDER:

1      Q. And in terms of this issue of your
2   active case files, the number of cases that are
3   open at any given time kind of goes up and down,
4   correct? It's not constant throughout the year?
5   It's not the same as it was in 2013 as present?
6   In any given year, it goes up and down and goes
7   up and down during the course of the year,
8   correct?
9      MS. FLOWERS: Object to the form.
10      THE WITNESS: Correct.
11   BY MR. ALEXANDER:
12      Q. And in terms of the -- Children's
13   Services, your staffing also has not remained
14   constant since 2013, correct?
15      A. Well, in terms of numbers? Is that --
16   no. Actually, staffing has remained fairly
17   stable in terms of staffing numbers, head count.
18      Q. And was there a reduction, as far as you
19   know, in terms of staffing and budgeting in the
20   2008-2009 period?
21      A. Yes. I believe there was a reduction in
22   either 2007 or '08 of staff. I was not there, so
23   I can't --
24      Q. Do you know why that happened? Why
25   there was that staff from budget reduction?

1      A. I believe that that occurred as a result
2   of closing of a medical clinic and a -- we had a
3   cafeteria and a medical clinic and changes
4   related to that. So those functions were
5   outsourced, and I believe that was the reason for
6   the reduction. But, again, I -- I was not there,
7   and I was not the director at that time, so . . .
8      Q. Do you know if there were also just
9   general budget cuts coming off of political
10   change and economic downturn in this time period;
11   if there was a -- drop overall in Children's
12   Services staffing and budgeting?
13      A. In terms of revenue, there was
14   definitely a decrease in revenue for our agency
15   specifically between 2008 and 2012. Our revenue
16   dropped by about $10 million annually in that
17   time period.
18      Q. That's generally related because you get
19   a lot of your money from a tax levy that is
20   focused on property values; and so if property
21   values drop during a economic downturn, like in
22   the housing crisis like we're talking about
23   during that time period, it affects your revenue?
24      MS. FLOWERS: Objection to the form.
25   Lack of foundation.

1      THE WITNESS: The levy did have an
2   impact on the loss of revenue. We went on the
3   ballot in 2008 when it was really kind of right
4   at the time of low property values. So we were
5   locked in a lower rate in terms of
6   collections. So levy collections did decrease in
7   that time frame.
8      The other issue in terms of revenue was
9   the loss of tangible personal property tax was
10   phased out. So for us, that was several million
11   dollars each year.
12      State funds also decreased in that time
13   period, as well. So it was a combination of
14   factors, not just the levy.
15   BY MR. ALEXANDER:
16      Q. So overall between 2008 and 2018, over
17   those ten years, the -- until the budget
18   initiative just passed, at least, the funding of
19   Children's Services for Summit County generally
20   dropped and the overall needs for Children's
21   Services and the overall number of active cases
22   climbed; is that correct?
23      A. That is correct, yes.
24      Q. And having less money to do more work,
25   did that affect your ability to provide good

44 (Pages 170 - 173)

Page 174

1  children's services?
2      A.  I think we certainly had to do more with
3  less.  I don't want to say we didn't do quality
4  work or our quality suffered necessarily.  I
5  think we had to do a lot of things to change.  We
6  tried to shift resources internally to make sure
7  that we were getting resources to the front
8  lines.  We've applied for many grants in trying
9  to help our revenue a little bit as well.
10      We have put projects on hold over time
11  so that we keep our focus and our priority always
12  on our children and making -- we have no choice
13  but to pay for the cost of placement, which has
14  increased substantially.
15      So it's been a -- I would say a shifting
16  game for several years to get by until we could
17  increase the levy revenue.
18      Q.  And -- and that -- those challenges that
19  you have or the -- the budgetary barriers to
20  providing the level of children's services that
21  you would want, you're not attributing all of
22  that to heroin abuse or anything relating to
23  opiates or opioids, correct?
24      MS. FLOWERS:  Object to the form.
25      THE WITNESS:  I think it's a combination

Page 175

1  of the loss of revenue along with the increased
2  need for services.  I would say that the
3  increased need for services, from my perspective,
4  is largely due to the opiate epidemic, yes.
5  BY MR. ALEXANDER:
6      Q.  And that is a specific area where there
7  have been analyses over the last two years or so
8  looking at how much of the increase in the need
9  for services can be attributed to opioids or
10  opiates or heroin or this entire group of
11  medicines and drugs, correct?
12      MS. FLOWERS:  Object to the form. Lack
13  of foundation.
14      THE WITNESS:  Yeah.  I don't really
15  understand the question.
16  BY MR. ALEXANDER:
17      Q.  So what you just mentioned, that you
18  think that the increased need for services --
19      A.  Uh-huh.  Yes.
20      Q.  -- the -- essentially, the burden on
21  Children's Services, is attributable, in part, to
22  the heroin epidemic and what you sometimes call
23  either the opiate crisis or the opioid crisis.
24  That is something that you and your staff have
25  actually looked at and discussed and tried to

Page 176

1  look at whether the data supports that, correct?
2      A.  Correct.
3      Q.  Okay.  And that has been part of
4  numerous discussions that you have had in public
5  fora, like at board meetings and public meetings
6  and with the press, correct?
7      A.  Correct.
8      Q.  And it's also been part of your personal
9  interaction and interaction through various
10  professional organizations with, like, elected
11  officials and state -- and state governmental
12  actors as a way to try to increase the funding to
13  offset the need to provide additional services;
14  is that fair?
15      A.  That's correct.  Uh-huh.
16      Q.  And additional funding has come in in
17  2018, correct?
18      MS. FLOWERS:  Object to the form.
19      THE WITNESS:  No.  The levy passed in
20  2018.  The additional funding would not collect
21  until 2020.
22  BY MR. ALEXANDER:
23      Q.  So the -- the efforts to get additional
24  funding through private sources, through the
25  state, all of -- all of the ways that you've been

Page 177

1  trying to get additional funding to offset the
2  additional needs since you've recognized these
3  issues over the time as an executive director,
4  have you been able to get additional money that's
5  actually come in yet?
6      MS. FLOWERS:  Object to the form.
7      THE WITNESS:  Other than small grants.
8  I mean, we have the STARS grant, which, as you
9  know, I believe I said started in 2012.  So that
10  was really prior to my time the STARS grant had
11  been awarded.  But that was a fairly substantial
12  federal grant.  So that would be included in the
13  revenue.
14      Other increases to the revenue have been
15  small grants.  We did really advocate with the
16  state for additional state child protection
17  allocation funds, which is the funding source
18  that they provide to us to do our children's
19  services work.  And they did do an increase
20  statewide of $15 million in this last biennium
21  each year.
22  BY MR. ALEXANDER:
23      Q.  How much went to Summit County?
24      A.  It was -- I want to say -- I'm not
25  sure -- 2- to 400,000.  But it was minimal.  They

Page 178

1  did a different formula than the typical formula
2  that they use to provide the allocation where
3  they provided the small counties with an
4  up-front, I believe, $100,000 to all of the
5  smaller counties.
6       So, then, what was left from that went
7  into the formula.  So it was skewed to the
8  smaller counties instead of the larger counties,
9  so . . .
10     Q.  So Summit County got less than its
11  share, as far as you're concerned, based upon its
12  overall -- it's population and its needs?
13       MS. FLOWERS:  Object to the form.
14       THE WITNESS:  Well, I -- there was only
15  $15,000 to go around.  So, frankly, you know,
16  as -- as a part of the Public Children's Services
17  Association of Ohio, I was not necessarily
18  opposed to the formula that they used for this.
19       I am certainly opposed to the amount of
20  money that the state of Ohio provides to
21  children's services because they provide the
22  lowest funding in the nation, and I have been
23  very vocal about that, yes.
24  BY MR. ALEXANDER:
25     Q.  You have.  And that was my next

Page 179

1  question.  Can -- can you just explain how you
2  think that that makes it harder for Summit County
3  to do its job in children's services given the
4  statewide funding and that Ohio has remained
5  No. 50 and not even close to No. 49?
6     A.  Obviously, we don't have enough money to
7  do the job, as far as I'm concerned.  So if you
8  didn't have local funds to support the work, I
9  don't know how those smaller counties who don't
10  have local funds are able to do -- even meet
11  their basic mandates.
12       But it really does leave the burden of
13  child protective services on the local community
14  financially.
15     Q.  And is -- what you said in terms of not
16  having the money to do the job, was that true in
17  2013 and 2014?
18     A.  Well, clearly, this entire levy cycle
19  for us, it's been very clear that, you know, we
20  had a revenue problem.  So I guess the answer is
21  yes, then.  Yeah.
22     Q.  Okay.  So before you noticed that there
23  was an uptick in heroin abuse and the impacts of
24  heroin abuse on children's services, even at that
25  point, you recognized that you didn't have enough

Page 180

1  money to do the job.  And you blame that, at
2  least in part, on underfunding from the state,
3  correct?
4       MS. FLOWERS:  Object to the form.
5  Misstates the testimony.
6       THE WITNESS:  Yes.  I believe we've had
7  a revenue problem this entire last levy cycle.
8  And part of that is certainly, I believe, a
9  result of the state underfunding child protective
10  services, yes.
11  BY MR. ALEXANDER:
12     Q.  And how long is the levy cycle?
13     A.  Six years.
14     Q.  Okay.  So from 2012 to present, till --
15  till, like, last month, the -- there was
16  inadequate funding to do the job that was
17  expected to be done even without any increase in
18  need for children's services attributable to
19  heroin or any other drug, correct?
20       MS. FLOWERS:  Object to the form.  Lack
21  of foundation.
22       THE WITNESS:  There is inadequate
23  revenue for the agency to do the job.  In this
24  last levy cycle, we have had to run on deficit
25  spending.  So if we had not had sufficient funds

Page 181

1  to operate in deficit spending, we would have had
2  a problem, of course.
3  BY MR. ALEXANDER:
4     Q.  You -- you have what are called
5  carryover funds?
6     A.  Yes.
7     Q.  Can you just explain briefly for the
8  nongovernment accounting types among us how
9  carryover funds work?
10     A.  Well, basically, it is, you know, a --
11  your cash balance, you know, it's -- at the end
12  of the year, if you have money left over, it
13  would be maintained in your cash balance and
14  carried forward into the following year.
15       So we have always had some form of a
16  cash balance.  And we have to have some level of
17  a cash balance because we are -- we operate on a
18  reimbursement basement -- basis for all of our
19  allocations.  So --
20     Q.  And -- and is the funding specific to
21  Children's Services or subdivisions of Children's
22  Services?  In other words, can money be moved
23  around to meet needs going forward?
24       MS. FLOWERS:  Object to the form.
25       THE WITNESS:  Are you asking if money

46 (Pages 178 - 181)

Page 182

1  can be moved around in the Children's Services
2  budget --
3  BY MR. ALEXANDER:
4  Q.  Yes.
5  A.  -- specifically?
6      It -- it can be.  I mean, you know,
7  there are certainly some regulations around what
8  can be moved and what can't and how much can be
9  moved.  But, you know, you have -- there's -- and
10 it's very complicated.  But it gets into pool
11 budgets, and there are pool -- budgets that are
12 line items within a pool.
13     So you can move money within the pool,
14 but if you're getting outside of moving money
15 from one pool to another, you have to do a budget
16 adjustment.
17 Q.  So what's Children's Services under
18 within the Summit County government?  How is it
19 organized?
20 A.  We're really independent from the
21 county, but we're under the county umbrella.  So
22 we are attached to them financially.  We operate
23 independently.  We have our own board of
24 trustees.  But we are connected to the county
25 financially.

Page 183

1      Our money runs through the county
2  general fund.  We have the same tax ID number,
3  those kinds of things.
4  Q.  So the carryover funding, that is just
5  money that's Children's Services that has to be
6  used by Children's Services?
7  A.  That's correct.
8  Q.  Okay.  And what is the current cash
9  balance that you have from last year?
10 A.  Our current cash balance is probably
11 just under 20 million.
12 Q.  And how much have you been depleting
13 that every year?
14 A.  It's varied year to year.  3 million,
15 4 million, 5 million.
16 Q.  Have you been --
17 A.  So --
18 Q.  -- using all of your budgets over the
19 time period you've been director?  Using -- have
20 you been spending up all of the money that you've
21 had allocated in your budgets?
22 A.  There's always some difference in the
23 actual budget to actual expenditures, if that's
24 what you mean.
25 Q.  You've mostly, from what we've seen,

Page 184

1  been under budget.
2  A.  Right.
3  Q.  You spend less --
4  A.  Yes --
5  Q.  -- than is in the budget?
6  A.  -- that's correct.
7  Q.  It's not like you've been exceeding
8  budget --
9  A.  No.
10 Q.  -- because of un expected costs that
11 occur during the year.  You've actually not been
12 spending all of what's been budgeted on a
13 year-to-year basis, correct?
14     MS. FLOWERS:  Object to the form.
15     THE WITNESS:  Most years, we have --
16 well, all of the years since I've been the
17 director, we have -- our budget-to-actual is
18 under, but it -- naturally, the way that we build
19 a budget and operate would be.
20     I mean, you -- you build a budget that
21 you must live within because the process to do a
22 budget adjustment is very cumbersome and complex.
23 So you can't suddenly say, "Oh, we don't have
24 enough money now to pay our overtime or our
25 personnel bill."

Page 185

1      So you have to budget at a certain level
2  knowing that you're most likely going to come in
3  under that budgeted level.  So our
4  budget-to-actual, I think, you know, is fairly
5  close given the size of the budget.  We try to
6  budget as close to budget-to-actual.
7      In the last few years, I think we've
8  really tried very hard to keep our actual
9  expenses under budget.  And we've made a very
10 concerted effort knowing that we would be
11 beginning at the end of this levy cycle with a
12 less-than-adequate carryforward balance to get
13 through the first quarter of 2020.
14 Q.  A couple of things.
15 A.  Uh-huh.
16 Q.  So you were also under budget or you
17 came within budget for 2015, 2016, 2017, the time
18 period we talked about where you had, from your
19 perception, the greatest impact of the heroin
20 use, correct?
21 A.  Correct.
22     MS. FLOWERS:  Object to the form.
23     THE WITNESS:  Yes.
24 BY MR. ALEXANDER:
25 Q.  Okay.  And when you talked about needing

47 (Pages 182 - 185)

Page 186

1  a cash balance for the first quarter, the way it
2  works is you -- you are paying, like, foster care
3  providers and you pay employee wages, you have a
4  lot of money that you pay out during the first
5  quarter before you start getting money back in
6  from reimbursement from federal reimbursement
7  programs and other sources; that tends to come
8  later in the year.  Is that the way it works?
9      MS. FLOWERS:  Objection.
10     THE WITNESS:  Yes.  Generally.  And our
11  largest portion of the revenue is the levy, which
12  does not collect until April.  So, you know,
13  that's -- that first quarter is where -- of 2020
14  was where we would have an issue and have had to
15  be very careful so that we could get the cash
16  balance adequate enough in the first quarter of
17  2020 to be able to make sure we had enough to
18  operate.
19  BY MR. ALEXANDER:
20     Q.  With the anticipated increased revenue
21  stream from the levy that just passed in the
22  ballot initiative last month, have you already
23  earmarked that for any additional programs or
24  hiring that would have anything to do with
25  opioids, opiates, heroin, substance abuse of any

Page 187

1  sort?
2      MS. FLOWERS:  Object to the form.
3      THE WITNESS:  We have earmarked it for
4  expenditures that I think are related to the
5  opiate epidemic, yes.
6      We -- we will increase the staff --
7  actually, we're going to go ahead and increase
8  the staff in '19 to 330 from 325, which is our
9  budgeted head count.  So we're adding five staff
10  because we feel the caseloads are -- have
11  increased higher than we are comfortable with
12  them being.  So we're going to increase the staff
13  by five.
14     The other issue is we have really -- are
15  having issues with the foster homes, inadequate
16  number of foster homes.  So some of what I think
17  we will do once -- once the levy is passed and
18  we're collecting is to put together a robust
19  recruitment plan for foster and adoptive homes.
20     We are very low in terms of foster and
21  adoptive homes.  And with -- we've had a
22  substantial increase in the number of children in
23  custody over the last few years.  So we don't
24  have enough foster and adoptive homes for the
25  placement.  So we do have to purchase our

Page 188

1  placements outside the agency at a higher rate
2  than we were previously, so . . .
3  BY MR. ALEXANDER:
4      Q.  Is there any document -- I -- I know
5  there are a lot of documents that go into the
6  budgeting process and that went into lobbying, if
7  you will, for the -- the tax levy.  Is there
8  anything that specifically talks about how the
9  five people to be hired and the additional needs
10  for foster and adoptive homes ties to some of the
11  past analysis about the impact of heroin abuse or
12  other drug abuse?
13     MS. FLOWERS:  Object to the form.
14     THE WITNESS:  I don't know if there's
15  specific documents.  There's certainly documents
16  that were created for the budget, so that's the
17  only thing that I could come up with.
18  BY MR. ALEXANDER:
19     Q.  Okay.
20     A.  I don't know.
21     Q.  And -- and if you were involved in them,
22  you would try to represent the facts accurately?
23     A.  If I was --
24     MS. FLOWERS:  Object to form.
25     THE WITNESS:  -- involved in?

Page 189

1  BY MR. ALEXANDER:
2      Q.  Involved in the budget documents that
3  talk about what your needs would be or what you
4  would do with the money, why you needed more
5  money, you tried to represent the facts
6  accurately, correct?
7      MS. FLOWERS:  Objection.
8      THE WITNESS:  Of course.
9  BY MR. ALEXANDER:
10     Q.  Same thing goes for when you made public
11  statements or statements to elected officials?
12  You've tried to represent the facts accurately,
13  correct?
14     MS. FLOWERS:  Object to the form.
15     THE WITNESS:  That's correct.
16  BY MR. ALEXANDER:
17     Q.  So one of the things that's an issue, of
18  course, is that in trying to get the budgets
19  approved and get the tax levy on the ballot and
20  ultimately try to get the ballot initiative
21  passed, there is some degree of advocacy that has
22  to go on, correct?
23     A.  Correct.
24     Q.  And you've been involved in that for,
25  basically, two, two-and-a-half years, leading up

48 (Pages 186 - 189)

Page 190

1  to the -- vote in November, correct?
2     A.  Yes.
3     Q.  At least that long --
4     A.  Yeah.
5     Q.  -- correct?
6     A.  At least.
7     Q.  And over, then, part of what has been an
8  issue in terms of advocating for additional money
9  is talking about the impact of the heroin
10  epidemic or opiate crisis or opioid crisis
11  described variously in the documents, correct?
12     A.  Correct.
13     MS. FLOWERS:  Object to the form.
14  BY MR. ALEXANDER:
15     Q.  And you've done that in a way knowing
16  that by talking about the impact upon Children's
17  Services of the issue with heroin in particular,
18  that it would help get additional funding if the
19  people involved in setting the ballot initiative
20  and ultimately voting agreed with the arguments
21  being made, correct?
22     MS. FLOWERS:  Object to the form.
23     THE WITNESS:  I think it's important
24  that the voters understand the impact to the
25  agency, if that's what you mean, yes.

Page 191

1  BY MR. ALEXANDER:
2     Q.  Okay.  And it wasn't just ultimately the
3  voters.  Before the voters, you had to deal with
4  other people in the budget process.  There are a
5  lot of players.  You talked to state legislators.
6  There were, like, letters sent to Donald Trump.
7  There were all of these steps that were taken
8  that you were involved in and people acting at
9  your direction were involved in --
10     A.  Uh-huh.
11     Q.  -- to ultimately help increase the
12  funding that you thought had been inadequate for
13  years, correct?
14     A.  Correct.
15     MS. FLOWERS:  Object to the form of the
16  question.
17  BY MR. ALEXANDER:
18     Q.  And part of those measures was to talk
19  about the impact of the use of heroin and
20  fentanyl and fentanyl analogs in the community
21  and its impact on children's services, correct?
22     MS. FLOWERS:  Objection.
23     THE WITNESS:  I don't know about
24  fentanyl and heroin specifically but, generally,
25  as I said, we've used the term "opiate use."

Page 192

1  BY MR. ALEXANDER:
2     Q.  And the -- worse it is, the more of
3  an impact it is, the better of an argument it is
4  to help get increased funding?
5     MS. FLOWERS:  Objection to the form.
6  BY MR. ALEXANDER:
7     Q.  That's the way that it plays out, right?
8     A.  Well, I don't know.  I mean, I guess --
9  I think it's important that the public understand
10  that the opiate -- opiate epidemic did impact our
11  agency and the cost to our agency because that
12  was a tremendous factor in our need for
13  additional money.  It was also revenue.  And I
14  think we were very honest and very clear with the
15  public about that as well.
16     Q.  Of saying your needs have increased
17  while your revenue has decreased?
18     A.  Right.
19     Q.  Okay.  And that there's this long-term
20  issue of underfunding and understaffing going
21  back to before 2010 --
22     MS. FLOWERS:  Objection.
23  BY MR. ALEXANDER:
24     Q.  -- correct?
25     MS. FLOWERS:  Lack of foundation.

Page 193

1     THE WITNESS:  There has been a lack of
2  funding at the state level going back, you know,
3  really, forever.  So, yeah, that's been -- at the
4  state, there was a lot of advocacy around state
5  funding related to just the lack of funding that
6  the state has provided but also the need for
7  increased funding as well, yes.
8     MR. ALEXANDER:  Okay.  Now is probably a
9  good time for a lunch break.  Do you want to take
10  that --
11     MS. FLOWERS:  Okay.
12     THE WITNESS:  Sure.
13     MR. ALEXANDER:  -- or do you want to
14  keep going a couple minutes?
15     THE WITNESS:  Yeah.  Sure.  That's fine.
16     MR. ALEXANDER:  Let's take a break.
17     THE VIDEOGRAPHER:  Off the record at
18  12:18 p.m.
19     (Luncheon recess taken.)
20        - - -
21
22
23
24
25

49 (Pages 190 - 193)

Page 194

P R O C E E D I N G S
- - -
Monday, December 3, 2018
Afternoon Session
- - -
THE VIDEOGRAPHER:  Back on the record at
1:22 p.m.
- - -
EXAMINATION (continued)
BY MR. ALEXANDER:
Q.  Ms. Barnes, do you have any of your
testimony from this morning you need to change or
supplement in any way?
A.  No, I don't.
Q.  I don't know that we actually went over
this, but can you explain what your
responsibilities are in your current position as
executive director of Summit County Children's
Services?
A.  I am responsible for, really, the
day-to-day operations of the agency; setting
policy and procedure, practice, goals for the
agency; identifying our outcomes and objectives;
creating a budget and implementing the budget.
Basically, that's it.

Page 195

Q.  Okay.  And can you explain the structure
and purview of Summit County Children's Services?
A.  We are the agency that is mandated to
assess child abuse and neglect for children in
Summit County.
Q.  And what are the -- the subdivisions of
Children's Services under you?  I have a -- I
have an organizational chart from earlier this
year.  That helps, but if you could explain it.
A.  We have various divisions in the agency.
I assume that's what you mean.  So we have a
social service division, which is where all of
our casework occurs.  We have a division that is
our human resources and support services.  We
have a legal and administrative services
division, and a fiscal division.
Q.  And within social services, are there
subdivisions of that in terms of the types of
issues that they address?
A.  Yes, there are.  There are different
departments in social services.  So there's an
intake department.  The intake department
assesses the child abuse and neglect as they come
in -- the calls come in to our hotline.
Then we have a protective department

Page 196

that does any kind of ongoing type work that
would need to happen with the family.
And then we have a department we call
perm planning -- permanency planning -- placement
and permanency planning.  So they do all of the
placement of children as well as the foster care
and adoption activities, including licensure and
adoption of children.
Q.  Does Children's Services deal with child
support when there are obligations for child
support payment?
A.  No, we don't.
Q.  And what -- what part of the county
deals with that or what organization deals with
that within the county?
A.  Child support in Summit County is under
the prosecutor's office.
Q.  Okay.  And -- and the children who are
at issue, do they go from birth until age of
majority?
A.  We serve children from birth through 18,
or through 21 for children who have developmental
disabilities.
Q.  And just to put a -- an idea on it, what
does the annual budget run for the -- the revenue

Page 197

and expenditures for your Summit County
Children's Services during the time you've been
executive director?
A.  Our -- it is approximately 45 to
46 million in revenue and 48 to 50 million in
expenses, you know, given each year it's varied a
little bit.
Q.  And where does most of your revenue come
from?
A.  The primary source of our revenue,
anywhere from 57 to 60 percent, comes from our
local levy.
Q.  And in terms of your expenditures, where
do most of the expenditures go?
A.  Our primary expenditure is
personnel-related costs --
Q.  And that --
A.  -- first.
Q.  And that includes benefits?
A.  That includes -- well, I mean, they're
separate, but benefits and personnel.  All
personnel costs would be our primary cost.
Q.  In terms of outside costs, not just
associated with hiring and having a staff, but
where money goes out, where does that mostly go?

50 (Pages 194 - 197)

Page 198

1     A.  I don't -- I'm not certain -- I'm not
2  sure I understand.
3     Q.   So we talked earlier about paying for
4  foster care and provide -- costs associated
5  with --
6     A.   Right.
7     Q.   -- homes that are intended for, I guess,
8  short-term or potentially long-term housing of
9  children.  Is that an outside expense?
10    A.   It can be.  There's different types of
11 placement expenditures.  We have our own license
12 by our agency foster homes so that -- my guess
13 would be an inside expense.  We have contracted
14 placements where we contract with providers who
15 do various levels of foster care, and so that's a
16 contracted outside expense.
17               - - -
18        Thereupon, Exhibit 1 was marked for
19        purposes of identification.
20               - - -
21 BY MR. ALEXANDER:
22    Q.   Marked as Exhibit 1, a document with the
23 Bates numbers starting SUMMIT 0 -- underscore
24 0000037847 running through -3857.  There's a copy
25 for you and a copy for plaintiffs' counsel.

Page 199

1        Have you ever seen Exhibit 1 before?
2     A.   I believe so.
3     Q.   And what's your understanding of what
4  Exhibit 1 represents?
5     A.   This is a table of organization of
6  Summit County Children's Services.
7     Q.   And I know some of the names may have
8  changed on here over time, but the structure
9  that's depicted, has this been the structure in
10 place since you became executive director in
11 2013?
12    A.   There's been a lot of structural changes
13 over time that would change the table of
14 organization.
15    Q.   I don't know that I need all of the
16 detail, and I think this is the one we have for
17 current.  Do you -- can you give us an overview
18 of what the structural changes have been to
19 Summit County Children's Services since 2013?
20    A.   Well, I mean, I can start with an
21 example.  If you want more, I'll be happy to give
22 you more.  But, for example, we had -- our
23 community relations director previously reported
24 to me.  When he retired, I moved the community
25 relations department under the administrative and

Page 200

1  legal services division rather than a direct
2  report to me.  So those are the kinds of changes
3  where we have moved things from just one place to
4  another.
5        We have a training center, a
6  professional development center, for example,
7  another example.  And that was previously under
8  our human resources and support services area.
9  The regional training center still remains there,
10 but the training units for social service have
11 returned to the social service department.
12       So lots of structural changes where
13 either the expertise changed or we needed, you
14 know, to balance out the number of reports or
15 programmatically something made sense that it sat
16 somewhere else.  So those kinds of structural
17 changes have occurred.
18    Q.   Have there been any new branches,
19 divisions, departments created at all since 2013?
20    A.   When I first came to the agency, human
21 resources was actually under administrative and
22 legal services, so I moved that into its own area
23 and division.  And I moved some of the support
24 services under that area as well.
25       So, for example, information technology

Page 201

1  reported directly to me -- to the former
2  director.  So when I came, that individual
3  reported to me, and I moved that under that
4  support services division.  Client rights and
5  quality improvement reported directly to me, and
6  I moved that as well.
7        So I guess you -- your question was:
8  Was there a new division?  Human resources was
9  not technically a division previously.
10    Q.   Some of the boxes have moved around --
11    A.   Right.
12    Q.   -- if you will?
13    A.   Yes.
14    Q.   There's new -- there's now a fourth
15 branch, among other things?
16    A.   Right.
17    Q.   Okay.  The administrative and legal
18 services, that's headed up by Katerina Papas?
19    A.   That's right.
20    Q.   And has she been the head of that the
21 entire time you've been executive director?
22    A.   Yes, she has.
23    Q.   So I understand how it works, do they
24 provide you with legal advice in connection with
25 anything, or is it more that they function in

51 (Pages 198 - 201)

1  conjunction with, like, other legal proceedings
2  where there's, like, a -- you know, a dispute
3  that involves one of your clients?
4      MS. FLOWERS:  I'm going to object just
5  for the extent it calls for a legal opinion.
6      If you can answer without giving that,
7  please do.
8      THE WITNESS:  Their primary role in that
9  division is to do the juvenile court preparation
10  work.  We are represented by the county
11  prosecutor.  They prepare the complaints, the
12  journal entries, the staff or testimony.  So they
13  work primarily on the juvenile law side.
14      If we have the need for outside counsel
15  for other legal matters, lawsuits, they will work
16  with the outside counsel to manage those lawsuits
17  as well.
18  BY MR. ALEXANDER:
19  Q.   Okay.  So other than the juvenile --
20  juvenile court, do they ever function in terms of
21  giving you, in your role as executive director,
22  legal advice?
23      MS. FLOWERS:  Same objection.
24      THE WITNESS:  Should I answer that?  Is
25  that --

1      MS. FLOWERS:  Yes.  You can answer it if
2  you can answer without giving away what legal
3  advice you might have been given.
4      THE WITNESS:  I mean, their role, for
5  example, if we sign a contract, they will review
6  that for me.  That's it -- yeah.  So I -- I guess
7  that's legal advice.
8      But they will look at legal documents
9  internally and discuss them with me, talk to me
10  about them if I need to understand them from a
11  legal perspective.
12  BY MR. ALEXANDER:
13  Q.   Do they also sometimes function in kind
14  of a business role, a more functional role or
15  administrative role?
16      MS. FLOWERS:  Object to form.
17      THE WITNESS:  The director -- the deputy
18  executive director, Katerina Papas, also does --
19  supervises the community relations department,
20  for example.  So, you know, they look at our
21  insurance area, all of those.  So there's those
22  administrative functions that go along with that
23  as well.
24      The government affairs, they -- our --
25  work with our advocates at the state on the rules

1  that are produced through the Ohio Administrative
2  Code.  So there's a lot of administrative
3  functions in that department or division as well.
4  BY MR. ALEXANDER:
5  Q.   Okay.  So somebody who's housed under
6  administrative and legal services division can
7  participate in meetings and be copied on e-mails
8  where they're not being asked to provide legal
9  advice, correct?
10  A.   They could --
11      MS. FLOWERS:  Object to the form.
12      THE WITNESS:  They could be, yes.
13  BY MR. ALEXANDER:
14  Q.   And that certainly goes for the
15  administrative half of that division, correct?
16      MS. FLOWERS:  Objection.  Misstates the
17  testimony.
18      THE WITNESS:  Yes.  That would be
19  correct.  There's administrative functions that
20  would not necessarily be a legal role.
21  BY MR. ALEXANDER:
22  Q.   Certainly all of the people under the
23  community relations chart -- part of the chart,
24  that's not legal?
25      MS. FLOWERS:  Objection.

1      THE WITNESS:  That's correct.
2  BY MR. ALEXANDER:
3  Q.   I don't want to take up too much time,
4  but I think after the first page, we start seeing
5  names --
6  A.   Uh-huh.
7  Q.   -- filling in the boxes, including --
8  A.   Right.
9  Q.   -- you on the second page for executive
10  staff under the Summit County Children's Services
11  board of trustees.
12  A.   Uh-huh.
13  Q.   I think you mentioned this briefly.
14  What -- what's the function of the board of
15  trustees?
16  A.   The board of trustees is primarily
17  the -- has the fiscal responsibility for the
18  agency.
19  Q.   And are those people from outside of the
20  government, outside of Summit County government?
21  A.   They are primarily outside of Summit
22  County government, yes.
23  Q.   And how often are there meetings of this
24  board?
25  A.   They have a monthly meeting.

52 (Pages 202 - 205)

Page 206

1    Q.   And do you participate in every monthly
2  meeting?
3    A.   Yes.
4    Q.   And in advance of each meeting, is there
5  an agenda prepared and minutes circulated of the
6  prior meeting?
7    A.   Yes, there is.
8    Q.   And then after the meeting, are minutes
9  generated for that meeting?
10    A.   Yes, there are.
11    Q.   What other sorts of documents are
12  created or circulated in connection with these
13  board meetings?
14    A.   I produce a data report and a executive
15  director report that is in a written format for
16  the board.  And then I give them an oral report
17  as well.
18    Q.   And what you've just described, has that
19  been the practice since you became executive
20  director in 2013?
21    A.   Yes.
22    Q.   Okay.  And the sorts of documents you've
23  talked about -- minutes, your executive report,
24  the other reports that you generate and
25  circulate -- are those also maintained in the

Page 207

1  regular course of business?
2    A.   Anything that's provided to our board is
3  maintained in the board packet.
4    Q.   Okay.
5    A.   So that is, yes, maintained in the board
6  documents.
7    Q.   And is there some sort of file where you
8  could go back and look to see what was circulated
9  to the board in June of 2014 or some other
10  specific month?
11    A.   Yes, there is.
12    Q.   Okay.  And you have the ability to
13  access those?
14    A.   I don't personally access them, but I
15  have -- I can get access to them.
16    Q.   Like your executive administrative
17  assistant, Beth Lowe, might be able to find that
18  stuff?
19    A.   Right.  She would maintain those
20  documents for me.
21    Q.   Okay.  And who actually creates the
22  minutes?
23    A.   Well, there are subcommittees of the
24  board.  Beth Lowe, my administrative assistant,
25  takes the minutes in the main board meeting.  We

Page 208

1  have a committee meeting called the resources
2  committee meeting, and those minutes are
3  maintained by the administrative assistant for
4  our director of fiscal services, Michelle
5  Tersigni.
6         And then we have a planning and program
7  committee that meets periodically.  And I think
8  sometimes Michelle Tersigni takes those minutes,
9  and sometimes the administrative assistant for
10  human resources takes those.
11    Q.   Okay.  So you said that the board's
12  function is financial oversight.
13    A.   Primarily, yes.
14    Q.   So you would expect that there would be
15  discussion of budgeting and expenditures and
16  various factors that impact budgeting and
17  expenditures?
18       MS. FLOWERS:  Object to the form.
19       THE WITNESS:  There are discussions
20  about the budget monthly.  One of the things I
21  failed to mention in your last question about
22  documents provided to them, they are provided
23  a -- of -- a financial update every month, as
24  well, written and verbal.
25  BY MR. ALEXANDER:

Page 209

1    Q.   Who generates that?
2    A.   Our fiscal department generates that.
3    Q.   So according to this, that's -- that
4  would be Deputy Executive Director Darin Kearns
5  currently?
6    A.   That's right.
7    Q.   Okay.  And so the practice you've been
8  describing of monthly meetings with these various
9  documents that are generated and circulated
10  relating to budget expenditure, factors and
11  trends affecting budgets and expenditures over
12  time, do you have an understanding as to whether
13  the same basic process was in place before you
14  became executive director?
15    A.   I believe it was similar.  I believe the
16  former executive director also provided a written
17  and a verbal report to the board monthly.  And
18  there was also a finance report given monthly by
19  the former finance director as well.
20    Q.   And so when you started in 2013, did you
21  have the ability to go back and look at minutes
22  or records that would have been circulated in
23  connection with prior board meetings before you
24  were the director?
25    A.   I would have access to those if I needed

53 (Pages 206 - 209)

Page 210

1  them, yes.
2      Q.   And those are maintained on an ongoing
3  basis in case there's a need to go backwards and
4  look?
5      A.   I believe those are maintained
6  permanently, but certainly for an extensive
7  period of time.
8      Q.   Okay.  And we talked earlier about the
9  time period when there started being discussions
10  about the impact of heroin and other drugs of
11  abuse.  In particular, in roughly 2014, do you
12  think that there would be documents related to
13  board meetings from around that time that started
14  talking about heroin abuse and other drug abuse
15  that would affect budgeting and expenditure
16  discussions?
17      MS. FLOWERS:  Objection to the form.
18      THE WITNESS:  I believe regularly in the
19  reports that I provide to the board, there are
20  mentions of the impact of the opiate epidemic on
21  the agency and on the finances.  So those would
22  be part of the reports that have been provided to
23  the board.
24  BY MR. ALEXANDER:
25      Q.   All right.  And in terms of any prior

Page 211

1  discussions, before the heroin issues were
2  noticed by you and your staff in 2014, when there
3  were issues going in the past relating to, you
4  know, the cocaine/crack epidemic or the meth
5  epidemic or any other, you know, area -- point in
6  time when there was a lot of substance abuse
7  affecting children's services, do you expect that
8  there would have been similar discussions with
9  the board of trustees?
10      MS. FLOWERS:  I object to the form and
11  to the extent it misstates the witness's
12  testimony.
13      THE WITNESS:  I don't -- I don't really
14  know.  That would have been the former director,
15  and I really did not review his reports other
16  than probably one or two of the most recent
17  reports.
18      When I became the executive director, I
19  looked back at a couple of his recent reports,
20  but I did not review anything he had provided to
21  the board previously.
22  BY MR. ALEXANDER:
23      Q.   What about back when you were at Summit
24  County, the prior stint back through 2007?  Did
25  you ever have occasion to know what was being

Page 212

1  discussed or presented to the board meetings?
2      A.   I attended some board meetings in my
3  prior role, but certainly not extensively.  That
4  really wasn't my role at that point.  So I -- you
5  know, I -- again, I don't really know.
6      Q.   Give -- given your knowledge of how the
7  board functions, do you expect that if there was
8  anything going on that was a big deal affecting
9  budgeting and expenditure, financial discussions
10  with the board, that it would have been included
11  in the board meeting minutes and documents
12  presented to the board?
13      MS. FLOWERS:  Object to the form.
14      THE WITNESS:  Well, that would be the
15  executive director's responsibility.
16  BY MR. ALEXANDER:
17      Q.   So you don't know if the executive
18  directors before you did it, but it was part of
19  their purview to do that?
20      A.   Correct.
21      Q.   Okay.  So looking here, Mr. Kearns, is
22  he still deputy executive director, fiscal
23  services and facilities management division?
24      A.   Yes, he is.
25      Q.   Ms. Davidson, MSW, LISW, is she still

Page 213

1  deputy executive director of social services
2  division?
3      A.   Yes, she is.
4      Q.   And Ms. Papas, she's still general
5  counsel of this division?
6      A.   Yes, she is.
7      Q.   Is Ms. Nash still the deputy executive
8  director of human resources and support services
9  division?
10      A.   Yes, she is.
11      Q.   And if you go to the -- the next page --
12  and I'm -- I will apologize.  I didn't make the
13  document.  But some of the print is really
14  small --
15      A.   Yeah.
16      Q.   -- and strains people's eyes, certainly
17  at a certain age of their being.
18      A.   I have no problem reading it.
19      Q.   Good.  So I don't want you to go through
20  all the names and all the boxes, but if you stay
21  at the director level --
22      A.   Okay.
23      Q.   -- are -- are there any of the people
24  listed in the -- top boxes that include the
25  director-level positions, the deputy executive

54 (Pages 210 - 213)

Page 214

1  director and director positions, who are not
2  current as of December of 2018?
3      A.  I believe those are all current.  The
4  names of those directors at the department
5  director level, I assume, is where you're
6  looking.  Since we already talked about the
7  deputy executive director level, I assume you're
8  looking at the department director level.  And
9  those, I believe, are all the same.
10     Q.  Yes, ma'am.  So that was Page 3.
11     A.  Yes.
12     Q.  That says "Management Staff."
13     A.  Uh-huh.
14     Q.  Can you go -- do the same thing on the
15  next page, "Fiscal Services Division"?
16     A.  Uh-huh.  The direct -- department
17  director level is the same.  There are some
18  changes of staff in the lower level.
19     Q.  And which ones are you aware of?
20     A.  For example, William Piurkowsky,
21  security officer, I don't think he's in that role
22  anymore.  Amanda Haviland I don't believe is with
23  the agency anymore.
24     Q.  Can you go to the next page, "Social
25  Services Division"?  Again, the same thing,

Page 215

1  department director level.  Are the folks here
2  all current?
3      A.  Yes.
4      Q.  Same thing for the next one, "Social
5  Services Program."
6      A.  The department director is the same.
7  There are some changes that have occurred at the
8  supervisor level.
9      Q.  What are those changes?
10     A.  The social service supervisor over the
11  substance abuse intervention unit moved into a
12  training role, so she's no longer in that role.
13         I can't really speak to the staff in the
14  levels beyond that, frankly.  I'm sure there have
15  been changes, but I would not be able to --
16     Q.  But --
17     A.  -- repeat them.
18     Q.  That's why I'm trying to focus mostly on
19  the department --
20     A.  Yeah.
21     Q.  -- director level.
22         And so the -- the budgeting that's come
23  in, the extra hiring that you're talking about,
24  is anyone going to be in the social services
25  programs, or is it all in the -- the later ones

Page 216

1  like intake and protective and placement
2  permanency?
3      A.  Intake and protective and placement and
4  permanency planning are the departments in social
5  services where I would anticipate we would
6  increase our staff by a minimum of five staff.
7  Although, at this point, we are having
8  conversations of increasing the staff further.
9          But we would be looking at our intake
10  department specifically for additional staff.
11  Although, we'll probably have to add a position
12  or two in the protective department as well.
13     Q.  So the intake department also tracks
14  information at the intake level about how often
15  there's some issue that relates to substance
16  abuse, correct?
17     A.  They can now track in SACWIS at the time
18  of a phone call to the hotline.  If someone
19  reports that there is substance use, they can
20  track that, as well as there is now a field for
21  the type of substance if the reporter is aware of
22  the type of substance.
23     Q.  And this is a change from some of the
24  prior versions of SACWIS going back in time?
25     A.  That's right.

Page 217

1      Q.  Okay.  So you can't necessarily make a
2  direct comparison between whatever they see at
3  intake in 2017 and '18 compared to 2013 before
4  those fields or options were available, correct?
5      MS. FLOWERS:  Object to the form.
6      THE WITNESS:  Not in that -- they're --
7  not in that field.  They would have to look at
8  and try to analyze that through a different
9  field.
10 BY MR. ALEXANDER:
11     Q.  So it may be that a case where there's
12  an initial report of something relating to
13  substance abuse when it's investigated, if it's
14  investigated, if it meets criteria for
15  investigation, turns out there isn't a substance
16  abuse issue, that's one possibility, correct?
17     A.  Correct.
18     MS. FLOWERS:  Object to the form.
19 BY MR. ALEXANDER:
20     Q.  And it's also -- you have criteria for
21  when you get from intake at the hotline call to
22  actually getting to open a case file and
23  investigating, correct?
24     A.  Well, we have to determine whether or
25  not it meets the criteria to be opened as a

55 (Pages 214 - 217)

Page 218

1  report or not.
2     Q.  And not all calls do meet the criteria?
3     A.  No.
4     Q.  And sometimes it can be that an initial
5  call doesn't report a substance abuse issue, a
6  case is opened, there's some investigation
7  conducted, and it turns out there is some
8  substance abuse issue that affects the case in
9  some form or fashion, correct?
10    A.  That's right.
11    Q.  Okay.  And -- but in terms of the data
12 that you've seen, the more recent data that
13 you've seen from the intake department in terms
14 of the intake calls and how often there's
15 substance abuse noted that specifically relates
16 to heroin, opiates, or opioids, that's about
17 8 percent of the time, correct?
18    MS. FLOWERS:  Object to the form.  Lack
19 of foundation.
20    THE WITNESS:  I -- I don't know that
21 specifically about calls that come in at the
22 hotline.
23 BY MR. ALEXANDER:
24    Q.  Do you remember seeing any data on --
25 looking at intake calls to see how often they

Page 219

1  relate to substance abuse, including specifically
2  heroin, opiates, or opioids?
3     A.  I have seen data about what comes in at
4  the hotline and what is substance use and what is
5  opioid abuse, but I don't know those numbers
6  about what comes into the hotline.
7     Q.  Okay.  We have some documents that we
8  can go over that.
9     A.  Okay.
10    Q.  I'm asking:  Do you know, like, what the
11 most recent current is?  Because the documents we
12 have may be outdated.  Maybe it's changed up or
13 down since then.
14    A.  I don't know any numbers.
15    Q.  Okay.  All right.  Intake department,
16 has anybody changed at the director level?
17    A.  I'm sorry.  What page?
18    Q.  We're on Page 7, I think.
19    A.  7.
20    Q.  It ends in -- it's the Bates number
21 ending -- ending in -53.
22    A.  Okay.  The director level is the same.
23    Q.  The next one, "Protective Department."
24 At the director level, has anybody changed?
25    A.  No.

Page 220

1     Q.  What about the supervisor level?  Has
2  any of that staffing changed?
3     A.  Supervisor level has had staffing
4  changes.  I know that the supervisor in the
5  medically fragile unit, the first one, S. Bodey,
6  he has recently left the agency, so he is no
7  longer in that role.
8     Q.  Can you -- is that it?
9     A.  I -- I think that M. Foster has left her
10 role as well.  So I think those are two changes
11 that have occurred there.
12    Q.  The caseworkers, they have Roman
13 Numerals and then letters after their names.  So
14 it would be, like, I-A, II-C.  There are all
15 these different combinations of numbers and
16 letters after the caseworkers.  Do you see that?
17    A.  I do.
18    Q.  And can you just explain, in general,
19 what is it -- what's the difference between a I-A
20 and a II-C or a II-B, any of the other
21 permutations here?
22    A.  Well, I can't give you any good
23 explanation for it.  It means something.  It has
24 to do with time in their role, education, their
25 licensure, degrees.  I mean, it's a very

Page 221

1  cumbersome and complex process driven by our
2  union contract, but I can't explain it to you.
3     Q.  Okay.  So it affects, essentially, how
4  much they get paid?
5     A.  I believe it is linked to pay, but,
6  yeah, I -- I don't know.
7     Q.  Okay.  Is this an area where the new
8  funding and increased hiring is -- is planned to
9  go for the protective department for these
10 different caseworker levels?
11    A.  If we add positions in the protective
12 department, which I believe they are understaffed
13 at this point, we would be adding
14 caseworker-level positions.  And whether that's
15 the III or the II or the I or the C or A, I don't
16 know.  One of those would be a training-level
17 position, so --
18    Q.  In --
19    A.  -- that's where they would start.
20    Q.  In general, when they come in, they come
21 in at the lowest level and work their way up
22 depending on what their background, education and
23 experience is?
24    A.  That's right.  They come in at a
25 training level based on background, education,

56 (Pages 218 - 221)

Page 222

1  experience.
2      Q.  And do you have a -- a target for
3  caseload by number of caseworker in this
4  protective department?
5      A.  We don't necessarily have a target.  And
6  we kind of stay away from that because we can't
7  really turn it off when the numbers go beyond a
8  target.  They -- I know they're certainly higher
9  than they were.  They were averaging probably
10  eight; they are more like ten at this point.  So
11  they are a little higher than they were.
12      I think part of the issue with their
13  caseloads is just the complexity of the case and
14  the number of siblings and the placement types
15  and places that they are.  So it has added a new
16  element of where they have to go see their
17  children, the transportation issues, the
18  visitation issues, a lot of extensive time spent
19  in supervising visits.
20      Q.  So some of the best practices documents
21  you might see in this area talk about trying to
22  set caseload targets.  You don't subscribe to
23  that being necessary to improve overall
24  performance?
25      A.  I -- I don't pay a lot of attention to

Page 223

1  those, frankly, because I think that every agency
2  does their work very differently.  So if the
3  state says, you know, 12 looks like a great
4  number to us -- which at some point they did
5  years and years ago, and they have not really, to
6  my knowledge, updated that.
7      But, again, that really depends on how
8  each agency structures their work.  So if your
9  staff don't have to supervise visits, for
10  example, they could carry more cases.  If they
11  don't have to do their own transportation, they
12  could carry more cases.
13      So it's really a lot of variables that
14  go into what is really the appropriate case level
15  for every division, and -- and every agency would
16  be different.
17      Q.  Okay.  And is there a specific number
18  that you're targeting hiring or at least
19  replacing who've left in this protective services
20  division?
21      A.  Well, I am at least targeting two
22  positions at this point, although I would say
23  that that is not necessarily adequate.  We really
24  probably need an entire unit of staff in the
25  protective department.  But I don't think that

Page 224

1  we -- at least not this year or next year, that
2  would not be in our budget to do that.
3      Q.  And that, too, is in addition to
4  replacing anybody who leaves, right?
5      A.  Yes.  I am talking about increasing by
6  two.
7      Q.  And -- and within this area, this
8  protective department --
9      A.  Yes.
10      Q.  -- is this where you see a lot of
11  turnover?
12      A.  No.  This is not necessarily where we
13  see our turnover.  It would be in our intake
14  department.
15      Q.  Okay.  All right.  And has the turnover
16  in intake increased or decreased in the last year
17  compared to the prior year?
18      A.  I believe it has increased.  I -- you
19  know, I haven't looked at the trend recently.  I
20  did -- I know we had a class of new hires --
21  several classes of new hires last year and we had
22  a significant loss of staff in 2017 in the first
23  year.  So that was unusual for us.
24      We don't have a high turnover rate,
25  generally, when we compare ourselves to other

Page 225

1  state organizations.  Our turnover has been
2  fairly low.  Last year, our turnover was higher
3  than it has been.  I believe our total turnover
4  was about 12 percent last year, but that
5  includes, obviously, all types of turnover:
6  retirements, different types of exits.  We had
7  two deaths in the agency as well, so . . .
8      Q.  So the 12 percent turnover was for 2018
9  or 2017?
10      A.  '17.
11      Q.  Do you know what it's looking like so
12  far this year or can you not tell?
13      A.  I don't know.
14      Q.  Okay.  Do you know what it was in '16?
15      A.  I don't know.
16      Q.  But it was lower than 12 percent?
17      A.  I believe it was lower, but I really
18  don't know, and I haven't looked at that
19  recently, so . . .
20      Q.  So if the heroin deaths and usage has
21  dropped from 16 to 4 -- if 16 was the peak and
22  it's dropped since then, would that indicate that
23  the turnover isn't driven by the number of cases
24  that you have that involve heroin or opioids or
25  opiates?

57 (Pages 222 - 225)

Page 226

1      MS. FLOWERS: Object to the form. Lack
2  of foundation.
3      THE WITNESS: Can you say that again?
4  BY MR. ALEXANDER:
5      Q.  Sure.  I think some of the information
6  we have from your documents and your office is
7  that the peak for impact on heroin in terms of
8  percentage of cases and all of that was 2016 but
9  that it went down in 2017 and has continued to
10  drop into 2018.
11      If that's the case and the turnover has
12  gone up since 2016, would that indicate to you
13  that the turnover is not being driven by the
14  number of cases that involve heroin or opiates or
15  opioids?
16      MS. FLOWERS: Form and foundation.
17      THE WITNESS: I don't know that I said
18  specifically it's driven by the cases involving
19  opiates.  I think it is specifically driven by
20  the stress related to the difficulty of the
21  cases, some of which are substance abuse or
22  opiate cases.
23      I think our, you know, turnover last
24  year, we had a young group.  The caseloads were
25  too high because our volume was just very high.

Page 227

1  You know, there's some delay in terms of your
2  cases coming in and then how you get your staff
3  trained and ready to go out on the line to do the
4  work.  It's a very extensive training process.
5      So we were really understaffed in -- in
6  terms of trained staff to do the work.  So when
7  you then bring in these new staff and they have
8  more cases and more complex issues than they're
9  capable of dealing with, we had a lot of turnover
10  with those young and new staff in that first
11  year.
12      Q.  Have you seen any analyses or
13  assessments of, like, the financial impact or
14  burden on training to train staff because of
15  turnover that you attribute in any way to
16  opioids, opiates, or heroin?
17      A.  PCSAO did some -- they produced some
18  analysis related to the workforce and the link to
19  the opiate epidemic.
20      Q.  Okay.  So for Summit County and the
21  turnover in Summit County Children's Services,
22  have you done or had your staff do any kind of
23  assessment about the impact, financial or
24  otherwise, of having to increase the training or
25  go through the process of hiring people given the

Page 228

1  turnover?
2      A.  Have we had to increase the training?
3  Is that your question?
4      Q.  Have you assessed how -- so I'll take it
5  step by step.
6      A.  Okay.
7      Q.  When there's turnover --
8      A.  Yes.
9      Q.  -- people need to be hired.  They
10  need -- you need to find them, you need to hire
11  them, you need to train them, correct?
12      A.  Correct.
13      Q.  That takes time and money, correct?
14      A.  Correct.
15      Q.  And the offset sometimes is you hire
16  somebody who costs less than the old employee
17  they're replacing, right?
18      MS. FLOWERS: Objection.
19      THE WITNESS: Maybe.  I don't know that
20  that's necessarily true.  If they're leaving in
21  the first year, I don't know that they're costing
22  us less --
23  BY MR. ALEXANDER:
24      Q.  But --
25      A.  -- and we've invested a year in them.

Page 229

1      Q.  But part of why you don't want your
2  turnover to be high is because of the costs
3  associated with replacing people and retraining
4  them, correct?
5      A.  That's correct.  Yes.
6      Q.  So I know we've talked about the impact,
7  if any, of the heroin epidemic or sometimes
8  the -- called the opioid -- or opioid or opiate
9  epidemic on the turnover of the staff within
10  Summit County Children's Services.
11      So have you done any kind of assessment
12  or asked that anybody to do any assessment or
13  analysis of the impact of the increased turnover
14  rate?
15      A.  I have not asked anybody to do that
16  specific analysis, no.
17      Q.  Are you aware of any analyses like that
18  specific to Summit County?
19      A.  Our data would have been included in the
20  state data.  But specifically doing it
21  internally, no.
22      Q.  Okay.  If you go to the next page.  It's
23  "Placement & Permanency Planning."
24      A.  Yeah.
25      Q.  And can you just explain placement and

58 (Pages 226 - 229)

Page 230

1  permanency planning?  What is that?
2      A.  They do the placement of children.  So
3  when a child needs to be placed into -- outside
4  of their home in some placement setting, the
5  staff actually identify the placement for the
6  child.  They assess the child and do the
7  placement for that -- identify the placement for
8  that child.
9          They also do the independent living
10  unit.  So they are working with teens who are
11  aging out of foster care, preparing them for
12  emancipation, basically.  They will do the
13  adoption subsidy work.  They identify the amount
14  of a subsidy for a family.  They process state
15  subsidies that come through for families who have
16  adopted children.
17          They do foster home support.  We
18  contract out our licensing process, but then they
19  are assigned to the foster home support workers.
20  And they also carry the caseloads of children who
21  are in the permanent custody of the agency,
22  moving towards adoption.  So they will have the
23  caseloads for those children in identifying the
24  adoptive placement for them.
25          They do the kinship work.  We place many

Page 231

1  children with kinship homes, which can be a blood
2  relative or a nonblood individual who has a
3  relationship with that child.  They do
4  assessments of all of those homes.  When a
5  kinship individual is identified for a child,
6  there is an assessment that has to be done to
7  approve that placement.
8          And that's it.
9  BY MR. ALEXANDER:
10      Q.  Thank you.  That's a lot, right?
11      A.  Yeah, that's a lot.
12      Q.  So that's from short term to long term
13  to complete adoption, correct?
14      A.  Well, I -- I don't know what you mean by
15  "short term."  They -- I mean, it -- it might be
16  a -- they might have the case for a short term if
17  there's an identified adoptive placement.
18  Otherwise, they could have the case for very long
19  term if there's not an adoptive placement and the
20  child ends up in an independent living situation
21  where they're emancipating from our custody.
22      Q.  The department director is described as
23  T. Danzy?
24      A.  That's right.
25      Q.  What's the full name?

Page 232

1      A.  Trina Danzy.
2      Q.  And is she still in her position?
3      A.  Yes, she is.
4      Q.  What about the supervisors listed here?
5  There are, it looks like, seven supervisors
6  listed.  Are they all current?
7      A.  No, they're not.  A. Irby by has retired
8  and been replaced with another individual.
9          C. Malpass is on a very extended medical
10  leave, so she has been temporarily replaced.
11          M. Dufore actually has replaced
12  C. Malpass, so she is no longer in the
13  independent living role right now.
14          And I think the rest of them are --
15  remain there.
16      Q.  Is this an area that's slated for a
17  hiring in addition to replacing anybody who
18  leaves?
19      A.  I don't know that we've determined what
20  or if we would hire here.  I -- I think one of
21  the things we will have to do -- I don't know if
22  it involves hiring or if it's just more services,
23  but in the kinship area, we've had a tremendous
24  increase in the number of children who are placed
25  with relatives and nonblood kin.  And the staff

Page 233

1  there are probably inadequate to handle the
2  number of assessments that we do.  So we may have
3  to look at that area specifically.
4          But also just in terms of supports to
5  the kinship families, I think we have to identify
6  some ways to help families to deal with the
7  children that are in their homes, both from a
8  financial resource perspective as well as a
9  support perspective.
10      Q.  Is placement and permanency planning an
11  area where you think you've seen increased
12  turnover?
13      A.  It's really a pretty steady area from a
14  turnover perspective.
15      Q.  Are -- are these the individuals who
16  have the most contact with children?
17      A.  Not necessarily, no.
18      Q.  Who else would?
19      A.  Well, all of the -- all of the social
20  service staff would have contact with children if
21  they're case carrying -- in a case-carrying role.
22          So in intake, there are staff that are
23  in the case-carrying role.  Actually, the
24  majority of the staff in intake would be in
25  case-carrying roles.

59 (Pages 230 - 233)

1      In protective, they are all
2  case-carrying role -- roles in that department.
3      In this department, two of the units are
4  case-carrying roles, and then other units are
5  more of a support.  Independent living is more of
6  a support.  The staff who are doing subsidies are
7  not necessarily working with children.
8      The placement staff are not necessarily
9  working with the children.  They're identifying
10  the placement and working with providers.
11      Q.  Okay.  I think we've gone over the next
12  one, Page 10, which was "Administrative & Legal
13  Services Division."
14      The last one, the last page of
15  Exhibit 1, is "Human Resources & Support --
16  Support Services Division."
17      A.  Uh-huh.
18      Q.  At the department director level, are
19  these folks all still there?
20      A.  Yes, they are.
21      Q.  Is any of this work outward facing or is
22  this all dealing with the rest of the department?
23      A.  Is it what?  I'm sorry.  I didn't hear
24  you.
25      Q.  I used the term "outward facing."  Like,

1  does it -- do any of the folks within human
2  resources and support services deal with clients?
3      A.  Not so much clients.  I mean,
4  professional development, they train not only our
5  staff, they train foster parents, for example.
6  They're not necessarily clients.
7      Client rights in the quality improvement
8  department could work specifically with clients
9  if they were working with them on an
10  ombudsman-type issue.
11      But, generally, this department does not
12  work with clients.  They work -- they are support
13  to the agency in various roles.
14      Q.  So maybe I missed it, but I didn't see
15  anything in -- in here that talked about STARS or
16  START.  Are those separate responsibilities, or
17  are there just people within these areas that
18  also deal with STARS or START?
19      A.  There was the -- there was a supervisor
20  who we talked about who was over the STARS
21  program.  She has moved out of that role into a
22  training role.
23      Q.  Which page are you on?
24      A.  I'm not sure.
25      Q.  We can just go by the title maybe.

1      A.  Her name is B. Kinney on the chart, but
2  I just -- I have to find her, so . . .
3      Q.  Was that under social services division?
4      A.  It would be in the social services
5  division, so --
6      Q.  So that should be Page 5 of the
7  document.
8      A.  5.
9      Q.  Unless it's within social services
10  programs, which is Page 6.
11      A.  Oh, yeah.  I think that's where it is.
12      Q.  Trying to help.
13      A.  Yes.  Thank you.  It is on Page 6.
14      The Substance Abuse Intervention Unit
15  does the STARS work.  The supervisor was Beth
16  Kinney.  She has moved out of that role and into
17  our training and professional development role.
18      Q.  Has somebody replaced her?
19      A.  Yes, someone has replaced her.  It is a
20  new supervisor, and I don't remember which one
21  took that unit, so . . .
22      Q.  Okay.  What about START?
23      A.  The START program is probably going to
24  be handled in the substance abuse intervention
25  unit.  That is a new grant that we have not

1  implemented yet.
2      Q.  Okay.  Is there a reason that you didn't
3  have a START program in place before whenever it
4  might start, maybe in 2019?
5      A.  It was -- they only took X number of
6  counties for the initial pilot.  I don't remember
7  if we applied to be part of the first pilot
8  because we were in the STARS grant at the time
9  and there were many similarities to those two
10  programs.
11      So I think we opted out of actually
12  applying to be part of the START grant in the
13  first round.  So when the second round became
14  available that we could apply, we did.
15      That's my recollection.
16      Q.  Okay.  Are there other areas of
17  responsibility that will need to get added to the
18  organization chart depicted in Exhibit 1 once
19  some of this grant money comes in and currently
20  planned programs are initiated?
21      A.  The START grant, you mean?
22      Q.  START or anything else.  Is there
23  anything beyond START that will need to get added
24  to Exhibit 1 --
25      A.  Oh.

Page 238

1    Q.   -- once the money comes in?
2    A.   I'm not aware of any other pending
3  grants at this point.  I mean, you know, we're
4  always applying for grants.  I don't know of
5  anything that's outstanding at this point.
6    Q.   Okay.
7              - - -
8         Thereupon, Exhibit 2 was marked for
9         purposes of identification.
10             - - -
11 BY MR. ALEXANDER:
12   Q.   Handing you a copy of Exhibit 2.
13 There's also a copy for Plaintiff's counsel.  The
14 Bates number here is SUMMIT_001912538 and then it
15 runs through -599.
16       I think what you'll see is an e-mail
17 with a series of attachments.
18   A.   Uh-huh.
19   Q.   In the e-mail, it says that you were the
20 organizer.  I guess that's like a calendar
21 invitation.  Is that what it was on the first
22 page?
23   A.   I don't know what that means.
24   Q.   Where it says "Organizer" --
25   A.   Yeah.

Page 239

1    Q.   -- "Location," "Start," "End" date, a
2  "Judicial Symposium on Addiction & CW With Judge
3  Teodosio."  Do you know her?
4    A.   I do.
5    Q.   And that this would be in Dublin, Ohio,
6  from June 23rd, 2015, for four-and-a-half hours.
7  Do you see that?
8    A.   Uh-huh.  Yes, I do.  It's -- looks like
9  a calendar invite.  Judicial Symposium on
10 Addiction with the Judge, Jerry Craig, and Becky
11 Ryba.
12   Q.   And does this ring any bells for you at
13 all?
14   A.   The e-mail certainly doesn't.  I believe
15 I attended the symposium, but there were a couple
16 different ones.  So this looks like this is May
17 of 2015?
18   Q.   Yeah.  Let -- let me orient you --
19   A.   Okay.
20   Q.   -- if I -- if I can.
21       So the second page in the exhibit is a
22 letter written by Governor Kasich and Chief
23 Justice of the Ohio Supreme Court Maureen
24 O'Connor, and it's addressed to Judge Teodosio.
25       Am I saying that name right?

Page 240

1    A.   Yes.  Uh-huh.
2    Q.   And she's here, Summit County, correct?
3    A.   Correct.
4    Q.   And you've dealt with her in connection
5  with some of the opioid or opiate initiatives
6  over the last several years, correct?
7    A.   That's right.
8    Q.   Is that how you know her?
9    A.   Well, I know her because she's the
10 juvenile court judge who handles all of the cases
11 involving all of the children when we file a
12 complaint and the court orders services or
13 custody.
14   Q.   So you've been dealing with her as part
15 of, essentially, regular child services that
16 affect -- that involve going to court for a
17 number of years?
18   A.   That's right.
19   Q.   So this is describing something called
20 the Judicial Symposium on Addiction and Child
21 Welfare.
22   A.   Uh-huh.
23   Q.   And if you look at this, it says that
24 there is going to be one held on June 23rd, 2015,
25 as the 2015 judicial symposium.  That correlates

Page 241

1  with when the invitation is that you were the
2  organizer for.
3        Do you see that, how that matches up?
4    A.   Yes.  Uh-huh.
5    Q.   Okay.  And it refers back to there had
6  been a prior judicial symposium on opiate
7  addiction in 2014.  Do you see that?
8    A.   On this letter, yes.
9    Q.   Yeah.
10   A.   Uh-huh.
11   Q.   So it says that the prior symposium
12 happened on June 30th, 2014, where ". . . nearly
13 900 community leaders joined a state-wide
14 initiative to effectively address opiate-addicted
15 adults in the criminal justice system . . . ."
16       Do you know if you participated or
17 anybody from your staff participated in that 2014
18 symposium?
19   A.   I believe I did.
20   Q.   Do you know if there was one before
21 that?
22   A.   I don't know.
23   Q.   Did you have materials from attending
24 the 2014 judicial symposium on opiate addiction?
25   A.   I don't remember.

61 (Pages 238 - 241)

Page 242

1    Q.  Did you have any e-mails or documents
2  that you would have shared with your colleagues
3  or sent to your staff in follow-up on anything
4  you learned or discussed at that symposium?
5      MS. FLOWERS:  Objection to the form.
6      THE WITNESS:  I don't remember.
7  BY MR. ALEXANDER:
8    Q.  What do you remember about the 2014
9  symposium?
10    A.  Well, I'm not sure if it was the '14 or
11  the '15.  I know I attended one of these.  It was
12  an educational forum that talked about opiate use
13  disorders.
14      There were -- so it was really training,
15  basically, for -- specific to child welfare and
16  how it was impacting child welfare.  And that's
17  my recollection.
18    Q.  So let's orient again.  It describes
19  that the 2014 one focused on the criminal justice
20  system.
21    A.  Uh-huh.
22    Q.  And then it says, in the second
23  paragraph, "Child welfare and judicial systems
24  throughout Ohio continue to work with families
25  struggling due to one or both parent's

Page 243

1  involvement with drugs and often times the
2  criminal justice system.  This letter is to
3  invite you to be a team leader to bring members
4  of your community to the Ohio's -- to Ohio's 2015
5  Judicial Symposium on Addiction and Child Welfare
6  on June 23rd, 2015."
7      Do you see that?
8    A.  Uh-huh.
9    Q.  Is that yes?
10    A.  Yes.
11    Q.  Does that refresh you at all as to
12  whether you would have gone to the one in 2014,
13  the one in 2015, or both?
14    A.  No.
15    Q.  The one in '15 is -- talks about all the
16  people involved with it:  the governor's office,
17  Supreme Court of Ohio, Ohio Department of Mental
18  Health and Addiction Services, Department of Job
19  and Family Services, Ohio Association of County
20  Behavioral Health Authorities.
21      You're familiar with those various
22  entities, correct?
23    A.  Yes.
24    Q.  "This Symposium will focus on how
25  juvenile judges, child welfare, and other

Page 244

1  community leaders can assist individuals with an
2  addiction in the child welfare system by helping
3  reunify families and changing the statistics like
4  those from the attached Child Welfare Opiate
5  Engagement Project White Paper."
6      Do you see that?
7    A.  Yes.
8    Q.  Do you remember ever seeing and reading
9  the white paper?
10    A.  I definitely was provided the white
11  paper at some point through PCSAO is my
12  recollection, yes.
13    Q.  Are -- are you pretty diligent about
14  maintaining your calendar on your e-mail that
15  says when you have an appointment, when you
16  attend a conference or a meeting?
17    A.  Yes, I am.
18    Q.  So would it be possible to check by
19  looking back and seeing if you went to 2014 or
20  2015 or both for this symposium?
21    A.  Yes.  Uh-huh.
22    Q.  That -- that would still exist, right?
23    A.  Yes.
24    Q.  Okay.
25    A.  Well, I think so.  I'm not sure.  It

Page 245

1  would -- I don't -- I would have to look at the
2  record retention schedule to see what the
3  calendars are.
4    Q.  All right.
5    A.  I definitely remember attending one of
6  these.  I don't remember which year.  That's kind
7  of running together for me.
8    Q.  Uh-huh.
9    A.  My recollection is the judge attended.
10  We had, you know, conversations, breakout
11  sessions where we talked.  I think we had some
12  other people there.  So yeah.  I'm sorry.  It's
13  going back a ways.
14    Q.  Just from the timing, by June of 2015,
15  based upon what you said before --
16    A.  Uh-huh.
17    Q.  -- you and your staff would have been
18  talking for at least a year about whether there
19  was an issue with heroin or opioids or opiates
20  within Summit County affecting children's
21  services, correct?
22      MS. FLOWERS:  Object --
23      THE WITNESS:  Yes.
24      MS. FLOWERS:  -- to the form.
25  Misstatement of Ms. -- of the witness's

62 (Pages 242 - 245)

Page 246

1 testimony.
2 BY MR. ALEXANDER:
3     Q.  I'm sorry.  Did you give your answer?
4     A.  Yes.  Uh-huh.
5     Q.  If you go to Page 1 of the child welfare
6 opiate project, which is the Bates number ending
7 in -47 in the bottom right.
8     A.  Uh-huh.
9     Q.  So this is a paper from September of
10 2014.  Do you see that at the bottom left?
11     A.  Yes.  Uh-huh.
12     Q.  So do you know if would you have gotten
13 a copy of the white paper back in 2014?
14         MS. FLOWERS:  Objection.  Asked and
15 answered.
16         THE WITNESS:  I don't know when I got
17 it.  I am assuming there's only one white paper,
18 so I -- but I don't know when I received it.  I
19 received it, I believe, through PCSAO.
20 BY MR. ALEXANDER:
21     Q.  So what I think you'll see is that the
22 white paper is 12 pages.
23     A.  Uh-huh.
24     Q.  And then after that is a County Data
25 Packet, which runs -- which is described as an

Page 247

1 appendix and runs another 31 pages.
2     A.  Oh, the next packet.  Yeah.  Uh-huh.
3 Okay.
4     Q.  You think would you have gotten this all
5 together at some point, but you're just not sure
6 exactly when?
7     A.  Well, this -- this was -- this is part
8 of the 2015, and it looks like this might have
9 been part of the 2014, the white paper.  I don't
10 know if it's June 2015.
11     Q.  So I think what --
12     A.  I don't remember.
13     Q.  -- you'll see is that the 2014 symposium
14 happened in June 2014.
15     A.  Okay.
16     Q.  And the white paper was created about
17 two-and-a-half months later.
18     A.  Okay.
19     Q.  And then it's recirculated in advance of
20 the 2015 symposium.
21         Does that make sense?
22     A.  Yes.
23     Q.  So at any point, by June of 2015, you
24 certainly had the white paper here, correct?
25         MS. FLOWERS:  Objection.

Page 248

1         THE WITNESS:  I don't know when I got
2 the white paper.
3 BY MR. ALEXANDER:
4     Q.  Well, I mean, we know that it's an
5 attachment to this calendar entry that you
6 created for a meeting that would have been in
7 June of 2015.  And it was forwarded to
8 Judge Teodosio and then on to you in May of 2015,
9 right?
10         MS. FLOWERS:  Object to the form.
11         THE WITNESS:  Okay.  Yeah.  So I must
12 have had it then.
13 BY MR. ALEXANDER:
14     Q.  If you could just go on -- on Page 1
15 that we were on.  It's Bates number ending in
16 -47.  It's going to be what you just set off to
17 the side.
18     A.  The original?
19     Q.  Yes, ma'am.  So if you just go forward a
20 couple of pages, I think you'll get there.
21     A.  Okay.
22     Q.  When I say the Bates number, the little
23 number at the bottom right.
24     A.  Yeah.
25     Q.  So if you --

Page 249

1     A.  Which page?
2     Q.  It ends in -47.
3     A.  -47.  Okay.
4     Q.  The first paragraph under "Child Welfare
5 Opiate Engagement Project" says, "The Ohio
6 General Assembly has adopted more than a dozen
7 bills in response to the opiate epidemic, aiming
8 to promote improved prescribing practices and
9 boost community-level treatment.  But, to date,
10 the legislature has not -- has yet to address the
11 fallout to children of opiate abusers."
12         Do you see that?
13     A.  Yes.
14     Q.  Does that refresh you at all that even
15 by this time, there had been attention to -- in
16 the press and in government circles
17 to legislation and whether they were adequate to
18 address the impact on Children's services?
19         MS. FLOWERS:  Object to the form of the
20 question.
21         THE WITNESS:  Well, I see that this was
22 September 2014.  So, yes, obviously, this was --
23 discussion occurred then.
24 BY MR. ALEXANDER:
25     Q.  And do you recall that that was

63 (Pages 246 - 249)

Page 250

1  something that you were aware of at the time as
2  part of your function of kind of staying up on
3  what's going on with the legislature and various
4  developments in the state that might affect the
5  performance of Summit County Children's Services?
6      MS. FLOWERS: Object to the form of the
7  question. Lack of foundation.
8      THE WITNESS: I don't -- I can't say
9  that it -- I remember the time. Obviously, this
10  makes sense that it was in September of 2014, but
11  I don't have a good recollection of the timeline.
12  BY MR. ALEXANDER:
13      Q. Okay.
14      A. I -- I think, as I said earlier, we
15  certainly knew in 2014 that opiates and the
16  opiate epidemic was an issue. It was in 2015 and
17  '16 that I think the magnitude of it became
18  really real and prevalent for us.
19      Q. The next paragraph says, "Nationally,
20  between 60 and 80 percent of substantiated child
21  abuse and neglect cases involve a parent or
22  guardian abusing substances."
23      Do you see that?
24      A. I do.
25      Q. Is that consistent with your experience

Page 251

1  in Summit County or is that higher or lower?
2      MS. FLOWERS: Objection.
3      THE WITNESS: Our -- I mean, it depends
4  on when they ran this data. Our data has also
5  depended on when you ran it and how you ran it.
6  So I don't know where this data's from.
7      We certainly have had time periods and
8  places where we had pulled substance abuse issues
9  being in that range, yes, but I can't speak
10  specifically to the substantiated child abuse and
11  neglect. I don't know where they're getting that
12  from.
13  BY MR. ALEXANDER:
14      Q. For what it's worth, these
15  are Citations 1 and 2. If you flip forward nine
16  pages, you'll see one's published in 2007, one's
17  published in 2012 from an organization called
18  NADCP.
19      A. Yeah.
20      Q. So back to -- my question is: For
21  Summit County, is your experience that 60 to 80
22  percent of child abuse and neglect cases involve
23  a parent or guardian abusing substances at any
24  time, including in these time periods well before
25  the heroin or opiate crisis?

Page 252

1      MS. FLOWERS: Object to the form.
2      THE WITNESS: We have definitely had
3  time periods where we have seen -- I -- I
4  wouldn't say 80 percent. We've seen close to
5  70 percent.
6  BY MR. ALEXANDER:
7      Q. Okay. And that's not just during this
8  peak period of the heroin crisis; this is going
9  back to the time before that as well, right?
10      MS. FLOWERS: Object to the form.
11  Misstates the testimony.
12      THE WITNESS: No. That would be
13  specific to the time period of the opiate
14  epidemic.
15  BY MR. ALEXANDER:
16      Q. So, like, in 2013, what -- what
17  percentage of substantiated child abuse and
18  neglect cases involved a parent or guardian
19  abusing substances for the Summit County
20  Children's Services?
21      MS. FLOWERS: Object to form.
22      THE WITNESS: I don't know that I know
23  '13. I know around 2012, we were seeing about
24  25 or 28 percent of our cases where case -- where
25  we had case plan with a parent who had a

Page 253

1  substance abuse issue. And that was as high as
2  67 and 68 percent when we were looking at '15 and
3  '16.
4  BY MR. ALEXANDER:
5      Q. And to what did you attribute that
6  increase over time?
7      A. The opiate epidemic.
8      Q. So the additional 40-whatever percent
9  of -- was -- of cases with substantiated child
10  abuse or neglect, those were all in people who
11  were abusing heroin or other opiates?
12      MS. FLOWERS: Object to the form of the
13  question.
14      THE WITNESS: I don't know that I know
15  specifically what the drugs were. I know that
16  the -- there's clearly a correlation between what
17  we were seeing with overdoses in the community,
18  with deaths in the community, with what the staff
19  were reporting, what they were seeing around
20  their clients using opiates -- opioids of some
21  kind, and a correlation with that and the number
22  of substance abuse cases.
23      So the timing was what mirrored what we
24  were seeing in the community, what we were seeing
25  at the state, what data there was from every

64 (Pages 250 - 253)

Page 254

1 other provider in the community. So there was
2 certainly a correlation between the opiate
3 epidemic and what we were seeing in terms of the
4 increase in custody and substance abuse.
5 BY MR. ALEXANDER:
6 Q. Those two data points that you gave,
7 2012 and 2016, '17, in terms of the percentage of
8 Summit County substantiated child abuse and
9 neglect cases involving opiates, where did that
10 analysis come from? Is that something you asked
11 be generated? Did you see that somewhere else?
12 MS. FLOWERS: Object to the form.
13 THE WITNESS: That would have been
14 something I asked from our data analysts, so yes.
15 BY MR. ALEXANDER:
16 Q. From whom in particular?
17 A. Kevin Brown.
18 Q. And when did you get that data?
19 A. It was -- you know, he produced some
20 data in both '15 and in '16. And I -- I just
21 want to be clear, this is really still a
22 different measure where they're saying
23 substantiated child abuse.
24 And my understanding is what Kevin
25 produced was families who were on a case plan who

Page 255

1 had substance abuse issues. And those numbers
2 were in the 60 to 70 percent range.
3 Now, so that could be families that --
4 that we have custody of. It could be families
5 that someone else, a grandparent or another
6 kinship -- a relative person has custody of. It
7 could be a substantiated, it could be an
8 indicated, or it could be a dependent child. So
9 it isn't necessarily the same measure that you're
10 talking about here.
11 Q. But you're talking about an
12 apples-to-apples comparison from 2012 until --
13 A. Yes.
14 Q. -- when you asked for it for a later
15 time period?
16 MS. FLOWERS: Objection.
17 THE WITNESS: I'm talking about my
18 comparison that Kevin did being apples to apples
19 but not apples to -- these are oranges here.
20 BY MR. ALEXANDER:
21 Q. Okay.
22 A. This is not the same comparison that we
23 have.
24 Q. I -- I --
25 A. It's the only one have.

Page 256

1 Q. But the one that you have, why did you
2 ask for it?
3 A. Because I wanted to know what percentage
4 of families had substance abuse issues.
5 Q. Was that part of a budgeting process,
6 part of preparing for a press interview, or is it
7 for some other purpose?
8 A. It was just, really, part of, I think,
9 the fact that we knew we had a problem. We had
10 more and more children coming into custody. Our
11 numbers of children in custody increased
12 substantially by, you know, a couple hundred
13 children in a -- or a hundred children in one
14 year.
15 So, you know, we knew that we had an
16 issue. We knew it was related to addiction
17 issues, substance use issues. And we were really
18 trying to just get a handle at that point on
19 what's the percentage of families that we're
20 working with that have substance use disorders.
21 So, yeah, that's -- for budgeting, for
22 programming, for reporting to our board, for
23 reporting to the community, for knowledge.
24 Q. And so when you said it was -- did you
25 say 60 percent or 70 percent?

Page 257

1 A. It was between 60 and 70 on the two
2 different times that he ran it. He ran it in
3 '15, and it was, again, just under 70 percent,
4 compared to 2012 where it was just under
5 30 percent.
6 He ran it again for some time period in
7 2016, and it was slightly different, but still in
8 the close-to-70 percent range.
9 Q. And that's not percentage of cases with
10 substance abuse; that's percentage of all cases?
11 A. That was percentage of all cases where a
12 parent on the case plan had a substance use
13 disorder listed as part of the reunification
14 plan.
15 Q. So what about the percentage of cases
16 where there was substance abuse or no substance
17 abuse? What was the percentage of cases with
18 child abuse or neglect where there was a
19 documented substance abuse involving opiates?
20 MS. FLOWERS: Object to the form.
21 BY MR. ALEXANDER:
22 Q. Did you ever calculate that?
23 A. Well, we calculated that a bunch of
24 different ways in different years. So, yes, we
25 did do calculations on what we knew we could

65 (Pages 254 - 257)

Page 258

1 pull, which was where our problem was in terms of
2 the data because, you know, you have to be
3 consistent in what you pull so you know you're
4 having a good comparison of apples to apples from
5 year to year.  So, you know, we would come up
6 with numbers.
7      As I said earlier, I think Sharon did --
8 Sharon Geffken did a hand count where she looked
9 at it and came up with something in the
10 40 percent range for opioid use, but that was
11 because she hand counted it out of each
12 individual case.  So that's really not feasible.
13 So you really have to find some field in SACWIS
14 where you can pull the substance -- type of
15 substance.
16      I -- I believe what we've tried to do is
17 look at it consistently is to look at that in a
18 field that we've called -- they call it person
19 characteristics.  The person characteristics
20 field has a place where the staff could put in
21 the type of substance used, and then we would use
22 that consistently so we could get a comparison
23 from year to year.
24      Q.  Okay.  When you did try to estimate the
25 percentage of substantiated child abuse and

Page 259

1 neglect cases that involved a parent abusing,
2 specifically an opiate, including heroin or one
3 of the other illegal ones, is that where you came
4 up with the 27 percent figure?
5      MS. FLOWERS:  Object to the form.
6      THE WITNESS:  The 27 percent?  What --
7 BY MR. ALEXANDER:
8      Q.  The estimate that 27 percent of those
9 cases involved opiate abuse.  20 percent of all
10 cases with confirmed abuse or neglect.
11      A.  Yeah.  I don't -- I don't know we're
12 talking about -- I don't understand because I
13 don't feel like we're talking about the same
14 thing.
15      And -- and I -- I want to clarify again
16 that the data that I just talked about was not
17 based on substantiated child and abuse -- neglect
18 cases.  So I don't know where they pulled this
19 from, so . . .
20      Q.  Let me ask this way:  The -- when you --
21 your staff went to figure out what percent of all
22 cases had a confirmed opiate abuse, not the
23 percentage of ones with confirmed substance abuse
24 that were opiate, but percent of all the cases
25 where there was opiate use or opiate abuse as

Page 260

1 a -- essentially, a driver of the need to consume
2 children's services, what was the best estimate
3 that you could come up with?
4      A.  Well, it varied from year to year.  So
5 it -- it varied everywhere from, you know,
6 20 percent to 30 or 40 percent when Sharon did it
7 as a hand count.  So it would -- it -- it was not
8 the same year to year.  It was in some range of
9 20 to 40 percent.
10      Q.  Okay.  Why don't we go back to the
11 document Exhibit 2.  The fourth paragraph says,
12 "Among the nearly 86,000 cases entering Ohio's
13 child welfare system annually, families dealing
14 with opiate and/or cocaine abuse, including crack
15 abuse, consumed the most resources."
16      Is that consistent with your experience
17 at this time period?
18      MS. FLOWERS:  Object to the form.
19      THE WITNESS:  Well, I would say it's
20 consistent that we believe they do consume a
21 higher level of need and, therefore, resources,
22 yes.
23 BY MR. ALEXANDER:
24      Q.  So after the two bullets, it says,
25 "Child welfare cases involving parents abusing

Page 261

1 heroin, cocaine or both have risen from about
2 15 percent to more than 25 percent of the
3 caseload during the past -- the last five years,
4 with heroin cases growing faster than cocaine
5 during the last three years."
6      Do you see that?
7      A.  I do.
8      Q.  Was that consistent with your experience
9 at this time?
10      MS. FLOWERS:  Object to the form.
11      THE WITNESS:  I -- I don't know.
12 BY MR. ALEXANDER:
13      Q.  Do you know any part of it?
14      MS. FLOWERS:  Object to the form.
15      THE WITNESS:  I -- I would say from our
16 experience, the heroin cases were growing faster,
17 certainly, than cocaine in the last five years.
18 That -- that would be accurate to say.
19 BY MR. ALEXANDER:
20      Q.  Had -- had cocaine, essentially, gone
21 away as a driver of children's services in terms
22 of parents being abused -- parents abusing
23 cocaine?
24      MS. FLOWERS:  Object to the form.
25      THE WITNESS:  Cocaine's never gone away.

66 (Pages 258 - 261)

Page 262

1  It's always been there and been a -- a factor.
2  It -- it wasn't growing -- from my recollection,
3  it certainly wasn't growing as heroin was.
4  BY MR. ALEXANDER:
5      Q.  So the next sentence says, "Another
6  troublesome trend:  70 percent of children age 1
7  or younger placed in Ohio's foster system are
8  children of parents with substance use disorders
9  involving opiates and cocaine."
10      Do you see that?
11      A.  I do.
12      Q.  And I'm not asking about the specific
13  number, but was that also consistent with your
14  experience?
15      A.  I -- I don't know about the percentage,
16  but I would say it is consistent with our
17  experience that younger children were being
18  placed at a higher rate due to heroin and
19  opiates.
20      Q.  It goes on to describe the impact --
21  lasting impact, potentially, on children who are
22  exposed to these issues.  Do you see that?
23      A.  I do.
24      Q.  Then it says, "This epidemic has one
25  more issue calling for urgent action.  Due to the

Page 263

1  negative impacts of temporary care on children,
2  when a child welfare agency removes a child from
3  a home, the agency must abide by the time limits
4  imposed in the 1998 Adoption and Safe Families
5  Act."
6      Do you see that?
7      A.  I do.
8      Q.  Do you know what that act Requires?
9      A.  It requires us to reunify the child
10  within the time limits of the 15 to 22 months.
11      Q.  And did your staff abide by that?
12      A.  Well, I mean, that's -- we certainly
13  make our -- every effort to reunify in that time
14  frame, but we're not completely in control of all
15  of those decisions that are involved -- the court
16  makes the decision on when a child is reunified.
17      Q.  At the end it says, "Currently, more
18  than 25 percent of foster placements involving
19  children of opiate- and/or cocaine-dependent
20  parents last 15 or more months, pushing against
21  the time limits."
22      So the -- just on this page, this
23  description of impacts on child welfare from
24  issues of addiction to heroin, cocaine, and, I
25  guess, undifferentiated opiates, was this -- was

Page 264

1  this surprising to you, the scope of what was
2  being highlighted in terms of potential effects?
3      MS. FLOWERS:  Object to the form.
4      THE WITNESS:  No.  This isn't surprising
5  to me.
6  BY MR. ALEXANDER:
7      Q.  Okay.  Was this surprising to you in
8  terms of the -- how big a problem it was
9  describing?
10      A.  No, it's not surprising to me.  I mean,
11  as I said, I think we -- we knew we had a
12  problem, so . . .
13      Q.  If you -- if you go to the next page,
14  it's the start of a -- five pages of best
15  practices.
16      A.  Okay.
17      Q.  And would you have read these best
18  practices back in 2004 -- I'm sorry -- 2014,
19  2015?
20      A.  I've -- I've definitely read this
21  document, yes.  So I don't know when I read it,
22  but I've read this document.
23      Q.  Did you push to have initiated any
24  changes in Summit County Children's Services'
25  practices as a response to this listing of best

Page 265

1  practices in Exhibit 2?
2      A.  We -- we made a lot of changes, of
3  course.  I mean, I think some of the best
4  practices that are mentioned here are related to
5  court.  We do have a court -- there are actually,
6  in Summit County, a number of different types of
7  drug courts in all of the courts.  But in our
8  juvenile court, there was a family reunification
9  recovery court.
10      We did participate in that initiative
11  with the court, a specialized docket for our --
12  our clients who were assessed to have substance
13  use disorders of any kind.
14      They were serviced in our agency by a
15  specific unit of staff.  The substance abuse
16  intervention unit would service those cases that
17  were handled through the family reunification
18  through recovery court.  So we have participated
19  extensively in that program.
20      We have --
21      Q.  Can I just stop you there for a
22  second --
23      A.  Sure.
24      Q.  -- because I want to make sure we're
25  talking about the same time frame.

67 (Pages 262 - 265)

Page 266

1    A.  Okay.
2    Q.  So if you can --
3    A.  Uh-huh.
4    Q.  -- back in 2014, did you initiate any
5  changes in practices as a result of the best
6  practices in Exhibit 2?
7        MS. FLOWERS:  Object to the form.
8        THE WITNESS:  I don't know that I can
9  say that anything is specifically as a result of
10  this white paper.  We've initiated changes on a
11  regular basis.  So I -- I don't see anything here
12  that we either weren't already doing or planning,
13  so . . .
14  BY MR. ALEXANDER:
15    Q.  Same thing for 2015.  Were there any
16  changes that were made in 2015 as a result of
17  anything in Exhibit 2?
18    A.  I don't know.  Again, as a result of
19  this exhibit, I can't say that, no.
20    Q.  Same answer for 2016?
21    A.  Yeah.
22    Q.  And the changes that you were talking
23  about that have been made in terms of --
24  obviously, START hasn't even started yet, but the
25  stuff that you identified in terms of court

Page 267

1  programs, have those all been 2017 and later?
2        MS. FLOWERS:  Object to the form.
3        THE WITNESS:  The family reunification
4  through recovery court program started probably
5  in 2013.
6  BY MR. ALEXANDER:
7    Q.  So before this?
8    A.  Before this.
9    Q.  So it didn't result in changes after
10  this?
11    A.  I said no, I think.
12    Q.  Okay.  So do you -- all right.
13        If you go to the next page, Page 7,
14  "Summary and Recommendations," there's a -- a
15  bullet list about --
16    A.  I'm not sure I'm on the right page.
17  That -- Page 7?
18    Q.  At the top it will say "Summary and
19  Recommendations."
20    A.  Okay.
21    Q.  It will be Page 7.  The Bates number
22  ends in -53, ma'am.
23    A.  -53?
24    Q.  -53.
25    A.  -53.

Page 268

1    Q.  I said, "-53, ma'am."  It probably
2  confused you.
3    A.  Sorry.  I didn't hear you.
4        Okay.  Yes.  I'm -- I'm there.
5    Q.  I'll just read it.  Under "Summary and
6  Recommendations," it says, "Ohio's opiate
7  epidemic is of such grave concern that during the
8  first 100 days in office, Governor Kasich created
9  a Cabinet-level Opiate Task Force.  Since that
10  time, new policies, investments and initiatives
11  have begun.  These include," and then it's a --
12  there are five bullets, all talking about
13  funding.
14        Do you see that?
15    A.  I do.
16    Q.  Did you guys get any additional funding
17  as a result of any of this?
18        MS. FLOWERS:  Object to the form.
19        THE WITNESS:  I'm unaware of any of this
20  funding -- these funding sources going directly
21  to any children's services agency or to us, so
22  no.
23  BY MR. ALEXANDER:
24    Q.  Specifically for Summit County, the --
25  the five bullets here are talking about increased

Page 269

1  funding to address what's described here as
2  opiate epidemic in Ohio didn't result, as far as
3  you know, in an additional dollar coming to
4  Summit County Children's Services, correct?
5        MS. FLOWERS:  Object to the form.  Lack
6  of foundation.
7        THE WITNESS:  I -- I don't believe so.
8  BY MR. ALEXANDER:
9    Q.  Would you have liked to have gotten some
10  money --
11        MS. FLOWERS:  Object.
12  BY MR. ALEXANDER:
13    Q.  -- as part of these initiatives, some
14  increased funding?
15    A.  Well, certainly.  Again, I just -- I
16  don't -- like medication-assisted treatment, for
17  example, we don't provide that.  So I'm assuming
18  that money would have gone to mental health
19  boards, which ultimately might have had a
20  positive impact for our clients.  But that
21  initiative wouldn't run through our agency.
22        It looks like money went to hospitals.
23  So, you know, this money didn't go to children's
24  service agencies.  But, yes, I would love to have
25  had any money they would have given me, so . . .

68 (Pages 266 - 269)

Page 270

1    Q.   Right.  In the discussion of increased
2  money being spent, and I guess it was touted at
3  this time back in 2014 in terms of what the state
4  was doing --
5    A.   Uh-huh.
6    Q.   -- whatever money was being spent, none
7  of it was coming to you?
8        MS. FLOWERS:  Object to the form.
9        THE WITNESS:  None of this money here
10  came to us, to my knowledge.
11  BY MR. ALEXANDER:
12    Q.   Well, none of the funding that came out
13  of this task force came to you at all, whether
14  it's described in these five bullets or not?
15        MS. FLOWERS:  Object to the form.
16        THE WITNESS:  Not directly, so . . .
17  You know, maybe indirectly, but I -- I guess I
18  don't know that I know that, so I can't speak to
19  it.
20        I -- you know, there have been
21  initiatives here and there where we've got
22  support through our mental health board that may
23  have been money that came from this, but I -- I
24  don't have any connection to where the money
25  comes from.

Page 271

1  BY MR. ALEXANDER:
2    Q.   So the last bullet talks about something
3  called a MOMS program, Maternal Opiate Medical
4  Support Project --
5    A.   Uh-huh.
6    Q.   -- which is money in hospitals in
7  connection, I believe, with delivery of children
8  and, like, additional treatment provided for the
9  mother who is addicted to some drug at the time
10  of delivery.
11        Is that your understanding of the MOMS
12  program?
13        MS. FLOWERS:  Object to the form.
14        THE WITNESS:  Yes.  I mean, I -- I
15  think, perhaps, it is not only at time of
16  delivery but to help mothers who have addiction
17  when they're pregnant as well, so yeah.
18  BY MR. ALEXANDER:
19    Q.   And does that inure to your department's
20  benefit at all, that kind of money, or -- meaning
21  that you don't have to spend money on treating
22  mothers with addiction?
23    A.   I believe Summit County has a MOMS
24  program.  I don't know if they receive this money
25  or not.  But, certainly, any services that other

Page 272

1  organizations in the community are able to
2  provide to our clients who are suffering from an
3  addiction would benefit our agency and our
4  clients, absolutely.
5    Q.   So what's after this is kind of a recap
6  of the best practices --
7    A.   Okay.
8    Q.   -- that we've gone over, right?  There
9  are five they list here.  We've gone over whether
10  you initiated any changes as a result of any of
11  this, correct?
12    A.   That's right.  Uh-huh.
13    Q.   From your perspective, was there more
14  that could have been done on a statewide level,
15  either by funding or other programs back starting
16  in 2014 to alleviate or minimize the impact of
17  heroin and opiate abuse on Summit County
18  Children's Services --
19        MS. FLOWERS:  Objection to the form.
20  BY MR. ALEXANDER:
21    Q.   -- your clients?
22    A.   Well, I -- I certainly think our funding
23  has been an issue and was an issue and continues
24  to be an issue from the state level.  So I would
25  like to have seen the state respond more in terms

Page 273

1  of our state funding allocation.
2    Q.   And what about the federal government
3  side?  Do you wish there would have been more
4  done on the federal government side back in this
5  time period to help?
6    A.   We don't -- I mean, our federal funding
7  is -- doesn't necessarily work that way, so we
8  don't get an allocation specifically for
9  something like this or services.  It's really
10  more of a reimbursement primarily for the
11  placement of children and the administrative
12  costs.  So that's the only federal funding that
13  we have ever received other than a grant
14  specifically that we applied for.
15        - - -
16        Thereupon, Exhibit 3 was marked for
17        purposes of identification.
18        - - -
19  BY MR. ALEXANDER:
20    Q.   Okay.  I've marked an e-mail chain as
21  Exhibit 3, and there's a copy for plaintiffs'
22  counsel.  It's SUMMIT_001911402 to -403.  There's
23  an attachment to it that is not consecutively
24  numbered, but it's actually part of it, is the
25  way these documents are structured.

69 (Pages 270 - 273)

1      If I can hand that to you to put with
2  it.  That too.  Let me give you -- if you don't
3  mind -- I'm sorry.  I just have to give you
4  that --
5      A.  Okay.  Uh-huh.
6      Q.  -- so that those going together.
7      A.  All right.
8      Q.  Do you see your name on the top of the
9  e-mail September 15th, 2017, sent to Katerina
10  Papas?
11     A.  Yes, I do.
12     Q.  Okay.  And do you recall the attachments
13  to this e-mail?
14     A.  "The attachments" meaning the letter to
15  the president?
16     Q.  Yeah.  And then there's a -- so
17  there's a -- there's a short version of a letter.
18     A.  Okay.  Uh-huh.
19     Q.  And then there's a long version where
20  your name is ended at the end --
21     A.  Yes.
22     Q.  -- your name is added with a whole bunch
23  of other folks.
24     A.  I see that, yes.
25     Q.  It looks like the letter is pretty much

1  the same, though.
2      A.  Yes.
3      Q.  So your letter to Ms. Papas asks her "Do
4  you see any reason I could not sign this on
5  behalf of the agency.  If I thought it was at all
6  controversial, I would want board approval, but I
7  cannot imagine the board would not agree.  What
8  do you think?"
9          Do you see that?
10     A.  I do.
11     Q.  Do you know what her response was?
12     A.  Well, obviously, that's not here, but I
13  believe she agreed with me that this was an
14  appropriate thing to sign and did not need board
15  approval because I don't believe we did take that
16  to the board, is my recollection.
17     Q.  And at the bottom of the cover e-mail
18  from Darlene Migas of ADM board -- that's the
19  Alcohol, Drug Addiction & Mental Health Services
20  Board of Summit County.
21         Do you see that?
22     A.  I do.
23     Q.  We were talking about that acronym
24  earlier, right?
25     A.  Right.  And I couldn't come up with it.

1  Yes, that's it.
2      Q.  You were close.
3          So at the bottom of this, it says, "I
4  will submit the letter with all authorized
5  signatures, and will also post the letter on the
6  Opiate Task Force Website."  And it gives a -- a
7  website address for that.
8          Do you see that?
9      A.  I do.
10     Q.  And by this time, were you participating
11  in the Opiate Task Force?
12     A.  I always -- I -- I don't generally go to
13  the Opiate Task Force meetings.  I've been to
14  probably a few.  But I am always aware of what
15  they're doing.  I get their e-mails.  I get their
16  newsletter, stuff like that, so yes.
17     Q.  And do you maintain those documents as
18  part of your business records?
19     A.  Not necessarily unless I need them for
20  something.
21     Q.  But are you participating with the task
22  force in an official capacity or personal
23  capacity?
24     A.  I don't really participate in the task
25  force.  I don't regularly attend those meetings.

1      Q.  When you've gone to the meetings or when
2  you get stuff sent to you, is it because you are
3  the executive director of Summit County
4  Children's Services or because of a personal
5  interest outside of your work position?
6      A.  It's because of my role as the executive
7  director of Summit County Children's Services.
8      Q.  So I -- I won't belabor it, but what --
9  what was the gist, from your perspective, of what
10  you wanted the federal government to do here in
11  September of 2017 to help alleviate the effects
12  of what's described as the opiate epidemic?
13         MS. FLOWERS:  Object to the form.
14         THE WITNESS:  Well, according to the
15  letter, we were asking that they would -- the
16  president would declare a public health emergency
17  with the goal, ultimately, of having some funds
18  to help with the opiate epidemic.
19  BY MR. ALEXANDER:
20     Q.  And we talked about how you had been
21  aware for a while that, from your perspective,
22  the state funding for Summit County Children's
23  Services was not sufficient from your
24  perspective, and that you thought that increased
25  funding would have been helpful to address the

Page 278

1  impact of heroin abuse and other aspects of
2  what's been described as the opiate epidemic.  Do
3  you remember that?
4     A.  Yes.
5        MS. FLOWERS:  Objection.
6        THE WITNESS:  Uh-huh.
7  BY MR. ALEXANDER:
8     Q.  Did you have a similar view about
9  federal government funding or involvement, that
10  more could have been done before September of
11  2017 to help nip this in the bud or limit the
12  effects on the children that were your clients?
13     A.  Generally, I would say yes.  But I --
14  you know, I'm probably not the right person to
15  ask that because we don't -- this funding doesn't
16  come through us.  So, you know, I was really much
17  more focused on our state funding, and that had a
18  direct impact on us.
19        My involvement when the -- with this
20  would be more from a community perspective around
21  making sure that those services that clients need
22  are available in the community, so . . .
23     Q.  So I'm asking about your perspective
24  because, you know, we know what your position is,
25  we have some documents from you that you have

Page 279

1  a -- kind of a role in this because the entity
2  that you oversee is part of what the plaintiffs
3  in this case are seeking damages for.
4        So I'm -- I'm asking you, from your
5  perspective, whether this was your job or not.
6  What is it you think the federal government
7  should have been doing more in terms of funding
8  or other initiatives to help make things better
9  for the children you believe were affected by
10  heroin abuse and other aspects of the opioid or
11  opiate epidemic?
12        MS. FLOWERS:  Object to the form.
13        THE WITNESS:  I think they needed to do
14  more and provide more funding to get the right
15  services out there, to fund the appropriate
16  organizations adequately.  Yes, I think they
17  needed to do more as well.
18  BY MR. ALEXANDER:
19     Q.  What do you mean "fund the appropriate
20  organizations" or fund them appropriately?
21     A.  Whether that would be through Health &
22  Human Services, through those organizations that
23  would through push funding down to the states.
24  Whether that be through mental health boards,
25  through the Office of Children and Families,

Page 280

1  although we, again, don't necessarily get federal
2  money.  I think this -- this is a good example.
3        They -- eventually, there was some money
4  for the Cures Act, is my understanding --
5     Q.  For --
6     A.  -- that went to the mental health
7  boards.
8     Q.  Did you say Cares Act?
9     A.  Cures.
10     Q.  Cures Act.
11     A.  Uh-huh.
12     Q.  When did you start getting that money?
13     A.  We didn't.  I -- I -- I believe that
14  went to mental health boards.
15     Q.  Has there been any increase in funding
16  that's focused on addressing effects of heroin
17  abuse or opiate abuse that's come from federal
18  sources that you've actually received since you
19  became executive director?
20     A.  Not -- not to our agency, no.
21     Q.  What about more generally in terms of
22  funding that's focused on addressing substance
23  abuse?  Has there been any new money that's come
24  to your agency at all since you became executive
25  director in 2013?

Page 281

1        MS. FLOWERS:  Object to the form.
2        THE WITNESS:  Not specifically unless it
3  was a grant, you know.  So, for example, the
4  START grant that we applied for, we'll get some
5  money for that.  The STARS grant was a federal
6  grant that was already in place, as you know.
7        So, no, I'm not aware of anything.
8  BY MR. ALEXANDER:
9     Q.  Okay.  Do you wish there had been?
10     A.  Sure.  Yes.
11     Q.  Is there something in particular other
12  than just more money would have been better to
13  hire more staff and do more training and have
14  more programs?
15     A.  There's a whole lot of things that I
16  would be able to use money for if I had
17  additional money.  Yeah.
18     Q.  Have you committed that list, kind of
19  the wish list of what would help, to writing?
20     A.  Sure.  Not to writing, no, but I've got
21  it.
22     Q.  You have it in your head?
23     A.  Uh-huh.
24     Q.  I don't know if it would take the rest
25  of our time, but can you give me your wish list?

71 (Pages 278 - 281)

Page 282

1    A.   Well, I could give you the short one.
2    Q.   Sure.  Right.
3    A.   But, you know, I think, you know, we
4  need additional funds, obviously, to staff
5  appropriately.  Our cases are too complex for the
6  caseloads that we currently have, so staffing
7  would be probably first and foremost.
8      But I also think we need to have more
9  foster homes, so we would need more money for
10  recruitment, which is very, very costly.
11     We would need additional dollars to
12  really support our staff internally.  I would
13  love to have a clinical person on staff that they
14  could talk to about their case, to staff their
15  cases.  I would also like someone to deal with
16  their secondary trauma issues in-house.  I think
17  that would be very helpful if they had someone
18  that they could process those things with outside
19  of our EOP program, which is not sufficient.
20  Some additional training for them.
21     But, really, a lot of resources for our
22  clients would be very, very helpful.  We have a
23  significant number of families who are placed
24  with the kinship, relatives or nonblood-related
25  people.  Those people struggle very much with the

Page 283

1  resources to take care of children.  Child care
2  is a very substantial issue for them.  They don't
3  have enough money when they take a child into
4  their home to pay the child care costs that go
5  along with that.  We pay a lot of that for them,
6  but that is limited to some extent on how much of
7  that we can do.
8      So I would love to see some additional
9  support.  I would love to have staff who really
10  are focused very much on the kinship family and
11  they're able to be a support person attached to
12  every kinship provider, but we do not have
13  resources to do that and have not been able to
14  provide that service.
15     I have -- I would love to have a trauma
16  expert on staff.  I guess that would be probably
17  another one.  Our children are very, very
18  traumatized by removal from the home, some of the
19  things they've seen in the home.  We know that
20  childhood trauma has a very, very long-term,
21  negative impact on children.  And I am extremely
22  worried about what we don't know yet about what's
23  going to happen with the children who have been
24  traumatized by what's happened to them in their
25  homes.

Page 284

1      I think that the sooner we can address
2  the childhood trauma for children, the better off
3  we're going to be because that is a long-term
4  issue for those children.  It's a long-term
5  resource issue that is an unknown factor at this
6  point.
7      So that's a few.
8    Q.   Is that the short list?
9    A.   That's the short list.
10    Q.   Have you proposed that to anybody of
11  saying, "Here are the things I would like"?
12    A.   No, not particularly.  I mean, there are
13  certain pieces of that that I have proposed and
14  had discussions with my board, but not all of
15  those because I think that they are not a
16  reality; at least, they have not been.  So I
17  think, you know, now that we have our levy
18  passed, we will look at, you know, pieces and
19  parts of that and what are the most critical.
20     I certainly could not afford to do all
21  of those with the levy increase that we have, but
22  I think that we will try to implement a few
23  things, particularly the resources for kinship
24  families, because I think that's very critical,
25  and really looking at our recruitment of foster

Page 285

1  homes and increasing the staff to some extent.
2    Q.   Do you have a price tag for any or all
3  of those measures?
4      MS. FLOWERS:  Object to the form.
5  BY MR. ALEXANDER:
6    Q.   How much it would cost to do them?
7    A.   Oh.
8      MS. FLOWERS:  Same objection.
9      THE WITNESS:  I -- I have not done a
10  financial analysis on how much each of those
11  things would cost, so no.
12         - - -
13     Thereupon, Exhibit 4 was marked for
14     purposes of identification.
15         - - -
16  BY MR. ALEXANDER:
17    Q.   Okay.  I think this will not take long.
18  I have Exhibit 4 for you, which is a two-page
19  e-mail, SUMMIT_001911463 through -464.  And
20  there's a copy for plaintiffs' counsel.
21     And if we -- we start at the back of
22  this, the e-mail chain starts July 5th, 2017.
23    A.   Okay.
24    Q.   So, essentially, two months before the
25  one we were just looking at that was the letter

72 (Pages 282 - 285)

Page 286

1 to President Trump.
2    A.  Okay.
3    Q.  Do you see that?
4    A.  Uh-huh.
5    Q.  Okay.  And the subject is an "Opioid
6 Survey."  Do you see that?
7    A.  I do.
8    Q.  And we've -- we've talked about whether
9 certain data was generated in connection with
10 opioid surveys that PCSAO was requesting at
11 different points in time.  You remember that
12 discussion?
13    A.  Yes.
14    Q.  Okay.  So first e-mail is from Amy
15 Davidson to Brady Stewart, copying -- copying
16 Elizabeth Mangon?
17       And we talked about Ms. Davidson,
18 correct?
19    A.  Correct.
20    Q.  And who is Brady Stewart and who is
21 Elizabeth Mangon?
22    A.  Brady Stewart is in our quality
23 improvement department.  He is primarily our
24 SACWIS person.  And he -- so he runs reports for
25 us and those kinds of things that come out of our

Page 287

1 quality improvement department.
2       Liz Mangon is the director of the
3 quality improvement department.
4    Q.  So I gave her a French pronunciation to
5 her last name.  It's just "Mangon"?
6    A.  "Mangon."
7    Q.  Okay.  All right.  So, ultimately,
8 Mr. Stewart writes back to Ms. Davidson later
9 that morning, sends her a spreadsheet about 466
10 removals in 2016 where there was a reunification
11 case plan that had substance use documented as a
12 concern/risk contributor.  Do you see that?
13    A.  Yes.
14    Q.  It's the bottom of the first page.
15    A.  Bottom of the first page.  Uh-huh.  Yes.
16    Q.  Okay.  And is that tied to what we were
17 talking about earlier in terms of looking at
18 people who had a -- a plan in place that
19 identified substance use?
20    A.  Right.  Yes.  Uh-huh.
21    Q.  And do you know if this was done in
22 connection with responding to a PCSAO opioid
23 survey?
24    A.  I believe that's what this is for, yes.
25    Q.  So it continues, "For those cases" -- so

Page 288

1 out of however many cases there were with a
2 removal in place, there were 466 that had
3 something about substance use as a concern or
4 risk contributor, correct?
5    A.  Correct.
6    Q.  Okay.  It said, "For those cases, I
7 wrote code to programatically pull the Drug Type
8 ('drug choice') from both the linked intakes and
9 parental Characteristics.  Out of 242 cases, we
10 had to physically look at 41 cases to find a
11 documented drug type."
12       Do you know what he means by that?
13       MS. FLOWERS:  Object to the form.
14       THE WITNESS:  I'm not sure what he means
15 by that, no.
16 BY MR. ALEXANDER:
17    Q.  Does that suggest an issue with the data
18 that's in SACWIS of needing to go physically look
19 at case files?
20       MS. FLOWERS:  Object to the form.
21       THE WITNESS:  I -- I -- I guess that
22 what he means is that when he looked at the
23 parental characteristics, he did not see it
24 there.  So he looked into those 41 cases because
25 he knew there was a substance abuse issue, but it

Page 289

1 wasn't identified.
2 BY MR. ALEXANDER:
3    Q.  When you say "looked into," means looked
4 at the --
5    A.  He looked --
6    Q.  -- actual file, case file?
7    A.  -- at the actual file then.
8    Q.  So in 2017, after the various efforts to
9 upgrade, make more robust the data that's in
10 SACWIS, there's still issues where the specific
11 drug is not specified for some portion of the
12 cases, correct?
13       MS. FLOWERS:  Object to the form.
14       THE WITNESS:  I -- I don't -- I don't
15 know.
16 BY MR. ALEXANDER:
17    Q.  I mean, it says that, basically,
18 one-sixth of the cases they identified didn't
19 have the drug specified without going back to the
20 case file?
21    A.  Right.
22       MS. FLOWERS:  Objection to the form.
23       THE WITNESS:  It wasn't -- sorry.  It
24 wasn't specified in that place in the record is
25 what I'm interpreting this to mean, but I -- I

73 (Pages 286 - 289)

Page 290

1 may be wrong about what he means here.
2 BY MR. ALEXANDER:
3     Q.  The -- the drug choice wasn't specified
4 in the database, so he had to go to the actual
5 case file to try to figure out if they could
6 figure out what the case -- what the drug of
7 choice was?
8         MS. FLOWERS:  Object to the form and
9 characterization.
10 BY MR. ALEXANDER:
11     Q.  Is that what it's saying?
12         MS. FLOWERS:  Objection.
13         THE WITNESS:  It -- it would still be in
14 the case -- it would still be in the database.
15 I -- I'm -- I believe -- and, again, I'm trying
16 to interpret a sentence that I didn't write, so I
17 don't know -- but I believe he probably, when he
18 looked at -- he says he looked at parental
19 characteristics, and of those cases, he had to
20 look at 41 for the documented drug type.
21         So if he went to parental
22 characteristics and didn't find a drug type but
23 he knew there was a substance use issue already
24 identified, he knew that it had to be somewhere
25 else, so he looked at another field.  And I don't

Page 291

1 have any idea where he looked or what he looked
2 at.
3 BY MR. ALEXANDER:
4     Q.  Well, it doesn't say "look."  It said
5 "physically look."  Do you know if that means
6 here that -- look at a -- case file, not just
7 at the database?
8         MS. FLOWERS:  Objection to the form of
9 the question.  The document speaks for itself.
10         THE WITNESS:  "Physically look," to me,
11 would mean he went into the record, the case
12 record, in some place in the case record.
13 BY MR. ALEXANDER:
14     Q.  Okay.  So it says 266 opioid removals or
15 27 percent of the total of 980 removals for 2016.
16 Do you see that?
17     A.  I do.
18     Q.  And then Ms. Davidson writes to you,
19 again later that morning, and says, "I think this
20 is the best data we have been able to come up
21 with so far to represent the impact of the opioid
22 epidemic."  Do you see that?
23     A.  Yes.
24     Q.  And by "best data," do you know what she
25 meant?

Page 292

1     A.  I believe I do.  I think we talked about
2 how we wanted to pull this so that we could be as
3 accurate as possible.  I think we believe this to
4 be an under-represented number, but it's an
5 accurate number.
6         So short of, you know, going into every
7 record and then really having to pull it out of a
8 variety of different fields or somehow analyze by
9 comparing those fields, we knew that if we pulled
10 it out of this particular area, that we would be
11 able to provide accurate data.
12     Q.  Okay.  So you feel that this measure,
13 looking at the removals with a reunification case
14 plan that have substance use documented as a
15 concern or risk contributor is an accurate way to
16 track this over time to see the impact of the
17 opioid or opiate epidemic on your group's
18 function, correct?
19         MS. FLOWERS:  Object to the form.
20         THE WITNESS:  I don't know that I can
21 speak to over time.  I think that, at this point,
22 we felt like this was the most accurate place to
23 pull this from.
24 BY MR. ALEXANDER:
25     Q.  Okay.  And that -- we know that this

Page 293

1 same sort of a calculation was done for 2017, so
2 you could compare --
3     A.  Right.
4     Q.  -- 2016 and 2017, right?
5     A.  Yes --
6         MS. FLOWERS:  Objection.
7         THE WITNESS:  -- I believe so.
8 BY MR. ALEXANDER:
9     Q.  And you thought that was a meaningful
10 comparison?
11         MS. FLOWERS:  Objection.
12         THE WITNESS:  Yes, I -- I do.
13 BY MR. ALEXANDER:
14     Q.  And if that had been available for prior
15 years, you think it also would have been a -- a
16 meaningful comparison subject to concerns about
17 pre-2016 SACWIS data when it comes to drug
18 choice, correct?
19         MS. FLOWERS:  Object to the form.
20         THE WITNESS:  I -- I don't know that
21 because I think that parental characteristics was
22 a place where we started trying to use to
23 identify the drug type.  So I don't know that, if
24 you looked at it historically, that you would
25 necessarily get as accurate data or as thorough

74 (Pages 290 - 293)

Page 294

1 of data because I don't know that the staff were
2 putting it in there consistently in that place.
3 BY MR. ALEXANDER:
4     Q.  Okay.  So when we talk about opioid
5 usage in here, that means that opiates --
6 opioids, as described here, meaning opioids,
7 opiates, including illegal drugs like heroin,
8 were at least one of the drugs that was
9 identified, correct?
10     MS. FLOWERS:  Objection to the form.
11     THE WITNESS:  Yes, I believe that's what
12 it means.
13 BY MR. ALEXANDER:
14     Q.  Okay.  There's nothing where it says
15 it's the sole drug or it's the primary drug,
16 correct?
17     MS. FLOWERS:  Objection.
18     THE WITNESS:  I don't understand the
19 question.
20 BY MR. ALEXANDER:
21     Q.  It's -- the 57 percent means that
22 there's some mention of what's described here as
23 opioid use in the record, correct?  They may also
24 have been using cocaine, they may have also been
25 using marijuana, they may have been using a

Page 295

1 variety of things, but one of these -- whatever
2 counts as an opioid here was one of what they
3 were using, correct?
4     MS. FLOWERS:  Object to form and
5 foundation.
6     THE WITNESS:  Yes.  They -- they may
7 have been using other drugs as well.
8 BY MR. ALEXANDER:
9     Q.  Okay.  There's no judgment in here when
10 it says that these are opioid use cases, that
11 opioid use was what was driving the issues or the
12 removal or even the primary drug of abuse,
13 correct?
14     MS. FLOWERS:  Objection.  Form and
15 foundation.
16     THE WITNESS:  This is -- this particular
17 data here is not specifically talking about
18 removal reason.  There's certainly a different
19 code for removal reason.  But removal reason is
20 not always related to substance use because we
21 don't often know at the time of removal that
22 substance use is the underlying issue.
23     So we might remove the child because the
24 parents left the child home alone or didn't feed
25 the child or, you know, neglected the child,

Page 296

1 basically, but we don't know at the time of
2 removal that that is a result of -- the reason --
3 underlying reason being that there's a substance
4 use issue.  So that's why we don't pull it based
5 on removal reason because often, at removal, you
6 don't know.
7 BY MR. ALEXANDER:
8     Q.  Okay.  So this may be little parts of
9 this because I think there are a couple of things
10 built in.  This 27 percent of removals have some
11 opioid use, it doesn't mean that they're -- the
12 removal is due to opioid use, correct?
13     MS. FLOWERS:  Object to the form.  Lack
14 of foundation.
15     THE WITNESS:  No.  I think what it means
16 is that opioid use was an issue, a factor, in the
17 removal.
18 BY MR. ALEXANDER:
19     Q.  Okay.  But not necessarily the reason,
20 correct?
21     MS. FLOWERS:  Object to the form.
22     THE WITNESS:  Not necessarily.  It
23 wouldn't be documented that way, certainly.  But,
24 you know, I would just tell you from my
25 experience that if opioid use or abuse is a

Page 297

1 factor, that is typically the primary reason that
2 a child is removed.
3 BY MR. ALEXANDER:
4     Q.  And the --
5     A.  Whether it comes out as abuse or
6 neglect, the real reason is because the parent
7 has an opiate addiction.
8     Q.  And what's that impression based on?
9 Just you've -- what you've seen --
10     A.  Just --
11     Q.  -- what you've seen and heard in
12 general, or some specific analyses?
13     A.  No.  I mean, I think it's really based
14 on a lot of years of watching casework and
15 knowing what we -- when we go to court and we
16 talk about the cases, for example, it might not
17 be the issue that comes up at the time of removal
18 but it's certainly at the time when we get, say,
19 the case disposition, we know then that there is
20 a bigger issue than the fact that the children
21 were left home alone.
22     So we may have removed because the
23 children were left home alone but, ultimately,
24 the real reason those children were removed was
25 because of the opiate use.

75 (Pages 294 - 297)

Page 298

BY MR. ALEXANDER:

1  Q.  So you said "opiate" just now.  It says
2  "opioid" here.  Do you know, does heroin count in
3  here, does --
4  A.  I'm using the terms interchangeably
5  because I don't have data that's separating them
6  out.
7  Q.  Okay.  So do we know what percentage or
8  what part of the 27 percent here actually
9  involved prescription opioids being used legally
10  by somebody with a prescription to receive them?
11  MS. FLOWERS:  Object to form.
12  THE WITNESS:  I don't --
13  MS. FLOWERS:  Asked and answered.
14  THE WITNESS:  I don't know.
15  MS. FLOWERS:  We've been going about two
16  hours.
17  MR. ALEXANDER:  The tape's about to end,
18  and I'm just --
19  MS. FLOWERS:  Okay.
20  MR. ALEXANDER:  -- finishing this
21  document.
22  MS. FLOWERS:  Okay.
23  MR. ALEXANDER:
24  Q.  Do you -- do you expect that the vast

1  BY MR. ALEXANDER:
2  Q.  So you said "opiate" just now.  It says
3  "opioid" here.  Do you know, does heroin count in
4  here, does --
5  A.  I'm using the terms interchangeably
6  because I don't have data that's separating them
7  out.
8  Q.  Okay.  So do we know what percentage or
9  what part of the 27 percent here actually
10  involved prescription opioids being used legally
11  by somebody with a prescription to receive them?
12  MS. FLOWERS:  Object to form.
13  THE WITNESS:  I don't --
14  MS. FLOWERS:  Asked and answered.
15  THE WITNESS:  I don't know.
16  MS. FLOWERS:  We've been going about two
17  hours.
18  MR. ALEXANDER:  The tape's about to end,
19  and I'm just --
20  MS. FLOWERS:  Okay.
21  MR. ALEXANDER:  -- finishing this
22  document.
23  MS. FLOWERS:  Okay.
24  MR. ALEXANDER:
25  Q.  Do you -- do you expect that the vast

Page 299

1  majority of this is heroin related?
2  MS. FLOWERS:  Objection.  Lack of
3  foundation.
4  THE WITNESS:  I don't know.  I -- I
5  think if you looked at it in terms of a report,
6  it would most likely demonstrate that it was a
7  higher level of heroin than any other opiate.
8  But I think that what we don't know and feel very
9  strongly about is that many of our clients take
10  heroin as a result of formerly being use -- using
11  an -- a prescription opiate.
12  BY MR. ALEXANDER:
13  Q.  And we talked about that earlier --
14  A.  Yes, we did.
15  Q.  -- that issue.
16  And this 27 percent number, do you think
17  this is the most representative number you have
18  for an impact of all of these opiates, opioids,
19  heroin collectively in terms of their impact on
20  the cases in 2006 for Summit County Children's
21  Services?
22  MS. FLOWERS:  Object to the form.
23  THE WITNESS:  I -- I'm not sure I
24  understand the question.
25  BY MR. ALEXANDER:

Page 300

1  Q.  The percent of your cases that involved
2  opioid, opiate, heroin abuse as some sort of at
3  least contributor to what was going on --
4  A.  Uh-huh.
5  Q.  -- do you have a number better than this
6  27 percent number for 2016?
7  MS. FLOWERS:  Object to the form.
8  THE WITNESS:  Better, I -- I -- I don't
9  know that I would say we have a better number.
10  BY MR. ALEXANDER:
11  Q.  More accurate?  More reliable?
12  A.  No.  I --
13  MS. FLOWERS:  Same objection.
14  THE WITNESS:  I think this is accurate
15  and reliable, which is why we used it in this
16  survey.  Because it was the most accurate number
17  and the most reliable number, not necessarily the
18  biggest number or the best number, whatever that
19  means.
20  But I -- I think it was something that
21  we felt that we had good data to show that this
22  was accurate data.  So we probably could have
23  used other sources or other numbers or other
24  combinations of factors.  And if we had done
25  that, these numbers would be higher, would be my

Page 301

1  best guess on that.
2  BY MR. ALEXANDER:
3  Q.  You felt strongly enough about this to
4  use it not just for PCSAO but in press statements
5  and in other presentations that you gave,
6  correct?
7  MS. FLOWERS:  Object to the form.
8  THE WITNESS:  I felt comfortable enough
9  that this was accurate that I could use this
10  data, yes.
11  MR. ALEXANDER:  Why don't we take a
12  break.
13  THE WITNESS:  Okay.
14  THE VIDEOGRAPHER:  Going off the record
15  at 3:24 p.m.
16  (Recess taken.)
17  THE VIDEOGRAPHER:  We're back on the
18  record at 3:44 p.m.
19  BY MR. ALEXANDER:
20  Q.  Ms. Barnes, is there any of your
21  testimony thus far you need to change or
22  supplement in any way?
23  A.  I don't believe so.
24  Q.  And we've been talking about the
25  information that you have based on your personal

76 (Pages 298 - 301)

Page 302

1  knowledge from within your role as executive
2  director of Summit County Children's Services.
3  Are there specific cases or analyses or
4  information that you have that you would want to
5  relay at trial that we have not yet already
6  discussed?
7      MS. FLOWERS: Object to the form.
8      THE WITNESS: I'm not sure. I don't
9  know.
10  BY MR. ALEXANDER:
11      Q.  I didn't hear you.
12      A.  I -- I don't know.
13      Q.  Okay.  Have you -- have you done
14  something where you've -- and I'm not asking
15  about specific discussions with lawyers for the
16  county, but have you done something where you've
17  looked through specific case files or gone back
18  through your own e-mails and own documents to try
19  to figure out what at trial you might want to
20  bring out to illustrate what you think has been
21  the impact of heroin or opiate -- or opioid use
22  on Summit County Children's Services?
23      A.  You know, short of looking at some of
24  the discovery documents, I don't think so, no.
25      Q.  And have you looked at any of the

Page 303

1  discovery responses, the written answers that a
2  party signs and describes their position on
3  certain things or their answers to certain
4  questions?
5      A.  No, I haven't.
6      Q.  Okay.  When you say "discovery
7  documents," you just mean the documents produced
8  from your department?
9      A.  Correct.
10      - - -
11      Thereupon, Exhibit 5 was marked for
12      purposes of identification.
13      - - -
14  BY MR. ALEXANDER:
15      Q.  Okay.  I have marked as Exhibit 1 [sic]
16  an e-mail chain that's on one page,
17  SUMMIT_001911167.
18      And there's a copy for plaintiffs'
19  counsel.  This is Exhibit 5.
20      The subject line is "board report
21  information."  And it starts with something from
22  you to Amy Davidson at the bottom.
23      A.  Uh-huh.
24      Q.  And then she responds, and then you
25  respond.  Is that how the chain goes?  All on the

Page 304

1  same day of March 22nd -- I'm -- March 21st,
2  2018.
3      A.  Yes.
4      Q.  Do you recall the context of having a
5  statement to the board about the portion of
6  hotline calls that involve different types of
7  drugs?
8      A.  No.  I -- I guess I need to read this,
9  so . . .
10      Okay.
11      Q.  So it says that Amy gave a statement to
12  a board.  Do you know what board that would have
13  been?
14      A.  The board of trustees.
15      Q.  Okay.  Not the social services advisory
16  board?
17      A.  No, I -- no.  Amy wouldn't give a report
18  to the social service advisory board.
19      Q.  You do sometimes, right?
20      A.  Yes.
21      Q.  Okay.  Because we haven't talked about
22  that.  That's a -- another board where you
23  sometimes present, and there are minutes
24  generated and reports generated, correct?
25      A.  That's right.

Page 305

1      Q.  And how often are those presentations or
2  those meetings?
3      A.  They're monthly meetings.  They have
4  subcommittee meetings -- various subcommittee
5  meetings as well, so . . .
6      Q.  And like we talked about before, there
7  would be documents generated and maintained in
8  connection with those social services advisory
9  board meetings as well, correct?
10      A.  Correct.
11      Q.  Going back the entire time you've been
12  executive director, correct?
13      MS. FLOWERS: Object to the form.
14      THE WITNESS: I don't necessarily
15  maintain all of those documents, but the social
16  service advisory board does.
17  BY MR. ALEXANDER:
18      Q.  Okay.
19      A.  Yes.
20      MR. ALEXANDER: And, Counsel, just --
21  and I will deal with it after the deposition but,
22  obviously, we reserve all of our right with
23  regard to continuing the deposition based upon
24  the document production issues that have been
25  discovered during the course of the deposition.

77 (Pages 302 - 305)

1      Again, I won't take up our time with
2  that, but this seems like a pertinent time to
3  raise it.
4      MS. FLOWERS:  And I'll put on the record
5  that we believe we've produced all documents for
6  this witness, but we can certainly discuss it
7  afterwards.
8  BY MR. ALEXANDER:
9      Q.  So the statement that you're asking
10  about to the board that Ms. Davidson gave is "Of
11  the Hotline calls screened in for abuse or
12  neglect during February" -- I assume that's 2018.
13      A.  Yes.
14      Q.  -- "67 of the reports had parental or
15  caregiver substance abuse being identified by the
16  referant.  Each of the 67 reports could have
17  multiple drug types identified.  Top drugs were."
18      Let me just pause there, "multiple drug
19  types identified."  And that's similar to what we
20  were talking about in the last document, that
21  there may be more than one drug that's identified
22  in any of these records, correct?
23      A.  Correct.
24      Q.  Okay.  "The top drugs were:  Opiates 36
25  percent" -- do you know what's included in

1  opiates?  Like, does that include heroin?
2  fentanyl? you know, prescription opioids? illegal
3  street drugs that are of the opiate class?
4      A.  That would be --
5      MS. FLOWERS:  Objection.
6      THE WITNESS:  -- all of the above.
7      MS. FLOWERS:  Asked and answered.
8  BY MR. ALEXANDER:
9      Q.  "Marijuana 34 percent; and
10  Methamphetamines 30 percent.  These are calls
11  where substance abuse is alleged, we often find
12  that substance abuse is the underlying cause of
13  the abuse/neglect during or assessment when it
14  has not been reported.  We had 105 more Hotline
15  calls this February, than [in] February of 2017."
16      And you asked, "Can you tell me the
17  total number of calls screened in for February so
18  the 67 reports identifying substance abuse has
19  some perspective?"
20      Did I read that right?
21      A.  Yes.
22      Q.  So you wanted to know, of 67 reports
23  with substance abuse identified by the referent,
24  the person on the phone, out of how many calls
25  was that in February of 2018, correct?

1      MS. FLOWERS:  Object to the form.
2      THE WITNESS:  I was asking her how many
3  calls there were in February.
4  BY MR. ALEXANDER:
5      Q.  Right.  So the 67 calls in February with
6  substance abuse described was out of 279 calls.
7  So 24 percent, about a quarter of the calls.
8      Do you see that?
9      MS. FLOWERS:  Object to the form.
10      THE WITNESS:  Yes.  Uh-huh.
11  BY MR. ALEXANDER:
12      Q.  Okay.  And then of those, 36 had some
13  opiate use, all -- all potential types of opiates
14  with or without other drugs.  That's 36, so it
15  means 24 of those 67 reports had opiates as
16  described, right?  I can just tell you that's the
17  math.
18      A.  Looks roughly like that's the math, yes.
19      Q.  It's the exact math.
20      A.  Okay.
21      Q.  And so that 24 of 279 is 8.6 percent,
22  meaning 8.6 percent of the calls that came in,
23  the referent talks about opiate substance abuse
24  along with, potentially, other drugs.  Do you see
25  that?

1      MS. FLOWERS:  Object to the form.
2  BY MR. ALEXANDER:
3      Q.  Again, that's how the math works, 24 out
4  of 279.
5      A.  If your math is correct, that's right.
6      Q.  Does that sound to be accurate to you,
7  that in February of 2018, we're down to substance
8  abuse involving broad class of opiates described
9  as being less than 10 percent of all calls coming
10  in?
11      MS. FLOWERS:  Object to the form of the
12  question.  Lack of foundation.
13      THE WITNESS:  I don't know that I have a
14  good perspective on that because we have really
15  only been tracking this data at the hotline,
16  really, I think for about a year maybe.  That was
17  a SACWIS change that occurred for 2017.  And Amy
18  had not necessarily reported this information to
19  me on a regular basis, which is one reason why I
20  had to ask a question.
21      And this was -- this was a report that
22  she -- she -- this was just something she
23  e-mailed me, I believe, to put in the board
24  report.  So if I have to speak to it in a board
25  report, I just needed to clarify it.

78 (Pages 306 - 309)

Page 310

1    But I -- I don't know what the history
2 would have been or could have been or how long we
3 were tracking it at the hotline.  So this is just
4 what the reporter would say at the hotline.
5 So -- so it's not a global who -- how many
6 families are using opiates.  This is a -- this is
7 something a reporter believes as part of an
8 allegation only.
9 BY MR. ALEXANDER:
10    Q.  Which is typically the starting point
11 for opening a file, correct?
12    A.  Yes.
13    Q.  Okay.  So we talked about the role of
14 these hotline calls.
15    A.  Yeah.
16    Q.  But if less than 20 -- less than
17 10 percent, this 8.6 percent, at least for
18 February of 2018 --
19    A.  Right.
20    Q.  -- involve some allegation of opiate use
21 with or without other drugs, is that lower than
22 you would expect for this time period?
23    MS. FLOWERS:  Object to the form.
24    THE WITNESS:  Not necessarily because I
25 don't think the hotline caller really knows if

Page 311

1 people are using substances or not.  That's
2 generally -- I mean, sometimes they call and say,
3 "Hey, you know, my next-door neighbor is -- is
4 using heroin or something," but, generally,
5 they're calling to say, "The kids are left home
6 alone."  They're not necessarily calling to
7 report substance use.
8 BY MR. ALEXANDER:
9    Q.  Would you like this number to be
10 dropping, the percentage of -- well, let me ask
11 it the other way.  If -- if it was that
12 80 percent of calls identified substance abuse of
13 some sort instead of the 24 percent here,
14 wouldn't that be concerning?
15    A.  That would --
16    MS. FLOWERS:  Object to the form.
17    THE WITNESS:  That would be very
18 concerning.
19 BY MR. ALEXANDER:
20    Q.  And if it wasn't 8.6 percent but
21 50 percent that involved some description of
22 opiate use as part of what the hotline caller is
23 calling about, that would be concerning, right?
24    MS. FLOWERS:  Object to the form.  Calls
25 for speculation.

Page 312

1    THE WITNESS:  Obviously, any number from
2 a reporter is concerning to me because if you're
3 getting it at that point, generally, again, my
4 experience is that they don't know what the
5 underlying issues are with the family.  They're
6 really calling to report other factors of abuse
7 or neglect.
8    So the fact that even 8 percent of
9 people are -- have enough knowledge to know that
10 there's an opiate use of some kind that
11 constitutes abuse or neglect, I think, is
12 concerning.  And probably it's more of a
13 professional reporter that would have that type
14 of information.
15 BY MR. ALEXANDER:
16    Q.  So sometimes the people reporting are,
17 like, health care professionals or school
18 administrators --
19    A.  Right.
20    Q.  -- or other professionals?
21    A.  That's right.
22    Q.  Okay.  So if 6 months earlier the number
23 was higher or 12 months earlier the number was
24 higher than this 8.6 percent, that's a good
25 trend, right, for this number to drop?

Page 313

1    MS. FLOWERS:  Objection.  The document
2 speaks for itself.
3    Go ahead and try to answer.
4    THE WITNESS:  I would -- I would want to
5 look at a trend before I would say it's a trend,
6 more than one month to one month, but --
7 BY MR. ALEXANDER:
8    Q.  If it's dropped compared to six months
9 earlier or a year earlier, that would be the --
10 the trend in the direction you would want it,
11 correct?
12    MS. FLOWERS:  Object to the form.
13    THE WITNESS:  If it's a trend, yes,
14 definitely.
15       - - -
16    Thereupon, Exhibit 6 was marked for
17       purposes of identification.
18       - - -
19 BY MR. ALEXANDER:
20    Q.  Okay.  So I've marked as Deposition
21 Exhibit 6 a three-page document, SUMMIT_000171798
22 to -1800.
23    There's a copy for you and a copy for
24 plaintiffs' counsel.
25    And we were just talking about the

79 (Pages 310 - 313)

Page 314

1  social services advisory board meetings.  This
2  was a meeting of the Summit County Public Health
3  from January 25th, 2017, and you're identified as
4  being present.
5      Do you see that?
6  A.  Yes.
7  Q.  And are you on any of the -- the
8  committees?
9  A.  I am on the health and human services
10  committee.
11  Q.  And if you see on the second page,
12  there's a discussion of a presentation by the
13  health and human services committee, including
14  some discussion about tracking the opiate
15  epidemic and the Affordable Health Care Act
16  repeal/replace.
17      Do you see that about three-quarters of
18  the way down the second page right after the --
19  right after where it says that "your subcommittee
20  met on January 12th?
21  A.  Oh.  Okay.
22  Q.  Do you see what I'm talking about?
23  A.  Not yet.
24  Q.  Do you want me to point you to it?
25      On the second page it says, "Health and

Page 315

1  Human Services Committee."  It's underlined.
2  Then it says that committee met on January 12th.
3  A.  Uh-huh.
4  Q.  Two paragraphs down from there --
5  A.  Okay.
6  Q.  -- it says, "items identified by HHS to
7  keep a pulse on."  And it says, "The opioid --
8  opiate epidemic and the Affordable Health Care
9  Act repeal/replace."
10  A.  Yes.
11  Q.  Do you see that?
12  A.  I see that.  Uh-huh.
13  Q.  And that indicates to you that this is
14  another forum where you would have had
15  discussions about the impact of heroin abuse and
16  opiate abuse on children's services and the
17  broader issue of -- of public health, correct?
18  A.  Correct.
19  Q.  Okay.  Under the "Executive Committee,"
20  it starts -- it says that met a week earlier, on
21  January 18th, to set the agenda for the board
22  meeting and prepare for a meeting with Eileen
23  Shapiro on January 23rd.
24      Who's Eileen Shapiro?
25  A.  The County of Summit executive.

Page 316

1  Q.  Right after that, it says, "John Saros
2  has submitted his resignation to Ilene Shapiro
3  and he has been replaced by Sadie Winlock who is
4  the CEO and President of the Akron Urban League."
5      Do you know what the resignation was?
6  MS. FLOWERS:  Object to the form.
7  THE WITNESS:  John Saros was appointed
8  to the Social service advisory board, and he
9  resigned from that position.
10  BY MR. ALEXANDER:
11  Q.  Did he resign from other positions
12  within the -- within Summit County at this time
13  too?
14  A.  I'm not aware if he was on any other.
15  Q.  Okay.  If you go down to -- a couple
16  paragraphs down, it says, "Ms. Shapiro was
17  invited to the strategic planning retreat in
18  June."
19      Did that happen, the strategic planning
20  retreat?
21  A.  Yes, it did.
22  Q.  Did you go to that?
23  A.  Yes, I did.
24  Q.  Was there any discussion about dealing
25  with opioids or opiates or heroin abuse?

Page 317

1  MS. FLOWERS:  Object to the form.
2  THE WITNESS:  I believe so, but there
3  was -- it was extensive discussion about all
4  kinds of community issues, so . . .
5  BY MR. ALEXANDER:
6  Q.  Did any plan or plan of action come out
7  of that retreat?
8  A.  Yes.
9  Q.  Do you have documents about that?
10  A.  I don't know.
11  Q.  Where would they be?
12  A.  They would be -- social service advisory
13  board would be the -- through Summit County
14  Public Health would be the holder of those
15  documents.
16  Q.  So, like, the meeting in June or July
17  would have described this in the minutes?
18  A.  Potentially.  Typically, they create,
19  like, a strategic plan out of those meetings, so
20  there's some document that would be the strategic
21  plan for the Social service advisory board.
22  Q.  Would it have been sent to you by e-mail
23  or in hard copy?
24  A.  Probably.
25  Q.  Do you still have that somewhere?

80 (Pages 314 - 317)

Page 318

1    A.  I don't know.
2    Q.  You haven't looked, have you?
3        MS. FLOWERS:  Object to the form and to
4    the question.
5        THE WITNESS:  I -- I didn't look for
6    that specifically, no.
7    BY MR. ALEXANDER:
8    Q.  Okay.  So the next paragraph says,
9    "Sandy Selby and Elaine Harlin updated the County
10   Executive about the role and activities of the
11   Health and Human Services Committee.  There was
12   [a] general discussion about the opiate epidemic
13   and thinking outside the box to address the
14   issue."
15       Do you remember this discussion at all?
16   A.  I -- I don't know what they're talking
17   about there, if they're talking about they had a
18   conversation with her during this meeting or --
19   Q.  Who's --
20   A.  There were -- there were a lot of
21   subcommittees in this particular meeting, as
22   well, so I don't know if that was a subcommittee
23   conversation.  I -- I just -- I'm not sure about
24   the context of that.
25   Q.  Who is Sandy Selby?

Page 319

1    A.  Sandy Selby is a member of the social
2    service advisory board.
3    Q.  Do you know his or her position?
4    A.  She is a faith-based pastor, leader of
5    some type.
6    Q.  Okay.  Elaine Harlin, what about her?
7    A.  Elaine Harlin is a member of social
8    service advisory board.  She was the former
9    director of Child Guidance and Family Solutions.
10   Q.  So it continues, "Ms. Shapiro noted that
11   many in the private community are interested in
12   helping.  There is a need for a holistic approach
13   and to view addiction/substance abuse as a
14   chronic disease.  There was discussion that 2017
15   should be the peak of the opiate epidemic but ADM
16   is finding that cocaine and meth" -- it says
17   "is" -- "still on the rise."
18       Do you see that?
19   A.  I do.
20   Q.  And ADM, we've talked about that,
21   essentially, the part of the county that deals
22   with addiction.
23   A.  Yes.
24   Q.  Does this refresh you at all about a
25   discussion about cocaine and meth both being on

Page 320

1    the rise in 2018?
2        MS. FLOWERS:  Objection.
3    BY MR. ALEXANDER:
4    Q.  I'm sorry.  2017.
5        MS. FLOWERS:  Objection.
6        THE WITNESS:  This -- this report is an
7    executive committee report.  I would not have
8    been in the executive committee, so I think
9    that's why this is not ringing a bell for me.
10   BY MR. ALEXANDER:
11   Q.  So the statement that follows, "The
12   substance may change but addiction is still the
13   issue," do you see that?
14   A.  Yes.
15   Q.  Do you agree with that in terms of the
16   impact on children's services?
17       MS. FLOWERS:  Objection to the form.
18       THE WITNESS:  I -- I don't know what
19   they're talking about here, so I don't -- I mean,
20   certainly, substance abuse -- any type of
21   addiction is -- is an issue for our families,
22   yes.  I would agree with that.  But I don't know
23   what they're saying here.
24   BY MR. ALEXANDER:
25   Q.  Did anything in terms of changing

Page 321

1    practices or efforts for children's services come
2    out of this Social service advisory board
3    meeting, to your knowledge?
4    A.  No.
5                - - -
6        Thereupon, Exhibit 7 was marked for
7        purposes of identification.
8                - - -
9    BY MR. ALEXANDER:
10   Q.  Handing you what we've marked as
11   Deposition Exhibit 7.  It's SUMMIT_0000 -- so
12   that's four zeros -- 19809 through -812.
13       There's a copy for you and a copy for
14   plaintiffs' counsel.
15       This is the 2016 Annual Report of Summit
16   County Children's Services.  You were involved in
17   preparing this, correct?
18   A.  My staff prepared this.  I approve it.
19   Q.  But we actually have a bunch of e-mails
20   back and forth from you changing the language --
21   A.  Yes.
22   Q.  -- the and various ways for the message
23   from the executive director and chair on the
24   first page --
25   A.  Yes.

81 (Pages 318 - 321)

Page 322

1      Q.  -- correct?
2      A.  Yes.  Well, I mean I assume so.  I
3  certainly do always alter the executive director
4  message, typically.
5      Q.  And you stand by what's listed on this
6  first page as coming from you, correct?
7          MS. FLOWERS:  Objection.
8          THE WITNESS:  I would have approved this
9  message, yes.
10  BY MR. ALEXANDER:
11     Q.  Are you aware of anything inaccurate in
12  here?
13     A.  No, I'm not.
14     Q.  Okay.  I mean, this reflects some of
15  what we talked about.  That --
16     A.  Uh-huh.
17     Q.  -- there's been an increase in the
18  number of children in custody and in the cost of
19  placing and caring for children.  At the same
20  time, Ohio was 50th in the nation for financial
21  support.
22          And you went on to say even if Ohio
23  doubled the funds allocated for the state child
24  protection, Ohio would still be the lowest in the
25  nation.  We've talked about that, right?

Page 323

1          MS. FLOWERS:  Objection.
2          THE WITNESS:  We didn't talk about that
3  Ohio -- if Ohio doubled funds, but we did talk
4  about Ohio being the lowest in the nation, yes.
5  BY MR. ALEXANDER:
6      Q.  This theme of -- and you've been public
7  about it, as you said -- that the state funding
8  is very low and hasn't increased to keep up with
9  the demands of child services, correct?
10     A.  Correct.
11     Q.  It continues on, "To meet these ongoing
12  needs, SCCS" -- Summit County Children's
13  Services -- "developed many collaborative
14  partnerships throughout the community that have
15  helped to establish and continue a multitude of
16  services for families experiencing substance
17  abuse and addiction, as well as for children who
18  have been affected by trauma."
19          Are there specific partnerships and
20  programs you were referencing there?
21     A.  The STARS partnership would certainly be
22  one of those.  The partnership that we have with
23  juvenile court on the -- through the family
24  reunification recovery court program would be
25  another one.

Page 324

1          We worked with some organizations to
2  provide recovery coaches for our clients.  That
3  would be a partnership with a couple different
4  organizations that we've worked with.
5          We provide parenting classes for some of
6  our parents with -- in collaboration with another
7  community agency as well.
8          We have some in-home services that we
9  have contracted with other agencies for -- to
10  support our clients also.
11     Q.  And do you think that these programs
12  that have been initiated, I guess, in roughly
13  2016 have been beneficial?
14         MS. FLOWERS:  Objection.
15         THE WITNESS:  Yes.  I -- I believe they
16  have been beneficial.  I -- I think, you know,
17  particularly the recovery coaches has been very,
18  very good for our clients.  They really enjoy
19  having someone who is outside of our
20  organization, so the recovery coaches are very
21  successful.
22         We have struggled with that, especially
23  since the STARS funding has been eliminated.  We
24  have continued to pay for some recovery coaches,
25  but there are some issues with that in terms of

Page 325

1  Medicaid coverage.
2  BY MR. ALEXANDER:
3      Q.  And are there two recovery coaches?  How
4  many -- how many are there?
5      A.  There's -- we don't have a number.  I
6  mean, we contract with organizations to provide
7  recovery coaches.  So it depends on how many each
8  organization has.
9      Q.  Okay.  So the next sentence says, "We
10  have seen many families overcome addiction with
11  the right intervention and support, and this
12  annual report highlights some of the services
13  provided to families."
14         Is that true?
15     A.  Yes, that's true.
16     Q.  Does that apply to families where there
17  is an issue of opiate addiction?
18     A.  Yes.
19     Q.  And are there -- is there any data on
20  that, any statistics on that of how many families
21  you think have overcome opiate addiction based
22  upon a timely response or timely intervention?
23     A.  I don't know that there's data
24  specifically on that or which intervention
25  particularly was the intervention that was the

Page 326

1  most effective, so . . .
2      Q.  You don't kind of track your successes
3  in that way?
4      A.  You know, we've done some tracking with
5  STARS, but I don't have that really at this
6  point, and we haven't submitted that final report
7  yet.  So there's -- there may be some tracking
8  related to that that hasn't really been produced
9  at this point.  So, no, not necessarily.
10      Q.  Okay.  On the next page, Page 2,
11  describing the substance abuse problem, the
12  second paragraph says, "Nearly 70 percent of all
13  families served by SCSS [sic] are challenged by
14  substance abuse and addiction."  Do you see that?
15      A.  I do.
16      Q.  Now, you mentioned a 70 percent number
17  earlier?
18      A.  Uh-huh.
19      Q.  Is that the same one that you're talking
20  about here as 70 percent of all families are
21  challenged by substance abuse and addiction of
22  any substance?
23      MS. FLOWERS:  Object to the form.
24      THE WITNESS:  This would be talking
25  about families who have substance abuse of any

Page 327

1  type, yes.
2  BY MR. ALEXANDER:
3      Q.  Okay.  Not specific at all to opioids or
4  opiates, correct?
5      A.  Not specific to any drug type.
6      Q.  The next one says, "In fact, half of the
7  children who entered foster care in 2016 came
8  from families where at least one parent struggled
9  with substance abuse.  And, one of four of these
10  children came from homes where an opiate was the
11  primary substance."
12      Do you see that?
13      A.  I do.
14      Q.  Is that accurate information?
15      A.  I believe so.
16      Q.  So, in other words, one of eight of the
17  children who came into foster care came from
18  homes where an opiate was the primary substance,
19  correct?
20      MS. FLOWERS:  Objection.
21      THE WITNESS:  That appears to be
22  accurate, yes.
23  BY MR. ALEXANDER:
24      Q.  Okay.  So, in other words, seven of
25  eight of the kids entering foster care in 2016

Page 328

1  had some -- had -- did not have an issue with any
2  of their parents of opiate abuse, correct?
3      MS. FLOWERS:  Objection.  Lack of
4  foundation and form.
5      THE WITNESS:  This is what we know.  So,
6  you know, if there is additional, I don't know
7  that.
8  BY MR. ALEXANDER:
9      Q.  That's the only data you have, correct?
10      MS. FLOWERS:  Objection.
11      THE WITNESS:  Correct.
12  BY MR. ALEXANDER:
13      Q.  So, in other words, 87.5 percent of the
14  foster care children came into foster care
15  without a parent with a known opiate addiction
16  issue, correct?
17      MS. FLOWERS:  Object to the form.  Lack
18  of foundation; misstates what the document says.
19      THE WITNESS:  Yeah, I'm not calculating
20  the math, but that -- I think that I see the
21  conclusion you're drawing, yes.
22  BY MR. ALEXANDER:
23      Q.  And the overall change in the numbers of
24  custody cases over time, in foster care cases
25  over time, is not explained by this, essentially,

Page 329

1  one-eighth part that has to do, potentially, with
2  opiate addiction, correct?
3      MS. FLOWERS:  Object to the form.  Lack
4  of foundation and to the mischaracterization of
5  the record.
6      THE WITNESS:  I -- I don't -- I don't
7  know that.  I mean, I -- again, I -- I don't know
8  that we always know that.  But I think that a
9  substantial number of the children who have come
10  into custody or the increase in the number in
11  custody is related to substance use disorders,
12  including opioids.
13  BY MR. ALEXANDER:
14      Q.  And I'm sorry.  The -- the number of
15  children in foster care at any point in time goes
16  up and down by more than 12 percent.  We've seen
17  that from your data over time, correct?
18      MS. FLOWERS:  Objection.  Asked and
19  answered.
20      THE WITNESS:  Well, it depends on what
21  time period you're looking at.  Yeah.  I mean --
22  BY MR. ALEXANDER:
23      Q.  Well, the average number for -- for a
24  year or any of the other measures, it's not the
25  same flat number of foster care cases every year

83 (Pages 326 - 329)

Page 330

1  since 2005, let's say.  Right?
2      MS. FLOWERS:  Objection.
3      THE WITNESS:  That's correct.  But you
4  used a percentage that I think was not correct.
5  BY MR. ALEXANDER:
6      Q.  Well, I mean, we -- we know that the
7  number of foster care cases has gone up and down
8  by -- well, let's say by more than 10 percent in
9  any given year, correct?
10      MS. FLOWERS:  Objection.
11      THE WITNESS:  Not consistently, no.
12  BY MR. ALEXANDER:
13      Q.  Okay.  Sometimes, it's up; sometimes,
14  it's down.
15      MS. FLOWERS:  Objection.  Asked and
16  answered.
17      THE WITNESS:  There have been some
18  pretty specific patterns.  It's not -- I mean,
19  it's not going up and down dramatically, no.  It
20  was up very substantially, historically for
21  different reasons.  But our custody numbers in
22  2012, for example, were about 550 children on the
23  average that year.  They were 100 more children
24  in 2017.
25  BY MR. ALEXANDER:

Page 331

1      Q.  Right.
2      A.  So . . .
3      Q.  So approximately 20 percent more --
4      A.  Yes.
5      Q.  -- another year, correct?
6      A.  Right.
7      Q.  And so what we're saying is comparing it
8  to what we said as the number who have one parent
9  with an opiate addiction problem as approximately
10  12 percent, the change in foster care numbers
11  from year to year can be more than the number
12  that's described as being possibly related to
13  opiates, correct?
14      MS. FLOWERS:  Objection to the form;
15  lack of foundation.
16      THE WITNESS:  Yeah.  I don't -- I don't
17  know that that's correct because you're --
18  that's -- you're talking about a span there in
19  time.  If you looked at each year, I -- I mean, I
20  would have to look at each year and calculate the
21  percentage increase each year.  So I don't know
22  that what you're saying is correct, no.
23      - - -
24      Thereupon, Exhibit 8 was marked for
25      purposes of identification.

Page 332

1      - - -
2  BY MR. ALEXANDER:
3      Q.  Okay.  Exhibit 8 --
4      A.  Okay.
5      Q.  -- is another e-mail chain.  This is
6  SUMMIT_000106321 to -22.  And it's a series --
7      A.  Oh.  Sorry.
8      Q.  -- of e-mails in October of 2017 between
9  you, Darin Kearns, and Mitch -- Rich Marountas.
10  And is Mr. Marountas an epidemiologist who works
11  for the county?
12      A.  He works for Summit County Public
13  Health, yes.
14      Q.  Okay.  And we've talked about Mr. Kearns
15  already, correct?
16      A.  Yes.
17      Q.  He's the financial guy?
18      A.  Yes.
19      Q.  And do you guys have different roles
20  when it comes to budget, you and Mr. Kearns?
21      A.  Yes.
22      Q.  What's the difference between your
23  roles?
24      A.  Well, my role would be a higher level of
25  managing the budget, approving the budget,

Page 333

1  reporting to the board on the budgets.
2      Darin, Mr. Kearns, does the day-to-day
3  operations of the budgets, paying the bills,
4  those kinds of things.  The forecasting, the
5  projecting, that he would provide to me in the
6  budget.
7      Q.  Okay.  So the start of this chain on
8  October 5th, 2017, you write to Mr. Kearns, and
9  you ask him to send the information we put
10  together for the county to demonstrate the cost
11  of opioid epidemic to Rich Marountas from Summit
12  County Public Health.  Do you see that?
13      A.  I do.
14      Q.  And there's some back-and-forth.  And
15  your e-mail at the top from October 18th, 2017,
16  it says "Hi, Rich, Sorry for my delay in
17  responding to you.  Our best estimate, which may
18  be conservative, is that about 30 percent of
19  children come into custody as a result of opioid
20  abuse/addiction in the home.
21      "Our calculations on the cost are simply
22  related to 30 percent of the cost of placement
23  and child care expenses.  So I assume I will have
24  our graphs sent to you for the number of children
25  in custody, and I would suggest we just use 30

84 (Pages 330 - 333)

Page 334

1  percent of that number."
2      Did I read that right?
3      A.  Yes.
4      Q.  Okay.  And that -- is that 30 percent
5  based on the 27 percent calculation we saw
6  before?
7      MS. FLOWERS:  Object to the form.
8      THE WITNESS:  I believe it is, yes.
9  BY MR. ALEXANDER:
10     Q.  Okay.  Just kind of rounded it up a
11 little bit?
12     MS. FLOWERS:  Object to the form.
13     THE WITNESS:  We rounded it up because
14 we knew that it was an under-representation of
15 the accurate number, yes.
16 BY MR. ALEXANDER:
17     Q.  So you rounded it up by about
18 10 percent?
19     MS. FLOWERS:  Objection to the form and
20 the characterization of the testimony.
21 BY MR. ALEXANDER:
22     Q.  So that's the --
23     A.  We rounded it up by 3 percent.
24     Q.  I'm saying 10 percent of the 27 percent.
25 I -- I'm sorry.

Page 335

1      All right.  So do you know what this was
2  to be used for?
3      A.  Yes, I do.
4      Q.  What do you think it was for?
5      A.  My recollection was that this was for us
6  to determine our costs related to whether or not
7  we would participate in this lawsuit.
8      Q.  Have you ever come up with a different
9  estimate for cost?
10     MS. FLOWERS:  Objection.  And I want
11 to -- again, I want to caution the witness just
12 to not relay anything on the record that you
13 learned in the course of attorney-client
14 communication.
15     So the question -- could you read it
16 back for her?
17     (Question read back as requested.)
18     THE WITNESS:  We have provided
19 additional information to our attorneys.
20 BY MR. ALEXANDER:
21     Q.  Okay.  What information?
22     A.  We have tried to just narrow down the
23 30 percent number so that we could be as accurate
24 as possible.
25     Q.  And have you come to a different number?

Page 336

1      A.  It -- you know, it depended on the year,
2  but we had different numbers for several
3  different years in a row.
4      Q.  When did you start?  What was the first
5  year that you came up with numbers for?
6      A.  I believe we tried to use the number of
7  the case plans and the characteristics which
8  occurred in 2016.
9      Q.  Do you have any estimates before 2016?
10     A.  We don't have any specific numbers for
11 earlier years on those.  We used these numbers.
12     Q.  So is it still 30 percent for 2016?
13     A.  I'm --
14     MS. FLOWERS:  Object to the form.
15     THE WITNESS:  Frankly, I'm not really
16 sure at this point what we're using in terms of
17 damages, so I really don't know how to answer
18 that question.
19 BY MR. ALEXANDER:
20     Q.  Is there a different estimate that
21 you're aware of, work that's gone into preparing
22 that estimate that you're aware of?
23     MS. FLOWERS:  Object to the form to the
24 extent that it calls for any information that's
25 covered by the attorney-client or work-product

Page 337

1  privilege.
2      MR. ALEXANDER:  Well, there's subject
3  matter waiver on work product, clearly, at this
4  point.
5  BY MR. ALEXANDER:
6      Q.  So go ahead.
7      MS. FLOWERS:  We can agree to disagree
8  on that.
9  BY MR. ALEXANDER:
10     Q.  You can answer.  Go ahead.
11     A.  We have provided a variety of different
12 ways to look at this information to our
13 attorneys.
14     Q.  Can you tell me what any of the numbers
15 are other than 30 percent for 2016?
16     MS. FLOWERS:  Objection.  Asked and
17 answered.
18     THE WITNESS:  I --
19     MS. FLOWERS:  Same -- same instruction,
20 please.
21     THE WITNESS:  I -- I really don't recall
22 the specific numbers.  We took the case plan
23 numbers instead of -- I don't remember where this
24 30 percent came from, but we took the case plan
25 numbers and applied them to the last couple of

85 (Pages 334 - 337)

1 years where we knew we had put in characteristics
2 and have provided some information on that.
3 BY MR. ALEXANDER:
4    Q.  Who worked on this other than you?
5      MS. FLOWERS:  Object to the form.
6      THE WITNESS:  I am guessing that the --
7 our QI staff had to pull some data in our
8 financial -- Darin, Mr. Kearns -- would have
9 applied any financial analysis to that.
10 BY MR. ALEXANDER:
11    Q.  Have you seen something that's, like, a
12 final estimate --
13      MS. FLOWERS:  Objection.
14 BY MR. ALEXANDER:
15    Q.  -- for 2016 or any other year?
16      MS. FLOWERS:  Objection, and the same
17 instruction.
18      THE WITNESS:  I don't really know the
19 answer to that.  I know we've provided some
20 numbers to our counsel, and I don't know what
21 they are.
22 BY MR. ALEXANDER:
23    Q.  Okay.  So you're not refusing to answer
24 what they are; you're just saying you don't know
25 the details?

1    A.  I don't know the details.
2    Q.  Okay.  But you know that there have been
3 assessments put together by you, Mr. Kearns --
4    A.  Yes.
5    Q.  -- and your staff to come up with
6 something --
7    A.  Yes.
8    Q.  -- is that right?
9    A.  Yes.
10    Q.  Okay.  Do you have paper on that,
11 documents at all?
12      MS. FLOWERS:  Objection.  Asked and
13 answered.
14      THE WITNESS:  Anything that I would have
15 has been provided to our attorneys.
16 BY MR. ALEXANDER:
17    Q.  Well, we don't have any of that other
18 than what I've been going over.  Nothing recent,
19 nothing since --
20    A.  I gave it to our attorneys.  I don't
21 know what --
22      MS. FLOWERS:  Objection.
23      THE WITNESS:  -- to tell you about that.
24      MR. ALEXANDER:  All right.  Well, let's
25 go on with our reservations about these issues.

1        - - -
2      Thereupon, Exhibit 9 was marked for
3      purposes of identification.
4        - - -
5 MR. ALEXANDER:
6    Q.  Exhibit 9.
7    A.  Okay.
8    Q.  I think it's kind of a follow-up of --
9 of where we were before.
10      THE WITNESS:  Oh.  Sorry.
11      MS. FLOWERS:  It's okay.
12 BY MR. ALEXANDER:
13    Q.  This is three pages of e-mails,
14 001910811 through -13.  And these are e-mails
15 from February of 2018 that include you on them
16 along with Beth Lowe and others.
17      There's a reference to some information
18 that you got from Brady, who we talked about
19 earlier, correct?
20    A.  Right.
21    Q.  So as I understand what's going on here,
22 essentially, this is providing what we had from
23 before of that 27 percent for 2016 and then
24 providing the information from 2017 by way of
25 contrast.  Do you see that?

1    A.  Yes.
2    Q.  Have I described it accurately; that's
3 what's going on here?
4      MS. FLOWERS:  Object to the form.
5      THE WITNESS:  It's providing data for
6 two years, yes.
7 BY MR. ALEXANDER:
8    Q.  Okay.  But the data for 2016 is the
9 exact one we went over before, the 27 percent
10 related to opioid removals with the various
11 caveats about opioid involves a variety of drugs
12 and possibly multiple drugs at the same time and
13 is not necessarily the reason for the removal,
14 correct?
15      MS. FLOWERS:  Object to the form.  Lack
16 of foundation.
17      THE WITNESS:  Yes.  I -- this would,
18 again, be the -- this was data pulled on the
19 reunification case plan, so not necessarily the
20 reason for removal, but that substance abuse had
21 been identified at some point so that it was on
22 the reunification case plans.
23 BY MR. ALEXANDER:
24    Q.  Essentially, the 2016 is the
25 cut-and-paste from what we saw before and went

1  over in a prior exhibit.  And then the 2017 data
2  was compiled in the same way, correct?
3        MS. FLOWERS:  Objection.
4        THE WITNESS:  Yes.  It looks like it's
5  the same data.  Same pull of data, yes.
6  BY MR. ALEXANDER:
7     Q.   So doing this sort of apples-to-apples
8  comparison we talked about before, we see that it
9  dropped from 2016 to 2017 from 27 percent to
10  21 percent, correct?
11        MS. FLOWERS:  Objection.  Object to the
12  form.
13        THE WITNESS:  Opioid removals were
14  27 percent of the total removals in 2016 and
15  21 percent of the total removals in 2017.
16  BY MR. ALEXANDER:
17     Q.   And, again, you think those are both
18  accurate estimates, correct?
19        MS. FLOWERS:  Object to the form.  Lack
20  of foundation.
21        THE WITNESS:  I think these are
22  underrepresented numbers.  They are accurate
23  based on how they were pulled.
24  BY MR. ALEXANDER:
25     Q.   Do you think that this is an accurate

1  comparison to say that the percentage involving
2  opioid use dropped in 2017 compared -- compared
3  to 2016?
4        MS. FLOWERS:  Objection.  Lack of
5  foundation.
6        THE WITNESS:  The percentage of opioid
7  removals on case plans was less in 2017 than it
8  was in 2016.
9  BY MR. ALEXANDER:
10     Q.   That's good, right?
11     A.   That is good.
12     Q.   And so the 30 percent that we talked
13  about before as a rounding up from the 27 percent
14  would not apply to 2017, correct?
15        MS. FLOWERS:  Object to the form.
16        THE WITNESS:  Yeah, I don't understand
17  that question.
18  BY MR. ALEXANDER:
19     Q.   30 percent we talked about in the last
20  document as a --
21     A.   Right.
22     Q.   -- that was based upon the 27 percent
23  and was adjusted up a little bit because of the
24  idea that it might be under-representative.
25  You're not saying that 30 percent would apply to

1  2017, correct?
2        MS. FLOWERS:  Object to the form of the
3  question and the characterization of the
4  witness's testimony.
5        THE WITNESS:  No, I'm not -- I'm not
6  necessarily saying that.  I don't know that it
7  isn't 30 percent.  But according to the way we
8  pulled this, 21 percent were on the -- were on
9  the case plans.
10  BY MR. ALEXANDER:
11     Q.   And do you know what the data is for
12  2018 so far?  More or less than 21 percent?
13     A.   I don't know.
14     Q.   Okay.
15                     - - -
16        Thereupon, Exhibit 10 was marked for
17        purposes of identification.
18                     - - -
19  BY MR. ALEXANDER:
20     Q.   Handing you what's been marked as
21  Deposition Exhibit 10.  A copy for plaintiffs'
22  counsel, as well.
23        This is another e-mail chain.  This is
24  February of 2018.  Basically, the next day.  And
25  this kind of builds off of what we were just

1  going over but has a detailed comment from you --
2  from Amy Davidson to you in response to your
3  request for bullet points on barriers to
4  successfully working with our clients and things
5  we were doing internally to work with clients in
6  substance abuse.
7        Do you see that?
8     A.   I do.
9     Q.   Okay.  The list of barriers that Amy
10  Davidson lists here, you see the seven bullets
11  that she has as current -- current barriers, do
12  you agree with all of those?
13        MS. FLOWERS:  Object to the form.
14        THE WITNESS:  I agree with her points,
15  yes.
16  BY MR. ALEXANDER:
17     Q.   And -- and these are barriers that are
18  not related to how many people in Summit County
19  at any given point in time are using heroin or
20  have some issue with drug addiction, correct?
21        MS. FLOWERS:  Object to the form.  The
22  document speaks for itself.
23        THE WITNESS:  I -- I -- I -- could you
24  repeat the question?
25  BY MR. ALEXANDER:

87 (Pages 342 - 345)

Page 346

1    Q.   These barriers are not barriers based
2 upon there being an issue of heroin use or other
3 drug abuse; these are barriers that exist in
4 working with patients independent of any issue of
5 drug abuse, correct?
6       MS. FLOWERS:  Objection.  Foundation.
7       THE WITNESS:  These are barriers that
8 exist for us in working with clients who have
9 substance use issues.
10 BY MR. ALEXANDER:
11    Q.   Right.  Regardless of how many there
12 are?
13    A.   Right.
14       MS. FLOWERS:  Objection.
15 BY MR. ALEXANDER:
16    Q.   And the --
17    A.   Yes.
18    Q.   -- what we're doing here, that list of
19 bullets, some of these are things that were just
20 initiated within the last year, correct?
21    A.   Of what we are doing.
22       Yes, some of them are within the last
23 year.
24          - - -
25

Page 347

1       Thereupon, Exhibit 11 was marked for
2       purposes of identification.
3          - - -
4 BY MR. ALEXANDER:
5    Q.   Exhibit 11 is another e-mail chain.
6 This one is from March of 2018, so a month after
7 what we were just looking at.  And this is
8 SUMMIT_0019111169 through -71.  And the top
9 e-mail is from you, but it's a back-and-forth
10 relating to a response to a request from Public
11 Broadcasting System Ideastream.  Is that, like, a
12 local television program?
13    A.   Yes.  Uh-huh.
14    Q.   Okay.  And all the data here in the
15 March 16th e-mail from Ann Ream to Katerina
16 Papas, all of this data is accurate?
17       MS. FLOWERS:  Object to the form of the
18 question.
19       THE WITNESS:  Well, I'd have to read it.
20 I -- I'm --
21 BY MR. ALEXANDER:
22    Q.   So who's Ann Ream?
23       MS. FLOWERS:  Counsel, she was still
24 reading the document trying to tell you if it's
25 accurate or not.  Do you want her to do that or

Page 348

1 not?
2 BY MR. ALEXANDER:
3    Q.   Are you -- are you done going through
4 it?
5    A.   Close to done.
6    Q.   I'll wait.
7    A.   If you'd like me to finish it.
8       Okay.  I'm -- what is -- what is your
9 question?
10    Q.   Is there any of the data that's listed
11 in the e-mail from Ann Ream to Katerina Papas
12 that you think is inaccurate?
13    A.   Not to my knowledge.
14    Q.   So who's Ann Ream?
15    A.   Ann Ream is the director of community
16 relations.
17    Q.   And so do you typically go through
18 community relations to interact with the press?
19    A.   Typically.
20    Q.   And Katerina Papas, what was the purpose
21 of copying her here?
22    A.   She supervises Ann Ream.  Community
23 relations falls under the administrative and
24 legal services division.
25    Q.   Okay.  So a nonlegal function, though?

Page 349

1       MS. FLOWERS:  Object to the form.  Calls
2 for a legal conclusion.
3       THE WITNESS:  Correct.
4 BY MR. ALEXANDER:
5    Q.   I didn't hear you.
6    A.   It's a nonlegal function.  This is her
7 function in supervising community relations.
8    Q.   So your e-mail at the top says, "Maybe
9 on the question about opioids five years ago, we
10 can add a statement that although we did not
11 track it, we had very few cases."
12       What did you mean by that?
13    A.   Five years ago, we didn't have a lot of
14 cases that were identified as opioid cases.
15    Q.   Identified.
16    A.   Uh-huh.
17    Q.   What do you mean by "identified"?
18    A.   We were not removing children and taking
19 children into custody or serving families who had
20 an opiate addiction in the family in the same
21 numbers that we were at this time.
22    Q.   And when you say, "we didn't track it,"
23 you mean because SACWIS didn't have that sort of
24 information and instructions to, you know, kind
25 of regularly and systematically update that

88 (Pages 346 - 349)

Page 350

1  information?
2      A.  Well, I think this is the same issue
3  that we talked about earlier that SACWIS didn't
4  really have a consistent good place to a put drug
5  type.
6              - - -
7      Thereupon, Exhibit 12 was marked for
8      purposes of identification.
9              - - -
10 BY MR. ALEXANDER:
11     Q.  Okay.  Handing you Exhibit 12.
12         A copy for plaintiffs' counsel.
13         This is a two-page series of e-mails
14 from March and April of 2018, SUMMIT_001910793
15 to -94.
16     Do you see your name on this e-mail
17 chain?
18     A.  I do.
19     Q.  Who's Leann Benitez?
20     A.  She is a caseworker in the permanency
21 planning department, and her role is to work with
22 the foster homes -- our licensed foster homes.
23     Q.  Under your umbrella?
24     A.  In the agency, yes.
25     Q.  Who is Maureen Flynn?

Page 351

1      A.  Maureen Flynn is the supervisor of our
2  placement unit.
3      Q.  So, basically, over Ms. Benitez?
4      A.  No.  She does not supervise Ms. Benitez.
5      Q.  So let's go back to the very first
6  e-mail in this.  It says "In 2004, Summit County
7  Children's Services had 1,254 children in custody
8  and dropped 55 percent by 2012 to 558."  Do you
9  see that?
10     A.  I do.
11     Q.  So you see that's -- that's a
12 significant drop over time, correct?
13     A.  Yes.  Yes, it is.
14     Q.  And can you explain briefly why there'd
15 be such a significant drop over the course of
16 eight years by more than half?
17     A.  Uh-huh.  Yeah.  I mean, I think it was
18 very -- a combination of a lot of factors.  It
19 was really a statewide issue.  I think that
20 Children's Services took more children into
21 custody at that time.  We kept them in custody
22 for a very long period of time.  We took a very
23 conservative approach to reunification as well as
24 relative placement at that time.
25     So there was really a statewide effort

Page 352

1  around trying to reduce the number of children in
2  custody and put, really, a philosophical change
3  around how long we'd take kids into custody, why
4  we would take kids into custody, and what we
5  could do in term -- in lieu of having children
6  come into our custody.
7      Q.  So in the six years since then -- I
8  don't know what your most recent data is -- but
9  based on the most recent data you have, how many
10 children are currently in custody compared to the
11 558 from 2012?
12     A.  Currently?
13     Q.  Yes, ma'am.
14     A.  Currently, we have roughly 800 children
15 in custody.
16     Q.  Okay.  Do you attribute that roughly
17 250-child increase solely to the impact of
18 opioids or is that multifactorial?
19     MS. FLOWERS:  Object to the form.
20     THE WITNESS:  I think it is
21 multifactorial.
22 BY MR. ALEXANDER:
23     Q.  Okay.  If you go to the e-mail from
24 Ms. Benitez --
25     A.  Uh-huh.

Page 353

1      Q.  -- she is talking about the opioid
2  epidemic --
3      A.  Uh-huh.
4      Q.  -- is the words she's using, "is hitting
5  us hard."  "Kids are coming in at alarming
6  numbers and parents are not staying clean.
7  Relapse is common and it's harder and harder
8  to -- for them to get it together.  Police are
9  quicker to Rule 6 and at times, I think workers
10 are quicker to file because of concern for
11 safety/liability."
12     Did I read that right?
13     A.  Yes.
14     Q.  What's Rule 6?
15     A.  Juvenile Rule 6 is the legal authority
16 of law enforcement to take children into custody
17 and put them in our placement for a 24-hour
18 period or until a shelter care hearing -- hearing
19 when there -- an emergency exists.
20     Q.  And do you interpret this as because of
21 the issue of opioids and opiates and heroin, that
22 Rule 6 is being used on a -- kind of a quicker
23 basis?
24     MS. FLOWERS:  Object to the form.
25     THE WITNESS:  Rule 6 has been a common

89 (Pages 350 - 353)

Page 354

1  practice in Summit County forever, to my
2  knowledge.  I think there were certainly more
3  children coming in through Rule 6 because of the
4  opiate epidemic because law enforcement would go
5  out into the home and find the parents overdosed
6  or they would do a drug bust in the home or, you
7  know, whatever kind of drug-related issues they
8  were looking at from the criminal perspective.
9       And whenever they do that, if there are
10  children in the home, they will call us out to
11  the home to come out and take the children, put
12  them in our custody, so that we can place them
13  safely at least overnight until we can have the
14  shelter care hearing.
15  BY MR. ALEXANDER:
16    Q.  Okay.  The next paragraph says, "Parents
17  and the courts continue to dump
18  unruly/delinquent/unwanted children on us.  We as
19  an agency don't really hold the families
20  accountable.  Who cares if they get a neglect
21  filing in court?  To them, it's worth not having
22  to be afraid in your own home."
23       Do you see that?
24    A.  Yes.
25    Q.  Do you agree with those statements?

Page 355

1    A.  I don't even --
2       MS. FLOWERS:  Object to the form.
3       THE WITNESS:  -- know what it means.
4  BY ALEXANDER:
5    Q.  Do you agree that "we as an agency don't
6  really hold the families accountable"?
7       MS. FLOWERS:  Object to the form.
8       THE WITNESS:  No, I -- I don't agree
9  with that.
10       I think this worker is looking at this
11  from the perspective of the foster care side of
12  it.  She's not a caseworker.  She's not doing the
13  casework that the ongoing protective and intake
14  staff are.
15       So she's venting.  And she can be known
16  to vent, so . . .
17       - - -
18       Thereupon, Exhibit 13 was marked for
19       purposes of identification.
20       - - -
21  BY MR. ALEXANDER:
22    Q.  Exhibit 13, and then I think we're
23  probably at a good point for a break.
24       This is another e-mail, SUMMIT_001911713
25  to -714.  And the top is an e-mail from you, the

Page 356

1  bottom is an e-mail from you, and the middle one
2  is back to you.  Again, it's with Rich Marountas
3  from February of 2017 about some of the -- the
4  data analyses related to opiate and heroin.
5       Do you see that?
6    A.  Yes, I do.
7    Q.  Okay.  So it starts with you asking Rich
8  about data on the number of children born in
9  Summit County who are either born addicted or
10  born to mothers who are testing positive at
11  birth.
12       Do you see that?
13    A.  Yes, I do.
14    Q.  Do you know why you wanted that
15  information?
16    A.  Just generally trying to get an
17  understanding of what that looked like, so -- I
18  mean, I knew it was a problem, but didn't have
19  good data on it, so . . .
20    Q.  And then there -- his response talks
21  about ways that he's been trying to figure out,
22  essentially, the number of neonatal abstinence
23  syndrome -- NAS -- births.  Do you see that?
24    A.  Yes.
25    Q.  And then your response says, "Thank you

Page 357

1  for your response and the data.  Unfortunately,
2  we don't have great data here either about the
3  number of NAS babies we are serving."  Do you see
4  that?
5    A.  I do.
6    Q.  And in what way do you serve NAS babies?
7    A.  Generally, if we are involved with an
8  NAS baby, that would be because the hospital has
9  called us at the time of the birth that the
10  mother and -- and/or baby has tested positive for
11  some type of drug.  And we would investigate that
12  to determine whether or not we need to continue
13  to be involved.  We might take custody of that
14  child and place that child in a foster home.  So
15  that's our involvement typically.
16       We're not always involved with an NAS
17  baby.  I mean, so a mother may test positive and
18  there might be a father who's appropriate to take
19  that child.  So we're not necessarily involved in
20  every NAS case.
21    Q.  Have you been involved in any analyses
22  or asked that any analyses be done to look at the
23  impact of NAS babies on the burden for Summit
24  County Children's Services?
25    A.  I have not been asked to analyze that

90 (Pages 354 - 357)

Page 358

1  specifically, no.
2      Q.  Or have you asked anybody to look into
3  that?
4      A.  Well, I was asking Rich, and I didn't
5  get some good data, but -- so, you know -- yeah.
6      Q.  What -- what about the cost side of it,
7  whether it increases the cost or the stay time or
8  anything like that by having these NAS babies
9  compared to babies without some sort of addiction
10  issue in their parent or compared to babies
11  addicted to other substances?
12      MS. FLOWERS:  Object to the form.
13      THE WITNESS:  Cost analysis, nothing
14  specific to my knowledge.  I would say that I do
15  believe they are very costly to the system,
16  generally, including ours.  They would tend to --
17  unless there is a relative or another nonaddicted
18  parent that might be able to parent that child,
19  if they -- they generally would go into custody
20  and be placed in foster care.
21      Infants from substance use disorder
22  families have a higher rate of going into our
23  permanent custody, so then they're in our
24  long-term care, potentially indefinitely, with a
25  cost associated with that child through adult- --

Page 359

1  adulthood, so . . .
2  BY MR. ALEXANDER:
3      Q.  And this has been seen -- or described,
4  at least, as an issue back with what were
5  sometimes called crack babies in the past and
6  with other types of addiction?  It's not just
7  something that's seen with children whose mother
8  was using opiates or opioids, correct?
9      MS. FLOWERS:  Object to the form.  Lack
10  of foundation.
11      THE WITNESS:  It would be any type of
12  drug that --
13  BY MR. ALEXANDER:
14      Q.  Okay.  And --
15      A.  -- caused that child to be born --
16      Q.  And focusing specifically on opioids,
17  have you initiated any kind of research to
18  evaluate specifically what's going on with the
19  impact on Summit County Children's Services with
20  NAS babies where their mother was using an opioid
21  or an opiate?
22      MS. FLOWERS:  Objection.  Asked and
23  answered.
24      THE WITNESS:  I -- I do believe I
25  answered that and said, no, I haven't.

Page 360

1          - - -
2      Thereupon, Exhibit 14 was marked for
3      purposes of identification.
4          - - -
5  BY MR. ALEXANDER:
6      Q.  This will be quick --
7      A.  Okay.
8      Q.  -- and then we'll break.  Sorry.
9  Exhibit 14 --
10      A.  I'm fine.
11      Q.  -- is an e-mail with attachments,
12  SUMMIT_001636461, and the attachments ultimately
13  include something that was produced in native
14  format with no Bates number.
15      And so I'm going to ask you about a
16  specific part of this.  This appears to be sent
17  in advance of a -- sent on April 26, 2018, to you
18  and others in advance of a May 3rd, 2018, meeting
19  of FCFC Full Council.  What does that mean?
20      A.  Family and Children's First Council.
21  Full council is the full committee of the Family
22  and Children's First Council.
23      Q.  And that's what sort of entity?
24      A.  Family and Children's First Council is a
25  state-mandated function that every county has to

Page 361

1  have a Family and children's First council.
2      Q.  And does that involve people who are
3  government employees as well as private citizens
4  as some sort of a coordinated effort?
5      A.  There is a core-mandated group Family
6  and Children's First Counsel members, and then
7  there are some members who are non-mandated that
8  can be locally defined.
9      Q.  So on the agenda on Page 2, it said that
10  you were going to present on an article on foster
11  care and the opioid crisis.  Do you see that?
12      A.  I do.
13      Q.  And then the article was attached.  It's
14  by Richard Wexler.
15      A.  Uh-huh.
16      Q.  Do you recall this at all?
17      A.  Yes.
18      Q.  And Mr. Wexler is very critical of the
19  Public Children's Services Association of Ohio
20  and what they have said about opiate crisis and
21  the impact on Children's Services; is that a fair
22  statement?
23      A.  Yes.
24      MS. FLOWERS:  Object to the form.
25  BY MR. ALEXANDER:

91 (Pages 358 - 361)

Page 362

1    Q.  And do you know him?
2    A.  I don't.  I know of him only, but I
3  don't know him.
4    Q.  And when you say you "know of him," what
5  do you know?
6      MS. FLOWERS:  Objection.
7      THE WITNESS:  I -- he's -- he's been a
8  long-term, you know, opposer of government
9  entities, generally, and specifically children's
10  services and foster care.  So he's -- he's
11  definitely been involved and written articles and
12  things related to child welfare.
13  BY MR. ALEXANDER:
14    Q.  And this particular article appeared in
15  the local paper here, the Akron Beacon Journal,
16  correct?
17    A.  They -- it was republished in our local
18  paper from another -- it was published somewhere
19  else.
20    Q.  And it was a response to something from
21  PCSO from December 24th, 2017, correct?
22    A.  Yes.
23      MS. FLOWERS:  Objection.
24  BY MR. ALEXANDER:
25    Q.  The criticisms he makes about -- about,

Page 363

1  essentially, the way Children's Services was
2  behaving in response to the heroin and opiate
3  epidemic, do you agree with any of his
4  criticisms?
5      MS. FLOWERS:  Objection.
6      THE WITNESS:  No.  I -- I don't agree
7  with anything he says.
8  BY MR. ALEXANDER:
9    Q.  Okay.  This entity that he's the
10  executive director of, the National Coalition for
11  Child Protection Reform, is that, like, a -- from
12  your view, kind of a crackpot organization, or
13  what?
14      MS. FLOWERS:  Object to the form.
15      THE WITNESS:  I don't know anything
16  about his organization.  I -- I think it's him,
17  really, so . . .
18  BY MR. ALEXANDER:
19    Q.  Okay.  So what was the purpose of
20  presenting this to the council?
21    A.  Because I --
22      MS. FLOWERS:  Object to form.
23      THE WITNESS:  -- I felt like he provided
24  very false information that had been locally
25  reprinted.  And I felt strongly that, as a

Page 364

1  community, we needed to be able to talk this
2  through and make sure that we understood that he
3  was presenting false information.
4  -BY MR. ALEXANDER:
5    Q.  And when --
6    A.  -- and that we had a real problem and
7  not a made-up problem, as he was insinuating.
8    Q.  And when you presented or you've spoken
9  to the press, Cleveland.com or some of the other
10  press outlets about these issues, you've tried to
11  be accurate, correct?
12    A.  Definitely.
13    Q.  And you stand by all of your statements
14  that you're aware of that have appeared in the
15  press around here, correct?
16    A.  I do.
17      MS. FLOWERS:  Object to the form.
18  BY MR. ALEXANDER:
19    Q.  And there has been press that was
20  negative press about overdose, including overdose
21  deaths of children who were within -- within the
22  responsibility or purview of Summit County
23  Children's Services, correct?
24      MS. FLOWERS:  Object to the form.  Lack
25  of foundation.

Page 365

1      THE WITNESS:  I'm not sure that's
2  accurate, no.
3  BY MR. ALEXANDER:
4    Q.  Well, maybe -- we'll say it this way:
5  There were press accounts talking about children
6  who overdosed on things like heroin and fentanyl
7  that their parents had and that they took, and
8  then Children's Services became involved.
9      Do you remember press accounts like
10  that?
11    A.  Yes, I do.
12    Q.  And in terms of the handling of those
13  cases, do you have any -- any criticisms of how
14  your entity has handled those?
15    A.  You're speaking globally, so, you know,
16  I can't think of anything specifically that I
17  would say we've handled poorly, no.
18    Q.  Okay.  And I'm -- I'm also just -- I'm
19  sensitive to mentioning any child by name.
20  We've -- there's been a lot of discussions about
21  that.
22    A.  Uh-huh.
23    Q.  And so when I talk about an instance of
24  a -- a child who died and issues relating to
25  particular children, we're -- we're trying not to

92 (Pages 362 - 365)

Page 366

1   talk about individual names, which is why it's a
2   little vague.
3          Does that make sense?
4      A.  Sure.  Yes.
5      Q.  So in terms of --
6      A.  Appreciate that.
7      Q.  -- any of the accounts that have
8   appeared in the press talking about problems with
9   drug exposure of children and the possible role
10  of Summit County Children's Services, you're not
11  critical of the performance of your group,
12  correct?
13     A.  No, I'm not.
14         MR. ALEXANDER:  Okay.  Why don't we take
15  a break, and we'll see whether I have additional
16  questioning or --
17         THE WITNESS:  Okay.
18         MR. ALEXANDER:  -- anybody else does.
19         THE WITNESS:  Okay.
20         THE VIDEOGRAPHER:  Off the record at
21  4:51 p.m.
22         (Recess taken.)
23         THE VIDEOGRAPHER:  Back on the record at
24  5:09 p.m.
25  BY MR. ALEXANDER:

Page 367

1      Q.  Is there any of your testimony thus far
2   you need to change or supplement or -- in any
3   way?
4      A.  I don't believe so.
5      Q.  I'm going to reiterate my position
6   relating to document production, and then I've
7   just got a handful of questions, and then pass
8   you on to the codefendants for their questioning
9   subject to our reservations about documents and
10  some of the other issues that have come up.
11         Now, at the start of this, I asked you
12  about allegations in the case relating to various
13  defendants including the defendants I referred to
14  as the distributors.  Remember those questions?
15     A.  Yes.
16     Q.  Okay.  Do you know, based on your own
17  personal knowledge, any facts at all relating to
18  AmerisourceBergen Drug Corporation?
19     A.  No, I don't.
20     Q.  Do you know who they are?  Do you know
21  what they do?  Do you know anything about them?
22     A.  Not really, no.
23     Q.  Do you know what, if anything, they have
24  to do with the distribution of prescription
25  opioids to Summit County?

Page 368

1      A.  I -- I really don't.
2      Q.  Same questions for Cardinal Health.  Do
3   you know anything about them?
4      A.  Nothing specific.
5      Q.  Do you know anything about what they
6   have to do with the distribution of prescription
7   opioids to Summit County?
8      A.  Not specifically.
9      Q.  Do you know anything about their role in
10  this case at all?
11     A.  Not specifically.
12     Q.  Do you have any personal knowledge of
13  anything that McKesson ever did or didn't do with
14  regard to prescription opioids?
15     A.  Not specifically.
16     Q.  Do you have any knowledge of anything
17  about McKesson in terms of their role in this
18  case?
19         MS. FLOWERS:  Objection.  Asked and
20  answered.
21         THE WITNESS:  Not specifically.
22  BY MR. ALEXANDER:
23     Q.  For any of the distributors, any
24  distributors large and small, any company that
25  ever distributed prescription opioids that they

Page 369

1   didn't manufacture or dispense in a retail
2   fashion, the distributors, do you know anything
3   about any of them in regards to anything about
4   this case?
5          MS. FLOWERS:  Object to the form.
6          THE WITNESS:  Not specifically.
7   BY MR. ALEXANDER:
8      Q.  Okay.  Do you intend to gain information
9   about any of the distributors to be able to offer
10  any testimony specific to them or to the
11  distributors as a whole?
12         MS. FLOWERS:  Objection.  Calls for
13  speculation.
14         THE WITNESS:  Not unless I need to, no.
15  BY MR. ALEXANDER:
16     Q.  Do -- do you -- I -- I know that there
17  may be things that come up and conversations you
18  have with lawyers and all sorts of stuff, but
19  you, to, like, do your job in Summit County
20  Children's Services, do you intend to gain any
21  information to be able to testify about anything
22  relating to anything a distributor ever did or
23  didn't do?
24         MS. FLOWERS:  Object to the form.
25         THE WITNESS:  I don't really think that

93 (Pages 366 - 369)

Page 370

1  has anything to do with me doing my job. I'm --
2  I'm really here to talk about how this impacts my
3  system, so I -- no, really, I -- I don't.
4  BY MR. ALEXANDER:
5     Q.  And subject to the documents that we
6  have, I've tried to be thorough in asking you
7  about everything you know and can say and can't
8  say relating to the impact on your job and your
9  department of what you understand to be related
10  to heroin abuse, opiate abuse, and opioid abuse.
11        Do you have anything else to add on any
12  of those subjects that we haven't already
13  covered?
14        MS. FLOWERS:  Object to the form.
15        THE WITNESS:  No.  I mean, I guess the
16  only other thing that I would really add is --
17  since you're just opening the door for me to say
18  whatever I want, I guess -- I -- I feel like, you
19  know, we're really trying to pin this down to
20  data and numbers very specifically, and that's
21  kind of been what this is about.
22        And I really do believe that, you know,
23  my 28 years of experience in working in child
24  welfare and watching what has happened to
25  children and families is a really big piece of

Page 371

1  how we analyze what we do and what's impacting
2  our system.
3  BY MR. ALEXANDER:
4     Q.  And observations that you've had over
5  the last, let's say, 12 years going back to 2006,
6  including the time when you had your prior
7  position with Summit County, any observations you
8  had about what you believe was the impact of
9  opioid use, opiate use, heroin, or any other drug
10  of abuse would be memorialized in documents that
11  you created at the time, correct?
12        MS. FLOWERS:  Object to the form.  Lack
13  of foundation.
14        THE WITNESS:  Not necessarily.  Again,
15  I -- I think this -- you know, it isn't always
16  about documents and data.  It's really, you know,
17  a -- about what I've observed, what I've
18  witnessed, what I've seen in years of experience,
19  what I've heard from my staff, what I see in my
20  caseworkers, the conversations that I have, not
21  only in the community but with my staff,
22  specifically about what they're saying, what
23  they're dealing with every day.
24        And I don't feel like we had any of
25  those conversations, which I understand.  I mean,

Page 372

1  your questions have been very data driven and
2  document driven, but there is more to the story
3  than the data and documents and statistics.
4  BY MR. ALEXANDER:
5     Q.  Well, I've asked you a number of times
6  if you had specific experiences with patients or
7  with facts relating to what you believe was
8  illustrative of the impact of the heroin epidemic
9  or opiate crisis, however it's been characterized
10  at different points in time, on Cuyahoga -- on
11  Summit County Children's Services.
12        Do you have any examples like that?  Do
13  you have specific instances you can talk about?
14        MS. FLOWERS:  Object to the form of the
15  question.  Asked and answered; lack of
16  foundation.
17        THE WITNESS:  I mean, I have many
18  examples of, you know, very specific situations
19  where I know that children have been harmed.  I
20  know that parents have died.  I know that parents
21  have overdosed frequently.  I know that my
22  caseworkers have struggled with, you know,
23  telling a child that their parent is deceased.
24        Removing a child from a home because
25  their parents have addiction issues and the

Page 373

1  trauma of removal alone is -- is a significant
2  trauma for children.
3        So, yeah, there's -- there's -- there's
4  endless examples of those kinds of scenarios that
5  go into my analysis and my reaction to how I
6  responded to this issue.
7        MR. ALEXANDER:  Okay.
8        MS. NADEL:  Not to interrupt, but
9  someone on the phone can't hear.  Do we know if
10  there's an issue with the audio?  I just got an
11  e-mail that somebody can't hear.
12        MR. ALEXANDER:  Don't know.
13        MS. NADEL:  Is it on mute?
14        MR. ALEXANDER:  It doesn't light up or
15  not light up when you push it.  So I -- I don't
16  think this is a good time to interrupt.
17  BY MR. ALEXANDER:
18     Q.  The examples you just referenced in the
19  abstract, can you say that any of them involved
20  people who were using prescription opioids
21  pursuant to prescription written for them at the
22  time the various adverse health consequences or
23  impact on the children occurred?
24     A.  Well, I mean, I think, as I stated
25  earlier, I don't specifically know -- you know,

94 (Pages 370 - 373)

Page 374

1  I'm talking about opioids generally, and not
2  breaking it down to specific types.
3      You know, have there been cases where
4  I've known the type of drug?  Absolutely.  Was it
5  heroin or was it -- but, generally, we're looking
6  at it in, you know, the totality of the opioid
7  epidemic.
8      Q.  Okay.  So sitting here today, when you
9  think about examples of these sorts of human
10  impacts of heroin abuse and opiate abuse, you
11  can't say that any of them involved somebody who
12  was actually taking a prescription opioid
13  pursuant to a prescription written for them at
14  the time of the events that you're talking about,
15  correct?
16      MS. FLOWERS:  Objection.  Asked and
17  answered -- asked and answered; mischaracterizes
18  the witness's testimony.
19      THE WITNESS:  Again, I -- I don't
20  necessarily know the type of drug or what drug
21  they started with, so I wouldn't necessarily have
22  that.
23      I -- I am aware that it is -- it is
24  different types of drugs.  So it could be
25  prescription drugs.  We do have cases where we

Page 375

1  know it's prescription drugs.  I might
2  necessarily not have that information.
3      When I have conversations with my staff,
4  when we have conversations in the community, we
5  talk about opioids generally.  We don't get into
6  the specifics of that.  So I really can't break
7  that down for you.
8  BY MR. ALEXANDER:
9      Q.  Okay.  So, again, I have another
10  specific focus question about the cases that
11  you're talking about.  Can you say that any of
12  those people, where they were using some illegal
13  drug like heroin later, that any of them actually
14  started with a prescription opioid written for
15  them and taken by them pursuant to a
16  prescription?
17      MS. FLOWERS:  Objection.  Asked and
18  answered.
19      THE WITNESS:  I think, you know, my
20  answer earlier was I don't think necessarily we
21  track that.  Do my staff know that?  Perhaps.  I
22  wouldn't know that.
23      You know, I'm kind of, again, generally
24  applying what we know statistically occurs around
25  heroin, having started with prescription drugs

Page 376

1  for a very high percentage of people.
2  BY MR. ALEXANDER:
3      Q.  So in response to my last question, the
4  answer is:  No.  As I sit here today, I can't
5  tell you that any of these specific cases
6  involved somebody who started with a prescription
7  opioid written for them and then went on to
8  illegal heroin, correct?
9      MS. FLOWERS:  Objection.  Argumentative;
10  misstates the witness's testimony.
11      THE WITNESS:  I can't specifically give
12  you a case example of that myself, no.
13  BY MR. ALEXANDER:
14      Q.  So when you've talked about that you can
15  identify cases where somebody was taking a
16  prescription opioid or where you know specific
17  cases that were -- you know which drug they were
18  taking in specific cases, how would we look at
19  those case files?  How would we be able to
20  evaluate those case files or those case records
21  on SACWIS or some other case file to look at the
22  facts and figure out for ourselves if it supports
23  your recollection?
24      MS. FLOWERS:  Object to the form.
25      THE WITNESS:  I don't think you would,

Page 377

1  frankly, because the information in the case
2  records is confidential and protected in a number
3  of ways.  So I -- we wouldn't provide
4  case-specific information to -- on that.
5  BY MR. ALEXANDER:
6      Q.  Right.  So in federal court like this,
7  where we have discovery, if you want to talk
8  about something that you say occurred and you say
9  the underlying facts of it are confidential, that
10  potentially creates an issue.
11      So I want to make sure that I've
12  explored this adequately so that if we have to
13  file motions and follow-up with the court, we can
14  do so.
15      You believe that any examples that you
16  have in your head of actual cases that you've
17  heard about or you've been involved in where
18  there was something that -- bad happened, like
19  a -- a child observing a parent dying or some
20  other bad situation that you would say is an
21  example of the impact of opioids or opiates or
22  heroin on Children's Services would require
23  evaluating confidential information on cases that
24  you could identify but wouldn't be willing to
25  because, from your perspective, it would be a

95 (Pages 374 - 377)

1  breach of confidentiality; is that correct?
2       MS. FLOWERS:  Object to the monologue
3  and to the characterization of the witness's
4  testimony and the form and lack of foundation.
5       THE WITNESS:  Well, let me clarify.
6  I -- I don't have examples for you that are
7  specific to a particular client who started on
8  one drug and ended up on another.
9       I -- I think I said that clearly, that I
10  am making some assumptions, again, statistically
11  based on what I know happens with heroin use.  So
12  I don't have specific examples of cases.
13       I believe some caseworkers may have some
14  cases where they know that occurred, but they
15  don't necessarily know that either.  So if they
16  have a client who is currently testing positive
17  or admitting to use of heroin, they may not know
18  where that started.
19  BY MR. ALEXANDER:
20       Q.  Okay.  So for any example based on an
21  individual case where you can say, "I know that
22  in the case of Jane Doe this bad thing happened
23  because of something about drug addiction, and it
24  had a horrible impact on a child or it had a
25  secondary impact on a caseworker or it was some

1  other -- in some other way, it was a great
2  example of what I've been talking about," if
3  there are examples like that, you wouldn't be
4  willing to let us look at those case files to
5  figure out what the file actually says, correct?
6       MS. FLOWERS:  Object to the form.  Lack
7  of foundation; misstates the witness's testimony.
8       THE WITNESS:  I wouldn't necessarily
9  know what cases those are, so I --
10  BY MR. ALEXANDER:
11       Q.  Okay.
12       A.  -- I couldn't say, you know, it's a
13  particular case.  So, no, I -- I couldn't say,
14  "This case you can look at; that case you can't,"
15  so I wouldn't be able to do that.
16       Q.  So let's make it a two-step process.
17  Can you identify with any degree of
18  particularity, whether they be case file numbers
19  or names, any of the actual cases that you're
20  kind of relying on in your head as examples of
21  the sorts of things that you've been talking
22  about of the -- the human impact of the opiate
23  epidemic?
24       MS. FLOWERS:  Form.
25       THE WITNESS:  I -- I think I already

1  said I don't have examples of that.
2  BY MR. ALEXANDER:
3       Q.  Okay.  And even if you could identify
4  examples, your view is that you wouldn't be
5  willing to share them because it would involve
6  looking at confidential information like patient
7  names, potentially children names --
8       MS. FLOWERS:  Same objection.
9  BY MR. ALEXANDER:
10       Q.  -- or client names?
11       A.  Correct.
12       Q.  So at trial, you don't intend to talk
13  about any specific examples, right?
14       MS. FLOWERS:  Object to form.  Calls for
15  speculation.
16       THE WITNESS:  No, I -- I don't.
17  BY MR. ALEXANDER:
18       Q.  I'm sorry?
19       A.  I said no, I don't.
20       MR. ALEXANDER:  Okay.  So subject to our
21  prior reservations and whatever issues we have to
22  deal with on motion, whatever those would be, I
23  was going to pass to the manufacturers and other
24  defendants for their questioning.
25       I would suggest that we just go off the

1  record for five seconds while we shift seats.
2       MS. FLOWERS:  Okay.  Before we go off
3  the record, we'll just state on behalf of the
4  plaintiff that we believe the documents have all
5  been produced for this witness.
6              - - -
7              EXAMINATION
8  BY MS. NADEL:
9       Q.  It's been a long day.  I just want to
10  remind you of who I am.  My name is Heidi Nadel.
11  I represent Insys Therapeutics, Inc.  And I only
12  have a couple of questions for you.
13       MS. NADEL:  Are we good?  Are we good?
14       Okay.
15  BY MS. NADEL:
16       Q.  We've talked a lot today about variously
17  called opioid, opiate epidemic or crisis.  Is it
18  okay if in my questions I refer to "the opiate
19  epidemic," and it will mean all of the things
20  that have been used today as opioid crisis,
21  opiate epidemic, however it's been used in the
22  documents, we have one term I can use?
23       A.  Yes.  That's fine with me.  That's
24  generally how I have been characterizing it today
25  as well.

Page 382

1    Q.  Okay.  And we've talked a lot about
2  effects from the opiate epidemic.  I want to ask
3  you if you have any knowledge about the cause of
4  the opiate epidemic.
5    A.  Uh-huh.
6      MS. FLOWERS:  Object to the form.
7      THE WITNESS:  My knowledge about the
8  cause of the opiate epidemic is it's a -- a
9  number of variables.  It is overprescribing of
10  opioids.  It is the addictive nature of opioids
11  that leads people to other drugs, heroin
12  specifically.  It is about the misinformation
13  related to doctors as well as patients about the
14  nonaddictive nature of opioids.  I think it is
15  about a culture being created of lack -- no pain
16  tolerance.
17      So I think it's a number of things that
18  have gotten us to where we are.  And, then, I
19  think a lack of the ability of the community to
20  be prepared and respond and to anticipate that
21  this was going to occur, so it really got out of
22  hand.
23      We weren't prepared with treatment for
24  the addiction.  We weren't prepared for detox for
25  some of these individuals.  I just don't think we

Page 383

1  were prepared to respond because it happened
2  rather rapidly when you look at it from a
3  historical perspective that this -- this got
4  ahead of us.
5    Q.  And earlier in your testimony -- and I'm
6  not going to put words into your mouth, but I
7  wrote them down to try to get as close as I could
8  and tell me if this is right.  Early in the day
9  you were asked about if you understood what
10  this -- or had an understanding what this case
11  was about generally or what the defendants were
12  supposed to have done wrong.
13      And you said something like
14  manufacturing, distributing, and marketing
15  opioids irresponsibly.  Do you remember that?
16    A.  Yes.
17    Q.  Did I -- did I say that correctly?
18    A.  I think that's exactly what I said.
19    Q.  And "irresponsibly," is that your word?
20    A.  Yes.
21    Q.  Do you have any knowledge about what any
22  individual manufacturer named in this case did to
23  manufacture an opioid irresponsibly?
24      MS. FLOWERS:  Objection.  Asked and
25  answered.

Page 384

1      THE WITNESS:  I think this was similar
2  to the questions that we just went through a few
3  minutes ago.  I don't have anything specific to
4  any particular manufacturer or distributor.
5  BY MS. NADEL:
6    Q.  Do you have any information about what
7  any manufacturer of opioids did specifically
8  to -- to manufacture opioids irresponsibly?
9      MS. FLOWERS:  Same objection.
10      THE WITNESS:  I don't -- I have, I
11  guess, the same answer.  Not specifically.
12  BY MS. NADEL:
13    Q.  Would it be the same answer if I asked
14  you:  Do you have any knowledge about what any
15  individually named manufacturer in this case did
16  to market opioids irresponsibly?
17      MS. FLOWERS:  Same objection.
18      THE WITNESS:  Just generally, not
19  specifically, that some of the things that I was
20  just talking about related to providing, you
21  know, inaccurate information, false information
22  about the addictive qualities of drugs, and
23  creating that culture of, you know, that there
24  should be no tolerance for pain, those kinds of
25  things.  Yeah.

Page 385

1  BY MS. NADEL:
2    Q.  Which manufacturer defendants named in
3  this case did those things?
4      MS. FLOWERS:  Objection.  Asked and
5  answered.
6      THE WITNESS:  I don't -- I don't know
7  specifically.  You know, my assumption is all of
8  them since they're all named as parties in the
9  case.
10  BY MS. NADEL:
11    Q.  Do you personally know whether any of
12  them did?
13      MS. FLOWERS:  Object to the form.
14      THE WITNESS:  I don't know anything
15  specific.
16  BY MS. NADEL:
17    Q.  Do you know anything generally?
18      MS. FLOWERS:  Object to the form.
19      THE WITNESS:  Other than what I just
20  said about, you know, what my understanding is of
21  the lawsuit and why.
22  BY MS. NADEL:
23    Q.  So what you're telling me is your
24  understanding of what the allegations are; is
25  that right?

97 (Pages 382 - 385)

Page 386

1    A.   That's right.
2    Q.   You're not telling me you have knowledge
3  about whether those are true or not, correct?
4        MS. FLOWERS:  Object to the form.
5        THE WITNESS:  I'm not saying that I know
6  that those are true or not specific to these
7  manufacturers.  I believe that that has occurred
8  in our community and is the reason for the opiate
9  epidemic.
10  BY MS. NADEL:
11    Q.   And when you refer to inaccurate, false
12  information about addictive quality of drugs, are
13  you aware of any specific statements any
14  manufacturer defendant named in this case made?
15    A.   I am not aware of specific statements,
16  no.
17    Q.   Are you aware of anything that the
18  manufacturers named in this case did to misinform
19  doctors or patients?
20    A.   Not specifically.
21    Q.   Are you aware of any role that any
22  manufacturer named in this case had in
23  overprescribing of opioids?
24        MS. FLOWERS:  Objection.  Asked and
25  answered.

Page 387

1        THE WITNESS:  Not specifically.
2  BY MS. NADEL:
3    Q.   Do you know anything about the
4  legalities of what manufacturing defendant --
5  what manufacturers are allowed to say and do with
6  respect to marketing opioids?
7        MS. FLOWERS:  Objection.  Calls for
8  legal conclusion.
9        THE WITNESS:  I don't -- I don't know
10  what they're legally allowed to say or not say.
11  I assume as long as they're providing accurate
12  and honest information, they're probably allowed
13  to say it.  I don't --
14  BY MS. NADEL:
15    Q.   You don't have any specific knowledge
16  about the Food and Drug Administration's
17  regulation of opioids, do you?
18    A.   Not specifically.
19    Q.   Or about any other regulation of
20  marketing of opioids, right?
21    A.   No.
22        MS. FLOWERS:  Object to the form.
23        THE WITNESS:  No, I don't.
24        MS. NADEL:  Subject to the same
25  reservation, which we'll just adopt, I'm all set.

Page 388

1  Thank you.
2        MS. FLOWERS:  Thank you.  We still on?
3        THE VIDEOGRAPHER:  Yeah.
4           - - -
5           EXAMINATION
6  BY MR. SCHUTTE:
7    Q.   Good afternoon, Ms. Barnes.  My name is
8  Scott Schutte.  I represent Rite Aid.
9        I want to ask you some questions that --
10  I'll try not to duplicate what Ms. Nadel just --
11  just asked about.
12        With respect to Rite Aid, CVS, Walgreens
13  and Walmart -- who I think you acknowledged early
14  on today that you were aware they were
15  Defendants, correct?
16    A.   Correct.
17    Q.   Okay.  What is it that you understand
18  that Rite Aid, CVS, Walgreens, and Walmart
19  allegedly did wrong?
20    A.   They would be the distributors of the
21  opioid medications, so distributing them, again,
22  with -- under the pretenses of the nonaddictive
23  qualities of medications, things like that.
24    Q.   Let me focus on your last part of your
25  answer about un- -- under the pretenses of

Page 389

1  nonaddictive qualities.  And let me break it down
2  to each of the retail pharmacies one by one.
3        What did Rite Aid do, in your mind, to
4  dispense drugs in a context of not revealing the
5  addictive qualities, as you said?
6    A.   I don't have any specific information
7  about Rite Aid or any of the others.
8    Q.   Okay.  Do you have any general
9  information about what the distributors -- a
10  retail distributor like Rite Aid, CVS, Walgreens,
11  or Walmart did to be held responsible for the
12  damages that are being sought in this case?
13    A.   No, I don't.
14    Q.   Okay.  One other line of questioning.  I
15  know that you testified several times today about
16  what you believe is a connection between the use
17  of legal -- you know, the taking opiates pursuant
18  to a legal prescription, then ultimately
19  transitioning to using illegal opiates, correct?
20    A.   Correct.
21        MS. FLOWERS:  Object to the form.
22  BY MR. SCHUTTE:
23    Q.   Mr. Alexander asked you some questions
24  early on saying:  "What is the basis of that?"
25  And I believe you said one American Medical

98 (Pages 386 - 389)

Page 390

1  Association study.
2       MS. FLOWERS:  Object to the form.
3       THE WITNESS:  I believe I mentioned
4  that.  It's the specific one that I recall.
5  BY MR. SCHUTTE:
6    Q.  Okay.  Do you remember the name of it?
7    A.  It was in a journal article.  No, I
8  don't remember the name of the article.
9    Q.  Okay.  Other than that single AMA
10 article you don't remember the name of, is there
11 any other basis for your testimony on several
12 occasions today that you believe that there is a
13 statistical correlation between the use of heroin
14 and the -- use of heroin that stems from the
15 use of opiates pursuant to a legal prescription?
16      MS. FLOWERS:  Object to the form.  Asked
17 and answered.
18      THE WITNESS:  I -- that -- that's
19 certainly been something that I -- I think is
20 commonly talked about in conferences, trainings,
21 you know, talking with community partners who
22 have, you know, knowledge about the opiate
23 epidemic, staff and experts from our ADM board,
24 for example.
25      So also, just generally, conversations

Page 391

1  with community partners and in trainings as well.
2  BY MR. SCHUTTE:
3    Q.  Can you give me the specifics of the --
4  this factual basis for your assertion that --
5  well, let me step back.
6       I understood from the questions that --
7  that Mr. Alexander just asked you that you're not
8  able to go back and look at particular files and
9  determine whether a heroin user started as a
10 heroin user, started as a illegal user of -- of
11 opiates, or started as a user of -- appropriate
12 user of opiates pursuant to prescription and
13 became a heroin addict, correct?
14      MS. FLOWERS:  Object to the form.
15 BY MR. SCHUTTE:
16   Q.  You can't tell -- you can't tell and
17 trace back from the heroin user back to the
18 origin, can you?
19      MS. FLOWERS:  Object to the form and the
20 mischaracterization of the witness's testimony.
21      THE WITNESS:  We can't run any kind of
22 report that would give us that type of
23 information.
24 BY MR. SCHUTTE:
25   Q.  All right.  So the basis for your

Page 392

1  assertion that you know --
2       What percentage of folks who use heroin
3  started with -- started as a heroin user versus
4  started as a user of opiates pursuant to a legal
5  presentation?
6    A.  You know, my recollection, and, again,
7  reading in various conversations, is that it's a
8  very strong correlation in the 80 to 85 percent
9  range.
10   Q.  All right.  And the specific example you
11 gave me or as specific as you could be was an
12 American Medical Association article.  Are there
13 any other specific articles, not conversations
14 unless it's a specific conversation, not
15 trainings unless it's a specific training?  Can
16 you give me specific examples that lead you to
17 the 80 to 85 percent number?
18      MS. FLOWERS:  Objection.  Asked and
19 answered.
20      THE WITNESS:  No, I don't have a
21 specific example.
22      MR. SCHUTTE:  Okay.  Subject to the same
23 reservations, that's all I have.
24      THE WITNESS:  Thank you.
25      MS. FLOWERS:  Can we go off just a

Page 393

1  moment?
2       THE VIDEOGRAPHER:  Going off the record
3  at 5:37 p.m.
4       (Off the record.)
5       THE VIDEOGRAPHER:  Back on the record at
6  5:38 p.m.
7       MS. FLOWERS:  Plaintiffs have no
8  questions for the witness.
9       Thank you very much, Ms. Barnes.
10      MS. NADEL:  Thank you very much for your
11 time.
12      THE WITNESS:  Thank you all.
13      THE VIDEOGRAPHER:  Off the record at
14 5:38 p.m.
15      (Signature not waived.)
16          - - -
17      (Thereupon, the video deposition
18      concluded at 5:37 p.m. on Monday,
19      December 3, 2018.)
20          - - -
21
22
23
24
25

99 (Pages 390 - 393)

Page 394

```
 1        C E R T I F I C A T E
 2            - - -
 3   State of Ohio,        :
                    SS:
 4   County of Franklin,   :
 5            - - -
 6        I, Linda D  Riffle, Registered Diplomate
      Reporter, Certified Realtime Reporter, Certified
 7   Realtime Captioner, and Notary Public in and for
      the State of Ohio, hereby certify that the
 8   foregoing is a true and accurate transcript of
      the deposition testimony, taken under oath on the
 9   date hereinbefore set forth, of Julie Barnes
              I further certify that I am neither
10   attorney or counsel for, nor related to or
      employed by any of the parties to the action in
11   which the deposition was taken; and further that
      I am not a relative or employee of any attorney
12   or counsel employed in this case, nor am I
      financially interested in the action; and further
13   that I am not under a contract as defined in Ohio
      Civil Rule 28(D)
14
15
16
              Linda D  Riffle,
17            Registered Diplomate
              Reporter, Certified
18            Realtime Reporter,
              Certified Realtime
19            Captioner, and Notary
              Public in and for the
20            State of Ohio
21   My Commission Expires:  July 26, 2021
22
              - - -
23
24
25
```

Page 396

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3133220
 3   CASE NAME: In Re: National Prescription Opiate Litigation
     DATE OF DEPOSITION: 12/3/2018
 4   WITNESS' NAME: Julie Barnes
 5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me
 7      I have made no changes to the testimony
     as transcribed by the court reporter
 8
 9   Date        Julie Barnes
10      Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed
15
        I have affixed my name and official seal
16
     this _____ day of_____, 20____
17   _____
18   Notary Public
19   _____
20   Commission Expiration Date
21
22
23
24
25
```

Page 395

```
 1        Veritext Legal Solutions
              1100 Superior Ave
 2               Suite 1820
              Cleveland, Ohio 44114
 3            Phone: 216-523-1313
 4
     December 6, 2018
 5
     To: Jodi Westbrook Flowers, Esq
 6
     Case Name: In Re: National Prescription Opiate Litigation
 7
     Veritext Reference Number: 3133220
 8
     Witness:  Julie Barnes     Deposition Date:  12/3/2018
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext com
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 397

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3133220
 3   CASE NAME: In Re: National Prescription Opiate Litigation
     DATE OF DEPOSITION: 12/3/2018
 4   WITNESS' NAME: Julie Barnes
 5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me
 7      I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s)
     I request that these changes be entered
 9   as part of the record of my testimony
10
        I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein
13   _____
     Date        Julie Barnes
14
        Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed
21      I have affixed my name and official seal
22   this _____ day of_____, 20____
23   _____
        Notary Public
24   _____
25      Commission Expiration Date
```

100 (Pages 394 - 397)

Page 398

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 12/3/2018
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date         Julie Barnes
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
       Notary Public
24
    _____
25     Commission Expiration Date
```

1               C E R T I F I C A T E

2                      - - -

3   State of Ohio,            :
                                   SS:
4   County of Franklin,       :

5                      - - -

6          I, Linda D. Riffle, Registered Diplomate
    Reporter, Certified Realtime Reporter, Certified
7   Realtime Captioner, and Notary Public in and for
    the State of Ohio, hereby certify that the
8   foregoing is a true and accurate transcript of
    the deposition testimony, taken under oath on the
9   date hereinbefore set forth, of Julie Barnes.
           I further certify that I am neither
10  attorney or counsel for, nor related to or
    employed by any of the parties to the action in
11  which the deposition was taken; and further that
    I am not a relative or employee of any attorney
12  or counsel employed in this case, nor am I
    financially interested in the action; and further
13  that I am not under a contract as defined in Ohio
    Civil Rule 28(D).

14

15

16  _____
    Linda D. Riffle,
17  Registered Diplomate
    Reporter, Certified
18  Realtime Reporter,
    Certified Realtime
19  Captioner, and Notary
    Public in and for the
20  State of Ohio

21  My Commission Expires:  July 26, 2021

22
                       - - -
23

24

25

**[& - 15]**  Page 1

| & |
| --- |
| **&**  3:3,8,14 4:4,9 27:8 29:23 41:9 41:18,22 229:23 234:12,15 239:2 275:19 279:21 |

| 0 |
| --- |
| **0**  198:23 |

**0000**  321:11
**0000037847**  198:24
**000003847**  6:10
**000003857**  6:11
**000019809**  7:5
**000019812**  7:5
**000106321**  7:7 332:6
**000106322**  7:7
**000143688**  6:17
**000143689**  6:17
**000171798**  6:23 313:21
**000171800**  6:24
**001011402**  6:16
**001011403**  6:16
**001636461**  7:20 360:12
**001636469**  7:20
**001910793**  7:16 350:14
**001910794**  7:16
**001910811**  340:14
**001910812**  7:9
**001910813**  7:9
**0019111169**  347:8
**001911167**  6:21 303:17
**001911169**  7:13
**001911171**  7:14

**001911402**  273:22
**001911463**  6:19 285:19
**001911464**  6:19
**001911713**  7:18 355:24
**001911714**  7:18
**001912277**  7:11
**001912279**  7:11
**001912538**  6:13 238:14
**001912599**  6:14
**08**  171:22

| 1 |
| --- |
| **1**  6:9 198:18,22 199:1,4 234:15 237:18,24 246:5 248:14 251:15 262:6 303:15 |

**1,254**  351:7
**10**  7:10 172:16 234:12 309:9 310:17 330:8 334:18,24 344:16 344:21
**100**  268:8 330:23
**100,000**  178:4
**100/17**  11:19
**1000**  3:21
**102/11**  11:20
**102/20**  11:21
**103/11**  11:22
**104/2**  11:23
**105**  307:14
**105/7**  11:24
**106/1**  11:25
**106/8**  12:4
**107/11**  12:6
**107/2**  12:5
**108/25**  12:8

**108/5**  12:7
**10:22**  110:8
**10:49**  110:11
**11**  7:12 347:1,5
**110/1**  12:9
**110/19**  12:10
**1100**  395:1
**111**  3:14
**111/16**  12:11
**112/18**  12:13
**112/4**  12:12
**114/13**  12:14
**114/18**  12:15
**115/1**  12:16
**115/18**  12:18
**115/24**  12:19
**115/9**  12:17
**116/12**  12:20
**117/18**  12:21
**12**  7:15 223:3 225:4,8,16 246:22 312:23 329:16 331:10 350:7,11 371:5
**12/3/2018**  395:8 396:3 397:3 398:2
**121/9**  12:22
**122/19**  12:24
**122/8**  12:23
**123/21**  12:25
**124/8**  13:4
**125/17**  13:6
**125/4**  13:5
**126/15**  13:7
**126/25**  13:8
**127/11**  13:9
**129/14**  13:11
**129/2**  13:10
**12:18**  193:18
**12th**  314:20 315:2

**13**  7:17 252:23 340:14 355:18,22
**130/8**  13:12
**1301**  3:21
**131/14**  13:14
**131/4**  13:13
**132/16**  13:16
**132/22**  13:17
**132/5**  13:15
**133/23**  13:19
**133/5**  13:18
**134/19**  13:20
**135/13**  13:21
**135/21**  13:22
**138/24**  13:25
**138/3**  13:23
**138/6**  13:24
**14**  7:19 35:7 81:7 93:23 96:19 99:1 100:19 141:6 242:10 360:2,9
**140/21**  14:4
**141/17**  14:5
**142/1**  14:6
**142/13**  14:7
**143/15**  14:9
**143/4**  14:8
**144/4**  14:10
**145/1**  14:11
**145/19**  14:12
**146/15**  14:14
**146/7**  14:13
**148/2**  14:15
**15**  6:15 7:8 35:8 86:19 91:25 93:25 96:19 139:4,9 141:6 177:20 242:11 243:15 253:2 254:20 257:3 261:2 263:10,20

**15,000**  178:15
**150/2**  14:16
**151/19**  14:18
**151/3**  14:17
**152/15**  14:19
**153/18**  14:20
**154/15**  14:21
**155/16**  14:23
**155/22**  14:24
**155/4**  14:22
**157/15**  14:25
**158/1**  15:4
**158/21**  15:5
**159/5**  15:6
**15th**  274:9
**16**  7:10,13 81:9
  86:19 92:1 93:25
  119:3 225:14,21
  225:21 250:17
  253:3 254:20
**160/13**  15:8
**160/24**  15:9
**160/8**  15:7
**162/4**  15:10
**163/8**  15:11
**165/24**  15:13
**165/9**  15:12
**167/12**  15:14
**167/20**  15:15
**168/16**  15:16
**169/3**  15:17
**16th**  347:15
**17**  1:7 157:11
  225:10 254:7
**170/18**  15:19
**170/21**  15:20
**170/9**  15:18
**171/9**  15:21
**172/24**  15:22
**174/24**  15:23

**175/12**  15:24
**176/18**  15:25
**177/6**  16:4
**178/13**  16:5
**18**  7:6 157:12
  196:21 217:3
**180/20**  16:7
**180/4**  16:6
**1800**  313:22
**181/24**  16:8
**1820**  395:2
**184/14**  16:9
**185/22**  16:10
**186/9**  16:11
**187/2**  16:12
**188/13**  16:13
**188/24**  16:14
**189/14**  16:16
**189/7**  16:15
**18th**  315:21
  333:15
**19**  187:8
**190/13**  16:17
**190/22**  16:18
**191/15**  16:19
**191/22**  16:20
**192/22**  16:22
**192/5**  16:21
**194**  6:5
**198**  6:9
**19809**  321:12
**1985**  31:2
**1998**  263:4
**1:18**  1:10
**1:22**  194:7

**2**

**2**  6:12 7:17 177:25
  238:8,12 251:15
  260:11 265:1
  266:6,17 326:10
  361:9

**20**  7:15 114:1
  137:20 169:12
  183:11 259:9
  260:6,9 310:16
  331:3 396:16
  397:22 398:22
**20001-3743**  4:5
**20001-4956**  4:11
**20005**  3:21
**2000s**  69:25 77:14
  77:18
**2002**  30:8,10,23
  40:16 77:23 78:6
  78:6
**2004**  264:18 351:6
**2005**  330:1
**2006**  30:1 35:1
  41:2 133:22 141:5
  299:20 371:5
**2007**  30:1,2 40:8
  40:17,20 41:2
  77:24 78:3,6
  141:5 171:22
  211:24 251:16
**2008**  172:15 173:3
  173:16
**2008-2009**  171:20
**2010**  192:21
**2012**  95:13 117:8
  119:2 172:15
  177:9 180:14
  251:17 252:23
  254:7 255:12
  257:4 330:22
  351:8 352:11
**2013**  29:19 35:6,7
  35:15 36:17 39:22
  53:4 54:15 83:17
  83:24 94:21 141:6
  157:24 158:9
  164:14 171:5,14

179:17 199:11,19
  200:19 206:20
  209:20 217:3
  252:16 267:5
  280:25
**2014**  86:19 88:1,16
  88:22 89:19 90:2
  90:5,9,24 91:7,13
  91:25 92:12,15
  93:10,21 95:8,11
  95:12,21 96:8,11
  96:17 98:5,6,18
  99:5 100:5,11,24
  140:10 179:17
  207:9 210:11
  211:2 241:7,12,17
  241:24 242:8,19
  243:12 244:19
  246:10,13 247:9
  247:13,14 249:22
  250:10,15 264:18
  266:4 270:3
  272:16
**2015**  43:17 44:16
  81:6,9 90:3,7 98:5
  98:10 119:3,16
  136:9,12 138:1
  139:24 140:10
  142:16,21 185:17
  239:6,17 240:24
  240:25 243:4,6,13
  244:20 245:14
  247:8,10,20,23
  248:7,8 250:16
  264:19 266:15,16
**2016**  7:4 39:15
  42:22 43:6,9 74:9
  75:6 77:2 94:12
  98:11 108:1 117:3
  117:8 119:14
  132:18 134:12

140:6 146:4,11
157:11 160:22
163:7 165:22
185:17 226:8,12
254:7 257:7
266:20 287:10
291:15 293:4,17
300:6 321:15
324:13 327:7,25
336:8,9,12 337:15
338:15 340:23
341:8,24 342:9,14
343:3,8
**2017**  6:15,19,23
7:6,17 40:3 91:24
185:17 217:3
224:22 225:9
226:9 267:1 274:9
277:11 278:11
285:22 289:8
293:1,4 307:15
309:17 314:3
319:14 320:4
330:24 332:8
333:8,15 340:24
342:1,9,15 343:2,7
343:14 344:1
356:3 362:21
**2018**  1:22 6:21 7:8
7:10,13,15,19 26:3
26:7 81:25 173:16
176:17,20 194:3
214:2 225:8
226:10 304:2
306:12 307:25
309:7 310:18
320:1 340:15
344:12,24 347:6
350:14 360:17,18
393:19 395:4

**2019**  237:4
**202**  3:22,22,23 4:6
4:6,11
**202/23**  16:24
**202/4**  16:23
**2020**  176:21
185:13 186:13,17
**2021**  394:21
**203/16**  16:25
**204/11**  17:4
**204/16**  17:5
**204/25**  17:6
**208/18**  17:7
**21**  6:21 196:22
342:10,15 344:8
344:12
**210/17**  17:8
**211/10**  17:9
**212/13**  17:10
**216-523-1313**
395:3
**216-9027**  2:7
**216-9140**  2:9
**216-9163**  2:6
**216-9225**  2:8
**217/18**  17:12
**217/5**  17:11
**218/18**  17:13
**21st**  304:1
**22**  263:10 332:6
**226/1**  17:14
**226/16**  17:15
**227-1994**  3:5
**227-2100**  3:5
**228/18**  17:16
**22nd**  304:1
**2300**  3:15
**238**  6:12
**23rd**  239:6 240:24
243:6 315:23

**24**  161:9 308:7,15
308:21 309:3
311:13 353:17
**241-8014**  3:16
**242**  288:9
**242/5**  17:17
**245/22**  17:18
**246**  2:14
**246/14**  17:19
**247/25**  17:20
**248/10**  17:21
**249/19**  17:22
**24th**  362:21
**25**  6:23 252:24
261:2 263:18
**250**  352:17
**250/6**  17:23
**251/1**  17:25
**251/2**  17:24
**252/10**  18:4
**252/21**  18:5
**253/12**  18:6
**254/12**  18:7
**255/16**  18:8
**257/20**  18:9
**259/5**  18:10
**25th**  314:3
**26**  7:19 360:17
394:21
**260/18**  18:11
**261/10**  18:12
**261/14**  18:13
**261/24**  18:14
**264**  29:14
**264/3**  18:15
**266**  291:14
**266/7**  18:16
**267/2**  18:17
**268/18**  18:18
**269/11**  18:20

**269/5**  18:19
**27**  259:4,6,8
291:15 296:10
298:9 299:16
300:6 334:5,24
340:23 341:9
342:9,14 343:13
343:22
**270/15**  18:22
**270/8**  18:21
**271/3**  18:23
**272/19**  18:24
**273**  6:15
**277/13**  18:25
**278/5**  19:4
**279**  308:6,21 309:4
**279/12**  19:5
**28**  2:5 72:1,4
75:19 116:7
252:24 370:23
394:13
**2800-3200**  3:4
**2804**  1:6,7
**281/1**  19:6
**285**  6:18
**285/4**  19:7
**285/8**  19:8
**288/13**  19:9
**288/20**  19:10
**289/13**  19:11
**289/22**  19:12
**29**  6:4
**290/12**  19:14
**290/8**  19:13
**291/8**  19:15
**292/19**  19:16
**293/11**  19:18
**293/19**  19:19
**293/6**  19:17
**294/10**  19:20

**294/17** 19:21
**29464** 2:6
**295/14** 19:23
**295/4** 19:22
**296/13** 19:24
**296/21** 19:25
**298/12** 20:4
**299/2** 20:5
**299/22** 20:6

**3**

**3** 1:22 6:15 26:3
183:14 194:3
214:10 273:16,21
334:23 393:19
**3/31/18** 7:21
**30** 58:6 257:5
260:6 307:10
333:18,22,25
334:4 335:23
336:12 337:15,24
343:12,19,25
344:7
**300/13** 20:8
**300/7** 20:7
**301/7** 20:9
**302/7** 20:10
**303** 6:20
**305** 2:22,23
**305/13** 20:11
**307/5** 20:12
**308/1** 20:13
**308/9** 20:14
**309/1** 20:15
**309/11** 20:16
**30th** 241:12
**31** 247:1
**310/23** 20:17
**311/16** 20:18
**311/24** 20:19
**312** 3:10,10

**313** 6:22
**313/1** 20:20
**313/12** 20:21
**3133220** 395:7
396:2 397:2
**316/6** 20:22
**317/1** 20:23
**318/3** 20:24
**320/17** 21:5
**320/2** 20:25
**320/5** 21:4
**321** 7:4
**322/7** 21:6
**323/1** 21:7
**324-1001** 3:10
**324-1773** 3:10
**324/14** 21:8
**325** 187:8
**326/23** 21:9
**327/20** 21:10
**328/10** 21:12
**328/17** 21:13
**328/3** 21:11
**329/18** 21:15
**329/3** 21:14
**33** 32:3
**33/10** 8:4
**330** 2:15,16,17
187:8
**330/10** 21:17
**330/15** 21:18
**330/2** 21:16
**3300** 2:21
**331** 7:6
**331/14** 21:19
**33131** 2:22
**334/12** 21:21
**334/19** 21:22
**334/7** 21:20
**335/10** 21:23

**336/14** 21:24
**336/23** 21:25
**337/16** 22:4
**338/13** 22:6
**338/16** 22:7
**338/5** 22:5
**339/12** 22:8
**339/22** 22:9
**34** 307:9
**34/16** 8:6
**34/2** 8:5
**340** 7:8
**341/15** 22:11
**341/4** 22:10
**342/11** 22:13
**342/19** 22:14
**342/3** 22:12
**343/15** 22:16
**343/4** 22:15
**344** 7:10
**344/2** 22:17
**345/13** 22:18
**345/21** 22:19
**346/14** 22:21
**346/6** 22:20
**347** 7:12
**347/17** 22:22
**349/1** 22:23
**35/24** 8:8
**35/9** 8:7
**350** 7:15
**352/19** 22:24
**353/24** 22:25
**355** 7:17
**355/2** 23:4
**355/7** 23:5
**358/12** 23:6
**359/22** 23:8
**359/9** 23:7
**36** 306:24 308:12
308:14

**36/18** 8:10
**36/23** 8:11
**36/8** 8:9
**360** 7:19
**361/24** 23:9
**362/23** 23:11
**362/6** 23:10
**363/14** 23:13
**363/22** 23:14
**363/5** 23:12
**364/17** 23:15
**364/24** 23:16
**368/19** 23:17
**369/12** 23:19
**369/24** 23:20
**369/5** 23:18
**37/22** 8:12
**370/14** 23:21
**371/12** 23:22
**372/14** 23:23
**374/16** 23:24
**375/17** 23:25
**376/24** 24:5
**376/9** 24:4
**378/2** 24:6
**379-1897** 2:16
**379-2041** 2:17
**379-2083** 2:15
**379/24** 24:8
**379/6** 24:7
**380/14** 24:10
**380/8** 24:9
**381** 6:6
**382/6** 24:11
**383/24** 24:12
**384/17** 24:14
**384/9** 24:13
**385/13** 24:16
**385/18** 24:17
**385/4** 24:15

**3857**  198:24
**386/24**  24:19
**386/4**  24:18
**387/22**  24:21
**387/7**  24:20
**388**  6:6
**389/21**  24:22
**39/17**  8:14
**39/2**  8:13
**39/21**  8:15
**390/16**  24:24
**390/2**  24:23
**391/14**  24:25
**391/19**  25:4
**392/18**  25:5
**3:24**  301:15
**3:44**  301:18
**3rd**  26:7 360:18

**4**

**4**  6:18 183:15
  225:21 285:13,18
**40**  137:18,20 253:8
  258:10 260:6,9
**400,000**  177:25
**403**  273:22
**41**  3:4 288:10,24
  290:20
**414-9286**  3:23
**414-9299**  3:22
**414-9403**  3:22
**42**  133:17
**42/13**  8:16
**43/7**  8:17
**43215-6194**  3:4
**44/17**  8:19
**44/24**  8:20
**44/3**  8:18
**44114**  395:2
**44306**  29:15
**44306-1354**  2:15

**45**  197:4
**45/10**  8:21
**45090**  1:10
**46**  197:5
**46/21**  8:22
**464**  285:19
**466**  287:9 288:2
**47**  246:7 248:16
  249:2,3
**47/3**  8:23
**48**  197:5
**49**  179:5
**4:51**  366:21

**5**

**5**  6:19,20 7:6
  183:15 236:6,8
  303:11,19
**50**  119:4 137:18,20
  179:5 197:5
  311:21
**503**  3:16,16
**50th**  322:20
**51/23**  8:24
**517-2951**  3:16
**52/11**  8:25
**53**  219:21 267:22
  267:23,24,25
  268:1
**54/17**  9:4
**54/22**  9:5
**55**  351:8
**550**  330:22
**558**  351:8 352:11
**57**  1:21 197:11
  294:21
**57/21**  9:7
**57/9**  9:6
**58/2**  9:8
**59/20**  9:10
**59/6**  9:9

**599**  238:15
**5:09**  366:24
**5:37**  393:3,18
**5:38**  393:6,14
**5th**  285:22 333:8

**6**

**6**  6:22 7:8,10,17
  58:6 236:10,13
  312:22 313:16,21
  353:9,14,15,22,25
  354:3 395:4
**60**  197:11 250:20
  251:21 255:2
  256:25 257:1
**60/13**  9:11
**600**  2:20
**601**  4:5
**60601-5094**  3:9
**61/12**  9:13
**61/4**  9:12
**614**  3:5,5
**62/14**  9:15
**62/2**  9:14
**63/6**  9:16
**64/2**  9:17
**65/2**  9:18
**65/25**  9:19
**662-5103**  4:11
**67**  253:2 306:14,16
  307:18,22 308:5
  308:15
**67/19**  9:20
**68**  253:2
**68/12**  9:22
**68/21**  9:23
**68/5**  9:21
**69/23**  9:25
**69/6**  9:24

**7**

**7**  7:4 219:18,19
  267:13,17,21
  321:6,11
**70**  252:5 255:2
  256:25 257:1,3,8
  262:6 326:12,16
  326:20
**70/1**  10:4
**70/20**  10:5
**71**  347:8
**71/3**  10:6
**714**  355:25
**714-9700**  2:22
**714-9799**  2:23
**72/12**  10:7
**72/21**  10:8
**73/15**  10:9
**74/14**  10:10
**75/11**  10:11
**76/16**  10:13
**76/3**  10:12
**77**  3:9
**77/15**  10:15
**77/25**  10:16
**77/5**  10:14
**78/12**  10:17
**79/1**  10:18
**79/24**  10:19

**8**

**8**  7:6 218:17 312:8
  331:24 332:3
**8.6**  308:21,22
  310:17 311:20
  312:24
**80**  137:25 250:20
  251:21 252:4
  311:12 392:8,17
**80/23**  10:21

**[80/7 - accurately]**

**80/7** 10:20
**800** 352:14
**812** 321:12
**82/18** 10:23
**82/2** 10:22
**83/12** 10:24
**84/15** 11:4
**84/25** 11:5
**84/4** 10:25
**843** 2:6,7,8,9
**85** 392:8,17
**850** 4:10
**86,000** 260:12
**86/12** 11:7
**86/21** 11:8
**86/9** 11:6
**87.5** 328:13
**87/4** 11:9
**88/6** 11:10
**89/8** 11:11
**8:59** 1:23 26:8

**9**

**9** 7:8 340:2,6
**900** 241:13
**90s** 49:7
**92/25** 11:12
**93** 31:9
**94** 350:15
**942-5999** 4:6
**942-6208** 4:6
**95/9** 11:13
**96/14** 11:14
**97/21** 11:16
**97/9** 11:15
**97204** 3:15
**98/19** 11:18
**98/8** 11:17
**980** 291:15
**99** 30:22 32:2

**a**

**a.m.** 1:23 26:8
110:8,11
**aaron** 1:8
**abide** 263:3,11
**ability** 76:12 82:20
107:22 131:12
173:25 207:12
209:21 382:19
**able** 71:15,16
95:16 107:15
144:16 163:20
166:22 177:4
179:10 186:17
207:17 215:15
272:1 281:16
283:11,13 291:20
292:11 358:18
364:1 369:9,21
376:19 379:15
391:8
**absolutely** 272:4
374:4
**abstinence** 356:22
**abstract** 373:19
**abuse** 64:24 65:12
68:3,11 69:3 70:8
70:9 72:6,18,19,24
73:14,22 74:6,6,10
74:11,11 75:7
76:13 78:9 79:16
79:16 82:9,10,12
82:19 83:9 86:6
86:18 88:5,19,20
95:18,19 111:7,25
114:2 117:25
118:1,8,17,19,24
123:5 126:9
131:25 134:2
136:8,13 137:16
137:17,25 143:2,2

143:14,21 147:11
147:11 158:17
160:7,7,20,22
162:14 163:6
164:20 166:11
167:17 170:6
174:22 179:23,24
186:25 188:11,12
195:4,23 210:11
210:14,14 211:6
215:11 216:16
217:13,16 218:5,8
218:15 219:1,5
226:21 236:14,24
250:21 251:8,10
251:22 252:17
253:1,10,22 254:4
254:8,23 255:1
256:4 257:10,16
257:17,18,19
258:25 259:9,10
259:17,22,23,25
260:14,15 265:15
272:17 278:1
279:10 280:17,17
280:23 288:25
295:12 296:25
297:5 300:2
306:11,15 307:11
307:12,13,18,23
308:6,23 309:8
311:12 312:6,11
315:15,16 316:25
319:13 320:20
323:17 326:11,14
326:21,25 327:9
328:2 333:20
341:20 345:6
346:3,5 370:10,10
370:10 371:10
374:10,10

**abused** 261:22
**abusers** 114:11
116:9 249:11
**abusing** 123:10
126:14 250:22
251:23 252:19
253:11 259:1
260:25 261:22
**access** 53:10,11
54:2,3 207:13,14
207:15 209:25
**accessed** 47:1
**accessing** 47:6
**account** 88:18
**accountable**
354:20 355:6
**accounting** 181:8
**accounts** 111:14
365:5,9 366:7
**accuracy** 120:1
132:19,23 133:12
133:14
**accurate** 57:8 70:4
74:20 107:14
119:22 120:1,8,12
120:14 133:21
134:1,3,25 135:1
136:7 137:4
261:18 292:3,5,11
292:15,22 293:25
300:11,14,16,22
301:9 309:6
327:14,22 334:15
335:23 342:18,22
342:25 347:16,25
364:11 365:2
387:11 394:8
**accurately** 73:13
74:1 96:20 134:16
188:22 189:6,12
341:2

**acknowledge** 396:11 397:16

**acknowledged** 126:6 388:13

**acronym** 95:17 275:23

**act** 263:5,8 280:4 280:8,10 314:15 315:9 396:14 397:20

**acting** 191:8

**action** 262:25 317:6 394:10,12

**active** 170:20 171:2 173:21

**activities** 196:7 318:10

**activity** 135:24

**actors** 176:12

**actual** 50:11 136:4 142:10 183:23,23 184:17 185:4,6,8 289:6,7 290:4 377:16 379:19

**add** 119:7 216:11 221:11 349:10 370:11,16

**added** 222:15 237:17,23 274:22

**addict** 391:13

**addicted** 62:25 70:14 241:14 271:9 356:9 358:11

**addiction** 6:12 71:1,7,10,14,18,20 71:20 73:9 127:20 148:19 239:2,10 240:20 241:7,24 243:5,18 244:2 256:16 263:24

**271**:16,22 272:3 275:19 297:7 319:13,22 320:12 320:21 323:17 325:10,17,21 326:14,21 328:15 329:2 331:9 333:20 345:20 349:20 358:9 359:6 372:25 378:23 382:24

**addictive** 62:22 65:4 144:11 382:10 384:22 386:12 389:5

**adding** 187:9 221:13

**addition** 92:19 224:3 232:17

**additional** 70:15 84:22 98:4 176:13 176:16,20,23 177:1,2,4,16 186:23 188:9 190:8,18 192:13 216:10 253:8 268:16 269:3 271:8 281:17 282:4,11,20 283:8 328:6 335:19 366:15

**address** 29:13 117:14 195:19 241:14 249:10,18 269:1 276:7 277:25 284:1 318:13 395:15

**addressed** 239:24

**addressing** 280:16 280:22

**adequate** 185:12 186:16 223:23 249:17

**adequately** 279:16 377:12

**adjusted** 343:23

**adjustment** 98:11 182:16 184:22

**adm** 148:12,17 275:18 319:15,20 390:23

**administration's** 387:16

**administrations** 94:10

**administrative** 38:18 52:24 53:1 53:24 195:15 199:25 200:21 201:17 203:15,22 204:1,2,6,15,19 207:16,24 208:3,9 234:12 273:11 348:23

**administrator** 30:4

**administrators** 312:18

**admitting** 378:17

**adopt** 387:25

**adopted** 230:16 249:6

**adoption** 30:6 40:2,15 77:22 196:7,8 230:13,22 231:13 263:4

**adoptive** 187:19 187:21,24 188:10 230:24 231:17,19

**adult** 358:25

**adulthood** 359:1

**adults** 70:23 169:24 241:15

**advance** 206:4 247:19 360:17,18

**adverse** 373:22

**advice** 42:1 201:24 202:22 203:3,7 204:9

**advisory** 6:22 304:15,18 305:8 305:16 314:1 316:8 317:12,21 319:2,8 321:2

**advocacy** 189:21 193:4

**advocate** 177:15

**advocates** 203:25

**advocating** 190:8

**affairs** 203:24

**affect** 82:13 83:1 84:9,22 86:7 114:13 173:25 210:15 240:16 250:4

**affirm** 28:5

**affixed** 396:15 397:21

**afford** 284:20

**affordable** 314:15 315:8

**afraid** 354:22

**afternoon** 194:4 388:7

**ag** 138:21

**age** 29:2 196:19 213:17 262:6

**agencies** 49:17 269:24 324:9

**agency** 29:18 37:13 49:16 69:8

93:4 148:18
154:20 157:18
161:14 162:8
172:14 180:23
188:1 190:25
192:11,11 194:21
194:23 195:3,10
198:12 200:20
205:18 210:21
214:23 220:6
223:1,8,15 225:7
230:21 235:13
263:2,3 265:14
268:21 269:21
272:3 275:5
280:20,24 324:7
350:24 354:19
355:5

**agency's** 36:1

**agenda** 206:5
315:21 361:9

**agendas** 36:11

**aggregate** 135:15
143:6,9

**aging** 230:11

**ago** 39:7 49:6,8
71:25 74:4 169:12
223:5 349:9,13
384:3

**agree** 275:7
320:15,22 337:7
345:12,14 354:25
355:5,8 363:3,6

**agreed** 190:20
275:13

**agreement** 1:20
5:9

**ahead** 44:11,12
50:22 187:7 313:3
337:6,10 383:4

**aid** 3:7 27:7 55:14
388:8,12,18 389:3
389:7,10

**aiming** 249:7

**akearse** 2:9

**akouba** 2:8

**akron** 1:20,21 2:2
2:15 26:15,18,21
29:14 316:4
362:15

**al** 1:9,10

**alarming** 353:5

**alcohol** 64:25 65:7
71:22 78:11,21
79:11,15,21,25
83:9 84:20 87:2
108:4 134:14
148:19 150:24
275:19

**alcoholism** 71:15

**alexander** 3:19 6:4
6:5 27:13,14 29:6
33:19 34:7,20
35:13 36:5,12,20
37:3,24 39:5,19,25
40:9 41:25 42:18
43:11 44:13,19
45:6,15 46:24
47:8 51:24 52:15
54:19,23 57:12,22
58:3,9 59:12,22
60:21 61:9,16
62:6 63:1,14 64:7
65:5 66:1 67:22
68:9,17,22 69:2,19
69:24 70:6,22
71:5 72:13 73:11
73:18 75:2,13
76:8,18 77:12,19
78:4,16 79:3 80:2
80:10 81:15 82:7

83:2,16 84:6,18
85:1,13 86:10,15
87:1,22 88:14
89:17 90:8 93:14
95:23 96:21 97:13
97:22 98:14 100:3
100:25 102:15,25
103:15 104:7
105:4,12 106:5,16
107:6,18 108:8
109:3 110:4,12,23
111:22 112:9,22
114:9,22 115:5,13
115:19 116:5,19
118:4 121:13
122:11 123:1,25
124:14 125:8,14
125:22 126:21
127:3 128:4 129:6
129:19 130:17
131:7,18 132:7,17
133:1,8 134:11,23
135:17,23 138:4
138:10 139:11
140:22 141:21
142:7,15 143:8,18
144:18 145:4
146:1,9,19 147:21
148:6 150:8 151:5
152:8 153:11,21
153:24 154:4,6,7
154:21 155:9,19
155:24 156:21
157:19 158:5,24
159:8 160:11,17
161:25 162:9
164:10 165:15
166:6 167:15
168:8,24 169:5
170:15,19,25
171:11 173:15

175:5,16 176:22
177:22 178:24
180:11 181:3
182:3 185:24
186:19 188:3,18
189:1,9,16 190:14
191:1,17 192:1,6
192:23 193:8,13
193:16 194:10
198:21 202:18
203:12 204:4,13
204:21 205:2
208:25 210:24
211:22 212:16
217:10,19 218:23
226:4 228:23
231:9 238:11
242:7 246:2,20
248:3,13 249:24
250:12 251:13
252:6,15 253:4
254:5,15 255:20
257:21 259:7
260:23 261:12,19
262:4 264:6
266:14 267:6
268:23 269:8,12
270:11 271:1,18
272:20 273:19
277:19 278:7
279:18 281:8
285:5,16 288:16
289:2,16 290:2,10
291:3,13 292:24
293:8,13 294:3,13
294:20 295:8
296:7,18 297:3
298:1,18,21,24
299:12,25 300:10
301:2,11,19
302:10 303:14

305:17,20 306:8
307:8 308:4,11
309:2 310:9 311:8
311:19 312:15
313:7,19 316:10
317:5 318:7 320:3
320:10,24 321:9
322:10 323:5
325:2 327:2,23
328:8,12,22
329:13,22 330:5
330:12,25 332:2
334:9,16,21
335:20 336:19
337:2,5,9 338:3,10
338:14,22 339:16
339:24 340:5,12
341:7,23 342:6,16
342:24 343:9,18
344:10,19 345:16
345:25 346:10,15
347:4,21 348:2
349:4 350:10
352:22 354:15
355:4,21 359:2,13
360:5 361:25
362:13,24 363:8
363:18 364:4,18
365:3 366:14,18
366:25 368:22
369:7,15 370:4
371:3 372:4 373:7
373:12,14,17
375:8 376:2,13
377:5 378:19
379:10 380:2,9,17
380:20 389:23
391:7
**allegation** 310:8
310:20

**allegations** 55:5,8
56:20 57:5,23
58:18,21 60:11,23
60:24 61:2,10
62:8 367:12
385:24
**alleged** 307:11
**allegedly** 388:19
**alleviate** 272:16
277:11
**allocated** 183:21
322:23
**allocation** 177:17
178:2 273:1,8
**allocations** 181:19
**allow** 107:9 121:5
123:12 124:5
**allowed** 387:5,10
387:12
**allows** 118:6
123:23 125:3
130:3
**alter** 87:11 322:3
**ama** 390:9
**amanda** 214:22
**american** 113:13
113:22 389:25
392:12
**amerisourceberg...**
3:18 27:11,14
367:18
**amount** 86:7
87:19 178:19
230:13
**amy** 286:14
303:22 304:11,17
309:17 345:2,9
**analog** 101:22
**analogs** 66:18
144:21 146:13
191:20

**analyses** 86:16,24
87:6,25 91:1,12
96:11 130:1,18
131:10,12 132:2
143:13 149:4
156:8 175:7
227:12 229:17
297:12 302:3
356:4 357:21,22
**analysis** 72:17
73:13 85:4 95:5
107:8,13 117:4
138:1 152:9,19
153:22 154:9,9,14
154:19 155:11,21
170:16 188:11
227:18 229:13,16
254:10 285:10
338:9 358:13
373:5
**analyst** 91:14
**analysts** 254:14
**analyze** 217:8
292:8 357:25
371:1
**analyzed** 130:16
142:23 149:15
168:11,23
**anecdotal** 72:17
**anew** 53:10
**animals** 66:17
**ann** 347:15,22
348:11,14,15,22
**anne** 2:4 26:20
**annie** 2:4 26:17
**annual** 7:4 196:25
321:15 325:12
**annually** 38:19
172:16 260:13
**answer** 33:16 45:1
48:8,24 50:7,21

58:7 60:15 65:21
88:9 89:10 96:19
98:23,24 104:13
104:18,22 127:16
128:2,5 130:13
144:20 170:14
179:20 202:6,24
203:1,2 246:3
266:20 313:3
336:17 337:10
338:19,23 375:20
376:4 384:11,13
388:25
**answered** 44:25
45:11 47:4 60:14
60:23 61:5 62:15
81:1 104:11 105:9
106:2 107:3
108:25 110:20
127:13 130:9
132:16 133:24
134:20 143:16
145:20 147:3
150:3 154:16
160:9 168:17
246:15 298:14
307:7 329:19
330:16 337:17
339:13 359:23,25
368:20 372:15
374:17,17 375:18
383:25 385:5
386:25 390:17
392:19
**answering** 104:12
**answers** 36:13
104:23 111:4
303:1,3
**anticipate** 216:5
382:20

**anticipated** 186:20
**anybody** 41:15
  50:16 54:20 125:3
  126:10 127:4
  137:8 219:16,24
  224:4 229:12,15
  232:17 241:17
  284:10 358:2
  366:18
**anymore** 214:22
  214:23
**anyway** 50:22
**apologize** 41:13
  48:6,22 95:16
  213:12
**appear** 396:11
  397:15
**appearances** 2:1
  3:1 4:1 26:12
**appeared** 362:14
  364:14 366:8
**appears** 327:21
  360:16
**appended** 397:11
  397:18
**appendix** 247:1
**apples** 255:12,12
  255:18,18,19
  258:4,4 342:7,7
**applicable** 1:15
  5:7 37:12
**applied** 174:8
  237:7 273:14
  281:4 337:25
  338:9
**applies** 134:22
**apply** 237:14
  325:16 343:14,25
**applying** 237:12
  238:4 375:24

**appointed** 316:7
**appointment**
  244:15
**appreciate** 366:6
**approach** 319:12
  351:23
**appropriate** 64:1
  85:17,19 86:1
  223:14 275:14
  279:15,19 357:18
  391:11
**appropriately**
  279:20 282:5
**approval** 275:6,15
**approve** 231:7
  321:18
**approved** 189:19
  322:8
**approving** 332:25
**approximately**
  29:25 197:4 331:3
  331:9
**april** 7:15,19
  186:12 350:14
  360:17
**area** 161:24 175:6
  200:8,22,24
  203:21 211:5
  221:7 222:21
  224:7 232:16,23
  233:3,11,13
  292:10
**areas** 31:20
  235:17 237:16
**argument** 192:3
**argumentative**
  376:9
**arguments** 190:20
**arlington** 2:14
  29:14

**arnold** 4:4 41:9
**arnoldporter.com**
  4:7
**arthur** 3:3
**article** 361:10,13
  362:14 390:7,8,10
  392:12
**articles** 59:9
  362:11 392:13
**ascertainable**
  103:24
**aside** 85:14 87:24
  123:7
**asked** 34:25 43:20
  44:24 45:10 47:3
  48:23 60:13 61:4
  62:14 65:21 88:8
  104:5,14 105:8
  106:2 107:2
  108:25 110:19
  127:12 130:8,19
  132:1,16 133:23
  134:19 143:15
  145:19 150:2
  153:19,21 154:2
  154:15 160:8
  168:16 170:16
  204:8 229:12,15
  246:14 254:10,14
  255:14 298:14
  307:7,16 329:18
  330:15 337:16
  339:12 357:22,25
  358:2 359:22
  367:11 368:19
  372:5,15 374:16
  374:17 375:17
  383:9,24 384:13
  385:4 386:24
  388:11 389:23
  390:16 391:7

  392:18
**asking** 33:8 42:20
  43:22 55:23 57:13
  57:15 72:22 79:2
  91:5 96:7 98:25
  104:9,10 117:21
  121:10 127:25
  129:23 131:8
  140:18 142:9
  153:15,25 154:8
  165:16 181:25
  219:10 262:12
  277:15 278:23
  279:4 302:14
  306:9 308:2 356:7
  358:4 370:6
**asks** 275:3
**aspects** 278:1
  279:10
**assembly** 249:6
**assertion** 391:4
  392:1
**assess** 92:23 95:6
  195:4 230:6
**assessed** 102:4
  228:4 265:12
**assesses** 195:23
**assessment** 89:4
  124:5 150:20
  227:23 229:11,12
  231:6 307:13
**assessments**
  227:13 231:4
  233:2 339:3
**assigned** 230:19
**assignment** 396:2
  397:2 398:2
**assist** 99:23 164:8
  244:1
**assistance** 30:16
  164:7

assistant 38:18
207:17,24 208:3,9
assisted 269:16
associate 135:19
associated 131:11
155:14 197:24
198:4 229:3
358:25
association 1:21
94:1,15,19 113:13
113:22 139:2
178:17 243:19
361:19 390:1
392:12
assume 47:12
113:4 158:8
170:11 195:11
214:5,7 306:12
322:2 333:23
387:11
assuming 117:10
246:17 269:17
assumption 385:7
assumptions
378:10
attached 151:22
182:22 244:4
283:11 361:13
397:7
attaching 141:24
attachment 6:16
248:5 273:23
attachments 36:7
238:17 274:12,14
360:11,12
attempt 160:3
attempting 49:19
attend 244:16
276:25
attended 212:2
239:15 242:11

245:9
attending 241:23
245:5
attention 72:15
85:15 90:2 169:12
222:25 249:15
attorney 44:25
94:10 335:13
336:25 394:10,11
attorneys 140:25
141:3 335:19
337:13 339:15,20
attributable 127:6
175:21 180:18
attribute 163:6
227:15 253:5
352:16
attributed 175:9
attributing 174:21
audio 373:10
authorities 243:20
authority 353:15
authorize 397:11
authorized 276:4
automated 120:19
available 123:12
123:18 125:3
149:22 217:4
237:14 278:22
293:14
ave 395:1
avenue 2:20 3:14
4:5
average 131:25
329:23 330:23
averaging 222:9
awarded 177:11
aware 46:13,23
47:5 52:3,16
55:11 80:4 83:25
106:6 108:15

114:1 115:11,17
116:4 131:10
143:12 147:9
156:8 162:5 168:1
214:19 216:21
229:17 238:2
250:1 276:14
277:21 281:7
316:14 322:11
336:21,22 364:14
374:23 386:13,15
386:17,21 388:14
awareness 169:1,6

**b**

b 58:6 220:20
236:1
babies 357:3,6,23
358:8,9,10 359:5
359:20
baby 357:8,10,17
back 30:1,24
34:22 35:1 38:23
40:1,5,19 50:25
53:6,9 54:2,4,12
54:13 69:20,20
72:4 77:3 78:5
83:17 90:24 91:12
91:25 93:21 94:21
95:2,7 96:6,8 98:2
98:5 100:12 101:2
104:8 105:1,2,4,6
110:10,13 114:14
120:11 125:10,15
125:16 136:4,5
146:20 154:8
157:23 163:21
164:14 186:5
192:21 193:2
194:6 207:8
209:21 211:19,23
211:24 216:24

241:5 244:19
245:13 246:13
251:20 252:9
260:10 264:18
266:4 270:3
272:15 273:4
285:21 287:8
289:19 301:17
302:17 305:11
321:20 333:14
335:16,17 347:9
351:5 356:2 359:4
366:23 371:5
391:5,8,17,17
393:5 395:15
background 50:6
221:22,25
backwards 210:3
bad 165:7 167:18
377:18,20 378:22
balance 181:11,13
181:16,17 183:9
183:10 185:12
186:1,16 200:14
ball 140:5
ballot 96:23 97:6
173:3 186:22
189:19,20 190:19
bar 1:21
barnes 1:13 5:5
6:4 26:8 28:8 29:1
29:9 110:13
194:11 301:20
388:7 393:9 394:9
395:8 396:4,9
397:4,13 398:20
barriers 86:6
174:19 345:3,9,11
345:17 346:1,1,3,7
based 45:18 52:23
62:7 63:2 83:14

88:24 111:19
124:20 129:22,23
150:20 155:8
160:23,25 161:2
178:11 221:25
245:15 259:17
296:4 297:8,13
301:25 305:23
319:4 325:21
334:5 342:23
343:22 346:1
352:9 367:16
378:11,20
**basement** 181:18
**bases** 129:25
**basic** 179:11
209:13
**basically** 31:18
49:18 181:10
189:25 194:25
230:12 242:15
289:17 296:1
344:24 351:3
**basis** 73:20 86:8
141:23 160:18
181:18 184:13
210:3 266:11
309:19 353:23
389:24 390:11
391:4,25
**bates** 198:23
219:20 238:14
246:6 248:15,22
267:21 360:14
**beacon** 362:15
**bear** 108:13
**becky** 239:10
**beginning** 1:22
93:2,9 99:18
185:11

**begun** 268:11
**behalf** 2:2,10,18
3:2,7,12,18 4:2,8
26:15,18 27:3,5,7
27:9,11 275:5
381:3
**behaving** 363:2
**behavior** 64:10
**behavioral** 82:23
243:20
**belabor** 277:8
**belief** 143:23
**believe** 31:9 32:1
32:13 33:23 34:4
34:25 44:18 46:17
49:22 55:1 62:21
64:12 75:15 80:15
84:5,11 91:23
98:10 110:16
118:13 124:10
131:5 134:21
135:10 137:22
138:12 139:8
141:18 145:22
147:18 148:14
149:23 153:3
161:17 169:9
171:21 172:1,5
177:9 178:4 180:6
180:8 199:2
209:15,15 210:5
210:18 214:3,9,22
221:5,12 224:18
225:3,17 239:14
241:19 246:19
258:16 260:20
269:7 271:7,23
275:13,15 279:9
280:13 287:24
290:15,17 292:1,3
293:7 294:11

301:23 306:5
309:23 317:2
324:15 327:15
334:8 336:6
358:15 359:24
367:4 370:22
371:8 372:7
377:15 378:13
381:4 386:7
389:16,25 390:3
390:12
**believed** 62:23
**believes** 310:7
**bell** 320:9
**bells** 239:12
**beneficial** 324:13
324:16
**benefit** 271:20
272:3
**benefits** 197:19,21
**benitez** 350:19
351:3,4 352:24
**best** 96:12 98:15
98:21 222:20
260:2 264:14,17
264:25 265:3
266:5 272:6
291:20,24 300:18
301:1 333:17
**beth** 207:17,24
236:15 340:16
**better** 69:18 87:21
92:23 119:19
121:16 125:12
136:6,25 137:4
144:17 147:25
192:3 279:8
281:12 284:2
300:5,8,9
**beyond** 33:15
215:14 222:7

237:23
**biennium** 177:20
**big** 68:14 212:8
264:8 370:25
**bigger** 164:24,25
166:20 297:20
**biggest** 68:10
70:10 75:20 80:19
166:19 300:18
**bill** 184:25
**bills** 249:7 333:3
**binders** 46:16
**birth** 196:19,21
356:11 357:9
**births** 356:23
**bit** 50:1 69:20
107:20 174:9
197:7 334:11
343:23
**bladder** 50:16
**blame** 180:1
**blitz** 74:3 117:14
117:20 118:3
119:14,17,23
**blood** 231:1
**board** 6:22 36:3
45:25 46:1 93:6
94:23 138:19
148:12 176:5
182:23 205:11,14
205:16,24 206:13
206:16 207:2,3,5,9
207:24,25 209:17
209:23 210:13,19
210:23 211:9,21
212:1,2,7,10,11,12
256:22 270:22
275:6,7,14,16,18
275:20 284:14
303:20 304:5,12
304:12,14,16,18

304:22 305:9,16
306:10 309:23,24
314:1 315:21
316:8 317:13,21
319:2,8 321:2
333:1 390:23
**board's** 208:11
**boards** 269:19
279:24 280:7,14
**bockius** 3:8
**bodey** 220:5
**boolean** 131:20
**boost** 249:9
**born** 356:8,9,10
359:15
**bottom** 246:7,10
248:23 275:17
276:3 287:14,15
303:22 356:1
**bought** 132:13
**boulevard** 2:5
**box** 318:13
**boxes** 201:10
205:7 213:20,24
**bracket** 96:22
**brady** 286:15,20
286:22 340:18
**branch** 201:15
**branches** 200:18
**brand** 121:20
**breach** 378:1
**break** 27:25 79:9
110:5,14 121:14
124:16 126:1
129:4 143:19
144:3 157:6 193:9
193:16 301:12
355:23 360:8
366:15 375:6
389:1

**breakdown**
146:18
**breaking** 374:2
**breakout** 245:10
**breaks** 50:12,12
50:14
**brickell** 2:20,21
**bridgeside** 2:5
**briefly** 57:3 181:7
205:13 351:14
**bring** 227:7 243:3
302:20
**broad** 64:4 66:5
309:8
**broadcasting**
347:11
**broader** 111:19,23
315:17
**broadly** 169:10
**broadway** 1:21
**brought** 45:13
**brown** 91:16,19
92:20 101:2
254:17
**bud** 278:11
**budget** 35:25 36:1
39:1 72:15 98:3
98:11 171:25
172:9 173:17
182:2,15 183:23
184:1,5,8,17,19,20
184:22 185:1,4,5,6
185:6,9,16,17
188:16 189:2
191:4 194:24,24
196:25 208:20
209:10 224:2
332:20,25,25
333:6
**budgetary** 72:9
102:6 174:19

**budgeted** 184:12
185:3 187:9
**budgeting** 97:15
97:24 109:19
171:19 172:12
188:6 208:15,16
210:15 212:9
215:22 256:5,21
**budgets** 42:24
43:1 45:20,21,23
46:15,15,20 47:7
182:11,11 183:18
183:21 189:18
209:11 333:1,3
**build** 184:18,20
**builds** 344:25
**built** 296:10
**bullet** 267:15
271:2 345:3
**bullets** 260:24
268:12,25 270:14
345:10 346:19
**bunch** 257:23
274:22 321:19
**burden** 151:18
175:20 179:12
227:14 357:23
**burling** 4:9 41:18
41:22
**business** 203:14
207:1 276:18
**bust** 354:6

**c**

**c** 2:12 3:3 26:1
194:1 220:14,20
221:15 232:9,12
394:1,1
**ca** 395:25
**cabinet** 268:9
**cafeteria** 172:3

**budgeted** → **calculate** 257:22
331:20
**calculated** 257:23
**calculating** 328:19
**calculation** 293:1
334:5
**calculations**
257:25 333:21
**calendar** 238:20
239:9 244:14
248:5
**calendars** 245:3
**call** 51:2 136:1
175:22 196:3
216:18 217:21
218:5 258:18
311:2 354:10
**called** 1:13 5:6
96:4 103:20 181:4
208:1 229:8
240:19 251:17
258:18 271:3
357:9 359:5
381:17
**caller** 310:25
311:22
**calling** 262:25
311:5,6,23 312:6
**calls** 44:25 127:13
195:24 202:5
218:2,14,21,25
304:6 306:11
307:10,15,17,24
308:3,5,6,7,22
309:9 310:14
311:12,24 336:24
349:1 369:12
380:14 387:7
**campaigns** 143:23
**capable** 227:9

**capacities** 31:16
**capacity** 276:22
  276:23
**captioner** 1:18
  394:7,19
**capture** 119:7
  134:16
**captured** 119:12
  135:2
**capturing** 107:14
  119:19
**cardinal** 3:2 27:5
  368:2
**care** 30:5 40:2,15
  58:14 59:3,16
  76:10,13 77:22
  82:15,21 128:16
  151:12 169:11,14
  186:2 196:6 198:4
  198:15 230:11
  263:1 283:1,1,4
  312:17 314:15
  315:8 327:7,17,25
  328:14,14,24
  329:15,25 330:7
  331:10 333:23
  353:18 354:14
  355:11 358:20,24
  361:11 362:10
**career** 33:22 71:21
  72:1
**careers** 75:19
**careful** 186:15
**caregiver** 306:15
**cares** 280:8 354:20
**carfentanil** 66:10
  66:12,16 144:21
  146:5
**caring** 322:19
**carolina** 2:6

**carried** 181:14
**carry** 223:10,12
  230:20
**carryforward**
  185:12
**carrying** 233:21
  233:21,23,25
  234:2,4
**carryover** 181:5,9
  183:4
**carter** 92:13,14
**case** 1:7,10 31:17
  34:15 47:12,14
  49:6,7,10,22 51:18
  51:18 52:2 55:6
  55:21 56:12,19
  59:23,24 64:11
  73:2,6,7 74:12
  75:8 76:19 99:19
  106:10,14 118:14
  118:16,18 120:13
  120:14 123:17
  124:3 129:10
  134:3 135:12,14
  135:19,20 136:1,5
  136:6,11 137:7
  142:10,11,14,14
  142:18,23 143:6
  151:10,13,17
  160:5 162:7
  163:19 167:7
  168:21 169:25
  170:20 171:2
  210:3 217:11,22
  218:6,8 222:13
  223:14 226:11
  231:16,18 233:21
  233:21,23,25
  234:2,4 252:24,25
  254:25 257:12
  258:12 279:3

282:14 287:11
  288:19 289:6,20
  290:5,6,14 291:6
  291:11,12 292:13
  297:19 302:17
  336:7 337:22,24
  341:19,22 343:7
  344:9 357:20
  367:12 368:10,18
  369:4 376:12,19
  376:20,20,21
  377:1,4 378:21,22
  379:4,13,14,14,18
  383:10,22 384:15
  385:3,9 386:14,18
  386:22 389:12
  394:12 395:6
  396:3 397:3
**caseload** 164:19
  222:3,22 261:3
**caseloads** 85:19,23
  87:9,9 88:3 152:5
  153:7 168:4
  187:10 222:13
  226:24 230:20,23
  282:6
**cases** 49:12 50:3
  85:22,24 86:4,5
  87:10 99:11,19
  122:20 131:23
  136:11 139:14
  150:14 152:22,25
  153:10,15 161:4
  171:2 173:21
  223:10,12 225:23
  226:8,14,18,21,22
  227:2,8 240:10
  250:21 251:22
  252:18,24 253:9
  253:22 254:9
  257:9,10,11,15,17

259:1,9,10,18,22
  259:24 260:12,25
  261:4,16 265:16
  282:5,15 287:25
  288:1,6,9,10,24
  289:12,18 290:19
  295:10 297:16
  299:20 300:1
  302:3 328:24,24
  329:25 330:7
  349:11,14,14
  365:13 374:3,25
  375:10 376:5,15
  376:17,18 377:16
  377:23 378:12,14
  379:9,19
**casework** 36:10
  153:6 195:13
  297:14 355:13
**caseworker** 50:2
  71:23 74:3 117:14
  117:20 118:3
  119:14,17,23
  161:7,12 221:10
  221:14 222:3
  350:20 355:12
  378:25
**caseworkers**
  90:16 152:20,21
  161:6 220:12,16
  371:20 372:22
  378:13
**cash** 181:11,13,16
  181:17 183:8,10
  186:1,15
**categories** 36:15
  60:2,12 80:17
  102:13 106:4
  124:19
**category** 58:10
  89:7 101:5,9,11,17

[category - children]                                                    Page 15

101:24 102:3,8,19
102:21 103:1,19
109:25 122:1
126:23
**cause** 168:3
307:12 382:3,8
**caused** 145:24
167:9 359:15
**causing** 80:13
**caution** 33:11 45:1
335:11
**caveat** 75:17
**caveats** 341:11
**center** 200:5,6,9
**ceo** 316:4
**certain** 66:4 87:16
119:22 122:25
124:17 130:12
185:1 198:1
213:17 284:13
286:9 303:3,3
**certainly** 71:20,25
81:13 82:20 85:5
89:22 94:8 95:12
102:16 109:4
127:23 134:8
140:13 144:6
145:9,22 147:5
152:3,19 156:13
164:16 174:2
178:19 180:8
182:7 188:15
204:14,22 210:6
212:3 213:16
222:8 239:14
247:24 250:15
251:7 254:2
261:17 262:3
263:12 269:15
271:25 272:22
284:20 295:18

296:23 297:18
306:6 320:20
322:3 323:21
354:2 390:19
**certificate** 397:11
**certification** 396:1
397:1
**certified** 1:17,18
394:6,6,17,18
**certify** 394:7,9
**chain** 109:13
138:21 273:20
285:22 303:16,25
332:5 333:7
344:23 347:5
350:17
**chair** 321:23
**challenge** 73:12
**challenged** 326:13
326:21
**challenges** 72:3
174:18
**chance** 148:1
**change** 71:18 72:8
91:4 107:16
110:15 157:11
172:10 174:5
194:12 199:13
216:23 301:21
309:17 320:12
328:23 331:10
352:2 367:2
395:13,14 397:8
398:3
**changed** 71:21,25
199:8 200:13
219:12,16,24
220:2
**changes** 73:25
96:12 98:15,21
99:6 167:17 172:3

199:12,18 200:2
200:12,17 214:18
215:7,9,15 220:4
220:10 264:24
265:2 266:5,10,16
266:22 267:9
272:10 395:12
396:7 397:7,9
**changing** 99:4
100:1 244:3
320:25 321:20
**character** 5:14
**characteristics**
120:6,8,9 258:19
258:19 288:9,23
290:19,22 293:21
336:7 338:1
**characterization**
290:9 334:20
344:3 378:3
**characterize** 89:1
**characterized**
372:9
**characterizing**
381:24
**chart** 6:10 195:8
204:23,23 236:1
237:18
**check** 244:18
**chemical** 121:20
**chicago** 3:9
**chief** 239:22
**child** 31:18 32:18
80:20 82:14,14
89:25 119:10
120:19 151:11
159:22 163:13,21
164:19 168:2
177:16 179:13
180:9 195:4,23
196:9,10,16 230:3

230:6,6,8 231:3,5
231:20 240:15,20
242:15,16,23
243:5,25 244:2,4
246:5 249:4
250:20 251:10,22
252:17 253:9
254:8,23 255:8
257:18 258:25
259:17 260:13,25
263:2,2,9,16,23
283:1,3,4 295:23
295:24,25,25
297:2 319:9
322:23 323:9
333:23 352:17
357:14,14,19
358:18,25 359:15
362:12 363:11
365:19,24 370:23
372:23,24 377:19
378:24
**childhood** 283:20
284:2
**children** 2:10,14
6:9 7:4,21 32:20
76:9 82:11,21
99:14,15,21
108:22 137:5
158:14 162:14,15
168:4,12 169:23
174:12 187:22
195:4 196:6,8,18
196:21,22 198:9
222:17 230:2,16
230:20,23 231:1
232:24 233:7,16
233:20 234:7,9
240:11 249:11
256:10,11,13,13
262:6,8,17,21

263:1,19 271:7
273:11 278:12
279:9,25 283:1,17
283:21,23 284:2,4
297:20,23,24
322:18,19 323:17
327:7,10,17
328:14 329:9,15
330:22,23 333:19
333:24 349:18,19
351:7,20 352:1,5
352:10,14 353:16
354:3,10,11,18
356:8 359:7
364:21 365:5,25
366:9 370:25
372:19 373:2,23
380:7

**children's** 26:22
26:24 27:1 29:12
30:5,23 38:2 40:3
40:16 50:2 51:2,4
51:5 56:7 63:17
63:22 64:14 65:10
68:4 69:4 70:10
70:15,17,24 72:8
72:20 73:23,24
75:8,23 78:8
79:22 80:20 83:4
83:7 84:13,14
86:18 88:2,17,24
89:21 90:13 91:3
94:15,19 98:16
101:6 102:5,18
103:6,25 105:15
106:24 111:12
112:14 114:13
116:9 118:25
124:2,18 126:11
127:9 128:10,22
128:25 129:12

136:8 139:2
142:19 148:23
149:13,25 150:11
151:18 152:12
153:20 154:3,14
155:12,13 162:12
163:2 165:8
168:13 169:2,8,24
170:2 171:12
172:11 173:19,20
174:1,20 175:21
177:18 178:16,21
179:3,24 180:18
181:21,21 182:1
182:17 183:5,6
190:16 191:21
194:18 195:2,7
196:9 197:2 199:6
199:19 205:10
211:7 227:21
229:10 245:20
249:18 250:5
252:20 260:2
261:21 264:24
268:21 269:4,23
272:18 277:4,7,22
299:20 302:2,22
315:16 320:16
321:1,16 323:12
351:7,20 357:24
359:19 360:20,22
360:24 361:1,6,19
361:21 362:9
363:1 364:23
365:8 366:10
369:20 372:11
377:22

**china** 101:23

**choice** 107:23
117:5 121:4,19
122:13 123:20

124:7 132:20
133:16 134:13
149:21 174:12
288:8 290:3,7
293:18

**choppy** 48:14

**chris** 27:2

**christopher** 2:19

**chronic** 319:14

**circles** 249:16

**circulate** 206:25

**circulated** 206:5
206:12 207:8
209:9,22

**citations** 251:15

**citizens** 361:3

**city** 2:2 26:15,18
26:21

**citycenter** 4:10

**civil** 1:15 5:8
394:13 396:5
397:5

**clarify** 259:15
309:25 378:5

**class** 224:20 307:3
309:8

**classes** 224:21
324:5

**clean** 353:6

**clear** 57:16 111:1
179:19 192:14
254:21

**clearly** 152:22,23
161:12,14 168:3
179:18 253:16
337:3 378:9

**cleveland** 30:16
395:2

**cleveland.com**
364:9

**client** 44:25
111:18 112:24
126:7 134:17
161:7,8,9 201:4
235:7 335:13
336:25 378:7,16
380:10

**clientele** 72:3

**clients** 68:7,15
69:10,16 71:4,8,19
73:23 79:14,15
80:1 82:10,13,20
83:13 84:8,9,24
85:6,7,9 87:15
88:11,18 89:12
90:4,18,22 93:12
116:8 118:8,23
144:6 151:9 152:1
152:25 155:2,6,12
162:21 202:3
235:2,3,6,8,12
253:20 265:12
269:20 272:2,4,21
278:12,21 282:22
299:9 324:2,10,18
345:4,5 346:8

**climbed** 119:15
173:22

**clinic** 123:8 172:2
172:3

**clinical** 282:13

**clinics** 59:17

**clomax** 2:23

**close** 97:5 163:20
179:5 185:5,6
252:4 257:8 276:2
348:5 383:7

**closer** 119:3

**closing** 172:2

**coaches** 324:2,17
324:20,24 325:3,7

**coaching** 153:23
154:2
**coalition** 363:10
**cocaine** 67:2 68:19
69:4,9,22 70:3,5
70:10,14 71:1,23
76:1,5,13,21,23
77:3 78:10,23
79:6 80:18 81:17
81:24 82:5 83:10
84:1,19 85:8
86:25 134:14
147:1,5,7,13
148:25 165:5,11
211:4 260:14
261:1,4,17,20,23
262:9 263:19,24
294:24 319:16,25
**cocaine's** 261:25
**code** 204:2 288:7
295:19
**codefendants**
367:8
**collaboration**
324:6
**collaborative**
323:13
**colleagues** 75:22
90:25 242:2
**collect** 176:20
186:12
**collected** 139:12
**collecting** 187:18
**collection** 95:5
**collections** 173:6,6
**collectively** 158:19
299:19
**college** 31:1,2 32:4
**colloquial** 123:9
**colloquy** 140:21

**columbus** 3:4
**combination**
131:3 173:13
174:25 351:18
**combinations**
146:6,14 220:15
300:24
**come** 46:9 77:3
81:3 99:15 143:9
153:9 176:16
177:5 185:2 186:7
188:17 195:23,24
197:8 215:22
218:21 221:20,20
221:24 230:15
254:10 258:5
260:3 275:25
278:16 280:17,23
286:25 291:20
317:6 321:1 329:9
333:19 335:8,25
339:5 352:6
354:11 367:10
369:17
**comes** 113:21
121:5 132:20
134:5,10 149:5,20
197:11 219:3,6
237:19 238:1
270:25 293:17
297:5,17 332:20
**comfortable**
187:11 301:8
**coming** 90:1 97:25
110:13 157:3
172:9 227:2
256:10 269:3
270:7 309:9 322:6
353:5 354:3
**comment** 158:16
345:1

**commission**
394:21 396:19
397:25 398:25
**committed** 281:18
**committee** 208:1,2
208:7 314:10,13
315:1,2,19 318:11
320:7,8 360:21
**committees** 314:8
**common** 80:19
353:7,25
**commonly** 390:20
**communication**
53:18,23 335:14
**community** 62:19
63:12,18 64:6
84:8 93:3,4,9,11
144:8,13,14
147:10 148:4,7,10
155:7 179:13
191:20 199:23,24
203:19 204:23
241:13 243:4
244:1 249:9
253:17,18,24
254:1 256:23
272:1 278:20,22
317:4 319:11
323:14 324:7
348:15,18,22
349:7 364:1
371:21 375:4
382:19 386:8
390:21 391:1
**companies** 4:3
41:12
**company** 61:17,19
61:22 109:8,12
368:24
**compare** 116:25
151:23 224:25

293:2
**compared** 157:12
217:3 224:17
257:4 313:8 343:2
343:2 352:10
358:9,10
**comparing** 292:9
331:7
**comparison** 117:2
118:12,13 120:12
217:2 255:12,18
255:22 258:4,22
293:10,16 342:8
343:1
**compiled** 342:2
**complaint** 56:22
56:23,25 57:6,24
58:19 63:5 240:12
**complaints** 56:19
202:11
**complete** 231:13
**completed** 31:9
137:12 159:1
395:15
**completely** 101:23
105:22 170:5
263:14
**complex** 153:9
161:4,20 184:22
221:1 227:8 282:5
**complexity** 222:13
**complicated**
182:10
**complied** 120:3
**comply** 120:3
**computer** 131:20
**concept** 111:4
113:9,19
**concern** 75:20
80:19 268:7
287:12 288:3

292:15 353:10

**concerned** 67:4
178:11 179:7

**concerning** 311:14
311:18,23 312:2
312:12

**concerns** 293:16

**concerted** 185:10

**concluded** 393:18

**concluding** 1:23

**conclusion** 328:21
349:2 387:8

**conduct** 57:6 59:2
63:24

**conducted** 86:24
87:7 218:7

**conference** 244:16

**conferences**
390:20

**confidential** 6:12
6:15,18,20 7:8,10
7:12,15,17,19
377:2,9,23 380:6

**confidentiality**
378:1

**confirmed** 259:10
259:22,23

**confused** 96:3
268:2

**conjunction** 202:1

**connected** 182:24

**connecting** 41:14

**connection** 33:7
34:14 42:5 44:14
67:23 127:23
154:17 162:14
201:24 206:12
209:23 240:4
270:24 271:7
286:9 287:22
305:8 389:16

**consecutively**
273:23

**consequences**
373:22

**conservative**
333:18 351:23

**consistent** 117:9
118:12 122:4,22
123:11,18 124:9
124:13 250:25
258:3 260:16,20
261:8 262:13,16
350:4

**consistently**
132:21 133:16
136:13 258:17,22
294:2 330:11

**constant** 78:21
79:13,17 171:4,14

**constantly** 99:25

**constitutes** 312:11

**consume** 260:1,20

**consumed** 260:15

**contact** 233:16,20

**context** 49:3 65:14
304:4 318:24
389:4

**continue** 242:24
323:15 354:17
357:12

**continued** 3:1 4:1
6:5 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 194:9 226:9
324:24

**continues** 272:23
287:25 319:10

323:11

**continuing** 73:8
95:21 305:23

**contract** 198:14
203:5 221:2
230:18 325:6
394:13

**contracted** 198:13
198:16 324:9

**contrast** 340:25

**contributor**
287:12 288:4
292:15 300:3

**control** 144:17
147:20,25 263:14

**controlled** 69:17

**controversial**
275:6

**conversation**
157:4 318:18,23
392:14

**conversations**
42:2 89:15 90:5,9
93:2 144:7 147:18
148:4,11,13
156:14,15 216:8
245:10 369:17
371:20,25 375:3,4
390:25 392:7,13

**coordinated** 361:4

**coordination**
94:25

**copied** 204:7

**copies** 45:21,22,24
47:22

**copy** 45:18 46:2,5
46:7,9,14,18 47:1
47:6,11,17 51:7
57:2 135:19
198:24,25 238:12
238:13 246:13

273:21 285:20
303:18 313:23,23
317:23 321:13,13
344:21 350:12

**copying** 286:15,15
348:21

**core** 361:5

**coroner's** 150:18

**corporation** 3:7
3:18 4:8 27:12,14
367:18

**correct** 32:6 35:16
35:17,20 36:19
40:17,18,23 51:21
53:4 58:3,16,17
60:12 62:8 70:18
71:2 72:20 73:14
73:17 74:7 75:23
75:24 76:2,14,15
76:20 77:4,14,22
78:11,18 80:14
82:17 83:5,6
84:10 85:2 86:1
86:11,13,20 88:5
88:20,21 97:8,11
97:18 98:10
102:19 103:10
104:1 105:25
106:7 107:10,21
107:23,24 108:4,7
108:24 109:8,10
109:11,14,25
110:2 114:17
115:8,23 117:5,17
119:7,16 121:1,2
123:6 127:10
129:1,5 131:3,5,13
132:3,4,14,15,21
134:18 135:4,12
141:16,25 144:21
144:22,24 145:18

147:8,15 152:14
155:3,14,20,23
157:8,9,14 169:15
171:4,8,10,14
173:22,23 174:23
175:11 176:1,2,6,7
176:15,17 180:3
180:19 183:7
184:6,13 185:20
185:21 189:6,13
189:15,22,23
190:1,5,11,12,21
191:13,14,21
192:24 204:9,15
204:19 205:1
212:20 216:16
217:4,16,17,23
218:9,17 228:11
228:12,13,14
229:4,5 231:13
240:2,3,6 243:22
245:21 247:24
269:4 272:11
286:18,19 288:4,5
289:12 292:18
293:18 294:9,16
294:23 295:3,13
296:12,20 301:6
303:9 304:24
305:9,10,12
306:22,23 307:25
309:5 310:11
313:11 315:17,18
321:17 322:1,6
323:9,10 327:4,19
328:2,9,11,16
329:2,17 330:3,4,9
331:5,13,17,22
332:15 340:19
341:14 342:2,10
342:18 343:14

344:1 345:20
346:5,20 349:3
351:12 359:8
362:16,21 364:11
364:15,23 366:12
371:11 374:15
376:8 378:1 379:5
380:11 386:3
388:15,16 389:19
389:20 391:13
**corrections** 395:12
397:17
**correctly** 383:17
**correlates** 240:25
**correlation** 115:16
253:16,21 254:2
390:13 392:8
**correspondence**
52:21 53:20
**cost** 84:13 85:4,14
87:6 154:20
174:13 192:11
197:22 285:6,11
322:18 333:10,21
333:22 335:9
358:6,7,13,25
**costing** 228:21
**costly** 282:10
358:15
**costs** 85:11 87:24
184:10 197:16,22
197:23 198:4
228:16 229:2
273:12 283:4
335:6
**council** 7:21
360:19,20,21,22
360:24 361:1
363:20
**counsel** 2:12,13
5:3 26:12,24,25

32:24 42:2 44:1
48:3 153:18 154:4
198:25 202:14,16
213:5 238:13
273:22 285:20
303:19 305:20
313:24 321:14
338:20 344:22
347:23 350:12
361:6 394:10,12
**counseling** 164:12
**count** 136:11
139:10 141:10
171:17 187:9
258:8 260:7 298:3
**counted** 258:11
**counties** 94:25
178:3,5,8,8 179:9
237:6
**counting** 128:8
**countries** 67:13
**counts** 295:2
**county** 1:9 2:2,10
2:14 6:9 7:4,20
26:15,18,21 29:12
29:23 30:5,23
31:15,21 38:1
40:2,16 49:8,10,11
49:12 53:3 56:6,8
59:5 67:14,18
68:2,20 69:21
77:21 78:7 81:20
89:21 105:15
106:24 108:22
112:12 120:3
124:2 125:2
126:11 127:9
128:23 129:1
135:18 138:20
142:25 145:10
149:10 150:15

151:21 165:22
173:19 177:23
178:10 179:2
182:18,21,21,24
183:1 194:18
195:2,5 196:13,15
196:16 197:1
199:6,19 202:10
205:10,20,22
211:24 227:20,21
229:10,18 240:2
243:19 245:20
246:24 250:5
251:1,21 252:19
254:8 264:24
265:6 268:24
269:4 271:23
272:17 275:20
277:3,7,22 299:20
302:2,16,22 314:2
315:25 316:12
317:13 318:9
319:21 321:16
323:12 332:11,12
333:10,12 345:18
351:6 354:1 356:9
357:24 359:19
360:25 364:22
366:10 367:25
368:7 369:19
371:7 372:11
394:4 396:10
397:15
**couple** 30:19 33:2
59:10 64:21 74:3
83:22 92:8 99:23
118:15 153:5
185:14 193:14
211:19 239:15
248:20 256:12
296:9 316:15

324:3 337:25
381:12
**course** 33:25
35:19 36:1 40:22
43:1 82:22 95:1
111:3 115:22
157:1 171:7 181:2
189:8,18 207:1
265:3 305:25
335:13 351:15
**court** 1:1,15 5:8
5:14 26:10 27:15
28:3,9 41:19
48:10 50:10 56:20
148:10,11 202:9
202:20 239:23
240:10,12,16
243:17 263:15
265:5,5,8,9,11,18
266:25 267:4
297:15 323:23,24
354:21 377:6,13
396:7
**courts** 93:7 265:7
265:7 354:17
**cov.com** 4:12
**cover** 275:17
**coverage** 325:1
**covered** 336:25
370:13
**covington** 4:9
41:18,22
**crack** 70:11 211:4
260:14 359:5
**crackpot** 363:12
**craig** 239:10
**create** 36:14
129:25 317:18
**created** 70:25
188:16 200:19
206:12 247:16

248:6 268:8
371:11 382:15
**creates** 207:21
377:10
**creating** 35:22
36:16 37:14 38:2
40:4,21 194:24
384:23
**criminal** 241:15
242:19 243:2
354:8
**crisis** 109:22,22,22
172:22 175:23,23
190:10,10 251:25
252:8 361:11,20
372:9 381:17,20
**criteria** 53:19
217:14,20,25
218:2
**critical** 284:19,24
361:18 366:11
**criticisms** 362:25
363:4 365:13
**cross** 151:9 155:5
155:8
**crum** 4:14
**crying** 167:3,6
**culprit** 75:21
**culture** 382:15
384:23
**cumbersome**
184:22 221:1
**cures** 280:4,9,10
**current** 183:8,10
194:17 199:17
214:2,3 215:2
219:11 232:6
345:11,11
**currently** 51:14
92:4 118:1 209:5
237:19 263:17

282:6 352:10,12
352:14 378:16
**custody** 82:14
151:13 187:23
230:21 231:21
240:13 254:4
255:4,6 256:10,11
322:18 328:24
329:10,11 330:21
333:19,25 349:19
351:7,21,21 352:2
352:3,4,6,10,15
353:16 354:12
357:13 358:19,23
**cut** 341:25
**cuts** 172:9
**cuyahoga** 372:10
**cvs** 55:14 388:12
388:18 389:10
**cw** 239:2
**cycle** 179:18 180:7
180:12,24 185:11

**d**

**d** 1:16 2:13 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
194:1 394:6,13,16
**d.c.** 3:21 4:5,11
**damages** 49:21
127:5 279:3
336:17 389:12
**dan** 1:8
**danzy** 231:23
232:1
**darin** 209:4 332:9
333:2 338:8

**darlene** 275:18
**darvocet** 65:18
**data** 47:15 67:17
72:17 73:13,21
74:10,20,25 75:10
76:5 79:12 81:21
91:18 95:5 100:21
106:20 107:7,13
107:15 111:11
116:20,23 117:3,4
117:9,23 119:6,7
119:15,19,25
120:9 123:16
125:2 126:7
129:10,11,24,25
130:3,16 131:22
132:19,24,25
133:2,15,19,21,25
134:1,4,5,16
135:16 136:3
137:2 139:1,1,6,12
139:24 140:1
141:25 142:24
143:6,7,9 145:5,9
145:11 149:3,4
151:20,22 155:8
176:1 206:14
218:11,12,24
219:3 229:19,20
246:24 251:4,4
253:25 254:6,14
254:18,20 258:2
259:16 286:9
288:17 289:9
291:20,24 292:11
293:17,25 294:1
295:17 298:6
300:21,22 301:10
309:15 325:19,23
328:9 329:17
338:7 341:5,8,18

342:1,5,5 344:11
347:14,16 348:10
352:8,9 356:4,8,19
357:1,2 358:5
370:20 371:16
372:1,3
data's 251:6
database 120:22
132:9,10 290:4,14
291:7
databases 132:10
135:5 143:12
date 26:6 239:1
249:9 394:9 395:8
396:3,9,19 397:3
397:13,25 398:20
398:25
dated 43:16 44:16
davidson 51:15
212:25 286:15,17
287:8 291:18
303:22 306:10
345:2,10
day 1:23 2:20 27:2
48:17 73:4 95:2
194:21,21 304:1
333:2,2 344:24
371:23 381:9
383:8 396:16
397:22 398:22
days 268:8 395:18
deal 76:24 147:10
162:22 191:3
196:9 212:8 233:6
235:2,18 282:15
305:21 380:22
dealing 72:2 153:7
153:9 158:13
161:4,19 162:20
227:9 234:22
240:14 260:13

316:24 371:23
dealings 63:8
deals 196:14,14
319:21
dealt 71:12 240:4
dear 395:10
death 144:17
145:25 147:20
152:1 154:19,20
168:12
deaths 68:3 69:14
76:2,6 144:12,13
144:19,23 145:6
146:3,11 150:10
151:7 152:4,7,10
153:8 154:10,13
155:13,18 165:12
169:23 170:2,8,17
225:7,20 253:18
364:21
deceased 372:23
december 1:22
26:3,7 29:19
91:24 194:3 214:2
362:21 393:19
395:4
deciphered 89:15
decision 263:16
decisions 140:14
263:15
declare 277:16
decrease 172:14
173:6
decreased 173:12
192:17 224:16
deed 396:14
397:20
deemed 395:19
defendant 2:18
3:2,7,12,18 4:8
61:11,25 62:1

386:14 387:4
defendants 1:14
4:2 5:6 55:5,10,20
56:7,12 57:7,25
58:11,20 60:3,12
62:9 63:25 64:10
367:13,13 380:24
383:11 385:2
388:15
deficit 180:24
181:1
define 64:18
defined 361:8
394:13
definitely 66:14
100:23 109:6
172:14 244:10
245:5 252:2
264:20 313:14
362:11 364:12
defrancesco 3:20
27:10,10
degree 31:7,8
189:21 379:17
degrees 220:25
delay 227:1
333:16
delinquent 354:18
delivery 128:24
271:7,10,16
demands 323:9
demonstrate
299:6 333:10
department 30:15
31:17,25 38:13,14
38:15 51:9,10,16
91:15 92:3,4,6
159:17 195:22,22
195:25 196:3
199:25 200:11
203:19 204:3

209:2 214:4,8,16
215:1,6,19 216:10
216:12,13 218:13
219:15,23 221:9
221:12 222:4
223:25 224:8,14
231:22 234:2,3,18
234:22 235:8,11
243:17,18 286:23
287:1,3 303:8
350:21 370:9
395:22
department's
271:19
departmental 47:9
departments 30:6
47:15 195:21
200:19 216:4
depend 53:18
depended 251:5
336:1
dependent 255:8
263:19
depending 78:24
82:21 149:22
221:22
depends 37:8
52:12 65:13 80:20
106:12 117:6
223:7 251:3 325:7
329:20
depicted 199:9
237:18
depleting 183:12
deposed 32:12,16
48:25 49:4 57:14
deposition 1:12
5:5,10,16,18,19,21
26:8 32:23 33:13
42:19 43:6,16,23
48:2 49:22 305:21

305:23,25 313:20
321:11 344:21
393:17 394:8,11
395:8,11 396:1,3
397:1,3
**depositions** 49:25
**deputy** 2:12
203:17 209:4
212:22 213:1,7,25
214:7
**describe** 262:20
**described** 59:19
62:10 98:7 109:21
190:11 206:18
231:22 246:25
269:1 270:14
277:12 278:2
294:6,22 308:6,16
309:8 317:17
331:12 341:2
359:3
**describes** 242:18
303:2
**describing** 66:7
76:25 209:8
240:19 264:9
326:11
**description** 263:23
311:21
**destroyed** 37:1
39:11
**destroys** 38:19
**destruction** 37:2,4
37:14 38:20
**detail** 57:4 199:16
**detailed** 345:1
**details** 37:11
47:21 122:4
338:25 339:1
**detectable** 154:12

**determine** 217:24
335:6 357:12
391:9
**determined**
232:19
**detox** 382:24
**developed** 323:13
**development** 36:2
200:6 235:4
236:17
**developmental**
196:22
**developments**
250:4
**die** 152:25 155:6,7
161:8 163:16
168:2 170:4,4
**died** 150:19,22
152:6,10 154:10
154:25 161:9
163:16 168:4,5
365:24 372:20
**dies** 163:25 164:19
170:12
**difference** 65:23
134:10 183:22
220:19 332:22
**different** 31:20
48:24 53:20 61:7
61:14 63:13 64:21
65:13 66:25,25
75:18,19 80:22
83:1,14 85:18
86:17 88:18 99:24
102:13 104:6,10
107:15 108:16
113:15 118:10,15
124:19 153:16
165:14 178:1
195:20 198:10
217:8 220:15

221:10 223:16
225:6 239:16
254:22 257:2,7,24
257:24 265:6
286:11 292:8
295:18 304:6
324:3 330:21
332:19 335:8,25
336:2,3,20 337:11
372:10 374:24
**differentiate**
105:21 106:9
**differentiated**
106:7
**differentiating**
134:12
**differently** 88:9
102:14 223:2
**difficult** 90:23
**difficulties** 41:14
**difficulty** 226:20
**diligent** 244:13
**diplomate** 1:17
394:6,17
**direct** 63:8 200:1
214:16 217:2
278:18
**direction** 191:9
313:10
**directly** 104:19
157:3 201:1,5
268:20 270:16
**director** 2:12
29:11,17,19,22
31:21 34:1 35:15
35:23 36:17 38:22
40:1,15 51:10,16
63:16,22 77:21
83:18 85:16 92:3
92:9,11 130:3
135:8 136:10,19

148:12 149:14
157:21 172:7
177:3 183:19
184:17 194:18
197:3 199:10,23
201:2,21 202:21
203:17,18 206:15
206:20 208:4
209:4,14,16,19,24
211:14,18 212:22
213:1,8,21,25
214:1,1,5,7,8,17
215:1,6,21 219:16
219:22,24 231:22
234:18 277:3,7
280:19,25 287:2
302:2 305:12
319:9 321:23
322:3 348:15
363:10
**director's** 212:15
**directors** 94:18
212:18 214:4
**disabilities** 196:23
**disagree** 337:7
**discovered** 305:25
**discovery** 34:6,10
34:14 160:5
302:24 303:1,6
377:7
**discuss** 203:9
306:6
**discussed** 33:12
63:13 168:11
175:25 212:1
242:4 302:6
**discussion** 104:19
124:22 146:25
148:5 156:3
208:15 249:23
270:1 286:12

[discussion - drop]

314:12,14 316:24
317:3 318:12,15
319:14,25
**discussions** 89:19
90:25 91:11 92:22
93:5,8 147:9,23
152:20 176:4
208:19 210:9,16
211:1,8 212:9
284:14 302:15
315:15 365:20
**disease** 319:14
**dismissed** 49:21
49:23
**disorder** 65:3,11
83:15 85:10 93:12
99:8,11,16 257:13
358:21
**disorders** 116:17
116:24 242:13
256:20 262:8
265:13 329:11
**dispense** 369:1
389:4
**dispensed** 109:13
130:5
**disposition** 73:6
297:19
**dispute** 151:14
202:2
**distinction** 149:16
**distraught** 161:15
**distributed** 60:17
108:23 109:8
368:25
**distributing** 56:16
61:23 383:14
388:21
**distribution** 62:5
367:24 368:6

**distributor** 61:11
128:17 369:22
384:4 389:10
**distributors** 58:22
60:7,16 62:17
63:9 367:14
368:23,24 369:2,9
369:11 388:20
389:9
**district** 1:1,2
26:10,11 30:17
**division** 1:3 26:11
195:12,13,16,16
200:1,23 201:4,8,9
202:9 204:3,6,15
212:23 213:2,5,9
214:15,25 223:15
223:20 234:13,16
236:3,5 348:24
**divisions** 195:10
200:19
**docket** 265:11
**doctors** 59:8,17,25
382:13 386:19
**document** 1:7
35:14 37:8,9,16,17
38:24 52:13 53:16
65:14 118:16
156:24 160:2
162:6 188:4
198:22 213:13
236:7 260:11
264:21,22 291:9
298:22 305:24
306:20 313:1,21
317:20 328:18
343:20 345:22
347:24 367:6
372:2
**documented**
168:23 257:19

287:11 288:11
290:20 292:14
296:23
**documents** 33:9
33:18,20,20,24
34:5,5,9,14,19,22
34:25 35:2,18,19
35:21,25 36:2,3,4
36:6,10,13,15,22
37:12 38:1,13,19
38:19,23 39:7,9,15
40:4,21 41:1,2,4
42:7,11,15,17,20
42:21,24 43:3,5,16
43:19,20 44:1,2,15
44:15,20 45:7,17
45:24,25 52:10,16
52:20,22,23 54:21
64:20 65:9,9
116:21 135:25
140:5,11,13,15,18
141:8 156:4 157:1
157:17 160:4,12
160:15 162:1
168:9,10,19,21
188:5,15,15 189:2
190:11 203:8
206:11,22 207:6
207:20 208:22
209:9 210:12
212:11 219:7,11
222:20 226:6
242:1 273:25
276:17 278:25
302:18,24 303:7,7
305:7,15 306:5
317:9,15 339:11
367:9 370:5
371:10,16 372:3
381:4,22

**doe** 378:22
**doing** 87:25 88:2
88:12 137:6
160:20 162:12
163:19 229:20
234:6 266:12
270:4 276:15
279:7 342:7 345:5
346:18,21 355:12
370:1
**dollar** 269:3
**dollars** 173:11
282:11
**donald** 191:6
**door** 311:3 370:17
**doubled** 322:23
323:3
**doubt** 115:2
**downstream**
163:5
**downturn** 172:10
172:21
**dozen** 249:6
**dramatically** 80:4
330:19
**drawing** 328:21
**drilling** 145:16
**drive** 3:9
**driven** 89:5,6,7
221:1 225:23
226:13,18,19
372:1,2
**driver** 260:1
261:21
**drivers** 86:4 165:7
**driving** 75:22
79:22 86:18
295:11
**drop** 172:11,21
226:10 312:25
351:12,15

**dropped** 77:2 80:4
172:16 173:20
225:21,22 313:8
342:9 343:2 351:8
**dropping** 311:10
**drug** 3:18 27:11
27:14 57:24 58:13
59:4 61:17 65:4
65:16 66:9,13,13
66:17 68:7 69:3
69:14 70:8 72:18
73:13,22 74:2,6,10
74:11 81:21 82:9
82:12 89:1 91:4
100:21,22 101:21
106:12,15 107:14
107:22,23 108:2
109:2,5,8,13
111:21,25 112:3
113:1,2 114:2,16
117:5,16,22 121:4
121:5,6,8,11,11,18
121:25 122:1,7,13
122:13,21 123:4
123:14,19,24
124:7 126:8,14,18
126:20 128:1,16
130:7,15 132:12
132:20 133:16,18
134:13 136:7,8,14
137:16 138:4
143:2,14,21
147:10,11 149:21
150:6 155:1
158:17 160:7
167:16 180:19
188:12 210:14
265:7 271:9
275:19 288:7,8,11
289:11,19 290:3,6
290:20,22 293:17

293:23 294:15,15
295:12 306:17,18
306:21 327:5
345:20 346:3,5
350:4 354:6,7
357:11 359:12
366:9 367:18
371:9 374:4,20,20
375:13 376:17
378:8,23 387:16
**drugs** 60:18,19
61:23 64:25 65:1
65:19 75:19,20
78:14,22 80:17,18
82:9 85:12 87:2,7
88:1 89:6,7 100:9
105:23,24,25
108:15,23,23
111:7 112:7,17
113:6,10,16,19
114:8 115:22
128:8 130:11,12
147:19 163:14
170:4,5 175:11
210:10 243:1
253:15 294:7,8
295:7 304:7
306:17,24 307:3
308:14,24 310:21
341:11,12 374:24
374:25 375:1,25
382:11 384:22
386:12 389:4
**dublin** 239:5
**due** 175:4 242:25
262:18,25 296:12
**dufore** 232:11
**duly** 29:2
**dump** 354:17
**duplicate** 388:10

**duties** 38:21 40:22
51:17
**dying** 151:16
161:7 377:19

**e**

**e** 2:4 6:1,15,19,21
7:1,6,8,10,13,15
7:17,19 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1,1 35:16
36:7 47:11 53:2,3
53:6,10,11,14,16
53:21 54:1,10
55:2 92:18 141:24
142:6 194:1,1
204:7 238:16,19
239:14 242:1
244:14 273:20
274:9,13 275:17
276:15 285:19,22
286:14 302:18
303:16 309:23
317:22 321:19
332:5,8 333:15
340:13,14 344:23
347:5,9,15 348:11
349:8 350:13,16
351:6 352:23
355:24,25 356:1
360:11 373:11
394:1,1
**ealexander** 3:23
**earlier** 42:2 43:17
44:16 92:5 116:6
147:8 195:8 198:3
210:8 250:14
258:7 275:24

287:17 299:13
312:22,23 313:9,9
315:20 326:17
336:11 340:19
350:3 373:25
375:20 383:5
**early** 69:25 81:6
91:7 93:10 100:24
383:8 388:13
389:24
**earmarked** 186:23
187:3
**easier** 143:24
**east** 3:21
**eastern** 1:3 26:11
**economic** 172:10
172:21
**educated** 144:14
**education** 30:25
31:4,4,7 69:12
143:22 144:9
220:24 221:22,25
**educational**
242:12
**effect** 5:19 163:5
168:14
**effective** 326:1
**effectively** 149:24
241:14
**effects** 264:2
277:11 278:12
280:16 382:2
**effort** 185:10
263:13 351:25
361:4
**efforts** 73:20
93:15,21,23,24
95:4,7 96:10 98:4
98:18 156:5
176:23 289:8
321:1

eight 222:10
327:16,25 351:16
eighth 329:1
eileen 315:22,24
either 68:3 125:11
171:22 175:23
200:13 266:12
272:15 356:9
357:2 378:15
elaine 318:9 319:6
319:7
elected 176:10
189:11
element 222:16
eliminated 324:23
elizabeth 51:17
92:5 286:16,21
else's 50:16 101:14
email 395:17
emancipating
231:21
emancipation
230:12
emergencies 50:17
emergency 277:16
353:19
employed 81:20
394:10,12
employee 49:5,13
164:6 168:14
186:3 228:16
394:11
employees 73:24
153:13 162:11
361:3
employment 30:10
enclosed 395:11
ended 95:22
274:20 378:8
endless 373:4

endo 4:2,2 41:9,10
endpoint 128:18
ends 57:18 219:20
231:20 249:2
267:22
enforcement 93:5
162:25 353:16
354:4
engagement 244:5
249:5
enjoy 324:18
entered 76:10
119:6,16 132:21
133:19 327:7
397:9
entering 260:12
327:25
entire 56:24 70:16
163:10 175:10
179:18 180:7
201:21 223:24
305:11 396:5
397:5
entities 243:22
362:9
entitled 130:6
entity 143:1 279:1
360:23 363:9
365:14
entries 202:12
entry 248:5
environmental
82:23
eop 282:19
epidemic 32:19
62:19 93:13
144:10 163:11
165:5,5,22 166:5
167:25 168:7
175:4,22 187:5
190:10 192:10

210:20 211:4,5
227:19 229:7,9
249:7 250:16
252:14 253:7
254:3 262:24
268:7 269:2
277:12,18 278:2
279:11 291:22
292:17 314:15
315:8 318:12
319:15 333:11
353:2 354:4 363:3
372:8 374:7
379:23 381:17,19
381:21 382:2,4,8
386:9 390:23
epidemiologist
81:20 332:10
eric 3:19 27:13,13
errata 395:13,18
397:7,10,18 398:1
especially 324:22
esq 2:3,4,4,12,13
2:19 3:3,8,13,19
3:20 4:4,9 395:5
essentially 33:25
57:18 62:11 75:20
86:17 97:7 105:14
107:19 123:5,8
133:15 151:17
175:20 221:3
240:15 260:1
261:20 285:24
319:21 328:25
340:22 341:24
356:22 363:1
establish 323:15
estimate 73:22
126:10 137:15
258:24 259:8
260:2 333:17

335:9 336:20,22
338:12
estimates 336:9
342:18
estimating 71:11
et 1:9,10
evaluate 64:9
359:18 376:20
evaluating 377:23
events 162:21
164:23 374:14
eventually 67:14
111:6 280:3
exacerbated 70:25
exact 144:1 308:19
341:9
exactly 33:8 70:2
89:1 111:1 247:6
383:18
examination 1:14
5:7 6:4,5,6,6 29:5
194:9 381:7 388:5
examined 29:3
examiner 148:14
examiner's 93:6
145:23 149:11
example 38:12
42:25 43:2 45:21
46:1 52:21 60:20
85:5 87:10,12,18
91:6 95:11 99:6
122:23 164:7
199:21,22 200:6,7
200:25 203:5,20
214:20 223:10
235:5 269:17
280:2 281:3
297:16 330:22
376:12 377:21
378:20 379:2
390:24 392:10,21

[examples - false]

Page 26

examples 372:12
372:18 373:4,18
374:9 377:15
378:6,12 379:3,20
380:1,4,13 392:16
exceeding 184:7
excessive 59:18
62:11
excuse 27:13
executed 397:10
execution 396:14
397:19
executive 2:12
29:11,17,18,22
34:1 35:15,23
36:17 38:22 63:16
63:22 83:18 85:16
130:2 135:8
149:14 157:21
177:3 194:18
197:3 199:10
201:21 202:21
203:18 205:9
206:14,19,23
207:16 209:4,14
209:16 211:18
212:15,17,22
213:1,7,25 214:7
277:3,6 280:19,24
302:1 305:12
315:19,25 318:10
320:7,8 321:23
322:3 363:10
exhibit 6:9,12,15
6:18,20,22 7:4,6,8
7:10,12,15,17,19
198:18,22 199:1,4
234:15 237:18,24
238:8,12 239:21
260:11 265:1
266:6,17,19

273:16,21 285:13
285:18 303:11,15
303:19 313:16,21
321:6,11 331:24
332:3 340:2,6
342:1 344:16,21
347:1,5 350:7,11
355:18,22 360:2,9
exhibits 6:8 7:3
exist 36:22,25 39:8
39:20,22 53:13
140:15 141:9
157:13 160:12
244:22 346:3,8
exists 129:10
353:19
exit 156:14,16,23
157:1 158:25
159:2,2,13,16,17
159:20 160:1,2,4
160:14,15 161:1
exits 225:6
expect 208:14
211:7 212:7
298:25 310:22
expected 180:17
184:10
expenditure
197:15 209:10
210:15 212:9
expenditures
183:23 187:4
197:1,13,14
198:11 208:15,17
209:11
expense 198:9,13
198:16
expenses 185:9
197:6 333:23
experience 159:24
161:19 162:13,20

169:15 221:23
222:1 250:25
251:21 260:16
261:8,16 262:14
262:17 296:25
312:4 370:23
371:18
experienced
161:15 163:12
experiences 372:6
experiencing
153:7 167:4,6
323:16
expert 129:17
152:1 283:16
expertise 200:13
experts 390:23
expiration 396:19
397:25 398:25
expires 394:21
explain 42:9 179:1
181:7 194:16
195:1,9 220:18
221:2 229:25
351:14
explained 328:25
explanation
220:23
exploding 81:10
explored 377:12
exposed 262:22
exposure 366:9
extended 232:9
extensive 210:6
222:18 227:4
317:3
extensively 212:3
265:19
extent 100:7 202:5
211:11 283:6
285:1 336:24

extra 215:23
extract 136:6
extremely 283:21
eyes 213:16

f

f 394:1
facilities 212:23
facing 234:21,25
fact 58:5 76:25
114:23 256:9
297:20 312:8
327:6
factor 85:6 118:18
161:22 192:12
262:1 284:5
296:16 297:1
factoring 118:24
factors 82:22,23
82:23,24 86:7
173:14 208:16
209:10 300:24
312:6 351:18
facts 188:22 189:5
189:12 367:17
372:7 376:22
377:9
factual 391:4
failed 208:21
fails 163:25
failure 163:24
fair 85:20 176:14
361:21
fairly 78:21 79:13
122:2 171:16
177:11 185:4
225:2
faith 319:4
fallout 249:11
falls 348:23
false 363:24 364:3
384:21 386:11

familiar 57:3
243:21
families 32:20
99:20 127:19
134:3 137:5
162:21 230:15
233:5,6 242:24
244:3 254:25
255:3,4 256:4,19
260:13 263:4
279:25 282:23
284:24 310:6
320:21 323:16
325:10,13,16,20
326:13,20,25
327:8 349:19
354:19 355:6
358:22 370:25
family 7:21 29:23
30:15 31:15 32:1
73:8 84:9 122:16
163:19,22 196:2
230:14 243:19
265:8,17 267:3
283:10 312:5
319:9 323:23
349:20 360:20,21
360:24 361:1,5
far 34:22 35:1
36:21 53:12 54:1
54:12,14,24 65:9
66:2 67:3 68:23
84:3 85:2 89:2
105:17 110:15
136:22 138:18
140:9 150:25
165:23 171:18
178:11 179:7
225:12 269:2
291:21 301:21
344:12 367:1

fashion 108:24
154:24 159:25
218:9 369:2
faster 261:4,16
father 357:18
fax 2:7,16,23 3:5
3:10,16,22 4:6
fcfc 360:19
feasible 258:12
february 7:8,10
7:17 40:16 306:12
307:15,15,17,25
308:3,5 309:7
310:18 340:15
344:24 356:3
federal 1:15 5:7
95:12 97:17
177:12 186:6
273:2,4,6,12
277:10 278:9
279:6 280:1,17
281:5 377:6
feed 295:24
feel 48:22 69:17
80:25 88:8 104:11
137:1 147:19
187:10 259:13
292:12 299:8
370:18 371:24
feeling 163:20
felt 137:1 292:22
300:21 301:3,8
363:23,25
fentanyl 66:10,14
66:18 101:22
144:20,21 146:5
146:13,13 191:20
191:20,24 307:2
365:6
fentanyls 66:25

field 32:5 74:18,19
116:7 117:8,22,23
117:24 118:2,5
120:7,8,9,10
123:22 124:11
126:18 151:24
159:22 169:1
216:20 217:7,9
258:13,18,20
290:25
fields 117:16
118:10 217:4
292:8,9
fifth 3:14
figure 64:14 121:6
123:13 138:2
259:4,21 290:5,6
302:19 356:21
376:22 379:5
file 45:18 46:14
119:8,11 136:1
142:14 168:21
207:7 217:22
240:11 289:6,6,7
289:20 290:5
291:6 310:11
353:10 376:21
377:13 379:5,18
filed 46:15 56:20
files 46:5,10,18
47:2,6,9,12,14
51:7,18,18 123:17
124:2,3 129:10
135:3,12,19 136:5
136:6 142:10,11
142:18,23 158:19
169:25 170:20
171:2 288:19
302:17 376:19,20
379:4 391:8

filing 54:6 354:21
fill 55:24 168:19
filling 205:7
final 31:20 326:6
338:12
finance 209:18,19
finances 210:21
financial 64:14
102:17 103:6,23
105:14,21 106:23
108:21 109:18
124:18 128:23
155:11 208:12,23
212:9 227:13,23
233:8 285:10
322:20 332:17
338:8,9
financially 179:14
182:22,25 394:12
find 90:21 207:17
228:10 236:2
258:13 288:10
290:22 307:11
354:5 395:11
finding 39:6
319:16
fine 193:15 360:10
381:23
finish 348:7
finishing 298:21
first 7:21 29:2
63:20 92:17 102:3
102:8,18,21 103:1
110:14 112:3
113:1,1 114:2,16
139:5 140:8
156:19 162:19,23
185:13 186:1,4,13
186:16 197:18
200:20 205:4
220:5 224:22

| | | | |
|---|---|---|---|
| 227:10 228:21 | 12:4,5,6,7,8,9,10 | 22:11,12,13,14,15 | 108:5,25 110:1,3 |
| 237:7,13 238:21 | 12:11,12,13,14,15 | 22:16,17,18,19,20 | 110:19 111:16 |
| 249:4 268:8 282:7 | 12:16,17,18,19,20 | 22:21,22,23,24,25 | 112:4,18 114:3,18 |
| 286:14 287:14,15 | 12:21,22,23,24,25 | 23:4,5,6,7,8,9,10 | 115:1,9,18,24 |
| 321:24 322:6 | 13:4,5,6,7,8,9,10 | 23:11,12,13,14,15 | 116:12 117:18 |
| 336:4 351:5 | 13:11,12,13,14,15 | 23:16,17,18,19,20 | 121:9 122:8,19 |
| 360:20,22,24 | 13:16,17,18,19,20 | 23:21,22,23,24,25 | 123:21 124:8 |
| 361:1,6 | 13:21,22,23,24,25 | 24:4,5,6,7,8,9,10 | 125:4,17 126:15 |
| **fiscal** 195:16 | 14:4,5,6,7,8,9,10 | 24:11,12,13,14,15 | 126:25 127:11 |
| 205:17 208:4 | 14:11,12,13,14,15 | 24:16,17,18,19,20 | 129:2,14 130:8 |
| 209:2 212:22 | 14:16,17,18,19,20 | 24:21,22,23,24,25 | 131:4,14 132:5,16 |
| 214:15 | 14:21,22,23,24,25 | 25:4,5 26:14,14 | 132:22 133:5,23 |
| **fit** 66:6,11 67:2 | 15:4,5,6,7,8,9,10 | 33:10,15 34:2,16 | 134:19 135:13,21 |
| **five** 37:7 52:9,17 | 15:11,12,13,14,15 | 35:9,24 36:8,18,23 | 138:3,6,24 140:21 |
| 130:2 135:7 187:9 | 15:16,17,18,19,20 | 37:22 39:2,17,21 | 141:17 142:1,13 |
| 187:13 188:9 | 15:21,22,23,24,25 | 40:7 41:15,23 | 143:4,15 144:4 |
| 216:6 261:3,17 | 16:4,5,6,7,8,9,10 | 42:13 43:7 44:3,7 | 145:1,19 146:7,15 |
| 264:14 268:12,25 | 16:11,12,13,14,15 | 44:10,17,24 45:10 | 147:16 148:2 |
| 270:14 272:9 | 16:16,17,18,19,20 | 46:21 47:3 51:23 | 150:2 151:3,19 |
| 349:9,13 381:1 | 16:21,22,23,24,25 | 52:11 54:17,22 | 152:15 153:18 |
| **fix** 50:19 | 17:4,5,6,7,8,9,10 | 57:9,21 58:2,4 | 154:1,5,15 155:4 |
| **flat** 329:25 | 17:11,12,13,14,15 | 59:6,20 60:13 | 155:16,22 157:15 |
| **flip** 251:15 | 17:16,17,18,19,20 | 61:4,12 62:2,14 | 158:1,21 159:5 |
| **florida** 2:22 | 17:21,22,23,24,25 | 63:6 64:2 65:2,25 | 160:8,13,24 162:4 |
| **flowers** 2:3 8:4,5,6 | 18:4,5,6,7,8,9,10 | 67:19 68:5,12,21 | 163:8 165:9,24 |
| 8:7,8,9,10,11,12 | 18:11,12,13,14,15 | 68:24 69:6,23 | 167:12,20 168:16 |
| 8:13,14,15,16,17 | 18:16,17,18,19,20 | 70:1,20 71:3 | 169:3 170:9,18,21 |
| 8:18,19,20,21,22 | 18:21,22,23,24,25 | 72:12,21 73:15 | 170:23 171:9 |
| 8:23,24,25 9:4,5,6 | 19:4,5,6,7,8,9,10 | 74:14 75:11 76:3 | 172:24 174:24 |
| 9:7,8,9,10,11,12 | 19:11,12,13,14,15 | 76:16 77:5,15,25 | 175:12 176:18 |
| 9:13,14,15,16,17 | 19:16,17,18,19,20 | 78:12 79:1,24 | 177:6 178:13 |
| 9:18,19,20,21,22 | 19:21,22,23,24,25 | 80:7,23 82:2,18 | 180:4,20 181:24 |
| 9:23,24,25 10:4,5 | 20:4,5,6,7,8,9,10 | 83:12 84:4,15,25 | 184:14 185:22 |
| 10:6,7,8,9,10,11 | 20:11,12,13,14,15 | 86:9,12,21 87:4 | 186:9 187:2 |
| 10:12,13,14,15,16 | 20:16,17,18,19,20 | 88:6 89:8 92:25 | 188:13,24 189:7 |
| 10:17,18,19,20,21 | 20:21,22,23,24,25 | 95:9 96:14 97:9 | 189:14 190:13,22 |
| 10:22,23,24,25 | 21:4,5,6,7,8,9,10 | 97:21 98:8,19 | 191:15,22 192:5 |
| 11:4,5,6,7,8,9,10 | 21:11,12,13,14,15 | 100:17 102:11,20 | 192:22,25 193:11 |
| 11:11,12,13,14,15 | 21:16,17,18,19,20 | 102:22 103:11 | 202:4,23 203:1,16 |
| 11:16,17,18,19,20 | 21:21,22,23,24,25 | 104:2 105:7 106:1 | 204:11,16,25 |
| 11:21,22,23,24,25 | 22:4,5,6,7,8,9,10 | 106:8 107:2,11 | 208:18 210:17 |

211:10 212:13
217:5,18 218:18
226:1,16 228:18
242:5 245:22,24
246:14 247:25
248:10 249:19
250:6 251:2 252:1
252:10,21 253:12
254:12 255:16
257:20 259:5
260:18 261:10,14
261:24 264:3
266:7 267:2
268:18 269:5,11
270:8,15 271:13
272:19 277:13
278:5 279:12
281:1 285:4,8
288:13,20 289:13
289:22 290:8,12
291:8 292:19
293:6,11,19
294:10,17 295:4
295:14 296:13,21
298:12,14,16,20
298:23 299:2,22
300:7,13 301:7
302:7 305:13
306:4 307:5,7
308:1,9 309:1,11
310:23 311:16,24
313:1,12 316:6
317:1 318:3 320:2
320:5,17 322:7
323:1 324:14
326:23 327:20
328:3,10,17 329:3
329:18 330:2,10
330:15 331:14
334:7,12,19
335:10 336:14,23

337:7,16,19 338:5
338:13,16 339:12
339:22 340:11
341:4,15 342:3,11
342:19 343:4,15
344:2 345:13,21
346:6,14 347:17
347:23 349:1
352:19 353:24
355:2,7 358:12
359:9,22 361:24
362:6,23 363:5,14
363:22 364:17,24
368:19 369:5,12
369:24 370:14
371:12 372:14
374:16 375:17
376:9,24 378:2
379:6,24 380:8,14
381:2 382:6
383:24 384:9,17
385:4,13,18 386:4
386:24 387:7,22
388:2 389:21
390:2,16 391:14
391:19 392:18,25
393:7 395:5
**flynn** 350:25 351:1
**focus** 63:20 130:4
149:12 174:11
215:18 243:24
375:10 388:24
**focused** 172:20
242:19 278:17
280:16,22 283:10
**focuses** 124:25
**focusing** 146:4
359:16
**folder** 54:13
**folders** 47:11
54:16

**folks** 91:10 215:1
234:19 235:1
274:23 392:2
**follow** 242:3 340:8
377:13
**followed** 38:9
**following** 181:14
**follows** 29:4
320:11
**food** 387:16
**fora** 176:5
**force** 5:19 166:25
268:9 270:13
276:6,11,13,22,25
**forces** 93:16
**forecasting** 333:4
**foregoing** 394:8
396:13 397:18
**foremost** 282:7
**forever** 193:3
354:1
**forgotten** 44:22
**form** 33:10 34:2
34:16 35:9,24
36:8,18,23 37:22
39:2,17 42:13
43:7 44:3 47:3
50:20 51:23 52:11
53:23 57:9 58:4
59:6 60:13 62:14
63:6 64:2 65:2,25
67:19 68:12,21
70:1,20 71:3
72:12,21 74:14
75:11 76:3,11
77:5,15,25 78:12
79:1,24 80:23
82:2,18 83:12
84:15,25 86:12,21
87:4 88:6 89:8
92:25 95:9 96:14

97:9 98:8,19
100:17 102:11
103:11 104:2
105:7 108:5,25
110:1 111:16
112:4,18 114:3,18
115:1,9,24 116:12
117:18 121:9
122:8,19 123:21
124:8 125:4,17
126:15 127:11
129:2,14 130:8
131:4 132:5,22
133:5,23 134:19
135:13,21 138:24
141:17 143:4
144:4 145:1 146:7
146:15 147:16
151:19 152:15
153:22 154:23
155:4,16 157:15
158:21 159:5,24
160:24 162:4
163:8 165:9
167:20 168:16
169:3 170:9 171:9
172:24 174:24
175:12 176:18
177:6 178:13
180:4,20 181:15
181:24 184:14
185:22 187:2
188:13,24 189:14
190:13,22 191:15
192:5 203:16
204:11 208:18
210:17 211:10
212:13 217:5,18
218:9,18 226:1,16
242:5 245:24
248:10 249:19

**[form - funding]**

250:6 252:1,10,21
253:12 254:12
257:20 259:5
260:18 261:10,14
261:24 264:3
266:7 267:2
268:18 269:5
270:8,15 271:13
272:19 277:13
279:12 281:1
285:4 288:13,20
289:13,22 290:8
291:8 292:19
293:19 294:10
295:4,14 296:13
296:21 298:12
299:22 300:7
301:7 302:7
305:13 308:1,9
309:1,11 310:23
311:16,24 313:12
316:6 317:1 318:3
320:17 326:23
328:4,17 329:3
331:14 334:7,12
334:19 336:14,23
338:5 341:4,15
342:12,19 343:15
344:2 345:13,21
347:17 349:1
352:19 353:24
355:2,7 358:12
359:9 361:24
363:14,22 364:17
364:24 369:5,24
370:14 371:12
372:14 376:24
378:4 379:6,24
380:14 382:6
385:13,18 386:4
387:22 389:21

390:2,16 391:14
391:19
**formal**  138:11,12
141:14
**format**  104:22
126:2 138:16,17
141:20 142:4
206:15 360:14
**former**  136:10,19
201:1 209:16,19
211:14 319:8
**formerly**  299:10
**forms**  70:15 71:2
**formula**  178:1,1,7
178:18
**forth**  56:20 321:20
333:14 347:9
394:9
**forum**  53:17
242:12 315:14
**forward**  78:6 97:8
181:14,23 248:19
251:15 395:15
**forwarded**  248:7
**foster**  30:5 40:2,15
76:10 77:22 82:15
151:12 186:2
187:15,16,19,20
187:24 188:10
196:6 198:4,12,15
220:9 230:11,17
230:19 235:5
262:7 263:18
282:9 284:25
327:7,17,25
328:14,14,24
329:15,25 330:7
331:10 350:22,22
355:11 357:14
358:20 361:10
362:10

**found**  150:21
155:1
**foundation**  34:3
35:10 36:24 68:13
68:24 77:6 78:12
80:24 82:3 86:22
97:10 104:3 106:2
108:6 114:4
115:10 117:19
125:5,18 126:16
129:3,15 131:14
135:22 142:2
146:16 158:2
170:23 172:25
175:13 180:21
192:25 218:19
226:2,16 250:7
269:6 295:5,15
296:14 299:3
309:12 328:4,18
329:4 331:15
341:16 342:20
343:5 346:6
359:10 364:25
371:13 372:16
378:4 379:7
**four**  239:6 321:12
327:9
**fourth**  201:14
260:11
**fragile**  220:5
**frame**  41:1 92:12
95:2,8 97:24
146:11 173:7
263:14 265:25
**franklin**  394:4
**frankly**  37:8 39:12
45:5 46:8 178:15
215:14 223:1
336:15 377:1

**free**  396:14 397:20
**french**  287:4
**frequency**  164:22
166:4,10 168:6
170:1,17
**frequent**  170:8
**frequently**  372:21
**front**  174:7 178:4
**full**  29:7 82:16
231:25 360:19,21
360:21
**function**  71:16
201:25 202:20
203:13 205:14
208:12 250:2
292:18 348:25
349:6,7 360:25
**functional**  203:14
**functioning**
169:14
**functions**  172:4
203:22 204:3,19
212:7
**fund**  183:2 279:15
279:19,20
**funding**  97:8 98:5
173:18 176:12,16
176:20,24 177:1
177:17 178:22
179:4 180:16
181:20 183:4
190:18 191:12
192:4 193:2,5,5,7
221:8 268:13,16
268:20,20 269:1
269:14 270:12
272:15,22 273:1,6
273:12 277:22,25
278:9,15,17 279:7
279:14,23 280:15
280:22 323:7

[funding - going]                                    Page 31

324:23
**funds**  173:12
    177:17 179:8,10
    180:25 181:5,9
    277:17 282:4
    322:23 323:3
**further**  216:8
    394:9,11,12

**g**

**g**  26:1 194:1
**gain**  369:8,20
**gained**  68:1
**game**  174:16
**gateway**  113:9,19
**gather**  34:18
    42:10 139:6
    142:24
**gathered**  63:3,16
    140:13 148:23
**gathering**  34:12
    42:7 54:21
**geauga**  31:15,21
**geffken**  136:20
    139:9,13,25
    141:10 142:5
    258:8
**general**  2:12 32:4
    32:13 34:11 50:13
    56:10,14 60:24
    62:10 66:5 70:7
    87:2 113:5 116:22
    118:18 146:2
    148:16 158:13
    172:9 183:2 213:4
    220:18 221:20
    249:6 297:12
    318:12 389:8
**general's**  94:11
**generally**  46:2
    47:18 116:3
    145:13 153:8

156:16,18 157:2
161:2 167:7
172:18 173:19
186:10 191:24
224:25 235:11
276:12 278:13
280:21 311:2,4
312:3 356:16
357:7 358:16,19
362:9 374:1,5
375:5,23 381:24
383:11 384:18
385:17 390:25
**generate**  131:12
    131:17 133:20
    142:19 206:24
**generated**  35:18
    139:24 140:2
    149:14 206:9
    209:9 254:11
    286:9 304:24,24
    305:7
**generates**  209:1,2
**generic**  122:3
**genetic**  82:24
**getting**  81:23
    117:9 122:15,17
    122:18,24 123:4
    123:14 174:7
    182:14 186:5
    217:22 251:11
    280:12 312:3
**gist**  144:2 277:9
**give**  28:6 32:15
    38:24 44:5 50:5
    81:20 131:22
    144:1 166:24
    199:17,21 206:16
    212:6 220:22
    246:3 274:2,3
    281:25 282:1

304:17 376:11
391:3,22 392:16
**given**  85:25 88:20
    91:3 101:5 104:19
    126:6 141:1 171:3
    171:6 179:3 185:5
    197:6 203:3
    209:18 212:6
    227:25 269:25
    330:9 345:19
**gives**  61:19 276:6
**giving**  48:4 202:6
    202:21 203:2
**glanced**  57:2
**global**  310:5
**globally**  365:15
**go**  30:24 31:25
    33:12 34:22 38:22
    44:11,12 45:25
    48:1 50:22 54:2,4
    54:12,13 55:23
    58:13 69:20 76:10
    78:5,23 82:24,24
    83:17 95:2,24
    96:6 98:2 99:22
    108:9 120:11
    138:20 146:20
    154:8 169:21
    178:15 187:7
    188:5 189:22
    196:19 197:14,25
    203:22 207:8
    209:21 210:3
    213:11,19 214:14
    214:24 219:8
    221:9 222:7,16
    223:14 227:3,25
    229:22 235:25
    246:5 248:14,19
    260:10 264:13
    267:13 269:23

276:12 283:4
288:18 290:4
297:15 313:3
316:15,22 337:6
337:10 339:25
348:17 351:5
352:23 354:4
358:19 373:5
380:25 381:2
391:8 392:25
**goal**  277:17
**goals**  194:22
**goes**  38:18 163:24
    171:3,6 189:10
    197:25 204:14
    262:20 303:25
    329:15
**going**  30:1 50:25
    65:12 72:4 91:25
    94:9,20 97:8
    101:4 107:13
    108:9 110:3,24
    115:21 116:9
    123:11,17 134:17
    145:16 164:20
    168:3 169:16
    181:23 185:2
    187:7,12 192:20
    193:2,14 202:4
    211:3 212:8
    215:24 216:24
    236:23 240:16,24
    245:13 248:16
    250:3 252:8
    268:20 274:6
    283:23 284:3
    289:19 292:6
    298:16 300:3
    301:14 305:11
    330:19 339:18
    340:21 341:3

[going - hear]

345:1 348:3
358:22 359:18
360:15 361:10
367:5 371:5
380:23 382:21
383:6 393:2
**good** 66:23 100:20
110:4 129:9,16
173:25 193:9
213:19 220:22
250:11 258:4
280:2 300:21
309:14 312:24
324:18 343:10,11
350:4 355:23
356:19 358:5
373:16 381:13,13
388:7
**gotten** 246:12
247:4 269:9
382:18
**government** 49:17
138:21 149:11
182:18 203:24
205:20,20,22
249:16 273:2,4
277:10 278:9
279:6 361:3 362:8
**governmental**
176:11
**governor** 93:17
239:22 268:8
**governor's** 243:16
**graduated** 30:25
31:2
**grandparent**
255:5
**grant** 7:21 95:10
95:13,14 99:6
177:8,10,12
236:25 237:8,12

237:19,21 273:13
281:3,4,5,6
**grants** 174:8 177:7
177:15 238:3,4
**graphs** 333:24
**grave** 268:7
**great** 223:3 357:2
379:1
**greatest** 72:2,7
185:19
**ground** 48:2
**group** 34:10,24
37:12 38:10 51:3
82:16 95:7 100:10
103:19 149:5
175:10 226:24
361:5 366:11
**group's** 292:17
**groups** 75:19
108:23
**growing** 261:4,16
262:2,3
**guardian** 250:22
251:23 252:18
**guess** 36:7 55:15
61:15 76:7 81:1
125:20 138:9
152:17 179:20
192:8 198:7,12
201:7 203:6
238:20 263:25
270:2,17 283:16
288:21 301:1
304:8 324:12
370:15,18 384:11
**guessing** 338:6
**guidance** 319:9
**guy** 332:17
**guys** 268:16
332:19

**h**

**half** 29:25 130:2
135:7 189:25
204:15 239:6
247:17 327:6
351:16
**hand** 28:4 136:11
139:10 141:10
258:8,11 260:7
274:1 382:22
**handful** 367:7
**handing** 238:12
321:10 344:20
350:11
**handle** 233:1
256:18
**handled** 42:16
236:24 265:17
365:14,17
**handles** 99:10
240:10
**handling** 62:5
152:24 365:12
**hands** 139:23
**happen** 93:2
138:18 196:2
283:23 316:19
**happened** 32:17
112:12 164:22
171:24 241:12
247:14 283:24
370:24 377:18
378:22 383:1
**happening** 93:10
**happens** 378:11
**happy** 199:21
**hard** 45:17,21,22
45:24 46:2,5,7,9
46:14,18 47:1,6,11
47:17,21 48:12
51:7 135:18 149:8

154:22 163:18
165:17 185:8
317:23 353:5
**harder** 74:17
160:21 179:2
353:7,7
**harlin** 318:9 319:6
319:7
**harm** 167:9
**harmed** 163:25
372:19
**hart** 2:13 26:25,25
**hartj** 2:17
**haviland** 214:22
**head** 50:8 52:6
171:17 187:9
201:20 281:22
377:16 379:20
**headed** 201:18
**health** 3:2 4:2 27:5
41:10 58:14 59:3
59:16 93:6 128:15
145:10 148:18,21
150:15,17 151:21
169:11,14 243:18
243:20 269:18
270:22 275:19
277:16 279:21,24
280:6,14 312:17
314:2,9,13,15,25
315:8,17 317:14
318:11 332:13
333:12 368:2
373:22
**hear** 62:18 64:5
81:7 90:4 92:17
149:8 167:2
234:23 268:3
302:11 349:5
373:9,11

**heard** 66:19 147:4
147:5,7 297:11
371:19 377:17
**hearing** 63:11
353:18,18 354:14
**heart** 37:6
**heather** 4:4 41:8
**heather.hosmer**
4:7
**heidi** 3:13 27:8
381:10
**heidi.nadel** 3:17
**height** 165:21
**held** 240:24
389:11
**help** 126:3 137:10
164:4,8 174:9
190:18 191:11
192:4 233:6
236:12 271:16
273:5 277:11,18
278:11 279:8
281:19
**helped** 323:15
**helpful** 83:19
277:25 282:17,22
**helping** 34:13
119:21 244:2
319:12
**helps** 195:9
**hereinbefore**
394:9
**heroin** 66:6,8
67:13,18 68:2,6,18
69:3,7,9,13 71:19
77:1,2 78:23
80:18 81:5,10
83:10 87:17 88:25
89:5,11,14,15,20
89:22 90:4,19
100:7,8 101:21

102:23 105:22
109:21 111:21
112:1,3,8,16,25,25
113:6,10,16,20
114:1,2,6,8,11,14
115:4,12,16,21,23
128:8 134:14
143:22 144:20
146:5,13 147:14
147:25 149:1
150:23 159:22
160:20,22 163:6
165:22 166:11
167:11 174:22
175:10,22 179:23
179:24 180:19
185:19 186:25
188:11 190:9,17
191:19,24 210:10
210:14 211:1
218:16 219:2
225:20,24 226:7
226:14 227:16
229:7 245:19
251:25 252:8
253:11 259:2
261:1,4,16 262:3
262:18 263:24
272:17 278:1
279:10 280:16
294:7 298:3 299:1
299:7,10,19 300:2
302:21 307:1
311:4 315:15
316:25 345:19
346:2 353:21
356:4 363:2 365:6
370:10 371:9
372:8 374:5,10
375:13,25 376:8
377:22 378:11,17

382:11 390:13,14
391:9,10,13,17
392:2,3
**hey** 131:22 311:3
**hhs** 315:6
**hi** 333:16
**hide** 140:4
**high** 3:4 164:1,1
224:24 226:25,25
229:2 253:1 376:1
**higher** 116:17
134:8 138:20
153:5 166:3,3,18
187:11 188:1
222:8,11 225:2
251:1 260:21
262:18 299:7
300:25 312:23,24
332:24 358:22
**highlighted** 264:2
**highlights** 325:12
**hiram** 31:2,13,14
**hire** 87:11 228:10
228:15 232:20
281:13
**hired** 188:9 228:9
**hires** 224:20,21
**hiring** 85:18 156:5
186:24 197:24
215:23 221:8
223:18 227:25
232:17,22
**historical** 157:14
383:3
**historically** 73:1
116:14 293:24
330:20
**history** 310:1
**hit** 90:6
**hitting** 353:4

**hklaw.com** 3:17
**hold** 32:7,8 174:10
354:19 355:6
**holder** 317:14
**holds** 37:15
**holistic** 319:12
**holland** 3:14 27:8
**home** 99:20,22
230:4,17,19 263:3
283:4,18,19
295:24 297:21,23
311:5 324:8
333:20 354:5,6,10
354:11,22 357:14
372:24
**homes** 99:16,22
187:15,16,19,21
187:24 188:10
198:7,12 231:1,4
233:7 282:9
283:25 285:1
327:10,18 350:22
350:22
**honest** 192:14
387:12
**honestly** 140:17
151:25 170:14
**horrible** 378:24
**horror** 159:23
**hosmer** 4:4 41:7,9
**hospital** 357:8
**hospitals** 269:22
271:6
**hotline** 195:24
216:18 217:21
218:22 219:4,6
304:6 306:11
307:14 309:15
310:3,4,14,25
311:22

**hour** 50:14 353:17
**hours** 33:5 161:9
  239:6 298:17
**house** 26:23,25
  282:16
**housed** 204:5
**housing** 172:22
  198:8
**hr** 159:17,19
**huh** 31:11 33:18
  42:4 49:2 51:4
  53:8 54:11 56:9
  56:22 57:1 59:1
  60:9 68:16 70:12
  70:21 77:16 83:23
  86:2,14 90:11
  91:7 101:10
  105:18 107:24
  108:17,19 129:21
  132:4,6 135:4
  141:12 146:23
  149:19 151:1
  156:2,7 175:19
  176:15 185:15
  191:10 205:6,12
  214:13,16 234:17
  238:18 239:8
  240:1,22 241:4,10
  242:21 243:8
  244:21 245:8,16
  246:4,8,11,23
  247:2 266:3 270:5
  271:5 272:12
  274:5,18 278:6
  280:11 281:23
  286:4 287:15,20
  300:4 303:23
  308:10 315:3,12
  322:16 326:18
  347:13 349:16
  351:17 352:25

  353:3 361:15
  365:22 382:5
**human** 195:14
  200:8,20 201:8
  208:10 213:8
  234:15 235:1
  279:22 314:9,13
  315:1 318:11
  374:9 379:22
**hundred** 256:12
  256:13
**hydrocodone**
  65:17

**i**

**idea** 32:13 196:24
  291:1 343:24
**ideastream** 347:11
**identification**
  198:19 238:9
  273:17 285:14
  303:12 313:17
  321:7 331:25
  340:3 344:17
  347:2 350:8
  355:19 360:3
**identified** 58:11
  73:5,7 106:15
  118:17,19 121:18
  231:5,17 266:25
  287:19 289:1,18
  290:24 294:9
  306:15,17,19,21
  307:23 311:12
  314:3 315:6
  341:21 349:14,15
  349:17
**identify** 38:15
  49:19 74:24
  107:22 136:12
  154:23 230:5,7,13
  233:5 293:23

  376:15 377:24
  379:17 380:3
**identifying** 75:8
  100:14 194:23
  230:23 234:9
  307:18
**ii** 220:14,20,20
  221:15
**iii** 221:15
**ilene** 316:2
**illegal** 65:1 101:21
  101:23 107:1
  108:3 109:24,24
  112:17 113:1
  128:8 259:3 294:7
  307:2 375:12
  376:8 389:19
  391:10
**illegally** 59:9 89:6
  101:13 105:23,23
  122:18 131:2
**illinois** 3:9
**illness** 170:5
**illustrate** 302:20
**illustrative** 372:8
**imaged** 46:3
**imagine** 275:7
**immediately** 29:20
  30:12,14 31:12,14
  78:7
**impact** 64:14
  70:10 72:7 77:1
  78:10 82:20 84:12
  84:21 92:24 95:6
  101:6 102:4,17,18
  103:6,6,23,24
  105:14,21,22
  106:23 108:21
  109:18,18,20
  119:18,21 124:17
  126:11,20 127:16

  128:9,23,24 130:4
  136:7 144:10
  152:10,12,22,23
  153:12,19 154:3
  154:10,13 155:11
  161:11 162:11,11
  162:17 163:2,10
  164:2,12,21
  165:16,18,21
  166:10 168:15
  169:7,22 173:2
  185:19 188:11
  190:9,16,24
  191:19,21 192:3
  192:10 208:16
  210:10,20 226:7
  227:13,23 229:6
  229:13 249:18
  262:20,21 269:20
  272:16 278:1,18
  283:21 291:21
  292:16 299:18,19
  302:21 315:15
  320:16 352:17
  357:23 359:19
  361:21 370:8
  371:8 372:8
  373:23 377:21
  378:24,25 379:22
**impacted** 32:19
  62:19 83:8 161:13
**impacting** 69:3
  72:19 82:10,14
  88:11 89:21 94:4
  137:5 242:16
  371:1
**impacts** 114:13
  150:11 163:5
  167:19 169:13
  179:23 263:1,23
  370:2 374:10

**implement** 99:7
284:22
**implemented**
95:20 237:1
**implementing**
194:24
**important** 54:10
190:23 192:9
**importation** 67:13
**imposed** 263:4
**impression** 116:6
116:22 143:20
156:10,13 162:2
165:19 297:8
**improve** 73:21
88:16 91:2 95:6
222:23
**improved** 249:8
**improvement** 91:9
91:15 92:4,9
201:5 235:7
286:23 287:1,3
**inaccuracy** 134:5
**inaccurate** 75:1
322:11 348:12
384:21 386:11
**inaccurately**
133:20
**inadequate** 180:16
180:22 187:15
191:12 233:1
**inappropriate**
64:1
**incident** 168:20
**incidents** 75:7
133:21
**include** 64:25 65:4
145:2 213:24
268:11 307:1
340:15 360:13

**included** 76:1
177:12 212:10
229:19 306:25
395:13
**includes** 197:19,20
225:5
**including** 65:7
77:20 93:15
109:23 119:16
143:2 144:20
149:9 156:4
162:14 196:7
205:7 219:1
251:24 259:2
260:14 294:7
314:13 329:12
358:16 364:20
367:13 371:6
**inconsistencies**
117:15
**incorporated**
397:12
**incorrect** 62:9
**increase** 73:22
97:6 156:5 167:23
168:6 174:17
175:8 176:12
177:19 180:17
187:6,7,12,22
191:11 216:6
227:24 228:2
232:24 253:6
254:4 280:15
284:21 322:17
329:10 331:21
352:17
**increased** 71:10
87:8 153:3 163:6
164:23 166:10
168:12 174:14
175:1,3,18 186:20

187:11 192:4,16
193:7 221:8
224:16,18 229:13
233:11 256:11
268:25 269:14
270:1 277:24
323:8
**increases** 151:17
177:14 358:7
**increasing** 169:6
216:8 224:5 285:1
**increasingly**
168:25
**indefinitely**
358:24
**independent**
182:20 230:9
231:20 232:13
234:5 346:4
**independently**
182:23
**indicate** 225:22
226:12
**indicated** 255:8
**indicates** 315:13
**indicating** 395:13
**indirectly** 270:17
**individual** 47:23
49:17 50:3 83:1
86:8 109:13
111:18 126:13
133:19 135:12,14
142:18,23 143:6
153:15 156:23
158:18,25 159:3
201:2 231:2,5
232:8 258:12
366:1 378:21
383:22
**individually**
384:15

**individuals** 47:10
233:15 244:1
382:25
**infants** 358:21
**information** 38:25
45:8,19 63:15
68:1 96:1 106:3
107:9 111:15
112:10 120:20,24
121:3,17 122:14
123:12,18 124:3
135:7 136:7 137:7
142:18 144:12
145:24 148:22
150:22 157:3
200:25 216:14
226:5 301:25
302:4 303:21
309:18 312:14
327:14 333:9
335:19,21 336:24
337:12 338:2
340:17,24 349:24
350:1 356:15
363:24 364:3
369:8,21 375:2
377:1,4,23 380:6
384:6,21,21
386:12 387:12
389:6,9 391:23
**informations** 6:13
**initial** 217:12
218:4 237:6
**initiate** 95:11
266:4
**initiated** 92:21,22
93:16 95:7 98:5
98:16 136:3,22,23
237:20 264:23
266:10 272:10
324:12 346:20

359:17
**initiating**  91:12
92:2
**initiative**  96:23
173:18 186:22
189:20 190:19
241:14 265:10
269:21
**initiatives**  92:19
96:7,18 240:5
268:10 269:13
270:21 279:8
**input**  117:4,10,15
**inquiry**  105:5
**inside**  198:13
**insinuating**  364:7
**instance**  150:17
365:23
**instances**  372:13
**instituted**  88:16
**instruction**  337:19
338:17
**instructions**
349:24
**insurance**  203:21
**insys**  3:12 27:9
381:11
**intake**  31:17 153:6
161:23 195:22,22
216:1,3,9,13,14
217:3,21 218:13
218:14,25 219:15
224:13,16 233:22
233:24 355:13
**intakes**  288:8
**intend**  369:8,20
380:12
**intended**  198:7
**interact**  112:13
151:15 169:24
348:18

**interacted**  70:24
**interacting**  118:25
127:8 128:22
**interaction**  55:19
56:5 176:9,9
**interchangeably**
298:5
**interest**  277:5
**interested**  319:11
394:12
**intermediary**
61:25
**internally**  136:17
142:25 174:6
203:9 229:21
282:12 345:5
**interpret**  290:16
353:20
**interpretation**
50:9
**interpreting**
289:25
**interrupt**  41:7
373:8,16
**interrupting**  41:13
**intervention**
215:11 236:14,24
265:16 325:11,22
325:24,25
**interview**  156:23
159:2,3,13,17,20
160:1,2,4,15,16
256:6
**interviews**  159:18
161:1
**inure**  271:19
**invested**  228:25
**investigate**  357:11
**investigated**
217:13,14

**investigating**
217:23
**investigation**
217:15 218:6
**investments**
268:10
**invitation**  238:21
241:1
**invite**  239:9 243:3
**invited**  316:17
**involve**  98:1
225:24 226:14
240:16 250:21
251:22 304:6
310:20 361:2
380:5
**involved**  37:20
38:2 40:21 61:22
63:12 94:2,20,22
139:14,15 142:22
144:15 147:22
151:12,13 161:5
188:21,25 189:2
189:24 190:19
191:8,9 243:16
252:18 259:1,9
263:15 298:10
300:1 311:21
321:16 357:7,13
357:16,19,21
362:11 365:8
373:19 374:11
376:6 377:17
**involvement**
152:21 243:1
278:9,19 357:15
**involves**  127:20
202:3 232:22
341:11
**involving**  152:25
153:10 226:18

240:11 254:9
257:19 260:25
262:9 263:18
309:8 343:1
**irby**  232:7
**irresponsibly**
56:17 58:24 60:18
62:4 383:15,19,23
384:8,16
**issue**  56:15 62:4,4
69:10 71:8,14,22
71:23,24 73:3,10
74:10,21 75:9
78:3 79:20,22
80:1 81:8 87:14
87:17 89:20,24
94:2,5,11 100:7
105:13 125:25
133:14 134:2,15
137:3 148:24
149:20 153:1,2
162:7 164:25
165:11,11 166:19
166:20 167:5,8
168:1,22,25
169:23 171:1
173:8 186:14
187:14 189:17
190:8,17 192:20
196:19 216:15
217:16 218:5,8
222:12 235:10
245:19 250:16
253:1 256:16
262:25 272:23,23
272:24 283:2
284:4,5 288:17,25
290:23 295:22
296:4,16 297:17
297:20 299:15
315:17 318:14

320:13,21 325:17
328:1,16 345:20
346:2,4 350:2
351:19 353:21
358:10 359:4
373:6,10 377:10
**issues** 56:1 59:8,10
70:13 71:14 88:10
90:18 111:2 117:4
118:8 132:3
136:13 153:9
156:9 161:20
164:11 170:5
177:3 187:15
195:19 211:1,3
222:17,18 227:8
251:8 255:1 256:4
256:17,17 262:22
263:24 282:16
289:10 295:11
305:24 312:5
317:4 324:25
339:25 346:9
354:7 364:10
365:24 367:10
372:25 380:21
**item** 53:22
**items** 182:12
315:6
**iterations** 119:8,9

**j**

**jane** 378:22
**janssen** 55:13
**january** 314:3,20
315:2,21,23
**jerry** 239:10
**jflowers** 2:7
**job** 29:23 30:15
31:15 32:1 34:1
50:10 64:8,13
67:24 72:10

111:24 112:5,11
119:19 146:8
156:20 160:20
162:12 166:22
169:15 179:3,7,16
180:1,16,23
243:18 279:5
369:19 370:1,8
**jobs** 31:12
**jodi** 2:3 26:14
395:5
**john** 316:1,7
**joined** 28:2 241:13
**jon** 26:25
**jonathon** 2:13
**jones** 2:20 27:2
**jonesday.com**
2:23
**journal** 202:12
362:15 390:7
**judge** 1:8 239:2,10
239:24 240:10
245:9 248:8
**judges** 243:25
**judgment** 295:9
**judicial** 6:12 239:2
239:9 240:20,25
241:6,24 242:23
243:5
**julie** 1:13 5:5 6:4
26:8 29:1,9 394:9
395:8 396:4,9
397:4,13 398:20
**july** 6:19,23 95:22
285:22 317:16
394:21
**june** 140:6 207:9
239:6 240:24
241:12 243:6
245:14 247:10,14
247:23 248:7

316:18 317:16
**justice** 239:23
241:15 242:19
243:2
**juvenile** 148:11
202:9,13,19,20
240:10 243:25
265:8 323:23
353:15

**k**

**k** 3:21
**kasich** 239:22
268:8
**katerina** 2:12
26:23 201:18
203:18 274:9
347:15 348:11,20
**kaye** 4:4
**kearns** 209:4
212:21 332:9,14
332:20 333:2,8
338:8 339:3
**kearse** 2:4 26:20
26:20 27:17,21,25
**keep** 45:21,22,24
47:17,18 54:14
99:21 156:25
174:11 185:8
193:14 315:7
323:8
**keeping** 42:1
75:17 106:19
**kent** 31:7
**kept** 351:21
**kevin** 91:16,16,19
92:1,20 100:19
101:2 254:17,24
255:18
**kids** 127:19 311:5
327:25 352:3,4
353:5

**kin** 232:25
**kind** 60:7 72:5,16
73:21 83:21 89:13
95:2 101:5 109:17
123:9 131:10
141:19 142:17
143:13 149:22,25
156:23 163:4
165:21 166:13
167:17 171:3
173:3 196:1
203:13 222:6
227:22 229:11
245:6 250:2
253:21 265:13
271:20 272:5
279:1 281:18
312:10 326:2
334:10 340:8
344:25 349:24
353:22 354:7
359:17 363:12
370:21 375:23
379:20 391:21
**kinds** 36:3 43:3
112:6 164:8
166:25 183:3
200:2,16 286:25
317:4 333:4 373:4
384:24
**kinney** 236:1,16
**kinship** 230:25
231:1,5 232:23
233:5 255:6
282:24 283:10,12
284:23
**knew** 85:6 124:12
136:23 250:15
256:9,15,16
257:25 264:11
288:25 290:23,24

**[knew - knowledge]**

292:9 334:14
338:1 356:18
**knight** 3:14 27:9
**know** 30:21 32:11
33:3 35:2,8 36:21
37:4,6,9,11 38:4
38:16,17 39:12,14
39:18 41:8 42:12
42:14,14,23,25
43:2,9 44:23 45:5
45:14 46:6,8,19,25
47:15,16,20 48:20
48:24 49:8 50:6
50:16,19 51:12,25
52:5,6,14,23 53:14
54:18,25 55:1,4,7
55:7,9,12,15,18
56:12 57:5,11,14
57:14,16,17,25
58:8,18 59:2,7,13
59:16,24 60:11
61:1,10,13,24 62:8
62:18,20 63:10
64:5 65:9 66:2,8
66:11,14,23 67:12
68:23 69:14 71:11
71:21 74:15,18
76:6 78:3,20
79:17,19 82:22
85:3,3,10 86:23,25
87:5,8 88:7,9 89:9
89:14,23,25 90:17
91:5,17 92:7,14
93:10 94:9 96:10
96:15,16,17 97:23
98:20 99:12,14
100:19,20,22
102:12 104:12,16
104:21 109:15
112:19,23 113:12
113:13 114:5,19

114:20,21,23
115:2,22 116:1,2,2
117:13,25 119:9
119:13,24,25
120:17 122:21,23
122:24 127:15,15
127:18 128:2,17
130:11,13 131:16
131:23 132:8,18
134:1 136:22
137:10 138:15,19
139:18 140:9,9,12
141:2,6,7 145:8,9
145:9,11 146:17
147:2,11 150:7,13
150:14,21 151:10
151:23,25 152:3
152:17 154:24
155:6,6 156:17
157:16,18 158:3,4
158:9,17,22
159:23 160:3,10
161:10,17 162:18
163:14 164:15,18
166:12 167:2
168:5 170:10,14
171:19,24 172:8
177:9 178:15
179:9,19 181:10
181:11 182:6,9
185:4 186:12
188:4,14,20
191:23 192:8
193:2 194:15
197:6 199:7,15
200:14 202:2
203:20 211:4,5,14
211:25 212:5,5,17
218:20 219:5,10
219:14 220:4
221:6,16 222:8

223:3 224:19,20
225:11,13,14,15
225:18 226:17,23
227:1 228:19,21
229:6 231:14
232:19,21 238:3,4
238:23 239:3
240:8,9 241:16,20
241:22 242:11
245:10 246:12,16
246:18 247:10
248:1,4 251:6,11
252:22,22,23
253:14,14,15
254:19 256:3,12
256:15 258:2,3,5
259:11,18 260:5
261:11,13 262:15
263:8 264:21
266:8,18 269:3,23
270:17,18,18,20
271:24 275:11
278:14,16,24,24
281:3,6,24 282:3,3
283:19,22 284:17
284:18 287:21
288:12 289:15
290:17 291:5,24
292:6,20,25
293:20,23 294:1
295:21,25 296:1,6
296:24 297:19
298:3,8,15 299:4,8
300:9 302:9,12,23
304:12 306:25
307:2,22 309:13
310:1 311:3 312:4
312:9 316:5
317:10 318:1,16
318:22 319:3
320:18,22 324:16

325:23 326:4
328:5,6,6 329:7,7
329:8 330:6
331:17,21 335:1
336:1,17 338:18
338:19,20,24
339:1,2,21 344:6
344:11,13 349:24
352:8 354:7 355:3
356:14 358:5
362:1,2,3,4,5,8
363:15 365:15
367:16,20,20,21
367:23 368:3,5,9
369:2,16 370:7,19
370:22 371:15,16
372:18,19,20,20
372:21,22 373:9
373:12,25,25
374:3,6,20 375:1
375:19,21,22,23
375:24 376:16,17
378:11,14,15,17
378:21 379:9,12
384:21,23 385:6,7
385:11,14,17,20
386:5 387:3,9
389:15,17 390:21
390:22 392:1,6
**knowing** 124:13
185:2,10 190:15
297:15
**knowledge** 56:5
57:18 62:7 63:3
63:10,23 67:5,15
80:9 81:18 117:25
119:18 123:23
124:10 137:9
143:5 152:13
212:6 223:6
256:23 270:10

302:1 312:9 321:3
348:13 354:2
358:14 367:17
368:12,16 382:3,7
383:21 384:14
386:2 387:15
390:22

**knowledgeable**
51:6

**known**   328:15
355:15 374:4

**knows**   310:25

**kouba**   2:4 26:17
26:17

**kpapas**   2:16

**l**

**l**   3:19 4:9 5:1
92:18

**l.p.**   1:10

**lack**   34:2 35:9
36:23 68:12,24
77:5 78:12 80:23
82:2 84:16 86:21
97:9 104:2 106:1
108:5 114:3 115:9
117:18 125:4,18
126:15 129:14
131:14 135:21
142:1 158:1
170:23 172:25
175:12 180:20
192:25 193:1,5
218:18 226:1
250:7 269:5
296:13 299:2
309:12 328:3,17
329:3 331:15
341:15 342:19
343:4 359:9
364:24 371:12
372:15 378:4

379:6 382:15,19

**language**   86:6
321:20

**large**   66:17 368:24

**largely**   175:4

**larger**   178:8

**largest**   186:11

**lasting**   262:21

**late**   49:6

**law**   29:3 93:5
162:24 202:13
353:16 354:4

**lawful**   29:2

**lawsuit**   49:5,6,7
57:11 335:7
385:21

**lawsuits**   202:15,16

**lawyers**   32:22
42:3 302:15
369:18

**lay**   139:23

**ldefrancesco**   3:24

**lead**   167:17
392:16

**leader**   243:3 319:4

**leaders**   241:13
244:1

**leading**   113:10,19
189:25

**leads**   382:11

**league**   316:4

**leann**   350:19

**learned**   242:4
335:13

**leave**   158:12
161:14 179:12
232:10

**leaves**   224:4
232:18

**leaving**   157:5
159:20 228:20

**led**   73:21 89:13

**left**   30:22 31:25
48:10 92:14
156:17 159:15
162:7 178:6
181:12 220:6,9
223:19 246:10
295:24 297:21,23
311:5

**legal**   2:13 38:10
42:16 56:18 63:5
101:15 103:8
108:24 127:7,14
132:12 195:15
200:1,22 201:17
201:24 202:1,5,15
202:22 203:2,7,8
203:11 204:6,8,20
204:24 234:12
348:24 349:2
353:15 387:8
389:17,18 390:15
392:4 395:1 398:1

**legalities**   387:4

**legally**   100:16
101:8,16,16 102:9
103:9 105:24
106:25 112:15
122:15 124:20
125:1 126:12,24
128:14,14 131:2
145:17 298:10
387:10

**legislation**   249:17

**legislators**   191:5

**legislature**   249:10
250:3

**lengthy**   56:25

**letter**   239:22
241:8 243:2
274:14,17,25

275:3 276:4,5
277:15 285:25
395:19

**letters**   191:6
220:13,16

**level**   32:9 85:23
90:17 94:10 122:4
153:6 161:19
164:17 165:12
166:3 174:20
181:16 185:1,3
193:2 213:21,25
214:5,7,8,17,18
215:1,8,21 216:14
219:16,22,24
220:1,3 221:14,16
221:21,25 223:14
234:18 249:9
260:21 268:9
272:14,24 299:7
332:24

**levels**   85:18
198:15 215:14
221:10

**levies**   97:18

**levy**   96:24 97:1,6
172:19 173:1,6,14
174:17 176:19
179:18 180:7,12
180:24 185:11
186:11,21 187:17
188:7 189:19
197:12 284:17,21

**lewis**   3:8 27:7

**liability**   353:11

**license**   32:8
198:11

**licensed**   32:10
58:14 128:15,17
350:22

licenses 32:7
licensing 230:18
licensure 196:7
  220:25
lies 106:11
lieu 352:5
light 373:14,15
liked 269:9
limit 278:11
limitations 79:13
  106:19 126:7
limited 283:6
limits 263:3,10,21
linda 1:16 394:6
  394:16
lindsay 3:20 27:10
line 8:3 9:3 10:3
  11:3 12:3 13:3
  14:3 15:3 16:3
  17:3 18:3 19:3
  20:3 21:3 22:3
  23:3 24:3 25:3
  182:12 227:3
  303:20 389:14
  395:13 397:7
  398:3
lines 111:9 174:8
link 112:7 113:5
  113:15 227:18
linked 89:12
  115:12 221:5
  288:8
list 42:15 43:20
  130:13,15 151:7
  267:15 272:9
  281:18,19,25
  284:8,9 345:9
  346:18
listed 53:22 74:19
  130:12 213:24
  232:4,6 257:13

322:5 348:10
  397:7,17
listing 264:25
  397:7
lists 131:24 345:10
lisw 212:25
literally 135:18
literature 111:25
  113:8,8,12,14,15
  113:18,23
litigation 1:6
  26:10 39:16 42:6
  54:24 395:6 396:3
  397:3
little 42:8 50:5
  69:20 93:24
  107:20 174:9
  197:7 222:11
  248:22 296:8
  334:11 343:23
  366:2
live 163:21 184:21
living 230:9
  231:20 232:13
  234:5
liz 92:14 287:2
llc 2:5
llp 3:3,8,14,20 4:9
lobbying 188:6
local 97:17 179:8
  179:10,13 197:12
  347:12 362:15,17
locally 361:8
  363:24
location 239:1
locked 173:5
log 135:24
lomax 2:19 27:2,2
long 29:16,24 30:7
  30:18 33:3 35:2
  51:25 54:5 94:23

95:17 97:24
  180:12 190:3
  192:19 198:8
  231:12,18 274:19
  283:20 284:3,4
  285:17 310:2
  351:22 352:3
  358:24 362:8
  381:9 387:11
longer 45:9 50:15
  53:1,13,24,25
  215:12 220:7
  232:12
look 38:24 39:1
  41:1 43:16,18
  44:2 54:20 55:2
  64:19 72:18 74:23
  85:25 86:3 88:10
  91:2 114:14 117:7
  119:5,8 120:11
  137:4 151:15
  160:4 168:11
  176:1 203:8,20
  207:8 209:21
  210:4 217:7 233:3
  240:23 245:1
  258:17,17 284:18
  288:10,18 290:20
  291:4,5,6,10 313:5
  318:5 331:20
  337:12 357:22
  358:2 376:18,21
  379:4,14 383:2
  391:8
looked 39:10 45:7
  88:2 100:24 117:7
  118:14,15 120:6,7
  137:7,15,24 142:9
  143:1 151:7
  175:25 211:19
  224:19 225:18

258:8 288:22,24
  289:3,3,5 290:18
  290:18,25 291:1,1
  293:24 299:5
  302:17,25 318:2
  331:19 356:17
looking 41:3 52:7
  72:17 75:6 79:18
  94:2,6 95:5 99:25
  103:16 107:25
  114:10 117:8
  152:9,11 170:17
  175:8 212:21
  214:6,8 216:9
  218:25 225:11
  244:19 253:2
  284:25 285:25
  287:17 292:13
  302:23 329:21
  347:7 354:8
  355:10 374:5
  380:6
looks 223:3 232:5
  239:8,16 247:8
  269:22 274:25
  308:18 342:4
lose 110:24
losing 161:23
loss 173:2,9 175:1
  224:22
lost 163:13
lot 97:14 98:21
  99:3,5,7,11 113:11
  144:9,11 149:8
  172:19 174:5
  186:4 188:5 191:5
  193:4 199:12
  204:2 211:6
  222:18,25 223:13
  224:10 227:9
  231:10,11 265:2

281:15 282:21 283:5 297:14 318:20 349:13 351:18 365:20 381:16 382:1

**lots**  113:14 200:12

**loud**  50:7

**love**  269:24 282:13 283:8,9,15

**low**  173:4 187:20 225:2 323:8

**lowe**  207:17,24 340:16

**lower**  84:1 134:9 173:5 214:18 225:16,17 251:1 310:21

**lowest**  178:22 221:21 322:24 323:4

**lsw**  32:8,9

**lumped**  130:23 145:13

**lumping**  100:10 109:23

**lunch**  193:9

**luncheon**  193:19

**m**

**m**  92:16 220:9 232:11

**ma'am**  29:10 30:3 76:22 214:10 248:19 267:22 268:1 352:13

**madam**  395:10

**magnitude**  250:17

**mail**  47:11 53:14 53:16,21 55:2 101:22 141:24 142:6 238:16,19 239:14 244:14

273:20 274:9,13 275:17 285:19,22 286:14 303:16 317:22 332:5 333:15 344:23 347:5,9,15 348:11 349:8 350:16 351:6 352:23 355:24,25 356:1 360:11 373:11

**mailed**  309:23

**mails**  6:15,19,21 7:6,8,10,13,15,17 7:19 35:16 36:7 53:2,3,6,10,11 54:1,10 204:7 242:1 276:15 302:18 321:19 332:8 340:13,14 350:13

**main**  207:25

**maintain**  38:14 45:17 46:19 85:23 207:19 276:17 305:15

**maintained**  46:2 47:10,12,14,21 51:7,8,19 52:1,2,4 52:25 124:4 129:12 157:7,13 158:7,18 181:13 206:25 207:3,5 208:3 210:2,5 305:7

**maintaining**  37:16 38:3 52:24 244:14

**maintains**  124:3

**major**  97:7

**majority**  146:3,11 196:20 233:24 299:1

**makeups**  67:1

**making**  38:9 41:5 166:21 174:12 278:21 378:10

**malpass**  232:9,12

**malpractice**  49:4 49:5,10,12

**manage**  69:18 71:16 202:16

**manageable**  85:23

**management**  2:13 65:17 66:15 72:14 212:23 214:12

**manager**  30:16

**managing**  332:25

**mandated**  195:3 360:25 361:5,7

**mandates**  179:11

**mangon**  51:17 92:5 286:16,21 287:2,5,6

**manner**  143:25

**manufacture** 369:1 383:23 384:8

**manufacturer** 109:4 383:22 384:4,7,15 385:2 386:14,22

**manufacturer's** 122:6

**manufacturers** 56:10 58:23 60:5 60:17,25 61:3,23 62:17 63:9 108:16 122:10 380:23 386:7,18 387:5

**manufacturing** 56:16 57:7,25 383:14 387:4

**march**  6:21 7:13 304:1,1 347:6,15 350:14

**marijuana**  78:11 78:18,19,22 79:5,5 80:12,14 83:9 84:20 87:3 108:4 115:7 134:13 294:25 307:9

**marked**  198:18,22 238:8 273:16,20 285:13 303:11,15 313:16,20 321:6 321:10 331:24 340:2 344:16,20 347:1 350:7 355:18 360:2

**market**  384:16

**marketed**  58:23 60:17

**marketing**  56:17 62:12 383:14 387:6,20

**marountas**  332:9 332:10 333:11 356:2

**massachusetts** 4:5

**master's**  31:6

**matches**  241:3

**materials**  241:23

**maternal**  271:3

**math**  308:17,18,19 309:3,5 328:20

**matter**  26:9 45:18 337:3

**matters**  33:12 202:15

**maureen**  239:23 350:25 351:1

mcginness 2:4
mckesson 4:8
41:18,22 368:13
368:17
md 1:7
mdl 1:6
mean 36:9 37:7
45:14 47:11 49:15
54:4 56:14 59:25
62:17 65:11 68:6
71:7 72:25 77:8
80:25 84:8 85:5
89:10,23 92:18
93:3 104:9,21
110:21 117:6
119:9 133:9 149:7
156:12,25 157:20
157:20 161:2,12
164:18 169:10
177:8 182:6
183:24 184:20
190:25 192:8
195:11 197:20
199:20 203:4
220:25 231:14,15
235:3 237:21
238:3 248:4 251:3
263:12 264:10
265:3 271:14
273:6 279:19
284:12 289:17,25
291:11 296:11
297:13 303:7
311:2 320:19
322:2,14 325:6
329:7,21 330:6,18
331:19 349:12,17
349:23 351:17
356:18 357:17
360:19 370:15
371:25 372:17

373:24 381:19
meaning 43:5
109:10 134:24
162:11 271:20
274:14 294:6
308:22
meaningful 293:9
293:16
means 66:22,24
107:25 220:23
238:23 288:12,14
288:22 289:3
290:1 291:5 294:5
294:12,21 296:15
300:19 308:15
355:3
meant 291:25
measure 165:17
166:9,12,23
254:22 255:9
292:12
measures 92:21
109:20 191:18
285:3 329:24
med 49:9
medicaid 325:1
medical 49:5,9,12
56:1 93:6 113:7
113:13,22 145:23
148:13 149:11
172:2,3 232:9
271:3 389:25
392:12
medically 220:5
medication 144:24
269:16
medications 58:24
59:8 388:21,23
medicines 175:11
meet 179:10
181:23 218:2

323:11
meeting 6:23
138:19 205:25
206:2,4,6,8,9
207:25 208:1,2
212:11 244:16
248:6 314:2
315:22,22 317:16
318:18,21 321:3
360:18
meetings 32:22,24
33:1,4,7,9 36:11
43:25 44:14 148:4
148:7,10,10,12
149:9 176:5,5
204:7 205:23
206:13 209:8,23
210:13 212:1,2
276:13,25 277:1
305:2,3,4,5,9
314:1 317:19
meets 208:7
217:14,25
member 63:17
122:17 319:1,7
members 164:21
243:3 361:6,7
memoranda
156:24
memorialized
140:17 156:22
159:24 371:10
memory 45:4
memos 158:25
mental 93:5
148:18,21 169:13
243:17 269:18
270:22 275:19
279:24 280:6,14
mention 208:21
294:22

mentioned 58:16
92:5 108:14 111:3
128:5 135:11
155:25 162:10
169:25 175:17
205:13 265:4
326:16 390:3
mentioning
365:19
mentions 210:20
message 321:22
322:4,9
messages 60:19
met 53:19 166:23
314:20 315:2,20
meth 69:11,16
77:7,14,17 78:2,10
79:6 81:3,13,14,24
85:5,6 86:25
108:4 144:6,16
147:5 148:15
150:5 165:11
211:4 319:16,25
methadone 123:8
methamphetamine
67:6 68:19 69:5
77:3 78:23 80:18
83:10,25 84:19
143:21,23 146:22
147:12,25 148:25
165:5
methamphetami...
307:10
metric 166:7
miami 2:22
michelle 4:9 41:17
41:21 208:4,8
mid 39:15 42:22
69:25 77:14,18
middle 356:1

[midlevel - names]                                                          Page 43

midlevel 30:4
midwest 395:17
  398:1
migas 275:18
million 172:16
  173:10 177:20
  183:11,14,15,15
  197:5,5
mind 42:1 45:13
  75:17 106:19
  113:21 274:3
  389:3
minimal 177:25
minimize 148:1
  272:16
minimum 216:6
minor 166:16
minutes 6:23
  193:14 206:5,8,23
  207:22,25 208:2,8
  209:21 212:11
  304:23 317:17
  384:3
mirrored 253:23
mirrors 113:4
mischaracterizat...
  44:4 329:4 391:20
mischaracterizes
  374:17
misinform 386:18
misinformation
  382:12
misrepresentation
  154:6
missed 235:14
missing 104:6
misspoke 40:10
misstatement
  245:25
misstates 60:14
  73:15 102:22

103:12 104:3
105:8 115:24
127:12 138:3,6
152:16 155:17
180:5 204:16
211:11 252:11
328:18 376:10
379:7
mitch 332:9
moment 393:1
moms 271:3,11,23
monday 1:22 26:3
  194:3 393:18
money 97:25
  172:19 173:24
  177:4 178:20
  179:6,16 180:1
  181:12,22,25
  182:13,14 183:1,5
  183:20 184:24
  186:4,5 189:4,5
  190:8 192:13
  197:25 228:13
  237:19 238:1
  269:10,18,22,23
  269:25 270:2,6,9
  270:23,24 271:6
  271:20,21,24
  280:2,3,12,23
  281:5,12,16,17
  282:9 283:3
monologue 378:2
month 96:23 97:1
  180:15 186:22
  207:10 208:23
  313:6,6 347:6
monthly 205:25
  206:1 208:20
  209:8,17,18 305:3
months 247:17
  263:10,20 285:24

312:22,23 313:8
morgan 3:8 27:6
morganlweis.com
  3:11
morning 26:4
  110:18 194:12
  287:9 291:19
morphine 65:18
morris 3:3
mother 271:9
  357:10,17 359:7
  359:20
mothers 271:16,22
  356:10
motion 96:8
  380:22
motions 377:13
motley 2:5 26:20
motleyrice.com
  2:7,8,9
mouth 383:6
move 111:6,21
  182:13
moved 72:14
  181:22 182:1,8,9
  199:24 200:3,22
  200:23 201:3,6,10
  215:11 235:21
  236:16
moving 97:14
  182:14 230:22
msw 212:25
mt 2:6
multifactorial
  352:18,21
multiple 43:25
  48:12 74:24
  306:17,18 341:12
multitude 323:15
mute 373:13

myocum 4:12

n

n 5:1 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 92:16
  92:18 194:1
nadcp 251:18
nadel 3:13 6:6
  27:8,8 373:8,13
  381:8,10,13,15
  384:5,12 385:1,10
  385:16,22 386:10
  387:2,14,24
  388:10 393:10
name 29:7 35:3
  36:22 38:6 39:15
  42:21,23 43:3
  55:15 91:15 92:13
  92:17 94:14 123:9
  136:15,20 140:6
  141:11 148:9
  154:25 231:25
  236:1 239:25
  274:8,20,22 287:5
  350:16 365:19
  381:10 388:7
  390:6,8,10 395:6
  396:3,4,15 397:3,4
  397:21
named 55:20
  108:18 383:22
  384:15 385:2,8
  386:14,18,22
names 37:19 55:9
  121:20 151:21
  199:7 205:5
  213:20 214:4

[names - number]

220:13 366:1
379:19 380:7,7,10
**narrow**  108:10
133:13 335:22
**nas**  356:23 357:3,6
357:8,16,20,23
358:8 359:20
**nash**  213:7
**nation**  178:22
322:20,25 323:4
**national**  1:5 26:9
363:10 395:6
396:3 397:3
**nationally**  250:19
**nationwide**  94:6
**native**  360:13
**naturally**  184:18
**nature**  382:10,14
**nealya**  92:13,14
92:18,18
**nearly**  241:12
260:12 326:12
**necessarily**  38:16
74:23 80:13 85:3
109:15 112:20
152:18 174:4
178:17 204:20
217:1 222:5
223:23 224:12
228:20 233:17
234:7,8 235:6
255:9 273:7
276:19 280:1
293:25 296:19,22
300:17 305:14
309:18 310:24
311:6 326:9
341:13,19 344:6
357:19 371:14
374:20,21 375:2
375:20 378:15

379:8
**necessary**  169:20
222:23
**need**  27:17 38:22
50:12 52:25 60:1
79:22 82:15 83:14
84:12,22 86:7,18
104:25 110:15
125:12,20,20
154:1,23 164:12
175:2,3,8,18
176:13 180:18
192:12 193:6
194:12 196:2
199:15 202:14
203:10 210:3
223:24 228:9,10
228:10,10,11
237:17,23 260:1
260:21 275:14
276:19 278:21
282:4,8,9,11
301:21 304:8
319:12 357:12
367:2 369:14
**needed**  119:18
189:4 200:13
209:25 279:13,17
309:25 364:1
**needing**  185:25
288:18
**needs**  50:16 70:16
70:25 72:9,15,15
75:23 86:5 88:3
88:12,12,24 102:6
102:7 109:19,19
165:8 166:22
173:20 177:2
178:12 181:23
188:9 189:3
192:16 230:3

323:12
**negative**  263:1
283:21 364:20
**negatively**  161:11
161:13
**neglect**  162:15
164:20 195:4,23
250:21 251:11,22
252:18 253:10
254:9 257:18
259:1,10,17 297:6
306:12 307:13
312:7,11 354:20
**neglected**  295:25
**neighbor**  311:3
**neither**  394:9
**neonatal**  356:22
**never**  33:21 115:7
261:25
**new**  89:22 153:6
164:16 200:18
201:8,14 221:7
222:15 224:20,21
227:7,10 236:20
236:25 268:10
280:23
**newer**  161:23
**newsletter**  276:16
**newspaper**  63:5
**nicotine**  115:6,15
115:16
**nine**  251:15
**nip**  278:11
**nods**  50:8
**non**  361:7
**nonaddicted**
358:17
**nonaddictive**
382:14 388:22
389:1

**nonblood**  231:2
232:25 282:24
**nongovernment**
181:8
**nonlegal**  348:25
349:6
**normal**  33:21
**northern**  1:2
26:11
**notarized**  395:14
**notary**  1:19 5:9,11
5:17,17,21 394:7
394:19 395:25
396:10,18 397:15
397:23 398:23
**note**  395:12
**noted**  218:15
319:10
**notes**  5:11
**notice**  1:20 5:9
88:23
**noticed**  100:8
179:22 211:2
**november**  190:1
**number**  31:15,19
84:24 85:21,24
116:18 132:2
134:8,9 144:12
150:10,14 152:4
154:24 171:2
173:21 183:2
187:16,22 200:14
219:20 222:3,14
223:4,17 225:23
226:14 232:24
233:2 237:5
238:14 240:17
246:6 248:15,22
248:23 253:21
262:13 265:6
267:21 282:23

292:4,5 299:16,17
300:5,6,9,16,17,18
300:18 307:17
311:9 312:1,22,23
312:25 322:18
325:5 326:16
329:9,10,14,23,25
330:7 331:8,11
333:24 334:1,15
335:23,25 336:6
352:1 356:8,22
357:3 360:14
372:5 377:2 382:9
382:17 392:17
395:7,13
**numbered**   273:24
**numbers**   116:21
127:18 171:15,17
198:23 219:5,14
220:15 222:7
255:1 256:11
258:6 300:23,25
328:23 330:21
331:10 336:2,5,10
336:11 337:14,22
337:23,25 338:20
342:22 349:21
353:6 370:20
379:18 397:7
**numerals**   220:13
**numerous**   176:4
**nw**   4:10

**o**

**o**   5:1 26:1 194:1
**o'connor**   239:24
**oath**   29:3 49:24
103:5,23 394:8
**object**   33:11 34:2
34:16 35:9,24
36:8,18,23 37:22
39:2,17 42:13

43:7 47:3 51:23
52:11 57:9 58:5
59:6 60:13 62:14
63:6 64:2 65:2,25
67:19 68:12,21
70:1,20 72:12,21
74:14 75:11 76:3
77:5,15,25 79:1,24
80:23 82:2,18
83:12 84:15,25
86:9,12,21 87:4
88:6 89:8 92:25
95:9 96:14 97:9
98:8,19 100:17
102:11 103:11
104:2 105:7 108:5
111:16 112:4,18
114:3,18 115:1,9
115:24 116:12
117:18 121:9
122:8,19 123:21
124:8 125:4
126:15 127:11
129:14 130:8
131:4 132:5,22
133:5,23 134:19
135:13,21 138:24
141:17 143:4
144:4 145:1 146:7
152:15 155:4,16
157:15 158:21
159:5 160:24
162:4 167:20
168:16 169:3
170:9 171:9
174:24 175:12
176:18 177:6
178:13 180:4,20
181:24 184:14
185:22 187:2
188:13,24 189:14

190:13,22 191:15
202:4 203:16
204:11 208:18
211:10 212:13
217:5,18 218:18
226:1 245:22
248:10 249:19
250:6 252:1,10,21
253:12 254:12
257:20 259:5
260:18 261:10,14
261:24 264:3
266:7 267:2
268:18 269:5,11
270:8,15 271:13
277:13 279:12
281:1 285:4
288:13,20 289:13
290:8 292:19
293:19 295:4
296:13,21 298:12
299:22 300:7
301:7 302:7
305:13 308:1,9
309:1,11 310:23
311:16,24 313:12
316:6 317:1 318:3
326:23 328:17
329:3 334:7,12
336:14,23 338:5
341:4,15 342:11
342:19 343:15
344:2 345:13,21
347:17 349:1
352:19 353:24
355:2,7 358:12
359:9 361:24
363:14,22 364:17
364:24 369:5,24
370:14 371:12
372:14 376:24

378:2 379:6
380:14 382:6
385:13,18 386:4
387:22 389:21
390:2,16 391:14
391:19
**objection**   33:10
39:21 44:3,17,24
45:10 46:21 50:20
54:17,22 57:21
58:2 59:20 61:4
61:12 62:2 68:5
69:6,23 71:3
73:15 76:16 80:7
84:4 97:21 102:20
106:1,8 107:2,11
110:1,19 115:18
125:17 126:25
129:2 138:3,6
140:21 142:1,13
143:15 145:19
146:15 147:16
148:2 150:2 151:3
151:19 153:18,22
154:15 155:22
158:1 160:8,13
163:8 165:9,24
167:12 170:18,21
172:24 186:9
189:7 191:22
192:5,22 202:23
204:16,25 210:17
228:18 242:5
246:14 247:25
251:2 255:16
272:19 278:5
285:8 289:22
290:12 291:8
293:6,11 294:10
294:17 295:14
299:2 300:13

307:5 313:1 320:2
320:5,17 322:7
323:1 324:14
327:20 328:3,10
329:18 330:2,10
330:15 331:14
334:19 335:10
337:16 338:13,16
339:12,22 342:3
342:11 343:4
346:6,14 359:22
362:6,23 363:5
368:19 369:12
374:16 375:17
376:9 380:8
383:24 384:9,17
385:4 386:24
387:7 392:18
**objections** 8:3 9:3
10:3 11:3 12:3
13:3 14:3 15:3
16:3 17:3 18:3
19:3 20:3 21:3
22:3 23:3 24:3
25:3 44:7 48:4
**objectives** 194:23
**obligations** 196:10
**observations** 98:6
98:17 371:4,7
**observed** 102:2
146:21 371:17
**observing** 377:19
**obtain** 74:17
101:12,15,16
102:8 128:16
**obtained** 74:17
89:6 100:16 101:7
101:22 103:9
105:23,24,25
106:25 108:24
112:15 123:24

124:20 125:1
126:12,23 128:13
131:2,2 145:17
**obtaining** 123:19
124:6
**obtains** 126:8
132:11
**obviously** 104:22
149:8 179:6 225:5
249:22 250:9
266:24 275:12
282:4 305:22
312:1
**occasion** 40:25
211:25
**occasions** 390:12
**occur** 90:6 164:17
164:19 184:11
382:21
**occurred** 69:15
93:24 96:18 98:12
152:4 172:1
200:17 215:7
220:11 249:23
309:17 336:8
373:23 377:8
378:14 386:7
**occurrence** 170:8
**occurring** 165:13
**occurs** 195:13
375:24
**october** 7:6 332:8
333:8,15
**offer** 102:17 103:5
124:16,24 127:5
369:9
**office** 30:17 46:16
93:6 94:11 145:23
149:11 150:18
167:3,7 196:17
226:6 243:16

268:8 279:25
**officer** 2:13
214:21
**official** 5:13
276:22 396:15
397:21
**officials** 176:11
189:11
**offset** 176:13
177:1 228:15
**offspring** 70:14
**oh** 97:1 116:23
184:23 236:11
237:25 247:2
285:7 314:21
332:7 340:10
**ohio** 1:2,9,19,22
2:15 3:4 26:11
29:15 30:15 31:25
94:16 139:2
178:17,20 179:4
204:1 239:5,23
242:24 243:17,17
243:19 249:5
269:2 322:20,22
322:24 323:3,3,4
361:19 394:3,7,13
394:20 395:2
**ohio's** 243:4,4
260:12 262:7
268:6
**okay** 27:25 30:24
31:23 32:3,9,11,21
33:14 34:8 37:11
38:8 40:13 43:12
43:14 44:5,9
46:18 47:9 48:9
48:16,25 50:5,25
56:4,23 57:23
61:18,21 63:15,21
66:21 67:6,12,23

70:13 73:12 74:9
75:17 79:10 80:11
83:3,17,20 89:4
92:19 94:24 95:24
95:25 96:2 97:2
98:15 100:4
101:11 102:1
103:3,21 104:15
104:20 105:4,19
107:7 108:9,12
109:4,17 110:24
111:11 113:24
114:10 115:17,20
117:2 118:5
119:13 120:16
121:24 122:12
123:2,7 124:15,24
125:23 126:5
127:4 128:12,21
130:22 133:11
135:11 139:23
140:19 142:8
146:2,24 148:22
149:18 151:2
153:14,17 155:10
157:10,23 158:11
158:25 159:9,19
160:18 166:21
176:3 179:22
180:14 183:8
185:25 188:19
191:2 192:19
193:8,11 195:1
196:18 201:17
202:19 204:5
206:22 207:4,12
207:21 208:11
209:7 210:8
212:21 213:22
217:1 218:11
219:7,9,15,22

221:3,7 223:17
224:15 225:14
227:20 228:6
229:22 234:11
236:22 237:2,16
238:6 239:19
241:5 244:24
247:3,15,18
248:11,21 249:3
250:13 252:7
255:21 258:24
260:10 264:7,16
266:1 267:12,20
268:4 272:7
273:20 274:5,12
274:18 281:9
285:17,23 286:2,5
286:14 287:7,16
288:6 291:14
292:12,25 294:4
294:14 295:9
296:8,19 298:8,20
298:23 301:13
302:13 303:6,15
304:10,15,21
305:18 306:24
308:12,20 310:13
312:22 313:20
314:21 315:5,19
316:15 318:8
319:6 322:14
325:9 326:10
327:3,24 330:13
332:3,4,14 333:7
334:4,10 335:21
338:23 339:2,10
340:7,11 341:8
344:14 345:9
347:14 348:8,25
350:11 352:16,23
354:16 356:7

359:14 360:7
363:9,19 365:18
366:14,17,19
367:16 369:8
373:7 374:8 375:9
378:20 379:11
380:3,20 381:2,14
381:18 382:1
388:17 389:8,14
390:6,9 392:22
**old** 38:24 39:10
41:4 53:10,11
228:16
**ombudsman**
235:10
**once** 45:8 53:24
187:17,17 237:18
238:1
**one's** 251:16,16
**ones** 52:6 55:12
56:11 72:7 214:19
215:25 239:16
259:3,23
**ongoing** 95:12
97:12 107:8 196:1
210:2 323:11
355:13
**op** 1:10
**open** 85:25 131:23
139:14 171:3
217:22
**opened** 217:25
218:6
**opening** 310:11
370:17
**operate** 181:1,17
182:22 184:19
186:18
**operations** 194:21
333:3

**operators** 131:20
**opiate** 1:5 26:9
32:18 65:19,20,24
66:3,9 67:3,7,11
89:13,16 90:19
100:10 101:21
107:1 108:3
109:22 113:1
149:2 150:10
152:11 154:12
155:14 161:5
163:11 166:5
167:24 168:7
175:4,23 187:5
190:10 191:25
192:10,10 210:20
226:22 227:19
229:8 240:5 241:6
241:14,24 242:12
244:4 246:6 249:5
249:7,11 250:16
251:25 252:13
253:7 254:2 259:2
259:9,22,24,25,25
260:14 263:19
268:6,9 269:2
271:3 272:17
276:6,11,13
277:12,18 278:2
279:11 280:17
292:17 297:7,25
298:2 299:7,11
300:2 302:21
307:3 308:13,23
310:20 311:22
312:10 314:14
315:8,16 318:12
319:15 325:17,21
327:10,18 328:2
328:15 329:2
331:9 349:20

354:4 356:4
359:21 361:20
363:2 370:10
371:9 372:9
374:10 379:22
381:17,18,21
382:2,4,8 386:8
390:22 395:6
396:3 397:3
**opiates** 71:18,24
72:2 81:5,10
87:18 88:25 89:11
89:20 90:5 94:4
95:18 99:9 101:23
109:25 114:16
124:19 131:1,1,1
138:1 143:3
156:11 160:7
174:23 175:10
186:25 218:16
219:2 225:25
226:14,19 227:16
245:19 250:15
253:11,20 254:9
257:19 262:9,19
263:25 294:5,7
299:18 306:24
307:1 308:13,15
309:8 310:6
316:25 327:4
331:13 353:21
359:8 377:21
389:17,19 390:15
391:11,12 392:4
**opinion** 127:5,13
202:5
**opioid** 60:17 65:15
65:16 66:4 67:3,7
93:13 100:10,16
101:7,20 102:9
103:9 108:3

[opioid - page]

Page 48

109:22 111:5
112:15 115:8
121:7,8,19 122:14
123:11,19 124:6
126:8,9 127:8,21
137:18 139:19
144:9,10,13,19,23
150:11 152:5,7,11
154:12 155:14
175:23 190:10
219:5 229:8,8
240:5 258:10
279:10 286:5,10
287:22 291:14,21
292:17 294:4,23
295:2,10,11
296:11,12,16,25
298:3 300:2
302:21 315:7
333:11,19 341:10
341:11 342:13
343:2,6 349:14
353:1 359:20
361:11 370:10
371:9 374:6,12
375:14 376:7,16
381:17,20 383:23
388:21
**opioids**  56:17
62:13,21 63:25
64:16 65:21,22
69:13 88:25 89:20
100:15 101:12
103:8 104:1
105:16 106:25
122:2 124:19
125:1 126:12,22
126:23 127:6,24
128:6,13 130:5
131:1 136:24
137:5 138:1 139:7

139:14,15 143:3
145:7,17 153:10
156:9,10 160:6
174:23 175:9
186:25 218:16
219:2 225:24
226:15 227:16
245:19 253:20
294:6,6 298:10
299:18 307:2
316:25 327:3
329:12 349:9
352:18 353:21
359:8,16 367:25
368:7,14,25
373:20 374:1
375:5 377:21
382:10,10,14
383:15 384:7,8,16
386:23 387:6,17
387:20
**opoid**  65:23
**opposed**  106:25
122:1 132:9
178:18,19
**opposer**  362:8
**opted**  237:11
**options**  217:4
**oral**  206:16
**orally**  138:14,15
159:12
**oranges**  255:19
**orders**  240:12
**oregon**  3:15
**organization**
94:13 196:14
199:5,14 237:18
251:17 324:20
325:8 363:12,16
**organizational**
6:10 195:8

**organizations**
176:10 225:1
272:1 279:16,20
279:22 324:1,4
325:6
**organized**  182:19
**organizer**  238:20
238:24 241:2
**orient**  239:18
242:18
**origin**  391:18
**original**  248:18
**outcome**  137:13
**outcomes**  194:23
**outdated**  219:12
**outlets**  364:10
**output**  93:20
**outside**  38:5
182:14 188:1
197:23 198:9,16
202:14,16 205:19
205:20,21 230:3
277:5 282:18
318:13 324:19
**outsourced**  172:5
**outstanding**  238:5
**outward**  234:21
234:25
**overall**  72:5 85:17
86:8 118:22
133:20 162:3
172:11 173:16,20
173:21 178:12
222:23 328:23
**overcome**  325:10
325:21
**overdose**  68:3
71:1 76:1,5
114:12 144:17
145:6,16 146:3,12
148:1 150:20

151:17 364:20,20
**overdosed**  159:22
163:15 354:5
365:6 372:21
**overdoses**  69:14
146:12 152:7
164:1 165:12
253:17
**overnight**  354:13
**overprescribing**
382:9 386:23
**oversee**  279:2
**oversight**  34:18
43:1 208:12
**overtime**  184:24
**overview**  199:17
**owed**  151:11
**oxycontin**  65:18

**p**

**p**  5:1 26:1 194:1
**p.m.**  193:18 194:7
301:15,18 366:21
366:24 393:3,6,14
393:18
**packet**  207:3
246:25 247:2
**page**  6:3,8 7:3 8:3
9:3 10:3 11:3 12:3
13:3 14:3 15:3
16:3 17:3 18:3
19:3 20:3 21:3
22:3 23:3 24:3
25:3 100:5 205:4
205:9 213:11
214:10,15,24
219:17,18 229:22
234:12,14 235:23
236:6,10,13
238:22 239:21
246:5 248:14
249:1 263:22

[page - peaking]                                                                                    Page 49

264:13 267:13,13
267:16,17,21
285:18 287:14,15
303:16 313:21
314:11,18,25
321:24 322:6
326:10,10 350:13
361:9 395:13,15
397:7 398:3
**pages**  246:22
247:1 248:20
251:16 264:14
340:13
**paid**  221:4
**pain**  65:17 66:15
66:16 167:9
382:15 384:24
**papas**  2:12 26:23
26:23 201:18
203:18 213:4
274:10 275:3
347:16 348:11,20
**paper**  59:10,14
244:5,9,11 246:9
246:13,17,22
247:9,16,24 248:2
266:10 339:10
362:15,18
**par**  4:2,3 41:10,11
**paragraph**  242:23
249:4 250:19
260:11 318:8
326:12 354:16
**paragraphs**  315:4
316:16
**parent**  163:22
170:12 250:21
251:23 252:18,25
257:12 259:1
297:6 327:8
328:15 331:8

358:10,18,18
372:23 377:19
**parent's**  242:25
**parental**  288:9,23
290:18,21 293:21
306:14
**parenting**  71:17
324:5
**parents**  76:12
79:15 152:6,6
163:14,16,17
168:5,12 235:5
260:25 261:22,22
262:8 263:20
295:24 324:6
328:2 353:6 354:5
354:16 365:7
372:20,20,25
**part**  51:17 55:2
63:20 64:8,13
72:9 84:21 95:10
103:17 111:24
112:5 118:19
123:4 128:9
139:18 142:17
148:3 166:17
175:21 176:3,8
178:16 180:2,8
190:7 191:18
196:13 204:23
210:22 212:18
222:12 229:1
237:7,12 240:14
247:7,9 250:2
256:5,6,8 257:13
261:13 269:13
273:24 276:18
279:2 298:9 310:7
311:22 319:21
329:1 360:16
388:24 397:9

**participants**  170:3
**participate**  204:7
206:1 265:10
276:24 335:7
**participated**
241:16,17 265:18
**participating**
93:19 276:10,21
**particular**  45:5
74:12,18,19 78:24
80:21 86:4 108:2
117:24 121:6,20
121:25 122:6,6
133:18 135:20
151:8 160:23
190:17 210:11
254:16 281:11
292:10 295:16
318:21 362:14
365:25 378:7
379:13 384:4
391:8
**particularity**
379:18
**particularly**  153:5
165:7 284:12,23
324:17 325:25
**parties**  5:4 385:8
394:10
**partners**  390:21
391:1
**partnership**
323:21,22 324:3
**partnerships**
323:14,19
**parts**  125:24 126:1
149:10 157:6
284:19 296:8
**party**  303:2
**pass**  91:22 96:10
96:23 367:7

380:23
**passed**  68:18,25
69:4 91:16,21,23
97:1 173:18
176:19 186:21
187:17 189:21
284:18
**paste**  341:25
**pastor**  319:4
**patient**  58:12 59:5
61:20 380:6
**patient's**  121:18
**patients**  143:20
346:4 372:6
382:13 386:19
**patterns**  80:22
91:4 330:18
**pause**  306:18
**pay**  72:15 85:15
174:13 184:24
186:3,4 221:5
222:25 283:4,5
324:24
**paying**  186:2
198:3 333:3
**payment**  196:11
**pcp**  150:23
**pcsao**  94:17,18
139:1,9,19,22
141:22 227:17
244:11 246:19
286:10 287:22
301:4
**pcso**  362:21
**peak**  69:22 70:3
77:14,17 81:3
225:21 226:7
252:8 319:15
**peaked**  70:5 77:1
**peaking**  163:6

**peaks** 84:2
**pending** 238:2
**people** 27:17
  37:19 38:17 47:17
  48:12 51:11 59:17
  62:21 70:14 74:5
  78:8 88:1 90:13
  99:22 100:15
  101:6,12 102:8
  111:4,20 112:1,13
  112:24 114:11
  115:20 146:5,25
  147:10,14,19,24
  148:24 149:21
  150:19 151:16
  155:7 166:21,21
  188:9 190:19
  191:4,8 204:22
  205:19 213:23
  227:25 228:9
  229:3 235:17
  243:16 245:12
  253:10 282:25,25
  287:18 311:1
  312:9,16 345:18
  361:2 373:20
  375:12 376:1
  382:11
**people's** 213:16
**percent** 112:2
  114:1 119:4
  133:17,17 137:18
  137:18,20,20,21
  137:25 197:11
  218:17 225:4,8,16
  250:20 251:22
  252:4,5,24 253:2,8
  255:2 256:25,25
  257:3,5,8 258:10
  259:4,6,8,9,21,24
  260:6,6,9 261:2,2

262:6 263:18
291:15 294:21
296:10 298:9
299:16 300:1,6
306:25 307:9,10
308:7,21,22 309:9
310:17,17 311:12
311:13,20,21
312:8,24 326:12
326:16,20 328:13
329:16 330:8
331:3,10 333:18
333:22 334:1,4,5
334:18,23,24,24
335:23 336:12
337:15,24 340:23
341:9 342:9,10,14
342:15 343:12,13
343:19,22,25
344:7,8,12 351:8
392:8,17
**percentage** 112:13
  112:24 114:6,7
  131:24 135:2
  139:7,13,14 226:8
  252:17 254:7
  256:3,19 257:9,10
  257:11,15,17
  258:25 259:23
  262:15 298:8
  311:10 330:4
  331:21 343:1,6
  376:1 392:2
**percentages**
  119:15
**perception** 185:19
**percocet** 65:18
**performance**
  88:17 222:24
  250:5 366:11

**period** 46:3 52:22
  77:23 79:21 98:23
  134:18 136:12
  141:9 146:4 151:8
  165:20 171:20
  172:10,17,23
  173:13 183:19
  185:18 210:7,9
  252:8,13 255:15
  257:6 260:17
  273:5 310:22
  329:21 351:22
  353:18
**periodically** 208:7
**periods** 251:7,24
  252:3
**perm** 196:4
**permanency** 196:4
  196:5 216:2,4
  229:23 230:1
  233:10 350:20
**permanent** 230:21
  358:23
**permanently** 52:2
  52:4 210:6
**permutations**
  220:21
**person** 37:15,17
  38:12 120:6,7,9
  122:5 128:21
  145:18 154:25
  159:14 255:6
  258:18,19 278:14
  282:13 283:11
  286:24 307:24
**personal** 55:19
  56:1,4 62:7 63:3
  63:10,23 67:15
  173:9 176:8
  276:22 277:4
  301:25 367:17

368:12
**personally** 34:18
  42:10 43:18 62:16
  64:4 112:6 147:22
  163:11 207:14
  385:11 396:11
  397:15
**personnel** 159:19
  184:25 197:16,21
  197:22
**persons** 51:11
**perspective** 32:18
  64:5 66:5 69:8
  75:21 94:7 175:3
  203:11 233:8,9,14
  272:13 277:9,21
  277:24 278:20,23
  279:5 307:19
  309:14 354:8
  355:11 377:25
  383:3
**pertinent** 306:2
**pharma** 1:10
  55:13
**pharmaceutical**
  4:3 41:11 57:7
  61:2
**pharmaceuticals**
  4:2,3 41:10,11
  55:14 56:11 60:6
**pharmacies** 58:12
  58:12 60:6 61:24
  389:2
**pharmacy** 61:20
  109:13 128:17
**phased** 173:10
**phenomenon**
  89:23
**philosophical**
  352:2

[phone - post]

Page 51

phone  27:18,22
   41:16 216:18
   307:24 373:9
   395:3
physically  288:10
   288:18 291:5,10
physician  59:3
piece  370:25
pieces  97:14
   284:13,18
pilot  237:6,7
pin  370:19
pinning  96:17
pinpoint  77:9
piurkowsky
   214:20
place  87:16 99:13
   99:17,20 120:5
   148:5 170:11
   199:10 200:3
   209:13 230:25
   237:3 258:20
   281:6 287:18
   288:2 289:24
   291:12 292:22
   293:22 294:2
   350:4 354:12
   357:14
placed  29:2 230:3
   232:24 262:7,18
   282:23 358:20
placement  98:12
   174:13 187:25
   196:4,6 198:11
   216:1,3 222:14
   229:23,25 230:2,4
   230:5,7,7,24 231:7
   231:17,19 233:10
   234:8,10 273:11
   333:22 351:2,24
   353:17

placements  188:1
   198:14 263:18
places  73:1,9
   74:24 78:15
   106:10,13 119:22
   121:22 130:10,14
   145:23 222:15
   251:8
placing  322:19
plaintiff  2:10 48:3
   381:4
plaintiff's  44:1
   238:13
plaintiffs  2:2 42:2
   56:21 198:25
   273:21 279:2
   285:20 303:18
   313:24 321:14
   344:21 350:12
   393:7
plan  90:22 118:14
   118:16,18,20
   120:13,14 134:3
   187:19 252:25
   254:25 257:12,14
   287:11,18 292:14
   317:6,6,19,21
   337:22,24 341:19
planned  221:8
   237:20
planning  196:4,4,5
   208:6 216:4
   229:23 230:1
   233:10 266:12
   316:17,19 350:21
plans  336:7
   341:22 343:7
   344:9
play  34:12
played  74:12

players  191:5
playing  75:7
plays  192:7
plaza  2:21
pleasant  2:6
please  26:12 27:16
   28:4 29:8 41:20
   68:25 125:15
   202:7 337:20
   395:11,11
plus  140:8,8
point  57:10 69:9
   71:24 81:3 85:7
   168:10 179:25
   211:5 212:4 216:7
   221:13 222:10
   223:4,22 238:3,5
   244:11 247:5,23
   256:18 284:6
   292:21 310:10
   312:3 314:24
   326:6,9 329:15
   336:16 337:4
   341:21 345:19
   355:23
points  73:9 133:19
   254:6 286:11
   345:3,14 372:10
police  353:8
policies  37:20,23
   37:25 268:10
policy  38:5 39:1
   51:21 52:9,18
   53:15,20 194:22
political  172:9
polster  1:9
pool  182:10,11,12
   182:13,15
poor  132:24
poorly  365:17

pop  93:9
population  71:12
   71:13 81:11
   112:25 113:4,5
   116:14,16 127:24
   134:17 137:23
   161:3 178:12
porter  3:3 4:4 27:4
   41:9
porterwright.com
   3:6
portion  79:14
   186:11 289:11
   304:5
portland  3:15
position  29:10,16
   29:21,24 30:3,7,8
   30:13,18 31:20,24
   35:15,22 36:17
   40:19 77:21 83:18
   102:16 103:5
   194:17 216:11
   221:17 232:2
   277:5 278:24
   303:2 316:9 319:3
   367:5 371:7
positions  85:18
   213:25 214:1,18
   221:11,14 223:22
   316:11
positive  269:20
   356:10 357:10,17
   378:16
possibility  217:16
possible  244:18
   292:3 335:24
   366:9
possibly  331:12
   341:12
post  276:5

potential 132:10
264:2 308:13
potentially 100:9
198:8 262:21
308:24 317:18
329:1 358:24
377:10 380:7
practice 99:4
100:1 194:22
206:19 209:7
354:1
practices 96:12
98:16,21 99:13
117:10,15 222:20
249:8 264:15,18
264:25 265:1,4
266:5,6 272:6
321:1
pre 133:22 293:17
preceding 29:20
30:12,14
predictable
143:25
preferred 107:22
pregnant 271:17
preparation 33:13
42:19 43:6,22
202:9
prepare 32:23
202:11 315:22
prepared 206:5
321:18 382:20,23
382:24 383:1
preparing 43:15
230:11 256:6
321:17 336:21
prescribed 29:3
58:23,25 59:4
66:15 100:15
prescribing 59:8
249:8

prescription 1:5
26:9 56:11 58:13
58:14 60:5,18
62:12 63:25 64:16
64:25 66:9,13
100:14,22 101:7,8
101:12,15,20
102:9,9 103:7,8,9
103:10 104:1
105:16,24,25
106:24 108:3,15
111:5,20 112:7,14
112:15 113:6,16
114:8,16 115:4,8
121:5,7,8 122:2,6
122:14,16 124:6
124:21 125:1
126:8,9,12,13,22
126:23,24 127:6,7
128:13,15 130:5,6
130:7 132:13
144:24 145:7,17
298:10,11 299:11
307:2 367:24
368:6,14,25
373:20,21 374:12
374:13,25 375:1
375:14,16,25
376:6,16 389:18
390:15 391:12
395:6 396:3 397:3
prescriptions
55:24 59:18 62:12
62:24
presence 5:12
present 4:13
142:24 157:24
164:13 171:5
180:14 304:23
314:4 361:10

presentation
314:12 392:5
presentations
301:5 305:1
presented 138:19
141:19 212:1,12
364:8
presenting 363:20
364:3
preserving 34:13
42:6
president 274:15
277:16 286:1
316:4
press 111:14 149:9
176:6 249:16
256:6 301:4
348:18 364:9,10
364:15,19,20
365:5,9 366:8
pretenses 388:22
388:25
pretty 233:13
244:13 274:25
330:18
prevalence 133:21
160:22
prevalent 147:6
250:18
previously 118:1
149:1 188:2
199:23 200:7
201:9 211:21
price 285:2
primarily 34:18
51:11 65:17 77:10
90:17 91:20
202:13 205:16,21
208:13 273:10
286:23

primary 69:10
71:22 75:21 78:3
81:9 91:17 197:10
197:15,22 202:8
294:15 295:12
297:1 327:11,18
print 213:13
prior 30:3 35:5
53:7 77:21 78:7
92:7,9,11 98:13
117:1 157:17
177:10 206:6
209:23 210:25
211:24 212:3
216:24 224:17
241:6,11 293:14
342:1 371:6
380:21
priority 174:11
private 97:17
176:24 319:11
361:3
privilege 44:25
337:1
probably 35:6
47:25 74:20 77:17
92:15 93:25 94:6
116:15 142:4
158:8 165:17
166:16 169:20
183:10 193:8
211:16 216:11
222:9 223:24
233:1 236:23
267:4 268:1
276:14 278:14
282:7 283:16
290:17 300:22
312:12 317:24
355:23 387:12

**problem** 68:4,14 80:5 90:1,6 92:24 106:11 136:24 164:25 179:20 180:7 181:2 213:18 256:9 258:1 264:8,12 326:11 331:9 356:18 364:6,7
**problems** 68:10 80:13 366:8
**procedure** 1:16 5:8 194:22 396:5 397:5
**proceedings** 202:1
**process** 97:5,12 99:12 162:22 184:21 188:6 191:4 209:13 221:1 227:4,25 230:14,18 256:5 282:18 379:16
**processing** 166:13
**produce** 36:2 42:10,15 43:20 46:1 49:20 54:24 140:14 206:14
**produced** 34:6,9 34:22 35:3 39:16 42:12,25 43:19,21 46:6 113:14 140:9 140:11 204:1 227:17 254:19,25 303:7 306:5 326:8 360:13 381:5
**produces** 151:21
**producing** 42:7 46:5
**product** 336:25 337:3

**production** 34:13 42:16 46:12 160:5 305:24 367:6 395:15,17,22
**productivity** 166:8
**professional** 29:13 30:9,25 31:3 58:15 59:3 128:16 176:10 200:6 235:4 236:17 312:13
**professionals** 144:7 169:2,11 312:17,20
**program** 88:12 164:7 208:6 215:5 235:21 236:23 237:3 265:19 267:4 271:3,12,24 282:19 323:24 347:12
**programatically** 288:7
**programmatically** 200:15
**programming** 256:22
**programs** 87:16 88:15 95:20 99:24 186:7,23 215:25 236:10 237:10,20 267:1 272:15 281:14 323:20 324:11
**project** 136:15 137:6,12 139:16 142:17,23 244:5 246:6 249:5 271:4
**projecting** 333:5

**projects** 92:2 96:12 136:4 142:9 174:10
**promote** 249:8
**pronunciation** 287:4
**proof** 5:13
**property** 172:20 172:20 173:4,9
**proposals** 91:2
**proposed** 284:10 284:13
**prosecutor** 202:11
**prosecutor's** 196:17
**protected** 377:2
**protection** 177:16 322:24 363:11
**protective** 82:15 179:13 180:9 195:25 216:1,3,12 219:23 221:9,11 222:4 223:19,25 224:8 234:1 355:13
**provide** 45:8 72:8 104:23 105:20 106:22 107:9 173:25 176:13 177:18 178:2,21 198:4 201:24 204:8 210:19 269:17 272:2 279:14 283:14 292:11 324:2,5 325:6 333:5 377:3
**provided** 46:7 70:17 85:20 88:17 102:6 139:1,3,8 140:3,25 141:2,6 144:11 178:3

193:6 207:2 208:22,22 209:16 210:22 211:20 244:10 271:8 325:13 335:18 337:11 338:2,19 339:15 363:23
**provider** 122:25 254:1 283:12
**providers** 59:17 186:3 198:14 234:10
**provides** 82:16 83:4,8 107:20 178:20
**providing** 84:24 174:20 340:22,24 341:5 384:20 387:11
**provision** 72:20 91:3 150:11
**public** 1:19 94:15 139:1 143:22 145:10 149:9 150:15,17 176:4,5 178:16 189:10 192:9,15 277:16 314:2 315:17 317:14 323:6 332:12 333:12 347:10 361:19 394:7,19 396:10 396:18 397:15,23 398:23
**published** 251:16 251:17 362:18
**pull** 107:15 117:23 126:18 137:2 170:13 258:1,3,14 288:7 292:2,7,23 296:4 338:7 342:5

**[pulled - really]**

**pulled** 91:18
116:23 118:2
134:1 251:8
259:18 292:9
341:18 342:23
344:8
**pulling** 142:18
**pulse** 315:7
**purchase** 187:25
**purdue** 1:9 55:13
**purpose** 256:7
348:20 363:19
**purposes** 160:4
198:19 238:9
273:17 285:14
303:12 313:17
321:7 331:25
340:3 344:17
347:2 350:8
355:19 360:3
**pursuant** 1:20 5:9
58:13 103:10
126:13,24 130:5
132:12 373:21
374:13 375:15
389:17 390:15
391:12 392:4
**purview** 195:2
212:19 364:22
**push** 264:23
279:23 373:15
**pushing** 263:20
**put** 77:9 87:16
91:2 99:13,17,19
106:12,13,14
117:21 119:22
120:24 123:23
124:11,12 126:22
134:6,7 170:12
174:10 187:18
196:24 258:20

274:1 306:4
309:23 333:9
338:1 339:3 350:4
352:2 353:17
354:11 383:6
**putting** 50:10 74:6
120:4 294:2

**q**

**qi** 91:6,8 92:1,20
338:7
**qualification** 5:14
**qualities** 384:22
388:23 389:1,5
**quality** 84:23
85:19 91:9,15
92:4,9 102:5
174:3,4 201:5
235:7 286:22
287:1,3 386:12
**quantifiable**
103:24
**quarter** 71:13
116:8,15 118:7,23
119:21 185:13
186:1,5,13,16
308:7
**quarters** 314:17
**question** 33:16
35:12 43:10,12
45:2 48:5,23
50:22 58:7 60:22
61:7,14,15 67:21
72:23 79:8 84:17
88:8 98:10,24,25
104:4,12,14,17,22
104:25 105:2,5,6
105:11 113:17
121:12 125:16,21
126:1,2 127:15
128:3,13 149:3
152:16 153:16,17

153:19 175:15
179:1 191:16
201:7 208:21
228:3 249:20
250:7 251:20
253:13 291:9
294:19 299:24
309:12,20 318:4
335:15,17 336:18
343:17 344:3
345:24 347:18
348:9 349:9
372:15 375:10
376:3
**questionable**
132:25 133:4
**questioning**
366:16 367:8
380:24 389:14
**questions** 50:18
57:15 76:12 87:23
91:6 104:23
110:18 132:19
149:12 303:4
367:7,14 368:2
372:1 381:12,18
384:2 388:9
389:23 391:6
393:8
**quick** 360:6
**quicker** 353:9,10
353:22
**quite** 50:1 56:25
92:17

**r**

**r** 26:1 194:1 394:1
**raise** 28:3 306:3
**ran** 251:4,5,5
257:2,2,6
**range** 70:16 82:16
83:4 133:13 251:9

255:2 257:8
258:10 260:8
392:9
**rapidly** 383:2
**rate** 153:3 166:9
173:5 188:1
224:24 229:14
262:18 358:22
**rates** 53:21
**react** 100:1
**reaction** 373:5
**read** 56:18,23,24
59:14 63:4 104:8
104:25 105:2,4,6
112:6 125:9,14,16
264:17,20,21,22
268:5 304:8
307:20 334:2
335:15,17 347:19
353:12 396:5,6,12
397:5,6,17
**reading** 63:11
213:18 244:8
347:24 392:7
395:19
**ready** 227:3
**real** 50:7 90:3
153:2 168:22
250:18 297:6,24
364:6
**reality** 284:16
**really** 33:6 39:12
48:1 50:6,9,15
53:16,18 56:15,24
59:11 66:16 67:20
69:12 76:7 79:18
81:6,8,9 85:4
89:15 90:2,6,22
93:3 94:3,5 98:13
98:25 106:13
111:18 119:24

136:25 137:14
138:9 145:12
161:2,21 164:4
166:13,17,20
173:3 175:14
177:10,15 179:12
182:20 185:8
187:14 193:3
194:20 211:13,15
212:4,5 213:13
215:13 222:7
223:5,7,13,14,23
225:17 227:5
233:13 242:14
250:18 254:21
256:8,17 258:12
258:13 273:9
276:24 278:16
282:12,21 283:9
284:25 292:7
297:13 309:14,16
310:25 312:6
324:18 326:5,8
336:15,17 337:21
338:18 350:4
351:19,25 352:2
354:19 355:6
363:17 367:22
368:1 369:25
370:2,3,16,19,22
370:25 371:16
375:6 382:21
realtime   1:17,18
394:6,7,18,18
ream   347:15,22
348:11,14,15,22
reason   118:24
131:15 136:21
152:2 156:17
158:11 159:15
170:3 172:5 237:2

275:4 295:18,19
295:19 296:2,3,5
296:19 297:1,6,24
309:19 341:13,20
386:8 395:14
397:8 398:3
reasons   62:20
82:25 167:16
330:21
recall   30:21 39:13
41:3 45:3 88:23
100:13 137:14
138:9,16 165:10
249:25 274:12
304:4 337:21
361:16 390:4
recap   272:5
receipt   395:18
receive   36:6,14
58:13 130:7
271:24 298:11
received   33:25
35:18 101:1
130:19 132:1
246:18,19 273:13
280:18
receiving   35:16
36:16 40:5,22
recess   110:9
193:19 301:16
366:22
recirculated
247:19
recognized   177:2
179:25
recollection   44:22
237:15 242:17
244:12 245:9
250:11 262:2
275:16 335:5
376:23 392:6

recommendations
267:14,19 268:6
record   26:7,13
29:7 37:1,4,14,17
38:7,20 39:23
48:15,18,19 49:13
110:7,10 135:1,20
142:14 143:6
193:17 194:6
245:2 289:24
291:11,12,12
292:7 294:23
301:14,18 306:4
329:5 335:12
366:20,23 381:1,3
393:2,4,5,13 397:9
records   49:18,19
51:9,11,12,15,16
52:2,3 92:6 123:3
129:11 135:15
136:12 209:22
276:18 306:22
376:20 377:2
recovery   265:9,18
267:4 323:24
324:2,17,20,24
325:3,7
recruitment
187:19 282:10
284:25
recurrence   77:8
reduce   352:1
reduced   5:10
reduction   171:18
171:21,25 172:6
reed   3:20 27:11
reedsmith.com
3:23,24
refer   51:3 142:10
381:18 386:11

referant   306:16
reference   155:5,8
157:14 340:17
395:7 396:2 397:2
referenced   37:21
90:10 151:9
373:18 396:11
397:15
referencing
323:20
referent   307:23
308:23
referred   367:13
referring   114:7
refers   241:5
reflect   74:1
reflects   322:14
reform   363:11
refresh   44:21
243:11 249:14
319:24
refreshed   45:4
refusing   338:23
regard   62:10
305:23 368:14
regardless   346:11
regards   369:3
regional   200:9
registered   1:17
394:6,17
regular   38:21
124:4 207:1
240:15 266:11
309:19
regularly   210:18
276:25 349:25
regulation   387:17
387:19
regulations   182:7
reimbursement
181:18 186:6,6

273:10
**reiterate** 367:5
**relapse** 163:17
164:1 353:7
**relapses** 163:22
**relate** 67:17 219:1
**related** 32:18 34:5
46:14 49:13 56:16
59:8 62:18 64:15
78:9 85:12 86:24
87:6,17 90:19,19
95:17 98:11
111:20 117:16
118:14 122:10
144:12,24 145:7
150:10 152:5,7,24
154:10 156:19
163:10 166:10
168:19 170:2
172:4,18 187:4
193:5 197:16
210:12 226:20
227:18 256:16
265:4 282:24
295:20 299:1
326:8 329:11
331:12 333:22
335:6 341:10
345:18 354:7
356:4 362:12
370:9 382:13
384:20 394:10
**relates** 1:7 132:9
148:24 216:15
218:15
**relating** 37:25
55:20 88:1 111:25
123:4 124:17
126:7 141:5 143:2
143:14 174:22
209:10 211:3

217:12 347:10
365:24 367:6,12
367:17 369:22
370:8 372:7
**relation** 63:25
163:3
**relations** 199:23
199:25 203:19
204:23 348:16,18
348:23 349:7
**relationship** 231:3
**relative** 231:2
255:6 351:24
358:17 394:11
**relatives** 232:25
282:24
**relay** 302:5 335:12
**relayed** 138:14,15
159:12
**reliability** 133:2
133:12
**reliable** 72:18
74:13,16 124:5
126:10 127:5
133:14 300:11,15
300:17
**relying** 379:20
**remain** 232:15
**remained** 78:21
79:13,17 171:13
171:16 179:4
**remains** 200:9
**remember** 45:9,12
48:20 70:2,4,8
76:5 78:1,2 81:23
82:4 89:18,18,25
93:19,22,23
108:18 111:8
116:10,13 124:21
128:12 145:12
147:3 148:19

218:24 236:20
237:6 241:25
242:6,8 244:8
245:5,6 247:12
250:9 278:3
286:11 318:15
337:23 365:9
367:14 383:15
390:6,8,10
**remind** 381:10
**removal** 283:18
288:2 295:12,18
295:19,19,21
296:2,5,5,12,17
297:17 341:13,20
373:1
**removals** 287:10
291:14,15 292:13
296:10 341:10
342:13,14,15
343:7
**remove** 295:23
**removed** 297:2,22
297:24
**removes** 263:2
**removing** 349:18
372:24
**renewals** 98:1
**repeal** 314:16
315:9
**repeat** 41:20 95:16
125:7,11 166:1
169:17 215:17
345:24
**rephrase** 125:23
126:4
**rephrased** 105:1
**replace** 314:16
315:9
**replaced** 232:8,10
232:11 236:18,19

316:3
**replacing** 223:19
224:4 228:17
229:3 232:17
**report** 7:4,21
81:23 137:11
138:11,13 141:19
170:13 200:2
206:14,15,16,23
209:17,18 217:12
218:1,5 299:5
303:20 304:17
309:21,24,25
311:7 312:6 320:6
320:7 321:15
325:12 326:6
391:22
**reported** 73:4
199:23 201:1,3,5
307:14 309:18
**reporter** 1:17,18
5:14 27:16 28:3,9
41:19 48:10
216:21 310:4,7
312:2,13 394:6,6
394:17,18 396:7
**reporter's** 50:10
**reporting** 253:19
256:22,23 312:16
333:1
**reports** 46:1 47:15
81:19 100:19,20
100:23 101:2
120:25,25 131:9
140:1 200:14
206:24 210:19,22
211:15,17,19
216:19 286:24
304:24 306:14,16
307:18,22 308:15

**represent** 188:22 189:5,12 291:21 381:11 388:8
**representation** 334:14
**representative** 299:17 343:24
**represented** 202:10 292:4
**representing** 41:9 41:18,22 137:3
**represents** 48:19 199:4
**reprinted** 363:25
**republished** 362:17
**request** 49:21 345:3 347:10 397:9,11
**requested** 105:6 125:16 335:17
**requesting** 49:18 130:1 286:10
**requests** 98:4
**require** 377:22
**required** 52:4 64:9 87:11 395:25
**requirements** 38:11
**requires** 263:8,9
**research** 64:9 91:19,20 111:19 111:23 136:16,18 137:6 359:17
**researcher** 91:17
**reservation** 387:25
**reservations** 339:25 367:9 380:21 392:23

**reserve** 305:22
**resign** 316:11
**resignation** 316:2 316:5
**resigned** 316:9
**resource** 233:8 284:5
**resources** 174:6,7 195:14 200:8,21 201:8 208:1,10 213:8 234:15 235:2 260:15,21 282:21 283:1,13 284:23
**respect** 387:6 388:12
**respective** 5:4
**respond** 272:25 303:25 382:20 383:1
**responded** 373:6
**responder** 162:19 162:24
**responding** 287:22 333:17
**responds** 303:24
**response** 41:24 249:7 264:25 275:11 325:22 345:2 347:10 356:20,25 357:1 362:20 363:2 376:3
**responses** 303:1
**responsibilities** 194:17 235:16
**responsibility** 37:16 205:17 212:15 237:17 364:22

**responsible** 36:1 37:14 38:8 194:20 389:11
**responsive** 110:18
**rest** 232:14 234:22 281:24
**result** 98:6,17 119:13 150:19 151:16 155:13 166:5 168:7 172:1 180:9 266:5,9,16 266:18 267:9 268:17 269:2 272:10 296:2 299:10 333:19
**resulted** 141:13
**resurgence** 69:11 81:14,16 147:4,12 148:15
**retail** 58:11 60:6 61:20,23 369:1 389:2,10
**retain** 54:5
**retained** 53:25 54:3
**retention** 37:10,12 37:25 38:7 39:23 49:14 51:21 52:9 52:17 53:14,21 245:2
**retired** 92:10 199:24 232:7
**retirements** 225:6
**retraining** 229:3
**retreat** 316:17,20 317:7
**return** 153:17
**returned** 53:3 200:11 395:18
**reunification** 118:17 120:13

163:23 257:13 265:8,17 267:3 287:10 292:13 323:24 341:19,22 351:23
**reunified** 263:16
**reunify** 244:3 263:9,13
**revealing** 389:4
**revenue** 172:13,14 172:15,23 173:2,8 174:9,17 175:1 177:13,14 179:20 180:7,23 186:11 186:20 192:13,17 196:25 197:5,8,10
**review** 33:17 44:15,15 203:5 211:15,20 395:12 396:1 397:1
**reviewed** 33:9 44:1,21
**reviewing** 111:24
**rice** 2:5 26:20
**rich** 332:9 333:11 333:16 356:2,7 358:4
**richard** 361:14
**riffle** 1:16 394:6 394:16
**right** 27:20,23 28:4 32:5,22 39:20 40:5 47:13 48:11 51:19,22 68:11 79:20 84:2 89:2 90:21 93:18 106:17 107:8 124:15 128:12 129:20 133:15 135:5,20 136:2 138:8 141:11

157:22 160:12
165:23 167:19
169:10 173:3
184:2 192:7,18
198:6 201:11,16
201:19 205:8
207:19 209:6
210:25 216:25
218:10 219:15
221:24 224:4,15
228:17 231:10,24
232:13 239:25
240:7,18 244:22
245:4 246:7 248:9
248:23 252:9
267:12,16 270:1
272:8,12 274:7
275:24,25 278:14
279:14 282:2
287:7,20 289:21
293:3,4 304:19,25
305:22 307:20
308:5,16 309:5
310:19 311:23
312:19,21,25
314:18,19 316:1
322:25 325:11
330:1 331:1,6
334:2 335:1 339:8
339:24 340:20
343:10,21 346:11
346:13 353:12
377:6 380:13
383:8 385:25
386:1 387:20
391:25 392:10
**rights** 201:4 235:7
**ring** 239:12
**ringing** 320:9
**rise** 319:17 320:1

**risen** 261:1
**risk** 2:13 144:17
147:20 287:12
288:4 292:15
**risks** 144:15
**rite** 3:7 27:7 55:14
388:8,12,18 389:3
389:7,10
**robust** 134:16
187:18 289:9
**role** 34:12 42:5
63:16 64:5 68:2
74:12 75:8 202:8
202:21 203:4,14
203:14,15 204:20
212:3,4 214:21
215:12,12 220:7
220:10,24 232:13
233:21,23 234:2
235:21,22 236:16
236:17 277:6
279:1 302:1
310:13 318:10
332:24 350:21
366:9 368:9,17
386:21
**roles** 233:25 234:2
234:4 235:13
332:19,23
**roman** 220:12
**rough** 137:15
**roughly** 30:1 32:3
50:13 71:10 74:9
116:15 118:7,22
210:11 308:18
324:12 352:14,16
**round** 237:13,13
**rounded** 334:10
334:13,17,23
**rounding** 343:13

**row** 336:3
**rule** 353:9,14,15
353:22,25 354:3
394:13
**rules** 1:15 5:7 48:2
203:25 396:5
397:5
**run** 100:19 120:24
120:25 131:9
180:24 196:25
269:21 391:21
**running** 100:20
198:24 245:7
**runs** 117:3 183:1
238:15 246:25
247:1 286:24
**ryba** 239:11

**s**

**s** 5:1,1 26:1 194:1
220:5 395:15
397:8,8 398:3
**s.w.** 3:14
**sacwis** 74:4 107:20
117:5,16 118:6
119:6 120:10,17
121:3,17,22
122:15 123:12,23
127:2 129:10,17
130:10,14 132:9
133:22 135:9,15
135:16 136:5
137:2 143:10,14
151:25 170:12
216:17,24 258:13
286:24 288:18
289:10 293:17
309:17 349:23
350:3 376:21
**sadie** 316:3
**safe** 62:22 99:21
263:4

**safely** 149:23
354:13
**safety** 60:19
353:11
**sandy** 318:9,25
319:1
**sara** 3:3 27:4
**saros** 316:1,7
**sat** 200:15
**save** 54:10
**saw** 43:5 56:22
71:18 81:3,5,12
334:5 341:25
**saying** 64:23 111:8
116:13 123:3
131:19 133:18
139:20 140:24
141:1,11 160:18
167:10 192:16
239:25 254:22
284:11 290:11
320:23 331:7,22
334:24 338:24
343:25 344:6
371:22 386:5
389:24
**says** 27:19 47:19
48:11 133:17
166:24 214:12
223:3 238:19,24
240:23 241:11
242:22 244:15
249:5 250:19
260:11,24 262:5
262:24 263:17
268:6 276:3
289:17 290:18
291:14,19 294:14
295:10 298:2
304:11 314:19,25
315:2,6,7,20 316:1

**[says - service]** Page 59

316:16 318:8
319:16 325:9
326:12 327:6
328:18 333:16
349:8 351:6
354:16 356:25
363:7 379:5
**scanned** 46:7,17
**sccs** 323:12
**scenarios** 373:4
**schedule** 37:2,5,10
37:15 38:5,6,7,20
39:24 47:19 49:14
52:7 245:2
**schedules** 53:21
**scheme** 66:7
**schiavone** 3:3 27:4
27:4
**scholer** 4:4
**school** 312:17
**schutte** 3:8 6:6
27:6,6 388:6,8
389:22 390:5
391:2,15,24
392:22
**scientific** 111:24
113:8
**scope** 38:21 264:1
**scott** 3:8 27:6
388:8
**screen** 150:21
**screened** 306:11
307:17
**screening** 99:18
**screenings** 99:14
**screens** 99:17
**scss** 326:13
**seal** 396:15 397:21
**search** 131:20
**seats** 381:1

**second** 44:5 64:19
101:17 205:9
237:13 239:21
242:22 265:22
314:11,18,25
326:12
**secondary** 153:1
162:10,17,18
163:5 164:6,11,15
164:17,18,24
165:4,16,17,21
166:3,4,10 167:19
167:23,25 168:3
168:15,22 169:7,7
169:22 282:16
378:25
**seconds** 381:1
**security** 154:24
214:21
**see** 42:21 71:19
97:25 121:25
122:15 152:12
157:10,10 165:2
167:2 207:8 217:2
218:25 220:16
222:16,21 224:10
224:13 235:14
238:16 239:7
241:3,7 243:7
244:6 245:2
246:10,21 247:13
249:12,21 250:23
251:16 254:11
261:6 262:10,22
263:6 266:11
268:14 274:8,24
275:4,9,21 276:8
283:8 286:3,6
287:12 288:23
291:16,22 292:16
308:8,24 314:5,11

314:17,22 315:11
315:12 319:18
320:13 326:14
327:12 328:20
333:12 340:25
342:8 345:7,10
350:16 351:9,11
354:23 356:5,12
356:23 357:3
361:11 366:15
371:19
**seeing** 69:15 81:13
90:18 93:11,20
100:2 144:15
148:15 159:21
167:18 205:4
218:24 244:8,19
252:23 253:17,19
253:24,24 254:3
**seeking** 97:5 279:3
**seen** 33:21 69:8,11
71:9 77:7 81:13
81:16 140:17
144:6 145:5,9
153:4 156:3
160:22 165:2
166:2,17 167:21
167:22,23,25
168:6 183:25
199:1 218:12,13
219:3 227:12
233:11 252:3,4
272:25 283:19
297:9,11 325:10
329:16 338:11
359:3,7 371:18
**selby** 318:9,25
319:1
**send** 163:21 333:9
**sending** 35:16
60:18 142:5

**sends** 287:9
**sense** 48:21 50:23
57:19 101:9,17,24
140:20 149:16
163:24 200:15
247:21 250:10
366:3
**sensitive** 41:5
365:19
**sent** 191:6 242:3
274:9 277:2
317:22 333:24
360:16,17
**sentence** 262:5
290:16 325:9
**separate** 96:18
197:21 235:16
**separated** 103:14
**separating** 298:6
**september** 6:15
246:9 249:22
250:10 274:9
277:11 278:10
**sequentially** 119:7
119:12
**series** 238:17
332:6 350:13
**serve** 32:20 68:8
68:15 71:8 73:8
127:19,20 196:21
357:6
**served** 326:13
**service** 40:3 83:7
90:17,21,23 101:6
118:20 195:12
200:10,11 215:10
233:20 265:16
269:24 283:14
304:18 305:16
316:8 317:12,21
319:2,8 321:2

**serviced** 265:14
**services** 2:11,14
  6:9,22 7:4 26:22
  26:24 27:1 29:12
  29:23 30:5,15,23
  31:15,22 32:1
  38:2 40:16 50:2
  51:2,4,6 56:7
  63:17,23 64:15
  65:10 68:4 69:4
  70:10,16,17,17,24
  72:8,20 73:23,24
  75:8,23 78:8
  79:23 80:20 82:15
  82:16 83:4,4,8,14
  84:13,14,23 85:20
  86:8,18 87:12
  88:2,17,24 89:21
  90:13 91:3 94:15
  94:19 98:17 99:20
  102:5,6,18 103:7
  103:25 105:15
  106:24 108:22
  111:12 112:14
  114:13 116:9
  118:25 124:2,18
  126:11 127:9
  128:10,22,25,25
  129:12 136:8,10
  136:19 139:2
  142:19 148:23
  149:13,25 150:12
  151:18 152:13
  153:20 154:3,14
  155:12,13 162:12
  163:2 165:8
  168:13 169:2,8,24
  170:2 171:13
  172:12 173:19,21
  174:1,20 175:2,3,9
  175:18,21 176:13

  177:19 178:16,21
  179:3,13,24
  180:10,18 181:21
  181:22 182:1,17
  183:5,6 190:17
  191:21 194:19
  195:2,7,14,15,17
  195:21 196:9
  197:2 199:6,19
  200:1,8,22,24
  201:4,18 204:6
  205:10 208:4
  211:7 212:23
  213:1,8 214:15,25
  215:5,24 216:5
  223:19 227:21
  229:10 232:22
  234:13,16 235:2
  236:3,4,9 240:12
  240:15 243:18,19
  245:21 249:18
  250:5 252:20
  260:2 261:21
  264:24 268:21
  269:4 271:25
  272:18 273:9
  275:19 277:4,7,23
  278:21 279:15,22
  299:21 302:2,22
  304:15 305:8
  314:1,9,13 315:1
  315:16 318:11
  320:16 321:1,16
  323:9,13,16 324:8
  325:12 348:24
  351:7,20 357:24
  359:19 361:19,21
  362:10 363:1
  364:23 365:8
  366:10 369:20
  372:11 377:22

**serving** 85:22
  93:11 162:22
  349:19 357:3
**session** 26:4 194:4
**sessions** 245:11
**set** 39:1 85:14 96:8
  222:22 248:16
  315:21 387:25
  394:9
**setting** 56:20
  87:24 123:7
  190:19 194:21
  230:4
**seven** 232:5
  327:24 345:10
**shakes** 50:8
**shapiro** 315:23,24
  316:2,16 319:10
**share** 156:16
  178:11 380:5
**shared** 242:2
**sharon** 136:20
  139:9 258:7,8
  260:6
**shaun** 4:14
**sheet** 395:13 397:7
  397:10,18 398:1
**shelter** 353:18
  354:14
**shift** 146:21 174:6
  381:1
**shifting** 174:15
**short** 198:8 231:12
  231:15,16 274:17
  282:1 284:8,9
  292:6 302:23
**shorter** 52:22
**show** 300:21
**showed** 119:1,2
**shown** 395:16

**siblings** 222:14
**sic** 303:15 326:13
**side** 202:13 248:17
  273:3,4 355:11
  358:6
**sign** 5:15 203:5
  275:4,14
**signature** 393:15
  395:14
**signatures** 276:5
**signed** 5:20 396:13
  397:18
**significant** 79:14
  163:13 224:22
  282:23 351:12,15
  373:1
**significantly**
  119:15
**signing** 395:19
**signs** 303:2
**similar** 122:3
  164:20 165:2
  209:15 211:8
  278:8 306:19
  384:1
**similarities** 237:9
**simply** 333:21
**sincerely** 395:21
**single** 390:9
**sir** 154:2 395:10
**sit** 167:4 376:4
**sitting** 103:4
  106:22 374:8
**situation** 231:20
  377:20
**situations** 158:14
  372:18
**six** 29:25 180:13
  313:8 352:7
**sixth** 289:18

size  185:5
skewed  178:7
slated  232:16
slightly  257:7
small  177:7,15
  178:3 213:14
  368:24
smaller  178:5,8
  179:9
smith  3:20 27:11
social  6:22 31:16
  31:21 32:8,10
  90:17 136:10,19
  154:24 195:12,17
  195:21 200:10,11
  213:1 214:24
  215:4,10,24 216:4
  233:19 236:3,4,9
  304:15,18 305:8
  305:15 314:1
  316:8 317:12,21
  319:1,7 321:2
sole  294:15
solely  352:17
solemnly  28:5
solutions  4:2
  41:10 319:9 395:1
  398:1
somebody  38:8
  46:9 47:20 51:1,5
  101:13,19 103:8
  121:6 122:12
  123:7,10,18 124:6
  127:7 128:14
  130:4,6 132:11
  136:4 138:20
  141:16,23 142:24
  151:10,11,12,13
  152:10 154:10
  158:12 204:5
  228:16 236:18

298:11 373:11
  374:11 376:6,15
somebody's  136:1
sooner  284:1
sorry  31:4 40:7,10
  41:7,19 44:11
  60:1 61:8 125:7
  156:11 169:19
  219:17 234:23
  245:12 246:3
  264:18 268:3
  274:3 289:23
  320:4 329:14
  332:7 333:16
  334:25 340:10
  360:8 380:18
sort  35:21 36:6
  45:18 50:17 54:6
  90:6 91:1 93:16
  112:3 118:23
  129:24 131:24
  135:6 136:3
  137:11 141:14,25
  142:19 149:20,24
  150:10 152:9
  155:1,11 156:24
  162:16 165:1
  167:8 168:14
  187:1 207:7 293:1
  300:2 311:13
  342:7 349:23
  358:9 360:23
  361:4
sorts  91:12 92:2
  95:1 114:12
  129:25 151:14
  158:14 164:11
  206:11,22 369:18
  374:9 379:21
sought  389:12

soul  158:15
sound  309:6
sounded  125:19
source  97:7
  177:17 197:10
sources  129:11,24
  176:24 186:7
  268:20 280:18
  300:23
south  1:21 2:6,14
  3:4 29:14
span  331:18
speak  48:3 76:6
  127:16 128:1
  215:13 251:9
  270:18 292:21
  309:24
speakers  148:8
speaking  365:15
speaks  291:9
  313:2 345:22
specialized  265:11
specific  36:10
  37:15 38:13 42:20
  53:16,19,22 55:4,8
  60:11,22 64:10
  65:16 75:9 87:6
  89:16,19 95:18
  98:3,22 103:17
  107:12 108:22
  109:1 112:10
  113:7,18 116:20
  117:21,22 118:5
  126:18,19,20
  131:21 133:10
  136:10 137:7
  139:16 148:7,9
  153:16 154:19
  156:8 158:16
  161:1 162:6
  168:20 175:6

181:20 188:15
  207:10 223:17
  229:16,18 242:15
  252:13 262:12
  265:15 289:10
  297:12 302:3,15
  302:17 323:19
  327:3,5 330:18
  336:10 337:22
  358:14 360:16
  368:4 369:10
  372:6,13,18 374:2
  375:10 376:5,16
  376:18 377:4
  378:7,12 380:13
  384:3 385:15
  386:6,13,15
  387:15 389:6
  390:4 392:10,11
  392:13,14,15,16
  392:21
specifically  42:23
  57:11 64:15 65:14
  66:3 78:2,10
  79:19 82:5 85:11
  86:24 87:14 89:16
  90:1 92:15 93:13
  99:1,9 100:13
  112:20 113:3,22
  114:6 115:3
  116:24 119:24,25
  123:2 124:25
  125:21 127:25
  130:4,16 132:8
  137:16 145:6
  146:12 150:9,13
  155:11,18 162:6
  172:15 182:5
  188:8 191:24
  216:10 218:15,21
  219:1 226:18,19

229:20 233:3
235:8 251:10
253:15 259:2
266:9 268:24
273:8,14 281:2
295:17 318:6
325:24 358:1
359:16,18 362:9
365:16 368:8,11
368:15,21 369:6
370:20 371:22
373:25 376:11
382:12 384:7,11
384:19 385:7
386:20 387:1,18
**specifics** 45:16
61:1 121:4,24
375:6 391:3
**specified** 289:11
289:19,24 290:3
**specify** 121:19
**speculation**
311:25 369:13
380:15
**spend** 184:3
271:21
**spending** 180:25
181:1 183:20
184:12
**spent** 33:4,5 137:6
222:18 270:2,6
**spoken** 364:8
**spouse** 161:9
**spouses** 162:15
**spreadsheet**
141:15,19 168:23
287:9
**ss** 394:3
**sschiavone** 3:6
**sschutte** 3:11

**stable** 143:24
171:17
**staff** 37:13 38:14
42:16 51:9 85:21
87:11,14,16,20
90:18 91:6 99:8
99:10 100:13
120:21 131:11,11
142:17,22 152:23
156:1,14,17,18
161:3,23 162:24
163:12 164:3,13
164:21 166:4,13
167:1 171:22,25
175:24 187:6,8,9
187:12 197:24
202:12 205:10
211:2 214:12,18
215:13 216:6,6,8
216:10 223:9,24
224:22 227:2,6,7
227:10,14,22
229:9 230:5
232:25 233:20,22
233:24 234:6,8
235:5 241:17
242:3 245:17
253:18 258:20
259:21 263:11
265:15 281:13
282:4,12,13,14
283:9,16 285:1
294:1 321:18
338:7 339:5
355:14 371:19,21
375:3,21 390:23
**staff's** 119:18
**staffing** 72:15
84:23 85:15,17
86:1 88:3,12
102:7 109:18

171:13,16,17,19
172:12 220:2,3
282:6
**stand** 148:17
322:5 364:13
**stands** 95:15
120:18
**stark** 29:22 49:7
49:10,11,11
**stars** 95:13 96:1
99:6 177:8,10
235:15,18,20
236:15 237:8
281:5 323:21
324:23 326:5
**start** 35:5 91:5
96:4,5 108:14
111:5,20 112:2
114:6,7,14 140:7
186:5 199:20
205:4 221:19
235:16,18 236:22
236:23 237:3,4,12
237:21,22,23
239:1 264:14
266:24 280:12
281:4 285:21
333:7 336:4
367:11
**started** 30:8,22
31:16 35:16 53:10
89:13 90:3,6,24
92:7 94:3 95:13
96:7,9 99:5
100:18 112:14
115:4,6 157:23
158:6 177:9
209:20 210:9,13
266:24 267:4
293:22 374:21
375:14,25 376:6

378:7,18 391:9,10
391:11 392:3,3,4
**starting** 81:7
86:19 88:23
198:23 272:15
310:10
**starts** 285:22
303:21 315:20
356:7
**state** 1:19 26:12
29:7 31:7 94:10
97:17 107:17
138:21 139:4,5
142:25 173:12
176:11,11,25
177:16,16 178:20
180:2,9 191:5
193:2,4,4,6 203:25
223:3 225:1
229:20 230:14
241:13 250:4
253:25 270:3
272:24,25 273:1
277:22 278:17
322:23 323:7
360:25 381:3
394:3,7,20 396:10
397:15
**stated** 373:24
**statement** 111:18
125:20 148:14
304:5,11 306:9
320:11 349:10
361:22 396:13,14
397:19,19
**statements** 189:11
189:11 301:4
354:25 364:13
386:13,15
**states** 1:1 26:10
94:25 279:23

**statewide** 73:20
93:15,21,22,24
94:2,5,5,7 120:2
120:19 141:23
177:20 179:4
272:14 351:19,25
**statistical** 390:13
**statistically** 113:5
375:24 378:10
**statistics** 157:1,7
157:25 244:3
325:20 372:3
**stats** 157:13
**stay** 131:25 213:20
222:6 358:7
**staying** 250:2
353:6
**steady** 233:13
**steal** 101:13
**stealing** 122:16
**stems** 390:14
**stenotype** 5:11
**step** 228:5,5
379:16 391:5
**steps** 191:7
**stewart** 286:15,20
286:22 287:8
**stint** 53:7 78:7
211:24
**stipulated** 5:3
**stop** 265:21
**stored** 51:13
**stories** 161:11
**story** 372:2
**strains** 213:16
**strategic** 316:17
316:19 317:19,20
**stream** 186:21
**street** 1:21 2:14
3:4,21 4:10 29:14
101:14,21 122:17

132:14 307:3
**stress** 152:24
156:19 161:3
167:4 226:20
**stressed** 166:25
**stressful** 158:13
158:15
**strictly** 52:23
**strong** 392:8
**strongest** 115:14
**strongly** 89:12
299:9 301:3
363:25
**structural** 199:12
199:18 200:12,16
**structure** 195:1
199:8,9
**structured** 273:25
**structures** 223:8
**struggle** 282:25
**struggled** 324:22
327:8 372:22
**struggles** 90:20
**struggling** 71:19
90:23 96:15 98:23
99:21 161:21
166:14 242:25
**study** 390:1
**stuff** 131:21
140:10,10 207:18
266:25 276:16
277:2 369:18
**subcommittee**
305:4,4 314:19
318:22
**subcommittees**
207:23 318:21
**subdivision** 143:1
**subdivisions** 56:6
181:21 195:6,18

**subfolders** 54:7,20
55:2
**subject** 45:18 50:9
51:20 105:20
169:1 286:5
293:16 303:20
337:2 367:9 370:5
380:20 387:24
392:22
**subjects** 370:12
**submission** 141:14
**submit** 276:4
**submitted** 316:2
326:6
**submitting** 139:22
**suboxone** 122:23
**subscribe** 222:22
**subscribed** 396:10
397:14 398:21
**subsidies** 230:15
234:6
**subsidy** 230:13,14
**substance** 64:24
65:3,11,12 68:3,11
69:17 70:9 72:5
72:19,24 73:2,10
74:2,6,11,17 75:7
78:9 79:16,16
82:9,12,19 83:8,15
85:10 86:6 93:12
95:18,19 99:8,11
99:16,18 116:10
116:16,24 117:25
118:1,8,17,19,24
119:20,20 131:24
134:2 136:13
137:16,17,25
139:6 160:7
186:25 211:6
215:11 216:15,19
216:21,22 217:13

217:15 218:5,8,15
219:1,4 226:21
236:14,24 251:8
253:1,22 254:4
255:1 256:4,17,20
257:10,12,16,16
257:19 258:14,15
258:21 259:23
262:8 265:12,15
280:22 287:11,19
288:3,25 290:23
292:14 295:20,22
296:3 306:15
307:11,12,18,23
308:6,23 309:7
311:7,12 319:13
320:12,20 323:16
326:11,14,21,22
326:25 327:9,11
327:18 329:11
341:20 345:6
346:9 358:21
**substances** 72:25
75:9 82:25 86:17
88:4,19,19 250:22
251:23 252:19
311:1 358:11
**substantial** 87:19
152:4 177:11
187:22 283:2
329:9
**substantially**
165:14 174:14
256:12 330:20
**substantiated**
250:20 251:10
252:17 253:9
254:8,23 255:7
258:25 259:17
**successes** 326:2

**successful**  120:2
  324:21
**successfully**  345:4
**suddenly**  184:23
**sued**  49:17 59:19
  59:23 60:3
**suffered**  174:4
**suffering**  272:2
**sufficient**  180:25
  277:23 282:19
**suggest**  288:17
  333:25 380:25
**suite**  2:21 3:21
  395:2
**suites**  3:4
**summary**  7:21
  137:12 267:14,18
  268:5
**summit**  1:9 2:2,10
  2:14 6:9,10,11,13
  6:14,16,16,17,17
  6:19,19,21,23,24
  7:4,5,5,7,7,9,9,11
  7:11,13,14,16,16
  7:18,18,20,20,20
  26:15,18,21 29:11
  30:4,23 38:1 40:2
  40:15 53:3 56:5
  59:5 67:14,18
  68:2,20 69:21
  77:21 78:7 89:21
  105:14 106:23
  108:22 112:12
  124:2 125:2
  126:11 127:9
  128:22,25 135:18
  145:10 149:10
  150:15 151:20
  165:22 173:19
  177:23 178:10
  179:2 182:18

194:18 195:2,5
  196:16 197:1
  198:23 199:6,19
  205:10,20,21
  211:23 227:20,21
  229:10,18 238:14
  240:2 245:20
  250:5 251:1,21
  252:19 254:8
  264:24 265:6
  268:24 269:4
  271:23 272:17
  273:22 275:20
  277:3,7,22 285:19
  299:20 302:2,22
  303:17 313:21
  314:2 315:25
  316:12 317:13
  321:11,15 323:12
  332:6,12 333:11
  345:18 347:8
  350:14 351:6
  354:1 355:24
  356:9 357:23
  359:19 360:12
  364:22 366:10
  367:25 368:7
  369:19 371:7
  372:11
**summitkids.org**
  2:16,17
**superior**  395:1
**supervise**  223:9
  351:4
**supervises**  203:19
  348:22
**supervising**
  222:19 349:7
**supervisor**  31:19
  51:10,15 157:3
  159:11,12,16,18

215:8,10 220:1,3,4
  235:19 236:15,20
  351:1
**supervisors**  90:16
  156:15 163:12
  232:4,5
**supplement**
  110:15 194:13
  301:22 367:2
**support**  82:14
  99:23 116:21
  151:11 179:8
  195:14 196:10,11
  196:16 200:8,23
  201:4 213:8
  230:17,19 233:9
  234:5,6,15,16
  235:2,12 270:22
  271:4 282:12
  283:9,11 322:21
  324:10 325:11
**supports**  118:21
  176:1 233:4
  376:22
**supposed**  56:13
  159:4,13 383:12
**supreme**  239:23
  243:17
**sure**  28:1 38:9
  40:24 41:5,21
  48:18 50:6 53:5
  54:9 57:20 60:2
  64:18,21 74:5
  76:4 96:19 97:7
  99:2 100:4 104:13
  104:18 105:3
  110:6 111:1
  125:13 126:4
  129:18 141:13
  142:12 165:25
  166:1,21 169:6,18

174:6 177:25
  186:17 193:12,15
  198:2 215:14
  226:5 235:24
  242:10 244:25
  247:5 265:23,24
  267:16 278:21
  281:10,20 282:2
  288:14 299:23
  302:8 318:23
  336:16 364:2
  365:1 366:4
  377:11
**surpassed**  69:9
**surprising**  264:1,4
  264:7,10
**survey**  139:19
  286:6 287:23
  300:16
**surveys**  286:10
**suspended**  38:10
**swear**  27:16 28:5
**switched**  143:20
**switching**  69:16
  144:16 147:1,14
  147:19 149:21
**sworn**  396:10,13
  397:14,18 398:21
**symposium**  6:12
  239:2,9,15 240:20
  240:25 241:6,11
  241:18,24 242:4,9
  243:5,24 244:20
  247:13,20
**syndrome**  356:23
**synthetic**  66:8,12
**system**  32:19 54:7
  73:25 74:4 76:11
  82:11 84:24 94:4
  107:17 115:21
  120:20 127:17

150:23,24 151:11
152:11 155:2,3
241:15 242:20
243:2 244:2
260:13 262:7
347:11 358:15
370:3 371:2
**systematic** 74:5
124:4 150:1
**systematically**
349:25
**systems** 242:23

**t**

**t** 3:8 5:1,1 231:23
394:1,1
**table** 199:5,13
**tag** 285:2
**take** 50:12 76:13
82:20 101:13
128:18 151:22
193:9,16 205:3
228:4 275:15
281:24 283:1,3
285:17 299:9
301:11 306:1
352:3,4 353:16
354:11 357:13,18
366:14
**taken** 1:16 5:8
46:14 110:9
154:11 191:7
193:19 301:16
366:22 375:15
394:8,11
**takes** 122:5 207:25
208:8,10 228:13
**talk** 32:17 64:22
64:24 82:8 94:24
97:23 103:22
112:6 113:19
127:17,18 161:3

161:10 162:1
189:3 191:18
203:9 222:21
282:14 294:4
297:16 323:2,3
364:1 365:23
366:1 370:2
372:13 375:5
377:7 380:12
**talked** 51:18 75:25
80:17 89:11
110:25 114:15
161:8 163:11
185:18,25 191:5
198:3 206:23
210:8 214:6 229:6
235:15,20 242:12
245:11 259:16
277:20 286:8,17
292:1 299:13
304:21 305:6
310:13 319:20
322:15,25 332:14
340:18 342:8
343:12,19 350:3
376:14 381:16
382:1 390:20
**talking** 41:6 48:13
63:15 78:25 84:7
94:13 100:5,11
102:1 105:13
108:11 109:17
113:9 124:15
128:9 132:3 138:5
144:23 147:23
161:6 162:16
163:3 172:22
190:9,16 210:14
215:23 224:5
245:18 255:10,11
255:17 259:12,13

265:25 266:22
268:12,25 275:23
287:17 295:17
301:24 306:20
313:25 314:22
318:16,17 320:19
326:19,24 331:18
353:1 365:5 366:8
374:1,14 375:11
379:2,21 384:20
390:21
**talks** 81:24 162:6
188:8 243:15
271:2 308:23
356:20
**tangible** 173:9
**tape's** 298:18
**target** 222:2,5,8
**targeting** 223:18
223:21
**targets** 222:22
**task** 93:15 268:9
270:13 276:6,11
276:13,21,24
**tax** 172:19 173:9
183:2 188:7
189:19
**team** 243:3
**technical** 30:16
41:14
**technically** 201:9
**technology** 200:25
**teens** 230:10
**telephone** 4:4,9
**television** 347:12
**tell** 131:16 132:11
225:12 296:24
307:16 308:16
337:14 339:23
347:24 376:5
383:8 391:16,16

**telling** 372:23
385:23 386:2
**tells** 145:5
**temporarily**
232:10
**temporary** 263:1
**ten** 49:8 78:17,20
78:25 79:11 80:11
173:17 222:10
**tend** 358:16
**tends** 186:7
**tenth** 4:10
**teodosio** 239:3,24
248:8
**term** 66:19 94:23
162:10 191:25
192:19 198:8,8
231:12,12,15,16
231:19 234:25
283:20 284:3,4
352:5 358:24
362:8 381:22
**terms** 34:17 36:2
42:6 57:23 64:18
64:21 68:2,11
80:13 82:13 85:17
96:11 99:4 100:21
102:5 112:11
115:20 119:21
120:2,12 131:20
131:21 133:10,12
134:12,15 140:5
150:6 152:18,19
152:24 158:11
165:7 166:8
169:22 171:1,12
171:15,17,19
172:13 173:5,8
179:15 187:20
190:8 195:18
197:13,23 202:20

210:25 218:11,13
226:7 227:1,6
233:4 254:3,7
258:1 261:21
264:2,8 266:23,25
270:3 272:25
279:7 280:21
287:17 298:5
299:5,19 320:15
320:25 324:25
336:16 365:12
366:5 368:17
**tersigni** 208:5,8
**test** 166:24 357:17
**tested** 357:10
**testified** 29:4
49:24 50:1 389:15
**testify** 369:21
**testimony** 28:6
44:4 60:14 73:16
102:17 103:5,12
104:3 105:8,20
106:23 110:14
115:25 116:11
124:17,25 127:12
138:7 152:16
155:17 180:5
194:12 202:12
204:17 211:12
246:1 252:11
301:21 334:20
344:4 367:1
369:10 374:18
376:10 378:4
379:7 383:5
390:11 391:20
394:8 396:6,7
397:6,9,12
**testing** 356:10
378:16

**teva** 55:14
**thank** 28:9 44:10
231:10 236:13
356:25 388:1,2
392:24 393:9,10
393:12
**theme** 323:6
**theory** 144:7
**therapeusis** 27:9
**therapeutics** 3:12
381:11
**thing** 46:13 48:7
50:17 64:23 81:2
93:16 96:4 108:10
112:3 149:24
152:18 158:17
162:16 165:1
188:17 189:10
214:14,25 215:4
259:14 266:15
275:14 370:16
378:22
**things** 38:25 44:22
45:20 47:16 54:15
56:19 57:16,17
63:11,13 65:1
85:15 87:13 88:3
92:23 94:8 95:1
98:12 99:3 102:2
110:25 112:6
140:6 149:8 150:5
151:14 162:13
164:5,8 165:6
167:1 174:5 183:3
185:14 189:17
200:3 201:15
208:20 232:21
279:8 281:15
282:18 283:19
284:11,23 285:11
286:25 295:1

296:9 303:3 333:4
345:4 346:19
362:12 365:6
369:17 379:21
381:19 382:17
384:19,25 385:3
388:23
**think** 30:21 40:14
46:15 48:20 56:2
56:15 57:10 58:21
59:21 60:15 63:7
66:3 69:12,15
71:9 72:23 74:25
77:7 78:19 81:2,6
89:10 90:3 94:9
94:12 104:5 109:2
110:22 113:11
116:3 118:10,21
119:1,17,20,23
120:2,5,7,11,13,16
122:22 125:2
126:9,17 127:4,14
127:16,17,18,22
130:3 132:23,24
134:9,10 137:17
139:4,17 140:24
141:8 142:8 144:5
147:5,6,17 148:8,9
152:22 158:6
160:19 161:17,22
163:1,9 164:22
166:2,16,18,20
167:22 168:18
170:10 174:2,5,25
175:18 179:2
185:4,7 187:4,16
190:23 192:9,14
199:16 205:4,13
208:7 210:12
214:21 219:18
220:9,10 222:12

223:1,25 226:5,19
226:23 232:14,20
233:5,11 234:11
236:11 237:11
238:16 244:25
245:11 246:21
247:4,11 248:20
250:14,17 256:8
258:7 264:11
265:3 267:11
271:15 272:22
275:8 279:6,13,16
280:2 282:3,8,16
284:1,15,17,22,24
285:17 291:19
292:1,3,21 293:15
293:21 296:9,15
297:13 299:5,8,16
300:14,20 302:20
302:24 309:16
310:25 312:11
320:8 324:11,16
325:21 328:20
329:8 330:4 335:4
340:8 342:17,21
342:25 348:12
350:2 351:17,19
352:20 353:9
354:2 355:10,22
363:16 365:16
369:25 371:15
373:16,24 374:9
375:19,20 376:25
378:9 379:25
382:14,17,19,25
383:18 384:1
388:13 390:19
**thinking** 113:18
124:1 145:12,15
147:24 318:13

**third** 71:12 101:19
101:24 116:8,15
118:7,23 119:2
**thirty** 395:18
**thorough** 74:5
293:25 370:6
**thoroughness**
132:24
**thought** 110:17
191:12 275:5
277:24 293:9
**three** 39:7 51:21
60:2,10,23 140:8
261:5 313:21
314:17 340:13
**tie** 99:1 156:9
160:6
**tied** 287:16
**ties** 188:10
**till** 180:14,15
**tim** 51:15
**time** 5:8 35:5 41:1
46:3 48:13 52:22
70:8,11 71:21,25
73:14 74:1 75:25
77:9,13,17,20,23
79:21 80:3 81:9
81:21,21,22,22
84:21 85:25 88:20
92:12 95:2,8
97:24 98:22
100:12 104:5
110:4 115:23
116:7 118:6
134:18 136:12
137:6,14 141:9
146:4,11,25 151:8
157:8 165:18,20
166:8 168:11
170:7 171:3 172:7
172:10,17,23

173:4,7,12 174:10
177:3,10 183:19
185:17 193:9
197:2 199:8,13
201:21 205:3
209:12 210:7,9,13
211:6 216:17,24
218:17 220:24
222:18 228:13
237:8 249:15
250:1,9 251:7,24
251:24 252:3,9,13
253:6 255:15
257:6 260:17
261:9 263:3,10,13
263:21 265:25
268:10 270:3
271:9,15 273:5
276:10 281:25
286:11 292:16,21
295:21 296:1
297:17,18 305:11
306:1,2 310:22
316:12 322:20
328:24,25 329:15
329:17,21 331:19
341:12 345:19
349:21 351:12,21
351:22,24 357:9
358:7 371:6,11
372:10 373:16,22
374:14 393:11
**timeline** 250:11
**timely** 325:22,22
**times** 75:18 80:16
165:3,6 243:1
257:2 353:9 372:5
389:15
**timing** 245:14
253:23

**title** 235:25
**titles** 37:19
**today** 32:12 76:19
103:4 106:22
107:5 374:8 376:4
381:16,20,24
388:14 389:15
390:12
**told** 62:23 137:13
159:20
**tolerance** 382:16
384:24
**top** 52:6 213:24
267:18 274:8
306:17,24 333:15
347:8 349:8
355:25
**topic** 54:7
**total** 33:3 137:22
137:23,23 225:3
291:15 307:17
342:14,15
**totality** 374:6
**touch** 132:2
**touted** 270:2
**tower** 3:15,21
**tox** 150:21
**trace** 391:17
**track** 1:14 5:6
72:16 73:13 85:24
109:20 112:20
113:3 127:1 135:6
145:11,21 150:4,6
150:13,16 216:17
216:20 292:16
326:2 349:11,22
375:21
**tracked** 78:13
85:11 111:12,17
145:22 149:15,25
150:9 158:19,23

**tracking** 72:5,23
72:24 78:8 80:14
84:20,21 94:3
170:7 309:15
310:3 314:14
326:4,7
**tracks** 133:16
145:10 216:13
**trail** 110:25
**train** 87:14 227:14
228:11 235:4,5
**trained** 227:3,6
**training** 99:7
164:12 200:5,9,10
215:12 221:16,25
227:4,14,24 228:2
235:22 236:17
242:14 281:13
282:20 392:15
**trainings** 87:17
164:5 390:20
391:1 392:15
**transcribed** 5:12
396:7
**transcript** 1:12
5:16,18,20 394:8
395:11,12 396:5
396:12 397:5,11
397:17
**transient** 52:22
53:23
**transitioning**
389:19
**transportation**
222:17 223:11
**trauma** 99:13
153:1 162:18,19
163:13 164:6,15
164:17,18,24
165:4 166:4 167:8
167:10,24,25

168:3,22 169:7
282:16 283:15,20
284:2 323:18
373:1,2
**traumatic**  162:20
162:23 164:2,23
167:8
**traumatized**  99:15
159:21 283:18,24
**treated**  102:13
**treating**  271:21
**treatment**  90:21
123:5 147:11
249:9 269:16
271:8 382:23
**tremendous**
163:10 192:12
232:23
**trend**  77:1 118:22
165:2 224:19
262:6 312:25
313:5,5,10,13
**trends**  67:18 72:6
78:9,17 81:21
88:19 102:3
111:25 112:1
167:21,23 209:11
**trial**  302:5,19
380:12
**tried**  64:13 88:16
118:10 164:4
174:6 175:25
185:8 189:5,12
258:16 335:22
336:6 364:10
370:6
**trina**  232:1
**trouble**  39:6 72:24
**troublesome**  262:6
**true**  58:1 152:19
179:16 228:20

325:14,15 386:3,6
394:8
**trump**  191:6 286:1
**trustees**  36:3
182:24 205:11,15
205:16 211:9
304:14
**truth**  28:6,7,7
**try**  48:3,7 50:19
73:21 74:1,4 81:2
87:15 97:6 117:14
117:23 136:6
140:9 160:5 166:1
176:12 185:5
188:22 189:20
217:8 258:24
284:22 290:5
302:18 313:3
383:7 388:10
**trying**  89:1 90:21
94:3 98:24 100:1
100:18 136:25
137:3 138:2 139:4
139:5 140:4 141:8
144:1 149:12
162:22 174:8
177:1 189:18
215:18 222:21
236:12 256:18
290:15 293:22
347:24 352:1
356:16,21 365:25
370:19
**turn**  222:7
**turnover**  153:3,4
155:25 156:3,9,25
157:7,11,17,24
160:19 163:3
166:9,18 224:11
224:13,15,24
225:1,2,3,5,8,23

226:11,13,23
227:9,15,21 228:1
228:7 229:2,9,13
233:12,14
**turnover's**  166:16
**turns**  217:15
218:7
**two**  38:23 39:7,10
49:11,25 51:20
60:8 97:5 107:19
125:24 126:1
130:21 156:6
157:6 175:7
189:25,25 211:16
216:12 220:10
223:21 224:6
225:7 234:3 237:9
247:17 254:6
257:1 260:24
285:18,24 298:16
315:4 325:3 341:6
350:13 379:16
**tying**  98:22 169:23
**type**  48:12 53:19
61:24 65:4 66:4,8
66:12 71:13 72:25
73:10 74:2 87:14
87:17 89:16 95:19
100:21,22 103:25
106:12,15 107:14
109:1,2 116:10
117:22,22 119:20
126:19 127:25
128:21 130:15
136:14 137:16
150:6 162:7 196:1
216:21,22 235:10
258:14,21 288:7
288:11 290:20,22
293:23 312:13
319:5 320:20

327:1,5 350:5
357:11 359:11
374:4,20 391:22
**types**  38:1 48:11
52:9 65:19,19
66:25 78:14 87:7
107:1,15 130:11
130:12 168:9
181:8 195:18
198:10 222:14
225:5,6 265:6
304:6 306:17,19
308:13 359:6
374:2,24
**typical**  40:22 52:8
52:14 178:1
**typically**  36:7
53:23 297:1
310:10 317:18
322:4 348:17,19
357:15
**typing**  131:19

| **u** |
| --- |

**u**  5:1
**u.s.bankcorp**  3:15
**uh**  31:11 33:18
42:4 49:2 51:4
53:8 54:11 56:9
56:22 57:1 59:1
60:9 68:16 70:12
70:21 77:16 83:23
86:2,14 90:11
91:7 101:10
105:18 107:24
108:17,19 129:21
132:4,6 135:4
141:12 146:23
149:19 151:1
156:2,7 175:19
176:15 185:15
191:10 205:6,12

214:13,16 234:17
238:18 239:8
240:1,22 241:4,10
242:21 243:8
244:21 245:8,16
246:4,8,11,23
247:2 266:3 270:5
271:5 272:12
274:5,18 278:6
280:11 281:23
286:4 287:15,20
300:4 303:23
308:10 315:3,12
322:16 326:18
347:13 349:16
351:17 352:25
353:3 361:15
365:22 382:5
**ultimately** 114:11
189:20 190:20
191:2,11 269:19
277:17 287:7
297:23 360:12
389:18
**umbrella** 182:21
350:23
**un** 184:10 388:25
**unable** 163:23
**unaware** 268:19
**uncertainty** 108:1
**underestimated**
75:14,16
**underfunding**
180:2,9 192:20
**undergoing** 107:8
**underlined** 315:1
**underlying** 295:22
296:3 307:12
312:5 377:9
**underrepresentat...**
74:22

**underrepresented**
75:1,10 120:15
342:22
**underscore** 198:23
**understaffed**
221:12 227:5
**understaffing**
192:20
**understand** 35:11
43:8,10 48:14
50:18,21 53:12
61:6 67:21 84:17
87:20 98:9 104:24
105:10 111:14
121:12 125:12,21
128:19 130:18
140:23 141:8
149:7 150:19
175:15 190:24
192:9 198:2
201:23 203:10
259:12 294:18
299:24 340:21
343:16 370:9
371:25 388:17
**understanding**
32:15 34:8,11,21
43:19 53:17 56:14
61:15 62:11 66:16
66:21,24 80:12
129:9,17,22,24
136:25 146:2,10
199:3 209:12
254:24 271:11
280:4 356:17
383:10 385:20,24
**understood** 364:2
383:9 391:6
**undifferentiated**
263:25

**unfortunately**
76:20 357:1
**union** 221:2
**unit** 99:10,12
215:11 220:5
223:24 230:10
236:14,21,25
265:15,16 351:2
**united** 1:1 26:10
**units** 84:9 200:10
234:3,4
**university** 31:7
**unknown** 284:5
**unrelated** 170:5
**unruly** 354:18
**unusual** 224:23
**unwanted** 354:18
**update** 208:23
349:25
**updated** 223:6
318:9
**upgrade** 289:9
**uptick** 68:20 81:25
82:6 88:24 100:8
100:14 146:21
179:23
**urban** 316:4
**urgent** 262:25
**usage** 67:18 80:12
80:14,22 81:21
225:20 294:5
**use** 64:16,20 65:3
65:11 69:13 73:2
74:2,18 76:23
78:18,19 79:12
83:15 84:1,7,8,19
85:5,10 86:25
88:25 91:4 93:12
99:8,11,16,18
100:14 103:7,25
105:16 107:1

109:24 112:8
113:10,20 114:2
115:12 116:16,24
117:16 118:11
119:20,24 126:12
127:6 136:7,8
137:18 139:6
143:22,24 144:10
146:22 147:7,13
149:23 155:14
161:5 166:8 178:2
185:20 191:19,25
216:19 219:4
242:12 256:17,20
257:12 258:10,21
259:25 262:8
265:13 281:16
287:11,19 288:3
290:23 292:14
293:22 294:23
295:10,11,20,22
296:4,11,12,16,25
297:25 299:10
301:4,9 302:21
308:13 310:20
311:7,22 312:10
329:11 333:25
336:6 343:2 346:2
346:9 358:21
371:9,9 378:11,17
381:22 389:16
390:13,14,15
392:2
**user** 391:9,10,10
391:11,12,17
392:3,4
**users** 112:1,25
114:2 115:21,23
**usually** 114:23
**utilize** 120:21

**utilized** 135:6
143:13

**v**

**v** 1:9
**vague** 366:2
**value** 52:24 53:1
53:25
**values** 172:20,21
173:4
**variables** 223:13
382:9
**varied** 183:14
197:6 260:4,5
**variety** 32:21
63:12 65:13 118:9
292:8 295:1
337:11 341:11
**various** 38:1 46:18
56:11 70:15 71:1
73:9 78:15 90:17
135:25 151:14
176:9 195:10
198:15 208:16
209:8 235:13
243:21 250:3
289:8 305:4
321:22 341:10
367:12 373:22
392:7
**variously** 109:21
190:11 381:16
**vast** 146:3,10
298:25
**vent** 355:16
**venting** 355:15
**verbal** 208:24
209:17
**veritext** 395:1,7
398:1
**veritext.com.**
395:17

**version** 274:17,19
**versions** 122:3
216:24
**versus** 46:7 96:19
105:23,24 133:12
392:3
**video** 1:12 5:4,10
5:16,17,18,21
48:19 393:17
**videographer** 4:14
26:6 27:15,19,23
110:7,10 193:17
194:6 301:14,17
366:20,23 388:3
393:2,5,13
**view** 278:8 319:13
363:12 380:4
**viewing** 60:10
72:4
**visitation** 222:18
**visits** 222:19 223:9
**vocal** 178:23
**volume** 137:1
226:25
**vote** 190:1
**voters** 190:24
191:3,3
**voting** 190:20

**w**

**wacker** 3:9
**wages** 186:3
**wait** 48:5 348:6
**waived** 5:15
393:15 395:19
**waiver** 337:3
**walgreens** 55:15
388:12,18 389:10
**walk** 83:21
**walmart** 2:18 27:3
55:14 388:13,18
389:11

**want** 33:11 48:17
52:13 63:20 64:18
64:21 95:2 98:2
100:4 104:8,13,18
105:1 111:1 125:9
153:16 166:2
174:3,21 177:24
193:9,13 199:21
205:3 213:19
229:1 254:21
259:15 265:24
275:6 302:4,19
313:4,10 314:24
335:10,11 347:25
370:18 377:7,11
381:9 382:2 388:9
**wanted** 41:8
139:23 256:3
277:10 292:2
307:22 356:14
**wanting** 161:21
**washington** 3:21
4:5,11
**watching** 297:14
370:24
**way** 46:25 48:24
67:14 72:17 83:1
83:3 103:14
110:15 119:6
122:18,22 124:4,9
124:13 125:11
128:2 129:5
142:21 145:11
150:1 158:20
162:3 170:1
176:12 184:18
186:1,8 190:15
192:7 194:13
221:21 227:15
259:20 273:7,25
292:15 296:23

301:22 311:11
314:18 326:3
340:24 342:2
344:7 357:6 363:1
365:4 367:3 379:1
**ways** 63:13 65:13
72:18 92:23,23
95:6 107:14
118:15 176:25
233:6 245:13
257:24 321:22
337:12 356:21
377:3
**we've** 62:18 71:11
72:3 76:25 78:13
80:17 85:9 87:18
99:11,13,25 102:1
110:3 116:14
118:10,14,15
132:3 144:9 147:6
148:11,13 152:3
163:15,16 165:2
167:23 168:5
174:8 180:6
183:25 185:7,9
187:21 191:25
228:25 229:6
232:19,23 234:11
252:4 258:16,18
266:10 270:21
272:8,9 286:8,8
298:16 301:24
306:5 319:20
321:10 322:25
324:4 326:4
329:16 332:14
338:19 365:17,20
381:16 382:1
**website** 276:6,7
**week** 315:20

welfare   31:18
32:18 89:25
120:19 240:21
242:15,16,23
243:5,25 244:2,4
246:5 249:4
260:13,25 263:2
263:23 362:12
370:24
went   112:16 136:4
136:11 141:15
173:2 177:23
178:6 188:6
194:15 226:9
244:19 259:21
269:22 280:6,14
290:21 291:11
322:22 341:9,25
376:7 384:2
west   3:9
westbrook   2:3
395:5
wexler   361:14,18
whichever   82:12
white   244:5,9,10
246:13,17,22
247:9,16,24 248:2
266:10
who've   163:16
223:19
wholesaler   61:11
wholesalers   60:7
wide   93:3 241:13
william   214:20
willing   377:24
379:4 380:5
winlock   316:3
wish   273:3 281:9
281:19,25
witness   1:13 2:2
5:5,13,15,20 6:3

26:16,19,22 27:16
33:11,14,17 34:4
34:17 35:11,25
36:9,19,25 37:23
39:3,18,22 40:8
42:14 43:8 44:6,9
44:12,18 45:3,12
46:22 47:5 50:15
52:12 54:18 57:10
58:5,6,8 59:7,21
60:15 61:6,13
62:3,16 63:7 64:3
65:3 67:20 68:6
68:14,25 69:7
70:2,21 71:4
72:22 73:17 74:15
75:12 76:4,17
77:7,16 78:1,13
79:2,25 80:8,25
82:4,19 83:13
84:5,16 86:13,23
87:5 88:7 89:9
93:1 95:10 96:15
97:11 98:9,20
100:18 102:12,21
102:23 103:13
104:4 105:10
106:3,9 107:4,12
108:7 109:1 110:2
110:6,21 111:17
112:5,19 114:5,19
115:2,11 116:1,13
117:20 121:10
122:9,20 123:22
124:9 125:6,19
126:17 127:1,14
129:4,16 130:10
131:5,15 132:6,23
133:6,25 134:21
135:14 138:8,25
141:18 142:3,14

143:5,17 144:5
145:2,21 146:8,17
147:17 148:3
150:4 151:4,20
152:17 154:1,17
155:5,18,23
156:12 157:16
158:3,22 159:6
160:10,14,25
162:5 163:9
165:10,25 167:13
167:21 168:18
169:4 170:10,22
170:24 171:10
173:1 174:25
175:14 176:19
177:7 178:14
180:6,22 181:25
184:15 185:23
186:10 187:3
188:14,25 189:8
189:15 190:23
191:23 193:1,12
193:15 202:8,24
203:4,17 204:12
204:18 205:1
208:19 210:18
211:13 212:14
217:6 218:20
226:3,17 228:19
242:6 245:23
246:16 248:1,11
249:21 250:8
251:3 252:2,12,22
253:14 254:13
255:17 259:6
260:19 261:11,15
261:25 264:4
266:8 267:3
268:19 269:7
270:9,16 271:14

277:14 278:6
279:13 281:2
285:9 288:14,21
289:14,23 290:13
291:10 292:20
293:7,12,20
294:11,18 295:6
295:16 296:15,22
298:13,15 299:4
299:23 300:8,14
301:8,13 302:8
305:14 306:6
307:6 308:2,10
309:13 310:24
311:17 312:1
313:4,13 316:7
317:2 318:5 320:6
320:18 322:8
323:2 324:15
326:24 327:21
328:5,11,19 329:6
329:20 330:3,11
330:17 331:16
334:8,13 335:11
335:18 336:15
337:18,21 338:6
338:18 339:14,23
340:10 341:5,17
342:4,13,21 343:6
343:16 344:5
345:14,23 346:7
347:19 349:3
352:20 353:25
355:3,8 358:13
359:11,24 362:7
363:6,15,23 365:1
366:17,19 368:21
369:6,14,25
370:15 371:14
372:17 374:19
375:19 376:11,25

**[witness - years]**

378:5 379:8,25
380:16 381:5
382:7 384:1,10,18
385:6,14,19 386:5
387:1,9,23 390:3
390:18 391:21
392:20,24 393:8
393:12 395:8,11
396:1,4,11 397:1,4
397:15
**witness's** 60:14
103:12 104:3
105:8 127:12
211:11 245:25
344:4 374:18
376:10 378:3
379:7 391:20
**witnessed** 371:18
**witnessing** 162:13
**witness'** 395:14
**word** 75:3 164:16
383:19
**words** 50:8,11
144:1 181:22
327:16,24 328:13
353:4 383:6
**work** 31:10,18
32:8 33:21 35:19
62:16 94:11 95:21
137:8 141:5
161:21 173:24
174:4 177:19
179:8 181:9 196:1
202:10,13,15
203:25 221:21
223:2,8 227:4,6
230:13,25 234:21
235:8,12,12
236:15 242:24
273:7 277:5
336:21,25 337:3

345:5 350:21
**worked** 30:14
31:14 91:14 99:11
324:1,4 338:4
**worker** 31:17
32:10 124:12
157:4 161:16
162:19 163:18
355:10
**workers** 117:21
161:18 169:14
230:19 353:9
**workforce** 152:23
153:2 163:10
227:18
**working** 92:1
163:19 230:10
234:7,9,10 235:9
256:20 345:4
346:4,8 370:23
**works** 186:2,8
201:23 309:3
332:10,12
**world** 2:21
**worried** 283:22
**worse** 192:2
**worth** 251:14
354:21
**wrenching** 158:15
**wright** 3:3 27:5
**write** 159:14
290:16 333:8
**writes** 287:8
291:18
**writing** 5:11 59:18
281:19,20
**written** 33:25
48:18 58:14 101:8
102:10 111:6
112:15 128:15
138:11 141:14

206:15 208:24
209:16 239:22
303:1 362:11
373:21 374:13
375:14 376:7
**wrong** 56:13 290:1
383:12 388:19
**wrote** 288:7 383:7

| x |
| --- |

**x** 6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 133:17 237:5

| y |
| --- |

**y** 92:18
**yeah** 37:25 38:4
39:3 43:8 44:6
55:3 56:22 60:4
64:3 66:20 67:20
67:25 68:6 75:5
75:15 76:17,23
78:20 88:7 91:9
141:4 148:15
149:4 175:14
179:21 190:4
193:3,15 203:6
213:15 215:20
221:6 229:24
231:11 236:11
238:25 239:18
241:9 245:12
247:2 248:11,24
251:19 256:21
259:11 266:21
271:17 274:16
281:17 310:15
328:19 329:21

331:16 343:16
351:17 358:5
373:3 384:25
388:3
**year** 31:1 51:21
52:9,17 68:18
69:5 70:4 72:1
75:19 77:10 78:1
78:24 80:21 81:14
81:17 96:16 97:5
98:13 139:3,5,10
151:8 156:6,19
157:25 158:4,10
171:4,6,7 173:11
177:21 181:12,14
183:9,13,14,14
184:11,13,13
186:8 195:9 197:6
224:1,1,16,17,21
224:23 225:2,4,12
226:24 227:11
228:21,25 245:6
245:18 256:14
258:5,5,23,23
260:4,4,8,8 309:16
313:9 329:24,25
330:9,23 331:5,11
331:11,19,20,21
336:1,5 338:15
346:20,23
**years** 29:25 30:19
32:3 37:7 38:23
39:7,10 49:6,8
51:19 71:24 72:4
72:25 73:19 74:4
78:18,20,25 79:11
80:11 83:22 86:20
87:20 92:8 97:12
99:4 107:19 116:7
116:25 117:1,2,11
130:2,20,21 135:7

140:8 153:5
157:12 169:12
173:17 174:16
175:7 180:13
184:15,16 185:7
187:23 189:25
191:13 223:5,5
240:6,17 257:24
261:3,5,17 293:15
297:14 336:3,11
338:1 341:6 349:9
349:13 351:16
352:7 370:23
371:5,18
**yocum**   4:9 41:17
41:17,21,21
**young**   153:5
156:18 226:24
227:10
**younger**   161:18
262:7,17

**z**

**zeros**   321:12

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.