Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL | ) | MDL No. 2804 |
| PRESCRIPTION OPIATE | ) | |
| LITIGATION, | ) | Case No. |
| | ) | 1:17-MD-2804 |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Hon. Dan A. |
| ALL CASES | ) | Polster |
| | ) | |

— — —

Tuesday, January 15, 2019

— — —

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

— — —

Videotaped Deposition of GREGORY BEAM,
held at 4206 South J.B. Hunt Drive, Rogers,
Arkansas, commencing at 8:36 a.m., on the
above date, before Debra A. Dibble, Certified
Court Reporter, Registered Diplomate
Reporter, Certified Realtime Captioner,
Certified Realtime Reporter and Notary
Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

1   A P P E A R A N C E S :
2   CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
    AGNELLO, P C
3   BY:  DONALD ECKLUND, ESQUIRE
    decklund@carellabyrne com
4   JAMES E  CECCHI, ESQUIRE
    jcecchi@carellabyrne com
5   DAVID G  GILFILLAN
    dgilfillan@carellabyrne com
6   MICHAEL INNES, ESQUIRE
    minnes@carellabyrne com
7   (appearing telephonically)
    ZACHARY BOWER, ESQUIRE
8   zbower@carellabyrne com
    (appearing telephonically)
9   5 Becker Farm Road
    Roseland, New Jersey 07068-1739
10  (973) 994-1700
    Counsel for Plaintiffs
11
12  JONES DAY
    BY:  JASON VARNADO, ESQUIRE
13  jvarnado@jonesday com
    GREGORY MITCHELL, ESQUIRE
14  gmitchell@jonesday com
    717 Texas, Suite 3300
15  Houston, Texas  77002- 2712
    832-239-3939
16  Counsel for Walmart
17
    MARCUS & SHAPIRA, LLP
18  (appearing telephonically)
    BY:  RICHARD HALPERN, ESQUIRE
19  rhalpern@marcus-shapira com
    301 Grant Street
20  35th Floor
    Pittsburgh, Pennsylvania 15219-6401
21  (412) 338-4690
    Counsel for HBC
22
23
24
25

## Page 3

1   WRIGHT, LINDSEY & JENNINGS, LLP
    BY:  CALEY B  VO, ESQUIRE
2   cvo@wlj com
    3333 Pinnacle Hills Parkway
3   Suite 510
    Rogers, Arkansas 72758-8498
4   (479) 986-0888
    Counsel for McKesson
5
6   O'MELVENY & MYERS LLP
    (appearing telephonically)
7   BY:  Ryan J  Snyder, ESQUIRE
    rsnyder@omm com
8   1999 Ave of The Stars, 8FL
    Los Angeles, CA 90067
9   (310) 246-6705
    Counsel for Janssen and Johnson & Johnson
10
11  JACKSON KELLY, PLLC
    (appearing telephonically)
12  BY:  JON ANDERSON, ESQUIRE
    janderson@jacksonkelly com
13  500 Lee Street East
    Suite 1600
14  Charleston, WV 25301-3202
    (304) 340-1288
15  Counsel for AmerisourceBergen
16
17  ARNOLD & PORTER KAYE SCHOLER, LLP
    (appearing telephonically)
18  BY:  HEATHER A  HOSMER, ESQUIRE
    hhosmer@arnoldporter com
19  601 Massachusetts Ave, NW
    Washington, DC 20001-3743
20  (202) 942-5000
21  Counsel for Endo Health Solutions Inc ;
    Endo Pharmaceuticals Inc ; Par
22  Pharmaceuticals, Inc ; Par
    Pharmaceutical Companies, Inc  formerly
23  known as Par Pharmaceutical Holdings,
    Inc
24
25

## Page 4

1   BARBER LAW FIRM, LLP
    BY:  M. EVAN STALLINGS, ESQUIRE
2   estallings@barberlawfirm.com
    425 West Capitol Avenue
3   Suite 3400
    Little Rock, Arkansas 72201
4   (501) 707-6182
    Counsel for Cardinal Health, Inc.
5
6   TUCKER ELLIS, LLP
    (appearing telephonically)
7   BY:  CHRISTINA MARINO, ESQUIRE
    christina.marino@tuckerellis.com
8   950 Main Avenue, Suite 1100
    Cleveland, Ohio 44113-7213
9   216-696-3675
    Counsel for Janssen and Johnson &
10  Johnson
11
12  ALSO PRESENT:
13  Paul D. Morris
    Senior Associate Counsel
14  Walmart, Inc.
15
    THE VIDEOGRAPHER:
16
    Chris Ritona
17  GOLKOW LITIGATION SERVICES
18                — — —
19
20
21
22
23
24
25

## Page 5

1               INDEX
2
    APPEARANCES              2
3
    PROCEEDINGS              8
4
5
6   EXAMINATION OF GREGORY BEAM:
7     DIRECT EXAMINATION        10
      BY MR. ECKLUND
8
9
10
11  CERTIFICATE              384
12  ERRATA                  386
13  ACKNOWLEDGMENT OF DEPONENT     387
14  LAWYER'S NOTES            388
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1          DEPOSITION EXHIBITS
            GREGORY BEAM
2         JANUARY 15, 2019
3    NUMBER        DESCRIPTION        PAGE
4    WALMART-  ANNUAL PERFORMANCE REVIEWS    15
     BEAM      FOR GREGORY BEAM
5    EXHIBIT 1  WMT_MDL_000057274-57362
6    WALMART-    SEPTEMBER 2010 EMAIL    88
     BEAM      SUBJ: RE: DEA AUDIT AT DC
7    EXHIBIT 2   6013
            WMT_MDL_000057259-57260
8
     WALMART-    MARCH 2012 EMAIL CHAIN    109
9    BEAM      WMT_MDL_000054729-54731
     EXHIBIT 3
10
     WALMART-   7-25-12 EMAIL FROM SUSANNE    125
11   BEAM     HILAND  SUBJ: CS POA
     EXHIBIT 4   WMT_MDL_000009427-9428
12
     WALMART-    SEPTEMBER 2012 EMAIL CHAIN    203
13   BEAM      SUBJ: RE: CII UTILIZATION
     EXHIBIT 5   REVIEW
14            WMT_MDL_000008089-8090,
15   WALMART-   5/10/13 EMAIL FROM SHIRLEY    222
     BEAM      RECTOR  SUBJ: CSMP
16   EXHIBIT 6   QUESTIONNAIRE
            MCKMDL00514052-514057
17
     WALMART-   JULY 2013 EMAIL CHAIN    233
18   BEAM      SUBJ: JUNE 405-1 REPORT
     EXHIBIT 7   WMT_MDL_000042794-42795
19            WITH ATTACHMENT
20
21
22
23
24

Page 7

1    WALMART-   10-16-14 EMAIL FROM JEFF    260
     BEAM      ABERNATHY  SUBJ: OVER
2    BEAM      20/50 REPORT
            WMT_MDL_000018858-18859
3            WITH ATTACHMENT
4    WALMART-   10-16-14 EMAIL FROM JEFF    260
     BEAM      ABERNATHY  SUBJ: OVER
5    EXHIBIT 9   20/50 REPORT
            WMT_MDL_000018862-18863
6
     WALMART-   JUNE 2014 SUBJ: RE: CUT    319
7    BEAM      REPORT FROM D C
     EXHIBIT 10  WMT_MDL_000008419
8
     WALMART-    SEPTEMBER 2017 EMAIL CHAIN    327
9    BEAM      SUBJ: RE: ARCHER QUESTION
     EXHIBIT 11  WMT_MDL_000073917394
10
     WALMART-   9/28/17 EMAIL FROM BRANDI    336
11   BEAM      WILLIAMSON
     EXHIBIT 12  WMT_MDL_000030095-30114
12
     WALMART-    SEPTEMBER 2015 EMAIL CHAIN    342
13   BEAM      SUBJ: RE: SOM EVALUATION
     EXHIBIT 13  NOTIFICATIONS
14            WMT_MDL_000016816
15   WALMART-    SEPTEMBER 25 EMAIL CHAIN    350
     BEAM      SUBJ: SIGNIFICANT
16   EXHIBIT 14  COMPLIANCE ISSUES
            WMT_MDL_000047185-47187
17
18
19
20
21
22
23
24

Page 8

1              PROCEEDINGS
2         (January 15, 2019 at 8:36 a m.)
3          THE VIDEOGRAPHER:  We are now
4    on the record.  My name is
5    Chris Ritona.  I am the videographer
6    for Golkow Litigation Services.
7    Today's date is January 15th, 2019.
8    The time is approximately 8:36 a.m.
9    This video deposition is being held in
10   Rogers, Arkansas, at Mitchell
11   Williams, 4206 South J.B. Hunt Drive,
12   Suite 200 in the matter of National
13   Prescription Opioid Litigation MDL
14   No. 2084, Case No. 17-MD-2084 in the
15   United States District Court, Northern
16   District of Ohio, Eastern Division.
17          The deponent today is Greg
18   Beam.  Will all counsel please
19   identify themselves for the record?
20          MR. ECKLUND:  Good morning.
21   Don Ecklund from Carella Byrne on
22   behalf of plaintiffs in the MDL.
23          MR. GILFILLAN:  David Gilfillan
24   from Carella Byrne on behalf of
25   plaintiffs.

Page 9

1          MR. CECCHI:  Jim Cecchi at
2    Carella Byrne on behalf of plaintiffs.
3          MR. VO:  Caley Vo from Wright,
4    Lindsey & Jennings on behalf of
5    McKesson.
6          MR. STALLINGS:  Evan Stallings
7    with Barber Law Firm on behalf of
8    Cardinal Health.
9          MR. MORRIS:  Paul Morris from
10   Walmart legal.
11          MR. MITCHELL:  Greg Mitchell,
12   Jones Day on behalf of Walmart.
13          MR. VARNADO:  Jason Varnado
14   with Jones Day on behalf of Walmart
15   and the witness.
16          THE VIDEOGRAPHER:  Will all
17   counsel --
18          MR. HALPERN:  Rick Halpern,
19   Marcus & Shapira on behalf of HBC.
20          MS. HOSMER:  Heather Hosmer of
21   Arnold & Porter on behalf of Endo and
22   Par defendants.
23          MS. MARINO:  Christina Marino
24   of Tucker and Ellis appearing on
25   behalf of Johnson & Johnson and

3 (Pages 6 to 9)

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    Janssen.
2        MR. ANDERSON:  Jon Anderson,
3    Jackson Kelly on behalf of
4    AmerisourceBergen.
5        VIDEOGRAPHER:  The court
6    reporter today, Debbie Dibble, will
7    please swear in the witness.
8        GREGORY BEAM,
9    having first been duly sworn, was examined
10   and testified as follows:
11       DIRECT EXAMINATION
12   BY MR. ECKLUND:
13       Q.   Good morning, Mr. Beam.
14   Moments ago the court reporter asked you to
15   take an oath.  What does that oath mean to
16   you today?
17       A.   That means under perjury of
18   law, I am bound to tell the truth.
19       Q.   And the whole truth?
20       A.   The whole truth.
21       Q.   Everything that you can recall,
22   your entire recollection?
23       A.   Yes, sir.
24       Q.   So throughout the day, that's
25   the expectation.

Page 11

1        Full disclosure, whatever you
2    can remember.  Fair?
3        A.   Fair.
4        Q.   Okay.  Have you ever been
5    deposed before?
6        A.   Sir?
7        Q.   Have you ever been deposed
8    before?  First deposition?
9        A.   I have.
10       Q.   How many times?
11       A.   Multiple times.  I can't recall
12   an exact.
13       Q.   More than ten?
14       A.   In criminal and civil, yes.
15       Q.   More than 20?
16       A.   No.
17       Q.   Okay.  So you're fairly
18   familiar with the process?
19       A.   Yes, sir.
20       Q.   Throughout the day I'll be
21   asking you questions.  Your attorney may at
22   points in time interject an objection.  If we
23   could both try to give breaks in between when
24   we're speaking it will help the court
25   reporter take a record.  If you don't

Page 12

1    understand a question, just let me know.
2    I'll try to rephrase it.  If you answer the
3    question, I'll assume you understood what I
4    was asking you about.  Is that fair?
5        A.   That's fair.
6        Q.   During the day if you want to
7    take a break, you need to stretch your legs,
8    you can stand up.  I'm not concerned about
9    that.  Any pending questions, we can answer
10   it and we'll try to get you that break.  Or I
11   might try to finish up a line of examination.
12       Is that fair?
13       A.   Yes, sir.
14       Q.   Any reason today why you --
15       MS. HOSMER:  I'm sorry to
16   interrupt.  There is about a 90-second lag
17   time with the online video.  Is there any way
18   to fix that?
19       (Discussion off the record.)
20       Q.   (BY MR. ECKLUND)  Okay.  So, if
21   at any point during the deposition you think
22   you may need to review a document when you're
23   going to answer a question that I'm going to
24   ask you, there's a chance that I might have
25   the document in the box that we brought here

Page 13

1    today.  There's also a chance that your
2    lawyers may be able to locate that document
3    if you describe it.  So if you need
4    something, say something about the document
5    you need.  Describe it.  What was it?  Is it
6    an Excel?  Is it a PowerPoint?  Is it an
7    email?  Okay?
8        A.   Yes, sir.
9        Q.   Policies.  Whatever it may be.
10   And we'll try to get that for you.  Okay?
11   This isn't intended to be a memory
12   examination.  It's intended to be a
13   fact-finding examination.
14       So if there's a document that's
15   going to help you answer questions for us
16   today, we want you to have those documents.
17   But it's on you to tell us what that document
18   looks like and that you need it.
19       Is that fair?
20       A.   Yes, sir.
21       Q.   What did you do to prepare for
22   your deposition today?
23       A.   I met with counsel.
24       Q.   How many times?
25       A.   Over a period of three days.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   In person?  Telephone?
2    A.   In person.
3    Q.   Video trainings?
4    A.   Video trainings?
5    Q.   Did you watch any videos about
6  how to sit for a deposition?
7    A.   No.
8    Q.   Read any manuals about how to
9  answer questions?
10   A.   No.
11   Q.   Review any of your documents
12  within your files to prepare for today?
13   A.   We did.
14   Q.   Approximately how long did you
15  spend reviewing documents to get ready for
16  today's deposition?
17   A.   Total time?
18   Q.   Total time?
19   A.   Approximately 15, 16 hours.
20   Q.   When did you start that
21  process?
22   A.   Last Thursday.
23   Q.   Did you meet the attorneys
24  before or after you started that process?
25   A.   That was during those meetings

Page 15

1  with the attorneys.
2    Q.   Okay.  What's your current
3  title within Walmart?
4    A.   I'm -- current title is
5  director of global investigations.
6    Q.   And when did you get that
7  title?
8    A.   Approximately 2011.
9    Q.   Let me hand you a document
10  that's going to be marked as Exhibit 1.
11       You may have seen these, or at
12  least portions of them.  These are
13  performance evaluations from within Walmart.
14       (Walmart-Beam Deposition
15  Exhibit 1, Annual Performance Reviews
16  for Gregory Beam, WMT_MDL_000057274-
17  57362, was marked for identification.)
18       MR. CECCHI:  We'll refer to
19  them as Beam 1 and then seriatim after
20  that.
21   Q.   (BY MR. ECKLUND) So why don't
22  you take a moment to peruse them quickly.
23  You don't need to review the whole thing
24  closely.
25       MS. HOSMER:  Will you read the

Page 16

1  Bates number into the record, please?
2        MR. ECKLUND:  57274.  And it
3  ends at 57362.
4        MS. HOSMER:  Thank you.
5        MR. ECKLUND:  You're welcome.
6        Mr. Beam, why don't you just
7  skip to the end, the last page or two,
8  and just verify this is a complete
9  collection of all of your evaluation
10  forms.
11       MR. VARNADO:  Object to the
12  form.
13       THE WITNESS:  I see fiscal
14  years '12 through '18.
15   Q.   (BY MR. ECKLUND) Are any
16  missing?
17   A.   None between those years, no,
18  sir.
19   Q.   Does it seem incomplete in any
20  way?
21   A.   I do not detect anything
22  incomplete at this time.
23   Q.   Great.
24       Okay.  Let's start on the first
25  page.

Page 17

1        February 1st, 2011.  Is that
2  when you started at Walmart?
3    A.   No, sir.
4    Q.   When did you start at Walmart?
5    A.   I started October of 2006.
6    Q.   And what was your title in
7  October 2006?
8    A.   In October 2006, I hired as a
9  drug diversion coordinator.
10   Q.   And was that your first
11  occasion as a drug diversion coordinator, or
12  did you come from another company with that
13  experience?
14   A.   I came from another company as
15  a district loss prevention supervisor.
16   Q.   Which company?
17   A.   Walgreens.
18   Q.   And within Walgreens, were you
19  responsible for drug diversion?
20   A.   Among other things, yes.
21   Q.   What other responsibilities did
22  you have within Walgreens?
23   A.   We had theft.  Shrink.  As well
24  as HR and employees relations matter.
25   Q.   When you talk about theft, are

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    you talking specifically about theft of
2    controlled substances or theft generally?
3        A.    Theft in general.
4        Q.    And what do you mean by
5    "shrink"?
6        A.    "Shrink" meaning stores that
7    are losing product without sales.
8        Q.    And that's a variation of
9    theft?
10       A.    It's also a variation of a
11   combination of other things.  It could be
12   shrinkage.  It could be customer theft.  And
13   it could also be reduction in price,
14   blowouts, sale blow costs.  There's a lot of
15   different things that contribute to shrink.
16       Q.    Okay.
17             And what was your role
18   concerning HR?
19       A.    These were HR investigations
20   that were telephoned in to corporate
21   headquarters.  Corporate headquarters would
22   in turn reassign those to an HR as well as
23   loss prevention supervisor for that location.
24       Q.    And just so that the record is
25   clear on all of this, because I haven't asked

Page 19

1    you and I probably should have, can I have
2    the benefit of your full educational history
3    after high school?
4        A.    Sure.  I graduated bachelor of
5    science, criminal justice and security
6    management, Capella University.
7        Q.    Any certifications following
8    college?
9        A.    No, sir.
10       Q.    Additional graduate school?
11       A.    No, sir.
12       Q.    Military service?
13       A.    Military service, yes.
14       Q.    When did you serve?
15       A.    From 1979 to 1999.
16       Q.    When did you graduate from
17   college?
18       A.    I graduated from college 2014,
19   finally.
20       Q.    When did you start college?
21       A.    Gosh, 2006.
22       Q.    Okay.  So you left high school,
23   went into the armed services, and which
24   branch?
25       A.    Air Force.

Page 20

1        Q.    Air Force.  And you were in the
2    Air Force for approximately 20 years?
3        A.    Correct.
4        Q.    And when you left, what was
5    your -- what was your title and what were you
6    doing within the Air Force?
7        A.    I was a special agent,
8    Air Force Office of Special Investigations.
9        Q.    And what type of investigations
10   were you doing within the Air Force?
11       A.    A variety of investigations.
12   Criminal investigations ranging from rape,
13   homicides, theft.
14       Q.    Did you receive any training
15   within the Air Force to conduct those
16   investigations?
17       A.    I did.
18       Q.    What type of training did you
19   receive?
20       A.    It was 12-week investigations,
21   basic investigations academia course.
22       Q.    Any continuing education
23   following the 12-week program you started
24   with?
25       A.    Yes.  We had advanced

Page 21

1    investigation school.  Also went to fire bomb
2    and arson school.  Also had completed
3    protective services operations school.
4        Q.    What was your rank when you
5    left the Air Force?
6        A.    I was an E7.
7        Q.    E7?
8        A.    E7, master sergeant.
9        Q.    Master sergeant.  Thank you.
10             MS. HOSMER:  I'm sorry to
11       interrupt.  I can't hear the witness
12       at all.
13             MS. MARINO:  I'm also having
14       difficulty hearing.
15       Q.    (BY MR. ECKLUND)  So let's talk
16   a little bit about the training you received
17   more than 20 years ago concerning an
18   investigation in advanced investigation
19   school.
20             At that time, what were you
21   told are some of the core principles of a
22   thorough investigation?
23             MR. VARNADO:  Object to the
24       form.
25             THE WITNESS:  First we go

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    through, and you'd want to identify
2    the crime scene.  And at that
3    particular point, you take meticulous
4    notes and you photograph the scene or
5    draft it out.
6        Q.   (BY MR. ECKLUND)  Do you share
7    the meticulous notes with other people?
8        A.   As lead investigator, you would
9    share that information with others arriving
10   on the scene and make assignments as
11   necessary.
12       Q.   So documentation is important
13   to a thorough investigation?
14       A.   Documentation is important to a
15   criminal investigation, yes.
16       Q.   I didn't ask whether it was
17   important to a criminal investigation,
18   particularly.  I'm just talking just broadly,
19   is documentation important to a thorough
20   investigation?
21            MR. VARNADO:  Object to the
22   form.
23            THE WITNESS:  Documentation
24   is -- can be very important to an
25   investigation depending on where we

Page 23

1    see the outcome.
2        Q.   (BY MR. ECKLUND)  How would
3    documentation not be important to an
4    investigation?
5        A.   There are some things that are
6    not going to be material to an investigation.
7        Q.   When you left the Air Force in
8    1999, what did you do at that point?
9        A.   At that time I took a 90-day
10   break and was hired with Walgreens.
11       Q.   So from 1999, you took a short
12   vacation for about three months, and then
13   found your footing at Walgreens, and you
14   stayed there until 2006?
15       A.   Yes, sir.
16       Q.   And when you started in 1999 --
17   it was 1999 when you started Walgreens?
18       A.   Approximately 2000.
19       Q.   Approximately 2000.
20            When you started at Walgreens
21   in approximately 2000, what was your title
22   when you began?
23       A.   Loss prevention supervisor.
24       Q.   And when you left in 2006 --
25       A.   It was loss prevention

Page 24

1    supervisor.
2        Q.   And throughout your period at
3    Walgreens, were you responsible for oversight
4    or supervision of any other employees?
5        A.   No.
6        Q.   And did you have a direct-line
7    person to whom you reported?
8        A.   I did.
9        Q.   And who was that?
10       A.   That was Jim Odom.
11       Q.   And what was Jim Odom's title?
12       A.   He was a regional loss
13   prevention supervisor.
14       Q.   Were you responsible for just a
15   particular region within the country?
16       A.   I was responsible for a
17   particular market.
18       Q.   Which market?
19       A.   Initially, I had started in
20   Minneapolis-St. Paul.  So I managed that --
21   or worked with the manage -- the district
22   management staff in that area for
23   approximately two years.  And then moved to
24   Atlanta.  And that market was emerging, so I
25   was responsible for that area up until the

Page 25

1    time I came on with Walmart.
2        Q.   And in 2006, you transitioned
3    from Walgreens to Walmart?
4        A.   Correct.
5        Q.   Okay.  And where did you begin
6    working within Walmart?  What part of the
7    country?
8        A.   Here.
9        Q.   In Bentonville or Rogers?
10       A.   In Rogers.
11            I'm sorry, Bentonville.  Home
12   office.
13       Q.   Okay.  So you start in
14   Bentonville, home office, and at that point
15   you had a somewhat different job
16   responsibility than what you had at
17   Walgreens; correct?
18       A.   Correct.
19       Q.   Okay.  How did you become
20   trained in your new role and responsibility
21   within Walmart?
22       A.   That was -- came from both
23   personal knowledge as well as experience in
24   some of the drug investigations that were
25   completed as special agent with OSI, as well

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review



Page 26

```
1    as conducting similar pharmacy-related
2    investigations within Walgreens.
3         Q.    Okay.  And when you began at
4    Walmart, were you focused on one category of
5    pharmacy products, all categories of pharmacy
6    products?
7         A.    We were focused on pharmacy
8    operations in total, which means all
9    categories of pharmacy products and process.
```

```
17        (Phone interruption.)
18        VIDEOGRAPHER:  8:54.  We are
19   off the video record.
20        (Recess taken, 8:57 a m. to
21   8:58 a.m.)
22        THE VIDEOGRAPHER:  8:58.  We
23   are on the video record.
```

Page 27

Page 28

Page 29

Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 38

Page 40

6        Q.    Do you have an understanding of
7    what the licenses for Tableau cost in 2011?
8        A.    I do not.
9        Q.    Do you have an understanding of
10   what a Tableau license costs today?
11       A.    I do not.
12       Q.    Do you know whether they would
13   be considered expensive to a company with the
14   market value of Walmart?
15           MR. VARNADO:  Object to form.
16           THE WITNESS:  I do not.
17       Q.    (BY MR. ECKLUND)  Do you think
18   that Tableau was developed by a company with
19   the hopes that they would only be able to
20   sell to companies in the top Fortune 50?
21           MR. VARNADO:  Object to form.
22           THE WITNESS:  That -- I could
23       not answer that question.  I don't
24       know what their motivation would be.
25       Q.    (BY MR. ECKLUND)  Okay.  But

Page 39

Page 41

1    it's not your expectation that they would
2    have wanted to sell only 100 licenses for
3    Tableau.  They would want to sell it broadly
4    across the country; correct?
5           MR. VARNADO:  Object to form.
6           THE WITNESS:  That wouldn't be
7       my understanding.  I do not understand
8       their business model.

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 46

Page 47

Q.    The same example.  The parent
gets prescribed Xanax.  And do you have an
understanding what Xanax is?
A.    I do.
Q.    What's Xanax?
A.    It's a tranquilizer.
Q.    And do you have an
understanding of what would happen if an
individual was to take crushed Xanax and also
drink alcohol?
A.    I personally do not have
knowledge of that.
Q.    I'm not asking you within your

Page 48

1   personal experience, but do you understand
2   generally what may happen to an individual
3   that would do that?
4        MR. VARNADO:  Object to form.
5        THE WITNESS:  I have an
6   understanding what it can -- the
7   impact it can have on certain
8   individuals or some individuals, and
9   that is information that I've gleaned
10   through open source media.
11        Q.    (BY MR. ECKLUND)  What's your
12   understanding, based on your independent
13   investigation of open source media?
14        A.    That these particular drugs
15   are -- there are situations of probably drug
16   use, meaning that individuals are combining
17   prescription medications with other
18   substances for a variety of reasons.
19        Q.    Okay.  And what might those
20   reasons include?
21        A.    Those reasons could be either
22   ignorance of the interaction, or potential
23   interaction, and it could also be that
24   persons are involved in this type of activity
25   and -- from peer group pressure, and they

Page 49

1   also could be involved in this activity as
2   social gatherings.
3        Q.    Okay.  And you talked about
4   some combinations of prescription
5   medications.  Are you familiar with what's
6   often referred to as the "trinity"?
7        A.    That is something that I
8   personally -- my personal knowledge of that
9   is it also comes through open source media,
10   yes.
11        Q.    Okay.  What's is your
12   understanding of what the "trinity" is?
13        A.    It is typically an opioid and
14   one of the anti-depressants or tranquilizers,
15   along with a muscle relaxer of some
16   nomenclature.
17        Q.    And what about the "holy
18   trinity"?  Are you familiar with the "holy
19   trinity"?
20        MR. VARNADO:  Object to form.
21        THE WITNESS:  Only what I've
22   read.
23        Q.    (BY MR. ECKLUND)  Okay.  And
24   again, what have you read about the holy
25   trinity as concerns combinations of

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    prescription medications?
2        A.    I have read that there have
3    been certain persons, in certain
4    circumstances, where that was a -- that that
5    was considered potentially problematic.  And
6    that that was a popular combination that was
7    being seen more and more prescribed from
8    medical doctors.
9        Q.    And you mentioned earlier that
10   you thought that people -- the reasons people
11   might use these particular medications could
12   include ignorance of the interaction, or the
13   potential interaction, peer group pressure,
14   and also could be involved in this activity
15   as social gatherings.
16           Why would people be combining
17   these medications during social gatherings?
18           MR. VARNADO:  Object to form.
19       Q.    (BY MR. ECKLUND)  Based on your
20   understanding of the social media.  I mean,
21   there's an opioid crisis.  Can we agree that
22   there's an opioid crisis?
23       A.    There is an opioid crisis.
24       Q.    When did you become familiar
25   with the opioid crisis?

Page 51

1        A.    My recollection goes back
2    personally, approximately 2006.
3        Q.    2006.  And in 2006, you were
4    already at Walmart?  You were joining
5    Walmart?
6        A.    I was.
7        Q.    Okay.  So you arrived on the
8    scene and you were aware that there's a
9    crisis of opioids at that point?
10       A.    I was aware personally that
11   there was communications in media of an
12   opioid crisis.
13       Q.    Did you disagree with the media
14   coverage concerning the opioid crisis?
15       A.    At that particular point in
16   time, I didn't have evidence to agree or
17   disagree.
18           I am looking -- I am looking at
19   and focusing on the potential for that.
20       Q.    All right.  Since 2006, have
21   you come to a point where you now would agree
22   that there is in fact an opioid crisis or
23   epidemic in the United States?
24           MR. VARNADO:  Object to form.
25           THE WITNESS:  I would agree

Page 52

1    that there is a crisis of opioids.
2    Opioids being a very general term in a
3    very broad class of substances.
4        Q.    (BY MR. ECKLUND)  Would you
5    agree that there is a prescription opioid
6    crisis in the United States today?
7        A.    I do not have the evidence or
8    the factors in front of me to agree or
9    disagree with that, Counsel.
10       Q.    Okay.  Are you aware that
11   between 2000 and 2014, unintentional drug
12   overdoses in the United States increased over
13   137 percent?
14       A.    I am familiar with numbers that
15   come from a multiple of different open
16   sources such as CDC, such as the DEA.  But
17   I'm not aware that -- whether -- what the
18   root cause of those overdose deaths were,
19   other than a broad class of opioids.
20       Q.    Okay.  Were you aware that
21   there was a 200 percent increase in overdose
22   deaths involving opioids?
23           MR. VARNADO:  Object to form.
24           THE WITNESS:  Again, opioids is
25   a broad class, both illicit and

Page 53

1    prescription.
2        Q.    (BY MR. ECKLUND)  Were you
3    aware that more than half a million deaths
4    were due to prescription overdoses?
5        A.    I'm not familiar with that
6    particular number related to specifically
7    prescription overdoses.
8        Q.    Okay.
9           In 2015, there were 47,000
10   overdose deaths.  And there were more than
11   28,000 deaths involving opioids including
12   heroin.  But within that same year there were
13   19,000 involving prescription opioids.
14           Were you aware of that?
15           MR. VARNADO:  Object to form.
16           THE WITNESS:  I don't recall
17   reading that.
18       Q.    (BY MR. ECKLUND)  Okay.
19       A.    Specifically.
20       Q.    In your investigations online,
21   have you ever taken the time to read the CDC,
22   National Center for Health Statistics and
23   Morbidies Mortality Report from
24   January 1st, 2016?
25       A.    I did.

14 (Pages 50 to 53)

Highly Confidential – Subject to Further Confidentiality Review



Page 54

1    Q.    You did?  That's where these
2    numbers are coming from.
3    A.    (Witness nods.)
4    Q.    Do you have any reason to
5    dispute any of the CDC's statistics?
6    A.    I'm not in a position to
7    dispute or support CDC's outcome or
8    statistics.
9    Q.    So you're not willing to accept
10   them, but you're also not in a position to
11   dispute them?
12       MR. VARNADO:  Object to form.
13       THE WITNESS:  I didn't say I
14   didn't accept them.  I said I have no
15   basis to accept or reject.

Highly Confidential - Subject to Further Confidentiality Review



Page 59

14          (Interruption with hold music.)
15          MR. ECKLUND:  So for the
16    benefit of the record, we've lowered
17    the volume on the speakerphone
18    because, once again, we've been placed
19    on hold and we'll just note for the
20    record that it's the same hold music,
21    so we suspect it's more than likely
22    the same individual or law firm.

Highly Confidential - Subject to Further Confidentiality Review



Page 62

Page 64

Page 63

Page 65

```
13        MR. ECKLUND:  You going to ask
14   them to take attendance?
15        MR. CECCHI:  Yeah.
16        Should we take an attendance of
17   all the attendees on the phone while
18   the hold music is playing and then
19   we'll do our own little diversion
20   investigation here and see who's on
21   hold?
22        Everyone on the phone, please
23   put your name on the record again.
24   You're going to have to speak up
25   because it's hard to hear you.
```

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

```
1          MR. INNES:  This is
2   Michael Innes for plaintiffs.
3          MR. ANDERSON:  Jon Anderson,
4   AmerisourceBergen.
5          MS. HOSMER:  Heather Hosmer,
6   Arnold & Porter.
7          MS. MARINO:  Christina Marino,
8   Tucker Ellis.
9          MR. BOWER:  Zach Bower, Carella
10  Byrne.
11         MR. CECCHI:  And, Zach, stop.
12  Who was the name before you?  That was
13  hard to hear.
14         MS. MARINO:  Christina Marino,
15  tucker Ellis.
16         MR. CECCHI:  Anyone else?
17         MR. HALPERN:  Rick Halpern,
18  Marcus & Shapira.
19         MR. SNYDER:  Ryan Snyder,
20  O'Melveny & Myers.
21         MR. ECKLUND:  Jon Anderson?
22         MR. ANDERSON:  I'm on there.
23  I've already announced myself.
24         MR. VARNADO:  All right.  Thank
25  you, everybody.  We're going to try to
```

Page 67

```
1   press on here.
2          Q.   (BY MR. ECKLUND)  It's always
3   unique, every deposition.
4          A.   The modern wonders of
5   technology.
6          Q.   That's right.
```

Page 68

Page 69



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 78

Page 79

Page 80

Page 81

```
15          MR. VARNADO:  Counsel, we've
16   been going close to an hour and a half.
17          MR. ECKLUND:  That's fine.
18          MR. VARNADO:  Take a little
19   break?  Doesn't have to be long.
20          VIDEOGRAPHER:  9:54.  We are
21   off the video record.
22          (Recess taken, 9:54 a.m. to
23   10:07 a.m.)
24          THE VIDEOGRAPHER:  10:07.  We
25   are on the video record.
```

21  (Pages 78 to 81)

Highly Confidential - Subject to Further Confidentiality Review

Page 82

```
 1        Q.   (BY MR. ECKLUND)  Welcome back,
 2   Mr. Beam.  You understand you're still under
 3   oath?
 4        A.   I do.
```

Page 83

```
 5        Q.   (BY MR. ECKLUND) You mentioned
 6   that sometimes good people make bad
 7   decisions.  Did you report any of those good
 8   people who made these bad decisions to local
 9   law enforcement?
10        A.   We did.
11        Q.   How many?
12        A.   In fact, every investigation
13   where diversion is proven, we have the
14   evidence, that information is referred for
15   prosecution and police are notified in each
16   individual case.
17        Q.   Okay.  So in every instance
18   where you have sufficient information, where,
19   using your term, where diversion is proven,
20   and where you have the evidence, that
21   information is referred to prosecution and
22   police are notified in each individual case.
23        Did you -- when you had
24   occasions to suspect diversion, did you refer
25   that information, whether it was proven or
```

Page 84

```
 1   not proven, just suspected, to DEA?
 2        MR. VARNADO:  Object to form.
 3        THE WITNESS:  That information
 4   was reported if there were losses
 5   connected.  But in terms of referring
 6   for local law enforcement, we did not
 7   refer to local law enforcement unless
 8   there is prosecutable evidence there.
 9        Q.   (BY MR. ECKLUND) I was
10   specifically asking about DEA.  So it would
11   have been reported to DEA.  And then as far
12   as referral for prosecution asks you
13   employees who were involved, that was only
14   when you felt that the evidence was clear?
15   That there was prosecutable evidence?
16        A.   Yes.
17        Q.   Okay.
18        A.   And the -- in reporting to the
19   DEA, each one of these investigations are
20   coordinated through compliance, who completes
21   the 106s, per their guidelines.  And per
22   their instructions.
23        What we do is submit the facts
24   to local law enforcement, our state law
25   enforcement, for additional action to include
```

Page 85

```
 1   prosecution.
```



22  (Pages 82 to 85)

Highly Confidential - Subject to Further Confidentiality Review



23 (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review



Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Page 154

```
19        MR. ECKLUND:  Why don't we take
20   that break.
21        MR. VARNADO:  Sure.
22        VIDEOGRAPHER:  11:26.  We are
23   off the video record.
24        (Recess taken, 11:26 a.m. to
25   11:38 a.m.)
```

Page 155

```
1         THE VIDEOGRAPHER:  11:38.  We
2    are on the video record.
```

Page 156

Page 157

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 198

Page 200

1      A.    Thank you.
2      Q.    I hope you enjoyed your lunch.
3            So, I just wanted to turn your
4   attention back to this composite exhibit.  If
5   you recall, this is what we had talked about
6   earlier.  This was what was marked as
7   Exhibit 1 in Miranda Johnson's deposition.
8            And do you recall we went
9   through these time periods.  We assembled
10  each of the Bates range documents that were
11  identified in Walmart responses in this
12  document.  And I had a couple of questions
13  about this particular document for you.
14           It bears Bates stamp 11106.
15           Do you see this document?
16  There we go.  Okay.  Here's the question I
17  have for you.

Page 199

3            MR. VARNADO:  We're getting
4   close to 12:30.  Whenever you are
5   ready for a break.  No rush.
6            MR. ECKLUND:  When you're
7   hungry or want to take a break, just
8   let me know.
9            THE WITNESS:  Certainly.
10           Are you ready?
11           MR. VARNADO:  Are you ready
12  now?
13           THE WITNESS:  Are we starting
14  with a new document?  Then I think
15  that would be a perfect time.
16           MR. VARNADO:  Sounds good.
17  That's fine.
18           VIDEOGRAPHER:  12:26.  We are
19  off the video record.
20           (Recess taken, 12:26 p.m. to
21  1:02 p.m.)
22           VIDEOGRAPHER:  1:02.  We are on
23  the video record.
24      Q.    (BY MR. ECKLUND)  Welcome back,
25  Mr. Beam.

Page 201



51 (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS



Page 214

Page 216

```
 1          MR. CECCHI:  8089.  It's
 2   Deposition Exhibit 5.
 3          MR. ECKLUND:  Correct.
 4          And what I was curious about
 5   was one of the prior exhibits, which
 6   is Bates stamp 57259.
 7          It's the one with the big
 8   redacted privilege block.
 9          Okay.  All right.
10          Now --
11          MR. VARNADO:  Exhibit 2, for
12   the record.
13          MR. ECKLUND:  Exhibit 2, for
14   the record.  Thank you.
```

Page 215

```
11          MR. VARNADO:  What page number?
12          MR. ECKLUND:  It's --
13          MR. VARNADO:  Are you reading
14   from Exhibit 5?
15          MR. ECKLUND:  No, no.  It's one
16   of the prior exhibits.  You can go
17   back.
18          MR. CECCHI:  Could you read the
19   Bates ranges of Exhibit 5 that's
20   been -- that we're talking about?  I'm
21   just confused what exhibit we're
22   looking at.
23          Read the Bates ranges into the
24   record.  I just want to make sure.
25          MR. ECKLUND:  8089.
```

Page 217

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 280

15    MR. VARNADO:  We've been going
16  about an hour and 20 minutes.
17    MR. ECKLUND:  We can take a
18  break.
19    MR. VARNADO:  Yeah.
20    VIDEOGRAPHER:  2:28.  We're off
21  the video record.
22    (Recess taken, 2:29 p.m. to
23  2:41 p.m.)
24    VIDEOGRAPHER:  2:41.  We are on
25  the video record.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 346

25            MR. VARNADO:  We've been going

Page 347

1    about another hour and 15.  Take
2    another break.
3            MR. ECKLUND:  Sure.
4            VIDEOGRAPHER:  3:56.  We are
5    off the video record.
6            (Recess taken, 3:57 p.m. to
7    4:05 p.m.)
8            VIDEOGRAPHER:  4:05.  We are on
9    the video record.

Page 348

Page 349

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 366

Page 368

```
23          MR. ECKLUND:  Let's take a
24     five-minute break.
25          VIDEOGRAPHER:  4:28.  We are
```

Page 367

Page 369

```
1     off the video record.
2          (Recess taken, 4:28 p.m. to
3     4:39 p.m.)
4          VIDEOGRAPHER:  4:39.  We are on
5     the video record.
6     Q.   (BY MR. ECKLUND)  Okay.
7     Mr. Beam, I have a few questions and I just
8     wanted to make sure we have clear testimony
9     on these issues.
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS



Page 382

Page 384

1                     CERTIFICATE
2        I, DEBRA A. DIBBLE, Registered
     Diplomate Reporter, Certified Realtime
3    Reporter, Certified Realtime Captioner,
     Certified Court Reporter and Notary Public,
4    do hereby certify that prior to the
     commencement of the examination, GREGORY BEAM
5    was duly sworn by me to testify to the truth,
     the whole truth and nothing but the truth
6
         I DO FURTHER CERTIFY that the
7    foregoing is a verbatim transcript of the
     testimony as taken stenographically by and
8    before me at the time, place and on the date
     hereinbefore set forth, to the best of my
9    ability
10       I DO FURTHER CERTIFY that pursuant
     to FRCP Rule 30, signature of the witness was
11   not requested by the witness or other party
     before the conclusion of the deposition
12
         I DO FURTHER CERTIFY that I am
13   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
14   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
15   that I am not financially interested in the
     action
16
17
18
19   _____
     DEBRA A. DIBBLE, RDR, CRR, CRC
20   NCRA Registered Diplomate Reporter
     NCRA Certified Realtime Reporter
21   Certified Court Reporter
22
     Dated: 1/18/19
23
24
25

Page 383

Page 385



3    Q.    Okay.
4        MR. ECKLUND:  Mr. Beam, thank
5    you for your time today.  I have no
6    further questions.
7        MR. VARNADO:  No further
8    questions from Walmart.
9        VIDEOGRAPHER:  4:55 p.m.  We
10   are off the video record.  This
11   concludes the video deposition of
12   Greg Beam.
13       (Proceedings recessed at
14   4:55 p.m.)
15       --o0o--
16
17
18
19
20
21
22
23
24
25

1           INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8        After doing so, please sign the
9    errata sheet and date it.
10       You are signing same subject to
11   the changes you have noted on the errata
12   sheet, which will be attached to your
13   deposition.
14       It is imperative that you return
15   the original errata sheet to the deposing
16   attorney within thirty (30) days of receipt
17   of the deposition transcript by you.  If you
18   fail to do so, the deposition transcript may
19   be deemed to be accurate and may be used in
20   court.
21
22
23
24
25

97  (Pages 382 to 385)

Highly Confidential - Subject to Further Confidentiality Review

Page 386

```
 1              ERRATA
 2    PAGE  LINE  CHANGE
 3    ____  ____  _____
 4          REASON: _____
 5          ____  _____
 6          REASON: _____
 7    ____  ____  _____
 8          REASON: _____
 9    ____  ____  _____
10          REASON: _____
11    ____  ____  _____
12          REASON: _____
13    ____  ____  _____
14          REASON: _____
15    ____  ____
16          REASON: _____
17    ____  ____  _____
18          REASON: _____
19    ____  ____  _____
20          REASON: _____
21    ____  ____  _____
22          REASON: _____
23    ____  ____  _____
24          REASON: _____
25
```

Page 388

```
 1              LAWYER'S NOTES
 2
 3    PAGE  LINE
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25
```

Page 387

```
 1         ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4         I, GREGORY BEAM, do hereby certify
           that I have read the foregoing pages and that
 5         the same is a correct transcription of the
           answers given by me to the questions therein
 6         propounded, except for the corrections or
           changes in form or substance, if any, noted
 7         in the attached
           Errata Sheet.
 8
 9
10
11
12    _____
      GREGORY BEAM              DATE
13
14
15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18
19    _____
20    Notary Public
21
22
23
24
25
```

98 (Pages 386 to 388)