**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OHIO
EASTERN DIVISION
- - -
IN RE: NATIONAL   :  MDL NO. 2804
PRESCRIPTION OPIATE :
LITIGATION       :
----------------------------------------
                 :  CASE NO.
THIS DOCUMENT    :  1:17-MD-2804
RELATES TO ALL CASES:
                 :  Hon. Dan A.
                 :  Polster
- - -

Tuesday, January 8, 2019
- - -
HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of
DEBORAH BEARER, taken pursuant to notice,
was held at the offices of Golkow
Litigation Services, One Liberty Place,
1650 Market Street, Suite 5150,
Philadelphia, Pennsylvania 19103,
beginning at 9:30 a.m., on the above
date, before Amanda Dee Maslynsky-Miller,
a Certified Realtime Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

**Page 2**

1
2
3   APPEARANCES:
3
     WAGSTAFF & CARTMELL, LLP
4    BY:  SARAH S. RUANE,  ESQUIRE
     BY:  BRIAN J. MADDEN, ESQUIRE
     4740 Grand Avenue
5    Suite 300
     Kansas City, MO 64112
6    (816) 701-1100
     Sruane@wcllp.com
7    Bmadden@wcllp.com
     Representing the Plaintiffs
8
9
10   BRANSTETTER, STRANCH & JENNINGS, PLLC
     BY:  BENJAMIN A. GASTEL, ESQUIRE
11   223 Rosa L. Parks Avenue
     Suite 200
12   Nashville, Tennessee 37203
     (877) 369-0267
13   Beng@bsjfirm.com
     Representing the Staubus Plaintiffs
14
15
16   MORGAN, LEWIS & BOCKIUS LLP
     BY:  REBECCA J. HILLYER, ESQUIRE
17   1701 Market Street
     Philadelphia, Pennsylvania 19103
18   (215) 963-4824
     Rebecca.hillyer@morganlewis.com
19   Representing the Defendant,
     Teva Corporation
20
21
22
23
24

**Page 3**

1    APPEARANCES: (Continued)
2
3    PIETRAGALLO GORDON ALFANO BOSICK &
     RASPANTI, LLP
4    BY:  LESLIE A. MARIOTTI, ESQUIRE
     1818 Market Street
5    Suite 3402
     Philadelphia, Pennsylvania 19103
6    (215) 320-6200
     LAM@pietragallo.com
7    Representing the Defendant,
     Cardinal Health, Inc.
8
9
10   JONES DAY
     BY:  SHUBHA M. HARRIS, ESQUIRE
11   90 South Seventh Street
     Suite 4950
12   Minneapolis, MN 55402
     (612) 217-8800
13   Shubhaharris@jonesday.com
     Representing the Defendant,
14   Walmart
15
16
17   ARNOLD & PORTER KAYE SCHOLER LLP
     BY: TIFFANY M. IKEDA, ESQUIRE
18   44th Floor
     777 South Figueroa Street
19   Los Angeles, California 90017
     (213) 243-4000
20   Tiffany.ikeda@arnoldporter.com
     Representing the Defendant,
21   Endo Pharmaceuticals, Endo Health,
     and Par Pharmaceuticals
22
23
24

**Page 4**

1    APPEARANCES: (Continued)
2    VIA TELEPHONE/LIVESTREAM:
3
4    ALLEGAERT BERGER & VOGEL, LLP
     BY:  LOUIS A. CRACO, JR., ESQUIRE
5    BY:  LUCY N. ONYEFORO, ESQUIRE
     111 Broadway
6    20th Floor
     New York, New York 10006
7    (212) 571-0550
     Lcraco@abv.com
8    Lonyeforo@abv.com
     Representing Rochester Drug
9    Cooperative
10
11   JACKSON KELLY PLLC
     BY:  JON L. ANDERSON,  ESQUIRE
12   500 Lee Street East
     Suite 1600
13   Charleston, West Virginia 25301
     (304) 340-1288
14   Representing the Defendant,
     AmerisourceBergen
15
16
     ALSO PRESENT:
17   David Lane, Videographer
18
19
20
21
22
23
24

Page 5

```
 1                - - -
 2           I N D E X
 3                - - -
 4      Testimony of: DEBORAH BEARER
 5
          By Ms  Ruane         10, 308
 6        By Mr  Madden         284
          By Ms  Hillyer        303, 373
 7        By Mr  Gastel         313
 8                - - -
 9
          E X H I B I T S
10
                 - - -
11
        NO        DESCRIPTION          PAGE
12
        Teva-Bearer
13      Exhibit-1   No Bates
              Notice of Deposition     13
14
        Teva-Bearer
15      Exhibit-2   TEVA_MDL_A_09144727    18
16      Teva-Bearer
        Exhibit-3   TEVA_MDL_A_00873333-335   38
17
        Teva-Bearer
18      Exhibit-4   TEVA_MDL_A_04838673-677   79
19      Teva-Bearer
        Exhibit-5   TEVA_MDL_A_04838485-490   86
20
        Teva-Bearer
21      Exhibit-6   TEVA_MDL_A_04484212-214   102
22      Teva-Bearer
        Exhibit-7   TEVA_MDL_A_04478352-356   113
23
        Teva-Bearer
24      Exhibit-8   TEVA_MDL_A_10070409-410   119
```

Page 6

```
 1                - - -
 2           E X H I B I T S
 3                - - -
 4      NO.        DESCRIPTION          PAGE
 5      Teva-Bearer
        Exhibit-9   TEVA_MDL_A_04426360-362   122
 6
        Teva-Bearer
 7      Exhibit-10  TEVA_MDL_A_10105779-782   137
 8      Teva-Bearer
        Exhibit-11  TEVA_CHI_00036903-930   140
 9
        Teva-Bearer
10      Exhibit-12  TEVA_CHI_00036931-955   153
11      Teva-Bearer
        Exhibit-13  TEVA_MDL_A_03272381-391   170
12
        Teva-Bearer
13      Exhibit-14  TEVA_MDL_A_04481825   191
14      Teva-Bearer
        Exhibit-15  TEVA_MDL_A_09457158-159   206
15
        Teva-Bearer
16      Exhibit-16  TEVA_MDL09451760   219
17      Teva-Bearer
        Exhibit-17  TEVA_MDL_A_04420139-141   227
18
        Teva-Bearer
19      Exhibit-18  TEVA_MDL_A_04848188-191   231
20      Teva-Bearer
        Exhibit-19  TEVA_MDL_A_01204074-092   243
21
        Teva-Bearer
22      Exhibit-20  TEVA_MDL_A_09191592-593,
              With attachment      249
23
24
```

Page 7

```
 1
                   - - -
 2
           E X H I B I T S
 3
                   - - -
 4
        NO.        DESCRIPTION          PAGE
 5
        Teva-Bearer
 6      Exhibit-21  TEVA_MDL_A_09165564-565,
              With attachment      262
 7
        Teva-Bearer
 8      Exhibit-22  TEVA_MDL_A_09218160-165   320
 9      Teva-Bearer
        Exhibit-23  TEVA_MDL_A_03967973-979   335
10
        Teva-Bearer
11      Exhibit-24  TEVA_MDL_A_03551263-266,
              With attachment          343
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
 1                - - -
 2      DEPOSITION SUPPORT INDEX
 3                - - -
 4
 5      Direction to Witness Not to Answer
 6      Page Line    Page Line    Page Line
 7      None
 8
 9
10      Request for Production of Documents
11      Page Line    Page Line    Page Line
12      None
13
14
15      Stipulations
16      Page Line    Page Line    Page Line
17      12   1
18
19
20      Question Marked
21      Page Line    Page Line    Page Line
22      None
23
24
```

Page 9

```
 1              - - -
 2          (It is hereby stipulated and
 3      agreed by and among counsel that
 4      sealing, filing and certification
 5      are waived; and that all
 6      objections, except as to the form
 7      of the question, will be reserved
 8      until the time of trial.)
 9              - - -
10          VIDEO TECHNICIAN:  We're now
11      on the record.  My name is David
12      Lane, videographer for Golkow
13      Litigation Services.  Today's date
14      is January 8th, 2019.  The time is
15      9:30 a.m.
16          This deposition is taking
17      place in Philadelphia,
18      Pennsylvania, in the matter of
19      National Prescription Opioid
20      Litigation.  Our deponent today is
21      Deborah Bearer.  Counsel will be
22      noted on the stenographic record.
23      The court reporter is Amanda
24      Miller and will now swear in our
```

Page 10

```
 1      witness.
 2              - - -
 3          DEBORAH BEARER, after having
 4      been duly sworn, was examined and
 5      testified as follows:
 6              - - -
 7          VIDEO TECHNICIAN:  Please
 8      begin.
 9              - - -
10          EXAMINATION
11              - - -
12  BY MS. RUANE:
13      Q.   Can you state your name for
14  the record, please?
15      A.   Deborah Bearer.
16      Q.   Ms. Bearer, my name is Sarah
17  Ruane.  We met briefly before the
18  deposition.  I'm here representing the
19  plaintiffs.
20          And we talked about the fact
21  that you actually have laryngitis right
22  now; is that correct?
23      A.   Correct.
24      Q.   So I apologize in advance.
```

Page 11

```
 1      You've been kind enough to still agree to
 2  move forward with the deposition right
 3  now.  I feel like asking you questions --
 4  it sounds like it's painful.
 5          Is it painful for you?
 6      A.   No.  No, it just sounds bad.
 7      Q.   Okay.  So if there are any
 8  accommodations we can make that help you,
 9  just let me know that, all right?
10      A.   Sure.  Thank you.
11      Q.   We will probably take breaks
12  about every hour anyway.
13      A.   Okay.
14      Q.   But if you need a break at
15  any time, just let me know.
16      A.   Sure.
17      Q.   Have you given a deposition
18  before?
19      A.   No.
20      Q.   A couple of ground rules,
21  just to make sure we're all
22  communicating, and some of them you may
23  have already heard from your attorney.
24          But the best way to get a
```

Page 12

```
 1  clean record is for me to ask a question,
 2  full stop, and then you give your answer,
 3  rather than speak over each other.
 4      A.   Right.
 5      Q.   Do you understand that?
 6      A.   I do.
 7      Q.   And so if any of us start to
 8  do that, I may do it as well, somebody
 9  will jump in and let us know.  We're not
10  trying to be rude, you know, we just want
11  to make sure we get a clean record.
12          Is that fair?
13      A.   That's fair.
14      Q.   Likewise, you understand
15  you're under oath today, just like if you
16  were before a judge and a jury in a
17  courtroom?
18      A.   Yes.
19      Q.   And that your testimony can
20  be used and played in court?
21      A.   Correct, I understand.
22      Q.   And along those lines, my
23  goal here today is to make sure I leave
24  understanding what you know and what you
```

Page 13

```
1   remember.
2         So I'm going to try to ask
3   good questions, but at some point I will
4   likely ask something that doesn't make
5   sense to you.
6         If I do that, will you let
7   me know?
8         A.   Yes.
9         Q.   And I will try to restate it
10  and make sure we get on the same page.
11        But if you answer a question
12  I've asked, I'll assume you've understood
13  it; is that fair?
14        A.   That's fair.
15        Q.   Okay.  Let's go ahead and
16  mark as Exhibit-1 your deposition notice.
17                - - -
18        (Whereupon, Teva-Bearer
19        Exhibit-1, No Bates, Notice of
20        Deposition, was marked for
21        identification.)
22                - - -
23  BY MS. RUANE:
24        Q.   And while I'm doing that,
```

Page 14

```
1   let me ask you, what is your current
2   address?
3         A.
4
5         Q.   And where is Newtown Square?
6         A.   Pennsylvania.
7         Q.   About how far away -- we're
8   in Philadelphia, right?
9         A.   Sorry, sorry.
10        It is -- it's a 40-minute
11  drive.  I will say that it's probably 20
12  miles.
13        Q.   And are you here pursuant to
14  that Exhibit-1 notice to take your
15  deposition?
16        A.   Yes.
17        Q.   Are you represented by
18  counsel today?
19        A.   Yes.
20        Q.   I think Ms. Hillyer is here
21  acting as your attorney?
22        A.   Yes.
23        Q.   And the attorney for Teva?
24        A.   Yes.
```

Page 15

```
1         Q.   Do you currently work for
2   Teva?
3         A.   Yes.
4         Q.   And what did you do to
5   prepare for your deposition today?
6         A.   I met with my counsel
7   yesterday.  Since I had not been deposed
8   prior, it was just to give me some
9   expectations --
10        MS. HILLYER:  Just make sure
11        that you don't disclose anything
12        that we discussed.
13        THE WITNESS:  No, no.
14        Just expectations for the
15        day.
16  BY MS. RUANE:
17        Q.   Got it.
18        And that's a good point that
19  Ms. Hillyer made.  I don't intend to ask
20  you anything about what the two of you
21  discussed.
22        So if you interpret my
23  question that way, it's never intended
24  to --
```

Page 16

```
1         A.   Right.
2         Q.   -- to seek that information.
3         But let me ask you this:
4   Prior to meeting with Ms. Hillyer, did
5   you do anything to refresh your memory
6   about the events in question?
7         A.   No.
8         Q.   When you met with Ms.
9   Hillyer yesterday, how long did you all
10  meet?
11        A.   I'll say eight hours.
12        Q.   And was there anyone else
13  present?
14        A.   Yes.
15        Q.   Were they all attorneys?
16        A.   Yes.
17        Q.   Okay.  All attorneys with
18  Ms. Hillyer's office?
19        A.   Yes.
20        Q.   Got it.
21        During that meeting, did you
22  review documents?
23        A.   Yes.
24        Q.   What types of documents do
```

Page 17

1    you recall reviewing?
2        A.    Primarily e-mails and some
3    presentations.
4        Q.    Did you -- were you provided
5    a copy or a set of those to take home and
6    review?
7        A.    No.
8        Q.    And what was, just kind of
9    the estimated range of time that those
10   e-mails and presentations encompassed?
11       A.    If I -- I'm not quite sure,
12   but I would have to say probably 2003 to
13   2014, '15, possibly.
14       Q.    So it's fair to say that
15   within the documents you reviewed
16   yesterday, you saw documents referring to
17   Actiq and Fentora and likely Vantrela as
18   well?
19       A.    Yes.
20       Q.    Did you review any
21   deposition testimony?
22       A.    No.
23       Q.    Did you review any summaries
24   of depositions?

Page 18

1        A.    No.
2        Q.    Okay.  Have you spoken with
3    anyone at Teva about the testimony
4    they've given or the --
5        A.    No.
6        Q.    Have you spoken with anybody
7    outside of Teva about depositions that
8    have occurred in this case, that aren't
9    attorneys?
10       A.    No.
11       Q.    Okay.  Let's back up a
12   little bit.  I just want to make sure,
13   since you and I are meeting for the first
14   time, that I have a good understanding of
15   your background.
16           So I'm going to mark as
17   Exhibit-2 a document.  This one is really
18   just --
19           MS. RUANE:  For the record,
20       it's TEVA_MDL_A_09144727.
21           - - -
22           (Whereupon, Teva-Bearer
23       Exhibit-2, TEVA_MDL_A_09144727,
24       was marked for identification.)

Page 19

1            - - -
2    BY MS. RUANE:
3        Q.    And I'll tell you, it's
4    titled, Talent Management Biography.
5    It's a document that was in the
6    production set that I thought may help us
7    kind of more efficiently go through your
8    time with Teva and, I guess, potentially
9    with Cephalon as well.
10           MS. RUANE:  You know what,
11       I'm sorry, I gave you the wrong
12       copy, that's my fault.  I should
13       have pulled that one out first.
14           Becca, would you mind
15       putting the sticker on that?
16       Thank you.
17           MS. HILLYER:  I wrote 2 on
18       that, but I can cover it up.
19           MS. RUANE:  Eventually I'll
20       get my system figured out.
21           MS. HILLYER:  It says 2 -- I
22       mean, I'm sure this will come off.
23   BY MS. RUANE:
24       Q.    So this is a document that

Page 20

1    was produced to us in the litigation.  If
2    you'll turn to Page 2 on it, you'll see,
3    is that a picture of you and some
4    description?
5        A.    Yes, it is.
6        Q.    My first question for you,
7    there's a career overview there.  And I
8    just want to make sure that, to you, that
9    looks accurate as far as your time at
10   different companies.
11       A.    Yes.
12       Q.    Where it says, National
13   account manager, was that -- were you
14   serving as national account manager at
15   that point for Cephalon?
16       A.    Yes.
17       Q.    And when did Cephalon become
18   Teva?
19       A.    I believe it was six years
20   ago, seven.
21       Q.    So it's fair to say that
22   your time, as well, as the director of
23   healthcare systems management, was with
24   Cephalon?

Page 21

1     A.   Correct.
2     Q.   And then you took over as
3  the director of healthcare systems
4  marketing when it was Cephalon and
5  maintained that title after the company
6  became Teva?
7     A.   Yes.
8     Q.   Okay.  Backing up a little
9  bit, what's your educational background?
10     A.   Bachelor of Science degree.
11     Q.   A Bachelor of Science?
12     A.   In business management.
13     Q.   Bachelor of Science in
14  business management.
15          And then did you start right
16  away, after graduation, as a sales rep in
17  1983?
18     A.   No.  I had a brief time
19  working in retail, commission sales.
20     Q.   Were those pharmaceutical
21  retail?
22     A.   No, no.
23     Q.   So was your first time
24  working in pharmaceuticals -- well,

Page 22

1  strike that.
2          Let me ask you, when was
3  your first time working in
4  pharmaceuticals?
5     A.   1983.
6     Q.   Got it.
7          And during your time as a
8  sales rep there, what were you doing?
9  What were you selling?
10     A.   I was -- we had -- oh, gosh,
11  I'm trying to remember how many products,
12  a broad spectrum of antibiotics, prenatal
13  vitamins, generics.
14          It was -- back in those
15  days, we carried quite a few products in
16  the bag, if you will.
17     Q.   Did you sell any opioids at
18  that time?
19     A.   No.
20     Q.   And was it at -- I apologize
21  if I'm mispronouncing it, is it
22  Sanofi-Aventis, was that the first time
23  that you had a role in the managed care
24  department?

Page 23

1     A.   No.  I'm sorry, wait a
2  minute.
3          Actually, this is not
4  completely correct.  At Dupont, when I
5  went to Dupont, so I went from Lederle to
6  Dupont.  Being that this is an internal
7  document, this was sort of just --
8     Q.   Yeah.  No worries.
9     A.   -- a brief abbreviation.
10          So I went to Dupont after
11  Lederle, and I was a rep.  And then while
12  I was at Dupont, I did about a year of
13  managed care market access.  Dupont --
14  yes, at Dupont.
15     Q.   And it looks like, to me,
16  you've stayed in the managed care arena
17  throughout the rest of your career?
18     A.   Yes, that's correct.  Since
19  about 1999 at some point I had a touch
20  point with managed care.
21     Q.   So it's fair to say from
22  1999 to today, your primary focus of
23  employment is managed care?
24     A.   Correct.

Page 24

1     Q.   And managed care -- well,
2  strike that.
3          Let me ask this: Can you
4  describe for the jury what managed care
5  is?
6     A.   So the words are
7  interchangeable between market access and
8  managed care, because there's been an
9  evolution over time as to what that
10  actually is.
11          But, basically, what it
12  involves is insurance companies taking
13  ownership and responsibility or financial
14  risk on behalf of the patient or the
15  employee for the employer.
16          So, for example, Aetna
17  gathers its medical benefits, pharmacy
18  benefits, so there are probably over 100
19  managed care organizations in the U.S.
20  This continues to evolve over time.
21          During that time, they make
22  formulary decisions around the access for
23  pharmaceuticals that an employee may
24  have.  So if a physician prescribes a

Page 25

1    medication that's not available, say,
2    through Aetna as your pharmacy, then
3    oftentimes it will be denied and other
4    products will be recommended.
5            That's just a very
6    simplified version.
7        Q.   That's helpful.  And I
8    appreciate it.
9            So during your time -- well,
10   let me ask this first.
11           When you moved over to
12   Cephalon --
13       A.   Yes.
14       Q.   -- as a national account
15   manager --
16       A.   Yes.
17       Q.   -- was that still in the
18   managed care arena?
19       A.   That is national -- so
20   national account managers are regional
21   account managers for pharmaceuticals with
22   reference to the CLI, calling on managed
23   care organizations, either PBMs, pharmacy
24   benefit managers, or managed care HMOs,

Page 26

1    things of that nature.  Not unlike a
2    sales rep would call on a physician.
3            So it's basically a selling,
4    promoting -- it's a promotional activity.
5    It falls under commercial.
6        Q.   Got it.  Okay.
7            And so at the time that you
8    moved over to Cephalon in 2003, you were
9    doing promotion to managed care entities?
10       A.   Correct.
11       Q.   And in -- am I right that in
12   2003, then, one of the drugs that you
13   would have been promoting to managed care
14   facilities would have been Actiq?
15       A.   Correct.
16       Q.   And, of course, over time is
17   it -- am I right that it's the kind of
18   2007-2008 time frame, then, when you all
19   would have started promoting Fentora to
20   managed care facilities?
21       A.   When it was launched it's my
22   understanding it was 2007.  I'm not 100
23   percent certain.  It seems correct.
24       Q.   And that's fair.  So I

Page 27

1    should have -- let me ask a better
2    question.
3            We can look up precisely
4    when it was launched, but around that
5    time frame --
6        A.   Yes.
7        Q.   -- whenever it was launched,
8    then, the role of the managed care team
9    was to promote Fentora, amongst others,
10   to the managed care entities?
11           MS. HILLYER:  Objection to
12   form.
13           You can answer.
14           THE WITNESS:  What?
15           MS. HILLYER:  You can
16   answer.
17           THE WITNESS:  That's -- I
18   want to clarify something.
19           In 2007, I was not in a
20   payer-facing, customer-facing
21   role.
22   BY MS. RUANE:
23       Q.   Thank you.  And that's a
24   good distinction.  So let's clarify that.

Page 28

1            In 2005, you moved over and
2    became the director of healthcare systems
3    management?
4        A.   Yes.
5        Q.   And so -- and was that a
6    supervisory role over national account
7    managers?
8        A.   No, no.  That was moving
9    into a home office type of position
10   working with the brand teams, not just
11   for this product but others as well, on
12   the strategy and some of the tactics for
13   each of the products as related to
14   reimbursement.
15       Q.   Got it.  So let me try to
16   ask a better question, then.
17       A.   Okay.
18       Q.   In your role, then, from
19   2007, or whenever Fentora launched, in
20   your role as director of healthcare
21   systems, one of your responsibilities
22   would have been to weigh in on strategy
23   and tactics to improve reimbursement of
24   the drug Fentora?

Page 29

```
 1        A.   That's correct.
 2        Q.   And one way to do that is to
 3   help managed care entities understand,
 4   from your perspective and from the
 5   company's perspective, that a broader
 6   group of indications for prior
 7   authorization would be useful and
 8   appropriate?
 9        MS. HILLYER:  Objection to
10   form.
11        You can answer if you
12   understand.
13        THE WITNESS:  Could you
14   rephrase it a little bit?  Because
15   I --
16   BY MS. RUANE:
17        Q.   Yes.  This is perfect.
18   You're doing the right thing.  This is
19   what's going to happen, I'm going to ask
20   bad questions, because I'm in my own
21   head, and I'll rephrase them and we'll
22   get through it together.  So let me ask
23   this differently.
24        What was the change in your
```

Page 30

```
 1   role after -- from director of healthcare
 2   systems management to director of
 3   healthcare systems marketing?
 4        A.   Okay.  You're right.  When I
 5   was director of healthcare systems
 6   management, I managed -- I need to
 7   correct something I said earlier, my
 8   timeline here.
 9        As the director of
10   healthcare systems management, I was
11   managing six account managers, and they
12   called on the payers.
13        When I moved into the
14   healthcare systems marketing, that's when
15   I became a home office.  So I apologize
16   for that.
17        The home office position,
18   which -- to state what I stated earlier,
19   worked with the brand team, looked at the
20   strategies related to reimbursement; not
21   only reimbursement in talking with
22   payers, but also reimbursement support
23   services for patients, et cetera.
24        Q.   Got it.  Okay.  That's
```

Page 31

```
 1   helpful.  And I appreciate that
 2   distinction.
 3        And so during the time from
 4   2005 to 2007 --
 5        A.   Yes.
 6        Q.   -- when you were supervising
 7   six account managers --
 8        A.   Correct.
 9        Q.   -- those account managers
10   would have been calling on managed care
11   entities --
12        A.   Correct.
13        Q.   -- to promote Actiq and
14   then, once the launch date occurred, to
15   promote Fentora?
16        A.   That's correct.
17        Q.   Okay.  On that same sheet,
18   if you look under current
19   responsibilities, the first bullet point
20   indicates that you provide market access,
21   marketing support and strategic planning.
22        A.   Yes.
23        Q.   Is that kind of what we've
24   been discussing before --
```

Page 32

```
 1        A.   That's what we've been
 2   talking about.
 3        MS. HILLYER:  Make sure she
 4   finishes the question.
 5        THE WITNESS:  I apologize.
 6        MS. HILLYER:  That's okay.
 7        MS. RUANE:  It's okay.
 8        THE WITNESS:  It was 20
 9   minutes before I did that.  Sorry.
10   BY MS. RUANE:
11        Q.   So the market access,
12   marketing support and strategic planning
13   is kind of that brand team strategy and
14   tactics that you've been discussing?
15        A.   Yes.
16        Q.   And you did that for the
17   Fentora product?
18        A.   Yes.
19        Q.   And the second bullet point
20   indicates that you lead cross-functional
21   market access for the Vantrela launch
22   teams?
23        A.   Yes.
24        Q.   Can you explain to me what
```

Page 33

```
 1    that means?
 2        A.   In preparation for the
 3    launch, the brand team, the commercial
 4    team, has various subteams that feed into
 5    the overarching brand strategy.
 6           So market access is one of
 7    them.  You would have, say,
 8    direct-to-consumer, you would have HCP
 9    and you would have market access, you
10    might have sales and distribution.
11           So I led that functional
12    subteam supporting the development of the
13    payer strategy for the launch of
14    Vantrela.
15        Q.   Got it.  For the launch of
16    Vantrela.
17           And on the fourth bullet
18    point there, it indicates that you
19    develop and manage reimbursement support
20    programs.
21        A.   Yes.
22        Q.   What are the reimbursement
23    support programs?
24        A.   And this was a
```

Page 34

```
 1    collaboration, by the way.  Most of these
 2    things are -- you know, are in a matrix
 3    organization at Teva, so.
 4           Reimbursement support
 5    programs, there's a patient assistance
 6    program, which is not under my purview,
 7    but it is something that I have knowledge
 8    of when it comes to the overarching
 9    reimbursement and assistance for
10    patients.
11           There's also the
12    reimbursement hotline, which is for
13    patients and physicians.  And I helped
14    facilitate -- there's a vendor, of
15    course, a third party that handles that.
16    So I'm the liaise between the brand,
17    those services, and being, more or less,
18    the content expert for market access and
19    reimbursement.
20        Q.   So it sounds like if there
21    are questions or concerns about the
22    hotline, they would be referred to you as
23    the --
24        A.   Yeah, as the --
```

Page 35

```
 1           MS. HILLYER:  Just let her
 2    finish.
 3           MS. RUANE:  Sorry.  I have a
 4    tendency in my questions to trail
 5    off as I'm thinking.  So that's
 6    not your fault, that's my fault.
 7    I'll try to fix it.
 8           THE WITNESS:  That's okay.
 9    BY MS. RUANE:
10        Q.   Let me restate it.
11           So it's fair to say that if
12    there were questions or concerns about
13    the hotline program, that they would be
14    referred to you as kind of the leader of
15    that entity?
16        A.   Yes.  As with any company,
17    though, obviously, roles and
18    responsibilities often shift a bit.
19           The brand has a lot of
20    responsibility as well, you know.  So
21    we're a support system for the marketing
22    team, the brand team.
23        Q.   And you work pretty closely
24    with the marketing team and brand team?
```

Page 36

```
 1        A.   Yes.
 2        Q.   Are some of the individuals
 3    on those teams that you work with Matt
 4    Day and Randy Spokane, or am I getting my
 5    teams mixed up?
 6        A.   Can you --
 7           MS. HILLYER:  Objection to
 8    form.  When are you talking about?
 9           MS. RUANE:  That's a good
10    point.
11           MS. HILLYER:  And which
12    product?
13    BY MS. RUANE:
14        Q.   Let's see.  Since you've
15    been there since 2003 and we're sitting
16    here in 2018, it's fair to say that over
17    time your roles changed and other
18    people's roles have changed?
19        A.   Correct.
20        Q.   During the time that Actiq
21    was being promoted to managed care
22    entities, did you have interactions with
23    people like Matt Day and Randy Spokane?
24           MS. HILLYER:  Objection to
```

Page 37

1      form.
2            You can answer.
3            THE WITNESS:  What do you
4      mean "interactions"?  Can you
5      clarify what you mean,
6      "interactions"?
7  BY MS. RUANE:
8      Q.   Sure.
9            You mentioned you work
10  closely with the marketing and brand
11  teams.
12      A.   Yes.
13      Q.   Would that have been
14  something that you would have done during
15  that time that Actiq was being promoted
16  to managed care entities?
17      A.   No.  Because marketing -- I
18  was in the field, at that time with
19  Actiq, and I was an account manager.
20            Now, I -- and, by the way,
21  Randy Spokane is not marketing, he's
22  sales.  And, yes, I did work with Randy
23  Spokane.
24      Q.   Got it.

Page 38

1      A.   Matt Day was in the home
2  office.
3            MS. RUANE:  I'm going to go
4  ahead and mark as Exhibit-3 an
5  employee self-appraisal.
6            MS. HILLYER:  Are we done
7  with 2?
8            MS. RUANE:  Yes.
9            - - -
10            (Whereupon, Teva-Bearer
11  Exhibit-3,
12  TEVA_MDL_A_00873333-335, was
13  marked for identification.)
14            - - -
15  BY MS. RUANE:
16      Q.   And I know how people love
17  to fill out self-appraisals, so I thought
18  maybe sitting here, 11 years later, we
19  would talk about it again.
20            But I really actually just
21  pulled it because I think it's a good way
22  for us to just review a couple of the
23  things you were doing around that time.
24            So this is dated October

Page 39

1  15th, 2007.
2            MS. RUANE:  And, for the
3  record, this is
4  TEVA_MDL_A_00873333 through 3335.
5  BY MS. RUANE:
6      Q.   A lot of this we've already
7  talked about.
8            Under objectives and
9  accomplishments, you identify the fact
10  that you're implementing managed care and
11  reimbursement strategy and tactics for
12  optimizing access for all Cephalon
13  products.
14            Is that consistent with what
15  we talked about, as far as the goal to
16  optimize access to Actiq during the time
17  frame it was involved, and then Fentora?
18            MS. HILLYER:  Hold on a
19  second.
20            Objection to form.
21            But you can answer.  And
22  take your time to look through it
23  if you need to.
24            THE WITNESS:  I'd like you

Page 40

1      to restate it for me, please.
2  BY MS. RUANE:
3      Q.   Sure.
4            We talked about the fact,
5  one of the goals of your role as a -- I
6  guess at this point you would have been a
7  director of healthcare systems marketing,
8  right?
9      A.   Yeah -- no.  Let me just
10  make sure.  Hold on.
11      Q.   I guess it's the year you
12  switched over, so --
13      A.   Yeah, probably.  Because it
14  mentions that I also managed.  So I was
15  probably transitioning.  I don't really
16  remember, to be honest with you.
17      Q.   Okay.  In any event, by
18  October of 2007, one of the things that
19  you defined as an objective and
20  accomplishment was implementing -- and
21  this is just part of that line right
22  under it -- implementing managed care and
23  reimbursement strategy and tactics for
24  optimizing access for all Cephalon

Page 41

1    products?
2         A.   Yes.
3         Q.   And down below, you kind of
4    call out, in a bullet point, Fentora as
5    one of the products that you're tasked
6    with optimizing access to, correct?
7         A.   Correct.
8         Q.   And you include there, in a
9    couple of the bullet points, the things
10   that you're doing as it relates to
11   Fentora.
12        One of those is, like we
13   talked about, optimizing access and
14   reducing barriers; is that correct?
15        A.   Yes.
16        Q.   The last bullet point under
17   Fentora indicates, Maintained access, 90
18   percent target accounts.
19        MS. HILLYER: Where are you?
20        MS. RUANE: I'm sorry. The
21   last bullet point under Fentora.
22        The top of 34.
23   BY MS. RUANE:
24        Q.   Can you explain to me what

Page 42

1    that's referring to?
2         A.   I need to define access for
3    you, because there's different levels of
4    access. It means the patient -- the
5    prescription is prescribed, there may be
6    paperwork involved, et cetera, but at the
7    end of the day, the patient has access to
8    the product.
9         Sometimes a prescription can
10   be written and it just goes to the
11   pharmacy and you walk away. Other times,
12   there's more hurdles involved.
13        So what this means is that
14   of the target accounts, this would be
15   referring to when I was managing the
16   account management team, which were those
17   six account managers, and what we were --
18   we identified target accounts. And of
19   those targets, we wanted to ensure that
20   patients have access to Fentora.
21        Q.   And so how did you identify
22   target accounts?
23        A.   There's many ways in which
24   this is done. Oftentimes, it's done in

Page 43

1    collaboration with the home office
2    marketing team, where you look at the
3    number of covered lives, the geographic
4    footprint, there's -- an example might be
5    in Pittsburgh, Highmark is one of the
6    target accounts. It influences a lot of
7    prescriber behavior, because many
8    patients are enrolled in Highmark.
9         So there is a strategy --
10   there is a method to identifying. Most
11   often, it really is related, though, to
12   where the most number of commercial
13   covered lives are.
14        Sorry, I'm trailing off.
15        Many times, it's obviously
16   based on enrollment, the larger the plan,
17   the more patients they have. They become
18   a target.
19        Q.   And so you mentioned
20   Highmark as an example in the Pittsburgh
21   area.
22        But when you would identify
23   managed care entities who had a large
24   enough either geographic footprint or,

Page 44

1    you know -- what did you say about lives?
2    I want to make sure I use the right term.
3         A.   Covered lives.
4         Q.   Covered lives.
5         A.   Think of it as enrollment,
6    same thing, covered lives.
7         Q.   So, basically, the largest
8    numbers of enrollment or covered lives
9    are going to be targets because there's
10   quite a few people who, potentially,
11   could receive access to a drug like
12   Fentora, for example?
13        MS. HILLYER: Objection to
14   form.
15        You can answer.
16        THE WITNESS: My answer is
17   that that's true of any drug,
18   correct.
19   BY MS. RUANE:
20        Q.   And the way that the managed
21   care team worked on maintaining access to
22   those drugs is kind of detailed in the
23   strategy and tactics for reimbursement
24   that you were involved in?

Page 45

```
 1              MS. HILLYER:  Objection to
 2       form.  What strategies and tactics
 3       are you referring to?
 4              MS. RUANE:  Let me rephrase
 5       that question.
 6   BY MS. RUANE:
 7       Q.   We talked about, for
 8   example, reimbursement support programs
 9   like hot lines, correct?
10       A.   No.
11       Q.   Would those be one form of
12   maintaining access?
13       A.   No.
14       Q.   Okay.  So what would be
15   forms of maintaining access?  What do you
16   do?
17       A.   You call on -- so you
18   provide -- you determine, say, a payer,
19   the account manager goes in, speaks to
20   the plan, provides the clinical
21   information about the product.
22              The plan can request
23   additional information.  They can request
24   information that's non-promotional
```

Page 46

```
 1   through a medical information request
 2   form.  Basically, it's negotiating the
 3   unmet need -- the benefits of the product
 4   and working with the plan to ensure that
 5   patients -- that they place it on the
 6   formulary so that patients, appropriate
 7   patients, have access.
 8       Q.   Is it correct that the
 9   ultimate goal is to have the medication
10   placed on the formulary?
11       A.   Yes.  The alternative is
12   it's blocked.
13       Q.   What is the difference
14   between -- I've also seen reference to
15   prior authorization --
16       A.   Yep.
17       Q.   -- and appeals and letters
18   of medical necessity.
19              And I'm going to ask you
20   some questions about that in a little
21   bit.
22       A.   Okay.
23       Q.   My first question is, what
24   is the distinction between a drug being
```

Page 47

```
 1   placed on a formulary and a drug
 2   receiving prior authorization?
 3              MS. HILLYER:  Objection.
 4       That's kind of broad.
 5              But you can answer if you
 6       can briefly.
 7              THE WITNESS:  I can answer
 8       it?
 9              So in order to -- the goal
10       is to get the drug placed on
11       formulary, that's the first step.
12              There are other things that
13       I'll talk about, if you need more
14       detail.  But the -- to answer your
15       question on prior authorization,
16       once the product is on formulary,
17       the plan may determine a prior
18       authorization is required, that
19       the physician fills out, based on
20       the criteria the plans deem
21       appropriate for covering that
22       drug.
23              It's an administrative
24       effort, most of the time, where
```

Page 48

```
 1       the doc fills out the form, it's
 2       reviewed by the plan, they
 3       determine whether it's covered or
 4       not; they either say yes or no.
 5              And then if it's yes, the
 6       patient has access to the product;
 7       if the answer is no, a physician
 8       can appeal.
 9   BY MS. RUANE:
10       Q.   Thank you.  I appreciate
11   that.
12              I also wanted to ask, the
13   bullet point just above that indicates,
14   Collaboration and communication with
15   sales teams to identify KOLs.
16              What are KOLs?
17       A.   Key opinion leaders,
18   physicians.
19       Q.   And did the brand -- strike
20   that.
21              Did the managed care team
22   utilize key opinion leaders?
23              MS. HILLYER:  Objection to
24       form.
```

Page 49

1    BY MS. RUANE:
2        Q.   As it relates to Actiq
3    and/or Fentora?
4        A.   Define "utilize."
5        Q.   Did the managed care team
6    have key opinion leaders that spoke to
7    managed care entities?
8        A.   There was a managed care
9    speaker bureau of which, if a plan
10   requested a clinical presentation or a
11   presentation from a clinician, typically
12   those would be considered KOLs.  So, yes.
13   In a limited fashion, but yes.
14       Q.   So Teva maintained a managed
15   care speaker bureau, which was kind of a
16   database of key opinion leaders who, at
17   the request of a managed care entity,
18   could be brought in to speak to that
19   entity; am I understanding that
20   correctly?
21       A.   That's correct.
22            MS. HILLYER:  Objection to
23       form.
24            Go ahead.

Page 50

1    BY MS. RUANE:
2        Q.   Am I understanding that
3    correctly?
4        A.   Restate it, because I --
5        Q.   Sure.
6            So Teva maintains a managed
7    care speaker bureau of key opinion
8    leaders that they identified.  And at the
9    request of a managed care entity, Teva
10   would facilitate one of those key opinion
11   leaders to come in and speak to the
12   managed care entity?
13       A.   Yes.
14       Q.   Okay.  Were you involved --
15   like sitting here right now, offhand, do
16   you know the names of the key opinion
17   leaders that would speak?
18            MS. HILLYER:  Objection to
19       form.  When and which product?
20       And which entity?
21            MS. RUANE:  Thank you.
22   BY MS. RUANE:
23       Q.   With Fentora.
24       A.   Any names?

Page 51

1        Q.   Any names.
2            Do any names come to mind?
3        A.   One name comes to mind, Jeff
4    Gudin.
5        Q.   And were you personally
6    involved in establishing or setting up
7    those key opinion leaders to go in and
8    speak?
9        A.   I was aware.  I don't recall
10   being a facilitator of it.
11       Q.   What about during the time
12   that managed care entities were being
13   called on to promote Actiq, are you --
14   just sitting here today, do you have a
15   memory of the names of any of the key
16   opinion leaders who spoke to managed care
17   entities?
18       A.   During that time, I don't
19   believe any did, that the speaker bureau
20   that we're referring to came later.
21            So that's why the timing of
22   your question is important.  There's been
23   an evolution.
24       Q.   Thank you.

Page 52

1            So if I'm understanding
2    correctly, the managed care speaker
3    bureau is something that applied to the
4    time frame after Fentora was launched?
5        A.   To the best of my
6    recollection, yes.
7        Q.   And when -- if you know,
8    when key opinion leaders were brought in
9    to speak to managed care entities, were
10   they compensated by Teva?
11       A.   Yes.
12       Q.   When -- whether it's the key
13   opinion leader or just a representative
14   from Teva calling on managed care
15   entities, who were the individuals in the
16   managed care entities who were present at
17   those meetings?  What roles?
18            MS. HILLYER:  Objection to
19       form.  That's compound.  You're
20       asking two different scenarios.
21       And it's confusing, because key
22       opinion leaders didn't call on
23       managed care.
24            MS. RUANE:  Let me divide

Page 53

1       them up.
2    BY MS. RUANE:
3       Q.   When key opinion leaders
4    would come in to speak to managed care
5    entities, as facilitated by Teva, who
6    would be in the audience, if you know?
7       A.   Typically, it would be a
8    pharmacy director, a pharmacy -- clinical
9    pharmacists and medical directors.
10      Q.   And when Teva employees
11   would simply call on managed care
12   entities in order to explain and try to
13   maintain access to their products, who
14   would be in the audience, typically, if
15   you know?
16      A.   Pharmacy directors.  Some
17   plans have trade pharmacy contracting.
18   So you have pharmacy and then there would
19   be a contracting arm as well,
20   potentially.  And, occasionally, clinical
21   pharmacists.  Same audience.
22      Q.   Would the medical directors
23   be present at those as well?
24      A.   That's a broad question.

Page 54

1    Sometimes, I guess, the answer would be.
2       Q.   And, I guess, I kind of
3    assumed this in my question, but I should
4    clarify, just to point out, the managed
5    care entities, we're talking about them
6    as entities, but, obviously, they have
7    employees, some of whom are physicians
8    and some of whom are pharmacists, in your
9    experience?
10      A.   They have both.  And in
11   addition to a number of other
12   responsible -- you know, employees.
13      Q.   And the reason I ask is just
14   because I think some people hear managed
15   care entity and they assume it's just a
16   whole bunch of business people.
17           So in your experience in the
18   managed care entities that you've called
19   on and that you've supervised people
20   calling on, the managed care entities,
21   the decision-makers include physicians
22   and pharmacists as well, correct?
23      A.   Correct.
24      Q.   Okay.  And it's fair to say,

Page 55

1    when you were involved in marketing and
2    promoting products like Fentora, that
3    marketing and promotion was going to --
4    in part, to physicians and pharmacists
5    employed by those managed care entities?
6           MS. HILLYER:  Objection to
7    the form.
8           You can answer if you
9    understand.
10          THE WITNESS:  Just clarify
11   for me, if you would --
12   BY MS. RUANE:
13      Q.   Sure.
14      A.   -- what you're asking.
15      Q.   As an example, we've talked
16   about the fact that you all might come up
17   with, you know, a new presentation to
18   give to a managed care entity.
19          And when you go in to give
20   that presentation, people in the audience
21   included physicians and pharmacists,
22   correct?
23      A.   They could, yes.
24      Q.   They could.

Page 56

1    That was generally your
2    experience?  I mean, I get every audience
3    is different.  But, generally speaking,
4    that was your experience?
5           MS. HILLYER:  Objection to
6    form.
7    BY MS. RUANE:
8       Q.   Am I correct?
9       A.   Generally.  I would say --
10   if you're asking me to be general, I
11   would say the majority of times the
12   medical directors were not present, but
13   they could be.
14      Q.   And are the medical
15   directors -- if you know, are the medical
16   directors the ultimate determinate of
17   prior authorization?
18          MS. HILLYER:  Objection.
19   Calls for speculation.
20          THE WITNESS:  I don't know.
21   BY MS. RUANE:
22      Q.   Okay.  Just a couple quick
23   things, and then we'll move on.
24          On Page 35, so the last page

Page 57

```
 1    of Exhibit-3, under, Fentora brand
 2    team --
 3           MS. HILLYER:  She's talking
 4        about these, 35.
 5           THE WITNESS:  Oh, I see.
 6    BY MS. RUANE:
 7        Q.   -- it indicates that you
 8    participated in the managed care working
 9    group for the FAST team, 2008 brand
10    strategy.
11        A.   Yes.
12        Q.   Can you describe for me what
13    that is?
14        A.   I hadn't seen it in a while.
15    I think it was just an acronym for the
16    Fentora action strategic something or
17    other.
18           It was just -- you know,
19    these are marketing people, they like to
20    name things.  But, basically, it was the
21    brand strategy team.
22        Q.   There's a lot of marketing
23    lingo.  So I appreciate you know some of
24    it, because it's taken me a while to
```

Page 58

```
 1    learn some of these.
 2           So the FAST team was kind of
 3    one of the names that marketing gave the
 4    Fentora launch?
 5        A.   As I recall.  And as I
 6    described earlier, the working group was
 7    the subteam that I referred to.
 8        Q.   Got it.
 9           And you also participated --
10    as a result of being part of that Fentora
11    brand team, you participated in the
12    development and review of the Fentora
13    dossier and NAM slide deck?
14        A.   Yes.
15           That would be the NAM,
16    national account manager, just so you
17    know.
18        Q.   So that was my question.  Is
19    the national account manager -- well,
20    strike that.  Let me ask this first.
21           The Fentora dossier and the
22    NAM slide deck, are those specific to
23    managed care?
24        A.   Yes.
```

Page 59

```
 1        Q.   And so prior to Fentora, was
 2    there an Actiq dossier or was this a new
 3    way of marketing?
 4           MS. HILLYER:  Let her
 5        finish.
 6           THE WITNESS:  I was going to
 7        cough.
 8           MS. HILLYER:  I thought you
 9        were about to answer.
10           THE WITNESS:  No, no.
11           To the best of my
12        recollection, there was not one
13        for Actiq.  This -- as we talked,
14        there's an evolution through
15        managed care.  Dossiers became
16        more recognized by plans during
17        this time.
18           So it's, basically, an AMCP,
19        Academy of Managed Care Pharmacy,
20        dossier format.
21           And often a company -- now
22        they're electronic, all pharma
23        companies typically, when they're
24        launching a product, provide a
```

Page 60

```
 1    dossier, upon request, to a plan.
 2    BY MS. RUANE:
 3        Q.   You mentioned the -- are you
 4    okay?
 5        A.   Yes.
 6        Q.   Just let me know if you need
 7    a break.
 8        A.   I will.  I'm not shy.
 9        Q.   You mentioned in there AMCP.
10           What's AMCP?
11        A.   Academy of Managed Care
12    Pharmacy.  It's an organization, like
13    some of the others, that have membership
14    of all the managed care companies,
15    individual membership.
16           They are like a so-called
17    overseer.  They have a journal they
18    produce.  They have a large meeting twice
19    a year for pharmacy students.  It's not
20    unlike some of the other professional
21    organizations.
22        Q.   Are you a member of that
23    professional organization?
24        A.   No.
```

Page 61

1    Q.   So the -- it sounds like
2  with Fentora -- because of the shift as
3  you described, with Fentora, a dossier
4  and a NAM slide deck was created that
5  would be provided, upon request, to the
6  managed care entities?
7    A.   No.  The dossier, yes.
8         The NAM slide deck is a
9  promotional piece, not unlike a sales
10 aid, that the account manager would use
11 in presenting or talking with a health
12 plan, a payer.
13   Q.   Got it.  I feel like it's
14 catching.
15        So thank you.  Let me ask
16 this question again, just to make sure
17 we're clear, and then we'll move on.
18        So the dossier would be
19 provided, upon request, to the managed
20 care entity.  The NAM slide deck was
21 something that was simply used during
22 presentations to managed care entities
23 from a Teva employee?
24        MS. HILLYER:  Objection to

Page 62

1  form.
2         You can answer.
3         THE WITNESS:  Is that
4  because it's compound?
5         MS. HILLYER:  Yes.
6  BY MS. RUANE:
7    Q.   I can divide them up --
8    A.   That's okay.
9    Q.   -- if it makes you feel
10 better.
11   A.   The dossier was upon
12 request.  The NAM presentation was as you
13 stated.
14   Q.   Got it.
15        And you participated in the
16 development of those documents, according
17 to --
18   A.   Yes, it says that.  But the
19 dossier is typically developed under the
20 medical team.
21        The only thing that I would
22 say to that, it's probably incorrectly
23 referenced, is it's a compilation of
24 study -- clinical data, any health

Page 63

1  economics data, et cetera.  It's not a
2  promotional piece.
3         I was privy to what was
4  included in the dossier.  This NAM slide
5  deck is a promotional piece.
6    Q.   And so dividing them up, you
7  were privy to the information that was
8  contained in the Fentora dossier?
9    A.   Yes.
10   Q.   And you were also -- and am
11 I understanding you correctly that your
12 memory is you did not actually
13 participate in the development of the
14 dossier --
15   A.   No.
16   Q.   -- you just knew what was in
17 it because you were on the e-mails?
18   A.   Yes.
19   Q.   Got it.
20        With the NAM slide deck, you
21 did participate in the development of the
22 NAM slide deck, correct?
23   A.   As I recall, yes.
24   Q.   Let's move on -- actually,

Page 64

1  before we do, a couple of things I just
2  want to make sure.
3         I've asked several questions
4  of you already about kind of marketing
5  terms or things that I don't understand
6  within this, and you've been kind enough
7  to define them so far.
8         There's a couple of other
9  things I want to make sure we're on the
10 same page about.
11        Do you agree that during the
12 time -- well, actually, the entire time
13 that Actiq was being sold that the
14 indication for Actiq was for breakthrough
15 pain in cancer patients?
16   A.   That's the label.
17   Q.   And I guess the full title
18 would be, For breakthrough pain in cancer
19 patients who are opioid tolerant,
20 correct?
21   A.   Correct.
22   Q.   Okay.  And that was true the
23 entire time that Actiq was being sold,
24 correct?

Page 65

1      A.   Correct.
2      Q.   Do you also agree that the
3  indication for Fentora was for
4  breakthrough cancer pain in patients who
5  are opioid tolerant?
6      A.   Cancer pain, yes.
7      Q.   For breakthrough cancer
8  pain, correct?
9      A.   Yes.
10     Q.   And so you understood that
11  it was illegal to market or promote those
12  products off label?
13         MS. HILLYER:  Objection.
14     Calls for a legal conclusion.
15         MS. RUANE:  You can answer.
16         THE WITNESS:  I'm not an
17     attorney.
18  BY MS. RUANE:
19     Q.   In your role working with
20  managed care entities, you had an
21  understanding about what on label was,
22  correct?  We just talked about it.
23         MS. HILLYER:  Objection to
24     form.

Page 66

1          But you can answer.
2          THE WITNESS:  I understand
3      what the label -- I understand
4      what the indication in the label
5      stated, yes.
6  BY MS. RUANE:
7      Q.   And the indication of the
8  label would be on-label use of those
9  products.
10         So that would be if a
11  physician prescribed -- let's take
12  Fentora, for example.  If a physician
13  prescribed Fentora for breakthrough pain
14  in a patient that he or she had who had
15  cancer and was opioid tolerant, that
16  would be on-label prescribing, correct?
17     A.   Correct.
18     Q.   Okay.  You also understood
19  that there was the potential for
20  off-label prescribing by physicians to
21  prescribe the product for breakthrough
22  pain in a patient who didn't have cancer,
23  for example, correct?
24     A.   Correct.

Page 67

1      Q.   And you --
2      A.   Sorry.
3      Q.   Sorry?
4      A.   Correct.
5      Q.   And you understood, in your
6  role with both Cephalon and Teva, that it
7  would be illegal to market or promote the
8  use of Actiq and Fentora for anything
9  other than on-label use?
10         MS. HILLYER:  Objection.
11     Asked and answered.  And calls for
12     a legal conclusion.
13         MS. RUANE:  You can answer.
14         THE WITNESS:  Say it again.
15     Sorry.
16  BY MS. RUANE:
17     Q.   Sure.
18         You understood --
19     A.   Right.
20     Q.   -- during the time that
21  you've been employed by Cephalon and then
22  Teva --
23     A.   Right.
24     Q.   -- that it is illegal to

Page 68

1  promote products off label, correct?
2          MS. HILLYER:  Same
3      objection.  Asked and answered.
4      And calls for a legal conclusion.
5          You can answer if you can.
6          THE WITNESS:  Based on the
7      way you phrased the question, I
8      would answer yes.
9  BY MS. RUANE:
10     Q.   And you knew that the reason
11  it was illegal to promote Fentora, as an
12  example, off label, was because the FDA
13  indication was limited to breakthrough
14  cancer pain in opioid-tolerant patients,
15  correct?
16         MS. HILLYER:  Objection to
17     form.  And calls for a legal
18     conclusion.
19         MS. RUANE:  Would you like
20     me to rephrase it, or are you able
21     to answer?
22         THE WITNESS:  I think the
23     answer is -- rephrase it, because
24     I want to make sure I answer

Page 69

1    correctly.
2  BY MS. RUANE:
3      Q.   Sure.
4         So we know that you
5  understood off-label marketing, marketing
6  or promoting a product like Fentora for
7  something beyond breakthrough cancer pain
8  in opioid-tolerant patients, was against
9  the law, right?
10        MS. HILLYER:  Same
11     objection.  Asked and answered.
12     And calls for a legal conclusion.
13  BY MS. RUANE:
14     Q.   That's correct?
15     A.   Yes.
16     Q.   And describing pain as, pain
17  is pain, or breakthrough cancer pain is
18  the same thing as breakthrough pain is
19  off-label marketing, isn't it?
20        MS. HILLYER:  Objection to
21     form.
22        THE WITNESS:  I don't -- I
23     don't -- I don't think that you're
24     accurate, no.

Page 70

1  BY MS. RUANE:
2      Q.   You agree that the only
3  on-label use for both Actiq and Fentora
4  was breakthrough cancer pain, correct?
5        MS. HILLYER:  Objection to
6     form.
7        You can answer.
8        THE WITNESS:  The
9     indication, you're correct.
10  BY MS. RUANE:
11     Q.   And so any promotion or
12  marketing which attempted to expand the
13  idea of pain from breakthrough cancer
14  pain to breakthrough pain would be
15  off-label marketing, wouldn't it?
16        MS. HILLYER:  Objection to
17     form.  That's confusing.
18        THE WITNESS:  I mean, that's
19     too vague.
20  BY MS. RUANE:
21     Q.   Do you believe that
22  marketing a product like Fentora for
23  breakthrough pain, without any reference
24  to cancer, is off-label marketing?

Page 71

1        MS. HILLYER:  Objection to
2     form.  It calls for a legal
3     conclusion.
4        THE WITNESS:  In the context
5     that you're stating, which I think
6     is pretty broad, I would agree
7     with you.
8  BY MS. RUANE:
9      Q.   And so it's important that
10  the phrase "pain is pain" be well
11  defined; because if "pain is pain" is
12  actually addressing the argument that
13  breakthrough cancer pain and breakthrough
14  pain of any other sort are the exact same
15  thing, that would be off-label marketing,
16  wouldn't it?
17        MS. HILLYER:  Objection to
18     form.  Calls for legal conclusion.
19     Argumentative.  And vague.
20        You can answer if you
21     understand the questions.
22        THE WITNESS:  I'm not
23     familiar with the "pain is pain"
24     relative to any of my experience

Page 72

1     within the organization.  So I
2     can't answer it.
3  BY MS. RUANE:
4      Q.   Okay.  Thank you.  And
5  that's a fair point.
6         So in your memory, you have
7  never used the phrase "pain is pain" --
8      A.   No.
9         Sorry.
10     Q.   And let me ask it again,
11  just to make sure we're not stepping on
12  each other.
13        In your memory, you have not
14  used the phrase "pain is pain" in the
15  promotion or marketing of an opioid
16  product?
17     A.   Not to my recollection.
18     Q.   And using the phrase "pain
19  is pain" in marketing an opioid product
20  like Fentora would be off-label
21  marketing, wouldn't it?
22        MS. HILLYER:  Objection.
23     Very vague.  And calls for a legal
24     conclusion.

Page 73

1      Any opioid product?
2      MS. RUANE: I said Fentora.
3      MS. HILLYER:  You said like
4   Fentora.
5      MS. RUANE:  Let me ask it
6   again.
7   BY MS. RUANE:
8      Q.   Would you have allowed, in
9   your role as managed care -- as -- excuse
10  me.
11     Would you have allowed, in
12  your role as director of healthcare
13  systems marketing, to -- an employee of
14  yours to market to a managed care entity
15  the use of Fentora with the description,
16  pain is pain?
17     MS. HILLYER:  Objection to
18  form.
19     THE WITNESS:  There was no
20  direction from me to any of my
21  team to make that statement, ever.
22  BY MS. RUANE:
23     Q.   And you wouldn't direct
24  anyone to make that statement because

Page 74

1   that would be off-label marketing,
2   wouldn't it?
3      A.   It's vague.
4      MS. HILLYER:  Objection to
5   form.
6      THE WITNESS:  In context, I
7   don't -- I don't think I can agree
8   with you.
9   BY MS. RUANE:
10     Q.   You don't think -- I want to
11  make sure I understand.  If you're not
12  agreeing with me, I want to make sure I
13  understand why.
14     In your role as director,
15  you would not have authorized, and you
16  don't believe you would -- you did ever
17  authorize, the use of the phrase "pain is
18  pain" in promotion or marketing of
19  Fentora?
20     A.   That's correct.
21     Q.   And the reason -- I mean,
22  you obviously have no memory of it.
23     But the reason -- am I
24  correct that the reason you think you

Page 75

1   would not have authorized that is because
2   that would be marketing the product
3   beyond its indication of breakthrough
4   cancer pain?
5      MS. HILLYER:  Objection to
6   form.
7      THE WITNESS:  I could see a
8   situation in which you're
9   having -- you're just making a
10  statement of what I would say is
11  context, or maybe opportunities to
12  have a conversation, in which
13  you're talking about pain
14  management.
15     But we always stuck to the
16  label, as far as what the
17  indication is for our product.
18     So there's, obviously,
19  conversations that people have
20  relative to pain management.  But
21  in terms of actually promoting and
22  recommending it, as it relates to
23  Fentora, that would not happen.
24  BY MS. RUANE:

Page 76

1      Q.   Okay.  And if it did happen,
2   it would have been off-label marketing,
3   correct?
4      MS. HILLYER:  Objection to
5   form.
6      THE WITNESS:  Again, there's
7   various types of pain.  You're
8   probably aware.  There's
9   nociceptive pain, neuropathic
10  pain.
11     So, again, I see this as a
12  very strong, broad statement.  If
13  you want to get specific about all
14  the different types of pain, low
15  back pain and all that, then we
16  can talk about that.
17  BY MS. RUANE:
18     Q.   And there are.
19     And, in fact, at some point,
20  Teva authored and issued letters of
21  medical necessity on different types of
22  pain, correct?
23     MS. HILLYER:  Objection.
24  BY MS. RUANE:

Page 77

1      Q.   Including back pain?
2          MS. HILLYER:  Objection.
3      Assumes facts not in evidence.
4   BY MS. RUANE:
5      Q.   We can look at them in a
6   little bit.  I'm just asking if you
7   remember.
8      A.   I believe so, yes.
9      Q.   My question for you is a
10  little bit different.
11         If the description of "pain
12  is pain" was being used in reference to
13  breakthrough cancer pain, and any other
14  breakthrough pain in a patient who
15  doesn't have cancer, is the same because
16  all pain is pain, that would have been
17  off-label marketing, correct?
18         MS. HILLYER:  Objection to
19  form.
20         THE WITNESS:  Again, I
21         feel -- I'm going to give you a
22         yes, in the sense of you're
23         pushing me to state something that
24         I believe is somewhat out of

Page 78

1   context.
2          Because I have not seen
3   anything specific to pain is pain.
4   BY MS. RUANE:
5      Q.   But given the information I
6   provided you, you would agree with that
7   statement?
8      A.   I'm not an expert on all the
9   nuances of off-label promotion.
10         But based on the way you
11  have asked me, a number of times, I would
12  answer, to the best of my knowledge, the
13  way that you've asked the question, yes.
14     Q.   Okay.  Let's move on to
15  Exhibit-4.
16         MS. HILLYER:  We've been
17  going about an hour.  Do you want
18  to take a quick break?
19         MS. RUANE:  That's perfect.
20  Let's take a break.
21         VIDEO TECHNICIAN:  Going off
22  record.  10:29 a.m.
23              - - -
24         (Whereupon, a brief recess

Page 79

1   was taken.)
2              - - -
3          VIDEO TECHNICIAN:  Back on
4   record.  10:42 a.m.
5   BY MS. RUANE:
6      Q.   Back on record after a short
7   break.
8          You understand you're still
9   under oath?
10     A.   I do.
11     Q.   Okay.  We're going to hand
12  you Exhibit-4, Bates range
13  TEVA_MDL_A_04838673 to 77.
14              - - -
15         (Whereupon, Teva-Bearer
16         Exhibit-4,
17         TEVA_MDL_A_04838673-677, was
18         marked for identification.)
19              - - -
20  BY MS. RUANE:
21     Q.   This is a document you
22  authored as the national account
23  manager --
24     A.   Okay.

Page 80

1      Q.   -- correct?
2          MS. HILLYER:  Take your time
3   to look it through.
4          THE WITNESS:  Okay.  Yes, my
5   name is on it, and it looks
6   familiar.
7   BY MS. RUANE:
8      Q.   The first page, Page 73,
9   you'll see an advocacy bullet point
10  there?
11     A.   Yes.
12     Q.   That indicates,
13  Advocacy-cultivate key physicians in each
14  target market to assist in influencing
15  key account formulary committees,
16  establishing PA criteria and guidelines,
17  challenging existing restrictions, et
18  cetera.
19         And then, Coordinate
20  peer-to-peer discussions and share best
21  practices.
22         Is that correct?
23     A.   That's what it says, yes.
24     Q.   Got it.

Page 81

1    We talked about the goal to
2  get, I guess at this point it would have
3  been Actiq, on to the formulary?
4       MS. HILLYER:  Objection to
5  form.
6  BY MS. RUANE:
7    Q.   We talked about that, prior?
8    A.   You're implying that it
9  wasn't on formulary.  This is -- these
10  are global objectives for all brands.
11    Q.   Okay.  One of the goals with
12  Actiq was to make sure that -- or to get
13  it on to formulary, if it wasn't,
14  correct?
15    A.   Yes.
16    Q.   And so you influenced --
17  your goal was to cultivate key physicians
18  to assist in influencing key account
19  formulary committees for that purpose,
20  correct?
21    A.   That's correct.
22    Q.   We've also talked about
23  prior authorization and you explained how
24  that works.

Page 82

1       One of the goals was to
2  establish prior authorization criteria
3  and guidelines and to challenge existing
4  restrictions, correct?
5    A.   This is a broad statement.
6       We don't know what the
7  restrictions are.  In general.  It's a
8  broad objective.
9    Q.   And that would have been
10  true as it relates to Actiq, to challenge
11  whatever existing restrictions there were
12  regarding prior authorization, correct?
13       MS. HILLYER:  Objection to
14  form.
15       THE WITNESS:  Again, a broad
16  statement.  There may be
17  restrictions that are appropriate.
18       So just to make a blanket
19  statement about restrictions
20  doesn't imply that some -- prior
21  authorizations often include very
22  appropriate restrictions as well,
23  like, for example, tolerance to
24  opioid, opioid tolerance.  That

Page 83

1       would be considered a restriction
2       that is appropriate.
3  BY MS. RUANE:
4    Q.   What about cancer pain, was
5  that considered a restriction that was
6  appropriate for Actiq?
7       MS. HILLYER:  Objection to
8  form.
9       THE WITNESS:  That is -- let
10  me state first that for both
11  Actiq, as it evolved in the
12  marketplace, prior authorizations
13  were required.  Often they default
14  to label.  Often they can include
15  beyond label.  It depends.
16       So there's not one answer to
17  your question.
18  BY MS. RUANE:
19    Q.   Okay.  My question for you,
20  as the national account manager who
21  drafted this document --
22    A.   Yes.
23    Q.   -- was, you gave the example
24  of opioid-tolerant patients as an

Page 84

1  appropriate indication that wouldn't --
2  that you wouldn't attempt to establish
3  prior authorization criteria beyond; is
4  that correct?
5       MS. HILLYER:  Objection to
6  form.  Mischaracterizes testimony.
7       THE WITNESS:  That's not
8  what I said.
9  BY MS. RUANE:
10    Q.   What was your example for
11  opioid-tolerant patients?  What were you
12  referring to?
13    A.   What I'm referring to is,
14  for everyone's edification, prior
15  authorizations often have very specific
16  requirements, it's called criteria, not
17  necessarily restrictions, criteria that
18  the plan determines.
19       Each plan makes their own
20  determination, based on the clinical data
21  and what's available to them from what's
22  going on in the marketplace.
23       If they choose to cover it
24  beyond label, that's their privilege to

Page 85

1    do so.
2          And each plan, if you were
3    to look at a prior authorization form,
4    might have very specific criteria that
5    varies from one plan to another.  And
6    that is up to the P&T committee and the
7    clinical team for that health plan.
8          Q.   And one of the goals, as a
9    national account manager at that time,
10   was to assist in establishing that prior
11   authorization criteria, correct?
12         A.   It depends.  It's part of
13   the -- you have a clinical discussion
14   with the team -- with the plan.  And they
15   write their PA criteria, we do not.
16         Q.   And at least at that time,
17   on Page 74, under, Anthem pharmacy
18   services --
19         A.   Yep.
20         Q.   -- the fourth bullet point
21   down, it looks like, to the extent Actiq
22   had updated clinical information, that
23   was going to be provided?
24         A.   That's what it says, yes.

Page 86

1          Q.   Let's turn to Page 77, it's
2    the last page.
3          You'll see there, there's a
4    heading, Manage resources effectively?
5          A.   Uh-huh.
6          Q.   The second-to-last bullet
7    point indicates, Learn and utilize Actiq
8    white paper, when available, to present
9    data to plans.
10         A.   That's what it says.
11         Q.   Is the Actiq white paper the
12   same as the dossier?
13         A.   No.
14         Q.   What was the Actiq white
15   paper?
16         A.   I honestly don't remember.
17   I remember there was one, but I don't
18   recall specifically what it was.
19         Q.   Do you recall who was
20   involved in creating it?
21         A.   I honestly don't.
22              - - -
23         (Whereupon, Teva-Bearer
24         Exhibit-5,

Page 87

1         TEVA_MDL_A_04838485-490, was
2         marked for identification.)
3              - - -
4    BY MS. RUANE:
5          Q.   I'm going to hand you what's
6    been marked as Exhibit-5.
7              This is a similar document,
8    just for 2005, correct?
9              MS. HILLYER:  Take your time
10        to look it over.
11   BY MS. RUANE:
12         Q.   And I'll tell you -- I mean,
13   take the time you need.  But I'll tell
14   you I'm just going to ask you one or two
15   questions, and then we'll move on.
16         A.   Okay.
17         Q.   On Page 2 of that document,
18   86, it's, I guess, the -- it's hard to
19   describe, right above Cigna, I guess, the
20   last bullet point right above Cigna, one
21   of the things included was to broaden the
22   Actiq prior authorization criteria?
23         A.   Yep.
24         Q.   And below that is an MEP on

Page 88

1    pain management, correct?
2          A.   Correct.
3          Q.   What's an MEP?
4          A.   Medical education program.
5          Q.   And so medical education
6    programs would be provided to managed
7    care entities with the goal of broadening
8    the Actiq prior authorization criteria,
9    correct?
10         A.   Not necessarily.  Managed
11   care organizations don't treat patients,
12   so we spend a lot of time with medical
13   education programs, particularly in the
14   pain area.
15         And you give them -- it's
16   like a disease state type of presentation
17   to educate them, because we can't assume
18   that every pharmacy director has working
19   knowledge of all the different
20   therapeutic areas or all the medications.
21         Q.   And in this case, the pain
22   management education is referenced, below
23   the goal, to broaden Actiq prior
24   authorization criteria; you would agree?

Page 89

1      A.   That's what it says.
2      Q.   Okay.  And there's also an
3   indication that the team is going to work
4   with the field to drive appeals and
5   letters of medical necessity, correct?
6      A.   That's what it says.
7      Q.   That's also under the
8   heading of, Broaden Actiq prior
9   authorization criteria, correct?
10     A.   Correct.
11     Q.   And the field would be
12  individuals -- sales representatives
13  calling on physicians, correct?
14     A.   Let me make sure I'm
15  answering you correctly.
16         Field -- yes.
17     Q.   And the sales
18  representatives calling on the field --
19  or within the field would be tasked with,
20  rather than having their -- the
21  physicians they call on accept a denial,
22  to undergo the appeal process and, if
23  necessary, submit a letter of medical
24  necessity, correct?

Page 90

1         MS. HILLYER:  Objection.
2   Calls for speculation.  Lack of
3   foundation.
4         THE WITNESS:  Why don't you
5   rephrase?
6   BY MS. RUANE:
7      Q.   Sure.
8         When it says, Work with the
9   field to drive appeals and letters of
10  medical necessity, that is to drive an
11  increase in the number of appeals and
12  letters of medical necessity, correct?
13        MS. HILLYER:  Objection.
14  Calls for speculation.
15        THE WITNESS:  This was a
16  time when prior authorizations,
17  letters of medical necessity, was
18  not as commonplace for many
19  offices.
20        The idea behind prior
21  authorizations and letters of
22  medical necessity was to ensure
23  that the office staff was familiar
24  with the process, to ensure

Page 91

1   appropriate patients, as deemed
2   appropriate by the physician, had
3   access to Fentora.
4   BY MS. RUANE:
5      Q.   And so to drive the number
6   of appeals and letters of medical
7   necessity would have the effect of
8   increasing, potentially, the number of
9   patients who, although they were first
10  denied, upon appeal and submission of a
11  letter of medical necessity, were able to
12  receive the opioid, correct?
13        MS. HILLYER:  Objection to
14  form.
15        THE WITNESS:  While I'll
16  state that you're -- the prior
17  authorization, the reasons for
18  denials of prior authorizations
19  are many, many; not just based on
20  diagnosis and indication.  So I
21  want to clarify that.
22  BY MS. RUANE:
23     Q.   And I appreciate that.
24        The practical effect of a

Page 92

1   denial is that medication is not going to
2   be paid for and the patient won't receive
3   the medication, correct?
4      A.   That's part of it.  It could
5   be that the information is not complete,
6   the requirement for prior therapies is
7   not documented.
8         So, like I say, there are
9   many reasons why prior authorizations are
10  denied.
11     Q.   And my question was a little
12  different.
13        The practical effect of
14  that, if there's a denial, is that
15  medication is not going to be paid for,
16  the patient is not going to receive that
17  medication, correct?
18     A.   The patient can pay cash,
19  but the payer is not going to pay for it.
20     Q.   If the patient doesn't pay
21  cash, excluding an out-of-pocket payment,
22  then the practical effect would be the
23  patient doesn't receive the medication --
24  that medication, correct?

Page 93

1    A.   Correct.
2    Q.   And so Teva, or Cephalon, I
3  guess at this time --
4    A.   Right.
5    Q.   -- doesn't receive that
6  profit, correct?
7    A.   The script won't be filled.
8    Q.   And Teva, or Cephalon at
9  that time, doesn't receive the profit for
10  that script, correct?
11       MS. HILLYER:  Objection to
12    form.
13       But you can answer.
14  BY MS. RUANE:
15    Q.   That's a true statement,
16  isn't it?
17       MS. HILLYER:  Same
18    objection.
19       THE WITNESS:  That sales --
20    sale would not be recognized by
21    Teva or Cephalon.
22  BY MS. RUANE:
23    Q.   The sale wouldn't be
24  recognized, and Teva or Cephalon wouldn't

Page 94

1  receive the money, correct?
2    A.   Unless the patient paid
3  cash.
4    Q.   And so one of the goals, in
5  order to increase the profits, would be
6  to utilize appeals and letters of medical
7  necessity in order to drive and increase
8  the number of patients who receive, at
9  this time, Actiq, correct?
10       MS. HILLYER:  Objection to
11    form.
12       THE WITNESS:  The premise
13    for driving appeals and/or
14    educating the staff is to ensure
15    the patient had access.  The
16    result of that, of course, would
17    be Cephalon would receive a sale.
18  BY MS. RUANE:
19    Q.   Okay.
20    A.   Appropriate patients having
21  access.
22    Q.   And that process has
23  continued, as far as -- strike that.
24       Let me ask a better

Page 95

1  question.  The process of utilizing
2  appeals and letters of medical necessity
3  in order to assist in patients receiving
4  the medication continued with Fentora,
5  correct?
6       MS. HILLYER:  Objection to
7    the form.
8       THE WITNESS:  I'm trying to
9    remember.  There were various
10    discussions around what letters of
11    medical necessity would be
12    available.
13       I believe we did have them
14    for Fentora, as I recall.
15  BY MS. RUANE:
16    Q.   Okay.
17    A.   And mind you, letters of
18  medical necessity are managed through our
19  medical department, not me.
20    Q.   On Page 87, toward the very
21  bottom, it's actually the second bullet
22  point above Eckerd Health Services, it
23  indicates, Continue to develop
24  relationships with local Actiq advocates.

Page 96

1    A.   Yep.
2    Q.   So the -- are "local Actiq
3  advocates" physicians who prescribe
4  Actiq?
5    A.   Yes.
6    Q.   And one of the things you
7  were tasked with, in your role, was to
8  continue to develop those relationships,
9  correct?
10    A.   Typically, working with
11  sales teams not individually.
12    Q.   So what you would do would
13  be to coordinate with the sales teams in
14  order to ensure that they were developing
15  positive relationships with the
16  physicians who you all considered to be
17  Actiq advocates?
18    A.   That's true with every
19  product.
20    Q.   That's also true with the
21  Fentora product, correct?
22    A.   It's true with any -- that's
23  a standard practice in the industry.
24       And I'll clarify.  When

Page 97

1   products may or may not be added to
2   formulary, many times pain specialists
3   are not a part of their P&T, so they rely
4   on those physicians we're referring to
5   for input in the decision-making.
6        Rarely have I ever seen or
7   heard of a pain specialist sitting on a
8   P&T committee that ultimately makes the
9   decision as to whether it's on formulary
10  and what the criteria covered -- what the
11  coverage criteria is.
12       Q.   So breaking that up, the P&T
13  committee is the committee that decides
14  whether a drug ends up on formulary,
15  correct?
16       A.   They make a recommendation.
17  And there's a financial piece to it
18  that the contracting side or the trade
19  side of the plan makes a determination,
20  based on the cost of the drug, et cetera.
21       Q.   So the P&T committee makes
22  the recommendation on whether a drug
23  should end up on formulary, correct?
24       A.   Yes.

Page 98

1        Q.   And Cephalon, and then Teva,
2   recognized that utilizing physician
3   advocates who advocate for their products
4   was a helpful step in obtaining formulary
5   status for their products?
6        MS. HILLYER:  Objection to
7   form.
8        THE WITNESS:  It's a broad
9   statement, because there's no
10  suggestion of -- I mean, if a plan
11  decides not to cover it at all,
12  you need an advocate to say, we
13  need this product.
14       It has nothing to do with
15  what the indication is, or what
16  have you, at that point.
17  BY MS. RUANE:
18       Q.   I'm sorry?
19       A.   So what I'm trying to say
20  is, yes, physicians are often tasked,
21  with their expertise in certain specialty
22  areas, for making -- giving opinions to
23  the P&T committee, clinical -- based on
24  their practice.

Page 99

1        Q.   And the role that Teva plays
2   in that is to maintain relationships with
3   those physicians?
4        MS. HILLYER:  Objection to
5   form.
6        THE WITNESS:  Teva?
7   BY MS. RUANE:
8        Q.   And Cephalon.
9        A.   But you're -- it's a
10  broad -- I mean, who?  Who in Teva?
11       Q.   Well, my question is,
12  because on your managed care and
13  reimbursement objectives, one of your
14  bullet points is to continue to develop
15  relationships with local Actiq advocates.
16       A.   Yes.
17       Q.   So my question is posed to
18  you because that's in a document that has
19  your name on it.
20       A.   Okay.
21       Q.   Would you agree --
22       A.   That was an objective.
23       Q.   -- that was an objective?
24       A.   Sorry.

Page 100

1        Q.   And that was also an
2   objective with the Fentora product,
3   correct?
4        MS. HILLYER:  Asked and
5   answered.
6        You can answer again.
7        THE WITNESS:  Again, going
8   back to the timeline, the majority
9   of my involvement with Fentora was
10  not customer-facing.
11  BY MS. RUANE:
12       Q.   But in your role at Teva,
13  you were aware of the fact that the goal
14  of maintaining relationships with patient
15  advocates in order to make sure there's
16  somebody to advocate for Fentora on the
17  formulary maintained a goal of the
18  organization, correct?
19       A.   You stated patient --
20       MS. HILLYER:  Objection to
21  form.
22       THE WITNESS:  You stated
23  patient advocate.  You said
24  patient advocate.

Page 101

1    BY MS. RUANE:
2        Q.   Let me ask the question
3    again.
4            In your role, though your
5    position changed, but you're aware of the
6    fact that it maintained -- that Teva
7    maintained, as a goal, to develop
8    relationships with advocates for Fentora
9    in order to, hopefully, provide somebody
10   to advocate for the use of Fentora on the
11   formulary?
12       A.   So as I stated in previous
13   comments relative to the landscape of
14   managed care, back when Actiq was
15   promoted, many times the role of an
16   account manager was just as you stated in
17   the objectives.
18           That evolved into a very
19   relatively ineffective way to have
20   physician advocates.  It's really up to
21   the sales representatives in the
22   marketplace to promote the product
23   appropriately to all physicians, whether
24   they are KOLs or not.

Page 102

1            So the practice of -- of an
2    account manager personally getting to
3    know a KOL was really not the norm in the
4    Fentora time frame.
5        Q.   So that was a shift from a
6    practice that occurred with Actiq?
7        A.   Yes, I would say it is.
8        Q.   Okay.
9        A.   And -- yes.
10       Q.   All right.
11           - - -
12           (Whereupon, Teva-Bearer
13       Exhibit-6,
14       TEVA_MDL_A_04484212-214, was
15       marked for identification.)
16           - - -
17           MS. RUANE:  I'm going to
18       hand you what's been marked as
19       Exhibit-6.  For the record, this
20       is TEVA_MDL_A_04484212 through 14.
21   BY MS. RUANE:
22       Q.   If you look down to the
23   second message there, the e-mail from
24   Terry Terifay.

Page 103

1            Are you cc'd on this e-mail?
2        A.   The second one, yes.
3        Q.   And this is referencing that
4    Actiq white paper --
5        A.   Okay.
6        Q.   -- that we talked about
7    earlier?
8            MS. HILLYER:  Take your time
9        to look through it if you need to.
10           THE WITNESS:  Okay.  Yes.
11   BY MS. RUANE:
12       Q.   Terry's e-mail, on which you
13   were cc'd, indicates that, in the first
14   line, This document is going to be a
15   great initiative as we roll out our 2005
16   tactics to address issues around
17   reimbursement for Actiq.
18           Did I read that correctly?
19       A.   Wait a minute.  This one
20   here?
21           Sorry.  I was looking --
22   yes, that's what it says.  Sorry.
23       Q.   So this Actiq white paper
24   was going to be used with managed care

Page 104

1    entities, correct?
2        A.   Yes.
3        Q.   And the Actiq white paper
4    was circulated to a certain set of
5    Cephalon employees, some of whom provided
6    feedback, correct?
7        A.   I don't, truthfully, recall
8    this.  Now that I'm reading it, it's
9    familiar.
10       Q.   Okay.  And you were included
11   on the e-mail chain with the feedback,
12   correct?
13       A.   That was routine, to be
14   cc'd.
15       Q.   I'm sorry, what did you say?
16       A.   It was -- it was routine
17   for -- you notice I was cc'd by Terry
18   because I was more of the marketing.
19           So he would automatically
20   copy me on things.
21       Q.   And in the message below, on
22   which you're cc'd, Bill Cunningham --
23   it's the last sentence on Page 212.
24       A.   Yep.

1      Q.   We'll talk about the
2   feedback itself in a minute.
3         But Bill indicates,
4   Essentially, the reason behind the need
5   to have the commentary section worded in
6   such a way is to ensure that managed care
7   clearly understands the nature of what is
8   being discussed and does not attempt to
9   misconstrue or misinterpret the
10  information.
11        Do you see that?
12     A.   I see that.
13     Q.   He goes on and talks about
14  the fact that he doesn't want managed
15  care to attempt to turn the intent of the
16  information around and possibly use it to
17  their own advantage.
18        Do you see that?
19     A.   I see that.
20     Q.   Do you have an understanding
21  of what he meant by that?
22     A.   I do not.
23        MS. HILLYER:  Objection.
24        Calls for speculation.

1   BY MS. RUANE:
2      Q.   You do not?
3      A.   No, I don't know.
4      Q.   Okay.  Feedback was
5   provided, below that, by Joseph -- I may
6   be mispronouncing it -- Duarte.
7      A.   Correct.
8      Q.   Do you know Joseph Duarte?
9      A.   Yes.
10     Q.   Does he have any medical or
11  pharmaceutical training, to your
12  knowledge?
13     A.   I don't know.
14     Q.   One of the things -- do you
15  know what Joseph's role was with the
16  company?
17        Actually, I say that.  Look
18  on Page 214, he's listed as a national
19  account manager?
20     A.   Yes.  He was a national
21  account manager.
22     Q.   And do you know what bucket,
23  I mean, what -- do you know, was he in
24  managed care?  Strike that.  Let me ask

1   it that way.
2         Was he in the managed care
3   group?
4      A.   Yes.  National account
5   manager.
6      Q.   For managed care?
7      A.   Yes.
8      Q.   He, it looks like, offices
9   out of California?
10     A.   Correct.
11     Q.   To your knowledge -- well,
12  strike that, let me ask this.
13        Joe had reviewed the Actiq
14  white paper.  And under Number 2, so I'm
15  on Page 213, in bold, he gives his
16  suggestions.  And he is talking about
17  Module 1.
18        It looks like it said,
19  Breakthrough pain, defined as a transient
20  flare in pain of moderate-to-severe
21  intensity occurring in conjunction with
22  persistent pain, is a prevalent form of
23  pain in patients with cancer or other
24  terminal diseases.

1         Do you see that?
2      A.   I see.  Yes.  I'm sorry,
3   yes, I do.
4      Q.   Do you see the suggestion --
5   he gave a couple different suggestions.
6   One was just to omit the whole thing and
7   end that sentence with, you know,
8   Persistent pain is a prevalent form of
9   pain in patients.
10        Do you see that?
11        MS. HILLYER:  Objection.  I
12  just want to be clear that it
13  looks like other people may have
14  commented.  And because this isn't
15  in color, it's not clear whose
16  comments are whose.
17        MS. RUANE:  That's fair.
18        MS. HILLYER:  But go ahead.
19  BY MS. RUANE:
20     Q.   So within the -- the only
21  reason I ask it that way is because at
22  that point it looks like it's an e-mail
23  just with Bill and Joe.
24        But there may have been

Page 109

1    others.
2        MS. HILLYER:  Terry had
3        comments, it looks like, perhaps.
4    BY MS. RUANE:
5        Q.   On that July 12th, 2004
6    e-mail, he gives three suggestions,
7    correct?
8        MS. HILLYER:  Same -- same
9        objection.
10       Go ahead.
11   BY MS. RUANE:
12       Q.   Do you see that he gives
13   three suggestions there?
14       A.   I see there are three
15   suggestions there.
16       I also notice that the font
17   is different on C, so I don't know, based
18   on what I'm reading here, if, in fact,
19   that is actually what -- his comment.  I
20   don't know.
21       Q.   Got it.
22       Whoever's suggestions they
23   are, every -- all three suggestions do
24   not limit that definition of breakthrough

Page 110

1    pain to patients with cancer; is that
2    correct?
3        A.   That's correct.
4        Q.   If you'll flip the page to
5    Page 214, Number 6 there on Module 2,
6    there's a question about whether they can
7    include the Turk editorial titled,
8    Remember the Distinction Between
9    Malignant and Benign Pain?  Well, forget
10   it.
11       Do you see that?
12       A.   Yes, I see it.
13       Q.   So those were requests made
14   by somebody within the Cephalon company,
15   as far as edits to the Actiq white paper,
16   correct?
17       MS. HILLYER:  Objection to
18       the form.
19       You can answer.
20       THE WITNESS:  What I don't
21       remember is if this was more or
22       less a disease state type of
23       document.  I don't remember.
24       If it was, then it would

Page 111

1    make sense to have a distinction,
2    you know, between -- there's
3    malignant and nonmalignant pain,
4    more of an education.  That's what
5    I don't remember.
6        So just looking at this, I
7    can't answer your question
8    specifically.
9    BY MS. RUANE:
10       Q.   We know it's titled, The
11   Actiq White Paper --
12       A.   Yes.
13       Q.   -- right?
14       Is that correct?
15       A.   Yes.
16       Q.   And so the Actiq white
17   paper --
18       A.   Okay.
19       Q.   -- would reference the drug
20   Actiq rather than a more general disease
21   state.
22       Do you agree?
23       A.   I think if -- without seeing
24   the deck itself in the context of the

Page 112

1    flow, oftentimes we would have
2    promotional decks or decks that would
3    give disease state awareness up front,
4    that's very common, and then go into the
5    product.  I have examples currently that
6    I use.
7        The slides themselves -- and
8    I don't remember, but I'm just educating
9    you, the slides themselves, anything that
10   is nonbranded would have a different
11   template, and then transition into a
12   branded template when you start speaking
13   about the product.
14       Q.   And --
15       A.   So --
16       Q.   And you don't remember, one
17   way or another, with this Actiq white
18   paper?
19       A.   I really don't, sorry.
20       Q.   Based on the names included
21   on this e-mail, if you just look at Page
22   2, I think all the names are included in
23   the July 20th, 2004 portion of the
24   e-mail, on Page 212, where Terry sends it

Page 113

1  out and cc's you, can you tell me, based
2  on your knowledge, whether anyone on that
3  e-mail has any medical training as a
4  physician or a pharmacist?
5      A.   I know for a fact Susan
6  Larijani does, she's in medical services.
7  I don't know the background of Joe, other
8  than my relationship with him at
9  Cephalon.
10      Andy Pyfer is -- I don't
11  believe has medical.  Nor Bill.
12      Q.   Do you happen to know what
13  Susan's training is?
14      A.   No.
15      MS. RUANE:  I'm going to
16      hand you Exhibit-7, which, for the
17      record, is TEVA_MDL_A_04478352
18      through 356.
19          - - -
20      (Whereupon, Teva-Bearer
21      Exhibit-7,
22      TEVA_MDL_A_04478352-356, was
23      marked for identification.)
24          - - -

Page 114

1      MS. HILLYER:  This is 7, you
2  said?
3      MS. RUANE:  Yes.
4  BY MS. RUANE:
5      Q.   This is a follow-up e-mail.
6  Susan indicates, on the
7  first page in the first sentence, Q and I
8  have reviewed your collective comments
9  and I have incorporated most of them in
10  to the final document.
11      Do you see that?
12      A.   I do.
13      Q.   Do you have any idea who Q
14  is?
15      A.   Medical director.
16      Q.   And that would have been the
17  medical director for --
18      A.   Pain.
19      Q.   Pain.
20      What's Q's full name?
21      A.   It's in the cc at the top.
22  They called him Q, but it's K-I-U-M --
23      Q.   Got it.
24      So for the record, that's

Page 115

1  K-I-U-M-A-R-S; last name, V-A-D-I-E-I?
2      A.   Correct.
3      Q.   I'm not going to try to
4  pronounce that.
5      A.   That's why he was called Q.
6      Q.   In any event, in this
7  document Susan includes, for example, on
8  Number 2, Subparagraph D, what the
9  revision is going to be.
10      Do you see that?
11      A.   I do.
12      Q.   And ultimately, after
13  reviewing the comments, the revision to
14  the Actiq white paper referenced,
15  Breakthrough pain, defined as a transient
16  flare in pain of moderate-to-severe
17  intensity occurring in conjunction with
18  persistent pain, is a prevalent form of
19  pain in patients with malignant and
20  nonmalignant diseases.
21      Do you see that?
22      A.   I do.
23      Q.   You would agree that's
24  beyond the scope of breakthrough pain in

Page 116

1  cancer patients?
2      MS. HILLYER:  Objection to
3      form.
4      THE WITNESS:  Again, I would
5      love to see the final deck,
6      because these are only
7      recommendations.
8  BY MS. RUANE:
9      Q.   We'll get there.
10      A.   Good.  Because I don't --
11  I'm answering you based on what I'm
12  seeing here.
13      I'm assuming the highlight
14  is included in the revision, so she added
15  it back in.  Because it seems like the
16  last one was a deletion if it was
17  highlighted, or no?
18      Q.   Yes.  That's correct.  There
19  were several options.
20      The one it appears they
21  landed on referenced a prevalent form of
22  pain in patients with malignant and
23  nonmalignant diseases, correct?
24      A.   That would be appropriate in

1    the disease state slide, for example.

2       Q.   And you would agree that

3    that revision references disease states

4    beyond the scope of breakthrough cancer

5    pain, correct?

6       A.   That's what it states.

7       Q.   Okay.  So my statement is

8    correct?

9       A.   Yes.

10      Q.   Under Module 2, it's

11   actually just Number 3 there, the

12   revision that they landed on, it

13   states -- and I apologize, it's a little

14   dark -- The use of opioids for the

15   management of cancer pain is well

16   accepted and the use of opioids for the

17   management of nonmalignant pain is

18   gaining wider acceptance among pain care

19   specialists.

20      Do you see that?

21      A.   Yes.

22      Q.   And then it goes on, Several

23   professional societies -- but it's not a

24   full sentence, right, at least in this

1    form?

2       A.   Correct.

3       Q.   So this document references

4    the use of opioids for the management of

5    nonmalignant pain, correct?

6       A.   Yep.  Yes.

7       Q.   So that is not just a

8    disease state presentation, correct?

9        MS. HILLYER:  Objection to

10   form.

11       THE WITNESS:  I don't know.

12   BY MS. RUANE:

13      Q.   It is referencing, you would

14   agree, the use of opioids, correct?

15      A.   Yes.

16      Q.   And it's referencing the use

17   of opioids for management of nonmalignant

18   pain, correct?

19      A.   Yes.

20      Q.   And you would agree that

21   that's referencing the use of opioids for

22   something beyond breakthrough cancer

23   pain, correct?

24      A.   Opioids in general, yes.

1       Q.   In an Actiq white paper,

2    right?

3       A.   That's what I'd like -- yes.

4    Yes.

5       It's not uncommon to include

6    standards of care, et cetera, in what we

7    would consider -- I'm assuming this is

8    promotion, but it's not uncommon to do

9    that.

10       - - -

11      (Whereupon, Teva-Bearer

12      Exhibit-8,

13      TEVA_MDL_A_10070409-410, was

14      marked for identification.)

15       - - -

16      MS. RUANE:  I'm going to

17      hand you what's been marked as

18      Exhibit-8.  This is

19      TEVA_MDL_A_10070409 to 410.

20   BY MS. RUANE:

21      Q.   The second paragraph -- this

22   one I'll be brief on.

23      But the second entry, I

24   guess, from Joe Duarte again, he's

1    requesting the addition of Dr. Tennant's

2    study to the Actiq white paper.  And that

3    study is entitled, The Use of Oral

4    Transmucosal Fentanyl Citrate for

5    Breakthrough Pain in Severe, Nonmalignant

6    Chronic Pain.

7       Do you see that?

8       A.   I do.

9       Q.   And so is that consistent

10   with your memory that the Actiq white

11   papers would provide medical studies?

12      A.   So I remember -- I stated

13   earlier, I don't recall a lot of detail

14   about the white paper.

15      After reading this, when I

16   see professional services, that would

17   come from our medical side, which is

18   where Susan Larijani resided.  Therefore,

19   this is not a promotional piece.

20      Q.   Am I understanding you

21   correctly that what you're saying is the

22   Actiq white paper is not a promotional

23   piece?

24      A.   Right.  Based on my

## Page 121

1  recollection now, after referring to
2  professional services.  And, typically,
3  anything coming from professional
4  services would be upon request,
5  unsolicited request from a physician.
6      Q.   So if it's not --
7      A.   I'm sorry.  Not a physician,
8  a plan.  Sorry.
9      Q.   Got it.
10         So if it's not a promotional
11  piece -- the significance to you of the
12  fact that it's -- the Actiq white paper
13  is not a promotional piece is that it
14  means it's not used by you or others when
15  you're calling on --
16      A.   Correct.
17      Q.   -- managed care entities?
18         MS. HILLYER:  Make sure she
19  finishes.
20  BY MS. RUANE:
21      Q.   I'll do it again, just to be
22  sure we're tracking.
23         The significance to you of
24  the fact that, in your mind, the Actiq

## Page 122

1  white paper was not a promotional piece
2  is that it was not used by you or others
3  when you're calling upon managed care
4  entities?
5      A.   Correct.
6      Q.   Okay.  Great.
7         - - -
8         (Whereupon, Teva-Bearer
9  Exhibit-9,
10  TEVA_MDL_A_04426360-362, was
11  marked for identification.)
12         - - -
13         MS. RUANE:  I'm going to
14  hand you what's been marked as
15  Exhibit-9.  This is, for the
16  record, TEVA_MDL_A_04426360
17  through 362.
18  BY MS. RUANE:
19      Q.   This is an e-mail chain
20  between you and Bill Cunningham, correct?
21      A.   Yeah.
22      Q.   Who is Bill Cunningham?
23      A.   My manager.
24      Q.   And what was his title?

## Page 123

1      A.   Probably director of market
2  access.  We had various titles.
3      Q.   It looks like -- did you and
4  Bill office in the same place?
5      A.   Bill was located in
6  California.
7      Q.   It looks like you were
8  e-mailing Bill to discuss a managed care
9  Actiq presentation, correct?
10      A.   Yes.
11      Q.   And so that would be a
12  promotional piece, correct?
13      A.   If I'm presenting it, yes.
14      Q.   You write, in the first line
15  of your e-mail on Page 361 --
16      A.   Yes.
17      Q.   -- Bill, I wanted to follow
18  up with you about the managed care Actiq
19  presentation.  I think there's a lot of
20  great information in these slides and I'm
21  sure we can consolidate them to address a
22  managed care audience.
23         Do you see that?
24      A.   I do.

## Page 124

1      Q.   So that would indicate that
2  this is a promotional piece that you or
3  your team are going to use to present to
4  a managed care audience, correct?
5      A.   Yep.
6      Q.   And your thoughts on that,
7  you define below.
8         There are four topics that
9  the slides could be broken into, which
10  you include there as defining pain,
11  economic impact of pain, pain management
12  and Actiq, correct?
13      A.   Yep.
14      Q.   And you indicate, The story
15  should be built around the objective of
16  explaining why providers want to or
17  should have access to Actiq.
18         Do you see that?
19      A.   Yep.
20      Q.   And this is an e-mail that
21  you drafted, correct?
22      A.   Yep.
23      Q.   And so your plan was to
24  provide a slide set promoting the use of

1      Actiq by providers, correct?
2          That's a bad question.  Let
3   me ask it differently.
4          You were speaking to managed
5   care entities who are evaluating the
6   prescriptions for Actiq that prescribers
7   out in the field are prescribing,
8   correct, to determine whether they will
9   be authorized and reimbursed?
10      A.   Under prior authorization,
11   is that -- we talked before about
12   formulary access versus prior
13   authorization.
14          So what is your question?
15      Q.   Let me ask first, you're
16   presenting, at this time, to managed care
17   entities in order to educate them about
18   Actiq and why providers, healthcare
19   providers, either want to or should have
20   access to Actiq, correct?
21      A.   For their patients, correct.
22      Q.   For their patients.
23          And so there may be a couple
24   of things that happen as a result of

1   that, if things go your way.
2          One of them would be that
3   the managed care entity expands the
4   criteria that they would use in order to
5   authorize use of Actiq?
6          MS. HILLYER:  Objection to
7      form.
8          THE WITNESS:  You're
9      implying that the Actiq coverage
10      was not broad.  You're making a
11      broad statement.  Each plan had
12      different coverage criteria.
13   BY MS. RUANE:
14      Q.   Were there plans who had
15   coverage criteria just for breakthrough
16   cancer pain?
17      A.   Yes.
18      Q.   And one of things that you
19   were doing, when you were promoting Actiq
20   to the managed care entities,
21   particularly those whose indication was
22   for breakthrough cancer pain, was an
23   attempt to educate them to expand beyond
24   breakthrough cancer pain, correct?

1          MS. HILLYER:  Objection to
2      form.
3          THE WITNESS:  It was to
4      educate them on pain and -- it
5      was, basically, again, talking
6      about pain management.
7   BY MS. RUANE:
8      Q.   Okay.  And you were
9   educating them on pain well beyond
10   breakthrough cancer pain, correct?
11      A.   General pain information,
12   pain management.
13      Q.   And so the answer to my
14   question would be, yes, you were
15   educating them on pain beyond
16   breakthrough cancer pain, correct?
17      A.   Correct.
18      Q.   In this slide set in
19   particular that you're proposing, you
20   start with the overall economic impact of
21   pain --
22      A.   Yep.
23      Q.   -- setting the stage.
24          And then you move to, What

1   does pain look like, correct?
2      A.   Yep.
3      Q.   And you paint the picture,
4   pain is pain, correct?
5      A.   Yes, I do.
6      Q.   And so you were using the
7   phrase "pain is pain," while promoting
8   Actiq to managed care entities, correct?
9          MS. HILLYER:  Objection to
10      form.  Mischaracterizes the
11      document.
12          THE WITNESS:  That is not
13      what that says.
14   BY MS. RUANE:
15      Q.   Your proposal for the slides
16   to be used in the promotion of Actiq to
17   managed care entities included the phrase
18   "pain is pain," correct?
19          MS. HILLYER:  Objection to
20      form.  Same objection.
21          THE WITNESS:  This is a
22      recommendation on building a slide
23      set.  There's nothing in this
24      document that said anyone would

Page 129

1    say "pain is pain."
2    BY MS. RUANE:
3        Q.   But you're -- in referencing
4    what your goal was for what the slide set
5    would convey to managed care entities,
6    you define it as painting the
7    picture-pain is pain, correct?
8        A.   Based on this document,
9    that's what it says, yes.
10       Q.   And you include in there
11   various types of pain, acute, chronic and
12   breakthrough, correct?
13       A.   Yes.
14       Q.   And that is not limited to
15   breakthrough cancer pain, is it?
16       A.   No.
17       Q.   You also reference there
18   BTP.
19           That references breakthrough
20   pain, right?
21       A.   Yes.
22       Q.   And BTCP references
23   breakthrough cancer pain, correct?
24       A.   Yes.

Page 130

1        Q.   So there is a distinction
2    between the two acronyms, BTP and BTCP,
3    right?
4        A.   Yes.
5        Q.   The C stands for cancer?
6        A.   Correct.
7        Q.   And within the company, it
8    was understood that BTP meant
9    breakthrough pain and BTCP meant
10   breakthrough cancer pain, correct?
11           MS. HILLYER:  Objection.
12       Objection to form.
13   BY MS. RUANE:
14       Q.   In your experience with the
15   company, you would use the phrase BTP to
16   reference breakthrough pain and BTCP to
17   reference breakthrough cancer pain,
18   correct?
19           MS. HILLYER:  Objection to
20       form.
21           THE WITNESS:  BTP, we
22       often -- in this situation, this
23       shows the two, but oftentimes we
24       got a little lazy with the BTP,

Page 131

1    breakthrough pain.  And it didn't
2    suggest that it wasn't -- if it
3    was referencing the product, it
4    didn't suggest that it wasn't
5    relevant to the indication.
6    BY MS. RUANE:
7        Q.   Here --
8        A.   Here.
9        Q.   -- you make the point of
10   distinguishing between BTP, which you use
11   to define breakthrough pain, and BTCP,
12   which you use to define breakthrough
13   cancer pain, correct?
14       A.   Yes, that's what I stated.
15       Q.   I'm sorry.  Do you need to
16   take a break?
17       A.   No, I was a little worried
18   about this getting caught.  Sorry.
19       Q.   You indicate, Show studies
20   for each - conclusion, pain is pain, not
21   treating underlying condition.
22           Correct?
23       A.   Yep, that's what it says.
24       Q.   The message that you wanted

Page 132

1    to convey with this managed care Actiq
2    presentation was the conclusion that pain
3    is pain, regardless of the underlying
4    condition, correct?
5        A.   What this states is we don't
6    treat the underlying condition.  We're
7    not treating the underlying condition.
8        Q.   But the conclusion is pain
9    is pain, correct?
10       A.   Yes, that's what it says.
11       Q.   Because whether -- what
12   you're suggesting there is you show
13   studies for each to indicate that whether
14   you're treating breakthrough cancer pain
15   or another type of pain, what you're
16   treating is the pain itself, correct?
17       A.   Treating pain, correct.
18       Q.   And that is a discussion of
19   the use of Actiq for something other than
20   breakthrough cancer pain, correct?
21           MS. HILLYER:  Objection to
22       the form.  Mischaracterizes the
23       document.
24           THE WITNESS:  Why don't you

Page 133

1      state it a different way?
2  BY MS. RUANE:
3      Q.   Sure.
4           The title that's in bold and
5  underlined there, Why Providers Want to
6  (Or Should) Have Access to Actiq, did I
7  read that correctly?
8      A.   Yes, you did.
9      Q.   So what we're talking about
10  with this document that you also referred
11  to as a managed care Actiq presentation
12  is a presentation on the drug Actiq,
13  correct?
14      A.   Correct.
15      Q.   And one of the bullet points
16  below that talks about the use of studies
17  to be included to reach the conclusion,
18  pain is pain --
19      A.   I see that, yep.
20      Q.   -- correct?
21      A.   That's what it says, yes.
22      Q.   And so the proposal here is
23  for a promotional document to be used in
24  managed care presentations discussing the

Page 134

1  use of Actiq for something other than
2  breakthrough cancer pain, correct?
3      A.   Based on --
4           MS. HILLYER:  Object to the
5  form.
6  BY MS. RUANE:
7      Q.   That's a correct statement?
8      A.   Based on what I'm reading.
9  I have no recollection as to whether we
10  actually put this deck together.  Maybe
11  you have a copy of it.
12           It may not have -- it may
13  not have ended up going through our
14  approval process in this format.  So I
15  don't know.
16      Q.   So my question is a little
17  different, just based on this document.
18      A.   Sure.
19      Q.   And I understand the
20  distinction.  I appreciate that.
21      A.   Okay.
22      Q.   What you were proposing, on
23  October 15th, 2004, was a managed care
24  Actiq presentation to promote the use of

Page 135

1  Actiq for something other than
2  breakthrough cancer pain, utilizing the
3  phrase "pain is pain," correct?
4      A.   I want to make a distinction
5  between promote -- health plans do not
6  prescribe medications.  This was at a
7  time in which, early on, Actiq was not
8  managed by plans, often it was just
9  available.
10           There was a trend to move
11  towards managing -- and when I say
12  "manage," I'm talking about what we said
13  earlier, prior authorizations and
14  criteria.
15           As a result of this, many
16  patients who doctors deemed appropriate
17  were on medications such as Actiq for
18  what they deemed appropriate, whether it
19  be noncancer pain, and that's their
20  prerogative.
21           So this was an effort,
22  albeit looking at it now, I don't know if
23  it ever made it to fruition, to establish
24  what the plan is, again, keeping in mind,

Page 136

1  plans were not experts on pain
2  management.  The majority of products
3  available for pain management were
4  generics, and plans don't pay a whole lot
5  of attention until branded products are
6  available.
7           And with Actiq, it was
8  highly managed across the board, it
9  evolved into that situation.  Ultimately,
10  with Fentora it was the same way.
11      Q.   So with this presentation,
12  your proposal was to present to managed
13  care entities advocating or explaining
14  why providers want to or should have
15  access to Actiq for something other than
16  breakthrough cancer pain, correct?
17           MS. HILLYER:  Objection to
18  form.
19           THE WITNESS:  I prefer the
20  word "explaining."
21  BY MS. RUANE:
22      Q.   Then let me ask it again.
23           The managed care Actiq
24  presentation that you were describing

1    here was a proposal to explain to managed
2    care entities why providers want to or
3    should have access to Actiq for something
4    other than breakthrough cancer pain,
5    correct?
6         A.   That's what it states.
7         Q.   You agree?  That's a correct
8    statement?
9         A.   That's exactly what it says.
10        Q.   Okay.
11             MS. RUANE:  All right.
12    Let's take a quick break.
13             VIDEO TECHNICIAN:  Going off
14    the record.  11:39 a.m.
15             - - -
16             (Whereupon, a brief recess
17    was taken.)
18             - - -
19             VIDEO TECHNICIAN:  We're
20    back on record at 11:51 a.m.
21    BY MS. RUANE:
22        Q.   I'm going to hand you
23    Exhibit-10.
24             - - -

1             (Whereupon, Teva-Bearer
2    Exhibit-10,
3    TEVA_MDL_A_10105779-782, was
4    marked for identification.)
5             - - -
6             MS. RUANE:  For the record,
7    this is TEVA_MDL_A_10105779
8    through 782.
9             MS. HILLYER:  Are they
10   different --
11             MS. RUANE:  Those are -- I'm
12    sorry.  And then -- so the
13    native -- if you look at 782, it's
14    the native attachment for the
15    sheets behind that.  They are the
16    exhibits -- or the attachments to
17    the e-mail.  Does that make sense?
18             MS. HILLYER:  Yes.
19             MS. RUANE:  Okay.
20             THE WITNESS:  Okay.
21    BY MS. RUANE:
22        Q.   This is quick.
23             This is an e-mail showing
24    that all the NAMs should receive a copy

1    of the Actiq MCO dossier.
2             Do you see that?
3         A.   Yes.
4         Q.   What are NAMs?
5         A.   National account managers.
6         Q.   And at that point, you were
7    a national account manager, in 2006?
8         A.   No.
9         Q.   No, you weren't.
10        A.   I was a manager.
11        Q.   Got it.
12             You'll see on the
13    attachments, just to the extent it's
14    helpful to you --
15        A.   Yes.
16        Q.   -- you're listed on both of
17    them.
18             Those are the attachments
19    for the individuals who should receive a
20    copy of the Actiq dossier.
21             Do you see that?
22             MS. HILLYER:  Objection to
23    form.
24             THE WITNESS:  Yes.

1             MS. HILLYER:  Go ahead.
2             THE WITNESS:  I'm sorry,
3    you're asking me to look at the
4    list -- the roster?
5    BY MS. RUANE:
6         Q.   You see your name is on the
7    list of people to receive an Actiq
8    dossier?
9         A.   Yes.
10        Q.   On the second page, 780, the
11    last sentence of the first paragraph --
12             MS. HILLYER:  Take your time
13    to look through it, if you need
14    to.
15    BY MS. RUANE:
16        Q.   -- indicates, There have
17    been some updates to the Provigil white
18    paper and we have arranged for all the
19    NAMs to receive copies of the Provigil
20    and Actiq white paper.
21             Do you see that?
22        A.   Yes.
23        Q.   So let me hand you
24    Exhibit-11.

Page 141

```
 1              - - -
 2         (Whereupon, Teva-Bearer
 3    Exhibit-11, TEVA_CHI_00036903-930,
 4    was marked for identification.)
 5              - - -
 6         MS. HILLYER:  Are we done
 7    with 10?
 8         MS. RUANE:  I think so.
 9         For the record, this is
10    TEVA_CHI_00036903 through 930.
11    BY MS. RUANE:
12         Q.   This is an Actiq managed
13    care dossier, correct?
14         A.   Yes.
15         Q.   Are you familiar with this
16    type of document?
17         A.   Yes.
18         Q.   These are documents provided
19    to managed care entities?
20         A.   Upon request of medical
21    services.
22         Q.   If a managed care entity
23    requested information about Actiq, it
24    would -- this managed care dossier would
```

Page 142

```
 1    be provided to them, correct?
 2         A.   Through medical services,
 3    correct.
 4         Q.   I assume that there were
 5    times where managed care entities would
 6    request, through medical services, a copy
 7    of the dossier, which is why it was
 8    created?
 9         A.   Correct.
10         Q.   This was the Actiq dossier,
11    correct?
12         A.   That's what it says, yes.
13         Q.   And I'll tell you, there's
14    three modules, they are divided up.
15         A.   I haven't seen this in
16    years, so I'm glad you told me that.
17         Q.   You would have seen it at
18    the time, correct?
19         A.   If it was sent to me, I saw
20    it, yes.
21         Q.   And in your interactions
22    with managed care entities during this
23    time frame, you would have spoken with
24    them about the dossier, if they had
```

Page 143

```
 1    requested it, correct?
 2         MS. HILLYER:  Objection to
 3    form.  Assuming facts not in
 4    evidence.
 5         THE WITNESS:  No.  No.  They
 6    would have -- if they asked for a
 7    dossier, we would send in a
 8    request to medical services,
 9    period.  That's all you can say.
10    You're not allowed to discuss
11    what's in the dossier.  It's not a
12    promotional piece.
13    BY MS. RUANE:
14         Q.   I'm sorry, what did you say
15    about promotional piece?
16         A.   This is not a promotional
17    piece.  This is a medical piece.
18         Q.   And in this document, on the
19    second page -- there's little page
20    numbers at the bottom, I'm going to use
21    those, just for ease of reference.
22         A.   I see.  And what page did
23    you say?  I'm sorry.
24         Q.   2.
```

Page 144

```
 1         A.   2, got it.
 2         Q.   This document indicates, in
 3    that last paragraph, Breakthrough pain,
 4    defined as a transitory flare of
 5    moderate-to-severe pain that occurs in
 6    patients with otherwise stable,
 7    controlled, persistent pain, is a
 8    prevalent form of pain in patients with
 9    malignant and nonmalignant diseases.
10         Do you see that?
11         A.   Yes.
12         Q.   I'm looking back at 7.
13         MS. HILLYER:  Do you want
14    her to?
15         MS. RUANE:  Yes.
16    BY MS. RUANE:
17         Q.   If you'll pull up Exhibit-7
18    as well.
19         MS. HILLYER:  Give me a
20    second, please.
21         Okay, we're there.
22    BY MS. RUANE:
23         Q.   Exhibit-7 was an e-mail
24    chain regarding feedback on the Actiq
```

Page 145

1  white paper.
2      Do you see that?
3      A.  Yes.
4      Q.  And the suggestion, under
5  Module 1, which we're looking at Module
6  1, right?
7      A.  So based on what I'm seeing
8  here today, these are two different --
9  two different pieces.
10      This is a dossier.  This is
11  a white paper.
12      Q.  Okay.  That's -- I'm going
13  to ask you --
14      A.  As I recall.  I mean, we
15  would not call a dossier a white paper.
16      Q.  So I want to make sure I'm
17  clear on something as it relates to that.
18      On Number 2, this Actiq
19  white paper feedback e-mail --
20      A.  Yes.
21      Q.  -- if you look at Number 2D,
22  the revision that they ended up with --
23      A.  Right.
24      Q.  -- indicates -- and we're

Page 146

1  looking at Exhibit-7 right now, so we're
2  talking about the white paper, right?
3      A.  Yes.
4      Q.  And it indicates,
5  Breakthrough pain, defined as a transient
6  flare in pain of moderate-to-severe
7  intensity occurring in conjunction with
8  persistent pain, is a prevalent form of
9  pain in patients with malignant and
10  nonmalignant diseases.
11      Correct?
12      A.  That's what it says.
13      Q.  Okay.  And that's the same
14  language that's included in the dossier,
15  correct?
16      MS. HILLYER:  Objection to
17      form.  It's not.  I mean, it's
18      not.
19  BY MS. RUANE:
20      Q.  With the exception of
21  "transitory" to "transient"?
22      MS. HILLYER:  There's some
23      different wording, but --
24  BY MS. RUANE:

Page 147

1      Q.  Let's look just at the part
2  that references, Patients with malignant
3  and nonmalignant diseases.
4      The phrase "patients with
5  malignant and nonmalignant diseases"
6  appears in both Exhibit-7 and 11,
7  correct?
8      A.  It's unfortunate -- correct.
9  It's unfortunate these aren't referenced,
10  because in many documents you'll have
11  inconsistent approaches to the way -- I
12  mean, in anything, as long as it's
13  sourced.
14      This is a very old dossier
15  layout.  Currently, you have to annotate
16  the entire thing and then you have
17  actual, you know, verbatim.  So this was
18  sort of in the beginning.  This is not
19  the traditional format that is used
20  today.  So I will just say that part.
21      So it wouldn't be uncommon
22  for one document to have -- as long --
23  because definition can come from one
24  source but reads differently than

Page 148

1  another.  So I can't really comment.
2      Q.  But what we do know, because
3  we have the documents before us, is that
4  the Exhibit-11, the dossier, references
5  breakthrough pain as a prevalent form of
6  pain in patients with malignant and
7  nonmalignant diseases, correct?
8      A.  Yes.
9      Q.  And based on Exhibit-7, we
10  also know that, at least the feedback for
11  the Actiq white paper, and the conclusion
12  that Susan, in medical services, reached
13  was to reference breakthrough pain as a
14  prevalent form of pain in patients with
15  malignant and nonmalignant diseases,
16  correct?
17      A.  Yes.
18      Q.  Okay.  Just a few more
19  questions on Exhibit-11.
20      On Page 10 of Exhibit-11,
21  the second -- or, I guess, the first full
22  paragraph starts, For many patients.
23      Do you see that?
24      A.  I do see that.

1      Q.   And the first sentence there
2   says, For many patients, no causative
3   factor can be found for the chronic pain
4   and no specific diagnosis can be made.
5         Do you see that?
6      A.   Yes.
7      Q.   Do you agree that is not
8   referencing breakthrough cancer pain,
9   correct?
10     A.   It does not mention
11  breakthrough cancer pain.
12     Q.   It mentions chronic pain
13  with no causative factor found, correct?
14     A.   Correct.
15     Q.   If you go on in the middle
16  of the paragraph, there's a sentence that
17  starts, However, experts in pain
18  management have recommended that the
19  primary goal of patient care for these
20  patients should be symptom control,
21  including the use of opioids where
22  appropriate.
23        Do you see that?
24     A.   Yes.

1      Q.   And then the next -- there's
2   citations.
3         So there were some cites in
4   this white paper?
5      A.   I see that.  I see that.
6      Q.   In the dossier, excuse me.
7      A.   Yeah.  Good.
8      Q.   And then it references,
9   Several professional organizations have
10  published guidelines to guide
11  practitioners in this area.
12        Do you see that?
13     A.   I see that.
14     Q.   And it references
15  specifically the American Academy of Pain
16  Medicine, the American Pain Society, and
17  the Federation of State Medical Boards of
18  the United States.
19        Do you see that?
20     A.   I see that.
21     Q.   So based on Exhibit-11, we
22  know that Cephalon, in its dossier, was
23  referring back to societies, at least as
24  part of the support for the proposition

1   that patients with no causative factor
2   for their chronic pain should be treated
3   with opioids?
4         MS. HILLYER:  Objection to
5      form.  Mischaracterizes the
6      document.
7         THE WITNESS:  You'll have to
8      restate that.  I don't agree with
9      what you just said.
10  BY MS. RUANE:
11     Q.   We know that Cephalon was
12  using a dossier and published a dossier
13  that discussed opioid treatment for
14  patients with chronic pain where no
15  specific diagnosis can be made, correct?
16        MS. HILLYER:  Objection to
17     form.
18        You can answer.
19        THE WITNESS:  So I didn't
20     create this document.  But what I
21     will tell you is, for the record,
22     patients who are prescribed a --
23     either Fentora or Actiq, were --
24     had chronic pain, they were on

1   chronic pain medications, which
2   sometimes included opioids.  So
3   this is all true.
4      This is more about chronic
5   pain and then, hopefully, it will
6   get to start talking about
7   breakthrough pain.
8      But these are chronic pain
9   patients who have been on a
10  long-acting OxyContin, something
11  of that nature, and they have
12  breakthrough episodes of which the
13  short-actings are appropriate.
14     So, to me, this is just
15  setting the stage in general, in
16  my interpretation.
17  BY MS. RUANE:
18     Q.   And it is referring to
19  patients who have that chronic pain but
20  do not have cancer, correct?
21     A.   It's a general statement
22  about pain.
23     Q.   Yes.
24        But the beginning paragraph

Page 153

1    discusses the fact that these are
2    patients where no causative factor can be
3    found for their chronic pain and no
4    specific diagnosis can be made, correct?
5        A.   That's what it states.
6            THE WITNESS:  Are we
7    finished with this one?
8            MS. RUANE:  Yes.
9            I'm going to hand you what's
10   been marked as Exhibit-12.  This
11   is Module 2 for the Actiq managed
12   care dossier.
13           - - -
14           (Whereupon, Teva-Bearer
15   Exhibit-12, TEVA_CHI_00036931-955,
16   was marked for identification.)
17           - - -
18   BY MS. RUANE:
19       Q.   And I want to make sure I
20   understand this right.
21           Your testimony is, aside
22   from reaching out to medical services to
23   request a dossier, if that conversation
24   was initiated by a managed care entity,

Page 154

1    you and your team did not discuss the
2    dossiers with the managed care entities;
3    is that correct?
4        A.   That's correct.  To my
5    recollection, as far as the
6    dissemination.
7            I will say I may -- I recall
8    at one point, I don't recall if it was
9    for Actiq or other products, before they
10   became electronic, which is the norm now,
11   they were hard copies, and they were
12   shrinkwrapped, and we were not able to
13   even open them.
14           And there may have been a
15   vehicle in which an account manager,
16   based on the shrinkwrap, could deliver
17   it.  I vaguely -- I do remember that.
18           I don't recall what product
19   it was, though.
20       Q.   Okay.  But it would have
21   been -- based on your training and time
22   with the company, it would have been
23   inappropriate for an individual to speak
24   to the managed care entities about the

Page 155

1    information in the dossier?
2            MS. HILLYER:  Objection to
3    form.
4            THE WITNESS:  That -- no,
5    there may be information in the
6    dossier which would be part of
7    what we would discuss, not
8    specific to the dossier.  So I
9    don't think that's accurate.
10   BY MS. RUANE:
11       Q.   With that distinction.
12   Obviously, the dossier covers a lot of
13   things.
14       A.   Exactly.
15       Q.   But as far as talking
16   specifically about the dossier and the
17   information in the dossier in front of,
18   you know, the managed care entity, it
19   would have been inappropriate for you or
20   your team to discuss the details of that
21   dossier specifically?
22           MS. HILLYER:  Objection to
23   form.
24           THE WITNESS:  Are you asking

Page 156

1    about the content?
2    BY MS. RUANE:
3        Q.   Yes.
4        A.   Are you asking what is -- if
5    the payer says, what is included, there
6    are several sections?  We would say,
7    well, there's economic information,
8    there's background information.
9    Generally like that.
10       Q.   I'm asking whether, based on
11   your earlier testimony that white papers
12   are one thing but dossiers are another,
13   dossiers go through medical services and
14   you would not have spoken with managed
15   care entities about information in the
16   dossier.
17           Am I -- I want to make sure
18   I understand you correctly.
19       A.   Yes, that is the policy --
20           MS. HILLYER:  Objection.
21   Mischaracterizes the testimony.
22   And objection to form.
23           You can answer.
24           THE WITNESS:  Sorry.

Page 157

1    As I recall -- mind you,
2 this is a long time ago and we've
3 changed, evolved with the dossier.
4    Based on my recollection, we
5 would not have discussed the
6 contents of the dossier.
7 That's my recollection, we would
8 not have.
9 BY MS. RUANE:
10    Q.   Do you have an understanding
11 of why that was the policy?
12    A.   This is not a medical/legal
13 review document.
14    Q.   And what do you mean by
15 that?
16    A.   It's not a promotional
17 piece.
18    Q.   The only documents -- am I
19 correct that the only documents your team
20 was allowed to discuss with the managed
21 care entities were promotional pieces?
22    A.   That's correct.
23    Q.   And am I correct that the
24 promotional pieces would have been

Page 158

1 approved by medical/legal?
2    A.   Yes.  Although I'm not
3 remembering about the WL lefts, the
4 reprints that may have been part of that
5 back in those days.
6    Obviously, policies have
7 changed over time.  So I don't recall if
8 there were any clinical reprints that
9 were approved for dissemination.
10    Q.   Okay.  And I appreciate
11 that.  If we get there, we get there; if
12 not, no big deal.
13    But what I want to make sure
14 I understand is, when you talk about the
15 promotional piece, it appears to have
16 some significance, the phrase
17 "promotional piece."  And so I want to
18 make sure I understand what that means to
19 you.
20    It sounds like what it means
21 to you is a piece that has been approved
22 by medical/legal that you can discuss
23 with the managed care entities; is that
24 correct?

Page 159

1    A.   Medical, legal, and
2 regulatory.
3    Q.   Okay.  And your memory is
4 the Actiq white paper, which I know is
5 different in your memory than what we're
6 looking at right now, but your memory is
7 the Actiq white paper was a promotional
8 piece?
9    MS. HILLYER:  Objection.
10 Mischaracterizes testimony.
11    THE WITNESS:  No.
12 BY MS. RUANE:
13    Q.   So the Actiq white paper is
14 not a promotional piece?
15    A.   My memory is based on the
16 e-mail you showed me, which shows
17 professional services.
18    And without specifically
19 remembering the details of the white
20 paper, anything that referenced
21 professional services fell under a
22 nonpromotional piece that was
23 disseminated upon request.
24    Q.   Let's look at -- I gave you

Page 160

1 Exhibit-12, right?  Module 2.
2    MS. HILLYER:  No.
3    I don't think you put it on
4 the record, if you wanted to.
5    MS. RUANE:  Sorry.  Thank
6 you.
7 BY MS. RUANE:
8    Q.   We're now looking at
9 Exhibit-12, which is TEVA_CHI_00036931.
10    Again, there's little
11 numbers on the document, I'm just going
12 to use those because it's easier.
13    A.   I see.
14    Q.   On Page 3 of the document,
15 the last paragraph, about halfway
16 through, there's a sentence that starts
17 with, Addiction?
18    A.   Yes.
19    Q.   It says, Addiction, a
20 disease characterized by behaviors such
21 as compulsion, harm to the user or
22 continued use despite harm, is uncommon
23 in patients using opioids for a medical
24 condition.

Page 161

1          Do you see that?
2          A.   I see that.
3          Q.   What scientific support is
4     there for that statement?
5               MS. HILLYER:  Objection.
6          Lack of foundation.  Calls for
7          speculation.
8     BY MS. RUANE:
9          Q.   Do you see any there?
10         A.   I can't answer that
11    question.
12         Q.   You had mentioned earlier
13    that sometimes there's citations to the
14    studies supporting statements.
15              Do you see any citation
16    there or reference point?
17         A.   Nope.
18         Q.   Do you know, just based on
19    your personal experience in managed care
20    with opioids over time, any -- do you
21    have any support, any scientific support,
22    that you're aware of for that statement?
23              MS. HILLYER:  Objection.
24         Calls for speculation.  Lack of

Page 162

1          foundation.
2               THE WITNESS:  I don't have
3          an opinion about that.
4     BY MS. RUANE:
5          Q.   Do you believe that
6     addiction is uncommon in patients using
7     opioids for medical conditions?
8               MS. HILLYER:  Objection to
9          form.
10              THE WITNESS:  I'm not a
11         physician.
12    BY MS. RUANE:
13         Q.   You have no opinion one way
14    or another?
15         A.   No.
16         Q.   Page 22 references
17    pseudoaddiction.
18              Do you see that?
19         A.   Yes, I do.
20         Q.   Are you familiar with the
21    term "pseudoaddiction"?
22         A.   I don't recall.
23         Q.   You agree it's a term that
24    was used in documents provided by the

Page 163

1     company?
2               MS. HILLYER:  Objection to
3          form.
4               THE WITNESS:  I don't
5          remember seeing pseudoaddiction in
6          any of the pieces that we used
7          with payers.
8               It may have been, I just
9          don't recall.
10    BY MS. RUANE:
11         Q.   Pseudoaddiction is in
12    Exhibit-12, which was provided to managed
13    care payers upon request?
14              MS. HILLYER:  Objection.
15         Assumes facts not in evidence.
16    BY MS. RUANE:
17         Q.   I mean, you see it in
18    Exhibit-12, right?
19         A.   I said I don't recall
20    because this is the first time I've seen
21    this in how many years.
22              But your statement is
23    correct.  In bold words -- letters, it
24    says, Pseudoaddiction.  And it's in a

Page 164

1     module that would have been received by
2     payers.
3          Q.   And pseudoaddiction there
4     states, Addiction should be distinguished
5     from pseudoaddiction, which is
6     characterized by drug-seeking behaviors
7     caused by unrelieved pain.  Some patients
8     with unrelieved or untreated pain may be
9     aggressive in requesting additional
10    analgesics.  When such requests are not
11    related to psychological beliefs nor to
12    psychic effects, but rather to unrelieved
13    pain, the appropriate response is
14    improved pain management.
15              Do you see that?
16         A.   I see that.
17         Q.   Do you see any scientific
18    support for that statement?
19              MS. HILLYER:  Objection.  Do
20         you mean in the document?
21              MS. RUANE:  In the document.
22              THE WITNESS:  I don't see
23         anything.
24    BY MS. RUANE:

Page 165

1      Q.   Do you know any
2   scientific -- I'm sorry, I didn't mean to
3   interrupt you.
4      A.   I was answering.  You just
5   couldn't hear me.
6      Q.   Sorry.  Go ahead.
7      A.   I do not see a reference on
8   this document.
9      Q.   Do you know of any
10  scientific support for the theory of
11  pseudoaddiction?
12         MS. HILLYER:  Objection to
13         form.
14         You can answer.
15         THE WITNESS:  I'm not
16         familiar with this, period.
17  BY MS. RUANE:
18     Q.   You're not familiar with
19  pseudoaddiction?
20     A.   So I can't answer your
21  question.
22     Q.   Given your role with managed
23  care entities assessing reimbursement
24  issues related to Actiq and then

Page 166

1   Fentora --
2      A.   Sure.
3      Q.   -- did you receive education
4   and training on issues related to
5   addiction or abuse of opioids?
6      A.   Sure.  I just don't recall
7   if this is what I stated.
8      Q.   And what type of training
9   and education did you receive?
10     A.   There were training modules
11  that all the account managers were
12  required to complete on the disease
13  state, misuse, abuse, diversion, all the
14  things that we're talking about, as far
15  as what you're referring to here, in
16  addition to the mechanism of action of
17  the product, as with any training on a
18  product that any pharmaceutical company
19  would provide, not unlike that.
20     Q.   And during your time working
21  with managed care entities on the
22  products Actiq and then Fentora, did you
23  come to any conclusions about the issues
24  of abuse associated with those drugs?

Page 167

1          MS. HILLYER:  Objection to
2          form.
3          THE WITNESS:  No
4          conclusions.
5   BY MS. RUANE:
6      Q.   Sitting here today, have you
7   reached a conclusion as to whether
8   there's an opioid epidemic?
9          MS. HILLYER:  Objection to
10         form.
11         THE WITNESS:  A conclusion,
12         no.
13  BY MS. RUANE:
14     Q.   Page 23 of Exhibit-12 --
15     A.   I'm sorry, you said 23?
16     Q.   Yes, just the next page.
17         The last sentence in the
18  first paragraph indicates, Similarly, the
19  risk of abuse is low in patients with
20  nonmalignant pain, though there is less
21  experience in this patient population.
22         Do you see that?
23     A.   I'm sorry, I wasn't
24  following where it is.

Page 168

1      Q.   Up at the top.
2      A.   Up at the top, sorry.
3      Q.   And then right below that,
4   under, Managing the risk of opioid abuse,
5   in that first sentence, it indicates,
6   Although it is uncommon for chronic pain
7   patients to abuse opioid medications,
8   there is a potential risk associated with
9   the use of all opioids.
10         Do you see that?
11     A.   I see that.
12     Q.   Do you know of any
13  scientific -- well, strike that.
14         First, let me ask you, do
15  you see any scientific support cited in
16  Exhibit-12 for those statements?
17     A.   No.
18     Q.   Do you personally have any
19  scientific support for the idea that it's
20  uncommon for chronic pain patients to
21  abuse opioid medications?
22         MS. HILLYER:  Objection to
23         form.
24         THE WITNESS:  Are you saying

Page 169

1    do I have an opinion?
2    BY MS. RUANE:
3        Q.    Yes.
4        A.    I don't have an opinion.
5        Q.    This is information that was
6    created by, I guess at this time, by
7    Cephalon, correct?
8        A.    It was -- yes.
9        Q.    And Cephalon was also the
10   company that was creating the modules
11   used to train you all on Actiq, correct?
12           MS. HILLYER:  Objection to
13   form.
14           THE WITNESS:  I was not
15   involved with the sales training.
16   I don't know who developed that.
17   BY MS. RUANE:
18       Q.    But Cephalon was the -- I
19   mean, you didn't receive training on
20   issues of opioids and potential abuse or
21   diversion from anyone outside the
22   company, correct?
23       A.    I don't -- no.  No, I don't
24   recall.

Page 170

1        Q.    So it's a correct statement
2    that your training on issues of potential
3    abuse, diversion of opioids would have
4    occurred through your employment with
5    Cephalon and then Teva, correct?
6        A.    That's a true statement.
7           MS. RUANE:  I'm going to
8    hand you what's been marked as
9    Exhibit-13.  And for the record,
10   this is TEVA_MDL_A_03272381.
11          - - -
12          (Whereupon, Teva-Bearer
13   Exhibit-13,
14   TEVA_MDL_A_03272381-391, was
15   marked for identification.)
16          - - -
17   BY MS. RUANE:
18       Q.    This is an e-mail you sent
19   to Terry Terifay regarding an upcoming
20   Actiq speaker training.
21       A.    Yes.
22       Q.    And Page 382, that second
23   page, what you'll see, as you go through
24   it, there's different -- I assume these

Page 171

1    are different managed care entities,
2    right?
3           You've got Blue Cross and
4    Blue Shield of Alabama and then Regents.
5    And you mentioned there's probably over
6    100 in the nation, but these are some you
7    all dealt with, correct?
8        A.    Correct.
9        Q.    Under Blue Cross and Blue
10   Shield of Alabama, the description under
11   primary purpose of the clinical
12   presentation, toward the bottom of the
13   page, this is a document that's providing
14   some managed care Medicaid scenarios for
15   an Actiq speaker training, correct?
16       A.    Yes.
17       Q.    And the Actiq speaker
18   training would be a training of -- well,
19   strike that.
20           Who -- what speakers were
21   being trained?
22       A.    I don't recall.
23       Q.    Are they Cephalon employees
24   or are they the key opinion leaders that

Page 172

1    we discussed earlier, do you know?
2        A.    Speakers -- say the question
3    one more time.
4        Q.    Sure.
5           The speaker training, would
6    it be for employees of Cephalon who are
7    going to do a managed care presentation?
8        A.    I don't recall.
9        Q.    Under the primary purpose of
10   the clinical presentation, the second
11   bullet point there indicates, Explain
12   different utilities for Actiq and reasons
13   why pain management specialists are
14   prescribing it for noncancer breakthrough
15   pain.
16           Do you see that?
17       A.    Yes.
18       Q.    And that's something that
19   would happen at these meetings with
20   managed care entities, correct?
21          MS. HILLYER:  Objection to
22   form.
23          THE WITNESS:  This -- the
24   way -- you're asking if this

Page 173

```
 1          presentation was for -- to payers?
 2      Is that what you're -- I'm sorry.
 3   BY MS. RUANE:
 4          Q.   Let's back up and make sure
 5      we're --
 6          A.   Let's make sure we're on the
 7      same page.
 8          Q.   -- on the same page.
 9              These are managed care
10      Medicaid scenarios --
11          A.   Yes.
12          Q.   -- provided by national
13      account managers --
14          A.   Yes.
15          Q.   -- for the upcoming Actiq
16      speaker training?
17          A.   Yes.
18          Q.   Okay.  So this is going to
19      be for a speaker training meeting?
20          A.   Right.
21          Q.   Presumably those speakers,
22      their role is then going to be to go out
23      and talk to managed care entities,
24      correct?
```

Page 174

```
 1          A.   No, I don't interpret it
 2      this way.
 3          Q.   What would the speaker
 4      training be for?
 5          A.   Based on what I'm reading
 6      here, having -- not recalling this,
 7      the --
 8              MS. HILLYER:  Then
 9      objection.  Calls for speculation.
10              THE WITNESS:  Yeah, I really
11      don't know.
12   BY MS. RUANE:
13          Q.   Let's back up a little bit.
14          A.   Okay.
15          Q.   Look, for example, on Blue
16      Cross and Blue Shield of Alabama, the
17      second heading there is, Key
18      decision-makers who will be attending the
19      clinical presentation.
20              Do you see that?
21          A.   Yes, I do.  Yep.  Yep.
22          Q.   Is that helpful?
23          A.   Yes.
24          Q.   So are we now on the same
```

Page 175

```
 1      page, that this is information provided
 2      in advance of meetings with managed care
 3      entities?
 4          A.   Hold off.  Let me look.
 5              That's the way I would
 6      interpret this.
 7          Q.   And down below, under
 8      primary purpose, there's the bullet point
 9      for explaining different utilities for
10      Actiq and reasons why pain management
11      specialists are prescribing it for
12      noncancer breakthrough pain, correct?
13          A.   That's what it says.
14          Q.   Okay.  And you were aware of
15      this at the time, because these were
16      scenarios that you sent to Terry Terifay,
17      correct?
18          A.   Yes.
19          Q.   The bullet point below that
20      indicates that another purpose of the
21      presentation was to convince the plan to
22      consider coverage for any of the above
23      uses, correct?
24          A.   I'm sorry, where are you
```

Page 176

```
 1      here?
 2          Q.   Sorry.  Third bullet point
 3      down on primary purpose.
 4          A.   Yes, that's what it says.
 5      Sorry.
 6          Q.   So one of the goals, when
 7      you're meeting with these managed care
 8      entities, is to convince the plan to
 9      consider coverage for any of the above
10      uses, and that's referring to noncancer
11      breakthrough pain uses, correct?
12          A.   That's what it says.
13          Q.   That was one of the goals of
14      you and your team when you were meeting
15      with managed care entities for Actiq and
16      then subsequently for Fentora, correct?
17              MS. HILLYER:  Objection to
18      form.
19              THE WITNESS:  In general.
20      We had different objectives for
21      each plan, depending on the
22      situation, because each plan payer
23      is different.
24   BY MS. RUANE:
```

Page 177

1      Q.   For Blue Cross and Blue
2   Shield of Alabama --
3      A.   I don't have any direct
4   knowledge of that.  That wasn't a part of
5   my area.
6           That's why I'm hesitating
7   quite a bit, because these are not
8   plans -- I was trying to figure -- that I
9   have direct knowledge of.
10     Q.   And the reason -- I mean, in
11  fairness to you, I understand it was a
12  long time ago, so we'll work through it
13  together.
14          But you are -- you were the
15  one that sent this e-mail, right?
16     A.   Correct.
17     Q.   And one of the things that
18  you just know, in addition to the e-mail,
19  from your own personal experience is that
20  many times when you were meeting with
21  managed care entities, one of the things
22  you were doing was working to convince
23  them to consider coverage for something
24  other than breakthrough cancer pain,

Page 178

1   correct?
2           MS. HILLYER:  Objection to
3   form.
4           THE WITNESS:  We presented
5   information.  As I stated before,
6   many plans -- I don't know the
7   details around these -- did not
8   have a lot of rigor behind Actiq
9   early on.
10          By the time I joined the
11  company in 2004 was when payers
12  were starting to take a look at
13  opioids.  And sometimes by just
14  default they would make decisions
15  on coverage.  I can't speak to
16  what specifically they were.
17          As I mentioned earlier,
18  coverage criteria goes beyond
19  indication.  There are many other
20  requirements in coverage criteria.
21          Additionally, many patients
22  were currently on, as a doctor
23  deemed appropriate, whether it --
24  whether they -- depending on the

Page 179

1   diagnosis, it was up to the doctor
2   as to what product was
3   appropriate.
4           So I view this as more of an
5   education, because many times when
6   restrictions come quickly, it
7   causes a disruption for the
8   patient in treatment.
9           So a lot of this was an
10  education process.  Many of these
11  plans we had not engaged with on a
12  regular basis for Actiq.
13  BY MS. RUANE:
14     Q.   And so the goal was, in
15  those cases, to convince plans to
16  consider coverage for something other
17  than breakthrough cancer pain, correct?
18     A.   The goal is --
19          MS. HILLYER:  Hold on.
20  Objection to form.  And asked and
21  answered.
22          You can answer again.
23  BY MS. RUANE:
24     Q.   I mean, at least as it

Page 180

1   relates to this Blue Cross and Blue
2   Shield of Alabama.
3           Let me ask a different
4   question.
5           You would agree that this
6   document, which you provided to Terry
7   Terifay, indicates that one of the
8   primary purposes of the clinical
9   presentation is to provide -- was to,
10  strike that -- to convince the plan to
11  consider coverage for any of the above
12  uses, which refers to noncancer
13  breakthrough plan?
14          MS. HILLYER:  Objection to
15  the form.  Lack of foundation.
16  And calls for speculation.  She
17  said she didn't cover this
18  account.
19          THE WITNESS:  I don't have
20  direct knowledge of Blue Cross
21  Blue Shield of Alabama.
22  BY MS. RUANE:
23     Q.   Let me ask a different
24  question.

Page 181

1    We know, and we talked about
2 in the first hour of this deposition, the
3 fact that you were -- as a national
4 account manager and then subsequently as
5 you became a director, you met with
6 managed care entities, right?
7    A.   Correct.
8    Q.   And one of the things you
9 did, during your time as a national
10 account manager at Cephalon, was to meet
11 with managed care entities, correct?
12    A.   Yes.
13    MS. HILLYER:  Asked and
14    answered.
15 BY MS. RUANE:
16    Q.   And during that time, one of
17 the products that you would discuss was
18 Actiq, correct?
19    A.   Correct.
20    Q.   And, obviously, it depends
21 on the plan and what their coverage is --
22    A.   Right.
23    Q.   -- at that time, but one of
24 the things that you did was work with

Page 182

1 plans who didn't have the coverage
2 criteria for Actiq would have been
3 most beneficial for purposes of increased
4 prescriptions, would be to work with
5 those plans on convincing them to
6 consider coverage for something other
7 than breakthrough cancer pain, correct?
8    MS. HILLYER:  Objection to
9    form.
10 BY MS. RUANE:
11    Q.   That's a thing that
12 happened, isn't it?
13    MS. HILLYER:  Objection to
14    form.
15    THE WITNESS:  A result --
16    MS. HILLYER:  Go ahead.
17    THE WITNESS:  As I stated
18    previously, much of the
19    interaction, whether it be
20    promotional or from medical, was
21    an educational process where many
22    patients, whatever the physician
23    deemed appropriate, prescribed
24    Actiq for their patients.

Page 183

1    Part of what we discussed
2    was the broad spectrum of pain
3    management, et cetera, as you've
4    seen in all of these documents.
5    If, in fact, they did change
6    criteria, the result would be the
7    patient would have access
8    ultimately at that point, to your
9    point, and Cephalon would have the
10    benefit of the sale of that
11    product. So that's an accurate
12    statement.
13 BY MS. RUANE:
14    Q.   And it's also an accurate
15 statement that during those times that
16 you were talking to the managed care
17 entities, you were talking to them about
18 the broad spectrum of pain, which
19 included pain beyond breakthrough cancer
20 pain, correct?
21    MS. HILLYER:  Objection to
22    form.
23    THE WITNESS:  Honestly, I
24    don't remember engaging with a

Page 184

1    plan specifically to the question
2    that you've asked me.  I really
3    don't recall specifically.
4    Many times, plans would
5    request information.
6 BY MS. RUANE:
7    Q.   And based on the fact that
8 you've been with the company, you know,
9 for over a decade -- I understand a lot
10 of this was a long time ago.
11    But you've just described
12 for us how you would speak to them about
13 the broad spectrum of pain; that was part
14 of the job, was to educate them on the
15 broad spectrum of pain.
16    And you agree that broad
17 spectrum of pain went beyond breakthrough
18 cancer pain, correct?
19    MS. HILLYER:  Objection to
20    form.  It mischaracterizes
21    testimony.
22 BY MS. RUANE:
23    Q.   That's a correct statement,
24 isn't it?

Page 185

1          MS. HILLYER: I made my
2     objection.
3          She can answer the question.
4          THE WITNESS: Again, pain
5     management was not something
6     familiar to payers. If I -- if I
7     had a conversation with a plan, it
8     would have been based on an
9     approved document that may have
10    had the disease background on pain
11    management. Because, again, this
12    is for patients suffering from
13    chronic pain who have breakthrough
14    episodes. So it's very relevant
15    to talk about chronic pain,
16    spectrum of pain, and talk about
17    breakthrough episodes specific to
18    our label, which would then
19    include cancer patients.
20    BY MS. RUANE:
21        Q.   And the conversation about
22    the chronic pain and the breakthrough
23    pain would not necessarily be limited to
24    cancer patients, correct?

Page 186

1          MS. HILLYER: Objection to
2     form.
3          THE WITNESS: I don't recall
4     the documents -- maybe you'll
5     provide them to me -- the
6     documents that we used. I
7     honestly don't remember the
8     content of those.
9          A lot of what we do with
10    payers is educate on disease
11    state, as I've stated before.
12    This is very common in current
13    products that we promote now.
14    It's very common to talk about
15    standard of care. It's very
16    common to talk about chronic and
17    acute medications.
18         It sets the foundation for
19    the discussion with a payer.
20    BY MS. RUANE:
21        Q.   Okay. If you look on
22    Exhibit-13, on Page 82 at the bottom, it
23    references several objections from the
24    plan, including the concern over abuse

Page 187

1     and diversion of opioids.
2          Do you see that?
3        A.   I saw it previously. Is
4     this 82?
5        Q.   82, yes. At the very
6     bottom.
7        A.   Right. Sorry.
8        Q.   Do you see that?
9        A.   Yep, yep.
10       Q.   On Page 85, the second
11    bullet point indicates, Physicians are
12    afraid of opioid use.
13       A.   You're saying 85?
14       Q.   Yes. 85.
15       A.   Yes.
16       Q.   Do you see that?
17       A.   Yes, that's what it says.
18       Q.   The last two -- well, strike
19    that. Let me ask this first.
20         Do you recall receiving
21    feedback from managed care entities
22    regarding fears of opioids and abuse as a
23    reason not to expand the criteria?
24       A.   Schedule II products, many

Page 188

1     of them. So, of course, we -- they would
2     discuss any scheduled product.
3        Q.   And so it was -- generally
4     speaking, it was a conversation you would
5     have with these managed care entities,
6     because they would bring up the concerns
7     associated with Schedule II products?
8          MS. HILLYER: Objection to
9     form.
10         THE WITNESS: Not -- you're
11    making a broad statement, and I
12    can't speak to every conversation
13    that I had with every plan.
14         Misuse, abuse and diversion,
15    we take a responsibility as a
16    company, we are certainly aware of
17    that.
18         So if they asked the
19    question, we would have a
20    conversation about it.
21    BY MS. RUANE:
22       Q.   And as a company, misuse,
23    abuse and diversion are things that the
24    company was aware of and you were aware

Page 189

1  of, correct?
2       MS. HILLYER:  Objection.
3  Calls for speculation.
4       THE WITNESS:  We're aware of
5  because it's a Schedule II
6  product.
7  BY MS. RUANE:
8       Q.   And because of that fact,
9  you found yourself speaking to managed
10 care entities about their questions
11 associated with a Schedule II product and
12 use, abuse and diversion, correct?
13      A.   I don't recall any specific
14 questions around -- I just don't recall
15 any specific questions that I received
16 and having that conversation.
17      Q.   But you would agree that
18 they did occur, at least sometimes,
19 because we've looked at a couple of them
20 in this document, correct?
21      MS. HILLYER:  Objection.
22 Calls for speculation.  Lack of
23 foundation.
24      THE WITNESS:  You do realize

Page 190

1       I did not create this document?
2       This was a compilation of
3  what was sent to me, and I
4  forwarded it on to marketing, it
5  appears.
6  BY MS. RUANE:
7       Q.   It was provided by the
8  national account managers, right?
9       A.   Yes, yes.  I didn't write
10 the document.
11      So when you're asking me
12 specifics around each of these plans, I
13 don't have the context to answer the
14 question.
15      Q.   But at least what we know
16 from Exhibit-13 is that the national
17 account managers were reporting
18 conversations regarding questions on use
19 and abuse of opioids?
20      MS. HILLYER:  Objection.
21 Calls for speculation.
22 BY MS. RUANE:
23      Q.   I mean, would you agree?  We
24 just looked at this.

Page 191

1       A.   Based on this, I would also
2  agree that there are other opioids on the
3  market.  It was a general opioids
4  statement.  Because it's a Schedule II,
5  it's logical to have that -- that's why
6  it's a Schedule II.
7       Q.   Okay.  I'm going to hand you
8  what's been marked as Exhibit-14.
9            - - -
10      (Whereupon, Teva-Bearer
11 Exhibit-14, TEVA_MDL_A_04481825,
12 was marked for identification.)
13           - - -
14      MS. RUANE:  It's
15 TEVA_MDL_A_04481825.
16 BY MS. RUANE:
17      Q.   This is an e-mail from
18 Robert Host to you.
19      Do you see that?
20      A.   Yes.
21      Q.   He references a Dr. Guarino,
22 who is a physician in St. Louis who just
23 presented a poster study at a recent pain
24 meeting on nonmalignant pain for Actiq.

Page 192

1       Do you see that?
2       A.   I see that.
3       Q.   Nonmalignant pain is pain
4  that is not related to cancer, correct?
5       A.   That's correct.
6       Q.   Speaking with Amy Jordheim,
7  the MDM.
8       Who is Amy Jordheim?  What
9  does MDM refer to?
10      A.   I don't remember the acronym
11 now, but it's basically an MSL.  I just
12 don't know what they --
13      Q.   Now I have to ask what an
14 MSL is?
15      A.   Medical science liaison.  So
16 they fall under the medical side.  They
17 deal with KOLs, thought leaders.  They're
18 medical, not sales.
19      Q.   Got it.
20      So she thinks, He --
21 referring to Dr. Guarino -- would be
22 an -- would be excellent to speak to
23 health plans.  And the fact that he has
24 actually completed a study for Actiq in

Page 193

1  nonmalignant pain might be beneficial for
2  other speakers to hear him at our meeting
3  in January.
4        Did I read that correctly?
5     A.   Yes, you did.
6     Q.   Okay.  So you were aware of
7  the use of Actiq by speakers who are
8  physicians?  We've spoken about that
9  before, right?
10    A.   Correct.
11    Q.   Would Dr. Guarino be the
12  type that we talked about before as a key
13  opinion leader?
14       MS. HILLYER:  Objection to
15  the form.
16       THE WITNESS:  I don't know
17  this.
18  BY MS. RUANE:
19    Q.   Because he was published on
20  the use of Actiq in something other
21  than -- in something beyond breakthrough
22  cancer pain, it was thought he might be
23  beneficial for other speakers to hear?
24       MS. HILLYER:  Objection.

Page 194

1        Calls for speculation.
2        THE WITNESS:  I don't know.
3  BY MS. RUANE:
4     Q.   I mean, I'm just reading
5  from what you wrote here.
6        Because he's actually
7  completed a study for Actiq in
8  nonmalignant pain, it might be beneficial
9  for other speakers to hear him at our
10  meeting in January.
11       Do you see that?
12       MS. HILLYER:  Objection to
13  form.  She didn't write this.
14  BY MS. RUANE:
15    Q.   Oh, I see.  You received it.
16  My apologies.
17       Robert wrote to you --
18    A.   Yes.
19    Q.   -- indicating that that
20  might be beneficial, correct?
21    A.   Yes.
22    Q.   What meeting in January is
23  Robb referring to, if you know?
24    A.   I don't recall.

Page 195

1     Q.   I'll tell you, the subject
2  up above indicates, Dr. Guarino for Actiq
3  managed care training.
4     A.   Oh, yeah, it does say that.
5     Q.   So would that have been a
6  meeting for managed care training?
7        MS. HILLYER:  Objection.
8  Calls for speculation.
9        THE WITNESS:  I don't know.
10  BY MS. RUANE:
11    Q.   Is it reasonable to assume,
12  since the subject is Dr. Guarino for
13  Actiq managed care training, that the
14  meeting that's discussed would be a
15  managed care training meeting?
16       MS. HILLYER:  Objection.
17  Calls for speculation.
18       THE WITNESS:  That's what it
19  states.
20  BY MS. RUANE:
21    Q.   Do you know whether -- well,
22  strike that.
23       Who is Robert Host?
24    A.   A national account manager.

Page 196

1     Q.   And at this time, you were
2  also a national account manager?
3     A.   Yes, I believe so, based on
4  the date, yes.
5     Q.   Did you have a management
6  role over Robert Host?
7     A.   No, I really don't recall.
8        But they're asking me to
9  speak to marketing.  So there was a point
10  where I was in management and still had a
11  home office, sort of liaise
12  responsibilities.
13       But that's perhaps why I
14  received this.  That's a speculation.  So
15  I don't know for sure.
16    Q.   And when you say they're
17  asking you to speak to marketing, you're
18  referring to his request that you check
19  with Terry --
20    A.   Yes.
21    Q.   Okay.
22       Is this a suggestion from
23  Robert Host that Guarino should be
24  utilized to promote the off-label use of

Page 197

1    Actiq?
2         MS. HILLYER:  Objection to
3    form.
4         THE WITNESS:  I can't -- I
5    can't speculate as to what
6    Robert's intention was.
7    BY MS. RUANE:
8         Q.   But you do agree that the
9    study he completed would be for off-label
10   use of Actiq, correct?
11        A.   It states that he did a
12   study on nonmalignant pain.
13        We often were requested to
14   bring in speakers, as I mentioned, to
15   educate the plan.  If the plan wanted to
16   understand why the prescribers are
17   prescribing Actiq, a request such as this
18   could come in, and we would, if a --
19   particularly if they've published
20   something or have done a study, there's
21   much more credibility, if the plan --
22   these are clinical pharmacists.
23        They may have a need to
24   understand the data associated with

Page 198

1    nonmalignant pain and Actiq.  So it's
2    very reasonable that you would have
3    someone that has done a study to give
4    that presentation --
5         Q.   And the data --
6         A.   -- upon request.
7         Q.   And the data associated with
8    nonmalignant pain, it would be data
9    associated with off-label use of Actiq,
10   correct?
11        A.   Clinical studies can be done
12   for any reason.
13        But based on what I -- a
14   physician makes a determination on how
15   they want to study the product.  So based
16   on what I'm reading here, this physician,
17   who I don't know, had a poster which
18   suggests that he did a clinical
19   presentation -- a clinical trial of some
20   sort on nonmalignant pain, which is,
21   again, outside the current -- outside
22   that current label.
23        Q.   Yes, outside the indication,
24   so off label, correct?

Page 199

1         A.   It's not in the current
2    indication, yes.
3         Q.   And I just want to be sure
4    we're on the same page.
5         If it's outside the current
6    indication -- inside the current
7    indication is on label?
8         A.   Yes.
9         Q.   Outside the current
10   indication is off label, right?
11        A.   That's correct, yes.
12        Q.   Okay.
13        THE WITNESS:  We're finished
14   with this?
15        MS. RUANE:  Let's take a
16   quick --
17        MS. HILLYER:  It's almost an
18   hour.  We're at 58.
19        MS. RUANE:  That's perfect.
20   Let's do lunch.
21        VIDEO TECHNICIAN:  Going off
22   the record.  12:45 p.m.
23        - - -
24        (Whereupon, a luncheon

Page 200

1    recess was taken.)
2         - - -
3         VIDEO TECHNICIAN:  Back on
4    record at 1:28 p.m.
5    BY MS. RUANE:
6         Q.   We're back on the record
7    after a lunch break.
8         Do you understand you're
9    still under oath?
10        A.   Yes.
11        Q.   Let me ask you, what
12   promotional activities did you perform
13   with regard to managed care for Actiq?
14        A.   In engaging with the payers,
15   we would have approved materials.  In
16   fact, I think we often used sales
17   materials because we didn't have a
18   managed care marker, like I am
19   presenting -- putting together specifics.
20   And there was a presentation, as I
21   recall.
22        Q.   And I apologize, I'm going
23   to repeat some of that to make sure I
24   heard you okay.  All right?

Page 201

1      So one of the things you
2  mentioned were actually using the sales
3  materials that the sales force used?
4      A.  We may have.  There wasn't a
5  managed care marketing department back in
6  those days, which is what I do now.
7  Therefore, managed care-specific pieces
8  were somewhat limited.
9      Q.  Because the managed care
10 team was kind of selling to the managed
11 care entities, while the sales team was
12 out with providers, correct?
13      MS. HILLYER:  Objection to
14 form.
15      THE WITNESS:  Managed
16      care -- the account managers would
17      present to payers if there was an
18      approved document, which, of
19      course, the sales force had
20      approved documents.
21      It's my recollection that,
22      in certain situations, we would
23      use promotional materials that
24      were approved for HCPs in general.

Page 202

1  BY MS. RUANE:
2      Q.  And what promotional -- do
3  you remember the names or types of
4  promotional materials?
5      A.  Honestly, I do not.
6      Q.  You also mentioned a
7  presentation?
8      A.  I believe there was a
9  presentation.  I know we were -- I think
10 there was a point where we were asking
11 for input around promotional
12 presentation.  Because the audience is
13 different with payers, oftentimes the
14 information may be different.
15      I honestly don't recall
16 presenting it, if it was, in fact,
17 approved.
18      Q.  And would that have been
19 kind of -- is your memory of it a slide
20 deck-type presentation?
21      A.  It would be, yes.
22      Q.  Do you have a memory of the
23 name that that type of promotional
24 presentation was given?

Page 203

1      A.  No.
2      Q.  What promotional -- well,
3  strike that.
4      Before I ask, are there any
5  other promotional activities, as it
6  relates to Actiq, that you can recall?
7      A.  With which audience?
8      Q.  With the managed care
9  entities.
10      A.  Not that I can recall.
11      Q.  Were there other audiences
12 that you were involved in providing
13 promotional activities with regard to
14 Actiq on?
15      A.  Not that I recall.
16      Q.  What promotional activities
17 did you perform with regard to managed
18 care for Fentora?
19      A.  Similar -- similarly, there
20 was a managed care presentation from a
21 promotional -- that would have to go
22 through our medical/legal, you know.
23      I believe when we launched
24 Fentora, I was transitioning to the other

Page 204

1  position.  So, again, I don't recall how
2  much interfacing, customer-facing, with
3  Fentora, I personally had.
4      Q.  Okay.  And so that managed
5  care presentation would be a slide deck
6  as well?
7      A.  Yes.
8      Q.  Were there sales materials
9  used in the promotion of Fentora to
10 managed care entities?
11      A.  I don't -- I don't recall.
12 Unlikely.
13      Q.  Was that because at that
14 point the managed care department had its
15 own marketing?
16      A.  Yes.  So we had
17 payer-specific information.
18      Q.  So the payer-specific
19 managed care marketing information for
20 Fentora would have been derived in the
21 managed care -- created within the
22 managed care system?
23      A.  Correct.  No.  Created in
24 the managed care system?

Page 205

1    Q.   On the managed care team.
2  Somebody in the -- was there a marketing
3  person within the managed care team?
4    A.   No -- well, until they moved
5  toward that.  But at that point, if
6  memory serves, typically, the -- there
7  was a marketing brand team member who had
8  responsibility for the payer piece to it.
9    Q.   Got it.
10       And do you recall who the
11  marketing brand team payer -- strike
12  that.  Let me start over.
13       Do you recall who the
14  marketing brand team member who was
15  assigned to managed care was?
16    A.   I believe it was Matt
17  Falker.
18    Q.   How do you spell that last
19  name?
20    A.   F, as in Frank, A-L, as in
21  live, K-E-R.
22    Q.   Did you -- backing up.
23       Did you have a hand in the
24  creation of the promotional materials

Page 206

1  used for Actiq?
2    A.   No.
3    Q.   Did you have a hand in the
4  creation of the promotional materials
5  used for Fentora?
6       MS. HILLYER:  Objection.
7       THE WITNESS:  For the payer?
8  BY MS. RUANE:
9    Q.   Payer, yes.
10    A.   Yes.
11       Could you define "hand,"
12  though?  What do you mean?
13    Q.   Did you provide content or
14  comments?
15    A.   Comments.
16    Q.   And those promotional
17  materials would be presented to managed
18  care entities and discussed with managed
19  care entities, correct?
20    A.   Yes.  Promotional materials
21  are presented to payers, managed care.
22       MS. RUANE:  I'm going to
23  hand you what's been marked as
24  Exhibit-15.

Page 207

1       - - -
2       (Whereupon, Teva-Bearer
3  Exhibit-15,
4  TEVA_MDL_A_09457158-159, was
5  marked for identification.)
6       - - -
7       MS. RUANE:  The document
8  number is TEVA_MDL_A_09457158.
9  BY MS. RUANE:
10    Q.   This was an e-mail to you.
11  And the subject is, Fentora MCO slides.
12       Do you see that?
13    A.   Yes, I do.
14    Q.   What is MCO?
15    A.   Managed care organization.
16    Q.   So would these be Fentora
17  slides for the managed care entities?
18    A.   I'm going to look at it, but
19  based on the -- yes.
20       MS. HILLYER:  Take your
21  time.
22       You've got two files
23  attached, it looks like, but only
24  one native Bates file attachment.

Page 208

1       MS. RUANE:  Let's see.
2       MS. HILLYER:  I have these
3  two here, right?
4       MS. RUANE:  Right.  Let's
5  look at this.
6       MS. HILLYER:  Are they all
7  part of one Bates?
8       MS. RUANE:  They are all --
9  the Bates numbers are in order.
10       MS. HILLYER:  Right.  I have
11  the e-mail and one native file
12  attachment.  So it looks like I
13  have two native file attachments.
14       MS. RUANE:  I see what
15  you're saying.  The second native
16  file attachment, Bates order-wise,
17  we go from 19457159 to 09457160.
18       MS. HILLYER:  I don't have
19  60 here.
20       MS. RUANE:  If you go -- do
21  you not have that page?
22       MS. HILLYER:  Yes.  That's
23  why I wanted to make sure.  I
24  don't think I do.

Page 209

1  MS. RUANE: That's a
2  printing issue on our end.
3  MS. HILLYER: All right. So
4  we're going to make it -- I don't
5  know if this copy does, then,
6  either. I just want to make sure
7  it's all -- that we keep track of
8  everything.
9  MS. RUANE: No, I appreciate
10  it. And I can explain it for the
11  record as well and get you that
12  native page.
13  MS. HILLYER: She also
14  doesn't have 60.
15  MS. RUANE: Then let me
16  explain for the record what it is,
17  just so that when we're looking
18  back later.
19  Thanks for clarifying that,
20  Becca.
21  BY MS. RUANE:
22  Q. So what you have before you
23  is Exhibit-18. And there is the native
24  page for the document entitled, Chronic

Page 210

1  Pain, the Breakthrough Pain Component,
2  09457159.
3  The Bates number for the
4  managed care presentation is 09451760.
5  MS. HILLYER: That's the
6  draft for review?
7  MS. RUANE: The draft for
8  review. That's correct.
9  BY MS. RUANE:
10  Q. So let me ask you --
11  MS. HILLYER: Sorry, I don't
12  mean to be picky. But the e-mail
13  only has one attachment, as far as
14  I can tell.
15  MS. RUANE: And that's
16  where --
17  MS. HILLYER: So I just want
18  to make sure these really belong
19  together.
20  MS. RUANE: I understand. I
21  understand the concern.
22  All I can tell you is -- the
23  managed care speaker deck -- I
24  mean, we can go -- the thing that

Page 211

1  I'll say about it is if you look
2  at the 7158, and then chronic pain
3  is 7159, managed care is --
4  MS. HILLYER: Not referenced
5  on the title.
6  MS. RUANE: Okay. All
7  right. Let's do this. Take out
8  managed care. I don't want to
9  confuse it. We'll deal with that
10  separately.
11  THE WITNESS: Okay.
12  MS. HILLYER: Okay.
13  MS. RUANE: All right.
14  MS. HILLYER: So what we
15  have here that says, Chronic Pain,
16  the Breakthrough Pain Component --
17  MS. RUANE: Yes.
18  MS. HILLYER: -- that,
19  you're saying, is what is referred
20  to as attachment, Managed Care
21  Speaker Deck Version 2.1 --
22  MS. RUANE: What I actually
23  think is the speaker deck includes
24  both of them, but I understand

Page 212

1  that it looks like there's one
2  attachment. I think it's a
3  PowerPoint. I don't understand
4  why there would be two native
5  images, but they line up in order.
6  MS. HILLYER: But what are
7  the Bates -- are there two Bates?
8  MS. RUANE: There's two
9  Bates.
10  MS. HILLYER: So it could
11  just be a different native file
12  than what was attached.
13  MS. RUANE: Correct. So
14  that's why, let's just leave it on
15  its own and we can deal with it --
16  MS. HILLYER: So Chronic
17  Pain, the Breakthrough Pain
18  Component is TEVA_MDL_A_09457159.
19  MS. RUANE: Yes. Correct.
20  MS. HILLYER: So what we
21  have as Exhibit-15, then, is 7158
22  through 7159?
23  MS. RUANE: Yes.
24  MS. HILLYER: We're going to

Page 213

1    set this one aside.  We're going
2    to focus this on the side and
3    focus on those two, the cover
4    e-mail and the attachment.
5         THE WITNESS:  Got it.
6    BY MS. RUANE:
7         Q.   So this is a managed care
8    speaker deck from 2007 regarding Fentora,
9    correct?
10        A.   That's what it says on the
11   e-mail.
12        Q.   You have no reason to
13   disagree or dispute that, correct?
14        A.   I -- there's nothing in this
15   document that says anything about managed
16   care.
17            So I'm -- I have no way of
18   knowing if this e-mail is in conjunction
19   with this deck.
20        Q.   And I'll tell you the way
21   that we, as attorneys, discern that is
22   the number assigned to it, the last two
23   digits there, 58, on the e-mail.  And on
24   that chronic pain document, the last two

Page 214

1    digits are 59.
2            So that's how we discern
3    that that's the attachment that goes with
4    it within our system.
5            But let me just ask you a
6    couple of questions about it.
7         A.   Sure.
8            MS. HILLYER:  And sorry,
9            again, to be picky, but the
10           numbers on the deck, you wrote
11           those in hand, right?
12           MS. RUANE:  Oh, yeah, I'm
13   sorry.  On the page numbers, yes.
14           MS. HILLYER:  Yes.
15   BY MS. RUANE:
16        Q.   I should have clarified.
17           So because this document
18   doesn't have page numbers, just for ease
19   of reference, I added page numbers on the
20   bottom so that we could follow along.
21           So if you turn to Page 5 --
22        A.   I'm tracking with you now.
23        Q.   -- you'll see there, Chronic
24   pain overview?

Page 215

1         A.   Yes.
2         Q.   And below that, a bullet
3    point for, Pain is pain, correct?
4         A.   I see that.
5         Q.   And that -- below that, it
6    says, CA and nonCA patients.
7            That refers to cancer and
8    noncancer patients, correct?
9         A.   That's what it says.
10           MS. HILLYER:  Objection to
11   form.  Calls for speculation.
12   BY MS. RUANE:
13        Q.   That's your understanding of
14   the CA reference within the Fentora
15   documents is cancer, correct?
16        A.   I don't know.  It doesn't
17   say cancer.
18        Q.   Do you understand CA --
19        A.   I do --
20        Q.   -- to be cancer?
21        A.   Oh, I've never seen -- I
22   don't recall seeing this document before.
23        Q.   But you would agree that the
24   CA and nonCA patients'-pathophysiology,

Page 216

1    the same regardless of etiology or
2    underlying disease, that that's
3    referenced under pain is pain on
4    Exhibit-15, correct?
5         A.   I see the reference, yes.
6         Q.   And this is a slide deck
7    regarding Fentora, correct?
8            MS. HILLYER:  Objection to
9            form.
10           THE WITNESS:  I'm just --
11           okay.  There's nothing in this
12           deck, other than the fact that
13           it's on the Fentora template, that
14           I'm seeing that says Fentora.
15   BY MS. RUANE:
16        Q.   There is the reference to
17   FEBT, correct, in the bottom right-hand
18   corner?
19        A.   That's what I just stated.
20   Other than the template itself, as I go
21   through this deck, this is -- it has many
22   topics.
23        Q.   I'm sorry, this is one of
24   those times where it's -- I don't mean to

Page 217

1  be misstating what you're saying, I'm
2  just trying to make sure I understand it
3  and hear you.
4      A.   Ask the question again.
5      Q.   So this is a Fentora
6  template, right?
7      A.   This is a Fentora template,
8  yes.
9      Q.   And it's a slide deck that
10  was provided to you in 2007, correct?
11     A.   It was e-mailed to me.
12     Q.   Yes.
13          It was provided to you via
14  e-mail, correct?
15     A.   It was provided to me, yes.
16  I had a copy of it.
17     Q.   And it references "pain is
18  pain"?
19     A.   In this deck, it does.
20     Q.   And right below that, it
21  references cancer and noncancer patients,
22  correct?
23     A.   Correct.
24     Q.   Okay.  And that would be

Page 218

1  beyond the indication for Fentora,
2  correct?
3      A.   This is for speakers.  This
4  is not for promotional use by an account
5  manager.  That's what it states.
6      Q.   Sorry.  Go ahead.
7          My question was a little
8  different.
9          You agree that is beyond the
10  indication for Fentora, correct?
11     A.   For Fentora, yes.
12     Q.   And so Teva would provide
13  speakers with these slide decks to use
14  when speaking with managed care entities?
15          MS. HILLYER:  Objection.
16  Calls for speculation.
17          THE WITNESS:  I don't know.
18  BY MS. RUANE:
19     Q.   Well, it's a speaker deck --
20  you just clarified it's a speaker deck --
21     A.   It is a speaker deck.
22     Q.   -- for a speaker, correct?
23          MS. HILLYER:  Objection to
24  form.

Page 219

1  BY MS. RUANE:
2      Q.   For a physician?
3          MS. HILLYER:  Same
4  objection.
5          THE WITNESS:  It says
6  nothing here stating that.  The
7  only thing it says is -- I'm
8  looking at the e-mail --
9  and Darren Keese, I don't even
10  know who that is.
11  BY MS. RUANE:
12     Q.   I'll tell you what, let's do
13  this.  I'm going to mark as Exhibit-16,
14  the managed care presentation draft for
15  review.
16          MS. HILLYER:  We don't have
17  a Bates?
18          MS. RUANE:
19  TEVA_MDL09451760.  And I can get
20  you a native page for that, I
21  apologize it wasn't on it.
22               - - -
23          (Whereupon, Teva-Bearer
24  Exhibit-16, TEVA_MDL09451760, was

Page 220

1  marked for identification.)
2               - - -
3  BY MS. RUANE:
4      Q.   And the first page of this
5  document indicates it's a managed care
6  presentation draft for review, correct?
7      A.   Yes, that's what it says.
8      Q.   So this would be a
9  presentation.
10          It's on a Fentora template,
11  right?
12     A.   Yes, it is.
13     Q.   Page 2 includes disclosures.
14  So there would be -- it references, in
15  the first bullet point, I'm an outside
16  consultant retained by Cephalon, correct?
17     A.   Correct.
18     Q.   So this would be a document
19  used by an outside consultant retained by
20  Cephalon.
21          And this presentation was
22  going to include, based on Exhibit-3,
23  discussion of off-label uses of Fentora,
24  correct?

Page 221

1      A.   Second bullet, in a response
2  to an unsolicited request.
3      Q.   I'm sorry, I meant to say
4  the third bullet.
5      A.   That's what the third bullet
6  says.
7      Q.   And that's a process that
8  you were familiar with in your role with
9  managed care, that physicians would be
10  retained and paid by the company to speak
11  on off-label uses of Fentora?
12          MS. HILLYER:  Objection to
13      form.
14          THE WITNESS:  Upon
15      unsolicited request.
16  BY MS. RUANE:
17      Q.   So if there was an
18  unsolicited request by a managed care
19  entity, the next step would be for the
20  company to have an individual physician
21  retained by them go in to speak to the
22  managed care entity on topics, including
23  off-label use of Fentora?
24      A.   If it was requested.

Page 222

1      Q.   So that's a correct
2  statement?
3      A.   If they requested broad use
4  of Fentora, a presentation on that, then
5  that would be -- that request would be
6  fulfilled.
7      Q.   Fulfilled, okay.
8          So at those presentations,
9  would employees of the company, Cephalon
10  and then subsequently Teva, be present?
11      A.   I don't recall who would be
12  present specifically, to be honest with
13  you.
14      Q.   Do you have any reason to
15  think that the representative from the
16  company would not have attended those
17  presentations?
18      A.   No.
19      Q.   Okay.
20      A.   Typically, it would be a
21  medical person.
22      Q.   Typically --
23      A.   As I recall.
24      Q.   Sorry.  Just to make sure I

Page 223

1  understand.
2          Typically a medical
3  person --
4      A.   Accompanying --
5      Q.   -- within the company would
6  attend?
7      A.   Sorry.  Accompanying a
8  speaker.
9      Q.   Got it.  Accompanying a
10  speaker?
11      A.   Yes.  Correct.
12      Q.   I'm going to say it one last
13  time, just to be sure.
14      A.   Please do.
15      Q.   So in your memory it would
16  typically be an employee of the company
17  within the medical department who would
18  be accompanying the speaker to the
19  presentation?
20      A.   That's what I recall, yes.
21      Q.   Got it.
22          Have you seen these managed
23  care program slides before, this
24  Exhibit-16?

Page 224

1      A.   It was e-mailed to me, so
2  the answer is yes.  But I don't know --
3  again, I'm confused about -- pardon me.
4          MS. HILLYER:  Just to be
5      clear, I don't know that this was
6      part of that e-mail.
7          THE WITNESS:  In that case,
8      I don't know.
9  BY MS. RUANE:
10      Q.   I'll figure that out on my
11  end.
12          If it was e-mailed to you --
13  well, strike that.
14          Let me ask it this way:  Do
15  you have a memory of reviewing managed
16  care presentations?
17          MS. HILLYER:  For Actiq and
18      Fentora?
19          MS. RUANE:  For Fentora.
20          THE WITNESS:  For Fentora?
21      For promotion?
22          MS. HILLYER:  For promotion,
23      she said.
24          THE WITNESS:  For promotion.

1    BY MS. RUANE:
2        Q.   Let's ask it both ways.
3        Do you have a memory of
4    reviewing managed care presentations for
5    promotion of Fentora?
6        A.   Yes.
7        Q.   Do you have a memory of
8    reviewing managed care presentations for
9    speakers?
10        A.   I don't -- I don't remember,
11    honestly.
12        Q.   Exhibit-16 that's before
13    you, did you have any role or
14    responsibility in reviewing or preparing
15    this document?
16        A.   Are we talking about this
17    one?
18        Q.   Yes.
19        A.   Okay.  Is there a date
20    associated with this, by the way?
21    Because that will help me give you --
22        Q.   I mean, it would have been
23    in the 2007 time frame, as best I can
24    tell.  There's citations in here to

1    2006 --
2        A.   No, I was not involved with
3    this.  This, again, is the -- for a
4    physician speaker.  I did not -- and my
5    role was not to develop speaker
6    program -- speaker slides for speakers.
7        Q.   How could we tell -- how
8    could we tell when a managed care
9    presentation is for promotion and
10    something that the managed care team
11    would present?  Like, is there a
12    distinction made in the way they're
13    named?
14        A.   There should have been.  If
15    there wasn't, I don't recall.  That's why
16    I previously was asking you about the
17    presentations.  This is not something
18    that an account manager would present.
19    This stack.
20        Q.   Okay.  There's a separate
21    version -- well, there's a separate type
22    of presentation that went through the
23    promotion committee to be approved that a
24    managed care employee would present,

1    correct?
2        A.   A managed care employee
3    would present?  You mean a Cephalon
4    employee under managed care would
5    present?
6        Q.   Yes.  Yes.
7        A.   We typically would name them
8    managed care presentation for --
9    presentation for managed care
10    decision-makers, that was the common --
11        Q.   Managed care
12    decision-makers?
13        A.   Yes, that was -- I know of
14    recently that's the way they have been
15    done.
16        MS. HILLYER:  The page
17    numbers on that last one you guys
18    put on, too, right?
19        MS. RUANE:  Yes, correct.
20    I'm going to hand you
21    Exhibit-17.
22        - - -
23    (Whereupon, Teva-Bearer
24    Exhibit-17,

1    TEVA_MDL_A_04420139-141, was
2    marked for identification.)
3        - - -
4    BY MS. RUANE:
5        Q.   You were involved in the
6    hotline that was available to healthcare
7    providers attempting to obtain coverage
8    for products like Actiq and Fentora,
9    correct?
10        A.   When you say "involved,"
11    this was work for the entire Cephalon,
12    the hotline.
13        Q.   The hotline, as it relates
14    to you --
15        A.   Yes.
16        Q.   -- we talked earlier about
17    the fact that you were kind of the
18    subject matter expert on managed care
19    issues, right?
20        A.   What time frame are you
21    talking about?
22        Q.   Well, let's talk about this
23    e-mail first.  This was in 2005.
24        That would have been part of

Page 229

1    your role, correct?
2        A.   No.  At this point, I was an
3    account manager in the field.
4        Q.   And you were copied on --
5    well, I guess the e-mail chain includes
6    you?
7        A.   Yes.
8        Q.   And is referencing some
9    questions about the hotline for national
10   account managers.
11           Do you see that?
12           MS. HILLYER:  Give her a
13       minute to look it over.
14           THE WITNESS:  Okay.  Ask
15       your question again.
16   BY MS. RUANE:
17       Q.   Okay.  The hotline possesses
18   tools needed, such as LMN templates and
19   other documents that are a part of
20   creating prior authorization or appeals
21   documentation, right?
22           Is that the way -- I mean, I
23   can --
24           MS. HILLYER:  Objection.

Page 230

1    BY MS. RUANE:
2        Q.   -- ask it more generally if
3    it's easier and faster, okay?
4            One of the things that would
5    happen with the hotline was providers
6    could call the hotline and the hotline
7    had tools, like letters of medical
8    necessity templates, correct?
9        A.   Correct.
10       Q.   There may be other documents
11   that help with prior authorization or an
12   appeals documentation issue, right?
13       A.   Correct.
14       Q.   And so what the hotline was
15   intended to do, at least in part, was
16   help patients secure coverage for the
17   products carried by Cephalon and then
18   Teva, right?
19       A.   It was -- the intent of the
20   hotline was to help the physician's
21   office and/or the patient navigate the
22   process to submit prior authorizations
23   for access.
24       Q.   Okay.

Page 231

1        A.   It's about the process.
2        Q.   And sometimes --
3            MS. RUANE:  I'm going to
4        hand you what's been marked as
5        Exhibit-18.
6            - - -
7        (Whereupon, Teva-Bearer
8        Exhibit-18,
9        TEVA_MDL_A_04848188-191, was
10       marked for identification.)
11           - - -
12           MS. RUANE:  For the record,
13       this is TEVA_MDL_A_04848188.
14   BY MS. RUANE:
15       Q.   I'll give you a second to
16   review it.
17           MS. HILLYER:  It's tiny, the
18       print.
19           THE WITNESS:  Okay.  Maybe
20       with your question I'll need to
21       read it again, but go ahead.
22   BY MS. RUANE:
23       Q.   The e-mail chain starts off
24   with an e-mail from -- on Page 89, with

Page 232

1    an e-mail from Alec Burlakoff?
2        A.   Yes.
3        Q.   And he's describing a
4    situation where a call was made to the
5    hotline.
6            And the first question asked
7    was, Does this patient have cancer?
8            Do you see that?
9        A.   Yes, I do.
10       Q.   And the office staff said
11   no.
12           Do you see that?
13       A.   Yes.
14       Q.   And the person from the
15   hotline says, Sorry, we cannot help you,
16   have a nice day, and hung up.
17           Do you see that?
18       A.   Yes, I see that.
19       Q.   The discussion is, it's
20   described as a mishap by Alec, correct?
21           He says, I truly believe
22   these mishaps are partly the reason for
23   the lack of hotline usage.  It is a
24   shame.

Page 233

1        A.    That's his opinion.
2        Q.    The e-mail is then forwarded
3    to you --
4        A.    Yep.
5        Q.    -- from Randy Spokane.  And
6    you forward it on and indicate, I am
7    concerned -- this is at the top of 89.
8            I am concerned about this
9    incident and the possibility of these
10   situations arising.  Fortunately, the
11   representative at the physician office --
12   was at the physician office and was able
13   to address the miscommunication as it
14   occurred.
15           Do you see that?
16       A.    I see that.
17       Q.    And then there's some
18   discussion of different possibilities for
19   why that might have happened that way.
20           But, ultimately, at the top
21   of Page 88, Randy clarifies the initial
22   reason for the call was for a noncancer
23   patient.
24           Do you see that?

Page 234

1        A.    Yes.
2        Q.    So this was a call for a
3    patient who would be receiving Actiq for
4    an off-label purpose, correct?
5        A.    That's what that -- that's
6    what -- I'm sorry.  That's what Randy
7    states.
8        Q.    And so the hotline was
9    correct to ask whether the patient had
10   cancer, because that's the indication for
11   the drug, correct?
12           MS. HILLYER:  Objection to
13       form.
14           THE WITNESS:  That is not
15       correct.
16   BY MS. RUANE:
17       Q.    The question, does this
18   patient have cancer, is intended to
19   determine whether this is a patient
20   within the indication for the label of
21   the drug, correct?
22       A.    No.
23       Q.    Why not?
24       A.    I can't -- if you read Lynn

Page 235

1    Macilwain on the first page, patient
2    assistance program.  Our patient
3    assistance program is different than the
4    hotline, although they facilitated the
5    call.
6            And the patient assistance
7    program was only for patients with
8    breakthrough cancer pain.
9        Q.    But you were concerned about
10   the possibility of patients who don't
11   have cancer not being able to move
12   forward through the hotline and obtain
13   additional information in order to seek
14   reimbursement, correct?
15       A.    No.  The issue would be,
16   based on my recollection, the training of
17   the customer service hotline.
18           The first question you don't
19   have to -- you would not necessarily have
20   to -- you wouldn't ask, is the diagnosis.
21   The hotline is providing reimbursement
22   support services, to include prior auth
23   forms, although we talked about, not
24   based on diagnosis.

Page 236

1        Q.    So it would be your
2    expectation, and the reason you were
3    following up was so that the hotline was
4    not seeking information that would
5    determine whether a patient had cancer --
6            MS. HILLYER:  Objection to
7        the form.
8    BY MS. RUANE:
9        Q.    -- as the initial question
10   on the call?
11       A.    The reason I was following
12   up is if this was a patient assistance
13   program, it may be appropriate to ask
14   that, because the patient wouldn't
15   qualify, you know, for patient
16   assistance.
17           And there was a warm
18   transfer, as I recall, for the patient
19   assistance program, which was sort of
20   there was a firewall between
21   reimbursement hotline services and the
22   patient assistance program, or otherwise
23   referred to as PAP.
24       Q.    And if this wasn't a patient

Page 237

1    assistance program call --
2        A.   Yes.
3        Q.   -- if this was just a call
4    for a patient of any other sort, your
5    expectation is that whether they were a
6    cancer patient would not be relevant to
7    whether the hotline was providing
8    services to them for reimbursement?
9        A.   Correct.
10       Q.   Because the purpose of the
11   hotline was to provide reimbursement
12   services, even if the patient did not
13   have cancer, correct?
14       A.   It was not based on
15   diagnosis.  There may have been prior
16   auth criteria beyond the diagnosis, of
17   which, again, navigating the process for
18   coverage was relatively foreign to a lot
19   of these offices, and that was the intent
20   of the service.
21            It was up to the physician
22   to determine what was an appropriate
23   patient and go through that process.
24       Q.   But the intent of the

Page 238

1    service, to the extent possible, was to
2    provide reimbursement services for
3    uses -- for use of the product even if it
4    is beyond the indication on the label,
5    correct?
6        MS. HILLYER:  Objection to
7        the form.
8        THE WITNESS:  Why don't you
9        rephrase that for me so I can give
10       you a concise answer?
11   BY MS. RUANE:
12       Q.   The purpose of the hotline
13   was to provide reimbursement services to
14   a provider, even if the particular
15   patient did not fall within the
16   indication on the label?
17       A.   The diagnosis is not
18   included in a reimbursement support
19   service.  It's just not.  It's not a
20   screening based on your indication.
21       Q.   So you would agree, then,
22   that the hotline was not screening based
23   on whether a patient was receiving
24   services on indication -- within the

Page 239

1    indication or outside of the indication?
2        A.   They would -- if they wanted
3    reimbursement support services, typically
4    the prior auth form would be sent to the
5    office staff.  The office staff includes
6    relevant information, to include
7    diagnosis.
8            And the part of the -- part
9    of the reimbursement support service was
10   to help facilitate that process not
11   specific to diagnosis.  There's lots of
12   information required on pre-A forms.
13       Q.   Are you aware of the fact
14   that Burlakoff pled guilty for illegal
15   promotion of a product by your
16   competitor, Subsys?
17       MS. HILLYER:  Objection.
18       Calls for speculation.  Assumes
19       facts not in evidence.
20   BY MS. RUANE:
21       Q.   Are you aware of that?
22       A.   No.
23       Q.   Do you know Alec Burlakoff?
24       A.   No.

Page 240

1        Q.   When you received this
2    e-mail, you were -- and received Randy's
3    e-mail indicating the initial reason for
4    the call was for a noncancer patient, you
5    were aware of the fact that that would be
6    a patient, then, who was prescribed the
7    drug for off-label use, correct?
8        A.   Correct.
9        Q.   And you're aware of the fact
10   that for a while, at least, the hotlines
11   had at their disposal letters of medical
12   necessity as one of the tools to
13   facilitate reimbursements?
14       A.   There was a period of time.
15   I don't recall how long it was, actually.
16       Q.   The letters of medical
17   necessity included a range of conditions,
18   and you would agree some of those
19   conditions were off-label uses, correct?
20       A.   As I recall.  I don't have a
21   recollection of exactly what they were.
22       Q.   We can get them out if we
23   need to.
24       A.   Okay.

Page 241

```
 1        Q.   But, for example, there
 2   might be a letter of medical necessity
 3   related to back pain?
 4        MS. HILLYER:  Objection.
 5   Calls for speculation.  She said
 6        she doesn't remember the
 7        specifics.
 8   BY MS. RUANE:
 9        Q.   Do you have a memory of
10   that?
11        A.   No.
12        Q.   Okay.  Actually, before I
13   bring up another exhibit, let me ask you,
14   those letters of medical necessity were
15   used, I know you don't remember exactly
16   when, it looks to me from 2008 to 2011.
17        Would that be consistent
18   with your memory, or do you know?
19        A.   I don't know the dates.
20        Q.   Okay.  Do you know why the
21   letters of medical necessity program was
22   discontinued in 2011?
23        A.   No.
24        Q.   Did anyone ever talk to you
```

Page 242

```
 1   about the reason for the discontinuation
 2   of that program?
 3        A.   No, not -- no, I don't
 4   recall having a conversation about it.
 5        Q.   Are letters of medical
 6   necessity still used for on-label use of
 7   the products?
 8        MS. HILLYER:  For Actiq and
 9        Fentora?
10        THE WITNESS:  For Actiq and
11        Fentora?
12   BY MS. RUANE:
13        Q.   For Fentora.
14        MS. HILLYER:  Objection to
15        form.
16        You can answer if you know.
17        But she's not in that role
18        anymore.
19        THE WITNESS:  We don't
20        support Fentora.
21   BY MS. RUANE:
22        Q.   A better question might be,
23   during the time that Fentora was on the
24   market --
```

Page 243

```
 1        A.   Yes.
 2        Q.   -- being supported, were
 3   letters of medical necessity for the
 4   within-indication use of Fentora still
 5   available, even after the off-label
 6   letters of medical necessity had been
 7   discontinued?
 8        A.   I don't recall.
 9        Q.   Okay.  Do you have any
10   reason to think that that didn't continue
11   to occur?
12        A.   I find it interesting that
13   we would need a letter of medical
14   necessity if the patient was eligible for
15   the product.
16        The idea is if there's some
17   reason -- and if there was some reason
18   that they would, then there may be a
19   template to follow.
20        MS. RUANE:  I'm going to
21        hand you what's been marked as
22        Exhibit-19.  For the record, this
23        is TEVA_MDL_A_01204074 through
24        092.
```

Page 244

```
 1        - - -
 2        (Whereupon, Teva-Bearer
 3   Exhibit-19,
 4   TEVA_MDL_A_01204074-092, was
 5   marked for identification.)
 6        - - -
 7   BY MS. RUANE:
 8        Q.   This is a Vantrela strategic
 9   brand plan.
10        And you were involved in the
11   strategy associated with the Vantrela
12   project -- product, correct?
13        A.   As it related to market
14   access, yes.
15        Q.   So within market access, one
16   of your jobs was to determine whether
17   managed care would pay for a product like
18   Vantrela?
19        A.   Yes.
20        Q.   Were you involved in the
21   creation of the strategic brand plan for
22   Vantrela?
23        A.   The brand plan itself, no.
24        Q.   What portion of the Vantrela
```

Page 245

1    strategy would you have been involved in?
2        A.   Payer strategy.
3        Q.   Got it.
4             And the payer strategy would
5    be the strategy for, basically, building
6    the case for payers to understand the
7    benefit of providing coverage for a drug
8    like Vantrela?
9        A.   Correct.
10       Q.   One of the things that is
11   relevant in providing -- making the case
12   to payers for why coverage for a product
13   like Vantrela is important is
14   establishing the need for abuse-deterrent
15   technology in drugs, correct?
16            MS. HILLYER:  Objection to
17        form.
18            THE WITNESS:  A treatment --
19        I would say a treatment option for
20        patients.
21   BY MS. RUANE:
22       Q.   And so in the strategic
23   brand plan that was created by Teva, on
24   Page 4, Number 1, the first topic there

Page 246

1    on the executive summary is, Abuse and
2    misuse of opioids.
3             Do you see that?
4        A.   Sorry.
5             Yes.
6        Q.   It talks about, The
7    prevalence of prescription opioid abuse
8    and misuse that has increased in the past
9    decade and poses a serious public health
10   issue.
11            Do you see that?
12       A.   Yes.
13       Q.   Do you agree with that
14   characterization?
15            MS. HILLYER:  Objection to
16        form.  And also lack of
17        foundation.  She testified that
18        she didn't have anything to do
19        with this document.
20   BY MS. RUANE:
21       Q.   We can go on and look at
22   some others that you did.
23            I'm just asking you right
24   now, as it relates to the prevalence of

Page 247

1    opioid abuse and misuse that's increased
2    over the past decade and now poses a
3    serious public health issue, is that
4    something that you personally believe to
5    be true?
6             MS. HILLYER:  Objection to
7        form.
8             THE WITNESS:  I don't
9        have -- I'm not going to offer my
10       opinion.
11   BY MS. RUANE:
12       Q.   Do you hold an opinion?
13            MS. HILLYER:  Objection to
14       form.  It calls for speculation.
15       She's not an expert on this.
16   BY MS. RUANE:
17       Q.   Ms. Bearer, I'm just asking
18   you, do you have an opinion as to whether
19   there's an opioid epidemic that's causing
20   a public health crisis right now in our
21   nation?
22            MS. HILLYER:  Objection to
23       form.
24            THE WITNESS:  As it relates

Page 248

1        to what you were asking me -- I
2        mean, no.
3    BY MS. RUANE:
4        Q.   You don't believe that to be
5    true?
6        A.   I'm answering the question
7    based on what you provided me here.
8    There's no --
9        Q.   I just want to make sure I
10   understand your answer.
11            You don't believe that there
12   is a serious public health issue that's
13   posed by the prevalence of prescription
14   opioid abuse and misuse in our nation
15   over the past decade?
16            MS. HILLYER:  Objection to
17       form.
18            THE WITNESS:  If you're
19       asking -- sorry.
20            There are statistics to
21       suggest that there is an opioid
22       epidemic.  I don't have any -- I
23       did not have anything to do with
24       this document.  So that was my

Page 249

```
 1        previous answer.
 2   BY MS. RUANE:
 3        Q.   But you have seen the
 4   statistics related to the opioid epidemic
 5   and the societal cost associated with
 6   that?
 7        A.   Yes.
 8            MS. HILLYER:  Objection to
 9        form.
10            THE WITNESS:  Sorry.
11   BY MS. RUANE:
12        Q.   Did you see those documents
13   as you prepared part of the brand plan
14   associated with managed care and
15   Vantrela?
16        A.   It was part of the --
17            MS. HILLYER:  Sorry.
18        Objection.  What documents?
19            THE WITNESS:  Yeah, I mean,
20        what --
21   BY MS. RUANE:
22        Q.   The -- let's do this.
23             - - -
24            (Whereupon, Teva-Bearer
```

Page 250

```
 1   Exhibit-20,
 2   TEVA_MDL_A_09191592-593, with
 3   attachment, was marked for
 4   identification.)
 5             - - -
 6            MS. RUANE:  I'm going to
 7   hand you what's been marked as
 8   Exhibit-20.  For the record, this
 9   is TEVA_MDL_A_09191592.
10            THE WITNESS:  Are we
11   finished with this one?
12            MS. RUANE:  For now.
13   BY MS. RUANE:
14        Q.   This document includes a
15   managed care overview for Vantrela on
16   Page 248?
17        A.   Yep.
18        Q.   And this is a document that
19   you --
20            MS. HILLYER:  You said 248?
21            MS. RUANE:  248, yes.
22            MS. HILLYER:  Oh, sorry,
23   hold on.  1592, 1593 -- these are
24   not sequential.  191593, and then
```

Page 251

```
 1        I jump to 83248.
 2            MR. GASTEL:  It's the
 3        attachments to previous e-mails.
 4            MS. HILLYER:  But this
 5        e-mail has several attachments
 6        which aren't attached here.
 7            MS. RUANE:  Let's do this --
 8            MS. HILLYER:  And there's
 9        no -- the earlier e-mail doesn't
10        appear to have any attachments.
11   BY MS. RUANE:
12        Q.   Let me ask you this, and
13   then we'll sort out where to go.
14        The document, 248, the
15   managed care overview --
16        A.   Got it.
17        Q.   -- is that a document that
18   you created?
19        A.   Yes.
20        Q.   On Page 252 of that
21   document -- and, again, this is a managed
22   care overview to be provided as it
23   relates to the Vantrela product, right?
24        A.   Correct.
```

Page 252

```
 1        Q.   Okay.  On 252, you identify
 2   the fact that the misuse, abuse and
 3   diversion of opioids is a major public
 4   health concern, correct?
 5        A.   Yes.  And they are all
 6   referenced.
 7        Q.   And if you look at the
 8   bottom, your references are there?
 9        A.   Correct.
10        Q.   And you identify the fact
11   that one in twenty Americans over 12
12   abused opioids in 2010, correct?
13        A.   Based on the reference,
14   correct.
15        Q.   You also identify the fact
16   that one in three drug-related emergency
17   room visits were opioid related in 2011,
18   correct?
19        A.   Yep.
20        Q.   And you cited 18,000
21   overdose deaths in 2014, correct?
22        A.   Cited it.
23        Q.   You included it in there
24   with the citation?
```

Page 253

1      A.   Yes, I'm sorry.  That's what
2  I said.  Sorry.  Cited, yes.
3      Q.   Sorry.  And you also
4  identified a more than 300 percent
5  increase in overdose deaths from 1999 to
6  2014, correct?
7      A.   Correct.
8      Q.   And those are statistics
9  that you identified and chose to put in
10  the managed care overview for Vantrela,
11  correct?
12      A.   Correct.
13      Q.   They were significant
14  statistics to you?
15          MS. HILLYER:  Objection to
16      form.
17          THE WITNESS:  That's an
18      opinion.  They were factual.
19  BY MS. RUANE:
20      Q.   They're factual.
21          And they're persuasive when
22  explaining to a managed care entity why
23  reimbursement for an abuse-deterrent
24  technology would be appropriate, correct?

Page 254

1          MS. HILLYER:  Objection to
2      the form.  And calls for
3      speculation.
4          THE WITNESS:  They are
5      facts.
6  BY MS. RUANE:
7      Q.   And they're facts you chose
8  to put in here for a reason, right?
9      A.   They are facts.  We are
10  looking at an abuse-deterrent
11  formulation, and these are facts
12  associated with, perhaps, the unmet need.
13      Q.   With, I'm sorry?
14      A.   These are facts associated
15  with that reference.  That's what I'm
16  saying.
17      Q.   They're facts associated
18  with the opioid epidemic and opioid
19  abuse, correct?
20      A.   The word we use is a misuse,
21  abuse and diversion.
22      Q.   Okay.  They are facts that
23  are significant to explain to a managed
24  care facility just how dire the opioid

Page 255

1  use, abuse and diversion has become in
2  America, correct?
3          MS. HILLYER:  Objection to
4      form.
5          THE WITNESS:  They are facts
6      associated with -- they are just
7      facts relative to opioid abuse,
8      diversion and misuse, which is on
9      the next slide, I believe.  Unless
10      I'm going backwards.
11  BY MS. RUANE:
12      Q.   On Page 255 -- sorry, it's
13  because of the staples --
14      A.   I'm going in the wrong
15  direction.
16      Q.   It says at the top, Opioid
17  abuse poses a substantial economic
18  burden.
19          Do you see that?
20      A.   Uh-huh.
21      Q.   That's information -- you
22  typed that in, right, as you created this
23  document, correct?
24      A.   I created the document.

Page 256

1      Q.   And you chose to define it
2  as, Opioid abuse posing a substantial
3  economic burden, right?
4      A.   Economic, yes.
5      Q.   And you include the fact
6  that there's, in the United States, in
7  the year 2015 there's $27.6 billion in
8  healthcare costs, correct?
9      A.   Yes.  And that's a -- yes.
10      Q.   You also included $28.3
11  billion in workplace costs?
12      A.   Yes.
13      Q.   And $5.6 billion in criminal
14  justice costs?
15      A.   That's correct.
16      Q.   For a total societal cost,
17  in 2015 alone, of $61.5 billion, correct?
18      A.   Correct.
19      Q.   My question for you is, who
20  do you believe should pay for the $61.5
21  billion per year in total societal cost?
22          MS. HILLYER:  Objection to
23      form.
24          THE WITNESS:  You're asking

Page 257

1     my opinion?
2 BY MS. RUANE:
3     Q.   Yeah.  I'm asking whether
4 you believe that it's appropriate and
5 fair for the companies that profited from
6 the use, abuse and diversion of opioids
7 to pay for the societal cost that America
8 is now facing?
9       MS. HILLYER:  Objection to
10     the form.
11       THE WITNESS:  I don't know.
12       MS. HILLYER:  And assumes
13     facts not in evidence.
14 BY MS. RUANE:
15     Q.   Is it your belief that
16 American taxpayers should bear that cost?
17       MS. HILLYER:  Objection to
18     form.
19       THE WITNESS:  I really don't
20     know.
21 BY MS. RUANE:
22     Q.   Between American taxpayers
23 and the companies that profited from the
24 sale of opioids, wouldn't you agree that

Page 258

1 the appropriate thing to do would be for
2 those companies to forfeit those profits
3 in order to address the societal costs
4 that they have created?
5       MS. HILLYER:  Objection to
6     form.  And assumes facts not in
7     evidence.  And calls for a legal
8     conclusion.
9 BY MS. RUANE:
10     Q.   Wouldn't you agree, Ms.
11 Bearer?
12       MS. HILLYER:  Same
13     objections.
14       THE WITNESS:  I'm not an
15     attorney.  You're asking for me to
16     provide you a response that
17     implies a legal reference that --
18     I'm sorry.  I'm not an attorney.
19 BY MS. RUANE:
20     Q.   And with all respect, I'm
21 not asking for an opinion -- or a legal
22 opinion right now.
23       I'm -- I understand that you
24 identified, as an important thing for

Page 259

1 third-party -- well, strike that -- for
2 managed care entities to know is that
3 there's $61.5 billion a year right now
4 that American society is bearing as a
5 result of the opioid epidemic.
6     A.   Yes.
7       MS. HILLYER:  Objection.
8 BY MS. RUANE:
9     Q.   And because that's a
10 decision -- or that's information that
11 you found significant at the time of
12 working on Vantrela, I'm wondering what
13 your personal opinion is as to who bears
14 the burden for that cost.
15       MS. HILLYER:  Objection to
16     form.  Mischaracterizes the
17     document.  Assumes facts not in
18     evidence.  And same objections I
19     made before.  And asked and
20     answered repeatedly now.  She's
21     answered your question.
22 BY MS. RUANE:
23     Q.   I won't -- you can answer it
24 one more time.  I won't ask it again.

Page 260

1       MS. HILLYER:  Same
2     objections.
3       THE WITNESS:  I'm not an
4     attorney and, therefore, cannot
5     provide an opinion as to -- to
6     answer your question.
7       MS. HILLYER:  Sarah, do you
8     want to separate these as
9     documents, because they don't
10     actually belong together?  Or how
11     do you want to --
12       MR. GASTEL:  They definitely
13     belong together.  There's just
14     numerous attachments and they are
15     all not --
16       MS. HILLYER:  So it's just
17     missing the in-between attachments
18     you're saying?  I see.  As long as
19     we're clear on the record, that's
20     fine.
21       THE WITNESS:  Are we
22     finished with this?
23       MS. HILLYER:  That one goes
24     before that.

Page 261

```
 1          THE WITNESS:  So we're
 2  finished with both of them, okay.
 3  Sounds good.
 4          MS. HILLYER:  We've been
 5  going about an hour.  If you have
 6  another quick document, we can do
 7  it, but --
 8          MS. RUANE:  Let's take a
 9  quick break.
10          VIDEO TECHNICIAN:  Going off
11  the record.  2:25.
12          - - -
13      (Whereupon, a brief recess
14  was taken.)
15          - - -
16          VIDEO TECHNICIAN:  Back on
17  record at 2:39 p.m.
18  BY MS. RUANE:
19      Q.   We're back on the record
20  after a short break.
21      You understand you're still
22  under oath?
23      A.   I do.
24      Q.   We're going to hand you
```

Page 262

```
 1  what's been marked as Exhibit-21.
 2          - - -
 3      (Whereupon, Teva-Bearer
 4  Exhibit-21,
 5  TEVA_MDL_A_09165564-565, with
 6  attachment, was marked for
 7  identification.)
 8          - - -
 9  BY MS. RUANE:
10      Q.   And there's the e-mail
11  itself which, for the record, is
12  TEVA_MDL_A_0916564 to 65, and then the
13  attachment is included on the back there.
14      This is a managed care mag
15  article for opioids.
16      This is an e-mail chain that
17  includes you and Jeff Dierks, at least at
18  the top.
19      Do you see that?
20      A.   I do.
21      Q.   Who is Jeff Dierks?
22      A.   He was the brand director at
23  the time for Fentora.
24      Q.   You said brand director for
```

Page 263

```
 1  Fentora?
 2      A.   Yes.
 3      Q.   You wrote Jeff about the
 4  article titled, The Societal and Economic
 5  Burden of Chronic Pain and Opioid Abuse,
 6  correct?
 7      A.   Yes.
 8      Q.   Do you remember this?
 9      A.   It's coming back to me.
10      Q.   In your e-mail to Jeff, you
11  reference the fact that there is no
12  collaboration -- you said, I had no
13  knowledge of this.
14      Are you referring to the
15  article itself?
16      A.   Yes.
17      Q.   That's a yes?
18      A.   Yes.
19      Q.   I didn't hear you.
20      You indicate, There is no
21  collaboration with regard to the market
22  access strategy.
23      Do you see that?
24      A.   Yes.
```

Page 264

```
 1      Q.   What do you mean by --
 2      A.   Sorry.
 3      Q.   What do you mean by "market
 4  access strategy"?
 5      A.   I mean as referenced prior,
 6  where I would lead the market access
 7  subteam.
 8      So Jeff would have been the
 9  brand director over the entire brand
10  strategy.  And my portion of the market
11  access strategy was not -- is what, you
12  know, I leaded, like, a subteam, for
13  example, basically.
14      Q.   And so the market access
15  subteam would be dealing with how to
16  properly brand and market to the managed
17  care facility -- or managed care
18  entities, correct?
19      A.   We would provide input, if
20  nothing -- so to be clear, market access,
21  my team still falls under the umbrella of
22  the brand as a total, the brand strategy,
23  minus just a subset.
24      Q.   So your team is actually
```

Page 265

1    under the brand team for Teva?
2        A.   I did not report in to the
3    brand team.  But I am a dotted line
4    representing the market access payer
5    strategy.
6        Q.   Okay.  What is -- is there a
7    line up above brand?  What does it go to?
8    Or is brand one of the top --
9            MS. HILLYER:  Objection to
10    the form.
11    BY MS. RUANE:
12        Q.   -- entities?
13            I may not be explaining that
14    right.  It may just be a bad question.
15    Let me try again.
16            What about marketing, are
17    marketing and brand on the same level?
18        A.   That's the same thing,
19    sorry.
20            So when we say "brand,"
21    we're saying brand marketing, I
22    apologize.
23        Q.   So your managed care
24    position had a dotted line to

Page 266

1    brand/marketing?
2        A.   Correct.
3        Q.   The market access strategy
4    that's being discussed here as it relates
5    to managed care, were you responsible for
6    managing a budget and --
7        A.   Yes.
8        Q.   -- and implementing certain
9    marketing, as a result, to managed care
10    facilities?
11        A.   We don't market to.  We
12    would have projects associated with
13    developing a strategy.  And that was the
14    budget.
15            That was what the budget was
16    used for, payer research, all sorts of
17    things along those lines.
18        Q.   Do you recall, for example,
19    in the year 2015, the estimate of what
20    your budget was that you were handling?
21            MS. HILLYER:  For Fentora?
22    BY MS. RUANE:
23        Q.   For Fentora.
24            MS. RUANE:  That's a good

Page 267

1    point.  Thanks.
2            MS. HILLYER:  Assumes facts
3    not in evidence.
4            THE WITNESS:  I would be
5    guessing if I told you.  I don't
6    recall specifically.  I had other
7    brands.
8    BY MS. RUANE:
9        Q.   And within your budget, were
10    there line items for sales presentations?
11        A.   No.
12        Q.   What were the line items
13    within your budget?
14        A.   They were extensive.  Can
15    you be more specific of what you're
16    trying to get to?  And I'll be happy --
17        Q.   I'm trying to make sure I
18    understand, when you talk about the
19    market access strategy, what your -- what
20    all the responsibilities were, or
21    potential, you know, marketing, for lack
22    of a better word, that you had at your
23    disposal within your budget.
24            MS. HILLYER:  Objection to

Page 268

1    form.  You mean as to all the
2    products that came under her
3    umbrella?
4            MS. RUANE:  No.
5    BY MS. RUANE:
6        Q.   Is your budget divided up by
7    product?
8        A.   Yes.
9        Q.   So let's take Fentora.
10        A.   Yes.
11        Q.   What were the kind of line
12    items or potential options that you would
13    have under the Fentora budget that you
14    managed for market access strategy?
15            MS. HILLYER:  Objection to
16    form.  Vague as to time frame.
17            THE WITNESS:  So if --
18    specifically, the projects are
19    dependent on the time frame.  So
20    if you want to give me -- if you
21    go to a long strategy, the
22    projects are different as you
23    evolve a strategy.
24    BY MS. RUANE:

Page 269

1      Q.   So in -- when Fentora
2  launched, let's talk about the 2007/2008
3  time frame, what types of line items
4  would have been in that budget?
5      A.   It would have been the
6  development of a payer presentation
7  tactic specifically for -- at the launch,
8  it would be tactics, primarily, for the
9  account management team.
10         If there was a vendor that
11  we needed, and I don't recall, I'm giving
12  an example, for, say, a budget impact
13  model or something of that nature, those
14  are the examples.
15         But I don't have specifics
16  for you for Fentora, frankly.
17      Q.   You mentioned in the e-mail
18  that the market access strategy requires
19  extensive payer research?
20      A.   That's correct.
21      Q.   What do you mean by that?
22      A.   To develop a strategy, you
23  can either have advisory boards, you can
24  do market research, you identify -- you

Page 270

1  have a third party to identify a
2  population representative of, say,
3  commercial payers.  It's blinded.  The
4  third party engages.
5         There are objectives and
6  research.  And that research comes back
7  and it is taken into consideration as
8  you're developing your value proposition
9  for the payer and messaging.
10         That's one example.
11      Q.   And you all engaged in that
12  process with the drug Fentora?
13         MS. HILLYER:  Objection to
14  form.
15         THE WITNESS:  That would
16  be -- that would be the norm.  If
17  you're asking me specifically
18  during that time, it was a
19  partnership between marketing and
20  my role.
21  BY MS. RUANE:
22      Q.   Okay.  You also reference
23  targeting patient profile, message
24  testing and positioning, et cetera.

Page 271

1      A.   Yes.
2      Q.   Explain for me what you mean
3  there.
4      A.   The target patient profile,
5  you paint a picture for the physician --
6  sorry, the payer as to the appropriate
7  population where a product would be --
8  would be appropriate -- sorry,
9  appropriate for, you know, characterizing
10  the enrollment within a plan, who is the
11  appropriate patient, based on research.
12  Sometimes analogs are used.
13         I'm sorry, you asked me
14  about target patient population?
15      Q.   Yes.
16      A.   Payers want to quantify how
17  many patients in their plan would be
18  candidates for a therapy.  So through
19  research, we're able to at least make
20  some assumptions.
21         And unless you want me to go
22  into all the details of how you do that,
23  it's extensive.  You can look at analogs.
24  You can have one-on-one conversations

Page 272

1  with payers.  But it's all third-party
2  facilitated.
3      Q.   So one of the things that
4  concerns you about the article that is
5  being referenced in your e-mail is the
6  fact that you weren't consulted on how to
7  appropriately paint the picture or
8  address market access strategy, correct?
9      A.   No.
10         MS. HILLYER:  Objection to
11  form.
12  BY MS. RUANE:
13      Q.   You define -- or in your
14  e-mail you describe this article as a
15  promotional tactic?
16      A.   I'm trying to remember where
17  it was published.
18         I'll tell you what I was
19  upset about is it was done in a vacuum,
20  and I wasn't consulted.  I didn't have an
21  opinion one way or the other, as I
22  recall, about the content itself.
23         But from a role and
24  responsibility, anything that touched

Page 273

1  managed care would have been -- at least
2  I would have been involved with.  And
3  this was done in a silo, and that's
4  really the tone of this.
5      So why wasn't I consulted
6  and I'm hearing about it after the fact?
7      Q.  You do describe the article
8  as a promotional tactic, correct?
9      A.  Well, because, I guess, it
10  went through PARC and it went through --
11  I'm trying to remember where it was
12  published.  Disease State Report.
13      So this is not a scientific
14  publication, as I remember.  Therefore,
15  it would be considered -- it's not like
16  we would use it in promotion.  It's just
17  a matter of certain publications -- our
18  medical team is the publication team.  We
19  have nothing to do with that.
20      This is -- if we submit an
21  article or have -- or if there's an
22  article submitted that we had any
23  editorial content with, it's not
24  considered scientific in general.

Page 274

1      Q.  It's considered promotional
2  and it goes through PARC, correct?
3      A.  That's what I'm told here,
4  this went through PARC.
5      Q.  And what is PARC?
6      A.  Promotional advertising
7  review committee.  It's our
8  medical/legal/regulatory.  It's just an
9  acronym.
10      Q.  I'm sorry, say that again.
11  Promotional --
12      A.  We have too many acronyms.
13      Promotion and advertising
14  review committee, I believe.  We just
15  call it PARC.  You get used to it, and
16  you don't know what it means.
17      Q.  So PARC, the promotional
18  advertising review committee, you
19  mentioned medical/legal there.  And I
20  want to make sure I understand what you
21  were saying.
22      Is there a medical review
23  that occurs when items are submitted to
24  PARC?

Page 275

1      A.  So PARC is a committee.  On
2  the committee is an attorney, a regulator
3  and a medical.
4      Q.  But the items that are
5  submitted to PARC are items -- the
6  submission to PARC is separate and apart
7  from items submitted through medical
8  services, correct?
9      A.  Yes.
10      Q.  Okay.  And items submitted
11  through PARC, members of the managed care
12  team may discuss during their
13  interactions with managed care entities,
14  correct?
15      A.  That would depend.
16      Q.  They aren't prohibited from
17  doing so, correct?
18      A.  The way our PARC works is
19  the audience has to be a part of the
20  project.  So there will be sales as the
21  audience -- HCPs, so those will be sales
22  pieces.  There will be managed care
23  decision-makers, that would be a piece
24  that a rep wouldn't have access to.

Page 276

1      Q.  And in the example here,
2  this article was submitted to PARC, was
3  then published, it looks like, maybe in a
4  managed care magazine?
5      MS. HILLYER:  Objection to
6  form.
7      THE WITNESS:  I really don't
8  know.
9  BY MS. RUANE:
10      Q.  The link at the end says
11  Managed Care Mag.com, so.
12      Is Managed Care Magazine
13  something you're familiar with?
14      A.  Yes.  Yes, that would be.
15      Q.  You also criticize the
16  caliber of the managed care experts and
17  indicate they would have been held to a
18  higher standard if you had the
19  opportunity to weigh in.
20      Do you see that?
21      A.  I see it.
22      Q.  What was your criticism of
23  the experts used?
24      A.  I'd have to go back and read

Page 277

1    it.  I apologize, I don't remember.
2        Q.   I'll just tell you, on Page
3    5 you can see who they are.
4        A.   Okay.  Thank you.
5            Well, I was forming an
6    opinion based on the way, at the time, I
7    interpreted the level of knowledge or
8    background and the credibility,
9    potentially.
10           It was probably an emotional
11   response to the fact that I wasn't
12   involved.  But I'm not familiar with
13   either of these two individuals.  And the
14   target audience for an article like this
15   would have been other managed care
16   organizations.
17       Q.   It indicates -- you're
18   familiar with Pain Matters?
19       A.   I'm familiar with it.  I
20   mean, I know of it.  I had nothing to do
21   with any -- no involvement whatsoever
22   with Pain Matters.
23       Q.   Okay.  Who was involved with
24   Pain Matters, if you know, and the

Page 278

1    implementation of that?
2        A.   The only individual that
3    comes to mind is Matt Day.  There may
4    have been others.
5        Q.   Did you advise or serve as a
6    supervisory role with Matt Day on Pain
7    Matters?
8        A.   No.
9        Q.   Have you been to the Pain
10   Matters website?
11       A.   No.
12       Q.   This e-mail references the
13   fact that they leverage Pain Matters
14   content.
15           Are you aware of what
16   Jeffrey Dierks was referring to when he
17   said that in his response to you?
18           MS. HILLYER:  Objection.
19   Calls for speculation.
20           THE WITNESS:  No.
21   BY MS. RUANE:
22       Q.   So you hadn't weighed in on
23   any Pain Matters content?
24       A.   No, no.

Page 279

1        Q.   Do you have a general
2    understanding that Pain Matters was used
3    to educate and promote on the issues of
4    chronic pain?
5            MS. HILLYER:  Objection.
6    Calls for speculation.  And lack
7    of foundation.
8            THE WITNESS:  I've not gone
9    on the website and gone through
10   Pain Matters.
11   BY MS. RUANE:
12       Q.   In your role with marketing
13   and strategic planning, did you -- were
14   you -- did you sit in on any meetings
15   addressing Pain Matters and the
16   implementation of Pain Matters?
17       A.   I recall meetings in which
18   it would have been a cross-functional
19   brand team meeting with updates, not
20   content.
21       Q.   And during those updates,
22   did you gain an understanding that Pain
23   Matters was a campaign being launched by
24   the company to educate on the issues of

Page 280

1    chronic pain?
2            MS. HILLYER:  Objection.
3    Calls for speculation.  Lack of
4    foundation.
5            THE WITNESS:  I never saw
6    anything that said, this is
7    what -- you know, the intent.  I
8    don't recall seeing any document
9    that said Pain Matters is intended
10   to.
11   BY MS. RUANE:
12       Q.   Sitting here today, do you
13   have an understanding of what Pain
14   Matters is?
15       A.   It's exactly as you
16   described it, based on what I have heard.
17   But, again, I have not gone through the
18   website.
19           In my role with payers, this
20   is not something that would involve the
21   payer community.
22       Q.   Okay.  But just based on
23   sitting in meetings and hearing updates
24   from different departments, your memory

Page 281

```
 1    is that it's as I described it, a
 2    resource to educate on chronic pain?
 3         A.   The way I understood it was
 4    it was a resource to educate on pain.
 5    That was the way I took it.  I don't ever
 6    recall specifically chronic pain as being
 7    the focus.  I don't recall.
 8         Q.   At the time of this e-mail
 9    in 2015 --
10         A.   Yep.
11         Q.   -- what branded opioids for
12    chronic pain were being sold by Teva at
13    the time?
14         A.   Are you asking -- oh,
15    branded.  Branded for chronic pain.  We
16    did not have a product for chronic pain.
17         Q.   And how was this piece a
18    promotional tactic if there were no
19    branded chronic pain products on the
20    market from Teva at that time?
21         A.   I can't answer that, because
22    I didn't create the -- I did not create
23    the -- I had nothing to do with the
24    article.  I did not sit on the PARC team.
```

Page 282

```
 1    I don't know how it was presented to
 2    PARC.  And I don't know what criteria
 3    they used for approval.
 4         Q.   What you know is that it
 5    seemed to you to be a promotional tactic,
 6    right?
 7         A.   It did seem to be a
 8    promotional tactic.
 9         Q.   And that was further
10    confirmed to you by the fact that it was
11    submitted to PARC, correct?
12         A.   I have no knowledge of it
13    actually being in PARC.  Everything that
14    I reacted to in this is predicated on
15    this e-mail.
16         Q.   And on this e-mail chain --
17    the only reason I ask that is because on
18    this e-mail chain, it indicates Matt Day
19    submitted this to PARC.
20         A.   That's correct.
21         Q.   So that's further indication
22    that it was promotional material being
23    provided in November of 2015, correct?
24         A.   He is a marketer.  If he
```

Page 283

```
 1    submitted it to PARC, it would be my
 2    opinion, at the time -- I mean, that's
 3    the way I interpreted it.
 4         Q.   I'm just wondering what drug
 5    was being promoted, then, if there were
 6    no branded opioids for chronic pain on
 7    the market from Teva?
 8         MS. HILLYER:  Objection to
 9    form.
10         THE WITNESS:  The way I
11    interpret this it that it was more
12    or less talking about educating on
13    pain, not specific to any product.
14         MS. RUANE:  I don't think I
15    have any further questions, but
16    Mr. Madden is going to get the
17    chance to talk to you now.
18         MS. HILLYER:  Sorry.  So if
19    I have redirect on some of this, I
20    should do that now, or do you want
21    me to do it after?  How do you
22    want me to do that?  I guess it
23    doesn't really matter --
24         MR. MADDEN:  I say we go and
```

Page 284

```
 1    then you do your redirect.
 2         MS. HILLYER:  We can do
 3    that.  That's okay by me.
 4         VIDEO TECHNICIAN:  Going off
 5    the record, 3:00 p.m.
 6              - - -
 7         (Whereupon, a brief recess
 8    was taken.)
 9              - - -
10         VIDEO TECHNICIAN:  Back on
11    record at 3:13 p.m.
12              - - -
13         EXAMINATION
14              - - -
15    BY MR. MADDEN:
16         Q.   Ms. Bearer, I'm Brian
17    Madden.  I represent the plaintiffs in
18    this MDL matter.
19         I am not going to ask you
20    questions that prior counsel asked you,
21    but just have a few things for you.
22         You started at Cephalon in
23    2003 --
24         A.   Correct.
```

Page 285

```
 1        Q.    -- correct?
 2        A.    Yes.
 3        Q.    And you were in managed care
 4   from the beginning?
 5        A.    Yes.
 6        Q.    You were at Cephalon when
 7   the company pleaded guilty with regard to
 8   off-label prescription of drugs,
 9   including Actiq?
10        MS. HILLYER:  Objection to
11   form.
12   BY MR. MADDEN:
13        Q.    Is that true?
14        A.    I was employed, yes.
15        Q.    Yes.
16        Were you made aware of that
17   guilty plea at the time of your
18   employment?
19        A.    Yes.
20        Q.    And that was in
21   approximately the fall of 2008; is that
22   right?
23        A.    I believe so, yes.
24        Q.    Were you disciplined at all
```

Page 286

```
 1   with regard to that guilty plea for
 2   off-label marketing of Actiq?
 3        A.    No.
 4        Q.    Did you lose your job as a
 5   result of that guilty plea?
 6        A.    No.
 7        Q.    Who did lose their job at
 8   Cephalon as a result of that guilty plea?
 9        MS. HILLYER:  Objection.
10   Calls for speculation.
11        THE WITNESS:  I really don't
12   know.
13   BY MR. MADDEN:
14        Q.    Do you know of anyone at
15   Cephalon who lost their job as a result
16   of the off-label marketing guilty plea
17   for Actiq?
18        MS. HILLYER:  Objection.
19   Calls for speculation.
20        THE WITNESS:  I really don't
21   know.
22   BY MR. MADDEN:
23        Q.    Prior to 2008, in your role
24   in managed care, were you made aware by
```

Page 287

```
 1   the company of the rules with regard to
 2   off-label marketing versus on-label
 3   marketing?
 4        A.    Yes.
 5        Q.    You were trained on that?
 6        A.    Yep.
 7        Q.    Did you take modules
 8   regarding that?
 9        A.    I don't remember
10   specifically.  Most likely, yes.  We take
11   a lot of modules.
12        When you're talking time
13   frame, I just don't have the specific
14   time frame.
15        Q.    But it's fair to say you
16   knew, prior to 2008, what the rules were
17   with regard to legal, on-label marketing
18   of a drug like Actiq; is that true?
19        A.    Yes.
20        Q.    Now, two documents that Ms.
21   Ruane discussed with you, let's first
22   look at Exhibit-12.
23        And I believe you have paper
24   versions, but we can also put them up on
```

Page 288

```
 1   the screen, if that helps you.
 2        A.    It's easier for me, if you
 3   don't mind, to read the hard copies.
 4        MS. HILLYER:  They are
 5   numbered on the bottom.  It should
 6   be in order.
 7        THE WITNESS:  I see.  I got
 8   it.
 9        MS. HILLYER:  It's this one.
10        THE WITNESS:  The dossier.
11   BY MR. MADDEN:
12        Q.    Exhibit-12 was marked as the
13   Actiq managed care dossier, correct?
14        A.    That's correct.
15        Q.    And do I recall your
16   testimony correctly that a dossier such
17   as this would be sent to a managed care
18   provider if they requested it?
19        A.    That's correct.
20        Q.    This was not promoted to a
21   managed care entity, but, rather, if they
22   asked for it, this would be sent by the
23   company to them; is that true?
24        A.    Yes.
```

Page 289

1    Q.   And if any of the issues
2    discussed on Page 1 of Exhibit-12 were
3    requested from Cephalon, this would be
4    sent to the managed care provider,
5    correct?
6         A.   I'm sorry, what?
7         Q.   Bad question.
8              If a managed care provider
9    had a question about any of the subjects
10   on Page 1 of Exhibit-12, they could ask
11   the company for this dossier, correct?
12        A.   Let me rephrase.
13             If they had a question on,
14   say, breakthrough pain specifically --
15        Q.   Yes.
16        A.   -- they wouldn't necessarily
17   know what was in the dossier.  Typically,
18   when they request the dossier, they
19   request the dossier.
20        Q.   Fair enough.
21        A.   Okay.
22        Q.   If a managed care entity or
23   payer had a question under Section 5.0,
24   Risk of opioid abuse by patients with

Page 290

1    chronic pain, and that question were
2    submitted to Cephalon, then Cephalon
3    could send this dossier to that managed
4    care entity, correct?
5         MS. HILLYER:  Objection to
6         the extent it calls for
7         speculation outside her knowledge.
8         THE WITNESS:  I don't know.
9         This was handled through medical,
10        not through my side of the
11        business.
12   BY MR. MADDEN:
13        Q.   We can look at the dossier.
14             And if this dossier went to
15   a managed care entity, it does discuss
16   risk of opioid abuse by patients --
17        A.   Yes, it does.
18        Q.   -- for chronic pain, true?
19             And if we go to Page 23 of
20   this document.
21        MR. MADDEN:  The last
22        sentence, last two sentences
23        before Section 5.2, would you
24        highlight those for me, please?

Page 291

1         THE WITNESS:  I'm sorry, say
2         that again.
3    BY MR. MADDEN:
4         Q.   Beginning with, Extensive.
5         A.   Extensive clinical
6    experience with the use -- you want me to
7    read it?
8         MS. HILLYER:  No.  He was
9         asking him to highlight that.
10        She wasn't aware of that.
11        MR. MADDEN:  I'm actually
12        talking to the tech.
13   BY MR. MADDEN:
14        Q.   Ms. Bearer, I point your
15   attention, in Exhibit-12, to the
16   highlighted language from Page 23 in the
17   Actiq dossier which says, Extensive
18   clinical experience with the use of
19   opioids for patients with cancer pain
20   indicates that the risk of addiction in
21   this population is very low.  Similarly,
22   the risk of abuse is low in patients with
23   nonmalignant pain, though there is less
24   experience in this patient population.

Page 292

1         Do you see that language?
2         A.   Yes, I do.
3         Q.   Now, we also looked at
4    another exhibit that you prepared,
5    Exhibit-20, which was a slide
6    presentation with regard to Vantrela.
7         Do you recall that?
8         A.   Yes.
9         Q.   And you accumulated data and
10   put that data into your slides and cited
11   to that data with regard to --
12        A.   Yes.
13        Q.   -- opioid abuse and
14   diversion, correct?
15        A.   Correct.
16        MS. HILLYER:  Objection to
17        form.
18   BY MR. MADDEN:
19        Q.   So let's pull up Exhibit-20.
20   And I'll reference you to Page 09183260.
21        A.   I'm out of order here.
22        MS. HILLYER:  One second
23        here.
24             260?  Sorry, do you have

Page 293

1     the -- so this is Exhibit-20.  So
2     it should be --
3                - - -
4        (Whereupon, a discussion off
5     the record occurred.)
6                - - -
7  BY MR. MADDEN:
8        Q.    Ms. Bearer, this is part of
9  the slide deck you put together with
10 regard to Vantrela, correct?
11       A.    That's correct.
12       Q.    And Vantrela was an
13 abuse-deterrent opioid that was developed
14 by Teva, correct?
15       A.    Correct.  Yes.
16       Q.    Okay.  This is one of the
17 slides you put together, right?
18       A.    Yes.
19            We're on 60?
20            MS. HILLYER:  Yes.  The
21       Bates number is 60.
22            MR. MADDEN:  Yes, ma'am.
23            THE WITNESS:  Yes.
24 BY MR. MADDEN:

Page 294

1        Q.    The top rectangle has some
2  language that says, Opioids have a high
3  rate of abuse and generate enormous
4  costs.  Almost 12 percent of opioid
5  patients become addicted.
6            Do you see that?
7        A.    I do.
8        Q.    Let's compare that with what
9  we saw in Exhibit-12, side by side.
10       A.    Okay.
11            MR. MADDEN:  So if you could
12       go back and highlight the
13       language?
14            MS. HILLYER:  Do you need
15       Exhibit-12?
16            THE WITNESS:  I know what it
17       says.
18 BY MR. MADDEN:
19       Q.    We have this language about
20 a high rate of abuse with opioid use and
21 this language from Exhibit-12, which was
22 the Actiq managed care dossier, which
23 talks about a low risk of abuse.
24            Do you see that?

Page 295

1        A.    I do.
2        Q.    Would you agree with me that
3  those are contradictory messages?
4            MS. HILLYER:  Objection to
5       form.  Lack of foundation as to
6       Exhibit-12.  She testified she had
7       nothing to do with that document
8       and has no knowledge of it.  It
9       calls for speculation.
10 BY MR. MADDEN:
11       Q.    I'll ask the question again.
12            Would you agree with me that
13 those are contradictory messages?
14            MS. HILLYER:  Same
15       objections.
16            THE WITNESS:  I can tell you
17       that the date referenced in the
18       most recent is much -- is recent.
19       I don't know the date of the
20       original document, because I
21       didn't create it.
22            So the data it's talking
23       about in the dossier was several
24       years prior to this information.

Page 296

1  BY MR. MADDEN:
2        Q.    All right.  Would you agree
3  with me that the information is
4  contradictory, regardless of the dates?
5            MS. HILLYER:  Same
6       objections.  And objection to
7       form.
8            THE WITNESS:  I believe
9       it's -- new data is available and
10      it's more up to date and more
11      recent, and it's cited.  There's
12      no citation in the dossier that I
13      can comment on.
14 BY MR. MADDEN:
15       Q.    Let's look -- let's go back
16 to Exhibit-12, that same page, 23.
17       A.    Yep.
18       Q.    Under managing the risk of
19 opioid abuse, the first sentence says,
20 Although it is uncommon for chronic pain
21 patients to abuse opioid medication,
22 there is a potential risk associated with
23 the use of all opioids.
24            Do you see that?

## Page 297

```
1    A.   Yes, I do.
2    Q.   Now, let's look at the slide
3  you put together in the Exhibit-20, the
4  following page, which is the Bates number
5  ending in 61.
6    A.   Yep.  Yes.
7        MR. MADDEN:  So if you can
8        highlight that first sentence for
9        me?
10       THE WITNESS:  Yep.
11  BY MR. MADDEN:
12   Q.   And then the slide we see on
13  the right is a slide you put together for
14  Vantrela, correct?
15   A.   Yep.
16   Q.   And you put in that slide
17  the at-risk subpopulation within chronic
18  pain is estimated to be about 27 percent
19  or 602 members per 100,000 plan members.
20       Do you see that?
21   A.   I do.
22   Q.   And the risk you're talking
23  about there for chronic pain patients is
24  abuse to opioids, correct?
```

## Page 298

```
1    A.   Yes.
2    Q.   Would you agree with me that
3  those two messages are contradictory?
4        MS. HILLYER:  Objection to
5        form.  And also lack of foundation
6        as to Exhibit-12.
7        THE WITNESS:  And I'll
8        repeat my answer, which is the --
9        I don't remember the name, the one
10       to the right of me, the at-risk
11       subpopulation of chronic pain has
12       a reference.  It's recent.  And I
13       don't know the date of the, or the
14       reference from the previous
15       document, as I did not create it.
16  BY MR. MADDEN:
17   Q.   Did Vantrela launch?
18   A.   No.
19   Q.   Why?
20       MS. HILLYER:  Objection to
21       the extent it calls for
22       speculation.
23       THE WITNESS:  Yes.  I had no
24       part in that decision --
```

## Page 299

```
1  BY MR. MADDEN:
2    Q.   Were you a part of that
3  decision-making?
4    A.   No, no.
5    Q.   Would you agree with me that
6  Vantrela was designed, according to your
7  slides, to help reduce the risk of abuse
8  of opioids?
9    A.   It was to illustrate that
10  there was an unmet need, potentially, for
11  treatment options for physicians for
12  patients in which they wanted to
13  prescribe a long-acting opioid in an
14  abuse-deterrent formulation.
15   Q.   Right.  But we've looked at
16  two slides in your PowerPoint --
17   A.   Yep.
18   Q.   -- specifically dealing
19  with --
20       MS. HILLYER:  Let him
21       finish.
22       THE WITNESS:  Sorry.
23  BY MR. MADDEN:
24   Q.   -- the incidence of abuse
```

## Page 300

```
1  for opioid users, correct?
2    A.   Correct.
3    Q.   So Vantrela, at least
4  according to your slides, was designed,
5  at least in part, to deal with that risk
6  of abuse, correct?
7    A.   It was designed, yes, to
8  create a treatment option for physicians
9  to prescribe to patients as they deemed
10  appropriate.  It was a non -- that was an
11  abuse-deterrent formulation.
12   Q.   Was there a concern that
13  managed care payers wouldn't pay for
14  Vantrela?
15       MS. HILLYER:  Objection to
16       form.
17       THE WITNESS:  As with any
18       new product, payers are always
19       scrutinizing whether they'll pay
20       for any branded product.
21  BY MR. MADDEN:
22   Q.   Am I correct that one of the
23  reasons Vantrela did not launch was
24  because there was concern within the
```

Page 301

1    company, Teva, that third-party payers
2    would not pay for Vantrela?
3         MS. HILLYER:  Objection.
4    Calls for speculation.  And lack
5    of foundation.  She testified she
6    didn't know why and she wasn't
7    part of that decision.
8    BY MR. MADDEN:
9         Q.   Do you know one way or the
10   other?
11        A.   I was not part of the
12   decision.  I was not part of the
13   decision.
14        Q.   To your knowledge, was the
15   Pain Matters campaign run, in part, to
16   support Teva's generic portfolio?
17        MS. HILLYER:  Objection to
18   form.  Calls for speculation.  And
19   lack of foundation.  She testified
20   she wasn't part of that.
21        THE WITNESS:  I have no
22   knowledge of that.
23   BY MR. MADDEN:
24        Q.   So as you sit here today,

Page 302

1    you don't know why the Pain Matters
2    campaign was run, as far as supporting
3    any particular product?
4         A.   As far as supporting any
5    particular product, that's correct.
6         MR. MADDEN:  All right.
7    I'll pass the witness.
8         VIDEO TECHNICIAN:  Going off
9    the record --
10        MS. HILLYER:  Can I just do
11   my redirect?  You can stay on the
12   record, unless you need to change
13   anything on the record.
14        THE WITNESS:  Do I look
15   straight ahead?
16        MS. HILLYER:  Yes.  I'm not
17   going to move over there.
18             - - -
19        EXAMINATION
20             - - -
21   BY MS. HILLYER:
22        Q.   Ms. Bearer, earlier you
23   testified about an MEP.
24        Do you recall that?

Page 303

1         A.   I do.
2         Q.   Can you explain again what
3    an MEP is?
4         A.   A medical education program.
5         Q.   And in your work at Teva and
6    Cephalon, that would have been in the
7    context of managed care programs?
8         A.   Yes.
9         Q.   And how would an MEP have
10   come about for a managed care program?
11        A.   If a health plan, payer,
12   requested information on any given
13   product, a MIRF would be submitted.  And
14   at that point, someone from medical is
15   required to present a medical education
16   program.
17        Q.   Would MEPs have been
18   presented by anybody on the market access
19   team?
20        A.   No.
21        Q.   So they would only be
22   presented to managed care upon an
23   unsolicited request?
24        A.   That's correct.

Page 304

1         Q.   Earlier you also testified
2    about the Actiq white paper.
3         Do you recall that?
4         A.   I do.
5         Q.   How, if at all, was the
6    Actiq white paper used in connection with
7    managed care organizations?
8         A.   Again, upon an unsolicited
9    request, if an account manager is
10   speaking to a payer and they had specific
11   questions relative to any given product
12   that was either -- that the -- at the
13   point in time the account manager could
14   not speak to, they would put a MIRF
15   through -- I'm sorry, medical information
16   request form, and which, then, the white
17   paper would be sent directly to the payer
18   who requested it.
19        Q.   And earlier you looked at
20   sections of the Actiq managed care
21   dossier in Exhibits-11 and 12.
22        Do you recall that?
23        A.   I do.
24        Q.   And just to clarify, what,

Page 305

1  if any, involvement did you have in
2  creating those documents?
3       A.  None.
4       Q.  Do you know if the versions
5  that are in Exhibit-11 and 12 are final
6  versions?
7       A.  No, I don't.
8       Q.  Do you know if the versions
9  at 11 and 12, Exhibits-11 and 12, were
10  provided to any payers?
11       A.  I -- no.
12       Q.  And over the course of the
13  day, Ms. Bearer, there was some testimony
14  around discussions you or members of the
15  market access team might have had with
16  managed care payers.
17           Would you or members of
18  managed -- the market access team at Teva
19  or Cephalon ever have substantive
20  discussions concerning the standard of
21  care for disease states other than
22  breakthrough pain in cancer patients who
23  are opioid tolerant in the context of
24  Actiq or Fentora?

Page 306

1       A.  No.
2           MS. RUANE:  Object to the
3  form.
4  BY MS. HILLYER:
5       Q.  Would you have had
6  substantive discussions regarding chronic
7  pain in the context of Actiq or Fentora?
8       A.  No.
9       Q.  Would members of the market
10  access team, to your knowledge, have
11  substantive discussions concerning
12  chronic pain, in the context of Actiq or
13  Fentora, with managed care entities?
14           MS. RUANE:  Object to form.
15           THE WITNESS:  No.
16  BY MS. HILLYER:
17       Q.  And would you have had
18  substantive discussions concerning acute
19  pain with managed care entities in the
20  context of Actiq or Fentora?
21           MS. RUANE:  Object to form.
22           THE WITNESS:  No.
23  BY MS. HILLYER:
24       Q.  Would members of the market

Page 307

1  access team have had substantive
2  discussions concerning acute pain with
3  managed care entities, in the context of
4  Actiq or Fentora, to your knowledge?
5           MS. RUANE:  Same objection.
6           MS. HILLYER:  You can
7  answer.
8           THE WITNESS:  Not to my
9  knowledge.
10  BY MS. HILLYER:
11       Q.  And did Cephalon or Teva
12  have a policy around those types of
13  discussions with managed care entities?
14       A.  Yes.
15       Q.  What was that?
16       A.  If it was not an approved
17  product and/or approved indication, if a
18  question was raised, the policy states
19  that you would say -- you would respond
20  by saying that we're not indicated for
21  whatever the question was, and if you
22  needed additional information, I'm happy
23  to send a MIRF; again, medical
24  information request form.

Page 308

1       Q.  And then, lastly, we talked
2  a little bit about Exhibit-16, which was
3  titled, Managed Care Presentation, Draft
4  for Review.
5           Just to clarify, did you
6  understand this to be a promotional
7  document?
8       A.  No.  This is, to me,
9  presented by a speaker.
10           MS. HILLYER:  I have no
11  further questions at this time.
12           MS. RUANE:  Just a few
13  follow-up, briefly.
14           -  -  -
15           EXAMINATION
16           -  -  -
17  BY MS. RUANE:
18       Q.  To be presented by -- the
19  last document you were looking at, that
20  would be to be presented by a speaker who
21  would be a physician compensated by Teva,
22  correct?
23       A.  Correct.
24       Q.  Do you know how much the

Page 309

1  physicians were compensated for speaking
2  and presenting slide decks like the one
3  before you?
4       A.  Fair market value.  I don't
5  know what that was.
6       Q.  Do you know how fair market
7  value was calculated?
8       A.  No.
9       Q.  You mentioned that there was
10  a policy regarding an approach -- or a
11  response if there were questions about
12  something beyond the indication.
13       Is that a written policy?
14       A.  I can't recall --
15       MS. HILLYER:  Objection to
16  form as to time.
17  BY MS. RUANE:
18       Q.  You can answer if you know.
19       A.  I don't recall -- what time
20  frame are you talking about?  Because --
21       Q.  Let's start during the time
22  frame of Teva.
23       Does Teva have a written
24  policy, to your knowledge, regarding the

Page 310

1  approach taken when a managed care entity
2  has questions about something beyond the
3  indication of a drug?
4       A.  We do have a managed care
5  reimbursement policy.
6       Q.  Is that the title of it,
7  managed care reimbursement policy?
8       A.  I don't recall the exact
9  title of it.
10       Q.  Do you believe that that
11  managed care reimbursement policy has,
12  the policy, a written policy within that
13  consistent with what you just described?
14       A.  To the best of my knowledge,
15  I have not read it recently.
16       Q.  What about during the time
17  of Cephalon, was there a written policy
18  at that time?
19       A.  I don't recall if it was
20  written or not.
21       Q.  You don't have a specific
22  memory of a written policy, during the
23  time that the company was Cephalon,
24  instructing the managed care folks on

Page 311

1  what to do if a managed care entity had a
2  question about something beyond the
3  indication?
4       MS. HILLYER:  Objection to
5  the form.  You're talking about a
6  long time frame.
7       But you can answer.
8       THE WITNESS:  You're asking
9  if there was a written policy?
10  BY MS. RUANE:
11       Q.  Yes.
12       A.  I don't recall if it was
13  written.  I just don't recall if it was
14  written.
15       Q.  Is there anything you can
16  think of where we could look to see a
17  document to confirm your memory that that
18  policy would have existed at the time
19  that the company was Cephalon?
20       A.  Old documents.  I don't
21  recall who -- again, we're talking about
22  a long span of time, and there's been an
23  evolution of modules and training and
24  sign-offs on various policies.

Page 312

1       Whoever in the organization
2  is -- compliance, typically, would be
3  the -- I would think -- and, again,
4  that's -- my first answer would be
5  compliance.
6       Q.  Okay.
7       MS. RUANE:  Thank you.
8  Nothing further.
9       VIDEO TECHNICIAN:  Going off
10  record.  3:37 p.m.
11       - - -
12       (Whereupon, a discussion off
13  the record occurred.)
14       - - -
15       VIDEO TECHNICIAN:  Back on
16  record.  3:38 p.m.
17       - - -
18       EXAMINATION
19       - - -
20  BY MR. GASTEL:
21       Q.  Good afternoon.  My name is
22  Ben Gastel, representing the plaintiffs
23  in the Tennessee cases that have been
24  cross-noticed into this deposition today.

Page 313

1    MR. GASTEL:  And I first
2    want to state, for the record,
3    that I object to the deposition,
4    on behalf of my clients, going
5    forward today due to Teva's
6    continuous failures to meet its
7    obligations as set forth in the
8    state and federal cooperation
9    protocol, as laid out in our
10   previous deposition records and
11   our pending motions to quash.
12       With that objection in mind,
13   I do have a handful of questions
14   for you.  Hopefully we will be
15   relatively short.  I assure you, I
16   will not be as long as your
17   previous questioners today.
18   BY MR. GASTEL:
19       Q.   As I stated, Ms. Bearer, the
20   group of plaintiffs that I'm representing
21   are located in Tennessee.
22       So I want to start, in your
23   work with Teva or Cephalon, did you ever
24   have the opportunity to travel to the

Page 314

1    state of Tennessee for your work?
2        A.   Not that I recall.
3        Q.   Would you agree that it's a
4    public health concern whenever
5    prescription opioids are illegally
6    diverted and consumed for nonmedical
7    purposes?
8        MS. HILLYER:  Objection to
9    form.
10       THE WITNESS:  Say it --
11   repeat the question to make sure I
12   answer you correctly.
13   BY MR. GASTEL:
14       Q.   Sure.
15       Would you agree that it's a
16   public health concern whenever
17   prescription opioids are illegally
18   diverted and consumed for nonmedical
19   purposes?
20       MS. HILLYER:  Same
21   objection.
22       THE WITNESS:  Yes.
23   BY MR. GASTEL:
24       Q.   Would you agree that it's a

Page 315

1    public health concern whenever
2    prescription opioids are consumed for
3    nonmedical purposes?
4        MS. HILLYER:  Objection to
5    form.
6        THE WITNESS:  Can you define
7    "nonmedical purposes"?
8    BY MR. GASTEL:
9        Q.   Well, in your mind, what are
10   the nonmedical reasons a person would
11   consume a prescription opioid?
12       MS. HILLYER:  Objection to
13   form.
14       THE WITNESS:  You asked the
15   question, so if you could just
16   give me the context of the
17   question.
18   BY MR. GASTEL:
19       Q.   Well, sure.  And so let's
20   take it in two parts here.
21       In your mind, what are the
22   nonmedical reasons that a person would
23   consume a prescription opioid?
24       MS. HILLYER:  Objection to

Page 316

1    form.  Calls for speculation.
2        THE WITNESS:  That would be
3    speculating.
4    BY MR. GASTEL:
5        Q.   So you don't have in your
6    mind any reason why somebody would
7    consume an opioid for a nonmedical
8    reason?
9        MS. HILLYER:  Objection to
10   form.  Calls for speculation.
11       THE WITNESS:  Again,
12   individuals have different reasons
13   for that behavior.  I can't speak
14   to it.
15   BY MR. GASTEL:
16       Q.   Do you have any
17   understanding about why individuals
18   consume opioids for nonmedical purposes?
19       MS. HILLYER:  Same
20   objections.  And now asked and
21   answered.
22       THE WITNESS:  Again, I
23   could -- there are probably
24   numerous reasons.  And I don't

Page 317

1      have any personal knowledge,
2      personally, of consuming opioids
3      for nonmedical reasons.
4   BY MR. GASTEL:
5      Q.   Can you get high from
6   consuming prescription opioids?
7         MS. HILLYER:  Objection.
8      Calls for speculation.
9         THE WITNESS:  I have no
10     personal knowledge of whether
11     someone can get high or not, based
12     personally on my own experience.
13  BY MR. GASTEL:
14     Q.   And you've never heard of
15  people getting high off of prescription
16  opioids?
17     A.   I hear a lot of things.  So,
18  again, you're asking me specifically
19  about my interpretation of getting high.
20        And I -- as far as having an
21  opinion about that, I know what I hear in
22  the media.  But no personal experience
23  with that.
24     Q.   I'm not asking you if you've

Page 318

1   ever been high.
2         I'm asking you if you have
3   an understanding of whether or not people
4   get high from prescription opioids?
5         MS. HILLYER:  Hold on.
6      Asked and answered.  She's
7      testified that she's heard in the
8      news about this, she has no
9      personal experience.
10        She's here as a fact witness
11     to testify about her personal
12     experience.
13        If you want to ask her about
14     that, go ahead.  But she's
15     answered your question.
16        MR. GASTEL:  Are you
17     directing her not to answer?
18        MS. HILLYER:  No.
19  BY MR. GASTEL:
20     Q.   You can answer.
21     A.   I have no personal
22  experience relative to individuals
23  getting high off of opioids.
24     Q.   In 2015, did you believe

Page 319

1   that there was a public health crisis of
2   abuse and addiction as it relates to
3   opioids?
4         MS. HILLYER:  Objection to
5      form.
6         THE WITNESS:  Did I have a
7      personal -- repeat it, I'm sorry.
8      I'm just --
9   BY MR. GASTEL:
10     Q.   In 2015 --
11     A.   2015.
12     Q.   -- did you believe that
13  there was a public health crisis of abuse
14  and addiction as it relates to opioids?
15        MS. HILLYER:  Same
16     objection.
17        THE WITNESS:  Yeah, I
18     don't -- you're asking my personal
19     belief?
20  BY MR. GASTEL:
21     Q.   Yes.
22     A.   Again, with no firsthand
23  knowledge, but data would suggest, in the
24  public domain, that that is correct.

Page 320

1      Q.   I'll show you a document
2   that we'll mark as Exhibit-22.
3         - - -
4         (Whereupon, Teva-Bearer
5      Exhibit-22,
6      TEVA_MDL_A_09218160-165, was
7      marked for identification.)
8         - - -
9         MR. GASTEL:  I've got a copy
10     for you, too.
11        MS. HILLYER:  Thank you.
12  BY MR. GASTEL:
13     Q.   You see that Exhibit-22 is
14  an e-mail that you sent to various
15  individuals on June 4th, 2015?
16        Do you see that?
17     A.   I do see that.
18     Q.   And the subject is the Time
19  Magazine Cover Story, Why America Can't
20  Kick Its Painkiller Problem.
21        Did I read that correctly?
22     A.   Yes.
23     Q.   And then in the subject of
24  the e-mail you write, All, more news

1  highlighting the public health crisis of
2  abuse and addiction.  Regards, Deb.
3          Did I read that correctly?
4      A.   You did.
5      Q.   And the e-mail goes on to
6  forward this cover story for Time
7  Magazine.
8          And if we go to the last
9  page of this exhibit, there is a picture
10  of the cover of the Time Magazine
11  article, and the cover says, They're the
12  most powerful painkillers ever invented
13  and they're creating the worst addiction
14  crisis America has ever seen.
15          Did I read that correctly?
16      A.   Yes.
17      Q.   And you forwarded this to
18  some of your colleagues at Teva, correct?
19      A.   Yep.
20      Q.   And it looks like you also
21  included some people from Insight
22  Strategies?
23      A.   Yes.
24      Q.   Who are Steve Reid and Harry

1  Schiavi?
2      A.   Yes, Schiavi.
3          They work for a managed
4  care -- they are strategic partners, a
5  third party, that have conducted payer
6  research, analog assessment, et cetera.
7      Q.   So they were a vendor --
8      A.   Correct.
9      Q.   -- that Teva would use as
10  part of its marketing and promotion to
11  managed care organizations?
12      A.   Correct.
13      Q.   And why did you think it was
14  important that they saw this Time
15  Magazine article?
16          MS. HILLYER:  Objection to
17      form.
18          THE WITNESS:  As I stated
19      previously, there was a lot of
20      information in the public domain
21      concerning this.  And, therefore,
22      I felt it was important, as we as
23      an organization were looking at
24      abuse, this was in preparation for

1  Vantrela.  That would be the
2  reason.
3  BY MR. GASTEL:
4      Q.   Sure.
5          And then -- now that you've
6  looked at this e-mail, does this refresh
7  your recollection that in 2015 you
8  believed that there was a public health
9  crisis of abuse and addiction?
10      A.   I said this is news
11  highlighting the public crisis, that was
12  in the public domain.
13          You asked me previously if
14  it was my personal.  And I answered the
15  question that I have no personal
16  experience with any individual or
17  individuals experiencing opioid
18  addiction.
19      Q.   And that's fine.
20          But you're the one who chose
21  the language that's used in this e-mail,
22  right?
23      A.   That's correct.
24      Q.   And if you didn't believe

1  that we were in the midst of a public
2  health crisis of abuse and addiction, why
3  did you use that in your e-mail?
4      A.   I didn't say that --
5          MS. HILLYER:  Objection to
6      form.
7          THE WITNESS:  What I'm
8      saying to you is, this is the type
9      of information that payers are
10      also -- it's public information.
11          And as it relates to our
12      customers, they read this
13      information as well.
14  BY MR. GASTEL:
15      Q.   I want to go through some of
16  the things that this article highlights.
17          The last paragraph on the
18  first page ending in 160, do you see
19  where it starts, This is not?
20          Are you with me?
21      A.   That paragraph, yes.  This
22  is not a story.
23      Q.   It says, This is not a story
24  about dark alleys and drug dealers.  It

Page 325

1  starts in doctors' offices with everyday
2  people seeking relief from pain and
3  suffering.  Around the nation, doctors so
4  frequently prescribe the drugs known as
5  opioids for chronic pain from conditions
6  like arthritis, migraines, and lower back
7  injuries, that there are enough pills
8  prescribed every year to keep every
9  American adult medicated around the clock
10 for a month.
11        Did I read that correctly?
12     A.   You did.
13     Q.   When you forwarded this
14 article to your colleagues at Teva and
15 your third-party vendors that you worked
16 with, did you agree with that statement
17 in this article?
18        MS. HILLYER:  Objection to
19     form.
20        THE WITNESS:  That's not
21     referenced.  It's simply what was
22     written.
23        If they put a reference, I
24     would have more reason to have an

Page 326

1  opinion.  I would have an opinion.
2  BY MR. GASTEL:
3     Q.   The paragraph goes on there,
4  The longer patients stay on the drugs,
5  which are chemically related to heroin
6  and trigger a similar biological
7  response, including euphoria, the higher
8  the chances users will become addicted.
9        Did I read that correctly?
10     A.   You did.
11     Q.   When you forwarded this
12 article to your colleagues at Teva and
13 your third-party vendors, did you agree
14 with this statement made in this article?
15        MS. HILLYER:  Objection to
16     form.
17        THE WITNESS:  I didn't have
18     an opinion about this statement
19     when I forwarded the e-mail.
20 BY MR. GASTEL:
21     Q.   Do you have an opinion now?
22     A.   There's no reference here
23 specific to what they're quoting.  And as
24 I mentioned earlier, there's a lot of

Page 327

1  information in the public domain, which
2  we take seriously, and we, obviously,
3  were looking at an abuse-deterrent
4  treatment option for patients physicians
5  deemed appropriate for an abuse-deterrent
6  formulation of opioids.
7     Q.   Are you done?
8     A.   Yeah, I'm sorry.
9     Q.   That's all right.  I was
10 just making sure you were done.
11        The article goes on.  When
12 doctors, regulators and law enforcement
13 officials try to curb access, addicted
14 patients buy pills on the black market,
15 where they are plentiful.
16        Did I read that correctly?
17     A.   Yes, you did.
18     Q.   When you forwarded this
19 article to your colleagues at Teva and
20 your third-party vendors, did you agree
21 with this statement made in this article?
22        MS. HILLYER:  Objection to
23     form.
24        THE WITNESS:  I didn't have

Page 328

1  an opinion about that -- that
2  statement.
3  BY MR. GASTEL:
4     Q.   Going down farther into the
5  next paragraph, the sentence beginning,
6  Of the 9.4 million Americans who take
7  opioids.
8        Do you see that?
9     A.   Where am I looking at?
10     Q.   The third line down,
11 three-quarters of the page over.
12     A.   I see it.  Thank you.
13     Q.   It says, Of the 9.4 million
14 Americans who take opioids for long-term
15 pain, 2.1 million are estimated by The
16 National Institutes of Health to be
17 hooked and are in danger of turning to
18 the black market.
19        Did I read that correctly?
20     A.   Yes.
21     Q.   When you forwarded this
22 article to your colleagues at Teva, did
23 you have any reason to dispute this
24 statistic from The National Institutes of

Page 329

1  Health as relayed by this Time Magazine
2  article?
3       MS. HILLYER:  Objection to
4       form.  Lack of foundation.
5       THE WITNESS:  Did I have any
6       reason to dispute it?
7  BY MR. GASTEL:
8       Q.   Yes.
9       A.   Again, other than the
10  reference to The National Institutes of
11  Health, of which I've not seen the actual
12  data, this is just a statement to me, of
13  which I don't have an opinion if it's
14  accurate or not.
15       Q.   Did you ever tell any of
16  your colleagues that you thought that The
17  National Institutes of Health was
18  overestimating the number of Americans
19  that are hooked and in danger of turning
20  to the black market?
21       A.   I don't have any
22  recollection of having a conversation.
23       Q.   Going down, skipping down
24  two paragraphs with the paragraph

Page 330

1  beginning, All now agree.
2       Do you see that?
3       A.   Yes.
4       Q.   About a quarter of the way
5  down the page.
6       All now agree that the
7  opioid epidemic is a terrible problem,
8  but few are taking responsibility.  It
9  has fallen to local law enforcement and
10  health professionals to clean up the mess
11  as addiction and abuse ravage their
12  communities.
13       Did I read that correctly?
14       A.   Yes, you did.
15       Q.   When you forwarded this
16  e-mail to your colleagues at Teva and
17  your third-party vendors, did you have
18  any reason to dispute that claim in the
19  Time Magazine article?
20       MS. HILLYER:  Same
21       objections.
22       THE WITNESS:  Once again,
23       there's no specific reference to
24       where they cite this data.

Page 331

1       Therefore, I don't have an
2       opinion.
3  BY MR. GASTEL:
4       Q.   Did you tell any of your
5  colleagues, or do you recall telling any
6  of your colleagues, that you thought Time
7  Magazine was wrong when they claimed that
8  local law enforcement and health
9  professionals were left to clean up the
10  mess?
11       MS. HILLYER:  Objection to
12       form.
13       THE WITNESS:  I don't recall
14       having any conversation.
15  BY MR. GASTEL:
16       Q.   I'm going to flip over to
17  the next page, the one ending with Bates
18  stamp 162.
19       A.   Okay.
20       Q.   And about halfway down,
21  there's a paragraph beginning, In some
22  cases.
23       Do you see that paragraph?
24       A.   I'll read it here.

Page 332

1       Okay.  Got it.  Thank you.
2       Q.   It says, In some cases,
3  regulators, doctors and patients were
4  criminally misled into believing opioids
5  were safe and effective.  In 2007, the
6  Department of Justice accused Purdue of
7  deceptively telling doctors that
8  OxyContin was safer and less addictive
9  than other drugs.
10       Did I read that correctly?
11       A.   You did.
12       Q.   When you forwarded this to
13  your colleague at Teva and your
14  third-party vendors, did you know about
15  the Department of Justice accusing Purdue
16  of deceptively marketing OxyContin?
17       A.   I don't recall whether I
18  knew at that time or not, when I
19  forwarded the message.  The message was
20  forwarded almost three years ago.  So I
21  don't recall.
22       Q.   Do you -- did you
23  subsequently do research into the
24  Department of Justice's accusations

Page 333

1 against Purdue about its deceptive
2 marketing of OxyContin?
3        A.   I don't recall doing any
4 research into the Department of Justice.
5        Q.   Are you aware of whether or
6 not the Department of Justice brought
7 criminal charges against Purdue in
8 Virginia, near the Tennessee border?
9        A.   I have -- no, I don't know.
10            MS. HILLYER:  Objection.
11       Assumes facts not in evidence.
12 BY MR. GASTEL:
13       Q.   That paragraph goes on to
14 say that, The company and several
15 executives pleaded guilty to misleading
16 doctors and were fined $635 million.
17            Did I read that correctly?
18       A.   You did.
19       Q.   Did you know about Purdue's
20 guilty plea and their fine of $635
21 million when you forwarded this e-mail?
22       A.   I can't speak to what I knew
23 at the time I forwarded the e-mail.
24       Q.   The paragraph goes on to

Page 334

1 talk about something that you probably do
2 have knowledge on.
3            It says, In 2008, Cephalon
4 paid $425 million in fines, partly for
5 marketing its Actiq opioid, which was
6 shaped like a lollipop, for use against
7 migraines and sickle-cell pain,
8 conditions for which the drug had not
9 been found safe and effective.
10           Did I read that correctly?
11      A.   You did.
12      Q.   And then the article goes on
13 to say, Actiq withdrew its lollipop but
14 by then there was no shortage of other
15 opioids available.
16           Did I read that correctly?
17      A.   You did.
18      Q.   When you forwarded this
19 article to your colleagues at Teva and
20 your third-party vendors, you were aware
21 that Cephalon had paid the $425 million
22 fine, correct?
23      A.   Correct.
24      Q.   And that that was, in part,

Page 335

1 due to its marketing of Actiq opioids,
2 correct?
3       A.   In part.
4       Q.   Is that a yes?
5       A.   Yes, in part.
6            I'm sorry.
7       Q.   And in 2008, did you
8 personally have a role in marketing
9 Cephalon's Actiq product?
10           MS. HILLYER:  Objection to
11      the form.
12           THE WITNESS:  2008?
13 BY MR. GASTEL:
14      Q.   Yes.
15      A.   Yes.
16      Q.   I think I'm done with that
17 article.
18               - - -
19           (Whereupon, Teva-Bearer
20      Exhibit-23,
21      TEVA_MDL_A_03967973-979, was
22      marked for identification.)
23               - - -
24           MR. GASTEL:  I'm going to

Page 336

1            hand you another document that
2            we'll mark as Exhibit-23.
3 BY MR. GASTEL:
4       Q.   This is an e-mail from
5 Yousseff Kahn, sent to a variety of
6 people, including you, on August 24th,
7 2015.
8            Do you recall receiving this
9 e-mail?
10      A.   I don't actually recall, but
11 I must have received it.  I'm on the
12 e-mail chain.
13      Q.   Sure.
14           And the subject is, CI news,
15 opioid use disorder, the continued rise
16 of opioid abuse and misuse.
17           Did I read that correctly?
18      A.   You did.
19      Q.   And it appears to be an
20 article written by Bill McCarberg.
21      A.   Yes.
22      Q.   Are you familiar with Dr.
23 McCarberg?
24      A.   I know the name, but I don't

Page 337

1    know specifically Dr. McCarberg.
2         Q.    And going down to the second
3    full paragraph beginning, In 2013.
4         Do you see that?
5         A.    Yes.
6         Q.    The article states, In 2013
7    in the United States, 40,982 deaths by
8    drug overdose occurred.  Of these, 16,235
9    were the result of opioid analgesics.
10         Did I read that correctly?
11         A.    You did.
12         Q.    And the article states that
13    that's equivalent to 46 deaths every day.
14         Did you have any reason to
15    dispute those statistics when you
16    received this e-mail in August of 2015?
17         A.    I don't have the references.
18    If it's referenced, then I would have no
19    reason to dispute it, until I read the
20    reference and determined whether it was
21    appropriate or not.
22         Q.    And the article goes on to
23    state that, While the age-adjusted rate
24    for drug overdose deaths related to

Page 338

1    opioids increased at a rate of 19 percent
2    per year from 2000 to 2006, the rates
3    slow down from 2 percent from 2006 to
4    2013.
5         Did I read that correctly?
6         A.    Yes.
7         Q.    It says, The age-adjusted
8    rate for opioid overdose deaths declined
9    from 5.4 to 5.1 per 100,000 from 2010 to
10    2013.
11         Did I read that correctly?
12         A.    Yes.
13         Q.    Do you have any reason to
14    doubt that those statistics were accurate
15    when you received this e-mail back in
16    2015?
17         A.    Again, I don't recall
18    receiving it.  Therefore, I don't know
19    what my impression was at the time.
20         It appears -- I don't see a
21    reference.
22         Q.    And then --
23         A.    Yes, it is referenced.
24    Sorry.

Page 339

1         Q.    Assuming those statistics
2    are true --
3         A.    Yes.
4         Q.    -- would you characterize
5    that, personally, as an opioid crisis?
6         MS. HILLYER:  Objection to
7    form.  Lack of foundation.  Calls
8    for speculation.
9         THE WITNESS:  Opioid crisis?
10         MS. HILLYER:  And assumes
11    facts not in evidence.
12         THE WITNESS:  Yeah, based on
13    this article, I would not -- I
14    would not -- I don't recall ever
15    having a personal discussion or
16    professional discussion around --
17    based on this article.  The
18    crisis, I don't recall that.
19    BY MR. GASTEL:
20         Q.    And so --
21         A.    The crisis.
22         Q.    -- we've looked now at a
23    couple of articles that you received in
24    2015 as it relates to what you described

Page 340

1    as the public health crisis of abuse and
2    addiction.
3         And I think your testimony
4    previously was that you started receiving
5    these when you were putting together
6    business plans and marketing promotional
7    efforts for Vantrela; is that correct?
8         MS. HILLYER:  Objection.
9    Mischaracterizes testimony on a
10    couple of counts.
11         But you can answer.
12         THE WITNESS:  The way I'm
13    making that -- I'm giving that
14    information is based on the date.
15    BY MR. GASTEL:
16         Q.    Sure.
17         A.    In preparation -- if the
18    date aligned with preparation for the
19    strategy, et cetera, for Vantrela, then
20    the answer would be yes.
21         Q.    And what do you mean by the
22    strategy for Vantrela?
23         A.    The payer strategy, as was
24    described previously for any product.

Page 341

1       Q.   And the payer strategy being
2   the way that you were going to promote in
3   marketing -- and market Vantrela to
4   third-party payers, right?
5       A.   Correct.
6       Q.   And a big part of that was
7   going to be promoting it as an abuse
8   deterrent, correct?
9       A.   Correct.
10      Q.   And you were going to do
11  that because the opioids on the market
12  were subject to abuse and misuse,
13  correct?
14          MS. HILLYER:  Objection to
15      form.
16          THE WITNESS:  There were
17      abuse-deterrent formulations
18      available, as well as
19      nonabuse-deterrent formulations
20      available.
21  BY MR. GASTEL:
22      Q.   Well, we have just gone
23  through some articles going through --
24  that you forwarded and that you received

Page 342

1   talking about opioid abuse, right?
2       A.   Right.
3       Q.   And so -- and you believe
4   that you received these articles as part
5   of developing the Vantrela payer
6   strategy, right?
7       A.   Correct.  Yes.
8       Q.   And it would only make sense
9   to market Vantrela as an abuse deterrent
10  to these third-party payers if they were
11  on the market at that time, prescription
12  opioids, that were subject to abuse,
13  right?
14          MS. HILLYER:  Objection to
15      form.
16          THE WITNESS:  Once again,
17      it's a treatment option the
18      physicians would have, based on
19      identifying appropriate patients,
20      that they could then determine if
21      an abuse-deterrent formulation of
22      an opioid was appropriate.
23  BY MR. GASTEL:
24      Q.   And so do you recall the

Page 343

1   active opioid ingredient in Vantrela?
2       A.   Hydrocodone.
3       Q.   And was the purpose of
4   trying to sell Vantrela an attempt to
5   displace some of the current hydrocodone
6   market?
7          MS. HILLYER:  Objection to
8      form.
9          THE WITNESS:  It was, again,
10      another option for physicians,
11      when they determined it was
12      appropriate to prescribe for a
13      patient an abuse-deterrent
14      formulation, which is just another
15      treatment option.
16              - - -
17          (Whereupon, Teva-Bearer
18      Exhibit-24,
19          TEVA_MDL_A_03551263-266, with
20      attachment, was marked for
21      identification.)
22              - - -
23  BY MR. GASTEL:
24      Q.   Let me show you a document

Page 344

1   that we'll mark as Exhibit-24.
2          MR. GASTEL:  This is
3      actually Exhibit-2.
4          MS. HILLYER:  Do you have a
5      copy for me?
6          MR. GASTEL:  Yes, I'm sorry.
7          MS. HILLYER:  That's okay.
8      Thanks.
9   BY MR. GASTEL:
10      Q.   So this is a long e-mail
11  string that begins on March 11, 2016.
12  And it looks like you are eventually
13  forwarded this string on Thursday, April
14  14th, 2016.
15          Do you see that?
16      A.   Yes, I do.
17      Q.   Do you recall receiving this
18  e-mail?
19      A.   I don't recall.
20      Q.   Let's flip through it a
21  little bit and set the stage, if you
22  will.
23          The e-mail chain begins with
24  an e-mail from Jeffrey Callahan --

Page 345

1    A.   Correct.
2    Q.   -- to Dana Kelly on March
3  11, 2016.
4         Do you see that?
5    A.   I do.
6    Q.   Who is Mr. Callahan?
7    A.   He was in forecasting.
8    Q.   And who is Ms. Kelly?
9    A.   Finance.
10    Q.   And it says, Good morning,
11  Dana.  Attached is the template that
12  provides you with units for new IR hydro
13  and oxy scenarios that we constructed
14  yesterday.
15         Did I read that correctly?
16    A.   You did.
17    Q.   And IR hydro and oxy is a
18  reference to immediate-release
19  hydrocodone and Oxycodone?
20    A.   Correct.
21    Q.   And those are prescription
22  opioids, right?
23    A.   Yes.
24    Q.   And it looks like Mr.

Page 346

1  Callahan forgot to attach the document.
2         And so he sends another
3  e-mail that says, It would help if I
4  remembered to attach the file.
5         Do you see that?
6    A.   Yes, I do.
7    Q.   And then on March 15th,
8  2016, Ms. Kelly responds, Hello.  Please
9  find the LRP units for IR hydro and oxy
10  attached.
11         Did I read that correctly?
12    A.   Yes.
13    Q.   What does "LRP units" mean?
14         MS. HILLYER:  Objection to
15  the extent it calls for
16  speculation.
17         THE WITNESS:  I don't know.
18  BY MR. GASTEL:
19    Q.   Well, I'm happy that I can
20  also be confused on that term, then, too.
21         Going back up, eventually
22  when you joined the e-mail chain, I
23  believe, on April 14th, 2016, at the top
24  of the second page of this document, with

Page 347

1  Bates stamp ending 264, Mr. Jeffrey
2  Dierks forwards you this e-mail chain.
3         Do you see that?
4    A.   I do.
5    Q.   I think you've previously
6  testified.
7         But just again for the
8  record, who is Mr. Dierks?
9    A.   He was the brand director
10  for Vantrela.
11    Q.   And in his role as brand
12  director for Vantrela, he was the person
13  who was principally involved in
14  attempting to market and develop
15  promotional material for Vantrela; is
16  that fair?
17    A.   His team, yes.
18    Q.   And it says, Deb, welcome
19  any of your thoughts on the below, as we
20  need to finalize some of the assumptions
21  for the development of the IR P&Ls.
22         Did I read that correctly?
23    A.   Yes.
24    Q.   And is the term "IR P&Ls" a

Page 348

1  reference to immediate-release profit and
2  loss?
3    A.   Yes.
4    Q.   So is it fair to say that
5  Mr. Dierks is at least partly trying to
6  figure out with this analysis whether or
7  not Teva could make money from marketing
8  and selling Vantrela?
9         MS. HILLYER:  Objection.
10  Calls for speculation.
11         THE WITNESS:  This, as I
12  read it, is in reference to
13  another product, Valzedo, which we
14  were looking potentially -- and,
15  again, I'm reading this, so I
16  believe this is what it was
17  referring to, not Vantrela --
18  Valzedo, which was an
19  immediate-release version of
20  hydrocodone.
21  BY MR. GASTEL:
22    Q.   And so eventually you,
23  again, flipping over to the next page,
24  you send an e-mail to Joseph Smith.

Page 349

1    Do you see that?
2    A.   Yes.
3    Q.   And it says, What were the
4  assumptions by channel?  I know we
5  typically assume 78 -- 70 to 80 percent
6  commercial.  With the new forecast, did
7  anything change?
8    Did I read that correctly?
9    A.   You did.
10   Q.   What does that mean, that
11  "we typically assume 70 to 80 percent
12  commercial"?
13   A.   Well, when we look at the
14  patient population for branded products,
15  we assume, based on data, that 70 to 80
16  percent of the patients will have
17  commercial insurance for which we are
18  promoting the product.
19   And I'm asking if that
20  changed, because Joe also is a
21  forecaster.
22   Q.   Got it.
23   And then he responds back
24  with this breakdown, right, in the e-mail

Page 350

1  dated April 18th, 2016 at 7:10 a.m.?
2    Do you see that?
3    A.   Yes.
4    Q.   And it says, Was looking for
5  you Friday and just connected with Jeff
6  and found out you were out until
7  Thursday.  I'd assume the below splits
8  based off the IMS data, since they
9  probably won't change significantly.
10   Did I read that correctly?
11   A.   Yes.
12   Q.   And then he provides a
13  breakdown between Medicaid, cash,
14  commercial, and Part D --
15   A.   Yes.
16   Q.   -- correct?
17   A.   Yes.
18   Q.   And this is, essentially,
19  various ways that end users of
20  prescription opioids can pay for those
21  opioids, right?
22   A.   That, you know, are
23  reimbursed.
24   Q.   And what do you mean by

Page 351

1  "reimbursed"?
2    A.   Your question, I believe,
3  was about patients.  Patients pay cash.
4  Medicaid, commercial and Part D are
5  insurers.  Therefore, the insurer
6  reimburses, for the patient, the cost of
7  the drug.
8    Q.   And then the reference to
9  IMS data, that's IMS Health data, right?
10   A.   Yes.
11   Q.   For the record, will you
12  just explain what IMS data is?
13   MS. HILLYER:  Objection to
14    the extent it calls for
15    speculation.
16   THE WITNESS:  They have a
17    variety of data.  And its claims
18    data, prescription -- typically,
19    claims data.  And it's used for --
20    to assess utilization.
21  BY MR. GASTEL:
22   Q.   Sure.  And I want to take a
23  look at some of this IMS data that you
24  were forwarded in this e-mail from Mr.

Page 352

1  Joseph Smith on April 18th, 2016.  And
2  it's attached to Exhibit-24.
3    A.   Okay.
4    Q.   And I believe it's the fifth
5  page of this exhibit.
6    And it says, across the
7  top -- it's an Excel spreadsheet --
8    MS. HILLYER:  Sorry, again,
9    just for the record, these are not
10    consecutive Bates.
11   MR. GASTEL:  Yeah, well,
12    it's the attachment to the April
13    18th, 2016 e-mail.
14   MS. HILLYER:  Then it would
15    be consequent -- there's no
16    attachment.  Which April 18th?
17   MR. GASTEL:  From Joseph
18    Smith.
19   MS. HILLYER:  So the middle,
20    the second e-mail chain, okay.
21   So do you have that -- it's
22    just not consecutive, so we don't
23    actually have, sitting here
24    today --

Page 353

1        MR. GASTEL:  I don't Bates
2    stamp them, you Bates stamp them.
3        MS. HILLYER:  I do.
4        MR. GASTEL:  If you want the
5    exhibits consecutive with the
6    e-mails they're attached to, Bates
7    stamp them that way.
8        MS. HILLYER:  We do.  This
9    is not a consecutive -- there's no
10   attachment to this top e-mail,
11   which has no attachment, so it is
12   consecutively Bates, if it was
13   attached to the second.  You just
14   didn't print that out and bring it
15   as an exhibit.  And that's not our
16   fault.
17       And I just want to make it
18   clear for the record that there's
19   two different Bates numbers and
20   you should probably put in the
21   record what those Bates numbers
22   are for future reference, so
23   nobody gets confused.
24       MR. GASTEL:  Well,

Page 354

1    regardless, the attachment is --
2    was produced natively to us as
3    Bates stamp document
4    TEVA_MDL_A_03550081.
5    BY MR. GASTEL:
6        Q.   And across the top on this
7    document it says, Product.
8            Do you see that?
9        A.   Yes.
10       Q.   And that would indicate that
11   this is the product of IMS Health data
12   that's been collected, correct?
13       A.   Yes.  It would appear that,
14   yes.
15       Q.   And the next column over, it
16   says, MAT, March 2014, Medicaid TRx.
17           Do you see that?
18       A.   I do.
19       Q.   Is that a -- is that a
20   reference to a monthly average total?
21       MS. HILLYER:  Objection to
22   the extent it calls for
23   speculation.
24       THE WITNESS:  I don't know.

Page 355

1    I didn't run the report.
2    BY MR. GASTEL:
3        Q.   But you received it, right?
4        A.   Well, to the point you made
5    earlier, just because it says -- I don't
6    know -- this was a long trail of
7    forwarded.  It doesn't necessarily mean
8    he forwarded me the attachment.
9            I don't recall receiving it,
10   is what I'm trying to say.
11       Q.   Well, let's go back to the
12   e-mail chain there.
13           Because it finishes off with
14   an e-mail from you to Joseph Smith that
15   says, Sorry I missed you on Friday.  As
16   of now, I would use these assumptions.
17       A.   Yes.
18       Q.   Right?  That's what it says?
19       A.   That has nothing to do with
20   the attachment.  That's these assumptions
21   at the bottom here, the channel --
22       Q.   So --
23       A.   -- not at the bottom, the
24   Medicaid, cash --

Page 356

1        MS. HILLYER:  Wait.  One at
2    a time.
3        THE WITNESS:  Pardon me?
4        MS. HILLYER:  One at a time.
5    BY MR. GASTEL:
6        Q.   So that doesn't refresh your
7    recollection as to whether or not you
8    looked at the attachment?
9        MS. HILLYER:  Objection to
10   form.  Improper refreshing.  And
11   mischaracterizes the document.
12       THE WITNESS:  Typically,
13   this type of data is summarized by
14   either someone in forecasting, et
15   cetera.  And this is the summary
16   that I would have looked at,
17   rather than scrutinizing the Excel
18   sheet.
19   BY MR. GASTEL:
20       Q.   Sure.  So you would have --
21       A.   They are the experts on IMS
22   data.
23       Q.   So you would have looked at
24   the analysis, is that what you're saying,

Page 357

1   to determine whether or not the
2   assumptions were correct?
3          A.   I don't recall ever
4   receiving this document.  These
5   colleagues are the experts in our company
6   that provide forecasting information.  I
7   would have no reason to challenge their
8   summary, which, to me, is what I'm
9   looking at here, which is Medicaid, cash,
10  commercial, Part D.
11         Q.   Well, let's go to the last
12  page, then.
13         A.   Okay.
14         Q.   Okay.  And you see that the
15  last page of this document has some
16  numbers on it.
17         Let's do the second-to-last
18  page, okay?  Do you see that it has --
19  the very bottom page says, Medicaid,
20  4,339,185, 4.62 percent.
21         Do you see that?
22         MS. HILLYER:  No.
23  BY MR. GASTEL:
24         Q.   Very last column.

Page 358

1          A.   I see that, yes.
2          Q.   So go back to the e-mail
3   that you received --
4          A.   Yes.
5          Q.   -- on April 18th, 2016.
6          And it says, Medicaid, the
7   exact same numbers and exact same
8   percentage.
9          Do you see that?
10         A.   I do.
11         Q.   Let's flip to the last page,
12  the one labeled cash, 6,658,519, 6.99
13  percent.
14         Do you see that?
15         A.   I do.
16         Q.   Let's go back to your e-mail
17  that you received on April 18th, 2016.
18         Exact same numbers for cash,
19  right?
20         A.   Yes.
21         Q.   Commercial, last page,
22  57,485,347, 60.36 percent.
23         Do you see that?
24         A.   I do.

Page 359

1          Q.   And I read that correctly?
2          A.   I believe you did.
3          Q.   And then it's the exact same
4   number in the e-mail of April 18th, 2016,
5   right?
6          A.   Right.
7          Q.   And then Part D, again, on
8   the last page, 26,699,350.
9          Did I read that correctly?
10         A.   You did.
11         Q.   28.03 percent.
12         Did I read that correctly?
13         A.   You did.
14         Q.   And then if you flip back to
15  the e-mail on April 18th, 2016, it's the
16  exact same numbers there in that e-mail,
17  right?
18         A.   Yes.
19         Q.   To which you responded, You
20  can use those assumptions, right?
21         A.   Yes.
22         Q.   And then if you take a look
23  at what that document is summarizing,
24  again, going back to the second-to-last

Page 360

1   page, you see, in what is essentially the
2   product column, it's HYCD/APAP.
3          All the way down.
4          A.   I see.
5          MS. HILLYER:  This is what
6   he's looking at.
7          THE WITNESS:  No, I know
8   what he's looking at.  I'm looking
9   at the previous to see -- yes.
10  Okay.
11  BY MR. GASTEL:
12         Q.   And is it your understanding
13  that that's a reference to hydrocodone
14  with acetaminophen?
15         A.   Yes.
16         Q.   And so according to this IMS
17  Health database that you were forwarded
18  on April 8th, 2016, there were
19  approximately, if I'm doing my math
20  right, 95 million prescriptions for these
21  hydrocodone products?
22         MS. HILLYER:  Objection.
23  Calls for speculation.  Lack of
24  foundation.  She's testified she

1    doesn't recall ever receiving
2    this, reviewing it, and had
3    nothing to do with it.
4          MR. GASTEL:  She received
5    the e-mail that has this data in
6    it.  And she told --
7          MS. HILLYER:  She doesn't
8    recall that.  And she said --
9          MR. GASTEL:  And she told
10   her colleague --
11         MS. HILLYER:  Hold on.  Let
12   me state my objection.
13         MR. GASTEL:  -- that she --
14   that he can go ahead and use the
15   assumptions.
16         MS. HILLYER:  For the
17   record, she testified that she
18   doesn't recall receiving this.
19   This document doesn't reflect that
20   she received this.  She testified
21   that the assumptions were in
22   reference to the substance of what
23   he wrote in the underlying e-mail,
24   not in this attachment.

1          You can ask your question
2    and she can answer it.  But my
3    objections are on the record.
4          THE WITNESS:  Rephrase,
5    sorry.
6    BY MR. GASTEL:
7       Q.   So if I'm doing my math
8    right, that's 95 million prescriptions,
9    right?
10         MS. HILLYER:  Same
11   objections.
12         THE WITNESS:  Well, I'm not
13   adding it up, so I'll -- if you
14   want to add all this together and
15   it comes to that, I'll believe
16   you.
17   BY MR. GASTEL:
18      Q.   Well, let's just do simple
19   math.
20         What's 56 plus 26?
21      A.   Okay.  I got you.
22         MS. HILLYER:  You're asking
23   her to do the math?
24         THE WITNESS:  You're asking

1    me to do the math?
2          MS. HILLYER:  Give her a
3    calculator.  I mean, come on,
4    she's here as a fact witness.
5    This is -- I mean, at some
6    point --
7          MR. GASTEL:  You're the one
8    who is making this hard.  Don't
9    get mad at me.
10         MS. HILLYER:  If you want
11   her to do the math, give her --
12         MR. GASTEL:  You're the one
13   who's making this hard.
14         MS. HILLYER:  -- put the
15   math up there.
16         No, I'm not.  She has
17   nothing to do with this document.
18         And somebody asked for a
19   break.  So after this answer,
20   we'll take a break.
21         And just for the record, Ms.
22   Bearer, why don't you state what
23   you're actually doing, the math.
24         THE WITNESS:  I'm taking the

1    totals that were provided on the
2    e-mail for the channels of
3    Medicaid, cash, commercial and
4    Part D, and I'm adding them
5    together.
6          Unless I did it incorrectly,
7    it comes to -- what I show, unless
8    I made a mistake, it's 95,242,401.
9          MS. HILLYER:  Just leave it,
10   in case there's more math.
11   BY MR. GASTEL:
12      Q.   And that was derived,
13   according to this e-mail, from the IMS
14   data that Joe sent to you on April 18th,
15   2016?
16         MS. HILLYER:  Objection to
17   form.  You're asking her whether
18   the number she just put into the
19   calculator was derived from the
20   IMS data in this e-mail?
21         MR. GASTEL:  Yes.
22         MS. HILLYER:  Objection to
23   form.  Same objections.  Lack of
24   foundation.  Calls for

Page 365

```
 1        speculation.  She testified that
 2     she doesn't know that she received
 3     the attachment.
 4           Go ahead.
 5           THE WITNESS:  I don't --
 6    BY MR. GASTEL:
 7        Q.   The e-mail itself references
 8    the IMS data, right?
 9        A.   So --
10        Q.   And you have no reason to
11    doubt that Joe is -- that Joe, when he
12    forwarded this e-mail on April 18th,
13    2016, was lying to you that the source of
14    this material was IMS data, right?
15        A.   No.
16           MS. HILLYER:  Objection to
17        form.
18           THE WITNESS:  I don't have
19        any reason to suggest he lied.
20        His role is very different than
21        mine.
22    BY MR. GASTEL:
23        Q.   Sure.
24        A.   So if he runs the data, then
```

Page 366

```
 1    I don't go back and do what you asked me
 2    to do, which is add it up.
 3        Q.   Sure.
 4        A.   I don't.
 5        Q.   And then you respond that,
 6    As of now, I would use those assumptions,
 7    right?
 8        A.   Yes.
 9           Let me be clear.  For the --
10    what were the assumptions by channel,
11    we're talking percentages.
12        Q.   Sure.  But the percentages
13    are based on these prescription numbers,
14    right?
15        A.   Yes.
16        Q.   And that's 95 million
17    prescriptions, right?
18           MS. HILLYER:  Objection to
19        form.
20           THE WITNESS:  Based on the
21        calculator that you provided me
22        and my adding it up, that's what
23        the number came to.
24    BY MR. GASTEL:
```

Page 367

```
 1        Q.   Does that sound like a lot
 2    of prescriptions to you, 95 million?
 3           MS. HILLYER:  Objection to
 4        form.
 5           THE WITNESS:  Compared to
 6        what?
 7    BY MR. GASTEL:
 8        Q.   Compared to anything.
 9           MS. HILLYER:  Objection to
10        form.
11           THE WITNESS:  I don't have
12        a -- I mean, it's a large number,
13        I'll agree to that.  It's a large
14        number.
15           MS. HILLYER:  Let's go off
16        the record.
17           VIDEO TECHNICIAN:  Going off
18        the record.  4:27 p.m.
19             - - -
20           (Whereupon, a brief recess
21        was taken.)
22             - - -
23           VIDEO TECHNICIAN:  Back on
24        record.  4:35.
```

Page 368

```
 1    BY MR. GASTEL:
 2        Q.   Going back to the Time
 3    Magazine article, flipping to the
 4    document Bates labeled 62, which I
 5    believe is the third --
 6           MS. HILLYER:  Which exhibit
 7        number?
 8    BY MR. GASTEL:
 9        Q.   -- the third page.
10           MS. HILLYER:  What exhibit?
11           MR. GASTEL:  22.  The Time
12        Magazine article.
13           THE WITNESS:  What page?  I
14        didn't hear you.  I'm sorry.
15    BY MR. GASTEL:
16        Q.   162.
17        A.   Okay.
18        Q.   About a little over halfway
19    down the article, it says, By 2011 -- do
20    you see that paragraph beginning?
21        A.   Yes.
22        Q.   By 2011, the number of
23    opioid prescriptions written for pain
24    treatment had tripled to 219 million.
```

Page 369

1       Did I read that correctly?
2       A.   Yes, you did.
3       Q.   And we just looked at some
4  IMS Health data that suggested that there
5  were 95 million prescriptions for
6  hydrocodone.
7            Does the number 219 million
8  cause you any concern?
9            MS. HILLYER:  Objection to
10       form.
11            THE WITNESS:  I mean, again,
12       reading this out of context,
13       there's no reference.  Therefore,
14       I don't have an opinion.
15  BY MR. GASTEL:
16       Q.   Well, when you forwarded
17  this article to your colleagues at Teva
18  and your third-party vendors and you saw
19  that Time Magazine was reporting
20  prescription rates of 219 million, did
21  that cause you concern at the time?
22            MS. HILLYER:  Objection to
23       form.
24            THE WITNESS:  This is

Page 370

1  information that was in the public
2  domain that our customers would
3  see.  And, therefore, the purpose
4  of forwarding it on was looking at
5  the landscape, we're preparing to
6  launch an abuse-deterrent
7  formulation.
8  BY MR. GASTEL:
9       Q.   And you're preparing to
10  launch an abuse-deterrent formulation
11  because there was widespread abuse and
12  addiction of opioids, right?
13            MS. HILLYER:  Objection to
14       form.  And asked and answered.
15            MR. GASTEL:  Let me
16       rephrase.
17            THE WITNESS:  Yeah, okay.
18  BY MR. GASTEL:
19       Q.   You were planning on
20  launching an abuse-deterrent formulation
21  in order -- in response to what you
22  described as the public health crisis of
23  abuse and addiction, right?
24            MS. HILLYER:  Objection to

Page 371

1       form.  And mischaracterizes the
2       document and the testimony.
3            You can answer.
4            THE WITNESS:  This was an
5       article on the public health
6       crisis, which we monitored
7       everything that was -- you know,
8       we tried to keep current with what
9       was in the public domain.
10  BY MR. GASTEL:
11       Q.   But the term "public health
12  crisis of abuse and addiction" is your
13  term; it's in your cover e-mail?
14       A.   That's correct.
15       Q.   That was the language that
16  you chose to use, right?
17       A.   That's correct.
18            MR. GASTEL:  Subject to my
19       previous objection -- oh, let me
20       ask -- I'm sorry, let me ask one
21       last question.
22  BY MR. GASTEL:
23       Q.   Where do you live, Ms.
24  Bearer?

Page 372

1       A.   Pennsylvania.
2       Q.   What is your actual address?
3       A.
4
5       Q.   And who lives there with
6  you?
7       A.   No one.
8            MS. HILLYER:  Objection to
9       form.
10  BY MR. GASTEL:
11       Q.   Do you have any plans to
12  move any time soon?
13       A.   I don't really have an
14  opinion, at this point, of whether I'm
15  going to move or not.
16       Q.   Do you own that residence?
17            MS. HILLYER:  Objection.
18            THE WITNESS:  Yes.
19            MR. GASTEL:  All right.
20       Subject to my previous objection,
21       Ms. Bearer, thank you for your
22       time.  I have no more questions
23       today.
24            THE WITNESS:  Okay.

Page 373

1      MS. HILLYER:  Just to
2   respond to your previous
3   objection, Teva is not in
4   violation of any protocol or
5   guidance concerning the state and
6   federal protocol.
7      We produced everything in a
8   timely manner and answered all of
9   the questions that you had.
10      I do have a few brief
11   redirect questions for Ms. Bearer.
12          - - -
13      EXAMINATION
14          - - -
15   BY MS. HILLYER:
16      Q.   Ms. Bearer, do you recall,
17   when was the launch of Fentora?
18      A.   2007.
19      Q.   Would you or anyone at Teva
20   have -- or Cephalon, excuse me, have
21   marketed Actiq after the launch of
22   Fentora?
23      A.   No.
24      Q.   Did you ever market or

Page 374

1   promote Actiq for off-label uses?
2      A.   No.
3      Q.   Did you ever market or
4   promote Fentora for off-label uses?
5      A.   No.
6      MS. HILLYER:  I have no
7   further questions.
8      Off the record.
9      VIDEO TECHNICIAN:  This ends
10   today's deposition.  Going off the
11   record at 4:40 p.m.
12          - - -
13   (Whereupon, the deposition
14   concluded at 4:40 p.m.)
15          - - -
16
17
18
19
20
21
22
23
24

Page 375

1      CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5   witness was duly sworn by me and that the
6   deposition is a true record of the
7   testimony given by the witness.
8
9
10
11   Amanda Maslynsky-Miller
     Certified Realtime Reporter
     Dated:  January 9, 2019
12
13
14
15
16
17      (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24

Page 376

1   INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8      After doing so, please sign
9   the errata sheet and date it.
10      You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14      It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 377

1          - - - - - -
          E R R A T A
2          - - - - - -
3    PAGE  LINE  CHANGE/REASON
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____

Page 378

1          ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do
     hereby certify that I have read the
4    foregoing pages,  1 - 374, and that the
     same is a correct transcription of the
5    answers given by me to the questions
     therein propounded, except for the
6    corrections or changes in form or
     substance, if any, noted in the attached
7    Errata Sheet.
8    _____
9    DEBORAH BEARER          DATE
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24

Page 379

1         LAWYER'S NOTES
2    PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____