## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE NATIONAL PRESCRIPTION
OPIATE LITIGATION
         MDL No  2804
THIS DOCUMENT APPLIES TO ALL   No  17-MD-2804
CASES           Hon  Dan A  Polster
_____/

HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

-- -- --

FRIDAY, FEBRUARY 1, 2019

-- -- --

Videotaped Deposition of STACEY BECKHARDT,
held at the Law Offices of Skikos Crawford Skikos &
Joseph, One Sansome Street, Suite 2830,
San Francisco, California, beginning at 9:40 a m ,
before Sandra Bunch VanderPol, FAPR, RMR, CRR,
CALIFORNIA CSR #3032

-- -- --

GOLKOW LITIGATION SERVICES
877 370 3377 ph | 917 591 5672 fax
Deps@golkow com

## Page 2

1
2             APPEARANCES
3  THOMAS P  CARTMELL, ESQ
    KATHLEEN E  HUDNALL, ESQ
4  WAGSTAFF & CARTMELL, LLP
    4740 Grand Avenue, Suite 300
5  Kansas City, Missouri 64112
    (816) 701-1100
6  tcartmell@wcllp com
    khudnall@wcllp com
7  Counsel for the Plaintiffs
8  MARK G  CRAWFORD, ESQ
    DYLAN JENSEN, ESQ
9  SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
    One Sansome Street, Suite 2830
10  San Francisco, California 94104
    (415) 546-7300
11  mcrawford@skikos com
    djensen@skikos com
12  Counsel for the Plaintiffs
13
    BENJAMIN A  GASTEL, ESQ
14  BRANSTETTER, STRANCH & JENNINGS, PLLC
    The Freedom Center
15  223 Rosa L  Parks Avenue, Suite 200
    Nashville, Tennessee 37203
16  (615) 254-8801
    beng@bsjfirm com
17  Counsel for the Tennessee Plaintiffs
18
19  COLLIE F  JAMES, IV, ESQ
    MAUREEN K  BARBER, ESQ
20  MORGAN, LEWIS & BOCKIUS, LLP
    600 Anton Boulevard, Suite 1800
    Costa Mesa, California 92626-7653
21  (949) 399-7199
    collie james@morganlewis com
22  maureen barber@morganlewis com
    Counsel for Defendant Cephalon/Teva and the
23  Witness
24
25  (Appearances continued on next page)

## Page 3

1  APPEARANCES (Continued):
2
    TAYLOR A  GOODSPEED, ESQ
3  JONES DAY
    555 California Street, 26th Floor
4  San Francisco, California 94104-1500
    (415) 626-3939
5  tgoodspeed@jonesday com
    Counsel for Defendant Walmart
6
7  JOEL S  JOHNSON, ESQ
    WILLIAMS & CONNOLLY, LLP
8  725 Twelfth Street, N W
    Washington, DC 20005
9  (650) 632-4715
    jjohnson@wc com
10  Counsel for Defendant Cardinal Health
11
    MARY M  BALASTER, ESQ  (Telephone, Video &
12  Realtime Streaming)
    REED SMITH LLP
13  811 Main Street, Suite 1700
    Houston, Texas 77002-6110
14  (713) 469-3800
    mbalaster@reedsmith com
15  Counsel for Defendant AmerisourceBergen
16
    KAREN RIGBERG, ESQ  (Telephone/Video &
17  realtime streaming)
    ARNOLD & PORTER KAYE SCHOLER, LLP
18  44th Floor, 777 South Figueroa Street
    Los Angeles, California 90017-5844
19  (213) 243-4120
    karen rigberg@arnoldporter com
20  Counsel for Defendants Endo Pharmaceuticals,
    Inc  and Endo Health Solutions, Inc
21
22  Also Present:
23  EVAN WOLFE, Trial Tech, Technical Support
24  RYAN WONG, Videographer
25  --o0o--

## Page 4

1          I N D E X
2  Examination by:         Page
3  MR. CARTMELL         10
    MR. CRAWFORD       332
4  MR. GASTEL        372
5        --o0o--
6
7  Teva-Beckhardt Exhibits
8  Exhibit 1  Actiq and Fentora pictures -     21
      promotional
9
    Exhibit 2  FDA Approved Indication of Actiq  and  51
10    Fentora
11  Exhibit 3  Email chain dated 11/25/03 re "Actiq  71
      Investigation segment on Channel 6
12    News," Bates TEVA_MDL_A_03316708 -
      710
13
    Exhibit 4  Email chain dated 11/21/01 re     83
14    "Non-flattering segment on Channel 6
      News, Bates TEVA_MDL_A_03316701 -
15    702
16  Exhibit 5  PoliceOne.com article, "Increase In  85
      Abuse Reported of Narcotic Lollipos
17    for Cancer Patients, dated 4/27/04
18  Exhibit 6  Email chain dated 1/24/05 re "JAMA  96
      (1/19): Research Letter Finds
19    Increased Reports of Methadone
      Diversion and Abuse," Bates
20    TEVA_MDL_A_03272549 - 551
21  Exhibit 7  Actiq Risk Management Program, dated  114
      8/1/01, Bates TEVA_MDL_A_03272088 -
22    117
23  Exhibit 8  Cephalon letter dated 9/19/06 to FDA  144
      re "Amendment to NDA:  Response to
24    FDA Correspondence Regarding
      RiskMAP," Bates TEVA_MDL_A_00028341
25    - 691

## Page 5

E X H I B I T S

Teva-Beckhardt Exhibits                      Page

Exhibit 9  Memorandum dated 4/26/08 to ALSDAC   161
from Rappaport re "Overview of the
May 6, 2008 ALSDAC Meeting," Bates
TEVA_MDL_A_07864371 - 502

Exhibit 10 PowerPoint Slides titled, "Fentora   170
Strategic Marketing Plan, 2007,
Bates TEVA_MDL_A_07846839 (Native
format)

Exhibit 11 Article in "The Street," titled,    183
"Cephalon Eyes New Fentora Use, no
Bates

Exhibit 12 ACTIQ 2002 Marketing Plan, Bates    195
TEVA_MDL_A_00454816 - 959

Exhibit 13 Document titled, "Risk Management    228
Program vs  Actiq Marketing Plans,"
Bates TEVA_MDL_A_03272088 and 2882

Exhibit 14 Document titled, "Risk Management    229
Program vs  Actiq Marketing Plans,"
Bates TEVA_MDL_A_03272088 and 816

Exhibit 15 Document titled, "Risk Management    237
Program vs  Actiq Marketing Plans,"
Bates TEVA_MDL_A_03272088 and 816

Exhibit 16 2013 Actiq Marketing Plan, Bates     238
TEVA_CHI_00042882 - 950

Exhibit 17 Document titled, "Risk Management    252
Program vs  Actiq Marketing Plans,"
Bates TEVA_MDL_A_03272088 and 882

Exhibit 18 US DOJ document dated 9/29/08,       262
"Biopharmaceutical Company,
Cephalon, to Pay $425 Million &
Enter Plea to Resolve Allegations of
Off-Label Marketing," no Bates

///
///

## Page 6

E X H I B I T S

Teva-Beckhardt Exhibits                      Page

Exhibit 19 Cephalon document, "Cephalon         277
Announces Positive Results for
Fentora (fentanyl buccal tablet) for
Breakthrough Pain in Patients with
Chronic Low Back Pain," Bates
TEVA_MDL_A_07366254 - 256

Exhibit 20 PowerPoint slides, "FAST Team        288
Meeting, dated 1/18/07, Bates
TEVA_CHI_00006142 (Native format)

Exhibit 21 Email dated 7/27/07 re "FAST Team    299
meeting," attaching PowerPoint slide
titled, "FAST Team Meeting," dated
7/20/07, Bates TEVA_MDL_A_00010346,
TEVA_MDL_A_0010347_001 through _082

Exhibit 22 Email chain dated 2/4/06 re "Pain    333
Franchise 2006 Budget Revised Draft
2 3 06 doc, with attachment, Bates
TEVA_MDL_A_02375504 - 509

Exhibit 23 Email chain dated 4/9/04 re          345
"Important News:  New Tools
Available," Bates
TEVA_MDL_A_09667462 - 463

Exhibit 24 Email dated 12/13/06 re "Do You      345
Still Have Pain," with attachment,
Bates TEVA_MDL_A_01399742 - 750

Exhibit 25 Educational Grant Draft Request;     345
Payee, American Pain Foundation;
Amount, $75,500, Bates
TEVA_MDL_A_01174115 - 147

Exhibit 26 Education Grant Request; Payee,      361
American Chronic Pain Association;
Amount, $33,800, Bates
TEVA_MDL_A_01089593 - 596

Exhibit 27 Email dated 10/2/06 re "ACPA         361
brochure, etc ," with attachment,
Bates TEVA_MDL_A_02935839 - 841

## Page 7

E X H I B I T S

Teva-Beckhardt Exhibits                      Page

Exhibit 28 American Chronic Pain Association    361
pamphlet, "Managing Breakthrough
Pain (BTP), no Bates

Exhibit 29 Educational Grant Draft Request;     366
Payee, American Pain Foundation;
Amount, $25,000, Bates
TEVA_MDL_A_01089587 - 589

Exhibit 30 Email chain dated 6/19/07 re "APF    367
Distributed the Treatment Options
Guidebook to Soldiers and Family
Members," with attachment, Bates
TEVA_MDL_A_01090493 - 579

Exhibit 31 Email dated 3/21/05 re "TIME (3/28)  378
Reports on OxyContin Abuse and
Diversion in Appalachian Virginia,"
Bates TEVA_MDL_A_03274246 - 247

Exhibit 32 Email dated 11/17/06 re "Pain        385
Franchise News Weekly Monitoring
Report 11-17-06," with attachment,
Bates TEVA_MDL_A_07848758 - 773

Exhibit 33 Email dated 2/16/07 re "Pain         394
Franchise News Weekly Monitoring
Report 2-16-07," with attachment,
Bates TEVA_MDL_A_02049666 - 675

Exhibit 34 Email dated 8/11/07 re "Pain         401
Franchise News Weekly Monitoring
Report 8-10-07," with attachment,
Bates TEVA_MDL_A_01864226 - 251

Exhibit 35 Email dated 5/30/08 re "Pain         405
Franchise News Weekly Monitoring
Report 5-30-08," with attachment,
Bates TEVA_MDL_A_02048242 - 251

Exhibit 36 PowerPoint slides titled, "Welcome   410
to AD Hydrocodone Launch Preparation
Kickoff, dated 4/16/13, not Bates
(Native format)

## Page 8

1      BE IT REMEMBERED that on Friday, the 1st day
2  of February commencing at the hour of 9:40 in the law
3  offices of Skikos Crawford Skikos & Joseph, One
4  Sansome Street, Suite 2830, San Francisco, before me,
5  Sandra Bunch VanderPol, a Certified Shorthand
6  Reporter in and for the State of California,
7  personally appeared.
8      STACEY BECKHARDT,
9  called as a witness (Cephalon/Teva), who, having been
10 duly sworn, was thereupon examined and interrogated as
11 hereinafter set forth.
12           --oOo--
13      THE VIDEOGRAPHER:  We are now on the record.
14 My name is Ryan Wong.  I'm a videographer for Golkow
15 Litigation Services.  Today's date is February 1st,
16 2019, and the time is 9:40 a.m.
17      This video deposition is being held in
18 San Francisco, California, in the matter of National
19 Prescription Opiate Litigation, for the United States
20 District Court, Northern District of Ohio.
21      The deponent is Stacey Beckhardt.
22      Will counsel please identify themselves for
23 the record.
24      MR. CARTMELL:  Tom Cartmell, on behalf of
25 the plaintiffs.

Page 9

1     MR. CRAWFORD:  Mark Crawford, on behalf of
2   the plaintiffs.
3     MR. WOLFE:  Evan Wolfe, technology support
4   for plaintiffs.
5     MR. JENSEN:  Dylan Jensen, for the
6   plaintiffs.
7     MS. GOODSPEED:  Taylor Goodspeed, Jones Day,
8   on behalf of Walmart.
9     MR. GASTEL:  Ben Gastel, from Branstetter,
10   Stranch & Jennings, on behalf of the Tennessee
11   plaintiffs.
12     MR. JOHNSON:  Joel Johnson, of Williams &
13   Connolly, on behalf of Cardinal Health.
14     MS. BARBER:  Maureen Barber, with Morgan
15   Lewis, on behalf of the Teva defendants.
16     MR. JAMES:  Collie James, Morgan Lewis, on
17   behalf of the witness and the Teva defendants.
18     THE VIDEOGRAPHER:  On the phone?
19     MS. BALASTER:  I'm Mary Balaster, of Reed
20   Smith, on behalf of AmerisourceBergen Drug
21   Corporation.
22     MS. RIGBERG:  Karen Rigberg, on behalf of
23   Arnold & Porter, for the Endo and Par defendants.
24     MR. CARTMELL:  Anyone else?
25     (No response.)

Page 10

1     THE VIDEOGRAPHER:  The court reporter is
2   Sandy VanderPol and will now swear in the witness.
3     THE REPORTER:  Raise your right hand,
4   please.
5     Do you solemnly swear or affirm that the
6   testimony you are about to give in this proceeding
7   will be the truth, the whole truth, and nothing but
8   the truth, so help you God?
9     THE WITNESS:  Yes.
10     EXAMINATION
11   BY MR. CARTMELL:
12     Q.    Good morning.
13     A.    Good morning.
14     Q.    Will you please state your full name
15   for the record.
16     A.    It's Stacey Beckhardt.
17     Q.    Ms. Beckhardt, my name is Tom
18   Cartmell. I'm going to be asking you questions
19   today. I represent various plaintiffs in this
20   lawsuit that has been filed against various drug
21   manufacturers in an MDL proceeding that's pending in
22   Ohio. Do you understand that?
23     A.    Yes, I do.
24     Q.    Have you ever been deposed before
25   today?

Page 11

1     A.    No.
2     Q.    Let me say a few things real quick
3   just so we can have this go as efficiently as
4   possible.
5     I'm going to ask you questions, and if at
6   any time you don't understand one of my questions,
7   I'm going to ask that you go ahead and tell me that,
8   and then I will try to restate it or rephrase it so
9   that you can understand it; is that okay?
10     A.    Yes.
11     Q.    The other thing is I want you to be
12   comfortable at all times today during the deposition.
13   So if at any time you need to take a break for any
14   reason, if you need to go to the restroom or talk to
15   your counsel or anything, just let me know that, and
16   we will be fine with taking a break; okay?
17     A.    Okay.
18     Q.    Now, you understand that you're under
19   oath today?
20     A.    Yes, I do.
21     Q.    Okay.  And where are you currently
22   employed?
23     A.    BioMarin.
24     Q.    BioMarin?
25     A.    Huh-huh.

Page 12

1     Q.    What is BioMarin?
2     A.    It's a pharmaceutical company.
3     Q.    Where is BioMarin located?
4     A.    It's located in San Rafael,
5   California.
6     Q.    Is that just outside San Francisco?
7     A.    Yes, it is.
8     Q.    How far from San Francisco?
9     A.    Probably about 15 miles, give or
10   take. Marin County.
11     Q.    And where -- I'm sorry.
12     What is your current position at BioMarin?
13     A.    I am Senior Director for the Global
14   Patient Advocacy Network.
15     Q.    Is that a public relations type
16   position?
17     A.    No.  It's an internally facing
18   position that coordinates patient advocacy.
19     Q.    Is it true that you were previously
20   employed by a pharmaceutical company called Cephalon?
21     A.    Yes, I was.
22     Q.    And is it true that you were also
23   employed previously at a pharmaceutical company
24   called Teva Pharmaceuticals?
25     A.    Yes.

## Page 13

1    Q.    I'm going to be asking you questions
2  about your time at Cephalon Pharmaceutical primarily,
3  but may ask you questions today about your time at
4  Teva Pharmaceuticals as well; okay?  Do you
5  understand that?
6    A.    Yes.
7    Q.    Now, my understanding is that you
8  were employed at Cephalon and Teva from the time
9  period 2001 through approximately -- was it April of
10  2012?
11    A.    Yes.
12    Q.    Okay.  And I think during that period
13  of time you worked for Cephalon until Teva
14  Pharmaceuticals actually acquired Cephalon sometime
15  in 2011; is that correct?
16    A.    That's correct.
17    Q.    And then after Teva Pharmaceuticals
18  acquired Cephalon, you continued on at Teva for a
19  period of approximately six months; is that right?
20    A.    That's correct.
21    Q.    Why was it that you left Teva after
22  six months, after Teva acquired Cephalon?
23    A.    They had no position available for me
24  full-time.
25    Q.    Were you terminated?

## Page 14

1    A.    Yes.
2    Q.    Were you given any reasons for your
3  termination specifically?
4    A.    It was a head count issue.
5    Q.    Did they do away with your position?
6    A.    Yes.
7    Q.    And as a result of your termination
8  from Teva, did you have a severance agreement?
9    A.    Yes, I did.
10    Q.    And in that severance agreement, were
11  you offered and did you accept some type of severance
12  payment from Teva?
13    A.    Yes, I did.
14    Q.    How much was that payment that Teva
15  made to you?
16    A.    It was one year's worth of salary.
17    Q.    Which at that time would have been
18  how much?
19    A.    I don't recall exactly.
20    Q.    Can you ballpark it for me?
21    A.    Probably about 125,000.
22    Q.    You were only making 125,000 in 2012?
23    A.    Give or take.
24    Q.    Okay.  Did the agreement that you had
25  with Teva Pharmaceuticals upon your termination

## Page 15

1  include any type of statement that you were not to
2  disparage Teva or Cephalon in any way?
3    A.    No.
4    Q.    Do you still have a copy of that
5  agreement?
6    A.    Not to my knowledge.
7    Q.    Are you here today represented by
8  counsel?
9    A.    Yes, I am.
10    Q.    Who is representing you?
11    A.    Collie James and --
12    Q.    And --
13    A.    -- Maureen Barber.
14    Q.    I'm sorry.  I cut you off.  Go ahead
15  and tell me who they are again.
16    A.    Collie James and Maureen Barber.
17    Q.    Mr. James or Ms. Barber, are they
18  Teva's lawyers?
19    A.    Yes, they are.
20    Q.    And I take it you had a chance to
21  meet with them prior to your deposition today?
22    A.    Yes.
23    Q.    When was it that you first met with
24  Teva's lawyers in preparation for your deposition
25  today?

## Page 16

1    A.    Yesterday.
2    Q.    And had you talked to them, though,
3  over the phone about the deposition prior to that?
4    A.    I had a phone call that explained the
5  circumstance, and that I was going to be deposed.
6    Q.    When was that phone call?
7    A.    Probably -- I don't know exactly.
8  Maybe a month ago or so.
9    Q.    And that phone call that you
10  referenced approximately a month ago, how long did
11  that take?
12    A.    About 30 minutes.
13    Q.    And then -- excuse me.  Strike that.
14    And then your meeting with Teva's lawyers
15  yesterday, where was that meeting?
16    A.    It was at their San Francisco
17  offices.
18    Q.    What's the name of the law firm; do
19  you know?
20    A.    Morgan Lewis.
21    Q.    So you went to Morgan Lewis's law
22  firm and had a meeting yesterday.  Approximately what
23  time did you arrive?
24    A.    8:30 in the morning.
25    Q.    And how long was your meeting with

## Page 17

1    Teva's lawyers yesterday?
2        A.    Until 4:45.
3        Q.    During that meeting with Teva's
4    lawyers, did you get a chance to prepare for today's
5    deposition?
6        A.    I was given an understanding of what
7    the deposition was going to be like.
8        Q.    Did you review any documents at that
9    time?
10       A.    Yes.
11       Q.    Have you maintained those documents?
12       A.    No.
13       Q.    So it is fair to say that your only
14   preparation for today's deposition has been about a
15   30-minute phone call a month ago and then a meeting
16   with Teva's lawyers yesterday from approximately 8:30
17   until 4:30?
18       A.    That's correct.
19       Q.    Have you had any discussions with
20   anybody else, whether or not they are lawyers from
21   Morgan Lewis, about today's deposition and in order
22   to prepare for today's deposition?
23       A.    There are some people who know I am
24   here.  But nobody has prepared me.
25       Q.    Who is it that knows you're here?

## Page 18

1        A.    Several of my colleagues at work,
2    because I had to get the time off.
3        Q.    Did you ever talk to any of your
4    former colleagues at Cephalon or Teva about today's
5    deposition?
6        A.    One person who is a current leader
7    within my company.
8        Q.    Who is that?
9        A.    Chuck Buckler.  He was the head of
10   oncology sales.
11       Q.    You said he was the head of oncology
12   sales.  Are you referring to the time period when you
13   were at Cephalon?
14       A.    Correct.
15       Q.    Was Mr. Buckler involved at all in
16   the marketing or promotion of the opioid products at
17   Cephalon?
18       A.    Yes.
19       Q.    In what capacity?
20       A.    Marketing to the oncology community.
21       Q.    And approximately what period of time
22   were you contemporaries together?
23       A.    Probably maybe -- I don't know for
24   sure.
25       Q.    Now, Ms. Beckhardt, you worked at

## Page 19

1    Cephalon from 2001 until 2011.  And is it fair to say
2    that during the majority of that time, you were
3    working in the Public Relations Department at
4    Cephalon?
5        A.    For about eight of those years.
6        Q.    Would that have been from
7    approximately November of 2001, for eight years after
8    that?
9        A.    Yes.
10       Q.    Until sometime in 2009 or '10; is
11   that right?
12       A.    Something like that.
13       Q.    And at that time, in late 2009 or
14   2010, did you change positions?
15       A.    Yes, I did.
16       Q.    What was your new position at that
17   time?
18       A.    It was focused on -- solely on
19   patient advocacy across all of our therapeutic areas,
20   both in development and marketed.
21       Q.    During your time in public relations
22   from 2001 to late 2009 or 2010, were you working as a
23   part of your duties with the pain franchise at
24   Cephalon?
25       A.    Yes, I was.

## Page 20

1        Q.    And when I refer to pain -- the pain
2    franchise, I'm referring to the franchise that
3    included drugs that were being promoted and sold by
4    Cephalon, namely the opioid narcotics called Actiq
5    and Fentora.  Do you understand that?
6        A.    Yes, I do.
7        Q.    The pain franchise that you were
8    involved with from 2001 through the end of 2009, were
9    there any drugs in that franchise other than the
10   opioid narcotics named Actiq and Fentora?
11       A.    There was a product called Amrix, but
12   it's not an opioid medication.
13       Q.    Is Amrix a narcotic?
14       A.    No.  It is a muscle relaxant.
15       Q.    Is it more like an NSAID, like --
16       A.    Yes.
17       Q.    -- Advil, Tylenol, or something like
18   that?
19       A.    It is prescription strength, but it
20   is more in that class of medicine.
21       Q.    I see.  So during the time that you
22   were in public relations with Cephalon and working
23   with the pain franchise, the only two opioid narcotic
24   drugs that you were overseeing were a drug called
25   Actiq and a drug called Fentora; is that fair?

Page 21

1    A.   That's correct.
2         (Exhibit No. 1 was marked.)
3         MR. JAMES:  Two copies?
4         MR. CARTMELL:  Yes.  Okay.  I'm not sure we
5    have three to give out.
6    Q.   Ms. Beckhardt, I've handed you a copy
7    of a document that has photographs or pictures of two
8    medications, I believe, that Cephalon was promoting,
9    marketing, and selling during the time period that
10   you were there; do you see that?
11   A.   Yes, I do.
12   Q.   Okay.  And I want to talk a little
13   bit about these medications.  The jury has by now
14   seen pictures of these opioid narcotics we're talking
15   about.  But if you could, why don't you explain to
16   the jury what this represents as far as the opioid
17   narcotic medications?
18        MR. JAMES:  Objection.  Vague and ambiguous.
19        MR. CARTMELL:  Strike that.  I will start
20   over.  That's a good objection.
21   Q.   Now, Exhibit 1 includes on the left,
22   Ms. Beckhardt, a picture of -- it looks like to be a
23   woman who is putting in her mouth what looks to be
24   something like a lollipop.  Tell us what that is.
25   A.   It's an Actiq unit.

Page 22

1    Q.   When you say "an Actiq unit," Actiq,
2    the drug, is a fentanyl-based opioid narcotic; is
3    that correct?
4    A.   Yes, it is.
5    Q.   And this unit, when you say "unit,"
6    does that mean one of these lollipop-type of
7    medications?  Is that a unit?
8    A.   Yes, it is.
9    Q.   Okay.  And a prescription for Actiq
10   for this fentanyl-based opioid narcotic would
11   typically include how many of these lollipop-type
12   units?
13        MR. JAMES:  Calls for speculation.
14   BY MR. CARTMELL:
15   Q.   Do you know?
16   A.   It depends on the prescription.
17   Q.   Now, this depiction, it looks like,
18   at the top has six different units of Actiq with
19   numbers below them.  For example, the top one has
20   200 mcg's.  What is that?
21   A.   The dosage strength.
22   Q.   So, for example, the lowest dosage
23   strength, is that true, would be 200 micrograms at
24   the top?
25   A.   Yes.

Page 23

1    Q.   And then if you go down, there was
2    actually a strength of 400 micrograms, 600
3    micrograms, 800 micrograms, 1200 micrograms, and 1600
4    micrograms; is that correct?
5    A.   Yes, it is.
6    Q.   Now, at the end of this stick that
7    looks like -- or the end of the unit that goes in the
8    mouth, what is that?
9    A.   That's where the medication is
10   located.
11   Q.   And I've heard that -- is it
12   sometimes referred to as a lozenge?
13   A.   Yes, we refer to it as a lozenge on a
14   handle.
15   Q.   And so when you put that lozenge in
16   your mouth, if you were a patient who's been
17   prescribed this, how is it that this medication, this
18   opioid narcotic medication, works?
19        MR. JAMES:  Calls for speculation.
20        MR. CARTMELL:  Strike that.
21   I will ask the question again.
22   Q.   Now, when the patient, as depicted
23   here, puts the lollipop end or the lozenge end of the
24   unit in the mouth, what are they supposed to do so
25   that they get the fentanyl opioid narcotic

Page 24

1    medication?
2    A.   They rub it between their cheek and
3    their gum, and it's a transmucosal delivery system.
4    Q.   And when you say "transmucosal," what
5    does that mean?
6    A.   It goes through the cheek and the gum
7    to the bloodstream.
8    Q.   Okay.  And it's supposed to be, I
9    think I've seen from documents, more rapid on-site --
10   or onset of the effect?
11   A.   That is correct.
12   Q.   So that's -- that's one of the
13   advantages, I take it, that Cephalon would tell
14   doctors would be that this is a rapid onset type of
15   medication; correct?
16        MR. JAMES:  Calls for speculation.
17        THE WITNESS:  Because it's appropriate for
18   the treatment of breakthrough cancer pain.
19   BY MR. CARTMELL:
20   Q.   Now, this Actiq, fentanyl-based
21   opioid medication, I think according to the records,
22   was first approved by the FDA in 1998, or
23   thereabouts; is that consistent with your memory?
24   A.   Yes.
25   Q.   Now, you didn't get to Cephalon until

Page 25

1    2001.  But was Cephalon already selling, promoting,
2    and marketing Actiq when you arrived?
3        A.    That's correct.
4        Q.    And I think because Cephalon
5    purchased another company called Anesta, who had
6    originally been the company who developed and
7    actually received or filed the NDA, the New Drug
8    Application, with the FDA and had the drug approved,
9    Cephalon purchased Anesta and started selling this
10   drug Actiq sometime around 2001; is that consistent
11   with your memory?
12       A.    Yes.
13       Q.    It was shortly before you arrived; is
14   that correct?
15       A.    That's correct.
16       Q.    Let me ask you about the drug listed
17   on the right.  It looks like it's called Fentora; is
18   that correct?
19       A.    Yes.
20       Q.    Now, is Fentora another
21   fentanyl-based opioid narcotic?
22       A.    Yes.
23       Q.    And this drug Fentora, it doesn't
24   look like it's a lollipop-looking lozenge.  But it
25   looks like if you look below the packages, there are

Page 26

1    tablets; is that right?
2        A.    That's correct.
3        Q.    Now, there's a depiction of an
4    individual who is putting the tablet in their mouth.
5    That's a Fentora tablet; is that right?
6        A.    Yes.
7        Q.    And this was a depiction from a
8    product piece that we received from Cephalon.  Do you
9    recognize this?
10       A.    Yes.
11       Q.    Okay.  And tell the jury, if you
12   will, how this tablet is supposed to be placed in the
13   mouth so that the individual or the patient who gets
14   the medication gets the fentanyl medication released.
15       A.    It goes between the cheek and the
16   gum.
17       Q.    Okay.  And so is it also
18   transmucosal?
19       A.    Yes, it is.
20       Q.    And it also is supposed to give a
21   very rapid onset of the medication; is that correct?
22       A.    Yes.
23       Q.    Now, these are both Class 2
24   narcotics; is that right?
25       A.    Yes.

Page 27

1        Q.    And Class 2 narcotics are the most
2    highly restricted narcotics in the United States; is
3    that correct?
4        A.    No.
5        Q.    What's the most highly restricted?
6        A.    Class 1.
7        MR. JAMES:  Calls for -- calls for legal
8    conclusion.
9        MR. CARTMELL:  Okay.  Let me start over.  I
10   will ask you again.
11       Q.    Class 2 narcotics are regulated by
12   the Drug Enforcement Administration; is that correct?
13       A.    Yes.
14       Q.    Okay.  And there are restrictions
15   placed on the sale of those types of medications; is
16   that correct?
17       A.    Yes.
18       Q.    Okay.  And these two drugs, Actiq and
19   Fentora, were they sold by Cephalon at the same time
20   while you were there?
21       A.    Yes.
22       Q.    Okay.  Tell me if I'm right about
23   this.  Actiq was sold by Cephalon from sometime in
24   2001, and it continued to be sold even after it lost
25   its exclusivity; correct?

Page 28

1        A.    That's correct.
2        Q.    But at some point in 2006, Actiq was
3    no longer promoted or marketed by Cephalon; is that
4    correct?
5        A.    That's correct.
6        Q.    And at the time that Actiq lost its
7    exclusivity or its patent protection, that's when, at
8    approximately the same time, Fentora, the opioid
9    narcotic in a tablet form, came to market; correct?
10       A.    That's correct.
11       Q.    In other words, the approval of
12   Fentora by the FDA was at precisely the same time as
13   the time that the company stopped promoting the Actiq
14   product; fair?
15       A.    I don't believe it to be a correct
16   timing.
17       Q.    But around the same time as each
18   other; do you remember that?
19       A.    Yes.
20       Q.    Now, each of these medications, as
21   you said, were a part of the pain portfolio at
22   Cephalon; correct?
23       A.    Yes.
24       Q.    And each of these medications, during
25   your time there, had a team that was responsible for

Page 29

1   the marketing and promotion and sales of these
2   medications, these opioid medications; correct?
3        A.   Yes.
4        Q.   And were you on the Actiq team during
5   the time that Cephalon was promoting, selling, and
6   marketing the drug Actiq?
7        A.   I was not on the marketing team.  But
8   I worked with the marketing team.
9        Q.   Were you -- did you consider yourself
10  on the Actiq team?
11       A.   Yes.
12       Q.   And then starting in 2006, or prior
13  to that time prelaunch of Fentora, were you on the
14  Fentora team as well?
15       A.   Yes.
16       Q.   During the time that you were at
17  Cephalon, did your job involve the marketing and
18  promotion of Actiq?
19       A.   No.
20       Q.   Did your job involve the marketing
21  and promotion of Fentora?
22       A.   No.
23       Q.   You said you worked, though, with the
24  Marketing Department; is that correct?
25       A.   That's correct.

Page 30

1        Q.   I want to try to give the jury some
2   idea about your involvement with these two narcotic
3   opioid products while you were at Cephalon.  And it
4   sounds like you were on -- or in the Public Relations
5   Department for eight years and were involved with
6   these products in some way; is that correct?
7        A.   That's correct.
8        Q.   Okay.  And tell us what your
9   involvement was.  And I may follow up and ask you
10  some questions, but tell the jury what your
11  involvement was as the manager on the public
12  relations team that was overseeing the Actiq team and
13  the Fentora team.
14       A.   I was responsible for public
15  relations, media relations, as well as working with
16  the advocacy community in some capacities to build
17  relationships and also patient education materials
18  that were disease awareness only.
19       Q.   Okay.  Let me follow up on that a
20  little bit.
21       Now, I saw from your bio online on your
22  LinkedIn page that you developed and implemented
23  product-related public relations strategy; is that
24  correct?
25       A.   That's correct.

Page 31

1        Q.   And you did that for both of these
2   opioid narcotics; correct?
3        A.   That's correct.
4        Q.   Okay.  And did that involve, for
5   example, messaging to various members of the public
6   about these products?
7        MR. JAMES:  Vague.
8        You can answer.
9        THE WITNESS:  It -- it related to messaging
10  having to do with the media, and through the media,
11  that would have gotten to the public.  And it also
12  related to messages that were used in some outreach
13  to the patient community.
14  BY MR. CARTMELL:
15       Q.   Okay.  And messaging.  Tell us what
16  messaging means.  That's a sort of a PR type of word,
17  isn't it?
18       A.   Yes.
19       Q.   What does it mean?
20       A.   It means finding a way to
21  appropriately describe what it is that you're trying
22  to communicate.
23       Q.   So you mentioned the media.  And
24  sometimes I saw from documents in your custodial file
25  that you would actually be involved with providing

Page 32

1   information about Actiq and Fentora to the media;
2   correct?
3        A.   That's correct.
4        Q.   And sometimes you would be involved
5   in what types of messages you would give the media
6   about these products; correct?
7        A.   That's correct.
8        Q.   And, for example, sometimes you would
9   be involved with giving the media messages about
10  Actiq and Fentora related to what types of products
11  they are; correct?
12       A.   That's correct.
13       Q.   And sometimes you would give the
14  media information about Actiq and Fentora about what
15  they could be used for; correct?
16       A.   That is correct.
17       Q.   And when we say "media," we're not
18  talking only about television, for example, radio,
19  for example, but we're also talking about the print
20  media?
21       A.   That's correct.
22       Q.   So, for example, the Wall Street
23  Journal or other AP types of newspapers, for example;
24  correct?
25       A.   That's correct.

Page 33

1    Q.    So a lot of your job, it looked like,
2   or a big part of your job, included messaging with
3   the media about these two narcotic opioid drugs;
4   correct?
5    A.    That's a portion of my job.
6    MR. JAMES:  Misstates her testimony.
7   BY MR. CARTMELL:
8    Q.    You can restate your answer, please.
9    A.    It was a portion of my job.
10   Q.    Now, the other things, it looks like
11  from your documents, that you were involved with and
12  you mentioned on your LinkedIn page is that you
13  partnered with industry groups, patient groups,
14  professional societies and key opinion leaders;
15  correct?
16   A.    That's correct.
17   Q.    What do you mean when you partnered
18  with those groups?  What do you mean by that?
19   A.    We developed -- we spoke about
20  breakthrough pain, what breakthrough pain was.  There
21  was lack of awareness of the condition.  So both
22  breakthrough pain, breakthrough cancer pain, and
23  what -- what the needs of those patient populations
24  were.
25   Q.    When you say you partnered with

Page 34

1   industry groups, give the jury some idea of what an
2   industry group in the pain community might be.
3    A.    The primary industry group was a
4   coalition called the Pain Care Coalition.  It
5   involved industry groups, patient advocacy
6   organizations, and professional societies.
7    Q.    So would that pain coalition, as you
8   called it, involve multiple pharmaceutical companies
9   in the industry?
10   A.    That's correct.
11   Q.    And so sometimes you would work with
12  those industry groups on the messaging that would be
13  given about, for example, opioids in general?
14   A.    That's not correct.
15   Q.    Let me ask you this, then.  Would you
16  sometimes be involved with that coalition related to,
17  for example, as you mentioned, breakthrough pain and
18  the messaging related to breakthrough pain?
19   A.    To increase the understanding of
20  breakthrough pain, yes.
21   Q.    And then you also mentioned that part
22  of your job in public relations, and as it related to
23  these opioid narcotics, had to do with your
24  partnering with patient groups; right?
25   A.    That's correct.

Page 35

1    Q.    Now, one of the things, I think, that
2   you would do is actually from time to time be
3   involved with providing some type of pamphlets or
4   brochures, or things like that, actually to patients?
5    A.    That's not correct.
6    Q.    Okay.  Let me re-ask it.  Actually,
7   strike that.
8    When you would partner with patient groups
9   about these opioid narcotic medications, what would
10  you do typically?  Tell the jury.
11   MR. JAMES:  Misstates her testimony.
12   THE WITNESS:  Can you clarify that question,
13  please?
14  BY MR. CARTMELL:
15   Q.    One of the things you would do during
16  your time at Cephalon and during the time that you
17  were in the Public Relations Department working with
18  Fentora and Actiq, the opioid narcotics, was you
19  would work with patient groups, for example; is that
20  true?
21   A.    That's true.
22   Q.    Give the jury an example of what you
23  mean when you say "a patient group."
24   A.    A patient group are organizations
25  that represent the interests of people with a

Page 36

1   specific condition.  And I worked with a number of
2   groups in that regard.
3    Q.    Okay.  So patient groups aren't
4   necessarily groups of patients who are taking these
5   drugs, but patient groups are actually organizations;
6   is that right?
7    A.    That's correct.
8    Q.    Give us the names of some of the
9   patient group organizations that you work with and
10  partnered with when you were dealing with the opioid
11  narcotics at Cephalon.
12   A.    Cancer Care; American Pain
13  Foundation; American Chronic Pain Association; reflex
14  Sympathetic Dystrophy Syndrome Association, were
15  probably the primary ones.
16   Q.    And these are organizations, I take
17  it, pain-type of organizations, that provide
18  materials, literature, maybe information on websites
19  to actual patients about opioid drugs?
20   MR. JAMES:  Calls for speculation.
21   THE WITNESS:  To some extent.
22  BY MR. CARTMELL:
23   Q.    Okay.  And those patient groups that
24  you just mentioned, the American Pain Foundation,
25  American Chronic Pain Association, those types of

## Page 37

1  pain -- or excuse me, patient groups, during the time
2  that you were working with PR at Cephalon, Cephalon
3  would provide those companies what are called grants
4  from time to time; correct?
5      A.   Those not-for-profits did receive
6  grants from Cephalon.
7      Q.   In other words, Cephalon would pay
8  amounts of money to those groups from time to time
9  related to providing information to patients about,
10  for example, breakthrough pain or opioid information
11  in general; correct?
12      MR. JAMES:  Vague and ambiguous.
13      THE WITNESS:  We would provide grants that
14  were unrestricted to them to create the materials
15  themselves.
16  BY MR. CARTMELL:
17      Q.   I understand.  But the American Pain
18  Foundation, the American Chronic Pain Association,
19  and the other patient-type groups that you dealt with
20  in PR, they might come to you and Cephalon and ask
21  for money; correct?
22      A.   For grants, yes.
23      Q.   Right.  And then you had to decide
24  what money or what grants you wanted Cephalon -- or
25  Cephalon had to decide what grants or what money they

## Page 38

1  wanted to provide to those patient groups; correct?
2      A.   In collaboration with a
3  cross-functional committee.
4      Q.   And that cross-functional committee
5  included marketing; didn't it?
6      A.   No.  It actually did not, to the best
7  of my memory.
8      Q.   Your belief is that the Marketing
9  Department was not involved in what grants were
10  provided to patient groups?
11      A.   They were not on the committee.
12      Q.   Were they involved?
13      MR. JAMES:  Vague.
14      THE WITNESS:  They were involved to the
15  extent that they were informed about possible
16  opportunities to work with organizations.
17  BY MR. CARTMELL:
18      Q.   And the grants or the money that you
19  would provide to these pain foundations and patient
20  groups, as you described, lots of times that money
21  would go into written materials that they would
22  produce for patients; correct?
23      A.   That's correct.
24      Q.   And those written materials that they
25  would produce, for example, would include information

## Page 39

1  about the treatment of pain with opioids; correct?
2      MR. JAMES:  Vague.
3      THE WITNESS:  They included information
4  about the treatment of opioids.  They included
5  information about the -- to build awareness about
6  what breakthrough pain and what breakthrough cancer
7  pain was.
8  BY MR. CARTMELL:
9      Q.   You just mentioned two things --
10  right? -- breakthrough pain and breakthrough cancer
11  pain.  We're going to be talking about that today
12  quite a bit.  But those are two different things;
13  correct?
14      MR. JAMES:  Vague.
15      THE WITNESS:  Two different patient
16  populations.  The same thing.
17  BY MR. CARTMELL:
18      Q.   Okay.  In other words, there are
19  certain patients who have chronic pain that is not
20  cancer related that have breakthrough pain; right?
21      A.   That is correct.
22      Q.   And then there are a separate group
23  of patients that have cancer and can have
24  breakthrough pain; correct?
25      A.   That's correct.

## Page 40

1      Q.   And your point is, those are two
2  separate things, but the pain is the same; correct?
3      MR. JAMES:  Misstates her testimony.
4      THE WITNESS:  It doesn't state my testimony.
5  BY MR. CARTMELL:
6      Q.   Explain again what you meant by that.
7      A.   There are different underlying
8  medical conditions that can lead to breakthrough
9  pain.
10      Q.   Okay.  And one condition is cancer;
11  right?
12      A.   One condition is cancer.
13      Q.   Other conditions might be things like
14  back pain; right?
15      A.   That's correct.
16      Q.   Arthritis?
17      A.   Possibly.
18      Q.   What other types of conditions?
19      A.   Certain neuropathic pain conditions.
20      Q.   Okay.  You also partnered with
21  professional societies when you were working with
22  these opioid narcotics, Actiq and Fentora.  Tell us
23  what you mean when you say a "professional society."
24      A.   Organizations that represent
25  health-care professionals, either doctors, nurses,

Page 41

1   and the like.
2       Q.   So these are societies that are
3   actually made up of physicians or nurses?
4       A.   That's correct.
5       Q.   And these societies, when you would
6   partner with them, tell us what you mean by that, and
7   why would you partner with them about these opioid
8   products?
9       A.   I worked primarily with the
10  leadership of those organizations to better
11  understand their perspective on breakthrough cancer
12  pain, breakthrough pain in general, and what the
13  needs of the patient population were.
14      Q.   I see.  And tell us the names of some
15  of those societies, those professional societies,
16  that you worked closely with.
17      A.   The American Academy of Pain
18  Medicine; American Pain Society; American Academy of
19  Pain Management; American Society of Pain Management
20  Nursing.
21      Q.   What about, for example, an
22  anesthesiology professional society?
23      A.   I did not work with them.
24      Q.   What about a professional -- strike
25  that.

Page 42

1       Any other professional societies that you
2   can remember working with related to the opioids
3   Actiq and Fentora?
4       A.   We had some outreach to the American
5   Society of Clinical Oncology.
6       Q.   Okay.  And then finally you, in your
7   job in PR related to Actiq and Fentora, the narcotic
8   opioids, would partner sometimes with what you would
9   call key opinion leaders; correct?
10      A.   That's correct.
11      Q.   Tell the jury what you mean when you
12  refer to someone as a key opinion leader.
13      A.   Somebody who is recognized as a
14  prominent leader by their colleagues.
15      Q.   And when you were working with these
16  key opinion leaders, you were -- I take it they were
17  typically doctors or nurses?
18      A.   That's correct.
19      Q.   In other words, a key opinion leader
20  that is a doctor, that's somebody the company works
21  with and may hire as a consultant; correct?
22      A.   In some circumstances.
23      Q.   And when the company might hire a key
24  opinion leader as a consultant, they would pay that
25  consultant for their time; is that right?

Page 43

1       A.   That's correct.
2       Q.   Sometimes they would pay that
3   consultant pursuant to an agreement on -- based on
4   the actual activity that the consultant is
5   performing; correct?
6       MR. JAMES:  Vague.  Calls for a legal
7   conclusion.
8       THE WITNESS:  I don't understand the
9   question.
10  BY MR. CARTMELL:
11      Q.   Well, for example, sometimes the --
12  Cephalon, the company, and you in PR, might partner
13  with key opinion leaders to -- to write potentially
14  manuscripts, for example; correct?
15      A.   Independent of the company.
16      Q.   I understand.  But Cephalon may pay
17  the individual --
18      A.   Not an individual.  You would not pay
19  an individual to do a manuscript unless they were
20  working on a -- something scientific related to our
21  clinical trial program and they were investigators.
22      Q.   Okay.  That's a good point.  We will
23  distinguish that.
24      First, let me ask you this, though:  Were
25  there times that you would pay an organization a

Page 44

1   grant that would then be utilized by key opinion
2   leaders to, for example, write materials related to a
3   disease condition or opioids?
4       A.   That's correct.
5       Q.   Okay.  In other words, the company
6   and you had control of the budget for a period of
7   time for PR; correct?
8       A.   That's correct.
9       Q.   You might decide that you wanted to
10  give a grant or money to an organization knowing that
11  that money may go to a doctor, a key opinion leader,
12  who would then write materials related to, for
13  example, opioids or a disease state like breakthrough
14  pain; correct?
15      A.   No, that's not correct.
16      Q.   What was wrong with what I just said?
17      A.   The money went to organizations, not
18  individual physicians, for the work that I worked on.
19      Q.   Right.  And that's -- I thought I
20  made that clear.  I think my question was this, but
21  let me restate it.
22      From time to time you would decide, as the
23  manager in the Public Relations Department, to pay
24  money to an organization that the company knew,
25  Cephalon knew and you knew, would then provide that

## Page 45

```
 1    money to a key opinion leader or a doctor who would
 2    use that money either to speak or write information
 3    related to opioids or a disease state related to
 4    pain; correct?
 5         A.    Not -- not in my responsibility.  My
 6    responsibility, individual physicians, to the best of
 7    my knowledge, were not paid by the organizations.
 8    Monies that we gave through grants went to the
 9    organizations.
10         Q.    I understand.  But is it -- are
11    you --
12         A.    It's not common practice for them, in
13    turn, to pay a physician to do that work.
14         Q.    Do you know if they did?
15    MR. JAMES:  Calls for speculation.
16    THE WITNESS:  Not to my knowledge.
17    BY MR. CARTMELL:
18         Q.    Some of your work in the Public
19    Relations Department, as you were a manager and
20    overseeing these opioid medications, Actiq and
21    Fentora, involved hiring key opinion leaders; is that
22    correct?
23    MR. JAMES:  Vague.
24    THE WITNESS:  I'm not sure what you mean by
25    "hiring."
```

## Page 46

```
 1    MR. CARTMELL:  Let me restate it.
 2         Q.    Some of your work in the Public
 3    Relations Department and working with the Actiq and
 4    Fentora involved you entering into consultant
 5    agreements and paying physicians to speak on certain
 6    topics; is that right?
 7         A.    In my role I only worked with -- in a
 8    consulting capacity with nurses.
 9         Q.    So then in your role, is it fair to
10    say that some of your work in the Public Relations
11    Department related to Actiq and Fentora would be that
12    you would enter into consulting relationships and pay
13    nurses to speak on certain issues?
14         A.    Not to speak.  We entered into
15    agreements to be on an advisory board.  They were not
16    speakers under my responsibilities.
17         Q.    So is it true that your company,
18    Cephalon, would actually enter into consulting
19    agreements with nurses across the country and pay
20    those nurses to be a member of an advisory board for
21    Cephalon?
22    MR. JAMES:  Misstates her testimony.
23    THE WITNESS:  Can you -- can you repeat
24    that?
25    ///
```

## Page 47

```
 1    BY MR. CARTMELL:
 2         Q.    Is it true that Cephalon would from
 3    time to time and you, as PR manager related to the
 4    opioids, would enter into consulting agreements with
 5    nurses across America to be on an advisory board?
 6         A.    That's correct.
 7         Q.    And that the payment that would come
 8    from those agreements to the nurses would be for them
 9    to attend meetings and discuss topics related to
10    opioids; is that correct?
11         A.    Related to opioid medications for --
12    that were approved for breakthrough cancer pain.
13         Q.    Have you been in the pharmaceutical
14    industry -- strike that.
15         Have you been in the pharmaceutical industry
16    for more than 30 years?
17         A.    No.  Since 2001.
18         Q.    Okay.  So you have -- so you've been
19    in the industry for approximately 18 years; is that
20    correct?
21         A.    That's correct.
22         Q.    And as someone with 18 years of
23    experience in public relations and other areas in the
24    pharmaceutical industry, I take it that you
25    understand that PR and promotional and marketing
```

## Page 48

```
 1    messages about your company's products, or Cephalon's
 2    products, should be true and accurate; fair?
 3         A.    That's correct.
 4         Q.    And I take it, as someone with
 5    approximately 18 years of experience in public
 6    relations and other areas in the pharmaceutical
 7    industry, you understand that public relations and
 8    promotional and marketing messages about Cephalon's
 9    products, for example, must be legal; correct?
10    MR. JAMES:  Calls for a legal conclusion.
11    Vague.
12    THE WITNESS:  Can you restate what you're
13    trying to get at?
14    BY MR. CARTMELL:
15         Q.    Well, I'm -- I take it that during
16    your approximately 18 years in the pharmaceutical
17    industry, someone has told you that there are laws
18    that apply to promotional messages, marketing
19    messages, public relations messages, to media related
20    to products; correct?
21         A.    That's correct.
22         Q.    And you know that from your
23    experience in the industry; correct?
24         A.    That's correct.
25         Q.    And as someone with 18 years of
```

Page 49

1  experience, I take it you know that there are laws
2  and regulations that establish what a company like
3  Cephalon can legally say and what it can't legally
4  say related to products like these opioid products?
5      MR. JAMES: Calls for a legal conclusion.
6      THE WITNESS: I am aware of the laws. I'm
7  not an expert because I'm not a lawyer.
8  BY MR. CARTMELL:
9      Q.   I understand.  But you have to be
10  aware of those laws because your position, for
11  example, at Cephalon with respect to these opioids
12  was one that you were going to be making statements
13  to the media and to the people in general about the
14  products; correct?
15      A.   That's correct.
16      Q.   And I take it you recognize that it's
17  important in your position to have a general
18  understanding of what those laws are; correct?
19      A.   That's correct.
20      Q.   And I take it that you understand
21  that you need to know what the law does and does not
22  permit a drug company to say in terms of marketing
23  and promotional messages about drugs like these
24  opioid drugs; correct?
25      A.   That's correct.

Page 50

1      Q.   I take it from being in the industry
2  for -- strike that.
3      I take it that since you've been in the
4  industry for apparently a little more than 18 years,
5  you're aware of the Food, Drug, and Cosmetic Act;
6  correct?
7      A.   Yes.
8      Q.   And I take it that when -- strike it,
9  please.
10      I take it that you understand that when a
11  drug like these drugs we're looking at, Actiq and
12  Fentora, is approved by the FDA for sale on the open
13  market, the FDA approves them for a specific
14  indication; is that fair?
15      A.   That's correct.
16      Q.   Okay.  And an indication means the
17  FDA is saying what they have decided the drug is safe
18  and effective to be used for; correct?
19      MR. JAMES: Calls for speculation.  Calls
20  for a legal conclusion.
21      THE WITNESS: That's my understanding, yes.
22  BY MR. CARTMELL:
23      Q.   And so these two drugs, for example,
24  Actiq and Fentora, the two opioid narcotics that you
25  were responsible for overseeing as a manager of PR at

Page 51

1  Cephalon, both of those drugs were approved for a
2  certain indication?  In other words, the FDA said
3  those opioid narcotic drugs can be used for
4  certain -- certain conditions; correct?
5      MR. JAMES: Calls for a legal conclusion.
6      THE WITNESS: They are approved for
7  breakthrough cancer pain in opioid-tolerant patients.
8          (Exhibit No. 2 was marked.)
9  BY MR. CARTMELL:
10      Q.   Let me hand you what's been marked as
11  Exhibit 2, Ms. Beckhardt.  And just asking, you have
12  seen, I take it, the approval letters on both Actiq
13  and Fentora; is that fair?
14      A.   Some of them.  Not all of them.
15      Q.   In other words, you have seen some of
16  the FDA materials that told the company Cephalon what
17  it was approving Actiq and Fentora for; correct?
18      A.   Correct.
19      Q.   Okay.  And this is a statement in
20  general, I think, of basically what you just said.
21  But both Actiq and Fentora were approved and only
22  indicated for breakthrough cancer pain in patients
23  with cancer who are already tolerant to opioid
24  therapy for their underlying cancer pain; correct?
25      A.   Correct.

Page 52

1      Q.   And that's a long way of saying that
2  the FDA approved Actiq and Fentora for treatment only
3  in cancer patients; correct?
4      MR. JAMES: Calls for a legal conclusion.
5  Calls for speculation.
6      THE WITNESS: That's reflective of the -- of
7  the indication.
8  BY MR. CARTMELL:
9      Q.   Right.  And so it had to be cancer
10  patients that were getting these drugs -- there were
11  some other requirements; right?  The cancer patients
12  had to be opioid tolerant, for example; right?
13      MR. JAMES: Calls for a legal conclusion.
14      THE WITNESS: It was critical that the
15  patients be opioid tolerant.
16  BY MR. CARTMELL:
17      Q.   And another requirement was, it was
18  critical that the patients being treated with these
19  highly potent opioid narcotics had breakthrough
20  cancer pain; correct?
21      MR. JAMES: Calls for a legal conclusion.
22      THE WITNESS: That is the indication.
23  BY MR. CARTMELL:
24      Q.   Okay.  In other words, you testified
25  previously there is one type of breakthrough pain

Page 53

1  that is cancer pain, and there's another type of
2  breakthrough pain that comes from other conditions
3  like back pain, for instance; correct?
4      A.   I think that misrepresents what I
5  said.  Breakthrough pain is a singular condition.
6  What is different is the underlying cause of that
7  pain.
8      Q.   I understand that.  And I'm not
9  trying to be controversial.  But I think what you're
10 saying is one underlying cause of breakthrough pain
11 is -- can be cancer, and then there are other
12 underlying causes of breakthrough pain as well;
13 correct?
14     A.   That's correct.
15     Q.   The FDA only approved Actiq and
16 Fentora for the breakthrough pain with an underlying
17 cause of cancer; correct?
18     A.   Correct.
19     Q.   And so once approved with the
20 indication, as in the case of Actiq and Fentora, you
21 understand, I take it from your 18 years of
22 experience in the pharmaceutical industry, that
23 Cephalon could not market or promote Actiq or Fentora
24 for so-called off-label uses; correct?
25     A.   That's correct.

Page 54

1      Q.   And off-label uses are uses of Actiq
2  or Fentora that were not approved by the FDA;
3  correct?
4      A.   Yes.
5      Q.   And did you have an understanding,
6  from your time in the pharmaceutical -- excuse me,
7  industry, that pharmaceutical companies can undermine
8  the approval process if they promote drugs for uses
9  for which they have not been proven to be safe and
10 effective; would you agree with that?
11     MR. JAMES:  Vague.
12     THE WITNESS:  I'm not sure what you mean.
13 BY MR. CARTMELL:
14     Q.   Let me ask you again.  Would you
15 agree that pharmaceutical companies can undermine the
16 drug approval process by promoting drugs for uses for
17 which they have not been proven to be safe and
18 effective?
19     MR. JAMES:  Calls for speculation.  Vague.
20     THE WITNESS:  I -- I don't know what you
21 mean by "undermine the approval process."
22 BY MR. CARTMELL:
23     Q.   You don't know what that means?
24     A.   No, I don't.  Because I don't see the
25 connection between the two.

Page 55

1      Q.   Let me ask you this:  Why is it that
2  drug companies, once drugs like Actiq and Fentora are
3  approved, are not allowed to market or promote for
4  off-label uses?
5      MR. JAMES:  Calls for speculation.  Calls
6  for a legal conclusion.
7      THE WITNESS:  I'm not a lawyer.
8  BY MR. CARTMELL:
9      Q.   Nobody has ever told you why -- once
10 a drug like Actiq or Fentora is approved for an
11 indication like for breakthrough cancer pain, nobody
12 has ever told you why the company can't then go out
13 and promote it for off-label uses?
14     A.   Because promoting within the label is
15 what is consistent with the regulation.
16     Q.   And promoting within the label is
17 consistent with the -- with what the FDA said was
18 safe and effective for the drug; correct?
19     MR. JAMES:  Calls for a legal conclusion.
20 Calls for speculation.
21     THE WITNESS:  A label is -- relates to
22 safety and efficacy based on the data that were
23 available at the time of approval.
24 BY MR. CARTMELL:
25     Q.   Right.  So, for example, with Actiq

Page 56

1  and Fentora, there was never any data, when they were
2  approved, given to the FDA to look at to determine
3  whether or not those drugs were safe and effective in
4  any conditions other than for breakthrough pain in
5  cancer; correct?
6      MR. JAMES:  Calls for speculation.
7      THE WITNESS:  I wasn't there when the Actiq
8  trials were conducted.
9  BY MR. CARTMELL:
10     Q.   But you know that from your
11 experience, almost eight, nine years' experience in
12 public relations working at Cephalon with these
13 drugs; correct?
14     MR. JAMES:  Calls for speculation.
15     THE WITNESS:  The original trials that were
16 conducted were in cancer patients, but there were
17 ongoing clinical trials that were in other patient
18 populations.
19 BY MR. CARTMELL:
20     Q.   I understand.  But you just made the
21 point that the reason the company needs to only
22 promote and market products for what the FDA has said
23 is safe and effective and the proper indication is
24 because the FDA has looked at trials, studies in that
25 indication; right?

Page 57

1      MR. JAMES:  Misstates her testimony.  Calls
2  for speculation.
3      THE WITNESS:  There are many instances where
4  FDA has approved drugs, to my understanding, that are
5  based on one data set and have given them a broader
6  or narrower indication.
7  BY MR. CARTMELL:
8      Q.    Do you know whether or not the FDA
9  ever considered any studies or data when it approved
10  Actiq and Fentora for breakthrough cancer pain?  Do
11  you know whether they considered any studies or data
12  outside of the cancer arena?  Do you know?
13      A.    In the original application?
14      Q.    Yes.
15      A.    Not to my knowledge.
16      Q.    Okay.
17      MR. JAMES:  We have been going about an
18  hour.
19      MR. CARTMELL:  Let's take a break.
20      MR. JAMES:  Take a break.
21      THE VIDEOGRAPHER:  We are going off the
22  record.  The time is 10:36 a.m.
23      (Recess taken.)
24      THE VIDEOGRAPHER:  We are back on the
25  record.  The time is 10:52 a.m.

Page 58

1  BY MR. CARTMELL:
2      Q.    We are back on the record after a
3  short break.  Are you ready to proceed?
4      A.    Yes.
5      Q.    Ms. Beckhardt, you mentioned
6  previously that sometimes your job in the PR
7  Department at Cephalon would involve delivering
8  messages to the media, either paper or television or
9  radio, related to the Actiq and Fentora opioid
10  products; correct?
11      A.    That's correct.
12      Q.    Now -- and I noticed from the
13  documents that were produced by Cephalon and Teva in
14  this lawsuit, that oftentimes you were a spokesperson
15  for Cephalon related to the opioid narcotic drugs;
16  correct?
17      A.    That's correct.
18      Q.    In other words, you were one of the
19  individuals within the company that when a reporter
20  might call the company or a writer for a paper,
21  things like that, you were one of the people who
22  might respond to that request for information for the
23  company; correct?
24      A.    Yes.
25      Q.    And -- and I noticed that in some of

Page 59

1  the documents, there was reference to being media
2  trained.  Do you know what that means?
3      A.    Yes, I know what that means.
4      Q.    And tell the jury what "media
5  trained" means.
6      A.    It means preparing an individual who
7  is going to speak to the media so that they
8  understand and can expect -- know what to expect and
9  can articulate messages in a way that's consistent
10  with the truth.
11      Q.    Okay.  And it's important that it be
12  the truth; correct?
13      A.    Absolutely.
14      Q.    In other words, when you're giving
15  those messages, you want them to be truthful and
16  accurate; correct?
17      A.    Yes.
18      Q.    Okay.  And were you one of the people
19  for the company that would oftentimes train other
20  individuals, managers, senior executives, things like
21  that, on speaking to media?
22      A.    There were occasions that I did that.
23      Q.    Okay.  And you did that on occasions
24  when they would respond to the media about the opioid
25  products; is that correct?

Page 60

1      A.    Yes.
2      Q.    Okay.  Now, we talked about your job
3  responsibilities.  And I noticed from the documents
4  that every single year, you put together a plan, a PR
5  plan or strategy, related to the opioid drugs;
6  correct?
7      A.    Yes.
8      Q.    Okay.  In other words, you had a
9  strategy from a public relations standpoint on PR
10  activities and tactics that you would use on a yearly
11  basis; correct?
12      A.    That we would propose to use.
13      Q.    And you would propose these tactics
14  and a strategy from a PR perspective to who?
15      A.    To others within the Public Relations
16  Department as well as the Marketing Department.
17      Q.    Okay.  And that's what I was going to
18  ask you.  You said you don't work within the
19  Marketing Department, but you work with the Marketing
20  Department; right?
21      A.    That's correct.
22      Q.    And so when you would put together
23  your public relations strategy on the messages and
24  tactics related to the opioids Actiq and Fentora,
25  would that then -- that strategy and your proposed

## Page 61

1    messages and tactics, would that then have to be
2    approved by the Marketing Department?
3         A.    Not the messages.
4         Q.    Okay.  But the strategy and the
5    tactics that you would use?
6         A.    The general strategy, the general
7    approach would be approved, but not necessarily the
8    specifics of how those strategies were implemented.
9         Q.    I didn't ask you this, but you were a
10   manager in the Public Relations Department when you
11   were hired in 2001; is that correct?
12        A.    I was a Senior Manager.
13        Q.    Okay.  And at all times you remained
14   in senior management; is that correct?
15        A.    Senior Manager is not a senior
16   management position.  I was promoted to Associate
17   Director.
18        Q.    Okay.  And I apologize, but really
19   all I was getting at is that you were managing others
20   within the PR Department at all times while you
21   were --
22        A.    I did not have any direct reports.
23        Q.    Did you ever have direct reports
24   while you were at Cephalon and working with Actiq and
25   Fentora?

## Page 62

1         A.    No.
2         Q.    I want to move on and talk more about
3    your involvement with Actiq and Fentora.  But before
4    we do that, I want to make sure you understand that
5    you're here today testifying under oath in a lawsuit
6    that has been filed by municipalities, including
7    cities and counties and some states, against drug
8    manufacturers, including your former employees --
9    employers, Cephalon and Teva; do you understand that?
10        A.    Yes.
11        Q.    And I want to make sure you
12   understand the claim that's being made in this case.
13   You understand, I take it, that municipalities across
14   the country in this case are claiming that Cephalon
15   and Teva, along with other drug manufacturing
16   companies that manufacture opioid products, the claim
17   is that they contributed to an opioid epidemic in
18   this country by unlawfully marketing, promoting, and
19   selling, in Cephalon's case, Actiq and Fentora to
20   doctors and patients, and that the illegal, unlawful
21   marketing resulted in significant overuse of Actiq
22   and Fentora.  Do you understand that?
23        MR. JAMES:  Calls for speculation.  Assumes
24   facts not in evidence.
25        THE WITNESS:  I've -- I've not read the

## Page 63

1    claim, so -- so myself.
2    BY MR. CARTMELL:
3         Q.    And I just want to make sure you
4    understand, before we get deeper into this, the
5    claim.  So let me state it and ask you if you
6    understand.
7         Do you understand that in this lawsuit that
8    municipalities from across the country in this case
9    are claiming that Cephalon and Teva contributed to an
10   opioid epidemic in this country by unlawfully
11   marketing, promoting, and selling Actiq and Fentora
12   to doctors and patients, and that the illegal,
13   unlawful marketing resulted in the significant
14   overuse of those opioid medications?  Do you
15   understand that?
16        MR. JAMES:  Calls for speculation.
17        THE WITNESS:  I understand what you are
18   saying is the claim.
19   BY MR. CARTMELL:
20        Q.    But you've never looked at any of the
21   pleadings in this case, the complaint, or what the
22   specific claims are?
23        A.    No, I have not.
24        Q.    And you've never been told before I
25   just told you what the specific claims are; is that

## Page 64

1    right?
2         A.    Not in that detail, no.
3         Q.    Okay.  And let me ask you, do you
4    believe, as you sit here today under oath, that there
5    is a prescription drug opioid epidemic in this
6    country?
7         A.    Yes.
8         Q.    And do you believe that that opioid
9    epidemic has gone on for sometime now, several years?
10        A.    That's correct.
11        MR. JAMES:  Vague.
12   BY MR. CARTMELL:
13        Q.    And I take it that during the time
14   that you were at Cephalon, you started to develop
15   that understanding; is that fair?
16        A.    Yes.
17        Q.    Okay.  And do you have personal
18   experience with this opioid epidemic?  In other
19   words, has this prescription drug opioid epidemic
20   affected you or your family?
21        A.    No, it has not.
22        Q.    You don't have any family members or
23   friends that it's affected?
24        A.    No.
25        Q.    Have you done any research or talking

Page 65

1  to any experts about the opioid epidemic, the
2  prescription drug opioid epidemic before today?
3       MR. JAMES:  Vague.
4       THE WITNESS:  At what point in time are you
5  speaking about?
6  BY MR. CARTMELL:
7       Q.   Any time before today.
8       A.   Yes.
9       Q.   What type of research have you done
10  related to this prescription drug opioid epidemic?
11       A.   I have not personally done research.
12  I've read research, and I've talked to investigators
13  who conducted that research who were experts in the
14  field of addiction.
15       Okay.  Let me tell you this, too,
16  because I want you to understand the claim and
17  what -- or what the claim in this lawsuit is with
18  respect to the damage that the drug companies have
19  caused from contributing to the opioid epidemic.  So
20  let me ask you if you understand this.
21       Do you understand that the claim is that
22  because of Cephalon and Teva's unlawful marketing and
23  promotional tactics caused the significant overuse of
24  Actiq and Fentora, there was a dramatic increase in
25  the abuse, misuse, and diversion of these drugs,

Page 66

1  leading to increased addiction, death, overdoses, and
2  huge societal costs related to these things?  Do you
3  understand that that is the claim in this case?
4       MR. JAMES:  Assumes --
5       A.   I understand that is the claim.
6       MR. JAMES:  Assumes facts not in evidence.
7  Calls for speculation.
8  BY MR. CARTMELL:
9       Q.   You can answer.  Just state it again,
10  because I think you guys were talking over each
11  other.
12       Go ahead and repeat.
13       A.   I understand that that is the claim,
14  as you have stated it.
15       Q.   Okay.  And, lastly, do you understand
16  that you're here today and we've asked to take your
17  deposition because you were at Cephalon during those
18  approximately ten years during the period of time
19  that the Fentora and Actiq opioid drugs were being
20  promoted and marketed by the Marketing Department,
21  and you were in the Public Relations Department at
22  that time?  Do you understand that?
23       A.   Yes.
24       Q.   Now, we talked about when you arrived
25  in 2001, Actiq was already being sold and marketed by

Page 67

1  Cephalon at that time; is that right?
2       A.   Yes.
3       Q.   And I take it when you arrived at the
4  company, you had to in some respects sort of dig in
5  and get up to speed on the drug, the opioid narcotic
6  Actiq, that was being sold at that time; is that
7  fair?
8       A.   That's correct.
9       Q.   In other words, you probably had to
10  go back and look at the documents to try to educate
11  yourself on what Actiq is as a drug and the potential
12  risks associated with that drug; is that fair?
13       A.   I'm not sure what documents you would
14  be referring to.
15       Q.   I'm just asking you, Ms. Beckhardt,
16  in general, when you arrived as a new employee at
17  Cephalon, whether you did some investigation and
18  research to try to determine what the risks, for
19  example, of Actiq, the opioid narcotic that was being
20  sold at that time by Cephalon?
21       A.   I was familiar and read information
22  from the label of the product.
23       Q.   When you arrived in 2001 at Cephalon,
24  had you ever worked with, in any capacity, a fentanyl
25  opioid narcotic before?

Page 68

1       A.   No.
2       Q.   Had you worked, though, prior to
3  coming to Cephalon, with any opioid medication?
4       A.   I have never -- I have never worked
5  with a medication before.
6       Q.   So your experience at Cephalon in
7  2001, this was the first time you had actually worked
8  in a pharmaceutical company related to a
9  medication -- any medication, much less an opioid
10  medication; fair?
11       A.   That's correct.
12       Q.   Now, do you have knowledge, you think
13  today, about the dangers associated with a highly
14  potent fentanyl narcotic opioid like Actiq and
15  Fentora?
16       MR. JAMES:  Calls for speculation.
17       THE WITNESS:  I'm not sure what you mean by
18  "dangers."  That's a very broad term.
19  BY MR. CARTMELL:
20       Q.   Do you believe that there are dangers
21  associated with Actiq and Fentora?
22       MR. JAMES:  Vague.
23       THE WITNESS:  The primary risk with Actiq
24  and Fentora related to the use in nonopioid-tolerant
25  patients.

Page 69

1    BY MR. CARTMELL:
2         Q.   And what risk was it that you're
3    referring to?
4         A.   The potential -- potential for
5    respiratory depression in nonopioid-tolerant
6    patients.
7         Q.   And when you say "nonopioid-tolerant
8    patients," I've seen documentation that refers
9    to patients who had not been on chronic or
10   longer-term opioid treatment; is that right?
11        A.   No, that's not correct.
12        Q.   What does it mean?
13        A.   It means that patients are currently
14   on long-term, around-the-clock opioid medication.
15        Q.   Was there an understanding you had
16   about how long a patient needed to be on
17   around-the-clock opioid medications prior to starting
18   the Fentora or Actiq?
19        A.   I do not believe that was referenced
20   in the label.
21        Q.   So, as far as you knew, the only
22   requirement was that the patient needed to be
23   currently on around-the-clock opioids to start the
24   subsequent opioid Fentora or Actiq; correct?
25        MR. JAMES:  Misstates her testimony.

Page 70

1         THE WITNESS:  Patients prescribed a -- a
2    medication for breakthrough pain should be on an
3    around-the-clock opioid simultaneously.
4    BY MR. CARTMELL:
5         Q.   I guess my question was:  How long
6    did they need to be on a simultaneous
7    around-the-clock pain medication before you could
8    start them on Actiq or Fentora, or do you know?
9         A.   I'm not a clinician.  I can't speak
10   to that.
11        Q.   When you started at Cephalon in 2001,
12   were you in a department or were you on a team called
13   the Diversion Team?
14        A.   Yes.
15        Q.   Tell the jury what the Diversion Team
16   was.
17        A.   The Diversion Team was intended to
18   monitor instances of diversion of the product and to
19   determine if there was a problem that needed
20   follow-up.
21        Q.   Okay.  So when you said diversion,
22   though, are you referring to instances when the
23   company would be informed about one of their
24   products, either Actiq or Fentora, being diverted
25   outside of appropriate uses and taken by somebody who

Page 71

1    wasn't prescribed?
2         A.   I'm referring specifically to
3    somebody taking a -- using a medication for whom it
4    was not prescribed.
5         Q.   Okay.  And so as a member of the
6    Diversion Team, whenever there were instances
7    reported to the company about the diversion, for
8    example, of Actiq starting in 2001, you would be on
9    the team that would be notified about that; is that
10   right?
11        A.   That's correct.
12        Q.   And shortly after you started at
13   Cephalon, I take it you started learning that the
14   Actiq product was from time to time being diverted;
15   is that right?
16        MR. JAMES:  Vague.
17        THE WITNESS:  I don't know what you mean by
18   "from time to time."
19             (Exhibit No. 3 was marked.)
20   BY MR. CARTMELL:
21        Q.   I've handed you Exhibit 3.  Why don't
22   we just look at this email string, if you don't mind,
23   that was produced to us from the internal files of
24   Teva in this case.  And I want to ask you a few
25   questions about this, Ms. Beckhardt.

Page 72

1         If you look at the first page,
2    Ms. Beckhardt, this is an email from you to several
3    other employees at Cephalon back in November of 2003;
4    is that right?
5         A.   May I have an opportunity to look at
6    the whole document, please?
7         Q.   Sure.
8         MR. RIGBERG:  This is Karen Rigberg, of
9    Arnold & Porter.  Is there a Bates number for this
10   exhibit?
11        MR. CARTMELL:  TEVAMDL03316708.
12        MR. RIGBERG:  Thank you.
13   BY MR. CARTMELL:
14        Q.   Ms. Beckhardt, this internal document
15   is an email from you to several other employees at
16   Cephalon in November back in 2003; is that correct?
17        A.   That's correct.
18        Q.   And the subject matter is "Actiq
19   Investigation Segment on Channel 6 News."  Do you see
20   that?
21        A.   Yes.
22        Q.   You state:
23             (Reading) I wanted to provide a quick
24             update to the local media story on
25             Actiq last week.  To date we have

Page 73

1              received no additional inquiries from
2              the media regarding this incident (end
3              of reading.
4          Now, let me ask you real quick:  Were you
5    one of the employees or the employee at Cephalon who
6    was in charge of sort of monitoring the inquiries
7    from the media about Actiq?
8          A.    I monitored.  We also took reports
9    from other employees.  I also had a public relations
10   agency that monitored media.
11         Q.    Okay.  It states:
12             (Reading) We have been in contact with
13             the local police department to
14             determine whether or not they had lot
15             numbers for the seized property (end
16             of reading.
17         And then it states:
18             (Reading) Their interest in learning
19             more about Actiq should not be
20             interpreted as a signal that they
21             believe there's a large problem in
22             Philadelphia; rather, they wish to be
23             more proactive in their efforts than
24             they were with Oxycontin (end of
25             reading.

Page 74

1          Do you see that?
2          A.    Yes.
3          Q.    I take it you learned, when you got
4    to Cephalon and started working in this industry with
5    these types of narcotic opioid drugs, that there had
6    been a problem in the past with a drug manufactured
7    by another drug manufacturer called Purdue and with
8    diversion of that product; is that correct?
9          A.    I'm aware of it.  It was not our
10   product.
11         Q.    And -- but at any rate, you knew that
12   another opioid at least, OxyContin, over the years
13   previously there had been large quantities of that
14   drug diverted, frankly, to the streets of America;
15   did you learn that?
16         MR. JAMES:  Calls for speculation.  Assumes
17   facts not in evidence.
18         MR. CARTMELL:  You can answer.
19         THE WITNESS:  We had 0.2 percent of the
20   marketplace.  We were indicated for a very narrow
21   usage.  And it was not a comparable situation.
22         MR. CARTMELL:  Okay.  I'm going to object
23   and move to strike that answer because it wasn't
24   responsive, and I will ask the other one again and
25   give you a chance to answer.

Page 75

1          Q.    But at any rate, you knew that
2    another opioid, OxyContin, over the years previously,
3    there had been large quantities of that drug diverted
4    to the streets of America?  You learned that;
5    correct?
6          MR. JAMES:  Same objections.
7          THE WITNESS:  I don't know how to quantify
8    "large quantities" because it was not my product.
9    BY MR. CARTMELL:
10         Q.    I understand.  But at any rate, you
11   learned that it was happening around America?
12         A.    I learned that there was some
13   diversion of Oxycontin.
14         Q.    Okay.  Now, I want to go to the next
15   page.  And there was actually an article or an Action
16   News exclusive, it looks like it's called -- attached
17   by you and sent around to several individuals, I
18   believe.  Or actually it was attached by a Cheryl
19   Williams?
20         A.    That's correct.
21         Q.    Okay.  Who was Cheryl Williams?
22         A.    She was my -- at that time she would
23   have been my boss.
24         Q.    Okay.  The title of this piece is,
25   "Heard the New Buzz on the Streets?"  Do you see

Page 76

1    that?
2          A.    Yes.
3          Q.    (Reading) November 20, 2003:
4              This is a Perc-O-Pop, the newest drug
5              to hit the streets of Philadelphia
6              (end of reading).
7          Now, Perc-O-Pop, I take it that was a name
8    for Actiq on the streets that I suspect you became
9    familiar with; is that fair?
10         A.    Yes.
11         Q.    Okay.  And the reason, I take it, for
12   that name Perc-O-Pop, was that as we saw previously
13   from the depiction of Actiq, it sort of looks like a
14   lollipop?  In other words, it has a stick and a
15   lozenge on the top of the stick; correct?
16         A.    That's correct.
17         MR. JAMES:  Calls for speculation.
18   BY MR. CARTMELL:
19         Q.    You can answer.
20         A.    I don't -- it is true that that's a
21   description of the product.  But I don't know how the
22   street name came.  You know, I'm not on the street.
23         Q.    I understand.  But --
24         You answered, though, "That is correct."
25   Then your lawyer objected.

Page 77

1      A.    Well, it's correct that I was aware
2    Perc-O-Pop was used on the streets.
3         MR. CARTMELL:  And just for you, you're
4    supposed to object to the form and not coach the
5    witness.
6         MR. JAMES:  I'm not trying to coach the
7    witness.
8         MR. CARTMELL:  So, believe me, we're a
9    hundred percent good with you objecting to the form.
10   And then if we need to take it up, you're not waiving
11   anything, you can take it up later.
12        MR. JAMES: Okay.
13        Q.    Okay.  It then states:
14          (Reading) this is the first time the
15          narcotics unit has come across them.
16          A Perc-O-Pop is actually oral
17          transmucosal fentanyl citrate.  It's
18          sold under the brand name Actiq and
19          sold to cancer patients who suck on
20          the sticks to relieve intense pain.
21          Now police say it's being stolen and
22          sold illegally (end of reading).
23        Correct?  That's what it says?
24        A.    That's what it says.
25        Q.    I take it, after you had worked there

Page 78

1    for a period of time, you began to get reports like
2    this of your Actiq product being diverted onto the
3    streets across America; correct?
4        A.    We had a limited number of reports.
5        Q.    Okay.  (Reading) Investigators
6          tell Action News just last month a
7          young female offered to sell
8          undercover agents Perc-O-Pops for $20
9          each (end of reading).
10        And you learned also, I take it,
11   Ms. Beckhardt, that Actiq started to have what's
12   oftentimes called street value; correct?
13        A.    Yes.
14        Q.    It states:
15          (Reading) We saw her make several
16          deliveries.  At one in particular,
17          there were three girls in front of a
18          Wawa, and I think their average age
19          was 16 to 20 years old.  Just this
20          past week, police raided their
21          suspect's Bucks County home and turned
22          up piles of Perc-O-Pops, cash, and
23          other drug paraphernalia.  We had no
24          trouble finding an 18-year-old
25          familiar with Perc-O-Pops.  They

Page 79

1          freeze them and, like, suck them and
2          get high off of it (end of reading).
3         Now, let me ask you:  Was there a time,
4    shortly after or during this period of time when you
5    got reports of the Actiq drugs being diverted onto
6    the streets, that it became apparent to you in PR, or
7    the management of the company, that there was a
8    certain interest in diversion of these types -- or
9    this type of fentanyl drug because it looked like a
10   lollipop and had a sweet taste?
11        A.    I don't agree with that premise.  We
12   were aware of some diversions.
13        Q.    And I take it you were also aware,
14   were you not, that in several reports there were
15   indications that, either from the authorities or from
16   the individuals involved, that there was a certain
17   interest in this product specifically because of the
18   way it tasted sweet and looked like a lollipop?  Did
19   you ever hear that?
20        A.    No.
21        Q.    It states:
22          (Reading) If you don't know any
23          better, a Perc-O-Pop just looks like a
24          harmless lollipop.  But the
25          manufacturer's label warns Actiq can

Page 80

1          be harmful, even fatal, to children
2          and can cause injury or death to
3          anyone who is not already using a
4          prescription pain medication (end of
5          reading).
6         And, Ms. Beckhardt, is that what you were
7    talking about, is that this drug is potent and that
8    it can cause death to individuals if it's diverted
9    and taken -- if the individual is not already on an
10   around-the-clock opioid?  Is that what you were
11   talking about?
12        A.    That statement is not my statement.
13   But when I said before, yes, there is a risk.  There
14   is a risk.
15        Q.    And the risk is death; correct?
16        A.    That is a risk factor.
17        Q.    "Also they can be highly addictive."
18   Do you agree with that, Actiq can be highly
19   addictive?
20        A.    I believe Actiq could be addictive in
21   the -- in a patient population that is -- or a using
22   population that is susceptible to addiction.
23        Q.    It states:
24          (Reading) All reasons why the
25          Narcotics Unit wants to make sure

Page 81

```
 1          police on the street and parents know
 2          they are out there.  They are
 3          dangerous, and unfortunately they are
 4          getting into the hands of young people
 5          (end of reading).
 6      Do you see that?
 7      A.   Yes.
 8      Q.   Now, do you remember in 2003, was
 9  there a period of time that Cephalon did anything to
10  up their monitoring or change their policies related
11  to the diversion of Actiq?
12      A.   Well, as stated in the first page of
13  this, we contacted the police.
14      Q.   Okay.  But other than contacting the
15  police after an incident like this, was there any
16  other changes to the monitoring, that you can recall,
17  for diversion, abuse, or misuses that were done
18  around this time in 2003 or 2004?
19      A.   I don't recall the dates.
20      Q.   But at any rate, from this report at
21  least, your company and you were aware the town
22  directly adjacent to where you were working, the
23  police were saying that there was starting to be
24  diversion of these Actiq lollipop-like fentanyl
25  products, opioid products, onto the streets; correct?
```

Page 82

```
 1          MR. JAMES:  Objection.  Form.
 2          THE WITNESS:  Could you repeat that
 3  question, please?
 4  BY MR. CARTMELL:
 5      Q.   At any rate, from this report at
 6  least, your company and you were aware that in the
 7  town, Philadelphia -- which was just adjacent to
 8  where you were working; correct?
 9      A.   Yes.
10      Q.   And these were local reports, in
11  other words, you were getting -- like this report is
12  from a local TV station; is that correct?
13      A.   That's correct.
14      Q.   Okay.  At least you knew at this
15  time, Cephalon knew at this time, that there were
16  reports of Actiq starting to be diverted into young
17  people's hands on the streets in Philadelphia?
18      A.   We were aware --
19      Q.   Go ahead.
20      A.   We were aware of what was in the
21  media report, that there was a diversion in the city
22  of Philadelphia.
23      Q.   Okay.  Well, you knew about more than
24  one reported diversion; didn't you?
25          MR. JAMES:  Vague.
```

Page 83

```
 1          THE WITNESS:  Yes, I was aware of individual
 2  incidents, but they were -- I believe they were
 3  relatively small in number.
 4          (Exhibit No. 4 was marked.)
 5  BY MR. CARTMELL:
 6      Q.   Okay.  I've handed you what's been
 7  marked as Exhibit 4.
 8      A.   Sorry.
 9          MR. CARTMELL:  Or excuse me, Exhibit 5.
10          MR. JAMES:  I think it's 4.  It's 4.
11          MR. CARTMELL:  Sorry.  4?
12          THE WITNESS:  Yes.
13  BY MR. CARTMELL:
14      Q.   Now, Exhibit 5 [sic] is another
15  internal email string that was produced in this
16  lawsuit, and I want to ask you just real quick a
17  question or two about this.  But if you go to the
18  bottom, there's an email from Victor Raczkowski.
19      Who is Mr. Raczkowski?
20      A.   At the time he was the Vice President
21  of Regulatory Affairs.
22      Q.   So was he in senior management?
23      A.   Yes.
24      Q.   And he says:
25          (Reading) Folks, I just got a phone
```

Page 84

```
 1          call from a Cephalon employee letting
 2          me know that tonight Channel 6 News
 3          aired a segment about Actiq finding
 4          its way to the streets (end of
 5          reading).
 6      And then it talks about -- on the next page
 7  it talks about and actually says that the piece
 8  showed a picture on the television of the Actiq
 9  product; correct?
10      A.   Yes, that is correct.
11      Q.   And he mentions here that -- it
12  mentioned that the -- the piece mentioned that it was
13  a morphine-like compound that's being diverted to the
14  streets for illicit recreational use and finding its
15  way into the hands of children.
16      Do you see that?
17      A.   That's what Dr. Raczkowski said the
18  media report said, yes.
19      Q.   And let me ask you:  Was that
20  concerning to you in public relations, that these
21  products were making their way into children's hands
22  that were not opioid tolerant?
23      A.   Of course.  Any diversion is a
24  concern.
25      Q.   And then if you look at the first
```

Page 85

1  page, there's a response, another email from a member
2  of the senior management at Cephalon to several
3  individuals, including Carol Marchione, who is
4  Regulatory Affairs; is that correct?
5      A.    That's correct.
6      Q.    And it states:
7          (Reading) FYI, it looks like diversion
8          of Actiq is becoming more of an issue
9          (end of reading).
10     Do you see that?
11     A.    Yes.
12     Q.    And so this was a time period, in
13  2003, when the company knew that diversion of these
14  highly potent products, Actiq, fentanyl opioid
15  narcotics, and that this was a time when it was
16  becoming more of an issue; correct?
17         MR. JAMES:  Objection.
18         THE WITNESS:  The Philadelphia diversion was
19  the first large-scale diversion about which I was
20  aware.  So, yes, it was concerning.  However, it was
21  not a -- we did not have a large number of diversions
22  prior to this, that I'm aware of.
23             (Exhibit No. 5 was marked.)
24  BY MR. CARTMELL:
25     Q.    I am going to hand you what's been

Page 86

1  marked as Exhibit 5, ask you a few questions about
2  this.
3          And this is actually a report that was
4  produced in this litigation from the files at Teva
5  and includes a statement by you.
6      A.    Yes.
7      Q.    The title of this article in 2004,
8  early 2004, April of 2004 is, "Increase in Abuse
9  Reported of Narcotic Lollipops for Cancer Patients."
10         (Reading) a narcotic pain killer in
11         lollipop-like form designed to speed
12         relief to cancer patients has begun
13         showing up in illegal sales in
14         Philadelphia and elsewhere under the
15         street name Perc-O-Pops (end of
16         reading).
17     Do you see that?
18     A.    I see what it states.
19     Q.    If you skip down on the paragraph, it
20  states:
21         (Reading) We are starting to see it
22         emerge as a drug, that is, we call
23         it, diverted which is a legally
24         prescribed drug being used illegally.
25         And it's a drug that is easily

Page 87

1          administered or taken by someone who
2          might be afraid to either take a pill,
3          snort, or inject a needle in their arm
4          (end of reading).
5      Do you see that?
6      A.    I see what it states.
7      Q.    Did y'all have any conversations at
8  any time that you can remember that potentially the
9  product itself and the fact that it was a
10  lollipop-looking product and the fact that it was
11  made sweet and sugary, that that might increase the
12  odds that it was actually a product that would be
13  abused, misused, and diverted?
14         MR. JAMES:  Objection.
15  BY MR. CARTMELL:
16     Q.    Or do you know?
17     A.    I don't know.  I understand why the
18  product was made sweeter.  But I don't know the
19  answer to your question.
20     Q.    If you skip down, there's a quote by
21  you that states:
22         (Reading) Stacey Beckhardt says, "The
23         company does not know the extent to
24         which Actiq is used recreationally"
25         (end of reading.)

Page 88

1      Do you see that?
2      A.    Yes.
3      Q.    And this is an instance, for an
4  example, when a media outlet reached out to the
5  company, they asked you to respond; is that fair?
6      A.    Yes.
7      Q.    And what you're saying there is that
8  actually you as a company didn't really know how
9  often these products were being diverted; correct?
10     A.    We knew what was reported to us.
11     Q.    Right.  And I guess that was going to
12  be sort of my point, was that your company would only
13  know about diversions if, in fact, the diversion of
14  the Actiq product ended up on a news outlet or in the
15  media or if it was reported to you; correct?
16         MR. JAMES:  Objection.
17         THE WITNESS:  We also knew of reports if
18  they came from the police.  But we were -- you know,
19  we were a very small piece of the marketplace.  So an
20  increase of diversion was not necessarily a
21  large-scale diversion.
22  BY MR. CARTMELL:
23     Q.    Well, what do you call large-scale
24  diversion?
25     A.    We, to my memory, at this time had

Page 89

1    had -- this was the largest diversion, the diversion
2    in Philadelphia, and there were 40 units or so.
3        Q.    And I understand what you're saying.
4    But my point is, the company only knows about
5    diversions that are in the media or reported to the
6    company by a police officer or somebody else; fair?
7        MR. JAMES:  Objection.
8    BY MR. CARTMELL:
9        Q.    In other words, the company can't
10   know what it doesn't know; right?
11       A.    Yes.
12       Q.    But you knew, as a PR person and
13   having worked with these drugs now for a period of
14   time, that the company wasn't being reported all the
15   diversions?  In other words, there were more
16   diversions out there on the streets and in the
17   communities than were reported to your company; you
18   knew that?
19       A.    I did not know that.
20       Q.    You didn't know that?
21       A.    No.
22       Q.    So your understanding, just so it's
23   clear for the jury, was that every time there was a
24   diversion of your product, your company knew about
25   it; is that your understanding?

Page 90

1        MR. JAMES:  Objection.
2        THE WITNESS:  You're misstating my
3    testimony.
4    BY MR. CARTMELL:
5        Q.    I'm not trying to be controversial,
6    but I think you just said that you figured that every
7    time there was a diversion, the company was going to
8    find out about it, it would be reported?
9        A.    That's not correct.
10       MR. JAMES:  Objection.
11   BY MR. CARTMELL:
12       Q.    So then my point is simply this:  You
13   knew that there were diversions out in the
14   communities and societies across America of your
15   products that your company never heard about?  You
16   knew that; correct?
17       A.    That's not true.
18       I don't know why we're not
19   communicating.  It's probably my fault.  But if
20   you -- if you -- if that's not true, then what am I
21   missing?
22       A.    Because we weren't -- because we were
23   not aware of them, we didn't know if there were other
24   cases.
25       Q.    I understand.  But were you actually

Page 91

1    thinking as a company that there potentially or
2    possibly or likely were other diversions; that you
3    just didn't find out about them?
4        MR. JAMES:  Objection.
5    BY MR. CARTMELL:
6        Q.    Was that a possibility in your mind?
7        A.    We took -- we took steps to mitigate
8    all the diversions that we could.
9        Q.    Okay.  That's not my question.
10   All -- I really am not trying to be controversial.  I
11   just want to know, did your company, Cephalon, think
12   it was possible or entertained the thought
13   potentially there were diversions happening that you
14   weren't finding out about?
15       MR. JAMES:  Objection.
16   BY MR. CARTMELL:
17       Q.    And maybe it's something you never
18   thought about.  That's fine.
19       A.    It's -- it's not the way we
20   addressed -- we focused on those that we were aware
21   of and tried to do something about those that we were
22   aware of.
23       Q.    Okay.  In other words, you waited
24   until they were reported to you, and then you focused
25   on those and investigated those in more depth;

Page 92

1    correct?
2        A.    That's not entirely true, because we
3    had a Risk Management Program in place that allowed
4    us to take some steps that ensured we were -- we had
5    control of our product to the best of our ability.
6    We had a very small portion of the marketplace and a
7    very tight distribution system.
8        Q.    It states on the next page:
9            (Reading) Philadelphia police arrested
10           a Bensalem couple in October on drug
11           charges and seized nearly 100
12           Perc-O-Pops (end of reading).
13       Do you see that?
14       A.    Yes.
15       Q.    I think you said a minute ago that
16   you thought the largest one was 40?
17       A.    I didn't recall this one.
18       Q.    Okay.  The 40 diversion was another
19   one?
20       MR. JAMES:  Objection.  It appears to be a
21   second diversion.
22   BY MR. CARTMELL:
23       Q.    And would you agree with me that a
24   hundred of these active lollipops on the streets,
25   being given to children or others who are not opioid

Page 93

1 tolerant and on an around-the-clock opioids, could be
2 very dangerous?  Do you agree with that?
3       MR. JAMES:  Objection.
4       THE WITNESS:  You're speculating who -- who
5 the products were used by.  We don't know that.
6 BY MR. CARTMELL:
7       Q.    If they were given to children or
8 people who were not opioid tolerant, do you agree
9 that a hundred of those floating around the streets
10 could be dangerous --
11       MR. JAMES:  Objection.
12 BY MR. CARTMELL:
13       Q.    -- in Philadelphia or Bensalem?
14       MR. JAMES:  Objection.
15       THE WITNESS:  Any diversion is a concern.
16 BY MR. CARTMELL:
17       Q.    It then states that:
18       (Reading) That raid was prompted by a
19       prior arrest in northeast Philadelphia
20       that netted about 30 of the Actiq
21       lozenges (end of reading).
22 Do you see that?
23       A.    Yes.
24       Q.    So that's another diversion of 30?
25       A.    No.  That's the previous diversion.

Page 94

1       Q.    (Reading) Parley said each Actiq
2       lozenge retails for $9.10, but the
3       going street value is $20 (end of
4       reading).
5 Do you see that?
6       A.    Yes.
7       Q.    And then it says:
8       (Reading) You don't want drug to taste
9       good, particularly a narcotic pain
10       killer that you don't want people to
11       use for long periods of time, he said
12       (end of reading).
13 You agree with that?
14       A.    He's not a clinician and does not
15 understand why it was berry flavored.
16       Q.    So you disagree with that?
17       A.    Correct.
18       Q.    At the bottom it states:
19       (Reading) Hospitals in the 48
20       contiguous states reported 576
21       incidents of nonmedical use of
22       fentanyl products in 2000, but the
23       number rose to 1506 by 2002 (end of
24       reading).
25       Do you see that?

Page 95

1       A.    I see that.
2       Q.    That's a tripling of the incidence in
3 a two-year time frame, according to this; correct?
4       A.    We do not believe those were our
5 products.  They were other fentanyl products on the
6 marketplace.
7       Q.    Okay.  First, I just -- I want you to
8 answer, that's a tripling, is it not, in a two-year
9 period?
10       A.    According to these statistics.
11       Q.    And that was right in the time period
12 when Actiq came to the market?  In other words, Actiq
13 came to the market in 2001; didn't it?
14       A.    There were --
15       MR. JAMES:  Objection.
16 You can answer.
17       THE WITNESS:  It's true that there were --
18 simultaneously there were other fentanyl products on
19 the market.
20 BY MR. CARTMELL:
21       Q.    I understand that.  Did y'all do
22 anything at this time, when there had been nearly a
23 hundred Perc-O-Pops diverted and another incident --
24 you said 30 -- and this was just in your hometown
25 when you -- where you were getting local reports --

Page 96

1 did you all do anything at this time to go out and
2 further investigate potential diversions and abuse
3 and misuse of Actiq that wasn't reported to your
4 company?
5       A.    That would not have been my
6 responsibility.
7       MR. CARTMELL:  I want to ask you if you
8 agree with something that was stated by one of your
9 colleagues in an email that we were given from your
10 internal files.  And I'm going to hand you Exhibit 6.
11       (Exhibit No. 6 was marked.)
12       MR. RIGBERG:  Is there a Bates number for
13 this document?
14       MR. CARTMELL:  TEVAMDL03272549.
15 (Witness reviewing document.)
16 BY MR. CARTMELL:
17       Q.    Now, Ms. Beckhardt, Exhibit 6 is an
18 email that was sent by you to several other
19 individuals at Cephalon in January of 2005; correct?
20       A.    That's correct.
21       Q.    And I want to start, like emails do,
22 from the back page, if that's okay with you.  And if
23 you go to the second page, there's an email from you
24 on the 24th of January to several other individuals.
25 And some of those are in marketing; is that correct?

Page 97

1    A.    That's correct.
2    Q.    Andy Pyfer, I see his name a lot.
3  Was he the Senior Director of Marketing?
4    A.    I don't remember his title.  But he
5  was the head of the team at that point.
6    Q.    Head of the Actiq team?
7    A.    Yes.
8    Q.    From a marketing standpoint?
9    A.    That's correct.
10    Q.    You say, "FYI, a research letter in
11  JAMA" -- that's a journal; is that right?
12    A.    That's correct.  A medical journal.
13    Q.    -- "reported on increased reports of
14  diversion and abuse of methadone."  What is
15  methadone?
16    A.    Methadone is an opioid medication
17  that's long-acting.
18    Q.    Okay.  And methadone, just so it's
19  clear for the jury, is not a pharmaceutical or a drug
20  that Cephalon manufactured or sold?
21    A.    That's correct.
22    Q.    Okay.  But this is a -- is a --
23  strike that.
24        This is an article that was of interest to
25  you, and so you felt like you should forward it on to

Page 98

1  your colleagues; correct?
2    A.    Because I kept my colleagues informed
3  of the general -- the use of opioids inappropriately
4  in the community.
5    Q.    Right.
6    A.    So that we were aware, and so that we
7  would take appropriate actions internally.
8    Q.    Okay.  And this is -- I'm not going
9  to go through this in detail, but this is stating
10  that this -- there were increased reports of
11  diversion and abuse of this other opioid, methadone.
12        Of interest, one of the researchers is James
13  Inciardi and the research was supported by Purdue
14  pharmaceuticals; correct?
15    A.    According to this, yes.
16    Q.    Okay.  And this study just talks
17  about there was a five-fold increase of diversion or
18  abuse reports with methadone in 2003; correct?
19    A.    That's what the article states.
20    Q.    Okay.  And methadone tablets were
21  indicated in more than 80 percent of the reports of
22  abuse and diversion, compared to wafer or liquid form
23  generally dispensed by methadone clinics; do you see
24  that?
25    A.    Yes.

Page 99

1    Q.    Now -- and I take it over time you
2  continued to get more and more reports of not just
3  diversions with your drug Actiq that you were
4  involved with in PR, but of other opioid products
5  being diverted across America; correct?
6    A.    That's correct.
7    Q.    And here's another report of another
8  opioid that had a five-fold increase during this
9  period of time; correct?
10    A.    It wasn't one of our products.
11    Q.    I understand.  But is it true that
12  you still had interest, and it still was concerning
13  to you even if it was another company's products,
14  that were being diverted, if they were opioids;
15  right?
16    A.    It was important for us to know about
17  it, yes.
18    Q.    Okay.  And then what I want to focus
19  your attention on is on the first page, an email from
20  Terrence Terifay that was on January 24th, 2005.
21        Do you see that?
22    A.    Yes.
23    Q.    And Terrence Terifay, I think, was a
24  manager in the Marketing Department; is that right?
25    A.    That's correct.

Page 100

1    Q.    And you had sent this to him, and he
2  responds to the article, and he states:
3        (Reading) Interesting study.  It makes
4        complete sense, since pain physicians,
5        hospitals, and managed care were
6        pushing methadone use right after the
7        Oxycontin explosion (end of reading).
8        And I want to refer you to the last
9  sentence.  He states:
10        (Reading) The bottom line is, as we
11        all know, greater availability of a
12        drug directly correlates to abuse and
13        diversion (end of reading).
14        Do you see that?
15    A.    Yes, I see that.
16    Q.    And do you agree with that statement
17  by your colleagues in management?
18    A.    I think that generally that is true.
19    Q.    Okay.  In other words, especially
20  with opioid drugs, would you agree with me that the
21  more widely available they are, the more abuse and
22  misuse and diversion you likely will have?
23        MR. JAMES:  Objection.
24        THE WITNESS:  I believe with any product,
25  whether it's an opioid or not an opioid, if it -- if

Page 101

1  there is an increase in usage, there's a potential
2  for it to be used inappropriate.  That's the
3  condition for any medication.
4  BY MR. CARTMELL:
5      Q.   Right.  It's common sense; right?
6      MR. JAMES:  Objection.
7      THE WITNESS:  I can't speak to common sense.
8  BY MR. CARTMELL:
9      Q.   Okay.  But, at any rate, one way that
10 a drug like an opioid can become significantly more
11 used or overused is by a high level of off-label
12 sales of that drug; correct?
13     MR. JAMES:  Objection.
14     THE WITNESS:  No.
15 BY MR. CARTMELL:
16     Q.   So is it your testimony to this jury
17 that high levels of off-label sales of an opioid
18 cannot contribute to overuse of a medication like an
19 opioid?
20     MR. JAMES:  Objection.
21     THE WITNESS:  Physicians make determinations
22 of how to use those medications.  And just because
23 you have off-label use does not mean you have
24 increased usage of the medication overall.
25 ///

Page 102

1  BY MR. CARTMELL:
2      Q.   It doesn't mean absolutely, but it
3  can; can't it?
4      MR. JAMES:  Objection.
5      THE WITNESS:  That's speculation I can't do.
6  BY MR. CARTMELL:
7      Q.   Okay.  And so -- and I understand,
8  just so it's clear for the record, you're saying it
9  would be speculation to say, for example, with Actiq,
10 that if there were extremely high levels of off-label
11 use, that that would increase significantly the
12 amount of use of that product; is that fair?
13     MR. JAMES:  Objection.
14     THE WITNESS:  I -- I think -- I don't
15 understand your question.
16     MR. CARTMELL:  Okay.  Let me try to make it
17 more clear.  I apologize.  I'm not trying to be
18 controversial here at all.
19     Q.   The fact that Actiq had extremely
20 high levels of off-label use -- and you're aware of
21 that; correct?
22     A.   Yes.
23     MR. JAMES:  Objection.
24 BY MR. CARTMELL:
25     Q.   The fact that it had those extremely

Page 103

1  high levels of off-label use, it's possible, is it
2  not, that that fact made Actiq more widely used or
3  overused than it would have been if the sales had
4  been confined just to, for example, the cancer
5  population; is that true?
6      MR. JAMES:  Objection.
7      THE WITNESS:  I can't answer that.
8  BY MR. CARTMELL:
9      Q.   You don't know one way or the other;
10 is that fair?
11     A.   That's correct.
12     Q.   Now, once you started, I take it one
13 of the things that you did was look into the FDA
14 files related to the approval of Actiq; correct?
15     MR. JAMES:  Vague.
16     THE WITNESS:  I don't know what documents
17 you're referring to.
18 BY MR. CARTMELL:
19     Q.   I'm just asking you in general.  I
20 would think that when you started, you needed to go
21 into the files at Cephalon, because you were working
22 with a new medication that you had never worked with
23 before, and you had to go back to the file and see if
24 you could find the FDA documents about the approval
25 of the product; is that fair?

Page 104

1      A.   I did not look at the approval
2  letters when I first started.  I looked at the label.
3      Q.   Okay.  We're looking at pictures of
4  the Actiq and Fentora opioid narcotics that Cephalon
5  was manufacturing and selling during the time you
6  were there; correct?
7      A.   Yes.
8      Q.   And you had responsibilities, as
9  we've discussed, related to PR, or public relations,
10 for those medications; correct?
11     A.   Correct.
12     Q.   Okay.  And as we agreed before, both
13 of these medications were approved by the FDA only
14 for use in cancer patients who had breakthrough pain
15 and were already opioid tolerant; correct?
16     A.   Yes.
17     Q.   Okay.  The FDA didn't approve either
18 of these drugs that we're looking at for use in
19 breakthrough pain caused by back pain; correct?
20     A.   That's correct.
21     Q.   It didn't -- the FDA did not approve
22 these drugs as safe and effective, either of them,
23 for breakthrough pain associated with migraines;
24 correct?
25     A.   That is correct.

## Page 105

1    Q.    Or headaches; correct?
2    A.    That is correct.
3    Q.    Or chronic pain; correct?
4    A.    Breakthrough pain is a subset of
5  chronic pain.  So that's -- I can't -- that's not a
6  correct characterization of the label.
7    Q.    I understand.  But there was not an
8  indication for the use of -- or let me ask you this
9  way:  Is it your testimony that there was an
10  indication for use of Fentora and Actiq in chronic
11  pain?
12    A.    Actiq --
13    Q.    Is that your testimony?
14    A.    Actiq and Fentora were approved --
15  approved for the use of breakthrough cancer pain,
16  which is a kind of chronic pain.
17    Q.    So you -- do you believe that your
18  company, during the time that you were there, could
19  promote and market Actiq for the use of chronic pain?
20    A.    Without the presence of breakthrough
21  pain; is that your question?
22    Q.    I will restate it, because that's a
23  good point.
24      Do you believe that Cephalon could
25  appropriately promote or market Actiq or Fentora

## Page 106

1  during the time you were there for use in chronic
2  pain without cancer-related breakthrough pain?
3    A.    Not for chronic pain that was not
4  associated with breakthrough pain.
5    Q.    Cancer pain; right?  It had to be
6  cancer pain?
7    A.    The label was for breakthrough cancer
8  pain.
9    Q.    So what I said is right; correct?  It
10  had to be cancer-related breakthrough pain; right?
11    A.    That was not your original question.
12  But that is correct.
13    Q.    The FDA never found these drugs safe
14  and effective for episodic pain; correct?
15    MR. JAMES:  Objection.
16    THE WITNESS:  How are you defining "episodic
17  pain"?
18  BY MR. CARTMELL:
19    Q.    Well, actually, I'm using a phrase
20  from the documents internally from Cephalon.  So how
21  do you interpret episodic pain?
22    MR. JAMES:  Objection.
23    THE WITNESS:  It's -- I'm not a clinician,
24  but it was my understanding that episodic pain was
25  pain that was -- that would occur not on a regular

## Page 107

1  basis, but that would be of significant intensity.
2  BY MR. CARTMELL:
3    Q.    Okay.  And do you believe that the --
4    A.    A kind of chronic pain.
5    Q.    Sorry to cut you off.
6      Do you believe that it was appropriate
7  for -- strike that.
8      Do you believe that Actiq or Fentora were
9  indicated for the treatment of episodic pain?
10    A.    They were approved for the use of
11  breakthrough cancer pain.
12    Q.    So is the answer to my question "yes"
13  or "no"?
14    A.    It's not my place to determine
15  whether the prescription was appropriate.  That's a
16  physician --
17    Q.    That's not --
18    A.    I'm not sure I understand your
19  question, then.
20    Q.    Okay.  I will ask it again.
21      Do you believe, based on your experience in
22  the industry and based on your experience at
23  Cephalon, that Teva -- strike that.
24      Do you believe, based on your experience at
25  Cephalon and working with Actiq and Fentora, that

## Page 108

1  either of those drugs were approved by the FDA and
2  indicated for episodic pain; "yes" or --
3    A.    They were not approved for episodic
4  pain.
5    Q.    Okay.  So a promotion of Fentora or
6  Actiq for episodic pain would be an off-label
7  promotion; correct?
8    A.    That is correct.
9    Q.    Now, both of these medications, when
10  they were approved by the FDA, were approved under
11  subpart (h) of the Act; is that correct?
12    MR. JAMES:  Objection.
13    THE WITNESS:  I don't recall the -- the
14  exact segment section of the Act.
15  BY MR. CARTMELL:
16    Q.    Okay.  Do you recall, though, that at
17  least both of these drugs were approved by the FDA
18  subject to having a Risk Management Program in place?
19    A.    That is correct.
20    Q.    And the FDA, according to subpart
21  (h), has the ability to require a company like
22  Cephalon to put in place a Risk Management Program in
23  order to sell or promote or market the approved
24  product, if it concludes that the product is shown to
25  be effective and it can only be safely used if

Page 109

1  distribution or use is restricted; correct?
2        MR. JAMES:  Objection.
3        THE WITNESS:  Again, I don't remember the
4  exact wording of subpart (h), as you indicated it was
5  called.
6  BY MR. CARTMELL:
7        Q.    I understand.  But was your general
8  understanding that the FDA has the power to say to
9  drug manufacturers, like Cephalon, that if they think
10 the drug can only be used safely and effective with a
11 Risk Management Program, they can require the company
12 to put a Risk Management Program in place; fair?
13       A.    That's correct.
14       MR. JAMES:  Objection.
15 BY MR. CARTMELL:
16       Q.    Okay.  And the Risk Management
17 Program is an agreement or commitments from the
18 pharmaceutical company to the FDA that they will
19 follow the commitments in the Risk Management Program
20 to make sure that the drug is used safely by
21 patients; correct?
22       MR. JAMES:  Objection.
23       THE WITNESS:  It's beyond the scope of my
24 responsibilities to implement the Risk Management
25 Program.

Page 110

1  BY MR. CARTMELL:
2        Q.    Okay.  But you were involved with
3  implementing the Risk Management Program; correct?
4        A.    I was on the Diversion Subteam.
5        Q.    Right.  And you were also, I think,
6  on Fentora Risk Management Program Launch Team;
7  correct?
8        A.    I was on the Fentora Launch Team.  I
9  don't remember specifically being on the -- on the
10 Risk Management Team.
11       Q.    We will go over that later.
12       But let me just ask you, Ms. Beckhardt, is
13 it true -- your understanding, I take it, is that
14 both of these drugs, Fentora and Actiq, were approved
15 by the FDA with Risk Management Plans in place?
16       A.    That's correct.
17       Q.    Okay.  And the FDA told Cephalon that
18 it could not sell these drugs unless they had a Risk
19 Management Program in place, and they were required
20 to follow it; correct?
21       MR. JAMES:  Objection.
22       THE WITNESS:  We had a risk management
23 place -- a Risk Management Program in place.
24 BY MR. CARTMELL:
25       Q.    You knew that; correct?

Page 111

1        A.    Yes.
2        Q.    And I take it you reviewed the Risk
3  Management Programs in place for each of these
4  products, Actiq and Fentora; correct?
5        A.    Yes.
6        Q.    And I take it, part of the reason why
7  you needed to be familiar and review those programs
8  is because you wanted to make sure that you and the
9  PR Department and Cephalon were complying with those
10 programs; correct?
11       A.    That was -- complying with the Risk
12 Management Program was outside of the scope of my
13 responsibility.
14       Q.    But you were going to be making
15 statements to people in the public about these
16 products; right?
17       A.    That is true.
18       Q.    So you needed to know what each of
19 these Risk Management Programs said about that,
20 didn't you?
21       A.    That's correct.
22       Q.    And you needed to make sure that when
23 you were making statements to the public and to the
24 media and to doctors and to nurses, that you were in
25 compliance with the Risk Management Programs;

Page 112

1  correct?
2        MR. JAMES:  Objection.
3        THE WITNESS:  I needed to understand the
4  Risk Management Program.
5  BY MR. CARTMELL:
6        Q.    And you needed to make sure that your
7  statements and your work was complying with it;
8  correct?
9        A.    I had to comply with the Risk
10 Management Program individually, yes.
11       Q.    And did anybody ever train you on
12 either of these Risk Management Programs in place for
13 Actiq or Fentora?
14       A.    I don't recall the training.  That
15 doesn't mean it didn't happen.  I just don't recall
16 it.
17       Q.    Okay.  And did anybody ever tell you
18 that the company needed to make sure that it complied
19 with the commitments in these programs?
20       A.    Yes.
21       MR. CARTMELL:  How long have we been going?
22       MR. JAMES:  We have been going -- my stomach
23 is starting to growl.
24       MR. WOLFE:  An hour five.
25       MR. CARTMELL:  Let's take a break.

Page 113

```
1           THE VIDEOGRAPHER:  We are going off the
2    record.  The time is 11:58 a.m.
3           (Lunch recess taken at 11:58 a.m.)
4                      --oOo--
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 114

```
1    AFTERNOON SESSION              12:49 P.M.
2                      --oOo--
3           THE VIDEOGRAPHER:  We are back on the
4    record.  The time is 12:49 p.m.
5    BY MR. CARTMELL:
6        Q.   Ms. Beckhardt, we're back on the
7    record after a lunch break.  Are you ready to
8    proceed?
9        A.   Yes.
10       Q.   Okay.  We were talking about the Risk
11   Management Programs that the FDA required Cephalon to
12   enter into with respect to both Actiq and Fentora,
13   the opioid narcotics Cephalon was selling before
14   break.  Do you recall that?
15       A.   Yes.
16            (Exhibit No. 7 was marked.)
17   BY MR. CARTMELL:
18       Q.   I've handed you what's been marked as
19   Exhibit 7, and I want to go through that with you.
20            This is a copy of the Actiq Risk Management
21   Program that was put into place August 1st, 2001; do
22   you see that?
23       A.   Yes.
24       Q.   Okay.  And as we discussed, Actiq was
25   first approved in 1998, but Anesta, another
```

Page 115

```
1    pharmaceutical company, was the company that
2    developed the program.  So originally there was a
3    Risk Management Program from back when Anesta was the
4    primary seller and marketer of the drug.
5           But my understanding is, and you correct me
6    if I'm wrong, this -- this Risk Management Program
7    was put into place once Cephalon purchased Anesta and
8    the Actiq drug from Anesta; is that fair?
9        MR. JAMES:  Objection.
10       THE WITNESS:  I don't know if it was
11   changed.  You're suggesting it was changed.  I don't
12   know if it was changed.
13           There was a Risk Management Program put in
14   place, but I don't know if it's any different than
15   Anesta's.
16   BY MR. CARTMELL:
17       Q.   And I apologize, I didn't mean to
18   insinuate that it had been changed.  I'm just saying,
19   because you had a new owner of the actual product,
20   Cephalon, there needed to be a commitment by Cephalon
21   to enter into the RiskMAP; correct?
22       A.   Yes.
23       Q.   And this was a copy that was provided
24   to us from the internal files of Teva of that Risk
25   Management Program related to Actiq.  And I take it
```

Page 116

```
1    that this is a document that you became familiar with
2    when you started the company shortly after this;
3    correct?
4        MR. JAMES:  Objection.
5        THE WITNESS:  I'm sure -- I don't recall
6    reading it, but I suspect that I did.
7    BY MR. CARTMELL:
8        Q.   Right.  And we discussed that.  But
9    obviously because you were involved in making
10   statements and messaging related to the Actiq
11   program -- or excuse me, the Actiq product, this is a
12   Risk Management Program that, to do your job
13   appropriately and effectively, you would need to
14   become familiar with; fair?
15       A.   Yes.
16       Q.   Okay.  Now, if you will go ahead and
17   turn to the "Introduction" section that is at page 5.
18   And I would want to go through just some of these
19   provisions.
20           You see at page 5, the introduction states:
21           (Reading) The Actiq Risk Management
22           Program has been designed to address
23           three key potential risk situations:
24           Accidental ingestion of Actiq by
25           children; improper patient selection;
```

Page 117

1    prescriptions to and usage by
2    opioid-nontolerant patients and
3    diversion or abuse (end of reading).
4    Do you see that?
5    A.    Yes.
6    Q.    And was your -- strike that.
7    It then states that:
8    (Reading) Anesta and Cephalon had
9    designed and developed this
10   comprehensive program with the primary
11   goal of making every reasonable effort
12   to reduce the risk of potential
13   untoward events in the unintended
14   populations to the extent possible
15   (end of reading).
16   Do you see that?
17   A.    Yes.
18   Q.    And so it was your understanding that
19   one of the reasons that the FDA required Cephalon to
20   enter into a Risk Management Program related to Actiq
21   was because they had certain concerns related to its
22   safe use or the safe use of the product --
23   MR. JAMES:  Objection.
24   BY MR. CARTMELL:
25   Q.    -- is that fair?

Page 118

1    MR. JAMES:  Objection.
2    THE WITNESS:  Well, one of the provisions of
3    the Risk Management Program obviously relates to
4    abuse and diversion.  But that does not suggest that
5    the product couldn't be used safe and effectively.
6    BY MR. CARTMELL:
7    Q.    Yeah, and that's not really -- I'm
8    not trying to say that that's not true.  I'm just
9    saying, obviously, the FDA had concerns about some
10   things with Actiq being prescribed on the open
11   market, and one was diversion or abuse; correct?
12   MR. JAMES:  Objection.
13   THE WITNESS:  It's what's in the RiskMAP,
14   the RMP.
15   BY MR. CARTMELL:
16   Q.    Okay.  And they wanted Cephalon to
17   make certain commitments to do certain things to help
18   reduce the risks of diversion and abuse; correct?
19   A.    That's correct.
20   Q.    And they also wanted Cephalon to do
21   certain things to try to reduce the risk that
22   patients who were not the intended patients for this
23   drug could be reduced; correct?
24   MR. JAMES:  Objection.
25   THE WITNESS:  According to this document

Page 119

1    and, you know, the issue for appropriate use related
2    to labeling.
3    BY MR. CARTMELL:
4    Q.    Well, actually, there's a section we
5    will go through in a second that talks more about
6    the -- the appropriate population.  But I see what
7    you're referring to.  It talks there about labeling;
8    correct?
9    A.    That's correct.
10   Q.    Okay.  It states:
11   (Reading) A lengthy series of events
12   must occur in sequence before a risk
13   event can occur.  And any other
14   multiple RiskMAP elements could
15   intervene to interrupt the sequence
16   and prevent the risk event (end of
17   reading).
18   Do you see that?
19   A.    I don't -- okay.  Thank you.
20   Q.    And then it states:
21   (Reading) The purpose of the RiskMAP
22   is to ensure the safe use of this
23   product (end of reading).
24   Do you see that?
25   A.    Yes.

Page 120

1    MR. JAMES:  RMP, not RiskMAP.
2    THE WITNESS:  Yeah.
3    MR. JAMES:  Just so it's --
4    THE WITNESS:  Clear.
5    MR. CARTMELL:  I'm sorry.
6    THE WITNESS:  The RMP is prior to the
7    RiskMAP, prior to the RMS.
8    BY MR. CARTMELL:
9    Q.    Let me restate it.  It then says:
10   (Reading) The purpose of the Risk
11   Management Program is to ensure the
12   safe use of this product (end of
13   reading).
14   Right?
15   A.    That's correct.
16   Q.    And I take it that was your
17   understanding, it's Cephalon's understanding, that
18   this Risk Management Program was put into place to
19   try to make patients who were taking Actiq safe;
20   correct?
21   MR. JAMES:  Objection.
22   THE WITNESS:  It was intended to ensure that
23   there was proper patient selection.
24   BY MR. CARTMELL:
25   Q.    And -- and that's a safety issue with

## Page 121

1  patients; correct?
2      A.   The use of Actiq or any transmucosal
3  product in an opioid-nontolerant patient was the
4  concern with the risk.
5      Q.   Well, okay.  Let's go through this.
6  But if you could answer my question.
7          My question was:  This clearly states that
8  the purpose of this Risk Management Program was to
9  ensure the safe use of this product; correct?
10     A.   That's correct.
11     Q.   And Cephalon's understanding and your
12  understanding was that was what this program was
13  about and the commitments by the company were about;
14  correct?
15     MR. JAMES:  Objection.
16     THE WITNESS:  The commitment was made before
17  I got there.  But that's -- it's -- it is for
18  appropriate -- it was intended to ensure appropriate
19  use of the product.
20  BY MR. CARTMELL:
21     Q.   Okay.  And safe use; correct?
22     MR. JAMES:  Objection.
23  BY MR. CARTMELL:
24     Q.   It says, "the safe use"; correct?
25     A.   It says it, yes.

## Page 122

1      Q.   And then there's key messages for
2  this Risk Management Program; you see that below?
3      A.   Yes.
4      Q.   And one of them is proper patient
5  selection and prevention of diversion and abuse
6  messages; do you see that?
7      A.   Yes.
8      Q.   So the FDA was asking the company to
9  send certain messages to physicians and patients and
10  pharmacists, and those messages included that there
11  needed to be proper patient selection for Actiq;
12  correct?
13     A.   That's correct.
14     Q.   And then it defines more clearly on
15  the next page a section called, "Proper Patient
16  Selection Messages."  Do you see that?
17     A.   Yes.
18     Q.   And there's several of them.  And one
19  that you mentioned is that it needs to be an
20  opioid-tolerant patient?
21     A.   Correct.
22     Q.   And then it can't be a specifically
23  contraindicated group of patients taking this, which
24  is opioid-nontolerant patients; correct?
25     A.   That's correct.

## Page 123

1      MR. JAMES:  Objection.
2  BY MR. CARTMELL:
3      Q.   And then you can't -- they
4  shouldn't -- strike that.
5          And then a proper patient is not somebody
6  who is using Actiq for acute pain or postoperative
7  pain; correct?
8      A.   That's correct.
9      Q.   Okay.  And then it states -- and I
10  want to focus on this for the jury it states:
11         (Reading) Actiq is specifically
12         indicated solely for the treatment of
13         breakthrough cancer pain in chronic
14         opioid-tolerant cancer patients (end
15         of reading).
16         Do you see that?
17     A.   I see that, yes.
18     Q.   So the company there is committing to
19  the FDA, that's risk management, that it's going to
20  ensure proper patient selection, which is cancer
21  patients who have breakthrough pain and are opioid
22  tolerant; fair?
23     A.   That's what's --
24     MR. JAMES:  Objection.
25     THE WITNESS:  -- on the label.

## Page 124

1  BY MR. CARTMELL:
2      Q.   And that was your understanding;
3  correct?
4      MR. JAMES:  Objection.
5      THE WITNESS:  My understanding of what?
6  Sorry.
7  BY MR. CARTMELL:
8      Q.   Just your understanding that the
9  company was committing that those were going to be
10  the messages that would be given about this product;
11  correct?
12     MR. JAMES:  Objection.
13     THE WITNESS:  It was the label and
14  communications were to be consistent with the label.
15  BY MR. CARTMELL:
16     Q.   Right.  But my point is, specifically
17  the commitment by the company included giving
18  messages that Actiq is specific -- specifically
19  indicated solely for the treatment of breakthrough
20  cancer pain in chronic opioid-tolerant cancer
21  patients; correct?
22     A.   And we did communicate that, yes.
23     MR. CARTMELL:  Object.  And move to strike.
24  And answer it again.
25     Q.   Specifically the commitment by the

Page 125

1  company included giving messages that Actiq is
2  specifically indicated solely for the treatment of
3  breakthrough cancer pain and chronic opioid-tolerant
4  cancer patients; correct?
5      MR. JAMES:  Objection.
6      THE WITNESS:  It's the labeled indication.
7  BY MR. CARTMELL:
8      Q.   So correct; right?  I'm really not
9  trying to be --
10     A.   It's the labeled indication.  So,
11 yes, one is to market according to the labeled
12 indication.
13     Q.   That's really not -- I'm not
14 trying -- I mean, I'm not trying to be disrespectful.
15 That's not my question.  If you could just try to
16 answer my question, and then I will move on.
17     One of the commitments that the company gave
18 in this Risk Management Program was that it would
19 give proper patient selection messages, including a
20 message that Actiq is specifically indicated solely
21 for the treatment of breakthrough cancer pain in
22 chronic, opioid-tolerant cancer patients; correct?
23     MR. JAMES:  Objection.
24     THE WITNESS:  That was a proper patient
25 selection message.

Page 126

1  BY MR. CARTMELL:
2      Q.   Okay.  And then it talks about
3  messages related to the prevention of diversion and
4  abuse; correct?
5      A.   Yes.
6      Q.   And the FC -- the F -- excuse me, the
7  FDA indicated that one of the messages related to
8  that would be that Actiq is a Class 2 medication;
9  right?
10     A.   Yes.
11     Q.   And that the company would tell
12 people, physicians, pharmacists, nurses, that Actiq
13 may be habit forming; correct?
14     MR. JAMES:  Objection.
15     THE WITNESS:  That's one of the messages,
16 all opioids can be habit forming.
17 BY MR. CARTMELL:
18     Q.   If you turn to page 12, there's
19 actually a section on "Professional Medical
20 Education."  And it states that:
21         (Reading) Cephalon will work in
22         conjunction with the FDA and interface
23         with licensing boards and professional
24         associations on the development and
25         dissemination of educational materials

Page 127

1          related to Actiq (end of reading).
2  Do you see that?
3      A.   Yes.
4      Q.   And is it true that that was one of
5  the things that you would do from time to time, is
6  interface with professional associations?
7      A.   Not in the context of professional
8  medical education.
9      Q.   But just in general, that was a
10 group -- professional associations were a group that
11 you would partner with from time to time related to
12 sending messages on the breakthrough pain disease --
13     A.   Correct.
14     Q.   -- things like that?
15     Okay.  "Key Message Points," it states:
16         (Reading) The education of physicians,
17         nurses, pharmacists, caregivers, and
18         patients on the safe use of Actiq is
19         an integral part of the Actiq Risk
20         Management Program (end of reading).
21     Do you agree with that?
22     A.   Yes.
23     Q.   It states that there are three main
24 messages.  And I want to focus on the last two, which
25 are proper patient selection messages; right?

Page 128

1      A.   Yes.
2      Q.   And remember from the prior page,
3  that included that the proper patients would be
4  limited solely to cancer patients who had
5  breakthrough pain and were opioid tolerant; correct?
6      A.   Yes.
7      Q.   Okay.  It states, "Prevention of
8  diversion and abuse messages."  Do you see that?
9      A.   Yes.
10     Q.   If you turn the page, it states at
11 the top:
12         (Reading) These key educational
13         messages primarily focusing on safety
14         are provided to the physicians,
15         nurses, and pharmacists through the
16         communication vehicles which are
17         discussed on the following pages (end
18         of reading).
19     And so this Risk Management Program, then,
20 had tools and vehicles that the company was
21 committing to use to try to get these messages out to
22 pharmacists and physicians and nurses and patients;
23 correct?
24     MR. JAMES:  Objection.
25     THE WITNESS:  I was not responsible for

Page 129

1    that, but that is -- we were -- we did give message
2    education to physicians, nurses, and pharmacists.
3    BY MR. CARTMELL:
4        Q.    My only question was, what we are
5    about to go through, were those messages that the
6    company -- excuse me, those tools and vehicles that
7    the company committed to using to get out those
8    messages; correct?
9        MR. JAMES:  Objection.
10       THE WITNESS:  I don't understand your
11   question.
12   BY MR. CARTMELL:
13       Q.    One -- one of those vehicles was the
14   Actiq Speakers Bureau/Medical Education Programs; do
15   you see that?
16       A.    Yes.
17       Q.    Now, that was, I don't think, an area
18   that you were involved in working on; is that right?
19       A.    That's correct.
20       Q.    Okay.  That would have been the
21   Marketing Department?
22       A.    No.  It would have been -- part of
23   it.  The speakers bureau may have been part of it.
24   But there was also the medical education programs
25   would have been led by our Medical Department.

Page 130

1        Q.    Okay.  But the speakers bureau would
2    have been the sales reps --
3        A.    No.
4        Q.    -- involved with marketing?
5        A.    No.  It would have been the Marketing
6    Department, not the Sales Department.
7        Q.    Okay.  Then I misunderstood you,
8    because I thought you said "may have been."  Let's
9    make the record clear.
10       The Actiq Speakers Bureau/Medical Education
11   Programs, those were not tactics or vehicles that you
12   were involved with; correct?
13       A.    That's correct.
14       Q.    But, for example, the Actiq speakers
15   bureau, that was something that the Marketing
16   Department was involved with; right?
17       A.    Correct.
18       Q.    Okay.  And then another vehicle below
19   that is, "Publications."  Do you see that?
20       A.    Yes.
21       Q.    And it talks here about the company
22   is agreeing to have manuscripts selected for
23   publications, are those that combine a specific focus
24   into the key cancer pain management audience.
25       Do you see that?

Page 131

1        A.    Yes.
2        Q.    Okay.  Turn, if you will, please, to
3    page 15.  This Risk Management Program talks about
4    the Actiq launch program and states that:
5        (Reading) Actiq will target a
6        relatively small group of clinicians.
7        The emphasis of the promotion will be
8        highly educational (end of reading).
9        Do you see that?
10       A.    Yes.
11       Q.    And it defines more on the next page,
12   Ms. Beckhardt, who that target audience is; right?
13       A.    Yes.
14       Q.    And it states:
15       (Reading) The target physician
16       audience for Actiq is a group of
17       approximately 5,000 oncologists and
18       pain specialists, their nurses and
19       office staff.  These physicians are
20       already using Class 2 opioids to treat
21       cancer pain, are generally
22       knowledgeable about breakthrough
23       cancer pain and should understand the
24       appropriate use of Actiq for
25       opioid-tolerant cancer patients (end

Page 132

1        of reading).
2        Do you see that?
3        A.    Yes.
4        Q.    And was your understanding in working
5    with occasionally the Marketing Department -- and as
6    a manager in the PR Department, that's the group of
7    doctors that Cephalon committed to the FDA that it
8    would call on?
9        MR. JAMES:  Objection.
10       THE WITNESS:  Our sales force called on
11   oncologists and pain specialists.
12   BY MR. CARTMELL:
13       Q.    And that's -- that was a commitment
14   right here, defining who the doctors are that the
15   sales force should call on; correct?
16       MR. JAMES:  Objection.
17       THE WITNESS:  It is -- we indicated that we
18   would call on oncologists and pain specialists.
19   BY MR. CARTMELL:
20       Q.    But this makes it clear, the company
21   is telling the FDA -- right? -- that it's going to
22   limit who it targets, what physicians it targets,
23   that those that have knowledge about the treatment of
24   cancer with opioids; correct?
25       MR. JAMES:  Objection.

Page 133

1    THE WITNESS:  Those are the physicians that
2  we targeted.
3  BY MR. CARTMELL:
4    Q.   Okay.  And that was the commitment to
5  the FDA; correct?
6    MR. JAMES:  Objection.
7    THE WITNESS:  You keep using the word
8  "commitment."  And I'm not sure.
9  BY MR. CARTMELL:
10    Q.   You're not willing to say that this
11  was a commitment to the FDA?
12    MR. JAMES:  Objection.
13    THE WITNESS:  It was a part of the Risk
14  Management Program, which was approved by the FDA.
15  BY MR. CARTMELL:
16    Q.   The FDA required it; right?
17    A.   Yes.
18    MR. JAMES:  Objection.
19  BY MR. CARTMELL:
20    Q.   And they required these things to be
21  done by your company; correct?
22    MR. JAMES:  Objection.
23    THE WITNESS:  Yes.
24  BY MR. CARTMELL:
25    Q.   Okay.  And my only point is:  Right

Page 134

1  here, this is talking about who the targeted
2  physicians will be.  And this is a commitment, is it
3  not, from the company that it will be a small group
4  of physicians, and only physicians that have
5  knowledge and expertise related to treating cancer
6  patients; correct?
7    A.   And they were --
8    MR. JAMES:  Objection.
9    THE WITNESS:  -- our target audience.
10  BY MR. CARTMELL:
11    Q.   You're saying that your company
12  followed this?
13    A.   I'm saying that oncologists and pain
14  specialists were our target -- our primary target
15  audience.
16    Q.   And they needed to be, would you
17  agree with me, pain specialists who had special
18  expertise and knowledge about treating cancer?
19    MR. JAMES:  Objection.
20    THE WITNESS:  They needed to have special
21  knowledge to treat cancer pain, not in treating
22  cancer.
23    MR. CARTMELL:  Okay.  I'm sorry.  That's a
24  good clarification.  Thank you for that.
25    Q.   Okay.  If you go to page 27, there's

Page 135

1  a specific section related to off-label usage.  Do
2  you see that?
3    A.   Yes.
4    Q.   We talked about that.  Off-label
5  usage is usage of the medication for a condition that
6  is not approved by the FDA; correct?
7    A.   Correct.
8    Q.   Okay.  It states:
9      (Reading) Whenever a problem of
10      off-label usage becomes known and
11      individual prescribers are identified,
12      the following activities will take
13      place (end of reading).
14    And then it outlines the things that the
15  company needs to do; correct?
16    A.   Yes.
17    Q.   It needs to send letters; right?
18    A.   Yes.
19    Q.   It needs to send letters to the
20  Medical Department of those prescribers that they
21  deem to be a problem; correct?
22    A.   Needed to be sent from our Medical
23  Department to prescribers.
24    Q.   Okay.  And then prescribing patterns
25  of these doctors will be monitored for these

Page 136

1  physicians who are prescribing off label; correct?
2    A.   Correct.
3    Q.   Okay.  And then it talks about groups
4  of prescribers below.  Do you see that?
5    A.   Yes.
6    Q.   (Reading) If groups of physicians,
7      such as a particular specialty, are
8      identified as having prescribed Actiq
9      inappropriately, and these
10      prescriptions represent potential
11      off-label usage greater than
12      15 percent of total quarterly Actiq
13      prescriptions, Cephalon will contact
14      the appropriate professional
15      society -- and then, for example, the
16      American College of Surgeons, the
17      American Society of Anesthesiologists
18      (end of reading).
19    Do you see that?
20    A.   Yes.
21    Q.   And I think you said earlier that
22  those were not societies or professional societies
23  that you worked with; is that right?
24    A.   Not that I personally worked with.
25    Q.   Okay.  Let me ask you:  Did anybody

Page 137

1    ever ask you to contact any professional society
2    because of off-label usage of the docs?
3         A.    It would -- it would not have been
4    my -- me.  It would have been come from the Medical
5    Department.
6         Q.    In the next paragraph it says:
7              (Reading) Prescribing patterns will be
8              monitored for the physician groups in
9              question.  And should the level
10             continue to exceed 15 percent (end of
11             reading) --
12       That's talking about off-label level;
13   correct?
14        A.    Yes.
15        Q.    -- (Reading) 15 percent of total
16             Actiq prescriptions for two additional
17             quarters, an aggressive educational
18             program will be initiated by mail,
19             clearly warning of the potential
20             liabilities of prescribing Actiq to
21             inappropriate patient populations (end
22             of reading).
23       Do you see that?
24        A.    Yes.
25        Q.    And, again, referring back to the

Page 138

1    agreement, it states that inappropriate patient
2    populations include those patients who don't have
3    cancer; correct?
4         A.    That's correct.
5         MR. JAMES:  Objection.
6         THE WITNESS:  That's correct.  But if the
7    first statement in -- that we read talked about the
8    importance of a -- primary concern of the RMP was
9    to look at opioid-nontolerant patients, to make sure
10   that people taking Actiq were opioid tolerant.
11   BY MR. CARTMELL:
12        Q.    Okay.  You've said that a couple
13   times.  Show me where in this document it says the
14   primary concern was for the patients to be opioid
15   tolerant.
16        A.    I will say medically that is the
17   primary concern because that -- it is that that
18   causes the potential risk of respiratory depression.
19        Q.    Okay.  I just want to make it clear
20   for the jury, though, nowhere in this agreement does
21   it say that the primary concern is opioid
22   intolerance; correct?
23        A.    It may not say the word "primary";
24   however, in the page that you referenced, page No. 5,
25   the Risk Management Program was designed to address

Page 139

1    three potential risk situations, and improper patient
2    selection, as I understand it in this document, is
3    described as prescriptions to and usage by
4    opioid-nontolerant patients.
5         Q.    Okay.
6         A.    And I understand that later the --
7    there is discussion about the population that the
8    indication was for were opioid-tolerant cancer
9    patients.  I understand that.  But I'm just stating
10   that the risk that was stated here as the key three
11   potential risk situations referred to opioid-tolerant
12   patients.
13        Q.    Okay.  But my point is, if you turn
14   to the next page, there are selection -- proper
15   patient selection messages which defines what a
16   proper patient is; correct?
17        A.    That is correct.
18        Q.    Okay.  And it states that Actiq is
19   specifically indicated solely for the treatment of
20   breakthrough cancer pain; correct?
21        A.    That's correct.
22        Q.    Okay.  It doesn't say that the
23   primary concern is opioid intolerance or tolerance
24   versus that; correct?
25        MR. JAMES:  Objection.

Page 140

1         THE WITNESS:  It doesn't say it in this
2    section, but it says it in the primary -- in the
3    section before.
4    BY MR. CARTMELL:
5         Q.    This section defines what an
6    appropriate patient is; correct?
7         MR. JAMES:  Objection.
8         THE WITNESS:  This section defines what's in
9    the label.
10   BY MR. CARTMELL:
11        Q.    Right.  And the label says the
12   appropriate patient selection is cancer patients;
13   correct?
14        MR. JAMES:  Objection.
15        THE WITNESS:  That is what the label -- the
16   label states what it is indicated for.
17        MR. CARTMELL:  Okay.  Thank you.
18        Q.    Let's move on.  I want to ask you a
19   few more questions about it.
20        It's clear from your viewing this document,
21   the Risk Management Program for Actiq, that there
22   were concerns by the FDA about abuse, misuse,
23   diversion, and addiction related to Actiq; correct?
24        MR. JAMES:  Objection.
25        THE WITNESS:  There are risks because of a

## Page 141

1    C2 opioid.
2         MR. CARTMELL:  I'm going to object and move
3    to strike that.  That's not my question.
4         Q.    It's apparent from reviewing this
5    document, this Risk Management Program, that the FDA
6    required of Cephalon -- that the FDA was concerned
7    about the risks of abuse or misuse and diversion and
8    addiction related to Actiq; correct?
9         MR. JAMES:  Objection.
10         THE WITNESS:  Yes, they were concerned.  But
11    the reason they were concerned was because it was a
12    C2 opioid.
13    BY MR. CARTMELL:
14         Q.    Okay.  And it's true, from looking at
15    this document, that the FDA was requiring Cephalon,
16    your company, to make sure that it was sending the
17    appropriate messages to doctors, physicians, and
18    pharmacists about the safety of this product;
19    correct?
20         MR. JAMES:  Objection.
21         THE WITNESS:  Yes.  And we did.
22    BY MR. CARTMELL:
23         Q.    And it's true, is it not, from this
24    Risk Management Program, that the FDA required --
25    that one of those messages that was required of

## Page 142

1    Cephalon to be sent to these physicians, patients,
2    and pharmacists was that Actiq should be used solely
3    by cancer patients with breakthrough pain and who are
4    opioid tolerant; correct?
5         MR. JAMES:  Objection.
6         THE WITNESS:  Those are the messages that
7    were required and that were given.
8    BY MR. CARTMELL:
9         Q.    Okay.  We will talk about whether or
10    not they were given.  Okay?
11         Now, is it true that you were involved in
12    some of these vehicles that this Risk Management
13    Program is talking about, as far as delivering
14    messages?
15         A.    I was not responsible for delivering
16    messages directly to health-care providers who were
17    prescribers or dispensing of the medication.
18         Q.    What about delivering --
19         A.    In that context.
20         Q.    I'm sorry.
21         What about delivering messages to patient
22    groups or industry groups or professional societies,
23    were you involved in --
24         A.    Yes.
25         Q.    -- delivering those messages?

## Page 143

1    You were; correct?
2         A.    I was involved in giving those
3    messages as they related to management of
4    breakthrough cancer pain and breakthrough pain.
5         Q.    And would you agree with me that it
6    was Cephalon's obligation to provide information
7    through the groups that were listed that was
8    consistent with the goals of the Risk Management
9    Program?
10         MR. JAMES:  Objection.
11         THE WITNESS:  What groups -- to which --
12    what groups are you referring to?  What section are
13    you --
14    BY MR. CARTMELL:
15         Q.    You will recall that the Risk
16    Management Program we just went through talked about
17    giving messages to physicians and pharmacists and
18    patients; correct?
19         A.    Yes.
20         Q.    And in certain circumstances giving
21    these messages to professional societies, for
22    example; correct?
23         A.    In certain circumstances, yes.
24         Q.    And would you agree with me that it
25    was Cephalon's obligation to provide those messages

## Page 144

1    to those groups that were consistent with the goals
2    of the Risk Management Program?
3         MR. JAMES:  Objection.
4         THE WITNESS:  Yes.
5         (Exhibit No. 8 was marked.)
6         MR. CARTMELL:  I'm handing you what's been
7    marked as Exhibit 8.
8         Q.    Ms. Beckhardt, we just looked at the
9    Risk Management Program for Actiq.  And I will
10    represent to you that this is the Risk Management
11    Program, sometimes referred to as the RiskMAP, for
12    Cephalon's other opioid narcotic, Fentora.
13         Do you see that?
14         A.    Yes.
15         Q.    And, again, I take it that this is
16    another Risk Management Program that you became
17    familiar with during your time working at Cephalon;
18    is that fair?
19         A.    Yes.
20         Q.    And you needed to become familiar
21    with the Risk Management Program because of your
22    involvement with providing messages related to
23    Fentora; correct?
24         A.    Messages related to the approval of
25    the product and its usage and data related to it to

Page 145

1    the media.  When I worked with patient advocacy
2    groups, my focus was on the disease state, not on the
3    product.
4        Q.   I understand, but -- and my point is
5    really just that this was a document that you had to
6    make sure that you knew well and were acquainted
7    with, so that you could make sure when you were
8    giving messages about Fentora, that you were
9    complying with this agreement; correct?
10       A.   Yes.
11       Q.   And I want to go through this and
12   talk a little bit about this.  But if you go to
13   page 3 of the Risk Management Program, which is the
14   last three Bates -347.  There's a section --
15       A.   Yes.
16       Q.   -- called, "Background."
17       A.   Yes.
18       Q.   And this gives the rationale for the
19   Risk Management Program or for the RiskMAP; right?
20       A.   Yes.
21       Q.   And so it's clear, these are
22   documents -- the last Actiq Risk Management Program
23   and this, these are documents that are created
24   actually by Cephalon; right?
25       MR. JAMES:  Calls for -- objection.

Page 146

1        THE WITNESS:  They are created by the --
2    they were created by the company with the approval of
3    the agency.
4    BY MR. CARTMELL:
5        Q.   Right.  So the FDA says you need to
6    put together a program that's going to help manage
7    risk related to these opioid products, and the
8    company puts the document together, and then the FDA
9    ultimately approves it; correct?
10       MR. JAMES:  Objection.
11       THE WITNESS:  That's my understanding.
12   BY MR. CARTMELL:
13       Q.   Okay.  And if you go about halfway
14   down or three-quarters of the way down on this
15   paragraph, it states:
16          (Reading) Opioid drug products have
17          important benefits in alleviating pain
18          but are associated with significant
19          risks of diversion, abuse, and
20          addiction (end of reading).
21       Do you see that?
22       A.   Yes.
23       Q.   Okay.  And, again, we saw in the
24   Actiq Risk Management Program, now with the Fentora
25   product, the FDA is expressing its concerns related

Page 147

1    to the risks of diversion, abuse, and addiction;
2    correct?
3        A.   There's risk of abuse and diversion
4    with any C2 medications.
5        MR. CARTMELL:  I'm going to object and move
6    to strike that answer as nonresponsive.
7        Q.   I will ask the question again:  And,
8    again, we saw in the Actiq Risk Management Program --
9    as we saw in the Actiq Risk Management Program, we
10   now see with the Fentora product and its Risk
11   Management Program that the FDA is again expressing
12   its concerns related to the risks of diversion,
13   abuse, and addiction; correct?
14       MR. JAMES:  Objection.
15       THE WITNESS:  Of Fentora, yes.
16   BY MR. CARTMELL:
17       Q.   Okay.  And it then states:
18          (Reading) To minimize the risks of
19          misuse, abuse, and addiction, and
20          diversion of Fentora, and to maximize
21          appropriate use only in
22          opioid-tolerant cancer patients,
23          Cephalon has developed the secure
24          solutions through education,
25          communication, and understanding risks

Page 148

1          minimization excellence program (end
2          of reading).
3        Do you see that?
4        A.   Yes.
5        Q.   Once again, now with Fentora, just
6    like with Actiq, Cephalon is making it clear, and the
7    FDA has approved, that this drug needs to be
8    appropriately used and will be appropriately used
9    only if it's used -- strike that.  Start over.
10       Once again, the FDA is making it clear that
11   the appropriate use -- and Cephalon is agreeing to
12   this -- the appropriate use is for use only in
13   opioid-tolerant cancer patients; correct?
14       MR. JAMES:  Objection.
15       THE WITNESS:  Yes.
16   BY MR. CARTMELL:
17       Q.   And then there's actually a statement
18   of what the risks are.  And the first risk stated is
19   the use of Fentora by opioid nontolerant individuals;
20   do you see that?
21       A.   Yes.
22       Q.   And then it talks about, as in the
23   case with the use of all opioids, individuals using
24   Fentora who are not tolerant to opioids are at risk
25   for clinically significant and life-threatening

## Page 149

1  adverse events, such as respiratory depression;
2  right?
3      A.    That's what I indicated previously,
4  yes.
5      Q.    And you agree with that?
6      A.    Yes.
7      Q.    Okay.  And we talked about you were
8  getting diversion reports, and some of those reports
9  actually talked about that as well; correct?
10     A.    We get a minimum number of diversion
11 reports.  And I don't recall specific references to
12 respiratory depression in those patients.  I just
13 don't recall.
14     Q.    Okay.  Then there's risk 2, which is,
15 "Misuse, Abuse, and Diversion of Fentora"; correct?
16     A.    Yes.
17     Q.    (Reading) Opioid misuse and abuse
18         have been known to be a precursor to
19         addiction.  The actual rate of
20         addiction to opioids is not known, but
21         has been estimated to be between 4 and
22         10 percent (end of reading).
23     Do you see that?
24     A.    Yes.
25     Q.    That's a -- that's a big percentage;

## Page 150

1  isn't it?
2          MR. JAMES:  Objection.
3  BY MR. CARTMELL:
4      Q.    As high as one out of every ten
5  patients who take opioids?
6          MR. JAMES:  Objection.
7          THE WITNESS:  I can't make a judgment as to
8  whether that's a big number or not.
9  BY MR. CARTMELL:
10     Q.    Okay.  "Fentanyl -- it then says
11 below:
12         (Reading) Fentanyl is a known drug of
13         abuse.  And the Fentora dosage form
14         buccal tablets has the potential to be
15         abused (end of reading).
16     Do you agree with that?
17     A.    Yes.
18     Q.    And then Risk 3, as it's stated above
19 on the next page is, "Unintended, Accidental Exposure
20 to Fentora."  Do you see that?
21     A.    Yes.
22     Q.    And then if you move forward, there
23 are goals and objectives of this Risk Management
24 Program, I want to talk to you about those on,
25 page 9.

## Page 151

1          (Reading) Cephalon has identified
2          three goals for the secure program.
3          These goals are expressed as ideal
4          outcomes of the Fentora RiskMAP.
5          Associated with each of these goals
6          there are specific and measurable
7          program objectives that are described
8          below.  Goal No. 1:  Fentora should be
9          used only by opioid-tolerant patients
10         with cancer (end of reading).
11     Do you see that?
12     A.    Yes.
13     Q.    Once again, this is the FDA, as it
14 had -- strike that.
15         Once again, this is Cephalon in the Risk
16 Management Program, as it did in the Actiq Risk
17 Management Program, stating that the opioid, the
18 fentanyl-based opioid, should only be used with
19 patients that have cancer; correct?
20         MR. JAMES:  Objection.
21         THE WITNESS:  That was an objective of the
22 RiskMAP.
23 BY MR. CARTMELL:
24     Q.    And it states, goal No. 1 below:
25         (Reading) Fentora should be used only

## Page 152

1          by opioid-tolerant patients with
2          cancer (end of reading).
3          And then it gives some objectives that the
4  company is committing to do to ensure that that is --
5  is the case; correct?
6      A.    Correct.
7      Q.    One is to educate physicians that
8  Fentora should not be used in opioid-nontolerant
9  patients; correct?
10     A.    Yes.
11     Q.    That's one.  But if you look at
12 No. 3, the company is also committing to educate
13 pharmacists and other health-care personnel of the
14 importance of Fentora being prescribed, distributed
15 and used only by opioid-tolerant patients with
16 cancer.  Do you see that?
17     A.    Yes.
18     Q.    So, again, Cephalon is telling the
19 FDA and committing to the FDA that it's going to
20 educate these health-care providers and tell them
21 that these products should only be used by patients
22 with cancer; correct?
23     A.    It was an objective to educate those
24 health-care professionals on the indication of the
25 medicine.

Page 153

```
 1        Q.    Right.  And that's a prudent thing
 2   for the company to do, because otherwise they would
 3   be off-label promoting?
 4        MR. JAMES:  Objection.
 5        THE WITNESS:  That's correct.
 6   BY MR. CARTMELL:
 7        Q.    It then, on the next page, talks
 8   about the overall strategy.  And it states:
 9             (Reading) In developing the goals,
10             objectives and tools for a secure
11             program, Cephalon relied on its
12             experience with implementing its Risk
13             Management Program for Actiq (end of
14             reading).
15        Do you see that?
16        A.    Yes.
17        Q.    Now, were you involved in developing
18   this Risk Management Program?
19        A.    For Fentora?
20        Q.    Yes, ma'am.
21        A.    I was -- I was not involved in its
22   final form.  I was involved in a committee that was
23   involved in writing sections of it in terms of what
24   other people decided that should be, you know, the --
25   putting things, what other people, said to paper,
```

Page 154

```
 1   drafting it --
 2        Q.    I see.
 3        A.    -- in certain sections.  Not all
 4   sections, but certain sections.
 5        Q.    Okay.  And then after this was
 6   approved by the FDA, did you believe yourself that
 7   you needed to comply with this Risk Management
 8   Program for Fentora?
 9        A.    Yes.
10        Q.    Okay.  If you go to page 15, there
11   are sections related to the strategy and tools
12   associated with these goals.
13        A.    Yes.
14        Q.    And it states, "Strategy and tools
15   associated with goal No. 1."  And goal No. 1 is that
16   Fentora should be used only by opioid-tolerant
17   patients with cancer.  It states:
18             (Reading) A variety of tools will be
19             used to communicate and reinforce the
20             message that Fentora should be used
21             only by opioid-tolerant patients with
22             cancer.  The tools have been designed
23             for specific purposes to be used as
24             part of an organized communications
25             campaign intended to influence
```

Page 155

```
 1             prescribers, pharmacists, and patients
 2             (end of reading).
 3        Do you see that?
 4        A.    Yes.
 5        Q.    And that is, in other words, Cephalon
 6   committing to use an educational program to influence
 7   physicians, pharmacists, and patients that the only
 8   patients that should use this drug have cancer;
 9   correct?
10        MR. JAMES:  Objection.
11        THE WITNESS:  That's what it states.
12   BY MR. CARTMELL:
13        Q.    The next paragraph states:
14             (Reading) From the outset, health-care
15             professionals will be alerted to the
16             risks of this new product through
17             product labeling and promotion.  They
18             will be educated about the product's
19             improved indication as well as about
20             the definition of opioid tolerant (end
21             of reading).
22        Correct?
23        A.    Correct.
24        Q.    The next paragraph talks about
25   "letters, visits, and assessments by field
```

Page 156

```
 1   representatives.  A Fentora website and targeted
 2   education and outreach programs directed to pain
 3   centers of excellence and professional societies."
 4        Do you see that?
 5        A.    Yes.
 6        Q.    And that's saying that all of these
 7   things will be used, these vehicles -- letters,
 8   visits to doctors' offices, websites, targeted
 9   education programs -- to specifically tell these
10   health-care providers that Fentora should only be
11   used by cancer patients who have breakthrough pain;
12   correct?
13        MR. JAMES:  Objection.
14        THE WITNESS:  To my knowledge, these -- that
15   is what it says.  And that's what was -- those things
16   were done.
17   BY MR. CARTMELL:
18        Q.    And then if you go to page -- I
19   apologize.  I apologize, but I skipped forward too
20   far.  I want to go back to page 12 and direct your
21   attention to the third paragraph down in the middle.
22   It talks about some of the education and vehicles
23   that the company is committing to do and utilize.  It
24   states:
25             (Reading) Using academic centers,
```

Page 157

1    professional societies and pain
2    centers of excellence -- pain centers
3    identified by Cephalon as having
4    excellent faculties and resources.
5    Additional education will be provided
6    through training and independent
7    continuing medical education.  Note:
8    CME programs will be conducted in
9    accordance with FDA and ACCME
10   guidelines (end of reading).
11       Were you involved actually in planning or
12   helping to plan continuing medical education programs
13   related to Fentora or Actiq?
14       A.    No.
15       Q.    (Reading) The importance of
16   interpersonal communication is based
17   not only on the need to provide
18   education to prescribers but also to
19   motivate behavioral adherence with the
20   screening process to assure only
21   appropriate patients are prescribed
22   Fentora (end of reading).
23       Do you see that?
24       A.    I see that.
25       Q.    And do you agree with that?

Page 158

1        A.    It is -- it is important to convey
2    what the label is.
3        Q.    Right.  And then the last sentence:
4        (Reading) Because physicians in
5    various localities may prefer to learn
6    via different methods, Cephalon will
7    work with pain centers of excellence
8    to provide teaching opportunities
9    consistent with the needs and
10   resources identified by each center
11   (end of reading).
12       Were you involved in that at all?
13       A.    No.
14       Q.    If you go to page 59, there's an
15   appendix that indicates the tools that Cephalon is to
16   employ and specifically related to physician
17   education targeted to members of professional
18   societies.  It says:
19       (Reading) Professional societies will
20   be contacted to offer educational
21   opportunities to learn about Fentora
22   and key messages and risks described
23   in the RiskMAP, including the risk for
24   misuse, abuse, and diversion.  The
25   educational platform for these

Page 159

1    offerings will be -- include symposia
2    at the professional societies'
3    meetings and teleconferences with
4    interested members (end of reading).
5        Do you see that?
6        A.    Yes.
7        Q.    Were you involved with that?
8        A.    No.
9        Q.    So that was not something that fell
10   within your purview?
11       A.    That's correct.
12       Q.    Okay.  Now, again, having gone
13   through now the Fentora Risk Management Program,
14   would you agree with me that Cephalon had entered
15   into an agreement, a Risk Management Program, and
16   committed to a Risk Management Program that was
17   designed to ensure, to the best of its ability, the
18   safe use of Fentora?
19       MR. JAMES:  Objection.
20       THE WITNESS:  That was the intent of the
21   Risk Management Program and the RiskMAP.
22   BY MR. CARTMELL:
23       Q.    And it was designed in part to
24   relieve concerns that the FDA had, and I'm sure
25   Cephalon had, about abuse and misuse and diversion

Page 160

1    and addiction related to Fentora, like any opioid;
2    correct?
3        A.    Like any opioid.
4        MR. JAMES:  Objection.
5    BY MR. CARTMELL:
6        Q.    And the primary way that Cephalon was
7    going to make sure that this product Fentora was used
8    by the appropriate patients, meaning those patients
9    who had cancer and breakthrough pain, was through the
10   tools, educations, letters, meetings with
11   professional societies, and sending those messages in
12   a redundant manner to make sure they understood;
13   correct?
14       MR. JAMES:  Objection.
15       THE WITNESS:  I'm not sure I understand your
16   question.
17   BY MR. CARTMELL:
18       Q.    The Fentora Risk Management Program
19   makes it clear that Cephalon is committing to use
20   various tools, including letters, performing
21   education programs, meeting with professional
22   societies, those types of things to ensure that they
23   know that Actiq -- excuse me, that Fentora and the
24   appropriate patients for the use of Fentora were
25   cancer patients with breakthrough pain; correct?

Page 161

1       MR. JAMES:  Objection.
2       THE WITNESS:  Correct.
3            (Exhibit No. 9 was marked.)
4   BY MR. CARTMELL:
5       Q.   I'm going to hand you what has been
6   marked as Exhibit 9.  And I just want to ask you a
7   quick question -- I'm not going to ask you in detail
8   about this right now.  But I want to ask you a quick
9   question about the first page of the memorandum, if
10  you turn the cover, which is a memorandum dated
11  April 26, 2008.  Do you see that?
12      A.   Yes.
13      Q.   And first let me ask you this:  You
14  were aware Cephalon at some point had asked the FDA
15  if the indication for Fentora could be broadened to
16  include treatment of not just cancer pain but other
17  types of chronic pain; correct?
18      A.   Yes.  After conducting three
19  randomized placebo-controlled clinical trials.
20      Q.   Okay.  And I think that happened in
21  something like 2006 or '07; is that right?
22      A.   I don't recall the exact dates.  But
23  that sounds approximately right.
24      Q.   Okay.  And, as you said, the company
25  Cephalon at that time submitted, I think you said,

Page 162

1   there were placebo-controlled trials; correct?
2       A.   That's correct.
3       Q.   To the FDA; right?
4       A.   That's correct.
5       Q.   And the FDA ultimately -- and we will
6   talk about this later -- said that although it
7   believed that Fentora might be efficacious for
8   treatment of other pain conditions, like back pain
9   and other chronic pain conditions, it did not believe
10  that Fentora could be used necessarily safely with
11  respect to abuse and misuse and diversion; correct?
12      MR. JAMES:  Objection.
13      THE WITNESS:  I don't remember the exact
14  language that the FDA used.
15  BY MR. CARTMELL:
16      Q.   At any rate, you recall, I suspect,
17  that the FDA denied Cephalon's request to expand the
18  indication; correct?
19      A.   That is correct.
20      Q.   Okay.  This is a memo from the
21  Director of the Division of Anesthesia and
22  Analgesia & Rheumatology Projects, Bob Rappaport; do
23  you see that?
24      A.   Yes.
25      Q.   And this has to do with the company's

Page 163

1   request to expand the indication beyond cancer pain.
2   And I want to focus your attention on the first
3   paragraph.  It states:
4            (Reading) Fentora was approved in 2006
5            for the treatment of breakthrough pain
6            in patients with cancer who already
7            treated with around-the-clock opioids.
8            Actiq, approved for the same
9            indication in 1998, was the first oral
10           transmucal fentanyl product developed
11           for this indication."  Do you see
12           that.
13      A.   Yes.
14      Q.   That's just a little bit of history
15  that we talked about.  Actiq came first, and it was
16  only for cancer pain, breakthrough cancer pain;
17  Fentora came second, and it was only for breakthrough
18  cancer pain; correct?
19      A.   Correct.
20      Q.   Then it says, "Actiq is a lozenge
21  that is presented on a stick making it easily
22  removable from the mouth, while Fentora is a lozenge
23  without a stick."  It as a tablet; right?
24      A.   That's correct.
25      Q.   "Because approval of these products

Page 164

1   represented availability of fentanyl without the
2   necessity of intravenous access, FDA had numerous
3   discussions with the sponsors during the development
4   of the products to address our concerns regarding the
5   potential for abuse and misuse, and the potential for
6   accidental exposure to these formulations."
7            Do you see that?
8       A.   I see that.
9       Q.   And when it refers to numerous
10  discussions with the sponsors, the sponsor is
11  Cephalon; correct?
12      A.   That's correct.
13      Q.   For Fentora?
14      A.   And the Risk Management Program and
15  the risk maps were intended to address those very
16  concerns.
17      Q.   Right.  And it states, "In order to
18  prevent abuse and misuse, an accidental exposure to
19  Actiq and Fentora, particularly by children, rigorous
20  Risk Management Programs were included as part of the
21  approval of the products"; right?
22      A.   That's correct.
23      Q.   We just went through those programs,
24  didn't we?
25      A.   That's right.

Page 165

1    Q.    "These Risk Management Programs were
2  designed to limit the prescribing of these products
3  to opioid-tolerant patients with breakthrough pain
4  from cancer with the intent that this would limit the
5  overall prescribing of the medication and perhaps
6  limit the amount of diversion for abuse and the
7  number of accidental exposures."
8      Do you see that?
9    A.    I see that.
10    Q.    In one sentence the FDA used three
11  times the word "limit."  Do you see that?
12    A.    I do see that.
13    Q.    And what the FDA is expressing there
14  is that when it put these Risk Management Programs in
15  place to govern the use of Actiq and Fentora, it was
16  trying to make sure that there was limited use of the
17  products only to cancer patients; correct?
18    A.    We had --
19    MR. JAMES:  Objection.
20    THE WITNESS:  We had 0.2 percent of the
21  marketplace.  Our product was in a very different
22  place than other opioid products.
23    MR. CARTMELL:  I'm going to object and move
24  to strike that.  And ask the question again.
25  That's -- that's not responsive to this question.

Page 166

1  And we will talk about that.  But let me ask the
2  question again.
3    Q.    And what the FDA is expressing there
4  is that when it put these Risk Management Programs in
5  place to govern the use of Actiq and Fentora, it was
6  trying to make sure that there was limited use of
7  these products only to cancer patients; correct?
8    MR. JAMES:  Objection.
9    THE WITNESS:  That's what it states here.
10  BY MR. CARTMELL:
11    Q.    All right.  We will come back to this
12  document later, but I want to move on.
13    MR. JAMES:  If you're at a breakpoint, I
14  think we've been going an hour.
15    MR. CARTMELL:  Okay.
16    MR. JAMES:  Take a quick break.
17    THE VIDEOGRAPHER:  We are going off the
18  record.  The time is 1:44 p.m.
19    (Recess taken.)
20    THE VIDEOGRAPHER:  We are back on the
21  record.  The time is 1:57 p.m.
22  BY MR. CARTMELL:
23    Q.    Ms. Beckhardt, we're back on the
24  record after a short break.  Are you ready to
25  proceed?

Page 167

1    A.    Yes.
2    Q.    We're talking about Exhibit 9, which
3  is the FDA's memo from the Director, Bob Rappaport.
4  And specifically we're talking about this highlighted
5  sentence where it states that:
6      (Reading) the Risk Management Plans
7      were designed to limit the prescribing
8      of these products, with the intent
9      that this would limit the overall
10      prescribing of the medication (end of
11      reading).
12    Would you agree with me that that is talking
13  about limiting the prescribing to cancer patients?
14    A.    That's what it states, yes.
15    Q.    And then it's talking about, by
16  limiting this prescribing to cancer patients, it had
17  the intent that this would then limit the overall
18  prescriptions of the medication; right?
19    MR. JAMES:  Objection.
20    THE WITNESS:  That's what it states here.
21  BY MR. CARTMELL:
22    Q.    And you will recall, we looked at
23  that email from your contemporary Terrence Terifay,
24  remember that?
25    A.    Yes.

Page 168

1    Q.    Where he stated that the bottom line
2  is, as we all know, greater availability of a drug
3  directly correlates to the abuse and diversion.  And
4  we agreed that that makes sense; correct?
5    A.    Yes.
6    Q.    And so what the FDA is stating here
7  is that they have that same concern, that they wanted
8  this drug -- or these drugs, Actiq and Fentora, to be
9  limited to cancer patients because their concern was
10  if it wasn't limited, it would be more available.
11  And then it says specifically that could lead to more
12  abuse and misuse and diversion; correct?
13    MR. JAMES:  Objection.
14    THE WITNESS:  It states that perhaps it
15  could limit.
16  BY MR. CARTMELL:
17    Q.    And you agree with that; correct?
18    A.    With that qualifier, yes.
19    Q.    Okay.  All right.  Now, it's pretty
20  clear that the FDA wanted Cephalon to keep pretty
21  tight reins on these drugs; correct?
22    MR. JAMES:  Objection.
23    THE WITNESS:  I think that's not a question
24  for me.  That's a question for FDA, what their intent
25  was.  It's clear that the risk -- we had Risk

Page 169

1    Management Programs.
2         BY MR. CARTMELL:
3         Q.    Okay.  And all I'm really getting at
4    is what we just looked at it.  It gave the history of
5    Actiq, it gave the history for Fentora, and then it
6    said for both of them we had Risk Management Programs
7    that were intended to limit the number of
8    prescriptions to those people that only had cancer;
9    right?
10         MR. JAMES:  Objection.
11         THE WITNESS:  To limit the prescribing to
12    people with cancer.
13         BY MR. CARTMELL:
14         Q.    Right.  And so would you agree with
15    me, based on those Risk Management Programs, that
16    Cephalon had committed to the FDA that it was going
17    to try to ensure that that was the case?
18         MR. JAMES:  Objection.
19         THE WITNESS:  That's what these documents
20    state.
21         BY MR. CARTMELL:
22         Q.    Okay.  Now, but it's true, is it
23    not --
24         Are you okay?  You have got water?
25         MS. HUDNALL:  Yes.

Page 170

1         BY MR. CARTMELL:
2         Q.    Ms. Beckhardt, the truth is that even
3    though the FDA wanted to restrict and limit the use
4    of Actiq and Fentora, Cephalon wanted the opposite;
5    isn't that true?
6         MR. JAMES:  Objection.
7         THE WITNESS:  I -- I -- I don't believe that
8    that's a fair characterization.
9         BY MR. CARTMELL:
10         Q.    It's true that Cephalon wanted the
11    opposite of what it told the FDA; it wanted to
12    maximize the use of these drugs, the prescriptions of
13    these drugs in all kinds of patient conditions,
14    correct?
15         A.    No.
16         MR. JAMES:  Objection.
17         THE WITNESS:  That's not correct.
18         BY MR. CARTMELL:
19         Q.    It's true that Cephalon wanted to
20    maximize these drugs for use in all kinds of pain
21    conditions because it wanted to maximize profits;
22    correct?
23         MR. JAMES:  Objection.
24         THE WITNESS:  That's not true.
25         (Exhibit No. 10 was marked.)

Page 171

1         BY MR. CARTMELL:
2         Q.    I'm going to hand you what has been
3    marked as Exhibit 10.  As you can see, Ms. Beckhardt,
4    Exhibit 10 is a Fentora strategic marketing plan from
5    2007; do you see that?
6         A.    Yes.
7         Q.    And this was produced from the files,
8    internal files at Teva.  And I'd like to ask you a
9    few questions about this.  But this -- strike that.
10         This PowerPoint starts out with -- or
11    includes a -- what's called a -- I'm sorry.  I'm in
12    the wrong place.  Let me start over.
13         Ms. Beckhardt, this PowerPoint, Fentora
14    presentation from 2007, has a market analysis
15    included in it at page 13 and several pages before
16    that.  Do you see that?
17         A.    Yes.
18         Q.    This is a market analysis, and it
19    states, "Overall Market Attractiveness," at the top.
20    Do you see that?
21         A.    Yes.
22         Q.    And for the jury's sake, when you're
23    talking about a market, what are you talking about?
24         MR. JAMES:  Objection.
25         THE WITNESS:  Market is the -- the universe

Page 172

1    of -- of potential prescribers.  But the universe
2    does not necessarily include the prescribers that you
3    would market to.
4         BY MR. CARTMELL:
5         Q.    Right.  So -- and it's -- it's
6    actually -- I think you meant to say this, but the
7    market is the universe of patients actually that
8    could be prescribed the drug; correct?
9         A.    This is not a product that you market
10    to -- direct to patients.  The actual market are the
11    prescribers.
12         Q.    Okay.  But when you -- when you look
13    at this analysis, for instance, this has a chart, as
14    you can see, that includes the number of patients --
15         A.    Right.
16         Q.    -- right?  And the conditions across
17    the bottom of it that exist in the potential market;
18    right?
19         MR. JAMES:  Objection.
20         BY MR. CARTMELL:
21         Q.    Do you see that?
22         A.    It says it -- that exists within the
23    context of the chronic pain market.
24         Q.    Okay.  So let's talk about this --
25    this page of this PowerPoint in 2007.  It states:

## Page 173

1          (Reading) Chronic pain market has
2              significant potential due to high
3              prevalence (end of reading).
4      Do you see that?
5          A.   Yes, I see that.
6          Q.   Okay.  And "significant potential due
7   to high prevalence."  This is saying that the market
8   for all chronic pain -- significant potential means a
9   lot of potential for prescriptions; right?
10         MR. JAMES:  Objection.
11         THE WITNESS:  These were not -- the
12  implication of this has nothing to do with
13  prescriptions for chronic pain.  This is a -- this is
14  a market analysis of potential patients who have
15  breakthrough pain, not which is, as I mentioned
16  before, a kind of chronic pain.  But the intent was
17  never to treat just chronic pain.
18  BY MR. CARTMELL:
19         Q.   Okay.  I understand that.  Let me see
20  if I understand this analysis, Ms. Beckhardt, and see
21  if you can explain this to the jury.
22         It says:
23             (Reading) Chronic pain market has
24             significant potential due to high
25             prevalence (end of reading).

## Page 174

1          What does that mean?
2          MR. JAMES:  Objection.
3          THE WITNESS:  What this chart is showing are
4   the proportion of people with different conditions
5   who are treated with opioids already around the
6   clock.
7   BY MR. CARTMELL:
8          Q.   Okay.  And so this includes the whole
9   market, if you included all chronic pain conditions;
10  is that right?
11         A.   No.
12         Q.   Okay.  This includes just some of
13  those conditions; correct?
14         MR. JAMES:  Objection.
15         THE WITNESS:  Yes.
16  BY MR. CARTMELL:
17         Q.   And what is the condition on this
18  chart that Fentora is indicated for?
19         A.   Cancer pain.
20         Q.   Okay.  So if we look at the left side
21  of this chart, that's being -- it's got a square
22  around it right now -- that is the group of patients
23  that Fentora was indicated for; correct?
24         MR. JAMES:  Objection.
25         THE WITNESS:  According to the approved

## Page 175

1   indication, yes.
2   BY MR. CARTMELL:
3          Q.   Okay.  And it looks like, if you look
4   at prevalence, that means -- prevalence is the number
5   of patients; right?
6          A.   Yes.
7          Q.   And that's like -- it doesn't look
8   like it's even --
9          A.   It's not -- prevalence is the -- if I
10  recall the definition -- is the number of new
11  patients.
12         Q.   Okay.  So the cancer number of new
13  patients at this time, according to this chart, it
14  looks like is about half of two million people; is
15  that right?
16         A.   I -- I suppose.  I can't -- I can't
17  read it clearly.
18         Q.   Okay.  And then there's these other
19  conditions that Fentora is not indicated for;
20  correct?
21         A.   That's correct.
22         Q.   In other words, the FDA has not said
23  that it's safe and effective for the use of back pain
24  or arthritic pain or neuropathic pain or headache;
25  correct?

## Page 176

1          A.   That's correct.  But these are all
2   patients who are treated with opioids around the
3   clock, a substantial portion of them.
4          Q.   Right.  But they're -- they're not
5   treated with fentanyl-based opioids that are only
6   approved for breakthrough pain in cancer patients;
7   correct?
8          MR. JAMES:  Objection.
9          THE WITNESS:  I -- there are some of those
10  patients who very well may have been prescribed
11  breakthrough pain medications, because the -- because
12  it was an appropriate medical prescription because
13  they were -- at the doctor's discretion, not the
14  company's discretion, because those patients were
15  opioid tolerant.
16  BY MR. CARTMELL:
17         Q.   Okay.  So if you look at, for
18  example, back pain.  The prevalence of back pain
19  patients, who are potentially treated with -- or
20  strike that.
21         The prevalence of back pain patients, it
22  looks like, is more like nine million patients;
23  correct?
24         A.   Not the -- it's the -- that would be
25  number of patients, not prevalence, but the number of

## Page 177

1  patients -- I'm not sure if it's prevalence or
2  incidence -- who were treated with opioids around the
3  clock, yes.
4       Q.   Okay.  And then if you look at
5  arthritis pain, the number of patients -- and I think
6  it is prevalence on the left because it's the red
7  color -- is more like, you know, 11 million patients;
8  correct?
9       A.   Oh, the prevalence.  Okay.
10      Q.   Neuropathic pain is almost ten
11 million patients; right?
12      A.   Yes.
13      Q.   Headache is over ten million
14 patients; isn't it?
15      A.   Yes.
16      Q.   So the number of cancer pain patients
17 is way, way less than the number of back pain
18 patients or arthritis pain patients or neuropathic
19 pain patients or headache pain patients; right?
20      MR. JAMES:  Objection.
21      THE WITNESS:  Because there's -- there are
22 fewer cases, thank goodness, of cancer than some of
23 these other more common conditions.
24 BY MR. CARTMELL:
25      Q.   Right.  So if the company was going

## Page 178

1  to just limit its prescriptions or if it was going to
2  only limit -- strike that.
3       So if Fentora was limited to only use in
4  cancer pain patients, the number of prescriptions
5  would be much, much less than if it expanded into,
6  for, say -- for example, back pain; correct?
7       A.   I can't say that.
8       Q.   What about if you expand it into
9  arthritis pain?
10      A.   I can't say that because I don't know
11 what the -- I do not recall what the proportions of
12 cancer pain -- how -- how far into the market we got.
13 I just don't recall.
14      Q.   When this slide says, "Chronic pain
15 market has significant potential due to high
16 prevalence," this is talking about the entire group
17 of cancer pain, back pain, arthritis pain,
18 neuropathic pain, and headache pain; correct?
19      A.   That's correct.
20      Q.   And when it's talking about the
21 entire group, all of those, other than cancer pain,
22 would be prescriptions for Fentora that would be off
23 label; correct?
24      A.   This does not suggest that that it's
25 prescriptions for Fentora.

## Page 179

1       Q.   Let me back up.  And I will move to
2  strike that and ask it again.
3       And when it's talking about the entire
4  group, all those other groups, other than cancer pain
5  listed here, would be prescriptions for Fentora that
6  would be off label; correct?
7       MR. JAMES:  Objection.
8       THE WITNESS:  This does not talk about
9  prescription.  It talks about the number of people
10 who are treated with opioids within a particular
11 community of patients.  It does not say anything
12 about numbers of prescriptions.
13 BY MR. CARTMELL:
14      Q.   This is talking about what is our
15 potential market to sell Fentora to; correct?
16      A.   Yes.
17      Q.   Okay.
18      A.   But that's not the question you asked
19 me.
20      Q.   Let's get down to what this is
21 talking about.
22      Ms. Beckhardt, this chart is talking about
23 what is the potential market to possibly sell Fentora
24 to; correct?
25      A.   That's correct.

## Page 180

1       Q.   And it's not just including cancer
2  pain, but it's including back pain, arthritis pain,
3  neuropathic pain, and headache pain; correct?
4       A.   They are indicating that that's part
5  of the marketplace, yes.
6       Q.   Right.  But everything other than
7  cancer pain on this, if in fact these people were
8  prescribed -- and I know it's a doctor's decision --
9  Fentora, those would be off-label usage; correct?
10      A.   That's correct.
11      Q.   Okay.  And if, in fact, the company
12 was able to prescribe to all of these off-label
13 indications on there -- back pain, arthritis pain,
14 neuropathic pain, headache pain -- it's possible, is
15 it not, that as it says here, the chronic pain market
16 would have significant potential; correct?
17      MR. JAMES:  Objection.
18      THE WITNESS:  The -- the market that was
19 being looked at was the market of people who were
20 already treated with opioids.  And, yes, that would
21 have expanded the market.  But it's not expanding it
22 to the extent of the prevalence of these conditions.
23      It's -- they were looking at this red, not
24 the orange square, in terms of people who are already
25 opioid tolerant.

Page 181

1    BY MR. CARTMELL:
2        Q.   I understand what you're saying.  So
3    let's make that clear for the jury.
4            What this is looking at is really how big
5    the market would be if you just considered the
6    individuals in each of these conditions who was
7    already being treated with opioids; correct?
8        A.   That's correct.
9        Q.   And so that's the red -- the red on
10   the right side of each of these; correct?
11       A.   Correct.
12       Q.   Okay.  And right now, if you just
13   limited it to cancer pain, it would be what's being
14   circled for the jury right now on the right side, of
15   cancer pain; correct?
16       A.   Yes.
17       Q.   But what this is talking about, if
18   you expanded the usage into back pain, arthritis
19   pain, neuropathic pain, and headache pain, you could
20   increase the usage potentially that much; correct?
21       MR. JAMES:  Objection.
22       THE WITNESS:  You could potentially increase
23   the usage in opioid-tolerant patients if a doctor
24   decided it was the appropriate prescription.
25   ///

Page 182

1    BY MR. CARTMELL:
2        Q.   Right.  And we've circled how much --
3    what you're saying is how much potentially the market
4    would grow if you expanded the usage of Fentora into
5    those other conditions; correct?
6        A.   I think the critical word there is
7    potential.
8        Q.   Right.
9        A.   Because that did not happen.
10       Q.   And so what this is talking about
11   when it says that there's significant potential, is
12   what we have circled here in the "Other Conditions"?
13   That's the significant potential growth, is under
14   each of those?  The ones that are treated with
15   around-the-clock opioids, we could add prescriptions
16   potentially that much; correct?
17       MR. JAMES:  Objection.
18       THE WITNESS:  Potentially, yes.
19   BY MR. CARTMELL:
20       Q.   And adding prescriptions potentially
21   that much, by thousands and thousands of people, if
22   that happened, that increases profits; correct?
23       MR. JAMES:  Objection.
24       THE WITNESS:  If you sell more product, any
25   product, you're going to increase profit.  It doesn't

Page 183

1    matter whether it's a medicine or a box of tissues.
2    BY MR. CARTMELL:
3        Q.   More sales goes to the bottom line?
4        A.   More sales goes to the bottom line,
5    yes.
6        Q.   And that was something that Cephalon
7    was interested in, was more prescriptions in other
8    indications outside of cancer; correct?
9        MR. JAMES:  Objection.
10       THE WITNESS:  I can't -- I can't speak to
11   that.  I was not in the Marketing Department.  So I
12   am aware there was usage, but I'm not -- I can't say
13   that that was the intent of the company.
14   BY MR. CARTMELL:
15       Q.   Well, you, in fact, have said, have
16   you not, that if you expanded the usage outside of
17   just cancer, that would increase the market
18   dramatically; correct?
19       MR. JAMES:  Objection.
20       THE WITNESS:  It would increase the market,
21   yes.
22           (Exhibit No. 11 was marked.)
23   BY MR. CARTMELL:
24       Q.   Let me hand you what's marked
25   Exhibit 11.  Exhibit 11 is an article in something

Page 184

1    called TheStreet.  Do you see that?
2        A.   Yes.
3        Q.   What's "TheStreet"?
4        A.   It's a journal that is primarily
5    intended for the investor community.
6        Q.   Right.  This is like talking about
7    stocks and bonds; it's one of those types of
8    journals, correct?
9        A.   Yes.
10       Q.   And investment in companies, and that
11   sort of thing; correct?
12       A.   That's correct.
13       Q.   And this title of this article is,
14   "Cephalon eyes new Fentora use:  The company hopes
15   the cancer pain drug can be used for broader
16   indications."
17           Do you see that?
18       A.   Yes.  And this is when we were doing
19   clinical trials, and it was before the FDA decision,
20   to the best of my memory.
21       MR. CARTMELL:  Object and move to strike
22   everything after "yes."  I will ask it one more time.
23       Q.   And this title -- strike that.
24           Okay.  And the title of this article is,
25   "Cephalon eyes new Fentora use.  The company hopes

Page 185

1    the cancer pain drug can be used for broader
2    indications."  Do you see that?
3        A.    Yes.
4        Q.    Okay.  It states, "Cephalon," and
5    then is that the stock symbol next to it, "CEPH"?
6        A.    Yes.
7        Q.    And that's because this is something
8    that's in an investment type --
9        A.    Correct.
10       Q.    -- of journal?  It's talking to
11   investors, things like that?
12       A.    It's more like a magazine, yes.
13       Q.    (Reading) Cephalon reported
14             encouraging reports from a clinical
15             trial designed to determine if the
16             cancer pain drug Fentora could be used
17             for broader indications.  As a result,
18             the Frazer, Pennsylvania based drug
19             maker expects to seek regulatory
20             approval during a third quarter for
21             Fentora to treat jolts of intense
22             discomfort, referred to as
23             breakthrough pain, in people with
24             chronic nerve pain (end of reading).
25       Do you see that?

Page 186

1        A.    Yes.
2        Q.    Now, this is in January of 2007;
3    correct?
4        A.    Yes.
5        Q.    At this time, in January of 2007, the
6    FDA had only approved Fentora for use in cancer pain,
7    breakthrough cancer pain; correct?
8        A.    Yes.  But clinical trials were
9    underway, were completed.
10       Q.    But my question is not that.  But my
11   question is:  At this time, in January of 2007, is it
12   not true that the indication for this drug
13   Fentora was for breakthrough cancer pain; correct?
14       A.    That is correct.  But this particular
15   article is referring to results from a clinical
16   trial.
17       Q.    I understand that.  My point is
18   simply, there is no indication at this time for your
19   drug Fentora to be used in anything other than
20   cancer; correct?
21       MR. JAMES:  Objection.
22       THE WITNESS:  That's the indication.
23   BY MR. CARTMELL:
24       Q.    Right.  And the FDA had never said it
25   was safe and effective to use Fentora for anything

Page 187

1    other than breakthrough cancer pain as of this time
2    in January of 2007; correct?
3        MR. JAMES:  Objection.
4    BY MR. CARTMELL:
5        Q.    Is that correct?
6        A.    It is correct.  But this is based on
7    clinical trial results, not FDA statements.
8        MR. CARTMELL:  Okay.  I will object and move
9    to strike everything after, "It is correct."
10       Q.    It then states that:
11             (Reading) The Food and Drug
12             Administration approved Fentora for
13             treating breakthrough pain which the
14             company says can last from 3 minutes
15             to 60 minutes in cancer patients who
16             are taking and can tolerate strong
17             narcotic painkillers (end of reading).
18             And then it talks about how Fentora carries
19   a black box warning, the FDA's strongest safety
20   alert, about the potential for abuse.
21       Do you see that?
22       A.    Yes.
23       Q.    (Reading) The drug contains the
24             narcotic fentanyl and it has the same
25             abuse warning as methadone and

Page 188

1             morphine (end of reading).
2             Right?
3        A.    Yes.
4        Q.    And then you were quoted
5    specifically, and you say:
6             (Reading) The market potential for
7             treatments other than for cancer pain
8             is, quote, quite large (end of
9             reading).
10       Do you see that?
11       MR. JAMES:  Objection.
12       THE WITNESS:  Yes, I see that.
13   BY MR. CARTMELL:
14       Q.    And when you're talking about the
15   market potential being quite large, you're talking
16   about a bigger market for indications other than
17   cancer?  It's a quite large market; right?
18       MR. JAMES:  Objection.
19       THE WITNESS:  The market, as -- if you
20   continue this quote, it indicates two to three
21   million people.
22   BY MR. CARTMELL:
23       Q.    Okay.  So -- and we will get to that.
24   When you say "it's quite large," the market, you're
25   talking about the potential for treatment other than

## Page 189

1  cancer pain; correct?

2      A.  Correct.  In the context of the

3  clinical trials.

4      Q.  Okay.

5      A.  That were being conducted.

6      Q.  Well, this is in the context of

7  January 8th, 2007, when the FDA had not said that

8  your drug had an indication or was safe and effective

9  for use for anything other than back -- or excuse me,

10  cancer pain?

11      A.  Correct.  But this statement that I

12  made talks about market potential, and it is based on

13  clinical trial results.

14      Q.  We will get to that.  You say then:

15        (Reading) Stacey Beckhardt, a Cephalon

16        spokesman, said Monday -- and then it

17        states -- the company estimates that

18        the cancer pain market includes

19        800,000 people (end of reading).

20  Do you see that?

21      A.  Yes.

22      MR. JAMES:  Objection.

23  BY MR. CARTMELL:

24      Q.  (Reading) Cephalon says the number

25        of people with moderate to severe

## Page 190

1  chronic pain conditions, such as

2        neuropathic pain or back pain, could

3        be two million to three million people

4        (end of reading).

5  Do you see that?

6      A.  Yes.

7      Q.  So what you're saying here to the

8  people who are reading this, the investors, potential

9  investors who are reading this, is that if the FDA

10  just approves your supplemental application for

11  neuropathic pain and treatment of back pain, and

12  things like that, you can triple to almost quadruple

13  the market; correct?

14      MR. JAMES:  Objection.

15      THE WITNESS:  We could increase the market

16  based on those indications if the FDA approved it,

17  because it was based on clinical trials that we did

18  specifically in those indications.

19  BY MR. CARTMELL:

20      Q.  Okay.  I understand.  But let's just

21  make it clear to the jury:  The FDA was given those

22  clinical trials and the FDA denied your application;

23  correct?

24      A.  The FDA also said that the product

25  was efficacious in those conditions.

## Page 191

1      Q.  Yeah, but it said they couldn't

2  approve it because they couldn't be convinced that it

3  was safe as far as whether there would be abuse,

4  misuse, and diversion; correct?

5      A.  That is what the Agency stated.

6      Q.  Okay.  But what you're saying to

7  investors here is, we're going to try to get a

8  broader indication.  We're going to try to get the

9  FDA to allow us to prescribe this to not only cancer

10  patients, because the cancer pain market is only

11  800,000 people -- but if we can now sell it to back

12  pain patients, and we can sell it potentially to

13  neuropathic pain patients, we could possibly have a

14  market of two to three million people; correct?

15      MR. JAMES:  Objection.

16      THE WITNESS:  We also know that 74 percent

17  of those patients experience breakthrough pain.

18      MR. CARTMELL:  Okay.  I'm going to object

19  and move to -- see what's happening here is you're

20  just trying to insert what you want to say.  And I'm

21  fine, but you've got to answer the questions I'm

22  asking.  And your counsel will get a chance to ask

23  you questions after that.  Okay?

24      So let me restate my question real quick.

25  And I'm not trying to be aggressive or mean.  But I

## Page 192

1  just want to make sure the record is clear on answers

2  to my questions.

3      Q.  But what you're saying to investors

4  here is, we're going to try to get the FDA to allow

5  us to prescribe this to not only cancer patients --

6  because the cancer pain market is only 800,000

7  people -- but if we can now sell it to back pain

8  patients and we can sell it potentially to neuro pain

9  patients, we could possibly have a market of two to

10  three million people; correct?

11      A.  Correct.

12      MR. JAMES:  Objection.

13  BY MR. CARTMELL:

14      Q.  And that's four times the size of the

15  cancer pain market; correct?

16      MR. JAMES:  Objection.

17      THE WITNESS:  Not four times by my math.  It

18  is larger, but it's not four times by my math.

19  BY MR. CARTMELL:

20      Q.  It's almost four times.  It's between

21  three and four times; is that fair?

22      A.  Yes.

23      Q.  Okay.  Ms. Beckhardt, I want to talk

24  to you about back in early 2000s, when you were

25  involved sometimes with marketing and with the PR of

## Page 193

1 the narcotic Actiq.
2 Q. Do you recall at that time that you would do
3 an annual PR strategy document?
4 A. That's correct.
5 Q. Okay. And the Marketing Department
6 would also do annual marketing plans; is that right?
7 A. That's correct.
8 Q. And I noticed from the internal
9 documents that were produced from your custodial file
10 that you were on the team that would actually review
11 the drafts of the marketing plans as they were being
12 developed?
13 A. I did not have a -- I was on the
14 teams, but I did not approve the marketing plan.
15 Q. I understand. I should have said,
16 and I apologize, you were on the team that would
17 review the drafts of the marketing plan; correct?
18 A. I would see the drafts, yes.
19 Q. And also from time to time you would
20 be asked by the Marketing Department to contribute to
21 and write a portion of those plans; correct?
22 A. Related to my responsibilities and
23 public relations.
24 Q. Right. And the marketing plans for
25 the company, even though you weren't in the Marketing

## Page 194

1 Department, actually incorporated your PR strategy
2 into the marketing plans; correct?
3 A. It was a cross-functional plan. So
4 yes.
5 Q. And early on with Actiq, Cephalon had
6 a strategy, a marketing strategy, related to trying
7 to convince doctors to prescribe Actiq for not only
8 cancer pain but also for all types of other pain,
9 like headaches or migraines or back pain or chronic
10 pain; correct? Do you remember --
11 MR. JAMES: Objection.
12 THE WITNESS: No, I do not remember. And
13 what I do remember is that there was not any effort
14 ever to prescribe to just chronic pain patients who
15 were --
16 MR. CARTMELL: Okay. I'm going to object to
17 the answer after you don't remember. And I will ask
18 it again.
19 Q. And early on with Actiq, Cephalon had
20 a strategy, a marketing strategy, that related to
21 trying to convince doctors to prescribe Actiq for not
22 only cancer pain but also for all types of other
23 pain, like headaches or migraines or back pain or
24 chronic pain; correct?
25 A. I don't recall.

## Page 195

1 MR. JAMES: Objection.
2 BY MR. CARTMELL:
3 Q. You do recall -- and we've just
4 looked at -- that the company told the FDA that it
5 would do its best and take reasonable steps to ensure
6 that Actiq was only used in the intended group of
7 cancer patients; correct?
8 A. That's correct.
9 (Exhibit No. 12 was marked.)
10 BY MR. CARTMELL:
11 Q. I'm going to hand you what has been
12 marked as Exhibit 12, which is an internal marketing
13 plan that was produced to us from the internal files
14 in this litigation. And this is the Actiq 2002
15 marketing plan.
16 I want to go through this with you. But I
17 noticed from documents in your file that, in fact,
18 you contributed in part to drafting the public
19 relations sections of this document; would that be
20 consistent with your memory?
21 A. I don't remember. But it would be
22 consistent with what likely would have happened.
23 Q. Okay. And on the front it talks
24 about -- or it mentions P. Andrew Pyfer, Product
25 Manager, Actiq; correct?

## Page 196

1 A. Yes.
2 Q. Who was Mr. Pyfer? When it says,
3 "Product manager," where was he on the totem pole as
4 far as the Actiq team?
5 A. He was the marketer, head marketer,
6 for Actiq at that time.
7 Q. So did he have direct reports to him?
8 A. At that time, no. But subsequently,
9 yes.
10 Q. Okay. So we're in 2002. And Actiq
11 has been on the market for, at the time this was
12 drafted, probably not even a year; correct? Or
13 strike that.
14 We're in 2002. And as of this time,
15 Cephalon has only been selling Actiq probably for
16 less than a year; is that right?
17 A. That would be correct.
18 Q. And this marketing plan has included
19 in it marketing strategies that the company had;
20 correct?
21 A. Yes.
22 Q. And it also has marketing tactics
23 that the company intends to use; correct?
24 MR. JAMES: Objection.
25 THE WITNESS: It has a summary of tactics.

Page 197

1    BY MR. CARTMELL:
2        Q.    Let's look actually at the inside
3    cover.  There's the table of contents.  Do you see
4    that?
5        A.    Yes.
6        Q.    And you see that there's things like
7    SWAT analysis, key marketing issues and development
8    needs; right?
9        A.    Yes.
10       Q.    Product vision and positioning; do
11   you see that?
12       A.    Yes.
13       Q.    What does it mean to position a
14   product?
15           MR. JAMES:  Objection.
16           THE WITNESS:  Positioning relates to
17   putting -- explaining to the marketplace what a
18   product is.
19   BY MR. CARTMELL:
20       Q.    And then it talks about the marketing
21   and promotional strategy, as we talked about; right?
22           MR. JAMES:  Objection.
23   BY MR. CARTMELL:
24       Q.    Do you see that?
25       A.    Yes.

Page 198

1        Q.    And then there's the tactical plan
2    that's going to go along -- those are the tactics
3    that will be used by the company to enforce the
4    strategy; is that right?
5        A.    Tactics to support the strategy, yes.
6        Q.    And will you agree with me,
7    Ms. Beckhardt, that this is the document that was
8    produced by the Marketing Department on a yearly
9    basis; right?
10       A.    This is a document -- there were
11   documents on a yearly basis.  They did not always
12   look like this.
13       Q.    Okay.  But as far as a marketing
14   plan -- and I think it changed later to a brand plan;
15   is that right?
16       A.    Brand plan.  Changed format.  Changed
17   some of the information that was included, yes.
18       Q.    But if -- if we wanted to go to the
19   document in the files at Cephalon that would tell us
20   what the strategy Cephalon had to market and promote
21   Actiq, this is the document we would go to; correct?
22           MR. JAMES:  Objection.
23           THE WITNESS:  It's a document that the
24   marketers produced.
25   ///

Page 199

1    BY MR. CARTMELL:
2        Q.    Right.  And this is sort of the
3    playbook of the strategy and the tactics that are
4    going to be used to promote Actiq for that year?
5            MR. JAMES:  Objection.
6            THE WITNESS:  For that year, yes.
7    BY MR. CARTMELL:
8        Q.    Now, this is confidential; is it not?
9        A.    Marketing plans are confidential.
10       Q.    Who gets to see these marketing plans
11   within the company?
12           MR. JAMES:  Objection.
13           THE WITNESS:  Who gets to see -- in terms
14   of -- I'm not sure I understand what you're --
15           MR. CARTMELL:  That was a bad question.
16       Q.    Are there certain people who get to
17   review these and certain people who don't?
18           MR. JAMES:  Objection.
19           THE WITNESS:  Yes.  I mean, you're not going
20   to have the entire company review your marketing
21   plan.  And it would be distributed to those people
22   who have expertise in marketing or expertise in a
23   particular tactic that was included in the marketing
24   plan.
25   ///

Page 200

1    BY MR. CARTMELL:
2        Q.    So, for example, the sales force, the
3    people in the company who were going to doctors'
4    offices and talking to doctors about the products,
5    would they get to see this plan?
6        A.    No.
7        Q.    Okay.  Why is it that the sales force
8    wouldn't get to see this document?
9            MR. JAMES:  Objection.
10           THE WITNESS:  Because the marketers set the
11   strategy.  The sales force are implementers.
12   BY MR. CARTMELL:
13       Q.    Okay.  Now, Cephalon had told the
14   FDA, as we just went through, that it was only going
15   to market and promote Actiq to a small group of
16   doctors who treated cancer breakthrough pain, and
17   only market and promote this to doctors that it was
18   to be used for breakthrough -- breakthrough pain in
19   cancer patients; right?
20           MR. JAMES:  Objection.
21           THE WITNESS:  That's what the label said,
22   yes.
23   BY MR. CARTMELL:
24       Q.    But let's look at what the strategy
25   was for this year.  And if you turn to page 2,

1    please.  There's an Executive Summary, and it starts
2    with the review of the prior year; is that right?
3         A.   Yes.
4         Q.   And it looks like, if you look at the
5    number of prescriptions, when Cephalon started
6    marketing and promoting this product Actiq, there
7    were 21,823 prescriptions; do you see that?
8         A.   Yes.
9         Q.   And then 2001 Cephalon increased
10   that, at this time of this plan, to 37,428; do you
11   see that?
12        A.   Yes.
13        Q.   And then the projected for that year
14   was 71,017; do you see that?
15        A.   Yes.
16        Q.   That's a 325 percent increase in one
17   year; isn't it?
18        A.   It is a -- I can't do the math off
19   the top of my head, but that's probably about right.
20        Q.   And then if you look at the numbers,
21   when they started -- Cephalon started promoting this
22   in 2000, before that, it was a $16 million a year in
23   revenue drug; correct?
24        A.   That's correct.
25        Q.   And projected by the end of 2001,

1    that was going to be -- or Actiq was going to be a
2    $50 million drug; correct?
3         A.   Yes.  And when we first acquired the
4    drug, there was very little available --
5    understanding and familiarity with breakthrough pain.
6         Q.   But that jumped from 16 million to
7    50 million in one year.  That's a 316 percent
8    increase; isn't it?
9         A.   That's what it indicates.
10        Q.   The second paragraph states:
11             (Reading) Anesthesiologists, pain
12             specialists, are the second largest
13             segment of the Actiq prescriber base
14             behind oncologists and will be the
15             largest by the end of 2001.  They have
16             proven to be the most receptive
17             segment and have most readily adopted
18             Actiq as a viable treatment option for
19             breakthrough pain in both malignant
20             and nonmalignant patients (end of
21             reading).
22        Do you see that?
23        A.   I see that.
24        Q.   So right away this summary of this --
25   in this strategy document for marketing, they are

1    talking about a group of doctors that Cephalon
2    already knows is willing to prescribe Actiq not only
3    to cancer patients who are the appropriate selection
4    of patients, but also to noncancer patients; correct?
5         MR. JAMES:  Objection.
6    BY MR. CARTMELL:
7         Q.   That's what it says?
8         A.   That is what it says.
9         Q.   It says:
10             (Reading) They have also utilized
11             Actiq in the treatment of episodic
12             pain, a substantial segment of the
13             pain market (end of reading).
14        Do you see that?
15        A.   I see that.
16        Q.   And episodic pain, we already talked
17   about that, that is something that is not indicated
18   for Actiq?  Actiq is not indicated for use in
19   episodic pain; correct?
20        A.   That's correct.
21        Q.   If you go down to the 2002 commercial
22   objectives.  And let me ask you first, what does it
23   mean, "Commercial objectives"?
24        MR. JAMES:  Objection.
25        THE WITNESS:  The goals of the commercial

1    team.
2    BY MR. CARTMELL:
3         Q.   And commercial team means sales;
4    correct?
5         A.   The commercial -- it's the goals that
6    the marketing team is setting.
7         Q.   Setting for sales; correct?
8         A.   Yes.
9         Q.   It says:
10             (Reading) In 2002 Actiq will be
11             positioned as the most rapid-acting,
12             noninvasive opioid available affording
13             patients personal pain control for
14             both breakthrough pain and episodic
15             pain (end of reading).
16        Do you see that?
17        A.   I see that.
18        Q.   The company Cephalon had just
19   committed to the FDA that it was going to try its
20   best to ensure that Actiq was only used in patients
21   with cancer; correct?
22        A.   Yes.
23        Q.   But right here, six months later,
24   they are already saying that they want to position
25   Actiq as the product that can be used not only for

Page 205

1 breakthrough cancer pain but also for off-label use
2 episodic pain; correct? That's what it says.
3     A.   It's what it says.
4     Q.   If you go down, it says:
5         (Reading) Without a solid Phase 4 case
6         series, publications plan to support
7         the use of Actiq in other pain types,
8         we will be severely limiting its
9         potential growth in the chronic pain
10        market, a market with a large, unmet
11        need for a rapid-acting, noninvasive
12        opioid (end of reading).
13     Do you see that?
14     A.   I see that.  And what that is saying
15 is that we needed to do studies to better understand
16 that marketplace, because we believed that there was
17 a medical need in other patient populations.
18     Q.   Right.  We will talk about that
19 because there's a section in here about why they need
20 studies, in a minute.
21     If you turn the page, though -- and,
22 actually, I want to go to page 5, if you don't mind.
23 There's a section at the bottom called, "Why Actiq?"
24     Do you see that?
25     A.   Yes.

Page 206

1     Q.   It says, "Actiq's clear feature is
2 its rapid onset of analgesia"; right?  That's true,
3 isn't it, it was going to be one of the messages that
4 your Marketing Department and potentially you as the
5 PR person was going to send out about an advantage of
6 using Actiq; correct?
7     A.   It's medically correct.
8     Q.   Okay.  I want to direct your
9 attention to the sentence:
10        (Reading) Additionally, due to Actiq's
11        rapid onset, it has a clear and
12        distinct advantage over other products
13        in the treatment of episodic or
14        recurrent pain, for example, sickle
15        cell crisis migraine headaches (end of
16        reading).
17     Do you see that?
18     A.   I see that.
19     Q.   Those are all off-label uses of this
20 drug; correct?
21     A.   That's correct.
22     Q.   "This type of pain represents a
23 substantial market opportunity"; do you see that?
24     A.   I see that.
25     Q.   Six months after telling the FDA that

Page 207

1 you were committed to trying to make sure your drug,
2 dangerous opioid potentially, was only used in cancer
3 patients, the marketing strategy is saying there's an
4 opportunity to sell it in off-label uses, including
5 migraine headaches and sickle cell; correct?  That's
6 what it says?
7     MR. JAMES:  Objection.
8     THE WITNESS:  It says that there's a market
9 potential.
10 BY MR. CARTMELL:
11     Q.   For off-label uses; correct?
12     A.   It says it has a distinct advantage
13 in those treatments -- in those areas.
14     Q.   Okay.  But that wasn't my question.
15 I apologize if I wasn't clear.
16     It says that it has a marketing opportunity,
17 and we discussed a marketing opportunity means an
18 opportunity for more prescriptions; correct?
19     A.   That's correct.
20     Q.   And it's talking about a marketing
21 opportunity or more prescriptions potentially in
22 off-label sales, like headaches, migraines, and
23 sickle cell; correct?  That's what it says?
24     A.   That's what it says.
25     Q.   If you then turn to page 28.  At page

Page 208

1 28 of this marketing document that talks about the
2 strategy to be used with Actiq, under Actiq's
3 potential it more clearly defines in dollars the
4 potential, in fact, if the company can sell Actiq for
5 not just cancer patients but for episodic pain
6 patients; correct?
7     A.   For both breakthrough pain and
8 episodic pain.
9     Q.   (Reading) Rapid pain relief is
10        a largely unmet need in patients
11        suffering from both breakthrough
12        cancer -- or excuse me -- breakthrough
13        pain -- it doesn't say cancer -- and
14        episodic pain.  These types of pain
15        represent a substantial market
16        opportunity.  The total market for
17        pure, short-acting opioids and
18        combination products has been 753
19        million in 1999 and 872 million in
20        2000 and is 568 million year-to-date
21        through July of 2001 (end of reading).
22     Correct?
23     A.   It states that we were not a
24 short-acting opioid or a combination product.
25     Q.   Right.  So --

## Page 209

1    A.    That's a statement of context, where
2  it is not representative of our product.
3    Q.    I understand.  But it's talking about
4  Actiq's potential, isn't it, ma'am?
5    A.    It is talking about that is the
6  market for pure, short-acting opioids and combination
7  products.  It is not saying that the full market
8  opportunity would be to replace those products.
9    Q.    At any rate, what it's saying is
10  there's potential for Actiq to get into the bigger
11  prescribing market if it goes off label; correct?
12    MR. JAMES:  Objection.
13    THE WITNESS:  It would be the case that if
14  it was prescribed off label, it would be a bigger
15  market of patients who are opioid tolerant.
16  BY MR. CARTMELL:
17    Q.    If you turn to page 29, there is
18  discussion about having studies like you said.  And
19  if you look under recommendations -- and just to put
20  this in context, Ms. Beckhardt, if you go to the
21  prior page, this is under the section titled, "Actiq
22  Development Needs."  Do you see that?
23    A.    Yes.
24    Q.    And so this is the section where the
25  company is talking about some things that the

## Page 210

1  Marketing Department and the company need to do and
2  develop in order to help better market the product;
3  correct?
4    A.    Development needs refer typically to
5  clinical development of a product.
6    Q.    Okay.  And when you say "clinical
7  development," you're talking about studies; right?
8    A.    Correct.
9    Q.    Okay.  And one of the things that you
10  know from your experience in the industry, is that if
11  there are studies done on a product and you can have
12  those studies published or presented to doctors, that
13  evidence that's produced from that study may help
14  with prescribing of the drug, for example; correct?
15    MR. JAMES:  Objection.
16    THE WITNESS:  A company can't promote on
17  those messages, but the medical community may read
18  those documents, yes.
19  BY MR. CARTMELL:
20    Q.    Right.  In this sentence, under
21  "Recommendations:  Minimal needs to continue to grow
22  the business" -- and growing the business means
23  expanding the prescriptions, expanding the sales,
24  making more profits; correct?
25    A.    That's correct.

## Page 211

1    Q.    It states, "Case series" -- or excuse
2  me, let me go up.
3    (Reading) To continue this growth in
4    2002, minimal needs must be met,
5    including case series development in
6    noncancer pain models, such as chronic
7    back pain, RSD, sickle cell disease,
8    migraine headaches, et cetera (end of
9    reading).
10  Do you see that?
11    A.    Yes.
12    Q.    Now, the company is talking about
13  here that it's going to do studies in off-label uses,
14  like migraines and back pain; correct?
15    A.    It's a very common phenomenon when
16  you have a product introduced for a particular
17  indication that a company would do additional studies
18  in a different -- to assess whether or not it was
19  appropriate to use it medically in other indications.
20    Q.    I understand that.  And what -- as a
21  strategy, and we will see it later in this, for the
22  company, why that's in the marketing part of the
23  company is because those studies can be used to help
24  market Actiq; correct?
25    MR. JAMES:  Objection.

## Page 212

1    THE WITNESS:  They can be published and they
2  can be part of the literature.  There's not -- they
3  are not something that the company should be actively
4  promoting on.
5  BY MR. CARTMELL:
6    Q.    I understand.  But once those are
7  done and published and they are out there, the fact
8  that they are out there can help them potentially get
9  prescriptions for off-label uses; correct?
10    MR. JAMES:  Objection.
11    THE WITNESS:  If a prescriber decides to, at
12  their discretion, follow those new studies, yes.
13  BY MR. CARTMELL:
14    Q.    And then if you turn to page 31, I
15  want to talk about the Actiq positioning.  You told
16  the jury what positioning means; correct?
17    A.    Yes.
18    Q.    It states:
19    (Reading) Current physician use of
20    Actiq suggests that Actiq has great
21    potential beyond the treatment of
22    breakthrough cancer pain (end of
23    reading).
24  Do you see that?
25    A.    Okay.  Yes, I see that.  Thank you.

Page 213

1    Q.    Okay.  So that's -- what that's
2  saying is that if we can expand, meaning Cephalon can
3  expand, beyond the indicated use, the FDA approved
4  use of breakthrough cancer pain, there's great
5  potential for this drug; correct?
6    A.    There's more potential for use, yes.
7    Q.    More potential for money, too; right?
8    A.    Yes.
9    Q.    And if you go down to the positioning
10 statement, it says:
11        (Reading) The 2002 positioning
12        statement for Actiq reflects that
13        these -- reflects these key
14        differentiating factors.  Actiq is a
15        medication in a unique oral
16        transmucosal delivery system that
17        provides the most rapid onset of
18        analgesic of any noninvasive opioid
19        formulation available and affords
20        patients personal pain control for
21        breakthrough pain or episodic pain
22        (end of reading).
23    Do you see that?
24    A.    Yes.
25    Q.    So with only a matter of months after

Page 214

1  entering into commitments and agreements and a Risk
2  Management Program with the FDA that told the FDA
3  your company would do whatever it could to ensure
4  that Actiq was only used in cancer patients
5  internally, inside the files of the company, the
6  strategy was going to be to position Actiq for use in
7  off-label uses like episodic pain; correct?
8        MR. JAMES:  Objection.
9        THE WITNESS:  That's what it states.
10 BY MR. CARTMELL:
11    Q.    Let me ask you this:  Were you
12 involved in this?
13    A.    No.
14    Q.    Do you think it's appropriate?
15        MR. JAMES:  Objection.
16        THE WITNESS:  I'm not a marketer.
17 BY MR. CARTMELL:
18    Q.    If you turn to page 33.  Page 33 is
19 where this part of the plan starts with marketing
20 strategy.  So if we read beyond page 33, we can
21 determine what the strategy of the company is going
22 to be; correct?
23        MR. JAMES:  Objection.
24        THE WITNESS:  Commercial strategy.
25 ///

Page 215

1  BY MR. CARTMELL:
2    Q.    Commercial strategy being how it's
3  going to be sold?
4    A.    It relates to marketing strategies,
5  yes.
6    Q.    Strategies and the messages, for
7  example, that will be sent, that type of thing, or
8  the tactics that will be used?
9    A.    From a commercial standpoint.
10    Q.    Okay.  If you go to page 35, I want
11 to talk about the section on clinical data.  And as
12 we discussed, one of the things the company wanted is
13 they wanted to get studies done in noncancer uses;
14 correct?
15    A.    That is correct.
16    Q.    Because that was going to give them a
17 potential -- like you said, potential opportunity to
18 grow the number of prescriptions into off-label
19 indications; correct?
20    A.    That is correct.
21    Q.    It states:
22        (Reading) There is substantial
23        opportunity for Actiq in the treatment
24        of breakthrough pain in
25        opioid-tolerant patients in a variety

Page 216

1  of pain diagnoses, not only
2  breakthrough cancer pain, as well as
3  episodic pain and other disease
4  states.  In order to continue Actiq's
5  growth outside of the cancer patient
6  population, Actiq's safety, efficacy,
7  and true onset of an analgesic effect
8  must be demonstrated in other large
9  segments of the pain market, for
10        example, chronic back pain, RSD (end
11        of reading).
12    Which is reflex sympathy dystrophy?
13    A.    Sympathetic dystrophy.
14    Q.    Reflex sympathetic dystrophy, that's
15 another pain condition; correct?
16    A.    Yes, it is.
17    Q.    Fibromyalgia, that's a chronic pain
18 condition, correct?
19    A.    That's correct.
20    Q.    Migraines, and sickle cell disease;
21 correct?
22    A.    Correct.
23    Q.    And the plan of the company
24 internally, internally the plan is to try to grow in
25 off-label prescriptions by getting clinical data to

Page 217

1  support that; correct?
2       MR. JAMES: Objection.
3  BY MR. CARTMELL:
4       Q.    That's what it says?
5       A.    The plan was to get clinical data to
6  support an understanding of the use -- the safe and
7  appropriate use of these medications in additional
8  indications.
9       Q.    Outside of cancer; right?
10      A.    Yes.
11      Q.    Even though there was no approval
12  that this drug Actiq was safe and effective with any
13  of those indications, not chronic back pain, not RSD,
14  not fibromyalgia, not migraine headaches, and not
15  sickle cell disease; correct?
16      MR. JAMES: Objection.
17      THE WITNESS:  Research is done in additional
18  indications.  We already had demonstrated its
19  efficacy in cancer.  So the research that was needed
20  was in other conditions.
21  BY MR. CARTMELL:
22      Q.    But the point is this, Ms. Beckhardt.
23  Research done is fine, if it's appropriate to be
24  done.  But this is a marketing strategy document.
25  And if the research is being done simply so that you

Page 218

1  increase the market into off-label usage, that's not
2  appropriate; is it?
3       MR. JAMES: Objection.
4       THE WITNESS:  I'm -- not my place to say
5  that.
6  BY MR. CARTMELL:
7       Q.    Let's turn to the tactical plan on
8  page 37.  Now, the tactical plan, that's the tactics
9  that the Marketing Department and, in fact, your
10  department, the PR Department, are going to employ to
11  try to promote and market the product Actiq; correct?
12      A.    I did not promote the product.
13      Q.    Let me restate that, then.
14      The tactical plan is going to be the actual
15  tactics that will be used by Cephalon to enforce the
16  strategy that we have just talked about; correct?
17      A.    That's correct.
18      Q.    And the marketing company is going to
19  employ -- the marketing side of the company is going
20  to employ certain tactics to help market and promote
21  the product; correct?
22      A.    That's correct.
23      Q.    And PR, you in the PR Department,
24  you're also going to be involved in certain tactics
25  as well; correct?

Page 219

1       A.    That's correct.
2       Q.    It states:
3       (Reading) The most significant change
4       in the position of Actiq in 2002 is
5       the incorporation of episodic pain as
6       a segment of the targeted pain market
7       (end of reading).
8       And as we discussed, episodic pain, that's
9  an off-label usage of Actiq; correct?
10      A.    That's correct.
11      Q.    (Reading) Actiq will be positioned
12      to greatly expand use in both the
13      breakthrough pain and the episodic
14      pain segments of the pain market by
15      employing -- by applying the key
16      messages listed above (end of
17      reading).
18      Do you see that?
19      A.    Yes.
20      Q.    So this is an internal strategy -- an
21  internal strategy to promote off label; correct?
22      MR. JAMES: Objection.
23      THE WITNESS:  It's an internal strategy that
24  acknowledges the potential market outside the
25  approved indication.

Page 220

1  BY MR. CARTMELL:
2       Q.    Well, it's talking about trying to
3  position it, take -- take actions to position it --
4  right? -- into areas of off-label usage; correct?
5  That's what it says?
6       A.    That's what it seems to suggest, yes.
7       Q.    And that is directly contrary to what
8  the company had told the FDA; correct?
9       MR. JAMES: Objection.
10      THE WITNESS:  It is contrary to the Risk
11  Management Program.
12  BY MR. CARTMELL:
13      Q.    Let's move to page 39.  I want to ask
14  you about this -- what would you call this --
15  tactical plan overview?  What is that called?  It's a
16  diagram, I guess; is that right?
17      A.    That's a legitimate description of
18  it.
19      Q.    Okay.  So this has here the different
20  sides of the company or departments in the company.
21  It has the sales part of the company on the left;
22  right?
23      A.    Yes.
24      Q.    And then it has the Marketing
25  Department in the middle; right?

1    A.    Uh-huh.

2    Q.    And then there is actually, I
3  believe, on here somewhere, indirect promotional.  Is
4  that you?

5    A.    That is -- that includes a broad
6  array of nondirect to -- nondirect contact with
7  physicians or other prescribers.  So, for example,
8  journal advertisements; that's something that's
9  indirect.  A prescriber may or may not see the
10  prescription; as opposed to marketing direct
11  campaigns, there's a direct interaction with the
12  health-care professional.

13    Q.    I see.  And so some of those things,
14  like journal advertisements, Internet activity,
15  website for CME, and things like that, you were
16  involved in some of those activities; correct?

17    A.    No, I was not.

18    Q.    Okay.  At any rate, one thing I want
19  to point out here, it says "CME programs."  Do you
20  see that?

21    A.    Yes.

22    Q.    In the middle.  That's continuing
23  medical education?

24    A.    Yes.

25    Q.    That's under marketing promotional.

1  Do you see that?

2    A.    Yes.

3    Q.    So the company knows; right?
4  Internally this is their sort of internal sort of
5  playbook?  The company knows that those continuing
6  medical education programs are actually marketing
7  promotional tactics; correct?

8    MR. JAMES:  Objection.

9    THE WITNESS:  I don't know why that it would
10  be listed as a market product -- marketing tactic,
11  because they were not led by the Marketing
12  Department.

13  BY MR. CARTMELL:

14    Q.    Okay.  But it's listed in their
15  internal document; is it not?

16    A.    I see it there, but I don't
17  understand why it's that way.

18    Q.    You wouldn't have put it there?

19    A.    I would not have put it there.

20    Q.    Take a look at -- if you would, at
21  page 43.  And this is where I think you come in, as
22  far as your involvement in public relations.  It
23  states:

24    (Reading) Public relations plan:  The
25    primary goals of the 2002 Actiq public

1    relations plan are to increase
2    awareness of breakthrough pain and
3    Actiq among targeted physician and
4    patient populations (end of reading).

5  Do you see that?

6    A.    Yes.

7    Q.    And -- and you're talking about
8  targeting physician and patient populations.  There
9  are specific targets that your company had, as far as
10  physicians, for example, who you were going to target
11  your messages and your marketing and promotional
12  activities to; right?

13    MR. JAMES:  Objection.

14    THE WITNESS:  The -- the commercial side of
15  the business did.  I did not.

16  BY MR. CARTMELL:

17    Q.    Okay.  And then there was also
18  patient populations, that you targeted certain parts
19  of the patient population that you wanted to target
20  as far as getting your messages out to them; correct?

21    MR. JAMES:  Objection.

22    THE WITNESS:  We worked with patient
23  advocacy groups, but we did not work -- do any work
24  direct to patient.

25  ///

1  BY MR. CARTMELL:

2    Q.    But you wrote this; didn't you?

3    A.    I understand.  I don't know if I
4  wrote -- I probably wrote some of them, because it
5  talks about public relations.  But we were not
6  talking about getting direct to patients.  We talked
7  about patient support organizations.  And that's
8  different than going direct to patient.

9    Q.    It then states --

10    A.    We did no direct-to-patient
11  communication.

12    Q.    So is what you're saying -- just so
13  I'm clear, are you saying that, for instance, you
14  might deal directly with, for example, a professional
15  society or -- what did you call them, a patient
16  group?

17    A.    That's correct.

18    Q.    And then they would distribute the
19  information to the patients directly; correct?

20    MR. JAMES:  Objection.

21    THE WITNESS:  At their discretion.

22  BY MR. CARTMELL:

23    Q.    Right.  It then states, "The targeted
24  patient populations" -- so you've got a patient
25  population that you're going to target -- "will be

Page 225

1    both cancer patients and chronic nonmalignant pain
2    patients."  Do you see that?
3        A.    Yes.
4        Q.    So in 2002, in the Public Relations
5    Department, you have already decided that you're not
6    only going to target for your message cancer
7    patients, but you're also going to target noncancer
8    patients for your messages; correct?
9        A.    That's what it states.
10       Q.    And that -- those messages going to
11   those people, if they get the prescription, these
12   noncancer people, that's off label; correct?
13       A.    Yes.  But this document continues to
14   say that cancer patients will be the primary focus.
15       Q.    Okay.  And I'm not arguing with you
16   about that.  But the fact of the matter is, in 2002,
17   you and your department, public relations, had
18   decided that you weren't going to limit your --
19   excuse me, your activities and tactics to just cancer
20   patients, you were going to expand it to noncancer
21   patients; correct?
22       A.    As led by the marketing strategy.
23       Q.    Right.  Are you saying that as led by
24   Andy Pyfer, at his direction, you had to expand it
25   beyond cancer patients to noncancer patients?

Page 226

1        A.    Andy was the head of marketing at
2    that time.
3        Q.    And you felt comfortable doing that?
4        MR. JAMES:  Objection.
5        THE WITNESS:  I was following the marketing
6    strategy.  And I felt comfortable if the patients
7    were already taking opioids.
8    BY MR. CARTMELL:
9        Q.    So it's clear for the jury, I just
10   want to make sure that they understand your
11   testimony.  As of the time you were sending messages
12   to -- and honestly through other organizations to
13   patients all over America, for example, about
14   breakthrough pain or about Actiq, your feeling was
15   that if they were already on another opioid, you felt
16   comfortable that you could present your marketing
17   messages to them even if they were not cancer
18   patients; is that what you're saying?
19       MR. JAMES:  Objection.
20       THE WITNESS:  I did not provide information
21   to those organizations specifically about the
22   product.  It was mostly disease awareness.  And
23   disease awareness, we did do breakthrough pain
24   awareness in both cancer and noncancer populations.
25   ///

Page 227

1    BY MR. CARTMELL:
2        Q.    Right.  Knowing full well, right --
3    you knew and the company knew, that if, in fact,
4    those patients went to their doctors and said, I have
5    breakthrough pain, and I don't have cancer, but I
6    want a drug, knowing full well that if they were put
7    on your drug, Actiq, that would be off-label usage;
8    correct?
9        MR. JAMES:  Objection.
10       THE WITNESS:  If prescribed by the
11   physician, yes.
12   BY MR. CARTMELL:
13       Q.    And you knew full well that the
14   company had committed to the FDA that they were not
15   going to take affirmative actions to try to have this
16   drug overused and used for off-label purposes;
17   correct?
18       MR. JAMES:  Objection.
19       THE WITNESS:  The commitment was not to use
20   it in an off-label manner.
21       MR. CARTMELL:  Let's take a break.
22       MR. JAMES:  Yes.
23       THE VIDEOGRAPHER:  We are going off the
24   record.  The time is 3:06 p.m.
25       (Recess taken.)

Page 228

1        THE VIDEOGRAPHER:  We are back on the
2    record.  The time is 3:26 p.m.
3    BY MR. CARTMELL:
4        Q.    Ms. Beckhardt, we are back on the
5    record after a short break.  Are you ready to
6    proceed?
7        A.    Yes.
8        Q.    We're talking about the 2002
9    marketing plan from Cephalon; correct?
10       A.    Yes.
11       Q.    And we have gone through several of
12   the provisions in that marketing plan that was put
13   together by Mr. Pyfer, and parts of it, the public
14   relations part, put together by you; correct?
15       A.    Correct.
16       (Exhibit No. 13 was marked.)
17   BY MR. CARTMELL:
18       Q.    And I want to hand you what's been
19   marked as Exhibit 70 -- or excuse me, Exhibit --
20       MR. JAMES:  13.
21       MR. CARTMELL:  -- 13.
22       Q.    Let me hand you what's been marked as
23   Exhibit 13.  And really this is for demonstrative
24   purposes, Ms. Beckhardt.  And you have looked at both
25   Exhibit 7, the Risk Management Program document for

Page 229

1    Actiq from 2001.
2         You know what, I gave you the wrong -- I
3    gave you the wrong one, I think.  This is 2003?
4         Okay.  I gave you the 2003.  I gave you the
5    wrong one.  You can hold on to that.
6         A.    Okay.
7              (Exhibit No. 14 was marked.)
8         MR. CARTMELL:  I'm going to give you
9    Exhibit 14 first.  Now I see.  Sorry.  I'm very
10   confused.
11            I'm going to hand you Exhibit 14, which is
12   for demonstrative purposes.
13        THE WITNESS:  Thank you.
14   BY MR. CARTMELL:
15        Q.    I've handed you Exhibit 14,
16   Ms. Beckhardt.  And this is for demonstrative
17   purposes.  And I want to ask you a few questions
18   about this.  But you've looked at the Risk Management
19   Program for Actiq that the Cephalon entered into with
20   the FDA in 2001, which is Exhibit 7; correct?
21        A.    Yes.
22        Q.    And we just got done looking at the
23   internal marketing plan for Cephalon from 2002;
24   correct?
25        A.    Correct.

Page 230

1         Q.    And I'm putting this up here for the
2    jury to sort of compare and contrast what Cephalon
3    was telling the FDA in 2001 related to its
4    obligations and the messages that it planned to send
5    to physicians and pharmacists and nurses related to
6    safety issues with Actiq.  And then internally what
7    Cephalon was saying its marketing strategies will be;
8    okay?
9         A.    Yes.
10        Q.    Okay.  And as you can see here, in
11   2001, as we know, the company was telling the FDA
12   that it was going to send messages and do what it
13   could for the safety of patients to ensure proper
14   patient selection.  And one of those messages was
15   going to be that Actiq is specifically indicated
16   solely for the treatment of breakthrough cancer pain
17   in chronic opioid-tolerant cancer patients.
18        Do you see that?
19        A.    Yes.
20        Q.    But you now know, from going through
21   the 2002 marketing plan, that internally the
22   Marketing Department had a strategy that was
23   inconsistent with that; correct?
24        MR. JAMES:  Objection.
25        THE WITNESS:  It was inconsistent, but it

Page 231

1    should be clear that these were not intended to
2    replace the around-the-clock medications.  These were
3    in opioid-tolerant patients.  This would have been a
4    medication in addition for patients who were
5    experiencing breakthrough pain.
6    BY MR. CARTMELL:
7         Q.    No.  I understand that.  And really
8    the point that I am focusing on is the company was
9    telling the FDA and committing to the FDA that it was
10   going to help the FDA limit the use of this product
11   to only cancer patients; right?
12        MR. JAMES:  Objection.
13        THE WITNESS:  Yes.
14   BY MR. CARTMELL:
15        Q.    But internally the company was
16   creating or had created a strategy to expand the
17   usage of the Actiq beyond just cancer patients;
18   correct?
19        A.    Based on clinical data.
20        MR. JAMES:  Objection.
21   BY MR. CARTMELL:
22        Q.    Right.  And it was planning to expand
23   the usage into chronic back pain, RSD, fibromyalgia,
24   migraine headaches, sickle cell disease?  That's what
25   it says; correct?

Page 232

1         A.    That's what it says.
2         Q.    And you would agree with me, would
3    you not, that what the company was doing, the
4    Marketing Department, the strategy that it had, what
5    it was doing, trying to expand the usage of Actiq,
6    was inconsistent with what it was telling the FDA;
7    correct?
8         MR. JAMES:  Objection.
9         THE WITNESS:  It's inconsistent with what is
10   in the Risk Management Program.
11   BY MR. CARTMELL:
12        Q.    And what's in the Risk Management
13   Program are obligations that they took on, that
14   Cephalon took on in order to sell this product;
15   correct?
16        MR. JAMES:  Objection.
17        THE WITNESS:  The Risk Management Program
18   was part of the approval process.
19        MR. CARTMELL:  I want to look at one more
20   section in the 2002 marketing plan, if you don't
21   mind, ma'am.
22        Q.    If you would look back at the
23   Exhibit 12 -- we didn't look at this, but I'd like
24   you to take a look at it.  But let me ask you a
25   question first:  CME programs, continuing medical

Page 233

1    education programs, that's what that stands for;
2    right?
3        A.    Correct.
4        Q.    And you saw that in the marketing
5    plan from 2002, Cephalon had listed those programs as
6    promotional in nature; correct?
7        A.    I'm not sure why they were listed in
8    that manner.
9        Q.    I know.  But you saw that that's the
10   way they listed it; correct?
11       A.    Correct.
12       Q.    And it wouldn't be appropriate, would
13   it be, for a company like Cephalon to enter into
14   continuing education, medical education programs,
15   solely to get around the restrictions that were
16   imposed by the RiskMAP; would it?
17       MR. JAMES:  Objection.
18       THE WITNESS:  I'm not in a position to
19   answer that.
20   BY MR. CARTMELL:
21       Q.    But would you agree with me that if
22   the company decided that it wanted to just do medical
23   education programs because it was restricted from
24   having its sales rep go in on an off-label market,
25   that wouldn't be appropriate; correct?

Page 234

1        MR. JAMES:  Objection.
2        THE WITNESS:  If -- if that was the sole
3    purpose, and the information presented was not
4    medically accurate and wasn't intended for education,
5    that would be a problem.  But if the CME program was
6    intended for education, was medically appropriate,
7    you know, that's not for me to say.
8    BY MR. CARTMELL:
9        Q.    Okay.  Turn to page 40, if you would.
10   This is Cephalon's playbook and marketing strategy as
11   of 2002, and it lists CME programs, peer-to-peer
12   educational programs.  That's what those are, right?
13       A.    No, they are -- peer-to-peer
14   educational programs may be CME, but they may not be
15   CME.
16       Q.    I understand.  But it talks here
17   about peer-to-peer educational programs such as CME
18   can be tremendously effective marketing.  Do you see
19   that?
20       MR. JAMES:  Objection.
21       THE WITNESS:  Yes, I see that.
22   BY MR. CARTMELL:
23       Q.    So the company Cephalon is
24   considering that these medical education programs,
25   where doctors speak to other doctors, those are

Page 235

1    tremendous marketing opportunities for this company.
2    That's what Cephalon is saying; correct?
3        MR. JAMES:  Objection.
4    BY MR. CARTMELL:
5        Q.    Do you see that?
6        A.    It is true that the CME -- a tactic
7    of using CME programs was included in this plan.
8        And it's saying that actually from a
9    marketing perspective, it's tremendously effective;
10   right?
11       MR. JAMES:  Objection.
12   BY MR. CARTMELL:
13       Q.    That's what it says at the end of the
14   first sentence?
15       A.    Yes, that's what it says.
16       Q.    If you go to the second sentence, it
17   says:
18       (Reading) The primary reason CME
19       programs will be largely employed in
20       2002 is due to the limited promotional
21       flexibility and ability to make claims
22       that a company's Actiq subpart (h)
23       classification (end of reading).
24   Do you see that?
25       A.    Yes.

Page 236

1        Q.    So what that's saying is because of
2    the Risk Management Program, we can't off-label
3    market, but we can have doctors go out there and talk
4    about off-label uses; correct?
5        MR. JAMES:  Objection.
6        THE WITNESS:  It's saying that you can have
7    continuing medical education programs that are not
8    led by the company.  And, yes, other doctors will be
9    participating in them and may, given this, suggest --
10   they may talk about issues that are beyond the label.
11   BY MR. CARTMELL:
12       Q.    Right.  And it says:
13       (Reading) CME programs allow us to use
14       peer-to-peer medical education to
15       raise awareness of the proper
16       assessment and treatment of
17       breakthrough pain and episodic
18       pain(end of reading).
19   Do you see that?
20       A.    Yes.
21       Q.    So what that's saying is if they use
22   doctors at medical education programs, they can
23   actually expand the usage and talk about episodic
24   pain, which is off-label; correct?
25       MR. JAMES:  Objection.

Page 237

1      THE WITNESS:  I can't speak to that because
2   I wasn't involved in those programs.
3   BY MR. CARTMELL:
4      Q.   I understand.  But it's saying that
5   that's the strategy they are going to use in those
6   continuing medication -- medical education programs;
7   correct?
8      A.   That is what it says here.
9      Q.   Okay.  And do you agree with me that
10  that is inconsistent with what the FDA wanted?
11     MR. JAMES:  Objection.
12     THE WITNESS:  It is inconsistent with the
13  Risk Management Program.
14         (Exhibit No. 15 was marked.)
15  BY MR. CARTMELL:
16     Q.   Right.  Let me hand you Exhibit 15.
17  If we look at a contrast and comparison to what the
18  company was telling the FDA in 2001, they were saying
19  they were going to do educational programs to tell
20  about safety messages and to enforce that this
21  product should only be used for cancer patients;
22  correct?
23     MR. JAMES:  Objection.
24     THE WITNESS:  It doesn't mention cancer
25  patients here.

Page 238

1   BY MR. CARTMELL:
2      Q.   Yeah, but you know that proper
3   patient selection messages is defined in that, as we
4   discussed earlier, about cancer -- as cancer
5   patients; correct?
6      A.   It also refers to opioid-tolerant
7   patients.
8      Q.   Right.  Both; right?
9      A.   That's correct.
10     Q.   So -- but if you look at that and
11  contrast what they are saying internally is they are
12  going to do educational programs to promote off-label
13  marketing and promotion; correct?
14     MR. JAMES:  Objection.
15     THE WITNESS:  That is what it states.
16  BY MR. CARTMELL:
17     Q.   Those two things are wholly
18  inconsistent; correct?
19     MR. JAMES:  Objection.
20     THE WITNESS:  They are inconsistent.
21     MR. CARTMELL:  I want to move to Exhibit 16,
22  which is the 2003 Actiq Marketing Plan.
23         (Exhibit No. 16 was marked.)
24  BY MR. CARTMELL:
25     Q.   And I will represent to you that from

Page 239

1   documents in your file, I believe you were also
2   involved in drafting a portion of this marketing
3   document related to public relations; would that be
4   consistent with your memory?
5      A.   It would be consistent with what I
6   would have been responsible for.  I don't remember
7   specifically.
8      Q.   Okay.  Again, if you look at this
9   plan, this is also Andrew Pyfer who was the Director
10  in the Marketing Department at that time; correct?
11     A.   Correct.
12     Q.   But now there's -- there's Christine
13  Wells and Paula Castagno; is that right?
14     A.   That's correct.
15     Q.   Were they added in 2003 to the
16  company or the Marketing Department?
17     A.   Around that time.
18     Q.   Okay.  Again, inside cover you look
19  at the table of contents, and I compared them, and
20  essentially it's the same -- or it is the same table
21  of contents from the 2002 plan; is that consistent
22  with your memory of how these plans were typically
23  set up for a number of years?
24     A.   At that time, yes.
25     Q.   Okay.  And so this would be the

Page 240

1   playbook, so to speak, for the marketing strategy and
2   tactics for the next year or 2003; correct?
3      A.   That's correct.
4      Q.   And if you look at the Executive
5   Summary on the inside, or next page, page 2, again,
6   there now -- strike that.
7      If you look at the Executive Summary,
8   there's a performance review that is summarizing how
9   the company did or Actiq did in 2002; right?
10     A.   Yes.
11     Q.   It states:
12     (Reading) Cephalon experienced another
13        extraordinarily successful year with
14        Actiq in 2002.  This achievement can
15        be attributed primarily to focused --
16        excuse me -- and integrated marketing
17        and sales efforts (end of reading).
18     Do you see that.
19     A.   Yes.
20     Q.   And is that -- was that the feeling
21  at the time, was that the marketing and sales
22  departments were responsible for this amazing and
23  extraordinary, as they say, growth of the Actiq
24  sales?
25     MR. JAMES:  Objection.

Page 241

1    THE WITNESS:  I -- I don't know.
2  BY MR. CARTMELL:
3      Q.    They say in 2002 they were
4  projecting -- or they did have -- they were
5  projecting, excuse me, prescriptions that would be
6  140 percent growth over the previous year.  Do you
7  see that?
8      A.    Yes.
9      Q.    Then if you go down to the commercial
10  objectives, that's where internally the company was
11  trying to -- trying to forecast or strategize on the
12  amount of sales and prescriptions that they wanted to
13  have in 2003; correct?
14      A.    Consistent with marketing plans in
15  general, yes.
16      Q.    And it says:
17          (Reading) The gross sales in 2002 were
18          133.8 million, and in 2003 they were
19          budgeting a 64 percent increase up to
20          218.8 million (end of reading).
21  Do you see that?
22      A.    Yes.
23      Q.    And an increase of 50 percent of
24  prescriptions of Actiq for 185,467 in 2002 all the
25  way up to 279,880 in 2003; do you see that?

Page 242

1      A.    Yes.  Those are prescriptions, but
2  not patients.
3      Q.    And more prescriptions, as we've
4  discussed, is more sales, more profits; correct?
5      MR. JAMES:  Objection.
6  BY MR. CARTMELL:
7      Q.    Correct?
8      A.    Yes.
9      Q.    If you then go back to page 16,
10  please.  This is a year later.  And just like in
11  2002, the Marketing Department is talking about
12  things that they needed to do to expand the usage of
13  Actiq; correct?
14      A.    It states, "Clinical needs to expand
15  usage."
16      Q.    And it states, in the middle of the
17  paragraph:
18          (Reading) The disease states that
19          represent the largest growth
20          opportunities for Actiq include, but
21          are not limited to, osteoarthritis,
22          rheumatoid arthritis, chronic back
23          pain, migraine headaches, complex
24          regional pain syndrome, and
25          postherpetic neuralgia (end of

Page 243

1          reading).
2  Do you see that?
3      A.    Yes.
4      Q.    So, again, a year later in 2003, the
5  company is trying to strategize on how to grow the
6  usage of Actiq outside of cancer into other
7  conditions; correct?
8      A.    Yes.
9      Q.    If you go to -- take a look at
10  Exhibit 13.  Once again, this is for demonstrative
11  purposes.  I had handed you that earlier.  Sorry
12  about that.
13          Once again, in 2003, a year later, if you
14  look at what the company had told the FDA, and it was
15  obligated to do, as far as making sure that messages
16  were sent and that it was doing everything reasonable
17  to try to make sure this drug was only prescribed to
18  cancer patients with breakthrough pain and that were
19  opioid tolerant, if you look internally at the
20  company, they have got a strategy that is wholly
21  inconsistent with that to try to expand into
22  osteoarthritis, into rheumatoid arthritis, chronic
23  back pain, migraine headaches, complex regional
24  syndrome and postherpetic neuralgia; correct?
25      MR. JAMES:  Objection.

Page 244

1      THE WITNESS:  The marketing plan talks about
2  conditions that are outside the Risk Management
3  Program.
4  BY MR. CARTMELL:
5      Q.    And do you think -- or did you think
6  at the time that it was appropriate for the company
7  to be strategizing, from a marketing perspective, to
8  expand the use of Actiq so much outside of the
9  indicated FDA-approved use?
10      MR. JAMES:  Objection.
11      THE WITNESS:  It's not my decision.
12  BY MR. CARTMELL:
13      Q.    Did you think it was appropriate --
14  or let me ask it this way.  Now, in retrospect,
15  knowing what you know, do you think it was
16  appropriate?
17      MR. JAMES:  Objection.
18      THE WITNESS:  Knowing what I know, seeing
19  the data from three randomized placebo-controlled
20  studies, I would say that there was some legitimate
21  medical need in patients who did not have cancer, and
22  that these products could be administered, at least
23  Fentora that we knew -- we didn't do the studies in
24  Actiq -- it could be administered and effectively
25  administered in other patient populations.

Page 245

1    BY MR. CARTMELL:
2        Q.    But do you agree with me that when
3    the FDA told you as a company not to do that
4    specifically, that the company shouldn't have done
5    that?
6            MR. JAMES:  Objection.
7            THE WITNESS:  I was not setting the
8    marketing strategy.
9    BY MR. CARTMELL:
10       Q.    If you were, would you have thought
11   that it was appropriate to tell the FDA that you were
12   going to limit the use to only cancer patients, do
13   everything you could to make that sure happen, but
14   internally, and your strategy as a company, you were
15   going to go out and try to expand into all these
16   different uses; would you have done that?
17           MR. JAMES:  Objection.
18           THE WITNESS:  I personally would not have
19   done that.
20   BY MR. CARTMELL:
21       Q.    If you would turn to page 36.  Under
22   "Medical Liaison Managers," it states:
23           (Reading) The medical liaison managers
24           support Actiq in three distinct
25           manners (end of reading).

Page 246

1        Tell the jury who medical liaison managers
2    are, please.
3        A.    Medical liaisons are individuals with
4    a medical background who interface directly with
5    non-healthcare professionals.
6        Q.    And were you involved with those
7    activities?
8        A.    No, I was not.
9        Q.    Let me just ask you quickly, though.
10   At the bottom it does say that they were going to
11   develop a case series outside of cancer patients, and
12   that we're doing that to grow Actiq beyond
13   breakthrough cancer pain in 2003 and beyond.  Do you
14   see that?
15       A.    It states that.
16           MR. JAMES:  Objection.
17   BY MR. CARTMELL:
18       Q.    That's another use of studies for
19   promotional purposes to grow off-label sales;
20   correct?
21           MR. JAMES:  Objection.
22           THE WITNESS:  Another opportunity to collect
23   data related to uses outside the label.
24   BY MR. CARTMELL:
25       Q.    Collecting data is fine; right?

Page 247

1        A.    Yes.
2        Q.    But using that data to promote and
3    market and grow sales and profits, that's not fine;
4    correct?
5            MR. JAMES:  Objection.
6            THE WITNESS:  If the data are in the public
7    domain in the medical literature, it's for a doctor
8    to determine whether or not they are going to rely on
9    those medicines -- that data.
10           Is it appropriate to promote on that?  It's
11   outside the indication.
12   BY MR. CARTMELL:
13       Q.    So it's not appropriate; right?
14       A.    That's correct.
15       Q.    And this is saying that it's part of
16   the marketing strategy to use that; correct?
17           MR. JAMES:  Objection.
18   BY MR. CARTMELL:
19       Q.    It's a promotion strategy, at least
20   by the Marketing Department in its internal document;
21   correct?
22           MR. JAMES:  Objection.
23           THE WITNESS:  It is part of the -- it is
24   listed as part of the marketing strategy.
25   ///

Page 248

1    BY MR. CARTMELL:
2        Q.    Turn to page 39, please.  This is
3    another section in 2003, a year later talking about
4    Actiq's potential.  Do you see that?
5        A.    Yes.
6        Q.    And, again, in 2003 it's talking
7    about rapid pain relief is largely unmet need in
8    patients suffering from malignant and nonmalignant
9    breakthrough pain as well as chronic episodic pain,
10   migraine, sickle cell.  These types of pain represent
11   a substantial market opportunity.
12           So, once again, internally, the company is
13   talking about market opportunities of expansion into
14   off-label uses; correct?
15       A.    That is what it says here.
16       Q.    And it's talking about increases in
17   sales from 906 million in 2000 -- or excuse me --
18   strike that.
19           And it's talking about increases in the
20   potential market for Cephalon of 906 million in 2000
21   all the way, in 2002 projected, $1.3 billion market;
22   do you see that?
23           MR. JAMES:  Objection.
24           THE WITNESS:  That's not correct in what it
25   says.

Page 249

1    MR. CARTMELL:  Oh, I'm sorry.  Let me
2  restate it.  I was reading the parentheses.
3       Q.    And it says, does it not, that
4  there's $906 million market in 2000, a $1.15 billion
5  market in 2001, and year-to-date, $640 million
6  market, but they were projecting it to be 1.3 by the
7  end of 2002; correct?
8       A.    That is not what it says.  It says
9  that is the market potential for pure, short-acting
10  opioids and combination products.  We were not a
11  short-acting opioid or a combination product.  And we
12  were not intended to replace those products.
13       Those were the kinds of products that were
14  used for management of breakthrough pain that were
15  not used -- that were shown medically not to be
16  particularly effective.
17       Q.    I understand what you're saying.  I
18  appreciate that clarification.
19       But what we do know is that what this is
20  saying is that part of the strategy was to look at
21  Actiq's potential and to move Actiq into a market
22  that was off-label and it specifically mentions
23  migraine use and sickle cell use; correct?
24       MR. JAMES:  Objection.
25       THE WITNESS:  That's correct.

Page 250

1  BY MR. CARTMELL:
2       Q.    And that, just like we've said
3  previously, was wholly inconsistent with what the
4  company told the FDA it would do; correct?
5       MR. JAMES:  Objection.
6       THE WITNESS:  Inconsistent with the Risk
7  Management Program.
8       BY MR. CARTMELL:
9       Q.    And the Risk Management Program was
10  put in place by the FDA; correct?
11       A.    That's correct.
12       Q.    And the company knew it couldn't sell
13  the product without the Risk Management Program;
14  correct?
15       MR. JAMES:  Objection.
16       THE WITNESS:  That was part of the labeling.
17       BY MR. CARTMELL:
18       Q.    Turn to page 44 of this 2003
19  marketing plan, please.  As of 2003, though, let me
20  ask you -- actually, the company had told,
21  Ms. Beckhardt, the FDA what it believed should be and
22  what it was going to try to make sure was the proper
23  patients to take this medication; correct?
24       MR. JAMES:  Objection.
25       THE WITNESS:  In the Risk Management

Page 251

1  Program.
2  BY MR. CARTMELL:
3       Q.    Right.  And the company told the FDA
4  that proper patient selection or the proper patients
5  for Actiq would be cancer patients with breakthrough
6  pain who were already opioid tolerant; correct?
7       A.    That's correct.
8       Q.    But internally, if you look at their
9  marketing strategy and plan, at page 4, they had a
10  different idea of what a proper patient was for their
11  medication.  It states:
12       (Reading) Patient profile:  The ideal
13       patients for Actiq are those that will
14       benefit from Actiq's rapid onset of
15       analgesia as well as its portability,
16       convenience and control.  Any
17       opioid-tolerant patient suffering from
18       breakthrough pain or chronic episodic
19       pain, regardless of disease state, are
20       potential Actiq patients (end of
21       reading).
22       Do you see that?
23       A.    Yes, I see that.
24       Q.    That is an expansion of a patient
25  profile into off-label indications; correct?

Page 252

1       A.    That is correct.
2       Q.    And that is wholly consistent --
3  inconsistent -- strike that.
4       That is wholly inconsistent with what the
5  company told the FDA; correct?
6       MR. JAMES:  Objection.
7       THE WITNESS:  It's inconsistent with the
8  Risk Management Program, yes.
9       (Exhibit No. 17 was marked.)
10       BY MR. CARTMELL:
11       Q.    I'm going to hand you Exhibit 17, so
12  the jury can see what the company was telling the FDA
13  in 2001 and their strategy internally what they were
14  doing in 2003; do you see that?
15       A.    Yes, I see that.
16       Q.    In 2001 they told the FDA and the
17  Risk Management Program they were going to send
18  messages and do everything they could to make sure
19  there was proper patient selection, including that
20  Actiq was only used with cancer patients; correct?
21       MR. JAMES:  Objection.
22       THE WITNESS:  Yes.
23       BY MR. CARTMELL:
24       Q.    In 2003 internally -- they put
25  together a profile internally that they wanted for

Page 253

1    their Actiq product, and it included sufferers, any
2    opioid-tolerant patient suffering from breakthrough
3    pain or chronic episodic pain regardless of whether
4    or not they had cancer; correct?
5         A.    That's correct.
6         Q.    Do you think that was appropriate for
7    them to be able to sell this potent opioid product
8    under the guise of a Risk Management Program that
9    they told the FDA they would do everything they could
10   to limit the use to cancer patients, but internally
11   set up a patient profile as part of their marketing
12   strategy that included all kinds of noncancer
13   patients?  Do you think that was appropriate?
14        MR. JAMES:  Objection.
15        THE WITNESS:  I was not in the marketing
16   plan.  I didn't set those profiles.
17   BY MR. CARTMELL:
18        Q.    If you were setting those profiles,
19   would you have done that?
20        A.    I would not have set it that way, no,
21   unless it was based on data sets.
22        Q.    And we have already seen in here that
23   they didn't have data sets then; did they?
24        A.    Not at that time, no.  There was
25   experience in the community using those -- using --

Page 254

1    treating breakthrough pain and noncancer states.
2         Q.    But no randomized, controlled, double
3    blind placebo-controlled studies; right?
4         A.    That is correct.  Not at that time.
5         Q.    Turn to page 47, please.  Starting in
6    2003, if you go down to the issue, "Low awareness,
7    lack of branding of Actiq Cephalon within the pain
8    community," it talks at the end of the paragraph
9    about:
10            (Reading) Marketing will sponsor
11            symposia at the American Academy of
12            Pain Management and possibly (end of
13            reading) --
14        What's PM&R; do you know?
15        A.    Pain medicine and rehabilitation.
16        Q.    -- (Reading) and possibly pain
17            medicine and rehabilitation meetings
18            on the topic of use of opioids in
19            neuropathic pain and use of opioids in
20            musculoskeletal pain (end of reading).
21        Do you see that?
22        A.    Yes.
23        Q.    So this is talking about strategies
24   to use to increase the use of Actiq into off-label
25   uses; correct?

Page 255

1         MR. JAMES:  Objection.
2         THE WITNESS:  Yes.  It is -- it does
3    indicate that marketing will sponsor the symposium,
4    but it is my understanding that marketing did not
5    create the symposia.  They had the financial -- they
6    had financial support from the Marketing Department,
7    but they did not do the content.
8    BY MR. CARTMELL:
9         Q.    I understand, but -- but what they
10   were doing, according to their marketing strategy,
11   was they were trying to pay grants or sponsor
12   programs that included off-label messages; correct?
13        A.    That's correct.
14        Q.    And that is inconsistent with the
15   obligations that they had entered into with the FDA;
16   correct?
17        MR. JAMES:  Objection.
18        THE WITNESS:  I'm not sure whether it's
19   inconsistent to support continuing medical education.
20   BY MR. CARTMELL:
21        Q.    Well, when you tell the FDA that
22   you're going to do all you can to spread the message
23   that the product should only be used for cancer, but
24   then you pay money, grants and things, to put on
25   medical education programs or symposia for off-label

Page 256

1    uses, isn't that inconsistent?
2         MR. JAMES:  Objection.
3         THE WITNESS:  It depends on what the content
4    was of those programs.  And I don't recall the
5    content.
6    BY MR. CARTMELL:
7         Q.    Okay.  And then I think if you turn
8    to page 55, this is one of the tactics that was used
9    by the company to further their strategy of
10   increasing usage of Actiq into off-label uses.  And
11   this is one that you were involved in; correct?
12        A.    Where are you?
13        Q.    Patient education materials and
14   programs.
15        A.    Yes.
16        Q.    It states:
17            (Reading) marketing and public
18            relations will work together (end of
19            reading) --
20        So you from time to time worked with
21   marketing; correct?
22        A.    That is correct.
23        Q.    -- (Reading) to create and/or
24            update appropriate patient education
25            materials, both branded and nonbranded

Page 257

1    patient education pieces were created
2    in 2002.  The focus of 2003 will be to
3    create additional nonbranded patient
4    educational materials.
5        The Nursing Advisory Board formed in
6    2002 will help to focus and drive this
7    process.  These materials will be
8    created, updated in coordination with
9    professional and/or patient support
10   organizations as necessary and may be
11   applicable across varying disease
12   states and patient populations (end of
13   reading).
14       Do you see that?
15   A.   Yes.
16       Q.   And so you're creating patient
17   educational materials and programs that don't just
18   deal with cancer, breakthrough pain in cancer
19   patients, but it's going to deal with conditions
20   across varying disease states; correct?
21       A.   With respect to disease awareness,
22   not product usage.
23       Q.   Okay.  And we will talk about some of
24   the things you did in that respect.  But that's --
25   those were some of the things you did related to

Page 258

1    Actiq and Fentora; correct?
2        MR. JAMES:  Objection.
3        THE WITNESS:  In terms of developing and
4    having a nurse's advisory board and working with
5    patient advocacy groups, yes.
6        MR. CARTMELL:  Okay.
7        Q.   Now, you were on the team that
8    prepared both of these marketing plans; correct?
9        A.   At this time I was not on the teams
10   that created these plans.  I was asked to provide
11   input just for the public relations portion.
12       Q.   Okay.  You reviewed those plans back
13   in realtime; correct?
14       A.   I reviewed them after they were
15   completed.
16       Q.   Okay.  Well, I think you actually
17   created a portion of them related to public
18   relations; correct?
19       A.   I created that portion, and it was --
20   and it was submitted to them.  But I did not see this
21   whole plan prior to its -- its completion.
22       Q.   Okay.  Well, based on your review of
23   both of these plans, the 2002 marketing strategy and
24   tactics plan and the 2003 marketing and strategy
25   plans related to Actiq, would you agree with me that

Page 259

1    with respect to marketing, and that department, that
2    Cephalon had a marketing strategy to expand the use
3    of Actiq into pain conditions, including back pain,
4    episodic pain, migraines, and other type of noncancer
5    pain?  Would you agree with me?
6        MR. JAMES:  Objection.
7        THE WITNESS:  I think there was intent to
8    look at breakthrough pain in those various
9    conditions.
10   BY MR. CARTMELL:
11       Q.   Okay.  I'm not asking about
12   breakthrough pain.  You saw multiple occasions where
13   the strategy and tactics were intended to increase
14   the usage of Actiq into off-label uses; correct?
15       MR. JAMES:  Objection.
16       THE WITNESS:  Correct.  But those off-label
17   usage were for breakthrough pain, not for the
18   underlying pain condition.
19   BY MR. CARTMELL:
20       Q.   The distinction you're making is that
21   the company was actually having a strategy to
22   increase into off-label usage, but it was for
23   breakthrough pain uses in noncancer conditions;
24   correct?
25       A.   That's correct.

Page 260

1        Q.   Still, it's true, is it not, that
2    those were not indicated conditions; correct?
3        A.   That is correct.
4        Q.   And still that strategy called for
5    off-label marketing and promotion; correct?
6        MR. JAMES:  Objection.
7        THE WITNESS:  Yes.
8    BY MR. CARTMELL:
9        Q.   And this was true even though
10   Cephalon committed to the FDA that it would take all
11   reasonable steps to ensure that Actiq was only used
12   in patients with breakthrough cancer pain; correct?
13       MR. JAMES:  Objection.
14       THE WITNESS:  That is correct.
15   BY MR. CARTMELL:
16       Q.   Now, let me ask you, did you know
17   back in 2003, in that period of time, that Cephalon
18   was being investigated by multiple different entities
19   related to off-label marketing?
20       A.   In 2003, I do not believe I was aware
21   of that.
22       Q.   At some point, I take it, that you
23   learned that that was the case; is that true?
24       A.   That's correct.
25       Q.   Can you recall specifically or even

Page 261

```
 1    generally when that was?
 2         A.   I don't remember the date.
 3         Q.   Did you know in 2008 that Cephalon
 4    actually admitted to breaking the law with respect to
 5    the promotion and marketing of Actiq?
 6         MR. JAMES:  Objection.
 7         THE WITNESS:  I know that in -- that we --
 8    we -- the company admitted to off-label promotion.
 9    BY MR. CARTMELL:
10         Q.   And did you know that back in 2008?
11         A.   I did not know the final decision on
12    any kind of case until after it was made.
13         Q.   Did anyone give you the details of
14    how Cephalon broke the law or what it was they did
15    that they admitted breaking the law, as far as
16    promotion and marketing of Actiq?
17         MR. JAMES:  Objection.
18         THE WITNESS:  I'm not exactly sure what
19    you're referring to.
20    BY MR. CARTMELL:
21         Q.   Okay.  Let me restate that question.
22    It was a crummy question.
23         Did anyone give you the details of what
24    actions Cephalon took or what tactics they used that
25    were off-label promotion and marketing?  Did anybody
```

Page 262

```
 1    tell you that?
 2         MR. JAMES:  Objection.
 3    BY MR. CARTMELL:
 4         Q.   And I'm talking about the tactics
 5    they used that they pled guilty to.
 6         MR. JAMES:  Objection.
 7         THE WITNESS:  I don't recall when I learned
 8    the details of the suit.
 9    BY MR. CARTMELL:
10         Q.   Did you ever look at the guilty plea?
11         A.   No, I did not.
12         Q.   Were you involved at all in the
13    investigation by the United States attorneys or the
14    Medicaid fraud units of Cephalon related to the
15    off-label promotion and marketing of Actiq?
16         A.   What do you mean by "involved"?
17         Q.   Well, any involvement.  In other
18    words, did you attend meetings relating to it?  Were
19    you a part of a media training related to that, or
20    any involvement?
21         A.   Not to my memory.
22         Q.   Did you ever talk to any of the
23    federal investigators?
24         A.   No, I did not.
25              (Exhibit No. 18 was marked.)
```

Page 263

```
 1    BY MR. CARTMELL:
 2         Q.   I'm going to hand you what's been
 3    marked as Exhibit 98 -- or excuse me.  That's not
 4    true.  See, I have these numbers on the documents.
 5         MR. JAMES:  I was wondering if I had really
 6    blanked out there for quite some time.
 7         MR. CARTMELL:  I know.  Here we are.  I hand
 8    you what's been marked as Exhibit 18.
 9         THE WITNESS:  Okay.
10         MR. CARTMELL:  I was only 80 off.
11         THE WITNESS:  Just a little bit.
12         MR. CARTMELL:  Yeah.
13         THE WITNESS:  Thank you.
14    BY MR. CARTMELL:
15         Q.   I've handed you Exhibit 18,
16    Ms. Beckhardt, which is a press release that was put
17    out by the Department of Justice in September of 2008
18    with respect to Cephalon and its guilty plea.
19         Have you seen this before?
20         A.   I don't remember.  I probably did,
21    but I don't recall.
22         Q.   As a director of the PR Department
23    and a spokesperson for the company, you suspect that
24    at some point you probably received this; fair?
25         A.   Probably, yes.
```

Page 264

```
 1         Q.   It's titled, "Biopharmaceutical
 2    company, Cephalon, to pay 425 million and enter plea
 3    to resolve allegations of off-label marketing."
 4         Do you see that?
 5         A.   That's correct.
 6         Q.   And were you knowledgeable at the
 7    time that Cephalon actually did pay 425 million
 8    related to the allegations against it for Medicare
 9    and Medicaid fraud and off-label promotion?
10         A.   Yes, I was.
11         Q.   Okay.  It states:
12         (Reading) The suits allege that
13         Cephalon engaged in a scheme to market
14         Gabitril, Actiq and Provigil for
15         unapproved uses in violation of the
16         Food, Drug and Cosmetic Act which
17         requires a company to specify the
18         intended uses of a product in its new
19         drug application to the FDA.  Once
20         approved, the drug may not be marketed
21         or promoted for so-called off-label
22         usage, any use not specified in
23         application and approved by the FDA
24         (end of reading).
25         Do you see that?
```

Page 265

1  A.  Yes.
2  Q.  A couple paragraphs down it says:
3  (Reading) The FDA approved Actiq for
4  use only in opioid-tolerant cancer
5  patients.  Between 2001 and 2003,
6  Cephalon allegedly promoted the drugs
7  for noncancer patients to use for such
8  maladies as migraine, sickle cell pain
9  crises, injuries and in anticipation
10  of changing wound dressings or
11  radiation therapy.  Cephalon also
12  promoted Actiq for use with patients
13  who were not opioid-tolerant (end of
14  reading).
15  Do you see that?
16  A.  I see what it says, yes.
17  Q.  And we just looked at the marketing
18  plans and strategy and tactics that the company was
19  using in 2002 and 2003.  And some of the things in
20  those plans are included here, including sickle cell
21  therapy strategy to expand into that use; correct?
22  A.  That is correct.
23  Q.  Do you know whether or not, in fact,
24  this was -- that strategy of off-label marketing was
25  actually engaged in from 2001 to 2006, or was that

Page 266

1  something that if it was, you didn't know about?
2  MR. JAMES:  Objection.
3  THE WITNESS:  I was aware there was
4  increased usage of our product in other -- other than
5  cancer.
6  BY MR. CARTMELL:
7  Q.  Okay.  Did you at the time suspect
8  that part of that large increase in off-label usage
9  may be the result of the sales team or the marketing
10  strategy put in place?
11  MR. JAMES:  Objection.
12  THE WITNESS:  I had some suspicions, yes.
13  BY MR. CARTMELL:
14  Q.  Did you talk to anybody about that,
15  any management, while you were there?
16  A.  Yes.
17  Q.  Who did you talk to about that?
18  A.  My supervisor.
19  Q.  Who was your supervisor at the time?
20  A.  Cheryl Williams.
21  Q.  And what were you told in response to
22  your concerns?
23  A.  I don't recall.  But she did not have
24  oversight over the marketing strategy in any shape or
25  form.

Page 267

1  Q.  Did you ever talk to Mr. Pyfer and
2  tell him that you had concerns that he was
3  instituting a strategy and tactics of off-label
4  promotion?
5  A.  I don't recall.
6  Q.  You may have, you just don't
7  remember?
8  A.  I don't recall.
9  Q.  In retrospect, now knowing that you
10  had suspicions and concerns about the off-label
11  promotion and marketing at the time at Cephalon, do
12  you wish you had done more to try to stop it?
13  MR. JAMES:  Objection.
14  THE WITNESS:  I don't know how to answer
15  that question.  I don't know the answer.
16  BY MR. CARTMELL:
17  Q.  Have you thought about that?
18  A.  No, I have not thought about that.
19  Q.  It states below:
20  (Reading) Cephalon undertook its
21  off-label promotional practices via a
22  variety of techniques, such as
23  training its sales force to disregard
24  restrictions of the FDA-approved label
25  and to promote the drugs for off-label

Page 268

1  uses.  For example, the Actiq label
2  stated that the drug was for
3  opioid-tolerant cancer patients with
4  breakthrough cancer pain, to be
5  prescribed by an oncologist or pain
6  specialist familiar with opioids.
7  Using the mantra, 'Pain is Pain,'
8  Cephalon instructed the Actiq sales
9  representatives to focus on physicians
10  other than oncologists, including
11  general practitioners, and to promote
12  this drug for many uses other than
13  breakthrough cancer pain (end of
14  reading).
15  Do you see that?
16  A.  I see that.
17  Q.  And is that part of the suspicion
18  that you had maybe going on with the sales team and
19  the marketing team?
20  A.  I did not have any suspicion that we
21  were marketing to general practitioners.
22  Q.  Okay.  But other than that, that's
23  one element here?
24  A.  That is correct.
25  Q.  Other than that, you had suspicions

Page 269

```
 1   of what's stated here?
 2       A.   Yes.
 3       Q.   And is that what you talked to your
 4   superior about?
 5       A.   Yes.
 6       Q.   It states:
 7           (Reading) Cephalon employed sales
 8           representatives and retained medical
 9           professionals to speak to doctors
10           about off-label uses of the three
11           drugs.  The company funded continuing
12           medical education programs through
13           millions of dollars in grants to
14           promote off-label uses of its drugs,
15           in violation of the FDA's requirements
16           (end of reading).
17       Do you see that?
18       A.   Yes, I see that.
19       Q.   Were you involved in doing any of
20   that?
21       A.   No, I was not.
22       Q.   Is this part of the suspicion you
23   had, though, from the sales or marketing teams, that
24   they were hiring and retaining key opinion leaders or
25   professionals to promote off-label usage?
```

Page 270

```
 1       A.   No.
 2       Q.   Do you know if this happened, or you
 3   just don't know one way or the other?
 4       A.   I know that there were physicians who
 5   participated in continuing medical education
 6   programs.
 7       Q.   But you don't know whether or not
 8   there were physicians who were hired simply to
 9   promote for off-label purposes?
10       A.   I do not know that.
11       Q.   Okay.  And then the prosecutor, the
12   main prosecutor from the U.S. Attorney's Office
13   states below:
14           (Reading) This company subverted the
15           very process put in place to protect
16           the public from harm and put patients'
17           health at risk for nothing more than
18           boosting its bottom line.  People have
19           an absolute right to their doctor's
20           best medical judgment.  They need to
21           know the recommendations a doctor
22           makes are not influenced by sales
23           tactics designed to convince the
24           doctor that the drug being prescribed
25           is safe for uses beyond what the FDA
```

Page 271

```
 1           has approved (end of reading).
 2       Do you see that?
 3       A.   Yes, I see that.
 4       Q.   And would you agree with me that with
 5   that last sentence, that although doctors can
 6   prescribe off label, pharmaceutical companies
 7   shouldn't have a strategy to influence those
 8   decisions or have strategies designed to convince
 9   those doctors that the drug being prescribed for the
10   off-label use is safe?  Would you agree with that?
11       A.   Are you talking about marketing
12   strategies?
13       Q.   Yes.
14       A.   Yes.
15       Q.   And was that part of actually the
16   suspicion and the concern you had?
17       MR. JAMES:  Objection.
18       THE WITNESS:  At the time that was not my
19   concern because I believed that having represented
20   physicians in a prior position before I came to
21   Cephalon, and working at an academic cancer center,
22   that physicians have the judgment to sort through the
23   information that they're -- that is shared with them.
24   BY MR. CARTMELL:
25       Q.   Now, knowing what you know and having
```

Page 272

```
 1   worked in pharmaceutical companies, do you suspect
 2   that that may happen, that pharmaceutical companies
 3   use marketing tactics to convince doctors that the
 4   use of off -- excuse me, off-label uses of drugs are
 5   safe?
 6       MR. JAMES:  Objection.
 7       THE WITNESS:  I can't speak to other
 8   products.  I can't speak to other products.
 9   BY MR. CARTMELL:
10       Q.   But do you suspect that now, knowing
11   what you know, that may have happened with Actiq?
12       MR. JAMES:  Objection.
13       THE WITNESS:  Again, I believe that it is
14   true that we sponsored continuing medical education,
15   and -- but I still would maintain that a physician
16   has the discretion and the expertise to weigh the
17   information that's presented to them.
18       MR. CARTMELL:  How long have we been going?
19       MR. JAMES:  Time for a break.
20       MR. CARTMELL:  Break?
21       MR. JAMES:  Yes, let's take a break.
22       THE VIDEOGRAPHER:  Off the record?  We are
23   going off the record.  The time is 4:17 p.m.
24       (Recess taken.)
25       THE VIDEOGRAPHER:  We are back on the
```

Page 273

1  record.  The time is 4:46 p.m.
2  BY MR. CARTMELL:
3       Q.    Okay.  Ms. Beckhardt, we are back on
4  the record after a break.  Are you ready to proceed?
5       A.    Yes.
6       Q.    Okay.  I want to sort of switch gears
7  a little bit.  And we've talked about your
8  involvement during the Actiq years and the internal
9  strategy from a marketing perspective and some things
10 that you were tasked with to do from a public
11 relations standpoint.  But in -- as we discussed
12 previously, in, I believe, September of 2006,
13 Cephalon's new opioid narcotic drug called Fentora
14 came to market; is that correct?
15      A.    Yes.
16      Q.    And we have talked to some other
17 witnesses about this, but I want to make sure it's
18 correct from -- from your memory, and that is that
19 when Fentora came on to the market at around that
20 time, the promotion in marketing by the company of
21 Actiq essentially ceased at that time; correct?
22      A.    At approximately that same time.
23      Q.    Okay.  And is it true that the team
24 that was working on Actiq from a promotional
25 standpoint and from a PR standpoint and from a

Page 274

1  marketing standpoint, did that team just transition
2  to become the Fentora team?
3       A.    Some people did.  Not everybody.
4       Q.    Okay.  Was there any major change in
5  the team?
6       A.    There were some new people who were
7  added to the team.
8       Q.    Do you remember who those people
9  were?
10      A.    For example, on the marketing team,
11 Matt Napoletano was added to the team.
12      Q.    And what was his job description or
13 what did he do?
14      A.    He was a marketer.
15      Q.    I see.  Okay.
16      A.    And then -- but he was a marketer for
17 awhile, and then he was put on our other product,
18 Amrix.
19      Q.    Were you working on Amrix during this
20 time as well or not?
21      A.    Yes.
22      Q.    At any rate, from a marketing
23 perspective and a promotional perspective, though, is
24 it your understanding that as far as the marketing
25 strategies were concerned, those continued and just

Page 275

1  were transferred over to Fentora?
2       MR. JAMES:  Objection.
3       THE WITNESS:  I'm not sure I understand the
4  question.
5  BY MR. CARTMELL:
6       Q.    Well, for example, during the Actiq
7  time period.  There had been, for example, key
8  opinion leaders who had been hired as consultants by
9  Cephalon to consult related to Actiq, for example;
10 correct?
11      A.    Yes.
12      Q.    When Actiq was no longer being
13 promoted by the company and Fentora now was on the
14 market and took its place, were those same key
15 opinion leaders then transferred to Fentora as
16 consultants?
17      A.    I don't know for sure.  I suspect
18 some were.  I don't know if all of them were.
19      Q.    Okay.
20      A.    And I don't know if there were
21 additional people involved as well.
22      Q.    As far as the basic plan and strategy
23 for marketing and promotion and PR, was there any
24 change in that specifically, that you can recall?
25      MR. JAMES:  Objection.

Page 276

1       THE WITNESS:  I -- the biggest change that I
2  would suggest there was is from the very beginning,
3  there was an intent to -- to do clinical trials.
4  BY MR. CARTMELL:
5       Q.    Okay.  And was that because, as we
6  saw from your quote, the company's strategy with
7  respect to Fentora was that even though the FDA had
8  only approved it for cancer pain, breakthrough cancer
9  pain, the strategy was that it would do clinical
10 trials and then submit those to the FDA in noncancer
11 conditions so that that could support a supplemental
12 new drug application and expansion into other pain
13 conditions?
14      A.    Other breakthrough pain cancer
15 conditions.
16      Q.    Other breakthrough cancer conditions?
17      A.    I'm sorry.  Other breakthrough pain
18 conditions.
19      Q.    So it's clear for the jury, the plan
20 from the very beginning with Fentora, I take it, was
21 that studies would be done by key opinion leaders
22 and, for example, back pain and neuro pain; correct?
23      A.    These were major clinical trials.
24 These were not Phase 4 trials.  They were randomized
25 placebo-controlled studies of the use of Fentora for

Page 277

1 breakthrough pain in opioid-tolerant patients in
2 different conditions.  They were studies that were
3 directed by the company, not individual
4 investigators.  And in part the clinical development
5 plan was developed in recognition of the fact that
6 there was use outside the label, and we understood
7 that there was interest in the community and wanted
8 to provide adequate data to be able to guide that
9 usage.
10          (Exhibit No. 19 was marked.)
11          MR. CARTMELL:  Okay.  Let me hand you what's
12 been marked as Exhibit 19, which I believe lists you
13 as the media contact on a press release.
14     Q.    Do you see this?
15     A.    Yes.
16     Q.    And this press release, I think it
17 has a date, it's October 11th of 2006; is that right?
18     A.    That's what it states, yes.
19     Q.    And my understanding from the
20 internal documents and the approval documents for
21 Fentora, Fentora had only been on the market for a
22 month at this time; is that consistent with your
23 memory?
24     A.    I don't remember the exact approval
25 date, but that sounds approximately right.

Page 278

1     Q.    Okay.  And as you stated, the company
2 was doing studies or had been doing studies using
3 this new product that had only been on the market at
4 this time, I think for a month, in off-label
5 conditions like back pain, and I think another one
6 was in some type of neurological pain; correct?
7     A.    Neuropathic pain, correct.
8     Q.    And so this is a press release issued
9 by the company.  It states:
10          (Reading) Frazer, Pennsylvania,
11          October 11, 2006:  Cephalon today
12          announced that data from a Phase 3
13          clinical trial of Fentora demonstrated
14          efficacy in the management of
15          breakthrough pain in opioid-tolerant
16          patients with chronic low back pain
17          (end of reading).
18          Right?
19     A.    That's correct.
20     Q.    So the company had done its own
21 study; is that what you said?
22     A.    Yes.
23     Q.    In other words, they didn't hire
24 consultants or key opinion leaders to do the study?
25     A.    There were people who were brought in

Page 279

1 as clinical investigators in the community, but we
2 directed the development of the study.
3     Q.    Okay.  But you did pay clinical
4 investigators -- I think like was Dr. Portenoy on one
5 of the studies?
6     A.    I don't know if Dr. Portenoy was on
7 one.  He was on our Actiq cancer-related breakthrough
8 pain studies.  I don't know -- recall if Dr. Portenoy
9 was on one of these studies.
10     Q.    Okay.
11     A.    And with respect to payment, the
12 payment, if there was any payment, was consistent
13 with whatever our policy was at the time.  Nothing
14 unusual was done with these investigators as compared
15 to any -- any investigators on any of our studies.
16     Q.    Okay.  At any rate, this is at a time
17 in October, the product has just been on the market
18 for a month, and the company has entered into a
19 RiskMAP, Risk Management Program, as we have seen,
20 where the company has told the FDA that it would not
21 off-label market Fentora, and it was going to do
22 everything it reasonably could to achieve its number
23 one goal, which was to make sure that Fentora was
24 used by cancer patients with breakthrough pain and
25 who were opioid tolerant; correct?

Page 280

1          MR. JAMES:  Objection.
2          THE WITNESS:  These studies were done for
3 scientific purposes, and it doesn't -- it was -- they
4 were ongoing because the decision was made, from a
5 corporate perspective, to first submit the cancer
6 data with the intent that we always were going to
7 submit an SMDA depending on the outcome of the
8 research.
9          MR. CARTMELL:  I will move to strike that as
10 not responsive to my comment.  Let me ask it again.
11     Q.    This press release is at a time in
12 October when Fentora had just come on the market for
13 a month, and the company had entered into a RiskMAP
14 or a Risk Management Program with the FDA, as we've
15 seen, and had told the FDA that it would not
16 off-label market Fentora, and it was going to do
17 everything it reasonably could to achieve its number
18 one goal, which was to make sure that Fentora was
19 used by cancer patients only; correct?
20          MR. JAMES:  Objection.
21          THE WITNESS:  A randomized,
22 placebo-controlled clinical trial is not promotional.
23 BY MR. CARTMELL:
24     Q.    I'm not asking that.  I'm really only
25 asking you -- I'm asking specifically about what time

Page 281

1    period this was and what the RiskMAP said, okay?  So
2    let me ask it again.
3         These studies were -- strike that.
4         The press release that we're looking at is
5    at a time in October when Fentora had just come on
6    the market for one month, and the company had entered
7    into a RiskMAP or a Risk Management Program with the
8    FDA, as we've seen, and the company had told the FDA
9    that it would not off-label make Fentora, and it
10   was going to do everything it reasonably could to
11   achieve its number one goal, which was to make sure
12   that Fentora was used by cancer patients only;
13   correct?
14        MR. JAMES:  Objection.
15   BY MR. CARTMELL:
16        Q.   I'm not asking about the actual
17   studies.  I'm just asking about that.  And then we
18   will talk about the press release.
19        MR. JAMES:  Objection.
20        THE WITNESS:  The -- the RiskMAP -- I think
21   it was called a RiskMAP at that time -- was limited
22   to cancer-related breakthrough pain.
23   BY MR. CARTMELL:
24        Q.   Okay.  And there was nothing in the
25   RiskMAP that said anything like, if you did studies

Page 282

1    on noncancer patients, that the company could use
2    that data and promote those off-label uses; was
3    there?
4         A.   No, there was nothing in the RiskMAP
5    to that extent, because risk maps are tied to an
6    approved indication.
7         Q.   Right.  And so let's look at this
8    press release that you have sent -- you have sent
9    out.  And were you the one responsible for putting
10   this together?
11        A.   Yes.
12        Q.   Okay.  And when you send out a press
13   release like that -- like this, who do you send it
14   to?
15        A.   We -- we had a media distribution
16   list.
17        Q.   Okay.  And that would be media
18   outlets all over America?
19        A.   It was major media outlets.
20        Q.   Okay.  Give us the names of some.
21        A.   It would be, for example, the New
22   York Times, the Wall Street Journal, you know,
23   major -- major press, AP, Reuters, outlets of that
24   nature.
25        Q.   So the company is putting out in its

Page 283

1    press release, sending it to the major press or media
2    outlets, hoping that they pick that up and then they
3    write an article in their media about this; correct?
4         A.   That is correct.
5         Q.   Okay.  And so this states:
6              (Reading) Further data from the
7              Cephalon-sponsored study will be
8              presented at upcoming medical
9              meetings, including a poster
10             presentation at the American Society
11             of Regional Anesthesia and Pain
12             Medicine November 16th
13             and 19th, 2006 in San Francisco (end
14             of reading).
15        Right?
16        A.   That's what it states.
17        Q.   There's then a quote:
18             (Reading) The results of this study
19             suggest that Fentora may have
20             application beyond its current
21             indication in cancer and provide
22             important support to our strategy for
23             future label expansion in breakthrough
24             pain associated with multiple chronic
25             pain conditions (end of reading).

Page 284

1    Correct?
2         A.   Yes.
3         Q.   That's what it says?
4         A.   And that's what I -- yes, that's what
5    I just said.
6         Q.   Right.  So this -- the intent of this
7    press release, though, is that it is seen by patients
8    and physicians out in the public, and that they then
9    learn this information that possibly Fentora can be
10   used for back pain; correct?
11        MR. JAMES:  Objection.
12   BY MR. CARTMELL:
13        Q.   That's the intent?
14        MR. JAMES:  Objection.
15        THE WITNESS:  The intent is for the public
16   to know that there's been a clinical trial, and there
17   are data that is going to be presented at a future
18   medical meeting.
19   BY MR. CARTMELL:
20        Q.   But this is a promotional activity;
21   correct?
22        MR. JAMES:  Objection.
23        THE WITNESS:  It is primarily an investor
24   relations activity, not a promotional activity,
25   because this information was material to our

Page 285

1    business, and, therefore, it needed to be
2    communicated to the investor community that we had
3    completed a major clinical trial.
4         BY MR. CARTMELL:
5         Q.    Because the idea being that if an
6    investor community sees this, your stock price might
7    go up; correct?
8         A.    No.  It's a matter of disclosure.
9         Q.    Well, this is in part a promotional
10   activity as well; correct?
11        MR. JAMES:  Objection.
12        THE WITNESS:  I would not -- promotional
13   activities are intended, in my opinion, to be direct
14   contact, as we talked before, with a clinician who
15   can prescribe.  This is an indirect -- one could say
16   this is an indirect educational outreach, but it is
17   not direct promotional pieces, and it's guided by
18   FDA.  And as you can see, we included all the
19   important safety warnings in this press release as
20   appropriate.
21        BY MR. CARTMELL:
22        Q.    Okay.  The bottom line is, the
23   product has only been approved for cancer pain -- and
24   this is a press release that's sent all over America
25   saying that there are results now that possibly

Page 286

1    allows Fentora to be used for back pain; correct?
2         MR. JAMES:  Objection.
3         THE WITNESS:  That's correct.
4         BY MR. CARTMELL:
5         Q.    And this is within a matter of months
6    that the company has committed to the FDA that its
7    number one goal is to try to ensure that the product
8    will only be used in patients who have cancer pain;
9    correct?
10        MR. JAMES:  Objection.
11        THE WITNESS:  Participation in clinical
12   trial is different than promotion.
13        MR. CARTMELL:  I will object and move to
14   strike that.
15        Q.    My question is a little different
16   than that.  Mine is -- the question is on timing.  My
17   question is:  And this is within a matter of months
18   that the company has committed to the FDA that its
19   number one goal is to try to ensure that the product
20   will only be used in patients who have cancer pain;
21   correct?
22        MR. JAMES:  Objection.
23        THE WITNESS:  This study was begun before
24   then.
25   ///

Page 287

1    BY MR. CARTMELL:
2         Q.    Okay.  I'm not asking about the
3    study.  I'm asking about the press release.  So I
4    will move to strike that.
5         My question only has to do with the timing
6    of this.  I will ask it one more time.
7         My question is this:  This is within a
8    matter of months that the company has committed to
9    the FDA that its number one goal is to try to ensure
10   that the product will only be used in patients who
11   have cancer pain; correct?
12        MR. JAMES:  Objection.
13        THE WITNESS:  The intent of --
14        BY MR. CARTMELL:
15        Q.    I'm not asking about the intent.  I
16   don't mean to -- I'm not asking about the intent.
17        A.    I am answering your question.
18        Q.    You're really not.
19        A.    This is shortly after the Risk
20   Management Program, RiskMAP, was put in place to talk
21   about opioid-tolerant use in cancer patients.
22        Q.    Okay.  I cut you off, so I want to
23   get a clean question and answer.
24        My question is that this is within a matter
25   of months, this press release, that the company has

Page 288

1    committed to the FDA that its number one goal is to
2    try to ensure that the product will only be used in
3    patients who have cancer pain; is that correct?
4         MR. JAMES:  Objection.
5         THE WITNESS:  It's correct in terms of
6    timing.
7         (Exhibit No. 20 was marked.)
8         BY MR. CARTMELL:
9         Q.    I'm going to hand you an Exhibit 20.
10   Sorry.  This is a big one.  I think that's two.  Is
11   that two?
12        A.    It doesn't have a number on it.
13        MR. CARTMELL:  Oh, here you go.  Sorry.
14   It's on my finger.
15        Q.    This is a PowerPoint presentation
16   that came from the internal files and were produced
17   in this litigation.  It's titled, "FAST Team meeting,
18   January 18th, 2007."  And I believe this was in your
19   custodial file.  Do you recognize this?
20        A.    I'm sure that I have seen it before.
21   I don't directly recognize it.
22        Q.    Okay.  The FAST Team, I take it,
23   means Fentora assessment strategy tactics; correct?
24        A.    Yes.
25        Q.    And the FAST Team was involved in

Page 289

1   promotional and marketing strategies as well as
2   public relations; is that correct?
3       A.   It was a cross-functional team.
4       Q.   Including public --
5       A.   Including marketing.
6       Q.   Okay.  Sorry.
7       A.   Including marketing.
8       Q.   And if you go to -- I don't think
9   these -- maybe there is page numbers.  Mine doesn't
10  have it.  Is there another one?  Oh, here's one.
11      I'm looking at the page that's entitled, "PR
12  Update."  Ms. Beckhardt, if you would turn to page
13  68.  I believe it states -- okay.  Okay.
14      If you turn to page 68, there's PR update.
15  Do you see that?
16      A.   Yes.
17      Q.   And 69 has some things, I take it,
18  that you and your team or you were presenting; is
19  that correct?
20      A.   Yes.
21      Q.   One of the things that you were doing
22  related to Fentora at this time was a breakthrough
23  pain awareness campaign; is that right?
24      A.   A disease-specific nonproduct-related
25  campaign, yes.

Page 290

1       Q.   Right.  And we talked about this.
2   But this is a campaign where you were trying to
3   increase the awareness of what's called breakthrough
4   pain; correct?
5       A.   That is correct.
6       Q.   And not -- not just cancer
7   breakthrough pain, but you were talking about
8   increasing the awareness of breakthrough pain in even
9   back pain -- or the cause being back pain or other
10  disease processes causing the breakthrough pain;
11  correct?
12      A.   As we were doing clinical trials in
13  those other areas, yes.
14      Q.   Right.  And so part of the things
15  that you wanted to do is get your messaging out there
16  about the awareness of this disease process or
17  condition called breakthrough pain; correct?
18      A.   Because there was very -- it was very
19  poorly recognized and undertreated at the time.
20      Q.   Right.  And so there were some
21  patients, right, who had cancer breakthrough pain;
22  right?
23      A.   Absolutely.
24      Q.   And that number of patients, as we
25  saw, would be a lot smaller than the number of

Page 291

1   patients that had, for example, breakthrough pain
2   caused by back pain, for instance; correct?
3       MR. JAMES:  Objection.
4       THE WITNESS:  The number of patients who
5   were opioid tolerant were -- there were additional,
6   but I don't think it was that much larger than the
7   actual cancer pain population, if you looked at those
8   patients who were already on opioids around the
9   clock.
10  BY MR. CARTMELL:
11      Q.   Okay.  But -- but -- and then there
12  was other disease states, several others that you
13  were trying to get this information out to
14  breakthrough pain, but their cause was not cancer;
15  correct?
16      A.   That's correct.
17      Q.   And the hopes was -- or the hopes
18  were, for the company, I take it, that these
19  individuals who had breakthrough pain that was not
20  caused by cancer would also be interested in possibly
21  being prescribed your product Fentora; correct?
22      MR. JAMES:  Objection.
23      THE WITNESS:  I didn't speak about the
24  specific products.
25      MR. CARTMELL:  I understand.

Page 292

1       THE WITNESS:  I did disease awareness.
2   BY MR. CARTMELL:
3       Q.   But -- but the only reason that your
4   company would be interested in reaching back pain
5   patients who are on opioids and neuropathic patients
6   who are on opioids and headache and migraine patients
7   who are on opioids, the only reason your company
8   would want to educate them on back -- on breakthrough
9   pain would be if they were potential candidates for
10  your breakthrough pain cancer medication; correct?
11      MR. JAMES:  Objection.
12      THE WITNESS:  The interest in doing disease
13  state of education did correspond with the intent to
14  do a supplemental NDA.
15      MR. CARTMELL:  Right.
16      THE WITNESS:  Which was to expand the
17  indication beyond cancer.
18  BY MR. CARTMELL:
19      Q.   Right.  And you're doing all of this
20  breakthrough pain awareness at a time when the
21  product Fentora did not have an indication and had
22  never been at that point found to be safe and
23  effective in anything other than breakthrough cancer
24  pain; correct?  That's a timing question.
25      A.   What is the timing of this?

Page 293

```
 1        Q.   This is 2007.
 2        A.   Well, this particular plan is after
 3  the data on low back pain were completed.
 4        Q.   Yeah, but --
 5        A.   After that study was completed, in
 6  which we had evidence that suggested that the product
 7  was safe and effective in that population.  It had
 8  not been reviewed by the FDA, but we had the clinical
 9  trial completed.
10        Q.   That's the point, isn't it?  The FDA
11  had not reviewed the data to tell you that it was
12  safe and effective for breakthrough pain in back pain
13  patients, had it?
14        A.   The FDA had not yet.  We had not
15  submitted the application.
16        Q.   But your company decided that you
17  could send out press releases all over America and do
18  breakthrough pain awareness campaigns without the
19  indication at that time, because the FDA hadn't even
20  seen the data; correct?
21        MR. JAMES:  Objection.
22        THE WITNESS:  Sending out a press release --
23  BY MR. CARTMELL:
24        Q.   First of all, you can answer it, and
25  then explain it.  Is that correct?
```

Page 294

```
 1        MR. JAMES:  Objection.
 2        THE WITNESS:  We sent out materials before
 3  the approved indication, yes.  But sending out a
 4  press release is not a direct promotion to
 5  health-care providers who can prescribe the
 6  medication.  And it is consistent with the need under
 7  the FCC to share material information.
 8  BY MR. CARTMELL:
 9        Q.   Do you know if it's consistent with
10  the RiskMAP that obligated the company not to
11  off-label market or promote the product for anything
12  other than cancer pain?  Is it consistent with that?
13        A.   These were clinical trials.
14        Q.   My question is not if it's a clinical
15  trial.
16        A.   Then I -- I understand that, but I do
17  not believe clinical trials are inconsistent with the
18  RiskMAP.
19        Q.   Okay.  Does the RiskMAP mention
20  anything that allowed the company to actually promote
21  or market clinical trials in off-label indications?
22  Does it mention anything?
23        A.   It does not mention that.
24        Q.   Okay.  If you turn to page 70 --
25        A.   Yes.
```

Page 295

```
 1        Q.   -- this is talking about early
 2  Fentora approval coverage.  And this is a quote that
 3  came from a press release that you put out after
 4  Fentora was approved in 2006; correct?
 5        A.   That is correct.
 6        Q.   And at that time you actually
 7  included a quote from your CEO; is that correct?
 8        A.   That's correct.
 9        Q.   Frank Baldino?
10        A.   Yes.
11        Q.   And the quote was:
12             (Reading) Longer-term clinical
13             strategy is focused on developing
14             Fentora for patients with breakthrough
15             pain associated with other conditions,
16             including neuropathic pain and back
17             pain (end of reading).
18        Do you see that?
19        A.   Yes, that's correct.
20        Q.   This is a timing question,
21  Ms. Beckhardt.  But the timing of this statement by
22  your CEO that was put in all of these media outlets
23  and stories were run all around the nation, the
24  timing of this quote was within a matter of months of
25  the company telling the FDA in the RiskMAP that it
```

Page 296

```
 1  would do everything possible to meet its number one
 2  goal which was to ensure that this product was only
 3  used in cancer patients; correct?
 4        MR. JAMES:  Objection.
 5        THE WITNESS:  If you're talking timing, this
 6  press release was issued not too far after the
 7  product was approved for breakthrough cancer pain.
 8  BY MR. CARTMELL:
 9        Q.   Okay.  I want to ask you a question
10  about page 74, if you don't mind.  "Radio Media Tour:
11  Chronic Low Back Pain Study."  Do you see that?
12        A.   Yes.
13        Q.   Now, John Peppin, DO, who is pictured
14  here; is that right?
15        A.   Yes.
16        Q.   He was one of the investigators in
17  the low back pain study with Fentora; is that
18  correct?
19        A.   That's correct.
20        Q.   And he was one of the authors on the
21  publication; is that right?
22        A.   To the best of my memory.
23        Q.   And that publication, incidentally,
24  also included I think Mr. Messina, who is an employee
25  inside of Cephalon; is that correct?
```

Page 297

1      A.    Yes.  He was the head of our clinical
2  development program for Fentora.
3      Q.    Okay.  Okay.  And this Dr. Peppin was
4  a key opinion leader for the company and was a paid
5  consultant for the company?
6      A.    I believe that he did receive payment
7  for some of his activities.
8      Q.    Okay.  And so Mr. Peppin, according
9  to your update on public relations media activities
10  going on with Fentora, did interviews around December
11  19th, around Christmas, with an audience reach of
12  3.5 million people to talk about the results of the
13  Fentora study with chronic low back pain; is that
14  correct?
15      A.    That's correct.
16      Q.    And this is a timing question,
17  Ms. Beckhardt.  But this was in a matter of months
18  that the company had agreed with the FDA that it
19  would try to achieve and ensure as its number one
20  goal that Fentora was only used in cancer patients;
21  correct?
22      MR. JAMES:  Objection.
23      THE WITNESS:  That it is within a few months
24  that we did this radio -- of the approval that we did
25  the radio media tour.

Page 298

1  BY MR. CARTMELL:
2      Q.    And if you look at page 75, it talks
3  about some of the messages that were conveyed by
4  Dr. Peppin; do you see that?
5      A.    Yes.
6      Q.    And when you talk about messages,
7  these were messages -- actually, we've talked about
8  that term "messages" that the company wanted
9  Dr. Peppin to convey in his radio tour; correct?
10      A.    These were messages that we discussed
11  with Dr. Peppin to make sure that he agreed that they
12  were medically accurate based on the data that we had
13  in our clinical trials.
14      Q.    Well, he's a doctor; right?
15      A.    That's right.
16      Q.    He can determine that?
17      A.    That's right.
18      Q.    But at any rate, what he did in this
19  radio media tour that reached 3.5 million people
20  around the country was talk about the use -- what he
21  did in part was talk about the use of Fentora in an
22  off-label condition for back pain; correct?
23      A.    He discussed it in the context of a
24  clinical trial.
25      Q.    Okay.

Page 299

1          (Exhibit No. 21 was marked.)
2  BY MR. CARTMELL:
3      Q.    Let me hand you Exhibit 21, which is
4  another FAST Team meeting PowerPoint six months
5  later.  If you go to the first page of the
6  PowerPoint, you will see this is FAST Team meeting
7  July 20th, 2007.  Do you see that?
8      A.    Yes.
9      Q.    Now the product has been on the
10  market for a little less than a year.  But if you --
11  if you turn to the back -- actually, the last three
12  digits of the -- oh, excuse me, Ms. Beckhardt, if you
13  turn to page -44, please.
14      MR. JAMES:  Bates label -44?
15      MR. CARTMELL:  Yes.
16      THE WITNESS:  This, okay.
17  BY MR. CARTMELL:
18      Q.    This is a slide that's an overview of
19  what the company is planning in 2008; is that
20  correct, for Fentora?
21      A.    This looks to be -- these are
22  presentations of clinical data based on different
23  studies at various medical meetings.
24      Q.    Okay.  So, again, several of these
25  studies deal with off-label usage like back pain and

Page 300

1  neurologic pain; is that correct?
2      A.    I don't know that for certain.  But I
3  would imagine given the timing, that's correct.
4      Q.    Okay.  And -- and one of the things
5  that Cephalon would do as a part of its strategy
6  related to Fentora was these studies that had been
7  done by the company on things other than cancer pain
8  would be presented by doctors at national meetings
9  that involved doctors; is that right?
10      A.    That's standard practice for clinical
11  data to be disseminated at a medical meeting.
12      Q.    Well, it was standard practice of
13  Cephalon --
14      A.    It's standard practice in every
15  pharmaceutical company, and every -- that I'm aware
16  of to release data at a medical meeting where
17  physicians have and other health-care professionals
18  are in an environment where they can do scientific
19  exchange.  It is not considered promotional by the
20  FDA.
21      Q.    Is it your belief that it's standard
22  practice to do this for off-label uses?
23      A.    When you're doing additional --
24      Q.    First, can you answer that question?
25      A.    Do I think it's standard practice?

## Page 301

1    Q.    Let me ask it again.  I didn't mean
2  to cut you off.  But I just -- if you could answer
3  that question so we can move things along.
4      Is it your testimony that it's standard
5  practice at national meetings for doctors to present
6  data related to pharmaceutical medications in
7  off-label studies?
8      A.    Yes.
9      MR. JAMES:  Objection.
10 BY MR. CARTMELL:
11     Q.    Okay.  And if you -- if you look down
12 here, it talks about the presentations at these
13 meetings are going to be about breakthrough pain, and
14 part of the message is going to be -- marketing
15 message is going to be that there are similar
16 characteristics in cancer and noncancer breakthrough
17 pain; correct?
18     A.    I think you're misinterpreting what
19 this says.
20     Q.    Okay.  Let me -- let me ask you,
21 though.  Does the first bullet point say,
22 "Breakthrough pain, similar characteristics in cancer
23 and noncancer"?
24     A.    That was based on clinical data, yes,
25 that is what it says.

## Page 302

1      Q.    Okay.  And I -- I don't think I've
2  asked you this.  But at this time, it's true, is it
3  not, that Fentora was the only breakthrough cancer
4  pain medication on the market?
5      A.    That's not true because Actiq was on
6  the market.
7      Q.    Okay.  That's a good point.  I
8  apologize.
9      Is it true, then, that the only breakthrough
10 cancer pain medications on the market at this time
11 were Actiq and Fentora?
12     A.    That's correct.
13     Q.    Okay.  And is it true also that the
14 only medications at this time that had a breakthrough
15 pain indication of any kind on the market were Actiq
16 and Fentora?
17     A.    That is correct.
18     Q.    So it's true that if you were doing
19 breakthrough pain awareness messaging around America
20 to doctors and patients, and things like that, the
21 only medication that any pharmaceutical company had
22 with that indication was Cephalon; correct?
23     A.    That is correct.
24     Q.    So it's true that you wanted to
25 include awareness of breakthrough pain because you

## Page 303

1  guys had the only drugs that had any indication of
2  breakthrough pain, albeit, it was only for cancer;
3  correct?
4      MR. JAMES:  Objection.
5      THE WITNESS:  We were attempting to do a
6  clinical development plan because we recognized that
7  there was clinical interest in using Actiq and
8  Fentora outside of the approved indication.  And our
9  clinical development plan was designed specifically
10 to address some of the issues we saw with Actiq where
11 usage was outside the label.
12 BY MR. CARTMELL:
13     Q.    Right.
14     A.    And that's why from the beginning of
15 the development we were very clear of our intent to
16 study this outside of cancer so that we could have,
17 in our mind, appropriate information on the label
18 because that's -- because those usages in those
19 patient populations there was breakthrough pain.
20     Q.    But -- but what your company chose to
21 do is not just do the studies, your company decided
22 to have a strategy that those studies would be -- the
23 results for those studies for off-label uses would be
24 shot out in press releases all over America, for one;
25 correct?

## Page 304

1      MR. JAMES:  Objection.
2      THE WITNESS:  You're making it sound like
3  there's something wrong with that.
4  BY MR. CARTMELL:
5      Q.    I'm just asking if that's factually
6  correct.
7      A.    It is correct that we issued press
8  releases.
9      Q.    The other thing you did is you didn't
10 just do those studies and give them to the FDA so
11 that they could decide whether or not it was safe to
12 have Actiq or Fentora used for back pain and other
13 things, is you decided to have key opinion leaders go
14 around America and present those studies to other
15 doctors before it was indicated; correct?
16     A.    We had -- we had data presented at
17 medical meetings by physicians.
18     Q.    And all of that was done at a time
19 when you knew the FDA was extremely concerned about
20 abuse and misuse and diversion of Fentora because of
21 the extreme off-label use that had happened with
22 Actiq; correct?
23     MR. JAMES:  Objection.
24     THE WITNESS:  I don't know that that is what
25 FDA's motivation was.

## Page 305

1    BY MR. CARTMELL:
2        Q.    Okay.  Well, it was all done at a
3    time when the FDA had required you, your company
4    Cephalon, to enter into a Risk Management Program
5    with Fentora; correct?
6        A.    That is correct.
7        Q.    And your company was the only opioid
8    company in America that had a Risk Management Program
9    associated with its drug at that time; correct?
10       A.    That is correct.
11       Q.    And not only that, you decided
12   also -- strike that.
13             Let's turn to page 72, medical center
14   briefings.  This is a slide that talks about
15   presentations that were given around America titled,
16   "Managing Pain:  Improving Patient Outcomes and
17   Minimizing Risks in Opioid Therapy of Chronic Pain."
18             Do you see that?
19       A.    Yes.
20       Q.    Now, Fentora was not approved by the
21   FDA for use in chronic pain; correct?
22       A.    It was approved for use in
23   breakthrough cancer pain, which is a component of
24   chronic pain.
25       Q.    But you could not promote at this

## Page 306

1    time -- in other words, a sales rep couldn't go into
2    a doctor's office and promote the use of Fentora for
3    chronic pain; correct?
4        A.    We never intended to promote it for
5    chronic pain.
6        Q.    Because that would be illegal
7    off-label promotion; correct?
8        MR. JAMES:  Objection.
9        THE WITNESS:  The product was approved for
10   breakthrough pain, and we never intended it for --
11   for it to be a substitute for the products that were
12   used to treat chronic -- the baseline medicines to
13   treat chronic pain.
14   BY MR. CARTMELL:
15       Q.    Ms. Beckhardt, this slide includes
16   the names of several doctors who were giving
17   presentations around America about managing chronic
18   pain; correct?
19       A.    That is correct.
20       Q.    And these presentations were
21   supported and sponsored by Cephalon; correct?
22       A.    That is correct.  They were put
23   together by an independent organ- -- CME company.
24   But we did sponsor the presentations.
25       Q.    And these individual doctors were

## Page 307

1    paid grants or consulting fees to do that for the
2    company; correct?
3        A.    They were not paid by Cephalon.  They
4    were selected by the CME company.
5        Q.    So Cephalon would pay the CME
6    company, and then the CME company may pay them;
7    correct?
8        A.    But we did not select the speaker.
9    We do -- in the CME program, the company does not
10   select the speakers.
11       Q.    But you understood -- just so it's
12   clear to the jury, you understood that you would make
13   a payment to the CME company, and the CME company
14   would then pay the doctor for the time; correct?
15       A.    An honorarium.  But we did not select
16   who those physicians were.
17       Q.    Let's talk about those physicians.
18   Scott Fishman was a key opinion leader, a paid
19   consultant of your company; wasn't he?
20       A.    For a short period of time.
21       Q.    So was Steven Passik; correct?
22       A.    Yes.
23       Q.    So was Gerald Aronoff; correct?
24       A.    Correct.
25       Q.    So was Howard Heit; correct?

## Page 308

1        A.    Yes.
2        Q.    So was Perry Fine; correct?
3        A.    Yes.
4        Q.    Every one of these people were paid
5    consultants of your company who were going around
6    America and talking about the use of Fentora in
7    off-label indications; correct?
8        A.    All of these individuals are key
9    opinion leaders and major, major names within the
10   pain community.
11       Q.    Your company would make sure, right,
12   that they were choosing as their key opinion leaders
13   people who were respected in the community; correct?
14       A.    That is correct.  But some of these
15   people -- for example, Scott Fishman -- was not --
16   was not a prescriber of Actiq or Fentora, to the best
17   of my knowledge.  So these are not people who were
18   selected based on their prescribing practices.  They
19   were selected from the CME company and ourselves
20   based on their expertise in pain medicine.
21       Q.    And also on whether or not they
22   believed in the prescribing of fentanyl-based
23   products for breakthrough pain; correct?
24       A.    These physicians did believe in the
25   prescribing of fentanyl breakthrough pain products

Page 309

1    for breakthrough pain.
2        MR. JAMES: Let's take a break, a quick
3    break. We have been going for awhile.
4        THE VIDEOGRAPHER: We are going off the
5    record. The time is 5:29 p.m.
6        (Recess taken.)
7        THE VIDEOGRAPHER: We are back on the
8    record. The time is 5:38 p.m.
9    BY MR. CARTMELL:
10       Q.    Ms. Beckhardt, we are back on the
11   record after a short break. Are you ready to
12   proceed?
13       A.    Yes.
14       Q.    Now, we were talking about or had
15   been talking about the company's promotion and
16   marketing and PR tactics related to Fentora; do you
17   recall that?
18       A.    Yes.
19       Q.    And in 2008, as we've discussed, the
20   company -- or prior to 2008 submitted some studies on
21   back pain and neuropathic pain to the FDA and asked
22   the FDA to determine whether or not it would allow
23   Cephalon to have an indication and find that it was
24   safe and effective for the company to promote and
25   market and sell Fentora for breakthrough pain in

Page 310

1    other noncancer conditions; correct?
2        A.    That is correct.
3        Q.    And the answer from the FDA was that
4    they did not believe -- although it was efficacious,
5    meaning that the pain therapy worked, they did not
6    believe that it could be indicated because of
7    concerns related to abuse and misuse and diversion;
8    correct?
9        A.    I don't remember the exact language,
10   but I'd have to look at the exact language that FDA
11   used.
12       Q.    At any rate, you recall that the FDA
13   declined the company's application for a broader --
14       A.    That is correct.
15       Q.    -- indication?
16       A.    That is correct.
17       Q.    So even though Cephalon, for a period
18   of time, had been sending out press releases about
19   using Fentora in back pain for two years, and even
20   though Cephalon had been hiring doctors who were
21   talking about studies and back pain and neuropathic
22   pain with Fentora for a period of time, when the FDA
23   was asked if it was safe and effective to approve
24   Fentora for that reason, the FDA said no; correct?
25       MR. JAMES: Objection.

Page 311

1        THE WITNESS: The FDA declined our
2    application for an sNDA; that is correct.
3    BY MR. CARTMELL:
4        Q.    But by the time that the FDA made
5    that determination, it had the ability to review the
6    data, it's true, is it not, that Fentora already had
7    an extreme off-label usage; correct?
8        MR. JAMES: Objection.
9        THE WITNESS: I don't know how to
10   characterize something as extreme.
11   BY MR. CARTMELL:
12       Q.    Well, eight out of ten patients who
13   were on Fentora were not on it for the indicated
14   cancer pain use; correct?
15       A.    I don't remember the exact
16   statistics, but that's probably about right.
17       Q.    Okay. And I think we saw a document
18   that with Actiq, it was nine out of ten patients that
19   were on Actiq for a reason other than cancer pain;
20   correct?
21       A.    That's probably about right. And
22   that's why we undertook the clinical development
23   program --
24       Q.    So --
25       A.    -- where the uses were shown to be

Page 312

1    efficacious.
2        Q.    But isn't it important to you that
3    even though the pain medicine worked, in other words,
4    these are extremely potent pain meds, and what you're
5    saying is they work, right? They help the pain for
6    people with back pain; right?
7        A.    That's correct.
8        Q.    But what the FDA was saying,
9    remember, the FDA was saying, but we don't think it
10   should be expanded to back pain and arthritis and
11   headaches because that's going to make it so
12   available that there's going to be more abuse and
13   misuse and diversion; right?
14       MR. JAMES: Objection.
15       THE WITNESS: I -- I can't say what the FDA
16   was thinking.
17   BY MR. CARTMELL:
18       Q.    Okay. Well, let's look, because we
19   looked at this earlier, at Exhibit 9. The first page
20   of the Director of the Division of Anesthesia,
21   Analgesia and Rheumatology Products memo in April of
22   2008; remember? If we look down at the sentence:
23       (Reading) These Risk Management Plans
24           were designed to limit the prescribing
25           of these products to opioid-tolerant

Page 313

1  patients with breakthrough pain from
2  cancer, with the intent that this
3  would limit the overall prescribing of
4  the medication and perhaps limit the
5  amount of diversion for abuse and the
6  number of -- perhaps limit the amount
7  of diversion for abuse and the number
8  of accidental exposures (end of
9  reading).
10  See that?
11      A.   Yes, I see that.  I can read that.
12      Q.   Okay.  And that's what we talked
13  about earlier, that the whole concern of the FDA was
14  they wanted to keep this limited to cancer patients.
15  That's what this says; right?
16      MR. JAMES: Objection.
17      THE WITNESS:  That is what it says.  And the
18  concern includes the word "perhaps."
19  BY MR. CARTMELL:
20      Q.   Right.
21      A.   It was a theoretical concern.
22      Q.   Well, it wasn't, because let's read
23  the next sentence:
24      (Reading) However, off-label
25      prescribing has unfortunately been

Page 314

1  widely practiced.  In the short time
2  that Fentora has been on the market
3  and despite a limited indication for
4  cancer patients, we have received
5  numerous reports -- numerous reports
6  of serious adverse events related to
7  the product, including deaths in
8  patients, prescribing to
9  nonopioid-tolerant patients,
10  misunderstanding of dosing
11  instructions and inappropriate
12  substitutions of Fentora by
13  pharmacists and prescribers (end of
14  reading).
15      It wasn't just perhaps.  They had experience
16  with it.  They had actual adverse events, including
17  deaths; correct?
18      A.   That --
19      Q.   Ms. Beckhardt, is that correct?
20      A.   That correct.  However, it is one
21  of the reasons we wanted to do these studies, so we
22  could get the data related to these other indications
23  into the label so there could be a better
24  understanding of that usage within those populations.
25      Q.   But that could just -- what the FDA

Page 315

1  was telling you, is that would just increase the
2  numbers even more?
3      MR. JAMES: Objection.
4  BY MR. CARTMELL:
5      Q.   Would be more widely used, that's
6  what they told the company; right?
7      MR. JAMES: Objection.
8      THE WITNESS:  That's what FDA said.  I don't
9  know if I concur with that statement.
10  BY MR. CARTMELL:
11      Q.   The agency issued a public health
12  advisory regarding Fentora last September:
13      (Reading) Additionally, we worked with
14      Cephalon, the sponsor, to make a
15      number of modifications to strengthen
16      the warnings in the product label (end
17      of reading).
18      Do you see that?
19      A.   That's correct.
20      Q.   And then it says in the next
21  paragraph in the middle:
22      (Reading) We are concerned that the
23      sponsor's request to expand the
24      current indication for Fentora to
25      opioid-tolerant patients with

Page 316

1  breakthrough pain who do not have
2  cancer may greatly increase the
3  prescribing of this product, which may
4  increase the availability of the
5  product for diversion, abuse, and
6  misuse, and increase the incidence of
7  accidental exposures which, due to the
8  potency of the product, could
9  potentially have devastating effects
10  (end of reading).
11  Do you see that?
12      A.   I see that statement.
13      Q.   And then it says:
14      (Reading) In this time of increasing
15      abuse of prescription opioid products,
16      it's important to address this
17      potential and to find effective risk
18      mitigation strategies to intervene
19      before it manifests as a public health
20      crisis (end of reading).
21      Do you see that?
22      A.   I see that statement.  But we --
23      Q.   And this was back in 2008; wasn't it?
24      A.   Yes.  But we were a very small part
25  of the market.

1      Q.    So you were a very small part of the
2   abuse and misuse and diversion that led to the opioid
3   crisis?
4      MR. JAMES:  Objection.
5      THE WITNESS:  We saw very low levels of
6   abuse and diversion in our products.
7   BY MR. CARTMELL:
8      Q.    That's -- but remember, we talked
9   about this.  You only know what was reported to the
10  company, don't you?
11     MR. JAMES:  Objection.
12     THE WITNESS:  We had no other evidence.  We
13  did not see any consistent patterns in any geographic
14  areas.  We had no -- we had no information that would
15  suggest that we had a major problem with abuse and
16  diversion.
17  BY MR. CARTMELL:
18     Q.    That's not what the FDA is saying.
19  They said they had increasing reports of serious
20  adverse events; didn't they?
21     MR. JAMES:  Objection.
22     THE WITNESS:  Those aren't -- that is not
23  related to diversion.  Serious adverse events relate
24  to patients who got those products.
25  ///

1   BY MR. CARTMELL:
2      Q.    Let's look at what you just said and
3   determine if that's what the FDA's experience was.
4      Look at, if you would, the last three Bates
5   stamped digits -415.  Wait, that's not going to help
6   you.  -4415.
7      This is actually a memo from a committee
8   within the FDA that was asked to look specifically at
9   whether Cephalon was doing the things they were asked
10  to do in the Fentora Risk Management Program;
11  correct?
12     A.    I have to look at this, please.
13     Q.    Sure.  Are you at that page?  I don't
14  think you are.
15     A.    I'm at -415.  -4415 at the end.
16     Q.    Okay.  Good.
17     A.    Yes, that appears to be an FDA
18  meeting to that effect.
19     Q.    And in the subject -- well, this was
20  a committee that was put together specifically to
21  look at, for the FDA, the Fentora Risk Minimization
22  Action Plan and the post-marketing experience related
23  to that; do you see that?
24     A.    That's correct.
25     Q.    If you go to actually page 2 of that,

1   which is -4418, there's an Executive Summary.  Do you
2   see that?
3      A.    Yes.
4      Q.    This committee gave an Executive
5   Summary to Cephalon, and this is what it says:
6         (Reading) The memorandum provides the
7         office of surveillance and
8         epidemiologies preliminary assessment
9         of the performance of the approved
10        Fentora Risk Minimization Action Plan
11        in meeting its risk minimization goals
12        as well as a review of the overall
13        post-marketing experience with Fentora
14        to date (end of reading).
15     Do you see that?
16     A.    Yes.
17     Q.    So the FDA has actually done -- put
18  together a committee and actually done investigation
19  and looked at, among other things, whether or not
20  your company was doing its job with respect to the
21  risk management plan; correct?
22     MR. JAMES:  Objection.
23     THE WITNESS:  It was looking at the --
24  whether the Risk Management Program was working.
25  ///

1   BY MR. CARTMELL:
2      Q.    Right.  And it also was looking at
3   the post-marketing experience, meaning were there
4   increasing abuse, misuse, diversion, those types of
5   things; right?
6      MR. JAMES:  Objection.
7      THE WITNESS:  Post-marketing experience just
8   means once the product is on the market.
9   BY MR. CARTMELL:
10     Q.    Right.  So what this committee was
11  looking at is after Fentora was on the market and
12  your Risk Management Program was in effect, were you
13  doing your job to try to decrease misuse, abuse,
14  diversion, addiction, things like that?  That's what
15  this committee was looking at; right?
16     MR. JAMES:  Objection.
17     THE WITNESS:  I think the company was
18  looking at the effectiveness of the RiskMAP, which is
19  not just about what a company does but whether the
20  way the RiskMAP was structured was effective.
21  BY MR. CARTMELL:
22     Q.    Well, let's -- let's -- let's look at
23  that.  But before we look at that, isn't it true that
24  Cephalon put together that Risk Management Program?
25     A.    In conjunction with the FDA.  And in

Page 321

1    truth, as we moved forward for the RMS that we
2    proposed with the expanded indication, we actually
3    proposed things that were more -- that included more
4    provisions than the FDA put into the ultimate turf
5    RMS.
6            Q.    The ultimate turf RMS that you're
7    talking about was a more strict, much more strict
8    program?
9            A.    I understand.  What we proposed for
10   the SNDA was stricter than that.
11           Q.    There wasn't a very strict RMS
12   program put into place until 2012; correct?
13           MR. JAMES:  Objection.
14           THE WITNESS:  I understand what we proposed.
15   BY MR. CARTMELL:
16           Q.    I'm just asking for the timing of it.
17           A.    That's correct.
18           Q.    There wasn't a strict RMS program
19   that was really prohibitive related to the use of
20   Fentora put into place until 2012; correct?
21           A.    That's probably about the right
22   timing.
23           Q.    And you had already left the company
24   by then, I think; correct?
25           A.    Yes.  I probably just had left.

Page 322

1            Q.    All right.  And the FDA required you
2    to do a much more intense and restrictive program,
3    Risk Management Program, related to Fentora, didn't
4    it?
5            A.    Not just Fentora.  All products in
6    the class.
7            Q.    Okay.  Let's go and look what they
8    found, this committee that looked at what Cephalon
9    did with Fentora's RiskMAP and how -- how they were
10   doing as far as safety.
11           It states:
12           (Reading) A RiskMAP was approved at
13           the time of the initial FDA approval.
14           Fentora as an important part of its
15           post-marketing risk management to:
16           One, minimize the use of Fentora by
17           opioid nontolerant individuals,
18           minimize misuse of Fentora, and
19           minimize unintended accidental
20           exposures (end of reading).
21           Do you see that?
22           A.    Yes.
23           Q.    If you go down to the next paragraph,
24   it states:
25           (Reading) Fentora use has increased

Page 323

1            more than fivefold since the initial
2            first quarter launch in December 2006
3            with most use occurring off label in
4            noncancer pain indications, and a
5            significant amount of use occurring in
6            opioid-nontolerant individuals (end of
7            reading).
8            Do you see that?
9            A.    I see that it states that.
10           Q.    And that was another requirement of
11   the risk mapping.  In fact, you had continually
12   referred me to that requirement, that one of the
13   biggest concerns with this Fentora drug was it had to
14   be given to opioid-tolerant patients or else it could
15   be very dangerous; correct?  Is that correct?
16           A.    That is correct.
17           Q.    Okay.  And, in fact, the FDA found
18   that in 2007, approximately 59 percent of the
19   patients who filled a prescription for Fentora were
20   on concurrent therapy with a product from the pain
21   market; correct?  Do you see that?
22           A.    That actually suggests that they were
23   opioid tolerant if they were on concurrent therapy.
24           Q.    Okay.  And exactly that's my point.
25   Only 59 percent, meaning 41 percent of the patients

Page 324

1    in 2007 who took Fentora, the FDA found were not
2    opioid tolerant; correct?
3            MR. JAMES:  Objection.
4            THE WITNESS:  According to these statistics.
5    BY MR. CARTMELL:
6            Q.    Four out of ten patients who took the
7    drug were not opioid tolerant, according to these
8    prescriptions, even though the company had told the
9    FDA that it would do everything reasonable in its
10   power to ensure its goal that the patients who took
11   Fentora would be opioid tolerant; correct?
12           MR. JAMES:  Objection.
13           THE WITNESS:  My --
14   BY MR. CARTMELL:
15           Q.    Is that correct?
16           A.    That is correct.  However, I will say
17   that in my -- to my knowledge, I don't believe there
18   were any materials coming out of the company that did
19   not stress opioid tolerance.
20           Q.    Regardless, we know, according to
21   what the FDA found, the program wasn't working
22   because four out of ten patients that were put on
23   that drug were not opioid tolerant; correct?
24           MR. JAMES:  Objection.
25           THE WITNESS:  That's what this statistic

Page 325

```
 1   says.
 2   BY MR. CARTMELL:
 3       Q.   It states:
 4            (Reading) The majority of these
 5       adverse events occurred when patients
 6       were being treated for off-label uses
 7       for Fentora, such as back pain,
 8       chronic noncancer pain, and migraines
 9       (end of reading).
10   Do you see that?
11       A.   I don't see where you are.
12       Q.   Actually, the sentence before:
13            (Reading) Improper use in medication
14       errors account for more than
15       two-thirds of the adverse events
16       reported with Fentora.  The majority
17       of these adverse events occurred when
18       patients were being treated for
19       off-label uses for Fentora, such as
20       back pain, chronic noncancer pain, and
21       migraines (end of reading).
22   Do you see that?
23       A.   Yes.
24       Q.   If you go to the next paragraph --
25   and I want to really stress this, make sure the jury
```

Page 326

```
 1   understands this:
 2            (Reading) Based on this FDA
 3       committee's review:  Based on our
 4       review of the post-marketing
 5       experience with Fentora, we do not
 6       believe the RiskMAP has been effective
 7       in minimizing the risks it was
 8       developed and implemented to minimize.
 9       Cephalon states in their approved
10       RiskMAP that, quote, interventions
11       will be instituted as warranted as
12       follow-up to surveillance and
13       monitoring activities.  But they have
14       never submitted information that
15       interventions and/or adjustments were
16       proactively considered or instituted
17       to address RiskMAP goal failures, in
18       particular, for the failure of the
19       RiskMAP goal number one, that Fentora
20       should be used only by opioid-tolerant
21       patients with cancer (end of reading).
22   Do you see that?
23       A.   I see what it says, yes.
24       Q.   The same concerns and problems that
25   happened with the Actiq RiskMAP, that huge rates of
```

Page 327

```
 1   off-label usage with Fentora just like Actiq;
 2   correct?
 3            MR. JAMES:  Objection.
 4            THE WITNESS:  It was used outside the
 5   approved indication.
 6   BY MR. CARTMELL:
 7       Q.   (Reading) Fentora -- the number
 8       one goal that Fentora should be used
 9       only on opioid-tolerant patients with
10       cancer, a goal that has consistently
11       failed since the launch of Fentora.
12       Instead, Cephalon uses the large
13       extent of product off-label use, which
14       reflects the failure of the RiskMAP
15       goal No. 1, to justify the proposed
16       expanded indication for Fentora (end
17       of reading).
18   Do you see that?
19       A.   Yes.
20       Q.   And that's just what you did to this
21   jury, what you said.  You said you were justifying
22   looking for an expanded use for the indication for
23   Fentora because of this huge off-label Fentora use;
24   weren't you?
25            MR. JAMES:  Objection.
```

Page 328

```
 1            THE WITNESS:  There was off-label use of the
 2   product.  We recognized there was off-label use of
 3   the product.  And we felt that it was appropriate to
 4   have data to support that use and to assess the
 5   safety in those patient populations.
 6   BY MR. CARTMELL:
 7       Q.   And that's what the FDA committee
 8   that was put together by the FDA said was
 9   inappropriate, to justify the off-label use, or the
10   subsequent -- strike that.
11            That's just what the FDA is talking about,
12   the company was trying to justify getting an
13   indication expanded just because it had a huge off
14   label already; right?
15            MR. JAMES:  Objection.
16   BY MR. CARTMELL:
17       Q.   That's what the FDA said?
18            MR. JAMES:  Objection.
19            THE WITNESS:  That is what it states.
20   BY MR. CARTMELL:
21       Q.   It states:
22            (Reading) Expanding the Fentora
23       indication as proposed will most
24       likely amplify and exacerbate the
25       adverse event trends and use pattern,
```

Page 329

```
 1          including use in opioid-nontolerant
 2     individuals we have already observed
 3          (end of reading).
 4          So the FDA is telling the company, this
 5     committee is saying, we've already observed expanding
 6     trends here of adverse events with Fentora; correct?
 7          MR. JAMES:  Objection.
 8          THE WITNESS:  It speculates that expanding
 9     the education may exacerbate trends that they see.
10     BY MR. CARTMELL:
11          Q.   Right.  My point is simply they are
12     already, as of 2008, seeing expanding adverse event
13     trends with Fentora; correct?  That's what it says?
14          A.   I do not recall the date --
15          Q.   I'm just asking if that's what it
16     says.
17          A.   That's what it says.  But I do not
18     recall the date.  And I'd like to review something to
19     see the date of this document relevant -- relative to
20     another document.
21          Q.   That's fine.  Go right ahead.
22          A.   Okay.  Thank you.
23          Q.   Ms. Beckhardt, I'm about done.  And I
24     want to ask you, did you or anybody at the company
25     ever do any research into or look into how many
```

Page 330

```
 1     additional cases of addiction or misuse or abuse or
 2     overdose deaths, those sorts of things, there were
 3     with Actiq or Fentora because of the very high rates
 4     of off-label use?
 5          A.   Our pharmacovigilance team was
 6     responsible for looking at rates of adverse events,
 7     including diversion.
 8          Q.   Did you do any investigation, I guess
 9     my question is, outside the company -- not the
10     reports just to the company -- to do any
11     investigation to see how many additional deaths there
12     were related to Actiq or Fentora because of the huge
13     80 and 90 percent off-label use with Actiq and
14     Fentora?
15          MR. JAMES:  Objection.
16     BY MR. CARTMELL:
17          Q.   Did you do that?
18          A.   I have a memory that we did get some
19     information from some of the additional data sets
20     that were not created by the company.
21          Q.   What were those?
22          A.   I don't remember the names of them.
23          Q.   Where would I go to look for those?
24          MR. JAMES:  Objection.
25          THE WITNESS:  Where would you go to look
```

Page 331

```
 1     for?
 2     BY MR. CARTMELL:
 3          Q.   That data that you're talking about
 4     the company got.
 5          A.   I can't remember the names of the
 6     data sets, so I can't answer that question.
 7          Q.   Looking back in retrospect,
 8     Ms. Beckhardt, we talked about your suspicions and
 9     concerns related to the off-label marketing in the
10     Marketing Department at the company; correct?
11          A.   I had some concerns about some of the
12     approaches that were taken, yes.
13          Q.   And you mentioned that you talked to
14     your superior about that; correct?
15          A.   These were concerns when we were
16     marketing Actiq, and it was before we initiated the
17     clinical trials for Fentora.
18          Q.   Ultimately, Fentora, after not
19     receiving an expanded indication from the FDA, the
20     FDA, as we talked, made or required -- not just
21     Cephalon but other companies in America who were
22     selling opioids to have a RMS, a Risk Management
23     Program, put in place; correct?
24          A.   For the transmucosal immediate
25     release fentanyl products, yes.
```

Page 332

```
 1          Q.   And were you involved in instituting
 2     that process?
 3          A.   No, I was not.  I was involved in
 4     early discussions that we were having that ultimately
 5     led to some recommendations of making the RMS more
 6     stringent that came from Cephalon to the FDA.
 7          Q.   Okay.  Cephalon and Teva stopped
 8     marketing Fentora; is that correct?
 9          A.   I don't know.
10          MR. CARTMELL:  I think that's all the
11     questions I have right now.  Thank you very much for
12     your time.
13          THE WITNESS:  Thank you.
14          MR. CRAWFORD:  I have some.
15          MR. JAMES:  Okay.
16          MR. CRAWFORD:  Could we go off the record
17     for a second, stop the clock.
18          THE VIDEOGRAPHER:  We are going off the
19     record.  The time is 6:03 p.m.
20          (Off the record.)
21          THE VIDEOGRAPHER:  We are back on the
22     record.  The time is 6:04 p.m.
23               EXAMINATION
24     BY MR. CRAWFORD:
25          Q.   Good evening.  I think we just passed
```

Page 333

1  the six o'clock point.  My name is Mark Crawford, I
2  represent the plaintiffs, and I'm going to have a few
3  follow-up questions.
4        I want to hand you Exhibit 22.
5        (Exhibit No. 22 was marked.)
6  BY MR. CRAWFORD:
7        Q.    And this is -- appears to be, just
8  looking down, an email from you to a number of
9  people, Matthew Napoletano, Denise Connelly and
10  others, dated February 3rd, 2006.  And this appears
11  to be attaching some kind of budget for Cooney/Waters
12  Group; correct?
13        A.    That's correct.
14        Q.    And were they a PR firm that Cephalon
15  had hired to help them promote Fentora?
16        A.    They were a PR agency that we hired
17  to help do public relation strategies.
18        Q.    All right.  And were they hired --
19  did, in fact, you hire them or did Cephalon hire them
20  about this time for Fentora?
21        A.    They were working with the company
22  prior to Fentora.
23        Q.    All right.  So for Actiq, they had
24  helped with Actiq as well?
25        A.    That's correct.

Page 334

1        Q.    And this is a budget for the launch
2  of Fentora; correct?
3        A.    May I take a minute to look at this,
4  please?
5        Q.    Yes.
6        A.    It is -- it appears to be a proposal
7  for the Fentora launch as well as other activities,
8  yes.
9        Q.    And was Cooney -- is it
10  Cooney/Waters?
11        A.    Yes.
12        Q.    And were they retained by Cephalon at
13  the time?
14        A.    Yes, they were.
15        Q.    All right.  And was this
16  approximately the budget that they were retained to
17  spend on the Fentora launch?
18        A.    I don't recall.
19        Q.    I think we're looking at a number
20  here --
21        A.    I presume it's probably in the range.
22        Q.    It's $890,000; right?
23        A.    Yes.
24        Q.    And was this -- it looks you're
25  debating whether to go forward with -- with retaining

Page 335

1  them to do this work for that amount; right?
2        A.    The issue was whether or not we were
3  going -- we were going to retain them.  The issue was
4  whether we were going to retain them for all of the
5  activities that are listed here.
6        Q.    All right.  And let's go through it.
7  The activities listed, were these the activities that
8  they, in fact, were retained for?  Take your time to
9  scan through it, if you would like.
10        A.    These are activities that we
11  discussed.  I cannot say whether all of them were
12  implemented.
13        Q.    All right.  Well, were a good number
14  of them, at least --
15        A.    Yes.
16        Q.    -- do you recall implemented?
17        A.    Yes.
18        Q.    Thank you.
19              And Cooney/Waters, they were a PR firm, you
20  were in the PR department at Cephalon.  Did they work
21  closely with you in this process?
22        A.    Yes.
23        Q.    And did they report to anyone else or
24  were they working primarily through your department?
25        A.    They were working primarily with me.

Page 336

1        Q.    All right.  And let's just go through
2  this quickly.  The first one is launch press
3  materials, media outreach prep, identify, secure
4  Cephalon representative and outside expert.
5              Is that something that you recall they
6  actually did?
7        A.    2006 was the initial approval?
8        Q.    Right.
9        A.    I'm sorry.  Could you repeat your
10  question?
11        Q.    Yeah.  The first item is to identify,
12  slash, secure Cephalon representative and outside
13  expert.  Is that something that they actually in fact
14  did?
15        A.    I believe so.
16        Q.    Okay.  And stop me, too.  So they had
17  actually been the PR firm for Cephalon previously for
18  Actiq; correct?
19        A.    That is correct.
20        Q.    And do you know when they came on
21  with Cephalon?
22        A.    I -- my recollection is that it was
23  approximately in -- sometime in 2000.
24        Q.    All right.  So before you got
25  there --

Page 337

1    A.   Correct.
2    Q.   -- they had already been the PR firm
3  for that company?
4    A.   Correct.  It may have been in 2001.
5  Actually, more likely it was 2001.
6    Q.   All right.  And do you know who the
7  Cephalon representative and outside experts were that
8  were eventually identified and secured?
9    A.   I don't recall.
10    Q.   Going down to the third one, it says,
11  "Video B-roll package for approval."  What is that?
12    A.   So a B-roll is video footage that can
13  be distributed to television outlets.
14    Q.   All right.  And was that, in fact,
15  done for Fentora by this company?
16    A.   I suspect it was.  I don't recall
17  what it -- what it was.  But I suspect that it was.
18  It would have been something we would have done.
19    Q.   And this, again -- all these
20  activities were related to the launch of Fentora,
21  because this is coming -- at least this email is
22  early 2006.
23    Do you recall if Fentora was approved
24  approximately September of '06; right?
25    A.   That's correct.

Page 338

1    Q.   And would these activities have
2  started prior to the launch?
3    A.   No.  The planning would have started
4  prior to launch, but they would not have been
5  executed until the product was approved.
6    Q.   Go to the next page, page 3.  Under
7  "Media Relations," it says, "Conduct" -- kind of
8  moving down, "Conduct trade professional media
9  outreach."
10    Is that something that Cooney/Waters
11  assisted your department with --
12    A.   Yes.
13    Q.   -- for the Fentora launch?
14    A.   Yes.
15    Q.   If you would just wait for me to
16  finish my question, just so the court reporter can
17  get it all down.
18    And then below that, "Issues Management."
19  The first one is, "Proactive, slash, PDUFA Date,
20  slash, Approval Preparation."
21    What is PDUFA?
22    A.   The PDUFA date, that's the date that
23  FDA gives you for the anticipated approval of a
24  product.
25    Q.   And one of the items in that

Page 339

1  paragraph is:
2    (Reading) Develop and implement
3    strategy for communications with
4    third-party organizations and KOLs
5    (end of reading).
6    Is that a function that they helped your
7  department with?
8    A.   That is correct.
9    Q.   And below that, "Media monitoring,"
10  that was something that they helped your department
11  with as well?
12    A.   That is correct.
13    Q.   And below that, "Response letters to
14  the media," one of the items, "Expanding coverage for
15  Actiq, slash, FEBT, slash, breakthrough pain."
16    FEBT is another name for Fentora; right?
17    A.   That is correct.
18    Q.   And did they assist your department
19  with that?
20    A.   I don't recall if there were
21  inaccuracies that we had to address.  They would have
22  helped me if there were inaccuracies, but I don't
23  recall.
24    Q.   So that was -- oh:
25    (Reading) Draft media letters

Page 340

1    responding to inaccuracies and
2    expanding coverage for Actiq FEBT
3    breakthrough pain (end of reading).
4    So if there were inaccuracies where that
5  needed to be done, they would have helped you with
6  that; right?
7    A.   That is correct.
8    Q.   And the next, page 4:
9    (Reading) Relationship building,
10    coordination with patient groups,
11    research and consult with groups with
12    which to partner, advise on corporate
13    contributions and ad hoc
14    opportunities, exclude specific
15    collaborations (end of reading).
16    Could you explain what that function was?
17    A.   We worked to identify patient groups,
18  as defined before, as organizations that represent
19  people who have various conditions.  In this case,
20  conditions related to breakthrough pain.  And
21  whether -- to see if there were some mutual --
22  opportunities of mutual interest to both the
23  organization, ourselves.  And once we had built
24  relationships with those organizations, what often
25  happens is that scenario is the organization will

Page 341

1    choose to submit a grant to you, and so you needed to
2    have a process by which to assess whether or not
3    those grants were approvable by the company.
4        Q.    Okay.  And this is something that --
5    that Cooney/Waters helped you with; right?
6        A.    Cooney/Waters did not help with the
7    relationship building, per se.  They helped with what
8    we would consider a landscape assessment, to help
9    identify potential groups that were out there.
10        Q.    And they advise you on corporate
11    contributions to these groups?
12        A.    They would advise on -- if we got a
13    particular contribution, I might have turned to them.
14    I don't recall specifically turning to them, but I
15    could have turned to them to ask their opinion about
16    a particular grant.
17        Q.    About how much to grant the
18    organization?
19        A.    It would not be -- it would not be
20    how much.  It would have been whether or not we would
21    recommend to the committee that reviewed these
22    things, that they would be -- we -- our
23    recommendation was to approve them.
24        Q.    And moving down it says:
25            (Reading) API:  A, target chronic pain

Page 342

1    initiative, provide support to revise
2        and repurpose target chronic pain
3        materials (end of reading).
4        What does that mean?
5        A.    The American Pain Foundation had
6    created a booklet called "Target Chronic Pain" that
7    included information about breakthrough pain, and
8    they had requested funding to revise that document
9    and distribute it.
10        Q.    Okay.  And then they helped you with
11    that?
12        A.    This, as you can see, is
13    out-of-pocket money.  There was no fee associated
14    with that for Cooney/Waters.
15        Q.    All right.  So what does that -- so
16    out of pocket in total, what was that money spent on,
17    then?
18        A.    That would be the -- that was our
19    estimate of the grant request that was going to come
20    in from APF.
21        Q.    And then:
22            (Reading) ACPA, BTP Pamphlet:  Provide
23        support to develop and distribute via
24        web or hand print pamphlet on BTP(end
25        of reading).

Page 343

1        Did they help you with that?
2        A.    Again, there was no out-of-pocket
3    fee.  That was the anticipated amount of the grant
4    request from the ACPA.
5        Q.    All right.  And then going to the
6    last page, 5, under "Relationship Building" still:
7            (Reading) Corporate Contributions and
8        Unrestricted, slash, Educational
9        Grants:  Support organization events,
10        slash, activities and include BTP
11        messages and enhance company image in
12        the pain oncology communities (end of
13        reading).
14        Is that something they helped you out with?
15        A.    This is, again, where we would advise
16    about whether we -- they would advise whether or not
17    there were opportunities in the community to -- to
18    collaborate with organizations or that organizations
19    would submit grants to us.
20        Q.    All right.  And then below that,
21    "Professional meetings and nurse advisory board
22    meetings," is that two functions that they helped
23    your department with?
24        A.    Yes.
25        Q.    And what did that entail for these

Page 344

1    two?
2        A.    So for the professional meetings, it
3    was helping primarily with scheduling meetings with
4    key opinion leaders and patient groups, and to
5    literally serve as meeting coordinators.  Those were
6    meetings that I would attend.
7        The nurse's advisory board was a meeting in
8    which they would -- they assisted in developing as my
9    agency, in developing the meeting agenda and some of
10    the coordination of the -- the logistics of the
11    actual meeting.
12        Q.    And would you attend those nurse
13    advisory board meetings?
14        A.    It was my -- it was my nurse's
15    advisory board.  I was the one who coordinated the
16    nurse's advisory board.
17        Q.    So it was -- nurse's advisory board
18    was developed and created by your department, then?
19        A.    That's correct.
20        Q.    And these professional meetings,
21    these were meetings that were developed and created
22    by your department --
23        A.    That's not correct.
24        Q.    Okay.  So were they already meetings
25    that were going to be held?

Page 345

1     A.    That's correct.  It's the American
2  Society of Pain Management Nursing, American Pain
3  Society, American Academy of Cancer -- I can't
4  remember what CPI stands for; it's a cancer
5  organization -- American Academy of Pain Medicine.
6          These were professional society meetings
7  that were already occurring that Cephalon had nothing
8  to do with.  We were using those meetings as an
9  opportunity to understand the community better.
10     Q.    And you said you attended these
11 meetings; right?
12     A.    I did attend those meetings.
13     Q.    Did you talk about breakthrough pain
14 at these meetings?
15     A.    I talked to key opinion leaders about
16 their perspective on breakthrough pain.  I did not
17 talk about product.
18          MR. CRAWFORD:  Let's mark the next exhibit,
19 2081.
20              (Exhibit No. 23 was marked.)
21          MR. CRAWFORD:  And let's mark the two after
22 that as well, 2085 and 1917.  So the exhibits -- I'm
23 sorry; 23, 24, and 25.
24              (Exhibit No. 24 was marked.)
25              (Exhibit No. 25 was marked.)

Page 346

1          MR. CRAWFORD:  Here we go.
2     Q.    We have marked Exhibits 23, 24, and
3  25.  I believe these are all related, but I want you
4  to take a look.  The first one is an April 9, 2004
5  email from Andy Pyfer to a number of people including
6  you, "Re:  Important News, New Tools Available."  And
7  then there are references to two documents, I
8  believe, or two -- two points here.
9          And what I want you to let me know, take a
10 look.  They are talking about -- let me read it here.
11 It says:
12          (Reading) Hi, Directors.  I have two
13          very important things to tell you
14          about.  Please read the entire email
15          (end of reading).
16 Let's go through this here.
17 So 1 is:
18          (Reading) When you have a minute,
19          please check out the link at the
20          bottom of this email.  Our PR person
21          for Actiq, Stacey Beckhardt, has been
22          working with the American Pain
23          Foundation (APF) over the last year to
24          develop tools to raise awareness of
25          the importance of assessing and

Page 347

1          treating chronic pain, especially BTP
2          as a component of chronic pain (end of
3          reading).
4          Is that in fact true, that you had worked
5  with the APF over the last year?
6     A.    I think the word "work" is a bit
7  misleading.  I did, in fact, speak on many occasions
8  with APF about the need for breakthrough pain and
9  breakthrough cancer pain education, because as a pain
10 organization, they had not been providing patient
11 education in this regard.
12          We subsequently did provide unrestricted
13 grants for them to work on these projects.
14     Q.    And it says:
15          (Reading) Through Cephalon support,
16          the APF developed two tools to do just
17          this.  They are the Target Chronic
18          Pain Card, which is a
19          clinician-focused tool to assess in
20          assessing and managing pain, and the
21          Target Chronic Pain Notebook, which is
22          a patient-focused pain diary type of
23          tool.  Both of these tools were
24          developed by KOL nurses with expertise
25          in pain and supported through grants

Page 348

1          of Cephalon (end of reading).
2          Is that an accurate statement?
3     A.    The projects were supported by grants
4  from Cephalon.  I just want to clarify that, not the
5  nurses.  The nurses were KOLs, but we did not provide
6  grants to those nurses.  So I just want to clarify
7  that.
8     Q.    So were they Cephalon's KOLs, those
9  nurses?
10     A.    I don't know what you mean by a
11 Cephalon KOL.
12     Q.    Okay.  Were they --
13     A.    They were key opinion leaders in
14 the -- in the field.
15     Q.    But were any of them paid by Cephalon
16 in any way?
17     A.    Some of them were and some were on
18 our nurse's advisory board.
19     Q.    And some of these nurses, in fact,
20 helped develop these materials; right?
21     A.    Yes.  And some of them were involved
22 in our clinical trials.  And so they -- they had
23 long-standing expertise in the field of breakthrough
24 pain, and they were cancer specialists as well as
25 pain management specialists.

## Page 349

1      Q.    All right.  Then it says:
2            (Reading) Unfortunately, we will not
3            be permitted to have our reps
4            disseminate these tools.  However, we
5            will be able to provide our reps with
6            order forms so that their pain
7            clinics' offices may order them from
8            APF for use in their practices.  Each
9            rep will receive examples of each tool
10           and order forms in the very near
11           future (end of reading).
12     Do you if in fact that was done, providing
13     these reps with these order forms to order -- so
14     their -- the people called upon could order from the
15     APF?
16     A.    I don't know if that was done.
17     Q.    And can you look at Exhibit 25.  This
18     is an educational grant draft request; correct?
19     A.    Yes.
20     Q.    And this is one that you -- if you
21     look at the fourth page, that's your signature;
22     correct?
23     A.    That is my signature, yes.
24     Q.    What is this form here?  Is this a --
25     A.    This form on page -- this next page?

## Page 350

1      Q.    4, yeah.
2      A.    This is an educational grant request
3      form.  We had a committee that reviewed grant
4      requests that included at this time scientific
5      communications, medical affairs, and our compliance
6      person from legal and government affairs.
7      Q.    All right.  And you -- this is your
8      signature; right?
9      A.    Yes.
10     Q.    Okay.  And this is a grant --
11     Cephalon was the only sponsor of this program;
12     correct?
13     A.    To my memory, we were the only
14     sponsor of this program.
15     Q.    And it was a grant of $75,500;
16     correct?
17     A.    That's correct.
18     Q.    And that was to disseminate patient
19     education and related materials; correct?
20     A.    That is correct.
21     Q.    And attached to the request are the
22     materials; correct?
23     A.    If I may look at this for a second,
24     please.  This was a request to reprint existing
25     materials.

## Page 351

1      Q.    All right.  And Cephalon was going to
2      pay for its dissemination; right?
3      A.    That was the grant request, yes.
4      Q.    And were these the materials
5      referenced by Mr. Pyfer in point 1 of his email?
6      A.    Yes, they are.
7      Q.    And did you get a chance to review
8      these materials before they were disseminated?
9      A.    We did not have a chance to review
10     the materials before they were finalized, because
11     they were finalized, and we were asked for an
12     additional grant for dissemination.
13     Yes, we did review the materials to make
14     sure that they had no product reference and that they
15     were just disease state education.
16     Q.    And disease state meaning
17     breakthrough pain was one of the disease states;
18     right?
19     A.    That is correct.
20     Q.    Okay.  Turn to page 3 of the first
21     handout.  On the right-hand column these are the
22     disease states that you're referring to; right?  It
23     says:
24           (Reading) Chronic pain lasts beyond
25           the usual healing time for an illness

## Page 352

1            or injury.  It can last for months to
2            years.  At times it can go away
3            completely or it can remain constant.
4            Types of chronic pain, colon (end of
5            reading).
6      And then it lists three:  Intermittent pain,
7      persistent pain and breakthrough pain; right?
8      A.    That's correct.
9      Q.    And are those three pains types of
10     chronic pain, in your view?
11     A.    Yes.
12     Q.    And one of them is breakthrough pain;
13     right?
14     A.    That's correct.
15     Q.    And breakthrough pain was treated by
16     Fentora and Actiq; right?
17     A.    That is correct.
18     Q.    And those were the only two products
19     on the market at this time that treated breakthrough
20     pain; right?
21     A.    That is correct.
22     MR. JAMES:  Objection.
23     BY MR. CARTMELL:
24     Q.    And, in fact, they were only approved
25     for cancer breakthrough pain; right?

Page 353

1    A.    That is correct.
2    Q.    But there's no reference at all
3 anywhere in this paragraph that -- to cancer; right?
4    A.    That is correct, because this is
5 disease awareness.  It was not about our products.
6    Q.    And this is a brochure that's
7 intended for the patient; right?
8    A.    The first section of this is intended
9 for -- for people living with chronic pain and acute
10 pain, yes.  They are intended for patients.  The last
11 two pages of this document were intended by the
12 American Pain Foundation to be a companion piece that
13 they -- they themselves, not Cephalon, would
14 disseminate to healthcare professionals to facilitate
15 a dialogue between healthcare professionals and
16 patients about chronic pain.
17    Q.    So you're talking about the document
18 at page --
19    A.    -46 and -47.
20    Q.    And that was intended for physicians;
21 right?
22    A.    And other healthcare professionals,
23 yes.
24    Q.    And the one for patients has no
25 reference to any risk of addiction; correct?  From

Page 354

1 any pain -- any opioid pain medication; right?
2 Strike that.
3        And then let's take a look at Exhibit 24.
4 Looking at a paragraph 2 first of 23.  Mr. Pyfer
5 writes:
6        (Reading) Another incredibly important
7        tool has been developed by Stacey in
8        PR.  This tool is a nonbranded BTP
9        brochure entitled, "Breakthrough Pain:
10       Do you still have pain?"  And it
11       should serve as a tremendous
12       complement to a nonbranded BTP posters
13       and table cards in raising awareness
14       of BTP in your pain clinics, slash,
15       offices (end of reading).
16       Is that accurate, that that was a tool that
17 you developed?
18    A.    That is correct.
19    Q.    And why did you develop this tool?
20    A.    I was asked to create materials that
21 would help awareness of breakthrough pain.
22    Q.    All right.
23    A.    In the patient community.
24    Q.    And who asked you to do that?
25    A.    It was consistent with the marketing

Page 355

1 strategy.
2    Q.    And that included the -- we're in
3 2006 here.  Was that -- was that a marketing plan for
4 Fentora to do that?
5        I'm sorry.  Strike that.
6        All right.  So what we marked as 24, you
7 have written here to Paula Castagno:
8        (Reading) Paula, pretty sure this is
9        the final version of the brochure.  I
10       left you a detailed message about the
11       ACPA brochure.  To recap, I would be
12       happy to facilitate.  But would you
13       first like -- but would first like to
14       know if you have had the opportunity
15       to talk to PDRC about the concept (end
16       of reading).
17       Then going on below:
18       (Reading) In addition, I wanted to
19       remind you that we have other PR
20       pieces that could possibly be
21       repurposed, e.g., a glossary that
22       needs a couple minor updates and a BTP
23       fact sheet prepared by the media and
24       that have already received PDRC
25       approval, Stacey (end of reading).

Page 356

1        And what I want to ask you, is the attached
2 "Breakthrough Pain:  Do you still have pain?" is that
3 the piece that you are talking about repurposing?
4    A.    No.
5    Q.    Okay.  So why -- why did you attach
6 this piece to this email?
7    A.    Because I was asked to provide a
8 final version of a particular brochure that I worked
9 on.
10    Q.    And did you work on this brochure?
11    A.    Yes, I did.
12    Q.    Okay.  And is this the same brochure
13 that's referenced in Exhibit 23?
14    A.    Yes, it is.
15    Q.    And I'm just trying to understand.
16 So what was -- why were you blowing the dust off it
17 here in this email?  This is 2006 in this email.
18 Exhibit 24.
19    A.    I -- I don't recall why the team was
20 interested in using it again.
21    Q.    So this is the -- this is the
22 brochure that Mr. Pyfer is referencing in this -- and
23 you prepared this at somebody's direction with regard
24 to the market strategy for Fentora; right?
25    A.    It was consistent with the marketing

Page 357

1  strategy, yes.
2      Q.    And what I want to ask here is at the
3  time you prepared this in '04, Actiq was the only
4  medication approved for any kind of breakthrough
5  pain; right?
6      A.    That is true.
7      Q.    And -- but it was only approved for
8  cancer; correct?
9      A.    That is correct.
10      Q.    And is there any reference in this
11  brochure about cancer?
12      A.    There are examples of -- there are
13  examples. The examples, for example, on page -- your
14  page -745 in the first column, the bottom paragraph,
15  talks about cancer patients' breakthrough pain flares
16  can peak in as little as three to five minutes and
17  last about 30 minutes. Those were all based on
18  cancer-related data. And it specifically gives the
19  reference to cancer.
20      Q.    But it doesn't say it's only approved
21  for cancer; correct?
22      MR. JAMES: Objection.
23      THE WITNESS: This is not a disease --
24  brochure that was intended to talk about product. It
25  only talks about disease state.

Page 358

1  BY MR. CRAWFORD:
2      Q.    But it does convey to the patient
3  here that there is a product to treat the
4  breakthrough pain; right?
5      A.    I'm not sure I understand where
6  you're referring to.
7      Q.    Well, I mean, this -- the purpose of
8  this brochure is to educate and make patients aware
9  that there might be some kind of treatment or
10  medication for their breakthrough pain; right?
11      A.    The purpose --
12      MR. JAMES: Objection.
13      THE WITNESS: The purpose of the brochure
14  was to make patients aware of whether or not they
15  were experiencing breakthrough pain. We did not
16  market direct to patients. It was not appropriate to
17  talk to them about treatments in this -- in this kind
18  of brochure.
19  BY MR. CRAWFORD:
20      Q.    So how was a brochure supposed to be
21  put into the hands of the patients? Is it as
22  Mr. Pyfer references here in his Exhibit 23?
23      MR. JAMES: Objection.
24      THE WITNESS: The brochure was intended to
25  be -- originally was intended to be provided to the

Page 359

1  sales force, as suggested here, for distribution, not
2  by Cephalon, but by physicians who chose to
3  distribute the brochures.
4  BY MR. CRAWFORD:
5      Q.    So he says:
6          (Reading) We will be shipping a
7          boatload (500 brochures) of these to
8          each rep along with the brochure
9          holders, only 15 initially due to
10          manufacture constraints, et cetera, in
11          the second quarter shipment, so that
12          they can be utilized in patient
13          waiting rooms to raise awareness of
14          BTP. Considering the incredible
15          historical impact of the nonbranded
16          BTP posters and table cards, I believe
17          that this tool may be the most
18          important, quote, sales aid, unquote,
19          we develop this year. Please
20          encourage your reps to utilize these
21          brochures in every clinical -- clinic
22          office possible. The more patients
23          and clinicians talk about BTP, the
24          greater chance we have at being
25          prescribed (end of reading).

Page 360

1          So really this was intended by the company
2  then to be a sales aid to be left in the doctor's
3  office of either -- by the doctor or through the
4  sales of giving it to the doctor; right?
5      MR. JAMES: Objection.
6      THE WITNESS: After I developed the
7  materials, Andy Pyfer thought that that was a good
8  way to disseminate the materials.
9  BY MR. CRAWFORD:
10      Q.    So if you turn to page -46 on the
11  bottom here.
12      A.    Yes.
13      Q.    There is a box says:
14          (Reading) Get rid of common myths
15          about pain. Asking for pain medicine
16          is not a sign of weakness. Side
17          effects of pain medicines can be
18          managed. Concerns about addiction
19          should not prevent proper pain
20          management (end of reading).
21          So this box is a reference -- is intended to
22  be a reference to the patient that there are
23  medications available and they shouldn't have to
24  worry about addiction; right?
25      MR. JAMES: Objection.

Page 361

1      THE WITNESS:  It does not say you shouldn't
2   worry about addiction.  It suggests that you may --
3   you should not be so afraid of addiction that you
4   don't seek out pain management.
5   BY MR. CRAWFORD:
6      Q.    And, again, the whole disease state
7   that is being conveyed here is breakthrough pain;
8   right?
9      A.    That's right.  With examples from
10   cancer patients.
11      Q.    But it doesn't say it's only for
12   cancer patients in the --
13      A.    That's correct.
14      Q.    All right.  I just want to mark the
15   next -- actually, what I think I will do is mark the
16   next three exhibits.  So we're marking 26, 27, and
17   28.
18          (Exhibit No. 26 was marked.)
19          (Exhibit No. 27 was marked.)
20          (Exhibit No. 28 was marked.)
21      MR. CRAWFORD:  How many minutes do I have
22   left?
23      MR. WOLFE:  I've got you at 16 minutes.
24      MR. CRAWFORD:  27.  And 28.
25      Q.    This is a series of three exhibits.

Page 362

1   I just want to have you identify them and whether
2   this is accurate.
3          So 26 is an educational grant request for
4   $33,800 to the American Chronic Pain Association.
5   It's dated in September 2006.  And this -- again,
6   this is one that you signed off on on the next page,
7   -594; correct?
8      A.    That is correct.
9      Q.    And -- and this was to -- for a
10   "patient brochure and radio media tour on BTP during
11   September Pain Awareness Month to be developed,
12   slash, sponsored by a patient advocacy group"; is
13   that correct?
14      A.    That is correct.
15      Q.    And this is, again, right before the
16   launch of Fentora that this was approved, right, by
17   this committee?
18      A.    I'm sorry.
19      Q.    Was this approved -- when it's signed
20   off by the committee, does that mean it was approved?
21      A.    Yes.
22      Q.    Okay.  And it was approved just about
23   when Fentora was approved and launched; right?
24      A.    Yes.  That is correct.
25      Q.    And what I want to ask here is, we

Page 363

1   marked Exhibit 27.  It's an email from Katherine
2   Collier with CCTU dated October 2nd, 2006, APA --
3   ACPA brochure, the attachment is "Breakthrough pain
4   9-20-06 PDF."
5          Is this the brochure that came out of this
6   grant?
7      A.    Yes, it is.
8      Q.    Okay.  And 2076, is that a color copy
9   of it?
10      A.    This -- 28?
11      Q.    I'm sorry.  28, yes.
12      A.    Yes, that is a color copy of the
13   brochure.
14      Q.    All right.  And the purpose of this
15   brochure, what was it supposed to -- who is it
16   supposed to be disseminated to?  Patients, correct?
17      A.    It is a patient -- it is a patient
18   brochure.
19      Q.    And this was going to be disseminated
20   by the ACPA; correct?
21      A.    That's correct.
22      Q.    And that's the American Chronic Pain
23   Association; right?
24      A.    That is correct.  It is a patient
25   organization.

Page 364

1      Q.    And the title of the document or the
2   brochure is, "Managing Breakthrough Pain, BTP"; is
3   that right?
4      A.    That's correct.
5      Q.    And that was -- as we had seen, that
6   is a type of chronic pain; right?
7      A.    Yes, it is a type of chronic pain.
8      Q.    And --
9      A.    But it is a type of chronic pain that
10   is managed on top of -- of around-the-clock pain.
11      Q.    And in this patient brochure, there's
12   nothing in this brochure that talks about the risk of
13   addiction; correct?
14      A.    That is correct.  It is a disease
15   awareness brochure.  It is not a -- it's not a
16   brochure about product.
17      Q.    But it does say on the second page,
18   second column, it says:
19          (Reading) Talk to your doctor about
20          medication that might help during BTP
21          episodes.  When using pain medications
22          for BTP, the goal should always be
23          improve pain relief and improve
24          function (end of reading).
25          So the only medication on the market at this

Page 365

1    time would have been Fentora and Actiq, both -- both
2    products made by Cephalon; right?
3          MR. JAMES:  Objection.
4          THE WITNESS:  That is correct.  This -- this
5    brochure was -- was developed independent of our
6    input.
7    BY MR. CRAWFORD:
8          Q.    But the intention was to fund a
9    brochure and a radio media tour on BTP that would be
10   released during Pain Awareness Month in September;
11   correct?
12         A.    That is correct.
13         Q.    And if you look at Exhibit 27,
14   there's a reference to a radio media tour on
15   breakthrough pain with Penny Cowan as the person with
16   pain and Dr. Knox Todd, professor of emergency
17   medicine.
18         Knox Todd was a paid Cephalon consultant;
19   correct, at this time?
20         A.    I do not -- I do not believe so, but
21   I don't know that for sure.  He was on the Board of
22   Directors of ACPA which is how Penny Cowan knew him.
23         Q.    All right.  And was -- the intention
24   was that some of these funds would be used from the
25   grant to pay Dr. Todd for his services --

Page 366

1          A.    No.
2          Q.    No?  So how -- did he get compensated
3    in any way for doing that radio media tour?
4          A.    Not to the best of my knowledge.
5          Q.    So he did it free?
6          A.    He's on the board of directors of a
7    patient advocacy organization, so yes.
8          Q.    Does he get paid as a member of the
9    board?
10         A.    No, he does not.
11         MR. CRAWFORD:  Now I want to mark two more
12   exhibits.  That will be 29 and 30.  How much time do
13   I have?
14         MR. WOLFE:  Ten.
15         (Exhibit No. 29 was marked.)
16         MR. CRAWFORD:  So 1930 and 2040.
17         Q.    I have marked here another
18   Educational Grant Draft Request for the American Pain
19   Foundation.  The amount is $25,000.  "Type of program
20   PR:  Patient-focused book on treatment options to be
21   developed by a patient advocacy group."  It's signed
22   off in about -- in September of '06.
23         That's about the time that Fentora was
24   approved; right?
25         A.    That's correct.

Page 367

1          Q.    And you signed off on this on the
2    next page; right?
3          A.    I signed off on this as the
4    submitter, yes.
5          Q.    And then attached to it is a letter
6    dated May 10th, 2006, from the American Pain
7    Foundation, Wilbert Rowe, and he is asking for
8    $25,000 to distribute American Pain Foundation's new
9    book, "Treatment Options for Pain"; correct?
10         A.    To produce and distribute.
11         Q.    And so this grant is to fund the --
12   is it to fund the production of the book and
13   distribution or just the distribution?
14         A.    Production and distribution, which is
15   an important distinction.  We had not seen any of the
16   content when we gave this grant.
17         (Exhibit No. 30 was marked.)
18   BY MR. CRAWFORD:
19         Q.    So but -- okay.  So let's take a
20   look.  It is Exhibit 30.  Is that the book that was
21   eventually produced out of this?
22         A.    Yes.
23         Q.    Okay.  And if you take a look at the
24   book, it does say at page -499 that Cephalon made
25   contributions to this; correct?

Page 368

1          A.    Financial contributions.  Not content
2    contributions.
3          Q.    Okay.  But if you look at page -501,
4    it says:
5          (Reading) American Pain Foundation
6          Board, reviewer -- physician
7          reviewers, Dr. Scott Fishman and
8          Dr. Russell Portenoy (end of reading).
9          Do you see that?
10         A.    That's correct.
11         Q.    And they were Cephalon-paid
12   consultants; correct?
13         A.    They were certain points in time that
14   they were compensated for certain work that they did.
15   They were both unpaid board members of the American
16   Pain Foundation.
17         Q.    But they were paid by Cephalon at
18   some point as consultants; right?
19         A.    For specific projects that they did.
20   Russ Portenoy, for example, was a clinical
21   investigator for the company.
22         Q.    How about Dr. Fishman, was he paid to
23   be a KOL by Cephalon?
24         A.    Dr. Fishman was a KOL, is a KOL.  He
25   is one of -- the two of these are two of the most

Page 369

1   prominent pain specialists in the country.  I don't
2   remember specifically Dr. Fishman being compensated
3   by Cephalon.  I just don't recall.  I know that we
4   did some projects with him, but I do not specifically
5   recall him being compensated for those projects.
6       Q.   So you're not sure if he was a paid
7   KOL by Cephalon or a paid speaker?
8       A.   That is correct.
9       Q.   All right.  And if you could go to
10  -516, this page does talk about breakthrough pain;
11  correct?
12      A.   Where are you reading?
13      Q.   I'm sorry.  -516, in the bubble it
14  would be.  It's a little hard to read.  But it
15  says -- it's up on the screen --
16           (Reading) Pain is considered
17           breakthrough pain when it breaks
18           through the pain medication being used
19           to treat persistent pain.
20           Breakthrough pain, BTP, can occur
21           suddenly in bursts and may last for
22           short periods of time.  BTP can also
23           be experienced during pain-producing
24           activities.  BTP can result when the
25           dose of a long-acting opioid begins to

Page 370

1           wear away (end of reading).
2       And that -- did I read that correctly?
3       A.   Yes, you did.
4       Q.   And it does say next to the bubble:
5           (Reading) Fentanyl is also available
6           in a losange.  In this formulation it
7           has a quick on set and short duration
8           of effect that makes it especially
9           useful for the treatment of, quote,
10          breakthrough, unquote, pain (end of
11          reading)?
12      Right?  And at this time, when this
13  publication comes out, or at least when you've
14  attached it, Fentora and Actiq are the only two
15  breakthrough pain medications out there; right?
16      A.   That is correct.
17      Q.   And they are only approved, as you
18  acknowledge, for cancer pain; right?  Cancer
19  breakthrough pain?
20      A.   That is correct.
21      Q.   And no -- there's no reference here
22  that this drug that's being referenced is not
23  approved for cancer breakthrough pain; is there?
24      MR. JAMES:  Objection.
25      THE WITNESS:  The content of this brochure

Page 371

1   was not created by us.  It was created by a patient
2   organization.
3   BY MR. CRAWFORD:
4       Q.   But with reviewers who at some point,
5   at least one of them that you're aware of, was paid
6   by Cephalon, right, Dr. Portenoy?
7       A.   This brochure includes reference to a
8   number of medications, to my memory.  I haven't had a
9   chance -- I know we're short on time.  But if you
10  look through it, it refers to a lot of medications,
11  not just breakthrough pain medicines.  This was
12  intended as a broad look at the field of pain
13  medicine from a patient perspective.
14      Q.   One of the medications it's referring
15  to is breakthrough pain medication, which at the time
16  was only Fentora; right -- and Actiq?
17      A.   That is correct.
18      Q.   And Cephalon, at least in part,
19  funded the creation and distribution of this booklet;
20  right?
21      A.   We were one of the funders, yes.
22      MR. CRAWFORD:  Let me just check my outline
23  here.
24      All right.  That's all I have.  Thank you.
25      THE WITNESS:  Thank you.

Page 372

1       MR. GASTEL:  Do you want to take a quick
2   five-minute break?
3       THE VIDEOGRAPHER:  We are going off the
4   record.  The time is 6:53 p.m.
5       (Recess taken.)
6       THE VIDEOGRAPHER:  We are back on the
7   record.  The time is seven o'clock p.m.
8           EXAMINATION
9   BY MR. GASTEL:
10      Q.   Good evening, Ms. Beckhardt, my name
11  is Ben Gastel and I represent plaintiffs in the
12  Tennessee lawsuits that have been cross-noticed into
13  this deposition.  And I represent some folks in
14  different cases than the two attorneys who have been
15  asking you questions previously today.
16      I began all of these examinations with an
17  objection.  We have a standing objection about these
18  depositions going forward.  I will just lodge it, and
19  we will continue.
20      But my first question is, is during your
21  work for Cephalon and Teva, did you ever on occasion
22  have chance to travel to the state of Tennessee?
23      A.   Not that I recall.  There -- not that
24  I recall.
25      Q.   And let me back up and do one

## Page 373

1  preliminary thing as well.
2      Where do you currently live?
3      A.   North of San Francisco.
4      Q.   What is your exact address?
5      A.   ███████████████████████
6      ███
7      Q.   How long have you lived there?
8      A.   Three-and-a-half years.
9      Q.   Who lives there with you?
10     A.   My partner, Andrew Litwood.
11     Q.   And then do you have any plans to
12  move in the near future?
13     A.   I do not.
14     Q.   You testified earlier in questioning
15  from Mr. Cartmell that you believe there is an opioid
16  epidemic in this country.  Do you recall that
17  testimony?
18     A.   Yes.
19     Q.   How did you form that understanding?
20     A.   I formed that understanding by
21  understanding statistics on abuse and diversion of
22  opioids in general.
23     Q.   And did you form that understanding,
24  at least in part, by reviewing media stories
25  concerning opioid abuse, misuse and diversion?

## Page 374

1      A.   To some extent.
2      Q.   How much of your time when were you
3  working in the public relations for Cephalon would
4  you spend tracking media reports about the company
5  and the company's products?
6      A.   Well, I did have a public relations
7  agency that did a lot of that tracking for me.  I
8  didn't have to do that much personally.
9      Q.   Sure.  And Cooney/Walters group were
10  some of those -- at one point was that public
11  relations firm; right?
12     A.   Cooney/Waters, yes.
13     Q.   And they would compile what were
14  essentially like weekly reports that they would send
15  to you, and then you would send out to various
16  members of the company regarding media reports about
17  Cephalon, Cephalon's products and opioids in general.
18     Do you recall those reports?
19     A.   Yes.
20     Q.   And then at some point, Cooney/Waters
21  stopped doing that and another firm called Vox Medica
22  started that?
23     A.   That's right.
24     Q.   Do you recall that?
25     A.   I changed agencies.

## Page 375

1      Q.   And then at some point you would take
2  those -- they would compile those and I assume send
3  them in an email to you, and then you had an internal
4  Cephalon list that you would then distribute those
5  reports out to; do you recall that?
6      A.   Yes.
7      Q.   And that happened on a weekly basis;
8  right?
9      A.   I don't know if it happened weekly.
10  It was frequent, but I don't know if it was weekly.
11     Q.   Sure.  And we will look at some of
12  them later and it might refresh your recollection on
13  that.
14     Did you discuss with those vendors how they
15  put those reports together?
16     A.   I'm not sure what you are asking.
17     Q.   Well, they would compile these media
18  stories; right?
19     A.   Correct.
20     Q.   Send them to you?
21     A.   Correct.
22     Q.   Did you discuss with them how they
23  were doing that?
24     A.   How they were collecting the
25  information?

## Page 376

1      Q.   Yeah.
2      A.   They were monitoring media stories.
3  No, I did not tell them how to monitor the media.
4  They had expertise in that regard.
5      Q.   Sure.  But what I'm talking about is
6  physically like how they were compiling those
7  stories?  Like how were they monitoring?  Did you
8  have those conversations with them?
9      A.   I guess I'm not exactly understanding
10  your question.  You're talking about the format in
11  which they were presented?
12     Q.   No, no, no.  I'm talking about, how
13  did they learn of the media stories that they then
14  forwarded on to you?
15     A.   They had media monitoring services
16  that they use through their agencies.  It was not
17  Cephalon controlled.  It was what they -- what they
18  found in the media through their monitoring services.
19     Q.   Sure.  And then they would find that,
20  forward it to you, and then you would forward it on
21  to other people in the company?
22     A.   That's correct.
23     Q.   Do you ever recall sending those
24  reports to anyone outside of Cephalon?
25     A.   I don't recall.

Page 377

1    Q.    From time to time, would employees
2  come to you and ask to be sort of added on to your
3  internal distribution list?
4    A.    I don't recall.
5    Q.    Was there any time that you can
6  recall that someone asked to have access to your
7  distribution list and you denied them access or
8  refused them access?
9    A.    Not that I recall.
10    Q.    Do you recall when Cephalon began
11  receiving those monitoring reports from its PR
12  vendors?
13    A.    I don't recall.  But Cooney/Waters --
14  I started working with Cooney/Waters in 2001, and
15  they were an agency of record prior to that time.  So
16  they probably were doing media monitoring from -- as
17  soon as they became an agency.  I don't know the
18  frequency in those early years.
19    Q.    From your entire time that you worked
20  for Cephalon and then Teva from roughly 2001 to 2012,
21  was there media monitoring going on during that time
22  period?
23    A.    Not that entire time frame, no.
24    Q.    When was the time frame when it
25  wasn't going on?

Page 378

1    A.    Under my -- it may have been going on
2  under somebody else's direction.  But under my
3  direction, I left my public relations role in
4  approximately -- I guess it was about 2008 or so.
5    Q.    Okay.  And then did somebody take
6  back up your public relations role and continue the
7  media monitoring?
8    A.    Yes.
9    Q.    And do you recall who that was?
10    A.    Jennifer Antonochi.
11    Q.    I'm going to hand you a document we
12  will mark as Exhibit 31 to your deposition.  If I can
13  find a place to put it.
14            (Exhibit No. 31 was marked.)
15  BY MR. GASTEL:
16    Q.    And we will get to your reports with
17  your PR documents.  But I want to start with this
18  document, which is an internal email from you to a
19  variety of people inside Cephalon and it's dated
20  March 21st, 2005; do you see that?
21    A.    Yes.
22    Q.    And the subject is, "Time (3/28)
23  Reports on OxyContin Abuse and Diversion in
24  Appalachian, Virginia."
25            Did I read that correctly?

Page 379

1    A.    It's in rural Virginia.
2    Q.    It's the subject line of the email?
3    A.    Oh, the subject line.  I'm sorry.
4  Yes.
5    Q.    And then you write, as you forward
6  this Time Magazine article in your cover email here
7  that says:
8          (Reading) Time reports, parentheses,
9          3-28, end parentheses, on the abuse
10          and diversion of OxyContin in rural
11          Virginia and local law enforcement's
12          efforts to grapple with pill-related
13          crime (end of reading).
14  Did I read that correctly?
15    A.    Yes.
16    Q.    And those were your words; right?
17    A.    "Grapple with pill-related crime"?
18    Q.    Well, what I'm saying is --
19    A.    That was a quote from the magazine.
20    Q.    Sure.  But this is a portion of the
21  email that you wrote; correct?
22    A.    That is correct.
23    Q.    And it says:
24          (Reading) Primarily an overview of the
25          problem and law enforcement's

Page 380

1            response.  The article does not
2            contain any new information about
3            OxyContin abuse (end of reading).
4            Did I read that correctly?
5    A.    Yes.
6    Q.    When you say it "does not contain any
7  new information about OxyContin abuse," is that
8  because you were already aware as early as 2005 that
9  OxyContin was being abused across the country?
10    A.    What it suggests is there had been
11  information in the media about the use of OxyContin,
12  but that -- that's all I can say, because that was
13  not my product.  And I was not involved in any way
14  with OxyContin.
15    Q.    Sure.  But you thought it was
16  important, at this point at least, to take this
17  article and forward it on to your colleagues inside
18  the company; right?
19    A.    Because we forwarded articles having
20  anything to do with opioids or abuse and addiction
21  situations, regardless of what the product was, so
22  that we understood the landscape, and we were in a
23  better position to understand whether other risk
24  management issues were needed through our Risk
25  Management Program.

Page 381

```
 1        Q.    Sure.  I want to read a little bit of
 2   this article.  First paragraph of the article states:
 3               (Reading) Folks in Tazewell County
 4          know they better keep their eyes open,
 5          their tool sheds locked, and their
 6          barn doors shut.  Junkies addicted to
 7          prescription pills and looking for
 8          anything to steal to pay for their
 9          next fix have turned this 520 square
10          mile patch of Appalachian Virginia, a
11          bucolic tangle of wooded mountains,
12          steep hills and rolling pastures
13          dotted with sagging barns and country
14          churches, into a society plagued by
15          pilferers (end of reading).
16          Did I read that correctly?
17        A.    Yes, you did.
18        Q.    I don't want to question you too much
19   on U.S. geography today.  But are you aware northeast
20   Tennessee and this part of rural Virginia intersect?
21        A.    Yes.
22        Q.    So you know that this is an area
23   that's very close to Tennessee; correct?
24        A.    That's correct.
25        Q.    The article goes on to state that,
```

Page 382

```
 1   again, beginning at the third paragraph:
 2               (Reading) Federal authorities are at a
 3          loss to explain why prescription pill
 4          abuse pops up in some places and not
 5          in others, and while places like
 6          central Maine, eastern Kentucky and
 7          southwestern Virginia where OxyContin
 8          abuse first emerged as a problem are
 9          awash in drug-related crime (end of
10          reading).
11          Did I read that correctly?
12        A.    Yes, you did.
13        Q.    Was that your understanding of the
14   opioid epidemic, that it popped up in some places and
15   not others?
16        A.    The data which I saw seemed to
17   suggest that there were some places where there were
18   more -- there was more abuse than others.  We did not
19   see that with Actiq or Fentora, any patterns of that
20   type.
21        Q.    Sure.  And what I'm getting at here
22   is that you were aware, at least as early as 2005,
23   that the problem with opioid abuse was particularly
24   acute in Appalachian counties in that area around
25   that geographic region?
```

Page 383

```
 1        A.    Not related to our product.  But I
 2   was aware there was a general problem in that
 3   geography, yes.
 4        Q.    Sure.  Continuing with this article,
 5   the next paragraph begins:
 6               (Reading) It has taken seven years for
 7          the full measure of the pill's
 8          stranglehold on Appalachian counties
 9          like Tazewell to become obvious -- in
10          clogged and crowded courts, in
11          villages whose jails are so full that
12          inmates sleep on the floor, and in
13          neighborhoods focused on leaving
14          nothing valuable lying around.
15          The number of robberies, burglaries,
16          and thefts has shot up 48 percent in
17          Tazewell in only five years, from 483
18          crimes in 1998 to 716 in 2003, even as
19          the national property crime rate fell
20          25 percent (end of reading).
21          Did I read that correctly?
22        A.    Yes, you read that correctly.
23        Q.    Was that your understanding of the
24   opioid epidemic, that it was resulting in increases
25   in crimes in communities that were under its spell?
```

Page 384

```
 1        MR. JAMES:  Objection.
 2        THE WITNESS:  I was aware of media reports.
 3   But I was not aware of our products being implicated
 4   in those situations.  Because, as I said, we had no
 5   evidence to suggest that we had geographic clusters.
 6   BY MR. GASTEL:
 7        Q.    Sure.  And then closing out this
 8   article, if you flip to the next page, second-to-last
 9   paragraph of the article.  It says:
10               (Reading) State and local officials
11          are building institutions virtually
12          overnight to grapple with pill-related
13          crimes.  Three regional jails are set
14          to open this spring to ease inmate
15          crowding in the state's Appalachian
16          corner and the Virginia general
17          assembly recently appointed another
18          circuit judge to help Tazewell (end of
19          reading).
20          Did I read that correctly?
21        A.    You read that correctly.
22        Q.    Was it your understanding that state
23   and local officials were having to expend funds to
24   deal with the opioid epidemic when they were
25   encountering problems with the opioid epidemic?
```

Page 385

1      A.    No, that was not my memory.
2           (Exhibit No. 32 was marked.)
3    BY MR. GASTEL:
4      Q.    I am going to hand you a document
5    that we will mark as Exhibit 32.  And this is
6    an email from Jacqueline Davis, sent to a variety of
7    people.  And if you look on the second-to-the-last
8    line of the "To" field, you will see your name.
9      A.    Do you see that?
10     Q.    Do you see that?
11     A.    Yes, I do.
12     Q.    And if you look about a quarter of
13   the way down, it says:
14          (Reading) Weekly Pain Monitoring
15          Report, compiled by Cooney/Waters
16          Group (end of reading).
17     Did I read that correctly?
18     A.    Yes.
19     Q.    Does that refresh your recollection
20   that you received these reports weekly at least
21   around this time period?
22     A.    Yes.  As I indicated before, it was
23   my -- that seemed about right, but I wasn't sure
24   exactly how frequently they came out.
25     Q.    Sure.  And the -- the pain monitoring

Page 386

1    report here has a section that's in bold called,
2    "Abuse addiction and diversion."  Do you see that?
3      A.    Yes.
4      Q.    And under that is a bullet point that
5    says:
6           (Reading) Reuters reported on the U.S.
7           Justice Department's National Drug
8           Intelligence Center study that
9           identifies drug threats for 2007.  One
10          alarming trend is that opioid users
11          are increasingly seeking heroin
12          because of law enforcement's crackdown
13          on the abuse of prescription narcotics
14          (end of reading).
15     Did I read that correctly?
16     A.    Yes, you did.
17     Q.    Then if you go later on in this
18   exhibit to the page with the end Bates label of -763.
19   Do you -- are you with me?
20     A.    Yes.
21     Q.    There at the bottom of the page it
22   actually includes that Reuters article.  Do you see
23   that?
24     A.    Yes.
25     Q.    And it says:

Page 387

1           (Reading) A crackdown on illegal use
2           of prescription narcotics like the
3           powerful painkiller OxyContin has
4           caused some addicts to switch to
5           heroin, a Justice Department report
6           said on Wednesday (end of reading).
7      Did I read that correctly?
8      A.    Yes, you do.
9      Q.    Then it goes on to state that
10   according to -- I'm sorry, in the third paragraph it
11   says:
12          (Reading) In some areas, such
13          substitutions among prescription drug
14          abusers have been widespread, creating
15          new challenges for local law
16          enforcement and public health agencies
17          compelled to address a widening local
18          heroin user population (end of
19          reading).
20     Did I read that correctly?
21     A.    You read that correctly.
22     Q.    And then the next paragraph:
23          (Reading) The study also found rates
24          of pharmaceutical drug abuse,
25          including pain relievers,

Page 388

1           tranquilizers, stimulants and
2           sedatives exceed that of all other
3           drugs, except marijuana (end of
4           reading).
5      Did I read that correctly?
6      A.    Yes, you did.
7      Q.    And then the report goes on to say:
8           (Reading) According to reports from
9           California, Florida, Michigan, Ohio
10          and Wisconsin, some opiate abusers in
11          that state who began using OxyContin
12          have switched to heroin (end of
13          reading).
14     Did I read that correctly?
15     A.    You read that correctly.
16     Q.    In your understanding of the opioid
17   epidemic, did you come to understand that some users
18   would switch over from using a prescription opioid
19   like OxyContin to using a nonprescription opioid,
20   like heroin?
21     A.    I was aware of media reports to that
22   regard.  Because I did not work for Purdue Pharma, I
23   have no idea what their pharmacovigilance data were
24   suggesting.
25     Q.    sure.  And then the article on the

Page 389

1    next page at the top says:
2          (Reading) Nearly 79 percent of state
3          and local law enforcement agencies
4          reported high or moderate availability
5          of diverted pharmaceuticals in their
6          area (end of reading).
7          Did I read that correctly?  I'm sorry.  At
8    the top of the page.
9          A.    Yes.
10         Q.    -764.  And then it goes on to say:
11         (Reading) Demand for the drug has
12         remained high with use by an estimated
13         15,172,000 people (end of reading).
14         Did I read that correctly?
15         A.    You read that correctly.
16         Q.    Are you troubled by that number,
17    15,172,000 people?
18         A.    Yes.
19         Q.    It's a staggering number, would you
20    agree with me?
21         A.    It's a large number.  But it's
22    unrelated.  It is not an article that refers to our
23    products.
24         Q.    Well, that's a fair point.  And then
25    if you go back to the first page of this email,

Page 390

1    there's a Wall Street Journal article referenced
2    there that actually does reference a Cephalon
3    product.  It's entitled, "Off-label use of potent
4    narcotic Actiq growing raising concern."
5          Do you see that?
6          A.    Yes.
7          Q.    And then again, that article is also
8    attached in this.  And it appears on the page Bates
9    labeled -762.
10         A.    Yes.
11         Q.    And it's an article that apparently
12    was originally printed in the Wall Street Journal but
13    also reprinted in the St. Paul Pioneer Press on
14    November 15, 2006.  Do you see that?
15         A.    I see that.
16         Q.    And it says, "While" -- it begins:
17         (Reading) While pregnant with her
18         second child three years ago, Tiare
19         Frontera suffered from bad migraines
20         (end of reading).
21         Did I read that correctly?
22         A.    Yes.
23         Q.    (Reading) A neurologist prescribed
24         Actiq, a berry-flavored lozenge on a
25         stick that looks and tastes like a

Page 391

1          lollipop.  After a few sucks on the
2          medicine, she says a rush of euphoria
3          washed her headache away (end of
4          reading).
5          Did I read that correctly?
6          A.    You read that correctly.
7          Q.    And then it says:
8          (Reading) Soon, Frontera, who had
9          struggled with addictions to milder
10         narcotics, was consuming five Actiq
11         lozenges a day.  When she gave birth,
12         her baby son was cranky and wouldn't
13         sleep.  Doctors told her he had become
14         addicted to the drug and was in
15         withdrawal (end of reading).
16         Did I read that correctly?
17         A.    Yes, you did.
18         Q.    That describes an incident of what's
19    called neonatal abstinence syndrome, also known as
20    NAS.  Are you familiar with that?
21         A.    Yes.
22         Q.    And you're familiar that if pregnant
23    women use opioids while pregnant, that that can
24    result in their baby being born with addiction; do
25    you understand that?

Page 392

1          A.    Yes.
2          Q.    The articles goes on to say:
3          (Reading) Frontera is one of thousands
4          of Americans who are prescribed Actiq,
5          an extremely potent narcotic for
6          ailments that have nothing to do with
7          its intended use.  The Food and Drug
8          Administration approved the drug eight
9          years ago for use in cancer patients
10         who suffer intense bouts of pain that
11         other narcotics don't relieve (end of
12         reading).
13         Did I read that correctly?
14         A.    Yes, you did.
15         Q.    When you received this article or
16    received this from your PR vendor, did you agree with
17    that statement?
18         A.    Which aspect of the statement?
19         Q.    That "The Food and Drug
20    Administration approved the drug eight years ago for
21    use only in cancer patients who suffer intense bouts
22    of pain that other narcotics don't relieve."
23         A.    We understood the -- statement
24    "intense bouts of pain" to mean breakthrough pain.
25    And if that is what the John Carribrew is referring

## Page 393

1   to, then yes, that is a correct statement.
2       Q.    And then do you agree with his
3   characterization that Actiq is an extremely potent
4   narcotic?
5       A.    Actiq is a Schedule 2 opioid.
6       Q.    And then the article goes on to say:
7           (Reading) In the first half of this
8           year, oncologists accounted for only
9           one percent of the 187,076 Actiq
10          prescriptions filled at retail
11          pharmacies in the United States (end
12          of reading).
13      Did I read that correctly?
14      A.    Yes, you did.
15      Q.    Did you -- in 2006, when you received
16  this article, were you concerned that, according to
17  this, there was only one percent of Actiq
18  prescriptions from oncologists?
19      A.    We were aware the rates of
20  prescribing by oncologists were low.  I personally
21  was not aware it was that low.
22      Q.    And then skipping the -- skipping
23  down to the paragraph beginning, "Actiq's broad
24  off-label use."
25      A.    Yes.

## Page 394

1       Q.    It says:
2           (Reading) Actiq's broad off-label use
3           raises questions about whether those
4           restrictions are sufficiently
5           protecting patients.  We all know
6           Actiq is being misused and abused as
7           Brian Sweet, a manager in the pharmacy
8           unit at health insurer WellPoint, Inc.
9           After witnessing a surge in Actiq
10          prescriptions, WellPoint cracked down
11          by making doctors show that patients
12          being prescribed the drug have cancer
13          (end of reading).
14      Did I read that correctly?
15      A.    You read that correctly.
16      Q.    And that sort of dovetails with your
17  testimony earlier when Mr. Cartmell was asking you
18  questions about Actiq's broad off-label use; correct?
19      MR. JAMES:  Objection.
20      THE WITNESS:  That is correct.
21          (Exhibit No. 33 was marked.)
22  BY MR. GASTEL:
23      Q.    I hand you a document that we will
24  mark -- I always tell myself I'm not going to mark
25  the wrong one, but then I always do at least once.

## Page 395

1   This is 33.
2           Ms. Beckhardt, this is another one of the
3   Cooney/Waters Weekly Pain Monitoring Reports that you
4   sent around to various Cephalon employees on
5   February 16, 2007.  Do you see that?
6       A.    Yes.
7       Q.    And if you flip over to the second
8   page, there is a reference to an Associated Press
9   report.  Do you see that?
10      A.    Yes.
11      Q.    And it says:
12          (Reading) The Associated Press
13          featured a report by John Walters,
14          director of the Office of National
15          Drug Council, that found while
16          marijuana use among teenagers has
17          declined, U.S. teens are still abusing
18          prescription drugs at a steady or, in
19          some cases, increasing rate (end of
20          reading).
21      Did I read that correctly?
22      A.    You read that correctly.  But it's
23  not referencing our products directly.
24      Q.    Sure.  It says:
25          (Reading) Increased use of both

## Page 396

1           OxyContin and Vicodin are noted (end
2           of reading).
3       Did I read that correctly?
4       A.    Yes.
5       Q.    And then, once again, it attaches the
6   report.  Again, if you flip to the Bates range -672,
7   you will see the Associated Press report.  And it
8   begins -- are you there?  I'm sorry.  I don't want to
9   go too fast.
10      A.    -672, about Associated Press?
11      Q.    Yeah.  "Teens using prescription
12  drugs."  Do you see that?
13      A.    Yes.
14      Q.    The article begins:
15          (Reading) Junior has been helping
16          himself to mother's little helper (end
17          of reading).
18      Did I read that correctly?
19      A.    Yes.
20      Q.    It says:
21          (Reading) That's the conclusion of a
22          report released Wednesday by White
23          House drug czar John Walters that
24          found while U.S. teenagers use of
25          marijuana is declining, their abuse of

Page 397

1    prescription drugs is holding steady
2    or, in some cases, increasing.  The
3    drug dealer is us, said Walters, the
4    national drug policy director (end of
5    reading).
6    Did I read that correctly?
7    A.    Yes, you read that correctly.
8    Q.    And then on the next page, it says:
9    (Reading) According to an analysis of
10   the national surveys prepared by
11   Walters' office, 2.1 million teenagers
12   abuse prescription drugs in 2005, most
13   year for which figures are available
14   (end of reading).
15   When you received this, did you believe that
16   that was an accurate figure?
17   A.    I didn't have the ability to question
18   it or verify it.
19   Q.    Sure.  But it came -- that number
20   apparently comes from a report from the White House
21   drug czar, John Walters, according to the article;
22   correct?
23   A.    That's correct.
24   Q.    And the article closes out with a
25   reference to a Dr. Terry Horton, the medical director

Page 398

1    of Phoenix House, which operates nearly 100 substance
2    abuse programs in nine states.  He said:
3    (Reading) That belief that
4    prescription drugs are safer than
5    street drugs is false (end of
6    reading).
7    Did I read that correctly?
8    A.    You read that correctly.
9    Q.    It says:
10   (Reading) These medicines cause
11   dependence and addiction when misused
12   and have the potential to cause death,
13   he said (end of reading).
14   You agree with that statement; correct?
15   A.    All Schedule 2 opioids have the --
16   that ability.
17   Q.    It says:
18   (Reading) We're talking about
19   medicines that are related
20   pharmacologically to heroin and have
21   very similar effects (end of reading).
22   Correct?
23   MR. JAMES:  Objection.
24   THE WITNESS:  It's what it says.
25   ///

Page 399

1    BY MR. GASTEL:
2    Q.    Oh, I'm sorry.  Did I read that
3    correctly?
4    A.    You read it correctly.
5    Q.    And this is an article that
6    references OxyContin and Vicodin; correct?
7    A.    Yes.
8    Q.    And then this particular one also --
9    this particular monitoring report also has a New York
10   Times article with it -- or, I'm sorry, a USA Today
11   article.
12   A.    And where is that, please?
13   Q.    It's February -- I'm sorry, it's on
14   the page ending in -671.
15   A.    Okay.  Thank you.
16   Q.    The top of the page.  It says:
17   (Reading) Pain killer more available
18   for abuse (end of reading).
19   Do you see that?
20   A.    Yes.
21   Q.    And it says:
22   (Reading) Methadone prescriptions
23   grow, adding to U.S.A.'s illicit drug
24   trade (end of reading).
25   Did I read that correctly?

Page 400

1    A.    Yes, you read that.
2    Q.    And then if you go down to the
3    very -- the second-to-last paragraph that's on this
4    page, it says:
5    (Reading) With more prescriptions,
6    there's more methadone in the supply
7    pipeline, Curry says, and, therefore,
8    more chance the drug will wind up for
9    sale on the street (end of reading).
10   Did I read that correctly?
11   A.    You read that correctly.
12   Q.    Do you agree -- and I think that you
13   testified that you did earlier with Mr. Cartmell --
14   that when you have more prescriptions, that leads to
15   more supply, and, therefore, a greater likelihood
16   that these prescription opioids will end up illegally
17   on the street; do you agree with that?
18   MR. JAMES:  Objection.
19   THE WITNESS:  I didn't suggest that they
20   would be used -- that they would get illegally on the
21   street.  I do think that they're -- I did suggest
22   that if you increase the number of prescriptions,
23   there is a possibility that there would be
24   inappropriate use, whether it be diversion or misuse.
25   But these -- this methadone is a totally

Page 401

1  different product than Actiq and Fentora, and we did
2  not see these same patterns that we were seeing with
3  other opioids.
4  BY MR. GASTEL:
5      Q.   Sure.  And then on the next page, the
6  article goes on to describe that:
7          (Reading) The NCHS study identified 12
8          states as having especially
9          significant increases in
10         methadone-related fatalities from 1999
11         to 2004 (end of reading).
12  Do you see that?
13     A.   Yes.
14     Q.   And it identifies Tennessee as one of
15  those states; correct?
16     A.   That is correct.
17         (Exhibit No. 34 was marked.)
18  BY MR. GASTEL:
19     Q.   I hand you another exhibit that we
20  will mark as Exhibit 34.  Once again, one of these
21  Weekly Pain Monitoring Reports from Cooney/Waters
22  Group that you sent to your internal Cephalon
23  distribution list on Saturday, August 11, 2007.  Do
24  you see that?
25     A.   Yes.

Page 402

1      Q.   And, again, it carries the heading,
2  "Abuse, addiction and diversion."
3      A.   Yes.
4      Q.   And it references a Reuters article;
5  do you see that?
6      A.   Yes.
7      Q.   And also a USA Today article under
8  the bullet point 6.  Do you see that?
9      A.   Yes.
10     Q.   Let's go to the USA Today article.
11  It's from August 5th, 2007 -- oh, I'm sorry, it's on
12  the Bates label page ending in -231.
13     A.   Okay.
14     Q.   Are you with me?
15     A.   Yes.
16     Q.   And it says -- and it's entitled
17  "Rising pain killer abuse reveals itself in damaged
18  lives."  Do you see that?
19     A.   Yes.
20     Q.   And it begins:
21         (Reading) When his cravings for
22         painkillers got to be too much, Steve
23         Dotson lay down and let his wife drive
24         a car over his leg.  It hurt, but he
25         didn't think about the pain.  He

Page 403

1          concentrated on the medicated bliss
2          that would follow (end of reading).
3  Did I read that correctly?
4      A.   Yes, you did.
5      Q.   Dropping down three paragraphs:
6          (Reading) With the -- With 124 million
7          prescriptions in 2005, hydrocodone is
8          the most often prescribed opiate pain
9          killer on the market sold under
10         hundreds of brand names and generic
11         titles.  All are combination products,
12         meaning they combine hydrocodone with
13         another ingredient (end of reading).
14  Did I read that correctly?
15     A.   You read that correctly.  And those
16  are not our medications.
17     Q.   Sure.  And then, "In Central
18  Appalachia, prescription pain killer" -- oh, I'm
19  sorry, I'm dropping down -- one, two, three, four,
20  five -- six paragraphs.
21         (Reading) In central Appalachia,
22         prescription painkillers first became
23         a national concern five or six years
24         ago.  Then the drug-causing alarm was
25         oxycodone, particularly under brand

Page 404

1          name OxyContin, which became infamous
2          as hillbilly heroin (end of reading).
3  Did I read that correctly?
4      A.   You read that correctly.
5      Q.   And it goes on to say:
6          (Reading) As OxyContin came under
7          scrutiny, doctors were more careful
8          about how they prescribed it.  Many
9          switched to hydrocodone products which
10         were already popular but didn't have
11         the same stigma (end of reading).
12  Did I read that correctly?
13     A.   You read that correctly.
14     Q.   (Reading) All 50 states saw
15         increases in the distribution of
16         hydrocodone between 2001 and 2005, but
17         the trend was particularly significant
18         in the south, where Tennessee and West
19         Virginia saw three digit rates of
20         increases (end of reading).
21  Did I read that correctly?
22     A.   You did.  But I repeat, it has --
23  it's not related to Actiq and Fentora.
24     Q.   Sure.  And so then the next
25  paragraph:

Page 405

1      (Reading) The ten states where
2      hydrocodone is highest are all
3      southern states, according to the DEA.
4      And the four of the top five,
5      Tennessee, West Virginia, Kentucky,
6      and Alabama, are in Appalachia (end of
7      reading).
8      Did I read that correctly?
9      A.    Yes.
10      Q.    I think folks in Alabama might be a
11 little surprised that this article considers
12 themselves part of Appalachia, but --
13      A.    Having lived -- having lived in
14 Alabama myself, I probably would question that.
15      Q.    Sure. And that's just another
16 article describing the opioid epidemic in places like
17 the south, like in Tennessee, that were particularly
18 hard hit by the opioid epidemic; right?
19      MR. JAMES:  Objection.
20      THE WITNESS:  It is another media story.
21 BY MR. GASTEL:
22      Q.    That describes problems with opioids
23 in the south; right?
24      A.    That is correct.
25          (Exhibit No. 35 was marked.)

Page 406

1 BY MR. GASTEL:
2      Q.    I will hand you -- I'm going in order
3 right now.
4      MR. WOLFE:  If you skip one, let me know.
5      MR. GASTEL:  I will let you know.
6      Q.    This is another one of the Weekly
7 Pain Monitoring Reports, but this one has apparently
8 been compiled by Vox Medica.
9      A.    That's correct.
10      Q.    And it's dated May 30th, 2008, but
11 once again it's something you distributed to your
12 internal Teva list; right? Well, Cephalon list at
13 the time; right?
14      A.    Cephalon, yes.
15      Q.    And, again, it has yet another
16 reference to suspected abuse and diversion; do you
17 see that on the second page?
18      A.    Yes.
19      Q.    And it references an Associated Press
20 story and an Arizona family dot com story.  Do you
21 see that?
22      A.    Yes.
23      Q.    Once again, those stories are
24 attached.  And the Associated Press story from May of
25 2008 concerns a pro wrestler who killed himself and

Page 407

1 his wife and his seven-year-old son as a result of
2 prescription pain killer addiction; do you see that?
3      A.    I see the report in the media, yes.
4      Q.    And then it goes on to report how his
5 doctor has been indicted for illegally prescribing
6 prescription opioids to this professional wrestler;
7 do you see that?
8      A.    I see that.  I'm not familiar with
9 that physician.
10      Q.    Sure. And then it goes on to
11 describe the illegal drugs that this doctor was
12 accused of giving to his patients in Georgia, which
13 included methadone, Percocet, Oxycontin, Demerol and
14 Xanax.  Do you see that?
15      A.    I see where it says that, yes.
16      Q.    And I don't -- I probably belabored
17 this point maybe more than I needed to, but you were
18 getting these reports on a weekly basis, sending them
19 out to people within Cephalon, and they would
20 regularly -- maybe not always -- but regularly
21 include stories about abuse, addiction, and
22 diversion; right?
23      A.    That's correct.
24      Q.    And a lot of these articles focus on
25 OxyContin and hydrocodone; right?

Page 408

1      A.    That's correct.
2      Q.    And you've kind of gone out of your
3 way to point out that Cephalon, at the time that you
4 worked there, were not -- was not in the business of
5 manufacturing hydrocodone or oxycodone; right?
6      A.    That is correct.
7      Q.    Would it surprise you that after you
8 left, and in 2016 and 2017, Teva -- Teva's products
9 containing hydrocodone, oxycodone and oxymorphone
10 filled close to two million individual prescriptions
11 in the state of Tennessee?
12      MR. JAMES:  Objection.
13      THE WITNESS:  I would not be aware of those
14 statistics.
15 BY MR. GASTEL:
16      Q.    But you've gone out of your way today
17 to point out in these articles and in your testimony
18 with Mr. Cartmell that Cephalon and Teva were not
19 producing these types of opioids; right?
20      A.    I went out of my way --
21      MR. JAMES:  Objection.
22      THE WITNESS:  -- to suggest that Cephalon
23 did not do that.  Teva has a generic business.
24      MR. GASTEL:  Sure.
25      THE WITNESS:  And that was not part of the

Page 409

1  Cephalon business.  And I was not aware and had no
2  information regarding the Teva generic business in
3  that regard.  So I cannot speak to those statistics.
4  BY MR. GASTEL:
5      Q.    And I understand that.  But would it
6  cause you concern, since you've kind of gone out of
7  your way today to point out that when you were at
8  Cephalon, they weren't making those products.  You
9  seemed to make that an important distinction in these
10  articles that we just went through, to learn that
11  Cephalon and Teva, after you left there, became major
12  players in the hydrocodone and oxycodone and
13  oxymorphone market?
14      MR. JAMES:  Objection.
15      THE WITNESS:  I don't have enough
16  information to respond to that.
17  BY MR. GASTEL:
18      Q.    And that's not my question.  My
19  question is not -- I'm not asking you to verify that.
20  I'm asking you if it causes you concern?
21      MR. JAMES:  Objection.
22      THE WITNESS:  I don't have a context for the
23  numbers of those prescriptions.
24  BY MR. GASTEL:
25      Q.    And, again, I'm not asking you to --

Page 410

1  about the context.  But you have gone out of your way
2  to say, hey, that wasn't us today, when we've been
3  reviewing these articles; right?
4      A.    That it wasn't Cephalon, yes.
5      Q.    Yeah.  And now, if it did become
6  Cephalon, and it did become Teva, does that cause you
7  concern?
8      MR. JAMES:  Objection.
9      THE WITNESS:  I have -- I do not know
10  whether -- have any information about whether Teva's
11  products -- how they were used or not, used
12  appropriately or inappropriately.  I was not at the
13  company at that time.
14  BY MR. GASTEL:
15      Q.    Were you at all involved in Teva's
16  attempts to launch an abuse deterrent form of
17  hydrocodone?
18      A.    They were -- there was some research
19  in that regard, I believe, right before I left.  But
20  I don't recall the timing.
21      Q.    Sure.  And I'm going to hand you a
22  document that we will mark as Exhibit 36.
23      (Exhibit No. 36 was marked.)
24      MR. GASTEL:  And for whatever reason, I
25  didn't get my cover page that came with this.  But

Page 411

1  just for the record, this is produced to us in native
2  format, TEVA, underscore, MDL, underscore, A,
3  underscore, 04004373.
4      Q.    And I want to direct your attention
5  to this particular PowerPoint presentation carries
6  just standard page numbers.
7      A.    Okay.
8      Q.    Can I direct your attention to pages
9  21 and 22.  Let's begin with 21.
10      A.    Yes.
11      Q.    This is the AD hydrocodone functional
12  team members slide.  Do you see that?
13      A.    Yes.
14      Q.    And is it your understanding that the
15  term AD hydrocodone is abuse deterrent hydrocodone?
16      A.    Yes.
17      Q.    And then if you look under the PR and
18  government affairs team, you're listed there as
19  health advocacy.  Do you see that?
20      A.    That's -- I was a consultant to Teva
21  at that time.
22      Q.    And I understand that.  And then if
23  you flip to the next page, there's the next AD
24  hydrocodone team member overlap.  Do you see that at
25  the top?

Page 412

1      A.    Yes.
2      Q.    And then if you look in the dark blue
3  overlap, about midway down in the second column,
4  you're also listed there, Stacey Beckhardt.
5      A.    I was a consultant to Teva at that
6  time.
7      Q.    And so do you recall being present
8  when this presentation was given?
9      A.    I don't recall.  But I don't -- it's
10  possible that I was there.
11      Q.    Let's flip to, again, page 12 real
12  quick.  Well, let me flip back to the front.  This is
13  dated April 16, 2013.  It's on the front page, ma'am.
14      A.    Yes.
15      Q.    And that is years after we have been
16  looking at these articles about widespread of abuse
17  and misuse of opioids, especially in the south;
18  correct?
19      A.    It is several years later, yes.
20      Q.    And then if you look on page 12, it
21  says:
22      (Reading) Pain is an attractive and
23      growing TA for global investment (end
24      of reading).
25      Do you see that?

Page 413

1    A.   Yes.
2    Q.   Do you know what TA stands for there?
3    A.   No, I do not.
4    Q.   And then underneath that it says:
5        (Reading) Global Pain Market Expected
6        growth, $51 billion in 2011 and $68
7        billion by 2020 (end of reading).
8    Do you see that?
9    A.   Yes.
10   Q.   So if I'm reading that correctly,
11  this appears that Teva -- it's Teva at that point;
12  right?
13   A.   Yes.
14   Q.   That Teva expects the global pain
15  market to grow $17 billion over the nine-year period
16  reflected there; right?
17   A.   That's what it states.
18   Q.   And so -- and that's despite Teva at
19  this point -- well, this is years after you've sent
20  those articles around about widespread abuse and
21  misuse of prescription opioids; right?
22   A.   They were -- they were -- many of
23  those people were not the same people, as those were
24  in Teva.
25   Q.   But certainly there were some people

Page 414

1   who were still there --
2    A.   There was some --
3    Q.   -- right?
4    A.   -- overlap.  Yes, there was some
5   overlap.
6    Q.   You, including some of the people who
7   were reviewing those news articles and then also part
8   of this attempt to launch the abuse deterrent form of
9   hydrocodone; right?
10   A.   Yes, which was a -- which was
11  intended to mitigate some of the challenges with
12  abuse.
13   Q.   Sure.  And the -- and the hope was
14  that this new abuse deterrent version of hydrocodone
15  could displace the current versions of hydrocodone on
16  the market and, therefore, hopefully lead to less
17  abuse and diversion of hydrocodone; right?
18   MR. JAMES:  Objection.
19   THE WITNESS:  I -- you know, as a
20  consultant, I can't say exactly what Teva's marketing
21  strategy was in that regard.
22  BY MR. GASTEL:
23   Q.   But it's kind of -- it's common sense
24  that -- and I think that your testimony was that the
25  abuse deterrent form was hopefully going to combat

Page 415

1   some of the abuse and misuse that we have looked at
2   in some of these articles; right?
3    A.   That's correct.
4    Q.   And that would only happen -- and,
5   again, I think that this is common sense -- if the
6   new abuse deterrent form of hydrocodone displaced the
7   forms of hydrocodone that were leading to abuse and
8   misuse in those articles that we reviewed; right?
9    MR. JAMES:  Objection.
10   THE WITNESS:  That also assumes that the
11  abuse deterrent products had that efficacy.
12  BY MR. GASTEL:
13   Q.   And -- but that was the hope in
14  trying to develop this abuse deterrent form of
15  hydrocodone; right?
16   MR. JAMES:  Objection.
17   THE WITNESS:  That was the hope.
18  BY MR. GASTEL:
19   Q.   And do you know if Teva's -- well, is
20  it your understanding that this abuse form of
21  hydrocodone eventually was given the name of
22  Vantrela?
23   A.   I'm not aware of that.
24   Q.   Are you aware of whether or not this
25  ever -- this project ever got off the ground for

Page 416

1   Teva?
2    A.   I am not aware.
3    Q.   Are you aware that they eventually
4   got FDA approval for Vantrela, but nevertheless
5   decided not to market it?
6    A.   I'm not aware of that.
7    MR. GASTEL:  Ms. Beckhardt, I think this
8   will be music to your ears, but subject to my
9   previous objection, that's all the questions I have
10  for you.
11   MR. JAMES:  I think we're done.
12   THE VIDEOGRAPHER:  This concludes the video
13  deposition of Stacey Beckhardt.  We are going off the
14  record at 7:48 p.m.
15   (The deposition was concluded at 7:48 p.m.)
16        --o0o--
17
18
19
20
21
22
23
24
25

Page 417

```
1        Please be advised I have read the foregoing
2    deposition, and I state there are:
3    (Check one) _____NO CORRECTIONS
4               _____CORRECTIONS PER ATTACHED
5
6
7    _____
8      STACEY BECKHARDT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 418

```
1        DEPONENT'S CHANGES OR CORRECTIONS
2    Note:  If you are adding to your testimony, print the
3    exact words you want to add   If you are deleting from
4    your testimony, print the exact words you want to
5    delete   Specify with "Add" or "Delete" and sign this
6    form
7    DEPOSITION OF:  STACEY BECKHARDT
8    CASE:  IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION
9    DATE OF DEPOSITION:  FEBRUARY 1, 2019
10   PAGE   LINE   CHANGE/REASON/ADD/DELETE
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   DEPONENT'S SIGNATURE _____
25   DATE_____
```

Page 419

```
1        CERTIFICATE OF REPORTER
2        I, SANDRA BUNCH VANDER POL, a Certified
3    Shorthand Reporter, hereby certify that the witness in
4    the foregoing deposition was by me duly sworn to tell
5    the truth, the whole truth and nothing but the truth
6    in the within-entitled cause;
7        That said deposition was taken down in shorthand
8    by me, a disinterested person, at the time and place
9    therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12       That before completion of the deposition, review
13   of the transcript was requested.  If requested, any
14   changes made by the deponent (and provided to the
15   reporter) during the period allowed are appended
16   hereto.
17       I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22   DATED:  FEBRUARY 4, 2019
23       _____
         SANDRA BUNCH VANDER POL, CSR 3032
24
25
```