Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3
     IN RE:  NATIONAL PRESCRIPTION      Case No. 1:17-MD-2804
 4   OPIATE LITIGATION
                                        Hon. Dan A. Polster
 5   APPLIES TO ALL CASES
 6
     _ _ _ _ _ _ _ _ _ _ _ _ _ /
 7
 8       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
 9
         VIDEOTAPED
10   DEPOSITION OF: CHRISTOPHER BELLI
11   DATE:          December 20, 2018
12   TIME:          9:35 a.m. to 12:05 p.m.
13
         PLACE:
14                  201 North Franklin Street
                    Suite 3400
15                  Tampa, Florida
16   PURSUANT TO:   Notice by counsel for
                    Plaintiffs for purposes of
17                  discovery, use at trial
                    or such other purposes
18                  as are permitted under
                    the Ohio Rules
19                  of Civil Procedure
20   BEFORE:        LISA A. SIMONS-CLARK, RMR, CRR
                    Notary Public, State of
21                  Florida at Large
22                  Pages 1 to 210
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2    MARK P. PIFKO, ESQUIRE
      Baron & Budd, P.C.
 3    15910 Ventura Boulevard, Suite 1600
      Encino, California 91436
 4    (818) 839-2333

 5    - and -

 6    WILLIAM G. POWERS, ESQUIRE
      Baron & Budd, P.C.
 7    600 New Hampshire Avenue NW
      The Watergate, Suite 10-A
 8    Washington, DC 20037
      (202) 333-4562
 9          Attorneys for Plaintiffs and PEC

10    ELISA P. McENROE, ESQUIRE
      Morgan Lewis & Bockius, LLP
11    1701 Market Street
      Philadelphia, Pennsylvania 19103-2921
12    (215) 963-5917

13    - and -

14    KELLY A. MOORE, ESQUIRE
      JOHN M. MALOY, ESQUIRE
15    Morgan Lewis & Bockius, LLP
      101 Park Avenue,
16    New York, New York 10178
      (212) 309-6612
17          Attorneys for Rite-Aid and Rick Chapman

18  APPEARANCES VIA TELEPHONE AND STREAM

19    ERIN GIBSON ALLEN, ESQUIRE
      Marcus & Shapira, LLP
20    301 Grant Street
      One Oxford Centre, 35th Floor
21    Pittsburgh, Pennsylvania 15219
      (412) 338-5202
22          Attorney for HBC

23    JOANNE CACERES, ESQUIRE
      Jones Day
24    77 West Wacker
      Chicago, Illinois 60601
25    (312) 782-3939
            Attorney for Walmart
```

Page 3

```
 1  APPEARANCES VIA TELEPHONE AND STREAM, CONTINUED:
 2    WEISS NUSRATY, ESQUIRE
      Covington & Burling, LLP
 3    One City Center
      850 Tenth Street, NW
 4    Washington, DC 20001
      (202) 662-6000
 5          Attorney for McKesson
 6    SEAN A. McCORMICK, ESQUIRE
      Arnold & Porter Kaye Scholer, LLP
 7    777 South Figueroa Street, Suite 4400
      Los Angeles, California 90017
 8    (213) 243-4000
            Attorney for Endo and Par
 9
      SHANA E. RUSSO, ESQUIRE
10    Reed Smith, LLP
      136 Main Street, Suite 250
11    Princeton, New Jersey 08540
      (609) 987-0050
12          Attorney for AmerisourceBergen
13    KATELYN ADAMS, ESQUIRE
      Williams & Connolly, LLP
14    725 Twelfth Street, N.W.
      Washington, DC 20005
15    (202) 434-5107
            Attorney for Cardinal Health
16
      JAY LICHTER, ESQUIRE
17    Baron & Budd, P.C.
      15910 Ventura Boulevard, Suite 1600
18    Encino, California 91436
      (818) 839-2333
19
      GRETCHEN KEARNEY
20    LITIGATION PARALEGAL
      Baron & Budd, P.C.
21
22    ALSO PRESENT:
23
      Jeff Fleming, the videographer
24    Willow Ashlynn, Trial Tech
25
```

Page 4

```
 1              INDEX
 2                          PAGE
    DIRECT EXAMINATION BY MR. PIFKO        6
 3  CERTIFICATE OF OATH          208
    REPORTER'S CERTIFICATE       209
 4  ERRATA SHEET                 210
 5
          (ATTACHED TO THE TRANSCRIPT)
 6  EXHIBITS               MARKED
 7  RITE AID BELLI 1 - Rite_Aid_OMDL_0015454 to 15506   17
 8  RITE AID BELLI 2 - Printout of Mr. Belli's
        LinkedIn profile                    53
 9
    RITE AID BELLI 3 - Rite_Aid_OMDL_0016717 to 719   68
10
    RITE AID BELLI 4 - Rite_Aid_OMDL_0015079 to 15081  74
11
    RITE AID BELLI 5 - Rite_Aid_OMDL_0014035 with
12       attachments                  79
13  RITE AID BELLI 6 - Rite_Aid_OMDL_0014727 to 14802   97
14  RITE AID BELLI 7 - Rite_Aid_OMDL_0014379 to 14452  115
15  RITE AID BELLI 8 - Rite_Aid_OMDL_0017279 to 17292,
        with attachments             121
16
    RITE AID BELLI 9 - Rite_Aid_OMDL_0021819 to 21823  137
17
    RITE AID BELLI 10 - Rite_Aid_OMDL_0017321 to 322,
18       with a Power Point attachment         141
19  RITE AID BELLI 11 - Rite_Aid_OMDL_0017445 to 17448 145
20  RITE AID BELLI 12 - Rite_Aid_OMDL_0014487 to 14490 149
21  RITE AID BELLI 13 - Rite_Aid_OMDL_0038075 to 77    154
22  RITE AID BELLI 14 - Rite_Aid_OMDL_0017328 with a
        native spreadsheet           160
23
    RITE AID BELLI 15 - Rite_Aid_OMDL_0040184 to
24       0040198                   164
25  RITE AID BELLI 16 - Rite_Aid_OMDL_0014948 to 51   175
```

Page 5

```
 1      THE VIDEOGRAPHER:  We are now on the record.
 2  My name is Jeff Fleming.  I am a videographer for
 3  Golkow Litigation Services.  Today's date is
 4  December 20, 2018.  The time is 9:35 a.m.
 5      This is -- this video deposition is being held
 6  in Tampa, Florida, in the matter of National
 7  Prescription Opiate Litigation MDL No. 2804 for
 8  the United States District Court for the Northern
 9  District of Ohio, Eastern Division.
10      The deponent is Christopher Belli.  Will
11  counsel please identify themselves for the record?
12      MR. PIFKO:  Good morning.  Mark Pifko from
13  Baron & Budd on behalf of Plaintiffs and the PEC.
14      MR. POWERS:  Will Powers, Baron & Budd.
15      MS. McENROE:  Good morning.  Elisa McEnroe
16  from Morgan Lewis & Bockius on behalf of Rite-Aid
17  and the witness, and together with me today I have
18  my colleagues Kelly Moore and John Maloy.
19      MR. PIFKO:  And then can we get everyone on
20  the phone to state your name and your firm and
21  your client?
22      MS. CACERES:  Joanne Caceres from Jones Day
23  representing Walmart.
24      MS. ALLEN:  Erin Gibson Allen from Marcus &
25  Shapira representing Defendant HBC.
```

Page 6

1   MS. RUSSO: Shana Russo from Reed Smith --

2   MS. ADAMS: Kate Adams --

3   THE REPORTER: One more time.

4   MS. RUSSO: Shana Russo --

5   MS. ADAMS: Kate Adams representing Cardinal

6   Health.

7   MS. RUSSO: Shana Russo with Reed Smith

8   representing AmerisourceBergen Corporation.

9   MR. McCORMICK: Sean McCormick for the Endo

10  and Par defendants.

11  THE VIDEOGRAPHER: Thank you. The court

12  reporter is Lisa Clark and will now swear in the

13  witness.

14  CHRISTOPHER BELLI,

15  the witness herein, being first duly sworn on oath, was

16  examined and deposed as follows:

17  THE WITNESS: I do.

18  DIRECT EXAMINATION

19  BY MR. PIFKO:

20  Q. Good morning, Mr. Belli.

21  A. Good morning.

22  Q. My name is Mark Pifko. We just met a few

23  minutes ago for the first time off the record. I'm

24  going to be asking you some questions today. Let's

25  start by having you state and spell your name for the

Page 7

1   record.

2   A. Christopher, C-h-r-i-s-t-o-p-h-e-r, Belli,

3   B-e-l-l-i.

4   Q. Okay. And have you ever had your deposition

5   taken before?

6   A. No.

7   Q. So I assume in preparing with your counsel,

8   they went over some of the basic parameters, but we're

9   going to go over a couple of the rules of the road just

10  so that we're all on the same page here. Okay?

11  A. Okay.

12  Q. First and foremost, you were just administered

13  the oath. Do you understand that?

14  A. Yes.

15  Q. Okay. And so that means that if you are

16  dishonest or you lie or are misleading intentionally,

17  that you could be subject to penalties from the court.

18  Do you understand that?

19  MS. McENROE: Objection to form.

20  THE WITNESS: Yes.

21  BY MR. PIFKO:

22  Q. Is there any reason why you're unable to tell

23  the truth today?

24  A. No.

25  Q. Are you undergoing any medical treatment or

Page 8

1   taking any -- any substances that would impair your

2   memory or your ability to provide truthful and accurate

3   testimony today?

4   MS. McENROE: Objection to form.

5   THE WITNESS: No.

6   BY MR. PIFKO:

7   Q. Is there any reason you can think of that this

8   deposition should not go forward?

9   A. No.

10  Q. Okay. So you've been doing fine so far. When

11  I ask a question, we need an audible response instead

12  of nodding your head or shrugging your shoulders. Do

13  you understand that?

14  A. Yes.

15  Q. Okay. And we can't have you say uh-huh or

16  uh-uh because when you see it in writing, it looks

17  the -- basically a yes and a no kind of look the same.

18  So try to give a verbal yes or no rather than saying

19  uh-huh or uh-uh. Okay?

20  A. Yes.

21  Q. I'm going to be asking you about some events

22  in the past. I don't want you to guess, but I am

23  entitled to your best recollection of the events.

24  Okay?

25  A. Yes.

Page 9

1   Q. And then if I ask a question that you don't

2   understand, please let me know and I'll rephrase it.

3   Understood?

4   A. Yes.

5   Q. If you answer the question, I'm going to

6   assume that you understand it. Okay?

7   A. Yes.

8   MS. McENROE: Can we take a quick break for

9   one second?

10  MR. PIFKO: Sure.

11  THE VIDEOGRAPHER: Off the record, 9:39 a.m.

12  (Brief recess was taken.)

13  THE VIDEOGRAPHER: On the record, 9:39 a.m.

14  BY MR. PIFKO:

15  Q. All right. So we just went over the basics of

16  a deposition. So you used to work for Rite-Aid,

17  correct?

18  A. Correct.

19  Q. And you understand that we're here today in

20  connection with a lawsuit that asserts claims against

21  various companies, including Rite-Aid. Do you

22  understand that?

23  A. Yes.

24  Q. When -- what years did you work for Rite-Aid?

25  A. 2007 to 2013.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  Q.  Did you have the same position while you
2  worked at Rite-Aid?
3  A.  No.
4  Q.  Okay.  What was the first position you held?
5  A.  The first position was an operations manager
6  in Atlanta, Georgia.
7  Q.  What was the time period you held that?
8  A.  2007 to 2009.
9  Q.  And then you moved to another position?
10  A.  I moved to Charlotte, North Carolina, as a
11  senior operations manager.
12  Q.  What was the time period for that job?
13  A.  2009 to 2011.
14  Q.  And then what was your next position?
15  A.  Senior manager of transportation.
16  Q.  Where was that located?
17  A.  Rite-Aid headquarters.
18  Q.  In Camp Hill?
19  A.  Yes.
20  Q.  What was the time period for that?
21  A.  2011 to 2012.
22  Q.  And what was your next position?
23  A.  Senior director of regulatory compliance and
24  pharmacy returns.
25  Q.  That was also in Camp Hill?

Page 11

1  A.  Yes.
2  Q.  And that was from 2012 to when?
3  A.  2013.
4  Q.  And then in 2013, you left the company?
5  A.  Yes.
6  Q.  Do you remember approximately what month that
7  was?
8  A.  October.
9  Q.  For that position, the regulatory compliance
10  position, do you remember approximately the month you
11  started?
12  A.  I don't.
13  Q.  Do you know if it was in the beginning of the
14  year or end of the year?  Do you have any sense?
15  A.  I don't remember.
16  Q.  Okay.  What's your highest level of education?
17  A.  I have a Bachelor's Degree from University of
18  Tennessee.
19  Q.  What year did you get that?
20  A.  I graduated in 2002.
21  Q.  Did you go straight through four years, like a
22  standard four-year university?
23  A.  Actually, three and a half years.
24  Q.  Okay.  Did you attend any graduate courses
25  after that?

Page 12

1  A.  No.
2  Q.  Have you gone to any school since then?
3  A.  No.
4  Q.  What's your current position?  Do you work for
5  somebody else right now?
6  A.  Yes, for team Novo Nordisk.  It's a
7  professional sports team.  I'm the VP of compliance,
8  HR, and finance.
9  Q.  Did you start that job right after you left
10  Rite-Aid?
11  A.  Yes.
12  Q.  You've had the same position there since you
13  left Rite-Aid to now?
14  A.  I started in just compliance, and then over
15  the past few years I've taken on new roles.
16  Q.  Okay.  When you were operations manager in
17  Atlanta, did you have any responsibilities that
18  concerned controlled substances?
19  A.  No.
20  Q.  How about when you were a senior operations
21  manager in Charlotte?
22  A.  No.
23  Q.  How about manager of transportation in
24  Camp Hill?
25  A.  No.

Page 13

1  Q.  So I assume you had some responsibilities when
2  you were regulatory compliance senior director --
3  A.  Yes.
4  Q.  -- with -- concerning controlled substances.
5  "Yes"?
6  A.  Yes.
7  Q.  Okay.  Are you familiar with the scheduling of
8  controlled substances?
9  MS. McENROE:  Objection to form.
10  THE WITNESS:  Yes.
11  BY MR. PIFKO:
12  Q.  Like Schedule 1, 2, through 5, you understand
13  that?
14  A.  Yes.
15  Q.  Okay.  Do you know what the difference is,
16  roughly, between the different schedules?
17  MS. McENROE:  Objection to form.
18  THE WITNESS:  Yes.
19  BY MR. PIFKO:
20  Q.  Okay.  What's your understanding of what the
21  difference is?
22  A.  The C2 through C5, the addictive level of each
23  drug.  Like 2 being opioids and 3, slowly going down to
24  5.
25  Q.  The risk of addiction is higher the lower the

Page 14

1 schedule number; is that correct?
2 　　MS. McENROE: Objection to form.
3 　　THE WITNESS: No. C5 would be less risk for
4 　addiction.
5 BY MR. PIFKO:
6 　Q. Right. So as you go lower in scheduling --
7 　A. Yes.
8 　Q. -- the higher the risk; is that correct?
9 　　MS. McENROE: Objection to form. You may
10 　answer.
11 　　THE WITNESS: Yeah. C5 would be less
12 　addiction than C2.
13 BY MR. PIFKO:
14 　Q. Okay. As part of your job as senior director
15 of regulatory compliance, did you undertake to become
16 familiar with the Controlled Substances Act?
17 　　MS. McENROE: Objection to form.
18 　　THE WITNESS: Yes.
19 BY MR. PIFKO:
20 　Q. What -- did you take any courses?
21 　A. I -- I worked with our government affairs
22 department and attended some conferences. Mainly the
23 government affairs.
24 　Q. Did they have a formal training seminar they
25 provided to you?

Page 15

1 　A. No. We had a lot of policies and procedures
2 already in place, so it was a matter of reviewing those
3 and working -- any questions I may have had working
4 with government affairs.
5 　Q. Is there a particular individual you remember
6 working with in government affairs to do your training?
7 　A. Yes.
8 　Q. What was the name of that person?
9 　A. Janet Hart.
10 　Q. Anyone else?
11 　A. Sophia Lai.
12 　Q. Anyone else?
13 　A. No.
14 　Q. What -- do you have an understanding about
15 what Janet's position was at that time, her official
16 title?
17 　A. I don't recall her official title.
18 　Q. How about Sophia?
19 　A. I don't recall her official title either.
20 　Q. Who -- who was your boss when you were senior
21 director of regulatory compliance?
22 　A. Rick Chapman.
23 　Q. Are you aware that he was deposed earlier this
24 week?
25 　A. Yes.

Page 16

1 　Q. Have you seen his deposition transcript?
2 　A. No.
3 　Q. When you -- so when you became senior director
4 of regulatory compliance, you were provided with
5 various policies and procedures of the company; is that
6 correct?
7 　A. Yes, I was provided, but I was also familiar
8 with a lot of them from working in distribution
9 centers.
10 　Q. Okay. When did you first become familiar with
11 these policies and procedures while working at
12 distribution centers?
13 　A. In probably 2009ish we started an audit team,
14 an internal audit team, and I was on the audit team,
15 and we used to audit internally the distribution
16 centers, and we audited all their policies and
17 procedures.
18 　　So that's when I first saw a lot of the
19 policies and procedures outside of the obvious ones
20 that I already knew from the operations I was involved
21 in.
22 　Q. Did your auditing include any issues
23 concerning controlled substances?
24 　A. We audited controlled substances.
25 　Q. How -- in what way did you audit controlled

Page 17

1 substances?
2 　A. To make sure the DCs were following the
3 policies and procedures put in place.
4 　Q. So do you believe that you have an accurate
5 understanding of what Rite-Aid's policies and
6 procedures were with respect to handling and
7 distributing controlled substances?
8 　　MS. McENROE: Objection to form.
9 　　THE WITNESS: I did at the time. I can't say
10 　I probably remember all of them exactly right now,
11 　but I do remember some.
12 BY MR. PIFKO:
13 　Q. So from time to time during the course of this
14 deposition I'm going to be handing you documents.
15 　A. Okay.
16 　Q. They're going to have a little sticker on it
17 with a number; and then I'm sure that, in preparing for
18 the deposition, Rite-Aid's counsel went over this, but
19 there's little numbers on the bottom. They're called
20 Bates numbers, and each page in the case has a unique
21 number, and I'll be referring to the pages that way.
22 　A. Okay.
23 　　(Rite-Aid Belli Exhibit No. 1 was marked for
24 identification.)
25 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1   Q.  So I'm handing you what's marked as Exhibit 1.
2   You can take your time to look at the exhibit as long
3   as you feel that you need.  I'm going to tell you I
4   only have a question about one of the pages, even
5   though this is a lengthy document.
6       Let the record reflect that the witness is
7   reviewing Exhibit 1.  For the record, Exhibit 1 is a
8   document headed Rite Aid of Maryland, Inc., DBA
9   Rite Aid Mid-Atlanta Customer Support Center (DC No.
10  10) Standard Operating Procedures Index.  It's Bates
11  labeled Rite_Aid_OMDL_0015454 through 15506.
12      Have you seen this document before?
13  A.  Yes.
14  Q.  When was the last time you believe you saw it?
15  A.  I don't recall.
16  Q.  Okay.  Sometime during -- you were working for
17  Rite-Aid you believe you saw this document before?
18  A.  Yes.
19  Q.  Okay.  Can you tell me what this is?
20  A.  It's the SOP for the DCs.
21  Q.  When you say "SOP for the DCs," what do you
22  mean?
23  A.  It's the standard operating procedures for the
24  Perryman Distribution Center.
25  Q.  If you could turn your attention to the page

Page 19

1   that's Bates labeled with that name I gave you earlier,
2   Rite_Aid_OMDL_0015459.  Are you there?
3   A.  Licensing --
4   Q.  Yeah.
5   A.  Yes.
6   Q.  So this is an SOP called Licensing
7   Requirements.  Agree?
8   A.  Yes.
9   Q.  Are you familiar with this?
10  A.  No.
11  Q.  Okay.  It says Effective Date January 5th,
12  2009.  Do you see that?
13  A.  Yes.
14  Q.  Is this a format of SOP that you're -- you
15  have experience having seen while working at Rite-Aid?
16      MS. McENROE:  Objection to form.
17      THE WITNESS:  This is one format.  We have
18      many SOPs.
19  BY MR. PIFKO:
20  Q.  Okay.  But this is one of the formats that
21  you're familiar with seeing?
22  A.  Yes.
23  Q.  Okay.  Do you see here -- it's got a couple
24  numbers here.  I want to direct your attention to 4.8
25  towards the bottom of the second to last paragraph

Page 20

1   there.  Do you see that?
2   A.  Yes.
3   Q.  It says DC 10 is a Wholesale Distributor for
4   Rite Aid corporation and is engaged in the "Wholesale
5   Distribution" of Prescription Drugs and Devices which,
6   for the purposes of this criteria, means distribution
7   of Prescription Drugs and Devices to persons other than
8   a consumer or patient and includes the offer to sell;
9   deliver; offer to deliver; give away; or transfer,
10  whether by passage of title, physical movement, or
11  both.  Do you see that?
12  A.  Yes.
13  Q.  Do you understand that DC -- Rite-Aid's DC 10
14  was a wholesale distributor?
15  A.  To our internal -- they're inner company
16  sales, so we only ship to our own stores.
17  Q.  Okay.  But for the purposes of shipping to
18  Rite-Aid's own stores, you understood that the Perryman
19  facility was a distributor under the Controlled
20  Substances Act?
21      MS. McENROE:  Objection to form.
22      THE WITNESS:  We were a distribution center
23      that were supplying product to our internal
24      stores.
25  BY MR. PIFKO:

Page 21

1   Q.  The Perryman facility was -- have you heard
2   the term "a registrant" under the Controlled Substances
3   Act?
4   A.  Yes.
5   Q.  Okay.  Do you understand that the Perryman
6   facility was a registrant under the Controlled
7   Substances Act?
8   A.  Yes.
9   Q.  Okay.  Were there any other -- and as a
10  registrant, that means that the Perryman facility was
11  licensed to distribute controlled substances; is that
12  correct?
13      MS. McENROE:  Objection to form.
14      THE WITNESS:  Yes.
15  BY MR. PIFKO:
16  Q.  Were there other facilities, distribution
17  centers, at Rite-Aid that were registrants who were
18  licensed to distribute controlled substances?
19  A.  Yes.
20  Q.  Which other distribution centers?
21  A.  Woodland and Tuscaloosa and Charlotte.
22  Q.  Any others?
23  A.  No.
24  Q.  So do you know the, roughly, the geographic
25  regions that these distribution centers serviced?

Page 22

1      MS. McENROE:  Objection to form.
2      THE WITNESS:  Yes.
3 BY MR. PIFKO:
4    Q.  Okay.  I'm just -- I'm not asking you
5 particular cities --
6    A.  Yeah.
7    Q.  -- but roughly the states.  Do you know --
8    A.  For some of the distribution centers.
9    Q.  Okay.  Well, let's talk about the Perryman
10 facility.  Do you know, roughly, which states it
11 serviced?
12    A.  I do not.
13    Q.  Okay.  How about if you think of portions of
14 the country, can you describe what your understanding
15 of what general region the Perryman facility serviced?
16      MS. McENROE:  Objection to form.
17      THE WITNESS:  The East Coast.
18 BY MR. PIFKO:
19    Q.  How about Woodland?
20    A.  The West Coast.
21    Q.  How about Tuscaloosa?
22    A.  Tuscaloosa and Charlotte both would be
23 Southeast.
24    Q.  How about states like Ohio, Kentucky, and
25 West Virginia, do you know which service --

Page 23

1 distribution center serviced those areas?
2    A.  Perryman.
3    Q.  As part of your job duties, did you, at the
4 time, have some more detailed familiarity with the
5 geographic regions serviced by the various distribution
6 centers?
7    A.  Yes.
8    Q.  So then there -- am I correct that there are
9 other distribution centers, in addition to the four
10 that you named?
11    A.  Yes, but they didn't all ship pharmacy.
12    Q.  Okay.  So it's only -- so while there are
13 other distribution centers for Rite-Aid, only those
14 four locations distributed controlled substances; is
15 that correct?
16    A.  Yes.
17    Q.  And when we were looking back and talking
18 about how the Perryman facility was a registrant of the
19 Controlled Substances Act, do you have an understanding
20 of which types of controlled substances were
21 distributed through that facility?
22      MS. McENROE:  Objection to form.
23      THE WITNESS:  Not the details of the NDCs, no.
24 BY MR. PIFKO:
25    Q.  How about by scheduling?

Page 24

1    A.  I knew it, yes.
2    Q.  Okay.  What -- what -- which schedule -- what
3 type of scheduled products did you understand that the
4 Perryman facility distributed?
5    A.  3 through 5.
6    Q.  And how about the Woodland facility?
7    A.  The same.
8    Q.  How about the Tuscaloosa facility?
9    A.  The same.
10    Q.  Charlotte?
11    A.  The same.
12    Q.  Did -- at any time to your knowledge, did any
13 of those facilities distribute Schedule 2 products?
14    A.  No.
15    Q.  Okay.  Do you have an understanding of what an
16 opioid is?
17      MS. McENROE:  Objection to form.
18      THE WITNESS:  Yes.
19 BY MR. PIFKO:
20    Q.  Okay.  What's your understanding of what an
21 opioid is?
22    A.  It's a medication that's prescribed for -- for
23 various reasons.
24    Q.  Can you give me any examples of products that
25 you understand to be opioid products?

Page 25

1    A.  Hydrocodone, OxyContin.
2    Q.  Any others?
3    A.  Those are the two that I can think of.
4    Q.  How about Tramadol, have you ever heard of
5 that?
6    A.  I've heard of it, yes.
7    Q.  Do you know if that's an opioid?
8    A.  I'm not sure.
9    Q.  Did you have an understanding that, among the
10 Schedule 3 through 5 products that were distributed by
11 these four distributors, that they included -- that
12 included opioid products?
13      MS. McENROE:  Objection to form.
14      THE WITNESS:  Yes.
15 BY MR. PIFKO:
16    Q.  Okay.  Have you ever heard of something called
17 a hydrocodone combination product?
18    A.  No.
19    Q.  Have you ever heard the term "suspicious order
20 monitoring"?
21    A.  Yes.
22    Q.  What does that mean to you?
23      MS. McENROE:  Objection to form.
24      THE WITNESS:  It's the due diligence that was
25 done to ensure the controlled substances stayed

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    within the supply chain and there's no diversion.
2  BY MR. PIFKO:
3    Q.  Do you know what diversion is?
4    A.  Yes.
5    Q.  What's your understanding of what diversion
6  is?
7    A.  When a controlled substances leaves its chain
8  of custody and gets into the hands of someone that it
9  wasn't intended for.
10   Q.  Do you understand Rite-Aid, as a registrant,
11 to have a duty to prevent diversion or to engage in
12 efforts designed to prevent diversion?
13       MS. McENROE:  Objection to form.
14       THE WITNESS:  Yes.
15 BY MR. PIFKO:
16   Q.  Do you have an understanding of what practices
17 and procedures Rite-Aid had in place to attempt to
18 prevent diversion?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  Yes.
21 BY MR. PIFKO:
22   Q.  Do you have an understanding of what
23 procedures and practices and policies Rite-Aid had in
24 place to identify and report suspicious orders?
25       MS. McENROE:  Objection to form.

Page 27

1        THE WITNESS:  Yes.
2  BY MR. PIFKO:
3    Q.  Do you know what a suspicious order is?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  Yes.
6  BY MR. PIFKO:
7    Q.  Okay.  Can you tell me what a suspicious order
8  is?
9    A.  It's anything that's, I guess, out of the --
10 out of the ordinary, not normal.  It could be -- it
11 could be various reasons, but, I mean, it's -- there's
12 not, like, I mean, a clear definition.  It would be --
13 it's unique to each store or situation.  There's not a
14 blanket answer for a suspicious order.
15   Q.  Okay.  Let's talk about Rite-Aid's policies,
16 practices, and procedures that were designed to attempt
17 to prevent diversion.  Okay?
18   A.  Yes.
19   Q.  What can you tell me, what were the procedures
20 that Rite-Aid had in place as a distributor to attempt
21 to prevent diversion?
22       MS. McENROE:  Objection to form.
23       THE WITNESS:  At the DC level or corporate
24    level?
25 BY MR. PIFKO:

Page 28

1    Q.  Well, let's go through both.
2    A.  Okay.
3    Q.  So let's start at the distribution center
4  level.
5    A.  At the distribution center level, there was
6  thresholds in place where if a picker received an order
7  above that threshold, that they would adjust the order
8  down to the threshold level.
9        Also, the pickers in those areas were senior
10 associates that worked there for a long time and were
11 very familiar with the stores they were picking for.
12 So if something seemed suspicious to them or out of the
13 ordinary to them, they could contact the store to do
14 further research.
15       We also had a replenishment system at the
16 store level where the orders that came to the
17 distribution center were already calculated based on
18 the store's volume, dispensing volume, which gave them
19 a suggested order quantity, which was based on their
20 history and then also asset protection.  The government
21 affairs did various reviews and audits.
22   Q.  Anything else?
23   A.  No.  I'm not that -- I mean, there may be
24 others, but those are the ones I recall.
25   Q.  Okay.  Let's go through some of the details of

Page 29

1  those.  You said that there were thresholds, correct?
2    A.  Correct.
3    Q.  Okay.  What's a threshold?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  It's a limit that we would never
6    pull over that amount.
7  BY MR. PIFKO:
8    Q.  When you say "never pull," what do you mean?
9    A.  Pick, pick an order, to ship to the store.
10   Q.  So even if an order comes in that exceeds a
11 threshold, Rite-Aid would never ship an order beyond
12 the threshold; is that correct?
13       MS. McENROE:  Objection to form.
14       THE WITNESS:  Yes, unless there is an
15    exception for that store.
16 BY MR. PIFKO:
17   Q.  During the time period that you worked for
18 Rite-Aid, are you familiar with what the thresholds
19 were?
20   A.  I don't recall at this time.  When I was in my
21 position I did.
22   Q.  Do you know if most stores had the same
23 threshold?
24   A.  All -- most stores had the same threshold with
25 the exceptions, with the exception stores that were

Page 30

1 reviewed periodically.
2 Q. Have you heard of the term that the thresholds
3 were around 5,000? Does that sound familiar?
4 MS. McENROE: Objection to form.
5 THE WITNESS: Yes.
6 BY MR. PIFKO:
7 Q. Okay. So most stores had a threshold of
8 5,000, and then there was a handful of stores that had
9 some other threshold?
10 A. Correct.
11 Q. Do you recall, roughly, what percentage of
12 stores had the -- were the exception stores?
13 A. It was under 10.
14 Q. Okay. Out of what, thousands of stores; is
15 that correct?
16 A. Correct.
17 Q. Okay. Do you remember any of those stores?
18 A. I do not.
19 Q. Do you know how the threshold was calculated
20 originally?
21 A. I do not.
22 Q. So that was already in place when you took
23 your job?
24 A. Correct.
25 Q. Did you ever speak to anyone about how the

Page 31

1 thresholds were calculated?
2 A. No.
3 Q. Are you familiar with any training that --
4 what -- sorry, let's back up. You used the term
5 "picker"; is that correct?
6 A. Yes.
7 Q. What's a picker?
8 A. An order selector, the associate in the DC
9 that selects the order for the store.
10 Q. Are you familiar with the process by which an
11 order selector selects items in an order for the store?
12 A. There's multiple processes, but I'm familiar
13 with some of them, yes.
14 Q. Okay. Is order selector the official title of
15 the people who do that job?
16 A. I'm -- I -- I don't know the official title.
17 I don't recall the official title.
18 Q. But you recall "order selector" being a term
19 that's --
20 A. Yes.
21 Q. -- used?
22 A. Yes.
23 Q. So what's your understanding of how an order
24 selector fulfills an order? You said there's multiple
25 ways. Just -- let's go through the first way that you

Page 32

1 recall.
2 MS. McENROE: Objection to form.
3 THE WITNESS: They could have picked off
4 paper. It could have been pick-to-light. Paper
5 is a paper order with the store number listed and
6 the order that they're selecting. Pick-to-light
7 was a system where the order is lit up in front,
8 and it told them the number to select of that
9 item.
10 BY MR. PIFKO:
11 Q. Do you know how or why an order could come in
12 by paper versus pick-to-light?
13 A. Its technology in the DC.
14 Q. Okay. With respect to the DCs that
15 distributed controlled substances, do you know, did
16 they have pick-to-light systems?
17 MS. McENROE: Objection to form.
18 THE WITNESS: Some DCs did; some -- I -- some
19 did not. It depended on the items they were
20 pulling. If it was a fast-moving item and it was
21 efficient at pick-to-light, it would.
22 BY MR. PIFKO:
23 Q. Okay. How about with respect to Schedule 3
24 controlled substances, do you know if all those items
25 were through the pick-to-light system?

Page 33

1 A. I don't recall.
2 Q. Okay. So in a situation where there's a paper
3 order, where does -- how does an order selector receive
4 the piece of paper, do you know?
5 MS. McENROE: Objection to form.
6 THE WITNESS: They -- there was a stack of
7 orders, and they would pull their order that was
8 next in line, and they would select for that
9 store.
10 BY MR. PIFKO:
11 Q. So it's like a -- I'm trying to visualize the
12 situation.
13 A. Yeah.
14 Q. It's like a store. They get a -- they get,
15 like, a shopping list, the order, and then they have to
16 walk through aisles and put items into some sort of
17 container. Is that how it works?
18 MS. McENROE: Objection to form.
19 THE WITNESS: Into a tote, yes. They would
20 have a piece of paper, the store, what they're
21 selecting, and yes, they would pull it off the
22 bins and put it into a red tote.
23 BY MR. PIFKO:
24 Q. What is -- a tote, is it like a bag, or is it
25 like a plastic container?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.  It's a plastic container.

2    Q.  Okay.  Like -- I travel a lot.  Like those
3  containers at the airport you put your suitcase in or
4  bigger?

5        MS. McENROE:  Objection to form.

6  BY MR. PIFKO:

7    Q.  When you go through security, if you know what
8  I'm talking about.

9    A.  I -- it's a red tote.  I mean, it's a tote
10  just like you see at any distribution center is using
11  they ship it in.  It's common in distribution.

12    Q.  Okay.  So they have the order.  It tells you
13  the name of the item and the quantity -- the quantity
14  of the item and then they walk through the warehouse
15  and put those quantities into the tote and set it aside
16  to be shipped; is that correct?

17        MS. McENROE:  Objection to form.

18        THE WITNESS:  That's their step in it, yes.

19  BY MR. PIFKO:

20    Q.  Okay.  When a paper order comes in and it
21  exceeds the threshold, how does the order selector know
22  that the order is exceeding the threshold?

23        MS. McENROE:  Objection to form.

24        THE WITNESS:  There's -- they went through
25    training, and there was sheets hanging up through

Page 35

1    the pick area of the threshold amounts, and there
2    was an amount of -- there was actually on the pick
3    area what the threshold was.  So there would be a
4    sticker next to it.

5  BY MR. PIFKO:

6    Q.  Okay.  So let's say, for example, there's a
7  hydrocodone combination product that's in an order, and
8  the piece of paper printed out says a thousand units of
9  this item, and you -- the order selector goes to the
10  area where that product is.  There's a label on there
11  that says you can't fill an order higher than this many
12  units; is that correct?

13        MS. McENROE:  Objection to form.

14        THE WITNESS:  Yes.

15  BY MR. PIFKO:

16    Q.  Okay.  What about when there's a pick-to-light
17  system, let's talk about how that works.

18    A.  The same thing.

19    Q.  Okay.  So when -- how does an order come in
20  through the pick-to-light system?

21    A.  They scan a label, which was the order label,
22  and it would light up the pick-to-light system.

23    Q.  Okay.  And so the pick-to-light system has
24  lights on an item on the shelf.  So when they're
25  walking down, they see which shelf -- which shelves

Page 36

1  they're supposed to go to?

2    A.  Correct.

3    Q.  And then when they get to the specific item,
4  there's an LED display that has the number of units
5  they're supposed to pick?

6    A.  Yes.

7    Q.  Does -- if they're picking an item that has a
8  threshold associated with it, how do they know what the
9  threshold is in the pick-to-light system?

10        MS. McENROE:  Objection to form.

11        THE WITNESS:  The same way I described
12    earlier, it was marked on the pick site.

13  BY MR. PIFKO:

14    Q.  Okay.  Does the LED display automatically
15  reduce itself to the threshold if the order comes in
16  exceeding the threshold?

17        MS. McENROE:  Objection to form.

18        THE WITNESS:  No.  The picker would reduce
19    the -- adjust the order down.

20  BY MR. PIFKO:

21    Q.  Okay.  So they walk up, and let's say that the
22  threshold is a thousand -- is a thousand but the order
23  is for 2,000.  They go up.  The screen will read 2,000,
24  but there's a sign that says only put a thousand in
25  there, and then they press a button to make it go down

Page 37

1  to a thousand; is that correct?

2    A.  Yes.

3    Q.  So you said there was training that was
4  provided for the order selector; is that correct?

5    A.  Yes.

6    Q.  Did you ever attend any of the training
7  sessions?

8    A.  No.

9    Q.  Do you know if there was written materials
10  that were provided to the order selectors in connection
11  with the training?

12    A.  Yes.

13    Q.  Have you ever seen the training materials that
14  were provided to them?

15    A.  Yes.  I mean, not since I've been employed or
16  worked in Rite-Aid, but yes.  There was -- there was
17  documents that existed.

18    Q.  Was it a single manual for being an order
19  selector, or do you know if it was various different
20  documents?

21    A.  It was various documents.

22    Q.  Did you ever draft any portions of those
23  documents?

24    A.  Not of the training documents, no.

25    Q.  Okay.  But you're familiar with them?

Page 38

1  A.  I remember seeing them, yes.

2  Q.  And do you believe that they had portions of

3  them that explained how the thresholds functioned?

4  A.  Yes.

5  Q.  And in the training manual, it told them if an

6  item exceeded the threshold, that they should only put

7  the amount up to the threshold in the tote; is that

8  correct?

9      MS. McENROE:  Objection to form.

10     THE WITNESS:  I don't recall the exact

11     language that was in the SOPs.

12 BY MR. PIFKO:

13  Q.  But that's your understanding of what the

14 process was; is that correct?

15     MS. McENROE:  Objection to form.

16     THE WITNESS:  Yes.  I know they went through

17     training on how the thresholds worked when pulling

18     controlled -- C2 -- C3s.  Excuse me.

19 BY MR. PIFKO:

20  Q.  And just to be clear, I know what you mean;

21 but for the record, when you say "C2," that's a

22 Schedule 2 controlled substance or "C3," that's a C3

23 controlled substance; is that correct?

24  A.  Correct.

25  Q.  Do you know, if an order exceeded a threshold,

Page 39

1 if there was any -- okay.  So an order selector only

2 fills the order up to the threshold, correct?

3      MS. McENROE:  Objection to form.

4      THE WITNESS:  Correct.

5 BY MR. PIFKO:

6  Q.  Is there any other process that comes into

7 play when an order comes in that exceeds a threshold?

8  A.  The order selector kept a log.  They would

9 call the store and confirm with the store, and they

10 would do research, and there was a log of every one of

11 those incidents.

12  Q.  So every time an order exceeded a threshold,

13 the policy was that the order selector needed to call

14 the store?

15  A.  Yes.

16  Q.  And they were -- they were obligated to write

17 down that they called the store?

18  A.  Yes.

19  Q.  Do you know, was there a policy on what types

20 of information they were supposed to obtain when they

21 called the store when an order exceeded a threshold?

22  A.  I don't recall, but they would do research

23 with the store and log actually who they talked to at

24 the store and any conversation they had.

25  Q.  But you don't know what they were supposed to

Page 40

1 ask about the order that exceeded the threshold?

2      MS. McENROE:  Objection to form.

3      THE WITNESS:  They were doing their due

4      diligence and research to find out why the order

5      exceeded the threshold.

6 BY MR. PIFKO:

7  Q.  And then they would write that down in the

8 document?

9  A.  In the log.

10  Q.  Okay.  What's the log called?

11  A.  I don't recall the name of the log.

12  Q.  Have you ever heard of a thing called --

13 something called a threshold log?

14  A.  Yes.  I mean --

15  Q.  Is that --

16  A.  I don't know if that was the exact name of the

17 log, but yes, there was a threshold log.

18  Q.  Can you think of any other documentation that

19 you recall seeing in connection with thresholds?

20     MS. McENROE:  Objection to form.

21     THE WITNESS:  No.

22 BY MR. PIFKO:

23  Q.  So the -- these calls that were made, they

24 were kept in some sort of log.  It may be the threshold

25 log, but it may be a different name of a document; is

Page 41

1 that correct?

2  A.  It was kept in a log.  I don't remember the

3 exact name of the log.

4  Q.  Was that a computerized log?

5  A.  It was a handwritten log.

6  Q.  Okay.  And was that log sent to somebody?

7  A.  It was kept on file at the DC; and, if there

8 was a DC audit from the DEA or any regulator, they

9 would have a file showing their -- their process for

10 the thresholds.

11  Q.  Was that log kept in some centralized file

12 area in the distribution center?

13  A.  Yes.

14  Q.  Okay.  Do you know the process by which the --

15 you said the logs -- so an order selector is supposed

16 to make a phone call, talk with the store and take

17 notes, and then they write it down in a log, correct?

18     MS. McENROE:  Objection to form.

19     THE WITNESS:  Correct.

20 BY MR. PIFKO:

21  Q.  And then what's the -- how does that -- do you

22 know how that paper then gets sent to the central

23 filing area in the distribution center?

24  A.  I do not.

25  Q.  Okay.  Do you believe it would have been sent

Page 42

1 somewhere daily or weekly or monthly? Do you have any
2 idea of the periods?
3      MS. McENROE: Objection to form.
4      THE WITNESS: There was a handwritten log that
5      also -- I mean, there's multiple logs because
6      there was logs that would generate for -- for
7      ARCOS reasons and things like that.
8      So you may have had duplicate information that
9      could have been on the threshold log that appeared
10     on other logs, but the intent for that log was
11     kept in a file at the DC.
12 BY MR. PIFKO:
13     Q.  Do you know if there were occasions when --
14 did an order selector have the ability to decide not to
15 ship an order after they made a call to the store?
16     A.  I don't recall an incident.
17     Q.  You don't recall if that was the process?
18     A.  If that was in the process, that it was deemed
19 suspicious, they would not ship.
20     Q.  Okay.  So the order selector, under the
21 company's policies, had the discretion to decide, based
22 on the conversation, not to ship an order?
23     A.  They would confirm with, after talking to the
24 store, they would also confirm with corporate, which
25 would be government affairs.

Page 43

1      Q.  Do you have an understanding about the process
2 by which an order selector would communicate with
3 someone at government affairs?
4      A.  I -- I don't recall the exact process.
5      Q.  Okay.  So were they supposed to call someone
6 at government affairs after an order exceeded
7 thresholds?
8      A.  No.  They -- because not all orders that
9 exceeded threshold were suspicious orders.  These
10 orders were already being calculated based on the store
11 history when sent to the DC.
12     So the order -- the orders coming to the DCs
13 were already adjusted on the store's volume, and then
14 if an order exceeded threshold, it did not make the
15 order automatically suspicious.  So that's why the
16 picker was calling the store to investigate.  So this
17 was kind of our second layer of reviewing an order.
18     Q.  Okay.  But -- so it's your understanding that
19 on every single occasion that an order exceeded
20 threshold, the order selector was supposed to make a
21 call to the store?
22     A.  When an order exceeded a threshold, they would
23 do the research to find out why the order was exceeding
24 the threshold.
25     Q.  And then they were supposed to write that

Page 44

1 down.  We talked about that, correct?
2      A.  Then they kept a log.
3      Q.  Okay.  And then on some occasions but not all
4 occasions they could then call someone in government
5 affairs?
6      MS. McENROE: Objection to form.
7      THE WITNESS: If they thought the order was
8      suspicious.
9 BY MR. PIFKO:
10     Q.  Okay.  So if, based on their conversation with
11 the store, they felt that an order was suspicious, it
12 was the company's policy that they then needed to call
13 someone in government affairs?
14     A.  If an order would have been found suspicious,
15 then yes, they would have contacted corporate.
16     Q.  Based on the order selector's decision; is
17 that correct?
18     MS. McENROE: Objection to form.
19     THE WITNESS: If the order -- after the order
20     selector did the research with the store, if it
21     was -- if it needed to get escalated to the next
22     level by being suspicious, if it was suspicious,
23     then they would contact government affairs.
24 BY MR. PIFKO:
25     Q.  What I'm trying to ask is if it was the order

Page 45

1 selector's decision as to whether -- so you think
2 there's a fork in the road, an order exceeds a
3 threshold.  They make a call to the store.  They can
4 either do nothing or they can call government affairs,
5 correct?
6      MS. McENROE: Objection to form.
7      THE WITNESS: Most of the calls to the stores
8      could be if an order was fat-fingered at the
9      store, they typed an error.  So those type of
10     conversations would not be suspicious orders; and
11     again, these were our internal stores.
12     We knew these stores very well.  We'd pull
13     these store orders weekly for most stores.  So we
14     had the relationship with the stores.  These
15     weren't -- we weren't shipping to stores outside
16     our network.  I mean, we were well aware of these
17     stores.
18     So at that level, a decision could be made if
19     it was just a store error; and also again, these
20     orders were already being calculated when they
21     were sent to the DC.  This was just a second layer
22     that we were using to bring the threshold down.
23 BY MR. PIFKO:
24     Q.  Okay.  Fair enough.  I'm just trying to -- I'm
25 just trying to understand.  If you think of, like, a

Page 46

1 decision tree: So order exceeds the threshold. Then
2 the next thing that the order selector must do was call
3 the store, correct?
4     MS. McENROE: Objection to form.
5     THE WITNESS: I mean, I can't speak to that.
6 That -- if an -- yes.
7 BY MR. PIFKO:
8     Q. Okay. So it's the company's policy that if an
9 order exceeded threshold, they must call -- the order
10 selector must call the store; is that correct?
11     MS. McENROE: Object to form.
12     THE WITNESS: I can't recall exactly what was
13 written in the procedure.
14 BY MR. PIFKO:
15     Q. Okay. So there may be occasions when an order
16 could exceed the threshold and they didn't call the
17 store?
18     MS. McENROE: Object to the form.
19     THE WITNESS: No. I mean, it was in the
20 procedure.
21 BY MR. PIFKO:
22     Q. Okay.
23     A. I --
24     Q. That's what they're supposed to do; is that
25 correct?

Page 47

1     A. Yes.
2     Q. Okay. And then after they call the store,
3 they have two choices: They can call someone in
4 government affairs and say that they think the order is
5 suspicious, or they can do nothing and proceed to fill
6 and ship the order so long as it's under the threshold;
7 is that correct?
8     MS. McENROE: Objection to form.
9     THE WITNESS: Again, if an order is above the
10 threshold, it did not make the order suspicious.
11 They -- they were trying to find out, confirm with
12 the store if that quantity was what they really
13 needed.
14 BY MR. PIFKO:
15     Q. Right. And I'm just -- I'm just -- all I'm
16 trying to get you to tell me is what the process is.
17 Okay? So I understand we have an order that exceeded
18 the threshold. Then the order selector's job is to --
19 they're supposed to call the store in that situation,
20 correct?
21     MS. McENROE: Objection to form.
22     THE WITNESS: I'm trying to explain
23 conceptually what we did, but this is six, seven
24 years ago, so the exact steps are -- I mean, I
25 don't recall the exact steps. So conceptually is

Page 48

1 what I'm explaining the process to you.
2 BY MR. PIFKO:
3     Q. Right. And I'm just trying to understand. So
4 then they call the store, and they have -- they can
5 then just decide that they're going to ship the
6 order --
7     A. No, we never --
8     Q. -- up to the threshold, or they can call
9 government affairs and say I think this is
10 suspicious --
11     MS. McENROE: Objection.
12 BY MR. PIFKO:
13     Q. -- after they talk to the store; is that
14 correct?
15     MS. McENROE: Objection to form.
16 BY MR. PIFKO:
17     Q. Is there any other option they could do?
18     MS. McENROE: Objection to form.
19     THE WITNESS: All the orders were brought down
20 to the threshold.
21 BY MR. PIFKO:
22     Q. Right. That's what I mean. They could ship
23 it up to what the threshold is?
24     MS. McENROE: Objection to form.
25     THE WITNESS: Correct. I mean, if the order

Page 49

1 was above the threshold, they brought it down to
2 the threshold, and we'd create a log, and they'd
3 call the stores to confirm the order quantity.
4     If, at that point, an order was suspicious for
5 some reason, which, in my time in this position,
6 we never had a suspicious order, then it would be
7 routed to the proper channels.
8 BY MR. PIFKO:
9     Q. Okay. And if it wasn't deemed to be
10 suspicious after that call, they would ship it in the
11 quantity that was -- did not exceed the threshold; is
12 that correct?
13     MS. McENROE: Objection to form.
14     THE WITNESS: They would ship it in the
15 quantity that was already calculated by a
16 replenishment system saying that's what the store
17 needed.
18 BY MR. PIFKO:
19     Q. Okay. So long as that didn't exceed the
20 threshold?
21     A. Correct.
22     Q. Could they, based on that conversation,
23 override the threshold and decide, I talked to the
24 store, I need to fill this order beyond the threshold?
25     A. No.

Page 50

1    Q.  You've talked a little bit about -- okay.  I
2  want to back up.  Do you know if the order selectors
3  were given training on how to make a decision about
4  whether an order was suspicious?
5    A.  Yes.  There was a DC procedure.
6    Q.  How -- what was the DC procedure on that?
7    A.  I don't recall.
8    Q.  Was there -- was it in writing somewhere?
9    A.  Yes.
10    Q.  Okay.  So there was some sort of training and
11  written procedure that instructed order selectors on
12  how, when making a call to a pharmacist, to decide if
13  an order was suspicious?
14    A.  They had a procedure for suspicious order
15  monitoring, yes.
16    Q.  Your answer was a little -- a little different
17  than my question and it's --
18    A.  I don't recall the details of the -- in the
19  procedure of suspicious monitoring, but there was a
20  procedure for the associate on identifying suspicious
21  orders.
22    Q.  Okay.  So there's some written procedure that
23  told an order selector how -- what factors they should
24  consider in deciding whether an order is suspicious?
25    A.  Again, I don't recall what -- the exact

Page 51

1  details of that procedure, but yes, there was a
2  procedure for the associate on suspicious order
3  monitoring.
4    Q.  And to your knowledge, the entire time that
5  you worked at Rite-Aid, there was no order that had
6  been found to be suspicious?
7    A.  While I was in my position, there was no
8  suspicious orders reported.
9    Q.  Okay.  Let's talk about you.  You talked
10  about -- I don't remember exactly the language that you
11  used, but we were talking about the process by which an
12  order is -- is made.  Do you have an understanding
13  about how an order comes through the -- starting at the
14  store?
15      MS. McENROE:  Objection to form.
16      THE WITNESS:  I don't know -- I do not know
17    how the store -- I'm familiar with the concept of
18    a replenishment system, but I do not know the
19    details of how a store order was placed.
20  BY MR. PIFKO:
21    Q.  Okay.  Do you have an understanding that it
22  was automated?
23    A.  Yes.
24    Q.  Okay.  Do you agree that the replenishment
25  system looked at the demand of items that were being

Page 52

1  sold and made a comparison to inventory on hand and
2  then projecting based on what was being sold, put in an
3  order for the amount it believed was necessary to
4  continue supply; is that correct?
5      MS. McENROE:  Objection to form.
6      THE WITNESS:  Yes.  I mean, there was a
7    calculation that was looking at on-hand and
8    dispensing that would generate a suggested order
9    quantity.
10  BY MR. PIFKO:
11    Q.  And so on occasions, that suggested order
12  quantity could exceed the threshold; is that correct?
13    A.  Yes.
14    Q.  Do you know any other factors that the
15  ordering system used to -- other than measuring the
16  demand for items and the amount going out the door
17  versus inventory as far as how it selected an order
18  quantity?
19      MS. McENROE:  Objection to form.
20      THE WITNESS:  No.
21  BY MR. PIFKO:
22    Q.  Do you know if the order system took into
23  account any other factors that occurred at a pharmacy,
24  such as whether there was theft?
25      MS. McENROE:  Objection to form.

Page 53

1      THE WITNESS:  I'm not -- I'm not familiar with
2    all the details of how the replenishment, like --
3  BY MR. PIFKO:
4    Q.  Okay.
5      MS. McENROE:  Mark, we've been going just
6    about an hour, if there's a time soon that's good
7    for a break.
8      MR. PIFKO:  Yeah, we can take a break in just
9    a minute.
10  BY MR. PIFKO:
11    Q.  Do you know if there was documentation on how
12  the order, the replenishment system, worked?
13    A.  Yes.
14    Q.  Okay.  We can take a break.  We started at
15  what -- do you know if there was a name for the
16  documentation on how the order replenishment system
17  functioned?
18    A.  I have no idea what the name would be.
19    Q.  Okay.
20      THE VIDEOGRAPHER:  Off the record, 10:29 a.m.
21    (Brief recess was taken.)
22      THE VIDEOGRAPHER:  On the record, 10:51 a.m.
23    (Rite-Aid Belli Exhibit No. 2 was marked for
24  identification.)
25  BY MR. PIFKO:

Page 54

1    Q.  I'm handing you what's marked as Exhibit 2.
2    A.  Okay.
3    Q.  For the record, Exhibit 2 is a printout of
4  your LinkedIn profile, and I really just had a quick
5  question.
6    A.  Okay.
7    Q.  Take your time to look at it and make yourself
8  comfortable that it's accurate.  What I want to know
9  is, earlier we kind of talked about your work history
10  and your education.
11       What I want to know is, is this Exhibit 2
12  correct?  Is it more correct than your memory?  Can we
13  rely on this as documentation of what you did, the time
14  periods, et cetera?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  No, because this says it was
17    Rite-Aid's employment the whole time.  Whereas,
18    actually, I started with Eckerd and then Brooks
19    Eckerd and then Rite-Aid.  So it was through
20    multiple buyouts, but the reason just Rite-Aid is
21    listed is because it's easier to show when looking
22    for employment --
23  BY MR. PIFKO:
24    Q.  Okay.
25    A.  -- but no, this is --

Page 55

1    Q.  We'll fix that, but then --
2    A.  Okay.
3    Q.  -- any other issues that you want to -- let's
4  go back to, you know, there's -- it says, on the bottom
5  right-hand corner, it has the page out of 4.
6    A.  Okay.
7    Q.  So let's go -- the last page is basically
8  blank.  The page 3 of 4 is the earlier thing, your
9  education there; is that correct?
10       MS. McENROE:  You're talking about the
11    University of Tennessee Knoxville?
12       THE WITNESS:  Tennessee.  Yes.
13  BY MR. PIFKO:
14    Q.  Okay.  That reflects your degree and the time
15  period that you attended that university?
16    A.  Yes.
17    Q.  Okay.  Then you've got an internship here; is
18  that correct?
19    A.  I did -- that internship was during -- I took
20  a semester off.  So that's why I stated three and a
21  half years.
22    Q.  Okay.
23    A.  So I took a semester off to do that
24  internship, and then I came back and graduated.
25    Q.  Okay.  The next job that you had, the Dollar

Page 56

1  Tree job, is that accurate?
2    A.  Yes.  That was my first job --
3    Q.  Okay.
4    A.  -- when I graduated.
5    Q.  And then so when you started, you actually
6  worked -- so it says here that you started in 2004, but
7  you believe it was some iteration of Eckerd?
8    A.  It was Eckerd.
9    Q.  Okay.  So that was for Eckerd.  The entire
10  time that was Eckerd?
11    A.  Yes.
12    Q.  Okay.
13    A.  Well, at some point -- I don't remember when
14  Brooks bought Eckerd, but yeah, it was somewhere during
15  that position.
16    Q.  Okay.
17    A.  I don't recall the year.
18    Q.  Roughly 2004.  Does that sound right?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  I don't recall.
21  BY MR. PIFKO:
22    Q.  Okay.
23    A.  I -- I remember being in that position when it
24  happened, but --
25    Q.  Okay.  So at some point in that first job,

Page 57

1  Brooks and Eckerd had some sort of corporate
2  transaction, and it was Brooks Eckerd after that?
3    A.  Correct.
4    Q.  And then so the next job up, that was for
5  Brooks Eckerd?
6    A.  Correct.
7       MS. McENROE:  And for clarity of the record,
8    that's the operation manager position?
9       MR. PIFKO:  Yes.
10  BY MR. PIFKO:
11    Q.  And then any other changes to the -- other
12  than that, is it accurate, what's on there?
13       MS. McENROE:  Objection to form.
14       THE WITNESS:  Yes.
15  BY MR. PIFKO:
16    Q.  Okay.  Then the senior manager job, was that
17  for Rite-Aid or still for Brooks Eckerd?
18    A.  For Brooks Eckerd.
19    Q.  Any other changes to that?
20    A.  No.
21    Q.  Okay.  Then going up to the operations manager
22  job at the bottom of 2 of 4.
23    A.  Yes.
24    Q.  Is that accurate?
25    A.  The operations manager, 2007 to 2009?



Page 58

1   Q.   Yeah.

2   A.   Yes, that's when I joined Rite-Aid.

3   Q.   Okay.  So at some point in the middle of that

4 or you think when you started that job it was all

5 Rite-Aid?

6   A.   When I started that job, it was -- it was

7 Rite-Aid.  The previous job was at Brooks Eckerd

8 corporate headquarters, so we closed that, and I did

9 not move to Camp Hill when I was in the op position.

10 So I went back out to the distribution center.

11   Q.   Okay.  So then looking at page 2 of 4,

12 everything on there is accurate; is that correct?

13      MS. McENROE:  Objection to form.

14      THE WITNESS:  Yes.

15 BY MR. PIFKO:

16   Q.   And then going to the first page, everything

17 on that page is accurate?

18      MS. McENROE:  Objection to form.

19      THE WITNESS:  Yes.

20 BY MR. PIFKO:

Page 59

Page 60

Page 61

17   Q.   Okay.  And each distribution center, each of

18 those four distribution centers that handled controlled

19 substances had a DEA coordinator?

20   A.   Correct.  And I did misspeak earlier.  There

21 was -- I left out Liverpool, which would have been a

22 fifth distribution center.

23   Q.   Okay.

24   A.   I thought of it after.

25   Q.   That one also handled controlled substances?



Page 62

1  A.  Correct.
2  Q.  So there's five?
3  A.  Yes.
4  Q.  And each one of those has a DEA coordinator?
5  A.  Yes.
6  Q.  Do you remember the names of any of the DEA
7  coordinators?
8  A.  Marian Wood was for Perryman.  Barb, I can't
9  think -- remember her last name -- was for Woodland.
10 Tuscaloosa had two.  Bill Walker was the most recent,
11 and prior to that, Patricia.  Liverpool was Kim.  I
12 don't remember Charlotte.  I don't recall.
13 Q.  If it comes to you, you can tell me.  Do you
14 know what the job responsibilities were for the DEA
15 coordinator?
16 A.  I mean, they had a list of responsibilities.
17 You need to be more specific.  I mean, they were --
18 they were responsible for -- to be -- I mean, they
19 ensured compliance with the DEA in the DC.
20 Q.  As senior director of regulatory compliance,
21 did they report to you?
22 A.  They did not.
23 Q.  Who did they report to?
24 A.  The pharmacy manager in the DC.
25 Q.  Did you interact with them regularly?

Page 63

1  MS. McENROE:  Objection to form.
2  THE WITNESS:  Yes.
3 BY MR. PIFKO:

Page 64

Page 65



Page 66

Page 68

1    Q.   What was the circumstances under which you met

2   with those people?

3    A.   Visiting the DC.  I mean, I worked in DC

4   operations for a long time.  So when I visited DCs, I

5   would visit different areas of the DC, and obviously I

6   would visit with the pharmacy areas and meet the

7   pickers, and we didn't sit down and have full

8   conversations.  I knew a lot of them, but it was like a

9   hello and how are things going type thing.

10    Q.   Have you visited all five distribution centers

11   that distributed controlled substances?

12    A.   Yes.

13    Q.   Throughout your time at Rite-Aid or only when

14   you were senior director of regulatory compliance?

15    A.   Throughout my time at Rite-Aid.

16       (Rite-Aid Belli Exhibit No. 3 was marked for

17   identification.)

18   BY MR. PIFKO:

19    Q.   I'm handing you what's marked as Exhibit 3.

20   Take a moment to review that.  For the record, Exhibit

21   3 is a three-page document Bates labeled

22   Rite_Aid_OMDL_0016717 through 719.  Let me know when

23   you're done reviewing that.

24    A.   Okay.

Page 67

Page 69

20   BY MR. PIFKO:

21    Q.   Did you ever meet -- did you ever meet any of

22   the people who were order selectors?

23    A.   Yes.

24    Q.   "Yes"?

25    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review





Page 74

12        (Rite-Aid Belli Exhibit No. 4 was marked for

13   identification.)

14   BY MR. PIFKO:

15        Q.  I'm handing you what's marked Exhibit 4.  Take

16   a moment to review that.  It's marked also a three-page

17   document, Rite_Aid_OMDL_0015079 through 15081.  Let me

18   know when you're done reviewing that document.

19        A.  Okay.

Page 75

Page 76

Page 77

25   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review



Page 78

Page 80

Page 79

10    (Rite-Aid Belli Exhibit No. 5 was marked for
11  identification.)
12  BY MR. PIFKO:
13    Q.  I'm handing you what's marked as Exhibit 5.
14  Take a moment to review that.  Let me know when you're
15  done.  For the record, Exhibit 5 is a several-page
16  document Bates labeled Rite_Aid_OMDL_0014035, and then
17  it's got an attachment which was a native spreadsheet
18  which was Bates labeled Rite_Aid_OMDL_001436.
19       All the native printouts have the same Bates
20  number because it's native, so there weren't different
21  pages.  Let me know when you're done reviewing that.

Page 81

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Page 94

Page 96

Page 95

Page 97

11    (Rite-Aid Belli Exhibit No. 6 was marked for

12  identification.)

13  BY MR. PIFKO:

14    Q.  I'm handing you what's marked as Exhibit 6.

15  For the record, Exhibit 6 is a document Bates labeled

16  Rite_Aid_OMDL_0014727 through 14802.  Can you take --

17  the earlier pages are an E-mail, and then it's

18  attaching a document that's entitled RITE AID

19  DISTRIBUTION CENTER DEA REGULATORY GUIDELINES.



Highly Confidential - Subject to Further Confidentiality Review



Page 102

Page 104

Page 103

Page 105

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 114

1 not ship it, correct?

2   A. Yes.

3   Q. To your knowledge during your tenure there, no

4 orders were ever reported as suspicious, correct?

5   MS. McENROE: Objection to form.

6   THE WITNESS: While I was the -- in my last

7   position there, no.

8 BY MR. PIFKO:

9   Q. How about before that, do you know?

10   A. I don't know.

11   Q. It's around noon. We can take a lunch break.

12   MS. KELLY: That's fine.

13   MS. McENROE: Yeah. It's up to you.

14   THE VIDEOGRAPHER: Off the record, 12:05 p.m.

15   (Luncheon recess.)

16   THE VIDEOGRAPHER: On the record, 12:51 p.m.

17 BY MR. PIFKO:

18   Q. Welcome back. I want to ask you a question,

19 going back to Exhibit 5, if you want to put that in

20 front of you real quick.

21   A. Okay.

22   Q. Do you remember this was the monthly --

23   A. Yes.

24   Q. -- orders above threshold that you received,

25 correct?

Page 115

5   (Rite-Aid Belli Exhibit No. 7 was marked for

6 identification.)

7 BY MR. PIFKO:

8   Q. I'm handing you what's marked as Exhibit 7.

9   A. Okay.

10   Q. Take a minute to look at this. Do you recall

11 before the break that we were looking at Exhibit 6 at

12 the -- Rite-Aid's DEA regulatory guidelines? And for

13 the record, Exhibit 7 is another earlier version of the

14 regulatory guidelines Bates labeled

15 Rite_Aid_OMDL_0014379 through 14452.

Page 116

Page 117



Highly Confidential - Subject to Further Confidentiality Review



Page 122

1   identification.)
2   BY MR. PIFKO:
3       Q.  I'm handing you what's marked as Exhibit 8.
4   For the record, Exhibit 8 starts with an E-mail, and
5   it's got an attachment.  It's Bates labeled
6   Rite_Aid_OMDL_0017279.
7           The E-mail matching it then is just two pages
8   to 17280; and then the attachment is Bates labeled
9   Rite_Aid_OMDL_0017281 because it was produced natively.
10  All those pages have the same number on them.  Do you
11  know what, they -- some of them have the page 17289.

Page 123

Page 124

Page 125

Highly Confidential - Subject to Further Confidentiality Review



Page 126

Page 128

Page 127

Page 129

Highly Confidential - Subject to Further Confidentiality Review





Page 134

Page 136

Page 135

Page 137

19    (Rite-Aid Belli Exhibit No. 9 was marked for
20 identification.)
21 BY MR. PIFKO:
22    Q.  I'm handing you what's marked as Exhibit 9.
23 For the record, Exhibit 9 is a multi-page document.  It
24 says -- well, I guess the headings on different pages
25 are different, but it's Bates labeled



Page 138

1  Rite_Aid_OMDL_0021819 through 21823. Go ahead and
2  review that, and let me know when you're done.

Page 140

Page 139

Page 141

15      (Rite-Aid Belli Exhibit No. 10 was marked for
16  identification.)
17  BY MR. PIFKO:
18      Q.  I'm handing you what's marked as Exhibit 10.
19  For the record, Exhibit 10 is a two-page E-mail
20  attaching a native document, and the Bates label is
21  Rite_Aid_OMDL_0017321, 322, and then there's a
22  multi-page Power Point which we'll discuss and identify
23  with the witness. Let me know when you're done
24  reviewing the document.
25      A.  Okay.



Page 142

Page 144

Page 143

Page 145

19    (Rite-Aid Belli Exhibit No. 11 was marked for
20  identification.)
21  BY MR. PIFKO:
22    Q.  I'm handing you what's marked as Exhibit 11.
23    A.  Okay.
24    Q.  For the record, Exhibit 11 is a three-page
25  E-mail attaching a native document.  The Bates label is



Page 146

1  Rite_Aid_OMDL_0017445 through 17448, and then it's got
2  a six-page native attachment. Take a minute to review
3  that, and let me know when you're done.
4      A.  Okay.

Page 148

16     Q.  Okay. Let's take another short break.
17        MS. McENROE: Sure.
18        THE VIDEOGRAPHER: Off the record, 1:42 p.m.
19        (Brief recess was taken.)
20        THE VIDEOGRAPHER: On the record, 1:58 p.m.
21  BY MR. PIFKO:
22     Q.  Did you ever attend any Buzzeo conferences
23  when you worked at Rite-Aid?
24     A.  I attended one, yes.
25     Q.  Okay. Just -- so it's your recollection that

Page 147

Page 149

1  you just attended it on one occasion?
2      A.  Yes. I believe the first year that I was in
3  the position.
4      Q.  In 2012?
5      A.  Yes.
6        (Rite-Aid Belli Exhibit No. 12 was marked for
7  identification.)
8  BY MR. PIFKO:
9      Q.  I'm handing you what's marked as Exhibit 12.
10  For the record, it's a four-page document Bates labeled
11  Rite_Aid_OMDL_0014487 through 14490. Take a minute to
12  review it, and let me know when you're done.
13      A.  Okay.

Highly Confidential - Subject to Further Confidentiality Review





Page 154

18      (Rite-Aid Belli Exhibit No. 13 was marked for
19  identification.)
20  BY MR. PIFKO:
21      Q.  I'm handing you what's marked as Exhibit 13.
22  This is something that was marked yesterday -- or two
23  days ago in Mr. Chapman's deposition as Exhibit 2.  For
24  the record, it's Bates labeled Rite_Aid_OMDL_0038075
25  through 77.  Take a minute to review this, and let me

Page 155

1  know when you're done.
2      A.  Okay.

Page 156

Page 157

Highly Confidential - Subject to Further Confidentiality Review



Page 158

24  information in?

25  A.  Correct.

Page 159

Page 160

20  (Rite-Aid Belli Exhibit No. 14 was marked for

21  identification.)

22  BY MR. PIFKO:

23  Q.  I'm handing you what's marked as Exhibit 14.

24  It's a one-page document Bates labeled

25  Rite_Aid_OMDL_0017328.  It's a native spreadsheet page.

Page 161

1  Let me know when you're done looking at this.

2  A.  Okay.

Highly Confidential - Subject to Further Confidentiality Review



Page 162

Page 163

Page 164

22    (Rite-Aid Belli Exhibit No. 15 was marked for
23  identification.)
24  BY MR. PIFKO:
25    Q.  All right.  I'm handing you what's marked as

Page 165

1  Exhibit 15.  This is a document that was also
2  introduced yesterday as Exhibit 7.  Take a minute to
3  review it.  For the record, it's Bates labeled
4  Rite_Aid_OMDL_0040184 through 0040198.  Let me know
5  when you're done.
6    A.  Okay.

Case: 1:17-md-02804-DAP Doc #: 1974-20 Filed: 07/24/19 43 of 54. PageID #: 212760





Page 170

Page 172

Page 171

Page 173



Page 174

Page 176

1  review that, and let me know when you're done.
2      A.  Okay.

Page 175

18      (Rite-Aid Belli Exhibit No. 16 was marked for
19  identification.)
20  BY MR. PIFKO:
21      Q.  I'm handing you what's marked as Exhibit 16.
22  It is a document that was also admitted yesterday as
23  Exhibit 3.  I'm sorry.  I keep saying "yesterday."  In
24  the Chapman deposition as Exhibit 3.  It's
25  Rite_Aid_OMDL_0014948 through 51.  Take a minute to

Page 177

Highly Confidential - Subject to Further Confidentiality Review



Page 178

Page 180

Page 179

Page 181



Page 182

Page 184

Page 183

Page 185

12  Q.  Did you ever interact with any DEA agents?

13  A.  Only over E-mail.

14  Q.  Okay.  Can you remember the names of any of

15  them?

16  A.  No.

17  Q.  When you say the DEA said you had a great

18  system, is that something a DEA agent told you?

19  A.  It was in an audit at the Perryman

20  Distribution Center.

21  Q.  Do you remember the name of that DEA agent?

22  A.  No.

23  Q.  Did you meet -- did you meet with them

24  personally?

25  A.  No, but we have a log of the visit and their

g

25  that you just wanted to do this to bring all your



Page 186

1  report at the Perryman Distribution Center.
2      Q.   So that's not a comment that you heard
3  directly yourself?
4      A.   No, but it's -- it's in the log from the visit
5  from the DEA.
6      Q.   That -- who wrote -- who wrote the log?
7      A.   I can't -- I don't remember who wrote the log,
8  who was at the DC.
9      Q.   Someone at Rite-Aid?
10     A.   Someone at Rite-Aid, yes.

Page 188

Page 187

Page 189

Case: 1:17-md-02804-DAP Doc #: 1974-20 Filed: 07/24/19 49 of 54. PageID #: 212766





Page 194

Page 195

Page 196

Page 197

24      MS. McENROE:  Mark, we're hoping to take a
25      break when you get a chance when it's a good time.



Page 198

1      MR. PIFKO:  Sure.  We can take a -- we can
2  take a break now.
3      THE VIDEOGRAPHER:  Off the record, 3:10 p.m.
4  (Brief recess was taken.)
5      THE VIDEOGRAPHER:  On the record, 3:23 p.m.
6  BY MR. PIFKO:

Page 200

Page 199

Page 201



Page 202

Page 203

Page 204

1 BY MR. PIFKO:

2 Q. Okay. Do you remember approximately the month

3 when you left?

4 A. October.

15 Q. That's where you live now?

16 A. Yes.

17 Q. I want to talk for a second about your

18 preparation for the deposition.

19 A. Okay.

20 Q. I don't want to ask about any attorney-client

21 communications. I'm sure that in preparing for this

22 deposition, your counsel went over the concepts here;

23 but when did you first learn about -- that you were

24 going to be deposed in this case?

25 A. I don't recall the exact date. It was, I

Page 205

1 would say, a few weeks ago maybe. I don't remember. I

2 mean, I knew it was going on, but I didn't know -- I

3 mean, I don't remember the exact date. I don't recall

4 the exact date I was actually notified that it was

5 happening.

6 Q. What did you do to prepare for the deposition?

7 A. Other than meeting with Kelly, John, and Elisa

8 yesterday and once last week, nothing.

9 Q. Okay. You met with them in person yesterday?

10 A. Yes.

11 Q. Okay. And you met -- did you meet with them

12 in person the other time?

13 A. Yes.

14 Q. Where was that meeting?

15 A. In New York.

16 Q. How long was the meeting yesterday?

17 A. Six hours. Five, six hours.

18 Q. How long was the meeting in New York?

19 A. Maybe seven or eight hours.

20 Q. Did you review documents when you met them in

21 New York?

22 A. Yes.

23 Q. And you reviewed documents yesterday?

24 A. Yes.

25 Q. Is anyone paying you for your testimony here

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| Page 206 | Page 208 |

Page 206

1 today?

2    A. No.

3    Q. Did you talk about that you were going to

4 testify with anyone from Rite-Aid other than the

5 lawyers?

6    A. Current employees of Rite-Aid? No.

7    Q. How about former employees?

8    A. Just Rick Chapman.

9    Q. You told him that you were going to testify?

10    A. Only because I knew he was going to be in

11 Tampa at the same time, and I haven't seen him in a

12 long time -- or he lives in Tampa, I should say. So I

13 was -- really just for logistics to meet, and that was

14 it.

15    Q. When did you talk to him?

16    A. When I was -- a few weeks ago.

17    Q. Did you talk about your -- your work at

18 Rite-Aid with him?

19    A. No.

20    Q. Did you meet with him here and talk about your

21 work with Rite-Aid?

22    A. No.

23    Q. All right. Subject to any direct questions,

24 Rite-Aid's counsel might have a few. I don't have any

25 further questions at this time.

Page 207

1    MS. McENROE: Can we take a quick break?

2    THE VIDEOGRAPHER: Off the record, 3:33 p.m.

3    (Brief recess was taken.)

4    THE VIDEOGRAPHER: On the record, 3:35 p.m.

5    MS. McENROE: No questions from us. Just

6 thank you very much.

7    MR. PIFKO: All right.

8    THE VIDEOGRAPHER: Off the record, 3:35 p.m.

9    (Deposition concluded at 3:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 208

1        CERTIFICATE OF OATH

2

3

4 STATE OF FLORIDA

5 COUNTY OF HILLSBOROUGH

6

7

8    I, Lisa A. Simons-Clark, RMR, CRR, Notary

9 Public, State of Florida, certify that CHRISTOPHER

10 BELLI personally appeared before me on the 20th day of

11 December, 2018, and was duly sworn.

12

13    WITNESS my hand and official seal this ____ day of

14 December, 2018.

15

16        _____

17        Lisa A. Simons-Clark, RMR, CRR

18        Notary Public - State of Florida

19        My Commission Expires: 7/1/20

20        Commission No. GG 001980

21

22

23

24

25

Page 209

1        REPORTER'S CERTIFICATE

2

3 STATE OF FLORIDA

4 COUNTY OF PINELLAS

5

6    I, Lisa A. Simons-Clark, Registered Merit
Reporter, Certified Realtime Reporter, certify that I
was authorized to and did stenographically report the

7 deposition of CHRISTOPHER BELLI; that a review of the
transcript was requested; and that the transcript is a

8 true and complete record of my stenographic notes.

9

10    I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,

11 nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I

12 financially interested in the action.

13

14    Dated this ____ day of December, 2018.

15

16

17        _____

         Lisa A. Simons-Clark, RMR, CRR

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

Page 210

```
1              ERRATA SHEET
2      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3   IN RE:  National Prescription Opiate Litigation
        WITNESS:  CHRISTOPHER BELLI
4       DATE OF DEPOSITION:  December 20, 2018
5  PAGE  LINE   CHANGE              REASON
6   ____  ____   _____
7   ____  ____   _____
8   ____  ____   _____
9   ____  ____   _____
10  ____  ____   _____
11  ____  ____   _____
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20
    Under penalties of perjury, I declare that I have read
21  the foregoing document and that the facts stated in it
    are true.
22
23
    _____
24  DATE         CHRISTOPHER BELLI
25  Reporter:  Lisa A. Simons-Clark, RMR, CRR
```