1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
 6                         :

 7

 8                  HIGHLY CONFIDENTIAL

 9      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                    - - - -

12                  JANUARY 22, 2019

13                    - - - -

14      VIDEOTAPED DEPOSITION OF FRED BENCIVENGO,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor,

17   Pittsburgh, Pennsylvania 15219, by and before Ann

18   Medis, Registered Professional Reporter and Notary

19   Public in and for the Commonwealth of

20   Pennsylvania, on Tuesday, January 22, 2019,

21   commencing at 2:08 p.m.

22                    - - - -

23             GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com

25
```

2

```
 1                 A P P E A R A N C E S

 2    On behalf of Plaintiffs

 3            WAGSTAFF & CARTMELL, LLP
              BY:  TYLER HUDSON, ESQUIRE
 4            4740 Grand Avenue, Suite 300
              Kansas City, Missouri  64112
 5            816.701.1100
              thudson@wcllp.com

 6

 7    On behalf of Defendant AmerisourceBergen Drug
      Corporation

 8
              (By Phone/Livestream)
 9            JACKSON KELLY, LLP
              BY:  ANDREW N. SCHOCK ESQUIRE
10            50 South Main Street, Suite 201
              Akron, Ohio  44308
11            330.252.9078
              anschock@jacksonkelly.com

12

13    On behalf of Defendant Cardinal Health, Inc.

14            PIETRAGALLO GORDON ALFANO BOSICK &
              RASPANTI, LLP
15            BY:  JOHN A. SCHWAB, ESQUIRE
              One Oxford Centre, 38th Floor
16            301 Grant Street
              Pittsburgh, Pennsylvania  15219
17            412.263.2000
              jas@pietragallo.com

18

19    On behalf of Defendants Endo Pharmaceuticals, Endo
      Health Solutions and Par Pharmaceuticals

20
              (By Phone/Livestream)
21            ARNOLD & PORTER KAYE SCHOLER LLP
              BY:  JAKE MILLER, ESQUIRE
22            777 South Figueroa Street
              Los Angeles, CA 90017-5844
23            213.243.4000
              jake.miller@arnoldporter.com

24


25
```

```
 1            A P P E A R A N C E S (Continued)

 2   On behalf of Defendant HBC Service Company

 3            MARCUS & SHAPIRA, LLP
              BY:  JOSHUA A. KOBRIN, ESQUIRE
 4            One Oxford Centre, 35th Floor
              Pittsburgh, Pennsylvania  15219
 5            412.471.3490
              kobrin@marcus-shapira.com
 6

 7   On behalf of Defendant McKesson Corporation

 8            COVINGTON & BURLING, LLP
              BY:  MEGHAN MONAGHAN, ESQUIRE
 9            One CityCenter
              850 Tenth Street, NW
10            Washington, DC  20001-4956
              202.662.5807
11            mmonaghan@cov.com

12

     On behalf of Defendant Walmart
13
              (By phone/Livestream)
14            JONES DAY
              BY:  RICHARD M. BRODSKY, ESQUIRE
15            150 West Jefferson Avenue, Suite 2100
              Detroit, Michigan  48226
16            313.230.7699
              rbrodsky@jonesday.com
17

18   Also present

19            Tyler Crotty, legal videographer

20

21

22

23

24

25
```

4

1                    * I N D E X *

2   FRED BENCIVENGO                          PAGE

3     EXAMINATION BY MR. HUDSON        7, 170, 180
      EXAMINATION BY MR. KOBRIN           156, 179
4

5       * INDEX OF HBC-BENCIVENGO EXHIBITS *

6   NO.              DESCRIPTION            PAGE
    Exhibit 1  Giant Eagle Retail Operations -   19
7              Pharmacy Operations 11/13/14
               org chart
8              HBC_MDL00002216

9   Exhibit 2  Giant Eagle Retail Operations -   19
               Pharmacy Operations 6/1/15
10             org chart
               HBC_MDL0002222
11
    Exhibit 3  Email, 6/26/13, from S. Cook to   68
12             A. Anthony, et al., subject:
               Giant Eagle CSMP - 06/26/2013,
13             attaching CSMP Giant Eagle
               Threshold Report 062613.xlsx
14             HBC_MDL00136237 - 00136238

15  Exhibit 4  Email, 7/16/13, from S. Medina    72
               to A. Anthony, et al., subject:
16             Giant Eagle CSMP 07.16.13
               attaching Giant Eagle CSMP
17             07.16.13.xlsx
               HBC_MDL00079510 - 00079511
18
    Exhibit 5  Email, 7/16/13, from S. Medina    72
19             to A. Anthony, et al., subject:
               Giant Eagle CSMP 07.17.13
20             attaching Giant Eagle CSMP
               07.17.13.xlsx
21             HBC_MDL00079386  - 00079387

22  Exhibit 6  Email, 7/18/13, from S. Medina    72
               to A. Anthony, et al., subject:
23             Giant Eagle CSMP, attaching
               Giant Eagle CSMP 07.18.13.xlsx
24             HBC_MDL00079491 - 00079492

25

5

1      * INDEX OF HBC-BENCIVENGO EXHIBITS (Continued) *

2    NO.                  DESCRIPTION                PAGE
     Exhibit 7    Email, 7/22/13, from S. Medina      72
3                 to A. Anthony, et al., subject:
                  Giant Eagle CSMP 7/22,
4                 attaching Giant Eagle CSMP
                  07.22.13.xlsx
5                 HBC_MDL00079213 - 00079214

6    Exhibit 8    Email, 10/18/13, from F1 Batch      72
                  User to S. Cook, et al., subject:
7                 Email of DEA Threshold Warning
                  Report_8164, attaching DEA
8                 Threshold Warning Report_8164.xls
                  HBC_MDL00174476 - 00174477
9
     Exhibit 9    Email chain, 7/1/08, from D.        77
10                Casar to J. Liliestedt, et al.,
                  subject: RE: Vicodin quota ?????????
11                HBC_MDL00179373 - 00179374

12   Exhibit 10   Conference call invitation,        90
                  1/9/13, from G. Chunderlik to
13                J. Millward, et al., subject:
                  Narcotic Audit Application,
14                attaching requirements for the
                  application
15                HBC_MDL00041837 - 00041850

16   Exhibit 11   Copy of Narcotic of Audit Chain   103
                  Discrepancies Summary_07-01-13
17                HBC_MDL00032853 (native)

18   Exhibit 12   Copy of Narcotic of Audit Chain   103
                  Discrepancies Summary_October 2013
19                HBC_MDL00032878 (native)

20                      - - - -

21

22

23

24

25

6

1                  P R O C E E D I N G S

2                      - - - -

3         THE VIDEOGRAPHER:  We are now on the

4   record.  I'm a videographer retained by Golkow

5   Litigation Services.  Today's date is Tuesday,

6   January 22, 2019, and the time is 2:08 p.m.

7      This video deposition is being held at One

8   Oxford Centre, Pittsburgh, PA, in the matter of

9   National Prescription Opiate Litigation MDL, for

10  the Northern District of Ohio.

11     The deponent is Fred Bencivengo.

12     Will counsel please identify themselves and

13  state whom they represent.

14         MR. HUDSON:  Ty Hudson of Wagstaff &

15  Cartmell for plaintiffs.

16         MS. MONAGHAN:  Meghan Monaghan from

17  Covington & Burling on behalf of McKesson.

18         MR. SCHWAB:  John Schwab on behalf of

19  Cardinal.

20         MR. KOBRIN:  Josh Kobrin of Marcus &

21  Shapira, on behalf of HBC Service Company.

22         THE VIDEOGRAPHER:  And counsel on the

23  phone, please identify yourselves.

24         MR. BRODSKY:  This is Richard Brodsky

25  from Jones Day on behalf of Walmart.

7

```
 1              MR. MILLER:  Hi.  This is Jake Miller

 2      from Arnold & Porter on behalf of the Endo and Par

 3      defendants.  I don't know if others on the phone

 4      are having this issue, but at least for me, the

 5      realtime feed does not appear to be working.  I'm

 6      not seeing any text generated on the screen.

 7              MR. SCHOCK:  This is Andrew Schock of

 8      Jackson Kelly for the AmerisouceBergen Drug

 9      Corporation.

10              THE VIDEOGRAPHER:  The court reporter is

11      Ann Medis, and she will now swear in the witness.

12                      FRED BENCIVENGO,

13        having been first duly sworn, was examined

14                and testified as follows:

15                      EXAMINATION

16      BY MR. HUDSON:

17        Q.   Sir, could you please state your full

18      name for the record.

19        A.   Fred Bencivengo.

20        Q.   And what is your current address?

21        A.   3556 Layer Road in Warren, Ohio.

22        Q.   Have you ever had your deposition taken

23      before?

24        A.   Yes.

25        Q.   How many times?
```

1       A.   Once.

2       Q.   And what was the nature of that case?

3       A.   It was an overdose actually on

4  methadone, and I was an expert witness for the

5  defense.

6       Q.   And when was that, how long ago?

7       A.   In the middle '90s.

8       Q.   Well, it's been a little while.  So I'll

9  just make sure that we understand the ground

10 rules.  I'm going to be asking questions.  From

11 time to time counsel may object.  Unless your

12 counsel instructs you not to answer, will you

13 agree to answer my questions?

14      A.   Yes.

15      Q.   And if you don't understand my question,

16 will you let me know so I can rephrase it?

17      A.   Sure.

18      Q.   Is it fair that if you answer my

19 question, I can assume that you understood it?

20      A.   Yeah.

21           COUNSEL ON PHONE:  Can others confirm,

22 is the text working for them on the live feed?

23 Because it's not working for me.

24           THE VIDEOGRAPHER:  We are going off the

25 record.  The time is 2:11 p.m.

9

1          (Recess from 2:11 p.m. to 2:21 p.m.)

2          THE VIDEOGRAPHER:  We're going back on

3     the record.  The time is 2:21 p.m.

4     BY MR. HUDSON:

5          Q.  Mr. Bencivengo, did I pronounce that

6     correctly?

7          A.  Yes.

8          Q.  You understand that you're under oath?

9          A.  Yes.

10         Q.  You're swearing to tell the truth just

11    like you would if you were in a courtroom in front

12    of a judge and a jury?

13         A.  Yes.

14         Q.  You're doing a good job of this, but if

15    you could, just give audible answers as opposed to

16    nonverbal nods or things like that.

17         A.  Okay.

18         Q.  And then lastly, if you need to take a

19    break at any time, just let me know, and we can go

20    off the record.  All I would ask, if there's a

21    pending question, you answer that before we go off

22    the record; is that fair?

23         A.  Yes.

24         Q.  What did you do to prepare for the

25    deposition today?

1        A.   Met with counsel.

2        Q.   Approximately how many hours did you

3   meet?

4        A.   With breaks and lunch, probably about

5   seven hours.

6        Q.   Did you look at documents?

7        A.   Yes.

8        Q.   Before meeting with counsel for that

9   seven-hour meeting, had you done anything else to

10   prepare for this deposition?

11        A.   No.

12        Q.   Had you talked to anyone about this

13   deposition?

14        A.   Josh.

15        Q.   Other than counsel.

16        A.   No, no.

17        Q.   I want to start then with your

18   education.  If you could, just describe where you

19   went to college.

20        A.   I have a bachelor's degree in pharmacy.

21   I got in 1992 from Ohio Northern University.

22        Q.   So explain to me what that degree is.

23   Is that a pharmacy degree?

24        A.   At that time, it was a five-year degree;

25   correct.

11

1      Q.   And would you describe it as a pharmacy

2   degree or degree from pharmacy school?

3      A.   It's a pharmacy school.  I have a

4   pharmacy degree.

5      Q.   After you received your pharmacy degree,

6   what did you do?

7      A.   I worked for an independent from '92 up

8   until 2000 in various roles.  We had about four

9   stores and their single pharmacy, mail order

10   pharmacy.  It split off.  I managed the four

11   stores.  It split off to four stores of retail and

12   one pretty nice size nursing home pharmacy.  I got

13   out of that part and became the operations

14   director of the retail side.

15      Q.   What was the name of that company?

16      A.   Conva-Med, C-O-N-V-A-Med.

17      Q.   Where was that company located?

18      A.   We had four stores.  The headquarters

19   was out of Cornersburg; Cornersburg, Ohio,

20   Austintown.

21      Q.   And is that where you were located?

22      A.   When we first started -- when we first

23   started, we started in Brookfield, moved out to

24   that location.  Then my office got moved over down

25   towards Youngstown.

1          Q.    Why did you leave Conva-Med?

2          A.    They closed.

3          Q.    And why did they close?

4          A.    Some bad business deals from the owners.

5          Q.    Was there any sort of investigation by

6     the DEA or others of the company?

7          A.    No.  It was a typical independent

8     closing.  We just couldn't do it anymore, and we

9     sold our files.

10         Q.    So when you mean bad business deals, you

11    just mean like financially they just made

12    decisions that caused them to lose money instead

13    of make money?

14         A.    Yeah.  The two owners were clashing.

15         Q.    We're starting to talk over each other,

16    and I'm sometimes guilty of that, too.  So if we

17    could, as best you can, let me finish my question

18    and then I will do my very best to let you finish

19    your answer before we start talking because,

20    otherwise, she's going to become very upset with

21    us.

22         So Conva-Med closed in 2000, and at that

23    point, did you go to work for Giant Eagle?

24         A.    Yes.

25         Q.    And what was your first role at Giant

                                                                          13

1    Eagle?

2         A.   I was the pharmacy manager in the store

3    in Ravenna, Ohio.

4         Q.   Say the name of the town again.

5         A.   Ravenna.

6         Q.   How long did you remain at that store?

7         A.   Until approximately the end of 2006.

8         Q.   And at that point, were you promoted to

9    a pharmacy district leader?

10        A.   Correct.

11        Q.   What territory did you have in 2006 when

12   you became a pharmacy district leader?

13        A.   The Akron/Canton area.

14        Q.   And do you remain in that role as a

15   pharmacy district leader today?

16        A.   Yes.

17        Q.   Is pharmacy district leader sometimes

18   referred to as a PDL?

19        A.   That's exactly what it is, yeah.

20        Q.   So if I use the acronym PDL, you'll know

21   what I mean, pharmacy district leader?

22        A.   Yes.

23        Q.   Has your territory, PDL territory

24   changed between 2006 and today?

25        A.   Actually, I'm back to the stores I was

14

1    in in 2006.  But, yes, it's changed over the year.

2         Q.   If you could, just walk me through the

3    evolution over that, I think, it's 12 years or so.

4         A.   Not hitting the dates correctly, I had

5    had that territory probably for about two years.

6    I took over the Youngstown/Erie, Pennsylvania

7    region for a very small period of time.  I went up

8    in east Cleveland after that.

9         Q.   And the east Cleveland territory, how

10   long did you have that?

11        A.   For a couple of years.

12        Q.   Do you have a ballpark on what those

13   years would be?

14        A.   Probably from I want to say '15 maybe to

15   '17.

16        Q.   And how about when you switched over to

17   the territory in Pennsylvania, did you add those

18   stores, or did you shift completely from Ohio to

19   Pennsylvania?

20        A.   There's not enough stores in Erie, so I

21   had Youngstown/warren.  There was 13 or 14 stores

22   there and then the five or six stores in Erie.

23        Q.   But all of those stores in Pennsylvania?

24        A.   Yeah.  It was a split.  There was like

25   13 or 14 in Ohio, and the rest were in

1    Pennsylvania.

2         Q.   And then in 2017, then you went back to

3    the region that had the Akron?

4         A.   Yeah.  They redraw the lines every once

5    in a while, add stores, take stores away.  But for

6    the most part, the stores I have now were the

7    stores I started at, for the most part.

8         Q.   So during the entire -- is it 12 years?

9    Is that about right?

10        A.   Yes.

11        Q.   -- 12-year period, you were continuously

12   covering stores in Ohio?

13        A.   Correct.

14        Q.   But for a couple of years you had -- you

15   were added some stores in Ohio, I mean, in

16   Pennsylvania as well; correct?

17        A.   Correct.

18        Q.   In terms of the State of Ohio, do you

19   have a sense of how many pharmacies Giant Eagle

20   has?

21        A.   Probably about -- I'm assuming about

22   120, somewhere around there.

23        Q.   And of those, how many -- over your 12

24   years, I know it's sort of fluctuated a little

25   bit, how many of those Ohio pharmacies did you

16

1    cover or have you covered?

2            MR. KOBRIN:  If you know.

3            THE WITNESS:  60 to 80.































31



32









1    Q.   So if inventory counts were wrong?

2    A.   Exactly.

3    Q.   Then that would be an example of where

4  you would get them involved.

5    Any other compliance issues you can think of

6  where you were interacting with Mr. Millward or

7  his group?

8    A.   Compliance issues, I mean, I guess

9  compliance is such a big umbrella.  If a customer

10  would come in and we would deem the prescription

11  wasn't valid and we weren't going to fill it, we

12  just wanted to make sure everyone knew about it

13  and these are the reasons why and we're going to

14  send them away.

15    Q.   Would you reach out to Mr. Millward or

16  someone in his group each time a pharmacy would

17  decide not to fill a prescription, or how would

18  there be -- how would the decision be made as to

19  whether or not to contact them or not?

20         MR. KOBRIN:  Object to form.  Who is

21  "them"?

22         MR. HUDSON:  Mr. Millward or his group.

23         THE WITNESS:  Only if there was a

24  situation where the customer would come back and

25  say, I'm going to sue you, or there was any kind

```
 1    of threat made.  The majority of the time, I think

 2    these people know if you're giving it back to

 3    them.  They're out the door.

 4        Q.   Did any of the pharmacies in your

 5    territory ever keep logs of prescriptions that

 6    were attempted to be filled or not filled by the

 7    pharmacists?

 8            MR. KOBRIN:  Object to form.

 9            THE WITNESS:  No.

10    BY MR. HUDSON:

11        Q.   As you sit here today, do you have any

12    sense of how many times pharmacists in your

13    territory would decide not to fill a prescription?

14            MR. KOBRIN:  During the entire time?

15            MR. HUDSON:  Yeah, between 2009 and

16    2016.

17            MR. KOBRIN:  If you can give an answer.

18            THE WITNESS:  I can't speculate.  I can

19    tell you a hundred percent it happens.

20    BY MR. HUDSON:

21        Q.   Did any pharmacist in your territory

22    between 2009 and 2016 ever bring to your attention

23    any concerns about patients or prescribers or pain

24    clinics where patients were coming and trying to

25    fill prescriptions and the pharmacist felt like
```

38

```
 1    they may not be valid or they'd be at risk of

 2    diversion?

 3            MR. KOBRIN:  Object to form.

 4            THE WITNESS:  Yes.

 5    BY MR. HUDSON:

 6        Q.   How many times would you say that

 7    happened?

 8        A.   Again, with the new law being capped, I

 9    couldn't even speculate.  I know that it happens.

10        Q.   Do you remember any of the details

11    around any times where pharmacists ever raised

12    concerns with you?

13        A.   The majority of the time, if the doctor

14    has a bad name in the area.  So they wanted to

15    know if they could not fill any prescriptions from

16    Dr. Bencivengo.  We don't -- we support them a

17    hundred percent on their decision to fill or not

18    fill, but we don't support just blankly saying

19    we're not filling any prescriptions from a doctor.

20        We have a process in place.  You do your due

21    diligence.  You make a decision that way.  If part

22    of the due diligence says this guy doesn't need a

23    script, he's a bad doctor, then send them on the

24    way.  We don't have any list of doctors that we

25    don't fill for.
```

1       Q.   In your territory in Ohio, from time to

2  time were there doctors identified by pharmacists

3  that they believe to be bad doctors?

4       A.   Yes.

5       Q.   Did you or anyone else at Giant Eagle

6  keep a log or a record of bad doctors in Ohio that

7  a prescription being written by them at least

8  raised a red flag of concern?

9       A.   Again, no official log.  I've walked

10  into many stores and saw something hand scribbled

11  on a bulletin board, be careful of these three

12  doctors; not do not fill, just but be careful.

13      Q.   Was that more of an individual store to

14  individual store?

15      A.   An FYI.  If I'm coming in as a floater

16  that day, this is what I should look for.

17      Q.   Was there any sort of log or -- I'm

18  trying to think of a good -- report, any way that

19  Giant Eagle is memorializing diversion risks at

20  the pharmacy level in terms of bad doctors or

21  anything else that would cause there to be a

22  concern about the diversion of controlled

23  substances?

24       MR. KOBRIN:  Object to form.  What do

25  you mean by bad doctors?



41







44













1    using the term suspicious orders and flagged

2    orders concurrently or interchangeably.

3              MR. HUDSON:  Because they are.

4              MR. KOBRIN:  I don't think they are to

5    the witness.  I think you're causing confusion

6    with him regarding flagged and suspicious orders.

7              THE WITNESS:  Okay.  That makes sense.

8              MR. HUDSON:  I'll let you clear that up.

9              MR. KOBRIN:  Well, I'm flagging that

10   issue for you.

11       Should we take a break?

12             MR. HUDSON:  Yeah, that's fine.  Take a

13   quick break.

14             THE VIDEOGRAPHER:  We are going off the

15   record.  The time is 3:11 p.m.

16             (Recess from 3:11 p.m. to 3:42 p.m.)

17             THE VIDEOGRAPHER:  We're going back on

18   the record.  The time is 3:42 p.m.

19   BY MR. HUDSON:

20       Q.   Welcome back, Mr. Bencivengo.  Before

21   the break, we were talking about pharmacists and

22   potential red flags for diversion, and you had

23   made reference to OARRS reports and CBTs, and that

24   kind of took us down this road.

25       So I want to go back to my original question

51

```
 1    which was:  For Giant Eagle pharmacists, was there
 2    any sort of uniform criteria that existed to apply
 3    to try to determine whether to fill a prescription
 4    or not?
 5            MR. KOBRIN:  Object to form.
 6            THE WITNESS:  We have document control
 7    dispensing.  In that document it lists the red
 8    flags, what to look for to do the due diligence
 9    and to make that decision.
10    BY MR. HUDSON:
11        Q.  As you sit here today, do you have a
12    recollection of what those red flags are?
13            MR. KOBRIN:  Object to form.  Do you
14    want to show him the document?
15            MR. HUDSON:  I don't have it.
16            THE WITNESS:  I mean, I can't name every
17    single one of them, but obviously the age, the
18    distance, the distance they drive, the distance
19    from the doctor to the pharmacy and the distance
20    where they live and to the pharmacy.  If they
21    mention the drugs by the street names, Percs,
22    Vics.  Any kind of combination product, the
23    trinities, the pain reliever, the muscle relaxer,
24    those are usually a sign that calls might need to
25    be made.
```

```
 1   BY MR. HUDSON:

 2        Q.   And in Ohio in your 12 years there, in

 3   your experience, were there patients coming into

 4   pharmacies that were trying to get drugs that

 5   weren't for medically necessary purposes?

 6             MR. KOBRIN:  Object to form.

 7             THE WITNESS:  Yes.

 8   BY MR. HUDSON:

 9        Q.   And how did you come to that opinion?

10        A.   As a practicing pharmacist or as a

11   person in my role right now?

12        Q.   Yeah, just as a whole, in other words,

13   really through those 12 years in your role as a

14   PDL.

15        A.   By doing the due diligence we needed to

16   do to fill those prescriptions, by viewing the red

17   flags, and then once it was determined, that's

18   when it was determined this wasn't necessary.

19        Q.   Did you have enough interaction with

20   pharmacists and just the communities of Ohio to

21   get a sense of whether or not opioid diversion or

22   opioid abuse was a problem in the communities

23   where your territory existed?

24             MR. KOBRIN:  Object to form.

25             THE WITNESS:  Enough with the
```























64

















72















79



1  ████████████████████████████████████

2  ████████████

3  ██████████████████████████

4  ██████████████████████████████████████

5  ███████████████

6          THE VIDEOGRAPHER:  We're going off the

7  record.  The time is 4:20 p.m.

8          (Recess from 4:20 p.m. to 4:21 p.m.)

9          THE VIDEOGRAPHER:  We're going back on

10  the record.  The time is 4:22 p.m.

11       ████████████████████████████

12  ████████████████████████████████████████

13  ██████████████████████████████████████

14  █████████████████████████████

15  █████████████

16  ██████████████████████████████████████

17  ████████████████████████████████████████

18  █████████████████████████████████████

19  ███

20  █████████████████████████████████████

21  ████████████████████████████████████████

22  ██████████████████████████████████

23  ██████████████████████████████████

24  ████████████

25  ████████████████████████████████















87





































105



106









110











115







118















125









129





131







134



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14          MR. KOBRIN:  Can we take a break?  Do
15  you want to take a break.
16          THE WITNESS:  Yeah.
17  BY MR. HUDSON:
18     Q.   Can we just finish this?  I'm almost
19  done.
20          MR. KOBRIN:  Yeah.  How many more
21  questions do you think you have?
22          MR. HUDSON:  Just going through, there's
23  probably like, I don't know, six more.  They're
24  just going to be the same questions every one.
25          MR. KOBRIN:  Why don't we just take a
```

135

1    quick break.

2              MR. HUDSON:  Okay.  We'll take a break.

3              THE VIDEOGRAPHER:  We're going off the

4    record.  The time is 5:29 p.m.

5              (Recess from 5:29 p.m. to 5:51 p.m.)

6              THE VIDEOGRAPHER:  We're going back on

7    the record.  The time is 5:51 p.m.

8    ███████████

9    ███████████████████

10   █████████████████████

11   ████████████████████

12   ██████████████

13   ███████████████

14   ████████████████

15   ██████████████████████

16   █████████████████████

17   ████████

18   ███████

19   ██████████████

20   ███

21   ████████████████

22   ██████████

23   ███████████████

24   █████████████████

25   ██████████████







139







142



143







146







149







152



153





155



156

1  ██████████████████████████████

2  ████████████████████████

3  ████████████████████████

4  ████████████████████████████████

5  ███████████████████████████████

6  ███████████████████████████████

7  ██████████████████████████

8  ███████████████████████████

9  ████████████████████████████████

10  ██████████

11          MR. HUDSON:  I don't have any further

12  questions.

13          MR. KOBRIN:  Let's go off the record

14  real quick.

15          THE VIDEOGRAPHER:  We're going off the

16  record.  The time is 6:15 p.m.

17          (Recess from 6:15 p.m. to 6:34 p.m.)

18          THE VIDEOGRAPHER:  We're going back on

19  the record.  The time is 6:34 p.m.

20                  ████████████

21  ███████████

22  ███████████████████████████████

23  ██████████████████████████

24  ███████████████████████████████

25  ████████████████████████████████



158

1    those doctors as a matter of policy or how you

2    kept track of those doctors or which scripts were

3    refused.  Do you recall that?

4         A.   Yes.

5         Q.   If a doctor was identified as a licensed

6    doctor who was causing concern for pharmacists,

7    what steps would your pharmacists take in your

8    pharmacies?

9         A.   Well, I think, for the most part, you go

10   in the stores and see a doctor's name on a cork

11   board, taped to a monitor so that anybody that

12   comes in there is aware that we're not not filling

13   all scripts from this doctor, but we're going to

14   scrutinize and drag that prescription through the

15   mud as much as possible to make sure it's for a

16   legitimate purpose.

17        A guy comes in.  It's after the hours.  We

18   can't get ahold of the doctor.  It's not getting

19   filled.  What we normally do after that is send an

20   email out at times or call the local stores and

21   say we just turned this guy away and this is the

22   reason.  It goes out to the stores.  I've had

23   times or I've heard of times where other stores,

24   CVS, has called us.  If we have a store across the

25   street, a competitor, we may call the competitor

159

```
1    and say, you know what, we just sent this guy

2    there with a script.  He took it back.  He may be

3    coming over to you now and this is why.  But

4    they're in the same area, so they have all the

5    same docs anyway.

6          Q.   So even if the person with a script from

7    the doctor who's kind of identified by the

8    pharmacy, even if that particular person bringing

9    that particular script in didn't raise any red

10   flags, you would still scrutinize that script?

11             MR. HUDSON:  Object to the form.

12   BY MR. KOBRIN:

13         Q.   Would you still scrutinize the script

14   even if the patient bringing in the script from a

15   doctor who had caused some concern for your

16   pharmacists?  Would you still scrutinize it even

17   if there were no red flags?

18             MR. HUDSON:  Object to the form.

19             THE WITNESS:  If it's from that doctor,

20   is that what you're asking?

21   BY MR. KOBRIN:

22         Q.   Yes.

23         A.   We would scrutinize it.

24         Q.   How would you scrutinize it?

25         A.   Reading the OARRS report, calling for
```

160

```
 1   the diagnosis whether he wants to give it to us or
 2   not, and only filling it during his business
 3   hours.  And if you can't get ahold of him to
 4   verify that he even wrote the script, then we
 5   would either give it back or -- it all depends.
 6        There's two options.  We'll call the doctor
 7   in the morning for you.  Come back and get it.  Or
 8   the guy might say, no, just give it to me.  Then
 9   we would try to call CVS or send an email out and
10   warn we just gave the script back.  This is why.
11        Q.  You said that anyone who comes in can
12   see the name on the cork board.  By that do you
13   mean anyone, customers?
14        A.  No.  It's back in the pharmacy facing
15   us.
16        Q.  So everyone at the store would know to
17   scrutinize this doctor's script?
18        A.  The pharmacists, yes.
19        Q.  We talked earlier in relation to your
20   testimony about doctors who were licensed but
21   still caused some concern to your pharmacists
22   about rejecting scripts.  Do you recall that?
23        A.  Yes.
24        Q.  And I know you said that you were -- I
25   believe your testimony was that you were a hundred
```

161

1     percent certain that it happened and the scripts

2     were rejected, but you couldn't give an exact

3     description of when that happened.  Do you recall

4     that?

5          A.   Yes.

6          Q.   Is that accurate?

7          A.   It's an inexact number.  I would say

8     that it happens weekly for the main reason, which

9     hasn't changed, is they always need it two or

10    three days early, early, early.  So you start

11    billing.  It comes back too soon.  You look at the

12    OARRS report.  You see the last time it was

13    filled, and we don't fill it.

14         Q.   So it did happen regularly, we'll say,

15    that scripts were rejected at the pharmacy that

16    you oversaw?

17         A.   Correct.

18              MR. HUDSON:  Object to the form.

19    BY MR. KOBRIN:

20         Q.   Did it happen regularly?

21         A.   Yes.

22         Q.   You testified a little bit about

23    thresholds and the thresholds, whether they be

24    from McKesson or Anda or HBC.  Do you remember

25    that?



162



164







166



168





170

```
 1        Q.   And you mentioned LP.  What is LP?

 2        A.   Loss prevention.

 3        Q.   And they're the people who kind of help

 4   you research all these issues at the next level?

 5        A.   Yes.

 6        Q.   I think we're all set.

 7             MR. KOBRIN:  Pass the witness.

 8                       RE-EXAMINATION

 9   BY MR. HUDSON:

10        Q.   In terms of scripts rejected, you

11   testified that it happens weekly.  Is that just

12   your sense from, as you sit here today, the best

13   of your recollection?

14        A.   It's my sense of just from me being in

15   the store from the time period we're talking, to

16   conversations about compliance with my team

17   members, what are some of the reasons we're

18   turning away scripts.

19        Q.   Is there any reason why Giant Eagle

20   couldn't have kept a scripts rejected log or

21   written down on the computer system or somewhere

22   each instance where a prescription was rejected

23   and the reason it was rejected?

24             MR. KOBRIN:  Object to the form.

25             THE WITNESS:  There would be no reason
```

171

```
 1    to keep a log like that.  You're determining
 2    whether you're going to fill something or not fill
 3    it.  You make the determination.  You can put into
 4    the computer refilled too soon or whatnot.  If you
 5    take the script back, there's no record in the
 6    computer of the script.
 7    BY MR. HUDSON:
 8         Q.   Right.  All I'm saying is in the
 9    computer system or somewhere could Giant Eagle
10    keep a log of scripts that were rejected due to
11    suspicion of diversion?
12              MR. KOBRIN:  Object to form.
13              THE WITNESS:  No, because some of those
14    don't even get into our system.  If you bring a
15    piece of paper to me and I do everything that we
16    spoke about here for the last -- since 1:00 or
17    2:00, that prescription might not get dropped
18    through our system and even get in the system.  So
19    there's no record of the prescription even there.
20    We just hand it back to you.  You take it away.
21    BY MR. HUDSON:
22         Q.   Right.  I guess what I'm saying is, is
23    there any reason why Giant Eagle couldn't keep a
24    log of some kind or a repository, like you take
25    the script and you go, this thing, this just
```

172

```
 1    doesn't look right to me.  I'm not filling this
 2    script.  In my professional judgment, this isn't
 3    legitimate.  Here's the name and what they were
 4    trying to fill and then the reason for rejecting
 5    it is because this doesn't look legitimate to me
 6    and I think it's a possible risk of diversion.
 7         Is there any reason why Giant Eagle
 8    pharmacists couldn't as a matter of practice have
 9    kept a log of prescriptions where they decided not
10    to fill them?
11              MR. KOBRIN:  Object to form.
12              THE WITNESS:  I don't know.  I don't
13    know why we would ever look at that log.  I do not
14    know what purpose it would serve.  We've already
15    determined we're not filling it.
16    BY MR. HUDSON:
17         Q.  Well, one purpose would just be to have
18    some sense, as we sit here today, of how many
19    prescriptions there were that were at risk of
20    diversion that were rejected; right?
21              MR. KOBRIN:  Object to form.
22              THE WITNESS:  It would help you here
23    today, yes.  It would help what you're trying to
24    go after.  It would help.  But it wouldn't give us
25    anything.
```

1    BY MR. HUDSON:

2        Q.   Well, it would help Giant Eagle, too,

3    because if you said that weekly -- it's your sense

4    that weekly pharmacists within your territory are

5    rejecting filling prescriptions, you could go to

6    that rejected prescription log and look at it.

7    And then we'd be able to say, yeah, Pennsylvania

8    is right.  Look down the log.  Every week there's

9    a pharmacist that's not filling a prescription.

10            MR. KOBRIN:  Object to form.

11   Argumentative.

12            THE WITNESS:  That was my response.  It

13   would help your case, but it wouldn't do anything

14   for me.  I would never have to see that.  They

15   didn't fill the script.  They did what they're

16   supposed to do.

17   BY MR. HUDSON:

18       Q.   Were you ever concerned or to your

19   knowledge was anyone at Giant Eagle ever concerned

20   about diversion of opioids?

21       A.   All of Giant Eagle is concerned.  Any

22   pharmacist, any pharmacy is concerned about

23   diversion of opioids.

24       Q.   Would keeping records and trying to

25   track the reasons why prescriptions are not filled

174

1   potentially serve a role to Giant Eagle in

2   becoming better at preventing diversion?

3          MR. KOBRIN:  Object to form.

4          THE WITNESS:  I don't believe it would.

5   BY MR. HUDSON:

6      Q.   Similarly, on Exhibits 11 and 12, when

7   you look at the line items, there's well over a

8   hundred, probably a couple hundred line items from

9   pharmacies in your territory of inventory

10  discrepancies just for these two months, right --

11         MR. KOBRIN:  Object to form.

12  BY MR. HUDSON:

13     Q.   -- that we've looked at?

14     A.   We looked at about 20 discrepancies.

15  The rest of the report are all resolved issues.

16     Q.   Well, let's look at back then at

17  Exhibit 11.  We looked at 20 discrepancies where

18  the reason for it was unknown; right?

19         MR. KOBRIN:  Object to form.  If we're

20  going to say 20, we should know what we're talking

21  about here.

22  BY MR. HUDSON:

23     Q.   We went through.  The record is what is.

24  We went through them; right?  Whatever it is it

25  is.





177



178







181



20          MR. HUDSON:  No further questions.

21          THE VIDEOGRAPHER:  This marks the end of

22    the testimony of Fred Bencivengo.  We are going

23    off the record.  The time is approximately

24    7:00 p.m.

25              (Whereupon, at 7:00 p.m., the taking of

182

1    the instant deposition ceased.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

183

```
 1    COMMONWEALTH OF PENNSYLVANIA  )

 2    COUNTY OF ALLEGHENY           )      SS:

 3                   C E R T I F I C A T E

 4            I, Ann Medis, Registered Professional

 5    Reporter, Certified Livenote Reporter and Notary

 6    Public within and for the Commonwealth of

 7    Pennsylvania, do hereby certify:

 8            That FRED BENCIVENGO, the witness whose

 9    deposition is hereinbefore set forth, was duly

10    sworn by me and that such deposition is a true

11    record of the testimony given by such witness.

12            I further certify the inspection,

13    reading and signing of said deposition were not

14    waived by counsel for the respective parties and

15    by the witness.

16            I further certify that I am not related

17    to any of the parties to this action by blood or

18    marriage and that I am in no way interested in the

19    outcome of this matter.

20            IN WITNESS WHEREOF, I have hereunto set

21    my hand this 25th day of January, 2019.

22

                    _____
23                            Notary Public

24

25
```

184

```
 1    COMMONWEALTH OF PENNSYLVANIA   )    E R R A T A
      COUNTY OF ALLEGHENY            )    S H E E T
 2

 3        I, FRED BENCIVENGO, have read the foregoing
      pages of my deposition given on January 22, 2019,
 4    and wish to make the following, if any,
      amendments, additions, deletions or corrections:
 5

 6    Page  Line    Change and reason for change:

 7    ____  ____    _____

 8    ____  ____    _____

 9    ____  ____    _____

10    ____  ____    _____

11    ____  ____    _____

12    ____  ____    _____

13    ____  ____    _____

14    ____  ____    _____

15    ____  ____    _____

16    ____  ____    _____

17    ____  ____    _____

18

19    In all other respects, the transcript is true and
      correct.
20

21                  _____
                    FRED BENCIVENGO
22

23    _____ day of _____, 2019.

24    _____
                    Notary Public
25
```