UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


-----------------------------) MDL No. 2804

IN RE:  NATIONAL PRESCRIPTION )

OPIATE LITIGATION             )

---------------------------  ) Case No. 17-md-2804

THIS DOCUMENT RELATES TO:     )

ALL CASES                     )

-----------------------------) Hon. Dan A. Polster


HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


VIDEOTAPED DEPOSITION OF

DEBORAH BISH


February 1, 2019


Toledo, Ohio

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    THE WITNESS: Oh, okay.
2  BY THE WITNESS:
3    A.   Well, I think they are kind of the same
4  thing. Did they get the information from that report?
5  I don't know where they got their information. It
6  could come off a computer screen, it could have
7  come off of a report. I don't know. But if they had
8  a query that showed them that there was too much
9  ordered, they would call the pharmacy manager. And if
10  they couldn't get ahold of him, they would call me at
11  home and I would just tell them put it on my desk
12  until I looked at it in the morning, called the
13  pharmacy manager. But whether -- where that
14  information came from, was it a printed report, was it
15  a disk, was it a -- I don't know.
16  BY MR. GADDY:
17    Q.   Okay. And the purpose of that was to make
18  sure that somebody hadn't entered the number of pills
19  they wanted instead of the number of bottles?
20    MS. SWIFT: Object to form.
21  BY THE WITNESS:
22    A.   Well, the purpose of that was to make sure
23  that what they wanted -- what they ordered was what
24  they intended to order and to make sure they really

Page 63

1  needed it.
2  BY MR. GADDY:
3    Q.   You were -- you were making sure they
4  hadn't entered an order by mistake?
5    MS. SWIFT: Object to the form.
6  BY THE WITNESS:
7    A.   Well, not only that, but, yeah, that was
8  the case sometimes. Some -- sometimes they would
9  enter 11 instead of 1 or whatever. But, yeah, and
10  sometimes they actually needed a larger than normal
11  quantity, and I would ask them why and they would tell
12  me why. And, you know, sometimes I would call Barb
13  Martin who was our pharmacy inventory person who had
14  all of the -- you know, the history of their sales,
15  and say, Does this sound right to you? And she would
16  say, Yeah, and then I would go ahead and dispense it.
17  There was only one time that I recall ever calling a
18  store that they said, Yeah, I really do want that, and
19  then they told me why, so.
20    Q.   Okay. Let me go back to where I started
21  with this.
22    As far as that suspicious order report,
23  are you aware of anybody, whether it's the SAIL
24  coordinator, the computer room, corporate, anybody

Page 64

1  ever contacting you after reviewing the suspicious
2  order report and giving you any updates or information
3  at all?
4    MS. SWIFT: Objection; asked and answered.
5  BY THE WITNESS:
6    A.   No.
7  BY MR. GADDY:
8    Q.   What is your understanding of what a
9  suspicious order is?
10    A.   An order that would be suspicious because
11  it's quantities that would be above the average
12  quantity ordered or the expected quantity ordered.
13    Q.   How do you have that understanding?
14    A.   Just by knowing what suspicious means, I
15  mean.
16    Q.   Just the common definition of the term
17  "suspicious"?
18    A.   Yeah.
19    Q.   Do you recall ever being provided any
20  training or education by -- by Walgreens or attending
21  any -- any DEA seminars about the -- the obligations
22  related to suspicious order monitoring?
23    A.   No.
24    MS. SWIFT: Object to the form.

Page 65

1  BY MR. GADDY:
2    Q.   Have you ever been -- ever attended any
3  DEA presentations in any form or fashion?
4    A.   No.
5    Q.   Walgreens has never sent you to hear --
6  hear from DEA agents talk about diversion of
7  controlled substances or -- or the duties or
8  obligations under the regulations?
9    A.   No.
10    Q.   I'll show you what I'll mark as Exhibit
11  No. 5. This is P-GEN 10.
12        (WHEREUPON, a certain document was
13         marked Walgreens - Bish Deposition
14         Exhibit No. 5, for identification, as
15         of 02/01/2019.)
16  BY MR. GADDY:
17    Q.   And this is -- if you look at the top of
18  the page, this is a printout from a -- from the DEA
19  website.
20    A.   Uh-huh.
21    Q.   And this is one particular regulation that
22  I'm just going to ask you if you've seen or if you are
23  familiar with.
24        Do you see about a third of the way down

17 (Pages 62 to 65)

Page 66

1  the page, it's a little bit faded, but it says
2  Title 21 Code of Federal Regulations?  It is just
3  under the heading at the top.  I'm sorry.
4      A.  Oh, up here.
5      Q.  Under the picture.
6      A.  Oh, okay.  Yeah.
7      Q.  And then below that it says "Part 1301"
8  and below that it says "Security Requirements" and
9  then it has the regulation 1301.74.
10         Do you see that?
11     A.  Um-hum.
12     Q.  Okay.
13         During the course of your time as the C-II
14  function manager, did you ever have the opportunity to
15  review any of the federal regulations related to the
16  distribution of controlled substances?
17     A.  I don't recall.
18     Q.  Do you recall anybody at Walgreens
19  corporate or otherwise ever -- ever giving you these
20  regulations or giving you any training on these
21  regulations?
22     A.  I don't recall that either.
23     Q.  Okay.  If you go down to paragraph (b), it
24  starts:  "The registrant shall".

Page 67

1      A.  Um-hum.
2      Q.  Do you see where I am?
3      A.  Um-hum.
4      Q.  And it says:
5         "The registrant shall design and operate a
6  system to disclose to the registrant suspicious orders
7  of controlled substances."
8         Do you see that?
9      A.  Um-hum.
10     Q.  Did you know that that was an obligation
11  that Walgreens had under the federal regulations?
12     MS. SWIFT:  Object to the form.
13  BY THE WITNESS:
14     A.  I thought we did have a computer program
15  that did that.  So this -- you know what I mean,
16  before the orders ever dropped, I thought we had a
17  program that ferreted those out.
18  BY MR. GADDY:
19     Q.  And you thought that based on seeing the
20  suspicious order report in the distribution center
21  from time to time?
22     MS. SWIFT:  Object to the form.
23  BY THE WITNESS:
24     A.  No.

Page 68

1  BY MR. GADDY:
2      Q.  Okay.
3      A.  I thought that because that's what I was
4  told.
5      Q.  Okay.  Who were you told that by?
6      A.  One of the programmers for C-II, Ann
7  Anaya, who I don't think is with the company any
8  longer, but...
9      Q.  Okay.  Did she work at Perrysburg or
10  somewhere else?
11     A.  At corporate.
12     Q.  Okay.  In what department?
13     A.  The -- she was part of the programming
14  department.  I don't know what they called it.  IT,
15  yeah.
16     Q.  And what did she tell you about that
17  program?
18     A.  She -- she didn't give me the details.
19  She just said there is a program that -- that will
20  keep -- will bounce out orders that are above what
21  they should be for their history, for their, you know,
22  history at that particular store.  So if they normally
23  do a hundred of something and we get an order for 200
24  of something, that's going to throw that out and send

Page 69

1  it back.
2      Q.  Okay.  Did -- did she show you the policy
3  or the procedure for how that worked?
4      A.  No.
5      Q.  Do you know the timeframe in which she
6  told you that was happening?
7      A.  No, I have no idea.
8      Q.  Did she talk to you at all about how that
9  program changed over time or when that program was
10  initiated?
11     A.  No.
12     Q.  Okay.  The paragraph (b) contin --
13  continues on to say:
14         "The registrant shall inform the Field
15  Division Office of the Administration in his area of
16  suspicious orders when discovered by the registrant."
17         Do you see that?
18     A.  Um-hum.
19     Q.  Did -- at any time while you were the C-II
20  function manager, did you ever contact the DEA
21  regarding an order of controlled substances that you
22  received?
23     A.  No.
24     Q.  Would that have been something that ever

18 (Pages 66 to 69)

Page 70

1  would have occurred to you to do?
2     MS. SWIFT:  Object to the form.
3  BY THE WITNESS:
4     A.  Probably not because we didn't fill the
5  orders that were odd or large.  You know, when I
6  called the store, like I said, there was only one case
7  that I remember that they actually said, Yes, I really
8  want 80 of those or whatever.  So, no, there was -- I
9  wouldn't have thought of calling them.
10  BY MR. GADDY:
11     Q.  Okay.  Well, when you say "orders that
12  were odd or large," I mean, you -- you shipped to -- I
13  think we just saw over 5,000 different stores,
14  correct?
15     A.  Um-hum, um-hum.
16     Q.  And I'm sorry.  You have to say yes or no
17  for her.
18     A.  Oh, yes.  Sorry.
19     Q.  And is it fair to say that -- that those
20  stores are in all different types of markets?
21     A.  Right, that's fair to say, yeah.
22     Q.  For example, there is a Walgreens in
23  Perrysburg, is -- is there?
24     A.  Yes, um-hum.

Page 71

1     Q.  Okay.  There is Walgreens in Cleveland,
2  correct?
3     A.  Yes.
4     Q.  Chicago?
5     A.  Yep.
6     Q.  So there is Walgreens in -- in big cities,
7  Walgreens in small towns, correct?
8     A.  Right, yes.
9     Q.  When you were looking at these orders, did
10  you do any evaluation of the population size that --
11  that these stores were serving?
12     A.  No.
13     Q.  Did you do any evaluation of how far the
14  patients were traveling to get to those stores to have
15  their prescriptions filled?
16     A.  No.
17     Q.  Did you do any evaluation of the numbers
18  and types of doctors that were writing the
19  prescriptions for these C-II drugs?
20     A.  No.
21     Q.  Okay.
22        Every time that an order came in, did
23  you -- did you do an historical analysis on that
24  particular store for every single order that you

Page 72

1  received?
2     A.  No.
3     Q.  So when you say you didn't fill the orders
4  that were odd, that would mean the orders that jumped
5  off the page as being very large and would require a
6  follow-up phone call to the store to make sure that
7  they didn't make an error when they were typing in
8  their order?
9     MS. SWIFT:  Object to the form.
10  BY THE WITNESS:
11     A.  Well, to make sure that they didn't make
12  an error or that they didn't really need it.  But,
13  like I said, again, there was only one case where I
14  recall them actually saying, Yes, that's what I need.
15  BY MR. GADDY:
16     Q.  Okay.  Usually it was, Oh, shoot.  I meant
17  3 and I typed 300?
18     A.  Usually, yeah.
19     Q.  And in those cases you would just delete
20  the 300 and put in a 3?
21     A.  Right.
22     Q.  It goes on to say in paragraph (b), it
23  says:
24        "Suspicious orders include orders of

Page 73

1  unusual size, orders deviating substantially from a
2  normal pattern, and orders of unusual frequency."
3        Do you see that?
4     A.  Um-hum.
5     Q.  Prior to just now, right here today in
6  this deposition, had you ever read that subsection of
7  this regulation before?
8     A.  I don't remember.  I don't remember if I
9  did or not.
10     Q.  Okay.  Do you recall anybody at Walgreens
11  ever giving you any training regarding this topic?
12     A.  Regarding orders deviating substantially
13  all -- from a normal pattern, that -- no, because,
14  again, that's something that I thought was done at
15  corporate.  They have all of the sales history.  In
16  the DCs we don't have that.
17     Q.  Okay.  But you were the C-II function
18  manager at Perrysburg, correct?
19     A.  Yep, yep.
20     Q.  Okay.  And you were the person, I think,
21  that Mr. Joseph said that your knowledge of C-IIs was
22  second to none, correct?
23     A.  Um-hum, yes.
24     Q.  Okay.  Let me show you another policy that

19 (Pages 70 to 73)

Page 74

1    would have been in place when you started at the
2    Perrysburg distribution center.
3        I'll mark this as Exhibit No. 6.
4            (WHEREUPON, a certain document was
5            marked Walgreens - Bish Deposition
6            Exhibit No. 6, for identification, as
7            of 02/01/2019.)
8    BY MR. GADDY:
9        Q.   Do you see the -- look at the bottom of
10   the page.  Do you see the -- the web address for kind
11   of the -- the Walgreens Intranet?
12       A.   This one down here?
13       Q.   Yes, ma'am.
14       A.   Yeah, um-hum, yes.
15       Q.   Okay.  And then it -- the top of the
16   page it's the -- one of the policies that was housed
17   there, "Handling Suspicious Drug Orders."
18           Do you see that?
19       A.   Yes, yes.
20       Q.   And if you look at just below the
21   paragraphs, it has the original date of the policy of
22   September of '98.
23           Do you see that?
24       A.   Yes.

Page 75

1        Q.   And then the revised date of February 15,
2    2005?
3        A.   Right.
4        Q.   Okay.  And it says -- for the policy, it
5    says:
6            "The Logistics and Planning Department
7    sends the suspicious control drug order reports" --
8    excuse me -- "suspicious control drug orders report to
9    all distribution centers."
10           Do you see that?
11       A.   Um-hum.
12       Q.   And that's consistent with what you said
13   that they would come in and -- and I think that the
14   SAIL coordinator was in charge of that, right?
15       A.   Yes.
16       Q.   It says:
17           "The report lists controlled drug orders
18   that may be of unusual size for a store in its
19   category, of unusual frequency for a store in its
20   category, or deviating from a normal pattern for a
21   store in its category."
22           Do you see that?
23       A.   Yep.
24       Q.   It then goes on to say:

Page 76

1            "The distribution center must file all
2    records for five years."
3        Q.   Do you see that?
4        A.   Yes.
5        Q.   Okay.  The policy, you would agree with
6    me, doesn't say that anything should be done with
7    those reports other than file them?
8        A.   That's the only action I see, yes.
9        Q.   Okay.  And you are not aware of anybody at
10   the distribution center doing any other action other
11   than just filing them, is that fair?
12       A.   With this report, yes, if that's what you
13   are referring to.
14       Q.   Okay.
15           Let me ask you some questions now about
16   the process that you've told us a little bit about as
17   far as spot-checking of -- of some of the orders that
18   came in.
19           I'll show you what I'll mark as Exhibit
20   No. 7.
21           (WHEREUPON, a certain document was
22           marked Walgreens - Bish Deposition
23           Exhibit No. 7, for identification, as
24           of 02/01/2019.)

Page 77

1    BY MR. GADDY:
2        Q.   Do you see the Walgreens policy -- the
3    Walgreens logo at the top of this document?
4        A.   Um-hum, yes.
5        Q.   And the subject here is:  "Rx Questionable
6    Order Quantity."
7            Do you see that?
8        A.   Yes.
9        Q.   And the original date of this policy is
10   12/11/2006.
11           Do you see that?
12       A.   Yes.
13       Q.   And it looks like this is the original
14   policy as there is no revision date.
15           Do you see that?
16       A.   Yes.
17       Q.   Okay.  And this policy was written by
18   Shelley Crisel?
19       A.   That's what it says.
20       Q.   Do you know who that is?
21       A.   No.
22       Q.   Okay.
23       A.   Someone at Mt. Vernon, I would assume.  It
24   was written at Mt. Vernon.

20 (Pages 74 to 77)

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    Q.   Okay.  That's another distribution center?
2    A.   Yes, um-hum.
3    Q.   And it says the Purpose of this policy is:
4         "To establish procedures for verifying
5    questionable store order quantities on Rx items."
6         Do you see that?
7    A.   Yes.
8    Q.   And it says under the Scope:
9         "This procedure covers the steps in
10   verifying questionable store order quantities prior to
11   order processing on Rx items."
12        Do you see that?
13   A.   Yes.
14   Q.   And that's what you told us a little bit
15   about that you would look for -- for orders that would
16   maybe -- maybe jump off the page as far as their size
17   and you would want to do some follow-up on those,
18   correct?
19   A.   Yes.
20   Q.   Okay.  Under Procedure under Section A, it
21   says:
22        "The responsibilities of the computer room
23   personnel and SAIL team," it says, "Prior to Order
24   Processing."

Page 79

1         And in the first under No. 1 there, it
2    says:
3         "Once the transmissions have been received
4    from the stores to its fullest, you run a query for
5    the" -- "for the cycle date and then it says: "Any Rx
6    order greater than 24 SKUs."
7         Do you see that?
8    A.   Um-hum.
9    Q.   SKUs means a unit?
10   A.   Pieces, um-hum.
11   Q.   Okay.  So one bottle of pills would be one
12   SKU?
13   A.   Yes.
14   Q.   Okay.  It says:
15        "Any Rx order greater than 24 SKUs," or
16   24 units, "of one item should print on a query in
17   store numerical order along with SS items."
18        Do you see that?
19   A.   Um-hum, yes.
20   Q.   What's SS items?
21   A.   Self serve.
22   Q.   Okay.  And that would be like which --
23   A.   Non-Rx items.
24   MS. SWIFT:  Let him finish his question.

Page 80

1    THE WITNESS:  Oh, sorry.
2    BY MR. GADDY:
3    Q.   That would be what we'd call like
4    front-of-store items?
5    A.   Yes.
6    Q.   Like paper towels, toilet paper, that type
7    of stuff?
8    A.   Yes.
9    Q.   Was 24 the number of -- let me -- let me
10   make sure that we are clear on that.
11        So when -- when we say one SKU, if we are
12   talking about a 100-count bottle of OxyContin, so a
13   bottle with a hundred pills in it, that would be one
14   SKU?
15   A.   Yes.
16   Q.   Okay.  What was the number of SKUs or
17   units that it would require to flag for you to do any
18   type of follow-up phone call to the pharmacy?
19   MS. SWIFT:  Object to the form.
20   BY THE WITNESS:
21   A.   There wasn't really a number.  It would
22   be -- generally any number in the triple would be a
23   definite flag, anything over a hundred would be a
24   definite flag, so.

Page 81

1    BY MR. GADDY:
2    Q.   Okay.  Is a hundred the number or was
3    there not a number or --
4    A.   There was not a number in particular.  It
5    was any number -- any order that looked funny or
6    didn't look right.  There was no number that I used.
7    The computer room did, apparently, but I didn't.
8    Q.   Okay.  Now, when -- who would you get this
9    report from?
10   A.   What report?
11   MS. SWIFT:  Objection to form.
12   THE WITNESS:  Sorry.
13   BY MR. GADDY:
14   Q.   This report that would show you the
15   quantities of -- of orders for you to look out and see
16   if anything jumped off the page at you?
17   MS. SWIFT:  Object to the form.
18   BY THE WITNESS:
19   A.   There was no report that I got that
20   would -- that was just from the pickers is actually
21   who would find that if -- if they got an order for a
22   hundred of something, they would go, This isn't right,
23   and they would bring it to me and I would call the
24   store.  It wasn't a piece of paper form.

21 (Pages 78 to 81)

Page 82

**REDACTED**

1    BY MR. GADDY:
2       Q.   Prior to the orders for C-IIs going to the
3    pickers for them to start -- and let me back up a
4    little bit, because I used the term "pickers."  I
5    think I know what that means, but let me make sure
6    it's clear.
7           Tell me in your words what a picker is?
8       A.   A picker is the team member who actually
9    takes the product out of the vault and puts it in a
10   container that's going to go get audited and then
11   boxed and shipped to the store.
12      Q.   Okay.  And so these are people that are --
13   that are taking the pill bottles off the shelf,
14   putting them in the bag and they end up getting on the
15   truck?
16      A.   Right.
17      Q.   Okay.  Prior to an order going to the
18   picker first for Schedule II drugs, is this -- this
19   review that you've told us about a couple of times
20   where you are looking for numbers that I think your
21   words were don't look right, triple digit orders,
22   anything that jumps off the page at you, is that
23   review done before the orders go to the pickers?
24      MS. SWIFT:  Object to the form.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 100

1    A.  Uh-huh.

2    Q.  -- that's something that takes how long?

3    MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5    A.  It depends.  If the pharmacy manager is

6    available and answers the phone, it doesn't take very

7    long.  If you have to wait for them to call you back,

8    it could take longer.

9    BY MR. GADDY:

10   Q.  It -- it is generally the same day?

11   A.  Oh, yeah, um-hum.

12   Q.  Okay.  Are there ever occasions under this

13   policy where you are holding orders for -- for days or

14   weeks at a time before you fill them?

15   A.  No.

16   Q.  Okay.  Are there ever occasions during

17   your time at C-II -- as the C-II function manager

18   where you are ever holding any orders for days or

19   weeks at a time for -- for any reason related to

20   investigating the order?

21   A.  Not related to investigating the order.

22   Q.  Okay.  What would be a reason that you

23   would hold an order for days or weeks at a time?

24   A.  Occasionally a new store would open late,

Page 101

1    so we'd be told we had to hold the order till they

2    were ready to receive it.

3    Q.  Okay.  Any other reasons that you can

4    think of?

5    A.  Not that I can think of.

6    Q.  Okay.  And when you say "a new store would

7    open late," that would be a situation where a store is

8    supposed to open on January 1st and it turns out they

9    don't open until February 1st and so all of the orders

10   that were ready to go out the door need to sit -- need

11   to sit in the -- the warehouse for an extra month?

12   A.  In the vault, um-hum.

13   Q.  Okay.  And I'm sorry.  You've got to say

14   yes or no.

15   A.  Yes.

16   Q.  Okay.  So, as far as this process that

17   we've been talking about a little bit, it sounds like,

18   and tell me if I'm wrong, but it sounds like either

19   the computer room or the pickers, anybody that would

20   have identified these orders that -- that needed a

21   call to the -- a call to the store, that would have

22   gone to you as the C-II function manager?

23   MS. SWIFT:  Object to the form.

24   BY THE WITNESS:

26 (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    A.  Yes.
2    BY MR. GADDY:
3    Q.  Okay.  Anybody other than you that would
4  have been in charge of handling that issue?
5    MS. SWIFT:  Object to the form.
6    BY THE WITNESS:
7    A.  Well, my lead if I wasn't there.  I mean,
8  I had someone that filled in when I was sick or on
9  vacation.
10   BY MR. GADDY:
11   Q.  Sure, sure.
12     But if you weren't -- if you were there
13  and you were working like normal course of business --
14   A.  Uh-huh.
15   Q.  -- the buck stopped with you as far as
16  following up on any of these orders that the computer
17  room or the pickers flagged?
18   MS. SWIFT:  Objection to form.
19   BY THE WITNESS:
20   A.  I would say yes.
21   BY MR. GADDY:
22   Q.  And one of the things that -- that you --
23  that I think you said you did was first that you
24  would -- your first question to the store would be,

Page 103

1  Did you really mean to order this amount.
2     And it sounds like, and tell me if I'm
3  wrong, but it sounds like every time but one the
4  answer was, Whoops, no, I didn't, reduce the order, is
5  that accurate?
6    MS. SWIFT:  Object to the form.
7    BY THE WITNESS:
8    A.  That's my recollection.  It could be
9  more, but that's all I can remember is one that I
10  actually...
11   BY MR. GADDY:
12   Q.  One time where you said, Hey, did you
13  really mean to order this number and every time but
14  one they told you it was a mistake?
15   A.  Yes.
16   Q.  Okay.  And you said from there -- I think
17  you said the other thing that you would do is
18  determine whether or not they really need that amount,
19  correct?
20   A.  Right, I would ask them why they needed it
21  and, actually, the case that I recall, and that's
22  probably why I remember it, is she said she had a
23  patient that had 48 hours to live and she needed it
24  for that patient.

Page 104

1    Q.  Okay.  What I'm interested in is what
2  information or data you would have had to review --
3    A.  Uh-huh.
4    Q.  -- to help you answer the question of why
5  do you need it?  And it sounds like one piece of
6  information or data should have been what was provided
7  verbally by the store?
8    A.  By the pharmacy manager.
9    Q.  Okay.  Any other information or data that
10  you had at your disposal to consider why a particular
11  store might have needed a high quantity of C-IIs?
12   A.  The only other source would have been
13  Barb Martin, who I also would call on occasion.
14   Q.  Okay.  At --
15   A.  At corporate, not at the DC.
16   Q.  Correct, correct.  She didn't work in the
17  distribution center?
18   A.  Uhn-uhn.
19   Q.  Okay.  And -- okay.  And you've told us
20  that you recall calling her about this one particular
21  order --
22   A.  Uh-huh.
23   Q.  -- and that she -- presumably you passed
24  on the information to her that you had received from

Page 105

1  the store?
2    A.  Right.
3    Q.  And she told you to fill the order?
4    A.  Right.
5    Q.  So would it be fair to say that the only
6  information you had that you had access to was
7  whatever was provided to you by the store, and that to
8  get other information, whether it's historical data
9  or -- or patterns or whatnot, you would have to go
10  through corporate via Barb Martin, is that fair?
11   A.  That's fair, yes.
12   Q.  Okay.  And you think -- and you think you
13  did that on -- on that one occasion?
14   A.  Yes.
15   Q.  Okay.
16     Okay.  So let's look at Paragraph C.  I
17  guess it is III.C of this 2010 policy.
18     Are you with me?
19   A.  Yes.
20   Q.  It says: "Responsibilities of Walgreens
21  company."
22     And No. 1 says:  "Suspicious store orders
23  and inquiries are handled through the corporate office
24  internal audit department."

27 (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Do you see that?
2    A.  Yeah, I see that.
3    Q.  What is the corporate office internal
4  audit department?
5    A.  It's a department where they do internal
6  audits, but I couldn't tell you exactly what they do.
7    Q.  Okay.
8    A.  I don't know.
9    Q.  What do they do internal audits of?
10    MS. SWIFT:  Objection; foundation.
11  BY THE WITNESS:
12    A.  I couldn't tell you.  I don't know.
13  BY MR. GADDY:
14    Q.  How -- can you tell me any members of the
15  internal audit department?
16    A.  Yarbrough is a familiar name, but I don't
17  really know if he was with internal audit.
18    Q.  You said Yarbrough?
19    A.  Yeah.
20    Q.  But you don't know if he was with internal
21  audit or not?
22    A.  Not for sure, uhn-uhn.
23    Q.  Okay.  Anybody else?
24    A.  I don't recall any other names, uh-uh.

Page 107

1    Q.  Okay.  Do you ever recall anybody else
2  from internal audit ever coming to the distribution
3  center in Perrysburg?
4    A.  If they did, they didn't tell me they were
5  with internal audit.  I don't...
6    Q.  Do you ever recall being asked to pull any
7  information for internal audit?
8    A.  No.
9    Q.  Ever being asked to pull any -- any data
10  or reports for the internal -- internal audit
11  committee or internal audit department?
12    MS. SWIFT:  Object to the form.
13  BY THE WITNESS:
14    A.  No.
15  BY MR. GADDY:
16    Q.  Do you know how many people make up the
17  internal audit department?
18    A.  No.
19    Q.  Do you know whether or not the internal
20  audit department has ever issued any reports or
21  findings related to the Perrysburg distribution center
22  and its compliance with DEA regulations?
23    A.  No, I don't.
24    Q.  Do you ever recall being a part of any

Page 108

1  meetings or training seminars where results of
2  internal audits of Perrysburg were -- were discussed?
3    A.  No, I don't remember any of those.
4    Q.  Okay.  Did you know that -- that
5  suspicious orders and inquiries were -- were handled
6  through the internal audit department?
7    MS. SWIFT:  Object to the form.
8  BY THE WITNESS:
9    A.  No.
10  BY MR. GADDY:
11    Q.  Do you ever recall being instructed or
12  requested by anybody with internal audit to -- to edit
13  or halt an order for C-IIs?
14    A.  No.
15    Q.  Do you ever be -- requested or advised by
16  anybody at Walgreens anywhere to -- to halt or edit a
17  C-II -- a C-II order?
18    MS. SWIFT:  Object to the form.
19  BY THE WITNESS:
20    A.  Just the case I already gave you if -- was
21  if a store was going to open late, we were supposed to
22  hold it, yeah.
23  BY MR. GADDY:
24    Q.  Okay.  It goes on to say:

Page 109

1    "Suspicious orders are then reported by
2  corporate to the FDA and/or DEA for controlled
3  substances within three days."
4    Do you see that?
5    A.  I see that.
6    Q.  Do you know whether or not that ever
7  happened?
8    A.  No, I don't know.
9    Q.  Did you have any visibility into that
10  process whatsoever?
11    A.  No.
12    Q.  Have you ever had any interaction with
13  anybody at Walgreens regarding suspicious order
14  monitoring?
15    MS. SWIFT:  Object to the form, vague.
16  BY THE WITNESS:
17    A.  Other than conversations with Ann Anaya
18  where I knew there was a program regarding, you know,
19  suspicious orders, no.
20  BY MR. GADDY:
21    Q.  Okay.  If you go to the next page, there
22  is actually a Roman numeral IV which is also new to
23  the 2010 version.
24    Do you see that?

28 (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    A.   Um-hum.

2    Q.   And it talks about training?

3    A.   Yes.

4    Q.   And it says in No. 1, it says:

5         "The SAIL function manager will be

6    responsible for the training and enforcement of all

7    the procedures."

8         Do you see that?

9    A.   Yes.

10   Q.   Are -- are you aware of -- of any training

11   ever being provided on this policy to any of the team

12   members at Perrysburg?

13   A.   I'm not aware of this written policy being

14   given to anyone, the team members, if that's -- that's

15   what you are asking me.

16   Q.   Okay.  Do you recall any -- there being

17   any training or guidance given to, whether it's --

18   it's the folks in the computer room or the pickers on

19   what they are supposed to be looking for as far as

20   contacting you about these questionable orders that --

21   that you might need to check for accuracy?

22   A.   Well, they just -- they just knew that if

23   it was -- they knew what was high because they picked

24   every day and they picked all stores every week, so

Page 111

1    they knew if something was unusually high.  There

2    wasn't really training given to them to identify that.

3    Q.   Did you -- I mean, they're -- you are --

4    this is talking about over 5,000 stores, right?

5    A.   Um-hum.

6    Q.   Would -- would it be safe to say that you,

7    when you see a store number, do you know what store

8    that is?

9    A.   No.

10   Q.   Okay.  So if you see, I want to say the

11   store numbers were five digits?

12   A.   Correct.

13   Q.   So -- so if you saw Store 12345, that

14   doesn't -- you don't know that -- that, Oh, we're

15   talk -- that's the store in Perrysburg, Ohio, you

16   don't particularly know where that store is or what

17   population it serves or -- what its typical

18   business is or anything like that, is that correct?

19   A.   That's correct.

20   Q.   Okay.  So when you say the pickers do this

21   every day and they know what they are seeing, you are

22   not telling me that -- that they know exactly how many

23   bottles Store 12345 typically gets on an average

24   order, are you?

Page 112

1    A.   No, that's not what I'm telling you.

2    Q.   Okay.  You are just saying as a whole

3    chain wide they're -- they're aware of what comes in?

4    A.   They -- they are aware of what was

5    unusually large.

6    Q.   On a chain-wide basis?

7    A.   On a chain-wide basis, yes.

8    Q.   You -- do you see any -- any potential

9    problems or issues with using a chain-wide basis to

10   evaluate size of -- sizes of orders?

11   MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13   A.   Well, I mean, every store would be

14   different based on where it's at.  Some were in

15   hospitals, some were in corporate offices, so...

16   BY MR. GADDY:

17   Q.   And -- and you would agree with me, it

18   would be fair to say that a -- that a store at a

19   hospital is probably going to need more C-IIs than a

20   store in Perrysburg, Ohio?

21   A.   Possibly, that would make sense.

22   Q.   And -- and you agree with me that it would

23   be possible that there could be an unusually large

24   number of bottles for Perrysburg, but that might be a

Page 113

1    normal order of bottles for a hospital, is that fair?

2    A.   That would be fair, um-hum.

3    Q.   Okay.  But you didn't have a daily

4    practice of calling all of the Walgreens stores and

5    hospitals, did you?

6    A.   No.

7    Q.   Okay.  So these or -- these orders that

8    were going to hospitals, those weren't popping on a

9    daily basis for you to follow up on, were they?

10   MS. SWIFT:  Objection; foundation.

11   BY THE WITNESS:

12   A.   No.

13   BY MR. GADDY:

14   Q.   Okay.  So what you would see is normal

15   orders for stores in a hospital setting were not high

16   enough to flag for you to do any follow-up calls or

17   investigation on, is that correct?

18   MS. SWIFT:  Objection; foundation.

19   BY THE WITNESS:

20   A.   That would be correct, because what

21   flagged them was, like, triple -- 300 of something.

22   Not even in a hospital do you need 300 of something.

23   I mean, that's what would flag them right away that

24   something was wrong.

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  BY MR. GADDY:
2      Q.   It had to be something crazy for it to
3  flag on this report for you to do a follow-up?
4      A.   Well, it had to be something large.  I
5  don't know if I would say crazy, but yeah.
6      Q.   Outside of being told by Anaya at some
7  point in time for -- that -- that it -- excuse me --
8  being told by Anaya at some point in time that at some
9  other point in time there was some type of system in
10 place --
11     A.   Uh-huh.
12     Q.   -- did you ever have any interaction with
13 anybody at Walgreens regarding suspicious orders?
14     MS. SWIFT:  Object to the form and foundation.
15 BY THE WITNESS:
16     A.   Just the computer room supervisor,
17 Matt Nye, the one we talked about earlier.
18 BY MR. GADDY:
19     Q.   Okay.
20          And what, if anything, would Matt tell you
21 about -- and -- and -- and I'm not talking about the
22 questionable orders, the -- not -- not about these
23 policies and this procedure here.
24     A.   Okay.

Page 115

1      Q.   But I'm asking specifically about the --
2  the suspicious order report that you said would come
3  into the C-II SAIL --
4      A.   Uh-huh.
5      Q.   -- or -- or the suspicious orders that's
6  handled by internal audit.
7          Did you have -- did you have any
8  conversations with Matt Nye about that suspicious
9  order report or -- or specifically the -- what
10 Walgreens referred to as suspicious orders?
11     MS. SWIFT:  Object to the form of the question.
12 BY THE WITNESS:
13     A.   Suspicious orders would be the query he
14 ran, I -- that's how I understood it, and then I -- he
15 would talk to me about those.  If he couldn't get
16 ahold of the store, he would tell me.
17          Is that what -- the query you are talking
18 about?  No.
19 BY MR. GADDY:
20     Q.   What you are talking about is what we've
21 been talking about for the last hour or so?
22     A.   Um-hum.
23     Q.   Okay.  So no.  I'm talking about something
24 different than that.

Page 116

1      A.   Okay.
2      Q.   I'm talking about what -- well, let me ask
3  you this:  Did Matt refer to those as suspicious
4  orders?
5      A.   I don't recall --
6      Q.   Okay.
7      A.   -- his verbiage, no.
8      Q.   I'm ask -- what I'm trying to ask about,
9  and -- and -- and I'm just going to be sus -- specific
10 to the phrase "suspicious orders."
11     A.   Okay.
12     Q.   Because that's what's used here in this
13 policy as it relates to internal audit and that's what
14 I think you told me was on that report that the
15 C-II -- that -- that Lori --
16     A.   Right.
17     Q.   -- who was the C-II SAIL coordinator,
18 would get, correct?
19     A.   Correct.
20     Q.   Or -- or -- or Brook was the other one,
21 right?
22     A.   Um-hum.
23     Q.   Did you ever have any conversations or
24 interactions with anybody at Walgreens, other than

Page 117

1  this Anaya conversation you told us about, regarding
2  suspicious order reports or suspicious orders, and --
3  and I'm confining it to that -- to that specific term?
4      MS. SWIFT:  Object to the form.
5  BY THE WITNESS:
6      A.   Not that I recall.
7  BY MR. GADDY:
8      Q.   Okay.  Do you know -- do you know a Mark
9  Betterridge?
10     A.   Yes.
11     Q.   Who is Mark and what did he do?
12     A.   He is another function manager at the DC.
13     Q.   Okay.  What is his purview -- what's under
14 his purview?
15     A.   Right now he is in NAKL mod, one of our
16 pick mods.
17     Q.   Okay.  Has he ever had any
18 responsibilities whatsoever for controlled substances?
19     A.   I didn't really follow C-III through V and
20 their activity when I was in receiving as a manager,
21 so I couldn't really answer that.  He may have during
22 that frame.  I don't know.
23     Q.   He never had any responsibilities over
24 C-IIs?

30 (Pages 114 to 117)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    A.   No.
2    Q.   Okay.  What about, do you know a person
3  named James Gill?
4    A.   Yes.
5    Q.   And how do you know Mr. Gill?
6    A.   He is also another manager on night shift.
7    Q.   Okay.  Has Mr. Gill ever had any
8  responsibilities for C-IIs?
9    A.   No.
10   Q.   Okay.  Do you know whether or not he had
11 any responsibilities over C-III through Vs?
12   A.   He may have.  I don't really remember.  I
13 don't remember.
14   Q.   Okay.  I'm going to show you what I'll
15 mark as Exhibit No. 9, and this is going to be what I
16 believe is the final version of that same policy.
17        (WHEREUPON, a certain document was
18            marked Walgreens - Bish Deposition
19            Exhibit No. 9, for identification, as
20            of 02/01/2019.)
21 BY MR. GADDY:
22   Q.   Do you see we are looking at the top of
23 the page another Walgreens document and it looks like
24 the subject has changed now.  It now says:

Page 119

1  "Authentication of Prescription Order Policy"?
2    A.   Right.
3    Q.   But if you look at the origination date,
4  it is the same, the 12/11/06?
5    A.   Yes.
6    Q.   And you can look at it, you can scan it if
7  you want, but it looks like Roman numerals I, II and
8  III are identical to the one -- or excuse me -- at
9  least I, II, and III.A and B are going to be
10 identical.
11   A.   That's what it looks like.
12   Q.   Okay.  And it looks like -- and we are
13 going to talk about some of the changes, but first you
14 see up -- up at the top, this is the October 2013
15 policy, or -- I should say version of policy,
16 correct?
17   A.   Correct.
18   Q.   Okay.  And so this would be after --
19 excuse me -- one of the -- some of the -- one of the
20 first documents we looked at were some of those, I
21 think was an April 2012 e-mail where they were
22 discussing the DEA concerns in Jupiter.
23        Do you recall that?
24   A.   Is it something we talked about earlier

Page 120

1  today?
2    A.   It was -- you can pull it out and look at
3  it if you want to.
4    A.   Okay.
5    Q.   I think it's No. 1.
6    A.   So No. 1 was about us taking over
7  Jupiter's -- possibly taking over Ju -- Jupiter's
8  orders.
9    Q.   Okay.  And does it reference the, I think
10 the first sentence says:  You probably heard what's
11 going on with the DEA?
12   A.   "You know what's happening in Jupiter with
13 the DEA" it says, yes.
14   Q.   Okay.  And that's an April 2012 e-mail?
15   A.   Yes.
16        Are we done with that one?
17   Q.   Yes, ma'am.  I was just trying to put it
18 in -- in kind of a time context.
19        So this policy you see is October 2013,
20 correct?
21   A.   Correct.
22   Q.   So this is going to be post-DEA issues in
23 Jupiter, right?
24   A.   Yes.

Page 121

1    Q.   Okay.
2    A.   It's post the other, yeah.
3    Q.   And it says here in Paragraph C, under
4  Responsibilities of Walgreens, and -- and this is --
5  this paragraph -- this -- what's written here is
6  different than what we saw in the last one, right?
7    A.   Right.
8    Q.   The last one said that suspicious order
9  monitoring was under the purview of the internal audit
10 committee or internal audit department?
11   A.   Yes, um-hum.
12   Q.   This one says:  "The Walgreens strategic
13 inventory management system."
14        And you're familiar with SIMS?
15   A.   Yes.
16   Q.   And that's your online ordering system?
17   A.   Operating system, uh-huh.
18   Q.   Okay.  It says:
19        "So the Walgreens SIMS will stop what
20 would be considered suspicious controlled drug orders
21 from being released for picking at the DC based on the
22 algorithm that looks at past sales and order
23 frequency."
24        Do you see that?

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1     A.   Yes.
2     Q.   And does that sound familiar to what Anaya
3  told you when you asked her about that?
4     A.   Yes.
5     Q.   Okay.  And that would be what we see in
6  this October of 2013 policy, correct?
7     A.   Correct.
8     Q.   Okay.  So, let me ask you this:  Were you
9  aware that orders were being either cut or -- or
10  blocked from coming into the distribution center for
11  C-IIs?
12     MS. SWIFT:  Object to the form.
13  BY THE WITNESS:
14     A.   Do you mean prior to '13 or after?  When?
15  At any time?
16  BY MR. GADDY:
17     Q.   At any time.
18     A.   Well, the program would have, this program
19  that we just read about, my understanding was that
20  would not allow orders to come in that were above what
21  was reasonable for their location and history and
22  whatever.
23     Q.   Okay.  And you had that understanding at
24  the time or you have that understanding from looking

Page 123

1  at this document?
2     A.   Oh, I had that understanding at the time.
3     Q.   Okay.  How, if at all, did that impact
4  what you did in the distribution center?
5     MS. SWIFT:  Object to the form.
6  BY THE WITNESS:
7     A.   In regards to what, how we handled large
8  orders or how...?
9  BY MR. GADDY:
10     Q.   To any part, any portion of your job?
11     MS. SWIFT:  Object to the form.
12  BY THE WITNESS:
13     A.   So how did that change our -- it -- it
14  didn't change anything we did.  We still called stores
15  if we got something that was too high.
16  BY MR. GADDY:
17     Q.   Okay.  I didn't think it did.  I just
18  wanted to make sure.
19     A.   Yeah.
20     Q.   But -- okay.  So nothing changed from your
21  perspective once -- once SIMS started reducing or
22  cutting orders?
23     MS. SWIFT:  Object to the form.
24  BY MR. GADDY:

Page 124

1     Q.   Correct?
2     A.   Not that I noticed.
3     Q.   Okay.
4     A.   Not that I was aware of.
5     Q.   You still -- I'm sorry.
6     A.   Not that I was aware of.
7     Q.   You still had orders come in every day and
8  you still processed those orders every day?
9     A.   Correct.
10     Q.   You still ran this, had the computer room
11  and the pickers be looking out for potential orders
12  that were entered in error?
13     A.   Correct.
14     Q.   You continued to place phone calls to
15  stores if you saw something very large that you
16  thought might be inaccurate?
17     A.   Correct.
18     Q.   Okay.  If you look at the very bottom
19  right-hand corner, do you see there is some Bates
20  numbering down there?
21     A.   The WAGMD?
22     Q.   Yes, ma'am.
23     A.   Uh-huh.
24     Q.   If you'd turn for me, please, to the

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

50 (Pages 194 to 197)

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED



Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

REDACTED

Golkow Litigation Services – 877.370.DEPS

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Case: 1:17-md-02804-DAP  Doc #: 1975-2  Filed:  07/24/19  151 of 156.  PageID #: 213110
Highly Confidential - Subject to Further Confidentiality Review

Page 533

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED