Page 1

1        UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF OHIO
3            EASTERN DIVISION
4
5         ~~~~~~~~~~~~~~~~~~~~
6
7   IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
    OPIATE LITIGATION
8                                 Case No.
                                  17-md-2804
9
                                  Judge Dan Aaron
10                                Polster
11  This document relates to:
12  The County of Summit, Ohio, et al. v. Purdue
    Pharma L.P., et al.
13
    Case No. 18-OP-45090 (N.D. Ohio)
14
15
          ~~~~~~~~~~~~~~~~~~~~
16
            Videotaped Deposition of
17
               TONYA BLOCK
18
             November 14, 2018
19                9:00 a.m.
20
21
              Taken at:
22
          Brennan Manna & Diamond
23         75 East Market Street
              Akron, Ohio
24
          Stephen J. DeBacco, RPR

Page 2

```
1  APPEARANCES:
2
        On behalf of the City of Akron, Summit
3  County, and the Witness:
4      Motley Rice LLC, by
        ANNE MCGINNESS KEARSE, ESQ
5      NATALIE DEYNEKA, ESQ
        28 Bridgeside Boulevard
6      Mt  Pleasant, South Carolina 29464
        (843) 216-9140
7      akearse@motleyrice.com
        (843) 216-9343
8      ndeyneka@motleyrice.com
9
        On behalf of Johnson & Johnson and
10  Janssen Pharmaceuticals, Inc :
11      Tucker Ellis, LLP, by
        TARIQ M  NAEEM, ESQ
12      ZACHARY J  ADAMS, ESQ
        950 North Main Avenue, Suite 1100
13      Cleveland, Ohio 44113-7213
        (216) 696-3675
14      tariq naeem@tuckerellis com
        (216) 696-5474
15      zachary adams@tuckerellis com
16
        On behalf of Walmart, Inc :
17
        Jones Day, by
18      SHIRLETHIA V  FRANKLIN, ESQ
        51 Louisiana Avenue Northwest
19      Washington D C  20001-2113
        (202) 879-3939
20      sfranklin@jonesday com
21      ~ ~ ~ ~ ~
22
23
24
25
```

Page 4

```
1  APPEARANCES, Continued:
2
        Oh behalf of Cardinal Health, Inc , via
3  teleconference:
4      Williams & Connolly LLP, by
        A  JOSHUA PODOLL, ESQ
5      725 Twelfth Street Northwest
        Washington D C  20005
6      (202) 434-5092
        apodoll@wc com
7
8      ~ ~ ~ ~ ~
9
        ALSO PRESENT:
10
        Henry Stieglitz, Motley Rice
11
        Luke Porter, Reed Smith (via
12      Veritext Virtual)
13      Delbert Tran, Covington & Burling
        (via Veritext Virtual)
14
        Jim Torok, Legal Videographer
15
16      ~ ~ ~ ~ ~
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  APPEARANCES, Continued:
2
        On behalf of AmerisourceBergen:
3
        Reed Smith LLP, by
4      STEVEN J  BORANIAN, ESQ
        101 Second Street, Suite 1800
5      San Francisco, California 94105
        (415) 659-5980
6      sboranian@reedsmith com
7
        On behalf of Cephalon, Inc ; Teva
8  Pharmaceuticals USA, Inc ; Actavis, LLC;
        Actavis Pharma, Inc  f/k/a Watson Pharma,
9  Inc ; and Watson Laboratories, Inc , via
        teleconference:
10
        Morgan, Lewis & Bockius LLP, by
11      PAMELA HOLLY, ESQ
        101 Park Avenue
12      New York, New York 10178-0060
        (212) 309-6864
13      pamela holly@morganlewis com
14
        On behalf of Prescription Supply, Inc ,
15  via teleconference:
16      Pelini, Campbell & Williams, LLC, by
        PAUL B  RICARD, ESQ
17      Bretton Commons - Suite 400
        8040 Cleveland Avenue Northwest
18      North Canton, Ohio 44720
        (330) 305-6400, ext  129
19      pbricard@pelini-law com
20
        ~ ~ ~ ~ ~
21
22
23
24
25
```

Page 5

```
1              TRANSCRIPT INDEX
2
3  APPEARANCES...............................   2
4
5  INDEX OF EXHIBITS .......................   6
6
7  EXAMINATION OF TONYA BLOCK
8  By Mr. Naeem...............................    12
9  By Mr. Boranian.........................  211
10  By Ms. Franklin..........................  262
11  By Ms. Kearse............................  283
12  By Mr. Naeem.............................  295
13
14  REPORTER'S CERTIFICATE...................  311
15
16  EXHIBIT CUSTODY
17  EXHIBITS RETAINED BY THE COURT REPORTER
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1        INDEX OF EXHIBITS
2  NUMBER     DESCRIPTION       MARKED
3  Exhibit 1  Document Titled "Summit     31
           County Public Health 2017
4          Internal Budget,"
           SUMMIT_000340431 to 240441
5
    Exhibit 2  Tonya A. Block Curriculum   63
6          Vitae, SUMMIT_001702613 to
           001702614
7
    Exhibit 3  Document Titled "Summit    65
8          County Public Health
           Organization Chart, January
9          2017," SUMMIT_001698224
10  Exhibit 4  October 2017 E-Mail Chain    95
           Re: AOD Dollars,
11         SUMMIT_001716632 to
           001716633
12
    Exhibit 5  Document Titled "Summit   121
13         County Public Health FY2018
           Funding Application
14         Summary," SUMMIT_000077684
           to 000077696
15
    Exhibit 6  12/7/2018 E-Mail Chain    171
16         between Tonya Block and
           Yvette Edwards Re:
17         Counseling Data - Secure,
           SUMMIT_001641475 to
18         001641479
19  Exhibit 7  10/9/2008 E-Mail from   225
           Kathleen Oberlin to Tonya
20         Block Re: First Lady FCFC
           Visit Challenges and Issues,
21         with Attachment,
           SUMMIT_001714776 to
22         001714811
23
24
25

Page 7

1  Exhibit 8  11/23/2010 E-Mail from Joe    232
           Gidley Re: CFHS Minutes and
2          Agenda for December 2, 2010,
           with Attachment,
3          SUMMIT_001711478 to
           001711481
4
    Exhibit 9  June 2012 E-Mail Chain Re:   236
5          ADM Board - Draft Community
           Plan, with Attachment,
6          SUMMIT_001702355 to
           001631373
7
    Exhibit 10  7/17/2018 ADM Board Meeting   246
8          Notice, SUMMIT_001631368 to
           001631373
9
    Exhibit 11  Document Titled "OARRS 2016   255
10         Annual Report
11  Exhibit 12  10/6/2010 E-Mail Chain Re:   295
           Summary of the ODH/LHD
12         Conference Call on September
           15, 2010, with Attachments,
13         SUMMIT_001712992 to
           001712998
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1        INDEX OF VIDEO OBJECTION
2  OBJECT              PAGE
3  object               17
   object               25
4  object               25
   object               29
5  object               32
   object               38
6  object               44
   object               46
7  object               51
   object               55
8  object               62
   object               74
9  object               77
   object               78
10  object              85
   object               86
11  object               87
   asked and answered          87
12  object               88
   object               89
13  object               89
   object               91
14  object               94
   object              111
15  object              111
   object              120
16  object              120
   object              124
17  object              125
   objection            126
18  object              128
   object              132
19  object              135
   object              139
20  object              146
   object              148
21  object              148
   object              157
22  object              158
   object              158
23  object              158
   object              166
24  object              187
   object              189
25  object              194

Page 9

1  object              196
   object              196
2  object              197
   object              204
3  object              205
   object              206
4  object              207
   object              207
5  object              208
   object              215
6  object              216
   objection            217
7  object              217
   object              218
8  objection            219
   objection            220
9  objection            221
   object              223
10  object              223
   object              231
11  object              236
   object              241
12  object              245
   objection            246
13  object              249
   object              253
14  objection            253
   objection            254
15  objection            257
   objection            257
16  objection            260
   objection            260
17  objection            261
   objection            261
18  objection            261
   object              264
19  object              264
   object              266
20  objection            270
   objection            272
21  objection            273
   objection            275
22  objection            276
   objection            276
23  objection            280
   objection            281
24  objection            281
   objection            282
25  object              285

3 (Pages 6 - 9)

Page 10

1 object.................................. 286
  object.................................. 287
2 object.................................. 290
  object.................................. 292
3 object.................................. 292
  object.................................. 293
4 objection.............................. 293
  object.................................. 293
5 object.................................. 293
  object.................................. 294
6 object.................................. 297
  objection.............................. 307
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1       THE VIDEOGRAPHER:  We're on the
2 record.  Today's date is November 14, 2018.
3 The time is 9:00 a.m.
4       We are here to take the videotaped
5 deposition of Tonya Block in the National
6 Prescription Opiate Litigation, Case No.
7 17-md-2804, to be heard in the United States
8 District Court, Northern District of Ohio,
9 Eastern Division, by Judge Aaron Polster.
10       Counsel, please state your name for
11 the record.
12       MS. KEARSE:  Anne Kearse, Motley
13 Rice, on behalf of County of Summit and City of
14 Akron.
15       MS. DEYNEKA:  Natalie Deyneka with
16 Motley Rice.
17       MR. BORANIAN:  Steven Boranian for
18 Defendant AmerisourceBergen.
19       MS. FRANKLIN:  Shirlethia Franklin
20 with Jones Day on behalf of Walmart, Inc.
21       MR. ADAMS:  Zach Adams with Tucker
22 Ellis on behalf of Janssen Pharmaceutical and
23 J&J.
24       MR. NAEEM:  Tariq Naeem, also from
25 Tucker Ellis, on behalf of Janssen and Johnson

Page 12

1 & Johnson.
2       THE VIDEOGRAPHER:  Folks on the
3 phone?
4       MR. PORTER:  Luke Porter for
5 AmerisourceBergen.
6       MS. HOLLY:  Pam Holly, Morgan Lewis
7 for Teva Pharmaceuticals, Cephalon, and three
8 of the Actavis entities, Watson Labs -- I'm
9 sorry -- Actavis Pharma, Inc., and Actavis
10 LLC.
11       MR. RICARD:  Paul Ricard,
12 Prescription Supply, Inc.
13       THE VIDEOGRAPHER:  Please swear the
14 witness.
15       TONYA BLOCK, of lawful age, called for
16 examination as provided by the Federal Rules of
17 Civil Procedure, being by me first duly sworn,
18 as hereinafter certified, deposed and said as
19 follows:
20       EXAMINATION OF TONYA BLOCK
21 BY MR. NAEEM:
22       Q.   Good morning.
23       A.   Hi.
24       Q.   Could you state your full name and
25 address for the record, please.

Page 13

1       A.   Tonya Block.  The address is 10233
2 Bell Meadow Drive.  That's Twinsburg, Ohio
3 44087.
4       Q.   Ms. Block, I briefly introduced
5 myself on the record, but my name is Tariq
6 Naeem.  I'm here to take your deposition in a
7 lawsuit filed by a number of parties, including
8 Summit Public Health, against a number of
9 defendants.
10       Before we get started, I just want
11 to ask you to -- kind of an instruction I give
12 before every deposition, but because we are
13 having everything you say transcribed by the
14 court reporter, I'd ask that we try not to talk
15 over one another.  So let me finish my
16 questions, I'll try to let you finish your
17 answers, and that way he's able to transcribe
18 everything clearly.  It's difficult for him to
19 take down when two people are talking.
20       And then the other similar
21 instruction would be that I'd ask that you make
22 all of your responses verbal and unambiguous,
23 so no nods or shrugs, no "uh-huhs" or "uh-uhs,"
24 because they don't come out on the record.
25 Okay?

4 (Pages 10 - 13)

Page 14

1    A.    Yes.
2    Q.    Thank you.
3          Ms. Block, have you had your
4 deposition taken before?
5    A.    Yes.  Well, once in a traffic
6 accident.  Based on a traffic accident.
7    Q.    All right.  Have you read the
8 complaint in this case?
9    A.    I've seen it.  I've not read it.
10    Q.    Seen it --
11    A.    In that it was sitting on the
12 health commissioner's desk.
13    Q.    Okay.  But -- but to be clear, you
14 didn't pick up a copy --
15    A.    I have not read it.
16    Q.    -- of the complaint and read it.
17    A.    Correct.
18    Q.    All right.  I'd like to start off
19 by talking about what you did to prepare for
20 this deposition, okay?
21    A.    Yes.
22    Q.    Could you tell me, did you -- did
23 you have meetings with anybody to discuss --
24 and I'm not going to ask you what you
25 discussed, but did you have meetings to discuss

Page 15

1 your deposition today?
2    A.    Yes.
3    Q.    All right.  Who did you meet with?
4    A.    I met with Anne and Natalie.
5    Q.    Okay.  And how many times did you
6 meet with any of the lawyers from Motley Rice
7 to prepare for your deposition?
8    A.    I have been in, I believe, three
9 meetings.
10    Q.    And during any of those meetings,
11 was there other people other than lawyers with
12 you at the meeting?
13    A.    Well, one of the meetings was a
14 larger group meeting that I was present at.
15    Q.    Was -- was this a meeting in 2017
16 to discuss whether Summit Public Health would
17 join the lawsuit against the Defendants?
18    A.    I was not in a meeting like that.
19    Q.    Okay.  What was that first meeting,
20 then, that you recall, just generally?
21    A.    It was a group meeting, and lots of
22 different organizations from Summit County were
23 present.  I think it was -- it may have been in
24 this room.
25    Q.    And do you recall month and year

Page 16

1 when that might have occurred?
2    A.    I do not.
3    Q.    Was it prior to 2018?
4    A.    I don't believe so.  I believe it
5 was in 2018.
6    Q.    All right.  So you believe it was
7 after the lawsuit had been filed?
8    A.    I don't know exactly when the
9 lawsuit was actually filed, so I don't know the
10 answer to that.
11    Q.    Okay.  Is it accurate for me to
12 state that that meeting wasn't -- your
13 deposition hadn't been scheduled at that point
14 in time?
15    A.    Oh, correct.
16    Q.    All right.  So that was one of the
17 three meetings that that you --
18    A.    I recall.
19    Q.    -- recall?
20          Now, the other two meetings you
21 said you had with the lawyers, did that involve
22 actually preparing for your deposition?
23    A.    Yes.
24    Q.    At either of those meetings, was
25 there anybody at the meeting, other than the

Page 17

1 attorneys from Motley Rice?
2    A.    No.
3    Q.    So, for example -- I'm just going
4 to ask it a different way -- none of your
5 colleagues at Summit County Health were at any
6 of those meetings?
7    A.    That's correct.
8    Q.    No employees from any other Summit
9 County government entity?
10    A.    That's correct.
11    Q.    Did you review documents at either
12 one of those two meetings to prepare you for
13 the deposition?
14    A.    No.
15    Q.    Have you reviewed any documents
16 outside of that meeting to prepare yourself for
17 this deposition?
18    A.    I was instructed to pull any --
19          MS. KEARSE:  I'm going to object to
20 any -- to any of our conversations where --
21 it's privileged on that, too, but --
22          MR. NAEEM:  Right.
23          MS. KEARSE:  -- so we can -- listen
24 to the question and answer that question, if
25 you reviewed anything.

5 (Pages 14 - 17)

Page 18

1  Q.  Right.  And so let me repeat the
2  question, and -- and Anne's point is very well
3  taken.  I don't want you to answer any question
4  where you start off with, "I was told by the
5  attorneys," even if in your head you're
6  thinking that.
7      All I want to know is no matter who
8  told you or why, did you review any documents
9  to prepare yourself for this deposition?
10  A.  I pulled documents from my L drive
11  on my computer that I was required to submit.
12  As part of that, I was pulling them up to see
13  what they were.  And that was the extent to
14  which, you know, I remember things that -- just
15  based on the documents that I was required to
16  pull.
17  Q.  All right.  And so --
18  MS. KEARSE:  That's part of our --
19  our obligations to produce documents to you.
20  MR. NAEEM:  And I -- and I thought
21  I understand that, so I'm going to --
22  Q.  But I'm going to ask you a few more
23  questions about that.
24      So after the lawsuit was filed, and
25  tell me if I'm correct, you were asked to

Page 19

1  collect documents that would be produced as
2  part of this litigation; is that accurate?
3  A.  Yes.
4  Q.  Okay.  And what you were just
5  describing to me about pulling documents from
6  your L drive was part of that process?
7  A.  Correct.
8  Q.  And I'm going to come back to that
9  in a minute.
10  A.  Okay.
11  Q.  But let me ask, other than that,
12  did you review documents actually to refresh
13  your memory about things that you thought you
14  might have to testify about at this deposition?
15  A.  I asked one of my staff to send me
16  numbers on a -- our syringe exchange program.
17  Q.  Okay.  And who is that staff
18  member?
19  A.  Angela Genet.
20  Q.  Can you spell her last name for me,
21  please?
22  A.  G-e-n-e-t.
23  Q.  Is this the same Angela who was
24  formerly known as Angela Burgess, who was
25  the -- who was kind of the budget person Donna

Page 20

1  Skoda talked about at her deposition for Summit
2  Public Health?
3  A.  No.
4  Q.  Somebody different.  Okay.
5      What is Ms. Genet's role?
6  A.  She is a program coordinator.  She
7  actually oversees the syringe exchange program.
8  Q.  And how long has she been employed
9  by Summit Public Health?
10  A.  I would say five years.
11  Q.  Okay.  So you asked Ms. Genet to
12  provide you some information regarding the
13  syringe program.
14      And -- and I don't know if I heard
15  you say this.  Was it -- you said numbers, but
16  was it budget numbers or was it units?
17  A.  Units.
18  Q.  And is Ms. Genet, is she in the
19  community health division?
20  A.  Yes.
21  Q.  Okay.  And is that the appropriate
22  title for me to use --
23  A.  Yes.
24  Q.  -- division --
25  A.  Yes.

Page 21

1  Q.  -- or is it a department?
2  A.  It's a division.
3  Q.  Okay.  Thanks.  I'll try to keep
4  that clear as we go along today.  Correct --
5  you know, feel free to correct me if I miss
6  that, though.
7      So we are talking about documents,
8  just -- not part of the collecting documents to
9  be produced in the lawsuit.  We're going to
10  come back to that in a minute.  But just any
11  documents that you may have reviewed to prepare
12  yourself for today's deposition.
13      You talked about these numbers that
14  Ms. Genet gave you.  Anything else that you
15  pulled specifically to prepare to give
16  testimony today?
17  A.  No.  And I just -- I was curious at
18  that point, because I hadn't looked at the
19  numbers.  I was curious to know how many --
20  what the difference was.  So that was it.
21      I can't say that I -- well, I can't
22  say that I asked her for that in preparation,
23  but I was curious to know when I talked about
24  the syringe exchange program, I -- it occurred
25  to me that I had no idea the difference between

6 (Pages 18 - 21)

**Page 22**

1 when we started the program and 2018, what
2 those numbers looked like.
3    Q.   And I'm sorry.  Did you say 2018
4 when you started the program?
5    A.   No, no.  When we started the
6 program, I believe, in 2016.
7    Q.   Okay.  And that's what I thought.
8 I just wanted to make sure you and I were on
9 the same page.
10        So what was your impression of the
11 numbers in terms of how those have changed
12 since 2016?
13    A.   I was -- I was very surprised at
14 the -- the difference between the number that
15 we distributed in 2016 versus what had been
16 distributed to date for 2018.
17    Q.   Okay.  So were there numbers that
18 you recall for each year from 2016, 2017, and
19 2018?
20    A.   I don't recall the 2017 numbers.  I
21 think in 2016, it was 266; and in 2018, it was
22 81,000 to date.
23    Q.   Okay.  So 266 --
24    A.   Two hundred --
25    Q.   .00?

**Page 23**

1    A.   Correct.
2    Q.   Okay.  Versus 81,000?
3    A.   Yes.
4    Q.   All right.  Do you know what month
5 in 2016 that syringe exchange program started?
6    A.   No, uh-uh.
7    Q.   Okay.  How many physical locations
8 was that syringe exchange program offered at in
9 2016, if you recall?
10    A.   In 2016, it was one.
11    Q.   And in 2018, do you know how many
12 locations that is now?
13    A.   I believe they're at three.
14    Q.   With that one location 2016, do you
15 recall what generally -- what days it was open?
16 What hours it was open?
17    A.   No, I didn't.  I don't recall that.
18    Q.   Do you know whether -- and I
19 understand we're talking about three sites now,
20 but in terms of individual availability to
21 sites, are there expanded hours and days in
22 2018 compared to 2016?
23    A.   Yes.
24    Q.   In 2016 compared to -- well, let me
25 ask it a different way.

**Page 24**

1        Are there more employees -- strike
2 that again.
3        Are there more people involved in
4 dispensing syringes in 2018 than there were in
5 2016?
6    A.   Yes.
7    Q.   And do you know how many employees
8 in 2018 that are involved in that?
9    A.   Maybe five.
10    Q.   And how many were there in 2016?
11    A.   Two.
12    Q.   Do you know anything about the
13 budget numbers for the syringe exchange program
14 in 2018?
15    A.   I do not.
16    Q.   Do you know the sources of the
17 funds that are used for the syringe exchange
18 program?
19    A.   I couldn't give you a breakdown.  I
20 believe it's -- I believe it's primarily
21 general revenue.  In terms of the staff that
22 staff it, they may work on a number of
23 different grants.  I couldn't tell you which
24 ones.  But in terms of purchasing supplies,
25 transportation to the locations, things of that

**Page 25**

1 nature, the whole kit that we give out, that --
2 that should be general revenue.
3    Q.   Okay.  Now, you mentioned some of
4 the employees, they may be on grants.  We'll
5 probably get into this on a program-specific
6 basis later on in the deposition, but is it
7 accurate for me to state that individual
8 employees of Summit Public Health may have
9 their salary and benefits paid for, or at least
10 allocated on the books, to different sources of
11 revenue within Summit Public Health?
12        MS. KEARSE:  Object to form.
13    A.   Yes.
14    Q.   Okay.  So, for example -- and let's
15 just you [sic] an exam- -- example, and I'm not
16 going to ask you specifically at this point for
17 the details, but if we were looking at the
18 accounting ledgers of Summit Public Health,
19 there would be different funds listed, perhaps,
20 from which the -- the money to pay your salary
21 and benefits comes from?
22    A.   Not mine.
23        MS. KEARSE:  I'm going to object.
24 I don't know if that was a question, but object
25 to the form.

7 (Pages 22 - 25)

Page 26

1    A.   Not me.
2    Q.   Okay.  So let's not use you as an
3  example.
4         A hypothetical employee who works
5  in the community health division --
6    A.   Uh-huh.
7    Q.   -- and works on substance abuse
8  programs --
9    A.   Uh-huh.
10   Q.   -- their salary and benefits would
11  be allocated to different -- could be allocated
12  to different funds, which represent different
13  sources of revenue for Summit Public Health?
14   A.   Yes.
15   Q.   Some of those could be general
16  revenue?
17   A.   Yes.
18   Q.   Okay.  Could you tell the jury,
19  what is general revenue?
20   A.   Those are funds that are brought in
21  primarily based on our -- the millage that we
22  receive from the various municipal subdivisions
23  within the county, so that's based on property
24  taxes.
25   Q.   And does Summit Public Health have

Page 27

1  its own -- and pardon me for, perhaps, not
2  being as sophisticated in this as you, as an
3  administrator would be -- does it have its own
4  millage within the property taxes that comes
5  directly to Summit Public Health?
6    A.   Yes.  Well, it goes through -- I
7  believe it goes through the County, but it is
8  allocated specifically for Public Health.
9    Q.   Okay. So for -- Summit County
10  can't say, "Well, we're facing a budget
11  shortfall this year.  We're not going to give
12  you as much as you're entitled to"?  It can't
13  withhold that?
14   A.   I don't know the answer to that,
15  but they -- we have to go before them with our
16  budget to be approved every year.  To the
17  budget commission.
18   Q.   Okay.  And is that approval
19  process -- does that include discussion of how
20  Summit Public Health proposes to spend its
21  general revenue?
22   A.   Yes.
23   Q.   Does it include how Summit Public
24  Health plans to spend its grant revenue?
25   A.   No.

Page 28

1    Q.   Do you know if fee-for-service
2  revenue, is it included within general revenue?
3    A.   I think it depends on the program.
4  Maybe -- and I can't think of a program off the
5  top of my head right now.
6         Typically, if we're perform- -- if
7  it's a fee for service -- let's use early
8  childhood development, home visitation -- we
9  have a contract in place with the State of Ohio
10  to do fee-for-service home visitation, so we
11  get paid for every unit that we provide, but
12  that money goes into the home visitation
13  program; it doesn't go into the standard
14  general revenue.
15   Q.   Okay.  Let's use a specific example
16  from the community health division.  One of
17  the -- one of the functions that I believe
18  Donna Skoda testified to within that division
19  is counseling services.
20   A.   Uh-huh.
21   Q.   And I believe she also testified
22  that services that are provided -- counseling
23  services that are provided can be billed to,
24  for example, Medicaid.
25   A.   Yes.

Page 29

1         MS. KEARSE:  I'm going to object to
2  the form.
3    Q.   Is it -- is it accurate that some
4  services provided -- counseling services
5  provided by the community health division are
6  billed to Medicaid?
7    A.   Yes.
8    Q.   Would that be considered by you as
9  a fee-for-service revenue?
10   A.   Yes.
11   Q.   Now, let's -- using that as an
12  example, can that -- does that revenue go into
13  the general revenue fund?
14   A.   It goes into the counseling budget.
15  They're required to project, at the beginning
16  of the year -- well, at the end of the prior
17  year -- what they anticipate bringing in from
18  various funding sources, and their budget is
19  set up based on that.
20         So it's all fee for service within
21  the counseling department, but those dollars
22  don't then go toward -- they have to -- they're
23  considered, I guess, general revenue when they
24  come in, but they're specifically allocated for
25  counseling services.

8 (Pages 26 - 29)

Page 30

1    Q.   Okay.  And you've partially
2  anticipated what one of my next questions was
3  going to be.  That money -- and we're just
4  talking about the counseling services --
5    A.   Uh-huh.
6    Q.   -- in the division of health -- I'm
7  sorry, the community health division -- does
8  not get put into the general revenue so it
9  would be available, for example, to the
10  environmental health division?
11    A.   That's correct.
12    Q.   Other than Medicaid, what are some
13  of the other sources of fee-for-service income
14  for counseling services?
15    A.   The ADM Board provides services --
16  rather, they provide funding for our services
17  and counseling for indigent populations.
18    Q.   Okay.  Are those considered grants,
19  or is it kind of a draw-down for services that
20  are provided?
21    A.   Well, we write a proposal for it
22  every year -- I believe every year -- write a
23  proposal, and they approve the proposal.  Then
24  there's a contract that's established, and we
25  bill against the contract.

Page 31

1    Q.   And so, then, if we were looking at
2  an accounting ledger for Summit Public Health,
3  do you know whether that ADM revenue would be
4  included within grants or some other category
5  of revenue?
6    A.   I don't understand what you mean.
7    Q.   Well, I can show you --
8         - - - - -
9       (Thereupon, Deposition Exhibit 1,
10      Document Titled "Summit County
11      Public Health 2017 Internal Budget,"
12      SUMMIT_000340431 to 240441, was
13      marked for purposes of
14      identification.)
15         - - - - -
16    Q.   Ms. Block, I'm handing you what
17  I've marked as Deposition Exhibit 1.
18       MS. KEARSE:  Thank you.
19    Q.   And you should take as much time as
20  you need to review that, if you'd like, but if
21  you could turn to page 4.
22    A.   Uh-huh.
23    Q.   Do you see that?  Okay.
24    A.   Yes.
25    Q.   And you'll see that under

Page 32

1  "Revenue," there are a number of line items.
2       MS. KEARSE:  I'm going to object to
3  the form first and ask that you lay a
4  foundation, if she's reviewed the document
5  before.
6    Q.   Do you see the line items?
7    A.   Yes.
8    Q.   Okay.  Now, in your role with
9  Summit Public Health, is budgeting part of your
10  job function?
11    A.   Yes.
12    Q.   Certainly, you've been at Summit
13  Public Health prior to 2017, correct?
14    A.   Yes.
15    Q.   And when you look at those sources
16  of revenue, are you generally familiar with
17  what those mean?
18    A.   Yes.
19    Q.   Okay.  Now, simple question, at
20  least for -- for now is we were talking about
21  ADM revenue --
22    A.   Uh-huh.
23    Q.   -- and can you let me know which
24  one of those line items ADM would fall under?
25    A.   I'd have to say grants.

Page 33

1    Q.   Okay.  We may come back to that.  I
2  just wanted to make sure you and I were on the
3  same page with some of the things we're going
4  to talk about today.
5       We -- we'd followed a string that
6  we started talking about based on the syringe
7  exchange program, if you'll recall.  I wanted
8  to at least close that off for now.
9       If we were to talk about
10  specifically the sources of funds used for that
11  syringe exchange program, would you know what
12  the sources were based on the categories we
13  talked about: Fee for services, grants, or
14  general revenue?
15    A.   When it was established in 2016, I
16  was, I'd say, very much a part of the
17  discussions around how we would get the program
18  up and running, and at that point primarily it
19  would have been general revenue.
20       In '17 and '18, I don't know
21  exactly the mix of funding sources used to
22  operate the program.
23    Q.   Okay.  And to be clear, you don't
24  know the amounts, or you don't even -- you
25  don't know the various sources that could be

9 (Pages 30 - 33)

Page 34

1  involved in funding that program?
2       A.  I don't know the various sources
3  involved in funding the program.
4       Q.  Other than internal revenue for
5  that program, do you know whether Summit Public
6  Health gets revenue from another Summit County
7  entity?  Do they partner with somebody else
8  from Summit County in those services?
9       A.  I do not believe so, no.  As a
10  matter of fact, I know that we don't.
11       Q.  So all of the revenue comes from
12  Summit Public Health for the syringe exchange
13  program?
14       A.  As far as I know.  As far as I am
15  aware.
16       Q.  And all of the employees who
17  provide those services are Summit Public Health
18  employees?
19       A.  Yes.
20       Q.  Okay.  So we- -- we've been talking
21  about, believe it or not, what you reviewed to
22  prepare for your deposition.
23       A.  Uh-huh.
24       Q.  I know that probably seems like a
25  long time ago.

Page 35

1            What I want to talk about now is
2  the actual -- that first process you described,
3  which was going through your documents to
4  identify things to turn over to the lawyers to
5  produce in this litigation.  Do you remember
6  generally we talked just a little bit about
7  that?
8       A.  Yes.
9       Q.  All right.  Again, without telling
10  me what the content of any communication was,
11  can you let me know whether it was the
12  attorneys who asked you to do it, or was it
13  somebody within Summit Public Health that asked
14  you to collect your documents?
15       A.  I -- Eddie Mink, our IT person, I
16  believe sent an e-mail to myself and some other
17  staff members that we needed to pull all of our
18  documents, and that was, I believe, the first
19  time I was notified that I needed to do that.
20       Q.  Did you already know, at that point
21  in time, that the lawsuit had been filed?
22       A.  At that point, yes.
23       Q.  Do you recall what year it was that
24  you got this e-mail from Mr. Mink?
25       A.  Yes.

Page 36

1       Q.  Do --
2       A.  It was 2018.
3       Q.  Do you recall the month?
4       A.  Maybe late September.  Maybe early
5  October.
6       Q.  Do -- do you recall who other --
7  who were the other employees that were on that
8  e-mail who were also asked to provide their
9  documents?
10       A.  Jackie Pollard, Myron Bennett.  I
11  think that's -- I think that's it.
12       Q.  Okay.  So prior -- prior to that
13  e-mail, to your knowledge, had anybody compiled
14  your e-mails or come and asked you to -- to
15  look through your documents to see whether
16  there's anything that needed to be produced in
17  this lawsuit?
18       A.  Not that I recall.
19       Q.  Okay.  Once you got the e-mail from
20  Mr. Mink, can you please just describe for me
21  what process you went through to identify what
22  needed to be produced?
23       A.  Well, he and I went back and forth
24  a couple times because I didn't really
25  understand what it -- what it was he was asking

Page 37

1  us to do.  And so I started by typing in the
2  phrase "opiates," because he gave us some
3  instruction on how to go about pulling it.  And
4  still I struggled with that.
5            I ran a search on my system, and
6  there wasn't a lot that came back.  So I
7  enlisted his help, and he set up a program
8  to -- with lots of different phrases and terms.
9  It's my understanding that's what he did, and
10  sort of mined my system for all of the data
11  that -- that was requested.
12       Q.  Did you do anything else yourself
13  to identify documents that were responsive to
14  the e-mail you got from Mr. Mink?
15       A.  I looked through all of the files
16  that are in my office to see if there were any
17  hard copies of things.
18       Q.  Did you find anything?
19       A.  No.
20       Q.  How long -- well, how far back did
21  those hard-copy documents go that you had in
22  your files?
23       A.  I guess it depends on the program.
24  Probably nothing prior to -- prior to '15,
25  because we had a flood and I lost every paper

10 (Pages 34 - 37)

Page 38

1 copy I --
2    Q.    You had a flood in 2015?  Is that
3 what you said?
4    A.    Yes.
5    Q.    Okay.  Now, those files that you --
6 those hard-copy files that you review in your
7 office, were those things that you saved for
8 your own benefit, or were those things that
9 were required to be saved because they were
10 Summit Public Health official documents?
11    A.    Well, they are Summit Public Health
12 official documents, but many of them I need to
13 refer back to for various meetings that I
14 attend.
15    Q.    Okay.  And I'm struggling on how to
16 ask this the right way.  I apologize.  I wasn't
17 very clear.
18        Were those the official copies of
19 program documents in your office, or wherever
20 you were looking through those hard-copy
21 documents, as -- as compared to copies that you
22 saved for your own quick reference?
23        MS. KEARSE:  Object to form.
24    A.    I would not have -- so, for
25 example, like, if a proposal was written and --

Page 39

1 I would not keep the RFP along with the
2 proposal and any program reports.  The program
3 person would do that.  So I wouldn't have any
4 original official copies of those types of
5 things.
6        It's more a matter of me sitting in
7 meetings, and if someone is asking me can we
8 hire four new staff, I may be taking notes, and
9 then I have to take that back to Donna to see
10 whether or not we can swing what they're
11 asking.  So I have a lot of notes related to
12 various programs, just along with summaries.
13        I don't keep contracts in my
14 office.  I don't keep RFPs or proposals for all
15 the various programs.
16    Q.    Okay.  So these were documents, if
17 I understand what you're saying, that you saved
18 for your own purposes --
19    A.    Yes.
20    Q.    -- for -- even though they were
21 Summit County Public Health official
22 documents --
23    A.    Yes.
24    Q.    -- you selected which ones you
25 wanted to keep?

Page 40

1    A.    Yes.
2    Q.    Okay.  So, for example, you didn't
3 have the file for the -- the official file for
4 the counseling services in 2014 that just
5 happened to be saved in your office.
6    A.    Correct.  No.
7    Q.    All right.  Now, to be clear, when
8 we're talking about a flood in 2015 --
9    A.    I think it was in 2015.
10    Q.    Okay.  What exactly was flooded?
11 Your office?  The whole storage facility?
12    A.    I'm sorry.  I was trying to think
13 of the year.  No, no.  The entire building was
14 flooded.
15    Q.    And I'm going to do my best not to
16 repeat questions that Ms. Skoda talked about
17 regarding organization of Summit Public Health
18 and background, those kinds of things.  But she
19 did talk about -- I don't recall the address --
20 one location where Summit Public Health keeps
21 their documents, hard-copy documents.
22    A.    Uh-huh.
23    Q.    Do you -- is this the building
24 we're talking about that you said had the
25 flood?

Page 41

1    A.    That -- it was at the time.  That
2 was our main site.  Now it's the Fairway Center
3 on West Market.
4    Q.    Okay.  And -- and I -- I do want to
5 talk about just the time of the flood, whenever
6 that was.
7    A.    That would have been 1100 Graham
8 Road Circle.
9    Q.    What did you do with the
10 documents -- and was your office one of the
11 areas affected by the flood?
12    A.    Yes.
13    Q.    Okay.  What did you do with those
14 hard-copy documents?
15    A.    I did not get them back.  They -- I
16 mean, there were tons of documents that were
17 destroyed, so I started, essentially, from
18 scratch.  Absolutely from scratch.  I had no
19 documents to start with.
20    Q.    Okay.  So the flood occurs in, you
21 think, 2015 --
22    A.    I don't remember the year.
23    Q.    And we can find out for certain --
24    A.    Okay.
25    Q.    -- through your attorneys or

11 (Pages 38 - 41)

1  through one of the other witnesses.

2     A.   Okay.

3     Q.   But your recollection is it's 2015

4  that this flood occurs, and you know, for

5  example, that you had documents in your office

6  that were damaged by the flood?

7     A.   Yes.

8     Q.   Somebody comes in to collect those

9  documents?

10    A.   There was a disaster recovery

11 company that came in.  A lot of the staff, the

12 day after the flood, came in, and they pulled

13 things that they could pull.  And I think they

14 tried to -- any number of strategies to save

15 the documents: hanging them dry, blowing them

16 dry, ironing them.

17       I don't know.  I was potentially on

18 vacation at the time, so -- but I did not

19 recover any documents.

20    Q.   Okay.

21    A.   No one said, "Oh, these came from

22 your office.  This box we saved."

23    Q.   Okay.  And that -- that's kind of

24 what I'm working towards, so I appreciate that.

25       To be clear, there were hard-copy

1  documents that you had been saving prior to the

2  flood.  After the flood, somebody took them;

3  you never saw them again?

4     A.   I -- yes.

5     Q.   Okay.  To your knowledge, were the

6  general Summit Public Health files also

7  affected by the flood?

8     A.   Yes.

9     Q.   Do you know whether some of those

10 documents were -- were damaged so much that

11 they were destroyed as well?

12    A.   Some were.

13    Q.   Do you know whether any of the

14 documents from the community health division

15 were affected and disposed of?

16    A.   Well, I was the director of

17 community health at the time, so I would say

18 yes.

19    Q.   Do you -- do you have an estimate,

20 as we sit here, by percentage, roughly, of the

21 documents prior to 2015 -- or prior to the

22 flood, hard-copy documents that were from the

23 community health division that were destroyed

24 by the flood, not recoverable?

25    A.   I do not.

1     Q.   Was it a lot of documents?

2     A.   Yes.

3        MS. KEARSE:  Object to form.

4     Q.   Was it more than half of the

5  documents?

6     A.   I don't know, because -- I just

7  don't know the answer to that.  We hadn't kept

8  documents in a way that would -- I just -- it

9  never occurred to me to estimate how many

10 documents when I think about the community

11 health staff combined -- yeah, I -- I don't

12 know the answer to that.

13       And then we had staff at other

14 sites.  We had primarily -- yeah.  Like, so,

15 for example, there was -- we had a clinic down

16 at the Morley Center in Akron.  Counseling

17 department was there.  There was a WIC clinic

18 there.  None of those, obviously, were impacted

19 by what happened at Graham Road.

20    Q.   And when you say "counseling," was

21 that Morley?  Is that what you said?

22    A.   Yeah, the Morley Health Center.

23    Q.   Okay.  We are -- again, in part,

24 are we talking about the substance abuse

25 services that are provided by Summit Public

1  Health?

2     A.   Yes.

3     Q.   So patient records, for example --

4     A.   Uh-huh.

5     Q.   -- for current patients that

6  were -- that were getting counseling services,

7  do you believe those were included in the

8  documents that were affected by the flood?

9     A.   I don't believe so.

10    Q.   Now, what about older patients who

11 were -- their records have been archived

12 because they were no longer getting services

13 from Summit Public Health, would those

14 documents be transferred to the site that was

15 affected by the flood?

16    A.   I don't believe that we archived

17 counseling services patient records at Graham

18 Road.

19    Q.   Do you believe that's done at the

20 Morley Health Clinic, then?

21    A.   Yes.

22    Q.   As far -- you mentioned you were on

23 vacation when this occurred.  If we needed to

24 talk to an employee of Summit Public Health who

25 was directly involved in working with a

Page 46

1 disaster remediation company, who would that
2 be?
3      A.   Well, there were three individuals:
4 Gene Nixon, who was the health commissioner at
5 the time; Donna Skoda; and Heather Pierce, who
6 was the director of admin at the time.
7      Q.   All right.  And just, I think, one
8 more question on this.  You weren't the only
9 employee whose hard-copy documents were
10 affected by the flood; is that accurate?
11      A.   Yes.
12      Q.   Okay.  We -- following the thread
13 back up again, we're talking about what you did
14 to organize documents that were going to be
15 produced in this case.
16           You talked about Mr. Mink's e-mail,
17 you did your own search, and then he ran a
18 broader search and mined your system for
19 documents, you looked through the hard-copy
20 files.  Everything prior to the flood was gone,
21 but you found things since the flood, and I
22 think what you said was you didn't really find
23 much that was very relevant?
24           MS. KEARSE:  Object to form.
25      Q.   Well, let me ask -- let me just

Page 47

1 ask.  I was trying to get us back to where we
2 were.
3           MS. KEARSE:  It's just a long
4 question, is --
5           MR. NAEEM:  I understand.
6      Q.   You -- you looked through your
7 hard-copy documents, correct?
8      A.   Yes.
9      Q.   Did you turn over documents based
10 on that review?
11      A.   No.
12      Q.   So you didn't find anything that
13 you thought needed to be produced from your
14 hard-copy documents?
15      A.   That's correct.
16      Q.   Other than the search you ran and
17 then that Mr. Mink helped you with, other than
18 reviewing the hard-copy documents you had, did
19 you do anything else to look for documents that
20 were to be turned over as part of this
21 litigation?
22      A.   No.
23      Q.   Going back quickly to the -- to the
24 electronic search you did, you talked about
25 your L drive.

Page 48

1      A.   Yes.
2      Q.   Are your e-mails stored on the L
3 drive?
4      A.   Some -- no.  There's -- on the
5 server, I believe.
6      Q.   Did you have to do anything to
7 assist in producing your e-mails as part of
8 this litigation?
9      A.   Eddie did that.
10      Q.   Okay.
11      A.   Mink.
12      Q.   All right.  So -- and I just -- I'm
13 asking because I want to know, did you actually
14 go through any of the e-mails to select which
15 would be produced and which didn't have to be
16 produced?
17      A.   No.
18      Q.   Were there separate folders in your
19 e-mail program that were easily identifiable
20 as, these are substance abuse-type e-mails,
21 these are childhood immunization e-mails, and
22 so get those, don't get those?
23      A.   No.
24      Q.   Okay.  Mr. Mink did all of the
25 collecting of the e-mails?

Page 49

1      A.   Yes.
2      Q.   So the L drive is somewhere where
3 you store documents, for example, that you
4 yourself are working on?
5      A.   Yes.
6      Q.   Did you do anything, other than the
7 search yourself, and then the one that Mr. Mink
8 did, to try to find documents that needed to be
9 produced?
10      A.   That's what I did.
11      Q.   So, again, the same thing with
12 e-mails, there -- well, do you have separate
13 folders on your L drive for different programs?
14      A.   Sorry, it's not L.  It's H.
15      Q.   H, sorry.
16      A.   No, no.  Yeah, it's our -- it's my
17 H drive.  It's my home drive.
18           And so what was the question?
19      Q.   Yeah.  I'll ask it again.
20           Are there separate folders on your
21 H drive for different programs, for example,
22 that you're responsible for?
23      A.   Yes.
24      Q.   So is there a separate folder for
25 the community health division that you use to

13 (Pages 46 - 49)

Page 50

1  store documents related to that -- to the
2  programs in that division?
3      A.  No.  It's not set up that way.
4      Q.  Do you have the ability to set up
5  your own folders?
6      A.  Yes.
7      Q.  Okay.  How do you -- how do you
8  save documents to your H drive?
9      A.  It's more program-related, so
10  that's -- again, home visitation, I would have
11  a folder that has all of that information in
12  there, solid waste.  I set it up by program,
13  not so much by division.
14      Q.  All right.  Do you have one for --
15  do you have a folder for the counseling
16  services?
17      A.  I do not.
18      Q.  Okay.
19      A.  I don't believe that I do.
20      Q.  Do you have one for substance abuse
21  prevention services?
22      A.  No.
23      Q.  How about Project DAWN?
24      A.  Maybe I -- I don't believe that I
25  have a Project DAWN folder.  I probably have

Page 51

1  some early documents that I would have gone --
2  during program development, information would
3  have been sent to me, "This is the way we think
4  we're going to set it up."
5          And so just in terms of program
6  development, maybe early on I may have -- I
7  know there should have been e-mails.  I don't
8  know if there's a folder on my H drive.
9      Q.  Okay.  And let's use that as an
10  example, where somebody sends you a proposed
11  budget, for example, for Project DAWN, and it's
12  an e-mail with an attachment.  Would you just
13  leave it in your e-mail system, or would you
14  save the document to your H drive?
15      MS. KEARSE:  Object to the form.
16      A.  Probably --
17      THE WITNESS:  Oh.
18      Q.  Go ahead.
19      A.  -- in the e-mail.
20      Q.  Do you have a program folder for
21  the medication-assisted -- medication-assisted
22  treatment program?
23      A.  I don't think I have a folder.  I
24  have lots of e-mails.  I don't -- I don't think
25  I have a folder.

Page 52

1      Q.  Do you have one for the
2  prescription drug disposal boxes that --
3      A.  D.U.M.P.?
4      Q.  Yeah.
5      A.  No.
6      Q.  Do you have one for the STARS
7  Program?
8      A.  Yes.
9      Q.  Do you have --
10      A.  I believe --
11      Q.  Oh, go ahead.
12      A.  I believe I do from early on.  I
13  don't know if it's an actual folder, but I -- I
14  probably have electronic documents from early
15  on, when it was being developed.
16      Q.  Do you think those were saved on
17  your H drive or that those are just in your
18  e-mail system?
19      A.  They should be in the e-mail
20  system, because I didn't actually write that
21  proposal.  I reviewed it, maybe made some
22  edits.  I don't -- but that wasn't even -- that
23  wasn't our program, so it was the children
24  services.  I don't believe I have a folder on
25  it.  That was five years ago, though.  I may.

Page 53

1      Q.  When I spoke with Ms. Skoda, she
2  mentioned that the end of the grant that --
3  that funded that program, the five-year grant,
4  was ending, I think she said, in September of
5  2018.
6      A.  Uh-huh.
7      Q.  Is that accurate?
8      A.  Yes.
9      Q.  Is Summit Public Health still
10  running that program --
11      A.  Our component --
12      Q.  -- now that that grant has ended?
13      A.  -- we are still funding a full-time
14  staff person to support the work they're doing.
15      Q.  Is that person doing the
16  assessments as part of that program or some
17  other function?
18      A.  She screens for ancillary services
19  that may be needed.  She makes referrals to
20  systems if she finds that they need them:
21  food, housing, clothing, transportation, things
22  of that nature.  She may or may not do home
23  visits, and tracking them throughout the
24  process to make sure that they're following
25  through with referrals that are made.  That's

14 (Pages 50 - 53)

1 what her role was identified as, so.

2  Q.   What's the name of that employee?

3  A.   Christa Brunelle.

4  Q.   Christa?

5  A.   Yes.

6  Q.   Burelle?

7  A.   Brunelle, B-r-u-n-e-l-l [sic], I

8 believe.

9  Q.   Was she part of the -- was she part

10 of the program prior to the grant ending?

11 Prior to September --

12  A.   Yes.

13  Q.   -- 2018?

14  A.   Yes.

15  Q.   Is the STAR program the only

16 program that she works on for Summit Public

17 Health?

18  A.   Well, it had been for -- for

19 however long she was on there.  Recently, I've

20 had a couple staff come to me and ask if they

21 could move her to another program, so I don't

22 know where we are on that yet.  Very recently.

23 Within the last few weeks.

24  Q.   Okay.

25  A.   They'd like to move her to MAT.

1  Q.   Okay.  And is that essentially

2 because there's not enough for one full-time

3 employee to do anymore on the STAR program with

4 respect to Summit Public Health's role with

5 that program?

6  MS. KEARSE:  Object to form.

7  A.   I have been having ongoing

8 discussions about the -- whether or not it's

9 necessary for Christa to be on site, how many

10 referrals are coming through.

11  We made a commitment that we would

12 allocate Christa to the program full-time for

13 six months, so I've been focusing a little bit

14 more, to the extent that I've been focusing on

15 it, on where we are with regard to the amount

16 of time than the number of referrals that have

17 been made.

18  Q.   Other than the -- the revenue

19 that's associated with Ms. Brunelle's salary

20 and benefits, are there any funds that Summit

21 Public Health is providing currently to that

22 program?

23  A.   We -- no.  We cover the cost of

24 Christa.

25  Q.   And that was a six-month

1 commitment, after which, at this point, you

2 don't know what's going to happen with her role

3 on that program; is that accurate?

4  A.   Well, we talked about a year, and

5 we would see how things looked at the six-month

6 mark.

7  Q.   Got you, okay.

8  We were talking about your -- your

9 hard-copy archive -- or, I'm sorry, your H

10 drive --

11  A.   Yes.

12  Q.   -- archive.  I just had one more

13 program I wanted to ask to see whether you had

14 a folder on there, and that's the Quick

15 Response Teams.  Anything that you have on your

16 H drive?

17  A.   I don't believe I have a folder.  I

18 probably have -- I'm sure I have e-mails

19 related to that.

20  Q.   Regardless of whatever the folders

21 were, it was this H drive that you yourself

22 originally did a search for opioid-type

23 documents?

24  A.   Yes.

25  Q.   And then, again, you testified

1 about this, but I want to close it off to make

2 sure.  Mr. Mink came in, and that's the same

3 drive that he did his enhanced search of to try

4 to find documents?

5  A.   Yes.

6  Q.   All right.  And so whatever he

7 found would have been turned over.  It was kind

8 of out of your hands at that point --

9  A.   Yes.

10  Q.   -- somebody else did that?

11  A.   Yes.

12  Q.   We talked about the H drive.  We

13 talked about the e-mails.  We talked about the

14 hard-copy documents.  Were there anything --

15 any other sources of information that you went

16 and looked at to see whether it needed to be

17 produced as part of this litigation?

18  A.   No.

19  Q.   Did you review Ms. Skoda's

20 deposition at any point in time after it was

21 taken?

22  A.   No.

23  Q.   Did you talk to Ms. Skoda about

24 your deposition, other than scheduling-type

25 things?  Did you talk about the substance?

Page 58

1    A.   No.  But I did tell her that I
2 don't feel as though I'm an expert on opiates,
3 and that I was concerned about that.  That I
4 don't know enough about details.  And she
5 told -- you know, we talked about that.  She
6 said that, "You know what you know, and just go
7 in there and tell them what you know."
8    Q.   Did she talk about her testimony,
9 give you advice on what to say, anything like
10 that?
11   A.   No.  She just would say, "Oh,
12 honey," just -- yeah.  Didn't want to talk
13 about it.  But I didn't ask her lots of
14 questions, either.  I did ask her, "What could
15 you possibly have to say for seven hours?"
16   Q.   I will suggest an answer to that
17 once we go off the record.
18        One last thing.  I'm sorry about
19 the H drive, and then I promise we'll move on.
20        Do you have a folder that you save
21 articles on, for example, that you find
22 interesting?
23   A.   No.  I have a folder on top of my
24 desk that I plan to read, but I don't have
25 any -- I don't believe I have a -- I know I

Page 59

1 don't have a folder, and I don't believe I have
2 an electronic folder.  Maybe I do.  I don't
3 know.
4        Oh, well, yeah.  I can remember
5 some articles related to developing the syringe
6 exchange program that I -- yes, I do recall
7 those.  Those probably are on my -- maybe.  I
8 don't know where they are.
9    Q.   Okay.
10   A.   I have electronic copies of syringe
11 exchange information.
12   Q.   It could be in your e-mail system
13 if somebody sent them to you?
14   A.   Could be in my e-mail system.
15   Q.   Could be on your H drive?
16   A.   Could be on my H drive, yes.
17   Q.   There wouldn't be any other -- and,
18 then, other than a hard copy that might be on
19 your desk, there aren't any other sources that
20 you could think of where that -- where those
21 articles would be, correct?
22   A.   Correct.
23   Q.   Now, the -- you mentioned -- I
24 think what you said, it was a hard-copy file
25 with articles in it.  Do you collect

Page 60

1 opioid-related articles to read for your own
2 education?
3    A.   No.  I got a really interesting one
4 that talked about opiate use in the 1800s
5 and -- but, no.  These articles are about
6 everything from infant mortality to county
7 government and Complete Streets.  It could be
8 anything related to public health.
9    Q.   Okay.
10   A.   And that was one of my challenges,
11 is that I have not become a local expert on
12 opiates.  Yeah, that was one of my concerns
13 about testifying, that I --
14   Q.   Well, I see --
15   A.   -- wasn't going to know enough to
16 answer your questions.
17   Q.   Ms. Block, we've been going --
18   A.   We've got hours, though, right?
19   Q.   -- we've been going about an hour,
20 and we've barely even mentioned opiates --
21   A.   Right.
22   Q.   -- so you can see --
23   A.   Right.
24   Q.   -- we'll come up with something to
25 talk about no matter -- no matter what your

Page 61

1 knowledge base is.
2    A.   Okay.
3    Q.   But you did mention at least one
4 article about opiate use in the 1800s.
5    A.   Yes.
6    Q.   Was that sent to you by somebody?
7    A.   Yes.  It was sent to me, I believe,
8 by Rich Marountas.  Yeah.
9    Q.   Okay.  What do you remember about
10 that article?
11   A.   I was struck by the fact that --
12 you know, the similarity in the messages being
13 given around the extent to which it may or may
14 not be addictive, and health officials talking
15 about the fact that it should not be
16 distributed in the way that it was, and for
17 things that it was used for.
18        And, yeah, I found that very
19 interesting that here, all these decades later,
20 we find ourselves in what appears to be a
21 similar situation.
22   Q.   Well, not just decades, 100
23 years --
24   A.   Yeah.
25   Q.   -- right?

16 (Pages 58 - 61)

Page 62

1    A.   Yes.
2    Q.   Since the article, right?
3    A.   Yes.
4    Q.   And so, certainly -- in fact, that
5  article was written -- I believe I've seen it,
6  from Mr. Marountas --
7    A.   Okay.
8    Q.   -- and we've talked about it with
9  Ms. Skoda --
10    A.   Uh-huh.
11    Q.   -- was written in the early 1900s.
12  Do you recall that?
13    A.   Well, I knew it was a long time
14  ago.  I couldn't tell you that.  I don't know
15  the year.
16    Q.   Okay.  But that article wasn't
17  written in the last few years?
18    A.   That's correct.
19    Q.   It's an old article?
20    A.   Yes.
21    Q.   And they're talking about opioid
22  addiction whatever time point that article was
23  written; would you agree?
24    A.   Yeah.
25        MS. KEARSE:  Object to form.

Page 63

1    A.   Yes.
2    Q.   Yeah.  I want to move on now to
3  talk very briefly -- and I think this will be
4  quick based on the discussion we just had --
5  your employment with Summit Public Health and
6  prior to coming to Summit Public Health.
7        MR. NAEEM:  So can we mark this?
8        - - - - -
9        (Thereupon, Deposition Exhibit 2,
10        Tonya A. Block Curriculum Vitae,
11        SUMMIT_001702613 to 001702614, was
12        marked for purposes of
13        identification.)
14        - - - - -
15    Q.   Ms. Pollard [sic] I've had marked
16  as Deposition Exhibit 2 a copy of a resume or
17  curriculum -- curriculum vitae we found.  It's
18  not current, but it was in -- it was attached
19  to one of the documents that was submitted for
20  one of the programs a number of years ago.
21        You testified earlier that at the
22  time of the flood, for example, you were the
23  director of community health.
24    A.   Yes.
25    Q.   Your title has changed since then;

Page 64

1  is that -- that fair?
2    A.   Yes.
3    Q.   Why don't you -- would you please
4  let us know, what's your current title with
5  Summit Public Health?
6    A.   I'm the assistant health
7  commissioner.
8    Q.   And could you give us, generally,
9  an overview of what your responsibilities are
10  as the assistant health commissioner?
11    A.   I supervise the five directors for
12  the various divisions that -- those are --
13  that's my primary responsibility.
14        Very recently, I've picked up human
15  resources.
16        Yeah, those are the...
17    Q.   And you report directly up to the
18  health commissioner?
19    A.   Yes.
20    Q.   And that is Donna Skoda?
21    A.   Yes.
22    Q.   How long have you been the
23  assistant health commissioner?  I'm sorry.  I
24  don't know if I asked.
25    A.   Two and a half years, maybe.

Page 65

1    Q.   So roughly since 2016?
2    A.   Yes.
3        - - - - -
4        (Thereupon, Deposition Exhibit 3,
5        Document Titled "Summit County
6        Public Health Organization Chart,
7        January 2017," SUMMIT_001698224, was
8        marked for purposes of
9        identification.)
10        - - - - -
11    Q.   Ms. Skoda -- I'm sorry.  Ms. Block,
12  I'm handing you what's marked as Deposition
13  Exhibit 3.  We may refer to it, we may not, as
14  we go along.
15        But turning back to Deposition
16  Exhibit 2, what was -- prior to 2016, what --
17  what role did you have with Summit Public
18  Health?
19    A.   I was the director of community
20  health.
21    Q.   And can you describe for the jury
22  what the community health division -- what role
23  it has in the Summit County area?  Or within
24  Summit Public Health?
25    A.   Yeah.  That division was made up of

17 (Pages 62 - 65)

Page 66

1 various programs that are public-facing, for
2 the most part.  Primarily social services.  And
3 at that time, it also included our clinic
4 services.  Those were combined.  So that was
5 everything from early childhood immunizations,
6 home visitation, the STARS Program.  We have
7 aging services, adult protective services, TB.
8 Yeah, lots of clinic and community health
9 services.
10    Q.   Okay.  And would -- could we add to
11 that list substance abuse-related services?
12    A.   Yes.  Sorry.
13    Q.   That's -- that's fine.
14        So there -- there could be
15 prevention-type services?
16    A.   Yes.
17    Q.   And that would be within that
18 division?
19    A.   Yes.
20    Q.   And then there could be
21 treatment-type services as well, correct?
22    A.   Correct.
23    Q.   And that would be within that
24 division?
25    A.   Yes.

Page 67

1    Q.   All right.  And -- and what I want
2 to try to do is focus strictly on the structure
3 within Summit Public Health that relates just
4 to the provision of substance abuse-type
5 services.
6    A.   Okay.
7    Q.   Is there any of the other divisions
8 in which substance abuse services are provided?
9    A.   The only thing that I can think of
10 is environmental health does most of the
11 D.U.M.P. program.
12    Q.   And prior to becoming assistant
13 health commissioner, did you have any oversight
14 over any of the operations of the environmental
15 health division?
16    A.   No.
17    Q.   Do you know -- I don't recall if we
18 talked about this, but how long has Summit
19 County Public Health been operating the
20 D.U.M.P. program?
21    A.   I don't know.  If I -- if I had to
22 guess, I would say five years.  Four or five
23 years.
24    Q.   Okay.  Certainly prior to you
25 becoming assistant health commissioner.

Page 68

1    A.   Yeah.  I believe so, yes.
2    Q.   Who is that -- who is currently the
3 director of environmental health?
4    A.   Her name is Tonia Burford.
5    Q.   Tonia Burford?
6    A.   B-u-r-f-o-r-d.
7    Q.   I lose track of the things we talk
8 about, and we're only an hour in.
9        But do you know where the revenue
10 comes to pay for the D.U.M.P. program?
11    A.   I do not.
12    Q.   As part of your role as assistant
13 health commissioner, are you responsible for
14 working with the individual division directors
15 to establish their budgets?
16    A.   Yes.
17    Q.   How does that process work?
18    A.   On an annual basis, the directors
19 are required to take a look at what their
20 staffing and programmatic needs are going to be
21 for the following year, as compared to the
22 prior year.  They also look at areas in which
23 they'd like to expand services, and then they
24 each put in an amount that they would like to
25 have allocated for the following year.

Page 69

1        And then there's a process of
2 debating, because there's only so much funding
3 available, prioritizing, revising, and
4 ultimately -- yeah, that budget is approved,
5 eventually.
6    Q.   Okay.  Are you part of that process
7 of prioritizing and -- and finalizing the
8 individual division budgets as assistant health
9 commissioner?
10    A.   I sit in on those -- I sit in on
11 those meetings.  A lot of that is conversation
12 that is between the director of admin and our
13 fiscal manager.
14        I was -- I'm more involved with
15 areas that they'd like to expand into.  They
16 wanted to talk about expanding into MAT.  They
17 wanted to talk about expanding our solid waste
18 program, things like that.  Whether or not
19 there would need to be more staffing, where
20 they're going to get the funding from, is the
21 need really there, those types of things.
22        But I am not going through their
23 budgets line by line.  Yeah.
24    Q.   Okay.  You -- you would be part of
25 the process, though, of that ongoing setting of

18 (Pages 66 - 69)

Page 70

1 the final budget?  At least --
2     A.   Yes.
3     Q.   -- sitting in is what you said,
4 right?
5     A.   Yes, I sit in.
6     Q.   And you get more involved if
7 somebody -- for example, the director of
8 environmental health says, "We want to put ten
9 more D.U.M.P. boxes around the community and we
10 need more money," that's something that, for
11 example, you would get more involved in?
12     A.   If she was saying she needed more
13 money, yes.
14     Q.   You said the director of
15 administration was involved in these
16 discussions?
17     A.   He is involved with the discussions
18 with the direct- -- with the other directors.
19     Q.   And what is his name?
20     A.   Eric Seachrist.
21     Q.   How long has he been in that
22 position?
23     A.   Maybe two years.
24     Q.   And --
25     A.   Maybe three.

Page 71

1     Q.   -- do you know who his predecessor
2 was?
3     A.   Heather Pierce.
4     Q.   Is she still with Summit Public
5 Health?
6     A.   She is.
7     Q.   What is her current role?
8     A.   She's a deputy health commissioner.
9     Q.   How long did she have the director
10 of administration role prior to Eric Seachrist?
11     A.   A long time.  Maybe -- maybe eight
12 years.  Maybe longer.
13     Q.   Okay.  Do you think it was prior to
14 2011?
15     A.   Well, at one point she was the
16 fiscal officer, so she moved from fiscal
17 officer to director of admin, but she was still
18 responsible for overseeing fiscal.  So I don't
19 know the exact number of years.
20     Q.   Okay.
21     A.   Was that your question?
22     Q.   I'll ask it a different way to see
23 if I can trigger your -- trigger your memory.
24     A.   Okay.
25     Q.   You're -- you're certainly -- you

Page 72

1 were employed by Summit Public Health at the
2 time it merged --
3     A.   In 2008.
4     Q.   -- with -- right.  So at the time
5 of the merger with Akron Health Department in
6 2011 --
7     A.   Yes.
8     Q.   -- you went through that process?
9     A.   Yes.
10     Q.   Do you know, was Heather Pierce the
11 director of administration at that time or the
12 fiscal officer?
13     A.   She, I believe, was the director of
14 admin.
15     Q.   All right.  So who's the current
16 fiscal officer for Summit Public Health?
17     A.   Angela Burgess.
18     Q.   Do you know how long she's had that
19 position?
20     A.   Maybe a year.
21     Q.   And who preceded her in that role?
22     A.   Eric Seachrist.
23     Q.   Okay.  And was he in that
24 position -- well, let me just ask.  How long
25 was he in that position?

Page 73

1     A.   I believe he was hired into that
2 position and -- maybe five years.  Maybe four
3 years he was in that -- maybe he was in that
4 position three years, and he has been the
5 director of admin for -- you know, since that
6 time.  I believe.  I didn't...
7     Q.   And do you know who preceded him as
8 fiscal officer?
9     A.   Andy Doyle.
10     Q.   D-o-y-l-e?
11     A.   Yes.
12     Q.   Is Mr. Doyle still employed by
13 Summit Public Health in any function?
14     A.   He died.
15     Q.   Oh.  I'm sorry to hear that.
16         Do you know, was he -- and using
17 again the Akron Health Department merger as a
18 reference, do you think he was the fiscal
19 officer at that time?
20     A.   Yes.  And he had been employed by
21 the Akron Health Department.
22     Q.   Oh, okay.  So he came over with the
23 merger?
24     A.   Yes.
25     Q.   So we were talking about the --

19 (Pages 70 - 73)

Page 74

1 essentially, we were talking about the
2 budgeting process, and for the most part what I
3 think I heard you say -- and I'll ask you to
4 correct me if I'm wrong -- but the individual
5 division directors come up with a proposed
6 budget that they work with the director of
7 administration and the fiscal officer to -- to
8 get approved?
9     MS. KEARSE:  Object to form.
10    A.   Sort of -- they hammer out the
11 numbers.
12    Q.   Okay.  Who has ultimate -- who
13 makes the ultimate decision as to what the
14 division's budget will be?
15    A.   Donna makes the recommendation to
16 the board.
17    Q.   So let's just talk generally about
18 how that process is finalized.
19        There's a negotiation process with
20 division directors, the director of
21 administration, the fiscal officer.
22    A.   Yes.
23    Q.   And then a recommendation is
24 provided to Ms. Skoda?
25    A.   Yes.

Page 75

1    Q.   And then Ms. Skoda makes --
2    A.   Well, a request.
3    Q.   Okay.  So -- so they hammer out
4 these requests from each of the individual
5 divisions --
6    A.   Uh-huh.
7    Q.   -- and then it goes to Ms. Skoda?
8    A.   Yes.
9    Q.   And then, ultimately, she sends it
10 to the board, who approves it?
11    A.   Yes.
12    Q.   Okay.
13    A.   Well, they approve that we can take
14 it to the budget commission.  I believe that's
15 how it goes.
16    Q.   Okay.  So there's another step.
17    A.   Yes, yes.
18    Q.   Okay.  So -- so the board approves
19 the proposal, but ultimately, the budget
20 commission has final say?
21    A.   On approving our budget, yes.
22    Q.   Is that part of Summit County
23 council?
24    A.   Well, I don't know if they're
25 part -- they're not -- no, I don't believe it's

Page 76

1 made up of council members.  It's the --
2 believe the fiscal administrator and there are
3 other members.  I don't know how that team is
4 made up.
5    Q.   Okay.
6    A.   What -- who's -- what it's
7 comprised of.  I've only been to two, yeah.
8    Q.   But it's the Summit County
9 government?
10    A.   Correct.
11    Q.   Yeah.  To your knowledge, at any
12 point in time has Ms. Skoda rejected any of the
13 proposed budgets that were sent to her by the
14 director of administration, fiscal officer, and
15 division directors?
16    A.   You mean just a flat-out rejection?
17    Q.   Just saying, "It's not good enough.
18 Go back and do it again."
19    A.   Well, yeah, she does that
20 frequently when they come in too high.  And
21 every year they come in -- we -- we come in too
22 high because it's sort of a -- almost a wish
23 list of these other things that we'd like to
24 do.
25    Q.   Okay.  Well, let's talk about

Page 77

1 your -- your role as director of the community
2 health division.  Do you recall that happening
3 to you when you were the director?
4    A.   Yes.
5    Q.   So you basically go back to the
6 drawing board, try to cut numbers --
7    A.   Uh-huh.
8    Q.   -- and then the process starts
9 again?
10    A.   Uh-huh.
11        MS. KEARSE:  Object to form.
12    A.   Well, yes.
13    Q.   Do you recall any -- well, and
14 let's make sure we're on the same page.
15        You became director of community
16 health services in 2007?
17    A.   Let me look at this, because this
18 doesn't -- these years don't seem right to me.
19        Okay.  I'll go with that.  That
20 number -- that year seems wrong to me, though,
21 as is my address.  So I don't -- you know, so.
22    Q.   Yeah.  Yeah, no, and certainly
23 this -- this is not a current copy of your --
24    A.   Yeah.
25    Q.   -- CV, correct?

20 (Pages 74 - 77)

Page 78

1    A.   Okay.  Yes.  No, it isn't.
2    Q.   I'm really mostly interested in the
3  time period from 2011 to the present.  So --
4    A.   Okay.
5    Q.   -- can we at least agree --
6    A.   Yes.
7    Q.   -- that you were director of the
8  community health division in 2011?
9    A.   Yes.
10    Q.   Up until you took your current role
11  as assistant health commissioner in 2016?
12    A.   Yes.
13    Q.   And is it fair for me to state that
14  prior to 2011, Summit Public Health did not
15  provide any substance abuse-related services to
16  citizens in Summit County?
17    A.   Yes.
18    Q.   That was being done by the Akron
19  Health Department?
20    A.   That's correct.
21    Q.   And in the merger, essentially,
22  Akron Health Department, their -- their
23  programs became part of Summit Public Health?
24    A.   Yes.
25        MS. KEARSE:  Object to form.

Page 79

1    Q.   All right.  So after 2011, do you
2  remember any discussions about -- well, let me
3  strike that and ask it again.
4        Between 2011 and 2016, while you
5  were director of the community health division,
6  do you remember any discussions with Ms. Skoda
7  or her predecessor, Mr. Nixon, about budget --
8  about the budget for substance abuse services?
9    A.   We've had -- I recall having
10  conversations about that, yeah.
11    Q.   Okay.  And were any of the
12  discussions related to increasing the
13  division's budget for provision of substance
14  abuse-related services?
15    A.   That was not the context of the
16  conversations.
17    Q.   Okay.  So, certainly, there would
18  have been discussions about the programs
19  themselves?
20    A.   Right.  But the way that the
21  counseling services budget is set up is each
22  year is a distinct year, and there's a con- --
23  there has historically been a contract in place
24  with the ADM Board, and there has been specific
25  categories of billing that goes through Ohio

Page 80

1  Medicaid, and then there -- if an individual
2  has private insurance, perhaps we bill those
3  insurances as well.
4        At the end of the year, we close
5  out -- it's my understanding the way that the
6  counseling budget goes is that those program
7  years are closed out, but there has
8  historically been funds left over, either
9  because we had fewer staff to charge, you know,
10  salaries to, for any number of reasons, the
11  productivity rate was higher, and then they
12  would start the next year with a new budget.
13        So there was the opportunity to
14  pull from prior year budgets' funds that had
15  been -- I'm using air quotes here -- "earned"
16  for the work that was done to support expanding
17  AOD services.
18    Q.   Was that a normal occurrence?  I
19  understand it's part of the budgeting process,
20  right?  You don't know in advance of the year
21  of the budget how much money you're actually
22  going to generate.
23    A.   Yes.
24    Q.   So what I'm hearing is that there
25  were years where there were excess funds at the

Page 81

1  end of the year?
2    A.   There were funds that had not been
3  utilized.
4    Q.   And so they were carried over to
5  the budget for the -- for the next year?
6    A.   No.
7    Q.   No?
8    A.   They were sitting in that program
9  year, and it wasn't until more recent years
10  that we tapped into those funds.  You know,
11  because the organization -- I don't want to
12  call it a firm policy, but the position we have
13  is that if funds are earned on a program, even
14  if they're in excess of what we needed to
15  operate, those funds should be used to continue
16  to support that program.
17    Q.   Okay.  And I do want to make that
18  point clear.  Those "earned," in air quotes,
19  monies weren't transmitted to, for example, the
20  immunization program.
21    A.   That's correct.
22    Q.   They stayed within the program.
23    A.   Yes.
24    Q.   So if, for example, the counseling
25  services generated this additional revenue --

21 (Pages 78 - 81)

1    A.   Uh-huh.
2    Q.   -- it would stay within counseling
3  services to be spent by them?
4    A.   Correct.
5    Q.   All right.  I didn't understand
6  what you meant by they were sitting in an
7  account.  Were they accruing over subsequent
8  years?
9    A.   They were -- yes.
10    Q.   All right.  Let's start in 2011.
11  Well, let's start out broader.  Between 2011
12  and 2016, do you recall any years where there
13  was, at the end of the budget year, earned,
14  additional funds from the provision of
15  counseling services?
16    A.   I know that there were.  I can't
17  tell you, year by year, what they were.  The
18  amounts, any of it, I don't know.
19    Q.   Okay.  All right.  So I certainly
20  appreciate you can't tell me the exact number.
21    A.   Yes.
22    Q.   Let's start out broad and see
23  how -- how narrow we can get, based --
24    A.   Okay.
25    Q.   -- on your recollection.

1    A.   Okay.
2    Q.   Were there any years between 2011
3  and 2016 where there was a revenue deficit?
4    A.   No.
5    Q.   Do you think that in every year
6  between 2011 and 2016, there was these
7  additional funds at the end of the budget?
8    A.   I -- I don't believe that we
9  were -- that there was a deficit in any year.
10  I can't say how much excess there was, but I
11  don't believe there was a deficit.
12    Q.   Okay.  Do you think in every year
13  between 2011 and 2016, that there was
14  additional funds left over from counseling
15  services?
16    A.   I don't know the answer to that.
17    Q.   Okay.  And -- and I have to ask.
18    A.   Yes.
19    Q.   In 2011, do you know whether there
20  was excess funds left over?
21    A.   That, I don't -- I don't know.
22  That was a transition year, and the way that
23  things were set up, I -- I don't know.  We had
24  a lot more counselors back then.  I really have
25  no idea.

1    Q.   Okay.  Let's actually work,
2  perhaps, backwards --
3    A.   Okay.
4    Q.   -- maybe from more recent to -- to
5  farther back.
6       In 2016, your last year -- and I
7  don't know if there was some overlap, so
8  correct me if I'm wrong -- but in 2016 was
9  there excess funds from the counseling services
10  division -- or counseling services provided
11  by --
12    A.   You mean at the end of '16 or going
13  into '16?
14    Q.   At the end of '16, were there extra
15  funds?
16    A.   Yes.
17    Q.   Okay.  At the end of 2015, so going
18  into 2016, were there extra funds?
19    A.   Well, let me just, as a point of
20  clarification, if there were funds that were
21  left over in 2015, when you're asking were
22  there funds left over in 2016, those could be
23  considered part of the funds that were left
24  over.  So I just -- are you asking at the end
25  of every year was there a specific amount from

1  that year, or do you mean just --
2    Q.   No.  I'm going to go back --
3    A.   -- in total?
4    Q.   Yes.  I'm going to go back every
5  year and ask you just like we just did --
6    A.   Okay.
7    Q.   -- and I understand if you don't
8  know the amounts --
9    A.   Okay.
10    Q.   -- and if there's somebody -- I'm
11  also going to ask you --
12    A.   You mean specifically -- I'm sorry.
13  I interrupted you.
14    Q.   Yeah.  No, I'm just, you know -- so
15  I guess what I think you're explaining to me,
16  and correct me if I'm wrong --
17    A.   Yes.
18    Q.   -- is that there's a budget --
19    A.   Yes.
20    Q.   -- and at the end of the year
21  sometimes you spend less than your budget;
22  sometimes you spend more?
23       MS. KEARSE:  Object to form, and
24  I'm not sure that that was the testimony.
25    Q.   What we're talking about is that

Page 86

1 those counseling services don't spend to budget
2 for certain years.
3 　　　MS. KEARSE:  Object to form.  It
4 misstates testimony.
5 　　Q.　Is that -- is that your
6 understanding, Ms. Block?  Is that what we've
7 been talking about?
8 　　A.　There have been years where we
9 brought in more money than we expended.
10 　　Q.　Okay.  And 2016 was one of those
11 years we just talked about.  I'm not going to
12 ask you the numbers because you've already said
13 you don't know.  I just -- I want to be able to
14 focus on the years.
15 　　A.　Yes.
16 　　Q.　And I don't want to go back and --
17 　　A.　Okay.  And I have to tell you, I
18 honestly don't know the specific years.  What I
19 know is that there were a number of years where
20 we did not spend down all of the money, so that
21 provided a balance that we had to use.
22 　　　And this is how it -- the reason
23 I'm more familiar with it is because we used a
24 lot of those funds to help set up and establish
25 our MAT clinic.  So I can't tell you which

Page 87

1 years brought in how much more that wasn't
2 spent in any given year.  I just know that
3 there was a balance from prior years.
4 　　Q.　Okay.  And -- and I appreciate
5 that.  I -- I do think we're talking about the
6 same thing --
7 　　A.　Yes.
8 　　Q.　-- but I am going to continue to
9 work backwards --
10 　　A.　Okay.
11 　　Q.　-- just -- just to see what you
12 recall.
13 　　A.　Okay.
14 　　Q.　At the end of 2015, were the -- was
15 there money left over from the revenue
16 generated by counseling services?
17 　　　MS. KEARSE:  Object to form.
18 　　A.　In 2016?
19 　　Q.　'15.  I'm sorry.
20 　　A.　In 2016 was there funds left over
21 from '15?
22 　　Q.　Right -- no.
23 　　　MS. KEARSE:  I believe that was
24 asked and answered.
25 　　　MR. NAEEM:  No, sorry.

Page 88

1 　　　MS. KEARSE:  Yeah.
2 　　　MR. NAEEM:  Yes.  No, that's not
3 what I'm asking.
4 　　　MS. KEARSE:  Why don't we take a
5 break?  It's about 10:30.
6 　　　MR. NAEEM:  Okay.  That's fine.
7 　　　MS. KEARSE:  I think it's getting
8 confusing.
9 　　　MR. NAEEM:  Yeah.  That's fine.
10 　　　THE VIDEOGRAPHER:  We're off the
11 record, 10:28.
12 　　　(A recess was taken.)
13 　　　THE VIDEOGRAPHER:  We're back on
14 the record, 10:59.
15 BY MR. NAEEM:
16 　　Q.　Ms. Block, before we went on break,
17 we'd been talking about unspent funds that were
18 generated out of the Summit Public Health
19 counseling services.
20 　　　MS. KEARSE:  Object to form.
21 　　Q.　And I wanted to finish that
22 discussion before we move on.
23 　　　We had talked about 2016, going
24 back to 2015.  To your recollection, were there
25 unspent funds at the end of the budget year in

Page 89

1 2015 from the revenue generated by the
2 counseling services program?
3 　　　MS. KEARSE:  Object to form.
4 　　A.　And I don't know specifically at
5 the end of each year whether or not there were.
6 I know that there were funds available at the
7 end of 2016 to support program development.  So
8 I --
9 　　Q.　Okay.
10 　　A.　Yeah, I can't tell you --
11 　　Q.　Okay.
12 　　A.　-- specifically.
13 　　Q.　To be clear, you can't tell me one
14 way or the other whether --
15 　　A.　Correct.
16 　　Q.　-- there were no unspent funds at
17 the end of the year or if there were?
18 　　A.　Correct.
19 　　　MS. KEARSE:  Object to form.
20 　　Q.　And you couldn't tell me how much
21 there were for any of those years.
22 　　A.　Per year, correct.
23 　　Q.　Okay.  Now, if I wanted to go find
24 that information, where would I look?
25 　　A.　Angela Burgess probably could.

23 (Pages 86 - 89)

Page 90

1    Q.   Are -- is that information
2  contained in any of the budget documents that
3  are created by the division directors for their
4  budget year?
5    A.   No.  What they are -- would be
6  requesting is they would request general
7  revenue dollars to support programs where there
8  was a deficit.
9       Historically, with the counseling
10 program, the way that that was set up is that
11 they -- they needed to earn the full amount.
12 Each individual counselor knew what they needed
13 to produce, the number of units they needed to
14 produce.  So there -- there wasn't a lot of --
15 there wasn't a huge request for additional
16 dollars in that area.
17      What we -- you may have seen on any
18 given year is administrative support, like
19 secretary support, support for the supervisor.
20 Yeah.  I don't -- not the director level, but
21 supervisor and administrative support, more
22 likely than not.
23    Q.   Okay.  And so just a general
24 question about -- and I know you can't tell me
25 what years or how -- how -- how much, but these

Page 91

1  unspent funds are attributable to the -- what
2  you -- are they attributable to what you
3  described as the counselors' unit budget?
4       MS. KEARSE:  Object to form.
5    A.   Well, there's a productivity rate.
6    Q.   Okay.
7    A.   And I think the minimum --
8  nationwide, the minimum standard is 50 percent.
9  Most behavioral health organizations require
10 anywhere from 50 to maybe as high as 70
11 percent.  And depending on any number of
12 factors, including whether or not the counselor
13 did more assessments than they did IOPs, would
14 determine the amount they'd bring in.
15      Plus the -- plus, when you look at
16 the total budget, factors such as, we may have
17 started the year with nine counselors and ended
18 the year with seven.  So that would account for
19 excesses, also.
20      So -- yeah, so there -- there was
21 no -- there's no real standard for predicting
22 how much you're going to need in any given
23 year.  But, typically, it is based on the
24 number of counselors plus the administrative
25 support and any supplies that we might need.

Page 92

1    Q.   Okay.  And you just mentioned a
2  productivity rate, and then you gave examples
3  of percentages.  Those are percentages of what?
4  Percentages of their time spent doing services?
5    A.   Correct.
6    Q.   How does Summit Public Health set
7  productivity rate for its counselors in setting
8  its annual budget?  What percentage rate?
9    A.   Historically, it's been around a 65
10 percent.  Partly because their rate of pay is
11 slightly higher than some of the
12 community-based agencies.  We work 35- -- a
13 35-hour work week.  So, yeah, it has
14 historically been that.
15      But we've recently gone through a
16 transition with the state, this behavioral
17 health redesign, and so it's difficult at this
18 point for us to estimate the level of
19 productivity that will get us to a place where
20 they're covering their costs.
21    Q.   So that's still a work in
22 progress --
23    A.   Yes.
24    Q.   -- is what you're telling me?
25      This behavioral health redesign,

Page 93

1  when -- what year did that take effect?
2    A.   We -- they started talking about it
3  a couple years ago, and it has been a slow
4  rollout.  This is the first full year that it's
5  been in effect.  And we had one meeting with --
6  we've had one meeting with the ADM Board about
7  how we're doing on that.
8    Q.   And is the significance of that
9  because it changes the services that have to be
10 provided?
11   A.   Well, no.  I believe that the
12 services are still the same, but the
13 reimbursement for various types of services has
14 changed, and the amount of time provided to
15 complete those services has changed.  I'm not
16 sure about the specifics of that, but those are
17 two areas that -- you know, that we've had to
18 look at.  And certain things aren't being
19 reimbursed at all, so.
20   Q.   And that behavioral health
21 redesign, does that apply just to substance
22 abuse services or all behavioral health
23 services, including mental health?
24   A.   Well, the state no longer separates
25 AODL from mental health, so it's just

24 (Pages 90 - 93)

Page 94

1 behavioral health.
2     Q.    Okay.  You mentioned the
3 medication-assisted treatment clinic as one of
4 the programs funded with these unspent funds.
5         MS. KEARSE:  Object to form.
6         I don't think that was her term,
7 "unspent funds."  So, Counsel, I just don't
8 want you to keep using a term that --
9         MR. NAEEM:  Okay.
10        MS. KEARSE:  -- I don't think she
11 said that.
12        MR. NAEEM:  Well, let's -- let's be
13 clear, then.
14    Q.    First of all, Ms. Block, when I use
15 the term "unspent funds," do you know what I'm
16 talking about?
17    A.    Prior year program funds.
18    Q.    Okay.  Is that a term that's used
19 within Summit Public Health?
20    A.    "Prior year"?  Yes.
21    Q.    And so in this discussion we've
22 been having, when I started using the word
23 "unspent funds," does that reflect the excess
24 of revenue over budget that we were previously
25 talking about for the years 2011 to 2016?

Page 95

1     A.    That it -- that it represents funds
2 in any given program year that had not been
3 expended fully.
4     Q.    Okay.  Is that -- yeah, that's your
5 understanding.  So when counsel objected that
6 I -- that I had just started using that term,
7 you did understand what that term meant, right?
8     A.    Yes, but that's not -- that isn't
9 what we call it, but I understood the term.
10        MS. KEARSE:  And that was my point.
11        - - - - -
12        (Thereupon, Deposition Exhibit 4,
13        October 2017 E-Mail Chain Re: AOD
14        Dollars, SUMMIT_001716632 to
15        001716633, was marked for purposes
16        of identification.)
17        - - - - -
18    Q.    Ms. Block, take your time to go
19 ahead and review that if you need to, but I've
20 handed you an exhibit that's been marked as
21 Deposition Exhibit 4.
22    A.    Okay.
23    Q.    Do you see that that's an e-mail
24 from Donna Barrett to you dated October 2017?
25    A.    I don't see -- oh, okay.  Up at the

Page 96

1 top, yes.  "As an FYI," yes.
2     Q.    Okay.  Who is Donna Barrett?
3     A.    She's the director of community
4 health.
5     Q.    And that was the position you had
6 previous to your current role?
7     A.    Yes.
8     Q.    Is she the current -- I think we've
9 said she is the current director to this day?
10    A.    She is, yes.
11    Q.    And you'll see the subject is "AOD
12 Dollars"?
13    A.    Yes.
14    Q.    All right.  Within the string, at
15 the bottom of page 1, you'll see an e-mail from
16 Donna Barrett to Craig Thompson --
17    A.    Yes.
18    Q.    -- dated October 2017.
19    A.    Yes.
20    Q.    Who is Craig Thompson?
21    A.    He is the account clerk for the
22 adult -- the AOD program, the counseling
23 program.
24    Q.    And Jackie Pollard, who is Jackie
25 Pollard?

Page 97

1     A.    Jackie is the assistant --
2 assistant director for counseling services.
3     Q.    And you see she was cc'd on this
4 e-mail to -- or from Donna Barrett to Craig
5 Thompson down at the bottom?
6     A.    That Jackie was?  Yes.
7     Q.    Yes, right.  And the subject again,
8 "AOD Dollars"?
9     A.    Yes.
10    Q.    And we're talking about counseling
11 services --
12    A.    Yes.
13    Q.    -- alcohol and other drugs?
14    A.    Yes.
15    Q.    And part of Donna's e-mail to
16 Mr. Thompson says, second line, "We need to
17 create a budget to spend down the
18 past year's unspent funds."
19        Do you see that?
20    A.    Yes, yes.
21    Q.    Okay.  That's a term that
22 Ms. Barrett used to discuss AOD dollars with
23 other members of her division; you'd agree?
24    A.    She did.
25    Q.    And you certainly -- this is --

25 (Pages 94 - 97)

Page 98

1 you'd agree that this is the concept we've been
2 talking about for the last few minutes?
3    A.   Yes.
4    Q.   Okay.
5    A.   That isn't how I refer to it,
6 though.
7    Q.   Okay.
8    A.   That's not how Donna Skoda would,
9 either.
10    Q.   Sure.  But -- but when I used that
11 phrase --
12    A.   Yes, I understand.
13    Q.   -- you understood it?
14    A.   Yes.
15    Q.   And when you received this e-mail
16 from Ms. Barrett, you understood what they were
17 talking about?
18    A.   Yes.
19         MS. KEARSE:  And, again, she's
20 allowed to explain herself, that that's not her
21 terminology they use.  And that was really --
22 thinking you need to lay the foundation.
23         MR. NAEEM:  Anne, I was just
24 responding to your objection.
25         MS. KEARSE:  Right.  I'm just --

Page 99

1 notably, that that's not her terminology.
2    Q.   All right.  What terminology would
3 you use, Ms. Block?
4    A.   I use "prior year program funds."
5    Q.   Is that the same term Donna Skoda
6 would use?
7    A.   I would think so, yes.
8    Q.   So other than the MAT clinic, are
9 there any programs that have been introduced
10 and funded based on prior year program funds
11 from the AOD services?
12    A.   Syringe exchange was supported by
13 some of those dollars.  I believe we charged a
14 portion of Dr. Erme for some of the development
15 of Project DAWN, and also for the work we did
16 with naloxone and training the first
17 respond- -- well, the first responders, fire
18 and police.  EMS.
19    Q.   Believe it or not, Ms. Block, we've
20 been talking about your CV.
21    A.   Uh-huh.
22    Q.   Very quickly, prior to com- --
23 prior to coming to Summit County Public Health,
24 you were employed by Cuyahoga County Board of
25 Health?

Page 100

1    A.   Yes.
2    Q.   Roughly what years were you
3 employed by Cuyahoga County Board of Health?
4    A.   About 1997 until -- no, not -- I'm
5 sorry.  I was at Metro from '91 to '97, and
6 Cuyahoga County from '98 until I came to the
7 health district -- well, came to Summit County
8 Public Health August of 2005, it looks like.
9    Q.   Okay.  Did any of your employment
10 with Cuyahoga County Board of Health have
11 anything to do with providing substance abuse
12 services to members of the public?
13    A.   In Cuyahoga County?  No.
14    Q.   Is that something that Cuyahoga
15 County Board of Health did during the time of
16 your employment?
17    A.   No.
18    Q.   So -- strike that.
19         Do you know why Cuyahoga County
20 Board of Health didn't provide substance abuse
21 services during that time frame?
22    A.   No.
23    Q.   And just so that you and I are on
24 the same page, we've talked about a number of
25 programs that we're going to talk about a

Page 101

1 little bit more, provided through the community
2 health division --
3    A.   Okay.
4    Q.   -- of Summit Public Health.
5         There are no counterpoints to those
6 programs that you're aware of at Cuyahoga
7 County Board of Health?
8    A.   Any of the programs from community
9 health?
10    Q.   Substance abuse-related.
11    A.   Oh, that's correct.
12    Q.   If we can -- if you can look at
13 Deposition Exhibit 3, is this an accurate
14 representation of how Summit Public Health is
15 currently organized?
16    A.   Yes, other than the fact that, as I
17 said, I've recently picked up human resources.
18 But that falls under administrative services,
19 so, yes.
20    Q.   Okay.  And if we look at the
21 community health division, are there any
22 additional substance abuse services that we
23 would want to add to that list that are
24 currently being provided by Summit Public
25 Health?

26 (Pages 98 - 101)

1    A.    Well, I don't see where they have
2  broken out Project DAWN.  It doesn't look as
3  though the syringe exchange program is listed
4  out here specifically.  Our MAT clinic is not
5  listed here specifically.
6    Q.    Okay.
7    A.    But in none of these, I don't
8  believe that in any of these divisions, every
9  single program that we have is listed out.
10    Q.    And to be fair, I'm simply trying
11  to get a starting point for our discussions --
12    A.    Okay.
13    Q.    -- on these services.  So --
14    A.    Okay.
15    Q.    -- currently on the list there's
16  the alcohol drug counseling, there's the
17  prescription drug overdose prevention.
18    A.    Uh-huh.
19    Q.    There's the STARS Program.  And
20  then you just added -- at least I wrote it down
21  and added to the list -- Project DAWN, syringe
22  exchange, and the MAT clinic.
23    A.    Correct.
24    Q.    Is there anything else with respect
25  to the substance abuse services provided by

1  Summit Health that we need to add to this list?
2    A.    There's a recent SAMHSA grant.
3  That is a training for providers and outreach
4  and recovery coaches, I believe.
5        There's -- there are -- there are
6  several other programs that are not listed here
7  related to addiction services.
8    Q.    Okay.
9    A.    I probably couldn't tell you every
10  single one of them.
11    Q.    Let me ask whether they -- would
12  they fall within the general category of
13  prevention or treatment, which are already
14  listed here?
15    A.    Well, depending on how you look at
16  it, yeah, I think that either of them -- any of
17  them could fall into those two -- one of those
18  two categories.
19    Q.    So the SAMHSA grant --
20    A.    Uh-huh.
21    Q.    -- when was that awarded?
22    A.    Very recently.  I'd say within the
23  last month to six weeks -- month to six weeks.
24    Q.    Okay.  So have the programs
25  associated with that grant already begun, or is

1  that for 2019 calendar year?
2    A.    Well, they're in the planning
3  stages:  looking at the staffing needs,
4  evaluation needs, time frame for hiring, that
5  sort of thing.  They're not there yet.
6    Q.    Okay.  And how long does that
7  grant -- how many years does that grant apply?
8    A.    I believe five years.  I haven't
9  read that proposal, though, so.
10    Q.    Yeah.  And, Ms. Block, I certainly
11  understand, and I'm only here to ask you
12  questions --
13    A.    Okay.
14    Q.    -- that you have personal knowledge
15  of.
16    A.    Okay.
17    Q.    If you don't, that's fine.
18    A.    Okay.
19    Q.    We can move on.
20    A.    Okay.
21    Q.    Do you recall how much that grant
22  was for?
23    A.    I believe it's about $500,000 a
24  year.
25    Q.    And I'm sorry.  I didn't write down

1  the two things you said that the grant was
2  going to be used for.  One sounded like
3  training.  I didn't get the other one.
4    A.    For providers.  I think it -- I
5  think -- I believe that it's heavily focused on
6  training for providers.
7    Q.    Is -- what kind of providers are we
8  talking about?
9    A.    Probably, more than anything, it
10  will be nurse practitioners and family practice
11  physicians.  We've had a difficult time
12  recruiting enough psychiatrists.  So, yeah,
13  we're going to have to train the people that
14  are here.  That's going to be nurse
15  practitioners and family practice providers.
16  Maybe adult medicine.
17    Q.    Okay.  And that's training for
18  what?
19    A.    For, hopefully, medicated-assisted
20  treatment.  Some of it will be -- well, for the
21  most part, it's medicated-assisted treatment
22  for this grant.
23        I know that there are -- there's
24  another grant that we have specifically for
25  working with emergency departments to identify

27 (Pages 102 - 105)

Page 106

1 individuals who come through there and do a
2 formal handoff to a counseling program, so that
3 there's a sort of hard stop with their
4 electronic health records.
5    Q.   Okay.
6    A.   So outreach and training for the
7 SAMHSA grant, I believe.
8    Q.   Okay.  As far as the -- the
9 training of providers on medication-assisted
10 treatment, is that to bring them within the
11 Summit Public Health program, or to allow them
12 to -- to provide those services to their
13 patients?
14    A.   Yes.
15    Q.   So --
16    A.   B.
17    Q.   -- as an example, the -- somebody
18 who's trained and now is able to prescribe that
19 and administer it to one of their patients --
20    A.   Yes.
21    Q.   -- there's no longer any connection
22 between that provider and Summit Public Health?
23    A.   Beyond the training?
24    Q.   (Nodding head.)
25    A.   I don't know what that -- I don't

Page 107

1 know the extent to which that connection would
2 continue.
3    Q.   And for the benefit of the jury,
4 can you -- can you let them know what is
5 SAMHSA?  You don't have to --
6    A.   Substance Abuse Mental Health -- A,
7 I don't know what the A is.
8    Q.   Services Agency?
9    A.   Agency, yes.
10    Q.   And so that's a federal government
11 agency?
12    A.   Correct.
13    Q.   And will Summit Public Health be
14 using any general revenue funds to support
15 those two projects you described as being part
16 of the SAMHSA grant?
17    A.   I don't believe so.
18    Q.   If we go back to Exhibit 3, the
19 assistant health commissioner is Tonya Block.
20 You supervise five divisions.  We're talking
21 about the director of community health.  And
22 the current director is Donna Barrett?
23    A.   Correct.
24    Q.   Prior to --
25    A.   Well, and when you put it that way,

Page 108

1 I suppose, yes, because Donna Barrett's salary
2 has historically been taken from general
3 revenue, and Jackie's.  So any work that they
4 did on it would be a GR draw.
5    Q.   And Jackie, you meant Jackie
6 Pollard?
7    A.   Yes.
8    Q.   Yeah, okay.  Other than personnel
9 costs, any general revenue funds that will be
10 used to support the SAMHSA grant programs?
11    A.   No, not that I'm aware of.
12    Q.   Okay.  Who preceded Donna Barrett?
13        Well, we already talked about this.
14 It was you, right?
15    A.   That would be me, yes.
16    Q.   It's a long day for us, too.  We're
17 just getting started.
18        MS. KEARSE:  That is the one thing
19 I told her.  It will be a long day.
20        THE WITNESS:  Yeah.
21        MR. NAEEM:  I'll do my best, Anne,
22 but, you know what I said that last time, and
23 we still didn't get out of here until after
24 6:00, so...
25    Q.   If -- you know, what I'd like to

Page 109

1 do, if possible, is kind of work from top to
2 bottom on revenue or budget --
3    A.   Okay.
4    Q.   -- for Summit Public Health --
5    A.   Okay.
6    Q.   -- and see if that's something that
7 you have knowledge of.
8        And so if we use current year,
9 2018 --
10    A.   Okay.
11    Q.   -- do you know what the current --
12 what -- what the budget is for Summit Public
13 Health, the entire organization?
14    A.   Including grants?
15    Q.   Everything.
16    A.   You mean everything?
17    Q.   Uh-huh.
18    A.   Geez -- I believe between 13 and 15
19 million.
20    Q.   And that's for the whole Summit
21 Public Health, or is that for the division of
22 community --
23    A.   Oh, you mean just for community
24 health?
25    Q.   No, no.  I mean the whole

28 (Pages 106 - 109)

Page 110

1 organization that Donna Skoda runs.
2      A.   Yeah, I think -- I believe it's --
3 or is it 26? 26.
4      Q.   26?
5           And this isn't a math test.  I'm
6 not -- you know, it's -- it's really, again,
7 to -- to your -- to the best of your knowledge.
8           How much of that -- and whether
9 it's a dollar number or a percentage --
10      A.   Uh-huh.
11      Q.   -- if you can give me, is part of
12 the community health division?
13      A.   For 2018?
14      Q.   Yeah.
15      A.   Maybe -- maybe 3.5.  That's an
16 estimate.
17      Q.   Uh-huh.  I understand.  And no one
18 is going to stand up and you, know, hit you
19 with a ruler on your hands --
20      A.   Okay.
21      Q.   -- if you're wrong.
22      MS. KEARSE:  Although, I am going
23 to advise you --
24      Q.   At least I won't.
25      MS. KEARSE:  -- by trying not to --

Page 111

1 you know, not to guess on that, too.
2      MR. NAEEM:  That's fair.
3      MS. KEARSE:  You may not stand up
4 and do that, but someone else may.
5      Q.   One thing, you know, and -- and I
6 know -- I already know I'm going to get an
7 objection for saying this, but one of the
8 things Donna Skoda said at her deposition was
9 that there were certain programs within Summit
10 Public Health that were mandated by the State.
11      MS. KEARSE:  And I'm going to
12 object to -- to form.  And I think the witness
13 already testified she did not read Ms. Skoda's
14 testimony.
15      MR. NAEEM:  Right.
16      MS. KEARSE:  So to the extent, I'll
17 object to the form.
18      Q.   Are there programs that are
19 required by Summit Public Health to be funded
20 and provided because of the State?
21      A.   Yes.
22      Q.   Okay.  Can you describe for me what
23 those are, at a high level, at least?
24      A.   Uh-huh.  Well, we're responsible
25 for sanitation, so certainly restaurant

Page 112

1 inspections, air quality, solid waste, just
2 septic and sewer systems, water quality,
3 tuberculosis, STDs, immunizations, emergency
4 preparedness, lead testing, vital statistics.
5 That's all I can think of right now.
6      Q.   And that's perfectly fine.
7      A.   Okay.
8      Q.   Let me -- let me ask a related
9 question, and that is, is there anything listed
10 under services of the community health
11 department that are mandated by the State?
12      A.   Well, adult protective services is.
13      Q.   Anything else you're --
14      A.   Well, I'm just thinking about it,
15 because we have been allocated funds by the
16 state to perform certain activities around
17 syringe exchange -- rather, not syringe
18 exchange, but naloxone and Project DAWN.  It's
19 not written into Revised Code, but the State
20 has -- that responsibility has been devolved
21 down from the state.
22      Q.   Okay.  Well, let me -- let me
23 ask -- let me ask a different way.
24           Certainly Summit Public Health has
25 to provide services related to grants awarded

Page 113

1 by the State of Ohio?
2      A.   Yes.
3      Q.   All right.  But if those grant
4 funds weren't -- hadn't been awarded, would
5 Summit Public Health be required to provide
6 Project DAWN facilities?
7      A.   That decision would have been left
8 to the health commissioner.  So, for example,
9 before the legislation changed, we did not have
10 the authority to establish a syringe exchange
11 program without declaring a state of emergency,
12 but the health commissioner at the time decided
13 that's what was going to happen, so we moved
14 forward.  So it wasn't mandated by the State at
15 the time, but it's something that, at the local
16 level, every health commissioner has the
17 responsibility or authority to make those
18 determinations.
19      Q.   And is that the same for what
20 happened with Project DAWN?
21      A.   Project DAWN was -- hmm, let me
22 think.  Do you mean that we decided to do it at
23 the local level before it was funded by the
24 State?
25      Q.   Does the State mandate that Summit

29 (Pages 110 - 113)

Page 114

1 Public Health provide Project DAWN services to
2 citizens in Summit County?
3      A.   Well, they allocate funds for us to
4 do it.
5      Q.   And once you get the funds, you
6 have to provide the services.
7      A.   Correct.
8      Q.   But if the State didn't provide the
9 funds, would someone have --
10      A.   We would have to make a decision at
11 the local level as to whether or not we were
12 going to do it.
13      Q.   So I -- we were talking about
14 services in the community health division, and
15 I think the only one you said mandated by the
16 State was adult protective services.
17           For all of those -- for that and
18 for the other list you gave me that are
19 mandated by the State, does the State provide
20 revenue for those?
21      A.   No, not all of them.
22      Q.   What are the other sources of
23 revenue to pay for, for example, childhood
24 immunizations?
25      A.   Oh, they do provide funding for

Page 115

1 that.  But, as an example, they don't provide
2 funding for food safety.  We set fees for that
3 based on a cost methodology, number of staff we
4 have, the number of restaurants that need to be
5 inspected, things of that nature.
6      Q.   So it's program by program?
7      A.   Yes.
8      Q.   Okay.  Generally, would it be
9 accurate to state that it's either paid for by
10 general revenue, grants, or fees.
11      A.   Or contracts.
12      Q.   Contracts.  What's an example of a
13 contract that --
14      A.   Well, we've got the contract with
15 the ADM Board, for example, that we bill
16 against.  We have -- we, in any given year,
17 might get contracts with, let's say, a
18 community foundation to support some of the
19 coalition work that we have.  I think of
20 contracts that we've got now, any number of
21 contracts come through.
22      Q.   And when we looked at Deposition
23 Exhibit 1, I thought we agreed that those
24 contracts were accounted for as grants in the
25 line item?  Page 4 of Exhibit 1.

Page 116

1      A.   Well, the ADM was.
2      Q.   Okay.
3      A.   Isn't that what you asked me about
4 back towards the --
5      Q.   I did at the time, right.
6      A.   Okay.  But it's not the only
7 program that we may have a contract for.
8      Q.   Well, what -- what line item
9 would -- other -- other than grants, would
10 contracts fit into?
11      A.   I'm sorry.  Would you say that
12 again?
13      Q.   Yeah.  So we're looking at page
14 4 --
15      A.   Yes.
16      Q.   -- of Exhibit 1 --
17      A.   Yes.
18      Q.   -- and the revenue line items.
19 You're right that we did talk about the ADM
20 contract being within the grants line item.
21      A.   Uh-huh.
22      Q.   I'm just saying, what other line
23 item would --
24      A.   A contract fall into?
25      Q.   -- a contract fall into?

Page 117

1      A.   I see.  Okay, yes.  Based on the
2 way it's set up here, that's correct, grants.
3      Q.   Within the community health -- we
4 were talking about 2018.  You said roughly the
5 community health budget was 3.5 million.
6           Do you know how much of that
7 relates to substance abuse-related services
8 versus any other things you're providing?
9      A.   Uh-huh.  I don't.  I don't want to
10 guess.  I'm sorry.  Angela could tell you that,
11 though.
12      Q.   And in the -- in the -- budget
13 documents that are worked up by the division
14 directors, would -- would that level of detail
15 be provided?
16      A.   No.  There's just --
17      Q.   Program related?
18      A.   There's just -- so in those budgets
19 that they're presenting, it list out the total
20 program cost.  It will ask for the general
21 revenue draw and just give a lump sum
22 balance.  So the balance of what they're asking
23 for in general revenue and the total amount for
24 the budget is a number, but that number could
25 be made up of multiple program funding sources.

30 (Pages 114 - 117)

Page 118

1 So, no.
2     Q.    Okay.  So what would you call those
3 documents that are used in that process that
4 the division director produces?  Is there a
5 formal spreadsheet or a formal --
6     A.    Well, they --
7     Q.    -- document?
8     A.    Yeah.  They will get a template for
9 a salary projection so that they can plug the
10 staff in to determine what the costs are going
11 to be for the upcoming year.  They get
12 information about charges for -- each of them
13 gets charged a percentage of their total budget
14 for facilities and electricity, and maybe IT,
15 maybe not.  You know, in some years we charge
16 it one way.  On other years, we charge it a
17 different way.
18         But at -- those administrative
19 costs, they get all of that information.  They
20 get information about the benefits packet and
21 whether or not there's going to be an increase
22 for medical insurance and things of that
23 nature.  So they're given all of that
24 information, and that's what they use to
25 determine their costs for the following year.

Page 119

1     Q.    Okay.  And ultimately, when the
2 health commissioner goes to the board to
3 present a budget, is there a formal document
4 for that?
5     A.    Yes.  It's a -- yes.
6     Q.    Is it that spreadsheet we just
7 looked at, or is it --
8     A.    It's the -- yeah.
9     Q.    Okay.  So, for example, Exhibit 1
10 is a presentation that would be given to the
11 board?
12     A.    Yes.  And they -- and this is just
13 an overview.  They more than likely get a far
14 more detailed in their packet, in their board
15 packet.  This is just what's, you know,
16 reviewed with finance and personnel.
17     Q.    But there is -- there is a document
18 that's provided to the board that allows them
19 to go through the expenses being requested?
20     A.    Yes.
21     Q.    Okay.  On a general revenue basis,
22 do you know how much money Summit Public Health
23 provides for the provision of substance abuse
24 services?
25     A.    I don't.  Angela would know that.

Page 120

1     Q.    Would you agree with me that the
2 majority of funds used for substance abuse
3 services come from ADM?
4         MS. KEARSE:  Object to form.
5     A.    I -- I don't know that I could
6 agree that a majority -- I couldn't agree or
7 disagree.  I know it's primarily -- it's split
8 three ways, for the most part.  That would be
9 the ADM Board, Medicaid, and private insurance.
10     Q.    Which, when you say it that way,
11 suggests to me that no general revenue is
12 provided for --
13     A.    The counseling services?
14     Q.    -- any substance abuse-related
15 services.  We can talk about program level,
16 too, and we will.
17     A.    Uh-huh.
18         MS. KEARSE:  Object to form.
19     Q.    But I was simply asking all
20 substance abuse-related programs.
21     A.    Oh, I thought you meant counseling
22 services when you said ADM.
23     Q.    Well, okay.  Then strike that and
24 let me ask it.
25         Other than ADM, Medicaid, and

Page 121

1 private insurance, are there any sources of
2 funds used for the provision of counseling
3 services?
4     A.    So could you define "provision"?
5 Because as I said, we covered Jackie and Donna
6 Barrett and the medical director with general
7 revenue services, but they don't provide direct
8 counseling services.  So when you say provision
9 of services, I -- I equate that to a counselor
10 providing services.
11     Q.    Okay.  Other than Dr. Erme, Jackie
12 Pollard, and Donna Barrett --
13     A.    Uh-huh.
14     Q.    -- and their salaries and benefits,
15 is there any other general revenue used to
16 support the counseling services provided by
17 Summit Public Health?
18     A.    If there is, I don't know.  Angela
19 could tell you more.  She could give you a much
20 more accurate number than I could.
21         - - - - -
22         (Thereupon, Deposition Exhibit 5,
23         Document Titled "Summit County
24         Public Health FY2018 Funding
25         Application Summary,"

31 (Pages 118 - 121)

Page 122

1         SUMMIT_000077684 to 000077696, was
2      marked for purposes of
3      identification.)
4         - - - - -
5      Q.    Okay.  Ms. Block, my intent is not
6  to belabor the point, but I'm handing you
7  what's been marked as Deposition Exhibit 5.
8  And do you recognize this as a portion of the
9  application for revenue from ADM for fiscal
10 year 2018?
11     A.    I do not.  But I didn't look at
12 that at all.
13     Q.    Okay.  That -- that's not something
14 that you're involved in in your current role?
15     A.    I did not review their application,
16 no.  But the format, I'm familiar with.
17     Q.    Okay.  Is this something that in
18 your prior -- prior role as director of the
19 community health division, you would have been
20 involved in?
21     A.    I am familiar with, yes, the
22 document, but it was the program supervisor
23 that put it together.
24     Q.    Okay.  So -- so within Summit
25 Public Health, when you are preparing for the

Page 123

1  coming fiscal year and you are preparing the
2  application for ADM -- not you -- not you
3  literally, but --
4      A.    Right.
5      Q.    -- Summit Public Health --
6      A.    Yes.
7      Q.    -- that's done by the program
8  director-level person?
9      A.    Yes.
10     Q.    Which currently, for example, would
11 be Jackie Pollard?
12     A.    Correct.  And -- or Griffin Brown,
13 who's the supervisor.
14     Q.    Okay.
15     A.    Yeah.
16     Q.    Her or her staff would prepare
17 this?
18     A.    Yes.
19     Q.    If we look at page 1 of Exhibit 5,
20 you'll see it's broken down into certain
21 programs, services provided by Summit Public
22 Health.
23     A.    Uh-huh.
24     Q.    Treatment prevention, Quick
25 Response Team --

Page 124

1      A.    Uh-huh.
2      Q.    -- and Project DAWN.  Do you see
3  that?
4      A.    Uh-huh.
5      Q.    And you recognize those all as
6  substance abuse services provided by Summit
7  Public Health?
8      A.    Yes.
9      Q.    Okay.  If we look at the treatment
10 portion, would you agree with me that this
11 document, Exhibit 5, suggests -- or, I'm
12 sorry -- indicates that 43 percent of the funds
13 provided for treatment are from ADM funds?
14     A.    Yes.
15     Q.    Now, the other --
16        MS. KEARSE:  Object to the form.
17 The document is speaking for itself.  I think
18 Ms. Block already said she has not seen this
19 particular document before.
20     Q.    The other 57 percent, that would
21 come from the Medicaid or private insurance as
22 we just discussed a few minutes ago?
23     A.    I don't know.
24     Q.    Okay.  If we went -- so prevention,
25 it's 88 percent funded by ADM.  You'll see that

Page 125

1  on the --
2        MS. KEARSE:  Counsel, I think I'm
3  going to object.  She's already testified she
4  doesn't know that -- what -- the document --
5        MR. NAEEM:  I understand.
6        MS. KEARSE:  -- what's on it, you
7  can say what's on the document.  She doesn't
8  know the substance or how the numbers came
9  about.
10        MR. NAEEM:  I appreciate your
11 objection, Anne.  I'm still going to ask my
12 questions.
13     Q.    Exhibit 5, page 1, prevention, it
14 indicates that 88 percent of the revenue comes
15 from ADM funds; you'd agree?
16     A.    It does indicate that.
17     Q.    If I asked the same question about
18 the other 12 percent, where -- where that comes
19 from, would you know one way or the other?
20     A.    I do not.
21     Q.    Quick Response Team funded 79
22 percent by ADM funds.  Do you see that on page
23 1?
24     A.    Yes.
25     Q.    The same question about the other

32 (Pages 122 - 125)

Page 126

1  21 percent.
2       MS. KEARSE:  The same objection.
3  The document speaks for itself.
4       Q.   Do you know where that revenue
5  comes from?
6       A.   I do not.
7       Q.   Okay.  If we flip through and we
8  get to -- actually, at the top of the page, it
9  will say page 184 of 206.
10      A.   Yes.
11      Q.   Could you just briefly look through
12  the prevention program summaries, and I just --
13  the bolded text:  the school program, summer
14  program, ATOD, education program, community
15  collaborations.  And I'll let you know what my
16  question is going to be so you can have the
17  appropriate context.
18      I want to know whether there --
19  whether these are essentially the same programs
20  that Summit Public Health has been providing
21  since 2001.
22      A.   2001?
23      Q.   2001.  I -- I want to know how
24  those -- the prevention programs have changed
25  over time.

Page 127

1       A.   So it's likely that I can't -- I
2  couldn't go back that far.  We didn't pick this
3  program up until we picked up the Akron Health
4  Department.  So --
5       Q.   Okay.
6       A.   -- I -- I can't tell you that
7  they've been --
8       Q.   Fair enough.  Let -- let me ask
9  it -- let me ask it a different way, then.
10      For the portion of time that Summit
11  Public Health has been providing prevention
12  services, have there been any programs
13  specifically addressing the opioid abuse and
14  addiction issues in Summit County?
15      A.   Okay.  I'm sorry.  Say that again.
16      Q.   Yeah.  That's a bad -- that's a
17  terrible question.
18      Are there any Summit -- currently,
19  in 2018, any Summit Public Health prevention
20  programs specifically targeting opioid
21  addiction?  Again --
22      A.   Like the MAT?
23      Q.   No.  Just prevention programs.
24      A.   Prevention.
25      Q.   I'm talking about prevention.

Page 128

1       A.   I'm sorry.
2       Q.   And I'm sorry.
3       A.   Yeah, okay.
4       Q.   Let me -- let me, to clear it up on
5  the record --
6       A.   Okay.
7       Q.   -- let me ask it again.
8       A.   Okay.
9       Q.   With respect to the prevention
10  programs --
11      A.   Yes, school programs --
12      Q.   -- currently being offered by
13  Summit Public Health --
14      A.   Yes.
15      Q.   -- would you agree with me that
16  they're all general to alcohol, tobacco, and
17  other drugs?
18      A.   No.
19      MS. KEARSE:  Object to form.
20      A.   We've got one prevention specialist
21  on staff, and she was sent for training.  She
22  went through a training -- I don't -- maybe in
23  2013 called -- maybe it's called Straight Talk.
24  Let's Start -- Start Talking!, which is a
25  state-sponsored training specifically for

Page 129

1  opiate prevention.  So she did get trained in
2  that.  It was -- she was supposed to integrate
3  what she learned in that into some of her
4  school-based programs.  So that is what I'm
5  aware of.
6       Q.   Okay.  And -- and --
7       A.   In terms of how programs have
8  changed.
9       Q.   Sure.  And I appreciate that.  And
10  let me ask a different question.
11      Is there any prevention program
12  being provided by Summit Public Health that
13  addresses only opioids?
14      A.   You don't mean school-based
15  prevention; you mean any prevention?
16      Q.   Any prevention programs.  And
17  I'm -- I'm not talking about --
18      A.   Project DAWN --
19      Q.   -- maybe an -- just prevention
20  programs.
21      A.   Yes.  Well, see, it depends on how
22  you look at it, because --
23      Q.   Well, I'm looking at --
24      A.   -- we view Project DAWN -- you mean
25  school-based?

33 (Pages 126 - 129)

Page 130

1    Q.   Well, so we're looking at --
2    A.   You're looking at prevention.
3    Q.   -- Exhibit 5.
4    A.   Okay.
5    Q.   And under "Treatment" --
6    A.   Yes.
7    Q.   -- Project DAWN is listed.
8    A.   Right.
9    Q.   It's not listed under "Prevention."
10       MS. KEARSE:  But you're asking her
11  on her interpretation on that.  So there's two
12  different things.  You're asking her to read
13  three pages of a document, but you're also
14  asking her open-ended questions on whether or
15  not public health does prevention.
16       So you're asking it two different
17  ways.  Either read it off the document or what
18  she -- this witness knows about.  So enter --
19       MR. NAEEM:  Well, to be fair, I'm
20  only asking it one way.
21       MS. KEARSE:  Well, she just -- she
22  just testified that Project --
23       MR. NAEEM:  It could be -- it could
24  be interpreted two ways, perhaps, Anne.  But I,
25  again, appreciate the speaking objection.

Page 131

1       MS. KEARSE:  Well, to the extent
2  that Project Dawn's prevention is in her --
3       MR. NAEEM:  I do -- I do appreciate
4  what you're saying.
5    Q.   So let me ask, does Summit Public
6  Health, in communicating with ADM about funding
7  requests, consider Project DAWN to be
8  prevention or treatment?
9    A.   I would list that as a prevention
10  program preventing overdose -- yeah, preventing
11  overdoses.  And I see that they had it listed
12  here.  But, again, that's my -- my
13  interpretation would be that it's an overdose
14  prevention program.
15   Q.   Does it treat people who have
16  overdosed?
17   A.   Who have overdosed?
18   Q.   Right.
19   A.   Yeah.
20   Q.   So is it prevention or treatment?
21   A.   Preventing -- well, preventing
22  overdose deaths.
23   Q.   Okay.  Well, let's look at page 11
24  of this -- of Exhibit 5.
25   A.   Okay.

Page 132

1    Q.   And near the top, you'll see
2  there's a new subsection for treatment.
3    A.   Yes.
4    Q.   Okay.  And underneath that, first
5  one is "outpatient therapy program"?
6    A.   Yes.
7    Q.   Inpatient, outpatient -- "intensive
8  outpatient" is the next, correct?
9    A.   Uh-huh.
10   Q.   If we flip to page 12, the next one
11  is Quick Response Team?
12   A.   Uh-huh.
13   Q.   And then the last one is Project
14  DAWN.  Agreed?
15   A.   Yes.
16   Q.   Okay.  So in communicating with ADM
17  for revenue requests, Summit Public Health
18  considers Project DAWN a treatment program?
19       MS. KEARSE:  Object to form and
20  asked and answered.
21   A.   The author of this structured the
22  grant in that way.  As I said, I -- I view
23  Project DAWN as an overdose prevention program,
24  to prevent opiate deaths.  I can see where they
25  have it listed here.

Page 133

1       I didn't -- I was not part of
2  writing this.  I don't --
3    Q.   Okay.
4    A.   -- know that I can tell you
5  anything else about it.
6    Q.   Well --
7    A.   How they -- how they listed it.
8    Q.   Within the -- are you -- are you
9  suggesting to me that within the public health
10  administration, that prevention services
11  includes providing medication?
12   A.   I think it depends on the -- what?
13  I'm sorry.  Go on.
14   Q.   Providing medication, is that
15  considered a prevention service?
16   A.   I think that if you can provide a
17  medication that will prevent a death,
18  that's prevention.
19   Q.   Okay.  Well, I'm talking about term
20  of art.
21   A.   Okay.
22   Q.   Is -- is -- in the public health
23  government situation, is prevention services a
24  term of art?
25   A.   I don't know what that means.

34 (Pages 130 - 133)

Page 134

1    Q.   Does it have a specific meaning?
2  If you go to the Cuyahoga County Board of
3  Health and ask them, "What kind of prevention
4  services are you providing?"
5    A.   There's a framework for prevention.
6  There's a framework for treatment.
7    Q.   And within that framework, where
8  does Project DAWN fit?
9    A.   I think it depends on the lens that
10  you're looking through, I think.  But for the
11  most part -- this -- I'm not saying that this
12  doesn't make sense.  Is that -- I don't have to
13  argue that with you.  I don't --
14    Q.   Well, I -- I --
15    A.   -- I'm not saying it doesn't --
16    Q.   -- can only rely on the documents
17  that have been provided to us --
18    A.   Okay.  But I'm --
19    Q.   -- but it -- and actually doesn't
20  matter for the --
21    A.   Okay.
22    Q.   -- purposes of this examination.
23         With -- with respect to the
24  prevention programs listed on Exhibit 5,
25  excluding Project DAWN, are there any programs

Page 135

1  that focus strictly on opioid addiction issues?
2    A.   In the prevention arena?  In the
3  prevention category?  No.
4    Q.   Okay.  Would you agree with me that
5  these prevention programs, the school programs
6  and the other ones listed under "Prevention,"
7  would still be provided by Summit Public Health
8  regardless of the outcome of opioid
9  addiction --
10         MS. KEARSE:  Object to the form.
11    Q.   -- crisis --
12         MS. KEARSE:  Speculation.
13    Q.   -- in Summit County?
14    A.   That we would still provide
15  prevention services in the schools?
16    Q.   Yeah.
17    A.   Yes.
18    Q.   I'm sorry.  Was that yes, the
19  answer to the question?
20    A.   Yes, yes.
21    Q.   Yeah, okay.  Thanks.
22         If we were to talk about -- well,
23  strike that.
24         You did mention Project DAWN, of
25  course, and that is obviously an

Page 136

1  opioid-specific program, would you agree?
2    A.   Yes.
3    Q.   Do you recall when Summit Public
4  Health implemented Project DAWN?
5    A.   I recall the process.  I don't
6  recall the month and the year.  I recall the
7  process we went through.
8    Q.   Okay.  And do -- do you remember
9  the year when actually Summit began training
10  and/or providing the Project DAWN kits?
11         And I'm only asking because you
12  said month and year.  I just want to make sure
13  you don't remember the year.
14    A.   No.
15    Q.   Just the year.  You don't?
16    A.   No.
17    Q.   Does -- well, if we look at
18  Exhibit 5, page 1, we can see that 100 percent
19  of Project DAWN is funded by ADM funds.  Do you
20  see that?
21    A.   I do.
22    Q.   In any year prior to 2018, was that
23  somehow different?
24    A.   Yes.
25    Q.   Okay.

Page 137

1    A.   I recall the state providing
2  funding for it.
3    Q.   Okay.  Has there been any point in
4  time where Summit Public Health provided
5  general revenue funds for Project DAWN that you
6  recall?
7    A.   I -- I -- I believe that just when
8  we're looking at salaries, Dr. Erme, Yvette
9  Edwards, those would -- that would be the
10  primary source of general revenue dollars.
11    Q.   Okay.  I don't believe we've used
12  Yvette Edwards' name.  Who -- who is
13  Ms. Edwards?
14    A.   She's a former supervisor for the
15  counseling program.
16    Q.   Okay.  You did use a supervisor's
17  name recently, I'm sorry.  I'm looking though
18  my --
19    A.   Griffin Brown?  Griffin Brown?
20    Q.   Griffin Brown.
21    A.   Yes.
22    Q.   Okay.  So he took over for Yvette?
23    A.   Jackie came in, and then sometime
24  thereafter we picked up Griffin.
25    Q.   Okay.  I want to make sure this is

35 (Pages 134 - 137)

Page 138

1 clear on the record -- and I promise I won't
2 ask you about every employee -- but when --
3 when I asked about general revenue, you
4 mentioned -- and we'd talked about this
5 before -- that a portion of their salary and
6 benefits is general revenue.  For example, for
7 Yvette Edwards, you used her name.
8     A.  Because she's management.
9     Q.  Okay.  And -- and I just --
10    A.  Oh, I see what you mean.
11    Q.  No, no.  Hold on.  Let me -- let me
12 just make sure we -- we get some clean
13 questions and answers on that.
14    A.  Okay.
15    Q.  So if we're talking about Project
16 DAWN, Yvette Edwards was somebody who was
17 involved with Project DAWN.
18    A.  Yes.
19    Q.  Okay.  Now, when we talk about
20 Yvette Edwards' salary and benefits, a portion
21 of that comes from general revenue.
22    A.  Correct.
23    Q.  Did some of that come from the
24 Project DAWN funds received by ADM or the
25 state?

Page 139

1        Let me ask it a different way.
2        Was a portion of Yvette Edwards'
3 salary and benefits attributable to funds other
4 than general revenue?
5     A.  I don't know.
6     Q.  Okay.  As a general matter, within
7 Summit Public Health and the provision of
8 substance abuse-related services, is it true
9 that some of the salary and benefits for Summit
10 employees are paid using the funds that provide
11 the services as well?
12    A.  Yes.
13    Q.  Okay.  And we'd need a spreadsheet
14 to see, but we could actually, within Summit
15 Public Health's records --
16    A.  Uh-huh.
17    Q.  -- pick an employee and see where
18 the revenue for their salary and benefits came
19 from?
20    A.  Yes.
21        MS. KEARSE:  Object to form.
22    Q.  Okay.  I'm just trying to get an
23 understanding of how the organization works.
24        Not every employee is paid strictly
25 by general revenue funds?

Page 140

1     A.  Correct.  But I just --
2     Q.  It depends on what they do?
3     A.  Yeah.
4     Q.  Yes?
5     A.  Yes.
6     Q.  And how what they do is paid for,
7 correct?
8     A.  Yes.  But -- so this, I think,
9 is -- I don't want to say that it's deceptive,
10 but this only speaks to how we broke out the
11 programs that we provided.
12        So, for example, if this were the
13 year, let's call it 2016, when we established
14 Project DAWN -- let's call it 2017 -- if this
15 split wasn't 100 percent and 0 percent, Yvette
16 Edwards or Griffin Brown could have worked on
17 that project and not been charged to the ADM
18 contract.
19        I just -- the ADM Board will tell
20 us how many funds are available for our
21 behavioral health services, and we fit into it
22 program areas, how much we think we're going to
23 need in each area.  But it may or may not cover
24 the full cost of all the services.  So I just
25 wanted to make sure that was clear.

Page 141

1     Q.  Okay.  And I -- what I want to
2 do is --
3     A.  Yeah.
4     Q.  -- is make sure, organizationally,
5 I get an understanding from you about where
6 other sources of funds, particularly the
7 general revenue funds --
8     A.  Uh-huh.
9     Q.  -- are used in the provision of the
10 services or the employee benefits --
11    A.  Uh-huh.
12    Q.  -- and salary for people who are
13 involved in that.
14    A.  Right.
15    Q.  Okay.
16    A.  For the most part, it would be
17 management-level individuals.  If we needed to
18 charge to general revenue, more likely than
19 not, those are the individuals that would be
20 charged.
21        And we have not, to date, to my
22 knowledge, fallen short in the AOD unit until
23 this year.  This year, we're running behind
24 because of the behavioral health redesign, and
25 maybe other factors.

36 (Pages 138 - 141)

Page 142

1      But this year Donna Barrett has
2 come to me as late as June or July to say we're
3 running behind.  Our charges seem to be
4 accurate, but our reimbursement is not matching
5 it.  So I don't know what that's going to mean
6 at the end of the year.
7      Q.   Okay.
8      A.   If that's the case, then general
9 revenue would need to cover the cost or we'd
10 have to reduce staff.  So that's the way that
11 works.
12      Q.   Okay.  We were talking about
13 Project DAWN.
14      A.   Uh-huh.
15      Q.   Do you know whether Summit Public
16 Health tracks any demographic information
17 regarding the people who are issued the Project
18 DAWN kits?
19      A.   We track infor- -- we do track
20 data.  I don't know how far they drilled down
21 for that.  I don't know if they get the name,
22 address, and phone number of the individuals.
23      They may just get, you know, the
24 number of kits that were distributed, the
25 number of individuals trained, the number of

Page 143

1 people who come back to get a refill, if you
2 will, because it's been used.  And I don't know
3 that they get name, address, and that sort of
4 thing.
5      Q.   Okay.  Let -- okay.  And is that
6 information kept in an electronic database, or
7 is it -- are they hard-copy documents?
8      A.   I don't know.
9      Q.   Do you know whether the information
10 that may be kept includes the type of drug that
11 the -- the person or the family member might
12 have used and needed the Dawn reversal for?
13      A.   I don't think so.
14      Q.   To the extent that you had to find
15 that information out, would you ask Griffin
16 Brown, or is there somebody else that you would
17 ask to answer that question?
18      A.   I would probably ask Angela Genet.
19      Q.   She is -- you described her as the
20 program coordinator --
21      A.   Program coordinator.
22      Q.   -- for the syringe program.  She
23 also has involvement with Project DAWN?
24      A.   Yeah.  She is a program
25 coordinator, and so she oversees various

Page 144

1 programs.  The Ohio Injury Prevention grant,
2 she oversees syringe exchange, and -- and
3 Project DAWN.
4      Q.   Okay.
5      A.   Griffin provides direct supervision
6 to the counseling, the counselors.
7      Q.   Syringe exchange, which is not
8 listed on Exhibit 5, we've talked about it a
9 little bit.  It is a program provided through
10 the community health division.
11      A.   Uh-huh.
12      Q.   Do you know whether records are
13 kept regarding the patients or the clients who
14 exchange needles through that program?
15      A.   Probably -- not records.  I'm sure
16 they don't provide records.  I'm sure we don't
17 collect that type of information.
18      Just probably -- definitely the
19 number of syringes that were dispensed.
20      Q.   Okay.  And -- and to be clear,
21 I'm -- I'm currently asking about whether
22 patient demographic data --
23      A.   Is collected?
24      Q.   -- is collected for --
25      A.   I don't --

Page 145

1      Q.   -- the syringe program?
2      A.   Yes, and I'm sure it is not.
3      Q.   Okay.  So to your knowledge,
4 there's no record that would tell us that a
5 certain percentage of those were for heroin
6 versus some other injectable substance?
7      A.   No.
8      Q.   The medication-assisted treatment,
9 we talked about it just briefly.  I want to
10 follow up a little bit on that.
11      When did that program start?
12      A.   2018.
13      Q.   At the time we spoke with Donna
14 Skoda, she described, essentially -- and so
15 this was in August of 2018 -- that there had
16 been a small group that had worked through that
17 program for part of certification purposes.
18      Does that sound familiar to you?
19      A.   A small what?
20      Q.   A small subset of patients, I think
21 she said 6 to 10, that were part of the kind of
22 certification --
23      A.   Yes.
24      Q.   -- for that program.
25      A.   Yes.

37 (Pages 142 - 145)

Page 146

1    MS. KEARSE:  Object to the form.
2    Q.  Has the MAT clinic progressed
3 beyond that initial certification?
4    A.  Yes.
5    Q.  All right.  Do you know how many
6 patients are currently being treated through
7 that program?
8    A.  I do not.
9    Q.  Is that program run by Dr. Erme?
10    A.  No.  Dr. Erme retired.  It's --
11 it's -- Jackie oversees the clinic, the MAT
12 clinic, but that's a joint venture between our
13 actual clinic services.  We use their nurses
14 and Jackie.  So it sort of straddles both.
15    Q.  Okay.  So -- so Jackie Pollard
16 supervises that?  Is that an okay word to use?
17 Is that what you'd use?  She doesn't -- she
18 can't give the shots, for example.
19    A.  Correct.  We essentially purchase a
20 nurse from the clinic.
21    Q.  Okay.  So she's a Summit Public
22 Health employee?
23    A.  The nurse?
24    Q.  Yes.
25    A.  Yes.

Page 147

1    Q.  But she would -- she -- on Exhibit
2 3, she would be in the clinical services
3 division?
4    A.  Correct.
5    Q.  But --
6    A.  Two days a week, as an example, she
7 will be over in the MAT clinic giving the shots
8 and the education.
9    Q.  All right.  And what do you know
10 about the -- the medication that's provided
11 through that program?
12    A.  Not even enough to be dangerous.
13    Q.  Okay.  Vivitrol, have you heard
14 that word?
15    A.  Yes, I have.
16    Q.  Is that the substance that you're
17 aware of is used?
18    A.  Yes.
19    Q.  Okay.  Do you know whether or not
20 it's used for anything other than opioid
21 addiction?
22    A.  I do not know.
23    Q.  So if, for example, I asked can it
24 be used for alcohol abuse --
25    A.  And I --

Page 148

1    Q.  -- would you know?
2    A.  -- don't --
3    MS. KEARSE:  Object to form.  Asked
4 and answered.
5    A.  Yeah, I don't know, but I don't --
6 I don't know.
7    Q.  Do you know how many patients are
8 currently in that program?
9    A.  No.
10    Q.  Do you know are there any
11 restrictions regarding the types of patients
12 who are allowed to be enrolled in that program?
13    A.  Do you mean based on the type of
14 addiction they have?
15    Q.  Type of addiction or the status of
16 their addiction in terms of whether they're
17 using or not using.
18    A.  Well --
19    Q.  Anything at all that you're aware
20 of?
21    A.  -- I know --
22    MS. KEARSE:  Object to form.
23    A.  -- that there's a screen --
24    MS. KEARSE:  Go ahead.
25    A.  There's a screen that the nurses go

Page 149

1 through with the client to determine whether or
2 not they're an appropriate candidate.  What
3 that consists of, I don't know.
4    Q.  Okay.  But as far as a written
5 procedure that says, for example, "We only
6 treat opioid-addicted patients that live in the
7 city of Akron," you're not aware of anything
8 like that?
9    A.  No.
10    Q.  That would be something to ask
11 Ms. Pollard?
12    A.  Yes.
13    Q.  Do you know how the -- that program
14 is funded?
15    A.  MAT?
16    Q.  Yeah.
17    A.  It's partially with prior year
18 funds, and I believe, at this point, partially
19 with the -- the SAMHSA funding that they
20 brought in.
21    Q.  Okay.  Is -- is part of the funding
22 for that fee -- fee for service?
23    A.  I don't know how it's -- I don't
24 know how the funding is set up for that.
25 Rather, I don't know how the billing is set up

38 (Pages 146 - 149)

Page 150

1 for that.
2     Q.    Okay.  So -- so let me -- let me
3 ask a different but related question.
4         Do you know one way or the other
5 whether clients are charged by Summit Public
6 Health for the Vivitrol shots they get monthly?
7     A.    I do not believe they are.
8     Q.    Okay.  Do you know whether Medicaid
9 is charged for those shots?
10     A.    Perhaps, but I don't know.
11     Q.    Okay.  Do you know whether
12 treatment records are maintained for the
13 patients who are in the MAT program?
14     A.    I'm sure, yes.
15     Q.    Are those maintained electronically
16 or in a hard copy, to your knowledge?
17     A.    I would say hard copy.
18     Q.    Is it your understanding that those
19 records are treated like any other clinic
20 patient would --
21     A.    You mean are they kept separately?
22     Q.    Is the process for creating them
23 and saving them similar to any other clinic
24 patient would be?
25     A.    I believe so, yes.

Page 151

1     Q.    And -- and who -- who actually
2 prescribe -- who signs the prescription for the
3 Vivitrol for those patients?
4     A.    Dr. Sobolewski.
5     Q.    Does she actually see the patients
6 before she writes a prescription?
7     A.    She collaborates with the nurse
8 practitioner.
9     Q.    So she speaks with the nurse
10 practitioner?
11     A.    Uh-huh.
12     Q.    But do you know whether she
13 actually sees the patients?
14     A.    I don't believe so.
15     Q.    Okay.  And is there a -- within
16 whatever the budget is for -- for that program,
17 to your knowledge is there a -- an expected
18 number of patients that Summit Public Health
19 expects to treat in that program per year?
20     A.    Yes.
21     Q.    Do you know what that is?
22     A.    No.
23     Q.    Is it --
24     A.    I don't know.
25     Q.    If I said is it more than 50 or --

Page 152

1     A.    My --
2     Q.    -- less than 50, you don't know
3 that?
4     A.    I don't, no.
5     Q.    Do you know as the --
6     A.    I can -- I know that the health
7 district expects the clinic to be fully
8 functioning and that there is an adequate and
9 appropriate number of individuals coming
10 through the clinic.
11         So if that number is low, we would
12 put some things in place to recruit additional
13 individuals to come in.  Like, we wouldn't have
14 two people come through a clinic and have that
15 be okay, even if the number were low, which I
16 don't know whether or not it is.
17     Q.    Okay.  As the assistant health
18 commissioner for Summit Public Health, are you
19 aware of whether there are any government
20 limits on the amount of patients that can be
21 seen by a MAT clinic?
22     A.    No, I -- no.
23     Q.    Okay.
24         MS. KEARSE:  Now's a good time for
25 a break for lunch?

Page 153

1         MR. NAEEM:  Sure.
2         THE VIDEOGRAPHER:  We're off the
3 record, 12:16.
4         (Luncheon recess.)
5         THE VIDEOGRAPHER:  We're back on
6 the record, 1:16.
7 BY MR. NAEEM:
8     Q.    Ms. Block, good afternoon.  Before
9 we took a break, we had been talking, and we
10 may have finished our discussion of the -- the
11 MAT program.
12     A.    Uh-huh.
13     Q.    I wanted to run through a few more
14 of the programs from the community health
15 division.
16         We talked a little bit about the
17 disposal boxes, D.U.M.P.?
18     A.    Yes.
19     Q.    You -- you -- I think you told me
20 that those are actually --
21     A.    Environmental health.
22     Q.    -- in the environmental health
23 division.
24         I apologize if I'm covering a
25 couple questions that might have come up when

39 (Pages 150 - 153)

Page 154

1 we were talking about it previously.
2        But do you recall when those --
3 that -- that program started in Summit County?
4      A.   I do not.  I think we -- yeah, I
5 don't remember --
6      Q.   Has it always been --
7      A.   -- the year.
8      Q.   Sorry.  I apologize for -- for
9 cutting you off.
10        Has it always been run out of
11 Summit Public Health?
12      A.   Yes.
13      Q.   Is there any collaboration with any
14 other Summit County entity?
15      A.   So the D.U.M.P. boxes have to sit
16 where there's a police station.  So in the
17 various locations, they are either hosp- --
18 based on a hospital site where they have their
19 own police force or very near a police
20 department with surveillance.
21        And there's also, I believe -- the
22 sheriff's department had, for several years,
23 provided the transport when they were being --
24 I think annually, they're incinerated.  So I'm
25 not sure if they still do that.  It seems to me

Page 155

1 there had been some discussion about the cost
2 of having the sheriff's department do that, but
3 that was the way it was originally set up.
4      Q.   Okay.  What is the purpose or
5 why -- why is it that those have to be situated
6 at police or sheriff facilities and monitored
7 at all times?
8      A.   Because they -- it's a controlled
9 substance, in a lot of cases.  I believe that
10 you could dump any type of medication, but for
11 the most part, they were set up specifically
12 for controlled substances, and that is why they
13 need to be monitored.
14      Q.   Now, there isn't actually a live
15 person monitoring those boxes 24/7, is there?
16      A.   No.  I believe it sits outside of
17 a -- or just inside of most sites where there's
18 a surveillance camera.  And, you know, it's out
19 -- it's -- there are police officers inside.
20      Q.   Okay.  And anybody can come in and
21 dump any type of medication they want in one of
22 those boxes?
23      A.   I believe so, yes.
24      Q.   There's no record created of --
25      A.   No.

Page 156

1      Q.   -- people registering to use those?
2      A.   No.
3      Q.   And as far as the funding goes, is
4 there any private entity that provides funding
5 for those -- for the operation of those boxes?
6      A.   No.
7      Q.   So again, just to be clear, that's
8 all a Summit Public Health-run --
9      A.   Program?
10      Q.   -- program?
11      A.   Yes.
12      Q.   As we sit here today, do you have
13 any recollection of the volume of medications
14 that are disposed of on a monthly or annual
15 basis, whatever it is?
16      A.   No.  And I can tell you that there
17 are other organizations that have similar types
18 of programs.  I believe Summa does an annual
19 collection and incineration.  I think they just
20 do that once a year.  I think Summa is the --
21 is the one big one.  I -- I can't speak to
22 whether or not there are others, but I know
23 they also have a program.
24      Q.   Okay.  Why is it important to have
25 a program like that in Summit County?

Page 157

1      A.   Well, we want to make sure that we
2 keep as many controlled substances out of the
3 hands of individuals as possible, and we don't
4 want it in the water supply either.
5        But yeah, I can -- I can remember I
6 was with Donna Skoda somewhere, and at some
7 function, and there was a guy talking about how
8 he fed his addiction by just going to open
9 houses every weekend, so -- and that was just
10 medications that they were just available.  You
11 walk into a house and you -- and, you know, You
12 can feed your addiction on that.  So, yeah, we
13 want them controlled and disposed of properly.
14      Q.   Okay.  You'd agree with me that
15 going to an open house and taking medication
16 out of somebody's cabinet is illegal?
17      A.   Yes.
18      Q.   And so would you agree with me that
19 the medications that are -- are being disposed
20 of in these D.U.M.P. boxes, it's an effort by
21 Summit Public Health to prevent more illegal
22 diversion of prescription drugs?
23        MS. KEARSE:  Object to form.
24      A.   Well, it's to keep as much off the
25 streets as possible.

40 (Pages 154 - 157)

Page 158

1    Q.    Right.
2    A.    Yes.
3    Q.    You'd agree somebody who uses a
4  medication they weren't prescribed is acting
5  illegally?
6         MS. KEARSE:  Object to form.
7    A.    Yes.
8    Q.    And like that example you used, the
9  person who went in and, you know, took those
10  medications out of someone's cabinet; that
11  would be illegal?
12    A.    Yes.
13    Q.    A family member who provides
14  medications to another family member that they
15  weren't prescribed, that would be illegal
16  conduct?
17         MS. KEARSE:  Object to form.
18    A.    Yes.
19    Q.    Getting a prescription and then
20  selling a couple of the pills on the street to
21  friends; that would be illegal?
22         MS. KEARSE:  Object to form.
23    A.    Yes.
24    Q.    Those -- and those are all, you
25  would recognize, as circumstances that do

Page 159

1  actually happen with respect to prescription
2  opioids in the community?
3    A.    Yes.
4    Q.    The Quick Response Team, we --
5  we -- we mentioned it within the context of one
6  of the exhibits here.  Could -- could you give
7  us a quick explanation of what those are?
8    A.    The teams?
9    Q.    Yeah.  Well, not necessarily the
10  composition of the team --
11    A.    Yeah.
12    Q.    -- but what -- what is the function
13  of the Quick Response Team?
14    A.    They do a follow-up, I believe it's
15  the next day, for individuals who had overdosed
16  and had gotten some type of intervention,
17  either through EMS or the emergency department.
18         So they go out, a counselor,
19  someone from EMS, and maybe police -- I'm not
20  sure.  It's a three-man team -- oh, a recovery
21  coach.  I'm sorry -- and try and engage the
22  individual, try and get them to go to
23  treatment.
24    Q.    You said EMS and police and a
25  recovery coach.  Are those- --

Page 160

1    A.    No, no.  I think it's an EMS, a
2  counselor --
3    Q.    Oh.
4    A.    -- and a recovery coach.  I believe
5  that's the composition.
6    Q.    Are one of those of the team always
7  from Summit Public Health?
8    A.    Yes.
9    Q.    Is it the counselor?
10    A.    Yes.
11    Q.    Does -- does Summit Public Health
12  keep records of the interventions they do
13  through these Quick Response Teams?
14    A.    I -- I don't believe that they keep
15  records of the individuals.  They -- no.  Maybe
16  the number of contacts they made.  I don't
17  believe they keep records of the individuals.
18    Q.    Who's the person who -- is that
19  also -- sorry.
20    A.    Which counselor?
21    Q.    No.  I was actually going to say
22  the -- is -- is that another function that's
23  supervised by Griffin Brown?
24    A.    Yes.
25    Q.    Okay.  And then beneath Griffin

Page 161

1  Brown in the community health division are a
2  number of counselors?
3    A.    Correct.
4    Q.    How many counselors currently are
5  employed by Summit Public Health?
6    A.    I believe there are nine.
7    Q.    Has that number been roughly the
8  same during your employment at --
9    A.    We've had --
10    Q.    -- Summit Public Health?
11    A.    We've had as many as 11, to my
12  knowledge, but around that.
13    Q.    And it's one of these -- currently
14  it would be one of these nine counselors who
15  would be part of a Quick Response Team?
16    A.    Yes.
17    Q.    Is -- is it, to your knowledge,
18  divided equally amongst them, or are there
19  certain folks who are the designated Summit
20  Public Health counselor to go on all of these
21  calls?
22    A.    I think that there are two.  And I
23  think there's a -- I believe there's a primary
24  individual, and when that person is not
25  available, there is an alternate.

41 (Pages 158 - 161)

Page 162

1    Q.    Do you know who the primary is?
2    A.    I believe it's Anna Copeland.
3    Q.    Do you know how long Ms. Copeland
4  has been employed by Summit Public Health?
5    A.    I would say approximately three
6  years.
7    Q.    These Quick Response Teams, when
8  did -- when were these teams implemented in
9  Summit County?  And I'm specifically referring
10  to just the teams in which Summit Public Health
11  would be a partner of.  Just the year is fine,
12  if you know.
13    A.    Late '15, early '16, I would -- I
14  would say.
15    Q.    And other than the employee salary
16  and benefit costs -- put -- put that aside --
17    A.    Uh-huh.
18    Q.    -- does Summit Public Health
19  provide any other funding for these Quick
20  Response Teams?
21    A.    No, I don't believe so.
22    Q.    Okay.  And -- and the function of
23  the -- of the counselor in these situations,
24  what is it specifically that they're -- that
25  they're doing if they're able to actually make

Page 163

1  contact with one of these overdose patients?
2    A.    Uh-huh.  Well, the recovery --
3  well, I will say that the recovery coaches
4  there -- and I'm only saying this so that I can
5  get to the counselor -- that's more of a lay
6  individual who has -- who is in recovery, but
7  if they encounter an individual who needs
8  clinical intervention at that point, that's
9  what the counselor is there for.  So --
10    Q.    And is that to encourage them --
11    A.    -- brief -- brief intervention.
12    Q.    Okay.
13    A.    Maybe assess whether or not that
14  person, you know, needs to go to the hospital,
15  are they clinically depressed at that point,
16  things of that nature.  So that's their role.
17        Yeah.  And the recovery coach talks
18  to them about the fact that they've been
19  through it, treatment is available, they can
20  help hold your hand through that process.
21    Q.    Okay.  Would you -- would you agree
22  with me that opioids are not the only drug
23  that leads to overdoses in this community?
24    A.    Yes.
25    Q.    Are these Quick Response Teams

Page 164

1  specific to opioid overdose situations, or any
2  reported overdose in the community?
3    A.    Any reported overdose, yeah.
4    Q.    Okay.  And these counselors we've
5  been talking about, we talked about them
6  generally in a couple instances within the
7  context of the community health division and we
8  talked about, for example, Anna Copeland.
9    A.    Uh-huh.
10    Q.    Are they just substance abuse
11  counselors, or do they have some function at
12  Summit Public Health that also involves mental
13  health counseling?
14    A.    Some of them can diagnose both
15  mental health and substance abuse.  All of
16  them, I believe, have -- are certified chemical
17  dependence counselors, but there's a range of
18  individuals that can provide counseling.
19        Anna, I believe, is a -- and she's
20  a licensed independent social worker, so she
21  can practice independently and focus on mental
22  health or addiction.
23    Q.    Okay.  Does Summit Public Health
24  actually have any specific mental health
25  programs?

Page 165

1    A.    Solely?
2    Q.    Well, I do want to ask you about
3  what you were just talking about with, you
4  know, this assessment that the counselor may do
5  during one of these Quick Response Team
6  visits --
7    A.    Uh-huh.
8    Q.    -- about the mental health of
9  the -- you know, of the patient.
10    A.    Uh-huh.
11    Q.    But before I ask that, what I was
12  trying to -- trying to get a sense of is -- are
13  there, yeah, mental health-specific programs
14  also offered through Summit Public Health that
15  are similar to those of the substance abuse
16  programs we've been talking about?
17    A.    No.
18    Q.    Okay.  So why -- why is it
19  important, then, for, you know, a counselor on
20  one of these Quick Response Team visits to
21  assess the mental health of somebody who's just
22  suffered an overdose?
23    A.    Well, I don't know exactly what
24  happens when they go out there.  I know that
25  this is the way the teams have been designed.

42 (Pages 162 - 165)

Page 166

1 That was based on evidence where it's been
2 successful elsewhere.
3       But from my perspective and from
4 information I've gotten from EMS providers,
5 emergency room people, people aren't happy when
6 they're jerked out of their high, and so, you
7 know, I don't know what that means long-term.
8 But we've had people walk into our offices that
9 were depressed and threatening suicide, so it
10 is important that they be able to recognize
11 signs of things like depression --
12    Q.   Okay.
13    A.   -- suicidal thoughts, that sort of
14 thing.
15    Q.   Are you aware of whether or not
16 there's a correlation between mental health
17 issues and substance abuse?
18    A.   A correlation...
19    Q.   Let me ask it a different way.
20       Do you know one way or the other
21 whether people with mental health issues have a
22 higher risk of substance abuse?
23    A.   I believe --
24       MS. KEARSE:  Object to form.
25    A.   I believe so.

Page 167

1    Q.   Okay.  Do the -- is there some sort
2 of a run report-type thing that the counselor
3 has to fill out when -- for example,
4 Ms. Copeland, when she comes back from the
5 Quick Response Team visit?
6    A.   I don't know if she completes that
7 or if the EMS person completes it.
8    Q.   But your expectation is that there
9 is some documentation created after the visit?
10    A.   Yes.
11    Q.   Okay.  We've touched on it,
12 although not talked about it directly yet, but
13 the division of community health, one of -- one
14 of the things they -- they do is provide
15 substance abuse counseling services.  And there
16 are -- there are a couple different types of
17 programs provided; would you agree?
18 Inpatient -- intensive outpatient and
19 outpatient programs?
20    A.   Yes.
21    Q.   We -- you -- a few minutes ago you
22 talked -- or you told me that there are
23 currently nine counselors, and in the past
24 there have been upwards of 11.
25    A.   Yes.

Page 168

1    Q.   Is there a limitation on the amount
2 of patients that can be treated in any of those
3 programs based on the amount of counselors that
4 are available?
5    A.   Caseload?  I mean, per --
6    Q.   Yeah.  Is there -- is there an
7 upper limit?
8    A.   Not aw--- I'm not aware of that.
9    Q.   We -- we've already talked about
10 how there are various sources of funding for
11 those programs.  You have ADM, fee for
12 service --
13    A.   Yes.
14    Q.   -- and general revenue that covers
15 some sort of percentage of the management, you
16 said, salaries.
17    A.   Yes.
18    Q.   As far as the counselors
19 themselves, is general revenue being used to
20 pay any of their salaries and benefits?
21    A.   No.
22    Q.   So that all comes out of the
23 program revenue?
24    A.   Historically, we've been able to do
25 that.  As I said, they -- we are questioning

Page 169

1 what 2018 is going to look like, but in prior
2 years we have been able to cover the cost of
3 the counselors.
4    Q.   Okay.  Are you aware of the --
5 well, let's -- let's keep it specific to 2018.
6       Do you have any information
7 regarding the types of patients, and
8 specifically the substance of abuse of those
9 patients, that are being treated by Summit
10 Public Health in calendar year 2018?
11       Yeah, I know.  Terrible.  I'm
12 sorry.
13       MS. KEARSE:  Yeah.  I'm looking at
14 it.  It's like -- I'm want to object, because
15 I'm even reading it.
16    Q.   Do you know how many patients
17 have -- have gone through the counseling
18 services at Summit Public Health in 2018?
19    A.   No.
20    Q.   Do you have any data regarding the
21 types of substances for which those patients
22 were seeking counseling?
23    A.   Do I personally?
24    Q.   Well, you personally or you on
25 behalf of Summit Public Health in your role as

43 (Pages 166 - 169)

Page 170

1  the -- the assistant health commissioner.
2      A.  I do not.  I feel pretty sure that
3  that data exists in the counseling department
4  within the files.
5      Q.   Now, from -- from information we
6  got from Ms. Skoda during her deposition, she
7  talked about there being an assessment form
8  that was created, filled out by the counselor,
9  every time they engaged a new patient.
10       Is that something you're familiar
11  with?
12      A.   The actual form or the process?
13      Q.   The form.  I'm talking about the
14  form.
15      A.   I saw the form a few years ago.
16      Q.   Okay.
17      A.   Yes.
18      Q.   You're aware that there is a form?
19      A.   Yes.
20      Q.   Okay.  As part of the record that's
21  created for the treatment of these patients?
22      A.   Yes.
23      Q.   Does that form require
24  documentation of the substance at issue?
25      A.   Yes.

Page 171

1      Q.   And, in fact, in order to be able
2  to bill that to Medicaid, would you need to
3  know the substance at issue?
4      A.   Yes.
5      Q.   Does Summit Public Health track
6  that data on an aggregate level?  So if I
7  wanted to know what percentage -- sorry -- what
8  percentage of patients were there for an opioid
9  addiction versus cocaine, could that data --
10  data be generated?
11      A.   I don't know.
12      Q.   Okay.
13         - - - - -
14      (Thereupon, Deposition Exhibit 6,
15      12/7/2018 E-Mail Chain between Tonya
16      Block and Yvette Edwards Re:
17      Counseling Data - Secure,
18      SUMMIT_001641475 to 001641479, was
19      marked for purposes of
20      identification.)
21         - - - - -
22      Q.   Ms. Block, I've handed you what
23  I've had marked as Deposition Exhibit 6.  I
24  want you to take as much time as you need to
25  review that.

Page 172

1        And just let me know when you're --
2  when you're through it and ready to answer a
3  few questions.
4      A.   Okay.  I think I'm ready.
5      Q.   Okay.  So Deposition Exhibit 6 is,
6  at the top, an e-mail from Yvette Edwards to a
7  number of people, including you.  Would you
8  agree?
9      A.   Yes.
10      Q.   E-mail is dated December 7, 2015,
11  agree?
12      A.   Yes.
13      Q.   Okay.  It -- it includes a couple
14  other e-mails in the chain, but the original
15  chain looks to have been an e-mail from Loren
16  Carpenter.
17        Do you see that --
18      A.   Yes.
19      Q.   -- in the middle of page 1?
20      A.   Yes.
21      Q.   Who is Loren Carpenter?
22      A.   She was our -- I don't remember her
23  title, but she organized all of the electronic
24  records around counseling and dental services
25  and things of that nature.

Page 173

1      Q.   Okay.  So -- so on the last page
2  it -- it indicates her title is informatics
3  coordinator?
4      A.   Informatics coordinator, yes.
5      Q.   Okay.  Is that a position within
6  administration, or is that within community
7  health?
8      A.   It was in population health.
9      Q.   Population health.  Okay.
10      A.   Yeah.
11      Q.   So -- so she wasn't specific to,
12  for example, counseling services; she had
13  access to all of the electronic data for Summit
14  Public Health?
15      A.   Yes.
16      Q.   All right.  Now, it seems to me
17  you -- you were referring to her in the past
18  tense, so she's no longer employed?
19      A.   That's correct.
20      Q.   Do you know when she left Summit
21  Public Health?
22      A.   Around March of '18.
23      Q.   Has her position been filled by
24  somebody else?
25      A.   No.

44 (Pages 170 - 173)

Page 174

1    Q.   Who, then -- and we're going --
2  we're going to get into the substance, but
3  if -- if you needed to get an electronic
4  summary of the patient-level data maintained by
5  Summit Public Health, who would you -- who
6  would you go to now instead of Loren Carpenter?
7    A.   I would start with Griffin.
8    Q.   Now, as we sit here, do you recall
9  receiving this e-mail?
10   A.   I -- yes.
11   Q.   Do you recall at any time since
12 December of 2015 getting similar reports of
13 substance abuse-data patients treated by Summit
14 Public Health?
15   A.   I -- I don't recall.
16   Q.   Is there any --
17   A.   I don't believe so.
18   Q.   Okay.  Is there -- is there any
19 report created periodically that contains
20 similar data like this for the benefit of
21 either the counselors or management at Summit
22 Public Health?
23   A.   If there is, it doesn't filter up
24 to Donna and I.  Or at least not to me, which
25 means she probably doesn't get it either.

Page 175

1  Maybe Jackie gets something like this on a
2  routine basis.  But, yeah.  No, I don't get
3  anything like this on a routine basis.
4    Q.   All right.  And are you aware
5  whether Summit Public Health is required to
6  provide data like this to any of the agencies
7  that provide funding for counseling services;
8  for example, ADM?
9    A.   Yes, and I -- but I think that's
10 through the super bill or the encounter that's
11 generated.  I don't know if they submit a
12 report like this.  I believe that the report is
13 comp- -- not even a report -- the information
14 is compiled on a patient-by-patient basis, I
15 believe.
16   Q.   Okay.  So -- so data of some sort,
17 which you believe is probably at not the high
18 level but the individual level --
19   A.   Yes.
20   Q.   -- is -- is required to be provided
21 to ADM?
22   A.   I believe so, yes.
23   Q.   Okay.  Are there any particular
24 contacts that you ever worked with when you
25 were the director of the community health

Page 176

1  division at ADM that you interacted with on the
2  actual programs that Summit Public Health was
3  running?
4    A.   I can't remember the fiscal
5  officer's name at the time, but it would have
6  been the fiscal officer.
7    Q.   Okay.  But as far as patient-level
8  information regarding specific drugs of abuse,
9  was that not something that you were involved
10 in?
11   A.   That's correct.
12   Q.   So you didn't -- whoever that would
13 have been at the ADM was not someone you
14 interacted with personally?
15   A.   Right.
16   Q.   If we go to the middle of the page
17 where Loren Carpenter's original e-mail begins,
18 she says at the beginning, "I was playing
19 around in the reporting session of the Open
20 Practice Solutions."
21   A.   Uh-huh.
22   Q.   What is Open Practice Solutions?
23   A.   That's the system used to schedule
24 patients, and I don't know what else it does.
25 But it's -- yeah.  It's like Dentrix for dental

Page 177

1  services, is my understanding.
2    Q.   I'm sorry.  It's like what for
3  dental services?
4    A.   It's the dental medical record.
5    Q.   Okay.
6    A.   Yeah.  So that's what this is for
7  counseling.
8    Q.   All right.  Do you know how long
9  Summit Public Health has been using that
10 particular database?
11   A.   A really long time.  I believe
12 we've used this since we merged.
13   Q.   Okay.  Is it still --
14   A.   Open Practice, I believe, yes.
15   Q.   Do you believe it's still in use
16 today?
17   A.   I believe so.
18   Q.   And is it -- is it -- I think this
19 is what you said, but let me ask it more
20 specifically.
21        If you wanted to access Open
22 Practice Solutions, would you do so yourself,
23 or would you talk to Griffin Brown?
24   A.   I would talk to Griffin.  I would,
25 yeah.

45 (Pages 174 - 177)

1    Q.   Okay.  If we look at some of the
2  data that's provided, it looks to me as if
3  there is data maintained on an aggregate basis
4  regarding the actual drugs of abuse.
5    A.   Yes.
6    Q.   Now, if we stay on just page 1 for
7  now, and where it says, "Totals, 1,688 unique
8  individual patients."
9       As we sit here, do you know what
10  that represents, unique patients?
11    A.   Yes.
12    Q.   What -- what does that mean?
13    A.   That is the difference between one
14  individual who comes in seven times and one
15  individual who that comes in one time.  It's
16  each individual client.
17    Q.   Okay.  And so it suggests to me
18  that between September and the end of November
19  of 2015, there were 1,688 unique individual
20  patients.
21    A.   That's what it says.
22    Q.   Okay.  And -- and they were
23  patients of what?
24    A.   I'm sorry?
25    Q.   What were they patients of?

1    A.   The counseling department.
2    Q.   The counseling department.
3    A.   Yes.
4    Q.   Is that consistent with the -- the
5  numbers of patients you're familiar with that
6  are being seen by Summit Public Health?
7    A.   I don't know that answer, but you
8  have to sort of -- we may have had 1,688
9  clients, but those clients might have come in
10  40 times over the course of this period, so
11  it's not limited to the number of individuals
12  that come in.  So I can't say.
13    Q.   I'm -- I want to make sure I
14  understand.  If it was 100 patients that came
15  in 17 times each --
16    A.   That was --
17    Q.   -- is that the number that's being
18  represented here or --
19    A.   No.  That -- no.
20    Q.   Okay.  That's what I thought you
21  said originally, but then your last answer kind
22  of confused me.
23       Summit Public Health in its
24  counseling department, according to this, saw
25  1,688 unique patients in a three-month period;

1  is that accurate?
2    A.   Yes, but that doesn't mean that
3  that's the number of visits.  It's the
4  number --
5    Q.   Okay.
6    A.   -- of clients, but not necessarily
7  the number of visits.
8    Q.   I got you.
9       In what other circumstance would
10  patients be recorded in the system, other than
11  actual visits?
12    A.   Can you repeat that?
13    Q.   Yeah.  So if somebody came to pick
14  up syringes --
15    A.   Uh-huh.
16    Q.   -- as part of a syringe exchange
17  program, would they be recorded as a unique,
18  individual patient?
19    A.   No, they wouldn't be recorded in
20  the system.
21    Q.   Okay.
22    A.   If someone came in for an
23  assessment on September 1st and then they come
24  in for IOP each week thereafter for the month
25  of September, that would be four visits for one

1  unique individual.
2    Q.   And I'm -- what I'm trying to get
3  at is this Open Practice Solutions, what
4  specific programs does it record patients for?
5    A.   Uh-huh.
6    Q.   You said it might not reflect
7  actual visits.
8    A.   Every visit, yeah.  So I don't
9  know --
10    Q.   So --
11    A.   -- the capabilities of it in terms
12  of that.  I don't -- I just -- I thought you
13  were asking me about the 1,688, and --
14    Q.   Yeah.
15    A.   -- and, you know, my response is it
16  says we saw 1,688 unique individuals, and I
17  just wanted to clarify that that doesn't
18  necessarily mean there weren't more visits.
19    Q.   Okay.  I -- I do understand what
20  you're saying, but I -- I thought -- I thought
21  we were talking about something different --
22    A.   Okay.
23    Q.   -- then, as we moved on.  So --
24    A.   Okay.
25    Q.   So this is 1,688 unique

46 (Pages 178 - 181)

Page 182

1 individuals --
2    A.   Yes.
3    Q.   -- that Summit provided some
4 counseling or some AOD services to --
5    A.   Yes.
6    Q.   -- in that three-month period?
7    A.   Yes.
8    Q.   Could have been the intensive
9 outpatient?
10    A.   Yes.
11    Q.   Could have been individual
12 counseling sessions?
13    A.   Yes.
14    But if it was the same patient in
15 both of those, it would still be one out of the
16 1,688?
17    A.   Yes.
18    Q.   Could it have been people that were
19 seen through the juvenile court services that
20 Summit Public Health provided?
21    A.   I don't know.
22    Q.   Okay.  Now, would you agree with me
23 that Summit Public Health no longer provides
24 services at the juvenile facility?
25    A.   That's correct.

Page 183

1    Q.   When did that end?
2    A.   About a year ago, I believe.  Yes.
3    Q.   And what was -- what was the --
4 what were the circumstances of -- of -- was it
5 the -- the jail that terminated the -- the
6 relationship?
7    A.   Yes, yes.
8    Q.   Did they begin using somebody else?
9    A.   They hired someone.
10    Q.   Within -- with -- I know we're
11 talking about 2015 here, and so maybe the dates
12 don't match, but hypothetically, if there was a
13 counselor who went out and saw somebody on one
14 of these Quick Response Team visits, would that
15 be recorded in --
16    A.   I don't believe so.
17    Q.   Okay.  Project DAWN, would it be
18 recorded?
19    A.   No.
20    Q.   So we're really just talking about
21 the counseling services?
22    A.   Yes.
23    Q.   What about the assessments that a
24 Summit Public Health counselor did as part of
25 the STARS Program?

Page 184

1    A.   No, I don't believe that they were
2 in Open Practice.
3    Q.   So as we sit here today, to the
4 best of your knowledge, these are counseling
5 patients?
6    A.   To the best of my knowledge, yes.
7    Q.   If we turn to page 3, these -- and
8 specifically the -- the table that starts on
9 that, we have the same time frame, September 15
10 through the end of November 15.  Do you see
11 that?
12    A.   Yes.
13    Q.   And it rep- -- or I'm sorry.  It
14 says below that "Diagnosis Code Totals," and
15 then it says, "ICD-10 equivalent."
16    What does that mean, "ICD-10
17 equivalent"?
18    A.   Well, the ICD-9 number is the
19 diagnosis number that is used for billing.  I
20 can't tell you what -- specifically what the
21 definition is -- of equivalent means --
22    Q.   Oh, okay.
23    A.   -- in this.
24    Q.   Well, at least within -- with
25 ICD-10 --

Page 185

1    A.   Yeah.
2    Q.   -- that's a billing --
3    A.   Or rather ICD -- yeah.  I used to
4 work in a hospital back when dinosaurs roamed
5 the earth.  I'm sorry.  It is 10 now.
6    Go ahead.
7    Q.   Well, really, the only one here who
8 didn't was this guy sitting next to me.  So --
9 and maybe Anne's colleague, too.  But the rest
10 of us have been around since that long as well.
11    A.   Okay.
12    Q.   So ICD-10, though, it's essentially
13 a diagnosis code that allows bill- -- for
14 billing purposes?
15    A.   Yes.
16    Q.   Okay.  And if we look, there are a
17 number of ICD-10 categories listed below, and
18 you'll see opioid appears three times, and then
19 many others on a list that includes 15 or 20
20 line entries.  Do you see that?
21    A.   Yes, yes.
22    Q.   If we look at the first three,
23 there's alcohol at 214.  Do you see that?
24    A.   Yes.
25    Q.   Cannabis at 168.

47 (Pages 182 - 185)

Page 186

1    A.   Uh-huh.
2    Q.   And opioid at 114.
3    A.   Yes.
4    Q.   All right.  Do these represent,
5  again, specific patients who have diagnoses of
6  these particular categories we just referenced?
7    A.   I believe so.
8    Q.   Okay.  And you'd agree with me, by
9  looking at this data in this e-mail that you
10 received in 2015, that alcohol and cannabis
11 individually, there were more patients treated
12 for those conditions than opioid dependence;
13 would you agree?
14   A.   Based on this, yes.
15   Q.   Okay.  So is it consistent with
16 your experience, both as the director of the
17 community health division and as the assistant
18 health commissioner for Summit Public Health,
19 that there are substances other than opioids
20 for which Summit Public Health is providing
21 treatment services to?
22   A.   Yes.
23   Q.   And at least in this three-month
24 period here in 2015, in fact, it looks like it
25 was maybe the third most common condition being

Page 187

1  treated for?
2        MS. KEARSE:  Object to form.
3    A.   Yes, yes.
4    Q.   And alcohol being -- almost twice
5  as many patients being treated for alcohol as
6  opioids, agreed?
7    A.   Yes.
8    Q.   If we turn the page to the -- it
9  should be page 4.  Again, it says "Practice
10 Analysis."  Do you see that?
11   A.   Uh-huh.
12   Q.   And some of those names seem
13 familiar, but is it -- is it accurate for me to
14 assume that all of those represent individual
15 counselors at Summit Public Health?
16   A.   Yes.
17   Q.   And Skoda is not Donna Skoda; as I
18 understand it, there's a Michael Skoda?
19   A.   Yes.
20   Q.   Who's not related to Donna Skoda?
21   A.   That's correct.
22   Q.   Okay.
23       MS. KEARSE:  He's been doing this
24 way too long.
25       MR. NAEEM:  We thought we had the

Page 188

1  "got you" question.  It didn't work out.
2    Q.   Okay.  And so do you know why
3  the -- so if we look at the "Patients" column
4  down at the bottom, it's 247.  If we look at
5  the "Encounters" column, it's 2,060 encounters.
6        Why doesn't the patient total equal
7  what we saw on page 1 with unique individual
8  patients?
9    A.   I don't know.
10   Q.   Okay.  That would be a question,
11 maybe, for Griffin Brown?
12   A.   I don't know if Griffin could
13 answer that.  I don't know.  I'd have to -- I
14 really don't know.
15       MR. BORANIAN:  I'm sorry to --
16   A.   Griffin might be --
17       MR. BORANIAN:  -- sorry to
18 interrupt.  Apparently people on the phone can
19 no longer hear the witness.  Can we check the
20 microphone?
21       THE VIDEOGRAPHER:  We're off the
22 record, 1:50.
23       (Off-the-record discussion.)
24       THE VIDEOGRAPHER:  We're back on
25 the record, 2:00.

Page 189

1    Q.   All right.  Just to finish up our
2  line of questioning, then, with respect to
3  Deposition Exhibit 6, you believe the Open
4  Practice Solutions program is still being used
5  at Summit Public Health.  Agreed?
6    A.   I believe so, yes.
7    Q.   And so we should be able to get the
8  same data that's represented here from that
9  if -- if we were to ask; would you agree?
10       MS. KEARSE:  Object to form.
11   A.   If there's someone who knows how
12 Loren ran this report, yes.
13   Q.   Okay.  Are you aware of any other
14 sources, other than the individual patient
15 records and the type of report we just saw,
16 that would allow us to characterize the drugs
17 of abuse that patients were coming in for
18 treatment for at Summit Public Health?
19   A.   Can you say that again?
20   Q.   Yeah.  So -- so really all I'm
21 looking for is if I want to understand how many
22 patients that Summit Public Health has seen and
23 the type of -- the alcohol or other drug that
24 they were being treated for --
25   A.   Yes.

48 (Pages 186 - 189)

Page 190

1    Q.  -- we've talked about a couple
2  sources, individual medical records.
3    A.  Yes.
4    Q.  And this Exhibit 6 with the Open --
5    A.  Open Practice.
6    Q.  Yeah.
7    A.  Yes.
8    Q.  Is there any other source of data
9  at Summit Public Health you're aware of where
10  you could answer that question if you needed
11  to, how many patients and what drugs they were
12  using?
13    A.  Not that I'm aware of.
14    Q.  So I'd like to -- to kind of close
15  the door on the programs, and I want to run
16  through them and make sure that I didn't miss
17  one that you've perhaps thought of since we've
18  started talking about this.  Okay?
19    A.  Okay.
20    Q.  We talked about the counseling
21  services.
22    A.  Yes.
23    Q.  We talked about prevention --
24    A.  Yes.
25    Q.  -- programs.

Page 191

1    A.  Yes.
2    Q.  We talked about Project DAWN,
3  syringe exchange, the MAT clinic, the disposal
4  boxes, STARS, and the Quick Response Teams.
5    A.  Yes.
6    Q.  As we sit here, are there any
7  programs through which Summit Public Health has
8  provided substance abuse treatment services to
9  patients that we haven't talked about?
10    A.  To patients specifically?
11    Q.  Yeah.
12    A.  No.  That I can -- that I'm aware
13  of, no, that I can think of.
14    Q.  Earlier -- I don't even remember
15  what we were talking about, but you told me
16  you're not an expert on opioids.  Do you -- do
17  you recall saying that?
18    A.  Yes.
19    Q.  Okay.  As a general matter, do you
20  know what types of treatments are available for
21  patients with chronic pain?  Is that something
22  you're familiar with?
23    A.  Not -- no.  Not enough to have a
24  conversation about the different types of
25  medications.  No.

Page 192

1    Q.  Okay.  Well, certainly one thing --
2  that's the reason we're here, right?
3    A.  Uh-huh.
4    Q.  -- is that opioids are used to
5  treat chronic pain.
6    A.  Yes.
7    Q.  Certainly you're aware of that.
8      MS. KEARSE:  Well, and I'll just --
9  she's here to answer questions as a fact
10  witness because you all wanted her to be
11  deposed.
12      MR. NAEEM:  Right.  And I'm trying
13  to get a sense of the witness's knowledge so I
14  can decide what questions to ask her.
15      MS. KEARSE:  She's here at your
16  request.
17      MR. NAEEM:  I don't remember what I
18  said, but I'm sure I said something that --
19      MS. KEARSE:  Okay.
20      MR. NAEEM:  You know I love you,
21  Anne.  I do actually enjoy being across the
22  table from you versus some of your colleagues.
23      MS. KEARSE:  Let the record
24  reflect.
25      MR. NAEEM:  Might have wanted to

Page 193

1  wait until we were off the record for that, but
2  I'm not afraid to let those folks know who they
3  are when I see them.
4    Q.  So certainly one of the ways to
5  treat chronic pain you're aware of is
6  prescription opioid medications?
7    A.  Yes.
8    Q.  All right.  Do you have any
9  knowledge regarding what other types of
10  treatment are available for patients with
11  chronic pain, other than prescription opioids?
12    A.  Like Tylenol?
13      MS. KEARSE:  Sure.
14    Q.  Okay.  So one alternative to
15  opioids you just mentioned would be
16  over-the-counter analgesics?
17    A.  Yes.
18    Q.  Okay.  So let's -- let's put aside
19  prescription opioids and over-the- --
20  over-the-counter analgesics.
21      Are you familiar with any other way
22  to treat chronic pain than those kinds of
23  medications?
24    A.  I would say physical therapy,
25  chiropractic services.  I don't -- yeah, I

49 (Pages 190 - 193)

Page 194

1 don't know.
2    Q.   Okay.  And are you familiar with
3 the consequences of untreated chronic pain?
4        So are you aware that --
5        MS. KEARSE:  She was about to
6 answer your question.
7        MR. NAEEM:  Yeah.  Okay.  I'm
8 sorry.  She was giving me kind of the look she
9 gives me when she's, like, "Can you ask the
10 question a different way?"
11       THE WITNESS:  Oh, yeah.
12       MS. KEARSE:  -- going to say,
13 another thing that she doesn't know.
14    A.   I don't know.
15    Q.   Are you aware of whether or not
16 people with chronic pain -- or I'm sorry --
17 that untreated chronic pain can lead to
18 depression?
19       MS. KEARSE:  Object to the form.
20    Q.   Have you heard that?
21    A.   Perhaps I've heard that, but I
22 don't know.  You're sort of going into
23 territory that I'm -- I'm just not familiar
24 with.
25    Q.   And that's really fair, and my

Page 195

1 point is not to --
2    A.   Test me on --
3    Q.   Well, I do need to -- I tried to --
4 I need to understand the testimony you could
5 give --
6    A.   Okay.
7    Q.   -- as a witness for Plaintiff in
8 this case.
9    A.   Okay.
10    Q.   And so I do have to test you,
11 technically, on certain things so that I can
12 make sure you don't come back later and provide
13 some testimony that I asked you about today.
14    A.   Okay.
15       MS. KEARSE:  And if she says she
16 doesn't know --
17       THE WITNESS:  Yeah.
18       MS. KEARSE:  -- then I think that's
19 your answer.
20       THE WITNESS:  Yeah.
21       MR. NAEEM:  Fair enough.  I'm
22 monologuing.
23    Q.   Are you familiar that people with
24 untreated chronic pain have higher incidents of
25 suicide?

Page 196

1       MS. KEARSE:  Object to form.
2    A.   Yes.
3    Q.   You have heard that?
4    A.   I have heard that, yeah.
5    Q.   Okay.  Are you of the belief that
6 chronic pain patients should not have access to
7 prescription opioids to treat their pain?
8       MS. KEARSE:  Object to form.
9    A.   No.
10    Q.   Okay.  Would you agree with me that
11 not every patient who uses prescription opioids
12 becomes an addict?
13    A.   Yes.
14    Q.   You -- you testified that you
15 didn't -- or that the Cuyahoga County Board of
16 Health didn't have any substance abuse-related
17 programs while you were employed.  Other than
18 that -- well, let's strike that.
19       Would you agree that many
20 substances other than opioids can lead to
21 addiction?
22    A.   Yes.
23    Q.   Would you agree with that -- with
24 me that legal substances can lead to addiction,
25 like alcohol?

Page 197

1    A.   Yes.
2    Q.   Are you aware of how long heroin
3 has been a drug of abuse in this community?
4    A.   No, I'm not.
5    Q.   Would you agree with me or have you
6 heard, for example, that soldiers coming back
7 from Vietnam -- or soldiers came back from
8 Vietnam in the '70s addicted to heroin?
9    A.   Yes.
10       MS. KEARSE:  Object to form.
11       MR. NAEEM:  I'm sorry?
12       MS. KEARSE:  I just objected to the
13 form.
14    Q.   Are you aware of when prescription
15 opioids became available to patients in the
16 United States?  What year?
17    A.   At least 2011.
18    Q.   Would you know whether it was --
19 strike that.
20       Are you aware of any details
21 regarding the FDA approval process?
22    A.   No.
23    Q.   Are you aware, though, that
24 prescription opioids need to be approved by FDA
25 before they can be sold --

50 (Pages 194 - 197)

Page 198

1     A.   Yes.
2     Q.   -- in the United States?
3     A.   Yes.
4     Q.   And that would include prescription
5  opioids, of course?
6     A.   Yes.
7     Q.   Do you know anything about the DEA
8  scheduling process?
9     A.   No.
10    Q.   Okay.  And you're -- you've heard,
11  certainly, of the drug enforcement agency?
12    A.   Yes.
13    Q.   Have you heard the phrase "Schedule
14  I drug"?
15    A.   Yes.
16    Q.   Okay.  Have you heard the phrase
17  "Schedule II drug"?
18    A.   Yes.
19    Q.   Do you know what --
20    A.   No.
21    Q.   -- the definition of any of those
22  are?
23    A.   No.
24    Q.   I asked you a little bit about,
25  when we were talking about documents, where

Page 199

1  they were located, and we talked a little bit
2  about articles that you had to review.
3        Have you done any research yourself
4  on prescription opioids and addiction?
5     A.   Well, I have, over the years, seen
6  things, you know, if I got sent a link to
7  information.  I remember reading things, seeing
8  presentations, but nothing that I could speak
9  to, nothing that I memorized, nothing that I
10  then could have a conversation with anyone
11  about.
12    Q.   Okay.  One of the initiatives that
13  we've heard talked about by some of the
14  witnesses is the Summit County Opiate Task
15  Force.  Are you familiar with that entity?
16    A.   Yes, yes.
17    Q.   Do you have any personal
18  involvement with that entity?
19    A.   I went to those meetings early on
20  quite a bit.
21    Q.   Okay.  And what was the purpose of
22  you attending those meetings?
23    A.   The health district was
24  initially -- the ADM Board, it was a
25  partnership to get the task force up and

Page 200

1  running.  We were going to facilitate those
2  meetings, and so I was there looking at the mix
3  of individuals that were there, trying to
4  identify whether there were gaps and other
5  people needed to be at the table, to hear what
6  was happening in the community around opiates
7  and why a task force was needed.
8     Q.   Okay.  And when is the last
9  involvement you've had with the Opiate Task
10  Force?
11    A.   I've not been to a task force
12  meeting in a couple years.
13    Q.   Okay.  Do you know what the program
14  Prescription for Prevention is?  Have you heard
15  of that?
16    A.   Is that a health district program?
17    Q.   Well, it was -- let me ask it in a
18  way it's as a question.
19        Were you involved in any of the
20  Ohio Department of Health's efforts around 2010
21  regarding the Prescription for Prevention
22  program?
23    A.   No.  The only thing that makes --
24  that sounds familiar to me is we purchased
25  prescription pads for physicians to prescribe

Page 201

1  exercise three times a day or prescribe fruits
2  and vegetables, so that's probably not what
3  you're talking about.
4     Q.   No, no.  So --
5     A.   Sorry.
6     Q.   -- with respect to any efforts by
7  the Ohio Department of Health in the 2010 time
8  frame to begin setting up task forces to
9  address opioid addiction issues, was that
10  something you were involved in that you recall?
11    A.   I was not involved.  I recall
12  hearing about those efforts through different
13  venues, but I was not personally involved in
14  that.
15    Q.   Okay.  Are you aware of data
16  regarding the numbers of prescription opioids
17  dispensed to patients in Summit County over the
18  course of time from 2010 to present, for
19  example?
20    A.   I -- I've heard numbers presented
21  here and there, something like 62 pills for
22  every person, man, woman, child in Summit
23  County.
24    Q.   Okay.  And -- and are you aware,
25  one way or another, whether those numbers have

51 (Pages 198 - 201)

Page 202

1 gone up, down, or stayed the same since 2010 to
2 present?
3     A.   I believe those numbers have gone
4 down.
5     Q.   Okay.  Have you seen any
6 information or do you recall any information
7 regarding how opioid overdoses have changed
8 over the same time frame?
9     A.   No.  I mean, I believe that the
10 numbers have gone down because the guidance
11 changed at -- at the state level around
12 prescribing; so, hence, I believe there was a
13 reduction in numbers.  In terms of overdoses, I
14 don't know.
15     Q.   Okay.  And -- and to be clear in my
16 last question, I meant any opioids,
17 prescription or illegal opioids --
18     A.   Ah.
19     Q.   -- like heroin and Fentanyl.
20     A.   Okay.
21     Q.   So with that qualification, have
22 you seen any data indicating whether those --
23 the number of overdoses from opioids have gone
24 up, down, or remained the same since 2010?
25     A.   I get a snapshot every day of the

Page 203

1 number of overdoses from the day before and
2 the -- for that week.
3     A.   I can't say that I -- you know, I
4 haven't stepped back to look at the big
5 picture, so I can't tell you from one month to
6 the next or from one year to the next what
7 those numbers are like.
8     Q.   Okay.  So you get -- you get daily
9 and up to monthly updates.  You don't recall
10 seeing --
11     A.   Not monthly.
12     Q.   -- something --
13     A.   It's weekly.
14     Q.   Okay.  Weekly.  I'm sorry.
15          But you don't -- you don't see
16 anything that shows -- or you don't recall
17 seeing anything that shows the breadth of time
18 from 2010 to present regarding opioids?
19     A.   Right.
20     Q.   Overdoses?
21     A.   Yes.  And I'm not saying it's not
22 out there; I just don't recall.
23     Q.   Right.  And I just need to know
24 whether you are or not aware of that data.
25     A.   Yeah.

Page 204

1     Q.   So you're not?
2     A.   Not that I recall seeing anything
3 about that.
4     Q.   Have you reviewed any information
5 regarding the role of pill mills in Summit
6 County in contributing to the opioid addiction
7 epidemic?
8          MS. KEARSE:  Object to form.
9     A.   I haven't reviewed anything, but I
10 do recall years ago when there was quite a bit
11 of information out -- and on Dateline and
12 various news channels, there was information
13 coming out of the governor's office about pill
14 mills and what the governor was doing to shut
15 them down and to shut down the pipeline to Ohio
16 for those things.
17          I wasn't as close to it.  That was
18 really more law enforcement involved at that
19 point.
20     Q.   And so --
21     A.   Probably still.
22     Q.   -- so other than just being
23 somebody who read the news or watched the news,
24 your -- your role as an employee of Summit
25 Public Health didn't involve anything to do

Page 205

1 with analysis of pill mills and their --
2 whether they contributed to the opioid crisis?
3     A.   My role as -- in public health,
4 yeah, didn't deal with analyzing it.  But, you
5 know, there were various meetings throughout
6 the county that take place where you have
7 multiple sectors sitting around the table and
8 the conversations would have been had, whether
9 it was the hospital systems talking about the
10 spike in babies being born with NAS, to police
11 and/or EMS talking about -- I think
12 conversations were being had about the number
13 of opiates that were on the street.
14     Q.   Okay.
15     A.   So.
16     Q.   And then, so is it fair to say that
17 you are aware, from those types of meetings,
18 that pill mill operators were contributing to
19 the supply of illegal opioids on the street?
20          MS. KEARSE:  Object to form.
21     A.   I am aware that there were lots of
22 pill mills and that the governor established a
23 task force to shut them down.
24     Q.   Okay.  Are you aware of any
25 information regarding how shutting down those

52 (Pages 202 - 205)

Page 206

1 pill mills might have affected the prescription
2 opioids being dispensed in the state of Ohio
3 from 2010 to the present?
4        MS. KEARSE:  Object to form.
5    A.    Can you ask me that question again?
6    Q.    Yeah.  So -- so you indicated you
7 were aware of some efforts at the state level
8 to change the laws regarding prescription
9 opioids.  And these are my words.
10   A.    Yes.
11   Q.    Tell me if they're wrong.  But they
12 were targeting pill mill operators?
13   A.    Yeah.  Well, yes.
14   Q.    Okay.  And -- and I'm just curious
15 whether you saw any follow-up information
16 indicating whether those efforts were
17 successful in reducing the amount of pills that
18 were being diverted.
19        That's actually not what my
20 question was, so let me ask it a different way.
21        Have you seen any analysis
22 indicating that the shut- -- the enforcement
23 actions on pill mills contributed to the
24 decrease in opioids being dispensed from 2010
25 to the present?

Page 207

1        MS. KEARSE:  Object to form.
2    A.    I can't say that I've seen
3 something specific, that specifically says
4 that.
5    Q.    Have you seen any other analysis
6 regarding the reasons why there are fewer
7 prescription opioids being dispensed currently
8 than there were in 2010?
9    A.    Well, I've been in --
10       MS. KEARSE:  Object to form.
11   A.    -- meetings and they've talked, and
12 there's been discussion about not only the pill
13 mills being shut down, but also the new
14 guidelines for physicians prescribing opiates.
15 I think that there was a significant decrease
16 then with that change.  But, yeah, in terms of
17 prescriptions.
18   Q.    And to be clear, you're talking
19 about guidelines for prescribing opioids --
20   A.    Yes.
21   Q.    -- there have been changes in that?
22   A.    Correct.
23   Q.    And is it your testimony that those
24 have contributed to the decrease in the amount
25 of opioids being prescribed currently versus

Page 208

1 2010?
2    A.    Yes.
3        MS. KEARSE:  Object to form.
4    A.    I believe so.
5    Q.    Are you aware of Ohio laws
6 regarding the types of medical practitioners
7 that are permitted to prescribe opioids to
8 patients in the state of Ohio?
9    A.    No.
10   Q.    Well, let -- let me ask it this
11 way.  Medical doctors can prescribe --
12   A.    Yes.
13   Q.    -- opioids, correct?
14   A.    Yes.
15   Q.    Were you aware or are you aware of
16 whether or not, for example, dentists can
17 prescribe opioids?
18   A.    Yes.
19   Q.    Okay.  Are there certain categories
20 of nurses that can prescribe opioids?
21   A.    Under the direction of a physician.
22   Q.    And it's your understanding that
23 it's state law that governs the type of medical
24 providers that can prescribe opioids?
25   A.    Yes, and -- yeah.

Page 209

1    Q.    Okay.  And in this lawsuit, the --
2 if you're aware, there are a number of
3 manufacturers who have been sued by Plaintiffs,
4 manufacturers of the prescription opioids;
5 would you agree?  You're aware of that?
6    A.    Yes.
7    Q.    Okay.  Manufacturers cannot
8 prescribe opioids to patients; would you agree?
9    A.    Yes.
10   Q.    And they can't -- they can't
11 provide opioids to patients without --
12   A.    A prescription.
13   Q.    -- a prescription, right.
14   A.    Yes.
15   Q.    So a patient needs a prescription
16 to get them legitimately?
17   A.    Yes.
18   Q.    Okay.  And pharmacies can't
19 dispense opioids to patients without a
20 prescription --
21   A.    That's correct.
22   Q.    -- agreed?
23   A.    Yes.
24   Q.    And do you have an understanding of
25 how any medication gets from a manufacturer to

53 (Pages 206 - 209)

Page 210

1 a pharmacy?  The supply chain?

2     A.    No.

3     Q.    Have you heard of distributors --

4 third-party distributors of opioids like

5 Cardinal Health, McKesson?

6     A.    I didn't -- I don't understand the

7 relationship between them and --

8     Q.    Okay.  Regardless, a patient --

9 strike that.

10         Have you provided any information

11 to anyone -- either at Summit Public Health,

12 City of Akron, Summit County -- analyzing the

13 amounts of money that Summit Public Health has

14 spent on opioid-related programs since 2010?

15     A.    I have not.

16     Q.    Are you aware of any analysis like

17 that that's been done?

18     A.    Not that I've seen.  That's not to

19 say that there hasn't been one done.  I've not

20 seen it.  I've not had any conversations about

21 it.

22     Q.    Okay.  And so you're not aware of

23 anything?

24     A.    Correct.

25         MR. NAEEM:  Ms. Block, I don't

Page 211

1 think I have any questions for you.  I know

2 that some of my colleagues down at the end of

3 the table have some questions.  And I don't

4 think I'll have any follow-up, but I -- I

5 appreciate your time.  Thank you very much.

6         THE WITNESS:  Thank you.

7         MS. KEARSE:  Are we going to take a

8 break now to transition?

9         THE VIDEOGRAPHER:  Let's go off the

10 record, 2:27.

11         (A recess was taken.)

12         THE VIDEOGRAPHER:  We're back on

13 the record, 2:55.

14         EXAMINATION OF TONYA BLOCK

15 BY MR. BORANIAN:

16     Q.    Good afternoon, Ms. Block.  Are you

17 ready to resume?

18     A.    I -- Yes.

19     Q.    Okay.  My name is Steven Boranian.

20 I represent AmerisourceBergen Drug Corporation.

21         Are you aware that Summit County

22 and Summit County Public Health have filed this

23 lawsuit alleging damages resulting from the use

24 and abuse of opioids?

25     A.    Yes.

Page 212

1     Q.    Okay.  Have you had a chance to

2 review any of the complaints, the operative

3 complaints, in this case?

4     A.    I did not review the complaints.

5         MS. KEARSE:  Asked and answered as

6 well.

7     Q.    Do you know which prescription

8 pharmaceutical distributors that the County

9 sued?

10     A.    No.  I know that there were

11 several.  I don't know which specific ones.

12     Q.    Have you ever heard of my client,

13 AmerisourceBergen, before today?

14     A.    No.

15     Q.    Have you ever heard of -- and

16 Mr. Naeem asked you this earlier, but I'll ask

17 you again.  Have you ever heard of Cardinal

18 Health?

19     A.    Yes.

20     Q.    And in what capacity have you heard

21 of Cardinal Health?

22     A.    That they're an insurance provider,

23 and that they -- we actually have a grant from

24 them, so.

25     Q.    Are you at all familiar with

Page 213

1 Cardinal Health's business as a prescription

2 drug distributor?

3     A.    No.

4     Q.    And what is the grant that you have

5 with Cardinal Health?

6     A.    It's for recovery coaches to help

7 link individuals leaving the jails to services.

8     Q.    Have you heard of McKesson

9 Corporation?

10     A.    Yes.

11     Q.    And in what capacity have you

12 heard --

13     A.    Just that I'm --

14     Q.    -- of McKesson?

15     A.    -- familiar with the name.

16     Q.    Okay.  The person seated to your

17 left is taking down everything we're saying, so

18 make sure you wait for me to finish --

19     A.    Oh, okay.

20     Q.    -- before you answer.

21     A.    Okay.

22     Q.    Can you name any other of the

23 prescription drug distributors that are named

24 in the complaint?

25     A.    No.

54 (Pages 210 - 213)

Page 214

1    Q.    Now, over the last 11 years in your
2 capacity first as a director of community and
3 then currently as the assistant health
4 commissioner, have you developed any
5 understanding of what a prescription drug
6 distributor does?
7    A.    A prescription drug distributor?
8    Q.    Correct.
9    A.    No.
10    Q.    So, for example, do you know if
11 prescription drug distributors manufacture --
12    A.    I believe they --
13    Q.    -- pharmaceuticals?
14    A.    That -- that was my understanding,
15 that they manufacture. That's what I --
16        So when you say distributor, it's
17 just a bit confusing for me.
18    Q.    And upon what do you base your
19 belief that prescription drug distributors
20 actually manufacture pharmaceuticals?
21    A.    I have -- I wasn't familiar with
22 the term "prescription drug distributors."
23    Q.    Okay.
24    A.    So pharmaceutical companies, I --
25 my understanding is that pharmaceutical

Page 215

1 companies develop pharmaceuticals.
2    Q.    And, in fact, you understand that
3 Summit County and Summit County Public Health
4 have sued a number of prescription drug
5 manufacturers, true?
6    A.    Yes. That's -- yes.
7    Q.    So my question is, upon what do you
8 base the statement that you just made that
9 prescription drug distributors actually
10 manufacture pharmaceuticals?
11    A.    I assume that they were one and the
12 same. When you say prescription drug
13 manufacturers, I assume that, for example,
14 McKesson was a manufacturer. So if that's not
15 true, then that's all I'm familiar with.
16    Q.    That's your assumption, correct?
17    A.    My assumption that that's all I'm
18 familiar with?
19    Q.    It's your assumption that McKesson,
20 for example, manufactures pharmaceuticals.
21    A.    Yes.
22        MS. KEARSE:  Object to the form.
23    Q.    That's what you just said, right?
24    A.    Yes.
25    Q.    Okay. I'll represent to you that

Page 216

1 prescription drug manufacturers and
2 prescription drug distributors do different
3 things.
4    A.    Okay.
5    Q.    Do you have any basis to disagree
6 with that statement?
7    A.    No.
8    Q.    Now, other than the assumption that
9 you just stated, do you have any knowledge, any
10 facts, upon which you can say that prescription
11 drug distributors manufacture pharmaceuticals?
12    A.    No.
13    Q.    Do you know if prescription drug
14 distributors ever interact with patients?
15    A.    I do not believe so.
16    Q.    Do you know if prescription drug
17 manufacturers ever interact directly with
18 physicians who prescribe drugs?
19    A.    I don't know.
20    Q.    Do prescription drug distributors
21 actually write prescriptions?
22    A.    I wouldn't believe so.
23    Q.    Doctors do that, correct?
24        MS. KEARSE:  Object to --
25    A.    They do.

Page 217

1    Q.    In your experience as a director of
2 community health and then as assistant health
3 commissioner, have you ever seen any marketing
4 of prescription drugs by a prescription drug
5 distributor?
6    A.    No.
7    Q.    Do you know if prescription drug
8 distributors have any role in preparing the
9 written warnings that come along with
10 prescription drugs?
11    A.    I don't know.
12    Q.    Do prescription drug distributors
13 fill prescriptions?
14        MS. KEARSE:  Objection.
15    A.    No.
16    Q.    Pharmacies do that, right?
17    A.    Yes.
18        MS. KEARSE:  Objection.
19    Q.    Do you know what a drug formulary
20 is?
21    A.    I have a sense of what it is from
22 my perspective as a -- someone who has health
23 insurance.
24    Q.    And I think you said earlier you
25 worked in a hospital setting --

55 (Pages 214 - 217)

Page 218

1  A.  Yes.
2  Q.  -- in the past, correct?
3  A.  Yes.
4  Q.  So is it fair to say a drug
5  formulary is a list of drugs that are available
6  within a certain facility?
7  A.  That's my understanding.
8  Q.  Do prescription drug distributors
9  have any role in determining any facility's
10  drug formulary?
11  A.  I don't know.
12  Q.  Do you understand the process under
13  which the Drug Enforcement Administration sets
14  quotas for the manufacturing of controlled
15  substances?
16  A.  No.
17  Q.  Do you know if distributors have
18  any part in that process?
19  A.  No.
20  Q.  If a distributor sells a given
21  medicine, including opioids, to a particular
22  pharmacy, does that distributor know how much
23  of the same medication that pharmacy bought
24  from a different distributor?
25      MS. KEARSE:  Object to form.

Page 219

1  A.  I don't know.
2  Q.  Do you know what HIPAA refers to?
3  A.  Yes.
4  Q.  That's the federal law that
5  protects patient privacy, correct?
6  A.  Yes.
7  Q.  Does a drug distributor know the
8  identity of patients to whom their distributed
9  products are actually prescribed?
10      MS. KEARSE:  Objection.
11      THE WITNESS:  Do I need to answer?
12      MR. BORANIAN:  You can answer.
13      THE WITNESS:  Oh.
14      MR. BORANIAN:  The question is do
15  you know.
16      MS. KEARSE:  Yeah.  I mean, she's
17  already testified she doesn't have direct
18  knowledge about distributor information on
19  there, too, so if you want her to keep saying
20  "I don't know," she can go down that road,
21  but --
22      MR. BORANIAN:  Do you want the
23  question repeated, ma'am?
24      THE WITNESS:  Please.
25      MR. BORANIAN:  Can you repeat the

Page 220

1  question, please?
2      (Record read.)
3      A.  I wouldn't think so.
4  Q.  Do prescription drug distributors
5  have any knowledge of what a patient actually
6  does with his or her prescription medication?
7      MS. KEARSE:  Objection.
8      THE WITNESS:  Do I answer when you
9  say "objection"?
10      MS. KEARSE:  Yes.  Yeah, you can
11  answer, even if your same answer is you don't
12  know, you don't know.
13      THE WITNESS:  Oh, okay.
14      MR. BORANIAN:  So if she tells you
15  not to answer --
16      THE WITNESS:  Then don't answer.
17      MR. BORANIAN:  -- then you don't
18  answer.
19      THE WITNESS:  Okay.
20      MR. BORANIAN:  But she hasn't done
21  that yet --
22      THE WITNESS:  Okay.
23      MR. BORANIAN:  -- but -- and I
24  doubt that she will, but --
25      THE WITNESS:  Okay.

Page 221

1      MS. KEARSE:  Well, suggesting --
2  you're kind of asking questions she's already
3  said she doesn't have any knowledge about, but
4  if you want to waste your time that way go
5  right ahead.
6      MR. BORANIAN:  Well, then I'll use
7  my time that way.
8      MS. KEARSE:  Then you can use your
9  time that way.
10      MR. BORANIAN:  Do you want the
11  question back again, ma'am?
12      THE WITNESS:  Yes, please.
13      (Record read.)
14  A.  I don't think so.
15  Q.  Do distributors know a patient's
16  diagnosis?
17  A.  An individual?  I don't know.  No,
18  I -- no.
19  Q.  Do distributors know anything about
20  what the patient has tried in terms of other
21  medications, whether the patient has any
22  history of addiction, any of those things?
23      MS. KEARSE:  Objection.
24  A.  I don't know.
25  Q.  Mr. Naeem asked you briefly about

56 (Pages 218 - 221)

Page 222

1 the regulation of prescription drugs.
2      Let me just ask you first, are you
3 familiar with any of the regulations that
4 prescription drug distributors have to follow?
5      A.   No.
6      Q.   So, for example, are you familiar
7 with any regulations that the State of Ohio
8 imposes on distributors?
9      A.   No.
10      Q.   Have you had any interaction at all
11 during your time in public health with the Ohio
12 Board of Pharmacy?
13      A.   No.
14      Q.   So are you familiar with any of the
15 regulations that the Ohio Board of Pharmacy
16 might impose on distributors?
17      A.   No.
18      Q.   Are you familiar at all with the
19 federal regulation of drug distributors?
20      A.   No.
21      Q.   Have you ever had any conversation
22 with any representative of a drug distributor,
23 other than myself?
24      A.   No.
25      Q.   Have you ever heard the term

Page 223

1 "suspicious order"?
2      A.   No.
3      Q.   Are you aware of any connection
4 between any specific order of prescription
5 drugs shipped by a Distributor Defendant and an
6 individual in Summit County who overdosed on
7 opioids?
8           MS. KEARSE:  Object to form.
9      A.   No.
10      Q.   Do you have any information or are
11 you aware of any link between any specific
12 order shipped by a Distributor Defendant and an
13 individual in Summit County who became addicted
14 to opioids?
15      A.   No.
16      Q.   Do you have any knowledge or any
17 awareness of any link between any specific
18 order shipped by a Distributor Defendant and an
19 individual in Summit County who abused opioids?
20           MS. KEARSE:  Objection.
21      A.   No.
22      Q.   You testified a little bit earlier
23 about your involvement with an opioid task
24 force.
25      A.   Yes.

Page 224

1      Q.   Do you remember that?
2      A.   Yes.
3      Q.   And which task force were you
4 referring to there?
5      A.   It's the Summit County opioid task
6 force.
7      Q.   Okay.  And I think you said you
8 last went to a meeting a couple years ago,
9 right?
10      A.   Yes.
11      Q.   When was the first time you went to
12 a meeting of the Summit County opioid task
13 force?
14      A.   When it was established, and that
15 was probably late '14, I believe.
16      Q.   So if we were to look up --
17      A.   Late '14, maybe '15.
18      Q.   So if we were to look up the date
19 and really nail that date down, that --
20      A.   I --
21      Q.   -- that would be -- that would be
22 the first time you went?
23      A.   I went when it was initially
24 established, so I don't know if that was the
25 actual date.

Page 225

1      Q.   Have you ever heard the term "drug
2 diversion"?
3      A.   No.
4      Q.   Are you aware of any connection
5 between any shipment of opioids from any
6 distributor and any diversion of opioids within
7 Summit County?
8      A.   No.
9      Q.   Are you aware of any criminal act
10 attributable to any Distributor Defendant --
11      A.   No.
12      Q.   -- during --
13           MR. BORANIAN:  Let me show you a
14 few documents.  This will be Exhibit 8?  Seven.
15           - - - - -
16           (Thereupon, Deposition Exhibit 7,
17           10/9/2008 E-Mail from Kathleen
18           Oberlin to Tonya Block Re: First
19           Lady FCFC Visit Challenges and
20           Issues, with Attachment,
21           SUMMIT_001714776 to 001714811, was
22           marked for purposes of
23           identification.)
24           - - - - -
25      Q.   So Exhibit 7, the first page is

57 (Pages 222 - 225)

Page 226

1 numbered, in the lower right-hand corner,
2 SUMMIT 001714776.  And it's an e-mail from
3 Kathleen Oberlin to you dated October 9th,
4 2008.
5      Is that all true, Ms. Block?
6      A.   Yes.
7      Q.   Who is Kathleen Oberlin?
8      A.   Kathleen worked for the state
9 mental health board.
10      Q.   The subject is -- is "Forward:
11 First Lady FCFC visit challenges and issues."
12      Is that what it says?
13      A.   Yes.
14      Q.   And she's forwarding this e-mail to
15 you with the attachment "For Your Eyes Only,"
16 right?
17      A.   Yes.
18      Q.   So if you look at the attachment,
19 it's a document entitled "OFCF Cabinet
20 Council," and that stands for Ohio Family and
21 Children First, correct?
22      A.   That's correct.
23      Q.   And is that an organization that
24 you've been affiliated with in the past?
25      A.   Yes.

Page 227

1      Q.   In what capacity?
2      A.   I came to Summit County as the
3 Family and Children First council director, the
4 local director.  It's a mandated state
5 organization.  Every county has to have one.
6      Q.   And so you were the director for
7 Summit County?
8      A.   Yes.
9      Q.   And so that's a state mandate.
10 Does that come along with state funding, too?
11      A.   $15,750.
12      Q.   Is that in -- when was that being
13 the amount?
14      A.   That is -- has been the amount
15 every year since it --
16      Q.   Okay.
17      A.   -- came into inception.
18      Q.   So this document is subtitled
19 "First Lady's 88-County FCFC Visits,
20 Prioritized Challenges and Issues, July 2008."
21      A.   Yes.
22      Q.   Do you recall receiving this
23 document?
24      A.   I don't recall receiving it, but
25 I -- yeah, I'm sure I received it.

Page 228

1      Q.   Do you know what the First Lady's
2 88-county FCFC visit refers to?
3      A.   Yes.
4      Q.   What is that?
5      A.   She made a series of visits to
6 every -- every county in the state to get a
7 sense of the challenges that each county was
8 facing and attempting to prioritize things that
9 they wanted to work on.
10      Q.   And who was the First Lady in July
11 of 2008, if you remember?
12      A.   Yeah.  It was the governor before
13 Kasich.  Strickland.  Governor -- yeah.
14      Q.   Okay.
15      A.   It was Mrs. Strickland.  I can't
16 remember her first name.
17      Q.   This is -- this is more than 10
18 years ago, right?
19      A.   Yeah.
20      Q.   So sorry to test your memory that
21 way.
22      A.   It's okay.
23      Q.   So if you turn to the section
24 called "Substance Abuse Challenges and Issues,"
25 it's on page 25 of the report.  The Bates

Page 229

1 number in the lower right-hand corner is
2 001714803.
3      A.   Uh-huh.
4      Q.   Are you with me?
5      A.   Yes.
6      Q.   So this is under -- so this is in a
7 report that is identifying priorities and
8 challenges, right?
9      A.   Uh-huh.
10      Q.   And it says here, at the very top,
11 "Service Barrier/Gaps."  First bullet point,
12 "Drug problem has escalated, but services seem
13 to have decreased, especially prevention."
14      Is that what it says?
15      A.   Yes.
16      Q.   And then the second bullet point --
17 the second solid bullet point below that, it
18 says, "More parents are using drugs, which is
19 creating more at-risk children and more in
20 foster care.  More babies being born to mothers
21 who use."
22      Is that what this report reflects?
23      A.   Yes.
24      Q.   The next bullet point is, "No AOD
25 residential facilities in rural counties."  Is

58 (Pages 226 - 229)

Page 230

1 that correct?
2    A.    Yes.
3    Q.    What does "AOD" stand for in this
4 context?
5    A.    Alcohol and other drugs.
6    Q.    And that's a term of art that's
7 often used in your industry, right?
8    A.    Yes.
9    Q.    So if you go to the second to last
10 bullet point, "Experiencing physicians
11 prescribing pain medications that find its way
12 to schools, communities, and clients."
13        That's what it says, right?
14    A.    Yes.
15    Q.    "Need to look at volume of pain
16 medication being prescribed by physician, find
17 a way to track this."
18        That's what it says, right?
19    A.    Yes.
20    Q.    So in October of 2008, Ms. Oberlin
21 forwarded this report to you that contained
22 these reports and findings, correct?
23    A.    Uh-huh.
24    Q.    And you received this report,
25 right?

Page 231

1    A.    Yes.
2    Q.    And did you appreciate, at the
3 time, that the use and abuse of opioids was
4 creating a public health issue?
5        MS. KEARSE:  Object to form.
6    A.    Yes.  Well, we -- this is when --
7 back in 2008, when I was the FCFC director, the
8 piece that resonated with me was the more
9 babies being born to mothers who abuse.  Those
10 were the conversations being had around the
11 table at that time in the role that I was in.
12    Q.    "At the time" meaning October of
13 2008, correct?
14    A.    Yes.  The other thing is that this
15 is not specific to Summit County.  This is a
16 statewide report, and so these comments
17 that were compiled from various counties, not
18 just here.
19    Q.    Okay.  It was forwarded to you in
20 2008, and at the time, you were the director of
21 community health, true?
22    A.    Yes.
23    Q.    And were you also at that time in
24 your role with the Family and Children First?
25    A.    Yes.

Page 232

1        MR. BORANIAN:  Okay.  This will be
2 Exhibit 8.
3        - - - - -
4        (Thereupon, Deposition Exhibit 8,
5        11/23/2010 E-Mail from Joe Gidley
6        Re: CFHS Minutes and Agenda for
7        December 2, 2010, with Attachment,
8        SUMMIT_001711478 to 001711481, was
9        marked for purposes of
10        identification.)
11        - - - - -
12    Q.    Ms. Block, Exhibit 8 is a document
13 with the Bates number in the lower right-hand
14 corner SUMMIT 001711478.  And this is an e-mail
15 from Joe Gidley dated November 23, 2010.  And
16 if you look at that long list of recipients,
17 you're the last one listed; is that correct?
18    A.    Yes.
19    Q.    Did you receive this e-mail and its
20 attachment on or about November 23, 2010?
21    A.    I assume so, yes.
22    Q.    So the subject line is, "CFHS
23 minutes and agenda for December 2, 2010,"
24 right?
25    A.    Yes.

Page 233

1    Q.    So who's Mr. Gidley?
2    A.    Joy.  It's one of our secretaries.
3    Q.    I'm sorry, joy Gidley.  I said Joe
4 earlier.
5    A.    That's okay.
6    Q.    Yeah.  Joy, J-o-y.
7    A.    Yes.
8    Q.    So Ms. Gidley forwarded to you the
9 agenda for a Thursday, December 2, 2010, child
10 and family health services meeting, right?
11    A.    Yes.
12    Q.    And the first item on the agenda is
13 the approval of the minutes from the October 7,
14 2010, meeting, right?
15    A.    Yes.
16    Q.    And those are attached here, the
17 page following --
18    A.    Okay.
19    Q.    -- true?
20    A.    Yes.
21    Q.    Are these the October 7, 2010,
22 minutes?
23    A.    I assume so, yes.
24    Q.    And you attended this meeting;
25 you're listed there as the fourth in order on

59 (Pages 230 - 233)

Page 234

1 the attendance list, right?
2    A.   Yes.
3    Q.   And under "Approval of Minutes,"
4 that first item, you seconded the approval of
5 the minutes, so you must have read them, right?
6    A.   Yes.
7    Q.   Okay.  Let's look at new business
8 on the next page.  This page is numbered
9 001711481.
10    A.   Oh, this is -- yeah.  Sorry.
11    Q.   What did you just recall there?
12    A.   Nothing.
13    Q.   Okay.  It says there "Sue Sorboro
14 stated that the number of days that an infant
15 is a patient in NICU for withdrawal of drug
16 exposure is increasing.  Neonatal abstinence
17 syndrome has doubled from the previous year."
18        That's what it says, right?
19    A.   Yes.
20    Q.   So who is Sue Sorbono -- Sorboro?
21    A.   She was a rep- -- she was one of
22 the representatives from Children's Hospital.
23    Q.   So did she come to the Thursday,
24 December 2, 2010, meeting and report to you all
25 these findings regarding infants?

Page 235

1    A.   I think that was -- December?
2    Q.   Strike that.  October 2010.
3    A.   Yes.
4    Q.   And did you have a discussion at
5 the time, on October 7, 2010, about composing a
6 press release from the Summit County Health
7 District to create awareness on the data of
8 patients addicted to opiates?
9    A.   Yes.  I think -- I recall that.
10    Q.   What did you all discuss?
11    A.   Well, this is the Maternal Child
12 Health Grant.  That's CFHS.  This grant is
13 responsible for putting programs and services
14 in place for individuals who are pregnant,
15 preconception, or recently delivered.  And so
16 we discussed whether or not that would be
17 helpful, who the audience should be, and what
18 the tone of the message should be, as I recall.
19    Q.   So Ms. Sorboro -- or is it
20 Dr. Sorboro?
21    A.   I believe it's Ms.
22    Q.   So Ms. Sorboro was reporting to you
23 a public health issue relating to infants and
24 opiates, right?
25    A.   Yes.

Page 236

1    Q.   And you had discussion about
2 getting the word out through a press release?
3    A.   Yes.
4    Q.   And this discussion occurred on
5 October 7, 2010, right?
6    A.   Yes.
7    Q.   And you had that discussion because
8 the use and potential abuse of opiates was, at
9 that time, a significant public health problem,
10 right?
11        MS. KEARSE:  Object to form.
12    A.   Always -- yes, and certainly an
13 increase.
14    Q.   Were you finished, Ms. Block?
15    A.   Yes.
16    Q.   Okay, sorry.
17        This will be Exhibit 9, Ms. Block.
18        - - - - -
19        (Thereupon, Deposition Exhibit 9,
20        June 2012 E-Mail Chain Re: ADM Board
21        - Draft Community Plan, with
22        Attachment, SUMMIT_001702355 to
23        001631373, was marked for purposes
24        of identification.)
25        - - - - -

Page 237

1    Q.   So the first page of Exhibit 9 is
2 page number SUMMIT 001702355, and this is an
3 e-mail from you to Kerry Kernen dated June 28,
4 2012.  Is that all true?
5    A.   Yes.
6    Q.   And you've copied Donna Skoda, who
7 we've discussed throughout today, correct?
8    A.   Yes.
9    Q.   You're a direct report to
10 Ms. Skoda, right?
11    A.   That's correct.
12    Q.   Were you a direct report to
13 Ms. Skoda on June 28, 2012?
14    A.   No.  I reported to Gene Nixon.
15    Q.   And then where did Gene Nixon stand
16 in relation to Ms. Skoda?
17    A.   He was the health commissioner.
18 Donna reported to him as well.
19    Q.   Okay.  The subject line is
20 "Forward:  ADM Board draft community plan"; is
21 that right?
22    A.   Yes.
23    Q.   What is the ADM Board?
24    A.   It's -- it's our local alcohol and
25 drug mental health agency.

60 (Pages 234 - 237)

Page 238

1    Q.   Is that an agency separate and
2 apart from the Summit County Health?
3    A.   Yes.  They're a board, our local
4 board.
5    Q.   Is it funded separately from your
6 organization?
7    A.   They're levy-funded.
8    Q.   Does the ADM ever offer funding to
9 programs that your department administers?
10   A.   Yes.
11   Q.   And are there any programs that ADM
12 funds for programs within your department that
13 we have not already discussed today?
14   A.   Could you repeat that?  I'm sorry.
15   Q.   Sure.  We've discussed a number of
16 programs over the course of today.  I don't
17 want to repeat any of it.
18   A.   Okay.
19   Q.   Are there any ADM-funded programs
20 within your department that we have not yet
21 discussed today?
22   A.   Not that I can think of.
23   Q.   If we were to want -- if we wanted
24 to drill down on that, would the ADM grants and
25 the programs they support be evident from the

Page 239

1 department budget?
2    A.   I believe so.
3    Q.   Would there be any other documents
4 we would want to go to to look for ADM-funded
5 programs?
6    A.   Not that I can think of.
7    Q.   So in this e-mail, you're sending
8 to Kerry Kernen a copy of the ADM Board draft
9 community plan.  Who is Kerry Kernen?
10   A.   An assistant director in community
11 health.
12   Q.   And is that Ms. Kernen or
13 Mr. Kernen?
14   A.   Ms.
15   Q.   And what were Ms. Kernen's
16 responsibilities at that time?
17   A.   She oversaw clinic services,
18 emergency preparedness, and -- yeah.  Those
19 were the two main -- main programs.  Yes.
20   Q.   So what is this community plan that
21 you were forwarding?
22   A.   I believe that this plan was
23 generated from the ID -- ADM Board and ended --
24 it was, I believe, a plan -- this is a long
25 time ago -- a plan for how they were moving

Page 240

1 forward, how would -- how they would prioritize
2 their funding based on local conditions.  And
3 conversations had been had between Jerry and I,
4 or perhaps Jerry and Donna, about the role the
5 health district was going to play above and
6 beyond the -- our AOD services.
7    Q.   So take a look at page 8 of this
8 draft community plan.  The Bates number is
9 001702363.
10        With me, Ms. Block?
11   A.   Yes.
12   Q.   So near the bottom it says, No. 3,
13 "What are the challenges within your local
14 system in addressing the finding of the needs
15 assessment"?
16        That's what it says, right?
17   A.   Yes.
18   Q.   And if you go to the next page, the
19 fifth challenge identified, letter E, is opiate
20 epidemic.
21   A.   Yes.
22   Q.   That's what it says, right?
23   A.   Yes.
24   Q.   And it reads, "Changes in drug of
25 choice for certain population groups, most

Page 241

1 specifically we are witnessing an increase in
2 the overprescribing and/or diversion of
3 opiate-based medications."
4        Is that what it says?
5    A.   Yes, it does.
6    Q.   Was there an opiate epidemic in
7 Summit County in June of 2012?
8        MS. KEARSE:  Object to form.
9    A.   That is certainly the term that was
10 being used at the time, and since then.
11   Q.   And at the time you were the
12 director of community health, right?
13   A.   I was, but this was not generated
14 from my office or the health district.  This
15 was generated by the ADM Board.
16   Q.   Correct.
17   A.   Yes.
18   Q.   And you forwarded it to other
19 people, right?
20   A.   Yes, my staff.
21   Q.   And the ADM Board issued this
22 community plan identifying an opiate epidemic
23 within Summit County as a challenge in June of
24 2012, correct?
25   A.   I don't know what you mean by "as a

61 (Pages 238 - 241)

Page 242

1  challenge."
2      Q.   Well, if you look back --
3      A.   Oh, "a challenge."  I
4  thought you --
5      Q.   If you look back at page 8 --
6      A.   Yes.  No.  I remember -- I know
7  what you're saying.
8      Q.   So let me ask --
9      A.   Some of the challenges, yeah.
10     Q.   So just let me ask it again so
11 we're clear.
12         So the ADM sent you this report,
13 this plan --
14     A.   Uh-huh.
15     Q.   -- and you forwarded it in June of
16 2012, and the ADM -- which is the board that
17 deals with drug addiction, right?
18     A.   Yes.
19     Q.   -- the ADM identified as a
20 challenge an opiate epidemic within Summit
21 County, true?
22     A.   Yes.
23     Q.   And you received this plan at that
24 time, right?
25     A.   Yes.

Page 243

1      Q.   If you look further in this
2  document at page 11 -- the Bates number is
3  001702366.
4      A.   Yes.
5      Q.   -- there's some discussion there of
6  drug trends, right?
7      A.   Yes.
8      Q.   And it says, "Different drug trends
9  have resulted in different impacts in the
10 treatment system.  Specific trends we have
11 addressed locally include opiates and bath
12 salts.  The opiate problem has been widely
13 recognized in Ohio."
14         Let me just pause there.
15         Do you agree that the opiate
16 problem was widely recognized in Ohio in June
17 of 2012?
18     A.   Yes.
19     Q.   So going on, "Within the state,
20 Summit County had been recognized as a hotspot,
21 per Wright State University."
22         Let me pause there.
23         I have two questions.  The first
24 is, do you agree that in 2012, Summit County
25 was a hotspot for the opiate problem?

Page 244

1      A.   It was a recognized problem in
2  Summit County.
3      Q.   My second question is, do you know
4  what this refers to when it refers to "per
5  Wright State University"?
6      A.   No.
7      Q.   Was there a study or a survey done
8  by Wright State University?
9      A.   I don't know.
10     Q.   Where is Wright State University?
11 I'm not from around here.
12     A.   South of here.  I don't know how
13 far.
14     Q.   Okay.  It's a local university?
15     A.   Well, it's in Ohio.
16     Q.   Fair enough.
17         So it goes on to say, "The advent
18 of direct-to-consumer prescriptions" -- let me
19 start over again.
20         "The advent of direct-to-consumer
21 prescription marketing in 1997, combined with
22 the American Medical Association defining
23 'pain' as the fifth vital sign has led to an
24 explosion of prescription opiate abuse."
25         I'm going to pause there.

Page 245

1          In your time in public health,
2  either as a director of community health or as
3  assistant health commissioner, have you ever
4  seen a direct-to-consumer advertisement by a
5  drug distributor for an opioid product?
6          MS. KEARSE:  Object to form.
7      A.   Not that I'm aware -- not that I'm
8  aware of.
9      Q.   Do you know if prescription drug
10 distributors played any role at all in defining
11 pain as the fifth vital sign?
12     A.   I don't know.
13     Q.   It goes on to say, "This requires
14 us to work more in concert with local pain
15 management clinics and emergency room
16 managers."
17         I'm going to pause there.
18         So that refers to providers of
19 medical care, right?
20     A.   Yes.
21     Q.   In other words, doctors who might
22 write prescriptions for opioids, true?
23     A.   That's -- yes.
24     Q.   And distributors don't write
25 prescriptions, do they?

62 (Pages 242 - 245)

Page 246

1      MS. KEARSE:  Objection.
2      A.   I don't believe they do.
3      Q.   So do you know if the ADM or if
4  your organization made any plans to work more
5  in concert with local pain management clinics
6  and emergency room managers --
7      A.   I don't --
8      Q.   -- following this?
9      A.   I don't know what the ADM Board
10 did.  The health district, this was not
11 something that we -- we did not pick this up as
12 a strategy for our organization.
13     Q.   And again, this was sent to you in
14 June of 2012, right?
15     A.   Yes.
16          This appendix goes with this?
17     Q.   It's all part of the same exhibit,
18 yes.
19          This will be Exhibit 10, Ms. Block.
20          - - - - -
21     (Thereupon, Deposition Exhibit 10,
22      7/17/2018 ADM Board Meeting Notice,
23      SUMMIT_001631368 to 001631373, was
24      marked for purposes of
25      identification.)

Page 247

1          - - - - -
2      Q.   So this is a document with the
3  Bates label in the lower right-hand corner
4  SUMMIT 001631368.  And it appears to be an ADM
5  Board meeting notice and agenda dated July 17,
6  2018, right?
7      A.   Yes.
8      Q.   So that was just a few months ago,
9  true?
10     A.   Yes.
11     Q.   Here's my first question.  Did you
12 receive this meeting notice?
13     A.   Maybe.
14     Q.   Did you attend a meeting of the ADM
15 in the -- in the Summit County Public Health
16 boardroom on Tuesday, July 24, 2018?
17     A.   No.
18     Q.   Do you typically attend ADM
19 meetings?
20     A.   No.
21     Q.   That's not your organization,
22 right?
23     A.   It's not.
24     Q.   Are you a member of the board of
25 directors of the ADM?

Page 248

1      A.   No.
2      Q.   Do you know anybody who is a member
3  of the board of directors?
4      A.   I know some- -- I knew someone.  I
5  don't know if she's still on board.  But
6  that's, yeah, one person.
7      Q.   Okay.  And what's her name?
8      A.   Liz England.
9      Q.   Do you know --
10     A.   Oh, maybe -- I guess this will tell
11 me, huh?
12     Q.   It may or may not.
13          Let me ask you this first.
14     A.   Okay.
15     Q.   The meeting notice is from Joseph
16 P. Saporito, board chair, right?
17     A.   Yes.
18     Q.   Do you know Mr. Saporito?
19     A.   I do not.
20     Q.   If you look at page -- well, I'm
21 going to use these -- the Bates number, the --
22     A.   Okay.
23     Q.   -- long number.  Okay?
24          It's page number SUMMIT 001631371.
25 And I think it's the third to last page of

Page 249

1  this --
2      A.   Yes.
3      Q.   -- exhibit.
4          So it says there in the middle,
5  "Executive Director's Report," right?
6      A.   Yes.
7      Q.   So let me read just a few
8  statements to you.
9          MS. KEARSE:  And I just -- let me
10 just -- I'm going to object.  I don't know that
11 Ms. Block actually testified to receiving this,
12 and I think it's directed to the board of
13 directors, so.
14          MR. BORANIAN:  She testified that
15 she did not receive it, I believe.
16          MS. KEARSE:  Right, yeah.  Oh,
17 okay.  So we're clear.
18          MR. BORANIAN:  Or she testified --
19          THE WITNESS:  Oh, I --
20          MR. BORANIAN:  -- that she may have
21 received it, but did not --
22          MS. KEARSE:  But -- but to the
23 board of directors, but I just want to make
24 sure she's -- as not familiar with this
25 document, so.

Page 250

1    MR. BORANIAN:  Okay.
2    Q.    It says there, at the fourth bullet
3  point, "To date this year, overdose deaths are
4  down and overdoses are down."
5        I'll pause there.
6        So from your point of view as the
7  assistant commissioner of public health, do you
8  agree that as of July 2018 overdose deaths and
9  overdoses were down in Summit County?
10   A.    I would not debate Jerry on that.
11   Q.    Who is Jerry?
12   A.    Craig, the executive director.
13  It's his report.
14   Q.    Very well.  So you have no basis
15  upon which to disagree with that statement,
16  right?
17   A.    Correct.
18   Q.    And it goes on to say, "The
19  community is experiencing a lag in demand for
20  services."
21        Do you agree with that statement?
22   A.    I don't know what that means.  A
23  lag in demand -- I -- that, I would not have
24  thought.  I don't know what he's basing it on.
25  He's got a different perspective than I do.  He

Page 251

1  funds a lot of the agencies.
2    Q.    So do you agree that the community
3  is experiencing a lag in demand for services?
4    A.    I don't agree or disagree.  I don't
5  know.
6    Q.    Okay.  It says further, here,
7  "Access to IOP and assessments is almost
8  immediate, and there are currently vacant beds
9  in the residential programs who are working to
10  clear the waiting list."
11        The first question is, do you know
12  what IOP stands for?
13   A.    Yes, indi- -- individual outpatient
14  therapy.
15   Q.    So do you agree that as of July of
16  2018 individual outpatient therapy and
17  assessment was almost immediate?
18   A.    I can see where that is the case,
19  yes.
20   Q.    And do you also agree that there
21  are currently vacant beds in the residential
22  programs?
23   A.    I don't -- I don't know at all
24  about the beds.  I don't know one way or the
25  other.

Page 252

1    Q.    So going to the next paragraph, it
2  says, "Several factors are at play:
3  proliferation of naloxone is keeping users
4  safer, the street supply is not as lethal, and
5  some significant drug busts have been made over
6  the past six months."
7        From your point of view in your
8  current position in public health, do you agree
9  with those statements?
10   A.    Yes, to the proliferation of
11  naloxone.  I would agree with that.
12        I don't know at all one way or the
13  other about how lethal the street supply is.
14        And I don't know the extent to
15  which drug busts have made a significant
16  difference.  I just -- I don't know.
17   Q.    But you agree that the availability
18  of naloxone is one of the factors at play in
19  decreasing demand for public health services?
20   A.    I believe it is, yes.
21   Q.    It goes on to say, "The area is
22  also seeing a resurgence in meth and cocaine,
23  and Fentanyl is still a major factor in all
24  toxicology reports, along with alcohol."
25        I'll pause there.

Page 253

1        None of the Defendants in this suit
2  sell meth or cocaine, true?
3    A.    Yes.  I...
4    Q.    And Fentanyl, Fentanyl is an opioid
5  that is commonly produced and sold in an
6  illicit and illegal fashion, true?
7        MS. KEARSE:  Object to form.
8    A.    I believe so.
9    Q.    And none of the Defendants in this
10  lawsuit sell, distribute, prescribe, dispense
11  illicit Fentanyl, true?
12        MS. KEARSE:  Objection.
13   A.    I don't know.
14   Q.    Do you have any reason to believe
15  that --
16   A.    No.
17   Q.    -- any of the Defendants --
18   A.    No, I don't, but I -- we
19  established that I don't know enough about the
20  distribution companies.
21   Q.    Well, let me just ask you a
22  question and then I'll move on.
23   A.    Okay.
24   Q.    Do you have any reason to believe
25  that any of the Defendants in this lawsuit has

64 (Pages 250 - 253)

Page 254

1  engaged in the sale of illicit Fentanyl?
2      MS. KEARSE:  Objection.
3    A.  No.
4      THE VIDEOGRAPHER:  Can I change the
5  video?  Can I change the video?
6      MR. BORANIAN:  Okay.
7      We're going to change the tape.
8      THE WITNESS:  Oh, okay.
9      MR. BORANIAN:  Don't go away.
10     THE VIDEOGRAPHER:  Going off the
11  record, 3:41.
12      (Off the record.)
13     THE VIDEOGRAPHER:  We're back on
14  the record, 3:42.
15    Q.  So, Ms. Block, this report refers
16  to alcohol as one of the factors in play,
17  right?
18    A.  I'm sorry.  Where are you?
19    Q.  So we'll go back over the sentence
20  I read before the break.
21      "The area is also seeing resurgence
22  in meth and cocaine, and Fentanyl is still a
23  major factor in all toxicology reports, along
24  with alcohol."
25      That's what it says, right?

Page 255

1    A.  Yes.
2    Q.  Alcohol has been a public health
3  issue requiring services from your organization
4  for as long as you've been there, right?
5    A.  Yes.
6    Q.  And alcohol has been a public
7  health issue requiring public health services
8  for long before you got there, true?
9    A.  Yes, yes.
10    Q.  So overall, the prescription and
11  dispensing of prescription opioids has
12  decreased substantially since 2011; is that
13  right?
14    A.  It seems that way, yes.
15      MR. BORANIAN:  Let's take a look at
16  this.  This will be Exhibit 11.
17         - - - - -
18      (Thereupon, Deposition Exhibit 11,
19      Document Titled "OARRS 2016 Annual
20      Report, was marked for purposes of
21      identification.)
22         - - - - -
23    Q.  Exhibit 11 doesn't have a Bates
24  number.  I printed it off the Internet.  It's
25  the 2016 annual report from the Ohio Automated

Page 256

1  Prescription Reporting System, also known as
2  OARRS, right?
3    A.  Yes.
4    Q.  Are you familiar with OARRS?
5    A.  Yes.
6    Q.  What is OARRS?
7    A.  It's the prescription reporting
8  system that the State -- it's their web-based
9  system.
10    Q.  Do you, in your current role, have
11  access to data from the OARRS system?
12    A.  I do not.
13    Q.  If you wanted to gather information
14  about the distribution or prescription of
15  controlled substances, would you have a way to
16  do that?
17    A.  I don't believe so.
18    Q.  For example, would you be able to
19  contact somebody who did have access to OARRS
20  to run a report for you?
21    A.  I don't know.
22    Q.  Have you ever tried?
23    A.  No.
24    Q.  Are you aware of the requirements
25  that prescription drug distributors have in

Page 257

1  terms of reporting to the OARRS system?
2    A.  I am aware that there are
3  requirements, yes.
4    Q.  So to your knowledge, prescription
5  drug distributors report shipments of
6  controlled substances to the OARRS system,
7  true?
8      MS. KEARSE:  Object to form.
9    A.  I don't know.  I -- I was under the
10  impression that they reported prescriptions
11  that they wrote.  I don't know about shipments
12  that they get in.
13    Q.  So let's just step back, then.
14    A.  Okay.
15    Q.  So you're familiar, then, with the
16  requirement that when doctors write
17  prescriptions, then the doctors have to report
18  those prescriptions to OARRS, true?
19    A.  That is my understanding.
20      MS. KEARSE:  Objection.
21    Q.  Do you have any understanding of
22  any other reporting requirements to the OARRS
23  system?
24    A.  No.
25    Q.  So if there were a requirement for

65 (Pages 254 - 257)

Page 258

1 a pharmacy to report prescriptions filled, you
2 wouldn't know --
3     A.   Oh, well --
4     Q.   -- about that, right?
5     A.   Yes.  But again, that's filled.  I
6 didn't -- I thought you were asking me about
7 receiving a supply, a shipment.
8     Q.   So are you aware of any reporting
9 requirement for the OARRS system for
10 pharmacies?
11    A.   Yes.
12    Q.   Are you aware of any reporting
13 requirement for the OARRS system for drug
14 distributors?
15    A.   No.
16    Q.   Are you aware of any reporting
17 requirement to the OARRS system for drug
18 manufacturers?
19    A.   No.
20    Q.   So let's take a look at this 2016
21 report.  And we'll go to the third page, where
22 it says, "Dear Governor Kasich."
23         You see where I am?  I think I'm a
24 little further forward.
25    A.   Yes.

Page 259

1     Q.   Do you see where I am there?
2     A.   Yes.
3     Q.   There's an introductory paragraph
4 there, and it says at the end, "Highlights from
5 the report include."  Do you see where I am?
6     A.   Yes.
7     Q.   It says, "The total doses of
8 opioids dispensed to Ohio patients decreased by
9 162 million doses, or 20.4 percent, from 2012
10 to 2016."  Is that what it says?
11    A.   It does.
12    Q.   Do you have any basis to dispute
13 the accuracy of those figures?
14    A.   I do not.
15    Q.   And those are consistent with what
16 you're seeing in terms of a decrease in opioids
17 dispensed to patients of Summit County, true?
18    A.   Based on the information, yes.
19    Q.   And the next bullet point is, "The
20 total number of opioid prescriptions issued by
21 Ohio" -- "issued to Ohio patients decreased by
22 2.5 million, or 20 percent, between 2012 and
23 2016."
24         Is that what it says?
25    A.   It does.

Page 260

1     Q.   Do you have any basis to dispute
2 the accuracy of those figures?
3     A.   No.
4     Q.   And again, is this decrease in
5 prescriptions issued to patients consistent
6 with what you're seeing in a decrease in
7 prescriptions in Summit County?
8         MS. KEARSE:  Objection.
9     A.   I don't know.  But I don't have --
10 yeah, I don't know.
11    Q.   You agree, though, that the number
12 of prescriptions issued for prescription
13 opioids has decreased?
14         MS. KEARSE:  Objection.
15    A.   I don't disagree.
16    Q.   And that's both in Ohio and in
17 Summit County, true?
18    A.   I assume so.
19    Q.   And those decreases are on the
20 order of 20 percent, right?
21    A.   That's what it says here.
22    Q.   Do you have any knowledge that
23 you've gained over the years regarding any
24 suspicious order reported by any Distributor
25 Defendant?

Page 261

1     A.   I don't know what that --
2         MS. KEARSE:  Objection.  Asked and
3 answered.
4     A.   I don't know what that -- no.
5     Q.   So you have no --
6     A.   Knowledge.
7     Q.   -- experience or knowledge at all
8 with regard to a distributor's obligations to
9 monitor for, detect, and report suspicious
10 orders, right?
11         MS. KEARSE:  Objection.  Asked and
12 answered.
13    A.   Correct.
14    Q.   And do you have any basis to
15 dispute that every opioid medicine distributed
16 by Distributor Defendants in this lawsuit was
17 FDA-approved medicine?
18         MS. KEARSE:  Objection.
19    A.   I have no reason to debate that,
20 no.
21         MR. BORANIAN:  That's all I have
22 for now, Ms. Block.  Thank you for your
23 patience.
24         THE WITNESS:  Thanks.
25         MS. FRANKLIN:  Can we take just one

66 (Pages 258 - 261)

Page 262

1 final break?
2        THE VIDEOGRAPHER: Off the record,
3 3:50.
4        (A recess was taken.)
5        THE VIDEOGRAPHER: We're back on
6 the record, 3:55.
7        EXAMINATION OF TONYA BLOCK
8 BY MS. FRANKLIN:
9     Q.   Good afternoon, Ms. Block. We met
10 briefly this morning, but again, my name is
11 Shirlethia Franklin. I'm with Jones Day law
12 firm, and I represent Walmart, Inc., in this
13 matter.
14     A.   Okay.
15     Q.   I'm going to ask you just a few
16 follow-up questions, but again, all of the
17 house rules that we talked about earlier still
18 remain.
19        If you need a break at any time,
20 even though I'm going to be fairly quick, let
21 me know and we can take a break whenever you
22 need one.
23     A.   Okay.
24     Q.   So first I want to turn quickly
25 back to Exhibit 9, the ADM Board draft

Page 263

1 community plan.
2     A.   Yes.
3     Q.   Okay. When discussing -- let me
4 have you turn to page 9.
5        So when discussing Section E on
6 page 9, and just let me know when you're there.
7     A.   Okay.
8     Q.   So Section E, entitled "Opiate
9 Epidemic," and you agreed, in your testimony a
10 little bit earlier that the opiate problem was
11 widely recognized in Ohio in June 2012,
12 correct?
13     A.   Yes.
14     Q.   And again, June 2012 -- June 28,
15 2012, is when you circulated the draft
16 community plan to Kerry Kernen; is that
17 correct?
18     A.   Yes.
19     Q.   Okay. Great. And let me have you
20 turn back also to Exhibit 8.
21        And from this exhibit, I'm
22 specifically referencing the October 7, 2010,
23 Summit County Child and Family Health Services
24 meeting minutes.
25     A.   Yes.

Page 264

1     Q.   And you testified to your
2 attendance at this meeting, correct?
3     A.   Yes.
4     Q.   You also testified to your
5 awareness that discussions took place about
6 composing a press release from Summit County
7 Health District --
8     A.   Yes.
9     Q.   -- to create awareness on the data
10 of patients addicted to opiates, correct?
11     A.   Yes.
12     Q.   And you agree that there was, in
13 fact, an increase in as early as 2010, correct?
14     A.   Yes.
15     Q.   So is it fair to say that Summit
16 County knew that there was an opiate problem as
17 early as 2010?
18        MS. KEARSE: Object to form.
19     A.   We began -- I -- we began seeing an
20 increase, and just based on conversations that
21 were being had.
22     Q.   Okay. So -- so, again, is it fair
23 to say that the County knew that there was an
24 increase or an opiate problem as early as 2010?
25        MS. KEARSE: Object to form.

Page 265

1     A.   If you're looking -- I don't
2 necessarily represent the entire agency, so I
3 sat in meetings where I heard different systems
4 talking about the same issue, yes.
5     Q.   Okay. And -- and including the
6 meeting in 2010, correct?
7     A.   Yes.
8     Q.   So is it fair to say that in
9 attending the meeting, from your own personal
10 attendance in 2010, that you heard about the
11 discussions of -- of this opiate increase in
12 2010?
13     A.   Yes. We were talking about it as
14 it relates to the number of women who were
15 giving birth to kids that had NAS.
16     Q.   And when you say "we were talking
17 about it," just for the record, who -- who --
18 who are you referring to as "we"?
19     A.   The other people in the -- you
20 know, at the table.
21     Q.   Okay. And as you were discussing
22 these issues in 2010, did the Summit County
23 Public Health take any steps to -- to address
24 the opiate issues that were presented in 2010?
25     A.   Well, in 2010 we didn't have a --

67 (Pages 262 - 265)

Page 266

1  we didn't have an AOD program. So, you know,
2  at that point that wasn't necessarily our role.
3  Our role was not to address the opioid
4  epidemic.
5      Q.   Okay.
6      A.   Yeah. So I can't say that we put
7  together a plan to address it, no.
8      Q.   Okay. And -- and what about in --
9  in 2012, when we talked about Exhibit 9, when
10  you acknowledged the opiate epidemic as -- in
11  2012, did the Summit County Public Health
12  Department take any steps in June 2012 or
13  shortly thereafter to address the opiate
14  epidemic?
15         MS. KEARSE: Object to form.
16      A.   Can you repeat the first part of
17  that question?
18      Q.   Sure, sure.
19         MS. FRANKLIN: Can you read it
20  back?
21         (Record read.)
22      A.   We -- well, we -- we're providing
23  services like other behavioral health
24  organizations, having discussions with the ADM
25  Board about whether or not services should be

Page 267

1  expanded.
2         I can't say that we had the
3  infrastructure or capacity, as a single entity,
4  to address the opioid epidemic. You know,
5  there are different systems that have to play a
6  role in that, whether it's the city, EMS, the
7  county, police, fire, it's -- the health
8  district alone couldn't address it.
9      Q.   Sure. And what specific services,
10  in 2012, were you providing to address this
11  issue?
12      A.   We were providing counseling
13  services.
14      Q.   Okay.
15      A.   Prevention services.
16      Q.   And the counseling and prevention
17  services that you provided weren't specifically
18  focused on opiates solely, correct?
19      A.   Not solely, no.
20      Q.   And these were -- these were
21  services that existed prior to 2012?
22      A.   Yes.
23      Q.   Okay. Now, I'm going to turn back
24  to Exhibit 2, which I believe you testified is
25  an outdated CV; is that correct?

Page 268

1      A.   Yes.
2      Q.   Have you provided an updated copy
3  of your resume or CV as a part of this
4  litigation?
5      A.   No, not to my knowledge. And
6  I don't see why I would --
7      Q.   So we -- we talked a bit about
8  your -- your background, and particularly your
9  employment history. I just want to confirm
10  your educational background.
11         So you -- you have a BA in social
12  work from the University of Akron --
13      A.   Yes.
14      Q.   -- Ohio; is that correct?
15      A.   Yes.
16      Q.   And what year did you receive the
17  BA?
18      A.   '91.
19      Q.   '91? Okay. So bachelor's degree
20  in '91, and you have a master's in social work
21  administration also from the University of
22  Akron; is that correct?
23      A.   Yes.
24      Q.   And can you confirm the year you
25  received your master's?

Page 269

1      A.   '96, '97, maybe.
2      Q.   '96 or '97?
3      A.   May have been later than that. I
4  don't -- I don't remember.
5      Q.   Okay. You can refer back to
6  Exhibit 2, your -- your -- the current -- the
7  version of the CV that we have says 2005.
8      A.   Well, that's when it would have
9  been.
10      Q.   Okay. So 2005 for the master's.
11         Do you have any other degrees that
12  are not listed on this resume, in addition to
13  the bachelor's and the master's?
14      A.   No.
15      Q.   How about any professional
16  certifications?
17      A.   Well, I'm licensed with the State
18  of Ohio Counselor and Social Worker Board.
19      Q.   All right. And you testified
20  earlier that you're not an expert on opiates,
21  correct?
22      A.   Yes.
23      Q.   And that you were even concerned
24  about testifying because you -- you felt like
25  you weren't an expert in this area; is that

68 (Pages 266 - 269)

1 correct?
2      MS. KEARSE:  Objection.
3      A.   Yes.
4      Q.   You're also not a physician,
5 correct?
6      A.   Correct.
7      Q.   Not a pharmacist?
8      A.   No.
9      Q.   Okay.  And you're not a
10 psychologist or a psychiatrist, correct?
11      A.   No.
12      Q.   Do you have any background or
13 training in medicine at all?
14      A.   No.
15      Q.   How about any background or
16 training in pharmacology?
17      A.   No.
18      Q.   What about epidemiology?
19      A.   No.
20      Q.   Any background and training on pain
21 management or the treatment of pain?
22      A.   No.
23      Q.   And you've already, of course,
24 testified you're not a doctor, so I'm assuming
25 you're not licensed or qualified to write

1 prescriptions, correct?
2      A.   Correct.
3      Q.   Any background or training as it
4 specifically relates to the role of pharmacists
5 in filling prescriptions?
6      A.   No.
7      Q.   Now, you testified earlier that you
8 saw the complaint but did not read it, and for
9 this litigation; is that correct?
10      A.   Yes.
11      Q.   And is there any particular reason
12 you didn't read it?
13      A.   Oh, you've seen it.
14      Q.   I have seen it.
15      A.   Yeah.
16      Q.   Okay.  So that's why, the length of
17 it?
18      A.   Well, it just -- yeah.
19      Q.   Did you have a role in deciding who
20 would be defendants in this case?
21      A.   No.
22      Q.   Now -- and I know you didn't read
23 the complaint, but in the complaint there's a
24 group of Defendants referred to as "national
25 retail pharmacies."  Do you know who those

1 Defendants are?
2      A.   No.
3          Oh, you didn't hear -- no.
4      Q.   Okay.
5      A.   Oh, yeah.  No.
6      Q.   Are you aware that the County of
7 Summit and Summit County Public Health has sued
8 Walmart in this case?
9      A.   Well, I wouldn't have known had you
10 not said it.
11      Q.   Okay.  So other than me referencing
12 it today, you had no prior knowledge?
13      A.   Right.  I -- I knew that there were
14 a number of entities included in the lawsuit.
15      Q.   Okay.  But you didn't have any
16 specific knowledge of the --
17      A.   Which ones, and I didn't read the
18 complaint, so I couldn't have named any of
19 them.
20      Q.   Okay.  Sure.  So would that be the
21 same case that you -- you didn't have any
22 knowledge that CVS has been sued in the case?
23      A.   Yeah.  No.
24          MS. KEARSE:  Objection to the form.
25      Q.   Would the same be true for Rite

1 Aid?
2      A.   The one system that I am familiar
3 with is Cardinal.
4      Q.   Okay.  Okay.  So other than --
5 than Cardinal, and I think you testified to
6 that earlier, so no knowledge that Walgreens
7 has been sued.
8      A.   Correct.
9      Q.   And I'm also assuming that you
10 don't know when these entities -- Walmart, CVS,
11 Rite Aid, or Walgreens -- were added as
12 Defendants in this case?
13      A.   Correct.
14      Q.   Now, excluding anything that --
15 that you may have been told by the County's or
16 the Summit County Public Health's attorneys, do
17 you have any personal knowledge as to why the
18 County has sued Walmart or CVS, Rite Aid, or
19 Walgreens?
20      A.   Personal knowledge?
21      Q.   Do you have any personal
22 understanding of why these four entities have
23 been sued or are a party in this case?
24      A.   I --
25          MS. KEARSE:  Objection.

69 (Pages 270 - 273)

Page 274

1     A.    I don't know how the systems were
2  identified that were going to be included in
3  it.
4     Q.    And in your -- your current role as
5  assistant health commissioner and your previous
6  role as director of the community health
7  division --
8     A.    Uh-huh.
9     Q.    -- have you ever had any
10  professional contact or interaction, meaning
11  contact in your role, with Walmart?
12     A.    No.
13     Q.    What about any professional contact
14  or interaction with CVS?
15     A.    No.  I don't -- no.
16     Q.    Any professional contact or
17  interaction with Rite Aid?
18     A.    No.
19     Q.    How about Walgreens?
20     A.    No.
21     Q.    So you've -- you've never had an
22  occasion or an instance where you've -- you've
23  actually proactively reached out to any of
24  these entities, Walmart, CVS, Rite Aid, or
25  Walgreens, for any reason whatsoever,

Page 275

1  particularly with assistance with battling the
2  opioid problem?
3     A.    No.
4          MS. KEARSE:  Objection to form.
5     Q.    Do you know if anyone in your
6  department has -- has reached out to any of
7  these entities --
8     A.    I --
9     Q.    -- for assistance?
10     A.    No, but I would -- I doubt it.
11     Q.    Now, I know Steven asked you
12  earlier, are you aware that Summit County and
13  Summit County Public Health is seeking monetary
14  damages in this --
15     A.    Yes.
16     Q.    -- this lawsuit.  Do you remember
17  that?
18     A.    Yes.
19     Q.    And -- and --
20     A.    Well, I don't remember that, but I
21  assumed that, yes.
22     Q.    Okay.  You assume that they're
23  seeking monetary damages?
24     A.    Yes.
25     Q.    And have you or your department

Page 276

1  ever made any effort to quantify the cost of
2  opioid abuse as it relates to Summit County
3  Public Health as a part of this litigation?
4          MS. KEARSE:  Objection.
5     A.    I have -- I have not.
6     Q.    Have you ever quant- -- had to
7  quantify the costs related to the opioid abuse?
8     A.    I have not.
9     Q.    Are you aware of anyone in your
10  department who has?
11     A.    I can't -- I can't say.  Perhaps
12  Donna Skoda, in speaking with our fiscal
13  department, did.
14     Q.    And -- and as you sit here today,
15  you can't tie any costs, if any incurred by
16  Summit County Public Health, related to
17  opiates, specifically to Walmart, correct?
18          MS. KEARSE:  Objection.
19     A.    Yes, correct.
20     Q.    Okay.  Would the same be true, that
21  you can't tie any -- any costs to any conduct
22  by CVS, Rite Aid, or Walgreens?
23     A.    Specifically, yes.
24     Q.    And just to sort of slightly
25  rephrase the same question for clarity, so

Page 277

1  today, as you sit here, you personally cannot
2  point to any specific conduct by Walmart, CVS,
3  Rite Aid, or Walgreens as it relates to any
4  alleged harm caused to the Summit County Public
5  Health Division?
6     A.    I cannot, but I -- I -- those
7  decisions were made by people at a higher level
8  than I am at.
9     Q.    Okay.  But you have no personal
10  knowledge --
11     A.    Personally, no.
12     Q.    -- correct?
13          Do you have any personal knowledge
14  of any instance in which any Defendant in this
15  case asked a physician to write an opioid
16  prescription for an individual serviced by
17  Summit County Public Health?
18     A.    Could you repeat that question?
19     Q.    Sure.  And I can rephrase it if you
20  need more clarity.
21          (Record read.)
22     A.    No.
23     Q.    Okay.  And do you have any personal
24  knowledge of any instance in which a doctor
25  inappropriately prescribed opioids or

70 (Pages 274 - 277)

Page 278

1 medication to any individual serviced by Summit
2 County Public Health?
3     A.   Not -- I don't have any knowledge
4 of that.
5     Q.   And do you have any personal
6 knowledge of any instance in which a pharmacy
7 inappropriately filled an improper prescription
8 for an individual serviced by Summit County
9 Public Health?
10     A.   I do not.
11     Q.   And -- and as you sit here today,
12 you -- you can't identify any public statements
13 made by Walmart with respect to prescription
14 opioids, can you?
15     A.   No.
16     Q.   Can you identify any public
17 statements made by CVS with respect to
18 prescription opioids?
19     A.   I can't say that I can.
20     Q.   Okay.  And would the same be true
21 for Rite Aid?
22     A.   I don't -- not that I -- no.
23     Q.   Okay.  And how about Walgreens?
24     A.   No.
25     Q.   We're almost at the end.

Page 279

1         Earlier this morning you -- you
2 described the process that you went through to
3 collect documents --
4     A.   Uh-huh.
5     Q.   -- from your H drive, you mentioned
6 e-mail, and some hard-copy documents; is that
7 correct?
8     A.   Yes.
9     Q.   Were you ever asked to preserve
10 documents or not throw away documents or delete
11 any documents?
12     A.   Yes.
13     Q.   And who asked you that?
14     A.   Either Anne or Eddie informed me
15 that.
16     Q.   So when the IT person reached out
17 about asking you to collect certain documents,
18 the IT person didn't mention anything about
19 preserving or not throwing away any documents?
20     A.   Well, it was either Anne or Eddie.
21 I got the information from both of them.  I
22 don't remember which one said it first.
23     Q.   And is Eddie the IT person?
24     A.   Yes.
25     Q.   And what's Eddie's last name again?

Page 280

1     A.   Mink.
2     Q.   Mink.
3         And do you recall when you received
4 this request?
5     A.   No, but it was recent.  It was -- I
6 don't know.  It couldn't have been more than
7 two or three months ago.  When I was notified
8 that I was going to need to give a deposition.
9     Q.   And I -- I couldn't hear.  You said
10 something about how many months ago?  It
11 couldn't have been how many months?
12     A.   I don't think it was more than
13 three.
14     Q.   Okay.  Not more than three.
15     A.   I don't believe so.
16     Q.   So maybe later in the summer of
17 2018?
18         MS. KEARSE:  Objection.
19     Q.   You can answer.
20     A.   Yeah, I don't -- I can't tell you
21 any more than I did already.
22     Q.   You -- you also testified earlier
23 that your -- you are not of the belief that
24 chronic pain patients should not have access to
25 prescription opioids to treat their pain.  Do

Page 281

1 you remember that testimony?
2     A.   Yes.
3     Q.   And so if -- if a person has
4 received a prescription from a licensed medical
5 professional, would you agree that that person
6 is entitled to have their prescription filled?
7         MS. KEARSE:  Objection.
8     A.   Have their prescrip--- if a -- I
9 believe that an individual should be able to
10 fill their -- a prescription that's given by
11 a -- but I can't testify as to whether or not a
12 prescription is appropriately written.  I have
13 no idea.
14     Q.   Sure.  But is -- under the -- the
15 hypothetical or the assumption that the
16 prescription is appropriate and it has been
17 prescribed by a licensed medical professional,
18 do you believe that a person is entitled to
19 have his or her prescription filled?
20     A.   Yes.
21         MS. KEARSE:  Objection.  Asked --
22 asked and answered.
23     A.   Yes.
24     Q.   You also agree that pharmacies
25 cannot dispense opioids to patients without a

71 (Pages 278 - 281)

Page 282

1 prescription, correct?
2     A.   Yes.
3     Q.   And if a pharmacy or pharmacist has
4 received a prescription from a licensed medical
5 professional, has that pharmacy or pharmacist
6 done anything wrong by filling the
7 prescription?
8     A.   No.
9         MS. KEARSE:  Objection.
10        MS. FRANKLIN:  Well, thank you very
11 much for your time, Ms. Block.  I don't have
12 any more questions, but I want to turn to my
13 co-counsel to see if they have any additional
14 questions.
15        Anyone on the phone?
16        MS. FRANKLIN:  Okay.  So hearing
17 none --
18        MS. KEARSE:  Okay.  Let's go ahead
19 and take a break.
20        THE VIDEOGRAPHER:  Off the record,
21 4:17.
22        (A recess was taken.)
23        THE VIDEOGRAPHER:  We're back on
24 the record, 4:52.
25        EXAMINATION OF TONYA BLOCK

Page 283

1 BY MS. KEARSE:
2     Q.   Ms. Block, thank you for being here
3 today and answering the questions for counsel.
4 Appreciate your time.  I know it's been a long
5 day.  Couple, just want clarifications.
6         You were asked today about
7 documents and a litigation hold.  Do you
8 remember those questions?
9     A.   Yes.
10    Q.   Okay.  Is there any reason, as we
11 sit here today, that any documents or e-mails
12 relevant to this litigation that you have
13 been -- believe have been destroyed since the
14 case was filed in November 2017?
15    A.   No.
16    Q.   And --
17    A.   No one --
18    Q.   Go ahead.
19    A.   We have a records retention policy,
20 so we're not allowed to destroy records
21 irrespective of the litigation.  There's a
22 policy in place that dictates when things are
23 destroyed.
24    Q.   And I believe you testified
25 Mr. Mink actually collected documents from the

Page 284

1 server.  That would also include your
2 documents?
3     A.   Yes.
4     Q.   Okay.  And he could do that with or
5 without your knowledge?
6     A.   Yes.
7     Q.   And I believe you provided counsel
8 information that you actually provided --
9         (Telephonic interruption.)
10    Q.   -- documents when you were notified
11 about your deposition request; is that correct?
12    A.   I'm sorry.  What did you say?
13    Q.   Those telephones.
14        When you -- I think I believe you
15 testified that you also provided documents when
16 you were notified that your deposition had been
17 requested; is that correct?
18    A.   Yes.
19    Q.   And as we sit here today, you are
20 someone with knowledge in regard to Summit
21 County's opioid crisis; is that correct?
22    A.   Yes.
23    Q.   Okay.  And I believe you testified
24 that you may not be an expert, per se, in
25 dealing with opioid addiction issues; is that

Page 285

1 correct?
2     A.   Yes.
3     Q.   But as a public health official,
4 you are certainly familiar with the opioid
5 crisis in Summit County?
6     A.   Yes.
7         MR. NAEEM:  Object to form.
8     Q.   And I'll ask it again.  Are you
9 someone with knowledge in regards to the Summit
10 County's opioid crisis?
11    A.   Yes.
12    Q.   And I believe we established you
13 currently serve as the assistant health
14 commissioner at Summit County Public Health; is
15 that correct?
16    A.   That's correct.
17    Q.   And prior to this you served as
18 Summit County director of community health; is
19 that correct?
20    A.   Yes.
21    Q.   And that was from 2010 to 2016, we
22 established?
23    A.   Uh-huh.
24    Q.   And is that yes?
25    A.   Yes.  Sorry.

72 (Pages 282 - 285)

Page 286

1    Q.   That's okay.
2         And during this time period, you
3   began to gain knowledge that opioids were
4   beginning to impact Ohio, and Summit County
5   specifically; is that correct?
6         MR. NAEEM:  Object to form.
7    A.   Yes.
8    Q.   And you were shown some documents
9   during this time period that started giving you
10  knowledge about the opioid issues in Summit
11  County?
12   A.   Yes.
13   Q.   And as time go on -- has -- and as
14  time has gone on, do you believe that you've
15  learned more about the scope of the opioid
16  issues in Summit County?
17   A.   Yes.  It was sort of an evolving
18  issue.  So, you know, on any given day I might
19  be sitting at a different type of table where
20  discussions were being had.  But I can't say
21  that it all came together at once, just based
22  on one conversation that I had.
23   Q.   Ms. Block, when -- at what point in
24  time do you believe that the opioid crisis rose
25  to a level that affected certain -- strike

Page 287

1   that.
2         At what point in time do you
3   believe the opioid crisis came to a level
4   and for the Summit County Public Health to
5   acknowledge it as a public health crisis?
6         MR. NAEEM:  Object to the form of
7   the question.
8    A.   The point at which I was aware that
9   the health district needed to be more involved
10  was right around 2014-2015.  We were getting
11  information from the State.  We were getting
12  information from the ADM Board.  We had had
13  conversations going back to 2011 with Jerry
14  Craig during the merger as to whether or not we
15  should -- as a health district who had not
16  historically had AOD services, should we
17  continue them?  Was it a need in the community?
18        And he made it very clear that
19  ongoing, every time we brought that subject up,
20  that the health district, as well as all of the
21  other behavioral health agencies, needed to
22  remain in business and to, if possible, expand
23  services because we -- there were issues
24  being -- there were issues affecting the
25  community around the opioid epidemic and

Page 288

1   alcohol.
2    Q.   And in 2014-2015, what did you
3   start seeing in Summit County that gave rise to
4   the public health issues surrounding opioids?
5    A.   Higher rates of -- higher rates of
6   overdoses; more information coming out of the
7   state; different types of task forces that were
8   being established; work that was being --
9   continuing to be done; the State identifying
10  programs that needed to be implemented at the
11  local level, whether it was Project DAWN or
12  naloxone or the Opiate Task Force; people
13  started talking about medicated-assisted
14  treatment, which hadn't been talked about for
15  years and years, since methadone.
16        You know, so there was a rise in a
17  lot of different things, and there were a lot
18  of conversations being had by a lot of
19  different systems.
20   Q.   And you say a lot of systems.  Can
21  you explain what --
22   A.   Police.
23   Q.   -- you mean to me?  Okay.
24   A.   Police, EMS, you know, hospital
25  systems, fire, children services board.  Their

Page 289

1   numbers were increasing exponentially.
2         Yeah, all of the public systems.
3   Juvenile court.  They were all being impacted
4   by -- well, they were all having discussions
5   about the fact that their budgets were being
6   impacted, their numbers were increasing.  They
7   were having to change the way they did
8   business.
9    Q.   And that was around 2014-2015 when
10  it started --
11   A.   Started to bubble up.
12   Q.   -- really impacting --
13        And all the systems were talking at
14  one time about that?
15   A.   (Witness nodding head.)
16   Q.   Is that the same time that the
17  opioid task force started as well in Summit
18  County?
19   A.   In '14 or -- late -- late '14, I
20  believe.  But it's the first time in my working
21  in public health, it is the first time that I
22  have experienced multiple systems having the
23  same conversation.
24        You know, historically, if we were
25  talking about maternal-child health, the people

73 (Pages 286 - 289)

Page 290

1 at the table were talking about birth spacing
2 and nutrition and breastfeeding and things of
3 that nature.  And if I was, you know, meeting
4 with children services, they were talking about
5 getting more foster parents and, you know, what
6 sort of programs we can put in place for kids
7 who were transitioning out of the system.
8       But what we started seeing was all
9 sorts of systems having the same conversation.
10    Q.   Is it fair to say you started
11 learning a little bit more about the
12 prescription opioids and how it was impacting
13 Summit County?
14    A.   Well, that's --
15       MR. NAEEM:  Object to the form.
16    A.   That was the topic of conversation.
17    Q.   And can you tell the jury what your
18 role is, has been, within public health in
19 regards to the opioid crisis in Summit County?
20    A.   Primarily my role, even as the
21 director, more specifically related to program
22 development.  So -- excuse me -- as issues crop
23 up, as issues and funding becomes available and
24 we identify that the numbers are increasing in
25 any area, my primary responsibility is to take

Page 291

1 a look at our internal capacity, take a look at
2 our funding, what the infrastructure is like,
3 what the staffing needs might be, what does the
4 evidence say about this or that type of
5 program, and how can we go about establishing a
6 program like that within our own system.  And
7 so it's a lot of internal development,
8 operations, that sort of thing.  Not
9 necessarily external.  I'm -- I'm primarily an
10 internal staff person.
11    Q.   Is it fair to say you're
12 operations-oriented?
13    A.   I'm operations, and Donna is more
14 external.
15    Q.   And when things rise to a level
16 that needs to be operational, you're able to
17 put that in place?
18    A.   Yes.  And it doesn't matter so
19 much -- you know, the opioid issue is a --
20 is -- we've not seen anything like this,
21 historically.  So we have had issues.  Even
22 Ebola, we haven't experienced anything like
23 this.
24       So yeah, it -- that is my
25 responsibility, to take a look at how we go

Page 292

1 about implementing, internally, who our
2 external partners need to be, what is
3 everyone's role going to be.  So I'm not
4 necessarily going to be an expert in any given
5 thing.
6       I would do the same thing if it
7 were -- we were putting out a new fee schedule
8 for septic systems.  You know, that's -- that's
9 what I do.  I do internal operations.  So I
10 don't know a lot of answers to a lot of the
11 specific questions.
12    Q.   But when something is an important
13 public health matter, you're called on to
14 implement the things that need to be done to
15 take care of that?
16    A.   Yes.
17    Q.   And to at least address the issues
18 that the public is facing.
19    A.   Yes.
20       MR. NAEEM:  Object to form.
21    Q.   And is it fair to say that the
22 opioid crisis has impacted the population as a
23 whole?
24       MR. NAEEM:  Object to form.
25    A.   Every segment of the population, I

Page 293

1 would say, has been --
2    Q.   All -- across all socioeconomic
3 classes?
4    A.   Yes.
5    Q.   Ages?
6    A.   Yes.
7       MR. NAEEM:  Object to form.
8    Q.   And races?
9       MR. NAEEM:  Continuing objection.
10    A.   Yes.
11    Q.   And will you agree with me that
12 today Summit County still has an opioid crisis?
13       MR. NAEEM:  Object to form.
14    A.   Yes, I would.
15    Q.   And as a public health official,
16 you're still implementing programs and
17 overseeing programs regarding the opioid
18 crisis?
19    A.   Yes.
20       MR. NAEEM:  Object to form.
21    Q.   And I believe you testified earlier
22 today, hours ago, that just for the needle
23 exchange program you've had 80- -- over 8,000
24 people involved in that program just this year?
25    A.   The number I got, I believe, was

74 (Pages 290 - 293)

Page 294

1 81,000 needles -- syringes distributed for
2 2018.
3    Q.   And that's a result of a public
4 health crisis?
5    A.   Yes.
6        MS. FRANKLIN:  Object to the form.
7        MS. KEARSE:  Thank you.
8    A.   The other thing -- I'm sorry.  Let
9 me just say that just because something is a
10 public health issue does not mean that the
11 public health department can tackle the entire
12 thing.  I have to just say that.
13       You know, anything that's affecting
14 large segments of the population is a public
15 health issue, but we can't do everything just
16 as one system.  There have to be partners at
17 the local level.  Everybody, all hands on deck,
18 when it's something like this, so.
19    Q.   And is that something that as --
20 that Summit County has been doing with all the
21 various organizations and systematic approaches
22 throughout the county on addressing and
23 attempting to address the issue?
24    A.   I would say so.  We've tried.
25       MS. KEARSE:  Yeah.

Page 295

1        MR. NAEEM:  Okay.  I have a couple
2 follow-up questions.
3        - - - - -
4        (Thereupon, Deposition Exhibit 12,
5        10/6/2010 E-Mail Chain Re:  Summary
6        of the ODH/LHD Conference Call on
7        September 15, 2010, with
8        Attachments, SUMMIT_001712992 to
9        001712998, was marked for purposes
10       of identification.)
11       - - - - -
12       EXAMINATION OF TONYA BLOCK
13 BY MR. NAEEM:
14    Q.   On just a couple topics, Ms. Block,
15 quickly.
16       You were asked by counsel about
17 destroying documents --
18    A.   Yes.
19    Q.   -- and whether you were aware of
20 it.
21       MS. KEARSE:  Of not destroying
22 documents.
23       MR. NAEEM:  And I'm sorry.  I'm not
24 trying to characterize her answer.  Just --
25 just the topic was --

Page 296

1        THE WITNESS:  Uh-huh.
2        MR. NAEEM:  -- whether or not
3 documents have been destroyed, to be fair.
4        THE WITNESS:  Uh-huh.
5    Q.   Now, you've testified in a couple
6 instances today about the Akron Health
7 Department and its merger --
8    A.   Uh-huh.
9    Q.   -- into Summit Public Health.
10   A.   Uh-huh, uh-huh.
11   Q.   You were a Summit Public Health
12 employee at the time that occurred, correct?
13   A.   Yes.
14   Q.   And as a member of operations,
15 which you've described your role is, were you
16 part of integrating Akron's health department,
17 specifically their AOD services, into Summit
18 Public Health?
19   A.   Yes.
20   Q.   Okay.  What happened to the
21 documents of Akron health's -- Akron's health
22 department during that process?
23   A.   The -- the documents would have
24 been -- do you mean the historic patient
25 records?

Page 297

1    Q.   Everything.  Anything related to
2 Akron's health department --
3    A.   Anything that was in our --
4    Q.   -- what happened to the documents?
5    A.   Okay.  So anything that was in
6 our -- on our retention schedule, which should
7 be everything, is either still there, or it has
8 gotten to the point where it has met the 7- or
9 10-year guideline for being destroyed.
10   Q.   Now, were you part of the process
11 of --
12   A.   I didn't go get the boxes.
13   Q.   Okay.  And are you aware of who
14 did?
15   A.   Trying to think who was the
16 young --
17       No, I'm not specifically aware
18 right now of who did.
19   Q.   Okay.  Did -- did you ever see
20 Akron Health Department records in the form
21 where they were -- they had been Akron Health
22 Department records, and now they were somewhere
23 at Summit Public Health?
24       MS. KEARSE:  Object to form.
25 I'm -- I'm just --

75 (Pages 294 - 297)

Page 298

1      THE WITNESS:  Can I --
2      MS. KEARSE:  -- I know that I asked
3  you questions, but my questions were specific
4  to the litigation hold.  It was different from
5  that, but -- but go ahead and ask your
6  questions.
7      MR. NAEEM:  We're getting to
8  destruction, which is an issue you raised.
9      MS. KEARSE:  No, no.  It was a
10  litigation hold issue with that, so it's --
11  it's a different thing, but go ahead and ask
12  your questions.
13      A.  I know where the records are
14  currently held at, our records that are on the
15  retention schedule are currently held.
16      I didn't see the person pick the
17  boxes up and put them in a truck and take them
18  up to the Fairway Center, though.  I can't say
19  that I saw that happen.
20      Q.  Okay.  And -- and I -- I'm not
21  talking about Summit Public Health records
22  generally.
23      A.  I'm sorry.  Okay.
24      Q.  I am talking about the very narrow
25  subset of documents that were created by Akron

Page 299

1  Health Department --
2      A.  Uh-huh.
3      Q.  -- with respect to its AOD
4  services --
5      A.  Uh-huh.
6      Q.  -- counseling, whatever it was, and
7  what happened to them after the 2011 merger.
8      Have you ever seen Akron Health
9  Department records that were from the pre-2011
10  time frame?
11      A.  I have not looked for them, so I
12  haven't seen them.  But I didn't look for them,
13  either.
14      Q.  Okay.
15      A.  I didn't personally --
16      Q.  Okay.  And --
17      A.  -- go look for them.
18      Q.  And can you confirm one way
19  or another whether Sum- -- Summit Public Health
20  ever took possession of those documents?
21      A.  I -- can I confirm in that did I
22  see it happen?
23      Q.  Right.  I -- I just want to know
24  one way or another if you know.
25      A.  I am under the assumption that we

Page 300

1  did.
2      Q.  Well, I -- I -- Ms. Skoda testified
3  that they never came.
4      A.  Okay.  I --
5      Q.  So I need to know whether you
6  personally have knowledge.  If you -- I don't
7  want you to assume, speculate --
8      A.  Personally, no.
9      Q.  -- whatever.  Just --
10      A.  Personally, no.
11      Q.  Okay.  I'm going to hand you what's
12  been marked as Deposition Exhibit 12, and,
13  hopefully just a few questions about that.
14      And let me know when you've had an
15  opportunity to familiarize yourself with
16  Exhibit 12, please.
17      A.  Okay.
18      Q.  Just a background question.  What
19  is the general relationship between the Ohio
20  Department of Health and local health districts
21  like Summit Public Health?
22      A.  Well, they're our state umbrella or
23  support organization.  They're a public system.
24  They do help us with establishing guidelines
25  for how we go about doing any number of

Page 301

1  mandated services.
2      They come in and they audit us
3  for -- to make sure that we're doing things in
4  the manner that we're supposed to.  They
5  provide funding for any number of various
6  programs, and they keep us informed about
7  looming issues, if you will.  West Nile, you
8  know, all sorts of different issues.
9      Q.  Prescription opioid abuse, is that
10  an issue --
11      A.  Yes.
12      Q.  -- they would be keeping you
13  informed of?
14      A.  Yes.
15      Q.  Is it fair to say that local health
16  departments like Summit Public Health work
17  collaboratively with the Ohio Department of
18  Health to address public health issues --
19  emerging public health issues in the state of
20  Ohio?
21      A.  Yes.
22      Q.  Okay.  Have you yourself
23  participated in teleconferences with Ohio
24  Department of Health providing updates on
25  public health issues?

76 (Pages 298 - 301)

1    A.   I have sat in on, yes, routinely.

2    Q.   So Exhibit 12, you'll see, is --

3 the original e-mail in the string is from Tomma

4 Flint, from the office of local health

5 department's court at the Ohio Department of

6 Health.  Do you see that?

7    A.   Yes.

8    Q.   And her e-mail is dated October 6,

9 2010 --

10    A.   Yes.

11    Q.   -- agree?

12    A.   Yes.

13    Q.   The top of the e-mail string

14 indicates that this e-mail was then forwarded

15 throughout the Summit Public Health department.

16 Would you agree?

17    A.   Yes.  Well, it was sent from the

18 State to all of these people.

19    Q.   And it included Gene Nixon, if you

20 see?

21    A.   Yes.

22    Q.   Who is the current --

23    A.   Health commissioner.  He -- he --

24 he was the health commissioner at the time.

25    Q.   At the time, correct.

1         And Donna Skoda was included as

2 well?

3    A.   Yes.

4    Q.   Okay.  And she is the current

5 health commissioner?

6    A.   Correct.

7    Q.   All right.  Do you see your name on

8 there?

9    A.   Yes.

10    Q.   And we don't have to go through all

11 of these people or what their functions are,

12 but I -- I counted 16 people, 16 recipients in

13 the Summit Public Health department.

14    A.   Yes.

15    Q.   If we turn to -- there are some

16 numbers at the very, very bottom right-hand

17 corners, 1712996.  Can you turn to that page?

18    A.   Uh-huh.

19    Q.   Okay.  Well, actually, I take

20 that -- let's -- let's -- before we get

21 there -- I apologize -- let's turn to page 2 of

22 the document.  It's a --

23    A.   Uh-huh.

24    Q.   It's a report of a weekly

25 conference call for September 15, 2010.  Do you

1 see that?  At the top of the page?

2    A.   Yeah.  I don't see the word

3 "report," if it --

4    Q.   Well, fair.  Let- -- let's turn

5 back to page 1, and you'll see the subject

6 line --

7    A.   Oh, okay.

8    Q.   -- is --

9    A.   I'm sorry.  I thought -- okay.

10    Q.   Just to make sure that this is the

11 attachment to this e-mail, the e-mail says,

12 "Subject:  Summary of the ODH/LHD conference

13 call on September 15, 2010," correct?

14    A.   It does.

15    Q.   And that is essentially what

16 appears to be at the top of page 2.

17    A.   Uh-huh.

18    Q.   "Weekly conference call agenda for

19 September 15, 2010," correct?

20    A.   Yes.

21    Q.   All right.  So now if we turn back

22 to 2996.

23    A.   Yes.

24    Q.   The -- the heading that starts at

25 the bottom of that page says, "Official kickoff

1 of the prescription for prevention, stop the

2 epidemic campaign launch, 9/21/10."  Yes?

3    A.   It does.

4    Q.   All right.  And if we turn the page

5 and we look at the second paragraph, it says,

6 "In response to the epidemic, the ODH injury

7 prevention program has been working with

8 FleishmanHillard, a SM company, on the

9 development of a comprehensive social marketing

10 campaign to raise awareness of the problem."

11         Do you see that?

12    A.   I do.

13    Q.   So, certainly, by reporting this in

14 a summary dated September 15, 2010, the ODH

15 injury prevention program had been working

16 prior to this to respond to a prescription

17 opioid epidemic; would you agree?

18    A.   Yes.

19    Q.   And this summary was provided to

20 Summit Public Health in September of 2010,

21 agree?

22    A.   Yes.

23    Q.   Including yourself and the former

24 head of Summit Public Health and the current

25 head of Summit Public Health.

77 (Pages 302 - 305)

Page 306

1   A.   Yes.
2   Q.   At the bottom, under the -- No. 2,
3 under "Other related activities" on that page,
4 do you see that?
5   A.   Yes.
6   Q.   "Ohio Prescription Drug Abuse Task
7 Force," do you know what that is?
8   A.   Yes.
9   Q.   And would you give me a --
10   A.   I cannot.
11   Q.   Okay.  Well, let's -- let's read
12 what it says.  And I'm going to read from the
13 bottom of that page up to the top of the next.
14 It says, "The Ohio Prescription Drug Abuse Task
15 Force, of which Dr. Alvin Jackson is the vice
16 chair, is close to wrapping up its
17 comprehensive report with recommendations for
18 addressing the problem from the perspective of
19 public health, treatment, law enforcement, in
20 addition to regulatory recommendations to the
21 problem.  The report is due to the governor on
22 10/1/10."
23        Did I read that correctly?
24   A.   That's what it says.
25   Q.   Okay.  So clearly, this is

Page 307

1 something that was ongoing prior to the date of
2 this summary.
3   A.   At this date, yes.
4   Q.   And, again, this summary was
5 something that was provided to you and other
6 members of the Summit Public Health department?
7   A.   It came out to us.  You -- yes.
8      MS. KEARSE:  You can answer if --
9      THE WITNESS:  No, no, it's fine.
10   Q.   Did you ever see a copy of that
11 report that was issued by the prescription drug
12 abuse task force?
13   A.   I don't believe I did.  I don't
14 recall seeing it.
15   Q.   Do you have any reason to dispute
16 that that was issued in 2010?
17      MS. KEARSE:  Objection.
18   A.   No.
19      MR. NAEEM:  Okay.  I don't have
20 questions, although somebody else might.
21      MS. KEARSE:  There's only one
22 minute left, so.
23      MR. BORANIAN:  No.  We get
24 minute-for-minute recross.
25      MS. KEARSE:  Yeah, but they get --

Page 308

1 it's 5:18 is my understanding.
2      MR. BORANIAN:  Beg your pardon?
3      MS. DEYNEKA:  So we started at
4 4:52, we switched over at 5:05, so 13 minutes.
5      MR. BORANIAN:  So what time --
6      THE VIDEOGRAPHER:  Let's go off the
7 record.  We're off the record at 5:17.
8      (Off-the-record discussion.)
9      THE VIDEOGRAPHER:  We're back on
10 the record, 5:19.
11      MS. KEARSE:  I just don't want
12 there to be any back and forth.  I think this
13 is going back and forth.  I'm usually not a
14 stickler with that, but we got --
15      MR. BORANIAN:  Trust me, it
16 wouldn't have been any back and forth.
17      MS. KEARSE:  Okay.  All right.
18      MR. BORANIAN:  But we'll remember
19 your position.
20      MS. KEARSE:  Okay.  We've had it
21 with us, too.
22      MR. BORANIAN:  Trust me on that,
23 too.
24      MS. KEARSE:  That's -- so.
25      Yeah, so I think -- I believe the

Page 309

1 deposition is closed.
2      THE VIDEOGRAPHER:  Thank you.
3 We're off the record at 5:19.
4      (Deposition concluded at 5:19 p.m.)
5        ~ ~ ~ ~ ~
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

78 (Pages 306 - 309)

Page 310

1 Whereupon, counsel was requested to give
2 instructions regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10 Counsel was requested to give instructions
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 311

1          REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3                      SS:
4 County of Cuyahoga.  )
5
6          I, Stephen J. DeBacco, a Notary
7 Public within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, TONYA BLOCK, was
10 by me first duly sworn to testify the truth,
11 the whole truth and nothing but the truth in
12 the cause aforesaid; that the testimony then
13 given by the above-referenced witness was by me
14 reduced to stenotypy in the presence of said
15 witness; afterwards transcribed, and that the
16 foregoing is a true and correct transcription
17 of the testimony so given by the
18 above-referenced witness.
19          I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

Page 312

1          I do further certify that I am not
2 a relative, counsel or attorney for either
3 party, or otherwise interested in the event of
4 this action.
5          IN WITNESS WHEREOF, I have hereunto
6 set my hand and affixed my seal of office at
7 Cleveland, Ohio, on this 19th day of
8 November, 2018.
9
10
11
12
13
14          Stephen J. DeBacco, Notary Public
15          within and for the State of Ohio
16
17 My commission expires September 30, 2022.
18
19
20
21
22
23
24
25

Page 313

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

November 19, 2018

To: Anne Kearse

Case Name: In Re: National Prescription Opiate Litigation v

Veritext Reference Number: 3111418

Witness: Tonya Block      Deposition Date: 11/14/2018

Dear Sir/Madam:

Enclosed please find a deposition transcript  Please have the witness
review the transcript and note any changes or corrections on the
included errata sheet, indicating the page, line number, change, and
the reason for the change  Have the witness' signature notarized and
forward the completed page(s) back to us at the Production address
shown
above, or email to production-midwest@veritext com

If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

79 (Pages 310 - 313)

Page 314

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3111418
3 CASE NAME: In Re: National Prescription Opiate Litigation v
  DATE OF DEPOSITION: 11/14/2018
4 WITNESS' NAME: Tonya Block
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7    I have made no changes to the testimony
  as transcribed by the court reporter
8
  _____
9 Date          Tonya Block
10    Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11 the referenced witness did personally appear
  and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed
15
      I have affixed my name and official seal
16
  this _____ day of _____, 20____
17
    _____
18    Notary Public
19
    _____
    Commission Expiration Date
20
21
22
23
24
25

Page 315

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3111418
3 CASE NAME: In Re: National Prescription Opiate Litigation v
  DATE OF DEPOSITION: 11/14/2018
4 WITNESS' NAME: Tonya Block
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7    I have listed my changes on the attached
  Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s)
9    I request that these changes be entered
  as part of the record of my testimony
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
  that both be appended to the transcript of my
12 testimony and be incorporated therein
13  _____
  Date         Tonya Block
14
    Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
  the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18    in the appended Errata Sheet;
    They signed the foregoing Sworn
19    Statement; and
    Their execution of this Statement is of
20    their free act and deed
21    I have affixed my name and official seal
22 this _____ day of _____, 20____
23
    _____
    Notary Public
24
    _____
25    Commission Expiration Date

Page 316

1      ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 11/14/2018
3 PAGE/LINE(S) /    CHANGE    /REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
  _____  _____
20 Date         Tonya Block
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23
    _____
    Notary Public
24
    _____
25    Commission Expiration Date

80 (Pages 314 - 316)

[& - 20]

| & | |
|---|---|
| **&** | 1:22 2:9 3:10,16 4:4,13 12:1 |

| 0 | |
|---|---|
| **0** | 140:15 |
| **00** | 22:25 |
| **000077684** | 6:14 122:1 |
| **000077696** | 6:14 122:1 |
| **000340431** | 6:4 31:12 |
| **001631368** | 7:8 246:23 247:4 |
| **001631371** | 248:24 |
| **001631373** | 7:6,8 236:23 246:23 |
| **001641475** | 6:17 171:18 |
| **001641479** | 6:18 171:18 |
| **001698224** | 6:9 65:7 |
| **001702355** | 7:6 236:22 237:2 |
| **001702363** | 240:9 |
| **001702366** | 243:3 |
| **001702613** | 6:6 63:11 |
| **001702614** | 6:6 63:11 |
| **001711478** | 7:3 232:8,14 |
| **001711481** | 7:3 232:8 234:9 |
| **001712992** | 7:13 295:8 |
| **001712998** | 7:13 295:9 |

**001714776** 6:21 225:21 226:2
**001714803** 229:2
**001714811** 6:22 225:21
**001716632** 6:11 95:14
**001716633** 6:11 95:15

| 1 | |
|---|---|
| **1** | 6:3 31:9,17 96:15 115:23,25 116:16 119:9 123:19 125:13,23 136:18 172:19 178:6 188:7 304:5 |
| **1,688** | 178:7,19 179:8,25 181:13 181:16,25 182:16 |
| **10** | 7:7 145:21 184:15,16,25 185:5,12,17 228:17 246:19,21 297:9 |
| **10/1/10** | 306:22 |
| **10/6/2010** | 7:11 295:5 |
| **10/9/2008** | 6:19 225:17 |
| **100** | 61:22 136:18 140:15 179:14 |
| **101** | 3:4,11 |
| **10178-0060** | 3:12 |
| **10233** | 13:1 |
| **10:28** | 88:11 |
| **10:30** | 88:5 |
| **10:59** | 88:14 |
| **11** | 7:9 131:23 161:11 167:24 214:1 243:2 255:16,18,23 |

**11/14/2018** 313:8 314:3 315:3 316:2
**11/23/2010** 7:1 232:5
**1100** 2:12 41:7 313:1
**111** 8:14,15
**114** 186:2
**11472** 312:13
**12** 5:8 7:11 125:18 132:10 295:4 300:12,16 302:2
**12/7/2018** 6:15 171:15
**120** 8:15,16
**121** 6:12
**124** 8:16
**125** 8:17
**126** 8:17
**128** 8:18
**129** 3:18
**12:16** 153:3
**13** 109:18 308:4
**132** 8:18
**135** 8:19
**139** 8:19
**14** 1:18 11:2 224:15,17 289:19 289:19
**146** 8:20
**148** 8:20,21
**15** 7:12 37:24 87:19,21 109:18 162:13 184:9,10 185:19 224:17 295:7 303:25 304:13,19 305:14
**15,750** 227:11
**157** 8:21
**158** 8:22,22,23

**16** 84:12,13,14 162:13 303:12,12
**162** 259:9
**166** 8:23
**168** 185:25
**17** 1:8 8:3 11:7 33:20 179:15 247:5
**171** 6:15
**1712996** 303:17
**18** 1:13 33:20 173:22
**1800** 3:4
**1800s** 60:4 61:4
**1820** 313:2
**184** 126:9
**187** 8:24
**189** 8:24
**19** 313:4
**1900s** 62:11
**194** 8:25
**196** 9:1,1
**197** 9:2
**1997** 100:4 244:21
**19th** 312:7
**1:16** 153:6
**1:50** 188:22
**1st** 180:23

| 2 | |
|---|---|
| **2** | 5:3 6:5 7:2 63:9 63:16 65:16 232:7 232:23 233:9 234:24 267:24 269:6 303:21 304:16 306:2 |
| **2,060** | 188:5 |
| **2.5** | 259:22 |
| **20** | 185:19 259:22 260:20 314:16 315:22 316:22 |

**20.4**   259:9
**20001-2113**   2:19
**20005**   4:5
**2001**   126:21,22,23
**2005**   100:8 269:7
269:10
**2007**   77:16
**2008**   72:3 226:4
227:20 228:11
230:20 231:7,13
231:20
**2010**   7:2,12 200:20
201:7,18 202:1,24
203:18 206:3,24
207:8 208:1
210:14 232:7,15
232:20,23 233:9
233:14,21 234:24
235:2,5 236:5
263:22 264:13,17
264:24 265:6,10
265:12,22,24,25
285:21 295:7
302:9 303:25
304:13,19 305:14
305:20 307:16
**2011**   71:14 72:6
78:3,8,14 79:1,4
82:10,11 83:2,6,13
83:19 94:25
197:17 255:12
287:13 299:7,9
**2012**   7:4 236:20
237:4,13 241:7,24
242:16 243:17,24
246:14 259:9,22
263:11,14,15
266:9,11,12
267:10,21
**2013**   128:23

**2014**   40:4
**2014-2015**   287:10
288:2 289:9
**2015**   38:2 40:8,9
41:21 42:3 43:21
84:17,21 87:14
88:24 89:1 172:10
174:12 178:19
183:11 186:10,24
**2016**   7:9 22:6,12
22:15,18,21 23:5,9
23:10,14,22,24
24:5,10 33:15
65:1,16 78:11
79:4 82:12 83:3,6
83:13 84:6,8,18,22
86:10 87:18,20
88:23 89:7 94:25
140:13 255:19,25
258:20 259:10,23
285:21
**2017**   6:3,9,10
15:15 22:18,20
31:11 32:13 65:7
95:13,24 96:18
140:14 283:14
**2018**   1:18 11:2
16:3,5 22:1,3,16
22:19,21 23:11,22
24:4,8,14 36:2
53:5 54:13 109:9
110:13 117:4
122:10 127:19
136:22 145:12,15
169:1,5,10,18
247:6,16 250:8
251:16 280:17
294:2 312:8 313:4
**2019**   104:1
**202**   2:19 4:6

**2022**   312:17
**204**   9:2
**205**   9:3
**206**   9:3 126:9
**207**   9:4,4
**208**   9:5
**21**   126:1
**211**   5:9
**212**   3:12
**214**   185:23
**215**   9:5
**216**   2:13,14 9:6
**216-523-1313**
313:3
**216-9140**   2:6
**216-9343**   2:7
**217**   9:6,7
**218**   9:7
**219**   9:8
**220**   9:8
**221**   9:9
**223**   9:9,10
**225**   6:19
**23**   232:15,20
**231**   9:10
**232**   7:1
**236**   7:4 9:11
**24**   247:16
**24/7**   155:15
**240441**   6:4 31:12
**241**   9:11
**245**   9:12
**246**   7:7 9:12
**247**   188:4
**249**   9:13
**25**   8:3,4 228:25
**253**   9:13,14
**254**   9:14
**255**   7:9
**257**   9:15,15

**26**   110:3,3,4
**260**   9:16,16
**261**   9:17,17,18
**262**   5:10
**264**   9:18,19
**266**   9:19 22:21,23
**270**   9:20
**272**   9:20
**273**   9:21
**275**   9:21
**276**   9:22,22
**28**   2:5 237:3,13
263:14
**280**   9:23
**2804**   1:7,8 11:7
**281**   9:23,24
**282**   9:24
**283**   5:11
**285**   9:25
**286**   10:1
**287**   10:1
**29**   8:4
**290**   10:2
**292**   10:2,3
**293**   10:3,4,4,5
**294**   10:5
**29464**   2:6
**295**   5:12 7:11
**297**   10:6
**2996**   304:22
**2:00**   188:25
**2:27**   211:10
**2:55**   211:13

**3**

**3**   6:7 65:4,13
101:13 107:18
147:2 184:7
240:12
**3.5**   117:5
**3.5.**   110:15

**30** 312:17
**305-6400** 3:18
**307** 10:6
**309-6864** 3:12
**31** 6:3
**311** 5:14
**3111418** 313:7 314:2 315:2
**32** 8:5
**330** 3:18
**35** 92:12,13
**38** 8:5
**3:41** 254:11
**3:42** 254:14
**3:50** 262:3
**3:55** 262:6

**4**

**4** 6:10 31:21 95:12 95:21 115:25 116:14 187:9
**40** 179:10
**400** 3:17
**415** 3:5
**43** 124:12
**434-5092** 4:6
**44** 8:6
**44087** 13:3
**44113-7213** 2:13
**44114** 313:2
**44720** 3:18
**45090** 1:13
**46** 8:6
**4:17** 282:21
**4:52** 282:24 308:4

**5**

**5** 6:12 121:22 122:7 123:19 124:11 125:13 130:3 131:24 134:24 136:18 144:8
**50** 91:8,10 151:25 152:2
**500,000** 104:23
**51** 2:18 8:7
**55** 8:7
**57** 124:20
**5:05** 308:4
**5:17** 308:7
**5:18** 308:1
**5:19** 308:10 309:3 309:4

**6**

**6** 5:5 6:15 145:21 171:14,23 172:5 189:3 190:4 302:8
**62** 8:8 201:21
**63** 6:5
**65** 6:7 92:9
**659-5980** 3:5
**696-3675** 2:13
**696-5474** 2:14
**6:00** 108:24

**7**

**7** 6:19 172:10 225:16,25 233:13 233:21 235:5 236:5 263:22 297:8
**7/17/2018** 7:7 246:22
**70** 91:10
**70s** 197:8
**725** 4:5
**74** 8:8
**75** 1:23
**77** 8:9
**78** 8:9
**79** 125:21

**8**

**8** 7:1 225:14 232:2 232:4,12 240:7 242:5 263:20
**8,000** 293:23
**80** 293:23
**8040** 3:17
**81,000** 22:22 23:2 294:1
**843** 2:6,7
**85** 8:10
**86** 8:10
**87** 8:11,11
**879-3939** 2:19
**88** 8:12 124:25 125:14 227:19 228:2
**89** 8:12,13

**9**

**9** 7:4 184:18 236:17,19 237:1 262:25 263:4,6 266:9
**9/21/10** 305:2
**91** 8:13 100:5 268:18,19,20
**94** 8:14
**94105** 3:5
**95** 6:10
**950** 2:12
**96** 269:1,2
**97** 100:5 269:1,2
**98** 100:6
**9:00** 1:19 11:3
**9th** 226:3

**a**

**a.m.** 1:19 11:3
**aaron** 1:9 11:9
**ability** 50:4
**able** 13:17 86:13 106:18 162:25 166:10 168:24 169:2 171:1 189:7 256:18 281:9 291:16
**absolutely** 41:18
**abstinence** 234:16
**abuse** 26:7 44:24 48:20 50:20 66:11 67:4,8 78:15 79:8 79:14 93:22 100:11,20 101:10 101:22 102:25 107:6 117:7 119:23 120:2,14 120:20 124:6 127:13 139:8 147:24 164:10,15 165:15 166:17,22 167:15 169:8 174:13 176:8 178:4 189:17 191:8 196:16 197:3 211:24 228:24 231:3,9 236:8 244:24 276:2,7 301:9 306:6,14 307:12
**abused** 223:19
**access** 173:13 177:21 196:6 251:7 256:11,19 280:24
**accident** 14:6,6
**account** 82:7 91:18 96:21
**accounted** 115:24
**accounting** 25:18 31:2

**accruing**  82:7
**accuracy**   259:13
  260:2
**accurate**   16:11
  19:2 25:7 29:3
  46:10 53:7 56:3
  101:13 115:9
  121:20 142:4
  180:1 187:13
**acknowledge**
  287:5 314:11
  315:16
**acknowledged**
  266:10
**act**   225:9 314:14
  315:20
**actavis**   3:8,8 12:8
  12:9,9
**acting**   158:4
**action**   312:4
**actions**   206:23
**activities**   112:16
  306:3
**actual**   35:2 52:13
  146:13 170:12
  176:2 178:4
  180:11 181:7
  224:25
**adams**   2:12 11:21
  11:21
**add**   66:10 101:23
  103:1
**added**   102:20,21
  273:11
**addict**   196:12
**addicted**   149:6
  197:8 223:13
  235:8 264:10
**addiction**   62:22
  103:7 127:14,21
  135:1,9 147:21

148:14,15,16
157:8,12 164:22
171:9 196:21,24
199:4 201:9 204:6
221:22 242:17
284:25
**addictive**   61:14
**addition**   269:12
  306:20
**additional**   81:25
  82:14 83:7,14
  90:15 101:22
  152:12 282:13
**address**   12:25
  13:1 40:19 77:21
  142:22 143:3
  201:9 265:23
  266:3,7,13 267:4,8
  267:10 292:17
  294:23 301:18
  313:15
**addressed**   243:11
**addresses**   129:13
**addressing**   127:13
  240:14 294:22
  306:18
**adequate**   152:8
**adjournment**
  311:22
**adm**   7:5,7 30:15
  31:3 32:21,24
  79:24 93:6 115:15
  116:1,19 120:3,9
  120:22,25 122:9
  123:2 124:13,25
  125:15,22 131:6
  132:16 136:19
  138:24 140:17,19
  168:11 175:8,21
  176:1,13 199:24
  236:20 237:20,23

238:8,11,19,24
239:4,8,23 241:15
241:21 242:12,16
242:19 246:3,9,22
247:4,14,18,25
262:25 266:24
287:12
**admin**   46:6 69:12
  71:17 72:14 73:5
**administer**   106:19
**administers**   238:9
**administration**
  70:15 71:10 72:11
  74:7,21 76:14
  133:10 173:6
  218:13 268:21
**administrative**
  90:18,21 91:24
  101:18 118:18
**administrator**
  27:3 76:2
**adult**   66:7 96:22
  105:16 112:12
  114:16
**advance**   80:20
**advent**   244:17,20
**advertisement**
  245:4
**advice**   58:9
**advise**   110:23
**affiliated**   226:24
**affixed**   312:6
  314:15 315:21
**aforesaid**   311:12
**afraid**   193:2
**afternoon**   153:8
  211:16 262:9
**age**   12:15
**agencies**   92:12
  175:6 251:1
  287:21

**agency**   107:8,9,11
  198:11 237:25
  238:1 265:2
**agenda**   7:2 232:6
  232:23 233:9,12
  247:5 304:18
**ages**   293:5
**aggregate**   171:6
  178:3
**aging**   66:7
**ago**   34:25 52:25
  62:14 63:20 93:3
  124:22 167:21
  170:15 183:2
  204:10 224:8
  228:18 239:25
  247:8 280:7,10
  293:22
**agree**   62:23 78:5
  97:23 98:1 120:1
  120:6,6 124:10
  125:15 128:15
  135:4 136:1
  157:14,18 158:3
  163:21 167:17
  172:8,11 182:22
  186:8,13 189:9
  196:10,19,23
  197:5 209:5,8
  243:15,24 250:8
  250:21 251:2,4,15
  251:20 252:8,11
  252:17 260:11
  264:12 281:5,24
  293:11 302:11,16
  305:17,21
**agreed**   115:23
  132:14 187:6
  189:5 209:22
  263:9

**[ah - approved]**

**ah** 202:18
**ahead** 51:18 52:11 95:19 148:24 185:6 221:5 282:18 283:18 298:5,11
**aid** 273:1,11,18 274:17,24 276:22 277:3 278:21
**air** 80:15 81:18 112:1
**akearse** 2:7
**akron** 1:23 2:2 11:14 44:16 72:5 73:17,21 78:18,22 127:3 149:7 210:12 268:12,22 296:6,21 297:20 297:21 298:25 299:8
**akron's** 296:16,21 297:2
**al** 1:12,12
**alcohol** 97:13 102:16 128:16 147:24 185:23 186:10 187:4,5 189:23 196:25 230:5 237:24 252:24 254:16,24 255:2,6 288:1
**alleged** 277:4
**alleging** 211:23
**allocate** 55:12 114:3
**allocated** 25:10 26:11,11 27:8 29:24 68:25 112:15
**allow** 106:11 189:16

**allowed** 98:20 148:12 283:20
**allows** 119:18 185:13
**alternate** 161:25
**alternative** 193:14
**alvin** 306:15
**american** 244:22
**amerisourceberg...** 3:2 11:18 12:5 211:20 212:13
**amount** 55:15 68:24 84:25 90:11 91:14 93:14 117:23 152:20 168:1,3 206:17 207:24 227:13,14
**amounts** 33:24 82:18 85:8 210:13
**analgesics** 193:16 193:20
**analysis** 187:10 205:1 206:21 207:5 210:16
**analyzing** 205:4 210:12
**ancillary** 53:18
**andy** 73:9
**angela** 19:19,23,24 72:17 89:25 117:10 119:25 121:18 143:18
**anna** 162:2 164:8 164:19
**anne** 2:4 11:12 15:4 98:23 108:21 125:11 130:24 192:21 279:14,20 313:5
**anne's** 18:2 185:9

**annual** 7:10 68:18 92:8 156:14,18 255:19,25
**annually** 154:24
**answer** 16:10 17:24 18:3 27:14 44:7,12 58:16 60:16 83:16 135:19 143:17 172:2 179:7,21 188:13 190:10 192:9 194:6 195:19 213:20 219:11,12 220:8 220:11,11,15,16 220:18 280:19 295:24 307:8
**answered** 8:11 87:24 132:20 148:4 212:5 261:3 261:12 281:22
**answering** 283:3
**answers** 13:17 138:13 292:10
**anticipate** 29:17
**anticipated** 30:2
**anybody** 14:23 16:25 36:13 155:20 248:2
**anymore** 55:3
**aod** 6:10 80:17 95:13 96:11,22 97:8,22 99:11 141:22 182:4 229:24 230:3 240:6 266:1 287:16 296:17 299:3
**aodl** 93:25
**apart** 238:2

**apodoll** 4:6
**apologize** 38:16 153:24 154:8 303:21
**apparently** 188:18
**appear** 314:11 315:15
**appearances** 2:1 3:1 4:1 5:3
**appears** 61:20 185:18 247:4 304:16
**appended** 315:11 315:18
**appendix** 246:16
**applicable** 310:7
**application** 6:13 121:25 122:9,15 123:2
**apply** 93:21 104:7
**appreciate** 42:24 82:20 87:4 125:10 129:9 130:25 131:3 211:5 231:2 283:4
**approaches** 294:21
**appropriate** 20:21 126:17 149:2 152:9 281:16
**appropriately** 281:12
**approval** 27:18 197:21 233:13 234:3,4
**approve** 30:23 75:13
**approved** 27:16 69:4 74:8 197:24 261:17

approves 75:10,18
approving 75:21
approximately
162:5
archive 56:9,12
archived 45:11,16
area 65:23 90:16
140:23 252:21
254:21 269:25
290:25
areas 41:11 68:22
69:15 93:17
140:22
arena 135:2
argue 134:13
art 133:20,24
230:6
article 61:4,10
62:2,5,16,19,22
articles 58:21 59:5
59:21,25 60:1,5
199:2
aside 162:16
193:18
asked 8:11 18:25
19:15 20:11 21:22
35:12,13 36:8,14
64:24 87:24 116:3
125:17 132:20
138:3 147:23
148:3 195:13
198:24 212:5,16
221:25 261:2,11
275:11 277:15
279:9,13 281:21
281:22 283:6
295:16 298:2
asking 36:25 39:7
39:11 48:13 84:21
84:24 88:3 117:22
120:19 130:10,12

130:14,16,20
136:11 144:21
181:13 221:2
258:6 279:17
assess 163:13
165:21
assessment 165:4
170:7 180:23
240:15 251:17
assessments 53:16
91:13 183:23
251:7
assignment 314:2
315:2 316:2
assist 48:7
assistance 275:1,9
assistant 64:6,10
64:23 67:12,25
68:12 69:8 78:11
97:1,2 107:19
152:17 170:1
186:17 214:3
217:2 239:10
245:3 250:7 274:5
285:13
assisted 51:21,21
94:3 105:19,21
106:9 145:8
288:13
associated 55:19
103:25
association 244:22
assume 187:14
215:11,13 232:21
233:23 260:18
275:22 300:7
assumed 275:21
assuming 270:24
273:9
assumption
215:16,17,19

216:8 281:15
299:25
atod 126:14
attached 63:18
233:16 315:7
attachment 6:21
7:2,5 51:12
225:20 226:15,18
232:7,20 236:22
304:11
attachments 7:12
295:8
attempting 228:8
294:23
attend 38:14
247:14,18
attendance 234:1
264:2 265:10
attended 233:24
attending 199:22
265:9
attorney 312:2
attorneys 17:1
18:5 35:12 41:25
273:16
attributable 91:1
91:2 139:3 225:10
audience 235:17
audit 301:2
august 100:8
145:15
author 132:21
authority 113:10
113:17
authorize 315:11
automated 255:25
availability 23:20
252:17
available 30:9
69:3 89:6 140:20
157:10 161:25

163:19 168:4
191:20 193:10
197:15 218:5
290:23
ave 313:1
avenue 2:12,18
3:11,17
aw 168:8
awarded 103:21
112:25 113:4
aware 34:15 101:6
108:11 129:5
147:17 148:19
149:7 152:19
166:15 168:8
169:4 170:18
175:4 189:13
190:9,13 191:12
192:7 193:5 194:4
194:15 197:2,14
197:20,23 201:15
201:24 203:24
205:17,21,24
206:7 208:5,15,15
209:2,5 210:16,22
211:21 223:3,11
225:4,9 245:7,8
256:24 257:2
258:8,12,16 272:6
275:12 276:9
287:8 295:19
297:13,17
awareness 223:17
235:7 264:5,9
305:10

**b**

b 3:16 54:7 68:6
106:16
ba 268:11,17
babies 205:10
229:20 231:9

**bachelor's** 268:19
269:13
**back** 19:8 21:10
33:1 36:23 37:6
37:20 38:13 39:9
41:15 46:13 47:1
47:23 65:15 76:18
77:5 83:24 84:5
85:2,4 86:16
88:13,24 107:18
116:4 127:2 143:1
153:5 167:4 185:4
188:24 195:12
197:6,7 203:4
211:12 221:11
231:7 242:2,5
254:13,19 257:13
262:5,25 263:20
266:20 267:23
269:5 282:23
287:13 304:5,21
308:9,12,13,16
313:15
**background** 40:18
268:8,10 270:12
270:15,20 271:3
300:18
**backwards** 84:2
87:9
**bad** 127:16
**balance** 86:21
87:3 117:22,22
**barely** 60:20
**barrett** 95:24 96:2
96:16 97:4,22
98:16 107:22
108:12 121:6,12
142:1
**barrett's** 108:1
**barrier** 229:11

**base** 61:1 214:18
215:8
**based** 14:6 18:15
26:21,23 29:19
33:6,12 47:9 63:4
82:23 91:23 92:12
99:10 115:3 117:1
129:4,14,25
148:13 154:18
166:1 168:3
186:14 240:2
241:3 256:8
259:18 264:20
286:21
**basically** 77:5
**basing** 250:24
**basis** 25:6 68:18
119:21 156:15
175:2,3,14 178:3
216:5 250:14
259:12 260:1
261:14
**bates** 228:25
232:13 240:8
243:2 247:3
248:21 255:23
**bath** 243:11
**battling** 275:1
**becoming** 67:12
67:25
**beds** 251:8,21,24
**beg** 308:2
**began** 136:9
264:19,19 286:3
**beginning** 29:15
176:18 286:4
**begins** 176:17
**begun** 103:25
**behalf** 2:2,9,16 3:2
3:7,14 4:2 11:13
11:20,22,25

169:25
**behavioral** 91:9
92:16,25 93:20,22
94:1 140:21
141:24 266:23
287:21
**belabor** 122:6
**belief** 196:5
214:19 280:23
**believe** 15:8 16:4,4
16:6 22:6 23:13
24:20,20 27:7
28:17,21 30:22
34:9,21 35:16,18
45:7,9,16,19 48:5
50:19,24 52:10,12
52:24 54:8 56:17
58:25 59:1 61:7
62:5 68:1 72:13
73:1,6 75:14,25
76:2 83:8,11
87:23 93:11 99:13
99:19 102:8 103:4
104:8,23 105:5
106:7 107:17
109:18 110:2
137:7,11 149:18
150:7,25 151:14
154:21 155:9,16
155:23 156:18
159:14 160:4,14
160:17 161:6,23
162:2,21 164:16
164:19 166:23,25
174:17 175:12,15
175:17,22 177:11
177:14,15,17
183:2,16 184:1
186:7 189:3,6
202:3,9,12 208:4
214:12 216:15,22

224:15 235:21
239:2,22,24 246:2
249:15 252:20
253:8,14,24
256:17 267:24
280:15 281:9,18
283:13,24 284:7
284:14,23 285:12
286:14,24 287:3
289:20 293:21,25
307:13 308:25
**bell** 13:2
**beneath** 160:25
**benefit** 38:8 107:3
162:16 174:20
**benefits** 25:9,21
26:10 55:20
118:20 121:14
138:6,20 139:3,9
139:18 141:10
168:20
**bennett** 36:10
**best** 40:15 108:21
110:7 184:4,6
**beyond** 106:23
146:3 240:6
**big** 156:21 203:4
**bill** 30:25 80:2
115:15 171:2
175:10 185:13
**billed** 28:23 29:6
**billing** 79:25
149:25 184:19
185:2,14
**birth** 265:15 290:1
**bit** 35:6 55:15
101:1 144:9
145:10 153:16
198:24 199:1,20
204:10 214:17
223:22 263:10

268:7 290:11
**block** 1:17 5:7 6:5
6:16,20 11:5
12:15,20 13:1,4
14:3 31:16 60:17
63:10 65:11 86:6
88:16 94:14 95:18
99:3,19 104:10
107:19 122:5
124:18 153:8
171:16,22 210:25
211:14,16 225:18
226:5 232:12
236:14,17 240:10
246:19 249:11
254:15 261:22
262:7,9 282:11,25
283:2 286:23
295:12,14 311:9
313:8 314:4,9
315:4,13 316:20
**blowing** 42:15
**board** 7:5,7 30:15
74:16 75:10,18
77:6 79:24 93:6
99:24 100:3,10,15
100:20 101:7
115:15 119:2,11
119:14,18 120:9
134:2 140:19
196:15 199:24
222:12,15 226:9
236:20 237:20,23
238:3,4 239:8,23
241:15,21 242:16
246:9,22 247:5,24
248:3,5,16 249:12
249:23 262:25
266:25 269:18
287:12 288:25

**boardroom**
247:16
**bockius** 3:10
**bolded** 126:13
**books** 25:10
**boranian** 3:4 5:9
11:17,17 188:15
188:17 211:15,19
219:12,14,22,25
220:14,17,20,23
221:6,10 225:13
232:1 249:14,18
249:20 250:1
254:6,9 255:15
261:21 307:23
308:2,5,15,18,22
**born** 205:10
229:20 231:9
**bottom** 96:15 97:5
109:2 188:4
240:12 303:16
304:25 306:2,13
**bought** 218:23
**boulevard** 2:5
**box** 42:22
**boxes** 52:2 70:9
153:17 154:15
155:15,22 156:5
157:20 191:4
297:12 298:17
**breadth** 203:17
**break** 88:5,16
152:25 153:9
211:8 254:20
262:1,19,21
282:19
**breakdown** 24:19
**breastfeeding**
290:2
**brennan** 1:22

**bretton** 3:17
**bridgeside** 2:5
**brief** 163:11,11
**briefly** 13:4 63:3
126:11 145:9
221:25 262:10
**bring** 91:14
106:10
**bringing** 29:17
**broad** 82:22
**broader** 46:18
82:11
**broke** 140:10
**broken** 102:2
123:20
**brought** 26:20
86:9 87:1 149:20
287:19
**brown** 123:12
137:19,19,20
140:16 143:16
160:23 161:1
177:23 188:11
**brunelle** 54:3,7
**brunelle's** 55:19
**bubble** 289:11
**budget** 6:4 19:25
20:16 24:13 27:10
27:16,17 29:14,18
31:11 51:11 69:4
70:1 74:6,14
75:14,19,21 79:7,8
79:13,21 80:6,12
80:21 81:5 82:13
83:7 85:18,21
86:1 88:25 90:2,4
91:3,16 92:8
94:24 97:17 109:2
109:12 117:5,12
117:24 118:13
119:3 151:16

239:1
**budgeting** 32:9
74:2 80:19
**budgets** 68:15
69:8,23 76:13
80:14 97:17
117:18 289:5
**building** 40:13,23
**bullet** 229:11,16
229:17,24 230:10
250:2 259:19
**burelle** 54:6
**burford** 68:4,5
**burgess** 19:24
72:17 89:25
**burling** 4:13
**business** 213:1
234:7 287:22
289:8
**busts** 252:5,15

**c**

**ca** 313:25
**cabinet** 157:16
158:10 226:19
**calendar** 104:1
169:10
**california** 3:5
**call** 7:12 81:12
95:9 118:2 140:13
140:14 295:6
303:25 304:13,18
**called** 12:15
128:23,23 228:24
292:13
**calls** 161:21
**camera** 155:18
**campaign** 305:2
305:10
**campbell** 3:16
**candidate** 149:2

cannabis  185:25
  186:10
canton  3:18
capabilities
  181:11
capacity  212:20
  213:11 214:2
  227:1 267:3 291:1
caption  311:21
cardinal  4:2 210:5
  212:17,21 213:1,5
  273:3,5
care  229:20
  245:19 292:15
carolina  2:6
carpenter  172:16
  172:21 174:6
carpenter's
  176:17
carried  81:4
case  1:8,13 11:6
  14:8 46:15 142:8
  195:8 212:3
  251:18 271:20
  272:8,21,22
  273:12,23 277:15
  283:14 313:6
  314:3 315:3
caseload  168:5
cases  155:9
categories  33:12
  79:25 103:18
  185:17 186:6
  208:19
category  31:4
  103:12 135:3
cause  311:12
caused  277:4
cc'd  97:3
center  41:2 44:16
  44:22 298:18

cephalon  3:7 12:7
certain  41:23 86:2
  93:18 111:9
  112:16 123:20
  145:5 161:19
  195:11 208:19
  218:6 240:25
  279:17 286:25
certainly  32:12
  62:4 67:24 71:25
  77:22 79:17 82:19
  97:25 104:10
  111:25 112:24
  192:1,7 193:4
  198:11 236:12
  241:9 285:4
  305:13
certificate  5:14
  311:1 315:11
certification
  145:17,22 146:3
  314:1 315:1
certifications
  269:16
certified  12:18
  164:16
certify  311:8,19
  312:1
cfhs  7:1 232:6,22
  235:12
chain  6:10,15 7:4
  7:11 95:13 171:15
  172:14,15 210:1
  236:20 295:5
chair  248:16
  306:16
challenge  240:19
  241:23 242:1,3,20
challenges  6:20
  60:10 225:19
  226:11 227:20

228:7,24 229:8
  240:13 242:9
chance  212:1
change  206:8
  207:16 254:4,5,7
  289:7 313:13,14
  315:8 316:3
changed  22:11
  63:25 93:14,15
  113:9 126:24
  129:8 202:7,11
changes  93:9
  207:21 240:24
  313:12 314:7
  315:7,9
channels  204:12
characterize
  189:16 295:24
charge  80:9
  118:15,16 141:18
charged  99:13
  118:13 140:17
  141:20 150:5,9
charges  118:12
  142:3
chart  6:8 65:6
check  188:19
chemical  164:16
child  201:22 233:9
  235:11 263:23
  289:25
childhood  28:8
  48:21 66:5 114:23
children  52:23
  226:21 227:3
  229:19 231:24
  288:25 290:4
children's  234:22
chiropractic
  193:25

choice  240:25
christa  54:3,4 55:9
  55:12,24
chronic  191:21
  192:5 193:5,11,22
  194:3,16,17
  195:24 196:6
  280:24
circle  41:8
circulated  263:15
circumstance
  180:9
circumstances
  158:25 183:4
citizens  78:16
  114:2
city  2:2 11:13
  149:7 210:12
  267:6
civil  12:17 310:3,7
  314:5 315:5
clarification  84:20
clarifications
  283:5
clarify  181:17
clarity  276:25
  277:20
classes  293:3
clean  138:12
clear  14:13 21:4
  33:23 38:17 40:7
  42:25 81:18 89:13
  94:13 128:4 138:1
  140:25 144:20
  156:7 202:15
  207:18 242:11
  249:17 251:10
  287:18
clearly  13:18
  306:25

**clerk** 96:21
**cleveland** 2:13
3:17 312:7 313:2
**client** 149:1
178:16 212:12
**clients** 144:13
150:5 179:9,9
180:6 230:12
**clinic** 44:15,17
45:20 66:3,8
86:25 94:3 99:8
102:4,22 146:2,11
146:12,13,20
147:1 150:19,23
152:7,10,14,21
191:3 239:17
**clinical** 147:2
163:8
**clinically** 163:15
**clinics** 245:15
246:5
**close** 33:8 57:1
80:4 190:14
204:17 306:16
**closed** 80:7 309:1
**clothing** 53:21
**coach** 159:21,25
160:4 163:17
**coaches** 103:4
163:3 213:6
**coalition** 115:19
**cocaine** 171:9
252:22 253:2
254:22
**code** 112:19
184:14 185:13
**collaborates** 151:7
**collaboration**
154:13
**collaborations**
126:15

**collaboratively**
301:17
**colleague** 185:9
**colleagues** 17:5
192:22 211:2
**collect** 19:1 35:14
42:8 59:25 144:17
279:3,17
**collected** 144:23
144:24 283:25
**collecting** 21:8
48:25
**collection** 156:19
**column** 188:3,5
**com** 99:22
**combined** 44:11
66:4 244:21
**come** 13:24 19:8
21:10 29:24 33:1
36:14 54:20 60:24
74:5 76:20,21,21
106:1 115:21
120:3 124:21
138:23 142:2
143:1 152:13,14
153:25 155:20
179:9,12 180:23
195:12 217:9
227:10 234:23
301:2
**comes** 25:21 27:4
34:11 42:8 68:10
125:14,18 126:5
138:21 167:4
168:22 178:14,15
**coming** 55:10 63:6
99:23 123:1 152:9
189:17 197:6
204:13 288:6
**comments** 231:16

**commission** 27:17
75:14,20 312:17
314:19 315:25
316:25
**commissioned**
311:8
**commissioner**
46:4 64:7,10,18,23
67:13,25 68:13
69:9 71:8 78:11
107:19 113:8,12
113:16 119:2
152:18 170:1
186:18 214:4
217:3 237:17
245:3 250:7 274:5
285:14 302:23,24
303:5
**commissioner's**
14:12
**commitment**
55:11 56:1
**common** 186:25
**commonly** 253:5
**commons** 3:17
**communicating**
131:6 132:16
**communication**
35:10
**communities**
230:12
**community** 7:5
20:19 26:5 28:16
29:5 30:7 43:14
43:17,23 44:10
49:25 63:23 65:19
65:22 66:8 70:9
77:1,15 78:8 79:5
92:12 96:3 101:1
101:8,21 107:21
109:22,23 110:12

112:10 114:10
115:18 117:3,5
122:19 126:14
144:10 153:14
159:2 161:1
163:23 164:2,7
167:13 173:6
175:25 186:17
197:3 200:6 214:2
217:2 231:21
236:21 237:20
239:9,10,20 240:8
241:12,22 245:2
250:19 251:2
263:1,16 274:6
285:18 287:17,25
**comp** 175:13
**companies** 214:24
215:1 253:20
**company** 42:11
46:1 305:8
**compared** 23:22
23:24 38:21 68:21
**compiled** 36:13
175:14 231:17
**complaint** 14:8,16
213:24 271:8,23
271:23 272:18
**complaints** 212:2
212:3,4
**complete** 60:7
93:15
**completed** 311:22
313:15
**completes** 167:6,7
**component** 53:11
**composing** 235:5
264:6
**composition**
159:10 160:5

**comprehensive**
305:9 306:17
**comprised** 76:7
**computer** 18:11
**con** 79:22
**concept** 98:1
**concerned** 58:3
269:23
**concerns** 60:12
**concert** 245:14
246:5
**concluded** 309:4
**condition** 186:25
**conditions** 186:12
240:2
**conduct** 158:16
276:21 277:2
**conference** 7:12
295:6 303:25
304:12,18
**confirm** 268:9,24
299:18,21
**confused** 179:22
**confusing** 88:8
214:17
**connection** 106:21
107:1 223:3 225:4
**connolly** 4:4
**consequences**
194:3
**consider** 131:7
**considered** 29:8
29:23 30:18 84:23
133:15
**considers** 132:18
**consistent** 179:4
186:15 259:15
260:5
**consists** 149:3
**consumer** 244:18
244:20 245:4

**contact** 163:1
256:19 274:10,11
274:13,16
**contacts** 160:16
175:24
**contained** 90:2
230:21
**contains** 174:19
**content** 35:10
**context** 79:15
126:17 159:5
164:7 230:4
**continue** 81:15
87:8 107:2 287:17
**continued** 3:1 4:1
**continuing** 288:9
293:9
**contract** 28:9
30:24,25 79:23
115:13,14 116:7
116:20,24,25
140:18
**contracts** 39:13
115:11,12,17,20
115:21,24 116:10
**contributed** 205:2
206:23 207:24
**contributing**
204:6 205:18
**controlled** 155:8
155:12 157:2,13
218:14 256:15
257:6
**conversation**
69:11 191:24
199:10 222:21
286:22 289:23
290:9,16
**conversations**
17:20 79:10,16
205:8,12 210:20

231:10 240:3
264:20 287:13
288:18
**coordinator** 20:6
143:20,21,25
173:3,4
**copeland** 162:2,3
164:8 167:4
**copied** 237:6
**copies** 37:17 38:18
38:21 39:4 59:10
**copy** 14:14 37:21
38:1,6,20 40:21
41:14 42:25 43:22
46:9,19 47:7,14,18
56:9 57:14 59:18
59:24 63:16 77:23
143:7 150:16,17
239:8 268:2 279:6
307:10
**corner** 226:1
229:1 232:14
247:3
**corners** 303:17
**corporation**
211:20 213:9
**correct** 14:17
16:15 17:7,10
18:25 19:7 21:4,5
23:1 30:11 32:13
40:6 47:7,15
59:21,22 62:18
66:21,22 74:4
76:10 77:25 78:20
81:21 82:4 84:8
85:16 89:15,18,22
92:5 101:11
102:23 107:12,23
114:7 117:2
123:12 132:8
138:22 140:1,7

146:19 147:4
161:3 173:19
176:11 182:25
187:21 207:22
208:13 209:21
210:24 214:8
215:16 216:23
218:2 219:5
226:21,22 230:1
230:22 231:13
232:17 237:7,11
241:16,24 250:17
261:13 263:12,17
264:2,10,13 265:6
267:18,25 268:14
268:22 269:21
270:1,5,6,10 271:1
271:2,9 273:8,13
276:17,19 277:12
279:7 282:1
284:11,17,21
285:1,15,16,19
286:5 296:12
302:25 303:6
304:13,19 311:16
**corrections** 313:12
315:17
**correctly** 306:23
**correlation** 166:16
166:18
**cost** 55:23 115:3
117:20 140:24
142:9 155:1 169:2
276:1
**costs** 92:20 108:9
118:10,19,25
162:16 276:7,15
276:21
**council** 75:23 76:1
226:20 227:3

**counsel** 11:10 94:7
95:5 125:2 282:13
283:3 284:7
295:16 310:1,10
312:2
**counseling** 6:17
28:19,22 29:4,14
29:21,25 30:4,14
30:17 40:4 44:16
44:20 45:6,17
50:15 79:21 80:6
81:24 82:2,15
83:14 84:9,10
86:1 87:16 88:19
89:2 90:9 96:22
97:2,10 102:16
106:2 120:13,21
121:2,8,16 137:15
144:6 164:13,18
167:15 169:17,22
170:3 171:17
172:24 173:12
175:7 177:7 179:1
179:2,24 182:4,12
183:21 184:4
190:20 267:12,16
299:6
**counselor** 90:12
91:12 121:9
159:18 160:2,9,20
161:20 162:23
163:5,9 165:4,19
167:2 170:8
183:13,24 269:18
**counselors** 83:24
91:3,17,24 92:7
144:6 161:2,4,14
164:4,11,17
167:23 168:3,18
169:3 174:21
187:15

**counted** 303:12
**counter** 193:16,20
**counterpoints**
101:5
**counties** 229:25
231:17
**county** 1:12 2:3
6:3,8,13 11:13
15:22 17:5,9
26:23 27:7,9
31:10 34:6,8
39:21 60:6 65:5
65:23 67:19 75:22
76:8 78:16 99:23
99:24 100:3,6,7,10
100:13,15,19
101:7 114:2
121:23 127:14
134:2 135:13
154:3,14 156:25
162:9 196:15
199:14 201:17,23
204:6 205:6
210:12 211:21,22
212:8 215:3,3
223:6,13,19 224:5
224:12 225:7
227:2,5,7,19 228:2
228:6,7 231:15
235:6 238:2 241:7
241:23 242:21
243:20,24 244:2
247:15 250:9
259:17 260:7,17
263:23 264:6,16
264:23 265:22
266:11 267:7
272:6,7 273:16,18
275:12,13 276:2
276:16 277:4,17
278:2,8 285:5,14

285:18 286:4,11
286:16 287:4
288:3 289:18
290:13,19 293:12
294:20,22 311:4
314:10 315:15
**county's** 273:15
284:21 285:10
**couple** 36:24
54:20 93:3 153:25
158:20 164:6
167:16 172:13
190:1 200:12
224:8 283:5 295:1
295:14 296:5
**course** 135:25
179:10 198:5
201:18 238:16
270:23
**court** 1:1 5:17
11:8 13:14 182:19
289:3 302:5 314:7
**cover** 55:23
140:23 142:9
169:2
**covered** 121:5
**covering** 92:20
153:24
**covers** 168:14
**covington** 4:13
**craig** 96:16,20
97:4 250:12
287:14
**create** 97:17 235:7
264:9
**created** 90:3
155:24 167:9
170:8,21 174:19
298:25
**creating** 150:22
229:19 231:4

**criminal** 225:9
**crisis** 135:11 205:2
284:21 285:5,10
286:24 287:3,5
290:19 292:22
293:12,18 294:4
**crop** 290:22
**curious** 21:17,19
21:23 206:14
**current** 45:5 63:18
64:4 71:7 72:15
77:23 78:10 96:6
96:8,9 107:22
109:8,11 122:14
252:8 256:10
269:6 274:4
302:22 303:4
305:24
**currently** 55:21
68:2 101:15,24
102:15 123:10
127:18 128:12
144:21 146:6
148:8 161:4,13
167:23 207:7,25
214:3 251:8,21
285:13 298:14,15
**curriculum** 6:5
63:10,17,17
**custody** 5:16
**cut** 77:6
**cutting** 154:9
**cuyahoga** 99:24
100:3,6,10,13,14
100:19 101:6
134:2 196:15
311:4
**cv** 77:25 99:20
267:25 268:3
269:7

**cvs** 272:22 273:10
273:18 274:14,24
276:22 277:2
278:17

**d**

**d** 68:6 73:10
**d.c.** 2:19 4:5
**d.u.m.p.** 52:3
67:11,20 68:10
70:9 153:17
154:15 157:20
**daily** 203:8
**damaged** 42:6
43:10
**damages** 211:23
275:14,23
**dan** 1:9
**dangerous** 147:12
**data** 6:17 37:10
142:20 144:22
169:20 170:3
171:6,9,10,17
173:13 174:4,13
174:20 175:6,16
178:2,3 186:9
189:8 190:8
201:15 202:22
203:24 235:7
256:11 264:9
**database** 143:6
177:10
**date** 11:2 22:16,22
141:21 224:18,19
224:25 250:3
307:1,3 310:11
313:8 314:3,9,19
315:3,13,25
316:20,25
**dated** 95:24 96:18
172:10 226:3
232:15 237:3

247:5 302:8
305:14
**dateline** 204:11
**dates** 183:11
**dawn** 50:23,25
51:11 99:15 102:2
102:21 112:18
113:6,20,21 114:1
124:2 129:18,24
130:7 131:7
132:14,18,23
134:8,25 135:24
136:4,10,19 137:5
138:16,17,24
140:14 142:13,18
143:12,23 144:3
183:17 191:2
288:11
**dawn's** 131:2
**day** 2:17 11:20
42:12 96:9 108:16
108:19 159:15
201:1 202:25
203:1 262:11
283:5 286:18
312:7 314:16
315:22 316:22
**days** 23:15,21
147:6 234:14
313:18
**dea** 198:7
**deal** 205:4
**dealing** 284:25
**deals** 242:17
**dear** 258:22
313:10
**death** 133:17
**deaths** 131:22
132:24 250:3,8
**debacco** 1:25
311:6 312:14

**debate** 250:10
261:19
**debating** 69:2
**decades** 61:19,22
**december** 7:2
172:10 174:12
232:7,23 233:9
234:24 235:1
**deceptive** 140:9
**decide** 192:14
**decided** 113:12,22
**deciding** 271:19
**decision** 74:13
113:7 114:10
**decisions** 277:7
**deck** 294:17
**declaring** 113:11
**decrease** 206:24
207:15,24 259:16
260:4,6
**decreased** 229:13
255:12 259:8,21
260:13
**decreases** 260:19
**decreasing** 252:19
**deed** 314:14
315:20
**deemed** 313:19
**defendant** 11:18
223:5,12,18
225:10 260:25
277:14
**defendants** 13:9
15:17 253:1,9,17
253:25 261:16
271:20,24 272:1
273:12
**deficit** 83:3,9,11
90:8
**define** 121:4

**defining** 244:22
245:10
**definitely** 144:18
**definition** 184:21
198:21
**degree** 268:19
**degrees** 269:11
**delbert** 4:13
**delete** 279:10
**delivered** 235:15
**delivery** 310:9,11
**demand** 250:19,23
251:3 252:19
**demographic**
142:16 144:22
**dental** 172:24
176:25 177:3,4
**dentists** 208:16
**dentrix** 176:25
**department** 21:1
29:21 44:17 72:5
73:17,21 78:19,22
112:11 127:4
154:20,22 155:2
159:17 170:3
179:1,2,24 200:20
201:7 238:9,12,20
239:1 266:12
275:6,25 276:10
276:13 294:11
296:7,16,22 297:2
297:20,22 299:1,9
300:20 301:17,24
302:5,15 303:13
307:6 313:22
**department's**
302:5
**departments**
105:25 301:16
**dependence**
164:17 186:12

**depending** 91:11
103:15
**depends** 28:3
37:23 129:21
133:12 134:9
140:2
**deposed** 12:18
192:11
**deposition** 1:16
11:5 13:6,12 14:4
14:20 15:1,7
16:13,22 17:13,17
18:9 19:14 20:1
21:12 25:6 31:9
31:17 34:22 57:20
57:24 63:9,16
65:4,12,15 95:12
95:21 101:13
111:8 115:22
121:22 122:7
170:6 171:14,23
172:5 189:3
225:16 232:4
236:19 246:21
255:18 280:8
284:11,16 295:4
300:12 309:1,4
311:20 313:8,11
314:1,3 315:1,3
**depressed** 163:15
166:9
**depression** 166:11
194:18
**deputy** 71:8
**describe** 36:20
65:21 111:22
**described** 35:2
91:3 107:15
143:19 145:14
279:2 296:15

**describing** 19:5
**description** 6:2
**designated** 161:19
**designed** 165:25
**desk** 14:12 58:24
59:19
**destroy** 283:20
**destroyed** 41:17
43:11,23 283:13
283:23 296:3
297:9
**destroying** 295:17
295:21
**destruction** 298:8
**detail** 117:14
**detailed** 119:14
**details** 25:17 58:4
197:20
**detect** 261:9
**determinations**
113:18
**determine** 91:14
118:10,25 149:1
**determining** 218:9
**develop** 215:1
**developed** 52:15
214:4
**developing** 59:5
**development** 28:8
51:2,6 89:7 99:14
290:22 291:7
305:9
**devolved** 112:20
**deyneka** 2:5 11:15
11:15 308:3
**diagnose** 164:14
**diagnoses** 186:5
**diagnosis** 184:14
184:19 185:13
221:16

**diamond** 1:22
**dictates** 283:22
**died** 73:14
**difference** 21:20
21:25 22:14
178:13 252:16
**different** 15:22
17:4 20:4 23:25
24:23 25:10,19
26:11,12,12 37:8
49:13,21 71:22
112:23 118:17
127:9 129:10
130:12,16 136:23
139:1 150:3
166:19 167:16
181:21 191:24
194:10 201:12
206:20 216:2
218:24 243:8,9
250:25 265:3
267:5 286:19
288:7,17,19 298:4
298:11 301:8
**difficult** 13:18
92:17 105:11
**dinosaurs** 185:4
**direct** 70:18 121:7
144:5 219:17
237:9,12 244:18
244:20 245:4
**directed** 249:12
**direction** 208:21
**directly** 27:5
45:25 64:17
167:12 216:17
**director** 43:16
46:6 63:23 65:19
68:3 69:12 70:7
70:14 71:9,17
72:11,13 73:5

74:6,20 76:14
77:1,3,15 78:7
79:5 90:20 96:3,9
97:2 107:21,22
118:4 121:6
122:18 123:8
175:25 186:16
214:2 217:1 227:3
227:4,6 231:7,20
239:10 241:12
245:2 250:12
274:6 285:18
290:21
**director's** 249:5
**directors** 64:11
68:14,18 70:18
74:5,20 76:15
90:3 117:14
247:25 248:3
249:13,23
**disagree** 120:7
216:5 250:15
251:4 260:15
**disaster** 42:10
46:1
**discuss** 14:23,25
15:16 97:22
235:10
**discussed** 14:25
124:22 235:16
237:7 238:13,15
238:21
**discussing** 263:3,5
265:21
**discussion** 27:19
63:4 88:22 94:21
153:10 155:1
188:23 207:12
235:4 236:1,4,7
243:5 308:8

[discussions - dr]

Page 15

discussions 33:17
55:8 70:16,17
79:2,6,12,18
102:11 264:5
265:11 266:24
286:20 289:4
dispense 209:19
253:10 281:25
dispensed 144:19
201:17 206:2,24
207:7 259:8,17
dispensing 24:4
255:11
disposal 52:2
153:17 191:3
disposed 43:15
156:14 157:13,19
dispute 259:12
260:1 261:15
307:15
distinct 79:22
distribute 253:10
distributed 22:15
22:16 61:16
142:24 219:8
261:15 294:1
distribution
253:20 256:14
distributor 213:2
214:6,7,16 217:5
218:20,22,24
219:7,18 222:22
223:5,12,18 225:6
225:10 245:5
260:24 261:16
distributor's
261:8
distributors 210:3
210:4 212:8
213:23 214:11,19
214:22 215:9

216:2,11,14,20
217:8,12 218:8,17
220:4 221:15,19
222:4,8,16,19
245:10,24 256:25
257:5 258:14
district 1:1,2 11:8
11:8 100:7 152:7
199:23 200:16
235:7 240:5
241:14 246:10
264:7 267:8 287:9
287:15,20
districts 300:20
diversion 157:22
225:2,6 241:2
diverted 206:18
divided 161:18
division 1:3 11:9
20:19,24 21:2
26:5 28:16,18
29:5 30:6,7,10
43:14,23 49:25
50:2,13 65:22,25
66:18,24 67:15
68:14 69:8 74:5
74:20 76:15 77:2
78:8 79:5 84:10
90:3 97:23 101:2
101:21 109:21
110:12 114:14
117:13 118:4
122:19 144:10
147:3 153:15,23
161:1 164:7
167:13 176:1
186:17 274:7
277:5
division's 74:14
79:13

divisions 64:12
67:7 75:5 102:8
107:20
doctor 270:24
277:24
doctors 208:11
216:23 245:21
257:16,17
document 1:11 6:3
6:7,12 7:9 31:10
32:4 51:14 65:5
118:7 119:3,17
121:23 122:22
124:11,17,19
125:4,7 126:3
130:13,17 226:19
227:18,23 232:12
243:2 247:2
249:25 255:19
303:22
documentation
167:9 170:24
documents 17:11
17:15 18:8,10,15
18:19 19:1,5,12
21:7,8,11 35:3,14
35:18 36:9,15
37:13,21 38:10,12
38:19,21 39:16,22
40:21,21 41:10,14
41:16,19 42:5,9,15
42:19 43:1,10,14
43:21,22 44:1,5,8
44:10 45:8,14
46:9,14,19 47:7,9
47:14,18,19 49:3,8
50:1,8 51:1 52:14
56:23 57:4,14
63:19 90:2 117:13
118:3 134:16
143:7 198:25

divisions 64:12
225:14 239:3
279:3,6,10,10,11
279:17,19 283:7
283:11,25 284:2
284:10,15 286:8
295:17,22 296:3
296:21,23 297:4
298:25 299:20
doing 53:14,15
92:4 93:7 162:25
187:23 204:14
294:20 300:25
301:3
dollar 110:9
dollars 6:10 29:21
90:7,16 95:14
96:12 97:8,22
99:13 137:10
donna 19:25 28:18
39:9 46:5 64:20
74:15 95:24 96:2
96:16 97:4 98:8
99:5 107:22 108:1
108:12 110:1
111:8 121:5,12
142:1 145:13
157:6 174:24
187:17,20 237:6
237:18 240:4
276:12 291:13
303:1
donna's 97:15
door 190:15
doses 259:7,9
doubled 234:17
doubt 220:24
275:10
doyle 73:9,12
dr 99:14 121:11
137:8 146:9,10
151:4 235:20

306:15
**draft** 7:5 236:21
  237:20 239:8
  240:8 262:25
  263:15
**draw** 30:19 108:4
  117:21
**drawing** 77:6
**drill** 238:24
**drilled** 142:20
**drive** 13:2 18:10
  19:6 47:25 48:3
  49:2,13,17,17,21
  50:8 51:8,14
  52:17 56:10,16,21
  57:3,12 58:19
  59:15,16 279:5
**drug** 52:2 102:16
  102:17 143:10
  163:22 189:23
  197:3 198:11,14
  198:17 211:20
  213:2,23 214:5,7
  214:11,19,22
  215:4,9,12 216:1,2
  216:11,13,16,20
  217:4,7,12,19
  218:4,8,10,13
  219:7 220:4 222:4
  222:19,22 225:1
  229:12 234:15
  237:25 240:24
  242:17 243:6,8
  245:5,9 252:5,15
  256:25 257:5
  258:13,17 306:6
  306:14 307:11
**drugs** 97:13
  128:17 157:22
  176:8 178:4
  189:16 190:11

216:18 217:4,10
  218:5 222:1 223:5
  229:18 230:5
**dry** 42:15,16
**due** 306:21
**duly** 12:17 311:7
  311:10
**dump** 155:10,21

**e**

**e** 6:10,15,19 7:1,4
  7:11 19:22,22
  35:16,24 36:8,13
  36:14,19 37:14
  46:16 48:2,7,14,19
  48:20,21,25 49:12
  51:7,12,13,19,24
  52:18,19 54:7
  56:18 57:13 59:12
  59:14 73:10 95:13
  95:23 96:15 97:4
  97:15 98:15
  171:15 172:6,10
  172:14,15 174:9
  176:17 186:9
  225:17 226:2,14
  232:5,14,19
  236:20 237:3
  239:7 240:19
  263:5,8 279:6
  283:11 295:5
  302:3,8,13,14
  304:11,11
**earlier** 63:21
  191:14 212:16
  217:24 223:22
  233:4 262:17
  263:10 269:20
  271:7 273:6
  275:12 279:1
  280:22 293:21

**early** 28:7 36:4
  51:1,6 52:12,14
  62:11 66:5 162:13
  199:19 264:13,17
  264:24
**earn** 90:11
**earned** 80:15
  81:13,18 82:13
**earth** 185:5
**easily** 48:19
**east** 1:23
**eastern** 1:3 11:9
**ebola** 291:22
**eddie** 35:15 48:9
  279:14,20,23
**eddie's** 279:25
**edits** 52:22
**education** 60:2
  126:14 147:8
**educational**
  268:10
**edwards** 6:16
  137:9,12,13 138:7
  138:16,20 139:2
  140:16 171:16
  172:6
**effect** 93:1,5
**effort** 157:20
  276:1
**efforts** 200:20
  201:6,12 206:7,16
**eight** 71:11
**either** 16:24 17:11
  58:14 80:8 98:9
  103:16 115:9
  130:17 154:17
  157:4 159:17
  174:21,25 210:11
  245:2 279:14,20
  297:7 299:13
  312:2

**electricity** 118:14
**electronic** 47:24
  52:14 59:2,10
  106:4 143:6
  172:23 173:13
  174:3
**electronically**
  150:15
**ellis** 2:11 11:22,25
**email** 313:17
**emergency** 105:25
  112:3 113:11
  159:17 166:5
  239:18 245:15
  246:6
**emerging** 301:19
**employed** 20:8
  72:1 73:12,20
  99:24 100:3 161:5
  162:4 173:18
  196:17
**employee** 26:4
  45:24 46:9 54:2
  55:3 138:2 139:17
  139:24 141:10
  146:22 162:15
  204:24 296:12
**employees** 17:8
  24:1,7 25:4,8
  34:16,18 36:7
  139:10
**employment** 63:5
  100:9,16 161:8
  268:9
**ems** 99:18 159:17
  159:19,24 160:1
  166:4 167:7
  205:11 267:6
  288:24
**enclosed** 313:11

encounter 163:7 175:10

encounters 188:5 188:5

encourage 163:10

ended 53:12 91:17 130:14 239:23

enforcement 198:11 204:18 206:22 218:13 306:19

engage 159:21

engaged 170:9 254:1

england 248:8

enhanced 57:3

enjoy 192:21

enlisted 37:7

enrolled 148:12

enter 130:18

entered 315:9

entire 40:13 109:13 265:2 294:11 314:5 315:5

entities 12:8 272:14 273:10,22 274:24 275:7

entitled 27:12 226:19 263:8 281:6,18

entity 17:9 34:7 154:14 156:4 199:15,18 267:3

entries 185:20

environmental 30:10 67:10,14 68:3 70:8 153:21 153:22

epidemic 204:7 240:20 241:6,22

242:20 263:9 266:4,10,14 267:4 287:25 305:2,6,17

epidemiology 270:18

equal 188:6

equally 161:18

equate 121:9

equivalent 184:15 184:17,21

eric 70:20 71:10 72:22

erme 99:14 121:11 137:8 146:9,10

errata 313:13,18 315:7,10,18 316:1

escalated 229:12

especially 229:13

esq 2:4,5,11,12,18 3:4,11,16 4:4

essentially 41:17 55:1 74:1 78:21 126:19 145:14 146:19 185:12 304:15

establish 68:15 86:24 113:10

established 30:24 33:15 140:13 205:22 224:14,24 253:19 285:12,22 288:8

establishing 291:5 300:24

estimate 43:19 44:9 92:18 110:16

et 1:12,12

evaluation 104:4

event 312:3

eventually 69:5

everybody 294:17

everyone's 292:3

evidence 166:1 291:4

evident 238:25

evolving 286:17

exact 71:19 82:20

exactly 16:8 33:21 40:10 165:23

exam 25:15

examination 5:7 12:16,20 134:22 211:14 262:7 282:25 295:12

example 17:3 25:14,15 26:3 28:15,24 29:12 30:9 38:25 40:2 42:5 44:15 45:3 49:3,21 51:10,11 58:21 63:22 70:7 70:11 81:19,24 106:17 113:8 114:23 115:1,12 115:15 119:9 123:10 138:6 140:12 146:18 147:6,23 149:5 158:8 164:8 167:3 173:12 175:8 197:6 201:19 208:16 214:10 215:13,20 222:6 256:18

examples 92:2

excess 80:25 81:14 83:10,20 84:9 94:23

excesses 91:19

exchange 19:16 20:7 21:24 23:5,8

24:13,17 33:7,11 34:12 59:6,11 99:12 102:3,22 112:17,18 113:10 144:2,7,14 180:16 191:3 293:23

excluding 134:25 273:14

excuse 290:22

executed 315:10

execution 314:14 315:19

executive 249:5 250:12

exercise 201:1

exhibit 5:16 6:3,5 6:7,10,12,15,19 7:1,4,7,9,11 31:9 31:17 63:9,16 65:4,13,16 95:12 95:20,21 101:13 107:18 115:23,25 116:16 119:9 121:22 122:7 123:19 124:11 125:13 130:3 131:24 134:24 136:18 144:8 147:1 171:14,23 172:5 189:3 190:4 225:14,16,25 232:2,4,12 236:17 236:19 237:1 246:17,19,21 249:3 255:16,18 255:23 262:25 263:20,21 266:9 267:24 269:6 295:4 300:12,16 302:2

**exhibits** 5:5,17 6:1
  159:6
**existed** 267:21
**exists** 170:3
**expand** 68:23
  69:15 287:22
**expanded** 23:21
  267:1
**expanding** 69:16
  69:17 80:16
**expectation** 167:8
**expected** 151:17
**expects** 151:19
  152:7
**expended** 86:9
  95:3
**expenses** 119:19
**experience** 186:16
  217:1 261:7
**experienced**
  289:22 291:22
**experiencing**
  230:10 250:19
  251:3
**expert** 58:2 60:11
  191:16 269:20,25
  284:24 292:4
**expiration** 314:19
  315:25 316:25
**expires** 312:17
**explain** 98:20
  288:21
**explaining** 85:15
**explanation** 159:7
**explosion** 244:24
**exponentially**
  289:1
**exposure** 234:16
**ext** 3:18
**extent** 18:13 55:14
  61:13 107:1

111:16 131:1
  143:14 252:14
**external** 291:9,14
  292:2
**extra** 84:14,18
**eyes** 226:15

**f**

**f** 3:8 68:6
**facilitate** 200:1
**facilities** 113:6
  118:14 155:6
  229:25
**facility** 40:11
  182:24 218:6
**facility's** 218:9
**facing** 27:10 66:1
  228:8 292:18
**fact** 34:10 61:11
  61:15 62:4 101:16
  163:18 171:1
  186:24 192:9
  215:2 264:13
  289:5
**factor** 252:23
  254:23
**factors** 91:12,16
  141:25 252:2,18
  254:16
**facts** 216:10
**fair** 64:1 78:13
  102:10 111:2
  127:8 130:19
  194:25 195:21
  205:16 218:4
  244:16 264:15,22
  265:8 290:10
  291:11 292:21
  296:3 301:15
  304:4
**fairly** 262:20

**fairway** 41:2
  298:18
**fall** 32:24 103:12
  103:17 116:24,25
**fallen** 141:22
**falls** 101:18
**familiar** 32:16
  86:23 122:16,21
  145:18 170:10
  179:5 187:13
  191:22 193:21
  194:2,23 195:23
  199:15 200:24
  212:25 213:15
  214:21 215:15,18
  222:3,6,14,18
  249:24 256:4
  257:15 273:2
  285:4
**familiarize** 300:15
**family** 105:10,15
  143:11 158:13,14
  226:20 227:3
  231:24 233:10
  263:23
**far** 34:14,14 37:20
  45:22 106:8
  119:13 127:2
  142:20 149:4
  156:3 168:18
  176:7 244:13
**farther** 84:5
**fashion** 253:6
**fcfc** 6:20 225:19
  226:11 227:19
  228:2 231:7
**fda** 197:21,24
  261:17
**fed** 157:8
**federal** 12:16
  107:10 219:4

222:19
**fee** 28:1,7,10 29:9
  29:20 30:13 33:13
  149:22,22 168:11
  292:7
**feed** 157:12
**feel** 21:5 58:2
  170:2
**fees** 115:2,10
**felt** 269:24
**fentanyl** 202:19
  252:23 253:4,4,11
  254:1,22
**fewer** 80:9 207:6
**fifth** 240:19
  244:23 245:11
**figures** 259:13
  260:2
**file** 40:3,3 59:24
**filed** 13:7 16:7,9
  18:24 35:21
  211:22 283:14
**files** 37:15,22 38:5
  38:6 43:6 46:20
  170:4
**fill** 167:3 217:13
  281:10
**filled** 170:8 173:23
  258:1,5 278:7
  281:6,19
**filling** 271:5 282:6
**filter** 174:23
**final** 70:1 75:20
  262:1
**finalized** 74:18
**finalizing** 69:7
**finance** 119:16
**find** 37:18 41:23
  46:22 47:12 49:8
  57:4 58:21 61:20
  89:23 143:14

230:11,16 313:11
**finding** 240:14
**findings** 230:22
234:25
**finds** 53:20
**fine** 66:13 88:6,9
104:17 112:6
162:11 307:9
**finish** 13:15,16
88:21 189:1
213:18
**finished** 153:10
236:14
**fire** 99:17 267:7
288:25
**firm** 81:12 262:12
**first** 6:20 12:17
15:19 32:3 35:2
35:18 93:4 94:14
99:16,17 132:4
185:22 214:2
222:2 224:11,22
225:18,25 226:11
226:21 227:3,19
228:1,10,16
229:11 231:24
233:12 234:4
237:1 243:23
247:11 248:13
251:11 262:24
266:16 279:22
289:20,21 311:10
**fiscal** 69:13 71:16
71:16,18 72:12,16
73:8,18 74:7,21
76:2,14 122:9
123:1 176:4,6
276:12
**fit** 116:10 134:8
140:21

**five** 20:10 24:9
52:25 53:3 64:11
67:22,22 73:2
104:8 107:20
**flat** 76:16
**fleishmanhillard**
305:8
**flint** 302:4
**flip** 126:7 132:10
**flood** 37:25 38:2
40:8,25 41:5,11,20
42:4,6,12 43:2,2,7
43:22,24 45:8,15
46:10,20,21 63:22
**flooded** 40:10,14
**focus** 67:2 86:14
135:1 164:21
**focused** 105:5
267:18
**focusing** 55:13,14
**folder** 49:24 50:11
50:15,25 51:8,20
51:23,25 52:13,24
56:14,17 58:20,23
59:1,2
**folders** 48:18
49:13,20 50:5
56:20
**folks** 12:2 161:19
193:2
**follow** 145:10
159:14 206:15
211:4 222:4
262:16 295:2
**followed** 33:5
**following** 46:12
53:24 68:21,25
118:25 233:17
246:8
**follows** 12:19

**food** 53:21 115:2
**force** 154:19
199:15,25 200:7
200:10,11 205:23
223:24 224:3,6,13
288:12 289:17
306:7,15 307:12
**forces** 201:8 288:7
**foregoing** 311:16
311:21 314:13
315:18
**form** 25:12,25
29:2 32:3 38:23
44:3 46:24 51:15
55:6 62:25 74:9
77:11 78:25 85:23
86:3 87:17 88:20
89:3,19 91:4 94:5
111:12,17 120:4
120:18 124:16
128:19 132:19
135:10 139:21
146:1 148:3,22
157:23 158:6,17
158:22 166:24
170:7,12,13,14,15
170:18,23 187:2
189:10 194:19
196:1,8 197:10,13
204:8 205:20
206:4 207:1,10
208:3 215:22
218:25 223:8
231:5 236:11
241:8 245:6 253:7
257:8 264:18,25
266:15 272:24
275:4 285:7 286:6
287:6 290:15
292:20,24 293:7
293:13,20 294:6

297:20,24
**formal** 106:2
118:5,5 119:3
**format** 122:16
**former** 137:14
305:23
**formerly** 19:24
**formulary** 217:19
218:5,10
**forth** 36:23 308:12
308:13,16
**forward** 113:14
226:10 237:20
240:1 258:24
313:15
**forwarded** 230:21
231:19 233:8
241:18 242:15
302:14
**forwarding**
226:14 239:21
**foster** 229:20
290:5
**found** 46:21 57:7
61:18 63:17
**foundation** 32:4
98:22 115:18
**four** 39:8 67:22
73:2 180:25
273:22
**fourth** 233:25
250:2
**frame** 100:21
104:4 184:9 201:8
202:8 299:10
**framework** 134:5
134:6,7
**francisco** 3:5
**franklin** 2:18 5:10
11:19,19 261:25
262:8,11 266:19

282:10,16 294:6
**free** 21:5 314:14
  315:20
**frequently** 76:20
**friends** 158:21
**fruits** 201:1
**full** 12:24 53:13
  55:2,12 90:11
  93:4 140:24
**fully** 95:3 152:7
**function** 32:10
  53:17 73:13 157:7
  159:12 160:22
  162:22 164:11
**functioning** 152:8
**functions** 28:17
  303:11
**fund** 29:13
**funded** 53:3 94:4
  99:10 111:19
  113:23 124:25
  125:21 136:19
  149:14 238:5,7,19
  239:4
**funding** 6:13
  29:18 30:16 33:21
  34:1,3 53:13 69:2
  69:20 114:25
  115:2 117:25
  121:24 131:6
  137:2 149:19,21
  149:24 156:3,4
  162:19 168:10
  175:7 227:10
  238:8 240:2
  290:23 291:2
  301:5
**funds** 24:17 25:19
  26:12,20 33:10
  55:20 80:8,14,25
  81:2,10,13,15

82:14 83:7,14,20
84:9,15,18,20,22
84:23 86:24 87:20
88:17,25 89:6,16
91:1 94:4,7,15,17
94:23 95:1 97:18
99:4,10 107:14
108:9 112:15
113:4 114:3,5,9
120:2 121:2
124:12,13 125:15
125:22 136:19
137:5 138:24
139:3,10,25
140:20 141:6,7
149:18 238:12
251:1
**further** 243:1
  251:6 258:24
  311:19 312:1
**fy2018** 6:13
  121:24
**fyi** 96:1

**g**

**g** 19:22
**gain** 286:3
**gained** 260:23
**gaps** 200:4 229:11
**gather** 256:13
**geez** 109:18
**gene** 46:4 237:14
  237:15 302:19
**general** 24:21 25:2
  26:15,19 27:21
  28:2,14 29:13,23
  30:8 33:14,19
  43:6 90:6,23
  103:12 107:14
  108:2,9 115:10
  117:20,23 119:21
  120:11 121:6,15

128:16 137:5,10
138:3,6,21 139:4,6
139:25 141:7,18
142:8 168:14,19
191:19 300:19
**generally** 15:20
  23:15 32:16 35:6
  64:8 74:17 115:8
  164:6 298:22
**generate** 80:22
**generated** 81:25
  87:16 88:18 89:1
  171:10 175:11
  239:23 241:13,15
**genet** 19:19 20:11
  20:18 21:14
  143:18
**genet's** 20:5
**getting** 45:6,12
  88:7 108:17
  158:19 174:12
  236:2 287:10,11
  290:5 298:7
**gidley** 7:1 232:5
  232:15 233:1,3,8
**give** 13:11 21:15
  24:19 25:1 27:11
  58:9 64:8 110:11
  117:21 121:19
  146:18 159:6
  195:5 280:8 306:9
  310:1,10
**given** 61:13 87:2
  90:18 91:22 95:2
  115:16 118:23
  119:10 218:20
  281:10 286:18
  292:4 311:13,17
**gives** 194:9
**giving** 147:7 194:8
  265:15 286:9

**go** 21:4 27:15
  28:13 29:12,22
  37:3,21 48:14
  51:18 52:11 58:6
  58:17 65:14 76:18
  77:5,19 85:2,4
  86:16 89:23 95:18
  107:18 119:19
  127:2 133:13
  134:2 148:24,25
  159:18,22 161:20
  163:14 165:24
  174:6 176:16
  185:6 211:9
  219:20 221:4
  230:9 239:4
  240:18 254:9,19
  258:21 282:18
  283:18 286:13
  291:5,25 297:12
  298:5,11 299:17
  300:25 303:10
  308:6
**goes** 27:6,7 28:12
  29:14 75:7,15
  79:25 80:6 119:2
  156:3 244:17
  245:13 246:16
  250:18 252:21
**going** 14:24 17:3
  17:19 18:21,22
  19:8 21:9 25:16
  25:23 27:11 29:1
  30:3 32:2 33:3
  35:3 40:15 46:14
  47:23 51:4 56:2
  60:15,17,19 68:20
  69:20,22 80:22
  84:12,17 85:2,4,11
  86:11 87:8 88:23
  91:22 100:25

105:2,13,14
110:18,22 111:6
111:11 113:13
114:12 118:10,21
125:3,11 126:16
140:22 142:5
157:8,15 160:21
169:1 174:1,2
194:12,22 200:1
211:7 240:5
243:19 244:25
245:17 248:21
249:10 252:1
254:7,10 262:15
262:20 267:23
274:2 280:8
287:13 292:3,4
300:11 306:12
308:13

**good** 12:22 76:17
152:24 153:8
211:16 262:9

**gotten** 159:16
166:4 297:8

**government** 17:9
60:7 76:9 107:10
133:23 152:19

**governor** 204:14
205:22 228:12,13
258:22 306:21

**governor's** 204:13

**governs** 208:23

**gr** 108:4

**graham** 41:7
44:19 45:17

**grant** 27:24 53:2,3
53:12 54:10 103:2
103:19,25 104:7,7
104:21 105:1,22
105:24 106:7
107:16 108:10

113:3 132:22
144:1 212:23
213:4 235:12,12

**grants** 24:23 25:4
30:18 31:4 32:25
33:13 109:14
112:25 115:10,24
116:9,20 117:2
238:24

**great** 263:19

**griffin** 123:12
137:19,19,20,24
140:16 143:15
144:5 160:23,25
174:7 177:23,24
188:11,12,16

**group** 15:14,21
145:16 271:24

**groups** 240:25

**guess** 29:23 37:23
67:22 85:15 111:1
117:10 248:10

**guidance** 202:10

**guideline** 297:9

**guidelines** 207:14
207:19 300:24

**guy** 157:7 185:8

**h**

**h** 49:14,15,17,21
50:8 51:8,14
52:17 56:9,16,21
57:12 58:19 59:15
59:16 279:5

**half** 44:4 64:25

**hammer** 74:10
75:3

**hand** 163:20 226:1
229:1 232:13
247:3 300:11
303:16 312:6

**handed** 95:20
171:22

**handing** 31:16
65:12 122:6

**handoff** 106:2

**hands** 57:8 110:19
157:3 294:17

**hanging** 42:15

**happen** 56:2
113:13 159:1
298:19 299:22

**happened** 40:5
44:19 113:20
296:20 297:4
299:7

**happening** 77:2
200:6

**happens** 165:24

**happy** 166:5

**hard** 37:17,21
38:6,20 40:21
41:14 42:25 43:22
46:9,19 47:7,14,18
56:9 57:14 59:18
59:24 106:3 143:7
150:16,17 279:6

**harm** 277:4

**head** 18:5 28:5
106:24 289:15
305:24,25

**heading** 304:24

**health** 4:2 6:3,8,13
13:8 14:12 15:16
17:5 20:2,9,19
25:8,11,18 26:5,13
26:25 27:5,8,20,24
28:16 29:5 30:6,7
30:10 31:2,11
32:9,13 34:6,12,17
35:13 38:10,11
39:21 40:17,20

43:6,14,17,23
44:11,22 45:1,13
45:20,24 46:4
49:25 53:9 54:17
55:21 60:8 61:14
63:5,6,23 64:5,6
64:10,18,23 65:6
65:18,20,22,24
66:8 67:3,10,13,15
67:19,25 68:3,13
69:8 70:8 71:5,8
72:1,5,16 73:13,17
73:21 77:2,16
78:8,11,14,19,22
78:23 79:5 88:18
91:9 92:6,17,25
93:20,22,23,25
94:1,19 96:4
99:23,25 100:3,7,8
100:10,15,20
101:2,4,7,9,14,21
101:25 103:1
106:4,11,22 107:6
107:13,19,21
109:4,13,21,24
110:12 111:10,19
112:10,24 113:5,8
113:12,16 114:1
114:14 117:3,5
119:2,22 121:17
121:24 122:19,25
123:5,22 124:7
126:20 127:3,11
127:19 128:13
129:12 130:15
131:6 132:17
133:9,22 134:3
135:7 136:4 137:4
139:7 140:21
141:24 142:16
144:10 146:22

150:6 151:18
152:6,17,18
153:14,21,22
154:11 156:8
157:21 160:7,11
161:1,5,10,20
162:4,10,18 164:7
164:12,13,15,22
164:23,24 165:8
165:13,14,21
166:16,21 167:13
169:10,18,25
170:1 171:5 173:7
173:8,9,14,21
174:5,14,22 175:5
175:25 176:2
177:9 179:6,23
182:20,23 183:24
186:17,18,18,20
187:15 189:5,18
189:22 190:9
191:7 196:16
199:23 200:16
201:7 204:25
205:3 210:5,11,13
211:22 212:18,21
213:5 214:3 215:3
217:2,2,22 222:11
226:9 231:4,21
233:10 235:6,12
235:23 236:9
237:17,25 238:2
239:11 240:5
241:12,14 245:1,2
245:3 246:10
247:15 250:7
252:8,19 255:2,7,7
263:23 264:7
265:23 266:11,23
267:7 272:7 274:5
274:6 275:13

276:3,16 277:5,17
278:2,9 285:3,13
285:14,18 287:4,5
287:9,15,20,21
288:4 289:21,25
290:18 292:13
293:15 294:4,10
294:11,15 296:6,9
296:11,16,18,21
297:2,20,21,23
298:21 299:1,8,19
300:20,20,21
301:15,16,18,18
301:19,24,25
302:4,6,15,23,24
303:5,13 305:20
305:24,25 306:19
307:6
**health's** 55:4
139:15 200:20
213:1 273:16
296:21
**hear** 73:15 188:19
200:5 272:3 280:9
**heard** 11:7 20:14
74:3 147:13
194:20,21 196:3,4
197:6 198:10,13
198:16 199:13
200:14 201:20
210:3 212:12,15
212:17,20 213:8
213:12 222:25
225:1 265:3,10
**hearing** 80:24
201:12 282:16
**heather** 46:5 71:3
72:10
**heavily** 105:5
**held** 298:14,15

**help** 37:7 86:24
163:20 213:6
300:24
**helped** 47:17
**helpful** 235:17
**henry** 4:10
**hereinafter** 12:18
**hereunto** 312:5
**heroin** 145:5
197:2,8 202:19
**hi** 12:23
**high** 76:20,22
91:10 111:23
166:6 175:17
**higher** 80:11
92:11 166:22
195:24 277:7
288:5,5
**highlights** 259:4
**hipaa** 219:2
**hire** 39:8
**hired** 73:1 183:9
**hiring** 104:4
**historic** 296:24
**historically** 79:23
80:8 90:9 92:9,14
108:2 168:24
287:16 289:24
291:21
**history** 221:22
268:9
**hit** 110:18
**hmm** 113:21
**hold** 138:11
163:20 283:7
298:4,10
**holly** 3:11 12:6,6
**home** 28:8,10,12
49:17 50:10 53:22
66:6

**honestly** 86:18
**honey** 58:12
**hopefully** 105:19
300:13
**hosp** 154:17
**hospital** 154:18
163:14 185:4
205:9 217:25
234:22 288:24
**hotspot** 243:20,25
**hour** 60:19 68:8
92:13
**hours** 23:16,21
58:15 60:18
293:22
**house** 157:11,15
262:17
**houses** 157:9
**housing** 53:21
**huge** 90:15
**huh** 26:6,9 28:20
30:5 31:22 32:22
34:23 40:22 45:4
53:6 62:10 75:6
77:7,10 82:1
99:21 102:18
103:20 109:17
110:10,17 111:24
116:21 117:9
120:17 121:13
123:23 124:1,4
132:9,12 139:16
141:8,11 142:14
144:11 151:11
153:12 162:17
163:2 164:9 165:7
165:10 176:21
180:15 181:5
186:1 187:11
192:3 229:3,9
230:23 242:14

248:11 274:8
279:4 285:23
296:1,4,8,10,10
299:2,5 303:18,23
304:17
**huhs** 13:23
**human** 64:14
101:17
**hundred** 22:24
**hypothetical** 26:4
281:15
**hypothetically**
183:12

**i**

**icd** 184:15,16,18
184:25 185:3,12
185:17
**idea** 21:25 83:25
281:13
**identifiable** 48:19
**identification**
31:14 63:13 65:9
95:16 122:3
171:22 225:23
232:10 236:24
246:25 255:21
295:10
**identified** 54:1
240:19 242:19
274:2
**identify** 35:4
36:21 37:13
105:25 200:4
278:12,16 290:24
**identifying** 229:7
241:22 288:9
**identity** 219:8
**ii** 198:17
**illegal** 157:16,21
158:11,15,21
202:17 205:19

253:6
**illegally** 158:5
**illicit** 253:6,11
254:1
**immediate** 251:8
251:17
**immunization**
48:21 81:20
**immunizations**
66:5 112:3 114:24
**impact** 286:4
**impacted** 44:18
289:3,6 292:22
**impacting** 289:12
290:12
**impacts** 243:9
**implement** 292:14
**implemented**
136:4 162:8
288:10
**implementing**
292:1 293:16
**important** 156:24
165:19 166:10
292:12
**impose** 222:16
**imposes** 222:8
**impression** 22:10
257:10
**improper** 278:7
**inappropriately**
277:25 278:7
**inception** 227:17
**incidents** 195:24
**incinerated**
154:24
**incineration**
156:19
**include** 27:19,23
198:4 243:11
259:5 284:1

**included** 28:2 31:4
45:7 66:3 272:14
274:2 302:19
303:1 313:13
**includes** 133:11
143:10 172:13
185:19
**including** 13:7
91:12 93:23
109:14 172:7
218:21 265:5
305:23
**income** 30:13
**incorporated**
315:12
**increase** 118:21
236:13 241:1
264:13,20,24
265:11
**increasing** 79:12
234:16 289:1,6
290:24
**incurred** 276:15
**independent**
164:20
**independently**
164:21
**index** 5:1,5 6:1 8:1
**indi** 251:13
**indicate** 125:16
**indicated** 206:6
**indicates** 124:12
125:14 173:2
302:14
**indicating** 202:22
206:16,22 313:13
**indigent** 30:17
**individual** 23:20
25:7 68:14 69:8
74:4 75:4 80:1
90:12 159:22

161:24 163:6,7
175:18 178:8,14
178:15,16,19
180:18 181:1
182:11 187:14
188:7 189:14
190:2 221:17
223:6,13,19
251:13,16 277:16
278:1,8 281:9
**individually**
186:11
**individuals** 46:3
106:1 141:17,19
142:22,25 152:9
152:13 157:3
159:15 160:15,17
164:18 179:11
181:16 182:1
200:3 213:7
235:14
**industry** 230:7
**infant** 60:6 234:14
**infants** 234:25
235:23
**infor** 142:19
**informatics** 173:2
173:4
**information** 20:12
50:11 51:2 57:15
59:11 89:24 90:1
118:12,19,20,24
142:16 143:6,9,15
144:17 166:4
169:6 170:5
175:13 176:8
199:7 202:6,6
204:4,11,12
205:25 206:15
210:10 219:18
223:10 256:13

259:18 279:21
284:8 287:11,12
288:6
**informed**  279:14
301:6,13
**infrastructure**
267:3 291:2
**initial**  146:3
**initially**  199:24
224:23
**initiatives**  199:12
**injectable**  145:6
**injury**  144:1 305:6
305:15
**inpatient**  132:7
167:18
**inside**  155:17,19
**inspected**  115:5
**inspections**  112:1
**instance**  274:22
277:14,24 278:6
**instances**  164:6
296:6
**instructed**  17:18
**instruction**  13:11
13:21 37:3
**instructions**  310:2
310:10
**insurance**  80:2
118:22 120:9
121:1 124:21
212:22 217:23
**insurances**  80:3
**integrate**  129:2
**integrating**  296:16
**intensive**  132:7
167:18 182:8
**intent**  122:5
**interact**  216:14,17
**interacted**  176:1
176:14

**interaction**  222:10
274:10,14,17
**interested**  78:2
312:3
**interesting**  58:22
60:3 61:19
**internal**  6:4 31:11
34:4 291:1,7,10
292:9
**internally**  292:1
**internet**  255:24
**interpretation**
130:11 131:13
**interpreted**
130:24
**interrupt**  188:18
**interrupted**  85:13
**interruption**  284:9
**intervention**
159:16 163:8,11
**interventions**
160:12
**introduced**  13:4
99:9
**introductory**
259:3
**involve**  16:21
204:25
**involved**  24:3,8
34:1,3 45:25
69:14 70:6,11,15
70:17 122:14,20
138:17 141:13
176:9 200:19
201:10,11,13
204:18 287:9
293:24
**involvement**
143:23 199:18
200:9 223:23

**involves**  164:12
**iop**  180:24 251:7
251:12
**iops**  91:13
**ironing**  42:16
**irrespective**
283:21
**issue**  170:24 171:3
231:4 235:23
255:3,7 265:4
267:11 286:18
291:19 294:10,15
294:23 298:8,10
301:10
**issued**  142:17
241:21 259:20,21
260:5,12 307:11
307:16
**issues**  6:20 127:14
135:1 166:17,21
201:9 225:20
226:11 227:20
228:24 265:22,24
284:25 286:10,16
287:23,24 288:4
290:22,23 291:21
292:17 301:7,8,18
301:19,25
**item**  115:25 116:8
116:20,23 233:12
234:4
**items**  32:1,6,24
116:18

**j**

**j**  1:25 2:12 3:4
233:6 311:6
312:14
**j&j**  11:23
**jackie**  36:10 96:24
96:24 97:1,6
108:5,5 121:5,11

123:11 137:23
146:11,14,15
175:1
**jackie's**  108:3
**jackson**  306:15
**jail**  183:5
**jails**  213:7
**janssen**  2:10 11:22
11:25
**january**  6:8 65:7
**jerked**  166:6
**jerry**  240:3,4
250:10,11 287:13
**jim**  4:14
**job**  32:10
**joe**  7:1 232:5,15
233:3
**johnson**  2:9,9
11:25 12:1
**join**  15:17
**joint**  146:12
**jones**  2:17 11:20
262:11
**jonesday.com**
2:20
**joseph**  248:15
**joshua**  4:4
**joy**  233:2,3,6
**judge**  1:9 11:9
**july**  142:2 227:20
228:10 247:5,16
250:8 251:15
**june**  7:4 142:2
236:20 237:3,13
241:7,23 242:15
243:16 246:14
263:11,14,14
266:12
**jury**  26:18 65:21
107:3 290:17

**juvenile** 182:19,24
289:3

**k**

**k** 3:8
**kasich** 228:13
258:22
**kathleen** 6:19
225:17 226:3,7,8
**kearse** 2:4 5:11
11:12,12 17:19,23
18:18 25:12,23
29:1 31:18 32:2
38:23 44:3 46:24
47:3 51:15 55:6
62:25 74:9 77:11
78:25 85:23 86:3
87:17,23 88:1,4,7
88:20 89:3,19
91:4 94:5,10
95:10 98:19,25
108:18 110:22,25
111:3,11,16 120:4
120:18 124:16
125:2,6 126:2
128:19 130:10,21
131:1 132:19
135:10,12 139:21
146:1 148:3,22,24
152:24 157:23
158:6,17,22
166:24 169:13
187:2,23 189:10
192:8,15,19,23
193:13 194:5,12
194:19 195:15,18
196:1,8 197:10,12
204:8 205:20
206:4 207:1,10
208:3 211:7 212:5
215:22 216:24
217:14,18 218:25

219:10,16 220:7
220:10 221:1,8,23
223:8,20 231:5
236:11 241:8
245:6 246:1 249:9
249:16,22 253:7
253:12 254:2
257:8,20 260:8,14
261:2,11,18
264:18,25 266:15
270:2 272:24
273:25 275:4
276:4,18 280:18
281:7,21 282:9,18
283:1 294:7,25
295:21 297:24
298:2,9 307:8,17
307:21,25 308:11
308:17,20,24
313:5
**keep** 21:3 39:1,13
39:14,25 94:8
157:2,24 160:12
160:14,17 169:5
219:19 301:6
**keeping** 252:3
301:12
**keeps** 40:20
**kept** 44:7 143:6,10
144:13 150:21
**kernen** 237:3
239:8,9,12,13
263:16
**kernen's** 239:15
**kerry** 237:3 239:8
239:9 263:16
**kickoff** 304:25
**kids** 265:15 290:6
**kind** 13:11 19:25
30:19 42:23 57:7
105:7 109:1 134:3

145:21 179:21
190:14 194:8
221:2
**kinds** 40:18
193:22
**kit** 25:1
**kits** 136:10 142:18
142:24
**knew** 62:13 90:12
248:4 264:16,23
272:13
**know** 16:8,9 18:7
18:14 20:14 21:5
21:19,23 23:4,11
23:18 24:7,12,16
25:24 27:14 28:1
31:3 32:23 33:11
33:20,24,25 34:2,5
34:10,14,24 35:11
35:20 42:4,17
43:9,13 44:6,7,12
48:13 51:7,8
52:13 54:22 56:2
58:4,5,6,6,7,25
59:3,8 60:15
61:12 62:14 64:4
64:24 67:17,21
68:9 71:1,19
72:10,18 73:5,7,16
75:24 76:3 77:21
80:9,20 81:10
82:16,18 83:16,19
83:21,23 84:7
85:8,14 86:13,18
86:19 87:2 89:4,6
90:24 93:17 94:15
100:19 105:23
106:25 107:1,4,7
108:22,25 109:11
110:6,18 111:1,5,6
111:6 117:6

118:15 119:15,22
119:25 120:5,7
121:18 124:23
125:4,8,19 126:4
126:15,18,23
133:4,25 139:5
142:5,15,20,21,23
143:2,8,9 144:12
146:5 147:9,19,22
148:1,5,6,7,10,21
149:3,13,23,24,25
150:4,8,10,11
151:12,21,24
152:2,5,6,16
155:18 156:22
157:11 158:9
162:1,3,12 163:14
165:4,9,19,23,24
166:7,7,20 167:6
169:11,16 171:3,7
171:11 172:1
173:20 175:11
176:24 177:8
178:9 179:7 181:9
181:15 182:21
183:10 188:2,9,12
188:13,14 191:20
192:20 193:2
194:1,13,14,22
195:16 197:18
198:7,19 199:6
200:13 202:14
203:3,23 205:5
211:1 212:7,10,11
214:10 216:13,16
216:19 217:7,11
217:19 218:11,17
218:22 219:1,2,7
219:15,20 220:12
220:12 221:15,17
221:19,24 224:24

228:1 241:25
242:6 244:3,9,12
245:9,12 246:3,9
248:2,4,5,9,18
249:10 250:22,24
251:5,11,23,24
252:12,14,16
253:13,19 256:21
257:9,11 258:2
260:9,10 261:1,4
262:21 263:6
265:20 266:1
267:4 271:22,25
273:10 274:1
275:5,11 280:6
283:4 286:18
288:16,24 289:24
290:3,5 291:19
292:8,10 294:13
298:2,13 299:23
299:24 300:5,14
301:8 306:7
**knowledge** 36:13
43:5 61:1 76:11
104:14 109:7
110:7 141:22
145:3 150:16
151:17 161:12,17
184:4,6 192:13
193:9 216:9
219:18 220:5
221:3 223:16
257:4 260:22
261:6,7 268:5
272:12,16,22
273:6,17,20
277:10,13,24
278:3,6 284:5,20
285:9 286:3,10
300:6

**known** 19:24
256:1 272:9
**knows** 130:18
189:11

**l**

**l** 18:10 19:6 47:25
48:2 49:2,13,14
54:7,7 73:10
**l.p.** 1:12
**label** 247:3
**laboratories** 3:9
**labs** 12:8
**lady** 6:20 225:19
226:11 228:10
**lady's** 227:19
228:1
**lag** 250:19,23
251:3
**large** 294:14
**larger** 15:14
**late** 36:4 142:2
162:13 224:15,17
289:19,19
**launch** 305:2
**law** 204:18 208:23
219:4 262:11
306:19
**law.com** 3:19
**lawful** 12:15
**laws** 206:8 208:5
**lawsuit** 13:7 15:17
16:7,9 18:24 21:9
35:21 36:17 209:1
211:23 253:10,25
261:16 272:14
275:16
**lawyers** 15:6,11
16:21 35:4
**lay** 32:3 98:22
163:5

**lead** 112:4 194:17
196:20,24
**leads** 163:23
**learned** 129:3
286:15
**learning** 290:11
**leave** 51:13
**leaving** 213:7
**led** 244:23
**ledger** 31:2
**ledgers** 25:18
**left** 80:8 83:14,20
84:21,22,23 87:15
87:20 113:7
173:20 213:17
307:22
**legal** 4:14 196:24
313:1 316:1
**legislation** 113:9
**legitimately**
209:16
**length** 271:16
**lens** 134:9
**lethal** 252:4,13
**letter** 240:19
313:19
**level** 90:20 92:18
111:23 113:16,23
114:11 117:14
120:15 123:8
141:17 171:6
174:4 175:18,18
176:7 202:11
206:7 277:7
286:25 287:3
288:11 291:15
294:17
**levy** 238:7
**lewis** 3:10 12:6
**lhd** 7:11 295:6
304:12

**licensed** 164:20
269:17 270:25
281:4,17 282:4
**limit** 168:7
**limitation** 168:1
**limited** 179:11
**limits** 152:20
**line** 32:1,6,24
69:23,23 97:16
115:25 116:8,18
116:20,22 185:20
189:2 232:22
237:19 304:6
313:13 315:7
316:3
**link** 199:6 213:7
223:11,17
**list** 66:11 76:23
101:23 102:15,21
103:1 114:18
117:19 131:9
185:19 218:5
232:16 234:1
251:10
**listed** 25:19 102:3
102:5,9 103:6,14
112:9 130:7,9
131:11 132:25
133:7 134:24
135:6 144:8
185:17 232:17
233:25 269:12
315:7,17
**listen** 17:23
**listing** 315:7
**literally** 123:3
**litigation** 1:7 11:6
19:2 35:5 47:21
48:8 57:17 268:4
271:9 276:3 283:7
283:12,21 298:4

298:10 313:6
314:3 315:3
**little** 35:6 55:13
101:1 144:9
145:10 153:16
198:24 199:1
223:22 258:24
263:10 290:11
**live** 149:6 155:14
**liz** 248:8
**llc** 2:4 3:8,16
12:10
**llp** 2:11 3:3,10 4:4
**local** 60:11 113:15
113:23 114:11
227:4 237:24
238:3 240:2,13
244:14 245:14
246:5 288:11
294:17 300:20
301:15 302:4
**locally** 243:11
**located** 199:1
**location** 23:14
40:20
**locations** 23:7,12
24:25 154:17
**long** 20:8 34:25
37:20 47:3 54:19
62:13 64:22 67:18
70:21 71:9,11
72:18,24 104:6
108:16,19 162:3
166:7 177:8,11
185:10 187:24
197:2 232:16
239:24 248:23
255:4,8 283:4
**longer** 45:12 71:12
93:24 106:21
173:18 182:23

188:19
**look** 32:15 36:15
47:19 68:19,22
77:17 89:24 91:15
93:18 101:12,20
102:2 103:15
122:11 123:19
124:9 126:11
129:22 131:23
136:17 169:1
178:1 185:16,22
188:3,4 194:8
203:4 224:16,18
226:18 230:15
232:16 234:7
239:4 240:7 242:2
242:5 243:1
248:20 255:15
258:20 291:1,1,25
299:12,17 305:5
**looked** 21:18 22:2
37:15 46:19 47:6
56:5 57:16 115:22
119:7 299:11
**looking** 25:17 31:1
38:20 104:3
116:13 129:23
130:1,2 134:10
137:8,17 169:13
186:9 189:21
200:2 265:1
**looks** 100:8 172:15
178:2 186:24
**looming** 301:7
**loren** 172:15,21
174:6 176:17
189:12
**lose** 68:7
**lost** 37:25
**lot** 37:6 39:11
42:11 44:1 69:11

83:24 86:24 90:14
155:9 251:1
288:17,17,18,20
291:7 292:10,10
**lots** 15:21 37:8
51:24 58:13 66:8
205:21
**louisiana** 2:18
**love** 192:20
**low** 152:11,15
**lower** 226:1 229:1
232:13 247:3
**luke** 4:11 12:4
**lump** 117:21
**lunch** 152:25
**luncheon** 153:4

**m**

**m** 2:11
**ma'am** 219:23
221:11
**madam** 313:10
**mail** 6:10,15,19
7:1,4,11 35:16,24
36:8,13,19 37:14
46:16 48:19 51:12
51:13,19 52:18,19
59:12,14 95:13,23
96:15 97:4,15
98:15 171:15
172:6,10,15 174:9
176:17 186:9
225:17 226:2,14
232:5,14,19
236:20 237:3
239:7 279:6 295:5
302:3,8,13,14
304:11,11
**mails** 36:14 48:2,7
48:14,20,21,25
49:12 51:7,24
56:18 57:13

172:14 283:11
**main** 2:12 41:2
239:19,19
**maintained**
150:12,15 174:4
178:3
**major** 252:23
254:23
**majority** 120:2,6
**man** 159:20
201:22
**management**
138:8 141:17
168:15 174:21
245:15 246:5
270:21
**manager** 69:13
**managers** 245:16
246:6
**mandate** 113:25
227:9
**mandated** 111:10
112:11 113:14
114:15,19 227:4
301:1
**manna** 1:22
**manner** 301:4
**manufacture**
214:11,15,20
215:10 216:11
**manufacturer**
209:25 215:14
**manufacturers**
209:3,4,7 215:5,13
216:1,17 258:18
**manufactures**
215:20
**manufacturing**
218:14
**march** 173:22

**mark**  56:6 63:7
**marked**  6:2 31:13
  31:17 63:12,15
  65:8,12 95:15,20
  122:2,7 171:19,23
  225:22 232:9
  236:23 246:24
  255:20 295:9
  300:12
**market**  1:23 41:3
**marketing**  217:3
  244:21 305:9
**marountas**  61:8
  62:6
**master's**  268:20
  268:25 269:10,13
**mat**  54:25 69:16
  86:25 99:8 102:4
  102:22 127:22
  146:2,11 147:7
  149:15 150:13
  152:21 153:11
  191:3
**match**  183:12
**matching**  142:4
**maternal**  235:11
  289:25
**math**  110:5
**matter**  18:7 34:10
  39:6 60:25,25
  134:20 139:6
  191:19 262:13
  291:18 292:13
**mcginness**  2:4
**mckesson**  210:5
  213:8,14 215:14
  215:19
**md**  1:8 11:7
**mdl**  1:7
**meadow**  13:2

**mean**  31:6 32:17
  41:16 76:16 84:12
  85:1,12 109:16,23
  109:25 113:22
  129:14,15,24
  138:10 142:5
  148:13 150:21
  168:5 178:12
  180:2 181:18
  184:16 202:9
  219:16 241:25
  288:23 294:10
  296:24
**meaning**  134:1
  231:12 274:10
**means**  133:25
  166:7 174:25
  184:21 250:22
**meant**  82:6 95:7
  108:5 120:21
  202:16
**medicaid**  28:24
  29:6 30:12 80:1
  120:9,25 124:21
  150:8 171:2
**medical**  118:22
  121:6 177:4 190:2
  208:6,11,23
  244:22 245:19
  281:4,17 282:4
**medicated**  105:19
  105:21 288:13
**medication**  51:21
  51:21 94:3 106:9
  133:11,14,17
  145:8 147:10
  155:10,21 157:15
  158:4 209:25
  218:23 220:6
  230:16 278:1

**medications**
  156:13 157:10,19
  158:10,14 191:25
  193:6,23 221:21
  230:11 241:3
**medicine**  105:16
  218:21 261:15,17
  270:13
**meet**  15:3,6
**meeting**  7:7 15:12
  15:14,15,18,19,21
  16:12,25 17:16
  93:5,6 200:12
  224:8,12 233:10
  233:14,24 234:24
  246:22 247:5,12
  247:14 248:15
  263:24 264:2
  265:6,9 290:3
**meetings**  14:23,25
  15:9,10,13 16:17
  16:20,24 17:6,12
  38:13 39:7 69:11
  199:19,22 200:2
  205:5,17 207:11
  247:19 265:3
**member**  19:18
  143:11 158:13,14
  247:24 248:2
  296:14
**members**  35:17
  76:1,3 97:23
  100:12 307:6
**memorized**  199:9
**memory**  19:13
  71:23 228:20
**mental**  93:23,25
  107:6 164:12,15
  164:21,24 165:8
  165:13,21 166:16
  166:21 226:9

  237:25
**mention**  61:3
  135:24 279:18
**mentioned**  25:3
  45:22 53:2 59:23
  60:20 92:1 94:2
  138:4 159:5
  193:15 279:5
**merged**  72:2
  177:12
**merger**  72:5 73:17
  73:23 78:21
  287:14 296:7
  299:7
**message**  235:18
**messages**  61:12
**met**  15:4 262:9
  297:8
**meth**  252:22 253:2
  254:22
**methadone**  288:15
**methodology**
  115:3
**metro**  100:5
**michael**  187:18
**microphone**
  188:20
**middle**  172:19
  176:16 249:4
**midwest**  313:17
  316:1
**mill**  205:18 206:12
**millage**  26:21 27:4
**million**  109:19
  117:5 259:9,22
**mills**  204:5,14
  205:1,22 206:1,23
  207:13
**mine**  25:22
**mined**  37:10 46:18

**minimum** 91:7,8
**mink** 35:15,24
  36:20 37:14 47:17
  48:11,24 49:7
  57:2 280:1,2
  283:25
**mink's** 46:16
**minute** 19:9 21:10
  307:22,24,24
**minutes** 7:1 98:2
  124:22 167:21
  232:6,23 233:13
  233:22 234:3,5
  263:24 308:4
**misstates** 86:4
**mix** 33:21 200:2
**monetary** 275:13
  275:23
**money** 25:20
  28:12 30:3 70:10
  70:13 80:21 86:9
  86:20 87:15
  119:22 210:13
**monies** 81:19
**monitor** 261:9
**monitored** 155:6
  155:13
**monitoring** 155:15
**monologuing**
  195:22
**month** 15:25 23:4
  36:3 55:25 56:5
  103:23,23 136:6
  136:12 179:25
  180:24 182:6
  186:23 203:5
**monthly** 150:6
  156:14 203:9,11
**months** 55:13
  247:8 252:6 280:7
  280:10,11

**morgan** 3:10 12:6
**morganlewis.com**
  3:13
**morley** 44:16,21
  44:22 45:20
**morning** 12:22
  262:10 279:1
**mortality** 60:6
**mothers** 229:20
  231:9
**motley** 2:4 4:10
  11:12,16 15:6
  17:1
**motleyrice.com**
  2:7,8
**move** 54:21,25
  58:19 63:2 88:22
  104:19 253:22
**moved** 71:16
  113:13 181:23
**moving** 239:25
**mt** 2:6
**multiple** 117:25
  205:7 289:22
**municipal** 26:22
**myron** 36:10

**n**

**n** 19:22 54:7
**n.d.** 1:13
**naeem** 2:11 5:8,12
  11:24,24 12:21
  13:6 17:22 18:20
  47:5 63:7 87:25
  88:2,6,9,15 94:9
  94:12 98:23
  108:21 111:2,15
  125:5,10 130:19
  130:23 131:3
  153:1,7 187:25
  192:12,17,20,25
  194:7 195:21

197:11 210:25
  212:16 221:25
  285:7 286:6 287:6
  290:15 292:20,24
  293:7,9,13,20
  295:1,13,23 296:2
  298:7 307:19
**nail** 224:19
**naloxone** 99:16
  112:18 252:3,11
  252:18 288:12
**name** 11:10 12:24
  13:5 19:20 54:2
  68:4 70:19 137:12
  137:17 138:7
  142:21 143:3
  176:5 211:19
  213:15,22 228:16
  248:7 262:10
  279:25 303:7
  313:6 314:3,4,15
  315:3,4,21
**named** 213:23
  272:18 311:9
**names** 187:12
**narrow** 82:23
  298:24
**nas** 205:10 265:15
**natalie** 2:5 11:15
  15:4
**national** 1:7 11:5
  271:24 313:6
  314:3 315:3
**nationwide** 91:8
**nature** 25:1 53:22
  115:5 118:23
  163:16 172:25
  290:3
**ndeyneka** 2:8
**near** 132:1 154:19
  240:12

**necessarily** 159:9
  180:6 181:18
  265:2 266:2 291:9
  292:4
**necessary** 55:9
**need** 31:20 38:12
  53:20 69:19,21
  70:10 91:22,25
  95:19 97:16 98:22
  103:1 115:4
  139:13 140:23
  142:9 155:13
  171:2,24 195:3,4
  197:24 203:23
  219:11 230:15
  262:19,22 277:20
  280:8 287:17
  292:2,14 300:5
**needed** 35:17,19
  36:16,22 45:23
  47:13 49:8 53:19
  57:16 70:12 81:14
  90:11,12,13
  141:17 143:12
  174:3 190:10
  200:5,7 287:9,21
  288:10
**needle** 293:22
**needles** 144:14
  294:1
**needs** 68:20 104:3
  104:4 163:7,14
  209:15 240:14
  291:3,16
**negotiation** 74:19
**neonatal** 234:16
**never** 43:3 44:9
  274:21 300:3
**new** 3:12,12 39:8
  80:12 132:2 170:9
  207:13 234:7

292:7

**news** 204:12,23,23

**nicu** 234:15

**nile** 301:7

**nine** 91:17 161:6
161:14 167:23

**nixon** 46:4 79:7
237:14,15 302:19

**nodding** 106:24
289:15

**nods** 13:23

**normal** 80:18

**north** 2:12 3:18

**northern** 1:2 11:8

**northwest** 2:18
3:17 4:5

**notably** 99:1

**notarized** 313:14

**notary** 311:6
312:14 313:25
314:10,18 315:15
315:23 316:23

**note** 313:12

**notes** 39:8,11

**notice** 7:8 246:22
247:5,12 248:15

**notified** 35:19
280:7 284:10,16

**november** 1:18
11:2 178:18
184:10 232:15,20
283:14 312:8
313:4

**now's** 152:24

**number** 6:2 13:7,8
22:14 24:22 32:1
42:14 55:16 63:20
71:19 77:20 80:10
82:20 86:19 90:13
91:11,24 100:24
110:9 115:3,4,20

117:24,24 121:20
142:22,24,25,25
144:19 151:18
152:9,11,15
160:16 161:2,7
172:7 179:11,17
180:3,4,7 184:18
184:19 185:17
202:23 203:1
205:12 209:2
215:4 229:1
232:13 234:14
237:2 238:15
240:8 243:2
248:21,23,24
255:24 259:20
260:11 265:14
272:14 293:25
300:25 301:5
313:7,13

**numbered** 226:1
234:8

**numbers** 19:16
20:15,16 21:13,19
22:2,11,17,20
24:13 74:11 77:6
86:12 125:8 179:5
201:16,20,25
202:3,10,13 203:7
289:1,6 290:24
303:16 315:7

**nurse** 105:10,14
146:20,23 151:7,9

**nurses** 146:13
148:25 208:20

**nutrition** 290:2

**o**

**o** 68:6 73:10 233:6

**oarrs** 7:9 255:19
256:2,4,6,11,19
257:1,6,18,22

258:9,13,17

**oberlin** 6:19
225:18 226:3,7
230:20

**object** 8:2,3,3,4,4
8:5,5,6,6,7,7,8,8,9
8:9,10,10,11,12,12
8:13,13,14,14,15
8:15,16,16,17,18
8:18,19,19,20,20
8:21,21,22,22,23
8:23,24,24,25 9:1
9:1,2,2,3,3,4,4,5,5
9:6,7,9,10,11,11
9:12,13,13,15,18
9:19,19,25 10:1,1
10:2,2,3,3,4,5,5,6
17:19 25:12,23,24
29:1 32:2 38:23
44:3 46:24 51:15
55:6 62:25 74:9
77:11 78:25 85:23
86:3 87:17 88:20
89:3,19 91:4 94:5
111:12,17 120:4
120:18 124:16
125:3 128:19
132:19 135:10
139:21 146:1
148:3,22 157:23
158:6,17,22
166:24 169:14
187:2 189:10
194:19 196:1,8
197:10 204:8
205:20 206:4
207:1,10 208:3
215:22 216:24
218:25 223:8
231:5 236:11
241:8 245:6

249:10 253:7
257:8 264:18,25
266:15 285:7
286:6 287:6
290:15 292:20,24
293:7,13,20 294:6
297:24

**objected** 95:5
197:12

**objection** 8:1,17
9:6,7,8,8,9,10,12
9:14,14,15,16,16
9:17,17,18,20,20
9:21,21,22,22,23
9:23,24,24 10:4,6
98:24 111:7
125:11 126:2
130:25 217:14,18
219:10 220:7,9
221:23 223:20
246:1 253:12
254:2 257:20
260:8,14 261:2,11
261:18 270:2
272:24 273:25
275:4 276:4,18
280:18 281:7,21
282:9 293:9
307:17

**obligations** 18:19
261:8

**obviously** 44:18
135:25

**occasion** 274:22

**occurred** 16:1
21:24 44:9 45:23
236:4 296:12

**occurrence** 80:18

**occurs** 41:20 42:4

**october** 6:10 36:5
95:13,24 96:18

| | | | |
|---|---|---|---|
| 226:3 230:20 | 258:3 271:13 | 75:18 76:5,25 | 155:4,20 156:24 |
| 231:12 233:13,21 | 272:3,5 304:7 | 77:19 78:1,4 | 157:14 160:25 |
| 235:2,5 236:5 | **ohio** 1:2,12,13,23 | 79:11,17 81:17 | 162:22 163:12,21 |
| 263:22 302:8 | 2:13 3:18 11:8 | 82:19,24 83:1,12 | 164:4,23 165:18 |
| **odh** 7:11 295:6 | 13:2 28:9 79:25 | 83:17 84:1,3,17 | 166:12 167:1,11 |
| 304:12 305:6,14 | 113:1 144:1 | 85:6,9 86:10,17 | 169:4 170:16,20 |
| **ofcf** 226:19 | 200:20 201:7 | 87:4,10,13 88:6 | 171:12 172:4,5,13 |
| **offer** 238:8 | 204:15 206:2 | 89:9,11,23 90:23 | 173:1,5,9 174:18 |
| **offered** 23:8 | 208:5,8 222:7,11 | 91:6 92:1 94:2,9 | 175:16,23 176:7 |
| 128:12 165:14 | 222:15 226:20 | 94:18 95:4,22,25 | 177:5,13 178:1,17 |
| **office** 37:16 38:7 | 243:13,16 244:15 | 96:2 97:21 98:4,7 | 178:22 179:20 |
| 38:19 39:14 40:5 | 255:25 259:8,21 | 100:9 101:3,20 | 180:5,21 181:19 |
| 40:11 41:10 42:5 | 259:21 260:16 | 102:6,12,14 103:8 | 181:22,24 182:22 |
| 42:22 204:13 | 263:11 268:14 | 103:24 104:6,13 | 183:17 184:22 |
| 241:14 302:4 | 269:18 286:4 | 104:16,18,20 | 185:11,16 186:8 |
| 312:6 | 300:19 301:17,20 | 105:17 106:5,8 | 186:15 187:22 |
| **officer** 71:16,17 | 301:23 302:5 | 108:8,12 109:3,5 | 188:2,10 189:13 |
| 72:12,16 73:8,19 | 306:6,14 311:2,7 | 109:10 110:20 | 190:18,19 191:19 |
| 74:7,21 76:14 | 312:7,15 313:2 | 111:22 112:7,22 | 192:1,19 193:14 |
| 176:6 | **okay** 13:25 14:13 | 115:8 116:2,6 | 193:18 194:2,7 |
| **officer's** 176:5 | 14:20 15:5,19 | 117:1 118:2 119:1 | 195:6,9,14 196:5 |
| **officers** 155:19 | 16:11 19:4,10,17 | 119:9,21 120:23 | 196:10 198:10,16 |
| **offices** 166:8 | 20:4,11,21 21:3 | 121:11 122:5,13 | 199:12,21 200:8 |
| **official** 38:10,12 | 22:7,17,23 23:2,7 | 122:17,24 123:14 | 200:13 201:15,24 |
| 38:18 39:4,21 | 25:3,14 26:2,18 | 124:9,24 126:7 | 202:5,15,20 203:8 |
| 40:3 285:3 293:15 | 27:9,18 28:15 | 127:5,15 128:3,6,8 | 203:14 205:14,24 |
| 304:25 314:15 | 30:1,18 31:23 | 129:6 130:4 | 206:14 208:19 |
| 315:21 | 32:8,19 33:1,23 | 131:23,25 132:4 | 209:1,7,18 210:8 |
| **officials** 61:14 | 34:20 36:12,19 | 132:16 133:3,19 | 210:22 211:19 |
| **oh** 4:2 16:15 42:21 | 38:5,15 39:16 | 133:21 134:18,21 | 212:1 213:16,19 |
| 51:17 52:11 58:11 | 40:2,10 41:4,13,20 | 135:4,21 136:8,25 | 213:21 214:23 |
| 59:4 73:15,22 | 41:24 42:2,20,23 | 137:3,11,16,22,25 | 215:25 216:4 |
| 95:25 101:11 | 43:5 44:23 46:12 | 138:9,14,19 139:6 | 220:13,19,22,25 |
| 109:23 114:25 | 48:10,24 50:7,18 | 139:13,22 141:1 | 224:7 227:16 |
| 120:21 138:10 | 51:9 54:24 55:1 | 141:15 142:7,12 | 228:14,22 231:19 |
| 159:20 160:3 | 56:7 59:9 60:9 | 143:5,5 144:4,20 | 232:1 233:5,18 |
| 184:22 194:11 | 61:2,9 62:7,16 | 145:3 146:15,16 | 234:7,13 236:16 |
| 213:19 219:13 | 66:10 67:6,24 | 146:21 147:13,19 | 237:19 238:18 |
| 220:13 234:10 | 69:6,24 71:13,20 | 149:4,21 150:2,8 | 244:14 248:7,14 |
| 242:3 248:10 | 71:24 72:23 73:22 | 150:11 151:15 | 248:22,23 249:17 |
| 249:16,19 254:8 | 74:12 75:3,12,16 | 152:15,17,23 | 250:1 251:6 |

253:23 254:6,8
257:14 262:14,23
263:3,7,19 264:22
265:5,21 266:5,8
267:14,23 268:19
269:5,10 270:9
271:16 272:4,11
272:15,20 273:4,4
275:22 276:20
277:9,23 278:20
278:23 280:14
282:16,18 283:10
284:4,23 286:1
288:23 295:1
296:20 297:5,13
297:19 298:20,23
299:14,16 300:4
300:11,17 301:22
303:4,19 304:7,9
306:11,25 307:19
308:17,20
**old** 62:19
**older** 45:10
**once** 14:5 36:19
58:17 114:5
156:20 286:21
**ones** 24:24 39:24
135:6 212:11
272:17
**ongoing** 55:7
69:25 287:19
307:1
**op** 1:13
**open** 23:15,16
130:14 157:8,15
176:19,22 177:14
177:21 181:3
184:2 189:3 190:4
190:5
**operate** 33:22
81:15

**operating** 67:19
**operation** 156:5
**operational**
291:16
**operations** 67:14
291:8,12,13 292:9
296:14
**operative** 212:2
**operators** 205:18
206:12
**opiate** 1:7 11:6
60:4 61:4 129:1
132:24 199:14
200:9 240:19
241:3,6,22 242:20
243:12,15,25
244:24 263:8,10
264:16,24 265:11
265:24 266:10,13
288:12 313:6
314:3 315:3
**opiates** 37:2 58:2
60:12,20 200:6
205:13 207:14
235:8,24 236:8
243:11 264:10
267:18 269:20
276:17
**opioid** 56:22 60:1
62:21 127:13,20
135:1,8 136:1
147:20 149:6
164:1 171:8
185:18 186:2,12
193:6 201:9 202:7
204:6 205:2
210:14 223:23
224:5,12 245:5
253:4 259:20
261:15 266:3
267:4 275:2 276:2

276:7 277:15
284:21,25 285:4
285:10 286:10,15
286:24 287:3,25
289:17 290:19
291:19 292:22
293:12,17 301:9
305:17
**opioids** 129:13
159:2 163:22
186:19 187:6
191:16 192:4
193:11,15,19
196:7,11,20
197:15,24 198:5
199:4 201:16
202:16,17,23
203:18 205:19
206:2,9,24 207:7
207:19,25 208:7
208:13,17,20,24
209:4,8,11,19
210:4 211:24
218:21 223:7,14
223:19 225:5,6
231:3 245:22
255:11 259:8,16
260:13 277:25
278:14,18 280:25
281:25 286:3
288:4 290:12
**opportunity** 80:13
300:15
**order** 171:1 223:1
223:4,12,18
233:25 260:20,24
**orders** 261:10
**organization** 6:8
40:17 65:6 81:11
109:13 110:1
139:23 226:23

227:5 238:6 246:4
246:12 247:21
255:3 300:23
**organizationally**
141:4
**organizations**
15:22 91:9 156:17
266:24 294:21
**organize** 46:14
**organized** 101:15
172:23
**oriented** 291:12
**original** 39:4
172:14 176:17
302:3
**originally** 56:22
155:3 179:21
**outcome** 135:8
**outdated** 267:25
**outpatient** 132:5,7
132:8 167:18,19
182:9 251:13,16
**outreach** 103:3
106:6
**outside** 17:16
155:16
**overall** 255:10
**overdose** 102:17
131:10,13,22
132:23 163:1
164:1,2,3 165:22
250:3,8
**overdosed** 131:16
131:17 159:15
223:6
**overdoses** 131:11
163:23 202:7,13
202:23 203:1,20
250:4,9 288:6
**overlap** 84:7

**overprescribing**
  241:2
**oversaw** 239:17
**overseeing** 71:18
  293:17
**oversees** 20:7
  143:25 144:2
  146:11
**oversight** 67:13
**overview** 64:9
  119:13

**p**

**p** 248:16
**p.m.** 309:4
**packet** 118:20
  119:14,15
**pads** 200:25
**page** 8:2 22:9
  31:21 33:3 77:14
  96:15 100:24
  115:25 116:13
  123:19 125:13,22
  126:8,9 131:23
  132:10 136:18
  172:19 173:1
  176:16 178:6
  184:7 187:8,9
  188:7 225:25
  228:25 233:17
  234:8,8 237:1,2
  240:7,18 242:5
  243:2 248:20,24
  248:25 258:21
  263:4,6 303:17,21
  304:1,5,16,25
  305:4 306:3,13
  313:13,15 315:7
  316:3
**pages** 130:13
**paid** 25:9 28:11
  115:9 139:10,24

140:6
**pain** 191:21 192:5
  193:5,11,22 194:3
  194:16,17 195:24
  196:6,7 230:11,15
  244:23 245:11,14
  246:5 270:20,21
  280:24,25
**pam** 12:6
**pamela** 3:11
**pamela.holly** 3:13
**paper** 37:25
**paragraph** 252:1
  259:3 305:5
**pardon** 27:1 308:2
**parents** 229:18
  290:5
**park** 3:11
**part** 18:12,18 19:2
  19:6 21:8 32:9
  33:16 44:23 47:20
  48:7 53:16 54:9,9
  57:17 66:2 68:12
  69:6,24 74:2
  75:22,25 78:23
  80:19 84:23 97:15
  105:21 107:15
  110:11 120:8
  133:1 134:11
  141:16 145:17,21
  149:21 155:11
  161:15 170:20
  180:16 183:24
  218:18 246:17
  266:16 268:3
  276:3 296:16
  297:10 315:9
**partially** 30:1
  149:17,18
**participated**
  301:23

**particular** 124:19
  175:23 177:10
  186:6 218:21
  271:11
**particularly** 141:6
  268:8 275:1
**parties** 13:7
**partly** 92:10
**partner** 34:7
  162:11
**partners** 292:2
  294:16
**partnership**
  199:25
**party** 210:4
  273:23 312:3
**patience** 261:23
**patient** 45:3,17
  144:22 150:20,24
  165:9 170:9 174:4
  175:14,14 176:7
  180:18 182:14
  188:6 189:14
  196:11 209:15
  210:8 219:5 220:5
  221:20,21 234:15
  296:24
**patient's** 221:15
**patients** 45:5,10
  106:13,19 144:13
  145:20 146:6
  148:7,11 149:6
  150:13 151:3,5,13
  151:18 152:20
  163:1 168:2 169:7
  169:9,16,21
  170:21 171:8
  174:13 176:24
  178:8,10,20,23,25
  179:5,14,25
  180:10 181:4

184:5 186:5,11
  187:5 188:3,8
  189:17,22 190:11
  191:9,10,21
  193:10 196:6
  197:15 201:17
  208:8 209:8,11,19
  216:14 219:8
  235:8 259:8,17,21
  260:5 264:10
  280:24 281:25
**paul** 3:16 12:11
**pause** 243:14,22
  244:25 245:17
  250:5 252:25
**pay** 25:20 68:10
  92:10 114:23
  168:20
**pbricard** 3:19
**pelini** 3:16,19
**people** 13:19
  15:11 24:3 105:13
  131:15 141:12
  142:17 143:1
  152:14 156:1
  166:5,5,8,21 172:7
  182:18 188:18
  194:16 195:23
  200:5 241:19
  265:19 277:7
  288:12 289:25
  293:24 302:18
  303:11,12
**percent** 91:8,11
  92:10 124:12,20
  124:25 125:14,18
  125:22 126:1
  136:18 140:15,15
  259:9,22 260:20
**percentage** 43:20
  92:8 110:9 118:13

145:5 168:15
171:7,8
**percentages** 92:3
92:3,4
**perfectly** 112:6
**perform** 28:6
112:16
**period** 78:3
179:10,25 182:6
186:24 286:2,9
**periodically**
174:19
**permitted** 208:7
**person** 19:25
35:15 39:3 53:14
53:15 123:8
143:11 155:15
158:9 160:18
161:24 163:14
167:7 201:22
213:16 248:6
279:16,18,23
281:3,5,18 291:10
298:16
**personal** 104:14
199:17 265:9
273:17,20,21
277:9,13,23 278:5
**personally** 169:23
169:24 176:14
201:13 277:1,11
299:15 300:6,8,10
314:11 315:15
**personnel** 108:8
119:16
**perspective** 166:3
217:22 250:25
306:18
**pharma** 1:12 3:8,8
12:9

**pharmaceutical**
11:22 212:8
214:24,25
**pharmaceuticals**
2:10 3:8 12:7
214:13,20 215:1
215:10,20 216:11
**pharmacies**
209:18 217:16
258:10 271:25
281:24
**pharmacist** 270:7
282:3,5
**pharmacists** 271:4
**pharmacology**
270:16
**pharmacy** 210:1
218:22,23 222:12
222:15 258:1
278:6 282:3,5
**phone** 12:3 142:22
188:18 282:15
313:3
**phrase** 37:2 98:11
198:13,16
**phrases** 37:8
**physical** 23:7
193:24
**physician** 208:21
230:16 270:4
277:15
**physicians** 105:11
200:25 207:14
216:18 230:10
**pick** 14:14 127:2
139:17 180:13
246:11 298:16
**picked** 64:14
101:17 127:3
137:24

**picture** 203:5
**piece** 231:8
**pierce** 46:5 71:3
72:10
**pill** 204:5,13 205:1
205:18,22 206:1
206:12,23 207:12
**pills** 158:20
201:21 206:17
**pipeline** 204:15
**place** 28:9 79:23
92:19 152:12
205:6 235:14
264:5 283:22
290:6 291:17
311:20
**plaintiff** 195:7
**plaintiffs** 209:3
**plan** 7:5 58:24
236:21 237:20
239:9,20,22,24,25
240:8 241:22
242:13,23 263:1
263:16 266:7
**planning** 104:2
**plans** 27:24 246:4
**play** 240:5 252:2
252:18 254:16
267:5
**played** 245:10
**playing** 176:18
**pleasant** 2:6
**please** 11:10 12:13
12:25 19:21 36:20
64:3 219:24 220:1
221:12 300:16
313:11,11
**plug** 118:9
**plus** 91:15,15,24
**podoll** 4:4

**point** 16:13 18:2
21:18 25:16 33:18
35:20,22 56:1
57:8,20 62:22
71:15 76:12 81:18
84:19 92:18 95:10
102:11 122:6
137:3 149:18
163:8,15 195:1
204:19 229:11,16
229:17,24 230:10
250:3,6 252:7
259:19 266:2
277:2 286:23
287:2,8 297:8
**police** 99:18
154:16,19,19
155:6,19 159:19
159:24 205:10
267:7 288:22,24
**policy** 81:12
283:19,22
**pollard** 36:10
63:15 96:24,25
108:6 121:12
123:11 146:15
149:11
**polster** 1:10 11:9
**population** 173:8
173:9 240:25
292:22,25 294:14
**populations** 30:17
**porter** 4:11 12:4,4
**portion** 99:14
122:8 124:10
127:10 138:5,20
139:2
**position** 70:22
72:19,24,25 73:2,4
81:12 96:5 173:5
173:23 252:8

308:19
possession 299:20
possible 109:1
157:3,25 287:22
possibly 58:15
potential 236:8
potentially 42:17
practice 105:10,15
164:21 176:20,22
177:14,22 181:3
184:2 187:9 189:4
190:5
practitioner 151:8
151:17
practitioners
105:10,15 208:6
pre 299:9
preceded 72:21
73:7 108:12
preconception
235:15
predecessor 71:1
79:7
predicting 91:21
pregnant 235:14
preparation 21:22
prepare 14:19
15:7 17:12,16
18:9 21:11,15
34:22 123:16
preparedness
112:4 239:18
preparing 16:22
122:25 123:1
217:8
prescribe 106:18
151:2 200:25
201:1 208:7,11,17
208:20,24 209:8
216:18 253:10

prescribed 158:4
158:15 207:25
219:9 230:16
277:25 281:17
prescribing
202:12 207:14,19
230:11
prescrip 281:8
prescription 1:7
3:14 11:6 12:12
52:2 102:17 151:2
151:6 157:22
158:19 159:1
193:6,11,19 196:7
196:11 197:14,24
198:4 199:4
200:14,21,25
201:16 202:17
206:1,8 207:7
209:4,12,13,15,20
212:7 213:1,23
214:5,7,11,19,22
215:4,9,12 216:1,2
216:10,13,16,20
217:4,4,7,10,12
218:8 220:4,6
222:1,4 223:4
244:21,24 245:9
255:10,11 256:1,7
256:14,25 257:4
260:12 277:16
278:7,13,18
280:25 281:4,6,10
281:12,16,19
282:1,4,7 290:12
301:9 305:1,16
306:6,14 307:11
313:6 314:3 315:3
prescriptions
207:17 216:21
217:13 244:18

245:22,25 257:10
257:17,18 258:1
259:20 260:5,7,12
271:1,5
presence 311:14
present 4:9 15:14
15:23 78:3 119:3
201:18 202:2
203:18 206:3,25
presentation
119:10
presentations
199:8
presented 201:20
265:24
presenting 117:19
preserve 279:9
preserving 279:19
press 235:6 236:2
264:6
pretty 170:2
prevent 132:24
133:17 157:21
preventing 131:10
131:10,21,21
prevention 50:21
66:15 102:17
103:13 123:24
124:24 125:13
126:12,24 127:11
127:19,23,24,25
128:9,20 129:1,11
129:15,15,16,19
130:2,9,15 131:2,8
131:9,14,20
132:23 133:10,15
133:18,23 134:3,5
134:24 135:2,3,5,6
135:15 144:1
190:23 200:14,21
229:13 267:15,16

305:1,7,15
previous 96:6
234:17 274:5
previously 94:24
154:1
primarily 24:20
26:21 33:18 44:14
66:2 120:7 290:20
291:9
primary 64:13
137:10 161:23
162:1 290:25
printed 255:24
prior 16:3 29:16
32:13 36:12,12
37:24,24 43:1,21
43:21 46:20 54:10
54:11 63:6 65:16
67:12,24 68:22
71:10,13 78:14
80:14 87:3 94:17
94:20 99:4,10,22
99:23 107:24
122:18,18 136:22
149:17 169:1
267:21 272:12
285:17 305:16
307:1
priorities 229:7
prioritize 228:8
240:1
prioritized 227:20
prioritizing 69:3,7
privacy 219:5
private 80:2 120:9
121:1 124:21
156:4
privileged 17:21
proactively
274:23

**probably**  25:5
34:24 37:24 50:25
51:16 52:14 56:18
59:7 89:25 103:9
105:9 143:18
144:15,18 174:25
175:17 201:2
204:21 224:15
**problem**  229:12
236:9 243:12,16
243:25 244:1
263:10 264:16,24
275:2 305:10
306:18,21
**procedure**  12:17
149:5 310:7 314:5
315:5
**process**  19:6 27:19
35:2 36:21 53:24
68:17 69:1,6,25
72:8 74:2,18,19
77:8 80:19 118:3
136:5,7 150:22
163:20 170:12
197:21 198:8
218:12,18 279:2
296:22 297:10
**produce**  18:19
35:5 90:13,14
**produced**  19:1
21:9 36:16,22
46:15 47:13 48:15
48:16 49:9 57:17
253:5
**produces**  118:4
**producing**  48:7
**product**  245:5
**production**  313:15
313:17,22
**productivity**
80:11 91:5 92:2,7

92:19
**products**  219:9
**professional**
269:15 274:10,13
274:16 281:5,17
282:5
**program**  19:16
20:6,7,13 21:24
22:1,4,6 23:5,8
24:13,18 25:5
28:3,4,13 33:7,11
33:17,22 34:1,3,5
34:13 37:7,23
38:19 39:2,2
48:19 50:9,12
51:2,5,20,22 52:7
52:23 53:3,10,16
54:10,15,16,21
55:3,5,12,22 56:3
56:13 59:6 66:6
67:11,20 68:10
69:18 80:6 81:8
81:13,16,20,22
89:2,7 90:10
94:17 95:2 96:22
96:23 99:4,10
102:3,9,19 106:2
106:11 113:11
115:6,6 116:7
117:17,20,25
120:15 122:22
123:7 126:12,13
126:14,14 127:3
129:11 131:10,14
132:5,18,23 136:1
137:15 140:22
143:20,21,22,24
144:9,14 145:1,11
145:17,24 146:7,9
147:11 148:8,12
149:13 150:13

151:16,19 153:11
154:3 156:9,10,23
156:25 168:23
180:17 183:25
189:4 200:13,16
200:22 266:1
290:21 291:5,6
293:23,24 305:7
305:15
**programmatic**
68:20
**programs**  26:8
39:12,15 49:13,21
50:2 63:20 66:1
78:23 79:18 90:7
94:4 99:9 100:25
101:6,8 103:6,24
108:10 111:9,18
120:20 123:21
126:19,24 127:12
127:20,23 128:10
128:11 129:4,7,16
129:20 134:24,25
135:5,5 140:11
144:1 153:14
156:18 164:25
165:13,16 167:17
167:19 168:3,11
176:2 181:4
190:15,25 191:7
196:17 210:14
235:13 238:9,11
238:12,16,19,25
239:5,19 251:9,22
288:10 290:6
293:16,17 301:6
**progress**  92:22
**progressed**  146:2
**project**  29:15
50:23,25 51:11
99:15 102:2,21

112:18 113:6,20
113:21 114:1
124:2 129:18,24
130:7,22 131:2,7
132:13,18,23
134:8,25 135:24
136:4,10,19 137:5
138:15,17,24
140:14,17 142:13
142:17 143:23
144:3 183:17
191:2 288:11
**projection**  118:9
**projects**  107:15
**proliferation**
252:3,10
**promise**  58:19
138:1
**properly**  157:13
**property**  26:23
27:4
**proposal**  30:21,23
30:23 38:25 39:2
52:21 75:19 104:9
**proposals**  39:14
**proposed**  51:10
74:5 76:13
**proposes**  27:20
**protective**  66:7
112:12 114:16
**protects**  219:5
**provide**  20:12
28:11 30:16 34:17
36:8 78:15 100:20
106:12 112:25
113:5 114:1,6,8,19
114:25 115:1
121:7 133:16
135:14 139:10
144:16 162:19
164:18 167:14

[provide - question]

175:6,7 195:12
209:11 301:5
**provided** 12:16
28:22,23 29:4,5
30:20 44:25 67:8
74:24 84:10 86:21
93:10,14 101:1,24
102:25 111:20
117:15 119:18
120:12 121:16
123:21 124:6,13
129:12 134:17
135:7 137:4
140:11 144:9
147:10 154:23
167:17 175:20
178:2 182:3,20
191:8 210:10
267:17 268:2
284:7,8,15 305:19
307:5
**provider** 106:22
212:22
**providers** 103:3
105:4,6,7,15 106:9
166:4 208:24
245:18
**provides** 30:15
119:23 144:5
156:4 158:13
182:23
**providing** 55:21
100:11 117:8
121:10 126:20
127:11 133:11,14
134:4 136:10
137:1 186:20
266:22 267:10,12
301:24
**provision** 67:4
79:13 82:14

119:23 121:2,4,8
139:7 141:9
**psychiatrist**
270:10
**psychiatrists**
105:12
**psychologist**
270:10
**public** 6:3,8,13
13:8 15:16 20:2,9
25:8,11,18 26:13
26:25 27:5,8,20,23
31:2,11 32:9,13
34:5,12,17 35:13
38:10,11 39:21
40:17,20 43:6
44:25 45:13,24
53:9 54:16 55:4
55:21 60:8 63:5,6
64:5 65:6,17,24
66:1 67:3,19 71:4
72:1,16 73:13
78:14,23 88:18
92:6 94:19 99:23
100:8,12 101:4,14
101:24 106:11,22
107:13 109:4,12
109:21 111:10,19
112:24 113:5
114:1 119:22
121:17,24 122:25
123:5,21 124:7
126:20 127:11,19
128:13 129:12
130:15 131:5
132:17 133:9,22
135:7 136:3 137:4
139:7,15 142:15
146:21 150:5
151:18 152:18
154:11 156:8

157:21 160:7,11
161:5,10,20 162:4
162:10,18 164:12
164:23 165:14
169:10,18,25
171:5 173:14,21
174:5,14,22 175:5
176:2 177:9 179:6
179:23 182:20,23
183:24 186:18,20
187:15 189:5,18
189:22 190:9
191:7 204:25
205:3 210:11,13
211:22 215:3
222:11 231:4
235:23 236:9
245:1 247:15
250:7 252:8,19
255:2,6,7 265:23
266:11 272:7
273:16 275:13
276:3,16 277:4,17
278:2,9,12,16
285:3,14 287:4,5
288:4 289:2,21
290:18 292:13,18
293:15 294:3,10
294:11,14 296:9
296:11,18 297:23
298:21 299:19
300:21,23 301:16
301:18,19,25
302:15 303:13
305:20,24,25
306:19 307:6
311:7 312:14
314:10,18 315:15
315:23 316:23
**pull** 17:18 18:16
35:17 42:13 80:14

**pulled** 18:10 21:15
42:12
**pulling** 18:12 19:5
37:3
**purchase** 146:19
**purchased** 200:24
**purchasing** 24:24
**purdue** 1:12
**purpose** 155:4
199:21
**purposes** 31:13
39:18 63:12 65:8
95:15 122:2
134:22 145:17
171:19 185:14
225:22 232:9
236:23 246:24
255:20 295:9
**pursuant** 310:3,6
**put** 30:8 68:24
70:8 107:25
122:23 152:12
162:16,16 193:18
266:6 290:6
291:17 298:17
**putting** 235:13
292:7

**q**

**qualification**
202:21
**qualified** 270:25
311:8
**quality** 112:1,2
**quant** 276:6
**quantify** 276:1,7
**question** 17:24,24
18:2,3 25:24
32:19 46:8 47:4
49:18 71:21 90:24
112:9 125:17,25
126:16 127:17

[question - records]                                                   Page 38

129:10 135:19
143:17 150:3
188:1,10 190:10
194:6,10 200:18
202:16 206:5,20
215:7 219:14,23
220:1 221:11
244:3 247:11
251:11 253:22
266:17 276:25
277:18 287:7
300:18
**questioning**
168:25 189:2
**questions** 13:16
18:23 30:2 40:16
58:14 60:16
104:12 125:12
130:14 138:13
153:25 172:3
192:9,14 211:1,3
221:2 243:23
262:16 282:12,14
283:3,8 292:11
295:2 298:3,3,6,12
300:13 307:20
**quick** 38:22 56:14
63:4 123:24
125:21 132:11
159:4,7,13 160:13
161:15 162:7,19
163:25 165:5,20
167:5 183:14
191:4 262:20
**quickly** 47:23
99:22 262:24
295:15
**quite** 199:20
204:10
**quotas** 218:14

**quotes** 80:15
81:18

**r**

**r** 54:7 68:6,6
**races** 293:8
**raise** 305:10
**raised** 298:8
**ran** 37:5 46:17
47:16 189:12
**range** 164:17
**rate** 80:11 91:5
92:2,7,8,10
**rates** 288:5,5
**reached** 274:23
275:6 279:16
**read** 14:7,9,15,16
58:24 60:1 104:9
111:13 130:12,17
204:23 220:2
221:13 234:5
249:7 254:20
266:19,21 271:8
271:12,22 272:17
277:21 306:11,12
306:23 314:5,6,12
315:5,6,17
**reading** 169:15
199:7 313:19
**reads** 240:24
**ready** 172:2,4
211:17
**real** 91:21
**really** 36:24 46:22
60:3 69:21 78:2
83:24 98:21 110:6
177:11 183:20
185:7 188:14
189:20 194:25
204:18 224:19
289:12

**reason** 86:22
192:2 253:14,24
261:19 271:11
274:25 283:10
307:15 313:14
315:8 316:3
**reasons** 80:10
207:6
**recall** 15:20,25
16:18,19 22:18,20
23:9,15,17 33:7
35:23 36:3,6,18
40:19 59:6 62:12
67:17 77:2,13
79:9 82:12 87:12
104:21 136:3,5,6,6
137:1,6 154:2
174:8,11,15
191:17 201:10,11
202:6 203:9,16,22
204:2,10 227:22
227:24 234:11
235:9,18 280:3
307:14
**receipt** 313:18
**receive** 26:22
232:19 247:12
249:15 268:16
**received** 98:15
138:24 186:10
227:25 230:24
242:23 249:21
268:25 280:3
281:4 282:4
**receiving** 174:9
227:22,24 249:11
258:7
**recess** 88:12 153:4
211:11 262:4
282:22

**recipients** 232:16
303:12
**recognize** 122:8
124:5 158:25
166:10
**recognized** 243:13
243:16,20 244:1
263:11
**recollection** 42:3
82:25 88:24
156:13
**recommendation**
74:15,23
**recommendations**
306:17,20
**record** 11:2,11
12:25 13:5,24
58:17 88:11,14
128:5 138:1 145:4
153:3,6 155:24
170:20 177:4
181:4 188:22,23
188:25 192:23
193:1 211:10,13
220:2 221:13
254:11,12,14
262:2,6 265:17
266:21 277:21
282:20,24 308:7,7
308:8,10 309:3
315:9
**recorded** 180:10
180:17,19 183:15
183:18
**records** 45:3,11,17
106:4 139:15
144:12,15,16
150:12,19 160:12
160:15,17 172:24
189:15 190:2
283:19,20 296:25

297:20,22 298:13
298:14,21 299:9
**recover**  42:19
**recoverable**  43:24
**recovery**  42:10
  103:4 159:20,25
  160:4 163:2,3,6,17
  213:6
**recross**  307:24
**recruit**  152:12
**recruiting**  105:12
**redesign**  92:17,25
  93:21 141:24
**reduce**  142:10
**reduced**  311:14
**reducing**  206:17
**reduction**  202:13
**reed**  3:3 4:11
**reedsmith.com**
  3:6
**refer**  38:13 65:13
  98:5 269:5
**reference**  38:22
  73:18 313:7 314:2
  315:2
**referenced**  186:6
  311:13,18 314:11
  315:15
**referencing**
  263:22 272:11
**referrals**  53:19,25
  55:10,16
**referred**  271:24
**referring**  162:9
  173:17 224:4
  265:18
**refers**  219:2 228:2
  244:4,4 245:18
  254:15
**refill**  143:1

**reflect**  94:23 181:6
  192:24
**reflects**  229:22
**refresh**  19:12
**regard**  55:15
  261:8 284:20
**regarding**  20:12
  40:17 142:17
  144:13 148:11
  169:7,20 176:8
  178:4 193:9
  197:21 200:21
  201:16 202:7
  203:18 204:5
  205:25 206:8
  207:6 208:6
  234:25 260:23
  293:17 310:2,11
**regardless**  56:20
  135:8 210:8
**regards**  285:9
  290:19
**registering**  156:1
**regulation**  222:1
  222:19
**regulations**  222:3
  222:7,15
**regulatory**  306:20
**reimbursed**  93:19
**reimbursement**
  93:13 142:4
**rejected**  76:12
**rejection**  76:16
**related**  39:11 50:1
  50:9 56:19 59:5
  60:1,8 66:11
  78:15 79:12,14
  101:10 103:7
  112:8,25 117:7,17
  120:14,20 139:8
  150:3 187:20

196:16 210:14
  276:7,16 290:21
  297:1 306:3
**relates**  1:11 67:3
  117:7 265:14
  271:4 276:2 277:3
**relating**  235:23
**relation**  237:16
**relationship**  183:6
  210:7 300:19
**relative**  312:2
**release**  235:6
  236:2 264:6
**relevant**  46:23
  283:12
**rely**  134:16
**remain**  262:18
  287:22
**remained**  202:24
**remediation**  46:1
**remember**  18:14
  35:5 41:22 59:4
  61:9 79:2,6 136:8
  136:13 154:5
  157:5 172:22
  176:4 191:14
  192:17 199:7
  224:1 228:11,16
  242:6 269:4
  275:16,20 279:22
  281:1 283:8
  308:18
**rep**  184:13 234:21
**repeat**  18:1 40:16
  180:12 219:25
  238:14,17 266:16
  277:18
**repeated**  219:23
**rephrase**  276:25
  277:19

**report**  7:10 64:17
  167:2 174:19
  175:12,12,13
  189:12,15 228:25
  229:7,22 230:21
  230:24 231:16
  234:24 237:9,12
  242:12 249:5
  250:13 254:15
  255:20,25 256:20
  257:5,17 258:1,21
  259:5 261:9
  303:24 304:3
  306:17,21 307:11
**reported**  164:2,3
  237:14,18 257:10
  260:24
**reporter**  5:17
  13:14 314:7
**reporter's**  5:14
  311:1
**reporting**  176:19
  235:22 256:1,7
  257:1,22 258:8,12
  258:16 305:13
**reports**  39:2
  174:12 230:22
  252:24 254:23
**represent**  26:12
  186:4 187:14
  211:20 215:25
  262:12 265:2
**representation**
  101:14
**representative**
  222:22
**representatives**
  234:22
**represented**
  179:18 189:8

**represents** 95:1
178:10
**request** 75:2 90:6
90:15 192:16
280:4 284:11
315:9,11
**requested** 37:11
119:19 284:17
310:1,6,10
**requesting** 90:6
**requests** 75:4
131:7 132:17
**require** 91:9
170:23
**required** 18:11,15
29:15 38:9 68:19
111:19 113:5
175:5,20 313:25
**requirement**
257:16,25 258:9
258:13,17
**requirements**
256:24 257:3,22
**requires** 245:13
**requiring** 255:3,7
**research** 199:3
**residential** 229:25
251:9,21
**resonated** 231:8
**resources** 64:15
101:17
**respect** 55:4
102:24 128:9
134:23 159:1
189:2 201:6
278:13,17 299:3
**respond** 99:17
305:16
**responders** 99:17
**responding** 98:24

**response** 56:15
123:25 125:21
132:11 159:4,13
160:13 161:15
162:7,20 163:25
165:5,20 167:5
181:15 183:14
191:4 305:6
**responses** 13:22
**responsibilities**
64:9 239:16
**responsibility**
64:13 112:20
113:17 290:25
291:25
**responsible** 49:22
68:13 71:18
111:24 235:13
**responsive** 37:13
**rest** 185:9
**restaurant** 111:25
**restaurants** 115:4
**restrictions**
148:11
**result** 294:3
**resulted** 243:9
**resulting** 211:23
**resume** 63:16
211:17 268:3
269:12
**resurgence** 252:22
254:21
**retail** 271:25
**retained** 5:17
**retention** 283:19
297:6 298:15
**retired** 146:10
**returned** 313:18
**revenue** 24:21
25:2,11 26:13,16
26:19 27:21,24

28:2,2,14 29:9,12
29:13,23 30:8
31:3,5 32:1,16,21
33:14,19 34:4,6,11
55:18 68:9 81:25
83:3 87:15 89:1
90:7 94:24 107:14
108:3,9 109:2
114:20,23 115:10
116:18 117:21,23
119:21 120:11
121:7,15 122:9
125:14 126:4
132:17 137:5,10
138:3,6,21 139:4
139:18,25 141:7
141:18 142:9
168:14,19,23
**reversal** 143:12
**review** 17:11 18:8
19:12 31:20 38:6
47:10 57:19 95:19
122:15 171:25
199:2 212:2,4
310:2,6 313:12
314:1 315:1
**reviewed** 17:15,25
21:11 32:4 34:21
52:21 119:16
204:4,9
**reviewing** 47:18
**revised** 112:19
**revising** 69:3
**rfp** 39:1
**rfps** 39:14
**ricard** 3:16 12:11
12:11
**rice** 2:4 4:10 11:13
11:16 15:6 17:1
**rich** 61:8

**right** 14:7,18 15:3
16:6,16 17:22
18:1,17 23:4 28:5
35:9 38:16 40:7
46:7 48:12 50:14
57:6 60:18,21,23
61:25 62:2 67:1
70:4 72:4,15
77:18 79:1,20
80:20 82:5,10,19
87:22 95:7 96:14
97:7 98:25 99:2
108:14 111:15
112:5 113:3 116:5
116:19 123:4
130:8 131:18
141:14 146:5
147:9 158:1
173:16 175:4
176:15 177:8
186:4 189:1 192:2
192:12 193:8
203:19,23 209:13
215:23 217:16
221:5 224:9 226:1
226:16 228:18
229:1,8 230:7,13
230:18,25 232:13
232:24 233:10,14
234:1,5,18 235:24
236:5,10 237:10
237:21 240:16,22
241:12,19 242:17
242:24 243:6
245:19 246:14
247:3,6,22 248:16
249:5,16 250:16
254:17,25 255:4
255:13 256:2
258:4 260:20
261:10 269:19

272:13 287:10
297:18 299:23
303:7,16 304:21
305:4 308:17
**rise** 288:3,16
291:15
**risk** 166:22 229:19
**rite** 272:25 273:11
273:18 274:17,24
276:22 277:3
278:21
**road** 41:8 44:19
45:18 219:20
**roamed** 185:4
**role** 20:5 32:8 54:1
55:4 56:2 65:17
65:22 68:12 71:7
71:10 72:21 77:1
78:10 96:6 122:14
122:18 163:16
169:25 204:5,24
205:3 217:8 218:9
231:11,24 240:4
245:10 256:10
266:2,3 267:6
271:4,19 274:4,6
274:11 290:18,20
292:3 296:15
**rollout** 93:4
**room** 15:24 166:5
245:15 246:6
**rose** 286:24
**roughly** 43:20
65:1 100:2 117:4
161:7
**routine** 175:2,3
**routinely** 302:1
**rpr** 1:25
**ruler** 110:19
**rules** 12:16 262:17
310:3,7 314:5

315:5
**run** 146:9 153:13
154:10 156:8
167:2 190:15
256:20
**running** 33:18
53:10 141:23
142:3 176:3 200:1
**runs** 110:1
**rural** 229:25

**s**

**s** 313:15 315:8,8
316:3
**safer** 252:4
**safety** 115:2
**salaries** 80:10
121:14 137:8
168:16,20
**salary** 25:9,20
26:10 55:19 108:1
118:9 138:5,20
139:3,9,18 141:12
162:15
**sale** 254:1
**salts** 243:12
**samhsa** 103:2,19
106:7 107:5,16
108:10 149:19
**san** 3:5
**sanitation** 111:25
**saporito** 248:16,18
**sat** 265:3 302:1
**save** 42:14 50:8
51:14 58:20
**saved** 38:7,9,22
39:17 40:5 42:22
52:16
**saving** 43:1 150:23
**saw** 43:3 170:15
179:24 181:16
183:13 188:7

189:15 206:15
271:8 298:19
**saying** 39:17 70:12
76:17 111:7
116:22 131:4
134:11,15 163:4
181:20 191:17
203:21 213:17
219:19 242:7
**says** 70:8 97:16
149:5 176:18
178:7,21 181:16
184:14,15 187:9
195:15 207:3
226:12 229:10,14
229:18 230:13,18
234:13,18 240:12
240:16,22 241:4
243:8 249:4 250:2
251:6 252:2
254:25 258:22
259:4,7,10,24
260:21 269:7
304:11,25 305:5
306:12,14,24
**sboranian** 3:6
**schedule** 176:23
198:13,17 292:7
297:6 298:15
**scheduled** 16:13
**scheduling** 57:24
198:8
**school** 126:13
128:11 129:4,14
129:25 135:5
**schools** 135:15
230:12
**scope** 286:15
**scratch** 41:18,18
**screen** 148:23,25

**screens** 53:18
**se** 284:24
**seachrist** 70:20
71:10 72:22
**seal** 312:6 314:15
315:21
**search** 37:5 46:17
46:18 47:16,24
49:7 56:22 57:3
**seated** 213:16
**second** 3:4 97:16
229:16,17 230:9
244:3 305:5
**seconded** 234:4
**secretaries** 233:2
**secretary** 90:19
**section** 228:23
263:5,8
**sectors** 205:7
**secure** 6:17 171:17
**see** 18:12 31:23,25
32:6 36:15 37:16
39:9 56:5,13
57:16 60:14,22
71:22 82:22 87:11
95:23,25 96:11,15
97:3,19 102:1
109:6 117:1
123:20 124:2,25
125:22 129:21
131:11 132:1,24
136:18,20 138:10
139:14,17 151:5
172:17 184:10
185:18,20,23
187:10 193:3
203:15 251:18
258:23 259:1,5
268:6 282:13
297:19 298:16
299:22 302:2,6,20

303:7 304:1,2,5
305:11 306:4
307:10
**seeing** 199:7
203:10,17 204:2
252:22 254:21
259:16 260:6
264:19 288:3
290:8 307:14
**seeking** 169:22
275:13,23
**seen** 14:9,10 62:5
90:17 124:18
152:21 179:6
182:19 189:22
199:5 202:5,22
206:21 207:2,5
210:18,20 217:3
245:4 271:13,14
291:20 299:8,12
**sees** 151:13
**segment** 292:25
**segments** 294:14
**select** 48:14
**selected** 39:24
**sell** 253:2,10
**selling** 158:20
**sells** 218:20
**send** 19:15
**sending** 239:7
**sends** 51:10 75:9
**sense** 134:12
165:12 192:13
217:21 228:7
**sent** 35:16 51:3
59:13 61:6,7
76:13 128:21
199:6 242:12
246:13 302:17
**sentence** 254:19

**separate** 48:18
49:12,20,24 238:1
**separately** 150:21
238:5
**separates** 93:24
**september** 7:12
36:4 53:4 54:11
178:18 180:23,25
184:9 295:7
303:25 304:13,19
305:14,20 312:17
**septic** 112:2 292:8
**series** 228:5
**serve** 285:13
**served** 285:17
**server** 48:5 284:1
**service** 28:1,7,10
29:9,20 30:13
133:15 149:22
168:12 229:11
**serviced** 277:16
278:1,8
**services** 28:19,22
28:23 29:4,4,25
30:4,14,15,16,19
33:13 34:8,17
40:4 44:25 45:6
45:12,17 50:16,21
52:24 53:18 66:2
66:4,7,7,9,11,15
66:21 67:5,8
68:23 77:16 78:15
79:8,14,21 80:17
81:25 82:3,15
83:15 84:9,10
86:1 87:16 88:19
89:2 92:4 93:9,12
93:13,15,22,23
97:2,11 99:11
100:12,21 101:18
101:22 102:13,25

103:7 106:12
107:8 112:10,12
112:25 114:1,6,14
114:16 117:7
119:24 120:3,13
120:15,22 121:3,7
121:8,9,10,16
123:21 124:6
127:12 133:10,23
134:4 135:15
139:8,11 140:21
140:24 141:10
146:13 147:2
167:15 169:18
172:24 173:12
175:7 177:1,3
182:4,19,24
183:21 186:21
190:21 191:8
193:25 213:7
229:12 233:10
235:13 239:17
240:6 250:20
251:3 252:19
255:3,7 263:23
266:23,25 267:9
267:13,15,17,21
287:16,23 288:25
290:4 296:17
299:4 301:1
**session** 176:19
**sessions** 182:12
**set** 29:19 37:7 50:3
50:4,12 51:4
79:21 83:23 86:24
90:10 92:6 115:2
117:2 149:24,25
155:3,11 312:6
**sets** 218:13
**setting** 69:25 92:7
201:8 217:25

**seven** 58:15 91:18
178:14 225:14
**sewer** 112:2
**sfranklin** 2:20
**sheet** 313:13 315:7
315:10,18 316:1
**sheriff** 155:6
**sheriff's** 154:22
155:2
**shipment** 225:5
258:7
**shipments** 257:5
257:11
**shipped** 223:5,12
223:18
**shirlethia** 2:18
11:19 262:11
**short** 141:22
**shortfall** 27:11
**shortly** 266:13
**shots** 146:18 147:7
150:6,9
**show** 31:7 225:13
**shown** 286:8
313:16
**shows** 203:16,17
**shrugs** 13:23
**shut** 204:14,15
205:23 206:22
207:13
**shutting** 205:25
**sic** 25:15 54:7
63:15
**sign** 244:23 245:11
**signature** 310:5
312:13 313:14
**signed** 314:13
315:18
**significance** 93:8
**significant** 207:15
236:9 252:5,15

signing 313:19
signs 151:2 166:11
similar 13:20
   61:21 150:23
   156:17 165:15
   174:12,20
similarity 61:12
simple 32:19
simply 102:10
   120:19
sincerely 313:21
single 102:9
   103:10 267:3
sir 313:10
sit 43:20 69:10,10
   70:5 154:15
   156:12 174:8
   178:9 184:3 191:6
   276:14 277:1
   278:11 283:11
   284:19
site 41:2 45:14
   55:9 154:18
sites 23:19,21
   44:14 155:17
sits 155:16
sitting 14:11 39:6
   70:3 81:8 82:6
   185:8 205:7
   286:19
situated 155:5
situation 61:21
   133:23
situations 162:23
   164:1
six 55:13,25 56:5
   103:23,23 252:6
skoda 20:1 28:18
   40:16 46:5 53:1
   57:23 62:9 64:20
   65:11 74:24 75:1

75:7 76:12 79:6
   98:8 99:5 110:1
   111:8 145:14
   157:6 170:6
   187:17,17,18,20
   237:6,10,13,16
   276:12 300:2
   303:1
skoda's 57:19
   111:13
slightly 92:11
   276:24
slow 93:3
sm 305:8
small 145:16,19,20
smith 3:3 4:11
snapshot 202:25
sobolewski 151:4
social 66:2 164:20
   268:11,20 269:18
   305:9
socioeconomic
   293:2
sold 197:25 253:5
soldiers 197:6,7
solely 165:1
   267:18,19
solid 50:12 69:17
   112:1 229:17
solutions 176:20
   176:22 177:22
   181:3 189:4 313:1
   316:1
somebody 20:4
   34:7 35:13 42:8
   43:2 51:10 57:10
   59:13 61:6 70:7
   85:10 106:17
   138:16 143:16
   158:3 165:21
   173:24 180:13

183:8,13 204:23
   256:19 307:20
somebody's
   157:16
someone's 158:10
sophisticated 27:2
sorbono 234:20
sorboro 234:13,20
   235:19,20,22
sorry 12:9 22:3
   30:7 40:12 49:14
   49:15 56:9 58:18
   64:23 65:11 66:12
   73:15 85:12 87:19
   87:25 100:5
   104:25 116:11
   117:10 124:12
   127:15 128:1,2
   133:13 135:18
   137:17 154:8
   159:21 160:19
   169:12 171:7
   177:2 178:24
   184:13 185:5
   188:15,17 194:8
   194:16 197:11
   201:5 203:14
   228:20 233:3
   234:10 236:16
   238:14 254:18
   284:12 285:25
   294:8 295:23
   298:23 304:9
sort 37:10 74:10
   76:22 104:5 106:3
   143:3 146:14
   166:13 167:1
   168:15 175:16
   179:8 194:22
   276:24 286:17
   290:6 291:8

sorts 290:9 301:8
sound 145:18
sounded 105:2
sounds 200:24
source 137:10
   190:8
sources 24:16
   25:10 26:13 29:18
   30:13 32:15 33:10
   33:12,21,25 34:2
   57:15 59:19
   114:22 117:25
   121:1 141:6
   168:10 189:14
   190:2
south 2:6 244:12
spacing 290:1
speak 156:21
   199:8
speaking 124:17
   130:25 276:12
speaks 126:3
   140:10 151:9
specialist 128:20
specific 25:5 28:15
   79:24 84:25 86:18
   134:1 136:1 164:1
   164:24 165:13
   169:5 173:11
   176:8 181:4 186:5
   207:3 212:11
   223:4,11,17
   231:15 243:10
   267:9 272:16
   277:2 292:11
   298:3
specifically 21:15
   25:16 27:8 29:24
   33:10 85:12 89:4
   89:12 102:4,5
   105:24 127:13,20

[specifically - substance]

128:25 155:11
162:9,24 169:8
177:20 184:8,20
191:10 207:3
241:1 263:22
267:17 271:4
276:17,23 286:5
290:21 296:17
297:17
**specifics** 93:16
**specified** 311:21
**speculate** 300:7
**speculation**
135:12
**spell** 19:20
**spend** 27:20,24
85:21,22 86:1,20
97:17
**spent** 82:3 87:2
92:4 210:14
**spike** 205:10
**split** 120:7 140:15
**spoke** 53:1 145:13
**sponsored** 128:25
**spreadsheet** 118:5
119:6 139:13
**ss** 311:3
**staff** 19:15,17
24:21,22 35:17
39:8 42:11 44:11
44:13 53:14 54:20
80:9 115:3 118:10
123:16 128:21
142:10 241:20
291:10
**staffing** 68:20
69:19 104:3 291:3
**stages** 104:3
**stand** 110:18
111:3 230:3
237:15

**standard** 28:13
91:8,21
**stands** 226:20
251:12
**star** 54:15 55:3
**stars** 52:6 66:6
102:19 183:25
191:4
**start** 14:18 18:4
41:19 80:12 82:10
82:11,22 128:24
128:24 145:11
174:7 244:19
288:3
**started** 13:10 22:1
22:4,5 23:5 33:6
37:1 41:17 91:17
93:2 94:22 95:6
108:17 154:3
190:18 286:9
288:13 289:10,11
289:17 290:8,10
308:3
**starting** 102:11
**starts** 77:8 184:8
304:24
**state** 11:10 12:24
16:12 25:7 28:9
78:13 92:16 93:24
111:10,20 112:11
112:16,19,21
113:1,11,14,24,25
114:8,16,19,19
115:9 128:25
137:1 138:25
202:11 206:2,7
208:8,23 222:7
226:8 227:4,9,10
228:6 243:19,21
244:5,8,10 256:8
269:17 287:11

288:7,9 300:22
301:19 302:18
311:2,7 312:15
314:10 315:15
**stated** 216:9
234:14
**statement** 215:8
216:6 250:15,21
314:13,14 315:19
315:19
**statements** 249:8
252:9 278:12,17
**states** 1:1 11:7
197:16 198:2
**statewide** 231:16
**station** 154:16
**statistics** 112:4
**status** 148:15
**stay** 82:2 178:6
**stayed** 81:22 202:1
**stds** 112:3
**stenotypy** 311:14
**step** 75:16 257:13
**stephen** 1:25
311:6 312:14
**stepped** 203:4
**steps** 265:23
266:12
**steven** 3:4 11:17
211:19 275:11
**stickler** 308:14
**stieglitz** 4:10
**stop** 106:3 305:1
**storage** 40:11
**store** 49:3 50:1
**stored** 48:2
**straddles** 146:14
**straight** 128:23
**strategies** 42:14
**strategy** 246:12

**street** 1:23 3:4 4:5
158:20 205:13,19
252:4,13
**streets** 60:7
157:25
**strickland** 228:13
228:15
**strictly** 67:2 135:1
139:24
**strike** 24:1 79:3
100:18 120:23
135:23 196:18
197:19 210:9
235:2 286:25
**string** 33:5 96:14
302:3,13
**struck** 61:11
**structure** 67:2
**structured** 132:21
**struggled** 37:4
**struggling** 38:15
**study** 244:7
**subdivisions** 26:22
**subject** 96:11 97:7
226:10 232:22
237:19 287:19
304:5,12
**submit** 18:11
175:11
**submitted** 63:19
**subscribed** 314:10
315:14 316:21
**subsection** 132:2
**subsequent** 82:7
**subset** 145:20
298:25
**substance** 26:7
44:24 48:20 50:20
57:25 66:11 67:4
67:8 78:15 79:8
79:13 93:21

100:11,20 101:10
101:22 102:25
107:6 117:7
119:23 120:2,14
120:20 124:6
125:8 139:8 145:6
147:16 155:9
164:10,15 165:15
166:17,22 167:15
169:8 170:24
171:3 174:2,13
191:8 196:16
228:24
**substances** 155:12
157:2 169:21
186:19 196:20,24
218:15 256:15
257:6
**substantially**
255:12
**subtitled** 227:18
**successful** 166:2
206:17
**sue** 234:13,20
**sued** 209:3 212:9
215:4 272:7,22
273:7,18,23
**suffered** 165:22
**suggest** 58:16
**suggesting** 133:9
221:1
**suggests** 120:11
124:11 178:17
**suicidal** 166:13
**suicide** 166:9
195:25
**suit** 253:1
**suite** 2:12 3:4,17
313:2
**sum** 117:21
299:19

**summa** 156:18,20
**summaries** 39:12
126:12
**summary** 6:14
7:11 121:25 174:4
295:5 304:12
305:14,19 307:2,4
**summer** 126:13
280:16
**summit** 1:12 2:2
6:3,4,6,7,9,11,12
6:14,17,21 7:3,6,8
7:13 11:13 13:8
15:16,22 17:5,8
20:1,9 25:8,11,18
26:13,25 27:5,9,20
27:23 31:2,10,12
32:9,12 34:5,6,8
34:12,17 35:13
38:10,11 39:21
40:17,20 43:6
44:25 45:13,24
53:9 54:16 55:4
55:20 63:5,6,11
64:5 65:5,7,17,23
65:24 67:3,18
71:4 72:1,16
73:13 75:22 76:8
78:14,16,23 88:18
92:6 94:19 95:14
99:23 100:7 101:4
101:14,24 103:1
106:11,22 107:13
109:4,12,20 111:9
111:19 112:24
113:5,25 114:2
119:22 121:17,23
122:1,24 123:5,21
124:6 126:20
127:10,14,18,19
128:13 129:12

131:5 132:17
135:7,13 136:3,9
137:4 139:7,9,14
142:15 146:21
150:5 151:18
152:18 154:3,11
154:14 156:8,25
157:21 160:7,11
161:5,10,19 162:4
162:9,10,18
164:12,23 165:14
169:9,18,25 171:5
171:18 173:13,20
174:5,13,21 175:5
176:2 177:9 179:6
179:23 182:3,20
182:23 183:24
186:18,20 187:15
189:5,18,22 190:9
191:7 199:14
201:17,22 204:5
204:24 210:11,12
210:13 211:21,22
215:3,3 223:6,13
223:19 224:5,12
225:7,21 226:2
227:2,7 231:15
232:8,14 235:6
236:22 237:2
238:2 241:7,23
242:20 243:20,24
244:2 246:23
247:4,15 248:24
250:9 259:17
260:7,17 263:23
264:6,15 265:22
266:11 272:7,7
273:16 275:12,13
276:2,16 277:4,17
278:1,8 284:20
285:5,9,14,18

286:4,10,16 287:4
288:3 289:17
290:13,19 293:12
294:20 295:8
296:9,11,17
297:23 298:21
299:19 300:21
301:16 302:15
303:13 305:20,24
305:25 307:6
**super** 175:10
**superior** 313:1
**supervise** 64:11
107:20
**supervised** 160:23
**supervises** 146:16
**supervision** 144:5
**supervisor** 90:19
90:21 122:22
123:13 137:14
**supervisor's**
137:16
**supplies** 24:24
91:25
**supply** 3:14 12:12
157:4 205:19
210:1 252:4,13
258:7
**support** 53:14
80:16 81:16 89:7
90:7,18,19,19,21
91:25 107:14
108:10 115:18
121:16 238:25
300:23
**supported** 99:12
**suppose** 108:1
**supposed** 129:2
301:4
**sure** 22:8 33:2
53:24 56:18 57:2

77:14 85:24 93:16
98:10 129:9
136:12 137:25
138:12 140:25
141:4 144:15,16
145:2 150:14
153:1 154:25
157:1 159:20
170:2 179:13
190:16 192:18
193:13 195:12
213:18 227:25
266:18,18 267:9
272:20 277:19
281:14 301:3
304:10
**surprised** 22:13
**surrounding**
288:4
**surveillance**
154:20 155:18
**survey** 244:7
**suspicious** 223:1
260:24 261:9
**swear** 12:13
**swing** 39:10
**switched** 308:4
**sworn** 12:17
311:10 314:10,13
315:14,18 316:21
**syndrome** 234:17
**syringe** 19:16 20:7
20:13 21:24 23:5
23:8 24:13,17
33:6,11 34:12
59:5,10 99:12
102:3,21 112:17
112:17 113:10
143:22 144:2,7
145:1 180:16

191:3
**syringes** 24:4
144:19 180:14
294:1
**system** 37:5,10
46:18 51:13 52:18
52:20 59:12,14
176:23 180:10,20
240:14 243:10
256:1,8,9,11 257:1
257:6,23 258:9,13
258:17 273:2
290:7 291:6
294:16 300:23
**systematic** 294:21
**systems** 53:20
112:2 205:9 265:3
267:5 274:1
288:19,20,25
289:2,13,22 290:9
292:8

**t**

**t** 19:22
**table** 184:8 192:22
200:5 205:7 211:3
231:11 265:20
286:19 290:1
**tackle** 294:11
**take** 11:4 13:6,19
31:19 39:9 68:19
75:13 88:4 93:1
95:18 171:24
205:6 211:7 240:7
255:15 258:20
261:25 262:21
265:23 266:12
282:19 290:25
291:1,25 292:15
298:17 303:19
**taken** 1:21 14:4
18:3 57:21 88:12

108:2 211:11
262:4 282:22
311:20
**talk** 13:14 33:4,9
35:1 40:19 41:5
45:24 57:23,25
58:8,12 60:25
63:3 68:7 69:16
69:17 74:17 76:25
100:25 116:19
120:15 128:23
135:22 138:19
177:23,24
**talked** 20:1 21:13
21:23 33:13 35:6
40:16 46:16 47:24
56:4 57:12,13,13
58:5 60:4 62:8
67:18 86:11 88:23
100:24 108:13
138:4 144:8 145:9
153:16 164:5,8
167:12,22 168:9
170:7 190:1,20,23
191:2,9 199:1,13
207:11 262:17
266:9 268:7
288:14
**talking** 13:19
14:19 21:7 23:19
30:4 32:20 33:6
34:20 40:8,24
44:24 46:13 56:8
61:14 62:21 73:25
74:1 85:25 86:7
87:5 88:17 93:2
94:16,25 97:10
98:2,17 99:20
105:8 107:20
114:13 117:4
127:25 128:24

129:17 133:19
138:15 142:12
153:9 154:1 157:7
164:5 165:3,16
170:13 181:21
183:11,20 190:18
191:15 198:25
201:3 205:9,11
207:18 265:4,13
265:16 288:13
289:13,25 290:1,4
298:21,24
**talks** 163:17
**tape** 254:7
**tapped** 81:10
**targeting** 127:20
206:12
**tariq** 2:11 11:24
13:5
**tariq.naeem** 2:14
**task** 199:14,25
200:7,9,11 201:8
205:23 223:23
224:3,5,12 288:7
288:12 289:17
306:6,14 307:12
**taxes** 26:24 27:4
**tb** 66:7
**team** 76:3 123:25
125:21 132:11
159:4,10,13,20
160:6 161:15
165:5,20 167:5
183:14
**teams** 56:15 159:8
160:13 162:7,8,10
162:20 163:25
165:25 191:4
**technically** 195:11
**teleconference** 3:9
3:15 4:3

**teleconferences**
301:23
**telephones**   284:13
**telephonic**   284:9
**tell**   14:22 18:25
24:23 26:18 58:1
58:7 62:14 82:17
82:20 86:17,25
89:10,13,20 90:24
103:9 117:10
121:19 127:6
133:4 140:19
145:4 156:16
184:20 203:5
206:11 248:10
280:20 290:17
**telling**   35:9 92:24
**tells**   220:14
**template**   118:8
**ten**   70:8
**tense**   173:18
**term**   94:6,8,15,18
95:6,7,9 97:21
99:5 133:19,24
166:7 214:22
222:25 225:1
230:6 241:9
**terminated**   183:5
**terminology**   98:21
99:1,2
**terms**   22:11 23:20
24:21,24 37:8
51:5 129:7 148:16
181:11 202:13
207:16 221:20
257:1 259:16
**terrible**   127:17
169:11
**territory**   194:23
**test**   110:5 195:2,10
228:20

**testified**   28:18,21
56:25 63:21
111:13 125:3
130:22 196:14
219:17 223:22
249:11,14,18
264:1,4 267:24
269:19 270:24
271:7 273:5
280:22 283:24
284:15,23 293:21
296:5 300:2
**testify**   19:14
281:11 311:10
**testifying**   60:13
269:24
**testimony**   21:16
58:8 85:24 86:4
111:14 195:4,13
207:23 263:9
281:1 311:12,17
314:6,7 315:6,9,12
**testing**   112:4
**teva**   3:7 12:7
**text**   126:13
**thank**   14:2 31:18
211:5,6 261:22
282:10 283:2
294:7 309:2
**thanks**   21:3
135:21 261:24
**therapy**   132:5
193:24 251:14,16
**thing**   49:11 58:18
67:9 87:6 104:5
108:18 111:5
143:4 166:14
167:2 192:1
194:13 200:23
231:14 291:8
292:5,6 294:8,12

298:11
**things**   18:14 19:13
24:25 33:3 35:4
37:17 38:7,8 39:5
40:18 42:13 46:21
53:21 56:5 57:25
61:17 68:7 69:18
69:21 76:23 83:23
93:18 105:1 111:8
115:5 117:8
118:22 130:12
152:12 163:16
166:11 167:14
172:25 195:11
199:6,7 204:16
216:3 221:22
228:8 283:22
288:17 290:2
291:15 292:14
301:3
**think**   15:23 22:21
28:3,4 36:11,11
40:9,12 41:21
42:13 44:10 46:7
46:22 51:3,23,24
52:16 53:4 59:20
59:24 63:3 67:9
71:13 73:18 74:3
83:5,12 85:15
87:5 88:7 91:7
94:6,10 96:8 99:7
103:16 105:4,5
110:2 111:12
112:5 113:22
114:15 115:19
124:17 125:2
133:12,16 134:9
134:10 140:8,22
143:13 145:20
153:19 154:4,24
156:19,20 160:1

161:22,23 172:4
175:9 177:18
191:13 195:18
205:11 207:15
211:1,4 217:24
220:3 221:14
224:7 235:1,9
238:22 239:6
248:25 249:12
258:23 273:5
280:12 284:14
297:15 308:12,25
**thinking**   18:6
98:22 112:14
**third**   186:25 210:4
248:25 258:21
**thirty**   313:18
**thompson**   96:16
96:20 97:5,16
**thought**   18:20
19:13 22:7 47:13
115:23 120:21
179:20 181:12,20
181:20 187:25
190:17 242:4
250:24 258:6
304:9
**thoughts**   166:13
**thread**   46:12
**threatening**   166:9
**three**   12:7 15:8
16:17 23:13,19
46:3 70:25 73:4
120:8 130:13
159:20 162:5
179:25 182:6
185:18,22 186:23
201:1 280:7,13,14
**throw**   279:10
**throwing**   279:19

thursday   233:9
234:23
tie   276:15,21
time   11:3 16:14
31:19 34:25 35:19
35:21 41:1,5
42:18 43:17 46:5
46:6 53:13 55:2
55:12,16 57:20
62:13,22 63:22
66:3 71:11 72:2,4
72:11 73:6,19
76:12 78:3 92:4
93:14 95:18
100:15,21 104:4
105:11 108:22
113:12,15 116:5
126:25 127:10
137:4 145:13
152:24 170:9
171:24 174:11
176:5 177:11
178:15 184:9
201:7,18 202:8
203:17 211:5
221:4,7,9 222:11
224:11,22 231:3
231:11,12,20,23
235:5 236:9
239:16,25 241:10
241:11 242:24
245:1 262:19
282:11 283:4
286:2,9,13,14,24
287:2,19 289:14
289:16,20,21
296:12 299:10
302:24,25 308:5
311:20
times   15:5 36:24
155:7 178:14

179:10,15 185:18
201:1
title   20:22 63:25
64:4 172:23 173:2
titled   6:3,7,12 7:9
31:10 65:5 121:23
255:19
tobacco   128:16
today   15:1 21:4,16
33:4 156:12
177:16 184:3
195:13 212:13
237:7 238:13,16
238:21 272:12
276:14 277:1
278:11 283:3,6,11
284:19 293:12,22
296:6
today's   11:2 21:12
told   18:4,8 58:5
108:19 153:19
167:22 191:15
273:15
tomma   302:3
tone   235:18
tonia   68:4,5
tons   41:16
tonya   1:17 5:7 6:5
6:16,19 11:5
12:15,20 13:1
63:10 107:19
171:15 211:14
225:18 262:7
282:25 295:12
311:9 313:8 314:4
314:9 315:4,13
316:20
top   28:5 58:23
96:1 109:1 126:8
132:1 172:6
229:10 302:13

304:1,16 306:13
topic   290:16
295:25
topics   295:14
torok   4:14
total   85:3 91:16
117:19,23 118:13
188:6 259:7,20
totals   178:7
184:14
touched   167:11
toxicology   252:24
254:23
track   68:7 142:19
142:19 171:5
230:17
tracking   53:23
tracks   142:16
traffic   14:5,6
train   105:13
trained   106:18
129:1 142:25
training   99:16
103:3 105:3,6,17
106:6,9,23 128:21
128:22,25 136:9
270:13,16,20
271:3
tran   4:13
transcribe   13:17
transcribed   13:13
311:15 314:7
transcript   5:1
310:3,6,9,11
313:11,12 314:5
314:12 315:5,11
315:17
transcription
311:16
transferred   45:14

transition   83:22
92:16 211:8
transitioning
290:7
transmitted   81:19
transport   154:23
transportation
24:25 53:21
treat   131:15 149:6
151:19 192:5
193:5,22 196:7
280:25
treated   146:6
150:19 168:2
169:9 174:13
186:11 187:1,5
189:24
treatment   51:22
66:21 94:3 103:13
105:20,21 106:10
123:24 124:9,13
130:5 131:8,20
132:2,18 134:6
145:8 150:12
159:23 163:19
170:21 186:21
189:18 191:8
193:10 243:10
270:21 288:14
306:19
treatments   191:20
trends   243:6,8,10
tried   42:14 195:3
221:20 256:22
294:24
trigger   71:23,23
truck   298:17
true   139:8 215:5
215:15 226:5
231:21 233:19
237:4 242:21

245:22 247:9
253:2,6,11 255:8
257:7,18 259:17
260:17 272:25
276:20 278:20
311:16
**trust** 308:15,22
**truth** 311:10,11,11
**try** 13:14,16 21:3
49:8 57:3 67:2
77:6 159:21,22
**trying** 40:12 47:1
102:10 110:25
139:22 165:12,12
181:2 192:12
200:3 295:24
297:15
**tuberculosis** 112:3
**tucker** 2:11 11:21
11:25
**tuckerellis.com**
2:14,15
**tuesday** 247:16
**turn** 31:21 35:4
47:9 184:7 187:8
228:23 262:24
263:4,20 267:23
282:12 303:15,17
303:21 304:4,21
305:4
**turned** 47:20 57:7
**turning** 65:15
**twelfth** 4:5
**twice** 187:4
**twinsburg** 13:2
**two** 13:19 16:20
17:12 22:24 24:11
64:25 70:23 76:7
93:17 103:17,18
105:1 107:15
130:11,16,24

147:6 152:14
161:22 239:19
243:23 280:7
**tylenol** 193:12
**type** 48:20 56:22
57:24 66:15,21
67:4 143:10
144:17 148:13,15
155:10,21 159:16
167:2 189:15,23
208:23 286:19
291:4
**types** 39:4 69:21
93:13 148:11
156:17 167:16
169:7,21 191:20
191:24 193:9
205:17 208:6
288:7
**typically** 28:6
91:23 247:18
**typing** 37:1

**u**

**u** 54:7 68:6
**uh** 13:23,23 23:6,6
26:6,9 28:20 30:5
31:22 32:22 34:23
40:22 45:4 53:6
62:10 75:6 77:7
77:10 82:1 99:21
102:18 103:20
109:17 110:10,17
111:24 116:21
117:9 120:17
121:13 123:23
124:1,4 132:9,12
139:16 141:8,11
142:14 144:11
151:11 153:12
162:17 163:2
164:9 165:7,10

176:21 180:15
181:5 186:1
187:11 192:3
229:3,9 230:23
242:14 274:8
279:4 285:23
296:1,4,8,10,10
299:2,5 303:18,23
304:17
**uhs** 13:23
**ultimate** 74:12,13
**ultimately** 69:4
75:9,19 119:1
**umbrella** 300:22
**unambiguous**
13:22
**underneath** 132:4
**understand** 18:21
23:19 31:6 36:25
39:17 47:5 80:19
82:5 85:7 95:7
98:12 104:11
110:17 125:5
179:14 181:19
187:18 189:21
195:4 210:6 215:2
218:12
**understanding**
37:9 80:5 86:6
95:5 139:23 141:5
150:18 177:1
208:22 209:24
214:5,14,25 218:7
257:19,21 273:22
308:1
**understood** 95:9
98:13,16
**unique** 178:7,10
178:19 179:25
180:17 181:1,16
181:25 188:7

**unit** 28:11 91:3
141:22
**united** 1:1 11:7
197:16 198:2
**units** 20:16,17
90:13
**university** 243:21
244:5,8,10,14
268:12,21
**unspent** 88:17,25
89:16 91:1 94:4,7
94:15,23 97:18
**untreated** 194:3
194:17 195:24
**upcoming** 118:11
**updated** 268:2
**updates** 203:9
301:24
**upper** 168:7
**upwards** 167:24
**usa** 3:8
**use** 20:22 26:2
28:7,15 49:25
51:9 60:4 61:4
86:21 94:14 98:21
99:3,4,6 109:8
118:24 137:16
146:13,16,17
156:1 177:15
211:23 221:6,8
229:21 231:3
236:8 248:21
**users** 252:3
**uses** 158:3 196:11
**usually** 308:13
**utilized** 81:3

**v**

**v** 1:12 2:18 313:6
314:3 315:3
**vacant** 251:8,21

vacation  42:18
  45:23
various  26:22
  29:18 33:25 34:2
  38:13 39:12,15
  64:12 66:1 93:13
  143:25 154:17
  168:10 204:12
  205:5 231:17
  294:21 301:5
vegetables  201:2
venture  146:12
venues  201:13
verbal  13:22
veritext  4:12,13
  313:1,7 316:1
veritext.com.
  313:17
version  269:7
versus  22:15 23:2
  117:8 145:6 171:9
  192:22 207:25
vice  306:15
video  8:1 254:5,5
videographer  4:14
  11:1 12:2,13
  88:10,13 153:2,5
  188:21,24 211:9
  211:12 254:4,10
  254:13 262:2,5
  282:20,23 308:6,9
  309:2
videotaped  1:16
  11:4
vietnam  197:7,8
view  129:24
  132:22 250:6
  252:7
virtual  4:12,13
visit  6:20 167:5,9
  181:8 225:19

226:11 228:2
visitation  28:8,10
  28:12 50:10 66:6
visits  53:23 165:6
  165:20 180:3,7,11
  180:25 181:7,18
  183:14 227:19
  228:5
vitae  6:6 63:10,17
vital  112:4 244:23
  245:11
vivitrol  147:13
  150:6 151:3
volume  156:13
  230:15

w

wait  193:1 213:18
waiting  251:10
waived  313:19
walgreens  273:6
  273:11,19 274:19
  274:25 276:22
  277:3 278:23
walk  157:11 166:8
walmart  2:16
  11:20 262:12
  272:8 273:10,18
  274:11,24 276:17
  277:2 278:13
want  13:10 18:3,7
  35:1 41:4 48:13
  57:1 58:12 63:2
  67:1 70:8 81:11
  81:17 86:13,16
  94:8 101:23 117:9
  126:18,23 136:12
  137:25 140:9
  141:1 145:9
  155:21 157:1,4,13
  165:2 169:14
  171:24 179:13

189:21 190:15
  219:19,22 221:4
  221:10 238:17,23
  239:4 249:23
  262:24 268:9
  282:12 283:5
  299:23 300:7
  308:11
wanted  22:8 33:2
  33:7 39:25 56:13
  69:16,17 88:21
  89:23 140:25
  153:13 171:7
  177:21 181:17
  192:10,25 228:9
  238:23 256:13
warnings  217:9
washington  2:19
  4:5
waste  50:12 69:17
  112:1 221:4
watched  204:23
water  112:2 157:4
watson  3:8,9 12:8
way  13:17 17:4
  23:25 38:16 44:8
  50:3 51:3 61:16
  71:22 79:20 80:5
  83:22 89:14 90:10
  107:25 112:23
  117:2 118:16,17
  120:10 125:19
  127:9 130:20
  132:22 139:1
  142:10 150:4
  155:3 165:25
  166:19,20 187:24
  193:21 194:10
  200:18 201:25
  206:20 208:11
  221:4,7,9 228:21

230:11,17 251:24
  252:12 255:14
  256:15 289:7
  299:18,24
ways  120:8 130:17
  130:24 193:4
wc.com  4:6
we've  34:20 60:17
  60:18,19,20 62:8
  79:9 86:6 92:15
  93:6,17 94:21
  96:8 98:1 99:19
  100:24 105:11
  115:14,20 128:20
  137:11 144:8
  161:9,11 164:4
  165:16 166:8
  167:11 168:9,24
  177:12 190:1,17
  199:13 237:7
  238:15 291:20
  294:24 308:20
web  256:8
week  92:13 147:6
  180:24 203:2
weekend  157:9
weekly  203:13,14
  303:24 304:18
weeks  54:23
  103:23,23
went  36:21,23
  57:15 72:8 88:16
  124:24 128:22
  136:7 158:9
  183:13 199:19
  224:8,11,22,23
  279:2
west  41:3 301:7
whatsoever
  274:25

| | | | |
|---|---|---|---|
| **whereof** 312:5 | 92:13,21 99:15 | **y** | 260:10 266:6 |
| **wic** 44:17 | 108:3 109:1 | | 271:15,18 272:5 |
| **widely** 243:12,16 | 115:19 185:4 | **y** 73:10 233:6 | 272:23 280:20 |
| 263:11 | 188:1 228:9 | **yeah** 44:11,14,22 | 289:2 291:24 |
| **williams** 3:16 4:4 | 245:14 246:4 | 49:16,19 52:4 | 294:25 304:2 |
| **wish** 76:22 | 268:12,20 288:8 | 58:12 59:4 60:12 | 307:25 308:25 |
| **withdrawal** | 301:16 | 61:8,18,24 62:24 | **year** 15:25 22:18 |
| 234:15 | **worked** 117:13 | 63:2 64:16 65:25 | 27:11,16 29:16,17 |
| **withhold** 27:13 | 140:16 145:16 | 66:8 68:1 69:4,23 | 30:22,22 35:23 |
| **witness** 2:3 12:14 | 175:24 217:25 | 76:7,11,19 77:22 | 40:13 41:22 53:3 |
| 51:17 108:20 | 226:8 | 77:22,24 79:10 | 56:4 62:15 68:21 |
| 111:12 130:18 | **worker** 164:20 | 85:14 88:1,9 | 68:22,25 72:20 |
| 188:19 192:10 | 269:18 | 89:10 90:20 91:20 | 76:21 77:20 79:22 |
| 194:11 195:7,17 | **working** 42:24 | 92:13 95:4 103:16 | 79:22 80:4,12,14 |
| 195:20 211:6 | 45:25 49:4 68:14 | 104:10 105:12 | 80:20 81:1,5,9 |
| 219:11,13,24 | 105:25 251:9 | 108:8,20 110:2,14 | 82:13,17,17 83:5,9 |
| 220:8,13,16,19,22 | 289:20 305:7,15 | 116:13 118:8 | 83:12,22 84:6,25 |
| 220:25 221:12 | **works** 26:4,7 | 119:8 123:15 | 85:1,5,20 87:2 |
| 249:19 254:8 | 54:16 139:23 | 127:16 128:3 | 88:25 89:5,17,22 |
| 261:24 289:15 | 142:11 | 131:10,19 135:16 | 90:4,18 91:17,18 |
| 296:1,4 298:1 | **wrapping** 306:16 | 135:21 140:3 | 91:23 93:1,4 |
| 307:9 311:9,13,15 | **wright** 243:21 | 141:3 143:24 | 94:17,20 95:2 |
| 311:18 312:5 | 244:5,8,10 | 148:5 149:16 | 99:4,10 104:1,24 |
| 313:8,11 314:1,4 | **write** 30:21,22 | 154:4 157:5,12 | 109:8 115:16 |
| 314:11 315:1,4,15 | 52:20 104:25 | 159:9,11 163:17 | 118:11,25 122:10 |
| **witness's** 192:13 | 216:21 245:22,24 | 164:3 165:13 | 123:1 136:6,9,12 |
| 310:2 | 257:16 270:25 | 168:6 169:11,13 | 136:13,15,22 |
| **witnesses** 42:1 | 277:15 | 173:10 175:2 | 140:13 141:23,23 |
| 199:14 | **writes** 151:6 | 176:25 177:6,25 | 142:1,6 149:17 |
| **witnessing** 241:1 | **writing** 133:2 | 180:13 181:8,14 | 151:19 154:7 |
| **witness'** 313:14 | **written** 38:25 62:5 | 185:1,3 189:20 | 156:20 162:11 |
| **woman** 201:22 | 62:11,17,23 | 190:6 191:11 | 169:10 183:2 |
| **women** 265:14 | 112:19 149:4 | 193:25 194:7,11 | 197:16 203:6 |
| **word** 94:22 146:16 | 217:9 281:12 | 195:17,20 196:4 | 227:15 234:17 |
| 147:14 236:2 | **wrong** 74:4 77:20 | 203:25 205:4 | 250:3 268:16,24 |
| 304:2 | 84:8 85:16 110:21 | 206:6,13 207:16 | 293:24 297:9 |
| **words** 206:9 | 206:11 282:6 | 208:25 219:16 | **year's** 97:18 |
| 245:21 | **wrote** 102:20 | 220:10 227:25 | **years** 20:10 52:25 |
| **work** 24:22 53:14 | 257:11 | 228:12,13,19 | 61:23 62:17 63:20 |
| 68:17 74:6 80:16 | | 233:6 234:10 | 64:25 67:22,23 |
| 84:1 87:9 92:12 | | 239:18 242:9 | 70:23 71:12,19 |
| | | 248:6 249:16 | |

73:2,3,4 77:18
80:7,25 81:9 82:8
82:12 83:2 86:2,8
86:11,14,18,19
87:1,3 89:21
90:25 93:3 94:25
100:2 104:7,8
118:15,16 154:22
162:6 169:2
170:15 199:5
200:12 204:10
214:1 224:8
228:18 260:23
288:15,15
**york**   3:12,12
**young**   297:16
**yvette**   6:16 137:8
137:12,22 138:7
138:16,20 139:2
140:15 171:16
172:6

**z**

**zach**   11:21
**zachary**   2:12
**zachary.adams**
  2:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.