1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION
3

    IN RE: NATIONAL          )
4   PRESCRIPTION             )   MDL No. 2804
    OPIATE LITIGATION        )
5   _____  )   Case No.
                             )   1:17-MD-2804
6                            )
    THIS DOCUMENT RELATES  )   Hon. Dan A.
7   TO ALL CASES           )   Polster
8
              THURSDAY, JULY 19, 2018
9
      HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                    – – –
12          Videotaped deposition of Gary L.
13   Boggs, held at the offices of The Cochran
14   Firm, D.C., 1100 New York Avenue, NW, Suite
15   340, Washington, DC, commencing at 9:05 a.m.,
16   on the above date, before Carrie A. Campbell,
17   Registered Diplomate Reporter and Certified
18   Realtime Reporter.
19
20
21                    – – –
22
           GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
25

```
 1              A P P E A R A N C E S :
 2
        SPANGENBERG SHIBLEY & LIBER LLP
 3      BY:  WILLIAM HAWAL, ESQUIRE
                 whawal@spanglaw.com
 4      1001 Lakeside Avenue East
        Cleveland, Ohio 44114
 5      (216) 600-0114
 6
        LEVIN PAPANTONIO THOMAS MITCHELL
 7      RAFFERTY PROCTOR, P.A.
        BY:  TROY RAFFERTY, ESQUIRE
 8               trafferty@levinlaw.com
                 (VIA TELECONFERENCE)
 9      316 South Baylen Street
        Pensacola, Florida 32502
10      (850) 435-7000
11
        MORGAN & MORGAN
12      BY:  SARAH FOSTER, ESQUIRE
                 sarahfoster@forthepeople.com
13               (VIA TELECONFERENCE)
        76 South Laura Street, Suite 1100
14      Jacksonville, Florida 32202
        (904) 398-2722
15      Counsel for Plaintiffs
16
        COVINGTON & BURLING LLP
17      BY:  ANDREW STANNER, ESQUIRE
                 astanner@cov.com
18               AMBER M. CHARLES, ESQUIRE
                 acharles@cov.com
19      850 Tenth Street, NW
        Washington, DC 20001-4956
20      (202) 662-6000
        Counsel for McKesson
21
22      WILLIAMS & CONNOLLY LLP
        BY:  COLLEEN MCNAMARA, ESQUIRE
23               cmcnamara@wc.com
        725 Twelfth Street, N.W.
24      Washington, DC 20005
        (202) 434-5331
25      Counsel for Cardinal Health, Inc.
```

```
 1       REED SMITH LLP
         BY:  SHANNON E. MCCLURE, ESQUIRE
 2            smcclure@reedsmith.com
         Three Logan Square
 3       1717 Arch Street, Suite 3100
         Philadelphia, Pennsylvania 19103
 4       (215) 851-8100
         Counsel for AmerisourceBergen
 5
 6       JONES DAY
         BY:  SARAH G. CONWAY, ESQUIRE
 7            sgconway@jonesday.com
         555 South Flower Street, 15th Floor
 8       Los Angeles, California 90071-2300
         (213) 489-3939
 9       Counsel for Walmart
10
         PELINI, CAMPBELL & WILLIAMS LLC
11       BY:  PAUL B. RICARD, ESQUIRE
              pbricard@pelini-law.com
12       8040 Cleveland Avenue NW, Suite 400
         North Canton, Ohio 44720
13       (330) 305-6400
         Counsel for Prescription Supply,
14       Inc.
15
         ZUCKERMAN SPAEDER LLP
16       BY:  DANIEL P. MOYLAN, ESQUIRE
              dmoylan@zuckerman.com
17       100 East Pratt Street, Suite 2440
         Baltimore, Maryland 21202-1031
18       (202) 778-1800
         Counsel for CVS Indiana, LLC, and
19       CVS RX Services, Inc.
20
         ARNOLD & PORTER KAYE SCHOLER, LLP
21       BY:  JOHN CELLA, ESQUIRE
              John.Cella@arnoldporter.com
22       601 Massachusetts Avenue, NW
         Washington, DC 20001-3743
23       (202) 942-5000
         Counsel for Endo Pharmaceuticals
24       Inc., and Endo Health Solutions Inc.
25
```

```
 1       MARCUS & SHAPIRA LLP
         BY:  SCOTT D. LIVINGSTON, ESQUIRE
 2           livingston@marcus-shapira.com
         301 Grant Street, 35th Floor
 3       Pittsburgh, Pennsylvania 15219-6401
         (412) 338-4690
 4       Counsel for HBC
 5
         KIRKLAND & ELLIS, LLP
 6       BY:  PAUL J. WEEKS, ESQUIRE
             paul.weeks@kirkland.com
 7       655 15th Street, NW, Suite 1200
         Washington, DC 20005
 8       (202) 879-5000
         Counsel for Allergan Finance, LLC
 9
10       JACKSON KELLY PLLC
         BY:  WILLIAM J. AUBEL, ESQUIRE
11           william.j.aubel@jacksonkelly.com
             (VIA TELECONFERENCE)
12       500 Lee Street East, Suite 1600
         Charleston, West Virginia 25301
13       (304) 340-1146
         Counsel for Miami-Luken
14
15       MORGAN, LEWIS & BOCKIUS LLP
         BY:  JANE DUDZINSKI, ESQUIRE
16           jane.dudzinski@morganlewis.com
             (VIA TELECONFERENCE)
17       77 West Wacker Drive
         Chicago, Illinois 60601-5094
18       (312) 324-1000
         Counsel for Teva Pharmaceuticals USA, Inc.,
19       Cephalon, Inc., Watson Laboratories,
         Inc., Actavis LLC, Actavis Pharma,
20       Inc., f/k/a Watson Pharma, Inc.
21
         MORGAN, LEWIS & BOCKIUS LLP
22       BY:  MATTHEW R. LADD, ESQUIRE
             matthew.ladd@morganlewis.com
23           (VIA TELECONFERENCE)
         101 Park Avenue
24       New York, New York 10178-0060
         (212) 309-6000
25       Counsel for Rite Aid
```

1

VIDEOGRAPHER:

2          DANIEL HOLMSTOCK,

           Golkow Litigation Services

3

                    - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        INDEX
                                              PAGE
APPEARANCES.................................  2
EXAMINATIONS
   BY MR. HAWAL..............................  10

                     EXHIBITS

        No.         Description                 Page

3

4        (Exhibits attached to the deposition.)

5    CERTIFICATE..................................100

6    ACKNOWLEDGMENT OF DEPONENT...................102

7    ERRATA......................................103

8    LAWYER'S NOTES..............................104

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          VIDEOGRAPHER:  We are now on

2     the record.  My name is Daniel

3     Holmstock.  I'm the videographer for

4     Golkow Litigation Services.

5          Today's date is July 19, 2018,

6     and the time is 9:05 a.m.  This video

7     deposition is being held at the law

8     offices of The Cochran Firm at 1100

9     New York Avenue, Northwest, Suite 340,

10    in Washington, DC, in the matter of

11    In Re: National Prescription Opiate

12    Litigation.  It's pending before the

13    United States District Court for the

14    Northern District of Ohio, Eastern

15    Division.

16         Our deponent today is Mr. Gary

17    Boggs.

18         Will counsel present please

19    identify themselves and whom they

20    represent.

21         MR. HAWAL:  William Hawal for

22    plaintiffs.

23         MR. MOYLAN:  Daniel Moylan,

24    Zuckerman Spaeder, for CVS.

25         MR. LIVINGSTON:  Scott

1    Livingston for defendant HBC.

2           MS. MCCLURE:  Shannon McClure,

3    Reed Smith, AmerisourceBergen Drug

4    Corporation.

5           MR. WEEKS:  Paul Weeks,

6    Kirkland & Ellis, for Allergan

7    Finance.

8           MR. RICARD:  Paul Ricard,

9    Prescription Supply, Inc.

10          MS. CHARLES:  Amber Charles

11   from Covington for McKesson as well as

12   the witness Gary Boggs.

13          MR. STANNER:  Andrew Stanner

14   from Covington on behalf of McKesson.

15          MS. CONWAY:  Sarah Conway from

16   Jones Day for Walmart.

17          MR. CELLA:  John Cella from

18   Arnold & Porter for Endo and Par.

19          MS. MCNAMARA:  Colleen McNamara

20   from Williams & Connolly for Cardinal

21   Health.

22          VIDEOGRAPHER:  Via telephone?

23          MR. LADD:  Matthew Ladd of

24   Morgan Lewis representing Rite Aid.

25          MS. DUDZINSKI:  Jane Dudzinski

```
1          of Morgan Lewis representing

2          Defendants Cephalon, Teva, USA,

3          Actavis, LLC, Actavis Pharma, and

4          Watson Laboratories.

5                  MR. AUBEL:  Bill Aubel of

6          Jackson Kelly representing

7          Miami-Luken, Inc.

8                  MR. RAFFERTY:  Troy Rafferty on

9          behalf of the PEC.

10                 MS. FOSTER:  Sarah Foster from

11         Morgan & Morgan for plaintiff.

12                 VIDEOGRAPHER:  If there's no

13         other present, the court reporter is

14         Carrie Campbell, who will now

15         administer the oath.

16

17                 GARY L. BOGGS,

18  of lawful age, having been first duly sworn

19  to tell the truth, the whole truth and

20  nothing but the truth, deposes and says on

21  behalf of the Plaintiffs, as follows:

22

23                 DIRECT EXAMINATION

24  QUESTIONS BY MR. HAWAL:

25         Q.    Mr. Boggs, good morning.
```

1      A.      Good morning.

2      Q.      Will you please state your full

3  name?

4      A.      Gary Lee Boggs.

5      Q.      My name is Bill Hawal.  I'm

6  here to take your deposition.

7              Have you ever had your

8  deposition taken before?

9      A.      I have.

10     Q.      Approximately how many times?

11     A.      Dozens.

12     Q.      As you know, if at any time you

13  don't understand my question or you need

14  clarification, please let me know.

15              Is that agreeable?

16     A.      I will.

17     Q.      And if you need to go back

18  during the course of this deposition to

19  correct any answers, feel free to do that.

20              All right?

21     A.      Thank you.

22     Q.      At the conclusion of the

23  deposition, I'm going to assume that you were

24  able to understand my questions if you

25  provided an answer.

1          Is that fair?

2     A.     It is.

3     Q.     All right.  Who are you

4  currently employed with?

5     A.     I'm employed by McKesson

6  Corporation.

7     Q.     And how long have you been

8  employed with McKesson?

9     A.     I've been employed since

10  November of 2013.

11     Q.     All right.  And what position

12  do you hold with McKesson?

13     A.     I'm the senior director of

14  regulatory affairs.

15     Q.     And have you held that position

16  the entire time that you've worked for

17  McKesson?

18     A.     I have.

19     Q.     All right.  Can you describe

20  for us the job responsibilities that you have

21  in that capacity?

22     A.     I can.

23          I'm responsible for managing

24  the east region, which is, for the most part,

25  essentially the -- well, east of the

1    Mississippi, the distribution centers that

2    are located in that region, with the

3    exception of the Chicago distribution center.

4                    I have a team of about 13

5    individuals that report either directly or

6    indirectly to me that -- I'm responsible for

7    overseeing the day-to-day implementation of

8    our controlled substance monitoring program.

9         Q.    All right.  Before you joined

10   McKesson in November of 2013, did that job

11   position exist at McKesson, to your

12   knowledge?

13        A.    It did not.

14        Q.    All right.  It was created to

15   accommodate your hiring?

16        A.    It was created to accommodate

17   an expansion or an evolution of our program,

18   and there was more positions created.

19        Q.    And who is your direct

20   supervisor?  Who do you report to?

21        A.    I report to the senior vice

22   president of regulatory and compliance.

23        Q.    And who would that be?

24        A.    The position is vacant at the

25   moment.

1    Q.    And how long has it been

2   vacant, approximately?

3    A.    The end of June of this year.

4    Q.    And who occupied that position

5   prior to June, end of June of this year?

6    A.    Lina Brenner.

7    Q.    And did she retire or did she

8   leave for some other reason, if you know?

9    A.    She left McKesson for

10  another -- another job.

11    Q.    And do you know where she is

12  and who she is working for?

13    A.    I do not.

14    Q.    All right.  Is your job focused

15  on efforts to have McKesson comply with laws

16  and regulations which require it to maintain

17  effective controls to prevent the diversion

18  of controlled substances such as opioids into

19  the illicit marketplace?

20    A.    It is.

21    Q.    All right.  And were you hired

22  in 2013 because it was deemed that McKesson's

23  performance in that capacity was lacking?

24         MR. STANNER:  Objection to the

25    form.

1      THE WITNESS:  I don't agree

2      with the characterization of that, no.

3  QUESTIONS BY MR. HAWAL:

4      Q.    Why were you hired if it

5  wasn't -- if it was up to -- up to par, if

6  the performance was up to par in terms of

7  that responsibility?

8      MR. STANNER:  Objection to the

9      form.

10     THE WITNESS:  I believe that

11     the company was expanding the

12     positions in the regulatory compliance

13     program, created that new position, I

14     applied for it and was subsequently

15     hired.

16  QUESTIONS BY MR. HAWAL:

17     Q.    Was it your job to try and

18  improve the company's performance in terms of

19  complying with the federal laws and

20  regulations that relate to the diversion of

21  controlled substances?

22     A.    I believe that part of my job

23  is to continually monitor the trends and make

24  sure that our program is contemporary, yes.

25     Q.    Well, do you believe that one

1    of your job responsibilities and goals was to

2    improve on McKesson's performance in

3    comparison to what it had been in the past in

4    terms of preventing diversion and complying

5    with federal laws and regulations?

6         A.    I think that my job is to

7    always look to -- ways to improve our

8    program.

9         Q.    Do you believe that your job --

10   your hiring was intended to accommodate that

11   or accomplish that?

12        A.    I don't know what the

13   individual's mind was when they decided to

14   pick that position.

15        Q.    Who hired you?

16        A.    Don Walker.

17        Q.    Is he still with the company?

18        A.    He is not.

19        Q.    And what was his position when

20   you were hired in 2013?

21        A.    He was the senior vice

22   president of distribution operations for US

23   pharma.

24        Q.    As I understand it, prior to

25   joining McKesson in 2013, you were an

1  employee of the Drug Enforcement Agency, DEA?

2       A.    I was an employee of the Drug

3  Enforcement Administration, yes.

4       Q.    And for what period of time?

5       A.    From 1985 until the end of June

6  of 2012.

7       Q.    And what positions had you held

8  for the DEA?

9       A.    I was -- throughout the entire

10 time I was a special agent.  I held positions

11 as a special agent, as a group supervisor, as

12 a unit chief and as an executive assistant.

13      Q.    And how long had you been an

14 executive assistant?

15      A.    I was an executive assistant

16 beginning in January of 2016 until I retired

17 from the Agency at the end of June of 2012.

18      Q.    And who did you report to or

19 who supervised you in that capacity?

20      A.    Joseph Rannazzisi.





 3      Q.      Have you met with other

 4   pharmaceutical distributors other than

 5   McKesson in your capacity as an executive

 6   assistant for DEA?

 7      A.      I believe I did, yes.

 8      Q.      Do you recall who -- what other

 9   companies you met with?

10      A.      I believe I might have had a

11   meeting with representatives from Cardinal.

12   I don't recall any others.









2 QUESTIONS BY MR. HAWAL:

3      Q.     You've been designated by

4 McKesson's counsel to be a representative of

5 the company for purposes of today's

6 deposition as the person most knowledgeable

7 concerning McKesson's interactions with the

8 DEA regarding distribution of controlled

9 substances, including compliance, regulatory

10 and administrative actions, communications

11 and penalties.

12            Do you understand that to be

13 the case?

14      A.     I do.

15      Q.     And are you the person at

16 McKesson that is most knowledgeable about

17 those subject matters?

18      A.     I believe I'm knowledgeable

19 about them, yes.

20      Q.     What did you do to become

21 knowledgeable about those matters as it

22 relates to what occurred at McKesson prior to

23 you joining the company in November of 2013?

24      A.     I've had meetings with counsel,

25 preparation, to prepare myself.

1    Q.    What else have you done, if

2 anything, to prepare yourself and become

3 knowledgeable about those subjects prior to

4 November of 2013?

5    A.    I reviewed various documents,

6 PowerPoint presentations.

7    Q.    And documents relating to what

8 time period?

9    A.    I believe 2007 or so to the

10 present.

11    Q.    Did you review any documents

12 that predated 2007?

13    A.    I don't recall.

14    Q.    Did you speak with anyone at

15 McKesson about the subject matters in order

16 to familiarize yourself with what had been

17 occurring at McKesson prior to you joining

18 the company?

19    A.    I did not.

20    Q.    What is the volume, approximate

21 volume, of materials that you've reviewed?

22    A.    There were several documents,

23 PowerPoint presentations.  I'm not sure how

24 to describe the volume.

25    Q.    Well, you say "several

1    documents."  Is that more or less than five?

2          A.      More.

3          Q.      More or less than ten?

4          A.      More.

5          Q.      More or less than 20?

6          A.      Probably more.

7          Q.      More or less than 30?

8          A.      I don't know at that point.

9          Q.      Did you have any role in

10   gathering those documents?

11         A.      I did not.

12         Q.      They were provided to you by

13   counsel?

14         A.      They were.





17     Q.     Were you involved -- you

18  mentioned that you were part of one meeting

19  in 2006 when you were with DEA, one meeting

20  with McKesson.

21          Did you ever have any reason to

22  correspond in writing with McKesson when you

23  were a DEA employee?

24     A.     I did not.

25     Q.     Did you ever have any role in

1    creating or reviewing the content of any

2    written communications on behalf of DEA that

3    was sent to McKesson?

4         A.     I did not.

5         Q.     According to the Congressional

6    record for the May 8, 2018 hearing of the

7    Congressional Subcommittee on Oversight and

8    Investigations relating to opioid -- the

9    opioid epidemic and concerns about

10   distribution and diversion, that there were

11   meetings between DEA and McKesson in 2005 and

12   2006.

13              Are you aware of that

14   transcript or aware of that hearing

15   referencing two meetings in 2005 and 2006?

16        A.     I'm aware of the hearing, yes.

17        Q.     All right.  Do you recall that

18   there was reference to a meeting in 2005 and

19   2006 between McKesson and DEA?

20        A.     I do not recall that

21   specifically from the hearing.

22        Q.     You mentioned previously that

23   you were part of the meeting in 2016.  Do you

24   recall that there was also a meeting in 2005

25   between DEA and McKesson?

 1          A.      I was not.  At the Drug

 2    Enforcement Administration, I was not in the

 3    Office of Diversion Control in 2005, so I'm

 4    not aware of that meeting.

 5          Q.      When did you become part of the

 6    Office of Diversion and Control?

 7          A.      January of 2006.

 8          Q.      Have you seen any records at

 9    McKesson that relate to a meeting in 2005

10    with DEA?

11          A.      Not that I recall.





20    Q.      What is diversion?

21            How do you define the term

22    "diversion" as it relates to controlled

23    substances?

24    A.      I would define diversion as an

25    act of removing controlled substances from

 1    legitimate channels to illegitimate channels.

 2         Q.    And that -- was that something

 3    that the DEA was invested in trying to

 4    prevent in the early, mid and late 2000s?

 5              MR. STANNER:  Objection to the

 6         form.

 7              THE WITNESS:  It was.

 8    QUESTIONS BY MR. HAWAL:

 9         Q.    Were substantial efforts

10    devoted to that goal?

11              MR. STANNER:  Objection to the

12         form.  Objection to outside the scope

13         of the notice.

14              THE WITNESS:  I believe that

15         there were some -- a fair amount of

16         efforts to try to deal with the scheme

17         of rogue Internet pharmacies during

18         that time frame.

19    QUESTIONS BY MR. HAWAL:

20         Q.    And those efforts were -- was

21    it communicated to McKesson and other

22    distributors at that time that the DEA was

23    indeed focused upon that problem?

24         A.    I believe that there were at

25    least two letters written by Joseph

1  Rannazzisi that addressed that topic, yes.

2     Q.    And were those letters directed

3  to pharmaceutical distributors because it was

4  well-recognized at that time that there was

5  an ongoing opioid crisis across the United

6  States?

7     A.    I believe that it was

8  recognized that there was a criminal scheme,

9  the rogue Internet pharmacy schemes, and

10  those efforts were trying to curb that and

11  prevent that scheme from flourishing.

12     Q.    Well, aside from there being a

13  scheme, was there a recognized opioid crisis

14  across the country that was resulting in

15  addiction and fatalities?

16          MR. STANNER:  Objection to the

17     form.  Objection to the notice.

18          THE WITNESS:  I believe that's

19     the case, yes.

20  QUESTIONS BY MR. HAWAL:

21     Q.    When did DEA first recognize

22  that there was an opioid crisis in the United

23  States?

24          MR. STANNER:  Objection to the

25     form.  Objection to the notice.

1          THE WITNESS:  I believe that
2     the opioid crisis -- the federal
3     government recognized that through the
4     CDC, not through the Drug Enforcement
5     Administration.
6  QUESTIONS BY MR. HAWAL:
7     Q.     And when did you become aware
8  that that was the fact?
9          MR. STANNER:  Objection to the
10     form.  Objection to the notice.
11          THE WITNESS:  I don't recall
12     specifically when they -- the CDC made
13     that announcement.
14  QUESTIONS BY MR. HAWAL:
15     Q.     Well, do you recall generally
16  was it prior to 2000 or shortly after the
17  year 2000?
18     A.     It was a fair amount after
19  that.
20     Q.     When you say "a fair amount,"
21  what do you mean by that?
22     A.     Several years.
23     Q.     And were Mr. Rannazzisi's
24  letters and the meetings that DEA had with
25  McKesson and other distributors prompted by

1    DEA's recognition that the diversion of

2    pharmaceutical opioids was occurring and

3    contributing to the opioid crisis or

4    epidemic?

5                    MR. STANNER:  Objection to the

6          form.  Objection.  Outside the scope

7          of the notice.

8                    THE WITNESS:  I think that that

9          would be fair assessment, yes.

10   QUESTIONS BY MR. HAWAL:

20         Q.    Those were statements that were

21   communicated to McKesson and other

22   distributors by -- through Mr. Rannazzisi's

23   letters, true?

24                    MS. MCCLURE:  Objection to

25         form.

1               THE WITNESS:  Could you repeat

2        the question?

3    QUESTIONS BY MR. HAWAL:

4        Q.     Yes.

5               Those concerns were

6    communicated via Mr. Rannazzisi's letters to

7    McKesson and other distributors, true?

8               MR. STANNER:  Objection to the

9        form.

10              MS. MCCLURE:  Same.

11              MR. STANNER:  Objection to the

12       notice.

13              THE WITNESS:  What concerns are

14       you referring to?

15   QUESTIONS BY MR. HAWAL:

16       Q.     I'm referring to the concerns

17   that McKesson and other distributors were not

18   implementing effective controls in order to

19   prevent the diversion of controlled

20   substances into the illicit marketplace.

21              MR. STANNER:  Objection to the

22       form.

23              THE WITNESS:  As I recall, the

24       letters were a reminder to the

25       distributors what their regulatory

1      obligations were in identifying and

2      reporting suspicious orders.  And the

3      letters also provided some guidance in

4      terms of potential red flags that they

5      should be aware of to look at in

6      knowing their customer.

7  QUESTIONS BY MR. HAWAL:

8      Q.    Well, why was McKesson required

9  to receive a reminder of its obligations?

10          MR. STANNER:  Objection to the

11      form.

12          THE WITNESS:  Those letters

13      were sent to all distributors, not

14      just McKesson.

15  QUESTIONS BY MR. HAWAL:

16      Q.    Why were all distributors

17  required -- or why did they require reminders

18  of their obligations under federal law and

19  regulations with respect to preventing the

20  diversion of controlled substances?

21          MR. STANNER:  Objection to the

22      form.

23          MS. MCCLURE:  Objection.

24          THE WITNESS:  I believe that

25      during that time frame that the rogue

1    Internet pharmacy schemes were a

2    relatively new scheme to both law

3    enforcement and to the health care

4    industry, and it was sent out as a

5    reminder of potentially evolving red

6    flags that they should be cognizant of

7    in fulfilling their obligations to

8    report suspicious orders.

9    QUESTIONS BY MR. HAWAL:





21          MS. MCCLURE:  And, Bill, while

22      we're on just a quick pause, if I

23      could just clarify through the record

24      that an objection for one stands for

25      an objection for all so I don't

1      keep --

2               MR. HAWAL:  No problem.

3               MS. MCCLURE:  -- interposing my

4      objections unnecessarily.

5               MR. HAWAL:  Understood.  Thank

6      you.

7               MS. MCCLURE:  Thank you.

8  QUESTIONS BY MR. HAWAL:

9       Q.    The DEA did not have a meeting

10  with all distributors, true?

11              MR. STANNER:  Objection to

12      form.

13  QUESTIONS BY MR. HAWAL:

14       Q.    In 2006?

15              MR. STANNER:  Objection to the

16      form.  Objection to the notice.

17              THE WITNESS:  Not that I'm

18      aware of.

19  QUESTIONS BY MR. HAWAL:

20       Q.    The meetings that you're aware

21  of that occurred in 2006 were with --

22  specifically with McKesson and Cardinal?

23       A.    I don't recall specifically

24  when the meeting with Cardinal was.  It may

25  have been 2006.  It may have been at another

 1   time frame.

 2        Q.     All right.  But those are the

 3   only two meetings that you recall since you

 4   joined the Office of Diversion and Control?

 5               MR. STANNER:  Objection to the

 6        form.

 7   QUESTIONS BY MR. HAWAL:

 8        Q.     In 2006 or thereabouts?

 9               MR. STANNER:  Objection to the

10        form.  Objection to the notice.

11               THE WITNESS:  There were

12        meetings with other registrants.

13        There were meetings with -- at that

14        time what was HDMA, the health care

15        industry trade -- or association.

16        There were several meetings.

17   QUESTIONS BY MR. HAWAL:

18        Q.     What were the meetings with

19   HDMA about?

20               MR. STANNER:  Objection to the

21        form.  Objection.  Outside the scope

22        of the notice.

23               THE WITNESS:  They were about a

24        wide variety of different things.

25        About attempts -- pending proposed

1          legislation, regulations, obtain --

2          looking for clarity in the

3          regulations.  Several different

4          topics.

5     QUESTIONS BY MR. HAWAL:

6          Q.     Were most of the meetings in

7     2006 that you were aware of focused primarily

8     upon efforts to prevent diversion of

9     controlled substances?

10          MR. STANNER:  Same objections.

11          THE WITNESS:  I would say -- in

12          those particular instances, yes.

13     QUESTIONS BY MR. HAWAL:

25          Q.     And can you describe for us

1    what your understanding is of what a show

2    cause order is?

3         A.     A show cause order issued by

4    the Drug Enforcement Administration is the

5    beginnings of an administrative procedure

6    against a registrant for the registrant to

7    show why the registration should or should

8    not be revoked.







16  QUESTIONS BY MR. HAWAL:

17       Q.     You previously referred to

18  letters by Joseph Rannazzisi, the Deputy

19  Assistant Administrator of DEA's Office of

20  Diversion Control, to McKesson.

21              Do you recall that?

22       A.     I do.

23       Q.     Was Mr. Rannazzisi at the time

24  one of your supervisors?

25       A.     He was my supervisor, yes.

1        Q.      And in 2006, he sent a letter

2   to McKesson on September 27, 2006.

3               You're aware of that?

4        A.      He sent that letter to all

5   distributors.

6        Q.      All right.  Including McKesson?

7        A.      Including McKesson.

8        Q.      And you've looked at that

9   letter in preparation for your deposition

10  today?

11       A.      I have.

12              (McKesson-Boggs Exhibit 1

13       marked for identification.)

14  QUESTIONS BY MR. HAWAL:

15       Q.      Sir, handing you what has been

16  marked as Plaintiff's Exhibit 1 for purposes

17  of your deposition is a four-page letter

18  dated September 27, 2006, which is actually

19  addressed to DBS Trading, Inc., in

20  Cincinnati.

21              But do you recognize that this

22  letter is, in fact, the same letter that

23  would have gone out to all distributors at

24  that time?

25              MR. STANNER:  Objection to the

1    form.

2         MS. MCCLURE:  Would you just

3    mind making just a note perhaps of the

4    Bates number on the document for

5    purposes of the transcript so there's

6    no --

7         MR. HAWAL:  Sure.  Well, this

8    one does not have a Bates number.

9    This is not part of the production.

10        MS. MCCLURE:  Okay.

11   QUESTIONS BY MR. HAWAL:

12        Q.    Have you had a chance to look

13   at the letter?

14        A.    I have.

15        Q.    Do you recognize this letter as

16   the letter that had gone out to all

17   distributors from the DEA on September 27,

18   2006?

19        A.    I do.

20        Q.    And this would have been a

21   letter that would have been sent to and

22   received by McKesson approximately at that

23   time?

24        A.    Around that time frame, yes.

25        Q.    Were you aware at the time that

1   this letter was being sent?

2        A.     I was.

3        Q.     Did you have any involvement

4   into its content?

5                MR. STANNER:  Objection.

6        Outside the scope of the 30(b)(6)

7        notice.

8                MR. HAWAL:  Excuse me, but

9        before we go on, how can this be

10       outside the scope since it's

11       communication between DEA and

12       McKesson?

13               MR. STANNER:  Sure.  And this

14       deposition is a corporate deposition

15       of him as a representative of

16       McKesson.  So to the extent you're

17       asking him to speak in his personal

18       capacity about his time at DEA, I

19       think it's outside the scope of this

20       notice.  There will be a fact

21       deposition.

22               MR. HAWAL:  Well, I'm simply

23       trying to put things in context.

24               MR. STANNER:  I understand.

25               MR. HAWAL:  Okay.  Thank you.

1          MR. STANNER:  I'm just trying

2     to preserve the issues.

3   QUESTIONS BY MR. HAWAL:

4     Q.    I can't recall if you answered

5   my question, but did you have any role in

6   contributing to the content of this letter?

7     A.    I did not.

8     Q.    Was it -- did you see it before

9   it was sent out?

10         MR. STANNER:  Same objection.

11         THE WITNESS:  I believe I did,

12     yes.

13   QUESTIONS BY MR. HAWAL:

14     Q.    Did you have any disagreement

15   with its content or make any recommendations

16   to Mr. Rannazzisi as to any revisions to the

17   letter?

18         MR. STANNER:  Same objections.

19         THE WITNESS:  Not that I

20     recall.

21   QUESTIONS BY MR. HAWAL:

22     Q.    Do you recall whether or not

23   this letter was prompted by DEA's frustration

24   that certain distributors were not

25   effectively preventing the diversion of

1   controlled substances, especially opioids, as

2   required by the Controlled Substances Act?

3                MR. STANNER:  Objection to the

4        form and the notice.

5                THE WITNESS:  I believe that it

6        was sent out to help ensure that

7        distributors were complying with their

8        obligations in order to help prevent

9        diversion.

10  QUESTIONS BY MR. HAWAL:

11       Q.    Was it also sent out because of

12  DEA's recognition that certain distributors

13  were not complying with their obligations

14  under the law and federal regulations?

15               MR. STANNER:  Same objections.

16               THE WITNESS:  I believe that

17       was the case, yes.

18  QUESTIONS BY MR. HAWAL:

19       Q.    And was that one of the reasons

20  that it was sent to McKesson?

21               MR. STANNER:  Same objection.

22               THE WITNESS:  It wasn't

23       specifically sent as being done

24       specifically to McKesson or any other

25       company.  It was done to send out to

1    all distributors as a reminder.

2    McKesson was not a focus specifically

3    for this letter to go out.  It was

4    sent out to all distributors.

5  QUESTIONS BY MR. HAWAL:

12    MR. STANNER:  Objection to the

13    form.

14  QUESTIONS BY MR. HAWAL:

15    Q.    Given that scenario and those

16  circumstances, was it your expectation or was

17  it your understanding the DEA in sending this

18  letter to McKesson was informing it of its

19  obligations under the Controlled Substances

20  Act because of the determination and finding

21  that it had not been complying with its

22  obligations?

23    MR. STANNER:  Objection to the

24    form and notice.

25    THE WITNESS:  It was sent out

1          to all the distributors as a reminder

2          of their obligations to help DEA in

3          its efforts to prevent diversion of

4          controlled substances.

5    QUESTIONS BY MR. HAWAL:

6          Q.    Do you believe that this letter

7    should have informed McKesson during this

8    time period of its obligations under the

9    Controlled Substances Act with respect to the

10   prevention of diversion of controlled

11   substances?

12          MR. STANNER:  Continuing

13          objections.

14          THE WITNESS:  I do.

15   QUESTIONS BY MR. HAWAL:

16          Q.    Did the DEA through this letter

17   intend to communicate to distributors,

18   including McKesson, some guidance on what

19   circumstances may indicate diversion by a

20   pharmacy customer to an illicit entity or

21   person?

22          MR. STANNER:  Same objections.

23          THE WITNESS:  I do.

24   QUESTIONS BY MR. HAWAL:

25          Q.    In this September of 2006

1  letter, did Mr. Rannazzisi also warn

2  distributors, including McKesson, that if

3  they failed to comply with their legal

4  obligation to effectively prevent diversion,

5  that they could be the subject of criminal

6  and civil penalties?

7          MR. STANNER:  Same objections.

8          THE WITNESS:  I believe that's

9      the case, yes.

10  QUESTIONS BY MR. HAWAL:

11      Q.    And just one distributor that

12  uses its DEA registration to facilitate

13  diversion can cause enormous harm, true?

14          MR. STANNER:  Same objections.

15          THE WITNESS:  It would depend

16      on the facts and circumstances.

17  QUESTIONS BY MR. HAWAL:

18      Q.    Well, that's what

19  Mr. Rannazzisi pointed out to the

20  distributors via this letter, true?

21      A.    That's what's in the letter,

22  yes.

23      Q.    And did Mr. Rannazzisi find it

24  necessary to follow up with another letter to

25  distributors on December 27, 2007?

1           MR. STANNER:  Objection to the

2      form.  Objection to the notice.

3           THE WITNESS:  I'm aware of that

4      letter, yes.

5           (McKesson-Boggs Exhibit 2

6      marked for identification.)

7   QUESTIONS BY MR. HAWAL:

8      Q.    Sir, handing you what has been

9   marked as Exhibit 2 for purposes of your

10  deposition is a letter dated December 27,

11  2007, this time directed to Masters

12  Pharmaceutical, Inc.

13           Do you recognize this letter?

14      A.    I do.

15      Q.    And is this a letter that would

16  have been sent to all pharmaceutical

17  distributors at or around December 27, 2007?

18           MR. STANNER:  Objection to the

19      form.

20           THE WITNESS:  It would have.

21  QUESTIONS BY MR. HAWAL:

22      Q.    And it would have been sent to

23  and received by McKesson at or around this

24  time frame?

25      A.    That's correct.

1    Q.    Was it determined at DEA that

2  it was necessary, again, to remind

3  distributors, including McKesson, of their

4  legal obligations under the Controlled

5  Substances Act to maintain effective controls

6  against the diversion of controlled

7  substances?

8         MR. STANNER:  Objection to the

9      form.

10        THE WITNESS:  It was.

11  QUESTIONS BY MR. HAWAL:

12    Q.    Why?

13    A.    There was a --

14        MR. STANNER:  Objection to the

15      form.  Objection.  Outside the scope

16      of the notice.

17        THE WITNESS:  During this time

18      frame, there was a continual problem

19      with the rogue Internet pharmacies and

20      we wanted to try to help prevent

21      diversion emanating out of that

22      particular scheme.  And we wanted to

23      continue reminding the registrants who

24      were supplying these pharmacies of

25      their obligations in order to help

1    stem the tide against those

2    distributions.

3    QUESTIONS BY MR. HAWAL:

20    (McKesson-Boggs Exhibit 3

21    marked for identification.)

22    QUESTIONS BY MR. HAWAL:

23    Q.    Sir, I'm handing you what I've

24    marked as Plaintiff's Exhibit 3 for purposes

25    of this deposition.

1                    Is that the settlement and

2    release agreement that was entered into

3    between McKesson and the Department of

4    Justice and the DEA?

5                    MS. MCCLURE:  While Mr. Boggs

6         is reading that, would you please

7         indicate for the record the Bates

8         number that appears on the first page

9         of the document?

10                    MR. HAWAL:  I am sorry.  Bates

11        number is MCKMDL00409289.

12                    MS. MCCLURE:  Thank you.

13   QUESTIONS BY MR. HAWAL:

14        Q.    Sir, is this the settlement

15   agreement that was entered into at that time?

16        A.    I believe it is, yes.

17        Q.    And McKesson agreed to pay a

18   fine of $13,250,000 as a part of that

19   settlement?

20        A.    It did.

21        Q.    In addition, McKesson agreed to

22   institute a compliance program to detect and

23   prevent diversion of controlled substances?

24        A.    That was part of the agreement,

25   yes.

1        Q.      Is that program described as

2    the -- is it described in a compliance

3    addendum?

4        A.      I believe it is.

5                (McKesson-Boggs Exhibit 4

6        marked for identification.)

7    QUESTIONS BY MR. HAWAL:

8        Q.      Sir, handing you what's been

9    marked as Exhibit 4.  Feel free to take a

10   look at it and ask you whether or not you

11   recognize that as a true and accurate copy of

12   the compliance addendum that was entered

13   into, which does not have a Bates number?

14       A.      This is not a compliance

15   addendum from 2008.

16       Q.      When is it?  When is that one?

17       A.      This is the most recent one.

18       Q.      And when was the most recent

19   one entered?

20       A.      It was -- we signed on

21   January 17, 2017.

22       Q.      What were the general terms or

23   provisions of the compliance addendum in

24   2008?

25       A.      There was an agreement to

1    maintain effective controls against

2    diversion, a controlled substances monitoring

3    program, and it outlines that agree -- in the

4    agreement.

5        Q.      And did the DEA communicate to

6    McKesson at that time that it intended or

7    expected McKesson to comply with the terms of

8    that addendum agreement and its new CSMP?

9        A.      I believe that's the case, yes.

19       Q.      And as a part of that

20   settlement, did McKesson promise that it

21   would discharge its legal obligations

22   regarding the prevention of the diversion of

23   controlled substances?

24       A.      I believe that to be part of

25   the terms of the agreement, yes.

1          Q.        And that would apply to all of

2    its distribution centers?

3          A.        All of the distribution centers

4    that handled controlled substances, yes.





2  QUESTIONS BY MR. HAWAL:

3      Q.      In terms of the expectations

4  that were communicated to McKesson as a part

5  of this settlement in 2008, do you have any

6  basis to say that McKesson would not have

7  been clearly informed of what its obligations

8  were as a part of that settlement in terms of

9  the prevention of diversion of pharmaceutical

10 controlled substances, including opioids?

11          MR. STANNER:  Objection to the

12      form.

13          THE WITNESS:  I think that they

14      were informed as to what the terms of

15      the agreement were and what their

16      obligations were as a registrant.

17 QUESTIONS BY MR. HAWAL:



17 QUESTIONS BY MR. HAWAL:

18     Q.    During that time period, from

19 2008 to 2013, were most of the communications

20 on behalf of the DEA to McKesson about its

21 failure to adhere to the 2008 settlement

22 agreement and its own CSMP communicated

23 through the US Department of Justice?

24         MR. STANNER:  Objection to the

25     form.

1                THE WITNESS:  Could you --

2        could you repeat the question?

3                MR. STANNER:  Counsel, just not

4        to interrupt you, it's been going

5        about an hour, so when you hit a

6        decent point.

7                MR. HAWAL:  Well, let me just

8        finish up this question.

9                MR. STANNER:  Of course, yeah.

10   QUESTIONS BY MR. HAWAL:

21                MR. HAWAL:  Take a break.

22                VIDEOGRAPHER:  The time is

23        10:04 a.m., and we're going off the

24        record.

25          (Off the record at 10:04 a.m.)

1    VIDEOGRAPHER:  The time is

2    10:18 a.m., and we're back on the

3    record.

4  QUESTIONS BY MR. HAWAL:

17    (McKesson-Boggs Exhibit 5

18    marked for identification.)

19  QUESTIONS BY MR. HAWAL:

20    Q.    Sir, handing you what has been

21  marked as Plaintiff's Exhibit 5 bearing Bates

22  number 00409224.

23    Have you seen this -- has this

24  letter made its way to you following its

25  receipt by McKesson's counsel from the

1    Department of Justice?

2              MR. STANNER:  For the record,

3         this is Bates number MCKMDL00409224.

4              MR. HAWAL:  Oh, I'm sorry.  I

5         was looking at the wrong page.

6              THE WITNESS:  I've seen this

7         document, yes.

8    QUESTIONS BY MR. HAWAL:











15          MR. STANNER:  So, Counsel, just

16     to clarify for the record --

17          MR. HAWAL:  I'm sorry.

18          MR. STANNER:  -- your version

19     of this document is double-sided and

20     the exhibit that we have is

21     single-sided, so we don't have

22     even-numbered pages.

23          MR. HAWAL:  Let me do this.

24     Let's take a break.

25          MR. STANNER:  To clarify, I

1          think we have all the pages.  I think

2          they're just numbered differently.

3               MR. HAWAL:  Ah.  Okay.

4     QUESTIONS BY MR. HAWAL:

5          Q.    Sir, do you have a page 15?

6          A.    I don't have a page 14.  I have

7     a page 15.

8          Q.    All right.  Well, I'm going to

9     refer you to page 15.

10         A.    Okay.

11         Q.    Very last sentence.

12              MR. STANNER:  And the Bates

13         numbers are correct, so maybe just use

14         the Bates numbers instead of page

15         numbers.

16    QUESTIONS BY MR. HAWAL:



12      THE WITNESS:  I do not have

13  that page.

14      MR. HAWAL:  You don't?

15      MR. STANNER:  No, we do not

16  have -- so maybe the Bates numbers are

17  not consistent.  It doesn't appear the

18  letter has all of the substance.  So

19  if you want to take a break, we can

20  take a break.

21      VIDEOGRAPHER:  Off the record,

22  Counsel?

23      MR. HAWAL:  Let me do this.

24  Let me just try and make this simpler.

25

1    QUESTIONS BY MR. HAWAL:

2         Q.    Reading from page 16, which is

3    00409239 -- I'm going to pass it to you after

4    I ask the question.

5         A.    Okay.

6         Q.    So --

7              MR. STANNER:  Actually,

8         maybe -- I'm sorry, Counselor, and I

9         really don't mean to interrupt you,

10        but since this is the exhibit, maybe

11        we can work from the exhibit version

12        which is different -- numbered

13        differently.

14             MR. HAWAL:  Let me see if it

15        corresponds with what I have.

16             Let's take a break.

17             MR. STANNER:  Sure.

18             VIDEOGRAPHER:  The time is

19        10:28 a.m., and we're going off the

20        record.

21         (Off the record at 10:28 a.m.)

22             VIDEOGRAPHER:  The time is

23        10:31 a.m., and we're back on the

24        record.

25

1    QUESTIONS BY MR. HAWAL:











19    QUESTIONS BY MR. HAWAL:

20         Q.    And in response to these

21    charges, McKesson agreed in April of 2015 to

22    pay a $150 million penalty, true?

23         A.    It was part of the settlement

24    agreement, yes.

25         Q.    And did it agree again to

1 change its practices regarding the prevention

2 of diversion of prescription opioids?

3          A.     I believe that was the case,

4 yes.

5          Q.     Did you agree that changes were

6 warranted?

7                 MR. STANNER:  Objection to the

8          form.  Objection.  Outside the scope

9          of the notice.

10                THE WITNESS:  I would agree

11         that McKesson was evolving their

12         program to be contemporary with

13         today's environment and laws and

14         regulations.

15 QUESTIONS BY MR. HAWAL:

16         Q.     Well, while McKesson may have

17 been evolving its programs, the law wasn't

18 evolving, was it?

19                MR. STANNER:  Objection to the

20         form.

21 QUESTIONS BY MR. HAWAL:

22         Q.     The legal responsibilities that

23 McKesson had were consistent from, when,

24 1970, to the present day?

25                MR. STANNER:  Objection to the

 1          form.  Objection.  Outside the scope

 2          the scope.

 3                   MR. HAWAL:  Well, I'm

 4          responding to his answer.

 5                   Go ahead.

 6                   THE WITNESS:  The laws were,

 7          but there were different diversion

 8          trends that occurred that in and of

 9          themselves had different red flags

10          that required evolution and -- to stay

11          contemporary with those evolving

12          trends.

13     QUESTIONS BY MR. HAWAL:

14          Q.    Well, the evolution of

15     McKesson's adherence to the laws went from

16     requiring a fine of 13 million in 2008 to a

17     fine of 150 million in 2014 because of its

18     failures to adhere to the terms of a

19     settlement agreement and the promises that it

20     made to the Drug Enforcement Administration

21     and the Department of Justice, true?

22                   MR. STANNER:  Objection to the

23          form.

24                   THE WITNESS:  I believe that

25          they were two different settlement

1    agreements that involved two different

2    sets of circumstances.

3  QUESTIONS BY MR. HAWAL:

4    Q.    Well, we agree that McKesson

5  made promises to the Department of Justice in

6  2008, true?

7    A.    It entered into a settlement

8  agreement that had various terms of that

9  settlement agreement, yes.

10    Q.    Terms that McKesson promised it

11  would adhere to as a part of its settlement

12  of the charges that were brought against it

13  by the Department of Justice in 2008 and

14  before, true?

15          MR. STANNER:  Objection to the

16    form.

17          THE WITNESS:  I believe that's

18    the case, yes.

19  QUESTIONS BY MR. HAWAL:

5    QUESTIONS BY MR. HAWAL:

6        Q.      Were you proud of the work that

7    the DEA was doing between 2006 and the time

8    that you left the DEA as it related to

9    efforts to prevent the diversion of opioids

10   and to try and reign in the opioid crisis?

11               MR. STANNER:  Objection.

12          Outside the scope of the 30(b)(6)

13          notice.

14               THE WITNESS:  I have been proud

15          of the work that I've done at the DEA

16          throughout the course of my entire

17          career.

18   QUESTIONS BY MR. HAWAL:

19       Q.      And some of the work that you

20   were directed to do, at least during that

21   time period, related to efforts to prevent

22   the diversion of opioid pharmaceutical

23   products into the illicit marketplace, true?

24               MR. STANNER:  Same objection.

25               THE WITNESS:  That would be

1    true, yes.

2   QUESTIONS BY MR. HAWAL:

3        Q.    Since 2014 -- well, since --

4   since you started with McKesson, have you had

5   any interactions with your former colleagues

6   that were involved in the investigation of

7   McKesson between 2008 and 2013 --

8             MR. STANNER:  Objection to the

9        form.

10  QUESTIONS BY MR. HAWAL:

11       Q.    -- such as Mr. Rannazzisi?

12            MR. STANNER:  Objection to the

13       form.

14            THE WITNESS:  I did not have

15       interactions with Mr. Rannazzisi

16       regarding the most recent settlement.

17  QUESTIONS BY MR. HAWAL:

18       Q.    Well, have you spoken to him at

19  all between the point in time when you

20  started with McKesson until today?

21       A.    I have.

22       Q.    Under what circumstances?

23       A.    Just personal time, you know.

24       Q.    You still consider him a

25  friend?

1        MR. STANNER:  Objection to the

2    form.

3        THE WITNESS:  I do.

4  QUESTIONS BY MR. HAWAL:

5    Q.    What about David Schiller, have

6  you spoken with him?

7        MR. STANNER:  Objection.

8    Outside the scope of the notice.

9        THE WITNESS:  I believe the

10    last time I spoke with him was at a

11    presentation that McKesson gave

12    regarding its controlled substances

13    monitoring program.

14  QUESTIONS BY MR. HAWAL:

15    Q.    Did you ever communicate with

16  either of them since you joined McKesson that

17  in your view McKesson's anti-diversion

18  efforts prior to 2013 were woefully

19  inadequate or words to that effect?

20    A.    I did not.

21    Q.    You deny doing so?

22    A.    Absolutely.

23    Q.    Are you familiar with the term

24  "drug diversion migration"?

25        MR. STANNER:  Objection.

1          Outside the scope of the notice.

2               THE WITNESS:  No.

3   QUESTIONS BY MR. HAWAL:

4        Q.    You're not familiar with the

5   term "drug migration"?

6               MR. STANNER:  Same objection.

7               THE WITNESS:  No, I'm not.

8               MR. STANNER:  And objection to

9        the form.

10  QUESTIONS BY MR. HAWAL:

11       Q.    Has McKesson ever discussed

12  with DEA the subject of drug diversion or

13  drug -- not drug diversion, but drug

14  migration?

15       A.    I'm not sure what context

16  you're defining drug migration.

17              (McKesson-Boggs Exhibit 6

18       marked for identification.)

19  QUESTIONS BY MR. HAWAL:

20       Q.    I'm handing you what I've

21  marked as Plaintiff's Exhibit 6.  It appears

22  to be a PowerPoint presentation of McKesson

23  dated 2014 entitled "Prescription Drug Abuse,

24  The National Perspective," 00407451.

25              Have you ever seen this

1    PowerPoint presentation or a printed version

2    of it as you're looking at today?

3            MR. STANNER:  So, Counsel, just

4        again, I think we're skipping Bates

5        numbers on this version of the

6        document.

7            MR. HAWAL:  Great.

8            MR. STANNER:  Maybe we should

9        check.

10            MR. HAWAL:  Well, I'm only

11        going to go to one page.

12            MR. STANNER:  But I just don't

13        know if he has the entire document.

14            MR. HAWAL:  What's that?

15            MR. STANNER:  I don't know that

16        he has the entire document.

17            MR. HAWAL:  I understand.

18        Well, I will substitute it at the

19        conclusion of the deposition, but...

20    QUESTIONS BY MR. HAWAL:

21        Q.    Do you have 00407465?

22        A.    I do.

23        Q.    It appears you do.

24            Have you ever seen this

25    document or that page 00407465?

1    A.    I've seen the document.  I
2  don't recall specifically the page you're
3  referring to.
4    Q.    Well, in what context would you
5  have seen this document?
6         MR. STANNER:  Just for the
7         record, an objection to Exhibit 6 is
8         it's incomplete.
9         THE WITNESS:  I don't recall
10        what context I would have seen it.
11  QUESTIONS BY MR. HAWAL:
12    Q.    Do you know if you would have
13  had any role in preparing it?
14    A.    I believe I may have, yes.







15  QUESTIONS BY MR. HAWAL:

16      Q.      Did you have any role in

17  studying this issue at McKesson?

18      A.      I did not.

19      Q.      Did you or any other McKesson

20  employee, to your knowledge, attend a DEA

21  distributors conference in Indianapolis on

22  May 10th and May 11, 2016?

23      A.      I believe someone from McKesson

24  would have attended that, yes.

25      Q.      Have you seen any documents

1  that were generated as a result of that

2  attendance or that presentation or program?

3         A.     I have not.

4         Q.     Has DEA communicated to

5  McKesson the importance of determining

6  whether one of its pharmaceutical customers

7  is obtaining controlled substances, not only

8  from McKesson, but from other distributors at

9  the time -- same time it's obtaining

10  controlled substances from McKesson?

11               MR. STANNER:  Objection to the

12         form.

13               THE WITNESS:  I'm not sure I

14         understand your question.

15  QUESTIONS BY MR. HAWAL:

16         Q.     Has the DEA ever communicated

17  to McKesson, to your knowledge, the

18  importance of McKesson determining whether a

19  pharmacy customer is receiving controlled

20  substances from McKesson at the same time

21  that it's receiving controlled substances

22  from other distributors?

23               MS. MCCLURE:  Objection.

24               MR. STANNER:  Same objection.

25               THE WITNESS:  Not that I

1        recall, no.

2     QUESTIONS BY MR. HAWAL:





11   QUESTIONS BY MR. HAWAL:

12        Q.      For as long as you've been with

13   the DEA and then an employee of McKesson, has

14   the DEA consistently communicated to

15   distributors, including McKesson, the

16   importance of maintaining effective controls

17   and procedures to guard against the diversion

18   of controlled substances?

19             MR. STANNER:  Objection to the

20        form.  Objection to the scope of the

21        notice.

22             THE WITNESS:  I believe so,

23        yes.

24   QUESTIONS BY MR. HAWAL:

25        Q.      Have you ever seen any written

1   communications from the DEA to McKesson or

2   any distributor that it was not required to

3   identify suspicious orders and report those

4   suspicious orders to the DEA?

5           MR. STANNER:  Objection to the

6       form.

7           THE WITNESS:  Not that I'm

8       aware of.

9   QUESTIONS BY MR. HAWAL:

10      Q.      For as long as you've been with

11  the DEA and then an employee of McKesson, has

12  the FDA -- I'm sorry, the DEA consistently

13  communicated to distributors, including

14  McKesson, the importance of blocking

15  suspicious orders that have been reported to

16  the DEA and not shipping them to the

17  customer?

18          MR. STANNER:  Objection to the

19      form.

20          THE WITNESS:  I do not believe

21      that they have -- that the DEA has

22      consistently done that, no.

23  QUESTIONS BY MR. HAWAL:

24      Q.      Have you seen any documents

25  that would be to the contrary that the DEA

 1   advised McKesson or any distributor that if

 2   they identify a suspicious order, that it not

 3   only needs to be reported to the DEA, but the

 4   order must not be shipped?

 5              MR. STANNER:  Objection to the

 6        form.

 7              THE WITNESS:  I believe that

 8        one of the letters authored by Joseph

 9        Rannazzisi spoke to blocking the

10        order.  I don't recall any other

11        information.

12   QUESTIONS BY MR. HAWAL:

13        Q.    Well, if you look at the

14   settlement agreement that McKesson entered

15   into in 2008, that specifically provides that

16   not only should suspicious orders be reported

17   to the DEA, but they should not be shipped,

18   true?

19        A.    I believe that's the case, yes.

20        Q.    Have you ever seen any

21   documents from the DEA which endorsed or

22   approved McKesson's controlled substance

23   monitoring program, or CSMP, or how it should

24   be implemented?

25        A.    The DEA?

 1       Q.      Yes, sir.

 2       A.      Not that I'm aware of, no.

 3       Q.      That discretion is left to

 4   the -- is left to McKesson or was left to

 5   McKesson, true?

 6               MR. STANNER:  Objection to the

 7       form.

 8   QUESTIONS BY MR. HAWAL:

 9       Q.      By the DEA?

10       A.      I believe that's the case, yes.

11       Q.      Have you ever seen any document

12   whereby McKesson communicated to the DEA that

13   it was incapable of identifying suspicious

14   orders or stopping their shipment?

15       A.      Not that I recall, no.

16       Q.      You were also identified as a

17   person most knowledgeable at McKesson about

18   controlled substance quotas, but we were told

19   that McKesson has no documents relating to

20   controlled substance quotas and does not set

21   quotas.

22               Is that familiar to you, sir?

23               MR. STANNER:  Objection --

24               THE WITNESS:  It's familiar to

25       me, yes.

1          MR. STANNER:  -- to the form.

2   QUESTIONS BY MR. HAWAL:

3       Q.    So is there any role -- does

4   McKesson play any role in setting quotas or

5   contributing to the establishment of quotas

6   for controlled substances?

7          MR. STANNER:  Objection to the

8       form.

9          THE WITNESS:  The Drug

10      Enforcement Administration sets the

11      quotas.

12  QUESTIONS BY MR. HAWAL:

13      Q.    All right.  And McKesson and

14  other distributors do not play a role in

15  that?

16      A.    The only role that we would

17  play is the ARCOS reporting, the data that we

18  report via ARCOS, which is considered as part

19  of the DEA determination when setting the

20  quotas.  That would be the only role that we

21  would play.

22          MR. HAWAL:  All right.  I don't

23      have any further questions.  We are

24      going to reserve our right to reopen

25      this deposition once McKesson complies

```
 1        with the Special Master's order on

 2        providing documents that predate 2013,

 3        which have not been produced as a part

 4        of the productions to date.

 5              So subject to that, we're going

 6        to suspend the deposition.  Okay.

 7              MR. STANNER:  No questions for

 8        McKesson.

 9              MR. HAWAL:  And I will

10        substitute a copy of that document,

11        Exhibit 6.

12              VIDEOGRAPHER:  Anyone else?

13        The time is 10:57 a.m., July 19, 2018,

14        going off the record.  End of the

15        videotaped deposition.

16      (Deposition concluded at 10:57 a.m.)

17              - - - - - - -

18

19

20

21

22

23

24

25
```

```
1                        CERTIFICATE
2
3            I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
4    Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
5    of the examination, Gary Boggs was duly sworn
     by me to testify to the truth, the whole
6    truth and nothing but the truth.
7            I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
8    testimony as taken stenographically by and
     before me at the time, place and on the date
9    hereinbefore set forth, to the best of my
     ability.
10
             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16
                 _____
17               CARRIE A. CAMPBELL,
                 NCRA Registered Diplomate Reporter
18               Certified Realtime Reporter
                 California Certified Shorthand
19               Reporter #13921
                 Missouri Certified Court Reporter #859
20               Illinois Certified Shorthand Reporter
                 #084-004229
21               Texas Certified Shorthand Reporter #9328
                 Kansas Certified Court Reporter #1715
22               Notary Public
23               Dated:  July 24, 2018
24
25
```

```
 1                INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8            After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13            It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

1           ACKNOWLEDGMENT OF DEPONENT

2

3

4          I,_____, do
   hereby certify that I have read the foregoing
5  pages and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.

8

9

10

11

12  _____
   Gary L. Boggs                        DATE
13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25

1                  – – – – – –

                      ERRATA

2                  – – – – – –

3     PAGE    LINE    CHANGE/REASON

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25

1               - - - - - -

                LAWYER'S NOTES

2               - - - - - -

3       PAGE   LINE

4       _____  _____   _____

5       _____  _____   _____

6       _____  _____   _____

7       _____  _____   _____

8       _____  _____   _____

9       _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____

25