1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OHIO

3               EASTERN DIVISION

4

5    ----------------------------x

6    IN RE: NATIONAL PRESCRIPTION   ) Case No.

7    OPIATE LITIGATION              ) 1:17-MD-2804

8    APPLIES TO ALL CASES           ) Hon. Dan A. Polster

9    ----------------------------x

10

11

12

          VIDEOTAPED DEPOSITION OF GARY L. BOGGS

13

                  WASHINGTON, D.C.

14

              THURSDAY, JANUARY 17, 2019

15

                    9:07 A.M.

16

17

18

19

20

21

22

23   Pages: 1 - 429

24   Reported by: Leslie A. Todd

1       Deposition of GARY L. BOGGS, held at the law

2    offices of:

3

4

5                 COVINGTON & BURLING, LLP

6                 One CityCenter

7                 850 Tenth Street, N.W.

8                 Washington, D.C. 20001

9                 (202) 662-6000

10

11

12

13       Pursuant to notice, before Leslie Anne Todd,

14    Court Reporter and Notary Public in and for the

15    District of Columbia, who officiated in

16    administering the oath to the witness.

17

18

19

20

21

22

23

24

```
 1                  A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFFS:

 4        WILLIAM HAWAL, ESQUIRE

 5        SPANGENBERG SHIBLEY & LIBER, LLP

 6        1001 Lakeside Avenue, East, Suite 1700

 7        Cleveland, Ohio 44114

 8        (216) 697-3232

 9

10        TROY RAFFERTY, ESQUIRE

11        LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &

12          PROCTOR, P.A.

13        316 South Baylen Street

14        Pensacola, Florida 32502

15        (850) 435-7163

16

17   ON BEHALF OF THE WORCESTER, MASSACHUSETTS

18   PLAINTIFFS:

19        BETH KASWAN, ESQUIRE

20        SEAN T. MASSON, ESQUIRE

21        SCOTT & SCOTT ATTORNEYS AT LAW, LLP

22        230 Park Avenue, 17th Floor

23        New York, New York 10169-1820

24        (212) 223-6444
```

1    APPEARANCES (Continued):

2    ON BEHALF OF McKESSON CORPORATION:

3         ANDREW STANNER, ESQUIRE

4         MEGHAN E. MONAGHAN, ESQUIRE

5         COVINGTON & BURLING LLP

6         One City Center

7         850 Tenth Street, N.W.

8         Washington, D.C. 20001-4956

9         (202) 662-5261

10

11   ON BEHALF OF THE WITNESS:

12        MICHAEL J. SATIN, ESQUIRE

13        MILLER & CHEVALIER

14        900 16th Street, N.W.

15        Washington, D.C. 20006

16        (202) 626-6009

17

18   ON BEHALF OF AMERISOURCEBERGEN DRUG:

19        STAN PERRY, ESQUIRE

20        LINDSAY A. DEFRANCESCO, ESQUIRE

21        REED SMITH, LLP

22        811 Main Street, Suite 1700

23        Houston, Texas 77002-6110

24        (713) 469-3847

1   APPEARANCES (Continued):

2

3   ON BEHALF OF CARDINAL HEALTH:

4        JOSEPH S. BUSHUR, ESQUIRE

5        WILLIAMS & CONNOLLY LLP

6        725 Twelfth Street, N.W.

7        Washington, D.C. 20005

8        (202) 434-5013

9

10  ON BEHALF OF HBC CO.:

11       SCOTT D. LIVINGSTON, ESQUIRE

12       MARCUS & SHAPIRA, LLP

13       One Oxford Centre, 35th Floor

14       Pittsburgh, Pennsylvania 15219

15       (412) 471-3490

16

17  ON BEHALF OF JANSSEN PHARMACEUTICALS AND JOHNSON &

18   JOHNSON:

19       EMILIE WINCKEL, ESQUIRE (Telephonically)

20       O'MELVENY & MYERS, LLP

21       1625 Eye Street, N.W.

22       Washington, D.C. 20006

23       (202) 383-5300

24

1    APPEARANCES (Continued):

2

3    ON BEHALF OF ENDO PHARMACEUTICALS AND PAR:

4        SETH WIENER, ESQUIRE (Telephonically)

5        ARNOLD & PORTER KAYE SCHOLER LLP

6        601 Massachusetts Avenue, N.W.

7        Washington, D.C. 20001-3743

8        (202) 942-5435

9

10   ON BEHALF OF WALMART:

11       RICHARD M. BRODSKY, ESQUIRE (Telephonically)

12       JONES DAY

13       150 West Jefferson Avenue, Suite 2100

14       Detroit, Michigan 48226-4438

15       (313) 733-3939

16

17   ON BEHALF OF UCB:

18       DIANE E. LIFTON, ESQUIRE (Telephonically)

19       HUGHES HUBBARD & REED, LLP

20       One Battery Park Plaza

21       New York, New York 10004-1482

22       (212) 837-6000

23

24

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF C&R PHARMACY:

 4        AMANDA ROSENTHAL, ESQUIRE (Telephonically)

 5

 6   ALSO PRESENT:

 7        EVAN WOLFE (Trial technician)

 8        DANIEL HOLMSTOCK (Videographer)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                    C O N T E N T S

2  EXAMINATION OF GARY L. BOGGS                    PAGE

3      By Mr. Hawal                            17, 387

4      By Mr. Rafferty                             266

5      By Mr. Stanner                              353

6

7                    E X H I B I T S

8              (Attached to transcript)

9  MCKESSON-BOGGS DEPOSITION EXHIBITS               PAGE

1                    E X H I B I T S (Continued)

2                    (Attached to transcript)

3    MCKESSON-BOGGS DEPOSITION EXHIBITS                    PAGE



23

24

1                    E X H I B I T S (Continued)

2                      (Attached to transcript)

3     MCKESSON-BOGGS DEPOSITION EXHIBITS                    PAGE



1               E X H I B I T S (Continued)

2                 (Attached to transcript)

3   MCKESSON-BOGGS DEPOSITION EXHIBITS                    PAGE



1            E X H I B I T S (Continued)

2              (Attached to transcript)

3    MCKESSON-BOGGS DEPOSITION EXHIBITS              PAGE



1                    E X H I B I T S (Continued)

2                    (Attached to transcript)

3    MCKESSON-BOGGS DEPOSITION EXHIBITS                    PAGE



23

24

1                    E X H I B I T S (Continued)

2                     (Attached to transcript)

3    MCKESSON-BOGGS DEPOSITION EXHIBITS                    PAGE



1          E X H I B I T S (Continued)

2          (Attached to transcript)

3     MCKESSON-BOGGS DEPOSITION EXHIBITS          PAGE



16

17

18

19

20

21

22

23

24

```
 1                P R O C E E D I N G S

 2                -------------------

 3                THE VIDEOGRAPHER:  We are now on the

 4      record.  My name is Daniel Holmstock.  I'm the

 5      videographer for Golkow Litigation Services.

 6      Today's date is January 17th, 2019.  The time on

 7      the video screen is 9:07 a.m.

 8                This video deposition is being held at

 9      the law offices of Covington & Burling LLP at One

10      City Center, 850 10th Street, Northwest, in

11      Washington, D.C., in the matter of In Re:

12      National Prescription Opiate Litigation, pending

13      before the United States District Court for the

14      Northern District of Ohio, Eastern Division.

15                Our deponent today is Mr. Gary Boggs.

16                Counsel will be noted on the

17      stenographic record for appearances.

18                The court reporter is Leslie A. Todd,

19      who will now administer the oath to the witness.

20                     GARY L. BOGGS,

21           and having been first duly sworn,

22          was examined and testified as follows:

23                   DIRECT EXAMINATION

24      BY MR. HAWAL:
```

1    Q    Good morning, Mr. Boggs.

2    A    Good morning.

3    Q    Please tell us your full name.

4    A    Gary Lee Boggs.

5    Q    Mr. Boggs, you've given depositions

6  before?

7    A    I have.

8    Q    Approximately how many times?

9    A    Dozens of times throughout my career.

10    Q    All right.  You understand that you're

11  testifying as if you would be in front of a judge

12  and a jury this morning?

13    A    I do.

14    Q    All right.  What have you done to

15  prepare yourself for this deposition today?

16    A    I've had meetings with counsel in

17  preparation for it.

18    Q    How many meetings?

19    A    There was about four.

20    Q    All right.  And how long were those

21  meetings?  How much time total did you spend with

22  counsel?

23    A    I didn't keep track of it.  I mean it

24  was four days.

1      Q     Approximately.

2      A     Approximately six, seven hours a day

3   times four.

4      Q     And have you reviewed any deposition

5   transcripts that have been taken in this case of

6   other witnesses?

7      A     I have not.

8      Q     Okay.  What is your current position

9   with McKesson?

10      A     I am Vice President of Regulatory

11   Affairs and Compliance.

12      Q     And how long have you had that position?

13      A     Since August of last year.

14      Q     And can you tell me what your job

15   responsibilities are or a description of what --

16   what you do, what your role is?

17      A     Sure.  I'm responsible for overseeing

18   the controlled substance monitoring program at

19   McKesson for the independent small, medium chain

20   pharmacies, hospitals, veterans, government

21   accounts, and overseeing a team that implements

22   that program across the United States.

23      Q     Who do you report to?

24      A     I report to Barbara Rowland, who is the

 1  senior vice president of Regulatory Affairs and

 2  Compliance.

 3       Q    And prior to the current position that

 4  you hold, what position did you have at McKesson?

 5       A    I was a senior director of Regulatory

 6  Affairs for the East region.

 7       Q    And over what period of time did you

 8  hold that position?

 9       A    From late November of 2013 until August

10  of 2018.

11       Q    And is that when you started with

12  McKesson, in late 2013?

13       A    In late November 2013, yes.

14       Q    And what was your job responsibility as

15  senior director of Regulatory Affairs for the East

16  region?

17       A    It's similar to what it is now, except I

18  covered only half of the United States, the

19  eastern half of the United States.

20       Q    Would I understand your job

21  responsibility to have been, for the entire time

22  that you've been with McKesson, to see to it that

23  McKesson complies with the federal laws and

24  regulations which exist in an effort to prevent

1 the diversion of controlled substances outside of

2 the legal framework or legal channels?

3          MR. STANNER:  Object to the form.

4          THE WITNESS:  I believe that that's part

5 of the responsibilities, yes.

6 BY MR. HAWAL:

7     Q    As I understand it, before you joined

8 McKesson in 2013, you were an employee of the Drug

9 Enforcement Administration, the DEA?

10    A    I was.

11    Q    All right.  Over what period of time

12 were you with the DEA?

13    A    From approximately June of 1985 until

14 the end of June 2012.

15    Q    And starting in June of 1985, I'm going

16 to ask you to take us through what positions you

17 held with the DEA.  Can you tell us what your

18 position was when you first started and what your

19 responsibilities were?

20    A    Sure, I'd be happy to.

21          I became a special agent with the Drug

22 Enforcement Administration in 1985, was

23 transferred from Orlando, Florida, to Detroit.  I

24 was a special agent in the Detroit office until

1    about March of 1999, when I was promoted to a

2    group supervisor in Detroit.  I --

3         Q    Excuse me, if I can interrupt for a

4    minute.

5              Up through March of 1999, did you have

6    any responsibilities in dealing with manufacturers

7    or distributors of controlled substances?

8         A    Not very much, no.  Very little.

9         Q    So you stopped at March of 1999.  Can

10   you continue and take us forward with your

11   positions with the DEA.

12        A    Sure.  I was a group supervisor

13   beginning around March of 1999.  I oversaw as a

14   group supervisor two or three different units.

15   Then I was a unit chief, also in Detroit, over the

16   special services section.

17              I was then transferred to headquarters

18   here in the District in 2003.  I was a unit chief

19   in the Office of Special Intelligence.  Was then

20   promoted in January of 2006 to be the executive

21   assistant in the Office of Diversion Control, and

22   I held that position until I retired from the DEA

23   in June of 2012.

24        Q    All right.  And as executive assistant

 1   in the division of -- what -- what was that again?

 2   What --

 3        A    At the time it was called the Office of

 4   Diversion Control.  It's now the Diversion Control

 5   Division.

 6        Q    And what were your responsibilities in

 7   that position?

 8        A    My responsibilities were, I would sort

 9   of say like a chief of staff to the person

10   overseeing that section.  We had day-to-day

11   responsibilities for the implementation of the

12   regulatory aspect of the Controlled Substances

13   Act, overseeing the DEA registrants that were

14   authorized to handle controlled substances.

15   That's essentially it.

16        Q    And the DEA registrants that you're

17   referring to would be wholesalers like McKesson?

18        A    That's one example of them.

19        Q    Another would be manu- --

20             (Interruption by counsel on the phone.)

21        Q    Another would --

22             MR. HAWAL:  Can we please have people on

23   the phone mute their lines?

24             (A discussion was held off the record.)

```
 1              MR. HAWAL:  Yeah, let's go off the

 2    record.

 3              THE VIDEOGRAPHER:  The time is 9:15 a.m.

 4    We're going off the record.

 5              (Resolving technical difficulties.)

 6              THE VIDEOGRAPHER:  The time is 9:20 a.m.

 7    We're back on the record.

 8              MR. HAWAL:  Bill Hawal for plaintiffs.

 9              MR. RAFFERTY:  Troy Rafferty for

10    plaintiffs.

11              MR. WOLFE:  Evan Wolfe, technical

12    support, for plaintiffs.

13              MS. KASWAN:  Beth Kaswan for plaintiffs

14    in the Massachusetts state action.

15              MR. LIVINGSTON:  Scott Livingston for

16    Defendant HPC.

17              MR. BUSHUR:  Joseph Bushur for Cardinal

18    Health.

19              MR. PERRY:  Stan Perry of Reed Smith for

20    AmerisourceBergen.

21              MR. SATIN:  Michael Satin for Miller &

22    Chevalier on behalf of Gary Boggs.

23              MS. MONAGHAN:  Meghan Monaghan from

24    Covington & Burling on behalf of McKesson.
```

1          MR. STANNER:  Andrew Stanner of

2     Covington & Burling on behalf of McKesson.

3          MR. HAWAL:  Folks on the phone, can you

4     please identify yourselves?

5          MR. WIENER:  This is Seth Wiener from

6     Arnold & Porter for Endo and PAR defendants.

7          MS. WINCKEL:  Emilie Winckel from

8     O'Melveny for Janssen and J&J.

9          MR. BRODSKY:  Richard Brodsky from Jones

10    Day for Walmart.

11         MS. ROSENTHAL:  Amanda Rosenthal --

12         MR. HAWAL:  One at a time, please.

13         THE REPORTER:  Amanda --

14         MS. ROSENTHAL:  Rosenthal.

15         MR. HAWAL:  For whom?

16         MS. ROSENTHAL:  C&R Pharmacy.

17         MR. HAWAL:  Anyone else?

18         MS. LIFTON:  Diane Lifton, Hughes

19    Hubbard, for UCB.

20         THE REPORTER:  Can you repeat your name,

21    please?

22         MS. LIFTON:  Diane Lifton, L-I-F-T-O-N.

23         THE REPORTER:  Thank you.

24    BY MR. HAWAL:

1      Q    Mr. Boggs, before we went off the

2   record, I believe that you mentioned that you

3   joined DEA's Office of Diversion Control in

4   January of 2006; is that correct?

5      A    That's correct, yes.

6      Q    And were you -- in that position, were

7   you responsible for interacting with wholesalers

8   and manufacturers of controlled substances?

9      A    I was.

10     Q    And was part of your job responsibility

11  to ensure that they were complying with the

12  Controlled Substances Act and federal laws and

13  regulations relating to controlled substances?

14     A    It was.

15     Q    All right.  And was your direct

16  supervisor Mr. Rannazzisi?

17     A    He was.

18     Q    And how long was he your direct

19  supervisor?

20     A    The entire -- from 2000 -- January 2006

21  till I retired in June of 2012.

22     Q    Before you became an employee of

23  McKesson in late 2013, was there a period of time

24  that you were a consultant for McKesson?

1          A    I consulted for McKesson just for a

2     couple of times prior to becoming an employee of

3     McKesson, yes.

4          Q    And over what period of time did that

5     occur?

6          A    It would have been, I believe, around

7     the summer of 2013, on and off a couple of times.

8          Q    And what did -- what was your role --

9     what did you -- what were you doing or what were

10    you asked to do as a consultant for McKesson?

11         A    I was asked to look at the Regulatory

12    Affairs program that they had.  I was asked to

13    provide some training.  I was asked to speak at a

14    couple of different conferences that McKesson had

15    put on for other folks outside of McKesson.

16         Q    And who at -- who at McKesson recruited

17    you or retained you to be a consultant?

18         A    Don Walker.

19         Q    Did you know Don Walker prior to that

20    time?  Were you acquainted with him in any way?

21         A    I might have -- in my capacity at DEA,

22    may have been at a meeting that he was at, but

23    other than that, I did not know him.

24         Q    And who was it that encouraged you or

1  recruited you as an employee to join McKesson in

2  2013?

3          MR. STANNER:  Objection.  Form.

4          THE WITNESS:  They advertised a

5  position, and I talked to Don Walker about it.

6  BY MR. HAWAL:

7      Q    When you were with the DEA, did you

8  always try to fairly and accurately set forth the

9  policies and positions of the DEA in your

10  communications with pharmaceutical distributors

11  and their trade association, HDMA?

12          MR. SATIN:  Mr. Boggs, I'm going to

13  instruct you not to answer that question to the

14  extent doing so would require you to disclose

15  information you acquired while you were at DEA --

16  at the DEA, to the extent that information is not

17  public and part of your official responsibilities

18  and duties.

19  BY MR. HAWAL:

20      Q    Will you answer the question, sir?

21      A    I -- I did not receive clearance from

22  the government to speak while I was there, so I

23  don't believe that I can answer that question.

24      Q    Is it your position that your

 1    interactions with various distributors is in some

 2    way confidential information?

 3            MR. SATIN:  Objection.  Sir, it's not

 4    his decision to make.

 5            MR. HAWAL:  I under- --

 6            MR. SATIN:  It's the government's

 7    decision to make, so it's not a question for him.

 8    He doesn't have authorization to speak.  The

 9    government can't be here.  So he can't provide

10    those answers until the government gives him

11    clearance to do so.

12            MR. HAWAL:  Well, the government -- the

13    government's position, as I understand it and as

14    was expressed at the time of a conference with the

15    court, is that if there is information that was in

16    the public domain, that the witness is permitted

17    to provide answers to those kinds of questions.

18            Is that -- is your understanding

19    different?

20            MR. SATIN:  If it is public information,

21    that's correct.  Your question, as I understood

22    it, was not calling for just public information.

23    BY MR. HAWAL:

24        Q    Well, sir, what is your understanding

 1   of -- of what HDMA was?

 2        A    HDMA is a trade association for

 3   manufacturers and distributors.

 4        Q    And is it your understanding that the

 5   HDMA had periodic meetings where representatives

 6   of various pharmaceutical distributors of

 7   controlled substances would attend?

 8             MR. SATIN:  You may answer that question

 9   to the extent doing so would not require you to

10   disclose non-public information that you acquired

11   during the course of your employment.

12             THE WITNESS:  It's my understanding that

13   they would have those types of meetings, yes.

14   BY MR. HAWAL:

15        Q    And those meetings would also be

16   attended by employees or representatives of HDMA,

17   the trade association?

18             MR. STANNER:  Object to the form of the

19   question.  Vague, time frame.

20             THE WITNESS:  Could you be more

21   specific?

22   BY MR. HAWAL:

23        Q    During the time that you were with the

24   Office of Diversion Control, would meetings that

1    would be attended by pharmaceutical manu- --

2    pharmaceutical distributor representatives also be

3    attended by employees or representatives of HDMA?

4         A    They may have, and other times they may

5    not have.

6         Q    Did you attend such meetings?

7              MR. SATIN:  Mr. Boggs, I'm going to

8    instruct you not to answer that question for the

9    same reasons we expressed earlier.

10             MR. HAWAL:  The HDMA would indicate --

11   attendance at meetings of HDMA would indicate that

12   that's public information.  There's -- there's

13   nothing that's confidential about HDMA as it

14   relates to Mr. Boggs, is there?

15             MR. SATIN:  I don't know.

16             The instruction to Mr. Boggs is,

17   Mr. Boggs, to the extent he believes that it was

18   public information, he can answer it.  To the

19   extent the information -- he's revealing

20   information that's not public, he can't.

21   BY MR. HAWAL:

22        Q    Mr. Boggs, when you attended meetings

23   with the HDMA, did you consider those -- that

24   information to be generally public?

1      A    I did not, no.

2      Q    In terms of your work with the Office of

3  Diversion Control, did you attend public meetings

4  where you set forth the positions of the DEA -- of

5  the DEA with respect to maintaining appropriate

6  obligations under the Controlled Substances Act?

7      A    I believe that I did speak at some

8  public conferences about the Drug Enforcement

9  Administration and the regulatory requirements.

10     Q    And its positions with regard to the

11 obligations of wholesalers like McKesson to

12 maintain appropriate legal obligations with

13 respect to avoiding the diversion of controlled

14 substances?

15     A    In some form of that, yes.

16     Q    And would those be meetings in which or

17 presentations in which HDMA members and/or

18 representatives of drug wholesalers like McKesson

19 would also be in attendance at?

20     A    I don't recall whether or not any of

21 those representatives were in attendance or not.

22     Q    When you were with the Office of

23 Diversion Control, were you required to know what

24 the legal obligations of pharmaceutical

1    distributors were with regard to their compliance

2    with federal laws and regulations?

3              MR. SATIN:  Objection.

4              Mr. Boggs, don't answer that question to

5    the extent it would require you to disclose

6    non-public information that you have obtained in

7    the course of your work at DEA.

8    BY MR. HAWAL:

9         Q    Do you -- do you refuse to answer, sir?

10        A    I am -- do not want to break the law, so

11   I don't -- I have not been cleared to answer

12   non-public information.

13        Q    Well, sir, do you have knowledge about

14   the substance of the Controlled Substances Act?

15             MR. SATIN:  To the extent that knowledge

16   comes from your time at the DEA, don't answer

17   that.

18             If you want to ask him about his time at

19   McKesson and his knowledge of those laws, you may

20   do so.

21             THE WITNESS:  I -- from my time at

22   McKesson, I am aware of what some of the

23   regulatory obligations are, yes.

24   BY MR. HAWAL:

1     Q    Were those regulatory obligations that

2  you became aware of when -- since you've been with

3  McKesson, were they the same obligations that

4  existed prior to that time as -- as to the period

5  of time that you were with the DEA?

6           MR. SATIN:  That question necessarily

7  calls for his knowledge when he was at DEA, so

8  object.

9           Don't answer that question.

10           MR. STANNER:  Object to the form.

11           THE WITNESS:  For the most part, I

12  believe they are.  There have been some recent

13  legislative changes to some of the regulatory

14  obligations.

15  BY MR. HAWAL:

16     Q    The regulatory obligations that apply to

17  distributors of controlled substances were created

18  with the Controlled Substances Act in 1970; is

19  that correct?

20     A    Approximately that time, yes.

21     Q    And up until the time of recent changes

22  in the law as a result of Congressional action,

23  have the obligations under the Controlled

24  Substances Act been fairly consistent and uniform

1   since 1970?

2           MR. STANNER:  Objection to the form.

3           THE WITNESS:  To the best of my

4   knowledge, the regulatory obligations as written

5   in the 21 CFR have not changed.

6   BY MR. HAWAL:

7       Q    Are you familiar with the Distributor

8   Initiative Program?

9           MR. SATIN:  To the extent that your

10  knowledge comes from your time with the DEA, don't

11  answer that question.

12          THE WITNESS:  I am familiar with the

13  Distributor Initiative in general, yes.

14  BY MR. HAWAL:

15      Q    And are you familiar with the purpose of

16  the Distributor Initiative Program?

17      A    I don't believe that I'm cleared to

18  answer that question.

19      Q    What is your understanding as to when

20  the opioid crisis was first appreciated in the

21  United States?

22      A    I believe that it began approximately

23  three decades ago.

24      Q    And is it your understanding that the

 1   opioid crisis since that time has consistently

 2   worsened in terms of its effect on individuals as

 3   well as communities and governmental entities in

 4   the United States?

 5              MR. STANNER:  Object to the form.

 6              THE WITNESS:  I believe that that is an

 7   accurate representation.

 8   BY MR. HAWAL:

 9       Q    Were you aware that Mr. Rannazzisi sent

10   a letter to all distributors in the United States

11   on September 27th, 2006?

12              MR. SATIN:  Objection to the extent that

13   calls for --

14              THE REPORTER:  I'm sorry, Counsel, can

15   you speak up a little bit?

16              MR. SATIN:  Yeah, I'm sorry.

17              Objection to the question.

18              And I instruct Mr. Boggs not to answer

19   that question insofar as it requires him to

20   disclose information about his time when he was at

21   the DEA.

22              THE WITNESS:  I'm aware that that --

23   that letter's -- that the distributors have that

24   letter, yes.

1  BY MR. HAWAL:

2      Q    All right.  And what is your

3  understanding as to the purpose of

4  Mr. Rannazzisi's letter?

5          MR. SATIN:  Objection.

6          Mr. Boggs, don't answer that question.

7          MR. HAWAL:  Counsel, we've already taken

8  Mr. Boggs' deposition and he answered questions

9  about that letter in some detail earlier this

10  year.  Is it your position that something has

11  changed since his last deposition?

12          MR. SATIN:  Yes, I've spoken to the

13  government -- I spoke to Mr. Bennett yesterday,

14  and he made very clear that he should not be

15  answering questions about his time at the DEA for

16  information that is non-public and as part of his

17  official duties without authorization from the

18  government.

19          So I wasn't at that hearing, but I can

20  tell you that Mr. Boggs does not have

21  authorization to do that.

22          MR. HAWAL:  Let's take a break.

23          THE VIDEOGRAPHER:  The time is

24  9:35 a.m., and we're going off the record.

1          (Recess.)

2          THE VIDEOGRAPHER:  The time is 9:53 a.m.

3    We're back on the record.

4          (Plaintiffs' Exhibit No. 1 was

5           marked for identification.)

6    BY MR. HAWAL:

7     Q    Mr. Boggs, I'm going to hand you what

8    we've marked as Plaintiffs' Exhibit 1.

9          Plaintiffs' Exhibit 1 is the

10   September 27th, 2006 Department of Justice, Drug

11   Enforcement Administration letter to McKesson,

12   correct?

13    A    It is.  It's a generic letter.  I

14   don't -- I don't know if this specific one was to

15   McKesson.

16    Q    And since you've joined McKesson, have

17   you seen this letter since you've joined McKesson?

18    A    I have.

19    Q    And do you know since you've joined

20   McKesson that this letter was sent to every

21   distributor by Mr. Rannazzisi in September of

22   2006?

23          MR. STANNER:  Object to the form.

24          THE WITNESS:  I believe that that's

 1  correct, yes.

 2  BY MR. HAWAL:

 3      Q    All right.  In fact, in the first

 4  paragraph, Mr. Rannazzisi indicates that this

 5  letter is being sent to every commercial entity in

 6  the United States registered with the Drug

 7  Enforcement Administration to distribute

 8  controlled substances, correct?

 9      A    You've read that correctly, yes.

10      Q    All right.  And you know since you've

11  seen this letter that Mr. Rannazzisi, his

12  intention was to reiterate to the distributors,

13  including McKesson, the responsibilities of

14  controlled substance distributors in view of the

15  prescription drug abuse problem in our nation --

16  our nation currently faces, correct?

17            MR. STANNER:  Object to the form.

18            THE WITNESS:  I believe you would have

19  to ask him about his intention.  I --

20  BY MR. HAWAL:

21      Q    Well, when was the first time that you

22  saw this letter?

23            MR. SATIN:  Objection, pursuant to

24  Touhy.

1           THE REPORTER:  Pursuant to?

2           MR. STANNER:  Touhy, T-U-O-H-Y, I

3    believe is the correct spelling.

4           MR. STANNER:  T-O-U.  O-U.

5           MR. SATIN:  T-O-U-H-Y.

6           THE WITNESS:  I'm sorry, I don't know

7    that I can answer that question.

8    BY MR. HAWAL:

9        Q    How long have you been aware that

10   controlled prescription drugs, that their abuse is

11   a serious and growing health problem in the United

12   States?

13          MR. STANNER:  Object to the form.

14          THE WITNESS:  I know that prescription

15   drug abuse has been around for decades and

16   decades.

17   BY MR. HAWAL:

18       Q    And you know that it continually

19   worsened over time?

20          MR. STANNER:  Object to the form.

21          THE WITNESS:  I believe that's correct,

22   yes.

23   BY MR. HAWAL:

24       Q    Now, since you've joined McKesson, did

1  you know that distributors must be vigilant in

2  deciding whether a prospective customer can be

3  trusted to deliver controlled substances only for

4  lawful purposes?

5          MR. STANNER:  Object to the form.

6          THE WITNESS:  I can't speak for all

7  distributors.  For -- for McKesson, I understand

8  that we have an obligation to maintain control.

9  BY MR. HAWAL:

10     Q    And do you understand that that

11 responsibility is critical?

12     A    I understand that --

13         MR. STANNER:  Object to the form.

14         THE WITNESS:  -- it's very important,

15 yes.

16 BY MR. HAWAL:

17     Q    Mr. Rannazzisi in his letter in the

18 third paragraph in the last sentence indicated

19 that:  "This responsibility is critical, as

20 Congress has expressly declared that the illegal

21 distribution of controlled substances has a

22 substantial and detrimental effect on the health

23 and general welfare of the American people."

24         Is it your understanding as a McKesson

 1    employee that that is a true statement?

 2        A    I believe that that's a true statement,

 3    yes.

 4        Q    And have you known since you joined

 5    McKesson that, as Mr. Rannazzisi indicates in the

 6    next paragraph:  "Although most distributors are

 7    already well aware of the following legal

 8    principles, they are reiterated here as additional

 9    background for this discussion"?

10             Did you know that he was reiterating

11    what distributors should have known as of 2006

12    based upon your work at McKesson?

13             MR. STANNER:  Object to the form.

14             MR. SATIN:  Objection that -- as I

15    understand the question, even though you're

16    asking as -- at McKesson, you're asking him to

17    talk about what he understood Mr. Rannazzisi --

18    I'm not pronouncing his name correctly -- but what

19    that gentleman was doing as of 2006.

20             So I would instruct you not to answer

21    that to the extent the answer requires you to

22    disclose information from that time period.

23             THE WITNESS:  I -- you'd have to ask

24    his -- him what his intent was.

1    BY MR. HAWAL:

2        Q    Let's go to page 2 of this letter.

3             In the second paragraph, Mr. Rannazzisi

4    says:  "Even just one distributor that uses its

5    DEA registration to facilitate -- facilitate

6    diversion can cause enormous harm."

7             As an employee of McKesson with your --

8    based on your current knowledge, do you agree with

9    that statement?

10       A    I -- I think that you would have to look

11   at the facts and circumstances of what -- whatever

12   the incident was and to the extent of whether or

13   not it was horrific or not.

14       Q    Well, let's assume for the sake of my

15   question that a distributor fails to report

16   suspicious orders or block orders that are

17   suspicious and delivers them to a customer.

18            Do you believe, based upon your current

19   understanding of federal laws, regulations and how

20   the distribution of controlled substances work,

21   that just one distributor that facilitates

22   diversion can cause enormous harm?

23            MR. STANNER:  Object to the form,

24   compound, vague.

1          THE WITNESS:  I think the first part of

2   your statement was about failure to report a

3   suspicious order.  That's a reporting requirement.

4   And it -- you may be assuming that that order was

5   shipped and maybe it wasn't shipped.

6          The other second part of that is

7   assuming that even if it was shipped, that it

8   somehow may or may not have been diverted.

9   BY MR. HAWAL:

10     Q    Well, let's assume it was diverted.  If

11  it was diverted, do you agree that that would

12  cause or could cause enormous harm?

13          MR. STANNER:  Object to the form.

14          THE WITNESS:  It depends on the facts

15  and circumstances.  I mean you could have one

16  shipment that might be a hundred pills that could

17  be diverted -- that could be diverted and simply

18  cause some harm.  Whether or not that's, quote,

19  enormous harm, I think is relevant to the fact of

20  the volume of what was shipped.

21  BY MR. HAWAL:

22     Q    Well, so -- so in your -- in your

23  opinion, volume matters?

24     A    It could matter.  It depends on the

1    facts and circumstances.

2         Q    Well, assuming sufficient volume

3    diverted into elicit channels, do you believe that

4    that could cause enormous harm as set forth in

5    Mr. Rannazzisi's letter?

6              MR. STANNER:  Object to the form.

7              THE WITNESS:  It could.

8    BY MR. HAWAL:

9         Q    And what kind of harm would you

10   contemplate could be caused by diversion?

11        A    If people illegally took it, they could

12   become addicted from it or any other consequences

13   associated with that.

14        Q    Including harms to communities?

15             MR. STANNER:  Object to the form.

16             THE WITNESS:  I -- I wouldn't want to

17   speculate without more facts, and I -- you would

18   have to look at the facts and circumstances.

19   BY MR. HAWAL:

20        Q    Well --

21        A    I don't want to paint with a broad

22   brush.

23        Q    Well, hypothetically, if diversion

24   occurs in sufficient quantities, do you agree,

1    based upon your understanding from your work at

2    McKesson in the diversion arena, that that can

3    cause harm to communities?

4         A    It could cause harm in there.  It

5    depends.

6         Q    And could cause harm to governmental

7    agencies?

8              MR. STANNER:  Object to the form.

9              THE WITNESS:  I -- you'd have to be more

10   specific.

11   BY MR. HAWAL:

12        Q    Well, increased costs for treatment of

13   individuals who are addicted, for example?

14             MR. STANNER:  Object to the form.

15   Speculation.

16             THE WITNESS:  That may be a consequence

17   of someone becoming addicted, that they need to

18   seek treatment.  Whether or not that was directly

19   related to the diversion of that or something that

20   they had legitimately, I think you'd have to look

21   at the facts.

22   BY MR. HAWAL:

23        Q    To -- in the -- continue on --

24   continuing on in Mr. Rannazzisi's letter in 2006,

1    he says:  "The DEA regulations require all

2    distributors to report suspicious orders of

3    controlled substances."

4         Based upon your understanding of -- of

5    the federal laws and regulations as a McKesson

6    employee, is that a true statement?

7    A    The regulations do require distributors

8    to build and operate a system to identify and

9    report suspicious orders.

10   Q    And how long has that been the case?

11   A    I believe --

12        MR. SATIN:  Objection to the extent that

13   requires you to rely on your work when you were at

14   the DEA.

15        THE WITNESS:  It's my understanding that

16   that was a regulation that was implemented with

17   the enactment of the Controlled Substances Act.

18   BY MR. HAWAL:

19   Q    In 1970?

20   A    Around that time frame, yes.

21   Q    At -- from your work at McKesson, did

22   you know that at the time that this letter was

23   sent, the DEA was actively investigating McKesson

24   for violations of the Controlled Substances Act?

1              MR. STANNER:  Objection to the form.

2              THE WITNESS:  Could you -- could you

3    repeat the question?

4    BY MR. HAWAL:

5         Q    Yes.  As an employee of McKesson, do you

6    know that at the time this letter was sent, the

7    DEA and the DOJ was actively investigating

8    McKesson for violations of the Controlled

9    Substances Act for failing to maintain effective

10   controls against diversion of certain

11   pharmaceutical opioid products?

12             MR. SATIN:  And objection.

13             You can't rely, though, on your time at

14   the DEA to answer that question, so it would only

15   be based on information you obtained while at

16   McKesson.

17             MR. STANNER:  Object to the form, calls

18   for speculation.

19             THE WITNESS:  I believe that that was

20   the case, yes.

21   BY MR. HAWAL:

22        Q    Did you bring with you when you joined

23   McKesson your wealth of knowledge that you gained

24   as a DEA agent, and do you use that knowledge in

1   your current position and employment?

2        A    I use my experiences gained from there,

3   yes.

4        Q    I assume that's why McKesson retained

5   you, for your knowledge and experience as a DEA

6   agent.  True?

7        A    I think that that's partially accurate,

8   yes.

9             MR. HAWAL:  Evan, can we bring up 910,

10  Bates, the second Rannazzisi letter.

11             (Plaintiffs' Exhibit No. 2 was

12             marked for identification.)

13  BY MR. HAWAL:

14       Q    Mr. Boggs, I'm handing you what has been

15  marked as Exhibit 2 is a U.S. Department of

16  Justice, Drug Enforcement Administration letter to

17  McKesson Corporation, dated December 27th, 2007,

18  signed by Joseph Rannazzisi.  Bates No.

19  MCKMDL00478910.

20             Have you seen this letter since you've

21  left the DEA?

22       A    The copy that I have is not a complete

23  document.  Only -- only one page.

24             MR. STANNER:  Oh, sorry.  What -- some

 1   of these look like they're double-sided.  This one

 2   is not.  The actual exhibit is not.

 3           MR. HAWAL:  Well, can you peel that off?

 4           MR. STANNER:  I can.  Lucky break.

 5   BY MR. HAWAL:

 6       Q    Have you seen this letter since you've

 7   left the DEA?

 8       A    I have.

 9       Q    And Mr. Rannazzisi apparently in

10   December of 2007 thought it was necessary to send

11   McKesson and other distributors a second reminder

12   of their legal obligations under the Controlled

13   Substances Act and federal regulations.

14           MR. SATIN:  Object --

15   BY MR. HAWAL:

16       Q    True?

17           MR. SATIN:  Objection.

18           Do not answer that question.

19           MR. STANNER:  Object to the form.

20   BY MR. HAWAL:

21       Q    The first paragraph of the letter

22   indicates that:  "The purpose of this letter is to

23   reiterate the responsibilities of controlled

24   substance manufacturers, distributors -- and

 1    distributors to inform DEA of suspicious orders in

 2    accordance with 21 CFR 1301.74(b)."

 3              Is it your understanding that that

 4    obligation exists today based upon your work at

 5    McKesson?

 6         A    It is.

 7         Q    And existed as far back as 1970?

 8         A    That's correct.

 9         Q    And according to Mr. Rannazzisi, the DEA

10    regulations require all manufacturers and

11    distributors to report suspicious orders of

12    controlled substances.

13              That's a true statement, accurate?

14         A    That's what the regulation requires,

15    yes.

16         Q    And he goes on to say:  "It specifically

17    requires that a registrant," quote, "design and

18    operate a system to disclose to the registrant

19    suspicious orders of controlled substances," close

20    quote.

21              Is it your understanding that that's an

22    accurate statement?

23         A    That's what the regulation says, yes.

24         Q    And he goes on to say:  "The regulations

```
 1   clearly indicates that it is the sole

 2   responsibility of the registrant to design and

 3   operate such a system."

 4             Do you agree with that statement?

 5      A    That's what the regulation requires,

 6   yes.

 7      Q    He goes on in the next paragraph to say

 8   that:  "The regulation also requires that the

 9   registrant inform the local DEA division office of

10   suspicious orders when discovered by the

11   registrant," and he emphasized the words "when

12   discovered."

13             Is that an accurate statement as to what

14   the regulations require?

15      A    I believe that's what the regulations

16   require, yes.

17      Q    And he goes on to say in that paragraph:

18   "Registrants are reminded that their

19   responsibility does not end merely with the filing

20   of a suspicious order report.  Registrants must

21   conduct an independent analysis of suspicious

22   orders prior to completing a sale to determine

23   whether the controlled substances are likely to be

24   diverted from legitimate channels."
```

1           Is that an accurate statement --

2           MR. STANNER:  Object --

3      BY MR. HAWAL:

4      Q    -- based upon your work at McKesson?

5           MR. STANNER:  Object to the form.

6      Vague.

7           THE WITNESS:  I don't know that that's

8      specifically in the regulation.

9      BY MR. HAWAL:

10     Q    Well, do you agree that that's an

11     accurate statement?

12          MR. STANNER:  Object to the form.

13          THE WITNESS:  I believe that part of

14     McKesson's regulatory program encompasses due

15     diligence that we conduct on our customers.

16     BY MR. HAWAL:

17     Q    In the next paragraph he goes on to say

18     that:  "The regulation specifically states that

19     suspicious orders include orders of an unusual

20     size, orders deviating substantially from a normal

21     pattern, and orders of an unusual frequency."

22          Is that a fair and accurate statement?

23     A    I believe that is what the regulations

24     require.

 1          Q    And he goes on to say that:  "The size

 2     of an order alone, whether or not it deviates from

 3     a normal pattern, is enough to trigger the

 4     registrant's responsibility to report the order as

 5     suspicious."

 6               Do you agree with that statement as

 7     being accurate?

 8               MR. STANNER:  Object to the form.

 9               THE WITNESS:  I believe that that could

10     be part of the analysis in determining whether or

11     not the order is of unusual size or deviating

12     substantially from a pattern or unusual frequency.

13     BY MR. HAWAL:

14          Q    As a -- as a McKesson employee, do you

15     believe that that is one of the responsibilities

16     of a distributor in -- in terms of performing its

17     due diligence?

18               MR. STANNER:  Object to the form, vague.

19               THE WITNESS:  I believe our

20     responsibility is to design and operate a system

21     to disclose suspicious orders as defined in the

22     regulations.

23     BY MR. HAWAL:

24          Q    Well, do you believe that an order that

1   deviates from a normal pattern should trigger a

2   responsibility to determine whether the order is

3   suspicious?

4          MR. STANNER:  Object to the form.

5          THE WITNESS:  That is one of the

6   definitions of "a suspicious order" under the

7   regulations.

8   BY MR. HAWAL:

9       Q    On page 2 of this letter in the second

10  paragraph, Mr. Rannazzisi states:  "Daily, weekly

11  or monthly reports submitted by a registrant

12  indicating," quote, "excessive purchases," close

13  quote, "do not comply with the requirement to

14  report suspicious orders, even if the registrant

15  calls such reports suspicious order reports."

16         Do you agree that that is an accurate

17  statement as you understand it from your work at

18  McKesson?

19         MR. STANNER:  Object to the form.

20         THE WITNESS:  Well, it depends on what

21  those orders were that were contained in the --

22  what they -- what's defined as "an excessive

23  order."  An excessive order could be an order of

24  unusual size, frequency or pattern, and therefore

 1  would be a suspicious order as defined under the

 2  regulations.

 3  BY MR. HAWAL:

 4      Q    In the next paragraph, he says:

 5  "Lastly, registrants that routinely report

 6  suspicious orders, yet fill these orders without

 7  first determining that the order is not being

 8  diverted into other than legitimate medical,

 9  scientific and industrial channels may be failing

10  to maintain effective controls against diversion."

11          Do you agree that that is an accurate

12  statement as set forth by Mr. Rannazzisi?

13          MR. STANNER:  Object to the form.

14          THE WITNESS:  The -- at my time at

15  McKesson, my understanding is that a registrant

16  such as distributors have an obligation to

17  maintain effective controls against diversion.

18  BY MR. HAWAL:

19      Q    And so you agree that that's an accurate

20  statement?

21          MR. STANNER:  Object to the form.

22  Vague, "accurate."

23          THE WITNESS:  I think it describes, at

24  least in part, what could be a review or a due

 1  diligence that is conducted to determine whether

 2  or not something might be diverted.

 3  BY MR. HAWAL:

 4      Q    Are you -- do you disagree with that

 5  statement?

 6      A    I don't know that I disagree with it.

 7  I -- I understand what our obligations are under

 8  the regulations.

 9      Q    You're aware of, since you joined

10  McKesson, that McKesson prior to 2010 was not

11  complying with its obligations to main- --

12  maintain effective controls to prevent diversion

13  of controlled substances; mainly -- namely, opioid

14  pills into the illegal marketplace?

15          MR. SATIN:  Mr. Boggs, to answer that

16  question, you can only rely on information you

17  learned at -- while at McKesson.

18          MR. STANNER:  Object to the form.

19          THE WITNESS:  Could you repeat the

20  question?

21  BY MR. HAWAL:

22      Q    Yes.  Since you've joined McKesson, have

23  you become aware that prior to 2010, McKesson was

24  not complying with its obligations to maintain

1  effective controls to prevent the diversion of

2  controlled substances?

3          MR. STANNER:  Object to the form.

4          MR. SATIN:  Same instruction.

5          THE WITNESS:  It was my understanding

6  that they were not necessarily reporting

7  suspicious orders.

8  BY MR. HAWAL:

9      Q    You're aware that in May of 2008,

10 McKesson entered into a settlement agreement and

11 signed a memorandum of understanding or memorandum

12 of agreement with the U.S. Department of Justice

13 and the DEA whereby McKesson agreed to pay a fine

14 of $13.25 million for failing to maintain

15 effective controls against diversion of certain

16 controlled substances at various of its

17 distribution centers in the United States?

18          MR. STANNER:  Object to the form.

19          THE WITNESS:  I'm aware of that

20 settlement, that that settlement agreement

21 happened.

22          (Plaintiffs' Exhibit No. 3 was

23          marked for identification.)

24          MR. HAWAL:  Andrew.

1          MR. STANNER:  I'm sorry.

2    BY MR. HAWAL:

3          Q    Mr. Boggs, I handed you what's been

4    marked as Exhibit 3.  It is a document marked --

5    Bates stamped MCKMDL00536478.  It is a Settlement

6    and Release Agreement and Administrative

7    Memorandum of Agreement, which is dated May 2nd,

8    2008.

9          You've seen this document previously?

10         A    Not since my time at McKesson, no.

11         Q    Well, did you see this document when

12   your deposition was taken this past summer?  Do

13   you recall that?

14         A    No, I don't recall.

15         Q    In any event, you're aware that this

16   agreement was executed between the Department of

17   Justice and McKesson?

18         A    I do.

19         Q    And if we look at page 10 of this

20   document, it's a document that was signed by

21   various individuals, including John Hammergren,

22   president of McKesson Corporation, and Donald

23   Walker, senior vice president.

24         A    I see that.

```
 1              MR. STANNER:  Sorry.  The Bates number
 2   is MCKMDL00536487.  The page numbers jump around.
 3   BY MR. HAWAL:
 4        Q    Mr. Hammergren is the president of
 5   McKesson today?
 6        A    He is not.
 7        Q    When did he stop being president of
 8   McKesson?
 9        A    I don't know.
10        Q    Well, can you give me an approximation?
11        A    I can't.
12        Q    Don Walker is still with McKesson?
13        A    He is not.
14        Q    When did he leave McKesson?
15        A    Maybe a year after I was hired by
16   McKesson, approximately.
17        Q    On page 3 of this document, at the very
18   top, "McKesson was alleged to have failed to
19   maintain adequate controls against the diversion
20   of controlled substances on or prior to
21   December 31st, 2007, at all distribution
22   facilities operated, owned or controlled by it."
23              Do you see that?
24        A    I do.
```

1      Q    And paragraph 4, it says that "McKesson

2    was alleged to have failed to detect and report

3    suspicious orders of controlled substances."

4           Is it your understanding that this was

5    the basis for this settlement resulting in

6    McKesson agreeing to make changes to its diversion

7    control efforts and to pay a fine of $13.25

8    million?

9           MR. STANNER:  Object to the form, vague,

10   compound.

11          THE WITNESS:  I believe that that's what

12   it says in the document, yes.

13   BY MR. HAWAL:

14     Q    And if you look at the terms and

15   conditions below that where McKesson assumed --

16   did McKesson assume certain obligations as a

17   result of this settlement with the Department of

18   Justice and the DEA?

19     A    That's what it says in the document,

20   yes.

21     Q    Well, did you know that that was in fact

22   true as a result of your employment with McKesson?

23          MR. STANNER:  Objection.  Form.

24          THE WITNESS:  Only inasmuch as what's in

1    the document.

2    BY MR. HAWAL:

3        Q    As a result of this settlement, McKesson

4    agreed to maintain a compliance program designed

5    to detect and prevent diversion of controlled

6    substances as required under the CSA, the

7    Controlled Substances Act, and applicable DEA

8    regulations, and then it goes on to indicate that

9    McKesson would establish thresholds for controlled

10   substances.

11            Is it your understanding that that was

12   part of the obligations assumed by McKesson as a

13   result of the settlement?

14       A    That's what it says on the document,

15   yes.

16       Q    And the document also indicates that

17   McKesson would have its employees be trained in

18   the detection of suspicious orders.  True?

19       A    That's correct.

20       Q    And required McKesson to not only

21   identify orders that are suspicious but report

22   those suspicious orders to the DEA.  True?

23            MR. STANNER:  Object to the form, vague.

24            THE WITNESS:  That's correct.

 1   BY MR. HAWAL:

 2        Q    As an employee of McKesson, did you --

 3   would you expect that McKesson would take this

 4   obligation seriously?

 5             MR. STANNER:  Object to the form.

 6             THE WITNESS:  Since my time at McKesson,

 7   I've seen nothing more than them taking their

 8   regulatory obligations seriously.

 9   BY MR. HAWAL:

10        Q    Well, was it your -- would it be your

11   expectation that by virtue of Mr. Walker and

12   Mr. Hammergren signing this settlement agreement

13   with the DEA, that it would in fact take the

14   obligations that it is said to have assumed on

15   page 3 as being taken seriously?

16             MR. STANNER:  Object to the form,

17   speculation.

18             THE WITNESS:  I assume that to be

19   correct.

20   BY MR. HAWAL:

21        Q    At this point in time in 2008, would it

22   be fair to say that the opioid crisis in the

23   United States was exploding?

24             MR. STANNER:  Object to the form,

 1  characterization, vague, speculation.

 2           MR. SATIN:  And objection to the extent

 3  you're relying on your official work at the DEA,

 4  don't answer with respect to that work.

 5           THE WITNESS:  I don't know that I can

 6  answer that question.

 7  BY MR. HAWAL:

 8      Q    Well, sir, I mean, were you -- you

 9  weren't living in a DEA bubble in 2008, were you?

10  Were you paying attention to what was in the news

11  media and in various forms, whether it be print

12  or -- or television?

13      A    I was paying attention to my duties and

14  responsibilities at the Drug Enforcement

15  Administration.

16      Q    Were you also aware that in the public

17  domain, by virtue of media reports, that it was

18  prominently identified in this time period that

19  the opioid epidemic was exploding in the United

20  States?

21           MR. STANNER:  Object to the form.

22           THE WITNESS:  I know that there were

23  media articles about the opioid epidemic during

24  that time frame.

1          (Plaintiffs' Exhibit No. 4 was

2          marked for identification.)

3          MR. HAWAL:  Andrew.

4          I'm going to use the ELMO.

5   BY MR. HAWAL:

6      Q   Mr. Boggs, I'm handing you what has been

7   marked as Plaintiffs' Exhibit 4.  It's a 2000 --

8   May of 2002 report of the United States General

9   Accounting Office, entitled "Prescription drugs:

10  State monitoring programs provide useful tools to

11  reduce diversion."

12          Have you seen this document?

13          MR. STANNER:  So let me just clarify,

14  Mr. Hawal.  What this appears to be is the cover

15  page --

16          MR. HAWAL:  Yeah.

17          MR. STANNER:  -- and an excerpt.  This

18  is not the entire document.  Is that accurate?

19          MR. HAWAL:  It's not the entire

20  document.

21          MR. STANNER:  I just want to clarify.

22          MR. HAWAL:  I'm just going to ask him

23  about one paragraph on page 2.  Well, actually,

24  it's on page 4.

 1   BY MR. HAWAL:

 2         Q    On the back of page 4, on the back of

 3   the exhibit that you have in front of you, it

 4   states:  "The diversion and abuse of prescription

 5   drugs are associated with incalculable costs to

 6   society in terms of addiction, overdose, death and

 7   related criminal activities.  DEA has stated that

 8   the diversion and abuse of legitimately produced

 9   controlled pharmaceuticals constitute a

10   multibillion dollar illicit market nationwide."

11              Based upon your experience, sir, is that

12   a true statement?

13              MR. STANNER:  Object to the form.

14              MR. SATIN:  And object to the extent

15   it's calling for you to rely on your time at the

16   DEA.  You can't rely on that information or

17   disclose information about your work at the DEA in

18   answering that question.

19              THE WITNESS:  I think that the abuse of

20   prescription drugs can cause societal issues and

21   costs associated with societal issues.

22   BY MR. HAWAL:

23         Q    So you do agree with that statement?

24              MR. STANNER:  Same objection.

```
 1              THE WITNESS:  Without some of -- seeing

 2    some of the specific facts in terms of the

 3    adjectives used in there, I don't know whether I

 4    can necessarily agree.  I mean, it is a horrific

 5    problem in this country.

 6              (Counsel conferring.)

 7              (Plaintiffs' Exhibit No. 5 was

 8              marked for identification.)

 9    BY MR. HAWAL:

10       Q    Mr. Boggs, I have handed you a

11    PowerPoint presentation marked as Exhibit 5.  Have

12    you -- have you seen this document before?

13              MR. SATIN:  We have a document that's

14    got writing in the middle.  I don't know if that's

15    a mistake.

16              MR. HAWAL:  No, it's -- it's the way it

17    was produced to me.  I don't know whose writing it

18    is, but...

19              MR. STANNER:  Do you -- I see there's no

20    Bates number on it.  Are you aware of where it was

21    produced from?

22              MR. HAWAL:  I -- I am not.  And I don't

23    have one with the Bates number on it.

24    BY MR. HAWAL:
```

```
 1        Q    In any event, this is a document that

 2   was apparently created by someone at the DEA.

 3   Would that be a fair statement, Mr. Boggs?

 4        A    I don't recall --

 5             MR. STANNER:  Object.  Form and

 6   foundation.

 7             THE WITNESS:  I don't recall ever seeing

 8   this document before.

 9   BY MR. HAWAL:

10        Q    Well, are you familiar with the logos on

11   the front page of the document as being logos

12   associated with the Department of Justice and the

13   DEA, Office of Diversion Control?

14        A    They certainly appear to be, yes.

15        Q    Are you aware that such a meeting or

16   that such meetings occurred in approximately 2009,

17   2008, and the late 2000s?

18             MR. SATIN:  Objection.

19             MR. STANNER:  Vague.  Object to the form

20   of the question.

21             MR. SATIN:  And objection pursuant to

22   Touhy.  Do not answer that.

23   BY MR. HAWAL:

24        Q    Let's go to slide number 3 under "Closed
```

 1   System."

 2              MR. HAWAL:  Do you have it?

 3              (Counsel conferring.)

 4   BY MR. HAWAL:

 5      Q    Slide number 3.  Do you see that the --

 6   where it identifies "Closed System," it's reported

 7   that:  "When a registrant fails to adhere to their

 8   responsibilities, those violations represent a

 9   danger to the public and jeopardize the closed

10   system of distribution."

11              Is it your understanding that as a

12   result of your work at McKesson that that is in

13   fact an accurate and true statement?

14              MR. STANNER:  Object to the form.

15              THE WITNESS:  I would agree that if --

16   potential failure to adhere to a responsibility

17   could have some consequences to that.

18   BY MR. HAWAL:

19      Q    And on slide number 15, this slide

20   reiterates what the obligations of a wholesaler,

21   including McKesson, is and has been since 1970 as

22   it relates to suspicious orders.  True?

23              MR. STANNER:  Object to the form of the

24   question and foundation.

1           THE WITNESS:  It appears to reiterate

2    the regulation, yes.

3    BY MR. HAWAL:

4        Q    And on the next page, slide 16, is it

5    your understanding that the reporting of a

6    suspicious order does not relieve a distributor,

7    including McKesson, of the responsibility to

8    maintain effective controls against diversion?

9           MR. STANNER:  Object to the form.

10          THE WITNESS:  It's my understanding that

11   the distributors, you know, have an obligation to

12   identify and report suspicious orders, and they

13   have an obligation to maintain effective controls

14   against diversion.

15   BY MR. HAWAL:

16       Q    Well, other than just reporting

17   suspicious orders, what other obligations does a

18   distributor have such as McKesson?

19       A    I --

20          MR. STANNER:  Objection.  Calls for a

21   narrative.

22          THE WITNESS:  A distributor has a

23   responsibility to maintain security over those

24   controlled substances that are maintained in our

1  warehouses, and we do that through cages and

2  vaults and security cameras, and all of those

3  kinds of things, while those things are in our

4  possession.

5  BY MR. HAWAL:

6      Q   Well, we're talking about reporting

7  suspicious orders.

8          What other -- in the context of this

9  statement, what other responsibilities does a

10  distributor have which is not relieved simply by

11  reporting suspicious orders?

12          MR. STANNER:  Objection to the form of

13  the question.

14          THE WITNESS:  Well, what the -- what

15  you're asking me about is the -- maintaining

16  effective controls against diversion, and part of

17  that is the security while they're in our

18  possession.

19  BY MR. HAWAL:

20      Q   Well --

21      A   That's maintaining effective controls

22  against diversion.

23      Q   Well, let's -- let's just focus for a

24  moment on suspicious orders as this slide is

 1    focused on.

 2              What other responsibilities does a

 3    distributor like McKesson have beyond simply

 4    reporting a suspicious order as it relates to

 5    suspicious orders?

 6              MR. STANNER:  Object to the form of the

 7    question.

 8              THE WITNESS:  Well, there's two

 9    different obligations that we have.  Under the --

10    as you're asking me about suspicious orders, our

11    obligation under the regulation is to design and

12    operate a system to identify suspicious orders,

13    and then report those to the DEA.  That's the

14    regulation for suspicious orders.

15    BY MR. HAWAL:

16       Q    Well, does that obligation also require

17    McKesson to not ship a suspicious order unless

18    it's determined through due diligence that it is

19    unlikely to be diverted into illicit channels?

20              MR. STANNER:  Objection to the form.

21              THE WITNESS:  I'm not -- I'm not aware

22    anywhere in the regulation it says not to ship.

23    It says to identify and report suspicious orders.

24    BY MR. HAWAL:



12    BY MR. HAWAL:

13        Q    Or at least should have been, true?

14            MR. STANNER:  Object to the form of the

15    question.

16            THE WITNESS:  The regulation does not

17    say that we -- to block.  It says to identify and

18    report suspicious orders.

19    BY MR. HAWAL:

20        Q    Since you have joined McKesson, have you

21    gone back to determine what McKesson was doing

22    with suspicious orders in 2007 and 2008?

23        A    I have reviewed some materials of the

24    type of programs that they had back in -- around

1    2007, 2008.

10   BY MR. HAWAL:

11       Q    Is it your understanding that that was

12   one of the responsibilities that McKesson assumed

13   and undertook as part of its settlement with the

14   Department of Justice and DEA in 2008?

15           MR. STANNER:  Objection.  Speculation.

16           THE WITNESS:  I think it was part of the

17   program that they created in response to the

18   settlement agreement.

19   BY MR. HAWAL:

20       Q    In other words, McKesson made an

21   obligation or set forth an obligation and

22   undertook an obligation, according to that

23   settlement agreement, that it would not only

24   report suspicious orders to the DEA but it would

 1  block and not ship suspicious orders.  True?

 2          MR. STANNER:  Objection to the form,

 3  speculation.

 4          THE WITNESS:  I believe as part of the

 5  settlement agreement that they were required or

 6  agreed to design and operate a system to identify

 7  suspicious orders and that they would block those

 8  orders.

 9  BY MR. HAWAL:

10      Q    And if we look at slide number 17, the

11  DEA, according to this PowerPoint presentation,

12  indicated that it cannot advise a distributor of

13  an order if an order is legitimate or not.

14          Do you see that?

15      A    I see that, yes.

16      Q    Has the DEA ever -- since you've been at

17  McKesson, has the DEA ever advised you or anyone

18  at McKesson otherwise than what is stated here?

19          MR. STANNER:  Object to the form to the

20  extent he knows about anyone at McKesson.

21          THE WITNESS:  I don't recall having any

22  discussions with anyone from DEA regarding that

23  specific area.

24  BY MR. HAWAL:

1      Q    Well, has DEA ever, to your knowledge,

2   informed McKesson that -- anything contrary to

3   what is stated here, that the DEA cannot advise a

4   distributor if an order is legitimate or not?

5           MR. SATIN:  And objection to the extent

6   it's asking you for your knowledge while at the

7   DEA, don't answer that.

8           THE WITNESS:  Since I've been at

9   McKesson, I have not seen anything from DEA that

10  even -- that discusses this topic.

11  BY MR. HAWAL:

12     Q    Is it your understanding as an employee

13  of McKesson that it is McKesson's obligation, and

14  not the DEA's, to determine whether an order is

15  suspicious or legitimate?

16          MR. STANNER:  Object to the form.

17          THE WITNESS:  I understand the

18  regulation requires businesses such as McKesson to

19  design and operate a system that discloses to

20  McKesson or other distributors suspicious orders

21  as defined in the regulation.

22  BY MR. HAWAL:

23     Q    Is it your understanding as an employee

24  of McKesson that it would not be appropriate

 1   simply to accumulate suspicious order reports and

 2   provide them in bulk to the DEA at the end of the

 3   month, but, rather, the obligation is to report to

 4   the DEA suspicious orders when they are

 5   discovered?

 6            MR. STANNER:  Object to the form of the

 7   question.

 8            THE WITNESS:  I'm not sure if there are

 9   certain parts of agreements that McKesson may have

10   entered into with the DEA to report things in a

11   different manner other than what the regulation

12   requires.  It's my understanding a regulation

13   requires us to report them when discovered.

14   However, I know that there are certain terms of

15   the settlement agreements that somewhat deviate a

16   little bit from the way the regulation is actually

17   written.

18   BY MR. HAWAL:

19       Q    Well, are you aware of any document

20   which sets forth an agreement between the DEA and

21   McKesson whereby it would be appropriate for

22   McKesson to accumulate suspicious order reports

23   and send them in bulk at the end of a month as

24   opposed to sending them when they are discovered?

 1          MR. STANNER:  Object to the form.

 2          THE WITNESS:  I don't know if there's

 3   any agreements between McKesson and the DEA prior

 4   to my employment that would have deviated from the

 5   regulatory requirements.

 6   BY MR. HAWAL:

 7       Q    As a result of your work with McKesson,

 8   are you aware of any published calculations or

 9   algorithms from the DEA which informed McKesson or

10   other distributors as to what orders should or

11   should not be reported to the DEA as suspicious?

12       A    Not that I'm aware of.

13       Q    According to slide number 17, the DEA is

14   identifying to distributors that it is their

15   responsibility to determine which orders are

16   suspicious and make their own decisions as to

17   whether or not those orders should be shipped or

18   not.  True?

19          MR. STANNER:  Objection.  Vague, "true."

20          THE WITNESS:  I understand under the

21   regulations that the distributor has an obligation

22   to design and operate a system that discloses to

23   the distributor those suspicious orders.

24   BY MR. HAWAL:

1        Q    Since you've been with McKesson, have

2    you ever seen or are you aware of the DEA ever

3    endorsing any calculations that were proposed by

4    any distributor, including McKesson, that would be

5    used to identify suspicious orders?

6        A    Are you asking strictly for calculations

7    or --

8        Q    Yes, sir.  For -- for calculations that

9    were created or proposed by DEA on how a

10   distributor like McKesson should be used to

11   identify suspicious orders.

12            MR. STANNER:  Object to the form.

13            THE WITNESS:  Not calculations

14   specifically.  There's been other guidance, but

15   not calculations.

16   BY MR. HAWAL:

17       Q    As to your knowledge, as a result of

18   your work at McKesson, has the DEA ever published

19   or provided any kind of advisory opinion to

20   McKesson or any other distributor regarding the

21   identify -- identification of an order as

22   suspicious?

23       A    I believe that --

24            MR. STANNER:  Object -- I'm going to

 1   object that it's vague.  Sorry.

 2          THE WITNESS:  I believe if you read the

 3   September 27th, 2006 letter from Joe Rannazzisi

 4   that you have submitted as an exhibit to me today,

 5   it puts forth some red flags that might be used in

 6   understanding of -- identification of certain

 7   suspicious orders.

 8   BY MR. HAWAL:

 9       Q    All right.  So you're referring to

10   Exhibit 1, the third page of Mr. Rannazzisi's

11   letter of September 27th, 2006?

12       A    That's correct.

13       Q    And in that letter, Mr. Rannazzisi is

14   identifying examples of circumstances that might

15   be indicative of diversion of controlled

16   substances?

17       A    I am.

18       Q    And in paragraph 1, it says:  "Ordering

19   excessive quantities of a limited variety of

20   controlled substances while ordering few, if any,

21   other drugs might be an indication that diversion

22   is occurring."

23       A    That's correct.

24       Q    And the same would be true with bullet

 1    point number 2:  "Ordering a limited variety of

 2    controlled substances in quantities that are

 3    disproportionate to non-controlled medications

 4    that are ordered"?

 5         A    That's correct.

 6              MR. STANNER:  Object -- I'm going to

 7    object to the form of that question.  It's unclear

 8    if you're asking if that's true or if that's what

 9    it says.

10              MR. HAWAL:  I'm asking whether or not --

11    well, let me clarify.  Obviously it's what he

12    said.

13    BY MR. HAWAL:

14         Q    But do you agree that that's an accurate

15    statement?

16         A    I believe that it -- it is a red flag or

17    could be indicative of diversion, depending on the

18    facts and circumstances.

19         Q    And number 3:  "Ordering excessive

20    quantities of a limited variety of controlled

21    substances in combination with excessive

22    quantities of lifestyle drugs."  Is that an

23    accurate statement?

24         A    That's what it says, yes.

1        Q    And what are lifestyle drugs?  Opioids?

2        A     No, I believe in the context of this,

3   lifestyle drugs may be things like testosterone

4   or -- you know, steroids or Viagra, or other

5   things like that, hair growth drugs.  People have

6   different definitions of "lifestyle drugs."

7        Q    And number 4:  "Ordering the same

8   controlled substances from multiple distributors"

9   could be another red flag?

10       A    That's what --

11            MR. STANNER:  Object to the form of the

12   question.

13   BY MR. HAWAL:

14       Q    So Mr. -- and then -- and then

15   Mr. Rannazzisi has ten additional bullet points.

16   I will not read them all.  But he is attempting to

17   provide distributors with examples of what they

18   should be looking for as part of their due

19   diligence with regard to their responsibility to

20   identify suspicious orders and not ship them.

21            MR. SATIN:  Object --

22   BY MR. HAWAL:

23       Q    True?

24            MR. SATIN:  Objection.  Do not answer

1  that question as it calls for the witness to

2  testify about what Mr. Rannazzisi's intentions

3  were back then.

4  BY MR. HAWAL:

5      Q    Well, would it be a fair interpretation

6  of these various bullet points that Mr. Rannazzisi

7  set forth on this page as setting forth examples

8  of what distributors should look for in

9  determining whether an order is suspicious and

10  shouldn't be shipped?  Would that be fair -- as

11  you sit here, a fair understanding of what this

12  document is intended to express?

13          MR. STANNER:  Objection to the form of

14  the question.

15          MR. SATIN:  Objection as well.  Do not

16  answer that.

17  BY MR. HAWAL:



21          MR. STANNER:  Object to the form of the

22   question.

23   BY MR. HAWAL:

24          Q    Have you -- did you see these letters

 1   before they went out, these Rannazzisi letters,

 2   both Exhibit 1 and Exhibit 2?

 3              MR. STANNER:  Object to the form of the

 4   question.

 5              You're referring to 2006?

 6              MR. HAWAL:  Yes, and 2007.

 7              MR. SATIN:  Objection.  Don't answer

 8   that question.

 9   BY MR. HAWAL:

10      Q    Did you have any role in drafting these

11   letters?

12              MR. SATIN:  Objection.  Don't answer

13   that question.

14   BY MR. HAWAL:





3        Q    Was it ever contemplated -- well, strike

4    that.

5             Since you've come to McKesson, did you

6    ever learn from the DEA that McKesson could

7    delegate to its customers the legal obligations to

8    prevent diversion of controlled substances?

9             MR. STANNER:  Objection to the form.

10            THE WITNESS:  I'm not sure I understand

11   your question.

12   BY MR. HAWAL:

13       Q    Well, we've talked about all the legal

14   obligations that a company like McKesson has as a

15   distributor to put in place a system to prevent

16   the diversion of controlled substances, right?

17       A    That's correct.

18       Q    Have you ever been told by the DEA that

19   McKesson could delegate that legal obligation to

20   its pharmacy customers?

21       A    It -- the pharmacy customers have their

22   own regulatory obligations to maintain effective

23   controls against diversion.

24       Q    So does -- does McKesson delegate its

1    obligations under the Controlled Substances Act to

2    customers?

3          A    Not to my knowledge.

4          Q    I mean, it's McKesson's obligation, and

5    it's a non-delegable obligation, true?

6          A    Well, all registrants have various

7    obligations.  So, you know, it's not just

8    McKesson's obligation and nobody else's.

9          Q    I under- --

10         A    Other registrants have obligations as

11   well.

12         Q    I understand.  But my question relates

13   to the obligations of a distributor like McKesson.

14   It has certain legal obligations, correct?

15         A    That's correct.

16         Q    You agree with me that McKesson cannot

17   delegate its obligations to a customer?

18         A    I agree.









17      Q    And do you agree that the law requires

18  that suspicious orders that are blocked should not

19  be shipped to the customer?

20          MR. STANNER:  Sorry.  Object to the form

21  of the question.  "Orders that are blocked" --

22          MR. HAWAL:  Yes, sir.

23          MR. STANNER:  -- "should not be

24  shipped."

1          THE WITNESS:  I don't know that there's

2   anything in the law that there's a requirement to

3   not ship that -- that.  It says to identify and

4   report suspicious orders.

5   BY MR. HAWAL:

6      Q    So is it your position that a suspicious

7   order that is identified and reported can be

8   shipped or should be shipped?

9          MR. STANNER:  Object to the form of the

10  question, calls for a legal conclusion.

11         THE WITNESS:  Under our program, we

12  block the order and don't ship it.

13  BY MR. HAWAL:

23  BY MR. HAWAL:

24     Q    You -- you do that in order to

1  effectively exercise your responsibility to avoid

2  diversion, true?

3          MR. STANNER:  Object to the form.

4          THE WITNESS:  Well, I think, first of

5  all, you have to understand that a suspicious

6  order does not equal a suspicious customer.  It's

7  important to understand that -- that orders that

8  are simply of unusual size or deviate

9  substantially from a normal pattern or -- or

10  frequency are simply that.  Without further

11  knowing more about the customer, you don't know

12  whether or not that suspicious order is destined

13  for diversion or not.  And we know from our

14  experience, more likely than not that that's not

15  the case.

16          So to focus on a suspicious order is

17  actually misplaced.  If you really want to know

18  whether or not diversion may or may not occur, you

19  need to know the customer.  And so part of our

20  program is extensive due diligence so that we know

21  our customer.

22  BY MR. HAWAL:



13    BY MR. HAWAL:

14         Q    I understand that there are all sorts of

15    possibilities, but the fact of the matter is that

16    suspicious orders can lead you to a suspicious

17    customer, true?

18              MR. STANNER:  Object to the form of the

19    question.

20              THE WITNESS:  Without knowing more about

21    the customer, no.

22    BY MR. HAWAL:

23         Q    Well --

24         A    There is an assumption that a suspicious

1  order equals a suspicious customer, and that's

2  very misplaced from my experience.

3      Q    Well, sir, are you talking about --

4  what -- what experience are you talking about?

5      A    My experience at McKesson.

6      Q    Well, the -- the terms and conditions of

7  the 2008 settlement agreement called for the

8  identification and detection of suspicious orders.

9  True?

10     A    That's correct.

11     Q    Do you see one word in this entire

12 agreement that talks about suspicious customers?

13         MR. STANNER:  I'm sorry, which exhibit

14 are you referring to?

15         MR. HAWAL:  I don't remember the -- the

16 number, but it's the settlement release and

17 agreement.

18         MS. MONAGHAN:  This is 3.

19         MR. STANNER:  Obviously we don't want

20 him to read the entire thing here.

21         MR. HAWAL:  Yeah, I don't.

22 BY MR. HAWAL:

23     Q    Did you ever see anything in this

24 obligation that McKesson undertook in 2008 that

 1  talks about anything other than suspicious orders

 2  and the need to identify them and report them?

 3          MR. STANNER:  Object to the form of the

 4  question, assumes facts.

 5          THE WITNESS:  It talks about maintaining

 6  effective controls against diversion.

 7  BY MR. HAWAL:

 8      Q    Mm-hmm.  And I think we went through --

 9      A    Sure.

10      Q    -- a number of times that

11  paragraph 1(a) identifies suspicious orders.  And

12  by my count, it's three in that paragraph.  And if

13  you go to paragraph (c), it again talks about

14  suspicious orders.

15          But nowhere do I see anything about

16  suspicious customers.  Am I incorrect?

17      A    I don't -- without reading the entire

18  document, I don't know that it speaks to it or

19  not.  I'm not sure what your question is.

20      Q    Well, if you would like to at -- you

21  know, during the course of the break to -- to read

22  the entire document and tell me where you find

23  suspicious customers, I'll be happy to allow you

24  to come back and correct -- correct me.  Okay?

 1             MR. SATIN:  Counsel, I don't think he

 2    can do that.  If you want him to read this now and

 3    give you an answer, he can do it.  But he can't --

 4    you can't ask him to do work outside of the

 5    hearing.  If you want an answer --

 6             MR. HAWAL:  Well, I can -- I can ask him

 7    anything I'd like.  I mean, we are going to be

 8    taking breaks during -- and including a lunch

 9    break, and if -- if you or McKesson's counsel

10    wants to assist the witness to identify suspicious

11    customers in this document, I would be happy to do

12    that as well.

13    BY MR. HAWAL:

14       Q    As part of this settlement agreement,

15    did it -- does it appear to you that the DEA and

16    the Department of Justice expected McKesson to

17    provide its employees, including sales

18    representatives, with adequate training and

19    guidance on how to implement and obey this new

20    Controlled Substance Monitoring Program?

21             MR. STANNER:  Object --

22             MR. SATIN:  Objection -- sorry.

23    Objection.  Do not answer that as it's asking for

24    what the DEA was intending.

 1   BY MR. HAWAL:

 2       Q    You've read this -- you've read this

 3   document previously, correct?

 4       A    I only -- I have not read it cover to

 5   cover, no.

 6       Q    Well, is it your expectation as a

 7   McKesson employee that McKesson's sales

 8   representatives and Regulatory Affairs

 9   representatives should have adequate training on

10   how to implement and effectively follow the

11   Controlled Substance Monitoring Program that

12   McKesson has created?

13            MR. STANNER:  Object to the form.

14            THE WITNESS:  I believe that that was

15   part of the settlement agreement for the -- for

16   the terms of the -- during the terms of the

17   settlement agreement.

18   BY MR. HAWAL:

19       Q    And do you believe as a McKesson

20   employee that that should be an obligation that

21   McKesson should have followed and adhere to?

22            MR. STANNER:  Object to the form.

23            THE WITNESS:  I believe that it was part

24   of the agreement during the terms of the life of

 1    this agreement and what they were responsible for.

 2    BY MR. HAWAL:













20    BY MR. HAWAL:

21         Q     As of 2011, did you make occasional

22    public statements expressing your frustration as a

23    DEA agent whereby you believed that certain

24    distributors were not following their obligations

1    under the law to prevent diversion of controlled

2    substances?

3        A    I'm not sure that I agree with the

4    characterization of it being my frustration.  I --

5    I'm sure that I -- during that time frame, I made

6    public statements on a variety of different

7    topics.

8        Q    Well, did you make some public

9    statements that were critical of distributors with

10   respect to violating their obligations under the

11   law to prevent diversion of controlled substances?

12       A    If you have a specific example that we

13   could talk about --

14       Q    Well, we --

15       A    -- I would be more than happy to.  I --

16   I don't recall every --

17       Q    You don't recall ever doing that?

18       A    I don't recall every statement I made.

19       Q    Do you recall making a statement to

20   USA Today which was published in 2012?

21       A    During my time at DEA, I made dozens of

22   statements to the media.  I don't recall off --

23   any one in particular.

24            MR. HAWAL:  I think we're on Exhibit 6.

 1                (Plaintiffs' Exhibit No. 6 was

 2                marked for identification.)

 3                MR. HAWAL:  I'm going to use the ELMO.

 4       BY MR. HAWAL:

 5            Q    Mr. Boggs, I'm handing you what has been

 6       marked as Exhibit 6.  Is an article that was in

 7       the USA Today on February 28, 2012, where it says:

 8       "DEA aims big to stem painkiller black market."

 9       And then below that it says:  "Cardinal Health

10       says it didn't look the other way."

11                Do you remember seeing this article at

12       or near the time that it came out?

13            A    I don't recall it, no.

14            Q    All right.  If we go to -- I think it's

15       the fourth page, it attributes certain statements

16       to you.  And the paragraph starts with:  "'Within

17       the closed system, each license holder has

18       responsibilities to maintain control of the drugs

19       and keep them from getting to illegitimate

20       players,' DEA Special Agent Gary Boggs said."

21                First of all, is that an accurate

22       statement?

23                MR. STANNER:  Object to the form, vague.

24                THE WITNESS:  The registrants have a

1    legal obligation to maintain effective controls --

2    BY MR. HAWAL:

3         Q    So it is --

4         A    -- against diversion.

5         Q    It is an accurate statement.

6         A    I agree.

7         Q    And do you deny having made that

8    statement to a USA Today reporter in that context?

9         A    I don't.

10        Q    Do you deny having a conversation with a

11   USA Today reporter about the subject of diversion

12   of controlled substances and distributors'

13   obligations?

14        A    I do not.

15        Q    Okay.  And then it goes on to say:

16   "'The law requires distributors, such as Cardinal

17   Health, to have systems to detect suspicious

18   orders, which must then be reported to the DEA.

19   The Agency repeatedly warns distributors that the

20   size of an order alone triggers the distributors'

21   responsibility to report it to the DEA,' Boggs

22   said."

23             First of all, was that an accurate

24   statement?

1            MR. STANNER:  Object to the form.

2    Accurate that it's there, or accurate that he said

3    it, or is the statement itself substantively

4    accurate?

5            THE WITNESS:  I believe you read it

6    correctly.

7    BY MR. HAWAL:

8        Q    Well, is it -- is it a true statement?

9        A    It's a paraphrase of the regulation,

10   yes.

11       Q    Again, do you have any reason to deny

12   having made that statement to a USA Today

13   reporter?

14       A    I do not.

15       Q    Then it says:  "'Distributors must cut

16   sales to those drugstores with suspicious orders,

17   even if they have a valid DEA license,' he said."

18            Is that also a true statement?

19            MR. STANNER:  Same objection.

20            THE WITNESS:  I don't know that I agree

21   with the characterization of that.  We have an

22   obligation to maintain effective controls against

23   diversion, and if that means stopping sales, that

24   could be, based upon the facts and circumstances,

1   the outcome.

2   BY MR. HAWAL:

3       Q    And then it has a statement in

4   quotations:  "If all those players involved are

5   either complicit or not doing their due diligence

6   correctly, that whole system comes tumbling down."

7            Do you disagree that you made that

8   statement?

9       A    I don't.

10      Q    And then below that it has further

11  statements attributable to you.  It says:

12  "'Distributors can act more quickly than law

13  enforcement if they know something is wrong,'

14  Boggs said."

15           Do you have any reason to dispute having

16  said that statement?

17           MR. STANNER:  Again, I'm going -- I'm

18  going to object to the foundation on all the

19  questions that are clearly paraphrases and not

20  quotations.

21  BY MR. HAWAL:

22      Q    Do you agree -- do you have any reason

23  to disagree that you made such a statement or a

24  statement to that effect?

 1        A    I do not.

 2        Q    And then it goes on to say:  "'We have

 3   to investigate things in a different manner than a

 4   company that can act on a suspicious order.  We

 5   have to meet constitutional and legal

 6   requirements.  They don't have to sell to

 7   someone,' Boggs said.  'They have a moral

 8   obligation as keepers of powerful and dangerous

 9   substances to make sure those substances are used

10   for legitimate medical purposes.'"

11             Do you have any reason to dispute having

12   made those statements?

13        A    I do not.

14        Q    Looking at the context of these

15   statements and in terms of what this article is

16   reported to be about, would it be fair to say that

17   you as a DEA agent at the time were expressing

18   dissatisfaction or frustration with certain

19   distributors as to their failure to maintain

20   effective controls to prevent the diversion of

21   controlled substances?

22             MR. STANNER:  Object to the form.

23             MR. SATIN:  And I -- objection.  I'm

24   objecting pursuant to Touhy.

1            I don't quite understand the question.

2    You can ask him about what he said but not why he

3    said it or what was going on at DEA at the time

4    that may have informed this statement.

5            MR. HAWAL:  Counsel, this -- this is --

6    he clearly made a public statement, and I believe

7    that the Touhy requirements allow me to explore

8    the circumstances of this public statement.  I

9    don't understand how you can object in the context

10   of what he says here.

11           MR. SATIN:  So I -- I had a conversation

12   with the AUSA, Mr. Bennett, on this subject, and

13   while it's permissible to ask about the fact of

14   those public statements, but what is behind those

15   statements, the circumstances, the motives, the

16   background material, that is off-limits.  That's

17   an issue you'll have to take up with the

18   government.

19           MS. KASWAN:  We've been going quite a

20   while.  Can we take a break?

21           MR. STANNER:  The witness is fine, so

22   we're happy to keep going.  Obviously, people

23   should feel free to use the restroom.

24           MS. KASWAN:  I could use a break.

 1                THE VIDEOGRAPHER:  The time is

 2    11:24 a.m.  We're going off the record.

 3                (Recess.)

 4                THE VIDEOGRAPHER:  The time is

 5    11:41 a.m., and we're back on the record.

 6    BY MR. HAWAL:

 7        Q    Mr. Boggs, continuing on with the

 8    USA Today article that we've been discussing,

 9    there's another statement that is attributable to

10    you, and it says:  "'You can have the ostrich

11    approach.  You can stick your head in the sand and

12    ignore blatant signs,' Boggs said."

13                And then it goes on to say:  "This

14    company is sitting in a state that has been the

15    epicenter of the problem.  It's no secret that the

16    drug of choice is oxycodone.  I don't think you

17    have to be that strong of an investigator to put

18    two and two together," close quote.

19                Are those statements that you would have

20    made?

21                MR. STANNER:  Object to the form of the

22    question, the word "attributable."

23                THE WITNESS:  I -- I believe that

24    they're correct, yes.

 1  BY MR. HAWAL:

 2       Q    Were these -- were these the kinds of

 3  statements that are attributive -- attributed to

 4  you in this article that you would have been

 5  generally making during this frame?

 6            MR. STANNER:  Object to the form of the

 7  question.

 8  BY MR. HAWAL:

 9       Q    In 2012.

10            MR. STANNER:  Same objection.

11            THE WITNESS:  I don't know that I

12  understand your question when you say --

13  BY MR. HAWAL:

14       Q    Well --

15       A    -- "generally making."

16       Q    Well, were these the kinds of statements

17  that you were generally making to individuals who

18  would have been inquiring about the opioid crisis

19  and certain distributors not living up to their

20  obligations under federal regulations?

21            MR. SATIN:  Counsel, I'm sorry to

22  interrupt.  Are you asking about statements he was

23  making --

24            MR. HAWAL:  In the public domain.

1          MR. SATIN:  -- in the public domain?

2          MR. HAWAL:  Yes, sir.

3          THE WITNESS:  This is a statement I made

4     in this particular article.  I don't recall every

5     statement that I made during that time frame.

6     BY MR. HAWAL:

7          Q    Let me ask you this:  When you left DEA,

8     did you get some type of clearance from the DEA to

9     go work for McKesson?

10         A    I believe that I was interviewed by

11    McKesson counsel on -- on that.

12         Q    Well, I'm not so concerned about

13    McKesson's counsel.  But did you seek clearance

14    from the DEA to go work for a distributor?

15         A    I don't recall doing that, no.

16         Q    So you don't have any type of written

17    agreement with the DEA that allowed you to go work

18    for McKesson?

19         A    I do not.

20         Q    Okay.  So as far as you know, there were

21    no restrictions placed upon you by the DEA as to

22    what you could or could not communicate with

23    McKesson about as it relates to your pre, or --

24    prior employment with the DEA?

 1          MR. STANNER:  Object to the form of the

 2     question.

 3          THE WITNESS:  I don't have any

 4     restrictions that I'm aware of, no, other than

 5     what we're talking about today.

 6          MR. STANNER:  Mr. Hawal, I think someone

 7     on the phone is complaining about the microphones.

 8          Can the people on the phone hear us?

 9          (UNIDENTIFIED SPEAKER):  It sounds like

10     the mics have been turned down a little bit.  I

11     don't know if there's a way to adjust the volume.

12     We were fine before the break.

13          MR. STANNER:  I think we just tried to

14     do that.  Has there -- have you -- have you

15     noticed any change?  We just tried -- we just

16     changed the volume.

17          (UNIDENTIFIED SPEAKER):  No, not yet.

18          THE VIDEOGRAPHER:  Do you hear anything

19     better now?

20          (UNIDENTIFIED SPEAKER):  Yes.  Much

21     better.  Thank you.

22          MR. STANNER:  Great.  If people on the

23     phone could mute their phones, that would be very

24     helpful.  Thanks.

1           (Plaintiffs' Exhibit No. 7 was

2           marked for identification.)

3   BY MR. HAWAL:

4       Q    Mr. Boggs, I'm handing you what has been

5   marked as Plaintiffs' Exhibit 7, which is a

6   different article but also from 2012.  And this

7   was published in Bloomberg Businessweek.  The

8   title of the article is "American Pain:  The

9   Largest U.S. Pill Mill's Rise and Fall."  "There

10  were 335 million prescriptions for painkillers

11  written in 2011.  Is it any wonder some of them

12  were from criminals?"

13          And my question is, do you recall being

14  interviewed by someone from Bloomberg Businessweek

15  at or around this time where you made certain

16  statements that were -- that appeared in this

17  article?

18      A    I do not.

19      Q    I'm going to put on the screen a

20  paragraph that has certain statements that are

21  attributable to you.  And it says:  "Gary Boggs,

22  Special Agent with the DEA's Office of Diversion

23  Control says, 'The cases that the DEA has brought

24  in recent years involved wholesalers knowingly

 1  making enormous sales to customers that were

 2  per se in violation of DEA rules.  The notion put

 3  out by HDMA that somehow or another the DEA is not

 4  providing essential information to them is simply

 5  not accurate,' says Boggs.  'It's a smoke screen.

 6  It's a step out of desperation.'"

 7              Do you remember making such statements

 8  in 2012?

 9              MR. STANNER:  Object to the form,

10  compound.  Vague if you're referring to the

11  quotation on the preceding sentence.

12              MR. HAWAL:  Yes.

13  BY MR. HAWAL:

14      Q    Do you -- do you remember making such

15  statement?

16              MR. HAWAL:  I'm sorry?

17              MR. STANNER:  I'm sorry, you said,

18  "Yes."  Do you mean -- are you referring just to

19  the quotation --

20              MR. HAWAL:  Yes.

21              MR. STANNER:  -- or to the entire --

22              MR. HAWAL:  Yeah, quotations.

23              THE WITNESS:  I -- I don't recall making

24  them.

1   BY MR. HAWAL:

2        Q    Were these statements that were

3   consistent with statements that you would have

4   been making at that time in the public domain?

5        A    It appears a statement that I made for

6   this article.

7        Q    Okay.  And in -- in June of 2012, were

8   you still a DEA employee or had you retired as of

9   that time?

10       A    I retired at the end of that month.

11       Q    Okay.  I'm going to hand you another

12  exhibit.  I think we're at Exhibit 8.

13            (Plaintiffs' Exhibit No. 8 was

14            marked for identification.)

15  BY MR. HAWAL:

16       Q    With regard to the statement that was in

17  the Bloomberg publication, you referred to HDMA.

18  HDMA is the trade association for pharmaceutical

19  wholesalers like McKesson and Cardinal and

20  AmerisourceBergen?

21       A    It was formerly HDA -- or HDMA.  Now

22  it's HDA.  Yes, it is.

23       Q    And you have attended HDMA meetings?

24            MR. SATIN:  Are you asking about since

1    he left the government or before?

2    BY MR. HAWAL:

3        Q    Well, let's talk about since you left

4    the DEA, have you attended HDMA meetings?

5        A    I don't believe I have, no.







8    BY MR. HAWAL:

9         Q    Well, would you agree with me that it

10   would be difficult to make improvements if one

11   didn't go back and determine where improvements

12   were necessary or needed?

13              MR. STANNER:  Object to the form,

14   misstates the testimony.

15              THE WITNESS:  I -- I think in some times

16   that's an opportunity to do that.  I think other

17   times you have to take into consideration that,

18   you know, what may or may not have led to some

19   issues that, you know, many years ago was for a

20   different time and different type of diversion

21   scheme where the red flags may have been different

22   than what they are today.

23              So I want to make sure that I'm not

24   looking at things that are no longer valid in

1   today's environment, so I'm looking more forward

2   and what is today's thread, if you will, of

3   diversion, and how best that we can identify that.

4   Not necessarily looking retrospective to schemes

5   that are no longer a relevant factor.

6   BY MR. HAWAL:

7       Q    Well, you would agree generally that if

8   one doesn't look at past mistakes, one won't learn

9   from their past mistakes.  Is that true?

10          MR. STANNER:  Object to the form of the

11  question.

12          THE WITNESS:  I think that that's

13  generally a -- a solid thing.

14          (Plaintiffs' Exhibit No. 9 was

15          marked for identification.)

16          MR. HAWAL:  Evan, 880.

17  BY MR. HAWAL:

18      Q    Mr. Boggs, I've handed you what has been

19  marked as Plaintiffs' Exhibit 9, bearing Bates

20  stamp MCK-AGMS-0060000880.

1          Do you recall this PowerPoint

2   presentation?

3        A    I do.

4        Q    Did you have a chance to review this

5   when you were preparing for this deposition with

6   your counsel?

7        A    I --

8             MR. STANNER:  Objection to the extent it

9   calls for privileged information.

10  BY MR. HAWAL:

11       Q    Did you review this?

12       A    I've looked at this document, yes.

13       Q    As part of your preparation for this

14  deposition?

15       A    I did.

16       Q    And this was prepared -- what does

17  "Olive Branch" mean?

18       A    Olive Branch is where the McKesson's

19  national redistribution center is.  It's Olive

20  Branch, Mississippi.

21       Q    Okay.  And this would have been prepared

22  after you left the DEA?

23       A    It would.

24       Q    Did it contain information that you

 1  would have learned or become aware of when you

 2  worked for the DEA?

 3      A    It did.  It does.

 4      Q    Did you seek and obtain any clearance

 5  from the DEA to make this presentation or put this

 6  material together?

 7      A    I did not.

 8      Q    Now, when you reviewed this PowerPoint

 9  presentation, did it appear to you to be correct

10  and accurate?  Was there anything -- or was there

11  anything that stood out as being inaccurate or

12  that you deemed required correction?

13      A    I --

14          MR. STANNER:  You're asking -- I'm

15  sorry, Counsel, you're asking at the time it was

16  prepared or since then?

17          MR. HAWAL:  No, when you -- when he

18  reviewed it in preparation for his deposition.

19          MR. STANNER:  My mistake.

20          THE WITNESS:  When I reviewed it, it

21  appeared to be an accurate representation of the

22  presentation that I gave.

23  BY MR. HAWAL:





1    use of prescription painkillers."

2              What did you mean by that statement?

3         A    What I meant by that statement, which is

4    reflected in the -- the next slide, is an example

5    of a manufacturer who was involved in an

6    investigation or a settlement with the government

7    that was about the false or misleading of

8    OxyContin, which was specifically to Purdue

9    Pharma.

10        Q    And the next page references Purdue

11   Pharma in a $635 million fine that was imposed on

12   Purdue for misleading advertising about its

13   OxyContin product?

14        A    That's correct.

15        Q    And you -- you consider that to be one

16   of the causes of the opioid crisis in the United

17   States?

18             MR. STANNER:  Object to the form of the

19   question.

20             THE WITNESS:  I think it has a

21   contributing factor, yes.

22   BY MR. HAWAL:

23        Q    And then the next page, you reference a

24   company, Cephalon, in a $425 million fine, which

1    it ended up agreeing to pay as a result of

2    inappropriate marketing of its drug fentanyl?

3        A    That's correct.

4        Q    Again, a factor that you considered to

5    be contributing to the opioid crisis in the United

6    States?

7             MR. STANNER:  Object to the form.

8             THE WITNESS:  I did.

4   BY MR. HAWAL:

5       Q    So are you saying that you do not agree

6   that as greater amounts of opioid pills are

7   diverted into the illicit marketplace, that the

8   probability is that the number of addictions and

9   deaths will increase?

10          MR. STANNER:  Same -- same objection.  I

11  think it --

12          MR. HAWAL:  I understand.  All you have

13  to do is say, "Objection," Andrew.

14          MR. STANNER:  Okay.

15          MR. HAWAL:  That would be appreciated,

16  because the rules require no speaking objections.

17          MR. STANNER:  I'm just trying to be

18  helpful.

19  BY MR. HAWAL:

20      Q    Sir?

21          MR. HAWAL:  I understand.  Thank you.

22          THE WITNESS:  I -- I think there is a

23  correlation between diversion and -- and

24  associated problems with diversion.

1    BY MR. HAWAL:

2        Q    Well, true.  And the greater the amount

3    of diversion, the greater the likelihood is of

4    ensuing harm, such as addiction and death.  True?

5        A    I believe that's a fair statement, yes.

6        Q    What was the source of this information

7    used to create this graph or chart?

8        A    I -- I don't recall.







21      Q      Have you seen any studies or statistics

22   that reference the cost to communities, both

23   cities and counties and states, as it relates to

24   the economic impact of the opioid crisis?

1          MR. STANNER:  Object to the form.

2          THE WITNESS:  Not that I recall

3   specifically that, no.

4   BY MR. HAWAL:





13    BY MR. HAWAL:

14         Q    I mean, for example, if a small

15    community in a given state that has, you know, 600

16    adults -- you know, a population of 600 adults and

17    is getting hundreds of thousands of opioid pills

18    provided to one pharmacy in such a small

19    community, that would indicate to you an example

20    of an exorbitant amount of pills going to a

21    potentially suspicious customer.  Fair?

22         A    It could be, yes.





 9  BY MR. HAWAL:

10      Q    I'm not -- I'm not saying automatically,

11  but generally speaking, would you agree that an

12  exorbitant amount going to a small community that

13  is also in the epicenter of diversion, that that

14  would be consistent with a greater degree of harm?

15      A    I think it requires a greater -- you

16  know, more diligence to determine what's going on

17  and what the factors are there, and maybe it's

18  diversion or maybe there's a legitimate reason.



14      Q      And these would be red flags that would

15  not have been first known in 2013, but would have

16  been red flags that distributors should have been

17  aware of for many years.  True?

18          MR. STANNER:  Object to the form.

19          THE WITNESS:  I don't know that that's

20  necessarily the case.  We're -- we're talking

21  about a couple of significant diversion schemes

22  that occurred at a period of time that have

23  never -- never happened before in this country.

24  So the red flags sometimes are very specific to

1   that criminal scheme that may not be applicable to

2   other types of schemes or other day-to-day

3   operations of regular pharmacies or practitioners.

4   BY MR. HAWAL:

5        Q    Well, sir, if a -- if a distributor in

6   2005 was aware that these red flags were occurring

7   in a given community or related to a given

8   customer, should these have been red flags in 2005

9   as well as they were in 2013?

10            MR. STANNER:  Object to the form.

11            MR. SATIN:  And objection.  Don't answer

12   that if you're going to disclose non-public

13   information that you obtained while at the DEA.

14            THE WITNESS:  I think that they are red

15   flags, yes.

16   BY MR. HAWAL:









17  BY MR. HAWAL:

18       Q    Well, it could have been an industry

19  practice earlier than that.  There's nothing

20  unique about setting thresholds that coincides

21  with 2006 and 2007.  True?

22            MR. STANNER:  Object to the form.

23            THE WITNESS:  It -- it's one methodology

24  to identify and report suspicious orders.  There

 1    may be others.

 2              (Plaintiffs' Exhibit No. 10 was

 3              marked for identification.)

 4    BY MR. HAWAL:

 5        Q    Mr. Boggs, I'm going to hand you what's

 6    been marked as Exhibit 10.  This is 301,

 7    Operations Manual.

 8              Mr. Boggs, I take it you've seen

 9    McKesson's Operations Manual for the Controlled

10    Substance Monitoring Program?

11        A    I have.

12        Q    If you look at page 13 of 16, and the

13    numbering is at the top right-hand corner, this --

14    is this the -- this is the manual for the

15    Controlled Substance Monitoring Program that was

16    enacted as a part of McKesson's obligations with

17    its 2008 settlement?

18              MR. STANNER:  Object to the form of the

19    question, foundation.

20              THE WITNESS:  It -- it was the -- the

21    program for -- that was instituted in 2008 for --

22    BY MR. HAWAL:



18          MR. STANNER:  Object to the form of the

19  question.  Calls for speculation, hearsay,

20  foundation.

21          THE WITNESS:  I don't agree with the

22  characterization of that.  I think that the intent

23  is to make sure that we're clear and that there's

24  not a -- a way to misconstrue what's being written

1    so that someone -- a third party that may not know

2    anything about what transpired would -- would

3    understand it with -- with some clarity.

4    BY MR. HAWAL:

5        Q    Well, let's go to the next highlighted

6    bullet point.  It says:  "Refrain from using the

7    word 'suspicious' in communications.  Once

8    McKesson deems an order and/or customer

9    suspicious, McKesson is required to act.  This

10   means all controlled substances sales to that

11   customer must cease, and the DEA must be

12   notified."

13            As a former DEA representative, does it

14   trouble you that McKesson is formally instructing

15   its employees to refrain from using the word

16   "suspicious" in communications because of the

17   obligation that follows identifying an order as

18   suspicious?

19            MR. STANNER:  Object to the form of the

20   question on several bases.  I'll avoid a lengthy

21   objection.

22   BY MR. HAWAL:

23       Q    Does that trouble you, sir?

24       A    I think with my understanding and

1  experience over the years is that -- and I think I

2  spoke about it earlier, is there is a -- often

3  misunderstanding that when we say "suspicious

4  order," that it's automatically a suspicious

5  customer.

6          And I think that over the years, I've

7  had a better appreciation for the fact that there

8  are many legitimate reasons why orders could be

9  placed why they are, and oftentimes the label

10  "suspicion" is misused in the context of how we

11  normally would think of that term.  And I think

12  that being prudent in terms of when something is

13  suspicious needs to be more clearly defined and

14  understood of when we -- when we say "suspicious,"

15  that it is -- there is something suspicious about

16  it, and not just label that because that's the

17  definition in the regulation.

18      Q    Well, or is this more consistent with

19  the public statements that you were making to the

20  publications that we identified earlier where you

21  were being critical of certain wholesalers in

22  terms of keeping their heads buried in the sand

23  like an ostrich with regard to their failure to

24  report suspicious orders and continue to ship to

1    customers that were suspicious?

2            MR. STANNER:  Object to the form of the

3    question.

4            THE WITNESS:  I don't think those

5    statements that I made correlate to what you're

6    referring to here in the document at all.

7    BY MR. HAWAL:

15            Q    Who were you criticizing in those

16    statements that you made to the USA Today and

17    Bloomberg News?

18            A    I -- that's -- those statements were

19    made five or six years ago.  I -- I don't even

20    recall that it was --

21            Q    So you don't recall --

22            THE REPORTER:  I need to get the rest of

23    the answer.  "I don't even recall," and you said

24    something else.

```
 1              THE WITNESS:  That it was made -- that

 2   those statements were made five or six years ago,

 3   and I don't recall which specific distributor that

 4   I was referring to or if I was just referring in

 5   general -- generalities.

 6   BY MR. HAWAL:

 7        Q    Well, the one article dealt specifically

 8   with Cardinal.  True?

 9              MR. STANNER:  Object.  Vague.  If you

10   want to point to an exhibit.

11              THE WITNESS:  That's what the article

12   was.

13   BY MR. HAWAL:

14        Q    Well --

15        A    I don't know that my discussions with

16   that reporter was more general in the context of

17   them writing an article that related to Cardinal.

18        Q    Well, would it be fair to characterize

19   those statements as being critical of certain

20   distributors in terms of their failures to monitor

21   suspicious orders and to do due diligence in terms

22   or preventing diversion?

23              MR. PERRY:  Objection.  Form.

24              THE WITNESS:  I -- I would think that's
```

1    a fair statement, yes.

2    BY MR. HAWAL:

3        Q    Now, after the 2008 settlement

4    agreement, you became aware when you were with

5    McKesson that McKesson was -- continued to be

6    under investigation by the DEA, correct?

7            MR. STANNER:  Object to the form.

8            THE WITNESS:  After I was employed by

9    McKesson?

10   BY MR. HAWAL:

11       Q    Yes, sir.

12       A    I understood that there was still a

13   settlement being negotiated between McKesson and

14   the government.

15       Q    Well, did you become aware that rather

16   than improve and adhere to the promises and

17   obligations that were made by McKesson as a part

18   of that 2008 settlement, that the DEA and the

19   Department of Justice determined that McKesson had

20   a continuing systemic or companywide failure to

21   take meaningful steps to prevent diversion of

22   opioids?

23           MR. STANNER:  Object to the form of the

24   question.

1          THE WITNESS:  I don't know that I would

2   agree with the characterization of "systemic."  I

3   don't recall anything in any of the documents that

4   there was systemic.  There was agreements in the

5   settlement agreement that McKesson acknowledged

6   that at various times they had not reported

7   suspicious orders.

8   BY MR. HAWAL:

9       Q    Well, did you recall that the

10  investigation that was conducted by the Department

11  of Justice made a determination that McKesson had

12  a systemic problem throughout the United States at

13  multiple distribution centers from 2008 forward?

14          MR. STANNER:  Object to the form of the

15  question, misstates.

16          MR. SATIN:  And objection -- objection

17  to the extent you're asking him for his -- his

18  answer as it relates to his work at the DEA as

19  opposed to what he learned while he was at

20  McKesson.

21          MR. HAWAL:  I specifically asked what he

22  came to know as a result of his working at

23  McKesson.

24          THE WITNESS:  I --

1          MR. SATIN:  That's not in that question,

2     just to be clear.  That's not what the question

3     was, that one.

4     BY MR. HAWAL:

5          Q    Sir, after you joined McKesson, did

6     you -- were you made aware, either by speaking to

7     McKesson personnel or reviewing documents at

8     McKesson, that the Department of Justice made the

9     claim that there were systemic problems throughout

10    various distribution centers of McKesson

11    throughout the country?

12         MR. STANNER:  Object to the form.

13         THE WITNESS:  I'm aware that the

14    settlement encompassed several different

15    distribution centers.

16              (Plaintiffs' Exhibit No. 11 was

17              marked for identification.)

18    BY MR. HAWAL:

8    BY MR. HAWAL:

9         Q    When did you last see it?

10        A    I looked at it briefly in some of the

11   preparation for this deposition.  I didn't read it

12   cover to cover, but I -- I've seen it a couple

13   different times.

18        Q    Who was in charge of the distribution

19   center at Aurora from a Regulatory Affairs

20   standpoint during 2009, 2010 through 2013?

21             MR. STANNER:  Objection.  Speculation.

22             THE WITNESS:  I believe it was Tom

23   McDonald.

24   BY MR. HAWAL:

```
 1        Q    And Tom McDonald is still employed with

 2   McKesson?

 3        A    He is.
```



```
24   BY MR. HAWAL:
```

     1          Q    Well, you weren't with McKesson when

     2   this investigation was largely being conducted.

     3   True?

     4          A    You asked me if I thought that this

     5   represented indifference, and I'm --

     6          Q    Yes.

     7          A    -- saying that my time, my five years at

     8   McKesson and talking to hundreds of people in

     9   McKesson, I have not seen any evidence of

    10   indifference to its regulatory obligations.

    11          Q    Well, this --

    12          A    And I don't know that it would have just

    13   all of a sudden happened prior to that, but I

    14   didn't -- I have not seen any evidence of

    15   indifference.

    16               MR. HAWAL:  I'm going to move to strike

    17   the answer as nonresponsive.

    18   BY MR. HAWAL:

    19          Q    My question, sir, is you were not with

    20   McKesson when this investigation was being

    21   conducted in Aurora, Colorado.  True?

    22               MR. STANNER:  Object to the form of the

    23   question.

    24               THE WITNESS:  That's correct.

1    BY MR. HAWAL:





2   BY MR. HAWAL:

3        Q    Would you expect that a diligent company

4   would want to investigate whether or not these

5   allegations were true or not?

6             MR. STANNER:  Object to the form.

7             THE WITNESS:  It's my understanding that

8   we have, and we have taken significant steps to

9   address these issues.

10            MR. HAWAL:  I'm not -- move to strike as

11  nonresponsive.

12  BY MR. HAWAL:

13        Q



1  BY MR. HAWAL:

2      Q    In fact, McKesson agreed to pay a

3  $150 million fine as a result of a settlement of

4  many of the allegations contained in this 23-page

5  letter.  True?

6           MR. STANNER:  Object to the form of the

7  question.

8           THE WITNESS:  I don't think that's

9  accurate at all.

10  BY MR. HAWAL:

11      Q    Well, do you --

12      A    The civil penalties relates to

13  non-reporting of suspicious orders.  There's no

14  other penalty -- civil penalty provision other

15  than that, and that's what -- the only way that

16  the dollars can be calculated --

17      Q    Well, you --

18      A    -- is related to failure to report a

19  suspicious order.

20      Q    Were you involved in negotiating the

21  settlement between McKesson and the Department of

22  Justice?

23      A    I was not.

24      Q    And did McKesson accept responsibility

1    as part of that $150 million settlement?

2              MR. STANNER:  Objection.  Form of the

3    question.

4              THE WITNESS:  As I recall, there's --

5    there's some context to that in the settlement

6    agreement, yes.

7    BY MR. HAWAL:

 1    BY MR. HAWAL:

 2         Q    Did anyone at McKesson?

 3              MR. STANNER:  Objection.  Calls for

 4    speculation.

 5    BY MR. HAWAL:

 6         Q    To your knowledge?

 7         A    We were looking at setting thresholds

 8    for -- in today, since I've been with McKesson.

 9         Q    No, that's not my question, sir.  My

10    question is, did anyone to your knowledge go back

11    and make a determination whether or not this

12    statement is true?

13              MR. STANNER:  Same objection.

14              THE WITNESS:  Not to my knowledge, no.

15    BY MR. HAWAL:





     4    BY MR. HAWAL:

     5         Q    So the answer to my question is, yes --

     6              THE REPORTER:  I have looked at?  I have

     7    looked at?

     8              MR. STANNER:  Let him finish the

     9    question -- answer.

    10              Did you finish your answer?

    11              THE WITNESS:  I did.

    12              MR. STANNER:  Okay.

    13    BY MR. HAWAL:

1    BY MR. HAWAL:

2        Q    Was anyone reprimanded or fired or in

3    any way negatively impacted as a result of what

4    had been going on that resulted in McKesson paying

5    a $150 million fine for its failure to effectively

6    follow the Controlled Substances Act?

7            MR. STANNER:  Objection.  Calls for

8    speculation.

9            THE WITNESS:  It's my understanding that

10   the CEO, Mr. Hammergren, testified that someone

11   had been displaced from McKesson.  I -- I'm not

12   privy to that information.

13   BY MR. HAWAL:

14       Q    So you don't know who was in any way

15   fired or otherwise disciplined for the violations

16   that gave rise to the $150 million penalty?

17       A    I don't --

18           MR. STANNER:  Objection to the form.

19           THE WITNESS:  I'm sorry.  I don't know

20   who that individual is or what other actions were

21   taken by senior management in the company.  I --

22   I'm not privy to that.

23   BY MR. HAWAL:





13   BY MR. HAWAL:

14        Q    What -- what states come to mind that

15   also were receiving large quantities of opioids

16   from McKesson that was significantly

17   disproportionate to the population?

18             MR. STANNER:  Object to the form.

19             THE WITNESS:  West Virginia comes to

20   mind in terms of some pharmacies that are in more

21   rural parts of the country with small populations.

22   BY MR. HAWAL:

23        Q    Is that -- is that all, West Virginia

24   and Colorado?

1     A    I haven't conducted a comprehensive

2  study to answer that question, but I -- I don't

3  know.  I --

4     Q    That's -- that's one of the red flags

5  that has long been identified as a potential

6  indicator of diversion?

7     A    It is a red flag, yes.

8     Q    Despite this $150 million penalty or

9  settlement that McKesson agreed to pay for

10 violations of the laws and regulations relating to

11 diversion of controlled substances, you're aware

12 that many employees of the DEA were -- who were

13 involved in these investigations were profoundly

14 disappointed that the fine was not much higher and

15 that some McKesson executives were not charged

16 criminally?

17          MR. STANNER:  Object to the form of the

18 question.

19          THE WITNESS:  I'm not aware of that, no.

20 BY MR. HAWAL:

21    Q    You've not -- have you ever watched any

22 of the "60 Minutes" segments on the opioid crisis

23 that contain interviews with your former

24 colleagues at DEA?

1      A     I have seen one -- one of the "60

2   Minutes" segments, yes.

3      Q     And do you recall that some of those

4   "60 Minutes" segments had interviews with your

5   former colleagues where they expressed significant

6   disappointment that McKesson received such a small

7   fine and that no one was held personally

8   responsible?

9           MR. STANNER:  Object to the form of the

10  question.

11          THE WITNESS:  I don't agree with the

12  characterization that it was a small fine.  It's

13  the largest fine that the DEA has ever gotten,

14  and -- to whether or not they were disappointed or

15  not, I know that they -- that was what they said

16  in that interview.

17  BY MR. HAWAL:

11      Q    Other distributors were also fined by

12 the DEA for failure to conform to the Controlled

13 Substances Act and -- and regulations.  True?

14 Besides McKesson.

15      A    There were other distributors that were

16 fined by the DEA, yes.

17      Q    And do you know what led to other

18 distributors' fines?

19      A    Define --

20           MR. STANNER:  Objection to the form.

21           MR. SATIN:  Objection --

22           THE WITNESS:  Define --

23           MR. SATIN:  Sorry.  Objection to the

24 extent you're asking -- or your answer would

1    reveal information about your work at the DEA.

2              THE WITNESS:  From any -- the public

3    information that I've read, it was related to a

4    failure to report a suspicious order.  That's the

5    only reason a civil fine can be levied on a

6    registrant.

7    BY MR. HAWAL:

8         Q    How many suspicious orders did McKesson

9    fail to report from 2008 through 2013?

10             MR. STANNER:  Objection to the form,

11   speculation.

12             THE WITNESS:  I -- I have no idea.  I

13   don't know.

14   BY MR. HAWAL:

15        Q    You don't know if it was ten or 10,000?

16             MR. STANNER:  Same objection.

17             THE WITNESS:  I don't know.

18   BY MR. HAWAL:



17    Q    Sir, do you know how many suspicious

18  orders were not blocked but were shipped?

19         MR. STANNER:  Objection to the form.

20  BY MR. HAWAL:

21    Q    By McKesson?

22    A    During what time frame?

23    Q    From 2008 to 2013.

24         MR. STANNER:  Same objection.

1              THE WITNESS:  It was prior to my

2    employment.  I -- I don't know.

3    BY MR. HAWAL:

4         Q    So you don't -- so you don't have an

5    answer to that question either, right?

6         A    I do not.

7         Q    Well, would you be concerned about a

8    suspicious order being shipped and not blocked,

9    and no due diligence being done to determine

10   whether or not that suspicious order should be

11   shipped?

12             MR. STANNER:  Objection to the form.

13             THE WITNESS:  Not necessarily.

14   BY MR. HAWAL:

15        Q    Okay.  Did you have a different

16   viewpoint when you were with the DEA?

17             MR. STANNER:  Objection --

18             MR. SATIN:  Objection.

19             MR. STANNER:  -- to the form.

20             MR. SATIN:  Same instruction.  Don't

21   answer that.

22             THE WITNESS:  I don't know that I can

23   answer at this time.

24   BY MR. HAWAL:

1    Q    Do you know who Gary Hilliard is?

2    A    I do.

3    Q    What is he -- what's his position with

4    McKesson?

5    A    I don't believe he's currently employed

6    by McKesson.

7    Q    What was his position with McKesson?

8    A    I believe his title was director of

9    Regulatory Affairs.

10    Q    For what region?

11    A    I don't know that he had a specific

12    region.  I think he had some different

13    responsibilities.

 8              (Plaintiffs' Exhibit No. 12 was

 9              marked for identification.)

10    BY MR. HAWAL:

11        Q     I'm going to hand you what has been

12    marked as Plaintiffs' Exhibit 12, which is a

13    series of e-mails, and the page that I'm going to

14    refer you to is MCKMDL00543972, which is an e-mail

15    exchange between Sharon Mackarness and Gary

16    Hilliard in 2006.

17              MR. STANNER:  I'm sorry, I -- the Bates

18    number that we have here starts at --

19              MR. HAWAL:  Yeah, it's the second --

20    it's the backside of that.

21              MR. STANNER:  Right.  I have 543916.  I

22    believe you said 543972.

23              MR. HAWAL:  Well, I have one that's

24    Bates-stamped 972, and I have the same document

 1    Bates-stamped 00543915.

 2              MR. STANNER:  I --

 3              MR. SATIN:  We have the 915.

 4              MR. STANNER:  We have 915.

 5              MR. HAWAL:  Okay.  Well, let's just --

 6    let's go with that one.  I mean it's the same

 7    document, but --

 8    BY MR. HAWAL:

 9         Q    Do you see the -- the e-mail that says

10    from Sharon Mackarness to Gary Hilliard dated

11    October 26, 2006?

12         A    I do.



23    BY MR. HAWAL:

24         Q    And how do you know that?

```
 1        A    From reading different documents --

 2        Q    Well --

 3        A    -- and seeing things in there that --

 4   that the purpose of doing that was not to avoid a

 5   suspicious order.

 6        Q    Well, was it -- was it to avoid losing

 7   sales?

 8             MR. STANNER:  Same objection.

 9             THE WITNESS:  I -- at the time --

10   what -- what was occurring at the time or on

11   specific instances, you'd have to ask the

12   individual what their intent was.  I don't know at

13   this point.

14   BY MR. HAWAL:
```









10          MR. HAWAL:  Let's take -- let's take a

11   lunch break.

12          THE VIDEOGRAPHER:  The time is 1:14 p.m.

13   We're going off the record.

14          MR. STANNER:  Can we stay on the record

15   and put two quick things on the record?

16          MR. SATIN:  Very quickly.  When at times

17   I've said, "Same objection," as I think everyone

18   here knows, I'm not referring to the same

19   objection that another lawyer in this room makes,

20   but the same objection I previously made as it

21   relates to Touhy.

22          MR. STANNER:  I --

23          MR. HAWAL:  Understood.

24          MR. STANNER:  I'd just like to put on

1  the record what I mentioned before we got started

2  today at the beginning of the day.

3          So obviously since then a number of

4  questions have come up that have implicated this

5  DEA stuff.  It is our view that Mr. Boggs is

6  subject to seven hours of a deposition.  So to the

7  extent that you want reserve some time pending a

8  Touhy ruling, I would ask you to be mindful of

9  that throughout the day.  But we would not consent

10  to seven hours today and any additional time based

11  on DEA.  So please be mindful of that.

12          MR. HAWAL:  Will do.  Thank you.

13          THE VIDEOGRAPHER:  The time is 1:14 p.m.

14  We're going off the record.

15          (Lunch recess.)

16          THE VIDEOGRAPHER:  The time is 2:05

17  p.m., and we're back on the record.

18          (Plaintiffs' Exhibit No. 14 was

19          marked for identification.)

20  BY MR. HAWAL:

21      Q    Mr. Boggs, I'm going to hand you what

22  has been marked as Plaintiffs' Exhibit 14.



23      Q     And the crisis in West Virginia is where

24   McKesson for years had shipped opioid pills in

1  enormous quantities to small towns with

2  populations --

3          MR. LIVINGSTON:  I'm sorry.  We can

4  barely hear you on the phone.

5          (A discussion was held off the record.)

6          THE VIDEOGRAPHER:  The time is 2:08 p.m.

7  We're going off the record.

8          (Pause.)

9          THE VIDEOGRAPHER:  The time is 2:10

10  p.m., and we're back on the record.

11  BY MR. HAWAL:

12      Q    Mr. Boggs, are you aware from the time

13  that you've been at McKesson that over the years

14  McKesson had shipped opioid pills to communities

15  that had small populations of hundreds or a few

16  thousand with enormous quantities of opioids that

17  were disproportionate to the populations of the

18  pharmacies servicing the community?

19          MR. STANNER:  Object to the form of the

20  question.

21          THE WITNESS:  I am.

22  BY MR. HAWAL:



21   BY MR. HAWAL:

22        Q    You're aware that the Attorney General

23   of West Virginia has filed a lawsuit against

24   McKesson and others related to the opioid epidemic

1    in that state?

2           MR. STANNER:  Object to the form of the

3    question.

4           THE WITNESS:  I am.

5    BY MR. HAWAL:

10    Q    By this time in September 1st of 2015,

11   the opioid epidemic had been well established not

12   only in West Virginia but across the country.

13   True?

14          MR. STANNER:  Object to the form.

15          THE WITNESS:  It had.

16   BY MR. HAWAL:





















21          (Plaintiffs' Exhibit No. 15 was

22          marked for identification.)

23    BY MR. HAWAL:

24          Q    Was that Exhibit 14?

1        A     Yes.

2        Q     I'm handing you what we've marked as

3   Exhibit 15.  It's an e-mail chain --

4              MR. WOLFE:  I don't --

5              MR. HAWAL:  Yeah, it's 692, but I'm not

6   sure that you have it, Evan.  I may put it on the

7   ELMO.

8   BY MR. HAWAL:

4   BY MR. HAWAL:

5        Q    Do you know who Jenny Melton is?

6        A    I've been on some conference calls

7   throughout my tenure at McKesson that she was on.

8        Q    Is she with Regulatory Affairs, do you

9   know?

10        A    I know she's not.

21              Don Walker was in Regulatory Affairs,

22   correct?

23              MR. STANNER:  Object to the form.

24              THE WITNESS:  He was the senior vice

1    president over the distribution operations, and as

2    part of his duties and responsibilities, the

3    Regulatory Affairs folks reported up to him.

4    BY MR. HAWAL:

13    BY MR. HAWAL:

14    Q    When you were with the DEA, did you

15    expect suspicious order reports to be sent to DEA

16    by a company like McKesson?

17         MR. SATIN:  Objection.  Pursuant to

18    Touhy, do not answer that, to the extent that

19    doing so would reveal information you obtained

20    while at DEA.

21    BY MR. HAWAL:

22    Q    Are you willing to answer that, sir?

23    A    I'm not able to answer that at this

24    time.

1        Q     Are you -- you mentioned -- you

2    referenced Mr. Hammergren's testimony before

3    Congress previously.

4             Mr. Hammergren, you're aware, testified

5    before Congress in his capacity as president of

6    McKesson dealing with the opioid crisis.

7        A     It was my understanding he testified as

8    the CEO of the company.

9        Q     Okay.

10       A     But -- I'm aware of that.

11       Q     Did you -- were you present for that

12   hearing or did you listen to it?

13       A     I was not present, but, yes, I did

14   listen to it.

15       Q     Do you remember that Mr. Hammergren

16   testified before Congress that if McKesson had its

17   current algorithm in place in 2007, that orders

18   which exceeded thresholds would not have been

19   shipped?  Do you recall that?

20            MR. STANNER:  Object to the form.

21            THE WITNESS:  I don't recall

22   specifically that, but I'll take your word for it.

23   BY MR. HAWAL:

24       Q     Well, does that -- does that sound

1    correct that --

2          A    I don't have any reason to doubt it.





24            (Plaintiffs' Exhibit No. 16 was

 1                    marked for identification.)

 2    BY MR. HAWAL:

 3        Q    Sir, I'm handing you what we've marked

 4    as Exhibit 16.

 5              It's a number of statements that I'm

 6    going to ask you whether you agree with that apply

 7    to establishing opioid thresholds at McKesson.

 8              Do you agree that thresholds are a

 9    critical part of CSMP at McKesson?

10              MR. STANNER:  Objection.  Form and

11    foundation.

12              THE WITNESS:  I think they're an

13    important part of our program, yes.

14    BY MR. HAWAL:

15        Q    And they were an important part of

16    McKesson's program certainly going back to the

17    creation of the CSMP in 2008 with its settlement

18    agreement, right?

19              MR. STANNER:  Same -- same objection.

20              MR. SATIN:  Objection with respect to

21    Touhy.  Don't answer if it would -- if your answer

22    would reveal information about your time at the

23    DEA.

24              THE WITNESS:  It is my understanding

 1    they were -- started back around 2007 under the

 2    Lifestyle Drug Monitoring Program.

 3    BY MR. HAWAL:

 4        Q    And do you agree that McKesson takes

 5    great care in setting thresholds, or should?

 6        A    I -- McKesson does take great care in

 7    setting thresholds.

 8        Q    And they should have taken great care in

 9    doing so back to 2007, correct?

10            MR. STANNER:  Object to the form.

11            THE WITNESS:  I don't know that they

12    didn't.

13    BY MR. HAWAL:

14        Q    I didn't ask you that.  I'm asking you

15    whether they should have.

16        A    I think it would have been an important

17    thing, yes.

18        Q    And would you agree that each customer

19    is unique so that the threshold is specific to

20    each customer's business needs?  Is that a true

21    statement?

22        A    I would agree with it, yes.

23        Q    And McKesson should make informed

24    decisions based on established threshold

 1   information.  Is that a fair statement?

 2              MR. STANNER:  Object to the form.

 3              THE WITNESS:  I agree with the

 4   statement, yes.

 5              MR. HAWAL:  I didn't mean to throw it.

 6              MR. STANNER:  I was going to say, I'm

 7   going to give you the benefit of the doubt that

 8   but you didn't mean to throw it.

 9              (Plaintiffs' Exhibit No. 17 was

10              marked for identification.)

11   BY MR. HAWAL:

12        Q    Have you seen this e-mail before, dated

13   December 27th, 2010?

14        A    I don't believe I've ever seen this

15   document.

16        Q    This is a document from Jay Kramer -- or

17   to Jay Kramer from SharePoint?

18              MR. STANNER:  Object to the form.

19   BY MR. HAWAL:

20        Q    It's MCK_00168027.

21              MR. STANNER:  So just for the record, it

22   doesn't have the MDL Bates on it, so maybe it's

23   cut off due to some sizing or imaging.  The -- I

24   think it's 165027.  Bill, I --

 1            MR. HAWAL:  Yeah, the copying -- it's

 2    been copied so many times, it -- it's hard to make

 3    out, but we've used it before.

 4            MR. STANNER:  Sure.  It's a SharePoint

 5    e-mail dated Monday, December 27, 2010, at

 6    6:12 p.m.

 7    BY MR. HAWAL:

 8        Q    Have you seen this before?

 9        A    I've never seen this before.

10        Q    Are you familiar with SharePoint?

11        A    I -- yes.

12        Q    What -- what is SharePoint?

13        A    SharePoint's kind of a software system

14    that McKesson and other companies use as a way to

15    manage certain functions.

16        Q    And is Dale's Pharmacy familiar to you?

17        A    It is not.

18        Q    No?  I want you to assume that Dale's

19    Pharmacy was indicted for distributing, selling

20    opioids to illicit customers in the state of

21    Colorado.



19        Q    Which is pure speculation on your part,

20   correct?

21             MR. STANNER:  Objection.  You've asked

22   him to speculate.

23             THE WITNESS:  Yeah, that was my

24   understanding.  You asked for my opinion on it.

1   BY MR. HAWAL:





24          (Plaintiffs' Exhibit No. 18 was

1          marked for identification.)

2    BY MR. HAWAL:

3        Q    I'm handing you what we marked as

4    Exhibit 18, is MCKMDL00596566, which is a

5    Controlled Substance Monitoring Program document.







15          (Plaintiffs' Exhibit No. 19 was

16          marked for identification.)

17   BY MR. HAWAL:

18        Q    I'm handing you what we marked as

19   Exhibit 19.  It's another Controlled Substance

20   Monitoring Program document relating to

21   thresholds.  Correct?

22        A    That's correct.



23          (Plaintiffs' Exhibit No. 20 was

24          marked for identification.)

1    BY MR. HAWAL:





19          MR. STANNER:  Objection to the form.

20          MR. SATIN:  Objection.  The insinuation

21    of some of your questions, when you use the word

22    "you," if you could be clear as to whom you are

23    referring to.

24          MR. HAWAL:  I'm referring to you as

 1    McKesson.

 2              MR. STANNER:  Well, I think that's the

 3    issue.  To the extent he being -- he's being asked

 4    to speak for McKesson, I would have a standing

 5    objection to some of the earlier questions.  I

 6    think he is here in his personal capacity.  He can

 7    speak to what he personally knows.

 8    BY MR. HAWAL:

 9        Q    Well, sir, you were -- you were retained

10    by McKesson to make changes because of problems

11    McKesson had been having with its Controlled

12    Substance Monitoring Program and its

13    anti-diversion procedures prior to your arrival,

14    right?

15              MR. STANNER:  Objection.  Calls for

16    speculation.  Object to the form.

17              THE WITNESS:  I was hired to work and

18    oversee the regulatory program and improve it

19    wherever we could --

20    BY MR. HAWAL:

21        Q    Well --

22        A    -- improve it and evolve it.

23        Q    -- you knew that McKesson had had a

24    problem that resulted in a settlement agreement

1    and fine in 2008 where they promised to make

2    changes, and you know that changes -- well, you

3    know that -- that problems continued that resulted

4    in a $150 -- a $150 million settlement in 2000 and

5    -- what was it, '18 or '17?

6         A    '17.

7         Q    '17.  And those problems were occurring

8    from 2008 through 2013, right?

9              MR. STANNER:  Same objections, compound.

10             MR. SATIN:  And objection pursuant to

11   Touhy.  Do not answer if it would reveal

12   information you learned while at DEA.

13             THE WITNESS:  I was not aware of the

14   second matter until after I was retained by

15   McKesson.

16   BY MR. HAWAL:

17        Q    Right.  But you -- do you understand

18   that the reason they hired you as a former DEA

19   agent was to come aboard and clean up what had

20   been happening with regard to their anti-diversion

21   programs?

22             MR. STANNER:  Same objection, calls for

23   speculation.

24             THE WITNESS:  I don't know if I agree

1   with the characterization.  I believe that I have

2   skill sets that can help improve and expand a

3   program and to continue to evolve that program.

4   BY MR. HAWAL:

5       Q    I want you to assume that Marc's is a

6   chain pharmacy that exists in Cuyahoga and Summit

7   counties in Ohio, and this is -- well, I

8   apologize.  I haven't marked it or identified it.

9   I'll do that.

10              (Plaintiffs' Exhibit No. 21 was

11              marked for identification.)

12  BY MR. HAWAL:



```
 7        Q    He's not.  Was he?

 8        A    He may have before I came on.  I

 9   don't -- I don't know that.

10             MR. STANNER:  Yes, let me just note

11   quickly for the record here, there's a previous
```

```
16             (Plaintiffs' Exhibit No. 22 was

17             marked for identification.)

18   BY MR. HAWAL:

19        Q    Mr. Boggs, was what your lawyer just

20   said accurate?

21        A    It is.

22        Q    I'm handing you what we've marked as

23   Exhibit 22, which is a series of e-mails between

24   someone at McKesson and someone at CVS.
```

6          MR. STANNER:  Object to the form.

7          And if you need time to read the

8  document, it's fairly lengthy.

9          Counsel, if there a specific point --

10  part you want to point us to, let -- also I don't

11  believe that --

12          MR. HAWAL:  I'm sorry.

13          MR. STANNER:  I don't believe this -- I

14  don't believe the document that's up there is this

15  document, unless I'm missing something.  I have

16  MCKMDL00627048.

17          MR. HAWAL:  That's what I'm referring

18  to, but -- let me put it on the ELMO.

19          Can you zoom in on it, Evan?  Okay.

20  Thank you.

21  BY MR. HAWAL:

22      Q    The e-mail -- this is MCKMDL00627048.

23  The e-mail is from Ned McKenna to Brian Whalen,

24  with copies to Tom McDonald and others, and

1    including Donald Walker.



21          MR. STANNER:  Object to the form,

22    speculation.  Vague, "you."

23          MR. SATIN:  Again, also you used the

24    word -- this is a 2010 document, and he wasn't at

1    McKesson.

2    BY MR. HAWAL:

19   BY MR. HAWAL:

20        Q    It is your understanding that CVS has

21   a -- has its own suspicious order monitoring

22   program?

23        A    CVS would not have a suspicious order

24   monitoring program.

 1        Q    It would not have its own, is that what

 2   you're saying?

 3        A    They don't -- they fill prescriptions to

 4   patients.  They don't --

 5        Q    I'm talking about its corporate -- you

 6   said you deal with the chains' corporate

 7   representatives.

 8        A    Right.

 9        Q    Does the corporate headquarters have

10   some type of Regulatory Affairs department or

11   suspicious monitoring program?

12             MR. STANNER:  Objection to the form.  He

13   did not said that he did it personally.

14             THE WITNESS:  They would have a

15   suspicious order -- or, I'm sorry, they would have

16   a Controlled Substance Monitoring Program, but

17   they would not have a suspicious order program.

18   BY MR. HAWAL:

19        Q    What does their controlled substance

20   monitoring program consist of, if you know?

21        A    I -- I don't know.

22             MR. STANNER:  Object to the form.

23   BY MR. HAWAL:

24        Q    Who at the company should know that?

1          MR. STANNER:  Object to the form.

2          THE WITNESS:  I would say that Nate

3   Hartle would be -- be knowledgeable about that.

4   BY MR. HAWAL:

5      Q    Are you aware that CVS had multiple

6   instances where they were fined by the Department

7   of Justice as a result of their failure to

8   appropriately implement a suspicious monitoring

9   program and its failure to adhere to the

10  obligations under the Controlled Substances Act

11  and -- and regulations?

12         MR. STANNER:  Object to the form.

13         THE WITNESS:  I'm only aware of -- of

14  one for that.  I'm not aware of multiple ones.

15         (Plaintiffs' Exhibit No. 23 was

16         marked for identification.)

17  BY MR. HAWAL:

18     Q    Sir --

19         MR. HAWAL:  Evan, I'm going to use the

20  ELMO because you have the wrong one.

21  BY MR. HAWAL:

22     Q    I'm handing you what we marked as

23  Exhibit 23.  It's a document from the United

24  States Attorney's Office for the Eastern District

1    of California, referencing the fact that CVS had

2    paid a $5 million penalty to resolve allegations

3    that it had violated the Controlled Substances

4    Act.

5              Do you see that?

6              MR. STANNER:  Object to the form.

7              THE WITNESS:  From my reading of this,

8    it -- it was a fine -- fine for recordkeeping

9    violations.

10   BY MR. HAWAL:

11        Q    Mm-hmm.  In violation of the Controlled

12   Substances Act?

13        A    Or the implementing regulations, yes.

14             (Plaintiffs' Exhibit No. 24 was

15             marked for identification.)

16   BY MR. HAWAL:

17        Q    I'm handing you what we marked as

18   Exhibit 24.  It is another release from the U.S.

19   Attorney's office for the District of

20   Massachusetts where CVS paid $3.5 million because

21   its pharmacists were filling fake prescriptions.

22             MR. STANNER:  Object to the form of the

23   question.

24             THE WITNESS:  I see that.

 1   BY MR. HAWAL:

 2       Q    Were you aware of that?

 3       A    No, I was not.

 4            (Plaintiffs' Exhibit No. 25 was

 5            marked for identification.)

 6   BY MR. HAWAL:

 7       Q    I'm handing you what has been marked as

 8   Exhibit 25.  It is another release from the U.S.

 9   Department -- or from, yeah, the U.S. Attorney's

10   Office for the District of Rhode Island where CVS

11   paid another civil penalty of $450,000 for

12   violations of the Controlled Substances Act by

13   filling invalid prescriptions and maintaining

14   deficient records.

15            MR. STANNER:  Objection to the form.

16            THE WITNESS:  I see it.

17   BY MR. HAWAL:

18       Q    Aware of that -- were you aware of that?

19       A    I was not aware of that, no.

20            (Plaintiffs' Exhibit No. 26 was

21            marked for identification.)

22   BY MR. HAWAL:

23       Q    Sir, I'm handing you what I've marked as

24   Exhibit 26.  Is that correct, is it 26 or 27?

1        A      26.

2        Q      Is -- this one is from the Western

3   District of Oklahoma whereby CVS agreed to pay

4   $11 million to settle -- settle claims that it

5   violated the Controlled Substances Act.

6              MR. STANNER:  Objection to the form of

7   the question.

8   BY MR. HAWAL:

9        Q      Do you see that?

10       A      I do see that.

11       Q      And at the bottom, in identifying the

12  reasons, it said it created and entered and

13  maintained invalid dummy DEA registration numbers

14  other than the valid DEA registration numbers of

15  the prescribing practitioners on dispensing

16  records, and in filling prescriptions for certain

17  prescribers whose DEA registration numbers were

18  not current or valid.

19              Were you aware of this civil penalty?

20              MR. STANNER:  Objection to the form,

21  assumes facts.  Calls for speculation.

22  BY MR. HAWAL:

23       Q      Which ones -- which CVS infractions were

24  you aware of that resulted in some type of -- of

1   penalty or action by the Department of Justice?

2        A    I'm aware of two CVS, Sanford, Florida,

3   pharmacies that were -- there was some issues

4   related to them.  I don't know whether or not

5   there was actually a fine or what the final

6   outcome of that was, but I -- I'm aware of that

7   one.

8        Q    Do you believe that these types of

9   reports would be monitored by someone at McKesson

10  who is responsible for the CVS account?

11            MR. STANNER:  Objection to the form.

12            THE WITNESS:  I would expect that to

13  some extent.  I mean every -- every one of these

14  appear to be a large -- there was a large focus

15  related to the civil fine on recordkeeping

16  violations.

17  BY MR. HAWAL:

18       Q    Well, are recordkeeping violations

19  important to you?

20            MR. STANNER:  Objection to the form.

21  Vague.

22            THE WITNESS:  They're important, yes.

23  BY MR. HAWAL:

24       Q    And do you believe that this type of

1    history with CVS would be something that McKesson

2    should be aware of and should be monitoring?

3          A    I -- to some degree, yes.

21               MR. HAWAL:  What are we on now, 28?

22               MR. STANNER:  That last one was 26, I

23    thought.

24               (Plaintiffs' Exhibit No. 27 was

1                marked for identification.)

2   BY MR. HAWAL:

3        Q    I'm handing you what has been marked as

4   Exhibit 27.  It is several e-mails,

5   MCKMDL00544143, between Bruce Skidgel and Donald

6   Walker.

14             MR. STANNER:  Objection to the form.

15  Foundation, speculation.

16             THE WITNESS:  If I could just take a

17  minute to read it.

18  BY MR. HAWAL:

19       Q    Mm-hmm.

20       A    (Peruses document.)  Could you repeat

21  your question?

 6   BY MR. HAWAL:

 7        Q    Mr. Boggs, I'm going to hand you what we

 8   previously marked at your earlier deposition as

 9   Exhibit 6, MCKMDL00407451.

10             MR. STANNER:  Is this 28?

11             MR. HAWAL:  Yeah.

12   BY MR. HAWAL:

13        Q    And we're going to mark it as Exhibit 28

14   for your deposition today.

15             (Plaintiffs' Exhibit No. 28 was

16             marked for identification.)

17   BY MR. HAWAL:

18        Q    You're familiar with the term

19   "diversion," "drug diversion"?

20        A    I am.

21        Q    And what is your understanding -- well,

22   strike that.

23             Are you familiar with the term "drug

24   migration" as it relates to diversion?

1      A    I am.

2      Q    In other words, drugs that find their

3   way into the illegal distribution system in a

4   given community will not remain in that community;

5   they will -- some of those drugs will migrate to

6   adjacent communities and even different states.

7   Is that a fair statement as to what drug migration

8   refers to?

9           MR. STANNER:  Objection to form.

10           THE WITNESS:  I agree with that.

11   BY MR. HAWAL:

12      Q    That is something that has been well

13   recognized for quite a few years now?

14           MR. STANNER:  Objection to form.

15           THE WITNESS:  I -- I agree with the --

16   the definition of it.  As long as it's been

17   recognized, I don't know.

18   BY MR. HAWAL:

19      Q    In fact, I've heard the term referred to

20   as the "Blue Highway."  Have you heard that

21   phrase?

22      A    I've not heard that one, no.

23      Q    In any event, on page 465 of the -- this

24   is a PowerPoint that you created; is that correct?

 1         A     I believe so, yes.

 2         Q     And on page 465 of this PowerPoint,

 3    there is a map of the United States, and the title

 4    is "Drug Diversion Migration Out of Florida," and

 5    it has a series of arrows.

 6              Is that intended to show where drugs

 7    that were being diverted in Florida were finding

 8    their way to different parts of the country?

 9              MR. STANNER:  Objection to the form.

10              THE WITNESS:  What this is depicting is

11    the criminal schemes of pill mills in Florida, and

12    where those that were complicit in that criminal

13    scheme would -- would take those, you know, out of

14    Florida and into other locations throughout the

15    United States.

16    BY MR. HAWAL:

17         Q     And sell them in communities in Georgia,

18    Tennessee, Kentucky, Ohio, and Missouri?

19         A     That could be.

20         Q     And I take it this was based upon

21    information that you either researched or had

22    knowledge about?

23              MR. STANNER:  Objection to form.

24    Foundation.

 1                THE WITNESS:  It is.

 2                (Plaintiffs' Exhibit No. 29 was

 3                marked for identification.)

 4    BY MR. HAWAL:

 5        Q    The last exhibit I'm going to have

 6    marked and ask you about is Exhibit No. 29.

 7                And although it is an Insys document and

 8    the Bates number is INSYS_MDL006972647, it is a

 9    communication from John Bonner, director of

10    Product Management, Branded Rx, at McKesson Drug

11    in San Francisco.

12                Do you know John Bonner?

13        A    I -- I do not.

18        Q    And do you believe that certain

19    pharmaceutical -- or pharmaceutical distributors

20    of opioid drugs consider the DEA the enemy?

21                MR. STANNER:  Objection to form.

22    Objection to foundation as to this exhibit.

23                THE WITNESS:  Can I just take a minute

24    and finish reading it?

1    BY MR. HAWAL:

2          Q    Sure.

3          A    (Peruses document.)

4          Q    Have you read it?

5          A    I have.

20               MR. STANNER:  Object to the form of the

21    question.

22               MR. SATIN:  Objection.  Pursuant to

23    Touhy, don't answer that question to the extent it

24    would disclose information you obtained while at

1    DEA.



19    BY MR. HAWAL:

20        Q    You're aware that a congressman in

21    Pennsylvania has sponsored legislation through

22    Congress that has changed the enforcement

23    responsibilities of the DEA and the Department of

24    Justice as it relates to wholesalers?

1           MR. STANNER:  Object to the form.

2    BY MR. HAWAL:

3        Q    Marino.  Tom Marino.

4           MR. STANNER:  Same objection.

5           THE WITNESS:  I'm aware --

6           MR. SATIN:  Same objection with respect

7    to Touhy.

8           THE WITNESS:  I'm aware of that

9    legislation.  I'm not agree -- I'm not sure I

10   would agree with the characterization that you

11   framed it out.

12   BY MR. HAWAL:

13       Q    Well, it's legislation that was passed

14   in 2016, correct?

15       A    That's correct.

16       Q    Do you know how much money McKesson has

17   contributed to lobbying efforts with Congressman

18   Marino and other congressmen to facilitate the

19   passage of that legislation?

20          MR. STANNER:  Object to the form.

21          THE WITNESS:  I do not.

22          MR. HAWAL:  Okay.  That's all the

23   questions I have.

24          MR. RAFFERTY:  Not for the plaintiffs,

 1    though.

 2            MR. STANNER:  Understood.

 3            MR. RAFFERTY:  Let's take a ten-minute

 4    break and will swap out some stuff.

 5            MR. STANNER:  That will be fine.

 6            THE VIDEOGRAPHER:  The time is 3:31 p.m.

 7    We're going off the record.

 8            (Recess.)

 9            THE VIDEOGRAPHER:  The time is 3:49 p.m.

10    We're back on the record.

11                    DIRECT EXAMINATION

12    BY MR. RAFFERTY:

13        Q    Mr. Boggs, good afternoon.  My name is

14    Troy Rafferty.  I'm representing the plaintiffs in

15    this case along with Mr. Hawal.  I'm going to ask

16    you some additional questions here for a bit,

17    okay?

18        A    Sure.

19        Q    Okay.  And if I talk over you, I

20    certainly don't mean to.  I know we're under time

21    crunches, and I'm going to do my best not to do

22    that, but if I do, I apologize, and I don't mean

23    to, and just point it out to me, or your counsel

24    will point it out to me.  Okay?

1        A     Sure.

2        Q     You were just being asked some questions

3   about a bill that was passed in 2016 by Mr. Hawal.

4   Are you familiar with that?

5        A     I am.

6        Q     In fact, you have been of the opinion

7   for several years, dating back even to your time

8   at the DEA, that the distributors of opioids and

9   narcotics had basically blown off the DEA.

10  Correct?

11             MR. STANNER:  Objection to form.

12             THE WITNESS:  I don't know if I would

13  necessarily characterize it that in its entirety.

14  BY MR. RAFFERTY:

15       Q     Well, how would you -- do you believe as

16  we sit here today that leading up to your

17  employment at McKesson that the distributors had

18  blown off the DEA?

19             MR. SATIN:  Objection pursuant to Touhy.

20  Don't ask that -- don't answer that if it's going

21  to reveal information you learned while at the

22  DEA.

23             THE WITNESS:  I don't believe I can

24  answer the question at this time.

 1  BY MR. RAFFERTY:

 2       Q    All right.  Well, let me -- let me show

 3  you what we're marking as Exhibit 30.

 4            (Plaintiffs' Exhibit No. 30 was

 5            marked for identification.)

 6            MR. STANNER:  Thank you.

 7  BY MR. RAFFERTY:

 8       Q    Two -- 1.2033.  And this is

 9  Bates-numbered MCKMDL00661483.

10            I'm going to direct your attention to

11  the middle e-mail.  That's the one I'm going to

12  ask you about, Mr. Boggs.

13            Do you know who Ann Berkey is?

14       A    She used to be employed by McKesson.  I

15  don't believe she's any longer employed by

16  McKesson.

17       Q    You had conversations with her in the

18  past about your time at the DEA and your

19  impressions of the -- of the interaction between

20  the distributors and DEA, correct?

21       A    I don't know that I had multiple

22  conversations with her.  I -- I recall a

23  conversation.

24       Q    Okay.  Well, let's take a look at what

1    Ms. Berkey says here in this e-mail dated April 8,

2    2014.  You were at -- at McKesson at that time,

3    correct?

4         A    I was.





22        Q     Okay.  And a distributor of narcotics

23   just like McKesson, right?

24        A     That's correct.



19    BY MR. RAFFERTY:

20        Q    So you were -- at least in 2014, you

21    were sharing information from your time at DEA

22    with employees of McKesson.  True?

23        A    In -- in generalities, yes.

24        Q    Okay.  Including how -- how the DEA had

1    processes in place to collaborate with the

2    wholesalers, correct?

3         A    That's correct.

4         Q    Okay.  And while you were at the DEA,

5    what processes were in place for you to

6    collaborate with wholesalers?

7              MR. SATIN:  Objection.  Pursuant to

8    Touhy, don't answer that question.

9    BY MR. RAFFERTY:

1   as Exhibit 31.  It's going to be a lot later --

2   lot lighter trip home for me.

3               (Plaintiffs' Exhibit No. 31 was

4               marked for identification.)

5   BY MR. RAFFERTY:

6        Q    So it is 1.1555.

7               MR. STANNER:  This is Boggs 31?

8               MR. RAFFERTY:  Boggs 31, yes, sir.

9   BY MR. RAFFERTY:

10       Q    Do you recognize this as Section 55,

11  Mr. Boggs?  Do you see at the top it says "55 -

12  Controlled Substances"?

13       A    Yes.  I do.

14       Q    And it's dated July 2000.  Do you see

15  that?

16       A    I do.



 9    BY MR. RAFFERTY:

10          Q    Well, but you reviewed it, you said,

11    right?

12          A    Only cursory.  I haven't -- this is --

13    this is not in place since I came to McKesson.

21    BY MR. RAFFERTY:

22          Q    Okay.  Are you -- okay.

23               Let's go ahead and just turn the page.

24    It should be at .29.  Down at the bottom, it

1    should say at some point 1.555.29.

2            MR. STANNER:  Sorry, at the top right of

3    our documents.

4            MR. RAFFERTY:  Top right, yes.  I'm

5    sorry.  Mine is at the bottom.

6            THE WITNESS:  What would -- what's the

7    number again?

8    BY MR. RAFFERTY:

9        Q    29.

10       A    Okay.

11           MR. STANNER:  555.29.

12           THE WITNESS:  Okay.

13   BY MR. RAFFERTY:











15      Q    Okay.  I'm going to hand you what we're

16   marking as exhibit -- I think we're at 33, right?

17   I hope so because that's the next one I got.

18              MR. STANNER:  I had this as 31.

19              MS. MONAGHAN:  Yeah, we're on 32.

20              MR. RAFFERTY:  We're on 32?

21              (A discussion was held off the record.)

22              MR. RAFFERTY:  Go off the record for

23   just one second.

24              THE VIDEOGRAPHER:  The time is 4:02 p.m.

1    We're going off the record.

2              (A discussion was held off the record.)

3              THE VIDEOGRAPHER:  The time is 4:02 p.m.

4    We're back on the record.

5              (Plaintiffs' Exhibit No. 32 was

6              marked for identification.)

7    BY MR. RAFFERTY:

8         Q    All right.  I've just handed your

9    counsel what we've marked as Exhibit 32,

10   Mr. Boggs.  And it is 1.2100.

11             So have you ever seen -- this, I'm going

12   to represent to you, was produced to us as an

13   example of a DU45 report that was submitted by

14   McKesson to the DEA.

15             Are you familiar -- have you seen any

16   type of document like that?

17        A    I have not seen it, no.

18        Q    Could you hold it up for the camera just

19   so -- because I'm going to represent to you that

20   that is two-sided, it's printed on both sides, and

21   it's approximately 600 pages long.





18        Q     In fact, you're aware that the DEA made

19   clear to all of the distributors that simply

20   submitting these excess purchase orders reports

21   did not satisfy the distributors' duties and

22   obligations under the Controlled Substances Act,

23   correct?

24            MR. SATIN:  Objection pursuant to Touhy.

1    Don't answer if it's going to reveal any

2    information from your time at DEA.

3                THE WITNESS:  I don't believe I can

4    answer that question right at this time.

5    BY MR. RAFFERTY:

6        Q    Okay.  In fact, if we look at what I'm

7    going to mark as exhibit -- I just found 32.

8    Okay.

9                MR. RAFFERTY:  Well, too late now.

10   BY MR. RAFFERTY:

11       Q    So Exhibit 33 -- all right.  So I'm

12   marking as Exhibit 33 -- that's why I don't

13   pre-mark exhibits.

14               (Plaintiffs' Exhibit No. 33 was

15               marked for identification.)

16   BY MR. RAFFERTY:

17       Q    What years were you work -- working at

18   the -- in the diversion -- or at the DEA in

19   regards to diversion?

20               MR. STANNER:  Objection.  Form.

21               THE WITNESS:  I started in January of

22   2006, and I retired from that position and the

23   Agency at the end of June of 2012.

24   BY MR. RAFFERTY:

1    Q    And then started with McKesson in 2013?

2    A    Almost the end of 2013, yes.

3    Q    Okay.  So here, looking at this

4    particular -- it's 1823.  Here it says:  "Summary

5    of DEA-HDMA meeting on suspicious orders.  Meeting

6    date, September 7th, 2007."

7         And it's got the different attendees of

8    the HDMA, and then the DEA.  Mark Caverly, Kathy

9    Gallagher, Mike Mapes and Lisa Sullivan.  Do you

10   know who those are?

11   A    I do.

12   Q    Okay.  You worked with them at the DEA?

13   A    I did.

20   Q    Did you meet with any of the wholesalers

21   one on one during the September 2007 time period?

22        MR. SATIN:  Objection pursuant to Touhy.

23        THE WITNESS:  I don't believe I can

24   answer that question at this time.

1    BY MR. RAFFERTY:





23    BY MR. RAFFERTY:

24         Q    Okay.  What about when you were at the

1   DEA, did you agree that DEA did not have the

2   resources to inspect every pharmacy?

3               MR. SATIN:  Objection pursuant to Touhy.

4               THE WITNESS:  I don't think I can answer

5   that question at this time.

6   BY MR. RAFFERTY:





3        Q    Now, you -- you agree with me that not

4   only must -- speaking of today, while you're here

5   at -- since you've been at McKesson, you would

6   agree that you have an obligation not to just

7   report but also to block suspicious orders --

8              MR. STANNER:  Object --

9   BY MR. RAFFERTY:

10       Q    -- and then perform due diligence on

11  those to determine whether or not they're likely

12  to be diverted to illegal uses, correct?

13             MR. STANNER:  Objection to the form on

14  several bases.  I'll save you the time unless you

15  want them.

16             MR. RAFFERTY:  That's okay.

17             THE WITNESS:  A regulatory obligation?

18  BY MR. RAFFERTY:

19       Q    Yes.

20       A    No, I don't agree with that at all.

21       Q    You don't agree with that.

22       A    I don't know anywhere in the regulation

23  that that's a requirement.

24       Q    Did you believe that when you were at

 1   the DEA?

 2            MR. SATIN:  Objection pursuant to Touhy.

 3            THE WITNESS:  I don't believe I can

 4   answer that question at this time.

 5   BY MR. RAFFERTY:

 6        Q    In fact, let's go ahead and mark this as

 7   Exhibit 34, 1946.

 8            (Plaintiffs' Exhibit No. 34 was

 9            marked for identification.)

10   BY MR. RAFFERTY:

11        Q    This is a -- this is a document,

12   Mr. Boggs, dated September 1 -- well, it's

13   actually dated October 20, 2005 up in the top

14   right corner, but it's referencing a presentation

15   on September 1st, 2005.

16            Do you see that?

17        A    I do.



 8     Q    Did you become aware while you were at

 9   the DEA that these meetings were taking place?

10          MR. SATIN:  Objection pursuant to Touhy.

11          THE WITNESS:  During the time frame of

12   this -- this memorandum, I was not in -- in the

13   diversion program, so I didn't -- I wasn't aware

14   of this.

15   BY MR. RAFFERTY:

16     Q    It says here that the -- it looks at --

17   it's to Joseph Rannazzisi from Michael Mapes.

18          I believe you said you knew Michael

19   Mapes?

20     A    I do.





16      Q     And you know today in your work with

17    McKesson that that's a requirement and has been a

18    requirement of the Controlled Substances Act since

19    its passage, correct?

20      A     That's correct.



 5      Q    Okay.  And you know that as -- as of

 6   today that's true, correct?

 7           MR. STANNER:  Objection to form.

 8   BY MR. RAFFERTY:

 9      Q    That simply reporting a suspicious order

10   does not relieve the distributor of its

11   responsibility to maintain effective controls

12   against diversion.

13           MR. STANNER:  Object to the form.

14           THE WITNESS:  I do.

15   BY MR. RAFFERTY:



13    BY MR. RAFFERTY:

14         Q    Okay.  And in fact, that never changed.

15    I think Mr. Hawal showed you Mr. Rannazzisi's

16    letter.  Do you recall that?

17         A    There were a couple of them.  Is there

18    one in particular that you are referencing?

19         Q    1464.

20              MR. RAFFERTY:  Exhibit 1?

21              (Counsel conferring.)

22              THE WITNESS:  Exhibit 1?

23    BY MR. RAFFERTY:

24         Q    Exhibit 1, yeah.

```
 1              So -- and this is in 2006.  So about a

 2   year after that presentation we just saw, the DEA

 3   was once again -- on page -- I'm sorry, sir,

 4   page 2, .2 -- on page 2 is telling McKesson and

 5   the other distributors:  "In addition to reporting

 6   all suspicious orders, a distributor has a

 7   statutory responsibility to exercise due diligence

 8   to avoid filling suspicious orders that might be

 9   diverted into then legitimate, medical

10   scientific -- into other than legitimate, medical,

11   scientific and industrial channels."

12              Do you see that?

13        A    I do.

14        Q    Okay.  And Mr. Rannazzisi, you know who

15   he is, right?

16        A    I do.

17        Q    Did you work with him at the DEA?

18        A    I did.

19        Q    Okay.  And here he says:  "There is a

20   statutory responsibility to exercise due diligence

21   to avoid filling suspicious orders."

22              When you avoid filling a suspicious

23   order, that means you block that suspicious order,

24   correct?
```

1          MR. SATIN:  You're asking him today

2    about what he believes?

3          MR. RAFFERTY:  Today.

4    BY MR. RAFFERTY:

5       Q    You understand that's what --

6          MR. STANNER:  Objection to form.

7    BY MR. RAFFERTY:

8       Q    That's what -- when you avoid filling --

9    if McKesson avoids filling a suspicious order,

10   that means they're blocking that order, they're

11   not shipping it.

12         MR. STANNER:  Objection to form.

13         THE WITNESS:  I'm not sure I understand

14   your question.  We -- we do block orders.

15   BY MR. RAFFERTY:

16      Q    That isn't my question.

17         Here's my question:  It says here that:

18   "There is a statutory responsibility to exercise

19   due diligence to avoid filling suspicious orders?"

20         Right?  That's what it says?

21      A    I'm not aware of a statutory or

22   regulatory obligation to block and not ship an

23   order.  We have -- we have a legal obligation to

24   maintain effective controls against diversion.

1      Q    And here, Mr. Rannazzisi at the DEA is

2    saying that you have -- you have a statutory

3    responsibility to avoid filling suspicious orders.

4    That's what he's saying, right?

5      A    That's what it says.

6      Q    Okay.  And you knew this letter had gone

7    out to these distributors, correct?

8              MR. SATIN:  Objection pursuant to Touhy.

9              THE WITNESS:  I've seen the letter since

10   I've been at McKesson.

11   BY MR. RAFFERTY:

12     Q    Had you seen this letter prior to being

13   at McKesson?

14             MR. SATIN:  Objection pursuant to Touhy.

15             THE WITNESS:  I don't know that I can

16   answer that question at this time.

17   BY MR. RAFFERTY:

18     Q    All right.  Then in 2007 -- if we look

19   at this, which we will mark as Exhibit 35 --

20             (Plaintiffs' Exhibit No. 35 was

21             marked for identification.)

22   BY MR. RAFFERTY:

23     Q    And I'm going to ask you specifically

24   about one particular portion of this.

1            Down at the bottom under -- the Gary

2    Hilliard e-mail dated September 11th, 2007, Do you

3    see that?

4            A    I do.





```
20        Q    Okay.  Well, and you would agree with me

21   today in your working with McKesson, and you would

22   agree that registrants like McKesson that

23   routinely report suspicious orders but fill the

24   orders with reason to believe that they are
```

1    destined for the illicit market are in fact

2    failing to maintain effective controls against

3    diversion, true?

4            MR. STANNER:  Objection to the form of

5    the question.

6            THE WITNESS:  If they have reason to

7    believe they're going to be destined, yes.

8    BY MR. RAFFERTY:

4    McKesson, you have testified, I believe, that you

5    have thought that that obligation was being met;

6    is that true?

7          A    Since my -- my time with McKesson, I

8    believe that that's correct, yes.

9          Q    Well, have you gone back and looked at

10   whether or not that had been being done since

11   2006?

12         A    I did not.

13         Q    Okay.  In 2006, you would agree that

14   there was a requirement that suspicious orders be

15   reported to the DEA, correct?

16         A    I would agree with that, yes.

17         Q    Okay.  I'm handing you what we're

18   marking as Exhibit 36.

19               (Plaintiffs' Exhibit No. 36 was

20               marked for identification.)

21   BY MR. RAFFERTY:

22         Q    And I'm going to represent the first

23   page is something that I -- I typed up and

24   calculated for use of -- in the -- for use in the

1  deposition, because it's a voluminous record there

2  that I'm attaching.

3          I'm also going to hand you -- while

4  we're doing it, I might as well give you the next

5  one too, which is 37.

6          (Plaintiffs' Exhibit No. 37 was

7          marked for identification.)

8  BY MR. RAFFERTY:

9      Q    And 36 -- here, if we look at that, I

10  will tell you that this was -- this document, the

11  spreadsheet starting on page 2, was information

12  produced to us by McKesson as the omit reports

13  from 2006 forward.

14          Are you familiar with what omit reports

15  are, sir?

16      A    I am.





1          MR. RAFFERTY:  Cuyahoga is 36.

2          MR. STANNER:  Cuyahoga is 36.

3          MR. RAFFERTY:  30 -- no, 30 -- whatever

4     the first one was I handed you.

5          THE WITNESS:  36 is Cuyahoga.

6          MR. RAFFERTY:  Cuyahoga.  And Summit is

7     37.

8          MR. STANNER:  And so which one are you

9     on now?

10         MR. RAFFERTY:  Cuyahoga, the first one.

11         MR. STANNER:  Got it.

12    BY MR. RAFFERTY:



 8        Q     In fact, if you go -- you can go all the

 9   way to page .9.  And if you go down towards the

10   middle of the page --

11             MR. STANNER:  So the page -- your page

12   numbers are cut off on ours.  Can you give -- is

13   there a Bates or is it all the same?

14             MR. RAFFERTY:  912.  Bates 912.

15             MR. STANNER:  They're all 912.  Sorry.

16   So -- you just got to give us a different marker.

17   The first entry on page 9, I believe is --













```
 1            MR. STANNER:  Objection to the form of

 2    the question.

 3    BY MR. RAFFERTY:

 4        Q    All right.  Now, interestingly --

 5            MR. STANNER:  Mr. Rafferty, I don't mean

 6    to interrupt you, if you're moving on to the next

 7    document, we have a new attorney in the room.

 8            Can you put your appearance on the

 9    record, please?

10            MS. DEFRANCESCO:  Absolutely.  Lindsay

11    DeFrancesco from Reed Smith for AmerisourceBergen.

12            MR. RAFFERTY:  Good.

13            MR. STANNER:  Fire away.

14    BY MR. RAFFERTY:

15        Q    All right.  Now, interestingly, if we

16    look at what we're going to mark as Exhibit 38.

17            (Plaintiffs' Exhibit No. 38 was

18            marked for identification.)

19            MR. RAFFERTY:  1433, Evan.

20    BY MR. RAFFERTY:

21        Q    And this may have been marked by

22    Mr. Hawal before, I don't know.  This is -- this

23    is the lengthy -- this is the 22, 23 pages --

24            MR. STANNER:  You can make it a new one.
```

 1            MR. RAFFERTY:  What's that?

 2            MR. STANNER:  You want to make a new

 3  one?

 4            MR. RAFFERTY:  Yeah, let's just do that.

 5  It'll be faster and easier.

 6            MR. STANNER:  So this is 30 -- 38.

 7  BY MR. RAFFERTY:

 8       Q    Okay.  38, okay.

 9            All right.  So if we look at this, this

10  is a letter from the Department of Justice,

11  August 2014.  You're at McKesson at this point,

12  right?

13       A    That's correct.

14       Q    And were you made aware of this

15  correspondence when you were at -- while you've

16  been at McKesson?

17       A    (Peruses document.)

18       Q    Do you recognize it, sir?

19       A    (Peruses document.)

20            MR. STANNER:  Oh, that -- what's up on

21  the visual and what's here are different

22  documents, at least what we have in our hands.

23  This is dated November 4th, 2014.

24            MR. RAFFERTY:  What's the number of it?

1  Oh, that's 1443.  I marked the wrong one.  I'm

2  sorry.  It's 1430 -- it's 1433.  I should have

3  marked it.  It's my fault.

4          MR. STANNER:  Do you want these back?

5          MR. RAFFERTY:  Yeah -- well, you can

6  have them.  I don't care.  We've got plenty.

7              (Counsel conferring.)

8          MR. STANNER:  Exhibit 11.

9          MR. RAFFERTY:  This is Exhibit -- this

10  is Exhibit 11?

11          MS. MONAGHAN:  What is up there is

12  Exhibit 11.

13          MR. RAFFERTY:  Okay.  Okay.  Good.  That

14  helps.

15          Okay.  Now I'm going --

16          MR. STANNER:  Okay.

17          MR. RAFFERTY:  Well, if I had gone

18  first, I would've had more time.

19  BY MR. RAFFERTY:

20      Q    All right.  Now, I'm going to screw

21  things up because I actually had marked the right

22  one.  I just pulled my -- my working copy was the

23  wrong one in that file.  So now we're going to

24  mark 38.

1             (Plaintiffs' Exhibit No. 38 was

2             remarked for identification.)

3             MR. STANNER:  This is --

4             MR. RAFFERTY:  This is 38, and this is

5   one that had not --

6             MR. STANNER:  This is the one from

7   before?

8             MR. RAFFERTY:  Yes.

9             MR. STANNER:  Okay.  So not that one.

10            MR. RAFFERTY:  Right.

11            THE WITNESS:  We're looking at the --

12            MR. SATIN:  The one, the 38 that we had

13  marked 38 before and then we crossed out, we're

14  going back to that one?

15            MR. RAFFERTY:  Yeah.

16  BY MR. RAFFERTY:

24       Q    Which is a part of the Department of

1    Justice, true?

2        A    It is, but it's not -- the letter is not

3    from the Department of Justice.

4        Q    Okay.  And in fact, if we look at this,

5    and we look at the -- it says -- if we look at

15       Q    Okay.  Are you familiar with this

16   document, sir?

17       A    I believe I read it before, yes.

18       Q    Okay.  And in fact, they say it was

19   systemic in that paragraph.







13    BY MR. RAFFERTY:

14        Q    Now, going to the LDMP you talked about,

15    and so you told Mr. Hawal, you were familiar with

16    the LDMP.  Do you recall that?

17        A    I -- I've read the documents regarding

18    that to some extent, yes.

19        Q    Okay.  And in fact, without going

20    through it, you know that the LD -- the LDMP

21    started in 2007, right?

22        A    That's my understanding, yes.





20   BY MR. RAFFERTY:

21        Q    Do you know whether or not the LDMP --

22   if we look at exhibit -- I don't know what the

23   LDMP was, so --

24             MR. SATIN:  I don't -- I actually don't

1    know that we've actually seen the LDMP.

2              MR. RAFFERTY:  Okay.  Well, let's go

3    ahead and do that real quick.  That will be

4    Exhibit 39.

5              (Plaintiffs' Exhibit No. 39 was

6              marked for identification.)

7              MR. RAFFERTY:  1333.

8    BY MR. RAFFERTY:



23          MR. RAFFERTY:  Okay.  Let's look

24    at 1829.  1829.  And mark that as Exhibit 40.

1          (Plaintiffs' Exhibit No. 40 was

2          marked for identification.)

3    BY MR. RAFFERTY:

4          Q    And if you look at this, this is a

5    letter to the Associate Chief Counsel, Diversion

6    and Regulatory Litigation Section, DEA, back in

7    April of 2007.  Do you see that?

8          A    I do.





 8          MR. RAFFERTY:  Okay.  So let's mark 2112

 9   as Exhibit 41.

10          (Plaintiffs' Exhibit No. 41 was

11          marked for identification.)

12   BY MR. RAFFERTY:

13      Q   Another very small spreadsheet.  And

14   this, I'll represent to you, is information from

15   the ARCOS database, Mr. Boggs.



13    BY MR. RAFFERTY:

14         Q    Okay.  And, in fact, there is no due

15    diligence -- there's no indication that any due

16    diligence had been done on this particular

17    pharmacy for these orders, and in that regard,

18    that would be not maintaining -- McKesson not

19    maintaining effective controls against diversion,

20    correct?

21              MR. STANNER:  Objection to the form.

22    Assumes facts, misstates, vague --

23              THE WITNESS:  I don't know if there was

24    due diligence done or not.

1    BY MR. RAFFERTY:

9    BY MR. RAFFERTY:

10          Q    But if --

11          A    I have no idea what was done or not.

12    This is way before my time.

13          Q    But if there wasn't, that would concern

14    you, correct?

15          MR. STANNER:  Objection to form.

16          THE WITNESS:  It might.  I don't know

17    what was known.

18    BY MR. RAFFERTY:

19          Q    And it's important -- you would agree --

20    I think you told Mr. Hawal earlier in the day that

21    it's important to document that due diligence is

22    being done.

23          You would agree with that, true?

24          MR. STANNER:  Objection to form.

```
 1            THE WITNESS:  I think it's important to

 2  do that, yeah.

 3  BY MR. RAFFERTY:

 4       Q    Okay.  Now, if we look at one particular

 5  pharmacy.

 6            MR. RAFFERTY:  How much time have I

 7  used?

 8            THE VIDEOGRAPHER:  You have four

 9  minutes --

10            MR. RAFFERTY:  Four minutes.  All right.

11  BY MR. RAFFERTY:

12       Q    You understood there were some red flags

13  -- you understand what the concept of red flags

14  are in terms of diversion, correct?

15       A    I do.

16       Q    And some of those red flags are, for

17  example, if a pharmacy is in a geographic area

18  where there's historical -- there's been a

19  historical high amount of abuse or usage of

20  opioids, correct?

21            MR. STANNER:  Objection to form.

22            THE WITNESS:  That -- that can be a red

23  flag, yes.

24  BY MR. RAFFERTY:
```



12      Q      Okay.

13             MR. RAFFERTY:  If we look at

14      Exhibit 1891.

15             MR. STANNER:  Sorry, are you handing us

16      one?

17             MR. RAFFERTY:  No, I say that for Evan's

18      purposes.  I'm sorry.

19             No, you know what, let's look at --

20      let's look at 1865, Evan.

21             And this will be Exhibit 42.

22             (Plaintiffs' Exhibit No. 42 was

23             marked for identification.)

24             MR. STANNER:  Thank you.

1    BY MR. RAFFERTY:

14    BY MR. RAFFERTY:

15        Q    Okay.  If we look at what we've marked

16    as Exhibit 42, I'll represent to you this is a

17    document discussing a pharmacy in Warren, Ohio.

18            Do you know where Warren, Ohio, is?

19        A    In Ohio.  I don't know -- I don't know

20    exactly where in Ohio it is.

21        Q    It's approximately 56 miles, as I

22    calculated on my phone, from Cleveland.

23        A    Okay.

24        Q    Okay.  So it says here in this one, if



```
4        Q    Leakage, what is that?

5        A    Leakage, as I understand it, would be a

6   customer's need that -- hypothetically, they

7   needed 15,000 doses, they bought 10,000 from us

8   and maybe 5,000 from Cardinal or ABC.  That would

9   be -- the 5,000 would be the leakage."
```

```
16  BY MR. RAFFERTY:

17       Q    Okay.  All right.  Then if we go --

18  that's 2007.

19            And then if we look at -- and this is a

20  time period that the LDMP is established, correct,

21  November 2007?

22       A    I believe around that time frame, yes.
```

3         MR. STANNER:  Objection to form.

4    BY MR. RAFFERTY:

5         Q    We saw that in the policy.

6         MR. STANNER:  Same objection, prior two

7    questions.

8         MR. RAFFERTY:  Okay.  And then if we

9    look at 1881, Evan.  And mark that as Exhibit 43.

10        (Plaintiffs' Exhibit No. 43 was

11        marked for identification.)

12   BY MR. RAFFERTY:

13        Q    It says here January 2009.  Do you see

14   that?





 9          MR. RAFFERTY:  Okay.  Well, let's take a

10    look at 1876.  1876 is -- 1876.  We'll mark it as

11    Exhibit 44.

12          (Plaintiffs' Exhibit No. 44 was

13          marked for identification.)

14    BY MR. RAFFERTY:

21     Q    And it says 35.65 controls to Rx

22    purchased, and 31.25 oxy percentage of controls,

23    and that's high, isn't it?

24          MR. STANNER:  Objection to form.

1          THE WITNESS:  Not just on the surface,

2    no.

3    BY MR. RAFFERTY:

4         Q    Oh, okay.  Well, it says at the top:

5    "We are going to set up CSMP visits for all of the

6    accounts below.  This is based on Joel Lumpkin's

7    monthly reports.  The first column represents

8    higher than normal controls percent to total

9    purchases.  The second column represents" -- this

10   would be IMSMC over 25 percent.  "The second

11   column represents high OxyContin purchases to

12   total control purchases (this is over 25

13   percent)."

14             Do you see that?

15        A    I do.

16        Q    So according to this, it's high, and

17   that's why it's being flagged, correct?

18             MR. STANNER:  Objection to form.

19             THE WITNESS:  I don't know what the

20   purpose of it is.

21             MR. RAFFERTY:  Okay.  Well, let's look

22   at 1912 now.  This is Exhibit 45.

23             (Plaintiffs' Exhibit No. 45 was

24             marked for identification.)

1    BY MR. RAFFERTY:

2         Q    And here, it says -- this is to Gary

3    Boggs from Gary Davis.  So does this reflect

4    your -- or refresh your memory that you're

5    familiar with this Franklin Pharmacy?

6         A    No, I --

7              MR. STANNER:  Objection to form.

8    BY MR. RAFFERTY:





21          It says at the top, "In 2013, the

22   population of Warren was listed at 40,768,"

23   correct?

24          A    It does.

4          MR. STANNER:  Objection to the form of

5     the question.  Objection to the "you."

6          MR. SATIN:  And it's a foundational

7     question.

8     BY MR. RAFFERTY:

9          Q    True?

10         MR. SATIN:  You haven't established that

11    he was the one doing the shipping, sir.

12         MR. RAFFERTY:  McKesson.

13         MR. STANNER:  Same objections.

14         THE WITNESS:  I'm trying to put this in

15    proper perspective for me to understand --

16    BY MR. RAFFERTY:

17         Q    I'm asking -- you don't get to ask --

18    you don't get to rephrase my question.

19         MR. STANNER:  Excuse me.  You can't talk

20    over him.  You asked the question.  He's giving

21    you the answer.

22         MR. RAFFERTY:  No, he's not.  He is

23    giving his answer he wants to give.

24         MR. STANNER:  You didn't even -- you

 1    didn't even listen to the words.

 2    BY MR. RAFFERTY:

13            MR. RAFFERTY:  Nothing further.  I will

14    reserve the rest for the Touhy.

15            MR. STANNER:  So, we understand that's

16    your position, and I understand why.  Obviously

17    by -- if you choose to leave this open, that's

18    fine.  We do not concede necessarily that you're

19    entitled to do this.  We haven't -- we don't waive

20    any objections to your request to the DEA filed in

21    January, so we'll deal with all that in front of

22    the special master when the time comes.  But

23    understood.

24            MR. RAFFERTY:  Well, and one of the

1    things -- I also want to make sure our position on

2    the record is that if for some reason there is no

3    ability to ask the Touhy questions, that we then

4    are reserving the right to come back and finish up

5    the time.

6           MR. STANNER:  And we would object to

7    that.

8           The witness is here.  If you have

9    non-Touhy questions, you should feel free to ask

10   them.

11          MR. RAFFERTY:  All right.  So how much

12   time do we have left?

13          THE VIDEOGRAPHER:  Six hours and 12

14   minutes is currently used on the record.

15          MR. RAFFERTY:  48 minutes.

16          THE VIDEOGRAPHER:  Do you want to go

17   back on -- off the record?

18          MR. RAFFERTY:  Off the record, yeah.

19   I'm sorry.

20          THE VIDEOGRAPHER:  The time is 5:09 p.m.

21   We're going off the record.

22          (Recess.)

23          THE VIDEOGRAPHER:  The time is 5:19 p.m.

24   We're back on the record.

1                    CROSS-EXAMINATION

2    BY MR. STANNER:

3         Q    Mr. Boggs, good evening.

4         A    Good evening.

5         Q    I want to ask you briefly about your

6    career before McKesson.  How long did you work at

7    the DEA?

8         A    Probably a little over 27 years.

9         Q    Okay.  And why did you decide to leave

10   your position at the DEA?

11        A    As a special agent for the government,

12   they have mandatory retirement at age 57.  There

13   are some exceptions that you can get a waiver,

14   which I was given a waiver for one year.  I worked

15   for about six or so months into that waiver, and

16   then I decided that I wanted to retire and spend

17   more time with my grandchildren and my daughter.

18        Q    And how long were you retired before you

19   started to work again?

20        A    I retired the end of June of 2012.  I

21   started doing some consulting probably around the

22   summer of 2013.

23        Q    And before you were at the DEA, what was

24   your job before that?

1        A      Before the DEA, I was a deputy sheriff

2   in Orange County, Florida, for about eight and a

3   half years.

4        Q      What did you do before that?

5        A      College student.

6        Q      Mr. Boggs, I want to ask you some

7   questions about diversion.  What is diversion?

8        A      Diversion is the act of taking

9   pharmaceutical controlled substances out of the

10  closed system of distribution or from legitimate

11  channels, patients, and then moving them into --

12  outside of that for abuse.

13       Q      And at McKesson, is it your

14  responsibility to prevent diversion?

15       A      Well, we can certainly present --

16  prevent -- try to prevent some of diversion.  We

17  certainly are not able to prevent all diversion.

18       Q      Well, why can't you prevent all

19  diversion?

20       A      Diversion can occur at different levels

21  outside of the distribution's control.  Diversion

22  can occur at a pharmacy by an employee pilfering

23  it.  It can occur by a pharmacy being burglarized

24  or robbed.  Diversion can occur even after

1  controlled substances have left with a legitimate

2  patient and are sitting in a medicine cabinet of

3  someone's home, and someone steals them out of

4  that medicine cabinet, that's diversion.  We

5  certainly can't control that.

6        Q    Everything you just described is a

7  crime.  Is that -- is there diversion other than

8  crime?

9        A    No, diversion --

10            MR. RAFFERTY:  Objection.

11            THE WITNESS:  Diversion is a crime.

12            MR. STANNER:  Sorry, can you tell me the

13  basis?

14            MR. RAFFERTY:  Well, I think it's lack

15  of foundation.

16            MR. STANNER:  Oh, okay.  I'll try and

17  lay a foundation then.

18  BY MR. STANNER:

19        Q    Is diversion crime?

20        A    In my opinion, it is, yes.

21        Q    Is it always a crime?

22        A    Yes.

23        Q    Okay.  So in your capacity at McKesson,

24  when you say you try to limit diversion, does that

1   mean you're trying to limit crime?

2       A    I'm sorry, could you repeat the

3   question?

4       Q    Sure.  In your -- at McKesson, when you

5   say you -- part of your role is to try to limit

6   diversion, does that mean you're trying to limit

7   crime?

8       A    It means we're trying to identify or

9   prevent situations where a crime would occur.  As

10  I said earlier, we have security measures in our

11  facility to prevent employee pilferage.  If the --

12  if a rogue employee was to pilfer, that would be a

13  crime.

14      Q    And can you describe, what is a

15  diversion trend?

16      A    There's different types of schemes that

17  can occur that would cause a -- what I would

18  consider a trend.  We've -- we've seen diversion

19  trends, such as rogue internet pharmacies, be a

20  diversion trend.  It's a massive criminal scheme.

21  We've seen pill mills in Florida.  That's a

22  diversion trend and is a criminal scheme.

23      Q    Are pill mills still a problem?

24           MR. RAFFERTY:  Objection.

1          THE WITNESS:  There are still some pill

2    mills that can be a rogue pain management facility

3    or something to that nature, yes.

4    BY MR. STANNER:

5          Q    Okay.  Is that -- is that a diversion

6    trend that you're particularly focused on now?

7          A    We try to focus on anything within our

8    ability to prevent diversion, and we see some pain

9    management clinics that are rogue.  We see some

10   specifically bad doctors.  They're -- they're

11   certainly not in the same context as what we knew

12   like the Florida pill mills to be, they're nothing

13   like that at all.

14         Q    Okay.  What are diversion trends that

15   are occurring -- that have been occurring since

16   your time at McKesson?

17         A    Well, first, they're vastly different

18   than before.  They're looking at the pharmacies

19   where the pharmacists or their staff may not be

20   exercising appropriate due diligence.  That can be

21   one -- one area that we look at.  We certainly

22   still continue security measures around our

23   facility.

24         Q    Well, what -- what do you do to keep

 1    abreast of diversion trends?

 2         A    I read anything on the internet that I

 3    can identify as diversion trends.  I read the

 4    National Survey on Drug Use and Health.  I read

 5    the DEA's annual report that they would put out on

 6    their website on drug -- the national drug trend.

 7    We attend conferences such as the National

 8    Association of Drug Diversion Investigator

 9    conferences, the National Association of State

10    Controlled Substance Authority, associations -- we

11    attend those conferences.  We attend other

12    conferences where DEA might be a keynote speaker

13    or break- -- have presentations at breakout

14    groups.

15         Q    What if a doctor writes a large

16    prescription, is that diversion?

17         A    It can be.  It may not be.  The mere

18    fact that it's large in and of itself doesn't mean

19    that it's diversion.  For the -- part of the

20    opioid epidemic has been fueled by

21    overprescribing.  That's not illegal prescribing

22    but it's overprescribing.

23         Q    Can you explain what the difference --

24    you just used two different terms,

1    "overprescribing" and "illegal prescribing."  Can

2    you explain what you mean by those?

3         A    Sure.  Illegal prescribing would be when

4    a doctor would be complicit in a scheme that they

5    know the patient doesn't need it, the patient is

6    paying in cash, the doctor writes a prescription

7    for a patient they've never seen before or

8    examined before.  The doctor meets -- meets

9    someone in a parking lot and writes a prescription

10   in exchange for money.  Those would be illegal

11   prescriptions.

12            Overprescribing, on the other hand,

13   might be a situation where a doctor has a

14   legitimate patient, has a legitimate need for the

15   drugs, but instead of writing that prescription

16   for, say, 15 days, they write it for 30 days.

17   It's a perfectly legitimate prescription but it's

18   overprescribing.  It's prescribing more than what

19   that patient would need.

20        Q    Can you give a -- can you give the jury

21   an example of a prescription that might be

22   overprescription -- that might be an

23   overprescription without being diversion?

24        A    Sure.  You might have a patient go to a

1    dentist and have a tooth -- tooth extraction, and

2    the patient needs the medication for maybe a

3    couple of days, but the doctor writes it for

4    30 days.  That's overprescribing.

5        Q    So does the -- does McKesson's

6    compliance program target overprescribing, as

7    you've just described it?

8        A    It -- it can't.

9        Q    Why not?

10        A    We don't see the prescription.  We're

11    prohibited by law under HIPAA from knowing

12    anything about the patient or any consultation

13    between the patient and the doctor, and we don't

14    have access to prescription -- the prescription

15    itself.

16        Q    You were asked some questions earlier

17    today about towns that received larger volumes of

18    pills relative to their population.  Do you

19    remember some of those questions?

20        A    I do.

21        Q    Do you know if those numbers are the

22    result of diversion or of overprescribing?

23        A    I don't.

24            MR. RAFFERTY:  Objection.

1   BY MR. STANNER:

2       Q    If -- if you know, do you -- do you know

3   if those numbers are the result of prescribing --

4   overprescribing or diversion?

5       A    It could be a combination of both.

6       Q    Are you able to say with any specificity

7   how much overprescribing is part of the problem

8   versus diversion?

9       A    I -- it would be my experience that a --

10  a very large percentage of opioids that are out

11  there are -- are through overprescribing.

12          MR. RAFFERTY:  Objection.

13  BY MR. STANNER:

14      Q    While at McKesson, has your role

15  included responsibility for submitting suspicious

16  order reports?

17      A    It has.

18      Q    What is a suspicious order?

19      A    A suspicious order would be an order

20  placed by the customer that is -- has been deemed

21  as an order of unusual size, an order that

22  deviated substantially from a normal pattern or

23  frequent -- unusual frequency.



 6      Q    Mr. Boggs, I'll rephrase.

 7           Mr. Boggs, do you know how many

 8    suspicious orders McKesson reports to the DEA in a

 9    typical month?

10           MR. RAFFERTY:  Objection.

11           THE WITNESS:  Thousands.





21      Q    So, Mr. Boggs, I'm going to show you

22   what I will mark here as Exhibit 47.  This is

23   Bates No. MCKMDL00616425.

24           MR. STANNER:  Here's some copies for

 1    counsel.  I can put it on the ELMO.

 2              It's a native -- it's not on there --

 3              MS. MONAGHAN:  It's a native and the

 4    Bates number is --

 5              MR. STANNER:  MCKMDL00616425.

 6              (Plaintiffs' Exhibit No. 47 was

 7              marked for identification.)

 8    BY MR. STANNER:

 9         Q    Mr. Boggs, looking here at Exhibit 47,

10    does this look familiar to you?

11         A    It does.





17    Q    Do you think that McKesson takes its --

18    its obligations -- its regulatory obligations

19    seriously?

20    A    I do.  In fact, if I didn't think they

21    did, I wouldn't work for them.

22    Q    Well, when you went to work for them,

23    did you have -- was it -- was it your impression

24    that they took the regulatory obligations

1  seriously then?

2      A    It was my understanding that they -- I

3  mean they hired me.  That was an example that they

4  were taking their regulatory obligations

5  seriously.  People that I had talked to during the

6  consulting periods of time, I was -- the

7  impression I had was that McKesson took the

8  regulatory obligations seriously.

9      Q    When you say the people that you -- took

10  their regulatory obligations seriously, who -- who

11  do you have in mind?  Did you -- did you ever

12  meet, for example, Don Walker?

13     A    I did.

14     Q    What were your impressions of Don

15  Walker?

16          MR. RAFFERTY:  Objection.

17          THE WITNESS:  That he was attempting to

18  do the right thing and he took his regulatory

19  obligations seriously.  He hired me for

20  consulting, and then ultimately hired me in the

21  role that I'm in now.

22  BY MR. STANNER:

23     Q    Have you ever seen anything in your time

24  at McKesson that makes you think that McKesson

1    would prioritize profits over following the law?

2        A    I have not.

3        Q    In your time at McKesson, have you ever

4    suggested terminating a customer and had the

5    company push back on that?

6        A    I have not.  They -- I have unilateral

7    authority to terminate a customer regardless of

8    any financial gain or loss to the company or

9    financial gain or loss to the -- to the customer.

10   And since I've been at McKesson, our program has

11   probably stopped shipping to 250-some-odd

12   customers.



     5     Q    You were -- are you familiar with

     6   Franklin Pharmacy in Warren, Ohio?

     7     A    The one we spoke about earlier, yes.







12          MR. STANNER:  Nothing further.

13          (A discussion was held off the record.)

14          THE VIDEOGRAPHER:  You want to go off

15     the record?

16          MR. RAFFERTY:  Let's Go off the record,

17     yeah.

18          THE VIDEOGRAPHER:  The time is 5:58 p.m.

19     We're going off the record.

20          (Recess.)

21          THE VIDEOGRAPHER:  The time is 6:07 p.m.

22     We're back on the record.

23          MR. RAFFERTY:  Before I get started on

24     behalf of plaintiffs, does anyone else on the line

1    or present have any questions of the witness?

2              And by virtue of everyone's silence,

3    I'll proceed.

4                    REDIRECT EXAMINATION

5    BY MR. HAWAL:

6         Q    Mr. Boggs, how many other former DEA

7    representatives or agents are now employed at

8    McKesson besides yourself, if you can estimate?

9         A    About six or seven.

10        Q    Does that include former DEA attorneys

11   as well as agents?

12        A    It did not, but there -- we -- there's

13   one.

14        Q    Just one.  And before 2013, do you know

15   whether any DEA agents were employed at McKesson,

16   former DEA agents?

17        A    There's a -- was a diversion

18   investigator, not a DEA agent, that was employed

19   by --

20        Q    Just one?

21        A    -- prior to my arrival, yes.

22        Q    Just one.  Okay.

23             Well, I heard you say that a company

24   like McKesson cannot prevent all diversion.  Is

1    that -- is that correct?

2         A    That's correct.

3         Q    Would you agree, though, that

4    wholesalers like McKesson can play an important

5    role in preventing diversion?

6         A    I would.

14        Q    I want to take you back to Exhibit 38.

15             MR. HAWAL:  If Evan can bring it up.

16   BY MR. HAWAL:

17        Q    Which is the November 4th, 2014 letter

18   from the DEA to Geoffrey Hobart of Covington &

19   Burling.  Do you recall that Mr. Rafferty asked

20   you about this letter?

21        A    I believe so, yes.

22        Q    In fact, Covington & Burling is the law

23   firm that represents McKesson and has its counsel

24   seated directly to your left representing you in

1    this deposition?

2                    MR. STANNER:  Objection to the form.

3                    THE WITNESS:  That's correct.

4    BY MR. HAWAL:











10    BY MR. HAWAL:

11         Q    You're aware, as we discussed earlier,

12    that McKesson ended up paying a $150 million fine

13    or penalty as a result of these types of

14    administrative proceedings that were initiated

15    against it by the Department of Justice and the

16    DEA --

17              MR. STANNER:  Objection to form.

18    BY MR. HAWAL:

19         Q    -- right?

20              MR. STANNER:  Objection to form.

21              THE WITNESS:  The $150 million fine

22    would be associated for not reporting suspicious

23    orders.

24    BY MR. HAWAL:

1      Q    And that's exactly what it wasn't doing

2   in these examples, right?

3           MR. STANNER:  Same objection.

4           THE WITNESS:  According to the document,

5   that's correct, yes.

6   BY MR. HAWAL:

7      Q    Which you have no basis to refute as you

8   sit here today, right?

9      A    I do not.

10          MR. STANNER:  Same objections.

11   BY MR. HAWAL:



12        Q     So if diversion occurs, it's your

13   position that it's the pharmacy's fault, not the

14   distributor's fault, right?

15             MR. STANNER:  Objection to the form.

16   Misstates.

17   BY MR. HAWAL:

18        Q     Is that your testimony?

19             MR. STANNER:  Same objection.

20             THE WITNESS:  Well, I think we were

21   assuming that on some of these that diversion was

22   occurring when we don't even know that there's not

23   evidence in here that diversion was actually

24   occurring.  In some -- some of them there is, and

1   some of them there's no information that diversion

2   has ever occurred at these locations.

3   BY MR. HAWAL:







5        MR. HAWAL:  Move to strike as

6   nonresponsive.

7        MR. STANNER:  Objection.

8   BY MR. HAWAL:



14   BY MR. HAWAL:

15       Q    Well, you can certainly answer the fact

16   that Mr. Rannazzisi, by virtue of the letters that

17   he wrote, he considered suspicious order reports

18   important and valuable, true?

19            MR. STANNER:  Objection.

20   BY MR. HAWAL:

21       Q    By virtue of what he put in the letters

22   that you saw, Exhibit 1 and Exhibit 2 or 3.

23            MR. STANNER:  Objection to the form.

24            THE WITNESS:  I -- I understand what was

1    in the letters in terms of what he thought about

2    it, and I would suggest --

3    BY MR. HAWAL:

4        Q    It spoke -- spoke for itself.

5             THE REPORTER:  You didn't get the rest

6    out.

7             THE WITNESS:  Yeah.  I would suggest if

8    you want to know what he was thinking about that,

9    you might have to ask him.

10   BY MR. HAWAL:

11       Q    Well, it's evident from the letters that

12   he wrote what he was thinking, true?

13            MR. STANNER:  Objection to the form.

14            THE WITNESS:  I -- I will take the

15   letter at face value, yes.

16   BY MR. HAWAL:

17       Q    And he was your supervisor, correct?

18       A    He was.

19       Q    He was the head of the Department of

20   Diversion Control at the DEA the entire time you

21   were in that department, true?

22       A    He was.

23       Q    And in terms of Mr. Rannazzisi's

24   letters, would -- do you believe it's unusual that

1　he would have to send repetitive letters to

2　wholesalers to remind them of their obligations

3　under the Controlled Substances Act and their

4　obligations to send suspicious order reports to

5　the DEA if he didn't believe that that was an

6　important part of their obligation?

7　　　　　　MR. STANNER:  Object to the form.

8　　　　　　MR. SATIN:  Objection pursuant to Touhy,

9　don't answer that question.

10　BY MR. HAWAL:

11　　　Q　　As you sit here today, and based on what

12　you know and what you've seen in those letters, do

13　you believe that he would have sent those letters

14　if he did not have concerns about McKesson's and

15　other distributors' failures to live up to their

16　obligations under the Controlled Substances Act?

17　　　　　　MR. STANNER:  Object to the form of the

18　question.

19　　　　　　MR. SATIN:  Objection pursuant to Touhy

20　to the extent it still relies -- the answer relies

21　on the information you obtained at that time when

22　you were at the DEA.

23　　　　　　THE WITNESS:  I don't believe I can

24　answer that question at this time.

1    BY MR. HAWAL:

2        Q    Well, since you've left the DEA, has --

3    has Mr. Rannazzisi or any other DEA representative

4    sent McKesson a letter saying, We don't want your

5    suspicious order reports, they're of no value to

6    us?  Has that ever happened?

7        A    I'm not familiar with any letters that

8    have that, no.

9        Q    If those letters did go to the -- to

10   McKesson, you would know about it, wouldn't you?

11           MR. STANNER:  Object -- object to the

12   form of the question.

13   BY MR. HAWAL:

14       Q    Wouldn't you?

15       A    I would hope so, yes.

16       Q    Now, you testified that you send

17   suspicious order reports that -- that you believe

18   are legitimate suspicious -- represent suspicious

19   orders to the DEA as well as suspicious order

20   reports that you don't believe represent or are

21   suspicious.  Is that -- is that your statement --

22   was that your testimony?

23       A    I don't believe that was my testimony at

24   all.

1        Q     Well, I thought you said that you --

2   with Exhibit -- I can't remember the number, but

3   the exhibit that your counsel referenced --

4            MR. STANNER:  Exhibit 47.

5   BY MR. HAWAL:

13  BY MR. HAWAL:

14       Q     Oh, okay.  Well, did you believe it was

15  a suspicious order?

16       A     I believe it was a suspicious order as

17  that is defined in the regulation, yes.



2   BY MR. HAWAL:

3        Q    But you were -- you also would send

4   reports to the DEA that you thought could

5   represent diversion -- suspicious order reports

6   that could represent diversion, true?

7        A    I --

8             MR. STANNER:  Objection to the form.

9             THE WITNESS:  I don't believe I said

10  that at all.

11  BY MR. HAWAL:



 9  BY MR. HAWAL:

10       Q    In any event, wholesalers like McKesson

11  play an integral part of the efforts at preventing

12  diversion.  True?

13       A    I believe we --

14            MR. STANNER:  Objection to form.

15            THE WITNESS:  -- play an important part.

16  BY MR. HAWAL:

  8   BY MR. HAWAL:

  9       Q    What are you -- are you -- are you

 10   telling us what you understood as a DEA agent at

 11   that time?  Where are -- where are you getting

 12   that information from?

 13            MR. STANNER:  Objection.  Counsel,

 14   you've asked him to speculate.

 15            MR. HAWAL:  Well, I understand, but

 16   he's -- he's now telling -- I think he's giving us

 17   information in violation of Touhy without his

 18   counsel even objecting to it.

 19            MR. SATIN:  Well, then maybe -- I don't

 20   believe so.  I thought your question was asking

 21   for him based on his time at McKesson to be

 22   evaluating what he understood McKesson was doing

 23   during those years that he learned in the course

 24   of his work at McKesson.

 1           But I will certainly advise you,

 2   Mr. Boggs, not to disclose information that's

 3   non-public and official that you learned while you

 4   were at the DEA and -- and to make that clear.

 5           MR. HAWAL:  Okay.  P -- P-1431, please.

 6           (Plaintiffs' Exhibit No. 48 was

 7           marked for identification.)

 8   BY MR. HAWAL:

 9      Q    Sir, I'm handing you another letter from

10   the Department of Justice to another lawyer at

11   your lawyer's law firm, Covington & Burling, dated

12   March 20th, 2004 -- March 20, 2014.  I'm sorry.





 5    BY MR. HAWAL:

 6         Q    And do you have any documents from the

 7    DEA indicating otherwise?

 8              MR. STANNER:  Objection to form.

 9              THE WITNESS:  Not to my knowledge, no.

10    BY MR. HAWAL:

2  BY MR. HAWAL:

3      Q    Were any of the answers that you gave in

4  your direct examination by your counsel informed

5  by information that you gained as a DEA

6  representative?

7              MR. STANNER:  Objection to the form of

8  the question.

9              THE WITNESS:  Not that I recall, no.

10             MR. STANNER:  Can I ask how long we've

11  been on the record?

12             THE VIDEOGRAPHER:  30 minutes.

13             MR. SATIN:  And I think the last

14  question asked about direct examination by his

15  counsel.  I never asked him any questions.

16             MR. HAWAL:  Yes.

17             MR. SATIN:  You're asking about the

18  direct examination that counsel for McKesson made.

19             MR. HAWAL:  Well, Counsel -- yeah,

20  Counsel --

21  BY MR. HAWAL:

22      Q    Let me ask you this, Mr. Boggs.  In your

23  preparation sessions for this deposition, were you

24  with counsel for McKesson?

```
1          A     I was.

2          Q     Okay.

3                (Plaintiffs' Exhibit No. 49 was

4                marked for identification.)

5     BY MR. HAWAL:

6          Q     I'm going to hand you what's been marked

7     as Exhibit 49, which is some e-mails in two

8     thousand -- March of 2014, when you were with --

9     an employee of McKesson.
```







 9  BY MR. HAWAL:

10      Q    So it's about documentation.

11      A    Documentation is a requirement of it.

12  And if the customer had a legitimate need for

13  that --

14      Q    Well --

15      A    -- there was no -- there's nothing

16  nefarious here.



 9          MR. STANNER:  I'm sorry, Mr. Hawal, are

10   you really doing an inquiry about whether or not

11   this man wants to spend time with his

12   grandchildren?  Is that how you want to end the

13   day?

14          MR. HAWAL:  Is -- is that on objection

15   or -- I don't understand.

16          MR. STANNER:  Yeah, it's a standing

17   objection to the line of inquiry, yes.

18          MR. HAWAL:  Thank you.

19          MR. STANNER:  How much time is left on

20   the record?

21          THE VIDEOGRAPHER:  37 minutes, 50 -- 58

22   seconds.

23          MR. STANNER:  You've got eight seconds.

24          MR. HAWAL:  Yeah, I'm waiting for an

1    answer.

2              THE WITNESS:  What was the question?

3    BY MR. HAWAL:

8              MR. HAWAL:  No further questions.

9              THE VIDEOGRAPHER:  Off the record.  The

10   time is 6:45 p.m.  We're going off the record.

11             (Whereupon, the deposition of

12             GARY L. BOGGS was adjourned at

13             6:45 p.m.)

14

15

16

17

18

19

20

21

22

23

24

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2          The undersigned Certified Shorthand Reporter

3      does hereby certify:

4          That the foregoing proceeding was taken before

5      me at the time and place therein set forth, at

6      which time the witness was duly sworn; That the

7      testimony of the witness and all objections made

8      at the time of the examination were recorded

9      stenographically by me and were thereafter

10     transcribed, said transcript being a true and

11     correct copy of my shorthand notes thereof; That

12     the dismantling of the original transcript will

13     void the reporter's certificate.

14         In witness thereof, I have subscribed my name

15     this date:  January 21, 2019.

16

17                         _____

18                         LESLIE A. TODD, CSR, RPR

19                         Certificate No. 5129

20     (The foregoing certification of

21     this transcript does not apply to any

22     reproduction of the same by any means,

23     unless under the direct control and/or

24     supervision of the certifying reporter.)

1                    INSTRUCTIONS TO WITNESS

2         Please read your deposition over carefully and

3    make any necessary corrections. You should state

4    the reason in the appropriate space on the errata

5    sheet for any corrections that are made.

6    After doing so, please sign the errata sheet

7    and date it.

8         You are signing same subject to the changes

9    you have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative

11   that you return the original errata sheet to the

12   deposing attorney within thirty (30) days of

13   receipt of the deposition transcript by you. If

14   you fail to do so, the deposition transcript may

15   be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

1                    - - - - - -

2                E R R A T A

3                    - - - - - -

4    PAGE LINE CHANGE

5    _____ _____ _____

6    REASON: _____

7    _____ _____ _____

8    REASON: _____

9    _____ _____ _____

10   REASON: _____

11   _____ _____ _____

12   REASON: _____

13   _____ _____ _____

14   REASON: _____

15   _____ _____ _____

16   REASON: _____

17   _____ _____ _____

18   REASON: _____

19   _____ _____ _____

20   REASON: _____

21   _____ _____ _____

22   REASON: _____

23   _____ _____ _____

24   REASON: _____

1          ACKNOWLEDGMENT OF DEPONENT

2     I,_____, do hereby

3  certify that I have read the foregoing pages, and

4  that the same is a correct transcription of the

5  answers given by me to the questions therein

6  propounded, except for the corrections or changes

7  in form or substance, if any, noted in the

8  attached Errata Sheet.

9

10 _____

11 GARY L. BOGGS                          DATE

12

13

14 Subscribed and sworn to

15 before me this

16 _____day of_____,20___.

17 My commission expires:_____

18 _____

19 Notary Public

20

21

22

23

24