## Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

IN RE: NATIONAL PRESCRIPTION

OPIATE LITIGATION        Case No.

1:17-MD-2804

APPLIES TO ALL CASES       Hon. Dan A.

Polster

Case No. 1:17-MD-2804

- - -

January 17, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

Videotaped deposition of

DOUGLAS BOOTHE, held at 250 Hudson Street,

New York, New York, commencing at 9:00 a.m.,

on the above date, before Marie Foley, a

Registered Merit Reporter, Certified

Realtime Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

Deps@golkow.com

## Page 2

1    A P P E A R A N C E S:

2

3    ROBBINS GELLER RUDMAN & DOWD LLP

4    BY: AELISH M. BAIG, ESQUIRE

5      DOREY ANTULLIS, ESQUIRE

6      Post-Montgomery Center

7      One Montgomery Street, Suite 1800

8      San Francisco, California  94104

9      415.288.4545

10     aelishb@rgrdlaw.com

11     Representing Plaintiff

12

13

14   MORGAN LEWIS & BOCKIUS, LLP

15   BY: TINOS DIAMANTATOS, ESQUIRE

16     LIZA B. FLEMING, ESQUIRE

17     77 West Wacker Drive

18     Chicago, Illinois  60601-5094

19     312.324.1145

20     tinos.diamantatos@morganlewis.com

21     liza.fleming@morganlewis.com

22     Representing Rite Aid

23

24

## Page 3

1    A P P E A R A N C E S: (Cont.)

2

3

4    FARRELL FRITZ, LLP

5    BY: MATTHEW D. DONOVAN, ESQUIRE

6      Grand Central Plaza

7      622 Third Avenue, Suite 37200

8      New York New York  10017

9      646.237.1803

10     mdonovan@farrellfritz.com

11     Representing Cardinal Health

12

13

14   COVINGTON & BURLING, LLP

15   BY: CLAYTON L. BAILEY, ESQUIRE

16     One CityCenter

17     850 Tenth Street NW

18     Washington, DC  20001

19     202.662.6000

20     cbailey@cov.com

21     Representing McKesson

22

23

24

## Page 4

1    A P P E A R A N C E S: (Cont.)

2

3    JONES DAY

4    BY: SARAH G. CONWAY, ESQUIRE

5      555 South Flower Street

6      Fiftieth Floor

7      Los Angeles, California  90071

8      213.489.3939

9      sgconway@jonesday.com

10     Representing Walmart

11

12

13   KIRKLAND & ELLIS LLP

14   BY: DONNA WELCH, ESQUIRE

15     ZACHARY A. CIULLO, ESQUIRE

16     300 North LaSalle

17     Chicago, Illinois  60654

18     312.862.2000

19     donna.welch@kirkland.com

20     zac.ciullo@kirkland.com

21     Representing Allergan Finance and

22     the witness

23

24

Page 5

```
 1    A P P E A R A N C E S: (Cont.)
 2
 3    ULMER BERNE LLP
 4    BY: PAUL J. COSGROVE, ESQUIRE
 5       600 Vine Street
 6       Suite 2800
 7       Cincinnati Ohio  45202-2409
 8       513.698.5000
 9       pcosgrove@ulmer com
10       Representing Amneal Pharmaceuticals
11
12
13    APPEARANCES VIA TELEPHONE AND STREAMING:
14
15    ARNOLD & PORTER, LLP
16    BY: WREDE SMITH, ESQUIRE
17       601 Massachusetts Avenue, NW
18       Washington, DC  20001
19       202-942-5000
20       Wrede.Smith@arnoldporter.com
21       Representing Par and Endo
22
23
24
```

Page 6

```
 1    APPEARANCES VIA TELEPHONE AND STREAMING:
 2    (Continued)
 3
 4    JACKSON KELLY PLLC
 5    BY: JON L. ANDERSON, ESQUIRE
 6       500 Lee Street East
 7       Suite 1600
 8       Charleston West Virginia  25301-2302
 9       304.340.1000
10       jlanderson@jacksonkelly.com
11       Representing AmerisourceBergen
12
13
14    ROPES & GRAY
15    BY: GREGORY F. MALLOY, ESQUIRE
16       Prudential Tower
17       800 Boylston Street
18       Boston, Massachusetts  02199
19       617.951.7000
20       gregory.malloy@ropesgray.com
21
22    ALSO PRESENT:
23       Tyler Crotty, videographer
24       Jeff Sayres, trial tech
```

Page 7

```
 1              - - -
 2         TRANSCRIPT INDEX
 3              PAGE
 4    APPEARANCES...................... 2 - 6
 5    INDEX OF EXHIBITS................. 8 - 16
 6    EXAMINATION OF DOUGLAS BOOTHE:
 7    BY: MS. BAIG.................... 19
 8    AFTERNOON SESSION............... 201
 9    SIGNATURE PAGE.................. 442
10    ERRATA.......................... 443
11    REPORTER'S CERTIFICATE........... 444
12
13    EXHIBITS WITH ORIGINAL TRANSCRIPT
14
15              - - -
16
17
18
19
20
21
22
23
24
```

Page 8

```
 1              - - -
 2            E X H I B I T S
 3              - - -
 4    NO.        DESCRIPTION        PAGE
 5    Allergan- Boothe   Actavis per4ma period     42
 6    Exhibit 1        covered by appraisal 2008,
 7                   Bates No.
 8                   Acquired_Actavis_01541043
 9                   to ALLERGAN_MDL_00128730
10
11    Allergan-Boothe    Email chain ending January    64
12    Exhibit 2      26, 2010, Bates No.
13                   ALLERGAN_MDL_03317313 to
14                   03317326
15
16    Allergan- Boothe   Email chain ending January    75
17    Exhibit 3      27, 2010, Bates No.
18                   ALLERGAN_MDL_03305226 to
19                   03305230
20
21
22
23
24
```

Page 9

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.         DESCRIPTION          PAGE
 5   Allergan-Boothe    Email dated January 2,      86
 6   Exhibit 4      2013, with attachment,
 7              Bates No.
 8              Acquired_Actavis_00885908
 9              to 00885912
10
11   Allergan-Boothe    Email chain ending      106
12   Exhibit 5      November 18, 2011,
13              Bates No. ACTAVIS0958177
14              to 0958182
15
16   Allergan-Boothe    Email chain ending October  117
17   Exhibit 6      18, 2006, with attachment,
18              Bates No.
19              ALLERGAN_MDL_01397096 to
20              01397159
21
22
23
24
```

Page 10

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.         DESCRIPTION          PAGE
 5   Allergan-Boothe    Development and Manufacturing 129
 6   Exhibit 7      Services Agreement effective
 7              February 1, 2008,
 8              Bates No.
 9              ALLERGAN_MDL_01474505 to
10              0147557
11
12   Allergan-Boothe    Email dated January 27, 2009, 156
13   Exhibit 8      with attachment,
14              Bates No.
15              ALLERGAN_MDL_01100742 to
16              01100752
17
18   Allergan-Boothe    Email chain ending March    167
19   Exhibit 9      10, 2009, Bates No.
20              ALLERGAN_MDL_01058383 to
21              01058385
22
23
24
```

Page 11

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.         DESCRIPTION          PAGE
 5   Allergan-Boothe    Email dated March 11,      181
 6   Exhibit 10     2009, Bates No.
 7              ALLERGAN_MDL_01725566 to
 8              01725569
 9
10   Allergan-Boothe    Email chain ending August   191
11   Exhibit 11     26, 2011,
12              Bates No. ACTAVIS0965151
13              to 0965154
14
15   Allergan-Boothe    Email chain ending      202
16   Exhibit 12     February 20, 2013, with
17              attachment,
18              Bates No. ACTAVIS1025294
19              to 1025297
20
21
22
23
24
```

Page 12

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.         DESCRIPTION          PAGE
 5   Allergan-Boothe    Email dated August 2,      212
 6   Exhibit 13     2012, with attachment,
 7              Bates No.
 8              ALLERGAN_MDL_00026060 to
 9              00026092
10   Allergan-Boothe    Email chain ending July    221
11   Exhibit 14     15, 2011, with attachment,
12              Bates No. ACTAVIS0506794
13              to 0506814
14
15   Allergan-Boothe    Email chain ending      250
16   Exhibit 15     February 25, 2012, with
17              attachment,
18              Bates No.
19              ALLERGAN_MDL_00676546 to
20              00676585
21
22   Allergan-Boothe    Email chain ending October  264
23   Exhibit 16     12, 2011, Bates No.
24              ACTAVIS0811957 to 0811960
```

Page 13

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.        DESCRIPTION        PAGE
 5  Allergan-Boothe    Adjudicated Discount    283
 6  Exhibit 17    Coupon Program Agreement,
 7              Bates No.
 8              ALLERGAN_MDL_01474262 to
 9              01474331
10
11  Allergan-Boothe    Email dated October 21,    319
12  Exhibit 18    2009, with attachment,
13              Bates No. ACTAVIS1132528
14              to 1132530
15
16  Allergan-Boothe    Email dated June 12, 2011,    328
17  Exhibit 19    with attachment,
18              Bates No. ACTAVIS0822310
19              to 0822331
20
21  Allergan-Boothe    Email dated June 21, 2011,    342
22  Exhibit 20    Bates No. ACTAVIS0971969
23              to 0971972
24
```

Page 14

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.        DESCRIPTION        PAGE
 5  Allergan Boothe    Email dated November 4,    345
 6  Exhibit 21    2011, with attachment,
 7              Bates No. ACTAVIS0960324
 8              to 0960327
 9
10  Allergan-Boothe    Email chain ending January    354
11  Exhibit 22    27, 2012, Bates No.
12              ALLERGAN_MDL_01898012 to
13              01898134
14
15  Allergan-Boothe    Slide deck Advocacy    360
16  Exhibit 23    Development Brainstorming
17              Meeting April 25, 2006,
18              Bates No.
19              ALLERGAN_MDL_02513100 to
20              02513130
21  Allergan-Boothe    Email chain ending May 6,    376
22  Exhibit 24    2011, Bates No.
23              ALLERGAN_MDL_01860386 to
24              01860397
```

Page 15

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.        DESCRIPTION        PAGE
 5  Allergan-Boothe    Email dated December 21,    382
 6  Exhibit 25    2011, with attachment,
 7              Bates No. ACTAVIS0804497
 8              to 0804563
 9  Allergan-Boothe    Email dated July 9, 2012,    401
10  Exhibit 26    with attachment,
11              Bates No. ACTAVIS0718476
12              to 0718533
13
14  Allergan-Boothe    Email chain ending August    417
15  Exhibit 27    18, 2009, Bates No.
16              ALLERGAN_MDL_02081243 to
17              02081245
18  Allergan-Boothe    Email chain ending July    429
19  Exhibit 28    11, 2012, with attachment,
20              Bates No.
21              ALLERGAN_MDL_00780096 to
22              00780473
23
24
```

Page 16

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4      NO.        DESCRIPTION        PAGE
 5  Allergan-Boothe    Email chain ending July    438
 6  Exhibit 29    23, 2010, with attachment,
 7              Bates No.
 8              ALLERGAN_MDL_01871495 to
 9              01871609
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 17

```
 1    DEPOSITION SUPPORT INDEX
 2              - - -
 3    DIRECTION TO WITNESS NOT TO ANSWER
 4    Page  Line
 5    - -none- -
 6
 7
 8    REQUEST FOR PRODUCTION OF DOCUMENTS
 9    Page  Line
10    - -none- -
11
12
13    STIPULATIONS
14    Page  Line
15    - -none- -
16
17
18    QUESTIONS MARKED
19    Page  Line
20    - -none- -
21
22
23
24
```

Page 18

```
 1              - - -
 2              9:07 a.m.
 3              New York, New York
 4              - - -
 5         THE VIDEOGRAPHER:  We are now on
 6    the record.
 7         My name is Tyler Crotty.  I'm a
 8    videographer for Golkow Litigation
 9    Services.
10         Today's date is January 17th,
11    2019, and the time is approximately
12    9:07 a.m.
13         This video deposition is being
14    held at 250 Hudson Street, New York,
15    New York, in the matter of National
16    Prescription Opiate Litigation MDL for
17    the court of the Northern District of
18    Ohio.
19         The deponent today is Doug
20    Boothe.
21         And counsel will be noted on the
22    stenographic record.
23         Our court reporter is Marie
24    Foley, and she will now swear in the
```

Page 19

```
 1    witness.
 2              - - -
 3    DOUGLAS BOOTHE, the Witness herein, having
 4    been first duly sworn by a Notary
 5    Public in and of the State of New
 6    York, was examined and testified as
 7    follows:
 8    EXAMINATION BY
 9    MS. BAIG:
10         Q.   Good morning, Mr. Boothe.
11         A.   Good morning.
12         Q.   I'm Aelish Baig.
13              Can you please state your full
14    name and address for the record?
15         A.   Sure.  It's Douglas Steven
16    Boothe,
17
18         Q.   And, have you had your
19    deposition taken before?
20         A.   Yes.
21         Q.   How many times?
22         A.   Over a dozen.
23         Q.   Okay.  So, fair to say that
24    you're familiar with the procedures?
```

Page 20

```
 1         A.   Yes.
 2         Q.   All right.  What did you do to
 3    prepare for today's deposition?
 4         A.   I met with our attorneys
 5    yesterday.
 6         Q.   Okay.  How many times did you
 7    meet with your attorneys?
 8         A.   Yesterday and --
 9         THE VIDEOGRAPHER:  Counsel.  I'm
10    sorry.  I don't know if I'm getting an
11    audio feed.  We might have -- we might
12    have to go off the record.
13         MS. BAIG:  Okay.
14         THE VIDEOGRAPHER:  We're going
15    off the record.
16         The time is 9:09 a.m.
17         (Recess taken.)
18         THE VIDEOGRAPHER:  We're going
19    back on the record.
20         The time is 9:12 a.m.
21    BY MS. BAIG:
22         Q.   So, how many times did you meet
23    with your attorneys in order to prep for
24    this depo?
```

Page 21

1     A.   Sure.  So, I met yesterday and
2  we met one time over the summer in June or
3  July-ish time frame and some email
4  exchanges, but largely just two -- two
5  times.
6     Q.   Okay.  And, you had no meetings
7  over the phone about preparation for this
8  deposition?
9     A.   No, just logistics.
10    Q.   Okay.  Did you read any
11 deposition transcripts in preparation for
12 this depo?
13    A.   No.
14    Q.   Did you talk to anybody at
15 Actavis in preparation for this
16 deposition?
17    A.   No.
18    Q.   Did you review any documents in
19 preparation for this deposition?
20    A.   Yes.
21    Q.   And, those were documents from
22 your files when you worked at Actavis?
23    A.   They weren't exclusively from my
24 files.  They were other documents as well.

Page 22

1     Q.   What -- what documents do you
2  recall looking at in preparation for your
3  deposition?
4     A.   It would be better if you just
5  want to show me a document, I'd be happy
6  to comment on it.
7     Q.   But my question to you is what
8  documents do you recall looking at in
9  preparation for your deposition?
10    A.   There were some documents from
11 regulatory team, some FDA communications,
12 some sales and training materials.
13    Q.   Anything else that you recall?
14    A.   No.
15    Q.   Email?
16    A.   There -- those were emails as
17 well as some attachments, yes.
18    Q.   Are you familiar with the
19 complaints on file in this action?
20    A.   To a certain extent, yes.
21    Q.   And, what's your understanding
22 of what the allegations are?
23    A.   I'm really not a lawyer.  So
24 you'd have to explain it to me.

Page 23

1     Q.   You have no understanding of
2  what this case is about?
3     A.   It's some sort of a class action
4  suit brought by plaintiffs about I'll say
5  marketing practices of branded
6  pharmaceutical companies.
7     Q.   And, do you know what the gist
8  of the wrongdoing alleged is?
9     A.   Again, allegations of marketing
10 activities by branded pharmaceutical
11 companies, is my understanding.
12    Q.   Allegations of misleading
13 marketing activities.
14         Is that your understanding, or
15 no?
16    A.   Again, you're -- you're asking
17 me.  I told you the answer.  I think it's
18 my understanding as it relates to
19 marketing activities of branded
20 pharmaceutical companies.
21    Q.   Okay.  You have no further
22 understanding of what this case is about.
23         Is that right?
24    A.   I'd be happy to answer a

Page 24

1  question.
2         I don't know.
3     Q.   You have -- okay.
4         At what company did you first
5  work on opioids?
6     A.   What do you mean by work on
7  opioids?
8         Can you describe that for me,
9  please?
10    Q.   Do you understand what an opioid
11 is?
12    A.   Sure.
13    Q.   Okay.  When was the first time
14 that you worked at a pharmaceutical
15 company that was selling opioids?
16    A.   My first pharmaceutical job was
17 with Pharmacia.  I'm not aware if they did
18 or didn't sell opioids.  That was in 2001.
19 I went to Alpharma in 2004, and Alpharma
20 had in its generic portfolio several
21 controlled substances.  Some may have been
22 opioids, but we had other controlled
23 substances, and Alpharma also had a
24 branded long-acting opioid product, which

Page 25

1    is Kadian extended-release, long-acting
2    morphine product, capsule.
3        Q.    And, what was your position at
4    Pharmacia?
5        A.    I joined Pharmacia in 2001.  I
6    was the vice-president of e-business and
7    emerging technologies.
8        Q.    And you kept that position until
9    2004?
10       A.    I was there until the spring of
11   2013.  Pfizer acquired Pharmacia.  So when
12   that transaction closed, which I believe
13   was in April, I exited the company.
14   2013 -- sorry.  2003.
15       Q.    Okay.
16       A.    2001 to 2003.
17       Q.    And, what was your first
18   position at Alpharma?
19       A.    I joined in January of 2004.  I
20   was the vice-president and general manager
21   of our solid oral dose business, generics.
22       Q.    And, what additional positions
23   did you hold at Alpharma?
24       A.    Within a year there, I took over

Page 26

1    really leadership for the entire generics
2    business, so it included the solid oral
3    dose, the semisolids liquid business, and
4    our over-the-counter business, generics
5    business.  Again, all over-the-counter
6    general label products.
7        Q.    And, when did you leave
8    Alpharma?
9        A.    Well, Alpharma was acquired by
10   Actavis.  That acquisition occurred at the
11   end of 2005.  So I stayed on with the new
12   entity, which was called Actavis US, and I
13   was there from 2006 through 2012 when
14   Watson Pharmaceutical acquired global
15   Actavis, including the US business.
16       Q.    And, what was your position at
17   Actavis?
18       A.    I had several roles.  When the
19   transaction first closed in 2006, I was
20   the vice-president sales and marketing, I
21   believe.  And then I became chief
22   commercial officer in 2007.  And in 2008 I
23   was appointed CEO of Actavis US, and that
24   expanded to CEO of Actavis Americas.  So

Page 27

1    from 2008 to 2012, I was the CEO of
2    Actavis in the U.S. and Americas.
3        Q.    And, what -- what happened in --
4    what -- where did you go in 2012?
5        A.    So, again, so, Watson
6    Pharmaceuticals acquired Actavis.  That
7    was announced in April of 2012.
8    Transaction closed, actually, October
9    30th, the day of Hurricane Sandy, in 2012.
10   I stayed with the company through the end
11   of the calendar year, as per my agreement,
12   and then I -- I exited in January, and I
13   started two weeks later at Perrigo
14   Pharmaceuticals January 2013.
15       Q.    And, what's your position at --
16   are you still at Perrigo?
17       A.    No.
18       Q.    What was your position at
19   Perrigo?
20       A.    I was the executive
21   vice-president and general manager of the
22   generic and specialty pharma business.
23   They call it the prescription business,
24   but it was generics and specialty pharma.

Page 28

1        Q.    And, were there opioids in the
2    portfolio at Perrigo?
3        A.    Yes.
4        Q.    Which ones?
5        A.    We sold a generic of -- we
6    brought to market a generic of Exalgo,
7    which I believe is either hydromorphone or
8    hydrocodone.  We had other controlled
9    substances.  I'm trying to think if we had
10   other opioids, but we had controlled
11   substances.
12       Q.    And, what was your next
13   position?
14       A.    I left Perrigo in July of 2016,
15   and I moved to Impacts Laboratories in
16   August of 2016.  I was the president of
17   the generics division at Impacts
18   Laboratories from August 2016 through May
19   of 2018.
20       Q.    And, did you take another
21   position after that?
22       A.    Yes.  I exited May of 2018,
23   which is when the Amneal acquisition
24   closed, and I started a position two weeks

Page 29

1  ago.
2      Q.    And, where are you working now?
3      A.    I'm the president and chief
4  executive officer of Acorn
5  Pharmaceuticals.
6      Q.    And, were there opioids in the
7  portfolio at Impacts?
8      A.    Yes.
9      Q.    Which ones?
10     A.    Again, the generics business we
11 sold -- manufactured and distributed
12 generic hydromorphone, hydrocodone,
13 hydromorphone.  We actually had a generic
14 for Kadian, which again is a morphine
15 product at Alpharma.  I think we also had
16 a generic for Avinza, which is another
17 generic morphine extended-release product.
18     Q.    And, are there --
19     A.    Sorry.  Oxycodone or -- Opana
20 was oxymorphone.  That was -- we had a
21 generic of that.
22     Q.    Okay.  And, are there opioids in
23 the portfolio at Acorn Pharmaceutical?
24     A.    You know, I'm still learning the

Page 30

1  product line there.  I believe we --
2  again, we have controlled substances.
3  I've toured the facilities and the vaults.
4  Not a significant part of the business.
5      I believe we have -- Acorn's
6  mostly injectable products and sterile
7  ophthalmics.  So we may have some
8  hospital-based controlled substance
9  products, but I'm not a hundred percent
10 sure on the portfolio still.
11     Q.    When you were at Alpharma as VP,
12 who did you report to?
13     A.    I joined the company in 2004.
14 My boss was -- was Fred Lynch.
15     Q.    And he did not come over to
16 Actavis when you did, correct?
17     A.    Correct.
18     Q.    And, did that reporting
19 structure change at all while you were at
20 Alpharma?
21     A.    No.
22     Q.    And, when you started at
23 Actavis, who did you report to?
24     A.    I reported to Sigurdur Olafsson.

Page 31

1      Q.    Is that Siggi?
2      A.    Correct.
3      Q.    And, what was Sigurdur
4  Olafsson's position?
5      A.    2006 he was president of Actavis
6  US.
7      Q.    And, what company did he work
8  for?  Actavis?
9      A.    Well, he came from Actavis,
10 yeah.
11     Q.    Did he come from the company
12 Actavis US?
13     A.    Again, that was his position.
14 Again, I don't know where he was in terms
15 of his employment standpoint, if he was
16 part of the parent or if he was part of --
17 but he lived in the United States.
18     Q.    And, who did Sigurdur Olafsson
19 report to?
20     A.    He reported to the Actavis CEO
21 at the time, Robert Wessman.
22     Q.    And, who did Robert Wessman
23 report to?
24     A.    He report to the board.  I mean,

Page 32

1  Robert was the CEO.
2      Q.    The board of Actavis?
3      A.    The board of Actavis Group that
4  was Icelandic-based.  So, again, I don't
5  know what the -- if it was -- I don't know
6  what the tag line is for an
7  Icelandic-based company.  But, yes,
8  Actavis Group.
9      Q.    But, was that board different
10 than the board of Allergan?
11         MS. WELCH:  Objection to form.
12     A.    Yes.
13     Q.    And, who was on the board of
14 Actavis Group at that time?
15     A.    In what year?
16     Q.    2006.
17     A.    I will say a bunch of
18 Icelandics, Icelanders.  Thor Bjorgolfsson
19 was the chairman.  He was the primary
20 shareholder and then -- I can't -- I would
21 not do a good job pronouncing their names.
22 I actually never participated in any board
23 meetings at Actavis.  I did -- at Actavis
24 Group, actually, is what it was called.  I

Page 33

1    did come to a board meeting at the end and
2    who introduced to several board members,
3    but I'd be hard-pressed to remember their
4    names.
5        Q.   And Actavis -- when was the
6    merger between Actavis and Allergan?
7        A.   There was no merger between
8    Actavis and Allergan.
9        Q.   What is the structure, to your
10   understanding, between Actavis and
11   Allergan when you were there?
12       A.   Again, there was no Allergan.
13            I was there til 2012.  So,
14   Watson Pharmaceuticals is the company that
15   acquired Actavis.  Watson Pharmaceuticals,
16   after the transaction, took on the Actavis
17   name.  So I was -- I left the company at
18   some point either 2013 or 2014.  I believe
19   that's when Actavis and Allergan combined.
20       Q.   Actavis and Allergan combined in
21   2014?
22       A.   I don't know the date.
23            MS. WELCH:  Objection;
24       foundation.

Page 34

1    BY MS. BAIG:
2        Q.   Who hired you at Actavis?
3        A.   Again, I was already there at
4    Alpharma, but essentially Siggi kept me
5    on.
6        Q.   And, did you report to Siggi for
7    the entire time?
8        A.   No.
9        Q.   How did that reporting structure
10   change?
11       A.   Later in 2006, one of the senior
12   people at Actavis Group exited.  So Siggi
13   went back to be deputy chairman, or deputy
14   CEO.  And, so, when Siggi left the U.S.
15   business, went back to Iceland,
16   essentially there were four people who
17   formed a management committee for the
18   U.S., and I reported to Robert Wessman
19   directly.
20       Q.   And Robert Wessman's position
21   was?
22       A.   He was the chief executive
23   officer of Actavis Group.
24       Q.   And he reported to?

Page 35

1        A.   The board.
2        Q.   The board of the Actavis Group?
3        A.   Correct.
4        Q.   Why did you leave Actavis?
5        A.   I -- again, when the transaction
6    was completed, Watson basically took over
7    the -- they acquired the Actavis Group.
8    So, Watson management team took over the
9    business and integrated it.  They didn't
10   have a role for me.
11       Q.   Did you ever use personal
12   computers or other devices, such as phones
13   or iPads, for work purposes?
14       A.   What time frame?
15       Q.   When you worked for Actavis.
16       A.   Yes.
17       Q.   And, when you were preparing for
18   this deposition, did you review any -- any
19   of the documents that would have come from
20   those types of devices?
21            MS. WELCH:  Objection;
22       foundation.
23       A.   Again --
24            MS. WELCH:  And form.

Page 36

1        A.   -- the personal computer that I
2    used was a company computer.  So when I
3    left the company, I gave it back.
4        Q.   And, was the phone a company
5    phone?
6        A.   Yes.
7        Q.   And, did you use text messaging
8    when you worked at Actavis at all?
9        A.   Yes.
10       Q.   And, did you review any text
11   messages in preparation for your
12   deposition today?
13       A.   No.
14       Q.   Do you know whether those text
15   messages have been produced?
16            MR. DIAMANTATOS:  Objection;
17       foundation.
18       A.   I'm not aware.
19       Q.   Did you ever use an instant
20   messenger program for work-related
21   communications?
22       A.   No.
23       Q.   Was your compensation, generally
24   in the positions we've just discussed,

Page 37

1    based on your ability to maximize sales of
2    the company's drugs?
3        MR. DIAMANTATOS:  Objection to
4    form.
5        A.   No.  That was a component, but
6    that wasn't exclusively that compensation.
7        Q.   Would you say that it was a
8    significant component?
9        MS. WELCH:  Objection to form.
10       MR. DIAMANTATOS:  Objection to
11   form.
12       A.   Could you repeat the question,
13   please?
14       Q.   Was your compensation based on
15   your ability to maximize sales of the
16   company's drugs?  Was that a significant
17   component of your compensation?
18       MS. WELCH:  Objection to form.
19       A.   No.
20       Q.   What was your compensation based
21   on?
22       A.   Again, it varied over the years,
23   but essentially my compensation, and most
24   employees of the company, compensation was

Page 38

1    based on a base salary, and then there
2    would be a bonus component.  The bonus
3    would be delivered based on performance
4    against annual goals.  Those annual goals
5    of Actavis were largely around EBITDA, so
6    earnings before -- earnings before
7    interest, taxes, depreciation and
8    amortization.  So revenue, of course,
9    helps to determine EBITDA, but not
10   exclusively.  And then, again, both myself
11   and individually folks in my organization
12   have specific metrics that would also
13   factor into the bonus calculation, as well
14   as personal activities, you know, could be
15   around quality, learning, training,
16   compliance.
17       Again, we -- one of my roles was
18   every year was to define those targets and
19   measurements and to work that through or
20   negotiate it with the parent company as to
21   what would be the financial targets and
22   what would be the personal targets and
23   what would be the organizational targets.
24       But, essentially, the -- at my

Page 39

1    level, base salary would be a certain
2    number and my bonus target would be
3    anywhere -- the bonus target could be
4    around 30, 40 percent of my base.  Could
5    be zero.  We had years where it was zero
6    and it could pay at up to maybe 120, 150
7    percent of the target.
8        And, as you went down the
9    organization, those bonus targets were a
10   smaller percentage of the base, no more
11   than 30 percent.
12       Q.   And, when you say 120 to 150
13   percent of the target, what do you mean by
14   target?
15       A.   So, again, if my base salary
16   was, just for math, it was $500,000 and my
17   target was 40 or 50 percent, it could be
18   paid out actually at zero, subject to, you
19   know, company not achieving its threshold
20   targets, or if we did better than the
21   target, it could be paid out up to 120 or
22   maybe even 150 percent.  I think 120 was
23   the number.  So, rather than 50 percent,
24   it could be as high as 60 percent,

Page 40

1    potentially.
2        Q.   Now, when you say if we did
3    better than the target, what do you mean
4    by target?
5        A.   Again, the targets were
6    dependent on the year, but essentially it
7    was around EBITDA.  So if the EBITDA
8    target was a hundred million and we did
9    110 million, that would have been slightly
10   better than target.  If the target was 100
11   million and we did 80 million, it would be
12   less than target.  And we had a threshold.
13   So effectively, if you were less than 80
14   percent of the target, the bonus would be
15   zero, subject to the management
16   discretion.
17       Q.   And, who at parent company would
18   you work those out with?
19       A.   Again, it would be, you know,
20   budgeting is a negotiation, but
21   essentially it would be ultimately with my
22   boss, Robert Wessman, the CEO, or Siggi,
23   or over time it was a different CEO.  We
24   had Claudio Albrecht.

Page 41

1    So, we would negotiate -- we
2   would come up with targets for the
3   regions, targets for the business, you
4   know, based on forecasting, based on
5   bottoms-up planning, based on cost
6   assumptions, based on pricing assumption,
7   based on new product activity, based on
8   other strategic priorities.  We would
9   basically do the goal-setting work either
10  at the end of the calendar year or the
11  first month or two in the next calendar
12  year, and that would be the basis for the
13  targets both for myself, and then I would
14  cascade those targets down through my
15  organization.
16   Q.   Did you receive performance
17  evaluations while you were at Actavis?
18   A.   Some.  I would say that Mr.
19  Wessman was not the best at performance
20  reviews.  But yes, sometimes I would get
21  verbal review.  I would certainly have a
22  year-end review about performance
23  associated with, you know, your bonus
24  and/or your raise.

Page 42

1    I see you have per4ma.  So
2   that's one of the platforms we used.  And,
3   again, Mr. -- Mr. Albrecht, who was the
4   CEO after -- after -- actually, no.  It
5   was Wessman and then actually Siggi was
6   the CEO for a few years and then Mr.
7   Albrecht.  Claudio actually was probably
8   the best in terms of doing performance
9   reviews, but I would prepare a performance
10  review every year and submit it as part of
11  the -- part of our management process.
12   MS. BAIG:  Okay.  Let's have
13  this document marked as Exhibit 1,
14  please.
15   (Boothe Exhibit 1, Actavis
16  per4ma period covered by appraisal
17  2008, Bates No.
18  Acquired_Actavis_ 01541043 to
19  ALLERGAN_MDL_00128730, was marked for
20  identification, as of this date.)
21  BY MS. BAIG:
22   Q.   That is a document Bates stamped
23  Acquired_Actavis_01541043 through -- well,
24  it starts with that Bates stamp number and

Page 43

1   it ends with ALLERGAN_MDL_00128730.  And
2   I'll represent to you that this is a
3   collection of -- of performance reviews
4   that we were able to collect from the
5   production of documents that we have.
6    Can you just take a quick look
7   at this document and -- and let me know if
8   this appears to be a series of performance
9   evaluations from your time at Actavis?
10   MS. WELCH:  Objection to form.
11   A.   From what you've handed me, it
12  looks like it's two years, 2008 and 2009.
13  So it's not really the full duration of my
14  time at Actavis.
15   Q.   And, do you recall seeing these
16  documents while you were at Actavis?
17   A.   Yes.
18   Q.   And if you look at the second
19  page of the document, you see for 2009
20  under Objective Number 1 it says:
21  Deliver 2009 Actavis Inc. recovery by
22  achieving budget number for revenue,
23  EBITDA and cash flow.
24   Do you see that?

Page 44

1    A.   Yes.
2    Q.   And it says:  For U.S. budget
3   551 million in revenues, 171.8 million in
4   EBITDA, excluding exceptional items, and
5   36.3 million in cash flow.
6    Do you see that?
7    A.   Yes.
8    Q.   Okay.  And these were the
9   objectives that you -- would these have
10  been the targets that we just discussed?
11   A.   Again, if you look at the
12  document, it's up to five objectives here.
13  So this was the first of five.
14   Q.   Sure.
15    These would be among the targets
16  that we just discussed?
17   A.   Correct.
18   Q.   And the first one, correct?
19   A.   Correct.
20   Q.   And, under Objective 2 you --
21  we -- I see here:  Pass all GMP
22  inspections.
23    Do you see that?
24   A.   Again, Objective 2 covers

Page 45

1    quality and compliance.
2        Q.    Yes.
3        A.    Covers GMP inspections, no
4    regulatory actions, yes, amongst other
5    activities around quality and compliance,
6    which was an important metric at the
7    company.
8        Q.    Okay.  And, what is a GMP
9    inspection?  What's GMP stand for?
10       A.    That's an acronym for good
11   manufacturing practice.
12       Q.    And, under Objective 2 there's
13   also:  New products/product supply.
14           Do you see that?
15       A.    Yes.
16       Q.    And it states:  67 million in
17   new product revenues on 16 plus launches.
18           Do you see that?
19       A.    Yes.
20       Q.    Was that a target that you
21   have -- that you attain 67 million in new
22   product revenues for that year?
23       A.    I'd have to look at the
24   documents later 'cause this is the

Page 46

1    beginning of the year.  So, certainly,
2    during the course of the year, we would,
3    when I did the year-end review, we would
4    have a number against that.  That's the
5    number when I mentioned before about
6    setting objectives.
7            In the generic space, new
8    products, it's always a challenging way to
9    plan because you don't have a fixed date.
10   You've submitted application to the FDA.
11   FDA would review it.  FDA doesn't commit
12   to a specific target date.  Back in this
13   time frame, there were not user fees.  So
14   what's in the space right now is GDUFA,
15   which is Generic User Fee Act -- Generic
16   Drug User Fee Act.  Just like in the brand
17   side PDUFA.  That's in place now which
18   provides a little bit more visibility
19   towards -- towards targeting, but back in
20   this time frame, there was not that in
21   place.  So you would submit an application
22   to the agency, and it could take 12
23   months, it could take 18 months, it could
24   take three years, four years.

Page 47

1            Many of our applications also
2    were Paragraph IVs, so that involved legal
3    challenges with the Hatch-Waxman activity.
4            So, one of the challenges every
5    year in setting targets was to agree to, I
6    mentioned the negotiation, agree to what
7    would be the target for new product
8    revenues which is a subset of the overall
9    business revenue.
10           So, that 67 is a subset in this
11   instance of the 551 which was the top line
12   revenue target for the business.
13       Q.    And, the next line references:
14   90 percent product availability.
15           What does that refer to?
16       A.    So, product availability was a
17   metric we used within the company about
18   basically having supply chain to support
19   customer.  So, again, product availability
20   here is essentially when a customer places
21   an order, we have that product in stock
22   and we can ship within -- within their
23   time frame, which is usually two or three
24   days.  So it's available to customers.

Page 48

1        Q.    And, who set these targets?  Did
2    you set these targets with Siggi, or did
3    he set them for you?  Or, how did that
4    work?
5            MR. DIAMANTATOS:  Objection to
6        form.
7        A.    Again, it was the negotiation.
8    So, the way we would do budgeting is,
9    again, my team, my organization, my sales
10   organization, my marketing team, my
11   finance group would all build up based on
12   looking at the market data, if it was IMS
13   or Wolters Kluwer, look at our position in
14   terms of market share, look at possible
15   new product launches, look at competitive
16   offerings and do a bottoms-up revenue
17   case.
18           Also, our plants would look at,
19   you know, cost of goods and acquiring raw
20   materials and access to DEA quota, for
21   example.  That was an item there.  And we
22   would basically build a bottoms-up
23   financial plan.  Then we'd present it to
24   Siggi and the management team or Robert

Page 49

1  Wessman. And there was always negotiation
2  because invariably whatever number we
3  would build up from the bottom was usually
4  lower than what was sort of expected from
5  the top down. So then we would sort of
6  negotiate and try to find opportunities,
7  and sometimes we took on challenges where
8  it was just like you got to go for this
9  number. It was sort of a -- anybody who's
10  been in the commercial sense, this is an
11  annual process that everybody goes
12  through.
13      Q.   And, so, I see on the next page
14  there's nothing filled out there.
15          Is that -- was that typical?
16      A.   What do you mean?
17          MR. DIAMANTATOS: Objection.
18          MS. WELCH: Object to the form.
19  BY MS. BAIG:
20      Q.   Well, on the next page it says
21  "Behavioral Indicators" and performance
22  and that's just blank, and so the
23  following page "Overall Performance
24  Evaluation."

Page 50

1      A.   Which specific page are you
2  asking?
3      Q.   The one that ends in '046. It's
4  the fourth page of the document.
5          It looks like it's a form, but
6  it hasn't been filled out.
7      A.   Well, again, I mean, so, there's
8  no date on this document. Or, is there?
9          It just says "Period Covered."
10  This may have been at the beginning of the
11  year. So, again, if you look at the form,
12  ambition, teamwork, customer care,
13  proactivity, flexibility. It actually
14  has -- has things that are the
15  expectations and then the spaces that are
16  blank are either midyear comments or
17  end-of-year comments.
18          So, again, if I look at other
19  documents down the road here, that's
20  blank.
21          2009, okay.
22      Q.   So, if you look at the first
23  document it says on the first page of the
24  whole exhibit "Period covered by appraisal

Page 51

1  2008." And then you have --
2      A.   Right. But, so, again --
3      Q.   Hang on. You have the fourth
4  page which doesn't really have anything
5  filled in and the fifth page which doesn't
6  appear to have anything really filled in.
7  Although it is checked "Exceeds
8  expectations."
9          So, no, there are some comments
10  here on the fifth page.
11          Do you see that?
12          MS. WELCH: Objection to form.
13      A.   Can you go back?
14      Q.   Sure. On the fifth page of the
15  document Bates stamp number the last few
16  digits are '047.
17      A.   Okay. Yeah.
18      Q.   "Overall performance evaluations
19  and comments."
20      A.   Yes.
21      Q.   And you see there's comment in
22  that box?
23      A.   Which box?
24      Q.   In the big box with five smaller

Page 52

1  boxes in it. Starting with "Fails to meet
2  expectations" and moving downwards towards
3  "Exceptional."
4          Do you see that box?
5      A.   I mean, those aren't comments.
6  Those were the guidelines that we -- when
7  we used this system for employees in terms
8  of rating performance.
9          So, like, yeah, as expected,
10  achieves goals as required or meets
11  critical goals, this was the template that
12  we used for performance management.
13      Q.   Okay. And you see it's marked
14  "Exceeds expectations" with two Xs there?
15      A.   There are two Xs there, yes.
16      Q.   And, is this -- was this
17  something that you would have marked, or
18  that Siggi would have marked for you?
19      A.   Well, again, it's my performance
20  review. So someone would have marked it
21  for me. I had a chance under "Employee
22  comments" to add my comments there, as
23  well as in these other forms the midyear
24  comments and the end-of-year comments

Page 53

 1    would both be potentially my comments, as
 2    well as Siggi's comments to the extent of
 3    which he did that.
 4         Like I say, this document, to
 5    me, doesn't appear to be the final version
 6    for 20 -- for 2008.
 7    Q.   Okay.  But this, to the extent
 8    it was marked, would likely have been
 9    marked by Siggi.
10         Is that right?
11         MS. WELCH:  Objection to form.
12    BY MS. BAIG:
13    Q.   "Exceeds expectations"?
14    A.   It's possible.  Or, again, maybe
15    I have -- I put that as my self-assessment
16    and he would come and have a chance to --
17    to make his own assessment.
18         There's no signatures there.
19    There's no names.
20    Q.   Right.
21    A.   The document's not even signed.
22    Q.   I noticed that.
23    A.   So I would say it's probably not
24    a final version.

Page 54

 1    Q.   Okay.  So then we have another
 2    version, which follows it, which also says
 3    "Period covered by appraisal 2008."
 4         MR. DIAMANTATOS:  Objection to
 5    form.
 6    BY MS. BAIG:
 7    Q.   Do you see that?
 8    A.   Yes.
 9    Q.   Okay.  But there's not a lot in
10    this document either.  I see under
11    "Midyear comments" and "End of year
12    comments" on page 2 those are all blank.
13         Do you see that?
14         MR. DIAMANTATOS:  Objection to
15    form.
16    A.   I think it's the same thing.
17    Q.   And then if you keep turning.
18    A.   Yeah.
19    Q.   If you turn to the document that
20    starts, or that's '4027 at the bottom, do
21    you see that?
22    A.   Mm-hm.
23    Q.   And that says "Period covered by
24    appraisal 2009."

Page 55

 1    A.   Correct.
 2    Q.   All right.  And then you have
 3    for Objective 1 you have:  U.S. budget
 4    $551 million in revenues.
 5         Do you see that?
 6    A.   Yeah.  So, again, if I look at
 7    the documents, the first three or four
 8    that you have that are kind of blank or
 9    whatever, I think what's misleading or
10    might be inaccurate is that period covered
11    by appraisal saying 2008, 'cause then if
12    you look at this one, which issued
13    starting 2010 and it's period covered
14    2009, but it has the same financial
15    objectives.
16    Q.   Yeah.  I saw that too.  I find
17    it confusing.
18         Do you know how to explain it,
19    or no?
20         I mean, these documents were
21    produced by your counsel.  So I'm just
22    trying to sort through them.
23         MR. DIAMANTATOS:  Objection to
24    form.

Page 56

 1    A.   My take on this would be the
 2    earlier ones were drafts, or were, you
 3    know, again part of the early part of the
 4    process, and somewhere along the way, you
 5    know, we, me, maybe someone from HR, maybe
 6    somebody else realized that we should
 7    probably update that period covered to say
 8    2009 'cause it clearly describes 2009
 9    goals.
10    Q.   Okay.
11    A.   And then you see again the
12    comments in here, the end-of-year
13    comments, if I look at these, I would say
14    these were my comments that I provided as
15    part of my self-assessment.
16         And, again, the way these
17    systems worked, it was, you know, it
18    wasn't -- it wasn't an online system, but
19    there was space that, again, my
20    supervisor, 2009 that would have been
21    Siggi, had the ability to make comments.
22    Q.   Okay.  So, if you look at the
23    second page of this document that starts
24    Acquired_Actavis_00004027 and I'm looking

Page 57

1  at page '4028.
2      Do you see that?
3  A.  Yes.
4  Q.  And, so, here again it says:
5  U.S. budget 551 million in revenues.  And
6  for end-of-year comments it says:
7  Exceeded 2009 5 plus 7 replan.
8      Do you see that?
9  A.  Yes.
10  Q.  What is 5 plus 7 replan?
11  A.  So, the way, again, the way we
12  would run the business is you make an
13  original year budget, which again for
14  2009, based on these documents, would say
15  that original revenue target was 551
16  million, the original EBITDA target was
17  171.8, and the cash flow for 36.3.
18      During the course of the year,
19  basically every month we would have one
20  month of actuals and then we'd have eleven
21  months of a rolling forecast.  Budget was
22  always the budget, but we would, from a
23  financial controls and management
24  perspective, we would do actual plus --

Page 58

1  plus a balance of the year forecast.
2      So, 5 plus 7 means that there
3  are five months of actual results and
4  seven months of forecast for the balance
5  of the year.
6      And my recollection of 2009,
7  given some of the, I'll say some of the
8  unique challenges that we had,
9  specifically around the Totowa facility
10  which was not producing product at the
11  beginning of the year, we did the base
12  level plan, we had a certain revenue case,
13  and then it appears from this that we did
14  a replan in 2009.
15      So, this is an example of where
16  we changed the targets, which is not
17  unheard of, but not in our normal course
18  of business.  This is in a year given
19  these specific changes.  And if you
20  notice, the change of targets is
21  significantly higher 'cause the -- the
22  target was no longer 551 million.  It was
23  626 million 'cause if we -- the business
24  performed 5 -- 656 versus 626, EBITDA of

Page 59

1  275 versus 241.  And one of the big
2  differences is when we did the first plan
3  in 2008, we didn't have Kadian in the
4  plan, and then of course we acquired that
5  asset at the end of 2008.  So the replan
6  would have captured the Kadian asset.
7  Q.  Okay.  So it notes here that the
8  combined U.S. revenues which were greater
9  than 656 million, there's reference that
10  says:  Recovery was led by successful in
11  the of Kadian, launch of Oxy CR and
12  outstanding pricing contract work by GRX
13  sales and marketing team.
14      Correct?
15  A.  Yes.
16  Q.  Okay.  And a little further down
17  under "End of Year Comments" it says:
18  Mostly attained.  Critical items exceeded.
19      Correct?
20  A.  That's for Objective 2.
21  Q.  For Objective 2, yes.
22  A.  Yes.
23  Q.  And it goes on to state:  LF
24  site wave 1 completed in April (Oxy IR

Page 60

1  review release.)
2      Right?
3  A.  Yes.
4  Q.  And a little further down it
5  says:  New product results exceeded but
6  based primarily on Oxy CR launch late
7  November.  58 million for CR.
8      What does 58 million for CR
9  refer to?
10  A.  So, again, at the end of 2009,
11  we had a, I mentioned before in our
12  pipeline we would have Paragraph IV items.
13  So one of the items that was in our
14  pipeline was a Paragraph IV challenge to
15  OxyContin, which is Oxy CR.  That was,
16  again, the brand product was a Purdue
17  item.  Actavis had that in its portfolio.
18  And we settled our Paragraph IV
19  litigation, and part of that settlement
20  was Purdue provided us a limited inventory
21  of private label generic OxyContin, which
22  we sold a portion of at the end of 2009
23  and a portion at the beginning of 2010.
24  Q.  And if you turn the page,

Page 61

1    there's a reference to a settlement
2    agreement with Purdue.
3         Is that -- is that what you're
4    talking about, or is that something
5    different?
6         MS. WELCH:  Objection to form.
7      A.   Yes.
8         And, as you're probably aware,
9    those settlements, when they are done,
10   they're submitted to the FTC.
11     Q.   And, what was the gist of that
12   litigation with Purdue?
13       MS. WELCH:  Objection to form.
14     A.   Well, again, I'm professed to
15   not be an expert, but the essentially the
16   way generic drugs work is you have a brand
17   company, has IP.  Potentially it could be
18   formulation, it could be development, it
19   could be method of use, it could be
20   delivery mechanism, and what generic
21   companies do is that they -- in order to
22   get a generic filed, you basically have to
23   demonstrate the same active ingredient,
24   the same route of administration to be

Page 62

1    bioequivalent in the same dosage form.  So
2    generic companies will formulate.  Some
3    will formulate doing what we call
4    copycats.  That's not the business model
5    for Actavis or most of the significant
6    generic players.  What we would do is try
7    to formulate around the IP or identify
8    what part of the IP we believe was invalid
9    or prior art.
10       And so, again, on this specific
11   molecule, there could have been multiple
12   patents in play.  I believe that there
13   were.  There were multiple Paragraph IV
14   filers on this.  There was a significant
15   change in the raw material.  Those who
16   know this molecule know that that's been a
17   contested item for quite some time.  But
18   essentially, what we did is we opted to
19   settle our litigation.  Litigation's
20   expensive, uncertain.  So for certainty,
21   we agreed to settle litigation.
22       And, as it says here in this
23   thing, it said:  Three paths for market
24   commercialization.  One was essentially we

Page 63

1    had a license to their IP, that -- those
2    that we believe were valid or part of our
3    settlement.  If we were to get our own
4    approval, we could then launch under a
5    license.
6        We opted to take the other path,
7    which is rather than to wait that out,
8    given the uncertainty of our application
9    and the legal situation, we opted to take
10   the raw materials or the finished goods
11   that Purdue was providing, which was part
12   of that settlement agreement, and we sold
13   that in the market both in late 2009 and
14   early 2010.
15     Q.   And if you turn to the last page
16   of the document, is that Siggi Olafsson's
17   signature?
18     A.   Which page?
19     Q.   The very last page of the
20   exhibit.
21     A.   I mean, yeah.  It looks like --
22   I don't know if it's a true signature or
23   an electronic signature, but yes.
24       MS. BAIG:  Let's have this

Page 64

1    document marked as Exhibit 2, please.
2      (Boothe Exhibit 2, email chain
3    ending January 26, 2010, Bates No.
4    ALLERGAN_MDL_03317313 to 03317326, was
5    marked for identification, as of this
6    date.)
7   BY MS. BAIG:
8     Q.   This is a document that starts
9   as an email from Hafrun Fridriksdottir to
10   Brenda Vesey, and it's Bates stamped
11   ALLERGAN_MDL_03317313 through 03317326.
12       Who is Hafrun Fridriksdottir?
13     A.   Sure.  So, Hafrun was my head of
14   R&D, research and development.
15     Q.   So he reported to you while you
16   were at Actavis?
17     A.   She.
18     Q.   She?
19     A.   She.
20     Q.   Okay.  She reported to you at
21   Actavis?
22     A.   Yes.  She -- she was with
23   Actavis, she had been with Actavis before
24   they acquired Alpharma.  Based in Iceland.

Page 65

1    She's Icelandic.  And she had
2    responsibility for global R&D.  And at
3    some point, I believe it was in 2008, I
4    was able to convince Siggi to have Hafrun
5    come to the U.S. and take over leadership
6    for the U.S.-based research and
7    development activities.
8        Q.  Okay.  And Brenda Vesey?
9        A.  Brenda was my head of human
10   resources, HR.
11       Q.  And USET goals refers to US
12   executive team goals.
13           Is that right?
14       A.  Correct.
15       Q.  Okay.  And, are these -- the US
16   executive team goals, are these part of
17   the targets that you described earlier?
18       A.  Well, again, this document is
19   2010.  So the document you were showing me
20   was goals for 2008.
21       Q.  Yes, but you spoke generally
22   about working with your team to create
23   targets generally.
24           Is this something different?

Page 66

1    Can you talk to me a little bit about US
2    executive team goals and what those are?
3        MS. WELCH:  Objection to form.
4        MR. DIAMANTATOS:  Objection to
5    form; mischaracterizes the witness's
6    testimony.
7        A.  Sure.  And if you look at the
8    other documents, they all say drafts.  So
9    certainly from a management process, and
10   this is draft and it says December of
11   2009.  So, as we were finishing the
12   calendar year and going into our -- our
13   budgeting, we may have already actually
14   had the targets from corporate, 'cause
15   that usually happened in November, and
16   this was, I would say, a little bit of an
17   alignment and a cascading activity 'cause,
18   again, there would be business targets and
19   there would be departmental targets and
20   there would be individual targets.
21           So, again, looking at this
22   document, which again I'll happily give
23   the details of it, it looks, if you
24   notice, you know, every U.S. executive

Page 67

1    team member contributed to this draft
2    sheet.  You know, we may or may not have
3    done this as an off-site.  We may or may
4    not have done this in a conference room.
5    It's a draft.  And one thing looking at
6    it, since it's about six or eight pages,
7    clearly we had to filter this down into a
8    finite set of top level objectives and of
9    course then would be cascaded to the
10   functional areas with functional-specific
11   objectives, which your question before
12   about how was compensation done, there
13   would be a salary, business results
14   portion of the bonus, and then either
15   departmental or individual.  So even that
16   30 percent target could be half based on
17   business results and half based on
18   individual targets subject to the company
19   achieving a minimum threshold of -- of
20   results.  And that's my recollection how
21   the program was set up.
22       Q.  And, who was on the U.S.
23   executive team?
24       MS. WELCH:  Objection to form.

Page 68

1        A.  Again, if you look at the --
2    from Brenda, who the "to" is, that was my
3    U.S. executive team at the time of January
4    26, 2010.  We subsequently added Michael
5    Clark at some point, I think that was in
6    2011 or 2012, as chief compliance officer.
7        Q.  I see.
8            So, these people, Bill
9    Ostrowski, Brenda Vesey, Chris Young,
10   Hafrun Fridriksdottir, John LaRocca, Lisa
11   Graver, Michael Profetto, Nasrat Hakim,
12   Stephen Gallagher, Terrence Fullem and
13   Terri Nataline, these are the U.S.
14   executive team members?
15       A.  Yes.
16       MS. WELCH:  Objection to form.
17       A.  They all reported to me
18   directly.
19       Q.  What's a Town Hall meeting?
20       A.  So, Town Hall meetings is,
21   essentially, again, where we would bring
22   in the associates from the location or
23   facility and we would do a Town Hall
24   meeting where, you know, myself or other

1    leaders or, by the way, sometimes we did
2    multiple things.  It was a means to
3    communicate, means to share results, to
4    provide direction on priorities for the
5    future.  We did a lot of recognition and
6    reward activity.  I would do Town Hall
7    meetings in the normal course of business
8    at all the Actavis facilities.
9         Q.   So, when you say associates, is
10   it an all-hands meeting, all employees,
11   or --
12        A.   That was the intent, yeah.  We
13   would invite all employees.  But we had
14   multiple facilities, so we had to do
15   multiple Town Halls.  We wouldn't bring
16   people from Florida up to New Jersey for a
17   Town Hall meeting.  We would go to
18   Florida.  We would go to North Carolina.
19        Q.   Is it your understanding that
20   this is a draft document and there would
21   be a final document that's executed?
22        MS. WELCH:  Objection to form.
23        A.   Well, again, I just read the
24   text that Brenda sent out to the

1    leadership team saying please find a file
2    that captures the goals discussion.  So,
3    since there was a discussion, it wasn't
4    finalized.
5         And the thing at the top is
6    Hafrun said:  Made.  And M-A-I-D, by the
7    way, so it's spelled wrong.  Made some
8    minor changes.
9         Q.   And, would you have been the one
10   that filled this out?
11        MS. WELCH:  Objection to form.
12        A.   Filled what out?
13        Q.   That inserted the comments in
14   the -- in the middle section.  So, for
15   example, on page -- the page that ends
16   '317, it says:  Support level -- support
17   service level of 95 percent.
18        Are you the one that completed
19   this?
20        MS. WELCH:  Same objection.
21        A.   Again, on this page, if you look
22   at the owner, you see MP, that would be
23   Mike Profetto, market and customer
24   service, customer service support, service

1    level 95.
2         So, service level, a 95 was a
3    consistent metric for the business, but
4    again, it's not just the manufacturing
5    team that's involved in delivering a
6    service level of 95 percent.  It starts
7    with the marketing forecast, which would
8    have been Mike's organization, and the raw
9    material procurement, which would be a
10   supply chain, the facilities would be
11   supply chain, the quality organization
12   that makes certain the product is
13   manufactured to specification.  If there
14   was any sort of deviation, we would assess
15   it, determine whether or not that product
16   was releasable.  And of course we had a
17   distribution group that would be
18   responsible to make certain.  We had a
19   customer service group that would take
20   orders in and process them.  And we
21   release -- and we use a third party called
22   UPS, actually, to do our distribution at
23   the time.
24        So, all -- basically something

1    that I managed the group by is basically
2    all functions are responsible for
3    delivering the key metrics.  Service level
4    is one of the key metrics.
5         Q.   And, so, Siggi would be
6    responsible for inserting the financial
7    metrics.
8         Is that right?
9         A.   On this document?
10        Q.   Mm-hm.
11        A.   No.
12        Q.   I'm just looking on the page
13   with the ending in the Bates stamp '315
14   and where it says "Finance and Financial."
15   It says "SG."
16        A.   Which page?
17        Q.   The page that ends in '315.
18        A.   Okay.
19        Q.   Do you see where it says
20   "Finance and Financial" and next to it it
21   says the owner is SG.
22        A.   Mm-hm.
23        Q.   Is that Siggi?
24        A.   No.

Page 73

1     Q.   Who's SG?
2     A.   Steve Gallagher.
3     Q.   Siggi would be SO.
4          All right.  Who's Steve
5  Gallagher?
6     A.   So, again, Steve Gallagher was
7  my chief financial officer, so a member of
8  the executive -- again, this is not a
9  Siggi document.  This was within the U.S.
10  organization.  This was our process to,
11  like I say, cascade.
12          So, on this chart, it says:
13  Meet or exceed the 2010 budget.  So that
14  615 and 235 on that chart would have been,
15  again, the metric of the target that had
16  been presented to or negotiated to or
17  agreed upon or told to the U.S. team.  And
18  I mentioned that would have been done as
19  sort of in the November time.  This is a
20  document in already late into January.  So
21  we were already executing as a business
22  against those financial metrics, but those
23  were not the sole performance metrics for
24  the company or for my team or for our

Page 74

1  organization.
2     Q.   And, what does COGNOS refer to?
3  C-O-G-N-O-S.
4     A.   Can you show me where that is,
5  please?
6     Q.   On the page that ends '318 in
7  the middle.
8     A.   110 percent of COGNOS, is that
9  what you mean?
10     Q.   Mm-hm.
11     A.   COGNOS number?
12     Q.   Yeah.
13          Do you know what COGNOS means?
14     A.   COGNOS, I believe, it's an
15  acronym for some sort of an IT system,
16  which I believe was like a business
17  intelligence or some sort of forecasting
18  tool.
19          Since they have brackets around
20  them, I'm sure they were placeholders.
21     Q.   Okay.
22          MS. BAIG:  All right.  Let's
23  have this document marked as
24  Exhibit 3, please.

Page 75

1          (Boothe Exhibit 3, email chain
2     ending January 27, 2010, Bates No.
3     ALLERGAN_MDL_03305226 to 03305230, was
4     marked for identification, as of this
5     date.)
6  BY MS. BAIG:
7     Q.   And, this is a document Bates
8  stamped ALLERGAN_MDL_03305226 through
9  '5230.  It starts as an email string from
10  you to Brenda Vesey, with the subject line
11  "2010 goals."
12          Do you see that?
13     A.   Yes.
14     Q.   Okay.  And, do you recall having
15  a discussion with -- with Brenda Vesey in
16  or about 2010 about -- about 2010 goals?
17     A.   Can I re -- review the entire
18  email chain here, please?
19     Q.   Sure.
20     A.   (Perusing document.)
21          Okay.  I got a general sense of
22  it.  Yeah.
23     Q.   All right.  So, do you -- do you
24  have a general -- general recollection of

Page 76

1  this discussion that you had with her
2  about -- about goals?
3          MR. DIAMANTATOS:  Objection to
4  form.
5     A.   This is actually less about
6  goals.
7          This is more a conversation
8  about the 2009 bonus payout for U.S.
9  associates.
10     Q.   Okay.  And, do you see in the --
11  on the first page of the document there's
12  a reference to US STIP.
13          What does that refer to?
14     A.   Sure.  STIP is an acronym for
15  short-term incentive plan.  So basically
16  it's the bonus that we talked about
17  earlier.
18     Q.   And, what was trying to be
19  decided here?
20          MS. WELCH:  Objection to form.
21     A.   Again, based on reading through
22  the documents here, again, Actavis was a
23  global company, had multiple parts it.  I
24  ran the U.S. portion, which is about a

Page 77

1   third of the company's revenue at the
2   time.  And if you read through the
3   materials here, it's basically -- and if
4   you go back to -- I mentioned that we did
5   a replan.  So that replan was actually the
6   2 plus 10, if you read the notes there.
7   And the U.S. -- and that was across the
8   entire company.  So, the U.S. business
9   exceeded its replan target of the 2 plus
10  10, but the other parts of the company did
11  not.
12         So, part of this is around,
13  again, negotiating that since the payout
14  if the U.S. is also subject to global
15  performance, the performance in the U.S.
16  was strong, but the rest was weak, we
17  wanted to make certain that the U.S.
18  organization was -- was appropriately
19  recognized and rewarded, even though some
20  parts of the company did not achieve that.
21  And that's -- that's essentially the basis
22  for the bulk of it.
23     Q.   And, were the successes of the
24  U.S. company that year based largely on

Page 78

1   Oxy CR, Kadian and Oxy IR?
2         MS. WELCH:  Objection to form.
3         MR. DIAMANTATOS:  Objection.
4     A.   Again, if I go back to that
5   prior document, those were contributors,
6   but there were other things.  You see, for
7   example, Acetazol was another product that
8   had a very, very strong performance.  We
9   did a better job in managing the facility.
10  We did a better job with costs.  We got
11  Totowa facility back and running.
12         And, again, the Oxy CR product
13  was not in the budget.  So yes, that was
14  certainly a -- at least I don't believe it
15  was in the budget.  That was a found
16  contributor to -- to the business
17  performance that year, the generic Oxy CR.
18     Q.   That was a profound contributor,
19  is that what you said?
20         MR. DIAMANTATOS:  Objection;
21     mischaracterizes the witness's
22     testimony.
23     A.   I didn't say "profound."  I
24  said --

Page 79

1     Q.   Well, the record says "that was
2   a found contributor."
3         What did you say?
4     A.   Found?
5     Q.   That's what the record says.
6   I'm asking you what you said.
7         What kind of contributor?
8     A.   Again, if it wasn't in the
9   budget and we actually delivered revenue,
10  that would be found, I guess is how you
11  would interpret that statement.
12     Q.   I see.  Okay.
13     A.   It was a contributor.
14     Q.   And you see the reference here
15  on the middle of the third page:  We did
16  have many, many successes last year, but
17  we also made our financial results based
18  largely on the following factors: Oxy CR,
19  Kadian, Oxy IR return and Acetazol pricing
20  and fortunate problems of competitors.
21     A.   What page is that?
22     Q.   The third page of the document
23  halfway down.
24     A.   Yes.

Page 80

1     Q.   And a little further up it
2   states:  Regarding U.S. performance, my
3   sense is that we came in between 105 and
4   110 percent on both revenue and EBITDA.
5         Do you see that?
6     A.   Yes.
7         So, essentially, this document
8   says that based on purely performing on
9   the financials, we could have requested or
10  expected 105 or 110 percent, so higher
11  than budget payout, but in light of the
12  fact that the other parts of the company
13  did not perform, we were going to propose
14  105 percent on the low end in recognition
15  of the challenges across the rest of the
16  company.  And likewise in other years,
17  there's been times where we underperformed
18  and we affected the global results of the
19  other parts of the country of the company,
20  which had actually been in 2008, where if
21  you see in the notes it says there was
22  actually no bonus paid to the U.S. team in
23  2008.
24         So, you set the targets.  You

Page 81

1    perform and then it gets, you know, like I
2    said, there's always some sort of a
3    negotiation sometimes.
4        Q.    And then if you look at the
5    first page, there's a reference to a
6    commitment that Siggi made to you.
7        A.    Where is that?
8        Q.    Last paragraph: Since Siggi's
9    commitment to you is not widely known,
10   people are expecting that the individual
11   component will need to be 100 percent in
12   order for payout to occur on the
13   individual component (U.S. component still
14   pays out.)
15          What was Siggi's commitment to
16   you that was not wildly known?
17       A.    Again, I think I referenced it
18   that globally the entire company had to
19   achieve a certain level of performance,
20   which we apparently did not globally, but
21   since the United States overachieved to
22   105 or 110 percent, the discussion was to
23   make certain not to punish the U.S.
24   organization, or to recognize the

Page 82

1    significant turnaround that occurred
2    between 2008 and 2009 and pay out a bonus,
3    but less than, essentially, like I said,
4    that the company, or that the division,
5    the group could have said based on our
6    actual results, we should get a higher
7    number.
8          So, I clearly had a conversation
9    with Siggi and others to -- in light of
10   the complexity and the situation, to -- to
11   have a bonus paid at that level rather
12   than a lower number in light of the global
13   performance.
14       Q.    And that would be for you and
15   for your team, correct?
16       A.    That would be for all U.S.
17   associates who ran a bonus program.
18       Q.    Okay.  And in the paragraph
19   preceding that, middle of the way through
20   there's a sentence that says:  There is a
21   step in the approval process after the
22   U.S. Compensation Committee reviews the
23   rolled up results to present those to
24   Siggi for a one-over-one approval.

Page 83

1          Do you see that?
2        A.    Yes.
3        Q.    That approval process, what is
4    that approval process?
5        A.    So, again, I mean, we were a
6    division of a global company.  So we had a
7    compensation committee within the U.S.
8    that I chaired.  Brenda was -- or,
9    actually, I think Brenda chaired.  Steve
10   and myself and John were on it.  And so we
11   would review all the financial results.
12   We would review the individual
13   performance.  We would set a
14   recommendation for what we believed the
15   business was in -- had earned as a bonus
16   for that year, but we had not the
17   authority to actually grant those bonuses.
18   We had to go to the corporate parent,
19   which would have been Siggi as the CEO,
20   and then Mark is Mark Keatley, who was the
21   global CFO at the time, which is again why
22   I mentioned it was somewhat of a
23   negotiation.  But we had the data, we had
24   the metrics, we had the specific

Page 84

1    performance.  And it wasn't, again, it
2    wasn't just revenue.  It was cash flows,
3    it was EBITDA and other specific targets.
4          But overall, the corporate
5    portion of it was half and then the --
6    excuse me.  May have been 40, 30 -- but
7    either way, it was corporate, there was a
8    division, and there was a personal
9    component to the -- the ESTIP.
10       Q.    And the U.S. Compensation
11   Committee, that was you and your team
12   leaders.
13          Is that right?
14       A.    Again, not everybody on the ET
15   was on that.  I believe it was four
16   people; I think -- believe it was John,
17   Brenda, myself and Steve.
18       Q.    John who?
19       A.    John LaRocca, general counsel.
20       Q.    Brenda Vesey?
21       A.    HR.
22       Q.    Steve?
23       A.    Finance.
24       Q.    Steve who?

Page 85

1    A.   Steve Gallagher.
2    Q.   And yourself?
3    A.   Yep.
4    Q.   When you left the company, did
5  you enter into a severance agreement?
6    A.   Yeah.  I mean, actually, I had a
7  severance agreement.  So, it was triggered
8  by the change in control.
9    Q.   And, as a result of the
10  severance agreement, were you -- were you
11  paid a sum of money?
12      MR. DIAMANTATOS:  Objection to
13  form.
14    A.   Yes.
15    Q.   And, how much was that, roughly?
16    A.   Do you have a document you can
17  show me?
18    Q.   No.  I'm just asking you if you
19  have a recollection as to how much you
20  were paid as part of your severance
21  agreement when you left the company.
22    A.   I believe it was one year of
23  salary and --
24      MS. BAIG:  We'll have this

Page 86

1  document marked as the next in order,
2  please.
3      (Boothe Exhibit 4, email dated
4  January 2, 2013, with attachment,
5  Bates No. Acquired_Actavis_00885908 to
6  00885912, was marked for
7  identification, as of this date.)
8  BY MS. BAIG:
9    Q.   So, this is Exhibit 4.
10    A.   All of it?
11      Oh, sorry.
12    Q.   This document is Bates stamped
13  Acquired_Actavis_00885908 through
14  '59112 -- 12.  It starts as an email from
15  you to Brenda Vesey and Gunner Agust
16  Beinteinsson.
17      Who's Gunner Agust Beinteinsson?
18    A.   Gunny, he was the corporate head
19  of HR for Actavis Group or Actavis
20  whatever they were called at that time, at
21  the time of the transaction with Watson.
22    Q.   And, was this your final
23  performance self-evaluation?
24      MR. DIAMANTATOS:  Objection to

Page 87

1  form.
2    A.   Yes.
3    Q.   And, under "Individual
4  Objectives" on the second page it says 1.1
5  and then it says SIV/FTF.
6      What does that stand for?
7    A.   The FTF stands for first to
8  file.
9      The SIV, again, Claudio provided
10  me very specific targets.  Claudio was the
11  CEO at the time.  So, Siggi was not with
12  the company anymore.
13    Q.   Claudia who?
14    A.   Claudio Albrecht.  He was the
15  CEO of Actavis Group.
16      He provided me very -- he was --
17  Claudio was very fixed on making sure that
18  we had our most important products with
19  dual API raw material qualified suppliers.
20  So I think that's what the SIV stands for,
21  but I'm not a hundred percent certain.
22  But the FTF stands for the first to file.
23      So, here's an instance where the
24  financial result is not the first metric

Page 88

1  or objective, unlike in past years.
2      Actually, I take that back.  1.3
3  has the second source program.  That's
4  what I was referring to.  That was -- that
5  was another objective.  So, Objective 1.1
6  was around the development group, product
7  portfolio, the Hafrun's business, Hafrun's
8  part of the business.
9    Q.   And there's a reference to the
10  weight being 30 percent there?
11    A.   Yes.
12    Q.   And that's a reference to what?
13    A.   So, as I mentioned, so, every
14  employee, if performance management is
15  done well, has a salary, has a bonus
16  target, and in that bonus target will have
17  a portion based on company results and a
18  portion based on individual specific
19  metrics.  So, this is actually my portion
20  of that individual specific metrics.
21      So, Claudio, as my boss,
22  specifically said I want to make sure
23  we're working on first to files, that
24  you're doing second source programs.

Page 89

```
 1   Alathur was a facility in India.  The
 2   Moxduo product at the time.
 3        Those were -- and so, with this,
 4   he and I had discussed, negotiated --
 5   Claudio was less of a negotiator.  He was
 6   Austrian, so he pretty much told you what
 7   it was going to be.  Some negotiation.
 8   And then, yes, then I would use this,
 9   since they affected my personal
10   performance, I made certain that my team
11   was aware of what I was being measured on.
12   So, of course, then cascade in a line so
13   everybody could contribute to the business
14   results, as well as attainment of my
15   personal objectives.
16        Q.  And then under "Status" it says:
17   Not started.
18        Is that right?
19        A.  Which one?
20        Q.  Right next to the 30 percent
21   figure.
22        A.  I think they all say "not
23   started."  That may have something to do
24   with whatever the system or whatever this
```

Page 90

```
 1   printout is, 'cause this is at the end of
 2   the year.  And, if you look at comments, I
 3   put comments in it.
 4        So, I would say that's probably
 5   more of a -- or it could have been, again,
 6   I think this thing is -- since this was an
 7   online system, if you didn't actually go
 8   in and use it, it would show as not
 9   started.
10        Q.  I see.
11        A.  For the evaluator.
12        Q.  So that's inaccurate?  The "not
13   started" part is inaccurate, to your
14   understanding, right?
15        MS. WELCH:  Objection to form.
16        A.  Yes.
17        And this was done in -- this was
18   done in 2013.  Yeah, so it would have been
19   after the fact.
20        Q.  Okay.  And on the next page --
21   or, under 1.2 you have a reference, or
22   there is a reference to Moxduo.
23        Do you see that?
24        A.  Yes.
```

Page 91

```
 1        Q.  And that was something that was
 2   initiated, but not followed through on.
 3        Is that right?
 4        MS. WELCH:  Objection to form.
 5        A.  Well, again, Moxduo was a
 6   product that we had licensed in as for our
 7   specialty side of the business.  We had
 8   partnership with a company called QRX
 9   Pharma and we actually -- QRX Pharma had a
10   PDUFA date.  I mentioned before what a
11   PDUFA date stood for was a fixed date when
12   the agency was going to determine if the
13   NDA, the new drug application, would be
14   approved.  That PDUFA date was in June or
15   July of 2012.  What happened was actually
16   the agency did review the application.  It
17   was not approved.
18        So, in here, the -- the metric
19   was actually basically get it approved and
20   be launched, and since it didn't happen
21   and if you look target base, that was a
22   hundred.  The actual achievement was zero.
23   So we did not achieve.  And if you look at
24   my comments:  On track prior to PDUFA.
```

Page 92

```
 1        So we had a lot of prelaunch
 2   activities in investment, but all
 3   activities on hold until the 2013 appeal.
 4   So we were still -- the company was
 5   looking at pursuing that, but in reality,
 6   it never -- it never -- it was never
 7   approved and it was abandoned once Watson
 8   took over the business.
 9        Q.  Do you know why it was not
10   approved?
11        MR. DIAMANTATOS:  Objection;
12   foundation.
13        A.  Again, there was an advisory
14   board panel, and they ultimately, I guess,
15   they did not believe the clinical data
16   supported the application's approval.
17        Q.  And, Claudio Albrecht's comments
18   in relation to that?
19        A.  "Change waiting."
20        Q.  He states that he's changing the
21   waiting.  Is that right?
22        And he gave you a performance
23   rating of 90 percent because the base
24   business/Kadian more than compensated for
```

Page 93

1    the Moxduo delay?
2        Is that right?
3        MR. DIAMANTATOS:  Objection to
4    form; foundation; calls for
5    speculation.
6        A.    I'm not sure those are his
7    comments or my comments 'cause it's under
8    Douglas Boothe's comments.
9        Q.    I see.
10       A.    So I suggested a 90 percent
11   outcome even though against the actual --
12   the actual objective was, but it was a --
13       Q.    And, do you know whether you
14   were given the 90 percent?
15       A.    I think all -- and, honestly, I
16   believe all of this was somewhat
17   perfunctory because as part of the
18   separation agreement, I was paid at
19   target.
20       Q.    Do you recall what your salary
21   was when you started at Alpharma?
22       A.    No.
23       Q.    Do you recall roughly?
24       A.    Base salary 275,000-ish, 250,

Page 94

1    somewhere between 250 and 300.
2        Q.    And, do you know what that
3    was -- well, let's start with were you
4    entitled to a bonus at Alpharma?
5        A.    Yes.
6        Q.    And, do you know roughly how
7    much of a bonus you received during your
8    years at Alpharma?
9        MS. WELCH:  Objection to form.
10       MR. DIAMANTATOS:  Objection.
11       A.    Well, again, the bonus was a
12   target percentage of your base salary
13   subject to achieving goals.  And there
14   were, again, there were years where it was
15   zero and there were years where it was
16   slightly above.  And you saw the 2009
17   where it was maybe 105 percent of target.
18       So, my bonus target was around
19   30 percent when I started.  When I was --
20   I think when I made C -- when I was COO it
21   was maybe 40, and I believe I negotiated
22   with Claudio a 50 percent bonus target for
23   the short-term incentive plan.
24       Q.    So, do you recall whether or not

Page 95

1    you received a bonus of 30 to 40 percent
2    for each of the years that you worked at
3    Alpharma?
4        MR. DIAMANTATOS:  Objection to
5    form.
6        A.    Again, Alpharma was two years.
7    So 2004, 2005.  I don't specifically
8    recall the 2004.  2005 was during the
9    transaction, so I believe the company
10   paid, again, at -- at target, so 30
11   percent.
12       But I don't have the data.  So
13   if you want to show me the data, I can
14   confirm or provide an explanation.
15       Q.    And that was for short-term
16   incentive plan.
17       Was there also a long-term
18   incentive plan at Alpharma?
19       A.    Yes.
20       MR. DIAMANTATOS:  Objection to
21   form.
22   BY MS. BAIG:
23       Q.    And, what was the long-term
24   incentive plan at Alpharma?

Page 96

1        A.    Alpharma's plan, as most
2    corporations will have, a combination of
3    stock options and/or restricted stock.
4    Alpharma was a publicly-traded company.
5        Q.    And, so, do you recall how much
6    you earned while at Alpharma through the
7    long-term incentive plan?
8        MS. WELCH:  Objection to form.
9        A.    No.
10       Q.    Do you recall roughly?
11       A.    Again, the -- as part of the
12   transaction, any sort of shares would have
13   been vested, but I don't recall what the
14   Alpharma shares were.  There was some --
15   maybe a hundred thousand dollars over the
16   two-year period.
17       Q.    And, when you moved to Actavis,
18   do you recall what your starting salary
19   was?
20       A.    Well, again, when Actavis
21   acquired Alpharma, basically my starting
22   salary was my Alpharma salary.  So it --
23   that's, again, around 275, 280, 300-ish.
24       Q.    And, did that change during your

Page 97

1    time at Actavis?
2        A.   Yes.
3        Q.   And, what did it change to?
4            MS. WELCH:  Objection to form.
5        A.   I believe I -- when -- when I
6    was made chief commercial or chief
7    operating officer, it bumped up to a
8    higher number, might have been 350.  When
9    I was CEO of Actavis from 2008, maybe
10   started at 400, and I believe by the time
11   I left in 2012 it was around 450 base.
12       Q.   And, do you recall what the
13   bonus structure was?
14           MR. DIAMANTATOS:  Objection to
15   form.
16   BY MS. BAIG:
17       Q.   Or how much you earned as a
18   bonus for your years at Actavis?
19           MR. DIAMANTATOS:  Objection.
20           MS. WELCH:  Objection to form.
21       A.   Again, I mean, my target would
22   be -- was either 40 or 50 percent and
23   subject to the business performance.
24           I know in 2008 the bonus was

Page 98

1    zero and in 2007, based -- or, sorry.
2    2009, based on the documents here, it
3    looks like it was between a hundred and
4    105 percent of target.
5        Q.   And, do you have a recollection
6    as to whether or not you received a bonus
7    in 2010 and '11?
8        A.   I believe I did.
9        Q.   Do you know if it was at target?
10       A.   No, I don't recall.  It was
11   around there.  Either slightly above or
12   slightly below, but it wasn't zero and it
13   wasn't, you know, it wasn't max'd.  It was
14   probably around the target number.
15       Q.   If it was at the target number,
16   wouldn't it be max'd, or no?
17       A.   No.  Like I -- as I explained
18   before, if -- if the target was a hundred
19   and the business did 105, then the bonus
20   might pay at a 105 percent of the target.
21       Q.   Okay.
22       A.   Subject to a cap, which I
23   believe is 120 percent.
24       Q.   And, was there a long-term

Page 99

1    incentive plan at Actavis?
2        A.   We created a program for the
3    U.S. associates, yes.
4        Q.   And, what was that?
5        A.   It was actually called -- it was
6    a phantom stock plan.  Actavis was a
7    privately-held company.  So, and again,
8    one of the reasons we had this was both as
9    an incentive for long-term growth and
10   investment, but also as a retention
11   vehicle.  The company was going through
12   all sorts of challenging situations with
13   integration with some of the facilities.
14   So we wanted to make certain we had a
15   program that rewarded, incentivized people
16   for investments in the business longer
17   term, as well as to stay around to
18   participate in the business growth and to
19   address and fix and invest in future
20   growth.
21       Q.   And, when was that long-term
22   incentive plan created?
23       A.   2008, I believe.
24       Q.   And, so, did you earn money as a

Page 100

1    result of the long-term incentive plan
2    from 2008 to 2012?
3            MR. DIAMANTATOS:  Objection to
4    form.
5        A.   Yes.
6        Q.   And, do you recall roughly how
7    much per year?
8        A.   Well, the way the program was
9    set up was there were annual grants and it
10   would take three years to vest.  So, if we
11   started in 2007 or 2008, I earned nothing
12   until 2010 or 2011.
13           And the way the program was set
14   up was they were phantom shares, so they
15   weren't real shares.  We pegged it to a
16   number like a one dollar per unit and the
17   share value would go up or down based on
18   company performance, and the number of
19   grants, number of shares that would vest
20   would be based on company performance,
21   that performance being the EBITDA target.
22       Q.   So, do you recall how much you
23   earned in the 2011/2012 time frame as a
24   result of the long-term incentive plan?

Page 101

1     A.   No, but I'm sure you could show
2  me a document, I'd be happy to comment on
3  it.
4     Q.   Do you recall whether it was
5  more than a hundred thousand dollars?
6     A.   Yes.
7     Q.   Was it?
8         What's the best range that you
9  can give me in terms of your best
10  recollection as to what you earned from
11  the long-term incentive plan between 2011
12  and 2012?
13         MS. WELCH:  Objection to form.
14     A.   Over $500,000.
15     Q.   For each year?
16     A.   No.
17     Q.   Total?
18     A.   Yes.
19     Q.   Do you know whether it was over
20  a million dollars?
21     A.   It could have been.  I don't
22  believe so.
23     Q.   So it was some -- somewhere
24  between 500,000 and a million, is your

Page 102

1  best estimate?
2         MR. DIAMANTATOS:  Objection;
3   mischaracterizes the witness's
4   testimony.
5  BY MS. BAIG:
6     Q.   Yes?
7     A.   Yes.
8         Again, you can happily show me a
9  document, I'd be able to comment more.
10  And, again, part of it was --
11     Q.   I'm just asking for your best
12  recollection.
13     A.   Also, part of it was with the
14  transaction.  Those shares that had been
15  granted, some portion of those vested or
16  accelerated vesting, which is pretty
17  typical in a -- in a transaction.  So, it
18  may have been compressed into a shorter
19  time frame rather than paid out over time,
20  so it may have showed a higher number than
21  what had been normally planned for
22  or expected.
23     Q.   And, so, what was -- what was
24  the component of -- what was -- what was

Page 103

1  the metric of the long-term incentive
2  plan?
3         MS. WELCH:  Objection to form.
4     A.   I believe it was EBITDA growth.
5     Q.   And for you it would have been
6  EBITDA growth of the U.S. company.
7         Is that right?
8     A.   For all the U.S. associates who
9  were part of the phantom stock plan.
10  There were probably 50 or so.  It was
11  directors and above.  It actually took
12  some specific high potentials.  We would
13  also put the that in the plan.  Because,
14  again, it was both a performance plan as
15  well as a retention plan, and since it was
16  over a three-year period of time, we were
17  making investments in people in 2007 and
18  2008 and those were paying out in 2010 and
19  2011, and that plan carried over at least
20  until the Watson transaction.  Pretty
21  typical compensation structure.
22         MS. WELCH:  If you're moving to
23   a new document, can we take a short
24   break?

Page 104

1         MS. BAIG:  Sure.
2         THE VIDEOGRAPHER:  We're going
3  off the record.
4         The time is 10:36 a.m.
5         (Recess taken.)
6         THE VIDEOGRAPHER:  We're going
7  back on the record.
8         The time is approximately 10:55
9  a.m.
10  BY MS. BAIG:
11     Q.   Do you recall what opioids
12  Alpharma sold while you were there?
13     A.   Again, so, Alpharma had a brand
14  group that sold a Kadian product, which is
15  morphine sulphate extended-release.  The
16  generic part of the business, classified
17  wasn't opioid.
18         I don't -- I don't think we had
19  a significant generic pain med.  We had
20  tramadol, but that's not an opioid.
21  That's an NSAID, I believe.
22         If you have a document or a
23  product catalog or some document from 2003
24  or 2004, I'd be happy to review and

Page 105

1    comment.
2        Q.   Do you recall what opioids
3    Actavis sold while you were there?
4        A.   Again, so, during my tenure at
5    Actavis, we -- we brought -- I mean, we
6    acquired the Kadian asset.  So that was
7    sold, you know, manufactured, distributed,
8    marketed sold 2009 through 2012.
9           We did sell generic versions of
10   I mentioned the -- the OxyContin
11   authorized generic product.  We had that
12   brief period of time late 2009, 2010.
13          We did sell a -- we got an
14   approval on a generic version of Opana ER,
15   which would have been oxymorphone.
16          We had -- we had a filing on
17   Avinza.  We never brought that to market.
18   Which was the morphine sulphate.
19          Oxycodone IR, which is
20   Roxicodone.  That was the product that was
21   sold from our Little Falls facility and
22   then our Elizabeth facility.
23          We did not do Vicodin.  We did
24   not do Percocet generics.

Page 106

1        I think those were the primary
2    ones.  There may have been others.
3        Q.   Do you have any experience
4    working with a company selling drugs to
5    treat the addiction to opioids?
6           MS. WELCH:  Objection to form.
7        A.   Could you repeat the question,
8    please?
9        Q.   Do you have any experience
10   working with a company selling drugs to
11   treat the addiction of -- to opioids?
12          MS. WELCH:  Same objection.
13       A.   No.
14          MS. BAIG:  We'll have this
15   marked as Exhibit 5.  The document is
16   Bates stamped ACTAVIS0958177 through
17   '181.  It starts as an email from
18   Michael Perfetto to you, November
19   18th, 2011.  And the subject line is
20   "Suboxone Walgreens offer."
21          (Boothe Exhibit 5, email chain
22   ending November 18, 2011, Bates No.
23   ACTAVIS0958177 to 0958182, was marked
24   for identification, as of this date.)

Page 107

1    BY MS. BAIG:
2        Q.   Do you know what Suboxone is?
3        A.   I'm just looking at the document
4    first.
5           (Perusing document.)
6           Okay.  Yeah.
7        Q.   Do you know what Suboxone is?
8        A.   Yes.
9        Q.   What is it?
10       A.   Well, the brand is Suboxone.
11   The generic is buprenorphine or
12   buprenorphine naloxone, and that's a
13   product that is actually used -- I
14   believe, one of its indications is for
15   treatment for substance abuse.
16       Q.   Including opioid abuse, right?
17       A.   Again, I don't know exactly what
18   it's -- what it's labeled indication is
19   for.
20       Q.   Do you have an understanding
21   that Suboxone is used to treat opioid
22   abuse?
23          MR. DIAMANTATOS:  Objection.
24          MS. WELCH:  Objection to form;

Page 108

1    asked and answered.
2        A.   If that's what you tell me it
3    is.  That's my understanding.
4        Q.   No.  I'm just asking if you have
5    any understanding of that independent of
6    this deposition.
7           MR. DIAMANTATOS:  Same
8    objection.
9    BY MS. BAIG:
10       Q.   Of what I said in this
11   deposition.
12       A.   I think the Suboxone has
13   multiple indications.  It's the naloxone
14   portion I thought was for abuse, for drug
15   addiction or for -- or treatment, like.
16       Q.   So, do you recall that Actavis
17   was selling Suboxone?
18       A.   I don't believe we got this
19   product approved.  This was the product
20   that we had in the plan.  It was called --
21   we had two versions.  There's a -- there's
22   the plain old -- there was the standalone
23   buprenorphine and then there was the
24   buprenorphine naloxone combination, which

Page 109

1    is the Suboxone, which was in our plan for
2    approval, but, for a whole host of
3    reasons, I do not believe it was approved
4    ever during my tenure at Actavis.
5        Q.   So, if you look at the second
6    page halfway down in an email from Michael
7    Dorsey to Ara Aprahamian and others, the
8    subject line is "Suboxone Walgreens
9    offer."
10       Do you recall having a Walgreens
11   offer for Suboxone?  I mean, it would have
12   had to be approved in order to have a
13   Walgreens offer, correct?
14       A.   No.
15       MR. DIAMANTATOS:  Objection to
16   form; assumes facts.
17   BY MS. BAIG:
18       Q.   No?  How come?
19       A.   Again, we -- it's in the normal
20   course of business.  We would actually
21   solicit for business in anticipation of
22   product approvals.  So we would have a
23   sense as to what the -- the demand would
24   be from certain customers.  So if we had,

Page 110

1    you know, limited inventory, we want to
2    make certain we had enough to support the
3    accounts we were going after to get a
4    sense for the market dynamics.
5        This was pretty common to ask
6    for information from accounts on products,
7    especially near in for launch.
8        Q.   So, if you had -- if you look at
9    the sentence on the very top of that page
10   it says:  We have a ton of inventory with
11   60 percent share target of a much higher
12   base of business in CY 11 budget and it's
13   going short soon.
14       Does that suggest to you that,
15   if you have inventory, that it would have
16   been approved, or no?
17       MR. DIAMANTATOS:  Objection to
18   form; foundation; calls for
19   speculation.
20       A.   I mean, again, we -- as part of
21   a launch -- so, first of all, if the
22   product was approved, to be helpful, if
23   you just could tell me.  I don't recall.
24   But if it was unapproved, it's typical to

Page 111

1    make -- first, you have to make -- you
2    have to validate the product.  So in order
3    to validate the product, you have to make
4    three batches.  So that's inventory right
5    there.  But it's not available because the
6    product's not approved, so it would be
7    under quarantine.  So that's the
8    inventory.
9        It was a practice that we had at
10   Actavis was we wanted to be prepared with
11   inventory in anticipation of launch so we
12   can get to market on day one.  Not all
13   generic companies had that approach.  Some
14   will wait until they have approval, and
15   then they will go and validate because of
16   the concern potentially of the inventory
17   going short date.
18       This was an item which we
19   thought had high value.  It was in our
20   target.  We anticipated we have approval.
21   So part of the business plan would be to
22   make inventory.
23       And, like I say, if we had it
24   approved, it would be helpful, you could

Page 112

1    show me the document, I could provide
2    better commentary.  I don't specifically
3    remember it being approved in this time
4    frame.
5        Q.   Okay.  And, do you remember it
6    being approved at all?
7        A.   Again, I don't believe it was
8    approved during my time at Actavis.  It
9    may have been approved later in the time.
10   But I believe it was subsequently was
11   approved under Watson or Actavis after
12   2012.
13       But, again, that's very easy to
14   check.  You can check the orange book.
15       Q.   Okay.  And, when you stated
16   here:  Yes, no need to be shy on this one.
17   Full bore.  You would have been referring
18   to just moving -- moving forward with the
19   approval process in the Walgreens offer?
20       A.   That's two separate things.
21       So, again, the approval process
22   for a new drug or even with a new drug is
23   with the regulatory organization and with
24   the FDA from a commercial preparation.  So

Page 113

1    Mike's responsibility was sales and
2    marketing for the generics. In his plan
3    would have been a target for revenue for
4    this product subject to it being approved,
5    and part of that would be prelaunch
6    planning to understand potentially which
7    customers were interested in the product.
8    There may have been multiple generics who
9    were coming to market, which is, again,
10   why it was important to be ready on day
11   one.
12        I don't specifically recall the
13   dynamics. But, if you look at the chart,
14   it looks like we had a pretty aggressive,
15   you know, high target for the percentage
16   of the generic market we were going to
17   supply. So, 40 percent or 40 -- or 60
18   percent gives me an indication that we
19   were thinking it was going to be us first
20   or us with an authorized generic or
21   possibly us with another competitor. So,
22   that's one of the success metrics in the
23   space is you be prepared for launch and
24   get your product out when it's approved.

Page 114

1    Q.    And, so, what did you mean by:
2    Yes, no need to be shy on this one. Full
3    bore?
4    A.    I was -- I was agreeing with
5    Mike, head of sales, that he should go out
6    there, he should be out talking with
7    customers and try to find potentially more
8    than our target 'cause that would be a way
9    potentially to exceed our goals.
10        But, again, just because a
11   customer provides usage and provides even
12   pricing and such, that doesn't mean you
13   have the business, and it doesn't really
14   count until you have the product approved
15   and you have their signed order, til you
16   actually -- so, experience would be
17   sometimes you have to talk to 30 people or
18   ten accounts to get six to commit.
19   Q.    And, Perfetto's response to you
20   was: I need not be told. Just get me
21   product at market formation and I will
22   make you look like a hero.
23        Do you see that?
24   A.    Yes.

Page 115

1    Q.    And then he goes on to say: PS.
2    Kadian was a very solid launch with 42
3    percent locked down prior to an AG. We
4    can't be on red alert for 18 months.
5        Do you see that?
6    A.    Yes.
7    Q.    What does 42 percent locked down
8    mean?
9        MR. DIAMANTATOS: Objection;
10   form; foundation; calls for
11   speculation.
12   A.    So, in this time frame, this is
13   dated November of 2011. So, at some point
14   prior to that, there was a generic
15   approval on Kadian. So, we were -- we,
16   Actavis, was selling the -- we're selling
17   the branded version of Kadian. And it's a
18   typical practice for brand companies, and
19   so again, we had a brand asset, that when
20   a generic -- when a generic was approved
21   that the brand company comes out with a
22   what's called an authorized generic. And
23   so, that's what we had prepared materials,
24   again, and that's what -- so, that's what

Page 116

1    the 42 percent is, that I guess our
2    authorized generic was marketing 42
3    percent of the available prescriptions
4    after -- after the generic market formed.
5    Q.    I see.
6        And, what's AG refer to in that
7    same sentence?
8    A.    AG stands for authorized
9    generic.
10   Q.    And, what was your understanding
11   of -- of red alert in that context?
12        MR. DIAMANTATOS: Objection to
13   form; foundation.
14   A.    I would -- my read of this is,
15   again, Mike being the head of sales,
16   knowing that the Suboxone product had been
17   in our pipeline, we had expected to be
18   approved earlier than this date. So,
19   essentially, he was preparing to go to
20   market. We had product. The approval was
21   being delayed. So, essentially, the
22   organization was ready to go, on red alert
23   to launch the product and we kept waiting
24   for the -- the final approval indication,

Page 117

1    which, again, didn't happen for quite some
2    time.
3         That's, again, very typical in
4    the generic space.  There's lots of
5    products over my time at Actavis and
6    subsequent companies where we would
7    prepare for launch and whatever reason the
8    launch would be delayed.
9         MS. BAIG:  Let's have this
10   document marked as Exhibit 6.  It's a
11   document that's Bates stamped
12   ALLERGAN_MDL_01397096 through '7159.
13   I'll note that '7159 is a multipage
14   document.  It starts as an email from
15   Kevin Bain to Chris Quigley.
16        (Boothe Exhibit 6, email chain
17   ending October 18, 2006, with
18   attachment, Bates No.
19   ALLERGAN_MDL_01397096 to 01397159, was
20   marked for identification, as of this
21   date.)
22   BY MS. BAIG:
23   Q.    Who is Kevin Bain?
24   A.    I'm just looking at the

Page 118

1    document.
2         (Perusing document.)
3         Okay.
4    Q.    Were you responsible for setting
5    budget for the Actavis companies?
6    A.    Could you repeat that?
7    Q.    Were you responsible for setting
8    the budget for the Actavis companies?
9    A.    Yes and no.  Again, Actavis
10   Group was the parent.  Actavis U.S. was
11   the U.S. portion of it.  So I participated
12   in the development of the budgets for the
13   U.S. portion of Actavis.  And, again,
14   there was a negotiation between corporate
15   and the division.  And then within
16   Actavis, we had the lines of business, as
17   I mentioned before, solid oral dose or
18   semisolid to liquid, or it could have been
19   by facility, Elizabeth or Lincolnton or
20   Owings Mills.
21        So, once we had the direction
22   from corporate for the U.S. targets, then
23   yes, I, myself and my leadership team
24   would then cascade that through the

Page 119

1    organization.
2    Q.    Okay.  And, who is Kevin Bain?
3    A.    Ken Bain was the chief financial
4    officer of Actavis at the time of this
5    email in 2006.  Actavis U.S.
6    Q.    Okay.  Thank you.
7         And Chris Quigley?
8    A.    Chris Quigley was in the finance
9    organization.  He was basically what would
10   be called an FP&A, financial planning and
11   analysis.  So, the finance portion of
12   working on the budgeting and the targets
13   and such.
14   Q.    And I see next to his name it
15   says AFCRA Alpharma.
16        Is that just because he moved
17   over from Al --
18   A.    What's that?
19   Q.    It's 2006.
20        Is this an Alpharma document?
21        MS. WELCH:  Objection to form.
22   A.    October 18, 2006, the generic
23   portion of Alpharma was part of Actavis.
24        That doesn't necessarily mean

Page 120

1    the IT systems had caught up, so, with
2    integration.
3    Q.    Okay.  And Gary DePaolo?
4    A.    Gary DePaolo.
5    Q.    What's his position?
6    A.    At that time, Gary was the
7    controller for the U.S. business, reported
8    to Kevin.
9    Q.    Okay.  And, this is a budget
10   presentation.
11        Did you create this document or
12   participate in the creation of this
13   document?
14   A.    And, again, I -- it's dated
15   October.  So I don't know if it's final.
16   It's probably a draft.  Looks like it was
17   anticipation of a presentation.  Look at
18   page 2 where everybody was participating,
19   all functional and other leads.
20        So, what's the question,
21   specifically?
22   Q.    Did you participate in creating
23   this document?
24   A.    I'm not sure I specifically

Page 121

1    participated in creating the document, but
2    I certainly was a participant in this --
3    this review or meeting dated October 19th.
4      Q.   Okay.  And, what was the purpose
5    of it?  Just to review the budget for the
6    U.S. company?
7          MR. DIAMANTATOS:  Objection to
8      form.
9      A.   Well, as I mentioned before, the
10   way the budgeting process worked was I
11   mentioned the November date was usually
12   when we had a conversation with corporate.
13   So, since this was October, this would
14   have been an internal activity to
15   understand from all the different
16   stakeholders the components that would
17   lead into our U.S. target bone -- target
18   budget, what we would present to corporate
19   as our proposal for budget.  And, again,
20   then in November there would be a
21   corporate review and there would be, I can
22   guarantee you there would be changes and
23   more likely the changes would be the
24   targets would be set higher than what the

Page 122

1    team had proposed, which is a very typical
2    practice across pharmaceutical companies
3    and all companies.
4      Q.   And, if you look at page 11 of
5    the Power Point it identifies "Quarterly
6    sales by major product."
7      Is that right?
8      A.   Yes, page 11.  Yeah.
9      Q.   And it identifies oxycodone
10   tablets third on the list.
11     Do you see that?
12     A.   Yes.
13     Q.   Is that the third largest
14   product at that time?
15         MR. DIAMANTATOS:  Objection to
16     form.
17     A.   Again, so, the 2007 I believe is
18   a forecast.
19     2006, this is dated October of
20   2006.  So, some portion of the 2006
21   numbers are also a forecast.  But, based
22   on the first half of the year, right, it
23   was the third largest individual generic
24   product sold.

Page 123

1      Q.   And, do you know for oxycodone
2    tablets why there would be such a large
3    discrepancy in sales between the first
4    half of the year and the second half of
5    the year for 2006?
6          MS. WELCH:  Objection to form.
7      A.   You'd -- I don't specifically
8    recall.
9      If you have any information, I'd
10   be happy to review it.
11     Q.   You don't recall why sales would
12   have gone down for quarters 3 and 4 of
13   2006?
14         MS. WELCH:  Objection to form.
15     A.   Sitting right here in 2019, I
16   don't specifically recall activities of
17   2006.
18     Q.   Okay.
19     A.   Again, I don't know if Q3 and Q4
20   might not even be actuals.  It's not clear
21   from the chart if those are actuals or
22   those are projections.
23     Q.   And, if you move to page 24
24   there's a heading on that page "Products

Page 124

1    Not Launched 2007 Versus LT 2007."
2      What's your understanding of
3    what that means?
4      (Pause.)
5      Q.   I'm looking at the page numbers
6    on the Power Point, page number 24.
7      A.   I'm just trying to look at the
8    context so I can provide a more complete
9    answer.
10     Products not launched -- so,
11   again, I don't specifically recall what LT
12   2007 was, some sort of a long-term
13   planning document.
14     But, this is saying as of
15   October -- as of October 2006, products
16   not launched 2007 versus L -- all right.
17     So, my interpretation of this
18   would be these are products that may have
19   been in an earlier version of some sort of
20   planning assumption, the LT 2007, that
21   based on this document we are not
22   including as revenues in this proposed
23   2007 budget.
24     And that could be for a whole

Page 125

1   host of reasons.  One could be that,
2   again, the product approval is delayed.
3   For example, the oxycodone ER would have
4   been a Paragraph IV.  So the litigation
5   was ongoing.  There might not have been a
6   decision.  Could have been related to the
7   fact that --
8       Q.   What do you mean by Paragraph
9   IV?
10      A.   Paragraph IV is a process when
11  you're a generic pharmaceutical company
12  and you file an abbreviated new drug
13  application, or an ANDA, there's different
14  classifications of how you file it with
15  the FDA.  And a Paragraph IV is basically
16  you are filing an abbreviated new drug
17  application against an NDA product, or a
18  new drug application, where this new drug
19  has existing intellectual property, or IP.
20      So, the Paragraph IV process was
21  created in 1984 as part of the
22  Hatch-Waxman Drug Competition and Patent
23  Restoration Act, and what that means is
24  that it enabled generic drug companies an

Page 126

1   opportunity to file, in advance of patent
2   expiry, to potentially bring lower cost
3   affordable generic products to market to
4   provide access to affordable medicines for
5   patients.
6       Paragraph IV process enables,
7   with the filing, an automatic 30-month
8   stay of approval that the FDA cannot
9   approve -- assuming, by the way, that the
10  brand company opts to sue you, that's
11  their right to do or not do, during that
12  period of time, during that 30-month
13  period of time, the FDA cannot approve
14  application.  That supposedly was set back
15  in the day as an appropriate time for any
16  pending litigation activities to be
17  resolved.  Not necessarily the case and
18  has yet to be the case.  But that's what a
19  Paragraph IV is.
20      Q.   So, what does the $16.6 million
21  next to oxycodone ER represent?
22      A.   Again, in this chart, my
23  understanding would be that our budget
24  here, proposed budget does not include any

Page 127

1   revenue -- or, includes some number of
2   revenue for oxycodone ER, but it's 16.6
3   million less than what was in an earlier
4   long-term plan, the LT 2007.
5       That's my understanding, but I
6   may -- may or may not be correct.
7       Q.   And if you look at page 34 of
8   the Power Point.
9       A.   Page 34 of the Power Point.
10      (Pause.)
11      Okay.
12      Q.   What does AMID, A-M-I-D, refer
13  to?
14      A.   AMID (different pronunciation.)
15      That was the Actavis -- Actavis
16  Iceland acquired two companies in the
17  United States.  They acquired the Alpharma
18  generics business and they acquired a
19  company called AMID.  It's also a generic
20  manufacturer based in northern New Jersey.
21      Q.   Okay.  And here you see there's
22  a reference to a 2006 8 plus 4 plus a
23  further reference to oxycodone ER tabs and
24  oxycodone?

Page 128

1       A.   Yes.
2       Q.   And, what is this showing?
3       MS. WELCH:  Objection to form.
4       A.   Well, again, this is a proposed
5   budget.  So, what the top part 8 plus 4
6   plan would have been sort of the run rate
7   base business assumption.  The oxycodone
8   ER tabs, it's a minus 17 million, and the
9   comment there is "delayed IP matter."  So,
10  if in a prior version there's an
11  expectation of revenue for this product,
12  this draft budget is saying it's going to
13  be 16.562 million less.  I don't know -- I
14  don't know if that was the full amount or
15  if the budget was 30 million and it's down
16  to 14.  I don't specifically recall.  But
17  basically it's saying it's a vary -- it's
18  a variation from an earlier planning
19  assumption.
20      MS. BAIG:  We'll the next
21  document marked as Exhibit 7.  It's
22  Bates stamped Allergan_MDL_01474505
23  through '4557 appeared it's entitled
24  "Development and Manufacturing

Page 129

1  Services Agreement."
2      (Boothe Exhibit 7, Development
3  and Manufacturing Services Agreement
4  effective February 1, 2008, Bates No.
5  ALLERGAN_MDL_01474505 to 0147557, was
6  marked for identification, as of this
7  date.)
8      THE WITNESS:  Okay.
9  BY MS. BAIG:
10     Q.  Do you have an understanding of
11 what this agreement is?
12     A.  It's a -- lots of pages.  Could
13 I have a chance to review it?
14     Q.  Sure.
15     What I'll tell you is that in
16 the first paragraph of the second page, do
17 you see that?
18     A.  Can I review the document?
19     Q.  Yeah.
20     MS. BAIG:  Let's go off the
21 record.
22     THE VIDEOGRAPHER:  We're going
23 off the record.
24     The time is approximately 11:22

Page 130

1  a m.
2      (Recess taken.)
3      THE VIDEOGRAPHER:  We're going
4  back on the record.
5      The time is 11:23 a m.
6  BY MS. BAIG:
7      Q.  What's your understanding as to
8  what this agreement is?
9      A.  It's a -- what we called a --
10 it's a development and manufacturing
11 service -- it's basically an agreement
12 between Actavis and Alpharma to address
13 the supply and other components of two
14 products which were one was in active
15 manufacturing and one was in development
16 at the Elizabeth, New Jersey facility,
17 which was part of Actavis, and its
18 obligations and arrangements with Alpharma
19 to support manufacturing of these two
20 products for Alpharma.
21     The reason that this was in
22 place was because when Alpharma sold the
23 generics business to Actavis, the facility
24 in New Jersey went with the generics

Page 131

1  business, but the -- the brand proprietary
2  items, we were Kadian and then a
3  development item, which I think became
4  Embeda, stayed with Alpharma, but they
5  were manufactured, they were developed,
6  there were resources that were commingled.
7  So this was basically like a transition
8  services agreement to clarify roles and
9  responsibilities, payments, other sorts of
10 things, between the two companies at that
11 facility.
12     Q.  When you were at Actavis, it was
13 the -- the director of generic marketing
14 reported to you.
15     Is that right?
16     A.  Which time frame?
17     Q.  At any time -- time frame when
18 you were at Actavis, did the director of
19 generic marketing report to you?
20     MS. WELCH:  Objection to form.
21     A.  No.
22     Q.  So, Jinping McCormick never
23 reported directly to you?
24     A.  She did when I was at Alpharma.

Page 132

1  I hired her in 2004.
2      Q.  Okay.  And, did she report to
3  you for her entire time at Alpharma?
4      A.  No.
5      Q.  Did she -- when did she report
6  to you at Alpharma?
7      A.  2004.
8      Q.  Just 2004?
9      A.  I believe so.
10     Q.  Okay.  And, when you were at
11 Actavis, Jinping McCormick reported
12 directly to Mike Perfetto.
13     Is that right?
14     A.  I believe that's my
15 recollection.
16     Q.  And Perfetto reported to you?
17     A.  Yes.
18     Q.  And, when you were at Actavis,
19 did the director of branded marketing
20 report to you?
21     A.  No.
22     Q.  So, Jennifer -- was Jennifer
23 Altiers [sic] the director of branded
24 marketing?

Page 133

1      MR. DIAMANTATOS:  Objection to
2  form.
3      A.   Jennifer Altier was with Actavis
4  2011 or 2012.  I believe she was a
5  contractor or a consultant.  I'm not sure
6  we actually ever made her a full-time
7  employee.
8          But, again, if you have a
9  document, I'd be happy to review it and
10  comment on it.
11     Q.   And, did Jennifer Altiers report
12  to Perfetto?
13     A.   No.
14     Q.   Who did she report to, to your
15  knowledge?
16     A.   Well, again, I'm not sure she
17  was an employee.  So if she wasn't an
18  employee, she didn't report to anybody.
19  She would have been brought on a contract
20  basis as a consultant.
21         But she was involved with the
22  Kadian brand side after we had brought
23  that back at Actavis.
24     Q.   Well, even if she was a

Page 134

1  consultant, she would be taking direction
2  from someone at the company; would she
3  not?
4      MR. DIAMANTATOS:  Objection to
5  form.
6      A.   Again, I'm uncomfortable
7  answering that 'cause there's all sorts of
8  legal implications about who's considered
9  employees back from the micro SOS.
10         So, if someone was not an
11  employee of the company, how their
12  relationship in reporting would be
13  something that I'd rather have someone
14  who's more familiar with employment law
15  comment on.
16         But she was brought in to do
17  specific projects.
18     Q.   Did you have another marketing
19  director for brand name drugs?
20     MR. DIAMANTATOS:  Objection to
21  form.
22     A.   Yes.
23     Q.   Who was that?
24     A.   Nathalie Leitch.  I don't know

Page 135

1  what her specific title was, but she was
2  responsible for the proprietary side of
3  the Actavis business.
4      Q.   And, who did she report to?
5      A.   She reported to Terry Fullem.
6      Q.   And, who did Terry Fullem report
7  to?
8      A.   Me.
9      Q.   And, what was Terry Fullem's
10  position?
11     A.   His responsibility changed over
12  time.
13         So, a specific time zone, time
14  area you want me to comment on?
15     Q.   What were his positions while
16  you were at Actavis?
17     MS. WELCH:  Objection to form.
18     A.   So, again, starting in 2007 --
19  or, sorry.  2006 with Actavis, Terry was
20  the general manager of the semisolids and
21  liquids part of the business, 2007.  And
22  then in 2008 or 2006, I don't
23  specifically -- either way, ultimately I
24  put Terry responsible for product

Page 136

1  selection, portfolio, business
2  development, and then new ventures, and
3  one of the new ventures when we acquired
4  the Kadian asset from Alpharma at the end
5  of 2008, I put Terry in responsible for
6  the specialty products as well as our
7  injectable portfolio which we were
8  developing.
9      Q.   Were there any other marketing
10  directors while you were at Actavis other
11  than Natalie Leitch?
12     MS. WELCH:  Objection to form.
13     A.   Again, I mean, we had marketing
14  people.
15         So, director like by title or
16  director in terms of they were involved in
17  marketing?
18     Q.   I mean leading the marketing for
19  brand name drugs.
20     MR. DIAMANTATOS:  Objection to
21  form.
22     A.   Just Nathalie, is my
23  understanding.
24     Q.   And she reported to Terry Fullem

Page 137

1  in what time frame?
2      A.   From the -- I believe from the
3  time she joined the company.  I don't know
4  when that was.  Until the time that the
5  Watson transaction closed.
6      Q.   Generally speaking, do you have
7  an understanding as to which drugs brought
8  in more money to the company: the branded
9  drugs or the generic drugs?
10      MS. WELCH:  Objection to form.
11      A.   What's the question?
12      Q.   Generally speaking, do you have
13  an understanding as to which drugs brought
14  in more money to the company: the branded
15  drugs or the generic drugs?
16      MS. WELCH:  Same objection.
17      A.   In which time frame?
18      Q.   While you were at Actavis.
19      MS. WELCH:  Same objection.
20      A.   Well, again, if -- if -- I
21  believe Kadian was under 200 million.  The
22  business was between 600 and 900-plus
23  million.
24      So, predominantly, the business

Page 138

1  was generic drugs.
2      Q.   I think you mentioned for the
3  opioids that Actavis was selling when you
4  were there Kadian, generic OxyContin,
5  generic Opana ER, oxycodone IR.
6      And I'm wondering if Actavis was
7  also selling fentanyl at any time while
8  you were there?
9      A.   Yes, we did sell fentanyl
10  product, correct.
11      Q.   And, when did you do that?
12      A.   We acquired a company in late
13  2006.  They had the fentanyl product in
14  their portfolio.  The product was approved
15  in two thousand and -- early late 2006 or
16  early 2007.  So we began marketing it
17  around that time, as soon as it was
18  approved.
19      Q.   And, which company was that?
20      A.   The company was called Abraca.
21  It was in Florida.
22      Q.   Did you ever have any
23  involvement with a drug called Norco?
24      A.   What's it called?

Page 139

1      Q.   Norco?
2      MR. DIAMANTATOS:  Objection to
3  form.
4      A.   What's the generic compound
5  name?
6      Q.   I don't have the answer to that.
7  I'm just asking you if you
8  recall working on a drug named Norco.
9      MR. DIAMANTATOS:  Objection to
10  form.
11      A.   No.
12      Q.   Did you review market research
13  and market share reports for -- for the
14  portfolio of products regularly?
15      MS. WELCH:  Objection to form.
16      A.   What do you mean by market
17  research?
18      Q.   You know that Jinping McCormick
19  testified that she did a good deal of
20  market research, and I'm wondering if you
21  reviewed that.
22      MS. WELCH:  Objection to form.
23      MR. DIAMANTATOS:  Objection to
24  form.

Page 140

1      A.   The marketing team would
2  consist -- would frequently update what
3  was called market share reports, which
4  would be the data from the IMS or the
5  Wolters Kluwer crew that would then show
6  prescription level data and again for the
7  generics would be share prescriptions
8  between if it was Actavis or Watson or
9  Teva or whomever else was in the space.
10  That's the market share reports, and I
11  would say that's probably what she meant
12  by market research.
13      But that doesn't mean, again, in
14  her role that she wasn't looking and
15  trying to see what was going on in the
16  space.  That was her -- that was her
17  responsibility.
18      Q.   And, would you review some of
19  that as well?  Would she present it to
20  you?
21      MS. WELCH:  Objection to form.
22      MR. DIAMANTATOS:  Assumes facts.
23      A.   Again, the market share report
24  was -- was shared with lots of people in

Page 141

1   the organization.  It was a regular thing.
2   It might have been done weekly or monthly.
3        So, yes, I would receive those.
4   I won't admit that I looked at them every
5   time.
6        And, as part of our budgeting
7   process, the market share and the market
8   research or the data about specific
9   molecules, specific prescription growth or
10  decline, competitive forces were all
11  critical inputs to our forecast, our
12  budgets and, quite frankly, our everyday
13  supply/demand planning activities.
14       Q.   Which you also reviewed,
15  correct?
16            MS. WELCH:  Objection to form.
17  BY MS. BAIG:
18       Q.   Reviewed the marketing and
19  financial evaluations for the products?
20            MS. WELCH:  Objection to form.
21       A.   Could you be more specific?
22       Q.   I'm just asking if you
23  generally, as part of your -- your job
24  responsibilities, you reviewed marketing

Page 142

1   and financial evaluations for various of
2   the products.
3        A.   At times, yes.
4        Q.   Including opioid products,
5   correct?
6        A.   Could you be more specific?
7        Q.   Did you look at financial
8   evaluations and marketing evaluations for
9   opioid products?
10            MS. WELCH:  Objection to form.
11       A.   What do you mean by financial
12  evaluations?
13       Q.   Jinping McCormick testified that
14  she put together a number of financial
15  evaluations and marketing evaluations.
16       A.   But what does that mean,
17  evaluations?
18       Q.   Do you have an understanding as
19  to what that means, or no?
20       A.   I'm asking you, so.
21       Q.   Right.  But you're the one being
22  deposed.
23            Do you have an understanding as
24  to whether or not you reviewed any

Page 143

1   financial evaluations for your opioid
2   products during your tenure at Actavis?
3            MS. WELCH:  Objection to form.
4        A.   I'd be happy to review on a
5   document if you -- I don't specifically
6   recognize the -- what Jinping testified to
7   as what marketing or financial evaluation
8   meant.
9        Q.   Okay.  So you don't have an
10  understanding as to what a financial
11  evaluation is?
12            MR. DIAMANTATOS:  Objection to
13       form; mischaracterizes the witness's
14       testimony.
15       A.   That's not what I said.
16       Q.   Do you have an understanding as
17  to what a financial evaluation is?
18            MR. DIAMANTATOS:  Objection;
19       form; asked and answered.
20       A.   If you put one in front of me,
21  I'd be happy to review it.
22       Q.   I'm just asking you, as you sit
23  here today with your many years of
24  experience, as to whether or not you have

Page 144

1   an understanding as to what a financial
2   evaluation is.
3            MR. DIAMANTATOS:  Objection to
4       form.
5            MS. WELCH:  Objection to form.
6            MR. DIAMANTATOS:  Asked and
7       answered; argumentative.
8        A.   Yeah, I do.
9        Q.   Okay.  What's your
10  understanding?
11       A.   But you asked specifically about
12  opioid products, and I'm not aware if we
13  did those or didn't do those.  So if you
14  show me --
15       Q.   That's fine.  Then you can just
16  testify --
17            THE COURT REPORTER:  Only one
18       person can speak at a time.
19  BY MS. BAIG:
20       Q.   My question is do you have an
21  understanding as to what a financial
22  evaluation is, and what is your
23  understanding?
24            MR. DIAMANTATOS:  Objection;

Page 145

1    form; argumentative; asked and
2    answered.
3         A.    Again, a financial evaluation
4    could be some set of potential revenues,
5    costs, some sort of a P&L, some sort of an
6    MPV.  There's all sorts of different
7    models.  They could be product specific.
8    They could be class specific.  They could
9    be region specific.  I don't know what --
10   inputs could be GDP growth.  There's all
11   sorts of things that could go into a
12   financial evaluation.  It could be some
13   sort of a model.  There could be scenarios
14   on it.
15        But I -- you asked me
16   specifically about what Ms. McCormick, and
17   I just asked if you could show me an
18   example, I could comment on it.
19        Q.    Did you review marketing
20   forecasts for pipeline products?
21        MS. WELCH:  Objection to form.
22        A.    Yes.
23        Q.    Did you review sales projections
24   for products, including opioids?

Page 146

1         MS. WELCH:  Objection to form.
2         A.    Yes.
3         Q.    You reviewed annual budget and
4    three-year plan processes?
5         A.    Yes.
6         Q.    Did you have to approve
7    marketing expenses?
8         MS. WELCH:  Objection to form.
9         A.    No.  I mean, certainly to a
10   certain level of authorization.  So
11   certainly we had a delegation of
12   authority.  We had an authorization
13   process.  Certain levels of expenses could
14   be approved depending on your -- your --
15   your authority level, at a director level
16   or at a manager level, at a VP level or at
17   a senior VP level and ultimately to me.
18        So, depending on the amount of
19   the expense, either my team would do them
20   or I would do them.
21        Q.    Are you aware of what marketing
22   tools were used by Actavis to drive sales
23   of its generic drugs, including opioids,
24   while you were at the company?

Page 147

1         MS. WELCH:  Objection to form.
2         A.    What do you mean by marketing
3    tools?
4         Q.    Do you have a general
5    understanding of what a marketing tool is?
6         A.    I'd be happy if you provided
7    some, I could comment if I thought that
8    was a marketing tool or not.
9         I mean, generic drugs generally
10   don't do a lot of marketing.
11        Q.    Actavis did have a generics
12   marketing department; did it not?
13        A.    Yes.
14        Q.    And, did that department have
15   work to do?
16        A.    Yes.
17        Q.    And, what are the marketing
18   mechanisms that the company used to market
19   its generic drugs?
20        MS. WELCH:  Objection to form.
21        A.    Again, the marketing department
22   predominantly did forecasting.  So, the
23   marketing team, as Ms. McCormick led,
24   would look at the marketing information

Page 148

1    provided by third parties such as IMS,
2    look at script datas, and then would look
3    at -- that would help to inform from a
4    trend perspective what the available
5    scripts would be.
6         The marketing team also was
7    involved in prelaunch activities.  So the
8    extent of which when we were putting a
9    product to market, we would have to make
10   certain that it was registered and that we
11   had labeling for it, that we actually
12   participated in trade events, that we
13   sometimes we would put an advertisement,
14   or form of an announcement.  Really not
15   advertisement.  Announcement that products
16   were available.  We had a product catalog
17   that was available in both hard copy and
18   electronic.
19        But the bulk of the marketing
20   team, and I'm using quotes for marketing
21   'cause most of the activity that the
22   marketing activity does in a generic drug,
23   it's not unique to Actavis, is mostly
24   product forecasting and then working very

Page 149

1    closely with supply chain organization to
2    make certain that the supply chain
3    organization knew the forecast, the volume
4    forecast, so they could build accordingly.
5        Q.   But internally, you referred to
6    that team as a marketing team, correct?
7        A.   Me and probably every other
8    generic organization.  Very common
9    nomenclature.
10       Q.   And, with respect to the
11   announcements that you alluded to,
12   internally you referred to them as
13   advertisements, correct?
14       A.   That's not what I said.
15       Q.   I'm asking you.
16       A.   Could you repeat the question,
17   please?
18       Q.   A moment ago you referred to
19   announcements that the marketing
20   department used to announce its drugs.
21   Internally those were referred to as
22   advertisements.
23            Isn't that right?
24            MS. WELCH:  Objection to form.

Page 150

1        A.   The last part about the
2    internally, I mean, so what we would do,
3    again, potentially is we would put a print
4    ad, so therefore an advertisement, to
5    announce a product approval or a product
6    becoming available.  All those materials
7    would also go through a marketing, a
8    regulatory and a legal review consistent
9    with DDMAC.
10       Q.   And, did you have something
11   called sizzle slides?
12       A.   What are sizzle slides?
13       Q.   My question to you is are you
14   aware of sizzle slides?
15       A.   Could you show me one?
16       Q.   I'm just asking you if you have
17   an understanding of what a sizzle slide
18   is, if you ever heard of that term, or if
19   they were used at Actavis.
20            MS. WELCH:  Objection to form.
21            MR. DIAMANTATOS:  Objection to
22   form.
23       A.   Again, if you could show me one,
24   I could comment on it.

Page 151

1            I'm not specifically remembering
2    it.
3        Q.   So you've never heard the term
4    "sizzle slide," that you recall right now?
5            MR. DIAMANTATOS:  Objection to
6    form; mischaracterizes the witness's
7    testimony.
8        A.   In the context of what?  What;s
9    a sizzle --
10       Q.   Marketing drugs.
11           MR. DIAMANTATOS:  Same
12   objection.
13       A.   I'd be happy to respond or
14   comment if you show me something.
15       Q.   My only question to you right
16   now is have you heard that term "sizzle
17   slide"?
18           MS. WELCH:  Objection to form.
19           MR. DIAMANTATOS:  Asked and
20   answered.
21       A.   From whom?
22       Q.   From anyone.
23       A.   You'd have to show it to me so I
24   could comment on it.

Page 152

1        Q.   So you don't remember?
2            The answer is -- it's a
3    yes-or-no question.
4            Do you recall hearing that term
5    before or not?
6            MR. DIAMANTATOS:  Objection to
7    form in instructing the witness how to
8    answer the question.
9        A.   No.
10       Q.   Do you recall that one of the
11   marketing tools used at Actavis to market
12   generic drugs was email blasts to
13   pharmacists?
14           MS. WELCH:  Objection to form.
15       A.   Yes.
16       Q.   Do you recall that one of the
17   marketing tools used by Actavis to promote
18   its generic drugs was targeting certain
19   magazines for advertisements?
20           MS. WELCH:  Objection to form.
21           MR. DIAMANTATOS:  Assumes facts.
22       A.   Can you repeat that question,
23   please?
24           MS. BAIG:  Could you read it

Page 153

1    back, please?
2         (The requested portion of the
3    record was read by the Court Reporter.)
4         A.   Yes.
5         Q.   And, what magazines do you
6    recall were targeted for advertisements?
7              MS. WELCH:  Objection to form.
8         A.   It would be like industry
9    publications, U.S. Pharmacist, Chain Drug
10   News.
11             Again, I mean, targeting, we
12   weren't targeting.  We would write a check
13   and place an ad.  So I don't know if
14   that's really targeting.
15             But we would pick the ones we
16   thought would had the greatest reach to
17   the intended customer audience.
18   Potentially pharmacists.  Not doctors, by
19   the way, pharmacists.
20        Q.   And, was it the generics
21   marketing division that was responsible
22   for that?
23        A.   For what?
24        Q.   For placing ads in magazines.

Page 154

1         A.   Yes.
2         Q.   Do you recall the generics
3    marketing division using telephone
4    campaigns to market drugs?
5              MS. WELCH:  Objection to form.
6         A.   Telephone campaigns to market
7    drugs, what does that mean?
8         Q.   I'm just asking if you have an
9    understanding of what that is or whether
10   it was used.
11             MS. WELCH:  Objection to form.
12        A.   No.
13        Q.   You don't recall there being
14   telephone campaigns of any sort?
15        A.   Again, if you could provide me
16   something to review.
17             I don't specifically recall
18   right now.
19        Q.   Do you recall that there were
20   direct mailers that were sent out --
21        A.   Yes.
22        Q.   -- to pharmacists?
23        A.   Yes.
24        Q.   Were direct mailers sent out to

Page 155

1    others?
2              MS. WELCH:  Objection to form.
3         A.   No.
4         Q.   Do you recall --
5         A.   Not that I'm aware of.
6         Q.   Do you recall that there were
7    fax blasts that were used to promote the
8    generic drugs?
9              MR. DIAMANTATOS:  Objection to
10   form.
11        A.   I believe fax blasts were sent
12   to wholesalers or distributors, yes.
13        Q.   Do you recall there being coupon
14   programs that were used to market generic
15   drugs?
16             MS. WELCH:  Objection to form.
17        A.   No.
18        Q.   Do you recall working with any
19   third parties to market your generic
20   drugs?
21             MS. WELCH:  Objection to form.
22        A.   Yes.
23        Q.   Who do you recall working with
24   to market generic drugs, including

Page 156

1    opioids?
2              MS. WELCH:  Objection to form.
3         A.   I don't specifically recall
4    anybody.
5              If you provide me, I can comment
6    on them.  But I know we used third
7    parties.
8         Q.   You don't recall any third party
9    that you might have used to market drugs?
10        A.   Correct.
11        Q.   And, do you recall any sort of
12   telemarketing of generic drugs?
13             MS. WELCH:  Objection to form.
14        A.   No.
15        Q.   Do you recall a company called
16   Media Media?
17        A.   Media Media?
18        Q.   Mm-hm.
19        A.   No.
20             MS. BAIG:  We'll have this
21   document marked as Exhibit 14, please.
22             (Boothe Exhibit 8, email dated
23   January 27, 2009, with attachment,
24   Bates No. ALLERGAN_MDL_01100742 to

Page 157

1    01100752, was marked for
2    identification, as of this date.)
3        MR. DIAMANTATOS:  You said
4    Exhibit 14?
5        MS. BAIG:  Sorry.  Exhibit 8.
6        And it is Bates stamped
7    ALLERGAN_MDL_01100742 through '752.
8    It starts as an email from Irene Katz
9    at Media Media.
10       THE WITNESS:  Medimedia.
11       MS. BAIG:  Sorry.  Medimedia.
12   BY MS. BAIG:
13       Q.   Do you recall Medimedia?
14       A.   No.
15       Q.   Dated January 27th, 2009.
16       And you'll see there's a
17   reference in the first paragraph to a
18   Kadian coupon artwork.
19       A.   Yes.
20       Q.   Are you familiar with the use of
21   a Kadian coupon?
22       A.   Yes.
23       Q.   And, what was that?
24       A.   This is a co-pay coupon for

Page 158

1    branded Kadian, not generic.
2        All those last questions were
3    all about generic.
4        Q.   And, so, what do you recall
5    about using the $50 coupon to promote
6    Kadian?
7        MR. DIAMANTATOS:  Objection to
8    form.
9        A.   What was the question, please?
10       Q.   What do you recall about using
11   the $50 coupon to promote Kadian?
12       MS. WELCH:  Objection to form.
13       A.   The coupon was actually a --
14   it's not a rebate.  It was a discount
15   for -- for someone filling a prescription.
16   So I don't know if it counts as marketing
17   Kadian.  It was consistent with other
18   people in the space practices that they
19   were doing to have a patient assistance
20   program or a co-pay card.
21       It's also not unique to opioids.
22   It's pretty common activity or tactic for
23   branded pharmaceuticals to offer some sort
24   of patient assistance or discount program

Page 159

1    for their prescriptions.
2        Q.   And Natalie Leitch oversaw this
3    program?
4        A.   Nathalie was, again, the
5    marketing director for Kadian.  So yes.
6        Q.   And the Kadian -- in the first
7    line of the first page it states:  We have
8    updated the Kadian coupon artwork to
9    reflect the new phone number at the help
10   desk.
11       A.   Yes.
12       Q.   Was it that the Kadian coupon
13   would direct people to call a phone number
14   in the event they needed help?
15       A.   Yes.
16       Q.   And, who would staff the help
17   desk?
18       A.   I don't know if -- I don't
19   believe it was -- I think this
20   Medimedia -- it was a third party, more
21   than likely.
22       Q.   So it would have been employees
23   at Medimedia that would staff the help
24   desk?

Page 160

1        MS. WELCH:  Objection;
2    foundation.
3        MR. DIAMANTATOS:  Objection;
4    foundation.
5        A.   Not necessarily.  Medimedia may
6    have been the, you know, the front end
7    that created the artwork.  I'm not certain
8    if they had a telephone desk.  Or, I don't
9    believe it was an Actavis employee who was
10   there.  It would have been part of the
11   support for this specific co-pay card
12   program.
13       Q.   So you don't know what
14   organization would have staffed the help
15   desk that was answering calls in response
16   to the Kadian coupon?
17       A.   I don't specifically recall.
18       Q.   And, what was the purpose of
19   offering a $50 coupon for Kadian?
20       MS. WELCH:  Objection to form.
21       A.   I think I mentioned before it
22   was a discount to folks from a patient
23   assistance or a co-pay assistance to
24   reduce their out-of-pocket costs

Page 161

1    potentially on the prescription.
2         Q.   And, what was the company's
3    purpose in offering that?
4         A.   To be in line with the other
5    promoted pain medications.  The
6    competition, my understanding at the time,
7    was also were offering coupons or patient
8    assistance cards.
9         And, again, as I've said
10   previously, this was a very familiar
11   tactic across brand companies as -- as a
12   way to counterbalance the formulary tiers
13   that PBMs and others had put in place for
14   branded products.  Still goes on today.
15        Q.   So you were trying to keep up
16   with the competitors.
17        Is that right?
18        MR. DIAMANTATOS:  Objection to
19   form.
20        A.   We were trying to maintain a
21   viable offering in light of the
22   competition.
23        Q.   And for this particular coupon,
24   if you look at pages 50 and -- well,

Page 162

1    they're all page 50.  I guess if you
2    scroll through a little bit, you can see
3    the coupons themselves.
4         Do you see it?
5         A.   Which is the coupon?
6         Q.   Well, I'm assuming it's this one
7    (indicating).
8         A.   This thing (indicating)?
9         That looks like a piece of
10   artwork of like a box or something.
11        Q.   You see at the top it says
12   "Kadian co-pay assistance program"?
13        A.   Yes.
14        Q.   And then it says "Save up to $50
15   toward each prescription of Kadian"?
16        A.   Yes.
17        Q.   And then it goes on to state
18   that it's good for up to $600 for 12
19   months.
20        Is that right?
21        A.   That's what it says, yes.
22        Q.   So, an individual could use this
23   coupon for a refill of twelve months.
24        Is that right?

Page 163

1         MS. WELCH:  Objection to form.
2         A.   Again, there -- well, again, I
3    don't know if it's one card or multiple
4    cards.  There could be, you know, like
5    a -- like a prepaid phone card.  I don't
6    know if it's one or twelve.
7         And, again, you don't get your
8    refills on controlled substances.
9    Every -- every prescription is a new one.
10   So a patient has to go to the physician to
11   get -- to get a new prescription.  There's
12   no refills on controlled substances, is my
13   understanding.  Especially on Class II
14   narcotics, which is what Kadian was.
15        Q.   But one patient could use this
16   coupon, or a series of coupons, for a
17   twelve-month period.
18        Isn't that right?
19        MS. WELCH:  Objection to form.
20        A.   Subject to having a valid
21   prescription, or prescriptions, multiple
22   prescriptions.
23        Q.   Understood.
24        It says "Good for up to $600 for

Page 164

1    12 months."
2         Do you see that?
3         A.   Yes.
4         Q.   Was one of the purposes of
5    offering the coupon for six -- sorry.
6         MS. BAIG:  Strike that.
7         Q.   Was one of the purposes for
8    offering a coupon for twelve months to
9    encourage the long-term use of Kadian?
10        MS. WELCH:  Objection to form.
11        A.   No.
12        Q.   It wasn't to encourage twelve
13   month use, which is what the coupon is
14   offered for?
15        MS. WELCH:  Objection to form;
16   misstates the document.
17        A.   No.
18        Q.   As part of its marketing, did
19   Actavis target high prescribers of certain
20   of its drugs?
21        MS. WELCH:  Objection to form.
22        MR. DIAMANTATOS:  Objection to
23   form.
24        A.   I wouldn't call it part of its

Page 165

1    marketing.  As part of our sales
2    targeting, which again is common for all
3    pharmaceutical companies, you look at who
4    are prescribing, and not just Kadian, but
5    who are prescribing drugs in that class.
6    This is in the pain class.  And that's
7    essentially where you would target your
8    sales representatives to call on on a more
9    frequent basis.  Although, depending on
10   the size of your sales organization, you
11   could call on all physicians, you could
12   call on a target subset of physicians, you
13   can target on specialty physicians.  That
14   is, again, a very -- that is the common
15   practice in the space.
16       Q.   Including in the opioid space,
17   correct?
18       MS. WELCH:  Objection to form.
19       A.   It's the common practice in all
20   the pharmaceutical space, all different
21   therapeutic areas, all different class,
22   specialty sales forces or primary care
23   forces are always -- the practice has been
24   you align your sales force with the

Page 166

1    physician practices that have the most
2    patients and, therefore, the most
3    prescriptions, potential available
4    prescriptions.
5        Q.   And, so, how did Actavis go
6    about targeting high prescribers?
7        MS. WELCH:  Objection to form.
8        MR. DIAMANTATOS:  Assumes facts.
9        A.   Again, Actavis would get the
10   third party data coming from a Wolters
11   Kluwer or IMS.  They sell those services
12   to all pharmaceutical companies and with
13   that do the same thing that all other
14   pharmaceutical companies do is you stack
15   rank them.  You create what's called
16   deciles, which is in blocks of ten, and
17   subject to the size of your sales force
18   and the geographic dis -- you know,
19   whatever, sped and how many folks you had
20   and the logistics of how many people
21   you're putting in the field would
22   determine how often you can make certain
23   calls.  Frequent -- it's called reaching
24   frequency.

Page 167

1        Again, it's what every branded
2    pharmaceutical company does, not just in
3    pain, but also in cardiovascular, in all
4    the conditions.
5        Q.   And, in order to do that,
6    Actavis would use the Wolters Kluwer data,
7    the IMS data, any other data you can think
8    of?
9        A.   No.  There's probably others,
10   but those are the two that I'm most
11   familiar with.
12       MS. BAIG:  Let's have this
13   document marked as Exhibit 9.  It's
14   Bates stamped ALLERGAN_MDL_01058383
15   through 58385.
16       (Boothe Exhibit 9, email chain
17   ending March 10, 2009, Bates No.
18   ALLERGAN_MDL_01058383 to 01058385, was
19   marked for identification, as of this
20   date.)
21       MS. BAIG:  It starts as an email
22   from you to Terrence Fullem and Kevin
23   Bain.
24       THE WITNESS:  Okay.  Yeah.

Page 168

1    BY MS. BAIG:
2        Q.   All right.  And, you see in the
3    second paragraph you're proposing some
4    sort of initial communication piece to all
5    (or at least the high decile physicians)
6    with a reminder about Kadian and to keep
7    to the brand messages, widest range of
8    dosing options, and PK profile (check the
9    marketing materials.)
10       A.   Where is this?
11       Q.   Second paragraph.
12       A.   Okay.  Thank you.
13       Me.  Okay.  Yeah.
14       Q.   Does this refresh your
15   recollection that Actavis was
16   communicating with high decile physicians?
17       A.   Well, again, this time frame in
18   March of 2009, I was proposing or
19   suggesting.  I'm not -- I don't believe we
20   had our sales -- contract sales force in
21   place.  And the context for these notes
22   were we had acquired the asset at the end
23   of 2008.  We had no -- we had no field
24   support.  Alpharma had pulled everything.

Page 169

1    We got none of that.  And essentially what
2    if we were seeing was our scripts were going
3    down in the space, and we were hearing
4    that basically of the other suppliers or
5    provides in the marketplace, including
6    Alpharma and King or Endo or whatever,
7    were basically saying the product had been
8    discontinued.  So we -- the belief was we
9    probably need to get some sort of message
10   out there that the product was still
11   available.
12      Q.   The message going to physicians,
13   correct?
14      A.   In this instance, potentially to
15   a targeted number of physicians.  This,
16   again, this is just a proposal.  This is
17   not a actual activity.  We did put
18   activities in place.  This is just sort
19   of, I guess, the beginning of that
20   discussion.
21      Q.   And you don't recall whether
22   this was implemented or not?
23      A.   Again, there's nothing to
24   implement here.  It just says I would

Page 170

1    propose some sort of communication.
2       If we went and put a
3    communication piece out at some point down
4    the road, it would have gone through an
5    internal review.  It would have gone
6    through -- would have been provided to
7    DDMAC.  We would have had the activities
8    and I think we -- I know we ended up doing
9    that.  I don't know if the message that
10   went out had anything to do with high
11   decile physicians or if it talked about
12   brand messaging or whatever.  This was,
13   again, very -- the initiation of
14   activities to start putting together a
15   direct promotion capability, which we did
16   not have at the time at Actavis.
17      Q.   But anything that had -- that
18   went out to high decile physicians or any
19   physicians would have gone to DDMAC for
20   review first?
21      A.   Again, the -- the process -- any
22   communication to a physician would have to
23   be on label and would have to be through a
24   regulatory review, a legal review

Page 171

1    potentially, some sort of internal review,
2    and then it would go -- it would be
3    submitted to DDMAC, which is the FDA group
4    that any sort of deemed promotional
5    material you would send to in the normal
6    course of business.  So yes.
7       Q.   And, do you see the next
8    sentence you state:  For sake of time, we
9    should not try to create any new copy as
10   that will require internal and DDMAC
11   review.
12       Do you see that?
13      A.   Yes.
14      Q.   So, were you using materials
15   that had come from Alpharma?
16      A.   Again, in this specific email,
17   this is just a proposal.  So I -- at some
18   point, I believe we did utilize or
19   repurpose the materials that Alpharma had
20   used in the past.  We -- we got that as
21   part of the -- the material with no
22   information about them and then we -- we
23   may or may not have used some of that
24   material that Alpharma had been using in

Page 172

1    the past.  I don't know if they used it
2    for years.
3       And, again, but even that, and
4    like the thing you had before where you
5    see the Alpharma -- or, Actavis is put on
6    it.  Any time you make any adjustment to a
7    piece of material, you do submit it to
8    DDMAC.  So we wouldn't have just send
9    stuff -- well, I don't know to speak for
10   that.
11       But, yes, we would do -- any
12   time you do something new, of course it
13   requires more iteration.  So if you took
14   something that existed before that had
15   been in the field for quite some time, my
16   belief would have been it would be much
17   more -- it would have been faster to
18   implement.  That doesn't mean that's what
19   we did.  So, this is just an email about
20   ideas.
21      Q.   So you don't recall whether it
22   was implemented or not?
23      MS. WELCH:  Objection to form.
24      A.   I believe we did something.  I'm

1    not certain what we did was what I had
2    proposed in this.
3         Again, by the way, it wasn't --
4    at the end of the day, it wasn't really my
5    decision.  It would be Terry's and the
6    brand team to come up with the best
7    recommendation for how to message to the
8    physician community.
9         Q.   Sure.
10        But Terry reports to you.  So
11   ultimately you have to approve it.
12        Isn't that right?
13        MS. WELCH:  Objection to form.
14        A.   I wouldn't necessarily have to
15   approve a letter to physicians.
16        Again, and, by the way, I'm not
17   the reviewer on that.  Again, it would be
18   our PRC or whatever you'd call it,
19   promotional review committee.  There's
20   different acronyms for it.
21        Actually, I would not be
22   reviewing and improving.  I might be
23   signing off on the invoice subject to the
24   expense level, but the content, I'm not a

1    subject matter expert.  We have people in
2    regulatory and the marketing teams and
3    third parties and legal who actually are
4    the subject matter experts and they're the
5    ones who determine what does or doesn't
6    get presented to -- to, in this instance
7    on brand products, to physicians.
8         None of our generic stuff goes
9    to physicians.  It's targeted more to
10   the -- the channel, the wholesalers or
11   pharmacists to be aware that our product
12   is available.  They should ask for it.
13        Q.   And, so, it goes on to state:  I
14   believe there are approximately 20,000 key
15   prescribers.  So if you figure 10 to $20
16   per item, it should be under 500,000.
17        Correct?
18        A.   That's what it says.
19        Q.   And, how would a prescriber
20   be -- which prescribers are key
21   prescribers?
22        A.   It could potentially be
23   practices that prescribe a lot of pain
24   medications or it could be practices that

1    have prescribed historically a lot of
2    Kadian, which again go back to the third
3    party data from Wolters Kluwer or from
4    IMS.
5         And, you know, again, in this
6    document, I am providing my perspective,
7    but it's not fact-based, I mean.
8         Q.   And the purpose of that was to
9    increase scripts, correct?
10        A.   The purpose, based on these
11   emails, is we were not -- we were seeing a
12   decline in our -- in our Kadian scripts
13   from the time we had acquired the asset
14   because we did not -- we had no share of
15   voice.  We had no participation in -- in
16   the market.  So, the other folks who were
17   also in the same space were telling
18   physicians, telling wholesalers that our
19   product was discontinued, it was no longer
20   available.  So, we -- we believed it made
21   sense to find some way to remind, to
22   announce, to let physicians know that our
23   product was still available, that Kadian,
24   which, by the way, served a, you know, an

1    FDA-approved medication, sort of a
2    specific medical need and a product that
3    had been prescribed quite often for quite
4    a long time.
5         Q.   And the purpose was to increase
6    the number of scripts, correct?
7         A.   The purpose here, again in
8    March -- in March of 2009, was to try to
9    slow down the rate at which the scripts
10   for Kadian were declining.  We had full
11   expectation that the scripts for Kadian
12   were going to decline over time.  We had
13   no sales organization.  Alpharma had a
14   sales organization of maybe 400 people who
15   were out there actively detailing this
16   product of their class of products.  Our
17   understanding was Endo had about 600 sales
18   representatives.  And, as you're
19   well-aware, we ended up putting a small
20   contract sales organization of about 18,
21   initially 18 sales representative in the
22   field.  So 18 against 400 or 600.  We had
23   no aspirations that we were going to
24   increase the scripts.  We were trying to

Page 177

1  slow down the rate in which prescriptions
2  stopped.  And, in fact, we had third
3  parties who had come and provided us
4  presentations that potentially had all
5  sorts of different curves for if we did no
6  promotion or certain levels of promotion,
7  what would it -- what it might mean for
8  scripts for this product.
9       Q.   And, do you see the next
10  sentence states:  On a strategic front, I
11  would propose that we find a detail
12  partner for a number two slot with script
13  gain incentive program?
14       A.   Yes.
15       Q.   And, so, who was the detail
16  partner, if anyone, that you used for --
17  for this script gain incentive program?
18       A.   We didn't.
19       Q.   You recall that you didn't find
20  anybody?
21       A.   No.  Again, I -- again, this
22  whole email that I wrote to Terry and to
23  Kevin was basically some ideas as to maybe
24  things we should look at to try to slow

Page 178

1  down the rate at which the Kadian
2  prescriptions were declining.
3       Q.   Did you find a partner to do
4  that?
5       A.   You didn't let me finish my
6  answer.
7       Q.   Go ahead.
8       A.   We opted to -- to not do that.
9  We -- you know, and the idea of a second
10  slot is you find someone who's out in the
11  space and you basically offer them the
12  ability to detail your product and you pay
13  them some sort of commission or some sort
14  of incentive.  We did not go down that
15  path.  So, again, these are ideas that
16  were being floated.
17       We decided, as I mentioned, we
18  decided to engage in 18 -- a third party
19  called inVentiv, and we engaged initially
20  with 18 sales representatives who would be
21  dedicated exclusively on Kadian.
22       Q.   So inVentiv was the detail
23  partner?
24       A.   Again, in this email, what I

Page 179

1  meant by detail partner, that would have
2  been another branded pharmaceutical
3  company.
4       Q.   I see.
5       A.   We opted not to partner.
6       We opted to basically contract
7  for our own.  And that's what CSO stands
8  for is contract sales organization.
9  InVentiv was a contract sales
10  organization.
11       Q.   I see.
12       A.   After the work we had done in
13  the analysis, we decided that that was a
14  better path forward.
15       Q.   If you move a little further
16  down in the email from Terrence Fullem to
17  you and Kevin Bain.
18       A.   Yep.
19       Q.   Halfway through the first
20  paragraph he states:  There are various
21  telemarketing outfits available and one of
22  the points we will have to make a judgment
23  call on is whether we want physician based
24  telemarketing such as Triple i provides or

Page 180

1  really good sales type telemarketers.
2       Do you see that?
3       A.   Yeah.  Yes.
4       Q.   Does this refresh your
5  recollection that telemarketing was at
6  least considered?
7       MS. WELCH:  Objection to form.
8       A.   I believe the earlier questions
9  you were asking about telemarketing
10  related to generic products.  This is not
11  a generic.  This is a brand item.
12       So yes, telemarketing was -- is
13  one of the multiple techniques that
14  branded pharmaceutical companies do.  And
15  the reason you do telemarketing, as I
16  described with the deciling is, at some
17  point, your sales force can only
18  effectively call on a certain number of
19  doctors and your sales force is more
20  expensive and you basically use a
21  telemarketing to potentially cover
22  additional doctors.  It's less effective.
23  It's -- and basically you're sort of
24  balancing the investment in promotion with

1    the potential benefit from the customer,
2    from the physicians.
3            MS. BAIG:  We'll have this
4    document marked as Exhibit 10.  It's
5    Bates stamped ALLERGAN_MDL_01725566
6    through 5569.  It's from you to
7    Natalie Leitch, Kevin Bain and
8    Terrence Fullem and others dated March
9    11th, 2009.
10           (Boothe Exhibit 10, email dated
11   March 11, 2009, Bates No.
12   ALLERGAN_MDL_01725566 to 01725569, was
13   marked for identification, as of this
14   date.)
15           THE WITNESS:  Okay.
16   BY MS. BAIG:
17   Q.   It appears to be an email string
18   addressing the $50 co-pay coupon that we
19   already discussed.
20           Correct?
21   A.   Yes.
22   Q.   And, in the first line it
23   references a mass distribution to up to
24   9,000 physicians.

1            Do you see that?
2    A.   Yes.
3    Q.   And those would be the 9,000
4    physicians that were targeted high decile
5    physicians from the Wolters Kluwer or IMS
6    data that we discussed?
7            MS. WELCH:  Objection to form.
8            MR. DIAMANTATOS:  Foundation.
9    A.   That's not how I read it.
10   Q.   How do you read it?
11   A.   Again, my email says:  My only
12   reservation is with the number up to 9,000
13   and 250,000 cards.
14           The next thing it says:  The
15   physician segmentation at less than 4,000
16   physicians generates 70 percent of the
17   scripts.
18           So, for my comment before about
19   deciling, I am suggesting that this
20   program is bigger than it needs to be.
21   Doesn't need to be 9,000 physicians, based
22   on the deciling, and then there's more to
23   it.
24   Q.   Because the 4,000 physicians are

1    generating 70 percent of the scripts, a
2    lot of the scripts, right?
3    A.   Yes.  And it -- I went on and
4    based on whatever data someone had shared
5    with me or 50 -- half scripts were
6    under 2,000 physicians.
7            So, looking at the cost benefit
8    potentially, this program could be even
9    2,000 prescription -- physicians.  It
10   could be 1,000 physicians.  It could be 20
11   physicians.  It really depends on
12   potentially what the --
13   Q.   How many scripts they're
14   writing?
15   A.   Potentially.
16   Q.   If you look at the second page.
17   A.   Yep.
18   Q.   It talks about the Triple i
19   agreement, and under "Overview" it
20   discusses objectives in the first bullet.
21           Do you see that?
22   A.   Yes.
23   Q.   And it states as an objective:
24   To increase new therapy starts and script

1    volume.
2            Do you see that?
3    A.   Yes.
4    Q.   And to increase average length
5    of therapy persistence.
6            Do you see that?
7    A.   Yes.
8    Q.   Does this refresh your
9    recollection that one of the purposes of
10   the coupon program was to increase the
11   duration, the average length of therapy
12   persistence?
13   A.   No.
14   Q.   Why not?
15   A.   Well, again, you're -- you're
16   reading me back the proposal from third
17   party Triple i.  That doesn't mean we did
18   this or we used it.
19   Q.   This email is from Natalie
20   Leitch, correct?
21   A.   Yes.
22   Q.   So this is her understanding of
23   what the objectives were.
24           Is that right?

Page 185

1    A.   She could have cut and pasted
2  that from a Triple i presentation.  I
3  don't know for certain.
4    Q.   So, do you think Triple i's
5  objectives in issuing the coupon that you
6  hired it to issue were different from your
7  objectives?
8        MS. WELCH:  Objection to form.
9  BY MS. BAIG:
10   Q.   From Actavis's objectives?
11       MS. WELCH:  Same objection.
12   A.   Again, I'm not certain at the
13  time this email is written if we
14  actually -- I don't think we had a coupon
15  program.  I think this is related to
16  experience that Triple i had shared with
17  us when they were doing the co-pay program
18  for Alpharma, or maybe with Dendrite was
19  another sort of.
20   Q.   Okay.  Well, we see in the first
21  sentence:  The Triple i agreement is
22  undergoing one last internal review.
23       Is it your understanding that
24  that is a Triple i agreement with Actavis?

Page 186

1    A.   Yes.
2    Q.   And then where she goes on to
3  state objectives and then after that she
4  states: 9,000 physicians targeted.
5        Do you see that?
6    A.   That's what she wrote.
7        And, like I said, on the first
8  page, I didn't think that was the right
9  number.  So this isn't the final -- this
10  isn't the final agreement or the final
11  document.
12   Q.   And it goes on to state that:
13  Each physician in the targeted file will
14  receive call from a customer service rep
15  at Triple i to communicate acquisition of
16  Kadian by Actavis and launch of new card
17  program.
18       Do you see that?
19   A.   Yes.
20   Q.   And the new card program, is
21  that the $50 coupon program for twelve
22  months?
23   A.   I believe so, but I'm not
24  certain.

Page 187

1    Q.   And it states:  Calls were
2  initiated today.
3        Do you see that?
4    A.   Yes.
5    Q.   Does that suggest to you that it
6  was underway at this time?
7    A.   Yes.
8    Q.   And it goes on to state that:
9  43,000 pharmacies would receive an email
10  introducing the new program.
11       Correct?
12   A.   Yes.
13   Q.   And the emails would be sent
14  March 16th, 2009, which is two days after
15  this email.
16       Correct?
17   A.   Five days after the email, but
18  yes.  March 11th is the email.
19   Q.   Thank you.
20       It goes on to state that:
21  270,000 cards to be distributed to
22  physicians' offices in three separate
23  mailings.
24       Do you see that?

Page 188

1    A.   Again, this is what it says.
2  I'm not certain this is what we did
3  'cause, as I note on the earlier chart, I
4  didn't agree, or I had some reservation,
5  as I said, with the number of physicians
6  and the number of cards.  We may have done
7  a much smaller program.  We may have done
8  a bigger program.  I don't know exactly
9  what we ended up doing.
10   Q.   Sure.
11       It says in the first sentence
12  that this is one last internal review.
13       Right?
14   A.   That's what the email says.
15  That doesn't mean that there weren't more
16  internal reviews after the, quote, one
17  last internal review.
18       And, look at the bullet point,
19  it says cards can be used up to twice per
20  month and max at 12 uses.  I don't think
21  that's the program that we put in place
22  because it was once per month is what --
23  or, one new prescription.
24       So, again, there were definitely

Page 189

```
 1    changes to what was ultimately put in
 2    place which is what this email is
 3    suggesting.  It could have been the
 4    number; it could have been the amount; it
 5    could have been the duration.  It could
 6    have been all those things.
 7        Q.   Do you recall what the changes
 8    were?
 9        A.   No.
10        Q.   The next bullet says:  Patients
11    can also request a card directly from
12    Triple i by calling their customer service
13    line or by completing/submitting a
14    registration form available on the Kadian
15    website.
16           Do you see that?
17        A.   Yes.
18        Q.   And then there's a note about
19    cards being able to be used up to two
20    times per month up to a max of twelve uses
21    and that the cards expire December 31st,
22    2009.
23           Correct?
24        A.   Yes.
```

Page 190

```
 1        Q.   And the Triple i total program
 2    expenses estimated cost was 2.5 million?
 3        A.   Yes.  Based on that proposal.  I
 4    don't believe that that's what we ended up
 5    doing.
 6        Q.   But you don't recall how it
 7    changed, correct?
 8        A.   No.
 9        Q.   If at all.
10           (Pause.)
11           MS. WELCH:  Aelish?
12           MS. BAIG:  Aelish (different
13    pronunciation).
14           MS. WELCH:  Aelish.  Sorry.
15           Maybe ten more minutes and then
16    a lunch break?
17           MS. BAIG:  Sure.  Whenever you
18    like lunch is fine.  We can go now, if
19    you want.
20           THE WITNESS:  No, I'm okay.
21           MS. BAIG:  Okay.
22           So, this document is marked as
23    Exhibit 11.  It's Bates stamped
24    ACTAVIS965151 through '513, from
```

Page 191

```
 1    Natalie Leitch, starts from Natalie
 2    Leitch to Jennifer Altier.
 3       (Boothe Exhibit 11, email chain
 4       ending August 26, 2011, Bates No.
 5       ACTAVIS0965151 to 0965154, was marked
 6       for identification, as of this date.)
 7    BY MS. BAIG:
 8        Q.   It appears to be discussing
 9    generic MS writers.
10           Do you see that?
11        A.   MS writers?
12        Q.   I'm looking at the second page,
13    second paragraph:  Our focus once again is
14    on the high volume generic MS writers.  We
15    now --
16        A.   Where is this?
17        Q.   Second paragraph, second page:
18    We now need to understand the MC coverage
19    in these new territories to make certain
20    Kadian is not disadvantaged.  The goal is
21    to have folks in the field, assuming we
22    don't uncover problems relating to MC
23    before the end of September.
24        A.   Okay.
```

Page 192

```
 1        Q.   What's your understanding of
 2    what's meant here by generic MS writers?
 3           What is MS?
 4           MR. DIAMANTATOS:  Objection to
 5    form; foundation.
 6        A.   I'd be guessing.  I don't know.
 7        Q.   You don't have any understanding
 8    what MS is?
 9           MS. WELCH:  Objection to form.
10    BY MS. BAIG:
11        Q.   In this context?
12           MR. DIAMANTATOS:  And
13    foundation.
14        A.   I thought it would be multiple
15    sclerosis, but I don't think that's it.
16    So no.
17        Q.   In the next paragraph it says:
18    We are pushing hard on the MC front.
19           Do you know what that is?
20           MR. DIAMANTATOS:  Objection to
21    form; foundation.
22        A.   I would take that as managed
23    care.
24        Q.   And a little further down it's
```

1  an email from you to Natalie Leitch noting
2  that you're losing momentum with respect
3  to Kadian.
4      Is that right?
5      A.  That's what the email says:  We
6  are losing -- we are certainly losing our
7  momentum here.
8      Q.  And you're talking about Kadian
9  sales?
10     A.  Doesn't explicitly say that.
11 Again, yeah, so I don't know.  More than
12 likely, but I don't know.
13     Q.  Do you recall there being a loss
14 in momentum in Kadian sales at around this
15 time?
16     A.  You'd have to show me some
17 documents.
18     I don't specifically recall.
19     Q.  Do you see at the bottom of the
20 first page in the email from Natalie
21 Leitch to you it states:  Here's rundown
22 of where we're at and what's planned.  The
23 team's objective coming out of the NSM was
24 to maintain target - does TRX mean

1  prescriptions?
2      A.  TRX I believe means total
3  prescriptions, yes.
4      Q.  Target total prescriptions at
5  the post Embeda recall level.  This meant
6  targets needed to write an average of
7  1,306 Kadian prescriptions per day for the
8  four months ending August.  So far the
9  team has managed to do this but only just.
10 They're trending at 1,301 per day.
11     Do you see that?
12     A.  Yes.
13     Q.  Okay.  And, so, was this a
14 target of 1,306 Kadian prescriptions per
15 day?  What was this target?
16     MR. DIAMANTATOS:  Objection to
17 form; foundation; assumes facts.
18     A.  I'm just reading the same thing
19 you're reading.
20     I'm not -- I'm not sure.  You'd
21 have it ask Nathalie, I guess.
22     Q.  You have no understanding of
23 what she meant by this?
24     MR. DIAMANTATOS:  Objection.

1      MS. WELCH:  Objection to form.
2      MR. DIAMANTATOS:  Asked and
3  answered.
4  BY MS. BAIG:
5      Q.  As you read it?
6      A.  No.
7      Q.  Do you have any understanding of
8  who the targets were?
9      MR. DIAMANTATOS:  Objection to
10 form.
11     A.  Not specifically, no.
12     Q.  But they would have been
13 prescribers, correct?
14     A.  The sales force would be calling
15 on physicians.  Yes, it be would
16 potential -- potential prescribers.
17     Q.  And, so, the hope was that each
18 potential prescriber would write an
19 average of 1,306 Kadian prescriptions per
20 day?
21     MR. DIAMANTATOS:  Objection.
22     MS. WELCH:  Objection;
23 foundation.
24     MR. DIAMANTATOS:  Assumes facts.

1      A.  I'm not sure.  That could be
2  all, the total pool.  I'm not sure it's an
3  individual or all the --
4      Q.  The pool, yes.  The pool of
5  targets.
6      Well, I don't know.  Do you
7  know?
8      MR. DIAMANTATOS:  Same
9  objections.
10     A.  I don't know either, no.
11     Q.  Okay.  Seems like a pretty high
12 target for an individual prescriber.
13     Wouldn't you agree?
14     MR. DIAMANTATOS:  Objection to
15 form; argumentative.
16     MS. WELCH:  Objection to form;
17 foundation.
18     A.  I have no basis for that.
19     Q.  1,306 prescriptions per day?
20     MS. WELCH:  Same objections.
21 BY MS. BAIG:
22     Q.  Would you agree that that would
23 be awfully high for an individual
24 prescriber?

1    MR. DIAMANTATOS:  Same
2  objections.
3    MS. WELCH:  Objection to form;
4  foundation.
5    A.   I have no basis to say one way
6  or the other.
7    Q.   Whether 1,306 Kadian
8  prescriptions per day would be awfully
9  high for an individual prescriber?
10    MS. WELCH:  Objection to form;
11  foundation.
12    MR. DIAMANTATOS:  Asked and
13  answered; argumentative.
14  BY MS. BAIG:
15    Q.   You don't know?
16    A.   No, don't know.
17    Q.   Do you see on the -- at the top
18  of the second page it states:  We added
19  new high volume generic MS writers to each
20  of the territories at the end of July.
21  The response from these writers to our
22  message has been positive so far.  We're
23  looking to this segment to drive growth
24  over the coming months.

1    Do you see that?
2    A.   Yes.
3    Q.   And then a little further down
4  there's a question from you:  What can we
5  do to reestablish our script level over
6  26,000 per week?
7    A.   Yes.
8    Q.   And that was Kadian scripts?
9    A.   It's not clear, but I think
10  that's a yes.  But it could be Kadian and,
11  by the way, generic Kadian.  I believe in
12  the August of 2011 time frame, there was
13  generic Kadian and our authorized generic.
14  So it's potential or probable it was both
15  combined, both branded Kadian and the
16  generic Kadian if, at that time, the
17  generic Kadian was available.
18    Q.   Okay.  And a little further down
19  you write:  Have we scratched any ideas
20  around speakers forums?
21    Do you see that?
22    A.   Yes.
23    Q.   And, had you scratched any ideas
24  around speakers forum at that time for the

1  promotion of Kadian?
2    A.   I don't know.
3    Q.   You don't recall learning that?
4    A.   I think that's why I asked the
5  question had we.  I was asking Nathalie,
6  this is something the team was
7  considering.  I don't know if they did or
8  didn't or if they were or they weren't.
9    Q.   Okay.  Do you recall whether or
10  not Actavis used speakers forums to
11  promote Kadian at any time?
12    A.   I don't believe we ever did.
13    Q.   Okay.  Do you recall any
14  discussions about that?
15    A.   There may have been discussions
16  I may or may not have been part of.  But,
17  again, at the end of the day, I don't
18  believe we ever did speakers forums for
19  this product.
20    I mean, we had a very finite
21  period of time from when we acquired the
22  asset to when we expected the generic
23  market to form.  It's about six quarters.
24  So I -- we never were significantly

1  invested.  That's why we used a contract
2  sales organization.  We tried to, again,
3  slow down the rate at which prescriptions
4  were declining.  That was our plan.
5    Q.   The contract sales organization
6  inVentiv?
7    A.   Correct.
8    Q.   And, do you recall using
9  speakers forums for other opioid products?
10    MS. WELCH:  Objection to form.
11    A.   We didn't -- I don't think we
12  ever -- well, we had plans to potentially
13  do some sort of speaker forum on the
14  Moxduo product, but that never got
15  approved by the FDA.  So the programs
16  never went into -- into place.  We had
17  done prelaunch planning on that.  And
18  those are the only two items, both the
19  Kadian brand and the potential Moxduo,
20  which would have been in promotional
21  activities of Actavis.  Moxduo was never
22  approved, and I don't believe we ever did
23  speaker forums on Kadian.
24    MS. BAIG:  Okay.  Good time to

Page 201

1    take lunch.
2        MS. WELCH:  Okay.
3        MS. BAIG:  How much time would
4    you like?
5        MS. WELCH:  45 minutes.
6        MS. BAIG:  Sure.
7        THE VIDEOGRAPHER:  We're going
8    off the record.
9        The time is 12:29 p.m.
10       (Luncheon recess taken.)
11            - - -
12       A F T E R N O O N   S E S S I O N
13            - - -
14       THE VIDEOGRAPHER:  We're going
15   back on the record.
16       The time is 1:17 p.m.
17       MS. BAIG:  So, we'll have this
18   document marked as the next exhibit,
19   please.
20       It's Bates stamped
21   ACTAVIS1025294 through '297.  It
22   starts as an email from Jennifer
23   Altier to Erin Faucette and Liz Reese
24   at an organization named Technekes.

Page 202

1        (Boothe Exhibit 12, email chain
2    ending February 20, 2013, with
3    attachment, Bates No. ACTAVIS1025294
4    to 1025297, was marked for
5    identification, as of this date.)
6    BY MS. BAIG:
7        Q.   Do you recall an organization
8    named Technekes?
9        A.   No.
10       Q.   You haven't heard of them?
11       A.   Nope.
12       Q.   Okay.  It appears this is an
13   email string about Kadian.  Starts off:
14   Erin and Liz.  Please find attached the
15   updated list of Kadian field targets to
16   now be called on by Technekes.
17       A.   So, this document is dated 2013.
18       Q.   Correct.
19       A.   I was no longer with the company
20   at this time.
21       Q.   Aha.
22       What -- this is February 20th,
23   2013, and you left at the end of 2012.
24       Is that right?

Page 203

1        A.   Correct.
2        Q.   Okay.  If you'd just take a look
3    at the second page of the document.
4        Did you ever see a document like
5    this when you were at Actavis?  It appears
6    to be a list generated perhaps by one of
7    the data organizations that you've talked
8    to -- talked about earlier generating a
9    list of physicians.
10       (Pause.)
11       A.   What's the question, sorry?
12       Q.   Have you ever seen a document
13   like this attachment here starting on the
14   second page?
15       MR. DIAMANTATOS:  Objection to
16   form.
17       A.   Not that I can recall.
18       Q.   Okay.  And my read of this email
19   is that this is a document that has been
20   identified -- that is identifying high
21   prescribers that is being used to generate
22   Kadian field targets to be called on by
23   Technekes.
24       Does this appear to be a type of

Page 204

1    document that would be generated from IMS?
2        MS. WELCH:  Objection to form;
3    foundation; speculation.
4        A.   I don't know.
5        Q.   Okay.  So, I believe you
6    testified earlier that Actavis was using
7    Kadian sales rep to detail opioids to
8    doctors, correct?
9        A.   Yes.
10       Q.   And -- and that those sales reps
11   came from inVentiv?
12       A.   Yes.
13       Q.   And, who trained the inVentiv
14   sales reps?
15       MS. WELCH:  Objection;
16   foundation.
17       A.   There was --
18       Q.   Well, if anyone trained them,
19   who trained them?
20       A.   They were inVentiv --
21       MS. WELCH:  Objection.
22   Objection to form; argumentative;
23   foundation.
24       Go ahead.

Page 205

1      A.    So, again, the -- the decision
2   to utilize inVentiv was that they were a
3   professional contract sales organization
4   who had infrastructure, had compliance,
5   had training, had car service, had expense
6   reimbursement, had Sunshine Act, and then
7   they would source experienced professional
8   pharmaceutical sales reps, and we would
9   provide content.  Again, in the instance
10  of Kadian, it was the label information.
11  And then they would, again, be in the
12  field.
13      So, I -- the answer to your
14  question is some of the materials came
15  from Actavis and some of the materials
16  were -- were reviewed and agreed to with
17  inVentiv.  So a combination of both.
18      Q.    Okay.  And, who at Actavis would
19  have had involvement with training
20  inVentiv employees?
21      A.    Well, again, you -- I believe
22  that inVentiv trained their employees, but
23  again, that Actavis personnel were
24  involved in the materials and the content

Page 206

1   and the oversight and that would be the
2   marketing team.  It would be the
3   compliance team.  It would be regulatory,
4   and, again, our compliance officer and it
5   would be legal.
6       Q.    So, all of those teams would
7   have been involved in preparing materials.
8            Is that what you're saying?
9   That could have been used by the sales
10  reps?
11           MS. WELCH:  Objection to form.
12      A.    Potentially.
13      Q.    Okay.  But which teams would be
14  involved with in-person training of sales
15  reps, if any?
16      A.    Again, all those four.  I mean,
17  my recollection is that, in addition to
18  the initial training, there would be
19  regular sales meetings or things that
20  pharma companies call them POAs or RSMs.
21  In all those meetings, there would always
22  be a regulatory person, a legal person, a
23  compliance person involved.
24           So, if there was any training

Page 207

1   done outside the initial training, it
2   was -- it was overseen with appropriate
3   qualified Actavis personnel.
4       Q.    Okay.  And, do you know who --
5   which people from Actavis would have been
6   involved in that?
7       A.    Again, you'd have to ask me, you
8   know, a specific event or a specific
9   meeting.
10           I -- like I say, it would be
11  someone from our regulatory organization,
12  someone from our legal organization,
13  someone from our branded side sales
14  organization, and compliance.
15      Q.    Okay.  But you can't tell me any
16  names of any people at this point.
17           Is that right?
18           MS. WELCH:  Objection to form.
19  BY MS. BAIG:
20      Q.    That would have been involved --
21      A.    That's not what I said.  I just
22  said if you gave me a specific meeting or
23  instance, I could probably look at the
24  materials, let you know who -- which who

Page 208

1   were in attendance were from which of the
2   different organizations.
3       Q.    Okay.  Right.
4            But without a document in front
5   of you, you cannot tell me any names of
6   any people that would have been in
7   training the inVentiv sales -- salespeople
8   face-to-face?
9            MS. WELCH:  Objection to form.
10  BY MS. BAIG:
11      Q.    Correct?
12      A.    Again, subject to the specific
13  time and place.  I mean, again --
14      Q.    I'm just -- I'm not talking
15  about a specific meeting.  I'm talking
16  about generally training the inVentiv
17  sales force.
18           Who at the company would have
19  done that?
20           And you've given me a number of
21  departments a few times.  I'm just
22  wondering if you know which individuals
23  from any of those departments would have
24  actually had the responsibility for doing

Page 209

1    that.
2        A.   Like I say, I know who the
3    people were in the specific groups and
4    subject to the time, I could confirm.
5    You're asking me to provide specifics, and
6    absent a specific instance, I'm less
7    familiar with the specifics.
8            I know who ran the regulatory
9    group.  I know who ran the legal group.  I
10   know who was the sales marketing people.
11   You obviously mentioned Ms. Leitch, so she
12   would have been involved.
13       Q.   Would Ms. Altiers -- Altier have
14   been involved as well?
15       A.   She may or may not be.  Like I
16   say, she wasn't an employee.  She -- I
17   believe we brought her in to Actavis in
18   2011 or 2012.  I -- so, at some point, she
19   would have been involved, but I don't
20   believe initially.
21           And you didn't provide a
22   specific time or instance.  So in 2009,
23   Miss Altier was not involved.
24       Q.   You wouldn't have had any

Page 210

1    involvement in training Kadian sales reps,
2    right?
3        A.   Absolutely not.
4        Q.   And you wouldn't have had any
5    involvement in reviewing materials which
6    were presented to Kadian sales reps, or
7    would you?
8            MS. WELCH:  Objection to form.
9        A.   I may have seen them, but I
10   wouldn't have been involved in reviewing
11   them or definitely not involved in
12   approving them.
13           And, again, I -- well, go ahead.
14       Q.   Were you aware that the Kadian
15   marketing department was using Alpharma
16   marketing materials?
17           MR. DIAMANTATOS:  Objection;
18   form; assumes facts.
19       A.   When we first acquired the
20   asset, we did utilize -- when we decided
21   to go with some materials into the
22   physicians, we did utilize or repurpose
23   the existing Alpharma materials that had
24   been, to our understanding, had been in

Page 211

1    the field for quite some time, had been,
2    you know, through a promotional review,
3    had been through Alpharma's legal,
4    regulatory, compliance departments and had
5    been submitted to DDMAC.  And then when we
6    repurposed those things, and I believe we
7    added the Actavis logo because we had a
8    limited period of time to utilize the
9    Alpharma trade dress.  We also then
10   submitted the revised logo, none of the
11   content changed, to the best of my
12   knowledge, also to DDMAC.
13       Q.   And, at some point, was Actavis
14   required to change its marketing materials
15   for Kadian?
16           MS. WELCH:  Objection to form.
17       A.   There was a -- there was a time
18   when Actavis received a warning letter
19   based on the materials that had come from
20   Alpharma, and we responded to that warning
21   letter that we modified -- we modified the
22   materials, but your question was were we
23   required.  We weren't required.  We made
24   the decision to comply with the request

Page 212

1    from the FDA.
2            MS. BAIG:  All right.  Let's
3    have this document marked -- marked as
4    the next exhibit.  It's Bates stamped
5    ALLERGAN_MDL_00026060 through '092.
6    It starts as an email from Jennifer
7    Altier to Tom Johnson.
8            So, this is Exhibit Number 13.
9            (Boothe Exhibit 13, email dated
10   August 2, 2012, with attachment, Bates
11   No. ALLERGAN_MDL_00026060 to 00026092,
12   was marked for identification, as of
13   this date.)
14   BY MS. BAIG:
15       Q.   The subject is "Slides for
16   today's conference call."  The attachments
17   noted are "Kadian detail aid suggestions
18   revised, Kadian detail pieces and
19   comments."
20           And, if you flip through, you
21   can see it starts Kadian detail at --
22   sorry.  Kadian detail aid expansion August
23   2nd, 2012.  Ivan T. Shaw's name is on it.
24           Do you know who Ivan Shaw is?

Page 213

1    A.   I'm still reviewing the
2  document.
3         (Perusing document.)
4         Two different documents here.
5    Q.   Well, there's two attachments
6  noted.  If you -- if you look at the
7  subject line and the attachments indicated
8  on the first page.
9    A.   Okay.  Yeah.
10   Q.   All right.  Who's Ivan Shaw; do
11 you know?
12   A.   I have no idea.
13   Q.   Okay.  What's your understanding
14 of what this document is?
15        MS. WELCH:  Objection to form.
16   A.   This is the first time I've seen
17 it, so.
18        It says Kadian detail aid
19 expansion.
20   Q.   What is a detail aid expansion?
21        MS. WELCH:  Objection to form;
22   foundation.
23   A.   A detail aid would be something
24 that the -- the branded marketing or sales

Page 214

1  team in conjunction with regulatory,
2  compliance and legal would develop, again
3  submit it to DDMAC, and once it was
4  determined to be able to share with the
5  sales organization, would be provided to
6  the sales organization as a content piece
7  to aid them in discussions with
8  physicians.
9    Q.   Do you know whether this -- if
10 you flip through to the next page after
11 the first page of the Power Point you see
12 current detail at -- aid August 9th, 2010.
13        Do you see that?
14   A.   Yes.
15   Q.   And, I mean, I'll tell you that
16 my read is that this is some sort of
17 expansion to the current detail aid, and
18 I'm wondering if this was done as a result
19 of the communications with DDMAC that you
20 just referenced.
21        MR. DIAMANTATOS:  Objection to
22   form.
23        MS. WELCH:  Objection to form;
24   foundation.

Page 215

1  BY MS. BAIG:
2    Q.   Or if this is something
3  different.
4         MS. WELCH:  Same objections.
5         MR. DIAMANTATOS:  Assumes facts.
6    A.   I'd say it's something different
7  because this is in 2012 and what I was
8  speaking to was in 2009 or 2010.
9    Q.   Okay.  Do you have an
10 understanding as to how the detail aid was
11 being expanded?
12        MS. WELCH:  Objection to form;
13   foundation; assumes facts not in
14   evidence.
15 BY MS. BAIG:
16   Q.   If it was.
17        MS. WELCH:  Same objections.
18   A.   No.
19   Q.   And you don't recall any sort of
20 expansion of the detail aid at around that
21 time, correct?
22   A.   I don't even know what you mean
23 by expansion.
24        But no.

Page 216

1    Q.   Well, I'm just reading the front
2  page where it says "Expansion."  It says
3  "Kadian detail aid expansion."
4    A.   That means it could be bigger
5  piece of paper.  That's an expansion,
6  potentially.
7    Q.   Is that how you read this
8  document?
9    A.   Do you want me to read every
10 page?  I'll take my time and go through it
11 and provide you my feedback.
12   Q.   I'm just wondering how you read
13 detail aid expansion.
14        Is that a term -- a term of art,
15 that you're aware of, or not?
16   A.   Again, I'm not sure what --
17   Q.   It's not a term of art I'm aware
18 of.
19   A.   Great.
20   Q.   What's ABM?
21   A.   Where is that?
22   Q.   ABM comment.  It's on page 1 of
23 the second document, which is '085, the
24 Bates number ending in '085.

Page 217

1    A.  I don't know.
2    Q.  And if you see the next page,
3  there's a reference to the co-pay card and
4  brochure.
5    A.  Yes.
6    Q.  And that's the $50 coupon that
7  we talked about earlier.
8      Is that right?
9      MS. WELCH:  Objection to form;
10  foundation.
11    A.  I'm not sure.
12      It's in 2012, so I don't know if
13  that's the program that was still in place
14  or not.
15    Q.  And, do you see at the top it
16  states, the top of that page it states:
17  My only suggestion would be to go back to
18  the co-pay card that says $50 off as it
19  gave a clear concise message.  With the
20  new co-pay card that reads $1200 off per
21  year, offices are confused by the
22  breakdown per month.  By the time the
23  patient receives the co-pay card, the $50
24  off per prescription is lost.

Page 218

1      Do you see that?
2    A.  That's what it says.
3    Q.  Do you know if there was ever a
4  movement from a $50 co-pay off with a
5  maximum of $600 to a maximum of $1200?
6      MS. WELCH:  Objection to form;
7  foundation.
8    A.  No.
9    Q.  So you don't know if there was
10  ever a newer co-pay card that reads $1200
11  off per year?
12    A.  Yes.
13      If you want to show it to me, I
14  could take a look at it, but I'm not
15  familiar with that.
16    Q.  Okay.  You don't recall the
17  co-pay card changing in that way ever?
18    A.  I don't specifically remember,
19  but if you have something to show me, I'd
20  be happy to review it.
21    Q.  Do you remember generally the
22  co-pay card being expanded or changed in
23  any way, or no?
24      MS. WELCH:  Objection to form;

Page 219

1    foundation.
2    A.  Not that I'm aware of.
3      (Pause.)
4    Q.  Do you recall that Kadian sales
5  reps were used to market oxymorphone ER at
6  all?
7      MS. WELCH:  Objection to form.
8    A.  Oxymorphone ER, I believe there
9  was a period of time when we asked the
10  Kadian sales team to send a message, or to
11  deliver a message of availability that
12  that product was still available.  I don't
13  think that would be -- in my world,
14  constitute as marketing or promotion.  It
15  was a availability reminder.
16      We had a situation where the
17  brand company, which was Endo, had removed
18  the -- certain strengths of their branded
19  oxycodone ER.  They had multiple other
20  strengths.  And we were the only generic
21  selling, or one of a few generics selling
22  those other strengths.  We wanted to make
23  certain that the physician community was
24  made aware that that approved available

Page 220

1  generic drug was still available for
2  medically necessary patients, because the
3  Endo team was out.  They had discontinued
4  and said it was no longer available.
5    Q.  And you were doing that so as to
6  maximize the company's results, correct?
7      MS. WELCH:  Objection to form.
8    A.  We were doing that to let
9  physicians know that that product was
10  still available because others were saying
11  that it had been discontinued, it was no
12  longer available.
13      And, again, it was an
14  FDA-approved medicine for medical
15  necessity.
16    Q.  And, was the sales team -- did
17  the sales team receive compensation that
18  was tied to increasing scripts for
19  oxymorphone ER?
20      MS. WELCH:  Objection to form;
21  foundation.
22    A.  Not that I'm aware of.
23      It was, again, it was a reminder
24  as part of visiting a physician's office

Page 221

1 with a primary focus on Kadian. Then it
2 was a reminder of -- there may have been a
3 leave-behind, I don't know, to say the
4 product was still available.
5 MS. BAIG: Let's have the next
6 document marked as Exhibit 14.
7 It's Bates stamped
8 ACTAVIS0506794 through '814. It
9 starts as an email from you to Michael
10 Perfetto dated July 15th, 2011. The
11 subject is "Sales rep training
12 material draft."
13 (Boothe Exhibit 14, email chain
14 ending July 15, 2011, with attachment,
15 Bates No. ACTAVIS0506794 to 0506814,
16 was marked for identification, as of
17 this date.)
18 THE WITNESS: (Perusing document.)
19 Okay. Yeah.
20 BY MS. BAIG:
21 Q. If you look at the fifth page
22 in, you see an email from Jinping
23 McCormick to Nathalie Leitch and Terrence
24 Fullem.

Page 222

1 A. Which page?
2 Q. The fourth page in.
3 In which she asks for a time
4 slot for oxymorphone ER training at your
5 upcoming sales meeting.
6 Do you see that?
7 MS. WELCH: What's the Bates
8 number?
9 MS. BAIG: The Bates stamp
10 number ends in '798.
11 BY MS. BAIG:
12 Q. Middle of the page.
13 A. Mm-hm.
14 Q. Do you see where Jinping is
15 asking for a time slot for oxymorphone ER
16 training at your upcoming sales meeting?
17 A. Yes.
18 Q. Okay. And it suggests that Ara,
19 I believe that's Ara Aprahamian, would
20 deliver the training if no one objects.
21 Do you see that?
22 A. Yes.
23 Q. What was Ara's position again?
24 A. Ara was in our pricing and

Page 223

1 contracts group, part of our sales
2 organization under Mike Perfetto. Generic
3 sales organization.
4 Q. And then, if you move to the
5 page before in the email from Michael
6 Perfetto to Jinping and others, there's a
7 query: Have we all agreed upon the bonus
8 plan for this?
9 Do you see that?
10 A. Yes.
11 Q. And there's a suggestion of
12 ideas. I now -- he goes on to state: I
13 know I suggest a few different idea.
14 Do you see that?
15 A. Yeah.
16 Q. And he states: I would prefer a
17 contest for the top five or ten reps based
18 on percentage group of scripts on this
19 product.
20 Do you see that?
21 A. Yeah.
22 Q. And he goes on to state: But
23 I'm open to any and all ideas that
24 maximize our results with not breaking the

Page 224

1 bank.
2 Do you see that?
3 A. Yeah.
4 Q. Does that suggest to you that --
5 that there was going to be a bonus plan
6 for the sales reps for their sales of
7 oxymorphone ER?
8 MR. DIAMANTATOS: Objection to
9 form; foundation.
10 A. Again, that was -- it appears
11 that that's what Mike was proposing. I'm
12 not certain if we ever put it into
13 applies.
14 And again, Mike ran the generics
15 team. So these may be for generics sales
16 rip, which again, he had five sales
17 representatives under his group calling on
18 the generic accounts. It's not clear to
19 me if this is for the Kadian team or not.
20 It's a proposal. It may or may not have
21 happened.
22 And, again, you got Nathalie and
23 Terry and others involved. So, I don't
24 specifically recall if we did this or not.

Page 225

```
 1    So if there's a document that shows that
 2    we did it, or -- I'd be happy to comment
 3    on it.
 4        Q.   So, do you see in the next email
 5    on the next page he's asking Natalie and
 6    Terry for a slot at their meeting.
 7        Does that suggest to you that
 8    it's a meeting with Kadian sales reps and
 9    not the generic sales reps?
10        MR. DIAMANTATOS:  Objection.
11        MS. WELCH:  Objection;
12    foundation.
13        A.   Where is that?
14        Q.   On the next page where he's
15    asking Nathalie -- sorry.  Where Jinping
16    is asking Nathalie and Terry:  Can you
17    please schedule a time slot for
18    oxymorphone ER training at your upcoming
19    sales meeting?
20        A.   Again, that was Jinping who was
21    in the generic marketing group asking.
22        Q.   Yeah.
23        A.   It may or may not have happened.
24        Q.   Sure.
```

Page 226

```
 1        You don't recall whether it
 2    happened or not?
 3        A.   I don't have any specific
 4    recollection, but --
 5        Q.   And, do you see on the second
 6    page of the entire document at the very
 7    bottom it says:  Nathalie suggested a
 8    regional TEAL contest.
 9        A.   Where is that?
10        Q.   At the very bottom of the second
11    page.
12        A.   Okay.  Yep.
13        Q.   And it goes on to state:  There
14    are four teams.
15        Do you see that?
16        A.   Yes.
17        Q.   Does that -- does that give you
18    any indication as to which teams are being
19    involved in this promotion of oxymorphone?
20        MR. DIAMANTATOS:  Objection to
21    form --
22        MS. WELCH:  Objection to form.
23        MR. DIAMANTATOS:  -- foundation;
24    assumes facts.
```

Page 227

```
 1        A.   Yeah, I mean, I read this and
 2    this here are all ideas being generated.
 3    Look at the first chart, you see:  Meeting
 4    is with the 25th.  The piece will need to
 5    send through regulatory and legal for
 6    review and approval.
 7        So, the extent to which we did
 8    or didn't ever do this was subject, again,
 9    to regulatory and compliance approval as
10    well.  We may have done it.  We may not
11    have done it.  I don't specifically
12    remember.
13        Q.   So, if you go back to the top of
14    page 2 in the email from Michael Perfetto,
15    do you see where he states:  Fine.  I
16    don't want to think -- I don't want to
17    overthink this.  I approve.  Just do it.
18        Does that suggest to you that
19    this was put into place?
20        A.   No.
21        Q.   And, do you see at the beginning
22    of the very first page in your email to
23    Michael Perfetto it says:  FYI only, but I
24    think it's good.
```

Page 228

```
 1        Does that suggest to you that it
 2    was put into place?
 3        A.   That's not from me.  That's from
 4    Mike to me.
 5        Q.   Yes.
 6        Does that suggest to you that
 7    this program was put into place?
 8        A.   It may have been.  It may not
 9    have been.
10        I -- if you had the agenda from
11    that sales meeting, maybe we could both
12    know the truth.
13        Q.   So you don't recall one way or
14    another whether the Kadian sales force was
15    tasked with promoting oxymorphone ER?
16        MS. WELCH:  Objection to form;
17    misstates testimony.
18        A.   I mean, as I said earlier,
19    there -- I do have a recollection at some
20    point we -- we leveraged or utilized the
21    Kadian sales team to provide information
22    that it was available, our FDA-approved
23    first-in-market generic for these
24    strengths because the Endo product had --
```

Page 229

1  Endo discontinued those two strengths.  So
2  if there's no -- physicians aren't aware
3  that the strengths are available, they
4  won't write the script, and therefore
5  there will be no prescriptions coming to
6  the generic side of the business.
7      Q.   And a little further down on the
8  first page, do you see from Jinping
9  McCormick to Perfetto and others it
10  states:  Attached please find a draft
11  oxymorphone training material for sales
12  reps?
13     A.   Yeah.
14     Q.   And, if you flip through three
15  or four pages, do you see an attachment
16  that appears to be a Power Point entitled
17  "Introduction of Oxymorphone Hydrochloride
18  Extended Release Tablets CII Sales
19  Training Class"?
20     A.   Again, if this is connected with
21  that email, I think it's clearly says this
22  is a draft.  We'll need to go through
23  regulatory and legal for review and
24  approval.

Page 230

1      So, I have no knowledge this is
2  the draft, this is the final, this is what
3  was or wasn't done.  And if it was done,
4  you know, again with our legal, compliance
5  and regulatory review, then fine.
6      Q.   And, would you have seen and
7  approved any draft that went to the sales
8  reps before it went to them?
9      A.   No.
10         MS. WELCH:  Objection to form;
11     asked and answered.
12  BY MS. BAIG:
13     Q.   That would have been Jinping
14  McCormick?
15     A.   No.
16     Q.   Who would that have been?
17     A.   Again, any set of materials that
18  would have gone or been shared with our
19  Kadian sales organization -- by the way,
20  again, if it was for internal or if it was
21  something that went to a -- as part of a
22  promotional material to a physician, which
23  this appears to be something of a
24  potential promotional material, or a sell

Page 231

1  sheet, as it's called, would go through
2  some sort of a internal review involving
3  legal, compliance, regulatory and the
4  commercial team and submitted to DDMAC.
5      Q.   And, if you turn the page, you
6  see an example, I believe, of a sell
7  sheet.  It says "Front and back."
8         Do you see that?
9      A.   Page 4?
10     Q.   Yes.
11     A.   Yep.
12     Q.   Is that a sell sheet that would
13  have been left with prescribers?
14         MR. DIAMANTATOS:  Objection to
15     form; foundation.
16     A.   I don't know.  Again, I -- it
17  has the PI on it, but that may or may not
18  be what -- if it was a leave-behind or
19  not, I don't know.
20     Q.   What do you mean by PI?
21     A.   That's the prescriber
22  information in the label.
23     Q.   What was the purpose of sell
24  sheets typically, or how were they used?

Page 232

1         MS. WELCH:  Objection to form;
2     foundation.
3      A.   This is, again, more like on the
4  generic side.  So this to me is actually
5  something that Jinping would have
6  developed.  This is something that
7  potentially we would have put into one of
8  the advertising journals that we talked
9  about before, like Drug Store News or U.S.
10  Pharmacists.
11         So, this is deemed a promotional
12  material 'cause it has information about
13  product and it has the PI.  This would
14  also go through an internal review and
15  ultimately, again, regulatory, compliance,
16  legal, marketing and submitted to DDMAC.
17  Any communication such as this would go
18  through that.
19         So, this in the vernacular of
20  Actavis meant that this is a material that
21  was for the generic side.  And we may have
22  repurposed it potentially, as you're
23  asking, and provided it to the sales
24  organization, but I'm not clear if we did

Page 233

1    that.  I'm not clear -- it's not clear to
2    me if we did, if they had the ability to
3    then just for their own knowledge or if it
4    was something that we were actually going
5    to leave potentially at a physician's
6    office or not.
7        Q.   Okay.  And, do you see the next
8    page where it says "Marketing Support"?
9        A.   Yes.
10       Q.   And there's three bullets.  The
11   first one is:  A two-wave direct mail
12   campaign to the top 10,000 prescribing
13   doctors.  The first wave is planned to
14   coincide with our launch to bring
15   awareness to prescribing doctors.  A
16   follow-up mailing is planned for four
17   weeks post-launch.
18       Do you see that?
19       A.   Yes.
20       Q.   Do you recall whether or not a
21   two-wave direct mail campaign to the top
22   10,000 prescribing doctors was
23   implemented?
24       A.   It may have been.  No, I don't

Page 234

1    specifically recall.
2        Q.   But the top 10,000 prescribing
3    doctors, that data would have come from
4    IMS?
5        MS. WELCH:  Objection to form.
6        MR. DIAMANTATOS:  Foundation.
7        A.   Could have been IMS or Wolters
8    Kluwer, whomever, we -- you know, we or
9    others would use to get prescribing
10   information.  Those are the third party
11   groups that sell that kind of data, yes.
12       And it could be, again, total
13   class.  It could be all pain medications.
14   It could be opioids.  It could be lots of
15   things.  I don't know who was this group
16   here.
17       Q.   And the second bullet is:
18   Journal advertising to cover both
19   prescribers and pharmacists.
20       Do you see that?
21       A.   Yes.
22       Q.   And it references practical pain
23   management and pharmacy times, which I
24   think we referred to earlier.

Page 235

1        Correct?
2        A.   Yes.
3        Q.   And then it also references an
4    email campaign reaching a pharmacy
5    audience of 87,000.
6        Correct?
7        A.   Yes.
8        Q.   So, if this went forward as
9    proposed here, is it your understanding
10   that it's this sell sheet that's being
11   sent to a pharmacy audience of 87,000?  Or
12   what actually is being sent?
13       MS. WELCH:  Objection to form;
14   foundation; speculation.
15       A.   Yeah, I don't know what -- what
16   was or wasn't sent.
17       Q.   Do you see on the next page it
18   has the oxymorphone boxed warning?
19       A.   Page 7?
20       Q.   Yeah.
21       A.   Yes.
22       Q.   And there's a warning.  It says:
23   Potential for abuse.  Importance of proper
24   patient selection and limitations of use.

Page 236

1        Do you see that?
2        A.   Where is that?
3        Q.   The first line in the box.
4        A.   Okay.  Yes.
5        Q.   Did you have an understanding as
6    to what proper patient selection meant?
7        A.   That's really a decision for a
8    physician to make.
9        This is a standard black box
10   warning for all Class II narcotics.  You
11   would see this on other Class II
12   narcotics.
13       The physician determines what
14   proper patient selection is.
15       Q.   Did you have an understanding as
16   to how a physician would go about
17   determining proper patient selection?
18       A.   Absolutely not.
19       MS. WELCH:  Objection to form.
20       MR. DIAMANTATOS:  Foundation.
21   BY MS. BAIG:
22       Q.   And, do you see under the second
23   bullet under "Potential For Abuse" it
24   states:  This should be considered --

Page 237

1  well, it's about oxymorphone.  And then it
2  states:  This should be considered when
3  prescribing or dispensing oxymorphone
4  hydrochloride extended-release tablets in
5  situations where the physician or
6  pharmacist is concerned about an increased
7  risk of misuse, abuse, or diversion.
8      Do you see that?
9      A.  Yes.
10     Q.  Do you know how the physician or
11 pharmacist was supposed to gauge whether
12 there was an increased risk of misuse,
13 abuse, or diversion?
14     MS. WELCH:  Objection to form;
15     foundation.
16     A.  Not specifically.  Although,
17 again, I don't know what time this is.
18 There was either a risk map or some sort
19 of REMS probably associated with class of
20 products by this point.
21     Q.  And hydromorphone was the
22 generic of Opana ER.
23     Is that right?
24     A.  I think it's oxymorphone.

Page 238

1      Q.  Oxymorphone, sorry.
2      Was that the generic for
3  Opana ER?
4      A.  Oxymorphone hydro --
5  hydrochloride extended-release tablets
6  would be the generic for Opana ER.
7      Q.  And Opana ER was no longer on
8  the market?
9      A.  Again, in 2011?  I'm just
10 reading from the materials here.
11     Opana ER, which is the Endo
12 product, had multiple different strengths
13 ranging from I think as low as five
14 milligrams to maybe up to 40 or 60, and
15 these two specific strengths, which were
16 7-and-a-half and 15 milligrams, Actavis
17 had FDA approval for a generic of it, and
18 Endo had removed the product.  So we
19 wanted -- again, we wanted to make sure
20 physicians were aware, physicians and
21 pharmacists were aware that there was an
22 available medically -- FDA-approved and
23 medically available product for their
24 patient population subject to their

Page 239

1  decisions on dispensing and prescription
2  writing.
3      Q.  So, was it your understanding
4  that Opana ER was still on the market in
5  certain strengths?
6      A.  Yes.
7      Q.  Until when?
8      A.  Opana ER was on the market until
9  late 2018.
10     Q.  The brand name?
11     A.  Yes.
12     Q.  Did you have an understanding as
13 to why the certain -- why certain
14 strengths of Opana ER were withdrawn from
15 the market?
16     MS. WELCH:  Objection;
17     foundation.
18     A.  I have my understanding, but it
19 may be inconsistent with Endo's
20 understanding.
21     Q.  Well, what's your understanding?
22     A.  My understanding is Endo removed
23 their strengths because they didn't want
24 the generics to come in with an approved

Page 240

1  lower cost alternative to their branded
2  product.
3      Q.  And, why do you think that that
4  might be inconsistent with Endo's
5  experience -- with Endo's understanding?
6      MS. WELCH:  Objection;
7      speculation.
8      A.  Yeah, I don't want to speak for
9  Endo, but it was a common practice that
10 brand companies would discontinue
11 strengths or discontinue products in
12 advance of the generic market formation.
13     Q.  And, if you look at the second
14 to last page before the "thank you" page.
15     A.  Yep.
16     Q.  Do you see under "Compensation
17 and Incentive" there's three bullet
18 points.  One is team award, one is
19 individual award, and one is renewable
20 upon review of overall performance.
21     Do you see that?
22     A.  Yep.
23     Q.  And it suggests that for the
24 team award the top regional team with the

Page 241

1  highest cumulative prescription written
2  for the period of August through October
3  of 2011 each member of the team would win
4  $500.
5       Correct?
6       A.  Yes.
7       Q.  And for the individual award it
8  states that the top two performers from
9  each team with the highest cumulative
10  prescription written for the period of
11  August through October 2011 each award is
12  $1,000.
13       Correct?
14       A.  Yes.
15       Q.  Do you recall whether sell
16  sheets were used for both branded and
17  generic drugs?
18       MS. WELCH:  Objection to form;
19       foundation.
20       A.  Again, in this draft materials,
21  the shell -- the sell sheet that's shown
22  here, from my recollection, would be
23  representative of what we would do with
24  all generic products being approved and

Page 242

1  launched across all of our multiple dose
2  forms and classes and therapeutic areas.
3       Q.  Did you use these types of sell
4  sheets for branded drugs as well?
5       A.  I don't believe we did, but I'm
6  not a hundred percent certain.
7       And, again, we only had one
8  brand product.  It was called Kadian.
9       Q.  And, are you familiar with the
10  term "pocket guide"?
11       A.  I've heard of it, but I'm not,
12  you know, intimately familiar with it.
13       Q.  What's your understanding of
14  what a pocket guide is?
15       MS. WELCH:  Objection;
16       foundation.
17       A.  I think it's a smaller version
18  of, again, approved promotional materials
19  so it could fit into a pocket.
20       Q.  And, do you recall whether
21  Actavis used pocket guides for its branded
22  and generic opioids?
23       A.  Not specifically.  We may --
24  again, you said branded and generic.

Page 243

1       Again, none of the generic products would
2  be detailed to physicians with, you know,
3  some exception.  This may have been a
4  limited exception.  But generally, the
5  generic products are not -- there's no
6  activity calling on physicians.  It's
7  purely a key account sale to the major
8  chains or wholesalers and then reminder
9  notices or communications to pharmacists.
10       Q.  Did Actavis also use pricing and
11  incentive programs to try to maximize
12  sales?
13       A.  Pricing and incentives programs
14  with whom?
15       Q.  With its key clients.
16       MS. WELCH:  Objection to form.
17       A.  What do you mean by key clients?
18       Q.  Well, do you have an
19  understanding of who some of the key
20  clients were, let's say, in the generics
21  division?
22       MS. WELCH:  Objection to form.
23       A.  So, our customers in the generic
24  division, people who bought our

Page 244

1  FDA-approved generics, would be either the
2  large direct chains, like a CVS, a
3  Walgreens, a Rite Aid, a large wholesaler
4  like a McKesson, a Cardinal,
5  AmerisourceBergen, mail orders, Express
6  Scripts, Medco, things like that, those
7  are our customers.  And yes, there would
8  be -- we would put programs in place
9  potentially to incentivize them through
10  additional rebates to take a bigger basket
11  of our available offerings.  You know, at
12  any given time, we may have had 200, 250
13  or 300 SKUs available, and at a given
14  time, we may have 50 of those or 60 of
15  those or a hundred of those on contract at
16  those different accounts.
17       So, part of, you know, Mike and
18  the team's opportunity and challenge was
19  to maybe get additional distribution on
20  our FDA-approved generic products and
21  somehow or potentially, like you said,
22  incentive programs and such would be an
23  incentive providing an additional discount
24  to our customers to take more of our

Page 245

1    products.
2        Q.   And those were typically
3    reflected in the customer agreements.
4        Is that right?
5        A.   Yes.  There would be customer
6    contracts and then basically you contract
7    on a product-by-product basis and those
8    individual products would have the key
9    terms and conditions.  And there may be
10   quarter end rebates or annual rebates
11   based on volume incentive tiers, so that
12   would be tracked throughout the course of
13   the year.  Our finance organization would
14   track those.  They would accrue
15   potentially for them if they were reached,
16   and then we would make those payments 30
17   or 90 days after the time period had
18   elapsed if the -- if the account achieved
19   the threshold.
20       Q.   Did Actavis attend certain trade
21   shows to promote its drugs?
22       MR. DIAMANTATOS:  Objection to
23   form.
24       MS. WELCH:  Objection to form.

Page 246

1        A.   Could you be specific?  What do
2    you mean by trade shows and promote its
3    product?
4        Q.   Well, by promote its product, I
5    mean maximize sales.
6        By trade shows, my question is
7    to you.
8        Do you know whether Actavis
9    participated in certain trade shows, or
10   that the marketing and sales departments
11   participated in certain trade shows?
12       MS. WELCH:  Objection to form.
13       A.   Yes, the generic sales team did
14   attend trade shows, customer events.  Yes.
15       Q.   What types of trade shows?
16       MS. WELCH:  Objection to form.
17       A.   There were multiple organization
18   who would organize they would call them
19   vendor events.  They would call them
20   technical exchanges.  One was the NACDS,
21   which is the National Association of Chain
22   Drug Stores.  They would have two events,
23   one in the spring, which was the annual
24   meeting; one in the fall, or late summer,

Page 247

1    fall, which was the technical exchange.
2    There was a thing called ECRM.  I don't
3    know what ECRM stands for.  That was more
4    of a regional event.
5        Again, all on the generic side.
6        Our branded team would not
7    attend any.  There's no trade shows
8    that -- well, that they would attend.  I
9    mean, sometimes there was a brand
10   component, but we didn't actually have a
11   sales group or a team that would go to
12   those things.
13       Those are the trade events that
14   I'm familiar with.  There might be others,
15   but those are the ones I'm familiar with.
16       Q.   And, did you attend any of
17   those?
18       A.   I, in the normal course of
19   business, I would attend several of those.
20   I would do the NACDS annual meeting most
21   likely in April.
22       Early in my tenure when I
23   mentioned our Alpharma days or early
24   Actavis days, I would attend the NACDS

Page 248

1    fall tech conference, but I stopped going
2    to that at a certain point.
3        I never went to ECRMs.
4        There was HDMA, there was all
5    bunch of different ones, but no, I did not
6    attend those.
7        Q.   Who would attend ECRM?
8        A.   Again, ECRM would probably be in
9    Mike Perfetto's organization the sales --
10   the sales team.  They would attend those
11   because it's much more regional, smaller
12   distributors and wholesalers and such.
13       Then Mike and pretty much most
14   of his commercial group, including Jinping
15   and Ara and the sales team, would attend
16   the NACDS fall tech.
17       Mike and I, and depending on the
18   year or the circumstance, we may bring one
19   or two people along with us, would attend
20   the NACDS annual meeting which was always
21   in Palm Beach or in Scottsdale, Arizona.
22       Q.   And how much HDMA?
23       A.   Again, either Mike or his sales
24   team or folks -- HDMA was -- that's -- I

Page 249

1   think that's a wholesaler.  So depending
2   how Mike had assigned accounts to the
3   sales team, they would attend.  You know,
4   there are other events that were specific
5   to GPOs.  So the guy that had the GPO
6   account would probably go to those.
7          But, again, that's my
8   recollection of the events.
9       Q.   And, did Actavis set up booths
10  at these trade shows?
11      A.   At NACDS, again, the fall tech
12  you would actually pay for exhibit space
13  to be on the floor.  So we actually we had
14  an exhibit booth like companies would have
15  20-by-20, whatever, and we would do those.
16         At the NACDS annual meeting, you
17  basically bought a table, so you had the
18  privilege to sit outside in the sun, which
19  was nice most of the time except when it
20  rained, to meet with customers.  You
21  bought a table.  I believe ECRM and the
22  other ones, I don't think you bought a
23  booth, but you actually rotated through
24  the customers areas, as my -- as it was

Page 250

1   described to me.  I've never been to them.
2       Q.   And, how about HDMA, were there
3   booths there?
4       A.   I don't know.
5          MS. BAIG:  Let's have this
6   document marked as Exhibit 15.
7   ALLERGAN_MDL_00676546 through '6582.
8   It starts as an email from Mike
9   Perfetto to you dated February 25th,
10  2012.  Subject is "Final
11  Presentation."  Attachments
12  "Leadership summit presentation
13  final."
14         (Boothe Exhibit 15, email chain
15  ending February 25, 2012, with
16  attachment, Bates No.
17  ALLERGAN_MDL_00676546 to 00676585, was
18  marked for identification, as of this
19  date.)
20         THE WITNESS:  There's the leaky
21  bucket.
22  BY MS. BAIG:
23      Q.   And, if you turn to the second
24  page, you see there's a Power Point that

Page 251

1   starts:  Realizing our vision.  Building a
2   global leader in generic pharmaceuticals.
3          And it has Mike Perfetto's name,
4   Jinping -- sharing Jinping McCormick's.
5       A.   Nice looking at the pictures of
6   the people.  I haven't seen these in a
7   long time.  Even me.
8          Okay.  Sorry.
9          What's the question?
10      Q.   So, what is this document?
11      A.   So, again, this was a document
12  that looks like Mike and Jinping
13  developed.  I'm not certain where it was
14  utilized.
15         Leadership summit.  So, I
16  believe this was something that -- yes.
17  So, this was in February of 2012, Actavis
18  Group the global company, would have an
19  annual meeting.  It was, again, talk about
20  last year's results, talk about goals and
21  objectives, and we called it the
22  leadership summit, or we called it lots of
23  different things.  But effectively a
24  subset of the senior leaders of all the

Page 252

1   different divisions, groups, locations
2   would all meet in one location, and as
3   part of that, there were presentations,
4   you know, information sharing across the
5   group, a chance for interaction, a chance
6   for networking, a chance to share best
7   practices.
8          And, at this meeting, which was,
9   again, held in Innsbruck, actually, we
10  did, or Mike and Jinping did a
11  presentation about the generic
12  organization for all of Actavis Group.  So
13  it was an internal presentation developed
14  for an internal audience, is my
15  understanding of this document.
16      Q.   When you say an internal
17  audience, what do you mean by that?
18      A.   Just within Actavis, Actavis
19  Group.
20      Q.   Okay.  And, if you look to the
21  page that ends in '573, the heading is
22  "Top 10 Generic Products for 2011."
23      A.   Yep.
24      Q.   It appears that the top two

Page 253

1   generic products at that time were
2   oxycodone tabs and fentanyl patch.
3       Is that right?  According to
4   this.
5       A.  Yes.
6       Q.  And, does this show -- report
7   that oxycodone tabs' net sales growth for
8   that year was 55 percent?
9       MS. WELCH:  Objection to form.
10      A.  Yes.  That's what the chart
11  says, yep.
12      Q.  And the fentanyl patch's sales
13  growth was 39 percent, correct?
14      A.  On a year-over-year basis, yep.
15      Q.  And those were the two top
16  products at the time?
17      MR. DIAMANTATOS:  Objection to
18  form.
19      A.  For the generics group.  Over
20  our total of $523 million in sales in
21  2011, those were the top two, yes.
22      Q.  And, if you turn about three
23  pages further, you see a document that has
24  some pictures on it called "Marketplace

Page 254

1   Support Advertising."
2       Do you see that?
3       A.  Yes.
4       Q.  And there's one that has a tree
5   on it.
6       Do you see that?
7       MS. WELCH:  Which Bates number?
8       MS. BAIG:  It ends '577.
9       A.  Is that what that thing is to
10  the right?  That thing?
11      Q.  Well, I could tell you --
12      MS. WELCH:  It's a different
13  number, '577.
14      A.  This page.
15      Q.  Ending '577.
16      A.  Sorry.  Yeah.
17      Q.  Was this what was referred to
18  internally as your tree ad?
19      A.  I don't know.
20      Was there an internal ad --
21  thing called tree ad?
22      Q.  I can just tell you that Jinping
23  told me about a tree ad, but I didn't have
24  a picture of it.  But now I'm looking at

Page 255

1   this and I'm wondering if this is the tree
2   ad.
3       A.  It's got a tree in it.
4       Q.  Did you ever contract with your
5   distributor customers for marketing
6   services?
7       MS. WELCH:  Objection to form.
8       A.  I think the answer is yes, but
9   I'd be happy to comment to a document.
10      Q.  Do you recall entering into
11  negotiations with big distributors like
12  McKesson such that you would pay marketing
13  fees to them?
14      MS. WELCH:  Objection to form.
15      A.  I think it's the other way
16  around.  I mean, the way the McKesson
17  contracts were is they charged you
18  marketing fees for the privilege of
19  selling product to them.
20      Q.  They were charging Actavis
21  marketing fees?
22      A.  Mm-hm.
23      Q.  So you would pay marketing fees
24  to --

Page 256

1       A.  Right, but it wasn't like we
2   negotiated.  We didn't really get much
3   marketing.  They -- that was part of
4   their -- McKesson if it was Progen
5   generics in their fee structure, they
6   charged you for marketing fees, they
7   charged you for data fees, they charged
8   you for warehousing fees.  That was all
9   part of the program.  And that was pretty
10  typical for the large wholesalers.
11      On occasion we would contract,
12  for example, to utilize their network of
13  pharmacists as part of their awareness ads
14  for new product launches, we would pay
15  them so they could, through their network,
16  share our information.  That was when you
17  asked the first question about did I
18  contract for services, that's what I was
19  referring to, is my understanding.
20      MS. BAIG:  Let's have this
21  document marked as Exhibit 16.
22      It's Bates stamped
23  ACTAVIS0811957 through '959.  It's an
24  email from you to Mike Perfetto on

Page 257

1      October 12th, 2011.
2           MS. WELCH:  Where are you?
3           THE WITNESS:  What's that?
4           MS. BAIG:  I was just stating
5      what it is.
6           THE WITNESS:  That's not the one
7      I have.
8           MS. WELCH:  That's not the one I
9      have either.
10          (Pause.)
11          MS. WELCH:  This has a 1969
12     bottom Bates number.
13          MS. BAIG:  No, I think you've
14     got the wrong one.
15          THE WITNESS:  Here you go
16     (handing.)
17          MS. BAIG:  Thank you.
18          (Pause.)
19          MR. DIAMANTATOS:  I wrote
20     Exhibit 16 on my copy, counsel.  In
21     case you want to switch it out with an
22     exhibit sticker.
23          MS. BAIG:  Okay.
24          MS. WELCH:  So did I.

Page 258

1           THE WITNESS:  I don't have a
2      pen.
3           (Pause.)
4           MS. BAIG:  Okay.  We'll come
5      back to that one.  It's no problem.
6      BY MS. BAIG:
7      Q.   Are you familiar with the
8      company Key OptiSource?
9      A.   OptiSource?
10     Q.   Mm-hm.
11     A.   I know who they are.
12     Q.   Who are they?
13     A.   They're a distributor or a
14     regional wholesaler, is my understanding.
15     Q.   Do they do mailing and
16     telemarketing?
17     A.   I don't know.
18          MS. WELCH:  Objection to form;
19     foundation.
20     A.   If they did, you can show me the
21     materials.  Yeah.
22     Q.   Do you know whether they did
23     mailing and telemarketing for Actavis?
24     A.   I don't specifically recall.

Page 259

1      Q.   Okay.  Are you familiar with a
2      company called Kerr Drug and Weiss?
3      A.   No.
4           K-E-R-R?
5      Q.   Mm-hm.
6      A.   Kerr Drug?
7      Q.   Mm-hm.
8      A.   Yes.  I'm -- yeah, they, again,
9      a regional wholesaler distributor.
10          And Weiss, W-E-I-S-S?
11     Q.   Mm-hm.
12     A.   Weiss, that's the supermarket
13     chain, Weiss Markets.
14     Q.   Okay.
15     A.   Pennsylvania and Maryland and
16     New Jersey.
17     Q.   And, do you know whether they
18     did marketing for Actavis at all?
19          MS. WELCH:  Objection to form.
20     A.   Again, they were an account.  So
21     again, we possibly -- well, again, I don't
22     know.  If you show me a document, I can
23     comment on it.
24     Q.   But you don't have a

Page 260

1      recollection as to whether or not they did
2      any marketing for Actavis?
3           MS. WELCH:  Objection to form.
4      A.   No.
5      Q.   How about Morris Dixon?
6      A.   Morris Dixon also is a regional
7      wholesaler.
8           So, you keep asking about
9      marketing for Actavis.  So, if we had
10     Morris Dixon --
11     Q.   Sorry.  Were you going to finish
12     your sentence?
13     A.   I -- you didn't ask a question,
14     so.
15     Q.   I was just wondering if you were
16     familiar with Morris Dixon.
17     A.   Yes.
18     Q.   They're the regional wholesaler.
19          Do you know whether they did any
20     marketing for Actavis, or you don't know?
21          MR. DIAMANTATOS:  Objection to
22     form.
23          MS. WELCH:  Objection to form.
24     A.   What I was going to say is,

Page 261

1    again, these regional wholesalers, they
2    have pharmacies who buy off of their
3    program.  So, to the extent of which we
4    got a product award of Morris Dixon,
5    Morris Dixon may send a notice to its
6    pharmacies with here's the Actavis
7    product, it's available.  Here's the
8    transfer price.  That's the information
9    that they would provide to their
10    pharmacies.  If that constitutes marketing
11    on behalf of Actavis, that answer would be
12    yes, but that's not something that Actavis
13    would have done or paid for.
14    Q.   But you would have marketing --
15    so, how is that different from the
16    marketing agreements we talked about just
17    a few moments ago if you had -- where
18    you're paying a marketing fee to somebody
19    like McKesson?
20    A.   So, again, McKesson, one of the
21    largest big three wholesalers.  Again,
22    quite frankly, they set the terms.  So, in
23    their contract, they charged us fees.
24    Cardinal would do the same thing, a

Page 262

1    percentage of WAC, percentage of AWP.  It
2    was sort of in their contract for the
3    privilege of doing business with them.
4    Some of these smaller accounts
5    are much smaller.  They didn't have the
6    ability to push their fees on to the
7    suppliers.  But if we wanted to
8    potentially communicate product
9    availability or when we got a product
10    award to the one of these accounts and we
11    wanted to communicate to their members or
12    their affiliates, we may have paid a -- a
13    fee.  It could have been $5,000 or some
14    number.  I don't know specifically.  But
15    that's my recollection of how it worked
16    with the smaller accounts versus the
17    larger accounts.
18    Q.   I'm not talking about fees in
19    general though.  I'm talking about
20    something called marketing fees.
21    Are you familiar with paying
22    marketing fees to someone like McKesson?
23    MR. BAILEY:  Objection to form.
24    A.   Again, that's what I described.

Page 263

1    Q.   Okay.
2    A.   So, in the contract, they
3    charged a marketing fee as a percentage of
4    the total business.  So if we're doing $10
5    million with them, they charge you one
6    percent, you're paying a hundred thousand
7    dollars for marketing fees.  You know, we
8    didn't really have a choice.  It's like a
9    franchise fee at like McDonald's or
10    something.
11    Q.   So they didn't charge additional
12    marketing fees for doing things like
13    telephone campaigns or things like that?
14    A.   Yes, we did.  If we opted --
15    MR. BAILEY: Objection.
16    A.   Yes.  If we engaged with -- to
17    get access to their accounts that were on
18    their programs, we would pay additional
19    fees, and they call them marketing fees.
20    Q.   Okay.
21    MS. BAIG:  Let's have this
22    document marked as Allergan -- as
23    Exhibit Number 16, and this is Bates
24    stamped ACTAVIS0851197 through '11960.

Page 264

1    (Boothe Exhibit 16, email chain
2    ending October 12, 2011, Bates No.
3    ACTAVIS0811957 to 0811960, was marked
4    for identification, as of this date.)
5    BY MS. BAIG:
6    Q.   It's an email from you to Mike
7    Perfetto dated October 12th, 2011, or it
8    starts that way.
9    A.  (Perusing document.)
10    Q.   Do you see on the last page at
11    the top there's a reference to "a new
12    sales slick out by week's end" and then it
13    says "Costco add"?
14    A.   Yeah.
15    Q.   What's your understanding of
16    what a sales slick is?
17    A.   I'm not sure.
18    Q.   And, was Costco a place where --
19    where there were direct ads?
20    MS. WELCH:  Objection;
21    foundation; form.
22    A.   Costco was one of our customers.
23    They would -- they would purchase -- they
24    had a generic formulary.  So yes.

Page 265

1      And add is two Ds.  A-D-D.  So
2  that means, I would say, an addition
3  rather than an advertisement, is how I
4  would read that.
5      Q.   Costco addition?
6      A.   Costco add, A-D-D.  Yeah.
7      Again, this is from Michael
8  Dorsey, so I -- you know, you would have
9  to ask him potentially what it meant.
10     Q.   And then next line says
11  "fentanyl patch" and towards the end it
12  says "new slick coming."
13     Do you see that?
14     A.   Mm-hm.
15     Q.   Were there ad slicks for the
16  fentanyl patch?
17     MS. WELCH:  Objection; form;
18  foundation.
19     A.   Again, the only thing I'm
20  familiar with are these we call them sell
21  sheets, something like that.  That may or
22  may not be what Mike here is referring to
23  as a slick.
24     Q.   And then there's a reference to

Page 266

1  a telemarketing program at Key OptiSource.
2      Do you see that?
3      A.   Mm-hm.
4      Q.   OptiSource, I can't recall what
5  you said.
6      Do you recall OptiSource doing
7  marketing for -- for Actavis?
8      A.   Like I say --
9      MS. WELCH:  Objection to form.
10     A.   -- OptiSource --
11     MS. WELCH:  Sorry.
12     THE WITNESS:  That's all right.
13     A.   Again, it's regional wholesaler
14  or regional distributor.  So they would
15  have other pharmacies.
16     So again, the space is you've
17  got -- everybody knows CVS, Walgreens,
18  Wal-Mart, all that stuff, but most of the
19  prescriptions or most of the pharmacies
20  are called independent, and they may or
21  may not buying their -- getting supplied
22  their pharmaceuticals from one of the big
23  three, Amerisource, Cardinal, McKesson.
24  They may also get them from some of these

Page 267

1  smaller accounts that may be networked and
2  affiliate.  By the way, and they my buy
3  them from multiple.  They may go out and
4  shop around see who's going to be transfer
5  price.  So telemarketing or these sorts of
6  things are your -- we would be paying for
7  OptiSource or whomever to reach out to
8  their affiliated accounts to make them
9  aware of our product and if we had a
10  contract with them, what the terms of
11  that, what the price what has been marked
12  as what the, again, the transfer costs.
13     By the way, none of this is to
14  end consumers.  This is to make sure that
15  our product, or FDA-approved product was
16  available in these pharmacies.  So when a
17  physician prescription came in or a
18  patient walked in with a prescription that
19  it would get filled with the Actavis
20  generic as compared to the Teva generic or
21  the Watson generic, 'cause that's the
22  space we were in.  We were competing with
23  multiple generic suppliers.  And when the
24  prescription comes in it just says

Page 268

1  whatever it says.  The pharmacist has the
2  power, the decision as to what to
3  dispense.  And, of course, if our
4  product's not in that pharmacy, then our
5  product doesn't get dispensed.
6      Q.   So, is it your understanding
7  then that OptiSource would be doing a
8  fentanyl patch telemarketing program to
9  pharmacies or to prescribers?
10     A.   Definitely not to prescribers.
11  They do not contact -- again, prescribers
12  are physicians.
13     If anything, this, again, a
14  telemarketing program, my read of this,
15  again it's from Mike Dorsey.  My read of
16  this is that we were providing
17  information to OptiSource and maybe paying
18  for some program for OptiSource to let
19  their member companies, their affiliated
20  pharmacies know that our product was
21  available in 2011.
22     Q.   And a little further down
23  there's a reference to oxymorphone and a
24  McKesson promotion.  And again it states:

Page 269

1  Telemarketing and online will start next
2  week. Cardinal exploring program.  NC
3  mailing Morris Dixon.
4      Do you see that?
5  A.  Mm-hm.
6  Q.  So, my read of that is McKesson
7  was engaged in a telemarketing and online
8  marketing program for oxymorphone on
9  Actavis's behalf.
10      Is that your understanding?
11      MS. WELCH:  Objection to form.
12  A.  It reads:  Oxymorphone McKesson
13  promotion telemarketing online will start
14  next week.
15      So, again, McKesson is a
16  significant wholesaler.  They have
17  multiple, multiple pharmacies that are
18  part of the Progen generics program, is
19  what they called it then.  So, it would
20  appear that we contracted with McKesson to
21  provide to their -- their affiliated
22  pharmacies through their internal system
23  or network or T.V. or email system or
24  whatever some sort of notification of

Page 270

1  availability of our product.  That's
2  what -- that's what that means to me.  And
3  that was common practice.
4      Q.  And, what does NC mailing refer
5  to?  Do you know?
6      A.  NC is -- actually I think it's
7  NC Mutual.  It was another -- it was, one
8  of the, again, another regional wholesaler
9  distributor.  So there must have been some
10  sort of mailing.  So, again, we may have
11  paid for some thing for an NC Mutual to
12  then send the Actavis sell sheet or some
13  approved material to their affiliated
14  pharmacies.
15      Q.  On -- on the page just prior
16  there's a reference about a quarter of the
17  way down to oxycodone and it states:  Will
18  supply key accounts through the end of the
19  year based on historical demand.  Do not
20  share with anyone that we received our Q4
21  allocation for oxycodone.
22      Do you see that?
23      A.  Yep.
24      Q.  Why was it important not to

Page 271

1  share with anyone that you had received
2  your Q4 allocation for oxycodone?
3      A.  So, as you're well-aware,
4  oxycodone is a scheduled narcotic, a Class
5  II.  So, in order to manufacture your
6  approved product, you need both FDA
7  approval and you need DEA quota.
8      The way DEA quota works is every
9  company that sells controlled substances
10  provides a forecast well in advance.  The
11  DEA reviews that forecast, has to -- with
12  justification for your request for the
13  following year, which is based on your
14  historical prescriptions, your historical
15  sales out, any potential new product
16  activity.  You submit that to the DEA
17  usually the first quarter of the calendar
18  year.  The DEA reviews it, assesses the
19  market, looks at your inventory levels,
20  looks at your history, and sometimes
21  somewhere towards the end of the year,
22  usually it can be as late as the end of --
23  like literally 29th of December, you will
24  get a letter from the DEA authorizing your

Page 272

1  quota for the following year.  That quota
2  enables you then to purchase the raw
3  material, in this case it would be
4  oxycodone, from the API suppliers who
5  produce that, companies like Mallinckrodt
6  and Cambrex and others who make controlled
7  substances, which again it's a very, very,
8  tightly controlled, all organized and
9  controlled by the DEA.  And what happens
10  sometimes, given the multi -- multi-source
11  nature of generic pharmaceuticals, given
12  other folks who may or may not have also
13  approved products who may have overbuilt
14  or underbuilt or had a production issue,
15  had a quality issues, sometimes people run
16  out of their quota.  You can't -- you
17  can't buy any of the following year's
18  quota early.  You can't place even an
19  order for the following year's quota until
20  you have the actual DEA authorization.
21  So, what sometimes happened, I think this
22  is what this is in reference to, is when
23  people run out of quota, and of course
24  which means the manufacturers run out of

Page 273

1    their quota and they're used to supplying
2    a Cardinal or a CVS, Cardinal or CVS looks
3    somewhere else for it.
4         I believe what -- 'cause I
5    remember these sorts of conversations.  We
6    wanted to make certain that we were
7    appropriately supplied so in the event
8    that somebody else ran out, we could
9    supply and utilize as an opportunity for
10   potentially a better transfer price to the
11   customer, if we didn't have them on our
12   accounts.  We had contracted accounts and
13   then accounts that weren't contracted.  If
14   somebody else ran out, they would come to
15   us, and we would sell at a different price
16   point.
17        Q.   So, why would it be a secret
18   that you had received your allocation for
19   oxycodone?  Wouldn't that be something
20   that you would want to make known to the
21   customers?
22             MS. WELCH:  Objection to form.
23        A.   Absolutely not.
24        Q.   Why?

Page 274

1        A.   Because it's in limited supply.
2    So if it's in limited supply, then
3    therefore the customer would be willing to
4    pay more for it.
5        Q.   I see.
6             On the first page in the first
7    line there's a reference to:  Any ability
8    to drive more fentanyl at MHA based on the
9    contracting data provided by Mike M?
10            Do you know what MHA refers to?
11       A.   Again, MHA is another account.
12   I don't know what the acronym stands for,
13   but another, again, regional wholesaler or
14   distributor.
15       Q.   And, so, you were asking if
16   there was ability to drive -- to sell more
17   fentanyl to MHA?  Is that what the
18   question is here?
19       A.   To provide, yes, to -- to
20   possibly sell into or have MHA take
21   more -- again, there's multiple suppliers
22   of fentanyl in 2011, generic.  This is,
23   again, FDA-approved generic.  There were
24   five or six different players.  It was a

Page 275

1    multi-source market.
2        Q.   For the customer clients that
3    you had marketing agreements with, like
4    McKesson or some other regional ones that
5    we just looked at, did Actavis review the
6    materials that were used for marketing by
7    those companies?
8             MS. WELCH:  Objection to form.
9        A.   Well, if those companies were
10   sending their own materials out, then no.
11   At least not that I'm aware of.  If we
12   provided information to those companies,
13   then yes, 'cause it would have gone
14   through our review and approval.
15       Q.   And to the extent they were
16   doing telemarketing on your behalf, who
17   would have created those scripts?  Actavis
18   or the company doing the telemarketing?
19            MR. DIAMANTATOS:  Objection to
20   form.
21            MS. WELCH:  Objection to form;
22   foundation.
23            MR. DIAMANTATOS:  Calls for
24   speculation.

Page 276

1        A.   Yeah, I don't -- I don't know.
2             I mean, again, you talk about
3    telemarketing.  My recollection of these
4    sorts of things is an email or a fax or
5    maybe a call to the -- to the pharmacies
6    in their chain to acknowledge that this
7    product was available.  That's what the
8    telemarketing was.  There was no medical
9    claims.  There was no -- it was -- again,
10   it was business to business.  It was the
11   wholesaler or the distributor to its
12   aligned pharmacies.
13       Q.   Would you have reviewed those
14   scripts?
15       A.   No.
16       Q.   Those scripts that were used for
17   purposes of telemarketing?
18       A.   From --
19            MS. WELCH:  Objection to form.
20       A.   Potentially from one of our
21   customers to their affiliated pharmacist?
22       Q.   Yeah, which you were contracting
23   with your customers for.
24       A.   I -- what was that last part?

Page 277

1      Q.   So, if you entered into a
2    contract with one of your customers, like
3    McKesson, to do telemarketing of one of
4    your products, would you personally have
5    reviewed the scripts that they were using
6    as --
7      A.   No.
8      Q.   -- part of that telemarketing?
9      A.   Me personally, no.
10     Q.   Okay.  Would your marketing
11   department have reviewed those scripts, if
12   you know?
13          MS. WELCH:  Objection;
14   foundation.
15     A.   I don't know.  Possibly, but I'm
16   not sure.
17     Q.   Can you identify all the
18   organizations that Actavis would have used
19   to market or promote its drugs, that you
20   can think of right now?
21          MR. DIAMANTATOS:  Objection to
22   form.
23          MS. WELCH:  Objection to form.
24          MR. DIAMANTATOS:  Time.

Page 278

1      A.   Can you repeat the question,
2    please?
3      Q.   Can you identify all the
4    organizations that Actavis would have used
5    to market or promote its drugs, that you
6    can think of right now, its opioid drugs?
7          MS. WELCH:  Objection to form.
8      A.   The -- the -- sorry.  One more
9    time.
10          Just the firms that --
11     Q.   The organizations that Actavis
12   would have used, perhaps contracted with,
13   to do marketing for its opioids.
14          MR. DIAMANTATOS:  Objection.
15          MS. WELCH:  Same objection.
16     A.   Again, we didn't market our
17   generic products.  I think these questions
18   are all about when we would enter into a
19   contract for distribution of our
20   FDA-approved medicines with DEA and
21   FDA-approved supply -- distributors, such
22   as McKesson, there would be a contract
23   price that determined the transfer price.
24   We may have also then contracted for

Page 279

1    marketing services that McKesson -- we pay
2    McKesson for them to communicate to its
3    member affiliate companies that our
4    product was available.
5      Q.   And that would have come out of
6    your --
7      A.   And that's --
8      Q.   Sorry.  Go ahead.
9      A.   No.  If that's what you mean by
10   marketing, that would be yes.
11          So, if you look at all the
12   available licensed DEA-approved
13   distributors and wholesalers, Cardinal,
14   McKesson, AmerisourceBergen, there's many,
15   many smaller ones, direct chains like
16   Wal-Mart, Walgreens, Rite Aid, CVS,
17   Express Scripts, Medco, those are the
18   firms that we contracted with for
19   distribution of our FDA-approved
20   medicines.
21     Q.   But I'm not asking specifically
22   about distribution.  I'm asking more about
23   marketing.
24          So, I've seen, for example,

Page 280

1    marketing agreements that you had with
2    McKesson.  They're separate.  They're
3    separate or they might be a component of
4    the overall agreement with McKesson, but
5    it's specific to marketing.
6          I'm just wondering what other
7    types of organizations, apart from perhaps
8    big distributors, you engaged to help with
9    promotion or marketing.  We've talked
10   already about, on the brand name side,
11   we've talked about inVentiv.
12          Are there any others that you
13   can think of as you sit here right now?
14          MS. WELCH:  Objection to form.
15          MR. DIAMANTATOS:  Objection to
16   form.
17     A.   It would certainly be helpful if
18   you provide me a document, something to
19   review.
20     Q.   Sure.
21          I'm just asking for your best
22   recollection right now as to --
23     A.   And my best recollection --
24     Q.   You can't think of any?

Page 281

```
 1       A.   -- in January of 2019 for
 2   facilities back in 2012, I'd be refreshed
 3   if you have a document that you can share
 4   with me.  I've provided you, to the best
 5   of my recollection, my understanding.
 6       Q.   Okay.  So you can't think of any
 7   right now, right?
 8       MS. WELCH:  Objection to form;
 9   misstates his testimony.
10       MS. BAIG:  Well, he hasn't
11   actually told me whether he can think
12   of any or not.  He's just told me that
13   he won't answer without a document.
14       THE WITNESS:  I told you.
15   BY MS. BAIG:
16       Q.   I would just like to know if you
17   can actually recall any right now.
18       A.   I specifically recalled
19   Cardinal, McKesson, AmerisourceBergen,
20   Walgreens, Rite Aid, Wal-Mart, Express
21   Scripts, Medco.
22       I think that's a pretty good
23   list from a recollection without any
24   specific materials in front of me.
```

Page 282

```
 1       Q.   Okay.  Any marketing companies?
 2       MR. DIAMANTATOS:  Objection to
 3   form.
 4       MS. WELCH:  Objection to form.
 5   BY MS. BAIG:
 6       Q.   Specific, you know, marketing
 7   companies that are solely devoted to
 8   marketing?
 9       MR. DIAMANTATOS:  Objection to
10   form.
11       MS. WELCH:  Objection to form.
12   BY MS. BAIG:
13       Q.   As opposed to big distributor or
14   small distributors?
15       A.   No.
16       MR. DIAMANTATOS:  Objection to
17   form.
18       MS. WELCH:  When you're at a
19   good point, can we take a five minute
20   break?
21       MS. BAIG:  Sure.  Why don't we
22   do that now.
23       THE VIDEOGRAPHER:  We're going
24   off the record.
```

Page 283

```
 1       The time is 2:39 p.m.
 2       (Recess taken.)
 3       THE VIDEOGRAPHER:  We're going
 4   back on the record.
 5       The time is 2:53 p.m.
 6       MS. BAIG:  All right.  Let's
 7   have this document marked as the next
 8   exhibit.
 9       This is Bates stamped 01474262
10   through '4451.
11       (Boothe Exhibit 17, Adjudicated
12   Discount Coupon Program Agreement,
13   Bates No. ALLERGAN_MDL_01474262 to
14   01474331, was marked for
15   identification, as of this date.)
16       THE WITNESS:  It's stamped on
17   the wrong side, but it's okay.  I
18   think it is.
19       MS. WELCH:  It's clipped.
20       It starts with '4262, correct?
21       MS. BAIG:  Yes.
22   BY MS. BAIG:
23       Q.   The document at the top of the
24   third page states it's the executed
```

Page 284

```
 1   version of Adjudicated Discount Coupon
 2   Program Agreement, and it appears to be
 3   between Triple i Division of Medimedia
 4   U.S.A. and Actavis Kadian LLC.
 5       A.   This is a different agreement.
 6       THE WITNESS:  There are multiple
 7   agreements here.
 8       MS. WELCH:  That's what I'm
 9   wondering.
10       Is this a compiled exhibit of
11   multiple agreements?  We're just
12   trying to understand what it is.
13       MS. BAIG:  My understanding is
14   that this was produced as one
15   document.
16       MS. ANTULLIS:  It was produced
17   as a family of documents.  Looking at
18   the first page, I assume it connects
19   them.
20   BY MS. BAIG:
21       Q.   So, if you look at, actually,
22   the second page of the exhibit, there's a
23   list of documents.
24       Do you see that?
```

Page 285

1    A.   This (indicating)?
2    Q.   Yes.
3    A.   Yeah.
4    Q.   Okay.  And my understanding is
5  this is an agreement between Actavis and
6  Medimedia with respect to the coupon
7  program for Kadian.
8        Is that your understanding?
9        MS. WELCH:  Objection to form.
10       And, are you talking about a
11  portion of the exhibit now?
12       MS. BAIG:  I'm talking about the
13  discount coupon program agreement on
14  page 2.
15   A.   Yeah, it only goes to '287.
16  Then you've got other agreements that are
17  different companies and different things.
18   Q.   All right.  So, let's start with
19  this discount coupon program agreement.
20   A.   Okay.
21   Q.   Well, actually let's back up and
22  look at the index.
23       Do you have an understanding as
24  to why all these documents would be

Page 286

1  grouped together, or no?
2    A.   From what I've seen the first
3  four, no.
4    Q.   Okay.  Did you have a file at
5  Actavis that kept all -- all agreements
6  together?  Maybe a hard copy file?
7    A.   Me?  No.
8        Usually the -- all our -- I may
9  have kept specific agreements hard copy,
10  but generally any signed agreement, if you
11  see here you see like a legal stamp.
12       My practice was I wouldn't sign
13  any agreement, by the way, unless there
14  was a legal stamp on it and the sign.
15       So like this one here has the
16  legal stamp (indicating.)
17   Q.   Which page number are you
18  looking at?
19   A.   It's Bates '4275.  This is,
20  again, relates to this Triple i agreement.
21   Q.   Okay.
22   A.   So, my practice was I wouldn't
23  sign anything unless there was a legal
24  stamp on it and initials in there.  And

Page 287

1  then when I did sign things, I signed this
2  one in March of 2009, then I may or may
3  not have kept a hard copy, but generally
4  the document of record legal would have
5  because they would have all the executed
6  signatures.  Sometimes you'd sign them
7  somewhere and the other party would sign
8  them somewhere else and they would keep
9  the integrated signature page.
10       So, again, I don't know why
11  these are all together 'cause this is
12  something and this is something and this
13  is something and you got travel policy
14  here.  And I haven't even dug down to the
15  bottom, so.
16   Q.   No, I understand.  These were
17  produced by your counsel as a family of
18  documents.  I assumed that they were
19  produced that way because there's one page
20  at the front which -- which indexes a
21  number of them, so maybe it was a
22  particular file from -- these documents
23  were all, for the most part, produced from
24  your custodial file.  So why they were

Page 288

1  organized the way they are, I'm not
2  entirely sure, but they were produced all
3  together.
4        In any event, let's start with
5  the first one, the Adjudicated Discount
6  Coupon Program Agreement.  And this was an
7  agreement, my understanding, correct me if
8  I'm wrong, is that this was an agreement
9  with Medimedia - we touched upon it a
10  little bit earlier - with respect to the
11  coupon program for Kadian.
12       Is that your understanding?
13   A.   This looks like it's both a
14  telemarketing physician outreach program,
15  as well as then the pharmacy e-blast, a
16  discount coupon, web coupons, program
17  execution discount coupon.  So it's more
18  than -- it was a agreement with Triple i
19  that covered several different marketing
20  programs.
21   Q.   Okay.  And, if you turn -- and
22  you signed this agreement, correct, on
23  March 18th, 2009?
24   A.   I signed, yeah, through --

Page 289

1  through page 12, and I didn't check to see
2  if all the exhibits were referenced,
3  but --
4      Q.   Okay.  And, if you look at
5  Exhibit A of this agreement, it's entitled
6  "Executive Summary."
7          Do you see that?
8      A.   Yes.
9      Q.   Okay.  And there's a section
10  called "Program Overview."
11          Do you see that?
12      A.   Yep.
13      Q.   And it references a physician
14  outreach program, a pharmacy email blast,
15  discount coupons, web coupon, project
16  flow, program execution, discount coupon -
17  up to $50 off each prescription.
18          And those appear to be the key
19  marketing services that are being included
20  here.
21          Would you agree?
22      A.   Yes.
23      Q.   Okay.  And, under the "Physician
24  Outreach Program," first bullet it states:

Page 290

1  A file of 9,000 physicians with phone
2  numbers will be provided by Actavis.
3          Do you see that?
4      A.   Yes.
5      Q.   And that would come from the IMS
6  data?
7      A.   It may have come from there,
8  Wolters Kluwer, or some database that had
9  physician contact information.  There's
10  multiple vendors who provide that.
11      Q.   Was ValueTrak one of them?  Or
12  ValueCentric?
13      A.   I don't know.
14      Q.   And, the third bullet underneath
15  the "Physician Outreach Program" states:
16  Triple i customer service representatives
17  will be trained on the approved call
18  script provided by Actavis.
19          Do you see that?
20      A.   Yes.
21      Q.   So your understanding is that
22  Actavis provided Triple i with the script?
23          MS. WELCH:  Objection;
24      foundation.

Page 291

1      A.   Will be trained on the approved
2  call script provided by Actavis.  That's
3  what it says.
4      Q.   And the next bullet states:
5  Each physician in the physician file will
6  receive a phone call from a CSR to
7  communicate the following.
8          Do you see that?
9      A.   Yes.
10      Q.   And it's:  Acquisition of Kadian
11  by Actavis, launch of new Kadian POS
12  coupon program, and any additional program
13  related to the product which Actavis has
14  assumed and chosen to continue.
15          Do you see that?
16      A.   Yes.
17      Q.   Do you know what additional
18  programs are being referred to there?
19      A.   No.
20      Q.   And it appears under the
21  pharmacy email blast section that: 43,300
22  pharmacies and stores will receive an
23  email blast at the launch of the point of
24  sale coupon program to introduce the new

Page 292

1  Kadian point of sale coupon program.
2          Correct?
3      A.   That's what it says.
4      Q.   And would Actavis be providing
5  the 43,000 pharmacies to Medimedia, or
6  would it be the other way around?  Do you
7  know?
8          MS. WELCH:  Objection;
9      foundation.
10      A.   I don't know.
11      Q.   But Actavis certainly had the
12  data to provide the 43,000 pharmacy
13  stores, correct?
14      A.   No.  I think it's actually that
15  they had a list of the pharmacies.
16      Q.   You don't think that Actavis had
17  pharmacy level data?
18      A.   For what?
19      Q.   Pharmacy level -- to target
20  pharmacies to receive this coupon pro --
21  this coupon.
22      A.   No.
23          MS. WELCH:  Objection to form.
24      A.   I don't believe we did.  I don't

Page 293

1    think we kept a record of pharmacies.
2       Q.   You don't believe that Actavis
3    had a record of -- you don't believe that
4    Actavis had data which would allow it to
5    target certain pharmacies?
6       A.   I don't believe so.
7          MS. WELCH:  Objection to form.
8       A.   Again, we didn't sell to
9    individual pharmacies.  Our product would
10   be distributed to FDA-approved and
11   DEA-licensed wholesalers or direct chains.
12   We didn't really distribute product at an
13   individual pharmacy level.  That doesn't
14   mean we didn't have access to lists of
15   pharmacies or, again, who were the member
16   pharmacies of the various regional
17   distributors.
18          I mean, obviously if a CVS, I
19   mean, CVS stores are all -- this is, by
20   the way, way before the advent of Google
21   Maps, I'm sure, but there are folks who
22   had lists of physical locations and many
23   of the distributors, and that was one of
24   their -- one of their selling points is

Page 294

1    they had access to all the individual
2    pharmacies.
3          So, I don't think in the normal
4    course of Actavis's business did we keep
5    an active or -- list of pharmacies.
6       Q.   I see.  But you received data
7    from another entity.
8          Is that right?
9          MS. WELCH:  Objection to form.
10      A.   Received what data?
11      Q.   Data with -- with respect to the
12   pharmacies to be able to target
13   pharmacies.
14          MS. WELCH:  Objection to form.
15      A.   I read this that Triple i was
16   sending out the blast.  We didn't send
17   them out.  So Triple i must have had or
18   they had their access to those pharmacies.
19   I'm not certain.
20          It doesn't appear to me that
21   they provided us that list, but I'm not
22   certain.  I don't think that they did.
23      Q.   And you don't believe that
24   Actavis could have a list of highest

Page 295

1    dispensing pharmacies from Wolters Kluwer
2    or IMS or any other data-providing
3    organization?
4          MS. WELCH:  Objection to form;
5    calls for speculation.
6          MR. DIAMANTATOS:
7    Mischaracterizes the witness's
8    testimony.
9       A.   I'm not aware if they had those
10   services or if we contracted for them.
11          Usually the Wolters Kluwer data
12   would be at a physician level, not at a
13   pharmacy level, but they may have had that
14   service.  We may have contracted for it.
15   I don't know if we did or we didn't.
16      Q.   Okay.
17      A.   If we had a list of pharmacies,
18   why would we use Triple i to then send
19   faxes to them?  We could send them
20   ourselves potentially.  But I don't think
21   we had a list of pharmacies.
22      Q.   Well, you had the list of
23   physicians and you're still using Triple
24   i.  I had the same question.

Page 296

1          Why didn't you just send it
2    yourself?
3       A.   Well, again, this is to have a
4    customer service representative call.  So
5    we contracted with Triple i to have their
6    customer service representatives call,
7    which takes effort, and we paid them a
8    per-call amount, rather than use our
9    own -- we didn't have an outbound
10   organization.
11      Q.   And, do you know whether, after
12   Medimedia sent the email blast to the
13   43,300 pharmacies, whether Actavis had a
14   list of which pharmacies received that
15   email blast?
16          MS. WELCH:  Objection to form;
17   foundation.
18      A.   No.  I mean, did they send us a
19   little -- you know, back in the days, I
20   mean, who faxes now, but that little fax
21   confirmation receipt page?  I don't know
22   if they did or didn't send it back to us.
23   I have no idea.
24      Q.   And under "Discount Coupons" it

Page 297

1　states:  A list of physicians to be
2　included in the point of sale coupon
3　program will be provided by Actavis with
4　the assistance of Triple i.
5　　　Do you see that that?
6　A.　Yes.
7　Q.　And 280,000 discount coupons
8　will be assembled into 28,000 units of 10.
9　　　Correct?
10　A.　Yes.
11　Q.　And each pack of 10 discount
12　coupons will contain a re-order business
13　reply card.
14　　　Do you see that?
15　A.　Yes.
16　Q.　Do you know what a re-order
17　business reply card is?
18　A.　I could speculate, but no, I
19　don't know exactly what that is.
20　Q.　Do you have a general idea of
21　what that is, or no?
22　A.　It's probably a index card that
23　has a self-addressed stamp or whatever,
24　like a post thing, and probably you fill

Page 298

1　in your information and you mail it back
2　and potentially that's what would -- you
3　mail it back to Triple i and if they're on
4　the list, they'll send them more cards,
5　potentially.  That's how I read that.
6　Q.　They'll send them more discount
7　coupons, correct?
8　A.　Correct.
9　　　Which is, I think, a card,
10　right?
11　Q.　And 10,000 discount coupons were
12　placed into inventory for fulfilment of
13　physician requests.
14　　　Correct?
15　A.　Yes, that's what it says.
16　Q.　And then with respect to the web
17　coupon, do you have an understanding of
18　what the web coupon was?
19　A.　It says:  Set up a coupon
20　landing page for a printable one-page
21　coupon that offers up to $50 off the
22　patient's out-of-pocket expense.
23　Q.　So, did that mean that a patient
24　could go to the Internet and print out the

Page 299

1　coupon?
2　A.　That's how I read it.
3　Q.　And then a few pages down you
4　see the final coupons.
5　　　Is that right?
6　A.　What page?
7　Q.　The one ending in '283 and '284.
8　A.　These are illustrative or
9　illustrations of it.
10　　　I see FPO, so that means it's
11　obviously not the final.  This is just a
12　placeholder for -- FPO is for placement
13　only, I believe.
14　Q.　So you don't know whether these
15　were the final or not?
16　A.　Well, again, this is a
17　presentation deck.  I mean, the final were
18　actual physical coupons.  So this would
19　never be the final.
20　Q.　Sure.
21　　　It says at the top "Hard copies
22　to be provided."
23　　　But, I guess my question is do
24　you know whether the hard copies were

Page 300

1　identical to what's here?
2　A.　No.
3　Q.　No, you don't know?
4　A.　I don't know.
5　Q.　Okay.  And, if you turn the next
6　page, there's something titled "Kadian
7　2009 In-Bound Calls Coupon NDC Utilization
8　Report."
9　　　What does this show?
10　　　MS. WELCH:  Objection;
11　foundation.
12　A.　Well, it's -- it's reading that
13　drug name, forms strength NDC,
14　redemptions, NDC expense, coupon.
15　　　This looks to be a --
16　essentially what happened was we provided
17　the coupons, and so when the patients went
18　with their prescription that the doctor
19　had written to the pharmacy to get their
20　prescription filled, then they would use
21　the coupon and so they would get $50 off
22　their co-pay at the pharmacy level.  If
23　the co-pay was $50.  If it was less than
24　$50, it would be free to them.  If it was

Page 301

1      more than $50, it would be whatever their
2      co-pay was minus the 50.
3            And this is essentially Triple i
4      was administering the program, would then
5      get information at the pharmacy level so
6      they could then basically pay the pharmacy
7      back for the $50 or whatever the amount
8      was that was the coupon.  So that way the
9      pharmacy is whole in the process.
10     Q.   I see.  So in the right-hand
11     column where it says "Total paid to
12     pharmacy," that's Actavis's payment to the
13     pharmacy to make them whole for the $50
14     coupons that were used?
15     A.   That was Triple i's payment to
16     the pharmacies for the program that we
17     contracted for them to administrate.
18     Q.   Okay.
19     A.   Which we paid Triple i for, so.
20     Q.   Okay.
21     A.   We didn't directly pay a
22     pharmacy.  We, Actavis, did not directly
23     pay a pharmacy.
24     Q.   And if you turn the page, it

Page 302

1      looks like it's the beginning of a new
2      agreement.  It says "Supply Agreement."
3            Do you see that?
4      A.   Yes.
5      Q.   And, who is Noramco Inc.?
6      A.   Let me just look at the
7      agreement here briefly.
8            (Perusing document.)
9      A.   So, Noramco, in this agreement
10     here, Noramco is a raw material supplier,
11     what was called an API supplier.  So a
12     DEA-licensed, FDA-approved supplier of raw
13     materials.  In this instance, it's
14     morphine sulphate, so the active
15     ingredient in both branded Kadian and
16     generic Kadian or other generic morphine
17     products, potentially.  This -- and they
18     were our raw material supplier for, don't
19     know if it says the specific drug in here
20     or not.
21            It says morphine sulphate.
22     Q.   If you move forward a few more
23     pages, you get to a new agreement.  It's
24     called "Contract Sales Force Agreement by

Page 303

1      and between inVentiv Commercial Services
2      LLC and Actavis Kadian" dated May 1st,
3      2009.
4            Do you see that one?
5      A.   Yep.
6            MS. WELCH:  Is that '304 at the
7      bottom?
8            MS. BAIG:  Yes.
9      BY MS. BAIG:
10     Q.   And this is the agreement with
11     respect to your use of the inVentiv
12     sales -- sales reps that we discussed
13     earlier?
14     A.   Yes.
15     Q.   And, if you turn to page 3
16     there's a definition of prescribers or
17     targeted prescribers.
18            Do you see that?
19     A.   Yeah.
20     Q.   And it states that:  Prescribers
21     or targeted prescribers shall mean as
22     identified by Actavis, 1, medical doctors
23     and doctors of osteopathy that are primary
24     care physicians, i.e. internal medicine

Page 304

1      practitioners, family practitioners and
2      general practitioners, pain specialists,
3      podiatrists, orthopedic specialists,
4      physical medicine and rehabilitation
5      specialists, neurologists and
6      anesthesiologists; and, 2, other health
7      care professionals or paraprofessionals as
8      indicated by Actavis from time to time
9      that are legally authorized to write
10     prescriptions for the product located in
11     the territory pursuant to applicable laws.
12            Do you see that?
13     A.   Yes.
14     Q.   And the product at issue is
15     Kadian.
16            Is that right?
17     A.   Branded Kadian, yes.  Morphine
18     sulphate extended-release, the brand, yes.
19     Q.   So, these were the types of
20     prescribers that were being targeted by
21     the sales force.
22            Is that your understanding?
23            MS. WELCH:  Objection; form.
24     A.   Yes.

Page 305

1  Q.   If you keep going many or pages
2  until you get to the one Bates stamped
3  01474358.
4  A.   '358.  Okay.
5  Q.   It's an Exhibit C-1 to the
6  inVentiv agreement stating "Performance
7  Compensation Plan."
8      Do you see that?
9  A.   Okay.
10  Q.   And it states:  2009 Kadian Area
11  Business Manager Incentive Compensation
12  Program.
13      Correct?
14  A.   Yep.
15  Q.   Who is this an incentive
16  compensation plan for?  Do you know?
17  A.   Well, again, the -- so, now, ABM
18  stands for area business manager.  I think
19  you asked that on an earlier chart.
20      So, the -- the resources we were
21  contracting with inVentiv, their -- their
22  sales team were either area business
23  managers or some -- so these would be the
24  folks who were calling on the physicians.

Page 306

1  This would be their incentive compensation
2  program.
3  Q.   And I think this is in line with
4  what you testified to earlier where it
5  says halfway through:  No bonus will be
6  earned until 85 percent of quota has been
7  met.
8      Is that right?
9  A.   That was a different -- you were
10  asking me more about how corporate bonuses
11  were paid.  Bonuses for me.
12      This is, again, this is for the
13  act -- the contracted sales
14  representatives that we contracted with
15  through inVentiv.  So, again, they had a
16  base salary and they had the opportunity
17  to earn up to looks like $20,000.  So
18  again, if I look at the mix, they were
19  probably -- it's probably in here
20  somewhere, whatever their actual salary
21  is, and then this potential bonus
22  component, subject to performance of --
23  performance against the quota.  The quota
24  here defined as some level of

Page 307

1  prescriptions written by their targeted
2  physicians.
3  Q.   Okay.  I think that's it on the
4  next page.
5      Do you see on the next page
6  where it says:  Table 1 Kadian ABM payout
7  versus percent to goal?
8  A.   Okay.
9  Q.   Is that what you're referencing?
10  A.   Yes.
11  Q.   Okay.  And if you turn to the
12  page that's Bates stamped '381 at the end
13  of the Bates stamp.
14      Well, actually, you need to move
15  forward to '372, please.  There's a
16  document that's titled "Patient Assistance
17  Program Agreement."
18      Do you see that?
19  A.   Yep.
20  Q.   Can you tell me what a patient
21  assistance program is?
22  A.   I'm just looking at this as
23  well, just so I make myself familiar with
24  it.

Page 308

1      (Perusing document.)
2      Okay.  I mean, I -- not that
3  it's material, but the document says
4  February 1st and my signature was
5  September 1st.  But that's another point.
6      But, a patient assist -- so, as
7  I mentioned before in my testimony, so, a
8  patient assistant program is a common
9  technique that pharmaceuticals companies
10  utilize to provide access for our
11  FDA-approved legally-dispensable product
12  for those patients that may not have
13  insurance, may be below a certain
14  financial income level.  Sometimes it's
15  two Xs to Medicaid.  So patients that may
16  be prescribed this product that fall below
17  a certain level are eligible to receive
18  either subsidized or free or much lower
19  priced product than those who apply for
20  and are deemed eligible for the patient
21  assistance program.  That's not the same
22  as the coupon program, which is a discount
23  off with a co-pay which, again, would be
24  for another -- you know, other patients

Page 309

1    who have been prescribed legally our
2    FDA-approved product by the licensed
3    physician.
4        Q.   And, why did Actavis offer a
5    patient assistance program?
6        A.   'Cause it was the belief of our
7    company, and I think a belief of most
8    branded ethical pharmaceutical companies,
9    to provide access to all our medicines
10   even if the patient can't afford it,
11   subject to certain financial criteria,
12   income criteria and other eligibility.
13       Q.   So, Actavis didn't profit off of
14   the patient assistance program?
15           MR. DIAMANTATOS:  Objection to
16   form.
17       A.   I think the purpose of the
18   assistant program is it was free or it was
19   at a reduced cost.
20       Q.   Do you know whether ultimately
21   Actavis would profit from patient
22   assistance programs?
23           MS. WELCH:  Objection to form.
24           MR. DIAMANTATOS:  Objection to

Page 310

1    form.
2        A.   Well, if the product was free,
3    then how -- it would be no.  I mean, we
4    would -- we would -- it would be a loss,
5    actually.
6        Q.   Unless it brought in new
7    customers that you expected to be paying
8    later.  I don't know the answer to that.
9            I'm just asking whether there
10   was ever return on investment analysis for
11   patient assistance programs?
12           MR. DIAMANTATOS:  Objection to
13   form.
14           MS. WELCH:  Objection to form.
15           MR. DIAMANTATOS:  Vague;
16   foundation; argumentative.
17       A.   Again, I mean, I'm not aware of
18   any return on investment analysis, as you
19   described.
20           This was, again, this was a -- a
21   decision we made as a company, consistent
22   with others who also provide patient
23   assistance programs, to provide access to
24   our FDA-approved product that had a clear

Page 311

1    and determined medical need that
2    physicians could prescribe.
3        Q.   Was it considered part of
4    commercial development?
5            MS. WELCH:  Objection to form.
6        A.   What do you mean by commercial
7    development?
8        Q.   Would it have fallen under
9    commercial development program?
10       A.   Which means what?
11           MS. WELCH:  Objection to form.
12       A.   I don't understand what you mean
13   by commercial development program.
14       Q.   Well, I'm just looking at the
15   page where it says "Terrence Fullem is the
16   VP of commercial development," and it
17   appears his name is on the patient
18   assistance program.
19       A.   Well, again, Terry, or Terrence
20   Fullem was responsible for all activities
21   around the Kadian brand as part of his
22   multiple responsibilities.  So, as I
23   testified earlier, he also had product
24   development, portfolio, corporate

Page 312

1    development, business development, so.
2        Q.   And, what does SOW refer to?  Do
3    you know?
4        A.   It's -- can you show me where it
5    is in the document?
6        Q.   Yeah, on the page with the Bates
7    stamp 01474383.
8        A.   Okay.
9        Q.   It says at the top:  Kadian
10   Capsules Patient Assistance Program SOW.
11       A.   Sorry.  Which Bates number
12   again?
13       Q.   It ends in '383.
14       A.   Okay.  Well, the '382 says SOW,
15   or says statement of work.  So I'm
16   assuming SOW probably means statement of
17   work.
18       Q.   And it states just below that:
19   Estimated volume 100 to 150 new patients
20   per month.
21           Do you see that?
22       A.   Yes.
23       Q.   And the program duration was for
24   twelve months.

Page 313

1      Do you see that?
2   A.  Yeah.
3      I just want to familiarize
4   myself with this document since you're
5   diving in on it.
6      So, what's the question?
7   Q.  This program was for twelve
8   months, according to this page?
9   A.  Yes, that's what it says.
10   Q.  Do you know whether it was
11   extended or whether the patient assistance
12   program for Kadian was longer than for
13   twelve months?
14   A.  I have no reason to believe we
15   didn't continue it, but if you can show me
16   a document, I could confirm that.
17   Q.  And this is the Triple i
18   division of Medimedia who is implementing
19   this program for Actavis.
20      Is that right?
21   A.  Is that who's --
22   Q.  I see Triple i referenced at the
23   top of page '384.
24   A.  Okay.  Yeah.

Page 314

1   Q.  And it goes on to state:  This
2   Actavis patient assistance program would
3   be completely turnkey and would provide
4   program management and support in the
5   following areas: front end support to the
6   physicians calling in to enroll their
7   patients in the program, receiving
8   applications, validating and capturing
9   practitioner requests, and then providing
10   a personalized Actavis patient assistance
11   program acceptance letter with direct
12   shipment of Kadian to patient to follow.
13   The direct shipment will allow qualified
14   patients to receive their monthly
15   prescription directly shipped to their
16   home address for free.
17      Do you see that?
18   A.  Yes.
19   Q.  And, is that your understanding
20   of what the program involved?
21   A.  These are the services that
22   Triple i is going to do on behalf of
23   Kadian as -- or, on behalf of Actavis as
24   part of this statement of work, yes.

Page 315

1   Q.  And, in connection with that,
2   Triple i was to design an Oracle database
3   to support the practitioner request.
4      Do you see that?
5   A.  Yep.
6   Q.  What is that?
7   A.  What's an Oracle database?
8   Q.  Mm-hm.
9   A.  Sounds like a big spreadsheet,
10   but you'd have to ask folks who know
11   Oracle better.
12   Q.  But you don't know what -- what
13   it -- what the purpose of the Oracle
14   database was in this context?
15   A.  I think it's to capture the --
16   support the practitioner request.  So, the
17   request came in, it went into this
18   database, and I'm sure there's validation
19   confirmation that it was a legitimate
20   physician, that they were licensed, that
21   blah, blah, you know, all those sorts of
22   things that would validate the request, as
23   well as whomever the patient is.  I'm sure
24   there's some criteria for accepting the

Page 316

1   patient into the program and that's why,
2   again, not an area of expertise for
3   Actavis.  This is an area of expertise
4   that Triple i performed this services for
5   multiple pharmaceutical companies, and
6   there are lots of other potential
7   suppliers.  That's who we opt -- I guess
8   we opted to pick of the available partners
9   for this.  Lots of companies provide
10   patient assistance programs.  So it's a
11   common program all throughout the
12   pharmaceutical space for -- to
13   counterbalance the high cost of branded
14   prescription products for the population
15   that's below a certain economic threshold,
16   income threshold.
17   Q.  And it goes on to state that:
18   Triple i will provide live operator phone
19   coverage for physicians and patients
20   requesting Actavis patient assistance
21   program services.
22      Correct?
23   A.  Yes.
24   Q.  And, who would have written the

Page 317

1    scripts for those phone calls?  Would that
2    come from Triple i, or would that come
3    from Actavis?
4        MS. WELCH:  Objection to form;
5    foundation.
6        A.   I don't know.  And I'm not
7    certain what the scripts would be.
8        Yeah, I don't know.
9        Q.   And on the next page, do you see
10   "Implementation and Assumptions"?
11       A.   Which page?
12       Q.   It ends in '386.
13       A.   So you're skipping the page that
14   talks about the program overview?
15       Q.   I think we talked about at least
16   a good part of it.
17       And, the program assumptions is
18   that there was an estimate of
19   approximately 100 to 150 new orders
20   processed monthly at the mail-order
21   pharmacy.  There are also 1700 patients in
22   the current program.
23       A.   That's what it says.
24       Q.   Okay.  A little further down it

Page 318

1    states that:  Patients will have Actavis
2    PAP program eligibility once approved for
3    twelve months but product will be limited
4    to a 30-day maximum supply at a time.
5        A.   Yes.
6        Q.   Did other organizations offer
7    patients -- patient assistance programs
8    for any of your opioid products for
9    Actavis?  Do you know?
10       MR. DIAMANTATOS:  Objection to
11   form.
12       MS. WELCH:  Objection; form.
13       A.   Could you just repeat that?
14       Q.   Were there other organizations,
15   apart from Medimedia, that provided
16   patient assistance programs for Actavis?
17       A.   I don't believe so.
18       Again, we had the rest of the
19   Actavis portfolio were all generic
20   products, which by nature are low-cost,
21   affordable, FDA-approved products.  So the
22   only brand item that we had that was
23   promoted was Kadian and this was the
24   patient assistance program specifically

Page 319

1    for that one branded product.
2        So I think the answer is no.
3        MS. BAIG:  Let's have this
4    document marked as Exhibit 16.  Sorry,
5    18.  It's Bates stamped ACTAVIS1132528
6    through '530.
7        THE WITNESS:  I think I messed
8    the order of this up a little bit.
9        MS. WELCH:  It's all right.
10       THE WITNESS:  If it matters.
11       MR. DIAMANTATOS:  Don't worry
12   about it.
13       THE WITNESS:  Yeah.  Sorry.
14       (Boothe Exhibit 18, email dated
15   October 21, 2009, with attachment,
16   Bates No. ACTAVIS1132528 to 1132530,
17   was marked for identification, as of
18   this date.)
19       (Pause.)
20   BY MS. BAIG:
21       Q.   It's an email from Norman
22   Stalsberg to you and Terry Fullem.
23       A.   Yep.
24       Q.   October 21st, 2009.

Page 320

1        Who's Norman Stalsberg?
2        A.   So, Norm, Norman or Norm, was
3    someone I knew.  He worked for -- he
4    actually may have worked for inVentiv, but
5    he was a supplier of contracted services
6    for pharmaceutical companies.
7        Q.   You mean in his capacity at
8    inVentiv?
9        A.   I don't know if he was -- I
10   can't tell from the email if this -- where
11   he was at at the time.
12       Norm's someone I've known for
13   quite some time in the space.
14       Q.   And, who is Gerard?  There's a
15   reference to him in the first line.
16       A.   I'm trying to figure that out
17   myself.  There was a Gerard who worked at
18   Actavis.  That may be him, but it's not
19   clear if that's that Gerard or a different
20   Gerard, or.
21       Q.   Do you know what division Gerard
22   worked in at Actavis?
23       A.   Gerard was in our -- Gerard
24   Farrell or Ferrell or something, he was in

1    internal communications or customer --
2    internal comms.  He had a, again, a
3    communications role.  He wasn't involved
4    in the marketing, selling, or he wasn't
5    involved in the business, per se.  He was
6    at headquarters.  That Gerard.  But this
7    could be a very different Gerard.
8         Q.   Do you know who Chris --
9    Christine Ballo is?
10        A.   I know her as someone, again,
11   back in my recollection is she works at
12   inVentiv.  So, at this time, this could
13   have been Norm was at inVentiv and
14   Christine Ballo was at inVentiv, and
15   Gerard could have been at inVentiv as
16   well.  It's not clear from the email.
17        Q.   In any event, Norman appears to
18   be sharing with you that he got a copy of
19   the raw physician file from Gerard and did
20   some checking.
21             Do you see that?
22        A.   Where do you read that?
23        Q.   In the first line.  Well, the
24   second sentence of the first line.

1         A.   Okay.
2         Q.   He states:  I got a copy of the
3    raw physician file from Gerard and did
4    some checking on my own.
5              Do you see that?
6         A.   Mm-hm.
7         Q.   Okay.  And then he goes on to
8    state:  According to Gerard, the final
9    targeting file for the 18 reps was 1,641
10   high Kadian prescribers.  The top 1,641
11   prescribers actually account for 50.3
12   percent of total Kadian volume.  So I
13   think your 91 percent pullback is a bit
14   misleading.
15             Do you see that?
16        A.   That's what he wrote.
17        Q.   Do you know what he's referring
18   to with respect to your 91 percent
19   pullback?
20        A.   It's this attachment at the end.
21        Q.   You mean the Kadian physicians
22   that are listed here?
23        A.   No.  This -- this page
24   (indicating.)

1         Q.   Okay.  The page that says
2    "Kadian monthly total prescriptions actual
3    versus consultants predictions"?
4         A.   Correct.
5         Q.   I see.
6              And there's a line here that's
7    marked "Actual (91 pullback.)"
8              Do you see that?
9         A.   Yeah.
10        Q.   What does that mean?
11        A.   Well, again, so, there was a
12   time where a third party came in to, and I
13   think it was with inVentiv or some other
14   group, to provide us a prospectus.  When
15   we acquired the asset, we didn't have any
16   sales resources in the field, and we saw
17   that decline in prescriptions faster than
18   we had thought.  That was -- I think we
19   had talked about that earlier in the
20   morning.  So we engaged with a third party
21   to give us a sense as to what, you know,
22   what are the options for the company and
23   the third party did a presentation, which
24   again it got repurposed here, that said

1    anywhere basically if you're provided a --
2    a hundred -- and so, pullback is 75
3    percent reduction means if you took the
4    number of sales reps that Alpharma had in
5    the field, which at the time was like 400,
6    and reduced it by 75 percent, this is what
7    the consultants would have said the
8    expected trajectory of the scripts would
9    happen, given the share of voice in the
10   market space, the way the physicians
11   respond to promotion, and then -- or 50
12   percent or half or -- 75 -- 25 percent,
13   which is three-quarters.  As I mentioned
14   before, we only had 18 people.  So
15   effectively, we had a 91 percent pullback.
16   I don't know if you do the math between
17   400 or whatever the number is and 18, but
18   that number of -- of salesperson that we
19   put in the field represented a 91 percent
20   reduction from the previous level of
21   support and promotion that this asset had
22   gotten at Alpharma prior to us acquiring
23   the asset.
24             And, so, this chart is basically

Page 325

1  saying, well, it's basically saying that
2  with a 18-person sales organization, we
3  basically stabilized around 50,000
4  prescriptions.
5       Although, again, by the way,
6  this is dated in October and the chart
7  goes out through December.  So some
8  portion of this is an approximation or an
9  estimate.  I don't know what portion of it
10  is real or actual.  You'd have to ask Mr.
11  Stalsberg for that.
12     Q.   And when he states: It's
13  believed that Alpharma had Kadian in a P2
14  detailing position and a significant
15  number of low value Kadian prescribers in
16  their call list.
17       What is a P2 detailing position?
18     A.   Position 2.
19       So, the way a sales organization
20  that has multiple products in its bag, as
21  they call it, or their -- a sales
22  representative is targeted with promoting
23  or providing information about multiple
24  branded products, FDA-branded approved

Page 326

1  products, P2 would be the whatever amount
2  of time they had with the physician, their
3  first detail position would be the first
4  message that they were to give, and if
5  they had an opportunity to go into a
6  second one, that would be P2.
7       I read this email as Mr.
8  Stalsberg trying to justify some time
9  earlier, either -- maybe it was his
10  consultants who provided this information,
11  'cause our actual facts are showing a much
12  different outcome.  So he's trying to
13  provide some justification for why either
14  him or his third party or some other group
15  provided that information which, as you
16  can tell from here, we didn't believe or
17  hold stock in and we went our own -- we
18  went our certain path.
19       That's how I read this and
20  that's my recollection of the -- the
21  background of the information.
22     Q.   Okay.  And he states that his
23  belief is that the current success that
24  Actavis was seeing could be attributed to

Page 327

1  two things.  One, the high value targets
2  mentioned above.
3       That would be the high
4  prescribers physician list.
5       Is that right?
6     A.   Yep.
7     Q.   2, a P1 detailing position.  And
8  3, ongoing volume carryover of currently
9  non-targeted physicians.
10       Is that consistent with your
11  understanding?
12     A.   That's what he wrote.
13     Q.   Did you have a different
14  understanding as to why you were seeing
15  success?
16       MS. WELCH:  Objection to form.
17     A.   Again, if I look at the data and
18  I remember the results, we -- we felt
19  very -- you know, with the commitment to
20  the resources and partnered with inVentiv
21  and the sales representatives that they
22  chose and how we aligned them towards the
23  high value or high prescribing physicians,
24  that these -- that these results were an

Page 328

1  indication that we were operationally
2  effective.
3       And I'm tipping myself to a
4  95-plus percent confident Gerard was an
5  inVentiv employee because now I think I
6  might know who that person might be.
7     Q.   Okay.  Do you know his last
8  name?
9     A.   I knew you were going to ask me
10  that.
11       No, but I think he's an inVentiv
12  employee, or was at the time.
13       MS. BAIG:  Let's have this next
14  document marked as Exhibit 19.  It's
15  ACTAVIS0822310 through '321.  It
16  starts as an email from Natalie Leitch
17  to you and others.  The subject is
18  "Response to Kadian return goods
19  policy."
20       (Boothe Exhibit 19, email dated
21  June 12, 2011, with attachment, Bates
22  No. ACTAVIS0822310 to 0822331, was
23  marked for identification, as of this
24  date.)

Page 329

1     THE WITNESS:  Okay.
2   BY MS. BAIG:
3     Q.  Do you know who Chris Hepp is?
4     A.  Yeah.
5     Q.  Who's that?
6     A.  So, Chris was one of the
7   regional -- or, regional sales manager or
8   district sales managers.
9       So, I believe at this point, we
10  had expanded the Kadian sales team from
11  around 18, which was the initial number,
12  to around 60.  So, in doing so, we put in
13  a layer of regional sales managers or
14  regional sales directors, and there were
15  four of them, and Chris was one of them.
16  He had the midwest, Chicago area-ish, or
17  maybe out to Denver, it looks like.  Or
18  maybe he had the west.  He had one of the
19  four territories.
20    Q.  And in the last paragraph of the
21  first page it states:  In the meantime,
22  I've had a look at ValueTrak data which
23  shows the units shipped to retail
24  locations for Kroger and Safeway.

Page 330

1     According to fiscal year 2010 data, 8,715
2   units (bottles of 100s) were shipped to
3   these chains.  This translates to about
4   13,000 prescriptions dispensed.  I will
5   confirm with ValueTrak tomorrow that all
6   Kroger and Safeway locations are captured
7   in the above data so that we can have a
8   clear idea of the volume we're doing
9   through these chains.
10      Does this refresh your
11  recollection at all as to what type of
12  data you were receiving from ValueTrak?
13    A.  I didn't say anything about what
14  kind of data we were receiving from
15  ValueTrak.
16    Q.  Correction.
17      I think I asked you about
18  ValueCentric, and I think you said you
19  didn't recall.  I could be wrong, but I
20  don't want to argue about it.
21      I'm just wondering if you know
22  anything about the data that Actavis was
23  receiving from ValueCentric or ValueTrak.
24      My understanding is that

Page 331

1   ValueCentric is the company and ValueTrak
2   is the data provider.
3     A.  I think ValueTrak came on at
4   some point, they had a service where they
5   would provide you data leveraging the EDI
6   about shipments to -- not to -- again, it
7   may be the specific location, but it
8   certainly was to specific trains -- chains
9   or accounts.  It was actually something we
10  utilized both on the brand side, on the
11  generic sides, as a means to validate.
12      A big issue in the generic side,
13  it's called gross to net, or chargebacks,
14  which I don't -- I could spend the next
15  six hours of this deposition describing
16  how chargebacks work.  But, effectively,
17  when you sell something into a -- into
18  a -- into a wholesaler, like a McKesson,
19  and they have a contract price with a
20  independent pharmacy who's in their
21  program, you sell it into McKesson at
22  what's called WAC, say it's a hundred
23  dollars, but you may have a contract price
24  with the direct pharmacy at $30.  So what

Page 332

1   will happen is you'll sell it to McKesson
2   at a hundred gross, and then what happens
3   is when McKesson actually -- when the
4   order comes in from the independent
5   pharmacy into McKesson on the program and
6   McKesson ships it to the pharmacy, they
7   will -- they will basically charge you
8   back, charge back to Actavis, $70, which
9   is the difference between the contract
10  price of 30 and the WAC price of 100.
11      So, the extent to which of let's
12  say that what was being allegedly charged
13  back seemed to be a lot more than what was
14  actually being shipped out or whatever,
15  ValueTrak actually provided a service,
16  very, very important on the generic side,
17  to make certain that, quite frankly, the
18  wholesalers or distributors weren't
19  playing any kind of games with it.
20      I think we also utilized this
21  just as, likewise, a control mechanism on
22  all our products, Kadian being one of
23  them, but the gross to net of the
24  chargeback issue was much less of an issue

Page 333

1  there because the contract price was
2  essentially the brand, AWP or WAC.
3       But again, I don't believe we
4  got the ValueTrak at this level of
5  specificity, which was store specific.  It
6  was account specific as each account had a
7  specific EDI code of some sort.  So that's
8  how ValueTrak was able to provide those
9  services, and we would track that way to
10  make certain that the chargeback data was
11  appropriate.
12      Q.   ValueTrak allowed you to make
13  sure the chargeback data was appropriate
14  because it allowed you to see the numbers
15  of drugs being shipped from your customers
16  to their customers.
17      Is that right?
18      A.   Again, well, as I described it,
19  ValueTrak provided shipment data from --
20  from wholesalers to the next where --
21  that's my understanding of ValueTrak, but
22  I won't profess to be an expert of it.
23      The reason that that is there,
24  and especially for controlled substances,

Page 334

1  would be the DEA 222 form, the DEA form
2  that any -- any order for any narcotic,
3  Schedule II to Schedule V, requires a
4  special form.  So, on one hand, the
5  physician's writing prescriptions, so the
6  physician is licensed, validated.  He
7  writes a -- he or she writes a
8  prescription, but the transfer of the --
9  of the materials, the bulk materials in
10  here, example bottles of 100 Kadian, no
11  order can come -- can be released
12  without -- without an accepted 222 form,
13  which is the DEA form.
14      So, pharmacy in Maryland that's
15  connected with AmerisourceBergen would
16  send a 222 order in to both us and to
17  McKesson and through our CSOS program,
18  which is controlled substance ordering
19  program, and then the suspicious order
20  monitoring program had in place, as
21  well as our partners had in place, they
22  had their owns, would then validate and
23  look at those orders and determine whether
24  or not to release those orders.

Page 335

1       But anyway, the ValueTrak would
2  just track the -- validate, if you will,
3  the physical movement of those products.
4  We used it -- like I say --
5      Q.   From your customers like a
6  distributor, for example, to the
7  pharmacies?
8      A.   That's my understanding of
9  ValueTrak.
10      And we used that to validate --
11  we used that to validate chargebacks.  I
12  believe we also used it to make certain
13  that, for example, there weren't shortages
14  in certain areas, potentially.  Because,
15  again, when we sent it to a wholesaler, we
16  would generally send it -- the wholesalers
17  had national logistic centers or regional
18  logistic centers.  So our contract with
19  Cardinal, for example, is every Cardinal
20  order, and Cardinal supports the entire
21  United States and Puerto Rico and other
22  parts of the world, but only licensed for
23  us in the U.S.  We would get one order for
24  Cardinal.  We would ship all of our

Page 336

1  product from our UPS distribution center
2  to the Cardinal national logistic center,
3  and then Cardinal would then determine how
4  that product got distributed around the
5  country.  We had no visibility to what
6  Cardinal did with once it got to into
7  their control other than we would have
8  chargeback data so then we could see.
9  'Cause the other issue was sometimes we
10  would contract for a price with a certain
11  account.  We'd send the product to
12  Cardinal.  The account would say hey, how
13  come we don't have access to product.  We
14  were like we sent it to Cardinal.  So
15  that's a question for those folks in the
16  distribution chain.
17      Q.   But you wanted visibility into
18  where Cardinal was sending your drugs so
19  that you could see whether or not the
20  chargebacks were correct?
21      MS. WELCH:  Objection to form.
22      A.   That's how I -- that's my
23  understanding of why ValueTrak was in --
24  in our infrastructure or whatever.  We

Page 337

1  subscribed to that service.
2      Q.  Okay.  And, could you also
3  obtain data from ValueTrak that showed
4  high-dispensing pharmacies for a certain
5  drug, irrespective of whether it was your
6  product or a competitor's product?
7      A.  I don't think so.
8          Like I say, as I described to
9  you my understanding of ValueTrak, again,
10  I don't think it was retail at that level
11  of pharmacy level.  It was, again, based
12  on the EDI or the license code for the --
13  the pharmacy or the -- so that's, I
14  believe it was all based on the EDI
15  systems and 222 forms, all stuff that was
16  at a more aggregated level, rather than at
17  a individual location level.
18      Q.  And, so, when -- we've already
19  talked about how it was that you were able
20  to target the highest prescribers, but how
21  were you able to target the highest
22  dispensing pharmacies?  Through what data
23  set?
24          MS. WELCH:  Objection to form.

Page 338

1      A.  We didn't target high-dispensing
2  pharmacies.
3      Q.  So when you did your email
4  blasts to thousands of pharmacies, you
5  just picked those randomly?
6          MR. DIAMANTATOS:  Objection to
7  form.
8          MS. WELCH:  Objection to form;
9  misstates testimony.
10          MR. DIAMANTATOS:  Argumentative.
11  BY MS. BAIG:
12      Q.  Or did you select certain
13  pharmacies to send your email blasts to?
14      A.  Well, the example you showed me
15  with Keenmore [ph], or whatever it is, my
16  understanding of that was that they had
17  43,000 pharmacies in their program.  So we
18  sent them to all of the pharmacies in that
19  example.
20          That's my understanding of that
21  example.  But if you have a more specific
22  one, I'd be happy to comment on it.
23      Q.  No.  But my question really is
24  just about your understanding.

Page 339

1          Was your understanding that you
2  had no way to track high-dispensing
3  pharmacies?
4          MS. WELCH:  Objection to form.
5      A.  Yes.
6      Q.  Okay.
7      A.  At Actavis.  Other than,
8  again --
9      Q.  No, but I don't just mean at
10  Actavis.  I mean through anybody that -- I
11  mean, you didn't have necessarily the data
12  on the high-prescribing doctors either.
13  You're getting data from a variety of
14  service -- of companies.
15          And my question to you is
16  through any of those companies, or through
17  your own company, did you have visibility
18  into what were the highest prescribing
19  pharmacies?
20      A.  I don't --
21          MS. WELCH:  Objection to form.
22      A.  I don't specifically recall that
23  or remember any of that.  But that doesn't
24  mean it doesn't exist.

Page 340

1          And if you had something you
2  could show me, I could comment on it.
3      Q.  So you don't remember one way or
4  the other whether Actavis was -- was
5  looking at high-dispensing pharmacies for
6  purposes of promotion its own drugs?
7          MS. WELCH:  Objection to form;
8  misstates testimony.
9      A.  I don't believe we did that.  I
10  don't recall us ever doing that, and I
11  don't think we had access to that
12  information.
13          Again, we -- we would get orders
14  in through 222 forms from our accounts,
15  which were, again, were not pharmacy
16  specific, and they would, again, they
17  would come either through the retail chain
18  or from the direct wholesaler.  I believe,
19  actually, that they came in from the
20  McKessons, the Cardinals of the world, but
21  also, again, anybody requesting a
22  controlled substance would also have to
23  submit their own 222 forms.  Everybody has
24  to be licensed by the DEA and in good

Page 341

1    standing.  So, any order that came in, if
2    this came in directly to us or through
3    McKesson, I think it came directly to us,
4    but we used McKesson for fulfilment.  So
5    that's why there was the computer -- the
6    controlled substance ordering system and
7    the suspicious order monitoring, to make
8    certain that there was alignment between
9    what the customers -- by the way, again,
10   through their DEA 222 form, that licensed
11   form, we just wanted to make certain that
12   it was legitimate order.
13       Q.  Do you know who Mark Killion is?
14       A.  Yeah.
15       Q.  Who is that?
16       A.  So, Mark was another one of the
17   four RSMs or DMs.  I think he also had
18   responsibility for training of the sales
19   force from an Actavis perspective.
20       Q.  Training of which sales force?
21       A.  The Kadian branded sales force
22   which we contracted through with inVentiv.
23       MS. BAIG:  Let's have this
24       document marked as Exhibit 20.  Bates

Page 342

1    stamp ACTAVIS09716 -- sorry, '1969
2    through '1971.
3       (Boothe Exhibit 20, email dated
4    June 21, 2011, Bates No.
5    ACTAVIS0971969 to 0971972, was marked
6    for identification, as of this date.)
7    BY MS. BAIG:
8       Q.  What's an objection handling
9    workshop?  Do you know?
10      A.  I'd be speculating.  It's not in
11   my normal vernacular.
12      Q.  Towards the end of the first
13   page, there's a paragraph that starts:  Is
14   there any way we can reference morphine
15   sulphate that's in the PK graph of our
16   sales aid?
17       Do you know what PK stands for?
18      A.  I think it's pharmacokinetic or
19   something, but I don't know a hundred
20   percent certain.  Something about blood
21   levels.
22      Q.  Can we ask a prescriber about
23   their personal experiences, preferences of
24   Kadian and morphine sulphate?

Page 343

1       Do you have an understanding
2    of -- of why he's asking that?
3       A.  Again, reading this email for
4    the first time, 'cause I was not on the
5    email string, it looks like Mark, who I'll
6    again, as I said, was one of the regional
7    sales leads.  So he had sales team
8    underneath him.  And looks like he
9    canvassed his team of ABMs, area business
10   managers, for ideas or questions,
11   whatever, always were bubbling up as part
12   of a normal process.
13       To the extent of which any of
14   this went anywhere is unclear.
15      Q.  And, what are ABMs again?
16       The area business managers.
17      A.  Yes.
18      Q.  And the current concern -- he
19   states at the bottom:  The concern is that
20   we ask the area business managers to
21   target prescribers who write a large
22   amount of morphine sulphate but can't
23   really discuss anything about conversions.
24   We know cost is a key issue and ease of

Page 344

1    prescribing due to reimbursement is why
2    they prescribe morphine sulphate.
3       What's your understanding of
4    what -- what that's referring to, ease of
5    prescribing due to reimbursement?
6       A.  So, morphine sulphate is a
7    generic and Kadian is a brand.  So
8    effectively, I mentioned before PBMs or
9    pharmacy benefit managers.  Generally when
10   there's an available generic in the
11   therapeutic area, and this would be
12   morphine, the PBMs will -- will make it
13   more challenging and more difficult for
14   physicians to write branded products.
15   They of course will do generic first.
16   They'll have -- I don't remember the
17   language for it.  They'll have prior
18   authorization, is an example of that, or
19   have other stops or have -- require
20   patients to fail.  Those are some of the
21   lingo, from my -- my understanding.
22       So, when there's an available
23   generic, and, again, morphine sulphate,
24   again that might be the generic of Kadian

Page 345

1    or it might be the generic of MS contin,
2    which is also morphine sulphate, then
3    again the -- it's easier -- with
4    physicians getting questions back from
5    patients who they've written a
6    prescription for and the pharmacy won't
7    fill, or with a high co-pay, that's
8    essentially what Mark is, or these ABMs
9    are funneling up as an area of potential
10   concern.
11            MS. BAIG:  Let's have this
12      document marked as Exhibit 21.  It's
13      Bates -- it's Bates stamped
14      ACTAVIS0960324 through '327.
15            (Boothe Exhibit 21, email dated
16      November 4, 2011, with attachment,
17      Bates No. ACTAVIS0960324 to 0960327,
18      was marked for identification, as of
19      this date.)
20   BY MS. BAIG:
21      Q.   And, I would just like to know
22   from you whether this is -- is this an
23   example of a weekly ValueTrak report?  Do
24   you know?

Page 346

1      A.   Which one?
2      Q.   Well, I think it's one document.
3    I think they -- even though there's a few
4    different pages, but --
5      A.   Okay.
6            (Perusing document.)
7            So, the first page -- so, what
8    was the question?  Sorry.
9      Q.   Is this a ValueTrak report?
10     A.   No.
11     Q.   When I look at the third page,
12   at the top of the chart it says "Total
13   ValueTrak input tab."  And, so, I was just
14   wondering if this is something that's
15   derived from the ValueTrak tool.
16     A.   I -- I believe that these pages,
17   starting from '327 to some point, is the
18   raw data from ValueTrak.  And the -- this
19   page '325 here is a summary or a
20   management dashboard that we created,
21   Actavis created, that incorporates in it
22   some of the ValueTrak information, but
23   actually has a lot more information in it
24   from a whole variety of sources.

Page 347

1            So this is a, you know, a
2    management dashboard that brings in
3    multiple different sources of information
4    in a nice one-page consolidated tool for
5    folks like me and others to look at who've
6    got a lot of other things going on in the
7    day-to-day business.
8      Q.   I see.
9            And, so, who generally created
10   reports like this?  Or, do you know who
11   would have created this report?
12     A.   This specific -- this page right
13   here?
14     Q.   Mm-hm.
15     A.   Again, this would have been -- I
16   think we utilized this across a variety of
17   our key products.
18            So, for the Kadian one it would
19   be Nathalie, but for the generic ones, it
20   might have been Jinping or someone in Mike
21   Perfetto's organization.
22            I believe we had several of
23   these, but I'm not a hundred percent sure.
24     Q.   And if you look at the first

Page 348

1    page in the email from Natalie Leitch to
2    you and others it says subject "Kadian
3    weekly update."
4            So, is -- was this something
5    that you received weekly?
6      A.   Yes.
7            It's Nathalie.
8      Q.   Okay.  And, on -- at this
9    particular time, it shows that
10   OxyContin -- has OxyContin identified on
11   the pie chart as 30 percent.
12            That's 30 percent of what?
13     A.   Okay.  So, this chart that --
14   pie chart says "Share of LAO TRX September
15   2011."  And the source isn't listed here,
16   but -- so, LAO stands for long-acting
17   opioids.  So this is the entire class, and
18   what you see in this pie chart is the mix,
19   the percentage of the entire class of TRX,
20   which I believe is total prescriptions,
21   but it could be total units.  It wasn't
22   clear.  We weren't sort of asking that.
23            So here you see, actually, that
24   Kadian is only 2.7 percent of the total

Page 349

1    class volume.  Whereas OxyContin, which is
2    the -- that's the branded Purdue item, I
3    believe, is 30 percent of the TRXs for the
4    class of -- in September of 2011.
5        Q.   So this is showing total market
6    share.  This is not specific to Actavis.
7        Is that right?
8        A.   Correct.
9        Again, the Kadian, we were the
10   only person who had -- well, again,
11   this -- 'cause the generic version of
12   Kadian would be bundled into the morphine
13   sulphate 'cause that's what the -- the
14   active ingredient is.  Just like MS -- so
15   MS Contin would -- brand would be
16   somewhere in the all other, but generic
17   version of MS Contin and generic version
18   of Avinza, all the generic versions of a
19   product with morphine sulphate as the
20   active ingredient would be in that blue
21   wedge.
22       There you see fentanyl.  Of
23   course that's the transdermal patch.  But
24   the actual brand of fentanyl is called

Page 350

1    Durasegic.  And there you see that by
2    September 2011 the Duragesic brand, since
3    there were multiple generics available,
4    has really receded as a script component
5    of the total long-acting opioid market,
6    the brand, but the generics were a big
7    chunk of the prescriptions.
8        Q.   And this total ValueTrak data
9    where it says "Sales out bottles," that's
10   all just Actavis bottles.
11       Is that right?
12       MS. WELCH:  Objection to form.
13       A.   Which page are you on?
14       Q.   The first page of the Total
15   ValueTrak input tab.
16       MS. WELCH:  Objection to form;
17   foundation.
18       A.   Yeah, I -- honestly, I don't
19   know the specifics of ValueTrak.  You
20   know, what's in, what's out.
21       We used it, again, like I said,
22   to validate chargebacks.  And on the first
23   page in here when you see sort of sales in
24   and sales out, we wanted to make certain

Page 351

1    that there was an alignment, a balance
2    between what was -- what we were shipping
3    into the channel and what was being pulled
4    through 'cause we wanted to avoid the risk
5    down the road of either being out of
6    product or having too much product in the
7    channel so we had product returns come
8    back, which are very, very expensive.
9        And, also, we looked at this as
10   a gauge to, since each of the customers
11   had certain buying frequency that they
12   would order on a weekly basis, on a
13   biweekly basis.  So, and they had their
14   own triggering mechanism for when they
15   thought the inventory level would get to a
16   point to trigger a reorder.  So every so
17   often we would to have call Amerisource
18   and say hey, we see you being less than
19   two weeks of inventory based on the
20   demand, you should place an order.  Most
21   of them did it automatically, but
22   occasionally they would order not enough
23   or order too much.  So this was part of
24   the management tool to see where we stood

Page 352

1    at days on hand effectively at the
2    accounts, which is why you see, it's in
3    here somewhere.  It's actually down at the
4    bottom stuff there, the inventory, days of
5    supply units.  And, so, we were tracking
6    that to make certain that we were keeping
7    our manufacturing organizational aligned
8    with the practice so we had our product
9    available for our customers.
10       Q.   So, this chart here which starts
11   on the third page --
12       A.   Yeah, I don't know how this raw
13   data --
14       Q.   -- this is Actavis specific?
15       A.   I don't know.
16       Q.   You don't know?
17       A.   Like I said, I'm not familiar
18   with the specifics of the ValueTrak data.
19       Q.   Okay.
20       A.   Someone would know much more
21   than I would.
22       Q.   If you wanted to know, who would
23   you ask?
24       A.   Well, in this one, I would ask

Page 353

1    Nathalie, I guess.
2      Q.  Okay.
3      A.  Came from her.
4      Q.  Can you tell me the difference
5    between 852 data and 863 data?
6      A.  Wow.
7      Q.  Do you remember?
8        MS. WELCH:  Objection;
9    foundation.
10     A.  Again, I -- those are EDI codes,
11   electronic data exchange or interchange.
12     Q.  I believe so.
13       But they're just referred to in
14   numerous emails, the 852 data or the 863
15   data.
16     A.  Again, one is, again, orders in
17   and one's orders out, is my understanding.
18       So, that's -- I don't know which
19   is which.  But, you know, by this time,
20   the days used to be that folks would fax
21   in orders.  Now everything was electronic,
22   and the EDI was a way to -- again, that's
23   what tied the DEA 222 forms.  That's what
24   tied the chargebacks.  Everything was done

Page 354

1    through electronic data.
2      Q.  When you say orders in and
3    orders out, what do you mean?
4      A.  So, again, when -- when McKesson
5    would place an order with us, they would
6    send order, push a button on their
7    computer, and it essentially would go
8    through the EDI.  So that would be an
9    order in.  And then we shipped the product
10   out, we would send and invoice, and that
11   would be we push a button and that would
12   be the order out.
13       And those are two different EDI
14   codes.  It might not be the two you
15   referenced, but that's kind of how it was
16   done.
17       MS. BAIG:  All right.  Let's
18   mark the next exhibit as Exhibit 22.
19   It's Bates stamped 01898012 through
20   '034.
21       (Boothe Exhibit 22, email chain
22   ending January 27, 2012, Bates No.
23   ALLERGAN_MDL_01898012 to 01898134, was
24   marked for identification, as of this

Page 355

1    date.)
2    BY MS. BAIG:
3      Q.  And this, if you turn to page 2,
4    I believe is the agreement that Actavis
5    had with ValueCentric, or at least one of
6    them.
7        Is that your understanding as
8    well?
9      A.  I'm just checking to see if the
10   agreement was signed, if the -- who signed
11   it.
12       Okay.  What was the question?
13     Q.  Is -- is it your understanding
14   that this is an agreement between Actavis
15   and ValueCentric for data services that
16   we've been discussing?
17     A.  Yes.
18     Q.  Okay.  And you signed this
19   document?
20     A.  Yes.
21     Q.  And, it appears that this is
22   from 2012.
23       Wait a minute.
24       Actually, from 2009.  But you're

Page 356

1    receiving an email here in 2012 asking if
2    you wish to extend.
3        Do you know whether -- whether
4    you had an agreement in place like this
5    with ValueCentric for the years 2009
6    through 2012 or beyond?
7      A.  Again, this agreement covers
8    February 2009.  So yes for 2009.
9        And, based on the email from Mr.
10   Sullivan, it looks like it was going to
11   expire in 2012.  So it must have been a
12   three-year deal.
13     Q.  And, if you turn to Schedule A
14   on the Bates stamp page 01898023.
15       Those are the -- those are the
16   services that were being provided.
17       Is that your understanding?
18     A.  Yes.
19     Q.  I believe you testified that the
20   ValueTrak data was used primarily for
21   purposes of gauging the accuracy of
22   chargebacks.
23       My question now is whether the
24   ValueTrak data was also used for

Page 357

1  suspicious order monitoring?
2       MS. WELCH:  Objection;
3  foundation.
4       A.   It may have been.  I don't know
5  for certain.
6       Q.   Do you recall using key opinion
7  leaders at all while you were at Actavis?
8       MR. DIAMANTATOS:  Objection to
9  form.
10       A.   Key opinion leaders for which
11  product or --
12       Q.   For any products.
13       MR. DIAMANTATOS:  Objection to
14  form.
15       MS. WELCH:  Objection to form.
16       A.   We had talked about key opinion
17  leaders in the context of the Moxduo
18  product that I referenced earlier that was
19  never approved.  I think as part of our
20  prelaunch planning we had laid out as part
21  of, again, a standard new pharmaceutical
22  product launch, those are sort of the
23  normal tools.  I believe there had been
24  some discussion about Kadian using a key

Page 358

1  opinion leaders or speaker, but we never
2  implemented those to my -- to my -- to my
3  recollection.
4       Q.   Do you recall using key opinion
5  leaders at Alpharma?
6       A.   Well, again at Alpharma -- well,
7  which time frame at Alpharma?
8       Q.   Any time frame.
9       A.   So, when I was Alpharma in 2004
10  and 2005, I just ran the generics
11  business.  So, to the extent of which
12  Alpharma used key opinion leaders, that
13  would not have been an area of my
14  responsibility.  And after 2005, the
15  period of 2006 through 2009, Alpharma and
16  Kadian were not part of Actavis.  So I
17  don't know exactly what Alpharma did
18  between 2006 and 2009, and really don't
19  know what Alpharma did for the brand group
20  before.  My responsibility was in the
21  generic space.
22       Q.   So you've never -- you've never
23  had any involvement working with key
24  opinion leaders.

Page 359

1       Is that right?
2       MR. DIAMANTATOS:  Objection to
3  form.
4       MS. WELCH:  Objection to form.
5       MR. DIAMANTATOS:
6  Mischaracterizes the witness's
7  testimony.
8       A.   What was the question again,
9  please?
10       Q.   Have you had any involvement
11  working with key opinion leaders?
12       A.   What do you mean by working
13  with?
14       Q.   Overseeing your company's work
15  with key opinion leaders.
16       MS. WELCH:  Objection to form.
17       A.   Again, I mentioned that during
18  the Moxduo there was some discussion about
19  key opinion leaders or advisory boards and
20  such.  So I was aware of that, the extent
21  of which we did, but that product was
22  never approved.
23       I'm not aware of any key opinion
24  leader activity associated with Kadian,

Page 360

1  nor would we have any reason to have any
2  sort of key opinion leader with any of the
3  generic products.
4       So, during my Actavis time, that
5  answer is no.
6       MS. BAIG:  Let's have this
7  document marked as Exhibit 23.
8       (Boothe Exhibit 23, slide deck
9  Advocacy Development Brainstorming
10  Meeting April 25, 2006, Bates No.
11  ALLERGAN_MDL_02513100 to 02513130, was
12  marked for identification, as of this
13  date.)
14  BY MS. BAIG:
15       Q.   This is a document Bates stamped
16  ALLERGAN_MDL_02513100 through '13130.
17  Appears to be, in part, a slide deck
18  titled "Kadian Advocacy Development
19  Brainstorming Meeting April 25th, 2006."
20       Do you recall any brainstorming
21  meetings in or about 2006 regarding
22  advocacy development?
23       A.   No.
24       Again, this document, 2006, this

Page 361

1  asset was part of Alpharma.
2      Q.  Okay.  So, you were at Alpharma
3  at the time, right?
4      A.  No.
5      Q.  Do you have an understanding of
6  what this document is?
7          MS. WELCH:  Objection;
8      foundation.
9      A.  It's the first time I've seen
10  it.
11      Q.  You haven't seen it before?
12      A.  Nope.
13      Q.  Okay.  Was Alpharma marketing
14  Kadian in 2006?
15          MS. WELCH:  Objection;
16      foundation.
17      A.  Again, I didn't work for
18  Alpharma in 2006.  You'd have to ask
19  Alpharma.
20          My belief is yes.
21      Q.  When did Actavis begin marketing
22  Kadian?
23      A.  We acquired the Kadian asset at
24  the end of 2008.  So we -- we assumed that

Page 362

1  in some of the documents that we saw in
2  the March, February, May time frame of
3  2009 is when we determined, based on the
4  reduction in scripts that we were seeing,
5  that we should look at options for direct
6  promotion for the Kadian asset as part of
7  Actavis, which is when we engaged inVentiv
8  and Triple i, some of the documents you've
9  asked me about previously.
10      Q.  So, is there -- is it your
11  belief, looking at this document for the
12  first time, that this is an Alpharma
13  document?
14          MS. WELCH:  Objection;
15      foundation.
16      A.  Yes.
17      Q.  And, how do you come to that
18  belief?
19      A.  The date says April 25th, 2006.
20  It says Kadian.  Alpharma owned Kadian in
21  April 25th of 2006.  So my belief is this
22  is an Alpharma document.
23      Q.  And it would -- and, why would
24  Actavis be producing an Alpharma document?

Page 363

1          MS. WELCH:  Objection;
2      foundation.
3          And objection to the extent
4      you're asking him to comment on the
5      work of the lawyers.
6      A.  I don't know.
7      Q.  Well, do you know how an
8  Alpharma document would have made its way
9  to Actavis?
10          MR. DIAMANTATOS:  Objection;
11      form; foundation; calls for
12      speculation.
13      A.  As part of the acquisition of
14  the Kadian asset, I believe we got
15  materials that Alpharma had.  This may
16  have been one of those.  But I don't
17  have -- I have no basis to confirm that or
18  validate that.
19      Q.  And, do you see on the second
20  page there's a slide entitled "KOL
21  Development"?
22      A.  That's what the slide says, yes.
23      Q.  Were you aware of any KOL
24  development at either Alpharma or Actavis

Page 364

1  when you were there?
2          MR. DIAMANTATOS:  Objection.
3          MS. WELCH:  Objection to form;
4      foundation; asked and answered.
5      A.  As I previously said, we at
6  Actavis did no KOL activity for Kadian or
7  any of our generic approved products.
8      Q.  Were you aware of any KOL
9  development for any opioid products at
10  Alpharma or Actavis?
11      A.  During which time frame?
12      Q.  Any time frame.
13      A.  Well, again, I worked for
14  Alpharma from 2004 to 2005, and I worked
15  for Actavis from 2006 to 2012.  So, during
16  my tenure at Actavis, 2006 to 2012, no
17  awareness of any KOL programs for branded
18  Kadian or any of the generics, and during
19  my time at Alpharma, 2004 to 2005, I was
20  solely involved in the generic side of the
21  business.  So I had no visibility to
22  whatever programs Alpharma may or may not
23  have been doing for the Kadian asset.
24      Q.  So, your answer is "no" then to

Page 365

1    the question were you aware of any KOL
2    development for any opioid products at
3    Alpharma or Actavis?
4        MR. DIAMANTATOS:  Objection;
5    form; asked and answered.
6    BY MS. BAIG:
7    Q.   Is your answer "no" to that?
8        MS. WELCH:  Same objections.
9    A.   During the time frame that I was
10   at Alpharma, 2004 to 2005, I had no
11   awareness of any KOL development being
12   done by Alpharma.  Doesn't mean it wasn't
13   happening, but it was not my area of
14   responsibility.
15       And from 2006 to 2012 during my
16   time at Actavis, I had no knowledge or
17   awareness of any KOL activity being
18   developed or in place.  I referenced that
19   we were exploring it for the potential
20   Moxduo product, but we never implemented
21   it 'cause the product was never approved.
22   Q.   So, in connection with your
23   response for Alpharma, answering that it
24   was not part of your responsibility is a

Page 366

1    little bit different than answering
2    whether or not you were aware of it.  And,
3    so, you could have become aware of it by
4    having communications with people at the
5    company or outside the company.
6        My question to you is were you
7    aware of any KOL development at Alpharma
8    at all ever?
9        MR. DIAMANTATOS:  Objection;
10   form; foundation; calls for
11   speculation; asked and answered.
12       MS. WELCH:  Same objections.
13   A.   Again, I -- no, not aware of it
14   during my time at Alpharma for Alpharma.
15   And what happened after Alpharma separated
16   is really a question for Alpharma.  I had
17   no specific knowledge of it.
18   Q.   Did you have any knowledge of
19   what happened at Alpharma with respect to
20   KOL development after you left?
21       MR. DIAMANTATOS:  Same
22   objections.
23       MS. WELCH:  Same objections.
24   A.   No.

Page 367

1    Q.   You never learned about that
2    from anybody?
3        MR. DIAMANTATOS:  Same
4    objections.
5    A.   No.
6    Q.   And you never had any
7    communications with anybody about KOL
8    development at Alpharma or Actavis, apart
9    from the Moxduo?
10       MR. DIAMANTATOS:  Same
11   objections.
12   A.   Not that I'm aware of.
13       But if you have a document you
14   want me to comment on, I'd be happy to
15   review it.
16   Q.   Were you aware that there were
17   third party organizations which assisted
18   pharmaceutical companies with KOL
19   development programs?
20       MR. DIAMANTATOS:  Objection to
21   form.
22       MS. WELCH:  Objection to form.
23       MR. DIAMANTATOS:  Vague.
24   A.   Yeah.  What do you mean by that?

Page 368

1    Q.   Do you know what a KOL is?
2    A.   Key opinion leader?
3    Q.   Yeah.
4        So, are you aware of any third
5    party entities that assist pharmaceutical
6    organizations generally with key opinion
7    leader development programs?
8        MR. DIAMANTATOS:  Objection;
9    form; vague.
10   A.   I mean, personally I know that
11   they exist.
12       I don't specifically know what
13   companies do that.
14   Q.   You don't know any companies
15   that do that?
16   A.   If you want to provide me a list
17   of companies, I can let you know if I'm
18   aware of them.
19       I would imagine that -- again,
20   we were talking with inVentiv about Moxduo
21   and talking about KOLs.  So inVentiv would
22   have been one of the companies that
23   potentially assist pharmaceutical
24   companies in key opinion leader

Page 369

1   development.  And there's lots of company
2   that provide the same sort of services as
3   inVentiv.  So there's probably lots of
4   companies that were involved in key
5   opinion leader development, but I have no
6   personal participation or experience in
7   engaging key opinion leader programs
8   directly during my tenure at Actavis or
9   Alpharma.
10      Q.  So, apart from possibly
11  inVentiv, can you think of any other
12  companies that may be involved in key
13  opinion leader development?
14      MS. WELCH:  Objection to form;
15  speculation.
16      MR. DIAMANTATOS:  Asked and
17  answered.
18      A.   You just have to provide me a
19  list if you want me to comment if I'm --
20      Q.   I don't have a list, sir.  My
21  question is about your recollection as you
22  sit here today.
23      Do you recall or do you know of
24  any third party companies that provide key

Page 370

1   opinion leader development programs?
2       If the answer's no, just say
3   "no."
4       MR. DIAMANTATOS:  Objection to
5   form.
6       MS. WELCH:  Asked and answered.
7       MS. BAIG:  It's been asked, but
8   it hasn't been answered.
9       MR. DIAMANTATOS:  Objection to
10  instructing the witness how to answer
11  the question.
12      A.   I think, like I said, there's
13  lots of pharmaceutical services companies
14  who would peddle key opinion leader
15  programs.  I can't recall the names of
16  them right now.
17      Q.   Okay.  Have you ever heard of a
18  company called Genesis Health Care?
19      A.   No.
20      Q.   Do you know a Marta Brooks?
21      A.   Who?
22      Q.   Marta Brooks?
23      A.   No.
24      Q.   Have you ever heard of KOL

Page 371

1   mapping?
2       A.   No.
3       MS. WELCH:  Objection to form.
4   BY MS. BAIG:
5       Q.   You have no understanding of
6   what that means?
7       A.   Is that a company or that's a
8   thing?
9       Q.   I think it's a thing.
10      MS. WELCH:  Objection to form.
11      A.   Okay.
12      Q.   The mapping of key opinion
13  leaders, have you ever heard of that?
14      A.   No.
15      I mean, it sounds like -- seems
16  reasonable.
17      Q.   Okay.  So, if you look at the
18  first page of the -- the first page of the
19  chart here, which is --
20      A.   So you want me to comment on an
21  Alpharma document from 2006 that I have
22  never seen before at a company I didn't
23  work for at the time?
24      Q.   I have a couple questions, yes.

Page 372

1       Can you turn to the Bates stamp
2   page ended at '106?
3       A.   There's no number.
4       Oh, there it is.  Yep.
5       Q.   The top it says "2006 Kadian
6   speaker training meeting attendees with
7   KOL mapping results."  It's dated April
8   25, 2006.  And it appears to list a number
9   of doctors, their areas of specialty, and
10  their regions of practice.
11      Do you see that?
12      MS. WELCH:  Objection to form;
13  foundation.
14      A.   That's what the document says.
15      Q.   Okay.  Have you ever heard of
16  this sort of KOL mapping whereby a
17  organization can come in and help a
18  pharmaceutical company by mapping key
19  opinion leaders for them?
20      MS. WELCH:  Objection to form;
21  foundation; asked and answered.
22      A.   No.
23      MR. DIAMANTATOS:  Assumes facts.
24

Page 373

1    BY MS. BAIG:
2        Q.   You never heard of that at any
3    of the conferences, pharmaceutical
4    conferences that you've attended or in
5    speaking with colleagues in the business?
6            MS. WELCH:  Objection to form.
7        A.   Heard of what?
8        Q.   This idea of key opinion leader
9    mapping.
10           MS. WELCH:  Objection to form;
11       asked and answered.
12       A.   Again, I'm aware of key opinion
13   leaders, what they are, but I've never
14   been personally involved in any sort of
15   key opinion leader programs other than,
16   like I mentioned, that there was some work
17   being done to contemplate developing that
18   as part of the Moxduo launch, but that was
19   not an area of specific participation for
20   me.  It would have been the team that was
21   working on that prelaunch activity, which
22   would have been some of the Actavis
23   employees and some of the inVentiv folks,
24   but it never got to my level of review or

Page 374

1    understanding or participation.
2        Q.   And you never talked with
3    colleagues about the notion of the key
4    opinion leader mapping outside of the
5    Moxduo context?
6            MS. WELCH:  Objection to form;
7        mischaracterizes his testimony.
8        A.   What do you mean by colleagues?
9    You mean fellow employees of Actavis?
10       Q.   No, not necessarily.  I mean
11   people that you meet at trade shows,
12   colleagues in the business, in the
13   pharmaceutical business.
14       A.   When I go to the trade shows,
15   I'm not really talking with colleagues.
16   I'm talking with customers.
17       Q.   Trade shows, conferences.
18           You see a wide variety of
19   people, I'm sure, in your daily business
20   activities.
21           My question is have you talked
22   with them about this idea of key opinion
23   leader mapping?
24       A.   No.

Page 375

1            MR. DIAMANTATOS:  Objection to
2        form; vague.
3    BY MS. BAIG:
4        Q.   You never have, that you can
5    recall?
6            MR. DIAMANTATOS:  Objection to
7        form; vague.
8        A.   No.
9        Q.   Do you know what the ACT
10   Communication Network is?
11       A.   Which page is this on?
12       Q.   The one ending in Bates stamp
13   numbers '123.
14       A.   No.
15           MS. WELCH:  Objection to form;
16       foundation.
17   BY MS. BAIG:
18       Q.   Next page I see, two pages later
19   Advanced Customized Therapy.
20           Have you ever heard of that
21   company?
22           MS. WELCH:  Objection to form;
23       foundation.
24       A.   No.

Page 376

1            MS. WELCH:  If you're done with
2    that exhibit, can we take a break?
3            MS. BAIG:  Sure.
4            THE VIDEOGRAPHER:  We're going
5    off the record.
6            The time is 4:33 p.m.
7            (Recess taken.)
8            THE VIDEOGRAPHER:  We're going
9    back on the record.
10           The time is 4:50 p.m.
11           MS. BAIG:  All right.  Let's
12   have this document marked as
13   Exhibit 24.  It's Bates stamped
14   ALLERGAN_MDL_01860386 through
15   01860397.
16           (Boothe Exhibit 24, email chain
17   ending May 6, 2011, Bates No.
18   ALLERGAN_MDL_01860386 to 01860397, was
19   marked for identification, as of this
20   date.)
21           MS. BAIG:  It starts as an email
22   from Nancy Baran dated May 6th, 2011.
23   BY MS. BAIG:
24       Q.   Do you know who Cegedim is, a

Page 377

1  company called Cegedim?
2    A.   Yeah.  Well, they were -- they
3  were a firm that provided pharmaceutical
4  services.  They had a bunch of stuff
5  underneath them.  But, Dendrite used to be
6  part of Cegedim.
7    Q.   And BuzzeoPDMA, is there a
8  connection between BuzzeoPDMA and Cegedim?
9       MS. WELCH:  Objection;
10  foundation.
11    A.   It says Cegedim compliance
12  solution powered by BuzzeoPDMA.
13       So, yeah, somehow there's some
14  connection.
15    Q.   Okay.  And, have you seen this
16  agreement before?
17    A.   I'm looking at it.  It's -- you
18  know, I'm not on the email.  I don't see
19  any signatures on it.  I don't see my
20  signature on it.  That doesn't mean I -- I
21  have or have not seen it.  I just don't
22  specifically recall.
23    Q.   Do you know what relationship
24  Actavis had, if any, with BuzzeoPDMA?

Page 378

1    A.   As it said here, we -- we con --
2  we discussed with them, I believe we
3  contracted with them to -- to update our
4  suspicious order monitoring platform.
5  We -- we were constantly looking at ways
6  to continue to expand and improve our --
7  our service, and Buzzeo, I guess, we must
8  have -- I believe we engaged with them, at
9  this time frame, to incorporate their
10  capabilities to our existing suspicious
11  order monitoring program.
12    Q.   And you see the first sentence
13  of the email from Nancy Baran, she states:
14  We have Doug's approval to move forward
15  with implementing a suspicious order
16  monitoring system.
17       Do you see that?
18    A.   Yes.
19    Q.   And, would you imagine that Doug
20  is Doug Boothe, is you?
21    A.   I would think so.
22    Q.   And she goes on to state:  We
23  have looked at a few options and the team
24  has agreed to move forward with Dendrite.

Page 379

1       Is that your understanding, that
2  Actavis moved forward with Dendrite to
3  implement a suspicious order monitoring
4  system?
5    A.   Yes.
6       I mean, again, Dendrite was part
7  of Cegedim, as was this Buzzeo group.
8    Q.   Okay.  And she goes on to state
9  that:  A copy of their proposal service
10  agreement is attached.  The team would
11  like to take the next steps.
12       Do you recall whether this was
13  the agreement that was ultimately
14  executed, or no?
15    A.   Not --
16       MS. WELCH:  Objection to form;
17  foundation.
18    A.   Not for certain.
19       Again, I don't see a signature
20  on it, but --
21    Q.   If you look at the -- the fourth
22  page from the end, you see a Schedule 1
23  Services and Service Fees?
24    A.   '394 page?

Page 380

1    Q.   Yes.
2    A.   Okay.  Yeah.
3    Q.   And it states:  Project Number
4  1.  Suspicious order monitoring
5  statistical model development and
6  consulting support.
7       Do you see that?
8    A.   Yes.
9    Q.   Was it your understanding that
10  you did receive, ultimately, a statistical
11  model development and consulting support
12  from Cegedim?
13    A.   Again, we -- my -- my
14  recollection is we had one in place
15  before.  So, if this was a new one or
16  improved one or expanded one.
17       Yes, I believe we did engage
18  with Buzzeo or Cegedim to do that in the
19  2011 time frame.
20    Q.   And, do you know how -- how it
21  changed from the one that was in place
22  before?
23    A.   I would say it was probably more
24  sophisticated, but I wouldn't know exactly

Page 381

1   what the changes were.  It may have been
2   more automated, may have had more
3   statistical modeling in it, per se.
4       Q.   Do you recall if the one that --
5   do you recall anything about the one that
6   existed before?
7       A.   No.
8            MS. WELCH:  Objection to form.
9   BY MS. BAIG:
10      Q.   Do you remember what the
11  suspicious order monitoring system, or
12  whether there was a suspicious order
13  monitoring system in place at Alpharma?
14           MR. DIAMANTATOS:  Objection to
15  form; foundation.
16      A.   Alpharma in what time frame?
17      Q.   When you were there.
18      A.   Well, again, I was at Alpharma
19  in 2004 and 2005, and I wasn't involved in
20  the branded side.
21           On the generic side, we were
22  selling -- I don't believe we -- again, we
23  were not selling generic Kadian at that
24  time.  We were not selling generic

Page 382

1   fentanyl at the time.  We were not selling
2   generic Opana at the time.
3            I don't believe we -- we had the
4   need or the requirement, based on the
5   product portfolio, to have a suspicious
6   order monitoring system, but I could be --
7   again, 2004, 2005, my recollection could
8   be not complete.
9            MS. BAIG:  We'll have this
10  document marked as Exhibit 24 -- 25.
11  Bates stamp ACTAVIS804497 through
12  804563.
13           (Boothe Exhibit 25, email dated
14  December 21, 2011, with attachment,
15  Bates No. ACTAVIS0804497 to 0804563,
16  was marked for identification, as of
17  this date.)
18           MS. BAIG:  It appears to start
19  as an email from Ali Iffat to Terry
20  Fullem, dated December 21st, 2011,
21  entitled "Actavis FDC Launch
22  Preparation."
23  BY MS. BAIG:
24      Q.   Do you know what's referred to

Page 383

1   by FDC launch preparation?
2       A.   It says:  Preparation of a fixed
3   dose combination, FDC asset, indicated for
4   acute pain.
5            That's what the second page
6   says.
7       Q.   Thank you.
8            Are you familiar with Campbell
9   Alliance?
10      A.   Yes.
11      Q.   What is Campbell Alliance?
12      A.   That was a division of inVentiv
13  that would be their strategic division or
14  their, sort of, brand launch division,
15  internal consulting group, my
16  recollection.
17      Q.   And, do you recall Actavis
18  receiving services from, specifically,
19  Campbell Alliance?
20      A.   My recollection is they, again,
21  they proposed this project kickoff.  So we
22  contracted for something with Campbell
23  Alliance.
24           And, again, fixed dose

Page 384

1   combination asset, that's Moxduo.  So all
2   this work for Campbell Alliance was
3   specific to the Moxduo activities we were
4   doing.
5       Q.   And, Ali Iffat is -- he's from a
6   Campbell Alliance, correct?
7       A.   Yes.
8       Q.   And, did you communicate with
9   him ever?
10      A.   I may have.
11           Do you have a document you want
12  to show me I can comment on?
13      Q.   I'm just asking if you recall
14  communicating with him.
15      A.   I may have.
16      Q.   Do you recall communicating with
17  anybody at Campbell Alliance?
18      A.   If I look at the 40 -- the '4503
19  group, Paul Mignon, but he actually was
20  inVentiv.  Rohit Sood, I definitely
21  communicated with.  Stephen Corby I
22  remember.  Alan and Keith Kelly, I don't
23  specifically remember too much.  Neil
24  Gray.

Page 385

1    Q.    What page are you looking on?
2    A.    I'm on page '4503 under "Project
3  teams."
4    Q.    When did you first work with
5  Campbell Alliance?
6    A.    Well, again, this document is
7  December 21st, 2011.  So somewhere in that
8  time frame.  We had no previous engagement
9  with Campbell Alliance on any of the other
10  Actavis generic or the FDA-approved Kadian
11  product.  This was purely brought in
12  related to the prelaunch planning
13  potential for the Moxduo product.  And
14  what Campbell Alliance, if you look at the
15  documents, they had their whole, you know,
16  launch planning module.  I think it -- I
17  kind of -- I think it was like product
18  launch in a box, or they call it launch
19  playbook.  So, they had a platform and
20  experience in potentially launching
21  branded promoted pharmaceutical products,
22  which is why we engaged with them for
23  Moxduo.
24    Q.    And, do you see on the page

Page 386

1  Bates stamped '4502 it starts
2  "Introduction and Project Objectives"?
3    A.    '4502, yes.
4    Q.    And there's three objectives:
5  1, to launch strategy and planning; 2,
6  pricing research and analysis; and 3, key
7  opinion leader identification and
8  influence mapping.
9       Do you see that?
10    A.    Yep.
11    Q.    And under the "Key opinion
12  leader identification and influence
13  mapping" it states:  Identify KOLs with
14  the greatest levels of influence
15  nationally and regionally.
16       Do you see that?
17    A.    Yep.
18    Q.    Was it your understanding that
19  Campbell Alliance was capable of such
20  identification?
21    A.    They may or may not be, you
22  know, specifically available.  They,
23  again, may be able to pull from
24  third-party resources and such.

Page 387

1       This -- Campbell Alliance was
2  like a strategy organization, so sort of a
3  front end.  They may be identifying
4  strategy and tactics, and then had their
5  work gone on further, they would identify
6  maybe specific partners, in line with what
7  you had asked me about earlier.
8    Q.    And, the second bullet says:
9  Develop a series of national and regional
10  KOL maps based on sphere of influence.
11       Do you see that?
12    A.    Sure.
13       This -- this whole thing is,
14  again, it's a draft document about a
15  meeting about a launch -- prelaunch
16  planning for a potentially approved FDA
17  controlled substance.
18    Q.    And, so, do you know whether or
19  not they actually performed this
20  identification of KOLs?
21    A.    For the purposes of the Moxduo
22  product?
23    Q.    Correct.
24    A.    They may have.  I don't believe

Page 388

1  that they did, but they may have.
2       And if you have a document, I'd
3  be happy to review it.
4    Q.    But you don't recall seeing one?
5    A.    If you have a document, I'd be
6  happy to review it.
7       I don't specifically recall
8  seeing one.
9    Q.    If you turn a few pages further
10  you get to the document Bates stamp '4506
11  and it's titled "Project Overview Key
12  Questions."
13       Do you see that?
14    A.    Mm-hm.
15    Q.    And item 3 under the key
16  questions is:  KOL planning.
17       Do you see that?
18    A.    Yeah.
19    Q.    And there are a number of
20  bullets.  The first is:  Who are the key
21  opinion leaders in the acute space?
22       Second:  What degree of
23  influence does each KOL have on
24  prescribing decisions both nationally and

1  regionally?
2       Do you know how an organization
3  such as Campbell Alliance would go about
4  finding the key opinion leaders with the
5  most influence?
6       MR. DIAMANTATOS:  Objection to
7  form; foundation.
8       MS. WELCH:  Objection to form;
9  foundation.
10      A.  No.
11      I mean, to me this is a very
12  generic pitch book where Campbell Alliance
13  had done this multiple times.  They're
14  pitching their services.  These charts are
15  all very pretty, consultancy [sic] speech
16  with -- and they basically added "Actavis"
17  to the bottom right and pitched us.
18      Q.  But you don't recall having any
19  communication with Campbell Alliance or
20  anyone else that would suggest to you how
21  it was that they would be able to identify
22  the key opinion leaders with the largest
23  degree of influence?
24      A.  Just keep reading the documents.

1       Q.  Is your answer no, you don't
2  recall?
3       A.  To best answer, I'm going to
4  read the document and understand if they
5  show any of it in here.
6       (Pause.)
7       So, the materials are all
8  illustrative examples where they're
9  looking at possible profiles based on
10  their associations or their organizations,
11  conferences, opinion leader management
12  service.  Looks like they have a webpage
13  here that may or may not be real.  It says
14  "draft."  So, maybe they have this in
15  their tool kit or maybe, again, they
16  utilize a third party.
17      So, no, I don't know exactly how
18  they were planning on doing it.  It's not
19  clear from the documents.
20      Q.  On the next page under "KOL
21  planning" do you see where it says:
22  Design and program a web-based survey?
23      A.  Which page are you on?  Sorry.
24      Q.  The one ending in '507.

1       A.  Yep.
2       Q.  Do you know if that web-based
3  survey was ever completed?
4       A.  I don't believe we actually
5  signed up for any of this work, or
6  specifically for the KOL, but we may have.
7       And, I don't know.  You'd have
8  to show me the document.
9       My recollection on Campbell is
10  we were underwhelmed what they delivered
11  against what they proposed.
12      Q.  You were underwhelmed with what
13  they delivered?
14      A.  That's my recollection.
15      Q.  What do you recall them
16  delivering?
17      A.  A bunch of Power Point slides
18  like this.
19      Q.  So your recollection is that you
20  were underwhelmed by the pitch and so that
21  you didn't sign up with them, or that you
22  signed up with them and were underwhelmed
23  by the product they delivered?
24      A.  We did something with Campbell.

1  I don't know if it was all three of these
2  proposed work streams or not.  And if it
3  was all three, whatever their output was
4  was underwhelming, and we got to, at some
5  point beyond that, to do it ourselves or
6  do with other portions of the inVentiv
7  group.
8       So I have not been a referral
9  for Campbell down the road.
10      Q.  When you say that at some point
11  you decided to do it yourselves, did you
12  actually start any sort of KOL mapping for
13  Moxduo internally?
14      A.  Well --
15      MS. WELCH:  Objection;
16  foundation.
17      A.  And it may have been through
18  Campbell or inVentiv.
19      But, like I say, I testified
20  before I know there was a part of the
21  prelaunch planning, there was some
22  discussion about key opinion leaders and
23  speaker bureaus and such.  I don't know
24  exactly what was ultimately decided, how

Page 393

1    much -- how far it was developed, who --
2    who worked on it.  But I also know it was
3    never implemented because the product was
4    never approved.
5        Q.  Do you remember why it wasn't
6    approved?
7        MS. WELCH:  Objection; asked and
8    answered.
9        A.   As I testified earlier, the FDA
10   advisory board did not give it a positive
11   recommendation, and the agency did not
12   approve it.
13       Q.  But do you know why?
14       A.   Well, again, you'd have to ask
15   the FDA or read the letter, but basically
16   my -- my belief was, my understanding was
17   that subject to the clinical trial data
18   that was provided as part of the
19   application, that we didn't -- we didn't
20   demonstrate to the agency, QRX Pharma did
21   not demonstrate to the agency the
22   necessary degree of efficacy versus
23   placebo that would justify an approval.
24       Q.   Did you have an understanding

Page 394

1    that it was not approved because of the
2    fear that it would be widely subject to
3    abuse?
4        A.   No.
5        MR. DIAMANTATOS:  Objection to
6    the form; foundation; calls for
7    speculation; asked and answered.
8        Q.   Did you ever have an
9    understanding that it was not approved
10   because it was considered to be too
11   dangerous?
12       MS. WELCH:  Objection to form.
13       A.   No.  I mean, there was a
14   communication back from the agency why it
15   was, to QRX Pharma as to the reason why
16   the application was not approved which was
17   the basis for the appeal which you read
18   somewhere in the documents here.
19       So, if you show me that
20   document, I'd be happy to comment on it,
21   to the best of my ability, but I'm far
22   from an expert on clinical studies or on
23   basis for FDA new drug approvals.
24       Q.   But it was not your

Page 395

1    understanding that it was denied approval
2    because it presented certain risks?
3        MS. WELCH:  Objection to form.
4    BY MS. BAIG:
5        Q.  Is that right?
6        A.   What do you mean by certain
7    risks?
8        Q.   Any risks of addiction, abuse,
9    any sort of dangers associated with the
10   drug.
11       MS. WELCH:  Objection to form;
12   vague.
13       A.   It's a Class II narcotic.  So,
14   by its classification, those would be the
15   risks known that would be in the black
16   box, just like all the other Class II
17   narcotics, both general and branded.  So
18   those risks were understood and would have
19   been part of the label.
20       Q.   Those risks were understood by
21   who?
22       A.   By the FDA, by the physician
23   community, by manufacturers.  That's why
24   it's a controlled substance.

Page 396

1        Q.   And, you never had an
2    understanding that Moxduo was not approved
3    because the risks were too great?
4        MS. WELCH:  Objection to form;
5    vague.
6    BY MS. BAIG:
7        Q.   Is that right?
8        MR. DIAMANTATOS:  Asked and
9    answered.
10       A.   My understanding is that Moxduo
11   was not approved because the FDA did not
12   agree to the clinical endpoints being hit
13   subject to the criteria for approval for
14   pain management relative to placebo.
15       Q.   I see.
16       So, it was not -- had nothing to
17   do with the risks associated with taking
18   Moxduo?
19       MS. WELCH:  Objection to form.
20       MR. DIAMANTATOS:  Objection to
21   form; asked and answered five times.
22       MS. WELCH:  And misstates his
23   testimony.
24       A.   No.

Page 397

1      Q.   If you go to the page stamped
2   ACTAVIS804532.
3      A.   '532.
4      Q.   Do you see there's a list of
5   centers of excellence there?
6      A.   Yes.
7      Q.   And, what's your -- what is your
8   understanding of what that is a list of?
9          MS. WELCH:  Objection to form;
10  foundation.
11     A.   Well, again, this particular
12  chart is an illustrative example, and the
13  centers of excellent not -- those look
14  like hospitals or hospital chains.
15     Q.   Being identified in this context
16  why?
17         MS. WELCH:  Objection to form;
18  foundation.
19     A.   Again, I look at the document
20  and I believe that the -- again, you're
21  asking me to interpret what Campbell
22  Alliance is presenting.  It looks like
23  they're utilizing some degree of number of
24  mentions nationally as an indication of

Page 398

1   the relative value or benefit of someone
2   affiliated with one of these centers in
3   the context of potentially putting
4   together some sort of key opinion leader
5   program.
6          That's my interpretation of the
7   document, but I'm far from an expert, as
8   I've testified, on how key opinion leaders
9   are developed or identified.
10     Q.   And two pages further, do you
11  see it says "Project approach survey
12  finalization"?
13     A.   Mm-hm.
14     Q.   And there's question at the top:
15  Is there an existing target list or other
16  Actavis screening criteria to be used for
17  recruitment?
18         Do you know whether there was,
19  in fact, an existing target list or other
20  screening criteria?
21     A.   To me, this is a consulting firm
22  asking the client to do their work for
23  them.
24         So, I don't know.

Page 399

1      Q.   On the next page under "Key
2   Opinion Leader Profiling," do you see a
3   list under "Profile information can
4   include"?
5      A.   Yep.
6      Q.   And there's a number of
7   different items listed there, one of which
8   is "Advisory board participation."
9          Do you see that?
10     A.   Yep.
11     Q.   So, this suggestion here, as I
12  read it, is that physicians who
13  participate on advisory boards may have
14  more influence than others.
15         Is that how you read it?
16     A.   Other whom?
17     Q.   Than physicians that don't have
18  participation on advisory boards.
19         MS. WELCH:  Objection to form;
20  foundation.
21     A.   That's one of 16 different
22  things or whatever more on this checklist.
23         Again, this is the kitchen sink.
24         I hope you're getting a sense

Page 400

1   that I wasn't too impressed with this
2   work.
3      Q.   Understood.
4          Have you participated on
5   advisory boards?
6      A.   Me personally?
7      Q.   Mm-hm.
8      A.   No.
9          Why would I?  I'm not a
10  physician.
11     Q.   Have you -- have you sat in or
12  been informed or educated by advisory
13  boards?
14         MS. WELCH:  Objection to form.
15     A.   On what?
16     Q.   On opioid drugs.
17     A.   No.
18         We -- we never had an advisory
19  board.
20     Q.   Well, did you have an advisory
21  board for Moxduo?
22     A.   There was discussion about
23  either creating an advisory board to
24  create a key opinion as part of our

Page 401

1    prelaunch planning.
2        I believe QRX Pharma had an
3    advisory board, who was our partner, but
4    that was not an Actavis activity that was
5    something we generated.
6        Q.   Do you remember whether or not
7    Actavis employees participated or were
8    educated by that advisory board?
9        A.   No.
10       Q.   You don't remember one way or
11   the other, or they weren't?
12       A.   I don't believe that they were.
13       MS. BAIG:  All right.  Let's
14   have this document marked as Exhibit
15   26.
16       And, it's Bates stamped
17   ACTAVIS0718476 through '8533.  It
18   starts as an email from Terri Nataline
19   to Carla Hedrick.
20       (Boothe Exhibit 26, email dated
21   July 9, 2012, with attachment, Bates
22   No. ACTAVIS0718476 to 0718533, was
23   marked for identification, as of this
24   date.)

Page 402

1    BY MS. BAIG:
2        Q.   Carla Hedrick is?
3        A.   Yeah, Carla was one of the
4    associates at Actavis working for Terri
5    Nataline.
6        Q.   And, if you turn to page 2 of
7    the document on the purchase requisition
8    page.
9        Is that your signature?
10       A.   Yes.
11       Q.   And this was a purchase order
12   for long-acting opioid REMS.
13       Is that right?
14       A.   Yes.
15       Q.   And it's with Campbell also --
16   it's with Campbell Alliance, right?
17       A.   Yep.
18       Q.   And, do you recall engaging
19   Campbell Alliance?
20       A.   Again, Actavis didn't
21   specifically engage Campbell Alliance.
22   Campbell Alliance was the -- the entity
23   that did the class-wide REMS for all the
24   companies that were actively marketing

Page 403

1    FDA-approved long-acting opioid products,
2    both brand and generic.  So it was like a
3    consortium.
4        Q.   But Actavis was engaging
5    Campbell Alliance, right?  Isn't what that
6    what your signature is, or no?
7        A.   We are basically paying our
8    component of the long-acting opioid REMS,
9    just like the other active marketers which
10   is on page -- the next page.  So I don't
11   think, again, I don't think -- we
12   basically signed on.  It was an FDA
13   requirement.  So we -- we complied with
14   it.
15       And, again, Terri Nataline can
16   provide you more information to the extent
17   of which we were actively engaged, or
18   again, we just -- we went along with the
19   program as a requirement to continue to
20   market our products, our approved
21   products.
22       Q.   And REMS refers to risk
23   evaluation and mitigation strategies.
24       Is that right?

Page 404

1        A.   Yes.
2        Q.   And, what was your understanding
3    as to what Campbell Alliance was going --
4    was going to do with respect to REMS?
5        A.   Well, I'd really have to read
6    this full document to understand exactly
7    what they were going to do, but --
8        Q.   Do you have a general
9    understanding of -- of what they were
10   going to do with respect to the REMS
11   program?
12       MS. WELCH:  Objection to form.
13   BY MS. BAIG:
14       Q.   Based on your recollection?
15       A.   I believe that, again, Campbell
16   was providing the industrywide long-acting
17   opioid REMS program, and so all
18   manufacturers who had approved products
19   that were marketed were required to be
20   part of this program.
21       So, effectively, we were paying
22   in, and the -- the purpose of the program
23   was to educate physicians who were writing
24   the prescriptions for long-acting opioids

1    about risk evaluation and mitigation
2    strategies.  So it was a program that was
3    going to outbound to all physicians who
4    had written any long-acting opioid
5    prescription ranging from OxyContin to
6    whatever's on that list, and they would be
7    trained, communicated with, there might
8    have been some certification required.
9    But Campbell was providing the service on
10   behalf of all the active marketers of
11   long-acting opioids, consistent with a
12   discussion, negotiation agreement with the
13   FDA and likely the DEA at the time.
14       So, all active participants were
15   brought into this REMS program, rather
16   than having -- in the past, every company
17   had individual risk maps, or maybe
18   individual REMS.  So, the purpose of this
19   program was to want to have one consistent
20   program that reiterated the -- the risk
21   associated with Class II or Class III
22   narcotics, especially here long-acting
23   opioids.  So, they were providing a
24   service for all the manufacturers.

1        Q.   What was your understanding of
2    Actavis's responsibilities under the law
3    with respect to preventing diversion?
4            MR. DIAMANTATOS:  Objection to
5    form.
6            MS. WELCH:  Objection to form.
7            MR. DIAMANTATOS:  Calls for a
8    legal conclusion.
9            MS. WELCH:  Same objection.
10       A.   What's the question again,
11   please?
12       Q.   What was your understanding of
13   Actavis's responsibilities under the law
14   with respect to preventing diversion?
15           MS. WELCH:  Objection to form;
16   calls for a legal conclusion.
17           Objection to the extent it would
18   call for you to divulge privileged
19   information.
20       A.   What do you mean by diversion?
21       Q.   Have you ever heard the term
22   "diversion" used before?
23       A.   Yeah.
24       Q.   And, so, what's your

1    understanding of what diversion is?
2        A.   Well, in what context?
3        Q.   In the context of controlled
4    drugs.
5        A.   You'd have to describe to me
6    your definition of that.  I was thinking
7    diversion in other context.
8        Q.   So, in the context of controlled
9    substances, have you heard of the word
10   "diversion" before?
11       A.   Yes.
12       Q.   Okay.  And, what's your
13   understanding of what that means with --
14   within the context of controlled
15   substances?
16       A.   Potentially somewhere between --
17   again, when I -- when a customer or
18   pharmacy submits a valid DEA 222 form to
19   order product and it's received by the
20   wholesaler or received by the manufacturer,
21   such as Actavis, and then when Actavis
22   would then ship or distribute the product
23   to the wholesaler or directly to the
24   pharmacy, if somehow that product, once it

1    was at the pharmacy level or at the
2    wholesale level, ended up going somewhere
3    else than where it was ended to go, which
4    would be outside or after the chain of
5    custody that we had for the product, that
6    would be my understanding of diversion.
7        Q.   So, what was your understanding
8    of Actavis's responsibilities under the
9    law with respect to preventing diversion
10   of opioids?
11           MS. WELCH:  Objection to form.
12           MR. DIAMANTATOS:  Objection to
13   form; foundation.
14           MS. WELCH:  Objection to the
15   extent it calls for a legal
16   conclusion.
17           MR. DIAMANTATOS:  Asked and
18   answered.
19   BY MS. BAIG:
20       Q.   Using your definition of
21   diversion.
22           MS. WELCH:  Same objections.
23       A.   Again, I don't think we had
24   responsibility for, accountability for

Page 409

1  preventing diversion.  We had
2  responsibility and accountability for
3  making certain that the orders that we
4  received were valid from licensed
5  pharmacies and were within our suspicious
6  order monitoring thresholds as it was
7  described earlier then with the Buzzeo
8  model or the more statistical model.  So
9  we -- that was our responsibility.
10      Once it goes outside of our
11  chain of custody, we have no capability or
12  responsibility or accountability to -- or
13  at least my understanding, I'm not a
14  lawyer, as it relates to diversion.  So,
15  once we ship a valid order to a wholesaler
16  or ship a valid order to a distributor or
17  another smaller wholesaler, our chain of
18  custody is finished at that point.
19      Q.   You had an understanding that
20  Actavis was required to have a suspicious
21  order monitoring program in place,
22  correct?
23      A.   Yes.
24      Q.   And, did you understand that

Page 410

1  Actavis was required to identify and halt
2  shipments of suspicious orders to its
3  distributor clients?
4      MS. WELCH:  Objection to form.
5      Objection to the extent it calls
6  for a legal conclusion.
7      A.   Well, again, I mean, again, all
8  of the orders were valid.  The issue was
9  whether or not they were within the
10  threshold.
11      So, again, any order that came
12  in for a controlled substance came from a
13  licensed company with a valid 222 DEA
14  recommendation or valid pharmacy license.
15  So, all those orders were valid.
16      What our suspicious order
17  monitoring system would do is to identify
18  if, for example, based on the historical
19  purchasing of -- of an account, if there
20  was a much higher order number.  That
21  happened all the time.  There are lots of
22  reasons why there was numbers that were
23  above the historical pattern.  Could be
24  that the business got a new account.  So,

Page 411

1  if somehow we agreed to a price to
2  distribute one of our controlled
3  substances to an account like Kroger's,
4  and Kroger's we would ship to directly,
5  but since there wasn't a history of that
6  additional volume to Kroger's, the system
7  would appropriately identify that as maybe
8  being an aberration.  And then the team,
9  the customer service team and the UPS team
10  would -- they would probably go back
11  sometimes to the sales -- or, they would
12  go back to the account and have them
13  justify the rationale for that.  That
14  happened very, very frequently as part of
15  our active daily process.  But all of it
16  starts with a legitimate 222 DEA form.
17      Which, by the way, all these
18  things were shared with the DEA, 'cause
19  that's the process, from a licensed
20  pharmacy, a request to purchase our
21  approved -- our FDA-approved product.
22      Q.   For orders that were deemed
23  suspicious, did you have an understanding
24  that Actavis had a responsibility to

Page 412

1  report and halt shipment?
2      MS. WELCH:  Objection to form.
3      Objection to the extent it calls
4  for a legal conclusion.
5      MR. DIAMANTATOS:  Objection;
6  asked and answered.
7      A.   Again, we wouldn't have to halt
8  shipment 'cause when that order would come
9  in, we would -- before we would release it
10  for shipment, we would actually look at
11  that order and determine whether or not it
12  was appropriate and do the appropriate
13  activity to validate the rationale, to get
14  the information as a support for it.  So,
15  all this happened well before any product
16  was potentially shipped to a wholesaler or
17  regional distributor.
18      So, if that's the definition, I
19  think we were in compliance with that.
20      Q.   So, you're saying that you would
21  look to see if there was a justification
22  for the unusually high order, and if there
23  was a justification, then it would be fine
24  and it would be shipped, correct?

## Page 413

1      MR. DIAMANTATOS:  Objection;
2  form; mischaracterizes the witness's
3  testimony.
4      MS. WELCH:  Same objections.
5      A.   Again, our -- again, our --
6  first of all, the orders were all DEA 222
7  forms.
8      So, was the DEA notified on
9  every order?  Yes.  Every 222 form goes to
10  the DEA.  So there's always notification
11  to the DEA.
12      And, as I said, there -- based
13  on the ordering pattern and, for example,
14  some accounts had multiple facilities, so
15  they may place an order for different
16  locations, and we would have that -- this
17  is by the distribution center, rather, you
18  know, not to the end pharmacy.  So we
19  would see situations where a distribution
20  center of AmerisourceBergen may have been
21  ordering a thousand bottles a week and
22  then -- for three months and then suddenly
23  they ordered 1500 bottles.  That would
24  actually, based on the thresholds of our

## Page 414

1  system, that would be identified as a --
2  an order to investigate, not a fraudulent
3  order, just a -- and then with that, we
4  would go back to the customer service team
5  and/or the commercial rep would call the
6  purchaser at that and say, you know, why
7  did you order 1500.  A place like
8  AmerisourceBergen, which by the way, I
9  think they had 62 distribution centers at
10  one point.  So they were also managing
11  their inventory within the dist -- so,
12  once we shipped it to AmerisourceBergen in
13  the past, one of their locations, if they
14  opted to move it from one of their
15  locations to one of the other locations in
16  their network and then because of that it
17  triggered a reply order from when they
18  moved it from one to there and the
19  distribution center back to us, we didn't
20  have that information.  So when that order
21  came in, if it potentially raised a
22  signal, then we would go and investigate
23  it and if that's what the rationale, that
24  was the basis for the customer describing

## Page 415

1  why they moved product around, why they
2  needed to order it back for our -- for
3  their distribution center and we believe
4  that that was appropriate, we would have
5  then released the order.
6      Q.   And, what if you got a rationale
7  that you did not believe it was
8  appropriate, did you halt shipment?
9      MR. DIAMANTATOS:  Objection to
10  form.
11      A.   Yeah, we would not -- we would
12  halt shipment.  We would not accept the
13  order.
14      And many times we would get
15  orders in, and based on the information,
16  we would say there's no justification for
17  ordering 10,000 bottles.  Your model --
18  our say 1500, 2,000.  We would then adjust
19  the order.  They would submit a new DEA
20  222 form, and if the order was within that
21  threshold, we would accept it and we would
22  ship it.  And I believe that that happened
23  frequently.
24      Q.   And, to the extent that that

## Page 416

1  happened, that would be saved in the
2  files.
3      Is that right?
4      MS. WELCH:  Objection to form;
5  foundation.
6      A.   The files.
7      Q.   There was a record that was kept
8  of orders that was -- that were flagged as
9  being of interest or suspicious, and the
10  justifications received or not received
11  and whether they were shipped or not
12  shipped.
13      Is that right?
14      MS. WELCH:  Objection to form;
15  foundation.
16      A.   That would be my understanding,
17  some sort of, yes, some sort of record
18  because, again, from a compliance
19  perspective, we operate also under a DEA
20  license, and the DEA had the right and the
21  authority to come in to inspect and
22  validate, which they did, you know, on a
23  frequent basis.  So that would likely be
24  something that they would want to monitor

Page 417

1  and validate that our suspicious order
2  monitoring was compliant with their
3  expectations, which they did.
4        MS. BAIG:  Let's have this
5  document marked as the next exhibit,
6  please.  It's Bates stamped 02 --
7  ALLERGAN_MDL_02081243 through '81245.
8        (Boothe Exhibit 27, email chain
9  ending August 18, 2009, Bates No.
10  ALLERGAN_MDL_02081243 to 02081245, was
11  marked for identification, as of this
12  date.)
13        MS. BAIG:  And it starts as an
14  email from Nancy Baran dated August
15  18th, 2009, to you and others.
16        THE WITNESS:  Okay.
17  BY MS. BAIG:
18     Q.   And, do you recall receiving
19  this email from Nancy Baran in which she
20  states:  I believe our process is not
21  current and there is significant room for
22  improvement.
23        In the second line?
24     A.   I received the email, yes.

Page 418

1     Q.   And she goes on to state:  I
2  have recommended that we bring in a few
3  key players from different functional
4  areas, all of whom have shared ownership
5  in the process.  The main goal is to
6  confirm that we are meeting our obligation
7  as a manufacturer of these controlled
8  drugs.
9     A.   That's great.  Yeah.  That's --
10  Nancy was our customer service
11  representative.  So she was identifying
12  her belief that we could improve --
13  continue to invest and improve our
14  systems.
15        Just because we weren't current,
16  doesn't mean we're not in compliance.
17  Which, again, subject to a DEA
18  investigation, there were no findings that
19  we were not in compliance with the
20  expectations on suspicious order
21  monitoring or suspicious order reporting.
22     Q.   Were you subject to a DEA
23  investigation on that issue?
24     A.   No.

Page 419

1        I'm saying that the DEA on --
2  per their practice, would come in and
3  audit for these sorts of things.  I don't
4  know exactly when or when that happened,
5  but there would be a record of it because
6  they would provide a record of the
7  inspection or the audit.  Somewhere in the
8  files.  I'm not sure of us being outside
9  of compliance.  And Nancy, to her credit,
10  was identifying or proposing to get more
11  people involved to continue to invest in
12  the space.
13     Q.   And, so, a little further down
14  it states:  An order appears on the
15  suspicious order report if it meets the
16  following criteria: if the amount ordered
17  by the customers is 25 percent over the
18  customer's rolling average.
19        Do you see that?
20     A.   Yes.
21     Q.   And, did you have an
22  understanding that 25 percent was the
23  threshold that was always used, or did
24  that change?

Page 420

1        MS. WELCH:  Objection to form;
2  foundation.
3     A.   At the time of this email in
4  2009, that -- that was -- I guess that was
5  one of the criteria.  We may have moved it
6  lower or may have raised it up as the
7  system became more sophisticated.  I --
8     Q.   You don't recall?
9     A.   Don't recall what?
10     Q.   You don't recall if it was
11  actually moved or not, if 25 percent was
12  always the threshold used?
13     A.   At the time of this email, Nancy
14  is indicating that that's one of the --
15  that's only -- that's one of the
16  thresholds is 25 percent of the customer's
17  rolling average, and she's proposing to
18  increase it to 40 percent for abuse-type
19  drugs.
20     Q.   And, why would she propose to
21  increase it from 25 to 40 percent for
22  abuse-type drugs?
23        It seems like if you increase
24  it, you're going to flag fewer orders.

Page 421

1    Is that your understanding?
2    MS. WELCH:  Objection to form;
3    foundation.
4    MR. DIAMANTATOS:  Objection to
5    form; foundation; calls for
6    speculation.
7    A.   I think she's commenting, again
8    this is her email, that the volume -- she
9    wanted to have better systems and controls
10    so there's less human intervention.
11    Q.   Do you know if there was any
12    suspicious orders ever recorded before
13    2010?
14    MS. WELCH:  Objection to form;
15    foundation.
16    A.   Reported to whom?
17    Q.   Recorded.  Flagged or recorded
18    in your documents.
19    I can represent to you that I
20    have not seen any, and I'm just wondering
21    if you know that suspicious orders were
22    tracked and recorded prior to 2010.
23    MS. WELCH:  Objection to form;
24    foundation.

Page 422

1    A.   Well, again, this email is dated
2    2009.  So, yes, we had a suspicious order
3    process.  And here it does talk about
4    flagging orders and holding orders and
5    such and that anything above the 25
6    percent threshold would be in that case.
7    So, if there were orders that
8    were above that threshold, the answer to
9    that would be yes.
10    Q.   And they would have been
11    documented?
12    MS. WELCH:  Objection to form;
13    foundation.
14    MR. DIAMANTATOS:  Asked and
15    answered.
16    A.   In whatever system was required,
17    and, yes, there's some sort of
18    documentation.  I don't know if it's a
19    spreadsheet.  I don't know if it was --
20    Q.   Do you know where -- where you
21    would look for that documentation if you
22    wanted to find it?
23    MS. WELCH:  Objection to form;
24    foundation.

Page 423

1    A.   I would ask the DEA
2    administrator for the business 'cause
3    they're the ones who would be responsible
4    for communication with the agency and
5    making certain we were compliant.  So that
6    suspicious order -- and we actually had a
7    compliance officer.  So I would start,
8    first and foremost, with the compliance
9    officer.
10    Q.   Do you know whether Actavis
11    outsourced its duty to -- to monitor
12    suspicious orders to any third parties?
13    MS. WELCH:  Objection to form.
14    A.   If we engaged a third party as
15    part of our suspicious order system, like
16    Buzzeo, for example in previous -- that
17    doesn't mean we've abdicated our
18    responsibility or accountability 'cause
19    ultimately it's our license.  It's our DEA
20    license.
21    So, if there were third parties
22    involved that we brought in because they
23    brought specific expertise or systems,
24    that would have been great, but ultimately

Page 424

1    we were accountable for our suspicious
2    order monitoring system.
3    And we also partnered with UPS.
4    They had an existing one as well.  So, we
5    had two -- two participations there.
6    Q.   Can you think of anybody else
7    that you partnered with for your
8    suspicious order monitoring procedures
9    other than UPS?
10    MS. WELCH:  Objection to form.
11    A.   Procedures, or?
12    Q.   Suspicious order monitoring.
13    A.   Well, again, you showed me a
14    document before from Buzzeo.  So I believe
15    that we engaged Buzzeo at some point.
16    That was in 2011.
17    We -- part of the reason we
18    chose UPS, prior to engaging with UPS, we
19    actually did our own distribution.  We had
20    our own facility in Maryland.  We made the
21    decision, which was a great one, I
22    believe, to go to a company that's world
23    class in logistics and shipping, world
24    class investment in IT systems and, at the

Page 425

1    time, had a computerized suspicious order
2    system or computerized CSOS which was
3    computerized -- controlled substance --
4    controlled substances ordering system,
5    CSOS, that included a baked-in suspicious
6    order monitoring platform.
7        So, we believe we had the best
8    in class by partnering with UPS, which is
9    something we did in this time frame.  And
10   then we augmented that with Buzzeo over
11   time.
12      Q.   Okay.  Any other outside
13   entities that you can recall being
14   involved?
15      A.   Not that I can recall.
16        There may have been others, but
17   those are the ones I specifically
18   remember.
19      Q.   Did you ever interact directly
20   with the DEA?
21      A.   Me personally?
22      Q.   Mm-hm.
23      A.   I don't believe so.
24      Q.   Did Actavis seek to try to

Page 426

1    increase DEA quotas that governed the
2    manufacture and distribution of
3    prescription opioids?
4        MR. DIAMANTATOS:  Objection to
5    form; time frame.
6    BY MS. BAIG:
7      Q.   Ever while you were at Actavis.
8      A.   Yes.
9        MS. WELCH:  Objection to form.
10     A.   Yes.  I mean, as I mentioned
11   before, the process for -- first of all,
12   all quota was governed by the DEA and as
13   part of the operations of that is a
14   licensed facility would have to request
15   quota.  The reason why we would request
16   additional quota could be couple-fold.
17   One is we had products in active
18   development.  So we would have had been
19   granted a quota for R&D quota, but in
20   order to do validation, prepare for a
21   commercial launch of an approved
22   controlled substance, we would need
23   additional quotas.  So that was one
24   instance where we would request additional

Page 427

1    quota.
2        Also, for example, if there was
3    a disruption in the market and we were
4    able to engage additional customer
5    distribution for some of the controlled
6    substances, we would actually then submit
7    a quota update revision request to the
8    agency, and with that we'd have to
9    demonstrate past orders, as well as to
10   show the customers and their requested
11   volumes.  That was another reason why we
12   would potentially ask for additional quota
13   from the DEA.
14        As well as following the IMS or
15   following the third-party systems.  If the
16   actual market itself, the category was
17   growing at a certain rate, 5 percent, 10
18   percent, 20 percent, that information
19   would be the basis for the year-over-year
20   request to increase the quota with the
21   commiserate amount.  So if we were at 5
22   percent market share or 10 percent market
23   share and the market was growing 10
24   percent, we would ask the following year

Page 428

1    for the same quota plus 10 percent so we
2    could maintain our position in the market.
3        Those are three examples of when
4    we would request additional quota from the
5    DEA.
6      Q.   Do you recall receiving a letter
7    from the FDA with respect to the Kadian
8    marketing, a warning letter?
9      A.   Yes.
10     Q.   Okay.  And, were you involved in
11   preparing the response?
12        MR. DIAMANTATOS:  Objection to
13   form.
14     A.   I was not personally involved in
15   preparing the response because that would
16   have been done by our regulatory
17   organization and our outside FDA advisors,
18   but the ultimate final response letter,
19   actually, I believe it was submitted by
20   Ms. Nataline, who's head of regulatory,
21   but I'm sure there was a conversation
22   about what was in, what commitments were
23   being made, and as part of those
24   commitments, as leader of the

Page 429

1   organization, I wanted to make sure that
2   we had the resources and the commitment
3   investment-wise to support that.
4       MS. BAIG:  So, we'll mark this
5   as Exhibit 28.  It's Bates stamped
6   ALLERGAN_MDL_00780097 through
7   00780473.  It's a large document.  But
8   it starts with the facsimile from the
9   FDA to you dated February 18th, 2010.
10      (Boothe Exhibit 28, email chain
11   ending July 11, 2012, with attachment,
12   Bates No. ALLERGAN_MDL_00780096 to
13   00780473, was marked for
14   identification, as of this date.)
15      MS. BAIG:  And then I'll have
16   marked as the next exhibit, because
17   they're companion exhibits --
18  BY MS. BAIG:
19      Q.   For this document, do you recall
20  receiving this from the FDA?
21      A.   Yes.
22      MS. WELCH:  Objection to form.
23      And, are you speaking about the
24   letter?  You've marked a document

Page 430

1   that's hundreds of pages, so.
2       MS. BAIG:  I'm talking about the
3   letter.
4       This document was produced
5   together by Actavis.
6       A.   So, in answer to your question,
7   do I remember receiving a warning letter,
8   I'm looking at the fax machine.
9       If I didn't -- I mean, it came
10  to my attention, my address.  So, yes, I
11  received it.  I reviewed it.
12      Q.   And, in response to this letter,
13  were there changes that were made with
14  respect to the Kadian promotional
15  materials?
16      MS. WELCH:  Objection to form.
17      A.   Yes.
18      Q.   And some of those we talked
19  about earlier, correct?
20      MS. WELCH:  Objection to form.
21      A.   Could you be more specific?
22      Q.   Did you serve on a generic
23  manufacturers advisory board?
24      A.   No.

Page 431

1       Q.   You never did?
2       A.   Are you referring to the GPHA?
3       Q.   Were you on a -- did you serve
4   on the board of GPHA?
5       A.   Yes.
6       Q.   What does GPHA stand for again?
7       A.   Generic Pharmaceutical
8   Manufacturing Association.
9       Q.   Yes, that's right.
10      How long did you serve on that
11  board?
12      A.   2006 til 2014 or '15 with maybe
13  some breaks in between subject to my
14  employment at certain places.
15      Q.   Okay.
16      A.   That's not an advisory board
17  though.
18      Q.   What is the GPHA?
19      A.   It's the -- it's the lobbying
20  association for generic manufacturers.
21  It's an organization based in Washington,
22  D.C. that generic companies have the
23  option to be members of, and then the GPHA
24  advocates on behalf of generic

Page 432

1   manufacturers both federally and at state
2   level on issues that are pertinent to
3   generic manufacturers.  It's the generic
4   equivalent of what everybody's more
5   familiar with called PhRMA, which is the
6   branded pharmaceutical lobbying advocacy
7   organization.
8       Q.   And, did you serve on the PhRMA
9   board as well?
10      A.   No.  We were never members of
11  PhRMA.
12      Q.   Okay.  And, what about NACDS?
13      A.   No.
14      Q.   Did you attend NACDS meetings?
15      A.   Yes.
16      Q.   And, with respect to the
17  lobbying, GPHA, do you recall working on
18  any lobbying that would have impacted
19  opioids?
20      MR. DIAMANTATOS:  Objection to
21  form; foundation; assumes facts.
22      MS. WELCH:  Objection to form.
23      A.   No.
24      And, again, I'm not a

Page 433

1   professional lobbyist.  So again, the GPHA
2   was a lobbying advocacy organization, but
3   the lobbying was done by the professionals
4   at GPHA.
5        Q.   But you don't recall Actavis
6   being involved or working with lobbyists
7   for any legislation that would have
8   impacted or involved opioids?
9        MS. WELCH:  Objection to form.
10       A.   No.
11       MR. DIAMANTATOS:  Foundation;
12   asked and answered.
13  BY MS. BAIG:
14       Q.   Are you familiar with the
15  American Pain Society?
16       A.   Not really, but seems like it's
17  a medical association of some sort.
18       Q.   You don't recall any Actavis
19  involvement with the American Pain
20  Society?
21       MR. DIAMANTATOS:  Objection to
22   form.
23       A.   I believe we provided -- we
24   invested in something at some point to the

Page 434

1   tune of about $15,000 in anticipation of
2   the Moxduo approval and launch.
3        Q.   How about the HDA Research
4   Foundation?
5        A.   No.
6        Q.   The National Wholesale Druggists
7   Association?
8        A.   What's that?
9        Q.   National Wholesale Druggists
10  Association?
11       A.   NWDA?
12       MS. WELCH:  I'm sorry.  What's
13   the question?
14  BY MS. BAIG:
15       Q.   Do you recall -- do you have any
16  familiarity with that association?
17       MR. DIAMANTATOS:  Objection to
18   form.
19       A.   HDMA I'm familiar with.
20       What's the other one?
21       Q.   The National Association of
22  Chain Drug Stores?
23       A.   Yes.  NACDS, yes.
24       Q.   And, what was your involvement,

Page 435

1   if any, with the National Wholesale
2   Druggists Association?
3        A.   None.
4        Q.   What was Actavis's involvement,
5   if any, with National Wholesale Druggists
6   Association?
7        MR. DIAMANTATOS:  Objection to
8   form; foundation.
9        A.   None.
10       National Wholesale
11  Druggist Association, I don't think it's
12  such a thing.
13       Q.   National -- so, for the National
14  Association of Chain Drug Stores, did
15  Actavis have any involvement with that?
16       A.   We participated -- we were not
17  members of NACDS.  Those are -- the
18  members of NACDS would be the national
19  chain drug stores, such as Walgreens or
20  CVS or Rite Aid.
21       We would attend -- as I
22  testified previously, they had two
23  industrywide events.  One was the annual
24  meeting in April, and I would attend that,

Page 436

1   and one was the fall technical meeting,
2   which I had attend -- stopped attending
3   probably in the 2010, 2011-ish time frame.
4        Q.   How about the American Pain
5   Foundation, are you familiar with that
6   foundation?
7        MR. DIAMANTATOS:  Objection to
8   form; asked and answered.
9        A.   No.
10       Q.   You're not familiar with it?
11       A.   (No response.)
12       Q.   Do you know whether Actavis had
13  any involvement with the American Pain
14  Foundation?
15       MR. DIAMANTATOS:  Objection to
16   form; foundation; asked and answered.
17       A.   I think I testified that we
18  paid -- we participated -- made some sort
19  of payment to participate or attend one of
20  their events to the tune of $15,000 in
21  anticipation of the Moxduo.  I don't know
22  who went.  It wasn't me.
23       Q.   I think that was the American
24  Pain Society.

Page 437

```
 1    A.   Okay.  So that was that one.
 2    What's the other one?
 3    Q.   American Pain Foundation.
 4    A.   No, I'm not familiar with them
 5  then.
 6    Q.   How about the American Academy
 7  of Pain Medicine?
 8    A.   No.
 9    Q.   Not familiar with it?
10    A.   I mean, just -- I think you're
11  describing medical associations that are
12  in the pain space, so they would be known
13  to people who are active in that space.
14  That's just not me.
15        MS. WELCH:  I think we're, our
16    calculation, at the seven-hour mark or
17    slightly over.
18        Is that correct?
19        MS. BAIG:  What's our time?
20        THE VIDEOGRAPHER:  About 7:05.
21  So seven hours and five minutes.
22        MS. WELCH:  Are you wrapping up?
23        MS. BAIG:  I'm wrapping up.
24
```

Page 438

```
 1  BY MS. BAIG:
 2    Q.   Were you involved at all with
 3  communications with the FDA about the REMS
 4  program?
 5        MS. WELCH:  Objection to form.
 6    A.   Me personally?
 7    Q.   Yes.
 8    A.   There may have been documents
 9  went out under my name on behalf of
10  Actavis, but generally any communication,
11  any engagement with the FDA would have
12  been through the regulatory team or the
13  legal team.  So that would be Terri
14  Nataline or John LaRocca.
15        MS. BAIG:  All right.  I have
16    one last document, and that's marked
17    Exhibit 29.
18      This document is Bates stamped
19    ALLERGAN_MDL_017871495 through
20  '9193 -- no, sorry.  Through '71609.
21  It starts as an email from Terri
22  Nataline to mfogelso.
23      (Boothe Exhibit 29, email chain
24    ending July 23, 2010, with attachment,
```

Page 439

```
 1  Bates No. ALLERGAN_MDL_01871495 to
 2  01871609, was marked for
 3  identification, as of this date.)
 4  BY MS. BAIG:
 5    Q.   Do you know who that is?
 6    A.   No.
 7    Q.   Do you know what KI -- KAI
 8  Research is?
 9    A.   No.
10    Q.   No.
11      And, it purports to be
12  sending -- well, it's a forward of an
13  email from Terri Nataline to Miriam
14  Fogelson at KAI Research, subject line
15  "DDMAC warning letter correspondence
16  Kadian."  And it purports to be forwarding
17  on the correspondence between FDA and
18  Actavis regarding Kadian.
19      She says:  Hopefully it doesn't
20  crash your computer.
21      Do you see that?
22    A.   Yes.
23    Q.   Okay.  And, were you generally
24  familiar with the correspondence between
```

Page 440

```
 1  Actavis and the FDA?
 2    A.   Yes.
 3    Q.   Regarding the warning letter?
 4    A.   Yes.
 5    Q.   And, does this appear to be a
 6  true and correct copy of that
 7  correspondence?
 8    A.   Again, I don't know if
 9  everything is -- and again, I don't know
10  who Miriam Fogelson is, so.
11      But, essentially, we received
12  the warning letter.  Our obligation was to
13  respond a certain time frame, which we
14  did, which I think was within 15 days,
15  with our response.  And I think, between
16  Terri Nataline and the Actavis resources
17  and the resources of the FDA, there was a
18  significant back and forth for several
19  weeks or months or so as both parties
20  worked through and got to agreement as to
21  the outcome of the warning letter request.
22      But, while that was going on, by
23  the way, we suspended all -- all use of
24  any of the materials that were previously
```

Page 441

1    in place that had been used for many, many
2    years.  These were, I think, materials we
3    inherited from Alpharma.  Stopped that.
4    And, ultimately, one of the outcomes was
5    some sort of a Dear Pharmacist and a Dear
6    Patient letter that went out ultimately
7    under my signature in the August-ish time
8    frame of 2010.
9        Q.   Which I think is included in
10   there.
11            MS. BAIG:  I don't have any
12   further questions.  Thank you.
13            THE WITNESS:  Okay.  Thank you,
14   very much.
15            THE VIDEOGRAPHER:  This marks
16   the end of the testimony given by Doug
17   Boothe.
18            We are going off the record.
19            The time is 5:58 p.m.
20            (Deposition adjourned at
21   approximately 5:58 p.m.)
22
23
24

Page 442

1                A C K N O W L E D G M E N T
2
3    STATE OF            )
4                        :ss
5    COUNTY OF           )
6
7        I, DOUGLAS BOOTHE, hereby certify
8    that I have read the transcript of my
9    testimony taken under oath in my
10   deposition of January 17, 2019; that the
11   transcript is a true and complete record
12   of my testimony, and that the answers on
13   the record as given by me are true and
14   correct.
15
16
17   _____
             DOUGLAS BOOTHE
18
19   Signed and subscribed to before me this
20   _____ day of _____, 2019.
21
22   _____
23   Notary Public, State of
24

Page 443

1                E R R A T A
2    PAGE / LINE / CHANGE   /   REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____

Page 444

1                C E R T I F I C A T E
2    STATE OF NEW YORK
3    COUNTY OF NEW YORK
4
5        I, Marie Foley, RMR, CRR, a
6    Certified Realtime Reporter and Notary
7    Public within and for the State of New
8    York, do hereby certify:
9        THAT DOUGLAS BOOTHE, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that such
12   deposition is a true record of the
13   testimony given by the witness.
14       I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I am
17   in no way interested in the outcome of
18   this matter.
19       IN WITNESS WHEREOF, I have
20   hereunto set my hand this 21st day of
21   January, 2019.
22
23   _____
             MARIE FOLEY, RMR, CRR
24

Page 445

1                LAWYER'S NOTES
2       PAGE / LINE
3       ____ ____ _____
4       ____ ____ _____
5       ____ ____ _____
6       ____ ____ _____
7       ____ ____ _____
8       ____ ____ _____
9       ____ ____ _____
10      ____ ____ _____
11      ____ ____ _____
12      ____ ____ _____
13      ____ ____ _____
14      ____ ____ _____
15      ____ ____ _____
16      ____ ____ _____
17      ____ ____ _____
18      ____ ____ _____
19      ____ ____ _____
20      ____ ____ _____
21      ____ ____ _____
22      ____ ____ _____
23      ____ ____ _____
24      ____ ____ _____