Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5   ----------------------------x

 6   IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7   OPIATE LITIGATION              ) 1:17-MD-2804

 8   APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9   ----------------------------x

10

11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                 CONFIDENTIALITY REVIEW

13       VIDEOTAPED DEPOSITION OF VICTOR BORELLI

                 BALTIMORE, MARYLAND

14

              THURSDAY, NOVEMBER 29, 2018

15

                      9:01 A.M.

16

17

18

19

20

21

22

23

24   Reported by: Leslie A. Todd
```

Page 2

1    Deposition of VICTOR BORELLI, held at the
2    offices of:
3
4
5           SILVERMAN THOMPSON SLUTKIN WHITE LLP
6           201 North Charles Street
7           26th Floor
8           Baltimore, Maryland 21201
9
10
11
12
13    Pursuant to notice, before Leslie Anne Todd,
14   Court Reporter and Notary Public in and for the
15   State of Maryland, who officiated in administering
16   the oath to the witness.
17
18
19
20
21
22
23
24

Page 3

1              A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFFS:
4      DEREK W. LOESER, ESQUIRE
5      ALISON S. GAFFNEY, ESQUIRE
6      DEAN KAWAMOTO, ESQUIRE
7      KELLER ROHRBACK LLP
8      1201 Third Avenue
9      Suite 3200
10     Seattle, Washington 98101-3052
11     (206) 623-1900
12
13   ON BEHALF OF TENNESSEE PLAINTIFFS:
14      TRICIA HERZFELD, ESQUIRE
15      BRANSTETTER, STRANCH & JENNINGS, PLLC
16      223 Rosa L. Parks Avenue
17      Suite 200
18      Nashville, Tennessee 37203
19      (615) 254-8801
20
21
22
23
24

Page 4

1   APPEARANCES (Continued):
2
3   ON BEHALF OF MALLINCKRODT PHARMACEUTICALS AND THE
4     WITNESS:
5       ROCKY C  TSAI, ESQUIRE
6       CASSANDRA A  LARUSSA, ESQUIRE
7       ROPES & GRAY, LLP
8       Three Embarcadero Center
9       San Francisco, California 94111-4006
10      (415) 315-6300
11
12   ON BEHALF OF McKESSON CORPORATION:
13      ALEJANDRO BARRIENTOS, ESQUIRE
14      COVINGTON & BURLING, LLP
15      One CityCenter
16      850 Tenth Street, N W
17      Washington, D C  20001-4956
18      (202) 662-5598
19
20
21
22
23
24

Page 5

1   APPEARANCES (Continued):
2
3   ON BEHALF OF DEFENDANT WALMART:
4      LAURA JANE DURFEE, ESQUIRE
5      JONES DAY
6      2727 North Harwood Street
7      Dallas, Texas 78201-1515
8      (214) 220-3939
9
10   ON BEHALF OF DEFENDANT CARDINAL HEALTH:
11      JOSHUA D. TULLY, ESQUIRE
12      WILLIAMS & CONNOLLY, LLP
13      725 Twelfth Street, N.W.
14      Washington, D.C. 20005
15      (202) 434-5000
16
17   ON BEHALF OF ENDO PHARMACEUTICALS, INC. and
18     ENDO HEALTH SOLUTIONS, INC.:
19      MICHAEL S. BULLERMAN, ESQUIRE (Telephonically)
20      ARNOLD & PORTER KAYE SCHOLER, LLP
21      70 West Madison Street
22      Suite 4200
23      Chicago, Illinois 60602-4231
24      (312) 583-2300

|  | Page 6 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ON BEHALF OF AMERISOURCEBERGEN: |
| 4 | RYAN K. BLAKE, ESQUIRE (Telephonically) |
| 5 | REED SMITH, LLP |
| 6 | Three Logan Square |
| 7 | 1717 Arch Street, Suite 3100 |
| 8 | Philadelphia, Pennsylvania 19103 |
| 9 | (215) 851-8100 |
| 10 | |
| 11 | ALSO PRESENT: |
| 12 | JASON TILLY, ESQUIRE (Mallinckrodt |
| 13 | Pharmaceuticals) |
| 14 | DANIEL HOLMSTOCK, Videographer |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 7 |
|---|---|
| 1 | CONTENTS |
| 2 | EXAMINATION OF VICTOR BORELLI        PAGE |
| 3 | By Mr. Loeser                16 |
| 4 | By Ms. Herzfeld              373 |
| 5 | |
| 6 | |
| 7 | |
| 8 | EXHIBITS |
| 9 | (Attached to transcript) |
| 10 | BORELLI-MALLINCKRODT            PAGE |
| 11 | No. 1    Plaintiff's Notice of Oral |
| 12 | Videotaped Deposition of Victor |
| 13 | Borelli and Requests for Production |
| 14 | of Documents            19 |
| 15 | No. 2    Document entitled "Retail Generic |
| 16 | Incentive Plan Earnings by Sales |
| 17 | Rep," Bates MNK-T1_0000315995      45 |
| 18 | No. 3    E-mail string re Final numbers for |
| 19 | FY 11, Bates MNK-T1_0002735515 to |
| 20 | 0002735516                53 |
| 21 | No. 4    Spreadsheet, Bates MNK-T1_0000562520  57 |
| 22 | No. 5    Spreadsheet, Bates MNK-T1_0000559531  62 |
| 23 | No. 6    Spreadsheet, Bates MNK-T1_00002739814 66 |
| 24 | |

|  | Page 8 |
|---|---|
| 1 | EXHIBITS (Continued) |
| 2 | (Attached to transcript) |
| 3 | BORELLI-MALLINCKRODT              PAGE |
| 4 | No. 7    E-mail re Sunrise Reports, and |
| 5 | attached documents, Bates |
| 6 | MNK-T1_0000448872 to 0000448873     107 |
| 7 | No. 8    Spreadsheet, Bates MNK-T1_0000264291 113 |
| 8 | No. 9    Spreadsheet, Bates MNK-T1_0000264291 121 |
| 9 | No. 10   Spreadsheet, Bates MNK-T1_0000264291 124 |
| 10 | No. 11   Spreadsheet, Bates MNK-T1_0000264292 137 |
| 11 | No. 12   E-mail string re Florida medication |
| 12 | coming into Tennessee, Bates |
| 13 | MNK-T1_0000562326 to 0000562329     144 |
| 14 | No. 13   E-mail string re Pete Kleissle, Oxy |
| 15 | Investigation, Bates MNK-T1_ |
| 16 | 0000290175 to 00002901777       152 |
| 17 | No. 14   E-mail re FW: Sunrise Chargeback |
| 18 | Summary, Bates MNK-T1_0000290041    156 |
| 19 | No. 15   Document entitled "From Worksheet |
| 20 | 'RS0304117 Cognos' (MNK-T1_ |
| 21 | 0000264291) Sunrise Sales of |
| 22 | Oxycodone HCL 15mg & 30mg Tabs"     159 |
| 23 | |
| 24 | |

|  | Page 9 |
|---|---|
| 1 | EXHIBITS (Continued) |
| 2 | (Attached to transcript) |
| 3 | BORELLI-MALLINCKRODT              PAGE |
| 4 | No. 16   Article entitled "Florida Physician |
| 5 | Gets 4 Years in Prison for |
| 6 | Operating Pill Mill"          167 |
| 7 | No. 17   DEA press release entitled "DEA To |
| 8 | Doctor, 'You've Been Served'"     172 |
| 9 | No. 18   Article entitled "'Pill Mill' Doctor |
| 10 | Charged with Trafficking Oxycodone" 176 |
| 11 | No. 19   E-mail string re Oxycodone |
| 12 | Chargeback Customer, Bates |
| 13 | MNK-T1_0000459263 to 0000459265     181 |
| 14 | No. 20   E-mail string re Sun Lake, Bates |
| 15 | MNK-T1_0000384160 to 0000384162     184 |
| 16 | No. 21   E-mail string re Oxycodone |
| 17 | Mallinckrodt, Bates MNK-T1_0000560613 |
| 18 | to 00000560614              186 |
| 19 | No. 22   E-mail re Oxycodone FL Update, |
| 20 | Bates MNK-T1_0000368646 to |
| 21 | 0000368649                190 |
| 22 | No. 23   E-mail re [blank], Bates |
| 23 | MNK-T1_0000384265            197 |
| 24 | |

Page 10

1      E X H I B I T S (Continued)

2      (Attached to transcript)

3  BORELLI-MALLINCKRODT      PAGE

4  No. 24  Article entitled "Inside Broward

5      County's pill mills," by Scott

6      Hiaasen, April 5, 2009      199

7  No. 25  E-mail string FW: [RxNews] Rx Drug

8      Abuse Epidemic, Bates MNK-T1_

9      0000290150 to 0000290151      202

10  No. 26  E-mail string re [RxNews] Grand Jury

11      wants to crack down on pill mills,

12      Ft. Lauderdale, Florida, Bates

13      MNK-T1_0000386857 to 0000386860    208

14  No. 27  E-mail string re FW: [RxNews]

15      OxyContin, Bates MNK-T1_00006450936

16      to 00006450937      216

17  No. 28  E-mail string re Assured Pharmacies,

18      Bates MNK-T1_0000384546 to 0000384548228

19  No. 29  Spreadsheet, Bates MNK-T1_0000264293 231

20  No. 30  E-mail re Oxy, Bates MNK-T1_

21      0000384679      233

22  No. 31  E-mail string re Oxy 30, Bates

23      MNK-T1_0000559532 to 0000559533    235

24

Page 11

1      E X H I B I T S (Continued)

2      (Attached to transcript)

3  BORELLI-MALLINCKRODT      PAGE

4  No. 32  E-mail string re Oxycodone 15 mg

5      tabs, Bates MNK-T1_0000562387 to

6      0000562390      236

7  No. 33  E-mail re Oxy 15 mg, Bates

8      MNK-T1_0000505952      243

9  No. 34  E-mail string re Guess who called

10      today..., Bates MNK-T1_0000560900

11      to 0000460901      250

12  No. 35  E-mail string re oxy 30 ml

13      KeySource PO#0016437, Bates

14      MNK-T1_0000560227 to 0000560230    255

15  No. 36  E-mail string re Oxycodone Sales in

16      Florida - Summary, Bates MNK-T1_

17      0000558886 to 0000558887      260

18  No. 37  E-mail string re Item #853001,

19      Bates MNK-T1_0000265732 to

20      0000265734      277

21  No. 38  E-mail string re Oxycodone Sales in

22      Florida - Summary, Bates

23      MNK-T1_0000559457 to 0000559459    282

24

Page 12

1      E X H I B I T S (Continued)

2      (Attached to transcript)

3  BORELLI-MALLINCKRODT      PAGE

4  No. 39  E-mail string re KeySource

5      Oxycodone Sales, Bates

6      MNK-T1_0000384462 to 0000384463    293

7  No. 40  E-mail string re Pain Clinics,

8      Bates MNK-T1_0000559259 to

9      0000559261      302

10  No. 41  E-mail string re Chargeback

11      Quantity on Oxycodone 30mg, Bates

12      MNK-T1_0000559412 to 0000559413    315

13  No. 42  E-mail string re KMI business

14      review, Bates MNK-T1_0000559994 to

15      0000559995      317

16  No. 43  E-mail string re FW: Oxycodone 30mg

17      Masters/Mallinckrodt, Bates

18      MNK-T1_0000559925      326

19  No. 44  Article entitled "Analysis: Meet the

20      Opioid wholesales who became

21      middlemen for the heroin epidemic,"

22      by David Holthaus, August 21, 2017   328

23

24

Page 13

1      E X H I B I T S (Continued)

2      (Attached to transcript)

3  BORELLI-MALLINCKRODT      PAGE

4  No. 45  E-mail string re Oxy 15 mg & 30 mg,

5      Bates MNK-T1_0000565624 to

6      0000565625      339

7  No. 46  E-mail string re Oxy 15 mg & 30 mg,

8      Bates MNK-T1_0000384266 to

9      0000384268      342

10  No. 47  E-mail string re 2 things, Bates

11      MNK-T1_0000562727 to 0000562728    345

12  No. 48  E-mail string re Sunrise Follow-up,

13      Bates MNK-T1_0000459331 to

14      0000459332      349

15  No. 49  E-mail string re Oxy monthly usage,

16      Bates MNK-T1_0000562701 to

17      0000562704      351

18  No. 50  E-mail re Masters oxy 30, Bates

19      MNK-T1_0000565518      356

20  No. 51  Map of the United States      379

21  No. 52  E-mail re Shipment Report for

22      Sunrise, Bates MNK-TNSTA01122627 to

23      01122628      398

24

Page 14

1    E X H I B I T S (Continued)
2      (Attached to transcript)
3  BORELLI-MALLINCKRODT              PAGE
4  No. 53   E-mail re Shipment Report for
5      Sunrise, Bates MNK-TNSTA01118235 to
6      01118236              399
7  No. 54   Booking Report for Lynn Averill,
8      05/28/15              416
9  No. 55   E-mail string re Florida sales,
10     Bates MNK-TNSTA01178893 to
11     01178894             436
12 No. 56   E-mail string re Sunrise meeting
13     Bates MNK-T1_0000276988 to
14     0000276989            441
15 No. 57   E-mail string re DEA License
16     Suspension per NAM, KeySource
17     Medical, Bates MNK-T1_0000561580 to
18     0000561582            444
19
20
21
22
23
24

Page 15

1      P R O C E E D I N G S
2      --------------------
3      THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Daniel Holmstock.  I'm the
5  videographer for Golkow Litigation Services.
6  Today's date is November 29th, 2018.  The time on
7  the video screen is 9:01 a.m.
8      This video deposition is being held at
9  the law offices of Silverman Thompson in
10 Baltimore, Maryland, in the matter of In Re:
11 National Prescription Opioid Litigation, pending
12 before the United States District Court for the
13 Northern District of Ohio, Eastern Division.
14     Our deponent today is Mr. Victor
15 Borelli.
16     Counsel will be noted on the
17 stenographic record.
18     The court reporter is Leslie A. Todd,
19 who will now administer the oath to the witness.
20     VICTOR BORELLI,
21   and having been first duly sworn,
22   was examined and testified as follows:
23     MR. LOESER:  Derek Loeser for the
24 plaintiffs, from Keller Rohrback.

Page 16

1      MS. GAFFNEY:  Alison Gaffney for the
2  plaintiff, from Keller Rohrback.
3      MR. KAWAMOTO:  Dean Kawamoto, also for
4  the plaintiffs, Keller Rohrback.
5      MR. BARRIENTOS:  Alejandro Barrientos
6  from Covington & Burling for McKesson.
7      MS. DURFEE:  Laura Jane Durfee for
8  Walmart.
9      MS. HERZFELD:  Tricia Herzfeld for
10 plaintiffs.
11     MR. TULLY:  Joshua Tully from Williams &
12 Connolly, on behalf of Cardinal Health.
13     MR. LOESER:  Go ahead.
14     MR. TILLY:  Jason Tilly, Mallinckrodt
15 Pharmaceuticals.
16     MS. LaRUSSA:  Cassandra LaRussa, of
17 Ropes & Gray, representing the witness and
18 Mallinckrodt.
19     MR. TSAI:  Good morning.  Rocky Tsai,
20 Ropes & Gray, representing the witness and
21 Mallinckrodt.
22     DIRECT EXAMINATION
23 BY MR. LOESER:
24     Q   Good morning, Mr. Borelli.  If you could

Page 17

1  please state your full name and spell your last
2  name for the record.
3      A   Victor Borelli, B-O-R --
4      MR. BULLERMAN:  This is Michael
5  Bullerman, from Arnold & Porter, on behalf of the
6  Endo Pharma defendants on the phone.
7      MR. LOESER:  Okay.  Anybody else on the
8  phone?
9      MR. BLAKE:  Ryan Blake with Reed Smith
10 on behalf of AmerisourceBergen.
11     THE WITNESS:  Victor Borelli.
12 B-O-R-E-L-L-I.
13 BY MR. LOESER:
14     Q   And, Mr. Borelli, you understand that
15 you're under oath?
16     A   I do.
17     Q   And you're required to tell the truth in
18 these proceedings?
19     A   (The witness nods.)
20     Q   Are you taking any medication or is
21 there any other reason why you could not testify
22 truthfully and accurately today?
23     A   No.  No medicine.
24     Q   Have you had your deposition taken

Page 18

1  before?
2      A   Never.
3      Q   I'll go over a few ground rules.  I'm
4  going to be asking you questions, and you will be
5  answering them.  It's important that we not speak
6  at the same time.  So if you could please wait for
7  me to finish my question before answering, and
8  I'll do the same with your answers before asking
9  another question.
10     Does that sound fair?
11     A   Yes.
12     Q   If you don't understand a question,
13 please say so, and I'll attempt to rephrase the
14 question.
15     Are you represented by counsel here
16 today?
17     A   I am.
18     Q   And who is that counsel?
19     A   Ropes & Gray.
20     Q   And did you select Ropes & Gray or were
21 you selected by Ropes & Gray?
22     MR. TSAI:  Object to the form.
23     Go ahead.
24     THE WITNESS:  Selected by.

Page 19

1      MR. LOESER:  I'm going to mark the first
2  exhibit as Exhibit 1 today.
3      Please hand that to the witness.
4      (Borelli Exhibit No. 1 was marked
5      for identification.)
6  BY MR. LOESER:
7      Q   Mr. Borelli, you've been handed what's
8  been marked as Exhibit 1, which is the notice of
9  your deposition today.
10     Have you seen this document before?
11     A   I'm not sure.  I don't think so.
12     Q   So the first time you've seen your
13 deposition notice is right now as it's been
14 presented to you?
15     A   I may have seen it, but it -- I get a
16 lot of paperwork.  I may have seen it before, but
17 it doesn't look so familiar.
18     Q   Okay.  If you could please look at the
19 bottom of the first page of that notice, there's a
20 paragraph that starts: "Additionally, please take
21 notice that pursuant to the applicable Federal
22 Rules of Civil Procedure, plaintiffs have
23 requested that the individual identified above
24 produce the documents identified in the

Page 20

1  Schedule A."
2      Do you see that paragraph?
3      A   I do.
4      Q   Could you please turn to Schedule A,
5  which is the next page in that document.  And go
6  to page 4.
7      The first request on page 4 is for a
8  copy of your current resume or CV.  Have you
9  provided that to your counsel for production?
10     A   I don't believe I have yet.
11     Q   If you could look at the second request,
12 which is for all documents, including electronic
13 data and e-mail in your possession related in any
14 way to any defendants' manufacture, marketing
15 sale, distribution, suspicious order monitoring
16 and lobbying efforts in connection with its opioid
17 business, have you searched for those documents
18 and provided them to your counsel?
19     A   I didn't have any.
20     Q   You didn't have any documents in your
21 possession that related in any way to your work
22 for Mallinckrodt?
23     A   That's right.
24     Q   And did you destroy all those documents

Page 21

1  or did you never have any?
2      A   I never had any.
3      Q   Did you search your personal e-mail for
4  any communications relating to your work?
5      A   I didn't do any work through personal
6  e-mail.  It was all through Mallinckrodt or
7  Covidien e-mail.
8      Q   So none of your customers ever contacted
9  you on your personal e-mail?
10     A   I don't believe so.
11     Q   Or text messages?
12     A   I did use my phone.  I'm a salesperson
13 so I traveled quite a bit, so I did use my phone.
14     Q   And did you text with your customers
15 when you were a Mallinckrodt salesperson?
16     A   I believe I did.
17     Q   Have you changed your phone service
18 since that time?
19     A   I have.
20     Q   And do you recall what your phone
21 service was when you worked for Mallinckrodt?
22     A   I do not.
23     Q   Is that something you could look into by
24 looking at old bills or anything like that to

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 figure that out?
2   A   I don't think I have that line anymore.
3   Q   Okay. If you look at the third request
4 on this document, it asks for all documents that
5 you have consulted or reviewed or plan to consult
6 in preparation for your deposition and have relied
7 upon or will rely upon for your testimony for your
8 deposition.
9       Have you come today with all of those
10 documents?
11  A   Can you ask that again, please.
12  Q   The request asks you to produce all
13 documents that you have consulted or reviewed. Is
14 it your understanding that all of the documents
15 that you've consulted or reviewed for your
16 testimony today have been produced to the
17 plaintiffs?
18      MR. TSAI: I'll just object on
19 attorney-client and work product grounds.
20      And to the extent the question is asking
21 the witness to identify any specific documents
22 selected and compiled and discussed with counsel,
23 I will instruct the witness not to answer.
24 BY MR. LOESER:

Page 23

1   Q   Do you know if that's true or not? Are
2 there documents that you reviewed?
3   A   I did review a few.
4   Q   Okay. And did you -- were you provided
5 those documents by counsel or did you have those
6 documents yourself?
7   A   By counsel.
8       MR. LOESER: And, Counsel, if there are
9 documents that were reviewed by Mr. Borelli that
10 have not been produced, we'd ask that you produce
11 those.
12      MR. TSAI: I can represent that all the
13 documents that were reviewed have been produced.
14 BY MR. LOESER:
15  Q   Mr. Borelli, what did you do to prepare
16 for your deposition today?
17  A   Met with counsel.
18  Q   And how many times did you meet with
19 counsel?
20  A   A few.
21  Q   A few: Two? Three? Five?
22  A   Yeah.
23  Q   Two times?
24  A   Yeah. About two or three.

Page 24

1   Q   Two times or three times?
2   A   Three.
3   Q   And do you recall when those meetings
4 occurred?
5   A   Before Thanksgiving and then yesterday.
6   Q   And do you recall how long each of those
7 meetings lasted?
8   A   Four, five hours each visit.
9   Q   And were those visits in person?
10  A   They were.
11  Q   And where did they occur?
12  A   Here in Baltimore.
13  Q   And do you recall who was present at
14 those meetings?
15  A   I do.
16  Q   And who was that?
17  A   The folks on my left, both lawyers on my
18 left.
19  Q   Okay. And do you know if there were
20 lawyers for any other parties in this litigation
21 who were present?
22  A   There were not.
23  Q   And at these meetings you reviewed some
24 documents?

Page 25

1   A   I did.
2   Q   Do you recall how many?
3   A   Maybe a dozen or two.
4   Q   And were those communications that you
5 had authored and communications that had been sent
6 to you?
7   A   Both.
8   Q   And any other materials?
9   A   No.
10  Q   Did you speak with anyone else before,
11 about your deposition, other than your attorneys?
12  A   No.
13  Q   You haven't contacted any former
14 customers to talk to them about your time at
15 Mallinckrodt?
16  A   No.
17  Q   No one at all?
18  A   No.
19  Q   Are you being compensated or reimbursed
20 in any way for your testimony today?
21  A   No.
22  Q   No expenses?
23  A   No.
24  Q   Mr. Borelli, have you ever been charged

Page 26

1  with a crime?
2      A    Never.
3      Q    I'm going to quickly go over your
4  education and work history.
5          Did you graduate from college?
6      A    I did.
7      Q    And where did you graduate from?
8      A    Northeastern University.
9      Q    In what year?
10     A    1984.
11     Q    And what did you major in?
12     A    Business management.
13     Q    Can you briefly describe your job
14  history since graduating from college?
15     A    My what?
16     Q    Your job history.
17     A    Certainly.  Leaving college, I started
18  with a -- the consumer products industry, and
19  started with a company called Lever Brothers.
20     Q    I'm sorry, called?
21     A    Lever Brothers.
22     Q    Could you spell that, please?
23     A    L-E-V-E-R.  They're part of Unilever,
24  U-N-I-L-E-V-E-R.  And I was a salesperson,

Page 27

1  territory manager.  I was with them for three or
2  four years.
3      Q    And what did you sell there?
4      A    Health and beauty care products.  So
5  it's consumer goods, toothpastes, shampoos,
6  mouthwash, things like that.
7          And I was with H.J. Heinz, spelled
8  H-E-I-N-Z.
9      Q    The ketchup company?
10     A    Yeah.  And again, consumer products.
11         And then most recently, in the consumer
12  products industry was with Sara Lee.
13     Q    And that's the pound cake company?
14     A    Yes.
15     Q    What else did Sara Lee make?
16     A    I managed the coffee business for them.
17         And then about 13 or so -- 14 or so
18  years ago -- pardon me -- I started with
19  Mallinckrodt in sales as well.  So sales
20  throughout.
21     Q    And what products did you sell at
22  Mallinckrodt?
23     A    We represented pain management products,
24  as well as a line of products that a company

Page 28

1  called Zydis had marketed and sold.  We were their
2  sales arm for all of their launches and rollouts.
3      Q    What types of drugs did they sell?
4      A    A number of drugs.  I mean, we marketed
5  and sold ten or -- I can't remember them all, but
6  atenolol and ribavirin and warfarin and
7  haloperidol and metformin.  You know, quite a bit
8  of those type of drugs.  Yeah.
9      Q    Okay.  So immediately prior to joining
10  Mallinckrodt and selling pain products, among
11  others, you worked for Sara Lee?
12     A    I did.
13     Q    Selling coffee products.
14     A    That's correct.
15     Q    When you started at Mallinckrodt or
16  prior to when you started, had you taken any
17  courses relating to controlled substances?
18     A    Prior to, no.  With, yes.
19     Q    And explain what courses you took.
20     A    When you say "courses," I thought
21  training.
22     Q    Well, let's start with courses.
23     A    Sure.
24     Q    Did you attend any educational seminars,

Page 29

1  anything unrelated to Mallinckrodt --
2      A    No.
3      Q    -- or not presented by Mallinckrodt?
4      A    No.
5      Q    So all of your training in controlled
6  substances was while you were an employee of
7  Mallinckrodt.
8      A    That's correct.
9      Q    And did that training include training
10  on the laws applicable to the distribution of
11  controlled substances?
12     A    I believe so.
13     Q    And do you recall the content of any of
14  that training?
15     A    It was a lot of different trainings over
16  the years, so not all.
17     Q    Were you presented with training
18  materials that you recall?
19     A    On launch products perhaps.
20     Q    Any training or legal materials on the
21  legal requirements relating to the distribution of
22  controlled substances?
23     A    I don't remember.
24     Q    When did you leave Mallinckrodt?

Page 30

1    A   I believe 2012.
2    Q   And again just briefly, can you walk me
3  through each of the positions you held when you
4  were at Mallinckrodt and, the best as you can
5  recall, the timing of when you held those
6  positions.
7    A   Sales for the entire time there.  So
8  started as a -- I don't remember my title --
9  district manager, and then was promoted to a
10 regional manager, and then promoted to a director
11 of national accounts, I believe.  I don't remember
12 the title so much.  Sorry.
13   Q   And what year were you promoted to the
14 director?
15   A   I don't remember the -- I don't
16 remember.
17   Q   Is that something that would be on your
18 CV?
19   A   Probably.
20   Q   Do you have a CV?
21   A   Not with me.
22   Q   But you've created one?
23   A   Yes.
24   Q   Do you recall how many -- and I believe

Page 31

1  your title was, in the last period of your
2  employment by Mallinckrodt, the national sales
3  director.  Does that sound correct?
4    A   Mm-hmm.
5    Q   And was there only one national sales
6  director or were there more?
7    A   I don't remember how many there were.  I
8  think there were five or six of us.
9    Q   And were you responsible for a
10 particular region as national sales director?
11   A   It wasn't land space as much as customer
12 responsibility.
13   Q   And explain how that worked, vis-à-vis
14 your co-national directors.
15   A   Some sales folks would have -- could
16 have a customer on the West Coast but live
17 centrally, and vice versa, somebody can live on
18 the East Coast and have a customer in Texas.
19   Q   And were you competing with your
20 colleagues for customers?
21   A   No.
22   Q   So how were the different customers
23 divided up in terms of marketing?  In terms of
24 getting those customers, how did that work?

Page 32

1    A   That was done by the head of sales --
2  vice president of sales for the realigning of
3  territories, which we did, or the senior vice
4  president -- I don't remember Mike's title, the
5  vice president of sales and marketing.
6    Q   So that person would tell the sales
7  directors which clients to pursue?
8    A   To realign territories, that's who would
9  do those realignment responsibilities.  Pursue,
10 not so much pursue, but realignments, yeah.
11   Q   Okay.  And what do you mean by
12 "realignments"?
13   A   Well, if I happened to manage a McKesson
14 account one year, I may move over to a Cardinal
15 account the following or two years later.  So just
16 realigning of accounts.
17   Q   And why -- why would accounts need to be
18 realigned?
19   A   It could be to -- a number of reasons.
20 It could be how the -- the territories want to be
21 broken out by the head of sales or by the
22 vice president of sales and marketing.  Could be
23 if one territory's getting lopsided in business,
24 to offload some work to then assign some work.

Page 33

1  So, you know, the shifting of territories could
2  happen because of that.
3    Q   Was there an effort to balance the --
4  the income or the compensation of the -- of the
5  different sales directors?
6    A   It -- none of it was tied to income or
7  compensation.  It's just following your customer.
8  Right.  Following the wholesaler that ships to
9  different entities that they supply to.
10   Q   So it sounds like the vice president of
11 sales had a lot of say in who your customers were.
12   A   It may have been the vice president of
13 sales or the senior vice president of sales and
14 marketing.  I'm not -- I'm not sure.  I can't be
15 sure.
16   Q   And do you recall who occupied those
17 positions when you were the national sales
18 director?
19   A   I do.  From a senior vice president of
20 sales and marketing, it was a person -- his name
21 is Mike Gunning.  And the direct report from me
22 would have been Mitchell Goldberg when I first
23 started, and then John Adams moved into that role.
24 And Jane Williams.  So I had three different

Page 34

1 managers there at different times when I first
2 started, the middle of my tenure and at the end.
3     Q    Okay.  And to go back for a second, I
4 realized I didn't ask you where you currently
5 work.  What's your current position?
6     A    I worked for Edenbridge Pharmaceuticals.
7     Q    And what do you do for them?
8     A    I'm the senior vice president of sales
9 and marketing.
10     Q    And when did you start working for them?
11     A    About a year and a half ago.
12     Q    And who did you work for before that?
13     A    A company called Dr. Reddy's.
14     Q    And what does Dr. Reddy's do?
15     A    A pharmaceutical company based in India
16 for sales in the United States.
17     Q    And what types of drugs do they sell?
18     A    A lot.  Eighty or so, 90 or so different
19 sort of molecules.
20     Q    And are you responsible for any
21 particular group of those drugs?
22     A    I'm not there anymore.
23     Q    Oh, I'm sorry.  When you were.
24     A    All of them.

Page 35

1     Q    And is that where you went after you
2 left Mallinckrodt?
3     A    It was.
4     Q    When you were the national sales
5 director, did you have a team that you managed?
6     A    I did not.
7     Q    When you were the national sales
8 director, did you receive yearly evaluations?
9     A    I believe I did.
10     Q    And who conducted those?
11     A    My direct manager.  And I'm not -- I
12 don't remember if HR was in the rooms as well or
13 if Mike, the senior vice president of sales and
14 marketing, was in as well.  But we had -- I don't
15 remember.  But I'm sure my manager.
16     Q    Who --
17     A    I don't remember.  Sorry.
18     Q    Who was your direct manager?
19     A    I shared that.  Mitchell Goldberg, John
20 Adams, and then Jane Williams.
21     Q    Do you recall if there were any written
22 records that were prepared that were given to you
23 during or following your evaluation?
24     A    I don't remember.

Page 36

1     Q    Do you recall where your evaluations
2 occurred?
3     A    No.  No.  That could be in the St. Louis
4 offices, but I'm not sure.
5     Q    How many years were you at Mallinckrodt?
6     A    Seven.  Six or seven.
7     Q    So you received six or seven performance
8 evaluations, and you don't recall where they
9 occurred?
10     A    I'm saying they could go in the
11 corporate offices when we were in there, but it
12 could have been in the field as well.  I don't
13 remember.
14     Q    Do you recall whether you were evaluated
15 based on any particular metrics?
16     A    I believe I was.
17     Q    And could you please describe those.
18     A    Sure.  Based on service level, customer
19 service level with the customer responsibilities,
20 I'm the direct liaison between the customer and
21 the company.  Managing back orders, managing
22 supply, forecasting sales on the -- the portfolio
23 products.  There could have been more, some MBOs
24 as well, but --

Page 37

1     Q    I'm sorry, what was the last thing?
2     A    MBOs, management by objectives, that is
3 created by the manager to -- you know, to tie into
4 the annual review.
5     Q    And those would be a review of sales
6 objectives?
7     A    Those were more code of conduct,
8 business ethics, training seminars, things like
9 that we -- as well as sales.
10     Q    Did you receive any commendations or
11 awards when you were employed by Mallinckrodt?
12     A    I did.
13     Q    Could you please describe those.
14     A    I was promoted a few times, and then I
15 received awards for president's -- President's
16 Club.
17     Q    What does that mean?
18     A    It was a program that the company had
19 that was built around the branded pro- -- program
20 that awarded top performers, tying into all the
21 things I said before.  Again, it was a branded
22 program that was then rolled into -- and I don't
23 know if we shared this before, but I managed
24 generic products -- and it was then shared into

Page 38

1 and with the generic team.
2     Q    So you didn't sell any branded products,
3 right?
4     A    That's -- that's correct.
5     Q    The drugs you sold were generic.
6     A    Genericized, right.
7     Q    And based upon your sales of generic
8 drugs, you received a commendation called the
9 President's Award?
10     A    That's correct.
11     Q    And what did you receive with that
12 award?
13     A    A recognition trip.
14     Q    And do you recall when that occurred and
15 where the trip was?
16     A    I don't remember when, you know, the
17 time of year as much -- let me think.  I don't
18 remember.  Maybe -- maybe the springs, I believe,
19 but I'm not quite sure.
20     Q    How many times did you receive that
21 award?
22     A    Twice.
23     Q    And was it likely to have coincided with
24 the years in which you had the highest sales?

Page 39

1     A    Sales is one factor, but I don't know if
2 I won it the year -- sales is one factor, yeah.
3     Q    Okay.  And so what's your -- your best
4 recollection of when those awards were given to
5 you?
6     A    I believe -- I think it was in the
7 spring --
8     Q    But of which years?
9     A    -- times.  2007, 2011.  Sorry.
10     Q    And do you recall where -- where you
11 were sent?
12     A    I believe one trip was to St. Thomas.  I
13 can't remember the other one.
14     Q    Some other place where it was warm and
15 sunny?
16     A    Hopefully.  I can't remember the
17 location.  I'm so sorry.
18     Q    During your time at Mallinckrodt, were
19 you ever disciplined or put on probation or
20 anything of the like?
21     A    No.
22     Q    Did you consider yourself a successful
23 national sales director at Mallinckrodt?
24     A    Yes.

Page 40

1     Q    And do you believe that Mallinckrodt
2 also considered you a successful national sales
3 director?
4     A    I believe so.
5     Q    Did you comply with all of the workplace
6 rules as far as you understood them?
7     A    I believe so.
8     Q    And is it fair to say that you did your
9 job the way you believed Mallinckrodt expected you
10 to do your job?
11     A    I believe so.
12     Q    And were you well regarded by your peers
13 at Mallinckrodt?
14     A    I believe so.
15     Q    Is it fair to say that you did the job
16 Mallinckrodt wanted you to do and you did it the
17 way they wanted you to do it?
18         MR. TSAI:  Object to the form.
19 BY MR. LOESER:
20     Q    You can answer.
21     A    I believe so.
22     Q    Can you please explain how your
23 compensation worked at Mallinckrodt?
24     A    Sure.  It was a salary structure.  And

Page 41

1 then a bonus.
2     Q    And do you recall your starting salary?
3     A    I do not.  I do not.
4     Q    A ballpark?
5     A    You mean in two thousand and --
6     Q    The year you started.
7     A    -- five.  I don't -- I could guess, but
8 it's not fair to guess.
9     Q    Okay.  Do you recall your ending salary?
10     A    I do not -- oh, you mean in my last year
11 there?
12     Q    Yeah.
13     A    It would be a guess.  I don't -- I do
14 not.
15     Q    And fair to say that you received
16 periodic raises when you were employed by
17 Mallinckrodt?
18     A    Yes.
19     Q    And those were a reflection of the good
20 job that Mallinckrodt believed you were doing?
21     A    Well, I think a few of the raises you
22 talk about are -- are annual raises.
23     Q    Annual raises meaning based on your
24 performance?

Page 42

1    A    End of year.  So you've put a year in,
2  and, you know, to manage cost of living or --
3    Q    So presumably if Mallinckrodt believed
4  you were doing a bad job, they wouldn't be giving
5  you raises.
6         MR. TSAI:  Object to the form.
7         THE WITNESS:  I don't know that.
8  BY MR. LOESER:
9    Q    Okay.  You also mentioned bonuses.  How
10 did that work?
11   A    Tied to launches or sales to forecast.
12   Q    And do you have a sense of to what
13 degree bonuses were based upon the level of your
14 sales?
15   A    What do you mean?
16   Q    If you sold more, did you expect to get
17 a bigger bonus?
18   A    No.  It -- well, it sounds -- you make
19 that sound so simple.
20   Q    Yeah.
21   A    It's not quite that simple.
22   Q    Explain to me how it works.
23   A    Sure.  A lot of the products that we
24 sold, about half the products we sold are

Page 43

1  scheduled products, and there's just a finite
2  amount of inventory that you have that's allocated
3  from the DEA.  So when you say if I sell more, I
4  may sell more at an account but less at another,
5  and conversely, someone else may sell more at an
6  account and less at -- and then I would be selling
7  less at mine.  It's just regulated quite
8  aggressively by -- by the DEA on things called
9  quota.  Quota they allocate for schedule -- for
10 schedule companies -- companies that sell
11 scheduled drugs.
12   Q    So within the amount allocated by the
13 quota, was your compensation based on the level of
14 controlled substances that you sold, was the bonus
15 portion of that?
16   A    Again, it's a shared -- it's a
17 complicated process, right.  Because if I sell
18 more of something, I'm going to sell less at
19 another account of mine or someone else's, and
20 conversely, it works the same way.  And it's based
21 on price points.  So you're saying it so simply.
22 Just the equation was built, and it wasn't such a
23 simple if I sell more, I make more type of
24 process.

Page 44

1         And then we also had launch items.  I
2  shared -- we represented a company while I was
3  there for five years called Zydis.  They didn't
4  have a sales and marketing arm.  We were their arm
5  for launches, and that's the launches I'm talking
6  about, atenolol and warfarin and ribavirin,
7  metformin and so on.  And those are not scheduled
8  products.  And we get sales on those as well.
9    Q    Fair to say that, again, within the
10 quota that was allocated, overall for all of your
11 customers, your compensation was based in part on
12 the amount of controlled substances that you sold?
13   A    In part, that's right.
14   Q    Was there any kind of bonus cap that
15 you're aware of?
16   A    I don't remember.  I don't remember.  I
17 believe so, but I don't remember, so I hate to say
18 yes and be not accurate.
19   Q    So I understand that it was a somewhat
20 complicated process, but the bonus that you
21 received applied to all of the products that you
22 sold.
23   A    That's correct.
24   Q    So these other products from this Zydis

Page 45

1  company that you mentioned, but also it applied to
2  the controlled substances --
3    A    Mm-hmm.
4    Q    -- that you were selling for
5  Mallinckrodt.
6         (Borelli Exhibit No. 2 was marked
7         for identification.)
8         MR. LOESER:  Present this to the
9  witness, please.
10        THE WITNESS:  Thank you.
11 BY MR. LOESER:
12   Q    Mr. Borelli, you've been handed what's
13 marked Exhibit 2, which has the Bates stamp
14 MNK-T1_0000315995.
15        Is that document in front of you, sir?
16   A    Yes.
17   Q    And why don't you take a moment to see
18 what that is.
19   A    (Peruses document.)
20   Q    And while you are reviewing that, for
21 the record, this is the Retail Generic Incentive
22 Plan By Sales Rep.  That's the description on the
23 top of the document.
24        Have you seen this document before?

Page 46

```
1    A  I have not.
2    Q  And if you look through this document,
3  it shows the sales rep bonuses for calendar years
4  2006 through 2011 on -- on the first page.  Do you
5  see that?
6    A  I do.
7    Q  And if we can just look at the names in
8  2006, and we'll go down the names, it's David
9  Irwin, Thomas Bane, Tim Berry, Bonnie New, Victor
10  Borelli and Steve Becker.
11       Were those the other national sales
12  directors in 2006, as you recall?
13    A  Yes.
14    Q  And for each of the years below that,
15  2007 through 2011, there's a list of names.  Those
16  are also true for any name that shows up that I
17  didn't just read, that person was a national sales
18  director as well?
19    A  Yes.
20    Q  Thomas Bane drops off the list after
21  2008.  Do you know who Thomas Bane is?
22    A  I do.
23    Q  Do you know why he comes off this list?
24    A  I don't.
```

Page 47

```
1    Q  So looking at the top, the year 2006,
2  your bonus was ███████.  Does that appear to be
3  correct to you?
4    A  I don't remember.
5    Q  You have no recollection at all of the
6  amount of your bonus?
7    A  I honestly don't.
8    Q  Any reason to think that's not a correct
9  number?
10    A  No reason to think that.
11    Q  And then in 2007, your bonus goes up to
12  ████████  Do you have a recollection as to why
13  your bonus increased?
14    A  I don't know the specifics tied to this,
15  but it could tie to the things we discussed a few
16  minutes ago.
17    Q  And so fair to say that it relates, at
18  least in part, to the increased sales of
19  controlled substances?
20    A  Yes.  But all products, we were graded
21  on all products.
22    Q  Okay.  And then in 2008, your bonus
23  jumps to $119,096.  Do you recall the reason for
24  that significant increase in your bonus?
```

Page 48

```
1    A  I do not.
2    Q  That must have been a -- you must have
3  been pleased with that bonus.
4    A  Is that a question?
5    Q  Yes.
6    A  I don't remember.
7    Q  Well, it's a significant increase over
8  the prior year.  You don't have any recollection
9  of receiving that bonus?
10    A  I do not.
11    Q  And you don't have any recollection as
12  to why in 2008 your sales bonus would go up so
13  much?
14    A  Well, it would be tied to those things
15  we discussed before.
16    Q  Okay.  So, again, in part due to the
17  controlled substances you were selling?
18    A  Some of the items, yep.  That's right.
19    Q  And then in 2009, your bonus is
20  $101,283, and same question, the amount of your
21  bonus was tied, at least in part, to the
22  controlled substances you were selling?
23    A  Yes.  Yes.
24    Q  And in 2010, your bonus is $110,335,
```

Page 49

```
1  again tied, at least in part, to the controlled
2  substances you were selling?
3    A  That's correct.
4    Q  And in 2011, you're just shy of ███
5  figures at ███████  Do you recall why your bonus
6  went down a bit that year?
7    A  I don't.
8    Q  Do you recall whether that was due, at
9  least in part, to a decrease in the amount of
10  controlled substances you were selling?
11    A  I don't know.  You're highlighting bonus
12  plans here for the year, so each year had
13  different assignments and different structures.
14  So when you ask why each year, each year was --
15  was changing, so I -- I don't know, right.
16    Q  2008 through 2011, fair to describe
17  those as very good years for you based on these
18  bonuses?
19    A  Compared to what?
20    Q  Compared to 2007.
21    A  Well, it's higher.
22    Q  Okay.  Higher is good?
23    A  I guess so.
24    Q  Do you recall what products you were
```

Page 50

1 selling a lot of in the 2008 through 2011 time
2 period?
3     A    Not specifically.
4     Q    Was that a time period in which your
5 clients were purchasing a significant amount of
6 oxycodone?
7     A    That's one of the products, yes.
8     Q    What -- what other products were your
9 clients purchasing more of to a significant degree
10 in this time period other than oxy?
11     A    I don't know the volumes, I don't know
12 the items, I don't know the molecules off the top
13 of my head from seven or eight -- sorry -- from
14 ten years ago.  Sorry.  I mean -- sorry.
15     Q    So there's nothing about that time
16 period in oxy sales, for example, that
17 particularly stands out to you?
18     A    Well, I know that I sold that product,
19 along with everything else I sold.  And again,
20 customer responsibilities changed, so if I picked
21 up a Walgreens or if I picked up a McKesson or a
22 Cardinal, the volume is quite different than a
23 Duane Reade.
24     Q    Do you recall if there were products

Page 51

1 other than oxycodone that had skyrocketing sales
2 during this time period?
3         MR. TSAI:  Objection to form.
4         Go ahead.
5 BY MR. LOESER:
6     Q    Well, let me back up.  Did the sale of
7 oxycodone skyrocket for you and your distributor
8 customers between 2008 and 2010?
9     A    Yeah, I don't remember the numbers.  Did
10 I sell more of it, that one specific as well as
11 other molecules, I don't have the numbers in front
12 of me, but I'm going to say -- I don't have the
13 numbers in front of me.  So...
14     Q    And when you say "molecules," do you
15 mean other morphine molecules or what molecules
16 are you talking about?
17     A    Just molecules that the company
18 manufactured, had license to sell.
19     Q    And you're telling me now as you sit
20 here, you don't recall whether the oxycodone sales
21 were particularly explosive during this time
22 period?
23     A    I think you asked it differently a
24 moment ago.  So I don't remember the growth on

Page 52

1 that molecule versus a metformin or a
2 hydrocodone-APAP.  I don't -- I don't know the
3 specifics.
4     Q    Do you recall if there were any
5 non-opioid products with skyrocketing sales during
6 this time period?
7     A    I don't remember.  Was I the lead
8 salesperson on atenolol?  I think I was.  Was I
9 lead the salesperson on metformin?  I think I was.
10 But I don't remember the numbers and I don't have
11 them.  But do I think I gained good distribution
12 on -- on those items?  I believe I did.
13     Q    On which items?
14     A    The ones I just shared.
15     Q    Were the years 2008 through 2011 the
16 highest compensation years for you at
17 Mallinckrodt?
18     A    Yes.
19     Q    When you left Mallinckrodt, did you
20 receive a severance?
21     A    No.  I left, I resigned.
22     Q    Why did you resign?
23     A    For an opportunity with another
24 organization.

Page 53

1     Q    Which organization was that?
2     A    That was the one I shared before, the
3 Indian firm, Dr. Reddy's.
4     Q    Okay.
5         MR. LOESER:  Let's mark this.
6         (Borelli Exhibit No. 3 was marked
7         for identification.)
8 BY MR. LOESER:
9     Q    Mr. Borelli, you've been handed
10 Exhibit 3, which is MNK-T1_0002735515.  This is an
11 e-mail from you to Jane Williams dated
12 January 20th, 2012.
13         Is that the document in front of you?
14     A    Yes.
15     Q    And Jane Williams was at this time your
16 immediate supervisor?
17     A    She -- she was.
18     Q    And so that it's clear, the address here
19 is victorborelli@covidien.com.
20         Can you explain the relationship between
21 Covidien and Mallinckrodt?
22     A    I believe Mallinckrodt was a company in
23 the Covidien umbrella.  I'm not -- I believe that
24 was the case.  Covidien corporately and

Page 54

1 Mallinckrodt, and there were quite a few other
2 entities under Covidien. I'm not exactly sure.
3 But I believe that's the case.
4     Q    Your address is covidien.com, but your
5 understanding is that you were a Mallinckrodt
6 employee.
7     A    I believe we moved over to a Covidien
8 employee, but the customer base knows us as
9 Mallinckrodt. I believe our bottles, the items we
10 marketed sold separate.
11     Q    And you functioned under the
12 Mallinckrodt heading?
13     A    I think it was a hybrid, you know, when
14 a company changes names.
15     Q    But as we go through these documents,
16 when we see references to Covidien and to
17 Mallinckrodt, we're talking about the same --
18     A    Yes.
19     Q    -- same company?
20     A    Yes. Correct.
21     Q    If you could take a minute just to
22 review that document.
23     A    (Peruses document.)
24     Q    And while you are doing that, I will

Page 55

1 describe the document for the record. The subject
2 is "Final Numbers for FY11," which I take means
3 for year '11 -- full year '11.
4        And you write: "Jane, please find my
5 sales for FY11 attached in below." And then you
6 describe your sales for '11.
7        And if I understand this document
8 correctly, you're also responding to the sales
9 goals that were presented to you in 2011; is that
10 correct?
11     A    I believe so.
12     Q    And you discuss a number of the drugs
13 that you were selling, and they all appear to
14 be -- most of them are opioid products; is that
15 correct?
16     A    I believe so.
17     Q    And that includes hydro-APAPs, oxy 15
18 and 30.
19        What is methylphenidate?
20     A    Another product that we market -- sold.
21     Q    Is that an opioid product or something
22 else?
23     A    I -- I can't remember. I think it's
24 Ritalin. So I'm not sure if it's an opiate. I

Page 56

1 don't believe -- I'm not sure. Sorry.
2     Q    Another product listed here is "fen
3 patch." I take it that's fentanyl patch?
4     A    That's correct.
5     Q    And that's a -- that's an opioid,
6 correct?
7     A    Yes.
8     Q    And another product listed is "fent
9 loz." I take it that's fentanyl lozenges?
10     A    Yes.
11     Q    And that's an opioid as well?
12     A    Yes.
13     Q    And the list continues, but there's a
14 variety of other products, most of which are
15 opioid products, correct?
16     A    I don't believe naltrexone is. I'm not
17 sure about APAC coding. I'm not sure about
18 imipramine. I don't think those are. I'm not
19 sure.
20     Q    Okay. But then going down, Oxy-IR,
21 opioid?
22     A    Yes.
23     Q    And morphine tabs are obviously opioid?
24     A    Yes.

Page 57

1     Q    Methadone, on the next page, is an
2 opioid?
3     A    Yes.
4     Q    Okay.
5     A    Temazepam, I don't believe is.
6     Q    And if you go back up to the middle of
7 the first page, you write: "First half quota
8 target 75 mm with historical sales of 119.9 mm
9 annually. This is a 25 percent growth goal to get
10 to 100 percent on the sales side."
11        So if I'm understanding this document
12 correctly, you're -- you were asked to increase
13 your sales by 25 percent for -- for 2012; is that
14 correct?
15     A    It looks that way, yes.
16     Q    And a lot of the products that you were
17 selling that would -- you would need to increase
18 the sales of during that time period would be
19 opioid products, correct?
20     A    As well as all others, yes.
21     MR. LOESER: Mark that Exhibit 4,
22 please.
23        (Borelli Exhibit No. 4 was marked
24        for identification.)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    THE WITNESS:  Thank you.
2  BY MR. LOESER:
3    Q    You've been handed what's been marked
4  Exhibit 4.  And I would read the Bates stamp, but
5  my hole punch is right through the middle of it.
6  It appears to be MNK-T1, ending with the numbers
7  2520.
8        Do you recognize the document that's in
9  front of you?
10   A    I do.
11   Q    Is this a document you've seen before?
12   A    I believe so.
13   Q    Can you please describe what it is.
14   A    It looks like -- I'm not quite sure, but
15  it looks like my territory for Mallinckrodt.
16   Q    And so on the first --
17   A    That year.  That year.
18   Q    And by your territory, you mean your
19  customers?
20   A    Right.
21   Q    And so your name appears on the top left
22  corner, and below that, there are a list of your
23  customers.
24   A    That's correct.

Page 59

1    Q    Correct?
2        And the second column says "2008," and
3  it has -- it says "Net sales objectives."  So
4  those were your objectives for those customers for
5  that year, correct?
6    A    That's correct.
7    Q    And then moving down those columns,
8  there are also columns that show your net sales
9  for time periods October through July, and then
10  after that, a "Net sales quota attainment."
11       Do you see that?
12   A    I do.
13   Q    And so that quota attainment means the
14  extent to which you met the objective or -- or
15  didn't or exceeded it; is that correct?
16   A    I believe so.
17   Q    And so if you go down the list, Masters
18  was one of your clients, correct?
19   A    Yes.
20   Q    And Masters is a wholesale distributor?
21   A    They are.
22   Q    And they were -- this shows that they
23  were a Mallinckrodt customer during this time
24  period.

Page 60

1    A    That's correct.
2    Q    And your sales objective for Masters in
3  2008 was $220,814.  Do you see that?
4    A    I do.
5    Q    And your actual sales from October
6  through July were $2,614,517.  Do you see that?
7    A    I do.
8    Q    And then the goals quota attainment says
9  1,421 percent.  Do you see that?
10   A    I do.
11   Q    So you exceeded the goal for Masters for
12  that time period by 1,421 percent.  Right?
13   A    Yes.
14   Q    And in fact, if you go down the list,
15  there's a number of your customers where you
16  significantly exceeded the -- the goal set for you
17  for 2008, right?
18   A    Yes.
19   Q    And overall, your -- your FY08 totals
20  for quota were at 130 percent.
21   A    Yes.
22   Q    Do you recall what the -- what product
23  Masters was buying from Mallinckrodt at such a
24  rate that you were able to exceed your sales goal

Page 61

1  by 1,421 percent?
2    A    I think we had good distribution on all
3  our products at Masters.
4    Q    So no particular product stood out as
5  you -- as you recall now?
6    A    They bought all -- I believe they bought
7  all my products or the majority of my products and
8  distribution.
9    Q    And do you recall if their sales were
10  dominated by any particular product?
11   A    They bought all of my products, and --
12  I'm going to say oxycodone, but they bought all my
13  products.
14   Q    Okay.  But there's nothing as you sit
15  here today that stands out in your mind about the
16  amount of oxy, for example, that they purchased
17  from you?
18   A    They bought oxycodone from me, from
19  Mallinckrodt, and all of my products.
20   Q    And again, to answer my question,
21  there's nothing that stands out about the amount
22  of oxy they were purchasing from you.
23   A    Oh.  No.
24   Q    Okay.  And if you look at another client

Page 62

1  of yours on here is KeySource Medical, and you
2  exceeded their goal by 167 percent.
3      Same question, is there anything
4  about -- any particular product as you sit here
5  today that you recall dominating the purchases of
6  KeySource Medical from Mallinckrodt?
7      A   Same response, they bought all my
8  products.
9      Q   Okay.  Same question again, oxy doesn't
10 stand out as one that they purchased more of than
11 anything else?
12     A   They bought that product from me.
13     Q   And you don't recall the amount they
14 buying dominating the other products they
15 purchased from you?
16     A   It wasn't my -- if you show me my
17 numbers on all my molecules, then I could say yes,
18 but --
19     Q   Okay.
20         MR. LOESER:  If we could mark this,
21 please.
22         (Borelli Exhibit No. 5 was marked
23         for identification.)
24         THE WITNESS:  Thank you.

Page 63

1  BY MR. LOESER:
2      Q   You've been handed what's marked
3  Exhibit 5.  And do you recognize this document,
4  Mr. Borelli?
5      A   It looks like the same document with a
6  different year.
7      Q   Okay.  And that different year is 2009,
8  correct?
9      A   Right.
10     Q   And again, the first column has your
11 name and it lists your customers.  And the list --
12     A   Yes.
13     Q   -- of customers is not exactly the same.
14 Is that because of the realignment that you were
15 discussing previously?
16     A   That's right.
17     Q   So if you go back to Exhibit 4 and look
18 at Masters.  Mr. Borelli, if you go back at the
19 other document --
20     A   Oh, sorry.
21     Q   -- and you look at the sales goal for
22 Masters, you see that the sales goal for Masters
23 in 2008 was $220,000; is that correct?
24     A   Yes.

Page 64

1      Q   And the sales goal for Masters in 2009
2  is $7,473,255.  Do you see that?
3      A   I do.
4      Q   And I won't have you do the math in your
5  head, but that's an increase of about 34 times.
6  Does that look about right?
7      A   If you did the math and you pulled that
8  number, then that's right.
9      Q   Yeah.  Well, you can look at the
10 number 200,000 and see that 7,473,000 is many
11 times -- the goal for Masters in 2009 was many
12 multiples -- in fact, 34 times larger than the
13 goal of 2008.  Correct?
14     A   Yes.
15     Q   So in 2008, you significantly exceeded
16 your sales quota by 1,420 percent, and the
17 response in 2009 was to increase your sales goal
18 significantly, right?
19     A   For that account, yes.
20     Q   Okay.  And then looking down that list,
21 in 2009, you also significantly exceeded your
22 quota, correct?  On Exhibit 5.
23     A   Yes.
24     Q   And on this page from October through

Page 65

1  December, it was 189 percent.  And if you flip to
2  the --
3      A   It was 189?  Oh, sorry.
4      Q   And if you flip to the second to last
5  page in that exhibit.  And that has the results
6  for October through February net sales.  If you go
7  down to Masters, you see that you exceeded the
8  quota by 178.6 percent.  Correct?
9      A   Yes.
10     Q   And if we go back to 2008 in Exhibit 4
11 again, to the prior document you looked at, and
12 you pick out another client, say KeySource
13 Medical, in 2008, the sales goal or objective for
14 KeySource was 515,127.  Do you see that?
15     A   I do.
16     Q   And then if you look at Exhibit 5, in
17 2009, the sales goal for key -- for KeySource goes
18 up to 1,977,000; is that correct?
19     A   I see that.
20     Q   So again, you beat the sales goal in
21 2008, and as a result, your objective increased.
22         MR. TSAI:  Object to the form.
23 BY MR. LOESER:
24     Q   You can answer.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    A    What was the question? I'm sorry, what?
2    Q    That when you beat your sales quota for
3 KeySource in 2008, when 2009 rolled around, your
4 sales objective had increased significantly.
5    A    From these numbers, it looks that way,
6 yes.
7         (Borelli Exhibit No. 6 was marked
8          for identification.)
9 BY MR. LOESER:
10    Q    Mr. Borelli, you been just -- you've
11 just been handed Exhibit 6. This is the -- the
12 same spreadsheet but for 2010; is that correct?
13    A    Yes.
14    Q    And so, again, on the first column, it
15 has your name, Victor Borelli, and below that it
16 has a list of your customers. Okay?
17    A    Yes.
18    Q    And if you looked at the -- look back at
19 the prior exhibit for 2009, and you look at
20 KeySource, you see that your sales objective for
21 KeySource was 1,097,000, right?
22    A    Yes.
23    Q    You exceeded it. Right?
24    A    Yes.

Page 67

1    Q    And then if you flip forward to 2010,
2 your sales goal for KeySource goes to 11,401,713.
3 Do you see that?
4    A    I do.
5    Q    And again, that's a very significant
6 increase over the prior year's sales goal, right?
7    A    It is.
8    Q    More than ten times larger, right?
9    A    I believe so.
10         MR. TSAI: Derek, we've been going about
11 an hour. Can we take a break after this exhibit?
12         MR. LOESER: We're finished with that
13 exhibit. So if we can just take a short break,
14 I'd appreciate it.
15         THE VIDEOGRAPHER: The time is
16 10:02 a.m. We're going off the record.
17         (Recess.)
18         THE VIDEOGRAPHER: The time is 10:15
19 a.m. We're back on the record.
20 BY MR. LOESER:
21    Q    Mr. Borelli, I asked you previously at
22 the beginning if you had reviewed any documents to
23 prepare for your deposition. Do you recall that?
24    A    Yes.

Page 68

1    Q    And did any of the documents that you
2 reviewed refresh your recollection about -- about
3 your time at Mallinckrodt?
4    A    Somewhat, but it was a long time ago.
5    Q    And which documents that you recall
6 refreshed your recollection about your employment
7 at Mallinckrodt?
8         MR. TSAI: Again, I will object on
9 attorney-client and work product grounds.
10         And instruct the witness not to identify
11 any specific documents discussed with counsel.
12 BY MR. LOESER:
13    Q    And for the documents that refreshed
14 your recollection -- there were some documents
15 that refreshed your recollection, correct?
16    A    Yes. From seeing my name on an e-mail,
17 but I don't remember the body of the e-mail at
18 all.
19    Q    And so when you saw the body of the
20 e-mail, that refreshed your recollection about the
21 subject matter of the e-mail, right?
22         MR. TSAI: Object to the form.
23 BY MR. LOESER:
24    Q    You can answer.

Page 69

1    A    I guess so.
2    Q    And so can you please generally describe
3 any document that when you read the document, it
4 refreshed your recollection of your employment at
5 Mallinckrodt?
6         MR. TSAI: Same instruction not to
7 identify any specific documents discussed with
8 counsel.
9         THE WITNESS: Can you ask that again?
10         MR. LOESER: Can you read the question
11 back, please.
12         (Whereupon, the requested record
13          was read.)
14         MR. TSAI: Same instruction not to
15 identify any specific documents selected and
16 discussed with counsel.
17         MR. LOESER: And, Counsel, just so I
18 understand, are you instructing him not to answer
19 a question asking him to describe documents that
20 refreshed his recollection?
21         MR. TSAI: Refreshed recollection is an
22 evidentiary issue. It doesn't implicate or
23 abrogate the attorney-client or work product
24 privilege. So that is my instruction not to

Page 70

1 identify any specific documents compiled, selected
2 and discussed with counsel.
3      MR. LOESER:  And I disagree with your
4 characterization of the law, and believe it's
5 inappropriate to instruct the witness not
6 to answer questions about documents that refreshed
7 his recollection.  So we can move on, but will
8 hold that as an issue that may require Mr. Borelli
9 to come back again and answer more questions.
10 BY MR. LOESER:
11      Q   In your earlier testimony we talked
12 about your phone, and you indicated that you did
13 use text messaging with customers.  Do you recall
14 how frequently that occurred?
15      A   I don't.
16      Q   And do you recall if your phone was
17 provided to you by Mallinckrodt or if it was a
18 personal phone?
19      A   I don't remember.  I -- I don't want to
20 assume, but I'll assume here that I think it was
21 personal, but I don't remember specifically.
22      MR. LOESER:  Counsel, if you could
23 please inquire as to whether Mr. Borelli's phone
24 was provided by Mallinckrodt, and if so, ensure

Page 71

1 that text messages have been searched and
2 responsively produced.
3      MR. TSAI:  My understanding is that
4 Mallinckrodt did not provide a phone to
5 Mr. Borelli, but we'll take that under advisement
6 and -- and confirm that.
7      MR. LOESER:  Thank you.
8 BY MR. LOESER:
9      Q   When you were selling coffee for Sara
10 Lee, do you recall what your -- what your largest
11 selling product was?
12      A   I do not.
13      Q   Mr. Borelli, you understand that opioids
14 are controlled substances, correct?
15      A   Yes.
16      Q   And you understand that opioids are
17 narcotics; is that correct?
18      A   Yes.
19      Q   And you are aware that the
20 manufacturer -- the manufacture and distribution
21 of narcotics must comply with the Controlled
22 Substances Act?
23      A   Yes.
24      Q   And I take it that you also understand

Page 72

1 that the Controlled Substances Act requires
2 persons who handle controlled substances to
3 register with the DEA?
4      A   Can you say that again, please?  I'm
5 sorry.
6      Q   Sure.  You understand that the
7 Controlled Substances Act requires persons who
8 handle controlled substances to register with the
9 DEA?
10      A   So I'm not so in tune with the
11 Controlled Substances Act to know that specific
12 piece.
13      Q   Do you know whether people who are
14 involved in the business of manufacturing and
15 selling and distributing controlled substances
16 have to have a DEA registration to do so?
17      A   Yes.
18      Q   You understand that?
19      A   Yes.
20      Q   And -- and drug manufacturers are among
21 the entities that must register with the DEA in
22 order to sell narcotics, correct?
23      A   Yes.
24      Q   Are you familiar with the concept of the

Page 73

1 closed system of controlled substance
2 distribution?  Do you know what that means?
3      A   I do not.
4      Q   You do know, however -- however, that if
5 you are not a registrant under the Controlled
6 Substances Act, you are not allowed to distribute
7 controlled substances, correct?
8      A   Yes, that's my assumption.
9      Q   And if you are a registrant with the
10 DEA, you must comply with the requirements as set
11 forth by the DEA for the distribution, manufacture
12 or dispensing of controlled substances, correct?
13      A   Yes.
14      Q   So, for example, you, Victor Borelli,
15 can't just decide to send a friend opioids just
16 because Mallinckrodt is a registrant under the
17 DEA, correct?
18      A   Correct.
19      Q   You must at all times comply with the
20 requirements of the DEA registration, right?
21      A   Yes.
22      Q   And it would be illegal to distribute
23 controlled substances in a manner that is not
24 authorized by a DEA registration, right?

Page 74

1    A   I assume you are right.
2    Q   So if you, for example, distributed
3 controlled substances to an acquaintance, that
4 would be illegal under the DEA registration that
5 Mallinckrodt has, correct?
6    A   I would think so.
7    Q   And so if a friend of a friend calls you
8 and says, Hey, Victor, can you send me 50 bottles
9 of OxyContin to my favorite pharmacy, that would
10 be illegal, correct?
11   A   I wouldn't send -- me send?  I -- I
12 don't send -- I don't package up the product and
13 send it.  And so -- I'm not -- can you ask that
14 again?
15   Q   So that would be illegal if you did
16 that, correct?
17   A   If I sent product to a pharmacy?
18   Q   Right.
19   A   I would imagine so.
20   Q   Okay.  And so if a friend of a friend
21 called you and said, Hey, can you tell one of your
22 distributor clients to send me 50 bottles of
23 OxyContin, that also would be illegal, correct?
24   A   I'm just not following the question.

Page 75

1 I'm sorry.  It's not part of the -- the business
2 practice.  I'm just not following the question.
3 Sorry about that.
4    Q   Okay.  If a friend of a friend called
5 you and said, Victor, can you please tell one of
6 your customers to send 50 bottles of OxyContin for
7 my use at my favorite pharmacy, that would not be
8 consistent with your DEA registration; is that
9 correct?  With Mallinckrodt's DEA registration.
10       MR. TSAI:  Object to the form.
11       Go ahead.
12       THE WITNESS:  I don't know the answer to
13 that.  If -- I don't know the answer to that.
14 BY MR. LOESER:
15   Q   That's not something you would ever do.
16   A   That's not what I said.  I said I don't
17 know the answer to what you're asking.  If -- if
18 McKesson was calling on an account, and I spoke to
19 a McKesson manager to highlight an out-of-stock
20 situation, I might -- I don't remember doing that
21 either, but I might.  But I'm not shipping -- I'm
22 not packaging up product and -- and shipping it to
23 a locate -- a pharmacy.
24   Q   I understand.  But going back to what I

Page 76

1 was asking you, if a friend of a friend contacted
2 you and said, Victor, can you please ask one of
3 your distributor customers to send me 50 bottles
4 of OxyContin to my favorite pharmacy, that would
5 be illegal, correct?
6       MR. TSAI:  Object to the form.
7       THE WITNESS:  We're kind of going around
8 here in --
9 BY MR. LOESER:
10   Q   Is that something that you would do?
11       MR. TSAI:  Object to the form.
12       THE WITNESS:  If there is an
13 out-of-stock in the marketplace, I don't know, I
14 might to --
15 BY MR. LOESER:
16   Q   I'm not asking if it's an out-of-stock
17 in the marketplace.  I'm asking you if a friend of
18 a friend called you and said, Victor, will you
19 please ask one of your distributor customers to
20 send me 50 bottles of OxyContin to my favorite
21 pharmacy, I'm asking you is that something that
22 you would do or not?
23       MR. TSAI:  Object to the form.
24       THE WITNESS:  I don't know the answer to

Page 77

1 that.  I might if there's an out of stock at that
2 pharmacy that patients need that product.
3 BY MR. LOESER:
4    Q   Is that --
5    A   If that's a -- if that's a registered --
6 if it's a registered pharmacy with an active DEA
7 license, and there's an out-of-stock or there's a
8 need, I don't know if I would or wouldn't, but I
9 don't see what -- what's the -- I don't know if I
10 would or wouldn't.  But I don't see -- if I did, I
11 don't believe that's wrong if there's a need at
12 that location for patients.
13   Q   So you believe that Mallinckrodt's DEA
14 registration allows you to receive a request from
15 a friend of a friend to ask a customer to send
16 OxyContin to your friend of friend's favorite
17 pharmacy --
18       MR. TSAI:  Object to the form.
19 BY MR. LOESER:
20   Q   -- that Mallinckrodt could do that
21 consistent with its DEA registration?
22       MR. TSAI:  Object to the form.
23 BY MR. LOESER:
24   Q   Or you just don't know.

Page 78

1  A   Perhaps I'm just not following your
2 question properly.  But in the example I shared
3 with you a moment ago, I don't see anything wrong
4 with that from a DEA-registered organization to
5 a -- to a pharmacy with a DEA license, if there's
6 no product availability from other manufacturers.
7 And again, Mallinckrodt is not the only
8 manufacturer on this product.  So if there's
9 out-of-stocks and Mallinckrodt has an opportunity,
10 I might.  But only from a -- from a DEA-registered
11 organization to a DEA-registered pharmacy.
12  Q   So you can think of reasons to do that
13 if that pharmacy is out of stock?
14      MR. TSAI:  Object to the form.
15      THE WITNESS:  That could be one of the
16 reasons.
17 BY MR. LOESER:
18  Q   Can you think of any other reasons?
19  A   I could.  Patient preference.  Right.
20 Patient preference is another.
21  Q   So you, the director of sales at
22 Mallinckrodt, takes into account patient
23 preference when making a decision to send
24 narcotics to a pharmacy?

Page 79

1      MR. TSAI:  Object to the form.
2      THE WITNESS:  I think you put words in
3 my mouth there.  If a patient only likes atenolol
4 with a blue color to it, they want that atenolol
5 with a blue color oval shape -- I mean we're going
6 down a road here that I'm not sure what you're
7 asking, so I'm sharing you about a registered
8 organization to a registered pharmacy.  And then I
9 think you're asking it another way, but I'm just
10 sharing my thoughts.  I don't see anything wrong
11 with that when situations and circumstances
12 prevail.
13 BY MR. LOESER:
14  Q   So you don't think there's anything
15 wrong with a friend of a friend calling you and
16 asking you to have a distributor client of yours
17 send OxyContin to a pharmacy.
18      MR. TSAI:  Object to the form.
19      THE WITNESS:  It depends -- and I've
20 shared the answer -- my thoughts with you already,
21 right?  It depends on the circumstance.
22 BY MR. LOESER:
23  Q   Is that something that happened a lot,
24 friends of friends would call you and ask you to

Page 80

1 send narcotics places?
2      MR. TSAI:  Object to the form.
3      THE WITNESS:  I don't believe so.
4 BY MR. LOESER:
5  Q   Do you recall it ever happening?
6  A   I don't believe so, but it may have.
7 But, again, if there's quota issues out in the
8 marketplace, if there's out-of-stocks issues in
9 the marketplace by my competitors, there's so many
10 things that can pertain to that question and that
11 situation, so I -- I don't know.
12  Q   And you understand that the Controlled
13 Substances Act requires Mallinckrodt to have a
14 system of controls to prevent diversion, correct?
15  A   I believe so.
16  Q   And what is diversion?
17  A   I'm going -- I'm going to think there's
18 many forms of diversion.
19  Q   Well, describe diversion as best you
20 can.
21  A   If a truck -- I think when I was at
22 Mallinckrodt, a truck of Watson, a competitor,
23 product was stolen.  I think that's a form of
24 diversion.

Page 81

1      I think if a pharmacy is robbed and they
2 take medicine, I think that's going to be -- I
3 think it's a form of either abuse or diversion.
4      I -- so if a FedEx -- Federal Express
5 site is robbed, I think that could be a form of
6 diversion.  So...
7  Q   If a dispensing physician prescribes
8 opioids for reasons other medical necessity, is
9 that diversion?
10  A   I -- was there a prescription?
11  Q   Whether there is or not, if a dispensing
12 physician prescribes opioids for reasons other
13 than medical necessity, is that diversion?
14  A   Was there a prescription?
15  Q   So are you saying that if there is a
16 prescription prescribing for reasons that are not
17 medical necessity, it's not diversion?
18      MR. TSAI:  Object to the form.
19      THE WITNESS:  You can't put words in my
20 mouth.
21 BY MR. LOESER:
22  Q   Well, I'm asking you to explain.
23 Explain the best you can.
24  A   I am doing that, right?  And I'm trying

## Page 82

1 my best here. And I asked if there was a
2 prescription. If there's a prescription, we
3 manufacture product, ship it to a wholesaler, who
4 then ships it to a pharmacy, an independent
5 pharmacy, a chain pharmacy, whatever. Then it is
6 dispensed to a patient, who comes in with a
7 prescription written by a doctor.
8      There's a lot of steps here. So you're
9 asking something -- so if there's a prescription,
10 that person was viewed by a doctor, and then the
11 pharmacist -- and the pharmacist at the location
12 is reviewing that patient as well. You know how
13 far removed I am from that question? So I can't
14 answer it.
15    Q   Well, so are you saying that if there's
16 a pharmacist involved and a doctor wrote a
17 prescription, that whatever happens to that opioid
18 cannot be diversion?
19      MR. TSAI: Object to the form.
20      THE WITNESS: When did I say that?
21 BY MR. LOESER:
22    Q   I'm asking you that. Is that your
23 understanding?
24      MR. TSAI: Object to the form.

## Page 83

1      THE WITNESS: Can you ask that again
2 then?
3      MR. LOESER: Could you please read back
4 the question.
5      (Whereupon, the requested record
6      was read.)
7      THE WITNESS: I don't know the answer to
8 that, right? How do I know what that patient is
9 doing? Selling it, using it improperly, it's --
10 you're asking somebody who's so far removed from
11 that, and your question, that it's a tough one to
12 answer.
13 BY MR. LOESER:
14    Q   Can you answer the question or not?
15    A   Can you ask that again.
16      (Whereupon, the requested record
17      was read.)
18      MR. TSAI: Object to the form.
19      THE WITNESS: So it's meant for
20 medicine -- medicinal purposes. In that fashion
21 and form, it's not -- in my -- in my humble
22 opinion, it's not going to be diverted. Can it
23 be? I don't know.
24 BY MR. LOESER:

## Page 84

1    Q   In the trainings that you received at
2 Mallinckrodt, did you receive any trainings on
3 what constitutes diversion?
4    A   I don't remember.
5    Q   Is it possible for a distributor that
6 you supplied pills to to engage in diversion?
7    A   Do you mean ship to a location without a
8 DEA license?
9    Q   Or any -- any type of diversion. Is
10 that something that you ever evaluated, whether a
11 distributor client was engaged in diversion?
12    A   Evaluated, no.
13    Q   Do you understand that the Controlled
14 Substances Act also required Mallinckrodt to have
15 a suspicious order monitoring system?
16    A   I shared before I don't know the
17 specifics about that act, but Mallinckrodt did
18 have that in place.
19    Q   And describe, if you can, your
20 understanding of how the suspicious order
21 monitoring system worked at Mallinckrodt.
22    A   I was in the sales department. I don't
23 know -- I don't know how they conducted
24 themselves. There are people specific at

## Page 85

1 Mallinckrodt that were in that department, and
2 it's probably best to ask how -- what their roles
3 and responsibilities were.
4    Q   So you're saying you weren't involved at
5 all in the suspicious order monitoring process at
6 Mallinckrodt?
7    A   In the actual process to evaluate
8 customers, not so much. Did I receive calls or
9 e-mails from -- from folks in that department at
10 Mallinckrodt, yes.
11    Q   And so what types of things would that
12 department ask you?
13    A   To arrange meetings with customers about
14 units ordered.
15    Q   Did you have an understanding of what
16 kinds of things the suspicious order monitoring
17 department was looking for?
18    A   Not so much.
19    Q   Okay. You just sold the pills to
20 distributors, and that was kind of the end of your
21 involvement.
22      MR. TSAI: Object to the form.
23      THE WITNESS: So, no, it doesn't end
24 there. I know I shared before about customer

Page 86

1  service and supply and quota conversations.
2  There's a number of things that go into the --
3  the -- the company, sales and the customer, and
4  the wholesaler or distributor.  Yeah.
5  BY MR. LOESER:
6      Q    But your job didn't involve helping
7  Mallinckrodt identify suspicious orders?
8      A    Not specifically.
9      Q    Well, in what way did it?
10     A    Well, as a salesperson, I was on the
11 road quite a bit, so visiting with customers and
12 seeing their operation.  That's part of a role --
13 part of my role.
14     Q    And when you were visiting customers and
15 seeing their operation, were you evaluating
16 whether they were engaged in shipping suspicious
17 orders?
18     A    Not that specific point, no.
19     Q    Okay.  Did you try and get a sense of
20 whether your customers were engaged in diversion?
21     A    I think I tried to get a sense of the
22 customer.
23     Q    What does that mean?
24     A    I don't know.  If you visit a customer's

Page 87

1  office, you can see if they're diverting product.
2  I don't know if you can do that.  I don't know if
3  that's possible.
4      Q    Did you try to do that?  Did you try to
5  understand your customer to know whether they were
6  engaged in diversion?
7      A    Understand the customer, yes.  The
8  diversion piece, that's a -- you know, once they
9  ship it, there's 50 states that they ship it to.
10 So, no.
11     Q    So you're saying you had no
12 visibility -- after you sold pills to the
13 distributor, that's where your visibility stopped
14 on what happened to those pills.
15     A    Yeah.
16     Q    Now, you do understand that Mallinckrodt
17 had a legal duty to identify and stop suspicious
18 orders to its distributor clients, right?
19          MR. TSAI:  Object to the form.
20 BY MR. LOESER:
21     Q    You can answer.
22     A    I believe so.
23     Q    And is it also your understanding that
24 Mallinckrodt had a duty to identify suspicious

Page 88

1  sales by its distributor customers to their
2  downstream clients?
3          MR. TSAI:  Object to the form.
4          THE WITNESS:  I don't see the -- where
5  the wholesaler ships to.  And even -- even when we
6  ship to a chain of stores, I don't see what store
7  that goes to.  And so if we sell to a -- a
8  Walgreens distribution center in -- and I'm making
9  this up -- Tempe, Arizona, I don't know if
10 product, mine and all other vendors they do
11 business with, I don't know where that goes, to
12 what store in Arizona or in California or in New
13 Mexico.  I don't know.
14 BY MR. LOESER:
15     Q    Do you understand that the purpose of
16 the closed system for opioid distribution and the
17 regulations that go with it is to minimize theft
18 and diversion of controlled substances?
19     A    I believe so.
20     Q    And if a registrant fails to satisfy its
21 obligations under the Controlled Substances Act,
22 that could result in controlled substances being
23 diverted, right?
24          MR. TSAI:  Object to the form.

Page 89

1          THE WITNESS:  Can you explain that a bit
2  more for me?
3  BY MR. LOESER:
4      Q    If a registrant such as Mallinckrodt
5  distributes to distributors without regard to what
6  that distributor is going to do with the pills
7  it's buying from Mallinckrodt, that could
8  contribute to diversion, correct?
9          MR. TSAI:  Object to the form.
10 BY MR. LOESER:
11     Q    Can you answer?
12     A    Well, you said "without regard."  I
13 don't know if Mallinckrodt did.
14     Q    But I'm asking if they did.
15     A    I don't --
16     Q    If that were to occur, that would --
17 that would be a problem, right, because that would
18 increase the risk of diversion?
19          MR. TSAI:  Object to the form.
20          THE WITNESS:  You mean if they shipped
21 to somebody without a DEA license?
22 BY MR. LOESER:
23     Q    If they shipped --
24     A    I'm just trying to follow you.

Page 90

1    Q   Yeah, I understand.
2        If they shipped to a distributor who
3    was -- who Mallinckrodt was aware recklessly
4    dispensed to downstream customers, recklessly
5    shipped to downstream customers, that would
6    increase the risk of diversion, right?
7        MR. TSAI:  Object to the form.
8        THE WITNESS:  If Mallinckrodt shipped to
9    somebody without a DEA license, I would think that
10   that would be a reckless scenario.
11       If -- if they -- if they shipped to
12   somebody with a DEA license who serviced a patient
13   in need with a prescription from a doctor, I don't
14   think that's reckless.  But that's just how I
15   think.
16   BY MR. LOESER:
17       Q   Would you agree that diversion
18   contributes to drug abuse and addiction?
19       MR. TSAI:  Object to the form.
20       THE WITNESS:  There are a lot of things
21   that tie into that.
22   BY MR. LOESER:
23       Q   Is diversion one of them?
24       A   It could --

Page 91

1        MR. TSAI:  Object to the form.
2        Go ahead.
3        THE WITNESS:  It could be.
4    BY MR. LOESER:
5        Q   Could be or it is?
6        MR. TSAI:  Object to the form.
7        THE WITNESS:  Could be.
8    BY MR. LOESER:
9        Q   Is there an opioid crisis in this
10   country?
11       A   That's a pretty broad brush statement
12   there.  I think there is some illegal and legally
13   manufactured products.  That's -- you know, it's a
14   broad brush statement.
15       Q   Have you heard of the expression "the
16   opioid epidemic"?
17       A   I have.
18       Q   And you understand that there is an
19   ongoing opioid epidemic in this country?
20       A   Yes.
21       Q   And when did you learn that there was an
22   opioid epidemic in this country?
23       A   I think it's been on the news and
24   articles.  So from reading, and I don't know when

Page 92

1    I read articles or see articles or -- so it's
2    ongoing.
3        Q   And of course, you were involved in the
4    sale of opioids, right?
5        A   Legally manufactured as well as other
6    molecules, yes.
7        Q   And during the time that you were
8    selling opioids, were you aware there was an --
9        A   When you --
10       Q   -- opioid epidemic?
11       A   When you -- when you speak of opioids, I
12   think of heroin, I think of crack, I think of so
13   many things that are all part of the epidemic.
14   And I think that's a part of the epidemic.  So,
15   I'm sorry, I just wanted to share.
16       Q   Okay.  But when you were selling
17   opioids, prescription opioids, OxyContin, for
18   example, did you know there was an opioid epidemic
19   going on?
20       A   I believe so.
21       Q   And do you recall when you realized
22   there was an opioid epidemic?
23       A   Well, I probably realized that much
24   sooner than when I worked at Mallinckrodt.

Page 93

1        Q   Okay.  So prior to what year?
2        A   I started with Mallinckrodt in 2005.
3        Q   So when you started you already knew
4    there was on opioid epidemic in this country?
5        A   I believe so.
6        Q   Did you evaluate the extent to which the
7    opioid epidemic was impacted -- well, strike that.
8        Did you evaluate the extent to which the
9    opioid epidemic impacted the communities that were
10   included in your sales region for Mallinckrodt?
11       A   No.
12       Q   Did you investigate the extent to which
13   pills manufactured by Mallinckrodt contributed to
14   the opioid epidemic?
15       A   Will you --
16       MR. TSAI:  Object to the form.
17       THE WITNESS:  Will you ask that again?
18       MR. LOESER:  Could you read it back,
19   please.
20       (Whereupon, the requested record
21       was read.)
22       MR. TSAI:  Object to the form.
23       THE WITNESS:  Perhaps at times.
24   BY MR. LOESER:

Page 94

1    Q  Okay.  Describe that.

2    A  I think from things you read, from

3 things you hear, from things you listen to,

4 understanding the DEA quotas assigned to scheduled

5 narcotic companies, how much quota is allocated.

6 I mean there's a lot of different things that come

7 into that.

8    Q  Okay.  And you took those things into

9 account how?

10    A  Just as an understanding of how the -- I

11 don't know if it's the -- the process for the

12 closed system, but all part of it.

13    Q  Okay.  Did you evaluate whether

14 particular types of pills manufactured by

15 Mallinckrodt were prone to abuse or diversion?

16    A  Did I evaluate?  I don't believe so.

17    Q  And when you were selling opioid

18 products for Mallinckrodt, were you aware that

19 oxy 15 and 30 milligram tablets were the most

20 widely abused and diverted prescription opioids?

21    MR. TSAI:  Object to the form.

22    THE WITNESS:  I did not know they were

23 the most wide -- widely used and -- and abused.  I

24 did not know that.

Page 95

1 BY MR. LOESER:

2    Q  That's news to you?

3    A  I said I didn't know -- I did not know

4 that that is the most widely abused.

5    Q  Did you know that your distributor

6 clients purchased enormous quantities of Oxy 15

7 and 30?

8    A  You know, they're servicing the whole

9 country, and there's not a warehouse full of

10 product that we just make -- that they can fill

11 and sell.  There's a finite amount of product

12 that's assigned to us and our 25 competitors.

13    Q  I'm going to ask my question again and

14 see if I understand your answer.

15    Did you know that your distributor

16 clients purchased enormous quantities of Oxy 15

17 and 30, yes or no?

18    MR. TSAI:  Object to the form.

19    THE WITNESS:  It's not a "yes" or "no"

20 answer.  I think I shared just now that they

21 service 50 states and Puerto Rico.  I don't know

22 how much Cardinal needs every day, every week,

23 every month.

24 BY MR. LOESER:

Page 96

1    Q  Mr. Borelli, you knew how much Oxy 15

2 and 30 your clients were buying, correct?

3    A  For the most part, yes.

4    Q  And you knew they were buying a lot,

5 correct?

6    A  "A lot" is a relative term.  A lot to

7 what?  For history or the United States needs?

8    Q  How about relative to what they were

9 buying before, the amount they were buying was

10 increasing significantly, correct?

11    MR. TSAI:  Object to the form.

12    THE WITNESS:  Again, you would have to

13 show me by molecule, by sales.  You showed me a

14 broad brush number in dollars, and you didn't talk

15 about the margin side.  But in dollars, there were

16 customers that were up and there were customers

17 that were down.  But I don't know the molecules

18 that were up, I don't know the molecules that were

19 down.

20 BY MR. LOESER:

21    Q  Just sitting here today, you just can't

22 recall any trends with Oxy 15 and 30 and your

23 clients.  Is that what you're saying?

24    A  Well, you showed sales dollars that went

Page 97

1 up.  Was it specific and only to Oxy 15 and 30?  I

2 don't believe so.

3    Q  Again, and we'll get into more specific

4 documents, but as you sit here today, there aren't

5 any trends with Oxy 15 and 30 in the time period

6 where your bonuses were very large that you

7 recall.

8    MR. TSAI:  Object to the form.

9    THE WITNESS:  "Trends" meaning sales

10 were increasing?

11 BY MR. LOESER:

12    Q  Correct.

13    A  Sales were increasing.

14    Q  And you were aware of that.

15    A  That sales were increasing?  For my

16 territory?  Okay.  I guess so.

17    I'd like to chime in for a second, if I

18 could.  If sales increase here, the sales will

19 decrease here because there's just a finite amount

20 of product.  So if Cardinal's sales are

21 increasing, McKesson's sales may be decreasing

22 from Mallinckrodt.  They buy from 25 -- I'm not

23 even sure how many other vendors they purchase

24 from.  So I don't know if sales are increasing on

Page 98

1  a grand 50-state scale. I don't know.
2      Q   But you do know whether they were
3  increasing in certain areas, right?
4          MR. TSAI: Object to the form.
5  BY MR. LOESER:
6      Q   It's not news to you that the sale of
7  Oxy in Florida was increasing significantly during
8  the time that you were selling Oxy to your
9  distributor clients, right?
10     A   Was it increase -- I don't know if it's
11  -- I don't know if it's increasing in quantity
12  year to year. If our sales are up, then someone
13  else's sales are down, because it's allocated by
14  the DEA. And conversely, if Watson's sales are
15  going up, somebody else's sales will be going
16  down. And it could be based on quota, could be
17  based on supply. There's a lot -- a lot of things
18  that go into that.
19     Q   Mr. Borelli, you understand that over
20  time, during the time where the opioid epidemic
21  was ongoing, which you said you knew about,
22  overall the amount of opioids being sold in this
23  country increased year over year, right?
24         MR. TSAI: Object to the form.

Page 99

1  BY MR. LOESER:
2      Q   That's not news to you.
3      A   I knew about the epidemic. I shared
4  that with you. I don't know overall sales for
5  that item in the country. And I don't know if
6  Mallinckrodt's sales were higher year over year.
7  Because, again, if I pick up sales, someone may
8  have a decline.
9      Q   Can you explain to me what a chargeback
10  is?
11     A   There was a specific chargeback
12  organization that Mallinckrodt -- it's a practice
13  used to -- in the pharmaceutical industry to get
14  to a contract price.
15     Q   Let me try and understand. Chargeback
16  payments are made by Mallinckrodt to distributor
17  clients, correct?
18     A   That's correct.
19     Q   And why does Mallinckrodt pay
20  distributor clients chargebacks?
21     A   Well, they only would allocate a
22  chargeback payment when the wholesaler sells it to
23  a pharmacy or a hospital.
24     Q   And isn't the idea if the Mallinckrodt

Page 100

1  distributor customer sells to its downstream
2  customer at a price lower than the price that that
3  distributor purchased from Mallinckrodt,
4  Mallinckrodt would make up the difference with a
5  chargeback?
6      A   I believe the -- again, there is a
7  department for chargebacks at Mallinckrodt. So I
8  believe that the chargeback was in place to get to
9  a contract price.
10     Q   Right. The contract price is the price
11  at which the drug was purchased from Mallinckrodt?
12     A   I'm sorry?
13     Q   Tell me what you mean by "contract
14  price."
15     A   An agreed-upon price that the
16  customer -- I'm sorry -- that the wholesaler would
17  pay for any molecule.
18     Q   Okay. And so if the customer
19  distributor sold to a downstream customer at a
20  price lower than the contract price, Mallinckrodt
21  would then pay a chargeback to the distributor to
22  get the distributor to the contract price; is that
23  right?
24     A   I believe so, but you're better off --

Page 101

1  there's a chargeback team in place, so you're
2  probably better off talking to the folks who
3  managed and worked in that department. But I
4  believe so.
5      Q   That's your understanding.
6      A   It's my understanding.
7      Q   And was there competition among
8  manufacturers over the amount of the chargeback
9  payments that were being paid to wholesalers?
10     A   I can't -- I can't speak to how other
11  companies went to market.
12     Q   And would you agree that the chargeback
13  payment to a distributor provides that distributor
14  with an incentive to sell Mallinckrodt's products
15  to its downstream customers?
16     A   I don't believe it's an incentive to
17  sell. It's not incentive. It's to get them to a
18  contract price that they can then sell it to a
19  cust- -- one of their pharmacies or hospitals,
20  yeah.
21     Q   So that contract price becomes kind of a
22  guarantee when the chargeback is taken into
23  account, right?
24     A   Yes, I don't know if -- I've never used

Page 102

1 that word with chargebacks, so I think it's best
2 to speak to the folks in the chargeback group or
3 department.
4     Q   And distributor -- wholesale distributor
5 clients are more likely to purchase product from
6 Mallinckrodt if they know that if they sell that
7 product below the contract price, Mallinckrodt
8 will make them whole, right?
9     MR. TSAI: Object to the form.
10     THE WITNESS: I'm not following you,
11 because why -- I don't know how they would sell it
12 below, because -- they would buy it from us, and
13 they sold it to a customer, pharmacy. If they
14 sold it below the contract price, then they would
15 be losing money.
16 BY MR. LOESER:
17     Q   And then they would get a chargeback,
18 right?
19     A   The chargeback gets into the contract.
20 So if it was $100 wholesale acquisition cost, and
21 the contract was at 50, there's a $50 chargeback.
22 If they sold it at 40, they would go out of
23 business, I believe, soon.
24     MR. TSAI: I'm sorry, the --

Page 103

1     THE WITNESS: I don't know the
2 specifics.
3     MR. TSAI: The realtime is lagging.
4 It's back up to -- it's caught up. Thanks.
5     THE WITNESS: And those are just -- I'm
6 just sharing easy numbers. I --
7 BY MR. LOESER:
8     Q   Right. Again, I want to make sure I
9 understand.
10     You have a distributor; they negotiate a
11 contract price with Mallinckrodt.
12     A   Yeah.
13     Q   The distributor sells to a downstream
14 customer at a price that's lower than the contract
15 price. Mallinckrodt then pays money to the
16 distributor to get them to the contract price.
17 They don't lose money on that sale, right?
18     A   No, I don't believe so. Again, the --
19 the Mallinckrodt system -- this was a while ago
20 for me -- so if they bought it at a wholesale
21 price, had a contract of a price below that, when
22 they sold that product to a pharmacy, selling
23 below contract wouldn't make sense.
24     MR. TSAI: I'm sorry. I have a

Page 104

1 transcript question. Madam Reporter, is -- I
2 think it might be -- if you could read back at
3 81 -- the question by counsel starting at 81-21.
4     THE REPORTER: I think ours are
5 different.
6     MR. LOESER: Do you want to go off the
7 record?
8     MR. TSAI: Yeah.
9     THE VIDEOGRAPHER: The time is 11:00
10 a.m. We're going off the record.
11     (Pause in the proceedings.)
12     THE VIDEOGRAPHER: The time is
13 11:01 a.m., and we're back on the record.
14 BY MR. LOESER:
15     Q   So when would a distributor receive a
16 chargeback payment? What would be the
17 circumstances that would require that?
18     A   I would believe when one of their
19 customers buys it, when they ship it to one of
20 their customers.
21     Q   So it's your understanding --
22     A   One of their pharmacies that they
23 service -- one of the stores that they service,
24 yeah.

Page 105

1     Q   Okay. So the chargeback, it's not paid
2 at the moment that the distributor purchases the
3 product from Mallinckrodt, right?
4     A   You'd have to talk to the chargeback
5 department. I think there's a -- there's a lag in
6 time from when the chargeback comes back to the
7 wholesaler from when they shipped it to one of
8 their pharmacies. There's a lag in -- in that
9 data feed.
10     Q   And that's because the chargeback is
11 based on the price that the wholesaler sells to
12 the pharmacy or other downstream customer,
13 correct?
14     A   It's based -- I don't believe so, but --
15 I don't believe so. I think -- I think it's best
16 to -- there's a chargeback department and a team
17 in place at Mallinckrodt that is better to talk to
18 on that.
19     Q   Did you track how much was paid to your
20 distributor clients in chargebacks?
21     A   I don't believe I did.
22     Q   You understand that Mallinckrodt
23 collected information from its distributor clients
24 about their sales to downstream customers,

| Page 106 | Page 108 |
|---|---|
| 1 correct?<br>2     A  I believe so.<br>3     Q  And that information was collected in<br>4 what was called the chargeback system, right?<br>5     A  Okay.<br>6     Q  And the chargeback system was a database<br>7 of sales transaction information between<br>8 distributors and customers, correct?<br>9     A  I believe so.<br>10     Q  And it also tracked Mallinckrodt sales<br>11 to its distributors, right?<br>12     A  Well, that -- I don't know if<br>13 chargebacks were used there, so I'm not quite<br>14 sure.<br>15     Q  Right.  But the database that was<br>16 maintained by Mallinckrodt that was used for<br>17 chargebacks tracked the sales by Mallinckrodt to<br>18 its distributors and by its distributors to the<br>19 downstream customers, correct?<br>20     A  I believe so.<br>21     Q  And you know that because you worked<br>22 with that data, right?<br>23     A  I was not in touch with the chargeback<br>24 data.  No. | 1 subject is "Sunrise Reports," and there are two<br>2 attachments and those are the two attachments to<br>3 the e-mail.<br>4     And I'll read the e-mail.  It says:<br>5 "Please find attached the requested reports.  The<br>6 first report is all DEA numbers that have been<br>7 shipped product from Sunrise in the past 12<br>8 months.  The second report is a chargeback report<br>9 by DEA and SKU showing Sunrise sales as well as<br>10 other wholesalers.  Please let me know if you need<br>11 anything else."<br>12     Do you see that?<br>13     A  I do.<br>14     Q  And this e-mail attaches two<br>15 spreadsheets that apparently you asked for; is<br>16 that correct?  That's what the cover e-mail<br>17 indicates?<br>18     A  I believe so.<br>19     Q  And if you look at the first<br>20 spreadsheet, it tracks all product shipped to<br>21 Sunrise.  Right?  So flip over to the --<br>22     A  You said something a second ago that I<br>23 asked for this report.  Does it -- I don't see<br>24 that. |

| Page 107 | Page 109 |
|---|---|
| 1     Q  But you -- you received reports, you<br>2 received information, you received printouts from<br>3 the chargeback system, right?<br>4     A  Occasionally.  I did not have hands-on<br>5 access or to chargeback -- chargeback information.<br>6     Q  But you understood that Mallinckrodt<br>7 collected this information, put it in something<br>8 called the chargeback system, so that it could<br>9 determine if it owed chargebacks to its<br>10 distributor clients, right?<br>11     A  Okay.<br>12     Q  That's your understanding?<br>13     A  I believe so.<br>14     MR. LOESER:  Exhibit 7.<br>15     (Borelli Exhibit No. 7 was marked<br>16     for identification.)<br>17 BY MR. LOESER:<br>18     Q  Mr. Borelli, you've been handed<br>19 Exhibit 7, which is three documents, a cover<br>20 e-mail and two spreadsheets.<br>21     For the record, the cover e-mail is<br>22 MNK-T1_0000448872.  This is an e-mail from Lisa<br>23 Lundergan to you, with a cc to John Adams, Kate<br>24 Muhlenkamp, and it's dated July 10th, 2009.  The | 1     Q  Well, it says:  "Please let me know if<br>2 you need anything else."  So, does that not<br>3 suggest to you that you asked for this<br>4 information.<br>5     A  I don't remember --<br>6     Q  It says:  "Please find the attached --<br>7 please find attached the requested reports."<br>8 So --<br>9     A  I see what it says, but I don't see<br>10 what -- where it says what you said.  And I<br>11 don't -- please let -- I don't know if that -- I<br>12 don't remember asking for it.  And I -- you know,<br>13 I just don't.<br>14     Q  Do you have any reason to doubt that you<br>15 sent this e-mail to Lisa Lundergan --<br>16     A  I didn't -- I didn't send.<br>17     Q  -- and that you received an e-mail from<br>18 Lisa Lundergan in which she said, "Please find<br>19 attached the requested reports"?<br>20     A  I see what she sent me.  I don't -- I<br>21 don't see me asking for it, and -- but you said I<br>22 asked for it.  I don't remember asking for it.<br>23     Q  So when she sends you an e-mail saying,<br>24 "Please find attached the requested reports," |

Page 110

1 you're saying you don't think you asked for these
2 reports.  Or you just don't recall.
3     A   Yeah, I don't recall asking for this
4 report.
5     Q   Now, if you would look at the first
6 spreadsheet --
7     A   Okay.
8     Q   -- the middle column is "Pricing
9 contract," and it says "Sunrise wholesalers."  Do
10 you see that?
11     A   I do.
12     Q   And Sunrise wholesalers is a distributor
13 customer of Mallinckrodt's, right?
14     A   Yes.
15     Q   And it was your client?
16     A   Yes.
17     Q   And you see that there are a number --
18 number of fields in this spreadsheet, and we'll
19 walk through them.  There's net sales, pricing
20 quantity, product description, SKU, pricing
21 contract, and then the -- and then ship-to
22 customer name.  Do you see that?
23     A   I do.
24     Q   And then next to that is DEA number.

Page 111

1         And is it your understanding that the
2 information in this report comes out of the
3 chargeback system that Mallinckrodt maintains?
4     A   I believe it does.
5     Q   And that chargeback system, as we can
6 see from the spreadsheet, includes the name of
7 Mallinckrodt's distributor.  Right?
8     A   Yes.
9     Q   That's Sunrise.  It also includes the
10 name of the person or clinic or entity to which
11 the distributor sent the product.  Is that right?
12     A   Yes.
13     Q   And that -- that person to which the
14 product was shipped by the distributor is the
15 downstream customer; is that correct?
16     A   That is correct.
17     Q   And so in this report, Mallinckrodt is
18 tracking the sales of its distributor clients to
19 their downstream customers, correct?
20         MR. TSAI:  Object to the form.
21 BY MR. LOESER:
22     Q   You can answer.
23     A   I believe so.
24     Q   And they're collecting information about

Page 112

1 that downstream customer, including the DEA
2 registration number.  Correct?
3     A   I believe so.
4     Q   So if there is a downstream customer
5 identified here, Mallinckrodt has the DEA
6 registration number, and you're also aware that
7 Mallinckrodt collects the address of that
8 downstream customer and the -- the type and
9 quantity of pills purchased by Mallinckrodt.
10     A   I believe so.
11     Q   And so, for example, all of these
12 Sunrise purchases, and there are pages of them in
13 this exhibit, are all for oxycodone 30 and
14 oxycodone 15, right?
15     A   There are other molecules in here as
16 well.
17     Q   That's correct.  There's hydromorphone,
18 there's methadone.  But everything on this
19 spreadsheet is an opioid, correct?
20     A   (Peruses document.)
21     Q   And while you're flipping through that,
22 Mr. Borelli, you see that the vast majority of
23 these entries are for oxycodone HCL 30 milligram
24 and oxycodone HCL 15 milligram, correct?

Page 113

1     A   So yes to your question before.  And
2 then you just asked another question?
3     Q   Yeah, the vast majority of these Sunrise
4 purchases from Mallinckrodt are for oxy 15 and 30,
5 correct?
6     A   It looks that way.
7     Q   And so from this report, which is taken
8 out of the chargeback system, Mallinckrodt knows
9 the distributor that purchased the product, they
10 know the product that was purchased, they know the
11 product that was shipped, they know the amount
12 that was shipped, and they know the name and
13 address and DEA registration number of the
14 downstream customer.
15     A   Yes.
16     Q   You can put that one aside, Mr. Borelli.
17         (Borelli Exhibit No. 8 was marked
18         for identification.)
19 BY MR. LOESER:
20     Q   Mr. Borelli, you've just been handed
21 Exhibit 8.
22         Now, you understand that -- that in the
23 chargeback system, Mallinckrodt could sort the
24 data based upon your distributor customer or any

Page 114

1 of the other fields in the database, right?
2      A   I guess so.  I didn't work in
3 chargebacks, so I don't know.  I'm going to assume
4 they can sort, but I didn't work in the
5 chargebacks group.
6      Q   But that's your understanding.
7      A   Yes.
8      Q   And what I've handed you is a sort of
9 the chargeback data that we put together.
10 Mallinckrodt produced the chargeback data in Excel
11 native format.  And so we went through the
12 chargeback data and we sorted the way Mallinckrodt
13 could sort on Mallinckrodt's customer Sunrise.
14          And I would like you to go through, and
15 we can just again identify the full collection of
16 fields that Mallinckrodt has available to it in
17 the chargeback system.  And so we've printed this
18 over several pages so that we can actually see
19 each of the fields.  And I'll just walk through
20 them with me, and you tell me if you see that
21 field.
22          The first field on this Exhibit 8 is,
23 "A. Sold Via Child Number," and you see
24 underneath that it's Sunrise Wholesale, Inc.,

Page 115

1 right?
2      A   Okay.
3      Q   So the child in that designation is
4 Mallinckrodt's wholesale distribution customer,
5 correct?
6          MR. TSAI:  Object to this line of
7 questions.
8          But go ahead.
9          THE WITNESS:  I don't know if that's --
10 I want to say yes, but I don't know if that's the
11 number that Mallinckrodt assigned to this specific
12 account.  I don't know the chargeback system so
13 well, so...
14 BY MR. LOESER:
15      Q   Okay.  Let's just walk through the
16 fields then --
17      A   Yeah.
18      Q   -- and make sure we understand what they
19 are.
20          The second column is the child address.
21 That appears to be the address of Sun -- Sunrise
22 Wholesale, right?
23      A   Okay.
24      Q   Do you see that?

Page 116

1      A   I do.
2      Q   And so it's the address, and then the
3 next column has the suite, and the next column has
4 the city.  That's the city where the distributor
5 is, Sunrise.
6      A   Okay.
7      Q   The next column has the state.  That's
8 Florida, right?
9          MR. TSAI:  Counsel, can I have a
10 standing objection to this exhibit, your questions
11 to the witness as to this exhibit?  Or do you want
12 me to object to every --
13          MR. LOESER:  A standing objection is
14 fine.
15          MR. TSAI:  Thank you.
16 BY MR. LOESER:
17      Q   And then you see the postal code for the
18 distributor client for Sunrise, right?
19      A   I do.
20      Q   And then you see the column that says
21 "Ship to Customer Number," right?
22      A   I see that column.
23      Q   And next to that it says "Ship to
24 Customer Name."

Page 117

1      A   I see that.
2      Q   Right?  And so what this spreadsheet
3 shows is that in the chargeback system, you know
4 the distributor, the distributor's address, you
5 know the downstream customer, right?  That's First
6 Choice Pharmacy here, right?
7      A   Okay.
8      Q   And then if you flip to the next page,
9 "Ship to Customer Address," that's the address of
10 the downstream customer, right?
11      A   Okay.
12      Q   Do you see that?
13      A   I assume so, yep.
14      Q   Okay.  And then you see that it has the
15 city of the downstream customer.  That's Fort
16 Lauderdale, right?
17      A   Okay.
18      Q   And next to that you have the state.
19 That's the state where the downstream customer
20 resides, right?
21      A   I see it.
22      Q   And the postal code?
23      A   I see it.
24      Q   Right?  And then you have a DEA number

Page 118

1  for the downstream customer, right?
2      A   I see that.
3      Q   And the product number, right?  That's
4  the designation of Mallinckrodt's product number?
5      A   I see that.
6      Q   Okay.  And then if you flip to the next
7  page, you have the product description, correct?
8          And so here you have oxycodone HCL 30
9  milligram tabs, USP, right?  So you have that
10  information in the chargeback system.
11      A   Mm-hmm.
12      Q   That's the product shipped by your
13  distributor to your downstream customer at the
14  address indicated there in Florida.
15      A   Okay.
16      Q   You have an order number, correct?  Do
17  you see that, column R?
18      A   I do.  I see it.
19      Q   And then next to that you have the order
20  type, it says "HS."  Do you know what HS is?
21      A   I do not.
22      Q   Okay.  Then there's an order type
23  description, and it says "Distributor sales
24  history feed," right?

Page 119

1      A   I see it.
2      Q   And moving down the line, you have an
3  order line type, right?  Do you see that field?
4      A   I do.
5      Q   And next to that you have the order line
6  type description, and it says "Chargeback unit
7  detail."  Right?
8      A   Mm-hmm.  I see it.
9      Q   And there's an invoice number, right?
10      A   I see it.
11      Q   And next to that is an invoice date.
12  That's the date that that product was sold by your
13  distributor customer to their downstream customer,
14  right?
15      A   I see it.
16      Q   And then the process date.  That's when
17  that downstream customer's order was processed,
18  right?
19          And then next to that, you see the
20  partner batch ID, right?
21      A   I do see that.
22      Q   So you have the ID of that downstream
23  customer.
24      A   I don't know what that represents, but I

Page 120

1  see the column.
2      Q   Okay.
3      A   And I didn't know what column U
4  represents, but I see the column.
5      Q   Okay.  And moving along, you have a
6  number of other fields, including column AE is the
7  gross sales.
8      A   Okay.
9      Q   That's the gross sales to that
10  downstream customer of Mallinckrodt's distributor
11  client.
12          There's a column for the chargebacks,
13  right?  Do you see that?
14      A   I see it.
15      Q   And there's a net sales, so presumably
16  that would be the gross sales less the chargeback
17  payment, right?
18      A   I see it.
19      Q   And then it shows in AH the quantities
20  shipped, right?
21      A   Yep.
22      Q   And AI, the sales quantity government
23  UOM.  Do you know what that metric is, government
24  UOM?

Page 121

1      A   I do not.
2      Q   That's not something that you saw before
3  when you were working with chargeback data?
4      A   It doesn't look familiar, no.
5      Q   All right.
6      A   When you say --
7          MR. TSAI:  Objection to the form.
8          Go ahead.
9          THE WITNESS:  I'm sorry.
10          When you say "working with chargeback
11  data," this is not a usual occurrence.  I did not
12  pull up chargeback data.
13  BY MR. LOESER:
14      Q   But as we saw from the e-mail, you
15  received reports that contained chargeback
16  information out of the chargeback system, right?
17      A   Yes, but -- infrequently, but yes.
18          (Borelli Exhibit No. 9 was marked
19          for identification.)
20  BY MR. LOESER:
21      Q   Mr. Borelli, you're being handed
22  Exhibit 9.  Exhibit 9, for the record, is a list
23  of the fields that we just went through that were
24  taken out of the Excel spreadsheet produced by

Page 122

1 Mallinckrodt from its chargeback system.
2         And do you see that it's columns A
3 through AI, Mr. Borelli, and those are the columns
4 that we were just talking about that were in that
5 report we went through, right?
6         MR. TSAI:  Same objection to this
7 exhibit and line of questions.
8         Go ahead.
9 BY MR. LOESER:
10    Q    That's my only question on the exhibit.
11    A    So I do see the page in front of me.
12    Q    Right.  And that page has column names
13 and those were the names from the exhibit we just
14 went through.  Correct?
15    A    Yes.
16    Q    Okay.
17        MR. TSAI:  We've been going about an
18 hour since the last break.  Is this a good time
19 for a break, and then we can go maybe another hour
20 until lunch?
21        MR. LOESER:  That's fine.
22        THE VIDEOGRAPHER:  The time is 11:21
23 a.m., and we're going off the record.
24        (Recess.)

Page 123

1         THE VIDEOGRAPHER:  The time is
2 11:37 a.m., and we're back on the record.
3 BY MR. LOESER:
4    Q    Mr. Borelli, you saw in Exhibit 7 an
5 e-mail from Ms. Lundergan that included chargeback
6 reports, and that report was sorted by -- by
7 Sunrise, correct?
8         Certain information regarding Sunrise
9 was isolated and we went through that information,
10 and on occasion, you received these chargeback
11 reports, so you do have some familiarity with the
12 data that's contained in them, right?
13    A    I've never seen that style report
14 before.  I don't remember seeing it at least.
15 Excuse me.
16    Q    And just to be clear, the style was
17 created by us.
18    A    Oh.
19    Q    We went into the --
20    A    Okay.
21    Q    -- Excel spreadsheet, we printed that
22 document.
23        But the spreadsheet from Ms. Lundergan
24 was a Mallinckrodt produced spreadsheet, so that

Page 124

1 style you were familiar with.
2    A    Okay.
3         (Borelli Exhibit No. 10 was marked
4         for identification.)
5 BY MR. LOESER:
6    Q    Mr. Borelli --
7    A    Thank you.
8    Q    -- you've been handed Exhibit 10.  This
9 is another printout from the Mallinckrodt
10 spreadsheet that we created, and so you might not
11 be familiar with the -- with the style of this one
12 as well.
13        But as we talked about, you saw a
14 printout from -- previously from Ms. Lundergan
15 that sorted on Sunrise, so you know that you can
16 go into this database and you can sort based on
17 the different fields in order to collect
18 information.
19        And on occasion, you -- you received
20 reports that were sorted in various ways, correct?
21    A    You said that I can.  No, I never went
22 into the chargeback data to --
23    Q    I understand that you didn't sort the
24 data, but you received printouts from the

Page 125

1 system --
2    A    Oh, okay.
3    Q    -- that was sorted --
4    A    I see.
5    Q    -- according to various fields, correct?
6    A    I believe so.
7    Q    Okay.  So in this printout, we have gone
8 through and instead of sorting just on Sunrise, we
9 also sorted on Sunrise's downstream customer Barry
10 Schultz.
11        So do you see the ship to customer name
12 and the name Barry Schultz?
13        MR. TSAI:  Can I have the same standing
14 objection as to this Exhibit 10 and the questions
15 to this witness?
16        MR. LOESER:  That's fine.
17        MR. TSAI:  Thank you.
18 BY MR. LOESER:
19    Q    Sir, do you see the field "Ship to
20 customer name" and it says Barry Schultz?
21    A    I see the column.
22    Q    Okay.  So you see that Sunrise
23 Wholesale, that's the child customer name, and we
24 talked about what that means before.  Sunrise

Page 126

1 Wholesale is Mallinckrodt's distributor client,
2 right?
3     A   I believe so.
4     Q   And that was your client.  Sunrise was
5 your client?
6     A   Yes.  At that time, yes.
7     Q   Okay.  And then the ship to customer
8 name, Barry Schultz, that's the downstream
9 customer of Sunrise -- of Sunrise, correct?
10    A   I believe so.
11    Q   And since there's a physician listed in
12 here, that indicates that this is a dispensing
13 physician, right?  Those are the only physicians
14 that would receive shipments from your wholesale
15 clients, right?
16    A   Uh, I'm not quite sure.
17    Q   Okay.  So you don't know --
18    A   Whether a pharmacy, a dispensing
19 physician, a hospital, I'm not quite sure.
20    Q   Okay.  But this downstream customer is
21 not a pharmacy.  It's an individual physician,
22 right?
23    A   Okay.
24    Q   And it's Barry Schultz, MD, correct?

Page 127

1     A   That's what it says.
2     Q   Okay.  And you can move down -- again,
3 this is information printed out from
4 Mallinckrodt's chargeback system or the Excel
5 spreadsheets that were produced, you can move down
6 the line and you can see where Mr. Schultz lives,
7 you can see his address or at least where he
8 works.
9     A   Mm-hmm.
10    Q   Delray Beach, Florida, and his postal
11 code, and you can see his DEA registration number,
12 right?
13    A   I see the column.
14    Q   Right.  And the product number, you see
15 that?
16    A   I do.
17    Q   That's the SKU, that's something that
18 Mallinckrodt can track so it knows every --
19 everything that went from Sunrise Wholesale to
20 Barry Schultz had a product number, right?
21    A   I see the column.
22    Q   And you can also see there's a product
23 description.  Right?
24    A   I see that.

Page 128

1     Q   So every drug that was sold by Sunrise
2 to Barry Schultz, you have the product number in
3 this data, and you also -- and "you," I mean
4 Mallinckrodt -- has the type of drug that was sent
5 to Mr. Schultz, correct?
6     A   Yes.
7     Q   And so you can go down this spreadsheet,
8 which again is a sort on Barry Schultz and
9 Sunrise, and you can see that every product
10 purchased by Barry Schultz from Sunrise was a
11 Mallinckrodt-made oxycodone 30 or 15 milligram
12 tablet, right?
13    A   In this column, yes.
14    Q   On this spreadsheet --
15    A   Yes.
16    Q   -- right?
17        And you can see the invoice date for
18 every single sale to Barry Schultz by Sunrise,
19 correct?
20    A   Yes.
21    Q   And you can see the gross sales, right?
22    A   Yes.
23    Q   And you can see if there's a chargeback
24 that was paid to Sunrise for its sale to Barry

Page 129

1 Schultz, right?
2     A   Yes.
3     Q   And you can see the net sales, right?
4     A   Yes.
5     Q   And you can see the quantity shipped
6 from Sunrise to their downstream customer, Barry
7 Schultz, right?
8     A   I see that.
9     Q   And then again, you can see the sales
10 quantity government UOM, and there is a number,
11 2,000, 3,000, 600, right?
12    A   Yes.
13    Q   And there's not any data on this
14 printout that we've provided to you that you --
15 that is unfamiliar to you, right?  All of these --
16 these fields are information that you have seen at
17 one time or another in information presented out
18 of the chargeback system.
19    A   Well, when you say the data is
20 unfamiliar, I don't -- I see -- I'm familiar with
21 the customer.  I'm familiar with the products.
22    Q   Let me ask you another way.
23    A   That's my familiarity with this
24 document.

Page 130

1   Q  Right. All of this information is
2 information that you know is maintained in the
3 chargeback system, right?
4   A  I believe so.
5   Q  So, Mr. Borelli, earlier you answered a
6 question of mine about what Mallinckrodt could see
7 after it sold its pills to the distributors that
8 were its clients, and I asked you -- so you're
9 saying you had no visibility after you sold pills
10 to the distributor, that's where your visibility
11 stopped on what happened to those pills. And you
12 answered yeah.
13     Okay. And let me ask you again based on
14 what we went through, and maybe I'll ask it in a
15 way that makes more sense to you. It's certainly
16 the case that Mallinckrodt knew exactly where its
17 pills were sent by its distributor clients,
18 correct?
19     MR. TSAI: Object to the form.
20     THE WITNESS: I believe so.
21 BY MR. LOESER:
22   Q  It's clear that Mallinckrodt in this
23 chargeback system data knew for every transaction
24 by a distributor client who the downstream

Page 131

1 customer was for that transaction, right?
2     MR. TSAI: Object to the form.
3 BY MR. LOESER:
4   Q  You can answer.
5   A  I believe so.
6   Q  And there's nothing terribly unique
7 about sorting on Dr. Schultz. Mallinckrodt could
8 also sort on any other downstream customer,
9 including pharmacies, right?
10     MR. TSAI: Object to the form.
11     THE WITNESS: I don't -- I'm going to
12 assume yes, but again, I'm not familiar with this
13 system or the -- or the sorting process.
14 BY MR. LOESER:
15   Q  But so when it says the field "Ship to
16 customer name," those are the customers of the
17 distributors and distributors' customers were not
18 just individual physicians, right? They were also
19 pharmacies and pain clinics and other customers of
20 the distributor, right?
21   A  I believe so.
22   Q  Are you aware of whether downstream
23 customers are also referred to as customers of
24 customers for Mallinckrodt? Have you heard that

Page 132

1 terminology before?
2   A  I've heard the term -- terminology. I
3 don't know if I've heard it at Mallinckrodt, but
4 I've heard the terminology before.
5   Q  And is that your understanding of
6 customers of customers are -- are the downstream
7 customers of your customers?
8   A  I believe so.
9   Q  And again, Mallinckrodt in this
10 chargeback system had detailed information about
11 the shipment of Mallinckrodt products between its
12 distributor clients and all of its downstream
13 customers, right?
14     MR. TSAI: Object to the form.
15     THE WITNESS: I don't -- I can't speak
16 to all of our -- I didn't manage all of our
17 customers, and I don't know the system. So...
18 BY MR. LOESER:
19   Q  But that's your understanding, that you
20 were tracking the downstream customers of your
21 distributors.
22     MR. TSAI: Object to the form.
23     THE WITNESS: I was not. If you're
24 asking if Mallinckrodt was, I -- I'm going to

Page 133

1 assume yes, but I -- you know, I wasn't in this
2 department.
3 BY MR. LOESER:
4   Q  And pharmacies are also downstream
5 customers of your distributor clients.
6   A  I believe so.
7   Q  And would you agree that it would not be
8 accurate to say that Mallinckrodt lacked detailed
9 information about the shipment of its products
10 between its distributor clients and pharmacies?
11     MR. TSAI: Object to the form.
12     THE WITNESS: I don't know the accuracy.
13 I mean, from -- and I think it's best to ask a
14 chargeback person that question to -- to know the
15 accuracy for the company.
16 BY MR. LOESER:
17   Q  But, sir, based upon the information
18 that you've looked through and the chargeback
19 system reports that you received in your time at
20 Mallinckrodt, you do know that the chargeback data
21 included downstream customers that were
22 pharmacies, right?
23   A  I believe so, but I just don't want you
24 to -- you know, I think you're talking about --

Page 134

1 you're telling me the chargeback systems, and I'm
2 not comfortable with that.
3    Q   Right, that's a fair point. I'd like to
4 know what -- just what you know.
5       So you think --
6    A   Yeah.
7    Q   You would agree based on what you've
8 seen that it would not be accurate to say that
9 Mallinckrodt lacked detailed information about its
10 distributor sales to its downstream customers who
11 were pharmacies.
12    A   I believe so.
13       MR. TSAI:  Object to the form.
14       Go ahead.
15       THE WITNESS:  I believe so.
16 BY MR. LOESER:
17    Q   Your answer was "I believe so"?
18    A   Yes. But I wasn't in that department,
19 so I'm assuming here.
20    Q   Okay. You weren't in that department,
21 but again, we've gone through these fields and you
22 see that -- that there's a customer name, and the
23 customer name is the customer of the distributor,
24 and that can be a pharmacy or that can be a pain

Page 135

1 clinic, right? Or that can be a dispensing
2 physician, right?
3    A   Or hospital. Yes.
4    Q   Okay. It's not your understanding that
5 the chargeback system does not also track sales by
6 your distributors to pharmacies?
7    A   Say that again.
8       MR. LOESER:  Could you repeat the
9 question, please.
10       (Whereupon, the requested record
11       was read.)
12 BY MR. LOESER:
13    Q   Put it more simply, the chargeback
14 system also tracks sales by distributors to
15 pharmacies.
16    A   Thanks. I believe so.
17    Q   And from the chargeback data,
18 Mallinckrodt could determine whether a distributor
19 client ordered a limited variety of controlled
20 substances, such as oxy 15s and 30s, while
21 ordering few, if any, other types of drugs, right?
22 So you could see if the -- if the downstream
23 customer was only ordering oxy and was not
24 ordering anything else from Mallinckrodt.

Page 136

1       MR. TSAI:  Object to the form.
2       THE WITNESS:  I believe so.
3 BY MR. LOESER:
4    Q   And you could determine whether a
5 downstream customer was ordering an excessive
6 number of pills from the chargeback system because
7 you could see exactly how many pills that
8 downstream customer was ordering from your
9 distributor customer, right?
10       MR. TSAI:  Object to the form.
11       THE WITNESS:  I'm not quite familiar
12 with -- I'm not sure -- when you say "excessive,"
13 I don't know what that means.
14 BY MR. LOESER:
15    Q   Okay. You could see the amount of pills
16 that any downstream customer ordered from any
17 distributor.
18       MR. TSAI:  Object to the form.
19       THE WITNESS:  I believe so.
20 BY MR. LOESER:
21    Q   And so Mallinckrodt could assess from
22 that data in however it chose to do so whether
23 that order was excessive or not, right?
24    A   I believe so.

Page 137

1    Q   And you could see from the chargeback
2 data whether a downstream customer ordered from a
3 variety of Mallinckrodt distributor clients,
4 right?
5    A   You're speaking about chargebacks
6 data -- chargeback data that I'm -- I'm just not
7 familiar with chargeback data specifically.
8    Q   So you --
9    A   There's a team in place -- there was a
10 team in place at Mallinckrodt that -- that was
11 specifically responsible for chargeback data. So
12 that's available, but --
13    Q   Okay.
14       (Borelli Exhibit No. 11 was marked
15       for identification.)
16       MR. TSAI:  Thank you.
17 BY MR. LOESER:
18    Q   I'm showing you what's been marked
19 Exhibit 11. This is another printout that we did
20 from the chargeback system data produced by
21 Mallinckrodt.
22       And you'll see that this exhibit sorts
23 on the customer Harvard Drug. Do you see that?
24    A   I do.

Page 138

1    Q   And Harvard Drug was another distributor
2   client of Mallinckrodt's, right?
3    A   They -- they were.
4    Q   Okay.  And you also see, if you go down
5   the line to "Ship to customer name," that Barry
6   Schultz was also buying Mallinckrodt oxy 15 and
7   30s from Harvard Drug, right?
8        MR. TSAI:  Same standing objection as
9   before to this Exhibit 11.
10       THE WITNESS:  I see his name in a
11  column, but I don't see anything else.  I see his
12  name and I see an address.
13  BY MR. LOESER:
14   Q   Okay.  So you see his name, ship to
15  customer name, Barry Schultz, and if you go back
16  to the left, you can see "Sold via child customer
17  name," and it says "Harvard Drug."  Do you see
18  that?
19       MR. TSAI:  Sorry.  Could you confirm I
20  have a standing objection to this exhibit?
21       MR. LOESER:  Yes.  Understood.
22       MR. TSAI:  Thank you.
23       THE WITNESS:  What was the question?
24  BY MR. LOESER:

Page 139

1    Q   You see the second column is customer
2   name and it says Harvard Drug, right?
3    A   I see that.
4    Q   But then you also see the next column
5   over, it says "dba," that's doing business as,
6   right, "First Veterinary Supply."  Do you see
7   that?
8    A   I do.
9    Q   Okay.  So what this data shows, which
10  again has been pulled from the chargeback system
11  data produced by Mallinckrodt, is that Barry
12  Schultz, in addition to purchasing oxy 15s and
13  30s, which you can see the drug type on the next
14  page, in addition to purchasing from Sunrise, was
15  also purchasing from another distributor client of
16  yours, Harvard Drug, that was doing business as
17  First Veterinary Supply, right?
18   A   I don't remember Harvard -- you know, I
19  shared with you before that we adjusted customer
20  base amongst the sales team often, annually
21  minimally, and I'm not familiar with First
22  veteran -- Veterinary Supply.  I'm not familiar
23  with that column.
24   Q   Right.  Would you --

Page 140

1    A   And I don't remember if -- you know,
2   what time -- when was this?  I don't remember when
3   I was responsible for Harvard or not.  So...
4    Q   Well, the date is -- all of these
5   transactions were between January and February
6   2010.
7    A   Okay.  So I don't know if I had Harvard
8   at that time.  I'm not quite sure, but --
9    Q   And whether you had that client or not,
10  this is information that resided in Mallinckrodt's
11  chargeback data, right?
12   A   Oh, okay.  Okay.
13   Q   And so Barry Schultz, as we saw in an
14  earlier exhibit, was purchasing from Sunrise, and
15  Barry Schultz is an MD, right?  That's what the
16  chargeback system said.
17       And on this exhibit, you see that in
18  addition to purchasing from another distributor
19  client of yours, he was being sent pills from a
20  company that was listed as a veterinary supply
21  company, right?
22   A   That's what it says here.
23   Q   So if you had seen this data when you
24  still worked at Mallinckrodt, would you have

Page 141

1   thought it unusual and perhaps suspicious that a
2   medical doctor was receiving oxy 15 and 30 from a
3   company doing business as First Veterinary Supply?
4        MR. TSAI:  Object to the form.
5   BY MR. LOESER:
6    Q   Does that seem suspicious to you?
7        MR. TSAI:  Object to the form.
8        THE WITNESS:  I don't know who this
9   person -- this doctor is.  Is he a vet?  Is he --
10  I don't -- I don't know.
11  BY MR. LOESER:
12   Q   Are vets MDs?
13   A   I -- I don't believe so.
14   Q   So you would agree with me that if
15  someone had looked at this data, and I'm not
16  saying that you did, but if someone had, they
17  could have seen that Mr. -- or Dr. Schultz was, in
18  addition to ordering pills from one of your
19  customers, Sunrise, as a medical MD -- and by
20  pills, I mean oxy 15 and 30 -- was also ordering
21  more oxy 15 and 30 from another Mallinckrodt
22  distributor customer, but this time a veterinary
23  supply company.
24       MR. TSAI:  Object to the form.

Page 142

1  BY MR. LOESER:
2      Q   That's all information that's in the
3  chargeback system, right?
4          MR. TSAI:  Object to the form.
5          THE WITNESS:  I believe so.  I'm not an
6  expert on the chargeback system, so you -- it's
7  best to speak to the team that was in place on the
8  chargeback process.
9  BY MR. LOESER:
10     Q   Right.  But you know what a suspicious
11 order is, right?
12     A   There was a -- there was a team in place
13 for suspicious order monitorings.  So that --
14     Q   Right, sir, but you were not --
15     A   You know, my job -- my job was a sales
16 role --
17     Q   Right.
18     A   -- with the company, to be a liaison
19 from the company to the customer, to the
20 wholesaler.  So you're talking about chargebacks,
21 which I'm not so familiar with, but now you're
22 talking about suspicious order -- orders.  So I'm
23 not so -- we have a team in place for that as
24 well.  So I think it's best to talk to the team

Page 143

1  that was responsible for that.
2      Q   Understood.  But, sir, even without
3  particular training on what is or isn't a
4  suspicious order, in your years of selling
5  opioids, you would agree with me that when a
6  medical doctor orders opioids from a vet -- from a
7  veterinary supply company, that has to be
8  considered a suspicious order, right?
9          MR. TSAI:  Object to the form.
10 BY MR. LOESER:
11     Q   Can you think of any legitimate reason
12 why a medical doctor orders opioids from a
13 veterinary supply company?
14     A   I can't --
15         MR. TSAI:  Object to the form.
16         THE WITNESS:  I can't speak for doctors'
17 practices.
18 BY MR. LOESER:
19     Q   So if the doctor has a DEA registration
20 number, even if he orders from a veterinary supply
21 company, from where you sit and what you
22 understand, that doesn't trigger any suspicious
23 order alarms in your head.
24         MR. TSAI:  Object to the form.

Page 144

1  BY MR. LOESER:
2      Q   You can answer.
3      A   You're tying in a lot of departments
4  here.  And you know my role.  So that's a tough
5  one to answer.
6      Q   That's a hard question to answer,
7  whether a doctor, a medical doctor buying opioids,
8  oxy 15 and 30, from a veterinary supply company
9  appears suspicious?
10         MR. TSAI:  Object to the form.
11         THE WITNESS:  Yes, it's a tough one to
12 answer.
13 BY MR. LOESER:
14     Q   Okay.
15         (Borelli Exhibit No. 12 was marked
16         for identification.)
17         THE WITNESS:  Thank you.
18 BY MR. LOESER:
19     Q   Mr. Borelli, you've been handed what's
20 marked Exhibit 12, which has Bates stamp
21 MNK-T1_0000562327.  And this is an e-mail string,
22 and the end of the string, it's a message from you
23 dated August 4th, 2009, to Bill Ratliff, with a cc
24 to Karen Harper.

Page 145

1      Who is Bill Ratliff?
2      A   I don't remember what -- I remember the
3  name, but I'm not quite sure what Bill did for --
4  I don't remember what he did for Mallinckrodt.
5      Q   Well, later in the e-mail it indicates
6  his signature --
7      A   Oh.
8      Q   -- address is director of security.
9      A   Okay.
10     Q   Is that your recollection?  Does that
11 refresh your recollection?
12     A   It says right here, yeah.
13     Q   Okay.  And Karen Harper, what was her
14 position at Mallinckrodt?
15     A   I don't know what her title was, but I
16 think she was -- I think they're both in the --
17 what you mentioned before, the compliance or
18 suspicious order monitoring department.
19     Q   Okay.  So if you go to the very end of
20 this string, you'll see a message from Dwayne
21 Collins to Bill Ratliff.  Do you see that?
22     A   I see it.
23     Q   And do you see the subject line,
24 "Florida medication coming into Tennessee"?

Page 146

1    A   I see that.
2    Q   And this is an e-mail that was sent from
3  a detective in Tennessee to the head of security,
4  the director of security for Mallinckrodt, in
5  which he describes an investigation that he was
6  doing.
7        Why don't you take a moment and just
8  familiarize yourself with that.
9    A   Okay.  (Peruses document.)  Okay.
10   Q   So in this e-mail from --
11   A   I just read from Dwayne to Bill.  Do you
12  want me to read the whole -- the entire e-mail?
13   Q   No, I'll -- we can go through as I ask
14  my questions.  You'll see the other portions --
15   A   Okay.
16   Q   -- of the string.
17       I will say for the record that -- that
18  the e-mail from Dwayne to Bill was then forwarded
19  to -- from Bill to Karen Harper, and then from
20  there it was forwarded to -- Karen Harper
21  responded, and eventually the -- the whole series
22  was cc'd to you --
23   A   Okay.
24   Q   -- involving some discussion from you,

Page 147

1  and getting to the top of the e-mail, there is an
2  e-mail from you that -- that is attached to your
3  e-mail is all of this discussion, some of which
4  you've now gone through.
5    A   Okay.
6    Q   So the e-mail string starts on July 7,
7  2009, with an e-mail from Dwayne Collins, who is a
8  detective in Tennessee, to the head of
9  Mallinckrodt's security department.
10       And if you look at the second paragraph
11  of Mr. Collins' e-mail, he states:  "My first
12  eye-opening experience to the pharmaceutical sale
13  of oxycodone sent me off into the direction of
14  looking at the pharmacies that were filling the
15  scripts.  It was then that I found that we were
16  dealing with several pain clinics in Florida where
17  doctors were prescribing an abundant amount of
18  oxycodone medication to numerous Tennesseans,
19  especially within the jurisdiction that I'm
20  assigned."
21       And he goes on to say:  "While I was
22  working through this to determine the level of
23  economic impact on oxycodone drug dealing, I came
24  upon some information from a CI where I had three

Page 148

1  individuals who were coming up out of Florida on a
2  regular basis, two- or three-week interval, and
3  selling massive amounts of oxycodone, 30
4  milligrams."
5        Do you see that?
6        And Mr. Collins goes on to explain that
7  he found some bottles of oxy 30, and when he
8  looked at the label, he saw that they were
9  manufactured by Mallinckrodt.
10       Do you see that?
11       And then from there he contacted the
12  head of security at Mallinckrodt, and the head of
13  security then, if you go to the page before that,
14  you'll see there's an e-mail from Bill Ratliff
15  dated July 10th, 2009, with a cc to Karen Harper,
16  in which Mr. Ratliff is able to tell Mr. Collins
17  exactly what was sold by Mallinckrodt's
18  distributor customer to the doctor that prescribed
19  those pills that ended up in Tennessee.
20       Do you see that?
21       And Mr. Ratliff says:  "Dwayne, the
22  doctor we discussed ordered the following during
23  the last 12 months:  78 bottles oxy 15 milligram,
24  204 oxy 30 milligram, 20 methadone 10 milligram,

Page 149

1  and four hydromorphone.  All came from the
2  customer we discussed except the hydromorphone."
3        Do you see that?
4    A   I do.
5    Q   And you understand that Mr. Ratliff was
6  able to retrieve that information because of the
7  sales transaction data maintained in the
8  chargeback system, right?
9        MR. TSAI:  Object to the form.
10       THE WITNESS:  I believe so.
11  BY MR. LOESER:
12   Q   Okay.  And then if you go to the e-mail
13  moving forward in time, July 15th, 2009, from Bill
14  Ratliff to a number of people, with a cc to Karen
15  Harper, he describes a meeting that he then had.
16       Why don't you read that e-mail.  It
17  starts on the second page of the exhibit and runs
18  into the third.  The e-mail at the bottom of that
19  page from --
20   A   Where it says "For information"?
21   Q   -- "For information," yeah.  Yes.
22   A   You will --
23   Q   You don't have to read it out loud.
24  Just familiar yourself -- familiarize yourself

Page 150

1  with that.
2      A   Thank you.  (Peruses document.)  Okay.
3      Q   Okay.  So what Mr. Ratliff writes to
4  this series of people, and, again, this is in a
5  string which is then attached to an e-mail that
6  you sent, so you had this string.
7          "For information, Karen Harper and I met
8  with the St. Louis DEA diversion group supervisor,
9  Pete Kleissle, this morning regarding the
10  information below.  We advised that Sunrise
11  Wholesale Inc. was the only distributor residing
12  in Florida that received this lot.  In addition,
13  we advised that Cardinal Health in Ohio has a
14  distribution center in Florida and had received
15  some of the lot.  But the doctor listed on one of
16  the 100 count bottles that was recovered only
17  purchased oxy form Sunrise.
18          "For background, Sunrise mainly sells to
19  pain clinics and to dispensing doctors.  One
20  doctor was identified by an empty 100-count bottle
21  found by one of two informants in the
22  investigation.  We tracked the doctor's purchases
23  through our chargeback system.  See below."
24          So that confirms what you said

Page 151

1  previously, that this information that Mr. Ratliff
2  was able to provide for Mr. Collins came from the
3  chargeback system, right?
4      A   Right.  You said something about me tied
5  to this e-mail.  I'm not on this one -- I'm not on
6  this -- that I -- you asked me to read.  I came in
7  later into the conversation, I believe, a week --
8  two weeks later.
9      Q   Right.
10      A   So this is -- right.
11      Q   Right.  But it's an e-mail string
12  attached to an e-mail you sent, right?
13      A   Got it.
14      Q   Do you have any recollection of this
15  series of events?
16      A   Not so much.  I -- not so much this, but
17  I do remember organizing a meeting between a
18  customer wholesaler, Sunrise.  I don't know when I
19  did that, but -- and Karen Harper.  I didn't read
20  this page yet, but -- and Karen Harper.  I'm not
21  sure who else was there.  I think a few other
22  folks, but maybe -- I don't know who else was
23  there.  Maybe Bill too.  I don't remember.
24      Q   And do you recall that this doctor who

Page 152

1  was supplying all these pills that were going to
2  Tennessee was identified by Mallinckrodt as
3  Dr. Schultz?
4      A   That -- that's what it says.
5      Q   And do you recall that?
6      A   I don't -- I don't recall that part of
7  the e-mail.  I remember creating a meeting with
8  the wholesaler and our compliance team.
9          Does it say that -- that person in here?
10  Does it say the doctor that it talked about?
11          Pardon me for a second.  You said it
12  says that doctor's name on here, and I didn't --
13      Q   I asked you -- yeah, I don't believe it
14  says Dr. Schultz.  I'm asking if you recall that
15  this event related to Dr. Schultz.
16      A   No.
17      Q   There's a number of e-mail --
18      A   So I -- I correct myself, no, I do not
19  at all.  I thought it said it in here, and I must
20  have -- I thought I missed it in the reading, but,
21  no, not at all.
22          (Counsel conferring.)
23          (Borelli Exhibit No. 13 was marked
24           for identification.)

Page 153

1      THE WITNESS:  Thank you.
2  BY MR. LOESER:
3      Q   I'm showing you what's been marked
4  Exhibit 13, which is a series of e-mails.  Under
5  the subject line, it says "Re:  Pete Kleissle
6  Oxy Investigation."
7          Do you see that?
8      A   I do.
9      Q   And if you go back to the second to last
10  page, you see the e-mail from Bill Ratliff that's
11  addressed to you and John Adams and Karen Harper.
12  Do you see that?
13      A   I do.
14      Q   And he writes:  "The DEA diversion group
15  supervisor recommended that we audit Sunrise as
16  soon as possible.  Please let me know the best way
17  to accomplish that."
18          Do you see that?
19      A   I do.
20      Q   And when you turn to the next page, in
21  the middle of the page there's an e-mail from
22  Karen Harper to Bill Ratliff that must have been
23  forwarded to you because of the cc above.
24          Or, I'm sorry, was not forwarded to you.

Page 154

1       Okay. Let's look at the middle of that
2 page, the e-mail from Karen Harper.
3     A   Okay.
4     Q   She writes towards the bottom of her
5 e-mail: "I don't know anything about the
6 chargeback access -- I don't know anything about
7 the chargeback system, which is how we detected
8 which physicians' pain clinics are receiving our
9 product through Sunrise."
10     Do you see that?
11     A   I read that, yeah. I see it.
12     Q   And above that, Bill Ratliff, the
13 director of security, responds: "Understood, but
14 believe that John and Victor do know or can
15 recommend someone." Right?
16     A   Oh, sorry. I see that.
17     Q   So the director of security believed
18 that you did know about the chargeback system and
19 that's how you detected or Mallinckrodt detected
20 which physicians' pain clinics are receiving our
21 product through Sunrise, right?
22     MR. TSAI: Object to the form.
23     THE WITNESS: That's a -- I -- I did not
24 have working knowledge or any experience with

Page 155

1 chargebacks. So if that's what he's saying here,
2 and I don't see how -- I don't see that in his
3 words, that I have a working knowledge of the
4 chargeback system, that's an inaccurate statement.
5 We have a chargeback team in place, and if that's
6 what he meant. Okay.
7 BY MR. LOESER:
8     Q   Okay. So he seemed to think that you
9 understood how that system operated. Did you
10 respond to his e-mail and say, I don't know
11 anything about this, you have to contact somebody
12 else?
13     A   In which one? This one is not to me.
14 This one is to -- this one is to Karen, and this
15 one is Karen to Bill. I'm not in that -- I'm not
16 in those.
17     Q   Right. You were involved in this
18 Sunrise audit, though, right?
19     A   I set up the meeting, yes.
20     Q   Okay. And did you tell Mr. Ratliff at
21 that time that -- that you did not understand
22 anything about the chargeback system, or were you
23 in fact working with the system to some degree and
24 understood what was in it?

Page 156

1     A   I don't know --
2     MR. TSAI: Object to the form.
3     THE WITNESS: Sorry. I don't remember
4 what I told Bill Ratliff. I barely remember Bill
5 Ratliff, so you're talking about something from
6 ten years ago, give or take.
7     (Borelli Exhibit No. 14 was marked
8     for identification.)
9     THE WITNESS: Thank you.
10 BY MR. LOESER:
11     Q   You've been handed what's been marked
12 Exhibit 14.
13     A   Yeah.
14     Q   MNK-T1_0000290041. The bottom half of
15 that page is an e-mail from Cathy Stewart dated
16 August 12, 2009, to Karen Harper and Bill Ratliff,
17 and you are cc'd on that.
18     Do you see that?
19     A   I do.
20     Q   And who is Cathy Stewart?
21     A   I remember the name, but I don't
22 remember what she did for the company.
23     Q   And do you see the subject line of that
24 e-mail?

Page 157

1     A   I do.
2     Q   And it's "Sunrise chargeback
3 summary.xls." Right?
4     A   No. Oh, up here. Yes. Down here, no.
5     Q   Okay. And I'll just read what she says.
6     "Please review the attached summary
7 worksheet. I took the chargeback file marketing
8 provided and removed pharmacies. Then I removed
9 purchases of methadone," and she lists a variety
10 of other drugs, "methadone, methylphenidate,
11 hydromorphone and oxy oral solutions, since the
12 volumes were very small in comparison. Of the
13 remaining oxy products, I reduced them to the
14 lowest common denominator by taking the quantities
15 sold times package size times milligram per dose.
16 The data is for the period CY08 and CY09 through
17 July."
18     Do you see that?
19     A   I do.
20     Q   So this shows -- and again, this is a
21 report that was to you -- Cathy Stewart taking
22 chargeback data and sorting it based on a variety
23 of characteristics in order to create a report.
24     A   The report was not sent to me. It

Page 158

1 was --
2    Q   Well, a summary --
3    A   I was cc'd on it.
4    Q   Okay.  But, nonetheless, the e-mail
5 refers to the attached summary worksheet, and that
6 was created by sorting the information in the
7 chargeback system, according to this e-mail.
8    A   Okay.
9    Q   Right?
10       Now, Mr. Borelli, when you were working
11 for Mallinckrodt and selling oxycodone, among
12 other drugs, did it ever -- did you ever wonder
13 what your distributor customers were doing with
14 all of the oxy you were selling them?
15    A   I wonder where all my products goes.
16    Q   Okay.  And did you -- since -- as we've
17 seen, even if you didn't sort the chargeback
18 system yourself, you received reports -- you knew
19 you could receive reports out of the chargeback
20 system, right?
21    A   I'm not so familiar with the chargeback
22 system, so I don't know what I infrequently asked
23 for.
24    Q   Okay.  But you could have asked somebody

Page 159

1 in the chargeback system -- the chargeback
2 department to sort data to give you a better
3 understanding of where all the drugs, where all
4 that oxy you were selling to your distributor
5 clients was going when they sold it to their
6 clients, right?
7    A   All -- we can do that on all of our
8 products, yes.
9    Q   Okay.
10       (Borelli Exhibit No. 15 was marked
11        for identification.)
12 BY MR. LOESER:
13    Q   Mr. Borelli, I'm handing you what's been
14 marked Exhibit 15.  And again, for the record,
15 this is another printout that we created from the
16 Excel file produced by Mallinckrodt, and at the
17 front of the worksheet it indicates the Bates
18 number of the -- of the spreadsheet itself that
19 was produced by Mallinckrodt.  And you can see
20 that it was produced from MNK-T1_0000264291.
21       And this is a sort of Sunrise sales of
22 oxycodone 15 and 30 tabs.  Do you see that at the
23 header?
24    A   I do.

Page 160

1    Q   And so using the chargeback system, you
2 or someone else in the chargeback department could
3 go into the system and could sort on a particular
4 type of drug -- we saw this in the last e-mail --
5 and could sort on the quantity of drugs sold,
6 correct?
7    A   No.  You said I can, and I did not ever
8 go into chargeback data individually or on my own.
9 Did we -- did I receive this from -- I'm not sure
10 what department Cathy Stewart was in.  It looks
11 like she supplied chargeback data.
12       You mentioned marketing department.  I
13 see a few names on here that look familiar from
14 the marketing department, but --
15    Q   I understand.
16    A   -- you said me, and I -- I did not do
17 that.
18    Q   Again, you individually were not sorting
19 data.
20    A   Right.
21    Q   But you could ask the chargeback
22 department or other people at Mallinckrodt to sort
23 the data so you, Victor Borelli, could see what
24 your distributor clients were doing with the oxy,

Page 161

1 for example, that you sold those distributor
2 clients, right?
3       And this chart you have not seen before
4 because we created it.
5    A   Oh, okay.
6    Q   And we created it from, again, the
7 information produced by Mallinckrodt from the
8 Excel file, and we have sorted -- knowing that
9 it's possible to sort the chargeback data based
10 upon the type of drug, the quantity of drug, and
11 the downstream customer of Sunrise, we have sorted
12 it that way, and what you will see is a list of
13 the top ten customers of Sunrise.
14    A   Okay.
15    Q   And this is information taken out of the
16 chargeback system.
17    A   Okay.
18       MR. TSAI:  Can I have a standing
19 objection to this exhibit?
20       MR. LOESER:  Yes.
21       MR. TSAI:  Thank you.
22 BY MR. LOESER:
23    Q   And if you look at the top of -- of this
24 top ten list, you'll see there is an individual

Page 162

1  Michael Shook.  Do you see that?
2      A   Yes.
3      Q   And Michael Shook, we learned from
4  Mallinckrodt's chargeback system, between
5  September 30th of 2008 and March 5th, 2010,
6  purchased oxy 15 and 30, 134 different times for a
7  total quantity of 728,400 UOM.
8          Do you see that?
9      A   I do.
10     Q   And Michael Shook is an MD, so he is a
11  dispensing physician.
12         So, if you had asked the chargeback
13  department to sort your distributor client
14  Sunrise's sales to downstream customers, you could
15  have created a list like this which showed the top
16  downstream customers of your distributor clients,
17  correct?
18         MR. TSAI:  Object to the form.
19         THE WITNESS:  I guess so.
20  BY MR. LOESER:
21     Q   Do you have any sense of whether one
22  doctor ordering oxy 134 times to the tune of
23  728,400 UOM seems excessive?
24     A   I don't know his client base.  I don't

Page 163

1  know anything about that doctor.
2      Q   Okay.  And had you done a sort like this
3  and identified him as the single top purchasing
4  downstream customer of Sunrise, you could have
5  learned something about him, right?
6          MR. TSAI:  Object to the form.
7          THE WITNESS:  I would learn something
8  about him.
9  BY MR. LOESER:
10     Q   Okay.  You could have -- or you could
11  have asked somebody in security at Mallinckrodt to
12  go visit this doctor's clinic, right?  You could
13  go see what kind of doctor in Florida orders 134
14  orders of oxy in this time period, 9/30 to -- to
15  3/10, right?
16         MR. TSAI:  Object to the form.
17         THE WITNESS:  When you say "go see," I
18  would not be visiting with the "shipped to" column
19  doctors.  Sunrise had -- I can't remember --
20  Sunrise had a specific person working for them, a
21  retired -- retired DEA agent that did that, that
22  vetted their customers for them to say -- you
23  know, I think he took pictures of the front of the
24  building, took pictures of the back of the

Page 164

1  building, took pictures of the vault.  Again, as I
2  said, he was a DEA -- Louis Fisher, DEA -- retired
3  DEA agent.  So they had somebody to do that, to
4  vet their customer base.
5  BY MR. LOESER:
6      Q   Understood.  If you or someone else--
7      A   So I would not have visited these -- I'm
8  sorry.  I would have not visited this.  I don't
9  know who they are.
10     Q   And you never visited any pain clinics
11  or downstream customers of your distributor
12  clients.
13     A   So I did work a day with Louis, just to
14  understand what he does for a living.
15     Q   Yeah.
16     A   And I think that might have been even
17  before we opened -- I don't remember the timing,
18  so forgive me -- but I think that was even before
19  we created an account with Sunrise.
20         And we did not create Sunrise.  They
21  were buying from other manufacturers prior to
22  Mallinckrodt that -- and I don't know the
23  circumstances -- that may have had back order
24  issues, DEA quota issues.  I'm -- I don't

Page 165

1  remember.  So, I'm sorry, if I --
2      Q   Who -- who chose the clinic that you
3  visited with Louis Fisher with Sunrise?
4      A   I don't remember that.  Sorry.
5      Q   But, nonetheless, in the chargeback
6  system you could have sorted in this way, you
7  could have seen, or someone else at Mallinckrodt,
8  that Michael Shook was the leading purchaser of
9  your oxy, and you could have provided that
10  information to Louis Fisher, and then you could
11  have gone and visited his client.
12         MR. TSAI:  Object to the form.
13  BY MR. LOESER:
14     Q   There's nothing about Michael Shook that
15  was a secret to Mallinckrodt.
16         MR. TSAI:  Object to the form.
17  BY MR. LOESER:
18     Q   Right?
19     A   I never heard of him.  But if you got
20  this data through chargebacks, it's best to go
21  through chargeback folks to --
22     Q   Right.
23     A   -- confirm that, but I don't know a
24  Michael Shook.

## Page 166

1  Q   Okay.  But you agree that the chargeback
2  system would allow you, if you asked, or anybody
3  else, to sort so you could identify who is the
4  single most frequent purchaser of oxy from our
5  distributor client, Sunrise.  That's something
6  that you or anyone else at Mallinckrodt could have
7  done, right?
8  A   I believe so.  But I guess I could do
9  the same for CVS stores and Duane Reade stores and
10  Walgreens stores.  You tell me when to stop.  It
11  wouldn't be a normal practice, that's for sure.
12  Q   It was not a normal practice --
13  A   For me.
14  Q   -- for you.
15  A   For me.
16  Q   Was it a normal practice for
17  Mallinckrodt?
18      MR. TSAI:  Object to the form.
19      THE WITNESS:  I can't answer that.  I
20  don't know.
21  BY MR. LOESER:
22  Q   If Mallinckrodt had sent somebody out to
23  your customers -- downstream customers, is that
24  something that you probably would have found out

## Page 167

1  about?
2      MR. TSAI:  Object to the form.
3      THE WITNESS:  I don't know the answer to
4  that.
5      (Borelli Exhibit No. 16 was marked
6      for identification.)
7      THE WITNESS:  Thank you.
8  BY MR. LOESER:
9  Q   I'm showing you what's been marked
10  Exhibit 16.  This is a short article with the
11  headline "Florida physician gets four years in
12  prison for operating pill mill."
13      Do you see that, and the date on this is
14  June 29, 2011?
15  A   I do.
16  Q   And it says:  "Michael Shook, MD, of
17  Oakland Park, Florida, has been sentenced to four
18  years in prison for illegally prescribing
19  painkillers to Kentuckians who travel to a
20  Florida-based pill mill, according to a report by
21  the Middlesboro Daily News."
22      Is that what that says?
23      MR. TSAI:  Hold on.  I object to this
24  Exhibit 16 and this line of questions.

## Page 168

1      But go ahead.
2      THE WITNESS:  That's what that says.
3  BY MR. LOESER:
4  Q   Okay.  And then if you skip a paragraph
5  it says:  "90 percent of patients at the pill mill
6  were from Kentucky.  Before writing prescriptions
7  for oxycodone and methadone, Dr. Shook performed
8  only limited examinations, if any at all.  All the
9  Kentucky visitors paid him in cash and filled the
10  prescriptions at the clinic's in-house pharmacy."
11      Do you see that?
12  A   I do.
13  Q   So do you think that if you had gone to
14  this clinic and seen what was going on, that you
15  would have seen a parking lot full of cars with
16  out-of-state plates and cash transactions?
17      MR. TSAI:  Object to the form of the
18  question.
19      THE WITNESS:  I don't know what I would
20  have seen.
21  BY MR. LOESER:
22  Q   Okay.  From the description of this
23  clinic, is there anything about it that sounds
24  like it would have been difficult to see that

## Page 169

1  people were coming in droves from out of state to
2  buy pain pills from Dr. Shook?
3      MR. TSAI:  Object to the form of the
4  question.
5      THE WITNESS:  So I don't know what the
6  parking lot would have looked like.  I don't know
7  that.  I don't know.
8  BY MR. LOESER:
9  Q   So if the information in this article is
10  accurate, and there were people in droves from
11  Kentucky traveling to this Florida-based pill
12  mill, wouldn't you expect to see a lot of cars
13  with out-of-state plates in that parking lot?
14      MR. TSAI:  Object to the form of the
15  question.
16      THE WITNESS:  I don't -- how --
17  BY MR. LOESER:
18  Q   You're bewildered by these questions.
19  This is the person who purchased the most
20  oxycodone of any of Sunrise customers, and Sunrise
21  was your distributor customer, right?
22  A   They were for a time, yes, that's
23  correct.
24  Q   And you know your customers, right?

Page 170

1  That's your -- as a salesman, that's what you're
2  supposed to do, know your customers.
3     A  I try to.  Yeah.
4     Q  Okay.  And so your customer Sunrise,
5  their number one client was Dr. Shook, right?  And
6  chargeback system data would have allowed you to
7  see who the number one -- number one client was,
8  right?
9        And there's nothing that stopped you
10 from asking someone at Mallinckrodt, if not
11 yourself, go see what's going on there, this guy
12 seems to be ordering an awful lot of oxy.
13       MR. TSAI:  Objection to the form of the
14 questions.
15       THE WITNESS:  Can you ask that again,
16 please?
17       MR. LOESER:  Can you read it back,
18 please.
19       (Discussion held off record.)
20 BY MR. LOESER:
21    Q  I'll ask it again.  Sunrise was your
22 customer.
23    A  Yeah.
24    Q  They're a wholesale distributor, right?

Page 171

1     A  Sunrise -- yes.
2     Q  Sunrise was --
3     A  I don't know if they were my customer
4  here, but go ahead.
5     Q  Okay.  Sunrise was purchasing large
6  volumes of oxy from Mallinckrodt, right?
7     A  Not compared to -- but compared to
8  Cardinal or Duane Reade or a CVS --
9     Q  The amount that Sunrise was purchasing
10 increased significantly in a -- in 2008, 2009,
11 2010 time period.  Do you recall that?
12    A  I believe so.
13    Q  Sunrise's number one customer was
14 Michael Shook.  You see that in the chargeback
15 system, right?
16    A  I do.
17    Q  Do you believe Michael Shook is the kind
18 of person that should be receiving Mallinckrodt-
19 made oxycodone?
20       MR. TSAI:  Object to the form of the
21 question.
22       THE WITNESS:  I don't know this person.
23 BY MR. LOESER:
24    Q  Mr. Borelli, if you turn back to

Page 172

1  Exhibit 15, the list of Sunrise's top ten
2  downstream customers, number 10 on that list is an
3  individual physician named Nader Shehata.  Do you
4  see that?
5     A  I do.
6     Q  And you see that between March 2009 and
7  June 2010, Mr. Shehata purchased oxy 15 and 30
8  102 times from Sunrise to the tune of 451,700
9  government UOM.  Do you see that?
10    A  I do.
11    Q  So, again, if you or someone else at
12 Mallinckrodt had sorted Sunrise's customers for
13 the customers that purchased the most, and you
14 made a top ten list, he would be on the top ten
15 list, right?
16       MR. TSAI:  Objection to the form of the
17 question.
18       THE WITNESS:  I believe so.
19       (Borelli Exhibit No. 17 was marked
20       for identification.)
21 BY MR. LOESER:
22    Q  I'm showing you what's been marked
23 Exhibit 16 -- I'm sorry, Exhibit 17.  This is a
24 press release from the DEA dated March 4th, 2011,

Page 173

1  with the heading "DEA to Doctor, 'You've Been
2  Served.'"
3        And this is in Miami, Florida, and if
4  you read down in that paragraph, it says:  "The
5  DEA's investigation of Dr. Shehata has determined
6  that his continued registration to prescribe
7  controlled substances is inconsistent with the
8  public interest and constitutes an imminent danger
9  to public health and safety."
10       Do you see that?
11       MR. TSAI:  Can I have a standing
12 objection to this exhibit and the line of
13 questions?
14       MR. LOESER:  Yes.
15       MR. TSAI:  Thank you.
16       THE WITNESS:  I do see that.
17 BY MR. LOESER:
18    Q  So this is another person that if you or
19 if someone else at Mallinckrodt had sorted on the
20 top ten customers of Sunrise, everything about
21 him, his name, his address, his DEA registration,
22 the number of times he purchased from Sunrise, and
23 the specific pills that were purchased, that would
24 be included in the information that Mallinckrodt

Page 174

1 could see, correct?
2      MR. TSAI:  Object to the form.
3      Go ahead.
4      THE WITNESS:  I believe so.
5 BY MR. LOESER:
6      Q    So if we can go back to Exhibit 10.
7      We went through spreadsheet --
8 spreadsheet before, and this is the sort of
9 Sunrise sales isolating Dr. Schultz's purchases.
10 Correct?
11      A    I believe so.
12      Q    And if you look down the column that
13 says "Invoice Date," which is -- one, two, three,
14 four, five -- six from the right, there's a date
15 associated with every time Sunrise sold
16 Mallinckrodt's oxy to Dr. Schultz, correct?
17      A    I see that column.
18      Q    And you see that a number of those
19 transactions, most of them are after July 14th,
20 2009.  Do you see that?
21      In fact, I've counted --
22      A    I do.
23      Q    -- there are 25 individual
24 transactions -- after or starting with July 14th,

Page 175

1 2009, there are 25 transactions.
2      A    Okay.
3      Q    You can take my word if you don't feel
4 like counting it.
5      And as we saw in the earlier e-mail with
6 the detective in Tennessee and with Bill Ratliff,
7 there -- at that time there was an investigation
8 of pills prescribed that ended up in Tennessee.
9 And those pills were prescribed by Dr. Schultz.
10      And assuming that's the case, that
11 meeting with Mr. Ratliff, which set in motion the
12 Sunrise audit, occurred in July -- turn and find
13 the exact date -- so Mr. Collins contacted
14 Mr. Ratliff on July 7th, 2009, setting in motion a
15 discussion with the director of security on
16 July 15th, and there's conversations July 29th,
17 and then an audit gets set up with Sunrise on
18 July 29th.
19      A    Okay.
20      Q    So after Dr. Schultz has been identified
21 in July, there are 25 transactions in which
22 Sunrise continued to sell to Dr. Schultz; is that
23 correct?
24      MR. TSAI:  Objection to the form.

Page 176

1 BY MR. LOESER:
2      Q    Based upon this data?
3      A    Looks that way, yes.
4      Q    And do you recall ever raising with your
5 client Sunrise its sales to Dr. Schultz?
6      MR. TSAI:  Object to the form.
7      THE WITNESS:  I do not.
8 BY MR. LOESER:
9      Q    And if you had told Sunrise at that time
10 to stop selling its product to Dr. Schultz, is
11 that something you would likely remember?
12      MR. TSAI:  Object to the form.
13      THE WITNESS:  It would, but we're
14 talking eight or nine years ago now.  So...
15 BY MR. LOESER:
16      Q    But you don't believe you told Sunrise
17 to stop selling to Dr. Schultz, do you?
18      MR. TSAI:  Object to the form.
19      THE WITNESS:  I don't remember.
20      (Borelli Exhibit No. 18 was marked
21      for identification.)
22      THE WITNESS:  Thank you.
23 BY MR. LOESER:
24      Q    I'm showing you what's been marked

Page 177

1 Exhibit 18.  This is a Broward-Palm Beach New
2 Times article with the title "Pill mill doctor
3 charged with trafficking oxycodone." It's dated
4 March 25th, 2011.  Do you see that?
5      A    I do.
6      MR. TSAI:  Can I have a standing
7 objection to this Exhibit 18 and this line of
8 questions?
9      MR. LOESER:  Sure.
10      MR. TSAI:  Thank you.
11 BY MR. LOESER:
12      Q    And it starts:  "Following an
13 investigation by the Palm Beach State Attorney,
14 Delray pain management doctor, Dr. Barry Schultz,
15 54, was arrested Thursday and charged with
16 trafficking oxycodone and unlawful prescription of
17 a controlled substance."
18      Do you see that?
19      A    I do.
20      Q    And are you aware that Dr. Schultz was
21 convicted and based on this and a manslaughter,
22 he's currently serving a 157-year sentence?
23      A    I was not.
24      Q    But back in 2011 when he was charged,

Page 178

1  right, Mallinckrodt obviously had its chargeback
2  system and had the details of all of his
3  transactions.  Correct?
4      MR. TSAI:  Object to the form.
5      THE WITNESS:  I believe so.
6  BY MR. LOESER:
7      Q    And going back in time to when
8  Dr. Schultz was first raised as a concern in 2009,
9  again Mallinckrodt had all the transaction
10 information with Dr. Schultz down to the pill
11 type, date of transaction and quantity.  Correct?
12     MR. TSAI:  Object to the form.
13     THE WITNESS:  I believe so.
14 BY MR. LOESER:
15     Q    And did you or anyone to your knowledge
16 at Mallinckrodt go to Dr. Schultz's clinic and
17 investigate what was going on in his clinic
18 following the 2009 arrest in Tennessee in which
19 pills prescribed by him had been found?
20     A    I can't answer that for all of
21 Mallinckrodt folks.  I don't believe I did.
22     Q    Is it your testimony here today that
23 Mallinckrodt had no obligation to try to prevent
24 its products from going to doctors like Mr. Shook,

Page 179

1  Dr. Shehata and Dr. Schultz?
2      A    I did not say that.
3      Q    So is it your testimony that they did
4  have an obligation to seek to prevent its pills
5  from going to doctors like Shook, Shehata and
6  Schultz?
7      A    We had a process in place to the
8  chargebacks -- I'm sorry -- suspicious order
9  monitoring system in place for this.
10     Q    But to your knowledge, that system was
11 not relying on the chargeback data to isolate
12 physicians that were purchasing inordinate
13 quantities in order to further investigate those
14 dispensing physicians?
15     A    I can't speak about that group of folks
16 in that department.
17     Q    But as far as your involvement, you were
18 not involved in anything like that?
19     A    Working in that department?
20     Q    No.  Investigating physicians like
21 Dr. Shook, Dr. Shehata and Dr. Schultz based upon
22 the data in the chargeback system?
23     A    I don't know any of those three doctors
24 that you mentioned.

Page 180

1      MR. LOESER:  Would you read that
2  question back, please.
3      Actually, I'll -- I'll go back further.
4  BY MR. LOESER:
5      Q    I asked you:  But to your knowledge,
6  that system was not relying on the chargeback data
7  to isolate physicians that were purchasing
8  inordinate quantities in order to further
9  investigate those dispensing physicians.
10     And my question for you is, were you
11 involved in any use of chargeback system data for
12 that purpose?
13     A    I was not a firsthand user of that
14 chargeback data.
15     Q    I understand.  But you yourself didn't
16 ask for access to that data in order to
17 investigate dispensing physicians, downstream
18 customers of your clients, like Dr. Shook,
19 Dr. Shehata and Dr. Schultz.
20     A    To the doctor level, I don't believe so,
21 but I did ask -- you say -- you said I asked for
22 one document before, but to the doctor level, I
23 don't believe so.  I think that's why we had folks
24 in place for that.

Page 181

1      MR. TSAI:  We're past 12:30.  Is this a
2  good time for a lunch break?
3      MR. LOESER:  Sure.
4      THE VIDEOGRAPHER:  The time is 12:40
5  p.m.  We're going off the record.
6      (Lunch recess.)
7      THE VIDEOGRAPHER:  The time is 1:34
8  p.m., and we're back on the record.
9      (Borelli Exhibit No. 19 was marked
10     for identification.)
11     THE WITNESS:  Thank you.
12 BY MR. LOESER:
13     Q    Mr. Borelli, you've been handed
14 Exhibit 19, which is an e-mail string, the end of
15 which is an e-mail from you to Steven Cochrane
16 dated July 9, 2010, with a cc to David Hoffman.
17     Is that what's in front of you, sir?
18     A    Yes.
19     Q    And, Mr. Cochrane, he is with KeySource;
20 is that correct?
21     A    He is.
22     Q    And do you recall what his position was
23 and what the full name of KeySource was?
24     A    What his title was?  What his position

Page 182

1  was? I think he was a buyer at KeySource, and
2  KeySource Medical, Inc., I think.
3      Q    And KeySource was a customer of yours?
4      A    They're a wholesaler, that's right.
5      Q    If you go to the last page of that
6  e-mail string, you'll see an e-mail from David
7  Hoffman at KeySource, and David Hoffman, according
8  to this e-mail, was the VP of business
9  development.  Do you see that?
10     A    I do.
11     Q    And the subject line of Mr. Hoffman's
12  e-mail is "Oxycodone chargeback customer."  Do you
13  see that?
14     A    I do.
15     Q    And he -- David Hoffman writes to Steve
16  Cochrane:  "Steve, I have an account that we shut
17  off in Florida because I thought too much business
18  on oxycodone was coming from one provider.  This
19  customer said we were his only supplier of
20  Mallinckrodt oxycodone.  Can you ask Mallinckrodt
21  if this customer was purchasing oxycodone from
22  other sources in May or June of this year?  The
23  pharmacy is Sunlight Pharmacy," and there's an
24  address and a DEA number.

Page 183

1          Do you see that?
2      A    I do see that.
3      Q    And then do you see on the next page,
4  Mr. Cochrane sent you an e-mail in which he
5  forwards Mr. Hoffman's e-mail to him.  Do you see
6  that?
7          And the e-mail from Mr. Cochrane to you
8  is dated July 7, 2010, and Mr. Cochrane writes:
9  "Victor, per our discussion earlier today, can you
10  tell me if this customer buys any Mallinckrodt
11  oxycodone 30 milligram tabs from any other
12  wholesaler distributors?"  Correct?
13     A    Yes.
14     Q    And you responded to his e-mail at -- on
15  the -- July 9th, and you provided him with the
16  information he was seeking, correct?
17     A    Yes.
18     Q    And you said:  "This account does buy
19  our oxy 30 mg as well as many other products from
20  both McKesson as well as Smith Drug."
21          Now, if you go back to the subject line
22  of the first e-mail, it's a reference to
23  "Oxycodone chargeback customer."  So your
24  customer -- your distributor client is asking you

Page 184

1  for information that you would then get from the
2  chargeback system; is that correct?
3      A    Yes.
4      Q    And you obtained that information and
5  you responded to him, correct?
6      A    Yes.
7          (Borelli Exhibit No. 20 was marked
8          for identification.)
9          THE WITNESS:  Thank you.
10  BY MR. LOESER:
11     Q    Mr. Borelli, I'm showing -- you have in
12  front of you what's been marked Exhibit 20.
13     A    (Peruses document.)
14     Q    And if you turn to the second page of
15  that exhibit, you'll see that there is a question
16  in the e-mail dated July 13, 2010, from you to
17  Karen Harper.  And in this e-mail you're following
18  up on that request from Mr. Cochrane for
19  information, and you start:  "There is an account
20  in Florida, Sunlight Pharmacy, that KMI" -- that's
21  KeySource -- "has been servicing for a while.
22  These account sales have been growing steadily,
23  and as you see, have purchased quite an assortment
24  of our SKUs from KMI."

Page 185

1          Do you see that?
2      A    Okay.
3      Q    And so this is you following up on that
4  request from KeySource to obtain information in
5  order to respond to his question; is that right?
6      A    Yes.
7      Q    And in fact, you're following up with
8  regard to a particular downstream customer of your
9  distributor client KeySource, correct?
10     A    Yes.
11     Q    And if you turn to the first page of
12  that exhibit, in the July 13th, 2010 e-mail from
13  you to Sandi Ivancho.  Do you see that?
14          Who is Sandi Ivancho?
15     A    I don't remember Sandi.
16     Q    Okay.  But you say to her:  "This issue
17  came up during a DEA situation, but as I drill
18  down, the account shows our SKU sales to Sunlight
19  Pharmacy, but our report doesn't show the same
20  sales."
21          So this is an example of you drilling
22  down into information about a downstream customer,
23  right?
24     A    This is a situation that a customer

Page 186

1 asked me in a one-off situation to see who this
2 account buys our -- if this account buys our
3 product from us, if this account buys our product
4 from somebody else as well. I think it started
5 with them, Dave Irwin -- Dave Hoffman questioning
6 their account.
7      Q   You looked into the information in
8 Mallinckrodt's chargeback system and you answered
9 the questions.
10     A   I had somebody do that, yes. I did not
11 look into -- I did not go into our system to do
12 that. And I don't remember if Sandi was the
13 person that did it either. Maybe she worked at
14 that -- one of the people that worked in that
15 department.
16         (Borelli Exhibit No. 21 was marked
17          for identification.)
18 BY MR. LOESER:
19     Q   I'm showing you -- showing you what's
20 been marked as Exhibit 22 --
21         MS. GAFFNEY: 21.
22     Q   -- 21, I'm sorry, which is an e-mail
23 from you dated June 23rd, 2010, again to Steve
24 Cochrane. Subject line, "Re: Oxycodone

Page 187

1 Mallinckrodt." The Bates number is
2 MNK-T1_000560613.
3          And if you go to the second page of
4 that, here again Mr. Hoffman of KeySource is
5 asking Steve Cochrane a question, and the question
6 is: "I have a question for Mallinckrodt regarding
7 some of our large purchasers of oxycodone in
8 Florida. I have usage reports on all of the
9 accounts and was thinking if Mallinckrodt could
10 provide us with total chargeback sales on oxy 15
11 mg and 30 mg, I could compare that to the usage
12 reports just to make sure they weren't purchasing
13 more than the usage report states. This would be
14 a double-check for possible diversion."
15         Do you see that in that e-mail?
16         And then once again, Mr. Cochrane sends
17 Mr. Hoffman's e-mail to you, and he says in his
18 June 23rd, 2010 e-mail: "Victor, call me when you
19 can. Dave is wanting to know if Mallinckrodt is
20 willing to share total," parentheses, "KeySource
21 and other suppliers," close parentheses, "monthly
22 chargeback data for the Roxi's as a check on
23 pharmacy usages. Wouldn't need the supplier's
24 name, just the units charged back." And he ends

Page 188

1 with: "Do you think Mallinckrodt is willing?"
2         Do you see that?
3     A   I do see that.
4     Q   So here you have an example of a
5 distributor customer of yours again asking you for
6 chargeback information, and this time in order to
7 attempt to determine if diversion is happening; is
8 that correct?
9     A   It looks that way.
10     Q   And there's a question whether
11 Mallinckrodt is willing to share this information
12 with KeySource. Do you recall whether
13 Mallinckrodt shared that information?
14     A   I don't remember.
15     Q   Do you believe that would have been
16 helpful information for your customer KeySource to
17 obtain from Mallinckrodt?
18     A   In what way?
19     Q   In order to help it determine if
20 diversion was happening.
21         MR. TSAI: Object to the form.
22         THE WITNESS: So I don't know if we
23 supplied that to the customer or not.
24 BY MR. LOESER:

Page 189

1     Q   Do you think it would have been helpful
2 to supply that information, whether they did or
3 they didn't?
4         MR. TSAI: Object to the form.
5         THE WITNESS: It would be good to -- to
6 see if their -- if the account, the pharmacy is
7 receiving more than -- shipments from more than
8 one of Mallinckrodt's wholesalers.
9 BY MR. LOESER:
10     Q   Because that would be an indication of
11 potential diversion, right?
12     A   Not necessarily tied to diversion, but
13 to see if others are shipping them to understand
14 the customer -- understanding their customer
15 better.
16     Q   KeySource was concerned that a
17 downstream customer was lying to KeySource about
18 where it was getting its oxy, right?
19     A   I -- if it's -- did it say that? I
20 thought they were asking for us to do a check and
21 balance or a double-check.
22     Q   Okay. Were they checking to confirm
23 whether the amount being reported to them was
24 accurate from their downstream customer?

Page 190

1    A   I don't -- I don't know why they are
2  asking.  I mean, I can assume, but I don't want to
3  assume.
4    Q   In other words, you don't know if
5  Mallinckrodt was willing to share the chargeback
6  information or not?
7    A   I don't know if they were able to or did
8  share.  I don't know if it's willing.  You said
9  "willing," not me.
10       (Borelli Exhibit No. 22 was marked
11       for identification.)
12       THE WITNESS:  Thank you.
13 BY MR. LOESER:
14   Q   I'm showing you what's been marked
15 Exhibit 22.  This is an e-mail from Lisa Lundergan
16 to Karen Harper, with a cc to Ginger Collier,
17 dated 4/18/2011.  This e-mail was not sent to you
18 but it -- attached to it are a couple of charts
19 that I wanted to ask you about.
20       So if you turn to the second page, this
21 is a chart showing the number of bottles of
22 oxycodone sold in the state of Florida; is that
23 correct?
24   A   It's the first time I've seen the chart,

Page 191

1  so -- it looks that way, yes.
2    Q   And during the time that you were
3  selling oxycodone in Florida, did you look at
4  information like this that tracked the total
5  number of bottles of pills of oxycodone that you
6  were selling to clients who were then shipping it
7  to Florida?
8        MR. TSAI:  Object to the form.
9        THE WITNESS:  I may have, but I don't
10 remember this document.
11 BY MR. LOESER:
12   Q   Okay.  Did you see that for FY10, for
13 2010, the total number of bottles of oxycodone
14 shipped to the state of Florida by Mallinckrodt
15 exceeded 2 million?  Do you see that in the -- in
16 either one of those charts?
17   A   I see it.
18   Q   And was that information that you were
19 aware of at the time that you were selling
20 thousands and thousands of bottles of oxycodone
21 that were being shipped to the state of Florida?
22   A   Again, I may have seen this.  I don't
23 remember it, though.
24   Q   Okay.  You don't recall if you knew how

Page 192

1  many bottles of oxycodone you were responsible for
2  selling that were shipped to Florida?
3    A   So when you say that, if I shipped to
4  McKesson's central field distribution center in
5  Memphis, I don't know where it goes.
6    Q   Okay.
7    A   If I ship to Cardinal's central field in
8  Groveport, Ohio, I don't know where that goes.
9        And if I ship to -- if I ship to
10 KeySource's distribution center in Ohio, I don't
11 know where that goes.
12       There's 50 states that those accounts
13 that I just mentioned have to distribute to.  So I
14 don't know where that goes.
15   Q   Now, you say you don't know where that
16 goes, but that information is carefully tracked
17 and reported in the chargeback system, correct?
18   A   In the chargeback system, yes.
19   Q   If you turn to the next page of this
20 exhibit, there are a list -- it says "Distributor
21 Data.  All Strengths - Oxycodone HCL," and there's
22 a list of customers, including the 2010 and '11
23 number of bottles of oxycodone that were shipped
24 to the state of Florida.

Page 193

1        Do you see that?
2    A   I do.
3    Q   And we know that that's tracking shipped
4  to the state of Florida, because the e-mail that's
5  attached to this notes that these reports are an
6  update on oxycodone Florida activity.
7    A   Okay.
8    Q   A number of these customers on this list
9  were your customers, correct?
10   A   A few.
11   Q   Can you go down the list and tell me
12 which customer was yours and how many bottles of
13 oxycodone were shipped to Florida in 2010?
14   A   I don't know which customers were mine
15 in 2010 and 2011.
16   Q   Okay.  Let me ask you this:  Was
17 Cardinal Preferred Source A/ID a customer of
18 yours?
19   A   At a certain time, but I don't know if
20 it was 2010 or 2011.
21   Q   Okay.  And in 2010, Cardinal shipped
22 127,309 bottles of oxycodone to Florida, correct?
23       MR. TULLY:  Object to form.
24       THE WITNESS:  Yes.

Page 194

BY MR. LOESER:

1   Q   Moving down the list, Harvard Drug, was
2   that a customer of yours?
3       A   At one time.
4       Q   Okay.  Including possibly 2010?
5       A   I don't know.
6       Q   Okay.  Harvard Drug sent 79,000 bottles
7   to Florida in 2010?
8           MR. TULLY:  Object to form.
9   BY MR. LOESER:
10      Q   Correct?
11      A   It says that here.
12      Q   Okay.  H.D. Smith, was that a customer
13  of yours?
14      A   At one time.
15      Q   Okay.  Including possibly 2010?
16      A   I don't believe so.
17      Q   Do you know when they stopping being a
18  customer of yours?
19      A   I don't.
20      Q   Okay.  Nonetheless, H.D. Smith shipped
21  396,697 bottles of oxycodone to Florida in 2010,
22  right, according to this report?
23      A   It says that here, yes.

Page 195

1       Q   KeySource Medical, was that a customer
2   of yours?
3       A   I believe so.
4       Q   Including in 2010?
5       A   Yes.
6       Q   In 2010, KeySource Medical shipped
7   373,141 bottles of oxycodone to Florida.  Do you
8   see that?
9       A   I do.
10      Q   Is that a number you've never seen
11  before?
12      A   It doesn't look familiar.
13      Q   Did you generally track the sales of
14  your customer KeySource?
15      A   I generally tracked sales on all my
16  molecules as best I can, for all my accounts.
17      Q   Master Pharmaceutical, was that a
18  customer of yours?
19      A   What we ship to an account doesn't get
20  assigned to us.  It's what they sell to their
21  customer.  Master was a customer of mine at one
22  time.
23      Q   And you see that in 2010 they shipped
24  238,000 --

Page 196

1       A   I shared -- I shared with you that we
2   switched customers around annually, so I don't
3   know if it was 2010 it was mine or somebody
4   else's.
5       Q   Okay.  Nonetheless, Master
6   Pharmaceutical shipped 238,171 bottles of
7   oxycodone in 2010, right?
8       A   Yes.
9       Q   Was McKesson OneStop a customer of
10  yours?
11      A   I believe so, but I'm not sure at what
12  time.
13      Q   McKesson One Shop shipped 283,661
14  bottles of oxycodone to Florida in 2010, correct?
15          MR. BARRIENTOS:  Objection.
16          THE WITNESS:  It says that here.
17  BY MR. LOESER:
18      Q   Skip down to Sunrise Wholesale, that was
19  a customer of yours, correct?
20      A   It was at one time.  I don't think in
21  2010, but --
22      Q   So the total for Sunrise Wholesale in
23  2010, 272,420 bottles of oxycodone.
24          Mr. Borelli, do you have any sense out

Page 197

1   of those 2.1 million bottles of oxycodone sent to
2   Florida, how many were sales you were responsible
3   for?
4       A   No, I do not.
5       Q   You don't recall -- were you ever
6   provided with that information so you could see
7   just how much oxycodone you were selling that was
8   going to Florida?
9       A   You're asking me a question if I know
10  how much of these are my customers at that time.
11  So I don't.  And then you're asking me if I know
12  of my customers how much went to Florida from an
13  e-mail from seven or eight years ago.  So I'm
14  sorry if I don't.
15          (Borelli Exhibit No. 23 was marked
16          for identification.)
17  BY MR. LOESER:
18      Q   Mr. Borelli, you've been handed what's
19  been marked Exhibit 23.  MNK-T1_0000384265.  This
20  is an e-mail from Jordan Polly or Polly Jordan to
21  you on March 4th, 2009.
22          Do you know who Polly Jordan is?
23      A   I do not.
24      Q   Do you see that it indicates that she is

Page 198

1 a customer service representative for
2 Mallinckrodt?
3     A   Mm-hmm.
4     Q   And her e-mail says to you:  "Hey,
5 Vic" -- that suggests she knows who you are,
6 right?  She calls you Vic?
7     A   If she's in customer service, she's
8 dealing with the sales team, so -- but I don't
9 recognize the name.
10     Q   Okay.  And she asks you:  "Have you
11 heard anything about oxycodone in Florida and why
12 there are so many people from Kentucky going to
13 Florida to get their prescriptions filled?"
14         You knew there were a lot of people
15 coming from Kentucky to get their prescriptions
16 filled in Florida, didn't you?
17     A   No, I -- I don't believe so.
18     Q   So did you answer her and say,
19 Ms. Jordan or Polly, I don't have any idea why
20 people are coming from Kentucky to get oxycodone
21 in Florida?
22         MR. TSAI:  Object to the form.
23         THE WITNESS:  I have no idea if I
24 answered her or not from nine years ago.

Page 199

1 BY MR. LOESER:
2     Q   Do you have any recollection as you sit
3 here today of people coming from out of the state
4 of Florida to purchase oxycodone in Florida?
5     A   I have no idea who's purchasing -- who's
6 purchasing the product in Florida.
7     Q   But were you aware of the problem of
8 people coming from out of the state of Florida to
9 purchase oxycodone in Florida?
10     A   Did I read an article about it?
11 Probably.  But do I know that people are driving
12 in caravans or in cars or together to Florida to
13 buy oxycodone?  No.
14     Q   You said you read an article about
15 people possibly coming to Florida to purchase
16 oxycodone.  Do you recall whether you read many
17 articles about that?
18     A   I don't know the quantity of articles
19 that I've read.
20         (Borelli Exhibit No. 24 was marked
21         for identification.)
22         THE WITNESS:  Thank you.
23 BY MR. LOESER:
24     Q   Mr. Borelli, you've been handed what's

Page 200

1 now marked as Exhibit 24.  This is an article with
2 the title "Inside Broward County's Pill Mills."
3 It's dated April 5th, 2009, and the author is
4 Scott Hiaasen from the Miami Herald.
5         If you look at the first paragraph of
6 that article, it states:  "Broward County has
7 become the painkiller capital of the United
8 States, the notorious home to a cottage industry
9 of storefront pain clinics selling alarming
10 numbers of narcotics and feeding a brazen black
11 market sprawling through the South and New
12 England."
13         Now, back in 2009, do you recall reading
14 articles such as this one that talk about Broward
15 County becoming the painkiller capital of the
16 United States?
17     A   I don't know what years or what year or
18 when in that year I read an article about that.
19     Q   Okay.  If you turn to the next page, go
20 down to the second paragraph, it states:  "And the
21 travelers come -- by the thousands, narcotics
22 investigators say, from Kentucky, Ohio, West
23 Virginia, Massachusetts and other states.
24 Prospective pill buyers sometimes camp outside

Page 201

1 clinics overnight, waiting for the doors to open,
2 said Hollywood Police Captain Allen Siegel,
3 director of the South Broward Narcotics Task
4 Force."
5         Now, was that phenomenon of people
6 flooding into the state of Florida from a number
7 of other states something that you had read about
8 when you were selling oxycodone into the state of
9 Florida?
10         MR. TSAI:  Object to the form of the
11 question.
12         THE WITNESS:  I don't remember when I
13 read the article or articles about this.
14 BY MR. LOESER:
15     Q   But you were generally aware of this
16 issue of people coming from out of state to buy
17 oxycodone, correct?
18         MR. TSAI:  Objection.  Vague as to time.
19 BY MR. LOESER:
20     Q   I'm sorry, did you answer?
21     A   I think I did.  Didn't I?
22     Q   I asked you:  But you were generally
23 aware of this issue of people coming from out of
24 state to buy oxycodone, correct?

Page 202

```
 1       MR. TSAI:  Objection.  Vague as to time.
 2       THE WITNESS:  So I don't know when I
 3  read the article, I said before, and you asked the
 4  same question I think again.  So I don't know when
 5  I read the article.
 6  BY MR. LOESER:
 7       Q   I understand that you don't remember
 8  when you read that article, but during the time
 9  that you were selling oxycodone and it was being
10  shipped to Florida, were you generally aware of
11  the problem of people coming to Florida to
12  purchase Mallinckrodt or other oxycodone?
13       A   I knew of it.
14       (Borelli Exhibit No. 25 was marked
15       for identification.)
16  BY MR. LOESER:
17       Q   Mr. Borelli, you're now looking at
18  what's been marked Exhibit 25, MNK-T1_0000290150.
19  For the record, this is an e-mail from you to
20  Karen Harper dated July 29th, 2009.  The subject
21  line is "Re: [RxNews] Rx Drug Abuse Epidemic."
22       Do you see that?
23       A   I do.
24       Q   And if you look down below, you'll see
```

Page 203

```
 1  that Karen Harper sent a number of people,
 2  including you, an article.  And the article's
 3  title was "Prescription Drug Abuse Epidemic."
 4       Do you see that?
 5       A   I do.
 6       Q   And the names -- who are the other
 7  names?  John Adams, he was a salesperson at
 8  Mallinckrodt; is that correct?  Or he was your
 9  supervisor?
10       A   Yes.
11       Q   Read the other names and tell me who
12  these people are.
13       A   George Saffold, I don't know.  Cathy
14  Stewart, I don't know.  Kate Muhlenkamp was a
15  marketing manager for the company.
16       I don't know what Cathy did.  I remember
17  the name and you showed an e-mail or two from
18  Cathy.  George, I don't remember.
19       Q   And if you go back up to your response
20  to Karen Harper's e-mail, you write: "Interesting
21  article."
22       Does that suggest that you actually read
23  the article that was attached to her e-mail?
24       A   It does.
```

Page 204

```
 1       Q   Okay.  So if we go down to the article
 2  itself, you'll see that the first line of the
 3  article states: "South Florida has become the
 4  largest supplier of illegal prescription drugs in
 5  the country."
 6       Do you see that?
 7       A   I do.
 8       Q   And does that refresh your recollection
 9  as to when you would have become aware of South
10  Florida becoming a major supplier of illegal
11  prescription drugs in the country?
12       A   I don't know when I was aware of it.  I
13  shared with you I read some articles.  I think it
14  also appears -- you didn't highlight it -- but is
15  that person's name Louis Fisher, the DEA agent
16  that worked for Sunrise, who would do the
17  background and research checks on the potential
18  customers for Sunrise.  That's their suspicious
19  order monitoring team.  Just like we had one.
20       Q   Okay.  In response to this article and
21  others that you perhaps read about South Florida
22  becoming the pill mill capital of the world, what
23  impact did that have on you and the sales of
24  oxycodone that you were responsible for?
```

Page 205

```
 1       MR. TSAI:  Object to the form.
 2       THE WITNESS:  I'm not quite sure what
 3  you mean by impact to me.  I just shared with you
 4  a check and balance process by a customer of ours.
 5  And our company has a check and balance with the
 6  suspicious order monitoring, so I think due
 7  diligence was being done.
 8       So when you say to me, none of this
 9  happens, right, none of this process occurs if
10  they're not licensed by the DEA and vetted by the
11  DEA to be able to dispense or receive and dispense
12  products.  So I'm going to take the DEA's
13  expertise on this versus mine.
14  BY MR. LOESER:
15       Q   Sir, you understand that your clients
16  were selling significant amounts of oxycodone to
17  downstream customers in Florida, right?
18       A   I know who --
19       MR. TSAI:  Object to the form.
20       Go ahead.
21       THE WITNESS:  I know who I sold to, and
22  it was -- and every year it changes.  Who they
23  sold to, no.
24  BY MR. LOESER:
```

**Page 206**

1    Q   So you paid no attention to where your
2  clients sold the Mallinckrodt oxycodone that they
3  bought.
4        MR. TSAI:  Object to the form.
5  BY MR. LOESER:
6    Q   You paid no attention to where your
7  clients shipped the products that you sold to
8  them.
9        MR. TSAI:  Object to the form.
10       THE WITNESS:  I think you're putting
11 words in my mouth or for me saying I pay no
12 attention.  There's an understanding of
13 chargebacks.  There's a team that the customers
14 put in place checking on their customers.  We rely
15 on that quite a bit more than -- than me versus
16 the experts.
17 BY MR. LOESER:
18   Q   So what actions did you take after you
19 learned that South Florida had become the national
20 capital for illegal pain pill trafficking?
21   A   When -- when you say "actions," what do
22 you mean?
23   Q   Did you contact any of your customers
24 and say, Stop selling any of Mallinckrodt's pills

**Page 207**

1  to places in Florida?
2    A   I believe that I did.  I believe that
3  there's -- from the suspicious order monitoring
4  team, the Bill Saffold -- no, Bill Rafferty and
5  Karen Harper, they periodically sent account names
6  out that we then forward to our customer base
7  saying, We're not going to ship to these accounts,
8  or do not ship to these accounts.
9        So I think that is an action -- that's
10 one of actions taken.
11   Q   Okay.  In terms of your actions, though,
12 when you learned -- when you read articles like
13 this one that said South Florida has become the
14 largest supplier of illegal prescriptions, did you
15 personally take any actions to try and slow down
16 the amount of oxycodone that your clients were
17 shipping to Florida?
18   A   Well, I sent correspondence out, like I
19 just shared with you a moment ago.  I think that's
20 an action taken.
21   Q   Can you think of anything else that you
22 did?
23   A   From nine or ten years ago, I'm sure
24 that's not the only thing I did.  But from nine or

**Page 208**

1  ten years ago, it's a tall order, a tall request.
2        And I think in this article alone,
3  talking about a new technology that Florida was
4  working on to limit or eliminate that doctor
5  process where -- you know, you're asking me to
6  know a customer's customer, and this is the next
7  step to the customer is the patient level.  So
8  how -- how do I know that?
9    Q   This article was about pain clinics.
10 Right?  Pain clinics were downstream customers of
11 your distributor clients, correct?
12   A   As well as hospitals, as well as
13 pharmacies, as well as IDNs.  So it's part of it
14 but not nearly all of it.  As well as chain stores
15 like the CVS, like a Walgreens, like a Duane
16 Reade.  Kerr Drug.
17       And the pharmacist is the line of
18 defense as well.  So there are checks and balances
19 in place.
20       (Borelli Exhibit No. 26 was marked
21       for identification.)
22 BY MR. LOESER:
23   Q   Mr. Borelli, you've been handed what's
24 been marked Exhibit 26, MNK-T1_0000386857.  This

**Page 209**

1  is an e-mail string that involves you.  The top
2  of the e-mail string is an e-mail from Karen
3  Harper to John Adams, with a cc to you, dated
4  November 23rd, 2009.
5        And if you flip back in the string,
6  you'll see that Karen Harper sent to you on
7  November 23rd, 2009, an article with the subject
8  "Grand Jury Wants to Crack Down on Pill Mills."
9  Fort Lauderdale, Florida.
10       And she writes:  "John and Victor, FYI,
11 the interim Grand Jury Report referenced in the
12 below article is attached."
13       And do you see the article, it starts
14 with the line, "Broward County has become known as
15 the 'pill mill capital' of the United States."
16 Correct?
17   A   I see the page.
18   Q   And then if you move up on the second
19 page of this e-mail string, there's an e-mail
20 from you to Karen Harper and John Adams dated
21 November 23rd, 2009, and you respond:  "Karen, I
22 appreciate you sending me this (and all Florida
23 articles), but a distributor or wholesaler that is
24 not located in the state ships to this state on a

Page 210

1  daily basis as well."
2        And then you go on to explain that
3  point, correct?  And so you conclude -- and you
4  ask her to send these articles not just to you but
5  to the other salespeople because distributors from
6  out of the state send into Florida as well; is
7  that correct?
8     A   I think you showed that on the other
9  page.
10    Q   And so if you go back to the article,
11 this is yet again another article sent to you in
12 November 2009 that discusses how Broward County
13 has become the pill mill capital of the world,
14 correct?
15       And if you look down a few paragraphs in
16 the article, it states:  "Oftentimes people come
17 from outside Florida to pain clinics because it is
18 so easy to obtain prescription drugs.  Those
19 people then take the pills back to their home
20 states and sell the drugs for inflated -- inflated
21 sums on the black market."
22       Do you see that?
23    A   I do.
24    Q   So provided you were being truthful in

Page 211

1  suggesting that you read this article when she
2  sent it to you, that's information that you were
3  aware of back in November of 2009, right?
4     A   Yes.
5     Q   And the larger point you're making to
6  Ms. Harper at the time about sending it to people
7  whose distributors were located out of the state
8  was that distributors can send their pills into
9  the state of Florida, correct?
10    A   Correct.
11    Q   Distributors that are out of state,
12 right?
13    A   Yes.
14    Q   And so you're making the point that to
15 understand what's going on in Florida, don't just
16 look at the distributors in Florida but also look
17 at the distributors out of Florida that are
18 sending to downstream customers in Florida, right?
19    A   I have the whole team aware, yeah.  I
20 have the whole team aware.
21    Q   Right.  And the same would be true in
22 other regions or areas or states, if you want to
23 understand what's happening with pills going into
24 that state, it's very important to look at

Page 212

1  distributors from out of that state as well that
2  might be sending to the downstream customers in
3  that state, correct?
4        MR. TSAI:  Object to the form.
5        THE WITNESS:  I don't know the answer to
6  that.
7  BY MR. LOESER:
8     Q   Well, if you want to understand what's
9  happening in Ohio, for example, you wouldn't just
10 look at distributors in Ohio; you would look at
11 distributors outside of Ohio but who are shipping
12 their pills to downstream customers in Ohio,
13 right?
14    A   Possibly.
15    Q   That's the point you were making about
16 Florida, right?
17    A   I'm not sure if that's the point.  I'm
18 making a point to tell and inform the entire team
19 about this situation.
20    Q   Because they're out of state doesn't
21 matter in terms of where their pills are going.
22    A   So everybody has the same information.
23    Q   Everybody who's selling pills, even if
24 they're located -- their distributor clients are

Page 213

1  located out of state, it's important to know --
2  important for them to know as well if you're
3  trying to understand what's happening with the
4  amount of pills going into a particular state.
5     A   It's good for the entire team to know.
6     Q   For that reason, correct?
7        MR. TSAI:  Object to the form.
8        THE WITNESS:  It's good for the entire
9  team to be on the same page on everything.
10 BY MR. LOESER:
11    Q   And why is it good for the entire team
12 to know?
13    A   It's just information.
14    Q   There's nothing in particular about this
15 information that has any value for them to know.
16 It's just all the information in the world they
17 can know is a good thing?
18       MR. TSAI:  Object to the form.
19 BY MR. LOESER:
20    Q   There's a pill epidemic in Florida.
21 You're being sent an article about the pill
22 epidemic in Florida.  Right?  And you said send it
23 to all the salespeople because people out of the
24 state also send into the state of Florida,

Page 214

1  correct?
2      A   What I said was it's good that everybody
3  knows the same information so the whole team
4  knows.
5      Q   Why?  Why is that important?
6      A   Information for the team.  So -- so
7  they're assuming that -- I don't want them to
8  assume that I'm the only person that knows.  I
9  want the entire team to know this information.
10        And the salesperson that sells to
11  McKesson, I believe the distribution center is in
12  Memphis, so that person should know.  And then the
13  same for Cardinal, that distribution center is in
14  Ohio, I believe.  And ABC has 27 different
15  distribution centers around the country.
16      Q   You wanted them all to know because
17  there was a problem in Florida and their customers
18  were shipping to Florida as well, right?
19      A   I want them to all -- I wanted them all
20  to know.  I wanted --
21      Q   For the love of knowledge or for some
22  particular reason?
23      A   I think it's right that you -- that you
24  share the -- all the information with the entire

Page 215

1  team.
2      Q   So the team collectively can help try
3  and do something about the problem?
4      A   Perhaps.
5      Q   And that would be true for any state
6  where there's a problem, right?  You would want
7  everybody to know, regardless of whether they were
8  in that state or not, if they had distributor
9  clients that sent into that state.
10      A   It's a tall order.  There are 27
11  distribution centers for AmerisourceBergen, and
12  the Minnesota distribution center could ship a
13  little to Minnesota but a lot to South and North
14  Dakota and Wyoming.  I -- I don't know that.
15  That's -- you're asking me to know about a
16  customer's process.  And I don't think that's a
17  fair -- I don't think that's a fair request.
18      Q   Sir, I was asking you about an e-mail
19  you sent in which you asked Karen Harper to send
20  the same article about pill mills in Florida to
21  people out of the state, and you explained that
22  the reason why you think they should see it is
23  because their clients also shipped into the state
24  of Florida, right?

Page 216

1      A   I thought you said that.  I said that
2  they should be in the know on the -- on articles
3  that come out to just select sales -- to a few
4  salespeople.  Send it to everybody.
5        (Borelli Exhibit No. 27 was marked
6        for identification.)
7        THE WITNESS:  Oh, sorry.
8  BY MR. LOESER:
9      Q   You've been handed what's been marked
10  Exhibit 27.  This is an e-mail from Jane Williams
11  to you dated March 1st, 2011.  It attaches subject
12  "[RxNews] OxyContin."
13        If you go to the second page of this
14  e-mail string, which went to you, it was sent to
15  you by Jane Williams, there's an e-mail from John
16  Burke.  And it states:  "I was talking to a
17  narcotics officer in Maine today, and he informed
18  me that they are not seeing the new OxyContin
19  tablets that have been reformulated.  Instead they
20  are seeing the oxycodone IR 30 mg, the same as
21  appears to be our trend, and what we see coming up
22  from Florida and the pill mills."
23        Do you see that?
24      A   I do.

Page 217

1      Q   And then if you turn to the next page,
2  in the e-mail that was forwarded to you that was
3  sent by Karen Harper to, among others, Pat Duft,
4  in the middle of that paragraph written by Douglas
5  Ross from the Department of Justice, he writes:
6  "Florida pain clinics have played a significant
7  role in the availability of the Mallinckrodt
8  tablets, which are physically transported or
9  mailed back to New England."
10        Do you see that?
11      A   I do.
12      Q   So this string informs you on March 1st,
13  2011, that Mallinckrodt oxy 30 has been reported
14  coming up out of Florida into other states,
15  correct?  And it -- is that correct?
16        MR. TSAI:  Object to the form.
17        THE WITNESS:  It says that.
18  BY MR. LOESER:
19      Q   Okay.  And it also indicates that the
20  Florida pain clinics have played a significant
21  role in the availability of the Mallinckrodt
22  tablets.  Do you see that?
23      A   No.  Where does it say that?
24      Q   In the e-mail sent by Douglas Ross to

Page 218

1  John Burke, the middle of the page.
2      A   Okay.
3      Q   So that was information that was
4  presented to you in this e-mail string on
5  March 1st, 2011; is that correct?
6      A   In an e-mail from Jane Williams to me --
7  here you go.  Okay.  I -- I see it was sent to me
8  by Jane, yes.
9      Q   So from these articles and this other
10  information, you were aware that people were
11  coming from out the state of Florida to get oxy
12  that was being distributed by pain clinics in
13  Florida, right?
14      A   If I read this article, if she sent it
15  to me, and I read down below, I would know it.
16  But do I know if I glanced it, skimmed it, read
17  it, didn't read it, I don't know.
18      Q   Okay.  Nonetheless, you received a
19  number of articles, some of which we've gone
20  through, that discuss that issue, right?
21      A   I received a few, yeah.
22      Q   And you know from the time that you were
23  selling oxycodone that the oversight of pain
24  clinics in Florida was particularly lax.  Right?

Page 219

1      A   No.  When you say "oversight," no.
2  That's why these companies, these wholesalers have
3  people in place to not have that happen.  That's
4  why this specific customer you talked about in
5  Florida has a Louis Fisher, and I'm not sure if
6  there were two or three Louis Fishers working for
7  them, but that's their job.  That's their
8  expertise, that's what they do for a living is to
9  vet out the places they ship to.  I don't do that.
10      Q   So, Mr. Borelli, as you sit here today,
11  do you recall whether in the time period that you
12  were selling oxycodone to Mallinckrodt distributor
13  clients that there was a pain pill epidemic in
14  Florida?
15      A   The articles you're showing me highlight
16  that, but do I remember the specifics and the
17  volumes?  No, I don't.
18      Q   Are you aware that the highway that went
19  from Florida up into Appalachia, do you know what
20  highway that is?
21      A   I do not.
22      Q   I-75.  Have you ever driven on I-75?
23  Have you ever --
24      A   I have no idea.

Page 220

1      Q   Have you ever heard I-75 referred to as
2  the oxy express?
3      A   If I did, I don't remember, but --
4      Q   So if you read that in articles in 2009,
5  you don't remember that now.
6      A   Yeah.
7      Q   And have you ever heard of I-75 referred
8  to as the Florida pipeline?
9      A   I don't remember it, no.
10      Q   Do you remember whether ever hearing the
11  road referred to as the blue highway?
12      A   No.
13      Q   Do you know what color Mallinckrodt oxy
14  is?
15      A   I don't remember.  I think white.
16      Q   You think that the --
17      A   I think white.  I don't remember.
18      Q   So you don't know if -- -
19      A   It's not something that we would ever --
20  I never touched one of our products.  It's not
21  something that we come in contact with.  It's
22  shipped from a DEA facility in Upstate New York to
23  customers.  I never come -- I've never come in
24  contact with our product.

Page 221

1      Q   So you didn't know that oxy 30s were
2  blue?
3      A   I don't remember it.  I thought they
4  were white.
5      Q   And you didn't know that the highway out
6  of Florida into Appalachia was called the blue
7  highway because of the color of all the oxy 30
8  that was purchased in Florida and brought out of
9  that state?
10      A   I'm sorry, I don't.
11      Q   And you don't know what amount of the
12  total volume of Mallinckrodt oxy 30 that was sold
13  in Florida was sold by you?
14      A   I don't know the specific amount at all.
15      Q   And if you had read an article
16  discussing the flood of oxy 30 up I-75 into
17  Appalachia, would that have caused you to take any
18  action to attempt to stem the sale by your
19  customers to downstream customers in Florida?
20          MR. TSAI:  Object to the form of the
21  question.
22          THE WITNESS:  I think actions were
23  taken.
24  BY MR. LOESER:

Page 222

1    Q    What actions did you take?  Did you stop
2  selling?
3    A    I think I shared with you that when our
4  team put information in front of us and shared
5  suspicious order monitoring information about
6  customers, we shared that with our customer base.
7    Q    Mr. Borelli, did you make sure that in
8  2009, less oxycodone was sold into the state of
9  Florida than in 2008?
10     MR. TSAI:  Object to the form.
11     THE WITNESS:  I -- I had no control of
12  what and where these wholesalers shipped product.
13  Like I said before, if we shipped to McKesson in
14  Memphis, I have no idea where that goes.  If you
15  ship to a Cardinal in Ohio, I have no idea where
16  that goes.
17  BY MR. LOESER:
18     Q    Did you take any action in 2010 to make
19  sure that the amount of oxycodone that your
20  clients shipped to Florida was less than in 2009?
21     A    I don't remember.
22     MR. TSAI:  Object to the form.
23     THE WITNESS:  Sorry.  I don't remember.
24  BY MR. LOESER:

Page 223

1    Q    And yet from at least 2009 forward,
2  based on the articles you saw, you knew that there
3  was a huge problem of pill mills in Florida and
4  people coming from out of state to get pills.
5    A    You're showing me articles that -- that
6  I was forwarded ten years ago, nine years ago.  So
7  it's a tough one.  Yeah, I'll stop there.
8    Q    We've talked about KeySource was one of
9  your customers, correct?
10     A    They were.
11     Q    And was that an important customer to
12  you?
13     A    I think -- I think all customers are
14  important.
15     Q    And they purchased a significant amount
16  of -- of oxy in particular from you, correct?
17     A    KeySource bought all of our product
18  lines from the scheduled drugs to the
19  non-scheduled drugs.  All of them.
20     Q    And as we saw from the hundreds of
21  thousands of bottles of oxy, that included a
22  significant amount of oxy, right?
23     A    Oxycodone, it would -- if I shipped it
24  to KeySource, and there weren't prescriptions out

Page 224

1  against that molecule, it would sit in KeySource's
2  warehouse.  I have no control of the prescriptions
3  being written.  I have no control of where they
4  ship it.
5    Q    But you know how much they buy from
6  Mallinckrodt, right?  You know how much product
7  your customers buy from your company.
8    A    I try to.
9    Q    And that's for all products, right?
10     A    Yes.
11     Q    You don't just pay attention to some of
12  them.  You pay attention to all of them.  So
13  you're paying attention to the amount of oxy your
14  customers are buying from Mallinckrodt, right?
15     A    Oxy -- all my -- you're highlighting
16  oxy, but it's all my products -- all my accounts.
17     Q    Did you pay any attention at all to the
18  percentage of your total sales that were oxy
19  versus other drugs?
20     A    I may have.
21     Q    So you may have seen that you were
22  selling a whole lot more oxy than anything else.
23     A    At certain accounts.
24     Q    That information was available to you.

Page 225

1    A    That's a chargeback -- that information
2  is available via chargebacks, and I never went
3  into the chargeback system to -- for that
4  information.  Never.
5    Q    Okay.  But as we've seen, you've asked
6  people -- other people in that department to get
7  information for you, right?
8    A    I think you showed me three e-mails.
9    Q    Right.  So there was nothing that
10  stopped you from asking people in the chargeback
11  department to tell you, Hey, how many bottles of
12  oxycodone did my clients buy?
13     A    Okay.
14     Q    You didn't look into that at all.
15     A    At times I did.  At times -- I mean,
16  you're highlighting it to me.  You're showing
17  just -- I mean you're just showing me how many
18  e-mails I sent throughout my career at
19  Mallinckrodt, but you're highlighting this much to
20  me.  It could have been more.  It could have been
21  on different items.  I don't know.
22     Q    Okay.  There's nothing about oxy in the
23  2008 to '10 time period that stands out as you sit
24  here today as being a particularly important time

Page 226

1  frame.
2      A   Well, that's what we're talking about
3  today, right?
4      Q   So is that a "yes" or a "no"?
5      A   It's one of the many products we
6  marketed and sold.
7      Q   Okay.  So when did your relationship
8  with KeySource start?
9      A   I don't remember.  Maybe 2005, 2006.  I
10 don't remember.
11     Q   Do you remember how it started?
12     A   Maybe at a trade show.
13     Q   Okay.  And is that where you met Steve
14 Cochrane.
15     A   I don't remember where I met him.
16     Q   Did you two become friends, would you
17 say?
18     A   Customer/buyer-seller relationship,
19 yeah.
20     Q   And would you say that was a pretty
21 close relationship?
22     A   I -- I've got closer; I've got further.
23     Q   So your relationship with Mr. Cochrane
24 was pretty typical for your relationships with

Page 227

1  your customers, wholesaler distributor customers?
2          MR. TSAI:  Objection to the form.
3          THE WITNESS:  I didn't say typical.  I
4  said I've got some customers that I'm closer with
5  and I've got some customers that I'm not.
6  BY MR. LOESER:
7      Q   Did you ever go to KeySource and see how
8  they conducted their business?
9      A   I did.
10     Q   And where were they located?
11     A   Their offices are in Cincinnati, Ohio.
12     Q   How many times did you go visit their
13 offices?
14     A   I have no idea.
15     Q   Did you get familiar with their
16 suspicious order monitoring system?
17     A   If -- you highlighted it on an e-mail or
18 two about a Dave Hoffman, so I know Dave at
19 KeySource, so I know Dave at KeySource.  So, yes,
20 I guess.
21     Q   And as you got to know KeySource, did
22 you also develop an understanding of who their
23 downstream customers were?
24     A   No -- who they shipped -- who they

Page 228

1  shipped to?  Is that what you're asking, who --
2      Q   Right --
3      A   -- they shipped to?  No, I don't know.
4  I'm not familiar with -- I'm familiar with my
5  customers.  And it's hard to know everything about
6  every customer, but you try as a salesperson
7  dealing with a customer base.  But who they
8  shipped to, it's a tall order.
9      Q   And it's fair to say that you helped
10 KeySource grow its business?
11         MR. TSAI:  Object to the form.
12         THE WITNESS:  I don't know
13 KeySource's -- I don't know how they did from a
14 growth position.  I worked with --
15 BY MR. LOESER:
16     Q   But my question was, is it fair to say
17 that you helped KeySource grow its business?
18     A   I don't know the answer to that.  If
19 I -- I don't know the answer to that.  I -- it's
20 KeySource's business, not -- business, not mine.
21     Q   And did you give KeySource advice on how
22 it could grow its business?
23     A   I don't remember.
24         (Borelli Exhibit No. 28 was marked

Page 229

1          for identification.)
2          THE WITNESS:  Thank you.
3  BY MR. LOESER:
4      Q   I'm showing you what's been marked
5  Exhibit 28.  MNK-T1_0000384546.  This is an e-mail
6  from Steve Cochrane to you dated October 7th,
7  2008; is that correct?  At the top of the page.
8      A   October 7th, is that what you said?
9      Q   Yeah.
10     A   Yes.
11     Q   And the subject line is "Re:  Assured
12 Pharmacies."  Do you see that?
13     A   Yes.
14     Q   And if you go to the very end of that
15 string where it starts on October 3rd, 2008,
16 Mr. Cochrane sends you an e-mail in which he asks
17 you: "Do you know who they are?  Would they be a
18 candidate for the Fruth Initiative?"
19         Do you see that?
20     A   Do I see --
21     Q   Do you see his e-mail to you?
22     A   I do.
23     Q   And do you see your response?
24     A   I do.

Page 230

1    Q   Can you read his response -- your
2  response, please.
3    A   "Never heard of them, and, yes, this is
4  a type customer that we can do the special 'for
5  them' program.  Who is their supplier?"
6    Q   And what is this special program, do you
7  recall?
8    A   I do not.  I do not.
9    Q   Okay.  And if you read through this
10  string, you talk back and forth about Assured.  So
11  you're talking to your customer KeySource about
12  one of its potential downstream customers,
13  Assured, correct?
14    A   It reads that way.
15    Q   Okay.
16    A   I never heard of Assured before this
17  e-mail, and I don't even know who they are today.
18    Q   Okay.  When you go to the top of the
19  e-mail Mr. Cochrane says to you:  "Just to
20  clarify," and he provides some information about
21  Assured, and he writes:  "Excellent opportunity in
22  my opinion, specifically a pain clinic pharmacy,
23  and HD cannot supply enough product to meet their
24  needs."

Page 231

1        Do you see that?
2    A   I do.
3    Q   And do you know if your customer,
4  KeySource, started supplying Assured --
5    A   I do not.
6    Q   -- following this?
7        But you do know that from this date on,
8  you had been provided information that Assured was
9  a pain clinic pharmacy, correct?
10    A   I don't know Assured, and if that's what
11  Steve Cochrane is saying here, I don't know it,
12  but I see he's saying that.
13    Q   Okay.  And you didn't have any reason to
14  believe that wasn't true?
15    A   I don't know if it's true or not.
16    MR. TSAI:  Derek, we're at 2:31.  You
17  want to take a break after you finish with this
18  exhibit?
19    MR. LOESER:  How about I talk about one
20  more, and then we'll take a break?
21    MR. TSAI:  Sure.
22    (Borelli Exhibit No. 29 was marked
23    for identification.)
24    THE WITNESS:  Thank you.

Page 232

1  BY MR. LOESER:
2    Q   Mr. Borelli, you've been handed what's
3  been marked Exhibit 29, which is a spreadsheet
4  that we created, again from the Mallinckrodt
5  chargeback system data, and as you flip through
6  that spreadsheet, you can see that this is a long
7  list of sales by KeySource to Assured.  Correct?
8    MR. TSAI:  Counsel, do you have a copy
9  for -- thank you.
10  BY MR. LOESER:
11    Q   And while you're going through that, I
12  will represent to you that there are 274 purchase
13  order transactions between Assured and KeySource
14  between January 2009 and June 2011, for a total of
15  685,700 UOMs.
16    A   Okay.
17    Q   And the e-mail that we went through a
18  minute before predates this spreadsheet and it may
19  be because we haven't been provided any data that
20  predates, but your e-mail was in, I believe,
21  October of 2008.
22        And then moving forward, sales start on
23  this chart, again perhaps because of how the data
24  was presented to us, but in January of 0002009,

Page 233

1  right?
2        And so for the entire period of time
3  that Assured was buying opioids from Mallinckrodt,
4  and this chart shows that all they bought was
5  oxycodone, for that entire period of time
6  Mallinckrodt always had in its possession
7  information indicating that Assured supplied pain
8  clinics.  Right?
9    MR. TSAI:  Object to the form.
10    THE WITNESS:  Through chargeback data, I
11  guess so.
12    MR. LOESER:  We can take a break.
13    THE VIDEOGRAPHER:  The time is 2:36 p.m.
14  We're going off the record.
15    (Recess.)
16    THE VIDEOGRAPHER:  The time is
17  2:50 p.m., and we're back on the record.
18    (Borelli Exhibit No. 30 was marked
19    for identification.)
20  BY MR. LOESER:
21    Q   Mr. Borelli, you have in front of you
22  what's been marked as Exhibit 30.
23  MNK-T1_0000384679.  This is an e-mail from you to
24  Steve Cochrane dated 6/18/2010.  Subject:  "Oxy."

| Page 234 |
| --- |

1 Do you see that?

2     A  I do.

3     Q  Can you read your e-mail, please.  Out

4 loud.

5     A  "Let's talk when you get a moment about

6 Florida and oxy sales as well as Sunrise

7 Wholesalers."  And in parentheses, "and Paragon as

8 well.  Safe travels.  Go Yankees."

9     Q  Okay.  And so you sent this e-mail to

10 Mr. Cochrane on June 18th, 2010, and you are

11 asking him specifically to talk about Florida and

12 oxy sales, correct?

13     A  It seems that --

14     Q  And do you recall why you were asking

15 him about Florida and oxy sales?

16     A  I do not.

17     Q  There's nothing that stands out in your

18 mind as you sit here today about this time period

19 that would suggest to you any particular reason to

20 talk about oxy and Florida sales?

21     A  It's eight-and-a-half years ago, so I'm

22 sorry, I do not.

23     Q  And there's a reference to Sunrise

24 Wholesalers.  Do you know why you were talking to

| Page 235 |
| --- |

1 Mr. Cochrane about Sunrise Wholesalers?

2     A  I do not.

3     (A discussion was held off the record.)

4     (Borelli Exhibit No. 31 was marked

5     for identification.)

6     THE WITNESS:  Thank you.

7 BY MR. LOESER:

8     Q  Mr. Borelli, you've been handed what is

9 marked Exhibit 31.  And on the bottom of the first

10 page, there's the header to an e-mail dated

11 January 27th, 2009, Tuesday.

12     And the e-mail states:  "Just got a

13 release today.  You will receive 1200 bottles on

14 Thursday morning."  And the subject line of that

15 e-mail is "Oxy 30."

16     Do you see that?

17     A  I do.

18     Q  And Mr. Cochrane responds to your e-mail

19 on January 27th, about a half an hour later, and

20 he sends you an e-mail, subject line "Re:

21 Oxy 30," and he writes:  "Keep them coming.

22 Flying out of here.  It's like people are addicted

23 to these things or something.  Oh, wait, people

24 are.  Thank you, Steve."

| Page 236 |
| --- |

1     And, sir, you responded to his e-mail at

2 4:12 p.m. on the same day, and you sent him an

3 e-mail subject line "Re: Oxy Thursday."

4     Could you please read your response to

5 him, please.

6     A  "Just like Doritos.  Keep eating, we'll

7 make more."

8     Q  And the context of this e-mail was you

9 were informing him that you were releasing a

10 shipment of oxy 30; is that correct?

11     A  Yes.

12     Q  And it was 1200 bottles of oxy 30?

13     A  Yes.

14     (Borelli Exhibit No. 32 was marked

15     for identification.)

16 BY MR. LOESER:

17     Q  Mr. Borelli, you've been handed --

18     A  Thank you.

19     Q  -- what's been marked as Exhibit 32,

20 which is an e-mail string.  It starts with an

21 e-mail from Kate Muhkenkamp to you, April 10th,

22 2009.  MNK-T1_0000562387.

23     And it's a relatively long string.  I'll

24 start at the very last page.  And second to last

| Page 237 |
| --- |

1 page there's a header to an e-mail at the bottom

2 of the page, and if you look at that header, it's

3 an e-mail from Heather Goodman to Dave Irwin.  And

4 the subject is "Oxycodone 15 milligram tablets."

5 The date is April 9th, 2009.

6     Do you know who Heather Goodman is?

7     A  I do not.

8     Q  Do you know who Dave Irwin is?

9     A  I do.

10     Q  Who is Dave Irwin?

11     A  Dave Irwin was one of the sales team

12 members for Mallinckrodt.

13     Q  So this e-mail starts with Heather

14 Goodman contacting Dave Irwin and saying:  "Dave,

15 I spoke with my aunt, and the independent pharmacy

16 she chose is Dane Drugs," and provides an address

17 in Columbus, Ohio.  "Her monthly prescription is

18 1500 oxycodone 15 milligrams.  We have not

19 contacted the pharmacy to let them know this is

20 happening yet.  In addition, as soon as we know

21 that this arrangement is set up, Aunt Sandra will

22 call her doctor and have him call in the script

23 for her.  Please let us know how you would like to

24 proceed."

Page 238

1   Do you see that?
2   A   I do.
3   Q   Okay.  And then if you turn to the next
4   page, Dave Irwin sends a message dated April 9th,
5   2009, at 3:51 p.m. to Kate Muhlenkamp.
6       And again, her job is what?
7   A   She had a number of jobs at
8   Mallinckrodt, so I don't know what -- what she was
9   doing at this -- it says product manager.
10  Q   Okay.  And that e-mail is cc'd to you
11  and to John Adams.  And Dave writes: "Kate, here
12  is the info we talked about earlier.  Is there
13  something I can do to help out from this point on?
14  Heather Goodman used to report to Craig Cowman,
15  who referred her to us.  You may want to let Mike
16  know what's going on.  He will see Craig at NACDS
17  in two weeks.
18      "Vic, thanks for helping set this up.
19  Sounds like it's much appreciated."
20      Do you see that?
21  A   I do.
22  Q   And then if you go up further, Kate
23  Muhlenkamp sends an e-mail to Dave Irwin saying:
24  "I've spoken with Victor, and he thinks he can

Page 239

1   make this happen.  Two cases a month to the below
2   pharmacy.  He is working on it and should have an
3   answer shortly."  Right?
4   A   Right.
5   Q   And then going forward to your Friday,
6   April 10th, 2009, e-mail to Kate Muhlenkamp, with
7   a cc to John Adams, and it's also sent to Dave
8   Irwin, you write:  "Kate, we need to talk when you
9   get a moment.  We can get this done today, but we
10  have one problem."
11      Do you see that?
12  A   I do.
13  Q   Do you recall what the one problem was?
14  A   I do not.
15  Q   All right.  And if you move up further,
16  Dave Irwin then sends you an e-mail at 9:58 a.m.,
17  So shortly after, and he says:  "I'm sure I will
18  be talking to Heather Goodman later today so I can
19  clarify this.  But I did the math in my head late
20  yesterday and this equates to 50 tablets per day.
21  Is that even possible?"
22      And that was sent to you.  Did you in
23  response to this determine whether it was possible
24  for Heather Goodman's Aunt Sandra to take 50

Page 240

1   15-milligram tablets of oxycodone a day?
2       MR. TSAI:  Object to the form.
3       THE WITNESS:  I don't see a response
4   to -- you're asking if I responded to Dave Irwin?
5   BY MR. LOESER:
6   Q   Right.
7   A   I don't see a response to Dave Irwin,
8   unless this is the response.
9   Q   And I'm asking, do you recall answering
10  his question --
11  A   One second.  One second.  (Peruses
12  document.)  Okay.
13  Q   Okay.  So you don't recall answering the
14  question about whether it's even possible for Aunt
15  Sandra -- you don't know who Aunt Sandra is, do
16  you?
17  A   I do not.
18  Q   You don't know who Heather Goodman is,
19  do you?
20  A   I do not.
21  Q   Okay.  But you don't know if it's
22  possible for this person, Aunt Sandra, to herself
23  consume 50 tablets of oxycodone a day.  You didn't
24  answer that question.

Page 241

1   A   It doesn't look like it.  I'm not a
2   doctor.  I'm not -- so I don't know the answer to
3   that.
4   Q   Okay.  So if you go to the first page of
5   the exhibit, you send an e-mail to Dave Irwin and
6   Kate Muhlenkamp, with a cc to John Adams, dated
7   April 10th, 2009, at 11:15 a.m., and you say:
8   "Here goes:  Kate and I have spoken, and KeySource
9   can get this done, but they need product.  I think
10  we are moving that along as we speak.
11      "KeySource has contacted the pharmacy
12  and is setting them up as we speak.
13      "The pharmacy will place an order for
14  this (and additional) products from KeySource
15  today, and Aunt Sarah" --
16      So it's becoming Aunt Sarah?
17  A   I screwed that up.
18  Q   Yeah.
19  -- "can walk into the pharmacy on
20  Thursday to pick up the product.  KeySource is
21  going to try to ship the pharmacy one month's
22  needs at a time, so depending on what is happening
23  with the marketplace (supply/demand), we may have
24  to circle back in a month to allocate more oxy 15

## Page 242

1  mg to them for this special circumstance."
2        Do you see that?
3        And then you ended with: "Thanks to
4  all, especially Aunt Sarah."
5        Do you see that?
6    A  I do see that.
7    Q  Okay.  So you're thanking Aunt Sarah for
8  this, sending her 1500 milligrams a day, her 50
9  tablets per day.
10   A  Well --
11   Q  Now, if you go up in your e-mail,
12  there's a message from Kate Muhlenkamp to you,
13  April 10th, 2009, 7:34 p.m.  And she writes to
14  you: "Vic, thank you for all of your work on
15  this.  I worked with Sarah, and we are shipping to
16  KeySource.  The order should ship to them on
17  Monday.  Thanks, Kate."  Right?
18   A  Yes.  So I don't know who this Sarah is,
19  and I screwed up the Sarah and a Sandra name here.
20       But I don't know if KeySource was
21  selling to this account.  So if they were to gain
22  a new account, it's a good thing.
23   Q  That's a pretty unusual way to gain a
24  new account, isn't it?

## Page 243

1    A  Well, it's a one-off situation, so an
2  anomaly is an anomaly, I guess.
3    Q  All right.
4       (Borelli Exhibit No. 33 was marked
5       for identification.)
6       THE WITNESS:  Thank you.
7       Am I allowed to go back on something you
8  brought up for a moment?
9  BY MR. LOESER:
10   Q  Well, there is no question, but your
11  counsel will have an opportunity to ask you
12  questions, and you can clarify that when he asks
13  you.
14   A  All right.  All right.
15   Q  So I want to make sure I understand what
16  happened here with Aunt Sandra.
17       Heather Goodman, who is a person who
18  used to report to Craig Cowman -- do you know
19  where Craig Cowman worked?
20   A  I believe Cardinal Health.
21   Q  Okay.  So Heather Goodman, who used to
22  report to an employee of Cardinal Health, got in
23  touch with Dave Irwin at Mallinckrodt and asked
24  for 36 bottles a month of oxy to be shipped to her

## Page 244

1  aunt to a particular pharmacy in Columbus, Ohio;
2  is that right?
3    A  That's what it says.
4    Q  And you called a distributor client,
5  KeySource, and arranged to have that client ship
6  the pills to a pharmacy of the purported patient's
7  choice.  Right?
8    A  I believe so.
9    Q  And was it your understanding that
10  Heather Goodman was authorized by the DEA to order
11  oxy for her aunt?
12   A  Is she ordering product?  She's asking,
13  she's requesting.  She's not placing an order.
14   Q  Do you believe she was authorized to ask
15  Mallinckrodt to arrange for a shipment of oxy for
16  her aunt?
17   A  Is she ordering a shipment for her aunt?
18   Q  Are you asking me a question?
19       My question to you is, was she
20  authorized to arrange for a shipment for her aunt
21  of oxy?
22       MR. TSAI:  Object to the form.
23       THE WITNESS:  This -- like we just said,
24  this is an anomaly.  This is a strange situation.

## Page 245

1  She's not placing an order.  She's asking a
2  person, who then goes out to another person, and
3  then comes to me for -- to do something.  So...
4  BY MR. LOESER:
5    Q  And, sir, I'm asking you if it's your
6  understanding that Heather Goodman, who used to
7  work for Cardinal Health, is authorized by the DEA
8  to ask Mallinckrodt to arrange for a shipment of
9  oxy for her aunt.
10   A  I -- I don't know Heather Goodman.  So I
11  don't know the answer to that.
12   Q  And is it your understanding that you
13  were authorized by the DEA to direct the
14  distribution of oxy for Heather Goodman's aunt?
15       MR. TSAI:  Object to the form.
16       THE WITNESS:  I was asked to look into
17  something for someone who needs pain medication.
18  That product still would not get to that person's
19  aunt without a prescription.  So I'm not sure what
20  you're asking me.
21  BY MR. LOESER:
22   Q  I'm asking you -- you remember back at
23  the beginning we were talking about the
24  requirements of the Controlled Substances Act, and

Page 246

1 we went over that people who handle or are
2 involved in the distribution of controlled
3 substances need to be registered with the DEA? Do
4 you remember that conversation?
5    A   I believe so.
6    Q   And do you remember that the
7 registration only permits the registrant to do
8 what the DEA authorizes that person to do,
9 correct?
10    A   Okay.
11    Q   So do you believe you, as a result of
12 Mallinckrodt's DEA authorization, that you are
13 authorized to arrange for the shipment of oxy for
14 Heather Goodman's aunt?
15        MR. TSAI:  Object to the form.
16        THE WITNESS:  I asked a wholesaler to
17 contact a pharmacy, period.
18 BY MR. LOESER:
19    Q   So can you answer my question, sir?
20        MR. TSAI:  Object to the form.
21        THE WITNESS:  What was the question?
22        (Whereupon, the requested record
23        was read.)
24        MR. TSAI:  Object to the form.

Page 247

1        THE WITNESS:  I didn't arrange any
2 shipment.  I didn't place an order for Dane
3 pharmacy.  I just was asked a question to look
4 into something, and I passed it along.  That's all
5 I did.
6 BY MR. LOESER:
7    Q   And do you believe that your actions
8 were authorized by Mallinckrodt's DEA
9 registration?
10        MR. TSAI:  Object to the form.
11        THE WITNESS:  I'm not sure what I did
12 wrong.  I'm not sure what you're saying.
13        MR. LOESER:  Can you read the question
14 back, please.
15        (Whereupon, the requested record
16        was read.)
17        MR. TSAI:  Object to the form.
18 BY MR. LOESER:
19    Q   It's a yes-or-no question, sir.
20        MR. TSAI:  Object to the form.
21        THE WITNESS:  I was just trying to do --
22 be a middle person between a wholesaler and a
23 pharmacy -- a customer of mine, a wholesaler of
24 mine, and it looks like to open up a new account.

Page 248

1 That's all I was doing.  They had to make that
2 inroad, not me.
3        MR. LOESER:  Would you read the question
4 back, please.
5        (Whereupon, the requested record
6        was read.)
7        MR. TSAI:  Object to the form.
8 BY MR. LOESER:
9    Q   Can you answer the question, please.
10        MR. TSAI:  Object to the form.
11        THE WITNESS:  I'm not sure how to
12 respond to that.
13 BY MR. LOESER:
14    Q   Well, there's three possible answers:
15 Yes, no, or I don't know.
16        MR. TSAI:  Object to the form.
17        THE WITNESS:  So I'll say I don't know.
18 BY MR. LOESER:
19    Q   Did you investigate to determine whether
20 Aunt Sandra used the pills?
21    A   I did not.
22    Q   No?
23    A   I don't believe I did.  This is -- this
24 is ten -- this is almost ten years ago.

Page 249

1    Q   And do you know if she sold the pills?
2    A   No idea.  How the heck would I know
3 that?
4    Q   If you could look at Exhibit 33, which I
5 think you have in front of you.
6        This is a message from you to Steve
7 Cochrane dated April 10th, 2009.  Subject:  "Oxy
8 15 milligram."  You write:  "720 bottles coming
9 your way for Tuesday, Wednesday delivery.  Can you
10 set that customer up, allocate 36 bottles for Aunt
11 Sarah and e-mail me back?  Thanks so much for
12 taking care of this.  P.S.  No commission
13 necessary, I insist."
14        Can you please explain this e-mail?
15    A   Well, from ten -- nine-and-a-half years
16 ago, I don't know the context.  But it looks
17 like -- I don't know the context.
18    Q   Okay.  Let's walk through it.  This
19 follows on the e-mail string we just went through.
20 You're communicating with your customer
21 Mr. Cochrane at KeySource, and you're directing
22 him precisely what to do with the bottles that you
23 are arranging to have distributed to a pharmacy in
24 Columbus, Ohio; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    A    A percentage, a small percentage of
2 those bottles I'm asking to accommodate the CEO's
3 contact at Cardinal.
4    Q    So the downstream customer in this
5 transaction is Dane Drugs. We went through that.
6 And Aunt Sarah then would be the -- the patient
7 picking up a prescription from the downstream
8 customer, right?
9    A    Customer's customer's customer, yes.
10   Q    Right. And you're involved to the
11 degree of where you're telling your distributor
12 client what pharmacy to send these drugs to and
13 what patient to allocate those drugs for; is that
14 correct?
15   A    I'm asking. Not telling.
16   Q    Okay. And so you're asking for 36
17 bottles a month to be made available at Dane Drugs
18 when she walks in with a prescription for Heather
19 Goodman's Aunt Sarah. Is that correct?
20   A    I'm asking them to do it. I'm not
21 telling them to do it.
22        (Borelli Exhibit No. 34 was marked
23        for identification.)
24        THE WITNESS: Thank you.

Page 251

1 BY MR. LOESER:
2    Q    You've been handed what's marked
3 Exhibit 34, which is more about this e-mail string
4 with Aunt Sandra. And if you go to the bottom,
5 this is an e-mail from Steve Cochrane to you dated
6 April 13th, 2009. And the subject line is "Guess
7 who called today," dot, dot, dot.
8        Do you see that?
9    A    Yes.
10   Q    And at the bottom it's -- he writes --
11   A    Sorry.
12   Q    -- in the body of the e-mail: "Dane
13 Drug! They wanted to know who the F this lady
14 Aunt Sandra was that showed up looking for her
15 oxycodone 15 milligram today. You can't make this
16 stuff up. Dane Drugs said they thought it was a
17 crank call when KeySource called Friday to arrange
18 the order with them."
19        Do you see that?
20   A    I do.
21   Q    So this was a pretty unusual
22 circumstance, at least according to Dane Drugs,
23 right?
24   A    I think I shared before that this seems

Page 252

1 like an unusual circumstance for everybody. I
2 think I used the word "anomaly." And I don't know
3 who Dane Drug is. I don't know Aunt Sarah or Aunt
4 Sandra. So this is -- this is a weird one, yeah.
5    Q    Yeah, you don't have any idea who any of
6 those people are, and yet you facilitated the
7 distribution of 36 bottles a month for Aunt
8 Sandra.
9        MR. TSAI: Object to the form.
10       THE WITNESS: I did not facilitate the
11 distribution. I asked the question. I did not
12 facilitate. I did not place a PO. I did not ship
13 Dane Drug anything. I did not contact Dane Drug.
14 I don't know who Dane Drug is.
15 BY MR. LOESER:
16   Q    Sir, if not for your involvement, 36
17 bottles a month for Aunt Sandra would not have
18 been shipped to Dane Drug; is that correct?
19       MR. TSAI: Object to the form.
20       THE WITNESS: I don't know if Dane Drug
21 received the 36 bottles of product. Does it say
22 that here? It looks like they didn't because they
23 don't know who the person is.
24 BY MR. LOESER:

Page 253

1    Q    Well, let's move up that e-mail string,
2 Mr. Borelli, to the middle of the page from Steve
3 Cochrane to you, dated April 13th. More on the
4 subject line "Guess who called today?"
5        "In response to your question in the
6 e-mail below, so what happened?"
7        He writes: "Maureen here said they were
8 very nice now that they understand what is going
9 on. Filled out a credit application so we have
10 their account ready to go. Sounds like they might
11 possibly order but not positive yet."
12       And do you see your response to that at
13 the top of the page?
14   A    I do.
15   Q    And that's an e-mail from you to Steve
16 at KeySource Medical, which I assume is Steve
17 Cochrane. And you write -- what do you write?
18 Why don't you go ahead and read that.
19   A    "Bastard. Thanks."
20   Q    And why --
21       THE REPORTER: Can you repeat?
22       THE WITNESS: "Bastard. Thanks."
23 BY MR. LOESER:
24   Q    And -- and why that response?

Page 254

1    A   Oh, I think that this -- you know, this
2   is again ten years ago, so I -- I don't know the
3   context.  I don't remember the -- the back and
4   forth conversation so much, nor these e-mails.
5   But perhaps I'm referring to this being such a
6   convoluted and long process, and the account not
7   knowing who it is, I don't know who Maureen is,
8   and -- and then them saying, "Sounds like they
9   might possibly order but not positive."  I don't
10  remember any of this.
11       And then perhaps I'm saying, boy, this
12  is a longwinded process, and then they don't
13  order.  I don't know who Dane Drug is.  I don't
14  know Aunt Sarah.  I don't know -- I don't know
15  that person.  I didn't ask them to place -- I
16  didn't tell them where to ship it.  I asked them.
17   Q   You took all of those actions based on a
18  request from a person you didn't know for a person
19  you didn't know, right?
20   A   I know Craig Cowman.
21   Q   You didn't know Heather Goodman?
22   A   I do not know Heather Goodman.
23   Q   Don't know Aunt Sandra, right?
24   A   I do not.

Page 255

1    Q   Didn't know Dane Drug.
2    A   I do not.
3    Q   And you don't know if the actions you
4   took complied with Mallinckrodt's DEA
5   registration?
6        MR. TSAI:  Object to the form.
7        THE WITNESS:  I don't.
8        (Borelli Exhibit No. 35 was marked
9        for identification.)
10       THE WITNESS:  Thank you.
11  BY MR. LOESER:
12   Q   I'm showing you what's been marked
13  Exhibit 35, which is an e-mail string with the
14  Bates number MNK-T1_0000560227.  And all these
15  numbers, just for the record, have been the first
16  page of the exhibits.
17       This is an e-mail from -- it starts with
18  you on March 18th, 2010, to Steve Cochrane.
19  Subject: "Oxy 30 ml, KeySource, PO No. 0016437."
20  Is that right?
21   A   Yes.
22   Q   And if you go to the very beginning of
23  this e-mail string, on the last page of the
24  exhibit, you send an e-mail to Mr. Cochrane on

Page 256

1   March 18th.  Subject: "Oxy 30 ml."  And you
2   state: "666 cases is 3,996 bottles, which would
3   bring you up to 5,004 bottles."
4    A   Okay.
5    Q   Why is it that you would contact
6   Mr. Cochrane and tell him the number of oxy
7   bottles he would be receiving from Mallinckrodt?
8    A   I don't know.
9    Q   If you go to the next page in the
10  exhibit, the e-mail above that one is from you --
11  or, I'm sorry, from Mr. Cochrane to you dated
12  March 18th, 2010.  It's more discussion of this
13  purchase order.
14       And he states: "Victor, just
15  transmitted the following order via EDI CSOS."
16       I take it that's the ordering system
17  that he used to order product from Mallinckrodt?
18   A   I don't remember.
19   Q   And he writes: "Please do not ship
20  before 3/26/2010 or later, if at all possible."
21       Why would your customer be asking you to
22  ship a product not before a certain date?
23       MR. TSAI:  Object to the form.
24       THE WITNESS:  I'm not sure.

Page 257

1   BY MR. LOESER:
2    Q   Would that have something to do with the
3   maximum allowed product that client was entitled
4   to receive within any particular time period?
5        MR. TSAI:  Object to the form.
6        THE WITNESS:  I don't know.  I was
7   thinking space management, but I don't know the
8   answer to that.
9   BY MR. LOESER:
10   Q   Okay.  If you go up to the next e-mail
11  from you to Steve Cochrane, dated March 18th,
12  2010, why don't you go ahead and read your e-mail.
13   A   From "okay"?
14   Q   Immediately above what we just went
15  through.  It starts, "Just heard back."
16   A   Oh.  "Just heard back from Katie pie.
17  Management is pushing her to get that crap,"
18  parentheses, "product," end of parentheses, "out
19  by 3/26, so it leaves that day (a Friday).  It
20  will get to you on a Monday -- on that Monday."
21   Q   And the crap product that you're talking
22  about is oxy 30?
23   A   I'm not sure if it's the only item on
24  the PO that KeySource placed.

Page 258

1  Q  Well, it says "Re: Oxy 30 ml KeySource
2  PO," so that would suggest that it's for oxy 30,
3  right?
4     A  It would suggest that oxy 30 is on that
5  PO.  I don't know what was on that PO, though.
6     Q  Okay.  And why would oxy 30 and whatever
7  else is on that PO be a crap product?
8     A  I'm not referring to it as crap product.
9  I wrote "crap product," and perhaps my e-mail is
10  in bad taste to whoever, but I'm not referring to
11  my product as crap.
12     Q  Who is Katie pie?
13     A  Kate.
14     Q  Okay.  So if you go to the next page of
15  that, Mr. Cochrane writes --
16     A  I guess Kate Neely, but I'm not sure.
17     Q  And there's some banter between --
18     A  Wait a sec.  You asked a question, so
19  give me a moment to see who this Katie pie is.
20  (Peruses document.)
21        I'm not quite sure.  I'm going to assume
22  a person I worked with.
23     Q  Kate Muhlenkamp?
24     A  Neely, but yeah.

Page 259

1     Q  And then moving up in the e-mail string,
2  Mr. Cochrane asks you questions about a photo from
3  a trip.  Do you know what trip he's talking about?
4        MR. TSAI:  Object to the form.
5        THE WITNESS:  I do not.
6  BY MR. LOESER:
7     Q  Flip forward to the first page of that
8  e-mail, Mr. Cochrane asks you about an etiquette
9  class.  Do you know what etiquette class he's
10  talking about?
11     A  I do not.
12     Q  Were you required to take an etiquette
13  class when you worked for Mallinckrodt?
14     A  I don't remember taking an etiquette
15  class.
16     Q  And this kind of banter with your
17  customer, is this pretty typical of your
18  relationship with Mallinckrodt's -- your
19  Mallinckrodt distributor wholesale clients?
20        MR. TSAI:  Object to the form.
21        THE WITNESS:  I think I shared before
22  that I had working relationships with -- good ones
23  with some and not so with others.
24        MR. LOESER:

Page 260

1  BY MR. LOESER:
2     Q  I take it --
3     A  And the banter that goes in between.
4     Q  I take it you didn't forward this
5  conversation to Ms. Muhlenkamp.
6     A  I don't know if I did or not.
7        (Borelli Exhibit No. 36 was marked
8        for identification.)
9  BY MR. LOESER:
10     Q  You've been handed what's been marked
11  Exhibit 36.  Bates No. MNK-T1_0000558886.  This is
12  an e-mail from you to Karen Harper dated
13  6/23/2010.  Subject line: "Oxycodone sales in
14  Florida - Summary."
15        Do you see that at the top of the page?
16     A  I do.
17     Q  If you go down to the e-mail below your
18  e-mail, it's a message from Kate Muhlenkamp to
19  you, among others, and she writes: "As many of
20  you have probably heard, Harvard Drugs' license to
21  handle controlled substances was suspended this
22  week.  The predominant reason for the suspension
23  was the sale of oxycodone in the state of Florida.
24  Please see the attached article for additional

Page 261

1  information and details."
2        Is that what this says?  Do you see
3  where that is written?
4     A  I do.
5     Q  And below that, she writes:
6  "Additionally, it came to our attention that
7  Sunrise Wholesalers' DEA license was suspended
8  pending further investigation.  Although the
9  official reason for the suspension has not been
10  named, we are under the impression that it is due
11  to the sale of oxycodone in the state of Florida."
12        Did I read that accurately?
13     A  That's what it says.
14     Q  And below that she writes:  "The two
15  wholesaler/distributor license suspensions led us
16  to do a more in-depth analysis of Covidien's
17  oxycodone sales in the state of Florida.  We
18  specifically focused on doctors' offices and pain
19  clinics.  It appears that Harvard and Sunrise were
20  the dominant players in this market with over 50
21  percent of their sales coming from this market.
22  H.D. Smith, KeySource and McKesson OneStop are
23  next with only 3 percent of their total sales
24  coming from the doctors' offices and pain

Page 262

1 clinics."
2     Do you see that?
3 A   I do.
4 Q   So Harvard Drug, a customer of yours?
5 A   I don't know.
6 Q   At one time a customer of yours?
7 A   I don't know the timing of it all.
8 Q   Were they ever a customer of yours?
9 A   Yes.
10 Q   And Sunrise Wholesaler, at one time a
11 customer of yours, correct?
12 A   At one time.  I don't know if it was
13 this time frame.
14 Q   And H.D. Smith, at one time a customer
15 of yours?
16 A   I believe so.  I don't know when I had
17 responsibility for them.
18 Q   And KeySource, at one time a customer of
19 yours?
20 A   Yes.
21 Q   And McKesson OneStop, at one time a
22 customer of yours?
23 A   And I -- I don't remember McKesson so
24 much.  They may have been.  I don't know.

Page 263

1 Q   And we talked about earlier about your
2 knowledge of oxycodone distribution in Florida,
3 but as you can see in this e-mail that was sent to
4 you in June 2010, two of your customers or at one
5 time your customers, Sunrise and Harvard, had
6 their DEA registration licenses suspended, and
7 this indicates that the predominant -- predominant
8 reason for the suspension was the sale of
9 oxycodone in the state of Florida, correct?
10 A   To clinics -- this -- this piece here,
11 to clinics in Florida, yes.
12 Q   Okay.  And the information about where
13 Sunrise and Harvard Drug sold Mallinckrodt's
14 products, that's exactly the information that was
15 maintained in Mallinckrodt's chargeback system,
16 right?
17     MR. TSAI:  Object to the form.
18     THE WITNESS:  I did not work in the
19 chargeback group.
20 BY MR. LOESER:
21 Q   But you know that to be true, correct?
22     MR. TSAI:  Object to the form.
23     THE WITNESS:  I think it's best if you
24 ask someone in chargebacks the specifics on that.

Page 264

1 BY MR. LOESER:
2 Q   But, sir, you know that the chargeback
3 system, which you occasionally asked people to
4 look into, contained information about Sunrise's
5 and Harvard Group's downstream customers.
6     MR. TSAI:  Object to the form.
7     THE WITNESS:  Yes.
8 BY MR. LOESER:
9 Q   And in fact, in this e-mail,
10 Ms. Muhlenkamp is saying that a more in-depth
11 analysis of Covidien's oxycodone sales were done,
12 and there was a particular or a specific focus on
13 doctors' offices and pain clinics, and she was
14 able to do that because the chargeback system data
15 allowed her to isolate those fields, correct?
16     MR. TSAI:  Object to the form.
17     THE WITNESS:  It reads that way, that
18 Kate went into the chargeback system, yes.
19 BY MR. LOESER:
20 Q   And there's a focus on doctors' offices
21 and pain clinics because in fact that's where a
22 lot of diversion was coming from, right?
23     MR. TSAI:  Object to the form.
24     THE WITNESS:  I don't know that.

Page 265

1 BY MR. LOESER:
2 Q   Well, you were sent this e-mail in
3 June 2010, right?  And in this e-mail,
4 Ms. Muhlenkamp indicates the DEA suspended the
5 licenses of these two distributor clients of
6 yours, right?
7 A   I don't -- I don't know that to be
8 factual.  I didn't know that Sunrise had their
9 license suspended.  I didn't know that.  And...
10 Q   You didn't know that after you received
11 this e-mail?
12 A   I don't know that to be true.  I don't
13 know.  I don't remember ever hearing it.  And I
14 don't remember this e-mail.  But I don't remember
15 ever hearing --
16 Q   Well, look at this e-mail.  Maybe it
17 will refresh your recollection.  It's dated
18 June 18th, 2010.  It's sent to you, and it says:
19 "It has come to our attention that Sunrise
20 Wholesalers' DEA license was suspended pending
21 further investigation."
22     So this did in fact inform you that
23 their DEA reg- -- that their DEA license was
24 suspended, right?

Page 266

1    A   You're saying that.  I don't know that
2  to be the case.  I had also heard that they turned
3  their license in.  So I don't know this to be
4  actual.
5    Q   So what you're saying is you don't know
6  if Kate Muhlenkamp is correct when she informs you
7  that the DEA suspended Sunrise's license.
8    A   She's saying that.  But in this clip of
9  an article, it's highlighting -- it's highlighting
10  Harvard, not Sunrise.  So how do I -- I don't know
11  if she knows that for a fact.
12    Q   Okay.  So you knew from this e-mail that
13  Harvard's license was suspended, right?
14    A   Yes.
15    Q   And that was because of sales to
16  doctors' offices and pain clinics.  That's the
17  reason that's given, right?
18    A   I'm sorry.  The reason it's given is
19  what?  I -- this is Kate's note saying she's
20  focusing on doctors' offices and pain clinics.
21    Q   Mr. Borelli, let's go to the top of the
22  e-mail from Kate, which I read: "As many of you
23  have probably heard, Harvard Drug's license to
24  handle controlled substances was suspended this

Page 267

1  week."
2        Do you see that?
3    A   I see that.
4    Q   And you see that it says then the
5  predominant reason for the suspension was the sale
6  of oxycodone in the state of Florida.  Do you see
7  that?
8    A   I do see that.
9    Q   So that's information that was provided
10  to you.  Do you see that?
11    A   Is that a question?
12    Q   I'm asking you if you see that in the
13  e-mail.
14    A   Oh.  Yes, I see that.
15    Q   Okay.  And then you also see that she
16  reports that Sunrise's Wholesale -- Sunrise
17  Wholesalers' DEA license was also suspended, and
18  the official reason was not named, but she was
19  under the impression that it's due to the sale of
20  oxycodone in Florida; is that correct?
21    A   I can't speak for Kate.  I shared with
22  you a moment ago that I don't know this to be
23  actual regarding Sunrise.  I -- again, I shared
24  with you a moment ago that I thought that they had

Page 268

1  turned their license in.  I may have read that in
2  an article.  I don't remember.
3    Q   And as we discussed, you see that in her
4  analysis in the deeper dive she's doing --
5        THE REPORTER:  I'm sorry, in the what?
6  BY MR. LOESER:
7    Q   -- in her deeper dive into Covidien's
8  oxycodone sales in the state of Florida, she
9  focused on doctors' offices and pain clinics.  Do
10  you see that?
11    A   I do.
12    Q   Do you have any idea why she would focus
13  on doctors' offices and pain clinics?
14    A   Did someone ask her for that
15  information, to pull that information?  I don't
16  know.
17    Q   So was there anything --
18    A   I don't know.
19    Q   -- anything about doctors' offices and
20  pain clinics that you were aware of that would
21  suggest that would be a good place to look for
22  suspicious information about sales of oxycodone in
23  Florida?
24    A   A doctor's office with a DEA license

Page 269

1  that's prescribing medicine?  I'm not -- I don't
2  understand the connection.  I'm sorry.
3    Q   So as long as a doctor's office in
4  Florida had a DEA registration, there was no
5  particular reason to think that there was anything
6  inappropriate going on with Mallinckrodt's oxy
7  that was being shipped to that doctor's office?
8        MR. TSAI:  Object to the form.
9        THE WITNESS:  By me?  By the -- I can't
10  speak for the DEA.  I don't know.
11  BY MR. LOESER:
12    Q   By you.  Nothing that you've seen or
13  read --
14    A   If the DEA -- if the DEA is saying
15  they've checked this customer out, they've
16  authorized and assigned a DEA license, okay, you
17  want me to question the DEA?
18    Q   So that's your understanding, that
19  whether a downstream customer of a distributor
20  client is engaged in diversion is a matter solely
21  for the investigation of the DEA?
22        MR. TSAI:  Object to the form.
23        THE WITNESS:  They're the experts.
24  BY MR. LOESER:

Page 270

1    Q   And can you answer my question?
2        MR. TSAI:  Object to the form.
3        THE WITNESS:  What an article says, what
4    people say, will not be as credible as what the
5    DEA does, in my humble opinion.
6    BY MR. LOESER:
7    Q   So you didn't believe you had any
8    responsibility to know anything about a doctor's
9    office that one of your customers was shipping
10   oxycodone to?
11       MR. TSAI:  Object to the form.
12       THE WITNESS:  I don't believe I said
13   that.
14   BY MR. LOESER:
15   Q   Do you disagree with that statement?
16       MR. TSAI:  Object to the form.
17       THE WITNESS:  You're putting words in my
18   mouth.  Do I care where our product goes?
19   Absolutely.  Absolutely.  And nobody in this room
20   cares more than me.
21   BY MR. LOESER:
22   Q   And so did you make sure that your
23   distributor clients weren't shipping pills that
24   you sold to them to dispensing physicians who were

Page 271

1    engaged in diversion?
2        MR. TSAI:  Object to the form.
3        THE WITNESS:  I believe that's why these
4    accounts have people in place to monitor their
5    customers and their practices.  A DEA agent like
6    Louis Fisher, who worked at Sunrise.  And I
7    believe -- I can't speak to the other accounts --
8    but let's use that example.  That's the person
9    that you would rely on to vet their customer.
10   They're not my customer.  We don't ship
11   to a -- Mallinckrodt does not ship to a treatment
12   clinic, a pain management clinic, a dispensing
13   physician.  Never -- while I was there, never
14   had -- never have.
15       These companies vet those -- their
16   customers.  And they use DEA agents, whether
17   they're on the DEA duty or they're retired and
18   acting as consultants.  I can't -- I can't get any
19   better information than that, in my humble
20   opinion.
21   BY MR. LOESER:
22   Q   And so you didn't try?
23       MR. TSAI:  Object to the form.
24       THE WITNESS:  I didn't try what?

Page 272

1    BY MR. LOESER:
2    Q   You didn't try and get any other
3    information.  You simply relied on your
4    distributor client entirely --
5    A   Well, to know a customer --
6        MR. TSAI:  Object to the response.
7    BY MR. LOESER:
8    Q   You relied on your distributor client
9    entirely to determine whether their downstream
10   customers were engaged in diversion.
11       MR. TSAI:  Object to the form.
12       THE WITNESS:  No, I don't think I said
13   that before either.  I think I shared with you
14   that I visit with customers on a periodic or
15   regular basis.
16       We did not -- when Sunrise came to us
17   years before we opened them up, we did not open
18   them up.  And then when they have a Louis Fisher,
19   a DEA agent on site vetting their customers for us
20   with pictures in the front of the building,
21   pictures in the back of the building, look in the
22   value, look at the customer list, I'm not going to
23   doubt that.  I don't think -- I don't think you
24   can get --

Page 273

1    BY MR. LOESER:
2    Q   And so you relied on that.
3    A   It's one of the things I relied on.  I
4    also shared that I went to customers' offices.
5    Q   If you go to the top of this e-mail
6    string, you note to Ms. Harper in your e-mail on
7    6/23/2010:  "Karen, KeySource is very concerned
8    that they are on this list, so can you tell me the
9    customers' names that make up this 3 percent?
10   They are unaware and sure they do not sell to
11   dispensing physicians, so perhaps there is a
12   coding issue."
13       Why did KeySource not sell to dispensing
14   physicians?
15       MR. TSAI:  Object to the form.
16       THE WITNESS:  I didn't work at
17   KeySource.  I don't know their business model.  I
18   don't know who they focused on, didn't focus on.
19   So I can't answer that for them.
20   BY MR. LOESER:
21   Q   So there's nothing about dispensing
22   physicians in Florida that -- that you have any
23   reason to believe one way or the other if it would
24   be prudent or not prudent to send oxy to

Page 274

1 dispensing physicians in Florida?
2        MR. TSAI: Object to the form.
3 BY MR. LOESER:
4    Q    It's unknown to you.
5    A    From this e-mail, all right, from the --
6 the e-mail from beginning -- from the beginning to
7 end, and the top statement it looks like KeySource
8 has a concern that if they're shipping to the
9 wrong accounts that are not the right accounts to
10 ship to, tell them so they'll shut them off.
11    Q    But, sir, was it the right accounts or
12 was it the right type of accounts? Because isn't
13 the concern of KeySource that they believe they're
14 not shipping to doctors' offices and pain clinics,
15 and they're put on a list that suggests they are?
16 Isn't that the concern they're raising?
17        MR. TSAI: Object to the form.
18        THE WITNESS: The concern they're
19 raising is who is on the list. Let them look at
20 the list to see who might be coded wrong, stop
21 shipping.
22        I can't speak on behalf of KeySource. I
23 didn't work there. I'm just sharing my insight or
24 my -- the way I kind of read through this e-mail.

Page 275

1 That's all I can do.
2 BY MR. LOESER:
3    Q    So you have -- I want to make sure I
4 understand what you're saying. You have no idea
5 why, when Mallinckrodt is doing a deeper look at
6 sales in Florida, that they would look
7 specifically at doctors' offices and pain clinics?
8        MR. TSAI: Object to the form.
9        THE WITNESS: That's correct.
10 BY MR. LOESER:
11    Q    And you have no idea why KeySource would
12 be upset if it found itself on a list that
13 suggested that they sold to doctors' offices and
14 pain clinics?
15        MR. TSAI: Object to the form.
16        THE WITNESS: I think KeySource would be
17 upset if they didn't know their customers that
18 they ship to. We know our customers. They want
19 to know their customers.
20        Before that, you know, again -- I'm
21 sorry, after that it's that customer who then
22 supplies the product to a patient, who has to come
23 in with a prescription. Nothing moves unless that
24 prescription is written. There is not a single

Page 276

1 stitch of whether it be atenolol, metformin,
2 promethazine, any item -- all these items we sold,
3 nothing moves out of the warehouse of a customer
4 of ours until a prescription is written.
5 BY MR. LOESER:
6    Q    So as long as a prescription is written,
7 there's no problem with the sale.
8        THE WITNESS: May I have a drink of
9 water? Thank you.
10        I'm sorry, I didn't hear --
11 BY MR. LOESER:
12    Q    So you're just looking for whether
13 there's a prescription written. That's --
14 prescription written, that's the end of it.
15        MR. TSAI: Object to the form.
16        THE WITNESS: I didn't say that's the
17 end of it. I said that's the start of it.
18 BY MR. LOESER:
19    Q    Okay. And you don't have any idea
20 whether -- why KeySource might decide not to sell
21 to dispensing physicians?
22    A    I think KeySource wants to know who we
23 deem -- or who is on the list that they may have
24 serviced or sent product to. It's a -- I don't

Page 277

1 know if it's 3 percent versus others, but they
2 don't want to have 1 percent on there.
3        But, again, now you're asking me to talk
4 for KeySource, and I --
5    Q    Sir --
6    A    -- I'm doing that too much because I
7 don't know their business model.
8    Q    -- I am asking you whether you have any
9 idea why KeySource would not sell to dispensing
10 physicians. Do you know why they would not do
11 that?
12    A    I don't know if it was in their business
13 model, but I can't speak for them.
14    Q    So you don't know.
15    A    That's right.
16        MR. TSAI: We've been going about an
17 hour. Is this a good time for a break?
18        MR. LOESER: Why don't I do one more
19 quick document, and then we'll stop.
20        MR. TSAI: Okay.
21        (Borelli Exhibit No. 37 was marked
22        for identification.)
23 BY MR. LOESER:
24    Q    This is an e-mail string, the top page

Page 278

1  of -- you've been handed Exhibit 37.  This is an
2  e-mail string from Brenda Rehkop to you dated
3  6/23/2010.  MNK-T1_0000265732.
4       If you go to the first page of the
5  string, it's the last page of the exhibit, an
6  e-mail from Tracey Coffey to Kate.
7       And it says: "Hi, Kate, I have
8  KeySource Medical, Inc., with their address in
9  Cincinnati, Ohio, asking if they will be able to
10 get 12,720 bottles of 853001 on July 1st, and
11 12,720 bottles of 853001 on July 2nd.  Do you see
12 any issues in filling these orders?"
13      And then she says: "Jim, Brenda, FYI,
14 this may show up on the PS old screen."
15      Do you know what the PS old screen was?
16   A  I have no idea.
17   Q  And then going to the next page in
18 Ms. Rehkop's e-mail to Tracey Coffey, also
19 including you, and cc'd to Jim Rausch and Rose
20 Adams, she writes: "Victor and Mark, Kate is out
21 of the office, and this will undoubtedly show up
22 as a peculiar order.  Do you know why they are
23 ordering so much oxy?  We need an answer that will
24 satisfy the DEA when they have questions in the

Page 279

1  future."
2       Do you see that?
3   A  I do.
4   Q  And if you move up from there, it looks
5  like you then forwarded this e-mail that was sent
6  to you to Steve Cochrane at KeySource.  And you
7  write: "FYI, help us understand this order
8  pattern."
9       Do you see that?
10  A  I do.
11  Q  So that's you looking into a particular
12 order by one of your customers that has been
13 flagged by Mallinckrodt as -- as peculiar, right?
14      Do you see that?
15  A  Was that a question?
16  Q  Yes, I'm asking if that --
17  A  I'm sorry.
18  Q  Did I accurately describe the e-mail?
19      THE WITNESS:  Can you read back what his
20 question was.  I didn't hear a question in there.
21 BY MR. LOESER:
22  Q  Well, I'll ask you again.  Did I
23 accurately describe the e-mail?
24  A  Before that.  I think you asked a

Page 280

1  question before that.
2   Q  Okay.  Did you send an e-mail -- if you
3  look at the middle of the page, Victor Borelli,
4  your e-mail to Steve Cochrane on June 23rd, 2010:
5  "FYI, help us understand this order pattern."
6       So you were forwarding this -- this
7  information indicating that one of KeySource's
8  orders was flagged as peculiar to your customer
9  client; is that right?
10  A  That's what it says, that's right.
11  Q  Okay.  And was that standard operating
12 procedure for you?  When an order from a customer
13 was identified as peculiar, would you just forward
14 the e-mail informing you of that to your
15 distributor client?
16  A  I think the customer -- customer service
17 person is asking me about an order about one of my
18 accounts at the time.  So I'm asking the account,
19 Please explain your position on this.
20  Q  Right.  You just forwarded it to your
21 client.  Right?
22      MR. TSAI:  Object to the form.
23      THE WITNESS:  So I don't know if I just
24 forward -- I don't know if I just forwarded to the

Page 281

1  account.  I may have -- I'm sure I had a
2  conversation with them as well.
3  BY MR. LOESER:
4   Q  Okay.  But, nonetheless, this e-mail
5  shows that you forwarded the question raised by
6  Tracey Coffey and Brenda Rehkop to your customer
7  client, Mr. Cochrane.
8   A  Well, you said "just."  You just
9  forwarded it.  You make it sound like I just
10 forwarded the e-mail, waiting for an answer on the
11 e-mail back.  That's not how I do business, so I'm
12 sure there's a phone call tied to this e-mail as
13 well.
14  Q  And, nonetheless, you forwarded the
15 query that you got on to your distributor client
16 customer, right?
17  A  Yes.
18  Q  And if you go up further, your client
19 gives you an explanation for this order, and he
20 says: "As discussed, we need to schedule the
21 delivery times due to the lack of space in the
22 current vault.  Since KeySource sells 40 to 45,000
23 bottles per month and 40 percent of that quantity
24 sells in the first week of the month, I would not

Page 282

1 judge these orders as peculiar since they are just
2 meeting current demand."
3          Would you -- so he asks you a question
4 about whether an order was peculiar or not.  Do
5 you see that?
6     A   I see his e-mail to me.
7     Q   And so do you feel that you were
8 qualified to answer his question as to whether his
9 order was peculiar or not?
10    A   I don't know the answer to that.  You
11 know, I don't know if they picked up a new
12 account, picked up new business.  I don't know
13 their business model.  So I don't know the answer
14 to that.  But I think --
15         MR. LOESER:  Did you want to take a
16 break?
17         MR. TSAI:  Yes, please.
18         THE VIDEOGRAPHER:  The time is 3:49 p.m.
19 We're going off the record.
20         (Recess.)
21         THE VIDEOGRAPHER:  The time is 4:04 p.m.
22 We're back on the record.
23         (Borelli Exhibit No. 38 was marked
24         for identification.)

Page 283

1 BY MR. LOESER:
2     Q   Mr. Borelli, you've been handed what's
3 been marked Exhibit 38, which is another e-mail
4 string between you and your distributor client
5 customer, Mr. Cochrane at KeySource Medical.  The
6 string starts with the Bates No. MNK-T1_0000559457
7 and this is a June 25th, 2010 e-mail from
8 Mr. Cochrane to you, with the subject line "Re:
9 Oxycodone sales in Florida - Summary."
10         Do you see that?
11    A   I do.  Is this -- I do.  Yeah.
12    Q   And if you go to where that chain
13 starts, you'll see there's an e-mail from you on
14 June 25th, 2010, at 7:31 a.m., to Mr. Cochrane.
15 The subject line "Oxycodone sales in Florida -
16 Summary."
17         And you write:  "Per your request, here
18 are the accounts that make up the 3 percent
19 outside the box list."
20         Do you see that?
21    A   I do.
22    Q   And so here you were providing
23 Mr. Cochrane with information on downstream
24 customers who were identified in the earlier

Page 284

1 e-mail -- e-mail we discussed as comprising
2 3 percent of KeySource's sales.  Correct?
3     A   I believe so.
4     Q   And if you turn to the first page of
5 that exhibit, in an e-mail on June 25th, 2010, at
6 7:56 a.m., an e-mail, Mr. Cochrane writes to you:
7 "Victor, I sent the list to Dave.  Do you think
8 non-addiction treatment clinic is a dangerous
9 category to sell to?"
10         So in this e-mail Mr. Cochrane is asking
11 you, if you, Victor Borelli, think this category
12 of downstream customers that he has is a dangerous
13 category to sell to; is that right?
14    A   Let me look at the -- couple of pages
15 here, if you don't mind.  (Peruses document.)
16         So he's asking me about this -- these
17 clinic -- treatment clinics.
18    Q   Right.
19    A   Okay.
20    Q   Your client is asking you your opinion
21 on whether a particular category of downstream
22 customers is a dangerous category, right?
23    A   He's asking me that question, yes.
24    Q   Okay.  And you see above his e-mail is

Page 285

1 your e-mail to him, four minutes later, in which
2 you respond.  Do you see that?
3     A   I do.
4     Q   And I'll read through your response.
5 You first answer his question by saying:  "Do they
6 dispense?"
7         Why is that something that could
8 potentially make non-addiction treatment clinics a
9 dangerous category?
10    A   I'm just highlighting some things to
11 him.  He's asking me a question, and I'm
12 responding within three minutes or four minutes
13 off-the-cuff kind of thoughts.
14    Q   And my question to you is, why did you
15 write, Do they dispense?"  Why is that a question
16 that's potentially indicative of whether
17 non-addiction treatment is a dangerous category?
18    A   Well, I believe that I'm tying in how
19 one of the accounts you mentioned before uses a
20 DEA agent for these specific things.  Pictures --
21 I shared that with you before, pictures of the
22 front door, back door, entrance and exits, meets
23 with them, interviews them.  So he's asking me a
24 question, and I'm highlighting just in three or

Page 286

1 four minutes things I thought of.

2     Q  Right. I understand what you wrote,

3 sir. I'm asking you why you wrote this.

4     Why did you think -- let's see if we can

5 answer that question -- why did you think "Do they

6 dispense?" is a question that could provide an

7 answer indicating whether a non-addition treatment

8 clinic is a dangerous category?

9     A  I wrote a number of responses.

10     Q  But I'm asking you about that one.

11     A  I don't know why I put that first in my

12 response.

13     Q  Okay. There's nothing about whether

14 they dispense that you can recall that would

15 provide any information about whether it's a

16 dangerous category to sell to?

17     A  No.

18     Q  And move to your next question, you say:

19 "Do they work in tandem with a pharmacy right next

20 door?"

21     Why did you identify that as a question

22 that could provide information on whether a

23 non-addiction treatment is a dangerous category to

24 sell to?

Page 287

1     A  That was what the DEA agent had talked

2 about things to look for, Louis Fisher.

3     Q  And did he also talk about looking for

4 whether they dispense?

5     A  I believe he did. I don't remember

6 specifically.

7     Q  Okay. And then you say: "Did you visit

8 them, take pictures, interview them?"

9     Why would that be potentially helpful

10 information for determining if a non-addiction

11 treatment clinic is a dangerous category to sell

12 to?

13     A  So he knows his customer.

14     Q  And what is it that you would learn

15 about your customer if you visit them, take

16 pictures and interview them?

17     A  I can't answer that. I think just the

18 conversation with a customer, is it somebody they

19 do business with.

20     Q  And do you think that if you're visiting

21 a non-addiction treatment clinic and you see a

22 line of people out the door with cash in their

23 hands that that might suggest that there's

24 diversion going on?

Page 288

1     MR. TSAI: Object to the form.

2 BY MR. LOESER:

3     Q  Is that the kind of thing you might

4 capture if you visit them, take pictures or

5 interview them?

6     MR. TSAI: Object to the form.

7     THE WITNESS: None of what you just said

8 is in this. I don't understand what you're

9 saying. I -- I'm not saying is a line of

10 people -- I'm saying -- I'm recommending what the

11 DEA agent who does this for a living recommends or

12 mentioned -- I don't know if he recommended it or

13 if he mentioned it. But again, in four minutes

14 later, that's my response off the top of my head.

15 BY MR. LOESER:

16     Q  Right. And would it be fair to say --

17     A  And I say, Who the heck knows? The DEA

18 doesn't have a formal process for any of the

19 customers that are in this room. They don't --

20 they don't tell any of them how to act or how to

21 not act. They just don't.

22     Q  So you're saying to your distributor

23 customer who is buying substantial quantities of

24 oxycodone for you, I don't really have any idea

Page 289

1 how you tell if something is a dangerous category

2 to sell to. Who the heck knows these days?

3     A  Well --

4     Q  Isn't that the idea?

5     A  No, I think the tone you just used is

6 improper. You're kind of being cavalier about

7 this, and that's the last thing I am is cavalier

8 about this.

9     Q  So what is "Who the heck knows"? How is

10 that not cavalier?

11     A  Who the heck knows, because that should

12 be driven from the DEA. The direction and who

13 should dispense -- who should write -- who should

14 receive product, that's all, in my humble opinion,

15 is driven from the DEA.

16     So who the heck knows, they don't have a

17 formal -- that's what I'm saying, they don't have

18 a formal process in place on what to do and what

19 not to do. I think everybody in the room has been

20 fined by the DEA.

21     Q  So when you say who the heck --

22     A  Not people. The companies they

23 represent.

24     Q  When you say, "Who the heck knows these

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 days?" you're saying you don't really know how one
2 would go about identifying non-addict -- whether a
3 non-addiction treatment clinic is a dangerous
4 category to sell to.
5     MR. TSAI:  Object to the form.
6 BY MR. LOESER:
7     Q    Right?  Isn't what you're telling your
8 client, you don't know?  You don't know how to
9 identify downstream customers that are a dangerous
10 category to sell to?
11     A    In a three-minute later e-mail, he asked
12 a question, I shared some thoughts off the cuff.
13 But I can't answer for the DEA.  I can't speak for
14 the DEA, and I think the DEA needs to give
15 direction on this product.
16     Q    And other than what you were told by the
17 DEA, there's -- there's nothing that you know
18 about any of the three categories that you wrote
19 that would indicate to you based on your
20 experience that that would be an indication of a
21 dangerous category.
22     MR. TSAI:  Object to the form.
23     THE WITNESS:  Again, I'm just going off
24 of what the DEA agent shared with me.  And he

Page 291

1 asked me a question at 7:56, and I'm quickly
2 typing at 8:00.  But I don't know what the DEA
3 looks -- looks for.  I can't speak for the DEA.
4 But do I think the onus is on the DEA?  In my
5 humble opinion, yes.
6     MR. LOESER:  Could you read my question
7 back, please.
8     (Whereupon, the requested record
9     was read.)
10     MR. TSAI:  Object to the form.
11     Can you answer?
12     THE WITNESS:  I thought I did.
13 BY MR. LOESER:
14     Q    Do you want the question read back
15 again?
16     A    Sure.
17     (Whereupon, the requested record
18     was read.)
19     MR. TSAI:  Object to the form.
20     THE WITNESS:  It -- it's just an
21 off-the-cuff, three-minute, four-minute later
22 response in an e-mail about some recommendations.
23 I also highlight "who the heck knows" because
24 there's no firm direction.

Page 292

1 BY MR. LOESER:
2     Q    And so to answer my question --
3     A    I just did.  Didn't I?
4     Q    No.  You want her to read it back again?
5     A    Please do.  I'm sorry if I'm not
6 answering it properly for you, but I think I am.
7     Q    Why don't we try one more time.
8     A    Certainly.
9     (Whereupon, the requested record
10     was read.)
11     MR. TSAI:  Object to the form.
12     THE WITNESS:  These are just three
13 things that were highlighted to me by a DEA
14 agent -- a retired DEA agent on things that he
15 that focused on.  He's asking a question.  I'm
16 responding three, four minutes later.
17 BY MR. LOESER:
18     Q    So the answer to my question is no,
19 your sole source of information on what would be
20 indicative of a dangerous category to sell to is
21 the DEA.
22     MR. TSAI:  Object to the form.
23     THE WITNESS:  It's one of the sources of
24 information that should be used.

Page 293

1 BY MR. LOESER:
2     Q    Okay.  Sir, you wrote three items down
3 that you thought were questions that one would ask
4 to determine whether something was a dangerous
5 category.
6     A    Okay.
7     Q    You wrote those questions solely because
8 the DEA told you those were things to look at.  Is
9 that right?
10     MR. TSAI:  Object to the form.
11     THE WITNESS:  I believe so.
12 BY MR. LOESER:
13     Q    Okay.
14     A    I also asked him to call me to talk at
15 10:30, and perhaps I would have more ideas or
16 thoughts.
17     Q    And did you give him more ideas and
18 thoughts when he called you?
19     A    Eight years later, I don't remember.
20     (Borelli Exhibit No. 39 was marked
21     for identification.)
22 BY MR. LOESER:
23     Q    You've been handed what's marked
24 Exhibit 39, which is an e-mail from you to

Page 294

1 Mr. Cochrane that includes an e-mail from Kate
2 Muhlenkamp to you.
3        Do you see that?  It's dated August 7th,
4 2010, is your e-mail to Mr. Cochrane.  And the
5 subject is "KeySource oxycodone sales."
6        Do you see that?
7    A  I do.
8    Q  And so looking at this, it appears that
9 you received an e-mail from Ms. Muhlenkamp and you
10 forwarded that e-mail to Mr. Cochrane, right?
11    A  Yes.  Sorry.
12    Q  And Ms. Muhlenkamp's e-mail to you says:
13 "Vic, per our conversation, please find the
14 attached draft showing the transition of oxycodone
15 sales from H.D. Smith to KeySource over the last
16 several months."
17        And then she goes on:  "Additionally, we
18 had Steve reach out to H.D. Smith to find out what
19 business they had walked away from.  Attached is a
20 list of customers that they have either shut down
21 or severely restricted.  We are not suggesting
22 that KeySource adhere to H.D. Smith's methods, but
23 thought it might be helpful for them to have a
24 list of accounts that a similar business had

Page 295

1 deemed suspicious."
2        Do you see that?
3    A  I do.
4    Q  And then she reports that Steve, and I
5 gather this is Steve Cochrane, asked H.D. Smith
6 how they identified these accounts, and H.D. Smith
7 noted the following.
8        Do you see that?
9    A  I do, but I doubt that that is Steve
10 Cochrane.
11    Q  Who do you think it is?
12    A  I doubt a customer would talk to another
13 customer.  It could be Steve Becker.
14    Q  Okay.  Somebody that --
15    A  But I don't know if it -- I'm not
16 exactly sure who that Steve is, but it -- you
17 know, it could be Steve Becker, who managed that
18 account at that time.  I don't know.
19    Q  So, nonetheless, Steve asked H.D. Smith
20 how they identified accounts they had shut down
21 and restricted, and he got a list from H.D. Smith.
22        And do you see the list on that e-mail?
23    A  I do.
24    Q  Do you know who C-I -- C, I think Roman

Page 296

1 numeral, II stands for?
2    A  I do.
3    Q  Who is that?
4    A  It's representing C-II.
5    Q  So controlled substances, Schedule II?
6    A  Yes.
7    Q  Is that right?
8        And the first item on his list says:
9 "C-II ratio to normal nonscheduled product
10 orders."
11        What does that mean to you?
12    A  How much -- I can't speak for Steve.
13 So, you know, I said -- I shared with you we've
14 got a portfolio of products.  So maybe he is
15 comparing C-II to other items.  It looks like
16 that.
17    Q  And why would the ratio of controlled
18 substances, Schedule II substances, to normal
19 nonscheduled products be a reason to shut down or
20 severely restrict a client?
21    A  I can't speak for Steve.
22    Q  I'm not asking you to speak for Steve.
23 I'm asking you, seeing this item here, which was a
24 reason given by H.D. Smith for why they shut down

Page 297

1 or severely restricted a downstream customer, do
2 you have any understanding why the ratio of
3 controlled substances to non-normal, nonscheduled
4 product orders would be a reason to cut off,
5 restrict a customer?
6    A  I can't speak for H.D. Smith either.
7    Q  Can you speak to that reason?  Do you
8 understand why the ratio of controlled substances
9 to nonscheduled products would be a reason to
10 restrict or shut down a sale to a downstream
11 customer?
12    A  I said I don't know H.D. Smith's
13 business model.  So H.D. Smith is a wholesaler
14 that has, I'm not sure, how many SKUs -- 13,000
15 SKUs.  So they have every item that is
16 manufactured.  So they're looking at so many
17 different items, so I --
18    Q  So you don't know, sir, why this
19 information would be relevant to determining
20 whether to shut off or restrict a customer.
21        That's my only question to you.  Do you
22 understand why this ratio would be a relevant
23 consideration when deciding to suspend or
24 eliminate a customer?

Page 298

1    A    Can you ask that again, please?
2    Q    Do you have any idea why the ratio of
3  controlled substances to nonscheduled products
4  would be relevant to the determination of whether
5  to restrict or suspend a customer?
6    A    I have no idea how H.D. Smith goes to
7  market and looks at their items.  If lisinopril is
8  an item that they sell more of than something
9  else, will they stop shipping lisinopril?  I don't
10  know.
11    Q    Mr. Borelli, did you pay any attention
12  to the ratio of controlled substances your
13  distributor clients bought from you relative to
14  noncontrolled substances?
15    A    Yeah, I did.
16    Q    Why?
17    A    I tried to look at all of my items that
18  I market -- that I sell.
19    Q    Is that an indication of potential
20  diversion when a customer is buying only
21  controlled substances and no nonscheduled
22  substances?
23    A    That's a tough one to answer.
24    Q    But is that why the information is here

Page 299

1  from H.D. Smith as to why -- is that a rational
2  conclusion to draw from H.D. Smith including that
3  as a consideration when deciding whether to shut
4  down or restrict a customer?
5    A    I can't --
6        MR. TSAI:  Object to the form.
7        THE WITNESS:  I'm sorry.  I can't speak
8  for H.D. Smith at all.  I never worked there.  I
9  barely managed them.  I don't know their model.
10  BY MR. LOESER:
11    Q    So you don't know the answer to this:
12  You don't know why you would look at that ratio?
13  That's all I'm asking you, sir, is if you know why
14  that ratio is relevant to identifying a customer
15  that should be shut down or severely restricted.
16  Can you answer that question?
17    A    I can't.
18    Q    Okay.  And if you go to the next item,
19  if the pharmacy was closed door, servicing just
20  physicians, do you know why that would be
21  something to look at when deciding whether to shut
22  down or restrict a customer?
23    A    Yeah, I do.
24    Q    And if you look at the next item, large

Page 300

1  pharmacies with excess orders, do you know why
2  that would be something to look at when deciding
3  whether to shut down or severely restrict a
4  downstream customer?
5    A    I do not.
6    Q    The next item, no physician sales, do
7  you know why that would be an item to look at when
8  deciding whether to shut down or severely restrict
9  a customer?
10    A    I do not.
11    Q    And the last item on the list for
12  reasons why H.D. Smith would shut down or severely
13  restrict a customer was pharmacy secondary
14  supplier relations.  Do you know what that means?
15    A    I do not.
16    Q    So you don't know what any of these
17  things mean, and yet you forwarded this
18  information to Mr. Cochrane and you wrote:  "Let's
19  talk about this when you get back from your mini
20  vacation.  I still don't buy off on this
21  information.  I would like to talk to you about
22  this to run a similar program with your data."
23        Why would you run a similar program with
24  his data?

Page 301

1    A    I wouldn't run it.  I wouldn't run the
2  program.  He would run the program with his data
3  to look at this -- and H.D. Smith is a competitor
4  of KeySource as they are with McKesson and
5  Cardinal and AmerisourceBergen.  So if -- we'll
6  talk when he gets back.
7        I don't know -- I mean, you asked me
8  like nine times about this, and I even said it up
9  here, "I don't buy off on it."  So I don't
10  understand how this pertains to business with
11  H.D. Smith because I don't know H.D. Smith's
12  model.  I said, Let's talk.
13    Q    Okay.  You see here in this e-mail from
14  Kate Muhlenkamp to you that your client KeySource
15  is taking over the business of H.D. Smith?
16    A    Yeah.
17    Q    H.D. Smith sales were going to go to
18  KeySource; is that right?  That's what happened
19  here, there was a transition.
20    A    Did -- did we sell to H.D. Smith our
21  product? I don't know.  Did Watson sell their
22  product to H.D. Smith?  I don't know.  Was there a
23  supply shortage, was there a DEA quota shortage?
24  I don't know any of these things.

Page 302

1    Q   So this says: "Per our conversation,
2 please find the attached graph showing transition
3 of oxycodone sales from H.D. Smith to KeySource."
4       So you understood that KeySource -- the
5 sales that were going to H.D. Smith were being
6 transitioned to KeySource.  Did you understand
7 that?
8    A   I don't know if there are sales on
9 oxycodone.  There are quite a number of vendors
10 that manufacture and sell oxycodone.  So I don't
11 know if H.D. Smith was using our brand or someone
12 else's brand.
13    Q   And so you don't know if when KeySource
14 took over H.D. Smith's sales, it utilized the same
15 system that H.D. Smith was using to eliminate or
16 severely restrict any downstream customers?
17    A   That's right.
18       (Borelli Exhibit No. 40 was marked
19       for identification.)
20       THE WITNESS:  Thank you.
21 BY MR. LOESER:
22    Q   Mr. Borelli, you're looking at
23 Exhibit 40, what's been marked Exhibit 40, the
24 MNK-T1_0000559259.  This is an e-mail string, the

Page 303

1 top of which is an e-mail from you to
2 Mr. Cochrane, with a subject line "Re:  Pain
3 clinics."
4       And if you look back, and I'll -- take a
5 minute to review this, but I'll generally describe
6 you -- in your August 24th, 2010 exchange, you
7 forwarded to Mr. Cochrane some older e-mail that
8 you had sent him in 2008.
9       And I would like to start with the last
10 page of this exhibit, which is an e-mail from
11 Mr. Cochrane to you, subject:  "Pain clinics,"
12 dated August 18th, 2008.
13       Do you see that?
14    A   I do.
15    Q   And in this e-mail Mr. Cochrane writes
16 to you:  "Mr. Victor, in the 'doesn't hurt to ask'
17 category, do you have a list of pain clinics; and
18 if not, do you know where we can get one cheap,
19 read free?"
20       Do you see that?
21    A   I do.
22    Q   And this was relatively early in your
23 relationship with Mr. Cochrane, wasn't it?
24    A   I don't remember when Mallinckrodt

Page 304

1 created an account with KeySource.
2    Q   So if you go then to the next e-mail in
3 that string, it's from you to Mr. Cochrane dated
4 August 18th, 2008, subject line "Re:  Pain
5 clinics."
6       You respond to his question:  "I do not.
7 I think that they, the Cinci bad boys, buy that
8 list, but I don't know where they get that from.
9 NACDS might be a good place to snoop around."
10       Who are the Cinci bad boys?
11    A   I'm going to assume another wholesaler
12 in Cincinnati.
13    Q   And do you know who that might be?
14    A   Masters, I assume.  I didn't name them
15 here, but I assume that.
16    Q   And then Mr. Cochrane responds to you in
17 his 10:47 p.m. e-mail on August 18th, and he says:
18 "Stephanie found a good source for pain clinics
19 online.  Got her pumped off now.  We're off to the
20 races.  Steve."
21       Do you see that?
22    A   I see it.
23    Q   And if you go up further in that
24 exchange, you have an e-mail to Mr. Cochrane dated

Page 305

1 August 19th, 2008, at 7:56 a.m.
2    A   I see it.
3    Q   And you write:  "Perhaps you may want to
4 position it with us at our meeting that you are
5 putting a team in place to market directly towards
6 dispensing physicians, pain management centers,
7 clinics, et cetera.  This would put a bug in the
8 ear of the marketing team, who doles out products,
9 to keep additional inventory for you."
10       Do you see that?
11    A   I do.
12    Q   So your customer distributor client
13 KeySource and VP of purchasing, Mr. Cochrane, asks
14 you for information about how to target pain
15 clinics.  And you respond that you don't have a
16 list, but you think you know where he could get
17 one.  He finds a list, and then you explain -- you
18 give this helpful advice to him about how he could
19 position his business approach at your meeting to
20 market specifically to dispensing physicians, pain
21 management centers, clinics, et cetera.  Correct?
22       MR. TSAI:  Object to the form.
23       THE WITNESS:  You asked a lot of things
24 there.

Page 306

BY MR. LOESER:

1 Q   Well, let me strike that question. I'll
3 start over.
4       You sent this e-mail to Mr. Cochrane on
5 August 19th, 2008, in which you suggested to him a
6 way to market directly towards dispensing
7 physicians, pain management centers and clinics,
8 right?
9       MR. TSAI: Object to the form.
10      THE WITNESS: No, I don't believe I did
11 that. I'm ask -- I'm highlighting to him if he is
12 thinking about -- you have to give me a second
13 here. (Peruses document.)
14      So if he is thinking about putting a
15 focus and a business model together for this part
16 of the business, to mention it at any NACDS -- the
17 upcoming NACDS meetings. It would -- at the NACDS
18 meetings, senior staff has a marketing team in
19 place who could understand the business model that
20 they're going forward with. Nothing is -- I
21 didn't say yes or no to any of this.
22 BY MR. LOESER:
23      Q   So you didn't say to him, Wait, wait,
24 wait, Steve, it would be a terrible idea to market

Page 307

1 directly towards dispensing physicians, pain
2 management centers, clinics. Instead, you
3 indicated that if he did that, it would put a bug
4 in the ear of the marketing team, and they're
5 responsible for doling out product, to keep
6 additional inventory for you.
7       So you're suggesting that if he markets
8 this way, there -- there would be more inventory
9 potentially available to him. Isn't that right?
10      MR. TSAI: Object to the form.
11 BY MR. LOESER:
12      Q   Isn't that what your e-mail actually
13 said?
14      A   What I'm saying --
15      MR. TSAI: Object to the form. Sorry.
16      THE WITNESS: What I'm saying is if he
17 wants to put a business model in place to target
18 that part of customer base, that he present it to
19 us at the upcoming meeting.
20      Nothing about -- while I say "keeping
21 additional inventory for you," he's got -- I mean
22 he's got to put a team in place -- he -- I'm
23 sorry, KeySource has got to put a plan or a model
24 in place, and then in front of us, and then the

Page 308

1 powers that be, not me, I don't say yes or no to
2 this. This is going to be a senior level
3 decision, whether it be John Adams, who would be
4 the head of all the sales, or Mike Gunning, God
5 rest his soul. I don't -- I wouldn't say yea or
6 nay. It's a joint effort, right? It's a joint
7 decision, marketing, senior management,
8 management.
9 BY MR. LOESER:
10      Q   So let's be clear here, Mr. Borelli,
11 your distributor client indicated to you an
12 interest in marketing to pain clinics and
13 dispensing physicians, right?
14      A   That was a business model they put --
15      Q   Right.
16      A   -- were looking at.
17      Q   And you made a suggestion to him on how
18 he could approach that with your marketing team,
19 right?
20      MR. TSAI: Object to the form.
21      THE WITNESS: I don't work for
22 KeySource. I don't know how they're going to put
23 a model together.
24 BY MR. LOESER:

Page 309

1      Q   Okay. It wasn't news to you because
2 Mr. Cochrane told you that he was going to be
3 targeting pain clinics. Right?
4      A   I don't know how far along he got on
5 targeting pain clinics. I don't think he did. I
6 don't -- I don't think he ever -- I don't think --
7 when I say "he," I'm sorry. I don't think they
8 ever did. I don't remember.
9      Q   After you received the question from him
10 about a list of pain clinics, and I'll read it
11 again, you responded: "Perhaps you may want to
12 position it with us at our meeting that you are
13 putting a team in place to market directly toward
14 dispensing physicians, pain management centers,
15 clinics, et cetera. This would put a bug in the
16 ear of the marketing team, who doles out product,
17 to keep additional inventory for you."
18      That is what you wrote, correct?
19      A   That is what I wrote.
20      Q   Okay. Now, if we go up to the next
21 e-mail, we get forward to August 23rd, 2010, and
22 this is the e-mail where you forwarded to him this
23 earlier exchange, and you write: "Wow, how times
24 have changed. I was digging up the restaurant

Highly Confidential -- Subject to Further Confidentiality Review

Page 310

1    name that we may go to and I found this string of
2    e-mails.  Funny stuff."
3          Do you recall why you thought that was
4    funny stuff that your client was looking into ways
5    to target pain clinics as downstream customers?
6          MR. TSAI:  Object to the form.
7          Go ahead.  Sorry.
8          THE WITNESS:  I do not.
9    BY MR. LOESER:
10        Q   Okay.  And if you look up Mr. Cochrane's
11   response to you, later that evening on
12   August 23rd, 2010, was:  "Wow, I got the creeps
13   reading this.  Are you sure this wasn't a Wildman,
14   an Rx-King e-mail exchange?  In hindsight, Denny
15   and Dave's trip to DC to visit DEA was a godsend!
16   Thankfully we never pursued this!!!  Steve."
17        Do you see that?
18        A   I do.
19        Q   And above that you write:  "Tru dat."
20   Right?
21        A   Yes.
22        Q   So why do you think Mr. Cochrane got the
23   creeps reading this?
24        MR. TSAI:  Object to the form.

Page 311

1          THE WITNESS:  I mean, he's looking at
2    something two years later.  Who knows the future?
3    I certainly don't.  So he was looking to put a
4    business model together, and then he's saying --
5    way back when, and then he's saying, thank gosh,
6    he didn't.
7    BY MR. LOESER:
8          Q   And why is that?  Why -- why thank gosh
9    he didn't?  Why the creeps?
10         A   I can't answer for Steve.
11         Q   You have no idea?
12         A   I can't answer for Steve.
13         Q   You have no idea why he would write,
14   "Wow, I got the creeps reading this"?
15         A   Well, I can't answer for Steve.  I'm
16   sorry.
17         Q   All right.  And what's the reference to
18   Wildman and Rx-King, do you know?
19         A   I have no idea.  I have no idea.
20         Q   Do you know what Denny and Dave's trip
21   to DC to visit DEA was?
22         A   I don't.  I'm not -- Denny -- I believe
23   Denny was the president of their organization,
24   KeySource, God rest his soul.  Dave, also from the

Page 312

1    e-mails you shared before, was also at KeySource.
2          Q   So, now, what you learned from this
3    e-mail is that Mr. Cochrane is extremely glad he
4    didn't target dispensing physicians and pain
5    clinics, right?
6          A   Right.
7          Q   But you knew you had other customers who
8    did in fact target dispensing physicians and pain
9    clinics, right?
10         A   Yes.  That were vetted by DEA -- DEA
11   agents -- agent in the process.
12         I feel like you are using certain words
13   and certain pieces of articles, and you're not
14   sharing the entire process and sharing the entire
15   e-mail.  I know you don't have to answer that
16   because you haven't before.  So I don't think
17   that's fair at all.
18         This is a good thing.  They didn't open
19   up and go after that business.
20         Q   And other customers of yours did,
21   correct?
22         A   Other customers in the marketplace did.
23         Q   Other Mallinckrodt wholesale distributor
24   customers of yours.

Page 313

1          A   You know, the customers you talk about,
2    we aren't the only ones selling product to them.
3    You make it sound like we are, but -- and we
4    didn't create these companies.  They were buying
5    from somebody else, but there may be -- may have
6    been a DEA quota issue for those companies.  I
7    don't know the -- yeah, ten years ago, I don't
8    remember.
9          Q   Why was it a good thing that
10   Mr. Cochrane didn't target pain clinics and
11   dispensing physicians?
12         A   Because he is highlighting that it's
13   a -- it looks like a messy business.
14         Q   Do you have any other understanding
15   about what that means?  What do you mean "messy
16   business"?
17         A   It looks like he's saying that's -- that
18   he's happy that they didn't pursue that business
19   model.  "Messy" is my word.  Perhaps that's wrong.
20         Q   And do you have any understanding of why
21   he would be happy about that?
22         A   I said it looks like he -- he's happy
23   they didn't pursue that.  "Messy" is my word.
24   It's nowhere in here.

Page 314

1  Q  And is the pain clinic and dispensing
2  physician business a messy one?
3       MR. TSAI:  Object to the form.
4       THE WITNESS:  Not if they have -- and
5  again, I shared this before:  DEA license, and a
6  patient that comes in for pain management products
7  for medicinal purposes, that's written by a doctor
8  with a DEA license.  You're talking about my
9  customer's customer's customer's customer.
10 BY MR. LOESER:
11  Q  Sir, I'm talking about the downstream
12 customers of your customers.  You have one
13 customer here telling you that he's sure glad he
14 didn't target pain clinics and dispensing
15 physicians, and at the other -- you have other
16 customers who did in fact target pain clinics and
17 dispensing physicians.
18      And I'm asking you why do you think it
19 was a good idea for KeySource not to target pain
20 clinics and dispensing physicians?
21  A  He's saying that.
22  Q  What is your understanding?  Why do you
23 think it's a good idea?
24  A  It's not a model that they wanted to get

Page 315

1  into.
2  Q  Because it's prone to diversion?  Is
3  that your understanding?
4       MR. TSAI:  Object to the form.
5       THE WITNESS:  I -- I've not said once
6  that a dispensing physician is prone for
7  diversion.  I don't know that to be accurate
8  because they've got a DEA license.  And they're
9  delivering and dispensing products to patients
10 that have a prescription in their hand from a
11 doctor with a DEA license.
12      (Borelli Exhibit No. 41 was marked
13      for identification.)
14      THE WITNESS:  Thank you.
15 BY MR. LOESER:
16  Q  I'm showing you what's been marked
17 Exhibit 41, which is an e-mail string.  The first
18 page from you to Dave Hoffman, with a cc to Steve
19 Cochrane, dated September 29th, 2010.
20      And if you go back to the beginning of
21 the string in the e-mail from Dave Hoffman to you
22 on September 3rd, 2010, the subject is "Chargeback
23 quantity of oxycodone 30," Hoffman writes to you:
24 "Vic, I have an account in Florida that is

Page 316

1  increasing their use of Mallinckrodt oxycodone
2  30 mg at a rapid pace.  In February of this year,
3  they provided me with a report on oxy 30 mg for
4  39,950 tablets.  The same report for the month of
5  July is 119,587 tablets.  Can you tell me if this
6  is the correct amount of oxy 30 showing up on
7  the chargebacks for him?  The name of the store is
8  PharmCo with an address in Florida."
9       Do you see that?
10  A  I do.
11  Q  And you take that information for
12 chargeback information from your client, you send
13 that to Kate Muhlenkamp, and you ask her:  "Can
14 you pull up the DEA number FP0784872 to see if
15 they pull our oxy 30 mg from anyone else than
16 KMI?"
17      That's KeySource, right?
18  A  Yes.
19  Q  "And what has their usage been for the
20 past 12 months?"
21  A  Yes.
22  Q  So you go into -- you ask Kate to go
23 into the chargeback system and provide you
24 information to respond to a client inquiry; is

Page 317

1  that right?
2  A  Yes.
3  Q  And then you forward that back to
4  Mr. Hoffman on September 29th, 2010, and you
5  write:  "Dave, sorry about the long delay on this.
6  I think this is what you wanted to review, this
7  information.  Let's talk.  P.S.," and you write,
8  "Shhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhh."
9       What's the P.S. about?
10  A  I have no idea.
11  Q  And why would you want him to keep quiet
12 about information you're providing to him from
13 Mallinckrodt's chargeback system?
14  A  I have no idea.
15      (Borelli Exhibit No. 42 was marked
16      for identification.)
17      THE WITNESS:  Thank you.
18 BY MR. LOESER:
19  Q  I'm showing you what's been marked
20 Exhibit 42, which is an e-mail dated January 10th,
21 2011, from you to Steve Cochrane.  The subject
22 line is "Re: KMI business review."
23      And if you look at the bottom of the
24 first page, there's an e-mail from you January 7,

Page 318

1 2011, to Michael Gunning, with a cc to Jane
2 Williams.
3        Who is Michael Gunning?
4    A  Mike -- Michael Gunning was the senior
5 vice -- I don't remember Mike's title, I'm sorry.
6 But I believe he was the senior vice president of
7 sales and marketing.
8    Q  For Mallinckrodt?
9    A  I'm sorry.  Yes, for Mallinckrodt.
10   Q  And you write Mike this message on
11 January 7th, 2000 -- sorry -- January 7th, 2011,
12 and you state: "Please find the business review
13 I'm going to present to KMI next week.  The sales
14 data is year over year," parentheses, "CY2009
15 versus CY2010," close parentheses.  "I know that
16 we talk about their skyrocketing oxycodone sales,
17 and, yes, while their volume has grown well over
18 year over year in the oxycodone family, i.e., 424
19 percent, their year over year sales on all their
20 families, excluding oxycodone, is up plus 216
21 percent.
22       "In addition to our growing our same
23 item sales on every single family year over year,
24 we are also able to add our only missing family,

Page 319

1 naltrexone, to our portfolio as well as gain
2 distribution on our fentanyl lozenge during the
3 introductory rollout time frame."
4        Do you see that?
5        So you're noting --
6    A  I do.
7    Q  -- skyrocketing -- you described them as
8 skyrocketing oxycodone sales; is that right?
9        Those are the words that you use?
10   A  I see it.
11   Q  Right.  You see where you wrote that
12 "KeySource's oxycodone sales are skyrocketing"?
13   A  I see it.
14   Q  Okay.  And then at the bottom of your
15 e-mail, you note:  "If there was ever a true
16 partner of ours in the industry, it's KeySource
17 Medical."
18       Why do you say that?
19   A  KeySource Medical supplied us with a lot
20 of price points in the marketplace, a lot of
21 competitive information, had a full and robust
22 portfolio of our products from us.  So our
23 distribution -- all of our items, not just our
24 oxycodone -- I think I highlight that, exclude oxy

Page 320

1 and they're up 216 percent -- so they buy all of
2 our products.  They share a lot of information and
3 they took on a new item.  So I call that a true
4 partner.
5    Q  And -- and among the products they
6 bought from you was skyrocketing purchases of
7 oxycodone, right?
8    A  That is one.
9    Q  Okay.  You don't describe the other
10 products that they're purchasing from you as
11 skyrocketing, right?
12   A  Well, I highlight that we're up 200 --
13 excluding oxycodone, we're up 216 percent.  I
14 could have written "skyrocketing" there as well.
15 I'm highlighting all --
16   Q  But you didn't do that, right?
17   A  You asked the question.
18   Q  You just wrote "skyrocketing" about
19 oxycodone?
20   A  Wait, you asked the question.
21       So I'm highlighting and giving some
22 background to Mike about the -- about this
23 organization and buying every molecule from us.
24   Q  They were a great customer.

Page 321

1    A  Scheduled and not scheduled.  They share
2 a world of information on price points.  They
3 share a world of information about competitors.
4 So that's a true partner.  There's a lot of things
5 that go into that.  Not just --
6    Q  What information did they share about
7 competitors?
8    A  You're talking ten years ago.  But if
9 they're having a new launch on a molecule.  If --
10 if Watson is coming out with atenolol, that's very
11 important for us to know.  If Aurobindo is coming
12 out with metformin, it's very, very important for
13 us to know these things so we know that they're
14 going to go after some of our accounts.  That's --
15 you know, not every account -- not every customer
16 does that.
17   Q  Did Mr. Cochrane share information with
18 you about other opioid manufacturers?
19   A  I believe so.
20   Q  Which ones?
21   A  Well, I mentioned that Watson on
22 atenolol.  It could be Watson on their molecules.
23 It could be KVK Tech.  It could be -- I don't
24 remember the specifics, but I'm sure he shared all

Page 322

1 items all the time.
2    Q   And how did Mallinckrodt use that
3 information?
4    A   I would pass it along to the sales as
5 well as the marketing team so they knew what
6 competitors are coming out with what items or
7 price points that are on the market.  These are
8 all important things for business.
9    Q   So among the other information about
10 Mallinckrodt's competitors that you were getting
11 from Mr. Cochrane was pricing information about
12 competitor products?
13    A   Sometimes.
14    Q   If we move up the string, you forward
15 your message to Mike Gunning to Mr. Cochrane.  So,
16 again, this is another example of you forwarding
17 an internal Mallinckrodt e-mail to your customer,
18 Mr. Cochrane, right?
19    A   Okay.
20    Q   And what you write to Mr. Cochrane on
21 January 7th, 2011, is: "Who loves ya baby?
22 Trying to give you some good press with the big
23 man.  These are the numbers we'll be talking to
24 so look / act surprised.  Thanks again for

Page 323

1 everything and I hope you have a great weekend."
2        Who's the big man that you're referring
3 to in this e-mail?
4    A   I'm going to assume it's Mike -- Michael
5 Gunning.
6    Q   Okay.  So you're sharing with your
7 customer the sales report summary that you gave to
8 your -- your boss.
9    A   I'm sharing with the customer what I
10 showed Mike, but I would be sharing with the
11 customer a week later, because I'm going to be
12 doing a year-over-year review.
13    Q   And when you tell him to look, act
14 surprised, is that because you probably shouldn't
15 be sending this information to him?
16        MR. TSAI:  Object to the form.
17        THE WITNESS:  No, I don't see -- what?
18 What do you mean?
19 BY MR. LOESER:
20    Q   Well, why would he need to look or act
21 surprised?
22    A   Not because I'm -- I would be showing it
23 to him a week later, so I -- I'm just giving him
24 some insight on what we're going to review.

Page 324

1    Q   Okay.  A little tip on the report that
2 he was going to get later?
3    A   I assume so.
4    Q   Okay.  Did anyone at Mallinckrodt ever
5 complain to you about your forwarding Mallinckrodt
6 e-mails to Mr. Cochrane?
7    A   Not -- not that I remember.
8    Q   Move up the chain, January 9th, 2011,
9 7:30 p.m., Mr. Cochrane e-mails you in response to
10 your "Who loves you, baby" e-mail:  "Thanks, bro.
11 Couldn't have done it without you.  On my flight
12 to Cincy right now.  Land in about 30 minutes.
13 Internet, First Class, unlimited beverages.  Only
14 thing missing is being able to stare at Jane's
15 rack the entire flight.  Guess you got me beat."
16        Do you see that?
17    A   I do.
18    Q   And what does he mean by he couldn't
19 have done it without you?
20    A   Well, it's a real business.  You've got
21 to have a salesperson that's making sure there's
22 inventory, making sure there's supply, making sure
23 that they're priced properly in the market to be
24 able to compete.  I don't know if all the sales

Page 325

1 managers -- I can't speak for them all, but I
2 don't know if all sales managers in the industry
3 do that.
4    Q   So you and Mr. Cochrane worked well
5 together, and based upon the tenor and content of
6 these e-mails, it looks like he was very
7 appreciative of what you did for him.
8        MR. TSAI:  Object to the form.
9        THE WITNESS:  I guess so.
10 BY MR. LOESER:
11    Q   Okay.  And the particular part of his
12 business that you noted was skyrocketing here
13 again was the oxycodone part.
14    A   I highlighted two parts of the business.
15 "Excluding oxycodone is up 216 percent," that's
16 quite well -- that's quite a big number as well.
17 I highlighted oxy specifically and called it out,
18 and his business is up overall quite well on all
19 items.
20    Q   Do you have any idea how much money
21 KeySource Medical made selling Mallinckrodt's
22 oxycodone?
23        MR. TSAI:  Object to the form.
24        THE WITNESS:  I didn't work at

Page 326

1  KeySource.  I have no idea.
2  BY MR. LOESER:
3      Q   Do you have any idea how much money
4  Mallinckrodt made selling oxycodone to KeySource?
5      A   No, not really.
6      Q   Now, who's the Jane that you're
7  discussing in your e-mail to Mr. Cochrane?
8          MR. TSAI:  Object to the form.
9          THE WITNESS:  Jane Williams.
10  BY MR. LOESER:
11     Q   And what was her position?
12     A   Vice president of sales.
13     Q   Was she your boss?
14     A   She was.
15         (Borelli Exhibit No. 43 was marked
16         for identification.)
17  BY MR. LOESER:
18     Q   I'm handing you what's been marked
19  Exhibit 43.  It's Bates No. MNK-T1_0000559925.
20  It's an e-mail from you, strangely enough, to
21  yourself.  Subject line "Oxycodone 30 milligram,"
22  Masters Mallinckrodt."
23         Is that what's in front of you, sir?
24     A   Yes.

Page 327

1      Q   And if you look down, it's another
2  e-mail from Mr. Cochrane to you dated January 25,
3  2011.  Subject "Oxycodone 30 milligram," Masters
4  Mallinckrodt."
5      And he writes:  "VB, call me about this
6  one when you have a minute -- when you have a
7  minute.  Ssshhhhhhhh, keep it on the down low.
8  Thank you, Steve."  And attached to that e-mail
9  is -- it looks like a purchase order.
10         Can you explain why this was sent to you
11  and why he wants you to keep it on the down low?
12     A   I don't believe this is a purchase
13  order.
14     Q   What is this?
15     A   It's -- this looks like a website page
16  that -- a MastersRx.com website page that's
17  highlighting a shipment process as well as a price
18  on a molecule.
19     Q   Okay.  Does this appear to be the
20  receipt of an online order of oxycodone
21  manufactured by Mallinckrodt?
22     A   I don't think so.  I don't -- I think
23  it -- I think it's what I said before.  I think
24  it's a snapshot of a website page with a product

Page 328

1  on it.
2      Q   And is it your understanding that
3  MastersRx.com was able to sell Mallinckrodt oxy 30
4  online?
5          MR. TSAI:  Object to the form.
6          THE WITNESS:  I don't know -- online,
7  I'm not -- I don't know what -- they're
8  highlighting product.  So I don't understand what
9  you mean by online.
10  BY MR. LOESER:
11     Q   Okay.  And you don't know why
12  Mr. Cochrane would be asking you to keep this
13  information on the down low.
14     A   Not on the down low, but this is part of
15  what I talked about before about competitive
16  information.  This looks like a web page.  I don't
17  know exactly, but it looks like a competitor of
18  theirs web page or an item that has a price on it.
19         (Borelli Exhibit No. 44 was marked
20         for identification.)
21  BY MR. LOESER:
22     Q   You've been handed Exhibit 44, which is
23  an article from WCPO Cincinnati, and it's called
24  "Analysis:  Meet the opioid wholesalers who became

Page 329

1  middlemen for the heroin epidemic."
2      Do you see that?
3      A   I do.
4      Q   And do you know if you've -- have you
5  seen this article before?
6      A   It doesn't look familiar.  But --
7  regarding articles today, I probably receive 40
8  articles a day of different clippings of different
9  Fierce Farmers, Drugstore News, drug topics, AA --
10  AAM information, wholesaler information.  Back
11  then I may have been receiving just as many, so if
12  I did receive this, okay.  I don't remember
13  receiving it, but I receive a lot.
14     Q   Okay.  Well, let's --
15         MR. TSAI:  Can I have a standing
16  objection to this exhibit and all the questions?
17         MR. LOESER:  Sure.
18  BY MR. LOESER:
19     Q   Let's turn to the -- go in to the
20  seventh page.  There's some information -- this is
21  an article about wholesalers, which Mallinckrodt's
22  customers were wholesalers, and there's a
23  discussion of -- in this article, a couple of the
24  Ohio-based wholesalers that were Mallinckrodt

| Page 330 | Page 332 |
|---|---|
| 1 customers and your customer, one is Masters and<br>2 the other is KeySource, and I want to ask you some<br>3 questions about the information in here to see<br>4 if --<br>5    A  Okay.<br>6    Q  -- it's consistent with your<br>7 understanding from when they were your customer.<br>8    A  Where does it show the page?<br>9    Q  You just have to flip in seven pages or<br>10 you flip in one; two, three, and it will be the<br>11 fourth page. There you go.<br>12    A  Okay.<br>13    Q  So if you see there's a heading in the<br>14 middle of the page, "Still selling even as DEA<br>15 investigates." And if you go down three<br>16 paragraphs, it states: "KeySource Medical is a<br>17 relatively" -- I'm sorry, "relatively small<br>18 independent drug supplier operating out of just<br>19 one facility in Blue Ash."<br>20      Were you aware of that when KeySource<br>21 was your customer?<br>22    A  That they operated in Blue Ash?<br>23    Q  Correct.<br>24    A  I thought it was Cincinnati. | 1 BY MR. LOESER:<br>2    Q  Sir, I'm asking you about the language<br>3 in this article. Were you aware that KeySource<br>4 specialized in generic hydrocodone and oxycodone<br>5 when KeySource was your customer?<br>6    A  Specializing in that, no. They've<br>7 had -- they have seven or 800 molecules in their<br>8 warehouse all the time. So was I aware of these<br>9 two of the 800 molecules? No. No.<br>10    Q  And were you aware that KeySource became<br>11 one of the top wholesalers of pain pills to<br>12 Florida pharmacies at the time that KeySource was<br>13 your customer?<br>14    A  No.<br>15    Q  And if you move down, the article<br>16 states: "In a two-year period, KeySource sold<br>17 more than 59 million doses of oxycodone to<br>18 customers in 40 states, the DEA said. The vast<br>19 majority of that, 78 percent was sold to<br>20 pharmacies in Florida, which was known as a haven<br>21 for pill mills, the DEA said."<br>22      At the time KeySource was your customer,<br>23 were you aware that KeySource sold more than 59<br>24 million doses of oxycodone to customers in 40 |

| Page 331 | Page 333 |
|---|---|
| 1    Q  Okay. Ohio, nonetheless?<br>2    A  Yes.<br>3    Q  And you knew they were a small<br>4 independent drug supplier, correct?<br>5    A  Yes.<br>6    Q  And moving to the next paragraph, it<br>7 says: "KeySource specialized in generic<br>8 hydrocodone and oxycodone, which the DEA calls the<br>9 most widely abused pills in the country. Although<br>10 it is a relatively small supplier, KeySource<br>11 became one of the top wholesalers of pain pills to<br>12 Florida pharmacies, the DEA said."<br>13      Is that something that you were aware of<br>14 during the time that you worked for Mallinckrodt?<br>15    A  I don't know this article. So --<br>16    Q  But do you know this -- these facts,<br>17 based on KeySource being a customer that you<br>18 worked very closely with and a customer that<br>19 indicated that it couldn't have done it without<br>20 you?<br>21      MR. TSAI: Object to the form.<br>22      THE WITNESS: You're referencing a note<br>23 that he sent me about a business review on all of<br>24 our products. | 1 states?<br>2      MR. TSAI: Object to the form.<br>3      THE WITNESS: I don't know how many<br>4 doses they sold, and when they sell the product,<br>5 whether it be atenolol, lisinopril or hydrocodone,<br>6 I don't know where they ship it to.<br>7 BY MR. LOESER:<br>8    Q  Okay. And were you aware that 78<br>9 percent of the oxycodone that KeySource purchased<br>10 was sold to pharmacies in Florida?<br>11      MR. TSAI: Object to the form.<br>12      THE WITNESS: No, I wasn't.<br>13 BY MR. LOESER:<br>14    Q  And were you -- was Mallinckrodt<br>15 KeySource's sole supplier of oxycodone?<br>16    A  I don't believe so.<br>17    Q  Okay. Who do you think the other<br>18 suppliers were?<br>19    A  I'm not sure. Actavis, Watson, KVK<br>20 Tech. I'm not sure, but I don't believe we were<br>21 the sole supplier.<br>22    Q  Moving in the article, it says: "Some<br>23 of those pills made their way back to Ohio and<br>24 Kentucky via what DEA officials call the Florida |

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  pipeline or the OxyContin Express.  Drugs
2  traffickers would hire people to drive to pill
3  mills in Florida every two weeks or so, buy
4  oxycodone for $40 a bottle, drive it back to Ohio
5  or Kentucky, and sell it on the black market for
6  $1500 a bottle, according to a DEA narrative."
7       Is that something that you were aware of
8  from the articles and other information that we
9  went through earlier at the time that KeySource
10 was your customer?
11      MR. TSAI:  Object to the form.
12      THE WITNESS:  No, I don't know any of
13 these specifics at all.
14 BY MR. LOESER:
15      Q   Is that something you ever investigated
16 or looked into when KeySource was your customer?
17      A   Looked into what, if they -- looked into
18 what?
19      Q   Looked into Mallinckrodt pills sold by
20 your customer to Florida pharmacies leaving
21 Florida and traveling to other states such as Ohio
22 and Kentucky.
23      A   I don't know how I could do that.  I
24 don't know how I could, one, know where they ship

Page 335

1  it to.  Two is how it gets dispensed to a patient,
2  and then what that patient -- you're asking me to
3  know what the patient does with it?
4       Q   No, sir.  You absolutely can know where
5  your wholesale distributor customers ship their
6  product, right?  We went through reams of
7  materials showing that that information is in the
8  chargeback system.  Right?
9       A   Which is something that I was not
10 involved with, the chargeback data.
11      Q   I'm asking you as you investigated this.
12 So did you look into, for example, in any detail
13 where your customers shipped their product?
14      A   At times, yes.
15      Q   And so did you look into whether product
16 that your customers shipped to Florida was being
17 diverted and driven to other states?
18      A   You asked two questions there.  So there
19 were chargeback -- there was chargeback data
20 regarding Florida sales throughout the pages you
21 supplied.  But I have no idea how that product is
22 used by that patient.  Driven on the Florida
23 pipeline, bought for $40, sold for $1500, no -- no
24 idea.

Page 336

1       Q   So you had access to information showing
2  that clients were sending most of their pills to
3  Florida, right?
4       MR. TSAI:  Object to the form.
5       THE WITNESS:  Not direct access.
6  BY MR. LOESER:
7       Q   Okay.  But access if you wanted it.
8       A   Not direct access.
9       Q   Okay.  Sir, did you have any access at
10 all?
11      A   I had to go to the chargeback department
12 or marketing department or somebody else to get
13 that information.
14      Q   Okay.  And from all of the articles we
15 looked at, it's your recollection as you sit here
16 today that you were not aware that pills were
17 migrating out of Florida from pain clinics and
18 dispensing physicians?  Is that new information to
19 you?
20      A   I shared with you a moment ago, I have
21 no idea what a patient does once they bring a
22 prescription into a pharmacy and receive their
23 medicine, prescribed.  What they do with it, how
24 would I possibly know that?

Page 337

1       Q   And, Mr. Borelli, I'm not asking you
2  about any specific patient.  I'm asking you
3  whether you were aware -- you were aware of the
4  phenomenon of people coming from out of state into
5  Florida and leaving the state with oxycodone
6  distributed by Florida pain clinics.  Was that a
7  phenomenon you were aware of when you worked at
8  Mallinckrodt?
9       A   I heard about it.  I think we -- you
10 shared articles about it that were sent to me,
11 so --
12      Q   Moving further in this article, it
13 notes: "In 2011, the DEA raided KeySource Blue
14 Ash office and ceased sales records, e-mails and
15 letters.  It suspended the company's license to
16 sell narcotics," quote, "to stop KMA -- KMI from
17 adding any more fuel to the flame of what is an
18 imminent and serious public health problem,"
19 period, end quote.  "KeySource was," quote,
20 "sending tens of millions of pills of oxycodone
21 into Florida, the national epicenter of the pill
22 problem, a DEA investigator said in court
23 documents."
24      Now, do you recall when the DEA shut

Page 338

1 down KeySource?
2     A   I do not.
3     Q   Did you read any information at the
4 time -- were you curious to know why that
5 happened?
6     A   What?
7     Q   Why the DEA shut down KeySource.
8     A   Of course.
9     Q   And what steps did you take when you
10 learned that to figure out what happened to all of
11 the oxycodone that you sold KeySource that was
12 shipped to Florida?
13         MR. TSAI:  Object to the form.
14         THE WITNESS:  I can't remember what I
15 did back then.
16         MR. TSAI:  It's been another interval.
17 An okay time to take a break?
18         MR. LOESER:  What is the time remaining?
19         THE VIDEOGRAPHER:  6:14 runtime, so 46
20 minutes left.
21         MR. LOESER:  Sure.  If it could be a
22 short one, I would appreciate it.
23         THE VIDEOGRAPHER:  The time is 5:08 p.m.
24 We're going off the record.

Page 339

1         (Recess.)
2         THE VIDEOGRAPHER:  The time is 5:19 p.m.
3 We're back on the record.
4 BY MR. LOESER:
5     Q   Mr. Borelli, do you know what a pill
6 mill is?
7     A   I've heard of the term, but I don't know
8 what it is.
9     Q   And do you have any understanding of how
10 pill mills contributed to the opioid epidemic?
11     A   Again, I've heard the term.  So a
12 pharmacy, I'm going to guess, but no.
13     Q   You didn't receive any training when you
14 were at Mallinckrodt on what a pill mill was?
15     A   On what a pill mill looks like or was?
16     Q   On what -- what it does.  How to
17 identify one.
18     A   I don't believe so.  I don't remember,
19 but --
20         (Borelli Exhibit No. 45 was marked
21         for identification.)
22 BY MR. LOESER:
23     Q   I'm showing you what's been marked
24 Exhibit 45, which is an e-mail string.

Page 340

1 MNK-T1_0000565624.  And the top of the string is
2 an e-mail from John Adams to you dated 11/13/2008.
3         Is that what's in front of you, sir?
4     A   It is.
5     Q   And if you go to the second page of that
6 exhibit, there's an e-mail from you to Kate
7 Muhlenkamp and Rebecca Coyner with the subject
8 "Oxy 15 mg and oxy 30 mg."  Do you see that?
9     A   I do.
10     Q   And that's dated November 12th, 2008.
11 And in your e-mail you write:  "Help.  Both
12 Sunrise Wholesalers and Masters Pharmaceuticals
13 are out of both our oxy 15 mg and oxy 30 mg and
14 have orders in the house on back order.  Sunrise
15 has both PO 259 and 261 on back order" --
16         Do you know what PO 259 and 261 were?
17     A   No.
18     Q   -- "and are bone dry on all products
19 listed on both POs.  We have displaced all
20 competitors at this account, and they are relying
21 on our supply to cover their demand.  If we don't
22 ship, they can't sell anything."
23         Do you see that?
24     A   I do.

Page 341

1     Q   So as of this date, November 12th, 2008,
2 you were Sunrise's sole supplier of oxy 15 and 30?
3     A   It reads that way.
4     Q   So when we look at statistics for the
5 percentage of oxy sold by Sunrise in Florida
6 during this time frame, all of that oxy would have
7 been oxy manufactured by Mallinckrodt and provided
8 to Sunrise, correct?
9     A   At this time, yes.
10         And that's a business model they have or
11 customers have to go with one vendor or go with
12 multiple.
13     Q   And if you are the sole supplier of oxy
14 to your customer, you know what your customer does
15 with all of the oxy that it ships, correct?
16     A   If we displaced a competitor, we would
17 be filling the POs for our customer.  What they --
18 you just asked the question of if -- would I know
19 what they do with the product.  I do not.
20     Q   No, sir, I asked you if you are the sole
21 supplier of oxy to your customer, do you know what
22 your customer does with all of the oxy that it
23 ships.  And by "you," I mean Mallinckrodt has the
24 information.  If Mallinckrodt is the sole supplier

Page 342

1  of oxy to Sunrise, then Mallinckrodt can look in
2  its chargeback system and see what Sunrise does
3  with that oxy, and therefore know what Sunrise
4  does with any oxy that it sells, correct?
5      MR. TSAI: Object to the form.
6      THE WITNESS: That's a -- that's a long
7  process, right. The -- to know where they ship it
8  is -- via the chargeback system which -- gosh,
9  that could be a -- it could be a month or two
10  months, maybe three months' timeline.
11 BY MR. LOESER:
12     Q   And Mallinckrodt has that information in
13  its chargeback system, correct?
14     A   I believe so.
15         (Borelli Exhibit No. 46 was marked
16         for identification.)
17 BY MR. LOESER:
18     Q   Now you're looking at what's been marked
19  Exhibit 46. This is an e-mail from you to John
20  Adams dated 11/14/2008. And the subject line is
21  "Re: Oxy 15 mg and 30 mg at Sunrise."
22         Do you see that?
23     A   I do.
24     Q   And if you move down to the middle of

Page 343

1  that page, there is an e-mail from you to John
2  Adams, November 14th, 2008, 3:19 p.m., part of the
3  same string.
4          And you write about Sunrise: "Got it.
5  It may not be a large jump, but it will be steady.
6  I met the new salesman, and he was the number one
7  salesman for Anda. Fast talker. Has systems in
8  place and knows how to do his job. I'll tell you
9  a good story about what happened during our
10  meetings this week when we get together. He is
11  bringing on new pain management clinics, more
12  dispensing physicians, and even some pharmacies
13  since starting at Sunrise six weeks ago. He is
14  spearheading the new sales team and some new
15  states as well."
16         Do you see that?
17     A   I do.
18     Q   And so you knew about Sunrise as of
19  November 14th, 2008, that Sunrise was bringing on
20  new pain management clinics and more dispensing
21  physicians, right?
22     A   That's what I wrote.
23     Q   And if you turn the page, at the bottom
24  of the page there is an e-mail from you to Kate

Page 344

1  Muhlenkamp, with a cc to John Adams, and you're
2  explaining your customer Sunrise and you note:
3  "Just a quick FYI regarding Sunrise. As you know,
4  they have been growing in sales each and every
5  month, and when I was visiting them this week,
6  they introduced me to their new sales manager.
7  He's -- he was Anda's number one salesman and
8  brings a wealth of knowledge and systems to
9  Sunrise. This salesman is extremely tied into the
10  Florida market and has been the cause of most of
11  the growth, new customers, contacts, et cetera."
12         Do you see that?
13     A   I do.
14     Q   And this is the sales -- same salesman
15  that you're referring to in the prior e-mail that
16  I read, right?
17     A   I believe so.
18     Q   And this is the salesman that is
19  bringing on new pain management clinics and more
20  dispensing physicians for Sunrise, correct?
21     A   He is bringing on new states, pharmacies
22  as well.
23     Q   And you mention a story, a good story
24  about what happened during your meeting. Do you

Page 345

1  recall what that was?
2      A   I do not. Sorry.
3          (Borelli Exhibit No. 47 was marked
4          for identification.)
5          THE WITNESS: You know -- well, go
6  ahead. I'm sorry.
7  BY MR. LOESER:
8      Q   You are looking at what's been marked
9  Exhibit 46 --
10         THE REPORTER: 47.
11 BY MR. LOESER:
12     Q   I'm sorry, 47. And this is an e-mail
13  string, the top of which is an e-mail from you to
14  John Adams dated 11/14/2008. And again it's "Oxy
15  15 mg and 30 mg at Sunrise."
16     A   It's from what? Can you say that again?
17  It's from --
18     Q   The subject line. It's from you to John
19  Adams. Do you see that?
20     A   It's from -- I'm sorry. It's from Sara
21  Heideman to Kate Neely. Am I -- thank you.
22     Q   You're correct, Mr. Borelli. This is an
23  e-mail from Sara Heideman to Kate Muhlenkamp, with
24  a cc to you. And if you look down that e-mail,

Page 346

1 there's an e-mail from you to Kate Muhlenkamp
2 dated February 23rd, 2009.
3          Do you see that?
4     A   I do.
5     Q   And you write: "On a separate note, I
6 need your help on something.  I know we are hand
7 to mouth on oxy 15 and 30 mg SKUs, but I am
8 putting Sunrise Wholesale in a tough position.
9 They used to buy their product from Masters (both
10 Actavis and Ethex) because we don't allow a
11 distributor to ship to a distributor.  Then we
12 opened them up directly, so they were pulling 90
13 percent of their business directly from us on the
14 15 and 30 mg, with some backup from Ethex (again
15 via Masters).  In the meantime, both Actavis and
16 Ethex are out of the market, and we are hand to
17 mouth.  We are 80 percent of their total business.
18 They specialize on pain management products at
19 both dispensing physicians and pain clinic
20 business, so we are truly their only avenue of
21 resource.  They are a small business and need our
22 help."
23          Is that -- did I read that accurately?
24     A   You did.

Page 347

1     Q   And from this, it's clear that you know
2 that Sunrise is specializing on pain management
3 products at both dispensing physician and pain
4 clinic businesses; is that correct?
5     A   That is correct.
6     Q   And you implore Mallinkrop --
7 Mallinckrodt to help Sunrise because it's a small
8 business, and as you state, they need your help;
9 is that right?
10     A   I think I implore them because the
11 customer put all of their eggs in one basket, us.
12     Q   Not all their eggs, sir, but their eggs
13 for oxy 15 and 30, correct?
14     A   On those two, they discontinued, and
15 those two cust- -- those two -- those two
16 companies, Actavis and Ethex, were competitors.
17 So they were pulling from -- they were using those
18 as their resource, and they moved to us.  And I
19 shared that part of my job is to manage
20 back orders, handle customer service or supply
21 issues, and inventory is critical.
22     Q   And so when --
23     A   So we didn't create this business.  They
24 were buying it, it looks like, from Actavis and

Page 348

1 Ethex, and we took over that position as primary
2 from those two vendors.
3     Q   And as you say, they're relying on you
4 for their products, and they were specializing in
5 pain management products at both the dispensing
6 physician and pain management clinic business,
7 correct?  That's the information contained in this
8 e-mail.
9          And I take it that Mallinckrodt --
10 Mallinckrodt did try and help Sunrise by shipping
11 all the product that it had available to ship to
12 them.
13     A   I don't know that.  Does it say that,
14 that we shipped this?
15     Q   Well, it was your customer, sir.  Did
16 you stop shipping oxy 15 and 30 to -- to Sunrise?
17     A   I don't know every --
18     Q   In 2009?
19     A   I don't know every PO.  I don't know
20 every order that my customers placed from nine
21 years ago.  So I don't know if we shipped this.  I
22 don't know if we shipped this in full.  I don't
23 know.
24     Q   Okay.  And what I'm asking about, sir,

Page 349

1 is your knowledge of who their downstream
2 customers were, and according to this e-mail, you
3 knew quite well that their downstream customers
4 were -- their specialization was on pain
5 management products at both dispensing physicians
6 and pain clinics.
7          And you were clear about that, right?
8     A   That was their business model.  That's
9 who Louis Fisher vetted -- the DEA agent vetted to
10 be proper customers for them.  That would be a
11 customer's customer from me, and I wouldn't know
12 that.
13     Q   Though, of course, Mallinckrodt had
14 access to that information, right?
15     A   Chargebacks.
16          (Borelli Exhibit No. 48 was marked
17          for identification.)
18 BY MR. LOESER:
19     Q   I'm showing you what's been marked
20 Exhibit 48.  This is an e-mail string between you
21 and Mr. Gunning dated July 9th, 2009.  Subject
22 line is "Re: Sunrise follow-up."
23          And if you go down to the second e-mail
24 on the page, Mr. Adams writes to you: "I wanted

Page 350

1 to follow up on the meeting with Karen Harper,
2 Bill Ratliff and others regarding the potential
3 issues for oxy 30. The initial tenor of the call
4 relative to suspicion and due diligence of Sunrise
5 Wholesale was quickly diffused by your initiative,
6 and I want to thank you. The information was
7 vital, and the presentation of it was fantastic,
8 not defensive or emotional, which could be
9 possible given the dollars at stake."
10     If we move down to the third paragraph,
11 he writes: "Second, you had information at your
12 fingertips and even referenced that you had
13 reports run two months ago to isolate what
14 customers Sunrise was selling to and the volumes."
15     So, sir, as of this date, July 9th,
16 2009, you had in fact looked into the customers
17 that Sunrise was selling to; is that right?
18     A   To a point, yes.
19     Q   And you knew, and your colleagues at
20 Mallinckrodt knew, that Sunrise was selling to
21 pain management -- selling pain management
22 products at both dispensing physicians and pain
23 clinics, correct?
24     A   So I did not know who they were selling

Page 351

1 to. I think before I already -- it was
2 highlighted that they opened up pharmacies as
3 well. But I don't know the specifics of who they
4 sold to. And I think at this meeting -- I
5 don't -- well, Louis Fisher was available and
6 present, and then our suspicious order monitoring
7 team was present as well.
8     Q   Well, sir, the information that you had
9 at your fingertips, which you're being praised for
10 having, was information about the customers
11 Sunrise was selling to and the volumes; is that
12 correct?
13     A   Yes.
14     (Borelli Exhibit No. 49 was marked
15     for identification.)
16 BY MR. LOESER:
17     Q   Mr. Borelli, you've been handed
18 Exhibit 49, which is an e-mail string. The front
19 of that is an e-mail from Kate Muhlenkamp to
20 Michael Gunning. It's dated 6/3/2008. Subject:
21 "Forwarding oxy monthly usage."
22     Do you see that?
23     A   I do.
24     Q   And in this e-mail string, there's a

Page 352

1 discussion that starts with the last e-mail in the
2 string, which is from you to Kate Muhlenkamp, the
3 subject is "Oxy monthly usage."
4     Do you see that?
5     A   I do. I'm going to read the entire
6 e-mail. You're picking and choosing pieces of
7 e-mails, so I'm going to read this e-mail if you
8 don't mind.
9     Q   Sure.
10     A   So I can understand the context a little
11 better than pieces.
12     (Peruses document.) Okay.
13     Q   Mr. Borelli, if you go to the second to
14 last page, you'll see an e-mail from you to Kate
15 Muhlenkamp, subject: "Oxy monthly usage," and you
16 write: "Kate, per your request, here are my
17 larger customers' monthly volumes by item," and
18 you list Masters, KeySource, Sunrise and NCM; is
19 that right?
20     A   Yes.
21     Q   And for each of them, and this is as of
22 June 2nd, 2008, you list the amount of oxy 15 and
23 30 that your customers are buying; is that right?
24     A   Yes.

Page 353

1     Q   And who is NCM?
2     A   North Carolina Mutual.
3     Q   So your customers, Masters, KeySource,
4 Sunrise, NCM, to your knowledge, which one of
5 those -- which of those customers had their DEA
6 registrations suspended during the time that you
7 worked for Mallinckrodt?
8     A   I'm not sure about the suspensions for
9 all these accounts. Again, I shared with you
10 before that Sunrise, I didn't know it was
11 suspended. NCM, no. KeySource and Masters, to my
12 knowledge -- I'm not quite sure about Masters
13 either.
14     Q   So you're not sure, sir, or you don't
15 recall which of your customers had their DEA
16 licenses suspended while you worked for
17 Mallinckrodt?
18     A   You asked me which of these were. I'm
19 not sure about Masters. KeySource had. I'm not
20 sure about Sunrise. Like I -- like I said before,
21 I believe that -- I don't know if it was
22 suspended. I don't believe NC Mutual is. But
23 there's -- that's all.
24     Q   Right. There's other customers as well

Page 354

1 and they're not on this list.
2       If you could turn to the next page --
3 the prior page there's an e-mail from Kate
4 Muhlenkamp to you dated June 2nd, 2008.
5 MNK-T1_0000562702.
6       And she writes to you:  "Vic, these
7 usages account for 10 percent of the 15 and 30 mg
8 market, and in the case of the 30 mg, are
9 significantly higher than those of Cardinal, who
10 we have on source.  These look very high and are
11 concerning to me.  We need to talk as I don't know
12 that I feel comfortable shipping them at such high
13 levels.  Do we know where the product is going?
14 We need to discuss."
15       Do you see that, sir?
16    A    I do.
17    Q    And you responded to Ms. Muhlenkamp's
18 e-mail on June 2nd, 2008, and you write:  "Kate,
19 the only places that they, Masters, can ship the
20 product to are authorized customers that we
21 approve from the chargebacks group."  Is that
22 right?
23    A    That's what it says.
24    Q    So what you're telling Ms. Muhlenkamp is

Page 355

1 that Mallinckrodt knows precisely who its
2 downstream customers are, because they are
3 approved from the chargeback group, right?
4    A    From the chargeback group, yes.
5    Q    And in fact, am I correct to read into
6 this that you're a little defensive about this and
7 perhaps offended that there's a suggestion that
8 you don't know where your customer is shipping its
9 product?
10       MR. TSAI:  Object to the form.
11       THE WITNESS:  I don't read that that
12 way.
13 BY MR. LOESER:
14    Q    Okay.  But, nonetheless, when she asks
15 you do you -- do we know where the product is
16 going, you respond yes.
17    A    I'm looking for the word "yes."
18    Q    Okay.  Well, I'm interpreting, but why
19 don't we just go with the language again that is
20 here.
21       You responded:  "The only places that
22 they, Masters, can ship the product to are
23 authorized customers that we approve from the
24 chargebacks group."

Page 356

1       That was your answer to her question,
2 right?
3    A    I trying --
4    Q    Let me make it shorter, sir.  What I
5 just read was what you wrote at the beginning of
6 your e-mail, correct?
7    A    Yes, I wrote that.  But I'm trying to
8 understand the context of the e-mail and what I'm
9 responding to, and it's not right away, and
10 it's -- and in her e-mail, she's highlighting
11 Masters specifically.  And, you know, volume
12 changes when you are primary -- sole primary.
13 So...
14    Q    Okay.  And you're explaining to her
15 why -- your understanding of why Masters' business
16 was growing so much that she would write to you
17 that the numbers look very high and they're
18 concerning to her, and you're providing her with
19 an explanation.
20    A    I don't think it's specific to Masters,
21 but, you know, I highlight that other vendors that
22 were selling to them are out of stock.  So a
23 number of reasons tie into that usage.
24       (Borelli Exhibit No. 50 was marked

Page 357

1       for identification.)
2       THE WITNESS:  Thank you.
3 BY MR. LOESER:
4    Q    Mr. Borelli, you've been handed what's
5 marked Exhibit 50.  MNK-T1_0000565518.  This is an
6 e-mail from you to Kate Muhlenkamp, with a cc to
7 John Adams.  The subject is "Masters oxy 30."
8       Do you see that, sir?
9    A    I do.
10    Q    And you write in this e-mail:  "Kate,
11 Masters just received their weekly 8,000 bottle
12 order this morning, and they have sold through it
13 already."  Parentheses, "I know, incredible.  This
14 has been happening week in/week out, and basically
15 they've been out of stock 80 percent of the week
16 due to the explosion on this item.  They want to
17 know if they can move away from their 8,000 bottle
18 a week number to more (i.e., 36,000 bottles a
19 month commitment).  I have done some groundwork
20 with them in that if we boost our supply up, then
21 we are guaranteeing our primary status going
22 forward, and Actavis is not.  There will be some
23 pulls on Actavis when they get back in business,
24 but we will be 90 -- we will be the 90/10 rule

Page 358

1  versus them because of what we have done for
2  them."
3      Do you see that?
4      A  I do.
5      Q  And so you're noting for Kate that they
6  are -- you described their sales as incredible,
7  right?
8      A  I think I'm describing that we displaced
9  the competitor.
10     Q  Okay.  And you use the word "incredible"
11 to describe their sales.  Right?
12     A  So I'm -- I'm highlighting that we
13 displaced another vendor that had the business
14 that we displaced.  I shared before about supply
15 being critical for medicine, for prescription
16 drugs.  So if you're out of stock, you're out of
17 business.
18     Q  Let me -- let me ask you again, sir,
19 based on what you actually wrote.  You said:
20 "Masters just received their weekly 8,000 bottle
21 order this morning, and they have sold through it
22 already.  I know, incredible."
23     The "incredible" that you wrote there
24 refers to the fact that they already sold their

Page 359

1  8,000 bottle order; isn't that right?
2      A  The "incredible" refers to sell through.
3      Q  And when you say "the explosion on this
4  item," the item we're talking about is oxy 30; is
5  that right?
6      A  Yes.
7      Q  Now, down the e-mail farther, you give
8  an explanation as to why you believe the exploding
9  volume of sales are sustainable.  Do you see that?
10     A  I do.
11     Q  And if you look at your list that you
12 wrote and you go down to the fourth item, could
13 you please read that item.
14     A  "Targeted sales team that is focusing on
15 dispensing physicians and pain management centers
16 throughout the country."
17     Q  Mr. Borelli, you previously testified
18 that no one in this room cares more about where
19 Mallinckrodt's products is going than you.
20     A  That's correct.
21     Q  So the record is clear, please tell the
22 jury what you did as the director of national
23 accounts for Mallinckrodt to ensure that
24 Mallinckrodt's products were not being diverted.

Page 360

1      MR. TSAI:  Object to the form of the
2  question.
3  BY MR. LOESER:
4      Q  And, sir, let me add to that, I'm not
5  asking you for what you think others on your team
6  did or what the DEA did.  I want the jury to hear
7  what you did to prevent diversion.
8      MR. TSAI:  Object to the form of the
9  question.
10     THE WITNESS:  Well, visiting with the
11 customer to understand their business model.
12 Highlighting why this item has growth because
13 other items in the market are out of the market.
14 CSOS -- highlighting CSOS, which is a monitoring
15 system that the customer put in place.  The
16 customer increased their sales team.  It says here
17 by --
18 BY MR. LOESER:
19     Q  I'm sorry, sir.  I should have made this
20 clearer.  I'm not asking you about that document,
21 so we can put that --
22     A  Oh.
23     Q  -- put that document aside.  It'll
24 probably make it easier to answer my question.

Page 361

1      Would you like me to read the question
2  again?
3      A  Sure.
4      Q  So the record is clear, please tell the
5  jury what you did as the director of national
6  accounts for Mallinckrodt to ensure that
7  Mallinckrodt's products were not being diverted.
8      MR. TSAI:  Object to the form of the
9  question.
10     Go ahead.
11     THE WITNESS:  Again, I don't know where
12 the customer that I sell to ships.  But when I
13 visit with accounts, you can -- you try to get a
14 feeling for or see who they're marketing to.
15 BY MR. LOESER:
16     Q  And -- and how often would you visit
17 your distributor customers?
18     A  And I'm not quite sure.  Three times,
19 four times a year, six times a year.  I'm not
20 sure.  It depends on the account.
21     Q  And when you visited them, did you
22 collect information about their downstream
23 customers?
24     A  I would try to.

Page 362

1    Q    And how would you do that?

2    A    In meetings, conversations.

3    Q    And so you visited Sunrise a number of
4  times?

5    A    I don't know how many times, but I
6  believe I did visit with them a number of times.
7  I'm not sure of the number.

8    Q    And KeySource a number of times?

9    A    I believe so.

10    Q    And Masters a number of times?

11    A    That's right.

12    Q    And did you at any point recommend that
13  KeySource, Masters or Sunrise be suspended as
14  customers of Mallinckrodt?

15    A    I think in -- not -- no e-mails you
16  showed, and there were some instances that we
17  didn't talk about, isolated pieces that you didn't
18  ask about.  But how I shared with our organization
19  that if any of these accounts or any of our
20  accounts are doing something wrong, we should call
21  them out; we should cut them off.

22    Q    And, sir, did you --

23    A    Yeah, I think -- let me finish.

24        So I do think I did those things on our

Page 363

1  organization's behalf regularly.

2    Q    And did you ever recommend that
3  KeySource be cut off as a customer?

4    A    I don't remember.

5    Q    And did you ever recommend that Masters
6  be cut off as a customer?

7    A    I don't remember.

8    Q    Do you -- did you ever recommend that
9  Sunrise be cut off as a customer?

10    A    I don't remember.

11    Q    So you have no memory of recommending
12  that any of your main customers that bought oxy 30
13  from you be cut off as customers?

14    A    Well, these -- you highlight these as my
15  main customers.  I managed Walgreens, CVS, as well
16  as AmerisourceBergen, and these customers have
17  national accounts.  They service the entire
18  country.  So I had a lot of accounts.

19    Q    And you didn't recommend that any of
20  those accounts be cut off as customers of
21  Mallinckrodt, did you?

22    A    I don't know if I did or didn't.

23    Q    That's not something that you would
24  remember?

Page 364

1        MR. TSAI:  Object to the form.

2        THE WITNESS:  I said I don't know if I
3  did or didn't.

4  BY MR. LOESER:

5    Q    And if you did, is that something that
6  would be reflected in e-mail and other records?

7    A    Probably.

8    Q    And so if it's not there, it likely
9  didn't happen?

10    A    I didn't say that.  I would -- I could
11  have had a conversation with someone about it as
12  well.

13    Q    But sitting here today, having been
14  through all of the records that we put in front of
15  you, you can't recall ever recommending that a
16  customer be suspended by Mallinckrodt; isn't that
17  true?

18    A    I think I did highlight some prevention
19  in a few of these e-mails that we didn't go over,
20  and these e-mails are this big (demonstrating),
21  half of an inch.  I've got to think there's 30
22  feet, a hundred feet of e-mails.  So do I know
23  what I put in all my e-mails today here, nine
24  years, ten years later?  I do not.

Page 365

1    Q    But of the customers --

2    A    But do I think I recommended to take
3  action on customers, yes, I do.

4    Q    Of the customers that were -- that
5  purchased the most oxy from Mallinckrodt that were
6  your customers, did you ever recommend that any of
7  them be suspended as Mallinckrodt customers?

8    A    I don't --

9    Q    Did you ever recommend that Mallinckrodt
10  stop selling oxy to any of your customers that
11  purchased the most oxy of your customers?

12    A    I don't know if I did or not.  I very
13  well may have.

14    Q    We talked about your involvement in the
15  shipment of 360 bottles -- 36 bottles a month of
16  oxy 15 to Dane Drug for Heather Goodman's Aunt
17  Sandra.

18        Do you recall that conversation?

19    A    Earlier today, yes.

20    Q    And did anyone at Mallinckrodt ever
21  criticize you or discipline you in any -- in any
22  way in connection with that order?

23    A    I don't remember.

24    Q    So as far as you know, Mallinckrodt had

Page 366

1  no problem with the 36 bottles a month being
2  allocated for Aunt Sandra at Dane Drug?
3       MR. TSAI:  Object to the form.
4       THE WITNESS:  I don't know if there were
5  36 bottles a month for that woman at that
6  pharmacy.  I don't know if that ever came to
7  fruition or not.  It never -- I don't you -- did
8  you show me that?  That the -- I don't remember
9  seeing that.
10 BY MR. LOESER:
11      Q   And if those pills were made available
12 at Dane Drug, if those pills were shipped by
13 KeySource to Dane Drug, that would be reflected in
14 the chargeback system, correct?
15      MR. TSAI:  Object to the form.
16      THE WITNESS:  I imagine so.
17      MR. LOESER:  Let me go off the record.
18      THE VIDEOGRAPHER:  The time is 5:53 p.m.
19 We're going off the record.
20      (Recess.)
21      THE VIDEOGRAPHER:  The time is 6:03 p.m.
22 We're back on the record.
23 BY MR. LOESER:
24      Q   Mr. Borelli, you testified, and I'll

Page 367

1  read your statement in answer to a question:
2  "Again, I don't know where the customer that I
3  sell to ships, but when I visit with accounts, you
4  can -- you try to get a feeling for or see who
5  they're marketing to."
6       And what information were you -- or
7  would you collect about who they were marketing
8  to?
9       A   I don't know if I collected, as in
10 gathered up, but when you're visiting with a
11 customer, and -- with a wholesaler, you listen to
12 conversation.
13      Q   So are there -- what information about
14 their downstream customers do you believe would be
15 relevant to learn in those meetings?
16      A   Maybe who they do business with.
17      Q   And why does that matter?
18      A   To see who they ship to, if possible.
19 Just picking up a few things when you're meeting
20 with them about that, so --
21      Q   Why does it matter who they ship to?
22      A   You want to make sure that they ship to
23 accounts that are registered with the DEA.
24      Q   Is that the only information about those

Page 368

1  customers that matters to you during these site
2  visits when you're trying to learn about their
3  downstream customers?
4       A   Not only, but I can't think of all the
5  reasons and rationale.  I mean that wouldn't be
6  the focus of why we go to customers' offices to do
7  business reviews.  That's not the majority of why
8  you go.  You'd share with them their coming items,
9  your pipeline, do a review of business with them.
10 So there's a number of things that would be a --
11 if it came up.  So it's not -- not the main reason
12 why you would go to visit a customer.
13      Q   Other than whether --
14      A   At least to me.
15      Q   Other than when the -- whether the
16 downstream customer had a DEA registration, was
17 there any other information about the downstream
18 customers that you attempted to learn when you
19 would visit with your distributor clients?
20 Specifically I'm asking, specifically do you
21 recall any other information that you would
22 attempt to learn about downstream customers other
23 than whether they had a DEA registration?
24      A   When I visited customers, that was not a

Page 369

1  priority.  It was -- it might be included in the
2  process, but not a priority to -- versus business
3  review year over year versus price points versus
4  pipeline.  A lot of things you go through.
5       Q   I understand there's lots of other
6  things you were learning, and I asked you if you
7  could identify anything specific other than DEA
8  registration, and you did not identify anything
9  else specific.
10      So is there anything else specific about
11 the downstream customers that you would attempt to
12 learn when you would visit with your distributor
13 customers?
14      A   I think I shared with you a few times
15 now that that's not the main focus of what we do
16 business reviews and visit customers for.  If it
17 came up, okay.
18      Q   Sir, can you answer the question
19 whether -- whether there was any other specific
20 information that you would attempt to collect?
21      A   I think I did.
22      Q   Let's try and make this short and clear.
23 Other than DEA registration, was there anything
24 else specific about a downstream customer of a

Page 370

1  distributor client that you would attempt to learn
2  when you visited with your distributor clients?
3     A   It wasn't a major focus or a main focus
4  versus --
5     Q   Was there anything else that you
6  would --
7     A   Let me finish -- you said to me early on
8  let me finish, and then I -- you said, I'll let
9  you finish.
10        So I'm sharing with you why we would go
11  to visit with a customer.
12     Q   I understand why you would go visit.
13     A   So -- can you let me finish?
14        So we understand, you review sales, we
15  discuss pipeline, we discuss back order, we
16  discuss out of stocks, we discuss the marketplace.
17  And if who they ship to and sold to came up, yes,
18  that's great information.
19     Q   So sometimes it came up, sometimes it
20  didn't.
21     A   Sometimes it came up, sometimes it
22  didn't.
23     Q   And you have not described any specific
24  information other than a DEA registration that you

Page 371

1  would learn, and is that because there is no other
2  information other than DEA registration that you
3  were seeking to learn about the downstream
4  customers?
5     A   You don't know what comes up at a
6  business review and a business meeting.
7     Q   Mr. Borelli, what's your understanding
8  of the risks of oxy?
9     A   The risks of oxy.  If it's prescribed
10  properly and used properly, there's not a risk.
11     Q   And do you know if oxy is addictive?
12     A   I believe it could be if it's used
13  improperly.  I believe it could be.
14     Q   And your understanding is based on
15  training you received at Mallinckrodt?
16     A   I'm not sure if it's training that I
17  received at Mallinckrodt.
18     Q   Did you receive any training at
19  Mallinckrodt on the risks of oxycodone?
20     A   I don't remember all the training, so
21  I'm not sure.
22     Q   Mr. Borelli, did anyone at Mallinckrodt
23  sell more oxycodone than you during the time
24  period that you worked there?

Page 372

1     MR. TSAI:  Object to the form.
2     THE WITNESS:  I don't know others' sales
3  numbers, others' sales volumes, but -- I don't
4  know.
5     MR. LOESER:  We can go off the record.
6     THE VIDEOGRAPHER:  The time is 6:10
7  p.m., and we're going off the record.
8        (Pause in the proceedings.)
9     THE VIDEOGRAPHER:  The time is 6:11
10  p.m., and we're back on the record.
11     MR. LOESER:  I have no further questions
12  at this time.
13        I do note for the record that
14  Mallinckrodt continues to produce documents, and
15  it is not clear to us whether there will be
16  additional productions relating to Mr. Borelli.
17  If there are such productions, we reserve the
18  right to recall him to ask him questions about any
19  subsequently produced information.
20     MR. LOESER:  Off the record.
21     THE VIDEOGRAPHER:  The time is 6:12 p.m.
22  We're going off the record.
23        (Recess.)
24     THE VIDEOGRAPHER:  The time is 6:27

Page 373

1  p.m., and we're back on the record.
2        DIRECT EXAMINATION
3  BY MS. HERZFELD:
4     Q   Okay.  Good evening, Mr. Borelli.  How
5  are you?
6     A   Good, thank you.
7     Q   Good.  My name is Tricia Herzfeld, and
8  I'm an attorney from Tennessee who's representing
9  the Tennessee plaintiffs in the Staubus and
10  Dunaway matters.
11     MS. HERZFELD:  I'd like to start out the
12  deposition by lodging an objection to some pretty
13  rank violations of the Court's order for the
14  production of documents in anticipation of this
15  document.  According to the Court's order for the
16  MDL case, which we are not a party to, we were
17  cross-noticed in this case, Mallinckrodt was to
18  produce Mr. Borelli, his complete and custodial
19  file by November the 15th.
20        On November the 23rd of this year, six
21  days before his deposition, Mallinckrodt produced
22  to the Tennessee plaintiffs over 2,000 documents,
23  sent to or from Mr. Borelli.
24        On the evening of November 27th, less

Page 374

1 than 48 hours before his deposition, Mallinckrodt
2 again produced courtesy copies of MDL files that
3 contained Borelli custodial files and his
4 personnel file.
5 Additionally, Mallinckrodt was required
6 to inform my clients whether Mr. Borelli had any
7 personal knowledge related to my clients'
8 lawsuits. Instead, Mallinckrodt simply stated
9 that Borelli had no Tennessee-specific knowledge.
10 We believe that this prejudices us in
11 our ability to go forward in the deposition today.
12 We reserve all rights to depose Mr. Borelli in the
13 future if we deem it to be necessary, and
14 specifically, if additional documents are
15 produced.
16 My understanding is Mallinckrodt has not
17 made a full production in this Staubus or Dunaway
18 case pursuant to pending discovery requests, so
19 Tennessee-specific information has not yet been
20 provided.
21 With that being said, I would like to go
22 forward, please.
23 I'm sure you have something to say.
24 MR. TSAI: For the record, we completely

Page 375

1 disagree with these characterizations and believe
2 the record will reflect that they are inaccurate,
3 and we reserve our rights accordingly.
4 MS. HERZFELD: So reserved.
5 BY MS. HERZFELD:
6 Q Okay. Mr. Borelli, I get two hours to
7 depose you today, so I'm going to try to just get
8 right to it, all right?
9 A Certainly.
10 Q Okay. So through the testimony that we
11 had already earlier today, you testified that you
12 knew generally of the opioid epidemic before and
13 during your time when you were employed at
14 Mallinckrodt; is that correct?
15 MR. TSAI: Objection. Cumulative.
16 Go ahead.
17 THE WITNESS: Generally.
18 BY MS. HERZFELD:
19 Q Is that a "yes"? Yes, sir?
20 A Yes.
21 Q Yes. Okay, great.
22 A Generally, yes.
23 Q Okay. And you knew about the Florida to
24 Kentucky pipeline for oxycodone as early as

Page 376

1 March 4th of 2009; is that correct?
2 A That was from someone sending me an
3 article, and if I read it, yes.
4 Q Okay. That would be the e-mail from
5 Ms. Polly -- here we go -- previously
6 marked as Exhibit 23, the e-mail from Ms. Polly,
7 March of 2009.
8 Do you believe, sir, that you knew
9 anything about the oxycodone pipeline that went
10 from Florida to Kentucky prior to receiving that
11 e-mail?
12 MR. TSAI: Objection. This is not
13 Tennessee specific.
14 Go ahead.
15 THE WITNESS: I'm not sure.
16 BY MS. HERZFELD:
17 Q Okay. Do you know where Tennessee is
18 located, sir?
19 A I -- I believe I do.
20 Q Okay. Where is Tennessee located?
21 A In the southeast part of the country.
22 Q Okay. And which states border it? Do
23 you know?
24 A I'm not sure.

Page 377

1 Q Okay. Where is Tennessee in relation to
2 Florida?
3 A Northwest, I believe.
4 Q Okay. Do you know where Tennessee is in
5 relation to Kentucky?
6 A South.
7 Q Okay. Did you know you were having a
8 geography test today?
9 A I did not.
10 Q Do you know --
11 A Sorry.
12 Q -- which states are north of Florida?
13 A I think quite a few.
14 Q Okay. And you traveled a lot for your
15 job; is that right?
16 A I do.
17 Q Okay. And when you traveled, did you
18 typically drive or did you travel by plane?
19 A It really depends where the customer is
20 and where I am at the time.
21 Q Okay. And have you ever driven on I-75?
22 A I don't believe so.
23 Q Okay. So have you been to Florida?
24 A I have.

| Page 378 | Page 380 |
|---|---|
| 1    Q   Okay.  And you don't believe you've ever<br>2  driven on I-75 in Florida.<br>3    A   So where does -- I'm not sure where it<br>4  starts or -- where does it start in Florida?<br>5    Q   I'm asking, do you know if you have or<br>6  not?<br>7    A   So I don't know.<br>8    Q   Okay.  Do you know which states I-75<br>9  goes through?<br>10    A   Not all.  No, I don't.  I'm sorry.<br>11    Q   Do you know generally what area of the<br>12  country I-75 is in?<br>13    A   Only from what we're talking about<br>14  today.  So I'm not very -- I'm not very<br>15  knowledgeable of Highway 75.<br>16    Q   Okay.  And so from what we talked about<br>17  today, what is your impression of where Highway 75<br>18  goes?<br>19    MR. TSAI:  Object to the form.<br>20  BY MS. HERZFELD:<br>21    Q   Is it in the --<br>22    A   From --<br>23    Q   Go ahead, sir.<br>24    A   From Florida to -- and I'm not sure what | 1    Q   Okay.  And what is between Alabama and<br>2  Kentucky?<br>3    A   Tennessee.<br>4    Q   Okay.  And what is between Georgia and<br>5  Kentucky?<br>6    A   Tennessee and North Carolina.<br>7    Q   Okay.  Does North Carolina border<br>8  Kentucky?<br>9    A   It does not.<br>10    Q   Okay.  So is there one state that is<br>11  between Georgia and Kentucky that touches them<br>12  both?<br>13    A   Tennessee.<br>14    Q   Okay.  And if I told you that I-24 goes<br>15  from Florida through Georgia, through Tennessee,<br>16  through Kentucky, and through Ohio, would that<br>17  sound right to you?<br>18    A   Is that a different --<br>19    MR. TSAI:  Object to the form.<br>20    THE WITNESS:  Is that a different road?<br>21  BY MS. HERZFELD:<br>22    Q   I'm sorry.  I-75.<br>23    A   Okay.  So I don't know --<br>24    MR. TSAI:  Same objection. |

| Page 379 | Page 381 |
|---|---|
| 1  states it goes through.<br>2    Q   Okay.  I'll help you out a little bit<br>3  here today.<br>4    A   Thank you.<br>5    MS. HERZFELD:  What next exhibit are we<br>6  on?<br>7    THE REPORTER:  51.<br>8    MS. HERZFELD:  51.  If we could mark<br>9  this as Exhibit 51.<br>10    (Borelli Exhibit No. 51 was marked<br>11    for identification.)<br>12    MS. HERZFELD:  Those of you following<br>13  along at home, it's a map of the United States.<br>14    THE WITNESS:  Thank you.<br>15  BY MS. HERZFELD:<br>16    Q   Sir, take a minute to look at the map,<br>17  and let's go through some of the geography here.<br>18    What are the two states that border<br>19  Florida?<br>20    A   Alabama and Georgia.<br>21    Q   Okay.  And what is north of Alabama and<br>22  Georgia?<br>23    A   Tennessee, South Carolina and North<br>24  Carolina. | 1    Go ahead.<br>2    THE WITNESS:  Sorry.<br>3    Can you ask that again?  I'm sorry.<br>4  BY MS. HERZFELD:<br>5    Q   I sure will.  And it was my fault.  I<br>6  said 24.<br>7    If I told you that I-75 went from<br>8  Florida through Georgia, through Tennessee,<br>9  through Kentucky, and then through Ohio, do you<br>10  know that to be true or false?<br>11    A   I don't know that, but if you're saying<br>12  it does, I'm going to take your word on it.  But I<br>13  don't know that.<br>14    Q   Okay.  So my next question is, if one<br>15  were to drive from Kentucky to Florida, would the<br>16  most direct route for them to be to go through<br>17  Tennessee?<br>18    A   Yeah, I imagine so.<br>19    Q   And would the same be true if someone<br>20  was driving from Florida to Kentucky, the most<br>21  direct route would be through Tennessee; is that<br>22  correct?<br>23    MR. TSAI:  Object to the form.<br>24    THE WITNESS:  Could be. |

Page 382

BY MS. HERZFELD:
1 Q   Okay.  And if one were to go to Ohio,
would the most direct route from Florida be
Florida, Georgia, either North Carolina or
Tennessee, Kentucky, Ohio?
       MR. TSAI:  Object to the form.
BY MS. HERZFELD:
   Q   If you draw a straight line.
       MR. TSAI:  Object to the form.
       THE WITNESS:  What was the question?
BY MS. HERZFELD:
   Q   If you draw a straight line to go from
Florida to Ohio --
   A   Okay.
   Q   -- the most direct route, if you go as
the crow flies, would it be Florida, Georgia,
Tennessee, maybe North Carolina, Kentucky, Ohio?
       MR. TSAI:  Object to the form.
       THE WITNESS:  I imagine so.
BY MS. HERZFELD:
   Q   Okay.  Thank you.
       And you learned about a Tennessee bust
from an officer in Tennessee in July of 2009; is
that correct?

Page 383

   A   I learned --
       MR. TSAI:  Object to the form.
       Go ahead.
       THE WITNESS:  I learned about that -- I
don't know when that bust was, and I -- I don't
know when I learned about it, but it came up
today.
BY MS. HERZFELD:
   Q   Okay.  I'm going to show you what's been
previously marked as Exhibit 12.  Take a look at
that.
   A   Okay.
   Q   Go ahead and read through it and see if
it refreshes your recollection as to when you
learned about the oxycodone bust in Tennessee.
   A   (Peruses document.)  So it says
July 7th.
   Q   Of what year, sir?
   A   2009.
   Q   2009.  Okay.
   A   You asked when -- I'm sorry, you asked
when I learned of it.  So -- so it looks like I
was first tied into this e-mail chain on the -- on
July 29th.

Page 384

   Q   Okay.  And Mallinckrodt learned of it a
few days earlier; is that right?
   A   It looks that way.
   Q   Okay.  And in that e-mail you were
generally informed by a law enforcement officer in
Tennessee that some folks were busted bringing in
some OxyContin pills from Florida and putting
those into the illegal drug market in Tennessee;
is that correct?
       MR. TSAI:  Objection to the form.
       THE WITNESS:  I was -- I was alerted by
not a -- not a police officer, by Bill Ratliff.
BY MS. HERZFELD:
   Q   Bill Ratliff is your director of
security?
   A   Yes.
   Q   Okay.  And he forwarded you an e-mail
from a law enforcement officer in Tennessee; is
that right?
   A   It looks that way.
   Q   And that e-mail from the law enforcement
officer in Tennessee talks about an oxycodone bust
in Tennessee with Mallinckrodt pills that had come
from Florida; is that right?

Page 385

   A   Yes.
   Q   Okay.  And they were pills that were
making their way from Florida to Tennessee to
enter into the illegal drug market there; is that
correct?
       MR. TSAI:  Object to the form.
       THE WITNESS:  I --
BY MS. HERZFELD:
   Q   You can feel free to reread his
synopsis.
   A   (Peruses document.)  The products were
found in a hotel.
   Q   Okay.
   A   Is that what you mean?
   Q   They were found at a hotel, yes, sir.
Keep reading.
   A   (Peruses document.)  I'm sorry, I don't
see the word "diversion" in here.
   Q   Okay.  That's okay.
       So look with me on the third page, I
think it's the third page of the e-mail, I'm going
to -- I think your copy is a little bit different
than mine.  But the one that starts from Dwayne
Collins to Bill Ratliff, Tuesday, July 2nd, 2009,

Page 386

1  at 12:22 p.m.
2      Do you see where I'm talking about?
3  Yours is double-sided so it may be different.
4      A   What day?
5      Q   July 7th, 2009.
6      A   12:22.
7      Q   12:22.  Do you see it?
8      A   I see it, yes.
9      Q   Okay.  And so this is from Dwayne
10 Collins, and his address is at mymorristown.com;
11 is that right?
12     A   Mm-hmm.
13     Q   Is that a "yes"?
14     A   Yes.
15     Q   Okay, great.  And do you know where
16 Morristown is?
17     A   I do not.
18     Q   Do you know if Morristown is in
19 Tennessee?
20     A   I do not.
21     Q   Okay.  What is the subject of this
22 e-mail?
23     A   "Florida medicine coming into
24 Tennessee."

Page 387

1      Q   Okay.  And so if we read through his
2  e-mail, he says a little bit of background, that
3  he spent 17-and-a-half years with the Morristown
4  Police Department before going to the State of
5  Tennessee and working with the Office of Homeland
6  Security, right?
7      A   Yes.  Yes.
8      Q   Okay.  And he spent four years in East
9  Tennessee, moved, and then came back to the
10 Morristown Police Department in 2007, right?
11     A   Yes.
12     Q   Okay.  Then in October 2008, it says he
13 was assigned to the newly opened HIDTA office here
14 in Morristown under the supervision of Special
15 Agent Kevin Keithly out of the Johnson City
16 office, which is the Knoxville division.
17     Do you see where I'm reading?
18     A   I do.
19     Q   Okay.  Do you know what a HIDTA office
20 is?
21     A   I do not.  I'm sorry.
22     Q   Have you ever heard of the High
23 Intensity Drug Trafficking Area?
24     A   I'm sorry, I have not.

Page 388

1      Q   Okay.  Were you ever trained on that
2  when you were at Mallinckrodt?
3      A   HIDTA?
4      Q   HIDTA.
5      A   Sorry.
6      Q   High Intensity Drug Trafficking Area or
7  High Intensity Drug Trafficking Corridor.
8      A   It -- I don't recognize that.
9      Q   Okay.  And what was your position at
10 Mallinckrodt?
11     A   Sales -- territory manager.
12     Q   Territory manager.  And was Tennessee in
13 your territory?
14     A   There -- there were no -- I don't
15 believe that there were any accounts in Tennessee
16 that I called on.  I don't think anywhere in
17 Tennessee.
18     Q   Okay.  Okay.  So then he goes on, if
19 you'll continue, that there's pharmaceutical sales
20 of oxycodone.  He's looking at that.  They got him
21 looking at a couple of pain clinics in Florida
22 where doctors were prescribing an abundant amount
23 of oxycodone medication to numerous Tennesseans,
24 especially within the jurisdiction that he's

Page 389

1  assigned.
2      Do you see that?
3      A   I do.
4      Q   Okay.  And the jurisdiction that he's
5  assigned, do you know if that's the Appalachian
6  region of East Tennessee?
7      A   I have no idea.
8      Q   Okay.  "While I was working to determine
9  this and the impact of oxycodone drug dealing" --
10 do you know who he means here by "oxycodone drug
11 dealing"?
12     Let me back up.  Oxycodone can be sold
13 legally; is that correct?
14     A   Yes.
15     Q   Okay.  And it can be sold illegally; is
16 that also correct?
17     A   I --
18     MR. TSAI:  Object to the form.
19     Go ahead.
20     THE WITNESS:  I guess so.
21 BY MS. HERZFELD:
22     Q   Okay.  It's a controlled substance.  Is
23 that correct?
24     A   Yes.

Page 390

1    Q   Okay.  And if a controlled substance is
2  sold to someone who doesn't have the appropriate
3  authority to take that controlled substance, that
4  would be an illegal sale; is that correct?
5    A   That -- that's a fair explanation, yes.
6    Q   Okay.  And so, to your knowledge, there
7  is an illegal drug market for oxycodone being sold
8  without a prescription?
9        MR. TSAI:  Object to the form.
10       THE WITNESS:  Somewhat, yes.
11 BY MS. HERZFELD:
12   Q   Okay.  And this gentleman here is
13 talking about oxycodone drug dealing.  He's
14 referring to the illegal drug market.
15   A   Okay.
16   Q   Yes, sir?
17   A   Oh, he is.
18   Q   Yes, sir.  Okay.  So he talks about
19 these three individuals that were coming up from
20 Florida on a regular basis, right?  Regular
21 amounts of oxycodone, et cetera, et cetera.
22       Do you see that?
23   A   I do.
24   Q   Okay.  He began looking at these

Page 391

1  individuals in April 2009, and then eventually he
2  manages to track that information back to Florida;
3  is that right?
4    A   I believe so.
5    Q   Okay.  During a conversation -- it looks
6  like there was a conversation -- they asked if
7  they knew the quantity that they were possibly in
8  possession of, and he said he's not totally sure,
9  but I can say during their last day, they
10 recovered several bottles near a motel that one of
11 the individuals was staying in.
12       Do you see that?
13   A   I do.
14   Q   Okay.  And he had seen as much as nine
15 bottles at one time but no more than 15, according
16 to the CIs.  Is that right?
17   A   I see that.
18   Q   Okay.  So I think my question before
19 was, in this e-mail, are they describing the --
20 more of the pills coming from Florida entering the
21 illegal drug market in Tennessee?
22       MR. TSAI:  Object to the form.
23       Go ahead.
24       THE WITNESS:  That's what they're

Page 392

1  depicting, yes.
2  BY MS. HERZFELD:
3    Q   Okay.  And so you were given that
4  information in July 29th of 2009; is that right?
5    A   Yes.
6    Q   Okay.  And then eventually you learned
7  that those pills in Morristown that they were
8  talking about came from a doctor in Florida called
9  Barry Schultz; is that right?
10       MR. TSAI:  Object to the form.  Vague as
11 to time.
12       THE WITNESS:  I don't see where it says
13 that person's name.
14 BY MS. HERZFELD:
15   Q   Okay.  So what did you learn about where
16 those pills were coming from?
17       MR. TSAI:  Object.  Vague as to time.
18 BY MS. HERZFELD:
19   Q   Okay, I'll back up.  So back in 2009,
20 when you get this e-mail, what investigation did
21 you do to find out where those pills were coming
22 from?
23   A   What investigation did I do?
24   Q   Yes, sir.

Page 393

1    A   I'm not sure -- I'm not sure.
2    Q   Okay.  Well, somebody sent you an e-mail
3  that gives you information about Mallinckrodt
4  pills that are coming -- oxycodone pills that are
5  coming from Florida to Tennessee and entering the
6  illegal drug market.
7        And so my question is, what did you do
8  with this information?
9    A   I'm not sure.  Did I call a meeting with
10 an account or two of mine?  I'm not quite sure.
11 So it looks like -- I'm not sure of the timing of
12 did I have a meeting or set up a meeting down
13 there or -- it highlights a conference call,
14 but -- it looks like I responded back to Bill.
15   Q   Okay.  So let's back up.
16       If you read the e-mail that Bill sent
17 back to Dwayne, Mr. Collins from Morristown,
18 Tennessee, it looks like Bill went and tracked
19 down exactly where those pills came from; is that
20 right?
21   A   Okay.
22   Q   Do you see where I'm at?  July 7, 2009,
23 at 16:19:11.
24   A   I'm sorry.

Page 394

1    Q   That's okay.
2    A   At 16 --
3    Q   You want me to show you?
4    A   Yeah. Please.
5    Q   If you give it to me, I'll show you.
6        Oh, that's because it's going on to a
7  second page. Okay. It starts here and then
8  continues on over here. Okay?
9    A   (Peruses document.) Okay.
10   Q   Okay. After reading that, does it look
11 like Bill determined where those pills came from?
12   A   Yes.
13   Q   Okay. And where did they come from?
14   A   From Florida.
15   Q   From Florida. And where in Florida?
16   A   Sunrise, Florida.
17   Q   Okay. And which distributor in Florida?
18   A   Sunrise Wholesale.
19   Q   And Sunrise Wholesale was one of your
20 clients; is that right?
21   A   They were. I'm not sure if it was at
22 this time, but they were.
23   Q   Okay. And then there was a further
24 investigation of Sunrise Wholesale; is that right?

Page 395

1    A   Yes.
2    Q   Okay. And do you know if it was
3  determined specifically where those drugs came
4  from Sunrise, who -- who Sunrise -- which doctor
5  prescribed those drugs at Sunrise, then filled the
6  prescription for it?
7        MR. TSAI: Object to the form.
8        THE WITNESS: I don't see that in this
9  e-mail of -- of who prescribed --
10 BY MS. HERZFELD:
11   Q   Okay.
12   A   -- or dispensed.
13   Q   Okay.
14   A   Is it in here?
15   Q   I -- I'm asking.
16   A   Because I don't see it.
17   Q   Do you know eventually who they did
18 trace those drugs to?
19       MR. TSAI: Objection. Vague as to time.
20       THE WITNESS: I'm not sure.
21 BY MS. HERZFELD:
22   Q   Would you be surprised to hear it was
23 Dr. Barry Schultz?
24   A   I don't know Barry --

Page 396

1        MR. TSAI: Object to the form.
2        Go ahead.
3        THE WITNESS: I don't know who Barry
4  Schultz is, other than what was discussed today.
5  BY MS. HERZFELD:
6    Q   Okay. So Barry Schultz wasn't somebody
7  you were keeping an eye on for any reason?
8    A   Not specifically, no.
9    Q   Okay. So looking at that document, you
10 knew that those drugs, those oxycodone pills had
11 made it into the illegal drug market in Tennessee
12 as of July on 2009, and that those oxycodone pills
13 had come from Sunrise. You had that information,
14 yes, sir?
15   A   Yes.
16   Q   Okay. And yet you continued shipping
17 oxycodone to Sunrise; is that correct?
18   A   I believe so. I'm not sure when an
19 audit was done with Sunrise. It may have been
20 right around this time then.
21   Q   Okay. So you were still shipping -- do
22 you know if you were still shipping in September
23 of 2009?
24   A   I'm not sure.

Page 397

1    Q   Okay. Do you know if you were still
2  shipping in November of 2009?
3    A   I'm not sure.
4    Q   Okay. Do you know that within six weeks
5  of the Tennessee information that Mallinckrodt
6  shipped 2.1 million oxycodone tablets to Sunrise?
7  Are you aware of that information?
8        MR. TSAI: Object to the form.
9        Go ahead.
10       THE WITNESS: I don't have any sales
11 reports in front of me, so I'm not sure. But --
12 so I'm not sure.
13 BY MS. HERZFELD:
14   Q   Okay. Do those numbers sound reasonable
15 for what your usual sales were for Sunrise?
16       MR. TSAI: Object to the form.
17       THE WITNESS: It's a long time ago, so
18 I'm not sure what sales we had at what accounts;
19 what sales I had at what accounts either.
20 BY MS. HERZFELD:
21   Q   Okay. So we'll back up a little bit.
22       MS. HERZFELD: What number are we on?
23       THE REPORTER: 52.
24       MS. HERZFELD: 52. No. 52.

Page 398

1    (Borelli Exhibit No. 52 was marked
2    for identification.)
3    THE WITNESS:  Thank you.
4  BY MS. HERZFELD:
5    Q    Have you seen this document before?  Do
6  you recognize it?
7    A    I do not.
8    Q    Okay.  Is this an e-mail that was sent
9  to you in September of 2009?
10    A    It was.
11    Q    Okay.  And is it attaching a shipment
12  report to Sunrise Wholesale?
13    A    It is.
14    Q    And on the second page, it says:
15  "Shipment report by customer, Victor Borelli."  Is
16  that you?
17    A    It is.
18    Q    Did you create this document?
19    A    I -- I don't believe I did.
20    Q    Okay.  And does this document show that
21  you were -- Mallinckrodt was continuing to ship
22  oxycodone to Sunrise Wholesale in September of
23  2009?
24    A    It highlights what was shipped.  So I

Page 399

1  don't know if that's shipped in September.
2  This -- oh, there's a date, September 3rd.  So I
3  don't know if this shipped prior to September 3rd
4  or not.
5    Q    Okay.
6    A    I'm going to -- if it shipped, it had to
7  ship prior to September 3rd.  Excuse me.
8    Q    So you believe it shipped on
9  September 3rd?
10    A    No.  I said if these products shipped,
11  and this is dated September 3rd, it would have had
12  to have shipped prior to that.
13    Q    Okay.
14    A    I believe.
15    Q    Okay.
16    MS. HERZFELD:  Okay.  We'll make this
17  one the next exhibit.
18    Sorry, I don't have a second page for
19  you guys.  It didn't make it on my copy.
20    (Borelli Exhibit No. 53 was marked
21    for identification.)
22    THE WITNESS:  Thank you.
23  BY MS. HERZFELD:
24    Q    Is this an e-mail that was sent to you,

Page 400

1  sir?
2    A    It looks to be.
3    Q    Okay.  And what is the date of the
4  e-mail?
5    A    September -- November 4th.
6    Q    Okay.  And what is on the second page?
7    A    A shipment report.
8    Q    Yes, sir.  And what does the shipment
9  report say?
10    A    A shipment report by customer, Victor
11  Borelli, my name.
12    Q    Yes, sir.
13    A    It says the customer, ties to PO, it has
14  an order number, it has an item number, it has an
15  item description, and it has the location and
16  quantity.
17    Q    Okay, sir.  And what is the date?
18    A    November 4th.
19    Q    November 4th of 2009?
20    A    I'm sorry.  Yes.
21    Q    Okay.  And what is the order?  What is
22  it for, the shipment?
23    A    The items?
24    Q    Yes, sir.

Page 401

1    A    Oxycodone 30 milligram tabs and
2  oxycodone 15 milligram tabs.
3    Q    Okay.  Great.  Thank you, sir.
4    Do you know what the street value is of
5  2.1 million oxycodone tablets in 2009?
6    MR. TSAI:  Object to the form.
7    THE WITNESS:  I have no idea.
8  BY MS. HERZFELD:
9    Q    Have you ever been to Tennessee, sir?
10    A    I don't -- I'm not quite sure, so I
11  don't believe so.
12    Q    Okay.  Not Memphis or Nashville or
13  Knoxville?
14    A    I don't believe so.
15    Q    You've never been to Tennessee for work?
16    A    I don't believe so.
17    Q    Do you have any friends that live in
18  Tennessee?
19    A    I don't think so.
20    Q    Are you married?
21    A    I am not.
22    Q    Have you been married?
23    A    I have.
24    MR. TSAI:  Object to the form.

Page 402

1    Go ahead.
2    THE WITNESS: I'm sorry. Yes.
3 BY MS. HERZFELD:
4    Q    How many times?
5    MR. TSAI: Object to the form. This is
6 getting into personal and private information. It
7 has nothing to do with Tennessee or the claims in
8 this case.
9    MS. HERZFELD: Noted.
10 BY MS. HERZFELD:
11    Q    How many times have you been married,
12 sir?
13    A    Once.
14    Q    Okay. And from what years?
15    MR. TSAI: Same objection.
16    THE WITNESS: 1994 to 2012, I believe.
17 2013. I'm not -- I should know that, I guess, but
18 sorry.
19 BY MS. HERZFELD:
20    Q    It's okay. Do you have any children?
21    A    I do.
22    Q    How many?
23    A    Two.
24    Q    Okay. Boy/girl, girl/boy, girl/girl,

Page 403

1 boy/boy?
2    A    Two girls.
3    Q    Two girls. Far apart in age?
4    A    Not so much.
5    Q    Okay. Are they minors now or adults?
6    A    Adults.
7    Q    Okay.
8    MR. TSAI: Madam Court Reporter, can you
9 mark this for me. Thank you.
10 BY MS. HERZFELD:
11    Q    Okay. So we've gone over a lot of news
12 articles that you've been forwarded -- that you
13 were forwarded during your time at Mallinckrodt;
14 is that right, today?
15    A    We went over a few.
16    Q    A few. So we have this first one that's
17 been marked as Exhibit 24, "Inside Broward
18 County's pill mills." We talked about that one.
19 Do you remember this one?
20    A    Thank you.
21    Q    Mm-hmm.
22    A    I was shown this before.
23    Q    Yes, sir.
24    A    Yeah, that's what -- you asked if I

Page 404

1 recognized it, so I was saying I was shown it
2 before.
3    Q    Yeah. Okay. And do you remember
4 reading it around the time, 2010, or knowing that
5 Broward County had a pill mill problem?
6    MR. TSAI: Object to the form.
7    THE WITNESS: I can't remember if I read
8 this back in 2000 -- 2010.
9 BY MS. HERZFELD:
10    Q    Okay. What about this one that's been
11 marked as Exhibit No. 25? It looks like that was
12 an article we've already talked about from an
13 e-mail that you received July 29th, 2009, called
14 "The prescription drug abuse epidemic." You
15 received and read that one, yes?
16    MR. TSAI: Objection. This is now the
17 fourth exhibit that is a duplicate exhibit that we
18 went through earlier today.
19    MS. HERZFELD: And I can ask him about
20 it.
21    MR. TSAI: Go ahead.
22    THE WITNESS: What was the question, do
23 I remember receiving this?
24 BY MS. HERZFELD:

Page 405

1    Q    You received that information, yes, sir?
2    A    This is ten -- almost ten years ago, so
3 I don't remember receiving it.
4    Q    It was sent to your e-mail account, yes,
5 sir?
6    A    Yes.
7    Q    Okay. And you responded to the e-mail,
8 yes, sir?
9    A    I did.
10    Q    Okay. And then this one, I'm going to
11 hand you Exhibit No. 26, dated November 2009,
12 forwarding an article called "Grand jury wants to
13 crack down on pill mills."
14    You received that one and responded,
15 yes, sir?
16    MR. TSAI: Again, this is now the fifth
17 duplicate e-mail or exhibit --
18    MS. HERZFELD: There's going to be like
19 ten, so you can have a standing objection.
20    THE WITNESS: Well, what was your
21 question?
22 BY MS. HERZFELD:
23    Q    You received that article in your
24 e-mail?

Page 406

1    A   I did.
2    Q   And you responded to it?  Yes, sir?
3        MR. TSAI:  Objection.  Duplicative,
4  cumulative.
5        THE WITNESS:  I did.
6  BY MS. HERZFELD:
7    Q   Okay.  And I believe we've already
8  talked about these ones as well.  Exhibit 16,
9  "Florida physician gets four years in prison for
10 operating a pill mill."
11       If you will take a look at this one.
12 And it talks about a gentleman in Kentucky, does
13 it not?
14       MR. TSAI:  Objection.  Cumulative,
15 duplicative, repetitive.
16       Go ahead.
17       THE WITNESS:  This -- this talks about a
18 doctor in Florida.
19 BY MS. HERZFELD:
20   Q   Correct.  But there's a connection to
21 Kentucky.  Do you see it?
22       MR. TSAI:  Object to the form.
23       Go ahead.
24       THE WITNESS:  The part where it says

Page 407

1  "Kentuckians"?
2  BY MS. HERZFELD:
3    Q   Yes, sir.
4    A   Yes, I see that.
5    Q   And do you think Kentuckians might have
6  to drive through Tennessee to get those pills in
7  Florida?
8        MR. TSAI:  Object to form.
9        THE WITNESS:  That's one way to get down
10 there.
11 BY MS. HERZFELD:
12   Q   Okay.  Did you ever hear about two
13 brothers getting in trouble in Tennessee because
14 they got hit by a train and they found a bunch of
15 oxycodone when those guys got hit by a train?
16       MR. TSAI:  Object to the form.
17       THE WITNESS:  I do not.
18 BY MS. HERZFELD:
19   Q   2009, you don't remember hearing
20 anything about a train and oxycodone in Tennessee?
21       MR. TSAI:  Object to the form.
22       THE WITNESS:  I do not.
23 BY MS. HERZFELD:
24   Q   Okay.  What did you do in your position

Page 408

1  at Mallinckrodt to keep the oxycodone from
2  entering the illegal drug market in Tennessee, to
3  go from Florida to Tennessee?
4        MR. TSAI:  Object to the form.
5        Go ahead.
6        THE WITNESS:  It -- it was not a -- that
7  was not one of my responsibilities versus others
8  in the organization.  My focus was to sell to my
9  customer base.
10 BY MS. HERZFELD:
11   Q   Okay.  But you knew that pills were
12 going from Florida to Kentucky to Tennessee.  You
13 knew that information.
14   A   From the articles you're showing and
15 that were sent back then that I read through, if I
16 read them all in detail, yeah.
17   Q   Okay.  And so what did you personally do
18 to stop those oxycodone pills from going from
19 Florida through that pipeline through Tennessee
20 into Kentucky and Ohio?
21       MR. TSAI:  Objection to form.  Assumes
22 facts not in evidence.
23       Go ahead.
24       THE WITNESS:  Well, what did I

Page 409

1  personally do?
2  BY MS. HERZFELD:
3    Q   What did you do, yes, sir.
4    A   If I saw any articles, I would forward
5  them into our suspicious order monitoring team;
6  if my suspicious order monitoring team asked me to
7  share with my customer base customers that we will
8  not honor chargebacks to.  Those are just a few.
9    Q   Okay.  And so what specifically having
10 to do with Tennessee did you -- did you do that
11 for?  Pass on those -- those requests for not
12 honoring chargebacks, for example?
13       MR. TSAI:  Objection to the form.
14       Go ahead.
15       THE WITNESS:  I'm not sure -- I'm not
16 sure what you mean by specific to Tennessee.
17 BY MS. HERZFELD:
18   Q   I mean specific to Tennessee --
19   A   There were no customers -- I didn't sell
20 to any customers in Tennessee.
21   Q   Okay.  And so -- but you had a lot of
22 customers in Florida, right?
23   A   Sunrise Wholesales was in Florida.  The
24 other customers, Harvard or -- I'm sorry,

Page 410

1 KeySource or -- they're not in Florida.
2    Q   Okay.  So --
3    A   So one customer in Florida.
4    Q   Okay.  So any of those other
5 customers -- did you tell any of your customers,
6 Hey, guys, be careful with Tennessee or when
7 you're, you know, picking up your own customers,
8 you need to be careful about Tennessee?  They seem
9 to have a real problem there.  Did you say
10 anything like that?
11        MR. TSAI:  Objection.  Lacks foundation.
12        Go ahead.
13        THE WITNESS:  I'm not sure if I was
14 specific to Tennessee specifically or North
15 Carolina or West Virginia or California.
16 BY MS. HERZFELD:
17    Q   Okay.  So let me back up.
18        When you were talking to your customers,
19 did you ever talk specifically about any region or
20 any state that they should be more aware of, that
21 they should be more cautious of?
22    A   It's a long time ago, so I don't quite
23 remember conversations I had with all my customers
24 throughout my tenure at Mallinckrodt.

Page 411

1    Q   Okay.  But do you remember any
2 conversations having to do with any specific
3 states or regions with your -- with your
4 customers, like, Hey, guys, be careful or treat
5 this one differently or we're going to make
6 different -- you know, different arrangements or
7 look out more, you know, cautiously for
8 Appalachia, or anything like that?
9        MR. TSAI:  Objection to form.
10        THE WITNESS:  Nothing comes to mind, but
11 I'm not sure if I did or didn't.
12 BY MS. HERZFELD:
13    Q   Okay.  If you did, do you think you
14 would remember that?
15        MR. TSAI:  Object to the form.
16        THE WITNESS:  I don't know.  From
17 nine --
18        MR. TSAI:  No question pending.
19        Go ahead.
20        THE WITNESS:  Sorry.  From nine years
21 ago, I don't know.
22 BY MS. HERZFELD:
23    Q   Okay.  Did you have a specific region of
24 the country that you were concerned about for

Page 412

1 opioid addiction?
2    A   Not specific.
3    Q   Okay.  What about for diversion of
4 opioids, was there a specific region of the
5 country that you were concerned about for
6 diversion of opioids?
7    A   I wasn't -- I'm not -- I wasn't involved
8 with the diversion process.  Right.  I think that
9 would be under compliance or a suspicious order
10 monitoring team that would alert me of certain
11 areas.  And I believe they did.  And that's why we
12 conduct a -- audits to the accounts that they
13 highlighted to me.
14    Q   Okay.  And so when they were having you
15 do audits of accounts that were highlighted to
16 you, do you know if any of those downstream
17 customers went to Tennessee?
18    A   Shipped --
19    Q   Yes, sir.
20    A   -- to?  No, I wouldn't know that.
21    Q   But you could have known that; is that
22 right?
23    A   I believe -- using chargeback data, but
24 I wasn't -- I did not pull up chargeback data.

Page 413

1 And I think from everything we saw today, every
2 time I was -- had chargeback data, it was asking
3 someone to do it or someone was sending it to me
4 on the handful of times that I was shown it today.
5    Q   Okay.  Do you know what neonatal
6 abstinence syndrome is?
7    A   I'm sorry, I do not.
8    Q   Have you ever heard of any sort of an
9 affliction or diagnosis for babies that are born
10 dependent on opioids?
11    A   I'm sorry, I do not.
12    Q   Did you know that there are babies that
13 are born dependent on opioids?
14    A   Not specifically, no.
15    Q   You haven't heard of drug-addicted
16 babies from opioids?
17    A   When you say that, I would think of
18 heroin personally, but I -- not specific to the --
19 the disease state you're talking about?
20    Q   Yes, sir.
21    A   I'm not knowledgeable of that at all.
22    Q   Okay.  So you don't know that Tennessee
23 is the number two state in the nation for babies
24 born dependent on opioids?

Page 414

1      MR. TSAI:  Object to the form.
2      THE WITNESS:  And I wouldn't know who
3 the number one state is either.  I'm sorry.
4 BY MS. HERZFELD:
5      Q    Did you monitor how many deaths related
6 to opioids there were state by state?
7      MR. TSAI:  Object to the form.
8 BY MS. HERZFELD:
9      Q    When you were at Mallinckrodt.
10     MR. TSAI:  Object to the form.
11     THE WITNESS:  No.
12 BY MS. HERZFELD:
13     Q    Okay.  So you have no idea how many
14 deaths were caused or related to opioids in the
15 state of Tennessee during the time you were
16 employed by Mallinckrodt?
17     MR. TSAI:  Object to the form.
18     THE WITNESS:  I'm sorry.  I do not.
19 BY MS. HERZFELD:
20     Q    Okay.  Did you ever specifically discuss
21 Tennessee with anyone in your department?
22     A    It doesn't come to mind.
23     Q    Okay.  Did you ever discuss opioid abuse
24 in Tennessee with any of your distributor

Page 415

1 customers?
2      A    It doesn't come to mind.
3      Q    Okay.  And other than the documentation
4 that's already been discussed today earlier, did
5 you receive reports of any kind that included
6 information about Tennessee?
7      A    Not that I remember.
8      Q    Were you ever present when opioid abuse
9 or diversion issues in Tennessee were discussed by
10 any other employees?
11     A    It doesn't come -- it doesn't come to
12 mind.
13     Q    Okay.  We've talked about already the
14 e-mail and various communication you had with the
15 detective from -- or the special agent from
16 Morristown.
17     Did you have any other communication
18 about that than what has already been discussed
19 today?
20     A    I don't believe so.  I did not
21 communicate with that officer, though.  I think
22 that was through some -- through Bill Ratliff or
23 Karen Harper.
24     Q    Okay.  But about that incident, did you

Page 416

1 discuss that incident with anybody else or that
2 inquiry from that gentleman in Morristown?
3      A    I don't remember.
4      Q    Okay.  There's nothing else that comes
5 to mind as to your involvement with that inquiry
6 from Morristown?
7      A    Not off the top of my head, no.
8      Q    Okay.  So other than the incident we've
9 discussed with the gentleman in Morristown, did
10 you ever communicate with any Tennessee agencies
11 or law enforcement officials?
12     A    I don't believe so.
13     Q    Did you ever discuss Tennessee with any
14 Sunrise Wholesale employees?
15     A    I don't believe so.
16     Q    Have you ever heard of a person named
17 Lynn Averill?
18     A    I don't believe I have.
19     Q    I'm going to hand you what we're going
20 to mark as Exhibit --
21     THE REPORTER:  54.
22 BY MS. HERZFELD:
23     Q    -- 54.
24     (Borelli Exhibit No. 54 was marked

Page 417

1      for identification.)
2      MS. HERZFELD:  And here's for the rest
3 of everybody.
4      THE WITNESS:  Thank you.
5 BY MS. HERZFELD:
6      Q    I don't expect you to read this whole
7 thing, but if you want to take a minute just to
8 flip through it.
9      A    Okay.  (Peruses document.)
10     Q    If you will turn with me to page 6.
11 It's the one that's marked "6 of 36."  My
12 apologies.
13     A    That's all right.
14     It's upside down.
15     Q    Yeah, mine is too.
16     A    That's all right.
17     Q    Sorry about that.
18     A    Not a problem.
19     Q    Okay.  Do you see it?
20     A    I do.
21     Q    Okay.  And it says here, if you'll look
22 with me at -- the heading says "Real Care Medical
23 Group, Dr. Lynn Averill."  Do you see where it
24 says that?

Page 418

1    MR. TSAI:  Objection to this exhibit and
2  to this line of questioning when he's already
3  testified he's never heard of Lynn Averill.
4    Go ahead.
5  BY MS. HERZFELD:
6    Q   Do you see where I'm looking, the
7  heading?
8    A   I do.
9    Q   Have you heard of Real Care Medical
10  Group?
11    A   I have not.
12    Q   Do you know if Real Care Medical Group
13  was a customer of Sunrise?
14    A   I do not.
15    Q   Okay.  If you'll read with me on page 5
16  of 36.
17    A   Is this something that I should read
18  before we --
19    Q   Yeah, go ahead, you can read it.  Page 5
20  of 36, just one page ahead of where you were.
21    A   Okay.
22    Q   Paragraph (b) is where I'm looking at.
23    A   (Peruses document.)  Okay.
24    Q   Okay.  Take a look and just read

Page 419

1  paragraph (b).  Have you had a chance to read it?
2    A   I did not yet.
3    Q   Okay.  Do that.
4    A   Okay.  (Peruses document.)
5    I don't know what "affiant" means.
6    Q   Okay.  It's the person who's writing it.
7  It's the author.
8    A   (Peruses document.)  Okay.
9    Q   Okay.  You read paragraph (b)?
10    A   I did.
11    Q   Okay.  So it says that there was an
12  investigation in 2010 by special agents with the
13  DEA of certain pain clinics in South Florida; is
14  that right?
15    MR. TSAI:  Objection to the form.  No
16  foundation.
17  BY MS. HERZFELD:
18    Q   Did I read it correctly?
19    MR. TSAI:  Objection to the form.
20    THE WITNESS:  I believe that's what it
21  says.
22  BY MS. HERZFELD:
23    Q   Okay.  And were you aware of those
24  investigations of pain clinics throughout South

Page 420

1  Florida?
2    A   I don't believe I was.
3    Q   And in this one specifically, it talks
4  about patients coming from Florida, traveling to
5  South Florida from other states, including
6  Kentucky, Tennessee, Ohio and South Carolina, to
7  obtain prescribed controlled substances.  The
8  patients then returned to their home states where
9  the oxycodone pills were personally consumed or
10  sold on the streets at a high profit.  For
11  example, a 30-milligram oxycodone pill can be
12  obtained from a pharmacy in South Florida for
13  approximately $1 to $5 per pill and sold in
14  Tennessee for approximately $30 a pill.
15    Did I read that correctly?
16    MR. TSAI:  Object to the form.
17    THE WITNESS:  You read that correctly.
18  BY MS. HERZFELD:
19    Q   Okay.  And were you aware of that
20  information before you read it here?
21    A   No.
22    Q   Do you think it describes that pipeline
23  we were talking about before going from Florida
24  through Kentucky, Tennessee, Ohio?  It kind of

Page 421

1  sounds the same?
2    MR. TSAI:  Objection to form.  No
3  foundation, calls for speculation, assumes facts.
4    MS. HERZFELD:  And we don't need
5  speaking objections.  Thanks, though.
6    MR. TSAI:  These aren't speaking
7  objections.  I'm stating the grounds for the
8  objection.
9    Go ahead.
10    MS. HERZFELD:  You can object to the
11  form, and that's sufficient.
12    THE WITNESS:  You mentioned these states
13  for that road.  You didn't mention -- I don't know
14  if you mentioned South Carolina or not, but that's
15  on here as well.
16  BY MS. HERZFELD:
17    Q   Okay.
18    A   So you mentioned those states before.
19    Q   Okay.  And were you aware that this
20  investigation for this woman, nine people died?
21    A   I was not.
22    Q   Okay.  So if you will switch with me to
23  the page that says 14 of 36.
24    A   Okay.

Page 422

1    Q   Okay.  Do you see where it says
2  "Background information regarding the deaths of
3  nine patients"?  Do you see that?
4    A   I do.
5    Q   Okay.  And then the first one, it says:
6  "Brian Moore was a 36-year-old white male from
7  East Bernstadt" -- in where?
8        MR. TSAI:  Object to the form.
9        MS. HERZFELD:  I'm asking him to read
10  it.
11        THE WITNESS:  Laurel County.
12  BY MS. HERZFELD:
13    Q   Laurel County where?
14    A   Kentucky.
15    Q   Okay.  And if you go to the second --
16  the third individual, Kenneth Hammond, on page 16
17  of 36.  One of the other deaths that's outlined in
18  this indictment.  Where was that individual born,
19  according to this -- this paragraph?
20        MR. TSAI:  Object to the form.
21        THE WITNESS:  I don't know where he was
22  born.
23  BY MS. HERZFELD:
24    Q   Where is he from?

Page 423

1    A   It says Knoxville, Tennessee.
2    Q   Okay.  And then going to the fifth one,
3  "Tony Ray, a 40-year-old male, from" -- can you
4  read that for me, please?
5        MR. TSAI:  Object to the form.
6        THE WITNESS:  New -- New Tazewell,
7  Tennessee.
8  BY MS. HERZFELD:
9    Q   Great.  Then if you will flip to the
10  next page for me, please.  Number 6, "Keith Konkol
11  was a 37-year-old white male from" --
12        MR. TSAI:  Object to the form.
13  BY MS. HERZFELD:
14    Q   Do you see that, 18 --
15    A   Kingsport, Tennessee.
16    Q   Kingsport, Tennessee.  So Keith Konkol
17  was a 37-year-old white male from Kingsport,
18  Tennessee.  And he traveled 843 miles with
19  Jeremiah Fields to RCMG in Plantation, Florida,
20  and then he was dead.
21        Okay.  Number 7, Sally Dykes.
22        MR. TSAI:  Objection to the testimony.
23  There was no question there.
24        But go ahead.

Page 424

1  BY MS. HERZFELD:
2    Q   Sally Dykes, number 7, do you see that?
3    A   I do.
4    Q   Okay.  So Sally Dykes was a 44-year-old
5  white female from Luttrell, Tennessee.  Is that
6  right?  That's what it says?
7    A   That's what --
8        MR. TSAI:  Object to the form.
9        THE WITNESS:  -- it says.  Sorry.
10  BY MS. HERZFELD:
11    Q   Okay.  And according to this, Sally
12  Dykes is also dead; is that right?
13        MR. TSAI:  Object to the form.
14        THE WITNESS:  I'm sorry.
15  BY MS. HERZFELD:
16    Q   The title of this topic is "Background
17  information regarding the death of nine patients."
18  Is that right?
19    A   So she is number 7.  Okay.
20    Q   Okay.  So of the nine -- one, two,
21  three, four, five -- five of those nine were from
22  Kentucky or Tennessee according to this report; is
23  that right?
24        MR. TSAI:  Object to the form.

Page 425

1        THE WITNESS:  How many did you say?
2  BY MS. HERZFELD:
3    Q   Five.  Five of nine.  One from Kentucky
4  and four from Tennessee.
5        MR. TSAI:  Object to the form.  Lacks
6  foundation.
7        Go ahead.
8        THE WITNESS:  Yes, five.
9  BY MS. HERZFELD:
10    Q   Okay.  If you will turn with me to the
11  very last page of this.  Flip all the way to the
12  back.
13        Go back one more.  And one more.  And
14  one more.  There.
15        Okay.  So on this one it says page 1 of
16  2 at the end.  It says:  "In the Circuit Court for
17  the Seventeenth Judicial Circuit, in and for
18  Broward County, Florida."
19        Do you see where I'm looking at?  I just
20  want to make sure I'm identifying the right page.
21    A   Yes.
22    Q   Okay.  And this is an arrest warrant for
23  Defendant Lynn Averill on -- for multiple charges
24  of manslaughter as well as racketeering.

Page 426

1    Have you ever seen this before?

2    A    I have not.

3    Q    Okay.  And you didn't know who Dr. Lynn

4  Averill was.

5    A    No.

6    Q    Okay.  And you hadn't heard of the pain

7  clinic we talked about earlier?

8    A    What was the name of it?

9    Q    I'll find it.  It's on the upside down

10  page.  Real Care Medical Group.

11    A    I'm not familiar with them.

12    Q    Okay.  And you don't know if they were

13  or were not a customer of Sunrise Medical?

14    A    I do not.

15    MR. TSAI:  Daniel, may I ask how long

16  have we been going since the last break?

17    THE VIDEOGRAPHER:  One hour, one minute.

18  BY MS. HERZFELD:

19    Q    Do you know if anybody that you worked

20  with monitored news stories about people being

21  arrested for oxycodone distribution?

22    A    Specifically did that as a -- you mean

23  did that for their -- as their job?

24    Q    Yes, sir.

Page 427

1    A    I don't -- I don't know.

2    Q    Did you, sir?

3    A    Did I see articles?  I did.

4    Q    The ones that were sent to you.  But did

5  you make it a point to go and research and look to

6  see if there were any news articles about illegal

7  oxycodone sales?

8    A    I don't believe I did.

9    Q    Okay.  Did you ever check the websites

10  of any Department of Justice or U.S. Attorneys'

11  office on locations to determine if people were

12  being indicted for oxycodone, illegal oxycodone

13  sales?

14    A    I don't believe I did.

15    Q    Okay.  Do you believe that you ever

16  visited the website or got any information from

17  the U.S. Attorney's office in Tennessee for the

18  Eastern District about any ongoing investigations

19  or arrests or convictions for oxycodone sales?

20    A    I don't believe I did.

21    Q    Okay.  Have you heard of Chris or Jeff

22  George?

23    A    I don't -- no.  Did they work for me?

24    Q    Those names don't ring a bell?

Page 428

1    A    Did they work for -- no, they do not.

2    Q    Pill mill operators?

3    A    Oh, no.

4    Q    No?  Okay.

5    A    No.

6    Q    Do you know which distributors shipped

7  Mallinckrodt opioids to Tennessee?

8    A    I do not.

9    Q    Do you know who would know?

10    A    I would imagine the chargeback

11  department.

12    Q    Okay.

13    A    Is that what you mean?  Okay.

14    Q    I'm asking you, who do you think would

15  know?  You worked there, so you would know better

16  than I would who would know.

17    A    I would think the chargeback department,

18  but I'm not sure.

19    Q    Okay.  Where would I find information

20  about which distributor shipped the greatest

21  number of Mallinckrodt opioids to Tennessee?

22    A    Either the suspicious order monitoring

23  team or chargeback team.

24    Q    Okay.  And I think we kind of danced

Page 429

1  around this before, but maybe this is a clearer

2  question.

3    Were distributors shipping to Tennessee

4  ever treated differently due to the severity of

5  the opioid abuse in Tennessee?  Were they treated

6  differently in any way?

7    MR. TSAI:  Object to the form.

8    THE WITNESS:  I don't know the answer to

9  that.

10  BY MS. HERZFELD:

11    Q    So to your knowledge, did you ever

12  instruct anyone to treat differently distributors

13  that were shipping to Tennessee?

14    A    I don't believe I -- I don't believe I

15  did, but I only had a small number of customers

16  versus the entire geography of the country.

17    Q    Did you ever hear of anyone else giving

18  an instruction like that?

19    A    Nothing comes to mind right now.

20    Q    Okay.  Did you discourage any of your

21  distributor customers from selling to pharmacies

22  in Tennessee?

23    A    I don't remember conversations I had

24  from back then, so I don't know.

Page 430

1    Q   Okay.  Do you know if you encouraged
2  them to sell to pharmacies in Tennessee?
3    A   I don't think I gave direction on
4  customers to go after like that, so I don't think
5  I encouraged.  But I -- you're talking 10 or 12
6  years ago.
7    Q   Okay.  So you don't have any specific
8  knowledge of telling anyone one way or the other
9  whether they should or should not want to sell to
10 pharmacies in Tennessee.
11   A   I believe that's correct.
12   Q   Okay.  Did you ever take population into
13 account when evaluating a potential customer and
14 where they were shipping to?
15   A   Nothing comes to mind.
16   Q   Okay.  Did you take any affirmative
17 steps to send fewer Mallinckrodt opioids to
18 Tennessee?
19      MR. TSAI:  Object to the form.
20      THE WITNESS:  I don't know where my
21 customers would ship product to.  But did I take
22 steps to safeguard our organization, I believe I
23 did.  I think there were -- not in this packet,
24 but I think from the packets earlier today, there

Page 431

1  were a few -- quite a few callouts about being
2  careful and dig deeper into the customer
3  background.
4  BY MS. HERZFELD:
5    Q   Okay, sir, but my question was, did you
6  ever seek to send fewer Mallinckrodt opioids
7  specifically to Tennessee?
8      MR. TSAI:  Object to the form.
9      THE WITNESS:  Well, I don't know whether
10 you count shipped to.  But if I'm giving direction
11 or talking to the suspicious order monitoring
12 team, I would think that that would be a yes to
13 that.
14 BY MS. HERZFELD:
15   Q   Okay.  So can you tell me what specific
16 steps you took to reduce the number of
17 Mallinckrodt opioids in Tennessee specifically.
18   A   Well, I don't know where my customers
19 shipped to, so I don't know if Tennessee or
20 California was the final destination for the
21 pharmacy.
22   Q   Okay.
23   A   So if I give a broad brush -- if I have
24 a broad brush conversation with suspicious order

Page 432

1  monitoring or if they share with me, and I share
2  with my customers, then, yes, it would -- and
3  maybe it would affect a Tennessee -- the product
4  that goes into Tennessee as well.
5    Q   Okay.  But other than the general stuff
6  that's already been talked about today, you didn't
7  make any specific efforts to reduce the number of
8  Mallinckrodt opioids in Tennessee, specifically
9  for Tennessee, other than the broad stuff you've
10 already talked about?
11   A   I don't know how I would.
12   Q   Okay.  Did you ever compare the number
13 of Mallinckrodt opioids sent to Tennessee to those
14 of other manufacturers?
15   A   It doesn't come to mind, no.
16   Q   And do you know which Tennessee
17 pharmacies received Mallinckrodt opioids?
18   A   I do not.
19   Q   Okay.  And do you know how I could find
20 that out?
21   A   I would think you could find that out
22 through chargebacks.
23   Q   Okay.
24   A   The chargebacks department.

Page 433

1    Q   Okay.  Did you interact at all with
2  pharmacies in Tennessee?  Did you personally
3  interact at all with any Tennessee pharmacies?
4    A   No, I did not.
5    Q   Do you know if anybody from your team
6  did?
7    A   I can't speak for my team.
8    Q   Do you know --
9    A   I didn't have a team.  There were -- you
10 mean -- you mean the other salespeople?
11   Q   Yes, sir.
12   A   I can't speak for them.
13   Q   Okay.  Did you ever hear of anybody
14 interacting with Tennessee pharmacies?
15   A   It doesn't come to mind.
16   Q   Okay.  Did Mallinckrodt maintain a list
17 of problem pharmacies in Tennessee?
18   A   I don't know the specifics of the list
19 of where the -- where the customers that the --
20 the suspicious order monitoring team put out.  I
21 don't know if they're Tennessee based or
22 California based or Minnesota based.  I don't
23 remember.
24   Q   Okay.  So you don't know anything

Page 434

1  specific about Tennessee in that regard?
2      A   No.
3      Q   Okay.  Do you know which Tennessee
4  pharmacies were on Mallinckrodt's chargeback
5  restriction list?
6      A   Not off the top of my head from ten
7  years ago.  I'm sorry, I do not.
8      Q   Okay.  If I told you some of them, would
9  you know why they were put on the list?
10     A   A name may not ring a bell to me.  I'm
11  sorry.
12     Q   Okay.  So Boatwright Drug Company, for
13  example, in Millington, do you know why that
14  pharmacy was put on the list?
15     A   I didn't know they were on the list, but
16  if they're on the list, I don't know why.
17     Q   Okay.  Who would be the best person that
18  would know that?
19     A   I would think perhaps the suspicious
20  order monitoring team.
21     Q   Okay.  And are there documents I could
22  go to to find the reasons?  Is there a report or
23  something you would get that would say why this
24  person has been put on the chargeback list?

Page 435

1      A   They would have that report.  If there
2  is a specific callout for a pharmacy, I'm going
3  to -- I'm assuming that they would.  It's not
4  something --
5      Q   Okay.  Just trying to figure out where
6  to look.
7      A   It's not something that I would
8  generate.
9      Q   Okay.
10     A   Or have.
11     Q   Okay.  Did you know anything about the
12  top prescribers of Mallinckrodt opioids in
13  Tennessee?  Do you know who they are?
14     A   I do not.
15     Q   Okay.  Did you receive a list of top
16  prescribers of Mallinckrodt opioids in Tennessee
17  at any point?
18     A   I don't remember receiving one, but I
19  may have.  But I don't remember ever receiving
20  one.
21     Q   Would that be usual that you would
22  receive sometimes a list of the top prescribers in
23  various jurisdictions?
24     A   I'm not sure what "usual" means right

Page 436

1  now.
2      Q   You could have received such a list.
3      A   I may have.  I don't know.
4      Q   And it wouldn't -- it wouldn't have been
5  weird for you to receive something like that?
6      MR. TSAI:  Object to the form.
7      THE WITNESS:  I don't know.  I don't
8  know.
9      MS. HERZFELD:  Okay.  Okay.  If we could
10  mark the next one, Exhibit --
11     THE REPORTER:  55.
12     MS. HERZFELD:  -- 55.
13     (Borelli Exhibit No. 55 was marked
14     for identification.)
15  BY MS. HERZFELD:
16     Q   Take a moment to read it from beginning
17  to end, please.
18     A   (Peruses document.)  Okay.
19     Q   Okay.  And do you recognize this as an
20  e-mail chain sent between you and Steve Cochrane
21  at KeySource Medical dated November 6th, 2009?
22     A   I recognize it, yes.
23     Q   Okay.  And the e-mail that you sent to
24  Steve, you're talking about a retired DEA agent

Page 437

1  that has a consulting company, yes?
2      A   Yes.
3      Q   Okay.  And if you get to kind of the
4  last line of that first paragraph, it says:  "Then
5  you could approach Denny with as much information
6  as possible when you are pitching for the Florida
7  oxycodone business again."
8      Did I read that correctly?
9      A   Yes.
10     Q   Okay.  And who is Denny?
11     A   I believe that was the president of
12  KeySource Medical, Denny Engel.
13     Q   Okay.  And what did you mean by:  "You
14  could approach Denny with as much information as
15  possible when you are pitching for the Florida
16  oxycodone business again"?
17     A   I'm not quite sure of the context, but I
18  don't -- I -- I can't speak to the context on this
19  one.
20     Q   Okay.  Was KeySource out of the
21  oxycodone business in Florida at some point?
22     A   I don't remember the timing of it all.
23  I don't remember the timing.
24     Q   Okay.  And then it looks like Steve's

Page 438

1 response to you up there: "Victor, thanks for the
2 info. I'm liking Louis already."
3        I'm assuming that has to do with the
4 fact that he is a Red Sox fan and doesn't like the
5 Yankees."
6    A    I -- I guess so.
7    Q    Okay.
8    A    Yes. Everybody hates the Yankees, I
9 guess.
10   Q    Okay. "At some point KeySource will
11 need to move forward and take advantage of some of
12 the," quote, "legitimate business that does exist
13 in Florida since there is plenty of it. I will
14 let Dave figure this one out. We don't call him
15 smart and sexy for nothing."
16        Did I read that correctly?
17   A    You did.
18   Q    Okay. And do you know what he's
19 referring to, the legitimate business in Florida?
20   A    This is his e-mail to me.
21   Q    Yes, sir.
22   A    So yeah, I know -- I'm just saying this
23 is his e-mail to me, so I can't speak for Steve
24 Cochrane on that. I'm not sure -- I'm not sure

Page 439

1 what he means by those sentences.
2    Q    So you're talking about the Florida
3 oxycodone business when you e-mail him, right?
4    A    I am.
5    Q    Okay. And then he responds that he
6 could take advantage of some of the, quote,
7 legitimate business that does exist in Florida.
8    A    When I'm talking about the Florida
9 business, I'm -- really the guts of this -- really
10 the only part of this e-mail is to refer him to a
11 consultant that was a DEA agent, Louis Fisher,
12 over 30 years. So -- he is also a registered
13 pharmacist. I forgot that. So that's what I --
14 that's what I'm sending this to him for is to
15 perhaps use a professional -- use a person who
16 vets out -- vets customers for wholesalers.
17   Q    Okay. And then when he talks to you
18 about the business in Florida, he puts in quotes
19 "legitimate" right? The legitimate businesses.
20   A    That's what he typed.
21   Q    So that would imply there's legitimate
22 and illegitimate oxycodone business in Florida.
23 Isn't that right?
24   A    Not that I know of. I don't know what

Page 440

1 he means by this. That was his -- him -- him
2 sending this to me.
3    Q    So you don't know what he meant by that?
4    A    That's right.
5    Q    Okay.
6        MS. HERZFELD: Okay. We will take a
7 break. I'll go through and see if I've got
8 anything else.
9        THE VIDEOGRAPHER: The time is 7:45 p.m.
10 We're going off the record.
11       (Recess.)
12       THE VIDEOGRAPHER: The time is 7:52 p.m.
13 We're back on the record.
14 BY MS. HERZFELD:
15   Q    Okay, Mr. Borelli, we're back on the
16 record. I've just got a couple more questions for
17 you.
18       Earlier when we were talking about
19 Dr. Barry Schultz, you said you -- I'm
20 paraphrasing here, but you didn't -- didn't recall
21 him.
22   A    He did not come to mind, yes.
23       MS. HERZFELD: Okay. I'm going to mark
24 this as Exhibit 56.

Page 441

1        (Borelli Exhibit No. 56 was marked
2        for identification.)
3 BY MS. HERZFELD:
4    Q    You'll read it from the bottom up.
5    A    (Peruses document.) Okay.
6    Q    Okay. You've had a chance to review it?
7    A    Yes.
8    Q    Okay. And now that you had a chance to
9 review it, does that refresh your recollection at
10 all about being involved at all with investigating
11 Sunrise and dealing with Barry Schultz?
12   A    I -- I was not part -- I was in the
13 meeting of the audit.
14   Q    Okay.
15   A    And it looks like Barry Schultz was one
16 of five random audits -- random accounts that was
17 pulled. I don't know if I pulled them or our
18 suspicious order monitoring team. I'm not sure.
19 It looks like one of five, yeah.
20   Q    Okay. And so you sent this initial
21 e-mail, right? It's from you, Victor Borelli, to
22 Karen Harper, copying John Adams, on August 18th,
23 2009, at 9:57 p.m.; is that correct?
24   A    Yeah. Recapping the meeting, yeah.

Page 442

1    Q   Okay.  And it says "Sunrise meeting,"
2  that's the subject, right?
3    A   Yes.
4    Q   Okay.  So you start out:  "Hey, Karen --
5  Hi, Karen, thanks for taking the time to come out
6  to visit with Sunrise Wholesalers, Inc."
7        You're referring there to the audit
8  meeting?
9    A   I believe so.
10   Q   Okay.  "I'll recap today's meeting by
11 the end of the week, but I did want to give you
12 the information that you were looking for from the
13 five targeted customers we reviewed during today's
14 audit/meeting."
15       Do you see where it said that?
16   A   Yes.
17   Q   Okay.  And it says "five targeted
18 customers," not five random customers; is that
19 right?
20   A   Yes.  But I don't know how those
21 customers -- I don't remember how those customers
22 were culled out.
23   Q   Okay.  But, importantly, number 4 is
24 Dr. Barry Schultz; is that right?

Page 443

1    A   Yes.
2    Q   And you said there was a review of the
3  formal questionnaire filled out by Louis Fisher as
4  well as the recent 222 forms with the orders
5  attached.  4.  Dr. Barry Schultz, during this
6  audit in August of 2009.  Is that right?
7    A   That's what it says.
8    Q   Okay.  And then Karen responds to your
9  e-mail and says:  "Thanks for the recap.  It was
10 good to work with you," et cetera, et cetera, et
11 cetera.  Is that right?
12   A   Yes.
13   Q   Okay.  And so you did have -- you did
14 review the ordering habits of Dr. Barry Schultz in
15 2009, and continued -- and as well as other
16 Sunrise targeted customers, and continued to ship
17 to Sunrise after these audit findings; is that
18 correct?
19       MR. TSAI:  Object to the form.
20       THE WITNESS:  With the -- with the
21 specific to number 4, Barry Schultz, it looks like
22 he ordered a certain amount, and they shipped him
23 a different amount, and then stopped the order.
24       So I don't know if there were -- so on

Page 444

1  this one, on this specific instance, they -- he
2  had an order in the system, they didn't ship in
3  full, and then they stopped the order, closed the
4  -- closed down the order.  I'm not quite sure what
5  that means, "closed down the order," but maybe
6  didn't ship the balance.
7  BY MS. HERZFELD:
8    Q   Okay.  And in your follow-up to that,
9  you say:  "This may have been done due to the
10 'tiered system' of ordering that Carlos Veron has
11 been referring to during today's meeting."
12       What's the tiered system?
13   A   I don't quite remember.  I'm not sure.
14   Q   All right.  Okay.
15   A   He said it, right.  Carlos Veron may
16 have mentioned it, so I highlighted that, but I
17 don't remember what it was.
18   Q   Okay.  Okay.  And then No. 57.  Oops,
19 let me give you the right one.
20       (Borelli Exhibit No. 57 was marked
21        for identification.)
22       THE WITNESS:  Thank you.
23 BY MS. HERZFELD:
24   Q   Okay.  If you'll look at the bottom and

Page 445

1  work your way up, it looks like an e-mail from you
2  to Jim Rausch and Karen Harper dated June 9th,
3  2011, at 8:34 p.m.
4        Did I read that correctly?
5    A   Yes.
6    Q   Okay.  And who is Jim Rausch?
7    A   I don't remember what Jim did with
8  the -- the company.  Custom -- customer service.
9  I'm not -- I'm not quite sure.
10   Q   Okay.  And Karen Harper, we know.  We've
11 already talked about Jane Williams and Michael
12 Gunning today, I believe; is that right?
13   A   Yes.
14   Q   And the topic here is "KeySource
15 Medical"; is that right?
16   A   Yes.
17   Q   Okay.  If you'll flip with me to the
18 charts on the second page, on the back page.
19 There you go.
20       So at the top here, and this is
21 Mallinckrodt TI_0000561581, just so we're clear
22 because there's two charts.
23       Does it have your name and information
24 at the top of this document?

Page 446

1    A    That -- that looks like my -- when I do
2  e-mails.
3    Q    Okay.
4    A    Oh, yeah.  Okay.
5    Q    Okay.  And then look at the bottom here,
6  underneath where it has your name, it says
7  "Oxycodone Distribution - KeySource"; is that
8  right?
9    A    Yes.
10   Q    Okay.  And so does this appear to be a
11 chart of where KeySource is sending oxycodone from
12 October 2007 through February of 2011?
13   A    It doesn't look familiar, but -- it
14 looks -- it's hard --
15   Q    Is that what the chart says?
16   A    It's hard to tell, but, yeah, I believe
17 so.
18   Q    Okay.  And it's measuring a couple of
19 different states, right:  Florida, Texas, Ohio,
20 Kentucky, Tennessee and Georgia?
21   A    Yes.
22   Q    Okay.  And before when we were talking,
23 you had said that you didn't think any of your
24 accounts were shipping to Tennessee.  Do you

Page 447

1  remember we talked about that?
2    A    I don't know -- I'm not sure if I said
3  I -- did I say I was certain they didn't ship to
4  Tennessee or I don't know if they shipped to
5  Tennessee?  I don't know where my accounts shipped
6  to.  I know where I shipped --
7    Q    Okay.
8    A    -- my product to, and I'm not certain of
9  where they ship it to.
10   A    And then I'm not certain of who they
11 dispense it to, those accounts to patients at all.
12   Q    Okay.  But this chart would seem to
13 indicate that KeySource was shipping at least some
14 oxycodone to Tennessee because it has its own line
15 here.
16   A    Okay.
17   Q    Do you see that?
18   MR. TSAI:  Objection.  Lacks foundation.
19   THE WITNESS:  So I do see that.
20 BY MS. HERZFELD:
21   Q    Okay.  So you see -- if you look all the
22 way to the right to the key on this chart, right,
23 it has "Tennessee," and it has a line with like an

Page 448

1  "X."  And so that's one you're supposed to look
2  for to determine Tennessee.
3    MR. TSAI:  Object --
4  BY MS. HERZFELD:
5    Q    It's a little hard because it's in black
6  and white.
7    MR. TSAI:  Object to the form, lacks
8  foundation.
9    THE WITNESS:  Yes.
10 BY MS. HERZFELD:
11   Q    Okay.  And do you see that line that
12 goes through for Tennessee being on the chart?
13 It's a little hard to see.
14   A    It's hard to see, so I'm not quite sure
15 which one Tennessee is, but there's a legend on
16 the right.
17   Q    Mm-hmm.  So you would think Tennessee is
18 included on this chart if it's on the legend.
19   MR. TSAI:  Object to the form, lacks
20 foundation.
21   THE WITNESS:  I would, but I don't see
22 it.
23 BY MS. HERZFELD:
24   Q    If you hand it to me, I might be able to

Page 449

1  help you out.  Thank you.
2    If you look right here, and I know it's
3  really hard because it's really faint, do you see
4  those little Xs there, and there's a little X
5  there and a little X there (indicating).  Do you
6  see those lines?  A little X there.  It's the one
7  with the X (indicating).
8    A    It's hard to see.
9    MR. TSAI:  Is there a question pending?
10 Go ahead.
11   MS. HERZFELD:  I just want him to take a
12 look at it.
13 BY MS. HERZFELD:
14   Q    Okay.  So the one with the little X, you
15 see where I pointed it out, right?  All of those
16 are under 10 percent, those little parts that I
17 pointed out to you.
18   A    Okay.
19   Q    Okay?  So that would be the Tennessee
20 line under -- under 10 percent.
21   MR. TSAI:  Object to the form, lacks
22 foundation.
23 BY MS. HERZFELD:
24   Q    But then it looks here -- if you look at

Page 450

1 the Florida, do you see the Florida line?

2     A   I do.

3     Q   Okay. So it looks like the Florida line

4 jumps way up at some point; is that right?

5     MR. TSAI: Object to the form, lacks

6 foundation.

7     THE WITNESS: It does.

8 BY MS. HERZFELD:

9     Q   Okay. And what -- what year does it

10 seem to make the -- the first big jump?

11     MR. TSAI: Object to the form.

12     THE WITNESS: Latter part of 2009.

13 BY MS. HERZFELD:

14     Q   Okay. And so it kind of stays under

15 10 percent generally, until you get to about

16 February of 2009, and then it jumps up to just

17 under 20 percent in April of 2009; is that right?

18     MR. TSAI: Object to the form.

19     THE WITNESS: That's right.

20 BY MS. HERZFELD:

21     Q   Okay. And then going from April of 2009

22 until you get to August of 2009, it really climbs

23 up to somewhere between 80 and 90 percent,

24 according to this chart; is that right?

Page 451

1     MR. TSAI: Object to the form, lacks

2 foundation.

3     THE WITNESS: When? April --

4 BY MS. HERZFELD:

5     Q   Between April 2009 and August of 2009.

6     A   Okay.

7     Q   Do you see the Florida jump goes way up

8 to almost 90 percent?

9     A   I do.

10     Q   Okay. And then at some point, does it

11 get over 90 percent, KeySource's oxycodone

12 distribution to the state of Florida?

13     A   Okay.

14     Q   Do you see it get over 90 percent at

15 some point?

16     A   I do.

17     Q   Okay. And when is that?

18     A   The middle of 2011 -- '10.

19     Q   Okay. And it kind of stays that way for

20 a while, right?

21     A   Yep.

22     Q   Okay. So my question is, KeySource's --

23 if 90 percent roughly, right, of KeySource's

24 oxycodone was going to Florida, is that something

Page 452

1 that -- that was concerning?

2     MR. TSAI: Object to the form.

3     THE WITNESS: Concerning -- I don't -- I

4 don't know where they shipped product to.

5 BY MS. HERZFELD:

6     Q   So you were unaware of this?

7     A   Well, I must have read this when I got

8 it, but I was unaware -- I don't know where they

9 shipped product to. There are 50 states.

10     Q   Okay. Do you think it's a little

11 lopsided that so much product for oxycodone was

12 going to one state versus others?

13     MR. TSAI: Object to the form.

14     THE WITNESS: If doctors are in -- so,

15 no, if doctors are in Florida writing for this

16 product, the product's got to be in Florida to be

17 distributed.

18 BY MS. HERZFELD:

19     Q   So there's just more doctors that write

20 more prescriptions in Florida for oxycodone?

21     MR. TSAI: Object to the form.

22     THE WITNESS: Nothing moves out of --

23 out of a wholesaler's warehouse until a customer

24 calls for the order, their customer. Nothing

Page 453

1 moves out of that customer, whether it be a

2 pharmacy or a clinic business, until a patient

3 walks in with a prescription.

4 BY MS. HERZFELD:

5     Q   Right. And --

6     A   That doesn't happen until it gets

7 written by a doctor. So, it looks like there are

8 more prescriptions in Florida.

9     Q   By a lot. No? I mean if you look here,

10 if you look at Texas, Ohio, Kentucky, Tennessee

11 and Georgia, those are all hovering around

12 10 percent. Maybe at one point, you know,

13 Kentucky shoots up and is at 45 percent, but, you

14 know, other than that Kentucky spike in those

15 couple of years, everything else is hovering

16 between 20 and 10, even under 10 percent. Florida

17 is like way up, right, over 90 percent?

18     MR. TSAI: Object to the form.

19 BY MS. HERZFELD:

20     Q   Do you know why?

21     A   I do not.

22     Q   Okay. And you could have had access to

23 this information about KeySource sending roughly

24 90 percent of its oxycodone to Florida. You could

Page 454

1  have had access to that information if you wanted
2  it, yes, sir?
3      A   It's not something I dealt with ever,
4  that I was ever in the chargeback system or data.
5  So I would have to ask for that.
6      Q   Okay.  But you could ask for it if you
7  wanted it?
8      A   I imagine so.
9      Q   Okay.  Sir, do you feel a moral
10 obligation to not contribute to the opioid crisis?
11         MR. TSAI:  Object to the form.
12         THE WITNESS:  Do I feel a moral
13 obligation not to?
14 BY MS. HERZFELD:
15     Q   Yes, sir.
16         MR. TSAI:  Object to the form.
17         THE WITNESS:  I'm not sure how to
18 answer that.  I assume --
19 BY MS. HERZFELD:
20     Q   Let me ask it -- I'm going to ask it a
21 different way.
22     A   Please.  Please.
23     Q   Do you feel that you, in doing your job,
24 contributed to the opioid crisis in this country?

Page 455

1      A   I do not.
2      Q   Do you feel that you have a moral
3  obligation to not contribute to the opioid crisis
4  in this country?
5      A   You just asked the same thing I didn't
6  understand the first time.
7      Q   Mm-hmm.
8      A   So I don't understand -- you -- I just
9  answered it, didn't I?
10     Q   I asked if you thought you had
11 contributed, and you said no.
12     A   Right.
13     Q   Do you think you have a moral obligation
14 to not contribute to the opioid crisis?
15     A   I believe I have a moral obligation --
16     Q   Is that a "yes"?
17     A   Can you ask it again, please?  It sounds
18 like there's a negative or --
19     Q   There is -- there is a negative, okay?
20 So --
21     A   So can you not --
22     Q   -- I'll try to ask it another way.
23     A   Sorry.
24     Q   That's okay.

Page 456

1          Okay.  So you don't think that you have
2  contributed to the opioid crisis when you were
3  doing your job for Mallinckrodt; is that right?
4      A   That is correct.
5      Q   Okay.  And you acknowledge that there is
6  an opioid crisis in this country?
7      A   I believe so.
8      Q   Okay.  And so do you think that in doing
9  your job, it's possible you could contribute to
10 the opioid crisis in this country when you were
11 working for Mallinckrodt?
12         MR. TSAI:  Object to the form.
13         THE WITNESS:  No, I said I didn't
14 consider me being part of that problem.
15 BY MS. HERZFELD:
16     Q   Okay.  And morally, do you think you
17 have an obligation to try to prevent that problem?
18     A   So the answer is yes to that.
19     Q   Okay.  And so you feel like in your
20 position at Mallinckrodt, when you were selling
21 oxycodone specifically to distributors that were
22 distributing them to various places, including
23 Florida, you had an obligation to not contribute
24 to the ongoing opioid crisis.

Page 457

1      A   Did you just do that again?
2      Q   I did.
3      A   Asked a negative in there.
4      Q   I don't know how else to ask it.
5      A   So I answered I do believe I have a
6  moral obligation, and I answered I do believe I
7  did not contribute to the opioid epidemic.
8      Q   Okay.  And so how is it that you think
9  that --
10     A   My -- my goal --
11     Q   Mm-hmm.
12     A   -- was to ship to customers of mine.  I
13 did not control who those customers, my customers
14 or the country's customers shipped to.
15     Q   Mm-hmm.
16     A   Nor did -- nor did those -- nor do I
17 know who those customers then give the
18 prescriptions to.
19     Q   Mm-hmm.  But if you know now, just say
20 you do, that some of those customers of your
21 customers were giving opioids out inappropriately,
22 were dispensing without a medical need, that
23 they -- that those pills were ending up in an
24 illegal drug market, those Mallinckrodt opioid

Page 458

1  pills, and they were going from Mallinckrodt to,
2  let's say, Sunrise, okay, to let's say Barry
3  Schultz, and they end up on a street in Tennessee
4  or wherever, do you think you had a role in that?
5       MR. TSAI:  Objection.  Assumes facts,
6  improper hypothetical.
7       Go ahead.
8       THE WITNESS:  That's a big hypothetical.
9  That's a big reach.  I don't believe I did.  I
10 shared with you that I had customers.  From that
11 point to who they shipped to, who they dispensed
12 to, from the doctor that writes it, it's a far
13 reach.
14 BY MS. HERZFELD:
15      Q   Okay.  So your job was just to sell it.
16      MR. TSAI:  Object to the form.
17      THE WITNESS:  Not just to sell, but to
18 be the liaison between my customer and my
19 organization, and then there were a lot of things
20 that go on as well.
21 BY MS. HERZFELD:
22      Q   Okay.  But your primary job was to sell
23 oxycodone to your customers; is that right?
24      MR. TSAI:  Object to the form.

Page 459

1       THE WITNESS:  No, not at all.
2  BY MS. HERZFELD:
3       Q   Okay.  To sell molecules, as you called
4  them, to your customers, that was your primary
5  job.
6       A   All of our family of products, that's
7  correct.
8       Q   Okay.  So your primary job is to sell
9  your entire family of products, your molecules to
10 your customers.  You were a salesman, that was
11 your job.
12      A   That's correct.
13      Q   Okay.  And one of those molecules, one
14 of those products that you had was oxycodone; is
15 that right?
16      A   That is correct.
17      Q   Okay.  And so part of your job -- at
18 least part of your job was to sell oxycodone to
19 your customers.
20      A   That is correct.
21      Q   Okay.  And so after that, you don't
22 think it's your responsibility on what happens to
23 it?
24      MR. TSAI:  Object to the form.

Page 460

1       THE WITNESS:  That's you saying that.  I
2  said I do believe I have a moral obligation, and I
3  believe I did take actions to make sure that my
4  organization or even my accounts that I had
5  managed throughout my career at -- at Mallinckrodt
6  did not ship to the accounts that abused or to
7  patients that abused the -- the product.
8  BY MS. HERZFELD:
9       Q   And that's what you talked about earlier
10 today, those are all the steps that -- that you
11 took.
12      A   We talked about a lot of things today.
13      Q   Are there any steps that you took in
14 that vein that you haven't talked to us about
15 today?
16      A   You know, we talked about a lot of
17 things today.  So I apologize if I don't 'member
18 them -- remember them all.
19      Q   Okay.  But as we sit here today, can you
20 think of any other steps that you took to stop the
21 opioid crisis, to not contribute to the opioid
22 crisis other than what we've talked about today?
23      MR. TSAI:  Objection.  Repetitive,
24 duplicative.

Page 461

1       THE WITNESS:  I think I responded to
2  that a bunch of times today.
3  BY MS. HERZFELD:
4       Q   Yeah, my question is, as you're sitting
5  here with me, do you remember anything else that
6  we haven't asked you about?
7       MR. TSAI:  Same objection.
8       THE WITNESS:  Off the top of my head,
9  not right now.
10      MS. HERZFELD:  Okay.  I don't think I
11 have any other questions.  Thanks.
12      MR. TSAI:  Can I get a time count from
13 the last break.
14      THE VIDEOGRAPHER:  This session was 20
15 minutes.
16      MR. TSAI:  Okay.  Off the record.
17      THE VIDEOGRAPHER:  The time is 8:13 p.m.
18 We're going off the record.
19      (Whereupon, the deposition of
20      VICTOR BORELLI was adjourned at
21      8:13 p.m.)
22
23
24

Page 462

1   CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      The undersigned Certified Shorthand Reporter
3   does hereby certify:
4      That the foregoing proceeding was taken before
5   me at the time and place therein set forth, at
6   which time the witness was duly sworn; That the
7   testimony of the witness and all objections made
8   at the time of the examination were recorded
9   stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14     In witness thereof, I have subscribed my name
15  this date:  December 3, 2018.
16
17     _____
18        LESLIE A. TODD, CSR, RPR
19        Certificate No. 5129
20  (The foregoing certification of
21  this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

Page 463

1         INSTRUCTIONS TO WITNESS
2      Please read your deposition over carefully and
3   make any necessary corrections. You should state
4   the reason in the appropriate space on the errata
5   sheet for any corrections that are made.
6   After doing so, please sign the errata sheet
7   and date it.
8      You are signing same subject to the changes
9   you have noted on the errata sheet, which will be
10  attached to your deposition.  It is imperative
11  that you return the original errata sheet to the
12  deposing attorney within thirty (30) days of
13  receipt of the deposition transcript by you. If
14  you fail to do so, the deposition transcript may
15  be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24

Page 464

1         - - - - - -
2         E R R A T A
3         - - - - - -
4   PAGE LINE CHANGE
5   ____ ____ _____
6   REASON: _____
7   ____ ____ _____
8   REASON: _____
9   ____ ____ _____
10  REASON: _____
11  ____ ____ _____
12  REASON: _____
13  ____ ____ _____
14  REASON: _____
15  ____ ____ _____
16  REASON: _____
17  ____ ____ _____
18  REASON: _____
19  ____ ____ _____
20  REASON: _____
21  ____ ____ _____
22  REASON: _____
23  ____ ____ _____
24  REASON: _____

Page 465

1      ACKNOWLEDGMENT OF DEPONENT
2      I,_____, do hereby
3   certify that I have read the foregoing pages, and
4   that the same is a correct transcription of the
5   answers given by me to the questions therein
6   propounded, except for the corrections or changes
7   in form or substance, if any, noted in the
8   attached Errata Sheet.
9
10  _____
11  VICTOR BORELLI              DATE
12
13
14  Subscribed and sworn to
15  before me this
16  _____day of_____,20___.
17  My commission expires:_____
18  _____
19  Notary Public
20
21
22
23
24