## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL             : HON. DAN A.
PRESCRIPTION OPIATE          : POLSTER
LITIGATION                   :
                             : NO.
APPLIES TO ALL CASES         : 1:17-MD-2804

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

JANUARY 15, 2019

- - -

Videotaped deposition of
ANDREW BOYER, held at the offices of
BRESSLER AMERY & ROSS, 325 Columbia
Turnpike, Florham Park, New Jersey, on
Tuesday, January 15, 2019, beginning at
approximately 9:50 a.m., the proceedings
being recorded stenographically by Gail
Inghram Verbano, Registered Diplomate
Reporter, Certified Realtime Reporter,
Certified Shorthand Reporter (No. 8635),
and transcribed under her direction.

Videotape technician:  Eric Davidson

## Page 2

1  APPEARANCES:
2  WAGSTAFF & CARTMELL, LLP
   4740 Grand Avenue, Suite 300
3  Kansas City, Missouri 64112
   816 701 1100
4  BY: JONATHAN P  KIEFFER, ESQ
   jpkieffer@wcllp com
5  BY: JACK T  HYDE, ESQ
   jhyde@wcllp com
6  Counsel for Plaintiff(s)
7  SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
   One Sansome Street, Suite 2830
8  San Francisco, California 94104
   415 546 7300
9  BY: MARK G  CRAWFORD, ESQ
   mcrawford@skikos com
10  Counsel for Plaintiff(s)
11  ROBBINS GELLER RUDMAN & DOWD, LLP
    Post-Montgomery Center
12  One Montgomery Street, Suite 1800
    San Francisco, California 94104
13  415 288 4545
    BY: KELLI BLACK, ESQ
14  kblack@rgrdlaw com
    Counsel for Plaintiff(s)
15
    ROBBINS GELLER RUDMAN & DOWD, LLP
16  655 West Broadway Suite 1900
    San Diego, California 92101
17  619 231 1068
    BY: THOMAS E  EGLER, ESQ
18  tegler@rgrdlaw com
    Counsel for Plaintiff(s)
19
    COVINGTON & BURLING, LLP
20  One City Center, 850 10th Street NW
    Washington, D C  20001-4956
21  202 662 5215
    BY:  J  CHASE JOHNSON, ESQ
22  jcjohnson@cov com
    Counsel for Defendant McKesson Corporation
23
24

## Page 3

1  APPEARANCES (Cont'd):
2  JONES DAY
   555 South Flower Street, 15th Floor
3  Los Angeles, California 90071
   213.243.2567
4  BY:  SARAH CONWAY, ESQ.
   sgconway@jonesday.com
5  Counsel for Defendant
6  KIRKLAND & ELLIS, LLP
   655 Fifteenth Street, Northwest
7  Washington, D.C.  20005
   202.879.5951
8  BY: PAUL J. WEEKS, ESQ.
   paul.weeks@kirkland.com
9  Counsel for Defendant
10  MORGAN LEWIS & BOCKIUS, LLP
    200 South Biscayne Boulevard, Suite 5300
11  Miami, Florida 331313-2339
    305.415.3416
12  BY:  BRIAN M. ERCOLE, ESQ.
    brian.ercole@morganlewis.com
13  BY: RICHARD HAND, ESQ.
    Counsel for Defendant Teva
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1  TELEPHONIC APPEARANCES:
2
   ROPES & GRAY, LLP
3  Prudential Tower 800 Boylston Street
   Boston, Massachusetts, 02199-300
4  617 951 7910
   BY: LUKE D  RILEY, ESQ
5  luke riley@ropesgray.com
   Counsel for Defendant Mallinckrodt
6
7  ULMER BERNE LLP
   600 Vine Street
8  Suite 2800
   Cincinnati, Ohio 45202
9  513 698 5104
   BY:  PAUL J  COSGROVE, ESQ
10  pcosgrove@ulmer com
    Counsel for Defendants Teva Pharmaceuticals, Inc ,
11  Cephalon Inc , Watson Laboratories, Actavis, LLC,
    and Actavis Pharma, Inc
12
    ARNOLD & PORTER KAYE SCHOLER, LLP
13  70 West Madison Street
    Suite 4200
14  Chicago, Illinois 60602
    312 583 2434
15  BY:  CAITLIN MARTINI MIKA, ESQ
    caitlin mika@arnoldporter com
16  Counsel for Defendants Endo Health Solutions, Endo
    Pharmaceuticals, Inc , Par Pharmaceutical Companies,
17  Inc  f/k/a Par Pharmaceutical Holdings, Inc
18  REED SMITH LLP
    3 Logan Square
19  1717 Arch Street, 31st Floor
    Philadelphia, Pennsylvania 19103
20  215 851 8226
    BY:  NICHOLAS RODRIGUEZ, ESQ
21  nrodriguez@reedsmith com
    Counsel for Defendant AmerisourceBergen Drug
22  Corporation
23
24

Page 5

```
1                - - -
2             I N D E X
3                - - -
   EXAMINATION OF:            PAGE
4  ANDREW BOYER
5      By Mr Kieffer       10
       By Mr Crawford      266
6      By Mr Egler         369
       By Mr Ercole        402
7
8                - - -
9          E X H I B I T S
10               - - -
11 NUMBER                 IDENTIFIED
12 Teva-Boyer 001  PowerPoint presentation  23
      titled "Welcome to Teva
13    Pharmaceutical Industries,
      Ltd  2017," (Produced
14    natively at
      TEVA_MDL_A_09643590)
15
   Teva-Boyer 002  Chart of Teva Opioid  36
16    Market Share Calculation:
      All Opioids
17    (TEVA_MDL_A_00455086 to
      094)
18
   Teva-Boyer 003  Determination that a  56
19    public health emergency
      exists, 10-36-17
20
   Teva-Boyer 004  Email communication,  71
21    2-4-13, Subject: "Sales &
      Marketing Meeting
22    Presentations 1-7 -
      1/10/2013," with attached
23    PowerPoint presentation
      (TEVA_MDL_A_12682275 and
24    2281)
```

Page 6

```
1  NUMBER                 IDENTIFIED
2  Teva-Boyer 005  Email communication,  93
      10-22-14, Subject: "RE:
3     Hey John"
      (TEVA_MDL_A_09639501)
4
   Teva-Boyer 006  Actavis PowerPoint  107
5     presentation titled
      "Operations Leadership
6     Team Meeting," 10-15-14,
      (Produced natively at
7     TEVA_MDL_A_09639483)
8  Teva-Boyer 007  Actavis PowerPoint  121
      presentation titled
9     "Marketing Department
      Overview" (Produced
10    natively at
      Acquired_Actavis_01367234)
11
   Teva-Boyer 008  Email communication,  134
12    12-21-15, Subject: "US
      Commercial Integration
13    Status Update," with
      attached presentation
14    (TEVA_MDL_A_12698266)
15 Teva-Boyer 009  Email communication,  150
      10-26-12, Subject: "Fw:
16    Hydrocodone Presentation
      Update Draft 10-25-12,"
17    with attached presentation
      (ALLERGAN_MDL_01029477 to
18    9500)
19 Teva-Boyer 010  Teva PowerPoint  173
      presentation titled
20    "Global Generic Medicines"
      (Produced natively at
21    TEVA_MDL_A_13481730)
22 Teva-Boyer 011  Teva PowerPoint  188
      presentation titled "US
23    Generical Market Review
      2016," 1-31-17 (Produced
24    natively at Actavis_MDL_A_12710598)
```

Page 7

```
1  NUMBER                 IDENTIFIED
2  Teva-Boyer 012  Teva PowerPoint  199
      presentation titled "Our
3     Business Units" (Produced
      natively at
4     TEVA_MDL_A_09644157)
5  Teva-Boyer 013  Email communication,  203
      12-5-16, Subject: "Re:
6     20-F update - time
      sensitive," with
7     attachments
      (TEVA_MDL_A_12707620 to
8     654)
9  Teva-Boyer 014  Letter from Watson Pharma  209
      to AmerisourceBergen,
10    9-26-11
      (TEVA_MDL_A_12678257 to
11    258)
12 Teva-Boyer 015  Email communication,  217
      3-27-13, Subject: "Bu/Na
13    Promotional Outreach
      Overview"
14    (Acquired_Actavis_02290885
      to 886)
15
   Teva-Boyer 016  Press release re:  227
16    Buprenorphine & Naloxone
      Shared Marketing Plan
17    Summary
      (Acquired_Actavis_01178983
18    to 990)
19 Teva-Boyer 017  Email communication,  233
      2-17-13, Subject: "FW:
20    BuNa marketing plan  "
      with attachments
21    (TEVA_MDL_A_12682371 to
      380)
22
   Teva-Boyer 018  Email communication,  236
23    4-7-13, Subject:
      "Buprenorphine Naloxone
24    Address/Phone List" (TEVA_MDL_A_13470477)
```

Page 8

```
1  NUMBER                 IDENTIFIED
2  Teva-Boyer 019  Actavis PowerPoint  238
      presentation titled "NACDS
3     2014, Boston, MA"
      (Produced natively at
4     Acquired_Actavis_02293291)
5  Teva-Boyer 020  Teva PowerPoint  260
      presentation titled "US
6     Generics: New Product
      Launch Opportunities,"
7     3-25-17 (Produced natively
      at TEVA_MDL_A_12711059)
8
   Teva-Boyer 021  US Commercial L4  268
9     Organization org charts
      (ALLERGAN_MDL_01286860 to
10    869)
11 Teva-Boyer 022  Email communication,  320
      2-15-13, Subject: "BuNa
12    marketing plan  " with
      attachments
13    (Acquired_Actavis_01178982
      to 990)
14
   Teva-Boyer 023  Actavis PowerPoint  339
15    presentation titled
      "Operations Planning
16    Summit," 6-2-15 (Produced
      natively at
17    TEVA_MDL_A_09640874)
18 Teva-Boyer 024  Email communication,  349
      11-6-09, Subject:
19    "Monitoring programs -
      RiskMaPs," with
20    attachments
      (Acquired_Actavis_02051705
21    to 721)
22 Teva-Boyer 025  Email communication,  370
      11-15-11, Subject: "Budget
23    Presentation," with
      attachment
24    (ALLERGAN_MDL_03464566 to 596)
```

## Page 9

```
 1              - - -
 2      DEPOSITION SUPPORT INDEX
 3              - - -
 4
        Directions Not to Answer
 5      Page Line
        None
 6
 7      Requests Made for Documents
        Page Line
 8      None
 9
10      Stipulations
        Page Line
11      None
12
13      Question Marked
        Page Line
14      None
15
16
17
18
19
20
21
22
23
24
```

## Page 10

```
 1          THE VIDEOGRAPHER:  We are now
 2      on the record.  My name is Eric
 3      Davidson.  I'm a videographer for
 4      Golkow Litigation Services.  Today's
 5      date is Tuesday, January 15th, 2019,
 6      and the time is approximately 9:50 a.m.
 7          This video deposition is being
 8      held at 325 Columbia Turnpike, Suite
 9      301, Florham Park, New Jersey, in the
10      matters of National Prescription Opiate
11      Litigation for the United States
12      District Court for the Eastern District
13      of Ohio.  The deponent is Andrew Boyer.
14          Please note that counsel will
15      be noted on the stenographic record.
16          The court reporter is Gail, and
17      she will now swear in the witness.
18          ANDREW BOYER,
19      called as a witness, having been
20      duly sworn by a Notary Public, was
21      examined and testified as follows:
22          EXAMINATION
23  BY MR. KIEFFER:
24      Q.  Good morning, sir.
```

## Page 11

```
 1      A.  Good morning.
 2      Q.  Would you state your full name
 3  for the record, please.
 4      A.  Andrew Boyer.
 5      Q.  Mr. Boyer, my name is Jon
 6  Kieffer.  I'm a lawyer.  We met briefly
 7  before we started the deposition today.
 8  Pardon me.
 9          I represent plaintiffs
10  nationwide in the matter of In Re:
11  National Prescription Opiate Litigation,
12  which is a lawsuit that's filed in the
13  Northern District of Ohio against Teva
14  Pharmaceuticals and others, and we're here
15  today to take your deposition in connection
16  with that case.
17          Is that your understanding of
18  why you're here?
19      A.  That is my understanding.
20      Q.  All right.  You understand the
21  court reporter just swore you in?
22      A.  Yes.
23      Q.  You understand that is the
24  same oath to tell the truth that you will
```

## Page 12

```
 1  take if you end up testifying as a witness
 2  in the trial of this case?
 3      A.  Yes.
 4      Q.  You also understand your
 5  testimony today is being videotaped?
 6      A.  Yes.
 7      Q.  One of the reasons for that
 8  is, in the event that case is tried and you
 9  are not present, we may elect to play part
10  or all of your videotaped testimony to the
11  jury.
12          You understand that as well?
13      A.  Yes.
14          MR. ERCOLE:  Object to the
15      form.  We can debate the
16      appropriateness of that at the
17      appropriate time.
18  BY MR. KIEFFER:
19      Q.  On that topic, sir, you are
20  here today voluntarily; meaning you have
21  not been served with a subpoena compelling
22  you to attend?
23      A.  I believe that's the case,
24  yes.
```

Page 13

1      Q.  You're here today because
2  someone, presumably your employer or
3  folks/attorneys on its behalf, asked you to
4  appear and give testimony?
5          MR. ERCOLE:  Objection to the
6      form.
7          THE WITNESS:  I'm not sure.  I
8      thought it was subpoenaed, but maybe,
9      maybe not.  I've done so many of these,
10     I don't know the answer.
11 BY MR. KIEFFER:
12     Q.  All right.  We'll get to that.
13     Sir, this case, as I
14  mentioned, is pending in Ohio, actually in
15  Cleveland, Ohio.
16         If you're asked by your
17  employer to testify as a witness in the
18  eventual trial of this case, will you do
19  your best to accommodate that request?
20     A.  Yes.
21     Q.  And the only reason I ask
22  that, sir, is if the case is eventually
23  tried and the jury has to watch your
24  videotape instead of having the benefit of

Page 14

1  hearing from you live, I want them to
2  understand it's not because you weren't
3  willing to come.  Okay?
4      A.  Fair enough.
5      Q.  All right.  Juries sometimes
6  don't like videotapes and --
7      A.  I've seen them before.
8      Q.  -- they take out their
9  frustration on the person that hits play.
10         Okay.  You mentioned that you
11  have done this, I think you said, many
12  times before; right?
13     A.  That is correct.
14     Q.  Okay.  How many depositions
15  have you given?
16     A.  Probably four or five dozen.
17     Q.  Four or five dozen?
18     A.  Yes.
19     Q.  Okay.  Have you testified in
20  trial?
21     A.  Yes.
22     Q.  About how many times?
23     A.  Two or three times.
24     Q.  Okay.  The four or five

Page 15

1  dozen -- I won't take our time to do the
2  mathematical calculation, but have those
3  been largely connected with your
4  employment?
5      A.  Yes.
6      Q.  And in connection with your
7  employer by whom?
8      A.  By a lot of different
9  entities.  I believe Watson Pharma, Actavis
10  Pharma, Teva, Allergan.  Those are probably
11  most of the entities.
12     Q.  Okay.
13     A.  Could be others, though.
14     Q.  I'm sorry?
15     A.  Could be others.
16     Q.  You've worked for all those
17  companies?
18     A.  Yes.
19     Q.  Okay.  Well, you obviously
20  know the drill.  You've done this before.
21  Let me give you just a few minutes of
22  ground rules, which is probably going to
23  sound an awful lot like lawyer spiels
24  you've heard before, but nevertheless, I

Page 16

1  want it clear on the record, and hopefully
2  that will help us to communicate going
3  forward.  Okay?
4      A.  Sounds good.
5      Q.  All right.  This is obviously
6  a verbal format, so it's my job to try to
7  ask a clear question, that makes sense,
8  that you can answer.  And assuming I do
9  that, it's your job to give a verbal answer
10  as opposed to a nod or a shake of the head
11  or uh-huh or huh-uh.
12         Do you understand that?
13     A.  Yes, I do.
14     Q.  Okay.  If you do that from
15  time to time -- that is, nod or shake your
16  head -- I may say, is that a yes, or is
17  that a no?  I'm not trying to be rude or a
18  tough guy, I'm just trying to make sure we
19  get a clear record.  Okay?
20     A.  More than fair.
21     Q.  Sometimes my questions can be
22  a little long, and sometimes, or many
23  times, you may have an idea of where I'm
24  going with a question.

1     A.  Uh-huh.
2     Q.  But even if you do, do your
3  best to let me finish my question before
4  you start in with your answer, and I'll do
5  my best to not interrupt your answer before
6  I launch into another question.  Okay?
7     A.  Okay.
8     Q.  I don't know how long we'll go
9  today.  It's not my intent to make it a
10  marathon.  We'll kind of see, but we'll
11  take breaks.  If you find you need a break
12  before we decide to take one, let us know,
13  and we'll try to accommodate you, so long
14  as there's not a question or a line of
15  questions pending.  Okay?
16     A.  Okay.
17     Q.  All right.  The depositions
18  that you've given in the past, speaking
19  generally, you identified for us the
20  different companies that you gave those --
21  whose -- on whose behalf you gave those
22  depositions.
23       Those are all companies in the
24  pharmaceutical industry; correct?

1     A.  That is correct.
2     Q.  All right.  Why don't you run
3  through for us, briefly but completely,
4  your employment history, post-college.
5     A.  Post-college?
6     Q.  Yeah.
7     A.  Sure.  I worked for a company
8  called Lederle Laboratories starting in
9  1988, in their IT area.  I was there from
10  '88 until '95 in different capacities.  It
11  was IT, it was physician-based sales, it
12  was generic forecasting and it was national
13  account sales.
14       In 2005 -- 2000 -- 2005, I
15  went to Barr Laboratories for six months as
16  a marketing manager.  I left Barr for three
17  years, from approximately 2006 [sic] to
18  2008.  I was in a health and beauty aid
19  store as part-owner.  Only health and
20  beauty aids, so it was outside of pharma.
21       And then, in 1998, I began to
22  work for a company called Watson Pharma.
23  And through all the different names -- that
24  was Watson Pharma, that was Actavis Pharma,

1  that was Allergan, that was Teva until
2  2016.
3       MR. ERCOLE:  Just so the record
4     is clear, I think there was -- you
5     referenced 2005 and 2008, rather than
6     1995 and 1998.
7       THE WITNESS:  Sorry about that.
8     It was 1998 until 2005, I believe.
9  BY MR. KIEFFER:
10     Q.  And did you go to work for
11  Barr in approximately 1995?
12     A.  I was only there for six
13  months.  I think it was 2005 for six
14  months.
15     Q.  And how about the period where
16  you were part-owner of a health and beauty
17  aid store, what were those years again?
18     A.  It was three years.  So it
19  would have been the three years prior to
20  1998.  So it was probably '96, '97 and part
21  of '98.
22     Q.  Okay.  But since sometime in
23  1998, you have worked for the company that
24  now is known as Teva?

1       MR. ERCOLE:  Objection.
2     Objection to form.
3       THE WITNESS:  I worked for
4     Watson Pharma, Actavis Pharma, and then
5     Teva bought Actavis Pharma.
6  BY MR. KIEFFER:
7     Q.  Who, strictly speaking, is
8  your employer?  Is it Teva Limited?  Teva
9  USA?
10       MR. ERCOLE:  Objection to the
11     form; vague, temporal scope.
12       THE WITNESS:  I don't know the
13     entities.  I was there for a short
14     period of time.
15  BY MR. KIEFFER:
16     Q.  You work for Teva today?
17     A.  No.
18     Q.  What do you do today?
19     A.  I work for Amneal
20  Pharmaceuticals today.
21     Q.  Spell that for me.
22     A.  A-M-N, as in Nancy, E-A-L.
23     Q.  And how long have you worked
24  for them?

Page 21

1      A.  Since February of last year,
2  so February of 2018.
3      Q.  So Teva -- I believe the
4  record reflects that Actavis was acquired
5  by Teva in 2016, perhaps around August of
6  2016.
7          Does that sound correct to
8  you?
9      A.  That's correct.
10         MR. ERCOLE:  Object --
11  objection to form.
12         THE WITNESS:  Whatever entity I
13  was working for, I became a part of
14  Teva in 2016.
15  BY MR. KIEFFER:
16     Q.  Okay.  And when you became
17  part of Teva in 2016, you just referred to
18  it as "Teva" right?
19     A.  I believe it was Teva USA, but
20  I don't want to guess.  But I was part of
21  the US organization.  I also had control of
22  Canada, so I don't know the exact entity.
23     Q.  Okay.  We'll call it Teva for
24  purposes of today's deposition.

Page 22

1          So you were employed by Teva
2  beginning with the acquisition in roughly
3  August of 2016 until you assumed your
4  current position in approximately February
5  of 2018?
6          MR. ERCOLE:  I'm going to
7  object, because I think the witness has
8  specified that it was Teva USA.  If we
9  can have an agreement that when you're
10  referring to "Teva," it's Teva USA,
11  then that's fine.
12  BY MR. KIEFFER:
13     Q.  That's fine, if that's your
14  understanding of who your employer was.
15     A.  Perfectly fine.
16     Q.  Okay.  All right.  So you
17  worked for Teva from that period of time,
18  August of 2016 until about February of
19  2018?
20     A.  That is correct.
21     Q.  Okay.  What was your title at
22  the time you worked for Teva?
23     A.  President and CEO of North
24  America.

Page 23

1      Q.  And as president and CEO of
2  Teva North America, were you -- did your
3  job entail only the generic side of Teva's
4  bills or branded products as well?
5      A.  Generics only.
6      Q.  From the period of time
7  beginning with your employment with Watson,
8  starting in 1998, did you work exclusively
9  on the generics side of the business?
10     A.  Generics only.
11     Q.  Has -- your pharma career,
12  since at least 1998, has been generics
13  only?
14     A.  That is correct.
15         MR. KIEFFER:  Pull up document
16  1720.
17            -  -  -
18     (Teva-Boyer No. 001 was marked for
19     identification.)
20            -  -  -
21  BY MR. KIEFFER:
22     Q.  Sir, I've just handed you what
23  we have marked as Exhibit 1.  This is a
24  document that was provided to us in this

Page 24

1  litigation by counsel for Teva, actually
2  from your electronic custodial files.
3          Having done this process
4  before, you're probably familiar with the
5  fact that parties exchange documents in
6  litigation?
7      A.  Yes.
8      Q.  Okay.  This particular one has
9  a number in the lower right-hand corner.
10  For the record, I'm going to have to state
11  them today.  I apologize.  They're a little
12  cumbersome, but we want our record to be
13  complete.
14          This one is
15  TEVA_MDL_A_09643590, and this a -- appears
16  to be a PowerPoint presentation dated --
17  "Welcome to Teva Pharmaceutical Industries,
18  Ltd," dated 2017.  And, again, for the
19  record, this came from Mr. Boyer's
20  custodial files.
21          As a prefatory question, sir,
22  I'm assuming in the time that you were at
23  Watson and then Actavis and then Teva, from
24  time to time, you would receive PowerPoint

Page 25

1  presentations in various forms that
2  pertained in some form or fashion to your
3  job.
4      A.  Yeah, I'm sure of that.
5      Q.  Companies use PowerPoints a
6  lot, and Actavis and Watson and Teva are no
7  different; right?
8      A.  I guess.
9      Q.  Okay.  This particular one --
10  let me ask you some questions about some of
11  the statements in here and see if you're
12  familiar with them.
13      Teva is -- it's one of the
14  world's largest pharmaceutical companies;
15  correct?
16      A.  I don't know how --
17      MR. ERCOLE:  Object to the
18  form.
19      THE WITNESS:  I don't know how
20  you're qualifying "largest
21  pharmaceutical companies," but -- I
22  don't know.
23  BY MR. KIEFFER:
24      Q.  How about in generics?  Is it

Page 26

1  the world's leading supplier of generic
2  medications?
3      A.  It was the largest generic
4  company in the US, that's for sure.
5      Q.  How about the world, do you
6  know?
7      A.  I believe so, but I don't know
8  the exact -- how you're calculating that.
9      Q.  But certainly when you were
10  there, it was the largest generic company
11  in the United States?
12      A.  Yes.
13      Q.  Okay.  Teva is based in
14  Israel; is that correct?
15      MR. ERCOLE:  Objection to the
16  form.  Again --
17      MR. KIEFFER:  Teva -- well,
18  Teva Limited, the parent company.
19      THE WITNESS:  The parent
20  company is located in Israel.
21  BY MR. KIEFFER:
22      Q.  Started out in 1901, according
23  to this, Page 4.
24      MR. ERCOLE:  Are you referring

Page 27

1  to Teva Limited or Teva USA?
2  BY MR. KIEFFER:
3      Q.  I'm referring to the company
4  that's referenced in this PowerPoint, which
5  is generically Teva.
6      When you worked for the
7  company, sir, did you understand their
8  global headquarters to be located in
9  Israel?
10      A.  I didn't pay attention.  The
11  US was in the US.  That's where it was.
12  There was a corporate headquarters in
13  Israel as well.  I don't know that one has
14  a thing to do with the other.
15      Q.  Okay.
16      A.  My CEO was in the US.
17      Q.  Okay.  And who was your CEO?
18      A.  At the time, it was Siggi
19  Olafsson.
20      Q.  And he was based in the US?
21      A.  Yes, he was.
22      Q.  Where at?
23      A.  He was in Parsippany,
24  New Jersey.

Page 28

1      Q.  I'm going to refer -- can we
2  go to Page 5 of the PowerPoint?
3      This does not have page
4  numbers on it, so I'm going to ask our tech
5  to get us there.
6      Page 5 is titled, "We came a
7  long way in the last century."  The top
8  line on the right states, "The leading
9  global generic company."
10      When you worked for Teva, did
11  you understand that it held itself out as
12  the leading global generic company?
13      A.  That's what it says.  I don't
14  know what the definition is, but that's
15  what it says.
16      Q.  Okay.  It indicated here at
17  least that revenues in 2016 were
18  21.9 billion.
19      Was your understanding
20  consistent with that?
21      A.  That's what it says.
22      Q.  Okay.  Next slide, please.
23      According to this document,
24  sir, Teva is headquartered in Israel.

| Page 29 |
|---|

1          Did you have an understanding
2   when you worked there as to whether that
3   was true or not.
4          A.   I knew it was an Israeli-based
5   company.  That's fine.
6          Q.   Turn to Page 7 of that
7   PowerPoint.
8          This indicates that Teva, at
9   least as of this point in time,
10   manufactured 120 billion tablets and
11   capsules annually.
12          Did you understand that it did
13   that kind of production volume?
14          A.   No.
15          Q.   Wouldn't surprise you?
16          A.   No.
17          MR. ERCOLE:  Object to form.
18          THE WITNESS:  No, I have no
19   reference point.
20   BY MR. KIEFFER:
21          Q.   Next page, please.
22          This slide states, "The
23   world's largest 'medicine cabinet.'
24   Generic specialty and OTC."

| Page 30 |
|---|

1          I've seen that phrase, "the
2   world's largest medicine cabinet," in
3   various Teva documents.  Is that a phrase
4   that you saw from time to time when you
5   worked for Teva?
6          A.   I've seen it before.
7          Q.   This next page of Exhibit 1
8   indicates, in the upper right-hand corner,
9   that one in six prescriptions in the US is
10   filled with a Teva medicine.
11          Is that information you were
12   familiar with when you worked for Teva?
13          A.   That's what it says here.
14          Q.   And as president and CEO of
15   Teva North America, I would assume you'd
16   have some familiarity with whether a
17   statement like that was remotely accurate
18   or not?
19          MR. ERCOLE:  Object to form.
20          THE WITNESS:  This wasn't
21   created by me.  This was done by some
22   other part of the organization, so I am
23   sure they have the backup to support
24   it.

| Page 31 |
|---|

1   BY MR. KIEFFER:
2          Q.   Okay.  Page 30, sir, of this
3   PowerPoint --
4          Actually, go back to the prior
5   page -- 29.
6          A.   What does it say?
7          Q.   Yeah.  It says, "Israel is an
8   ecosystem of pharmaceutical solutions."
9          MR. ERCOLE:  Give the witness a
10   second so we can get there.
11          MR. KIEFFER:  Sure.
12   BY MR. KIEFFER:
13          Q.   Are you there?
14          A.   Okay.
15          Q.   Okay.  And then flip to the
16   next page.
17          And then Slide 30 here states,
18   "A strong biopharmaceutical cluster."  It
19   says, "Presence of top global
20   pharmaceutical companies," and there's a
21   number of them listed there, with Teva
22   being on the top row at the left.
23          Do you see that?
24          A.   Yes, I do.

| Page 32 |
|---|

1          Q.   And it says there, under
2   Teva's name, "Global HQ," for
3   "headquarters."
4          Do you understand?
5          A.   Yes.
6          Q.   Does that jog any memory that,
7   in the time that you worked for Teva, its
8   global headquarters was, in fact, in
9   Israel?
10          MR. ERCOLE:  Objection to form.
11   Again, no differentiation between Teva
12   USA and Teva Limited, but --
13          THE WITNESS:  This says "Global
14   headquarters R&D and manufacturing
15   sites."
16   BY MR. KIEFFER:
17          Q.   Okay.
18          A.   So -- so whether that's global
19   headquarters is a different discussion.
20   This is about R&D and manufacturing.
21          Q.   Okay.  Let me follow up on
22   that.
23          Did you understand, when you
24   worked for Teva US, that its global R&D was

Page 33

1    based in Israel?
2         A.   I didn't know that.
3         Q.   Okay.  Did Teva USA have R&D
4    operations here in the United States?
5         A.   Yes.
6         Q.   Specifically where?
7         A.   You'd have to ask the R&D
8    team, but we had, I believe, Salt Lake
9    City -- I don't remember all the different
10   sites, but there were US sites.
11        Q.   Okay.  Do you know what
12   specific --
13        A.   Elizabeth, New Jersey.
14        Q.   Do you know what specific
15   products were the subject of Teva US R&D?
16        A.   US, Salt Lake City, was -- was
17   patch and gel technologies and products of
18   that nature.
19        Q.   When you say "patch and gel
20   technologies," would that also include
21   things like fentanyl patch?
22        A.   I believe they did fentanyl
23   patch there.
24        Q.   You told us earlier, at least

Page 34

1    in the time that you worked for Teva USA,
2    you understood that it was the largest
3    generic drugmaker in the US?
4              MR. ERCOLE:  Objection to form.
5         Mischaracterizes.
6              THE WITNESS:  Depending on how
7         you calculate "largest," but I believe
8         it had the largest dollars and the
9         largest extended units.
10   BY MR. KIEFFER:
11        Q.   Okay.  And when you say -- I
12   understand what "largest dollars" is, and I
13   think our jury will as well.
14             When you say "largest extended
15   units," describe specifically what you
16   mean.
17        A.   Tablets, capsules, patches, if
18   you were to calculate that.
19        Q.   Okay.  Individual units versus
20   bottles, packages, those sorts of things?
21        A.   That is correct.
22        Q.   Okay.  And how about
23   prescriptions that were filled with a
24   generic medicine?  When you worked for Teva

Page 35

1    USA, did you understand that more
2    prescriptions in this country were filled
3    with a Teva generic than with any other
4    company's generic?
5              MR. ERCOLE:  Objection to form.
6              THE WITNESS:  I believe that's
7         the case.
8    BY MR. KIEFFER:
9         Q.   Okay.  Teva also was the
10   largest manufacturer in the US of generic
11   opioids?
12        A.   Of that --
13             MR. ERCOLE:  Objection to form.
14             THE WITNESS:  I don't know the
15        answer to that.
16   BY MR. KIEFFER:
17        Q.   You don't know one way or the
18   other?
19        A.   No, I don't know, from a
20   manufacturing standpoint, who the largest
21   was.
22        Q.   Okay.
23             MR. KIEFFER:  Pull up document
24        00306D.

Page 36

1              -  -  -
2         (Teva-Boyer No. 002 was marked for
3         identification.)
4              -  -  -
5    BY MR. KIEFFER:
6         Q.   Sir, we've just marked as
7    Exhibit 2 a document with the number
8    TEVA_MDL_A_00455086.  It's also been marked
9    in previous depositions in this case.  This
10   was a document provided to us by counsel
11   for Teva.  It's entitled "Teva Opioid
12   Market Share Calculation:  All Opioids."
13             Do you see that label at the
14   top?
15        A.   Yes.
16        Q.   This document, at least in the
17   top line of the grid, reflects Teva opioid
18   script volume for the years 2012 through
19   2016.
20             Do you see that?
21        A.   Yes.
22             MR. ERCOLE:  Objection to form.
23   BY MR. KIEFFER:
24        Q.   I think it may be

Page 37

```
 1   self-explanatory, but "script" is shorthand
 2   for "prescriptions"; correct?
 3          MR. ERCOLE:  Objection to form;
 4   no foundation.
 5   BY MR. KIEFFER:
 6       Q.  Or do you know?
 7       A.  I don't know anything about
 8   this document.  Does this include -- this
 9   is just Teva?  Does this include at
10   Actavis?  Does this include Watson?
11       Q.  Yeah.
12       A.  I don't know what this is.
13       Q.  Yeah, it's all set forth in
14   the footnotes.
15          My only question for you is,
16   you understand the reference to script to
17   typically be referring to prescriptions?
18          MR. ERCOLE:  Objection to form;
19   foundation.
20          THE WITNESS:  Yeah, I know what
21   a script is, yes.
22   BY MR. KIEFFER:
23       Q.  Okay.  Fair enough.
24          According to this document,
```

Page 38

```
 1   which, again, was furnished to us by Teva,
 2   Teva script volume about doubled between
 3   2015 and 2016, from a little over
 4   15 million to almost 31 million
 5   prescriptions.
 6          Without asking you at the
 7   moment to vouch for the accuracy of that
 8   data, if we assume it's accurate, do you
 9   know why the significant increase?
10          MR. ERCOLE:  Objection to the
11   form; calls for speculation.
12          THE WITNESS:  I would assume or
13   I would guess that part of the
14   transaction was the purchase of
15   Actavis, or they launched a tremendous
16   amount of new products.  I don't know
17   which one it is.
18   BY MR. KIEFFER:
19       Q.  Okay.  But you had an
20   understanding at least in a general sense,
21   when you were at Teva, that its acquisition
22   of Actavis in 2016 would, by definition,
23   increase the amount of prescriptions that
24   ultimately were filled with a Teva generic
```

Page 39

```
 1   product?
 2       A.  Yes.
 3       Q.  Simply because they were two,
 4   huge, generic players in the US market?
 5          MR. ERCOLE:  Objection to the
 6   form.
 7          THE WITNESS:  They were both
 8   big generic companies in the US.  And
 9   by default, you would have a certain
10   amount of increase in prescriptions as
11   a combined company.
12   BY MR. KIEFFER:
13       Q.  Okay.  And at least according
14   to this document, the volume of
15   prescriptions that were filled with a Teva
16   product increased from about 6 percent in
17   2015 to 14 percent in 2016.
18          Is that information that you
19   were familiar with when you worked at Teva?
20       A.  No.
21          MR. ERCOLE:  Objection to form
22   and foundation.
23   BY MR. KIEFFER:
24       Q.  Never looked at it?
```

Page 40

```
 1       A.  No, not as a whole.
 2       Q.  When you say "not as a whole,"
 3   what do you mean?
 4       A.  We forecasted products on an
 5   individual basis, NDC by NDC.  There may
 6   have been soundbites that corporate was
 7   maybe using for that, but that's not
 8   something that we were focusing on.
 9       Q.  Okay.  Typically, what was the
10   term you used for tablets, capsules, gels?
11       A.  Extended units?
12       Q.  Extended units.  Thank you.
13          For most of the extended unit
14   products that Teva made, those came in some
15   sort of multidose packaging; right?
16          MR. ERCOLE:  Objection --
17   BY MR. KIEFFER:
18       Q.  Bottles, for example?
19          MR. ERCOLE:  Objection to form;
20   time period, vague.
21   BY MR. KIEFFER:
22       Q.  When you were there.
23       A.  When I was at Teva, the
24   packages consisted of blister packs,
```

Page 41

1    bottles, sachets, there's liquids.  So
2    there's a multitude of different
3    calculations for extended units or eaches.
4         Q.  Okay.  So bottles, for
5    example, of an opioid product, what would
6    be the smallest count of pills or caplets
7    that you would have seen in your time at
8    Teva?
9         A.  I don't remember if there were
10   any blisters, but probably 30, if I had to
11   guess, but I don't know off the top of my
12   head.
13        We had probably close to a
14   thousand different products, NDCs or stock
15   keeping units, so I don't know the package
16   size of all of our products.
17        Q.  Okay.  You made a reference to
18   blisters.  That's shorthand for blister
19   packs.
20        A.  Yes.
21        Q.  And you made a reference to
22   30.
23        And my question is:  Would a
24   blister pack have been typically the

Page 42

1    smallest dose unit if we're taking about a
2    pill or a caplet?
3         A.  Yeah, but there could be a
4    blister of one or two capsules or tablets
5    also.  I just don't remember, from a
6    private label standpoint or other package
7    sizes, that we sold those products.
8         Q.  Any idea what the larger sizes
9    were of pills?
10        A.  On opioids?
11        Q.  Yeah.  Bottles, for example.
12        A.  Probably 500s or 1,000s.
13        Q.  In a single bottle?
14        A.  Yes, but I don't know the --
15   the answer --
16        Q.  Okay.  All right.
17        A.  -- off the top of my head.
18        Q.  For what it's worth, sir, if
19   you total up the scripts here for 2012 to
20   2016, you get something in excess of
21   84 million prescriptions -- Teva opioid
22   prescriptions.
23        Does anything about a number
24   like that surprise you, based upon what you

Page 43

1    knew of Teva, as president and CEO, when
2    you were there until early 2018?
3         MR. ERCOLE:  Objection to the
4    form; foundation, speculation.
5         THE WITNESS:  Couple things.
6    On the generic side, I don't look at it
7    on a product-by-product basis.  Whether
8    it's opioids, we sell blood pressure
9    medications, oral contraceptives -- we
10   have a whole host of products that we
11   sell.  So the fact that the volumes
12   were growing of generic pharmaceuticals
13   in general didn't surprise me.
14        Healthcare was moving from
15   brands to generics, and the total
16   generic marketplace was growing
17   significantly over a period of time, as
18   people moved from the brand to the
19   generic for a lower-cost alternative.
20        So just this by itself, does it
21   surprise me?  No.  The amount of
22   prescriptions were growing into the
23   billions for the overall generic
24   marketplace.

Page 44

1    BY MR. KIEFFER:
2         Q.  And that would include opioids
3    as well?
4         A.  Absolutely.
5         Q.  Okay.  And regardless of the
6    specific numbers, no doubt about it, in the
7    time that you were at Teva, it had a
8    significant presence in the US market for
9    generic opioids.
10        We can agree on that?
11        MR. ERCOLE:  Objection to form;
12   calls for an improper characterization.
13        THE WITNESS:  Teva, Actavis,
14   Watson, as being some of the larger
15   companies in the industry, had
16   tremendous volumes of all products.
17        We launched a number of new
18   generic products between 2012 and 2016.
19   So, you know, I can't tell from this
20   how many products this represents,
21   whether the growth was due to new
22   product launches or one single chemical
23   entity.
24        I'm going to go out on a limb

Page 45

1  and guess that it's multiple products,
2  because we were launching products in
3  all classes, not just opioids, during
4  that period of time.  A tremendous
5  amount of new product launches that we
6  were bringing to the market to lower
7  the cost of healthcare.
8  BY MR. KIEFFER:
9      Q.  Understood.  My question was a
10  little more basic than that.
11         I don't think it's in dispute
12  there were new product launches, and I
13  don't think it's in dispute that Teva and
14  Actavis and Watson were significant players
15  in the generic pharmaceutical industry.
16         My question was:  In the time
17  that you were at Teva, as president and CEO
18  of North America -- Teva USA North America,
19  you understood that Teva had a significant
20  presence in the generic opioid market?
21         MR. ERCOLE:  Objection to form.
22     And again, it's assumed, before you
23     answer, that we're referring to Teva
24     USA; is that correct?

Page 46

1         MR. KIEFFER:  For that
2  question, we certainly were.
3         MR. ERCOLE:  Okay.
4         THE WITNESS:  I think Teva had
5  a significant presence in the generic
6  pharmaceutical industry.
7         What I don't have in front of
8  me is how big was Teva compared to our
9  competitors on opioids.  If you've got
10  that, I'm more than willing to look at
11  it.
12         But we were a large player in
13  generic pharmaceuticals, but I can't
14  tell you what percentage of the market,
15  from an opioid standpoint, this would
16  have been or not been.
17         It looks to me like, you know,
18  you've only got a piece of the question
19  that you're asking, so I can't really
20  give you an answer.
21  BY MR. KIEFFER:
22     Q.  Yeah.  And the question,
23  again, that I asked was simpler.  I wasn't
24  asking you for the market share of others

Page 47

1  or necessarily to even vouch for these
2  numbers.
3         My question was:  As president
4  and CEO of Teva USA North America, when you
5  were there, you understood Teva had a
6  significant presence in the market for US
7  generic opioids?
8         MR. ERCOLE:  Again, objection;
9     asked and answered.
10         THE WITNESS:  How are you
11  defining "significant"?
12  BY MR. KIEFFER:
13     Q.  And if you don't know the
14  answer or you are unable to answer, I'll
15  accept that.
16     A.  Unless you can tell me what
17  the definition of "significant" is, I
18  really have no way of telling you what that
19  answer is.
20     Q.  Okay.  If I were to ask you,
21  during your time as president and CEO of
22  Teva North America, whether Teva was the
23  No. 1 US manufacturer of generic opioids,
24  the No. 2, the No. 5 or the No. 25, would

Page 48

1  you be able to answer that question?
2     A.  I don't know the number, but I
3  would say we were in the top three.
4     Q.  And if you were in the top
5  three -- "you" being Teva -- who were the
6  other two?
7     A.  I would expect Mallinckrodt to
8  be one of those.  And I would expect
9  probably Mylan to be one of those.
10     Q.  If the data reflects that,
11  during the period of 2012 to 2016, Teva
12  supplied literally billions of
13  opioid-containing pills and tablets and
14  other dose units of products to the US
15  market, would that surprise you?
16         MR. ERCOLE:  Objection to form.
17     Again, I just -- can we just make sure
18     this is absolutely clear, that these
19     questions, when you're referring to
20     Teva, it's Teva USA; correct?
21         MR. KIEFFER:  I'll tell you
22     what, we'll say it's Teva USA unless I
23     specify otherwise.  Okay?
24         MR. ERCOLE:  Okay.  That's

Page 49

1    fair. Thank you.
2         MR. KIEFFER: All right. Sure.
3         MR. ERCOLE: Do you mind
4    reasking that question? I appreciate
5    it.
6    BY MR. KIEFFER:
7         Q. Sure. If the data reflects
8    that, during the period of 2012 to 2016,
9    Teva supplied literally billions of tablets
10   and capsules and other dose units of
11   generic opioids to the US market, would
12   that surprise you?
13        MR. ERCOLE: I'm going to
14   object to form. Vague referring to
15   sort of Teva as an unspecified entity.
16   If you're referring to Teva USA, that's
17   one thing. And asked and answered.
18        THE WITNESS: So as large as
19   Teva was as a generic supplier, I don't
20   know how many billions of tablets by
21   therapeutic area, because we didn't
22   look at the business that way. We
23   looked at it as overall generic
24   company.

Page 50

1         So I don't know if it was
2    billions or not. It could very well
3    be, but without seeing the data and the
4    size of the prescriptions, it's hard
5    for me to tell you how many -- how many
6    billions or millions of tablets we sold
7    of opioids versus anything else.
8    BY MR. KIEFFER:
9         Q. Fair enough. But if it turns
10   out the number is in the billions, that
11   wouldn't surprise you?
12        MR. ERCOLE: Objection to form.
13        THE WITNESS: I don't think
14   that it would.
15   BY MR. KIEFFER:
16        Q. Okay. A substantial
17   percentage of the dispensed opioid
18   prescriptions from retail pharmacies in the
19   United States are generic opioids. True?
20        A. I think the overall generic
21   market, in general, is better than
22   85 percent generic --
23        Q. Okay.
24        A. -- and that would include

Page 51

1    opioids.
2         Q. Okay. I think it's clear from
3    your question [sic], when you say the
4    "overall generic market," you mean across
5    the board, all medications?
6         A. All generic medications are
7    85 percent of the US market of a product
8    being dispensed in the US today.
9         Q. And so, for example, if there
10   is data that would reflect, for example, in
11   2016, that approximately 96 percent of all
12   filled opioid prescriptions -- all opioid
13   prescriptions filled by US pharmacies were
14   filled with a generic opioid, that wouldn't
15   surprise you?
16        MR. ERCOLE: Objection to form;
17   foundation.
18        THE WITNESS: It's larger than
19   85 percent, so, you know, it could very
20   well be. I don't know the answer.
21   BY MR. KIEFFER:
22        Q. Are you familiar with a group
23   called the IMS National Prescription Drug
24   Audit?

Page 52

1         A. Yes.
2         Q. What is that?
3         A. IMS is the company that
4    captures prescription data, warehouse
5    movement data of product from a warehouse
6    down to retail, and provides information
7    back to the industry and to, you know, all
8    aspects of the healthcare community.
9         Q. Okay. It's recognized as
10   industry standard data?
11        A. That is correct.
12        Q. Okay. Did you use IMS
13   National Prescription Audit data from time
14   to time when you worked for Watson and
15   Actavis and Teva?
16        MR. ERCOLE: Objection to form.
17   Which Teva entity are you referring to?
18        MR. KIEFFER: I think I told
19   you, Teva USA, unless I specify
20   otherwise.
21        MR. ERCOLE: Oh, okay. The
22   record had it otherwise, but that's
23   fair. Yes, if that's the agreement,
24   then I appreciate that.

Page 53

1          THE WITNESS:  So I think that
2     that's what we utilized, was the
3     prescription-level data at all those
4     different entities.
5          I don't know if we called it
6     NPA, but we did utilize data to
7     understand the marketplace for
8     forecasting purposes.
9     BY MR. KIEFFER:
10         Q.  Okay.  And, again, I don't
11    want to bog us down looking at documents
12    just for the sake of looking at them, but,
13    for example, if there is IMS National
14    Prescription Audit data that would reflect,
15    for the year 2016, that approximately
16    96 percent of all prescriptions for opioids
17    in the United States were filled with a
18    generic opioid, that wouldn't surprise you?
19         MR. ERCOLE:  Objection to form;
20    speculation, foundation.
21         THE WITNESS:  I don't know that
22    it would surprise me, no.
23    BY MR. KIEFFER:
24         Q.  And you wouldn't necessarily

Page 54

1     have a reason to dispute it, if indeed that
2     is what the IMS National Prescription Audit
3     data reflects, because they are a reliable
4     source?
5          MR. ERCOLE:  Objection.
6          THE WITNESS:  That is correct.
7     BY MR. KIEFFER:
8          Q.  Do you believe, sir, that --
9     well, strike that.
10         The company you work for
11    now -- what's the name of it again?
12         A.  Amneal Pharmaceuticals.
13         Q.  Do they make opioids?
14         A.  Yes.
15         Q.  Okay.  What kinds of opioids
16    do they make?
17         MR. ERCOLE:  Objection to the
18    form; relevance.  What's the basis for
19    asking?
20         MR. KIEFFER:  Just general
21    background.
22         MR. ERCOLE:  I mean, I'll give
23    you some leeway to ask some questions,
24    but --

Page 55

1          MR. KIEFFER:  Yeah.  I'm not
2     going to spend a lot of time on it.
3          MR. CRAWFORD:  Amneal is a
4     defendant in the litigation.
5          MR. ERCOLE:  Not in this
6     particular case at all.  This
7     deposition is for Summit, and they're
8     not a defendant in this case.
9          MR. KIEFFER:  It's very general
10    information.
11    BY MR. KIEFFER:
12         Q.  Generally, what type of
13    opioids do they produce?
14         A.  Hydrocodone, oxycodone are two
15    of them, for sure.
16         Q.  Okay.  Again, general
17    question, and then I'll move on.
18         In terms of the breadth of
19    their product line, is it, in general,
20    narrower than Teva's?
21         A.  Yes.
22         Q.  Okay.  Okay.  Do you believe
23    that a public health emergency exists
24    nationwide and that there is a crisis

Page 56

1     affecting the country as a consequence of
2     opioid abuse and addiction?
3          MR. ERCOLE:  Objection to form;
4     vague.
5          THE WITNESS:  I would say that
6     there is an opioid problem in the
7     United States, yes.
8     BY MR. KIEFFER:
9          Q.  Thank you.  My question was a
10    little bit more specific.
11         Do you believe that there is a
12    public health emergency that exists
13    nationwide and that there is a crisis
14    affecting this country as a consequence of
15    opioid abuse and addiction?
16         MR. ERCOLE:  Objection to form;
17    calls for speculation, improper
18    question.
19         THE WITNESS:  I think,
20    depending on what your definition is,
21    I'd say that there's a problem in the
22    United States with opioids.
23         MR. KIEFFER:  Okay.
24             - - -

Page 57

```
 1        (Teva-Boyer No. 003 was marked for
 2        identification.)
 3            - - -
 4   BY MR. KIEFFER:
 5        Q.  Sir, we've just handed you as
 6   Exhibit No. 3 a document, a determination
 7   by Eric Hargan, the acting secretary of the
 8   Department of Health and Human Services,
 9   captioned "Determination that a public
10   health emergency exists," and it's dated
11   10/26 of '17.
12        Do you see the document that
13   I'm referring to?
14        A.  Yes, I do.
15        Q.  This document states, "As a
16   result of the consequences of the opioid
17   crisis affecting our Nation, on this date
18   and after consultation with public health
19   officials as necessary, I, Eric D. Hargan,
20   Acting Secretary of Health and Human
21   Services, pursuant to the authority vested
22   in me under section 319 of the Public
23   Health Service Act, do hereby determine
24   that a public health emergency exists
```

Page 58

```
 1   nationwide."
 2        Do you see what I just read?
 3        A.  Yes.
 4        Q.  Were you aware that this
 5   determination had been made by the acting
 6   secretary of the Department of Health and
 7   Human Services?
 8        A.  No.
 9        Q.  Today is the first time you've
10   learned of that?
11        A.  First time I've seen that,
12   yes.
13        Q.  First time you've seen this
14   document or learned that the acting
15   secretary of the Department of Health and
16   Human Services, in October of 2017, made
17   this determination, that a public health
18   emergency existed?
19        A.  Both.
20        Q.  Both.  Okay.
21        At this time -- this was dated
22   10/26 of '17.  That was post -- strike
23   that.  Let me ask a better question.
24        The Teva acquisition of
```

Page 59

```
 1   Actavis --
 2        A.  Yes.
 3        Q.  I don't want to get us into
 4   the legal weeds, but is "acquisition" -- is
 5   that the correct term to use?
 6        MR. ERCOLE:  Objection to form.
 7        THE WITNESS:  I believe that
 8        Teva -- it acquired the Actavis
 9        business, generic business.
10   BY MR. KIEFFER:
11        Q.  Okay.  And I'm not trying to
12   bind you or Teva with a question like this,
13   but in terms of a merger, you understood it
14   more to be in the nature of an acquisition,
15   at least insofar as you understand those
16   terms are commonly used?
17        MR. ERCOLE:  Objection to form;
18        calls for a legal conclusion.
19        THE WITNESS:  Yes.
20   BY MR. KIEFFER:
21        Q.  Okay.  Now, October 26 of 2017
22   was after Teva acquired Actavis; correct?
23        A.  Yes.
24        Q.  And it was still during the
```

Page 60

```
 1   period of time that you were employed by
 2   Teva?
 3        A.  That is correct.
 4        Q.  As president and CEO of North
 5   America?
 6        A.  That is correct.
 7        Q.  Okay.  As president and CEO of
 8   Teva North America, do you think it -- do
 9   you think it was important to remain
10   abreast of significant developments, such
11   as a determination by the acting secretary
12   of the Department of Health and Human
13   Services that there was a public health
14   emergency as a consequence of the opioid
15   crisis?
16        MR. ERCOLE:  Objection to form.
17        THE WITNESS:  I think if you
18        look at what the generic companies do,
19        which is supply product based upon a
20        forecasted need of our customers, I
21        think that we had policies in place as
22        relates to suspicious order management
23        that was being managed by our DEA
24        compliance organization and -- and I
```

1    would hope that our systems that were
2    in place were managing it accordingly,
3    based upon any kind of a public
4    announcement that way.
5    BY MR. KIEFFER:
6        Q.  Okay.  My question was a
7    little bit different.
8        I understand that there may be
9    systems in place and that there are
10   different departments, but in your role as
11   the president and CEO, at the time, of Teva
12   North America, did you feel that it was
13   important to remain abreast of significant
14   departments in government, such as a
15   determination by the Department of Health
16   and Human Services that there was a public
17   health emergency as a consequence of the
18   opioid crisis, particularly given that Teva
19   manufactured opioids?
20       MR. ERCOLE:  Object to form.
21       THE WITNESS:  I would say it
22       would be important for me to make sure
23       that the company was running the
24       business in accordance with rules and

1    regulations and laws of the -- of the
2    distribution of our products, whether
3    it be opioids or anything else.
4        And, yes, it's something that I
5    was probably not directly aware of the
6    exact letter, but was aware of opioids
7    in the United States and the problem.
8    BY MR. KIEFFER:
9        Q.  Did -- did the suspicious
10   order monitoring function report to you?
11       A.  No, it did not.
12       Q.  Who did it report to?
13       A.  It reported in to another part
14   of the organization.  I think you would
15   want a separation of a church and state.
16   The compliance organization, you would not
17   want that to roll up to a commercial
18   organization, so it was a completely
19   separate entity, outside of commercial.
20       Q.  Okay.  And when you say it
21   rolled up to a different part of the
22   organization, what part of the organization
23   did it ultimately roll up to?
24       A.  I don't know the answer.

1        Q.  But not you?
2        A.  Definitely not commercial.
3        Q.  And when you say "commercial,"
4    that's the side of the business you were
5    on?
6        A.  That is correct.
7        Q.  The side you were in?
8        A.  Right.  As president and CEO,
9    I was responsible for sales, marketing,
10   pricing, contracts, customer service, and
11   distribution -- actually, not even
12   distribution at that point in time at Teva.
13   Everything but distribution.
14       Q.  Okay.  And so you were not
15   involved, on any kind of a regular basis,
16   with anything having to do with suspicious
17   order monitoring?
18       A.  That's correct.
19       Q.  Were you involved at all with
20   a suspicious order monitoring?
21       MR. ERCOLE:  Objection to form;
22       time period.
23   BY MR. KIEFFER:
24       Q.  You were when president and

1    CEO of Teva North America.
2        A.  No, I was not.
3        Q.  Not at all?
4        A.  Not at all.
5        Q.  Okay.  Now, you used the
6    phrase a moment ago that intrigued me a
7    little.  You used the phrase "separation of
8    church and state."
9        A.  That's correct.
10       Q.  Is it your testimony that, in
11   your time as president and CEO of Teva
12   North America, there was a total separation
13   between the commercial side of the business
14   that you ran and monitoring, ordering for
15   suspicious order patterns and drug
16   diversion and things of that nature?
17       A.  No, not at all.
18       Q.  So if there was not a total --
19   strike that.
20       You testified a moment ago you
21   didn't have anything to do with suspicious
22   order monitoring?
23       A.  Me personally, yes, that's
24   correct.

Page 65

1    Q.   And people that reported to
2  you as well?
3    A.   People that reported to me
4  were responsible for providing data, from
5  customer service, for instance, order
6  management systems.  That would kick out of
7  our systems, and that would go to DEA
8  compliance, but that had nothing to do with
9  me on a daily basis.
10   But the customer service
11  organization did report up through me.
12   Q.   Customer service did?
13   A.   Yeah.  Order management,
14  customer service.
15   Q.   But in terms of looking at
16  ordering patterns, particular customers,
17  trends, areas of concern, those were not
18  issues that you ever looked at when you
19  were president and CEO of Teva North
20  America; correct?
21   MR. ERCOLE:  Objection to form.
22   You're asking him in his
23   individual capacity, I assume?
24   MR. KIEFFER:  Yeah.

Page 66

1   THE WITNESS:  So my
2   responsibility was sales and marketing,
3   pricing contracts and customer service.
4   I did not have responsibility for the
5   suspicious order management process.
6   That did take and report up through a
7   separate portion of the organization.
8  BY MR. KIEFFER:
9    Q.   You think it might be
10  beneficial for a company like Teva to have
11  data flowing to someone at as senior level
12  as you occupied when you were there
13  regarding suspicious order monitoring so
14  that you could determine whether any
15  activities of a sales or marketing nature
16  that might be taking place on the
17  commercial side were having an effect,
18  intended or unintended, on suspicious
19  orders?
20   MR. ERCOLE:  Objection to form;
21   compound, vague.
22   THE WITNESS:  In my opinion,
23   there isn't really anything that sales
24   and marketing can do to influence those

Page 67

1  orders.
2   The customer has a forecast and
3  a historical utilization.  There's an
4  algorithm that's been determined,
5  across almost all the entities that I
6  ever worked for, that was managed by
7  the DEA compliance organizations, and
8  they were responsible for either
9  allowing orders to be released or
10  holding orders from being released,
11  based upon the information they were
12  provided by the customer and their
13  historical utilization.
14   That is not something that
15  sales and marketing had the ability to
16  influence or weigh in on.
17  BY MR. KIEFFER:
18   Q.   You have not, at any point in
19  time, even as president and CEO of Teva
20  USA, undertaken to do any kind of review to
21  determine the sufficiency or lack thereof
22  of Teva's suspicious order monitoring
23  system; is that true?
24   MR. ERCOLE:  Objection to form.

Page 68

1   THE WITNESS:  That is correct.
2   As president and CEO, the
3   responsibility was a commercial CEO.  I
4   was not responsible for the other areas
5   of the business that you're speaking
6   of.
7  BY MR. KIEFFER:
8    Q.   Okay.
9    A.   That was a title.
10   Q.   I'm sorry?
11   A.   That was a title, the
12  president and CEO, but the responsibilities
13  were that of a commercial entity.
14   Q.   If there has been evidence
15  produced previously in this litigation --
16  documents and testimony -- to indicate
17  that, as of 2012, the company that now goes
18  by the name of Teva had not made a single
19  report of a suspicious order of an opioid
20  product to the DEA, is that anything that
21  you are aware of?
22   MR. ERCOLE:  Objection to form;
23   it's vague, improper legal conclusion.
24   You can answer if you can.

1    THE WITNESS:  I am not aware of
2  it.
3  BY MR. KIEFFER:
4    Q.  Okay.  And if there's been
5  evidence produced previously in this
6  litigation, in the form of documents and
7  testimony, to indicate that, as of 2012,
8  the company that now goes by the name of
9  Teva hadn't made a single report to the DEA
10  of a suspicious order, would that surprise
11  you?
12    MR. ERCOLE:  Objection to form.
13  He didn't even work for Teva in 2012.
14    THE WITNESS:  I can't speak on
15  behalf of the company prior to August
16  of 2016.
17  BY MR. KIEFFER:
18    Q.  Okay.  Would it concern you?
19    MR. ERCOLE:  Same objection.
20    THE WITNESS:  I don't know what
21  their process was in 2012.
22  BY MR. KIEFFER:
23    Q.  One way that a company like
24  Teva or Actavis or Watson, when you worked

1  for them, can help prevent abuse of opioids
2  is to take reasonable and necessary steps
3  to prevent diversion of their products.
4  Correct?
5    MR. ERCOLE:  Objection to form.
6    THE WITNESS:  I think that we
7  had a responsibility, as far as a
8  suspicious order management system that
9  I am not party to.  That was not my
10  area of responsibility.  And I believe
11  if that's what was required, according
12  to the companies -- and I would hope
13  that we had the right process in place
14  to prevent what you're asking about.
15  BY MR. KIEFFER:
16    Q.  And the last part of your
17  answer was that you "would hope that we had
18  the right process in place to prevent what
19  you're asking about."  Correct?
20    A.  That is correct.
21    Q.  All right.
22    A.  I can't speak to a process
23  that I wasn't a part of.
24    MR. KIEFFER:  Let me hand you

1  what we've marked as Exhibit 4, and it
2  looks like the last page came
3  unstapled, so be a little careful there
4  that you don't snag your finger.
5       - - -
6    (Teva-Boyer No. 004 was marked for
7    identification.)
8       - - -
9  BY MR. KIEFFER:
10    Q.  Sir, Exhibit 4 is a document
11  with a Bates label, in the lower right-hand
12  corner, of TEVA_MDL_A_12682275.  This is an
13  additional set of materials that counsel
14  for Teva provided to us, that came from
15  your custodial file.  It beginnings with an
16  email dated February 4th, 2013, from Sara
17  Copp to you and others.  The subject is,
18  "Sales & Marketing (POA) Meeting
19  Presentations 1/7 to 1/10/2013."
20    Do you see what I'm referring
21  to there?
22    A.  Yes.
23    Q.  Who is Sara Copp?
24    A.  My executive assistant.

1    Q.  Okay.  All right.  If you
2  would, turn to the third page of Exhibit
3  No. 4.  That appears to be the cover page
4  of a PowerPoint presentation.
5    Do you see that?
6    A.  Yes.
7    Q.  And it's titled "DEA
8  Compliance Updates - SOM, U.S. Order
9  Management, January 2013."  Correct?
10    A.  Yes.
11    Q.  Okay.  If your executive
12  assistant was forwarding this particular
13  slide deck to you in February of 2013,
14  would that have been because this might be
15  material you were involved in presenting?
16    A.  No.
17    Q.  Okay.  Material you might be
18  involved in pulling together?
19    A.  No.
20    Q.  Material that might be
21  pertinent to something you were about to
22  attend?
23    A.  No.
24    Q.  Okay.  What are the reasons

Page 73

1    that your executive assistant might have
2    been sending you this particular slide deck
3    we have as Exhibit 4?
4        MR. ERCOLE:  Feel free to read
5    through the slides.
6        THE WITNESS:  Yeah, I'm just
7    looking to see, because I've never seen
8    it before, so I'm going to look at it.
9        So this may have been an update
10   by different parts of the organization,
11   just to let the balance of the sales
12   and the organization know some of the
13   activities that were going on in the
14   organization.  So more of an update
15   than anything else.
16       Mary Woods was responsible for
17   the US order management system of
18   Actavis, and she was giving an update
19   of some of her -- you know, some of her
20   activities and what we may be getting
21   done as part of the combination of
22   Watson and Actavis.
23       The area of this that I
24   probably did as a presentation probably

Page 74

1    begins on the US commercial update.
2    That looks more along the lines of a
3    presentation that I may have done and
4    put together on behalf of the
5    combination of Watson and Actavis.
6    BY MR. KIEFFER:
7        Q.  Okay.  So you might have had a
8    hand in developing a portion of the
9    information in this package?
10       A.  The back end of it, yes.
11       Q.  The back end of it.
12       All right.  Well, let me ask
13   you about a couple of things in here, if I
14   may, and particularly we'll get to stuff
15   you might have had a hand in.
16       As to the title that appears
17   on the first page of that, "DEA Compliance
18   Updates - SOM," "SOM" stands for
19   "suspicious order management"; right?
20       A.  Yes, I'm assuming so.
21       Q.  And without asking you for a
22   legal conclusion or getting you into the
23   legal weeds, you understand that a company
24   like Actavis, and Watson at the time, did

Page 75

1    have certain obligations, under US law, to
2    undertake monitoring of orders of scheduled
3    control substances, some type of
4    monitoring?
5        A.  I would agree.
6        Q.  Looking forward -- again, this
7    is general; not trying to marry you to the
8    legal weeds -- but monitoring for orders
9    that could be, quote, suspicious, in terms
10   of their size or their frequency or the
11   nature of the product or other criteria,
12   potentially?
13       MR. ERCOLE:  Objection to form;
14   vague.
15       THE WITNESS:  I'm assuming that
16   there was an obligation to do that.  We
17   looked at all of our orders, not just
18   controlled substances.  But yes, that
19   was part of the order management's
20   responsibility.
21   BY MR. KIEFFER:
22       Q.  If you turn to the first page
23   after the cover page, there's a little bit
24   of an organizational chart.  It has the

Page 76

1    name of the lady you referenced, Mary
2    Woods, as US order management.
3        Again, to be clear, did she
4    report up through you?
5        A.  Up through me, yes.
6        Q.  And did she have a hand in the
7    suspicious order monitoring function then?
8        A.  She was part of customer
9    commerce service and order management, yes.
10       Q.  Okay.  Turn to the next page,
11   which is, I think, according to my count,
12   the fifth page into the overall exhibit.
13   The heading is "DEA Compliance Updates:
14   SOM," for "suspicious order management,"
15   and this states, "Combined Watson plus
16   Actavis product are the most widely
17   diverted and receive the highest scrutiny
18   from the DEA."
19       Do you see what I just read
20   there?
21       A.  That is correct.
22       Q.  Were you aware of that at the
23   time that you were president/CEO of Teva
24   North America?

Page 77

1  MR. ERCOLE: Objection to form.
2  THE WITNESS: This is prior to
3  the president and CEO of Teva North
4  America.
5  BY MR. KIEFFER:
6  Q. I'm sorry.
7  A. This is when I was responsible
8  for Watson and Actavis.
9  Q. Okay.
10  A. I was not aware of that.
11  Q. Okay. Let me clean up the
12  question. And thank you for -- your answer
13  was more precise than my question.
14  This document, just to refresh
15  our memory, is dated February 4, 2013.
16  At that point in time, Watson
17  and Actavis had combined into one company;
18  correct?
19  A. I believe that by then it was,
20  yes.
21  Q. Okay. And what would your
22  title have been at that time?
23  A. Senior vice president of sales
24  and marketing.

Page 78

1  Q. The senior vice president of
2  sales and marketing for Watson and Actavis?
3  A. It would have been called
4  Watson at the time, Watson Pharma.
5  Q. All right. And as senior vice
6  president of sales and marketing for Watson
7  Pharma in 2013, were you the most senior
8  sales officer in the organization?
9  MR. ERCOLE: Objection to form.
10  THE WITNESS: I was the most
11  senior -- US commercial person in the
12  organization.
13  BY MR. KIEFFER:
14  Q. Okay. And who did you report
15  to at that time?
16  A. I believe Siggi Olafsson.
17  Q. Okay. And as senior vice
18  president of sales and marketing for Watson
19  Pharma in 2013, am I correct, from your
20  last answer, you were not aware that
21  combined Watson and Actavis products were
22  the most widely diverted and received the
23  highest scrutiny from the DEA?
24  A. That is correct. This, to me,

Page 79

1  looks like a presentation -- you'd have to
2  ask Mary Woods, though -- that she provided
3  data that she had gotten from DEA
4  compliance, because she wouldn't have been
5  in charge of this aspect of it. But she
6  had the interaction with our DEA compliance
7  team.
8  So, yeah, I was not aware of
9  that.
10  Q. Okay. Today is the first time
11  you were made aware of this?
12  A. Yes.
13  Q. Okay. Having been made aware
14  of it, does it concern you about anything
15  that may have been happening or not
16  happening with respect to DEA compliance at
17  Watson and Actavis in 2013, when you were a
18  senior officer in that organization?
19  MR. ERCOLE: Objection to form.
20  THE WITNESS: I would say that
21  any of our product, knowing that
22  they're prescription pharmaceuticals,
23  whether it be a DEA product or any
24  other product, I would be concerned

Page 80

1  that it was the most widely diverted.
2  BY MR. KIEFFER:
3  Q. Was any information ever
4  shared with you in 2013, when you were a
5  senior officer at Watson Pharma, about the
6  reason or reasons why Watson and Actavis
7  product were the most widely diverted and
8  received the highest scrutiny from the DEA?
9  A. No. I don't even know if
10  that's something that's true or something
11  they perceived.
12  Q. Sure.
13  A. I don't know where it came
14  from.
15  Q. Okay. Well, let's assume for
16  the moment, for purposes of the next
17  question, that it's true.
18  A. Okay.
19  Q. At the time, which is
20  February 2013, who ultimately in the
21  organization would have been responsible
22  for an issue like this? Understanding the
23  reasons why and taking whatever steps might
24  be necessary to address them.

Page 81

1      MR. ERCOLE:  Objection to form.
2      THE WITNESS:  It would start
3  with DEA compliance.
4  BY MR. KIEFFER:
5      Q.  Okay.  And who was that person
6  at the time?
7      A.  I don't remember at the time
8  who that was.
9      Q.  Okay.  You said it would start
10  with DEA compliance.  And who would it end
11  with?
12      A.  I think that would roll up
13  through whoever the DEA compliance was
14  reporting into.  Probably operations and
15  then on up to the CEO.
16      Q.  Okay.  Do you know who was in
17  charge of operations at Watson Pharma in
18  2013?
19      A.  I don't know exactly who it
20  was.  There were a number of people at the
21  time.
22      Q.  If you turn two pages further
23  in that Exhibit 4, sir, there's a heading
24  that says "DEA Compliance Updates - SOM."

Page 82

1  The first statement is:
2      "Manufacturers being held
3  accountable.
4      "Need to have a clear
5  understanding of where product is going."
6      Do you see that?
7      A.  That's correct.
8      Q.  And then the second bullet
9  says:
10      "Expectation is to:  Know your
11  customers' customer.'"
12      Do you see that as well?
13      A.  Yes, I do.
14      Q.  When you were senior vice
15  president of sales and marketing for Watson
16  Pharma in 2013, did you undertake any steps
17  to ensure that, on the sales side of the
18  organization, all data that could
19  reasonably be captured was captured that
20  would reflect where your opioid products
21  were going and who your customers'
22  customers were?
23      MR. ERCOLE:  Objection to the
24  form; lack of foundation, compound.

Page 83

1      THE WITNESS:  I don't recall
2  what DEA would have asked the
3  organization at that period of time.  I
4  do not know.
5  BY MR. KIEFFER:
6      Q.  That type of information,
7  though, information that would reflect a
8  clear understanding by Watson Pharma of
9  where its opioid products were going and
10  who its customers' customers were, the
11  sales side of the organization would be the
12  starting point for that information; right?
13      MR. ERCOLE:  Same objection;
14  form.
15      THE WITNESS:  The sales side
16  would know who our direct customer is.
17  BY MR. KIEFFER:
18      Q.  Right.
19      A.  But beyond that, they probably
20  would not know who the customers' customer
21  is, no.
22      Q.  Okay.  All right.  And that --
23  why is that, again, broadly speaking?  Just
24  because of the nature of the data that

Page 84

1  Watson captured at the time?
2      A.  I just think the data
3  available at the time, probably you
4  wouldn't have all of that information.
5      Q.  Okay.  So I don't want to go
6  through a laundry list of customers, but
7  certainly there were wholesalers that were
8  customers of Watson Pharma in 2013?
9      A.  That is correct.
10      Q.  AmerisourceBergen being one?
11      A.  That is correct.
12      Q.  Was Cardinal one?
13      A.  Yes.
14      Q.  McKesson?
15      A.  Yes.
16      Q.  Okay.  Walmart?
17      A.  Yes.
18      Q.  Walgreens Boots Alliance?
19      A.  Walgreens.  Boots Alliance
20  didn't exist at the time, I don't believe.
21      Q.  Okay.  Fair enough.
22      That Boots Alliance goes by an
23  acronym WBAD.  Some witnesses have said
24  "webad"?

Page 85

1       A.  That is correct.
2       Q.  And that is essentially a
3   negotiating arm that negotiates
4   pharmaceutical and generic pharmaceutical
5   pricing on behalf of, for example,
6   Walgreens?
7       A.  That is correct.
8       Q.  And AmerisourceBergen?
9       A.  That is correct.
10      Q.  And your memory -- and this is
11  not a memory test, but your memory is, at
12  least as of 2013, Boots Alliance did not
13  exist?
14      A.  I don't know the answer when
15  that came together.
16      Q.  Okay.  Fair enough.  Let me
17  back up.
18      So, for example, with respect
19  to AmerisourceBergen and Cardinal and
20  McKesson, those are recognized as three
21  very large pharmaceutical distributors?
22      A.  Yes, they are.
23      Q.  And I think it was your
24  testimony a moment ago that, in 2013, you

Page 86

1   don't believe -- strike that.
2       It was your testimony a moment
3   ago that certainly Watson Pharma, in 2013,
4   would have known who those customers were
5   and the products they were buying, the
6   volume of products and kind of historical
7   buying patterns.  True?
8       MR. ERCOLE:  Objection to form;
9   compound, vague.
10      THE WITNESS:  I would agree.
11  BY MR. KIEFFER:
12      Q.  But I understood from your
13  testimony a moment ago that you don't
14  believe that Watson Pharma, in 2013, likely
15  knew who all of their customers were --
16  "their" being the McKessons, the
17  AmerisourceBergenens, the Cardinals;
18  correct?
19      A.  We would have known the
20  majority of them, but we wouldn't have
21  known all of them.  And we wouldn't have
22  known if they were selling to another
23  wholesaler distributor, who was selling
24  down to another pharmacy or some other

Page 87

1   entity that we wouldn't know.
2       Q.  You would not have known that?
3       A.  No, I wouldn't.
4       Q.  And so, for example, just to
5   give us a couple of examples to try to make
6   it clear to those of us that don't do this
7   every day or at all.
8       You said if -- let's take
9   AmerisourceBergen -- or any of the
10  wholesalers -- AmerisourceBergen, Cardinal,
11  McKesson -- if they were selling your
12  company's products to another wholesaler,
13  did I understand you to say you would not
14  have known that?
15      MR. ERCOLE:  Objection to form;
16  I mean, it's vague, generalized.
17      THE WITNESS:  If they sold it
18  under a contract price, we would have
19  known that, but then we wouldn't have
20  known where that next customer was
21  selling.  And if they sold it to them
22  at the wholesale acquisition cost, the
23  list price, we would not know where it
24  went.

Page 88

1   BY MR. KIEFFER:
2       Q.  Okay.  Did that ever change
3   during your time at this organization, even
4   up through when you left in 2018 and the
5   company was Teva?
6       A.  No.
7       Q.  Your answer would be the same
8   if I ask you those same questions as it
9   relates to early 2018?
10      A.  That is correct.
11      Q.  Okay.  Where did you say, sir,
12  you thought the information you supplied to
13  this update might begin?
14      A.  Beginning with the "US
15  Commercial Update."
16      Q.  Okay.  Bear with me, because
17  this wasn't numbered, as it was produced to
18  us.
19      All right.  And that's dated
20  January 2013.
21      Are these -- and we can go --
22  I don't intend to cover all of them, but
23  the slides that would appear behind this
24  heading "US Commercial Update," are those

Page 89

1   slides that either you prepared or somebody
2   under your direction likely prepared?
3        A.  Not necessarily under my
4   direction.  There's some corporate slides
5   here that would have been incorporated in
6   from other entities within the
7   organization.
8        Q.  Okay.  If you consider that
9   slide that says "US Commercial Update" to
10  be Page 1, if you then turn 12 pages, there
11  is a slide that says "Overall US Strategy."
12       A.  Okay.
13       Q.  Are you there?
14       A.  Yes, I am.
15       Q.  The first bullet there says,
16  "Maximize value of product portfolio."
17       Do you see that?
18       A.  Yes, that's correct.
19       Q.  And the second subhead under
20  that says, "Execute strategic
21  pricing/volume matrix opportunities."
22       Do you see that?
23       A.  That is correct.
24       Q.  What does that mean in

Page 90

1   layman's terms?
2        A.  In layman's terms, that means
3   where there are products that are in short
4   supply, look for opportunities to have a
5   price increase, capture extra value.  Or
6   products that have -- you know, we have
7   less than the volume that we would have
8   expected, to increase that volume.
9        So if it's a four-player
10  market, we want 25 percent market share.
11  And if we'd only have 10 percent market
12  share, it would be the strategic
13  opportunity to capture the other 15 percent
14  market share in a four-player market, was
15  usually the goal.
16       Q.  Okay.  Thank you.
17       If you'd flip several pages
18  back to what I'll call Page 15 -- so about
19  three more pages back in that document --
20  there's a slide that says "2012
21  Accomplishments."  It was about three
22  slides behind what we were just looking at.
23  It's entitled "2012 Accomplishments."
24       A.  The other way, it's ahead.

Page 91

1   Got it.
2        Q.  All right.  There are -- this,
3   I presume, is information that would have
4   been supplied, in some form or fashion,
5   under your direction; it would have been
6   information pertinent to your area?
7        A.  That's correct.
8        Q.  Okay.  There's six bullets
9   here listed under "2012 Accomplishments."
10  Let me focus you on the third one.  It says
11  there, "Maximize price/volume matrix."
12       And that's what we were just
13  talking about a moment ago; right?
14       A.  Yes.
15       Q.  And one of the things that's
16  indicated here:  "Price increases included:
17  Methylphenidate ER and Hydrocodone."
18       Correct?
19       A.  That is correct.
20       Q.  All right.  If you considered
21  it to be a 2012 accomplishment that there
22  was price increases on hydrocodone, would
23  that have likely been because of supply
24  shortages in the market?

Page 92

1        MR. ERCOLE:  Objection to form;
2   calls for speculation.
3        THE WITNESS:  I don't believe
4   that was the shortages.  I believe that
5   went through -- and I'm guessing now --
6   we had something called a product
7   rationalization group, and there were
8   certain products -- and hydrocodone, if
9   I'm not mistaken, at that time, was one
10  of them.  We were either breaking even
11  or losing money on our dispensing or
12  our distribution of hydrocodone.  And
13  the choice, at that point in time, was
14  probably to take a price increase or
15  get out of it.
16  BY MR. KIEFFER:
17       Q.  And it looks like you took a
18  price increase?
19       A.  Looks like we took a price
20  increase.
21       Q.  And it sounds like that was a
22  successful strategy, because it was listed
23  as one of six accomplishments in 2012 on
24  this slide; correct?

Page 93

1       MR. ERCOLE: Objection to form.
2       THE WITNESS: I believe in 2012
3  we took a lot of price increases.
4  Those were two of the price increases
5  that were a success.
6       - - -
7       (Teva-Boyer No. 005 was marked for
8       identification.)
9       - - -
10  BY MR. KIEFFER:
11     Q. Sir, I just handed you a
12  document marked as Exhibit 5. It has a
13  number in the lower right-hand corner
14  TEVA_MDL_A_09639501. It is an email string
15  that involves you, at least on what appears
16  to be the end of the string, at the top of
17  the first page of that exhibit.
18     Feel free to take a moment and
19  look through it. You don't have to -- I'm
20  not going to ask you about every little
21  line, but feel free to take a moment and
22  peruse it and then let me know. I've got a
23  couple of questions for you.
24     A. (Witness reviews document.)

Page 94

1       Okay.
2     Q. All right. Let me just ask
3  you a few questions, sir.
4     The email from you at the top
5  of this string on Page -- first page of
6  Exhibit 5 is dated 10/22 of 2014, and it's
7  got your name @actavis.com; correct?
8     A. Yes.
9     Q. Did you consider yourself, at
10  the time, to be employed by Actavis or
11  Watson or --
12     A. Switched over to Actavis, so
13  I'm assuming it was Actavis Pharma.
14     Q. Okay. You appear to be
15  responding to an email, just a little bit
16  further down the page, from a Lisa
17  DeFrancesco, if I said that right?
18     A. Yes.
19     Q. Who was she?
20     A. Lisa was in charge of, at the
21  time, I believe, investor relations.
22     Q. Okay. And reading further on
23  down the page -- and I'll hit the
24  highlights I want to ask you about, but

Page 95

1  before I do that, I want to have an
2  understanding as to who some of these
3  people are.
4     About two-thirds of the way
5  down the page, it says, "FromSent," and it
6  says "pete@jnk."
7     Do you see that?
8     A. Yes.
9     Q. And "JNK" appears to reference
10  JNK Securities Corp.?
11     A. I have no idea.
12     Q. You have no idea who they are?
13     A. No.
14     Q. Not at all?
15     A. Not at all.
16     Q. Okay. Let me ask you here,
17  toward the very bottom of the page, in
18  boldface, it says, "This was an incoming
19  client request by a major player in these
20  names - so my presumption is that there is
21  legit fear of negative repercussions
22  hitting these opioid manufacturers as well
23  as publicly traded SNFs -- Got 15 minutes
24  to get in front of this?"

Page 96

1     Do you see what I just read
2  there?
3     A. Yes.
4     Q. Then it goes on to state,
5  "Please let me know if you would like a
6  call."
7     And then beneath that, it
8  states, "On October -- On October 9, the
9  Medicare Payments Advisory Commission
10  (MedPAC) issued a research report about the
11  levels and extent of opioid prescription
12  use in all 50 states. The findings are
13  making their way around Washington policy
14  circles, including FDA regulators, CMS and
15  state medical boards."
16     "Topics of Discussion."
17     Do you see where I am?
18     A. Yes.
19     Q. Okay. And the first topic of
20  discussion and the first bullet point
21  states, "It appears approximately
22  10 percent of all opioid prescriptions are
23  for legitimate use as defined by extensive
24  peer-reviewed research. This primarily

Page 97

1    includes cancer patients and those at
2    end-of-life."
3         Do you see what I just read?
4         A.  Yes.
5         Q.  Okay.  Before this email
6    string was forwarded to you, were you aware
7    that this Medicare Payments Advisory
8    Commission had apparently issued this
9    research report with some of these findings
10   that are referenced?
11        A.  I've never heard of it.
12        Q.  Okay.  Upon receiving this
13   email string directed to you, did the
14   statements attributable to the research
15   report of this MedPAC group -- were they
16   any cause of concern to you?
17        MR. ERCOLE:  Objection to the
18   form.
19        THE WITNESS:  No. 1, I don't
20   remember ever getting it.
21        Knowing me, from an email
22   standpoint, when the first thing -- it
23   says, "You are aware of this escalating
24   opioid sitch snowballing," I would have

Page 98

1    just responded right away, saying I
2    have never heard it.  I wouldn't have
3    read through the rest of it, to be
4    fair.
5    BY MR. KIEFFER:
6         Q.  I think you anticipated my
7    next question.
8         There's an email on the first
9    page from a Ben, who looks like Sun, S-U-N,
10   @chartwellip.com.
11        Do you know who that is?
12        A.  No.
13        Q.  No idea?
14        A.  No.
15        Q.  He states, "Lisa I got this
16   Opioid thing, would like to follow up if
17   possible.  Thanks."
18        Do you see that?
19        A.  Yes.
20        Q.  And then it looks like she
21   forwards it on up to a group, including
22   you:  "FYI - let me know if you know
23   anything about this."
24        Do you see that?

Page 99

1         A.  That is correct.
2         Q.  And then it looks like you
3    responded, "Have not heard of anything
4    yesterday."
5         Am I correct?
6         A.  Yeah.
7         Q.  Okay.  And just to be clear,
8    it's your testimony that when you
9    responded, "Have not heard of anything
10   yet," you likely did not read through the
11   email to see what the topic was?
12        A.  That is correct.  With the
13   amount of emails that I get every day, I've
14   told my team for years, if it's not in the
15   subject title or the first sentence, I'm
16   probably not reading the whole email.
17        Q.  Okay.  Fair enough.  I
18   appreciate your candor.
19        So based on what you just told
20   us and your normal custom and practice, is
21   it likely that today is the first time
22   you've actually read these statements that
23   are attributable to a research report of
24   this MedPAC group?

Page 100

1         A.  That is correct.
2         Q.  Okay.  Including this first
3    topic of discussion, that according to the
4    MedPAC research report, it appeared that
5    approximately 10 percent of all opioid
6    prescriptions are for legitimate use;
7    right?
8         MR. ERCOLE:  Objection to form.
9         THE WITNESS:  That's what it
10   says.
11   BY MR. KIEFFER:
12        Q.  Okay.  Having now read that
13   today for the first time, if indeed this
14   Medicare Payments Advisory Commission, back
15   in 2014, issued a report stating that,
16   based on extensive peer-reviewed research,
17   approximately 10 percent of all opioid
18   prescriptions were for legitimate use, does
19   that cause you any concern as someone who
20   at the time was in the senior level --
21   senior management level of an organization
22   that manufactured a lot of opioids?
23        MR. ERCOLE:  Objection to form;
24   lack of foundation, calls for

Page 101

1    speculation.
2        THE WITNESS:  I'm not involved
3    in the research that they're talking
4    about.  I wouldn't believe it, but I
5    have no way of saying yes or no as
6    to -- to the accuracy of it.
7    BY MR. KIEFFER:
8        Q.  Okay.  So your immediate
9    reaction is you don't believe it; true?
10       A.  No.
11       Q.  Correct?
12       A.  Yeah.
13       Q.  Okay.  And whether you believe
14   it or don't believe it, it doesn't sound
15   like it's a concern --
16       MR. ERCOLE:  Objection to form.
17   BY MR. KIEFFER:
18       Q.  -- or would have been at the
19   time?
20       A.  Not that it's not a --
21       MR. ERCOLE:  Hold on.
22       Objection to form;
23   mischaracterizes testimony, asked and
24   answered.

Page 102

1        THE WITNESS:  Not that it's a
2    concern or not a concern.  I hadn't
3    read it, so I can't react to it.  I
4    don't know the background of the
5    research, how accurate it is or it
6    isn't.  I don't know what the outcome
7    of that research was, whether others
8    poked holes in it, that it was false or
9    not false.  I just don't know.
10   BY MR. KIEFFER:
11       Q.  Okay.  Fair enough.
12       But your at least initial
13   reaction, having read it today, is you
14   don't tend to believe it?
15       MR. ERCOLE:  Objection to form.
16       THE WITNESS:  If you're asking
17   me in my personal capacity, with not
18   scientific knowledge of the results or
19   how it was conducted, I would find it
20   hard to believe that one in ten were
21   legitimate.
22   BY MR. KIEFFER:
23       Q.  Okay.
24       MR. ERCOLE:  I think we've been

Page 103

1    going for about an hour and 20 minutes.
2    Is now a good time to take a break?
3        MR. KIEFFER:  Sure, yeah.
4        MR. ERCOLE:  Keep it quick.
5        THE VIDEOGRAPHER:  The time is
6    approximately 11:06 a.m.  We're going
7    off the record.
8        (Recess taken from 11:06 a.m. to
9        11:22 a.m.)
10       THE VIDEOGRAPHER:  We are back
11   on the record.  The time is
12   approximately 11:22 a.m.
13   BY MR. KIEFFER:
14       Q.  Mr. Boyer, we're back on the
15   record after a break.  Are you ready to
16   proceed?
17       A.  Yes, I am.
18       Q.  I learned when we adjourned
19   for the break, I guess, that we had a
20   slight technical issue with one exhibit,
21   having nothing to do with you.  I think we
22   resolved that.  It is Exhibit 5.  My
23   document is 1623.  I just want to get this
24   up on the video screen and ask you one or

Page 104

1    two quick questions just to make it clear
2    on our video record what we were
3    discussing, since the other one was too
4    small to even see.
5        This is the email string that
6    appears to end with you at the top on
7    October 22nd, 2014.
8        That's your response to Lisa
9    DeFrancesco; correct?
10       A.  That is correct.
11       Q.  Okay.  And the substance of
12   it, that we were discussing shortly before
13   the break, had to do with this apparent
14   research report by the Medicare Payments
15   Advisory Commission, or MedPAC, one of the
16   findings of which, according to what's
17   stated here, is that MedPAC had determined
18   that it appeared that "approximately
19   10 percent of all opioid prescriptions are
20   for legitimate use as defined by extensive
21   peer-reviewed research.  This primarily
22   includes cancer patients and those at
23   end-of-life.
24       You recall that discussion?

Page 105

1    A.  Yes.
2    Q.  And this is the document we
3  were discussing?
4    A.  That is correct.
5    Q.  Okay.  Don't mean to be
6  tedious, but having done this, you can
7  probably understand that if we have to play
8  this for the jury and they can't see what
9  we're talking about, it can make it
10  cumbersome.
11    A.  All good.
12    Q.  All right.  Let's move on.
13  Let me go back and ask you a question.
14    You told us early on that you
15  had given a lot of depositions before.  You
16  either said four or five dozen or five or
17  six dozen.
18    Was it five or six dozen?
19    A.  Probably about four or five
20  dozen.
21    Q.  Okay.  Four or five dozen.
22    Did any of those involve the
23  subject matter of opioids?
24    A.  I don't recall that any of

Page 106

1  them were for opioids.
2    Q.  When is the most recent one?
3    A.  One was -- what product was it
4  for?
5    I did one a few months ago on
6  a product.  I just don't recall what it
7  was.  I've done so many on products.  I've
8  done them on other areas of litigation.  I
9  don't recall which one it was.
10    Q.  Okay.  But as you sit here
11  today, you don't recall giving testimony in
12  any of those numerous other depositions
13  about opioid medications?
14    A.  I don't believe so.  I'm not
15  positive.
16    Q.  Any in-court testimony that
17  you gave, briefly, what was the subject
18  matter of the, I think you said, two to
19  three trials that you testified in?
20    A.  Yes.  AWP and Medicaid.
21    Q.  And just for the sake of our
22  record, "AWP" is "average wholesale price"?
23    A.  Yes.
24    Q.  Okay.  All right.  Thank you.

Page 107

1         - - -
2    (Teva-Boyer No. 006 was marked for
3    identification.)
4         - - -
5  BY MR. KIEFFER:
6    Q.  Mr. Boyer, we have just handed
7  you what we marked as Exhibit No. 6.  That
8  is a document that was produced to us by
9  counsel for Teva with a number in the
10  right-hand corner of TEVA_MDL_A_09639483.
11  This is also -- was produced to us in its
12  native electronic format.  This is also a
13  document that was produced to us from your
14  custodial emails.
15    The first page of it is titled
16  "US Generics, Operations Leadership Team
17  Meeting, October 15th, 2014."
18    Do you see that?
19    A.  Yes.
20    Q.  And would this have been at
21  the time that your employer was going under
22  the Actavis name?
23    A.  Yes, it would have been
24  Actavis Pharma at the time.

Page 108

1    Q.  All right.  What is an
2  operations leadership team meeting, as it
3  existed in October of 2014 at Actavis?
4    A.  I don't know.  My guess is
5  it's my direct reports.
6    Q.  Okay.  Your direct reports?
7    A.  Yeah.
8    Q.  Okay.  Generally -- and I --
9  look, it doesn't say it on here; I'm not
10  going to hold you to it -- but generally,
11  from what functional areas?  All
12  operations?
13    A.  No, this would have -- I don't
14  remember what the OLT was, but I'm assuming
15  sales, marketing, pricing, contracts,
16  customer service.
17    I don't remember what the
18  operational leadership team was at the
19  time.
20    Q.  You would, from time to time,
21  participate in these sorts of meetings?
22    A.  Yes.
23    Q.  Okay.  Always or typically?
24    A.  Not always.  Sometimes.

Page 109

```
 1    Q.  Okay.  Sometimes.
 2    A.  Yeah.
 3    Q.  All right.  Fair enough.
 4         This is a fairly short
 5  document.  I had numbered, because it
 6  wasn't numbered, as provided to us, the
 7  cover page as Page 1.  And it appears to be
 8  about six pages long.
 9         If you turn to the fifth page,
10  which is the next-to-the-last page -- the
11  slide there says "Key Product Trends."
12         Do you see where I am?
13    A.  Yes.
14    Q.  Okay.  Certain of the products
15  listed in the left-hand column are opioid
16  medications, are they not?
17    A.  That is correct.
18    Q.  Which ones are?
19    A.  Oxycodone, hydrocodone --
20  oxycodone APAP, hydrocodone APAP, oxycodone
21  TR.
22    Q.  Okay.  Very good.
23         The next-to-the-left-hand
24  column says -- it appears to be fourth
```

Page 110

```
 1  quarter forecast; is that the abbreviation?
 2    A.  Yes.
 3    Q.  Okay.  In dollars; right?
 4    A.  That is correct.
 5    Q.  Okay.  So, for example,
 6  oxycodone APAP says 21.8.  Would that be
 7  millions of dollars?
 8    A.  Yes.
 9    Q.  All right.  And the same for
10  hydrocodone APAP and oxycodone TR, millions
11  of dollars?
12    A.  Yes, that's correct.
13    Q.  Just to be clear, everything
14  that's shown in the fourth quarter forecast
15  column is stated in millions of dollars?
16    A.  Yes.
17    Q.  Okay.  And was it typical for
18  these operations leadership team meetings
19  that the team would focus on some of the
20  larger revenue contributors?
21         MR. ERCOLE:  Objection to form.
22         THE WITNESS:  No.  I don't
23    remember what the operational
24    leadership team was.  If you had a
```

Page 111

```
 1    context of where this was pulled
 2    from -- there was an OLT that was my
 3    level, but it was for the CEO at the
 4    time, that created these, for a
 5    cross-functional organization; and this
 6    may have been a one-time that I gave a
 7    generic update.  I don't know if it was
 8    that or it was with my own direct
 9    reports.
10  BY MR. KIEFFER:
11    Q.  Fair enough.
12         On the right-hand side, the
13    far right-hand column, corresponding to
14    hydrocodone APAP, there is a "Comments"
15    column.
16         Do you see that?
17    A.  Yes.
18    Q.  It says, "Price Increase, CII
19  Pipeline Fill."
20         Do you see that?
21    A.  That is correct.
22    Q.  Okay.  "Price increase" seems
23  self-explanatory.  Do you interpret that to
24  mean that that particular product,
```

Page 112

```
 1  hydrocodone APAP, had recently undergone a
 2  price increase?
 3    A.  That is correct.
 4    Q.  Okay.  And then the phrase
 5  "CII Pipeline Fill" -- CII would appear to
 6  relate to the fact that this medication is
 7  a Schedule II controlled substance?
 8    A.  That is correct.
 9    Q.  Okay.  What does the phrase
10  "pipeline fill" mean?
11    A.  So if I am not mistaken, at
12  this point in time, hydrocodone went from a
13  CIII to a CII product.  And that would have
14  meant that the wholesalers and chains would
15  have moved out or would have sold through
16  their CIII products and moved them out of
17  what a -- probably a control cage.  And CII
18  is required to be in a vault.
19         So my gut tells me that this
20  was us backfilling -- if they keep one week
21  of inventory on hand or two weeks of
22  inventory on hand, that we were pipeline --
23  or backfilling what their traditional
24  levels of on-hand inventory they would keep
```

Page 113

1   to satisfy their customers.
2       Q.  Okay.  With -- with the new --
3   with the CII product?
4       A.  Right.  You would have had a
5   decrease in the CIII down to zero, and the
6   CII would replace it at that point in time.
7       Q.  Okay.  And with the change in
8   controlled substance scheduling for
9   hydrocodone APAP from a CIII to a CII, did
10  that involve all hydrocodone-containing
11  products?
12      A.  I believe the answer is yes.
13      Q.  Okay.  And did it involve --
14  "it" being the change in controlled
15  substance scheduling of hydrocodone
16  products from a CIII to a CII -- did it
17  involve a formulation change in the
18  product?
19      A.  That, I don't recall.
20      Q.  Okay.  And when I said
21  "formulation change," I should have said a
22  formulation change as opposed to simply how
23  it was scheduled, how it was classified.
24          MR. ERCOLE:  Objection to form.

Page 114

1           THE WITNESS:  I don't know the
2   timing of changes.  I don't know that
3   there was a formulation change.
4           There was a change in the
5   amount of acetaminophen, or APAP, that
6   was allowed to be in a product, and I
7   don't remember the timing of the
8   changing of the scheduling as well as
9   the changing of -- it wouldn't be a
10  formulation, but it would be a -- a
11  different version of it that would be
12  on the market.
13  BY MR. KIEFFER:
14      Q.  Okay.  Thank you.
15          And the change in the
16  acetaminophen content of hydrocodone APAP,
17  that was not directly related to the
18  rescheduling of that from being a CIII
19  controlled substance to a CII controlled
20  substance, that was done for other reasons;
21  correct?
22      A.  I don't know the answer -- I
23  don't know the timing of it.  It was done
24  for other reasons.  I just don't know the

Page 115

1   timing of it.
2       Q.  Fair enough.  And timing may
3   not be important for this question.
4       A.  Okay.
5       Q.  The reason why the
6   acetaminophen content was changed was over
7   a concern about liver toxicity; right?
8       A.  Correct.
9       Q.  Not how was it being
10  classified and how was it being controlled
11  as a controlled substance?
12      A.  That is correct.
13      Q.  Okay.  If a product is
14  reclassified from a CIII controlled
15  substance to a CII controlled substance,
16  there are certain additional controls that
17  apply to it?
18      A.  That is correct.
19      Q.  Okay.  One thing you mentioned
20  is just how it is physically warehoused; I
21  think you said in a cage or a vault?
22      A.  Cage versus a vault, yes.
23      Q.  Okay.  What's the difference
24  between the cage and the vault, in your --

Page 116

1       A.  Just different levels of
2   security.
3       Q.  Lower levels?
4       A.  Different levels.
5       Q.  Different levels.  Thank you.
6           There are also differences in
7   who can prescribe a CIII controlled
8   substance versus a CII controlled
9   substance.  Also true?
10      A.  Not familiar with the
11  prescription end of it, as far as it being
12  written as a script.
13      Q.  Not at all?
14      A.  I don't know about nurse
15  practitioners or physicians' assistants or
16  physicians by state or, you know,
17  municipality.  I know there are differences
18  sometimes, but I really have no
19  understanding of it.
20      Q.  Okay.  Fair enough.  So let me
21  follow up on that.
22          Without asking you about a
23  specific state, if there are documents, for
24  example, that Teva has produced in this

Page 117

1   litigation that would suggest that when a
2   product like hydrocodone APAP was
3   reclassified from a CIII to a CII, that did
4   carry with it certain implications as to
5   who could prescribe it; and in some
6   circumstances, folks like physician's
7   assistants and nurse practitioners, who
8   formerly could write a script for the CIII
9   version, could no longer write a script for
10  the CII version.
11          You're familiar with that
12  general issue?
13          MR. ERCOLE:  Objection to form;
14      vague, compound, calls for a legal
15      conclusion.
16          THE WITNESS:  I'll take your
17      word for it.  But I believe that
18      there's different states that have
19      different regulations, not just about
20      controlled substances.  Whether it's
21      CII or CIII, some products are listed
22      as a controlled in one state; and in
23      another state, they're noncontrols.
24          So I believe there's

Page 118

1       differences.  I don't know the exact
2       answer that -- you know, to it, though.
3   BY MR. KIEFFER:
4       Q.  Fair enough.
5           Again, in general terms, you
6   have an understanding that when a product
7   like hydrocodone APAP is reclassified from
8   a CIII controlled substance to a CII
9   controlled substance, that may have some
10  implications on who can prescribe the CII
11  version?
12      A.  I would agree with that.
13      Q.  And some of those implications
14  in some circumstances might translate to
15  fewer providers being able to write a
16  prescription for the CII version versus the
17  CIII version --
18          MR. ERCOLE:  Objection to form.
19  BY MR. KIEFFER:
20      Q.  -- because of different
21  controls?
22          MR. ERCOLE:  Sorry -- I
23      apologize for interrupting you.
24          Objection to form.

Page 119

1           THE WITNESS:  Okay.  I can't
2   tell you what the prescription writing
3   authority is or whether a nurse
4   practitioner or a physician assistant
5   can write or not write a control.  I
6   didn't even know physicians' assistants
7   and nurse practitioners could write a
8   CIII, never mind a CII.  So I can't
9   speak to them.
10          I'm just assuming that what you
11  are telling me is accurate, but I
12  really don't know the answer.
13  BY MR. KIEFFER:
14      Q.  Okay.  Let me shift gears, at
15  least for moment.
16          (Incidental comments off the
17          stenographic record.)
18  BY MR. KIEFFER:
19      Q.  Let me shift gears for a
20  moment, Mr. Boyer.
21          During the time that you were
22  at Actavis, when the company went by that
23  name, the sales and marketing function or
24  department, whatever the proper term is,

Page 120

1   reported up through you?
2       A.  That is correct.
3       Q.  Okay.  There is a gentleman by
4   the name of David Myers who worked at
5   Actavis and now still works at Teva.
6           He was one of your reports;
7   correct?
8       A.  At a point in time.  He came
9   from the Actavis organization.  So whenever
10  the transaction occurred, he came over and
11  reported -- not to me directly but to my
12  executive director or vice president of
13  marketing, at the time of that transaction.
14      Q.  Okay.  Fair enough.
15          And that individual is
16  Napoleon Clark?
17      A.  That is correct.
18      Q.  So Mr. Myers would be what you
19  might call an indirect report?
20      A.  Right.  Mr. Myers would have
21  gone from Actavis to Watson and then back
22  to Actavis.
23      Q.  Okay.  All right.  Fair
24  enough.

Page 121

1      You at least know the name,
2  remember who it was?
3      A.  Yes.  I know who he is.
4      Q.  Okay.  Fair enough.
5            - - -
6      (Teva-Boyer No. 007 was marked for
7      identification.)
8            - - -
9  BY MR. KIEFFER:
10      Q.  Let me hand you what we've
11  marked as Exhibit No. 7.  And this is a
12  document that was also marked in Mr. Myers'
13  deposition.  I'm not going to spend a lot
14  of time on it, but I do have a couple of
15  questions for you.
16      And the Bates number, just for
17  our record, is Acquired_Actavis_01367234.
18  And these were internal Actavis documents
19  that were provided to us in this
20  litigation.
21      This is a PowerPoint, sir,
22  that provides an overview of the marketing
23  department, if you look on the first page
24  of it.  There have been numbers inserted,

Page 122

1  kind of in boldface, on the upper right.
2      Do you see the statement
3  "Marketing Department Overview"?
4      A.  Yes.
5      Q.  Okay.  And if you would, take
6  a look at the second page, Page 2 of that
7  document.
8      A.  Yep.
9      Q.  That states, at the top,
10  "Marketing Goal-Maximizing Profit."
11      Do you see that?
12      A.  Yes.
13      Q.  As far as you're concerned, at
14  the time that the marketing and sales
15  department rolled up under your
16  supervision, that was indeed the goal?
17      A.  I've never seen this document
18  before.  I believe this was prior to the
19  Watson transaction of Actavis.
20      Q.  Okay.  And what is it that
21  leads you to believe that?
22      A.  The orange Actavis symbol.
23  We -- our symbol was blue and green.
24      Q.  Okay.

Page 123

1      A.  So when we changed over from
2  Watson to Actavis, we used a different -- a
3  different symbol.
4      Q.  Okay.  Fair enough.
5      Well, at the time that you
6  were at Actavis and the marketing and sales
7  function rolled up to you, was it true that
8  the goal of the marketing department was to
9  maximize profit?
10      A.  I would agree with that, yes.
11      Q.  Okay.  There's a little kind
12  of hub-and-spoke graphic here, and I don't
13  want to spend a lot of time on it, but the
14  one at the lower left, at about the
15  7 o'clock position, says "Company
16  Promotion."
17      Do you see that?
18      A.  Yes.
19      Q.  And there are some
20  promotional-type materials further in this
21  PowerPoint that I may ask you about.
22      But as a general statement, a
23  company like Actavis, when you were in
24  charge of the marketing and sales function,

Page 124

1  it did undertake certain promotional
2  activities with respect to its generic
3  products, they just may have been different
4  promotional activities than the kind that
5  happened on the branded side of the
6  organization; true?
7      MR. ERCOLE:  Objection to form.
8      THE WITNESS:  Almost zero, when
9  I was in charge of -- of the
10  Watson/Actavis organization.  I didn't
11  believe in spending dollars on product
12  and/or company promotion, because I
13  didn't believe that we could influence
14  the procurement of buyers that way.
15      If we did company promotion, it
16  was to let them know that we were
17  investing in R&D or that we had a great
18  supply chain or something along those
19  lines.  But very little beyond that,
20  unlike the brand side of the business.
21  It was very different.
22  BY MR. KIEFFER:
23      Q.  So no promotion at all when
24  you were in charge?

Page 125

1    A.  Almost zero.
2        You'd have to show me my
3    budgets, but I will show -- I will go
4    through them and show you how little
5    promotion we did of the company or the
6    products --
7    Q.  And -- I'm sorry.
8    A.  -- if any.
9    Q.  Okay.  And when you say you
10   did little, if any, promotion of the
11   company or the products, you're meaning the
12   products across the whole product line, all
13   the generics, not just opioids?
14   A.  Across everything, all
15   generics.
16   Q.  Okay.  So, for example, things
17   like print advertising, internet
18   advertising, recruitment of key opinion
19   leaders, those were not things that were
20   done when you were at Actavis and then
21   later Teva, in charge of the marketing
22   function?
23   A.  Not on the generic side of the
24   business.

Page 126

1    Q.  Okay.  Not at all?
2    A.  Not at all.
3    Q.  Didn't engage in any kind of
4    cross-company -- meaning joint marketing
5    and promotion efforts of generic
6    products -- with other manufacturers of
7    generics --
8        MR. ERCOLE:  Objection to form.
9        THE WITNESS:  No.
10   BY MR. KIEFFER:
11   Q.  -- to increase overall market
12   demand?
13   A.  No.
14   Q.  The notion -- or the old
15   phrase, a rising tide lifts all boats;
16   right?
17   A.  No.
18   Q.  Never did that?
19   A.  No.
20   Q.  Okay.  So if you turn to Page
21   16 of Exhibit 7, there is a little slide
22   that says, "Marketing Communications:
23   Electronic."
24       Do you see that?

Page 127

1    A.  Yes.
2    Q.  Okay.  Up top in the "From"
3    line, it says it's from "Drug Store News."
4        Do you see that?
5    A.  Yes.
6    Q.  You know who Drug Store News
7    is?
8    A.  Yes.
9    Q.  It's a big trade publication?
10   A.  One of the trade publications.
11   Q.  All right.  I'll just
12   represent to you, Mr. Myers testified that
13   this was some electronic advertising that
14   would have appeared in Drug Store News.
15   A.  Okay.
16   Q.  The particular ad to the right
17   is captioned "Demand, meet supply."  And
18   it's for oxycodone hydrochloride tablets in
19   15 -- blow that up -- in 15- and
20   30-milligram strengths.
21       My question to you is:  Is it
22   your testimony that, in the time you were
23   at Actavis, you never approved advertising
24   of this kind whatsoever?

Page 128

1        MR. ERCOLE:  Objection to form.
2        THE WITNESS:  If we did
3    anything -- and you'd have to go back
4    and ask either Napoleon or the
5    marketing team -- it was either "now
6    available" products or "coming soon"
7    products, but really nothing that would
8    say anything more than that.
9    BY MR. KIEFFER:
10   Q.  Okay.  You did mention, I
11   think in a prior answer, that insofar as
12   marketing or promotion during your time --
13   A.  Yeah.
14   Q.  -- running that side of the
15   organization, that you might have
16   undertaken some marketing or promotional
17   activities that would focus on the nature
18   of the company's supply chain?
19       MR. ERCOLE:  Objection to form;
20       mischaracterizes testimony.
21   BY MR. KIEFFER:
22   Q.  I don't want to
23   mischaracterize your testimony.
24   A.  So what I would say is, is

1    that if we were doing corporate ads, there
2    were ads that we did saying that we have
3    one of the best service levels in the
4    industry. There were ads saying that we
5    had a very strong R&D pipeline. So things
6    of that nature.
7         I could have -- you know, we
8    did do some of those -- I just don't
9    remember what points in time, whether it
10   was Watson, it was Actavis, but we did do
11   some of that. I just don't recall anything
12   product-specific.
13        Q. Okay. Any sort of email
14   blasts that you recall?
15        A. So email blasts that we would
16   send out were "now available." In other
17   words, we would send it out to wholesalers,
18   distributors, chains, saying that this
19   product is now approved and we are now
20   shipping. So those type of initiatives we
21   would do.
22        We had a brand-to-generic
23   guide, which gave the brand name and the
24   generic name, so the pharmacist would know

1    the equivalents of certain products.
2         Q. Okay.
3         A. We also did a brochure that
4    showed all the names of our products, and
5    the color, shape and size of the tablet or
6    capsule, as well the publicly listed
7    prices -- wholesale acquisition cost or
8    suggested wholesale price.
9         But beyond that, I'm -- off
10   the top of my head, I do not recall any
11   real advertising or promotion, per se.
12        Q. Okay. Let me ask you about a
13   couple more things, and then I'm going to
14   move on from this exhibit.
15        If you turn to Page 12. Page
16   12 is entitled "Marketing Communications:
17   Corporate Ads."
18        Do you see that?
19        A. Yes.
20        Q. And there are some specific
21   products listed by name on the left-hand
22   side.
23        My only question is: Based on
24   what you just told us, during your time

1    running sales and marketing function at
2    Actavis and then later Teva, you do not
3    recall specifically advertising any generic
4    products?
5         A. Not products like that, no.
6         Q. By name?
7         A. No. Not like that, no.
8         Q. Okay. Similar question. If
9    you turn to Page 13 -- actually, 13 and
10   14 -- 13 says -- is captioned "Lyrical
11   Sellsheets," and 14 is captioned
12   "Sellsheets." Both of those appear to
13   identify some specific products by name.
14        During your time running
15   marketing and sales at Actavis, and later
16   Teva, it's your testimony you didn't
17   undertake that sort of promotion?
18        A. So let me speak for Watson and
19   Actavis, when I controlled all of the
20   marketing budgets more directly. The
21   answer is, no, we really didn't do any of
22   that.
23        On the Teva side, again, not
24   something that I would look at on a daily

1    basis. There may have been some of these
2    things. I don't -- I don't know off the
3    top of my head.
4         Q. Okay. Page 15 references
5    something called an "Advertorial."
6         During your time at Watson,
7    Actavis, and then later at Teva, did
8    you-all ever do any advertorials focusing
9    on specific products -- generic products?
10        A. I don't believe so.
11        Q. Okay. How about targeted
12   mailings and/or telemarketing campaigns to
13   specific prescribing doctors advising them
14   of a specific Watson, Actavis or Teva
15   generic product? Was any of that done when
16   you were managing the marketing and sales
17   function for those organizations?
18        MR. ERCOLE: Objection to form;
19   compound, vague.
20        THE WITNESS: I don't recall
21   any product-specific, other than
22   possibly methylphenidate ER.
23        There was a -- there were two
24   products on the market that were

Page 133

1      changed from AB-rated, meaning they
2      were equivalent to the brand product,
3      to a BX rating, which means they were
4      not equivalent to the brand product
5      anymore.  And we may have done some
6      blasts to let the industry know that we
7      had the authorized generic which was
8      equivalent to the brand.
9      BY MR. KIEFFER:
10         Q.  Okay.  And what was that
11     product again?
12         A.  Methylphenidate ER.
13         Q.  And what is that?  What's it
14     used for?  What's the indication?
15         A.  I think it's AD --
16         MR. ERCOLE:  Hold on, hold on.
17     Objection to form; multiple questions.
18         THE WITNESS:  Methylphenidate
19     ER, I believe it's ADHD, but I don't
20     know exactly what the label says.
21     BY MR. KIEFFER:
22         Q.  And you recall what the brand
23     name equivalent of that is?
24         A.  Concerta.

Page 134

1      Q.  Got it.  Okay.
2          That's the only product that
3      you recall in your time at Watson/Actavis,
4      and later at Teva, where the company
5      undertook generic product specific
6      market --
7          A.  Yeah, I think -- you need to
8      ask the marketing people.  But for Watson
9      and Actavis, that's really the only one
10     that I remember.  Teva, I really have very
11     little recollection of what they were
12     spending -- spending money on, because I
13     was too far removed as president and CEO.
14         Q.  Okay.  But even at Teva, the
15     marketing and sales function still rolled
16     up to you?
17         A.  It did, yes.
18         Q.  Okay.
19              - - -
20     (Teva-Boyer No. 008 was marked for
21     identification.)
22              - - -
23     BY MR. KIEFFER:
24         Q.  Mr. Boyer, I've handed you

Page 135

1      Exhibit 8, which, for the record, bears a
2      Teva Bates label in the lower right-hand
3      corner of TEVA_MDL_A_12698266.  It is an
4      email string.  The first page is an email
5      from Michelle.Osmian@tevapharm.com, to you
6      and -- and others, dated 12/21 of '15.  The
7      subject is "US Commercial Integration
8      Status Update," and then there's a
9      reference to a weekly status update.
10         Do you see that?
11         A.  Yes.
12         Q.  And there are a couple pages
13     attached to it.
14         A.  Yep.
15         Q.  Who is Michelle Osmian?
16         A.  Michelle Osmian was the senior
17     director of operations, which was customer
18     service.
19         Q.  And did she report to you
20     directly or indirectly?
21         A.  Well, at this point in time,
22     Actavis had not been acquired by Teva as of
23     yet.
24         Q.  Okay.

Page 136

1      A.  So I don't know exactly what
2      the reporting lines were.  I believe it was
3      Christine Baeder.  Brendan O'Grady was the
4      president and CEO of the generic business
5      for Teva at that point in time.
6          Q.  Okay.  So these were kind of
7      joint communications that the two companies
8      were having in the lead-up to the
9      acquisition?
10         A.  I would say this was an update
11     that they copied -- they copied me, since I
12     was going to be running the organization
13     thereafter, giving me an update on the
14     integration that was going on behind the
15     scenes.
16         Q.  Okay.  And the integration was
17     already ongoing, even though perhaps the
18     deal wasn't official?
19         A.  Preparation for integration.
20         Q.  Preparation.
21             Would this also be what some
22     might refer to as sort of a due diligence
23     phase or more of a transitional operation?
24         MR. ERCOLE:  Objection to form.

1 BY MR. KIEFFER:
2     Q.  You'd called it integration?
3     A.  I'd call it pre-integration,
4 because you really can't share information
5 until the deal is complete.  So this is
6 pre-integration work that's being done,
7 either as standalone Teva or standalone
8 Actavis, leading up to it.
9     Q.  All right.  But you recall
10 having some weekly status updates during
11 that period of time?
12     A.  I didn't say weekly.  I have
13 no idea what I was getting.  This happens
14 to be one document that I got.
15     Q.  Okay.  And I was just going by
16 the title that says "weekly status update."
17     A.  Yeah.  I don't remember
18 getting weekly status updates, but it's
19 possible.
20     Q.  You recall there were some
21 integration-related communications that you
22 received --
23     A.  Yeah --
24     Q.  -- during this period?

1     A.  -- I remember --
2     MR. ERCOLE:  Objection to form.
3     THE WITNESS:  Okay.  I don't
4 know exactly -- this one here has my
5 name on it; I'm assuming I received it.
6 BY MR. KIEFFER:
7     Q.  Sure.
8     A.  It doesn't look familiar.
9     Q.  Yeah.  Okay.  And I don't know
10 if I said for our record, but this was
11 furnished to us by counsel for Teva from
12 your custodial email files.
13     A.  That's fine.
14     Q.  Take a look, if you would, at
15 the last page of that document, which I
16 think is the third page.  There's a heading
17 at the top.  It looks like, Item 4, "Open
18 issues, risks, and decisions required."
19     Do you see that?
20     A.  Yes.
21     Q.  There are some bullets on the
22 right-hand column.  The third bullet point
23 down states "SOMS," S-O-M-S, (Suspicious
24 Order Monitoring for DEA Controlled items)

1 - Teva DEA Compliance has raised concerns
2 of risk with existing Actavis SOMS process,
3 regarding both support resources and
4 elements of review process."
5     Did you see what I just read?
6     A.  Yes.
7     Q.  Okay.  Do you have an
8 understanding as to the nature and extent
9 of Teva DEA compliance, their -- the
10 concerns they'd raised regarding Actavis'
11 SOM process?
12     MR. ERCOLE:  Objection to form.
13     THE WITNESS:  No.  Since it's
14 Teva DEA compliance saying it, I'm
15 assuming they were talking to Actavis
16 DEA compliance directly and working
17 with them on what would be our process
18 that we would need to have in place for
19 day one as a combined entity.
20 BY MR. KIEFFER:
21     Q.  Okay.  Do you know?
22     A.  What's that?
23     Q.  Do you know specifically what
24 this was referring to?

1     A.  No, but it's definitely not
2 referring to me.
3     If it's Teva DEA compliance,
4 then it's Teva DEA compliance talking to
5 Actavis DEA compliance, because there
6 wouldn't have been anybody else to talk to
7 about it.
8     Q.  And your position was what --
9 what at the time?
10     A.  I was the senior vice
11 president of sales and marketing for
12 Actavis.
13     Q.  Okay.  And as senior vice
14 president of sales and marketing for
15 Actavis at the time, you would not have
16 taken it upon yourself to ask any questions
17 or inquire any further regarding whatever
18 the apparent nature and extent of the
19 concerns about risk were that Teva DEA
20 compliance had raised with regard to the
21 existing Actavis suspicious order
22 monitoring process?
23     MR. ERCOLE:  Objection to form.
24     THE WITNESS:  Again, we had a

Page 141

1    group within the organization that were
2    the authorities and the -- you know,
3    the expertise in DEA compliance within
4    Actavis, and I would have left it up to
5    the experts and their processes and
6    their decision-making to make the
7    appropriate decisions on behalf of the
8    Actavis organization, the same as I
9    would have expected out of Teva.
10   BY MR. KIEFFER:
11       Q.  Okay.  You recall we looked at
12   a document earlier, a PowerPoint that was
13   from your files -- I think it was dated
14   about two and a half years earlier -- that
15   indicated that Watson plus Actavis product
16   were the most diverted and receiving the
17   most scrutiny from DEA at least at that
18   time?
19       MR. ERCOLE:  Objection to form.
20       THE WITNESS:  Somebody's
21       opinion, I'm assuming, unless it's been
22       documented somewhere.  I -- yes, I
23       remember seeing it.
24   BY MR. KIEFFER:

Page 142

1       Q.  Okay.  So to the extent that,
2    a couple of years later, Teva, in this
3    pre-integration phase, is raising concerns
4    about suspicious order monitoring, again,
5    that is nothing that you would have
6    followed up on --
7       MR. ERCOLE:  Objection --
8    BY MR. KIEFFER:
9       Q.  -- period?
10       MR. ERCOLE:  Objection to form;
11   foundation, argumentative.
12       THE WITNESS:  No, what I would
13       say is that the Actavis DEA compliance
14       organization would have to assess --
15       because I don't know what "diverted"
16       means.  I don't know if that's diverted
17       after it's been shipped to our
18       wholesalers and distributors; if that's
19       once it got to the chains, and there
20       were pharmacists dispensing it or
21       stealing it.  You know, what you're
22       stating there is something that I don't
23       know enough about.
24       It would be part of our DEA

Page 143

1    compliance team, and it would be their
2    responsibility to ensure the safety of
3    our supply chain and the effectiveness
4    of it.  There were processes in place
5    that was their area of expertise.  It
6    didn't roll up to commercial.
7    BY MR. KIEFFER:
8       Q.  For the reasons you stated
9    before, in your words, there was a
10   separation of church and state, whereby
11   sales and commercial did not get involved
12   in the area of suspicious order monitoring,
13   and they left that to the DEA compliance
14   department?
15       MR. ERCOLE:  Objection to form.
16       THE WITNESS:  That's not what I
17       said.  What I said was that you've got
18       two different parts of the organization
19       that have different responsibilities.
20       It's not that we didn't share
21       information.  We gave them all of the
22       orders from our order management
23       system.  They would get the access to
24       those and look at those orders, but

Page 144

1    they got to make the decision
2    independent of the commercial
3    organization.
4    BY MR. KIEFFER:
5       Q.  Okay.  If there was -- in your
6    time at Watson and Actavis and later at
7    Teva, to your knowledge, did anybody from
8    your side of the organization, the
9    commercial side, ever reach out and call a
10   customer, any customer, to get some
11   explanation from the customer about an
12   order or orders that might have been
13   flagged as suspicious by the suspicious
14   order monitoring folks?
15       A.  Absolutely.
16       Q.  Okay.  With what kind of
17   regularity did that happen?
18       MR. ERCOLE:  Objection to form;
19   vague.
20       THE WITNESS:  Mary Woods -- you
21       showed me an org chart that she had
22       order management -- suspicious order
23       management.  The responsibility of that
24       team was to communicate with DEA

Page 145

```
 1        compliance and communicate with the
 2        customers to address any of those
 3        orders that would come in that didn't
 4        meet the criteria the DEA compliance
 5        had put in place.
 6             So if there were issues, it was
 7        her responsibility to ask those
 8        questions, either with DEA compliance
 9        or on behalf of DEA compliance, and
10        provide that information back to DEA
11        compliance for their decision-making
12        process.
13   BY MR. KIEFFER:
14        Q.  Okay.  And do you have any
15   understanding as to the regularity with
16   which DEA compliance actually spoke
17   directly to the customers whose orders had
18   been flagged as suspicious?
19             MR. ERCOLE:  Same objection.
20             THE WITNESS:  I don't know the
21        regularity.  I don't know what their
22        protocols were.  I know that they did
23        have processes in place to assess all
24        of our customers, but I couldn't speak
```

Page 146

```
 1        to the regularity.  You'd have to ask
 2        the experts.
 3   BY MR. KIEFFER:
 4        Q.  As a point of curiosity, if
 5   there is this separation of church and
 6   state, as you've described it, between the
 7   commercial side of the organization and the
 8   DEA compliance side of the organization,
 9   why not just have DEA compliance speak
10   directly with any customers whose orders
11   had been flagged as suspicious without
12   involving someone from the commercial side?
13        A.  I believe that they did.  But
14   you'd have to speak to them directly.  But
15   the customer service team was managing the
16   entire customer relationship day in and day
17   out, not just for suspicious orders but for
18   all of our orders.
19             Remember, we had 3-, 4-, 500
20   products.  The majority of our products
21   were noncontrolled substances, as far as
22   number of SKUs and products.  So they
23   maintained those relationships with the
24   customer day in and day out.
```

Page 147

```
 1             To say that the DEA didn't
 2   speak directly to customers is probably not
 3   an accurate assessment, but I'm not the one
 4   to ask, because I was not involved in it on
 5   a day-to-day basis.
 6        Q.  Okay.  And who would be the
 7   one to ask?
 8        A.  I would ask -- in that case,
 9   it would have been Mary Woods, who was in
10   charge of that department; or I would ask
11   whoever you have as the head of the DEA
12   compliance team at any point in time for
13   those different entities.
14        Q.  Okay.  And are those issues
15   issues that Ms. Baeder got involved in --
16   with from time to time?
17        A.  I don't know the answer to
18   that.
19             Again, I was only there for
20   about 15 months.  I spent my 15 months at
21   Teva working on integration.  I was not
22   involved in the weeds for 15 months.
23        Q.  You were not involved -- I'm
24   sorry -- "in the weeds"?
```

Page 148

```
 1        A.  In the weeds of the
 2   organization.
 3        Q.  Sir, are you familiar with a
 4   group by the name of the Generic
 5   Pharmaceutical Association, or GPhA?
 6        A.  It doesn't exist anymore as
 7   that name, but yes.
 8        Q.  Okay.  Does it go by a new
 9   name now?
10        A.  Yes.
11        Q.  What's the new name?
12        A.  AAM, Affordable Accessible
13   Medicines, or whatever it stands for now.
14        Q.  Okay.  I'm going to call it
15   the Generic Pharmaceutical Association,
16   since it apparently went by that name --
17        A.  Okay.
18        Q.  -- during the period I want to
19   ask about.
20             That was -- is under a new
21   name, an industry group?
22        A.  Yes.
23        Q.  An industry group made up
24   predominantly or exclusively of generic
```

Page 149

1    pharmaceutical manufacturers?
2        A.  Yes.
3        Q.  Okay.  Advocacy group who
4    advocates for the interests of its members?
5            MR. ERCOLE:  Objection to form.
6            THE WITNESS:  I would assume
7    so.
8    BY MR. KIEFFER:
9        Q.  Undertakes, from time to time,
10   lobbying?
11       A.  You'd have to speak to the
12   group exactly what they do, but that's
13   fair.
14       Q.  Have you attended meetings
15   where -- either hosted by or where there
16   were participants from the Generic
17   Pharmaceutical Association?
18       A.  Yes.
19       Q.  With some frequency?
20       A.  There's usually about a
21   once-a-year meeting that I went to probably
22   three out of every four years.
23       Q.  Okay.  All right.  Annual
24   meeting, national meeting, that kind of

Page 150

1    thing?
2        A.  Yes.
3            - - -
4    (Teva-Boyer No. 009 was marked for
5    identification.)
6            - - -
7    BY MR. KIEFFER:
8        Q.  Okay.  Let me hand you what
9    we've marked as Exhibit 9.  And Exhibit 9
10   bears a Bates number in the lower
11   right-hand corner of ALLERGAN_MDL_01029477.
12   And it includes some materials, primarily a
13   PowerPoint presentation, behind the email
14   string.  And this was also provided to us,
15   sir, from your electronic custodial files.
16           Take a minute and glance at
17   it, if you want.  I'm only going to ask you
18   about a few things in here.
19           MR. ERCOLE:  Take your time to
20   read the document.
21           THE WITNESS:  Yeah.  Well, as
22   he asks, I'll look.  I don't recall the
23   document, so . . .
24   BY MR. KIEFFER:

Page 151

1        Q.  And I should have said it
2    before:  On any question that I ask you, if
3    you want to pause and review the document
4    or different parts of it, you're welcome to
5    do that.
6        A.  Okay.
7        Q.  All right.  The top email on
8    the first page of Exhibit 9 is from someone
9    by the name of Scott Soltis, and it's to
10   you and others, dated October 26th, 2012.
11           Who is Scott Soltis?
12       A.  He may have been DEA
13   compliance.  I don't remember his title.
14       Q.  Okay.  The subject is stated
15   as, "Hydrocodone Presentation Update Draft
16   10-25-12."  And underneath that, it appears
17   to state
18   "HydrocodoneAdvisoryCommitteePresentation."
19           Do you see that?
20       A.  Yes.
21       Q.  And then further down, there's
22   the email that precedes it.  The first
23   paragraph, after it states "All" -- it
24   says, "Attached is the Final version of the

Page 152

1    slide deck for Monday's FDA Meeting."
2            Do you see that?
3        A.  Yes.
4        Q.  And that appears to be signed
5    by a gentleman named David Gaugh,
6    G-A-U-G-H, if I said that right, senior
7    vice president for sciences and regulatory
8    at the Generic Pharmaceutical Association.
9            Do you see that?
10       A.  Yes.
11       Q.  Do you know who Mr. Gaugh is?
12       A.  Yes, I do know who he is.
13       Q.  Do you know if I'm pronouncing
14   his name right?
15       A.  I don't.
16       Q.  Okay.  He's somebody that you
17   would see or periodically interact with at
18   some of these meetings?
19       A.  No.
20       Q.  Not really?
21       A.  No.
22       Q.  You just know who he is --
23       A.  Yes.
24       Q.  -- by virtue of being involved

Page 153

1    with the organization?
2        A.   Yes.
3        Q.   All right.  Okay.  Turn a few
4    pages, if you would, to where this
5    PowerPoint begins.  And the page number is
6    ALLERGAN_MDL, the last three digits are
7    482, and that is entitled "Meeting of the
8    Drug Safety and Risk Management Advisory
9    Committee Meeting:  Risks and benefits of
10   hydrocodone combination analgesic
11   products."
12           Do you see that?
13       A.   Yes.
14       Q.   Okay.  The -- we had a little
15   discussion earlier about the fact that
16   there came a point in time where
17   hydrocodone-containing products were
18   rescheduled by the FDA from a Class III
19   controlled substance to a Class II
20   controlled substance.
21           Do you recall that general
22   discussion?
23       A.   Yes.
24       Q.   Let me represent to you, this

Page 154

1    presentation, if you were to look through
2    it, certainly appears to relate to the
3    period of time before -- while that
4    decision was being considered but before
5    that decision was being made.  All right?
6        A.   Okay.
7            MR. ERCOLE:  Objection to form.
8    BY MR. KIEFFER:
9        Q.   And it's dated, on the page we
10   were looking at, October 29th and 30th,
11   2012.
12           Let me just ask you a couple
13   of questions.  Turn two pages further in
14   the document from that cover page.  There
15   is a slide called "Generic Pharmaceutical
16   Association."
17           Do you see that?
18       A.   Yep.
19       Q.   And there's a statement that
20   says:
21           "Disclaimer:
22           "GPhA members are not experts
23   in the complexities of abuse and addiction
24   deterrence and prevention."

Page 155

1            Do you see that?
2        A.   Yes.
3        Q.   I don't think I asked you
4    this, but when you were Watson and Actavis,
5    were they members of the Generic
6    Pharmaceutical Association?
7        A.   Yes.
8        Q.   And same with Teva?
9        A.   Yes.  There was a point in
10   time I think that Teva wasn't involved in
11   it, but yes, for the most part.
12       Q.   And are the --
13       A.   In fact, maybe even Watson or
14   Actavis wasn't involved for a period of
15   time.
16       Q.   Okay.
17       A.   In and out of it.
18       Q.   In and out during your tenure?
19       A.   Yeah.
20       Q.   Okay.  Was it just the
21   companies that were members of the Generic
22   Pharmaceutical Association, or were
23   individuals within the organization also
24   members?

Page 156

1        A.   No.  It's the company that's a
2    member.
3        Q.   Company -- membership is just
4    companies?
5        A.   Yes.
6        Q.   Okay.  So the disclaimer
7    states, "GPhA members are not experts in
8    the complexities of abuse and addiction
9    deterrence and prevention."
10           As far as you're concerned,
11   based on your personal experience in these
12   companies, Watson, Actavis and Teva, would
13   that be a true statement of those three
14   companies?
15           MR. ERCOLE:  Objection to form;
16   compound, vague.
17           THE WITNESS:  I would say from
18   a scientific, generic standpoint,
19   speaking on behalf of myself, I am
20   definitely not an expert in abuse and
21   addiction and deterrence and
22   prevention.
23   BY MR. KIEFFER:
24       Q.   Okay.  And in your time at

Page 157

1    Watson and Actavis and later Teva, did you
2    ever have cause to interact with or receive
3    communications from anyone in the
4    organization that you interpreted as having
5    specialized expertise in the complexity of
6    abuse and addiction deterrence and
7    prevention?
8         MR. ERCOLE:  Same objection.
9         THE WITNESS:  No.
10   BY MR. KIEFFER:
11        Q.  If you turn to the next page
12   further back in that PowerPoint, it's also
13   captioned "Generic Pharmaceutical
14   Association."  It states:
15        "Members we represent: 30
16   manufacturers of generic drugs; produce
17   approximately 85 percent of generic drugs
18   marketed in the U.S."
19        Do you see that?
20        A.  Yes.
21        Q.  And then it says,
22   "Manufacturers of hydrocodone-containing
23   analgesic and cough products"?
24        A.  Yes.

Page 158

1         Q.  And Watson, Actavis and Teva
2    produces those sorts of products; right?
3    Correct?
4         MR. ERCOLE:  Objection to form.
5         THE WITNESS:  Watson did.  Teva
6    did.  And I believe Actavis had some
7    products as well, yes.
8    BY MR. KIEFFER:
9         Q.  Okay.  Turn another three
10   pages further into that presentation.  The
11   last three digits in the lower right-hand
12   corner are 487.  The slide says "Summary."
13   The first bullet point there states, "GPhA
14   acknowledges the rise in abuse and misuse
15   of hydrocodone-containing products."
16        Do you see that?
17        A.  Yes.
18        Q.  This is dated in October of
19   2012.
20        Insofar as you were concerned,
21   did you understand, in October of 2012,
22   that there was being seen a rise in abuse
23   and misuse of hydrocodone-containing
24   products?

Page 159

1         A.  I don't recall the
2    presentation.  I think there was a rise in
3    prescription use of the product.  The abuse
4    and misuse is not something that I would
5    have been educated on to that extent.
6         Q.  Okay.  And I think you
7    answered a couple of questions there.  One
8    had to do with the presentation, the other
9    was more general.  Let me focus on the more
10   general.
11        And again, focusing on this
12   time period, October of 2012, at that time,
13   you would not have had information -- or
14   would have formed an impression as to
15   whether there was being observed a rise in
16   abuse and misuse of hydrocodone-containing
17   products; is that true?
18        MR. ERCOLE:  Objection to form.
19        THE WITNESS:  You're asking me,
20   six or seven years ago, what I was
21   thinking about at the time that a
22   document was presented?  I really don't
23   know what I was thinking about it in
24   October of 2012, regarding the subject.

Page 160

1    BY MR. KIEFFER:
2         Q.  But let me ask it a little bit
3    differently.
4         We talked, early in the
5    deposition, about a determination by the
6    Department of Health and Human Services in,
7    I believe, October of 2007, that there was
8    a public health emergency related to the
9    opioid crisis.
10        Do you recall that discussion?
11        A.  Yes.
12        Q.  We went back and forth a
13   little bit on some questions and answers.
14   At one point, you said you thought
15   certainly there was an opioid problem in
16   the United States currently; right?
17        A.  Correct, currently.
18        Q.  When do you recall first
19   forming the impression or the opinion that
20   there was an opioid problem in the form of
21   abuse or misuse in the United States?
22        A.  I have no idea.
23        MR. ERCOLE:  Objection to form.
24        THE WITNESS:  Yeah, I have no

Page 161

1    idea.
2    BY MR. KIEFFER:
3        Q.   No idea?
4        A.   Not a clue.
5        Q.   Whether it was this year, last
6    year, five years ago, can't say?
7        A.   No idea.
8        Q.   The next bullet on this same
9    page, ending in 487, states, "There is no
10   evidence that a more restrictive schedule
11   curtails abuse and misuse of opioids, and
12   may simply shift abuse and misuse to other
13   licit and illicit drugs."
14       Do you see that?
15       A.   Yes.
16       Q.   Do you have any information
17   about that topic at all?
18       A.   No.  Just a guess.
19       Q.   Is this -- well, this would
20   certainly -- this is certainly a statement,
21   the statement being there's no evidence
22   that a more restrictive schedule curtails
23   abuse and misuse of opioids -- that is a
24   statement being advanced by the Generic

Page 162

1    Pharmaceutical Association to the FDA;
2    correct?
3        MR. ERCOLE:  Objection to form;
4    lack of foundation.  The witness has
5    said he doesn't recall this document.
6        THE WITNESS:  So two things
7    that I would say.  No. 1 is, it's on
8    behalf of GPhA.  There's 30
9    different -- I think it said 30
10   different members here.  I can't tell
11   you that 30 members agreed unanimously
12   that they all agreed with the
13   statements or the document that you're
14   presenting here.  I would have no way
15   of knowing that.  I wasn't part of
16   putting that together, and I wasn't
17   part of any kind of a, you know,
18   collection of data and/or information
19   regarding it.
20   BY MR. KIEFFER:
21       Q.   Okay.  Fair enough.
22       If you flip back to the very
23   first page of Exhibit 9, which is the
24   email -- the one beneath Mr. Soltis's from

Page 163

1    David Gaugh, it looks like some of the
2    recipients have email addresses at
3    tevapharm.com, endo.com, amneal.com;
4    correct?
5        A.   Yes.
6        Q.   Amneal is your current
7    employer; right?
8        A.   Yes.
9        Q.   Okay.  And he's enclosing this
10   final slide deck; right?
11       A.   Yes.
12       Q.   Okay.  You don't have any
13   memory of this, you said; right?
14       A.   No.
15       Q.   Okay.  You don't have any
16   memory of speaking up and saying, "Hey,
17   I've reviewed this slide deck, and I
18   disagree, or this doesn't state the
19   position of Teva.  You're not speaking for
20   us, "anything like that?
21       MR. ERCOLE:  Objection to form.
22   He wasn't even working at Teva at that
23   time.  Asked and answered,
24   mischaracterizes testimony.

Page 164

1        THE WITNESS:  The people that
2    are on this copy besides me were more
3    involved in GPhA than I was.
4    BY MR. KIEFFER:
5        Q.   Okay.
6        A.   So I was being copied,
7    probably, as a nice-to-have cc.
8        You know, the names that
9    you've represented here as far as Amneal
10   and Endo and whoever else -- Teva -- that's
11   not all 30 companies, so I don't know how
12   this was created, who agreed, who
13   disagreed, who provided input, who didn't
14   provide input.  It's impossible for me to
15   take and judge that.
16       Q.   Okay.  Did Watson and
17   Actavis -- when you were there in 2012,
18   they opposed the move of hydro -- the
19   reclassification of hydrocodone from a CIII
20   controlled substance to a CII controlled
21   substance, did they not?
22       MR. ERCOLE:  Objection to form.
23       THE WITNESS:  This is October
24   of '12.  I don't remember the exact

1  date of the combination. I think the
2  combination was before this.
3      I don't know. I don't know if
4  the people that are on behalf -- that
5  were speaking on behalf of the company,
6  that were in government affairs and
7  regulatory and in DEA compliance, I
8  don't know if they were part of the
9  team that were against it or not.
10 BY MR. KIEFFER:
11     Q. Okay. You don't know one way
12 or the other the position taken by the
13 company?
14     A. I think -- I think you'd need
15 to ask them. I don't know the answer.
16     Q. Yeah, no. I'm just asking
17 you. Do you know?
18     A. Yeah, I don't know the answer.
19     Q. No idea?
20     A. I don't.
21     Q. Okay. Sir, if you turn to the
22 next page, ending in 488, entitled, "Use of
23 Hydrocodone-Containing Products," and about
24 midway down the page, the second large

1  bullet states, "Hydrocodone-containing
2  analgesics, as a group, are the
3  most-prescribed pain medications in the
4  U.S."
5      My question to you is: Do you
6  know -- were you aware of that fact in
7  2012?
8      A. Yes.
9      Q. And as far as you're
10 concerned, that's accurate?
11     A. Yes.
12     Q. Okay. The statement beneath
13 that, "In 2008, hydrocodone-containing
14 analgesics were prescribed nearly
15 124 million times."
16     Do you see that?
17     A. Yes.
18     Q. I don't expect that, in 2012,
19 you had the number 124 million at your
20 fingertips; is that a fair assumption?
21     A. Oh, I would have no idea how
22 many prescriptions were sold overall. We
23 were looking at, at this point in time,
24 probably Watson or Activas alone, so I

1  wouldn't have known the overall number.
2      Q. Wouldn't surprise you if
3  that's what the number was?
4      A. Again, I --
5      MR. ERCOLE: Objection.
6  Objection to form.
7      THE WITNESS: I have no
8  reference point.
9  BY MR. KIEFFER:
10     Q. Okay. If you turn several
11 more pages, to the page ending in 494,
12 entitled, "Potential Consequences:
13 Provision of Healthcare," the second bullet
14 there, sir, states, "There are fewer
15 prescribers of Schedule II products in the
16 healthcare system and there are limited
17 choices for moderately -- for moderate to
18 moderately severe pain that are Schedule II
19 or lower."
20     Do you see that?
21     A. "Schedule III or lower."
22     Q. I'm sorry. "Schedule III or
23 lower."
24     Do you see where I'm reading?

1      A. Yes.
2      Q. Do you agree with that
3  statement?
4      A. Again, not knowing enough
5  about the community of prescribers and not
6  knowing about the physicians' assistants
7  and nurse practitioners, like we spoke
8  about before, I didn't even realize that
9  physicians' assistants and nurse
10 practitioners could prescribe controlled
11 substances to begin with, so I probably
12 wouldn't have known about this at the time.
13     If they do -- if they are able
14 to prescribe controlled substances, then
15 going from a CIII to a CII, at this point
16 in time, for sure would be less, but I
17 don't know about that point in time.
18     Q. Okay. Fair enough.
19     Turn just a little bit
20 further, before we leave this document, to
21 the page that ends in 499. The topic of
22 the slide is "Generic Drug Sponsors'
23 Proposal."
24     The first bullet there states,

Page 169

1    "Conduct additional studies to specifically
2    assess abuse of hydrocodone-containing
3    products."
4            Do you see that?
5        A.  Yes.
6        Q.  Did you understand that at the
7    time, the time being October 2012, that the
8    Generic Pharmaceuticals Association was
9    advocating that rather than changing
10   hydrocodone-containing products from a CIII
11   to a CII controlled substances, that
12   instead they should be left as a CIII and
13   additional studies should be conducted?
14           MR. ERCOLE:  Objection to form;
15       lack of foundation, compound.
16           You can answer if you can.
17           THE WITNESS:  I have no idea.
18   BY MR. KIEFFER:
19       Q.  Would you agree, in general,
20   with the statement that a company that
21   makes controlled substances, like Teva and
22   Actavis and Watson, should work in
23   cooperation with entities like the DEA and
24   the FDA to take all necessary and

Page 170

1    reasonable steps to reduce the risk of
2    diversion, abuse, overdose and death from
3    controlled substances like opioids?
4            MR. ERCOLE:  Objection to form.
5            THE WITNESS:  I would agree
6        that the manufacturers should work with
7        DEA and FDA to have medications used
8        properly versus improperly, yes.
9    BY MR. KIEFFER:
10       Q.  Okay.  And would you agree
11   that a company like Watson and Actavis and
12   Teva that make controlled substances should
13   not view legitimate action by the DEA or
14   the FDA that's designed to reduce the risk
15   of diversion and abuse and overdose and
16   death as some sort of negative thing or a
17   threat to its business?
18           MR. ERCOLE:  Objection to form.
19           THE WITNESS:  No, I believe
20       that the manufacturers may have a point
21       of view and they should be allowed to
22       express their point of view, if that's
23       what you're asking.
24           I don't know the factual basis

Page 171

1        behind the DEA or FDA or the
2        manufacturers', you know, expression of
3        their -- of their opinions.
4    BY MR. KIEFFER:
5        Q.  So was that a "no"?
6            MR. ERCOLE:  Objection to form;
7        asked and answered.
8            The question is confusing and
9        misleading, but you can answer the
10       question if you can.
11           THE WITNESS:  So I think that,
12       you know, there's different -- the DEA
13       and FDA have an opinion that they're
14       entitled to.  I think the manufacturers
15       have an opinion they're entitled to.
16       They don't necessarily have to agree.
17           But per your previous question,
18       they should be working together to do
19       whatever they can to make sure
20       medications are being used properly.
21       That doesn't matter whether it's
22       opioids or any other medication that we
23       currently distribute and manufacture.
24   BY MR. KIEFFER:

Page 172

1        Q.  And I think we're close to
2    being on the same page.  I wasn't meaning
3    to refer to a reasonable difference of
4    opinion or action by the DEA or the FDA
5    that might be out on the fringe.
6            My question was framed in
7    terms of legitimate action by the DEA or
8    the FDA that's designed to reduce the risk
9    of diversion, abuse, overdose and death.
10           Would you agree that if it's
11   legitimate action by those agencies, that
12   companies like Actavis and Watson and Teva
13   shouldn't view that as a threat to their
14   business?
15           MR. ERCOLE:  Objection to form;
16       calls for speculation.  It's vague,
17       asking for some hypothetical situation.
18           THE WITNESS:  What you
19       determine to be legitimate based upon
20       the FDA and DEA could -- may or may not
21       be legitimate based upon somebody
22       else's point of view.  So I can't say
23       that that's a legitimate reason for a
24       decision-making process.

Page 173

```
 1              MR. KIEFFER:  Okay.
 2                  - - -
 3          (Teva-Boyer No. 010 was marked for
 4          identification.)
 5                  - - -
 6  BY MR. KIEFFER:
 7      Q.  Mr. Boyer, we just handed you
 8  what was marked as Exhibit 10.  This is a
 9  document provided, again, from your
10  custodial files by counsel for Teva.  It
11  bears Bates No. TEVA_MDL_A_13481730.  It
12  appears to be a PowerPoint or a slide deck,
13  the first page of which is it captioned
14  "Global Generic Medicines," presented by an
15  individual who -- whose name I won't
16  attempt to read at the moment, identified
17  as president and CEO of Global Generic
18  Medicines.
19          Do you see that?
20      A.  Yes.
21      Q.  And the first name -- I'm
22  going to take a stab at it.  Dipankar?
23      A.  Yes.
24      Q.  Say the last name for me, if
```

Page 174

```
 1  you can.
 2      A.  Bhattacharjee.
 3      Q.  You know who that individual
 4  is?
 5      A.  Yes.
 6      Q.  Did you -- is it a man?
 7      A.  Yes.
 8      Q.  Did you report to him --
 9      A.  Yes.
10      Q.  -- at one point in time?
11          Okay.  Then the next slide in
12  the packet -- and these are numbered --
13  Page 2 says "GGM," Global Generic
14  Medicines, "Executive Summary."
15          Do you see that?
16      A.  Yeah.
17          MR. ERCOLE:  Take your time to
18  look through the document.
19          THE WITNESS:  Yes, that's fine.
20  BY MR. KIEFFER:
21      Q.  Yeah.  And I've only got a few
22  questions.  I promise you I'm not going to
23  go through all these pages.
24          Page 3, sir, of the document
```

Page 175

```
 1  has an organizational chart at the top.
 2  Identified as president and CEO of Global
 3  Generic Medicines is the gentleman that you
 4  just identified for us; right?
 5      A.  Yes.
 6      Q.  Okay.  And then there --
 7  beneath that, on the first line, there are
 8  various individuals identified, and your
 9  name appears under the heading "North
10  America"?
11      A.  Yes.
12      Q.  All right.  And I'll represent
13  to you, sir, this document is from 2007.
14          Would this organizational
15  chart pertain to the time when you were
16  president and CEO of Teva North America?
17      A.  Yes.
18      Q.  Bear with me.
19          Page 41, if you turn there,
20  the slide is entitled "U.S. Generics."
21          Do you see that?
22      A.  Yes.
23      Q.  And then flip to the very next
24  page, if you would, Page 42.  That's
```

Page 176

```
 1  entitled "U.S. Generics Markets Face
 2  Extreme Buyer Consolidation."
 3          Do you see that as well?
 4      A.  Yes.
 5      Q.  All right.  Before I go
 6  further, let me ask you:  Do you know
 7  whether you would have had input into this
 8  presentation -- you or your staff?
 9          MR. ERCOLE:  Again, take your
10  time to look through the document.
11          THE WITNESS:  There's probably
12  certain slides that we did have input
13  into.
14  BY MR. KIEFFER:
15      Q.  Okay.  On the one we're
16  looking at here, Page 42, that states "U.S.
17  Generic Markets Face Extreme Buyer
18  Consolidation," it states in the first
19  bullet on the right, "Dominance of 3 major
20  buyers for US products increasing pricing
21  pressure."
22          Did I read that correctly?
23      A.  "Price pressure," yes.
24      Q.  Thanks.  You're reading it
```

## Page 177

1  more closely than I am.
2      The three -- those three major
3  buyers are identified there on the left:
4  McKesson, AmerisourceBergen and
5  CardinalHealth; correct?
6      A.  No, those are -- those are
7  some of the -- some of the buyers.
8      Q.  Okay.  Who are the three major
9  buyers?
10     A.  Well, this -- what this is
11 basically saying is that McKesson and
12 Walmart came together as ClarusONE.
13 Walgreens, AmerisourceBergen, part of
14 Rite Aid and Econdisc -- or at this point
15 in time, it might have been all of Rite Aid
16 and Econdisc, which was a combination of
17 Express Scripts, Albertsons and Kroger --
18 was a part of the light blue, which would
19 have been WBAD, as you had mentioned
20 before.
21     And then at the bottom would
22 have been CVS and Cardinal and Target
23 stores, which would have been Red Oak
24 Sourcing, are the three main buyers.

## Page 178

1      Q.  Thank you.  I appreciate the
2  explanation.
3      And so is it correct, in
4  interpreting this chart -- and at the very
5  top, there's a box that says "Other
6  13 percent"; right?
7      A.  Yes.
8      Q.  So is it a correct
9  interpretation of this chart -- strike
10 that.
11     On the right, as I think you
12 were alluding to, there's a heading that
13 says "Major Moves in 2017"?
14     A.  Yes.
15     Q.  And did all of these events
16 that you were just describing take place,
17 more or less, in 2017?
18     A.  On or about, probably.
19     Q.  Okay.  Fair enough.
20     So would it be a true
21 statement that, as of some point in time in
22 2017, 87 percent of the market for US
23 generics was basically consolidated in
24 these three major buyers and 13 percent in

## Page 179

1  all other buyers?
2      MR. ERCOLE:  Object to form.
3      THE WITNESS:  That was the
4  estimate at that time, yes.
5  BY MR. KIEFFER:
6      Q.  Fair enough.
7      And I think it's communicated
8  in this slide, but the fact that 87 percent
9  of the US market for generic drugs was
10 consolidated among these three buyers, that
11 fact gives those three buyers substantial
12 negotiating leverage when it comes to the
13 price for generic medications; correct?
14     MR. ERCOLE:  Objection to form.
15     THE WITNESS:  I would agree
16 with that.
17 BY MR. KIEFFER:
18     Q.  Would you agree that it --
19 certainly in 2017, generic pharmaceutical
20 makers, like Teva, faced extreme price
21 pressure in the market for generic
22 medications?
23     MR. ERCOLE:  Same objection.
24     THE WITNESS:  I think in --

## Page 180

1  in -- you know, if you look at the
2  marketplace, it was pretty well
3  documented that there was price erosion
4  and pricing pressure in the generic
5  industry.
6  BY MR. KIEFFER:
7      Q.  Significant price pressure
8  that had existed for some period of time
9  but -- but got more extreme as time went
10 on, leading up to 2011?
11     A.  Consolidation led to
12 additional price erosion.
13     Q.  And in layman's terms, "price
14 erosion" means pressure to either reduce
15 prices or hold prices down or not implement
16 increases, those sorts of things?
17     MR. ERCOLE:  Objection to form.
18     THE WITNESS:  I think there
19 were still increases, but I think that
20 the competition and the pricing overall
21 for the market created additional
22 erosion that may or may have not been
23 as extreme as had been in the past.
24 BY MR. KIEFFER:

Page 181

1      Q.  Thank you.
2          Turn to, if you would, Page 55
3  of that document.  There's a slide, and it
4  says, "Main items going into 2018 AOP."
5          Do you see that?
6      A.  Yes.
7      Q.  What does "AOP" stand for?
8      A.  I think it was "actual
9  operating plan."
10     Q.  All right.  There are two
11 subheadings.  The first is "Opportunities
12 Beyond Financial Budget."  The second is
13 "Identified threats."
14         Do you see that?
15     A.  Yes.
16     Q.  Okay.  The third bullet under
17 "Identified threats" states, "Government
18 regulation of pricing and potential opioid
19 actions."
20         Do you see that?
21     A.  That is correct.
22     Q.  Okay.  When you were at Teva
23 as president and CEO of North America
24 operations in 2017, did you understand that

Page 182

1  others in Teva management viewed potential
2  opioid actions as a threat, looking into
3  2018?
4          MR. ERCOLE:  I'm going to
5  object.  I want -- I want to advise you
6  not to disclose any attorney-client
7  communications you may or may not --
8  you may have had at that time regarding
9  such information.  You can answer the
10 question otherwise, but I'd advise you
11 not to disclose any attorney-client
12 communications you would have had.
13         THE WITNESS:  Yeah, independent
14 of attorney-client communications, I
15 think there was also a concern, whether
16 it be opioids or any changes in the
17 government regulation of pricing and
18 products, that it would influence our
19 forecasts, no different than healthcare
20 reform changed our forecasts, sometimes
21 higher, sometimes lower, depending on
22 the product.
23         And when you're looking at main
24 items that are going into an actual

Page 183

1  operating plan, you're looking for
2  potential opportunities and potential
3  risks that the organization should know
4  about as you go into those -- into
5  those budgeting years.
6  BY MR. KIEFFER:
7      Q.  Understood.
8          And what is identified as a
9  threat here in the third bullet isn't
10 just -- there's a general statement about
11 govern regulation pricing and then a more
12 specific statement about potential opioid
13 actions; correct?
14     A.  Yeah, not -- I don't know the
15 exact context of what this was written --
16     Q.  Okay.
17     A.  -- at that point in time.
18     Q.  But as of 2017, given your
19 quite senior position in the North American
20 operations, you understood that Teva viewed
21 government action or potential government
22 action around opioids as a threat that it
23 had identified in 2017 looking forward into
24 2018?

Page 184

1          MR. ERCOLE:  Objection to form.
2          THE WITNESS:  I would say any
3  government regulation is going to have
4  an impact and a threat to the business.
5  It could be a positive or a negative,
6  depending on what that -- you know,
7  what that change is.  So that -- you
8  know, that's what I'm saying.
9  BY MR. KIEFFER:
10     Q.  Okay.  And I'm -- I'm truly
11 not meaning this as an argumentative
12 question.  It's really a semantic question.
13     A.  Yes.
14     Q.  I don't typically see the word
15 "threat" used in a positive connotation.
16         Is it your testimony that what
17 is stated here on Page 55 of this exhibit
18 as an identified threat regarding potential
19 opioid actions might be communicating a
20 potential positive action for the company?
21     A.  Well, if you reduce the amount
22 of opioids enough, chances are the prices
23 are going to go up much higher than they
24 are today, if I'm looking at, you know,

Page 185

1    just regular supply and demand.
2         So I see it listed as a threat
3    here.  It could be looked upon either way.
4    And in my previous capacities, in looking
5    at these marketplaces, we did look at it
6    that way.
7         Q.  Okay.  And thanks for the
8    explanation.  Again, I don't mean to
9    quarrel with you --
10        A.  No, at this point in time,
11   they're saying it's a threat, but I don't
12   know what the context was or where it came
13   from, but it could be looked at in either
14   way.
15        Q.  If the thinking was that there
16   might be increased government regulation
17   that would reduce the supply of opioids
18   and, in turn, lift the price, that might be
19   something that would cause folks to
20   identify potential opioid actions under the
21   "Opportunities" heading, not the "Threats"
22   heading; right?
23        MR. ERCOLE:  Objection to form.
24   He's already testified he doesn't

Page 186

1    understand the context.
2         THE WITNESS:  I'm telling you
3    what -- the way I would look at it.
4         I don't know what the context
5    was here and who was making the
6    statement, because I look at it -- I
7    would look at it as an opportunity
8    and/or a threat, depending on what the
9    government regulation is.
10   BY MR. KIEFFER:
11        Q.  Okay.  I think I neglected to
12   ask, sir:  A presentation such as we have
13   here, from Mr.  -- and I'm sorry, would you
14   say his name again?
15        A.  Dipankar Bhattacharjee.
16        Q.  Okay.  Thanks.  I'll butcher
17   it if I say it.
18        Do you know who the audience
19   was for this?
20        A.  I don't.
21        Q.  Do you know if it was an
22   internal audience or an external audience?
23        A.  I -- I don't.
24        Q.  Okay.

Page 187

1         A.  I'm assuming internal, but I
2    don't know the answer.
3         Q.  Okay.  If we assume that this
4    gentleman who is listed on the first page
5    was the presenter or the primary presenter
6    of this material, it's a fairly safe
7    assumption that at least he viewed
8    potential government action around opioids
9    as a threat that had been identified in
10   2017 looking forward?
11        MR. ERCOLE:  Objection to form;
12   improper assumption, calls for
13   speculation.
14        THE WITNESS:  You'd have to ask
15   him, but it's in his presentation.
16        Want to take a break after this
17   one, just because it's so hot in here?
18        MR. KIEFFER:  We can -- I was
19   going to go over two documents fairly
20   briefly and then suggest we take a
21   break for lunch, but if you want to
22   break now, we can.  I don't have strong
23   feelings.  It's hot.
24        THE WITNESS:  Yeah.  All right.

Page 188

1    He got to take his jacket off, I
2    didn't.
3         MR. KIEFFER:  Do you want to
4    take a break now?
5         THE WITNESS:  Yeah, let's take
6    a break now.  It's hot.
7         MR. KIEFFER:  Sure.  Fair
8    enough.
9         THE VIDEOGRAPHER:  The time is
10   approximately 12:34 p.m.  We're going
11   off the record.
12             - - -
13   (Luncheon recess taken from 12:34
14    p.m. to 1:14 p.m.)
15        THE VIDEOGRAPHER:  We are back
16   on the record.  The time is
17   approximately 1:14 p.m.
18   BY MR. KIEFFER:
19        Q.  Mr. Boyer, welcome back.
20   We're back on the record after a lunch
21   break.  Are you ready to proceed?
22        A.  Yes, please.
23             - - -
24   (Teva-Boyer No. 011 was marked for

Page 189

1   identification.)
2             - - -
3   BY MR. KIEFFER:
4       Q.   All right.  I've marked what
5   I'm going to hand to you as Exhibit No. 8
6   [sic].  Exhibit 8 bears a Bates number in
7   the lower right-hand corner of
8   TEVA_MDL_A_12710598.  And this is a
9   PowerPoint that was provided to us by
10  Teva's counsel from your electronic
11  custodial files.
12          I have just a couple of
13  questions about it for you, whenever you're
14  ready.
15      A.   Okay.
16      Q.   Okay?
17          The first page of this is
18  entitled "US Generics, Market Review,
19  January 31, 2017."
20          What's a market review?
21      A.   Just an update on the market.
22      Q.   And did you participate or
23  attend things like a market review when you
24  were at Teva?

Page 190

1       A.   No, I just think it's another
2   name for update.
3       Q.   Who would an update like this
4   typically be provided to?  Folks internally
5   or externally or both?
6       A.   Yeah, this is probably
7   internal.  It looks like most of these
8   slides were lifted from one of the IMS
9   IQVIA presentations and dropped into --
10  dropped into this presentation.
11      Q.   Okay.  And the presentation
12  you just mention -- you said "IMS."  And
13  what was the other --
14      A.   IQVIA is the new name of IMS.
15      Q.   Got it.  Okay.
16      A.   I-Q-V-I-A.
17      Q.   And would folks from Teva
18  periodically then make presentations to
19  IMS?
20      A.   No, no.  This is just
21  information that we lifted -- they did
22  presentations to the industry.
23      Q.   I got it.
24      A.   And we used to take and lift

Page 191

1   some of that information for internal uses,
2   just to educate our existing team.
3       Q.   Okay.  Fair enough.  Thank
4   you.
5          So this is dated
6   January 31st, 2017.  On Page 2, there's a
7   slide that says, "What's Happened in the US
8   Market Since Last Year?"
9          Down the lower left-hand
10  corner, in the box that says "Regulation,"
11  it says, New FDA/DEA guidance on Controlled
12  Substances."
13          Do you see that?
14      A.   Yes.
15      Q.   Do you know specifically
16  what's being referenced there?
17      A.   No.
18      Q.   Do you recall that, even into
19  2017, there continued to be increasing FDA
20  and DEA action and attention and scrutiny
21  around opioid medications?
22      MR. ERCOLE:  Objection to form.
23      THE WITNESS:  I'm assuming
24  there was discussion going on.  I don't

Page 192

1   know the timelines of it.  Again, this
2   is not one of my own personal slides.
3   BY MR. KIEFFER:
4       Q.   Okay.  Do you know whether
5   there are slides that you or folks in your
6   area would have supplied to this
7   presentation?
8       MR. ERCOLE:  Obviously take a
9   look through the presentation.
10      THE WITNESS:  I am.
11          Slide 8 probably is one of our
12  slides.
13  BY MR. KIEFFER:
14      Q.   Okay.
15      A.   Slide 11, Slide 12, Slide 13,
16  Slide 14, Slide 15, Slide 16 and Slide 17.
17      Q.   Okay.  You began -- an answer
18  to that last question, you began at
19  Slide 8.  Turn to Slide 7, if you would.
20  That one is entitled "Dynamic challenges to
21  growth."
22          Is that a slide that you
23  believe would have been supplied by your
24  group?

Page 193

1        A.  No.
2           MR. ERCOLE:  Objection to the
3      form; asked and answered.
4           THE WITNESS:  No.  I said
5      that -- I believe this was from the
6      outside, but I've never seen this slide
7      before.
8  BY MR. KIEFFER:
9        Q.  Okay.  On the right-hand side,
10     there's a graphic, what appears to be kind
11     of a caution symbol.  And under the main
12     heading of "Dynamic challenges to growth"
13     is the statement, "Headwinds from
14     hydrocodone rescheduling and opioid
15     prescribing scrutiny."
16           Do you see that?
17       A.  Yes.
18       Q.  The hydrocodone rescheduling
19     would appear to relate to what we discussed
20     before, that hydrocodone-containing
21     products were rescheduled from a Class III
22     controlled substance to a Class II
23     controlled substance?
24           MR. ERCOLE:  Objection to form.

Page 194

1        He testified that he doesn't --
2           (Simultaneous cross-talk.)
3           MR. ERCOLE:  Let me just
4      finish.
5           THE WITNESS:  Sorry, sorry,
6      sorry.
7           MR. ERCOLE:  -- that he
8      hasn't -- not aware of the context or
9      created this slide.
10  BY MR. KIEFFER:
11       Q.  That's how you would interpret
12     it?
13       A.  Yeah, I don't know the timing
14     of it, of when it was versus when the
15     statements were made here.  Again, this is
16     not one of my slides.
17       Q.  Okay.  And then at the bottom
18     there, that same portion of the exhibit, it
19     says "3 million Rx lost to Teva."
20           Do you see that?
21       A.  Yes.
22       Q.  And "Rx" is "prescription"?
23       A.  Yes.
24       Q.  Okay.  This would appear to be

Page 195

1      communicating that -- what is described as
2      headwinds from the hydrocodone rescheduling
3      and opioid prescribing scrutiny had
4      resulted in a loss of 3 million
5      prescriptions to Teva.
6           Is that how you would
7      interpret this?
8           MR. ERCOLE:  Again, objection
9      to form; lack of context, foundation.
10           THE WITNESS:  I don't know
11     exactly where it came from.  It's from
12     IMS, so I'm not sure what the time line
13     of it was, what it pertains to.  I
14     really don't.
15  BY MR. KIEFFER:
16       Q.  IMS is an outside group?
17       A.  Yes.
18       Q.  Why would IMS be reporting
19     3 million prescription -- a 3 million
20     prescription loss to Teva specifically?
21       A.  Well, if -- if Teva was one of
22     the ones that they called out on it -- I
23     don't know if it was a presentation they
24     had done to Teva or -- I don't know where

Page 196

1      this presentation came from, that they did.
2      It could have been at one of the NACDS or
3      HDA functions.  I don't know what the
4      derivation of it is.
5        Q.  It's not your testimony that
6      you're confident this slide did not
7      originate from someone within Teva, is it?
8        A.  I don't think so.  I've never
9      seen it before.
10       Q.  And the opinion of someone, it
11     would appear, that the rescheduling of
12     hydrocodone as well what's described as
13     opioid prescribing certainly had resulted
14     in a loss of prescriptions to Teva?
15           MR. ERCOLE:  Objection to form.
16       You're asking him to comment on whether
17       someone has an opinion on that?
18           THE WITNESS:  Again, I don't
19       know what the context was.
20  BY MR. KIEFFER:
21       Q.  Did you ever evaluate, in your
22     time at Teva, whether these sorts of
23     actions that are described here had
24     resulted in a measurable loss of

Page 197

```
1    prescriptions or sales or revenue to Teva?
2          MR. ERCOLE:  Objection; form.
3          THE WITNESS:  No.  What my team
4    did every single month was forecast
5    across our entire book of business, 3-,
6    4-, 500 products, depending on what
7    point in time it was -- it wouldn't
8    have just been hydrocodone; it would
9    have been across the board -- our
10   expected utilization of products in
11   general, but not specific to
12   hydrocodone or any of the other
13   opioids.
14   BY MR. KIEFFER:
15         Q.   Take a look, if you would, at
16   Page 14 of that presentation.  That, I
17   think, is one of them you said appeared to
18   originate with your group?
19         A.   Yes.
20         Q.   That's entitled "2017:  Must
21   Wins - New Product Launches."
22         What does the phrase "must
23   win" mean in this context?
24         A.   It was verbiage inside of
```

Page 198

```
1    Teva, was -- in order for us to hit our
2    annual operating plan, these are the things
3    that we needed to execute on.
4          Q.   Okay.
5          A.   These are new product
6    launches.
7          Q.   All right.  And there are --
8    there's -- the upper blue box says
9    "Launches in the Annual Operating Plan
10   (AOP)," and the bottom blue box says
11   "Additional Launches (Potential upside)."
12         Do you see that?
13         A.   Yes.
14         Q.   In the upper portion there,
15   "Launches in the Annual Operating Plan,"
16   which of those medications are opioid
17   medications?
18         A.   In the upper one?
19         Q.   Yeah, if any.
20         A.   I don't think any.
21         Q.   Okay.  Let me turn your
22   attention to the lower one.  Let me ask you
23   about buprenorphine/naloxone, thin film and
24   MR tabs.
```

Page 199

```
1          Do you see that?
2          A.   Yeah.
3          Q.   What are those products?
4          A.   It's a combination of
5    buprenorphine and naloxone.
6          Q.   What are the indications?
7    What are they used for?
8          A.   I don't know the answer.
9          Q.   Used for opioid overdose
10   addiction?
11         A.   I don't know the label on it.
12         Q.   Don't know at all?
13         A.   No.
14         Q.   No idea?
15         A.   I have an inkling, but I don't
16   know exactly what the label is.
17         Q.   What's your inkling?
18         A.   That it's used as part of
19   opioids.  I don't know if it's for
20   addiction or if it's prevention or -- but
21   it has something to do with the opioid
22   marketplace.
23         - - -
24         (Teva-Boyer No. 012 was marked for
```

Page 200

```
1    identification.)
2          - - -
3    BY MR. KIEFFER:
4          Q.   Hand you what we've marked as
5    Exhibit No. 12.  It's document 1651.
6          Exhibit No. 12 bears a Bates
7    number of TEVA_MDL_A_09644157.  It is also
8    a document that was provided to us from
9    your native electronic files.  It is a
10   Teva, what appears to be, presentation
11   dated 10/20 of '17.
12         Let me just ask you a couple
13   of questions about it if I can.  Turn to
14   Page 2 of that presentation, if you would,
15   with the actual Page No. 2.
16         A.   Uh-huh.
17         Q.   Does this accurately reflect
18   the reporting structure on your side of the
19   organization in October of 2017?
20         A.   Yes, I would assume so.
21         Q.   Ms. Baeder's name came up
22   before.  She appears immediately below you,
23   underneath the first line, entitled "Senior
24   Vice President Customer & Marketing
```

Page 201

1    Operations - US Generics."
2          Was Ms. Baeder involved, in
3    any form or fashion, on any sort of regular
4    basis with the issue of suspicious order
5    monitoring?
6          A.  It did roll up through her,
7    through Michelle Osmian.  What her
8    day-to-day interaction with that was, I
9    don't know the answer.
10         Q.  And how long was Michelle
11   Osmian's day-to-day interaction with that
12   particular subject area?  What was that?
13         A.  Well, she had order
14   management, I do believe.  So I would
15   expect that she would have had some
16   involvement in that, but I don't know the
17   specifics.
18         Q.  Okay.  Take a look, if you
19   would, at Page -- bear with me -- Page 6.
20         Page 6 has a title that says
21   "TRx Market Share - Rolling 12 months."
22         What does the "TRx" present?
23         A.  Prescriptions -- total
24   prescriptions.

Page 202

1          Q.  Total prescriptions.  Okay.  I
2    knew the Rx part.  So "T" is for "total"?
3          A.  Yes.
4          Q.  There's a box on the lower
5    right, in gray, entitled "Market dynamics
6    negatively affecting Teva share."
7          Do you see that?
8          A.  Yes.
9          Q.  The third bullet of the three
10   states, "Hydrocodone rescheduling and
11   scrutiny of opioids (3 million prescription
12   loss to Teva)."
13         Do you see that?
14         A.  Yes.
15         Q.  Similar statement to what we
16   saw in the prior exhibit that we looked at;
17   right?
18         A.  That's correct.
19         Q.  Okay.  Is this an internal
20   Teva-created slide, or is it your testimony
21   you think this came from an outside group?
22         A.  No, but I don't -- that
23   statement may have been lifted from the
24   other -- from the other document.  I don't

Page 203

1    know.
2          But this looks like a draft,
3    because it says "placeholder."  So I'm not
4    exactly sure if it was ever a presentation
5    or a draft that was created internally, so
6    it's hard to -- it's hard to say exactly
7    what this was.
8          Q.  But in terms of the
9    information that's depicted there, that
10   looks to you to be an internally
11   Teva-created slide?
12         MR. ERCOLE:  Objection to form.
13         THE WITNESS:  The slide itself
14         is -- looks internally created.  The
15         soundbites don't necessarily come
16         directly from internally.  That could
17         have easily been lifted from IMS, like
18         we did in a lot of cases.
19   BY MR. KIEFFER:
20         Q.  You don't know one way or the
21   other, I take it?
22         A.  No, I don't.
23              -  -  -
24         (Teva-Boyer No. 013 was marked for

Page 204

1          identification.)
2              -  -  -
3    BY MR. KIEFFER:
4          Q.  Handing you, sir, what we've
5    marked as Exhibit 13.  The first page of
6    Exhibit 13 bears a Bates number of
7    TEVA_MDL_A_12707620.  It's an email with an
8    attached document beginning with
9    Page TEVA_MDL_A_12707621.
10         Represent to you this came
11   from your custodial file and were furnished
12   by counsel.  This is dated 12/5 of '16.
13   The email is from Doug Sommerville with a
14   cc to you.
15         The bottom of the first page
16   of that document, sir, is an email to a
17   Doug Sommerville from Andrew -- I'm
18   sorry -- carbon copying you from somebody
19   with the first name of Itamar.
20         Did I say that correctly?
21         A.  Yes.
22         Q.  Itamar Ben-Anat?
23         A.  Ben-Anat, yes.
24         Q.  Who is that individual?

Page 205

1    A.  I don't remember what his
2  title was, unless it's in here.  He was --
3  I don't know exactly what his title was.
4  He was like a catchall in the organization
5  to help put presentations together for the
6  organization.
7    Q.  Do you know where he was
8  based?
9    A.  He was in North Wales,
10  Pennsylvania.
11    Q.  Okay.  He states here in this
12  email, "Hi, Doug.  I hope all is well.  We
13  are currently updating the annual report
14  and I would need your update as to the CA
15  market."
16    Do you see that?
17    A.  Yes.
18    Q.  Does that mean Canadian, "CA"?
19    A.  Yes.
20    Q.  Okay.  Let me ask you a couple
21  of questions about the attached document.
22    Second page of that, which
23  begin -- which has a page number ending in
24  621, just quickly take a look.

Page 206

1    Do you recognize that as a
2  portion of the material that was being
3  revised to go into an annual report, at
4  least according to the cover email?
5    A.  Assume so.
6    Q.  Okay.  Just want to ask you
7  about a couple of statements in there.
8  Page 625 -- and again, those are the last
9  three digits in the lower, right-hand
10  corner.  There's a subhead at the bottom of
11  the page that says "United States."
12    Do you see that?
13    A.  Yes.
14    Q.  Okay.  Second paragraph
15  states:  "In the United States, we are
16  subject to intense competition in the
17  generic drug market from domestic and
18  international generic drug manufacturers,
19  brand-name pharmaceutical companies through
20  lifecycle management initiatives,
21  authorized generics, existing brand
22  equivalents and manufacturers of
23  therapeutically similar drugs."
24    Do you see what I just read?

Page 207

1    A.  Yes.
2    Q.  Is that a true statement, as
3  far as you are concerned based upon your
4  role in the organization at that time?
5    A.  Yes.
6    Q.  If you turn to the next page,
7  which ends in 626, the second paragraph
8  from the top states, "In the United States,
9  our wholesale and retail selling efforts
10  are supported by advertising in
11  professional journals and on leading
12  pharmacy websites, as well as participating
13  in key medical and pharmaceutical
14  conferences.  We continue to strengthen
15  customer awareness of the benefits of
16  generics through partnerships and digital
17  marketing programs."
18    Do you see that?
19    A.  Yes.
20    Q.  As far as you were concerned,
21  based upon your position in the company at
22  the time, was that a true statement?
23    A.  It might be a true statement
24  for the brand part of our organization.

Page 208

1    Q.  Okay.
2    A.  It wouldn't -- it wouldn't be
3  for the generic part of the organization.
4    Q.  Not at all?  Would any part of
5  it be true for the generic part?
6    A.  I could see the -- some of the
7  journal advertising -- with our "now
8  available" ads or "coming soon" ads, there
9  could have been some of that in the
10  professional journals.
11    And this is only for Teva;
12  correct?
13    Q.  Correct.
14    A.  Okay.  Doubtful, pharmacy
15  websites.
16    Definitely not key medical and
17  pharmaceutical conferences, other than what
18  I would consider to be NACDS or HDA, where
19  we would use the same "coming soon," "now
20  available" or corporate positioning, such
21  as supply chain and R&D capabilities.
22    And I would doubt any kind of
23  consumer awareness through partnerships and
24  digital marketing programs.  That would not

Page 209

1    be generics at all.
2        Q.  Now -- I'm sorry.
3        A.  That would not be the generic
4    side of the business, no.  There could be
5    something on the brand side, and I'm
6    assuming, based upon this being in there,
7    that that was probably the case.
8        Q.  Okay.
9            - - -
10       (Teva-Boyer No. 014 was marked for
11       identification.)
12           - - -
13   BY MR. KIEFFER:
14       Q.  Hand you, sir, what we have
15   marked as Exhibit 14.  It's a document
16   bearing a number in the lower, right-hand
17   corner of TEVA_MDL_A_ 12678257.  This was
18   furnished to us from your custodial file.
19   This is on Watson letterhead.  It's a
20   letter dated September 26th, 2011, to an
21   individual at AmerisourceBergen Drug
22   Corporation.
23           Take just a moment to look at
24   it, and then I have a question for you.

Page 210

1        A.  Okay.
2        Q.  This letter -- I'm sorry.
3    Have you had a chance to look at it?
4        A.  Yes.
5        Q.  This letter states it's
6    regarding loyalty rebate.  It states:
7        "Dear Ms. Patel:
8        "Watson Pharma is pleased to
9    offer the following rebate."
10       And it says, "Loyalty Rebate,"
11   and then it states, "Watson shall provide
12   AmerisourceBergen with a one-time 2011
13   loyalty rebate payment of $250,000 for
14   maintaining the following product in
15   primary position through December 31,
16   2011.
17       "Hydrocodone/APAP."
18       Do you see that?
19       A.  Yes.
20       Q.  Were you familiar with royalty
21   rebates when you were at Watson?
22           MR. RODRIGUEZ:  This is Nick
23       Rodriguez on behalf of
24       AmerisourceBergen.  I'm going to object

Page 211

1        to the introduction of this exhibit.
2        It's not clear to us that the witness
3        has seen this before, and it wasn't
4        provided to us in advance of this
5        deposition.
6            MR. KIEFFER:  Noted.
7    BY MR. KIEFFER:
8        Q.  Were you familiar, sir, with
9    the topic of loyalty rebates when you were
10   at Watson?
11       A.  We've got a lot of different
12   rebates.  I don't know if they were called
13   loyalty rebates.
14           I don't remember this one in
15   particular, and I don't know what the
16   context was leading up to this particular
17   rebate being put in place.
18       Q.  Okay.  You said there were a
19   lot of different kinds of rebates.  What
20   were some of the different kinds of
21   rebates?
22       A.  There's volume incentives.
23   There's off-invoice.  There's a whole host
24   of different structured rebates, depending

Page 212

1    on services provided or products and other.
2        Q.  Volume rebates, I think, as
3    the name implies, are -- are typically
4    determined in percentage terms, and moneys
5    are rebated back to customers based upon
6    the customer placing a certain sales
7    volume?
8            MR. ERCOLE:  Objection to form.
9            THE WITNESS:  Usually not on a
10       product-specific basis, on your entire
11       book of business.  So as we were
12       launching more and more products and
13       our business was growing, we were
14       allowing a customer to participate in
15       that growth through a volume rebate by
16       awarding us some of those new products.
17   BY MR. KIEFFER:
18       Q.  Okay.  And based upon a
19   reading of this particular exhibit, it
20   appears that Watson was offering
21   AmerisourceBergen, as of September 26,
22   2011, $250,000 to maintain Hydrocodone/APAP
23   in primary position through December 31 of
24   2011; correct?

Page 213

1        MR. ERCOLE:  Objection to form.
2    The witness has already testified he's
3    not aware of the context of this
4    particular document.
5        THE WITNESS:  Again, I don't
6    know what the context was for.
7    BY MR. KIEFFER:
8        Q.  The context?
9        A.  The context of this.  I don't
10   know what led up to this rebate or why.  I
11   don't know what was transpiring in the
12   marketplace.  I don't know if we did a
13   price increase.  I don't know if we were
14   losing market share to one of our
15   competitors.  I have no idea what led to
16   this loyalty rebate.
17       Q.  Fair enough.  My question
18   really doesn't pertain to context, though.
19   My question really was just trying to make
20   sure that we're clear on what the offer is.
21       The offer here, from Watson to
22   AmerisourceBergen, on September 26th,
23   2011, was:  Watson would pay
24   AmerisourceBergen $250,000 if

Page 214

1    AmerisourceBergen maintained in a primary
2    position, through December 31, 2011, the
3    medication Hydrocodone/APAP; correct?
4        MR. ERCOLE:  Objection to form.
5        MR. RODRIGUEZ:  Again, this is
6    Nicholas Rodriguez.  I'm going to
7    object, again, to this entire line of
8    questioning for the same basis that I
9    raised before.  Just want to preserve
10   the objection.
11       MR. ERCOLE:  Sure.  And we
12   object that the witness has testified
13   he's not familiar with the document.
14       THE WITNESS:  I can only say
15   that's what the document says.
16   BY MR. KIEFFER:
17       Q.  That's how you'd interpret it;
18   right?
19       MR. ERCOLE:  Same objection.
20       THE WITNESS:  I don't know what
21   the context of this rebate is.  The
22   fact that they were offering a rebate
23   on it, I'm assuming you're telling me
24   that's what it is, but I don't know

Page 215

1    exactly what it was for.
2    BY MR. KIEFFER:
3        Q.  I'm just telling you what the
4    document says, I'm not asking you about the
5    context.
6        A.  And I'm just telling you, I
7    agree with what the document says.
8        Q.  You do?
9        A.  That's what the document says,
10   but I don't know what that means.  I don't
11   know what the content of that means.
12       MR. RODRIGUEZ:  This is Nick
13   Rodriguez.  It's clear that the witness
14   hasn't seen this, and this wasn't
15   provided to us in anticipation of this
16   deposition.  And so, again, we're
17   objecting to the use of this exhibit.
18       MR. ERCOLE:  I'd request that
19   you let the witness finish his answer
20   before you start speaking.
21       MR. KIEFFER:  Just trying to
22   move it along.  No, I get it.
23   BY MR. KIEFFER:
24       Q.  Sir, what does it mean to

Page 216

1    maintain a product in primary position at a
2    company -- at a wholesaler like
3    AmerisourceBergen?
4        MR. ERCOLE:  Objection to form.
5        THE WITNESS:  I would assume
6    that they would not dual-award the
7    product.
8    BY MR. KIEFFER:
9        Q.  "Dual-award the product"
10   meaning they would keep -- in this
11   particular instance, they would keep the
12   Watson Hydrocodone/APAP in their formulary
13   and that they would use the Watson product
14   to fill orders from versus Watson's and
15   someone else's; right?
16       MR. ERCOLE:  Objection; form.
17       THE WITNESS:  What's the date
18   of this?  Yes, because this would have
19   been a CIII at that time, that is
20   correct.
21   BY MR. KIEFFER:
22       Q.  Okay.  So this phrase about
23   maintaining a product in primary position,
24   incentives to a customer -- in this

Page 217

1   instance, AmerisourceBergen -- to maintain
2   a product in primary position is one way
3   that Watson can protect its market share or
4   increase its market share for a particular
5   product?
6        MR. ERCOLE:  Objection to form.
7        THE WITNESS:  In this
8   particular instance, that's what it
9   looks like.  Not very customary, but it
10   has been done.
11        - - -
12   (Teva-Boyer No. 015 was marked for
13   identification.)
14        - - -
15   BY MR. KIEFFER:
16   Q.  Sir, I've just handed you as
17   Exhibit No. 15 an email string.  It bears a
18   Bates number in the lower, right-hand
19   corner of Acquired_ Actavis_02290885.  At
20   the top of the first page, there is an
21   email from David Myers to you and Napoleon
22   Clark dated 3/27 of '13.
23        Do you see what I'm referring
24   to?

Page 218

1   A.  Yes.
2   Q.  And the subject is "Bu/Na
3   Promotional Outreach Overview."
4        Do you see that?
5   A.  Yup.
6   Q.  And he states in the first
7   paragraph, "I wanted to provide an update
8   on the programs we are currently performing
9   and those we are considering in support of
10   our buprenorphine/naloxone sales effort."
11        Do you see that?
12   A.  Yes.
13   Q.  All right.  The first is a
14   joint promotion with Amneal.  Do you see
15   that as well?
16   A.  Yes.
17   Q.  And then underneath that, it
18   indicates email and fax blasts to
19   "DATA 2000 physicians"; correct?
20   A.  Uh-huh.
21   Q.  Do you know what DATA 2000
22   physicians are?
23   A.  No.
24   Q.  Then there's a subhead that

Page 219

1   says "Actavis-sponsored programs."
2        Do you see that?
3   A.  Yes.
4   Q.  It states, "A press release
5   was emailed along with a product picture to
6   the following publications for inclusion in
7   their new product sections," and then there
8   is a list of various publications that
9   appear beneath that; correct?
10   A.  Yes.
11   Q.  And then there is another
12   subhead that says "Programs in-development
13   (or being considered)."
14        Do you see that?
15   A.  Yes.
16   Q.  An email blast to 294,000
17   pharmacy professionals and a budget amount
18   there of $10,000; correct?
19   A.  Yes.
20   Q.  A printed mailer included in
21   PDQ Pharmacist's Flash Co-op Mailer that
22   reaches 70,000 retail pharmacies, and a
23   budget attached to that as well; right?
24   A.  Yes.

Page 220

1   Q.  Direct mail using 9x12 clear
2   poly mailer reaching 1,000 high-prescribers
3   of Suboxone, with a budget attached to
4   that.
5        Do you see that as well?
6   A.  Yes.
7   Q.  And an email follow-up
8   broadcast to high-prescribers who received
9   the direct mail piece, and a budget number
10   attached to that as well; correct?
11   A.  That's correct.
12   Q.  A telemarketing campaign
13   focused on high-prescribing physicians,
14   with a cost to be determined.
15        That's stated there as well?
16   A.  Yes.
17   Q.  And then Catalina Health
18   direct-to-patient marketing campaign
19   targeting patients who received
20   Suboxone-brand Bu/Na, cost to be
21   determined.
22        Right?  Do you see that?
23   A.  Yes.
24   Q.  And in that last paragraph

1  before Mr. Myers -- and we established
2  earlier you recall Mr. Myers from the time
3  when you were with the Actavis organization
4  and then later at Teva?
5      A.  Yes.
6      Q.  Next-to-last paragraph,
7  Mr. Myers states, "As you can see, we are
8  moving full steam ahead on maximizing the
9  value of Buprenorphine Naloxone.  Please
10  give me a call if you'd like to discuss."
11      Correct?
12      A.  Yes.
13      Q.  All right.  Now, this product
14  that he is referring to --
15  buprenorphine/naloxone -- that is a generic
16  product; correct?
17      A.  That is correct.
18      Q.  And what he describes in his
19  email are significant and fairly broad
20  marketing and promotional efforts directed
21  to that specific generic product; also
22  correct?
23      MR. ERCOLE:  Objection to form;
24      improper characterization.

1      THE WITNESS:  I don't know
2  exactly what he was doing here.  I
3  don't remember if it was ever even
4  implemented.
5      What happened with
6  buprenorphine/naloxone was we had
7  launched a tablet or a capsule, and the
8  brand company, if I'm not mistaken, had
9  moved most of the market to the thin
10  film at a much higher price than the
11  generic version of the tablet.  And I
12  remember them looking for a way to have
13  physicians use the oral solid versus
14  using the thin film.
15      I don't know if they've ever --
16  they ever implemented anything other
17  than the original awareness.
18  BY MR. KIEFFER:
19      Q.  Fair enough.  And I appreciate
20  the detail.  My question was just perhaps a
21  little more fundamental.
22      Regardless of the reasons
23  why --
24      A.  Yeah.

1      Q.  -- regardless of what was
2  ultimately done, what Mr. Myers is
3  describing here represents marketing and
4  promotion around a generic product, No. 1;
5  true?
6      MR. ERCOLE:  Objection to form.
7      THE WITNESS:  I would agree
8      that that would be -- you know, it's
9      not features and benefits; it's an
10      awareness campaign.  But if you wanted
11      to call that marketing promotion, I
12      think you could, yes.
13  BY MR. KIEFFER:
14      Q.  And the various vehicles or
15  channels that he is describing are pretty
16  broad here; also true?
17      MR. ERCOLE:  Objection to form.
18      THE WITNESS:  It's an
19      awareness -- what he's looking at is an
20      awareness campaign.  How you -- it's
21      not an expensive campaign by any
22      stretch of the imagination, but it's an
23      awareness campaign to -- you know, to
24      different healthcare professionals.

1  BY MR. KIEFFER:
2      Q.  And regardless of the
3  nomenclature we use, the end goal of this
4  awareness campaign was to drive sales of
5  this particular buprenorphine/naloxone
6  product; correct?
7      A.  I think the intent was to make
8  physicians and others, if it did go to
9  market, aware that there was a tablet and
10  capsule available versus the higher-priced
11  thin film version of the product.
12      Q.  So that they would hopefully
13  buy the tablet/capsule version and thereby
14  increase sales and maximize the value of
15  the product?
16      MR. ERCOLE:  Objection to form.
17      THE WITNESS:  No.  This would
18      be for physicians to be aware that
19      instead of writing for the thin film
20      that they were currently writing for,
21      that was costing both the patient and
22      the healthcare insurance companies more
23      money, that there was a generic
24      alternative available to the capsule

Page 225

1      and tablet; and that if they were going
2      to write for buprenorphine/naloxone,
3      they would serve their patients well,
4      as well as the cost of the healthcare,
5      to write for the tablet or capsule
6      versus the thin film.
7   BY MR. KIEFFER:
8      Q.  So it's your testimony this
9   email from Mr. Myers is not describing
10  activities that are being undertaken or are
11  being contemplated -- may be undertaken to
12  support the company's sales efforts or to
13  maximize the value of the product?
14       MR. ERCOLE:  Objection to form;
15       asked and answered.  Not sure I
16       understand.
17       THE WITNESS:  No.  What I would
18       say is, this is to maximize the value
19       of our tablet.  This is not to expand
20       the market or grow the market in any
21       way.  It's using an alternative to the
22       market, which is a tablet or capsule,
23       which, by default, if they utilize the
24       tablet and capsule, since we didn't

Page 226

1      have a thin film on the market, that we
2      would create more value for the
3      organization, yes.
4   BY MR. KIEFFER:
5      Q.  Okay.  And he does say, after
6   all, at the end of the first paragraph, "in
7   support of our Buprenorphine/Naloxone sales
8   efforts"; correct?
9      A.  Yeah, that's correct.  It's
10  for our tablet and capsule.
11     Q.  And in the last paragraph, "As
12  you can see, we are moving full steam ahead
13  on maximizing the value of Buprenorphine
14  Naloxone."
15       Right?
16     A.  And we would do that with
17  every product.  Not necessarily to this
18  extent, where there's a competing product
19  on the market, but on any generic product,
20  our intent is to maximize the value of that
21  asset.
22     Q.  And the most fundamental way
23  you maximize the value of the product is
24  your company's customers buy it or buy more

Page 227

1   of it and create sales revenues; right?
2   It's axiomatic, isn't it?
3       MR. ERCOLE:  Objection to form.
4       THE WITNESS:  No.  The way we
5       try and build our business is to have a
6       better supply chain, a better R&D
7       pipeline, and a lower cost to our
8       competitors, so that they're willing to
9       buy more of our product than our
10      competitor's product, then, in fact,
11      increasing sales.
12       MR. KIEFFER:  All right.  Fair
13       enough.
14            -  -  -
15      (Teva-Boyer No. 016 was marked for
16      identification.)
17            -  -  -
18  BY MR. KIEFFER:
19     Q.  Sir, I've handed you what
20  we've marked as Exhibit 16.  This is a
21  document that was provided to us, again,
22  from your custodial files.  It has a
23  number, in the lower, right-hand corner, of
24  Acquired_Actavis_ 01178983.  It's entitled

Page 228

1   "Buprenorphine & Naloxone Shared Marketing
2   Plan Summary."
3       Do you see what I'm referring
4   to there?
5      A.  Yes.
6      Q.  I'm not going to ask you about
7   all of it.  I really think my questions are
8   pretty confined.
9       The first paragraph on the
10  first page states, "This marketing plan
11  covers the market as a whole.  Because it
12  is designed as a shared program between
13  manufacturers, it does not target specific
14  accounts.  The ultimate goal is to get
15  Suboxone sublingual film patients,
16  dispensing pharmacists, and physicians to
17  convert their scripts to the generic
18  sublingual tablet."
19       That's what you were
20  describing a moment ago; correct?
21     A.  That's exactly right.
22     Q.  Right.  "Other generic
23  Buprenorphine and Naloxone manufacturers
24  are invited to deploy this joint marketing

Page 229

1    effort in order to achieve this goal."
2        Did I read that correctly?
3        A.  Yes.  I don't know who created
4    this document.  If I'm not mistaken, it
5    came from one of the other generic
6    manufacturers, and they were trying to get
7    others involved in this campaign of
8    notifying physicians of an alternative to
9    the, as you said, the sublingual film or
10   the thin film.
11       Q.  Okay.  And the idea it speaks
12   here, it is not targeted to specific
13   accounts.  And you've called it an
14   awareness campaign; right?
15       A.  I would say that's what it is,
16   yes.
17       Q.  And the idea, in bold -- and I
18   won't repeat it all -- is to try to get
19   prescribers to switch from this thin film
20   to the alternative product, which Actavis
21   made at the time?
22       A.  Right.  So the brand company
23   launched a succession -- a
24   life-cycle-management product, and they

Page 230

1    moved all their patients from their brand
2    tablet product to the brand thin film.  And
3    this was an attempt by, I believe, one of
4    the manufacturers to figure out a way that
5    all generic companies that happened to have
6    the tablet could participate in educating
7    physicians of a lower cost alternative and
8    move it back to the generic tablet they
9    were originally using.
10       Q.  Okay.  And this awareness
11   campaign that you've described, the idea
12   behind it is sort of a -- the old a rising
13   tide lifts all boats; right?  If the
14   generic manufacturers who were invested in
15   this alternative version of buprenorphine
16   and naloxone can get prescribers to switch
17   to that versus the thin film, perhaps
18   everyone benefits?
19       MR. ERCOLE:  Objection to form.
20       THE WITNESS:  I think it's a
21   little mischaracterization.
22       The answer is yes, but the --
23   in this case, the benefit is not just
24   the manufacturers.  It's also the

Page 231

1    patient and healthcare costs and
2    everything else, because the generic
3    tablet and capsule was a lower cost
4    alternative to the thin film.  So when
5    you look at something like this, which
6    I don't even know if it ever made it to
7    the market, this is the kind of program
8    that benefited the healthcare system in
9    general, including the patient, and not
10   just the manufacturer.
11   BY MR. KIEFFER:
12       Q.  Fair enough.  But --
13       A.  It was an interesting concept.
14       Q.  But it would benefit the
15   manufacturer if the manufacturer sold more
16   of the product, by definition?
17       A.  It could, yes.
18       Q.  Okay.  The second paragraph of
19   this document -- can you pull that up --
20   states, "The plan is broken out into three
21   primary audiences for the initial blitz:
22   physicians, pharmacists and patients.
23   Secondary target audiences include payers,
24   PBMs, Key Opinion Leaders (physicians and

Page 232

1    others), addiction and recovery groups and
2    advocacy organizations.  We'll begin with
3    an immediate national press release day-one
4    of approval, followed swiftly by a mix of
5    independent and customer-sponsored
6    campaigns, and more targeted print media
7    outreach over time.  The plan below
8    outlines the message, frequency and
9    vehicles targeted for each audience.  All
10   materials will be submitted to legal and RA
11   for approval and FDA DDMAC review prior to
12   use."
13       Do you see what I just read?
14       A.  Yes.
15       Q.  That describes a pretty broad
16   and detailed marketing and promotional
17   plan, at least, for this buprenorphine and
18   naloxone product, does it not?
19       MR. ERCOLE:  Objection to the
20       form; document speaks for itself.
21       THE WITNESS:  Again, this was a
22   plan that was not created by, at the
23   time, I don't know if it was Watson or
24   Actavis.  This was a plan that was

Page 233

1    created by another entity that was
2    pitching either Watson or Actavis at
3    the time, to participate in a
4    promotional plan that they had derived.
5                - - -
6          (Teva-Boyer No. 017 was marked for
7          identification.)
8                - - -
9    BY MR. KIEFFER:
10         Q.  Sir, I'm going to hand you
11   what we've marked as Exhibit 17.  It bears
12   a Bates number TEVA_MDL_A_12682371.  It is
13   a one-page email, attaching what appears to
14   be the same document.  And I apologize, it
15   looks like we only got here with one copy,
16   so I'm going to hand you mine at the
17   moment.
18             Let me know when you've had a
19   chance to review that.
20         A.  (Witness reviews the
21   document.)
22         Okay.
23         Q.  There's an email from you, at
24   the very top of the page, to Napoleon Clark

Page 234

1    dated 2/17 of '13.  Subject is "Forwarding
2    Bu/Na marketing plan," and you state, "FYI.
3    We will need to discuss Tuesday."  Correct?
4          A.  That's correct.
5          Q.  And beneath that there is an
6    email from a gentleman named Jim Luce to
7    you, same subject, "BuNa marketing plan,"
8    and it states, "Andy... As we discussed I
9    am forwarding our marketing plan to drive
10   conversion of the Suboxone product (both
11   dosage forms) to the generic sublingual
12   products," and then it goes on from there.
13            Do you see what I just read?
14         A.  Yes.
15         Q.  Okay.  A moment ago, you
16   testified a couple of times -- and
17   relatively emphatically, at least to my
18   ear, that this marketing plan document that
19   is attached was not your company's -- "your
20   company" being Actavis, at the time -- but
21   was from a competitor.  A plain reading of
22   this email would perhaps suggest otherwise.
23            Having looked at this email,
24   does that jog any different recollection?

Page 235

1          MR. ERCOLE:  Objection to form;
2    argumentative.
3          THE WITNESS:  Not at all.
4          MR. ERCOLE:  Move to strike the
5    initial commentary by plaintiff's
6    counsel.
7          THE WITNESS:  Yeah.  Not at
8    all.  This was something that was
9    created by the Amneal organization via
10   Jim Luce.  He reached out to me and
11   asked me if we are interested in it.  I
12   dropped an email to Napoleon and said,
13   "Napoleon, we should discuss to figure
14   out what the cost of this program would
15   be."
16   BY MR. KIEFFER:
17         Q.  Okay.
18         A.  And whether we thought that it
19   was -- was worth looking at it and could we
20   afford it within our marketing budget.
21         Q.  Okay.  And do you recall what
22   the results of your discussion with
23   Napoleon were?
24         A.  I don't know, but I don't

Page 236

1    remember having a program in place ever.
2                - - -
3          (Teva-Boyer No. 018 was marked for
4          identification.)
5                - - -
6    BY MR. KIEFFER:
7          Q.  Sir, I'm handing you what
8    we've marked as Exhibit 18.  Exhibit 18 is
9    an email from Napoleon Clark to David
10   Myers, carbon copying you, and the subject
11   is "Buprenorphine Naloxone Address/Phone
12   List."
13            Do you see that?
14         A.  Yes.
15         Q.  And it appears to have
16   attachments which are identified as
17   "Buprenorphine Physician Treatment Centers
18   and State Agencies."
19            Do you see that as well?
20         A.  Yes.
21         Q.  All right.  Now, this is dated
22   April 7th, 2013.  The prior email from
23   you to Mr. Clark was dated February 17th,
24   2013.  So six weeks or so afterwards,

Page 237

1    thereabouts.
2         Does that sound right to you?
3         A.  That is correct.
4         Q.  Okay.  And Mr. Clark says,
5    "Look what I got," with several exclamation
6    points.  "Has everything except for email.
7    I got all 13,000+ docs address and phone
8    number.  I got the US treatment centers
9    address and phone number.  And I got the
10   State Substance abuse agencies address,
11   phone number.  So it looks like we have all
12   of the contacts we need.  Just need to
13   determine what outreach materials to send
14   and how to go about making the contact."
15        Do you see that?
16        A.  Yes, I do.
17        Q.  This email would certainly
18   appear to suggest that, at least as of
19   April 7th, 2013, Mr. Clark was under the
20   impression that this -- at least this
21   particular portion of a marketing program
22   for buprenorphine was moving forward; true?
23        MR. ERCOLE:  Objection to form;
24   calls for speculation.

Page 238

1         THE WITNESS:  I think you'd
2    need to ask Napoleon.  Again, I don't
3    remember ever introducing any of these
4    programs, so I don't know the answer.
5    He was obviously still working on it
6    behind the scenes after the original
7    February 17th date.
8    BY MR. KIEFFER:
9         Q.  Okay.  It's not your
10   testimony, I take it, that when you were at
11   Actavis in April of 2013 and thereafter,
12   that Actavis did not undertake some of
13   these activities -- some of these contacts
14   to some of these individuals and groups
15   that Mr. Clark identifies in his email, you
16   just don't remember; is that right?
17        MR. ERCOLE:  Objection to form.
18        If -- you can answer if you
19   understand the question.
20        (Simultaneous cross-talk.)
21        (Clarification by reporter.)
22        THE WITNESS:  I do not know the
23   answer.
24             - - -

Page 239

1         (Teva-Boyer No. 019 was marked for
2         identification.)
3             - - -
4    BY MR. KIEFFER:
5         Q.  Sir, let me hand you what
6    we've marked as Exhibit 19.  Exhibit 19 is
7    a document -- again, it was provided to us
8    from your custodial electronic files with a
9    number on the first page of
10   Acquired_Actavis_ 02293291.  And it
11   attaches a slide deck, with the first page
12   identifying "NACDS 2014, Boston,
13   Massachusetts."
14        Do you see what I'm referring
15   to there?
16        A.  Yes.
17        Q.  You've mentioned the NACDS a
18   couple of times.  That's the National
19   Association of Chain Drug Stores; correct?
20        A.  Yes.
21        Q.  They have a convention or
22   annual or semiannual meeting?
23        A.  Yes.
24        Q.  Okay.  Is it annual?  Is it

Page 240

1    semiannual?
2         A.  This one here is annual.
3         Q.  Annual, okay.
4         Is that something that you
5    would typically have gone to?
6         A.  This one, probably yes.
7         Q.  Okay.  This appears to be
8    PowerPoint materials that Actavis put
9    together in connection with that meeting?
10        A.  Yes.
11        Q.  All right.  Take a look, if
12   you would, at Page 10 of that PowerPoint.
13   It's the next-to-the-last page.  The title
14   of that slide is "Select Actavis
15   First-to-Files (FTF) confirmed in the last
16   12 months."
17        Do you see that?
18        A.  Yes.
19        Q.  For the benefit of our jury,
20   who may or may not have heard this term
21   before, what does the term
22   "first-to-files," or "FTF" -- what does
23   that mean in layman's terms?
24        A.  It means that Watson, or in

Page 241

1    this case Actavis, filed a product and is
2    getting designation from the FDA that we
3    were the first-to-file of that product and
4    it would entitle us to, in most cases,
5    either a shared or a six-month exclusivity
6    on our own.
7        Q.   Okay.  And first-to-file as a
8    pharmaceutical company with the generic
9    version of a product; right?
10       A.   That is correct.
11       Q.   Okay.  So being the
12   first-to-file can be a big deal, for lack
13   of a better word, in terms of product
14   launch?
15           MR. ERCOLE:  Objection to form.
16           THE WITNESS:  Being
17       first-to-file is the time that you come
18       to market as your own -- on your own or
19       as a select group.  There is more value
20       for the manufacturer, and it brings a
21       lower cost alternative to the
22       marketplace, versus the brand that the
23       patient may be currently on.
24   BY MR. KIEFFER:

Page 242

1        Q.   The -- on the left-hand column
2    there, that says "Product" -- and there's
3    various products identified with
4    manufacturer names.  Those are the -- are
5    those the branded version of the particular
6    product?
7        A.   Yes.
8        Q.   So, for example, the
9    next-to-the-last one says "Suboxone," and
10   then it looks like it's "Reckitt
11   Benckiser"?  Did I say that right?
12       A.   I believe so.
13       Q.   Okay.  And then, in
14   parenthetical, "Buprenorphine/Naloxone";
15   right?  That is the -- that represents a
16   product that Actavis was the first-to-file
17   on in the last 12 months with a generic
18   equivalent?
19       A.   They believed that they were
20   the first-to-file as of this point in time
21   on that particular product for the thin
22   film, yes.
23       Q.   Okay.  And the indication
24   listed there is "opioid dependence"?

Page 243

1        A.   Yes, that's what it says.
2        Q.   Okay.  And do you have a
3    memory that that product indeed was
4    intended to treat opioid dependence?
5        A.   Again, I remember -- I said it
6    before, I didn't know the indication
7    exactly, but I'm assuming that that's
8    accurate.
9        Q.   Okay.  And then there's a
10   column on the far right that says "IMS
11   Sales MAT/6/14."
12           Do you see that?
13       A.   Yes.
14       Q.   What does "IMS" stand for?
15       A.   IMS was the company that we
16   talked about before that provides all of
17   the data.
18       Q.   Sales data?
19       A.   Yes.
20       Q.   So is that, as you understand
21   it, the figure that is listed here for this
22   particular medication -- the 1,388 -- first
23   of all, that looks like that's described in
24   millions?

Page 244

1        A.   That's correct.
2        Q.   So is that -- in layman's
3    terms, is that basically $1,388,000,000
4    that's being communicated there?
5        A.   That's what IMS dollars were,
6    according to IMS, yes.
7        Q.   According to IMS?
8        A.   Yes.
9        Q.   Okay.
10       A.   But the dollars in IMS are not
11   accurate, like they are on the prescription
12   side for TRxs and units.  So if you wanted
13   the real dollars, you'd probably have to go
14   back to Reckitt Benckiser, if they are
15   publicly traded at the time, and see what
16   exactly they told the Street was their
17   number for buprenorphine/naloxone, the thin
18   film.
19       Q.   Well, in this -- be that as it
20   may, as you told us a moment ago, this is
21   an Actavis-prepared PowerPoint that was
22   presented to the NACDS; correct?
23           MR. ERCOLE:  Objection to form.
24           THE WITNESS:  So it's fairly

Page 245

1    consistent in the marketplace to use,
2    as a benchmark, the brand dollars that
3    are put out there by IMS. That's not
4    necessarily -- we don't believe that
5    those are the exact numbers for the
6    brand. But since there's no other way
7    to have a consistent number for all
8    products across all companies, that's
9    why it was used for that.
10        But yes, that would be an
11   internal document that was utilized by
12   Actavis.
13   BY MR. KIEFFER:
14       Q.  Fair enough.
15       And IMS sales dollars were
16   used because they were believed to be a
17   reasonable benchmark. Might not be
18   precise, but reasonably close?
19       A.  You know what --
20           MR. ERCOLE:  Objection to form;
21   asked and answered.
22       Go ahead.
23           THE WITNESS:  They were
24   utilized because you didn't have

Page 246

1    anything else.
2    BY MR. KIEFFER:
3        Q.  Fair enough.
4        And if -- is it correct that
5    this 1.3, almost $1.4 billion, is the IMS
6    sales figure that is attributable to sales
7    of this branded product by this one
8    company, Reckitt Benckiser?
9        A.  Right. So this -- what this
10   says is, the moving annual total as of
11   June 2014, which would have been the
12   previous 12 months leading up to June of
13   '14, that there was $1.388 billion of
14   buprenorphine/naloxone -- as a brand,
15   Suboxone -- thin film sales, according to
16   IMS WACC dollars.
17       Q.  And the reason this data is
18   included and presented in the way it is is
19   to give audience members an idea of the
20   potential market that Actavis is getting
21   into by virtue of being the first-to-file
22   with respect to a particular product; true?
23       A.  No, the intent of this was to
24   let the -- you know, our customers know

Page 247

1    that we have a very good R&D pipeline; and
2    as you need to make decisions on our
3    existing inline portfolio or our pipeline,
4    we want you to take and do more business
5    with us overall, not necessarily on that
6    particular product.
7        But, again, I said to you
8    earlier on that we grow through our supply
9    chain, through our R&D pipeline, our
10   ability to supply consistently at a low
11   price.
12       And this is giving the -- an
13   indication to the market, the folks that we
14   do business with, these are some of the
15   products that will be in our portfolio and
16   a reason why you would want to partner with
17   us on our existing product portfolio as we
18   grow together.
19       Q.  Okay. And not taking away
20   from that, sir, but if that's all true, why
21   include the dollars of the branded product
22   at all?
23       A.  Because the only thing that
24   the marketplace recognizes is brand dollars

Page 248

1    on products. They have no other way of
2    referencing, comparing one brand to
3    another, how big a product may or may not
4    be in the marketplace. IMS dollars are the
5    only thing that does that.
6        Whether they're accurate or
7    not really is immaterial. It's just, like
8    you said before, a benchmark of one versus
9    another.
10       Q.  Okay. Fair enough.
11       Fair to say that there would
12   appear to be, at least as of this point in
13   time, a very substantial market for the
14   branded product Suboxone at almost
15   $1.4 billion; correct?
16       A.  For the brand product, it's a
17   very large market. The generic market will
18   only be as big as the number of competitors
19   and when you launch.
20       So for the brand market, it
21   was a very big market, yes.
22       Q.  And certainly in the -- the
23   products that Actavis is identifying here,
24   where it was the first-to-file as confirmed

Page 249

1    in the last 12 months, the market for
2    Suboxone is substantially higher than the
3    market for any other product on that
4    particular table; true?
5          A.   The one two above, it's a
6    billion-dollar market.
7              But, you know, the reality is,
8    the size of the brand market does not
9    really indicate whether the generic is
10   going to be valuable, very valuable, or
11   limited value.
12             It depends on how many generic
13   players come to market as part of this
14   first-to-file.  If that's a shared
15   first-to-file with 10 players, that
16   $1.38 billion will go to $1.3 million in
17   the course of minutes.
18             So the value on the brand side
19   is only as valuable as the number of
20   competitors that you have at the time of
21   launch, and whether you are first in as a
22   shared or you're late to market will
23   determine what the value of that product
24   is, regardless of what the brand is.

Page 250

1          Q.   Well, the value -- what you
2    just described, the value of the product
3    when you get into the market, you said,
4    depends somewhat on the number of
5    competitors; true?
6          A.   That is correct.
7          Q.   That's a supply-side
8    phenomenon; right?  How many people are
9    supplying the market at a given point in
10   time; correct?
11             MR. ERCOLE:  Objection to form.
12             THE WITNESS:  It's based upon
13   how many people are able to gain
14   approval, when they gain removal, what
15   their strategy was for an approval, was
16   it a first-to-file.  There's a whole
17   lot of other things that go into that
18   besides just supply and demand.
19   BY MR. KIEFFER:
20         Q.   You got where I was going.
21             Whether the product is
22   profitable or not also has a lot to do with
23   factors on the demand side; right?
24         A.   When we make decisions to get

Page 251

1    into a product, we do not know the number
2    of players that are going to be on that
3    market when we do come to market as a
4    generic.  So the assumption is that you're
5    going to be first and early.
6              There's some cases that you
7    are and some cases that you're not.  But
8    you usually don't know this far in advance.
9          Q.   You don't know the number of
10   players that are going to be involved when
11   you come to market, but you do have some
12   idea of the demand side of the market,
13   true, for example, based on this IMS sales
14   data?
15         A.   You have demand units, you
16   definitely know, yes.
17         Q.   Demands units or demand sales,
18   as reflected here; right?
19         A.   Demand sales are --
20             MR. ERCOLE:  Objection to form.
21             THE WITNESS:  Demand sales are
22   irrelevant.
23   BY MR. KIEFFER:
24         Q.   Irrelevant?

Page 252

1          A.   Yes.
2          Q.   Okay.  So -- and then I'll
3    move on.
4              If they're irrelevant, why is
5    Actavis presenting that information to the
6    National Association of Chain Drug Stores?
7          A.   Well, we're not promoting it
8    to the National Association of Chain Drug
9    Stores.  We're speaking to some of their
10   members and letting them know these are the
11   products that we are bringing to market.
12             I think that they are savvy
13   enough to know, in their own minds, if
14   we're not the only ones that are speaking
15   to them, they may have spoken to three
16   other companies before us to say that
17   they're coming at the same time as we are
18   with the thin film.
19             So they're not looking at the
20   brand dollars.  That's just a reference
21   point.  What they're making decisions on
22   is:  How many players are going to be
23   there?  Who is going to have a good cost?
24   Who is going to have a good supply chain?

Page 253

1    But the brand dollars
2    themselves are irrelevant, unless you've
3    got the whole picture of number of players.
4        Q.   When Actavis makes decisions
5    about what products it may seek to be the
6    first-to-file on, I assume that a decision
7    like that has consequences within the
8    organization -- resource consequences;
9    personnel time, dollars spent, those sorts
10   of things?
11       MR. ERCOLE:  Objection to form;
12   compound, vague.
13       THE WITNESS:  We have a finite
14   amount of resources that we will spend
15   on our R&D pipeline.  So at the time
16   that you're making the decision, you
17   are cross-functionally making decisions
18   with legal and regulatory and R&D and
19   operations on all the different
20   functional areas as to whether we've
21   got the capability of developing it,
22   filing it, getting approval for it,
23   manufacturing it.
24       And, you know, obviously, it's

Page 254

1    a -- it's a horserace for us as to who
2    can try and get there first.
3    BY MR. KIEFFER:
4        Q.   Because you have finite --
5    because the company has finite resources,
6    it is not practical to be the first-to-file
7    on every opportunity that's out there to
8    develop and go to market with the generic
9    equivalent of a branded medicine; true as a
10   general rule?
11       A.   Say that again.
12       Q.   Yeah.  Because you've got
13   finite resources, it is not practical to
14   try to be the first-to-file in each and
15   every instance where your company might
16   have an opportunity to come to market first
17   with the generic equivalent of a branded
18   pharmaceutical; true?
19       MR. ERCOLE:  Objection to form.
20   BY MR. KIEFFER:
21       Q.   You got to pick your horses,
22   in other words, if it's a horserace.
23       A.   Yes, but there's a --
24       MR. ERCOLE:  Hold on.

Page 255

1    Objection to form; multiple
2    questions, no time frame.
3        You can answer the question if
4    you know --
5        THE WITNESS:  Regardless of all
6    of that, when you're making a decision
7    to develop a product, you don't develop
8    every single product with the intent of
9    being first-to-file.
10   BY MR. KIEFFER:
11       Q.   Right.
12       A.   Right?
13       So you're looking at your
14   capacity in your facilities.  You're
15   looking at the technology.  You're looking
16   at your R&D capabilities of whether you can
17   even develop a thin film.  Some companies
18   can; some companies can't.  All of those --
19   the regulatory pathway, the legal pathway.
20   All of those go into the decision-making
21   process.
22       And sometimes you actually
23   become first-to-file, and sometimes you're
24   not.  But you don't know normally make that

Page 256

1    decision all the way in advance, even
2    before you start to develop the product.
3        It's a calculated risk.  You
4    win some; you lose some.
5        Q.   When you were at Actavis and
6    decisions were being made about which
7    products the company would attempt to be
8    the first-to-file on, was consideration
9    given to the potential demand in the
10   marketplace for a generic version of that
11   particular product?
12       A.   Forecast models were created
13   based upon when we would get approval, how
14   many players would be in the market at that
15   particular time, where we thought the price
16   would be, what the market share is that we
17   would be attempting to get.  And that
18   combined made part of the decision of what
19   products we would look to commercialize.
20       Q.   Okay.  And one of the factors
21   that was considered was the demand or the
22   potential size of the market for a generic
23   version of a particular branded product,
24   wasn't it?

Page 257

1      MR. ERCOLE:  Objection to form.
2  BY MR. KIEFFER:
3      Q.  Or not.  If -- if -- if demand
4  and market size is a nonfactor, tell me
5  that and I'll move on.
6      MR. ERCOLE:  Objection to form;
7  asked and answered multiple times
8  already.
9      THE WITNESS:  Well, you're --
10  you're missing the point.  The point
11  is, there's products that are a
12  $20-million brand, that a generic
13  company can make more money on that as
14  an exclusive than on a $5-billion
15  product, where there's 10, 11 or 12
16  players.
17      So looking at the brand dollars
18  by itself, before the generics come to
19  market, is not the only indicator as to
20  what the value is to the organization.
21  BY MR. KIEFFER:
22      Q.  And my question isn't did you
23  only look at brand dollars by themselves as
24  the only indicator, my question is:

Page 258

1  Looking at brand dollars was certainly a
2  factor that folks in senior management like
3  you at Actavis would consider when
4  determining whether to try to be the
5  first-to-file on a new medication?
6      MR. ERCOLE:  Same objection.
7      THE WITNESS:  I think you're
8  missing the point that we looked at
9  everything in its totality and not that
10  by itself.
11      Again, there could be a
12  $20-million brand that a generic
13  company could be exclusive for the next
14  10 years and make more money on that
15  product than you would make on Lipitor,
16  which was a $5-billion or $7-billion
17  brand in the market.
18      So you've got to look at it
19  as -- in its totality.  We developed
20  both of them but the actual value of
21  that is based upon a lot of other
22  factors than just the brand dollars
23  that you're looking at.
24  BY MR. KIEFFER:

Page 259

1      Q.  I'm not looking -- we're not
2  communicating.
3      It's fine to say you've got to
4  look at it in its totality.  Did its
5  totality include brand dollars or ignore
6  brand dollars?
7      A.  No, you -- it would include
8  it.
9      Q.  It's an important metric to
10  consider, is it not?
11      MR. ERCOLE:  Objection.
12      THE WITNESS:  No.
13      MR. ERCOLE:  Objection to form;
14  it's been asked and answered multiple,
15  multiple times now.
16      THE WITNESS:  No.
17  BY MR. KIEFFER:
18      Q.  Not an important metric?
19      A.  It's only a piece of the
20  puzzle.  You cannot look at that piece of
21  the puzzle by itself.
22      Q.  Okay.  Be that as it may, on
23  this particular exhibit, Exhibit 19, the
24  first-to-file slide we were looking at,

Page 260

1  Slide 10, in fact, identifies brand
2  dollars, does it not, versus some other
3  metric?
4      MR. ERCOLE:  Objection to the
5  form; asked and answered, the document
6  speaks for itself.
7      THE WITNESS:  That's correct.
8  That's the only publicly available data
9  that -- that all products can be looked
10  upon as.  That is correct.
11      But to your point, as I look
12  at this, there's products on here that are
13  smaller in brand dollars than Suboxone that
14  will make more money as a generic than
15  Suboxone will in its life as a generic.
16      MR. KIEFFER:  Okay.
17          -  -  -
18      (Teva-Boyer No. 020 was marked for
19  identification.)
20          -  -  -
21  BY MR. KIEFFER:
22      Q.  Sir, we just handed you
23  Exhibit 20.  Exhibit 20 has a number in the
24  lower, right-hand corner,

Page 261

1   TEVA_MDL_A_12711059.  This was provided to
2   us from your electronic custodial files at
3   Teva.  The first page of this slide deck is
4   entitled "US Generics:  New Product Launch
5   Opportunities."  It says, "TEC updated
6   March 25, 2017."
7           Do you see that?
8       A.  Yes.
9       Q.  What's "TEC" stand for?
10      A.  Teva executive committee.
11      Q.  Is this a slide deck that you
12  would have had some input into?
13      A.  Yes.
14      Q.  Were you on the Teva executive
15  committee?
16      A.  No, I was not.
17      Q.  But you would have helped to
18  have prepared this for review by members of
19  the executive committee?
20      A.  Part of it, yes.
21      Q.  Take a look, if you would, at
22  Page 4 of the slide deck.  It's entitled
23  "Product Launch Summaries."
24          Do you see that?

Page 262

1           The first item listed there is
2   buprenorphine/naloxone thin film that we've
3   been discussing; correct?
4       A.  Yes.
5       Q.  And, again, brand sales,
6   according to IMS, are identified there, in
7   this instance, they are 1 million -- I'm
8   sorry -- $1,568,000,000; correct?
9       A.  Yes.
10      Q.  And then there is a column to
11  the right of that that says "Forecast Range
12  (Base-Upside)"; right?
13      A.  Yes.
14      Q.  And I'm assuming that is a
15  forecast of the potential upside to Teva of
16  that particular product launch?
17      A.  That would be the generic
18  range of that particular product.
19      Q.  The generic range?
20      A.  You could make zero or you
21  could make 240 million.
22      Q.  Right.  Got it.  But the
23  generic range of potential sales to Teva of
24  that product?

Page 263

1       A.  That would be correct.
2       Q.  Okay.  And for that particular
3   range, what is the corresponding time
4   period?  Is it annual sales?
5       A.  Don't know the answer, based
6   upon this.
7       Q.  What would be your belief,
8   having looked at a lot of Teva internal
9   documents and Actavis ones before that?
10          MR. ERCOLE:  Hold on.
11      Objection to form.  You're asking him
12      to speculate.
13  BY MR. KIEFFER:
14      Q.  Well, I -- and let me back up
15  and say I'm really not asking you to
16  speculate.  I mean, if you tell me, "I have
17  absolutely no idea whatsoever, I'd have to
18  guess," tell me that.  If your best
19  assumption is it's annual versus sales over
20  the entire life of the product, that's all
21  I'm trying to get a sense of.
22          MR. ERCOLE:  Same objection.
23          THE WITNESS:  I don't know the
24      answer, because this was probably done

Page 264

1       by portfolio.  If I was guessing, it
2       would probably be the first year sales.
3   BY MR. KIEFFER:
4       Q.  Okay.  First year after
5   launch?
6       A.  The first year after launch,
7   assuming whatever they decided as far as
8   competition goes and price and everything
9   else.
10      Q.  Okay.
11      A.  If it materialized.
12      Q.  And the zero to the left of
13  the $240 million, is there -- in your time
14  at Teva, was there a first-to-file product
15  launch where Teva actually earned zero from
16  the product?  Or is that just
17  communicating, "We don't know -- here's
18  what we think the potential upside is, but
19  we're not sure where we are going to land
20  in that range the first year"?
21      A.  Well --
22          MR. ERCOLE:  Objection to form;
23      compound.
24          THE WITNESS:  There's a couple

Page 265

1 of things.
2 If we can't get regulatory
3 approval, it goes to zero. If we can't
4 get legal clearance, it goes to zero.
5 If we can't get manufacturing to make
6 the product consistently, it goes to
7 zero.
8 So if you're asking are there
9 products that are on this list that are
10 actually attaining zero, the answer is
11 100 percent yes. Because there's so
12 many other factors besides just our
13 forecast model that tries to determine
14 what the base case is and the upside
15 case is.
16 BY MR. KIEFFER:
17 Q. Okay. There may be products
18 on a list that are obtaining zero dollars
19 in sales at a particular point in time;
20 correct?
21 A. They may never see the market.
22 I don't even know if -- I don't think this
23 was ever launched. I'm not positive,
24 but --

Page 266

1 Q. Do you know?
2 A. I don't.
3 MR. KIEFFER: Why don't we take
4 a break. We've been going about an
5 hour and 15 minutes.
6 (Incidental comments held off the
7 stenographic record.)
8 THE VIDEOGRAPHER: The time is
9 approximately 2:28 p.m. We're going
10 off the record.
11 (Recess taken from 2:28 p.m. to
12 2:41 p.m.)
13 THE VIDEOGRAPHER: We are back
14 on the record. The time is
15 approximately 2:41 p.m.
16 MR. KIEFFER: I'm going to pass
17 the witness, for the time being, to
18 Mr. Crawford.
19 EXAMINATION
20 BY MR. CRAWFORD:
21 Q. Good afternoon, Mr. Boyer.
22 A. Good afternoon.
23 Q. I'm Mark Crawford. I
24 represent the plaintiffs in this opioid

Page 267

1 case, and I want to follow up with some
2 questions that Mr. Kieffer asked. First of
3 all, just a few preliminaries.
4 What is your current
5 residence? Where do you live?
6 A.
7 .
8 Q. And where is your business
9 address?
10 A. 400 Crossing Boulevard. That
11 is in Bridgewater, New Jersey.
12 Q. And your current employer is
13 Amneal Pharmaceuticals; is that correct?
14 A. That is correct.
15 Q. All right. And can you just
16 remind the jury what your current position
17 is there?
18 A. I am in charge of sales,
19 marketing, pricing, contracts, customer
20 service and distribution.
21 Q. And do you have an official
22 title at Amneal?
23 A. Executive vice president,
24 commercial operations.

Page 268

1 Q. And please remind the jury,
2 what was your position when you -- your
3 last position at Actavis, before Teva
4 purchased the business?
5 A. Senior vice president of sales
6 and marketing.
7 - - -
8 (Teva-Boyer No. 021 was marked for
9 identification.)
10 - - -
11 BY MR. CRAWFORD:
12 Q. Okay. I want to mark the next
13 exhibit, which is 21. Give you the
14 original here.
15 A. Thank you, sir.
16 Q. These are some corporate
17 organizational charts. The document number
18 is Allergan_MDL_02186860. And if you look
19 at the first page there, that's -- this
20 will be -- pull it up on the screen,
21 here -- this will be Document No. 1198.
22 MR. ERCOLE: Before you ask
23 your next question, can we go off the
24 record for one second?

Page 269

1         MR. CRAWFORD:  Sure.
2         THE VIDEOGRAPHER:  The time is
3   approximately 2:43 p.m. and we're going
4   off the video record.
5     (Discussion off the record.)
6         THE VIDEOGRAPHER:  We are back
7   on the record.  The time is
8   approximately 2:45 p.m.
9   BY MR. CRAWFORD:
10        Q.   All right.  I've handed you a
11  corporate org chart, and this is an Actavis
12  chart when you were at Actavis; correct?
13        A.   No.
14        Q.   Is this Teva?
15        A.   This was Teva.
16        Q.   Okay.  And you're at the top
17  there, and your position at Teva was
18  president and CEO of North American
19  generics; correct?
20        A.   Correct.
21        Q.   You had below you -- what I
22  want to do is get an idea of -- you had
23  certain marketing people working below you;
24  correct?

Page 270

1         MR. ERCOLE:  Objection to form.
2         THE WITNESS:  I had a whole
3   host of people, but, yes, with
4   different titles.
5   BY MR. CRAWFORD:
6         Q.   Yeah.  So I'm trying to give
7   the jury an idea of what the functions are
8   of some of these marketing people who
9   reported to you.
10        A.   Okay.
11        Q.   And by the way, who do you
12  report to within this corporate structure?
13  Who was above you?
14        A.   When was this?
15        Q.   Well, whenever the structure
16  existed, probably the year you were there.
17  So 2016.
18        A.   I had two different global
19  CEOs.
20        Q.   Okay.  And what were -- who
21  were they and what were the time periods?
22        A.   Siggi Olafsson was the global
23  CEO from August of '16 when I started at
24  Teva until approximately November or

Page 271

1   December of '17.
2         Q.   Okay.  And then who succeeded
3   Mr. Olafsson?
4         A.   Dipankar Bhattacharjee.
5         Q.   Who?
6         A.   Dipankar Bhattacharjee.
7         Q.   Okay.
8              Do you need the spelling of
9   that?
10             MR. KIEFFER:  We've already
11  referenced his name.
12  BY MR. CRAWFORD:
13        Q.   All right.  So and did they
14  report -- do you know who they reported to?
15        A.   They would have reported to
16  the CEO.
17        Q.   And who was that?
18        A.   The global CEO.
19             Initially, it was Erez
20  Vigodman.  And after Erez, it was a
21  temporary -- Yitzhak -- I forget his last
22  name.
23        Q.   But they were based in Israel;
24  correct?

Page 272

1         A.   Yes.
2         Q.   And you said you were involved
3   in the transition.  So Teva purchased
4   Actavis, the generic business, in 2016;
5   right?
6         A.   That is correct.
7         Q.   And you were at Actavis and
8   came over to Teva, right, in your position
9   here?
10        A.   Correct.
11        Q.   And you were involved in
12  trying to merge or transition the
13  business -- Actavis business into Teva;
14  correct?
15             MR. ERCOLE:  Objection to form.
16             THE WITNESS:  My responsibility
17    was to work with the team to integrate
18    the two businesses together.
19  BY MR. CRAWFORD:
20        Q.   And the team -- was there
21  anyone on the team from the Teva Israeli
22  entity?
23             MR. ERCOLE:  Objection to form.
24  What are you referring to as the "Teva

Page 273

1    Israeli entity"?
2         MR. CRAWFORD:  Teva Limited.
3         MR. ERCOLE:  Okay.
4    BY MR. CRAWFORD:
5         Q.  Was anyone from Israel that
6    was on your team?
7         MR. ERCOLE:  Objection to form.
8         Is the question:  Was there
9    anyone from Teva Limited there or
10   anyone from Israel there?
11        MR. CRAWFORD:  I'm rephrasing
12   it.  Anyone -- because he seemed to
13   indicate he didn't know the difference
14   between the Tevas.
15   BY MR. CRAWFORD:
16        Q.  So I'm just wondering if
17   anyone from Israel was on the transition
18   team.
19        MR. ERCOLE:  Objection to form.
20   Move to strike, mischaracterizes his
21   testimony.
22        I think it was clear earlier
23   that the agreement was the reference to
24   Teva was to Teva USA, so all those

Page 274

1    questions pertained to Teva USA.
2         If you want to now ask about
3    Teva Limited, just make sure that
4    that's clear.
5         MR. CRAWFORD:  Okay.
6    BY MR. CRAWFORD:
7         Q.  All I'm asking is if someone
8    on your transition team was in Israel.
9         A.  So I'm not sure what you mean
10   by "transition team."  If I look at this
11   first page, there isn't anybody on this
12   page, that I can see, that was out of
13   Israel.
14        Q.  Okay.  I'm actually deviating
15   from the chart.
16        A.  Okay.
17        Q.  Going to -- you were on a
18   transition team.  You referenced a
19   transition team; right?
20        A.  No, it wasn't a team.  I was
21   integrating two businesses.  It's not a
22   team.  It's -- the team is putting together
23   a new organizational structure, and we're
24   integrating two businesses together.

Page 275

1         Q.  Okay.  So it was a group of
2    you within Teva, now, trying to integrate
3    the two organizations; right?
4         A.  So I was named as president
5    and CEO.  And I named my next level of
6    management.  And their job was to name the
7    next level of management, and that's part
8    of the integration process.
9         Q.  Okay.  So was there any -- as
10   part of the integration process, did you
11   interface with anyone from Israel?
12        A.  There's manufacturing in
13   Israel.  There's other entities in Israel,
14   including finance, that there was a US base
15   as well as some piece of that in Israel.
16   So I'm sure I interfaced with people in
17   Israel.
18        Q.  Do you remember any of their
19   names?
20        A.  I don't know off the top of my
21   head, no.
22        Q.  But you did interface --
23        A.  I mean, I spoke to Erez
24   Vigodman, who was the CEO, not necessarily

Page 276

1    about the everyday business, but I knew who
2    he was.  I spoke to him.
3         Q.  And he's in Israel; correct?
4         A.  He was in Israel.
5         Q.  So I'm just trying to get an
6    idea.  Was there an integration plan, a
7    written integration plan to integrate the
8    two businesses?
9         A.  There were huge integration
10   plans across the entire company.
11        Q.  Do you know who prepared the
12   integration plans?
13        A.  The people that were on my
14   team would prepare it for each of their
15   individual areas.
16        Q.  Okay.  Were any of the plans
17   prepared in Israel?
18        MR. ERCOLE:  Objection to form.
19        MR. CRAWFORD:  If you know.
20        MR. ERCOLE:  Calls for
21   speculation.
22        THE WITNESS:  The commercial
23   plans were done in the US, because they
24   were for the commercial business for

1    the US. If there were other plans or
2    other parts of the organization, I
3    can't speak to them.
4    BY MR. CRAWFORD:
5        Q.  Okay.  You're aware that Teva
6    Limited, the Israeli company, purchased the
7    Actavis entities from Allergan; correct?
8            MR. ERCOLE:  Objection to form.
9            THE WITNESS:  I don't know
10   legal entities.  That's not my area of
11   expertise.
12   BY MR. CRAWFORD:
13       Q.  All right.  Getting back to
14   the org chart, you have Maureen Cavanaugh
15   below you, SVP, COO, North American
16   generics.
17           What was Ms. Cavanaugh's
18   function with this organization here?
19       A.  She moved over -- she took
20   over our financial administration, our OTC
21   business, our new product launch planning,
22   and also our other pieces of the financial
23   business.  So there were two people working
24   on the financial side in financial

1    administration.
2        Q.  And she reported directly to
3    you; correct?
4        A.  That's correct.
5        Q.  Did she come over from Actavis
6    or was she at Teva originally?
7        A.  She was at Teva.
8        Q.  And reporting to her is Tim
9    McFadden. He's a VP of market strategy,
10   according to this chart.  What was his
11   function?
12       A.  He was working on, you know,
13   US strategies, and I don't know the exact
14   scope of it.  He ended up having the OTC
15   business as well.  The nonprescription
16   business reported up through him.
17       Q.  All right.  But Ms. Cavanaugh
18   was senior vice president/COO for generics
19   in North America; correct?
20       A.  That was her title, yes.
21       Q.  But she didn't just work OTC;
22   she worked on generics too; right?
23       A.  So she was originally in
24   charge of sales and marketing at Teva,

1    prior to me joining the company.  She moved
2    over and took a role in new product
3    launches and OTCs and customer
4    administration and financial administration
5    of the business.
6        Q.  Did she have anything to do
7    with generic pharmaceutical drugs?
8        A.  Well, she was part of the
9    team.  So all the new product launches that
10   were generics were generic pharmaceutical
11   drugs, for the most part.  There were some
12   OTCs in that as well, but she was in charge
13   of all new product launches, including all
14   of our generic Rx.
15       Q.  So she did work on generic
16   pharmaceutical products; right?
17       A.  What do you mean by "working
18   on generic pharmaceutical products"?  She
19   was part of the generic organization.
20       Q.  Right.
21       A.  So she had new product
22   launches that were Rx and a few that were
23   OTC as well.  She was responsible for
24   forecasting that and working on portfolio

1    selection with parts of the organization.
2    That was her new area of responsibility,
3    when the transaction was completed.
4        Q.  So Mr. McFadden, did he work
5    on generic projects too, or was it just
6    OTC?
7        A.  He worked on overall corporate
8    strategies -- you know, branding of the
9    name Teva.  He worked on OTC strategies.
10   You know, what would Teva look like in the
11   future.  Very, you know,
12   hundred-thousand-square-foot strategies of
13   the future of Teva.
14       Q.  And did that involve generic
15   pharmaceutical products?
16       A.  He did very -- if anything, on
17   pharmaceutical products, no.
18       Q.  So he was just OTC, primarily?
19       A.  He had the OTCs reporting in,
20   and he was working on more strategy than
21   products.
22       Q.  So "OTC," that means "over-the-
23   counter"; right?
24       A.  Yes.

Page 281

1    Q.  And what OTC drugs
2  specifically was he handling?
3    A.  We had Plan B One-Step.  We
4  had all of our private-label nicotine gum.
5  We had some private-label creams and
6  ointments.  We had some cough syrups,
7  ibuprofen.
8    Q.  Okay.  And then we have -- is
9  it Isi --
10    A.  Isi.
11    Q.  Isi Agbato?
12    A.  Isi Agbato.
13    Q.  And is it male or female, Isi?
14    A.  It's a she, female.
15    Q.  And she's senior director, new
16  product introduction planning.
17      Did that involve generic
18  products?
19    A.  That is correct.
20    Q.  And so what was her specific
21  function?
22    A.  She worked with portfolio
23  management, with regulatory, with legal,
24  with operations, to prepare us to have

Page 282

1  products available at the time of launch.
2    Q.  All right.  And moving over to
3  Christine Baeder, she's senior vice
4  president, customer and marketing
5  operations, US generics.
6      What was her role with regard
7  to your pharmaceutical generic products?
8    A.  She took over marketing,
9  pricing and -- marketing and pricing is
10  what she took over for all of Rx.  Customer
11  service as well.
12    Q.  What were her marketing
13  functions?
14    A.  Marketing was all of our
15  forecasting for both financial forecasting
16  as well as manufacturing operations
17  forecasting.
18    Q.  Was she involved at all in
19  marketing strategy for generics?
20    MR. ERCOLE:  Objection to form.
21    THE WITNESS:  What's your
22  definition of "marketing strategy"?
23  BY MR. CRAWFORD:
24    Q.  Well, coming up with ways to

Page 283

1  grow the generic market for Teva and to
2  increase product sales.
3    A.  There really wasn't that kind
4  of a marketing budget or marketing strategy
5  associated with the company.
6    Q.  So below her is Napoleon
7  Clark.  He's VP of marketing; right?
8    A.  Yes.
9    Q.  So what was his marketing
10  function?
11    A.  That really was all of our
12  forecasting; new product launch
13  forecasting, that was inline product
14  portfolio forecasting, that was working
15  with operations to make sure that we
16  weren't going to go on back order, have the
17  right amount of product in the right NDCs,
18  so that we could support our -- have our
19  good service levels.  That all reported up
20  through him.
21    Q.  What's your definition of
22  "marketing"?
23    MR. ERCOLE:  Objection to form;
24  vague.

Page 284

1    THE WITNESS:  On the brand
2  side, I can't speak to.  On the generic
3  side, to me, marketing is really the
4  forecasting of our product portfolio
5  and -- and making decisions on, you
6  know, what customers could to go to
7  when we launch a product.
8  BY MR. CRAWFORD:
9    Q.  And what do you mean by
10  "forecasting product portfolio"?
11    A.  Well, when you have 3-, 4-,
12  500 different products -- you know, when
13  you asked me the traditional marketing of a
14  brand, a brand marketing strategy is for
15  one product.  We have 3-, 4-, 500 products.
16      The most important thing about
17  the generic industry is to have a
18  consistent supply chain so that we can
19  support our customers.
20      So that's what his team did a
21  tremendous amount of, which was doing all
22  of the forecasting that operations utilized
23  to do their production forecasts.
24    Q.  And then below Mr. Clark is a

Page 285

1  Kevin Galownia?
2      A.  Kevin Galownia.
3      Q.  Senior director of pricing.
4          What was his function?
5      A.  He was responsible for pricing
6  of our product portfolio.
7      Q.  And pricing was part of your
8  way to stay competitive in the generic
9  market; correct?
10         MR. ERCOLE:  Objection to form.
11         THE WITNESS:  Well, I think
12     you've got two important aspects, one
13     in pricing and one is capability of
14     supply -- are probably the two most
15     important things in a generic business.
16  BY MR. CRAWFORD:
17     Q.  What about product line,
18  having an expansive generic product line?
19     A.  Well, if you're exclusive, it
20  doesn't matter whether you've got one
21  product or 600 products.  If you've got the
22  only product on the market, you're going to
23  be able to sell it.
24         So the breadth of your

Page 286

1  portfolio can sometimes help.  If you look
2  at it today, the breadth of the
3  portfolio -- most companies are shrinking
4  their portfolio.  So it just all depends on
5  what point in time you're talking about and
6  what the expectations are for the company.
7      Q.  But when you go to
8  customers -- your customers are what?
9  Wholesalers?  Retail pharmacies?
10     A.  Not retail.  Chain drugstores.
11     Q.  Chain drugstores.
12     A.  Today, it's three big
13  procurement organizations, as I spoke to
14  earlier today -- are the majority of the
15  business.  And what you're going there is
16  with a price and a capability of supply.
17     Q.  What about a product
18  portfolio?  If you've got more product,
19  does that make you more attractive to a
20  smaller generic company that has fewer
21  products?
22         MR. ERCOLE:  Object to form.
23         THE WITNESS:  Today, no, I
24     don't think it does.

Page 287

1  BY MR. CRAWFORD:
2      Q.  What was the advantage Teva
3  saw in buying Actavis?
4      A.  What they saw before the
5  transaction and after the transaction may
6  be very different, as you can see what
7  direction the company went.
8      Q.  I mean before the transaction.
9  What was the purpose of buying Actavis?
10     A.  They believed that --
11         MR. ERCOLE:  Objection --
12         THE WITNESS:  Go ahead.
13         MR. ERCOLE:  Objection to form,
14     and I don't even believe he was at Teva
15     prior to the transaction, but . . .
16         THE WITNESS:  I wasn't part of
17     the strategy of why they bought Actavis
18     and the price that they paid for it.
19         I think part of it was you saw
20     a consolidation on the procurement
21     side.  And way before they purchased
22     Actavis, they had said that -- I forget
23     who it was that said it within the
24     organization -- that they thought that

Page 288

1  the industry would be three big
2  manufacturers, three big wholesalers
3  and distributors and three big chains
4  someday in the future.  And I think
5  that their original intent was to
6  possibly grow in order to have the same
7  leverage that our customers had on them
8  at the time.
9  BY MR. CRAWFORD:
10     Q.  So they -- they bought them to
11  gain leverage on their customers, then;
12  right?
13         MR. ERCOLE:  Objection to form;
14     calls for speculation.  Again, he
15     wasn't at Teva at the time.
16  BY MR. CRAWFORD:
17     Q.  Okay.  But in your view,
18  that's -- I mean, you're a senior person in
19  the Teva organization right after the
20  merger; right?
21     A.  Yeah, but the decision to buy
22  Actavis happened before I got there.  The
23  reality is, is they were trying to match
24  leverage with leverage.

Page 289

1      Q.  What do you mean by
2  "leverage"?
3      A.  This was consolidating into
4  bigger groups.  They were under the
5  impression -- somebody in their strategy
6  organization was under the impression that
7  they could do the same.
8      Q.  So "leverage" meaning, if they
9  became bigger and acquired Actavis, they
10 could raise the prices of their drugs,
11 potentially?
12     MR. ERCOLE:  Objection to form.
13     THE WITNESS:  Not true.
14 BY MR. CRAWFORD:
15     Q.  So that wasn't any part, as
16 far as your thinking, why the acquisition
17 occurred, was so they could control price
18 better?
19     A.  No, you can't --
20     MR. ERCOLE:  Objection to form,
21 again; calls for speculation, lack of
22 foundation, about what Teva was
23 thinking prior to an acquisition where
24 he wasn't even there.

Page 290

1      THE WITNESS:  Independent of
2  Teva, you can't control price just
3  because you're bigger.  If there's
4  four -- it's done on a
5  product-by-product basis.
6      If there's four competitors on
7  the product, you've got four
8  competitors that are going to put a
9  price out to the marketplace that
10 you're going to have to compete
11 against.  If there's two players on the
12 market on that particular product, then
13 it's going to be a two-player market,
14 and you're going to compete on price in
15 those two players.  If there's 15
16 players on the market, then you're
17 going to compete on price based upon 15
18 players.
19     So it really -- the -- raising
20 the prices I don't think was the
21 expectation in any way, stretch or
22 form.
23 BY MR. CRAWFORD:
24     Q.  What about offering a bigger

Page 291

1  product portfolio to the customers?  Would
2  that be a factor of why they might want to
3  acquire Actavis?
4      MR. ERCOLE:  Same objection;
5  calls for speculation and asked and
6  answered.
7      THE WITNESS:  If you're trying
8  to build a relationship with a company,
9  that's probably the only thing of being
10 a larger supplier would do, but they're
11 still going to make a decision on
12 price.
13     And it doesn't matter how many
14 products you have in your portfolio;
15 price will dictate whether they use one
16 manufacturer or another as well as your
17 capability of supply.
18 BY MR. CRAWFORD:
19     Q.  So you testified that there
20 was downward price pressure after you got
21 to Teva; right?
22     A.  Yes.
23     Q.  Okay.  And if there's downward
24 price pressure, unless you sell more of a

Page 292

1  drug, you're not going to make as much
2  profit off the drugs; right?
3      MR. ERCOLE:  Objection to form.
4      THE WITNESS:  My personal
5  opinion or Teva's opinion?
6  BY MR. CRAWFORD:
7      Q.  Your personal opinion.
8      A.  My personal opinion is you
9  will never make up the value by selling
10 more product at a lower price.
11     Q.  But certainly the goal of the
12 company is to sell more product; right?
13     A.  Goal of the company should be
14 to maximize -- my opinion, should be to
15 maximize the value of your assets.  I'm
16 willing to take less units and less market
17 share at a higher price.
18     Q.  Okay.  So did the company ever
19 have any kind of strategy of trying to
20 increase sales of its generic products?
21     MR. ERCOLE:  Objection to form;
22 lack of any temporal scope, vague.
23 BY MR. CRAWFORD:
24     Q.  At Teva?

Page 293

1      A.  The objective of any sales
2   organization or any sales and marketing
3   organization is to maximize the value of
4   their assets.  So whether it is more volume
5   at a higher price, less volume -- or higher
6   volume at a lower price, every product
7   you're trying to maximize the value of the
8   assets.
9           So I don't know that that was
10  what the focus of the business was.
11      Q.  Well, wouldn't one goal be
12  to maximize profits too, not just the value
13  of the assets; right?
14          MR. ERCOLE:  Objection to form.
15          THE WITNESS:  Well, when I say
16      "assets," I'm talking about profits.
17      I'm willing to take less volume at a
18      higher price if overall it makes better
19      business sense.
20  BY MR. CRAWFORD:
21      Q.  Right.  So does volume play
22  any role at all in any kind of strategy to
23  try to grow your profits?
24          MR. ERCOLE:  Objection to form;

Page 294

1   hypothetical.
2           THE WITNESS:  On a
3       product-by-product basis, it's -- every
4       product you're making a different
5       decision on.  So if you're asking me,
6       overall, if I -- if I had more volume,
7       would I be more profitable?  The answer
8       is not necessarily.  In fact, it might
9       be less profitable.
10  BY MR. CRAWFORD:
11      Q.  Did Teva ever use -- or
12  Actavis, rather, when you were at
13  Actavis -- did they ever use their
14  customers -- their wholesaler customers,
15  like McKesson, to help them market their
16  products?
17          MR. ERCOLE:  Objection to form.
18          THE WITNESS:  What do you mean
19      by "market"?
20  BY MR. CRAWFORD:
21      Q.  Well, for instance, would
22  Actavis ever enter into any kind of
23  agreements or arrangement with McKesson
24  where they would kind of actively promote

Page 295

1   Actavis products, for a fee or for some
2   type of cost?
3           MR. ERCOLE:  Same objection.
4           THE WITNESS:  The wholesalers
5       in general are responsible for what I
6       would call source programs, where they
7       signed up a lot of independent
8       pharmacies, and they were the exclusive
9       supplier to those independent
10      pharmacies.
11          So, you know, what they were
12      doing from a marketing standpoint, I
13      can't tell you on a day-in and day-out
14      basis.
15          Had we done in the past, you
16      know, "product now available" for their
17      program, they may have pushed something
18      out that way.  But I'm not sure that
19      they were, in my mind, considered a
20      marketing arm of the generic company,
21      no.
22  BY MR. CRAWFORD:
23      Q.  So you never heard of them
24  using their online portals to push Actavis

Page 296

1   products or doing fax blasts to their
2   pharmacy customers about Actavis products
3   or -- or trying to do a telephone campaign
4   for their products?  Have you heard of any
5   of that?
6           MR. ERCOLE:  Objection to form;
7       vague, compound, no temporal scope.
8           You can answer if you know.
9           THE WITNESS:  They may have
10      done those, but I'm not -- I don't
11      think they were on behalf of Actavis.
12      They were on behalf of themselves to
13      get the product out to the market so
14      that they could create their own value.
15  BY MR. CRAWFORD:
16      Q.  So McKesson or wholesalers
17  never entered into any kind of contractual
18  arrangement with Actavis to feature or push
19  their products through these means?
20      A.  You'd have to go back --
21          MR. ERCOLE:  Objection to form.
22          THE WITNESS:  You'd have to go
23      back and ask my team.  I'm not aware of
24      us sitting there pushing products

1   specifically for Actavis.  Their portal
2   was used not for Actavis.  It was used
3   to push their overall program, their
4   source program.
5          So how they utilized that -- I
6   wasn't on any of those so-called email
7   blasts that you mentioned, so I don't
8   know the exact -- you know, the exact
9   utilization of those.
10  BY MR. CRAWFORD:
11      Q.  Well, I wasn't asking if you
12  were on an email blast.  I was asking if
13  your company -- your department ever
14  entered into any contractual arrangements
15  to have them featuring the Actavis products
16  in an email blast to their customers, not
17  you.
18      A.  You'd have to ask my team.
19      Q.  Who on your team would be
20  involved in that at Actavis?
21      A.  I would say either the
22  salesperson or the marketing people.
23  Probably the salespeople would know more so
24  than --

1       Q.  Who were your marketing people
2   reporting to you at Actavis?
3       A.  It would be Napolean Clark's
4   team.  But my gut tells me it would have
5   been the -- the salespeople would have
6   known that --
7       Q.  Okay.
8       A.  -- and/or the inside marketing
9   managers that reported to Napoleon Clark.
10      Q.  Who were the salespeople?
11  Were they -- at Actavis?  Were they divided
12  by region, or were they national and
13  divided by specialty, or how was that
14  organized?
15      A.  They were national account
16  directors, and they were mostly separated
17  out kind of by region, wherever possible,
18  but more so by customer.
19      Q.  Okay.  So -- and what would
20  the sales representatives -- what was their
21  function in the sales and marketing
22  department?
23      A.  Negotiate product pricing and
24  new opportunities.

1       Q.  Okay.  And what do you mean by
2   "new opportunities"?
3       A.  So as we were launching new
4   products, they would bring it to Cardinal
5   or AmerisourceBergen or McKesson, or if at
6   the time it was the procurement WBAD or
7   ClarusONE or Red Oak, they would be the
8   ones that would bring those opportunities
9   to those procurement organizations and
10  offer up, "This is the price we're willing
11  to offer you for whatever utilization you
12  may or may not have, if we're capable of
13  supplying it."
14      Q.  So pricing was your main
15  marketing strategy to get customers then;
16  right?
17      A.  I would say pricing used to be
18  the most important aspect of getting new
19  business.
20      Q.  And used to be.  What is it
21  now?
22      A.  I would say --
23      MR. ERCOLE:  Objection to form;
24  relevance.

1       THE WITNESS:  I would say
2   supply chain.  There's been so many
3   shortages in the marketplace that a
4   combination of price and capability of
5   supply, which was always important --
6   quality and supply chain capabilities
7   were always important.  It's become
8   even more important today.
9   BY MR. CRAWFORD:
10      Q.  And what would disrupt supply
11  chains in the generic market?
12      A.  Oh, FDA inspections, API
13  problems, intermediary problems coming from
14  other countries, manufacturing -- you know,
15  issues with your own equipment.  There's a
16  whole host of things that could change.
17      Q.  What do you mean by "API"?
18      A.  The active pharmaceutical
19  ingredient, the raw materials, are usually
20  manufactured outside of the -- outside of
21  the manufacturer.  There are some that are
22  vertically integrated, but a lot of them
23  are not, and they rely upon other companies
24  to supply the raw materials in order to

Page 301

1    manufacture the products.
2         MR. CRAWFORD: Mark the next
3    exhibit here, 1621.
4    BY MR. CRAWFORD:
5         Q.   So actually -- I'll take that
6    back.  Pull out Exhibit 6.
7         Let's go to -- I know this has
8    already been covered to some degree, but
9    let's go to the fourth page.  I had a
10   couple of questions on this.
11        And shows your Q4 forecast
12   contribution of 18.4 percent QoQ.  I just
13   want to look at that last column, "2014F."
14        A.   Which one are you on?  I'm
15   sorry.  Excuse me.  Which one?  This one
16   here?
17        Q.   Are you sure that's the right
18   one?
19        A.   Is this the one?
20        Q.   Yeah, I don't think so.
21        A.   Okay.  18.4 percent QoverQ.  I
22   got it.
23        Q.   Okay.  Okay.  You got it.
24        A.   Yep.

Page 302

1         Q.   I just have a truncated
2    version of it.
3         A.   Yeah.
4         Q.   Okay.  So the last column
5    basically is the -- are the dollar numbers
6    for the whole year for 2014; correct?
7         A.   Yes.
8         Q.   Okay.  Net revenue is close to
9    $4 billion from -- is that from your
10   generic US sales; correct?
11        A.   That is correct.
12        Q.   And then your gross profit
13   less selling is 2,388.  That is
14   $2.388 billion; correct?
15        A.   That's correct.
16        Q.   So what it's subtracting out
17   is selling and marketing, and that number
18   is $67.5 million; correct?
19        MR. ERCOLE:  Objection to form.
20        THE WITNESS:  That is correct.
21   BY MR. CRAWFORD:
22        Q.   Okay.  So that's the cost of
23   selling and marketing your US generic
24   drugs; right?

Page 303

1         A.   You haven't asked me what the
2    definition of "selling and marketing" is.
3         Q.   But I'm --
4         A.   The definition of "selling and
5    marketing" in there --
6         Q.   Right.
7         A.   -- is all of our distribution,
8    all of our freight, all of our insurance,
9    all of our pharma fees.
10        The actual selling and
11   marketing that you're looking for, for the
12   cost of our sales rep, travel and
13   entertainment, what you would consider to
14   be brand marketing, is a fraction of that
15   67 and a half million dollars.
16        MR. CRAWFORD:  Move to strike
17   as nonresponsive.
18        MR. ERCOLE:  I'm going to
19   object.  You asked the question,
20   so . . .
21   BY MR. CRAWFORD:
22        Q.   I'm just asking that -- there
23   is a line item that says "Selling &
24   marketing."  They're deducting out 67 and a

Page 304

1    half million dollars; correct?
2         MR. ERCOLE:  Objection to form.
3         THE WITNESS:  That's not --
4    that's not strictly selling and
5    marketing.
6    BY MR. CRAWFORD:
7         Q.   Okay.  So you disagree with
8    that line?
9         A.   I disagree with the title of
10   the line and the context that you're using
11   it in.
12        Q.   Moving down, it says, "Gross
13   margin - products."  So that means the
14   gross margin, 61.2 percent, is
15   essentially -- tell me what that figure is.
16        A.   That would be your revenues
17   minus your cost of sales --
18        Q.   So basically, you're
19   getting --
20        A.   -- as a percentage.
21        Q.   -- 61 percent return off your
22   cost of sales; is that what that means?
23        A.   Without any of the other
24   reductions to gross profit, yes.

Page 305

1      Q.  Okay.  That's all I have on
2  that.
3          Does -- when you were at Teva,
4  does Teva put its profits ahead of customer
5  safety, of patient safety?
6          MR. ERCOLE:  Objection to form;
7      argumentative.
8          THE WITNESS:  Are you asking me
9      my opinion?
10  BY MR. CRAWFORD:
11      Q.  Sure.
12      A.  Absolutely not.
13      Q.  So Teva sold and sells
14  high-risk opioid products; correct?
15          MR. ERCOLE:  Objection to form.
16          THE WITNESS:  Teva sells 600
17      different generic -- or at this point,
18      maybe 700 different generic products
19      into the marketplace, including
20      opioids.
21  BY MR. CRAWFORD:
22      Q.  All right.  But after the
23  Actavis purchase, it had over 10 percent of
24  the opioid market; correct?

Page 306

1      A.  I don't know the answer to
2  that.
3      Q.  But you saw a document that
4  indicated that; correct?
5          MR. ERCOLE:  Objection to form.
6      If you want to show him the document,
7      go ahead and show it to him.
8          THE WITNESS:  You know,
9      exactly.  I don't know what the number
10      is.
11  BY MR. CRAWFORD:
12      Q.  Are you aware of what the
13  percentage of the opioid market is generic
14  product?
15          MR. ERCOLE:  Objection to form;
16      no temporal scope.
17          THE WITNESS:  Sorry.  I said
18      greater than 85 percent.  I think
19      somebody threw out a number of
20      96 percent, but I don't have anything
21      to show that.
22  BY MR. CRAWFORD:
23      Q.  All right.  And opioids are a
24  Class II, Schedule II product with the DEA;

Page 307

1  correct?
2      A.  I believe, at this point in
3  time, opioids are a CII, yes.
4      Q.  Okay.  And what I want to ask
5  is who, in your view, is primarily
6  responsible for informing doctors of the
7  proper use and risks associated with opioid
8  products?
9          MR. ERCOLE:  Objection to form.
10          THE WITNESS:  My opinion was
11      the branded manufacturers that detailed
12      products were the first line of
13      communicating features and benefits to
14      physicians.  Not knowing what any of
15      them communicated and what the outcomes
16      were, I can't speak to it, but that to
17      me was the -- that those -- that's how
18      the markets were created for opioids.
19  BY MR. CRAWFORD:
20      Q.  Do you believe that a generic
21  opioid manufacturer has any duty or
22  responsibility to inform doctors of the
23  proper use and risks of their drugs?
24          MR. ERCOLE:  Objection to form;

Page 308

1  calls for legal conclusion.
2          THE WITNESS:  Aside from what
3      the FDA has required for the risk --
4      risk management's programs that are
5      consistent with what the brands are,
6      aside from DEA compliance which are
7      regulations that require us to operate
8      in a certain manner, to me, that is --
9      that is what the generic companies are
10      truly responsible for, to meet those
11      guidelines and ensure that that's
12      happening in a proper manner.
13  BY MR. CRAWFORD:
14      Q.  So your view is that the
15  generic manufacturers -- their only
16  requirement to ensure that doctors are
17  properly informed about safe use and risks
18  drugs are if the DEA or the FDA require it?
19          MR. ERCOLE:  Objection to form.
20          THE WITNESS:  The market for
21      opioids or any other branded product
22      are created by those that detail the
23      physicians.  That is not something that
24      the generic companies have ever done.

Page 309

1    We do not supply features or
2  benefits to physicians in order to
3  promote our products.  Those markets
4  were already created.
5  BY MR. CRAWFORD:
6    Q.  Okay.  So if -- if the opioid
7  market now is dominated by generics;
8  correct?
9    MR. ERCOLE:  Objection to form.
10    THE WITNESS:  According to your
11  numbers, yes.
12  BY MR. CRAWFORD:
13    Q.  So at that point, does the
14  pendulum shift and does the generic have
15  any responsibility -- setting aside what
16  the FDA mandates or requires -- to go out
17  and make sure that doctors are properly
18  informed about the safe use of their drugs,
19  the drugs that those generic manufacturers
20  make?
21    MR. ERCOLE:  Objection to form;
22  compound, vague, calls for a legal
23  conclusion.
24    THE WITNESS:  Yeah, that's not

Page 310

1  my area of responsibility.  I think all
2  of these markets were created by the
3  branded companies.  And the generic
4  companies don't dispense, we don't
5  write the scripts, you know, we didn't
6  have any plan in that.  And I think
7  that if -- you know, if the FDA or some
8  other entity believes that there should
9  be additional work done in order to
10  ensure safety and so on with
11  physicians, then we should look at
12  doing that.  But that's not the way it
13  is today.
14  BY MR. CRAWFORD:
15    Q.  So -- but Teva and Actavis had
16  ways to communicate with physicians if they
17  wanted to, to communicate safety
18  information.  They could write a Dear
19  Doctor letter or they could send a
20  representative out to talk to the doctor if
21  they become aware that doctors don't
22  understand the proper use of the drugs,
23  right?
24    MR. ERCOLE:  Objection to form.

Page 311

1  Are you talking -- vague.  Are you
2  talking generics, nongenerics?
3    If you can answer that --
4  BY MR. CRAWFORD:
5    Q.  Doctors are --
6    MR. ERCOLE:  Hold on.  If you
7  can answer the question, feel free to
8  try and answer the question.
9    THE WITNESS:  Doctors are
10  writing products because they know
11  about the branded product.  So they're
12  not writing it because they don't know
13  anything about the product.  So the
14  only way they would have gotten
15  information about the product would
16  have had to be from a branded company.
17  They were never given any features or
18  benefits or detailed by a generic
19  company.
20    So if they're writing for it,
21  and they're writing for it and they
22  don't know what they're writing for, I
23  don't know how you can expect a generic
24  company to educate them.  They

Page 312

1  shouldn't have been writing for the
2  product to begin with.  But that was
3  created by the brand organizations.
4  BY MR. CRAWFORD:
5    Q.  So now that the doctor doesn't
6  know how to properly use it and prescribe
7  it, you guys, the generics, just come in
8  and fill the void and sell it?
9    MR. ERCOLE:  Objection to form;
10  calls for speculation, among other
11  things.
12    THE WITNESS:  You're telling me
13  they don't know how to write it or they
14  understand it.  I don't know that.
15  BY MR. CRAWFORD:
16    Q.  I'm just using your words.
17  You said that they may not know.
18    A.  I don't know.
19    Q.  And you said there were --
20    A.  I don't deal with physicians.
21  I have no idea what they know or don't
22  know.  I don't -- I don't interact with
23  physicians.
24    Q.  So --

Page 313

1         A.  So I would have no way of
2     knowing.
3         Q.  So do you view it as any --
4     your -- your -- you work for a generic
5     company right now; does Amneal have any
6     branded products?
7             MR. ERCOLE:  Objection to form.
8             THE WITNESS:  Yes.
9     BY MR. CRAWFORD:
10        Q.  All right.  But you're -- when
11    you were at Teva, you were head of the
12    generic department; right?
13        A.  Yes.  And I'm still head of
14    generics.
15        Q.  Okay.  So at Teva, there were
16    generic opioids that were marketed and sold
17    through your department; correct?
18        A.  That is correct.
19        Q.  Okay.  So do you view your
20    department as having any responsibility to
21    educate doctors about the proper use of
22    their drugs outside of what the FDA tells
23    you, if you become aware that they're not
24    properly using your drugs?

Page 314

1             MR. ERCOLE:  Objection to form.
2             THE WITNESS:  I would say that
3     I'm not in the business -- I feel --
4     you know, I feel compassionate for the
5     opioid problem that exists right now,
6     but to think that the generic companies
7     have the capacity to go out and detail
8     physicians on products they were
9     already detailed on by the branded
10    organizations that created these
11    marketplaces is just not within our
12    capabilities.
13            I had six or seven salespeople.
14    I had two or three marketing people
15    that were responsible for forecasting.
16    I'm not responsible for the marketing
17    efforts that you're talking about.
18    BY MR. CRAWFORD:
19        Q.  Yeah, but you're selling a
20    very high-risk opioid narcotic product at
21    Teva; right?
22            MR. ERCOLE:  Objection to form;
23    argumentative.
24            THE WITNESS:  I sold 600

Page 315

1     products.  I don't want any of our
2     products to be misused, whether it's an
3     opioid, an oral contraceptive, a -- you
4     know, a cough and cold medicine,
5     anything.  I don't want anything to be
6     misused.
7     BY MR. CRAWFORD:
8         Q.  So you're --
9         A.  And we sell a lot more than --
10    a lot more than opioids in the marketplace,
11    and I can't tell you if the physicians are
12    using them properly or not.
13        Q.  So you equate an opioid with a
14    cough and cold medicine, as far as risks
15    and dangers?
16            MR. ERCOLE:  Objection to form;
17    argumentative.
18            Go ahead.  If you can answer
19    the question, feel free.
20            THE WITNESS:  I'm not equating
21    anything.  I'm saying we had 600
22    products.  There's cholesterol-lowering
23    medications.  There's blood pressure
24    medications.  There's organ transplant

Page 316

1     drugs.  There's opioids.  There's oral
2     contraceptives.  We marketed all of
3     those therapeutic areas in the context
4     of offering a price and trying to get
5     more market share.
6             So I don't know that you're
7     equating one to another.  But all I'm
8     saying is, is that's the -- that's the
9     generic market.  I wouldn't want any of
10    those products to be misused.
11    BY MR. CRAWFORD:
12        Q.  You said you had six or seven
13    salespeople.  Why couldn't you hire more
14    salespeople to go out and properly educate
15    doctors?
16            MR. ERCOLE:  Objection -- I'm
17    sorry.  I need to keep doing this to
18    create a record.
19            Objection to the form;
20    argumentative, vague, temporal scope.
21            Go ahead.
22    BY MR. CRAWFORD:
23        Q.  I'm talking about at Teva.
24        A.  It would be cost-prohibitive

Page 317

1  for us to do that.  The branded companies
2  have thousands of sales representatives
3  calling on physicians.  It is physically
4  impossible for a generic company to hire
5  enough sales representatives to go in and
6  speak to physicians about all of our
7  generic products.
8      Q.  But we --
9      A.  There wouldn't be a generic
10  market if we did that.
11      Q.  But --
12      MR. ERCOLE:  Let him finish his
13      answer before you start your next
14      question, if you don't mind.  Thank
15      you.
16  BY MR. CRAWFORD:
17      Q.  Are you finished?
18      A.  Go ahead.
19      Q.  Okay.  We just looked at -- we
20  looked at Actavis' profits, gross profits
21  $2.3 billion; correct?
22      A.  Yeah.
23      Q.  Why is that cost-prohibitive
24  to hire extra people to educate doctors --

Page 318

1      MR. ERCOLE:  Objection to form.
2  BY MR. CRAWFORD:
3      Q.  -- given the amount of profit
4  that the company has made in that one year?
5      MR. ERCOLE:  Objection to form.
6      THE WITNESS:  What goes into
7  that cost, you're spending money on
8  R&D, you're spending money on
9  manufacturing facilities.  Those pieces
10  aren't necessarily in the numbers
11  you're looking at.  And then you're
12  asking them to hire, for 600
13  products -- as I look at it, if you had
14  a thousand representatives calling on
15  one brand product, and I've got 600,
16  then you've got to multiply a thousand
17  times 600 people -- that's 600,000
18  representatives that they can call on
19  600 different products.  That's not
20  physically possible.
21  BY MR. CRAWFORD:
22      Q.  Well, there are less expensive
23  ways, too, even simpler ways that you can
24  communicate with physicians risk

Page 319

1  information and -- and safety information;
2  right?
3      MR. ERCOLE:  Objection to form.
4      THE WITNESS:  That's your
5  opinion.
6  BY MR. CRAWFORD:
7      Q.  But you're -- what about
8  yours?  Do you have an opinion that there
9  is --
10      A.  That's your opinion.
11      MR. ERCOLE:  Objection to form;
12  asked and answered.
13  BY MR. CRAWFORD:
14      Q.  Do you know if Teva or Actavis
15  ever utilized any methods available to them
16  to detail people or Dear Doctor letters or
17  anything to send to doctors to inform them
18  about proper use and risks regarding their
19  opioid products?
20      MR. ERCOLE:  Hold on.
21  Objection to form; vague, doesn't
22  discuss whether we're talking about
23  generics, nongenerics and actually
24  calls for a legal conclusion.

Page 320

1      But go ahead.
2      MR. CRAWFORD:  I'm talking
3  about generics.
4      THE WITNESS:  I am not aware of
5  our generic organization's planning to
6  do any kind of detailing to physicians
7  for any of our products.
8  BY MR. CRAWFORD:
9      Q.  What about, putting aside
10  detailing, stuff as simple as sending a
11  Dear Doctor letter or educational materials
12  about the proper use and safe use of their
13  generic opioid products?  Have they ever
14  done that?
15      A.  I'm not aware of it.
16      MR. ERCOLE:  Objection to form.
17          - - -
18  (Teva-Boyer No. 022 was marked for
19  identification.)
20          - - -
21  BY MR. CRAWFORD:
22      Q.  I'm going to mark an exhibit
23  that's already been marked as 15 and 16,
24  but this is actually a combined document of

Page 321

1    the email and the plan or summary on
2    Suboxone.  So this is a document
3    Acquired_Actavis_01178982, an email from
4    Jim Luce to Andrew Boyer, 2/15/13, about
5    the BuNa marketing plan.  And then it has
6    the attachment, Buprenorphine & Naloxone
7    Shared Marketing Plan Summary.
8            This was, I think, previously
9    marked as 15 and 16, as separate documents.
10   You agree that those go together; correct?
11   This is what the email is referring to?
12          MR. ERCOLE:  Objection to form.
13          THE WITNESS:  That's fine.
14   BY MR. CRAWFORD:
15      Q.   And this was a -- Amneal had
16   approached Actavis to jointly market their
17   generic Suboxone product; correct?
18          MR. ERCOLE:  Hold on.
19   Objection to form; asked and answered.
20          You just spent 40 minutes with
21   this document earlier.  Now you're
22   going to go back and ask the witness
23   the same questions by a different
24   person?  I'm just -- is that what your

Page 322

1    intent is to ask this witness the
2    same -- different questions on the same
3    document that your co-counsel just
4    spend 40 minutes with earlier?
5            MR. CRAWFORD:  They'll be
6    different questions, but definitely
7    need to introduce the document again,
8    so that's all I'm doing.
9            THE WITNESS:  So what are you
10   asking?
11   BY MR. CRAWFORD:
12      Q.   Okay.  The question is:  Is --
13   just to refresh the jury's recollection,
14   this was Amneal approaching Actavis to
15   propose a joint marketing plan for their
16   generic Suboxone products; right?
17          MR. ERCOLE:  Objection to form.
18          THE WITNESS:  I believe this
19   was Amneal providing a document that
20   they had spent money on to put together
21   a marketing plan that they thought that
22   they could utilize in the marketplace
23   with -- this time it was, I guess,
24   Actavis and whoever else was on the

Page 323

1    product.
2    BY MR. CRAWFORD:
3      Q.   Okay.  So this was forwarded
4    to your attention; correct?
5      A.   That is correct.
6      Q.   And do you know if Actavis and
7    Amneal, in fact, joined together to do
8    joint marketing of their products?
9            MR. ERCOLE:  Objection to form.
10   This question has been asked multiple
11   times already.
12          THE WITNESS:  I answered it
13   earlier.  I said I don't believe it
14   ever was implemented.
15   BY MR. CRAWFORD:
16      Q.   And the generic Suboxone --
17   Suboxone is an opioid dependency treatment;
18   right?  You've since seen documents that
19   refresh your recollection that it's an
20   opioid dependency treatment; right?
21          MR. ERCOLE:  Objection to form.
22   Again, this has been asked and
23   answered.  I mean, I thought you just
24   said you were going to ask new

Page 324

1    questions.
2            THE WITNESS:  The one document
3    said opioid dependence.
4    BY MR. CRAWFORD:
5      Q.   All right.  And what I want to
6    ask here is, if you can go to page ending
7    in 985, Page 3 of the attachment, this is a
8    proposal, I believe, that Amneal is making
9    to reach a physician audience with
10   information about this generic Suboxone
11   opioid dependency treatment drug; correct?
12          MR. ERCOLE:  Objection to form.
13   He's already testified.
14          THE WITNESS:  I guess so.
15          MR. ERCOLE:  Objection to form.
16   If you can -- if you know the
17   answer to the question, you can answer.
18          THE WITNESS:  I haven't read
19   through it so -- yep, I'm assuming
20   that's what you're saying.
21   BY MR. CRAWFORD:
22      Q.   So the first line says,
23   "Physicians and clinics on the DATA 2000
24   [sic] list will be targeted."

1    So basically, drug companies
2  like Actavis and Amneal do have access to
3  physician lists where they can send
4  information to them; correct?
5        MR. ERCOLE:  Objection to form;
6  calls for speculation, vague.
7        THE WITNESS:  On the generic
8    side, I don't know enough about what
9    their access is or is not.
10       This is a document, as I look
11   through it, that was going to cost
12   $2 million to target physicians, I
13   guess, for all of these different
14   ideas.  And you know, as you were
15   asking before, if I've got 600 products
16   and I'm going to spend $2 million on
17   each product for a finite amount of
18   time to go to physicians, it's probably
19   cost-prohibitive.
20       But I don't know exactly what
21   this ended up being.  I don't think it
22   was ever implemented.  And I think the
23   reason being was, it was
24   cost-prohibitive and we just didn't

1    know enough about dealing with the
2    physician marketplace, because that's
3    not what we do.
4  BY MR. CRAWFORD:
5    Q.  Well, there are ways -- I'm
6  just trying to establish -- there are ways
7  available to generic drug companies to
8  communicate with doctors information about
9  their products through some type of mass
10  mailing or email list, and you referenced
11  $2 million, but there is a cost, but there
12  are ways to do it; correct?
13       MR. ERCOLE:  Objection to form.
14       THE WITNESS:  I would ask
15   somebody that's more adept in dealing
16   with physicians of, where do they get
17   data and how do they influence
18   physicians.  That is not something,
19   from a generic standpoint, that I have
20   an expertise in.
21  BY MR. CRAWFORD:
22    Q.  Does anyone in your generic
23  department have an expertise in how to
24  communicate with physicians about their

1  drugs?
2    A.  No.
3        MR. ERCOLE:  Objection to the
4    form.
5  BY MR. CRAWFORD:
6    Q.  No?
7    A.  You would probably have to go
8  to an outside consultant.
9    Q.  Did they have that at Teva?
10       MR. ERCOLE:  Hold on.
11   Objection to form; vague.
12       MR. CRAWFORD:  I'm addressing
13   it because I'm going to narrow it down.
14  BY MR. CRAWFORD:
15    Q.  Teva, do they have any type of
16  person or means available to communicate
17  with physicians --
18    A.  Teva, when I was there?
19       MR. ERCOLE:  Hold on.
20  BY MR. CRAWFORD:
21    Q.  -- about their generic
22  products?
23       MR. ERCOLE:  Before you
24   answer -- just let him finish his

1  question before you respond --
2        THE WITNESS:  Got it.
3        MR. ERCOLE:  -- and then let me
4    object.
5        Do you mind -- I apologize for
6    that.  I just wanted to -- do you mind
7    reasking that question again?  Thank
8    you.
9  BY MR. CRAWFORD:
10    Q.  Okay.  My question was:  Does
11  anyone in your generic department have an
12  expertise in how to communicate with
13  physicians about their drugs?  And you
14  answered no.
15       And I'm just clarifying:  That
16  was both at Teva and at Actavis; correct?
17       MR. ERCOLE:  Objection to form.
18       THE WITNESS:  I was at Teva in
19   August of 2016.  While I was there, I
20   don't believe there was generic
21   capabilities to discuss these type of
22   things with physicians.
23  BY MR. CRAWFORD:
24    Q.  And to communicate with them?

Page 329

```
 1        A.  That's correct.  I don't
 2  believe so.
 3        Q.  How about at Actavis?  Were
 4  those capabilities within your generic
 5  department to do that about your generic
 6  drugs?
 7        A.  I don't know if we had
 8  capabilities.  I think that we would have
 9  required to use outside consultants to try
10  and do something like that.
11        Q.  Okay.  And are you aware of
12  that ever being done at Actavis?
13        A.  Not while I was there.
14        Q.  How about --
15        A.  Again, I don't know if this
16  buprenorphine -- I don't believe this ever
17  existed.  But I don't believe that it
18  existed at Watson or Actavis, and I don't
19  believe that it existed while I was at
20  Teva.
21        Q.  So looking down at Page 3, it
22  looks like some of the means that Amneal
23  was proposing communicating with those
24  doctors is fax marketing to the DATA 2000
```

Page 330

```
 1  physician list; right?
 2        MR. ERCOLE:  Objection to form.
 3     He's already testified that he doesn't
 4     know what this is about or even whether
 5     it was implemented or not.
 6  BY MR. CRAWFORD:
 7        Q.  All right.  Well, that's one
 8  thing that Amneal is suggesting.  Would you
 9  agree with me there?
10        A.  This is a suggestion that came
11  from Amneal or an outside consultant.  I
12  have no idea what it is.
13        Q.  Okay.  And he's also
14  suggesting email marketing to DATA 2000
15  subset with validated email accounts.
16        MR. ERCOLE:  Objection to form;
17     the document --
18  BY MR. CRAWFORD:
19        Q.  You're suggesting that;
20  correct?
21        MR. ERCOLE:  Objection to form;
22     the document speaks for itself.  Sorry.
23        THE WITNESS:  I don't know
24     where you're looking.
```

Page 331

```
 1  BY MR. CRAWFORD:
 2        Q.  Okay.  So the third bullet
 3  down below "Media," he's suggesting an
 4  email marketing blast to doctors about the
 5  product; right?
 6        MR. ERCOLE:  Objection to form;
 7     foundation.
 8        THE WITNESS:  He's trying to
 9     get to email accounts that have been
10     validated using DATA 2000, which I have
11     no idea what is.
12  BY MR. CRAWFORD:
13        Q.  Well, at the top, he says,
14  "Physicians and clinics on the DATA 2000
15  list".
16        So probably a list of
17  physicians; right?
18        MR. ERCOLE:  Objection to form.
19        THE WITNESS:  You got to ask
20     him.  I don't know.
21  BY MR. CRAWFORD:
22        Q.  All right.  He's also
23  suggesting direct mail -- combination of
24  letters, self-mailers and postcards sent to
```

Page 332

```
 1  physicians; right?
 2        So that would be one way to
 3  communicate with physicians, is send them
 4  something by direct mail; right?
 5        MR. ERCOLE:  Objection to form.
 6        THE WITNESS:  I think if you
 7     want to know about this document, you
 8     need to talk to Jim Luce, because he's
 9     closer to it than I was.  This was just
10     something that was sent to me.  I don't
11     know what the capabilities are.  I
12     don't know how successful it could be.
13     I really don't know anything about it.
14  BY MR. CRAWFORD:
15        Q.  But do you agree with me that
16  direct mail to physicians was an option to
17  you, at Actavis and Teva, to communicate
18  with doctors about your generic drugs;
19  right?
20        MR. ERCOLE:  Objection to form;
21     calls for a legal conclusion, calls for
22     speculation.
23        If you can answer the
24     question --
```

Page 333

1      THE WITNESS:  If you direct
2  mail a million physicians and one of
3  them reads your mail, it's not really a
4  viable option.  So I don't know -- you
5  can always use direct mail; but if it's
6  not being utilized, then it really
7  wouldn't do you any good.
8      So, again, not knowing the
9  program, not knowing what the success
10  rates are, not knowing what people are
11  utilizing, how they were utilizing the
12  direct mail, it's impossible for me to
13  take and communicate on this.
14  BY MR. CRAWFORD:
15      Q.  Have you ever heard of a Dear
16  Doctor letter?
17      A.  Sure.
18      Q.  What is a Dear Doctor letter?
19      A.  It's a letter that's written
20  to a physician.
21      Q.  Generally, what's in a Dear
22  Doctor letter?
23      A.  That, I don't know.
24      Q.  Does -- have you ever heard

Page 334

1  the term of art "Dear Doctor letter" in the
2  pharmaceutical world as being a letter
3  written by a pharmaceutical drug company
4  providing important risk or safety
5  information about the drugs they sell?
6      A.  Again, you'd have to ask the
7  brand side of the business.  I've never
8  been -- that's not been my area of
9  expertise or -- where I've worked.
10      Q.  Let's go to the next document
11  here.
12      If you could pull Exhibit 15.
13  I had a question about that.  I'll wait for
14  you to pull it out there.
15      Okay.  This was the email --
16  March 27th, 2013 email from David Myers
17  to you and Napoleon Clark.
18      Again, who is David Myers?
19      A.  David Myers was -- I don't
20  know what his title was -- might have been
21  a marketing manager.
22      Q.  Okay.
23      A.  He was a senior manager,
24  products and communications, coming out of

Page 335

1  the Actavis organization, reporting to
2  Napolean.
3      Q.  And he's providing you the
4  Bu/Na promotional outreach overview.  This
5  is about the efforts -- outreach efforts
6  regarding your generic Suboxone product;
7  correct?
8      MR. ERCOLE:  Objection to form;
9  asked and answered.
10      THE WITNESS:  He's sending an
11  email based upon the prior letter that
12  we just looked at from Jim Luce, it
13  looks like.
14  BY MR. CRAWFORD:
15      Q.  And he's talking about "an
16  update on the programs we are currently
17  performing - and those we are considering -
18  in support of our Buprenorphine/Naloxone
19  sales efforts."
20      And the first point he's
21  talking about is "joint promotion with
22  Amneal (non-company-specific):  Email and
23  fax blasts to the DATA 2000 physicians."
24  And he's got a schedule here:  "Fax - 3/14,

Page 336

1  Email - 3/20, Fax - 3/26, Email - 3/28."
2      So the company, in fact,
3  according to this email, did enter into
4  some kind of joint marketing effort with
5  Amneal; right?
6      MR. ERCOLE:  Objection to form.
7  This has been asked and answered
8  countless times.  He's already
9  testified that he doesn't believe
10  that's the case.
11      Feel free to answer this
12  question.  If he asks the same question
13  again, I'm going to instruct him not to
14  answer it.
15      THE WITNESS:  With that kind of
16  a schedule, the answer is no.  I would
17  have known if we did that much going to
18  market -- two, four, six, eight
19  communications?  The answer is no, this
20  never went out.
21  BY MR. CRAWFORD:
22      Q.  Okay.  Well, it says, "Fax -
23  3/14."  The email is dated 3/24.
24      A.  I just don't --

Page 337

1      Q.  Does he just not --
2      A.  Maybe his schedule is off.  I
3  don't remember any of this -- eight
4  opportunities for this to go out?  I don't
5  remember it at all.  You'd have to ask him.
6      Q.  All right.  So, I mean, is it
7  possible you're wrong, that that -- that,
8  in fact, these communications did take
9  place at Amneal?
10     MR. ERCOLE:  Objection to form.
11     THE WITNESS:  I would ask David
12  or Napoleon.
13  BY MR. CRAWFORD:
14     Q.  Okay.  All right.  And then it
15  says, "Programs in-development (or being
16  considered)."
17     I think we went through this,
18  but there are ways here that you're
19  considering about reaching doctors
20  specifically about your generic products,
21  and that's including targeting mailers to
22  1900 high-prescribers of Suboxone.  That's
23  the brand drug; right?
24     MR. ERCOLE:  Objection to

Page 338

1  form --
2  BY MR. CRAWFORD:
3      Q.  You're able to find those
4  physicians and target them with this;
5  right?
6      MR. ERCOLE:  Hold on.
7      Objection to form.  Document
8  says what it says.  He's answered these
9  questions already.  There's no
10  foundation, given that he said he
11  doesn't know anything about this.
12     THE WITNESS:  I don't know
13  enough about it.  You're asking the
14  wrong person.
15  BY MR. CRAWFORD:
16     Q.  So you're head of this
17  department here, this marketing department;
18  right?
19     A.  No.
20     Q.  At Actavis?
21     A.  No.
22     Q.  What's your position at the
23  time?
24     A.  Napolean was the head of

Page 339

1  marketing.
2      Q.  And what's your position at
3  this time?
4      A.  I was heading up all of
5  commercial, which was sales and marketing.
6      Q.  So you had a top marketing
7  type position at the company above
8  Napolean; right?
9      MR. ERCOLE:  Objection to form.
10     THE WITNESS:  That would be
11  correct for generics.
12  BY MR. CRAWFORD:
13     Q.  And you have no idea if it's
14  possible to communicate with doctors
15  through these methods listed in this email?
16     MR. ERCOLE:  Objection to form.
17     THE WITNESS:  I spent zero part
18  of my career targeting physicians, so I
19  do not know anything about this.
20  BY MR. CRAWFORD:
21     Q.  I don't think we marked this,
22  but if we did, then we'll just have a
23  redundant document.  Exhibit 23.
24           - - -

Page 340

1      (Teva-Boyer No. 023 was marked for
2      identification.)
3           - - -
4  BY MR. CRAWFORD:
5      Q.  I think we've seen documents
6  like this, but this is the -- or maybe
7  we've actually seen it.  But this is the
8  Operations Planning Summit, dated
9  June 2nd, 2015, for Actavis; right?
10     MR. ERCOLE:  Take a look
11  through the document.
12     MR. JOHNSON:  Can you read the
13  Bates number, please?
14     MR. CRAWFORD:  Sure.  It is
15  TEVA_MDL_A_09640874.
16     MR. JOHNSON:  Thank you.
17     THE WITNESS:  Okay.
18  BY MR. CRAWFORD:
19     Q.  All right.  Operations
20  planning summit -- I think we've talked
21  about these -- is that something that you
22  might attend or did attend in 2015?
23     A.  I believe this was probably a
24  presentation that I did to our

Page 341

1   manufacturing team.
2       Q.   Okay.  You did this to the
3   manufacturing team.  Okay, thank you.
4           And who is the manufacturing
5   team?  What was their function?
6       A.   Manufacturing products.
7       Q.   Okay.  So you were -- where
8   were they based, or where was the
9   presentation?
10      A.   All over the country and the
11  world.
12      Q.   Where do you think this
13  presentation was done?
14      A.   Probably in New Jersey.
15      Q.   Okay.  And what was the
16  purpose of this presentation to the
17  manufacturing team?
18      A.   If I'm not mistaken, the
19  manufacturing operations had a meeting --
20  an internal meeting for themselves, and
21  they asked me, as the head of commercial,
22  to come and present to them regarding the
23  marketplace.
24      Q.   And why were they interested

Page 342

1   in the marketplace?
2       A.   So that they could know that
3   all the hard work that they're doing are
4   bringing safe and high-quality products on
5   a regular basis to the market, they'd have
6   an understanding of where the product was
7   going and how the marketplace looked.
8       Q.   All right.  So let's go to
9   Page 8 of this document.  I think here -- I
10  think we've seen charts like this.
11          So you were conveying to the
12  marketing department that Actavis is the
13  third largest US generics company; correct?
14      A.   Yes, this was an IMS slide,
15  and I took the IMS slide, as you can see
16  from here, and I put it into my
17  presentation.
18      Q.   All right.  And Teva's No. 1;
19  right?
20      A.   Teva was No. 1 at the time.
21      Q.   And they acquired the Actavis
22  generic entities, US ones -- or all of
23  them, in 2016.
24          So they would stay No. 1 now,

Page 343

1   having acquired Actavis in 2016; right?
2       MR. ERCOLE:  Objection to form.
3       THE WITNESS:  This was a moving
4   annual total in December of '14.  So
5   two years later, you'd have to see what
6   a new chart looks like, but I believe
7   that they were No. 1 in 2016.
8   BY MR. CRAWFORD:
9       Q.   All right.  And then if you
10  could go to Page 10.  You're conveying here
11  the top 15 products for Actavis in actual
12  2014 sales; right?
13      A.   Yes.
14      Q.   All right.  So -- and there
15  are opioids listed on here, Class II or
16  Schedule II opioids; right?  Oxycodone and
17  hydrocodone?
18      A.   Yes.
19      Q.   Right.  Your annual sales of
20  oxycodone were 93,400,000 and hydrocodone
21  63,600,000 for 2014.  Is that what that
22  means?
23      A.   That is correct.
24      Q.   And also, too, it looks like

Page 344

1   your Suboxone product, the generic product,
2   buprenorphine and naloxone, has made the
3   top 15 list this year; correct?
4       A.   That is correct.
5       Q.   And that, again, is an opioid
6   dependency treatment drug; right?
7       A.   I believe that's what was in
8   the documents.
9       Q.   And you were selling
10  72 million dollars' worth of that generic
11  opioid dependency treatment drug in 2014;
12  correct?
13      A.   That's what this looks like.
14      Q.   So three of your top 15 drugs,
15  two of them are the actual opioids that you
16  were selling, and one of them is an opioid
17  treatment; right?
18      MR. ERCOLE:  Objection to form.
19      THE WITNESS:  Remember, we
20  had -- and this is Actavis at the
21  time -- 300 products.  So you're
22  looking at 15 out of 300.  And it just
23  so happens that those three products,
24  at this point in time, were in our top

1    15 products.  But if you look at the
2    top 3 or 4 or 5, they were 8, 9, 10
3    times the size of the other ones that
4    you're looking at.
5  BY MR. CRAWFORD:
6    Q.  So, I mean, you were
7  pushing -- pushing the generic Suboxone,
8  the buprenorphine/naloxone pretty hard;
9  right?  I mean, you did do -- you made
10  efforts to try to get this -- get the word
11  out about it being available; right?
12    MR. ERCOLE:  Hold on.
13    Objection to form, compound,
14    mischaracterizes or -- you know,
15    improper use of the word "push."
16    THE WITNESS:  Yeah, it's a nice
17    sound bite that you're trying to take
18    and push across, but that's not the
19    reality.
20    We sell 300 products in our
21    portfolio, and all of these products,
22    we spent time with our customers trying
23    to drive our market share and our --
24    maximizing the value of our assets.

1  BY MR. CRAWFORD:
2    Q.  So you're doing it for both
3  your Class II, Schedule II opioids and your
4  opioid treatment drugs; right?  They made
5  the top 15, three of them?
6    MR. ERCOLE:  Objection to form;
7    vague.  I'm not sure what you mean by
8    "it," but objection to form.
9    THE WITNESS:  We don't detail
10    products, as I've said before.  These
11    are not brands, these are generics.  We
12    offer up a price and we offer up a
13    consistent supply in our supply chain
14    and hopefully quality products, as said
15    by the FDA.  That's what we do.
16    There's no pushing, there's no
17    detailing, there's nothing else there.
18  BY MR. CRAWFORD:
19    Q.  Okay.  Did Actavis, or Watson
20  at the time, whatever they were called --
21  Watson became Actavis; correct?
22    A.  Watson changed its name to
23  Actavis.
24    Q.  Right.  After it bought

1  Actavis?
2    A.  That is correct.
3    Q.  Okay.  So at one point in
4  time, had you heard of Actavis trying to
5  get approval for a generic form of
6  fentanyl -- or of Fentora?
7    A.  I don't recall.
8    Q.  You mentioned before RiskMAPs
9  or REMS.  Have you ever heard of those
10  terms?
11    A.  Yes.
12    Q.  And you're aware that a number
13  of Actavis products were subject to an
14  FDA-mandated RiskMAP or REMS; correct?
15    A.  Actavis when?
16    Q.  Actavis while you were there,
17  any time.
18    A.  Well, can't be any time.
19  Remember, we bought them at a certain point
20  in time.  So I don't know if, prior to the
21  transaction of Watson buying Actavis, what
22  they were working on, from a Fentora or any
23  other risk management product.
24    So if you've got a point in

1  time and a document that we're talking
2  about, I'm more than happy to discuss it,
3  but if not, I'm not exactly sure what
4  you're asking.
5    Q.  You've got a good point.
6    Whatever Watson or Actavis
7  entity you were at, while you were at that
8  entity, they had at that time, that entity,
9  opioid products that were subject to a
10  FDA-mandated RiskMAP or REMS; right?
11    MR. ERCOLE:  Objection to form;
12    compound, failure to distinguish
13    between Actavis and Watson.
14    If you can answer the
15    question . . .
16    THE WITNESS:  There were
17    RiskMAPs that were being developed or
18    had been developed by the brand, and I
19    can't necessarily speak to the generic,
20    but they had to be a part of it at some
21    point.
22  BY MR. CRAWFORD:
23    Q.  So RiskMAPs generally, if
24  there's one for the brand, there's got to

Page 349

```
 1   be one for the generic; right?
 2        A.  That's correct.
 3              -  -  -
 4        (Teva-Boyer No. 024 was marked for
 5        identification.)
 6              -  -  -
 7   BY MR. CRAWFORD:
 8        Q.  So I will show you a
 9   document -- Exhibit 24.
10              So this is a document
11   Acquired_Actavis_02051705.  It is a
12   November 6th, 2009 email from Napoleon
13   Clark to a number of individuals, with
14   carbon copy to you; correct?
15        A.  Yes.
16        Q.  And it's regarding monitoring
17   programs - RiskMAPs; right?
18        A.  That is correct.
19        Q.  So Napoleon Clark, he reported
20   to you, as we discussed; right?
21        A.  No, he reported to Diane
22   Miranda at this time.
23        Q.  Okay.  And then did she report
24   to you?
```

Page 350

```
 1        A.  Diane reported to me.
 2        Q.  All right.  Okay.  And so he
 3   writes, "Beth, Gary; As you're aware, we
 4   have various products" -- did I give you
 5   this?  Okay, yeah -- "various products in
 6   our portfolio and pipeline that require(d)
 7   some time of monitoring program" -- I think
 8   he means some type of monitoring program --
 9   "as a component of the Risk management
10   program.
11              "Because these monitoring
12   activities are a requirement for us to
13   market the product, we (Marketing) sought
14   proposals from several Market Research
15   firms to conduct the primary and secondary
16   research activities.  For your reference I
17   have attached two proposals for Next Choice
18   and gFentora."
19              So does this -- this is back
20   in 2009.  Does this refresh your
21   recollection that at this time -- was it
22   Watson or Actavis at this time?
23              MR. ERCOLE:  You mean Watson --
24        which Watson?
```

Page 351

```
 1   BY MR. CRAWFORD:
 2        Q.  What was the company called at
 3   this time, Watson or Actavis?
 4        A.  Watson.
 5        Q.  Okay.  So does this refresh
 6   your recollection at the time that Watson
 7   was trying to get approval of a generic
 8   form of Fentora and that it would have had
 9   to develop a RiskMAP program for the
10   generic version of the drug?
11        A.  I don't know if this was done
12   as part of a forecast.  I -- so it doesn't
13   refresh my memory at all.  I don't know if
14   they already had it in development or if
15   they were thinking about putting together a
16   forecast to figure out if they should
17   develop it.  From this, I can't tell.  All
18   it's saying is that the RiskMAP would be
19   required if they did, and they started to
20   evaluate that.  That's what it looks to me.
21        Q.  And tell me what your
22   understanding of a RiskMAP is.
23        A.  It's a Risk and mitigation and
24   whatever the acronym stands for -- usually
```

Page 352

```
 1   created by the branded companies, and a
 2   generic company would need to match in
 3   order to participate in the marketplace.
 4        Q.  Or come up with their own
 5   program, right, if they're going to do a
 6   generic; right?
 7              MR. ERCOLE:  Objection to form;
 8        calls for a legal conclusion.
 9              THE WITNESS:  From a legal
10        standpoint, to your point, you'd have
11        to ask legal if you can do that, to
12        find a way to get around the brand
13        manufacturer's risk program and whether
14        it's cost-effective or cost-prohibitive
15        to do so.  A lot of the REMS became
16        shared REMS because the generic
17        companies could not physically, on
18        their own, from the cost standpoint,
19        develop them themselves.
20              So I don't know what this is in
21        reference to, at the time, whether it
22        was before or after we started
23        developing a product or not, or if it
24        was part of just the evaluation to do
```

Page 353

1    so.
2    BY MR. CRAWFORD:
3        Q.  Okay.  Go back to the
4    cost-prohibition.  If the company ever
5    thought it was too cost-prohibitive to
6    institute safety programs to inform doctors
7    about risks about a product, you didn't
8    have to sell the product; right?
9        MR. ERCOLE:  Objection --
10   BY MR. CRAWFORD:
11       Q.  Just not sell it.
12       MR. ERCOLE:  Objection to form.
13       THE WITNESS:  Yeah, it would
14   have been part of the evaluation as to
15   whether to commercialize or develop a
16   product, at that point in time.  You're
17   right.
18   BY MR. CRAWFORD:
19       Q.  Okay.  So once you decide to
20   sell a product, there are obligations to
21   inform doctors in any way, that's -- you've
22   got to absorb that cost; right?
23       MR. ERCOLE:  Objection to form;
24   calls for a legal conclusion.

Page 354

1        THE WITNESS:  If you chose to
2    commercialize a product upon approval
3    and you can support a program that
4    already exists out there, then you
5    would look to do so.  A lot of the
6    cases, they were shared programs with
7    the brand.  In particular, one, to not
8    create confusion for the patient or the
9    pharmacist having multiple programs out
10   there, and the generic company would
11   buy into the risk program that already
12   existed from the brand.
13   BY MR. CRAWFORD:
14       Q.  Okay.  So if you could go to
15   Page 1714 -- it's kind of in the middle.
16   This is a proposal, it appears, by
17   Advantage Healthcare.  "Revised Proposal,
18   Risk Assessment Tracking Program for
19   Fentanyl Citrate Buccal Tablets, (FCBT),"
20   and it's dated October 16th, 2009.
21       So is it your understanding,
22   just looking at the email and looking at
23   this attachment, that -- that Actavis or
24   Watson at the time wanted to get their

Page 355

1    fentanyl tablet approved, their generic
2    version, but in order to do so, they had to
3    have some type of risk management program
4    in place, and they were contacting a
5    third-party contractor to give them a
6    proposal; right?
7        A.  I don't know the timelines of
8    development, I don't know what the timeline
9    for approval would have been, and I don't
10   know if they're doing it on the front end
11   before those things happened or after they
12   already got their filing or their approval,
13   and now they're trying to find out what
14   it's going to cost to take and manage a
15   program if they were to come to market.  I
16   don't know the timing of all of that.
17       Q.  Okay.  So this is the
18   proposal -- if you go to the first page, it
19   does say:
20       "Background/Objectives.
21       "Watson Pharmaceuticals is
22   currently in the process of developing a
23   risk management program for their fentanyl
24   citrate buccal tablet (FCBT), the generic

Page 356

1    version of Cephalon's brand, Fentora."
2        This is a highly potent opioid
3    product; right?  It's what -- the tablet
4    that dissolves in your mouth, it's
5    fentanyl-based.
6        A.  I know --
7        MR. ERCOLE:  Objection to form;
8    compound.  You can figure out which
9    question you want to answer.
10   BY MR. CRAWFORD:
11       Q.  Are you familiar with this
12   product?
13       A.  I know very little about the
14   product, other than it's fentanyl-based.
15       Q.  Okay.  So it's an opioid?
16       A.  Yes.
17       Q.  And they're talking about:
18       "The risk management program
19   elements for FCBT will be similar to
20   Cephalon's risk minimization action plan
21   (RiskMAP) known as SECURE.  The SECURE
22   program focuses on 3 primary objectives;
23   similar objectives will apply for Watson's
24   risk management program and include:

Page 357

1    "Ensuring that patients and
2  healthcare professionals understand that
3  FCBT should only be used in opioid-tolerant
4  patients with cancer."
5         So one of the objectives of
6  the program would be to make sure
7  healthcare professionals understand that
8  it's only indicated under these conditions,
9  including they have to be cancer patients;
10 right?
11        MR. ERCOLE:  Objection to form.
12 BY MR. CRAWFORD:
13     Q.  Is that how you interpret
14 that?
15     A.  I don't know how to interpret
16 that.  But I'm assuming that's what that
17 says.  I don't know enough about the risk
18 management program.
19        The only thing I would say is,
20 to your point before, did we have the
21 capabilities internally of communicating
22 with physicians and understanding these
23 things?  This is clear that we did not have
24 those capabilities internally and we had to

Page 358

1  go to an outside company.
2     Q.  Well, this is not about
3  communicating, it's doing research; right?
4  This is not --
5     A.  But this is going to be part
6  of communication.
7     Q.  So --
8     A.  This is research to
9  communicate, and it's part of a risk --
10        MR. ERCOLE:  Hold on, hold on,
11 guys.  Let me object.  If you can let
12 the witness finish answering, and if
13 you can let plaintiff's counsel finish
14 asking the question, it will make my
15 life and the court reporter's life a
16 lot easier.  Thank you.
17        MR. CRAWFORD:  Thank you.
18 BY MR. CRAWFORD:
19     Q.  Go ahead.
20        MR. ERCOLE:  Do you mind
21 repeating the question, just so that
22 the record is clear on that?
23 BY MR. CRAWFORD:
24     Q.  If you want to take a look at

Page 359

1  this document, this document is not about
2  communicating with doctors about risks and
3  informing them.  It's more researching what
4  doctors know about the messages and risks,
5  so the company can then decide whether to
6  take action; is that correct?
7     A.  It says --
8        MR. ERCOLE:  Objection to form.
9  Basically trying to tell him what the
10 document is and isn't.
11        MR. CRAWFORD:  I'm just trying
12 to see if he agrees.
13        THE WITNESS:  One of the items
14 here says "Internet survey.  50
15 physicians, 50 pharmacists, 15 minutes
16 each."
17 BY MR. CRAWFORD:
18     Q.  Right.
19     A.  So I'm assuming they're
20 looking to access physicians.
21     Q.  Right.
22     A.  And there's an internet survey
23 of 50 patients.  So this is -- this is --
24 they're going to do a survey, and they're

Page 360

1  going to have access to physicians,
2  pharmacists and patients.
3     Q.  Right.  But they're --
4     A.  And all I'm saying to you is,
5  is that we didn't have the expertise.  We
6  had to go to outside, to an outside
7  consultant, to find out, you know, how to
8  do those things.
9     Q.  Right.  And the consultant,
10 though, they're not actually telling
11 doctors of the risks.  They're actually
12 doing surveys to see what the doctors know.
13 Is that what that is?
14        MR. ERCOLE:  Objection to form.
15 He's already testified he's not aware
16 of the specifics.
17        THE WITNESS:  I don't know
18 about -- I'm talking about access.  You
19 were talking about -- before about the
20 DATA 2000 and getting access to the
21 information available and did we have
22 the internal capabilities.
23        The answer I said to you was
24 no.  This is consistent with what I

Page 361

1    said to you before.  We didn't have
2    internal capabilities to do these
3    things.  We went to outside
4    consultants.
5          If that was the case in this
6    particular instance to find out how to
7    access 50 physicians, 50 pharmacists
8    and 50 patients.  That's what I was
9    saying.
10   BY MR. CRAWFORD:
11       Q.  So to develop the
12   capabilities, you could either go to a
13   third-party outside and utilize their
14   resources to do that job, or you could
15   bring on more people and then the people
16   you had and develop your own program
17   internally.  Those were options, if you
18   wanted to do that; correct?
19       MR. ERCOLE:  Objection to form;
20   no temporal scope, assumes facts, asked
21   and answered.  Go ahead.
22       THE WITNESS:  No idea what the
23   requirement would be to bring it
24   internally.  All I'm saying is, is that

Page 362

1    we didn't have the expertise as a
2    generic company.
3    BY MR. CRAWFORD:
4        Q.  If you look here, the cost of
5    this project -- if you look at Page 1720,
6    and they're talking about reporting to you
7    on -- on their work, the first year of cost
8    is $210,000, correct, plus or minus
9    10 percent, to do this for this opioid
10   product?
11       A.  For this particular program,
12   yes.
13       Q.  And Year 2, it's $196,000;
14   correct?
15       MR. ERCOLE:  Objection to form.
16   I mean, the witness has already
17   testified he's not aware of the
18   specific details here.
19       MR. CRAWFORD:  I'm just seeing
20   what the document says.
21       THE WITNESS:  That specific
22   proposal, yes.  I'm not sure what it
23   entails, whether it meets the needs of
24   the risk management program.  That's

Page 363

1    what this proposal says, though.  I
2    know nothing about it.
3    BY MR. CRAWFORD:
4        Q.  In Year 3, it drops down to
5    $49,175, plus or minus 10 percent; correct?
6        A.  Again, that's a program, and I
7    don't know what the outcome is going to be,
8    whether that's accurate or not, whether
9    that meets the needs.  I don't know enough
10   about it.
11       Q.  And are you aware if Watson or
12   Actavis ever got approval of their generic
13   fentanyl tablet?
14       A.  I don't believe so.
15       Q.  Okay.  And are you aware
16   Actavis, while you were -- whatever entity
17   you were at, Watson or Actavis, they did
18   have actual RiskMAP programs in place or
19   REMS programs in place for some of their
20   opioid products; correct?
21       A.  I don't know at what point in
22   time.  I'm sure we had a risk management
23   program on a particular product.  I don't
24   know if it was Plan B or if it was an

Page 364

1    opioid.  I don't know the answer off the
2    top of my head --
3        Q.  And these --
4        A.  -- and I don't know the point
5    in time.
6        Q.  And these would have been
7    plans only if they were required by the
8    FDA, either you get approval or to maintain
9    the drug on the market?
10       A.  That is correct.
11       Q.  Is there anything in your view
12   that would have precluded or prevented
13   Actavis at this time from utilizing some of
14   these tools in these plans for their other
15   opioid drugs, where it wasn't FDA required,
16   utilizing them to communicate with doctors
17   if they were not aware of -- if Actavis
18   became aware that they weren't properly
19   prescribing the drug?
20       MR. ERCOLE:  I'm going to
21   object to form.  And I'm going to say
22   all of these questions about what
23   Actavis could or couldn't do implies
24   legal conclusions that are, in fact,

Page 365

1    wrong as a matter of law.
2         But if you can answer the
3    question, feel free to go ahead and do
4    so.
5         THE WITNESS:  So --
6         MR. CRAWFORD:  Hold on.  I want
7    to respond to that.
8         You're incorrect that it's
9    wrong as a matter of law.  I vehemently
10   disagree with that, but let the witness
11   answer.
12        THE WITNESS:  Actavis at what
13   point in time?
14   BY MR. CRAWFORD:
15        Q.  At this point in time, in
16   2009.
17        Actavis had other opioids
18   where there was no RiskMAP plan or no
19   strategy to communicate with doctors about
20   the risks; right?
21        MR. ERCOLE:  Objection to form.
22        THE WITNESS:  Actavis was not a
23   part of the organization in 2009.
24   BY MR. CRAWFORD:

Page 366

1         Q.  What do you mean by that?
2         I'm talking about Actavis or
3    Watson as the predecessor.
4         A.  Watson would have existed in
5    2009.  Actavis was not a part of the
6    Watson/Actavis in 2009.
7         Q.  Let me rephrase it.
8         So Watson at the time had
9    other opioids in their portfolio that
10   didn't have a RiskMAP plan, right --
11        MR. ERCOLE:  Objection to --
12   BY MR. CRAWFORD:
13        Q.  -- Class II, Schedule II
14   opioids?
15        MR. ERCOLE:  Objection to form.
16   To the extent you know.
17        THE WITNESS:  I'm guessing the
18   answer is yes.
19   BY MR. CRAWFORD:
20        Q.  And is it your view or your
21   understanding -- was there any impediment
22   to Watson utilizing some of these RiskMAP
23   tools to communicate with doctors for
24   opioids where it wasn't required by the

Page 367

1    FDA?
2         MR. ERCOLE:  Objection to form;
3    calls for a legal conclusion.
4         THE WITNESS:  Regulatory and
5    legal gave us criteria what we needed
6    to do in order to commercialize
7    products.  That's approvals.  That
8    would be risk programs, if they
9    existed.  That would be when we can
10   ship product, when we can't ship
11   product.  SOMS programs are all part of
12   it.
13        Beyond that, there wasn't any
14   other evaluation independently by the
15   commercial organization.
16   BY MR. CRAWFORD:
17        Q.  So I'm just trying to think.
18   How would a decision be made within Watson
19   at this time about whether to approach
20   doctors to inform them about risks and a
21   proper use of their generic opioid
22   products?  How would that decision come
23   about?
24        A.  I think --

Page 368

1         Q.  Does it come from legal and
2    regulatory or sales and marketing?
3         MR. ERCOLE:  Hold on.  I'm
4    going to object and say, to the extent
5    it involves disclosure of any legal
6    communications, that would be
7    privileged, and I would instruct you
8    not to disclose that.
9         But to the extent you can
10   answer without disclosing the contents
11   of any such communications, feel to do
12   so.
13        THE WITNESS:  I would expect it
14   would come from regulatory and legal.
15        MR. CRAWFORD:  I think that's
16   all I have.
17        MR. ERCOLE:  Yeah, can we just
18   take -- can we take a five-minute
19   break, actually?  Is that okay?
20        THE VIDEOGRAPHER:  The time is
21   approximately 4:03 p.m., and we're
22   going off the record.
23        (Recess taken from 4:03 p.m. to
24   4:13 p.m.)

Page 369

1    THE VIDEOGRAPHER:  We are back
2  on the record.  The time is
3  approximately 4:13 p.m.
4    EXAMINATION
5  BY MR. EGLER:
6    Q.  Mr. Boyer, my name is Tom
7  Egler, and I represent plaintiffs in this
8  case, and I'm from a law firm called
9  Robbins Geller Rudman & Dowd in San Diego.
10    I'm going to hand you -- I got
11  a couple of questions right before we start
12  that -- just first about, how long did you
13  think about it -- did you plan or did you
14  take to prepare for today's deposition?
15    A.  In total, probably about
16  five -- five hours plus.
17    Q.  And did you meet with anybody
18  or talk with anybody about preparing for
19  today's deposition?
20    A.  Not outside of legal counsel,
21  no.
22    Q.  But you did talk with your
23  legal counsel about it?
24    A.  Yes.

Page 370

1    - - -
2    (Teva-Boyer No. 025 was marked for
3  identification.)
4    - - -
5    MR. EGLER:  So I'm going to
6  hand you what we're going to mark as
7  Boyer 25 and --
8    MR. ERCOLE:  I have copies.
9    MR. EGLER:  Here's a copy for
10  you guys.
11  BY MR. EGLER:
12    Q.  Can you look through what
13  we've marked as Exhibit Boyer 25.  And as
14  you're looking through it, I'll read into
15  the record the Bates numbers.  It's
16  ALLERGAN_MDL_034 -- let me start over --
17  03464566 through 597.
18    And I don't expect you to read
19  the whole thing.  But as you look at this
20  document right now, can you tell me if you
21  remember ever seeing it before?
22    A.  Yes.  It looks like my budget
23  presentation, maybe myself or with my team,
24  to -- what was it, Siggi at the time --

Page 371

1  Siggi Olafsson.
2    Q.  So let's go to the first page,
3  the very first page of the exhibit,
4  No. 566, this one.
5    A.  Yeah.
6    Q.  I want to ask you about this,
7  just so we can get it in context.
8    So you used email at your work
9  at Watson; is that right?
10    A.  Yes.
11    Q.  And did you ever print out an
12  email when you were at Watson?
13    A.  I'm sure I did.
14    Q.  Did it look like this, this
15  first page of Exhibit 25?
16    A.  At that point in time, I have
17  no idea.
18    Q.  And I'll represent to you that
19  this Exhibit 25 is what's referred to as a
20  family of documents that was produced to us
21  by counsel, so it's like an email and
22  attachments or something like that.  So
23  this was all presented together as one
24  group of documents.

Page 372

1    So assuming this is an email,
2  with your name at the top, the next line
3  says, "Sent:  Tuesday, November 15, 2011 at
4  5:35 a.m."
5    And the next line there says,
6  "To," and then it's "Sigurdur Olafsson"; is
7  that right?
8    A.  Yes.
9    Q.  So who is Mr. Olafsson?
10    A.  He was the head of the generic
11  business for Watson at that time.
12    Q.  So as you think about it,
13  around this time, mid-November 2011, where
14  was your office at Watson?
15    A.  I believe -- I believe it was
16  in Parsippany, New Jersey.
17    Q.  If it helps just to put it in
18  context, how long have you worked at -- or
19  how long -- when did you start working at
20  Watson?
21    A.  1998.
22    Q.  And when did you first start
23  working at Parsippany at Watson?
24    A.  I don't remember what year,

Page 373

1    but I've worked in Livingston, Florham
2    Park, Morristown, and Parsippany as a part
3    of that Watson organization.
4         Q.   And then when Watson bought
5    Actavis, did you move?
6         A.   No.  So --
7         Q.   When -- oh, go ahead.
8         A.   So if -- I don't remember the
9    exact date of the Actavis transaction, but
10   I would have been in Parsippany at that
11   point in time.
12        Q.   When the combined
13   Actavis/Watson's sold the generics to Teva,
14   did you move offices then?
15        A.   No.
16        Q.   So you've been at Parsippany
17   the whole time, since around 2011 -- let me
18   start over.
19             When you worked at Watson,
20   Actavis maybe Allergan and then Teva, that
21   whole time did you work in Parsippany?
22        A.   Whatever year we moved to
23   Parsippany, I've been there -- I was there
24   since, until I left the organization.

Page 374

1         Q.   All right.  Great.
2              And then Mr. Olafsson, do you
3    remember where his office was around this
4    time?
5         A.   He would have been in
6    Parsippany as well.  That's where I was.
7         Q.   When you think about the
8    Parsippany office building itself, about
9    how many floors did it have?
10        A.   The building had three floors,
11   I believe.
12        Q.   What floor were you on, do you
13   remember?
14        A.   I was on the second floor.
15   May have been four floors.
16        Q.   Okay.  Was Mr. Olafsson on the
17   same floor as you?
18        A.   No, he was not.
19        Q.   Do you remember what floor he
20   was on?
21        A.   I believe he was on the fourth
22   floor, and I was on the second floor.
23        Q.   As you think about the second
24   floor around this time, of the building in

Page 375

1    Parsippany for Watson, about -- as you
2    think about the various organizations in
3    the company, which organizations were on
4    the second floor?
5         A.   HR was on the second floor.
6    Part of portfolio management was on the
7    second floor.  The generic commercial,
8    customer service, financial administration
9    or customer administration was all on the
10   second floor.
11        Q.   All right.  So going down in
12   this document, you state, or the subject is
13   "Budget Presentation," and below that is --
14   it says "2012 Proposed Generic Budget v3 w
15   back-up.pptx."
16             So around the middle of
17   November 2011, do you remember sending the
18   2012 proposed generic budget to
19   Mr. Olafsson?
20        A.   I would have no memory of that
21   whatsoever.  It's reasonable, because that
22   would be the timing that we would go
23   through the presentation for 2012, but you
24   know, remembering an email that I sent,

Page 376

1    it's kind of hard to do.
2         Q.   So in a nutshell or like as an
3    overview, can you tell me, as you think of
4    it, the schedule for the annual budget when
5    you were at Watson and Actavis?  And this
6    is mid-November 2011 and you're sending a
7    2012 proposed budget, how would that fit
8    into the general generic budget, as you
9    think about it, in the approval process?
10             MR. ERCOLE:  Objection to form;
11        compound.
12             THE WITNESS:  We would start
13        working on budgets probably at the end
14        of the third quarter, beginning of the
15        fourth quarter, which would have been
16        September/October.  And we would
17        finalize them, usually the following
18        year, in January and February.
19   BY MR. EGLER:
20        Q.   And who -- let me start over.
21             What was your responsibility,
22   as you think about your time at Watson, and
23   especially around this time, the middle of
24   November 2011, what was your responsibility

Page 377

1  in the proposed budget process for the
2  generics?
3      A.  Review of expenses for the
4  following year, review of headcount for the
5  following year, review of the unit
6  forecasts by the marketing team that they
7  would do, the new product launch forecasts,
8  and some of the assumptions that would be
9  made about competition in the marketplace
10  during the following year.
11      I think most of it, the key
12  budget assumptions that you've got on
13  Page -- whatever that is -- the next page,
14  is kind of -- Bates number that ends in 68
15  is pretty close to a lot of the things that
16  we looked at.
17      Q.  Then at some point, as you
18  think about it with this proposed budget
19  that's in Exhibit 25, would it be formally
20  presented as part of a -- as a dog and pony
21  show, for lack of a better term, or would
22  there be a meeting about it or something
23  else?
24          MR. ERCOLE:  Objection to form.

Page 378

1          THE WITNESS:  You know, the
2  generic side of the business and the
3  amount of expenses that we had, from a
4  budget presentation of the marketing
5  and the expenses side, nobody ever
6  really looked at our expenses, because
7  we didn't spend a whole lot of money.
8      Most of the time was spent on
9  what was our forecast of top-line
10  sales, what was our new product launch
11  assumptions, what was our competition
12  assumptions, what was our price erosion
13  in the marketplace for our overall book
14  of business assumptions.  That's where
15  the majority of the time was spent on
16  these presentations.
17  BY MR. EGLER:
18      Q.  That data that you're talking
19  about, the forecasting, is that contained
20  in the document that's attached to Exhibit
21  25?
22      A.  This is more of the expenses.
23      Let me just see here for a
24  second.

Page 379

1      Yeah, this was an expense
2  presentation.  This wasn't even -- this
3  wasn't even the product unit sales or
4  marketing presentation, this was actually
5  just our expense budget presentation.
6      Q.  All right.  Great.  So let's
7  move into this document, to the third page,
8  and I think you had referred to this
9  earlier, 2012 Key Budget Assumptions.  It's
10  Bates number 4586.
11      Do you see that there?
12      A.  Yes.
13      Q.  And as you think about the
14  bullet points and the text that appears
15  there, who would have been responsible for
16  gathering all that text and putting it
17  together in the proposed budget?
18      A.  What do you mean, "gathering
19  the text"?
20      Q.  Well, let's start out with,
21  like ultimately, what would your
22  responsibility be, with regard to the text
23  that appears here?
24      A.  Well, I mean, I had each of

Page 380

1  these departments that would tell me about
2  their headcount, per se.
3      Q.  Okay.
4      A.  And they would provide
5  their -- for the sales team, you had Allan
6  Slavsky, he would be responsible for T&E.
7  And then the rest of it would be any other
8  expenses that are associated with these
9  different programs.
10      Q.  If you look at the last bullet
11  on that third page of Exhibit 25, it says,
12  "REM's" -- apostrophe S -- "programs funded
13  through Medical Education."
14      Do you see that there?
15      A.  Right.
16      Q.  That term, "medical
17  education," what does that mean to you in
18  the context of your work back at Watson,
19  understanding that this was about seven
20  years ago?
21      A.  There must have been a medical
22  education department, functional area.  And
23  anything that would be related to REMS
24  programs would have been funded or

Page 381

1  evaluated and put into the budget through
2  their budget versus the commercial budget.
3      Q.  Do you remember that being a
4  fact, as you sit here today, that the REMS
5  programs at Watson were funded through the
6  medical education group?
7      A.  Well, just knowing me, the
8  fact that I capitalized "Medical
9  Education," to me means that there was
10  probably some other functional area that I
11  was calling Medical Education that was
12  funding the -- whatever REMS programs were
13  required for the organization.
14      Q.  And as you think about that
15  term, "REMS program," the first word in
16  that sentence, what does that mean to you
17  in the context of your work, say, at
18  Watson?
19      A.  Whatever Legal and Regulatory
20  had required as part of our
21  commercialization of products, if there
22  were REMS programs associated with it, the
23  costs of those programs were being captured
24  in the medical education functional area.

Page 382

1      Q.  As you sit here today, do you
2  remember ever having a conversation with
3  someone about the allocation of costs for
4  the REMS programs for the -- any generic
5  drugs that Watson sold around this time,
6  year-end 2011?
7      A.  No, I don't recall.
8      Q.  All right.  So let's move on
9  into this document.  And the next -- not
10  the next page, but the page after it, it's
11  570.
12      Do you see that there?
13      A.  Yes.
14      Q.  And 570, it says "Current
15  Organizational Structure."
16      And as you look at this
17  generally, understanding, again, that this
18  was about seven years ago, do you recognize
19  this as the then-current organizational
20  structure for the -- top part of the
21  sales and marketing group at Watson?
22      A.  Yes.
23      Q.  All right.  So it has your
24  name there, Andrew Boyer, senior vice

Page 383

1  president, sales and marketing; and then
2  Sara Copp, the executive assistant.  Do you
3  see that there?
4      A.  Yes.
5      Q.  And then below the two of you,
6  there's Allan Slavsky, VP, sales?
7      A.  Yes.
8      Q.  And then Napoleon Clark,
9  executive director of marketing; and then
10  Jeff Weiner, executive direct of marketing;
11  Rick Rogerson, director of pricing; and
12  Kathleen Karlson, executive director of
13  bids and contracts; and then Mary Woods,
14  executive director of customer service.
15      Do you see that there?
16      A.  Yes.
17      Q.  So with regard to the six
18  people that I just mentioned, and
19  understanding that I think most of the
20  answer is below there, can we go through
21  them and can you tell me generally what
22  their roles were with regard to that --
23  with regard to the generics sales and
24  marketing group at Watson in -- around

Page 384

1  year-end 2011?
2      A.  The responsibilities are
3  pretty self-explanatory, if you want me to
4  read them off the page.
5      Q.  Well, let me ask you a couple
6  of questions about them.  And you
7  understand that as well -- that's how I
8  understand it -- that there's an arrow that
9  points down that says "Responsibility," and
10  each of those boxes corresponds to the
11  person above it; is that right?
12      A.  Yes.
13      Q.  All right.  So Allan Slavsky
14  is listed as VP of sales, and then below
15  there, it says [reading]:  National Account
16  Management and Generic Prescription, Brand
17  Prescription, and Generic OTC.
18      Is that right?
19      A.  Yes.
20      Q.  As you think about that term
21  "generic prescription" and "brand
22  prescription," what do those two terms mean
23  in the context of that box in this Exhibit
24  27 [sic]?

Page 385

1      A.  So our customers, because
2  of -- the order management system was one,
3  combined order management system that came
4  into customer service, if a customer was
5  ordering brands or generics, they would
6  reach out to Allan Slavsky, but for the
7  sole purpose of just buying products.
8  There was no detailing -- it was strictly
9  the process of:  Placing an order, the
10  order goes out.
11          If there was ever a financial
12  issue where they didn't get paid -- we
13  didn't get paid on time or, for instance,
14  there was a lost order, they had one point
15  of contact in our sales organization.
16      Q.  Have you ever heard the term
17  "SAP system" in the context of your work at
18  Watson?
19      A.  Yes.
20      Q.  Would Mr. Slavsky be related
21  some way to the SAP system at Watson?
22      A.  No.
23      Q.  Okay.  Now, over to the other
24  corner, Mary Woods.

Page 386

1          Do you see that there?
2      A.  Yes.
3      Q.  And she -- below her, it says
4  [reading]:  Order Processing, Customer
5  Service, Customer Master Database, Customer
6  Licensing, Suspicious Order Review -- and I
7  think that's -- is it International Account
8  Administration?
9      A.  Yes.
10      Q.  And then Product Support
11  Programs.
12      A.  Yes.
13      Q.  And in the middle there, or
14  close to the bottom, it says, Suspicious
15  Order Review.
16      A.  Right.
17      Q.  So are you familiar with the
18  suspicious order review system at Watson
19  around this time frame, year-end 2011?
20      A.  No.
21      Q.  As you think of it, what if
22  anything was your involvement with the --
23  well, let me start over.
24          So as we've been going in this

Page 387

1  case, and I think in this document, this is
2  sometimes referred to as a "Suspicious
3  Order Monitoring Program"?
4      A.  Yes.
5      Q.  Have you ever heard that term?
6      A.  Yes.
7      Q.  All right.  And is that the
8  same thing or a similar thing to what's
9  listed there as "Suspicious Order Review"
10  on that Page 570?
11      A.  Yes, my -- my thought on that
12  would be:  Orders came in from our
13  customers; if it kicked out of our SOMS
14  system, Mary would provide that information
15  to DEA compliance, and DEA compliance would
16  make a decision, based upon that order, as
17  to whether we release it or not.
18      Q.  In your career, even before
19  Watson or after Watson, have you ever
20  worked firsthand with the management of a
21  suspicious order review or suspicious order
22  monitoring system?
23      A.  No, I have not.
24      Q.  All right.  So as you go

Page 388

1  forward into this document to Page 572, it
2  states, "Headcount Review Commercial
3  Relations."
4          Do you see that there?
5      A.  Yes.
6      Q.  As you look at the chart that
7  appears on this Page 572, what does that
8  appear to you to be?
9      A.  This was the breakout of the
10  headcount in customer relations.
11      Q.  So it -- underneath it, in
12  this chart, it states, "Functional Area"
13  and then it states, "2011 Actual," and,
14  "2012 Proposed."
15          Do you see that there?
16      A.  Yes.
17      Q.  And under "Data Admin," and
18  then in parentheses it says, "Licenses,
19  Customers, SOMS, Portal," and then closed
20  parentheses.
21          Do you see that?
22      A.  Yes.
23      Q.  Do you understand that -- part
24  of that to be the suspicious order

Page 389

1    monitoring system at the company?
2        A.  Right.  So recognizing that it
3    was an electronic suspicious order
4    monitoring system, which is what my
5    understanding is, is that an order comes
6    in, it gets checked within the system based
7    upon the criteria that's been set by the
8    DEA compliance team, and if something were
9    to kick out, then these people would be
10   responsible, either through Mary, at this
11   time, or directly with DEA compliance, to
12   provide that information to them.
13       Q.  All right.  Do you -- and it
14   indicates here that, for the whole group
15   that's listed on that line, that Data Admin
16   Group that I just read in, there were three
17   people responsible for it in 2011, and
18   there were proposed to be three people in
19   2012.
20           Is that right?
21       A.  Yes.
22       Q.  All right.  There's -- as you
23   sit here today, you don't read it to have
24   any breakdown as to between licenses,

Page 390

1    customers, SOMS and portal; right?
2        A.  No.
3        Q.  This chart doesn't indicate
4    anything in any way?
5        A.  No.
6        Q.  So as you go further into this
7    document -- we're going to go a number of
8    pages in -- can you look at Page 4585?  And
9    it looks like this (indicating).  I'll just
10   hold it to up for you.  4585.
11       A.  (Witness complies.)
12       Q.  And Page 4585, at the top,
13   states, "customer Relations 2012 Proposed
14   Budget," and as you look at the data that's
15   on that Page 4585 in Exhibit 25, can you
16   tell me what that appears to you to be?
17       A.  This is the expense categories
18   for the customer relations proposed budget
19   for 2012.
20       Q.  Do you remember who would have
21   been responsible for preparing the data
22   that appears on this Page 4585?
23       A.  Well, the data would have come
24   out of finance, with input from Mary Woods.

Page 391

1        Q.  And then, as you go into this
2    chart on Page 4585, there's 2011 and 2012
3    indications.  And then on the left-hand
4    side, it says "Cost Center Name."  There
5    are various things that are listed there.
6    One of them is the second one there.  It
7    says "Allocation."  And I'll just represent
8    to you that "Allocation" appears in every
9    chart in this exhibit.
10           As you think about that term
11   as it's used -- or as it was used in the
12   context of your work at Watson, do you have
13   an understanding of what that word
14   "allocation" would mean on this page?
15       A.  I don't know exactly what the
16   allocation was for, but in the -- in the
17   financial systems for Watson at the time,
18   an allocation meant that you were being
19   charged by another area of the organization
20   for services being provided.
21       Q.  Okay.  And could that be
22   something even like janitorial services or
23   something?
24       A.  You know, this -- I have no

Page 392

1    idea what it was.
2        Q.  All right.  So as you go down
3    into this Page 4585 chart, there's another
4    line there that says "License, Dues &
5    Subscriptions."
6           Do you see that?
7        A.  Yes.
8        Q.  And then the -- under "2011,"
9    it states "Budget" and then "Forecast."
10   And then under "2012," it states "Budget."
11           When you -- as you read it in
12   the context of what your work was at
13   2011 -- in 2011 at Watson, what does that
14   term "budget" mean, especially in the
15   context of forecast?
16       A.  This is a proposed budget for
17   2012.
18       Q.  All right.  So as you read it,
19   was there a budget in 2011 of -- would that
20   be $31,000 for subscriptions and then a
21   proposed budget for 2012 of $171,000?
22       A.  Right.  So the budget for '11
23   was 31-, the forecast that we ended up
24   spending was 89,000; and the budget for '12

Page 393

1   was 171,000.
2           And these are licenses, dues
3   and subscriptions.  These are the software
4   licenses, such as -- you mentioned SAP
5   users.  So if you were a user of SAP, you
6   might have a software license, or you maybe
7   have the customer relationship management,
8   which was called sales force, I believe, at
9   the time.  So it would have been those
10  software licenses for the organization.
11          Q.  Do you know who would have put
12  together the 2012 budget for the -- well,
13  let me start over.
14          As you look at this
15  document -- I think you had said that Mary
16  Woods with the financial group would have
17  put together the data that appears on this
18  page.
19          With regard to the 2012
20  budget, who would have been primarily
21  responsible for budgeting the license, dues
22  and subscriptions that appear there on
23  Page 4585?
24          A.  It probably would have been

Page 394

1   input from finance that they got from IT as
2   to how many people we had utilizing systems
3   and what the cost of those licenses were
4   going to be.  They probably provided that
5   to Mary, and Mary probably put it into the
6   budget.
7           Q.  All right.  All right.  And
8   then can you turn to Page 4595.  And
9   actually, as we're going, just -- so -- to
10  put it into context, turn to the page
11  before that, 4954.  It states "2011 Key
12  Accomplishments."
13          Do you see that there?
14          A.  Yes.
15          Q.  Who would have been
16  responsible for the text that appears on
17  that page, 4594?
18          A.  I'm going to guess the
19  majority of this was either Mary -- Mary
20  along with input from others.
21          Q.  All right.  And then going to
22  the next page, "2012 Objectives,"
23  Page 4595 --
24          A.  Yes.

Page 395

1           Q.  -- as you see the text on this
2   page, who would have been responsible for
3   contributing the text of this page?
4           A.  And I would say the same
5   person.  Mary and/or others.
6           Q.  All right.  And on this page,
7   it states, "Systems" -- let me start over
8   -- "System Enhancements."
9           Do you see that there?
10          A.  Yes.
11          Q.  And it says, "Partner with
12  Contract Operations to develop streamlined
13  process for CARS membership, addition,
14  deletion, changes process."  And then it
15  states, "Partner with DEA Affairs on
16  enhancements to current SOMS systems."
17          So there's a term there, "CARS
18  membership."  Do you have an understanding
19  of what that meant in 2011 in your work at
20  Watson?
21          A.  CARS was a software that
22  contained all of our master data for, I
23  believe, customers and so on.  So I'm not
24  exactly sure what she was asking about

Page 396

1   here.  It had all of our contracts and
2   customers, if I'm not mistaken.
3           Q.  All right.  And then it's
4   written, "Partner with DEA Affairs on
5   enhancements to current SOMS systems."
6           And then SOMS system is the
7   system that we've been talking about
8   before, suspicious order management system;
9   is that right?
10          A.  Yes.
11          Q.  Do you remember there being an
12  objective for 2012, at the end of 2011,
13  to -- at Watson to partner with DEA affairs
14  to enhance the current SOMS system?
15          A.  No.  And I don't know what the
16  definition of "enhancement" is.  I don't
17  know if that's faster communication or
18  faster order processing.  I would have no
19  idea.
20          Q.  Do you remember around this
21  time -- end of 2011, any discussions at
22  Watson about whether the SOMS system
23  required enhancement?
24          A.  I do not.

Page 397

1         MR. ERCOLE:  Objection to form.
2 BY MR. EGLER:
3     Q.  So go to the next page.  It
4 says "2011 YTD" and then in parentheses
5 "August."  And it states "Productivity
6 Statistics."
7       And -- well, as you look at
8 this document, do you remember who at
9 Watson would have been responsible for the
10 data that appears on this page?
11     A.  Mary.
12     Q.  And that's Mary Woods; is that
13 right?
14     A.  Yes.
15     Q.  All right.  So -- and we're
16 talking about Page 4596 in Exhibit 25.
17       And about halfway down the
18 page, there's a -- there's a -- well, at
19 the top of the page, it states, "Customer
20 relations," and then a dash, "key
21 performance indicators."
22       Do you see that there?
23     A.  Yes.
24     Q.  And then there's a column that

Page 398

1 states "2010," and then "Year To Date
2 August 2011," and then "2011 Year To Date
3 versus 2010 Year To Date percent of
4 change."
5     A.  Yes.
6     Q.  Okay.  And then about -- I
7 guess about two-thirds of the way down the
8 page, it states "Master Data Statistics."
9       Do you see that there?
10     A.  Yes.
11     Q.  And it states "monthly average
12 per MDA."
13       Do you have an understanding
14 of what the term "MDA" means in the context
15 of this document?
16     A.  No.
17     Q.  Do you have an understanding
18 that it means an individual and not some
19 type of computer system or something?
20       MR. ERCOLE:  Objection to form.
21       THE WITNESS:  I don't know.
22 BY MR. EGLER:
23     Q.  Do you remember having a
24 discussion about the rate of SOMS

Page 399

1 validations that's listed there around the
2 end of 2011 at Watson with anyone?
3     A.  I do not.
4     Q.  Do you remember having a
5 discussion about the productivity of the
6 various people who were performing SOMS
7 validations at Watson around the year-end
8 of 2011?
9     A.  I do not.
10     Q.  Do you remember ever having a
11 discussion about the fact that the number
12 of validations performed by the various
13 staff people had increased by a third
14 between 2010 and year-to-date August 2010?
15       MR. ERCOLE:  Objection to form.
16       THE WITNESS:  I do not.
17 BY MR. EGLER:
18     Q.  Do you remember ever having a
19 discussion with anyone about the need or
20 preference for a higher number of people
21 performing SOMS validations at Watson
22 around this time?
23     A.  You know, the organization was
24 growing quickly.  So what I would say is --

Page 400

1 and this is a conversation I remember
2 having internally.  I've had it for years
3 now -- as your volume increases, the
4 requirements of the organization to satisfy
5 the needs of the organization sometimes
6 increases on order management or others.
7       But I don't recall anything
8 specific to this, to be fair.
9     Q.  Do you remember ever hiring
10 more than three people to examine the
11 pended orders in Watson's suspicious order
12 monitoring system?
13     A.  To be --
14       MR. ERCOLE:  Objection to form.
15       THE WITNESS:  To be fair, they
16 didn't review those orders.  Their
17 responsibility was to collect those
18 orders, is my understanding -- Mary
19 would know better than I would --
20 collect those orders, that was an
21 automated process coming out of the
22 system, and provide that to DEA
23 compliance.
24       Now, I don't know if they did

Page 401

1    that manually.  And the enhancement was
2    to get it off of paper or get it more
3    electronic.  I don't know what those
4    enhancements were.  Mary is the one
5    that you would need to ask.
6         But throwing people at a
7    process doesn't necessarily make it
8    work any more efficiently.  So I don't
9    know that people is the answer.  As
10   certain parts of the organization grew,
11   sometimes it was software enhancements
12   or, you know, other SAP enhancements
13   that were required.
14   BY MR. EGLER:
15       Q.   Just because I don't want it
16   to be a trick question, I'll just represent
17   to you, we took her deposition last week.
18       A.   Okay.
19       Q.   And that's why I'm kind of
20   asking you whether you have any -- I don't
21   want to characterize her testimony.
22       A.   Yeah.
23       Q.   I don't want to put words -- I
24   don't want to describe what she said,

Page 402

1    because everyone will think I'm describing
2    it wrong, even if I'm thinking it's right.
3         But I just want to tell you --
4    I just want to ask you, as you sit here
5    today, do you remember there ever being a
6    discussion of whether it would be
7    beneficial or whether it was required to
8    bring more people into the Watson SOMS
9    system to review the pending orders around
10   this time, yearend 2011?
11       A.   Seven or eight years ago, I
12   don't remember.  Somebody else could have a
13   better memory than I do, for sure.
14       MR. EGLER:  That's all I wanted
15   to know.
16         Okay.  I don't have any further
17   questions.
18       THE VIDEOGRAPHER:  Any other
19   questions for anyone?
20       MR. ERCOLE:  I have a couple of
21   questions.
22         EXAMINATION
23   BY MR. ERCOLE:
24       Q.   Good afternoon, Mr. Boyer.

Page 403

1        A.   Evening.
2        Q.   Good evening.  Thank you for
3    that clarification.
4          Do you mind reiterating when
5    you started at Watson Pharma?
6        A.   1998, September.
7        Q.   And there's been a lot of
8    discussion today of the difference between
9    brand opioid -- excuse me -- brand
10   medicines and generic medicines.  When you
11   worked at Watson Pharma, did you ever work
12   with brand versions of opioid medicine?
13       A.   No.  I was responsible for
14   generics.
15       Q.   And when you worked at Watson
16   Pharma, did you have knowledge of any
17   specific promotional activities associated
18   with brand opioids there?
19       A.   No.
20       MR. EGLER:  Object to form.
21         You can answer.
22       THE WITNESS:  Okay.  No.  I was
23   not involved in any of the strategy or
24   the detailing of any of the brand

Page 404

1    products, opioids or other, from the
2    brand side of our business.
3    BY MR. ERCOLE:
4        Q.   Would that apply to any
5    marketing activities on the brand side of
6    the business?
7        MR. EGLER:  Object to form.
8          You can answer.
9        THE WITNESS:  That would apply
10   to Watson, Actavis and Teva for any of
11   the branded products for any of those
12   companies.
13   BY MR. ERCOLE:
14       Q.   And when you say "that
15   applies," what do you mean by that?
16       A.   Well, that means any of the
17   features and benefits and detailing aids
18   and items that a brand organization would
19   traditionally do was done by the brand
20   organization.  The generic organization,
21   including myself and my team, didn't
22   participate in any of that promotional
23   activity.
24       Q.   And what you just described

Page 405

1    applied when you were at Watson Pharma; is
2    that correct?
3         A.  Yes.
4              MR. EGLER:  Objection.
5              You can answer.
6              THE WITNESS:  Yes.
7    BY MR. ERCOLE:
8         Q.  And did it apply when you were
9    at Actavis Pharma?
10             MR. EGLER:  Same objection.
11             You can answer.
12             THE WITNESS:  When Watson went
13   to Actavis, yes, that's the case.
14   BY MR. ERCOLE:
15        Q.  And did it apply when you
16   worked with Teva USA?
17             MR. EGLER:  Same objection.
18             You can answer.
19             THE WITNESS:  Yes.
20   BY MR. ERCOLE:
21        Q.  With respect to the work that
22   you did at Watson Pharma as to generics, do
23   you recall any detailing of physicians with
24   respect to generic medicines?

Page 406

1         A.  Not that I recall.
2         Q.  Do you recall any sponsorship
3    of CMEs regarding opioid medicines that
4    would have been done on the generic side of
5    Watson Pharma.
6         A.  Continuing medical education?
7    Not that I'm aware of, no.
8         Q.  Are you aware of any payments
9    made by the generic business of Watson
10   Pharma to third-party pain management
11   groups?
12             MR. EGLER:  Object to form.
13             You can answer.
14             THE WITNESS:  No.
15   BY MR. ERCOLE:
16        Q.  How about, would what you just
17   testified about -- strike that.
18             When you worked at Actavis
19   Pharma, do you recall any detailing done by
20   the generic side of the business with
21   respect to opioid medications?
22        A.  No.
23             MR. EGLER:  Object to form.
24   BY MR. ERCOLE:

Page 407

1         Q.  And when you were at Actavis
2    Pharma, do you have any knowledge of any
3    sponsorship of -- strike that.
4              I mentioned the word "CMEs,"
5    and I should not have assumed, necessarily,
6    that everyone knows what that is.
7              Do you have any knowledge of
8    what a CME is?
9         A.  It's usually the continuing
10   medical education, that the brand
11   organization sometimes sponsored, to
12   educate physicians on a particular topic.
13        Q.  With respect to your work at
14   Actavis Pharma, was there any sponsorship
15   of CMEs done on the generic side of the
16   business?
17        A.  Not that I'm aware of.
18        Q.  When you worked at Teva, was
19   there any sponsorship of CMEs done on the
20   generic side of the business when you were
21   there?
22             MR. CRAWFORD:  Objection;
23   vague.
24             THE WITNESS:  Not that I'm

Page 408

1    aware of.
2    BY MR. ERCOLE:
3         Q.  Did you understand what I
4    meant by that question, sir?
5         A.  Strictly generics -- I don't
6    recall any continuing medical education to
7    physicians done by any of the generic
8    entities that I was a part of during my
9    time there.
10        Q.  And with respect to any of the
11   generic entities that you worked at, since
12   1998, do you have any payments to -- strike
13   that.
14             I referred earlier to
15   third-party pain management associations;
16   do you recall that?
17        A.  Yes.
18        Q.  Do you have an idea of what a
19   third-party pain management association is?
20        A.  I know what an association is.
21   I don't know what the pain management
22   association is.  But I'm not aware of any
23   payments being made to any of the so-called
24   therapeutic-specific associations that

Page 409

```
 1    would be -- that were paid for by a generic
 2    business.
 3            That's not just opioids, but
 4    that would be, you know, OB/GYNs, you know,
 5    repro -- I'm not aware of any of those
 6    types of associations where the generic
 7    organization was paying for any kind of
 8    participation in those --
 9        Q.  How about --
10        A.  -- associations.
11        Q.  And how about any third-party
12    pain management trade associations?
13        A.  No, not that I'm aware of.
14        Q.  To the best of your
15    recollection, was there any detailing of
16    physicians done, with respect to generic
17    medicines, at the entities that you worked
18    for since 1998?
19        A.  Again, I was not aware, and I
20    think I testified already that I'm not
21    aware of any physician-based detailing of
22    features and benefits of our generic
23    business.
24            MR. ERCOLE:  Thank you.
```

Page 410

```
 1            THE VIDEOGRAPHER:  The time is
 2    approximately 4:49 p m., and this
 3    concludes the deposition.
 4        (Videotaped deposition concluded at
 5        4:49 p m.)
 6
 7
 8          C E R T I F I C A T I O N
 9
10
11        I hereby certify that I have
12    read the foregoing transcript of my
13    deposition testimony, and that my answers
14    to the questions propounded, with the
15    attached corrections or changes, if any,
16    are true and correct.
17
18    ------------------------------
18    ANDREW BOYER
19
20
21
22
23
24
```

Page 411

```
 1        CERTIFICATE OF SHORTHAND REPORTER
 2
 3        I, Gail Inghram Verbano,
 4    Registered Diplomate Reporter, Certified
 5    Realtime Reporter, Certified Shorthand
 6    Reporter and Notary Public, the
 7    officer before whom the foregoing
 8    proceedings were taken, do hereby certify
 9    that the foregoing transcript is a true and
10    correct record of the proceedings; that
11    said proceedings were taken by me
12    stenographically and thereafter reduced to
13    typewriting under my supervision; and that
14    I am neither counsel for, related to, nor
15    employed by any of the parties to this case
16    and have no interest, financial or
17    otherwise, in its outcome.
18
19
20
21    _____
        Gail Inghram Verbano, CSR, RDR, CRR
22
23
24
```

Page 412

```
 1          - - - - - -
              E R R A T A
 2          - - - - - -
 3
 4    PAGE  LINE  CHANGE
 5    ____ ____ _____
 6        REASON: _____
 7    ____ ____ _____
 8        REASON: _____
 9    ____ ____ _____
10        REASON: _____
11    ____ ____ _____
12        REASON: _____
13    ____ ____ _____
14        REASON: _____
15    ____ ____ _____
16        REASON: _____
17    ____ ____ _____
18        REASON: _____
19    ____ ____ _____
20        REASON: _____
21    ____ ____ _____
22        REASON: _____
23    ____ ____ _____
24        REASON: _____
```

Page 413

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5     hereby certify that I have read the
 6     foregoing pages, and that the same is
 7     a correct transcription of the answers
 8     given by me to the questions therein
 9     propounded, except for the corrections or
10     changes in form or substance, if any,
11     noted in the attached Errata Sheet.
12
13
14     _____
15      ANDREW BOYER              DATE
16
17
18     Subscribed and sworn
       to before me this
19     _____ day of _____, 20____.
20     My commission expires:_____
21
       _____
22     Notary Public
23
24
```