Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------     )
IN RE: NATIONAL              ) MDL No. 2804
PRESCRIPTION OPIATE          )
LITIGATION                   ) Case No.
------------------------     ) 1:17-MD-2804
                             )
THIS DOCUMENT RELATES TO     ) Hon. Dan A. Polster
ALL CASES                    )
------------------------     )
```

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VIDEOTAPED 30(b)(6) DEPOSITION

OF

WALGREENS BOOTS ALLIANCE, INC. a/k/a WALGREEN CO.

BY

EDWARD BRATTON

December 16, 2018

Chicago, Illinois

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 32

1      MR. MOUGEY:  They are.
2           (WHEREUPON, certain documents were
3           premarked Bratton 30(b)(6) Exhibit
4           Nos 5 through 16; Description given
5           in Index.)
6  BY MR. MOUGEY:
7      Q.   All right.  I don't want you to take my
8  word for it.  We're going to check those.
9           But what you have in front of you, I
10  believe, or what I tried to do was to take the
11  Bates ranges in No. 2 which are incorporated into
12  request 6 and request 7 and those are the stack
13  that's in front of you.  Okay?
14           So, what I want -- they should be in
15  Bates order in the same.  If you would go to No. 6
16  on Bratton 30(b)(6) 4, I want to go through and
17  check off those Bates ranges that we were -- we
18  were given today to prepare.
19      A.   Okay.
20      Q.   Let me know when you get to page 6 on
21  Bratton Exhibit 4.
22      MR. MOUGEY:  Corey, if you can put the Bates
23  ranges up on the screen, that would be great.
24  BY THE WITNESS:

Page 31

1      Q.   And almost all of that preparation for
2  today has been done in the last two weeks.  Am I
3  stating that accurately?
4      A.   Preparation by me, yes.
5      Q.   Yes, sir.  So, these notebooks behind
6  me, have you been using those over the last two
7  weeks to prepare yourself for your testimony today?
8      A.   They've been part of my preparation,
9  yes.
10      Q.   And the notebooks that I have behind me
11  that -- I'm assuming you've been through those and
12  you're familiar with them, correct?
13      MR. BENSINGER:  Asked and answered.
14  BY THE WITNESS:
15      A.   Fairly familiar, yes.
16  BY MR. MOUGEY:
17      Q.   And you -- you've been using those same
18  notebooks over the last two weeks to prepare
19  yourself?
20      A.   Yes.
21      Q.   So, I'm going to hand you what I'm going
22  to mark as Bratton 30(b)(6) 5 through Bratton
23  30(b)(6) Exhibit 15.  Okay.
24      MR. BENSINGER:  Counsel, are these premarked?

Page 33

1      A.   Okay.
2  BY MR. MOUGEY:
3      Q.   So, let's start with the first -- the
4  document in front of you.  And does the Bates range
5  begin with 1854?
6      A.   Of Exhibit 5?
7      Q.   Yes.
8      A.   I do not think so, no.
9      Q.   Exhibit 5 should look like this.  No?
10      MR. BENSINGER:  Mr. Mougey, there are two
11  Bates numbers.  Perhaps you could direct the
12  witness to the Bates number to which you are now
13  referring.
14      MR. MOUGEY:  Thank you.
15  BY MR. MOUGEY:
16      Q.   In the bottom, there is two numbers in
17  the right-hand corner, and the smaller of which is
18  1854; and I think you and I are on the same
19  document, but I'm not sure.
20      A.   Yes.
21      Q.   Does it say 1854?
22      A.   Yes.
23      Q.   Let's check that one off.  I tried to
24  get these in order.  I'm not entirely sure I did.

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1        And if you look at Bratton Exhibit 6,
2   the last three digits are 965.
3        Do you see that, sir?
4   A.   Yes.
5   Q.   And if you look at Bratton 30(b)(6), the
6   next digit range is 625.
7        Do you see that, sir?
8   A.   Yes.
9   Q.   Okay.  So far we have the first three in
10  a row, right?  We have gone through the first three
11  Bates ranges on the bottom of page 6 of the
12  combined discovery responses, right?
13  A.   Yes.
14       MR. BENSINGER:  Mr. Mougey, you may want to
15  identify Exhibit 7.  You just omitted to mention
16  the Bates range is Exhibit 7.
17       MR. MOUGEY:  Thank you.
18  BY MR. MOUGEY:
19  Q.   And the Bates ranges on Bratton 30(b)(6)
20  Exhibit 8 end with 923.
21  A.   Yes.
22  Q.   All right.  And we can pick up the pace
23  here.
24       Bratton 30(b)(6) Exhibit 9 end with 503?

Page 35

1   A.   Yes.
2   Q.   And we're still going in order and we
3   are catching every one on bottom of page 6, top of
4   page 7, right?
5   A.   I believe so, yes.
6   Q.   And Bratton 30(b)(6) 10 end with the
7   Bates numbers 132.
8        Do you see that?
9   A.   Yes.
10  Q.   And Bratton 30(b)(6) 11, Bates numbers
11  end with 638.  We are still going in order, right?
12  A.   Yes.
13  Q.   We've got them all so far, correct?
14  A.   I believe so.
15  Q.   And Bratton 30(b)(6) Exhibit 12 ends
16  with Bates ranges 937?
17  A.   Yes.
18  Q.   And Bratton 30(b)(6) Exhibit 13 end with
19  Bates ranges Exhibit 342?
20  A.   Yes.
21  Q.   And Bratton 30(b)(6) Exhibit 14 ends
22  with Bates No. 27, 027?
23  A.   Yes.
24       MR. BENSINGER:  Excuse me, Mr. Mougey.  Were

Page 36

1   you just referring to Bratton Exhibit 14?
2        MR. MOUGEY:  Bratton Exhibit 14, 30(b)(6) 14,
3   ends with Bates No. 027.  Yes, sir.
4        MR. BENSINGER:  The copy that you handed to me
5   ends with Bates No. 028.  I have a loose sheet of
6   paper that ends in Bates No. 027, but it does not
7   have an exhibit sticker upon it.
8        MR. MOUGEY:  That's the first page and the
9   loose piece of paper that does not have an exhibit
10  on it is -- if you'd just handwrite it on there for
11  me, that would be great -- that's Exhibit 14.
12  Bratton 30(b)(6) 14.
13       MR. BENSINGER:  So, could you just state, so
14  the record is clear, which is the first page and
15  which is the second page of Bratton Exhibit 14.
16       MR. MOUGEY:  "Handling Suspicious Orders" is
17  the title of the document, Bates No. 027, which is
18  marked as Exhibit 14, and Bates No. 28 is the
19  second page.  Thank you.  Okay?
20  BY MR. MOUGEY:
21  Q.   Exhibit 15, Bratton 30(b)(6) 15 --
22       MR. MOUGEY:  And, Peter, it looks like I have
23  a dupe.  But it's 27 and 28 is the first one.
24  Bratton Exhibit 15 is also Bates No. 028.

Page 37

1   BY MR. MOUGEY:
2   Q.   Do you see that, Mr. Bratton?
3   A.   Yes.
4   Q.   All right.
5        MR. BENSINGER:  Mr. Mougey, the document that
6   you handed to me that has the exhibit sticker
7   Bratton 30(b)(6) Exhibit 15 begins with a Bates
8   No. 957.
9        MR. MOUGEY:  And that mark as 16 for me.
10       MR. BENSINGER:  So, the exhibit sticker on the
11  document is incorrect and I should change it?
12       MR. MOUGEY:  Exactly what I just said.  Why
13  don't you mark it as Exhibit 16 for me, Peter.  You
14  got it?  Great.  Thank you.  All right.
15  BY MR. MOUGEY:
16  Q.   So, it looks like I have got all of the
17  exhibits in combined discovery request 2, 6 and 7
18  regarding Walgreens suspicious order monitoring
19  policies and procedures since January 1, 2006 that
20  we just went through, right?
21  A.   I believe so, yes.
22  Q.   Okay.  Now, you have in front of you it
23  looks like four pages of a listing of specific
24  information.  Is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1     A.   Yes.
2     Q.   Is that in the notebooks behind me?
3     A.   Yes.
4     Q.   Now, the 12 documents that we have just
5  gone through that are a response to suspicious
6  order monitoring policies combined discovery
7  request 2, 6 and 7, I'm assuming that at least
8  based on the stack behind me, there are
9  significantly more documents in this stack,
10  correct?
11     A.   There is additional documents in the
12  folders, yes.
13     Q.   What I was prepared to do this morning
14  is to have you walk me through Walgreens combined
15  discovery request 2 with the documents that I was
16  provided to prepare for today and have you explain
17  Walgreens' suspicious order monitoring policies and
18  procedures.
19          Are the documents that I just handed
20  you, the 12 different documents that were given to
21  me to prepare today, are those not enough to
22  provide a complete and accurate description of
23  Walgreens' suspicious order monitoring policies and
24  do I in fact need to reference the documents behind

Page 39

1  me?
2          MR. BENSINGER:  Objection; calls for a legal
3  conclusion.
4  BY THE WITNESS:
5     A.   I'm not sure.
6  BY MR. MOUGEY:
7     Q.   I mean do you need documents that are in
8  these notebooks behind me or are the 12 documents I
9  just gave you sufficient to be able to walk us
10  through?
11     A.   I think it would depend on your
12  questions.  There could be reference that I might
13  like to look at from the binders.
14     Q.   I would like for you to be able to walk
15  me through Walgreens' suspicious order monitoring
16  policies, procedures, the criteria used in those
17  throughout 2006 until the time -- point in time
18  when Walgreens stopped distributing.
19          Are the 12 documents that I've given you
20  enough for you to testify today on Walgreens'
21  position regarding its suspicious order monitoring
22  policies or do we need to use the box of documents
23  behind me?
24          MR. BENSINGER:  Objection; vague, compound.

Page 40

1  BY THE WITNESS:
2     A.   I may need to refer to the binders
3  during your questioning.
4  BY MR. MOUGEY:
5     Q.   Explain to me what you have in front of
6  you on those four sheets.
7     A.   This is a chronology of the documents
8  that are in the three binders.
9     Q.   A chronology of the documents that are
10  in the three binders.  And how many different
11  documents do you have on those four sheets, unique
12  documents?
13     A.   I'm not sure of the count.
14     Q.   Take a -- take a SWAG at it.
15     A.   Probably about 50.
16     Q.   About 50?
17     A.   Maybe more.
18     Q.   And we just went through on combined
19  responses to our discovery request in response to
20  No. 2, we went through about 12, right?
21     A.   Correct.  These are -- incorporate
22  multiple topics, but...
23     Q.   All right.  Why don't we start off with
24  the stack that I was given.  Okay.  Why don't we

Page 41

1  start off with the very first document that has the
2  Bates No. 1854 and it's titled "Handling Suspicious
3  Drug Orders."
4     A.   Okay.  It's Exhibit 5?
5     Q.   Pardon me?
6     A.   That's Exhibit 5?
7     Q.   Exhibit 5.  Thank you, yes.
8          Now, sir, explain to me what this
9  document is.  What is it?
10     A.   This was a document for the distribution
11  centers that detailed the policy regarding
12  suspicious order reporting.
13     Q.   If I look under http://snetapp on the
14  very bottom of the page.
15          Do you see that?
16     A.   I do.
17     Q.   And is that a designation off of or an
18  HTP off of Walgreens' intranet?
19     A.   I believe so.
20     Q.   And this is
21  handlingsuspiciousdrugorders.htm.
22          Do you see that, sir?
23     A.   Yes.
24     Q.   And walgreens.com/prodpublishers/dea/

11 (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  security/handlingsuspiciousorders.htm.  Correct?
2      MR. BENSINGER:  Objection.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MR. MOUGEY:
6      Q.   And, sir, this was Walgreens' suspicious
7  order monitoring policy at least of beginning at
8  the beginning of 2006, correct, sir?
9      A.   This document indicates it goes back to
10  1998, but at least 2006, yes.
11     Q.   It does.  You see that in the upper
12  right-hand corner where it says "Originated" --
13  upper-left hand corner, "Originated:  9/8/2008,"
14  correct?
15         Do you see that, "Originated 9/8/98"?
16     A.   Oh, '98.  Yes.
17     Q.   Yes.
18     A.   Sorry.  I thought you said 2008.
19     Q.   I might have.  "Originated 9/8/98"?
20     A.   Yes.
21     Q.   But I don't have the copies from 9/8/98
22  until the revised 2/15/05.  Do you see the date
23  right above it?
24     A.   I do.

Page 43

1      Q.   Are you familiar with what reiterations,
2  if any, there were from 9/8/98 to 2/15/05?
3      A.   I don't believe we were able to -- to
4  find those documents.  So, I'm not familiar with
5  them.
6      Q.   So, it originated in some form and
7  fashion in '98; and the next revision we can tell,
8  at least from this document, was in 2/15/2005,
9  correct?
10     A.   Correct.
11     Q.   "Handling Suspicious Orders.  The
12  Logistics and Planning Department sends the
13  Suspicious Control Drug Orders report to all
14  distribution centers.  The report lists controlled
15  drug orders that may be of unusual size for a store
16  in its category, of unusual frequency for a store
17  in its category, deviating from a normal pattern
18  for a store in its category."
19         Do you see that?
20     A.   I do.
21     Q.   Okay.  And this manual section is the
22  entirety, this section, of what Walgreens had in
23  place in its manual beginning in 2006, correct?
24     MR. BENSINGER:  Objection; mischaracterization.

Page 44

1  BY THE WITNESS:
2      A.   This document was used by the DCs in
3  conjunction with other policies and procedures that
4  they -- they had based on my interviews with them.
5  BY MR. MOUGEY:
6      Q.   Because what we have in front of us, and
7  let's just continue to the next page so we have the
8  whole thing, and this next page is titled "Handling
9  Suspicious Orders and Loss of Controlled Drugs."
10         Do you see that, sir?
11     A.   I do.
12     Q.   And the "Policy, Distribution centers
13  must file all Suspicious Control Drug Orders
14  reports for five years.  The administration manager
15  must complete the Report of Theft of Loss of
16  Controlled Substances (DEA Form 106) when any of
17  the following circumstances occur:  A theft of
18  controlled drugs, no matter how small (also file a
19  police report); a substantial loss; all in-transit
20  losses or thefts as described above."
21         I didn't read everything, but does that
22  fairly capture the three bullet points?
23     A.   Yes.
24     Q.   Okay.  Now, is there any other manual

Page 45

1  section that encapsulates Walgreens' position at
2  any point in time from 2005 to the beginning of
3  2012?
4      MR. BENSINGER:  Objection; mischaracterization.
5  BY THE WITNESS:
6      A.   A manual?  Not that I have been able to
7  discover or find.
8  BY MR. MOUGEY:
9      Q.   Not that you have been able to discover.
10  Not that anybody has shown you, correct?
11     A.   Correct.
12     Q.   Now, when I say "a manual," are you and
13  I on the same page?  A document that encapsulates
14  the policies, procedures, governing Walgreens'
15  conduct to manage suspicious order monitoring
16  policies?
17     A.   Correct.
18     Q.   Now, this document that we have in front
19  of us, Bratton 30(b)(6) Exhibit 5, does not give
20  any guidance for Walgreens regarding the criteria
21  to use to identify unusual size, correct?
22     A.   Correct.
23     Q.   It doesn't give any guidance on what
24  constitutes unusual frequency, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    A.   Correct.
2    Q.   It doesn't give any criteria on what
3  constitutes deviating from a normal pattern,
4  correct?
5    A.   Correct.
6    Q.   It doesn't provide any thresholds,
7  correct?
8    A.   Correct.
9    Q.   Doesn't provide any parameters, correct?
10    A.   Correct.
11    Q.   Doesn't provide any definitions for any
12  of those sections, correct?
13    A.   Correct.
14    Q.   Now, it does not designate on Bratton
15  30(b)(6) Exhibit 5 whether or not suspicious orders
16  are sent to the DEA, correct?
17    A.   It does not in this page, no.
18    Q.   It doesn't in either of these two pages,
19  correct?
20    A.   Correct.
21    Q.   There is nothing in Walgreens' manual
22  about whether or not due diligence is performed
23  prior to shipment, correct?
24    A.   Not on this page, no.

Page 47

1    Q.   There is nothing in these two pages,
2  Bratton 30(b)(6) Exhibit 5, the Walgreens manual
3  that's in play as of 2/15/05, of whether due
4  diligence is performed at all on suspicious orders,
5  correct?
6    A.   Not on this document, no.
7    Q.   Can you point me to any other document
8  at Walgreens from -- that was in full force and
9  effect at the same time as Bratton Exhibit 30(b)(6)
10  5, any document, that encapsulates Walgreens'
11  policies and procedures for suspicious order
12  monitoring?
13    A.   During what time period?
14    Q.   At the time that this policy was in
15  effect in this manual section that we're looking at
16  in Bratton 30(b)(6) 5.
17    A.   So, I believe --
18    MR. BENSINGER:  Objection; mischaracterization.
19  BY THE WITNESS:
20    A.   I believe that this policy is still in
21  effect to this day, so there could be a variety of
22  documents --
23  BY MR. MOUGEY:
24    Q.   I'm not --

Page 48

1    A.   -- after the 2005 date that would
2  describe our handling of.
3    Q.   A variety of documents?
4    A.   Um-hmm.
5    Q.   And that variety of documents, is that
6  what you have in kind of a theme list or issue in
7  the four pages in front of you?
8    A.   Some of those characterize our systems
9  and policies around controlled substance order
10  monitoring.
11    Q.   If I'm an employee at Walgreens at
12  this -- from the date of this manual, 2005 on,
13  where would I go to find Walgreens' suspicious
14  order monitoring policies and procedures?
15    MR. BENSINGER:  Objection; mischaracterization.
16  BY THE WITNESS:
17    A.   I believe that those employees would
18  reach out to the relevant teams to ask about the
19  procedures.
20  BY MR. MOUGEY:
21    Q.   The relevant teams.  All right.
22      Now, there is 250,000 employees at
23  Walgreens.  Where in this manual section that's in
24  play as of '05, where does it tell me who to ask in

Page 49

1  that 250,000 people?
2    MR. BENSINGER:  Objection; mischaracterization.
3  BY THE WITNESS:
4    A.   It does not.  However, this policy
5  specifically is dealing with DC center employees,
6  so it wouldn't be relevant to all 250,000
7  employees.
8      And from my understanding, the
9  distribution center was in contact and knew the
10  teams to reach out to if they had questions.
11  BY MR. MOUGEY:
12    Q.   Oh.  So, this policy is, according to
13  your testimony today, is just for the distribution
14  centers?
15    A.   I believe so.
16    Q.   But the distribution centers, sir, what
17  was their role in suspicious order monitoring
18  policies and procedures at the point in time that
19  this manual came into play in 2005, the document we
20  have in front of you?
21    A.   What was --
22    MR. BENSINGER:  Objection.  Objection.
23  mischaracterization, vague.
24  BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1      A.   What was their role in producing this
2   document?  Or what was their role in --
3   BY MR. MOUGEY:
4      Q.   What was their role in Walgreens'
5   suspicious order monitoring policies and
6   procedures?
7      A.   You want me to describe the actions that
8   they took to monitor?
9      Q.   I do.  What was their role?
10      A.   Sure.  So, the distribution center staff
11   would, in early 2006, '7, at this time period,
12   would -- there was a query that they would run in
13   the mornings and they would identify orders of
14   unusual size with that query.
15         They -- the SAIL coordinators would run
16   that and, if they saw fit, would provide additional
17   details to management in the distribution center.
18         Additionally, the staff in the vault at
19   Perrysburg would be familiar with orders and so if
20   they were to see an order of unusual size or
21   quantity, they would reach out to their immediate
22   supervisor, one of which was Deb Bish, and she
23   would -- she -- in our interviews with her, she
24   indicated that if they saw an unusual order, they

Page 51

1   would reach out to the store and attempt to
2   investigate what -- why the order was of unusual
3   size and they might modify or change or delete that
4   order depending on the results of their
5   conversations.
6      Q.   What is the basis for your -- your
7   testimony?  What are you referring to?
8      A.   I am -- this is based on interviews with
9   distribution center staff.
10      Q.   So, there is no written policy or
11   procedure that you just referenced that -- that
12   process you just referenced?
13      A.   Not that I'm aware of for this time
14   period or for the 2005, '6, '7 period, no.
15      Q.   Why don't you -- let's do it this way.
16         Why don't you tell me when is the first
17   document that you have that you relied on for your
18   testimony today that, outside of Bratton 30(b)(6)
19   Exhibit 5, from January of 2006 until 12/31 of
20   2008, what written document encapsulates or
21   describes Walgreens' suspicious order monitoring
22   policy and procedures?
23      A.   One moment.
24         Some of the processes or procedures

Page 52

1   are -- are detailed in an e-mail from our -- from
2   Dwayne Piñon to DEA agent Barbara Dobric, and it
3   discusses how we were reporting at that time; and I
4   believe there was a request at that time to modify
5   the reporting to match the Chemical Handler's
6   Manual Appendix E-3.  But it discusses some of the
7   reporting we were doing at that time.
8      Q.   The only document -- can you come up
9   with anything else?
10      A.   One moment, please.
11         There's another e-mail in 2008 from
12   Dwayne Piñon to Lisa Sullivan in which they discuss
13   some of our reporting practices and monitoring
14   practices pursuant to Appendix E-3.
15         I'm sorry.  What was the end of the time
16   frame you were asking?  2008.
17      Q.   12/31/2008.
18      A.   I think that's all the documents that I
19   have in that time period.
20      Q.   So, the only thing from January 1, 2006
21   to the end of December 2008 is Bratton 30(b)(6) 5
22   that we just went through, right?
23      A.   Um-hmm.
24      Q.   And two e-mails.

Page 53

1         And you just put that notebook away.
2   Would you read those two, the Bates numbers of
3   those two e-mails.
4      A.   Sure.  Bates No. WAGMDL00387642 through
5   664 -- 645.  Ends in 645.
6         Oh, there is a -- there is an additional
7   one, WAGMDL00387646 through 7650.  And then the
8   Mapes e-mail is WAGMDL003876635 through 637.
9      Q.   So, how many documents total was that?
10      A.   I believe that's three.
11      Q.   That's three docs.
12      A.   Yeah.
13      Q.   Is that including Exhibit 5, the policy
14   section?
15      A.   No.  Four with Exhibit 5.
16      Q.   So, four with the policy section?
17      A.   Correct.
18      Q.   Three e-mails and one policy section.
19   Do I have that right?
20      A.   Correct.
21      Q.   Now, would you look through the combined
22   discovery responses that we went through, the 12
23   documents.  We have the manual.
24      A.   This is on page 6 of Response 2?

14 (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review


**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



26 (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

45 (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 192

1    and explain to me what, if any, other reports or
2    mechanisms was Walgreens using post-2006 to
3    identify suspicious orders?
4        A.   There was also line limits that were in
5    place.  So, that is a process that no more than
6    a -- there is a maximum upper limit to the quantity
7    per line item that can be shipped.
8            In discussions with the inventory and DC
9    folks, they believe that line limits were in place
10   throughout this time, though until later we were
11   not able to definitively establish on what
12   products, but from their recollection they talked
13   about line limits.
14       Q.   I apologize for interrupting, but help
15   me.  Are line limits different than the excessive
16   quantity query?
17       A.   Yes.
18       Q.   Okay.  And, so, when you say line
19   limits, help me understand a little bit what you're
20   talking about because -- this is out of the
21   distribution center?
22       A.   Correct.
23       Q.   Okay.  So, start from scratch.  What are
24   line limits?

Page 193

1        A.   Line limit is, it refers to a line on
2    the order and it is the maximum quantity for a
3    particular product that that line can have the
4    quantity be.  So, for example, 100 tablets of
5    alprazolam can't exceed 5 bottles on any order.
6        Q.   Have you seen any reports that were
7    generated identifying orders that exceeded the line
8    limits?
9        A.   The line limit would be a hard stop that
10   can't be exceeded.
11       Q.   But have you seen any reports
12   identifying instances where that happened?
13       A.   I have not.
14       Q.   Have you seen any written policies or
15   procedures identifying what the criteria is for
16   when that happens?
17       A.   I have not -- I have seen e-mails and
18   presentations that speak about what drugs were
19   subject to line limits, but not what the quantity
20   and the number was at the time of the line limits.
21       Q.   Anything to see what the line limits
22   were, how they were created?
23       A.   We don't have written documentation as
24   to what the number was on the line limit.  We just

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    know that it was extant.
2        Q.    Do you know -- I'm sorry.  Go ahead.
3        A.    That's it.
4        Q.    Do you know what time period the line --
5    I'm just going to call it line limits -- the line
6    limits policy was in place?
7        A.    The interviews in which I conducted,
8    they thought that they had always been in place but
9    they could not quantify what items at what time
10   were subject to those line limits.
11           There are some later documents in 2012 I
12   think as part of that presentation to the DEA and
13   another internal document shortly thereafter that
14   details the products that were subject to line
15   limits, but we have been unable to determine what
16   the number was on the line limit.
17       Q.    Okay.  So let me make sure, going back
18   to our chart, I'm going to put "Line Limits" under
19   the "Criteria."  Does that make sense?
20       A.    Correct.
21       Q.    And under the "Date," I'm going to put a
22   question mark because we're not sure, right?
23       A.    2000 forward, but we're not sure what.
24       Q.    Did you say "2000 forward"?

Page 195

1        A.    Yeah.
2        Q.    But not sure.  I'm going to put a
3    question mark.  Is that fair?
4        A.    Fair.
5        Q.    Okay.  And under the "Criteria" I'm
6    going to put a question mark because we're not
7    sure?
8        A.    Criteria were certain drugs, products.
9        Q.    Okay.
10       A.    What those were at what time, we don't
11   know.
12       Q.    Okay.  So, kind of like the greater than
13   X.  We know that somebody's told you that line
14   items -- I'm sorry -- line limits were certain
15   drugs, but we don't know which ones, right?
16       A.    We -- we have in later documents a list
17   of chemicals, a list of products that were included
18   in the line limits.
19       Q.    List of products?
20       A.    Um-hmm.
21       Q.    Does that include opiates?
22       A.    Correct.
23       Q.    "List of products, chemicals but later."
24   Is that later date?

Page 196

1        A.    Correct.
2        Q.    So, again, not entirely sure what
3    certain drugs were at any one point in time and
4    what the criteria was?
5        A.    We're not able to establish what those
6    were with documentation.
7        Q.    Okay.  So, when those orders were
8    flagged, were they suspicious?
9        A.    They could also be suspicious.
10       Q.    Okay.  So, possibly suspicious like the
11   others and the answer is yes, then?
12       A.    Yes.
13       Q.    Okay.  The due diligence, is there any
14   mechanism to perform due diligence on an order that
15   tripped the line limits?
16       A.    There likely -- they would likely also
17   appear on the excessive quantity query.  The
18   difference here is that it would not allow,
19   regardless of an override -- so, even if the DC
20   staff investigated and found it not to be
21   suspicious, it's still -- they could still not
22   exceed the line limit in how much product was
23   shipped.
24       Q.    If I put in "Due Diligence" to say a

Page 197

1    "Hard Stop," is that accurate?
2        A.    Correct.
3        Q.    Okay.  So, I'm going to put "Hard Stop"
4    and then "/no" on the "Due Diligence."  Is that
5    fair?
6        A.    Again, I think there would be overlap
7    with excessive quantity query on these.  Also, if
8    the quantity exceeded the line limit, it wouldn't
9    be shipped at all.
10       Q.    I'll just leave the "Hard Stop."
11           So, continuing under "Policies and
12   Procedures Written," that's no, right?
13       A.    No.
14       Q.    And then "Policy and Procedures Verbal,"
15   it's yes but with uncertainty.  Is that fair?
16       A.    Yes.
17       Q.    And we already answered the no due
18   diligence.  I'm just going to call that a hard
19   stop.
20           And they weren't shipped if they
21   exceeded the line limit, right?
22       A.    That's my understanding, yes.
23       Q.    So, what department within Walgreens was
24   responsible for identifying what that hard stop

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  number was?
2      A.   From my understanding, it was a
3  collaboration between the logistics, DCs, and the
4  inventory teams.
5      Q.   Okay.  So, those are three separate
6  departments?
7      A.   Well, DCs are part of logistics.
8      Q.   What people specifically did you talk to
9  that tried to help you understand what the line
10  limits were?
11      A.   The DC staff, when I talked to them, I
12  recall them talking about line limits.
13      Q.   Okay.  Who is that?
14      A.   Justin Joseph and for sure.  I think
15  Steve Kneller also.
16      Q.   Okay.  They are both DC staff?
17      A.   Correct.
18      Q.   Okay.
19      A.   I believe Bamberg, Steve Bamberg,
20  mentioned line limits as well.
21      Q.   All right.
22      A.   As Denny Murray and Barb Martin.
23      Q.   Is Steve Bamberg a DC staff?
24      A.   No.  He is a systems developer, but he

Page 199

1  had some awareness of line limits.
2      Q.   Okay.
3      A.   He wouldn't be responsible for
4  determining them, as best I can determine.
5      Q.   I got lost there after Steve.  So, I
6  have Justin Joseph, Steve Kneller, Steve Bamberg
7  and who else?
8      A.   Barb Martin.
9      Q.   And Barb Martin?
10      A.   And Denny Murray.
11      Q.   Okay.  Is Denny Murray a DC staff?
12      A.   He is in our Rx inventory team.
13      Q.   Okay.  And one more time I'm missing
14  one.
15      A.   Barb Martin.
16      Q.   That's right.
17      A.   Also Rx inventory.
18      Q.   But she works out of the DC offices?
19      A.   No.  What I'm saying is the DCs and
20  inventory would work together to set the line
21  limits is what I've understood from the interviews.
22      Q.   So, you talked to four people about line
23  limits and no one recalls any policy or procedure,
24  no one recalls the specific line item and no one

Page 200

1  recalls what the hard stop was, right?
2      A.   Correct.
3      Q.   Okay.  Do you think that that answer --
4  and I'm sorry that you're getting put in this
5  position, but you're only as good as the
6  information you get, right?
7      A.   Um-hmm.
8      Q.   And you're charged sitting here today as
9  getting up to speed, as we went through earlier,
10  duty to prepare to talk about the different
11  policies and procedures and formulas for suspicious
12  order monitoring.
13          But everything we've gone through so
14  far, there's been virtually nothing in writing on a
15  policy and procedure evidencing what the criteria
16  was.  Is that fair?
17      MR. BENSINGER:  Objection; argument.
18  BY THE WITNESS:
19      A.   The -- there's been limited policies and
20  procedures.  We have interviews and then also
21  variety of e-mails or presentations that reference
22  the line limits.  But the -- it's a limited set of
23  information.
24  BY MR. MOUGEY:

Page 201

1      Q.   What we have gone through so far, do you
2  agree that Walgreens' suspicious order monitoring
3  program, policies and procedures was a Byzantine
4  maze of patchwork of pieces put together?
5      MR. BENSINGER:  Special Master, I object that
6  this is argument and now asking for a personal
7  opinion, not asking for a corporate designee.
8      SPECIAL MASTER COHEN:  Sustained.
9  BY MR. MOUGEY:
10      Q.   Who was in charge of, and I apologize if
11  I already asked this, who was in charge of
12  implementing or looking at the line limit reports
13  on a daily basis?
14      A.   I don't know that they -- it wasn't a
15  report so much as it was a threshold in the system
16  that could not be exceeded.  So, I don't know that
17  anyone was reviewing the threshold on a daily
18  basis.
19      Q.   So, if an order exceeded the threshold
20  and wasn't filled, no one pointed you to any
21  automation or notification for any specific
22  individual that warranted to go take a closer look?
23      A.   No.
24      Q.   Would you agree that an order that

51 (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  tripped the line limit was suspicious?
2      A.   It was -- it would be possibly
3  suspicious.
4      Q.   But no one did any follow-up to see why
5  it was tripped?
6      A.   Not that I'm aware of.
7      Q.   All right.  So, now after the line
8  limits, what other policies were in place that
9  Walgreen used to fulfill its obligations as a
10  distributor under the Controlled Substance Act?
11     A.   Sure.  Let me switch to my other binder
12  here.
13         So, the next, if we're going in time
14  order, we began development and then deployment of
15  phase 1 in 2009.
16     Q.   All right.  So, 2009.  And that was an
17  algorithm written by Wayne Bancroft, correct?
18     A.   Correct.
19     Q.   And that algorithm is memorialized in a
20  memorandum, correct?
21     A.   Correct.
22     Q.   And that's part of your -- bear with me.
23         I think the first manual -- I'm sorry --
24  memo that memorialized Mr. Bancroft's memo was

Page 203

1  2008, correct?
2      A.   I believe so, yes.
3      MR. MOUGEY:  Alex, can I get 1757.
4      I hand you what we're going to mark as
5  Bancroft (sic) 30(b)(6) 22.
6         (WHEREUPON, a certain document was
7          marked as Bratton 30(b)(6) Exhibit
8          No. 22:  6/23/08 memo;
9          WAGMDL00624503 - 00624509.)
10  BY MR. MOUGEY:
11     Q.   June 23, 2008, correct, sir?
12     A.   Correct.
13     Q.   Written by Wayne Bancroft and Tracy
14  Morris, correct?
15     A.   Correct.
16     Q.   And to multiple other Walgreens
17  employees, correct?
18     A.   Correct.
19     Q.   The deliverable is "Proposal for
20  defining 'suspicious orders' in the Walgreen
21  distribution system," correct?
22     A.   Correct.
23     Q.   And the regarding, "DEA suspicious order
24  reporting," as I already mentioned, dated June 23,

Page 204

1  2008, correct?
2      A.   Correct.
3      Q.   "The DEA is requiring Walgreens to
4  monitor the orders for control substances that our
5  stores place on our distribution centers for
6  suspicious activity."
7         Do you see that in the first sentence?
8      A.   I do.
9      Q.   "Suspicious orders are defined in terms
10  of order size and order frequency.  This document
11  proposes a methodology for identifying suspicious
12  orders in terms of order size and order frequency."
13         Do you see that, sir?
14     A.   I do.
15     Q.   Okay.  So, there wasn't anything that
16  had changed in June of 2008 that warranted that
17  Walgreens was now all of a sudden responsible for
18  identifying suspicious orders, correct, sir?
19     A.   In the conversations that I had with --
20  with the folks that I interviewed, their consensus
21  was there was a shift in the industry and in the
22  DEA's enforcement posture, and this led us to look
23  for additional ways to try to get our hands around
24  the suspicious order question.

Page 205

1      Q.   But as we go back, and we don't
2  need this, the chart you and I have been putting
3  together, the earliest date you and I have
4  identified is '98.
5         So, Walgreens was aware that it was
6  responsible for designing a system to identify
7  suspicious orders going all the way back to '98,
8  correct?
9      A.   Correct.
10     Q.   Yes, sir.  So, the memo coming out in
11  2008, there was no sea change and all of a sudden
12  there was a new responsibility for Walgreens,
13  correct, sir?
14     A.   I don't believe that it was a new
15  responsibility, no.
16     Q.   So, this methodology written by
17  Mr. Wayne Bancroft and Ms. Tracy Morris, they were
18  charged with designing a new methodology within
19  Walgreens to identify suspicious orders, correct,
20  sir?
21     A.   Correct.
22     Q.   And, so, would you please explain to me
23  what your understanding, what's -- of what that
24  methodology was in 2008?

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1      A.   So, I think, you know, based off of
2  interviews and with these folks that were involved,
3  there were concerns from the DEA that the previous
4  E-3 reports were overinclusive, and we sought to
5  clarify that, but in the absence of any clarity, we
6  proceeded with this plan of action.
7      So, I'm not a Ph.D. in math like Wayne
8  is, but my understanding is that if it would look
9  back at the quantities that's normally ordered by a
10  store and it would use math to determine if that
11  quantity was irregular and if it was irregular, it
12  would -- it would flag it as potentially suspicious.

REDACTED

19      Q.   So, Mr. -- the system that Mr. Bancroft
20  was discussing in this memorandum dated June 23,
21  2008 was designed to identify outliers outside the
22  average of a certain store, correct?
23      MR. BENSINGER:  Objection; characterization.
24  BY THE WITNESS:

Page 207

1      A.   I'm not sure if it was on a
2  store-by-store basis or not or if it was compared
3  to all orders of that size.
4  BY MR. MOUGEY:
5      Q.   You just explain to me what you think
6  Mr. Bancroft -- and I understand that it's an
7  algorithm that is -- has a lot of Greek symbols in
8  it.
9      So, why don't you just tell me in your
10  own plain English what you think Walgreens' system
11  that it was discussing in June of 2008 to identify
12  suspicious orders?
13      A.   I think it would try to identify
14  quantities or frequencies outside of a normal
15  pattern and then flag those as potentially
16  suspicious.
17      Q.   And then what would happen once they
18  were flagged as potentially suspicious?
19      A.   Well, phase 1 starting in '09 was a test
20  and during that proof of concept phase, we were
21  evaluating the flagged orders to see if they really
22  met muster, if you will, and were something that we
23  would consider suspicious.
24      So, for about ten months, they were

Page 208

1  testing the system and refining the characteristics
2  of what might be identified.
3      Then in phase 2 --
4      Q.   Can I stop you there?  I apologize for
5  interrupting.
6      But when you said that phase 1 was a
7  test and during that proof of concept phase we were
8  evaluating the orders to see if they would really
9  pass muster.
10      So, what I want to know is when did
11  phase 1 go into place based on the final algorithm
12  from Mr. Bancroft?
13      A.   So, phase 1 was producing reports in
14  August of '09.
15      Q.   Okay.  Now, when I say "producing
16  reports," are you saying in a pilot concept or it
17  was implemented across all of the stores?
18      A.   Pilot concept.
19      Q.   Pilot concept.  But what I'm looking for
20  is when was it implemented across Walgreens in its
21  final form?
22      A.   Well, the phase 2, which is based off of
23  this initial algorithm, after they tested it in the
24  proof of concept, it went live in September of 2010.

Page 209

1      Q.   Okay.  So I'm back to our chart.  I've
2  now created a second page here because we ran out
3  of room on the first one.
4      So, phase 1 was not operational across
5  Walgreens.  Is that right?
6      A.   No.
7      Q.   I'm sorry.  Am I right that it wasn't
8  operational across Walgreens?
9      A.   Correct.  It was only a proof of
10  concept.
11      Q.   So, if I write "Phase 1 - not
12  operational," I'm going to just write "Proof of
13  concept."  Is that fair?
14      A.   That's fair.
15      Q.   Okay.  And you and I know from looking
16  at this memo that about June 2008 is when that -- I
17  won't say started because you clearly had done some
18  work, but at least memorialized.  How's that?
19      Okay.  So, to keep it general, should I
20  say 2008 to 2000 and -- phase 2 was implemented in
21  2010 you said, right?
22      A.   Correct.
23      Q.   So, can I put 2008 to 2010 under
24  phase 1?

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    A.   Yes.
2    Q.   Is that fair?
3    A.   Fair.
4    Q.   Okay.  So, "2008 to 2010, phase 1 - not
5    operational, proof of concept."
6         Does that sound right?
7    A.   Correct.
8    Q.   Okay.  So, what do you refer to or what
9    does Walgreens refer to as Mr. Bancroft's algorithm
10   in phase 1?  What was the --
11   A.   The tolerance and frequency limits.
12   Q.   Okay.  So, I'm going to under "Criteria"
13   put "Tolerance and Frequency," and I am going to
14   reference this Bates number, 24503, as a reference.
15   Is that fair?
16   A.   Yes.
17   Q.   Is this memo a good memorialization of
18   that phase 1?
19   A.   Correct.
20   Q.   Okay.  So, phase 1, 24503.  I'm going to
21   put a 6 in front of it.  "624503, Tolerance and
22   Frequency," and that was on a pilot basis, correct?
23   A.   Correct.
24   Q.   So, let's talk about the pilot stores

Page 211

1    for a minute.  I get some of these mixed up a
2    little bit.  Is that Nevada, Tennessee?  Tell me
3    where the pilots were.  Do you remember?
4    A.   I believe some were in Nevada.  I'm
5    not -- I don't know -- I don't recall them
6    mentioning Tennessee.
7    Q.   Okay.  And when we say "pilots," were --
8    was the formula being run and was a report being
9    generated that suspicious orders were -- were going
10   to certain individuals within Walgreens?
11   A.   So, during that time, Barb Martin and
12   Marcy Ranick would review monthly data from the --
13   the stores, and there's some discussions that I've
14   had with Barb and also e-mails and notes that I've
15   seen where they would evaluate is this potentially
16   suspicious or not and, for instance, there's
17   examples where there is things that shouldn't have
18   been flagged or may have -- the system was
19   interpreting actions by the store incorrectly and
20   so those shouldn't be included in the flagging.
21   Q.   So, Bob and -- I'm sorry.
22        Barb Martin and Marcy Ranick were kind
23   of looking at the reports generated as a pilot?
24   A.   Correct.

Page 212

1    Q.   So, was it operational in the pilot
2    stores?
3    A.   It was only collecting data, from my
4    understanding.
5    Q.   Okay.  It was a beta test.  How's that?
6    Is that fair?
7    A.   That's fair.
8    Q.   So, it wasn't implemented in those pilot
9    stores.  It was beta testing to see what the
10   results were for accuracy and making sure
11   everything was running smoothly?
12   A.   Correct.
13   Q.   And that continued from '08 until 2010
14   when phase 2 was implemented, is that -- is that
15   accurate?
16   A.   When phase -- phase 2 was deployed, yes.
17   Q.   Okay.  And do you have an understanding
18   of when phase 2 was deployed?
19   A.   September 2010.
20   Q.   September 2010?
21   A.   Correct.
22   Q.   All right.  And please explain what
23   phase 2 is.  Is it the same methodology with the
24   tolerance and frequency that we just discussed in

Page 213

1    phase 1?
2    A.   So, they made some changes --
3    Q.   Okay.
4    A.   -- is what I was told and updated the
5    way the system was functioning and then --
6    Q.   Okay.
7    A.   -- once those changes were incorporated,
8    it was deployed in September of 2010, and at that
9    time it would automatically reduce orders that
10   exceeded the tolerance threshold.
11   Q.   Okay.  So, "Possible Suspicious Orders"
12   would be a yes, correct?
13   A.   Yes.
14   Q.   Okay.  Now, let me go back.  I should
15   have filled out the rest of these.
16        I'm just going to put "Beta" across all
17   these columns at the top.  Is that fair?
18   A.   Yes.
19   Q.   Okay.  Now, let me make sure I got this
20   right.
21        So, Mr. Bancroft's formula would run
22   through the system across the country and if an
23   order exceeded frequency or tolerance, the order
24   was reduced, correct?

54 (Pages 210 to 213)

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    A.   Correct.
2    Q.   And if the order triggered frequency or
3  tolerance, was a suspicious report generated?
4    A.   No.
5    Q.   Okay.  So, you'd agree with me that
6  triggering frequency or tolerance, that that would
7  possibly be a suspicious order, correct?
8    A.   Possibly.  However, it would be reduced
9  before it was ever transmitted to the DC.
10   Q.   All right.  So, under "Possibly
11 Suspicious Orders," I'm going to put "Yes but
12 reduced."  Is that fair?  Is that accurate?
13   A.   Yes.
14   Q.   Okay.  The criteria under deployed in
15 9/10 in phase 2 was kind of the same thing I put in
16 this first column, "Some changes and updates,"
17 right?
18   A.   Updated tolerance and frequency, yes.
19   Q.   All right.  I'm going to put "Some
20 changes/updates to phase 1."
21      Do you know what those were, what the
22 changes and updates were?
23   A.   They are design documents.  I'm not sure
24 if they call out specifically like in a -- like

Page 215

1  before and after kind of format.  But I think they
2  detail what was implemented.
3    Q.   Do you believe that there is specific
4  documents that identify what the changes and
5  updates were from phase 1 to phase 2?
6    A.   There's the design docs, but you'd have
7  to compare the version 1 and version 2 design doc
8  and draw out the differences.  There was also some
9  e-mails from Marcy and Barb that said, you know,
10 this shouldn't be flagged or we need a new
11 category.  This is incorrectly --
12   Q.   Sitting here --
13   A.   -- being positioned.
14   Q.   Sorry.  Didn't meant to interrupt you.
15      But sitting here today you can't tell
16 this jury with specificity what the difference is
17 between phase 1 and phase 2 of Walgreens'
18 suspicious order monitoring policies, can you?
19   A.   I think we would have to do a review of
20 the business requirements for each phase and then
21 produce a deliverable, yeah, that would.
22   Q.   When you say "business requirements,"
23 you're referring to the internal memorandum
24 generated on an ongoing basis updating, correct?

Page 216

1    A.   The -- yes, and the design documents
2  that specify what the system shall do and how that
3  will be accomplished.
4    Q.   So, as part of your preparation for
5  today, no one's helped educate you on the
6  differences between phase 1 and phase 2 in kind of
7  a list of what the differences are, right?
8    A.   Not at that level of specificity.
9    Q.   Quite frankly, can you give me
10 any direction as to what the differences between
11 phase 1 and phase 2 are other than just pointing me
12 to the numerous business requirements documents
13 generated internally?
14   A.   I think there were some adjustments to
15 Steve or -- excuse me -- Wayne's formula.  I don't
16 fully understand how that -- those work.
17      As I said, I think they added
18 additional.  So, when it was flagged, it would have
19 a sort of a disposition as to why.  And they added
20 additional criteria or dispositions.
21      And then there were times when it was --
22 we looked at examples where it was the store
23 changed the order, but they may have actually
24 changed it to be less or in a way that was

Page 217

1  acceptable, but those were getting flagged because
2  it was touched at all by the store, which was not
3  appropriate based -- not an appropriate criteria to
4  mark it as suspicious, only that it was touched.
5    Q.   So, sir, sitting here today with Bratton
6  Exhibit 2, the First Notice of Deposition pursuant
7  to 30(b)(6), you can't explain to the jury what
8  Walgreens' standards and metrics were as elaborated
9  in Mr. Bancroft's memo with any -- with any
10 specificity other than what you just gave, correct?
11   A.   Correct.
12   Q.   So, how the formula worked, what the
13 formula was, what data it pulled, those aren't --
14 that's not information you have in response to (i)
15 today?
16   A.   Those are contained in the documents.
17   Q.   Yes, sir.  I'd have go back and kind of
18 compare all the different business requirements
19 documents and see if I can discern what the
20 differences were, correct?
21   A.   Correct.
22   Q.   Can you actually point me to a document
23 that says this is phase 2, this is it?
24   A.   So, there's a number of documents.  The

55 (Pages 214 to 217)

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  first one would be the design for phase 2.
2      Q.   Before I interrupt, I just want to make
3  sure before you keep going.  What I'm looking for
4  is a final, final document with a final algorithm.
5  Can you -- not a series of documents with updates.
6          Can you point me to a final document
7  with a final algorithm formula?
8      A.   I believe that the micro design for
9  phase 2, and that's Bates No. 492076, outlines the
10  final formula for the system.  And there is an
11  attachment to that report that has a separate -- I
12  thought there was.
13      Q.   What concerns me a little bit about your
14  answer is you said "I believe."  Is it?  Is 492076
15  the final version of phase 2?
16      A.   I believe so, yes.  This is what they
17  would have built and implemented.
18      Q.   Okay.  You just use the word "I believe"
19  again.  Is that a caveat or are you saying that
20  is -- that is or you're not really sure?
21      A.   The challenge with any of our IT
22  projects is they would begin with this design doc
23  and as they deployed the software, if there were
24  defects or bugs that were identified as part of

Page 219

1  the -- so, any time we go through the business
2  requirements, functional requirements, macro
3  design, micro design, build, test, and then pilot.
4      Q.   Right.
5      A.   As part of the pilot, it's a limited
6  distribution smaller number of stores.
7      Q.   Get it.
8      A.   As part of that pilot, they may identify
9  defects in the product.
10      Q.   Okay.
11      A.   I -- we were unable to determine if
12  there were any of those documents that outlined any
13  defects --
14      Q.   Okay.
15      A.   -- that were -- would have -- might have
16  precipitated a change during the pilot phase.
17      Q.   So, the answer to my question is we're
18  not really sure what the exact final formula or
19  algorithm was that was actually deployed after the
20  macro, micro, pilot, you know, any tweaks or
21  changes right when it was deployed, right?
22      A.   I have no evidence that would lead me to
23  believe it wasn't what's in the micro design, but
24  I'm also not ruling out there is a possibility that

Page 220

1  something was changed.
2      Q.   Okay.  You would agree with me, sir,
3  that under (i), one of the questions we had today
4  that Walgreens was to prepare you on was the
5  metrics used to identify orders of unusual size,
6  orders deviating substantially from a normal
7  pattern and orders of unusual frequency, right?
8      A.   Yes.
9      Q.   And what we're discussing would fall
10  under (i), correct?
11      A.   Correct.
12      Q.   And, so, even sitting here after now
13  years later, months into this litigation, Walgreens
14  isn't able to tell us what the exact algorithm was
15  in 2009 that was deployed, correct?
16      A.   I reasonably believe, I feel, that this
17  was what was deployed but I can't --
18      Q.   You can't say for sure?
19      A.   I can't say with 100 percent certainty.
20      Q.   Okay.  Now, orders that were cut down
21  were based on this tolerance and frequency.  Were
22  there -- was there due diligence performed on the
23  order as it was submitted?
24      A.   Other than the previously discussed

Page 221

1  diligence, no.
2      Q.   So, there's no one at Walgreens that's
3  receiving these reports or the results of the phase
4  2 algorithm and performing due diligence on any of
5  these?
6      A.   Well, the orders after they were cut
7  would be released to the DC and the DC would --
8  would perform their diligence, but I know that Barb
9  and Marcy were still looking at these periodically
10  as well.
11      Q.   The orders that were -- that triggered
12  the formula for tolerance and frequency and were
13  cut, were those reported to the DEA as suspicious?
14      A.   They would not have been included in
15  the -- the Appendix 3-E report.
16      Q.   Or any report for that matter?
17      A.   Not based on the -- they might have been
18  in there, but they weren't included based on their
19  being flagged in this process.
20      Q.   There was no report for suspicious
21  orders being sent to the DEA as a result of orders
22  being cut based on tolerance and frequency, right?
23      A.   Not at this time, no.
24      Q.   Okay.  So, "Possible Suspicious Order"

56 (Pages 218 to 221)

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  column, back to the chart, "Yes, but reduced.  No
2  SOR," suspicious order reports, "to DEA," I'm going
3  to say, "based on phase 2."  Is that fair?
4      A.    Yes.
5      Q.    And based on phase 2, order getting cut,
6  there was no due diligence on why the order
7  exceeded the tolerance and frequency either,
8  correct?
9      A.    Not based only on phase 2, correct.
10     Q.    Okay.  So, I said below that, "No on
11 phase 2."  Is that -- that's accurate, right?
12     A.    Other than the other diligence, no.
13     Q.    Yes, sir.  So, I think it's safe to
14 assume and there is not any policies and procedures
15 written on what due diligence to perform based on
16 the orders that were cut, right?
17     A.    Correct.
18     Q.    So, I'm going to put "Not on due
19 diligence for orders that were cut."  Is that fair?
20     A.    Yes.
21     Q.    Okay.
22     A.    There was retrospective analysis, but
23 not --
24     Q.    Before they were shipped?

Page 223

1      A.    Correct.
2      Q.    And the retrospective analysis was what?
3      A.    The LP, Marcy Ranick and Barb Martin
4  would review a sample of these and review the
5  appropriateness of the orders.
6      Q.    All right.  So, how do you know that?
7      A.    Based on discussions with them and
8  e-mails that I've seen where they discuss.
9      Q.    So, no -- no written policies or
10 procedures on what that due diligence was?
11     A.    No.
12     Q.    Okay.  So, I'm going to say "Policy and
13 Procedures on Due Diligence," I'm going to say,
14 "Nothing in writing other than e-mails and verbal
15 or interviews."  Is that fair?
16     A.    Correct.
17     Q.    All right.  So, phase 2.  How long was
18 phase 2 in play?
19     A.    Let me switch back to my reference
20 material here.
21     Q.    Are you looking for an end to phase 2?
22     A.    Yes.  So, phase 3 was deployed in
23 June of 2012.
24     Q.    Okay.  So, I'm going to say

Page 224

1  September '10 to May of '12 for phase 2, is that
2  right?
3      A.    Correct.
4      Q.    Okay.  So, phase 3 is June of '12,
5  right?
6      A.    Correct.
7      Q.    So, do you have an understanding --
8  actually, before we get into that, let me make sure
9  that you and I are clear on something.
10           When an order triggered the tolerance
11 and frequency under phase 2 and it was cut, let me
12 make sure you and I are saying the same thing, cut
13 meaning that the order was reduced to the amount
14 set internally by Walgreens.  Is that fair?
15     A.    Based on the algorithm developed by
16 Wayne.
17     Q.    Okay.  And, so, therefore, the order was
18 not sent from the distribution center?
19     A.    It was reduced and fulfilled.
20     Q.    Reduced and fulfilled.  Okay.  Fulfilled
21 meaning the order was reduced to the amount that
22 Walgreens said it was okay and then it was
23 fulfilled, correct?
24     A.    Correct.

Page 225

1      Q.    Okay.  Now, phase 3.  Was that process
2  still in place in phase 3?
3      A.    Correct.
4      Q.    Reduced and fulfilled?
5      A.    Correct.
6      Q.    Okay.  So, how long was phase 3 in play?
7      A.    Phase 3 was from June of '12 to
8  August of '12.
9      Q.    And what was different between phase 2
10 and phase 3?
11     A.    Further refinement of the math.
12     Q.    Okay.  So, what specifically?
13     A.    Let me take a look.
14           So, the frequency calculation was
15 updated and they specified in this -- this is --
16 I'm looking at the functional macro design
17 documents.  Do you need a Bates?
18     Q.    That would be wonderful.  Thank you.
19     A.    325172.  And this contains details on
20 how the frequency calculation was changed.
21     Q.    All right.  Are you comfortable that
22 that is 325172 the final?
23     A.    Yes.
24     Q.    Okay.  So, what is your understanding

57 (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    generally about what the changes in the algorithm
2    were as elaborated on on 325172?
3        A.   One moment.
4            It says here that they were including
5    vendor orders in frequency.  So, previously we had
6    only considered orders from our own distribution
7    centers.
8        Q.   So, included under the "Criteria," I'm
9    going to put "Included vendor orders"?
10       A.   For consideration in frequency.
11       Q.   Just frequency?
12       A.   Correct.
13           And then they corrected an order -- an
14   issue in which an incorrectly adjusted quantity or
15   user adjusted quantity would -- it appears they
16   would appear incorrectly in the system.  So, they
17   were fixing a bug.
18       Q.   Okay.  And the bug was regarding?
19       A.   The order details.
20       Q.   Okay.  All right.  So, under "Criteria"
21   I put, "Same as 2 but included vendor orders for
22   consideration in just frequency and fixed a bug for
23   order details."  Is that right?
24       A.   Correct.

Page 227

1        Q.   Okay.  So, now, when an order was
2    reduced and fulfilled, I believe you called it,
3    under phase 2 and phase 3, were those orders
4    identified as suspicious and sent to the DEA?
5        A.   No.
6        Q.   Did Walgreens not believe that the order
7    that was reduced was a suspicious order?
8        A.   I believe that we believed that since it
9    was reduced, it was no longer met the criteria for
10   being suspicious.
11       Q.   So, it would just be reduced and then it
12   was no longer suspicious?
13       A.   Correct.
14       Q.   Oh, okay.  So, the order comes in,
15   formula reduces it, and then Walgreens says it's
16   not suspicious, right?  Did I get that right?
17       A.   Correct.
18       Q.   Okay.  But if I go back to Wayne
19   Bancroft's memo, all the way back in June of 2008,
20   which is Bratton 22, the proposal was to define
21   suspicious orders, right?
22       A.   Correct.
23       Q.   And this entire proposal that Mr. Wayne
24   Bancroft -- and you said he has a Ph.D. in math?

Page 228

1        A.   Correct.
2        Q.   Over these next few pages has a very
3    intricate algorithm, was designed to identify
4    orders that were outliers, correct?
5        A.   Correct.
6        Q.   And when it found those orders that were
7    outliers, he refers to those orders throughout his
8    memo as suspicious orders, correct?
9        A.   He does.
10       Q.   And, so, in June of 2008, those outlier
11   orders from the gentleman, the Ph.D. in math that
12   wrote this algorithm, said those are suspicious
13   orders, correct?
14       A.   He did.  However, Wayne being a smart
15   guy but is not a lawyer and I don't think this
16   represents our legal position on what these -- this
17   algorithm did.
18       Q.   And the legal position is that if the
19   suspicious orders reduced, it just magically is no
20   longer suspicious?
21           MR. BENSINGER:  Objection; beyond the scope,
22   calling for a legal opinion and interpretation.
23           SPECIAL MASTER COHEN:  Sustained.
24   BY MR. MOUGEY:

Page 229

1        Q.   Walgreens has to understand what the
2    industry standards are when implementing its
3    algorithm, correct?
4            MR. BENSINGER:  Objection; argument.
5    BY THE WITNESS:
6        A.   We -- we were implementing this program
7    for monitoring.  We believed we were meeting the
8    requirement via the Appendix E-3 reporting.
9    BY MR. MOUGEY:
10       Q.   If Walgreens thought it was meeting the
11   requirement under E-3, it brought in Wayne to write
12   a pretty sophisticated algorithm in 2008, right?
13       A.   Correct.
14       Q.   So, let's go back to understanding
15   industry standards.
16           Walgreens, in order to effectively
17   implement its responsibilities as a distributor,
18   needs to understand what the industry standards are
19   for identifying suspicious order monitoring,
20   correct?
21           MR. BENSINGER:  Objection; scope and again
22   calls for opinion testimony beyond the designation
23   of this corporate spokesperson.
24           SPECIAL MASTER COHEN:  Overruled.

58 (Pages 226 to 229)

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    BY THE WITNESS:
2        A.   I'm sorry.  Can you repeat the question.
3    BY MR. MOUGEY:
4        Q.   Walgreens people have to understand what
5    the industry standards are when implementing the
6    suspicious order monitoring policies, correct?
7        A.   We were seeking to understand those.  I
8    believe that the challenge for us was that the
9    other distributors could not fully elaborate on
10   what they thought they needed to do and when we
11   tried to seek clarity from the DEA, we did not
12   receive additional guidance when our -- our legal
13   team inquired with them.
14       So, we were doing what we thought based
15   off of feedback from other parties, things we had
16   heard, would improve our system so that it would be
17   more effective.
18       Q.   And when Mr. Bancroft, the Ph.D., sat
19   down and wrote the algorithm with the input of
20   people from Walgreens, you would expect that he
21   went to other individuals to gather information to
22   write the algorithm, right?
23       MR. BENSINGER:  Objection; calls for
24   speculation, scope.

Page 231

1    BY THE WITNESS:
2        A.   I'm not sure what Wayne did to -- to
3    write, author this other than what he's told me,
4    which is he sat down and --
5    BY MR. MOUGEY:
6        Q.   What department is Steve Bamberg in?
7        A.   IT.
8        Q.   What department is Ed Choroski in?
9        A.   I don't know.
10       Q.   What department is Rick Gates in?
11       A.   Pharmacy operations.
12       Q.   What department is Tim Gorman in?
13       A.   I don't know.
14       Q.   What department is Scott Jonkman in?
15       A.   Loss prevention.
16       Q.   What department is Brian Leander in,
17   please?
18       A.   I don't know.
19       Q.   What department is Barb Martin in?
20       A.   Barb Martin is in inventory.
21       Q.   What department is Dwayne Piñon in?
22       A.   Legal, regulatory, law.
23       Q.   What department is Linda Rambo in?
24       A.   I don't recall.

Page 232

1        Q.   What department is James VanOverbake in?
2        A.   I don't know.
3        Q.   So, just the people that you know
4    sitting here, we have IT, we have loss prevention,
5    we have inventory management and we have
6    legal/regulatory just on this memo, the ones that
7    we could identify, correct?
8        A.   Correct.
9        Q.   Mr. Bancroft took his work and brought
10   it to multiple departments, correct?
11       A.   Correct.
12       Q.   And based on his input and his algorithm
13   that he drafted, he believed that he was charged
14   with identifying orders that were suspicious,
15   correct?
16       MR. BENSINGER:  Objection; calls for
17   speculation.
18   BY THE WITNESS:
19       A.   I can't tell you what Wayne believed.
20   BY MR. MOUGEY:
21       Q.   I'm asking what does it say right in
22   this deliverable, "Proposal for defining
23   'suspicious orders,'" correct, sir?
24       A.   I see that it says that, yes.

Page 233

1        Q.   And what is Walgreens' position that an
2    order that's identified by Mr. Bancroft's algorithm
3    that is just reduced is no longer suspicious?
4    Where did that come from?
5        MR. BENSINGER:  Objection to characterization.
6    BY THE WITNESS:
7        A.   I think that was a legal interpretation
8    by our regulatory/law team.
9    BY MR. MOUGEY:
10       Q.   And who specifically?
11       A.   I don't know.
12       Q.   So, the regulatory/law team said that an
13   order that is flagged as a result of this algorithm
14   and is identified by Mr. Bancroft's own language as
15   suspicious is no longer suspicious if we reduce it
16   and don't fill, correct?
17       MR. BENSINGER:  Mr. Bratton, I instruct you
18   not to answer the question on the ground that as
19   phrased it seeks to elicit attorney-client
20   communication.
21   BY MR. MOUGEY:
22       Q.   Sir, isn't that actually -- what I'm
23   asking you are the details of the metric of the
24   suspicious order monitoring system.  All right.

59 (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    So, the metric that Mr. Bancroft used
2 identified these orders as suspicious, correct,
3 sir?
4    A.   Possibly suspicious.
5    Q.   It doesn't say "possibly" in the
6 deliverable, does it, sir?
7    A.   They're in quotes.  So, I don't know
8 what that means.
9    Q.   So, you read in when it's in quotes to
10 mean possibly?
11    A.   It's -- it's not definitively
12 suspicious.
13    Q.   Do you see the second sentence
14 underneath "Overview," "This document proposes a
15 methodology for identifying suspicious orders"?
16    A.   Correct.
17    Q.   That's not in quotes, right?
18    A.   No.
19    Q.   So, Mr. Bancroft, based on his work,
20 along with Tracy Morris, decides that an order that
21 is flagged as a result of his algorithm is
22 suspicious, correct?
23    MR. BENSINGER:  Objection; calls for
24 speculation.

Page 235

1 BY THE WITNESS:
2    A.   I'm sorry.  Can you repeat the question.
3 BY MR. MOUGEY:
4    Q.   Yes, sir.  Mr. Bancroft, based on his
5 work, along with Tracy Morris, determined that an
6 order -- you know what?  Let me ask the question
7 another way.
8    Mr. Bancroft and Tracy Morris' memo
9 delivered to multiple departments at Walgreens
10 determined that an order that is flagged as a
11 result of this algorithm is suspicious, correct,
12 sir?
13    A.   I think what he was attempting to
14 identify here were possible suspicious orders that
15 we would, as we see later in the development of
16 this system, that we would then flag for additional
17 review.
18    Q.   Sir, you see "suspicious orders" under
19 "Deliverable," correct?
20    A.   Correct.
21    Q.   You see in the very first sentence
22 "orders" and then "suspicious activity," correct,
23 sir?
24    A.   Correct.

Page 236

1    Q.   The first part of the second sentence
2 says "suspicious orders," correct?
3    A.   Correct.
4    Q.   The third sentence uses the language
5 "suspicious orders," correct?
6    A.   Correct.
7    Q.   Sir, you don't see the words in any of
8 that language "possible," "potential," "probable,"
9 do you?
10    A.   No.
11    Q.   You don't see anywhere in this memo that
12 talks about flagging orders that may or may not be
13 suspicious down the road, correct?
14    A.   Steve -- or Wayne didn't characterize it
15 that way, no.
16    Q.   No, sir.  Who changed Mr. Bancroft's
17 language based on his work in this memorandum that
18 an order that was flagged as a result of his
19 algorithm was no longer suspicious if it was
20 reduced?
21    A.   I don't know.
22    MR. BENSINGER:  Mr. Mougey.
23    MR. MOUGEY:  Allow me to just finish, please,
24 sir.

Page 237

1 BY MR. MOUGEY:
2    Q.   And, sir, you understand that as part of
3 your duty today to be prepared to testify on
4 Walgreens' positions that we are entitled to an
5 answer on the standards and metrics used to
6 identify orders of unusual size, orders deviating
7 substantially from a normal pattern and orders of
8 unusual frequency, correct, sir?
9    A.   Correct.
10    Q.   And, sir, you can't tell me what input
11 went into changing Mr. Bancroft's memorandum that
12 orders that were flagged as a result of his
13 algorithm were no longer suspicious, correct?
14    A.   I can't --
15    MR. BENSINGER:  Objection; vague.
16 BY THE WITNESS:
17    A.   I can't point to any specific
18 determination.
19 BY MR. MOUGEY:
20    Q.   You don't know the answer?
21    A.   No.
22    MR. BENSINGER:  Mr. Mougey, should we go off
23 the record, take a short break?
24    MR. MOUGEY:  Sounds good.  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    THE VIDEOGRAPHER:  We are off the record at
2  3:06 p.m.
3          (WHEREUPON, a recess was had
4            from 3:06 to 3:18 p.m.)
5    THE VIDEOGRAPHER:  We are back on the record
6  at 3:18 p.m.
7    SPECIAL MASTER COHEN:  Just to explain how
8  this is going to happen going forward.  I've ruled
9  that Plaintiff is allowed, instead of seven hours,
10  eight hours of deposition time.  He can split up
11  that deposition time any way he chooses.
12          In other words, this -- today's
13  deposition will be recessed.  It will resume with
14  the remaining time.  And that is in order to allow
15  Plaintiffs' counsel to review the documents he was
16  just given, and the parties will work together to
17  find a time when that resumed deposition will take
18  place, preferably after the Defendants' document
19  production and responses to Interrogatories are
20  complete.
21          And because it's a relatively short
22  period of time, the hope is that that perhaps can
23  be piggybacked with another deposition here in
24  Chicago.

Page 239

1          Everybody understand?
2    MR. MOUGEY:  Yes, sir.
3    SPECIAL MASTER COHEN:  Okay.
4  BY MR. MOUGEY:
5    Q.   Mr. Bratton, if an order is identified
6  as suspicious, it would need to be reported to the
7  DEA, correct?
8    MR. BENSINGER:  Objection; calls for a legal
9  conclusion.
10  BY THE WITNESS:
11    A.   If it was confirmed to be suspicious --
12  I'm sorry.  At which time frame are you?
13  BY MR. MOUGEY:
14    Q.   Does it matter?  If Walgreens identifies
15  an order as suspicious, it's required to report it
16  to the DEA, correct?
17    MR. BENSINGER:  Objection; calls for legal
18  conclusion.  You may answer.
19  BY THE WITNESS:
20    A.   If we were previously reporting orders
21  that we thought may be suspicious prior to
22  December -- November of '12, after that point we
23  would report confirmed orders.
24  BY MR. MOUGEY:

Page 240

1    Q.   That's not the question I asked you.
2          The question that I asked you was:  If
3  Walgreens identifies an order as suspicious, it
4  needs to report it to the DEA when discovered,
5  correct?
6    MR. BENSINGER:  Objection; vague.  You can
7  answer.
8  BY THE WITNESS:
9    A.   If it's a confirmed suspicious order, I
10  would believe the answer is yes.
11  BY MR. MOUGEY:
12    Q.   And if Walgreens is not reporting
13  suspicious orders to the DEA as they are
14  discovered, it is not fulfilling its obligations as
15  a distributor, correct, sir?
16    MR. BENSINGER:  Objection.  That calls for a
17  legal conclusion and violates the Special Master's
18  order on scope.
19    SPECIAL MASTER COHEN:  Sustained.
20  BY MR. MOUGEY:
21    Q.   You understand that Walgreens has
22  obligations as a distributor, correct?
23    A.   Yes.
24    Q.   And where does -- and Walgreens

Page 241

1  understands that those responsibilities are defined
2  in places like the Controlled Substance Act,
3  correct?
4    A.   Correct.
5    Q.   And that Walgreens' obligations are
6  further refined under the Code of Federal
7  Regulations that are promulgated under the
8  Controlled Substance Act, correct?
9    A.   Correct.
10    Q.   And in order to or for Walgreens to
11  fulfill its obligations as a distributor, Walgreens
12  needs to understand what its roles and
13  responsibilities are, correct, sir?
14    A.   Correct.
15    Q.   And, sir, Walgreens understands that in
16  order to fulfill its obligations as a distributor,
17  one of its jobs is to report suspicious orders to
18  the DEA, correct, sir?
19    A.   Correct.
20    Q.   And if it doesn't report suspicious
21  orders to the DEA, it has not fulfilled its
22  obligation as a distributor, correct?
23    MR. BENSINGER:  Same objection.
24    MR. MOUGEY:  I have danced and tried to make

61 (Pages 238 to 241)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1   them as happy as --
2       SPECIAL MASTER COHEN:  Sustained.
3       MR. MOUGEY:  I did not mention -- Special
4   Master Cohen, I haven't mentioned the CSA.  I
5   haven't mentioned the regs.  I'm asking what his
6   understanding of what the industry standards are.
7   I didn't even mention the code.  I didn't mention
8   his interpretation.
9       SPECIAL MASTER COHEN:  You need to move on
10  BY MR. MOUGEY:
11      Q.   How does Walgreens understand what its
12  roles and responsibilities are as a distributor?
13  Where does it go to figure that out?
14      MR. BENSINGER:  Objection; vague.  You can
15  answer.
16  BY THE WITNESS:
17      A.   Communications with other members in the
18  industry, communications that we receive from the
19  DEA either through inspections, letters,
20  conferences that we attend, e-mails, communication.
21  Conglomerate of a multitude of sources.
22  BY MR. MOUGEY:
23      Q.   All right.  So, that's a good example,
24  letters, communications with the DEA helps

Page 243

1   Walgreens understand its roles and responsibilities
2   as a distributor, correct, sir?
3       A.   That's one of the ways that we can seek
4   to understand.
5       Q.   And you mentioned organizations.
6   Industry organizations, correct?
7       A.   Correct.
8       Q.   What industry organizations are you
9   referring to?
10      A.   So, there have been times at NACDS,
11  which is the National Association of Chain Drug --
12  National Association of Chain Drug Stores, there
13  have been times when the DEA has presented at those
14  trade organizations -- meetings.
15      Q.   What other trade organizations that
16  Walgreens belonged to that it believes helps
17  identify what its roles and responsibilities are as
18  a distributor?
19      A.   Additionally, we participate with the
20  National Association of Boards of Pharmacies, and
21  then we have less formal relationships with other
22  companies within the industry where we might share
23  information.
24      Q.   And that helps set industry standards,

Page 244

1   the less formal relationships with other
2   distributors?
3       MR. BENSINGER:  Objection; calls --
4   BY THE WITNESS:
5       A.   It can --
6       MR. BENSINGER:  Objection; calls for
7   speculation.
8   BY THE WITNESS:
9       A.   I think it can help us try to clarify
10  what the requirements are.
11  BY MR. MOUGEY:
12      Q.   The relationships and the communications
13  with other distributors?
14      A.   Or other pharmacies, et cetera.
15      Q.   Help -- the relationships with other
16  pharmacies and other distributors help clarify what
17  Walgreens' responsibilities are as a distributor.
18  Is that your testimony, sir?
19      A.   Yes.
20      Q.   Sir, the memo that we just left, Bratton
21  22.  I'm going to hand you what I'm going to mark
22  as Bratton 30(b)(6) 23.
23          (WHEREUPON, a certain document was
24          marked as Bratton 30(b)(6) Exhibit

Page 245

1           No. 23:  10/01/09 Project Request
2           Estimate; WAGMDL00492070 -
3           00492072.)
4   BY MR. MOUGEY:
5       Q.   23 is a little more than a year later
6   than the memo drafted by Wayne Bancroft on June 23,
7   2008, correct?
8       A.   Correct.
9       Q.   And in the memo on 23 there is an update
10  on the different phases of the suspicious order
11  algorithm, correct, sir?
12      A.   Correct.
13      Q.   And under "Description" in this update
14  on the algorithm, "Create a process to
15  systematically identify and prevent suspicious
16  orders for C-II and PSE drug items."  Correct?
17      A.   Yes, that's what's on the page.
18      Q.   So, as of October of 2009, a year after
19  the first memo, the algorithm was still designed to
20  identify and prevent suspicious orders, correct?
21      A.   Correct.  However, it was in testing and
22  this neither specifies probable or confirmed
23  suspicious orders.
24      Q.   And this doesn't make any distinction in

62 (Pages 242 to 245)

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    this October 1, 2009 memorandum between probable or
2    potential suspicious orders.  It just simply says
3    an order that is flagged as a result of the
4    algorithm is suspicious, correct, sir?
5         MR. BENSINGER:  Object to the characterization.
6    BY THE WITNESS:
7         A.    It says here, "Any orders that are
8    deemed suspicious will be flagged as suspicious and
9    populated in a file to be sent to LP and Rx
10   Services for review and analysis."
11   BY MR. MOUGEY:
12        Q.    Do you agree that that is an accurate
13   statement about what the algorithm was designed to
14   do?
15        A.    That it would flag them as suspicious?
16   Again, I think there is a distinction here as
17   potentially or confirmed suspicious.  And, again,
18   this was during the testing period.  But yes.
19        Q.    Let's go through it sentence by
20   sentence.  The second sentence says, "An order
21   quantity will be deemed suspicious based on a
22   formula."  Correct, sir?
23        A.    It does say.
24        Q.    Is that an accurate statement that an

Page 247

1    order quantity will be deemed suspicious based on a
2    formula used to determine inconsistent ordering
3    patterns?
4         A.    That's what's on the page.
5         Q.    Is that accurate?  Does Walgreens
6    believe that statement is accurate, that an order
7    that was flagged as a result of the algorithm will
8    be deemed suspicious based on that formula?
9         A.    I believe that our position is that it
10   is a probable, not confirmed suspicious order.
11        Q.    Can you point me to anywhere -- well,
12   let's just keep going.
13             The next sentence, "Any orders that are
14   deemed suspicious will be flagged as suspicious."
15   Correct?
16        A.    Correct.
17        Q.    And the orders that are deemed
18   suspicious are orders that were flagged as a result
19   of the formula, correct?
20        A.    Correct.
21        Q.    So, you believe that's an inaccurate
22   statement of the policies as implemented by
23   Walgreens, correct, sir?
24        A.    I don't think that Rakesh, the author of

Page 248

1    this document, a programmer analyst, is in a
2    position to delineate the entire corporate policy
3    of Walgreens, no.
4         Q.    So, the simple answer is, in addition to
5    Mr. Bancroft, Mr. Khanna is wrong too, correct?
6         A.    Correct.
7         Q.    Yes, sir.  So, this is the second
8    document that is incorrect that an order flagged by
9    the system is suspicious, correct, sir?
10        A.    Probable suspicious would be a correct
11   characterization.  I don't -- again, I think there
12   is a distinction between confirmed and probable
13   that is not discussed in this document.
14        Q.    Yes, sir.  But the question I asked was:
15   This is the second document in a row that we've
16   looked at that you believe is incorrect that
17   designates an order flagged by the algorithm as
18   suspicious, correct, sir?  Yes or no.
19        A.    Neither of these documents I think make
20   any distinction between possible and confirmed
21   suspicious orders.
22        Q.    So, the simple answer to my question is
23   yes, that is the second document in a row that
24   we've looked at that have incorrectly stated that

Page 249

1    an order flagged by the system is deemed
2    suspicious, correct?
3         A.    They have failed to make a distinction
4    between probable and confirmed.  Both documents.
5         Q.    So, they are incorrect?
6         A.    They are incomplete.
7         Q.    So, sir, let me hand you what I'm going
8    to mark as Bratton 24, which is dated 2/8/2012.
9             (WHEREUPON, a certain document was
10            marked as Bratton 30(b)(6) Exhibit
11            No. 24:  2/8/12 e-mail with
12            attachment; WAGMDL00325129 -
13            00325130.)
14   BY MR. MOUGEY:
15        Q.    You see, sir, that this isn't from one
16   of the algorithm or one of the tech folks.  This is
17   from Barbara Martin, correct?
18        A.    Correct.
19        Q.    Ms. Martin that you've been citing all
20   day long about interview process, correct?
21        A.    Correct.
22        Q.    And this is dated 2/8 of 2012.  Do you
23   see that?
24        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    Q.   Almost three and a half years after the
2  first memo we looked at with Wayne Bancroft,
3  correct, sir?
4    A.   Correct.
5    Q.   And Ms. Martin, the subject, and
6  attaches a document entitled "Suspicious Order
7  Monitoring Process," correct?
8    A.   Correct.
9    Q.   And she sent this to Denman Murray.  And
10  who is Denman Murray?
11    A.   Her boss.
12    Q.   You don't think she'd send her boss
13  something that was incorrect or inaccurate, right?
14    A.   I don't know.
15    Q.   I mean, you wouldn't expect Ms. Martin
16  is -- "Suspicious Order Monitoring Process,"
17  page 2.  Do you see the title?
18    A.   I do.
19    Q.   "Current Process."  Fourth bullet down.
20  "Original project design was to prevent the DCs
21  from filling any potential suspicious order."
22        Do you see that?
23    A.   I do.
24    Q.   "And to capture the data to identify

Page 251

1  stores with potentially suspicious activity for
2  loss prevention team to investigate."  Correct?
3    A.   Correct.
4    Q.   And underneath the "Enhancements," "The
5  system will identify stores that had order quantity
6  decreased and then placed order to vendor."
7  Correct?
8    A.   Correct.
9    Q.   So, between 2009 and 2012, when did
10  Walgreens decide that orders flagged from the
11  algorithm were no longer suspicious because they
12  had been cut?
13    A.   I don't know.
14    Q.   You don't know?
15    A.   I don't know.
16    Q.   Because if they were deemed suspicious,
17  orders that were flagged from the algorithm, they
18  were required to be reported to the DEA, correct,
19  sir?
20        MR. BENSINGER:  Objection; argument and calls
21  for a legal conclusion, scope.
22  BY MR. MOUGEY:
23    Q.   Do you need me to redo the question?
24    A.   I believe that our position at that time

Page 252

1  was that if we reduced the order, it was not
2  suspicious.
3    Q.   That's not what I asked.  I said if the
4  orders were deemed suspicious that were flagged by
5  the algorithm, they were required to be reported to
6  the DEA, correct, sir?
7        MR. BENSINGER:  Objection; calls for a legal
8  conclusion and a violation of the Walmart ruling by
9  Special Master Cohen on interpretation.
10        SPECIAL MASTER COHEN:  I'll allow it as asked.
11  BY THE WITNESS:
12    A.   I'm not sure that it was clear to us if
13  it was or it was not suspicious.  Again, we were
14  reaching out to the DEA and asking for clarity,
15  trying to discuss with field agents and receiving a
16  variety of responses.
17        So, our reporting stance at that time
18  was orders that are possibly suspicious are
19  reported in the Appendix E-3 report and these were
20  not.
21  BY MR. MOUGEY:
22    Q.   But that's not what I asked.
23        What I asked you, sir, was:  If the
24  orders were deemed suspicious that were flagged

Page 253

1  from the algorithm, they were required to be
2  reported to the DEA, correct, sir?
3        MR. BENSINGER:  Asked and answered and same
4  objection.
5  BY THE WITNESS:
6    A.   I would -- my belief, I think what our
7  position was that if they were confirmed
8  suspicious after an investigation, they should be
9  reported.
10  BY MR. MOUGEY:
11    Q.   But that's a little different than the
12  question I asked.  Okay.  If you think the answer
13  is no, that's okay.
14        But what I asked was:  If the orders
15  were deemed suspicious that were flagged from the
16  algorithm, they were required to be reported to the
17  DEA, correct?
18        MR. BENSINGER:  I continue to object on the
19  ground Mr. Mougey is seeking to elicit an
20  interpretation of regulations and a legal
21  conclusion, not fact testimony about Walgreens'
22  practices.  And so I object.
23  BY MR. MOUGEY:
24    Q.   It's the same question I've asked four

64 (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    or five times in a row.
2        A.   No, I don't believe they were required
3    to be reported.
4        Q.   All right.  We've now gone through phase
5    1 through 3.
6        A.   4.
7        Q.   I'm sorry.  Phase 1 through 4.  Thank
8    you.
9             What time frame was 4 initiated?
10       A.   4 was deployed August '12.  So, two,
11   three months after the previous version.  And then
12   5, it was in effect through November '12 when
13   version 5 came online.
14       Q.   And what was the difference with phase 4
15   from phase 3?
16       A.   It incorporated vendor orders and
17   partial fills to make them eligible for flagging or
18   reduction.
19            So, my understanding is 3 considered
20   vendor orders in its calculation, 4 would flag or
21   reduce vendor orders as well as our own DC orders.
22       Q.   I'm a little confused.  Help me with
23   what vendors.
24            So, up until June of 2012 with this

Page 255

1    whole algorithm, let's just say I come in with
2    1,000 orders, it's flagged and reduced to 500, and
3    I'm the pharmacist and I want to get that
4    Schedule II or Schedule III.
5             Can I just -- up until June of '12, can
6    I just pick up and order from another vendor
7    outside of Walgreens?
8        A.   It's possible.  I know at some point we
9    requested that our vendor no longer accept phone
10   orders though I haven't been able to definitively
11   establish when that occurred.
12       Q.   Let's do it another way.
13            Does Walgreens' system detect that when
14   an order has been flagged as a result of the
15   algorithm and reduced, up until June of '12, can a
16   pharmacist then order from another vendor?
17       A.   Yes.
18       Q.   And there was no monitoring of that
19   pharmacist ordering from another vendor once their
20   order had been reduced by Walgreens?
21       A.   I believe that Barb and Marcy were
22   looking at reports related to that.  I can't
23   comment on what monitoring the vendor did at their
24   distribution center.

Page 256

1        Q.   I didn't ask what that vendor did at
2    their distribution center.  We'll get into that
3    later.
4             What I'm asking you right now is
5    Walgreens had absolutely zero policy and procedure
6    in place in writing to detect pharmacies that --
7    whose orders were being reduced by the algorithm at
8    Walgreens and then ordering from another vendor up
9    to June of 2012, correct, sir?
10       A.   I -- no, I don't agree with that, and
11   the reason -- the basis that I give for that is I
12   believe that Barb and Marcy were seeing this type
13   of activity, which is why we sought to include
14   vendor orders in the system.
15       Q.   What makes you believe that Barb and
16   Marcy -- Barb and Marcy must have been really busy.
17   Barb and Marcy are everywhere, aren't they?
18       MR. BENSINGER:  Objection; argumentative.
19   BY MR. MOUGEY:
20       Q.   They are.  Barb and Marcy are filling a
21   tremendous amount of roles in the suspicious
22   ordering monitoring policies, aren't they?
23       A.   They are heavily involved with
24   inventory --

Page 257

1        Q.   Two people?
2        A.   -- and suspicious order monitoring.
3        Q.   Yes, sir.  Two people at the -- at that
4    level are filling multiple roles in an operation
5    that has anywhere, depending on the time frame, 5,
6    6, 7,000, stores, correct?
7        A.   Correct.
8        Q.   200,000 people and it's Barb and Marcy,
9    right, in a lot of the answers today, correct?
10       MR. BENSINGER:  Objection.
11   BY MR. MOUGEY:
12       Q.   So, what was the system in place at
13   Walgreens when it cut an order as a result of its
14   algorithm and reduced it to monitor a pharmacist
15   from going to another vendor like a Cardinal or
16   AmeriSource or Anda and ordering from that vendor?
17       A.   I believe that it was -- they would
18   monitor those as part of the audits, the
19   retrospective audits.
20       Q.   "I believe" sounds to me like a guess.
21            What policy and procedure is in place
22   that would oversee a pharmacist whose order was cut
23   and flagged by the algorithm from ordering from
24   another vendor up until June of 2012?

65 (Pages 254 to 257)

Page 258

1    A.   Only the retrospective review that would
2  have been performed by loss prevention and
3  inventory.
4    Q.   And retrospective review, how often is
5  that?
6    A.   They told me that this was occurring
7  monthly.
8    Q.   What I asked was what -- not what they
9  told you, not what somebody said.  I want to know
10  what written policies and procedures were in place
11  at Walgreens to detect when a pharmacist whose
12  order had been rejected and cut down as part of the
13  algorithm and then placed the order at another
14  vendor like a Cardinal, Anda or AmerisourceBergen,
15  and the answer is there were none, correct, sir?
16    A.   I believe there were no written
17  documents, no.
18    Q.   Thank you.  You are familiar with the
19  term "interstoring"?
20    A.   Correct.
21    Q.   Interstoring is when one Walgreens
22  pharmacy would go to another Walgreens pharmacy to
23  help fill an order, correct?
24    A.   Transfer product between two stores.

Page 259

1    Q.   That was another loophole in Walgreens'
2  system when an order had been reduced, not filled,
3  that a store could go to another store and
4  interstore, correct?
5    MR. BENSINGER:  Objection; argumentative.
6  BY THE WITNESS:
7    A.   There is a possibility that they could
8  interstore product.
9  BY MR. MOUGEY:
10    Q.   And what written system was in place at
11  Walgreens to detect and monitor interstoring for
12  Schedule II and III controlled substances up until
13  June of 2012?
14    A.   Other than the retrospective review, I
15  don't believe there was a process to prevent them
16  from interstoring at that time.
17    Q.   And I understand that's what people have
18  told you about the retrospective review, but the
19  question I asked you was a little different.
20    What written policies and procedures
21  were in place to monitor for interstoring, one
22  Walgreens goes to another Walgreens and gets
23  Schedule II or Schedule III opiates, after its
24  order had been flagged by the algorithm and

Page 260

1  reduced?
2    Not what somebody told you.  Where is
3  the written policy and procedure?
4    A.   I don't believe there is one for that
5  time period.
6    Q.   Sir, isn't it also true that another
7  exception from phase 1 through June of 2012 was
8  that Rx Services would have the ability to remove
9  items from the order limitation process or even to
10  remove an entire store from the order limit program
11  for a limited amount of time?
12    MR. BENSINGER:  Objection; compound.
13  BY THE WITNESS:
14    A.   The -- I understand that they had the
15  ability to, based on their judgment and evaluation
16  of the store or the item, exempt it from this
17  process, yes.
18    Q.   Let me make sure that we -- it's not
19  compound and it's not confusing.
20    Rx Services had the ability to remove
21  items from the order limitation that was being
22  monitored by Walgreens, correct?
23    A.   From the reduction, yes.
24    Q.   Yes, sir.  And Rx Services also had the

Page 261

1  ability to remove from the reduction an entire
2  store?
3    A.   Correct, based on their evaluation of
4  that store.
5    Q.   What other loopholes other than the
6  ability to remove a store, the ability to remove
7  items, interstore, and the ability of a pharmacist
8  to order from another distributor, what other
9  loopholes are you aware of?
10    MR. BENSINGER:  Objection; argument.
11  BY THE WITNESS:
12    A.   I believe that there is legitimate
13  reasons why stores might be removed from the
14  reduction or certain items based on a variety of
15  factors.  However, I'm not aware of any additional
16  reasons that an order might not go through, so
17  I'm...
18    Q.   Isn't it possible that the button on the
19  computer interface could be turned off?
20    A.   By whom?
21    MR. BENSINGER:  Objection; vague.
22  BY MR. MOUGEY:
23    Q.   By -- isn't it possible that a store was
24  turned off from the DEA internal review on the

66 (Pages 258 to 261)

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    algorithm?  It's possible a store could just be
2    turned off from the system, correct?
3        A.    My understanding would be that that's
4    possible based on exceptional circumstances.
5        Q.    Like and those exceptional circumstances
6    are like weather?
7        A.    No.  That that store has a different
8    book of business that warrants more -- more of that
9    type of product, that it's either being removed
10   from or the item is being removed from.
11       Q.    Sir, where are the written policies and
12   procedures that delineate when a store can be
13   removed because of its book of business?
14       A.    I don't believe there is a written
15   policy.
16       Q.    I'm going to come back to some of those
17   exceptions in a minute.  If I could direct your
18   attention to P-WAG-18 and 19.
19           Mr. Bratton, I'm going to hand you what
20   I'm going to mark as Exhibit 25.
21           (WHEREUPON, a certain document was
22           marked as Bratton 30(b)(6) Exhibit
23           No. 25: July 2011, DEA Statistics;
24           WAGMDL00492171.)

Page 263

1    BY MR. MOUGEY:
2        Q.    July 11.  Do you see that?
3        A.    I do.
4        Q.    "DEA Statistics," correct?
5        A.    Correct.
6        Q.    "How many orders are flagged each
7    month?"
8           According to this synopsis, in the month
9    of July, 20,699 items are marked suspicious,
10   correct?
11       A.    It says that there, yes.
12       Q.    And the next bullet, "For the orders
13   flagged, how many orders violated 1, 2 or all 3
14   flags?"
15           Do you see that?
16       A.    I see that.
17       Q.    And below are tolerance violation,
18   inventory violation and frequency violation,
19   correct?
20       A.    Correct.
21       Q.    So, this isn't the E-3 Chemical
22   Handler's Manual, correct?
23       A.    Correct.
24       Q.    This is the algorithm from Wayne, right?

Page 264

1        A.    Correct.
2        Q.    That this is referencing.  The
3    memorandum is referencing the algorithm all the way
4    back to the memo we saw in 2008.  This is a
5    variation several steps down the road in July of
6    2011, correct?
7           MR. BENSINGER:  Objection; foundation.
8    BY THE WITNESS:
9        A.    It appears to be in 2011.
10   BY MR. MOUGEY:
11       Q.    There is no other system in place at
12   this point in time other than the E-3 Chemical
13   Handler's, this and then the query that you
14   mentioned earlier, correct?
15       A.    Not that I'm aware of, no.
16       Q.    Yes, sir.  So, according to this memo,
17   20,699 items are marked suspicious, right?
18       A.    That's what it says, yes.
19       Q.    Yes, sir.  And those would be orders
20   that have been reduced and then filled, correct?
21           MR. BENSINGER:  Objection; mischaracterization.
22   BY THE WITNESS:
23       A.    I believe at this time they would be
24   reduced and filled.

Page 265

1    BY MR. MOUGEY:
2        Q.    But it was not, even though they are
3    being referred to as suspicious internally, these
4    orders were not reported to the DEA, correct, sir?
5        A.    Correct.  I think frequently internally
6    there is a conflation of probable suspicious and
7    confirmed suspicious.
8        Q.    I hand you what we're going to mark as
9    Bratton 30(b)(6) 24 -- 26.  I'm sorry.
10           (WHEREUPON, a certain document was
11           marked as Bratton 30(b)(6) Exhibit
12           No. 26: DEA Statistics;
13           WAGMDL00492169.)
14   BY MR. MOUGEY:
15       Q.    Similar memo from August of 2011,
16   correct, sir?
17       A.    It says it was for data in that month,
18   yes.
19       Q.    Yes, sir.  Which is the next month from
20   Bratton 23 we just looked at, correct?
21       A.    Correct.
22       Q.    Total of 40,176 items are marked
23   suspicious, correct?
24       A.    That's what it says there.

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Q.   And, again, we see below, tolerance
2  violation, inventory adjustments and frequency
3  violations, correct?
4    A.   Correct.
5    Q.   That is very similar to the algorithm
6  drafted by Mr. Bancroft back in 2008, correct?
7    A.   Correct.
8    Q.   And similar to the last month, the
9  orders that are flagged and then reduced internally
10 are being referred to as suspicious, correct, sir?
11   A.   That's how they refer to them here, yes.
12   Q.   And if you look all the way at the
13 bottom of that page, do you see the 102,116?
14   A.   Correct.
15   Q.   So, there had been 102,000 orders at the
16 time of this August '11 e-mail that had been cut
17 and reduced but not reported to the DEA because
18 they were not suspicious, correct, sir?
19   MR. BENSINGER:  Objection; mischaracterization.
20 BY THE WITNESS:
21   A.   It appears that there had been 102,000
22 that had been cut and reduced up until this time.
23 BY MR. MOUGEY:
24   Q.   Yes, sir.  There had been 102,000 orders

Page 267

1  up to this time in August of 2011 that had been
2  flagged, cut, reduced and, according to the
3  practices of Walgreens, not reported to the DEA as
4  suspicious, correct, sir?
5    A.   Correct.
6    Q.   And, sir, by looking at this memo, do
7  you have any understanding of how far back in time
8  the 102,000 went?
9    A.   I would -- not based only on this memo,
10 no.
11   Q.   Where was Walgreens recording the number
12 of orders that had been flagged, reduced and not
13 shipped?
14   A.   Based on conversations with Steve
15 Bamberg and others in the IT apparatus, I believe
16 that there is reporting that existed on a server
17 called ADR 4 or ADR 7.  I'm not sure which one.
18 And I know that Barb would pull data from that to
19 review.  So, I think that that's where that
20 information was kept.
21   Q.   So, Barb and -- sorry.  Marcy?
22   A.   Yes.
23   Q.   Barb and Marcy are the ones responsible
24 for those 102,000 orders, looking at those

Page 268

1  retrospectively?
2    A.   A portion.  They looked at a sample.
3    Q.   Yes, sir.  Another potential weakness in
4  Walgreens' system is the overrides, correct, sir?
5    A.   I'm not sure what you mean by that.
6    Q.   Do you know what Walgreens referred to
7  as overrides?
8    A.   At what time?
9    Q.   Up until 2012.
10   A.   So, my understanding is that stores or
11 pharmacy supervisors could request an override
12 based on circumstances at the store.  That's my
13 understanding.
14   Q.   So, we have gone through interstoring.
15 We've gone through calling another vendor.  We've
16 gone through a store being removed from the system.
17     The pharmacist can also call and ask for
18 an override, correct?
19   A.   Correct.  However, that has to be
20 approved by field leadership and the -- at one time
21 the inventory team and at a later date the
22 Rx Integrity team.
23   Q.   And just in Cleveland and Cuyahoga, from
24 2006 to 2013, early '14, when Walgreens stopped

Page 269

1  distributing, do you have any idea how many times
2  the stores in those two counties called and asked
3  and were approved for overrides?
4    A.   I do not know the number.
5    Q.   Have you seen documents that evidence
6  the number of overrides?
7    A.   I don't.  I don't recall.
8    Q.   Does Walgreens have policies and
9  procedures in place in writing about what the
10 criteria for those overrides are?
11   A.   For certain, in 2013.  Prior to that,
12 there may be.  One moment.
13     There are documents that describe the
14 process of requesting an override, but I don't know
15 that we have it in the 2012 time period documents
16 that describe how inventory would make the
17 determination to override or not to override other
18 than in collaboration with the pharmacy supervisor.
19   Q.   Or what the criteria is for that
20 override, whether it's approved or not approved in
21 kind of a Walgreens policies and procedures on when
22 to approve an override and when not to approve an
23 override, correct?
24   A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    Q.   And the section that you're referring to
2  is simply a how do you go about filling out the
3  right section on the Walgreens intranet to request
4  the override, right?
5    A.   Correct.
6    Q.   More of an automation process, not
7  necessarily the policies and procedures on when it
8  is appropriate, right?
9    A.   Correct.
10    MR. MOUGEY:  I think this is a good time for a
11  break if it's all right with everybody else.
12    THE VIDEOGRAPHER:  We are off the record at
13  3:56 p.m.
14        (WHEREUPON, a recess was had
15         from 3:56 to 4:17 p.m.)
16    THE VIDEOGRAPHER:  We are back on the record
17  at 4:17 p.m.
18  BY MR. MOUGEY:
19    Q.   Mr. Bratton, I'd like to finish up this
20  chart to make sure I got everything here.
21        Phase 4, I have August '12, and I
22  apologize because I think you already told me, but
23  how long did phase 4 -- August '12 to when?
24    A.   November '12.

Page 271

1    Q.   Till November.  Okay.
2        And your understanding is that the
3  change in the criteria on phase 4 was that vendor
4  orders and partial fills were now under the DEA
5  requirement umbrella or were monitored, correct?
6    A.   Correct.
7    Q.   Tell me what the partial fill portion is
8  because I'm not -- I don't recall that.
9    A.   When a prescription in the front end is
10  marked as a partial fill or out of stock, it
11  reduces the -- the system thinks that the pharmacy
12  is out.  They may not actually be.  That may not
13  even be the store's intention.  They may just not
14  have enough to fill the complete quantity.  And
15  that could trigger a replenishment order.  And, so,
16  I think that they were ensuring that it wasn't
17  unduly weighing partial fills in the algorithm.
18    Q.   Okay.  Any other changes in phase 4?
19    A.   No.
20    Q.   All right.  We just briefly discussed
21  interstoring.  When was interstoring -- when did
22  that become prohibited?
23    A.   I believe in phase 5.
24    Q.   Okay.  And phase 5 begins then in --

Page 272

1  sometime in 11/12?
2    A.   November '12, yeah.
3    Q.   November '12, okay.  Tell me what was
4  different in phase 5 from phase 4.
5    A.   The biggest -- well, there is a couple
6  differences.
7        First is that the frequency calculation
8  was replaced instead with a ceiling calculation,
9  and what that ceiling does is it considers the
10  amount of orders and the quantity of those orders
11  over a period of time as opposed to just how often
12  an order was placed irregardless of its size.
13    Q.   Okay.  Anything else?
14    A.   So, I believe at this point the system
15  would flag orders and reduce them to zero, and that
16  at that point the store -- we removed the frequency
17  threshold because it was superseded by ceiling.
18    Q.   Flag and replace to zero.  Explain to
19  that?
20    A.   So, whereas previously the orders were
21  cut to the quantity that the system -- so,
22  previously if you had a limit of 5 and you tried to
23  order 10, it would reduce it to 5.
24    Q.   Okay.

Page 273

1    A.   Now it is reducing an order that exceeds
2  the ceiling or tolerance to zero.
3    Q.   All right.  Anything else?
4    A.   I believe around this time we began the
5  process.  So, we reduced their order to zero and
6  then if they want to get additional product, they
7  would have to --
8    Q.   Reorder?
9    A.   -- do an override request.  If they just
10  reordered, it would be cut to zero again.
11    Q.   Okay.
12    A.   So, that wouldn't help them really.
13  They'd have to do an override request.  And also I
14  believe around the time this rolled out we began
15  investigating those flagged orders, even if they
16  were reduced to zero.
17    Q.   Okay.  And, so, "Investigating orders
18  that triggered algorithm."  How does that sound?
19  Order triggered by algorithm, by the algorithm, is
20  that right?
21    A.   Correct.
22    Q.   And when you say "investigated," you
23  mean due diligence?
24    A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q.   Were they then reported to the DEA?
2    A.   If they were confirmed suspicious, they
3    would be reported to the DEA.  Initially I believe
4    by fax and then later by electronic fax to the
5    field office that's relevant to the store's
6    registration.
7    Q.   All right.  Let me just go through what
8    I just wrote down.
9         "11/12."  And I'm assuming phase 5
10   lasted until Walgreens was no longer a distributor?
11   A.   There was a phase 6, but it had to do
12   with improvements primarily to the -- in some
13   documents they call it phase 6, but in other
14   documents they call it phase 2 of the dashboard.
15   Q.   Right.
16   A.   And, so, it was primarily with how the
17   Rx Integrity or inventory before that would view
18   this information that the system was generating.  I
19   don't believe it impacted the functioning of the
20   algorithm, though.
21   Q.   It was more of an interface issue?
22   A.   Correct.
23   Q.   Okay.  So, bear with me.
24        11/12 till when, phase 5?

Page 275

1    A.   Till we ceased to be a distributor.
2    Q.   Pretty much till the end of the --
3    till --
4    A.   2014.
5    Q.   I'm going to just put "When Walgreens
6    out of distribution business."  Is that fair?
7    A.   For controlled substances, yes.
8    Q.   Yes.  Thank you.
9    A.   So, we continue to use the system today,
10   but as we are no longer a distributor, we don't
11   report the orders, but we still have the system in
12   place for --
13        (WHEREUPON, there was a short
14        interruption.)
15   MR. MOUGEY:  I hate to do this.  It's Cohen.
16   MR. BENSINGER:  Should we go off the record
17   for the housekeeping?
18   MR. MOUGEY:  Hey, David.
19   THE VIDEOGRAPHER:  Off the record at 4:23.  Do
20   you want it on?
21   MR. MOUGEY:  It's okay.
22        (WHEREUPON, a recess was had
23         from 4:23 to 4:27 p.m.)
24   THE VIDEOGRAPHER:  We are back on the record

Page 276

1    at 4:27 p.m.
2    BY MR. MOUGEY:
3    Q.   All right.  Mr. Bratton, you were in the
4    middle of explaining to us that you still use the
5    system today, but you're no longer a distributor.
6    We don't report the orders and you were -- can you
7    finish what you were explaining to us about the
8    system and as it's in place until today?
9    A.   So, I just wanted to make the
10   distinction that we continue to operate this
11   system.  However, as we're no longer a distributor,
12   we don't report flagged orders to the DEA.
13   Q.   All right.  So, the system in large part
14   that you're using today as a -- in the dispensing
15   capacity is almost identical to the system you were
16   using as a distributor?
17   A.   Well, we still use it to evaluate orders
18   before they're transmitted to ABC.  It still
19   relates to orders, not necessarily dispensing.
20   But, yes.  As a non-distributor.
21   Q.   Let's do it this way, then.
22        So, the system that Walgreens is using
23   today, the phase 1 through 5, the steps that you
24   explained to us, are still being used today by

Page 277

1    Walgreens to fulfill its role even as a dispenser
2    or a pharmacy, correct?
3    A.   I think that we have continued --
4    MR. BENSINGER:  Objection to form.  Could I
5    have that -- give me just a moment to look at this
6    question, please.
7        Objection to form based on the scope of
8    the question.
9        Do you have it in mind?
10   THE WITNESS:  What's that?
11   MR. BENSINGER:  Do you have the question in
12   mind?
13   THE WITNESS:  No, I need it again.
14   MR. BENSINGER:  I objected to scope.  You can
15   answer.
16   BY MR. MOUGEY:
17   Q.   So, the question I asked was that the
18   system that Walgreens is using today as you
19   described, phase 1 through 5, the steps that you
20   explained to us, those are still being used today
21   by Walgreens to fulfill its role even as a
22   dispenser or a pharmacy, correct?
23   A.   I think that we continue to use it today
24   out of an abundance of caution and as a good

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    practice.  I don't know that it's specifically
2    related to any responsibility as a dispenser.
3        Q.   Okay.  If it's not as a pharmacy or
4    dispenser, what other capacity would Walgreens be
5    using this system to discharge its duties on
6    controlled substances?
7        A.   As I said, I think we continue to use it
8    out of an abundance of caution.  Also, I -- from my
9    personal knowledge, my understanding is that it is
10   for our Know Your Customer program of our
11   distributor, they like that we have something in
12   place to screen our orders.
13       Q.   Do any of the vendors that Walgreens
14   uses -- forget it.  Let me just go back.
15            Talk about averages for a second and
16   Wayne Bancroft's, essentially the metrics used in
17   the algorithm as it changes over time.  Okay?
18       A.   Um-hmm.

**REDACTED**

21       Q.   What impact would -- I'll tell you what.
22   There are some charts in your production with
23   the -- with a linear regression model graph,
24   correct?

Page 280

1        A.   Correct.
2        Q.   And I believe I've already passed -- I
3    will make it a little easier.  Bear with me.  Let
4    me find that.
5            One of those examples would be in the
6    controlled substance ordering that we have marked
7    as 8, would it not?
8        A.   Of the -- of the linear regression?
9        Q.   Yes.
10       A.   This looks like a linear regression.  I
11   don't know if this is real data or, you know, made
12   up.  But this is what it would look like typically,
13   what's on slide or I have Bates No. 7941.
14       Q.   And you're on Bates No. 7941?
15       A.   667941.  But in the exhibit that you
16   provided.
17       Q.   Yes.  Let's look at Exhibit 8.  It's a
18   different Bates number.  The Bates number I'm
19   looking at is 395925.  Do you see it?
20       A.   Yes.
21       Q.   It's on "Phase 5 Functionality - Ceiling
22   Calculation."  Correct?
23       A.   Correct.  Same one I was looking at in
24   the other Bates number.

Page 281

1        Q.   Okay.  And part of your preparation
2    today was to understand the metrics that were used
3    as elaborated in (i) under the subject matters for
4    testimony, correct?
5        A.   Correct.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

Page 282

**REDACTED**

**REDACTED**

3      Q.   So, what impact, if any, would increases
4    in volume for controlled substances distributed by
5    Walgreens have year to year on the line
6    demonstrating the ceiling on Bates No. 925?
7      A.   It's --
8      MR. BENSINGER:  Objection; beyond the scope.
9    You can answer.
10   BY THE WITNESS:

**REDACTED**

7      Q.   Do you recall anyone from in your
8    preparation analyzing the impact of increasing
9    dispensing of controlled substances, what impact
10   that would have on the ceiling for Schedule II and
11   III year to year?
12     A.   Since the time that I have been
13   involved, in February of '13, as a result of this
14   system, you know, all the green dots in this chart
15   are being cut off until they fall below this line.
16         We've generally seen almost all items
17   declining, initially to great complaint by stores
18   and in some cases patients and boards of
19   pharmacies.  And so I don't think that was
20   happening.  I don't recall if we specifically
21   analyzed that exact thing, though.
22     Q.   And I'm not asking you in your personal
23   capacity when you began at Pharmaceutical
24   Integrity.

72 (Pages 282 to 285)

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

73 (Pages 286 to 289)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

