Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


-----------------------------)

IN RE:  NATIONAL PRESCRIPTION )

OPIATE LITIGATION            ) Case No. 1:17-MD-2804

-----------------------------) Hon. Dan A. Polster

APPLIES TO ALL CASES         )

-----------------------------)



HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


        The videotaped deposition of EDWARD

BRATTON, called for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before JULIANA F. ZAJICEK, a

Registered Professional Reporter and a Certified

Shorthand Reporter, at Bartlit Beck Herman Palenchar &

Scott, LLP, Suite 400, 54 West Hubbard Street,

Chicago, Illinois, on November 30, 2018, at 9:05 a.m.

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 48

```
 1        You see in the first sentence, sir, that
 2   it identifies "orders of controlled substances,"
 3   correct?
 4        A.   Correct.
 5        Q.   Do you have an understanding that -- that
 6   this section is referring to a system designed to
 7   identify suspicious orders as opposed to suspicious
 8   shipments?
 9        MR. HILL:  Object to the form.
10   BY THE WITNESS:
11        A.   It -- it appears that way, yeah.
12   BY MR. MOUGEY:
13        Q.   And if you look at the next sentence:
14        "The registrant shall inform the field
15   division office of the administration in his area of
16   suspicious orders when discovered by the registrant."
17        Do you see that, sir?
18        A.   Yes.
19        Q.   And "when discovered by the registrant,"
20   do you have an understanding of what timeframe that
21   means?
22        MR. HILL:  Objection to the form.
23   BY THE WITNESS:
24        A.   I -- I don't know what they mean by
```

Page 47

```
 1        "The registrant shall design and operate a
 2   system to disclose to the registrant suspicious orders
 3   of controlled substances."
 4        Did I read that first sentence right?
 5        A.   Yes.
 6        Q.   Now, as an employee of Walgreens, do you
 7   believe that Walgreens had a system designed to
 8   identify suspicious orders of controlled substances?
 9        MR. HILL:  Object to the form.
10   BY THE WITNESS:
11        A.   At -- at what time?
12   BY MR. MOUGEY:
13        Q.   From the time you began in pharmaceutical
14   integrity.
15        A.   From the time I began, yes.
16        Q.   All right.  Do you believe that Walgreens
17   had a system in place designed to identify suspicious
18   orders of controlled substances prior to you starting
19   at pharmaceutical -- or in pharmaceutical integrity?
20        MR. HILL:  Ob- -- objection to the form.
21   BY THE WITNESS:
22        A.   I don't know.
23   BY MR. MOUGEY:
24        Q.   You don't know.
```

Page 49

```
 1   discovered.
 2   BY MR. MOUGEY:
 3        Q.   Well, do you have an understanding or how
 4   did you interpret that when -- what -- when discovered
 5   means?
 6        MR. HILL:  Objection to form.
 7   BY THE WITNESS:
 8        A.   I don't know.  From the -- I don't know.
 9   BY MR. MOUGEY:
10        Q.   The third sentence:
11        "Suspicious orders include orders of
12   unusual size, orders deviating substantially from a
13   normal pattern, and orders of unusual frequency."
14        Do you see that, sir?
15        A.   Yes.
16        Q.   Did I read that correctly?
17        A.   Yes.
18        Q.   And -- and do you understand that that is
19   Walgreens' responsibility to have a system to identify
20   orders deviating substantial from the normal pattern
21   and orders of unusual frequency, correct, sir?
22        MR. HILL:  Objection to the form.
23   BY THE WITNESS:
24        A.   I -- I don't know.  I mean, I see that
```

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1   that's what that says here.
2   BY MR. MOUGEY:
3       Q.   But no one has ever told you that's the
4   responsibility at -- of Walgreens during your tenure
5   at Walgreens?
6       A.   No.
7       MR. HILL:  Objection.
8       Hold on one second.  Sorry.  I ask you not
9   to -- counsel you not to disclose any attorney client
10  privileged communication you might have had about that
11  subject.
12  BY THE WITNESS:
13      A.   So we -- we rely on our regulatory law
14  group to guide us.  You know, I'm not an attorney and
15  there is a variety of case law and regulations and
16  state and federal.  So we rely on their guidance on
17  how to proceed as it relates to the patchwork of
18  regulations that we have to comply with.
19  BY MR. MOUGEY:
20      Q.   Sure.
21      And you relied on that regulatory law
22  group about the details of the regulatory framework?
23      A.   Correct.
24      Q.   And so when you had a question about the

Page 51

1   details of the regulatory framework, you would contact
2   the regulatory law group.
3       Does that make sense?
4       MR. HILL:  Objection to the form.
5   BY THE WITNESS:
6       A.   Correct.
7   BY MR. MOUGEY:
8       Q.   And so part of your training about the
9   details of this CFR we just went through, 1301.74, was
10  training from the regulatory law group, correct?
11      A.   I don't know that I would -- training per
12  se, but as -- as I started in the role, I know that we
13  were trying to report suspicious orders for RDCs.
14      Q.   I understand.  That's not what we are
15  talking about right now.  What we are talking about is
16  your interaction with the regulatory law group and
17  details about Section 1301.74.
18      Do you see that?
19      A.   Um-hum.
20      Q.   So interpretations of what you mentioned
21  of the -- I think you used the word "patchwork," case
22  law, regs, DEA interpretations, you would rely on the
23  regulatory group for those details?
24      A.   Correct.

Page 52

1       Q.   How often did you interact on a, say, a
2   monthly basis with any lawyers at Walgreens regarding
3   the details of the regulatory framework regarding to
4   the monitoring -- related to the monitoring of
5   controlled substances?
6       MR. HILL:  And Mr. -- Mr. Bratton, just don't
7   disclose any of the actual communications.  This is
8   just a question about timing and the numbers of
9   communications.
10  BY THE WITNESS:
11      A.   I -- I don't recall.  At the time I
12  started I can tell you that we talked with them
13  frequently on a variety of issues.  I don't recall
14  exactly on this one five years ago how often I spoke
15  with them.
16  BY MR. MOUGEY:
17      Q.   In that frequently on a variety of issues
18  related to the details of the regulatory framework
19  covering controlled -- monitoring of controlled
20  substances?
21      A.   Monitoring of controlled substances,
22  reporting of controlled substance loss, controlled
23  substance dispensing, et cetera.
24      Q.   Now, on those details that you talked to

Page 53

1   the regulatory law group about, when you said
2   frequently, is that twice a week, twice a day, just
3   generally?
4       A.   Twice a week, probably.
5       Q.   And that was more in the beginning when
6   you started with pharmaceutical integrity?
7       A.   I think it continues to this day.  Maybe
8   not on this topic as much.
9       Q.   So a couple times a week you would
10  interact with the regulatory law group about the
11  details of Walgreens' control monitoring system?
12      A.   Or details or specific incidents that
13  might arise, et cetera.
14      Q.   And -- and it's important for you as a
15  manager of the southern operation to have an
16  understanding of the regulatory framework covering
17  Walgreens' responsibilities in relation to monitoring
18  of controlled substances, correct?
19      MR. HILL:  Object to the form.
20  BY THE WITNESS:
21      A.   I -- I think for our group it was
22  important to execute the tasks and the -- the -- the
23  programs we've been implement -- charged with.  I
24  don't know that I need to understand the law to

14 (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1   understand what we needed to do.
2   BY MR. MOUGEY:
3       Q.   The question I asked you was a little
4   different.  What I asked was:  Is it important for you
5   as a manager of the southern operation to have an
6   understanding of the regulatory framework covering
7   Walgreens' responsibilities in relation to monitoring
8   of Schedule II and Schedule III opiates?
9       MR. HILL:  Object to the form.
10  BY THE WITNESS:
11      A.   I -- I don't know how to answer that
12  question.
13  BY MR. MOUGEY:
14      Q.   What's confusing to you about that
15  question?  Is it important that you understand the
16  regulatory framework?
17      MR. HILL:  Same objection.
18  BY THE WITNESS:
19      A.   I think I have a general concept, but I
20  don't think I'm an expert on all of the issues at
21  every level of government, no.
22  BY MR. MOUGEY:
23      Q.   Yeah, I don't -- I don't think I asked you
24  about whether you were an expert at every level of

Page 55

1   government.  What I asked was is it important as a
2   manager of the southern operation for Walgreens in
3   pharmaceutical integrity to understand, just
4   generally, the regulatory framework covering
5   Walgreens' responsibilities in relation to monitoring
6   Schedule II and Schedule III opiates?
7       MR. HILL:  Objection to the form.
8   BY THE WITNESS:
9       A.   I'm not sure.
10  BY MR. MOUGEY:
11      Q.   Has someone instructed you to -- to say
12  "I'm not sure" to questions about what Walgreens'
13  responsibilities were?
14      A.   No.
15      Q.   Have you been told just to -- if -- if
16  anyone asks you about what Walgreens' responsibilities
17  were, just to say I'm not sure?
18      A.   I'm trying to answer truthfully.
19      Q.   Well, let's go back to Bratton 1, okay.
20           Manager of pharmaceutical integrity,
21  southern operation, February 2013 to the present,
22  right?
23      A.   Um-hum.
24      Q.   Okay.  Now, you -- you put this next

Page 56

1   paragraph in your LinkedIn profile, correct?
2       A.   This is copied from my job posting.
3       Q.   Yes, sir.  So you put this in there,
4   right?
5       A.   I copy and pasted, yes.
6       Q.   You copied it.  And it's accurate,
7   correct?
8       A.   I believe so.
9       Q.   So Bratton 1, your profile:  "Responsible
10  for managing, creating, and maintaining controlled
11  substance dispensing, monitoring and reporting
12  programs."
13           Is that accurate, sir?
14      A.   Yes.
15      Q.   And that was part of the scope of your
16  responsibilities from February '13 on?
17      A.   Correct.
18      Q.   Second sentence:
19           "Developed, recommends, implements
20  programs, procedures and techniques which will
21  identify and minimize loss of company assets and
22  ensure the safety, compliance and security of the
23  ordering and dispensing of controlled substances,"
24  correct?

Page 57

1       A.   Correct.
2       Q.   Now, when you say controlled substances
3   in -- in this paragraph, that is a number of different
4   types of drugs, correct?
5       A.   Correct.
6       Q.   And you understand that this litigation is
7   about Schedule II and Schedule III opiates, correct,
8   sir?
9       A.   Correct.
10      Q.   And you understand, sir, in your role as
11  manager of the southern operation that those
12  Schedule II and Schedule III opiates are highly
13  addictive, correct?
14      MR. HILL:  Object to the form.
15  BY THE WITNESS:
16      A.   My understanding is they can be addictive
17  for some people.
18  BY MR. MOUGEY:
19      Q.   Yes, sir, they can be addictive to some
20  people.
21           And did you understand in February
22  of 2013, that the country was in the midst of an
23  opiate crisis?
24      MR. HILL:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1   BY THE WITNESS:
2       A.   I believe that I was becoming aware of it,
3   yes.
4   BY MR. MOUGEY:
5       Q.   And how did you become aware of that in
6   February of 2013?
7       A.   Partially through my -- my work,
8   partially, you know, you -- the news and things you
9   see on television.
10      Q.   Well, let's talk about the partially
11  because of your work.
12           How at work did you become aware that in
13  2013 the country was in the middle of an opiate
14  crisis?
15      A.   I don't recall the specific details.  I
16  know that we -- it was something that was, you know,
17  in our minds as we were drafting our policies and
18  procedures.
19      Q.   It was in your mind.
20           Help -- help me to understand how it got
21  in your mind?
22      A.   Direction from my boss --
23      Q.   Ms. Polster?
24      A.   Yes.

Page 59

1       Q.   And when you say "direction," what do you
2   mean?
3       A.   We would meet in meetings with our -- my
4   peers or our team members and discuss issues and she
5   would provide direction as to programs we should work
6   on.
7       Q.   Did anybody ever tell you that there had
8   been ongoing congressional investigations into the
9   opiate crisis almost 13 years by the time you started
10  in 2013?
11      A.   No.
12      Q.   Did anybody tell you that there was year
13  upon year upon year increase in the amount of opiates
14  dispensed across the country?
15      A.   I knew that.  I don't know that anyone at
16  work told me that.
17      Q.   Did anyone ever as part of your training
18  advise you that the amount of deaths had increased,
19  overdose deaths related to Schedule II and
20  Schedule III opiates had increased exponentially
21  beginning in late '90s, early 2000s?
22  MR. HILL:  Objection to the form.
23  BY THE WITNESS:
24      A.   I don't recall.

Page 60

1   BY MR. MOUGEY:
2       Q.   You don't recall.  You don't recall
3   walking in the first month of my job and somebody
4   saying, We are in the middle of an opiate crisis,
5   people are dying every day, Florida is the hot bed,
6   you are in charge of the southern operation, there is
7   drugs migrating up to Ohio, and it is our job as
8   distributors to monitor and identify controlled
9   substances?
10           Anything along those lines?
11  MR. HILL:  Objection to the form.
12  BY THE WITNESS:
13      A.   I don't recall.
14  BY MR. MOUGEY:
15      Q.   Anything saying this is -- this is very,
16  very, very important that we are on the front line of
17  defense for Walgreens and we dispense as -- as many --
18  or more opiates than anyone in the country?
19      A.   I don't recall.
20      Q.   You don't recall any meetings with a sense
21  of urgency like that?
22      A.   I -- when I first was in the role, we were
23  very focused on the settlement with the DEA and the
24  provisions that our legal teams had outlined that we

Page 61

1   needed to implement.  That was one of the critical
2   focuses at that time.
3       Q.   And the -- in the midst of the
4   investigations by the DEA, what are you referring to?
5       A.   The -- when I was there, it was the
6   settlement agreement that we had signed and so we
7   received a laundry list of -- of tasks and programs
8   and changes that we were working to implement.
9       Q.   And that was in -- the agreement was
10  signed.
11           Do you have a recollection of when the
12  agreement was signed?
13      A.   Shortly after I started.
14      Q.   Like in June of 2013?
15      A.   That sounds right.
16      Q.   Were -- did anyone alert you or notify you
17  from your date in February of '13 until the date the
18  agreement was signed about the ongoing investigations?
19      A.   We were in discussions about the terms of
20  the settlement and what that might include.  Some of
21  the things that the government had already outlined
22  that we had committed to.
23      Q.   Including the closing of six Walgreens'
24  stores in Florida, correct?

16 (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1     MR. HILL:  Objection to the form.
2  BY THE WITNESS:
3     A.  I don't know if I knew that at that time.
4  BY MR. MOUGEY:
5     Q.   Including these -- the requirement that
6  six Walgreens' pharmacies were no longer dispensing
7  Schedule II and Schedule III narcotics?
8     A.   That was included in the eventual
9  settlement, but I don't know if I knew that that was a
10  condition at that time.
11     Q.   Were you a -- are you aware that there was
12  a -- a distribution center in Jupiter, Florida,
13  correct?
14     A.   I -- once I was in this role, yes.
15     Q.   As of February of 2013, were -- were you
16  aware that that Jupiter distribution center was part
17  of the investigation?
18     A.   I knew that they were no longer dispensing
19  and that there had been an order to show cause.
20     Q.   So let's go back to Branton -- I'm
21  sorry -- Bratton 2.
22        You have a general understanding that
23  Walgreens is charged with implementing a system
24  designed to identify suspicious orders, correct?

Page 63

1     A.   General --
2     MR. HILL:  Object to the form.
3  BY THE WITNESS:
4     A.   Generally, yes.
5  BY MR. MOUGEY:
6     Q.   Do you have an understanding that -- a
7  general understanding that Walgreens was required to
8  report suspicious orders to the DEA?
9     MR. HILL:  Same objection.
10  BY THE WITNESS:
11     A.   Generally, yes.
12  BY MR. MOUGEY:
13     Q.   And that suspicious orders include orders
14  of unusual size, correct?
15     MR. HILL:  Object to the form.
16  BY THE WITNESS:
17     A.   Yes.
18  BY MR. MOUGEY:
19     Q.   Orders deviating substantially from a
20  norther -- normal pattern?
21     MR. HILL:  Same objection.
22  BY MR. MOUGEY:
23     Q.   Correct?
24     A.   Correct.

Page 64

1     Q.   And orders of unusual frequency?
2     A.   Correct.
3     Q.   Do you have an understanding in February
4  of 2013 what Walgreens had been doing to perform due
5  diligence once an order had been identified as
6  suspicious?
7     MR. HILL:  Objection to the form.
8  BY THE WITNESS:
9     A.   As of the implementation of the CSOM or
10  before that?
11  BY MR. MOUGEY:
12     Q.   Let's start with that.
13        From October of 2012 until February of '13
14  when you started at pharmaceutical integrity, do you
15  have an understanding of what Walgreens was doing to
16  perform due diligence on suspicious orders?
17     A.   I believe so, yes.
18     Q.   And what was that understanding?
19     A.   So, if the -- we established a -- a
20  ceiling and tolerance for each product at each
21  location and if an order was attempted to be placed by
22  a store that exceeded that, we would then investigate
23  why that order was placed, and if it was deemed to be
24  suspicious, we would report it to the DEA.  Also, if

Page 65

1  the store did not reply, we would report it to the
2  DEA.
3     Q.   Do you have an understanding where that
4  due diligence, beginning in October of '12 on, was
5  kept or stored once performed by Walgreens?
6     MR. HILL:  Ob- -- objection to the form.
7  BY THE WITNESS:
8     A.   Some of it is kept in the notes in the
9  CSOM system, some of it might also be in e-mail or --
10  or the steps we took to investigate?
11  BY MR. MOUGEY:
12     Q.   Yes, sir.
13     A.   Yeah, they might be e-mails or phone calls
14  that were conducted or notes that were placed in the
15  CSOM system.
16     Q.   If it's not in the CSO -- CSOM system,
17  where was the memorialization of those notes or phone
18  calls from the investigation, you called it?
19     MR. HILL:  Ob- -- objection to the form.
20  BY THE WITNESS:
21     A.   On -- I don't know.  I mean, it could
22  be -- as I said, it could be in an e-mail, it could be
23  in discussions that we had, but I don't know that
24  if -- if we didn't document it in that system, I don't

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  know where else we would have documented it. But that
2  doesn't necessarily mean it didn't occur.
3  BY MR. MOUGEY:
4      Q.   Do you have a general understanding of the
5  suspicious order monitoring policies in place at
6  Walgreens prior to the CSOM in October of 2012?
7      A.   Not really.
8      Q.   Not really or -- or none?
9      MR. HILL:  Objection to form, asked and
10 answered.
11 BY THE WITNESS:
12     A.   Very little understanding prior to the --
13 2012.
14 BY MR. MOUGEY:
15     Q.   Ex- --- explain to me what you understood
16 was in place prior to the CSOM policy in October
17 of 2012?
18     A.   I know that there were reports that were
19 generated and sent. I don't know the criteria for how
20 those were produced. I know that DC staff would look
21 at orders, but I don't know what order criteria they
22 used to -- to look at those orders.
23     Q.   When you say orders were generated and
24 sent, sent to whom?

Page 67

1      A.   I believe DEA field offices.
2      Q.   But you are not sure?
3      A.   I'm not sure.
4      Q.   Who would know?
5      A.   Denny Murray from our inventory team, I
6  believe, or Barb Martin. Probably. I believe. I
7  don't know. Maybe others on those teams.
8      Q.   Well, when you started in -- in February
9  of '13 in pharmaceutical integrity and your charge was
10 creating a system for identifying suspicious orders,
11 did you go back and look at what history -- Walgreens
12 had done historically?
13     A.   There had already been a substantial
14 amount of effort put into the new system. It was
15 already up and running before I started, so I did not,
16 no.
17     Q.   It was up and running by February of '13?
18     A.   Yes.
19     Q.   And who had done that substantial amount
20 of work before you got there?
21     A.   I think that would be Tasha, I know Eric
22 started before I did, Eric Stahmann. Again, probably
23 Denny Murray, John Merritello, and Wayne Bancroft from
24 inventory teams.

Page 68

1      Q.   And do you know when Eric Stahmann
2  started?
3      A.   I don't.  I -- it was a few months, I
4  think, before me.
5      Q.   A month or two before you?
6      A.   I don't know the exact timeframe. I know
7  it was shortly before I did. In that --
8      Q.   Did Ms. -- go ahead.
9      A.   In that role.
10     Q.   Was Ms. Daugherty part of that role of
11 developing and -- the system to identify suspicious
12 orders?
13     A.   I don't know. I think she may have
14 started after me, but I don't -- I don't know for
15 sure.
16     Q.   How well do you know Eric Stahmann?
17     A.   I mean, I've worked with him for some
18 number of years. I know him, you know, a medium
19 amount, I guess, I don't know.
20     Q.   There's four managers in pharmaceutical
21 integrity, correct?
22     A.   Well, there are three managers and then
23 our -- our boss, so...
24     Q.   And at inception in early '13, there were

Page 69

1  four, correct?
2      A.   Ah, correct, yes, I take that back.
3      Q.   And Mr. Stahmann is one of those -- one of
4  those managers, whether it is three or four, correct?
5      A.   Correct.
6      Q.   And -- and you are one of those managers,
7  whether it is three or four, correct?
8      A.   Correct.
9      Q.   And both of you are responsible for
10 different geographic parts of the country, correct?
11     A.   Correct.
12     Q.   You all interact regularly, I would
13 assume, in your roles in pharmaceutical integrity,
14 correct?
15     A.   Yes.
16     Q.   You sit in meetings with him regularly,
17 correct?
18     A.   Correct.
19     Q.   You -- you talk about policies and
20 procedures in those meetings, correct?
21     A.   Correct.
22     Q.   You talk about once those reports are
23 generated that you all perform investigations as a
24 result, correct?

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED