Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      - - -

 5   IN RE:  NATIONAL              :

     PRESCRIPTION                  :  MDL No. 2804

 6   OPIATE LITIGATION             :

     _____  :  Case No.

 7                                 :  1:17-MD-2804

     THIS DOCUMENT RELATES         :

 8   TO ALL CASES                  :  Hon. Dan A. Polster

 9                      - - -

10          Thursday, December 6, 2018

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                CONFIDENTIALITY REVIEW

12

                        - - -

13

14        Videotaped deposition of JASON BRISCOE, held

15   at the offices of Cavitch, Familo & Durkin,

16   1300 East Ninth Street, Cleveland, Ohio, commencing at

17   9:05 a.m., on the above date, before Carol A. Kirk,

18   Registered Merit Reporter and Notary Public.

19

20                      - - -

21

22          GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

23               deps@golkow.com

24
```

```
 1              A P P E A R A N C E S:
 2   On behalf of the Plaintiffs:
          LEVIN PAPANTONIO THOMAS MITCHELL
 3        RAFFERTY & PROCTOR P.A.
          BY:  PETER MOUGEY, ESQUIRE
 4            pmougey@levinlaw.com
              JEFF GADDY, ESQUIRE (via live stream)
 5            jgaddy@levinlaw.com
              PAGE POERSCHKE, ESQUIRE (via live stream)
 6            ppoerschke@levinlaw.com
          316 South Baylen Street, Suite 600
 7        Pensacola, Florida  32502
          205-435-7000
 8            and
          COHEN & MALAD, LLP
 9        BY:  GABRIEL A. HAWKINS, ESQUIRE
              ghawkins@cohenandmalad.com
10        One Indiana Square, Suite 1400
          Indianapolis, Indiana  46204
11        317-636-6481
12   On behalf of Discount Drug Mart:
          CAVITCH FAMILO & DURKIN, LPA
13        BY:  TIMOTHY JOHNSON, ESQUIRE
              tjohnson@cavitch.com
14            GREGORY O'BRIEN, ESQUIRE
              gobrien@cavitch.com
15        1300 East Ninth Street, 20th Floor
          Cleveland, Ohio  44114
16        216-621-7860
17   On behalf of the Cardinal Health, Inc. (via
     teleconference and live stream):
18        WILLIAMS & CONNOLLY LLP
          BY:  SUZANNE SALGADO, ESQUIRE
19            ssalgado@wc.com
          725 Twelfth Street, N.W.
20        Washington, DC  20005
          202-434-5000
21   On behalf of the AmerisourceBergen:
          JACKSON KELLY PLLC
22        BY:  SANDRA K. ZERRUSEN, ESQUIRE
              skzerrusen@jacksonkelly.com
23        50 South Main Street, Suite 201
          Akron, Ohio  44308
24        330-252-9060
```

```
 1    On behalf of HBC:
              MARCUS & SHAPIRA LLP
 2            BY:  MOIRA CAIN-MANNIX, ESQUIRE
                  cain-mannix@marcus-shapira.com
 3            One Oxford Center, 35th Floor
              301 Grant Street
 4            Pittsburgh, Pennsylvania  15219-6401
              412-338-3344
 5
      On behalf of Walmart (via teleconference):
 6            JONES DAY
              BY:  SCOTT D. QUELLHORST, ESQUIRE
 7                squellhorst@jonesday.com
              77 West Wacker Drive
 8            Chicago, Illinois  60601
              312-782-3939
 9
      On behalf of Endo Pharmaceuticals, Inc. and
10    Endo Health Solutions Inc. (via live stream and
      teleconference):
11            ARNOLD & PORTER KAYE SCHOLER, LLP
              BY:  JAKE R. MILLER, ESQUIRE
12                jake.miller@apks.com
              777 S. Figueroa Street, Suite 4400
13            Los Angeles, California  90017
              213-243-4000
14
      On behalf of the Allergan Defendants (via live stream
15    and teleconference):
              KIRKLAND & ELLIS LLP
16            BY:  KAITLYN L. COVERSTONE, ESQUIRE
                  kaitlyn.coverstone@kirkland.com
17            300 North LaSalle
              Chicago, Illinois  60654
18            312-862-3671
19    On behalf of Johnson & Johnson and
      Janssen Pharmaceuticals:
20            TUCKER ELLIS LLP
              BY:  BRENDA A. SWEET, ESQUIRE
21                brenda.sweet@tuckerellis.com
              950 Main Avenue, Suite 1100
22            Cleveland, Ohio  44113
              216-592-5000
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   On behalf of McKesson:
             ULMER & BERNE, LLP
 2       BY:  DOLORES (LOLA) GARCIA-PRIGNITZ, ESQUIRE
                dgarcia-prignitz@ulmer.com
 3       1660 West 2nd Street, Suite 1100
         Cleveland, Ohio  44113
 4       216-583-7000
 5   On behalf of Mallinckrodt (via live stream):
             ROPES & GRAY LLP
 6       BY:  SEAN B. KENNEDY, ESQUIRE
                sean.kennedy@ropesgray.com
 7       800 Boyleston Street
         Boston, Massachusetts  02199
 8       614-951-7000
 9   On behalf of Pernix Therapeutics:
             CLARK MICHIE LLP
10       BY:  BRUCE CLARK, ESQUIRE
                bruce.clark@clarkmichie.com
11       220 Alexander Street
         Princeton, New Jersey  08540
12       609-423-2142
13
14   ALSO PRESENT:
15       Madison Shelquist, Levin Papantonio
         Karolynn Schneegas, Levin Papantonio
16       Alexandra Garlock, Levin Papantonio
         Katie Mayo, Levin Papantonio (via live stream)
17       Josh Gay, Levin Papantonio (via live stream)
         Tom McConnell, Discount Drug Mart
18       David Lane, Videographer
         Corey Smith, Trial Technician
19
20                     - - -
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        VIDEOTAPED DEPOSITION OF JASON BRISCOE

 2               INDEX TO EXAMINATION

 3   DDM-BRISCOE      DESCRIPTION                    PAGE

 4   JASON BRISCOE

 5        DIRECT EXAMINATION BY MR. MOUGEY:          11

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        VIDEOTAPED DEPOSITION OF JASON BRISCOE
 2                INDEX TO EXHIBITS
 3    DDM-BRISCOE       DESCRIPTION                PAGE
 4    DDM-Briscoe 1     Plaintiff's Amended Notice of    13
                        Oral Videotaped 30(b)(6)
 5                      Deposition of Jason Briscoe,
                        P-DDM-1011
 6
      DDM-Briscoe 2     First Notice of Deposition       15
 7                      Pursuant to Rule 30(B)(6) and
                        Document Request Pursuant to
 8                      Rule 30(B)(2) and Rule 34 to
                        Defendant Discount Drug Mart,
 9                      Inc., P-DDM-1001
10    DDM-Briscoe 3     Second Notice of Deposition      26
                        Pursuant to Rule 30(B)(6) and
11                      Document Request Pursuant to
                        Rule 30(B)(2) and Rule 34 to
12                      Defendant Discount Drug Mart,
                        Inc., P-DDM-1002
13
      DDM-Briscoe 4     Curriculum vitae of Jason        28
14                      Briscoe, P-DDM-1003
15    DDM-Briscoe 5     Controlled Substances Act,       37
                        P-GEN-0040
16
      DDM-Briscoe 6     Document titled "Chapter II -    48
17                      Drug Enforcement
                        Administration, Department of
18                      Justice, P-GEN-0064
19    DDM-Briscoe 7     Letter from Mr. Rannazzisi,      111
                        dated September 27, 2006,
20                      Bates-stamped MCKMDL00478906
                        through 478909
21
      DDM-Briscoe 8     Letter to Registrant from        130
22                      Mr. Rannazzisi dated December
                        27, 2007, Bates-stamped
23                      MCKMDL00478910 and 478911
24
```

Highly Confidential - Subject to Further Confidentiality Review

| 1 | | INDEX TO EXHIBITS (CONT'D) | |
|---|---|---|---|
| 2 | DDM-BRISCOE | DESCRIPTION | PAGE |
| 3 | DDM-Briscoe 9 | Due diligence report dated 5/5/08, Bates-stamped DDM00440505 and 440506 | 181 |
| 5 | DDM-Briscoe 10 | Due diligence report Bates-stamped DDM00440507 through 440509 | 199 |
| 7 | DDM-Briscoe 11 | Due diligence report Bates-stamped DDM00440510 and 440511 | 201 |
| 9 | DDM-Briscoe 12 | Due diligence report, dated 11/11/13, Bates-stamped DDM00440512 through 550514 | 202 |
| 11 | DDM-Briscoe 13 | Due diligence report, dated 11/11/13, Bates-stamped DDM00440515 | 203 |
| 13 | DDM-Briscoe 14 | Due diligence report, dated 1/2/08, Bates-stamped DDM00440516 | 204 |
| 15 | DDM-Briscoe 15 | Graph titled "Hydrocodone Shipments to BD2308155 from Discount Drug Mart (Total Dosage Units), P-DDM-0501 | 227 |
| 17 | DDM-Briscoe 16 | Discount Drug Mart, Inc. Responses to Plaintiffs' Combined Discovery Requests, P-DDM-1032 | 241 |
| 20 | DDM-Briscoe 17 | Document titled "Temperature Management System Healthcare Specifications 2016," Bates-stamped DDM00000242 through 250 | 248 |
| 23 | | | |
| 24 | | | |

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INDEX TO EXHIBITS (CONT'D)

 2    DDM-BRISCOE        DESCRIPTION                  PAGE

 3    DDM-Briscoe 18   Document titled "Policy:        249
                       Temperature Standards, Date
 4                     Adopted:  12/1/2016,"
                       Bates-stamped DDM00000251
 5                     through 254

 6    DDM-Briscoe 19   Document titled "Policy:        253
                       Humidity Standards, Date
 7                     Adopted:  12/1/2016,"
                       Bates-stamped DDM00000255
 8                     through 256

 9    DDM-Briscoe 20   Document titled, "Policy:       258
                       Inventory Controls, Date
10                     Adopted:  12/1/2016,"
                       Bates-stamped DDM00000467
11                     through 469

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2              P R O C E E D I N G S

 3                      - - -

 4              THE VIDEOGRAPHER:  We're now on

 5       the record.  My name is David Lane,

 6       videographer for Golkow Litigation

 7       Services.  Today's date is December 6th,

 8       2018.  Our time is 9:05 a.m.

 9              This deposition is taking place in

10       Cleveland, Ohio, in the matter of:

11       National Prescription Opiate Litigation

12       MDL.  Our deponent today is Jason

13       Briscoe.  Counsel will be noted on the

14       stenographic record.  The court reporter

15       is Carol Kirk, who will now swear in the

16       witness.

17              (Witness sworn.)

18              THE VIDEOGRAPHER:  Please begin.

19              MR. MOUGEY:  Do you mind if we go

20       around and get everybody on the -- or do

21       we already have that, who's here?

22              MR. JOHNSON:  Oh, just to

23       introduce ourselves?

24              MR. MOUGEY:  Yeah, that would be
```

```
 1          great.

 2               MR. JOHNSON:  Okay.  I'm Tim

 3          Johnson.  I represent Discount Drug

 4          Mart.

 5               MR. O'BRIEN:  Greg O'Brien.  I'm

 6          also representing Drug Mart.

 7               MR. McCONNELL:  I'm Tom McConnell.

 8          I'm with Discount Drug Mart as corporate

 9          representative.

10               MS. CAIN-MANNIX:  Moira

11          Cain-Mannix from Marcus & Shapira on

12          behalf of HBC Services Company.

13               MS. GARCIA-PRIGNITZ:  Dolores

14          Garcia-Prignitz of Ulmer & Berne on

15          behalf of McKesson Corporation.

16               MS. SWEET:  Brenda Sweet of Tucker

17          Ellis LLP on behalf of Janssen

18          Pharmaceuticals and Johnson & Johnson.

19               MS. ZERRUSEN:  Sandra Zerrusen

20          from Jackson Kelly on behalf of

21          AmerisourceBergen Drug Corporation.

22               MS. SHELQUIST:  Madison Shelquist

23          on behalf of Levin Papantonio

24          representing the Plaintiff.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. SCHNEEGAS:  Karolynn Schneegas

 2           on behalf of Plaintiff.

 3                    MR. HAWKINS:  Gabe Hawkins,

 4           Plaintiff.

 5                    MS. GARLOCK:  Alexandra Garlock,

 6           Plaintiff.

 7                    MR. MOUGEY:  And Peter Mougey on

 8           behalf of the Plaintiff.  Thank you.

 9                         - - -

10                    JASON BRISCOE

11   being by me first duly sworn, as hereinafter

12   certified, deposes and says as follows:

13                    DIRECT EXAMINATION

14   BY MR. MOUGEY:

15           Q.    Good morning, Mr. Briscoe.  My

16   name is Peter Mougey.  I represent the

17   Plaintiffs in this case.

18                    Have you ever given a deposition

19   before?

20                    MS. COVERSTONE:  Excuse me.  I'd

21           like to enter my appearance.  This is

22           Kaitlyn Coverstone on behalf of Allergan

23           Finance, LLC.

24                    MR. QUELLHORST:  And Scott
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Quellhorst with Jones Day on behalf of

 2              Walmart.

 3                   MS. SALGADO:  Suzanne Salgado on

 4              behalf of Cardinal Health.

 5                   MR. MILLER:  Hi.  This is Jake

 6              Miller on behalf of the Endo and Par

 7              Pharmaceutical Defendants, and I am with

 8              the law firm Arnold & Porter.

 9  BY MR. MOUGEY:

10         Q.    Okay.  Good morning.  Peter Mougey

11  on behalf of the Plaintiffs.

12              Have you ever given testimony in

13  any deposition or sworn statement?

14         A.    I have not.

15         Q.    Okay.  One thing I'm going to

16  guarantee you through the course of the day is

17  that I will interrupt you before you're finished

18  speaking.  So if you take a breath and I think

19  you're done and you're not, just stop me and

20  say, "I had more to my answer."

21              I don't mean to interrupt you or

22  be rude or anything else, but I just tend to --

23  tend to speak quickly and I'll -- if you take a

24  break, I'll keep going.  Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2           (DDM-Briscoe Exhibit 1 marked.)

 3                      - - -

 4  BY MR. MOUGEY:

 5           Q.    I'm going to hand you what I have

 6  marked as Briscoe 1, which is titled your --

 7  it's Amended Notice of Oral Videotaped 30(b)(6)

 8  Deposition with your name on top of that, okay?

 9                And if you look in the fourth

10  paragraph, it says, "The oral examination is to

11  be taken for purposes of discovery, for use at

12  trial, or for such other purposes as permitted

13  under the federal rules of evidence."

14                Do you see that?

15           A.    Yes, sir.

16           Q.    And your name on top, Jason

17  Briscoe, correct?

18           A.    Yes.

19           Q.    And you understand today that you

20  are representing Walgreens?

21           A.    I'm not.

22           Q.    I'm sorry.  You're -- well, DDM.

23                MR. JOHNSON:  You're in the wrong

24           city.
```

```
 1                    MR. MOUGEY:  Yeah, same city,

 2           different --

 3           Q.    DDM, correct?

 4           A.    Yes, sir.

 5           Q.    And at Discount Drug Mart, you are

 6    the corporate representative speaking on behalf

 7    of Discount Drug Mart, correct?

 8           A.    One of the three 30(b)(6), yes.

 9           Q.    Yes, sir.  And that -- you've

10    heard the saying before, you know, you wear --

11    you wear different hats, so to speak, maybe at

12    the office or wherever else.  You're familiar

13    with that saying?

14           A.    Yes, sir.

15           Q.    All right.  So you have your --

16    your personal capacity is Jason Briscoe, which

17    is your personal knowledge and you also have

18    your capacity today that you represent DDM or

19    Discount Drug Mart, correct?

20           A.    Yes.

21           Q.    So the answers that you provide

22    today, you are speaking on behalf of Discount

23    Drug Mart, not in your personal capacity as

24    Jason Briscoe.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You understand that?

 2          A.    I do.

 3          Q.    Okay.  And you see in the second

 4    paragraph of Briscoe 1 that there are a series

 5    of numbers in that paragraph designating

 6    specific topics that you and I are going to go

 7    through today, correct?

 8          A.    Yes, sir.

 9          Q.    It -- I'll hand you what --

10                MR. JOHNSON:  With the exception

11          of Number 10 that we discussed off the

12          record before we started, right, Peter?

13                MR. MOUGEY:  Exactly.  Exactly.

14          So we'll go through those.

15                           - - -

16          (DDM-Briscoe Exhibit 2 marked.)

17                           - - -

18    BY MR. MOUGEY:

19          Q.    I'll hand you what we'll mark as

20    Briscoe 2.

21          A.    Three copies of the same document,

22    sir?

23          Q.    Yes.

24          A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOUGEY:  All right.  Briscoe 2

 2      is 1011, Corey.

 3              And, Corey, I'm sorry.  It's 1002.

 4              Nope.  One more time.  1001.

 5      There we go.

 6   BY MR. MOUGEY:

 7        Q.    And this is titled First Notice of

 8   Deposition Pursuant to Rule 30(B)(6) and

 9   Document Request Pursuant to Rule 30(B)(2),

10   correct?

11              And you've seen this before,

12   correct?

13        A.    I have.

14        Q.    And under the second paragraph on

15   the first page of Briscoe 2, it says, "Pursuant

16   to Federal Rules of Civil Procedure 30(b)(6),

17   Discount Drug shall designate and produce a

18   representative or representatives, as may be

19   required, who are knowledgeable and prepared to

20   testify fully on behalf of Discount Drug

21   concerning the topics identified in Schedule A

22   below."

23              Do you see that?

24        A.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    All right.  And if you turn to

 2     page 2 of Briscoe 2, it has -- there's a section

 3     titled Duty to Prepare.  And the Duty to

 4     Prepare, "The testimony elicited in the

 5     deposition represents Discount Drug's knowledge,

 6     not the individual deponent's knowledge.

 7     Discount Drug must conduct a thorough

 8     investigation in response to the deposition

 9     notice and must prepare a witness to testify to

10     all matters known or reasonably available to the

11     organization."

12              Did I read that right?

13              A.    Yes, sir.

14              Q.    All right.  "Therefore, if

15     Discount Drug's designee is not knowledgeable

16     about the matters specified in the deposition

17     notice, it must nonetheless prepare such

18     designee to give knowledgeable, binding

19     answers."

20              And by "knowledgeable" and

21     "binding," meaning when you speak today on

22     behalf of DDM, you are binding the corporation

23     with your answers.

24              You understand that, correct, sir?
```

```
 1              A.    Yes, sir.

 2              Q.    The paragraph continues,

 3      "Reasonably available information includes all

 4      documents that the organization has the

 5      authority, legal right, or practical ability to

 6      obtain.  An inadequately prepared designated

 7      witness will amount to an impermissible refusal

 8      to answer and a sanctionable failure to appear."

 9                    And you understand that, correct,

10      sir?

11              A.    Yes, sir.

12              Q.    All right.  And if we go back to

13      the title of that paragraph, Duty to Prepare,

14      sir, have you, in fact, prepared for your

15      testimony today?

16              A.    I have.

17              Q.    All right.  And do you have a --

18      kind of a general understanding of how many

19      hours you've spent preparing for your testimony

20      today?

21              A.    Eight to ten.

22              Q.    Eight to ten hours.

23                    And when did you start preparing

24      for your testimony today?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I suppose when we first heard of

 2      the case and I was designated as a 30(b)(6).

 3              Q.    Okay.  So for over the last couple

 4      of months, last few months?

 5              A.    (Witness nodding.)

 6              Q.    You have to answer yes or no.

 7              A.    Yes.  Sorry.

 8              Q.    Okay.  So over the last few

 9      months, you've spent eight to ten hours

10      preparing for the topics in the 30(b)(6) that

11      you've been designated to testify on, correct?

12              A.    And that would be in addition to

13      the time that I spent in helping to provide the

14      request for documents, interrogatories,

15      et cetera.

16              Q.    All right.  Perfect.

17                    So -- and then, of course, in

18      addition to your knowledge, you've spent, I

19      think, the last 15, 16 years at DDM as well,

20      correct?

21              A.    True.

22              Q.    So if you would turn to page 6 of

23      Briscoe 2.  It's titled III, Subject Matter for

24      Testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

1                 Do you see that?

2          A.    Yes, sir.

3          Q.    And I want to go through -- we're

4    going to do this in the second notice, but I

5    want to go through this first notice in some

6    detail, okay?  So -- and it will also help us

7    get our kind of lingo down between the two of

8    us, all right?

9                 So "a" is suspicious order

10   monitoring systems.  And I'm going to refer to

11   those as the acronym SOM, suspicious order

12   monitoring, okay?

13         A.    Okay.

14         Q.    And you're familiar and have spent

15   time preparing today to be able to testify as to

16   DDM's SOMS policy, correct?

17         A.    Yes.

18         Q.    And you're familiar under b with

19   the -- a term of art in the -- with the DEA

20   about Know Your Customer?

21         A.    I am.

22         Q.    All right.  Would you explain what

23   your understanding of Know Your Customer is.

24         A.    So essentially anybody that is

```
 1    distributing has a responsibility to ensure that

 2    those that they're distributing to -- in our

 3    instance, we don't have customers, but, rather,

 4    stores that are under our umbrella that we

 5    distribute to, that we have a familiarity with,

 6    in a formal way, to ensure that they have a DEA

 7    license that's active, and then also that we

 8    have the ability to know that their ongoing

 9    business practices, you know, are in good

10    standing.  So it's not just enough to have a

11    valid DEA license.  We also have to be operating

12    in a -- in a manner that would give us

13    confidence in distributing products to those

14    entities.

15            Q.    And so the customer, as referenced

16    here in b and is known in the industry with DDM,

17    is its own wholly-owned pharmacies, correct?

18            A.    Yes.

19            Q.    And c, "Your past/present

20    interpretation, compliance, agreement and/or

21    disagreement with the Dear Registrant letters

22    from the DEA outlining the duties imposed on a

23    distributor under federal law."

24                    You're prepared to testify today
```

Highly Confidential - Subject to Further Confidentiality Review

1    on behalf of DDM regarding its duties under

2    federal law as a distributor, correct?

3              A.    Yes.

4              Q.    And you understand, sir, today

5    that DDM is here in its capacity as a

6    distributor to its own wholly-owned pharmacies,

7    correct?

8              A.    Yes.

9              Q.    And you understand that its role

10   as a distributor is different than its role and

11   obligation as a pharmacy or dispensing

12   operation, correct?

13             A.    Yes.

14             Q.    Under d, "Your past/present

15   interpretation, compliance, agreement and/or

16   disagreement with the reporting requirement and

17   shipping requirement as referenced in Masters

18   Pharmaceutical."

19                   Are you familiar and prepared to

20   testify today about the shipping requirement and

21   the due diligence requirement under -- I'm

22   sorry -- reporting requirement and shipping

23   requirement as reported and referenced in

24   Masters?

1        A.    Yes.

2        Q.    And (e), "DDM's interpretation and

3    compliance with the reporting requirement and

4    whether that's changed over time"?

5        A.    Yes.

6        Q.    F, "DDM's interpretation and

7    compliance with the shipping requirement and

8    whether that's changed over time"?

9        A.    Yes.

10        Q.    All right.  Let's stop there for a

11    second.

12              Would you explain to me what your

13    understanding of -- "your" meaning DDM's --

14    interpretation is of the Masters reporting

15    requirement.

16        A.    So I could start -- is it okay if

17    I start with how we operated pre Masters, or

18    would you like me to start from my

19    interpretation of --

20        Q.    You just explain to me, for

21    purposes right now of going through this list,

22    of what the reporting requirement is.

23        A.    So the reporting requirement, if

24    you were to identify a suspicious order that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    needs to be reported to the DEA.

 2          Q.    Okay.  And then under g,

 3    historically whether you have shipped suspicious

 4    orders without reporting and/or conducting due

 5    diligence prior to Masters Pharmaceutical.

 6                You're prepared to testify today

 7    to that issue, correct?

 8          A.    Yes, sir.

 9          Q.    All right.  H, past/present

10    policies and procedures related to due diligence

11    once a suspicious order is detected.

12                Correct?

13          A.    Mm-hmm.

14          Q.    And i, your past/present policies,

15    procedures, standards and metrics used to

16    identify orders of unusual size, orders

17    deviating substantially from a normal pattern,

18    or orders of unusual frequency.

19                You're prepared to testify today

20    on behalf of DDM in regard to the language I

21    just read in subsection i?

22          A.    Yes.

23          Q.    All right.  J, your policies,

24    procedures, standards and metrics used to
```

```
 1    identify suspicious orders and how those have

 2    changed over time?

 3          A.    Yes.

 4          Q.    And k, policies, procedures,

 5    standards and metrics used to set and/or alter

 6    thresholds.

 7                Correct, sir?

 8          A.    Yes.

 9          Q.    And what those have changed over

10    time, correct?

11          A.    Mm-hmm.

12          Q.    And the policies and procedures

13    related to the DDM's responsibility to perform

14    due diligence on suspicious orders, correct?

15          A.    Yes, sir.

16          Q.    And m, your past/present programs,

17    policies and procedures relating to maintenance

18    of effective controls against diversion, as

19    required under the U.S. Code.

20                Correct?

21          A.    Yes.

22          Q.    You're prepared to testify on

23    those topics?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And the very last one, o, whether

 2    or not any consultant or other third party

 3    retained to assist you in the maintenance of

 4    effective controls.

 5              So whether DDM hired any third

 6    party or vendor and used any outside assistance

 7    in performing its obligations as required under

 8    the federal law and the regs promulgated

 9    thereunder, correct?

10         A.    Are you asking if I'm prepared or

11    would you like an answer?

12         Q.    No, sir.  Whether you're prepared.

13         A.    Yes.

14                      - - -

15         (DDM-Briscoe Exhibit 3 marked.)

16                      - - -

17    BY MR. MOUGEY:

18         Q.    Hand you what we've marked as

19    Briscoe 3.

20         A.    Thank you.

21         Q.    All right.  Briscoe 3 looks almost

22    identical to Briscoe 2, excepting for some of

23    the list of what you're being asked to testify

24    today on behalf of DDM's changed just a bit.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I'm not going to go through these, but I'm -- is

 2    it -- are you prepared to testify on each and

 3    every one of these topics that you've been

 4    designated on under the 30(b)(6) notice, too?

 5            A.    Yes, sir, with the absence of

 6    Number 10, as we discussed.

 7            Q.    Yes, sir.  The data mine?

 8            A.    Yes.

 9            Q.    And then there are other topics

10    that were carved out, but --

11            A.    Yes.

12            Q.    -- other than 10 --

13            A.    Yes, sir.

14            Q.    -- and the topics that were

15    previously carved out, which essentially is 6,

16    7, 8, 9, 11, 12, 13, all the way to topic 23,

17    with the exception of 19?

18            A.    Correct.

19            Q.    Thank you.

20                  MR. JOHNSON:  A point of

21          procedure.

22                  (Discussion off the record.)

23    BY MR. MOUGEY:

24            Q.    I have your -- what I believe is
```

Highly Confidential - Subject to Further Confidentiality Review

1    your LinkedIn -- your resumé or your CV.  I'll

2    hand you what I've marked as Briscoe 4.

3                        - - -

4            (DDM-Briscoe Exhibit 4 marked.)

5                        - - -

6                (Discussion held off the record.)

7            Q.    I've just put in front of you

8    on -- as Briscoe 4 is what I believe is your CV.

9                Have you seen this document

10   before?

11           A.    Yes.

12           Q.    All right.  And when I say "your

13   CV," I mean as it is on LinkedIn.

14           A.    Yes, sir.

15           Q.    And have you reviewed this

16   document before?

17           A.    Yes.

18           Q.    Is the information accurate in

19   Briscoe 4?

20           A.    Yes.

21           Q.    I just want to get a little bit of

22   your background.

23                You have your PharmD from Northern

24   University, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Ohio Northern, yes.

 2              Q.     Ohio Northern.

 3                     And right out of school, you

 4    started with Discount Drug Mart?

 5              A.     I did.

 6              Q.     It was 2002, correct?

 7              A.     Yes, sir.

 8              Q.     And you've been in different

 9    capacities with Discount Drug Mart up until

10    today, correct?

11              A.     That's true.

12              Q.     And started as a pharmacist and

13    you were promoted in October of 2014 to -- as

14    the director of pharmacy operations, correct?

15              A.     Correct.

16              Q.     After your initial role as a staff

17    pharmacist, you were promoted to chief

18    pharmacist in January 2006, correct?

19              A.     Yes.

20              Q.     And in May of '06, five months

21    later, promoted to district pharmacy supervisor

22    for Southwest Ohio, correct?

23              A.     Yes.

24              Q.     And in January 2008, about a year
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and a half later, promoted to regional pharmacy

 2    supervisor for Central and Southwest Ohio,

 3    correct?

 4           A.    Yes, sir.

 5           Q.    And October '14 to today, you have

 6    been the director of pharmacy operations,

 7    correct?

 8           A.    Yes.

 9           Q.    Would you just explain to me your

10    role from October '14 to now what is encompassed

11    in pharmacy operations?

12           A.    A little bit of -- of everything

13    that we do related to our pharmacy.  If you're

14    familiar with Discount Drug Mart, about

15    50 percent of our business is on the front end

16    and 50 percent is in -- in the pharmacy.

17                 So part of my role as director of

18    pharmacy operations would be a conduit to all

19    the departments under the Discount Drug Mart

20    umbrella, whether that's human resources,

21    payroll, front end OTC procurement, our

22    professional medical equipment and services

23    business, our specialty pharmacy.  So I'm kind

24    of the quarterback, so to speak, between
```

Highly Confidential - Subject to Further Confidentiality Review

1    interdepartmental communications.

2              Part of our pharmacy operations

3    team, I report to a senior vice president of

4    pharmacy.  He has three directors, one of which

5    is me, pharmacy operations.  We have one that's

6    pharmacy compliance and then also a clinical

7    pharmacy -- a director of clinical services.

8    And, again, kind of a -- as a right arm to the

9    SVP of pharmacy, I play quarterback with those

10   directors and the three additional pharmacy

11   supervisors we have out in the field.

12             And then from there, our 74 retail

13   locations, we have a responsible pharmacist, or

14   what we call a chief pharmacist, at every

15   location, and then no less than one staff

16   pharmacist, depending upon the pharmacist

17   staffing needs at those locations.

18             In addition to those pharmacists,

19   we have what we call floaters, and they would be

20   pharmacists that rotate from store to store,

21   depending upon where the need is to cover

22   shifts, which could be vacation-based,

23   transitioning between a staff or a chief

24   pharmacist at a location for a period of time.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    And then in addition, we have PRN pharmacists.

 2              So the number of pharmacists on

 3    our team that would essentially report upwards

 4    towards me would be roughly 225.  And then out

 5    in the field we have roughly 700 technicians.

 6    So if you look at it from store level on the way

 7    up to pharmacy operations, everybody has a role

 8    to play, but if there are situations not

 9    resolved or questions not answered, they

10    continue to float their way through --

11         Q.    Okay.

12         A.    -- to pharmacy operations.

13         Q.    All right.  Thank you.

14              Distribution centers.  How many

15    distribution centers does DDM have?

16         A.    One.

17         Q.    One.  And has that been the same

18    answer going back until 2000, say?

19         A.    To my knowledge, yes.

20         Q.    All right.  And does that

21    distribution center also distribute all of the

22    controlled substances?

23         A.    So let me back up a second.

24              When you mention distribution
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   center, are you speaking specific to the

 2   distribution of prescription medications?

 3          Q.    You tell me.

 4          A.    Okay.  So we have a -- again, a

 5   front end operation that accounts for a large

 6   percentage of our business, where that

 7   distribution center fulfills OTC-related orders,

 8   but separate from that, but connected.  And the

 9   way that we distribute via the trucks that are

10   delivered to our stores would be our pharmacy

11   distribution center, which, you know, we're here

12   talking about today.

13          Q.    And I'm not sure I'm following you

14   and I apologize.

15                So when you say "OTC," what are

16   you referring to?

17          A.    From paper towels to motor oil

18   to -- you name it.

19          Q.    All right.

20                MR. JOHNSON:  Over-the-counter.

21          A.    We're a one-stop shop retailer

22   from that perspective.

23          Q.    Okay.  So OTC stands for

24   over-the-counter?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    Yes.

2              Q.    And when you reference OTC, you're

3     referring to your -- your front end operations,

4     which is all -- when you walk into the pharmacy,

5     from candy bars to paper plates to --

6              A.    Yes.

7              Q.    -- whatever is in there?

8              A.    Front end is a good term for it.

9              Q.    All right.  Thank you.  And ...

10             All right.  So what I'm referring

11    to when I'm talking about distribution center is

12    your -- your prescriptions, your -- whatever --

13    dosage units, pills, whatever --

14             A.    Yep.

15             Q.    -- how many --

16             MR. JOHNSON:  And we can agree

17        that that will stay the same unless you

18        designate otherwise as we go forward?

19             MR. MOUGEY:  Thank you.  That

20        would be helpful, yes.  Thank you.

21             MR. JOHNSON:  So we're all clear?

22             MR. MOUGEY:  Thank you.

23    BY MR. MOUGEY:

24             Q.    So distribution center for
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    prescriptions or more specifically for

2    controlled substances, how many distribution

3    centers for prescriptions or controlled

4    substances does DDM have?

5           A.    One.

6           Q.    And where is that located?

7           A.    211 Commerce Drive, Medina, Ohio.

8           Q.    Okay.  And that one distribution

9    center, is that different than the facility that

10   carries all of the products for the front end of

11   the store or the OTC?

12          A.    Yes, sir.

13          Q.    All right.  And so all of the

14   Schedule III, Schedule IV, Schedule V controlled

15   substances that DDM distributes to its

16   pharmacies come from 211 Commerce?

17          A.    Yes.

18          Q.    Now, did any of your roles in your

19   16-plus years at DDM cover responsibility for

20   211 Commerce, the distribution center?

21          A.    As far as me being the responsible

22   pharmacist on the license, no.

23          Q.    Okay.  Did you oversee the roles

24   and responsibilities of DDM as a distributor in
```

1   any of your capacities at DDM?

2          A.    The pharmacy manager reports to

3   our SVP of pharmacy.  However, I'm involved in

4   supporting her if and when necessary.

5          Q.    All right.  We'll come back to

6   that.

7                In part of your preparation for

8   today, did you have an opportunity to review

9   DDM's responsibilities under the Controlled

10  Substances Act?

11         A.    Yes.

12         Q.    And you understand the Controlled

13  Substances Act is the kind of rubric that

14  governs --

15         A.    Is that supposed to be blank?

16         Q.    I should have explained that to

17  you when we started.  The screen in front of

18  you, when we have a document open, it's a --

19  it's a little distracting.  But it's the same

20  document you have in front of you.  And if I'm

21  referring to a specific paragraph or a specific

22  sentence, which we'll get there, it will help

23  you kind of find where you are.  But it's the

24  same thing.  So if you have a paper version, you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    can feel free to use that.  If you want to use

 2    the one on the screen, use that.

 3             A.    Got it.

 4             Q.    Okay?  Sorry.  I should have said

 5    that in the beginning.

 6             A.    Okay.

 7             Q.    So you understand that the

 8    Controlled Substances Act or the CSA governs

 9    DDM's responsibilities in its role as a

10    distributor, correct?

11             A.    Yes.

12             Q.    And there are different or

13    additional responsibilities that -- statutes

14    that govern DDM's responsibility as a pharmacy,

15    correct?

16             A.    Yes.

17             Q.    There is a rubric under the CSA

18    that governs pharmacists in dispensing, and that

19    is different than the roles and responsibility

20    under the CSA for DDM as a distributor, correct?

21             A.    Yes.

22                          - - -

23             (DDM-Briscoe Exhibit 5 marked.)

24                          - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MOUGEY:

 2          Q.    I'll hand you what I've marked as

 3   Briscoe 5.  I'll hand that to you for now.

 4          A.    Thank you.

 5          Q.    There's an additional exhibit

 6   sticker on this from another depo, so I just

 7   crossed that out and wrote 5 on there, okay?

 8          A.    Okay.

 9                MR. JOHNSON:  We can mark it

10          ourselves.

11                MR. MOUGEY:  Okay.  I just didn't

12          want you to get confused with the 6 on

13          there.

14   BY MR. MOUGEY:

15          Q.    So Briscoe 5 is a copy of the

16   Controlled Substances Act, which -- do you have

17   an understanding that that bill originated, as

18   on page 2, in 1970 --

19          A.    Okay.

20          Q.    -- right in the middle of the

21   page.

22                Do you see that?

23          A.    Yes.

24          Q.    All right.  And I'd like to walk
```

```
 1    you through a couple of -- of pieces of this --

 2    of the Controlled Substances Act.  And if you

 3    would please turn to -- there's numbers at the

 4    very top of the page in addition -- in addition

 5    to the Bates numbers at the bottom.

 6              On the top of the page, upper

 7    right-hand corner, Number 5.

 8         A.   The number trailing MCK --

 9         Q.   Yes, sir, exactly.

10         A.   Okay.  Thank you.

11         Q.   Thank you.

12              Under Title II:  Control and

13    Enforcement.

14              Do you see that?

15         A.   Yes.

16         Q.   All right.  "The bill provides for

17    control by the Justice Department of problems

18    related to drug abuse through registration of

19    manufacturers, wholesalers, retailers, and all

20    others in the legitimate distribution chain, and

21    makes transactions outside the legitimate

22    distribution chain illegal."

23              Do you see that, sir?

24         A.   Mm-hmm.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. JOHNSON:  Out loud.

 2          A.    Yes.

 3          Q.    Thanks.  It's hard.

 4                And, sir, if you would turn to

 5   page 8, which -- upper right-hand corner.

 6          A.    Here (indicating)?

 7          Q.    Yes.  Second full paragraph that

 8   begins with "The bill."  There you go.

 9                "The bill is designed to improve

10   the administration and regulation of the

11   manufacturing, distribution, and dispensing of

12   controlled substances by providing for a closed

13   system of drug distribution for legitimate

14   handlers of such drugs.  Such a closed system

15   should significantly reduce the widespread

16   diversion of the drugs out of legitimate

17   channels into the illicit market, while at the

18   same time providing the legitimate drug industry

19   with a unified approach to narcotic and

20   dangerous drug control."

21          A.    Okay.

22          Q.    Let's start with just helping me

23   understand what you believe some of these terms

24   mean.  So let's walk through the first three
```

Highly Confidential - Subject to Further Confidentiality Review

1    words in the second sentence, manufacturing and

2    distribution and dispensing, okay?

3              Explain to me what you understand

4    a manufacturer, a distributor and dispensing is

5    under the controlled system -- under the closed

6    system.  I'm sorry.

7         A.    Okay.  Manufacturing would be

8    groups, entities responsible for bringing --

9    manufacturing, producing, bringing products to

10   market that are approved by the FDA and the DEA

11   with their specific schedule to be distributed,

12   whether that be by wholesalers or an entity like

13   ourselves, down to retail pharmacy or other

14   dispensing locations.

15        Q.    Now, DDM, in addition to

16   distributing to itself, also used third parties

17   on occasion for Schedule III, IV and V, correct?

18        A.    So when you speak of DDM utilizing

19   other sources, you mean our retail locations

20   procuring product?

21        Q.    Yes, sir.  From -- when I say

22   "product," I'm referring to Schedule -- Schedule

23   III, IV, V, specifically here hydrocodone, okay?

24              So hydrocodone up until 2014,

```
 1    Schedule III, correct?

 2           A.    Yes.

 3           Q.    All right.  For hydrocodone DDM

 4    also secured the pills, whatever you want to

 5    call them, from other distributors other than

 6    the 211 Commerce -- the distribution center from

 7    DDM, correct?

 8           A.    Yes.

 9           Q.    For example, you all had

10    agreements with Cardinal, correct?

11           A.    Correct.

12           Q.    You had agreements with PSI,

13    correct?

14           A.    Do you know the --

15           Q.    I'm not trying to memory test.

16    Just other vendors or other --

17           A.    And McKesson, yes.

18           Q.    All right.  Now, you understand

19    the difference between Schedule II and

20    Schedule III under the Controlled Substances

21    Act, correct?

22           A.    Yes.

23           Q.    Explain to me what your

24    understanding of the difference between
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Schedule II and Schedule III is.

 2          A.    The difference between Schedule II

 3   and Schedule III would be correlated to abuse

 4   potential or safety issues, whether it's the --

 5   the FDA and DEA determining -- or the DEA

 6   determining what schedule that medication

 7   belongs in.  And that could be a fluid process,

 8   as we've learned over the years.

 9                But Schedule IIs compared to III,

10   IVs and V need to be handled in a different

11   manner within the closed system, in the manner

12   by which you order them, in the manner by which

13   you receive them, in the manner by which you

14   keep records, in the manner by which you

15   dispense them.

16                And the same goes for III through

17   Vs, compared to a nonscheduled medication, in

18   that if you think of it as in three buckets,

19   each in our closed system have their own pathway

20   that needs to be handled in a separate specific

21   manner.

22          Q.    So I like the description that you

23   used, the abuse potential, meaning that

24   Schedule II and Schedule III, the abuse
```

```
 1    potential for Schedule II was -- was higher

 2    than, say, for instance, Schedule Vs, correct?

 3            A.    Generally speaking, yes.

 4            Q.    And Schedule II, DDM used other

 5    distributors in its procurement of those --

 6    those Schedule IIs to dispense to its patients,

 7    correct, sir?

 8            A.    True statement.  While IIIs

 9    through Vs, you know, we would have distributed

10    to our stores.  But also our stores would have

11    had the ability to procure III through Vs from

12    other means, as you provided the example of

13    Cardinal.

14                 It is only true that we would have

15    procured Schedule IIs from the beginning of

16    Discount Drug Mart's existence from entities

17    outside of our own distribution center.

18            Q.    Okay.  Let's go back to page 8 of

19    Briscoe 5 and the reference to a closed system.

20                 What's your understanding of a

21    closed system under the Controlled Substances

22    Act?

23            A.    My understanding would be that

24    from start to finish, there is recordkeeping
```

Highly Confidential - Subject to Further Confidentiality Review

1    and -- there's security measures along the way.

2    There's recordkeeping along the way, so that at

3    any part of the manufacturing, distribution,

4    dispensing of that product, you would be able to

5    point to every step of the way.

6            Q.    Meaning that every -- every pill

7    under the closed system under the CSA from

8    manufacturer to a relabeler, wholesaler, or

9    distributor to the pharmacy is tracked and

10   monitored, correct?

11           A.    I wouldn't commit to saying every

12   pill.  I would -- I would -- for example, if

13   there was -- that would be tough for me to say

14   that that would happen 100 percent of the time.

15           Q.    That is the goal or objective, is

16   that every pill is tracked from manufacturer to

17   distributor, wholesaler to --

18           A.    Sure.

19           Q.    -- the --

20           A.    Sure.

21           Q.    -- pharmacy, correct?

22                 And in order to be a participant

23   in manufacturer, distributor, wholesaler and

24   pharmacy, that entity has to be registered with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the federal government, correct?

 2         A.    Yes.

 3         Q.    And as a distributor, DDM is

 4    licensed by the federal government, correct?

 5         A.    We are.

 6         Q.    And in order to distribute even to

 7    your own pharmacies, DDM is required to follow

 8    the federal regulations for a distributor under

 9    the Controlled Substances Act, correct?

10         A.    Yes, sir.

11         Q.    Same document, sir, if you turn to

12    page 34 under subsection 2.  I want to direct

13    your attention to the last part of that

14    sentence, "The illegal importation, manufacture,

15    distribution, and possession and improper use of

16    controlled substances have a substantial

17    detrimental effect on the public's health and

18    general welfare."

19              So was DDM aware, going back to

20    the initiation of this act, that controlled

21    substances have a substantial detrimental effect

22    on the public's health and the general welfare?

23         A.    When -- when dispensed or when

24    distributed in a illegal importation manner, is
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that -- is that what the beginning --

2         Q.    Yes.

3         A.    Yes.  Yes.

4         Q.    And as you just mentioned that

5    Schedule II and Schedule III, the abuse

6    potential is significantly higher than it is for

7    other types of prescriptions, correct?

8         A.    Yes.

9         Q.    And that was no secret going back

10   to -- I mean, historically, going back decades

11   and even hundreds of years, that there was

12   significant abuse or potential for abuse with

13   Schedule II and Schedule III opiates, correct,

14   sir?

15              MR. JOHNSON:  Objection.

16              Go ahead.

17        A.    I was going to say that that would

18   more likely be true if -- if this were not

19   written in a legitimate way with corresponding

20   responsibility by the pharmacy that would have

21   dispensed it for legitimate medical purposes.

22        Q.    So it becomes imperative that each

23   of the participants in the closed system fulfill

24   its responsibilities to minimize any potential
```

```
 1    abuse for Schedule II/III opiates because they

 2    have or could have a substantial detrimental

 3    effect on the public's health and general

 4    welfare, correct?

 5           A.    Yes.

 6                         - - -

 7           (DDM-Briscoe Exhibit 6 marked.)

 8                         - - -

 9           A.    I'm still looking this over.

10           Q.    I hand you what I've marked as

11    Briscoe 6.  It's P-GEN-0064.

12                 Now, what I've just put in front

13    of you as Briscoe 6 is the regulations under the

14    rubric of the Controlled Substances Act that

15    include, amongst other things, the

16    responsibilities of a distributor, okay?

17           A.    Okay.

18           Q.    Have you had an opportunity to

19    review the applicable sections in this document

20    that would apply to DDM's responsibilities?

21           A.    When needed, yes.

22           Q.    Okay.

23           A.    I certainly know where I can

24    access them when -- when needed.
```

 1          Q.    So I'm going to reference the

 2    actual page numbers of this document, and I'm

 3    going to take you to page 29, specifically

 4    subsection (e) at the bottom right-hand corner

 5    of that page that begins with "The

 6    administration."

 7                Do you see that?

 8          A.    Yes, sir.

 9          Q.    All right.  The administration may

10    suspend any registration simultaneously with or

11    at any time subsequent to the service upon the

12    registrant of an order to show cause why such

13    registrant [sic] in any case where he or she

14    finds that it is an imminent danger to the

15    public health or safety.

16                Okay?

17          A.    Mm-hmm.

18          Q.    And, sir, was DDM aware that

19    through the 2000s into 2006, 2007, 2008, there

20    were numerous DEA investigations into companies

21    across the United States related to the

22    distribution and diversion of Schedule II and

23    Schedule III opiates?

24          A.    I'm not sure.  I wasn't there at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that time.  My belief, being a pharmacist at

 2    store level, was, you know, yes, that's

 3    something we need to be aware of.

 4            Q.    And I understand the pharmacists

 5    at the store level.  But what I'm referring to

 6    is DDM's responsibility as a distributor, okay?

 7                 Was DDM -- use the word

 8    "monitoring" -- developments in the -- with

 9    DEA's guidance --

10            A.    Okay.

11            Q.    -- and rules and regulations

12    regarding the roles and responsibilities of

13    distributors?

14            A.    Yes.

15            Q.    And were you aware, as we progress

16    through the 2000s, 2006, 2007, 2008, that there

17    were numerous suspensions or revocations of

18    registrations for distributors related to

19    suspicious order monitoring policies and

20    procedures?

21            A.    Honestly, I'm not sure.

22            Q.    And if you'd turn to page 38 of

23    this document.  Specifically on the right-hand

24    side of the middle of the page, section
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    1301.74 --

 2           A.    Okay.

 3           Q.    -- titled "Other security controls

 4    for non-practitioners; narcotic treatment

 5    programs and compounders for narcotic treatment

 6    programs."

 7                 And do you see under (b) -- well,

 8    let's do (a) first.  (a), "Before distributing a

 9    controlled substance to any person who the

10    registrant does not know to be registered to

11    possess the controlled substance, the registrant

12    shall make a good faith inquiry with the

13    administration or with the appropriate State

14    controlled substances registration agency, if

15    any, to determine that person is registered to

16    possess the controlled substance."

17                 So for DDM, DDM only distributed

18    to it's wholly-owned pharmacies, correct?

19           A.    Correct.

20           Q.    So under (b), sir, is it your

21    understanding that DDM was obligated to design

22    and operate a system to disclose the registrant

23    suspicious orders of controlled substances?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1         Q.    All right.  And do you believe

2    that DDM had a system at all periods of time at

3    issue here --

4               MR. JOHNSON:  Could we define

5          those so that he knows?

6         Q.    Well, let's do it this way:

7               From 1999 on, up to today, did DDM

8    have a -- designed and operated a system to

9    disclose to the registrant suspicious orders of

10   controlled substances?

11              MR. JOHNSON:  Objection.

12        A.    I can speak from 2006 on, that,

13   yes, we did.  I'm not certain prior to that.

14        Q.    2006 on, you believe that DDM had

15   a system designed to identify suspicious orders

16   of controlled substances?

17        A.    Yes, sir.

18        Q.    And you believed that that system

19   was designed to identify orders deviating

20   substantially from the normal pattern and orders

21   of unusual frequency?

22        A.    Yes.

23        Q.    Let's continue with that section,

24   second sentence:

1                    "The registrant shall inform the

2     Field Diversion Office of the administration in

3     his area of suspicious orders when discovered."

4          A.    Yes.

5          Q.    Do you agree that DDM had a

6     responsibility to inform the DEA's field office

7     in DDM's area of suspicious orders when

8     discovered?

9          A.    Yes.

10         Q.    Now, the system that DDM created

11    you believe identified orders of unusual size,

12    orders deviating substantially from a normal

13    pattern or orders of unusual frequency?

14         A.    Yes.

15         Q.    And was that an automated system,

16    like a -- a computer-based model identifying

17    those orders?

18         A.    There were -- there are

19    essentially three levels, one of which is

20    automated, computer-generated.  Second would be

21    reviewed by pharmacy operations and, if

22    necessary, the third phase would be due

23    diligence.  Beyond that, pharmacy operations

24    review.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And those three levels, automated,

2   pharmacy, and due diligence, were in operation

3   from 2006 until today?

4        A.    Yes.

5        Q.    And have they remained consistent

6   or constant during that period of time?

7        A.    Yes.

8        Q.    Why don't you explain to me the --

9   what the automated system at -- at DDM was.

10       A.    So there's essentially a couple --

11   well, not essentially.  There are two reports,

12   one of which is not specific to controlled

13   substances, and even more specifically, not to

14   opioids alone.  But every purchase order our

15   stores create will create a report that spits

16   out -- and it's specific to an NDC or an item,

17   so not a family of items.

18             But if that purchase order creates

19   a level that is greater than the six-week

20   average, then that would show up at store level,

21   and that would show up in the distribution

22   center as take a look because you've ordered a

23   quantity that is greater than your six-week

24   average.  And, again, that is not specific to

Highly Confidential - Subject to Further Confidentiality Review

```
1    opioids.

2              The second report is generated on

3    a monthly basis, the first day of every month.

4    The system will identify any controlled

5    substances for which a location received at a

6    quantity that is greater than the 12-month

7    average, the 12-month monthly average of that

8    item, and it would show up on a report that says

9    this quantity this month has a -- is greater

10   than the monthly average over the last 12

11   months.

12             And then from there, that report

13   would be reviewed by pharmacy operations to

14   determine if what invoked on that report can be

15   explained prior to involving the store and

16   following up with that store for due diligence.

17             And then our approach from there

18   was if we did due diligence and the store

19   responded in a manner that we were then

20   satisfied, then that resolved that item that

21   showed up on that report; therefore, that would

22   not have been a suspicious order; therefore, we

23   would not have reported it.

24        Q.   All right.  Let's break that down
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    into some different pieces for me --
 2             A.    Sure.
 3             Q.    -- okay?
 4                   So there's two reports.  The first
 5    report you described was not specific to
 6    controlled substances.  So explain to me what
 7    was included in that first report.
 8             A.    So our stores create purchase
 9    orders to be fulfilled by our distribution
10    center.  And typically on a weekly basis, stores
11    send two purchase orders to be delivered once
12    weekly at each location.  And every item within
13    that purchase order, possibly two purchase
14    orders per week, that invoked a quantity greater
15    than the six-week average, it's a take a look at
16    store level.  Do you really need this quantity?
17    And it's also a mechanism for those at the
18    distribution center to say -- or to capture fat
19    finger errors.  So if somebody intended to enter
20    1 but it came across as 11, it would be a way to
21    prevent that purchase order from being -- ever
22    even being processed.  It would be a call back
23    to the store to say, "Do you really need 11?"
24    "Oh, no.  Thanks for catching that error.  Just
```

1    send me one."

2           Q.    Let me stop you if I could.  And

3    what I'm trying to figure out -- and I'm sorry

4    if I missed it, but I said what was included in

5    that automated report.  Is this front end to

6    back end or is this just -- just --

7           A.    Prescription --

8           Q.    -- pharmaceuticals?

9           A.    All --

10          Q.    All pharmaceuticals?

11          A.    All prescription items, regardless

12   of scheduling.

13          Q.    All right.  So when you said

14   "distribution center," you were -- you're

15   just -- this report is --

16          A.    Pharmacy.

17          Q.    -- just covering pharmacy?

18          A.    Yes.

19          Q.    So it doesn't matter -- doesn't

20   matter what pharmacy -- what pharmaceutical it

21   was capturing in this report?

22          A.    Yes, sir.

23          Q.    All right.  Six-week average.

24   Six-week average of what?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Received items.

 2            Q.    All right.

 3            A.    So, for example, if a store

 4   ordered two -- let's just go over a six-week

 5   period.

 6                  If they ordered two bottles, then

 7   zero bottles, then two bottles, then zero

 8   bottles, then two bottles, that's essentially

 9   six bottles over a six-week period.

10            Q.    Okay.

11            A.    Therefore, their average is one

12   bottle per week over that six-week period.  But

13   if they ordered two, this report would call that

14   out as a potential anomaly that, "Hey, you're

15   ordering a quantity that's greater than your

16   six-week average."  But that is not an anomaly

17   that would be concerning to the store or to the

18   distribution center in that example, based on

19   that ordering pattern.

20            Q.    So who would this -- what all do

21   you call this report internally?

22            A.    Greater than six-week average

23   report.

24                  MR. JOHNSON:  Creative.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    I can't take credit.

2              Q.    And what department was

3    responsible for reviewing that greater than

4    six-week average report?

5              A.    So the pharmacist who sent the

6    purchase order would receive a copy.  After they

7    transmitted their order to the distribution

8    center, we'd auto print a report that says,

9    "Take a look," and then also those in the

10   distribution center responsible for filling --

11   for fulfilling the purchase orders to be

12   ultimately shipped back to the store.

13             Q.    All right.  So that report would

14   go to, one, the pharmacist, and two, the

15   distribution center.

16                   And who was responsible, if there

17   was an order in excess of the six-week average

18   for performing any due diligence on that report

19   or order?

20             A.    It would be the pharmacy warehouse

21   team.

22             Q.    And when you say "the pharmacy

23   warehouse team," what is -- who is that?

24             A.    So it would be our pharmacy buyer
```

Highly Confidential - Subject to Further Confidentiality Review

 1    and those individuals that report and work with

 2    her.  So in the example I've provided where

 3    there was a quantity of 11 and let's say it

 4    wasn't a fat finger, but it was, you know, "I'm

 5    raising my hand that we might need to take a

 6    look at this," that due diligence, if and when

 7    that would have occurred, would be forwarded

 8    from the pharmacy warehouse team to pharmacy

 9    operations.

10           Q.    And you mentioned the pharmacy

11    buyer being a -- you said -- you referenced

12    "her." is that a specific individual that --

13           A.    Yes.

14           Q.    -- that filled -- who was that?

15           A.    Jill Strang.

16           Q.    Jill?

17           A.    Strang, S-t-r-a-n-g.

18           Q.    And how long was Ms. Strang in the

19    role as pharmacy buyer?

20           A.    As long as I've been there.  I

21    think further beyond that, too.  I know that

22    she's being deposed.

23           Q.    Prior to 2006?

24           A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    All right.  And would the only

2    orders on that greater than six weeks average

3    report be the orders that deviated from the

4    average of that six weeks, or was it every

5    single PO?

6          A.    Every single PO that had any item,

7    scheduled or otherwise, that deviated from that

8    six-week average would be a -- would be on

9    that -- on that purchase order.

10         Q.    Okay.  So would that be

11   transmitted via e-mail to -- is it Stang?

12               MR. JOHNSON:  Strang.

13         Q.    Strang.

14         A.    I believe it would have come

15   across on their green bar report, similar to the

16   reports that they receive when picking and

17   invoicing their purchase orders.

18         Q.    What is a green bar report?

19         A.    That's just a description of the

20   type of paper and report that's printed out

21   that, you know, we use in our merchandising

22   system.

23         Q.    You mean that it's on green paper?

24         A.    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    All right.  And what I'm trying to

2   get to, is that -- is that a different report

3   than the greater than six-week average report?

4      A.    No.

5      Q.    Is it a number of reports?  Is

6   it -- other than the six-week average report?

7            MR. JOHNSON:  That is the six-week

8       average report.

9      A.    Yeah.  Yes.

10      Q.    So the green bar report and the

11   six-week average report are -- are one and the

12   same?

13      A.    Yeah.  And, again, I'm not

14   positive that that copy that they receive is

15   printed on green bar versus 8-1/2 by 11.  I'm

16   not -- I'm not sure about that.

17      Q.    All right.  And I apologize,

18   you've already -- just keep walking through

19   this.

20            So the greater than six-week

21   average report comes to Ms. Strang.  And what's

22   the first thing she does with that report?

23      A.    Her team would review it to see if

24   there were anything that would jump off the page

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that they need -- would need to raise -- raise

 2    their hand to somebody else.

 3           Q.    Okay.  And is there a policy or

 4    procedure in place that set the criteria for

 5    what would cause Ms. Strang to perform due

 6    diligence on any order that was greater than the

 7    six-week average?

 8           A.    I don't believe so.  That

 9    particular report -- I didn't mean to --

10           Q.    No, that's okay.

11           A.    -- rush the answer, but I don't

12    believe so.

13                 That report was not necessarily

14    designated for the purpose of our SOMS, but

15    augments it in a way that is potentially helpful

16    at store level and in the distribution center.

17    It's more of a report to create operational

18    efficiencies in a way that we order all

19    products.

20           Q.    What it sounds to me like is it's

21    more of an inventory management report, correct?

22           A.    Yes.

23           Q.    And the -- DDM's pharmacies, this

24    was a way to ensure that there was not too much
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    product being delivered to the pharmacy for any

2    of the -- any of the different prescriptions --

3            A.    Yeah.

4            Q.    -- so it was to create kind of a

5    glut in the system, correct?

6            A.    Yep.  And we see value in that.

7    If there's additional sets of eyes that are

8    paying attention to a purchase order,

9    unbeknownst to them or known to them, that we

10   are seeing and providing you this information

11   that you're ordering product greater than your

12   six-week average -- which might not be

13   actionable, which likely is not actionable --

14   it's value to us that they see it at the store

15   and they would see it at the distribution

16   center.

17           Q.    All right.  And you're familiar

18   with the concept of just-in-time inventory,

19   right?  Money's -- inventory sitting on the

20   shelves costs DDM money on its bottom line,

21   right?

22           A.    Mm-hmm.

23           Q.    So the less inventory sitting on

24   the shelf, the more money DDM makes, correct?
```

```
 1              A.    Inventory terms is -- is something

 2      that we -- we measure, right.

 3              Q.    So I believe what I just heard you

 4      testify was that -- that this report, this

 5      six -- greater than six-week average report, the

 6      specific purpose of that report was not to

 7      fulfill DDM's role or responsibilities under

 8      section 1301.74?

 9              A.    Correct.

10              MR. JOHNSON:  Objection.

11              Q.    All right.  Let's continue with --

12      with Ms. Strang.

13              She decides that there's a -- an

14      order that she wants to follow up with, correct?

15              A.    (Witness nodding.)

16              Q.    And --

17              MR. JOHNSON:  You have to answer

18              out loud.

19              Q.    I'll keep going.  I'll help too.

20      And it's -- in typical conversation we do a lot

21      of shaking head and saying "mm-hmm," and

22      unfortunately, in order for everybody to get

23      your testimony down, you have to say yes or no,

24      okay?  I'll let you know --
```

1        A.    Let's get back to Jill Strang?

2        Q.    Yes.

3        A.    Yes.

4        Q.    That really wasn't -- that was

5   more of a statement probably with a little bit

6   of inflection in my voice.  That's my fault.

7              So let's get back to Ms. Strang,

8   all right?

9        A.    Yes, sir.

10       Q.    Okay.  So an order causes her, you

11  said, to -- to raise her hand and she will

12  potentially look at it further, correct?

13       A.    Yes.

14       Q.    All right.  There's no written

15  policies or guidance or anything for Ms. Strang

16  to give her some parameters about what orders

17  she should be following up on performing due

18  diligence, correct?

19       A.    That's true.

20       Q.    And so do you have an

21  understanding, sitting here today, of what the

22  criteria Ms. Strang would use to follow up on an

23  order?

24       A.    Again, I think if it were a

Highly Confidential - Subject to Further Confidentiality Review

```
 1   significant anomaly, they would call the store

 2   and -- and "Hey, this came across as" -- and

 3   we're talking instead of 5, 50; instead of 1,

 4   11.  They would call the store and say, "This

 5   came across."  And this, again, is not related

 6   specific to controlled substances, but could be.

 7   And then that would be the intervention before

 8   that purchase order had even been processed.

 9   So, therefore, it wouldn't be in motion to be

10   fulfilled.

11           Q.    It could be blood pressure

12   medication, correct?

13           A.    Yes.

14           Q.    I mean, it could be acne medicine,

15   right?

16           A.    Right.

17           Q.    I mean, it could be just about

18   anything that there was an order that you called

19   a significant anomaly would pop on that report,

20   correct?

21           A.    Yes.

22           Q.    So you used the phrase

23   "significant anomaly."  So what is DDM's

24   definition of what a significant anomaly was,
```

Highly Confidential - Subject to Further Confidentiality Review

1    and under Controlled Substances Act, Schedule

2    III Narcotics, what was the significant anomaly

3    that would cause Ms. Strang to do further due

4    diligence?

5            A.    With that report?

6            Q.    Yes.

7            A.    That was not the -- the intent of

8    that report.  That report would kick out, to use

9    my word, anomalies again where the average that

10   they sent was greater than what they had

11   received over the last six weeks.  So there

12   wouldn't be precision to that report kicking out

13   items that are suspicious.

14           Q.    So the purpose -- I'm sorry.  Were

15   you finished?

16           A.    Yep.

17           Q.    The purpose of that report,

18   meaning the greater than six-week average

19   report, was more of an inventory management

20   tool, correct?

21           A.    Sure.

22                 MR. JOHNSON:  I'll object.

23           A.    But, again, we saw value in

24   augmenting our other processes with sets of eyes

1   at the store and in the distribution center with

2   that report.

3          Q.    Okay.  Let's get into your --

4   DDM's other processes, okay?  And when I say

5   "other processes," I'm still on Briscoe 6.  I'm

6   still under 1301.74, "DDM's responsibility for

7   designing and operating a system to disclose to

8   the registrant suspicious orders of controlled

9   substances."  Okay?  So we just went over

10  that -- that six-week average report.

11             What other reports or systems were

12  in place from '06 on to identify suspicious

13  orders?

14          A.    Okay.  There is a report that runs

15  on a monthly basis, the first day of every

16  month, and that -- and that report is specific

17  to controlled substances.  Again, we only carry

18  Schedule III, IV, V, not Schedule II.  And that

19  report would identify families of items, such

20  as -- a little more meaningful of a report than

21  that six-week average because the six-week

22  average spoke specifically to an NDC.  And there

23  are reasons why an average could have been lower

24  with an NDC.  If I switch manufacturers, then it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would stand to reason that the first time I

 2    order that product on a six-week report would

 3    invoke as an anomaly.

 4              But back to the monthly report,

 5    that is identifying families.  And by

 6    "families," I mean if drug X has five

 7    manufacturers, then there could be five NDCs

 8    associated with that drug X family that we would

 9    want to pay attention to related to movement.

10              So it would be more purposeful for

11    us to track the purchase history by store, by

12    family, to learn if that drug's family is

13    invoking an anomaly that needs to be looked at

14    by pharmacy operations.  So I'll get back to the

15    guts of the report.

16              It's any family that spits out a

17    quantity ordered that month which was greater

18    than the monthly average as calculated over the

19    last 12 months.  And this is at -- by store, by

20    drug family, for all Schedule III through V

21    products.

22         Q.   All right.  Monthly average,

23    12 months, by store, by drug family?

24         A.   Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And what was that called?  What
 2    was that report called?
 3              A.    I think it's a controlled
 4    substance monitoring report.
 5              Q.    Okay.
 6              A.    I believe we defined it in the
 7    requests, but I -- I apologize.  I don't know
 8    for sure.
 9              Q.    Okay.  And the report was run
10    monthly, correct?
11              A.    Yes.
12              Q.    And who did that report go to?
13              A.    Tom Nameth.
14              Q.    Tom Nameth?  Joe's brother?
15              A.    Spelled differently.
16              Q.    Okay.
17              A.    Maybe related.
18              Q.    What's Tom Nameth's title?
19              A.    He is now retired --
20              Q.    Okay.
21              A.    -- but at the time he was our
22    director of pharmacy operations --
23              Q.    Right.
24              A.    -- from that period of time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    And so did he retire in -- what
 2   year did he retire?
 3           A.    I know that about the time that I
 4   came into my role as director of pharmacy, he
 5   stayed on board in a part-time capacity.  I
 6   don't have the exact month in front of me when
 7   he retired, but I believe it was maybe a year
 8   and a half later.  So maybe early -- late '15,
 9   early '16.
10               MR. JOHNSON:  He's on the schedule
11         if that's what you're checking for.
12           Q.    You started as director of
13   pharmacy operations in October of 2014.  So did
14   Mr. Nameth receive those reports from '06 to
15   whenever he retired --
16           A.    Yes.
17           Q.    -- in '14ish?
18               Yes?  Okay.
19               MR. JOHNSON:  Slow down.  Let him
20         get his whole question out.  We're
21         stomping on each other a little there.
22           Q.    After he retired, he stayed in a
23   kind of advisorial capacity for a while?
24           A.    Yeah, he worked a couple of days a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    week.

 2            Q.    Okay.  Because he didn't want to

 3    spend too much time at home, right?

 4                  So let me make sure I don't have

 5    this confused.  You filled his position when he

 6    retired.  Am I mistaken?

 7            A.    You're not.

 8            Q.    Okay.  So when he retired, did you

 9    assume responsibility for reviewing the

10    controlled substance monitoring report?

11            A.    Yes.

12            Q.    All right.  So sometime -- you

13    began in October '14.  Let's call it late '14,

14    early '15, you assumed responsibility for

15    reviewing the controlled substance monitoring

16    report?

17            A.    I would say it would be more close

18    to when Tom fully retired, that that transition

19    occurred specific to this report, which I

20    believe to be late '15 or early '16.

21            Q.    Okay.  So he continued in that

22    capacity until he totally phased out, which was

23    late '15, early '16, somewhere in that ballpark?

24            A.    I believe so, yes.
```

1          Q.    Okay.  So let's go back to the --

2     the guts of the report.

3               How was that delivered to either

4     Mr. Nameth or yourself when it was generated on

5     a monthly basis?

6          A.    From -- our IT team created that

7     report.  I believe it was what we considered to

8     be an auto job that automatically prints in --

9     ironically on green bar paper and then is

10    delivered, typically by somebody on the pharmacy

11    operations team, to Tom's desk and -- and now my

12    desk.

13         Q.    Okay.  So it was delivered in a

14    paper format?

15         A.    Yes.

16         Q.    And not via e-mail?

17         A.    No.

18         Q.    Okay.  And were -- when those

19    reports were given to Mr. Nameth, were they then

20    kept or stored anywhere?

21         A.    I don't know if the reports were

22    retained in their entirety.  I do know that he

23    would sign off on at least the front page and

24    retain -- and he would retain those.  And each

1   of those reports are retrievable from that

2   standpoint.

3           Q.    What did -- once Mr. Nameth

4   received the controlled substance monitoring

5   reports with the monthly average going back

6   12 months by store, by drug family, what did he

7   do with that report?  What did DDM do with that

8   report?

9           A.    So looking by store, by family, we

10  would look to see if that anomaly was one that

11  could be explained in a way that did not -- that

12  did not require due diligence involving feedback

13  from the location that led to the anomaly.

14              For example, if we transitioned a

15  particular drug family from a wholesaler into

16  our pharmacy distribution center, there would

17  not be 12 months of activity specific to the

18  distributions of that drug family from our

19  distribution center to that store.  So for a

20  period of time, it's possible there would be

21  anomalies, to continue to use that word, that

22  would be on that report that are completely

23  understandable and -- and would not require

24  additional steps which would then -- would have

```
 1    involved due diligence with interaction with our

 2    store.

 3            Q.    All right.  So each of the reports

 4    we've discussed so far, the six-week average

 5    report and the controlled substance monitoring

 6    report, were each generated once a month,

 7    correct?

 8            A.    The second report that we're

 9    speaking on right now, once per month.

10            Q.    Once per month?

11            A.    The first report was every

12    purchase order at every store at the time the

13    purchase order is created.  And, generally

14    speaking, our stores send two to three purchase

15    orders to the distribution center on a weekly

16    basis, but they receive just one shipment via

17    our distribution channels on a weekly basis.

18                  So the first report is anytime

19    somebody creates an order directly from a store

20    specific to prescription medications to our

21    prescription distribution center.

22            Q.    Okay.  What was the software or

23    database that each of those reports were

24    generated out of?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I believe the computer software

 2    program is John II or John III.  I know we

 3    utilize -- our merchandising system which

 4    interfaces with the distribution center is the

 5    AS/400.

 6              Q.    And that answer applies to both of

 7    the reports we discussed so far, the greater

 8    than six-week average and the controlled

 9    substance monitoring report?

10              A.    Yes, sir.

11              Q.    Okay.  Any other reports or

12    systems in place designed to meet the

13    requirements of 1301.74, which is a system

14    designed to identify suspicious orders of

15    controlled substances?

16              A.    Yes, sir.

17              Q.    Okay.  What else?

18              A.    So once we get beyond pharmacy

19    operations review in a way that explains what

20    would have popped as an anomaly, if we review

21    but determine "I can't explain that this anomaly

22    is actually legitimate because there's activity

23    at store level associated with prescriptions

24    that should be dispensed."
```

```
 1                    So if there is something that we

 2    need to take a deeper look at, there is due

 3    diligence taken between pharmacy operations and

 4    the store from which that anomaly showed on the

 5    report, and that report would essentially

 6    explain to the store, "We recognize that this

 7    month for this drug family, you ordered a

 8    quantity of X, and this quantity of X is greater

 9    than your last 12-month monthly average.  Please

10    provide me information as to how these

11    additional -- you know, or this -- this order is

12    not suspicious or this order was for legitimate

13    purposes."

14          Q.    All right.  One thing I'm a little

15    confused with still is that -- so once we go

16    beyond pharmacy operations, is Mr. Nameth in

17    pharmacy operations?

18          A.    Yes.

19          Q.    Okay.  And while that report is

20    being generated on a monthly basis and while

21    pharmacy operations is reviewing the anomalies

22    in that report --

23          A.    Tom?

24          Q.    Right, or yourself.
```

```
 1            A.    Yes.

 2            Q.    -- that order is then shipped to

 3    the DDM pharmacy, correct, sir?

 4            A.    Those orders would have been

 5    shipped, yes, because that monthly report where

 6    there's a retrospective view of what had

 7    occurred in the previous month ...

 8                  MR. JOHNSON:  Peter, when you get

 9            to a natural place to take a break,

10            let's take a midmorning break.

11                  MR. MOUGEY:  Sure.  That's

12            perfect.  I'm good now.

13                  MR. JOHNSON:  Is now fine?

14                  MR. MOUGEY:  Yep.  That is fine.

15                  THE VIDEOGRAPHER:  Going off the

16            record at 10:17 a.m.

17                  (Recess taken.)

18                  THE VIDEOGRAPHER:  Back on record

19            at 10:35 a.m.

20    BY MR. MOUGEY:

21            Q.    Mr. Briscoe, we've gone through

22    the --

23            A.    Exhibit 6, sir?

24            Q.    Yes, sir, still Exhibit 6.
```

Highly Confidential - Subject to Further Confidentiality Review

 1               We've gone through two reports,

 2     the six-week average report and the second

 3     monthly report, controlled substance monitoring

 4     report, I think.  Does that name, controlled

 5     substance monitoring report, anywhere -- appear

 6     anywhere on that document?

 7          A.    I'm going by memory alone.  I

 8     believe there is a header on that report, but I

 9     don't recall if it's the term that I provided to

10     you earlier or a term we might have provided in

11     our request for documents.  I apologize.

12          Q.    Do you know if those reports are

13     stored in any hard drive, server, somebody's

14     filing cabinet?

15          A.    I know that the top page of the

16     hard copy reports I sign off on and file away in

17     the event that the DEA would come in and ask

18     for -- you know, "Show me where you did your

19     portion of your order monitoring."  And I also

20     believe -- and I think in, again, the requests

21     or the interrogatories when we described this

22     process, they are retrievable.  So we could, if

23     we needed to retrospectively --

24          Q.    Go back and pull them --

```
 1          A.   Yes.

 2          Q.   -- on a monthly basis, going back

 3    to -- at least to 2006?

 4          A.   I can't speak with confidence on

 5    how far back we would be able to pull them, but

 6    I think the answer to that is yes.

 7          Q.   Okay.

 8               MR. JOHNSON:  Are they -- can I

 9          clarify?  Are they in paper form or are

10          they electronically stored someplace?

11               THE WITNESS:  Well, part of my

12          process whenever -- my segment of the

13          overall puzzle, so to speak, I sign the

14          first page and document that I've

15          reviewed all item families at all

16          stores, and then I sign that and store

17          that page.

18               His follow-up, I believe --

19               MR. JOHNSON:  Store it in paper?

20               THE WITNESS:  Paper.

21               MR. JOHNSON:  Okay.

22               THE WITNESS:  Yeah.  Wet ink

23          signature.

24               MR. JOHNSON:  Okay.  So I just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              want to clarify because I -- I have a

 2              feeling Peter is going to ask to see

 3              those or may want to.

 4                   Are they -- are they stored

 5              anywhere electronically?

 6                   THE WITNESS:  The report

 7              themselves, I don't know that "stored"

 8              is the right word or able to be

 9              retrieved by generating the report on

10              demand.

11                   MR. JOHNSON:  Oh.  So we'd be

12              generating a new report to simulate old

13              reports?

14                   THE WITNESS:  Correct.

15                   MR. JOHNSON:  Okay.

16   BY MR. MOUGEY:

17         Q.    I think what you testified to

18   earlier is that you could repopulate the

19   previous report through the system; is that --

20         A.    Yes.

21         Q.    All right.  Outside of those two

22   reports -- and I'm still on Briscoe 6,

23   section 1301.74, identifying DDM's

24   responsibilities as the distributor to have a
```

Highly Confidential - Subject to Further Confidentiality Review

1    system designed to identify suspicious orders,

2    okay?

3              What other systems were in place

4    at DDM other than the two reports we just

5    discussed designed to identify suspicious

6    orders?

7         A.    So the process by which Tom Nameth

8    or myself would review by store, by item family,

9    if we determined that any item family at any

10   respective store could not be explained and

11   required further review with the involvement of

12   the store that was involved, we would send that

13   store what we call a due diligence report

14   outlining why they're receiving this document

15   related to this month's activity associated with

16   that family of drugs, and then requiring,

17   requesting in an urgent manner reasons and/or

18   data associated with what led to them ordering

19   and receiving that quantity that month.

20        Q.    Now, let's go back to the actual

21   formula for what that report populated.  That

22   was a 12-month average by store, by drug family.

23        A.    You got it.

24        Q.    Okay.  So what is the average?

Highly Confidential - Subject to Further Confidentiality Review

1   What -- is it prescriptions?  Is it dosage

2   units?  Is it MME?  What is the average?

3   Average of what?

4           A.    It would be units of -- you know,

5   whatever a unit would be of a stock package.  So

6   if it were a bottle of 100 tablets, it would --

7   again, so if there's a family that's involved,

8   so a 100-count bottle versus 500-count bottle,

9   it would -- it would expose to us the activity

10  by NDC within the family.  So we would have full

11  view of all activity of any NDC associated with

12  that family, so we could see if they received

13  six bottles of a 100-count or one bottle of

14  500-count that would be tabulating towards that

15  monthly average.

16          Q.    All right.  So is the tabulation

17  to the monthly average dosage units?

18          A.    Bottles.

19          Q.    Okay.  But a bottle could be just

20  as you just indicated, 100 tablets or 500

21  tablets.  So if it's just by bottles, you could

22  have five bottles of 500 dosage units for 2,500

23  dosage units over one month and that would only

24  be five bottles, or -- and then the -- the next

Highly Confidential - Subject to Further Confidentiality Review

```
 1    month you could have -- you know what?  Strike

 2    that.  Let me do it the other way.

 3              You could have five bottles with

 4    100 dosage units and -- for one month and that

 5    would be 500 dosage units, correct?  Right?

 6         A.   Yeah.  Yes.

 7         Q.   Okay.  And then the next month you

 8    have five bottles again with 500 dosage units?

 9         A.   I'm tracking with you.

10         Q.   Okay.  So the 2,500 versus the

11    five would be a 500 percent increase, correct?

12         A.   In your example, yes.

13         Q.   All right.  Go ahead.

14         A.   And that would be -- you know, the

15    reason for our approach in not using that

16    computer-generated or systems-generated report

17    alone to precisely identify suspicious orders

18    because that wouldn't be enough the way that

19    that report is created.

20              So in your example, I would have a

21    full view or Tom would have a full view of the

22    example you just provided, and that would be a

23    potential reason that that example is more

24    likely to require the next level of the due
```

Highly Confidential - Subject to Further Confidentiality Review

1    diligence report, rather than just relying on

2    this report spitting out five bottles versus

3    five bottles of the monthly average over

4    12 months.  That's not good enough, and that's

5    part of the reason why there's human involvement

6    before that next step involving the store would

7    be.

8              Q.    How many DDM pharmacies in the

9    State of Ohio, 70?

10             A.    In Ohio?

11             Q.    Yes.

12             A.    Currently retail locations?

13             Q.    Yes.

14             A.    Seventy-four.

15             Q.    Seventy-four.  And that number has

16   stayed fairly consistent over the last 10 or

17   15 years, correct?

18             A.    We've had some pretty strong

19   conservative growth where -- in 2006, I bet we

20   were in the low 60s as far as store numbers.

21             Q.    So 60, 70 pharmacies from 2006 to

22   now?

23             A.    Mm-hmm.

24             Q.    And you asked me just Ohio.  My

Highly Confidential - Subject to Further Confidentiality Review

1   understanding is DDM just does business in Ohio.

2   Am I mistaken?

3          A.   And my question for you was just

4   retail locations.

5          Q.   Okay.  But DDM only does business

6   in Ohio, correct?

7          A.   You got it.  Yes.

8          Q.   And the distribution center for

9   the pharmaceuticals is in Ohio, correct?

10         A.   Yes.

11         Q.   And the pharmacies are all located

12  in Ohio, correct?

13         A.   Yes.

14         Q.   All the organizational structure

15  at the operational level is in Ohio?

16         A.   Yes.

17         Q.   All right.  So -- now, the report,

18  we -- that report, the average is just based on

19  bottles?

20         A.   But it provides granularity to

21  what is leading to that number.  So if you were

22  to look at the report, it would provide any NDC

23  and associated package size within a drug

24  family.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Right.

2          A.     So if I -- if drug X had five NDCs

3    but three of which that store purchased from our

4    distribution center that month --

5          Q.     Mm-hmm.

6          A.     -- we would see all three NDCs in

7    the associated package size and quantity.

8          Q.     All right.  So what would trigger

9    a store -- an order being placed on that report

10   exceeding that average?  I mean 10 percent,

11   50 percent, 100 percent?

12         A.     99 percent greater than the

13   monthly average when calculated over the last

14   12 months.

15         Q.     So essentially it would have to

16   double?

17         A.     Yes.

18         Q.     How many pages were those reports

19   typically?

20         A.     The way the green bar is

21   printed -- I mean, if you're talking about

22   number of sheets of paper --

23         Q.     Yeah.

24         A.     -- it would be one page for every

Highly Confidential - Subject to Further Confidentiality Review

1    store followed by one blank page followed by the

2    next store.  So if there are 74 stores,

3    148 pages.

4         Q.    All right.  And how often would

5    a -- frequency-wise would a store be on this

6    report with an order that exceeded the previous

7    12-month average by bottle by 99 percent?

8         A.    Tough for me to characterize your

9    definition of "frequent."  I mean, I would say

10   very infrequent.  I don't know how else to

11   characterize that.

12        Q.    Meaning that it was not very -- we

13   can -- it was not a regular occurrence for an

14   order to be on the suspicious order monitoring

15   report because it exceeded the previous 12-month

16   average by bottle by 99 percent?

17        A.    Yeah.  A large majority of the

18   time, a large majority of our stores would have

19   no instances by which a drug family would --

20   would populate on this report.

21        Q.    Let's put it this way:

22              DDM did not have a significant

23   part of anyone's responsibility designed to

24   monitoring and reviewing that report on a -- on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a monthly basis because there really were not

 2    that many entries, correct?

 3            A.    Well --

 4                  MR. JOHNSON:  Objection.

 5            A.    Yeah.  I wouldn't say that we

 6    didn't take that report seriously or it wasn't

 7    reviewed in a significant manner.  It certainly

 8    was.  The report and the number of examples that

 9    would populate wouldn't -- does not take a

10    terribly long time to work based on the

11    infrequency by which a drug family populates.

12            Q.    From 2006 until last Friday, DDM

13    has never had an order from any of its

14    pharmacies that it considered suspicious and,

15    therefore, reported it to the DEA, correct?

16                  MR. JOHNSON:  Objection.

17            A.    Yes.

18            Q.    "Yes" meaning --

19            A.    Correct.

20            Q.    -- DDM has never reported one

21    single order to the DEA as suspicious from 2006

22    until at least last Friday, correct?

23            A.    That is my understanding, yes.

24            Q.    Those two reports, pharmacy
```

```
 1   operations, Mr. Nasmith (phonetic) --

 2                   MR. JOHNSON:  Nameth.

 3           Q.    Thank you.

 4                   -- Nameth and -- basketball,

 5   football.

 6                   Those two reports, Mr. Nameth --

 7   Ms. Strange, was it?  Stange?  Strange?

 8                   MR. JOHNSON:  Strang.

 9                   MR. MOUGEY:  Strang.  Thank you.

10   BY MR. MOUGEY:

11           Q.    Those two reports, Ms. Strang,

12   Mr. Nameth, outside of that description, what

13   else did DDM do to fulfill its responsibilities

14   under 1301.74 to identify suspicious orders of

15   controlled substances?

16           A.    So it would be that -- that third

17   phase where, once Mr. Nameth or myself would

18   work that report, if we were to identify that

19   followup was necessary, in our view, from the

20   store, we would send that form that I've

21   described as due diligence explaining why

22   they're receiving the form based on that monthly

23   report, and then with some instructions on what

24   information they would need to provide back to
```

1   us, for us then to review their feedback on why

2   that order was shipped at the quantity it was

3   compared to the last 12 months, and then we

4   would make a decision on whether that would be

5   resolved or not.

6          Q.    So from 2006 until -- well, it's

7   almost a 13-year period -- based on these

8   reports, due diligence analysis, the monthly

9   analysis of the pharmacies under the controlled

10  substance monitor policy report, the six-week

11  average report, the follow-up on the due

12  diligence, DDM never identified one single order

13  as suspicious, despite the fact it shipped and

14  distributed 72 million dosage units of

15  hydrocodone in the State of Ohio, correct?

16              MR. JOHNSON:  Objection.

17         A.    Yeah, I can't speak to the dosage

18  units accuracy, but I can tell you that we've

19  not reported a suspicious order.

20         Q.    Do you have any idea what kind of

21  volume DDM has -- has distributed in the State

22  of Ohio dosage unit-wise?

23         A.    I know where I could grab that

24  information, but off the top of my head, I do

Highly Confidential - Subject to Further Confidentiality Review

1    not.

2          Q.    Would 72 million dosage units in

3    the State of Ohio from DDM surprise you from

4    2006 to 2014?

5                MR. JOHNSON:  Objection.

6          Q.    Hydrocodone?

7                MR. JOHNSON:  Objection.

8          A.    I would have to -- to -- again,

9    would it surprise me?  I'd have to look at other

10   information associated with dosage units,

11   associated all controlled substance or, further,

12   all dosage units of all medications that we

13   dispense to see what percentage of dosage units

14   we dispense at our retail locations were opioid

15   compared to the entire bucket.  Forgive my term.

16         Q.    Sir, did DDM have any part of the

17   process you just described to me where it was

18   monitoring Schedule IIs like OxyContin in

19   conjunction with its own Schedule III

20   distribution?

21         A.    From a distribution standpoint,

22   no.

23         Q.    Okay.  So 1301.74, the regs under

24   the Controlled Substances Act, you would agree

Highly Confidential - Subject to Further Confidentiality Review

1    with me that if DDM was shipping suspicious

2    orders without performing due diligence, that

3    those would be unlawful, correct?

4              MR. JOHNSON:  Objection.

5         A.    If those orders that had been

6    shipped, following our review, we learned to

7    have been resolved, then, no, I don't believe in

8    our view in that period of time that we're

9    discussing would have been unlawful.

10         Q.    What I'm asking you is a little

11    bit different.  What I asked you was, under the

12    Controlled Substances Act, that if DDM shipped

13    suspicious orders without performing due

14    diligence, those -- that would be unlawful,

15    correct?

16              MR. JOHNSON:  Objection.  It's a

17         hypothetical.

18         A.    I don't believe we have been

19    involved in any unlawful activity associated

20    with the distribution of the products from

21    our -- our distribution center.

22         Q.    And I understand.  What I'm asking

23    you, though, is, today, you're here as a

24    representative of DDM and your understanding of

Highly Confidential - Subject to Further Confidentiality Review

1    DDM's obligations under the Controlled

2    Substances Act, correct?

3         A.    Yes, sir.

4         Q.    And what I'm asking you is, if DDM

5    shipped suspicious orders without performing due

6    diligence on those orders, those shipments would

7    be unlawful, correct?

8              MR. JOHNSON:  Objection.

9         A.    Again, you know -- prior to the

10   Masters case, you know, my answer would remain

11   the same -- and I think that would be industry

12   standard -- that orders had been shipped, that

13   there was due diligence done after the fact to

14   learn that they were resolved.

15             Our situation is somewhat unique,

16   in that we are all under one umbrella in a

17   closed system, and literally a closed system, in

18   that our distribution center is only shipping to

19   our stores, and we have measures and steps and

20   processes and recordkeeping associated with

21   knowing that all the pharmacies that we're

22   distributing to are practicing pharmacy the

23   right way.

24             Now, post Masters and -- and the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    way that that ruling came down -- and, again,

 2    there's some potential room for interpretation

 3    based on Masters and some of the factors

 4    associated with them specifically and the way

 5    the ruling came down, but on a go-forward, we

 6    will be looking to identify a suspicious order

 7    and prevent that from being shipped.

 8         Q.    The anomalies -- your word -- that

 9    were identified on the reports that you -- that

10    DDM used, those were suspicious orders, correct?

11         A.    No.

12         Q.    And in order to be on those

13    reports, DDM considered those orders the to be

14    anomalies, right?

15         A.    Yes.

16         Q.    And anomaly is, in your terms,

17    what, a rare occurrence?

18         A.    No.  It's something that deserves

19    to be looked at further because the report -- or

20    the reports themselves were not or are not

21    created in a way that's precise enough to spit

22    out what exactly is a suspicious order from the

23    standpoint of it should be shipped or it

24    shouldn't be shipped.  So in both directions,
```

1   our system has value in somebody taking a look.

2   So we had to start with what do we take a look

3   at.  And those are those anomalies that I speak

4   of.  But those are not viewed in our system as

5   defined by -- you know, they're not suspicious

6   orders.

7           Q.    Are you familiar with the -- the

8   term "red flag"?

9           A.    Yes.

10          Q.    Would you agree with me that the

11  orders identified on the reports we just walked

12  through were red flags?

13          MR. JOHNSON:  Objection.

14          A.    Again, the report in the way that

15  it's designed is not precise enough to

16  characterize those as red flags, because

17  examples of us moving from an ordering behavior

18  away from a wholesaler to our distribution

19  center would create a situation by which that

20  first bottle you receive is greater than your

21  12-month average because there was no activity

22  from the distribution center on that example.

23          Another example would be that

24  based on days' supply being dispensed in a

Highly Confidential - Subject to Further Confidentiality Review

```
 1   legitimate manner at our retail locations, the

 2   ordering patterns dictate two bottles January,

 3   no bottles February, two bottles March,

 4   et cetera, leading to a one-bottle average for

 5   that location in that drug family; therefore,

 6   six out of those 12 months, that item

 7   potentially would pop as an anomaly because 2 is

 8   a greater than 1 average -- that -- that 2 is

 9   greater than the average of 1.  That is not

10   suspicious upon review by Tom Nameth or myself

11   in taking a look at dispensing history at that

12   location to see that pattern.

13        Q.    The reports which we just walked

14   through were not precise enough to identify

15   specific trends that warranted or dictated that

16   there be human involvement reviewing those

17   reports, correct?

18        A.    The strength of our process, our

19   suspicious ordering monitoring system, is the

20   totality of its components, and the human factor

21   is an important part of that.

22        Q.    So not precise enough equates into

23   a need for human involvement, and that

24   translates to the totality of the circumstances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    So to the point where Tom Nameth

 2    or myself is latched onto the reports to review,

 3    and then we have a responsibility to then

 4    determine if there's further activity or further

 5    communication with the store for which that

 6    anomaly populated.  So that would be the due

 7    diligence.

 8          Q.    So let me get this straight.  The

 9    reports are not precise enough on a monthly

10    basis that DDM has to have individuals reviewing

11    those reports, correct?

12          A.    Yeah.  I'd probably characterize

13    that in a negative manner, but, yeah -- yes.

14          Q.    And while the human involvement is

15    trying to figure out things like adding up

16    dosage units and NDC codes and -- and putting

17    more meat on the bones, so to speak, the orders

18    are shipped, correct?

19          A.    Yes.

20          Q.    And when the anomalies are

21    identified on these reports on a monthly basis

22    that are not precise enough to warrant kind of

23    manual calculations, those aren't reported to

24    the DEA, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1              MR. JOHNSON:  Objection.

2        A.    No.

3        Q.    Meaning they're not reported to

4   the DEA, so the answer to the question is yes,

5   right?

6        A.    Yeah, they're not reported to the

7   DEA.

8        Q.    That's right.  So often, by the

9   time the reports are generated, the information

10  is not precise enough, you have to do some

11  manual calculations, you continue to make phone

12  calls and look at it further.  By the time you

13  get an answer back from the pharmacy, that order

14  could be six, seven, eight weeks in the rearview

15  mirror, correct?

16             MR. JOHNSON:  Objection.

17       A.    No, it would not -- that process

18  would not be that lengthy in nature.

19       Q.    If the order came out on -- came

20  in on the 1st of -- just say 1st of January,

21  okay, the report's generated once a month.  So

22  that 30-day window, the report's a month later,

23  right?  So there's one month after the order,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes.

2            Q.    So that order then is on that

3     report as an anomaly, correct?

4            A.    Yes.

5            Q.    The calculations on the report

6     aren't precise enough that warrant some human

7     calculation, correct?

8                  MR. JOHNSON:  Objection.

9            A.    Can you repeat that?

10           Q.    The reporting, the data on the

11    report, is not precise enough that warrants some

12    human calculations, some adding, some math on

13    the report, right?

14                 MR. JOHNSON:  Objection.

15           A.    I think the intent of your

16    question is that it's not precise enough to not

17    warrant human interaction, meaning there needs

18    to be human interaction?

19           Q.    Sure.  I mean, it's measuring

20    bottles.  You have to add up how many pills and

21    how many dosage units are in each bottle.

22    You've got to go and look through the 140-page

23    reports and do some calculations to see what

24    jumps, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    And it's not -- you're

 2   characterizing it as a difficult process, but

 3   it's not.

 4          Q.    Sure.  So that 140-page report,

 5   30 days -- it could come out 30 days after the

 6   order was entered, right?  So there's 30 days in

 7   the rearview mirror, correct?

 8          A.    Potentially, yes.

 9          Q.    You've got to go flip through the

10   report, you've got to do some manual

11   calculations, correct?

12          A.    Yes.

13          Q.    No one ever automated those

14   calculations from 2006 until 2018 to make the

15   calculations, just self-reporting, right?

16          A.    Excuse me.  I think those

17   calculations, whether it's Discount Drug Mart or

18   any entity, including the DEA, that's difficult

19   to create something that is precise that you

20   could treat as the truth without somebody taking

21   a look at it.

22          Q.    I'm not asking you that.  What I'm

23   simply asking you is, instead of bottle count,

24   measuring dosage units could have been done with
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   a simple calculation, a simple formula within

2   that report, correct?

3                MR. JOHNSON:  Objection.

4        A.    I think what you're suggesting is

5   maybe the report could be enhanced that would

6   make Tom's job or my job easier in normalizing

7   the quantity that would have been received on a

8   monthly basis.

9        Q.    Sure.  Because measuring bottle to

10  bottle to bottle to bottle really isn't a --

11  comparing apples to apples, correct?

12               MR. JOHNSON:  Objection.

13       A.    It's exposed on the report, so

14  the -- the extra layer is a little bit more work

15  for those that are reviewing it.

16       Q.    And over a 12-year period, no one

17  ever thought at DDM to embed a simple formula,

18  the NDC code with the number of dosage units in

19  a bottle, so you could quickly see apples to

20  apples, correct?

21               MR. JOHNSON:  Objection.

22       A.    I can't speak to if anybody

23  thought about that or not.  It certainly hasn't

24  been implemented in a change.  I could say
```

Highly Confidential - Subject to Further Confidentiality Review

1    that's likely due to our past performance, in

2    that we haven't had issues that would have had

3    us take a longer look at the way that we're

4    having this approach, again, in its totality.

5         Q.    Sure.  And you've never reported a

6    suspicious order to the DEA as required under

7    1301.74 in 12 years, correct?

8              MR. JOHNSON:  Objection.

9         A.    Correct.

10        Q.    So maybe saying "We're the gold

11   standard and we've never had an issue," you

12   recognize as DDM it's your responsibility to

13   identify suspicious orders, and no one at DDM

14   ever thought about embedding a simple formula

15   translating bottle count into dosage units so

16   the person reviewing the report could compare

17   apples to apples, correct, sir?

18             MR. JOHNSON:  Objection.

19        A.    I wouldn't -- I mean, I didn't say

20   we were the gold standard.  I would say we have

21   confidence in the way that we operate.  And,

22   again, I can't speak to if anybody thought about

23   that.  I would agree that that hasn't been

24   changed since the time the report was first

Highly Confidential - Subject to Further Confidentiality Review

```
1    created.

2            Q.    And no one from DDM ever took the

3    time to embed a simple formula translating

4    bottle counts into dosage units so the

5    individual reviewing that report could compare

6    apples to apples, correct?

7                  MR. JOHNSON:  Objection.  Asked

8            and answered, I believe.  Yeah.

9            Q.    Please answer the question.

10           A.    Yeah.  Correct.  And, again, I

11   view that as it -- it would make the process of

12   reviewing the report slightly easier for Tom

13   Nameth or myself.

14           Q.    Sir, if you'd turn to page 71.

15           A.    Sure.

16           Q.    We've already covered this

17   generally.  I just want to -- specifically on

18   page 70, do you see the title Part 1306,

19   Prescriptions?

20           A.    I'm sorry.

21           Q.    Page 70, bottom of the --

22           A.    Seventy?

23                 MR. JOHNSON:  Lower left of 70.

24           Q.    Seventy.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yeah, I'm with you.

 2            Q.    Okay.  Prescriptions in the lower

 3   left, okay, 1306?

 4            A.    Yes.

 5            Q.    And page 71, 1306.04, Purpose of

 6   Issue of Prescriptions.

 7                  Do you see that?

 8            A.    I do.

 9            Q.    And under (a), "A prescription for

10   a controlled substance to be effective must be

11   issued for a legitimate medical purpose by an

12   individual practitioner acting in the usual

13   course of his professional practice."

14                  Correct?

15            A.    Yes, sir.

16            Q.    And it continues, The

17   responsibility for the proper prescribing and

18   dispensing of the prescribing practitioner

19   [sic], but a corresponding responsibility rests

20   with the pharmacist who fills the prescription.

21                  Do you see that?

22            A.    Mm-hmm.

23            Q.    Did I read that correctly?

24            A.    You did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Okay.  And earlier we touched on

 2    the responsibilities of DDM as a pharmacy and

 3    the responsibilities of DDM as a distributor,

 4    okay?

 5              A.     Mm-hmm.

 6              Q.     And 1306.04 touches on the

 7    responsibilities of DDM as a pharmacy, correct?

 8              A.     Yes.

 9              Q.     1301.74 that we went through on

10    page 38 about a system designed to identify

11    suspicious orders and reporting those suspicious

12    orders, is DDM's responsibility as a

13    distributor, correct?

14              A.     Yes.

15              Q.     And while those two may overlap,

16    they are distinct responsibilities, correct?

17              A.     Yes.

18              Q.     Did DDM have any part of its

19    system wherein it relied on data from its

20    pharmacy operations to review suspicious orders

21    from a distributor perspective?

22              MR. JOHNSON:  Objection.

23              A.     Yes.  From the standpoint of the

24    Tom Nameth and Jason Briscoe review post
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   anomaly, post report, and due diligence when

 2   involving the store.  There would be information

 3   accessed, obtained, provided.

 4        Q.    So 1301.74 uses the word "system,"

 5   designed a system, okay?

 6              And what is the system that

 7   Mr. Nasmith used --

 8              MR. JOHNSON:  Nameth.

 9        Q.    I'm sorry.

10              -- Nameth used and yourself --

11   what was -- what was the system, meaning the

12   written policies and procedures, to perform

13   whatever due diligence or analysis on those

14   reports?

15        A.    There really wasn't depth to the

16   written policy and procedure other than pharmacy

17   operations to review.

18        Q.    When you say there wasn't any

19   depth, there really wasn't --

20        A.    Well, in the procedure it mentions

21   pharmacy operations to review.

22        Q.    But that's it?  So no depth

23   meaning there's zero policies and procedures

24   other than pharmacy operations to review,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2                MR. JOHNSON:  Objection.

 3         A.    There's no examples to follow or

 4    details beyond that, yes.

 5         Q.    There's no examples, there's no

 6    criteria, there's no thresholds, there's no

 7    frequently asked questions.  There is nothing

 8    other than pharmacy operations to review,

 9    correct?

10         A.    And we're speaking at the

11    distributor --

12                MR. JOHNSON:  Objection.

13         A.    -- distributor level?

14         Q.    Yes, sir.

15         A.    Yes.

16         Q.    Yes, meaning there is zero

17    criteria, zero thresholds, zero parameters?

18    Anything of detail other than pharmacy

19    operations to review, that's the entirety of the

20    system with those reports, correct?

21         A.    Well --

22                MR. JOHNSON:  Objection.

23         A.    -- I was speaking to the component

24    by which Tom Nameth or myself would review.  So
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   when you mentioned thresholds, in a sense, these

 2   reports are predicated on a threshold that we

 3   created to have these anomalies populate on a

 4   report to be reviewed.  So I wouldn't agree with

 5   your entire statement within that question.

 6            Q.    Let's do it this way:

 7                  Once the anomaly is populated on

 8   the report, the entirety of DDM's system is

 9   for -- in writing is for pharmacy operations to

10   review, correct?

11            A.    Yes.

12            Q.    So in writing, when pharmacy

13   operations is reviewing the anomalies posted on

14   those reports, there is no direction through

15   criteria, thresholds, parameters, anything, to

16   give pharmacy operations guidance when reviewing

17   those anomalies, correct?

18                  MR. JOHNSON:  Objection.

19            A.    Yes.

20            Q.    Correct meaning there's nothing in

21   writing, correct?

22            A.    Correct.

23            Q.    Okay.  Now, sir, you're familiar

24   that the DEA would provide information to
```

1    distributors, manufacturers, registrants in the

2    system about what the requirements were under

3    the regs, correct?

4            A.    Yes.

5            Q.    All right.  And one of those

6    examples -- let me hand you what I'm going to

7    mark as Briscoe 7.

8                        - - -

9            (DDM-Briscoe Exhibit 7 marked.)

10                       - - -

11   BY MR. MOUGEY:

12           Q.    What I've just put in front of

13   you, Mr. Briscoe, is a letter from the

14   U.S. Department of Justice, Drug Enforcement

15   Administration, dated September 27, 2006,

16   correct?

17           A.    Yes.

18           Q.    Now, have you ever seen this

19   letter before?

20           A.    I don't believe I have.

21           Q.    Even preparing for today, have you

22   ever seen it?

23           A.    I don't believe I have.

24           Q.    And dated on September 27, 2006,

Highly Confidential - Subject to Further Confidentiality Review

1    the letter relays that it's being sent, in the

2    very first paragraph, "to every commercial

3    entity in the United States registered with the

4    Drug Enforcement Administration to distribute

5    controlled substances."

6              Correct?

7         A.   Yes.

8         Q.   "The purpose of this letter is to

9    reiterate the responsibilities of controlled

10   substance distributors in view of the

11   prescription drug abuse problems our nation

12   currently faces."  Okay?

13             Do you have an understanding, as

14   DDM, whether or not it received this letter on

15   or about September 27, 2006?

16             MR. JOHNSON:  Objection.

17        A.   Being that we would have been a

18   DEA registrant, it would -- it would be my

19   belief that, yes, we did.

20        Q.   All right.  And do you agree with

21   the DEA that the responsibilities of -- strike

22   that.  Let me keep going.

23             Underneath Background --

24        A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    -- "As each of you is undoubtedly

2    aware, the abuse (nonmedical use) of controlled

3    prescription drugs is a serious and growing

4    health problem in this country."

5          Do you agree, sir, with the DEA in

6    2006 that the controlled prescription --

7    controlled prescription abuse is a serious and

8    growing health problem in the country?

9      A.    I wouldn't have any reason to

10    disagree with what they cited.

11      Q.    Was DDM aware in 2006 that the

12    abuse of controlled substances was a growing

13    health problem in the U.S.?

14          MR. JOHNSON:  Objection.

15      A.    I believe the answer would be yes.

16      Q.    Was DDM aware in the State of Ohio

17    that there was an opiate epidemic in 2006 of

18    abuse of Schedule II and Schedule III?

19      A.    I believe the answer would be yes.

20          MR. JOHNSON:  Show an objection to

21        that.

22      Q.    The next paragraph, "The CSA" --

23    and that stands for the Controlled Substances

24    Act -- "was designed by Congress to combat

1    diversion by providing for a closed system of

2    drug distribution in which all legitimate

3    handlers of controlled substances must obtain a

4    DEA registration and, as a condition of

5    maintaining such registration, must take

6    reasonable steps to ensure that their

7    registration is not being utilized as a source

8    of diversion."

9           Did I read that right?

10         A.    You did.

11         Q.    And you agree with that sentence

12   from the DEA, sir?

13         A.    Sure.  Yes.

14         Q.    The next sentence, "Distributors

15   are, of course, one of the key components of the

16   distribution chain."

17         Do you see that, sir?

18         A.    I do.

19         Q.    And do you agree with the DEA that

20   DDM, in its role as a distributor, is one of the

21   key components of the distribution chain?

22         A.    Yes.

23         Q.    And, as the next sentence relays,

24   "If the closed system is to function properly as

Highly Confidential - Subject to Further Confidentiality Review

1  Congress envisioned, distributors must be

2  vigilant in deciding whether a prospective

3  customer can be trusted to deliver controlled

4  substances only for lawful purposes."

5          Correct?

6      A.   Yep.

7      Q.   And your testimony today is that

8  DDM had designed a system to identify suspicious

9  orders that fulfilled its obligations to be

10 vigilant?

11     A.   Yes.  And I think the highlighted

12 portion speaks to vigilant in deciding whether a

13 prospective customer can be trusted to deliver.

14 And, you know, being that our stores -- being we

15 don't have customers, but our stores are also

16 operated under our umbrella, you know, is a

17 strength from that perspective --

18     Q.   Sure.  As we talked about --

19     A.   -- in knowing your customers.

20     Q.   As we talked about a couple of

21 hours ago at the very beginning, DDM's customers

22 are its own pharmacies, correct?

23     A.   Yes.

24     Q.   All 60, 70 of them scattered

Highly Confidential - Subject to Further Confidentiality Review

1    throughout the State of Ohio, correct?

2          A.    Yes.

3          Q.    And DDM's responsibility under the

4    Controlled Substances Act in its role as a

5    distributor is to be vigilant in identifying and

6    reporting suspicious orders, correct, sir?

7          A.    Not specific to this paragraph,

8    but -- but, yes.

9          Q.    And the last sentence of this

10   paragraph, "This responsibility is critical, as

11   Congress has expressly declared that the illegal

12   distribution of controlled substances has a

13   substantial and detrimental effect on the health

14   and general welfare of the American people."

15              Do agree with that sentence?

16         A.    I do.

17         Q.    And you agree that DDM's role was

18   critical in combating the opiate epidemic, not

19   only in the State of Ohio, but beyond the

20   state's borders?

21         A.    I don't know that we would have

22   had an -- a direct impact outside of Ohio, but I

23   also want to point out that the background of

24   this Dear Registrant letter, again, speaks to

```
 1   vigilance associated with the distributor making

 2   sure it's only going to be shipping to -- excuse

 3   me -- customers trusted to deliver controlled

 4   substances only for lawful purposes.

 5            And I do believe that we're

 6   vigilant in making sure that our stores are

 7   licensed by the DEA, in good standing, have

 8   ongoing business practices that would -- would

 9   meet the standards that they -- they mention --

10   or that they reference.

11        Q.   And you have no question here

12   today, sir, as DDM, that the responsibilities of

13   DDM as a distributor were to have a system

14   designed to identify suspicious orders, correct?

15        A.   Correct.

16        Q.   You have zero problem, zero

17   equivocation with that statement?  It doesn't

18   matter if it's to your own pharmacies or not,

19   DDM's role as a distributor was to design and

20   implement an effective system to identify and

21   report suspicious orders to the DEA, correct,

22   sir?

23            MR. JOHNSON:  Objection.

24        A.   Yes, sir.  But, again, not
```

```
 1    specific to this Dear Registrant letter.

 2            Q.     This Dear Registrant --

 3            A.     Or at least that paragraph that we

 4    were on.  Excuse me, sir.

 5            Q.     No, that's okay.  Go ahead.

 6            A.     No, I'm done.

 7            Q.     The Dear Registrant letter that

 8    you're referencing here on September 27, 2006

 9    was simply to reiterate those responsibilities,

10    correct?

11            A.     It appears to be, yes.

12            MR. JOHNSON:  Objection.

13            Q.     Right.  And these responsibilities

14    that we're talking about are not driven by this

15    letter, but more from the Controlled Substances

16    Act from 1970 we just looked at and the regs

17    promulgated thereunder, correct?

18            A.     Yes.  And what I was trying to

19    explain and I wasn't doing a good job is that --

20    and, again, I haven't seen this letter or don't

21    have it memorized, so if we go down further and

22    there's a section related to developing a

23    process in place to prevent and report

24    suspicious orders, then I apologize.
```

Highly Confidential - Subject to Further Confidentiality Review

1                    But, again, to me, the purpose of

2    this letter appears to be making sure we're

3    doing our due diligence and being vigilant and

4    that who we plan to ship to, you know -- again,

5    sorry -- can be trusted to deliver controlled

6    substances for only lawful purposes.

7            Q.    Right.  And that the prescriptions

8    that are going out the door of Schedule III are

9    legitimate prescriptions for medical use,

10   correct?

11           A.    Yes, sir.

12                 MR. JOHNSON:  Objection.

13           Q.    You're familiar with the term

14   "diversion."

15                 Correct?

16           A.    Yes.

17           Q.    Are you familiar with the concept

18   of doctor shopping?

19           A.    Yes.

20           Q.    And DDM's role -- well, explain to

21   me what doctor -- what your understanding of

22   what doctor shopping is.

23           A.    You know, it would be a situation

24   by which a -- a patient is seeking a medication

Highly Confidential - Subject to Further Confidentiality Review

```
 1   from multiple prescribers.

 2          Q.    And either -- and those pills that

 3   were secured from doctor shopping have a high

 4   probability of being used for nonmedical use,

 5   correct?

 6          A.    Likely, yes.

 7          Q.    Yes.  In that they would enter the

 8   stream of commerce through a -- an individual

 9   doctor shopping by selling those pills on the

10   street, correct?

11          A.    Yes.

12          Q.    And DDM's responsibility --

13          A.    I can't speak to what they would

14   do with them on the street.

15          Q.    Sure, but that -- you knew that

16   was a problem.  DDM knew that it was a problem

17   with hydrocodone being sold on the street in the

18   black market by nothing more than drug dealers

19   after securing those pills from pharmacies in

20   the State of Ohio, correct?

21               MR. JOHNSON:  Objection.

22          A.    Can you repeat that.  I apologize.

23          Q.    DDM knew that there was a problem

24   in the State of Ohio with individuals doctor
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    shopping and then securing prescriptions and

2    selling those pills on the street for nonmedical

3    purposes, right?

4              MR. JOHNSON:  Objection.

5         A.    Yes.

6         Q.    And those are drug dealers, right?

7         A.    Sure.

8         Q.    And they -- part of the way pills

9    made it into the black market through drug

10   dealers was securing prescriptions from doctors

11   through a practice we just discussed as doctor

12   shopping, right?

13             MR. JOHNSON:  Objection.

14        A.    Yes.

15        Q.    And those were -- that is one

16   example of many of ways that pills make it into

17   the black market or into the street, correct?

18        A.    That is one way, yes.

19        Q.    And DDM's responsibility as a

20   distributor was to be vigilant in designing a

21   system that would identify suspicious orders and

22   prevent pills like hydrocodone making it into

23   this black market, correct?

24        A.    We would need -- yeah, we
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    certainly are responsible for creating a system

 2    that would prevent medication, controlled

 3    substances, being shipped to our retail

 4    locations that ultimately was not dispensed for

 5    a legitimate medical purpose.

 6            Q.    If you go to the second page of

 7    this -- of Briscoe 7, the reiteration of

 8    responsibilities by the Department of Justice

 9    and the DEA, second paragraph.

10            A.    I'm sorry.  Where are we at,

11    Exhibit 7?

12            Q.    Exhibit 7, second page.

13            A.    Okay.

14            Q.    Second paragraph, the sentence

15    that begins with "Moreover."

16            A.    Okay.

17            Q.    "Moreover, all registrants,

18    manufacturers, distributors" --

19            A.    Where are we?

20                  MR. JOHNSON:  I'm sorry.

21            Q.    Do you see it?

22            A.    Second sentence, second paragraph?

23            Q.    Second sentence, second paragraph.

24                  MR. JOHNSON:  Oh, second sentence.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I'm with you.

 2            Q.    It begins with "Moreover."  It's

 3   on the screen.  Do you see that?

 4                  All right.  "Moreover, all

 5   registrants, manufacturers, distributors,

 6   pharmacies, and practitioners share

 7   responsibility for maintaining appropriate

 8   safeguards against diversion."

 9                  Correct?

10            A.    Yes.

11            Q.    And you see there, this letter

12   from the Department of Justice, that there is a

13   separate entry for distributors and pharmacies,

14   correct?

15            A.    It's not highlighted.  Okay, yeah,

16   I see.  Yes.

17            Q.    They're separate.

18            A.    I'm with you.

19            Q.    One is distributor, one is a

20   pharmacy, right?

21            A.    I was looking at a different

22   sentence.

23            Q.    Right.  So having a set of rules

24   for pharmacists doesn't fulfill DDM's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    responsibilities as a distributor in the State

 2    of Ohio under the Controlled Substances Act,

 3    correct?

 4              MR. JOHNSON:  Objection.

 5         A.    Ensuring that the pharmacies we

 6    ship to have a set of rules that lead to

 7    dispensing medications under the guise of a

 8    legitimate -- legitimate medical reason would be

 9    a reason or an avenue to ensure that we are

10    being vigilant in knowing our customers and

11    knowing who we are shipping to.

12         Q.    But the question I asked you was a

13    little different.  I said, "Having a set of

14    rules for pharmacists doesn't fulfill DDM's

15    responsibility as a distributor under the

16    Controlled Substances Act."

17              Correct?

18         A.    No --

19              MR. JOHNSON:  Objection.

20         A.    -- it does not.

21         Q.    Okay.  Thank you.

22              The next sentence, "Nonetheless,

23    given the extent of prescription drug abuse in

24    the United States, along with the dangerous and
```

```
 1    potentially lethal consequences of such abuse,

 2    even just one distributor that uses its DEA

 3    registration to facilitate diversion can cause

 4    enormous harm."

 5              Correct?  Did I read that right?

 6         A.    You did.

 7         Q.    And, sir, you, as DDM, understood

 8    that in 2006, the DEA believed that controlled

 9    substances were dangerous and could have

10    potentially lethal consequences, correct?

11         A.    Yes.

12         Q.    And you understood in 2006 and the

13    years thereafter that the death rates in Ohio

14    from overdoses continued to climb, correct?

15         A.    Yes.

16              MR. JOHNSON:  Objection.

17         Q.    You understood that it was

18    becoming, as you went through the 2000s, a

19    national epidemic with overdoses and overdose

20    deaths, correct?

21              MR. JOHNSON:  Objection.

22         A.    Yes.

23         Q.    The next paragraph, "The statutory

24    factors DEA must consider in whether to revoke a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributor's registration are set forth in 21

 2    U.S.C. 823(e).  Listed among these factors is

 3    the duty of the distributors to maintain

 4    effective controls against diversion of

 5    controlled substances into other than legitimate

 6    medical, scientific, and industrial channels."

 7              Correct?

 8         A.   Yes.

 9         Q.   It's crystal clear from this 2006

10    letter that the DEA, through the Department of

11    Justice, thought it was extremely important,

12    critical, that distributors fulfill its role to

13    implement a system to identify suspicious

14    orders, correct?

15              MR. JOHNSON:  Objection.

16         A.   Maintain effective controls

17    against diversion of controlled substances, so

18    yes.

19         Q.   It was critical?

20              MR. JOHNSON:  Objection.

21         A.   Their words or my opinion?

22         Q.   A simple question.  It doesn't

23    matter whose words or your opinion.

24              It was critical that DDM design
```

Highly Confidential - Subject to Further Confidentiality Review

1    and implement a system to identify and report

2    suspicious orders?

3           A.    It was their regulation, which we

4    would, you know, take seriously and adhere to,

5    yes.

6           Q.    The DEA reiterates in the

7    paragraph below that, the 1301.74(b), with the

8    reg that we just looked through, reiterating

9    that it's extremely important for DDM to have a

10   system designed to identify suspicious orders,

11   correct?

12                MR. JOHNSON:  Objection.

13          A.    How did you characterize --

14          Q.    Just a reminder, another

15   reiteration from the DEA --

16          A.    Yes.

17          Q.    -- quoting to 1301.74, correct?

18          A.    Reiteration, yes.

19                MR. JOHNSON:  Objection.

20          Q.    Skip a paragraph.  "Thus, in

21   addition to reporting all suspicious orders, a

22   distributor has a statutory responsibility to

23   exercise due diligence to avoid filling

24   suspicious orders that might be diverted into

Highly Confidential - Subject to Further Confidentiality Review

1  other than legitimate, medical, scientific, and

2  industrial channels."

3          Did I read that right?

4      A.   You did.

5      Q.   All right.  Let's stop and focus

6  on that sentence for a minute.

7          So in addition to reporting

8  suspicious orders -- that's reiteration from the

9  DEA Number 1.

10         Do you see that in that sentence?

11     A.   If an order had been deemed

12  suspicious, it's required to report, yes.

13     Q.   A distributor has a statutory

14  responsibility to exercise due diligence to

15  avoid filling that order?

16     A.   It said to avoid filling

17  suspicious orders.

18     Q.   Yes, sir.  DDM filled the orders

19  as they came in, whether it was identified as an

20  anomaly on a subsequent report or not, correct?

21         MR. JOHNSON:  Objection.

22     A.   With the exception of the six-week

23  average report that could have led to an error,

24  that would have prevented that order from ever

1    being processed.

2         Q.    The inventory management system?

3         A.    Yes.

4         Q.    Other than that, can you point me

5    to one order at DDM from 2006 until today that

6    was not filled, despite the fact it appeared as

7    an anomaly on the controlled monitor --

8    monitoring system report that we discussed

9    earlier?

10             MR. JOHNSON:  Objection.

11        A.    My answer is I don't believe that

12   I could; however, I don't know that if there

13   were a situation by which an order was not sent

14   but yet populated in that report as if it was

15   received, that would be one example where --

16   that would -- that would be something I -- I

17   don't know for 100 percent certainty.  But I

18   don't know of any documented examples of what

19   you described.

20        Q.    So DDM would fill orders, populate

21   a report subsequently as an anomaly, and then

22   perform due diligence, correct?

23        A.    We would first do the Tom

24   Nameth/Jason Briscoe review, and then, if it

Highly Confidential - Subject to Further Confidentiality Review

1   warranted due diligence, due diligence would

2   follow, yes.

3          Q.    And that process that you just

4   described does not comply with the DEA's

5   direction in the September 27, 2006

6   correspondence that a distributor has a

7   statutory responsibility to exercise due

8   diligence to avoid filling suspicious orders,

9   correct?

10          MR. JOHNSON:  Objection.

11          A.    While you might describe our

12   process as potentially leading to an order that

13   would have been filled that shouldn't have

14   because it would have been deemed suspicious,

15   we've never had a suspicious order in the time

16   frame that we are looking at.

17          Q.    All right.  Please keep that --

18          A.    7?

19          Q.    -- 7 in front of you.

20          A.    Sure.

21                      - - -

22          (DDM-Briscoe Exhibit 8 marked.)

23                      - - -

24          Q.    And I'm going to hand you

Highly Confidential - Subject to Further Confidentiality Review

1    Briscoe 8, which is reference number 00051.

2            A.    What time do we have?

3            Q.    A half an hour to lunch.

4            A.    Okay.

5            Q.    Hand you Briscoe 8.

6            A.    I have it.

7            Q.    Take a minute, if you would, sir,

8    and compare -- well, let's do this:

9                  Briscoe 8 is U.S. Department of

10   Justice, Drug Enforcement Administration, dated

11   December 27, 2007, correct?

12           A.    It is.

13           Q.    And that's approximately -- what

14   is that? -- 14, 15 months after the letter we

15   just reviewed, Briscoe 7, correct?

16           A.    Yes.

17           Q.    And take a minute, but these two

18   letters appear to be almost identical, correct?

19           A.    Yes.  I'm slightly confused by

20   the --

21                 MR. JOHNSON:  Well, we'll take

22           your representation.  Do you want him to

23           read the whole -- the whole -- the

24           letters?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MOUGEY:  It's a page and a

 2            half.  I don't want anybody to take my

 3            representation.

 4    BY MR. MOUGEY:

 5            Q.    The message in the September 2006

 6    letter and the December 2007 letter, Briscoe 7

 7    and 8, the messaging from the Department of

 8    Justice is -- is very similar, correct?

 9            A.    I'm not -- I'm not familiar with

10    the letter.  I may have read it in the past.  I

11    don't believe that I have, but I certainly

12    wouldn't be able to attest that this letter is

13    similar to the previous one, and I'm slightly

14    confused why the header would include McKesson

15    Corporation.

16            Q.    It's because you all haven't

17    produced this letter, so I used the example from

18    McKesson.

19            A.    Thank you.

20            Q.    It's the same entry -- let's just

21    go ahead and review the letter.  And the letter

22    is being sent to every entity in the U.S.

23    registered with the Drug Enforcement

24    Administration to manufacture or distribute
```

 1   controlled substances.

 2            Do you see that?

 3        A.   Yes, sir.

 4        Q.   Same entry as the previous letter,

 5   correct?  We're sending it to everybody licensed

 6   in the closed system, correct?

 7        A.   Yes.  Sorry.

 8        Q.   And that would be DDM.  That would

 9   include DDM, correct?

10        A.   Yes.  At that time, yes.

11        Q.   Yes.  "The purpose of this letter

12   is to reiterate the responsibility of controlled

13   substance manufacturers and distributors to

14   inform DEA of suspicious orders, in accordance

15   with 21 CFR 1301.74."

16            Correct?

17        A.   Yes.

18        Q.   Very similar message to what came

19   out in September of 2006, correct?

20        A.   That paragraph, yes.  Again,

21   I'm -- I apologize.  I'm not familiar with the

22   guts of the rest of the letter yet.

23        Q.   That's okay.  We're going to keep

24   walking through it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    The second paragraph walks the

 2   recipient through the requirement to report

 3   suspicious orders of controlled substance under

 4   1301.74, correct?

 5           A.    Yes.

 6           Q.    And that paragraph continues,

 7   "Title 121 CFR 1301.74(b) specifically requires

 8   that a registrant design and operate a system to

 9   disclose to the registrant suspicious orders of

10   controlled substances.  The regulation clearly

11   indicates that it is the sole responsibility of

12   the registrant to design and operate such a

13   system."

14                    Correct?

15           A.    Yes.

16           Q.    All right.  The DEA, through the

17   Department of Justice, is reiterating the

18   responsibility of DDM to design and operate a

19   system identified to identify suspicious orders,

20   correct?

21           A.    Yes, sir.

22           Q.    The next paragraph, Once those

23   suspicious orders are identified, the DEA is

24   relaying that they needed to be relayed to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DEA when discovered.

 2              Correct?

 3         A.    Help me with the highlight.  I'm

 4    sorry.

 5         Q.    "The regulation also requires that

 6    the registrant inform the local DEA division

 7    office of suspicious orders when discovered by

 8    the registrant."

 9              Do you see that?

10         A.    Yes.  I was getting spoiled.  I'm

11    sorry.

12         Q.    That's all right.

13              Do you know where the local DEA

14    office is in this -- offices are in the State of

15    Ohio?

16         A.    Off the top of my head, I believe

17    there's one in Cincinnati, Columbus, and

18    Cleveland.

19         Q.    All right.  If you had to report a

20    suspicious order to one of the DEA field

21    offices, would you know how to do it?

22         A.    Yes.

23         Q.    How would you do it?

24         A.    We would provide formal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    notification in a written manner.  I believe

 2    they prefer fax of the suspicious order.

 3          Q.    The paragraph continues, the next

 4    sentence, "Filing a monthly report of completed

 5    transactions, excessive purchase report or high

 6    unit purchases, does not meet the regulatory

 7    requirement to report suspicious orders."

 8              Do you see that?

 9          A.    Yes.

10          Q.    Now, did anyone from DDM when

11    receiving this letter inquire with the DEA what

12    it meant by "excessive purchase report" or "high

13    unit purchases"?

14              MR. JOHNSON:  Objection.

15          A.    I don't know if anybody reached

16    out for clarification associated with excessive

17    purchase report or high unit purchases.

18          Q.    "Registrants are reminded that

19    their responsibility does not end merely with

20    the filing of a suspicious order report.

21    Registrants must conduct an independent analysis

22    of suspicious orders prior to completing a

23    sale."

24              Do you see that?
```

```
 1            A.    Yes.

 2            Q.    But that's not what DDM did,

 3    correct?  DDM would perform the due diligence

 4    after completing the order, correct?

 5                 MR. JOHNSON:  Objection.

 6            A.    If there were a suspicious order,

 7    your statement would be true, but we've not had

 8    any suspicious orders.

 9            Q.    That's right.  We've established

10    that.  In 12 years, DDM has never had one

11    suspicious order that it ever thought was

12    important to report to the DEA, right?  We're on

13    the same page, right?

14            A.    We are.

15            Q.    What I'm asking you is, before

16    even -- any due diligence, that order appearing

17    as an anomaly on one of your reports, you all,

18    DDM, filled or completed that sale, and then

19    determined whether it was suspicious afterwards,

20    correct?

21            A.    And I don't mean to --

22                 MR. JOHNSON:  Objection.

23            A.    -- you know, latch onto the verb

24    you're using, but it wouldn't have been a sale.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It would have just been a distribution to one of

 2    our stores, since they're not our customers and

 3    it's not a transaction by which we are creating

 4    revenue.  It's just distribution.  But --

 5          Q.    Let's use the word "order," okay?

 6          A.    Okay.

 7          Q.    Order, sale, DEA --

 8          A.    Can you repeat -- I got off track.

 9          Q.    That's okay.

10                So DDM is not determining whether

11    an order is -- it's an anomaly, it appears in

12    that report -- whether it's suspicious or not

13    until after it completes the order, correct?

14                MR. JOHNSON:  Objection.

15          A.    The realtime opportunity to

16    identify an order to be an anomaly that

17    potentially would lead to due diligence and

18    identified as an unresolved suspicious order

19    would be based on that -- that inventory

20    management report that every purchase order,

21    regardless of schedule -- when that's created.

22                But the second phase of our system

23    is a retrospective analysis of the previous

24    month's purchases.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Let's go back to that inventory

 2    management report, the six-week average, right,

 3    with -- is it Ms. Strang?  Am I saying that

 4    right?

 5              A.    You got it.

 6              Q.    Okay.  Thanks.

 7                    Ms. Strang, she would call the

 8    pharmacy, right, if she got -- something popped

 9    up on that six-week average report?

10              A.    Whether it's blood pressure or --

11              Q.    Yep.

12              A.    Yep.

13              Q.    I mean, it doesn't matter.  The

14    blood pressure, acne medicine, birth control, it

15    doesn't make any difference what it is, right?

16    She'd call the pharmacy and say, "You've popped

17    up on my six-week average report."

18                    Right?  She was confirming that

19    that order was placed and there was no fat

20    fingers or anything, right?

21              A.    True.

22              Q.    There was no due diligence at that

23    point other than confirming there were no fat

24    finger entries on the keyboard, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. JOHNSON:  Objection.

 2          A.    It depends on how you're defining

 3    "due diligence," but I would think that that

 4    extra set of eyes in both the pharmacy and at

 5    the distribution center would be a layer of

 6    protection.

 7          Q.    If the pharmacist said, "Yes, I

 8    ordered seven bottles of some prescription acne

 9    medication," then it would get -- the order

10    would go through, correct?

11                MR. JOHNSON:  Objection.

12          A.    I can't put myself in Jill's

13    shoes.  Depending upon the store, the

14    medication, the situation, the answer, you know,

15    Jill might have come to us to say, "We need to

16    take a further look."

17          Q.    I'm not asking you to be in Jill's

18    shoes.  I'm asking you from DDM's perspective.

19    If DDM has a six-week average report, contacts

20    the pharmacist and said, "This purchase order

21    has popped up on my six-week average report.

22    Did you, in fact, order seven bottles of this

23    acne medication," and the pharmacist says, "Why,

24    yes, we did," it would get shipped, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  Objection.

 2          A.    Depends, again, on Jill's

 3    interaction at -- with that particular

 4    conversation, but, you know, it --

 5          Q.    Let's call that the fat finger

 6    report.  She's calling to check to make sure

 7    that the entry wasn't incorrect --

 8                    MR. JOHNSON:  Objection.

 9          Q.    -- correct?

10          A.    That's the initiation of her call,

11    yes.

12          Q.    Yes, sir.  That report is simply

13    checking to make sure that the purchase order

14    matches what the pharmacist intended to enter,

15    correct?

16          A.    Yes.

17          Q.    And if DDM calls and certifies and

18    the pharmacy says, "Yes, that's what I intended

19    to order," boom, it was -- it was sent out,

20    correct?

21                    MR. JOHNSON:  Objection.

22          A.    Possibly, yes.

23          Q.    Okay.  Well, when you say

24    "possibly," what other -- what other policies
```

1    and procedures in the six-week average report,

2    as the DDM representative here today, were in

3    place in that specific six-week average report?

4          A.    That's a slightly different

5    question.  I can't speak to policies and

6    procedures that would give her next steps.  But

7    at the same time, I also can't agree that just

8    because the pharmacist said "Yes, I want it,"

9    she would then send it.

10         Q.    Sitting here today, preparing for

11   your 30(b)(6) topics, asking you as the DDM

12   representative to testify to what the policies

13   and procedures were under the SOMS for DDM, are

14   you aware of anything in writing that

15   Ms. Strang, getting the six-week average report,

16   would contact the pharmacy to confirm the

17   purchase order -- is there anything else in

18   writing other than that?

19         A.    I would have to refer to our

20   warehouse manual or our VAWD accreditation

21   policies and procedures to answer accurately.  I

22   don't know that off the top of my head, if there

23   is or there isn't written policy specific to

24   those types of situations.

```
 1            Q.    Well, your testimony this morning

 2    was that there were two kind of umbrella

 3    reports, a six-week average and the controlled

 4    substance monitoring report.

 5            So the six-week average report, in

 6    your preparation for today, you can point me to

 7    absolutely nothing in writing giving criteria,

 8    thresholds, parameters, for when Ms. Strang

 9    confirms the purchase order, pharmacist says

10    yes, whether there's anything else she needs to

11    check for?

12            MR. JOHNSON:  Objection.

13            A.    Again, I'm trying to be, you know,

14    obviously accurate, you know, in my answer to

15    you.  I don't know for certain if we have

16    written policies and procedures, but I know I

17    would know where to look and where they're

18    accessible for me to answer that question.

19            Q.    But in your preparation for today

20    that you've had a couple of months to work on,

21    you have two reports, you don't know if there's

22    anything in writing sitting here right now?

23            MR. JOHNSON:  Objection.  He

24            already identified something in writing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.    Six-week average report,

2    parameters, controls, thresholds, other than

3    confirming the fat finger problem, you can't

4    point to anything else in writing, correct?

5                 MR. JOHNSON:  Objection.

6           A.    As I sit here right now, I can

7    tell you that I've not memorized all of our

8    policies and procedures within our distribution

9    center's operating manual, and so ...

10          Q.    And I'm not asking you, sir, if

11   you've memorized them.  Okay?  What I'm asking

12   is, sitting here today, after having months to

13   prepare for this testimony, which is driven

14   almost exclusively to suspicious order

15   monitoring policies and procedures, out of the

16   two reports, you can't point me to anything, not

17   one single piece of criteria that Ms. Strang

18   employs when contacting the pharmacist to

19   confirm a problem with a fat finger entry,

20   correct?

21          A.    Verbally --

22                MR. JOHNSON:  Objection.

23          A.    Verbally as I speak here -- as I

24   sit here now, I cannot.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  Let's go back to Briscoe 8,

 2   the sentence we were just on "... which

 3   registrants must conduct an independent analysis

 4   of suspicious orders prior to completing a

 5   sale."

 6                MR. JOHNSON:  Is that a question?

 7          Q.    Oh, I'm just making sure -- are

 8   you there?

 9          A.    "Registrants must conduct an

10   independent" --

11          Q.    Yes.

12          A.    Yes.

13          Q.    Explain to me what system DDM had

14   in place to identify suspicious orders before

15   they were shipped.

16                MR. JOHNSON:  Objection; asked and

17          answered.

18                But go ahead.

19          A.    Again, it's the totality of our

20   operation from a distribution standpoint, and

21   knowing who our customers are, and access to the

22   activity that occurs, and checks and balances,

23   and reporting.

24          Q.    Those are all very general
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    30,000-foot.

2               You understand -- you've testified

3    repeatedly that DDM has a responsibility to

4    identify suspicious orders, right?  We've gone

5    through what the systems are.

6               Prior to being shipped, what

7    system does DDM have in place to identify

8    suspicious orders prior to being shipped?

9               MR. JOHNSON:  Objection.

10        A.    Again, I would point to that --

11   the report that we just spent some time.

12        Q.    The fat finger report?

13        A.    The six-week average report.

14             MR. JOHNSON:  Objection.

15        Q.    So other than -- other than

16   confirming whether the purchase order is correct

17   from Ms. Strang to the pharmacist, is there any

18   system in place that DDM has to identify

19   suspicious orders before they were shipped?

20        A.    No.

21        Q.    All right.  Let's turn the page

22   for me.

23             MR. JOHNSON:  Exhibit 8?

24             MR. MOUGEY:  Exhibit 8.  Thank
```

Highly Confidential - Subject to Further Confidentiality Review

1          you.

2                Q.    Now, would you agree with me that

3    both of the reports you just identified, the

4    six-week average and the controlled substance

5    order monitoring report, are both based on rigid

6    formulas?

7                      MR. JOHNSON:  Objection.

8                A.    Would I agree that they're both

9    based on rigid --

10               Q.    Rigid formulas.

11               A.    No.

12               Q.    Both of those reports, in order to

13   populate -- let me do it this way:

14                     The orders that populate those

15   reports are both based on formulas, correct?

16               A.    Yes.

17               Q.    And both of those formulas are

18   rigid, correct?

19               A.    "Rigid" meaning they're not fluid,

20   and they're not dynamic, and they're changing on

21   a regular basis?

22               Q.    Yes.

23               A.    That's correct.

24               Q.    There's no statistical analysis

Highly Confidential - Subject to Further Confidentiality Review

1    that goes into either that -- a report that's

2    identified as an anomaly populating those

3    reports, correct?

4         A.    No.

5         Q.    It's essentially one's a six-week

6    average and one's a 52-week average, right?

7         A.    Yes.

8         Q.    All right.  One's based on bottles

9    and the other is a confirmation of the purchase

10   order, right?

11        A.    With the bottles, that's what --

12   the column that would -- the math is done on,

13   yes.  But, again, there's granularity to all

14   NDCs within that family that would be displayed

15   with detail on that report.

16        Q.    So on the second page of

17   Briscoe 8, the DEA relays in 2007 that

18   "Registrants that rely on rigid formulas to

19   define whether an order is suspicious may be

20   failing to defect suspicious orders."

21             Did I read that right?

22        A.    You did.

23        Q.    "For example, a system that

24   identifies an order as suspicious only if the

Highly Confidential - Subject to Further Confidentiality Review

1    total amount of a controlled substance ordered

2    during one month exceeds the amount ordered by

3    the previous month by a certain percentage or

4    more is insufficient."

5              Do you see that?

6         A.    Yes.

7         Q.    So as of 2007, the DEA is telling

8    registrants like DDM that comparing one month to

9    the next based on a certain percentage is

10   insufficient, correct?

11        A.    Yes.

12        Q.    And DDM continued to use that

13   formula comparing orders to previous months

14   despite the DEA's edict in this letter, correct?

15             MR. JOHNSON:  Objection.

16        A.    They were only components of our

17   SOMS, in that this report we recognized was not

18   precise enough -- I believe my words -- to have

19   it stand on its face.  So, therefore, the

20   strength of our process involved the Tom Nameth

21   and Jason Briscoe review followed by due

22   diligence with the store, if necessary.

23        Q.    But we just went through the fact

24   that neither of the policies that -- none of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   policies that we've walked through identified

 2   orders as suspicious before they were shipped,

 3   correct?

 4               MR. JOHNSON:  Objection.

 5         Q.    That's problem number one, right?

 6               MR. JOHNSON:  Objection.

 7         A.    There weren't any orders that were

 8   suspicious, but in a hypothetical ...

 9         Q.    No, I'm not -- this isn't a

10   hypothetical.  You didn't identify one order in

11   12 years, DDM, that was ever suspicious.  So

12   this isn't a hypothetical.

13               In 12 years that we're talking

14   about, '06, to 2018, DDM used a formula to

15   compare one month's orders to previous orders,

16   correct?

17         A.    We did, yes.

18         Q.    And one of those formulas was

19   simply to confirm purchase orders with the

20   pharmacist, correct?

21               MR. JOHNSON:  Objection.

22         A.    One of the two reports?

23         Q.    Yes, sir.

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Neither of the two reports were

2    designed to halt or cease shipments once that

3    anomaly -- that order was placed on a report,

4    correct?

5                MR. JOHNSON:  Objection.

6          A.    On their face --

7          Q.    Yes.

8          A.    -- by themselves?

9                No.

10         Q.    Once -- even though it would

11    populate a report, the order would still go out

12    the door, correct?

13         A.    Yes.

14         Q.    Even though it would have been

15    identified as an anomaly on that report,

16    correct?

17                MR. JOHNSON:  Objection.

18         A.    Yes.

19         Q.    The DEA relayed that formulas

20    comparing one month to a next are insufficient

21    to identify suspicious orders, correct?

22                MR. JOHNSON:  Objection.

23         A.    Yes.

24         Q.    And that was DDM's system to

Highly Confidential - Subject to Further Confidentiality Review

1  generate -- the only -- only reports it

2  generated were both based on formulas comparing

3  month to month, correct?

4          MR. JOHNSON:  Objection.

5     A.    That is correct; however, that was

6  not the end of the system.  That was only the

7  first portion of our system.

8     Q.    But the only anomalies that were

9  reviewed by Mr. Nameth, DDM, anyone at DDM, were

10  anomalies on those reports, right?

11          MR. JOHNSON:  Objection.

12     A.    The only anomalies that would have

13  been investigated specific to these reports,

14  yes.  If there was another situation that was

15  brought to our attention, I can't speak to

16  whether or not it was investigated, but I'm

17  certain it would have been.

18     Q.    And the sentence here from the DEA

19  says, "For example, a system that identifies

20  orders as suspicious only if the total amount of

21  controlled substance ordered during one month

22  exceeds the amount ordered the previous month by

23  a certain percentage or more is insufficient."

24          That almost perfectly describes

Highly Confidential - Subject to Further Confidentiality Review

1    the DEA -- I'm sorry -- the DDM system of

2    populating reports based on averages from month

3    to month, correct?

4              MR. JOHNSON:  Objection.

5         A.    It doesn't describe our total

6    system.  It describes the first phase of our

7    system accurately.

8         Q.    It describes the first phase of

9    your system to identify anomalies --

10        A.    Not suspicious orders.

11        Q.    -- on reports?

12        A.    Yes.

13        Q.    Yes.  You all didn't consider them

14   suspicious, correct?

15        A.    On those reports, no, not at that

16   point.

17        Q.    So even though an order might have

18   exceeded by 99 percent, you all didn't consider

19   that to be suspicious, correct?

20        A.    Correct.

21        Q.    So suffice it to say, when this

22   letter came out in 2007, DDM never changed its

23   SOM policies to incorporate or identify orders

24   that may be suspicious other than the rigid

Highly Confidential - Subject to Further Confidentiality Review

```
1    formulas, correct?

2              MR. JOHNSON:  Objection.

3         A.    Not to my knowledge.

4         Q.    The second paragraph from the

5    bottom of the page, "Lastly, registrants that

6    routinely report suspicious orders, yet fill

7    these orders without determining that order is

8    not being diverted into other legitimate,

9    medical, scientific, and industrial channels,

10   may be failing to maintain effective controls

11   against diversion."

12             Do you see that?

13        A.    Yes.

14        Q.    And doesn't that sentence tell DDM

15   that if you're filling orders prior to

16   performing due diligence, you may not be

17   maintaining effective controls against

18   diversion?

19             MR. JOHNSON:  Objection.

20        A.    That paragraph I read as if you

21   are a registrant that routinely has reported

22   suspicious orders but did not do anything about,

23   that would be an issue.

24        Q.    So you all took care of that by
```

1   just not reporting any suspicious orders,

2   correct?

3                MR. JOHNSON:  Objection.

4        A.    No.

5        Q.    So you didn't report any

6   suspicious orders --

7        A.    We didn't have any suspicious

8   orders.

9        Q.    Yes, sir.  But you didn't figure

10  out whether -- you didn't do any homework to

11  figure out whether they were suspicious or not

12  until the order had already went out the door?

13               MR. JOHNSON:  Objection.

14       A.    The process that is described by

15  the 12-month average and Tom Nameth/Jason

16  Briscoe followed by due diligence would be

17  retrospective, yes.  But in a way that would

18  certainly curb or curtail or prevent future

19  issues, if there were any, at a particular

20  location or a particular family of medication at

21  a location.

22       Q.    And that's it exactly.  Your

23  system was designed to prevent future problems

24  looking at month-old reports, but there was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    nothing in place to cease or halt a shipment

 2    that was a potential problem or had been flagged

 3    prior to it going out the door, correct?

 4              MR. JOHNSON:  Objection.

 5         A.    The six-week PO report could

 6    certainly lead to that being halted, but that

 7    report didn't speak to "this must be halted."

 8         Q.    And I appreciate you going

 9    routinely back to the six-week report or the fat

10    fingers report, but you can't identify one

11    single instance a suspicious order was not

12    shipped based on that six-week average or the

13    fat finger report, right?

14              MR. JOHNSON:  Objection.

15         A.    Well, I'm not trying to split

16    hairs.  If it were identified in that manner, it

17    would not have been a suspicious order.  It

18    would have been an ordering error, and it never

19    would have been part of an invoice that would

20    have been intended to be shipped.  So we would

21    have cut that off proactively at the pass.

22         Q.    Sure.  An ordering error.  The fat

23    finger report, you would have cut that off at

24    the pass.  Other than someone hitting a 9 rather
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    than a 6 --

2            A.    I don't --

3            Q.    -- it wouldn't have -- that

4    wouldn't have stopped anything, right?

5            A.    That is one --

6            MR. JOHNSON:  Objection.

7            A.    That's one mechanism by which a

8    quantity that would appear to be much greater

9    than the norm could happen.  A fat finger is an

10   example of that happening, or it could be, you

11   know, other -- other examples.

12           Q.    And the only reason we keep going

13   back to this is because you keep referring back

14   to it.  But it's crystal clear that if the

15   pharmacist confirmed, "Yes, I ordered that many

16   bottles of hydrocodone," that there is no

17   written policy or procedure in place --

18           A.    That's not true.

19           Q.    -- for DDM --

20           A.    Excuse me.  Sorry.

21           Q.    -- to follow up on any criteria on

22   that inventory control report?

23           A.    I wouldn't say --

24           MR. JOHNSON:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I wouldn't say that's crystal

 2    clear.

 3            Q.    Well, you certainly can't cite me

 4    to anything, right?

 5            A.    Well, I can't verbally point you

 6    to what the policy or procedure is or if it

 7    exists.

 8            Q.    Verbally, smoke signals, anything

 9    within the months that you've had to prepare

10    yourself for today, you can't tell this jury --

11    you can't ascribe anything on that six-month

12    average, the fat finger report, that would

13    prevent or identify suspicious orders after

14    confirming with the pharmacist, correct?

15            MR. JOHNSON:  Objection.  He's

16            pointed you to a document.

17            A.    Yeah.  Today I can't regurgitate

18    if there is a policy and what that policy is.

19            MR. MOUGEY:  If you want to object

20            to the form, Tim, object to the form.

21            But I really don't want to hear your --

22            your answer from the witness, okay?

23            MR. JOHNSON:  Well, we're going

24            over old ground.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MOUGEY:  No.  I --

 2   BY MR. MOUGEY:

 3        Q.    You've repeated it -- you can't

 4   tell me in that document -- the inventory,

 5   whatever it is, you can't -- after months of

 6   preparation, you can't cite to me or this jury

 7   anything in that -- that manual that gives

 8   Ms. Strang criteria, thresholds, parameters on

 9   that six-week average report, correct?

10                    MR. JOHNSON:  Objection.

11        A.    What I can't speak to --

12        Q.    Just yes or no, sir.  Can you

13   point me to any written policy --

14        A.    On that report?

15        Q.    -- or procedure on the six-week

16   average -- just give me a simple yes or no.

17                    Can you point me to any policies,

18   any procedures, any criteria on that six-week

19   average report or the fat finger report that

20   Ms. Strang would follow when confirming with the

21   pharmacist?

22                    MR. JOHNSON:  Objection.

23        Q.    Yes or no?

24        A.    I can't point you for right now,
```

Highly Confidential - Subject to Further Confidentiality Review

1    but what I don't know and what I don't have

2    memorized is if there are mechanisms outside of

3    this six-week report that could be inclusive of

4    this six-week report as the source by which

5    somebody at the pharmacy warehouse would take

6    action when they see a large quantity come

7    across on a purchase order.

8            Q.    So the answer to my question is

9    "No, I can't point you to any policies, any

10   procedures, anything in writing that Ms. Strang

11   would use on that six-week average report when

12   confirming a purchase order with the pharmacy"?

13           The answer is --

14           MR. JOHNSON:  Objection.

15           Q.    -- "No, I can't point you to

16   anything."

17           Right?

18           A.    My answer is I don't have our

19   policies and procedures memorized.  If I did and

20   if it were there, I would point you right there.

21   But I don't know if we have them and what they

22   are -- how they are written.

23           Q.    So it's a simple answer.  The

24   answer is, "No, I can't point you to anything

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specific or generally about policies,

 2    procedures, thresholds, ceilings, anything that

 3    Ms. Strang could use when calling the pharmacist

 4    to confirm a purchase order"?  You can't point

 5    me to anything --

 6          A.    As we sit here --

 7                MR. JOHNSON:  Objection.

 8          A.    -- right now, the answer is no.

 9          Q.    Thank you.

10                MR. MOUGEY:  Good time for a

11          break.

12                THE VIDEOGRAPHER:  Going off the

13          record, the time is 11:58.

14                      - - -

15          Thereupon, at 11:58 a.m. a lunch

16          recess was taken until 1:01 p.m.

17                      - - -

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        Thursday Afternoon Session

                          December 6, 2018

 2                             1:01 p.m.

 3                              - - -

 4            THE VIDEOGRAPHER:  Back on record

 5       at 1:01 p.m.

 6  BY MR. MOUGEY:

 7            Q.    Mr. Briscoe, I'd like to go back

 8  to -- I forget if you were referring to it as

 9  Phase 2 or Tier 2, you and Mr. Nameth, DDM

10  performing due diligence on orders that were

11  identified as anomalies shipped, and then you

12  all would perform the due diligence.

13            Do I have that sequence right?

14            MR. JOHNSON:  Objection.

15       A.    Can you repeat?

16            Q.    Order comes in.  It's shipped,

17  placed on an order as an anomaly, and then DDM

18  performs due diligence, correct?  Do I have that

19  sequence right?

20            MR. JOHNSON:  Objection.

21       A.    The first phase would be the, you

22  know, review of the report, review of the

23  anomaly, we would characterize due diligence.

24  If that evaluation by Mr. Nameth or myself would
```

Highly Confidential - Subject to Further Confidentiality Review

1   resolve it in a way that we wouldn't need to do

2   the due diligence at store level, then the next

3   level would be due diligence, and that would be

4   communication in that form back to the store.

5          Q.    So you're taking issue with the

6   language "due diligence"?  You said that the

7   review of the report, review of the anomaly.

8   You don't call that due diligence?  That's fine.

9   I just am trying --

10         A.    No.  Formally due diligence would

11  be the third layer, which would be those

12  situations that got -- you know, that Tom or

13  myself identified that deserved communication

14  back to the store, with the store communicating

15  back to us.  So that's why I'm making that -- I

16  don't have a problem with your words.  I'm just

17  making sure that we're distinguishing the

18  different layers of the SOMS.

19         Q.    Let's take the people out of it,

20  then.  Let's say that order comes in, okay?

21  It's shipped.

22                Are we still on the same page?

23         A.    Assuming that there wasn't

24  anything along the way that would have prevented

Highly Confidential - Subject to Further Confidentiality Review

```
1    it from being shipped, such as the six-week

2    average report, yes.

3           Q.    So let's do it that way.  So order

4    comes in.  It passes the scrutiny of the fat

5    fingers report, right?

6           A.    The six-week average report.

7           Q.    Then it's shipped, okay?  So --

8    and then it's shipped after the six-week average

9    or fat fingers report, right?

10          A.    Yes.  Yes, sir.

11          Q.    All right.  So after that, if it

12   meets one of the thresholds we discussed

13   previously and is identified as an anomaly, it

14   goes on the SOMS report, correct?

15          A.    Yes.

16          Q.    And the first review of that is

17   you or Mr. Nameth reviewing that anomaly report,

18   right?

19          A.    Yes.

20                MR. JOHNSON:  Objection.

21                MR. MOUGEY:  What's the basis for

22          the objection?

23                MR. JOHNSON:  You're saying the

24          first review of it.  I mean, as I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              understand his testimony, there's a

2              number of different components to the

3              whole SOMS thing.  The six-week report,

4              Jill's intervention, then the --

5                   MR. MOUGEY:  Okay.  So your basis

6              is that I'm mischaracterizing the

7              evidence?  I didn't want a recitation.

8              Just did I miss --

9                   MR. JOHNSON:  Oh, I'm sorry.  Yes.

10             We skipped the Jill part.

11   BY MR. MOUGEY:

12             Q.   Did Jill at any point in time,

13   Ms. Strang, ever bring to you an order that she

14   wanted you or Mr. Nameth to review as a

15   potential issue for diversion?

16             A.   I don't recall her bringing one to

17   me.

18             Q.   Okay.  Did you see any evidence in

19   your preparation today that Ms. Strang had ever

20   brought an order to you -- I'm sorry -- to

21   Mr. Nameth with his help as -- to review for

22   potential diversion?

23             A.   No.

24             Q.   So the order comes in.  It doesn't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    trigger the six-week average or the fat finger

 2    order, okay?  And -- but it does trigger the

 3    52-week average threshold, okay?

 4              Do I have the sequence right?

 5         A.   Yes.

 6         Q.   All right.  The order is still

 7    shipped, correct?

 8         A.   Yes.

 9         Q.   Now, you and/or Mr. Nameth receive

10    the anomaly report once a month?

11         A.   Yes.

12         Q.   And that is what you were

13    referring to as the -- was it Phase 2 or Tier 2?

14         A.   Generally speaking or, you know,

15    in common terms, yes, Phase 2.

16         Q.   Okay.  Phase 2.

17              I'd like to have you explain to

18    the jury in the Phase 2, after the order has

19    already gone out the door, what is DDM's policy

20    in writing about what should be done with those

21    orders on the anomaly report?

22         A.   As I mentioned earlier, I believe

23    the written policy speaks to review by pharmacy

24    operations.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So just you and/or

 2     Mr. Nameth taking a look at the report?

 3              A.    Yes.

 4              Q.    All right.  So --

 5              A.    And, you know, taking further

 6     steps once we've taken a look at the report.

 7              Q.    So once you've taken a look at the

 8     report, what are you -- what are you looking

 9     for?

10              A.    First off, is it a medication that

11     might be new to our distribution facility.

12              Q.    Okay.

13              A.    So if this was something we were

14     obtaining -- a family that we were obtaining

15     from another supplier, such as a wholesaler, and

16     now we are purchasing it from our own

17     distribution center, that would be an example of

18     something presenting as an anomaly that can be

19     legitimately explained, because we're no longer

20     procuring that medication from the wholesaler

21     and now procuring it from our distribution

22     center.

23              Q.    All right.  What --

24              A.    Another --
```

 1          Q.    Go ahead.  No, go ahead.  I'm

 2    sorry.

 3          A.    Another example would be an

 4    ordering pattern which can be explained by the

 5    dispensing pattern of a medication at a store.

 6          Q.    Can you explain that a little more

 7    when you --

 8          A.    Sure.  So if we're looking

 9    retrospectively over the last 12 months -- and

10    I'll use the same example as earlier -- is that

11    if the ordering pattern of that store for that

12    family had been two bottles, zero bottles, two

13    bottles, zero bottles and plays out over

14    12 months, the subsequent month, if we were to

15    place -- and let me pause there.  That would

16    equate to a 12-month average of one bottle.

17                And let's take it a step further

18    on what I would do.  Let's say that bottle was

19    the 500-count the entire step of the way.  So,

20    therefore, there was an average of 500 units

21    shipped to that store per month for the last

22    12 months.  If that pattern continues six out of

23    those 12 months, it would pop as an anomaly

24    because two bottles or 1 000 units is greater

Highly Confidential - Subject to Further Confidentiality Review

```
 1    than 99 percent than one bottle or 500 tablets.

 2             And if I were then to go at that

 3    store specific to that family to look for a

 4    legitimate dispensing history, I would see that

 5    the pattern of how we're dispensing dictated the

 6    pattern by which they're ordering and were

 7    shipping.  Therefore, that would not go on to

 8    the next level of due diligence, asking the

 9    store, "Please explain why you ordered two

10    bottles instead of one."

11         Q.   Let me see if I can simplify what

12    your explanation is.  Maybe my head is just a

13    little smaller than yours.

14             You have 12 months, okay?  Six

15    months you order, your example, 1,000.  The

16    order comes in for 1,000.  Six months it comes

17    in for zero.  That averages 500.

18         A.   Yes, sir.

19         Q.   Is my math right?

20         A.   Yep.

21         Q.   Okay.  Thirteenth month, an order

22    comes in for 1,000.  That's more than 99 percent

23    and would be --

24         A.   An anomaly is what we've
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   characterized it.

2          Q.    So you'd look at that and think,

3   "Well, every other month they're ordering

4   1,000" --

5          A.    I wouldn't think.  I would go --

6   go into the store's dispensing history to see

7   what reality is and then determine if it

8   requires the next level of due diligence

9   involving the store's feedback.

10              Didn't mean to interrupt you.

11         Q.    No, that's okay.

12              So same example.  Month 13, the

13  next year -- second year, let's just call it --

14  the average is now 1,000, okay?  1,000, 1,000,

15  1,000, 1,000, every month.  So your order in

16  year 1 was 500.  Your order in year 2 was 1,000.

17  Those are averages.

18         A.    Over the 12-month period?

19         Q.    That's right.

20         A.    Okay.

21         Q.    Okay?  So your average has now

22  doubled.  So just take this to its logical

23  conclusion.  Thirteenth month, you see, yeah,

24  one month zero, one month 1,000.  You contact
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the pharmacy -- pharmacist.  You look at their

 2    legitimate -- what you've described as

 3    legitimate dispensing and you think, "Yes, it's

 4    500, but one month it's 1,000, one month zero.

 5    That's why it's on the report."

 6                  Am I capturing that right?

 7          A.   Yes.  I don't think we could get

 8    to your example on that 13th month without

 9    having other situations along the way that would

10    have led to an anomaly populating.  So if we're

11    going from an average of 500 in this 12-month

12    period to an average of 1,000 in the next

13    12-month period, there would have been some

14    anomalies that would have headed towards that

15    1,000.

16          Q.   Because you would have seen it

17    along the way --

18          A.   Yes.

19          Q.   -- and that would have triggered

20    the 99 percent.

21                  So now, second year, same fact

22    pattern to keep it simple, okay?  Now 1,000 a

23    month.  It's double what it was in year 1.

24    Okay?  The first month of year 3 comes in, and
```

```
 1    it's 2,000.  Do you look back at the dispensing

 2    history and, although the average was 1,000, one

 3    month was two, one month was zero, one month was

 4    two, one month was zero, same fact pattern as

 5    year 1, excepting for now it's two and zero and

 6    the average is one, rather than one and zero and

 7    the average is 500.  It's now doubled.

 8            A.    Yep.

 9            Q.    Okay?  What do you do then?

10            A.    So not every -- not every example

11    am I looking solely on ordering patterns or

12    dispensing patterns.  There would be other areas

13    that we would be looking into.

14            Q.    Like what?

15            A.    Potentially a pharmacy down the

16    street closed, a new prescriber's office in the

17    area.  You know, local knowledge in that we're

18    intimately connected to all of our stores, we

19    have an understanding on -- on what could lead

20    to -- lead to the legitimate increase of

21    dispensing medications under legitimate medical

22    purposes.

23            Q.    Okay.  Is there any others?  I've

24    got new prescriber, pharmacy down the street,
```

Highly Confidential - Subject to Further Confidentiality Review

1   family from another supplier, ordering pattern

2   explained by dispensing pattern.

3          A.    New patients.

4          Q.    New patients?

5          A.    Yep.  So let's say it's a

6   relatively -- well, it could be any store and,

7   you know, we're increasing our business not

8   specific to opioids or controlled substances.

9   But generally speaking, more people are coming

10  into our doors to take advantage of the care we

11  provide as pharmacists.  So a natural

12  progression in prescriptions dispensed of any

13  type would also explain a natural progression in

14  what had been shipped to the store.

15         Q.    All right.  So we have just added

16  new patients.  Anything else?

17         A.    I mean, transferred prescriptions

18  would -- would constitute new patients.  If

19  there were a recall of a medication --

20         Q.    Mm-hmm.

21         A.    -- and now all of a sudden

22  everything that was on the shelf had to be sent

23  for destruction and we have to replenish the

24  level that we were at, but did so in a way that

Highly Confidential - Subject to Further Confidentiality Review

```
1    was one purchase order versus several purchase

2    orders for several months to get back to that

3    level, that would be an indication of a

4    legitimate reason why that store ordered a

5    family greater than the 12-month average.

6              Q.    All right.  So Phase 2, looking

7    for or identifying issues that would explain the

8    anomaly.  Am I saying that correct?

9              A.    Yeah.

10             Q.    Okay.  Anything from new

11   prescribers to new patients, a pharmacy closed

12   down the street, just transferred over from

13   another supplier.  Anything else you can think

14   of that you're looking for on the -- to answer

15   questions on the anomaly?

16             A.    If there was a known loss or theft

17   and that medication is no longer in stock and we

18   have to replenish it, that would be another

19   example of --

20             Q.    Okay.

21             A.    -- replenishing it beyond what

22   would be typical.

23             Q.    Anything else you can think of?

24             A.    New product comes to market and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   there isn't a past order history.

 2          Q.     Mm-hmm.

 3          A.     I might have mentioned that

 4   already.

 5          Q.     Anything else you could think of

 6   sitting here today?

 7          A.     Not at this time.

 8          Q.     All right.  All of those that you

 9   just walked me through were looking for reasons

10   to explain the reason for the anomaly, correct?

11          A.     Can you restate that.

12          Q.     Everything you just -- every one

13   of those bullets you've just walked me through

14   in the last ten minutes are looking for reasons

15   to explain the anomaly?

16          A.     It could give us comfort in

17   knowing that that medication deserved to be

18   shipped.

19          Q.     Exactly.  And, retrospectively,

20   looking to approve or explain away the order

21   that popped on the anomaly so it wouldn't be

22   suspicious, right?

23          A.     So it wouldn't then head to due

24   diligence with that form we've discussed
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   earlier.

 2           Q.    Yes, sir.

 3                 So when do you contact the

 4   pharmacy?  At what point in time?  When in this

 5   process of Phase 2 do you contact the pharmacy?

 6           A.    In Phase 2?  Okay.

 7           Q.    Whatever phase you got --

 8           A.    Yep.

 9           Q.    -- just tell me when you contact

10   the pharmacy as we --

11           A.    If there were information I could

12   not glean from the dispensing system with me

13   having access --

14           Q.    Mm-hmm.

15           A.    -- to the prescription history and

16   the scenarios I've just described, if there were

17   other factors that I wasn't readily aware of,

18   such as a pharmacy down the street had closed or

19   a new prescriber's office just moved into the

20   area --

21           Q.    Mm-hmm.

22           A.    -- that type of local knowledge,

23   if I didn't have that and still wasn't satisfied

24   based on what I was looking at from ordering
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    patterns, et cetera, I would -- I would then

 2    call the pharmacy.

 3              But if your question is related to

 4    when do I send the pharmacy what we call a due

 5    diligence report --

 6         Q.    Right.

 7         A.    -- like, it's if everything that

 8    we just walked through, I still want more

 9    information that I can't find or don't have --

10         Q.    Mm-hmm.

11         A.    -- that's whenever we send a form

12    to them to say, "Here's what happened.  We need

13    information from you as to why that happened."

14         Q.    Right.  You send that form to the

15    pharmacy, and you call that the due diligence

16    report?

17         A.    Yes.

18         Q.    And you ask the chief pharmacist

19    to fill it out?

20         A.    Yes.

21         Q.    And that's when you can't explain

22    the anomaly based on the factors you just gave

23    me, right?

24         A.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And the chief pharmacist or

2       the staff pharmacist fills that out?

3              A.    Chief pharmacist, I believe, is --

4       if they're available, is who was on the form, I

5       believe.

6              Q.    Is there -- I'm sorry.

7              A.    Go ahead.

8              Q.    Is there a time limit on when they

9       can get that back to you?

10             A.    I believe the verbiage is ASAP.

11             Q.    Okay.  And do you have a -- and

12      what's that mean?  That means different things

13      to different people.

14             A.    That means if we don't hear back

15      from them, you know, that day or the next day,

16      we'll be following up with a phone call.

17             Q.    A couple days.

18                   And there's a form -- is that form

19      stored anywhere at DDM?

20             A.    Yes.

21             Q.    Where is it stored?

22             A.    It's stored electronically in a

23      folder -- I think C -- controlled inventory -- I

24      can't remember the name of the folder, but it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   electronically stored that we have access to in

 2   a --

 3           Q.    So you mentioned early in the

 4   deposition that you had worked at gathering

 5   answers and responses for this litigation,

 6   right?

 7           A.    Yes.

 8           Q.    And I'm assuming you went to where

 9   these were stored and directed your counsel that

10   here's where they are and all of them were

11   produced, right?

12           A.    Yes.

13           Q.    And those were kept in the

14   ordinary course of business and digitally, so if

15   you wanted to look back at them, you could?

16           A.    Yes.

17           Q.    And how were they organized?

18           A.    By store, by date, labeled with

19   item included.

20           Q.    Okay.  So in the course of this

21   litigation, is it safe for me to conclude that I

22   have those due diligence reports from the

23   pharmacies as you or Mr. Nameth sent them to the

24   pharmacies and received them back.  They would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have been produced to us?

 2            A.     Yeah.  From 2006 to 2014 in --

 3            Q.     Yes.

 4            A.     -- Summit and Cuyahoga County

 5    related to opioid products.

 6            Q.     Do you have just a recollection

 7    sitting here generally of how many reports there

 8    were?

 9            A.     I believe there were 11.

10            Q.     Okay.  So do you have a general

11    understanding of how many dosage units DDM has

12    put into commerce in the State of Ohio from, you

13    know, the last ten years or so?

14            A.     You mentioned a number earlier.

15            Q.     I mentioned 72 million.

16            A.     Mm-hmm.

17            Q.     And I've pulled that number from

18    ARCOS, hydrocodone.  And you understand what

19    ARCOS is, right?

20            A.     Yeah.  And that would be all

21    stores?

22            Q.     That would be all the stores

23    within the Ohio network of DDM.

24            A.     Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    All right.  So about 11 times, DDM

2  couldn't answer the question of the anomaly on

3  the report and they went to the pharmacist?

4        A.    Yes.

5        Q.    All right.  And I'm going to hand

6  you what I'm going to mark as Briscoe 9.

7              - - -

8      (DDM-Briscoe Exhibit 9 marked.)

9              - - -

10       Q.    So Briscoe 9, at the top of the

11  page, Confidential.  Attention: Chief

12  Pharmacist.

13         Is this an example of one of the

14  due diligence reports you were referencing?

15       A.    It is.

16       Q.    So the first paragraph says, "The

17  Drug Enforcement Agency, U.S. Department of

18  Justice, has requested that Discount Drug Mart

19  pharmacy operations maintain records of

20  controlled substances purchases that exceed an

21  average of purchases calculated from the

22  previous 12 months or that deviate substantially

23  from normal average per month."

24         Correct?  Did I read that right?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. JOHNSON:  Correct, you read it

2       right?

3              MR. MOUGEY:  Yeah.

4       A.    Yes.

5       Q.    Now, is that an accurate statement

6  that the DEA has requested that DDM use a

7  formula from the previous 12 months?

8       A.    I can't speak to whether that

9  request came from the DEA to somebody else.  My

10 gut says that was meant to provide some urgency

11 to those that would be receiving it and that our

12 intent was to make sure that they understand the

13 importance of what we're sending them.

14      Q.    So quite frankly, the formula,

15 based on the previous 12 months, runs counter to

16 the direction from the DEA that we just reviewed

17 in the 2006 and 2007 correspondence, right?

18             MR. JOHNSON:  Objection.

19      A.    Well, I would argue that the fact

20 that we're looking at a rolling 12 months gives

21 us a more accurate and actionable view if there

22 is, indeed, an anomaly based on the last

23 12 months, rather than looking in the document

24 that you had provided month versus month versus
```

Highly Confidential - Subject to Further Confidentiality Review

1    month.  I think there's probably more false

2    positives or more false negatives associated

3    with only looking at from one month to the next.

4    I don't think you're going to be as accurate as

5    what we're -- we were doing with a 12-month

6    rolling view.

7         Q.    Now, the document that you're

8    referencing that I handed you isn't a Peter

9    Mougey document.  That's from the DEA, right?

10        A.    Yeah.

11        Q.    And the DEA has relayed to its

12   registrants that it not use a formula, correct?

13   So when you say -- you said, "I would argue,"

14   you're not arguing with me; you're arguing that

15   the DEA don't use a formula was wrong?  Right?

16             MR. JOHNSON:  Objection.

17        A.    No.  I think we've explained

18   that -- and I can't recall the paragraph that we

19   spoke about earlier, but we certainly don't lean

20   on the report alone to trigger due diligence.

21   That's why there's Phase 2 with Mr. Nameth and

22   myself being involved.

23        Q.    Why don't you grab back in front

24   of you Briscoe 8.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Sure.  I have it.

 2              Q.    The second page of Briscoe 8 says,

 3     "Registrants that rely on rigid formulas to

 4     define whether an order is suspicious may be

 5     failing to detect suspicious orders."

 6                    So let's just start here.  Let's

 7     compare Briscoe 8 and Briscoe 9.  Briscoe 9

 8     relays that the DEA has asked us to maintain

 9     records of controlled substance purchases that

10     exceed an averages of purchases calculated from

11     the previous 12 months, right?

12                    Is that a formula, previous 12

13     months, that you're using?

14              A.    Yes.

15              Q.    Is it a rigid formula?

16              A.    I think we agreed --

17                    MR. JOHNSON:  Objection.

18              A.    -- we agreed that it was, but it

19     was also not the only phase of our SOMS.

20              Q.    All right.  But all I'm asking you

21     right now is about the formula that populates --

22              A.    I understand.

23              Q.    -- the anomalies, right?  I

24     understand.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     Okay.  So where I'm a little
 2    confused is you said, "Well, where I would argue
 3    with you is that our formula provides more than
 4    a month to month to month."
 5                     There's nowhere in any guidance
 6    from the DEA that you can point me to that the
 7    DEA has asked DDM to run an average of purchases
 8    calculated from the previous 12 months, correct?
 9                     MR. JOHNSON:  I'm going to object,
10          but --
11          A.    Again, to my knowledge, yeah.
12          Q.    All right.  In fact, the DEA has
13    told DDM that a system that identifies orders is
14    suspicious only if the total amount of
15    controlled substance ordered one month exceeds
16    the amount ordered the previous month by a
17    certain percentage is insufficient.
18                     Do you see that?
19          A.    Is that 8 or 7?
20                     MR. JOHNSON:  That's 8, second
21          page, first paragraph.
22          Q.    Same paragraph we were just on.
23    8, second page, second paragraph.
24                     DEA says that the total amount of
```

1    a controlled substance ordered during one month

2    exceeds the amount ordered the previous month by

3    a certain percentage or more is insufficient,

4    correct?

5          A.    Yep.  Yep.  And I think whenever

6    we were speaking of this earlier, I agreed with

7    you that that sounds an awful like -- a lot like

8    our system.  And, in actuality, the first phase

9    of our system, which triggers the anomalies to

10   populate on a report, is not this exactly,

11   because this speaks to looking only one month

12   back, whereas we look a rolling 12 months back.

13         Q.    Now, did that come to you over

14   lunch, when you were having lunch with your

15   counsel and the corporate representative?

16         A.    I was just replaying conversations

17   in my head.

18         Q.    Mm-hmm.

19               So the system that DDM had, you

20   feel, is using the rigid formula of an average

21   of 12 months and that 13-month or whatever time

22   during that period would exceed by 99 percent,

23   you believe that that was a system designed to

24   report suspicious orders, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. JOHNSON:  Objection.

 2           A.    That was Phase 1 of our SOMS, yes,

 3    sir.

 4           Q.    So now we have Phase 2, and you're

 5    trying to explain the reason for the anomaly and

 6    you can't.  So in 11 instances from 2006 to

 7    2018, the chief pharmacist was sent a due

 8    diligence report, correct?

 9           A.    Yes.

10           Q.    All right.  And the chief

11    pharmacist is asked to fill out the reason why

12    there on the bottom, correct?

13           A.    Yes.

14           Q.    And DDM fills out the top portion,

15    and in this example, Briscoe 9, an April 2008

16    report indicates an increase in purchases is

17    hydro -- is that Bit?

18           A.    It's Hydrocodone

19    Bitartrate/Acetaminophen 10/325 would be what --

20           Q.    Yes.

21           A.    -- that abbreviation stands for.

22           Q.    And the next series of numbers is

23    the NDC code?

24           A.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Your average monthly purchases of

2    this item are 3.0 bottles.  This month

3    11 bottles were ordered, correct?

4      A.    Yes.

5      Q.    And it goes on and says, "Please

6    verify this quantity and provide appropriate

7    explanation as to the necessity of the increase.

8    Thank you for immediate response to this

9    request.  Please complete requested information

10   below and return to pharmacy operations ASAP."

11          Do you see that?

12     A.    I do.

13     Q.    And the explanation for the order

14   increase was had two or three prescriptions for

15   larger amounts than usual -- I can't read that

16   next word.

17     A.    Directions -- or excuse me.

18   "Quantities were verified with physicians."

19     Q.    All right.  So I'm assuming, since

20   DDM never found an order suspicious, never

21   reported anything to the DEA, that that

22   explanation was sufficient.

23     A.    Yes.

24     Q.    So when quantities were verified

Highly Confidential - Subject to Further Confidentiality Review

```
1    with physicians, as long as the pharmacist said,

2    "Called and spoke with the physicians," then

3    everything was okay?

4           A.    Yeah.  So if the prescriptions

5    were filled without the double-check of

6    following up with a physician to confirm the

7    quantity, that potentially could have led to a

8    resolution to this.  But, again, this was one

9    Tom had worked on.  The fact that the pharmacist

10   took the time to double-check that this

11   prescription for a larger-than-usual quantity

12   had been prescribed, that pharmacist felt it

13   necessary to call.  And when they spoke to the

14   physician, he was satisfied that, "Yes, I'm

15   going to go forward in dispensing this

16   medication."

17          Q.    Now, I have not seen any reports

18   from DDM the entire time where -- well, strike

19   that.  I'm going to do something different.

20                We talked about doctor shopping

21   earlier, right?  And one of the problems with

22   pills making their way into the illicit or

23   illegal drug trade was through doctor shopping,

24   right?  You agree with me?
```

```
 1                    MR. JOHNSON:  May I interrupt?

 2                    Well, I'll object, but is that a

 3           defined term someplace, just for my

 4           information?

 5                    MR. MOUGEY:  Which part?

 6                    MR. JOHNSON:  Doctor shopping, or

 7           is that just vernacular?

 8     BY MR. MOUGEY:

 9           Q.    Do you know what I mean by "doctor

10     shopping"?  I asked you earlier.  I think you

11     gave us an explanation, right?

12                    MR. JOHNSON:  He gave you his

13           definition.

14           Q.    You're familiar when I say "doctor

15     shopping" that -- you gave me an explanation

16     before, correct?

17           A.    Yes.

18           Q.    All right.  So you understand that

19     doctor shopping was one of the ways that pills

20     made their way into the black market or illegal

21     drug trade, right?

22           A.    Yes.

23           Q.    And DDM, through its databases,

24     could identify the highest -- the physicians
```

Highly Confidential - Subject to Further Confidentiality Review

1    with the highest percentage of Schedule II and

2    Schedule III prescriptions, correct?

3              MR. JOHNSON:  Objection.

4        A.    Could we?

5        Q.    Yes.

6        A.    We could.

7        Q.    Pretty easy, right?

8        A.    I wouldn't say it's easy.

9        Q.    You just run a query in the

10   database and run it by -- sort it by prescriber

11   and then sort by Schedule II and Schedule III,

12   right?

13             A.    A little more complicated than

14   that based on the way our pharmacy management

15   system works, but I understand what you're

16   saying.

17             Q.    All right.  But this is a company

18   that's -- DDM does about 400 million in sales

19   per year, right?

20        A.    I don't believe that's accurate.

21             MR. JOHNSON:  Objection.

22        Q.    You had 400 million in revenue?

23        A.    Are you speaking specific to the

24   pharmacy?

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    I'm talking to the whole

2    operation.

3              A.    I think that number is greater

4    than that.

5              Q.    Do you have an understanding

6    that -- that DDM hired a lobbyist or an

7    individual to help meet with regulators in D.C.?

8                    MR. JOHNSON:  Objection.

9              A.    No.

10             Q.    Do you have any understanding that

11   DDM has ever hired anyone to handle its affairs

12   with any governmental issues out of D.C.?

13             A.    A lobbyist?

14             Q.    And I rephrased it and took out

15   the word "lobbyist."  I said hired anyone to

16   deal with any governmental body -- bodies in

17   D.C.

18                   MR. JOHNSON:  Objection.

19             A.    We have a gentleman on staff that

20   his title is related to legal and regulatory

21   affairs.

22             Q.    Yes, sir.  And he interacts

23   regularly with governmental entities, correct?

24             A.    Regularly, I'm not -- not sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    He reports back to DDM on what

 2   his -- what his -- the results of his -- fruits

 3   of his labor, the results of his meetings?  Are

 4   you familiar --

 5              A.    Sure.

 6              Q.    Okay.  And that's part of his job

 7   description, right?

 8              A.    Yes.  To my knowledge, yes.

 9              Q.    So DDM could query their

10   databases, has the capability to do that, to

11   identify higher risk prescribers, correct?

12              A.    Would we have the ability?  Yes.

13              Q.    Yes.  I have not seen one report

14   generated by DDM identifying physicians that

15   have high percentages of their prescriptions

16   coming from Schedule II and Schedule III

17   opiates.  Can you point me anywhere that DDM was

18   running reports similar?

19              A.    Specific to the distribution

20   center?

21              Q.    Specific to physicians that were

22   writing disproportionately high percentages of

23   Schedule II and Schedule III prescriptions.

24              MR. JOHNSON:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I would say that reports

 2    definitely have been run.  I wouldn't say that

 3    they would be done on a systematic basis from

 4    the corporate level or from the distribution

 5    center.  But associated with our controlled

 6    substance quality assurance program, whenever

 7    there's a resolution of red flags when it comes

 8    time to dispense medication, you know, that

 9    would be part of the red flag identification

10    work to resolve it and -- and documentation.

11              So they would be looking at -- if

12    they were suspicious of a particular prescriber,

13    they would have access at store level to run

14    those types of --

15         Q.    Mr. Briscoe, we're sitting here

16    talking about suspicious order monitoring

17    policies, are we not?

18         A.    Yeah.

19         Q.    We're talking about DDM's

20    responsibility under CFR 1301.74; are we not?

21         A.    We are.

22         Q.    We're talking about all of the

23    different policies and procedures in place,

24    correct, sir?  There's not any question about
```

Highly Confidential - Subject to Further Confidentiality Review

1    what we're talking about, correct?

2                    MR. JOHNSON:  Objection.

3            A.    Yeah.

4            Q.    Is there any -- is there any

5    policy or procedure that DDM was running to

6    identify high risk prescribers in response to

7    any of the orders that were identified as

8    anomalies?

9                    MR. JOHNSON:  Objection.

10           A.    There are not reports we've run on

11   a regular basis as part of the Phase 1 that --

12   if -- if that's what we're referring to,

13   identification of anomalies.

14           Q.    But what I asked you, sir, was, is

15   there any policy -- I need you to answer so we

16   can, despite the snow, get out of here.  Okay?

17                    Is there any policy or procedure

18   that DDM was running to identify high risk

19   prescribers in response to any of the orders

20   that were identified as anomalies?

21                    MR. JOHNSON:  Objection.

22           A.    It's not part of the Phase 1 of

23   our SOMS, but I -- reports can and have been run

24   based on specific circumstances that would have

Highly Confidential – Subject to Further Confidentiality Review

1    us taking a deeper look.

2         Q.    We've gotten through the "can they

3    be run."  I understand.  You told me, "We can

4    run it through a query."  I get that.

5         A.    Okay.

6         Q.    Okay?  But what I asked was, is

7    there any policy or procedure that necessitates

8    that DDM use a report to identify high risk

9    prescribers through a high percentage of

10   Schedule II and Schedule III in response to any

11   of the anomalies?

12              MR. JOHNSON:  Objection.

13        A.    Can I ask you a question to

14   clarify?  Is that ahead of a prescription being

15   presented at a store where one of our

16   pharmacists would be evaluating the legitimacy

17   of that prescription, of which would be making

18   sure the prescriber not only is prescribing

19   something legitimate, but they're legitimate

20   themselves?

21        Q.    I'm talking about DDM's

22   responsibilities as a distributor.

23        A.    Part of our responsibility as a

24   distributor is to know our customers.  And I

Highly Confidential - Subject to Further Confidentiality Review

```
 1   could tell you the totality of our efforts in

 2   knowing our customers --

 3          Q.    I don't want to hear the totality

 4   of your efforts.  I'm asking a very, very

 5   specific question.  I've asked it three times.

 6          A.    I'm not trying to dance around it.

 7          Q.    Can you point to --

 8                MR. JOHNSON:  He's answered it

 9          three times, too.

10                MR. MOUGEY:  I'm sorry, but I

11          don't feel like it, and I don't feel

12          like I'm getting a straight answer.

13   BY MR. MOUGEY:

14          Q.    Is there any policies or

15   procedures that require a look or review of the

16   high risk prescribers dispensing a

17   disproportionate high percentage of Schedule II

18   or III in response to an order being placed on

19   one of the reports as an anomaly?

20                MR. JOHNSON:  Objection.

21          A.    The very specific way you've

22   phrased that, the answer is no.

23          Q.    Can you point me to any -- any

24   report, anything that you've run and DDM has
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    kept, where it's analyzing high risk prescribers

2    through a disproportionately high percentage of

3    prescriptions of Schedule II and Schedule III

4    opiates?

5              MR. JOHNSON:  Objection.

6         A.    Specific to the distribution

7    center, no.  Resolution of red flags on a

8    prescription-by-prescription basis, I think we

9    would -- we would find.

10        Q.    We've already gone over that.

11   We've already discussed DDM's responsibilities

12   as a pharmacy and DDM's responsibility as a

13   distributor.  All right?  So now I understand

14   that -- that maybe you want to point me to DDM

15   as a pharmacy, but I'm asking you as a -- DDM as

16   a distributor.

17             Do you understand we're here --

18        A.    I'm with you.

19        Q.    Okay.

20             MR. JOHNSON:  These questions are

21         strictly about distributors.

22        Q.    You understand that we're here

23   today talking about DDM as a distributor and the

24   access to information it has, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes.

2            Q.    And it has access to information

3    also in its role as a dispenser, correct?

4            A.    Yes.

5            Q.    But in its role as a distributor,

6    can you point me to any reports that it's

7    running to identify high risk prescribers

8    through a disproportionate prescriptions of

9    Schedule II and Schedule III opioids?

10                MR. JOHNSON:  Objection.

11           A.    No.

12                      - - -

13           (DDM-Briscoe Exhibit 10 marked.)

14                      - - -

15           Q.    I'm going to hand you what I've

16    marked as Exhibit 10.  I'm going to hand you a

17    series of these.

18                Is this another example of the due

19    diligence report?

20           A.    It is.

21           Q.    And the average monthly purchase

22    of this item went from 2.8 to 8.6, right?

23           A.    I believe, looking at this,

24    there -- this report contains two medications,
```

1    and their respective increase would be from 0.9

2    to 8 and 2.8 to 6.

3           Q.    I want you to turn to that -- I

4    can't read the bottom.  Can you?

5           A.    I can't.

6           Q.    Okay.  Second page, which appears

7    to be a computer printout.  Explain to me what

8    this is.

9           A.    So for the respective NDCs that

10   were identified on the top half of the report,

11   this is the dispensing history by that NDC from

12   April 1, 2012 through May 25, 2012.

13          Q.    So --

14          A.    Go ahead.

15          Q.    -- just looking for a reason to

16   explain the reason why it popped as an anomaly?

17          A.    Looking for -- step one would be

18   making sure that there were prescriptions that

19   were dispensed totaling the quantities that we

20   have shipped, meaning if there were fewer

21   tablets on their shelf plus what's been

22   dispensed, and that's less than what had been

23   shipped, that's an opportunity or an example of

24   potential diversion, meaning where did those

Highly Confidential - Subject to Further Confidentiality Review

```
 1    tablets go.

 2              So first step it appears Tom took

 3    was to ensure that the math made sense on the

 4    total dispensing compared to what that store had

 5    on hand before the shipment and what they would

 6    have had on hand after that larger-than-average

 7    shipment.

 8         Q.   And, again, the question I simply

 9    asked was, looking for a reason to explain why

10    it popped as an anomaly, correct?

11         A.   Yes.

12         Q.   Yes.

13                    - - -

14         (DDM-Briscoe Exhibit 11 marked.)

15                    - - -

16         Q.   Exhibit 11, Briscoe 11, another

17    example of a due diligence report dated

18    9/18/2012, correct?

19         A.   Yes.

20         Q.   And, again, second page, a copy of

21    the dispensing history, looking for a reason to

22    explain the reason why the anomaly popped,

23    correct?

24         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     - - -

 2            (DDM-Briscoe Exhibit 12 marked.)

 3                     - - -

 4        Q.    Briscoe 12, another example of a

 5   due diligence report with an example of hydro,

 6   October 13, three bottles to 16 bottles,

 7   correct?

 8        A.    Yes.

 9        Q.    A 530 percent increase, correct?

10   Five times --

11        A.    I'm trusting your math.

12        Q.    Five times, right?  Five times --

13   5 times 3 is 15, right?

14        A.    Plus one.

15        Q.    Plus one.  One is one-third of

16   three, approximately 530.  533 percent increase

17   in one month?

18        A.    Without getting a calculator out,

19   yes, I will --

20        Q.    Turning to page 2, a printout of

21   the dispensing history, correct?

22        A.    Yes.

23        Q.    And, again, looking for a reason

24   to explain why it popped as an anomaly, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2                      - - -

 3          (DDM-Briscoe Exhibit 13 marked.)

 4                      - - -

 5          Q.    Briscoe 13, another example of a

 6   due diligence report dated 11/11/13, correct?

 7          A.    Yes.

 8          Q.    Zero bottles to 22, correct?

 9          A.    Yes.

10          Q.    And the explanation is below the

11   dispensing history, correct?

12          A.    Yes.

13          Q.    And the chief pharmacist

14   referenced the -- the dispensing history and

15   amount of inventory on our shelf, correct?

16          A.    Yes.

17          Q.    And, again, that order wasn't

18   identified as suspicious either, correct?

19          A.    I think he also pointed to --

20   there was a -- a situation with the auto

21   reordering system over-ordering and that they

22   accounted for all of the quantity that had been

23   ordered.

24          Q.    Why wouldn't the six-month average
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have picked that up, the fat finger report that

 2    came in when the inventory was already there?

 3                  MR. MOUGEY:  Objection.

 4         A.    I don't know.

 5                      - - -

 6         (DDM-Briscoe Exhibit 14 marked.)

 7                      - - -

 8         Q.    Briscoe 14, one of the 11 due

 9    diligence reports over a period of 12 years,

10    another hydro issue, correct?

11         A.    Yes, sir.

12         Q.    Two bottles was the average and

13    ten bottles that month, correct?

14         A.    Yes.

15         Q.    Now, how can you tell how many

16    dosage units two bottles to ten bottles went to

17    from looking at this?

18         A.    The NDC, which isn't on this

19    example, would -- would get you there.

20         Q.    The NDC code in the middle of the

21    page is -- is blank, correct?

22         A.    It's down below on the bottom

23    half, but, yes, it was blank on the top.

24         Q.    So this is 2008.  This is during
```

```
 1    your tenure, correct?

 2          A.    No.

 3          Q.    Who's tenure was this?

 4          A.    Tom Nameth.

 5          Q.    Oh, I'm sorry.  Yes.  Mr. Nameth's

 6    time period.

 7                The NDC code is blank.  So for the

 8    top half of this when he sent it out, it's

 9    impossible to discern how many dosage units

10    we're talking about, correct?

11                MR. JOHNSON:  Objection.

12          A.    No.  It could have been a -- I'm

13    not excusing it, but it's simply a clerical

14    error where he left that field blank, but he

15    well could have known or should have known or

16    did know how many units we were talking about.

17          Q.    Now, this report is not organized

18    by NDC code, right?

19          A.    "This"?

20          Q.    I'm sorry.  The 52-week average

21    report is not organized by NDC code, correct?

22          A.    It's not grouped by NDC --

23          Q.    Okay.

24          A.    -- it's grouped by family.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    But every NDC that would have been

 2      shipped in that month would have been exposed.

 3           Q.    So I'm having trouble connecting

 4      the dots on that.  If it's by family, which

 5      would mean hydrocodone based on different

 6      strengths essentially?

 7           A.    No -- no, sir.  When I speak of

 8      family, what I mean is in this example,

 9      hydrocodone with acetaminophen

10      7.5 milligrams/500 milligrams.

11           Q.    Okay.

12           A.    There isn't just one manufacturer

13      of that product available in the marketplace.

14           Q.    Okay.

15           A.    So if there are multiple

16      manufacturers of that same generic family, which

17      means same drug, same strength, same dosage

18      form, we have interest in and need to have

19      visibility to all activity, not just based on an

20      NDC, but that entire family, because that's

21      relevant information in knowing that you might

22      be getting this NDC which is equivalent to the

23      other NDC, and if we don't have visibility to

24      both on that report, that creates opportunities
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for, you know, missing the anomalies.

 2            Q.    So this is an example of a report

 3    where the average over the 52 weeks goes up by

 4    500 percent, and this explanation from the

 5    pharmacist met with your or DDM's approval,

 6    correct?

 7            A.    Yes.

 8            Q.    So, as a matter of fact not -- you

 9    can't point me to one time ever at DDM from 2006

10    to now that one of these due diligence reports

11    from the chief pharmacist were ever denied or

12    deemed suspicious?

13            A.    Correct.

14            Q.    So is it safe to assume that there

15    is no policy or procedure after receiving back

16    these due diligence reports about what further

17    inquiry was necessary?

18                 MR. JOHNSON:  Objection.

19            A.    No, but we would trigger an

20    investigation with pharmacy operations and loss

21    prevention, and if, upon that investigation we

22    found there to be issues, we would then

23    communicate with the local State Board of

24    Pharmacy, the DEA.  If law enforcement was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    necessary, we would speak to them as well.
 2           Q.    Can you point me to any time or
 3    any order that triggered an investigation with
 4    pharmacy operations and loss prevention where
 5    you communicated with the local State Board of
 6    Pharmacy, the DEA and/or law enforcement?
 7           A.    No, sir.
 8           Q.    Never?  Not once?
 9           A.    No.
10           Q.    Is that policy or procedure that
11    you just mentioned, wherein the due diligence
12    report would return from the chief pharmacist
13    and there was still a problem, is there anywhere
14    that that policy or procedure is written down?
15           A.    As a continuation of the SOMS, I
16    don't believe so.  But anytime that the
17    potential for diversion is detected, yes, we
18    have a written procedure that would speak to an
19    open investigation at that point to open an
20    investigation.
21           Q.    All right.  So where is that
22    written procedure that would speak to an open
23    investigation?  Where is that?
24           A.    To opening an investigation?
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Mm-hmm.

2          A.     From a -- at store level, it would

3    be part of our CSQA.  At the warehouse, it would

4    be in our warehouse manual policies and

5    procedures.

6          Q.     Are you talking about like DEA

7    Form 106s?

8          A.     That would be if -- if an

9    investigation following --

10         Q.     A theft?

11         A.     -- a situation led to a known loss

12   or -- a theft or known loss, then, yes, we would

13   head down the path of contacting the State Board

14   of Pharmacy, law enforcement, if necessary.  We

15   would notify the DEA with the facts and then be

16   sure to follow up with a 106.

17         Q.     Sure.  And that all sounds great,

18   and I appreciate that explanation about the 106

19   form, DEA Form 106s that covers thefts, right?

20   Correct?

21         A.     Yeah.

22         Q.     All right.  So what I'm driving at

23   is, in -- in DDM's responsibility as a

24   distributor with a system designed to identify

1    and report suspicious orders, after you receive

2    that, quote/unquote, due diligence report back,

3    is there anything in writing giving pharmacy

4    operations guidance on what further inquiries

5    should be made?

6                  MR. JOHNSON:  Objection.

7         A.    Can you repeat the first part.

8         Q.    Sure.

9         A.    Lead me into it again.

10        Q.    DDM's responsibility as a

11   distributor with a system designed to identify

12   and report suspicious orders, once you get that,

13   quote/unquote, due diligence report back, is

14   there anything in writing giving pharmacy

15   operations guidance on what further inquiries

16   should be made?

17        A.    Well, again, not specific to the

18   extension of the SOMS leading to the due

19   diligence, but if there's any evidence of

20   diversion, we would trigger what I described.

21   And I believe those policies are found in the

22   two places that I had mentioned, if not

23   additional places.

24        Q.    But sitting here today, you can't

Highly Confidential - Subject to Further Confidentiality Review

1   point me to anything specific about criteria,

2   thresholds, parameters, ceilings, anything

3   relating to that due diligence report as it's

4   coming back?

5          A.    Well, I --

6                MR. JOHNSON:  Objection.

7          A.    -- I thought we were speaking of

8   diversion, and I don't know that we would treat

9   the reporting of diversion any differently based

10  on the level of diversion we thought it to be.

11  If we identified it as potentially diversion, it

12  would -- it would be reported.

13         Q.    I don't think I asked you anything

14  about the magnitude of it.  Let me do it again,

15  okay?

16                Can you point me to anything

17  specific -- criteria, thresholds, parameters,

18  ceilings, anything -- that gives DDM and its

19  pharmacy operations direction as to what to do

20  when that due diligence report comes back?

21                MR. JOHNSON:  Objection.

22         A.    It all depends on what we learn

23  when the due diligence report comes back if --

24  if we continue to go forward.  And

Highly Confidential - Subject to Further Confidentiality Review

```
 1   unfortunately, we don't have -- or fortunately,

 2   we don't have examples to point to.

 3              But if we learned that an order

 4   was, indeed, suspicious and what made it

 5   suspicious is we believed that there was some

 6   type of diversion that took place, we would

 7   trigger the steps I just described.

 8         Q.   But as of right now, you've

 9   defined absolutely nothing to me criteria-wise,

10   looking at any of these anomalies, going to the

11   chief pharmacist, other than criteria trying to

12   explain the reason for the anomaly?

13              MR. JOHNSON:  Objection.

14         A.   I guess the point I'm trying to

15   make -- and maybe I'm not doing a good job -- is

16   if we determined that one pill was stolen by a

17   pharmacy technician, that wouldn't necessarily

18   be tied to a threshold, et cetera, meaning if we

19   identified that to be diversion because we -- we

20   deemed it to be or learned that it was as part

21   of the investigation, then we would -- we would

22   report.

23         Q.   Okay.  Is the 52-week average

24   rolling or based on what period of time?  What
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   52 weeks?

 2          A.    Rolling.

 3          Q.    Rolling.  So do you see any issues

 4   with using averages?

 5          A.    Certainly.

 6          Q.    Do you see any problems using

 7   averages in a formula when spotting potential

 8   suspicious orders?

 9          A.    Yes, and -- but --

10          Q.    What happens with averages over

11   long periods of time?

12          A.    What I'm saying is --

13          MR. JOHNSON:  He had more to say,

14   I think.

15          A.    And I think they used -- they used

16   the word "rigid."  And, again, that -- that's

17   why that report doesn't stand alone.  That's why

18   that report only produces anomalies to be

19   reviewed by Tom, because we recognize that that

20   report is not enough.  But that doesn't make our

21   SOMS, in our view, any less effective.  It's

22   just part of the process.

23          Q.    That wasn't what I asked.  Could

24   you just focus on what I asked you, okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    What I asked you was, do you see

 2      any issues or problems -- and if the answer to

 3      my question is yes, I do see issues or problems

 4      with using 52-week averages, then please just

 5      say yes, okay, because what you just answered me

 6      was, "Well, I had a whole -- this broad system

 7      with Mr. Nameth."

 8                    So I get that you want to focus on

 9      Mr. Nameth, but what I'm asking you is, is the

10      formula -- using a 52-week average, do you see

11      potential problems with that as a system

12      designed to spot suspicious orders?

13                    MR. JOHNSON:  Objection.

14           A.    If that system is in a vacuum

15      standing on its own with no other phases to it,

16      yes.

17           Q.    So that system in and of itself is

18      what's designed to spot anomalies warranting

19      further review, correct?

20           A.    That is a report, not a system,

21      yes, that identifies --

22           Q.    That is a system in its entirety,

23      Mr. Briscoe, to identify orders that were

24      anomalies warranting DDM's further review,
```

1    correct?

2                    MR. JOHNSON:  Objection.  And,

3            really, Peter, you don't need to raise

4            your voice, sir.  You're here to ask

5            questions respectably, and he's

6            answering your questions respectably, I

7            believe, so ...

8            Q.    Please just answer my question.

9    Okay?  I'm not -- my -- I'm sorry, but I don't

10   believe you are answering my questions.  You're

11   answering questions which you -- which you're

12   attempting to see where I'm going three -- three

13   issues down the cycle.

14                   I'm simply asking, the entire

15   system designed to identify suspicious orders --

16   just let me finish.

17           A.    Sure.

18           Q.    The entire system designed to

19   identify anomalies warranting DDM's review was

20   the formula, correct, sir?

21           A.    In addition --

22                   MR. JOHNSON:  Objection.

23           A.    In addition to the six-week

24   average.  But, yes, the last way that you

Highly Confidential - Subject to Further Confidentiality Review

```
 1   described it, anomalies was right.  The last --

 2         Q.    Which are both formulas, are they

 3   not, sir?  Six-week, 52-week, they're both

 4   averages, right?

 5         A.    Yeah.

 6         Q.    Look, you have your Ph.D., right?

 7   I mean, you're -- you have a doctorate degree,

 8   correct?

 9               MR. JOHNSON:  Wait.  Wait.  No.

10         Hold on.

11         Q.    You have a doctorate degree,

12   correct, sir?

13               MR. JOHNSON:  Let's not get down

14         to that level.

15         Q.    But you know what "averages"

16   means, correct?

17               THE COURT REPORTER:  Wait a

18         second.  One at a time.

19         Q.    You know what an average means,

20   right?

21         A.    Where I was not answering your

22   question, sir, was when you spoke to that being

23   our system to identify suspicious orders, and

24   all I wanted to make sure you were saying was
```

Highly Confidential - Subject to Further Confidentiality Review

1   that is the system to identify anomalies.  And

2   you did it the last time, and that's why I

3   answered yes.

4        Q.   No, you didn't answer yes.  You

5   answered yes and then you wanted to talk about

6   the six weeks.  So let's do it your way.

7             The six-week average report and

8   the 52-week reports were the entirety of the

9   system designed to identify anomalies for

10  further DDM review, correct?

11       A.   Yes, sir.

12       Q.   And the entirety of DDM's system

13  to identify anomalies was based on averages,

14  correct, sir?

15       A.   Yes.

16       Q.   And, sir, you understand that

17  there are problems associated with using

18  averages to identify anomalies, do you not, sir?

19            MR. JOHNSON:  Objection.

20       A.   I would identify that if problems

21  is one way to characterize it or there's more

22  work that needs to be done in the review process

23  because that report only focuses on averages.

24       Q.   You would agree with me, sir, that

1   using averages as a system designed to identify

2   anomalies warranting further review from DDM was

3   not precise enough?

4              MR. JOHNSON:  Objection.

5        A.    I would answer that it could be

6   more precise.

7              Q.    Thank you.

8                    And part of the reason why those

9   formulas in both the six-week average and the

10  52-week average were not precise enough was the

11  use of averages with no further identifying

12  factors, correct, sir?

13             MR. JOHNSON:  Objection.

14        A.    Could you please reask that.

15             Q.    Sir, when you use averages --

16  let's go back to the example we were going

17  through before.

18                   Averages over 12 months, the

19  average 500, zero, 500, zero -- I'm sorry.

20  Let's go back to the same example.  1,000 zero,

21  1,000, zero, 1,000, zero.  Average is 500,

22  right?  Correct?

23        A.    Mm-hmm.

24             Q.    Okay.  The second year, if the

Highly Confidential - Subject to Further Confidentiality Review

1    average is 500, 1,000, 500, 1,000, 500, 1,000,

2    that wouldn't spot -- that wouldn't trigger on

3    the anomaly in that second year, right?

4            A.    It would along the way, because,

5    again, you're every month looking 12 months

6    backwards.  So as you continue to ramp,

7    depending upon the rhythm of that order, the 500

8    would not, the 1,000 would until you get to the

9    average -- you know, until the quantity shipped

10   is less than 99 percent than the average.

11           So there wouldn't be a gap of

12   12 months before all of a sudden it appeared as

13   an anomaly that we have double from one year to

14   the next.  There would be triggers along the way

15   in getting to that second doubling in your

16   example of the average.

17           Q.    1,000, zero for the first year

18   with a 500 average, okay?

19           A.    Mm-hmm.

20           Q.    Second year, the order comes in --

21   or 13th month, the order comes in at 900, 13th

22   month.  Would it trigger?

23           A.    No.

24           Q.    Yet the increase in the average

Highly Confidential - Subject to Further Confidentiality Review

```
1    would be approximately -- what is that?

2          A.    Four times.

3          Q.    400 percent, four times, right?

4    No, I mean -- I'm sorry.  It would be -- the

5    average would be 500 and the 13th month would be

6    900, correct?

7          A.    That would be less than a

8    99 percent increase.

9          Q.    That's right.  It would be less

10   than 99 percent.

11               So the 13th month, 14th month,

12   15th month, 16th month, all the way through the

13   second year, that line of orders could continue

14   at 900 and they would never pop on your anomaly

15   list, correct?

16         A.    In your example, yes.

17         Q.    The beginning of the third year,

18   okay -- so the previous 52 weeks we're all now

19   an average of 900.  The beginning of the third

20   year, the order -- first month, third year, the

21   order could go up to 1,700 a month.  Would it

22   trigger?

23         A.    There would have been orders along

24   the way leading to the increase of the average
```

1    that certainly would have triggered, yes.

2          Q.    We just did 900, 900, 900, 900.

3    That would not have popped in the previous -- in

4    the second 24 months, right?  If you want to do

5    the math again, we can, okay?

6          A.    That's correct.

7          Q.    All right.  So every month the

8    second year, 900, 900, 900.  It had gone up

9    from -- average from 500 to 900 and that would

10   never pop on your report, correct?  You'd never

11   look at it?

12         A.    On the report, no.

13         Q.    In the beginning of the third

14   year, the order could go up to -- to 1,700,

15   okay?  Less than 99 percent, correct?

16         A.    Mm-hmm.

17         Q.    It would never trigger on the

18   anomaly, correct?

19         A.    Yes.  I mean correct.

20         Q.    So now, the end of the 12th month,

21   month 1 to 12, the average is 500, right?

22   Correct?

23         A.    Mm-hmm.

24         Q.    Second year, it's consistently 900

Highly Confidential - Subject to Further Confidentiality Review

1    a month.  It would never appear on the anomaly

2    list, right?  Correct?

3            A.    I'm tracking with you, yes.

4            Q.    Third year, it would go all the

5    way up to 1,700.  That would not pop on the

6    anomaly list, correct?

7            A.    Correct.

8            Q.    So from month 12 to the first

9    month of the third year, it could go from an

10   average of 5- to 1,700, and there would be no

11   pop on your anomaly list warranting any further

12   review, correct?

13           A.    Correct.  And I might add that

14   that would mean there would be 36 months of the

15   same quantity being ordered in that rhythm.  So

16   it's possible, but the way most situations -- I

17   don't know that that scenario would be likely to

18   play out, but --

19           Q.    And you consider the same rhythm

20   to be month 12, 500-pill average, and month 25

21   to be 340 percent higher in the same rhythm?

22   That's your definition -- that's DDM's

23   definition of same rhythm, correct?  A

24   340 percent increase in 13 months would be in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the same rhythm?

 2               MR. JOHNSON:  Objection.

 3         A.    The way I was tracking it is, you

 4    were indicating that there could be a long

 5    period of time by which you continue to increase

 6    your quantities received that are just below the

 7    threshold of our report.  But what I was stating

 8    is that that would be quite the coincidence that

 9    a store ordered just under that level for 36

10    consecutive months not triggering any type of

11    anomaly along the way.  But that was your

12    example.

13         Q.    Let's get back to my question.

14               And you consider the same rhythm

15    to be month 12, 500 dosage units.  Month 25

16    would be 1,700, a 340 percent increase in the

17    same rhythm, and none of that would pop on your

18    anomaly report, correct?

19         A.    No.  If 500 was the average all

20    along the way and then 17- became that -- that

21    month's order, then that certainly would have

22    popped.

23         Q.    Here's a piece of paper.

24         A.    I have some.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Write down month 1 through 12, 500

 2    average.  12-month --

 3              A.    Mm-hmm.

 4              Q.    -- 500 average, okay?

 5              Go ahead.  Let's write it down

 6    because we've done it three times.

 7              Month 12, 500.  You got it?  I'll

 8    do it for you if you don't want to do it.  Month

 9    12, 500, okay?  Month 13 all the way to month

10    24 -- it's the second year -- every one of those

11    months are 900.  That would not pop on the

12    anomaly report for you to perform any further

13    inquiry, correct?

14              A.    That's true.  I agree to that.

15              Q.    Month 25, the beginning of the

16    third year, it goes -- the order goes to 1,700.

17              A.    Mm-hmm.

18              Q.    That would not pop on your anomaly

19    report, correct?

20              A.    Yes.

21              Q.    The 52 weeks prior are 900.

22    That's a year, correct?

23              A.    Yes.

24              Q.    In order for it to trigger, it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would need to be 99 percent higher than the

 2    previous 52 weeks of 900, correct?  That would

 3    be -- that's about 1,800.

 4            A.    Correct.

 5                  MR. JOHNSON:  You already went

 6            through this and he agreed with you.

 7            Are you changing something?

 8            Q.    Fifty-two weeks are all 900.  The

 9    beginning of the third year, the dosage units go

10    to 1,700.

11            A.    Mm-hmm.

12            Q.    That 1,700 does not pop on the

13    anomaly report, correct?  It's not 99 percent

14    higher than the previous 52 weeks --

15            A.    Now that the 12 -- now that the

16    average --

17            Q.    That's right.

18            A.    -- is 900 --

19            Q.    That's right.

20            A.    Yeah.

21            Q.    The previous 52 weeks, correct?

22                  So from month 12 to month 25,

23    13 months, the dosage units go from 500 to

24    1,700, an increase of 340 percent, and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    system designed by DDM to spot suspicious orders

 2    would never identify that pattern, correct, sir?

 3            A.    Not that pattern.

 4            Q.    Yes, sir.

 5                  MR. MOUGEY:  Let's take a break.

 6                  THE VIDEOGRAPHER:  Going off the

 7            record.  The time is 2:12.

 8                  (Recess taken.)

 9                  THE VIDEOGRAPHER:  Back on record

10            at 2:31 p.m.

11    BY MR. MOUGEY:

12            Q.    I asked you earlier your -- DDM's

13    understanding of ARCOS.  You understand that DDM

14    reports its distribution of controlled

15    substances to the DEA and that goes into a

16    database commonly referred to as ARCOS, correct?

17            A.    Yes.

18            Q.    And that that ARCOS data tracks

19    each delivery from DDM as a distributor to its

20    own pharmacies, correct?

21            A.    Yes.

22            Q.    And that same data is available to

23    DDM, obviously, and its database is from its

24    dispensing side as well, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    The same data?

2          Q.    Yes.

3          A.    Yes.

4          Q.    So if you wanted to perform

5    analysis going back over a period of time -- DDM

6    did -- on the trends in distribution of

7    Schedule III hydrocodone, it could, correct?

8          A.    Yes.

9          Q.    And do you understand in the

10   course of this litigation that DDM has produced

11   its transactional data going back to the early

12   2000s with hydrocodone?

13         A.    Yes.

14         Q.    And have you had an opportunity to

15   review the transactional data and the data that

16   went to the DEA into ARCOS in preparation for

17   today's testimony?

18         A.    I did not.

19                       - - -

20         (DDM-Briscoe Exhibit 15 marked.)

21                       - - -

22         Q.    I have two charts prepared for

23   you.  I'm going to mark them as Composite

24   Exhibit 15, which is a combination of the ARCOS
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    data with the DDM transactional data, okay?

 2              So let's start at the top

 3    left-hand corner of this page.

 4              MR. MOUGEY:  And, Corey, it is

 5         DDM 0501.  You might not have it.  We

 6         just got the data in.  If not, that's

 7         okay.

 8    BY MR. MOUGEY:

 9         Q.   Upper left-hand corner, you see

10    Discount Drug Mart, correct?

11         A.   Yes.

12         Q.   And 6476 York Road, you recognize

13    that as a pharmacy -- DDM pharmacy in Parma

14    Heights, Ohio, correct?

15         A.   Yes.

16         Q.   And that's here in Cleveland,

17    Parma Heights, correct?

18         A.   Suburb of Cleveland.

19         Q.   It's in the Cleveland area.  How

20    does that sound?

21         A.   Sure.

22         Q.   And the store also has a DEA

23    number which is what's referenced in the title,

24    BD2308155.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    I don't have that memorized,

2    but ...

3            Q.    Okay.  And this is a chart with

4    month-to-month distribution of hydrocodone

5    shipments starting in January of '99 and ending

6    at the end of 2014, okay?

7                  What, if anything, do you know

8    about the transactional data that DDM keeps?

9    And I'm kind of focusing on '99 to 2002.

10           A.    Can you clarify?

11           Q.    Yeah.  I mean, how accurate is the

12   transactional data that DDM has evidencing

13   distributions to its own pharmacies dating back

14   to January 1999 to the beginning of 2002?

15           A.    And are you speaking of what we

16   turned over in discovery or to what we -- we

17   transmit to ARCOS on a regular basis?

18           Q.    Both.  So I don't have -- I have

19   ARCOS from January 2006 to the end of '14.

20   Okay?  So all of the data to the left of

21   January 2006 on this graph is from DDM, okay?

22   So -- the transactional data.

23                 So do you know that the -- are you

24   familiar with DDM's transactional data from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    January '99 to January of '06 --

 2           A.    No.

 3           Q.    -- and how it's stored or kept?

 4           A.    No.

 5           Q.    Okay.  So I'm going to -- just for

 6    the benefit of the doubt here, I want to start

 7    on January of '02.  Do you see where I drew the

 8    line there, January of '02?

 9           A.    Yes.

10           Q.    And you and I just went through

11    kind of some of the issues associated with using

12    averages over a rolling 52-week period that was

13    part of the system designed to identify --

14           A.    Anomalies.

15           Q.    -- anomalies in DDM's ordering

16    from its pharmacies, correct?

17           A.    Yes.

18           Q.    Now, I'm assuming you're like the

19    rest of us, and at some point in your life, if

20    not still, you had a mortgage on your house and

21    you're paying interest on your mortgage, right?

22    You get that, right, and how interest works from

23    the bank; they're usually compounding as opposed

24    to simple?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Does that make sense?
 2          A.    Yes.
 3          Q.    And you understand the difference
 4   between compounding interest and simple
 5   interest?  Yes?
 6          A.    Yes.
 7          Q.    Okay.  And simple interest is
 8   taking just 100,000 and adding 5 percent
 9   annually, which would be 5,000 and it would be
10   105,000, right, and that's just -- that's
11   straight interest.
12                    Does that make sense?
13          A.    (Witness nodding.)
14          Q.    Whereas compounding at 5 percent
15   every month -- or really every day -- whatever
16   the daily proportion of 5 percent would be added
17   to the balance and it kind of compounds and that
18   builds or adds faster, compounding interest than
19   simple interest, correct?
20          A.    Mm-hmm.
21          Q.    So the example that we just went
22   through before that from month 12 to month 25,
23   orders could increase at 340 percent without
24   being placed on the anomaly list, you recognize
```

Highly Confidential - Subject to Further Confidentiality Review

1    that that was kind of simple math versus kind of

2    a compounding math on a monthly basis, right?

3            A.    Your question is recognition of

4    compound versus simple?

5            Q.    Yeah, in the --

6            A.    Yes.

7            Q.    -- in the example we gave, that

8    340 percent increase from month 12 to month 25

9    was using simple -- which would decrease the --

10   which would reduce the 340 percent that it --

11   I'm sorry, bad question -- that using simple

12   averages as opposed to kind of monthly

13   compounding would reduce the impact over time of

14   what orders would escape the rolling 52-week

15   average, right?

16                MR. JOHNSON:  Objection.

17           Q.    Is that question awkward?

18           A.    In the hypothetical example you

19   provided and as you just described it, that is

20   true.

21           Q.    Okay.  So the example we have in

22   front of you is a real world example of a -- one

23   of DDM's pharmacies out of the 60 or 70, and if

24   you look back in the early 2002, 2003 range, you

```
 1   can see that the average hydrocodone dosage

 2   units -- excuse me -- per month are somewhere in

 3   the 3- to 5,000 range, 3- to 6,000 range; is

 4   that fair?

 5           A.    What period of time, sir?

 6           Q.    Early '02 to '03.

 7           A.    Yes.

 8           Q.    Okay.  And, again, that's just

 9   rough.  I'm not asking you to calculate the

10   lines there.  But somewhere in the 3-, 4-, 5,000

11   range average per month, maybe 6,000, right?

12           A.    Yes.

13           Q.    All right.  And if you go then to

14   the 2004 to 2005 to 2006 to 2007, you can see

15   that the average increase is growing, correct?

16           A.    I see fluctuation in the average,

17   but the overall trend is growing, yes.

18           Q.    Yes.  I mean, if we were to draw a

19   line from the average from year to year to year,

20   over time that average is increasing, correct?

21           A.    Again, first I've seen this, but

22   it would be interesting to know the impact that

23   the decrease in the months that are a valley, so

24   to speak, how that balances out the overall
```

Highly Confidential - Subject to Further Confidentiality Review

1    growth.

2         Q.    Well, it really doesn't take a

3    math Ph.D. to figure out that the line, even if

4    you take the valleys -- looks something like

5    that with the pen on there, correct?

6         A.    Again, first time I had a chance

7    to look at this, but does that line flatten out

8    whenever you look at every month in its totality

9    as a sum.  And, again, it's the first I'm

10   looking at this.

11        Q.    So you believe that you can't see

12   a trend from 2002 to 2013 and '14 that the

13   average dosage units go from 3-, 4-, 5,000 to

14   here we are in '14 to somewhere in the 13-, 14-,

15   15,000?

16        A.    I can see that.

17        Q.    Okay.  That doesn't take a lot of

18   analysis to figure out, right?

19             And so the trend from '02 over the

20   period of a decade at this pharmacy in Parma,

21   Ohio, goes from 3- or 4- or 5,000 pills per

22   month to -- or dosage units per month to

23   somewhere in the 14-, 15,000 pills per month,

24   correct?

```
 1          A.     Yes.

 2          Q.     And kind of based on the math that

 3    we went through, unless a monthly order exceeded

 4    the 52 months rolling average by 99 percent, it

 5    would not have popped on your anomaly report,

 6    right?

 7                 MR. JOHNSON:  Objection.

 8          A.     Correct.

 9          Q.     And so this trend going from 3,000

10    increasing to the tune of roughly 500 percent

11    over the course of a decade, unless one month in

12    particular would have increased by 99 percent

13    over the previous 52 rolling weeks or it would

14    have popped on the six-week average or fat

15    thumbs report, it wouldn't have come to your

16    attention, right?

17          A.     On that report, no.

18          Q.     Now, if the amount of dosage units

19    going into the State of Ohio, but more

20    specifically, the Cleveland surrounding area in

21    Parma Heights, increases from 3- to 4-, 5,000

22    dosage units in some pharmacies up 4- or

23    500 percent, would that have caused DDM any

24    reason for concern as we get to 2012, '13, '14
```

Highly Confidential - Subject to Further Confidentiality Review

1    that would warrant any investigation into

2    pharmacies, specific pharmacies?

3                    MR. JOHNSON:  Objection.

4           A.    I need you to repeat that if you

5    don't mind.

6           Q.    Would increase -- looking at the

7    chart that we're looking at right now, dosage

8    units increasing from 3-, 4- or 5,000 dosage

9    units per month to 13-, 14-, 15,000 dosage units

10   per month going into one store in Parma Heights,

11   Ohio, would that cause DDM any reason for

12   concern?

13                   MR. JOHNSON:  Objection.

14          A.    The answer is possibly.  And,

15   again, not -- not having seen this prior, we

16   would look to see what the growth of the rest of

17   the prescription business would be.  And if this

18   were a new store that over time they're building

19   business with new prescriptions and their opioid

20   growth is commensurate with their overall

21   prescription growth, that would be an example

22   where that wouldn't be as concerning.

23          Q.    That's a great example.  So one of

24   the metrics that -- I'm glad you brought that

Highly Confidential - Subject to Further Confidentiality Review

```
1    up.

2                 So one of the metrics that DDM

3    could have used over this period of time would

4    have been controlled substance prescriptions

5    percentage compared to overall prescription

6    percentage, correct?

7         A.    Yes.

8              MR. JOHNSON:  Objection.

9         Q.    And that is a metric that's often

10   used in the industry to help identify problems

11   with specific orders, correct?

12        A.    Possibly.

13        Q.    Yeah.  And you've seen -- DDM has

14   seen other vendors over a period of time

15   approach it with different metrics than some of

16   the rolling averages that you referenced

17   earlier, right?

18        A.    Yes, sir.

19        Q.    And one of those different metrics

20   that was proposed by an outside vendor was the

21   percentage of controlled substance prescriptions

22   as compared to the percentage of overall

23   prescriptions, right?

24        A.    Okay.
```

1        Q.    So can you point me to any policy

2   or procedure or automation that your pharmacies,

3   your customers, like the one in front of you,

4   looking at or analyzing or reviewing their

5   percentages of controlled substance

6   prescriptions as compared to overall

7   prescriptions as part of the automation process?

8        A.    No, sir.

9        Q.    So when you received an anomaly on

10   that report over the last decade, was it part of

11   the regular process for DDM to run metrics like

12   percentage of controlled substance prescriptions

13   as opposed to overall prescriptions?

14        A.    Not to my knowledge.

15        Q.    So that's another metric in

16   addition to the one we discussed earlier about

17   looking at the higher risk prescribers that are

18   writing a disproportionate number of controlled

19   substance prescriptions as opposed to their

20   overall prescriptions, correct?

21        A.    That would be another example,

22   yes.

23        Q.    And those are both metrics that

24   were being discussed in the industry in early

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2000s, mid 2000s that DDM did not use to

 2   identify suspicious orders on a regular basis,

 3   correct, sir?

 4          A.    Yes.

 5          Q.    If you would, sir, turn to page 2

 6   of Briscoe 15.  And here's another example --

 7   now, Euclid, Ohio, that's where -- that's where

 8   DDM was originated, correct?  Am I losing --

 9          A.    Elyria.

10          Q.    Okay.  All right.  Close.

11                Where's Euclid, Ohio?

12          A.    It's east, so along the Lake.

13          Q.    Okay.

14          A.    Northeast.

15          Q.    And, again, so this is Euclid,

16   DDM, hydrocodone, has the DEA number, total

17   dosage units.  But if we do the same thing we

18   did in the last chart and look sometime the

19   beginning of 2002 into 2003, the average dosage

20   units appear to be somewhere around 3- or 4,000,

21   depending on what time period you're looking

22   there; is that -- is that a fair look at that?

23          A.    Yes.

24          Q.    Okay.  And by the time we get into
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    2011 and 2012, if we do the same kind of

2    trending analysis, very sophisticated with my

3    pen, it gets us somewhere into the 8-, 9-,

4    10,000 dosage units per month, correct?

5         A.   I would say that the height of the

6    peaks is certainly trending in that direction.

7    I'd be curious to know if we used a different

8    method to analyze, what the valleys would do to

9    the impact of an annual view to this chart.

10        Q.   All right.  But as you said

11   before, you've never seen this data or attempted

12   to run that analysis?  And I say "you," I mean

13   that you've seen from DDM, correct?

14        A.   Not to my knowledge.

15        Q.   So Peter Mougey, some redneck

16   lawyer out of Pensacola, Florida, running DDM's

17   analysis is kind of the first time you've seen

18   this?

19             MR. JOHNSON:  Don't be so hard on

20        yourself.

21             MR. MOUGEY:  I'm still working on

22        it.

23        A.   Not the first time I've seen a

24   report like this, nor not the first time I would
```

```
 1    have run a report like this.  But the way you

 2    phrased the questions earlier specific to the

 3    way we distribute products and leading to an

 4    anomaly populating on the report, no.  But I'm

 5    familiar with that metric and it has been

 6    utilized in some reports on demand that I've run

 7    in the past.

 8            Q.    So let's look at -- in preparation

 9    for today and as part of DDM's responses to

10    discovery --

11                  MR. JOHNSON:  I'm sorry.  Are you

12            in the middle of a question?

13                  MR. MOUGEY:  No.  Go ahead.

14                  (Discussion off the record.)

15                          - - -

16            (DDM-Briscoe Exhibit 16 marked.)

17                          - - -

18    BY MR. MOUGEY:

19            Q.    All right.  I'm going to hand

20    you -- Mr. Briscoe, I'm going to hand you what

21    we're marking as Briscoe 16.

22            A.    Thank you.

23            Q.    And in preparation for your

24    testimony today, have you seen what I've just
```

Highly Confidential - Subject to Further Confidentiality Review

1    put in front of you marked as Briscoe 16?

2         A.    I believe I have, yes.

3         Q.    Okay.  And your counsel forwarded

4    this to us last Friday afternoon, and we were

5    trying to get the answers to DDM's suspicious

6    order monitoring policies and procedures and try

7    to put some kind of meat on the bone, so to

8    speak, okay?  And Judge Polster ordered the

9    Defendants to give us some answers to a few

10   questions, and I want to take you through a

11   couple of those, the ones that relate to your

12   suspicious order monitoring policy.

13              So who would be the right person

14   to talk to about the transactional data, those

15   two charts that we just went through from like

16   '99 to 2002, and what's there and what's not, is

17   it accurate, are we missing, is there holes --

18   who would be the right person that would know

19   that?

20        A.    So I believe both have been named.

21   The previous director or VP of IT, her name is

22   P.J. Ferut.

23        Q.    Okay.

24        A.    And then our current director of

```
 1   IT is Keith Miller.

 2         Q.    All right.  So P.J. Ferut could

 3   help --

 4         A.    P.J. Ferut and Keith Miller.

 5         Q.    Okay.  Perfect.

 6               All right.  Number 2 is "Please

 7   produce each of your Suspicious Order Monitoring

 8   System (SOMS) policies and procedures since

 9   January of '06 and identify the Bates stamp

10   range for each.  Please identify the effective

11   dates each was in force and effect."

12               Did I read that right?

13         A.    Yes.

14         Q.    Bear with me here, Mr. Briscoe.  I

15   just thought of something I forgot to look at

16   beforehand.

17               Now, your counsel was kind

18   enough -- as you can see here, it says, "To the

19   extent the Bates range stamps are needed, we

20   will supplement."  Okay?  And we did inquire to

21   try to get the Bates ranges.  And I'm going

22   to -- if the last few hours wasn't awkward

23   enough, this might be worse, because we got

24   those with working with your counsel yesterday
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about 1:30, and we were already en route here.

 2    So I don't have a real good command of where we

 3    are with all these, and they're a big stack,

 4    okay?

 5              So what I want you to do is not

 6    worry about the stack so much, but recognize

 7    that I might not have a real good command of the

 8    stack.  And I just have a few questions.

 9              So do you believe that from

10    January of '06 that the suspicious order

11    monitoring systems, policies, and procedures are

12    in writing within DDM evidencing what the

13    formulas and the methodology was?

14         A.    In writing from 2006?

15         Q.    Yes.

16         A.    I don't believe so.

17         Q.    Do you know when, at what point in

18    time, there was something in writing evidencing

19    DDM's system that was designed to identify

20    suspicious orders, when was that put into

21    writing?

22         A.    I don't know.

23         Q.    Do you know if it was ever put

24    into writing?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I know that in preparation for,
 2   you know, these documents in my deposition, we
 3   formalized by describing what our policies and
 4   procedures are.
 5            Q.    Now, what do you mean by that, "In
 6   preparation for these documents in my deposition
 7   we formalized by describing ..."?  What do you
 8   mean?
 9            A.    Meaning I did not go to a document
10   or a policy and procedure that was created to
11   hand over as describing our -- the way that we
12   operated.
13            Q.    That would have made it real easy,
14   wouldn't it?
15            A.    Yes, it would.
16            Q.    Because it really -- there wasn't
17   anything in writing, right?
18            A.    I think there were components in
19   writing.  I don't know that it was -- that all
20   the dots were connected in a policy and
21   procedure.
22            Q.    Let's make it -- let's maybe see
23   if we can connect some of those dots, okay?
24                  The 52-week average report that we
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   kind of went through in detail, in writing

 2   anywhere?

 3         A.    On the description of the report

 4   on the top of the report, the guts of what

 5   created the math associated with the report,

 6   those were in writing related to how the report

 7   was generated from an IT perspective.  So in the

 8   systems and the way that they create reports,

 9   there was that historical information on how

10   that report came to be and what its purpose was.

11         Q.    All right.  So you believed -- did

12   you help with identifying what documents were

13   responsive to this Number 2?

14         A.    Yes.

15         Q.    Okay.  And let me tell you where

16   I'm struggling a little bit, okay?  So I got the

17   stack in and it's fairly significant.  Okay?  We

18   got the Bates ranges, which is helpful, but in

19   preparing for today, I'm just going to give you

20   some problems where I had a little bit of

21   trouble.

22               So in response to this -- like,

23   for example, Bates Number 242 is titled

24   Temperature Management System Healthcare
```

```
 1    Specifications, where we've got specifications

 2    for keeping the humidity and the moisture in

 3    the -- in some of the distribution centers,

 4    right?  There's several documents.  And they're

 5    not a ton, but there's several, and that's just

 6    an example.

 7                 I wouldn't think that -- and you

 8    can correct me if I am wrong here, but managing

 9    humidity in the distribution centers is kind of

10    what we're driving at when we're looking at --

11    for suspicious order monitoring systems policies

12    and procedures.  Do you -- if you want me to

13    hand it to you, I can.

14          A.    No, no.  No, I think that was just

15    included as the -- one of the policies

16    associated with the distribution center and our

17    pharmacy warehouse and their operation.  So we

18    didn't withhold any of the policies and

19    procedures that were in place based on the topic

20    of the procedure.

21          Q.    Right.  But, more importantly, let

22    me hand you what I've marked as Briscoe 17.

23                        - - -

24                 (DDM-Briscoe Exhibit 17 marked.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2           Q.    And this is one of the documents

 3    that was identified as responsive to Number 2,

 4    and it says, "Please produce each of your

 5    suspicious order monitoring system policies and

 6    procedures since January 1, 2006 and identify

 7    the Bates range for each.  Please identify the

 8    effective dates each was in force and effect."

 9    Okay?

10              So we're sitting here trying --

11    from the outside in trying to figure out what's

12    going on.  So does this document have -- does

13    that -- does this give us any helpful

14    information to try to discern what DDM

15    suspicious order monitoring system policies and

16    procedures were from January 1 of '06 to the

17    current date?

18           A.    No.  I don't recall this being one

19    of the documents associated with the different

20    policies and procedures that we pointed to

21    related to SOMS.

22           Q.    Okay.  Let me give you what I've

23    marked as Briscoe 18.

24                      - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (DDM-Briscoe Exhibit 18 marked.)

 2                        - - -

 3         Q.    Now, before I ask anything

 4   specific about this document, do you recognize

 5   the -- kind of the format or the layout of this

 6   document?

 7         A.    Yes.

 8         Q.    What is this?

 9         A.    This is Policy 110 of the

10   Verified-Accredited Wholesale Distributor

11   accreditation that we received in 2017, which

12   was a rigorous review of our policies and

13   procedures, an on-site survey of our business

14   practices at the distribution center, to ensure

15   that there's security and we are safely

16   distributing prescription medications.

17         Q.    I might get some of this mixed up

18   here, but as of 2017, you all were not

19   distributing any Schedule II or Schedule III any

20   longer, correct?

21         A.    As of '17 --

22         Q.    Yes.

23         A.    -- no longer Schedule II.

24         Q.    Okay.  Still Schedule III?  I'm
```

```
 1    getting my pharmacies mixed up.

 2           A.    Yes.

 3           Q.    So have you received any feedback

 4    yet on that accreditation process from 2017?

 5           A.    Yes.

 6           Q.    All right.  And has that been

 7    memorialized in writing?

 8           A.    I'm not sure, but I believe we

 9    were accredited or we passed.  You know, VAWD

10    certification I think might be the correct term.

11           Q.    What was that acronym that you

12    just used?

13           A.    VAWD, V-A-W-D.

14           Q.    All right.  So every time I see

15    one of these policy numbers like we're looking

16    at here in Briscoe 18, this is -- would you

17    refer to this as a manual?

18           A.    There were two sets of information

19    specific to the distribution center's day-to-day

20    operations --

21           Q.    Okay.

22           A.    -- one of which was labeled VAWD

23    accreditation, and the other, I believe, was

24    labeled as pharmacy warehouse manual or pharmacy
```

Highly Confidential - Subject to Further Confidentiality Review

1    warehouse policies and procedures.  And there

2    was a lot of redundancy between the two because

3    a lot of the policies and procedures they had

4    written satisfied or led up into the way that

5    the VAWD needed to be organized with each

6    segment that they would be reviewing.

7           Q.    Okay.  Were all of these policies

8    all kept in one place?  So this is policy 110.

9    I'm assuming there's policy 1 through 109 before

10   this?

11          A.    There's 101 through -- I believe

12   maybe 116, but don't quote me.

13          Q.    Okay.

14          A.    I don't think --

15          Q.    But you think there's somewhere

16   around 15 or 20 of these?

17          A.    Specific to the VAWD process, yes.

18          Q.    Okay.  All right.  Now -- and,

19   again, I apologize for not having all the lingo

20   down yet, but are these out of a policy and

21   procedures manual that exist somewhere else?

22          A.    The -- what led to the VAWD

23   policies and procedures?

24          Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    -- stemmed from written policy and

2    procedure from the pharmacy warehouse.  So,

3    again, I think what might have been produced to

4    you was two chunks of information labeled in a

5    different manner where there would have been

6    some redundancy.

7          Q.    So, again, the document that we're

8    looking at at Briscoe 18, policy 110, this is a

9    process for ensuring drugs and devices are

10   stored at temperature standards according to the

11   drug device labeling and/or USP standards,

12   right?

13         A.    Mm-hmm.

14         Q.    And that doesn't really help me

15   with trying to figure out the suspicious order

16   monitoring system at DDM, does it?  I'm just a

17   little -- making sure I'm not missing something

18   here.

19         A.    No.  I'm not missing anything I

20   can't think of.

21         Q.    Okay.  So if we can go through it,

22   here's Briscoe 19, policy 111.

23                      - - -

24         (DDM-Briscoe Exhibit 19 marked.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2          Q.    And, again, another reference to

 3   humidity and standards in -- in -- and that's --

 4   I'm not missing anything.  That's not really

 5   helpful to us.

 6          A.    It was not removed as part of what

 7   we concluded that surrounded activity in the

 8   distribution center.

 9          Q.    Okay.  So let me make sure I

10   understand.  When you're saying they were pulled

11   from -- did you say inventory warehouse or a

12   policy or what did you -- what were you -- what

13   did you refer to it as?

14          A.    Well, so using the term

15   synonymously, our pharmacy warehouse --

16          Q.    Right.

17          A.    -- is also our distribution

18   facility.

19          Q.    Right.

20          A.    So in 2017, maybe prior to that,

21   we went through the -- made the decision to go

22   through the process of VAWD certification.

23          Q.    Okay.

24          A.    And part of VAWD certification is
```

Highly Confidential - Subject to Further Confidentiality Review

1   making sure that you have policies and

2   procedures in place and they are rigorously

3   vetted by the accrediting group.  And part of

4   the end result of that process led to having

5   these policies and procedures labeled 101

6   through whatever number they end in.

7          Q.    Okay.  Now, are you familiar with

8   workshops that were put on and offered to DDM

9   for suspicious order monitoring and developing

10  policies and procedures that would help assist

11  DDM in putting its policies and procedures in

12  place?

13         A.    I never attended a workshop.

14         Q.    All right.  I guess where I'm

15  going is, there is no question in your mind that

16  DDM had designed, implemented, and operated a

17  system designed to detect suspicious orders from

18  2006 until 2016?

19         A.    Rephrase or -- I'm sorry -- reask.

20         Q.    Sure.  There's --

21              MR. JOHNSON:  Do you want him to

22         reread it?

23              MR. MOUGEY:  No, I've got it.

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MOUGEY:

 2         Q.    There's no question that DDM had

 3    designed, implemented, and operated a system to

 4    detect suspicious orders from 2006 until 2016?

 5         A.    I truly believe that -- again, I

 6    don't like the phrase, but the totality of our

 7    efforts in the way that we operate in the

 8    distribution center, the fact that we do not

 9    have customers and we're not making sales, we

10    are distributing to our own stores for which we

11    were very familiar and have direct control over,

12    I'm confident in saying that we did not have a

13    suspicious order in that time frame.

14              I would never say in any segment

15    of our business that, you know what, we have it

16    completely figured out and there isn't ways that

17    we can continually look at room for

18    enhancements, et cetera, but I'm confident in

19    saying that we did not have any suspicious

20    orders from that facility during that time.

21         Q.    But the question I asked you was a

22    little bit different.  The question I asked was

23    not whether you're confident there were

24    suspicious orders, but whether or not DD --
```

```
 1                    MR. JOHNSON:  Were not -- were not

 2          suspicious orders you mean?

 3                    MR. MOUGEY:  Yeah.  Yeah, whatever

 4          I said.

 5    BY MR. MOUGEY:

 6          Q.    But the question I asked was a

 7    little bit different, which is, there's no

 8    question DDM believes it had designed,

 9    implemented, and operated a system to detect

10    suspicious orders from 2006 until 2016?

11          A.    We did design a system to detect,

12    yes.

13          Q.    And from 2006 until 2016, DDM had

14    that system designed -- that was designed to

15    identify suspicious orders of controlled

16    substances?

17          A.    Yes.

18          Q.    And have you seen any discussion

19    internally at DDM that there was not a policy or

20    a procedure in place?

21          A.    I don't believe so.

22          Q.    Because if, in fact, DDM did not

23    have a system that was effective to identify

24    suspicious orders and then report them to the
```

```
 1    DEA, it would have violated its obligations

 2    under the Controlled Substances Act and the regs

 3    promulgated thereunder, correct?

 4                MR. JOHNSON:  Objection.

 5         A.    We had a system --

 6         Q.    Right.

 7         A.    -- and we did not identify any

 8    suspicious orders; therefore, we did not report

 9    suspicious orders.

10         Q.    Now, who was in charge of pulling

11    these policies -- I think you said 101 to 116 or

12    somewhere thereabout together and ensuring they

13    were accurate?

14         A.    So Jill Strang, who we've talked

15    about earlier, and then the SVP of pharmacy

16    who's on the license of the distribution center,

17    his name is Pete Ratycz.

18         Q.    All right.  So Mr. Ratycz and

19    Ms. Strang are both people you have worked with

20    for quite some time, correct?

21         A.    Yes.

22         Q.    And they are more than capable in

23    their positions, correct?

24         A.    Yes.
```

```
 1              Q.    And they're certainly not going to

 2    gather information and submit it to an

 3    accreditation board that wasn't accurate, right?

 4              A.    Correct.

 5              Q.    And you believe that they did

 6    their homework when putting together that --

 7    those reports for the VAWD certification,

 8    correct?

 9              A.    To my knowledge, yes.

10                          - - -

11              (DDM-Briscoe Exhibit 20 marked.)

12                          - - -

13              Q.    Hand you what we've marked as

14    Briscoe 20.  And, sir, this is a policy titled

15    Inventory Controls dated 12/1/2016, correct,

16    sir?

17              A.    Yes.

18              Q.    And it's dated -- it's -- I'm

19    sorry -- policy number 112, correct?

20              A.    Yes.

21              Q.    And the purpose is process to

22    identify any inventory concerns, cycle counts,

23    losses or theft, correct?

24              A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               Q.    And the folks putting together

 2    this policy for the accreditation, after doing

 3    their homework and analyzing DDM's policies and

 4    procedures, came to the conclusion that "We do

 5    not" -- and I'm in the first paragraph -- "We do

 6    not sell any items outside of our own company,

 7    so there is no policy in place for ordering

 8    patterns or payment amounts that would identify

 9    potential diversion or criminal activity."

10               Do you see that, sir?

11               A.    I do.

12               Q.    Is that an accurate statement?

13               A.    I think that's a poorly written

14    portion of that policy.

15               Q.    Yes, sir.  And have you seen this

16    in preparation for your testimony today?

17               A.    I believe I've seen it.  I don't

18    know that that section landed on me as I was

19    preparing.

20               Q.    So this went out to -- this came

21    from the senior VP of pharmacy, correct?

22               A.    I believe Jill authored the

23    policies and, you know, he's listed as the

24    responsible pharmacist.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    He signed them, I believe.  He

 2    signed -- is on the distribution license,

 3    correct?

 4              A.    Yes.

 5              Q.    And this was approved by one of

 6    the most senior people in DDM's organization,

 7    correct?

 8              A.    On the pharmacy side, yes.

 9              Q.    Yes, sir.  And based on the direct

10    reports to him and the information provided to

11    him, he approved the language that there's no

12    policy in place for ordering patterns or payment

13    amounts that would identify potential diversion

14    or criminal activity, correct, sir?

15              A.    That's what's written there, yes.

16              Q.    Yes.  And if that is an accurate

17    statement, sir, written by a senior vice

18    president of DDM, DDM did not comply with the

19    Code of Federal Regulations 74 requiring a

20    system designed to identify and report

21    suspicious orders, correct, sir?

22                    MR. JOHNSON:  Objection.

23              A.    We did have a system in place that

24    we utilized that we described.  You saw 11
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    examples of due diligence, which is Phase 3 of

 2    that example.  This is just a poor

 3    characterization of what that -- that procedure

 4    is and was living and breathing and active.

 5            Q.    Was the living and breathing and

 6    active system that you designed, was it secret

 7    within DDM?

 8            A.    No.

 9            Q.    Was it kept in a -- under a lock

10    and key in your filing cabinet in your office?

11            A.    No.

12            Q.    Was it -- did you hide it from the

13    senior VP?

14            A.    No.

15            Q.    Did you report on it regularly in

16    meetings with the senior VP and tell him what

17    you were doing?

18            A.    No.

19            Q.    Did you keep him up to date on all

20    of the activity that DDM was doing regarding the

21    analysis and the system designed to identify

22    suspicious orders?

23            A.    It probably has come up in

24    conversation, but we didn't have regular
```

```
 1    meetings.

 2            Q.    But you can't point to anything

 3    specific?

 4            A.    Not as I sit here today.

 5            Q.    So this system that was designed

 6    to identify suspicious orders in compliance with

 7    the Code of Federal Regulations promulgated

 8    under the Controlled Substances Act was such a

 9    part of the day-to-day conversation at DDM and

10    the reporting at DDM and part of the culture of

11    DDM that the senior vice president of operations

12    signed off on the VAWD accreditation that there

13    was no policy in place for ordering patterns or

14    payment amounts that would identify potential

15    diversion, correct, sir?

16                  MR. JOHNSON:  Objection.

17            A.    I would indicate that this policy

18    and this process of going through VAWD

19    accreditation took place in 2016.  This was

20    beyond a point in time whenever we had, you

21    know, hydrocodone products in our distribution

22    center.  That's not -- that's not an excuse, but

23    whenever you indicate that we're not having

24    daily conversations associated with this topic
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and how we handle suspicious order monitoring,

 2    there is -- there is very little activity as a

 3    total bucket of our distributions from that

 4    distribution center that are controlled

 5    substances and even fewer products that are

 6    opioids.  And that does not excuse having a

 7    policy and a procedure and a system in place,

 8    but I can assure you the system has always been

 9    in place.

10              This is a poor characterization,

11    an inaccurate characterization of the activity

12    that surrounded our approach to suspicious order

13    monitoring.

14         Q.   Do you see what date this poor

15    characterization was adopted on this document,

16    sir?

17         A.   Yes.

18         Q.   And what date is that?

19         A.   Well, it was accepted -- adopted

20    on 12/1 of '16.

21         Q.   Yes, sir.  And it's such a poor

22    characterization and it -- it so

23    mischaracterizes DDM's true policies that it was

24    updated on March 1st, 2017 and continued to be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    adopted in this process, correct?

 2          A.    Three months later, yes.

 3          Q.    Yes, sir.  And do you know how

 4    long this statement contained and remained in

 5    this report?

 6          A.    I don't -- I mean, to my

 7    knowledge, if we produced it in this manner, it

 8    hasn't changed from the time it was adopted.

 9          Q.    So as of today, 2018, December,

10    you believe that policy 112, the senior VP

11    stating that there's no policy in place for

12    ordering patterns that would identify potential

13    diversion, this has never been changed?

14          A.    Again, I would say yes, it's

15    our -- our procedure, what we actually do has

16    not changed.  And also accurate is this

17    paragraph, which is a poor representation of

18    reality, has not changed.

19          Q.    Policy 112 in this memorandum that

20    you in front of this jury today is saying is

21    inaccurate but it was signed by the senior vice

22    president and then updated three months later

23    and continued to be approved is still in the

24    language today, yes or no?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    It is.  It is.  May I add that

 2    it's not impactful to the way that we operate.

 3              Q.    Yes, sir.  But it might be

 4    impactful to the people in the State of Ohio

 5    that have seen hydrocodone distributions dosage

 6    units go from 3- or 4,000 on average in a

 7    pharmacy up to 14- or 15,000 over a period of

 8    years.  Do you think it might be impactful to

 9    them?

10              MR. JOHNSON:  Objection.  You're

11         just arguing with the witness.

12              Q.    You think it might be impactful to

13    them?

14              A.    What I'm saying is we're

15    continuing --

16              MR. JOHNSON:  Objection.

17              A.    -- to execute on the processes we

18    have in place.  They're just not characterized

19    well in that paragraph.

20              Q.    Exactly.  And during the time

21    period when -- you and I just went through the

22    formula used where it could -- in a period of

23    13 months, dosage units could increase by a

24    period -- by an amount of 340 percent using
```

Highly Confidential - Subject to Further Confidentiality Review

1    simple math, that was -- that wasn't impactful

2    to the people in the State of Ohio?

3              MR. JOHNSON:  Objection.

4         A.    Again, your hypothetical would

5    have had to have happened in a way that it

6    perfectly stayed underneath 99 percent as it

7    grew to that number without invoking an anomaly.

8         Q.    Yes, sir.  And what I then

9    demonstrated after you pointing to the fact you

10   thought it was a hypothetical is, in fact, close

11   to reality, that the dosage units dispensed out

12   of DDM's own pharmacies in the Cleveland area

13   increased 3- to 400 percent, and it's very

14   possible, using the formula DDM supposedly

15   employed, that that never triggered one of the

16   anomaly reports that you reviewed, correct?

17             MR. JOHNSON:  Objection.

18        A.    It's possible.

19             MR. MOUGEY:  This is a good time

20        for a break.

21             THE VIDEOGRAPHER:  Going off

22        record, the time is 3:18.

23             (Recess taken.)

24             THE VIDEOGRAPHER:  We're back on

Highly Confidential - Subject to Further Confidentiality Review

```
1              record, 3:28.

2                   MR. MOUGEY:  I don't have any

3              further questions at this point.  I

4              do -- just wanted to note that DDM did

5              respond to Judge Polster's order on

6              Friday, actually before the deadline,

7              and we reached out to DDM and they --

8                   MR. JOHNSON:  Bates-stamped?

9                   MR. MOUGEY:  Yes.  They didn't put

10             the Bates stamps in the actual response.

11             We reached out on Friday, like ten

12             minutes after that you all filed, asked

13             for the Bates stamps.  DDM did get us

14             the Bates-stamped documents.

15                  Today is Thursday.  We got them

16             Wednesday and we were en route.  I did

17             not get a chance to go through them.

18                  I don't anticipate any issues, but

19             I do want to keep the deposition open in

20             the event that when we do get through

21             the Bates stamps pointed out to us

22             yesterday in more detail, if I see any

23             issues, I do want to reserve to keep it

24             open.  And, of course, I'll reach out to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          DDM's counsel, Tim, before I do anything
 2          else, but I did want to reserve that on
 3          the record.
 4              MR. JOHNSON:  Oh, no problem.
 5          And, just to be accurate, I think Jeff
 6          at least communicated with me on --
 7          let's see, today's Thursday -- that
 8          would be Tuesday and asked for them by
 9          tomorrow, which would have been
10          Wednesday, and we did get them to him.
11              But I totally understand that
12          you've only had them a short time and
13          that doesn't really change anything.
14              So I don't have a problem with
15          that.
16              MR. MOUGEY:  Okay.  I don't have
17          any further questions at this point.
18              MR. JOHNSON:  No, nothing.
19              MR. MOUGEY:  Thank you.
20              THE VIDEOGRAPHER:  This ends
21          today's deposition.  We are going off
22          record at 3:30 p.m.
23          (Signature not waived.)
24                        - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Thereupon, at 3:30 p.m., on Thursday,

 2      December 6, 2-19, the deposition was concluded.

 3                              - - -

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         CERTIFICATE

 2    STATE OF OHIO         :

                                    SS:

 3    COUNTY OF _____:

 4

 5            I, JASON BRISCOE, do hereby certify that I

 6    have read the foregoing transcript of my

 7    cross-examination given on December 6, 2018; that

 8    together with the correction page attached hereto

 9    noting changes in form or substance, if any, it is

10    true and correct.

11                         _____

                                    JASON BRISCOE

12

13            I do hereby certify that the foregoing

14    transcript of the cross-examination of JASON BRISCOE

15    was submitted to the witness for reading and signing;

16    that after he had stated to the undersigned Notary

17    Public that he had read and examined his

18    cross-examination, he signed the same in my presence

19    on the _____ day of _____, 2018.

20

                          _____

21                         NOTARY PUBLIC - STATE OF OHIO

22

23    My Commission Expires:

24    _____, _____.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2   STATE OF OHIO        :
                                  SS:
 3   COUNTY OF FRANKLIN   :
 4           I, Carol A. Kirk, a Registered Merit
     Reporter and Notary Public in and for the State of
 5   Ohio, duly commissioned and qualified, do hereby
     certify that the within-named JASON BRISCOE was by me
 6   first duly sworn to testify to the truth, the whole
     truth, and nothing but the truth in the cause
 7   aforesaid; that the deposition then given by him was
     by me reduced to stenotype in the presence of said
 8   witness; that the foregoing is a true and correct
     transcript of the deposition so given by him; that the
 9   deposition was taken at the time and place in the
     caption specified and was completed without
10   adjournment; and that I am in no way related to or
     employed by any attorney or party hereto or
11   financially interested in the action; and I am not,
     nor is the court reporting firm with which I am
12   affiliated, under a contract as defined in Civil Rule
     28(D).
13
             IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office at Columbus, Ohio
     on this 11th day of December 2018.
15
16
17
18                         _____
                           CAROL A. KIRK, RMR
19                         NOTARY PUBLIC - STATE OF OHIO
20   My Commission Expires:  April 9, 2022.
21                     - - -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2   I, JASON BRISCOE, have read the transcript

     of my deposition taken on the 6th day of December

 3   2018, or the same has been read to me.  I request that

     the following changes be entered upon the record for

 4   the reasons so indicated.  I have signed the signature

     page and authorize you to attach the same to the

 5   original transcript.

 6   Page  Line  Correction or Change and Reason:

 7   ____  ____  _____

 8   ____  ____  _____

 9   ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____ Signature _____
```