Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   | MDL No. 2804
                                   |
 4   OPIATE LITIGATION             | Case No. 17-MD-2804
                                   |
 5   This Document Relates to:     | Hon. Dan A. Polster
                                   |
 6   The County of Summit, Ohio,   |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12
                         - - -
13
                 Monday, December 3, 2018
14
                         - - -
15
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                 CONFIDENTIALITY REVIEW
17
                         - - -
18
           Videotaped deposition of ROBERT BROWN, held
19       at Foley & Lardner LLP, One Biscayne Tower, 2
         Biscayne Boulevard, Suite 1900, Miami, Florida,
20       commencing at 9:26 a.m., on the above date,
         before Susan D. Wasilewski, Registered
21       Professional Reporter, Certified Realtime
         Reporter and Certified Realtime Captioner.
22
23
                         - - -
24             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

```
 1    APPEARANCES:

 2        WEITZ & LUXENBERG, P.C.
          BY:  PAUL F. NOVAK, ESQUIRE
 3            TIFFANY ELLIS, ESQUIRE
          3011 West Grand Boulevard, Suite 2150
 4        Detroit, Michigan 48202
          (313) 800-4170
 5        pnovak@weitzlux.com
          tellis@weitzlux.com
 6        Representing Plaintiffs

 7

 8        FOLEY & LARDNER LLP
          BY:  JAMES W. MATTHEWS, ESQUIRE
 9        111 Huntington Avenue
          Boston, Massachusetts 02199
10        (617) 342-4000
          jmatthews@foley.com
11        Representing Anda Inc. and the witness

12

13        WILLIAMS & CONNOLLY LLP
          BY:  JULI ANN LUND, ESQUIRE
14        725 Twelfth Street, N.W.
          Washington, D.C. 20005
15        (202) 434-5239
          jlund@wc.com
16        Representing Cardinal Health, Inc.

17

18        REED SMITH LLP
          BY:  SUJEY S. HERRERA, ESQUIRE
19        1001 Brickell Bay Drive, Suite 900
          Miami, Florida 33131
20        (786) 747-0207
          sherrera@reedsmith.com
21        Representing AmerisourceBergen Corporation and
          AmerisourceBergen Drug Corporation

22

23

24

25
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:

 2       JONES DAY
         BY:  CASTEEL E. BORSAY, ESQUIRE
 3       325 John H. McConnell Boulevard, Suite 600
         Columbus, Ohio 43215
 4       (614) 281-3618
         cborsay@jonesday.com
 5       Representing Walmart

 6

 7       ROPES & GRAY LLP
         BY:  FEIFEI (ANDREA) REN, ESQUIRE
 8       1211 Avenue of the Americas
         New York, New York 10036-8704
 9       (212) 596 9303
         andrea.ren@ropesgray.com
10       Representing Mallinckrodt

11

12       ARNOLD & PORTER KAYE SCHOLER, LLP
         BY:  SEAN HENNESSY, ESQUIRE
13       601 Massachusetts Avenue, NW
         Washington, D.C. 20001
14       (202) 942-5644
         sean.hennessy@arnoldporter.com
15       Representing Endo and Par Pharmaceutical

16

17       COVINGTON & BURLING LLP
         BY:  AMBER CHARLES, ESQUIRE
18       One CityCenter, 850 Tenth Street, NW
         Washington, DC 20001-4956
19       (202) 662-5518
         acharles@cov.com
20       Representing McKesson Corporation

21

22    ALSO PRESENT:

23       JEFF FLEMING, Videographer

24

25
```

```
 1                    - - -
 2              I N D E X
 3                    - - -
 4  Testimony of:  ROBERT BROWN                    PAGE
 5      DIRECT EXAMINATION BY MR. NOVAK............  9
 6    CROSS-EXAMINATION BY MR. MATTHEWS............ 271
 7

                 E X H I B I T S
 8
              (Attached to transcript)
 9
    ROBERT BROWN DEPOSITION EXHIBITS              PAGE
10
    Anda-Brown     Notice of Videotaped Deposition of  9
11  Exhibit 1      Robert Brown
12  Anda-Brown     E-mail - Subject: Potential        23
    Exhibit 2      DEA-HDMA Meeting -- Input
13                 Requested by December 12
                   Anda-Opioids_MDL_0000085677
14                 through 85690
15  Anda-Brown     E-mail - Subject: HDMA Weekly       27
    Exhibit 3      Digest, January 20: Distribution
16                 Management Conference and Expo to
                   Explore Critical Supply Chain
17                 Topics
                   Anda-Opioids_MDL_0000598068
18                 through 598071
19  Anda-Brown     E-mail - Subject: National          43
    Exhibit 4      Accounts Pipeline
20                 Anda-Opioids_MDL_0000546477 and
                   546478
21
    Anda-Brown     E-mail - Subject: (No subject)      66
22  Exhibit 5      Anda-Opioids_MDL_0000091399
                   through 91410
23
    Anda-Brown     Standard Operating Procedure       114
24  Exhibit 6      OPS-040-00
                   Anda_opioids_MDL0000056015 and
25                 56016
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S
 2            (Attached to transcript)
 3    ROBERT BROWN DEPOSITION EXHIBITS              PAGE
 4   Anda-Brown     E-mail - Subject: Information    118
     Exhibit 7      Requested by DEA Subpoena Received
 5                  June 27, 2016
                    Anda-Opioids_MDL_0000036508
 6                  through 36522
 7   Anda-Brown     E-mail - Subject: Glenn Burnie   133
     Exhibit 8      Pharmacist Settlement-Abuse
 8                  Updates
                    Anda-Opioids_MDL_0000560658
 9                  through 560660
10   Anda-Brown     E-mail - Subject: Report from SOM 137
     Exhibit 9      Review
11                  Anda-Opioids_MDL_0000546429 and
                    Anda_Opioids_MDL0000539208 through
12                  539217
13   Anda-Brown     E-mail - Subject: Revised Report 138
     Exhibit 10     Anda-Opioids_MDL_0000539140
14                  through 539150
15   Anda-Brown     E-mail - Subject: AUDIT - Top     177
     Exhibit 11     Customers
16                  Anda-Opioids_MDL_0000601903
                    through 601905
17
     Anda-Brown     E-mail - Subject: Follow Up Items 194
18   Exhibit 12     Anda-Opioids_MDL_0000084481
                    through 84488
19
     Anda-Brown     E-mail - Subject: Current         202
20   Exhibit 13     Suspicious Order SOPs
                    Anda-Opioids_MDL_0000143508
21                  through 143569
22   Anda-Brown     E-mail - Subject: Updated List of 221
     Exhibit 14     Customers Not Eligible to Purchase
23                  Controls from Anda
                    Anda-Opioids_MDL_0000543135 and
24                  543136
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2               (Attached to transcript)

 3    ROBERT BROWN DEPOSITION EXHIBITS              PAGE

 4   Anda-Brown     E-mail - Subject: FINAL compliance   248

     Exhibit 15     docs for meeting tomorrow - BARB

 5                  PLEASE SEND

                    Anda-Opioids_MDL_0000132043

 6                  through 132066

 7   Anda-Brown     E-mail - Subject: Walgreens State    255

     Exhibit 16     Controls Summaries

 8                  Anda-Opioids_MDL_0000090454

                    through 90457

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                        - - -

2              THE VIDEOGRAPHER:  We are now on the record.

3       My name is Jeff Fleming, I'm a videographer for

4       Golkow Litigation Services.  Today's date is

5       December 3rd, 2018.  The time is 9:26 a.m.

6              This video deposition is being held in

7       Miami, Florida, in the matter of National

8       Prescription Opiate Litigation, MDL Number 2804,

9       for the United States District Court, Northern

10      District of Ohio, Eastern Division.

11             The deponent is Robert Brown.  Counsel will

12      be noted on the stenographic record.

13             The court reporter is Susan Wasilewski and

14      will now swear in the witness.

15             THE COURT REPORTER:  Sir, would you raise

16      your right hand?

17             Do you solemnly swear or affirm the

18      testimony you're about to give will be the truth,

19      the whole truth, and nothing but the truth?

20             THE WITNESS:  I do.

21             THE COURT REPORTER:  Thank you.

22             MR. NOVAK:  Before we begin, I'd like to

23      just put the appearance of counsel on the record.

24      This is Paul Novak and also Attorney Tiffany

25      Ellis of the Weitz & Luxenberg firm on behalf of

Highly Confidential - Subject to Further Confidentiality Review

1      the Track One Plaintiffs pursuant to a notice of

2      deposition that was issued for the deposition

3      today under the Federal Rules of Civil Procedure

4      and the deposition protocol.

5           Can the other counsel place their appearance

6      on the record?

7           MR. MATTHEWS:  Good morning.  It's James

8      Matthews of Foley & Lardner for Anda, Inc., and

9      for the witness.

10          MS. LUND:  Juli Ann Lund from Williams &

11     Connolly for Defendant Cardinal Health.

12          MS. HERRERA:  Sujey Herrera from Reed Smith

13     for Defendant AmerisourceBergen Drug Corporation.

14          MR. NOVAK:  And counsel on the phone want to

15     place their appearance on the record?

16          MR. HENNESSY:  Good morning.  This is Sean

17     Hennessy from Arnold & Porter on behalf of the

18     Endo and Par Pharmaceutical defendants.

19          MS. BORSAY:  Good morning.  Casteel Borsay

20     with Jones Day on behalf of Defendant Walmart.

21          MS. CHARLES:  Good morning, Amber Charles

22     with Covington & Burling on behalf of Defendant

23     McKesson Corporation.

24          MR. NOVAK:  Any other counsel on the phone?

25               (No response.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. NOVAK:  All right.  We've marked as

 2       Deposition Exhibit Anda-Brown 1 the Notice of

 3       Videotaped Deposition for today, really more for

 4       record purposes than anything else, but I'll hand

 5       a copy to counsel if they need or want it.

 6              (Anda-Brown Exhibit 1 was marked for

 7       identification.)

 8              ROBERT BROWN, called as a witness by the

 9       Track One Plaintiffs, having been duly sworn,

10       testified as follows:

11                      DIRECT EXAMINATION

12       BY MR. NOVAK:

13       Q.   Good morning, Mr. Brown.  Could you state

14       your full name for the record?

15       A.   Robert I. Brown.

16       Q.   Okay.  And where do you currently live?

17       ███████████████████████████████████████████

18       ███████████████████████████████████████████

19       Q.   Okay.  How long have you lived at that

20       address?

21       A.   Since December 2013.

22       Q.   I'd like to start by having you talk a

23       little bit about your educational background and

24       employment history prior to working at a time for

25       Anda.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Can you give me a summary of just your

 2    educational background?

 3        A.   Okay.  I have a bachelor of arts degree from

 4    the University of Michigan majoring in history and

 5    political science, graduating December 1976, and I

 6    have a law degree from Wayne State University law

 7    school in Detroit, graduating December 1986.

 8        Q.   Okay.  Can you give me a brief description

 9    of any employment work you had in the pharmaceutical

10    industry prior to working for Anda?

11        A.   Prior to working for Anda, I was the senior

12    vice president and general counsel for the Harvard

13    Drug Group that was headquartered in Livonia,

14    Michigan, and I was at that position from April 2006

15    to April 2012.

16        Q.   Okay.  Is it fair to say that the work at

17    the Harvard Drug Group was your only work in the

18    pharmaceutical industry prior to your time at Anda?

19        A.   Yes.

20        Q.   Okay.  And what did you do -- or actually,

21    I'll start over.

22              Can you describe for me generally what type

23    of company Harvard Drug Group was?

24        A.   Harvard Drug Group was a secondary supply

25    wholesaler to the pharmaceutical industry primarily
```

Highly Confidential - Subject to Further Confidentiality Review

1   pharmacies, as well as some other types of companies

2   that sold pharmaceutical products and long-term care

3   and some -- a few hospitals.

4       Q.   Okay.   In the beginning of that answer you

5   used the term "secondary supply wholesaler."

6       A.   Correct.

7       Q.   Can you give me a description as to what

8   that term means?

9       A.   Yes.   In the pharmaceutical distribution

10  industry there are three major primary wholesalers,

11  AmerisourceBergen, McKesson and Cardinal that

12  probably account for somewhere from 92 to 94 percent

13  of the business that is conducted in wholesale

14  pharmaceuticals.   Secondary, there are a number of

15  secondary suppliers that assist their customers who

16  may need items that their primary wholesaler does

17  not carry at a particular time or there may be a

18  certain brand -- brand is a bad term.   I was going

19  to say SKU but I don't know if that translates well.

20  But you have multiple manufacturers who make a

21  certain product in most cases and maybe the primary,

22  you know, carries three of those manufacturers,

23  maybe a secondary carries a fourth that is desirable

24  to certain customers of that pharmacy, so they'll

25  purchase from a secondary supplier for items that

```
 1    they may not be able to get from their primary

 2    wholesaler.

 3        Q.   Okay.  I think we'll explore that a little

 4    more later --

 5        A.   Okay.

 6        Q.   -- this morning.

 7        A.   Okay.

 8        Q.   But I appreciate your answer.  By the way, I

 9    usually give a few instructions at the beginning of

10    the deposition, which I just completely skipped

11    over, so I'll do them now.

12        A.   Okay.

13        Q.   I want to make sure that when I ask

14    questions, make sure that your answer is verbal.

15    It's difficult for the reporter to transcribe

16    nonverbal answers, although they will get picked up

17    on the videotape.

18             Secondly if there is any question that I ask

19    that you don't understand or feel needs to be

20    rephrased, let me know, and I'll try to rephrase it

21    in a manner that makes sure we're both on the same

22    wavelength.

23             We've talked a little bit about your

24    experience at Harvard Drug Group.  Was Harvard Drug

25    acquired at some point?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   Well, I guess at what -- acquired and at

 2   what time, because there were several transactions

 3   both before I arrived at Harvard and after I left.

 4   So I guess I'm trying to get some clarification on

 5   time period or, you know -- because --

 6       Q.   Let me -- I'll ask a different question.

 7       A.   Okay.

 8       Q.   Is Harvard Drug Group still in existence

 9   today?

10       A.   My understanding is that when Cardinal

11   Health purchased Harvard, I believe in 2014, and I

12   believe that the name Harvard is no longer utilized

13   in the industry.  I think it was merged into Belco,

14   I believe.

15       Q.   Okay.

16       A.   But that was -- I -- just to clarify, that

17   was after I left Harvard.

18       Q.   Yeah.  Can you give a general description as

19   to what your responsibilities were at Harvard Drug?

20       A.   They were varied because it was senior vice

21   president of business development and general

22   counsel, so I was responsible for external

23   acquisitions, we did five when I was there, and I

24   was responsible for finding the acquisitions and

25   vetting them and organizing the due diligence
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    process and working with the outside counsel and

 2    accountants to -- to finalize the agreements and

 3    help with the integration of those companies.

 4         I was responsible for all company internal

 5    agreements that dealt with vendors, with customers,

 6    with credit.  I was responsible for -- we had

 7    several offices throughout the country.  I was

 8    responsible for various leases.  I was responsible

 9    for managing our veterinary distribution -- First

10    Vet, which was a division of the company.

11         And, really, you know, worked -- we also had

12    a private label company that was incorporated into

13    Harvard called Major Pharmaceuticals.  I was

14    involved with the contracts that were there.  I

15    worked with pretty much every department, including

16    compliance.

17    Q.   Okay.  That was where I was going next.

18    A.   Okay.

19    Q.   Can you describe for me what your

20    responsibilities at Harvard Drug were as it related

21    to compliance?

22    A.   It was overall working -- working with the

23    compliance department and external counsel who

24    compliance -- the compliance department really had

25    more of the interface, direct interface, because
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they had been there -- they had all been people that
 2    had been worked with before I got there, but
 3    basically, you know, helping -- assisting when it
 4    was necessary or when it was appropriate for me to
 5    be involved with any contracts they had, any product
 6    registrations, through Major, through any -- and
 7    that role changed, I will tell you.
 8          When I first got there it was more, you
 9    know, legal working with customers.  As time went
10    on, and particularly after the -- a consent judgment
11    following -- or consent following a suspension order
12    was issued, I was -- I was the main person in
13    working with both the DEA and the administrative law
14    judge in ensuring that we got our license restored
15    and that we developed processes and procedures to
16    ensure that we would not have those issues again
17    with respect to controlled substances.
18    Q.    Okay.  The suspension to which you referred
19    in the last part of that answer, was issued by the
20    DEA against Harvard Drug?
21    A.    Yes.  I mean, signed by an administrative
22    law judge in June 2010.
23    Q.    Okay.  And can you describe for me the
24    circumstances which led to the DEA issuing a
25    suspension of Harvard Drug?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    At -- I'll try to put it in some context,

 2    because this was something that was taking place

 3    throughout the industry with the awareness of opioid

 4    distribution, so-called pill mill, both in, you

 5    know, in Florida and other places, and Harvard was

 6    one of the distributors that was probably, you know,

 7    caught, you know, like most of the industry, where

 8    probably didn't, in hindsight, didn't probably have

 9    the diligence that certainly has now in terms of

10    vetting customers and really, you know, examining

11    the types of customers and also the volumes of

12    controlled substances that were being sent or

13    distributed to pharmacies and, in some cases,

14    physicians as well.

15        Q.    Were there particular types of controlled

16    substances that were the subject of the DEA's

17    suspension order against Harvard Drug?

18        A.    It was primarily oxycodone.  There was some

19    hydrocodone products, but it was primarily

20    oxycodone.

21        Q.    And the DEA concluded that Harvard Drug

22    didn't exercise the requisite amount of due

23    diligence in adhering to suspicious order monitoring

24    requirements as it related to oxycodone?

25            MR. MATTHEWS:  Objection.
```

```
 1              MS. LUND:  Objection.

 2      A.    I think it was more -- it wasn't just

 3    suspicious orders.  It was an overall -- I would say

 4    an overall due diligence in terms of customers,

 5    customer vetting, in terms of, you know, knowing --

 6    knowing your customer.  And while that isn't, you

 7    know -- it may not be written that is a require --

 8    that is something that is a requirement, to know

 9    your customer, and I think they concluded that there

10    were certain customers that the company knew or

11    should have known required additional scrutiny.

12      Q.    Okay.  How is it that you came to work for

13    Anda?

14      A.    The way it worked was Harvard was acquired

15    by a company called Court Square Partners.  It was a

16    private equity firm.  The CEO, who had hired me, and

17    the president had retired and basically they brought

18    in a new executive team and they replaced pretty

19    much all the prior senior management.  I was

20    retained as senior -- as a general counsel, but they

21    had -- they were coming to a point where, you know,

22    they were looking into the future to -- private

23    equity, you look to sell the company, and, you know,

24    if you can eliminate people that -- salaries, I

25    don't say people, positions, you know, it probably
```

Highly Confidential - Subject to Further Confidentiality Review

1    excels better and they made a determination they

2    didn't really need a general counsel, but the CEO

3    of -- who was the CEO, Terry Haas, had told Jay

4    Levine, who was the former president of Harvard,

5    look, Robert is doing a great job for us, I don't

6    want to see him out of a job, and that he knew that

7    Jay was -- had a very good relationship with Anda

8    and with Al Paonessa, who was the president of Anda

9    and he said, why don't you explore, even though Anda

10   was a competitor, why don't you see if they need

11   somebody who can do this.

12          And it turned out that Anda was looking for

13   a director of regulatory compliance focusing on DEA

14   and controlled substance issues, and because, as I

15   mentioned, once we had the suspension, I kind of

16   became immersed in working with our DEA counsel, and

17   our local counsel with respect to the administrative

18   law judge, as well as the DEA directly, and

19   internally to develop better systems and processes

20   so that we could get our license back, which we did,

21   and they were looking for someone to specialize in

22   that area, and they interviewed me and I began work

23   there on -- the end of April 2012.

24       Q.   Okay.   Who was it at Anda who interviewed

25   you for the position?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   It was -- there was a phone interview with

 2   Al Paonessa, who was the president, and Michael

 3   Cochrane who was the executive director of

 4   regulatory compliance.  He was responsible for

 5   licensing, for the operations of -- the compliance

 6   operations of all the warehouses, which at that time

 7   were two.  He had all the different responsibilities

 8   and he really wanted somebody to focus on the

 9   controlled substance issues.

10        So Allen -- Michael interviewed me by phone

11   and then in my in-person interview, Al and Patrick

12   Cochrane, who was the Vice President of Operations,

13   and I think it was some of the senior sales and

14   purchasing executives.  It turned out that the day I

15   came down for my interview, Michael's son was born

16   and so he wasn't able to attend my interview.

17        Q.   Okay.  In the interview process, were there

18   any particular responsibilities that were conveyed

19   to you as the types of things you would be working

20   on?

21        A.   Well, primarily to ensure that we were

22   selling -- basically to ensure that we were selling

23   the right products to the right customers and being

24   able to vet -- having enough information on each

25   customer to have systems in place to look at each
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customer and determine are these the customers that

 2    we -- that we need to sell to and what are we

 3    selling to them.  That was the basic responsibility

 4    that I was told.

 5        Q.   And was there a particular emphasis, as you

 6    were interviewing for the position, on selling the

 7    right product to the right customer as it related to

 8    opioids?

 9        A.   Yes.  It was controlled substances, so

10    making determinations, should we sell controls at

11    all, are these the right -- to these customers, you

12    know, on a customer by customer basis, should we

13    sell controls, you know, what quantities.  If we

14    agree that we're satisfied, what quantities, what

15    products and really make sure that we had systems in

16    place to look at each customer and make a good

17    determination to protect the company.

18        Q.   As you were exploring the prospect of

19    working for Anda, did they describe to you, that is

20    representatives of Anda, any particular regulatory

21    challenges that they faced?

22            MR. MATTHEWS:  Objection.

23        A.   I mean, they really didn't -- that did not

24    come up in the discussions that we had, no.

25        Q.   Did anyone at Anda discuss with you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    outstanding regulatory compliance issues that the

 2    company had with the DEA?

 3       A.   Not during my interview process.

 4       Q.   Okay.  What else did you do to familiarize

 5    yourself with Anda prior to taking the position?

 6       A.   Basically, you know, learned about the

 7    company, went on the website, looked at, you know,

 8    where -- what their position in the industry was,

 9    who some of the key people were, some of the --

10    found out some of the customers.  Because Harvard

11    and Anda did share customers.  Now, again, I mean,

12    so I wasn't looking for sales information or pricing

13    or any of that, but just to understand, you know,

14    the type of business that Anda had.

15       Q.   Now, you had earlier characterized Harvard

16    Drug as a secondary wholesaler.

17       A.   Correct.

18       Q.   Is that an accurate description of Anda as

19    well?

20       A.   Yes, it is.

21       Q.   Okay.  And in particular, was it your

22    understanding coming into the position at Anda that

23    they were a secondary supplier, for the most part,

24    as it related to opioid products?

25            MR. MATTHEWS:  Objection.
```

```
 1      A.    Yes.  Yes.

 2      Q.    Okay.  Prior to your time -- I'll start

 3   over.

 4            When you were at Harvard Drug, did you

 5   participate in any industry trade associations that

 6   dealt with the wholesale distribution of

 7   pharmaceutical products?

 8      A.    I'm trying to think of the time frame.  I

 9   certainly read up on different items.  I did go to

10   some industry conferences and also I did -- because

11   again, my role was multifaceted.  I also went to

12   different conferences that were learning about

13   different aspects of the pharmaceutical industry in

14   general, and in many cases looking for what would be

15   a, you know, potential add-on for the company and

16   maybe a little bit out of the traditional, you know,

17   pharmaceutical distribution but maybe like to either

18   different products or different customers.

19            So yes, I did go to industry conventions or

20   seminars and I also read up on these and I -- and

21   also after we had our issues with the DEA, I did go

22   to some industry conferences to -- from HDA to

23   become more conversant with what others in the

24   industry were doing as well as what the HDA had

25   recommended and what they were doing with respect to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DEA.

 2        Q.   Okay.  You referred to HDA in that answer.

 3    Can you tell me what HDA is?

 4        A.   Well, it's now called -- it's now HDA,

 5    Health Distribution Association.  It's the major

 6    industry representative.  It used to be HDMA, Health

 7    Distribution and Management Association, but it's

 8    now primarily focused on distributors and it's based

 9    outside of Washington, D.C.

10        Q.   Okay.

11             MR. NOVAK:  I'll have this marked.

12             (Anda-Brown Exhibit 2 was marked for

13    identification.)

14    BY MR. NOVAK:

15        Q.   We've had a document marked as Anda --

16    Deposition Exhibit Anda-Brown 2?

17        A.   Okay.

18        Q.   And the document is comprised of both an

19    e-mail and an attachment.  The e-mail sent to Robert

20    Brown from Michael Cochrane with -- bearing the

21    Bates number Anda_Opioids_MDL 85677, and then the

22    attachment is a multipage document bearing the Bates

23    number Anda_Opioids_MDL 85679 and continuing through

24    85690.

25        A.   Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Mr. Brown, is this an e-mail and attachment
2    that you would have received during your employment
3    with Anda from Michael Cochrane?
4        MR. MATTHEWS:  Objection.
5        A.   I -- based on what I'm seeing, it appears
6    that's the case.  I don't have -- I don't have
7    firsthand recollection of this, but yes, it -- you
8    know, it's -- it look -- it certainly appears that I
9    was -- that Michael sent me this survey and I'm sure
10   I reviewed it, if I -- although again, I don't
11   have -- I don't have firsthand recollection at
12   this -- as we sit here today, but it certainly looks
13   like something that I would have received.
14       Q.   Okay.  Now, at the top, in the portion of
15   the document that is the e-mail from Mr. Cochrane to
16   you, it simply says:  See below, we should go.
17            And that appears to be referencing a
18   potential DEA-HDMA meeting that HDMA was attempting
19   to schedule.
20       A.   Uh-huh.
21       Q.   Do you recall whether you actually attended
22   the meeting that's referenced in this document?
23       A.   You know, I don't recall and to be -- again,
24   I'm -- I don't really want to speculate, but I'm
25   just not sure if that meeting was ever actually
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    held.

 2         Q.   Okay.  Let me ask you more generally.  What

 3    was your understanding or, well, actually, I'll take

 4    a step back and ask a different question.

 5              During your time at Anda, did you

 6    participate in any HDMA regulatory committees?

 7         A.   Not committees.  I believe Michael was on

 8    those, so I don't -- I don't believe I participated

 9    on the committees themselves.

10         Q.   Okay.  In addition to committees, HDMA

11    provided conferences to educate industry

12    participants in regulatory compliance matters?

13         A.   Yes, they did.

14         Q.   Okay.  Did you participate in those?

15         A.   Yes.

16         Q.   Okay.  Did you review HDMA publications

17    designed to educate industry participants about

18    regulatory compliance?

19         A.   Yes.

20         Q.   Were there particular compliance

21    publications that HDMA issued that you were

22    knowledgeable of?

23         A.   I can't recall offhand but I -- I do know

24    that -- I don't know if it was publications or

25    e-mails or, you know, certain items that were
```

Highly Confidential - Subject to Further Confidentiality Review

1    distributed to industry, and yes, I would have -- I

2    would have reviewed those.  I'm not sure how to

3    quite characterize them but yes, I certainly did

4    review various HDMA recommendations, pronouncements,

5    et cetera.

6       Q.   Okay.  If you turn to the page of Deposition

7    Exhibit Anda-Brown 2, bearing the Bates number

8    85679.

9       A.   Okay.

10       Q.   There is a reference in the first bullet

11    point to a document titled:  HDMA Industry

12    Compliance Guidelines, Reporting Suspicious Orders

13    and Preventing Diversion of Controlled Substances.

14          Do you see that reference?

15       A.   Yes, I do.

16       Q.   Does that refresh your recollection as to

17    one of the publications that, issued by HDMA, that

18    you would have reviewed in your time at Anda?

19       A.   I can't say specifically.  I mean, I did

20    review a lot of industry publications -- documents

21    and so on.  I mean, I can't particularly say.  I

22    mean, this was -- this looks like it was, you know,

23    June 1st, 2011, which was before I got to Anda.

24    I -- I mean I just -- I don't know.

25       Q.   Okay.  But your understanding is that HDMA

Highly Confidential - Subject to Further Confidentiality Review

```
 1    provided these industry guidelines to provide

 2    assistance to all the industry participants as it

 3    related to distribution and regulatory compliance?

 4           MR. MATTHEWS:  Objection.

 5           MS. LUND:  Objection.

 6    Q.   You can answer.

 7           MR. MATTHEWS:  You can answer.

 8    A.   My understanding is yes.

 9    Q.   And you participated in industry conferences

10    from time to time?

11    A.   Yes.

12           MR. NOVAK:  We'll have this marked as

13    Anda-Brown 3.

14           (Anda-Brown Exhibit 3 was marked for

15    identification.)

16    BY MR. NOVAK:

17    Q.   We've had marked as deposition

18    Exhibit Anda-Brown 3, a document that appears to be

19    an e-mail from Robert Brown to a number of different

20    participants, which also forwards an HDMA weekly

21    digest.  The Bates number for the document is

22    Anda_Opioids_MDL 598068 through 598071.

23           And let me ask just a couple general

24    questions as it relates to Anda-Brown Exhibit 3.

25    The first one relates to the weekly digest.  Were
```

Highly Confidential - Subject to Further Confidentiality Review

1    those reports that you received on a weekly basis

2    during your time as the director of regulatory

3    compliance at Anda?

4        A.   Yes.

5        Q.   And was there useful information conveyed on

6    those as to things going on in the industry?

7             MR. MATTHEWS:   Objection.

8        A.   Yes.

9        Q.   Okay.   In particular, if you look at

10   Anda-Brown 3, the page ending in 598069, there is

11   reference -- there is reference at the top of the

12   page to a 2015 distribution management conference

13   and expo to explore critical supply and chain

14   topics.

15            Do you see that reference?

16       A.   Yes.

17       Q.   Okay.   And under that there are a number of

18   what are referred to as session highlights.   Do you

19   see that reference?

20       A.   Yes.

21       Q.   One of which is a bullet point entitled:

22   Applying ARCOS Data Analysis to Suspicious Order

23   Monitoring Programs.

24            Do you see that?

25       A.   Yes.

1      Q.    Do you know whether you attended this

2    particular HDMA distribution management conference?

3      A.    Yes, I did.

4      Q.    Okay.

5            THE VIDEOGRAPHER:   Perfect.

6      Q.    Did you attend the session of the

7    distribution management conference dealing with the

8    application of ARCOS data to suspicious order

9    monitoring programs?

10     A.    I can't recall specifically, but I would --

11   without getting into speculation, I believe I would

12   have, I just can't specifically recall.  Sitting and

13   doing, but yes, that would have been something I

14   would have done.

15     Q.    Well, let me ask more generally.  Can you

16   describe for me your understanding as to how ARCOS

17   data might be used for purposes of facilitating

18   compliance with suspicious order monitoring

19   requirements?

20     A.    What the DEA requires is that orders of

21   Schedule II and Schedule III narcotics are

22   submitted, each distributor is -- manufacturer

23   and -- I'm trying to remember -- certainly,

24   actually, pharmacy are required to submit those

25   reports to the DEA and the DEA uses the data the way

```
 1    they would use it and, you know, if -- I don't

 2    really want to speculate because the DEA doesn't,

 3    frankly has not in the past shared a lot of

 4    information about the ARCOS data that they receive

 5    based on, I guess, what they claim are privacy

 6    concerns, so they haven't really shared, you know,

 7    the exact way they use it, but certainly I would --

 8    by getting information of what products are sold to

 9    which customers and which and how -- and the

10    quantities and by how many sources, you know, I'm

11    sure that that -- I would think that would help them

12    in some of their analysis in determining trends in

13    the industry and maybe specific customers, but

14    again, I would say that some of that is speculation

15    only because they don't share the specifics of how

16    they utilize it.

17        Q.    Okay.  My question, I think, is a little

18    different.  What I'm asking is are there particular

19    uses of ARCOS data that Anda would use for purposes

20    of facilitating suspicious order monitoring

21    compliance?

22        A.    I would certain -- certainly the information

23    that is used in -- to prepare the ARCOS reports is

24    absolutely utilized.  I -- I'm not sure I would

25    characterize it that it would be the report itself.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It's really the data and the information that goes

 2    into those:  Sales reports, sales history, you know,

 3    for each customer, per product, per what -- yes, and

 4    that -- and some of that information is shared in

 5    ARCOS but it's actually a lot broader information

 6    that Anda would use.

 7       Q.   During the time that you were employed at

 8    Anda, did the ARCOS data to which you had access,

 9    was it solely the data supplied by Anda?

10       A.   Yes.

11       Q.   Did you have access to ARCOS data supply --

12    let me step back for a second.  I'll ask a different

13    question.

14            At various times during your employment at

15    Anda, they were a subsidiary of different drug

16    manufacturers.  Is that correct?

17       A.   Yes.

18       Q.   During the time, can you go through the

19    different manufacturers who owned Anda?

20       A.   To the best of my recollection, and there

21    was a little -- when I got there, Watson

22    Pharmaceuticals owned Anda.  At some point, I want

23    to say maybe 2013, but I'm not sure, Watson bought

24    Actavis, but the Actavis name became the company --

25    you know, the overriding company, I guess, for
```

 1    brands -- branding, and again, not -- not to be

 2    confused with brand drugs, but the brand -- it was a

 3    generic company.

 4         And then in 2013 -- maybe 2013, 2014,

 5    Allergan bought Actavis, and they used that name as

 6    the encompassing, and Allergan was a brand

 7    manufacturer and was buying -- you know, was getting

 8    generics.  It was buying a generic -- bulk buying

 9    the product.

10    Q.    Okay.

11    A.    And then, well, of course, before I left,

12    Teva then bought -- in 2016 Teva bought -- well,

13    they bought -- they bought the generic products from

14    Allergan and then they also acquired Anda.

15    Q.    Okay.  Before we went into that chain of

16    ownership, we were talking about ARCOS data.  During

17    the time you were employed at Anda, did you have

18    access to the ARCOS data submitted by any of the

19    manufacturers that you just identified?

20    A.    No.

21    Q.    Okay.  So you didn't have access to Watson's

22    ARCOS data?

23    A.    No.

24    Q.    And not Actavis's?

25    A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Or Teva's?

 2      A.   No.

 3      Q.   Or Allergan's?

 4      A.   Correct.

 5           MR. NOVAK:  Okay.  Why don't we take our

 6      first break.

 7           THE VIDEOGRAPHER:  Off the record, 10:06 a.m.

 8        (Recess from 10:06 a.m. until 10:25 a.m.)

 9           THE VIDEOGRAPHER:  On the record, 10:25 a.m.

10   BY MR. NOVAK:

11      Q.   Okay.  We're back on the record.  Mr. Brown,

12   we talked a little bit about the discussions you had

13   with Anda employees and officers in the interview

14   process.  We didn't really go through what your job

15   responsibilities actually were when you began with

16   the company.  Can you describe those for me?

17      A.   There were, under regulatory compliance that

18   Michael, Michael Cochrane was executive director,

19   there was a licensing division or subset, and a

20   controlled substance subset, and I was responsible

21   for the controlled substance division of, if you

22   will, of regulatory compliance and when I came there

23   were two people who were analysts who reported to

24   me, and then the other -- the licensing -- the

25   people they reported to Emily Schultz.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  The people who reported to you were

2    who?

3    A.   Sabrina Solis and Mary Barber.

4    Q.   And what were your duties managing that

5    controlled substance area of compliance?

6    A.   I mean, the overall responsibility was to,

7    one, review every customer who applied for -- to

8    purchase controlled substance, substances.  Those

9    were new -- new control customers.

10        The other was to review current customers'

11   purchases of controlled substances in terms of what

12   they were buying, how much, all different -- all

13   different factors to ensure that we really had a

14   good handle on each customer buying controls.

15        The next part was if a customer, and we did

16   have limits on the amount of controls that a

17   customer could purchase in a given month and they

18   were by family, so, for example, alprazolam, if it

19   was 1,000 alprazolam a month, that would mean it

20   didn't matter if it was two milligram, one

21   milligram, .5 milligram, it was 1,000.  So we would

22   get requests from customers saying, you know, I'd

23   like to purchase more alprazolam, I've reached --

24   I'd like to raise my limits, so we would analyze

25   each one of those requests because they were done on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    an individual basis based on the -- based on

 2    information that a customer would submit to justify

 3    why they would want a limit increase, and so those

 4    are the kind -- those are the kinds of things that

 5    we would do.

 6          And, yeah, those were primarily -- it was

 7    really customer diligence at all different levels.

 8       Q.   Okay.  In that answer you said you would

 9    analyze each one of the requests of a customer to

10    increase their control limit.

11       A.   Uh-huh.

12       Q.   In answering that way, did you mean you

13    personally or someone within your team?

14       A.   It would either be Sabrina, Mary or myself.

15    Each person in our team had authority to make

16    decisions, but they were always free -- if they

17    weren't sure, they were free to come to me and I

18    would be happy to be -- not -- I would be the person

19    responsible if they had a question, but they had --

20    they had authority.  They were trained and Sabrina

21    had been with the company seven -- seven, eight

22    years by that time, Mary had been in compliance.  I

23    mean, they were both there before I was but she had

24    a compliance background.  So these were people that

25    were trained and were experienced to make decisions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  So the basic areas that we've covered

 2   so far that were your responsibilities when you

 3   started at Anda, were addressing new control

 4   customers, existing control customers, evaluating

 5   increases in controlled limits, and analyzing each

 6   of those requests.

 7      A.   Uh-huh.

 8      Q.   Were there additional responsibilities

 9   beyond those?

10           MR. MATTHEWS:  Objection.

11      A.   There were -- again, we -- we had a -- we

12   had a very robust customer, due diligence customer

13   review system, and the other component of that was

14   an electronic system that would look at orders of

15   controls and every order that came in, you know,

16   would -- there would be orders that would be --

17   would be held for further review, and it was the

18   responsibility of our team to look at each order and

19   make a determination based on the information that

20   we had on the customer as to whether that was a

21   valid order, and if we needed more information, we

22   would do that.  If we didn't, that's -- we would

23   make that decision.  So that was -- that was the

24   other part of it.

25           And one other item that we would do on
```

1    probably a quarterly basis, and this was actually

2    Sabrina handled a lot of this because she was very

3    good with data, we would go over -- we would audit

4    let's say sales of -- pick a drug, hydrocodone, in a

5    particular region and we would look at each -- each

6    customer that was buying controls in that region and

7    see what the numbers were, what the -- what they're

8    buying, what strengths they were buying.  We would

9    compare that to other regions of the country, and

10   then we would do other -- well, who are our highest

11   carisoprodol or oxycodone purchasers and let's look

12   at each one of those and then go back and see, what

13   do we have on these customers, what's been their

14   trends, et cetera.  So we would spend a lot of time

15   really, you know, not just analyzing the day-to-day,

16   but going back, you know, several months or what

17   have you and making comparisons, because we had, you

18   know, all the sales data available that we were able

19   to look at for each customer.

20       Q.   Okay.  How about recordkeeping requirements,

21   were those part of your responsibilities as director

22   of regulatory compliance?

23       A.   In -- could you --

24            MR. MATTHEWS:  Objection.

25       A.   Could you be a little more specific on what

Highly Confidential - Subject to Further Confidentiality Review

```
 1    records were -- you're referring to?
 2        Q.   Well, did you have any responsibilities, as
 3    it related to, assuring that recordkeeping
 4    requirements for regulatory compliance purposes were
 5    adhered to?
 6        A.   I did not personally, if we're -- if you're
 7    referring to required, if we're talking about CSOS
 8    or 222 forms, no, I personally did not maintain
 9    those.
10        Q.   Okay.
11        A.   Now, on other records --
12        Q.   Well, actually, we're almost to the point
13    where we will get into some different records.
14        A.   Okay.
15        Q.   But I just want to be clear.  If a DEA agent
16    came to Anda's offices and asked, who is responsible
17    for maintaining the records that we would like to
18    look at?
19             What would the company's answer be?
20        A.   Michael Cochrane.
21        Q.   Okay.
22             MR. MATTHEWS:  During what time period?
23        A.   During the time -- you're talking about
24    during the time I was there, correct?
25        Q.   Yes.  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

    1        A.    And then -- well, then I -- during the time

    2    I was there, Jay Spellman, assumed that role

    3    afterward.

    4        Q.    Okay.  Now, you've touched upon a couple

    5    different types of electronic systems that were in

    6    place or databases --

    7        A.    Uh-huh.

    8        Q.    -- at Anda and I'd like to go through a

    9    whole array of --

   10        A.    Okay.

   11        Q.    -- different types of electronic systems.

   12    One that you mentioned was CSOS.  Can you provide a

   13    description as to what you meant by that term?

   14        A.    Yes.  CSOS was actually, in fact -- CSOS is

   15    an electronic ordering system for control -- for

   16    Schedule II controlled substances.  A customer --

   17    it's used two ways.  One, it's used for a

   18    distributor to purchase controls -- Schedule II

   19    controls from a supplier, so, for example, you know,

   20    if Anda is buying a product from Qualitest and it's

   21    a Schedule II item, they will submit that order

   22    electronically.

   23            Likewise, if Jim's Pharmacy is -- submit --

   24    is buying Schedule II products from Anda, they will

   25    submit an electronic order that is maintained by

Highly Confidential - Subject to Further Confidentiality Review

 1    both the customer and the supplier and it's a record

 2    and so it would go back and see each order and by

 3    quantity.

 4        Q.    When did Anda implement a -- by the way,

 5    what does CSOS stand for?

 6        A.    Controlled Substance Ordering System.

 7        Q.    Okay.  Do you know when Anda implemented a

 8    Controlled Substance Ordering System?

 9        A.    I don't.  It was before -- before I arrived

10    there.

11        Q.    Okay.  Have you heard the term, TPS?

12        A.    Yes.

13        Q.    And what does TPS mean?

14        A.    TPS maintains -- it's a -- it's a ingrown --

15    it's a home grown system at Anda that maintains

16    certain sales data, sales history, and also current

17    status of each customer.  And it -- I mean, there

18    are many usages -- there are many uses to it.  I can

19    also be, I didn't use it as much, you know, product

20    pricing.  You can look at price of different

21    products, but it was widely used at Anda for many

22    purposes.

23            For compliance, for example, a -- you go to

24    the one page, you put in a customer number and when

25    the customer name, address, would come up, their

Highly Confidential - Subject to Further Confidentiality Review

```
 1    current state of licenses, both their state and

 2    federal licenses, when they were -- when they

 3    expired, it would talk about whether -- it would

 4    show whether they were approved for controls, it

 5    would show whether they -- what documents they

 6    submitted.

 7            So it would give a picture of that customer,

 8    and then from there you could go into other screens

 9    that would show what they have purchased by

10    noncontrols, by controls, by product, by strength.

11    So we used that extensively in our review and

12    analysis.

13      Q.   Were due diligence materials, with respect

14    to particular customers, kept in the TPS system?

15      A.   No, no.  They were -- they were -- let me go

16    back.  They were noted either in the first page,

17    where it would show customer questionnaire, yes, no,

18    I think dispense report -- I think dispense report

19    was on there.  So it was noted whether they --

20    whether they were submitted, and there was a notes

21    section in TPS for each customer that whatever

22    determinations were made about a customer, whether

23    they were approved, not approved, whether they

24    were -- whether they were cut off, whether they --

25    limits were approved or not, or whether limit
```

Highly Confidential - Subject to Further Confidentiality Review

 1    increases were denied, that was in the notes

 2    section, but the actual materials for each customer

 3    were kept in a separate O drive by customer number,

 4    which was the same customer number that was used in

 5    TPS.  The customer was assigned a number when they

 6    became a customer of Anda.

 7       Q.   That's just the customer account number?

 8       A.   Correct -- well, it -- yeah, I think it --

 9    yeah, it is the customer -- I was trying to remember

10    if it was the same account that was used for credit

11    and others.  I think it was.

12       Q.   You said the due diligence materials for

13    each customer are kept in the O drive.

14       A.   Yes.

15       Q.   Who is responsible for maintaining that?

16       A.   Every time it -- sorry.  We had -- again, we

17    had a set of different people who were analysts in

18    our group, so a customer would send in due diligence

19    to let's say, Mary, they send in a customer

20    questionnaire and dispense data.  The first thing

21    that she would be -- if she received it on her desk,

22    the first thing she'd be responsible for is, one,

23    putting it in the customer's file on the O drive,

24    and then secondly, going into the TPS customer page

25    and indicating that it was received and the date it

Highly Confidential - Subject to Further Confidentiality Review

```
 1   was received.

 2          So each analyst would be responsible for

 3   ensuring that any time any customer information was

 4   received, that it was placed in the O drive.  It

 5   could be as simple as an e-mail communication to a

 6   customer, and response to -- response from the

 7   customer.  Whatever was there had to be placed

 8   immediately.  Those files had to be updated and that

 9   was a requirement.

10          (Anda-Brown Exhibit 4 was marked for

11   identification.)

12   BY MR. NOVAK:

13      Q.   We've had a document marked as Anda

14   Deposition -- or Anda-Brown Deposition 4, which is

15   comprised of a single page bearing the Bates stamp,

16   Anda_Opioids_MDL 546477, and then attached to that

17   is a document produced in native format bearing the

18   Bates number 546478.

19          We have brought an electronic copy of the

20   document that was produced in native format, if we

21   can put that on the screen, but I'll ask you a

22   quick -- a quick question with respect to just the

23   e-mail part.

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 8        Q.    Okay.

 9              MR. MATTHEWS:   Just -- before we go on, I

10        just want to put an objection on the record, that

11        the spreadsheet which Mr. Brown is being asked

12        about is produced today only in electronic form.

13        And as I understand it, we're not going to be

14        able to print a copy of what's been used to make

15        a record of the actual document that was used

16        here at the deposition, and so I object to that

17        procedure.
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5          MR. NOVAK:   Okay.

 6     BY MR. NOVAK:

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5      A.   Leslie Harrington is a national account

 6   manager, so she was responsible for obtaining these

 7   types of accounts.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



```
 9      Q.   Okay.   And when you say Schedule II
10   controls, that would include opioid products like
11   OxyContin and fentanyl?
12      A.   It may.   There are nonopioid Schedule II
13   products, so I'm not sure which products -- by this
14   I couldn't tell which products she was -- she was
15   looking at.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6      Q.    Okay.  Was part of your work in compliance

7   at Anda, associated with performing some of the work

8   necessary to either create a new sales account with

9   the company or to expand upon what could be sold to

10  existing accounts?

11          MR. MATTHEWS:  Objection.  I'm not sure

12      that -- I'm not sure that really captures what

13      our role was.  I'll try -- I'll answer it to

14      my -- I'm trying to understand the question.

15      What our role was, that any sales opportunity

16      that came to the company that involved the sales

17      of controlled substances, had to be reviewed and

18      approved by compliance before those sales would

19      be permitted.

20          And I personally reviewed many of these

21      customers myself.  I personally did it.  Some of

22      the other members -- some of those other members

23      of our team handled, we parsed out the work, but

24      that was our responsibility.  It was -- like I

25      say, it was an approval or rejection process, and

Highly Confidential - Subject to Further Confidentiality Review

```
 1        making sure that all required information was

 2        received from each of these potential -- either

 3        potential control substance customers before they

 4        were approved to purchase controls.
```

10        MR. MATTHEWS:  Objection.

11    A.    I mean, there are -- you know, if it's an

12    individual customer, individual pharmacy, you know,

13    the pharmacy representative will notify the customer

14    of the requirements of a customer seeking to

15    purchase controls.  First of all, it has to be an

16    existing customer, and then that customer would be

17    able to go to our website, print out a copy of the

18    customer questionnaire that we required of each

19    customer, they would fill that out, they would

20    provide dispense data that -- 90 day prior dispense

21    data for all products dispensed by that pharmacy by

22    unit, dosage unit, individual dosage unit and number

23    of prescriptions per item, and I believe -- I'm not

24    sure what time frame, but I think at some point we

25    started asking for their procedures for fill -- for

1    dispensing controls.  We wanted to know what their

2    procedures were.

3         And they would put that packet together.

4    There was a fax number on the questionnaire and they

5    would fax it in.  It was a dedicated fax line to be

6    submitted to compliance.  And it could go right to

7    compliance and that's how a customer -- a sales rep

8    would say, this is what you have to do, and a

9    customer would do it from there.

10        Or they could take the same documents and

11   e-mail them to a dedicated compliance e-mail.

12        So that's, you know -- and for independent

13   pharmacies, that was the most common way that sales

14   would at least -- would notify their customer of the

15   manner in which they were required to apply if -- to

16   purchase controls if they so desired.

17    Q.   Okay.  How about for regional or national

18   chains, how would that be communicated?

19    A.   It would be -- well, this was one way.

20   Another way would be that a national account manager

21   would say -- and this happened sometimes, although,

22   I can't recall a specific instance, but they would

23   say, look, I'm working on this opportunity, I've

24   got, you know, they want to purchase controls,

25   here's their -- I'd like to set up a call with you

Highly Confidential - Subject to Further Confidentiality Review

```
1    and I -- it could be somebody else I designate but
2    in those cases it was usually me, and their
3    compliance people and you tell them exactly what you
4    need, let them know what is required and you guys
5    can talk and see, you know, and so they understand
6    what it is, so I'm not the messenger.
7            That would happen from time to time as well.
8    More than time to time, it happened a decent amount
9    of times.
10   Q.   At the very beginning of that answer you
11   said:  Well, this was one way.
12   A.   This was one way, yeah.
13   Q.   What were you referring to when you said,
14   "this"?
15   A.   This -- this pipeline as a notification, but
16   if it got more --
17   Q.   Okay.
18   A.   -- detailed, for example, if there was a
19   new -- and I don't know if it ever came to fruition,
20   but just using the Dale Hayes example, okay, you're
21   talking to these people, if it ever got past that
22   stage, all right, we know about it, so if Leslie
23   Harrington were to pick up the phone or send me an
24   e-mail and said, you know, I talked to the buyer,
25   finally connected with them, they have a compliance
```

Highly Confidential - Subject to Further Confidentiality Review

1    director, can you talk to them?

2         That would be -- that's how that would --

3    Q.   Another way of communicating?

4    A.   Yes.  Exactly.  Exactly.

5    Q.   Okay.  That's, I think, all I have for

6    Deposition Exhibit 4.

7         Mr. Brown, were there particular standard

8    operating procedures that you familiarized yourself

9    with when coming to Anda?

10   A.   There were -- there were standard operating

11   procedures in place that I was given, I think,

12   probably my first day at Anda that I reviewed, yes,

13   and utilized in the -- and made sure our team

14   utilized in terms of conducting our day-to-day

15   affairs.

16   Q.   Okay.  Can you describe for me what

17   different standard operating procedures you used in

18   compliance on a day-to-day basis?

19   A.   Well, we used -- and it's -- I think I've

20   described some of it.  When we had a new customer --

21   a -- an existing customer who wanted to purchase

22   controls, we laid out all of the requirements that

23   we would need to review that request.  One SOP, I

24   believe, dealt with that.

25        Another SOP -- and not having those in front

Highly Confidential - Subject to Further Confidentiality Review

```
 1   of me and not having reviewed them for the last few
 2   years, I can't recite them by rote, but one was
 3   also -- another one was as we discussed earlier, a--
 4   if a customer wishes to have an increase in the
 5   limits that they are allowed to purchase, monthly
 6   limits, what the process is for that, you know, and
 7   making sure that we went through that, and then
 8   there was another SOP that dealt with controlled
 9   substance orders that were, as we called them, of
10   interest or needed further review -- that we
11   would -- and the process we would use to verify
12   those orders, the information and how we would
13   analyze those and determine whether, you know, those
14   were legitimate orders or required additional
15   explanation or whatever disposition there would be.
16        Q.   Okay.  Let me have this marked as Anda-Brown
17   Deposition Exhibit Number 5.
18             (Anda-Brown Exhibit 5 was marked for
19   identification.)
20   BY MR. NOVAK:
21        Q.   We've had marked as deposition Exhibit -- or
22   Anda-Brown Deposition Exhibit 5, a document which
23   purports to be an e-mail exchange between you and
24   Michael Cochrane, is the first page and then
25   attached to that are what appear to be versions of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    three separate standard operating procedures at

 2    Anda, Standard Operating Procedure 28, Standard

 3    Operating Procedure 40, and Standard Operating

 4    Procedure 45.

 5            And I should note that the document bears

 6    the Bates number Anda_Opioids_MDL 91399 through

 7    91410.

 8            Is that an accurate characterization of what

 9    the document is?

10            MR. MATTHEWS:  Objection.

11        A.   Let me look.  From what I can tell.  I don't

12    have specific recollection other than this document.

13    Again, just reading it, it looks like -- again, I'm

14    just reading the words, that Michael and I had had a

15    conversation, that I had -- we had talked about

16    potential revisions to the SOPs once I had -- as I

17    say, I had reviewed -- I had been handed these when

18    I walked in and had had some time to review them.  I

19    had some suggestions.  It looks like, and again, I'm

20    not trying to speculate, but I'm looking at the

21    language, I may have attached a letter on May 31st

22    that outlined those changes.  Michael says, why

23    don't you just put them in the SOPs and that's what

24    it looks like I did.

25            But again, having no independent knowledge
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    other than what the document says.

2       Q.   Okay.  Well, let's go through the e-mail

3    exchange itself.  The first one is an e-mail from

4    you to Michael Cochrane on May 31st, where it just

5    says, per our discussion today.  And then Michael

6    responds the following morning, June 1st, and says:

7    I think it looks great to streamline things and keep

8    things formatted the same way.  What do you think

9    about working specific things from this letter into

10   one or more of these existing SOPs or we can create

11   a new SOP in this format when an inspection is a

12   definite must.

13          And then you reply on the afternoon of June

14   1st at 2:39 and say:  I attempted to add the

15   pertinent sections to each of the existing SOPs as

16   appropriate.  Please let me know your thoughts when

17   you have a chance.

18          Do you have any reason to believe that you

19   didn't have the e-mail exchanges that are depicted

20   on the first page of Anda-Brown Deposition

21   Exhibit 5?

22      A.   I don't have any reason to believe that

23   didn't happen, no.

24      Q.   Okay.  This is an accurate depiction of the

25   e-mail exchanges that occurred between you and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Michael?
 2        A.   With one exception.  I don't -- unless it's
 3    attached here and I didn't really see it, I'm not
 4    sure -- this seems to imply -- the May 31st, seems
 5    to imply, per our discussion earlier today, and
 6    Michael's response, that I attached a document to
 7    the May 31st e-mail, and so if -- again, I'm
 8    implying, based on the language, so if that's the
 9    case and it's not attached, I don't know if this is
10    a complete depiction, is all, I guess, I'm saying.
11        Q.   Okay.  There may be an additional letter
12    that's referenced in that June 1st e-mail from
13    Michael to you?
14        A.   Based solely on what I'm seeing in this
15    document, yes.
16        Q.   Okay.  I want to go through a couple pages
17    now of the underlying SOPs.
18        A.   Okay.
19        Q.   And really, what I'm going to focus on
20    initially are just some of the data entry functions.
21        A.   Okay.
22        Q.   If you look at Standard Operating Procedure
23    40, and that begins at the Bates page,
24    Anda_Opioids_MDL 91403 of Deposition Exhibit 5,
25    first of all, let me start by asking what is the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    purpose of Standard Operating Procedure 40?

 2    A.    The purpose is to set -- to establish the

 3    procedures that are utilized to analyze any order

 4    that is identified in the company's electronic

 5    order -- control order monitoring system.

 6    Q.    Is it fair to say that Standard Operating

 7    Procedure 40 is designed to record those steps that

 8    the compliance department would take in evaluating a

 9    controlled substance account to determine whether

10    Anda would sell controlled substances to a

11    particular entity?

12         MR. MATTHEWS:  Objection.

13    A.    That's not -- that's not this SOP.

14    Q.    Okay.  That would be Standard Operating

15    Procedure 28?

16         MR. MATTHEWS:  Objection.

17    A.    Just -- I'm just looking to see.  Yes.

18    Q.    Okay.  So going to Standard Operating

19    Procedure 40, it is designed to record the steps

20    that Anda implements for purposes of operating a

21    suspicious order monitoring program?

22         MR. MATTHEWS:  Objection.

23    A.    No.

24    Q.    I still didn't get it right?

25    A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

 1     Q.   How would you describe what the purpose of

 2    SOP 40 is?

 3     A.   The purpose of this procedure is to document

 4    the steps that are taken when an order is identified

 5    and held in the company's electronic order

 6    monitoring, order monitoring system.

 7     Q.   Okay.  And the electronic order monitoring

 8    system you are making reference to is the TPS

 9    system?

10     A.   I believe it was in TPS, yes.

11     Q.   Okay.  At least during your initial years?

12     A.   Uh-huh.

13     Q.   At Anda?

14     A.   Correct.

15     Q.   Was there a period in time that a different

16    system was in place while you were at Anda --

17     A.   Not while I was at Anda.

18     Q.   Let me finish the question.

19     A.   All right.

20     Q.   To identify orders of interest?

21          MR. MATTHEWS:  Objection.

22     A.   Not when I was at Anda.

23     Q.   When did you leave?

24     A.   January 2017.

25     Q.   Okay.  We'll get to the whole Buzzeo thing

Highly Confidential - Subject to Further Confidentiality Review

1    later.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16        MR. MATTHEWS:  Just to be clear, we're
17     talking about the time that he was at Anda,
18     right?
19        MR. NOVAK:  Yes.
20        MR. MATTHEWS:  Okay.
21  BY MR. NOVAK:
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
```

```
 4     Q.    Okay.  That's the O drive that you made
 5   reference to earlier, where the customer
 6   questionnaires are kept?
 7     A.    Correct.
 8     Q.    Okay.  Not in TPS?
 9     A.    Correct.
10     Q.    The O drive is a server maintained folder
11   that's available to anyone in Anda?
12           MR. MATTHEWS:  Objection.
13     A.    The O drive itself contains many folders
14   related to different information that is maintained
15   by Anda of all different sorts of items.  There are
16   specific folders dealing with compliance and this
17   particular folder is accessible only by authorized
18   designated people which would again be the people on
19   my team, Emily, and Michael Cochrane while I was
20   there.
21     Q.    Okay.  And so for this particular O drive
22   folder, security is tighter as to who can place
23   documents or change documents in that particular
24   folder; is that correct?
25     A.    That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review



16    Q.   Is the summary dispensing data kept in the

17   same subfolders as the customer questionnaire?

18    A.   By customer.  So in the O drive you list

19   every customer -- you have a separate folder for

20   each customer.

21    Q.   Okay.

22    A.   And that would include all of the

23   information that each customer has submitted as --

24   and again, as well as any e-mail, including any

25   e-mails that might have gone to the customer, and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    their responses, and so it would be by customer that
 2    data would be included.
 3       Q.   Okay.  If a customer has multiple stores,
 4    would there be even more subfolders, one for each
 5    store to reflect the dispensing data of each
 6    individual store?
 7       A.   There would be a -- it would be by customer
 8    number and we would try to -- I can't remember how
 9    we figured out how to make sure that they were
10    somewhat linked, but every -- every store location
11    would have its own individual customer folder,
12    including questionnaire, dispense data -- yeah, it
13    would have each -- each folder would have, yes.
14       Q.   Okay.  So if Walgreens had, say, 150 or 250
15    stores in the state of Ohio, there would be, kept in
16    the O drive, a separate customer questionnaire and a
17    separate summary dispensing data on file as for each
18    of them?
19            MR. MATTHEWS:  Objection.
20       A.   That's correct.  It's correct.  The only
21    thing I would maybe revise is there would be a
22    separate Walgreens folder that would list -- have a
23    folder for every location, regardless of state,
24    regardless of what -- just be if it was Walgreens,
25    store number, whatever, and would have all that
```

```
 1    information.

 2        Q.   I wasn't suggesting you kept it only for

 3    Ohio.

 4        A.   No, I know.  But I mean -- it's not also

 5    segmented by state is I guess what I'm saying.

 6        Q.   Okay.

 7        A.   You know, customer number 12345 is in

 8    Albuquerque and customer 12346 is in Anchorage, it

 9    would still be in -- it would each have their own

10    folder but it would be in a separate Walgreens

11    folder by --

12        Q.   Would there be a method to search it by

13    state?

14        A.   We could.  Yes, there were definitely -- we

15    had -- we had a lot of ways that would -- that would

16    slice and dice, so to speak.

17        Q.   I was about to use the same term.

18        A.   Which -- I will not tell you I was --

19    expertise, I had good people on my team to do that.

20        Q.   Who were the best slicers and dicers in your

21    department?

22        A.   Sabrina Solis and Latoya Samuels.

23        Q.   They would have the ability to go into the O

24    drive and extract data using various methods?

25        A.   O drive or TPS, because if it dealt with
```

Highly Confidential - Subject to Further Confidentiality Review

1    customer sales information and purchasing history,

2    it would be in TPS.  So yes, they could work the

3    different systems to get that.  I need a report on,

4    you know, et cetera, how many customers we have in

5    Ohio that have bought so much whatever, and they

6    would be able to do that.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3      A.   And -- just to say -- again, I don't have --

4           MR. MATTHEWS:  Wait for a question.

5           THE WITNESS:  I'm sorry.  Okay.

6      A.   Could you -- just --

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7          They might say, you know, I just picked up a

8      new clinic, you know, Dr. Smith, he's five minutes

9      from me, here is his specialty, here is his DEA

10     number, we might make a quick check, make sure there

11     aren't any issues with that doctor and the specialty

12     conforms with the request.  Okay.  And we'll say,

13     all right, if it makes sense, and we have enough

14     written documentation, not oral, but written, we

15     will approve and we'll move the limit up to 1200, as

16     an example.

17          Q.   Okay.

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



15          MR. MATTHEWS:  Objection.

16     Q.   As one example.

17          MR. MATTHEWS:  Objection.

18     A.   As an -- as an example, yes.

24     Q.   These are the steps that a compliance team

25     member should undertake in order to say yes or no to

Highly Confidential - Subject to Further Confidentiality Review

1    the person in sales who is asking the question?

2        A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9    Q.   Okay.  Now, earlier I think you said that a

10   new customer has a period of time before they're

11   eligible to even request to purchase controlled

12   substances?

13   A.   Correct.  Correct.

14   Q.   60 or 90 days?

15   A.   Yeah, I can't remember that.  I think it's

16   90 but I'm not sure.

17   Q.   So at the end of that period of time, if

18   they said, okay, my 90 days are up, I'd now like to

19   buy some OxyContin.

20       In order to do that would sales have to

21   submit a remedy review process request under these

22   procedures to have their status changed so that they

23   were eligible to purchase OxyContin?

24   A.   That would be -- well, all right, let me go

25   back.  They would not be able to purchase oxycodone

Highly Confidential - Subject to Further Confidentiality Review

```
 1    at all, even if they were eligible to purchase

 2    controls.  Use alprazolam, why don't we use that,

 3    that would be easier.

 4         So again, as I mentioned, a customer could

 5    either submit the questionnaire and the dispense

 6    data and -- oh, I forgot to mention, I'm sorry,

 7    photographs of the pharmacy.  We also wanted to see

 8    that.  Because somebody could say, I'm a closed door

 9    pharmacy and then you've got -- or they could say

10    I'm a retail pharmacy and there's no front end and

11    that would be like a little sign, because again, we

12    want to verify as much as we can.

13         So they could either submit that directly to

14    compliance by the fax or e-mail, or they can submit

15    that information through the reps.  So if the rep

16    has that information, then they would submit it --

17    they could submit it, attach it to the remedy

18    request for a new customer, a new control

19    customer -- an existing customer seeking to purchase

20    controls.  So it could come through remedy.

21         And I will say there is one other, because

22    I'm trying to be -- you know, give you -- let's say

23    a customer provides us information through e-mail or

24    fax directly to compliance, and maybe the customer

25    then calls a day later, where am I, what did
```

Highly Confidential - Subject to Further Confidentiality Review

1    compliance do, I want to order.

2           And so it could be -- a remedy request could

3    be from the rep:  A customer says they submitted

4    this, can you tell me status.

5           And then we would say we're in the process

6    of reviewing or we didn't get everything we needed,

7    or whatever it would be.

8

9

10

11

12

13

14    Q.   Okay.  Let me ask a different question.  As

15    this material is input into the TPS system over

16    time, do old entries get changed or modified or is

17    it kind of a linear process, where new information

18    just continues to be added?

19           MR. MATTHEWS:  Objection.

20    A.   Notes can never be changed.  They are a

21    permanent record and so they are not changed and

22    they are not deleted.  They continue on and it's

23    linear.  So anybody going in to look at a customer

24    can see the entire history.

25    Q.   You can only add to the compliance notes --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2        Q.    -- in the TPS system, you can't alter

 3   earlier entries of compliance notes in the TPS

 4   system?

 5        A.    That's correct.

 6        Q.    Okay.  And then the next category is review

 7   customer questionnaire, and in that category it

 8   says -- the first bullet point is:  Save new

 9   customer questionnaire to O drive if necessary for

10   recordkeeping.

11              That's simply to -- if a customer

12   questionnaire doesn't exist, it needs to be placed

13   into the O drive?

14        A.    Or -- and I can't remember at what point,

15   but we said we need -- we wanted a new customer

16   questionnaire every three years.  So it may be that

17   they were due -- in order to continue to be eligible

18   for -- to purchase controls, we needed annual

19   dispense data at least.  Now, if they were looking

20   for increases, we'd get it more frequently but not

21   less than once a year we'd get dispense data, and

22   that's if they kept ordering at the same rate,

23   otherwise more and then every three years we would

24   get a new customer questionnaire because it is a

25   rather extensive document but we wanted to see how
```

Highly Confidential - Subject to Further Confidentiality Review

1    their business had changed and we reviewed

2    everything that came in and we would put it side by

3    side, so yes.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
1
2
```

3    Q.    So the existence of a new questionnaire in

4    the file for a particular customer doesn't mean that

5    the old customer questionnaire is deleted?

6    A.    Not at all.

7    Q.    Okay.  In the -- when it says "flag Y", that

8    is simply confirming in TPS that a customer

9    questionnaire is on file.

10    A.    Right.  If it's not, there is an N.

11    Q.    Okay.  And then the last bullet point, it

12    says:  Determine type of pharmacy reviewing, volume,

13    location, age, et cetera.

14          What is the purpose of that step in the

15    remedy review process?

16    A.    Well, let's look at volume first.  If this

17    is a customer that is -- dispenses 50 prescriptions

18    a week, and they -- and they are a new customer,

19    let's say they haven't -- let's take a couple

20    examples.

21          They dispense 50 a week and now they have

22    all this information that they want to purchase

23    controls from Anda, we're thinking well, you want to

24    purchase controls, we're not going -- we're going to

25    look at their dispense data and kind of match up,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    one, do they really need it, is this something --
 2    why aren't they getting this from their primary, and
 3    certainly it will affect -- impact the volume we
 4    agree to provide, if in fact we approve them at all.
 5    So that's one, a small or large pharmacy, who do
 6    they deal with and location.  If they are in a small
 7    town and they are dispensing, you know, 3,000 scrips
 8    a week, well, we want to know why that is, we want
 9    to get more information.  Are they located next to a
10    hospital, I mean what's going on here.
11           So that's that one.
12           And then age, if they are open six months
13    and they are already dispensing oxycodone and
14    methadone, we're going to have a concern about that.
15    Why would that be -- why would that be the first
16    thing you're getting as a new pharmacy.  I am using
17    different examples but that's the kind of things we
18    would look at.
19      Q.   And that information is all recorded in the
20    customer questionnaire?
21      A.   Correct.
22      Q.   Okay.  But the dispensing volume is
23    separately recorded from the -- or is that with the
24    customer questionnaire?
25      A.   It's in the O drive with the customer
```

Highly Confidential - Subject to Further Confidentiality Review

1    questionnaire.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13     Q.    Something about that answer struck me.

14   There's a difference between what the customer

15   purchases and what they dispense, correct?

16          MR. MATTHEWS:  Objection.

17     A.    Are you talking about purchasing from Anda

18   or purchasing --

19     Q.    Yeah.  What the customer purchases from Anda

20   versus what they sell to consumers.

21     A.    As a secondary, that would be -- as a

22   secondary, that would be across the board controls

23   or noncontrols, that is correct, for a secondary.

24     Q.    Right.

25     A.    So there is no -- whether it's -- whether

```
 1    it's metformin or omeprazole or hydrocodone, that is

 2    true for any product.

 3        Q.   And what you're evaluating -- are you

 4    evaluating both what they're requesting to purchase

 5    from Anda, as well as what they're dispensing to

 6    customers, to their consumers?

 7        A.   It could be both or it could be either/or.

 8    If we see -- if we see dispense data and I'll give

 9    you two -- I'll give you a couple of different

10    examples on that.  If we see dispense data where the

11    highest product -- and this did happen on a few

12    occasions -- is oxycodone 30 and their next item was

13    methadone and the next item was hydromorphone 8

14    milligrams.  And the guy says.  I don't want to

15    purchase any of that from you, I don't even need

16    CII's, I just want to purchase lorazepam, you have a

17    good price on it, we would say no.  And our

18    philosophy was, if you wouldn't sell them oxycodone,

19    why would you sell them another control?  That was

20    the philosophy from the time I came there.  Mike --

21    Mike Cochrane was very clear on that.  No, it is

22    either all or nothing.  If you're not comfortable,

23    it doesn't matter if they are buying that from us,

24    because we're at the customer level, we're not

25    worried about what they are buying from us.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              On the other hand, so it doesn't matter what
 2      they are buying, doesn't matter what they want to
 3      buy from us, we will just not -- don't even turn me
 4      on for CII's and just give me lorazepam and give me
 5      1,000 a month and we would say no.
 6              On the other hand, there would come a time
 7      when, you know, we would evaluate percentages or
 8      we'd look at a customer and say -- and we do this on
 9      a, you know, monthly or quarterly basis, who has
10      been increasing their control ratios or adding --
11      because again, they had limits but who has been
12      adding -- and if they were purchasing more from us
13      and it got to a point where we're looking at --
14      we're seeing that they are purchasing more volume of
15      controls than they had a month earlier or two months
16      earlier or three months earlier, and understanding
17      we're secondary, we very well could say, you know
18      what, we're not comfortable with this pattern
19      anymore and we're not -- it's not one order, it's
20      just we're not comfortable with their pattern and --
21      so we looked at both.
22      Q.    Now, the last bullet points under Roman
23      numeral 7 states:  For an increase request,
24      determine if dispense data indicates a need for an
25      increase.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              What does that mean?

 2       A.    Let's just say they have -- let's say

 3    they're at 1200 limit for carisoprodol, could be

 4    hydrocodone, whatever it is, and we look on their

 5    dispense data and they're only dispensing 1500 or

 6    1800 or 2,000.  Wait a minute, we're already -- or

 7    2500.  Wait a minute, why do you need that increase

 8    from us.  You're not dispensing enough to justify

 9    that type of increase.  So you know, because again,

10    the more -- that's when you -- that's when you have

11    a little, you know -- and the next -- the next set

12    of analysis comes in.

13       Q.    Okay.  Now, if one of the compliance team

14    members in your department were making observations

15    about these different bullet points that we've just

16    been walking through on dispensing data, where would

17    they record their observations after having reviewed

18    it?

19       A.    They -- they would put that in the customer

20    notes or there are other times they would even, when

21    they respond to the remedy request -- so let's take

22    that last example:  Denied, customer only dispensing

23    X number of pills per month, increase not warranted.

24              So they put that in -- in the response to

25    the -- in the remedy and those are also recorded.
```

1    So you go back, you look at that if it came up

2    again.

3        Q.   Okay.  Recorded where?

4        A.   In the -- in TPS.  That would be under

5    remedy -- I'm sorry, remedy, not TPS.  My mistake.

6    It would be recorded under -- because would it be --

7    in the response to the remedy, and I think -- and

8    again, I don't want to misstate, it's been a few

9    years, but I think on something like that it would

10   probably also go in the customer notes, something

11   like that.

12       Q.   Okay.  So it would be back, if we're looking

13   at the last page that we reviewed, ending in 1407,

14   it would be in the customer compliance notes or the

15   customer notes?

16       A.   Right.  Or again, it could also be in

17   remedy, the remedy notes themselves, because every

18   remedy opportunity -- see, in order to track it, the

19   person who is going through those requests has to,

20   what they call, close them out.  So there has to be

21   a disposition.  It can't remain -- I mean, it -- I

22   suppose it could remain open if -- the way it

23   remains open is we need more data in order to

24   fulfill this request.  And if you don't get the

25   data, you know, so it could be a couple days and

Highly Confidential - Subject to Further Confidentiality Review

```
1    it's still open, you know, because we haven't

2    gotten -- we haven't gotten the updated data.  So it

3    stays open.

4         But the goal is to get these adjudicated.  I

5    mean, you don't want a customer waiting.  If there

6    is a problem, you want to get that adjudicated.  So

7    you don't really want to have these open forever.

8    You want to get those -- you want to get them

9    addressed as soon as -- as soon as makes -- as it

10   makes sense.  I mean we're not here to rush, because

11   it could require more analysis, but -- so when you

12   close out a remedy request, you know, you will

13   always put a reason, this is what happened, it was

14   denied for this reason or approved for this reason.

15        MR. MATTHEWS:  Is this a good time to take a

16      break or -- we've been going for a long time.

17        MR. NOVAK:  My goal is to get through this

18      document.

19        MR. MATTHEWS:  We've been going -- it's a

20      long document and we've been going for well over

21      an hour.

22        MR. NOVAK:  If you want a break --

23        MR. MATTHEWS:  We've been going for two

24      hours since the last break, so why don't we

25      actually just take a break, I'm exhausted, so
```

Highly Confidential - Subject to Further Confidentiality Review

1          five minutes and that will be it.

2                  THE VIDEOGRAPHER:  Off the record, 12:29 p.m.

3              (Recess from 12:29 p.m. until 1:35 p.m.)

4                  THE VIDEOGRAPHER:  On the record, 1:35 p.m.

5      BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



15    Q.   And that is all contained in either TPS or

16    in the O drive?

17    A.   That is correct.

18    Q.   Is there any reflection of the due diligence

19    being performed that is indicated by the entry of a

20    yes or a no similar to what we saw with whether a

21    customer questionnaire had been received?

22         MR. MATTHEWS:  Objection.

23    A.   A determination of eligibility, so if a

24    customer is approved for controls, there will be a

25    note in the customer notes that will say, you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know -- mean, depending on how extensive, but there

 2    will be a note that indicates that the customer was

 3    approved.  It may -- I mean, again, it could be --

 4    various things are said, all due diligence reviewed,

 5    customer approved for controls.  If they are denied

 6    for controls, it will say why, you know, top five

 7    products were controlled substances, customer denied

 8    access to controls.  So it will be -- most -- most

 9    times it would be in the -- but for eligibility, it

10    will be in the customer notes, in TPS.
```



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9      Q.    Okay.  How is that measured, 1,000 what?

10      A.    Pills, dosage units.

11      Q.    So, for example, hydrocodone would be

12   limited to 1,000 pills?

13      A.    That is correct.

14      Q.    What other opioids would have that initial

15   limit in them once the customer is authorized to

16   purchase controls from Anda?

17      A.    When we started or when I started, meth --

18   or hydromorphone was also 1,000.  Later on that was

19   added to the -- to the -- oxycodone and methadone

20   limitation, but at the time -- at the time that

21   this, 2012, hydromorphone and oxymorphone were

22   1,000.

23      Q.    Okay.  Any other opioids that had 1,000

24   limitation on the control family?

25      A.    I want to say fentanyl, and that was later
```

Highly Confidential - Subject to Further Confidentiality Review

1    changed as well, but at the time it was 1,000.

2          I might add that at the time of 2012,

3    hydrocodone was a Schedule III.  I think it was 2014

4    that it was rescheduled.

5          (Anda-Brown Exhibit 6 was marked for

6    identification.)

7    BY MR. NOVAK:

8      Q.   We've had marked for identification purposes

9    Deposition Exhibit Anda-Brown 6, which is a two-page

10   document bearing the Bates number Anda_Opioids_MDL

11   56015 and 6.

12         This appears to be a -- well, let me just

13   ask you.  Can you identify what deposition

14   Exhibit Anda-Brown 6 is?

15     A.   No, I can't.  I've never seen this before,

16   before you just handed it to me.

17

18

19

20

21

22

23

24         MR. MATTHEWS:  Objection.

25

Highly Confidential - Subject to Further Confidentiality Review

1

2

3      Q.   Okay.  How in the period of time that you

4   were at Anda as director of regulatory compliance,

5   was a system formula devised to determine orders of

6   interest for a suspicious order monitoring program?

7         MR. MATTHEWS:  Objection.

8      A.   It was already in place when I started, so

9   I'm -- I really don't have any firsthand knowledge

10  of how that was -- how that formula was arrived.  It

11  was -- I just don't have any knowledge of how it was

12  originally arrived at.

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    Q.   Did you ever have discussions with the DEA

14    as to what the average -- how the average was

15    calculated or how the multiplier was selected?

16        MR. MATTHEWS:  Objection; compound.

17    A.   To my recollection, I don't -- in the times

18    that I was with the DEA and met with them and

19    inspections, I don't believe -- I don't remember

20    that coming up.

Highly Confidential - Subject to Further Confidentiality Review



17          (Anda-Brown Exhibit 7 was marked for

18     identification.)

19     BY MR. NOVAK:

20          Q.   We've had marked for identification purposes

21     Deposition Exhibit Anda-Brown 7 which bears the

22     Bates range, Anda_Opioids_MDL 36508 through 36522.

23          A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5

 6

 7

 8      Q.    Okay.  Do you recall responding to a

 9   subpoena issued by the US Department of Justice?

10      A.    Frankly, we received several subpoenas,

11   whether it be from -- no, I don't -- it wasn't

12   Department of Justice.  It was the DEA.

13      Q.    Okay.

14      A.    It wouldn't have been the department -- it

15   would have been the DEA and we received, you know,

16   various subpoenas from DEA or state boards of

17   pharmacy, you know, with respect to records of

18   particular customers, so I certainly don't recall

19   that one, but --

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19      Q.   Now, when you send new account setup

20   information to a customer, do you send a whole

21   packet of information that includes more than one

22   document?

23      A.   We really don't send anything to a customer.

24   They could either get it online -- they usually

25   would get it online and be able to print it off as I

Highly Confidential - Subject to Further Confidentiality Review

```
1    described earlier.  It's information needed to set

2    up an account.  It would be the customer sending

3    information to Anda, not vice versa.

4        Q.   If a customer contacts Anda and says I'd

5    like the information to set up an account, what does

6    Anda send them?

7        A.   Again, we might send them -- we might send

8    it but more often than not, more often than not

9    we're going to tell them go online and print it off

10   because then it doesn't get lost in the mail, it's

11   there -- it's not the same chance of something

12   getting lost or misplaced or a document not being

13   there.  Chances are, we would -- we would be

14   telling -- we would be asking the customer just

15   print off and send this to us.  There may be times

16   we would send it.  It wasn't that often, to be very

17   honest.

18       Q.   Mr. Brown, I'm Walmart and I'm about to

19   spend a billion dollars on pharmaceutical products.

20   I'm calling up Anda and saying, can you send me the

21   information, the packet of information that I need

22   to fill out to become a customer.  What do you send

23   them?

24           MS. CHARLES:  Object to form.

25       A.   Well, are you talking about new control --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    new control customer or new customer generally.  I

2    just want to be clear, because there is different --

3    there is different information, that's all.  I can

4    tell you what we would send them from a

5    control standpoint.

6        Q.    Okay.  Let's start with that.

7        A.    From a control standpoint, we would send

8    them a copy of our customer questionnaire, a copy of

9    our -- a copy of our dispense data format, and we

10   would also send them -- we probably -- in some cases

11   we probably would send them this other item

12   prescription drug -- prescription drug abusive, a

13   team effort -- or fighting prescription drug abuse,

14   a team effort, to explain what we do and why we do

15   it.
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12      Q.    Is that accurate?

13      A.    Correct.

14      Q.    Okay.  So that information goes to the new

15   customer?

16      A.    Uh-huh.

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   Okay.  So this is you opening a new account

3   with your customer and Anda is providing them

4   information about the problems associated with

5   prescription drug abuse?

6         MR. MATTHEWS:  Objection.

7      A.   Well, it's really -- that's one -- this is

8   not just used for new customers.  Again, we keep it

9   on our website as information to existing customers,

10   to people who can go on the website who may not be

11   existing customers at all, but be able to view what

12   we -- what we do, why we do it, and our -- you know,

13   our -- what are the concerns and how we try to

14   address those.

15      Q.   And part of the concerns that you're trying

16   to convey to the customer is that you need to

17   collect a lot of information from them because there

18   is a prescription drug abuse epidemic in the

19   country?

20         MR. MATTHEWS:  Objection.

21      A.   In order -- well, what we say is, we need to

22   collect information, we know there is an issue and

23   in order for us to allow you to purchase these

24   items, we need to have this information.

25      Q.   Okay.  Now, the last sentence in that first

```
 1    paragraph at page 6509 states:  Currently, Americans

 2    account for over 80 percent of the world's

 3    population's usage of opioid drugs and 99 percent of

 4    the total usage of hydrocodone.

 5            Again, is this Anda attempting to educate

 6    its customers on the potential abuses associated

 7    with opioid products?

 8        A.   It's explaining why, unless we have --

 9    unless we get -- it goes on about knowing a

10    customer, unless we have a comfort level with our --

11    with our customers who are looking to buy these

12    products, we are not going to be able to provide

13    these items and there is, you know, there certainly

14    is an issue with them in terms of addiction, of

15    abuse, et cetera, that is concerning, yes.

16        Q.   Okay.  And the know your customer segment of

17    this is described in fuller detail in the third

18    paragraph of this communication to a potential

19    customer, which states, quote:  Manufacturers and

20    distributors are required to know their customers to

21    whom they are providing controls and maintain

22    suspicious order monitoring systems that identify

23    orders of controlled substances that vary from the

24    customer's normal frequency, size, and pattern.

25            You're conveying to the customer, as part of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    potentially opening an account with them, that you

 2    have to obtain certain know your customer

 3    information?

 4        A.   Uh-huh.

 5        Q.   I need verbal answers.

 6        A.   Yes.

 7        Q.   Okay.  And in particular, you need to obtain

 8    sufficient information to maintain suspicious order

 9    monitoring systems?

10        A.   Yes.

11        Q.   And to determine whether the orders that

12    those customers submit vary from the customer's

13    normal frequency, size, and pattern?

14            MR. MATTHEWS:  Objection.

15        A.   Yes.

16        Q.   In fact, the frequency, size, and pattern

17    are all part of the suspicious order monitoring

18    regulation, aren't they?

19            MR. MATTHEWS:  Objection.

20        A.   I -- I don't have it in front of me, but --

21    so I'd have to verify that, but I believe that's the

22    case, that's how it's defined.

23        Q.   Okay.

24        A.   Or at least listed in the -- in the code.

25
```

Highly Confidential - Subject to Further Confidentiality Review



19    Q.    Okay.  Part of the performance of your

20    responsibilities at Anda involved keeping yourself

21    apprised of information as it related to the

22    existence of an opioid product epidemic, did it not?

23         MR. MATTHEWS:  Objection.

24    A.    Certainly I was required to maintain current

25    knowledge of controlled substance trends, issues,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    concerns, policy determinations, changes in

 2    statutes, regulations, yes.

 3       Q.   Okay.  And part of that was also keeping

 4    your staff informed about the nature of a

 5    prescription drug opioid epidemic, was it not?

 6            MR. MATTHEWS:  Objection.

 7       A.   Again, my responsibility was to inform our

 8    staff about all or most current developments and the

 9    most current statutes and regulations and findings

10    dealing with controlled substances, both if they

11    were -- if there were changes in state issues, if

12    there were changes in federal issues, trends,

13    et cetera.  So it's a pretty broad responsibility in

14    terms of knowledge base and sharing of information.

15       Q.   Okay.  And part of changes in federal issues

16    or trends that you provided to staff included

17    information about the nature of the opioid epidemic?

18            MR. MATTHEWS:  Objection.

19       A.   As -- as a -- as information came out,

20    again, in the context of controlled substances,

21    dealing with all -- dealing with many types of

22    issues, yes.

23       Q.   If you can go back a moment to Anda-Brown

24    Deposition Exhibit 3, if you look at the top of an

25    e-mail, and this is the page of Anda-Brown
```

Highly Confidential - Subject to Further Confidentiality Review

1    Deposition Exhibit Number 3 ending in 8068, if I'm

2    reading the numbers correctly, and that's just a

3    vision thing.

4        A.    Sure.  Got it.  Got it.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2            (Anda-Brown Exhibit 8 was marked for

3      identification.)

4      BY MR. NOVAK:

5        Q.   We've had marked for identification purposes

6      Anda-Brown Deposition Exhibit 8, which is a document

7      bearing the Bates number Anda_Opioids_MDL 560658

8      through 560660.  The only portion of the exhibit

9      that I will ask you about is the page ending in

10     60658.

11            There is an e-mail there authored by you on

12     December 6th, 2013, to Thomas Skono.  Who is

13     Mr. Skono?

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9          MR. NOVAK:  Take a quick five minute break

10      so I can move some paper around.

11          THE VIDEOGRAPHER:  Off the record, 2:21 p.m.

12          (Recess from 2:21 p.m. until 2:31 p.m.)

13          THE VIDEOGRAPHER:  On the record, 2:31 p.m.

14  BY MR. NOVAK:

15      Q.   Mr. Brown, do you know who Buzzeo is?

16      A.   Yes.  It has gone -- it's undergone -- it's

17  a company that's undergone several iterations.  It

18  was started by a former DEA executive, Ron Buzzeo,

19  it later became BuzzeoPDMA, it became Quintiles, I

20  think it was then -- and I can't remember the name

21  of the information service that -- the data that

22  they provide.  And then it was -- I think it is

23  IQVIA, now I believe.  So yes, I am familiar.  They

24  are a consulting company and they do a variety of

25  things in the pharmaceutical industry and various
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   consulting.

 2       Q.   During the time that you were director of

 3   regulatory compliance at Anda, did you contract with

 4   BuzzeoPDMA?

 5       A.   We did to -- we -- it was a two-pronged

 6   approach.  One was to do a review of our entire

 7   suspicious order monitoring system, which

 8   included -- includes our customer due diligence and

 9   what we do to vet customers and gather information,

10   and then also to look at the electronic system and

11   see if there were ways of upgrading or enhancing, I

12   should say, that system, because that's something

13   that they had indicated they, you know, they had a

14   system that's -- you know, that they wanted them to,

15   at least, look at ours and kind of compare it.

16           If I may add, we ultimately did engage them

17   to develop a new -- an enhanced electronic order

18   system.

19           (Anda-Brown Exhibit 9 was marked for

20   identification.)

21   BY MR. NOVAK:

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          (Anda-Brown Exhibit 10 was marked for

25      identification.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



15    Q.   Okay.  And you facilitated a meeting that

16    the BuzzeoPDMA people had with Michael Cochrane, the

17    Executive Director of Regulatory Compliance at Anda?

18    A.   Yes, let me clarify, that Michael and I did

19    this jointly, but I was -- and he said, go ahead and

20    handle it, so I did.  I mean, asking them for the

21    assessment, you know, entering the agreement, having

22    the engagement was all done in coordination with

23    Michael.  It was not done independently or without

24    knowledge, let's put it that way.

25

Highly Confidential - Subject to Further Confidentiality Review



6    Q.   Charles Phillips is the President of Anda?

7    A.   That is correct.

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Q.   Is that consistent with your understanding

Highly Confidential - Subject to Further Confidentiality Review

 1    as to the regulatory investigations that occurred at

 2    Groveport and Westin?

 3              MR. MATTHEWS:  Objection.

 4       A.   I do know there were -- there were some

 5    delays in the Groveport, Ohio, and Westin, I know it

 6    took -- it took -- the recertification took about

 7    almost a year, but I will say that what the DEA

 8    informed us on that was, that they just weren't in

 9    any hurry because we were operating and they didn't

10    have any major concerns.

11       Q.   Now, we haven't really talked much about the

12    distribution facilities for Anda.  There were three

13    main distribution centers at the company during the

14    time that you were there, correct?

15       A.   Yes.

16       Q.   And those were located at Groveport, Ohio,

17    Westin, Florida, and Olive Branch, Mississippi?

18       A.   That's correct.

19       Q.   And the vast majority of the controlled

20    Schedule II narcotics that Anda delivered to its

21    customers, including almost all the opioids, went

22    through the Groveport, Ohio, facility, is that

23    correct?

24              MR. MATTHEWS:  Objection.

25       A.   To the best of my recollection.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   Okay.   Over 90 percent?

2        A.   I don't know that amount.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15      Q.   Okay.  So you, James Gatto, that was the

16  individual?

17      A.   Yes.

18      Q.   Sabrina Solis, Mary --

19      A.   Barber.

20      Q.   -- Barber and the other two?

21      A.   At that time it was Latoya Samuels and Tasha

22  Campbell and then Sabrina was actually reassigned to

23  the licensing portion of the compliance, because

24  they were also dealing with some other -- they also

25  gained some additional responsibilities in that

Highly Confidential - Subject to Further Confidentiality Review

1    division, so Sabrina worked under Emily Schultz and

2    we brought in a gentleman named John Kincaide, who

3    had been in the contracts department.  So we didn't

4    lose anybody, the numbers stayed the same, but

5    Sabrina was reassigned at that point.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3          I think your testimony this morning had

4     touched upon the every three years for the customer

5     questionnaire.  I don't recall.  Did you also

6     identify that there was requests for fresh

7     dispensing data every year?

8          A.   Yes, I did say that, and I said, at minimum

9     once a year because in the event that they wanted to

10    be eligible for methadone or oxycodone or have a

11    limit increase, that they would have to provide

12    dispense data, so it may have been more than once a

13    year, but a minimum once a year, yes.

14

15

16

17

18

19

20

21          Is that the standard operating procedure we

22    were reviewing this morning?

23          A.   Yes, it is.

24          Q.   It continued --

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
```

7      Q.   There are -- and let's take a break and talk

8    about that for just a quick second.

9      A.   Okay.

10          THE VIDEOGRAPHER:  Are we going off the

11    record?

12          MR. NOVAK:  No.  No.  No.

13      Q.   The standard operating procedures that we

14    reviewed this morning, SOP 28 for new customers,

15    SOP 40 for suspicious order monitoring, and SOP 45

16    for the remedy review program, all of those are

17    subject to review by compliance officials at Anda on

18    an annual basis, correct?

19      A.   That is correct.

20      Q.   And they're evaluated to determine if any

21    tweaks or revisions to them are necessary?

22      A.   That is correct.

23      Q.   And they are also signed off upon even if no

24    revisions are made to reflect the fact that they are

25    revised on an annual basis?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   That is correct.

 2      Q.   Or I'm sorry, reviewed on an annual basis?

 3      A.   Correct.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 1

 2

 3      Q.   Ah, how did we -- how did we both miss that?

 4      A.   Exactly.   Exactly.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3       Q.   But just to be clear, Anda did have

4   customers when you were there that ordered 2,000

5   pills per month of OxyContin?

6       A.   That is correct.

7       Q.   In fact, Anda had some customers that

8   ordered much more than 2,000 pills per month?

9            MR. MATTHEWS:  Objection.

10      A.   I'd have to go back and look.  To my -- the

11  best of my recollection, there were some customers,

12  yes.

13      Q.   Okay.  And they would have gotten to those

14  higher levels by virtue of Anda's compliance people

15  performing a remedy review process, pursuant to

16  Standard Operating Procedure 45, that would have

17  enabled them to increase their limits.

18      A.   That is correct.

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14     Q.    Okay.  And those eight reasons would, with

15   the appropriate due diligence being performed, allow

16   someone on your compliance team to release an order

17   that exceeded the 1,000-pill limit for OxyContin?

18          MR. MATTHEWS:  Objection.

19     A.    The limit would have to have been raised

20   before the order is released.  They couldn't order

21   1200 unless they were allowed to order, which means

22   the limit would have to be increased, and then

23   oftentimes it would be -- depending on the customer

24   history, it would be flagged because it was the

25   first time they ordered that much, or -- and/or --

```
 1    remember we talked a little bit about a secondary,

 2    being a secondary supplier.  And customers

 3    generally, not all the time, but generally customers

 4    who order from a secondary supplier order them --

 5    make those orders when their primary is either out

 6    or has a higher price or doesn't have that

 7    particular item.  So it's not a consistent ordering

 8    pattern.  So it may not be -- so they may order

 9    something -- they may order 800 of something in June

10    and they don't order another, that same product

11    again until November.  Well, the order would flag

12    and we want it to flag because at least we want to

13    see, oh, what are they ordering here, and it might

14    flag for that purpose but in the meantime they

15    needed 1200, because they said, we only ordered 8,

16    but we normally dispense 15,000 and we need to -- we

17    have a doctor who likes this product, this SKU and

18    you are the ones who carry it and you have a better

19    price, and they put all that in writing with the

20    doctor and the patient and all that, and we say

21    fine, but we'll approve that limit, but a lot of the

22    orders really hit because there is no established

23    pattern because it's a -- we're a secondary

24    supplier.

25        Q.   Okay.  In that answer you suggested that the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customer may typically order 15,000 units of

 2    OxyContin?

 3        A.   No.  I said they may dispense a total -- a

 4    total of 15,000, they want to go from 1,000 to 1200

 5    or 1,300 from us.  They want an extra 13 --  your

 6    example, 1200, they may want an extra 200.  They

 7    give us the reasons and we go back and say well,

 8    they do 15,000 a year and their Metformin is at

 9    50,000, it's a whole analysis.

10            But, I guess, what I'm saying is many

11    customers who are second -- who utilize -- who order

12    from their secondary are not necessarily ordering

13    the same product in the same quantities month after

14    month after month.

15        Q.   Okay.  It makes it more challenging for Anda

16    to figure out what a pattern of typical ordering is?

17            MR. MATTHEWS:  Objection.

18        A.   Correct.  Which is why -- yes, that's

19    correct.

20        Q.   And for that matter, Anda needs to obtain

21    dispensing data not only for the opioids that the

22    customer provides from Anda, but also the opioids

23    that the customer dispenses that it bought from its

24    primary supplier?

25            MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Again, I would just -- I would just change

 2   it to it's not just opioids, it's all controls and

 3   frankly, it's noncontrols as well because we look

 4   for that -- you know, conversely, if they are buying

 5   three noncontrolled products from us and that's all

 6   they are buying and those are the only noncontrolled

 7   products they are buying because we see what else

 8   they have dispensing from other people, that's

 9   another issue.  That's why we need to see the whole

10   picture.

11      Q.   Okay.  You understand we're talking today

12   and we're here because of an opioids epidemic, not

13   because of dispensing of other types of drugs,

14   right?

15           MR. MATTHEWS:  Objection.

16      A.   I understand, but if we're going to describe

17   the factors that we reviewed in determining whether

18   we were comfortable selling product, opioid -- if

19   we're selling opioids, we have to look at the entire

20   customer picture because even if, again, they are

21   not buying -- the example I used before, we don't

22   want oxycodone from you, we don't want any opioids,

23   we want to buy -- we want to only use lorazepam

24   because you have a good price on it but their top

25   six products are hydrocodone, hydromorphone,
```

Highly Confidential - Subject to Further Confidentiality Review

1    oxycodone 30 and oxycodone 15, we are not going to

2    sell to them.  So that's why we need the whole

3    picture.  I'm just trying to explain our analysis of

4    how we looked at customers and how we make these

5    decisions.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



    24        Q.    Right.   So when these increased orders came

    25    in from the customer due to pricing or promotion

Highly Confidential - Subject to Further Confidentiality Review

```
 1    changes, it wasn't your price break that led to the
 2    increase in the order, it was the price break that
 3    the manufacturer offered and you allowed the
 4    increased order to go through to reflect their price
 5    break?
 6        A.   Right.
 7             MR. MATTHEWS:  Objection.
 8        A.   And it -- when that happened -- and, again,
 9    I would also -- I would also add that the
10    manufacturers we dealt with did their own due
11    diligence on us as well as certain customers,
12    especially there were some that they sold direct to
13    or sold direct through Anda as a -- as a supplier,
14    but they did their own due diligence as well as
15    ours.  So there were really two levels of due
16    diligence on -- on a lot of those items.
17        Q.   Okay.  You were specifically aware of those
18    types of promotion -- pricing promotions as it
19    related to Anda's parent from time to time, were you
20    not?
21             MR. MATTHEWS:  Objection.
22        A.   Sometimes we were.  It depended how it was
23    communicated, but if -- if we didn't -- let's put it
24    this way:  If we weren't aware when the order came
25    in, we investigated and validated whether that was
```

Highly Confidential - Subject to Further Confidentiality Review

1    the case.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16      Q.   Okay.  And for each Anda customer there

17   is -- there are threshold limits contained in the

18   TPS system?

19      A.   That is correct.

20      Q.   Also in the O drive?

21      A.   No.

22           MR. MATTHEWS:  Is this a good time for a

23   break?

24           MR. NOVAK:  Sure.

25           THE VIDEOGRAPHER:  Off the record, 3:33 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Recess from 3:33 p.m. until 3:47 p.m.)

 2              THE VIDEOGRAPHER:  On the record, 3:47 p.m.

 3     BY MR. NOVAK:

 4         Q.   I think that's all for Deposition

 5     Exhibit 10.

 6              MR. NOVAK:  Do you have the spreadsheet that

 7         goes with Exhibit 14?

 8              MS. ELLIS:  Yes.

 9              (Anda-Brown Exhibit 11 was marked for

10     identification.)

11     BY MR. NOVAK:

12         Q.   We've had marked next Anda Deposition

13     Exhibit 11 --

14              MR. MATTHEWS:  Anda-Brown.

15         Q.   -- Anda-Brown -- thanks -- Deposition

16     Exhibit 11, which consists of an exchange of e-mail

17     that are between Robert Brown, Sabrina Solis, and

18     Tasha Campbell.  The exhibit bears the Bates number

19     Anda_Opioids_MDL 601903 and 904, and then attached

20     to the e-mail was a spreadsheet bearing the Anda

21     Bates number MDL 601905.

22         A.   Okay.  I don't -- I don't have that, but I

23     guess you must have it.  It's on there?

24         Q.   The spreadsheet we will review

25     electronically.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Okay.

 2            MR. MATTHEWS:  Can I just put my objection

 3      on the record to using a spreadsheet, an

 4      electronic spreadsheet, with the witness, which

 5      isn't being produced in hard copy form and as to

 6      which there will be no record of a marked exhibit

 7      in a deposition.

 8            MR. NOVAK:  Sure.  I can provide to you -- I

 9      mean, there's only so much paper I can lug to

10      Miami.  If it assists in resolving your

11      objection, I can certainly e-mail to you

12      immediately the electronic version of the

13      spreadsheet.

14            MR. MATTHEWS:  Sure.

15            MR. NOVAK:  Okay.

16            MR. MATTHEWS:  How many pages is it, do you

17      know?

18            MR. NOVAK:  I don't.  I just know at some

19      point our -- there was only so much we could do,

20      but --

21            MR. MATTHEWS:  Let me just say, what I'll

22      try to do is get the pages you're using printed

23      so we can print and mark it.

24            MR. NOVAK:  Okay.  Why don't we go off the

25      record just for a second and we'll get the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        logistics of this worked out.

 2             THE VIDEOGRAPHER:  Off the record, 3:51 p.m.

 3             (Recess from 3:51 p.m. until 3:52 p.m.)

 4             THE VIDEOGRAPHER:  On the record, 3:52 p.m.

 5   BY MR. NOVAK:

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Now --

 2            MR. MATTHEWS:  Can I interrupt you for a

 3       second?

 4            MR. NOVAK:  Yes.

 5            MR. MATTHEWS:  Would you mind e-mailing me

 6       the spreadsheet?

 7            MR. NOVAK:  Yeah.

 8            MR. MATTHEWS:  Maybe I need to take a closer

 9       look at it before the end of the day.

10            MR. NOVAK:  Okay.

11            MR. MATTHEWS:  Can we do this off the

12       record?

13            MR. NOVAK:  Sure.

14            THE VIDEOGRAPHER:  Off the record, 4:05 p.m.

15            (Recess from 4:05 p.m. until 4:07 p.m.)

16            THE VIDEOGRAPHER:  On the record, 4:07 p.m.

17   BY MR. NOVAK:

18       Q.   If we can go back to Anda-Brown Deposition

19       Exhibit 10 for a moment.

20       A.   Uh-huh.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8      Q.    Okay.   Now, I'm going to take a huge leap

9    and guess that Anda's not going to agree to let me

10   do that.

11          And -- and what I would like to know is if

12   there were -- how would one go about obtaining the

13   electronic files that record the due diligence for

14   particular customers?

15     A.    Well, again, in this case, because I -- and

16   I have personal knowledge because I did it.   I would

17   go into my screen.   I would go into my O drive.   I

18   would pull up, and I would show them examples of

19   what we had with the various customer files.

20          That's -- in terms of how they get

21   transmitted, I have no idea how it gets -- how that

22   file would get transmitted somewhere else.   I don't

23   know if it has to be copied.   I don't know if it can

24   be down -- I have no idea how that gets done.

25          I do know how it gets in there.   I know it

Highly Confidential - Subject to Further Confidentiality Review

1    gets scanned and downloaded into that file -- into a

2    particular file.  When a questionnaire comes in, it

3    goes into that particular file for that customer.

4        Q.   And for the -- for the purchase history of

5    controlled Schedule IIs, is that recorded in the O

6    drive or the TPS?

7        A.   TPS.

8        Q.   Okay.

9        A.   And, again, not to belabor it, but it's

10   several different.  It shows controls.  It shows

11   noncontrols.  Then I -- it goes percentage of

12   controls, percentage -- then I can go in and say let

13   me see the number of hydrocodone purchases, and

14   it'll go down and I can look as long as it's been.

15   And they'll have it by -- by strength.  You know,

16   one month it's oxy, hydrocodone 5, one month 10/325,

17   et cetera, so I can see it that way and then play --

18   you know, play with that as well, so depending on

19   what I want to see out of that.

20       Q.   And that would lay out the whole order

21   history as well?

22       A.   Yes.

23       Q.   Okay.

24       A.   By -- in that case, it's by product, but I

25   could also go -- and I didn't do this too often,

Highly Confidential - Subject to Further Confidentiality Review

1    but -- well, with specific orders, I did.

2            I'd go in and I'd see what the order itself

3    was on, you know, November 27th, 2012, what they

4    ordered on that day.  But then there were -- I could

5    also -- most of the time, I was doing it by history,

6    so I was doing it by product and by controls,

7    noncontrols.

Highly Confidential - Subject to Further Confidentiality Review

10      Q.    Okay.

11      A.    Again, you know, reminding that we do get --

12   I know there are exceptions, but we do get due -- we

13   do get dispense data.  The only way we increase it

14   is with dispense data.  And from that point forward,

15   we get dispense data on a -- on a yearly basis.  So

16   it's kind of verified, you know, is that still

17   necessary.

18      Q.    Okay.

19      A.    And I would say, too, that there were times

20   when we would look at a customer's purchase history

21   with us, and maybe they're -- they have 1,000 limit

22   or 1,500 limit on a family, and they were only

23   purchasing 300 a month for 10 months or so.  And

24   we'd say to the rep, you know what, we're -- we're

25   reducing this limit.  They're not purchasing this

Highly Confidential - Subject to Further Confidentiality Review

 1    from us, so why are we -- why are we keeping them at

 2    that limit?

 3          And we would reduce it, but we would also

 4    let the sales rep know so it wouldn't come as a

 5    surprise when they -- plus if the customer did try

 6    to order the 1,000, well, you weren't -- you know,

 7    you'd let them know.  You weren't purchasing so

 8    you're -- you know, what have you.  There would be

 9    some communication, it wouldn't come as a shock, and

10    the customer wouldn't get upset with just the idea

11    that, you know, you don't need us for that so why

12    would we give you that opportunity.

13          And that did happen.

14    Q.   And the adjustment of limits for all

15    customers is itself a separate data field that -- or

16    it -- or it's in customer notes?

17    A.   Well, the adjustment itself is in the

18    limits -- the individual customer limits, the

19    individual customer family limits.  You can actually

20    make the adjustment.  But then it's noted in the

21    notes as to when and why.

22    Q.   Okay.  So a history of all of Anda's

23    customers could be extracted just from the customer

24    notes field for each customer of the company?

25    A.   If there -- I mean, if there are any notes.

```
 1    Let's say, for example, you have a customer that --

 2    who was, you know, approved in 2014 and nothing has

 3    happened.  I mean, they got approved, and it will

 4    say approved.  And they've never adjusted their

 5    limits, they've never asked for new products,

 6    they've never done anything else.

 7         It'll just -- you won't see many notes in

 8    there.  And all it will really change is either

 9    the -- is the date -- so let's just use 2014 as the

10    example.  You will see new dispense data when the

11    last date -- the most recent date it was submitted

12    and, you know, the most recent date that a customer

13    questionnaire was submitted.

14         But that's not -- that's not in the notes

15    section.  That's on the first page of the customer

16    information section.

17    Q.   Okay.  And that's also reflected in the due

18    diligence field?

19    A.   TPS, yes.

20    Q.   Okay.  Does the -- is the TPS -- is there a

21    TPS field that actually has a Y or N in the due

22    diligence?

23    A.   On the first -- in the first -- when you --

24    when you go to TPS and you type in a customer

25    number, the first page that pops up has the name,
```

Highly Confidential - Subject to Further Confidentiality Review

1    the address, the DEA number, the state license

2    number.  If it's -- if the license expired, it will

3    be in red.  Otherwise, current.

4         And I think it -- I think it has -- if I

5    remember, it does have an expiration date.  And then

6    it will say DEA license, and there was one item in

7    the SOP that talked about see what schedules they're

8    approved for, because there are some DEA licenses

9    that don't -- they don't have -- the customer hasn't

10   been approved for Schedule II, for example, or II or

11   3N or whatever it happens to be.

12        So it will say all the schedules that it's

13   approved for, and then it will say, you know,

14   approved for controls, Y; customer questionnaire on

15   file, it will give Y give the date; and customer due

16   diligence and, it will give the date.

17        Yeah, you can find that all on the first

18   page.

19   Q.   Okay.

20        (Anda-Brown Exhibit 12 was marked for

21   identification.)

22        MR. NOVAK:  It's a two-parter.

23        MR. MATTHEWS:  Are these two separate?

24   What's going on here?

25        MR. NOVAK:  There's the e-mail and the

Highly Confidential - Subject to Further Confidentiality Review

```
 1        attachment -- actually, a couple attachments.

 2             MR. MATTHEWS:  All of which collectively is

 3        going to be Exhibit --

 4             THE COURT REPORTER:  12.

 5             MR. MATTHEWS:  Thank you.

 6   BY MR. NOVAK:

 7        Q.  We have had marked as Anda Deposition --

 8   Anda-Brown Deposition Exhibit 12 an e-mail sent from

 9   Michael Cochrane to Valerie Mitchell, who has a

10   usdoj.gov address, and then with a CC to Robert

11   Brown.

12             And then a number of documents are attached

13   to the e-mail:  an SOP 28 form, an SOP 40 form, and

14   then a reference to controlled substance sales as

15   broken down at the -- the Westin, Florida; Grove

16   Port, Ohio; and Olive Branch distribution centers of

17   Anda.

18             Mr. Brown, I'll -- oh, and I should also

19   reference that the Bates number for the agreement --

20   for the document is Anda_Opioids_MDL 84481.

21             MR. MATTHEWS:  Can I ask a question for

22        clarification?

23             MR. NOVAK:  Yes.

24             MR. MATTHEWS:  The attachments don't have

25        Bates numbers on them, that I see.  Is -- were --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       is it your position that the attachments were

 2       attached to the e-mail?

 3            MR. NOVAK:  Yes, and they appear to all have

 4       been printed in native format.

 5            We can go off the record for a second on

 6       that.

 7            THE VIDEOGRAPHER:  Off the record, 4:21 p.m.

 8            (Recess from 4:21 p.m. until 4:23 p.m.)

 9            THE VIDEOGRAPHER:  On the record, 4:23 p.m.

10   BY MR. NOVAK:

11       Q.   I want to direct your attention, Mr. Brown,

12   first, to the e-mail.  It purports to be an e-mail

13   from Michael Cochrane, on which you are cc'd, in

14   addition to a number of other individuals; and it's

15   addressed by Mr. Cochrane to Ms. Mitchell.

16            Looking down at the second paragraph, midway

17   through it reads, quote:  "Going forward we will not

18   commingle our customers cut off or refused with any

19   suspicious orders.  Rather than an e-mail containing

20   all the information from Emily Schultz, you'll

21   receive a separate e-mail from Robert Brown, as well

22   as a phone call, in the event there is a suspicious

23   order to report.  We will include all the specifics

24   regarding the order in our e-mail transmission as

25   well as a verbal via phone call to you or a
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    designee."
2         You saw that portion of the e-mail?
3    A.   Yes.
4    Q.   Okay.  Do you recall back in 2014 when
5    Mr. Cochrane designated you as the one to convey
6    separately any suspicious order reports to the
7    Department of Justice or DEA officials?
8    A.   Yes, but I do want to clarify something on
9    that.
10   Q.   Yes.
11   A.   Because before I started, Anda had begun --
12   had had a practice for -- that Emily Schultz kept a
13   report that if there was -- if there were customers
14   that were denied, customers that were cut off, you
15   know, an order, and control customers who were no
16   longer, or customers -- and there were some
17   customers that were reinstated for controls if they
18   had significant changes in their dispense data or
19   what have you, or other information, and suspicious
20   orders, it was contained on a spreadsheet that was a
21   rolling spreadsheet that Emily would send to local
22   and -- field offices and DEA in Washington listing
23   all these, and it was a way of, in our thought, you
24   know, notifying the DEA that we've come across some
25   pharmacies or customers that we're not comfortable
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with and you might want to take a look at them.

 2            In our meeting of, I believe, it doesn't say

 3    on here, but it was early September of 2014, we had

 4    a meeting in Columbus with Valerie Mitchell and

 5    two -- actually, if I remember correctly, Brittany

 6    Freeman from DEA was not present.  She was by phone.

 7    Duane Stickles was there.  Brice Burchard, who was

 8    from New Orleans, but he -- Mississippi, and it was

 9    Alberto Esteves, Michael Cochrane.  Alberto was our

10    warehouse director in Ohio, and Al Paonessa, who was

11    our President, and we met with them regarding the

12    Ohio -- status of the Ohio inspection, and one of

13    the things that came out of that, we explained what

14    we do in our procedures, and we prepared a pretty,

15    you know, extensive description of the systems, some

16    -- a lot of which we've gone over here, showed them

17    actual screens of what we looked at and information

18    and how we pulled up the 2.2.4.1.  We actually had

19    screen shots.

20            So we talked about this report that we were

21    sending, and Valerie Mitchell said, you know, just

22    having this list of customers doesn't really help

23    us, and if you're reporting suspicious orders, you

24    need to kind of flag it more specifically than just,

25    you know, put it on another column of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    spreadsheet, so what we'd like you to do is, if you
 2    deny a customer, tell us why.  You don't have to --
 3    it doesn't have to be a book, but indicate this is
 4    why you're denied; or you cut them off, what
 5    changed, why; if you're reinstated, why.  If it's
 6    shorter, we want to see that -- when you transmit
 7    the e-mail to our offices, we want that highlighted
 8    if they -- there's a suspicious order, and, you
 9    know, if you cut a customer off, was it by a -- was
10    it for an order, a suspicious, or was it something
11    else.
12            So that then revised -- I just want to give
13    this context.  That's -- that revised -- it wasn't a
14    separate form, it was -- it was an enhancement of
15    the current form and then an e-mail cover that
16    specifically identified if any -- that, you know,
17    any suspicious orders that were in that report.
18    Q.   Okay.  Let me follow up on that for a
19    moment.  What is the difference between Anda cutting
20    off a customer who submits an order because they're
21    not comfortable for some reason with the controlled
22    substance that the customer has ordered, on the one
23    hand, and determining that it's a suspicious order
24    on the other?
25            MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   We were not -- in 99 percent of the cases,
 2   we were not cutting off the customer because of a
 3   specific order.  We were cutting off a customer
 4   because over -- I'll give a couple of reasons could
 5   happen.  Customer's control purchase percentage over
 6   a three-month period went from 10 percent to 30
 7   percent.  Okay?  That's not any one order.  That's a
 8   pattern.  That's -- and it's controls.  It's not by
 9   family.  It's a pattern of overall control sales.
10           We're not -- we're not your control
11   supply -- we're not your controlled substance
12   supplier.  We are a secondary for all products
13   unless we have a specific arrangement with you, and
14   in most cases, retail pharmacies, we didn't have
15   that kind of specific arrangement.  So that was one
16   reason.
17           The second reason would be let's say we
18   approved a customer, we looked at their dispense
19   data, and oxycodone 30 was their 80th product and
20   they were averaging 50 pills a script.
21           Now we get updated dispense data and
22   oxycodone 30 is their third product and it's at 200
23   pills a script.  They have -- chances are they're
24   not buying it from us, but that's a significant
25   change that we're not comfortable with.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Or a customer -- a customer gives us some

 2    additional information about a -- or in a

 3    questionnaire, you know, they -- or an updated

 4    questionnaire, they give us their five physicians,

 5    and two of them have discipline action and they

 6    don't know that they have, and you call -- I did

 7    this myself.  I'd call the customer.  Do you know

 8    that, you know, two of your physicians have

 9    discipline actions?  Oh, no, I don't know.  Which

10    ones?

11              They'd be cut off, because to us that meant

12    that they were not able to fulfill their

13    corresponding responsibility, which the DEA hammered

14    every time either we met with them or we went to a

15    DEA seminar.  Corresponding responsibility.  If they

16    weren't carrying that out, then we would say we

17    can't do business with you anymore and we'd report

18    that to DEA.

19              But it really -- it was very rarely, almost

20    none, based on an individual order.  It was based on

21    something changed, if we cut them off.  Now, of

22    course, the denial is the first part of it, we never

23    sold them anything, and that was the reason, so --

24    but that's what we would do, and that's what --

25    that's what's referenced here.  I just wanted to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    clarify.

 2              (Anda-Brown Exhibit 13 was marked for

 3    identification.)

 4    BY MR. NOVAK:

 5

 6

 7

 8

 9

10

11

12

13              The document bears Anda's Bates number

14    MDL143508 through 143559.

15              Mr. Brown, in interacting with Buzzeo PDMA,

16    was Mr. Williamson one of the individuals with whom

17    you interacted?

18       A.   Yes.

19       Q.   Your primary contact there?

20       A.   No, he was not the primary, but he was -- he

21    was the -- the DEA compliance person.  He was a

22    retired DEA agent, and so when it came to not -- not

23    statistical algorithms or things of that nature,

24    but, basically, you know, compliance, he was the

25    contact.
```

```
 1        Q.   Okay.   Towards the latter portion of your

 2   employment at Anda, were you working with Buzzeo

 3   PDMA on developing a new suspicious order monitoring

 4   program?

 5        A.   We were not -- it was not a new program.

 6   What it was was enhancements to our -- what we were

 7   doing, and it primarily focused on some different

 8   statistical algorithms that they recommended over, I

 9   think -- I think we had a rolling 30-day in ours and

10   they recommended maybe a longer rolling period

11   because of, as they indicated, you know, being a

12   secondary supplier, it's really hard to get a true

13   and accurate assessment of the -- of the validity of

14   an order just with 30 days.

15             So they made some changes in there and they

16   designed some screens that made it a little -- maybe

17   a little less cumbersome to be able to access more

18   information quickly rather than flipping screen to

19   screen to screen.  So they were working on that.

20             But one of the things that -- in the

21   engagement with Buzzeo was if they were going to

22   put -- if they were going to do the statistical

23   algorithm and they were going to, you know, make

24   some enhancements to the system, we wanted to make

25   sure that the SOPs, which, you know, let's say
```

1    SOP -- at least SOP 40 was enhanced to accurately

2    reflect what this system was -- and types of orders

3    it was flagging and the algorithms that it was using

4    so that it was consistent.

5           And we did -- since we weren't -- you know,

6    they were the experts in their system, not that

7    we -- we needed -- we needed to have something in

8    writing that, one, we would understand and we could

9    explain, and two, the DEA comes in, we're not going

10   to say, oh, that's Buzzeo.  We weren't -- now, we

11   called some of their customers, and they said -- and

12   the smaller customers and their customers said, ah,

13   we just tell the DEA that we're using the Buzzeo

14   system and that's okay, they're fine.

15          Well, we definitely didn't feel comfortable

16   with that, so we wanted -- we wanted some additional

17   documentation that actually reflected what their

18   system was flagging or what -- or what they were

19   looking at, the factors, and so on.

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14          MR. NOVAK:   I want to go back to that last
15      question and break it up to address your
16      objection.
17   BY MR. NOVAK:
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5

 6

 7

 8     Q.   All right.  I'd like to turn to one of the

 9   attachments in Anda-Brown Deposition Exhibit 13 that

10   begins at the Bates numbers ending with the four

11   digits 3511.  And it appears to be a four-page

12   letter that is authored by a Mr. Joseph Rannazzisi,

13   the deputy assistant administrator at the office of

14   diversion control.

15        Are you familiar with this letter?

16     A.   It was sent to me, so I would -- you know, I

17   would gather at some point I have reviewed it.

18   Again, it was -- 2006 was the date.  I certainly

19   didn't review it contemporaneously when -- when --

20   as to when it was sent out, but, yes, I would have.

21        And it's been a long time, but I would -- I

22   would think that I have -- I did review this at some

23   point, yes.

24     Q.   Were you at Valley Drug in 2006 -- I'm

25   sorry, at -- at --
```

```
 1       A.    Harvard?

 2       Q.    -- Harvard Drug?

 3       A.    I was at Harvard, yes.

 4       Q.    Okay.  Do you recall receiving this letter

 5    while at Harvard Drug?

 6             MS. HERRERA:  Objection.

 7       A.    I don't recall.

 8       Q.    Do you have an understanding as to whether

 9    this correspondence was sent to all DEA registrants

10    for controlled substance sales?

11             MR. MATTHEWS:  Objection.

12             MS. HERRERA:  Objection.

13       A.    I -- I don't really have an understanding

14    other than the first sentence of the letter, but I

15    can't validate whether that actually took place or

16    didn't.

17       Q.    Okay.  At the third page of the letter

18    ending in Bates range number 3513, there are a

19    number of different circumstances -- or a number of

20    different numbered sentences that are identified

21    under the heading "Circumstances" that might be

22    indicative of diversion.

23             Do you see that reference?

24       A.    Yes, I do.

25       Q.    Okay.  Are these circumstances something
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that you reviewed as part of the performance of your

 2    responsibilities at Anda?

 3            MR. MATTHEWS:  Objection.

 4        A.  Let me phrase it this way.

 5            These were items that, when we looked at

 6    dispense data and other customer information, these

 7    were certainly items that were part of our --

 8    among -- among many other things, were part of our

 9    analysis.  I'm certainly not going to say that

10    because of this letter we did it.

11            I mean this -- and at Anda, I mean, frankly,

12    a lot of that was already in place.  But certainly

13    this does -- this paragraph does include certain

14    factors and -- and conditions that -- and so on that

15    we would look at through -- in a customer's due

16    diligence information that, you know, would

17    certainly, you know, stand out to us and we would

18    pay particular attention to, among others.

19        Q.  So your due diligence program was designed

20    to identify the types of certain circumstances that

21    are contained at page 3 of this Rannazzisi letter?

22            MR. MATTHEWS:  Objection.

23        A.  Well, again, our -- the -- the

24    information -- the way we reviewed information that

25    was provided by our customers certainly included
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    these items, but it was -- it was certainly -- that

 2    was only -- these were only a certain portion of

 3    what we really looked for.  We looked for a lot of

 4    different things relating to controls.

 5             So, you know, I mean -- and, again, that was

 6    one of the reasons, you know, why it's so important

 7    for us, and I think for -- for us to get dispense

 8    because, you know, how would we know what they're

 9    ordering from multiple distributors unless we look

10    at dispense data.  You don't know what they're

11    buying from anybody else.

12             So, again, this was -- these were things

13    that we looked at, but it wasn't due to this letter

14    and it certainly isn't the -- these aren't -- this

15    is not anywhere near the -- the only factors that we

16    reviewed.  These were included in our regular due

17    diligence and analysis.

18       Q.    Okay.  Running through the top of the page,

19    there are four circumstances that are identified

20    there.

21             The first is ordering excessive quantities

22    of a limited variety of controlled substances, e.g.,

23    ordering only phentermine, hydrocodone, and

24    alprazolam while ordering few, if any, other drugs.

25             Would you agree that that characterizes a
```

```
 1    circumstance that might be indicative of diversion?

 2    A.   It depends.

 3         I mean, in general, it would be something we

 4    would look very closely at.

 5         On the other hand, I can think of

 6    circumstances where maybe, because of the nature of

 7    the customer and the people that they're servicing,

 8    it may be -- there may be an explanation.  I don't

 9    know.

10         But we would certainly -- the burden of

11    proof, so to speak, would certainly be on that

12    customer to be very clear as to why, and -- and it

13    would be -- I would say it would be very, very hard

14    to justify selling controls to a -- to a customer

15    that would be doing that.

16    Q.   Okay.

17    A.   But I didn't want to foreclose that there

18    isn't the remote possibility that there could be a

19    business practice out there where that might make

20    sense, but, again, it's got to be very, very, very

21    clear.

22    Q.   So -- so that is a circumstance that is

23    suspicious, but there may be circumstances that

24    would, upon additional investigation, dispel the

25    suspicious?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2       A.   It -- it -- let's put -- without -- without

 3   significant information to the contrary, we would --

 4   under those circumstances, we would -- if we saw

 5   either dispense data to that nature, chances are not

 6   very likely we would be opening a customer.

 7       Q.   It would be -- it would be tough to dispel

 8   the suspicion in that case?

 9              MR. MATTHEWS:  Objection.

10       A.   It would be difficult to justify the

11   ordering pattern.

12       Q.   Okay.  How about the second one, ordering a

13   limited variety of controlled substances in

14   quantities disproportionate to the quantity of

15   noncontrolled medications ordered?

16       A.   Again, it would definitely be a concern.

17   There might be specialty practices or -- or -- or a

18   specialty type of pharmacy but over -- over time, we

19   did see some pharmacies that really catered to

20   specific medical conditions, specific medical

21   practices, again, maybe closed door, and maybe there

22   was a justification for that.

23              But, again, in -- in order to, you know,

24   make us comfortable, there would have to be

25   significant information provided.
```

```
 1      Q.   Okay.  The third one identified is -- as a

 2   circumstance indicative of diversion is ordering

 3   excessive quantities of a limited variety of

 4   controlled substances in combination with excessive

 5   quantities of lifestyle drugs.

 6           First of all, do you have an understanding

 7   as to what lifestyle drugs are?

 8      A.   I really don't.  I'm not sure myself what

 9   that refers to.  I'm sure it's an easy explanation,

10   but I don't -- I never use that term so I'm not

11   really sure what that means.

12      Q.   Okay.  Well then I'm going to skip that one

13   and go on to the fourth circumstance that is

14   identified in this letter as something that might be

15   indicative of diversion.

16           And it reads:  Ordering the same controlled

17   substance from multiple distributors.

18      A.   It -- again, it certainly is -- it -- it --

19   it certainly is indicative -- or it would require

20   further investigation.

21           On the other hand, at this point in time --

22   and I guess we will shortly, or somewhat shortly,

23   based on the legislation that was signed,

24   distributors will be able to get information from

25   ARCOS that will not name the suppliers but at least
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    will say they're getting alprazolam from the -- from

 2    four sources.

 3            Right now, there is really no way of knowing

 4    that unless the customer volunteers that

 5    information.

 6            In other words, go back to our

 7    questionnaire.  And we ask:  Who are your suppliers?

 8    Who are your other -- you know, let's say they'll

 9    say McKesson and ParMed.  Let's just use two as an

10    example.  And Anda, okay.  So you've got three.  But

11    unless -- and they give us dispense data.

12            But unless we were to say, well, do you

13    order -- how much do you order from Cardinal or ABC

14    and how much do you order from ParMed of

15    hydrocodone, it's really not easy to know that.  Is

16    it hydrocodone 5 or hydrocodone 10?  You order --

17    you know, hydrocodone 10, you have to go through

18    every product and really ask that question.

19            And it would be -- I think it would be very

20    difficult to obtain that information.

21            So, really, you have to almost, you know,

22    make some assumptions based on the information you

23    get that, yeah, they're ordering with these three

24    and how much do they really want?  And that's if

25    you're comfortable with the dispense data, if you're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    comfortable with the practice, if you're comfortable

 2    with the doctors, if you're comfortable with the

 3    patient condition, if you're comfortable with their

 4    procedures.

 5            Then you might say, well, you know, we're

 6    not their primary and they have another secondary so

 7    we're probably not going to be interested in

 8    supplying them with much but -- of that product.

 9            But to break it down like this, I think

10    is -- in the real world is difficult to really get

11    that information.

12    Q.   Have you ever requested of a potential

13    opioid customer, as part of your due diligence,

14    information on the quantities of opioids they've

15    purchase from other distributors?

16    A.   Well, first of all, we know they're

17    purchasing from other distributors because when

18    they -- when they submit their data to apply and

19    they're dispensing 15 -- you know whatever number

20    they're dispensing -- we know they're getting it

21    from -- we knew they were getting it from others,

22    and we assume they are getting it from the -- the

23    suppliers that they've listed on their

24    questionnaire.  So we know that.

25            You know, do we -- do we ask them, well, how
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    much are you getting from Cardinal versus how much

 2    are you getting from, you know, ParMed, we probably

 3    don't do that, no.  But we know -- we know how much

 4    they're getting total, and we know who their

 5    supplier -- their other suppliers are.

 6        Q.   Okay.  Has Anda ever discussed internally

 7    the prospect of going to other data vendors to

 8    obtain more detailed information about where their

 9    customers are getting opioid prescriptions?

10             MR. MATTHEWS:  Objection.

11        A.   I think -- I -- to my knowledge -- to my

12    knowledge, I don't know of any source that would

13    provide that information with that specificity.

14        Q.   Okay.  Has Anda ever sought information

15    about the quantities of opioid products sold to its

16    customers from its parent companies, whether it be

17    Watson or Actavis or Teva or -- I'm missing the

18    fourth one.

19        A.   Well, first of all, except in limited cases,

20    the manufacturer is not selling the product directly

21    to the pharmacy.  They're selling it through other

22    distributors.

23             And one thing that all of these companies

24    maintained -- and I think rightfully so -- was that

25    the integrity of the industry -- I mean, why it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would be -- it would compromise, really, the

 2    integrity of the closed system of distribution and

 3    also, you know, the information to circumvent,

 4    because they happened to open -- because they

 5    happened to own one distributor, and they've got

 6    seven others that they're supplying and to provide

 7    information about those seven others.

 8            They would not do it.  It would hurt their

 9    place in the industry.  They would lose some of

10    those customers.  And I think it would be -- you

11    know, I don't think it's realistic that -- that we

12    wouldn't even put them on the spot to answer because

13    their answer would be no.

14            And let me -- let me be a little more -- let

15    me give a little more -- elaborate on that just a

16    bit.

17            When it came to auditing or, you know,

18    auditing their customers, which are distributors, in

19    the time I was there, the parent companies, they

20    would treat Anda just like they treated anyone else.

21    They would want our SOPs.  They'd want to -- they'd

22    want to understand our systems.  They'd want to

23    understand how we -- how we vet customers.  They'd

24    want to look at the information we maintained, and

25    they would treat us just like anyone else.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            In fact, Tom Napoli, who was included in

 2    that -- one of the e-mails was the person who had

 3    come, either by phone or by letter or even visit,

 4    and say, okay, I need -- I need to understand what

 5    you're doing.

 6            So we were treated no differently when it

 7    came to compliance issues.

 8    Q.   Can I just read that answer for a second?

 9            Set aside Anda receiving information from

10    its parent about sales that the parent may make

11    through other distributors to particular customers.

12    Does Anda ever provide information about sales to

13    customers to other manufacturers?

14    A.   Usually not specific customers; however,

15    there are times, just like -- just like we have --

16    we have an electronic order system that will -- you

17    know, will flag certain orders of interest that

18    require different -- require additional integrity,

19    we've had cases where manufacturers will call us and

20    say, well, we got this order of hydrocodone that was

21    larger than you've ordered in the past.  Why?  And

22    we would have to provide a written explanation.

23            And in many cases, we would say, yes,

24    Walgreens primary was out of this product, and we

25    ordered -- we ordered more for you -- from you
```

Highly Confidential - Subject to Further Confidentiality Review

1    because we needed to supply them with their -- with

2    those items.

3        Q.   In your view, is it inappropriate to provide

4    that type of information to manufacturers?

5            MR. MATTHEWS:  Objection.

6        A.   Just like -- just like we'll ask a customer,

7    well, why did you -- why are -- why do you want --

8    why did you all of sudden order a particular product

9    that you hadn't ordered before and we're going to

10   want the name of the doctor who prescribed it or the

11   clinic that's ordering, I think they have a right.

12   And, you know, if they're doing their due diligence,

13   I don't -- I don't think that's -- you know, it's

14   the same thing that we do.

15          I mean, just -- I mean, I used to tell our

16   customers when they were complaining about

17   questionnaires, I said we fill out the same

18   questionnaire for our suppliers every year.  And

19   sometimes they'll even come onsite, they'll do

20   whatever they -- but whatever they decide to do,

21   we're -- if we want to continue to buy product from

22   them, we have to do the same thing.

23          So don't -- don't complain.  This is the

24   nature of the industry today.

25       Q.   So in those types of questionnaires, Anda

1    will provide information with respect to its

2    customers to different manufacturers?

3         A.   Well --

4              MR. MATTHEWS:  Objection.

5         A.   Well, those questionnaires don't ask for

6    specific customers.  The questionnaires ask for, in

7    many cases, what percentage of your, let's say,

8    controlled substance are pharmacies, what percentage

9    are closed door, what percentage are hospitals, what

10   percentage are independent pharmacies, which

11   percentage -- they don't ask the names of the

12   customers.  Those questionnaires don't ask, and we

13   don't ask.

14             But if, again, here's -- in a case where

15   it's a specific order that they are investigating

16   and determining if it's valid, yeah, I mean, that --

17   that would be -- and to be -- to be frank, I don't

18   think there's anybody in the industry that doesn't

19   know that Anda is a secondary supplier for

20   Walgreens, so it's -- there's no proprietary

21   information there.

22        Q.   Do any of Anda's -- strike that.

23             MR. NOVAK:  We can take a quick break.

24             THE VIDEOGRAPHER:  Off the record, 5:01 p.m.

25             (Recess from 5:01 p.m. until 5:12 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE VIDEOGRAPHER:  On the record, 5:12 p.m.

 2                (Anda-Brown Exhibit 14 was marked for

 3      identification.)

 4      BY MR. NOVAK:

 5          Q.   We've had marked for identification purposes

 6      Anda-Brown Deposition Exhibit Number 14, which is

 7      comprised of a one-page e-mail bearing the Bates

 8      Number Anda_Opioids_MDL 543135, and there is a

 9      spreadsheet, an Excel spreadsheet, attached to the

10      e-mail that bears the Anda_Opioids_MDL Number

11      543136, which we are conveying electronically and

12      we'll also have up on the screen as we proceed with

13      the questioning.

14                Mr. Brown, Deposition Exhibit Anda-Brown 14

15      is an e-mail that you authored to various officials

16      at both the Department of Justice and also Anda

17      employees?

18                MR. MATTHEWS:  Sorry.  Do you have a copy

19         for me?

20                MR. NOVAK:  Oh.

21                MS. LUND:  I think you handed me two.

22                MR. MATTHEWS:  Oh, my codefendants stole my

23         copy.  I apologize.

24                MS. LUND:  In my defense, there's two

25         instead of three.
```

```
 1              THE WITNESS:  Yes, I see it.

 2    BY MR. NOVAK:

 3       Q.   Just so we're clear, this is an e-mail that

 4    you authored to the various recipients in the --

 5    that are identified in the "to" line?

 6       A.   That is correct.

 7       Q.   Okay.  And this reflects a list of customers

 8    that have been listed as not eligible or shut off?

 9       A.   Or reinstated.

10       Q.   Okay.  Can you explain to me how you

11    delineate between a customer whose control

12    privileges have been denied, between that category

13    and one who is no longer eligible?

14       A.   Yes.  A customer that is denied controls is

15    one who has applied for controls with Anda, first

16    time and they haven't receive controls before,

17    they've asked to purchase controls, and we've said,

18    based on the information that they have -- that they

19    have provided we are not -- we are not comfortable

20    with supplying controls.

21              A customer who has been cut off is one that

22    has been purchasing controls and for reasons that

23    we -- several reasons, some of which we actually

24    discussed earlier in connection with Exhibit 12, we

25    have decided that we are no longer comfortable
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    providing controls.

 2        Q.   Okay.  Why don't we switch screens to the

 3    spreadsheet that was attached to your e-mail.

 4        A.   And, again, I'll elaborate a little bit for

 5    context.  This was something that was -- again, it's

 6    pursuant to the September 10th, 2014, e-mail that

 7    Michael Cochrane sent, and this was submitted every

 8    time there was an additional customer added or, in

 9    some cases, a -- a suspicious order.

10        Q.   Okay.

11        A.   It's a rolling -- it's -- you know, it's

12    really a rolling list.

13        Q.   So the first tab in the spreadsheet that was

14    attached and is part of Anda-Brown Deposition

15    Exhibit 14 is the customer cutoff tab?

16        A.   Uh-huh.

17        Q.   And these list an array of different Anda

18    customers, many of whom have something denoted in

19    the comments field?

20        A.   Uh-huh.

21        Q.   Now, when something is denoted in the -- in

22    the comments field as it is in this customer cutoff

23    tab, where would that information be extracted in

24    Anda's systems?

25        A.   It would be in the customer notes, in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TNTPS, because the same information is there.  Let
 2    me again, just for clarification, it's not that it
 3    was -- these are special customers who the notes are
 4    there for.  This list had been provided on an
 5    ongoing basis starting in, like, probably 2011, but
 6    based upon our -- we just sent it as is.
 7            During the meeting that we had in September
 8    of 2014 that Michael Cochrane references in
 9    Exhibit 12, Valerie Mitchell said, look, this list
10    doesn't really help us because it doesn't tell us
11    why.
12            Now, that was the first time we ever got
13    that feedback, so it isn't as if we ever asked,
14    we're sending this all the time for the three --
15    previous three years, and we thought we were helping
16    or being proactive with the DEA, and they never
17    said, well, there's a problem or there isn't a
18    problem.  They just, okay.
19            But when she said, you know, it doesn't
20    really help us because we need more explanation, so
21    we agreed starting -- you know, this was
22    September 10, so you'll notice 9/12/14 there's an
23    explanation --
24        Q.    Okay.
25        A.    -- and it goes from there.  So I just wanted
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to be clear on that.

 2        Q.   Let's -- let's look at that line item for

 3    9/12/14 --

 4        A.   Uh-huh.

 5        Q.   -- which is, I think, line 540 of the

 6    customer cutoff section of the spreadsheet.  That's

 7    for an account whose name is The Health and Beauty,

 8    d/b/a Lakeland account, in Ronkonkoma, New York.

 9        A.   Uh-huh.

10        Q.   Okay.  And then looking at the Anda comments

11    that are in Column I, it states:  Eight of the top

12    10 dispensed pills/tablets are controls, including

13    five strengths of oxycodone, and the customer did

14    not provide an explanation of the reasons for these

15    products being the most highly dispensed.

16             That would have been taken from the customer

17    notes?

18        A.   The -- well, let me go back.  This and --

19    this sheet and the customer notes are filled in

20    simultaneously.

21        Q.   Okay.

22        A.   So -- and I was the one who did it, so I can

23    explain to you what I did.

24        Q.   Okay.

25        A.   Let's say -- and this one, again, without
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    seeing the customer file, I don't know exactly
 2    what -- what happened.  Okay?  But somehow or -- we
 3    got updated dispense data, I don't know why, don't
 4    if it was -- it was just part of the yearly deal or
 5    whether it was, you know, they were asking for
 6    increase.  I don't know what the reason was.  We
 7    went back and we compared the previous dispense
 8    data, and we said, oh, my gosh, this is not good,
 9    we're not comfortable.
10          So I would fill this sheet out, and then I
11    would turn around while -- again, almost
12    simultaneously, push the TPS button and put exactly
13    the same verbiage in.  And I would do -- it would
14    just say customer discontinued from controls or
15    customer cut off, reported to DEA.  It would have
16    the same notes.
17          And it would verify that this was on this
18    list -- this e-mail was submitted to the DEA.
19    Q.   Okay.  The e-mail that you wrote to the DEA,
20    that's the first page of Anda-Brown 14, states:  The
21    most recent determination was not based on the
22    suspicious order but rather information provided by
23    the customer.
24    A.   Uh-huh.
25    Q.   How do you know from looking at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    spreadsheet that this particular pharmacy -- whose

 2    name I forgot unless you scroll back -- Health and

 3    Beauty d/b/a Lakeland Pharmacy in New York, that's

 4    Anda Account Number 741026, how do you know that

 5    this wasn't based upon a suspicious order?

 6        A.   Because if you go all the way to the end of

 7    this sheet, there is a category -- where is it?

 8    Hmm.

 9             Oh, all right.  I do know why.  Because it

10    would have said customer -- it would have

11    specifically stated in that comments Anda -- they

12    attempted to order da da da da da and -- oh, no,

13    there is another tab, "Suspicious Orders."  This is

14    "Cut Off," "Denied," "Reinstated," "Suspicious

15    Orders."  There's four tabs.

16             And if it was a suspicious order, it would

17    be under "Suspicious Order."

18        Q.   Is there something in Anda's files with

19    respect to this particular pharmacy that identifies

20    whether they placed orders for controlled substances

21    to Anda?

22        A.   If -- I'm sure they did because they were

23    cut off as opposed to being denied.  So at some

24    point they did -- they did have orders for controls.

25        Q.   Okay.  Well, if they had orders for controls
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and you cut them off because eight of the top ten
 2    dispensed pills or tablets are controls, including
 3    five strengths of oxycodone, and the customer didn't
 4    provide an explanation and the reasons for these
 5    products being the most highly dispensed, why
 6    weren't they reported as a suspicious order as
 7    opposed to simply being reported as a customer who
 8    was cut off?
 9         MR. MATTHEWS:  Objection.
10    A.   Again, without seeing the file, I can't -- I
11    don't want to speculate, except in most cases where
12    this happened, they were granted control privileges
13    because of the information they had previously
14    provided.
15         They either sent this data as part of their
16    annual requirement or they sent it because they were
17    asking to purchase something or purchase something
18    in quantities that they hadn't done previously.
19         Chances are -- I mean, I don't know if -- we
20    may or may not have ever sold them oxycodone or any
21    of these items.  When we -- when we agreed to sell
22    them product -- and again, without know -- without
23    seeing the file, I can't really, you know, be
24    specific, but in terms of describing our procedures,
25    it had not -- really wasn't a specific order.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              We got this information and we said we don't

 2      really care if they never ordered this stuff from us

 3      before, we don't like the data that they've provided

 4      that is different from the data that they provided

 5      to us previously, and we're not comfortable

 6      continuing to sell them controls based upon their

 7      dispense patterns.  It had nothing to do with an

 8      order.

 9          Q.   How is this distinguished from a controls

10      denied scenario?

11          A.   Controls denied is when they apply -- they

12      have not purchased controls.  They're applying to

13      purchase controls and we've said, no, we're denying

14      their -- we are -- we are not allowing them to

15      purchase controls based on the information that

16      they've provided.

17          Q.   Okay.  What would I look to in Anda's either

18      TPS system or O drive to determine whether there had

19      been an order submitted by this customer on or about

20      September of 2014?

21          A.   Well, you -- you could look at the TPS.

22      There is ordering history for that customer.

23          Q.   Okay.  And the ordering history would

24      demonstrate the different instances in which the

25      customer submitted an order for controlled
```

```
 1    substances?

 2      A.   Correct.

 3      Q.   Okay.

 4      A.   I -- I would -- I would say that in the time

 5    I was there, most of the determinations that were

 6    made, a customer did not often deal -- did not even

 7    deal with products, for the most part, that we were

 8    providing.  It was more to that particular customer,

 9    not providing to other people but providing to that

10    customer.

11          It was -- we looked at the information they

12    were -- they were submitting, and we were not

13    comfortable with their overall either dispense

14    pattern or I'm sure you can find some that says --

15    especially, well, more under the controls denied

16    than under the cutoff.  You know, three -- two of

17    their doctors had discipline actions or -- or what

18    have you, so --

19      Q.   Now, without running through them, because

20    there are a ton of them --

21      A.   Yes, there are.

22      Q.   -- the Anda comments in the other -- for --

23    for the other customers where that field Column I is

24    populated, would those also be taken from customer

25    notes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   All the --

 2             MR. MATTHEWS:  Objection.

 3        A.   Again, to -- just to clarify, if they were

 4   done simultaneously.  Same notes except in the notes

 5   section it would say customer -- you know,

 6   whatever -- cut off, here is the reason, and they

 7   were reported to DEA, but it was done

 8   simultaneously.

 9             It wasn't like, oh, well, I got this out of

10   the notes.  No.  The determination was made based on

11   the information and it was placed in two places --

12   or noted in two difference places, this e-mail and

13   then the customer notes.

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25       Q.   And you would have their order history with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Anda?

 2        A.   Yes.

 3        Q.   And you would have a filled out customer

 4    questionnaire?

 5        A.   Yes.

 6        Q.   And you would have a products mix of the

 7    percentage of controls being dispensed as compared

 8    to noncontrols?

 9        A.   Yes.

10        Q.   And you would have a listing of the

11    physicians who were the top prescribers of

12    controlled products at those pharmacies?

13        A.   Yes.

14        Q.   Isn't that enough information to give you

15    some idea as to whether they were engaging in

16    suspicious orders?

17        A.   We don't know --

18             MR. MATTHEWS:  Objection.

19        A.   We have -- we have no idea what each order

20    looked like.  We don't know how often they're

21    ordering from other people.  We don't know what each

22    order is, consists of.  We don't know what -- that

23    what their -- what others -- other companies do in

24    terms of either thresholds or due diligence that

25    they do or anything else.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So unless -- until we can actually see the

 2      orders and see the information, what products and

 3      each one are they ordering, what percentages, we

 4      have no idea.  They list three other distributors in

 5      their questionnaire.  We don't know what they're

 6      ordering from each one.  But we do know what we see

 7      that they're doing overall.

 8              Again, I think we distinguished between --

 9      we don't focus -- in this situation, it's not about

10      a particular order.  We don't know if the -- from

11      other people what each particular order is, and

12      that, to me, is -- if it's a suspicious order, it's

13      one order that they put in on August 28th and here's

14      the six products that they ordered and they're

15      different from what they ordered three weeks ago.

16              That's not what we -- that's not what we're

17      looking at here.  We're looking at are we

18      comfortable with this -- this customer -- these

19      customers could have been ordering fine from us.

20      But -- everything was fine, but we don't like what

21      they're dispensing overall.

22      Q.   I -- I didn't ask as to whether what they

23      were ordering from you was fine.

24      A.   I know.  I know.  I understand.

25      Q.   I was asking whether you thought you
```

```
 1    possessed sufficient information to know whether

 2    they were engaging in suspicious orders.

 3            MR. MATTHEWS:  Objection.

 4       A.   You know --

 5       Q.   And your position is, based upon all the

 6    information that you had in your files, that you

 7    didn't know?

 8       A.   I don't know.

 9            MR. MATTHEWS:  Objection.

10       A.   I don't see the orders.  We do not see the

11    individual orders.  So without seeing the individual

12    orders that -- from another company.  Not -- not --

13    not the quantities per month or per 90 days or

14    anything else, but the specific order and what --

15    and what that -- their patterns are, what their

16    frequency is, or what -- whatever it happens to be,

17    we're not in a position to talk about orders from

18    somebody else.

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2      Q.   Now, for that pharmacy, you would have a
 3  full due diligence file, correct?
 4      A.   Yes.
 5      Q.   And it would include the physicians that
 6  were the lead prescribers, and it would include --
 7  I'm sorry.
 8           Can I get a verbal answer to that question?
 9      A.   Yes.  Yes.
10      Q.   And it would include the customer
11  questionnaire?
12      A.   Yes.
13      Q.   It would include the dispensing data?
14      A.   Yes.
15      Q.   Both for controlleds and noncontrolleds?
16      A.   Yes.
17      Q.   It would include the average prescription
18  strength?
19      A.   Yes.
20      Q.   And from all of that information, you could
21  not make a determination as to whether a pharmacy
22  that has oxycodone 30 as its highest dispensed
23  pill/tablet by five times the next highest dispensed
24  product, and the next highest product was another
25  oxycodone product, that that wasn't a suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order?

 2            MR. MATTHEWS:  Objection.

 3       A.   Again, without seeing the specific orders,

 4    we don't know what combination.  We don't know when.

 5    We don't know anything about how they're ordering.

 6    There's a difference between an individual order,

 7    which we don't see -- we don't see -- we only see

 8    individual orders from us -- and what they're

 9    dispensing and getting from other people.  We don't

10    know in which way they're getting it.

11            It would be a real presumption to be -- to

12    be able to say, oh, Cardinal, there are -- they're

13    submitting suspicious orders to Cardinal.  We can't

14    do that.  We have no information to that impact.

15    We're saying what we see and the determination we

16    make, we are not comfortable continuing to sell

17    controls based on their dispense pattern, not on any

18    particular order.

19

20            MR. NOVAK:  If we can scroll back to the

21       left and take a look at that one for a moment.

22            Nope, I think you passed it.

23       A.   I see it.

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



10    Q.   Again, this would be a pharmacy where you

11   have the dispensing data of what they provided to

12   their customers?

13    A.   Yes.

14    Q.   Correct?

15         You would have the information --

16    A.   Totals.  The totals of what they provided.

17   Of overall, to all customers of all pills, et

18   cetera.

19    Q.   Yes.

20    A.   Yes.

21    Q.   Both the controlled products and the

22   noncontrolled products?

23    A.   Correct.  Correct.

24    Q.   So you would have the percentages of each?

25    A.   Uh-huh.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   You also would have a list of the top

2   prescribers for the controlled substances?

3      A.   Uh-huh.  Yes.

4      Q.   You would have the prescription strengths?

5      A.   Yes.

6      Q.   You would have the average number of pills

7   per prescription?

8      A.   Yes.

9      Q.   And with all of that information, you

10  wouldn't be able to determine whether that pharmacy

11  in Fairfield, Ohio, was engaging in suspicious

12  orders?

13          MR. MATTHEWS:  Objection.

14     A.   Engaging in suspicious orders from other

15  distributors?  Ordering from other distributors,

16  suspicious orders?  Placing suspicious orders with

17  other distributors?

18     Q.   Yes.

19     A.   No.

20          MR. MATTHEWS:  Objection.

21     A.   We don't -- look, just because oxy -- let me

22  give you an example here.

23          Oxycodone APAP 10/325 and oxycodone 30,

24  they're the highest dispensed product.  Let's say

25  they're at 15 and 12,000.  And the next highest
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    noncontrol is 2,000.

 2            Let's just -- I mean, I'm making up numbers,

 3    and of course, I'm making up numbers because I don't

 4    have any file in front of me, but, theoretically,

 5    that customer could order 1,000 or 2,000 oxycodone

 6    10/325, 2,000 oxy 30, and then order 300 of 20 other

 7    noncontrol products, theoretically.  I don't know if

 8    that hits Cardinal's system or McKesson's system.  I

 9    don't know how they do that.

10            Without seeing the order itself -- again,

11    we're talking about specific, individual orders.

12    We're not talking about overall customer

13    eligibility.  We're talking about a specific order.

14            There is no capacity that we would --

15    without seeing the specific order, one, we can't

16    make that judgment; and, two, we don't know --

17    it's -- it's another -- it's another -- it's another

18    distributor that we have absolutely no visibility

19    into other than their overall dispense pattern over

20    a 90-day period.

21            So, no, we would have no ability to say

22    any -- we don't even know what date they order on.

23    How would we be able to say a specific order is

24    suspicious?

25            We don't know what dates.  This is a 90-day.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It could be anywhere within that 90-day period
 2    they're ordering this, and we don't know what other
 3    products they're ordering with it.
 4          So, no, we -- that's -- that's just not
 5    something we would ever be able to do, and neither
 6    would Cardinal be able to look at that same
 7    information and say, oh, they're ordering
 8    suspicious -- they're submitting suspicious orders
 9    to Anda.  They can't do it.  It's just not possible
10    based on being able to see specific orders, because
11    we can't.
12          We don't see theirs, and they don't see
13    ours.  We see cumulative -- cumulative information.
14    Q.   Okay.  If there were a pharmacy sitting in
15    Cleveland in Ohio that dispensed a million
16    oxycodone 30 pills and the only other thing they
17    dispensed was a bottle of aspirin on an every month
18    basis, if those orders were being placed by
19    someone else -- with someone else, except for the
20    aspirin that they bought from Anda, is it your view
21    that you would be unable to determine whether they
22    were placing suspicious orders?
23          MR. MATTHEWS:  Objection.
24    A.   Again, we are notifying the DEA of a
25    customer that we are not comfortable with based on
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    the information that we have, based on the

2    information that we've received, and we're telling

3    them, one, we're not selling to them; two, this is

4    the reason why, and we have concerns.

5         But I don't think there's any -- aside from

6    the inability, unless you can show me some

7    statutory, regulatory, or advisory document that

8    would either require or -- or suggest that one

9    distributor would tell about -- would go to the DEA

10   and say they're ordering -- they're -- and they're

11   making suspicious orders from another distributor,

12   that's -- I just never heard that before, and I

13   don't -- I just don't think it's -- it's within the

14   purview of the industry or it's ever been

15   contemplated that that would happen.

16   Q.   And you've never heard of another

17   distributor under similar circumstances reporting on

18   suspicious orders from another distributor?

19        MR. MATTHEWS:  Objection.

20        MS. CHARLES:  Objection; form.

21   A.   I've never heard of that, and I don't know

22   how they could because they don't know what the

23   order is.  You're talking about a specific -- when

24   you're doing that, you're talking about reporting a

25   specific order, and without knowing what that order
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    is, that specific order, it's -- I don't see how

2    anyone would be able to do that.

3        Q.   So the entire industry could have

4    information about a particular pharmacy that's

5    dispensing absurd amounts of OxyContin or other

6    controlled substances, and your position is the only

7    one that would be able to report them for a

8    controlled substance or a suspicious order is the

9    one for whom they placed the order with?

10           MR. MATTHEWS:   Objection.

11       A.   That's the only one that knows what the

12   order is, and the DEA knows because they get the

13   ARCOS data.

14           We were saying we have a concern about this

15   customer.  Again, we've ceased doing business with

16   them, and we've gone to the DEA and said we have a

17   concern.  And they see the ARCOS reports; they see

18   who's -- what they're ordering from other people;

19   and they see the individual orders.

20           I think we went, you know, pretty far in

21   terms of our responsibility.  We're not selling and

22   we're reporting them.  And to me -- and my own -- my

23   own view, I think it's a lot more valuable to

24   support a customer -- to report a customer than it

25   is maybe one particular or two particular orders.
```

Highly Confidential - Subject to Further Confidentiality Review

1        I mean, whether or not Cardinal reported

2    them, I'm not sure it really matters.  The DEA has

3    been on notice that this is a bad customer in our

4    mind, and this is why.

5        Q.   But not through a suspicious order report?

6        A.   No.

7             MR. MATTHEWS:  Objection.

8        A.   No.

9             When we had suspicion -- when we had orders

10   that we considered suspicious, we reported it as an

11   order.  But for the vast majority, it was customers.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14    Q.   Okay.  And what was it about these orders

15    that drew you to the conclusion that they were

16    suspicious?

17    A.   It was the -- it was the items that they

18    were ordering, the quantities that they were

19    ordering, the combinations that they were ordering.

20    My guess is they probably didn't -- yeah, and -- and

21    I don't know if they ordered those before or not.

22    I'd have to see.

23         But it was the -- it was the items in the --

24    in two of the cases, it was the combination.  And in

25    the other cases, it was the actual item.  And in the

1    other case, it was hydrocodone that was larger than

2    the previous order and we -- we -- my guess is on

3    that one we might have -- we might have asked for an

4    explanation and we didn't get it.  So we didn't get

5    it within 24 hours, the order was deleted, reported

6    as suspicious, and the customer was cut off.

7              MR. MATTHEWS:  How are we doing on time?

8              THE COURT REPORTER:  Six hours and 19

9       minutes on the record.

10             (Anda-Brown Exhibit 15 was marked for

11      identification.)

12   BY MR. NOVAK:

13      Q.   We've had marked for identification purposes

14   Anda-Brown Deposition Exhibit 19.

15             MR. MATTHEWS:  15?

16             MR. NOVAK:  Oh, okay.  Sorry.  15.

17             THE COURT REPORTER:  Tricked you.  Sorry

18      about that.

19   BY MR. NOVAK:

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8       Q.    Okay.  So you participated in the present --
 9   or in the preparation --
10       A.    Yes.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review



17     Q.   Okay.  And it sets out both you as the

18   director of compliance and Emily Schultz as the

19   associate direct -- director of regulatory

20   compliance?

21     A.   Yes.

22     Q.   And as of this time, you had five employees

23   that reported to you?

24     A.   Yes.

25     Q.   And they were James Gatto, Latoya Samuels,

Highly Confidential - Subject to Further Confidentiality Review

1     Mary Barber, John Kincaide, and Tasha Campbell?

2         A.   That is correct.

3         Q.   Okay.  And the individuals who were tasked

4     with performing the due diligence on transactions

5     and new customer applications for controlled

6     substances would have been these five individuals in

7     addition to yourself?

8         A.   That is correct.

9

10

11

12

13

14              MR. MATTHEWS:   Objection.

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7    Q.    On the dispensing data that we reviewed for

8    the -- for the various customers on the cut-off list

9    that Anda submitted to the Department of Justice,

10   what prevented you from coming to the conclusion

11   that those customers had engaged in orders deviating

12   from a normal pattern?

13        MR. MATTHEWS:  Objection.

14   A.    They may not have been our orders.  They may

15   not have been from us.  I don't know that.  Without

16   looking at the customer's actual history, I don't

17   know if their orders from us deviated in any way.  I

18   don't know what they were ordering from us.

19        That's -- those are -- those conclusions

20   summarized the top products that they were

21   dispensing, period.  We don't -- I don't -- without

22    -- without having that customer file in front of me

23   and all the information we look at, I would have no

24   way of knowing what they -- what they ordered from

25   us.

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   I didn't ask about whether they ordered it

2   from you.   I asked simply whether you possess

3   sufficient information to conclude that they were

4   engaging in orders deviating from a normal pattern.

5          MR. MATTHEWS:  Objection.

6      A.   Again, as we discussed earlier, the only way

7   I would know that -- the only orders I can see are

8   what they were ordering from us.  And without seeing

9   their order history, I would have no idea if they

10  were deviating from a pattern or not.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  So between the six of you, you would

2    have been responsible for approximately 4,333 orders

3    apiece if you were just divvying them up equally

4    among the six?

5      A.   If that was the case, yes.

6      Q.   Over a six-month period?

7      A.   Over a six-month period.

8      Q.   So 722 orders a month apiece for each of the

9    compliance members?

10     A.   If that's what the math -- if that's what

11   the math averages out to, yes.

12     Q.   Okay.  And the due diligence that would be

13   performed for roughly 722 orders that were held per

14   person in -- in your compliance team, those would be

15   all of the due diligence steps that we reviewed in

16   SOP 40?

17     A.   That's correct.

18     Q.   I think that's all I have for Anda-Brown 15.

19          MR. NOVAK:  Do you want to take a quick

20     break?

21          THE VIDEOGRAPHER:  Off the record, 6:03 p.m.

22          (Recess from 6:03 p.m. until 6:14 p.m.)

23          THE VIDEOGRAPHER:  On the record, 6:14 p.m.

24          (Anda-Brown Exhibit 16 was marked for

25     identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   We've had marked for identification purposes

 3    Deposition Exhibit 16, which is comprised of an

 4    e-mail -- a two-page e-mail -- or I should say an

 5    exchange of e-mails -- between Vicki Mangus and

 6    various people within Anda and then Robert Brown who

 7    apparently forwarded the e-mail to Michael Cochrane.

 8        A.   Just -- just to clarify, the people that

 9    it's -- that it is to, her e-mail, are all -- all

10    Walgreens people.  The only other Anda person other

11    than myself who is cc'd is Bill Versosky.  Everyone

12    else that -- the line "to," those are all -- those

13    are all people from Walgreens.

14        Q.   Okay.  What is Vicki Mangus' position within

15    Anda?

16        A.   At that time or now?

17        Q.   At that time.

18        A.   National Account Manager.

19        Q.   And what was Mr. Versosky's responsibility?

20        A.   He was Vice President of Sales.

21        Q.   Okay.

22        A.   So Vicki reported to him.

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12
```

13      Q.   Okay.   During the time that you were at

14   Anda, did you ever report Walgreens to the DEA as

15   having specific stores for which you refused

16   controls?

17      A.   There were stores that we did not -- I'm

18   trying to remember if we actually -- I mean, I know

19   there were stores that we -- we failed -- that we

20   refused to -- to service.   But, to tell you the

21   truth, I can't recall if they were actually reported

22   to the DEA.

23        At the time, very, very frankly, I was not

24   running that report.   I kind of took that over in

25   2014.   So I don't really -- I just don't remember if

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that was the case.

 2         Q.   When you say "the report" in that answer,

 3    you're referring to the report that was made to the

 4    DEA?

 5         A.   Correct.

 6         Q.   The one that, after September 10 of 2014,

 7    you were identified as being responsible for, at

 8    least separately supporting the suspicious orders?

 9         A.   Well, yeah.  I mean, as -- I was the one

10    who -- after September 10th, I was the one who did

11    it all.  It just made more sense.  So I did -- I

12    just included those -- included the additional

13    information points, but I was the one who took over

14    that report.

15         Q.   Who was it prior to September 10 of 2014 --

16         A.   Emily Schultz.

17         Q.   -- that prepared those reports?

18         A.   Oh, I'm sorry.

19              Emily Schultz.

20         Q.   Okay.  And -- and you don't recall whether

21    there were any Walgreens stores that were ever

22    reported to the DEA as -- as stores that you had cut

23    off?

24         A.   Well, we had -- no.  You mean denied, not

25    cut off.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Denied.

 2        A.    I don't recall.

 3        Q.    How about cut off?

 4        A.    We -- I -- to my -- to my knowledge, we

 5   didn't cut them -- we didn't cut stores off.  We got

 6   data on a regular basis, but we did not cut them

 7   off.  And part of the reason was that -- let's see.

 8            This was November 20, 2012.  By the time we

 9   really started servicing these stores in -- in

10   2000 -- full blast, 2013, they had a full -- they

11   didn't have a full compliance team, but they had a

12   full compliance team.  And what did they call it?

13            They had a program that they used for all

14   stores.  Oh, shoot.  I know it's -- I know I've had

15   it.  It's something about proper dispensing

16   practices.  They called it -- it was actually where

17   each store had to fill out the information in order

18   for -- in order for their own -- in order for their

19   own compliance department to approve them to even

20   come to us for -- for controls.

21            I mean -- I mean, they wouldn't -- if they

22   weren't -- if they weren't doing the proper

23   practices, they wouldn't even allow them to buy from

24   us.

25            I'm trying to remember what they called it.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Vicki would probably know, and I just can't recall

2    what it was.

Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3
```

4      Q.   Okay.  So there were a number of Walgreens

5   stores, then, that you decided not to service?

6      A.   At that time, yes.  And, again, it -- I

7   believe again that they underwent, in the next six,

8   eight months, significant changes in their -- in

9   their compliance, in their -- in their review store

10  by store.

11          And I think that, if I recall, that a lot of

12  the stores underwent significant changes in their

13  dispense patterns.

14     Q.   So your refusal to provide controls to a

15  number of the stores back at that time would be

16  recorded as controls denied in the spreadsheets that

17  you maintained for the different companies?

18     A.   Actually, there were spreadsheets, but

19  because -- this was frankly -- frankly, this

20  particular exercise, so to speak, was not I'm -- I

21  want to -- I want to get controls.

22          It was we're looking to Anda, would you

23  service us, so we're going to -- we're going to give

24  you preliminary information to see if you would even

25  consider servicing Walgreens and tell us does it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    even make sense.  Because if you reject enough of

 2    our stores and you're telling us you'll never

 3    service us, we'll go somewhere else.

 4           So it wasn't like, oh, I'm applying for

 5    controls.  It was like -- it was like two steps

 6    before I'm applying for controls.  We want -- we

 7    want you -- we know -- you know, we know compliance

 8    has to approve these.  Before we go too far down the

 9    line and look at any contracts or look at any

10    business arrangements, we want to see what -- what

11    would even happen here based on our current status.

12           And so we're going to give you information

13    that we normally don't share, but we're going to

14    give it and you tell us what -- what you think.

15    Q.   So they provided preliminary information to

16    Anda --

17    A.   Yes.

18    Q.   -- to get a gut reaction as to whether they

19    would have compliance issues based on their

20    dispensing data?

21    A.   Correct.

22           MR. MATTHEWS:  Objection.

23    A.   Yes.  That's --

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



18     Q.   Okay.  For purposes of reviewing the due

19   diligence that was performed for Walgreens stores

20   once they ultimately received control authorization,

21   those would similarly be contained in the same

22   places that we've talked about for the other retail

23   pharmacies?

24       MR. MATTHEWS:  Objection.

25     A.   To my knowledge -- and, again, I haven't

Highly Confidential - Subject to Further Confidentiality Review

```
 1    been there in a couple of years -- but we did retain

 2    Walgreens' individual store data, store-by-store

 3    store information in the O drive under Walgreens.

 4        Q.    Okay.   So there is dispensing data in the O

 5    drive.   There is maybe a modified customer

 6    questionnaire to reflect the fact that it's a big

 7    chain?

 8        A.    Yes.

 9        Q.    And then all of the other information that

10    we've gone through that would comply with SOP 28,

11    SOP 40, and SOP 45, would be compiled and retained

12    for Walgreens?

13        A.    Yes.   I'll just make one note:   They had the

14    same procedures for every store, so we didn't get

15    thousands of copies --

16        Q.    Right.

17        A.    -- of the same one.

18             And, frankly, pretty much every Walgreens

19    looks the same inside, so we didn't get pictures of

20    each store, of each Walgreens.   So we got -- we did

21    get pictures of what a Walgreens store looked like,

22    but we didn't get 8,000 or however many there were

23    because they pretty much do look alike.

24        Q.    Have you ever -- to your knowledge, has Anda

25    ever submitted a suspicious order report to the FDA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for any chain pharmacy?

 2        A.   Did you say FDA or DEA?

 3        Q.   DEA.  Thank you.

 4        A.   There is one for Bi-Mart that was on there,

 5    yes.

 6        Q.   Okay.  Other than the Bi-Mart one, any for

 7    Walgreens?

 8        A.   Not to my knowledge, no.  No, I don't recall

 9    any.

10        Q.   Any for Publix?

11        A.   No.

12             If I may add, in the times we met with the

13    DEA, they told us Publix is the -- like a gold

14    standard for -- for how they handle controlled

15    substances.

16             And, as I mentioned, even in our exit

17    interview in 2015, the DEA representative said, you

18    know, you don't even need due diligence on the

19    Moffitt Center.  You know what they do.  And we just

20    want to make sure that good patients who need

21    controls that really have conditions that warrant it

22    are getting it and they're not held up because, you

23    know, they're being denied to legitimate patients.

24             And they used that as an example.

25        Q.   We've gone through a number of different
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    databases or portals that are used by Anda.

 2           One that we haven't touched upon.  Have you

 3    heard of the Cognos system?

 4       A.   Yeah.  I didn't use it that much.  I

 5    think -- I think other people did for data -- for

 6    data -- you know, for -- for like doing reports.  I

 7    didn't really do reports.  That was, like I say,

 8    mostly Sabrina and Latoya.  But they did use Cognos,

 9    you know, to, you know, capture historic data,

10    either cumulate it, break it out, et cetera.

11       Q.   Okay.  What -- what is Cognos?  I don't even

12    know.

13       A.   It's -- it's a -- it's a -- it's data

14    repository.  And, frankly, I can't really tell -- I

15    can't really tell you much about it because I didn't

16    really use it on a daily basis.  I don't think I --

17    I'm trying to remember myself how it -- how I -- I

18    don't think I -- I don't think I used it very much.

19       Q.   And what was the purpose that they used it

20    for?

21       A.   They used it to file reports.

22           So, for example, the report that I -- that

23    Sabrina sent me about the customers, the one that we

24    referred to earlier, she -- she might have -- how

25    many -- you know, what do they -- what do they
```

```
 1    order, what's the percentage of controls, what

 2    they've done.

 3         And she was able to utilize that to get, you

 4    know, historic data, cumulative data, things of that

 5    nature.

 6    Q.   Okay.

 7         MR. NOVAK:  Take a quick break.

 8         THE VIDEOGRAPHER:  Off the record, 6:33 p.m.

 9         (Recess from 6:33 p.m. until 6:37 p.m.)

10         THE VIDEOGRAPHER:  On the record, 6:37 p.m.

11    BY MR. NOVAK:

12    Q.   Mr. Brown, when did you leave Anda?

13    A.   January 2017.

14    Q.   Okay.  What were the circumstances that led

15    to your departure?

16    A.   Following the purchase of -- of Anda by

17    Teva, Teva announced that they would require

18    significant position reductions throughout their --

19    all of their entities, and I think they were

20    shooting for 25 percent reduction in -- in the

21    workforce.  And so Anda was one of those that --

22    that really -- it was affected and my position was

23    eliminated.

24    Q.   Okay.

25    A.   Along with other members of the compliance
```

```
 1    department as well.
 2        Q.   All right.  Do you have an understanding as
 3    to what the compliance staffing for the suspicious
 4    order monitoring is for Anda today?
 5        A.   I -- I don't.
 6        Q.   Do you know how many employees they have?
 7        A.   I really don't.  I don't know if they've --
 8    I mean, when I left, I mean, there were -- of the
 9    six -- of the six dedicated people, three were left,
10    but I don't know if they've, you know, they had --
11    if they -- if they mingled the two facets, the
12    licensing and suspicious order, and they have some
13    people who are working on that.  So I really don't
14    know.  I don't know how that worked.
15        Q.   Okay.
16             MR. NOVAK:  That's all I have.
17             MR. MATTHEWS:  Anyone have anything?
18             I actually have a few questions.
19             Do I need to move?
20             THE VIDEOGRAPHER:  That's up to you.
21             MR. MATTHEWS:  I'm going to stay here.
22                       CROSS-EXAMINATION
23    BY MR. MATTHEWS:
24        Q.   Mr. Brown, I want to follow up on a few
25    questions.  My name is James Matthews, as you know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I represent you at this deposition today, and I

 2    represent Anda.  I have a few questions I want to

 3    follow up on.

 4         Early in the day, you were asked some

 5    questions about the know your customer idea, and you

 6    used the word "required" with respect to the know

 7    your customer diligence.

 8         Could you explain how you meant the word

 9    "required" with respect to know your customer?

10    A.   We were advised in -- in face-to-face

11    meetings with our DEA representatives here in

12    Florida and at DEA conferences that there was an

13    expectation that a registrant would -- would know

14    who they're selling controls to.  There is certainly

15    nothing in any statute or -- or regulation that

16    sets -- that uses -- that either uses that language

17    or sets it as a requirement.

18    Q.   Also during the day you were asked some

19    questions about reports submitted by Anda to DEA

20    which listed, among other things, customers that

21    Anda had denied controlled substances sales to or

22    had cut off.

23         And you mentioned, do you recall, that one

24    of the DEA agents that you met with told you that

25    those reports were not helpful.
```

```
 1              Do you remember that testimony?

 2              MR. NOVAK:  Objection.

 3       A.   Yes.  Yes.

 4       Q.   Okay.  Would you explain what you meant when

 5   you testified that DEA agents told you those reports

 6   were not helpful?

 7              MR. NOVAK:  Objection.

 8       A.   Well, specifically in our September 2014

 9   meeting, we were discussing with all of the DEA

10   representatives who were present of the different

11   aspects of our customer due diligence, suspicious

12   order monitoring, et cetera, our entire compliance

13   program.  And we said among those are -- as we've

14   been reporting for quite some time on customers who

15   were either cut off or denied or, in fact,

16   reinstated.

17              And Valerie Mitchell said, well, it would be

18   a lot more helpful if you would include the reasons.

19   We -- we don't really have the ability to utilize

20   those as much if -- but we would -- it would be

21   much -- we don't have the ability to utilize them in

22   their present format, but if you included additional

23   specific information, it would be -- it would be

24   helpful.

25       Q.   Was it your understanding that DEA was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    dissatisfied with the reports?

 2           MR. NOVAK:  Objection.

 3     A.    No.

 4     Q.    Was it your understanding that DEA believed,

 5    or Ms. Mitchell in particular believed, that the

 6    reports were inadequate in any respect?

 7           MR. NOVAK:  Objection.

 8     A.    No.

 9     Q.    With that in mind -- withdrawn.

10           MR. MATTHEWS:  I don't have any further

11    questions.

12           MR. NOVAK:  I think we're done.

13           MR. MATTHEWS:  Great.

14           THE WITNESS:  How much time was left?

15           THE VIDEOGRAPHER:  Off the record, 6:43 p.m.

16           (Whereupon, the deposition concluded at

17    6:43 p.m.)

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby

 5    certify that, pursuant to notice, the deposition of

 6    ROBERT BROWN was duly taken on Monday,

 7    December 3, 2018, at 9:26 a.m. before me.

 8          The said ROBERT BROWN was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness, and that a

16    review of the transcript was requested.

17

18    _____

19    Susan D. Wasilewski, RPR, CRR, CCP, CMRS, FPR, CCR

20    (The foregoing certification of this transcript does

21    not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                      - - - - - -

2                    E R R A T A

3                      - - - - - -

4   PAGE   LINE   CHANGE

5   _____  _____  _____

6      REASON: _____

7   _____  _____  _____

8      REASON: _____

9   _____  _____  _____

10     REASON: _____

11  _____  _____  _____

12     REASON: _____

13  _____  _____  _____

14     REASON: _____

15  _____  _____  _____

16     REASON: _____

17  _____  _____  _____

18     REASON: _____

19  _____  _____  _____

20     REASON: _____

21  _____  _____  _____

22     REASON: _____

23  _____  _____  _____

24     REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4    acknowledge that I have read the foregoing pages, 1

 5    through 278, and that the same is a correct

 6    transcription of the answers given by me to the

 7    questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12    _____     _____

13    ROBERT BROWN                                    DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

23    Notary Public

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                          LAWYER'S NOTES

 3     PAGE    LINE

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25     _____   _____   _____
```