Highly Confidential - Todd Cameron

```
 1              THE STATE OF MONTANA

            OFFICE OF THE ATTORNEY GENERAL

 2          OFFICE OF CONSUMER PROTECTION

 3

 4                    - - -

 5               SEPTEMBER 26, 2018

 6              HIGHLY CONFIDENTIAL

 7                    - - -

 8

 9          Oral testimony of TODD CAMERON, taken

10    pursuant to notice, was held at the law offices of

11    Baker & Hostetler, LLP, 250 South Civic Center Drive,

12    Suite 1200, Columbus, Ohio 43215, commencing at 10:23

13    a.m., on the above date, before Carol A. Kirk, a

14    Registered Merit Reporter.

15

16                    - - -

17

18

19

20

21          GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

22              deps@golkow.com

23

24
```

Highly Confidential - Todd Cameron

```
 1            DEPOSITION OF TODD CAMERON
 2                  APPEARANCES
 3                    - - -
 4

          LINDA SINGER, ESQUIRE
 5        MOTLEY RICE LLC
          401 9th Street, NW, Suite 1001
 6        Washington, DC  20004
          202-386-9626
 7        lsinger@motleyrice.com
 8        - and -
 9        NATALIE DEYNEKA, ESQUIRE
          MOTLEY RICE LLC
10        28 Bridgeside Boulevard
          Mount Pleasant, South Carolina  29464
11        843-216-9343
          ndeyneka@motleyrice.com
12
13        JENNIFER G. WICHT, ESQUIRE
          JOSHUA D. TULLY, ESQUIRE
14        WILLIAMS & CONNOLLY, LLP
          725 12th Street, N.W.
15        Washington, DC  20005
          202-434-5331
16        jwicht@wc.com
17
18     ALSO PRESENT:
19       Kaitlyn Anderson, Esquire
20       Kelley Hubbard via teleconference
21
22
23
24            DEPOSITION OF TODD CAMERON
```

Highly Confidential - Todd Cameron

```
 1                    INDEX TO EXAMINATION

 2    WITNESS                                      PAGE

 3    TODD CAMERON

 4         CROSS-EXAMINATION BY MS. SINGER:           8

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24              DEPOSITION OF TODD CAMERON
```

Highly Confidential - Todd Cameron

```
 1                INDEX TO EXHIBITS
 2   MONTANA-CARDINAL    DESCRIPTION              PAGE
 3   Montana-Cardinal 1  Subpoena                  10
 4   Montana-Cardinal 2  Document titled, Cardinal  93
 5                       Health, Inc. v. Holder,
 6                       Attachment 13 to Defendants'
                         Opposition to Plaintiff's
 7                       Motion for Preliminary
                         Injunction"
 8
     Montana-Cardinal 3  Document titled, "Process to  116
 9                       Establish SOM Threshold
                         Limits," Bates-stamped
10                       CAH_MTAG_0001167 through 1170
11   Montana-Cardinal 4  Document titled, "Industry    132
                         Compliance Guidelines"
12
     Montana-Cardinal 5  E-mail from Mr. Todd, dated   172
13                       3/11/14, Bates-stamped
                         CAH_MDL2804_00220583
14
     Montana-Cardinal 6  Spreadsheet of suspicious     208
15                       reports
16   Montana-Cardinal 7  Text fields                   209
17   Montana-Cardinal 8  Spreadsheet                   218
18   Montana-Cardinal 9  Document titled "QRA SOME     222
                         Customer Analytics General
19                       Awareness Instructions,"
                         Bates-stamped CAH_MTAG_
20                       0001728 through 1745
21   Montana-Cardinal 10 Spreadsheet                   234
22   Montana-Cardinal 11 E-mail string ending with     237
                         an e-mail to Mr. Hartman
23                       from Mr. Cameron, dated
                         1/11/08, Bates-stamped
24                       CAH_MDL_PRIORPROD_DEA07_
```

Highly Confidential - Todd Cameron

```
 1            INDEX TO EXHIBITS (CONT'D)
 2   MONTANA-CARDINAL      DESCRIPTION                PAGE
 3   Montana-Cardinal 12  E-mail to GMB-QRA-Anti-      243
                          Diversion from Ms. Morse,
 4                        dated 12/3/08, Bates-
                          stamped CAH_MTAG_0001798
 5                        through 1833
 6   Montana-Cardinal 13  Document titled, "Sales -    292
                          Anti-Diversion Alert
 7                        Signals," Bates-stamped
                          CAH_MTAG_240 through 243
 8
     Montana-Cardinal 14  Document titled, "Cage/Vault  310
 9                        SOM Process," Bates-stamped
                          CAH_MTAG_0001614 through 1618
10
     Montana-Cardinal 15  Document titled "Daily        326
11                        Threshold Reporting,"
                          Bates-stamped CAH_MTAG_
12                        0001161 through 1166
13   Montana-Cardinal 16  Document titled "Sales -      329
                          Highlight Report," Bates-
14                        stamped CAH_MTAG_0001324
                          through 1328
15
     Montana-Cardinal 17  Document titled             333
16                        "Regulatory Notification of
                          Suspicious Orders and/or
17                        Suspension of Sales of
                          Scheduled/List 1 Substances,"
18                        Bates-stamped CAH_MTAG_
                          0000898 through 906
19
     Montana-Cardinal 18  Document titled "Standard     335
20                        Operating Procedures,
                          Pharmaceutical Distribution,
21                        Detecting and Reporting
                          Suspicious Orders and
22                        Responding to Threshold
                          Events," Bates-stamped
23                        CAH_MTAG_0001106 through
                          1101
24
```

Highly Confidential - Todd Cameron

```
 1              INDEX TO EXHIBITS (CONT'D)

 2   MONTANA-CARDINAL      DESCRIPTION              PAGE

 3   Montana-Cardinal 19   Document titled "Attention.    340
                           Held Pending Regulatory
 4                         Review," Bates-stamped
                           CAH_MTAG_0001438
 5
     Montana-Cardinal 20   Document titled "Standard      343
 6                         Operation Procedure,
                           Corporate Quality and
 7                         Regulatory Affairs, New
                           Account Approval," Bates-
 8                         stamped CAH_MTAG_0000316
                           through 323
 9
     Montana-Cardinal 21   Document titled "Standard      346
10                         Operating Procedure,
                           Pharmaceutical Distribution,
11                         National Account Types that
                           Bypass Corporate Quality and
12                         Regulatory Affairs Due
                           Diligence," Bates-stamped
13                         CAH_MTAG_0000214 through 218

14   Montana-Cardinal 22   Document titled               352
                           "Wholesaler/Distributor
15                         Questionnaire," Bates-stamped
                           CAH_MTAG_383 through 387
16
     Montana-Cardinal 23   Document titled "QRA SOM       355
17                         Customer Analytics General
                           Work Instructions," Bates-
18                         stamped CAH_MTAG_0001728
                           through 1745
19

20

21

22

23

24
```

Highly Confidential - Todd Cameron

```
 1              P R O C E E D I N G S

 2                    - - -

 3              MS. SINGER:  This is Linda Singer

 4         for the Montana Attorney General's

 5         Office.

 6              MS. DEYNEKA:  And Natalie Deyneka,

 7         also with MotleyRice and Linda Singer.

 8              MS. SINGER:  And on the phone,

 9         Kelly Hubbard from the Montana Attorney

10         General's Office.

11              MS. ANDERSON:  I'm Kaitlyn

12         Anderson, in-house counsel for Cardinal

13         Health.

14              MS. WICHT:  Jennifer Wicht from

15         Williams & Connolly for Cardinal Health.

16              MR. TULLY:  Josh Tully from

17         Williams & Connolly, also for Cardinal

18         Health.

19              THE WITNESS:  Todd Cameron of

20         Cardinal Health, the anti-diversion

21         group.

22                    - - -

23                 TODD CAMERON

24   being by me first duly sworn, as hereinafter certified,
```

Highly Confidential - Todd Cameron

```
 1    testifies and says as follows:

 2                    EXAMINATION

 3    BY MS. SINGER:

 4         Q.    All right.  So as we're getting

 5    started, I just want to give you some

 6    suggestions, ground rules, whatever you want to

 7    call them.  Take as much time as you need to

 8    answer questions; standing, sitting, however you

 9    want to do them.

10              If you don't understand a

11    question, please ask me to rephrase it or ask me

12    to explain what I mean.  You were sworn in at

13    the start of this testimony.  I take it you

14    understand that you are testifying under oath

15    subject to a subpoena for testimony by the

16    Montana Attorney General's Office?

17         A.    Yes.

18         Q.    And you understand that a court

19    reporter is going to be transcribing your

20    testimony.

21         A.    Yes.

22         Q.    Is there any reason you can't

23    testify truthfully today?

24         A.    No.
```

Highly Confidential - Todd Cameron

```
 1            Q.    Have you ever testified in

 2   connection with Cardinal's anti-diversion

 3   program?

 4            A.    No.

 5            Q.    And how much time did you spend

 6   preparing for this deposition -- this testimony?

 7   We'll call it testimony.  That's what it is

 8   under Montana law.  How much time?

 9            A.    This deposition specifically?

10            Q.    Yes.

11            A.    Several hours.

12            Q.    Okay.  And other than your counsel

13   at Cardinal and at Williams & Connolly, is there

14   anyone else you consulted with in preparation

15   for today's testimony?

16            A.    Counsel at BakerHostetler.

17            Q.    Okay.  Any non-lawyers?

18            A.    No.

19            Q.    And were there any documents that

20   you reviewed?

21            A.    Yes.

22            Q.    And what documents did you review?

23                  MS. WICHT:  Linda, I'll -- I think

24            that we've generally been doing this.  I
```

Highly Confidential - Todd Cameron

```
 1          object on the basis of privilege to just

 2          the question asking him to identify all

 3          documents.  So I will instruct him not

 4          to answer that one.

 5               To the extent there are individual

 6          documents that you show him and you want

 7          to ask if he reviewed that in prep, I

 8          would allow him to answer that.

 9               MS. SINGER:  Okay.

10  BY MS. SINGER:

11          Q.   Are there any documents that you

12  reviewed on your own initiative that weren't

13  shown to you by counsel?

14          A.   No.

15          Q.   Okay.  And did you review the

16  subpoena that was issued by the Attorney

17  General's Office in advance of coming today?

18          A.   No.

19          Q.   Okay.  Do you know the topics or

20  subjects that were identified on that subpoena?

21          A.   No.

22               MS. SINGER:  So this is going to

23          be Exhibit 1.

24                    - - -
```

Highly Confidential - Todd Cameron

```
 1          (Montana-Cardinal Exhibit 1 marked.)

 2                    - - -

 3      A.    Should I read this?

 4      Q.    Yes.  If you could take a look --

 5  focus on the list of topics or subject areas.

 6  That's at page III.  It's III, "Subject Matters

 7  for Testimony."  If you could just skim through

 8  those, please.

 9          MS. WICHT:  You can go ahead and

10          read that.  While he's reading that,

11          Linda, my understanding of the

12          discussions that we had leading up to

13          this deposition are that -- and what

14          we're prepared to do today -- is that

15          Mr. Cameron is here in his individual

16          capacity, not as sort of a corporate

17          representative of Cardinal Health.

18          So I think -- and we'll see once

19          he reviews -- but I think he's -- in his

20          personal knowledge would cover many of

21          these.  But we didn't prepare him as a

22          corporate witness.  And he's not being

23          offered in that capacity today.

24          MS. SINGER:  Yes.  That is
```

Highly Confidential - Todd Cameron

```
 1          understood.

 2                MS. WICHT:  Okay.

 3   BY MS. SINGER:

 4          Q.    Mr. Cameron, have you had a chance

 5   to look at the list of subjects?

 6          A.    Yes.

 7          Q.    All right.  Are you familiar with

 8   all of those subject areas in your work at

 9   Cardinal?

10          A.    I am familiar with the areas, yes.

11          Q.    Okay.  When did you start working

12   at Cardinal?

13          A.    August of 1993.

14          Q.    Was it your first job?

15          A.    It was.

16          Q.    And in what capacity did you start

17   with the company?

18          A.    I was involved in the IT

19   department around data elements of the

20   distribution side of the company.

21          Q.    And was that on the compliance or

22   marketing side of Cardinal Health?

23          A.    Marketing.

24          Q.    And can you take us through your
```

Highly Confidential - Todd Cameron

```
 1    positions at Cardinal Health.

 2            A.    I can try.  I was in --

 3            Q.    If you can't, I can't.

 4            A.    Right.  Yeah.

 5                  I was in the -- and the reason I

 6    hesitate is when I started, the company was very

 7    small.  And we didn't have the specific

 8    department structure silos that we have today.

 9    It was really kind of a group of -- it was very

10    small.  It was about 70 people when I started.

11                  But I was in the marketing

12    department as far as customer data elements that

13    were used on the distribution side of the

14    business, and moved into an IT role that was

15    focused around customer IT solutions from an

16    inventory management standpoint side.

17                  And then moved into what at the

18    time was referred to as sales administration.

19    Then went back into another IT role.  Then went

20    into a consumer health role, which was all the

21    front-end nonprescription products that Cardinal

22    carries.

23                  Then went back into a sales

24    operations role.  And then went from there into
```

Highly Confidential - Todd Cameron

```
1    the anti-diversion team.  And each of those

2    steps had two or three jobs within those

3    movements.

4            Q.    Okay.  And so what is your current

5    title at Cardinal?

6            A.    I believe it is -- and I say that

7    because I'm not sure what the actual HR roadmap

8    title is.  But I believe it is SVP of supply

9    chain integrity.

10           Q.    All right.  Do we need to check

11   your business card?

12           A.    Yeah, I don't have one with me.

13   But I think that's what it says.

14           Q.    So this is not the part of the

15   testimony where you're supposed to get squishy?

16           A.    Well, I haven't stood up yet.  So

17   I'm still sitting down.

18           Q.    Okay.  And so in your current

19   position, whatever it is, at Cardinal Health,

20   you're responsible for anti-diversion

21   compliance; is that correct?

22           A.    Correct.

23           Q.    And when did you first move into a

24   role related to anti-diversion compliance?
```

Highly Confidential - Todd Cameron

```
 1          A.    Late 2012.

 2          Q.    And what were the circumstances of

 3   that transition?

 4          A.    I moved in I believe it was

 5   September of '12.  I was asked to take a lateral

 6   move into that role from my current position at

 7   the time to help the company continue to evolve

 8   its anti-diversion program focused on data and

 9   analytics.

10          Q.    And did you succeed somebody in

11   that position?

12          A.    I did.

13          Q.    And who was that?

14          A.    Michael Mone.

15          Q.    And to the extent you know, why

16   was he moved from that position?

17          A.    I don't know.  I know that Michael

18   is still here in a similar level capacity today

19   doing things with the Boards of Pharmacy.

20          Q.    And do you know why you were

21   chosen for the position?

22          A.    I was under the impression that

23   they wanted somebody that was good with numbers

24   and could understand customer data and help
```

Highly Confidential - Todd Cameron

```
 1   determine what objective components would make

 2   sense to evaluate customers.

 3          Q.    Okay.  And is that the same

 4   position that you're still in now?

 5          A.    Basically, yes.

 6          Q.    Okay.  And how many people report

 7   to you?

 8          A.    About 35.

 9          Q.    And what job functions do they

10   have?  What kind of people are we talking about?

11          A.    As far as the roles?

12          Q.    Yes.

13          A.    Everything related around to

14   anti-diversion, knowing our customers, setting

15   thresholds, doing visits.

16                MS. SINGER:  And let me just pause

17          for a second.

18                Kelly Hubbard, can you hear us

19          okay?

20                MS. HUBBARD:  Yes, I can.  Thank

21          you.

22   BY MS. SINGER:

23          Q.    Before you took this new position

24   or at any point, I take it you don't have any
```

Highly Confidential - Todd Cameron

```
 1    background in law enforcement or compliance?

 2         A.    I do not.

 3         Q.    And what awareness did you have

 4    of --

 5         A.    I have a criminal justice degree,

 6    but that probably doesn't count.

 7         Q.    As long as you don't have other

 8    criminal justice experience, that's a positive.

 9               What was your awareness of opioid

10    diversion and abuse at the time you moved into

11    your current position?

12         A.    At the time of the move, it was, I

13    would say, probably equal to other Cardinal

14    employees that were not part of the

15    anti-diversion group.

16         Q.    So specifically what were your

17    impressions about issues around opioid diversion

18    at that time?

19         A.    I knew that we obviously

20    distributed controlled substances.  I knew that

21    we distributed C-IIs, that we had a vault that

22    those were kept in that had specific ordering

23    requirements from customers.  We had certain

24    recordkeeping requirements.
```

Highly Confidential - Todd Cameron

1             And I knew that we supplied C-III

2    through Vs that were kept in a cage that had

3    different but still restrictions around them

4    from a customer ordering and recordkeeping

5    standpoint.  And that was pretty much it.

6         Q.    And when you talk about C-II and

7    C-III through C-V, those are the schedules of

8    controlled substances --

9         A.    Yes.

10        Q.    -- according to the DEA?

11        A.    Correct.  Yes.

12        Q.    And did you have any awareness of

13   outside of Cardinal what was going on with

14   opioid abuse and diversion in the larger

15   society?

16        A.    No.  Not from a prescription

17   standpoint.  Obviously I knew of heroin and

18   cocaine and drugs like that.

19        Q.    And what marching orders were you

20   given when you came into the position?

21        A.    I was instructed to continue to

22   evolve and build out the objective data driven

23   system and to help educate the business and the

24   sales forces on the components of the program

Highly Confidential - Todd Cameron

1   and to be able to help evaluate customers.

2           Q.    And was there a specific

3   deficiency or gap that you were brought in to

4   help fill?

5           A.    Not that I was aware of, no.

6           Q.    And in your position, both from

7   the get-go until now, who are the people you

8   work with most closely?

9           A.    I mean, I work obviously with my

10  team very closely.  Every day I work with the

11  business side of the company, those that are

12  interacting more directly with the customers.  I

13  work a lot with the legal teams around all the

14  pieces that we're putting together and rolling

15  out.

16          Q.    So who are the three to five

17  people that you interact most closely with?

18          A.    Oh, gosh.

19          Q.    We won't tell them.

20          A.    Yeah.  I don't know if I could

21  come up with only -- on a weekly basis, it's

22  probably 50 people that I interact with.

23          Q.    Okay.  And do you have a deputy, a

24  number two?

Highly Confidential - Todd Cameron

```
 1            A.    I have a next level down of direct

 2    reports, but I've got more than one.

 3            Q.    How many?

 4            A.    Four.

 5            Q.    Okay.  And who are they?

 6            A.    Kimberly Soisson, Patrick Dudley,

 7    Rich Ryu, R-y-u, and Danielle Roberts.

 8            Q.    And who is your counterpart on the

 9    sales side of Cardinal?

10            A.    I don't believe that I have one.

11            Q.    Okay.  So since you started in

12    your SVP role in compliance, what has been your

13    role in developing and implementing Cardinal's

14    suspicious order monitoring program?

15            A.    Can I go back one question?

16            Q.    Yes.

17            A.    So from a counterpoint standpoint

18    when I said I didn't have one, there are SVPs on

19    the sales side, but they're broken up by

20    specific classes of customer trade.

21            Q.    Okay.

22            A.    So I don't have a one to one, but

23    there are four or five other SVPs that handle

24    the business side of things that I interact
```

Highly Confidential - Todd Cameron

1  with.

2          Q.    Okay.  Thank you for clarifying

3  that.

4          A.    And I apologize.  Can you ask the

5  question again?

6          Q.    Yes.  So since you took your

7  position as SVP on the compliance side in 2012,

8  what has been your role in developing and

9  implementing Cardinal's suspicious order

10  monitoring program?

11          A.    I came in in September of '12, and

12  the foundational work of a lot of the components

13  that were going to be used to evaluate customers

14  had already been identified.  And I've been

15  involved in constantly enhancing the use of

16  those.  As obviously numbers continue to change,

17  areas of diversion change.  So I've been

18  involved in continuing to evolve the core

19  components of the program that were in place

20  when I got there to where we are today.

21          Q.    And that program, when did the

22  building out of that start?

23          A.    I don't know.  It was in place --

24  it had been going on when I arrived in September

1    of '12.

2         Q.    Okay.  And when you got started in

3    your position, what kind of work did you do to

4    familiarize yourself with the elements of the

5    program?

6         A.    I spent a lot of time with the

7    leadership of the groups that touched the area

8    that I was involved in and then all the

9    individuals that had been doing a lot of work

10   prior to my arrival.

11        Q.    And is that the same group that's

12   in those roles today, or was it a different

13   circle of people?

14        A.    It was a slightly different circle

15   of people.

16        Q.    So who else was in that mix?

17        A.    Bob Giacalone, Gilberto Quintero,

18   Linden Barber, Nick Rausch.

19             Those are the names.

20        Q.    And are those individuals still in

21   compliance functions at Cardinal?

22        A.    One has left compliance and moved

23   into the business side, and one has retired.

24        Q.    Which ones?

Highly Confidential - Todd Cameron

```
1           A.     Bob has retired, Bob Giacalone has

2    retired, and Nick Rausch has moved into the

3    business.

4           Q.     And the other two are still in

5    compliance at Cardinal Health?

6           A.     Yes.  Now -- I'm sorry.  When I

7    say that, Linden was actually outside counsel at

8    the time and did not become in-house until about

9    a year ago.  But I worked with him extensively.

10          Q.     And over the period you've been in

11   this current role, have you ever received any

12   feedback from Cardinal that things weren't

13   moving quick enough, that you weren't doing

14   enough, any concerns expressed to you either

15   about the program or your performance?

16          A.     No.

17          Q.     Any concerns about the design of

18   the compliance program, the pieces of it, as you

19   talked about it?

20          A.     No.

21          Q.     Okay.  And what about the

22   implementation of the compliance program, any

23   concerns expressed about that?

24          A.     No concerns on any of the three
```

Highly Confidential - Todd Cameron

1   you just asked.  Just obviously constant

2   discussion, awareness, making sure that all the

3   bases were covered.

4          Q.    Okay.  Who do you report up to in

5   having those conversations?

6          A.    I report to Craig Morford.

7          Q.    Whose position is?

8          A.    I believe he is chief legal and

9   compliance officer.

10          Q.    Have you made any recommendations

11   to Cardinal about its compliance efforts that

12   haven't been adopted?

13          A.    No.

14          Q.    Any places that, as you sit here

15   now, you think Cardinal could be working more

16   effectively to prevent diversion?

17          A.    No.

18          Q.    Any improvements that are on your

19   wish list of things to get done in the year or

20   years ahead?

21          A.    Again, we are constantly evolving

22   and improving the system.  And we literally on a

23   weekly basis will be evaluating threshold

24   setting, threshold methodology, threshold

Highly Confidential - Todd Cameron

```
 1   events, to determine if we are setting the dials

 2   correctly.  But I don't have a specific thing

 3   that has to happen.

 4        Q.   Okay.  So you are satisfied that

 5   there aren't currently any shortcomings in

 6   Cardinal's compliance efforts or anti-diversion

 7   efforts that need to be addressed?

 8        A.   From Cardinal's distribution

 9   position that we sit in in the supply chain, no.

10        Q.   And when you qualify that

11   response, what are you excluding?

12        A.   I mean it would be great if there

13   was something we could do to decrease the

14   overprescribing of opioids.  That would

15   obviously help a ton.

16        Q.   Okay.  Do you participate in your

17   current role at Cardinal in any trade

18   associations related to distribution or

19   compliance?

20        A.   Does HDA qualify as one?

21        Q.   In my book, yes.

22        A.   Then, yes, HDA.

23        Q.   And HDA is?

24        A.   I'm not sure -- they've changed
```

Highly Confidential - Todd Cameron

1    their name recently.  I'm not sure what HDA

2    stands for.

3            Q.    Okay.  Does it sound like the

4    Healthcare Distribution Alliance?

5            A.    I think so, yes.  There used to be

6    an M in there maybe.

7            Q.    Used to.

8            A.    Yeah.

9            Q.    They rebranded.

10           A.    Yes.

11           Q.    What is your role on Cardinal's

12   behalf in the HDA?

13           A.    Representing Cardinal on the calls

14   that take place with HDA and other distributors

15   around DEA compliance, anti-diversion issues,

16   new regulations that could be coming out from

17   either the federal government or specific state

18   governments.

19           Q.    Are there other people from

20   Cardinal who participate in those calls?

21           A.    There are.

22           Q.    Who else?

23           A.    I don't know everybody.  I know a

24   lot of the regulatory lawyers are involved in

Highly Confidential - Todd Cameron

1   those calls.  Gary Cacciatore, Martha Russell,

2   to name two of the attorneys that I think were

3   usually on those calls.

4           Q.    And how often do those calls

5   happen?

6           A.    I don't know that there's a

7   specific cadence.  I would say it probably feels

8   like maybe monthly.

9           Q.    And do you have an official role

10  in HDA?  Do you serve on a board or a committee?

11          A.    No.

12          Q.    And, to your knowledge, does

13  anybody from Cardinal serve on the HDA's board

14  or committee?

15          A.    I don't know.  If they would, I

16  wouldn't know it.

17          Q.    Okay.  Are there any other

18  industry associations or organizations with

19  which you are involved?

20          A.    No.

21          Q.    Any associations that

22  manufacturers of opioids also participate in?

23          A.    That I'm involved?

24          Q.    Yes.

Highly Confidential - Todd Cameron

```
 1          A.    No.

 2          Q.    From your involvement in HDA

 3   calls, is that only distributors of prescription

 4   and other healthcare products or manufacturers

 5   as well?

 6          A.    I believe on the calls that I'm

 7   on, I think it's only distributors.  But I know

 8   there are a lot of other HDA calls that

 9   different groups are involved in that I'm not

10   on.

11          Q.    Okay.  And the calls you

12   participate in, is there a particular subject

13   area or group that they fall within?

14          A.    Usually related around controlled

15   substances.  And, again, a lot of it's been

16   around potential new regulations coming out from

17   specific state Boards of Pharmacy lately.

18          Q.    Okay.  And I take it there are

19   e-mails that flow from HDA to you and other

20   members of that group about those topics?

21          A.    I'm sure there are.

22          Q.    Okay.  Do you recall specifically?

23          A.    I do not.

24          Q.    And you mentioned that those calls
```

Highly Confidential - Todd Cameron

```
 1    have been about regulatory developments.

 2         A.    Yes.

 3         Q.    Have there been discussions in

 4    particular about DEA guidance and authority and

 5    enforcement?

 6         A.    The two subjects that I think have

 7    been the most common lately that I can

 8    specifically recall are Ohio is putting out a

 9    new regulation around controlled substance

10    distributions, the things that distributors are

11    required to do from a due diligence standpoint.

12    And New York has put out or is putting out an

13    opioid tax.  Those have been -- probably the

14    last 15 calls I've been on have been about one

15    of those two subjects.

16         Q.    Okay.  And over the course of your

17    tenure, going back farther than the last couple

18    of weeks or months, are there other topics you

19    recall discussing?

20         A.    No.

21         Q.    Have there been any issues that

22    have come up relating to the State of Montana?

23         A.    No, not that I can recall.

24         Q.    Have you all discussed any issues
```

Highly Confidential - Todd Cameron

1   relating to Congressional oversight or inquiries

2   related to the distribution of opioids?

3           A.     Not any calls I've been on.

4           Q.     Any discussion of litigation over

5   the distribution of opioids?

6           A.     Not on any calls I've been on.

7           Q.     Or state enforcement activity?

8           A.     Other than the potential reg

9   changes, no.

10          Q.     And have you personally

11  participated in any meetings with the DEA about

12  Cardinal's compliance?

13          A.     Yes.

14          Q.     And how often and when?  Can you

15  give us some details on that?

16          A.     I've been to DEA headquarters

17  three times since I've been in the role.

18          Q.     So this is going to be a piece of

19  cake compared to that.

20          A.     Yes.  They wouldn't let me stand

21  up either.

22                 I think I was there twice in 2015,

23  or maybe once in '15 and once in '16.  I can't

24  remember the exact time frame.  And then I was

1    there again in the last six months.

2         Q.    And what were the specific issues

3    that were discussed during those meetings with

4    the DEA?

5         A.    We wanted to show our

6    anti-diversion program to DEA, make them aware

7    of kind of how we were doing the things that we

8    were doing, and talk to them about understanding

9    the suspicious orders that would be coming from

10   us.  And then have conversations about trying to

11   have collaborative discussions to help both of

12   us in controlling diversion.

13        Q.    And who did you meet with at DEA?

14        A.    So the first two times Lou Milione

15   was the acting deputy administrator, I believe

16   was the title, and then probably ten people on

17   his staff.  I can't remember all the specifics.

18   I remember Lee Reeves was in one of those

19   meetings.

20             And then this last time was with

21   probably about eight individuals from DEA.  I'm

22   not sure exactly what level everyone was.  But

23   Tom Prevoznik was the one -- was kind of, I

24   think, the ranking member of the room.

Highly Confidential - Todd Cameron

```
 1          Q.    Okay.  And so when you say you
 2   talked generally about your program and
 3   suspicious orders DEA would be seeing, what
 4   issues were you specifically lifting up for DEA?
 5          A.    I wanted DEA to understand the
 6   filters that we used to evaluate customers, and
 7   to get some of their feedback on those filters.
 8   And then, again, to explain how we were using
 9   thresholds to control the controlled substance
10   distributions that we were making to customers
11   that would lead to suspicious orders.
12          Q.    When you say "filters," what do
13   you mean by that?
14          A.    All of the objective criteria that
15   we use to evaluate a customer's business model,
16   the contextual size of the pharmacy, the
17   controlled substance ratios, potential mixes
18   within specific controlled substances from a
19   strength standpoint.  Those types of things.
20          Q.    And was there any specific event
21   or initiative that sparked any or all of those
22   meetings?
23          A.    No.
24          Q.    And other than those three
```

1   meetings, had you previously had any meetings

2   with the DEA?

3          A.    No.

4          Q.    And did you give any kind of

5   materials or presentation to DEA?

6          A.    We presented each time to DEA, but

7   didn't leave anything.

8          Q.    Okay.  PowerPoint, I assume?

9          A.    Yes.

10          Q.    Okay.  And who else was with you

11   from Cardinal?

12          A.    The first time I went was Craig

13   Morford and Bob Giacalone.  The second time I

14   went was Bob Giacalone and Al Santos who had

15   just retired from DEA.  And then this last time

16   I went, it was just me and Linden Barber.

17          Q.    And during each of those meetings,

18   did you get any feedback from DEA about what you

19   all were doing?

20          A.    We did.

21          Q.    And what was that feedback?

22          A.    A lot of acknowledgment of

23   understanding now kind of how we set thresholds

24   and the effects that that then has on the number

Highly Confidential - Todd Cameron

1   of suspicious orders that we report to DEA.  And

2   obviously DEA is not going to give you the Good

3   Housekeeping seal of approval, but they told us

4   that we were looking at all the right components

5   and looking at them in the right manner to run

6   an anti-diversion program.

7        Q.    And when you talk about the

8   thresholds you were using to generate suspicious

9   orders --

10       A.    Yes.

11       Q.    -- again, what you were you trying

12  to clue DEA into?

13       A.    So we -- one of the core

14  principles of our program is that we are going

15  to use thresholds to ensure that the controlled

16  substance distributions we make to customers

17  make sense.  And that can be very tricky when

18  you have pharmacies that buy from three, four,

19  or five different wholesalers.

20            So we are focused on the slice, if

21  you will, of a business that comes to us from a

22  pharmacy, that we're going to ensure that that

23  specific slice looks within a normal range.

24            So you could have a pharmacy

Highly Confidential - Todd Cameron

 1    that's very large and all in.  They look normal.

 2    And their ratios make sense.  The volumes make

 3    sense for the contextual size of the pharmacy.

 4    But for whatever reason, they only want to give

 5    you 20 percent of their total control and

 6    non-control volume.  We're going to make sure

 7    that that 20 percent slice looks normal.  Even

 8    though in the total contextual size of the

 9    customer, they could be fine, but you could be

10    getting a disproportionate share of controls

11    from one wholesaler.  We are going to force that

12    volume to look normal based on how we set

13    thresholds, which can lead to a lot more

14    threshold events.

15              We wanted DEA to kind of get some

16    visuals of how we do that so they would

17    understand why we were reporting the number of

18    suspicious orders and the levels of pill volume

19    that was triggering suspicious orders for

20    potential customers.

21         Q.    And were there any specific types

22    of customers or regions on drugs on which you

23    were focused with DEA, or was this an overall

24    presentation?

Highly Confidential - Todd Cameron

1          A.    The focus from a drug standpoint

2     was oxycodone and hydrocodone.  And we talked

3     about other drugs as well.  But obviously those

4     are two of the main drugs that are abused today.

5     So we spent a lot of time on those drugs.  But

6     there was no specific regionality to it.  We

7     were looking at the entire country as a whole.

8          Q.    And you said a couple of minutes

9     ago that DEA doesn't give a Good Housekeeping

10    seal of approval.

11         A.    Yes.

12         Q.    Is it true that DEA also

13    specifically says, "It's your job to design and

14    operate an effective program"?

15         A.    That's what the reg says, yes.

16         Q.    Okay.  And that's what DEA, I

17    assume, also reiterates to you in these

18    meetings?

19         A.    Yeah.  Yes.

20         Q.    Have you ever done any meetings

21    with members of Congress on Cardinal's behalf?

22         A.    No.

23         Q.    Any other regulators?

24         A.    I've met with the Ohio Board of

Highly Confidential - Todd Cameron

1   Pharmacy.  I'm trying to think -- I've met with

2   several DEA field offices.  I think that's it.

3          Q.    Okay.  Do you know if you've ever

4   met with the DEA field office that covers the

5   State of Montana?

6          A.    I don't know what office that

7   would be.  I know I met with the DEA office that

8   is in Houston.

9          Q.    What about Denver?

10         A.    I didn't go to Denver.  Houston.

11  And then I met with the office that is in

12  Louisiana.  I think the office is actually

13  Mississippi, but they cover Louisiana.  Those

14  are the two that come to mind.

15         Q.    Okay.  And in terms of the overall

16  focus of Cardinal's compliance efforts, you

17  mentioned that the DEA meetings focused on

18  oxycodone and hydrocodone.  Is it those two

19  drugs that you and Cardinal have been focused on

20  or drug families?

21         A.    No.  There are over 100 DEA base

22  codes or drug families that we monitor.  We've

23  got thresholds for every single one of those for

24  every customer that we have.

Highly Confidential - Todd Cameron

1      Q.     In terms of the bulk of your

2   efforts, though, what drugs are you really

3   spending time worrying about and addressing?

4      A.     We're focused on literally all 100

5   of the drug families from a methodology

6   standpoint.  But the majority of our threshold

7   events are for either oxycodone or hydrocodone.

8      Q.     Okay.  And when you're talking

9   with your team as you've mentioned about

10  compliance, how much of your attention is on

11  opioids as opposed to other problem areas?

12     A.     The majority.

13     Q.     All right.  So now in applying

14  your thresholds and evaluating and identifying

15  suspicious orders --

16     A.     Yes.

17     Q.     -- Cardinal relies on the order

18  data you have for your customers; is that

19  correct?

20     A.     That is one component of it, yes.

21     Q.     Okay.  What are the other data

22  sources that you look at?

23     A.     We have incorporated data from the

24  DEA that has been published.  We've incorporated

1    data from the CDC, data from IMS, and data from

2    Symphony Health.

3         Q.    What was the last one?

4         A.    Symphony Health.

5         Q.    Okay.

6         A.    It used to be called Wolters

7    Kluwer, if that rings any bells.

8         Q.    And I'm going to regret asking you

9    this question, but let's break those down.

10             So the data you get from ARCOS I

11   assume is the public reports that they do?

12        A.    So the DEA publishes things

13   like -- and I'll butcher the name.  But

14   dangerous drugs and something report that is

15   probably created from the ARCOS data.  But it's

16   more aggregate level data across regions around

17   total opioid volumes and the -- I can't think

18   the word.  For the manufacturers to -- the quota

19   data.

20        Q.    And so when you talk about

21   Cardinal's 20 percent, for instance, with a

22   customer, the DEA's data gives you the whole

23   picture of all distributors?

24        A.    Not at a customer level.  Just

Highly Confidential - Todd Cameron

```
 1    across broad geographies, yes.

 2            Q.    All right.  So that's the DEA

 3    data.

 4            A.    Yes.

 5            Q.    And then I think the next thing

 6    you mentioned was CDC.  What dataset is that?

 7            A.    So there's a lot of CDC reports

 8    that we've used that look at prescribing, the

 9    rate of prescribing, for example, for opioids;

10    is that going up?  Is that going down?  Average

11    pills per prescription.  Those types of things.

12            Q.    And when you look at the CDC data,

13    are you looking at data on overdoses and

14    hospitalization or any of the other kind of

15    wonder data?

16            A.    We're focused on understanding

17    what the prescribing volumes are of those opioid

18    prescriptions.  And, again, kind of pills per

19    script.

20            Q.    Okay.  So does that mean you're

21    not looking at hospitalization and overdose

22    data?

23            A.    When you look at a lot of those

24    things, it includes opiates.  So it's got
```

Highly Confidential - Todd Cameron

```
1   heroin.  It's got the illicit street fentanyl

2   drug, which obviously we don't distribute.

3               So it has a lot of those things

4   factored in.  And you can't tell necessarily how

5   much were driven from which.  So there's not a

6   lot of value to us in that.

7               But, again, we're setting

8   thresholds at the customer level.  So there's no

9   way to determine which customer from what

10  pharmacy might have gone to a specific hospital

11  obviously.

12        Q.    Okay.  So your -- just because I

13  want to get us to an answer on this --

14        A.    Yes.

15        Q.    -- understanding the reasons --

16        A.    Yes.

17        Q.    -- Cardinal is not looking at

18  overdose or hospitalization data to help you

19  focus on particular regions of the country or

20  drug sources, for instance?

21        A.    No.  We're focused on aggregate

22  level dispense data from other sources that we

23  could tie back to actual prescription

24  medications that are filled at pharmacies.
```

Highly Confidential - Todd Cameron

```
 1            Q.    And are you saying, Mr. Cameron,

 2    that that data on hospitalizations and overdoses

 3    doesn't serve a useful role for your compliance

 4    program?

 5            A.    Yeah.  I'm not sure how we would

 6    be able to take hospitalization data that,

 7    again, would include things like heroin and

 8    figure out how to tie that back to a specific

 9    pharmacy's level of prescriptions that they

10    filled.  So I'm not sure how we would use that.

11            Q.    Okay.  So you wouldn't use it, for

12    instance, to see that there has been a spike of

13    overdoses in a particular state and know that

14    you want to look more closely at those

15    customers, for instance?

16            A.    We look at all 40,000 customers

17    that we distribute to regardless of what

18    overdose rates look like.

19            Q.    Okay.  So that was CDC data.

20                  I think the next you mentioned was

21    IMS data.

22            A.    Yes.

23            Q.    And what data do you get from IMS?

24            A.    Again, there are a lot of
```

Highly Confidential - Todd Cameron

```
 1   published IMS sources that look at prescribing

 2   rates, pills per prescription, the morphine

 3   milligram equivalences, grams across those

 4   medications.  So IMS gives us very good high

 5   level industry data of what the trends are from

 6   a prescribing standpoint.

 7         Q.    Okay.  So what the volume of

 8   prescriptions are --

 9         A.    Yes.

10         Q.    -- what the nature of

11   prescriptions are?

12         A.    Exactly.

13         Q.    Okay.  And that's proprietary data

14   that Cardinal purchases, correct?

15         A.    No.  It's -- well, I don't know

16   the answer.  I know it comes from IMS.  I'm not

17   sure -- there are a lot of groups within

18   Cardinal that work directly with IMS.  It's not

19   just anti-diversion stuff.  So I'm not sure if

20   it was stuff that was purchased or if it was

21   stuff that was published publicly by IMS or not.

22         Q.    Okay.  And are there particular

23   datasets from IMS that you use most heavily?

24         A.    No.  I mean, I think they're very
```

Highly Confidential - Todd Cameron



1   good on the prescribing trends and what the

2   morphine milligram equivalences are.   Those are

3   probably the two main things.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



15          A.    Yes, Symphony Health.

16          Q.    Okay.  And what data do you get

17    there?

18          A.    Symphony, very similar company to

19    IMS as far as the output data-wise.  And

20    Symphony we get blinded industry data for

21    pharmacies of overall size of the pharmacy,

22    oxycodone, hydrocodone volumes, opioid volumes.

23    Those types of things.

24          Q.    And so that's by pharmacy without

Highly Confidential - Todd Cameron

1    identifying the pharmacy?

2          A.    Exactly.  Yes.

15          Q.    Have I missed any data source that

16    you're using in your anti-diversion efforts?

17          A.    You mentioned the -- our own

18    Cardinal internal customer distribution data.

19          Q.    Okay.  So now Cardinal has -- when

20    we talk about Cardinal's order data, you have

21    data on your customers, controlled substances

22    and non-controlled substances.

23          A.    Purchase-wise.  Can I add one

24    thing back to your previous question?

Highly Confidential - Todd Cameron

```
 1          Q.      You can.

 2          A.      We also do have --

 3          Q.      That's actually the joy of being

 4   in your position.  You can always --

 5          A.      Well, I feel bad for her.

 6                  We also do have certain customers

 7   that sign what we call a data feed.  It allows

 8   us to see at the pharmacy level their

 9   adjudicated dispensing data.

10          Q.      Their adjudicated?  What does that

11   mean?

12          A.      It means it's the data that runs

13   through the switch for third-party

14   reimbursement.  So it does not include cash.  So

15   it's not a complete picture.  In some cases, it

16   could be 100 percent.  In some cases, it could

17   be 50 percent.  So it really varies by customer.

18          Q.      Okay.

19          A.      We also have that.

20          ███     ████    ██████████████
    ██  ████████████████████████████████████
    ██  ████████████████████████
    ██      ███    ████████████████████████
    ██  ████████████████████████████████
```

Highly Confidential - Todd Cameron

1 ███████████████████████ █████████████

██ ████████████████████████████████████

██ █████ █████ ████████████████████████

██ ██████████████████████

██ █████ █████ ███████████

6          Q.    Okay.  And when we talk about

7    these data sources, by the way, these are the

8    same data sources that you've had available to

9    you for your tenure in this position?

10         A.    We started purchasing the Symphony

11   data in 2013.

12         Q.    Okay.

13         A.    But everything else, yes.

14         Q.    Okay.  Now, I have to remember.

15   Yes.

16               So Cardinal's order data includes

17   controlled and non-controlled substances that

18   you sell to your customers, correct?

19         A.    Yes.

20         Q.    And that's different than what you

21   report to the DEA in ARCOS, which is only

22   controlled substances?

23         A.    Yes.

24         Q.    Okay.

Highly Confidential - Todd Cameron

1        A.    And I say yes to that.  I think

2    ARCOS is C-IIs.  And then the narcotic

3    analgesics that are III through Vs, I don't

4    think -- it's not all controlled substances that

5    are part of ARCOS.

6        Q.    But you don't report to DEA any

7    non-controlled substances?

8        A.    Correct.

9

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron









Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



18          Q.     How many orders of opioids does

19    Cardinal process in a year?

20          A.     I don't know the answer to that.

21    I'm not sure how many actual orders.

22          Q.     What volume of opioids, then, do

23    you distribute in a year?

24          A.     Off the top of my head, I couldn't

Highly Confidential - Todd Cameron

```
1    tell you what that number is.

2           Q.    Has that number -- all of the --

3    we've covered a lot of this, so let me just

4    catch up.

5                 Does any of the data sources that

6    Cardinal purchases allow you to get a sense of

7    your market share?

8           A.    Yes.

9           Q.    And what data is that?

10          A.    The Symphony Health data does.

11   The IMS data might also.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



19        Q.    Unless you're wrong?  Yes or no?

20        A.    I'm not sure what you mean by

21   "wrong."

22        Q.    Well, it seems to me, as somebody

23   who's a lawyer and not a data person or an IT

24   person, that one check on whether the thresholds

Highly Confidential - Todd Cameron

```
 1   have correctly calibrated the volume would be

 2   whether they add up to the sum that doesn't make

 3   sense --

 4           A.    Right.

 5           Q.    -- for the individual factors?

 6           A.    And if every pharmacy makes sense,

 7   then what you described can't happen.

 8           Q.    Unless it happens?

 9           A.    Well, it can't happen.  That's not

10   how thresholds work.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



 9          Q.    Okay.   That was very inarticulate,

10    but I think we understand each other.

11          A.    Yes.

12          Q.    We talked about --

13                MS. WICHT:  I only was taking a

14          breath to say we -- Todd, we've been

15          going for about an hour, and I just want

16          to check in.  If you're doing okay --

17                THE WITNESS:  I'm okay.

18                MS. WICHT:  -- it's fine to keep

19          going.  Okay.

20    BY MS. SINGER:

21          Q.    We talked about the prescription

22    data that Cardinal gets from IMS and Symphony.

23                Cardinal has a joint venture

24    called ArcLight.  Are you familiar with that?

Highly Confidential - Todd Cameron

```
 1              A.    I know ArcLight was a company

 2     that -- I think ArcLight has been out of

 3     business for like ten years.

 4              Q.    Okay.  Okay.  And so while -- and

 5     that would have preceded your tenure?

 6              A.    Yes.  I don't know that it's been

 7     ten years, but I don't -- I think it's been

 8     quite a while that ArcLight has been formed.

 9              Q.    So it's not in business now?

10              A.    Not that I'm aware of, no.

11              Q.    Okay.  And there's no data that

12     comes from this entity in the period that it was

13     in operation that you all used for compliance

14     functions?

15              A.    No.

16              Q.    Okay.  What about -- what are

17     Medicine Shoppe and Medicap Pharmacy.  Are you

18     familiar with those?

19              A.    I am.

20              Q.    And what are they?

21              A.    They are -- it is a franchise of

22     pharmacies that kind of operates as a co-op

23     across a common branding theme for the

24     pharmacies.
```

Highly Confidential - Todd Cameron

1          Q.     So it's like a marketing

2    assistance program --

3          A.     Yes.

4          Q.     -- that Cardinal provides to

5    certain pharmacies?

6          A.     Yeah.  It's a franchise.

7          Q.     Got it.

8          A.     Yes.

9          Q.     And Cardinal owns this?

10         A.     I'm not sure what capacity.  But,

11   yes, we've got some -- something to do with the

12   Medicine Shoppe franchise.

13         Q.     Okay.  And do you distribute

14   opioids to these pharmacies, too?

15         A.     To some of them.  They don't have

16   to buy from us.

17         Q.     And do you get their dispensing

18   data?

19         A.     If they are customers that are

20   part of that batch I talked about earlier that

21   have signed up, then yes.

22         Q.     Okay.  But that's not all of them?

23   It's not a condition of their franchise?

24         A.     No.  They're not required to buy

Highly Confidential - Todd Cameron

1    from us either.

2          Q.    Okay.  And Kenray, are you

3    familiar with that?

4          A.    I am.

5          Q.    And what is Kenray?

6          A.    Kenray is a former regional

7    distributor in New York that Cardinal acquired

8    in the 2010, 2011, '12 time frame.

9          Q.    Okay.  And so that just became

10   part of Cardinal's operations?

11         A.    Exactly.

12         Q.    Did you acquire its data and order

13   history, too?

14         A.    Yes.

15         Q.    And do you use that for compliance

16   purposes?

17         A.    We have owned them since I've been

18   in the role the entire time.  So they all would

19   have been part of the normal Cardinal data when

20   I came on board.

21         Q.    Now, the data that you get from

22   IMS on prescribing and from Symphony and the

23   data feed --

24         A.    Yes.

Highly Confidential - Todd Cameron

```
 1          Q.    -- I think those are the three
 2   sources that give you prescription data and
 3   dispensing data; is that right?
 4          A.    Yeah.  I wouldn't say IMS.  IMS is
 5   more aggregate level overall industry numbers.
 6   But the other two get down to more granular.
 7          Q.    Okay.  Are there any other data
 8   sources that give you the more granular
 9   prescribing and dispensing data?
10          A.    No.
11          Q.    Okay.  And do you use that data --
12   forgive me if we've gone over this.
13          Do you use that data in your
14   granular compliance efforts?  Is that
15   integrated?
16          A.    Yes.
17          Q.    Okay.  And in what system does all
18   of this data live?
19          A.    A lot of them -- we've got
20   multiple IT systems that talk to each other that
21   some data -- partial is housed here, and other
22   pieces housed here, and we've got to pull it
23   together into a different system to use it, that
24   type of thing.
```

Highly Confidential - Todd Cameron

```
 1            Q.     Okay.  And what is the master

 2   system?

 3            A.     There isn't one master system.

 4   They're all different individual standalone

 5   systems with multiple purposes, and some

 6   purposes overlap and some don't.

 7            Q.     But from a compliance perspective,

 8   you have access to all of that data

 9   collectively?

10            A.     Yes.
```



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

4          Q.     Okay.  So beyond the data sources

5    that we've spent all of this time painfully

6    talking about, Cardinal has non-quantitative

7    sources of information too, right, meaning you

8    have PBCs or pharmacy consultants who are going

9    out into the pharmacies?

10          A.     Yes.

11          Q.     And how many sales representatives

12   does Cardinal have?

13          A.     Across all classes of drugs,

14   probably 500.

15          Q.     How often is a typical pharmacy

16   visited by a Cardinal sales rep?

17          A.      It depends on the overall size of

18   the pharmacy and the class of trade, but monthly

19   would be common.

20          Q.     And for a large customer, more

21   frequent than monthly?

22          A.     Could be.

23          Q.     And does Cardinal set any goals

24   for how many pharmacies its sales reps need to

Highly Confidential - Todd Cameron

1    visit in a particular period?

2            A.    I believe it does.  I'm not

3    involved in that process, but I know there's

4    some type of -- all the territories are

5    different sizes.  So it's not a flat number.

6    There's a bunch of factors that go into it.

7            Q.    Okay.  And how many -- and the

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

███████████████████████████

███  ████████████████████████

████████████████████████

███████████

 5          Q.    Okay.  And in terms of your

 6    contract and relationship with manufacturers, in

 7    the opioid space, who are your principal

 8    suppliers?

 9          A.    As far as the manufacturers?

10          Q.    Yes.

11          A.    Oh, it's literally 80 of them.

12          Q.    And there are none that stand out

13    above the others?

14          A.    No.

15          Q.    Okay.  And explain how chargeback

16    data gives manufacturers a window -- explain

17    what it is granularly.

18          A.    So this is a -- I'm not the expert

19    in this area.  So I don't know if you really

20    want me to answer this question.  But

21    chargebacks at the manufacturer level get

22    submitted based off of the price the wholesaler

23    pays for the product versus what the customer

24    paid for the product.

Highly Confidential - Todd Cameron

1    And if the wholesaler has to --

2    because of a contractual obligation with a

3    customer directly with the manufacturer, if the

4    wholesaler has to sell that product below the

5    wholesaler's contract cost, the manufacturer

6    makes the wholesaler whole.  In order to do

7    that, that data has to go to the manufacturer.

8    They can then see how much volume went to which

9    customer from every wholesaler.

10        Q.    And who is the expert on

11   chargeback data at Cardinal?

12        A.    I don't know.  Somebody in

13   purchasing.

14        Q.    Okay.  Now, we know that

15   Mallinckrodt has sent letters to distributors

16   saying "We want you to look at the following

17   customers" or -- you're raising your eyebrows.

18   So tell me why that is.

19        A.    Mallinckrodt doesn't send us

20   letters that say that.

21        Q.    Okay.  Are you familiar with a

22   letter that Mallinckrodt sent that was filed in

23   Cardinal Health versus Holder?

24        A.    I am not.

Highly Confidential - Todd Cameron

1      Q.     Okay.

2                      - - -

3      (Montana-Cardinal Exhibit 2 marked.)

4                      - - -

5      Q.     So looking at Exhibit 2 --

6      A.     Yes.

7      Q.     -- beyond the exhibit cover page,

8  is that letter familiar to you?

9      A.     No.

10      Q.     Okay.

11      A.     You got the Karen Harper name

12  right there.

13      Q.     Bonus points for that.

14      A.     Thank you.

15      Q.     So you've never seen a letter like

16  this from Mallinckrodt?

17      A.     I'm sorry.  Okay.  Yes, I have.

18  So that's why I raised my eyebrows.  So this is

19  the Mallinckrodt chargeback cutoff letter is

20  what this is.

21              When you asked, you said asking

22  about a customer.  So we get these -- they're

23  not asking anything of us.  They are telling us

24  that they are no longer going to honor

```
 1    chargebacks for this specific customer or

 2    customers.

 3              Q.    Okay.

 4              A.    They're not asking anything of us.

 5              Q.    I'm sorry?

 6              A.    They're not asking anything of us.

 7              Q.    Okay.  And they notify you of that

 8    because it means you're no longer guaranteed --

 9              A.    Yes.

10              Q.    -- from a pricing perspective?

11              A.    Exactly.

12              Q.    Okay.  And what do you do from a

13    compliance perspective when you get a letter

14    like that?

              ▮       ▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

              ▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

              ▮       ▮       ▮▮▮▮▮▮▮▮

              ▮       ▮       ▮▮▮▮▮▮▮

19              Q.    And do you recall getting other

20    letters like that from Mallinckrodt?

21              A.    Absolutely.

22              Q.    And from other manufacturers as

23    well?

24              A.    I don't recall receiving them from
```

Highly Confidential - Todd Cameron

```
 1    any other manufacturer, but definitely from

 2    Mallinckrodt.

 3         Q.   Okay.  And the reason Mallinckrodt

 4    would cut off a customer from chargebacks is

 5    there's something that has made them suspect

 6    that customer is engaged in diversion?

 7              MS. WICHT:  If you know what

 8         Mallinckrodt was thinking.

 9         A.   Yeah.  They don't say that in the

10    letter.  It just says they will no longer honor

11    chargebacks.  Again, knowing they can see all of

12    their volume from all sources to a pharmacy,

13    that's a logical assumption.

14         Q.   Okay.

▮▮       ▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮  ▮▮▮▮

18         Q.   What is the date on that letter?

19         A.   Sometime in 2011, September of

20    '11, the year before I left.

21         Q.   Okay.  And during your tenure, you

22    don't recall similar letters like that from

23    other manufacturers?

24         A.   It doesn't mean that I did not
```

Highly Confidential - Todd Cameron

```
1    receive them.  I just know that they don't come

2    with the frequency that Mallinckrodt's do.

3           Q.    Okay.  And if they did come in,

4    would you be aware of them?

5           A.    Yes.

6           Q.    Where are those letters?  I know

7    that there is a standard operating procedure

8    that refers to these letters.  Where are those

9    saved within Cardinal's system?

10          A.    That's a good question.  Because

11   Mallinckrodt is nice enough to send this to a

12   ton of people, and they BCC everybody.  So I

13   don't know who all it goes to.  But then I will

14   have ten different people in the purchasing that

15   receive this and forward it to me.  So any time

16   a letter comes out, I usually get about 20

17   copies of it.

18          Q.    And then what do you do -- where

19   does it get stored?

20          A.    We keep a file of -- a record of

21   the Mallinckrodt letters of the customers.

22   Because, again, there's no information on here

23   that's specific to the customer other than the

24   fact they've been put on the list.  Mallinckrodt
```

Highly Confidential - Todd Cameron

1    also takes them off the list.  So you could get

2    a letter a year later that says they've taken

3    the customer off the list.  That's very common

4    as well.

5            Q.    Okay.  And then so what do you

6    do --

7                  MS. WICHT:  Can we take a break

8            whenever you're at a pausing point?

9                  MS. SINGER:  Of course.

10   BY MS. SINGER:

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

1     MS. WICHT:  Has that ever

2          happened?  Is that what you're --

3     MS. SINGER:  (Indicates

4          affirmatively.)

5     MS. WICHT:  Okay.



Highly Confidential - Todd Cameron

████  ██████████████████

████  ████  ██████████████

████  ████████████████

4        Q.    And now Cardinal has marketing

5   agreements with various manufacturers.  Is that

6   something that you're aware of?

7        A.    No.

8        Q.    Do you get any data from marketing

9   efforts that Cardinal undertakes with

10  manufacturers for your compliance efforts?

11       A.    Can you be more specific?

12       Q.    So is there any data you get from

13  various marketing programs that Cardinal is

14  running that you use in evaluating a customer or

15  otherwise looking at diversion?

16       A.    Give an example of what that type

17  of data would be.

18       Q.    So Cardinal runs copayment

19  programs --

20       A.    Oh, gotcha.

21       Q.    -- or adherence programs.

22       A.    Yes.  No, there would be no data

23  that would come out from that.

24       Q.    Okay.  Have you ever asked about

Highly Confidential - Todd Cameron

1    getting access to that data?

2           A.    I'm not sure what -- I follow what

3    data that would be.

4           Q.    I mean, presumably that -- I'm on

5    the outside here.  There are customer lists and

6    initiative -- things that Cardinal gets and then

7    is in touch with either patients or pharmacies,

8    right?  Does that data ever get filtered back to

9    you?

10          A.    Like distribution data?

11          Q.    I mean, again --

12          A.    I'm not sure what the data would

13   be that would be the output of that.

14          Q.    So you would be in the best

15   position to know --

16          A.    I don't think there is any data

17   that would be driven off of that.  I don't

18   think.  And if there is, I haven't seen it.

19          Q.    Okay.  Almost done with this

20   section.

21               Is there any source of data or

22   information that you use in your compliance

23   efforts that we haven't talked about?

24          A.    █████████████████████████████

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

10        Q.      Okay.  Have you ever used an

11   outside vendor to assess whether there's other

12   data that Cardinal could be mining in its

13   compliance efforts?

14        A.      A vendor?  No.

15        Q.      Any kind of consultant?

16        A.      Not that I'm aware of.

17        Q.      Okay.  Have you ever worked with

18   anybody outside of Cardinal to advise you on how

19   to use the data you have more effectively for

20   compliance?

21        A.      Yes.

22        Q.      And who's that?

23        A.      Linden Barber.

24        Q.      Before he was with you?

Highly Confidential - Todd Cameron

```
 1          A.    Yes.  He was outside.

 2          Q.    Okay.  And in what entity was he?

 3          A.    He was, I believe, outside

 4   counsel.

 5          Q.    Okay.  All right.  And have there

 6   been any proposals you've received for other

 7   data sources or other ways of using data you've

 8   rejected?

 9          A.    Not that I'm aware of.

10          Q.    Okay.  And any data which you've

11   had that Cardinal has said, "Nah, too expensive"

12   or "We don't need it"?

13          A.    I wish they could push down the

14   overprescribing.  That would help.

21          Q.    Have you ever talked about data

22   sources on any of these HDA calls or

23   conferences?

24          A.    Not on the calls that I've been
```

Highly Confidential - Todd Cameron

```
 1   on, no.

 2          Q.    Or with HDA generally?

 3          A.    No.  And, again, I don't speak to

 4   HDA a ton.  Again, there are so many different

 5   Cardinal groups that interact with HDA.  I'm

 6   only a small portion of it.

 7                MS. SINGER:  Okay.  We can take a

 8          break now.

 9                THE WITNESS:  Thank you.

10                (Recess taken.)

11   BY MS. SINGER:

12          Q.    All right.  So, Mr. Cameron, you

13   remain under oath.

14          A.    Yes.

15          Q.    Okay.  SOP is Cardinal terminology

16   for?

17          A.    Standard operating procedure.

18          Q.    So, as I understand it, an SOP is

19   what lays out the procedure across the country

20   on a particular process or topic; is that right?

21          A.    Yes.

22          Q.    And it's how Cardinal communicates

23   a policy or a procedure across the organization

24   or across a division; is that correct?
```

Highly Confidential - Todd Cameron

```
1           A.    Yes.

2           Q.    Okay.  So if an employee wanted to

3    figure out what to do on a particular issue,

4    they would go to the SOP, and it would tell them

5    how to handle it?

6           A.    Yes.

7           Q.    And you train your employees on

8    relevant SOPs; is that correct?

9           A.    We do.

10          Q.    And then SOPs are updated and

11   replaced and reviewed periodically.  Is that

12   true as well?

13          A.    Yes.

14          Q.    Okay.  And are employees who don't

15   follow SOPs, like, subject to discipline?  Is

16   this an important expectation?

17          A.    Yes.

18          Q.    In 2006 Cardinal and other

19   distributors received a letter from the Office

20   of Diversion Control about suspicious order

21   monitoring and anti-diversion efforts signed by

22   Joe Rannazzisi.  I assume you know what I'm

23   referring to?

24          A.    I do.
```

Highly Confidential - Todd Cameron

```
 1              Q.     And so -- I know this was before
 2    you were in your current position.  But do you
 3    know what Cardinal's response to that first 2006
 4    letter was?
 5              A.     As far as a response to DEA?
 6              Q.     And let me clarify.  I don't mean
 7    if you sent a responsive letter.  But what did
 8    Cardinal do or change in response to that letter
 9    as a result of that letter or following on that
10    letter?
11              A.     At that point in time, I was not
12    involved in the area in 2006 when the letters
13    were received.  So I'm not sure what changes
14    would have taken place at that specific point in
15    time.
16              Q.     And when you moved into your
17    position and acclimated yourself within the job,
18    is that not something you came across?
19              A.     I know that a lot of the changes
20    that had been made prior to my arrival had
21    connectivity back to those letters.
22              Q.     And how do you know that?
23              A.     Because we talked about a lot of
24    the components within the letters.
```

Highly Confidential - Todd Cameron

```
 1          Q.    And who is "we"?  The people you

 2   consulted?

 3          A.    Yeah, exactly.

 4          Q.    Okay.  And so what did they say

 5   that connected those dots for you?

 6                MS. WICHT:  I will just give you a

 7           caution here, because I think, as I

 8           understand it, that at least some of

 9           those conversations would have been with

10           lawyers.

11                To the extent that you were

12           getting -- that Cardinal was getting

13           legal advice from lawyers on that, you

14           shouldn't reveal that.

15                If there are things that you know

16           were done or discussed that weren't from

17           lawyers, then you're free to reveal

18           that.

19          A.    I know that there are multiple

20   letters.  So I'm not sure which letter

21   sequentially included which.  But I know there

22   are components in the letter that talk about

23   some of the objective pieces that we use to

24   evaluate customers.
```

Highly Confidential - Todd Cameron

1      Q.    Okay.  Meaning that Cardinal took

2    queues from those letters and made changes in

3    its SOPs or policies after those letters?

4      A.    I don't know if they took the

5    queues from the letters or if those were things

6    that they looked at prior to the letters,

7    because I came so much later than letters.  I

8    just know that some of the things in the letters

9    are components of the program.

10     Q.    Okay.  Have you seen a report that

11   was done to Cardinal's board in 2013 in

12   connection with a shareholder lawsuit against

13   the company?

14     A.    Yes.

15     Q.    Okay.  And is it accurate,

16   consistent with that report, that prior to 2008

17   Cardinal did not have an electronic system for

18   detecting and reporting suspicious orders?

19     A.    I'm not sure.

20     Q.    Okay.  Have you seen any evidence

21   that Cardinal did have such a system?

22     A.    I've not seen any components of

23   the program back at that point in time.

24     Q.    And do you -- Cardinal started

Highly Confidential - Todd Cameron

```
 1   using thresholds in 2008; is that right?

 2          A.    I'm not sure.

 3          Q.    And do you know how Cardinal

 4   reported suspicious orders or identified them

 5   prior to 2008?

 6          A.    I do not.

 7          Q.    Are you familiar with excessive

 8   purchase reports?

 9          A.    I'm familiar with the concept.

10          Q.    Okay.  What is it?

11          A.    There was a reporting mechanism

12   that wholesalers were required to run I think at

13   the end of every month that was an algorithm

14   that came from DEA that identified shipments

15   that DEA wanted information on about customers.

16          Q.    Okay.  So, as you understand it,

17   an excessive purchase report was run on

18   customers that DEA identified with an algorithm

19   they used, or were they customers identified

20   through DEA's algorithm?

21          A.    DEA made the algorithm.  And then

22   the wholesaler ran the algorithm, and whatever

23   customers came out of being identified from the

24   algorithm, that information went to DEA.
```

Highly Confidential - Todd Cameron

1        Q.    Okay.

2        A.    That's my understanding.

3        Q.    Okay.  And was there any

4   suspicious order monitoring system, to your

5   knowledge, apart from the excessive purchase

6   reports?

7        A.    I don't know.

8        Q.    Did Cardinal have any procedure in

9   place not to ship orders identified in those

10   excessive purchase reports, to your knowledge?

11        A.    Again, I've got a very limited

12   knowledge of what those reports were.  But my

13   understanding is the wholesaler was supposed to

14   run them on distributions that were made.

15        Q.    Meaning that since they were

16   already made, there could be no stopped

17   shipment?

18        A.    That's my understanding.

19        Q.    Okay.  Now, as you understand it,

20   reporting a suspicious order is not the full

21   scope of Cardinal's duty under the Controlled

22   Substances Act or implementing regulations?

23        A.    Ask me that again.  Sorry.

24        Q.    Cardinal has to do more to comply

Highly Confidential - Todd Cameron

1 with the law than just report a suspicious

2 order?

3           A.    Yes.

4           Q.    Is that correct?

5           A.    I believe so.

6           Q.    Okay.  Do you have any hesitance

7 about that?

8           A.    I was only hesitating just from

9 the standpoint of when you started to ask, I was

10 thinking about the reg itself around designing

11 and operating the system to identify suspicious

12 orders, and I was thinking about the specific

13 reg.  That's why I was hesitating.

14          Q.    Okay.  So it is a duty -- and

15 correct me if I'm misstating this -- to detect,

16 report, and prevent suspicious orders?  Is that

17 a correct statement as you understand it?  Or

18 put it in your own words.

19          A.    The reg specifically says that the

20 wholesaler -- that the registrant shall design

21 and operate a system to identify orders of

22 varying frequency, size, and pattern.

23          Q.    And report them promptly, report

24 them immediately to DEA?

Highly Confidential - Todd Cameron

```
 1              A.    I don't think the reg says that.

 2    That's why I was hesitating.  We do, but that's

 3    what I thought.

 4              Q.    Okay.  And Cardinal has

 5    responsibility under the law to design and

 6    operate a system that places effective controls

 7    to prevent diversion?

 8              A.    Yes.

 9              Q.    Okay.  And that is in addition to

10    suspicious order reporting, correct?

11              A.    I believe so.

12              Q.    Okay.  So just having suspicious

13    order reports doesn't fully discharge your duty?

14              A.    Yes.  I'm not sure about the word

15    "duty" in all that, but yes.

16              Q.    Okay.  Do you know if there was an

17    SOP for stopping shipping of suspicious orders

18    prior to 2008?

19              A.    I do not know.

20              Q.    When are you aware that Cardinal

21    first had a procedure in place to stop shipping

22    suspicious orders?

23              A.    I do not know the specific date,

24    but I know that it was well before my arrival.
```

Highly Confidential - Todd Cameron

1    Q.    Who was responsible for

2  anti-diversion compliance from 2006 forward?

3  You mentioned your predecessor.  Was there

4  anybody else who had held that role?

5    A.    I'm not sure.  I don't know.

6    Q.    Okay.  So the name you gave

7  before, I think, was Mr. Mone?

8    A.    Yes.

9    Q.    And is there anybody else you're

10  familiar with who had a senior role in

11  compliance before that?

12    A.    I'm not, but it doesn't mean that

13  person didn't exist.  I just had no dealings

14  with that area.

15    Q.    Are you familiar with the outside

16  vendor -- I'm sure I'm going to butcher the

17  name.  So you know where I'm going.  Cegedim

18  Dendrite.

19    A.    Yes.

20    Q.    Did I say it right?

21    A.    I don't know how to say it right

22  either, so yes.  That was good.

23    Q.    So for us, that's what it's going

24  to be.

Highly Confidential - Todd Cameron

```
 1          A.    I just call them Cegedim.

 2          Q.    Or we can go with Dendrite.  How's

 3   that?

 4          A.    There you go.  That's even easier.

 5          Q.    So what was their role in the

 6   suspicious order monitoring system at Cardinal?

 7          A.    So I apologize.  I don't -- there

 8   has been a lot of movement in the industry from

 9   a company standpoint.  So I'm not sure if

10   Cegedim is part of other companies or spun off

11   or got absorbed.  A lot of that part of the

12   industry has moved around a lot.  But they, I

13   know, were used at one point in time to do site

14   visits.

15          Q.    Okay.  And are you familiar with a

16   role they played in developing the threshold

17   system at Cardinal?

18          A.    I am not.

19          Q.    Okay.  You've never seen any

20   documents related to their work?

21          A.    Other than visits, no.

22                      - - -

23          (Montana-Cardinal Exhibit 3 marked.)

24                      - - -
```

Highly Confidential - Todd Cameron

1          Q.     All right.  Mr. Cameron, showing

2     you Exhibit 3, which is SOP -- the SOP on -- why

3     don't you read the title.

4          A.     "Process to Establish SOM

5     Threshold Limits."

6          Q.     Okay.  Are you familiar with that

7     SOP?  Whenever you're ready.

8          A.     I am not.

9          Q.     Either that iteration or any of

10     the later forms of it?

11          A.     Definitely not this iteration.

12          Q.     Okay.  Have you seen it in

13     subsequent forms?

14          A.     There are SOPs today around seven

15     thresholds.

16          Q.     Okay.  And it seems like that this

17     is a new -- that this is not a document or a

18     version of a document you're terribly familiar

19     with; is that right?

20          A.     Correct.

21          Q.     And how is that?

22          A.     How is that the case --

23          Q.     Yes.

24          A.     -- or how am I not familiar with

Highly Confidential - Todd Cameron

1    it?

2            Q.    So is it that SOPs, like our

3    personnel manual at my law firm, sit on the

4    shelf, or is it because -- I mean, tell me how

5    that is.

6            A.    I know the SOPs are updated

7    periodically and reviewed periodically.  When I

8    look at, for example, 0001169, I'm not sure what

9    all that stuff is.  As I read that, I'm assuming

10   that's got something to do with the DEA

11   algorithm from the previous stuff you were

12   asking about earlier.

13           Q.    Okay.

14           A.    That's my assumption.

15           Q.    Okay.  But the later version of

16   this that's current is not something that sits

17   on your desk and you refer to when you have a

18   question?  It doesn't sound that way.

19           A.    It would depend on what was being

20   discussed, the situation.  We use our working

21   guidelines much more.

22           Q.    And what are the working

23   guidelines?

24           A.    I would describe them as more

Highly Confidential - Todd Cameron

 1    action oriented details around what's in the

 2    SOPs.

 3          Q.    So it's a level of detail beyond

 4    an SOP that are more day-to-day practical?

 5          A.    Yes.

 6          Q.    Okay.  Do you know where the idea

 7    of using thresholds for suspicious order

 8    monitoring came from?

 9          A.    I do not.

10          Q.    Mystery.

11          A.    They were there when I got there.

12          Q.    Okay.  And you never asked anybody

13    why; why does our system turn on this?

14          A.    Why does our system do what?

15          Q.    Turn on thresholds.  Why are they

16    such a central part of Cardinal's compliance

17    system?  Why do we use thresholds?

18          A.    Oh, I understood that it was to

19    limit the volume of controlled substances that

20    were distributed.

21          Q.    Okay.  And do you know why the

22    thresholds were the mechanism for doing that?

23          A.    I don't know that I ever thought

24    about it.

Highly Confidential - Todd Cameron

```
 1          Q.    Okay.  When you first joined the
 2   compliance side of Cardinal, how many people
 3   were on the staff there?
 4          A.    I'm not sure.
 5          Q.    Can you give a rough estimate?
 6   Was it 20, 100, 200?
 7          A.    For all of compliance?
 8          Q.    Yes.
 9          A.    Hundreds.
10          Q.    Below 500?
11          A.    I don't know.
12          Q.    And how is it -- what is the size
13   of compliance now?
14          A.    Hundreds.
15          Q.    Larger or smaller than it was when
16   you first started?
17          A.    I would say larger.
18          Q.    Significantly larger?
19          A.    I don't see all the areas of
20   compliance because I'm not involved in them.  So
21   I don't know how much larger it's grown.
22          Q.    Okay.  So what is your area of
23   compliance?
24          A.    The anti-diversion controlled
```

Highly Confidential - Todd Cameron

```
1    substance monitoring program.

2         Q.    Okay.  And is that a division

3    within the compliance department?

4         A.    Yes.

5         Q.    Okay.  And how many people were in

6    that division when you joined it?

7         A.    I don't know the exact number, but

8    it's -- we are definitely bigger today than we

9    were when I started.

10        Q.    Okay.  And so it's some subset of

11   the hundreds.  I mean, again, are we talking

12   dozens?  Are we talking --

13        A.    As far as the increase?

14        Q.    How many people were there in 2012

15   when you -- well, yeah.

16        A.    Maybe -- I've never thought about

17   it, so I'm sorry.

18        Q.    It's okay.  I would say you're not

19   a numbers person, but you're clearly a numbers

20   person.

21        A.    But I just -- the bodies, I hadn't

22   thought about what it was then versus what it is

23   now.  Because, again, when I came in, they had

24   already started to make changes to the program.
```

Highly Confidential - Todd Cameron

```
 1   So a lot of the pieces were moving when I got

 2   there.  I don't know the exact numbers, what

 3   they were back then.

 4         Q.    Okay.  And so you don't know the

 5   head count now either?

 6         A.    I don't.  I guess -- can you ask

 7   me exactly what area you're asking me about?

 8         Q.    So I'm asking the anti-diversion

 9   effort that you are responsible for.

10         A.    My area specifically?

11         Q.    Yes.

12         A.    Okay.  And what's the question?

13         Q.    How many people work in it?

14         A.    About 35.

15         Q.    Okay.  And their responsibilities

16   are to run what areas of the anti-diversion

17   effort?

18         A.    The controlled substance

19   monitoring.

20         Q.    Okay.  And so that's data

21   analytics --

22         A.    Yes.

23         Q.    -- and investigations?

24         A.    Yes.
```

Highly Confidential - Todd Cameron

```
 1           Q.     What other functions?

 2           A.     Know Your Customer.

 3           Q.     Okay.  Anything else?

 4           A.     Those are the three main

 5   components.

 6           Q.     And how is your staff divided up

 7   among those three?

 8           A.     You want actual numbers?

 9           Q.     Just roughly.  You know, most

10   people are in investigations or --

11           A.     It's pretty equally spread across

12   the segments.

13           Q.     Okay.  And do all of the

14   investigators who go out and do site

15   inspections, for instance, work in your unit?

16           A.     Yes.

17           Q.     And all of the data analytics on

18   the compliance side as opposed to the sales or

19   marketing side?

20           A.     Yes.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



20          A.    One of the things that we learned

21    from Linden when he came on is that --

22                MS. WICHT:  Linden is a lawyer,

23          and I can't -- I can't tell whether what

24          you're about to convey is something

Highly Confidential - Todd Cameron



1          that's legal advice from Linden or not.

2                 THE WITNESS:  I might be.  It

3          probably is.

4                 MS. WICHT:  So you can't reveal

5          legal advice that came from Linden.

6     BY MS. SINGER:

7          Q.   It's overbroad, but -- without

8     talking about the source of knowledge, what I'm

Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



15        Q.    Have you ever seen the HDA's

16   industry compliance guidelines?

17        A.    I'm not sure.

18                    - - -

19        (Montana-Cardinal Exhibit 4 marked.)

20                    - - -

21        Q.    All right.  Looking at Exhibit 4,

22   HDMA, then "Industry Compliance Guidelines,

23   Reporting Suspicious Orders and Preventing

24   Diversion of Controlled Substances."

1          Have you seen this guide before?

2          A.    I'm not sure if I've seen it in

3    this exact format or not.

4          Q.    All right.  Are you familiar with

5    the substance of these guidelines?

6          A.    I know that our regulatory legal

7    team is constantly reviewing these types of

8    things and coming to us around the program.

9          Q.    To ask for your feedback?

10         A.    It would depend on the subject.

11   It could be to ask for feedback.  It could be to

12   give us information of things that are changing.

13         Q.    Okay.  All right.  If you turn to

14   page 8.  About halfway down the page,

15   "Distributors are also encouraged to consider

16   the following when developing thresholds ..."

17         A.    Yes.

18         Q.    If you look at the second bullet,

19   it encourages distributors "to ascertain changes

20   in diversion patterns or emerging local or

21   regional concerns.  Such new information may be

22   used to adjust thresholds as appropriate."

23              Do you all do that?  It doesn't

24   sound consistent with what you're describing.

Highly Confidential - Todd Cameron

```
 1              MS. WICHT:  Which set of bullets

 2         are you in?

 3              MS. SINGER:  The second page under

 4         "Distributors are also encouraged."

 5              MS. WICHT:  Oh, I see.  And you

 6         read the second part of it?

 7              MS. SINGER:  Yes.

 8              MS. WICHT:  Okay.  Thank you.

 9    BY MS. SINGER:

10         Q.    That's just not guidance that

11    Cardinal follows; is that correct?

12         A.    And which part -- the six-month's

13    sales history or reaching out to the DEA?

14         Q.    The reaching out to DEA and

15    looking at regional variations.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



21        Q.    And you mentioned before that you

22   have a level more detailed than SOPs.  I forget

23   what you called it.

24        A.    Working guidelines.

Highly Confidential - Todd Cameron

```
 1              Q.    Okay.  Do you have a working

 2    guidance that lays this out?

 3              A.    It may not in the manner in which

 4    you're asking the questions.  But, yeah, all the

 5    components are there.

 6              Q.    Okay.  And which working guidance

 7    is this?

 8              A.    I don't know.  You asked questions

 9    across a lot of them.

10              Q.    Okay.  Tell me which areas it

11    covers.  So which guidances would we need to put

12    the pieces together here?

13              A.    Probably all of them that you

14    have.

15              Q.    And how many of them are there?

16              A.    I don't know the exact number.

17              Q.    Okay.  Give me some of the subject

18    areas.

19              A.    Threshold setting.  That's

20    probably the big one.

21              Q.    Okay.  And what others?

22              A.    I'd start with that one.

23              Q.    Okay.  And then what would I read

24    next if I was really curious?
```

Highly Confidential - Todd Cameron

```
1              A.    I'm not sure.  Whichever one you

2    wanted to.

3              Q.    Is there one on customer segments?

4              A.    As far as?

5              Q.    I'm just -- you said this was in

6    multiple guidances.  So I'm just trying to

7    figure out what other areas it would be in.

8              A.    I'm not sure I follow the question

9    about customer segments.

10             Q.    I'm just asking what other

11   guidances you have that lay out this process.

12             A.    The working guidelines would be --

13   yeah.

14             Q.    Okay.  Are they organized by

15   subject area?

16             A.    Yes.

17             Q.    And what are the subjects beyond

18   thresholds?

19             A.    I don't have all them in front of

20   me.

21             Q.    Just name of the ones that come to

22   mind.

23             A.    LV TAC.

24             Q.    Okay.  Anything else?
```

Highly Confidential - Todd Cameron

```
 1          A.    No.

 2          Q.    There was a period presumably when

 3   Cardinal applied thresholds to all of its

 4   customers presumably before your time in the

 5   position; is that correct?

 6          A.    Yes.

 7          Q.    And when you were setting

 8   thresholds initially, you looked at some

 9   baseline data, right, to look at what was

10   average or normal --

11          A.    Yes.

12          Q.    -- correct?

13                And do you know what year was used

14   as that baseline?

15          A.    For the initial process, no.  As

16   far as when I was involved, that's where we

17   consulted with Linden who had just come from the

18   DEA.

19          Q.    Okay.  So that would have been in

20   2012?

21          A.    That's when I got there.  Linden

22   came before I did though.

23          Q.    Okay.  All right.  And was there

24   ever a time -- and so now when you're bringing
```

Highly Confidential - Todd Cameron



1   on a customer, you use 2018 data for what's

2   average or normal, correct?

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



13      A.      They're not reports.  They're

14   metrics.

15      Q.      Okay.  Whatever you had over

16   lunch ...

17              Okay.  So we got to this from the

18   question of whether you ever add up

19   thresholds --

20      A.      Yes.

21      Q.      -- in a particular jurisdiction.

22

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

```
 1        ███      ██████████████████

 2             MS. WICHT:  Can we take a restroom

 3        break when you're at an okay stopping

 4        point?

 5             MS. SINGER:  Yes.  You know what?

 6        Why don't we go ahead and do it now.

 7             (Recess taken.)

 8   BY MS. SINGER:

 9        Q.   So, Mr. Cameron, you have Exhibit

10   5.

11        A.   Yes.

12             MS. SINGER:  Did we give it to

13        you, Jen?

14             MS. WICHT:  I don't think so.

15             THE WITNESS:  It's not the same as

16        3, right?

17             MS. DEYNEKA:  I think it is.

18             MS. SINGER:  Oh, I'm sorry.

19   BY MS. SINGER:

20        Q.   So Exhibit 3, "Process to

21   Establish Suspicious Order Monitoring Threshold

22   Limits."  Do you have that in front of you,

23   Mr. Cameron?

24        A.   Yes.
```

Highly Confidential - Todd Cameron



17          Q.     Okay.  And then -- all right.

18                 Let's move to page 3, which is

19     Bates number 1169.

20          A.     Yes.

21          Q.     So at VI, it talks about

22     multiplying the monthly quantity of base code by

23     a factor --

24          A.     Yes.

Highly Confidential - Todd Cameron

```
1          Q.    -- of 3, 5, or 8.

2          A.    Yes.

3          Q.    Can you explain where those

4    factors come from and what their significance

5    is?

6          A.    I cannot.  I've never seen this

7    before.  Again, I don't know if that is the

8    DEA's algorithm that we talked about earlier or

9    not.
```

█       █        ████████████████████

█    ██████████

█       █     ████

█       █        ███████████████████████████

█   ████████████████████████████████████

█       █     ████

█                ████████████    █████████████████

█             ███████████████████

█                ████████████    █████████████████

█             ████████████████████████████

█       █████

█                ████████████    █████████████

```
22              MS. WICHT:  Maybe that's what you

23          were answering as to.  Sorry.  I didn't

24          mean to confuse -- okay.
```

Highly Confidential - Todd Cameron

```
1          A.     Yeah.  I've never seen the 3, 5,

2     or 8 before.

3          Q.     Okay.  And then going to the first

4     page, 1167 Bates number.  Under 4.0 Policy, the

5     second and third lines have the sentence, "The

6     baseline purchase pattern is then adjusted up by

7     a statistically significant factor or variable

8     to formulate the threshold limit."

9                 Have I read that correctly?

10         A.     Yes.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



        7                    - - -

        8        (Montana-Cardinal Exhibit 5 marked.)

        9                    - - -

       10        Q.    All right.  So now actual Exhibit

       11   5.  All right.  Mr. Cameron, you should be

       12   looking at CAH_MDL2804_220583.  That's the Bates

       13   number at the bottom.

       14        A.    Yes, yes.

       15        Q.    All right.

       16             MS. WICHT:  I think, Linda -- I'm

       17        not going to cut off questioning on this

       18        document.  I guess -- I think this is

       19        obviously something that was produced in

       20        the MDL.  As I understand the MDL

       21        protective order, I'm not sure it would

       22        allow --

       23             MS. SINGER:  So Montana AG has

       24        signed that protective order.

Highly Confidential - Todd Cameron

```
 1              MS. WICHT:  The MDL protective

 2      order?

 3              MS. SINGER:  Yep.

 4              MS. WICHT:  Okay.  Thank you for

 5      that information.  And as I said, I will

 6      let him answer questions on it, and

 7      maybe that resolves it.  I'll think

 8      about it.  But thank you.

 9              MS. SINGER:  Of course.

10  BY MS. SINGER:

11      Q.    All right.  So do you recognize

12  this as an e-mail to you?

13      A.    From me?

14      Q.    Oh, from you.  Yes.

15      A.    Yes.

16      Q.    All right.  And the subject reads

17  what?
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



22          Q.     All right.   Next is Number 6.

23     Okay.   We're going to come back to that.

24                    Do you know when Cardinal first

Highly Confidential - Todd Cameron

1   reported a suspicious order in the State of

2   Montana, a suspicious order arising in the State

3   of Montana?

4           A.    I do not know.

5           Q.    Does 2013 sound right to you?

6           A.    I do not know.



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

```
 1          Q.     Are you aware when Cardinal put in

 2   place its threshold system, there were a number

 3   of customers that were kind of newly identified,

 4   and Cardinal went through and sorted out who was

 5   suspicious and who wasn't.  Is that an event

 6   that you're familiar with generally?

 7          A.     The concept makes sense to me.

 8          Q.     Okay.  Do you know how many of

 9   those customers that were identified through

10   that process were subsequently terminated?

11          A.     I do not.  I know there were

12   terminations prior to my arrival.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

1

2          Q.    In December 2007 -- I know this

3     was before your time.

4          A.    Yes.

5          Q.    So if you're familiar with it.

6     Cardinal sent a letter to Linden Barber when he

7     was at DEA and said based on these new

8     thresholds, that you had terminated certain

9     customers with AHOP drugs, which you will know

10    what it stands for, right?

11         A.    I do know what AHOP stands for.

12         Q.    Okay.  Which is what?

13         A.    Alprazolam, hydrocodone,

14    oxycodone, and phentermine.

15         Q.    That wasn't a test.  I couldn't do

16    it.

17         A.    That's what it is.

18         Q.    Greater than 30 percent of total

19    purchases?

20         A.    Right.

21         Q.    So all of these customers --

22         A.    So pulling the AHOP out threw me

23    off.  This is a letter from who to who?

24         Q.    From Cardinal to Linden Barber,

Highly Confidential - Todd Cameron

 1    and said, "There are a bunch of customers from

 2    our new thresholds that" --

 3           A.    I'm sorry.  This is dated when?

 4           Q.    December 2007.

 5           A.    Okay.  Got it.  Sorry.

 6           Q.    That's okay.  You're good at the

 7    questioning.

 8                 That based on these thresholds,

 9    these customers were buying -- that more than

10    30 percent of their purchases were for AHOP

11    drugs --

12           A.    Okay.

13           Q.    -- and that you were terminating

14    them.

15           A.    Okay.

16           Q.    Do you know anything about these

17    customers?

18           A.    I do not.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

4          Q.     And when you asked that question,

5    is that because you know of something before you

6    got involved or because you don't know what

7    happened before you were involved?

8          A.     I don't know what happened before

9    I was involved.

10          Q.     Okay.  So, again, I know your

11    knowledge is really 2012 and later, but having

12    looked back at Cardinal's compliance and

13    anti-diversion program before you started, do

14    you think Cardinal was doing everything it

15    needed to to prevent diversion pre-2012?

16          A.     I really have no clue what was or

17    wasn't being done.

18          Q.     Okay.  So I think his title is

19    chairman, George Barrett.

20          A.     Yes.

21          Q.     When he testified in Congress last

22    year or this year, whenever it was, he said that

23    Cardinal's compliance system is better now

24    because it's more objective.

Highly Confidential - Todd Cameron



```
1        A.     Yes.

2        Q.     In what way has Cardinal's

3   compliance system become more objective?
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

████  ████████████████████████████

████  ████████████████████████████

████  ████████████████████████████████████

████  ████████████████████  ██████████████████

████  ██████████████████████

6            Q.    Okay.  So in this round of

7    Jeopardy, we're going to be turning to Montana

8    in particular.

9            A.    It's not been Double Jeopardy yet?

10           Q.    Right.  This is the lightning

11   round.

12                 Did you have a chance to look at

13   the suspicious order spreadsheet that Cardinal

14   provided to the State of Montana?

15           A.    I'm not sure.

16           Q.    Okay.  I hope your vision is good.

17           A.    It is up close.

18                        - - -

19       (Montana-Cardinal Exhibit 6 marked.)

20                        - - -

21           Q.    So showing you Exhibit 6.  So this

22   is -- you're welcome to borrow mine.  This is a

23   report that was produced to the State of

24   Montana.  It lists all of the suspicious order

Highly Confidential - Todd Cameron

1    reports that Cardinal filed with DEA for the

2    State of Montana from 2013 forward.

3         A.    Okay.

4         Q.    So we'll let you look at that for

5    a minute.

6         A.    And all the pages are the same,

7    right; it's just more data?

8         Q.    Right.  So they're different

9    orders --

10        A.    Yes.

11        Q.    -- but in the same format.

12        A.    The headers are all the same.

13        Q.    Exactly.

14        A.    Got it.

15                    - - -

16        (Montana-Cardinal Exhibit 7 marked.)

17                    - - -

18        Q.    These were the two documents that

19   we obtained from Cardinal that list suspicious

20   order reports.  So obviously Exhibit 7 that you

21   were given is text fields.  Very hard to read.

22   But I wanted you to have the two reports that

23   were produced to us.

24        A.    Yes.

Highly Confidential - Todd Cameron

1    Q.    Okay.  And I'm not going to ask

2    you specifics about individual orders.

3    A.    Okay.

4    Q.    I just wanted you to have the

5    spreadsheets in front of you.

6          So in Exhibit 6 with the

7    columns --

8    A.    Yes.

9    Q.    -- I think -- does it have a title

10   on it?

11   A.    It does not.

12   Q.    Okay.

13   A.    I mean, the columns have headers,

14   but there's no title on the document.

15   Q.    Okay.  So do you recognize Exhibit

16   7, the text fields?  Is that something you've

17   seen before?  Can you parse what that is?  It

18   was listed to us as "reported to DEA case."

19   A.    The individual pieces on here are

20   obviously familiar to me, but the format of it

21   I'm not sure.

22   Q.    Okay.  We'll do our best muddling

23   through them.

24          So on the spreadsheet -- not the

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



1

2             THE WITNESS:  Speak?

3             MS. WICHT:  I think so.  But do

4        you have a concern about privilege?  Is

5        that what you're --

6             THE WITNESS:  Huh-uh.

7             MS. WICHT:  Oh, yeah.  Go ahead.

8        A.    So my first question would be:

9    Are the start and end dates identical?  That

10   would be my first question.

11        Q.    So we do believe so, because they

12   were produced by you to us for the same period.

13   So let's assume that's the case.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

```
 1                    And can you also explain -- I'm

 2   not going to trouble you with the exhibit,

 3   because it's just a lot more paper.  But are

 4   there instances where Cardinal would ship more

 5   than a customer ordered?

 6           A.    No.

 7           Q.    Okay.  We found 157 examples of

 8   that.

 9           A.    And how are you seeing the order?

10           Q.    Again, this was --

11                 MS. SINGER:  Do you have 1371?

12                 MS. DEYNEKA:  It's the

13                 distribution of opioid medications to

14                 Montana on a per order basis from 2006

15                 to 2018.

16                 MS. WICHT:  That's what Exhibit 8

17                 is -- or no.  That's what you're

18                 comparing.

19           A.    So you're seeing an order for 100,

20   and you see a shipment of 110, for example.

21   Again, not being involved in how any of that was

22   created, my initial response to that would be I

23   don't know if maybe there was a backorder

24   situation where a product could have been on
```

Highly Confidential - Todd Cameron

```
 1   backorder.  And then the backorder order would

 2   have been released that would not have been tied

 3   to that individual order that came after the

 4   fact.  And you could have the backorder material

 5   becomes part of the same order.  That would be

 6   my initial reaction.  But, again ...

 7          Q.     Okay.

 8                 MS. SINGER:  Why don't we do 1728.

 9          Q.     You think these are questions to

10   you.  This is really a test for Natalie.

11          A.     She's doing a good job.

12                        - - -

13      (Montana-Cardinal Exhibit 9 marked.)

14                        - - -

15          Q.     So we understand Exhibit 9, which

16   is CAH_MTAG_1728, to represent -- to include at

17   the back 17 --

18          A.     So wait.  These are the working

19   instructions you had.

20          Q.     I see you feel very vindicated by

21   that.

22                 Let me ask you a general question.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

6       Q.      Okay.  Does Cardinal supply

7   physicians directly?

8       A.      Not through its pharmaceutical

9   distribution business.

10      Q.      Okay.  Meaning Cardinal does, but

11  not within your purview?

12      A.      Not within the pharmaceutical

13  distribution business.  There's another business

14  that does that, but we do have thresholds in

15  place for those as well.

16      Q.      And are you responsible for

17  anti-diversion efforts with respect to those

18  sales?

19      A.      Yes.

20      Q.      And was there a period when

21  Cardinal started looking at its supplies to

22  individual physicians?

23      A.      I believe -- and this is before my

24  time -- that at one point in time, there was

Highly Confidential - Todd Cameron

1    distributions from PD to physicians offices, but

2    that's not the case today.

3        Q.    Okay.

4        A.    It gets tricky because clinics,

5    physical clinics, use physician registrations

6    that it might look like it's a doctor himself,

7    but it's the doctor's DEA registration that the

8    clinic is registered under.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



19                    - - -

20        (Montana-Cardinal Exhibit 11 marked.)

21                    - - -

22        Q.    All right.  So you could take a

23   minute and look, but Exhibit 11 is an e-mail

24   from you Friday, January 11, 2008, correct?

Highly Confidential - Todd Cameron

```
1          A.    Yes.

2          Q.    So one thing that's curious about

3    this, is this is before you moved into

4    anti-diversion.

5          A.    Correct.

6          Q.    And so how -- you can read the

7    communication obviously before answering that.

8    But the first question will be:  How were you

9    involved in this chain before you were involved

10   in compliance?

11         A.    Okay.

12         Q.    So how were you involved in this

13   chain from your previous role?

14         A.    So in reading this e-mail, and not

15   remembering exactly the specifics of this, when

16   I was in the sales office and involved in

17   customer data, this team came to me and was

18   asking for me to produce data from a reporting

19   standpoint to give to them to allow them to

20   analyze the components that they were looking to

21   analyze as they were building out an IT solution

22   in the bigger picture.

23         Q.    Okay.  So in the e-mail at

24   CAH_MDL_PRIORPROD-DEA07_111090 --
```

Highly Confidential - Todd Cameron

```
 1          A.    Yes.

 2          Q.    We're actually going to do 92.

 3          A.    92?

 4          Q.    Yes.  So it talks about threshold

 5   creepers.

 6          A.    Yes.  Wait.  Let me find it.  Are

 7   you on the top half or bottom half?

 8          Q.    It's right in the middle of the

 9   page.

10          A.    Okay.

11          Q.    What is a threshold creeper, and

12   what has Cardinal done to deal with it?

13                And, you know, before you answer

14   that actually, so if you can read the second

15   paragraph of the e-mail from Michael Mone.

16          A.    Same page?

17          Q.    Yep.  To Mark Hartman.  It says --

18   it talks about "the potential for diversion

19   through a process of small adjustments --

20          A.    Yes.

21          Q.    -- that result in large changes

22   over time."

23          A.    Yes.  That's exactly what you just

24   asked me about.
```

Highly Confidential - Todd Cameron



1          Q.    Yes.

2          A.    Yes.

3          Q.    So these threshold creepers.  So

4    this is 2008.

5          A.    Yes.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

4    BY MS. SINGER:

5         Q.    Okay.  We identified four pharmacy

6    customers in Montana, and we asked Cardinal to

7    produce all of the diligence files related to

8    those customers.  We just want to show them to

9    you and make sure we have everything that would

10   go in a typical file.  So this will be Exhibit

11   12.

12                    - - -

13       (Montana-Cardinal Exhibit 12 marked.)

14                    - - -

15        Q.    All right.  So this relates to --

16             MS. SINGER:  Which pharmacy is

17        this?

18             MS. DEYNEKA:  Plaza United.

19   BY MS. SINGER:

20        Q.    This is the Plaza United Pharmacy,

21   which is where?  I have an address but not a

22   city.  So it is on 11th Avenue.

23             And if you could just take a

24   minute and look at this.  These documents, first

Highly Confidential - Todd Cameron

1   of all, would have come from what system within

2   Cardinal?

3         A.    So are you looking at 1798?

4         Q.    Yes.  So we're looking at just for

5   the record CAH_MTAG_1798.

6         A.    So this appears to be what

7   probably was at that point in time the Know Your

8   Customer document.  Now, I say that.  This also

9   could have been a questionnaire that they could

10   have had the customer fill out if there was a

11   potential threshold event.  It could be that as

12   well.

13         Q.    Okay.  And then we move to

14   CAH_MTAG_1805.

15         A.    So this looks like the new -- this

16   is the actual new customer.  This was probably

17   the threshold event questionnaire, and this

18   looks like the new customer.

19         Q.    Meaning that this is the raw

20   questionnaire that then got entered into the

21   system producing 1798?

22         A.    Yes.  I'd look at 1805 as this was

23   the information that was gathered upon the

24   onboarding.  And then this was information that

Highly Confidential - Todd Cameron

1   was gathered at some point in the future from

2   the customer.

3          Q.    Okay.  All right.  And then

4   CAH_MTAG_1812?

5          A.    This is two minutes after 1798.

6   So my guess is that 1812 is some type of

7   verification on who filled out 1798.

8          Q.    And so this is an e-mail --

9          A.    Yes.

10          Q.    -- to Sherry Morse.

11          How are e-mails captured in your

12   system and associated with a customer record?

13          MS. WICHT:  From Sherry Norris.

14          MS. SINGER:  Yes.  I'm sorry.

15   Thank you.

16          A.    In this specific example, this

17   e-mail went into a group mailbox that I assume

18   was done for storage purposes.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron

```
1              Q.    Okay.  And is there a point at
2    which the records get dicey?
3              A.    I don't know if I'd call them
4    "dicey" or not.  But, for example --
5              Q.    That was my word.
6              A.    For example, LV TAC was created
7    out of the MOA with the DEA.  So there would be
8    no LV TAC review prior to May of '12, for
9    example.
10             Q.    Okay.  And why was LV TAC created?
11             A.    I don't know -- I wasn't involved
12   in any of the negotiation components obviously
13   of the MOA.  But it's my understanding that it
14   was to ensure that the larger volume customers
15   were reviewed by senior leadership.
16             Q.    And is there a difference between
17   an LV TAC customer and, for instance, a national
18   chain?
19             A.    No.
20             Q.    They're going to pick up the same
21   universe of customers?
22             A.    Yes.  Absolutely.  It's all volume
23   and ratio driven.
24             Q.    Okay.  So are you familiar with
```

Highly Confidential - Todd Cameron

1    the disk track held order report?

2          A.    I'm not familiar with that

3    specific report, but I'm familiar with disk

4    track and held orders.

5          Q.    Okay.  And you can run a report, I

6    believe, that lets you see how many held orders

7    there are at any particular moment; is that

8    right?

9          A.    Yes.

10         Q.    And is that an archive so that you

11   can see every order that's been held for a

12   customer, for instance, even if it's since been

13   released?

14         A.    I believe so.

15         Q.    And is that in disk track or

16   someplace else?

17         A.    I believe it's in disk track.

18         Q.    Okay.

19         A.    I think.

20         Q.    And there's a customer profile for

21   every customer, correct?

22         A.    And when you say "customer

23   profile," you mean --

24         Q.    I think it's in Winwatcher, maybe?

Highly Confidential - Todd Cameron

```
 1          A.    Well, tell me what you mean when

 2    you say "profile."

 3          Q.    What?

 4          A.    Tell me what you mean when you say

 5    "profile."

 6          Q.    It's basic demographics of a

 7    customer.  It's what you would use to get the

 8    key details.

 9          A.    In relation to anti-diversion?

10          Q.    Yes.

11          A.    That wouldn't necessarily -- so

12    Winwatcher is the sales force automation tool.

13    So it's not our tool that it does thousands of

14    things as far as managing the business.  So

15    there would be profiles in there, but they

16    wouldn't necessarily be related directly to

17    anti-diversion.

18          Q.    Okay.  And are there

19    anti-diversion profiles?  And where do those

20    live?  In the ADC?

21          A.    Very good.  There are -- yes.

22    And, again, I was hesitant to say "profile,"

23    because this could be a profile, some review of

24    volumes.
```

Highly Confidential - Todd Cameron

1      Q.    "This" being the customer

2   diligence file?

3      A.    Yes.  That's why I wasn't sure

4   what you meant when you said "profile."

5      Q.    But ADC is the system where you

6   collect all of the relevant information about a

7   customer, or at least a thumbnail of them?

8      A.    Yes, most of the information.

9      Q.    Okay.

10     A.    Yes.

11     Q.    And ADC, explain how that came

12   into being.

13     A.    It is the tool that is used to

14   manage threshold and threshold events.  So you

15   made reference to disk track.  Disk track is the

16   pick, pack, and ship system that the orders come

17   into.  The thresholds live in disk track, but

18   ADC interacts with disk track that when the

19   threshold event happens in disk track, it tells

20   ADC, and you go into ADC and you work the

21   threshold event.

22     Q.    Okay.  And, again, ADC will keep

23   all of that historical information.  So if there

24   was --

Highly Confidential - Todd Cameron

```
 1            A.    I don't believe that ADC would

 2    keep all the held order historical information.

 3    I assume it has a dropoff window.  Because it

 4    actually happened in disk track.  It didn't

 5    happen in ADC.  ADC was what was used to read

 6    the information out of the disk track.  If that

 7    makes any sense.

 8            Q.    Okay.  And so IBM came in to

 9    develop ADC for you, correct?

10            A.    I don't know.  It was developed

11    before I came into the role.  So I'm not sure

12    who did it.

13            Q.    And I want to make sure we cover

14    as a tangent.  So of the outside vendors and

15    consultants you've worked with who have either

16    helped in developing or evaluating various

17    aspects of the anti-diversion program, who have

18    you worked with?

19            A.    As far as technology vendors?

20            Q.    Any kind programmatic vendor

21    related to the anti-diversion program.

22            A.    I have not worked with any

23    technology vendors since I've been in the role.

24            Q.    Okay.  And how about
```

Highly Confidential - Todd Cameron

```
 1   non-technology vendors?

 2        A.   He's not a vendor.  But Linden

 3   obviously was heavily involved in the creation

 4   of the program.  And then the only other vendors

 5   that we would work with would be the third

 6   parties that we used to do site visits.

 7        Q.   Okay.  And that's Cegedim

 8   Dendrite?

 9        A.   Yeah, it's not now.  And, again, I

10   don't know if -- it's a new -- I can't keep the

11   name -- so it's Cegedim, but then I think they

12   got bought by IMS, and it's Avantha.

13        Q.   And so you use them basically as

14   additional investigators to help do site visits.

15             How many investigators do you have

16   on your staff to do site visits?

17        A.   Seven.

18        Q.   And how many distinct pharmacy

19   customers does Cardinal have who order

20   controlled substances from you?

21        A.   Any controlled substance in any

22   volume?

23        Q.   Yes.

24        A.   I would guess 25,000 to 30,000.
```

Highly Confidential - Todd Cameron

```
 1            Q.    And if we were to narrow that down

 2   by customers who buy opioids, is that a smaller

 3   group?

 4            A.    Yes.

 5            Q.    And how much smaller?

 6            A.    20,000.

 7            Q.    Okay.  And so how many additional

 8   outside investigators do you use through

 9   Cegegim?

10            A.    I don't know the number of

11   investigators.  We give them a pool of customers

12   to do the visits on.  I don't know how many

13   investigators -- we pay a price per visit, not

14   per investigator.  So I'm not sure how many

15   investigators they have.

16            Q.    Okay.  And how many site visits do

17   you do in a year?

18            A.    Which type?

19            Q.    Tell me by type.
```

████    ████    ████████████████████████

████    ██████████████████████████████████

████    ██████████████████████    ████████████

████    ██████████████████████    ████████████

████    ████████████████████████████████

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



18      Q.    And sales reps who do these -- I

19   just want to step back on that for a minute.  So

20   sales reps get a straight salary and a bonus?

21      A.    Yes.

22      Q.    And their bonus is not related to

23   volumes of controlled substances sold; is that

24   correct?

Highly Confidential - Todd Cameron

```
 1          A.    Correct.

 2          Q.    Is it volume related overall

 3   either in terms of volume of sales or new

 4   customers?

 5          A.    It is tied to overall volume, yes.

 6          Q.    Overall volume of purchases?

 7          A.    Yes.

 8          Q.    Including controlled substances?

 9          A.    Yes.  Not pulled out separately

10   with a separate target number, but it is a

11   subset inherently in the distributions.

12          Q.    And do sales reps have any metrics

13   they need to meet in terms of numbers of new

14   customers or volume of sales or increase in

15   sales?

16          A.    I don't know the answer to that

17   other than I know it varies probably by

18   territory, but I don't know exactly.

19          Q.    Okay.  But without knowing the

20   number, there are metrics.  There are subfloors

21   they have to meet?

22          A.    I don't know if there's -- to your

23   point, I don't know if there's a new business

24   metrics, for example.  Again, that's why I would
```

Highly Confidential - Todd Cameron

1    say it would vary by territory.  If you have a

2    very saturated territory where you have every

3    customer, you wouldn't have -- do you know what

4    I mean?

5          Q.    And are there any expectations on

6    the number of surveillance visits that your

7    sales reps are going to do?

8          A.    There is.

9          Q.    How much is that?

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

6          MS. SINGER:  Okay.  And I probably

7      have one more block to do.  I realize

8      you all may want one more break before

9      we conclude for the day, so whenever you

10     want to do it.

11          MS. WICHT:  Let's do it.

12          (Recess taken.)

13          MS. WICHT:  So we have -- as we

14     discussed briefly off the record, have a

15     clarification from some testimony

16     earlier today that we'd like to offer.

17          So as we talked about, I'm going

18     to ask Mr. Cameron just one or two

19     questions just to introduce it and allow

20     him to make the clarification.  And

21     then, of course, invite you to follow-up

22     on it as you deem appropriate

23     thereafter.

24          And it is -- I know this is

Highly Confidential - Todd Cameron

```
1          something that we consulted about over

2          the break.  So this is a clarification

3          that's being made after Mr. Cameron had

4          a conversation with his counsel during

5          the break.

6               Okay.  So, Todd --

7               THE WITNESS:  Yes.

8               MS. WICHT:  -- earlier this

9          morning we were talking about some

10         meetings -- three different meetings

11         that you've had with the DEA, remember?

12              THE WITNESS:  Yes.

13              MS. WICHT:  Okay.  And the third

14         meeting in particular was one that

15         happened in 2018.

16              THE WITNESS:  Yes.

17              MS. WICHT:  And you had discussed

18         the fact that what you did at that

19         meeting was to present the program to

20         DEA and things of that nature, right?

21              THE WITNESS:  Yes.

22              MS. WICHT:  Okay.  And I think

23         that Ms. Singer had asked a question

24         about whether there were -- what I wrote
```

Highly Confidential - Todd Cameron

```
 1          down was something like a specific event

 2          that had triggered the meeting.

 3                  THE WITNESS:  Yes.

 4                  MS. WICHT:  And I wanted to

 5          clarify with you, for another person who

 6          was participating in that meeting?

 7                  THE WITNESS:  Yes.

 8                  MS. WICHT:  Was there a specific

 9          event that triggered the meeting?

10                  THE WITNESS:  Yes.  So my

11          meeting -- my purpose of going to meet

12          with DEA was because previous leadership

13          had changed over.  And the individuals

14          that were at the two previous meetings

15          were mostly gone from at least that

16          branch of the DEA.

17                  So I had been instructed by my

18          boss to go and meet with the new

19          leadership and present the program to

20          them.

21                  Linden came with me, because

22          Linden went to talk about suspicious

23          orders that we had identified internally

24          through our normal process that we had
```

Highly Confidential - Todd Cameron

```
1              canceled and not shipped, but the orders

2              through an IT glitch did not get

3              reported to DEA.

4                   So Linden had gone to discuss with

5              DEA the orders that, again, had not

6              shipped but had not been reported and to

7              hear from DEA if DEA wanted those to be

8              submitted at the present time.

9                   MS. SINGER:  Okay.  All right.

10             Well, thank you for clarifying that.

11   BY MS. SINGER:

12        Q.    So that raises just two questions.

13   When had those orders not been reported?  What

14   time period was this?

15        A.    I believe it was 2012 through

16   2015.

17        Q.    And how many orders does this

18   involve?

19        A.    I don't know the exact number, but

20   it was around 14,000 and change.

21        Q.    Separate orders?

22        A.    Yes.

23        Q.    And did they relate to particular

24   customers, or were they across the country?
```

Highly Confidential - Todd Cameron

```
 1            A.     They were across the country.  But

 2     the majority of them were related to the subbase

 3     code concept that we had talked about earlier,

 4     that when we had put that subbase code logic in

 5     place, those orders were getting held.  We were

 6     canceling them based on customer review.  But

 7     they were not getting transmitted through the

 8     normal transmittal process to DEA.  But it was

 9     coast to coast, top to bottom, no specific DC or

10     state.  It was all across the board.

11            Q.     And do you know how many of those

12     orders involved opioids?

13            A.     I would assume the vast majority.

14            Q.     And do you know what the volume of

15     opioids was that was --

16            A.     For the orders?

17            Q.     Mm-hmm.

18            A.     I do not.  I do not.

19            Q.     And did the DEA take any action on

20     the basis of that disclosure?

21            A.     No.  I know that Linden had asked

22     them if they wanted us to submit them now.  And

23     I know the DEA was going to get back to Linden.

24     I'm unaware of them getting back to him or not.
```

Highly Confidential - Todd Cameron

```
 1    I don't think they have.  But they would talk

 2    directly to him.

 3           Q.    Are you aware of other instances

 4    where there were similar technology issues that

 5    related either to orders not being reported or

 6    orders being shipped that should have been held?

 7           A.    I am not, no.

 8           Q.    Okay.  And as a result of this

 9    discovery --

10           A.    Yes.

11           Q.    -- what steps did Cardinal take to

12    understand the scope of it and to address it?

13           A.    We had gone through an audit

14    process that had identified the need to ensure

15    that -- kind of some of your questions earlier

16    about ADC and disk track, that that linkage

17    existed.

18                 So an audit process was put in

19    place back in 2015 to ensure that that was

20    taking place.  What we hadn't done is we hadn't

21    then gone back retroactively to look to see if

22    any had happened prior to that.

23                 And then in going through the

24    process of producing data for these pieces,
```

Highly Confidential - Todd Cameron

1    that's when it was uncovered.

2             But, no, it's the only piece.

3    None of the orders were shipped.  It still

4    canceled all the orders.  It just was not

5    transmitting the actual suspicious for those

6    individuals.

7        Q.   All right.  I appreciate that

8    disclosure.  We may come back to it.  But that's

9    all that I have for now.

10            Okay.  So we are literally going

11   to go into lightning round, and I'm going to go

12   through just a scatter shot of the things that

13   we didn't cover previously.  If I'm moving too

14   fast, same caveat, or you need context for any

15   of that stuff -- and this is really a test of

16   Natalie and not of you.

17       A.   She's passed so far.

18   BY MS. SINGER:



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





16        Q.    Whose "totes"?

17        A.    The delivery totes, yeah.  So when

18   the product comes, they come in totes, and you

19   see --

20        Q.    Not in the public radio sense?

21        A.     No, no, no, no.  Yeah, you see the

22   delivery boxes from the wholesaler that it comes

23   in.

24

Highly Confidential - Todd Cameron

███

███

███

███

███

███

███

███

███

Q.    And I take it Cardinal has

11    incentives for people to put you in the primary

12    position?

13         A.    The position dictates the costing

14    structure of the product.

15         Q.    So is it the case that you either

16    have to order a certain volume or proportion of

17    your sales in order to get more favorable

18    pricing?  Is that how that works?

19         A.    There are a lot of factors that go

20    into it.  I know like, for example, we have a

21    credit department that looks at payment terms

22    and those types of pieces.  So a lot of that

23    factors into -- we've got buying groups.  A lot

24    of our customers are part of larger buying

Highly Confidential - Todd Cameron

```
 1   groups, and that can dictate the deal that goes

 2   to the buying group, and those types of things.

 3   So there's actually a lot of factors that drive

 4   what that price looks like.

 5        Q.   But is one of the factors the

 6   proportion of volume of business that they do

 7   with Cardinal?

 8        A.   It could be in certain instances,

 9   yes.

10        Q.   Okay.

11        A.   Yes.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



21          MS. SINGER:  Can we pull MTAG 240.

22          MS. DEYNEKA:  Yes, we can.

23   BY MS. SINGER:

24          Q.   While Natalie's pulling that,

Highly Confidential - Todd Cameron



1    there is a list in your SOPs of things sales

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



21          A.     I believe when I look at this,

22     that this is -- this says "Don't distribute

23     externally."  I'm not sure if you're allowed to

24     have this.

Highly Confidential - Todd Cameron

```
 1          Q.    Say that again.

 2          A.    It says, "Don't distribute

 3   externally," so I'm not sure how you have this.

 4                I believe that this right here,

 5   this page, is making actually reference back to

 6   the e-mail you asked me about earlier.

 7          Q.    Okay.

 8          A.    That's what the output of that

 9   was, which was trying to get information into

10   the sales force's hands to understand what

11   increased levels they should be aware of at the

12   customer level.

13          Q.    Okay.

14          A.    That's what, I believe, this is

15   making reference to.

16          Q.    Okay.  All right.  And Tom

17   DeGemmis --

18          A.    Yes.

19          Q.    -- who is he?

20          A.    He was the head of the independent

21   sales force at that time.

22          Q.    Okay.  But he no longer is?

23          A.    He is no longer there, no.

24          Q.    And who has that role now?
```

Highly Confidential - Todd Cameron

```
 1            A.    Steve Lawrence.

 2            Q.    And the attachment goes on to talk

 3    about these highlight reports.

 4            A.    Yes.

 5            Q.    Those were discontinued; is that

 6    correct?

 7            A.    I believe they were, yes.

 8            Q.    And do you know why?

 9            A.    Not specifically, no.  I don't

10    know if then the other components that that

11    e-mail made reference to would be part of that

12    greater IT solution, then came into play, and

13    then these were no longer -- because these were

14    manual reports run on the Sales Operations side

15    for QRA that they were working on a bigger

16    solution.

17            Q.    Okay.  And this concept of yellow

18    flag, red flag, and watch list, does that still

19    exist within Cardinal in any way?

20            A.    The term "red flag" is obviously

21    used in many ways.  But as far as how these

22    three pieces are structured, no.

23            Q.    Okay.  And as I read this, for red

24    flag -- for all three groups, the watch list,
```

Highly Confidential - Todd Cameron

1    yellow flag, and red flag, these were

2    obligations to look at the customer with

3    different levels of urgency?

4         A.    Yes.

5         Q.    Is that fair?

6         A.    Yes.

7         Q.    In none of these instances did a

8    customer going on any of these three lists

9    trigger a do not ship requirement; is that

10   correct?

11        A.    These would be the sales force

12   specific views use, not reports that QRA was

13   using to make decisions to stop selling to

14   customers.

15        Q.    Okay.  So that's an entirely

16   different process --

17        A.    Yes.

18        Q.    -- correct?

19             So a customer being designated red

20   flag or yellow flag didn't trigger any other

21   suspicious order report or do not ship?

22        A.    It could have factored into how

23   QRA would set thresholds.  I wasn't -- I'm not

24   sure how they on the QRA side used it back then.

Highly Confidential - Todd Cameron



1          Q.    Okay.  All right.  But you don't

2    know?

3          A.    I do not know, no.

22              MS. SINGER:  Do you have the rest

23         of the report that goes with 253?

24

Highly Confidential - Todd Cameron



1    BY MS. SINGER:

2         Q.    While Natalie is responding to my

3    ever changing requests, we can go to another

4    one.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

```
 1                    - - -

 2          (Montana-Cardinal Exhibit 14 marked.)

 3                    - - -

 4          Q.    So Exhibit 14 is -- CAH_MTAG_1614

 5   is the Bates number.

 6          A.    Yes.

 7          Q.    And I want you to look at Bates

 8   number 1618.

 9          A.    Okay.

10          Q.    And, by the way, is this SOP on

11   cage/vault suspicious order monitoring familiar

12   to you?

13          A.    It is not.  This would be part of

14   the compliance officer side of things because

15   it's in the distribution centers, the security

16   cage and vault.

17          Q.    All right.  Number 8 on Bates

18   number 1618 indicates about halfway through,

19   "Notification does not apply to national chain

20   accounts."

21                And you can take a minute and read

22   the context.  But why are chain accounts treated

23   differently?

24          A.    So, again, this is not -- there's
```

Highly Confidential - Todd Cameron

```
1    your huddle on there.

2           Q.    Thanks.

3           A.    Yeah.  So this is not my area.  So

4    I am giving you my best interpretation of this.

5    But I would assume that the communication would

6    take place directly with the corporate office of

7    the national account as opposed to trying to

8    communicate and get information straight from

9    the individual pharmacy.

10          Q.    You referred earlier to that

11   survey that was no longer being done.

12          A.    Yes.

13          Q.    Do you know why that was

14   discontinued?

15          A.    The level at which the questions

16   were asked in the survey versus how we ask

17   questions today around a specific drug family,

18   we get into much more detailed questioning at

19   the customer level.

20                That survey was -- when you first

21   read it, it almost looked like it was a KYC.  It

22   wasn't getting into specific drug issues.  So

23   that was at that point in time sent as part of a

24   threshold.  Now is the threshold where we're
```

Highly Confidential - Todd Cameron

```
1   reaching out and asking about the specific drug

2   family, the strength.  So there's just a much

3   more detailed conversation that takes place

4   today that if it were in the form of a survey,

5   it would be 50 pages.

6           Q.    Okay.  And when you say KYC, I

7   assume you mean Know Your Customer?

8           A.    I'm sorry.  Yes.  Know Your

9   Customer, yes.
```

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





13        Q.    Have you been involved in any

14   reporting to Cardinal's board?

15        A.    Yes.

16        Q.    And when and what has that been?

17        A.    It's been kind of presenting the

18   program to the board of how we're doing, what

19   we're doing, why we're doing it the way that

20   we're doing it.

21        Q.    And are those reports or metrics?

22        A.    They're PowerPoints.

23        Q.    Okay.

24        A.    And I know that there are other

```
 1    board discussions around certain pieces of this

 2    that I'm not a part of.

 3          Q.     Okay.  And how many reports to

 4    Cardinal's board have you done?

 5          A.     Thirty.

 6          Q.     Okay.  And those took the form of

 7    PowerPoints?

 8          A.     Yes, or discussions.

 9          Q.     Okay.  And have those been to the

10    full board or to a committee of the board?

11          A.     Both.  There's a subcommittee and

12    then a board.

13          Q.     And what's the subcommittee

14    called?

15          A.     I'm not sure.  I'm not sure what

16    the specific name is.

17          Q.     Okay.  And have you ever had board

18    members reach out to you with questions or

19    concerns?

20          A.     Not outside of those formal

21    meetings.

22          Q.     When did those meetings happen?

23          A.     We had one recently.  And then

24    another one was probably the year before.
```

Highly Confidential - Todd Cameron

```
 1            Q.    And what concerns did the board

 2    raise and what questions in the context of those

 3    discussions?

 4                  MS. WICHT:  Todd, I'm going to

 5            interject.  I don't have any -- I don't

 6            have any reason to understand that those

 7            were privileged.  But I just raise that

 8            for you in case for some reason you're

 9            aware of it.

10            A.    Just a lot of questions around the

11    trends; you know, is prescribing going up, is it

12    going down, what does the customer base look

13    like, you know, whose -- questions around other

14    wholesalers and programs and things like that.

15            Q.    And are those conversations

16    reflected in board minutes?

17            A.    I don't know.

18            Q.    Have you ever seen any minutes of

19    those discussions?

20            A.    No.  I only get to be there for my

21    little part, and they kick me out.

22            Q.    And have there been any concerns

23    raised about Cardinal's program?

24            A.    Not that I'm aware of, no.
```

Highly Confidential - Todd Cameron

1    Q.    Have there been any discussions

2  with the board about DEA authority or

3  enforcement or DEA concerns about Cardinal's

4  compliance program that you've been involved in?

5    A.    Can you ask me that again?

6    Q.    So I'll break it down.  Have you

7  had any discussions with the board about the

8  nature or content or trajectory of DEA's

9  enforcement or inspections of Cardinal?

10    A.    No.  Now, I know that there are

11  discussions around the cyclic inspections that

12  take place with DEA and the distribution center,

13  but I wouldn't have spoken to that.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



14          Q.    Okay.  "DEA Limit Over Threshold

15   Report," is that the report that generates

16   suspicious order reports for DEA?

17          A.    I'm not sure what that is based on

18   that name.

19          Q.    Okay.  So that name is not

20   familiar to you?

21          A.    That name is not familiar.

22          Q.    Okay.

23          A.    I would assume that it was the

24   algorithm report based on the way it sounds.

Highly Confidential - Todd Cameron



1    But I don't know that for sure.

2         Q.    Okay.  You mentioned earlier while

3    Natalie was looking for those documents that

Highly Confidential - Todd Cameron

```
1                    - - -

2        (Montana-Cardinal Exhibit 15 marked.)

3                    - - -

4        Q.    All right.  So this is CAH_MTAG

5    Bates Number 1161.

6               So is that document familiar?  And

7    if you could, read the title of it, please.

8        A.    "Daily Threshold Reporting."

9        Q.    So on page 1164 of that --

10       A.    Yes.

11       Q.    -- it has a reference to that

12   report I mentioned, the over -- if you could say

13   the name.

14       A.    The daily threshold reporting?

15       Q.    Yes.  Does that give you any other

16   clues about what that's referring to?

17       A.    So what is on page 1164?

18       Q.    Yes.  It's Number 2, "E-mail

19   modified daily."

20       A.    Yeah.  I'm assuming --

21       Q.    And you're on the distribution

22   list?

23       A.    I am.  I'm going to read this real

24   quick.  Sorry.
```

Highly Confidential - Todd Cameron

```
 1                  So I'm assuming this is the report

 2      that would have been created notifying people of

 3      the threshold events that happened.

 4             Q.    Okay.

 5             A.    So basically an e-mail of all the

 6      held orders.

 7             Q.    Okay.  And those are sent out

 8      every day?

 9             A.    Yes.

10             Q.    And it doesn't sound like this is

11      a critical report in your mind, so you couldn't

12      remember it.  But do you know what people are

13      looking for in that report or if they are using

14      it?

15             A.    I don't know if it's used or for

16      what exactly, but the concept of it is to let

17      people know that a specific pharmacy had their

18      order canceled or reported as suspicious in case

19      a customer calls and says, "Hey, I didn't get my

20      order.  What happened?"

21             Q.    So this goes to the sales side as

22      well?

23             A.    Yes.  Exactly.

24             Q.    And then Bates Number 1165 has an
```

Highly Confidential - Todd Cameron

```
 1    attachment that is the anti-diversion customer

 2    profile.  Is this familiar to you?

 3         A.    This specific view of it is not,

 4    but components within it are familiar to me.

 5         Q.    Okay.  So in hopes of finding some

 6    of those.  "Total Number of Events" at the

 7    bottom of the first column --

 8         A.    Yes.

 9         Q.    -- do you know what that

10    represents?

11         A.    I assume that represents number of

12    thresholds.

13         Q.    Okay.  And "QRA Restriction"?

14         A.    I would assume that would be a

15    customer has been cut off, but I'm not sure.

16         Q.    I'm sorry.  I missed that.

17         A.    It might be that the customer had

18    been cut off, but I'm not sure.

19         Q.    Okay.  And then on the second

20    column, "Percentage Order Quantity Above

21    Average"?

22         A.    I'm not sure.  This wasn't

23    something that was part of the e-mail that we

24    just talked about.  This is an internal QRA
```

Highly Confidential - Todd Cameron



1    document --

2         Q.    Okay.

3         A.    -- that was back from 2008.

4         Q.    So it's not currently used?

5         A.    No.

6         Q.    Okay.

7         A.    No.

8                    - - -

9       (Montana-Cardinal Exhibit 16 marked.)

10                   - - -

11        Q.    So I just wanted to ask you about

12   the dialogue.

13        A.    Yes.

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



12                          - - -

13          (Montana-Cardinal Exhibit 17 marked.)

14                          - - -

15          Q.    All right.  So Exhibit 17 starts

16  at CAH_MTAG_898.

17          A.    Yes.

18          Q.    And I just want to turn your

19  attention to 902.

20          A.    Okay.

21          Q.    Is that what a suspicious order

22  report looks like?

23          A.    I do not believe so.

24          Q.    Is that document familiar to you?

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron

4                    - - -

5        (Montana-Cardinal Exhibit 19 marked.)

6                    - - -

7        Q.    Exhibit 19 is titled "Attention.

8   Health Pending Regulatory Review."  It's Bates

9   Number CAH_MTAG_1438.

10            Is that familiar to you?

11       A.    I've got 1417.

12       Q.    Sorry.  Let's sub in, and we'll

13  just --

14            MS. WICHT:  What number are we

15       supposed to have?  Sorry.

16            THE WITNESS:  1438.

17            MS. SINGER:  It's the same

18       document.

19            MS. WICHT:  Okay.

20  BY MS. SINGER:

21       Q.    So it can either be 1417 or --

22  what did you say the other Bates number is?

23       A.    1438.

24            MS. WICHT:  I have 1499.  Just

Highly Confidential - Todd Cameron

```
 1          want to make sure I have the right

 2          thing.  That's all.  That actually does

 3          look a little bit different.

 4               Thank you.  I appreciate it.

 5    BY MS. SINGER:

 6          Q.   Is that familiar to you?

 7          A.   It is not.  I think I know what it

 8    is.

 9          Q.   What is it?

10          A.   It looks like something that would

11    go in the customer's tote, the delivery box, not

12    the other, when an order was held.  When a

13    threshold event occurred, this looks like what

14    would show up in lieu of the product.

15          Q.   Okay.  So that's handled by the

16    distribution center?

17          A.   Yes.

18          Q.   I'm going to try to do some of

19    these without pulling documents.  If you need to

20    see them, just ask.

21          A.   Okay.
```



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



24                          - - -

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron





Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



13                    MS. SINGER:  Okay.  Can I take two

14            minutes and just make sure I've looked

15            at everything?  I'm going to step out

16            for one second.

17                    (Recess taken.)

18    BY MS. SINGER:

19            Q.    A couple of cleanup questions.

20

Highly Confidential - Todd Cameron



Highly Confidential - Todd Cameron



```
 7              MS. SINGER:  So you know what?

 8       It's been a long day.  There's some

 9       cleanup questions I could ask.  But,

10       Jen, I will bother you with them and

11       deal with them on the side to the extent

12       that there's anything important.

13              MS. WICHT:  Okay.

14              MS. SINGER:  Thank you very much.

15              THE WITNESS:  Thank you.

16              MS. SINGER:  I really appreciate

17       it.

18          (Signature not waived.)

19                      - - -

20          Thereupon, at 6:09 p.m., on Wednesday,

21    September 27, 2018, the sworn testimony was concluded.

22                      - - -

23

24
```

Highly Confidential - Todd Cameron

```
 1                    CERTIFICATE

 2   STATE OF OHIO        :

                                    SS:

 3   COUNTY OF FRANKLIN  :

 4

 5          I, TODD CAMERON, do hereby certify that I

 6   have read the foregoing transcript of my testimony

 7   given on September 26, 2018; that together with the

 8   correction page attached hereto noting changes in form

 9   or substance, if any, it is true and correct.

10                          _____

                           TODD CAMERON

11

12          I do hereby certify that the foregoing

13   transcript of the examination of TODD CAMERON was

14   submitted to the witness for reading and signing; that

15   after he had stated to the undersigned Notary Public

16   that he had read and examined his examination, he

17   signed the same in my presence on the _____ day of

18   _____, 2018.

19

                           _____

20                         NOTARY PUBLIC - STATE OF OHIO

21

22   My Commission Expires:

23   _____, _____.

24
```

Highly Confidential - Todd Cameron

```
 1                    CERTIFICATE
 2   STATE OF OHIO        :
                                    SS:
 3   COUNTY OF FRANKLIN   :
 4          I, Carol A. Kirk, a Registered Merit Reporter
     and Notary Public in and for the State of Ohio, duly
 5   commissioned and qualified, do hereby certify that the
     within-named TODD CAMERON was by me first duly sworn to
 6   testify to the truth, the whole truth, and nothing but
     the truth; that the sworn testimony then given by him
 7   was by me reduced to stenotype in the presence of said
     witness; that the foregoing is a true and correct
 8   transcript of the sworn testimony so given by him; that
     the sworn testimony was taken at the time and place in
 9   the caption specified and was completed without
     adjournment; and that I am in no way related to or
10   employed by any attorney or party hereto or financially
     interested in the action; and I am not, nor is the
11   court reporting firm with which I am affiliated, under
     a contract as defined in Civil Rule 28(D).
12
            IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my seal of office at Columbus, Ohio on
     this 8th day of October 2018.
14
15
16
17                      _____
                        CAROL A. KIRK, RMR
18                      NOTARY PUBLIC - STATE OF OHIO
19   My Commission Expires:  April 9, 2022.
20                   - - -
21
22
23
24
```

```
 1              DEPOSITION ERRATA SHEET

 2    I, TODD CAMERON, have read the transcript

      of my deposition taken on the 26th day of

 3    September2018, or the same has been read to me.  I

      request that the following changes be entered upon the

 4    record for the reasons so indicated.  I have signed the

      signature page and authorize you to attach the same to

 5    the original transcript.

 6    Page  Line  Correction or Change and Reason:

 7    ____  _____  _____

 8    ____  _____  _____

 9    ____  _____  _____

10    ____  _____  _____

11    ____  _____  _____

12    ____  _____  _____

13    ____  _____  _____

14    ____  _____  _____

15    ____  _____  _____

16    ____  _____  _____

17    ____  _____  _____

18    ____  _____  _____

19    ____  _____  _____

20    ____  _____  _____

21    ____  _____  _____

22    ____  _____  _____

23    ____  _____  _____

24    Date _____  Signature _____
```