1        UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF OHIO

3             EASTERN DIVISION

4                 -   -   -

5   IN RE: NATIONAL PRESCRIPTION

6   OPIATE LITIGATION              Case No.

7                                  1:17-MD-2804

8   APPLIES TO ALL CASES           Hon. Dan A.

9                                  Polster

10   Case No. 1:17-MD-2804

11                 -   -   -

12             March 21, 2019

13                 -   -   -

14     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

15            CONFIDENTIALITY REVIEW

16         Videotaped deposition of PAUL

17   CAMPANELLI, held at 250 West 55th Street,

18   New York, New York, commencing at 9:10 a.m.,

19   on the above date, before Marie Foley, a

20   Registered Merit Reporter, Certified

21   Realtime Reporter and Notary Public.

22          GOLKOW LITIGATION SERVICES

23      877.370.3377 ph | 917.591.5672 fax

24             Deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S:

 2

 3   SEEGER WEISS LLP

 4   BY: DAVID R. BUCHANAN, ESQUIRE

 5       JENNIFER SCULLION, ESQUIRE

 6       77 Water Street

 7       8th Floor

 8       New York, New York  10005

 9       212.584.0700

10       dbuchanan@seegerweiss.com

11       jscullion@seegerweiss.com

12       Representing Plaintiffs

13

14   BRANSTETTER, STRANCH & JENNINGS, PLLC

15   BY: TRICIA HERZFELD, ESQUIRE

16       The Freedom Center

17       223 Rosa L. Parks Avenue, Suite 200

18       Nashville, Tennessee  37203

19       615.254.8801

20       triciah@bsjfirm.com

21       Representing the Tennessee Plaintiffs

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2

 3    ARNOLD & PORTER KAYE SCHOLER, LLP

 4    BY: JONATHAN L. STERN, ESQUIRE

 5        JOANNA PERSIO, ESQUIRE

 6        601 Massachusetts Avenue, NW

 7        Washington DC  20001-3743

 8        202.942.5000

 9        jonathan.stern@arnoldporter.com

10        Representing Endo and Par

11

12

13    DECHERT LLP

14    BY: JENNIFER PARK, ESQUIRE

15        Three Bryant Park

16        1095 Avenue of the Americas

17        New York, New York  10036-6796

18        212.698.3500

19        jennifer.park@dechert.com

20        Representing Purdue

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2

 3    COVINGTON & BURLING, LLP

 4    BY: FREDERICK BENSON, ESQUIRE

 5        One CityCenter

 6        850 Tenth Street NW

 7        Washington, DC  20001-4956

 8        202.662.6000

 9        Representing McKesson

10

11

12    JONES DAY

13    BY: ADAM HOLLINGSWORTH, ESQUIRE

14        North Point

15        901 Lakeside Avenue

16        Cleveland Ohio  44114-1190

17        216.586.3939

18        ahollingsworth@jonesday.com

19        Representing Walmart

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAMING:

 2

 3    JOSHUA DAVIS, Arnold Porter

 4    MICHAEL TYALOR, Bailey Wyant

 5    PAUL E. ASFENDIS, Gibbons P.C.

 6    ERIN ALLEN, Marcus & Shapira

 7

 8

 9

10    ALSO PRESENT:

11        Charles Bachman, Seeger Weiss

12        Jobina Jones-McDonald, Endo

13        Henry Marte, videographer

14        Corey Smith, trial tech

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2                 TRANSCRIPT INDEX

 3                                    PAGE

 4    APPEARANCES...................... 2 - 5

 5    INDEX OF EXHIBITS................. 7 - 21

 6    EXAMINATION OF PAUL CAMPANELLI:

 7    BY:  MR. BUCHANAN................. 23, 592

 8    BY:  MS. HERZFELD................. 511

 9    BY:  MR. STERN.................... 586

10    AFTERNOON SESSION................. 319

11    SIGNATURE PAGE.................... 600

12    ERRATA........................... 601

13    REPORTER'S CERTIFICATE........... 602

14

15

16

17                      -   -   -

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2                E  X  H  I  B  I  T  S

 3                      -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                    PAGE

 5   Campanelli    Chart Endo Corporate           26

 6   Exhibit 201   History

 7

 8   Campanelli    Endo Opioid Drugs              43

 9   Exhibit 202

10

11   Campanelli    Qualitest Opioid Drugs         56

12   Exhibit 203

13

14   Campanelli    Par Opioid Drugs               60

15   Exhibit 204

16

17   Campanelli    CDC Vital Signs November       67

18   Exhibit 1     2011, Bates No.

19                 ENDO_OPIOID_MDL_00527673 -

20                 676

21   Campanelli    E-mail 11/14/01 with          102

22   Exhibit 3     attachment, Bates No.

23                 ENDO-CHI-LIT-00241435 - 436

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    -   -   -

2                 E X H I B I T S

3                    -   -   -

4   ENDO-CAMPANELLI EXHIBITS                 PAGE

5   Campanelli    CDC report March 2016,      111

6   Exhibit 2     Bates No.

7                 ENDO_OPIOID_MDL_03705632 -

8                 683

9

10  Campanelli    The Epidemic                113

11  Exhibit 205

12

13  Campanelli    1999-2017 Endo Total Pills  128

14  Exhibit 206

15

16  Campanelli    QT Total Pills/Units Counts 136

17  Exhibit 208

18

19  Campanelli    Par Total Pills/Units Counts 150

20  Exhibit 207

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2                  E X H I B I T S

 3                      -   -   -

 4    ENDO-CAMPANELLI EXHIBITS                    PAGE

 5    Campanelli   Annual Sales                    155

 6    Exhibit 210

 7

 8    Campanelli   Annual Sales                    162

 9    Exhibit 211

10

11    Campanelli   E-mail 7/14/03, with            168

12    Exhibit 11   attachment, Bates No.

13                 ENDO_OPIOID_MDL_01692316-321

14

15    Campanelli   Bloomquist article              174

16    Exhibit 12

17

18    Campanelli   E-mail 1/29/07, with            181

19    Exhibit 13   attachment, Bates No.

20                 ENDO_OPIOID_MDL_00860364-748

21    Campanelli   E-mail 8/24/01, with            189

22    Exhibit 14   attachment, Bates No.

23                 ENDO_OPIOID_MDL_03388209-210

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2                  E X H I B I T S

 3                      -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                    PAGE

 5   Campanelli    Endo History of Major Drugs   190

 6   Exhibit 212

 7

 8   Campanelli    Slide deck, Bates No.         202

 9   Exhibit 101   ENDO-OPIOID_MDL-04136658

10

11   Campanelli    Slide deck, Bates No.         210

12   Exhibit 15    ENDO-OPIOID_MDL-01139611

13

14   Campanelli    E-mail 10/7/2005, Bates No.   223

15   Exhibit 102   ENDO_OPIOID_MDL-01139609-610

16

17   Campanelli    Slide deck, Bates No.         231

18   Exhibit 16    ENDO-CHI_LIT-00078229

19

20   Campanelli    E-mail 4/5/02 with           243

21   Exhibit 103   attachment, Bates No.

22                 ENDO-OPIOID_MDL-04908487-488

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                          -   -   -

2                     E X H I B I T S

3                          -   -   -

4    ENDO-CAMPANELLI EXHIBITS                      PAGE

5    Campanelli   Slide deck, Bates No.      246

6    Exhibit 15   ENDO-OPIOID_MDL-01139611

7

8    Campanelli   CD&E 1999 Objectives,      251

9    Exhibit 104  Bates No.

10                ENDO-OPIOID_MDL-03258200-202

11   Campanelli   Slide deck, Bates No.      254

12   Exhibit 105  ENDO-OPIOID_MDL-02344002

13

14   Campanelli   E-mail 4/7/2001 with       268

15   Exhibit 19   attachment, Bates No.

16                END00152457-473

17

18   Campanelli   Endo Payments to NIPC,     273

19   Exhibit 21   2003-2012

20

21   Campanelli   Pain Management Today,     274

22   Exhibit 22   Bates No.

23                ENDO-OPIOID_MDL-01605952-958

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -

 2                E X H I B I T S

 3                     -   -   -

 4    ENDO-CAMPANELLI EXHIBITS                    PAGE

 5    Campanelli   Slide deck, Bates No.        276

 6    Exhibit 23   KP360 0HIOMDL_000050938-1097

 7

 8    Campanelli   Slide deck, Bates No.        280

 9    Exhibit 24   KP360_0HIOMDL_000121628-728

10

11    Campanelli   Slide deck, Bates No.        282

12    Exhibit 25   ENDO-OR-CID-00749100-178

13

14    Campanelli   Evidence Review, Bates No.   283

15    Exhibit 40   ENDO-OPIOID_MDL-01463855-4070

16

17    Campanelli   ASSURANCE OF DISCONTINUANCE  288

18    Exhibit 106  UNDER EXECUTIVE LAW

19                 SECTION 63, SUBDIVISION 15

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -

 2                    E X H I B I T S

 3                       -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                    PAGE

 5   Campanelli    CD                            294

 6   Exhibit 26

 7

 8   Campanelli    NIPC Executive Summary,       303

 9   Exhibit 28    Bates No.

10                 KP360-0HIOMDL-000241-244

11

12   Campanelli    E-mail 11/16/03, Bates No.    311

13   Exhibit 27    ENDO-OPIOID_MDL-01928285-286

14

15   Campanelli    Spreadsheet                   318

16   Exhibit 214

17

18   Campanelli    Spreadsheet                   318

19   Exhibit 213

20

21   Campanelli    Flash drive, Bates No.        318

22   Exhibit 209   ENDO_DATA-OPIOID_MDL-

23                 00000025-41

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2                 E X H I B I T S

 3                    -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                    PAGE

 5   Campanelli   E-mail 8/2/2001 with          324

 6   Exhibit 31   attachment, Bates No.

 7                ENDO-OPIOID_MDL-06234029-037

 8

 9   Campanelli   APF Pain Action Guide,        328

10   Exhibit 32   Bates No.

11                CHI_000435580-597

12   Campanelli   APF Pain Action Guide, Bates 337

13   Exhibit 33   No. CHI_000432493-507

14

15   Campanelli   E-mail 3/16/04 with          343

16   Exhibit 34   attachment, Bates No.

17                ENDO-OPIOID_MDL-02255331-346

18

19   Campanelli   Report of CIOMS Working      346

20   Exhibit 36   Group IV 1998

21

22   Campanelli   E-mail 8/21/2009 with        358

23   Exhibit 38   attachment, Bates No.

24                ENDO-OPIOID_MDL-05968029-075
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -

 2                    E X H I B I T S

 3                          -   -   -

 4    ENDO-CAMPANELLI EXHIBITS                    PAGE

 5    Campanelli    Evidence Report/Technology    360

 6    Exhibit 39    Assessment Number 218

 7

 8    Campanelli    E-mail 1/23/2004 with         366

 9    Exhibit 44    attachment, Bates No.

10                  ENDO-OPIOID_MDL-03256654-717

11

12    Campanelli    Market Watch March 24, 2004   373

13    Exhibit 9

14

15    Campanelli   Book chapter                   385

16    Exhibit 45

17

18    Campanelli   Slide deck, Bates No.          389

19    Exhibit 46   ENDO-OPIOID MDL-04137791

20

21    Campanelli   E-mail 3/25/2002 with          393

22    Exhibit 107  attachment, Bates No.

23                  ENDO-OPIOID_MDL-04095507

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                            -   -   -

3                       E X H I B I T S

4                            -   -   -

5    ENDO-CAMPANELLI EXHIBITS                        PAGE

6    Campanelli  E-mail 12/20/2007 with           397

7    Exhibit 47  attachment, Bates No.

8                ENDO-OPIOID_MDL-02162731

9

10   Campanelli  E-mail 12/19/2007 with           404

11   Exhibit 49  attachment, Bates No.

12               ENDO-OPIOID_MDL-02086096-099

13

14   Campanelli  Slide deck, Bates No.             418

15   Exhibit 50  ENDO-CHI_LIT-00547543

16

17   Campanelli  Slide deck, Bates No.             421

18   Exhibit 51  ENDO-CHI_LIT-00012061

19

20   Campanelli  E-mail 4/30/2009 with            428

21   Exhibit 52  attachment, Bates No.

22               ENDO-OPIOID MDL-06127944-945

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2                   E X H I B I T S

 3                        -   -   -

 4    ENDO-CAMPANELLI EXHIBITS                  PAGE

 5    Campanelli  DEA Brief May 2011, Bates No. 435

 6    Exhibit 54  ENDO-OR-CID-00694084-087

 7

 8    Campanelli  E-mail 6/29/2011, Bates No.   442

 9    Exhibit 53  END00259233-235

10

11    Campanelli  E-mail 3/5/2009 with          454

12    Exhibit 61  attachment, Bates No.

13                ENDO-CHI_LIT-00067298-327

14

15    Campanelli  E-mail May 31, 2012, Bates    470

16    Exhibit 66  No.

17                ENDO-CHI LIT-00008100-101

18

19    Campanelli  Test battery - results, Bayes 482

20    Exhibit 70  No. ENDO-CHI_LIT-00067901-954

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2                    E X H I B I T S

 3                        -   -   -

 4   ENDO-CAMPANELLI EXHIBITS                    PAGE

 5   Campanelli  Q4 Face-to-Face Meeting,     484

 6   Exhibit 69  Chadds Ford December 7-8, 2009

 7               Bates No.

 8               ENDO-CHI_LIT-00064407-414

 9

10   Campanelli  Box of documents             488

11   Exhibit 108

12

13   Campanelli  Detail Visits to Dr. Adolf   495

14   Exhibit 110 Harper, 2008-2012

15

16   Campanelli  E-mail 4/20/2012 with        499

17   Exhibit 109 attachment, Bates No.

18               ENDO-OPIOID_MDL-02716741-742

19   Campanelli  NAVIPPRO report 3/13/2014,   524

20   Exhibit 500 Bates No.

21               ENDO-OPIOID_MDL-06183930-4083

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                         -   -   -

 3                    E X H I B I T S

 4                         -   -   -

 5   ENDO-CAMPANELLI EXHIBITS                    PAGE

 6   Campanelli  NAVIPPRO report 5/17/2013,    532

 7   Exhibit 501 Bates No. EPI001760592-680

 8

 9   Campanelli  NAVIPPRO report 8/19/2014,    538

10   Exhibit 502 Bates No.

11               ENDO-OPIOID_MDL-01459827-911

12

13   Campanelli  NAVIPPRO report 8/18/2015    546

14   Exhibit 503

15

16   Campanelli  NAVIPPRO report 8/19/2016,    550

17   Exhibit 504 Bates No.

18               ENDO-OPIOID_MDL-01232762-869

19

20   Campanelli  E-mail 11/13/2004, Bates No.  567

21   Exhibit 505 ENDO-OPIOID_MDL-02667006-007

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                          -   -   -

2                    E  X  H  I  B  I  T  S

3                          -   -   -

4    ENDO-CAMPANELLI EXHIBITS                    PAGE

5    Campanelli  Slide deck                       576

6    Exhibit 506

7

8    Campanelli  E-mail 3/23/2017, Bates No.   581

9    Exhibit 507 ENDO-OPIOID_MDL-01848038

10

11   Campanelli  E-mail May 17, 2018 with       593

12   Exhibit 111 attachment, Bates No.

13              PAR_OPIOID_MDL_0001895807-808

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1    DEPOSITION SUPPORT INDEX

2

3    DIRECTION TO WITNESS NOT TO ANSWER

4     Page   Line

5     - -none- -

6

7

8    REQUEST FOR PRODUCTION OF DOCUMENTS

9     Page   Line

10     - -none- -

11

12

13    STIPULATIONS

14     Page   Line

15     - -none- -

16

17

18    QUESTIONS MARKED

19     Page   Line

20     - -none- -

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -

 2                     9:10 a.m.

 3                New York, New York

 4                        -  -  -

 5            THE VIDEOGRAPHER:  All right.

 6    We are now on the record.

 7            My name is Henry Marte.  I am a

 8    videographer with Golkow Litigation

 9    Services.

10            Today's date is March 21st,

11    2019, and the time is 9:10 a.m.

12            This videotaped deposition is

13    being held in New York, New York, in

14    the matter of National Prescription

15    Opiate Litigation.  The deponent today

16    is Paul Campanelli.

17            All appearances are noted on the

18    stenographic record.

19            Will the court reporter please

20    administer the oath to the witness.

21                        -  -  -

22

23

24
```

1    PAUL CAMPANELLI, the Witness herein,

2          having been first duly sworn by a

3          Notary Public in and of the State of

4          New York, was examined and testified as

5          follows:

6    EXAMINATION BY

7    MR. BUCHANAN:

8          Q.    Good morning, Mr. Campanelli.

9    My name is Dave Buchanan.

10              Could you please state your name

11    for the record, sir?

12         A.    It's Paul Campanelli.

13         Q.    And, are you the current chief

14    executive officer of Endo?

15         A.    Yes.

16         Q.    You're also a board member of

17    Endo.

18              Is that right?

19         A.    Yes.

20         Q.    Okay.  Just so you understand

21    where I come from on this, I and others

22    working with us represent cities,

23    municipalities, counties who've been

24    impacted by the opioid epidemic.  They've

Highly Confidential - Subject to Further Confidentiality Review

1    brought claims against you and other

2    entities.

3              Do you have some general sense

4    of that litigation, the opioid litigation

5    by municipalities, counties, cities?

6       A.    Yes.

7              MR. BUCHANAN:  Okay.  Can we go

8       off the record for a moment?

9              THE VIDEOGRAPHER:  The time is

10      9:11 a.m.

11             Off the record.

12             (Discussion held off the record.)

13             THE VIDEOGRAPHER:  We are back

14      on the record.

15             The time is 9:12 a.m.

16   BY MR. BUCHANAN:

17      Q.    I apologize for that

18   interruption, sir.

19             Just to restate where we were,

20   you are the current CEO of Endo.

21             Is that right?

22      A.    Correct.

23      Q.    You're board member of Endo?

24      A.    Correct.

1      Q.     I take it you're a shareholder

2   of Endo?

3      A.     Yes.

4      Q.     Okay.  As the CEO, that means

5   chief executive officer?

6      A.     Yes.

7      Q.     You are the senior-most officer

8   of the company?

9      A.     Yes.

10      Q.     As a board member, you're on the

11   board of directors of the company?

12      A.     Correct.

13      Q.     Board of directors is the group

14   that's appointed by the shareholders to

15   oversee the operations of the company,

16   correct?

17      A.     To govern the company, yes.

18      Q.     To govern the company, thank

19   you.

20             The board and its senior

21   officers are charged with returning value

22   and profits to shareholders, right?

23      A.     Yes.

24      Q.     Shareholders owner the company,

1    right?

2         A.    Yes.

3         Q.    And you work for the

4    shareholders to make money for the

5    shareholders?

6         A.    Yes.

7         Q.    Thank you.

8              What I'd like to do, because

9    there's been some different acquisitions

10   and some different names, I want to see if

11   we can orient ourselves from the various

12   entities and get some common knowledge and

13   dates down.  We have a slide that

14   hopefully will simplify this.

15              MR. BUCHANAN:  Could we get

16        slide 2 over to counsel?

17              And what's that going to be

18        marked as an exhibit?

19              This is Exhibit 201.

20              (Campanelli Exhibit 201,

21        document, was marked for

22        identification, as of this date.)

23              MR. BUCHANAN:  My intent,

24        counsel, is to mark demonstratives

1     from 200 up.  With regard to

2     substantive exhibits, they'll be in

3     the first range of 100.  We may not

4     mark them all.

5  BY MR. BUCHANAN:

6     Q.    Showing you what's marked as

7  201, sir, it's a timeline of the Endo

8  corporate history.

9          You see off in the left, Endo

10 Pharmaceuticals actually goes back, well,

11 a long time, right?  Back to the 1920s?

12         MR. STERN:  Objection; lack of

13     foundation.

14     A.    This is back in the DuPont Merck

15 days.

16     Q.    This actually even precedes the

17 DuPont Merck days, correct, sir?

18     A.    Yes, correct.

19     Q.    You see the far left column Endo

20 Pharmaceuticals formed in 1920?

21     A.    Yes.

22     Q.    And that's a history that you've

23 referenced in annual reports and

24 shareholder reports over the years, that

Highly Confidential - Subject to Further Confidentiality Review

1    this is a company that goes back to the

2    1920s.

3            Correct, sir?

4            MR. STERN:  Objection; lack of

5        foundation.

6        A.    To the best of my knowledge,

7    that -- that is part of the original

8    predating DuPont Merck.

9            So, while in name, yes.  I don't

10   believe the company actually started until

11   about 1997.

12       Q.    Okay.  And, what you're alluding

13   to, sir, is that at some point in time,

14   the timeline indicates 1970, but without

15   regard to whether it was 1970 or '71 or

16   '69, DuPont acquired Endo, correct?

17       A.    That's what it says here.

18       Q.    Okay.  And then ultimately there

19   was a join venture between DuPont and

20   Merck to focus on pharmaceuticals,

21   correct?

22       A.    I -- I'm not sure of the case

23   there.

24       Q.    Okay.  Then in the late '90s,

1    1997 or so, some executives of what was

2    then operating as the DuPont Merck joint

3    venture essentially spun off the Endo

4    portfolio and established a new company

5    called Endo Pharmaceuticals.

6            Correct, sir?

7    A.    I think what happened was a

8    group of individuals were given an

9    opportunity to acquire a series of

10   products and acquired the name Endo back

11   in 1970.

12   Q.    Understood.

13           So whatever the corporate

14   transactional structure were, some

15   products that were currently being

16   promoted, manufactured, et cetera, by the

17   Merck DuPont joint venture were sold by

18   the DuPont Merck joint venture together

19   with the name Endo and a new company was

20   formed, correct?

21           MR. STERN:  I apologize,

22      Mr. Buchanan.  You're talking about

23      1970 now?

24           MR. BUCHANAN:  I was, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I think that's right.  That

2    three individuals bought a handful of

3    products and bought the name Endo back in

4    1997.

5      Q.     Okay.  And the CEO for that

6    reformed Endo Pharmaceuticals in 1997 was

7    whom?

8      A.     I believe it was Carol Ammons.

9    I believe that's her name.

10     Q.     Okay.  And then the company

11   operated for a number of years privately

12   and then ultimately went public and gained

13   public shareholders in 2000, right?

14     A.     I -- I'm not sure of the date.

15            I see it here on the sheet.  So

16   I have no reason not to believe it.

17     Q.     And I don't think that's going

18   to be a material point for us today.  I

19   just wanted to make sure we were oriented

20   here.

21            In 2010, we see an acquisition

22   of a then large generic pharmaceutical

23   company, correct?

24     A.     They acquired Qualitest, yes, a

Highly Confidential - Subject to Further Confidentiality Review

1    generics company.

2    Q.    And 2010 is consistent with your

3    recollection, sir, of when that occurred?

4    A.    Yes.

5    Q.    Then we could probably skip over

6    2014 which references an Irish inversion.

7         Something I assume done for tax

8    returns and other reasons, right?

9    A.    Yes.

10   Q.    Okay.  And Endo is the U.S.

11   subsidiary going forward from that point

12   in time.

13        And then Endo acquired Par,

14   correct?

15   A.    Endo acquired Par in 2015.

16   Q.    Okay.  And so we have,

17   essentially, three pharmaceutical

18   companies that had their own portfolios.

19        If we look in the post-1997 era,

20   we've got Endo with a portfolio of

21   products it brought from DuPont Merck,

22   correct?

23   A.    Yes.

24   Q.    We've got Qualitest

1    Pharmaceuticals with its portfolio of

2    generics products, correct?

3         A.    Yes.

4         Q.    And we have Par with its

5    portfolio of products that were acquired

6    by Endo in 2015, correct?

7         A.    Correct.

8         Q.    And it looks like as a business

9    matter, after that merger or acquisition

10   in 2015, generic products, meaning

11   non-branded pharmaceutical products, were

12   consolidated in the Par brand, right?

13            MR. STERN:  Objection to the

14       form.

15       A.    In 2015 when Endo acquired Par,

16   the Qualitest portfolio fell under to the

17   Par portfolio in name and then was

18   governed under Endo.

19       Q.    And just to make sure we have

20   context in how you come to this, sir, you

21   came into the Endo entities through the

22   acquisition of Par in 2015?

23       A.    Correct.

24       Q.    Okay.  And, so, let's dial back

Highly Confidential - Subject to Further Confidentiality Review

1    the clock and make sure we understand kind

2    of your role and involvement in the

3    pharmaceutical industry.

4            You were with Par from, what,

5    roughly 2000, 2001?

6        A.    2001.

7        Q.    Okay.  And moved through various

8    positions though.

9            Ultimately, you reached the CEO

10   position at Par, correct?

11       A.    Started in business development

12   and concluded as the CEO.

13       Q.    And you were the CEO from, what,

14   2010 or so?

15       A.    No.  I was the CEO from 2012 to

16   2015.

17       Q.    And, during your time at Par,

18   Par was also in the opioid business,

19   right?

20       A.    We had a small portfolio, yes.

21       Q.    And, at the time when Endo

22   acquired Par it was in the opioid business

23   still at that point, correct?

24            MR. STERN:  Objection to form.

1      A.      I'm sorry.  Could you repeat

2    that?

3      Q.      In 2015 when Endo acquired Par,

4    it was making opioid products for sale,

5    correct?

6      A.      Par?

7      Q.      Par.

8      A.      Yes.

9      Q.      I see the confusion with my

10   question.

11            In 2015 when Endo acquired Par,

12   Par was still in the business of making

13   opioid products, correct, sir?

14            MR. STERN:  Object to the form.

15     A.      Par was manufacturing and either

16   would have acquired and distributed

17   opioids from third parties.

18     Q.      Okay.  At the point in time in

19   2010 when Endo acquired Qualitest,

20   Qualitest, which you indicated was a

21   generic manufacturer of drugs, they also

22   had a portfolio of opioid products they

23   were manufacturing and distributing,

24   correct?

1    A.    That's my general understanding.

2    Q.    As of the time you became CEO of

3  Endo, the Endo company prior to the merger

4  was substantially invested in the pain

5  segment.

6         Fair?

7    A.    I'm a little confused with your

8  question.  I'm sorry.  Could you just

9  re --

10    Q.    No, no, that's fine.  And please

11  do that throughout the day if, for

12  whatever reason, we're not communicating

13  clearly or my questions aren't clear.

14         Prior to the acquisition of the

15  Par assets in 2015, I mean, you were a

16  part of that discussion and negotiation

17  back and forth with Endo?

18    A.    For the acquisition of Par, yes.

19    Q.    Yes.

20         And Endo ultimately paid, what,

21  8 billion dollars to acquire the Par

22  assets?

23    A.    Correct.

24    Q.    And if I understand correctly,

Highly Confidential - Subject to Further Confidentiality Review

1    sir, the Par assets had sold for 2 billion

2    dollars just a few years before that,

3    right?

4        A.    2.2 billion dollars.

5        Q.    So roughly a fourfold return for

6    the company, its shareholders, when it

7    sold in 2015?

8        A.    Generally, yes.

9            MR. STERN:  Objection to the

10       form.

11   BY MR. BUCHANAN:

12       Q.    Okay.  At the point in time when

13   you were having this discussion with Endo

14   in 2015 about selling Par, becoming

15   involved in Endo, Endo was in the pain

16   business at that point in time, right?

17       A.    It had a portfolio of products

18   that were detailed into pain, yes, amongst

19   others.

20       Q.    Endo was essentially known as a

21   pain management company, correct?

22       A.    In 2015?

23            2015 I think it was

24   transitioning to a specialty company.

1    Q.    You recognize historically, sir,

2    that Endo was a pain management company,

3    if we go back to the '90s, early 2000s,

4    2010.

5          Fair?

6    A.    Yes.

7    Q.    Okay.  And its portfolio of

8    products in pain management significantly

9    included opioid products, true?

10         MR. STERN:  Objection to the

11    form.

12    A.    My understanding was there was a

13    couple of opioid products in the

14    portfolio.

15    Q.    Okay.  Well, let's see if we can

16    orient ourselves more specifically.  We're

17    talking about opioid products today.

18    That's, essentially, the subject of the

19    case, for reasons we'll get into.

20         You have an understanding of

21    really in some sense what opioid products

22    do?

23    A.    Generally, yes.

24    Q.    Okay.  They bind to receptors in

1    the brain, among other things, right?

2            MR. STERN:  Objection to the

3        form.

4        A.    Sounds reasonable.

5        Q.    Okay.  They can trigger a series

6    of reactions in the body that can release

7    feelings of pleasure, euphoria, suppress

8    anxiety.

9            Fair?

10            MR. STERN:  Objection to the

11        form.

12        A.    These areas I really don't know.

13        Q.    Okay.  Do you have some general

14    sense, sir, that they can lead to a

15    subjective feeling of pleasure and

16    euphoria?

17        A.    Generally.

18        Q.    Okay.  And that's not something

19    that's really new or unique in the

20    portfolio of products that Endo brought

21    out in 1997, right?

22            MR. STERN:  Objection to the

23        form.

24        A.    I'm not sure I follow your

Highly Confidential - Subject to Further Confidentiality Review

1    question.

2        Q.    I mean, I guess where I was

3    going is that's just the characteristic of

4    opioids, right?

5            MR. STERN:  Objection to the

6        form.

7        A.    I really don't know the -- the

8    specificity of the characteristics.  I

9    just don't, really.

10       Q.    Do you have some understanding,

11   sir, more broadly that, I mean, opioids go

12   back thousands of years.

13           Fair?

14       A.    Fair.

15       Q.    Obviously not in tablet form.

16   In different forms, but derived from the

17   opium poppy?

18       A.    Understood.

19       Q.    Over time, scientists figured

20   out how to synthesize those into either

21   drugs for pleasure or drugs for treatment?

22           MR. STERN:  Objection to the

23       form.

24

1    BY MR. BUCHANAN:

2        Q.    Right?

3        A.    I don't know about drugs for

4    pleasure.

5              I know that drugs were focused

6    on for pain.

7        Q.    Well, I mean, you've heard of

8    opium dens, sir?

9        A.    Yes.

10       Q.    And I just want to orient

11   ourselves.

12             I mean, this class of drugs that

13   kind of brings us in this room today had

14   predecessor compounds going back thousands

15   of years that had been the subject of

16   abuse and use, right?

17       A.    I understand abuse and misuse of

18   opioids, generally speaking, yes.

19       Q.    Okay.  And really this isn't the

20   first time we've had to deal with issues

21   of opioid abuse, even opioid epidemics?

22             MR. STERN:  Objection to the

23        form.

24       A.    Again, I'm not -- I'm not sure

1  specifically.

2      Q.    I just want to have an

3  understanding, even generally, sir.  I

4  mean, as the CEO of a company that still

5  has a portfolio of opioid products, I

6  mean, you do have some understanding that

7  there is a history with opioid products

8  and abuse and addiction, being diverted.

9          Fair?

10          MR. STERN:  Objection to the

11      form.

12      A.    As a CEO, I am aware of abuse

13  and misuse of opioids over time.

14      Q.    But that's something that you

15  didn't have to wait until 2010 to find

16  out, right?

17      A.    Me personally?

18      Q.    Yeah.

19      A.    Generally -- general

20  understanding, it would have been in -- in

21  probably the 2015 time frame that it

22  really became an awareness for me.

23      Q.    Okay.  We'll see if we can pin

24  that down as we move throughout the day,

1   sir.

2              I mean, just as a person growing

3   up over the last 50 or so years, you have

4   an awareness that drugs, whether it's

5   Morphine, whether it's OxyContin, whether

6   it's heroin, are highly sought and highly

7   abused.

8              Fair?

9              MR. STERN:  Objection to the

10      form.

11      A.    I am aware that these type of

12  drugs can be abused and misused, yes.

13      Q.    And that awareness, sir, you had

14  that prior to 2015?

15      A.    Fair, yes.

16      Q.    Okay.  Well, let's see if we can

17  maybe using this chart as a reference

18  point, see if we can see where the

19  company's various products fit in, if we

20  could.

21              MR. BUCHANAN:  Corey, could I

22      have slide 20 up on the screen?

23              I'll pass one over to counsel.

24              What exhibit number will this

Highly Confidential - Subject to Further Confidentiality Review

1      be?

2              I'm going to pass you Exhibit

3      202, a copy for the witness and

4      counsel.

5              MR. STERN:  Thank you.

6              (Campanelli Exhibit 202,

7      document, was marked for

8      identification, as of this date.)

9  BY MR. BUCHANAN:

10     Q.    Sir, I'll represent to you that

11 in the course of litigation, what happens

12 is we exchange information with each

13 other.  You'll give us a bunch of

14 documents.  We'll give you documents and

15 both sides will try and sift through that

16 and see what the state of play is.

17             From records produced through

18 Endo over the years, we have an

19 understanding that Endo made various

20 oxycodone products.

21             Do you have that awareness, sir?

22     A.    Yes.

23     Q.    Okay.  And on the left-hand

24 column we see several different, if you

1    will, formulations of those products

2    together with brand names that were used

3    from time to time.

4              Do you see those?

5    A.     Yes.

6    Q.     Percocet, that's your brand,

7    right?

8    A.     Correct.

9    Q.     Percocet's been a brand of the

10   company since the '70s, correct?

11   A.     I know it's been approved for

12   many years.  I'm not sure about the

13   specific date.

14   Q.     Okay.  And Percocet contains

15   oxycodone as its active pharmaceutical

16   ingredient, correct?

17   A.     I believe that's one of them.

18   Q.     What is the active

19   pharmaceutical ingredient, sir, in

20   OxyContin?

21   A.     Oxycodone.

22   Q.     Okay.  And, so, we see that the

23   company here, Endo, is a manufacturer of

24   Percocet, an oxycodone product, as well as

Highly Confidential - Subject to Further Confidentiality Review

1    another product called Endocet.

2              Do you see that?

3    A.    Yes.

4    Q.    Do you recognize that, sir, as

5    the generic formulation of the company's

6    Percocet product?

7    A.    Yes.

8    Q.    And for years, sir, the company

9    made, marketed and sold Endocet, correct?

10   A.    Yes.

11             MR. STERN:  Objection to the

12        form; lack of foundation.

13   BY MR. BUCHANAN:

14   Q.    Endocet and Percocet.  There's

15   also a reference to Percodan and Endodan.

16             Percodan is also your brand,

17   right?

18             MR. STERN:  Object to the form.

19   A.    I'm not familiar with it.  I see

20   it on the sheet here.

21   Q.    Okay.  Do you recognize that,

22   sir, as the combination of oxycodone and

23   aspirin?

24   A.    I'm not familiar with the drugs.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  I take it you wouldn't

2    dispute if we had records from -- from

3    your company that said you sold a bunch of

4    Percodan and Endodan that you actually did

5    so?

6           MR. STERN:  Objection to the

7       form.

8    A.    I -- I don't know, but I

9    wouldn't have any reason to dispute it.

10   Q.    Fair enough.

11          There's a reference to oxycodone

12   ER.

13          Do you see that?

14   A.    Yes.

15   Q.    That's the generic formulation

16   of a brand product, right, sir?

17   A.    Yes.

18   Q.    And please tell the jury what

19   the brand name of that product is.

20   A.    OxyContin extended-release.

21   Q.    And you sold a bunch of those

22   pills?

23          MR. STERN:  Objection to the

24      form.

1    BY MR. BUCHANAN:

2        Q.    Right?

3        A.    We sold -- we sold the product.

4        Q.    And we're going to talk about

5    volume at some point today.

6              I mean, at what point is it a

7    lot of product, sir?  I mean, are billions

8    of pills a lot of product?

9              MR. STERN:  Objection to the

10       form.

11       A.    I never thought about it in

12   terms of what a lot is.  It's usually

13   based upon what the wholesalers' purchase

14   orders are.

15       Q.    Right.

16             Would you be surprised to learn,

17   sir, that you sold billions of

18   oxycodone-containing products?

19             MR. STERN:  Objection to the

20       form.

21       A.    Again, if that was based upon a

22   purchase order, it would not surprise me.

23       Q.    Okay.  We'll have a chance,

24   hopefully, to look at that today.

1          And then we see Percolone and

2    Endocodone as two additional formulations

3    of oxycodone-containing products.

4          Do you see those?

5    A.    I see the names.

6    Q.    You're aware, sir, that

7    oxycodone products were target of abuse

8    and diversion in the market.

9          Fair?

10         MR. STERN:  Objection to the

11    form.

12    A.    I'm sorry.  Could you say that

13    again?

14    Q.    You're aware that

15    oxycodone-containing products were a

16    target of abuse and diversion in the

17    market?

18         MR. STERN:  Objection to the

19    form.

20    A.    I'm aware that it's -- it's

21    abused and misused.

22    Q.    Okay.  Let's look at the next

23    column, sir.  And I didn't go into each of

24    the -- staying in the left column for a

1    moment, the oxycodone column.

2              You made a number of different

3    formulations in each of those products.

4    Well, not for all of them, but for some of

5    them.

6              Fair?

7              MR. STERN:  Objection to the

8         form.

9         A.    Again, I'm personally

10   familiar -- familiar with about three of

11   these products.  I -- I'm not familiar

12   with every product on this sheet here in

13   the left column.

14        Q.    I take it some of these products

15   were more popular than others?

16             MR. STERN:  Objection to the

17        form.

18        A.    I don't know if they were

19   popular or not.  I'm just not familiar

20   with their names.

21        Q.    Okay.  Well, some of these were

22   bigger sellers than others?

23        A.    I'm familiar with Endocet.  I'm

24   familiar with oxycodone ER and I'm

Highly Confidential - Subject to Further Confidentiality Review

1    familiar with Percocet.

2         Q.    Okay.  Let's move forward now to

3    hydrocodone.

4              Company made a number of

5    hydrocodone-containing products, correct?

6         A.    I'm familiar with one product in

7    this column here, the Hydro/APAP.

8         Q.    And hydrocodone/APAP if we were

9    trying to link that with a brand name,

10   that would be Vicodin, right?

11        A.    That's my understanding.

12        Q.    So in the oxycodone column we

13   have you all making Percocet and the

14   generic form of OxyContin as kind of

15   common trade names, right?

16             MR. STERN:  Objection to the

17        form.

18        A.    I'm sorry.  Could you say that

19   one more time?

20        Q.    Yeah.

21             In the oxycodone column, just so

22   we can kind of link this up with some

23   branded names to the extent that they're

24   not branded names, we have you making

Highly Confidential - Subject to Further Confidentiality Review

1    Percocet, OxyContin generic and Percodan

2    as brands.

3              Fair?

4              MR. STERN:  Objection to the

5       form.

6       A.    Percocet is the brand name.

7    Endocet is the generic name and oxycodone

8    ER is a generic name for OxyContin ER.

9       Q.    Okay.  Moving over to the second

10   column from the left, hydrocodone.  We see

11   you all making Vicodin, generic Vicodin.

12   Excuse me.

13             MR. STERN:  Objection to the

14      form.

15      A.    We make a generic version of

16   Vicodin, which is hydrocodone/APAP.

17      Q.    Okay.  Another drug that was

18   sought after and abused.

19             Fair?

20             MR. STERN:  Objection to the

21      form.

22      A.    Again, it -- I'm aware that has

23   been abused and misused.

24      Q.    Okay.  And then we have Morphine

1    in the middle.  Morphine sulphate.

2            Do you see that?

3    A.    Yes.

4    Q.    That was another product that

5    you made, right?

6            MR. STERN:  Objection to the

7        form.

8    A.     It's a product that -- it's a

9    generic version that was made, I believe,

10   at Qualitest.

11   Q.    Sir, I'll represent to you that

12   the data that I'm showing on this chart is

13   just for Endo.

14           I take it sitting here today --

15           MR. STERN:  Objection.

16   BY MR. BUCHANAN:

17   Q.    You can accept my representation

18   or not.  I will tell you that that's what

19   the data reflects.

20           MR. STERN:  Objection; lack of

21       foundation.

22           MR. BUCHANAN:  Okay.

23   BY MR. BUCHANAN:

24   Q.    Do you have any basis to

1    disagree, sir, that Endo actually made

2    morphine sulphate over the years, ER?

3        A.    I can't dispute that.

4        Q.    Okay.  Let's go one further

5    notch to the right.  Oxymorphone.

6              These were some big products for

7    the company, right?

8        A.    These were products which were

9    distributed by Endo, yes.

10       Q.    Marketed, promoted, distributed,

11   sold.

12             Fair?

13       A.    Correct.

14       Q.    We've got Opana, Opana ER and

15   Opana ER reformulated, correct?

16       A.    Yes.

17       Q.    And then we have another product

18   off to the right hydromorphone.

19             Do you see that?

20       A.    Yes.

21       Q.    And, are you familiar, sir, with

22   the concept of MMEs, Morphine equivalents?

23       A.    Yes.

24       Q.    There's different potencies of

Highly Confidential - Subject to Further Confidentiality Review

1    the various opioids with regard to the

2    effects on the various receptors in the

3    brain.

4          Fair?

5    A.    I don't know that.

6    Q.    You're familiar, sir, that

7    certain products --

8          MR. BUCHANAN:  Withdrawn.

9    Q.    Within your business, sir,

10   certainly within the way these products

11   are promoted, a consideration that's to be

12   given with regard to dosing is how much

13   stronger in terms of potency the drug is

14   gram-for-gram relevant to Morphine.

15         Correct?

16         MR. STERN:  Objection to the

17         form.

18   A.    I know that MMEs are based on

19   the milligram equivalents.

20   Q.    Okay.  So, for example, one

21   milligram of Morphine -- excuse me.

22   Probably easier to go this direction.

23         MR. BUCHANAN:  Withdrawn.

24   Q.    One milligram of oxymorphone,

Highly Confidential - Subject to Further Confidentiality Review

1    your Opana products, is equivalent to

2    three milligrams of Morphine, right?

3        A.    That -- that appears correct.

4        Q.    Okay.  Three-to-one --

5        A.    Correct.

6        Q.    -- is the MME conversion, right?

7              And with regard to your

8    oxycodone products and Morphine, that's,

9    what, one-and-a-half-to-one?

10             MR. STERN:  Objection to the

11        form.

12        A.    Yes.

13        Q.    And, so, essentially what that

14   means, sir, is that if we're looking at a

15   30 milligram Opana tablet, 30 milligram

16   Opana tablet --

17             MR. BUCHANAN:  Withdrawn.

18             MR. STERN:  Here comes the math.

19             MR. BUCHANAN:  Thank you.

20        That's why I went to law school.

21             Withdrawn.

22        Q.    If we look at a 30 milligram

23   Opana tablet or any of the oxymorphone

24   tablets there, that translates into

Highly Confidential - Subject to Further Confidentiality Review

1    roughly 90 milligrams of Morphine, right?

2         A.    Three-to-one.

3         Q.    Three times 30, I think I can do

4    that without my calculator.  That's 90

5    milligrams.  All right.

6               Okay.  So, these are the Endo

7    products, sir.

8               Let me pass you over Qualitest's

9    products.

10              (Campanelli Exhibit 203,

11         document, was marked for

12         identification, as of this date.)

13   BY MR. BUCHANAN:

14        Q.    We talked a moment ago, sir,

15   about Qualitest's role and involvement

16   with regard to opioids and its

17   relationship with Endo.

18              Passing you what we're marking

19   as Exhibit 203.  Just let me know when you

20   have that, sir.

21              (Pause.)

22        Q.    Sir, I'll represent to you that

23   this is just a graphic reflecting the

24   various products that have been identified

Highly Confidential - Subject to Further Confidentiality Review

1    in the order records from Qualitest over

2    the years.

3              We see, again, three columns.

4    And we're having some difficulty, I think,

5    showing the heading on the screen.  It's

6    kind of blacked out right now.

7              But on your printout, you can

8    see the headings, correct, sir?

9        A.    Yes.

10             MR. STERN:  I'm sorry,

11       Mr. Buchanan.  By headings do you mean

12       hydrocodone, oxycodone and

13       oxymorphone?

14             MR. BUCHANAN:  I did.  Thanks

15       for the clarification, counsel.

16   BY MR. BUCHANAN:

17       Q.    So, the heading at the top of

18   Exhibit 203 says "Qualitest opioid drugs,"

19   correct?

20       A.    Yes.

21       Q.    On the left-hand side we have

22   hydrocodone.

23             Do you see that?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In the middle we have oxycodone,

2    right?

3    A.    Yes.

4    Q.    And to the far right we have

5    oxymorphone?

6    A.    Yes.

7    Q.    Okay.  And do you have the

8    knowledge, sir, that in fact Qualitest was

9    in the business of making, selling and

10   distributing hydrocodone opioid products?

11        MR. STERN:  Objection; lack of

12        foundation.  Objection to the form.

13   BY MR. BUCHANAN:

14   Q.    You can answer.

15   A.    I'm aware that Qualitest

16   manufactured hydrocodone.

17   Q.    Okay.  And we talk hydrocodone

18   products, we're talking about

19   hydrocodone/APAP, that's that Vicodin

20   tablet, right?  Or the brand?

21   A.    That's my understanding.  Okay.

22   Q.    And we go to the middle column

23   here and we see oxycodone again and we

24   have oxycodone APAP at the bottom.

Highly Confidential - Subject to Further Confidentiality Review

1          I think you told us a few

2    minutes ago oxycodone APAP would be the

3    Endo-branded product Percocet, right?

4          A.    Correct.

5          Q.    And then we have other oxycodone

6    tablets which if they were ER would be

7    OxyContins, right?

8          A.    If they were ER.

9          Q.    And if you just sold them plain,

10    it would just be OxyContin, right?

11          MR. STERN:  Objection to the

12      form.

13    BY MR. BUCHANAN:

14          Q.    IR?

15          A.    IR here is an immediate release

16    product.

17          Q.    Thank you.

18          Then on the right we have

19    oxymorphone, that's the active ingredient

20    in that drug that you marketed under the

21    brand name Opana, correct?

22          MR. STERN:  Objection to the

23      form.

24          A.    Oxymorphone here is a generic

1    version of Opana IR.

2        Q.    And we're already using terms

3    that may not be clear.  I guess IR is

4    immediate release?

5        A.    Correct.

6        Q.    ER is extended-release?

7        A.    Correct.

8        Q.    Okay.  So when we talk about

9    oxycodone ER, which I think you said was

10   OxyContin, that's oxycodone

11   extended-release, right?

12       A.    Yes.

13       Q.    If you're talking oxycodone IR,

14   that's the active ingredient in OxyContin

15   but for immediate-release?

16       A.    Yes.

17       Q.    Thank you.  All right.

18            Let's go forward to the next

19   one.  Some Par products.

20            Can we pass over, please,

21   Exhibit 204?

22            (Campanelli Exhibit 204,

23       document, was marked for

24       identification, as of this date.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    I think you told us, sir, that

3    you were the CEO of Par from 2012 to 2015,

4    correct?

5        A.    Correct.

6        Q.    And you worked there, I think,

7    from, what, 2000 to 2012 in various roles

8    as you escalated through the management

9    ranks, right?

10       A.    Yes, from 2001 through 2015.

11       Q.    Okay.  Let's just kind of get in

12   context, if you will, where Par was in the

13   mix, okay.

14            Par made fentanyl products,

15   right?

16       A.    No.

17       Q.    No, sir?

18       A.    No.

19       Q.    We have shipping records that

20   reflect that you were selling fentanyl.

21       A.    Par sold fentanyl.

22       Q.    Fair enough.

23            So the fuss or the disagreement

24   was "make" versus "sold"?

1           MR. STERN:  Objection to the

2      form.

3      A.    Correct.

4      Q.    And help me out, sir.

5            You didn't make, but you

6   acquired it?

7      A.    Correct.

8      Q.    And then sold it?

9      A.    Yes.

10     Q.    Does that mean you had a

11  contract manufacturer?

12     A.    Yes.

13     Q.    For each of these columns here

14  in the chart, and I probably should have

15  oriented us a little bit, these are Par

16  opioid drugs as we've identified from, if

17  you will, the order records that Par has

18  provided to us.

19            Fair?

20            MR. STERN:  Objection to the

21      form.

22  BY MR. BUCHANAN:

23     Q.    I'll tell you that.  That's my

24  representation.

Highly Confidential - Subject to Further Confidentiality Review

1              Do you recollect, sir, selling

2     fentanyl-containing products while at Par?

3              MR. STERN:  Objection to the

4         form.

5         A.    Par sold two forms of fentanyl

6     products.

7         Q.    Okay.  They sold fentanyl

8     citrate?

9         A.    Yes.

10        Q.    And that's the lozenge or

11    lollipop?

12        A.    Correct.

13        Q.    You also sold fentanyl patch?

14        A.    We sold fentanyl patch for a

15    period of time.

16        Q.    Okay.  You also sold Morphine,

17    right?

18              MR. STERN:  Objection to the

19        form.

20        A.    We sold Morphine.

21        Q.    Okay.  Same qualification that

22    you provided with regard to fentanyl, sir.

23    That you sold it but didn't make it?

24              MR. STERN:  Objection to the

1     form.

2     A.     Par manufactured and sold

3  Morphine.

4     Q.     You did, okay.

5            Let's look at oxycodone ER, sir.

6            That would be the OxyContin,

7  right?

8     A.     Yes.

9     Q.     So, Par, did they manufacture

10 and sell generic OxyContin?

11    A.     No.  Par sold.

12    Q.     Okay.  And with regard to

13 hydrocodone, looks like you sold some

14 liquids.  That would be the active

15 ingredient in Vicodin hydrocodone, right?

16            MR. STERN:  Objection to the

17       form.

18            MR. BUCHANAN:  I'll withdraw.

19 BY MR. BUCHANAN:

20    Q.     Hydrocodone, that's the active

21 ingredient in Vicodin?

22    A.     Correct.

23    Q.     And you sold hydrocodone

24 liquids, fair?

Highly Confidential - Subject to Further Confidentiality Review

1     MR. STERN:  Objection to the

2     form.

3     A.    Par sold, did not manufacture,

4     Tussionex.

5     Q.    Okay.  And, certainly you were

6     kind of boots on the ground, so to speak,

7     or maybe not on the ground, but you were

8     at Par between 2010 and 2015 when these

9     products were either being made and sold

10    or sold by Par.

11          Fair?

12    A.    Fair.

13    Q.    Okay.  You have recollection

14    that those were, in fact, active products

15    in the Par portfolio eligible for

16    purchase.

17          Fair?

18    A.    Yes.

19    Q.    Okay.  You can set that aside.

20          MR. BUCHANAN:  You can take that

21    down, Corey.  Thank you.

22    BY MR. BUCHANAN:

23    Q.    We're doing pretty good on

24    agreeing with one another on the various

1    facts, sir.  I imagine we'll have some

2    fuss at some point today, but I want to

3    see if there's an area where we agree

4    there's no fuss.

5              No dispute, sir, that there is

6    an opioid epidemic in the country today.

7              Fair?

8              MR. STERN:  Objection to the

9        form.

10   A.    There's no dispute that there's

11   an opioid abuse epidemic.

12   Q.    You're qualifying it with the

13   word "abuse"?

14   A.    Correct.

15   Q.    I see.

16             When did you become aware that

17   there was an opioid epidemic of any form,

18   sir?

19             MR. STERN:  Objection to the

20       form.

21   A.    Where it resonated was in the

22   2015 time frame.

23   Q.    Okay.

24             MR. BUCHANAN:  Can I have

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 1?

2         (Campanelli Exhibit 1, document,

3    was marked for identification, as of

4    this date.)

5    BY MR. BUCHANAN:

6    Q.    To make this, I guess, easy

7    today, hopefully.  We'll see if it works.

8    We've got a good portion of the day's

9    exhibits in a binder before you.  We've

10   got a copy for your counsel.

11        MR. BUCHANAN:  Here you are

12   (handing).  There you go.

13   Q.    The tab is the exhibit number.

14   So when I say go to Exhibit 1, please, you

15   can just go to Tab 1.  Okay.

16        I will reference additional

17   numbers today.  That's more for my tech

18   down the end of the table so he can put

19   them up on the screen for our benefit.

20        MR. STERN:  Mr. Buchanan, excuse

21   me.  These will be marked.  There's no

22   exhibit stickers on mine.  They're

23   going to be -- we can deal with this

24   on a break.  We just need to make sure

1    we get them in the record the right

2    way.

3         MR. BUCHANAN:  The witness's are

4    marked.

5         MR. STERN:  They are, okay.

6         MR. BUCHANAN:  We have an

7    exhibit tab in the corner, hopefully

8    if we've passed you the right binder,

9    sir.

10        MR. STERN:  Yep.  Thank you.

11        (Pause.)

12  BY MR. BUCHANAN:

13    Q.    Sir, before you is --

14        MR. STERN:  I'm sorry,

15    Mr. Buchanan.  Can we straighten

16    out -- we can go off the record for a

17    minute?  It will be my time.  I just

18    want to straighten out the binders.

19        MR. BUCHANAN:  That's fine.

20        THE VIDEOGRAPHER:  All right.

21    The time is 9:47 a.m.

22        Off the record.

23        (Discussion held off the

24    record.)

Highly Confidential - Subject to Further Confidentiality Review

 1              THE VIDEOGRAPHER:  Okay.  The

 2       time is 9:47 a.m.

 3              Back on the record.

 4    BY MR. BUCHANAN:

 5       Q.    Sir, do you have before you the

 6    binder that we passed you with exhibits

 7    for today?

 8       A.    Yes.

 9       Q.    Okay.  If you turn to Tab 1,

10    that should be Exhibit 1 for today's

11    deposition.  There should be a notation on

12    the bottom right corner.

13       A.    Okay.

14              MR. BUCHANAN:  I'm going to ask

15       my tech, please, to pull up 1888,

16       E1888, for those viewing this.

17       Q.    Sir, in 2011, the CDC declared

18    an epidemic, right?

19       A.    I'm not sure that's what this is

20    saying.

21       Q.    Well, before you, sir, we have

22    the November 2011 CDC Vital Signs Alert,

23    correct?

24       A.    Correct.

1    Q.    It says: Prescription painkiller

2    overdoses in the U.S.

3         Do you see that?

4    A.    Yes.

5    Q.    Let's look at the first

6    sentence.

7         Could you read that into the

8    record, sir?

9    A.    (Reading) Deaths from

10   prescription painkillers - with an

11   asterisk - have reach epidemic levels in

12   the past decade.

13   Q.    Okay.  Let's pause on that.

14        In 2011, the CDC declared a

15   prescription painkiller death overdose

16   epidemic.

17        Correct?

18        MR. STERN:  Objection to the

19   form.

20   A.    That's what it says.

21   Q.    And we see what prescription

22   painkillers are being referred to,

23   correct?

24   A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    There's a footnote at the bottom

2     it says:  Prescription painkillers refers

3     to opioid or narcotic pain relievers,

4     including drugs such as Vicodin - in

5     parentheses - hydrocodone.

6                You see that?

7          A.    I see it.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16      Q.    Let's go to the next page, sir.

17           (Reading) Overdose deaths from

18   prescription painkillers have skyrocketed

19   during the past decade.

20           Do you see that at the top of

21   the page, sir?

22      A.    Yes, I see the words.

23      Q.    This is the CDC, right?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Center For Disease Control end

2    of 2011, correct?

3    A.    Correct.

4    Q.    Did you have that awareness,

5    sir?

6         MR. STERN:  Objection to the

7         form.

8    BY MR. BUCHANAN:

9    Q.    As of the end of 2011 or prior

10   to 2015, sir?

11   A.    No, I did not have that

12   awareness.

13   Q.    It states again:  Problem.

14        You see that on the left in

15   white.

16        (Reading) Prescription

17   painkiller overdoses are a public health

18   epidemic.

19        You see that, sir?

20   A.    I see that.

21   Q.    (Reading) Prescription

22   painkiller overdoses killed nearly 15,000

23   people in the U.S. in 2008.  This is more

24   than three times the 4,000 people killed

Highly Confidential - Subject to Further Confidentiality Review

1    by these drugs in 1999.

2              You see that?

3        A.    I see it.

4        Q.    It's getting bad.

5              MR. STERN:  Object to the form.

6    BY MR. BUCHANAN:

7        Q.    Right?

8        A.    What's getting bad?

9        Q.    This problem.

10             Prescription painkiller

11   overdoses are a public health epidemic.

12             Is that not bad?

13       A.    That's bad.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.    Well, let's read the next

3   bullet.  I'm sorry, the second bullet

4   after that:  Many states report problems

5   with pill mills.

6            Do you see that?

7      A.    Yes.

8      Q.    What's a pill mill, sir?

9      A.    These are pain clinics that are

10   misusing opioids or other controlled

11   substances.

12      Q.    Pain clinics, there's a doctor

13   there, right?

14      A.    It's my understanding.

15      Q.    There's often a long line of

16   people in there, right?

17            MR. STERN:  Objection to the

18      form; lack of foundation.

19      A.    I don't know that answer.

20      Q.    Do you have any foundation on

21   that?  I mean, you're not aware of what

22   pill mills look like?

23      A.    I'm aware --

24            MR. STERN:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm aware of what a pill mill

2  is.

3          I'm not aware of long lines

4  coming out of pill mills.

5    Q.    Doctors having their assistants

6  fill out prescriptions for patients

7  without actually conducting even a visit,

8  right?

9          MR. STERN:  Object to the form.

10 BY MR. BUCHANAN:

11   Q.    Or an examination?

12         MR. STERN:  Objection to the

13   form.

14   A.    That appears to be a legal, that

15 I -- something I don't know much about.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16   A.   Could you point me to where

17   you're looking?

18   Q.   Yeah.  It's on the right-hand

19   side of the chart on the screen.  That's

20   the easiest way for me to orient you.

21   A.   Okay.  Thank you.

22   Q.   No worries.

23   A.   I see that back in 2011, yes.

24   Q.   (Reading) Many states report

Highly Confidential - Subject to Further Confidentiality Review

1    problems with pill mills where doctors

2    prescribe large quantities of painkillers

3    to people who don't need them medically.

4    Some people also obtain prescriptions from

5    multiple prescribers by doctor shopping.

6              Do you see that, sir?

7        A.    I see it.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7            MR. BUCHANAN:  Okay.  Can we go,

8     please, to point 3.

9            Let's -- can we blow up that

10    chart on the top right?

11    Q.    And there's probably an easier

12  to read blowup on your screen, sir.

13           We're at 1888.3.  Again still in

14  Exhibit 1.  Rates of prescription

15  painkiller sales, death and substance

16  abuse treatment admissions 1990 to 2010.

17           Do you see that, sir?

18    A.    Yes.

19    Q.    It plots three things, right?

20    A.    Yes.

21    Q.    Sales.

22           Do you see that?

23    A.    Yes.

24    Q.    Deaths?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And treatment, right?

 3        A.    Yes.

 4        Q.    Sales going up over the years.

 5              See that?

 6        A.    Yes.

 7        Q.    Deaths going up over the years.

 8              See that?

 9        A.    Yes.

10        Q.    Treatment admissions going up

11   over the years?

12        A.    I see it.

13        Q.    Not good.

14              MR. STERN:  Objection to the

15        form.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16    Q.    What is the CDC, sir?

17    A.    Center For Disease Control.

18    Q.    The CDC declared a prescription

19    drug epidemic.

20         MR. STERN:  Objection to the

21         form.

22    BY MR. BUCHANAN:

23    Q.    In 2011.

24         MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1        form.

2    BY MR. BUCHANAN:

3        Q.    Right?

4        A.    That's what it says.

5        Q.    You at Par in 2011 were the CEO

6    of a drug company, right?

7        A.    No.

8        Q.    In 2012, sir?

9        A.    Yes.

10       Q.    A month after this came out?

11       A.    Yes.

12       Q.    Endo was in the opioid business,

13   in a big way, in 2011, right?

14             MR. STERN:  Objection to the

15       form.

16       A.    Endo sold several products that

17   contained opioids.

18       Q.    Endo's Qualitest subsidiary that

19   it bought in 2010 was in opioids in a big

20   way?

21             MR. STERN:  Object to the form.

22       A.    Qualitest manufactured and sold

23   a number of -- of opioid-based products.

24       Q.    Would you agree, sir, that

Highly Confidential - Subject to Further Confidentiality Review

1    there's a direct correlation -- there's a

2    direct correlation on this chart between

3    increasing sales, increasing deaths and

4    increasing treatments?

5            MR. STERN:  Objection to the

6        form; lack of foundation.

7        A.     That's what it says.

8        Q.     Do you agree?

9            MR. STERN:  Objection to the

10       form.

11   BY MR. BUCHANAN:

12       Q.     As the CEO of a pharmaceutical

13   company in this space?

14           MR. STERN:  Objection to the

15       form; lack of foundation.

16       A.     Can you just repeat the question

17   one more time for me, sir?

18       Q.     Do you agree, sir, that there's

19   a direct correlation on this chart between

20   increasing sales, increasing deaths and

21   increasing treatments?

22           MR. STERN:  He answered that

23       question.  You asked a different

24       question.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Clearly you can see all three

2    lines are increasing over -- over time.

3    Q.    You agree there's a correlation

4    between them?

5         MR. STERN:  Objection; form;

6    lack of foundation.

7    A.    I certainly would like to have

8    more information tied back to this

9    document I've never seen before, but I can

10   see over time how as sales are increasing,

11   deaths are increasing and treatment is

12   also increasing.

13   Q.    So, it would seem to reason,

14   sir, that --

15        MR. BUCHANAN:  Withdrawn.

16   Q.    If I could, sir, I'd like to

17   take you to Exhibit 3.

18        (Campanelli Exhibit 3, document,

19   was marked for identification, as of

20   this date.)

21   BY MR. BUCHANAN:

22   Q.    Should be the third tab in your

23   binder.  Let's just make sure you and your

24   counsel are in synch.

Highly Confidential - Subject to Further Confidentiality Review

1          You appear to be.

2          MR. BUCHANAN:  Corey, Exhibit 3

3     is E715.

4     BY MR. BUCHANAN:

5          Q.    Exhibit 715, sir, is a document

6     from 2011 concerning Endo's REMs.  And I'd

7     like to take you to, specifically --

8     you're welcome to peruse the pages, if

9     you'd like.  I'm going to take you to

10     dot-15.  And this is an Endo internal

11     document.

12          You see the Bates numbers in the

13     bottom right corner, sir?

14          A.    Yes.

15          Q.    It indicates that we received

16     these files from -- from the company.

17          And this is a slide prepared by

18     the company.

19          A.    Do you want me to go to the

20     slide?

21          Q.    Yeah, if you could.  It's

22     715.15.

23          MR. STERN:  When Mr. Buchanan

24     says dot-15, look at the top right.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BUCHANAN:  And I guess it's

2      going to be hard.  You have to turn

3      landscape.  So give yourself enough

4      room to turn the binder.

5           THE WITNESS:  Okay.  I'm sorry.

6           MR. BUCHANAN:  No worries.

7           THE WITNESS:  Okay.

8  BY MR. BUCHANAN:

9      Q.    Before you, sir, is Exhibit 3.

10  We're on page dot-15.

11           You see there's a slide within a

12  slide, so to speak, right?

13      A.    I see it, yes.

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8       Q.    Okay.  You've seen the 2016 CDC

9    guidelines?

10      A.    Where am I --

11      Q.    Have you seen the 2016 CDC

12   guidelines, sir?

13      A.    No, I have not.

14      Q.    Could you go, please, to

15   Exhibit 2.

16            (Campanelli Exhibit 2, document,

17       was marked for identification, as of

18       this date.)

19            MR. BUCHANAN:  Corey, could you

20       pull up E729?

21   BY MR. BUCHANAN:

22      Q.    Sir, let's go to the first page,

23   dot-1.  CDC guideline for prescribing

24   opioids for chronic pain.  United States

Highly Confidential - Subject to Further Confidentiality Review

1   2016.

2            Do you see that?

3   A.    I do.

4            MR. BUCHANAN:  Let's go to

5   dot-4, Corey.

6            Actually, let's just pull up

7   slide 44, Corey.  And we'll just mark

8   this.

9            You can look at the full

10  document, sir.  At any point when I

11  show you a slide today that's based on

12  an exhibit, feel free to look at the

13  full.

14           THE WITNESS:  Okay.

15           MR. STERN:  I'm sorry,

16  Mr. Buchanan.  I don't have a 44.

17           MR. BUCHANAN:  It's being passed

18  over to you.

19           MR. STERN:  Thank you.

20           MR. BUCHANAN:  I wasn't sure we

21  were going to need to use it.

22           What exhibit number?

23           This is Exhibit 205, a

24  demonstrative aid, sir.

```
 1              (Campanelli Exhibit 205,

 2         document, was marked for

 3         identification, as of this date.)

 4    BY MR. BUCHANAN:

 5         Q.    You are free, of course, to look

 6    at the page, which is dot-4, or you're

 7    free to look at the demonstrative that's

 8    on the screen.

 9              MR. STERN:  Just to be clear,

10         Mr. Buchanan, for the record, what's

11         Exhibit 205, the demonstrative is not

12         the same thing as dot-4.  You just

13         said he can look at the screen or he

14         can look at --

15              MR. BUCHANAN:  It is.  It is.

16              MR. STERN:  What?  I may be on

17         the wrong 44.

18              MR. BUCHANAN:  I'm sorry.

19              You know what, let's clarify.

20              MR. STERN:  Should we hold on to

21         these?

22              (Pause.)

23              MR. BUCHANAN:  I'm not clear on

24         the confusion, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  Your representation

2     made it seem as though, and maybe I

3     misunderstood you, that dot-4 of

4     Exhibit 2 was the same document as

5     205.

6          So here's dot-4 and here's 205

7     (indicating).

8          MR. BUCHANAN:  Let me see.

9          MR. STERN:  These may be

10    excerpts.

11         MR. BUCHANAN:  No.  To be clear,

12    in the top right corner it says E729

13    of the --

14         MR. STERN:  Right.

15         MR. BUCHANAN:  Okay.  E729, sir,

16    is the source of the quotes that are

17    on the slide.

18         MR. STERN:  The source.  I'm

19    sorry.

20         I just want the record to be

21    clear that what is portrayed on 205 is

22    the not same thing as the text of

23    dot-4.

24         MR. BUCHANAN:  That's fine.  I

Highly Confidential - Subject to Further Confidentiality Review

1      accept that, sir.  The text is as

2      reflected --

3              MR. STERN:  In here.

4              MR. BUCHANAN:  Yes.

5              For simplicity for the witness

6      on a dense page, we prepared these.

7   BY MR. BUCHANAN:

8      Q.    Sir, you are free to refer to

9   E729.4, which is the hard copy of the

10  document.

11             MR. STERN:  May I have a moment,

12     Mr. Buchanan, just to explain to Mr.

13     Campanelli.

14             So, this dot-4 refers to that

15     dot-4.

16             THE WITNESS:  Got it.

17             MR. STERN:  And these are

18     purported to be excerpts of this page.

19     This is the preceding page, the dot-3.

20             THE WITNESS:  Okay.

21  BY MR. BUCHANAN:

22     Q.    With that confusion hopefully

23  clarified either some by me or others, I'm

24  not sure, but I am ready to go if you are,

1    sir.

2          Are you familiar that the CDC

3    issued guidelines concerning the

4    prescription of opioids for chronic pain

5    in 2016?

6    A.    Not specifically.

7    Q.    Okay.  In their prescribing

8    guidelines, sir, they describe the

9    epidemic.

10         You see that on page dot-4 of

11   Exhibit 2?

12   A.    This sheet, sir (indicating)?

13         Where am I looking?  Am I

14   looking at this sheet?

15   Q.    You can look at either.

16   A.    I see these words.  I assume

17   that they're in the same.

18   Q.    (Reading) From 1999 to 2014,

19   more than 165,000 people -- persons died

20   from overdose related to opioid pain

21   medications in the United States.

22         Do you see that, sir?

23   A.    I see that.

24   Q.    That's alarming, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    That is not good.

 3                MR. STERN:  Objection to the

 4          form.

 5   BY MR. BUCHANAN:

 6          Q.    Fair?

 7          A.    Fair.  Very bad.

 8          Q.    We saw, sir, a moment ago the

 9   direct correlation between sales and

10   deaths.

11                Do you recall that?

12          A.    I saw the sales going up and I

13   saw the increase in deaths, yes.

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So then would it be fair

2    to say, sir, that you recognized that your

3    sale of opioid products was leading to

4    over -- overdose deaths?

5         MR. STERN:  Objection to the

6         form; lack of foundation.

7    A.    We were aware in 2016 when the

8    product was abused or misused it would

9    lead or could lead to deaths.

10    Q.    Okay.  We'll talk about that in

11    greater detail a little later.

12    A.    Okay.

13    Q.    (Reading) In the past decade -

14    according to the CDC - while the death

15    rates for the top leading causes of death,

16    such as heart disease and cancer, have

17    decreased substantially, the death rate

18    associated with opioid pain medications

19    has increased markedly.  Sales of opioid

20    pain medication have increased in parallel

21    with opioid-related overdose deaths.

22         Do you see that, sir?

23    A.    I see that.

24    Q.    That's the point we were talking

Highly Confidential - Subject to Further Confidentiality Review

1    about?

2             MR. STERN:  Mr. Buchanan, I

3        apologize.  Can you, as you're doing

4        this, it's totally fine, I understand

5        what you're doing.  Can you at least

6        give us -- tell us where these

7        excerpts are appearing on the page?

8             MR. BUCHANAN:  I'm happy to have

9        somebody try and highlight this as we

10       proceed.  I'd rather continue with my

11       examination in the form that I'm

12       doing.

13            MR. STERN:  Okay.  Well, then

14       hold on just one moment so I can

15       orient myself.

16            (Pause.)

17            MR. STERN:  Thank you.

18   BY MR. BUCHANAN:

19       Q.    And just before counsel's

20   question or interruption, I want to get

21   back to my question.

22            That was:  In the past decade,

23   while the death rates for the top leading

24   causes of death, such as heart decease and

Highly Confidential - Subject to Further Confidentiality Review

1    cancer, have decreased substantially, the

2    death rate associated with opioid pain

3    medication has increased markedly.  Sales

4    of opioid pain medication have increased

5    in parallel with opioid-related overdose

6    deaths.

7              Did I read that correctly, sir?

8        A.    Yes.

9        Q.    Okay.  That's that point we were

10   talking about a moment ago, sir, that

11   direct correlation between increasing

12   sales and increasing prescription overdose

13   opioid deaths, correct?

14       A.    I see the parallel.

15       Q.    (Reading) In 2013 - the CDC

16   continues - on the basis of DSM-IV

17   diagnosis criteria, an estimated 1.9

18   million persons abused or were dependent

19   on prescription opioid pain medications.

20             Do you see that, sir?

21       A.    I do.

22       Q.    That's not good.

23             MR. STERN:  Object to the form.

24

1   BY MR. BUCHANAN:

2       Q.    Do you agree?

3       A.    Is that a question?

4       Q.    It is.

5       A.    I'm sorry.  Could you ask it

6   again?

7       Q.    Do you agree, sir, that that's

8   not good?

9            MR. STERN:  Object to the form.

10      A.    1.9 million persons abuse is not

11  good.

12      Q.    Does it surprise you, sir, that

13  that abuse and dependence is having real

14  consequences on communities in this

15  country?

16           MR. STERN:  Object to the form.

17      A.    I'm aware of the impact in the

18  communities.

19      Q.    You're aware of the billions and

20  billions of dollars of financial impact,

21  human toll, loss of life, disruption to

22  family --

23           MR. STERN:  Objection.

24      Q.    -- that is being suffered in the

1    communities in this country.

2              True?

3              MR. STERN:  Objection to form;

4       lack of foundation.

5       A.    I'm certainly -- I'm not aware

6    of the dollar amount you just indicated,

7    but clearly I am aware and sympathetic to

8    the families in the communities all around

9    the United States.

10      Q.    That awareness, sir, you

11   reached, it took four years, four years

12   for you, sir, as a pharmaceutical

13   executive, CEO of a company, to even

14   become aware of the existence of a

15   problem?

16             MR. STERN:  Objection to the

17      form and mischaracterizing --

18   BY MR. BUCHANAN:

19      Q.    Following the CDC announcement

20   in 2011?

21             MR. STERN:  Objection to the

22      form and mischaracterizing the

23      witness's testimony.

24      A.    As I said before, in 2015, the

1    2015 time frame, it started to resonate

2    with me.

3        Q.    Would it surprise you, sir, if

4    this had resonated with people, with

5    families, with government agencies, with

6    the CDC in a massive human toll all around

7    you for years and years before 2015?

8              MR. STERN:  Objection to the

9        form; lack of foundation.

10       A.    Can you -- can you rephrase that

11   for me so I understand it better?

12       Q.    I'm saying, sir, would it

13   surprise you, there's 165,000 overdose

14   deaths secondary to prescription pain

15   medication between 1999 and 2014 and

16   you're saying, sir, that did not resonate

17   with you until 2015?

18             MR. STERN:  Objection to the

19       form.

20       A.    I was aware of an issue in terms

21   of the use of it being an epidemic abuse

22   issue, that did not resonate with me until

23   2015.  In my role, again, I was aware of

24   orders that would come in to our office

Highly Confidential - Subject to Further Confidentiality Review

1    and we would process in normal course

2    based upon wholesaler use.  That's what we

3    were doing.

4        Q.    By definition, sir, as the

5    company selling controlled substances, you

6    know those substances, people want to get

7    them out of that controlled system, right?

8             MR. STERN:  Object to the form.

9        A.    We have systems and procedures

10   to protect against that.

11       Q.    They are products that are

12   targets for abuse and diversion, right?

13            MR. STERN:  Object to the form;

14        lack of foundation.

15       A.    They could be.  And that's why

16   we have systems and procedures and safes

17   and security cameras to help curb that.

18       Q.    165,000 people in 15 years died

19   from these pain medications in the United

20   States.

21            You see that?

22            MR. STERN:  Object to the form.

23       A.    I see it.

24       Q.    The estimate was in 2011 some

1    400,000 treatment admissions every year

2    for opioid-related treatment secondary to

3    addiction or dependence.

4            You recall that?

5    A.    No.  I'm not following the

6    question, sir.

7    Q.    Do you recall in the 2011 sheet,

8    sir, 400,000 or so admissions for

9    treatment?

10   A.    Okay.  I recall that.

11   Q.    Does it surprise you, sir, that

12   there is a vast human toll that goes back

13   not just to 2015, 10, 15, 17, 18 years

14   since you were marketing and promoting

15   these drugs?

16           MR. STERN:  Objection to the

17       form.

18   A.    As I sit here today, I clearly

19   understand it.  It's a terrible situation.

20   We also have a duty and a responsibility

21   that there's millions of people that need

22   these drugs as well.

23           It's a terrible situation on the

24   deaths.  I admit to that.  And for that a

Highly Confidential - Subject to Further Confidentiality Review

1    lot of people feel terrible, including

2    myself.

3        Q.    How many hundreds of people did

4    Par have working at in 2012, 2013, 2014?

5        A.    I'm sorry?

6        Q.    How many hundreds of people did

7    Par have working at it in 2012, '13, '14?

8        A.    Probably about a thousand.

9        Q.    Not one of a thousand people,

10   sir, in that entity brought the epidemic

11   to your desk and said "I've got real

12   concerns about what we're doing here"?

13       A.    As I sit here today, I don't

14   recall.  I'm not saying it didn't happen,

15   but I don't -- I don't recall that

16   happening.

17            MR. BUCHANAN:  I suggest we take

18       a short break.

19            MR. STERN:  Sure.

20            THE VIDEOGRAPHER:  Remove your

21       microphones, please.

22            The time is 10:38 a.m.

23            Off the record.

24            (Recess taken.)

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE VIDEOGRAPHER:  We are back
2        on record.
3              The time is 10:53 a.m.
4   BY MR. BUCHANAN:
5        Q.    Sir, I'd like to circle back to
6   where we were finishing.  We were talking
7   about kind of where we were, so to speak,
8   in the last several years with regard to
9   this epidemic.
10             I want to kind of see where your
11  products kind of fit into the mix, if
12  that's okay.
13             Do you still have Exhibit 202?
14  You remember that pill chart we were
15  looking at?
16             MR. BUCHANAN:  Can you pull up
17        202, Corey?  Slide 20.
18  BY MR. BUCHANAN:
19        Q.    And these are the various
20  products that Endo has marketed and sold
21  over the years, correct, sir?
22        A.    I -- I know that it's marketed
23  Opana.  I'm not sure if it marketed or
24  pro -- I know it marketed and promoted
```

Highly Confidential - Subject to Further Confidentiality Review

1    Opana and Percocet.  That I do know.

2        Q.    Okay.  Two big brands for the

3    company?

4        A.    Two brands, yes.

5        Q.    Okay.  Let's -- let's kind of

6    talk about what that means in terms of

7    sales.

8            MR. BUCHANAN:  I'm sorry.  Can

9        we go off the record for a moment?

10           THE VIDEOGRAPHER:  The time is

11       10:55 a.m.

12           Going off the record.

13           (Recess taken.)

14           (Campanelli Exhibit 206,

15       document, was marked for

16       identification, as of this date.)

17           THE VIDEOGRAPHER:  We are back

18       on the record.

19           The time is 11:03 a.m.

20   BY MR. BUCHANAN:

21       Q.    Sir, passing you what we've

22   marked as Exhibit 206.  This is a chart of

23   Endo's various products over the years and

24   sales volume in pills, or extended units.

 1     I'll represent to you, sir, that it's

 2     generated from data that's been identified

 3     to us by defense counsel, Endo's counsel,

 4     in this litigation.

 5             We can see --

 6             MR. BUCHANAN:  If you go to the

 7         far left column, please, Corey.

 8     Q.    We can see, if you will, various

 9     products listings on the left and we can

10     see sales volume in extended units.

11     That's pills, or conversions for other

12     types of formulations, over the various

13     years.  And we see going back to 1999 Endo

14     was making Endocet.

15             You see that, sir?

16     A.    Yes.

17     Q.    I think you told us, and we saw

18     in the prior exhibit, that Endocet was a

19     generic form of Percocet, right?

20     A.    Correct.

21     Q.    So, in 1999, Endo made some 160

22     million Endocet tablets, according to

23     shipment data and reflected on this chart,

24     correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Yes.

 2        Q.     We see Percocet, some hundred

 3    million or so tablets, 102, 101.

 4               You see that?

 5        A.     Yes, I see it.

 6        Q.     Okay.

 7               MR. BUCHANAN:  And we can scroll

 8        it all the way to the right, maybe,

 9        Corey.  If you can split the screen so

10        we can kind of see where we were with

11        the product listing on the left and

12        the total pills that were sold on the

13        right.

14               There's a totals column, Corey.

15        Can you just give us the totals?

16               There we go.  Great.

17               Can you get them to the same

18        scale, roughly, so we can line them

19        up?  And really all I need is the

20        totals column, Corey.

21               Thank you.

22               There we go.  And if you can

23        mush them together so we can kind of

24        see the products and see the totals.
```

1    And they're a little off, I guess.

2              There we go.

3    BY MR. BUCHANAN:

4        Q.    So, you can see, sir, Endocet

5    total sales of this Percocet generic

6    formulation over the years roughly 4.2

7    billion pills.

8              You see that, sir?

9              MR. STERN:  Objection to the

10    form.

11       A.    No.  No, I don't see that.

12       Q.    If you go to the far right

13    column total pills sold over the course of

14    the period of time?

15       A.    You -- your question flipped on

16    me, just so you know.

17       Q.    Fair enough.  Sorry about that.

18             Do you understand my question

19    now to be referring to total sales of

20    Endocet between the period of time they

21    started selling it until they stopped

22    would be about 4.2 billion Endocets?

23       A.    I think you need to clarify your

24    question, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And, what's confusing about it,

2    or what's tripping us up?

3    A.    Are you saying sales or units,

4    sir?

5    Q.    I'm sorry.  Sales of those

6    units.

7          These are, in fact, the units

8    that have been represented as sold to us.

9    A.    Okay.

10         MR. STERN:  Not dollars, is the

11    point.

12         MR. BUCHANAN:  Fair.

13         MR. STERN:  Right.

14         MR. BUCHANAN:  Fair.

15   BY MR. BUCHANAN:

16    Q.    And I'm -- you sold this volume

17    of pills, sir?

18    A.    This sheet indicates that we've

19    sold these unit -- extended units of these

20    pills.

21    Q.    Fair enough.  Thank you.

22          Yeah, I did not mean to suggest

23    that these are dollars.  There's a legend

24    at the top that I think reflects extended

1    units.  That's what we're talking about

2    with these numbers.

3        A.    Okay.

4        Q.    Okay.  And we're looking at just

5    the Endo numbers in this chart, I'll

6    represent to you, sir.  Okay.

7            MR. STERN:  Objection to the

8        form.

9    BY MR. BUCHANAN:

10        Q.    So, we see roughly 4.2 billion

11    Endocet units, that's pills, over the time

12    that Endo provided us data from '99 to

13    present, right?

14        A.    4.2 billion extended units.

15        Q.    For Percocet we see, as the

16    brand, Endo's brand, we see some 1.6

17    billion extended units, correct?

18        A.    Correct.

19        Q.    All right.  So, those two

20    oxycodone acetaminophen combinations

21    represent almost, what, 6 billion pills

22    sold by Endo for that controlled

23    substance.

24            Is that right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    About 5.6, 5.7 billion units,

2   yes.

3      Q.    Yeah, 5.8 even?

4      A.    Okay.

5      Q.    There's another line in there

6   oxycodone APAP, I guess they sold a

7   different formulation of Percocet there,

8   right?  Or another -- another formulation?

9      A.    It's a formulation of oxycodone,

10  yes.

11     Q.    Okay.  And there's some

12  additional sales off to the right.

13  Doesn't look like too much, I guess,

14  right?  Just a million pills, or 845,000?

15          MR. STERN:  Objection to the

16      form.

17      A.    845,000 extended units.

18      Q.    Okay.  And, so, we also see that

19  branded product that you all sold

20  Opana ER --

21          MR. STERN:  Objection.

22      Q.    -- close to 500 million units

23  sold in that product, right?

24          MR. STERN:  Objection to the

1      form.

2      A.     Almost 500 million unit --

3    extended units of Opana ER.

4      Q.     Okay.  And then Morphine, we

5    talked about that on the -- the product

6    chart earlier today, some 1.1 billion

7    units of Morphine, right?

8      A.     1.1 billion extended units, yes.

9      Q.     Okay.  So, look, we don't have

10   to go through each of these line items to

11   get them into the record, but it's some

12   8.2 billion extended units over the period

13   of time that we received data from Endo

14   for, correct?

15     A.     Yes, that's what it says.

16          MR. BUCHANAN:  Okay.  Could I

17     have the chart, please, for Qualitest?

18   BY MR. BUCHANAN:

19     Q.     We looked at that kind of

20   corporate history chart earlier today,

21   sir, and saw that in 2010, Endo acquired

22   either Qualitest, or the assets of

23   Qualitest.

24          Do you recall that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Yes.

 2        Q.     Okay.  That was roughly 2010, I

 3   believe, when that happened.

 4               (Campanelli Exhibit 208,

 5          document, was marked for

 6          identification, as of this date.)

 7   BY MR. BUCHANAN:

 8        Q.     I'm going to pass you Exhibit

 9   208.

10        A.     Are we done with this document?

11        Q.     For the moment, yes.  You can

12   keep them close, but we don't know when

13   we'll need to refer to them.

14               A similar chart, sir, in Exhibit

15   208 to what we looked at for Endo just a

16   moment ago.

17               As we talked about, Qualitest

18   was in the business of making opioid

19   products, right?

20               MR. STERN:  Objection; lack of

21          foundation.

22        A.     Qualitest manufactured opioids,

23   yes.

24        Q.     Okay.  Manufactured a lot of
```

1    them, right?

2         A.    It shows 24 billion unit --

3    extended units.

4         Q.    Let's pause on that.

5              24 billion?

6         A.    Yes.

7         Q.    So, if we look at this chart,

8    sir, we see, boy, making a lot of Vicodin,

9    right?

10             MR. STERN:  Object to the form.

11        A.    Could you show me what product

12   you're referring to?

13        Q.    I'm referring to hydrocodone

14   APAP.

15             Do you see that?

16        A.    Yes.

17        Q.    18 billion pills.

18             You see that, sir?

19        A.    I see it.

20        Q.    That's a lot of Vicodin.

21             MR. STERN:  Object to the form.

22        A.    It's -- it's -- it's significant

23   volume.

24        Q.    Market leader in Vicodin?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. STERN:  Object to the form.

2      A.     That, I don't know.

3      Q.     Okay.  Let's look down to -- and

4   there's other hydrocodone products there,

5   sir, and the jury will obviously have this

6   evidence.  But I -- I would like to call a

7   few things out.

8           If we could, go down to it looks

9   like Qualitest was also making Endocet,

10  correct?

11     A.     Correct.

12     Q.     Do you recall, sir, that after

13  Par -- excuse me.  Qualitest was acquired

14  by Endo, the generic operations of Endo

15  kind of moved into Qualitest operations?

16          MR. STERN:  Object to the form.

17     A.     I'm sorry.  Could you say that

18  one more time?

19     Q.     Yeah.

20          Do you recall, sir, that after

21  Endo acquired Qualitest in 2010, some of

22  the generic portfolio of Endo moved into

23  the operating business of Qualitest?  Do

24  you recall that?

1       A.    I -- I don't know if that

2    happened in 2010.

3       Q.    Okay.

4             MR. BUCHANAN:  Can we scroll,

5       Corey, to just see the years from 2010

6       to -- no, actually, if you could kind

7       of just pull the right one over so we

8       could see 2010.

9       Q.    So, okay.  These are the -- this

10   is product mix.  We see Endocets start to

11   be made by Qualitest in 2011.

12            You see that?

13      A.    I see that.

14      Q.    Okay.  Hundred million pills

15   that year, 358 million the next year, 170

16   million the year after that, and it

17   continues.

18            MR. BUCHANAN:  Could you go to

19      the right, Corey?

20      Q.    For a total of some 880 million

21   Endocets, right?

22      A.    I see that, yes.

23      Q.    And we've also got Qualitest

24   making Percocet, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     87 million Percocets made?

3      A.     Yes.  Qualitest is manufacturing

4   on behalf of Endo at this time.

5      Q.     Okay.  So, yeah, after -- after

6   the time of the merger, some of the pills

7   that used to be made or contracted for by

8   Endo are now being made or contracted for

9   by Qualitest, right?

10     A.     Yes.

11            I'm sorry.  You said 2010.  I

12  just think it's more like 2011, but yes.

13     Q.     And that's just a matter of when

14  the operations get formally integrated,

15  right?

16     A.     Seems reasonable.

17     Q.     Okay.  And, so, let's total this

18  up.  So -- actually, before we do that,

19  there's also this other line item for

20  oxycodone APAP.

21            Do you see that?

22     A.     Yes.

23     Q.     Oxycodone APAP, that would be

24  another way of referring to Percocet,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2        A.    Yes.

3        Q.    Okay.  You got Percocet in,

4    essentially, three different buckets at

5    least, right?

6        A.    There's a generic form in here.

7        Q.    And that would be the oxycodone

8    APAP?

9        A.    Correct.

10       Q.    Okay.  And, so, what we see

11   here, sir, is Qualitest, prior to the time

12   of its acquisition and after the time of

13   its acquisition, pushing out a lot of

14   opioid pills, right?

15            MR. STERN:  Object to the form.

16       A.    I see the volume here on the

17   paper.

18       Q.    25 billion, right?

19       A.    25 billion extended units, yes.

20       Q.    And we can agree that's a lot,

21   right?

22       A.    It's a high volume of -- of

23   opioids, or controlled substances.

24       Q.    I mean, that's -- that's enough

1    for a hundred count bottle for every adult

2    in the United States, right?

3        A.    This is over a 15-year period.

4        Q.    The answer to my question

5    though, sir, would be yes, that is enough

6    for a hundred count bottle hydrocodone,

7    oxycodone, oxymorphone, collection of

8    opioid pills manufactured by Qualitest for

9    every adult in the United States, correct?

10           MR. STERN:  Objection to the

11       form.

12       A.    I don't -- I don't know the

13   answer to that.

14       Q.    The answer is you just don't

15   know the population of adults in the

16   United States?

17       A.    That's correct.

18       Q.    Okay.  Does it surprise you that

19   Qualitest made that many opioids?

20           MR. STERN:  Object to the form.

21   BY MR. BUCHANAN:

22       Q.    I just want to -- are you -- are

23   you learning this sitting here today, or

24   did you have that awareness before you

Highly Confidential - Subject to Further Confidentiality Review

1    came in today?

2        A.    I did not have the specific

3    volume, but it's not surprising that

4    Qualitest had historically been known as

5    an opioid producer.  So that -- that --

6    that's -- that's factual.  That's known in

7    the industry.

8        Q.    Let's look at the bottom, if we

9    could, sir.

10            MR. STERN:  I'm sorry, the

11        bottom -- are we still on?

12            MR. BUCHANAN:  We're still on

13        this exhibit.

14            MR. STERN:  208.

15            MR. BUCHANAN:  Thank you.

16        Exhibit 208.

17    BY MR. BUCHANAN:

18        Q.    The screen may or may not be

19    easier.  I think probably your -- you can

20    probably read it just fine if you look on

21    the exhibit itself.

22            But, we see, I mean, Qualitest

23    volume of opioids grew quite dramatically.

24            MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

 1      form.

 2    BY MR. BUCHANAN:

 3      Q.     True?

 4      A.     The generic versions of what

 5    they were producing increased.

 6      Q.     And, so, we look at the counts

 7    and we go back to 2001.  In fairness, sir,

 8    I don't know if that's a full 2001 year's

 9    worth of data.  This is everything that we

10    were given.

11           2001 reports 162, 162 million

12    pills.  I'd suggest probably the better

13    reference point would be 2002.

14           Would you agree with me?

15      A.     I would agree with that.

16      Q.     Okay.  Probably didn't multiply

17    it by five time in one year, right?

18      A.     Unlikely.

19      Q.     So, in 2002, we see Qualitest

20    made some 721 million opioid pills, right,

21    or other extended units?

22      A.     Yes, I see that.

23      Q.     2003 it's grown 846 million,

24    right?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      Growing in 2004 984 million,

3    right?

4       A.      Yes.

5       Q.      Growing in 2005 1.2 billion

6    pills, right?

7       A.      Yes.

8       Q.      Had a little dip in 2006 it

9    looks like, right?

10      A.      Agreed.

11      Q.      997 million.  A little flat

12   there in 2007 at 1.03 billion.

13              You see that?

14      A.      I see it.

15      Q.      A billion in 2008.  And then

16   2009 growing again.

17              Right?

18      A.      I see it.

19      Q.      Okay.  1.3 billion pills in

20   2009?

21      A.      Correct.

22      Q.      One year, right?

23      A.      Yes.

24      Q.      1.6 billion in 2010.

1           True?

2      A.    Yes.

3      Q.    2.4 billion in 2011, right?

4      A.    Yes.

5      Q.    2011 is the year we saw that CDC

6   report about there being an epidemic,

7   right?

8      A.    Yes.

9      Q.    3.3 billion, still rising, in

10   2012, right?

11      A.    Yes.

12      Q.    2013 we're up to 2.9 billion,

13   correct?

14      A.    Correct.

15      Q.    And then 3.7 billion in 2014,

16   right?

17      A.    Yes.

18      Q.    And then in 2015 it's down to

19   2.5 billion, I see, right?

20      A.    Right.

21           MR. STERN:  Mr. Buchanan, if I

22      may.  Ultimately this exhibit will

23      speak for itself.

24           I'd just like to note that we're

Highly Confidential - Subject to Further Confidentiality Review

```
 1         not being entirely precise with these

 2         numbers.

 3              MR. BUCHANAN:  I appreciate

 4         that.

 5    BY MR. BUCHANAN:

 6         Q.   And you can agree, sir, you and

 7    I have both been doing a little rounding

 8    in our dialogue.

 9              Fair?

10         A.   Agreed.

11              MR. BUCHANAN:  The numbers are

12         on the sheet, and I don't think either

13         side is going to fuss with whatever

14         the data shows is the data.

15              Correct, counsel?

16              MR. STERN:  Yes.

17              MR. BUCHANAN:  And I'd be to

18         happy to get a stipulation from

19         counsel and put the precise numbers on

20         so we don't have any fuss about that,

21         but that's not an issue for today.

22    BY MR. BUCHANAN:

23         Q.   All right.  Sir, let's look at

24    the next one.
```

1          All right.  I should indicate in

2     2015, is that the year when Par and

3     Endo/Qualitest came together?

4          A.     Yes.

5          Q.     And there was some realignment

6     of products among the various portfolio

7     companies beginning in 2015?

8          A.     The portfolio were evaluated and

9     we started to synergize products.

10         Q.     Okay.  And would it be fair to

11     say, sir, that some of the loss in volume

12     between 2014 and 2015 is accounted for by

13     the reallocation of products between Endo,

14     Qualitest and Par as part of that merger

15     process?

16              MR. STERN:  Objection; lack of

17         foundation.

18         A.     Could you say that one more time

19     for me, sir?

20         Q.     Sure.

21              Would it be fair to say, sir,

22     that some of the loss in volume between

23     2014 and 2015 as reflected on the sales

24     for Qualitest, in terms of extended units,

Highly Confidential - Subject to Further Confidentiality Review

1    is accounted for by the reallocation of

2    products between Qualitest and Endo or

3    Par, or don't you know?

4        A.    I don't believe there was a

5    reallocation of products between the

6    portfolios, no.  There was not.

7        Q.    When did that begin?

8        A.    Maybe you can just help me.

9    What do you mean by reallocation?

10       Q.    Certain products were deemed to

11   be Qualitest products versus Par products

12   or vice versa, or Endo or Qualitest

13   products or Par products or vice versa, as

14   part of the integration of the companies

15   that began in 2015.

16            Correct?

17       A.    I just want to make sure that

18   I'm understanding your question.  Is

19   that -- is that your rationale for the

20   decline in -- in volume?

21       Q.    I'm just asking you whether that

22   happened.

23       A.    Fair enough.

24            The portfolios were combined.

Highly Confidential - Subject to Further Confidentiality Review

1    The Par and the -- the Par and the

2    Qualitest portfolios were combined.

3        Q.    Okay.  Well, let's take a look

4    now at the Par sheet.  You can set that

5    one aside.

6            MR. BUCHANAN:  Could I have,

7        please, Exhibit 207?

8            (Campanelli Exhibit 207,

9        document, was marked for

10        identification, as of this date.)

11   BY MR. BUCHANAN:

12       Q.    I saw kind of a smile in

13   recognition when you looked at 207, sir.

14            Do you see that's what happened

15   by looking at the Par data?  That, in

16   fact, some products that were not Par

17   products were now kind of on the Par side

18   of the ledger?

19       A.    Agreed.

20       Q.    Okay.

21            MR. BUCHANAN:  Let's pull up,

22        please, E1809, Corey.

23   BY MR. BUCHANAN:

24       Q.    All right.  We have it on the

1    screen here.  This is a spreadsheet that's

2    been generated by us in response to

3    information provided to us by your

4    company, or at least by counsel for the

5    company.  And on the left-hand side, like

6    the other charts, it lists the various

7    products that had been kind of on Par's

8    ledger over the years as orders shipped or

9    manufactured by the company.

10           Do you recognize those products,

11   sir?  Let's look prior to 2015.  Do you

12   recognize those products for which there

13   is shipment data as products that Par was

14   selling during that period of time?

15        A.    Yes.

16        Q.    Okay.  And, so, we see that the

17   company is selling, just for simplicity,

18   sir, we'll look at the pre-2015 period of

19   time just to get a sense of really what

20   the company was doing, okay.

21           Would that be fair?

22        A.    Yes.

23        Q.    Okay.  So, if we look at 2014,

24   for example, this would be some two, three

1    years after the CDC had stated there's an

2    epidemic of prescription dug --

3    prescription drug overdose in this

4    country.

5              Do you see the products that Par

6    was selling that year?

7        A.    Yes.

8        Q.    What products was Par selling?

9        A.    Chlorpheniramine, hydrocodone,

10   which is Tussionex.  It sold the -- the

11   fentanyl patch.  It sold -- I apologize.

12   I went out of order here.  It sold the

13   fentanyl lozenge, again the fentanyl

14   patch.  It sold Morphine extended-release

15   tablets.  It sold an authorized generic

16   version of oxycodone and it sold oxycodone

17   in combination with acetaminophen.

18       Q.    Okay.  And, so, just to drill

19   down on that a little.  I mean, those

20   are -- the names you just read correlate

21   with the pictures we were looking at on

22   that demonstrative earlier today, on that

23   slide?

24       A.    The Par portfolio?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yes.

2    A.    Correct.

3    Q.    Okay.  I just want to make sure

4    that we fairly characterize the Par

5    portfolio.

6              So, in 2014, sir, Par, for the

7    first year in its history, enters the

8    opioid market with Percocet, right?

9    A.    With the oxycodone APAP generic

10   product you're referring to?

11   Q.    That's what I was referring to.

12   And Corey was kind enough to highlight the

13   actual word I spoke, which is fair.

14   A.    Okay.

15   Q.    But I was looking at the

16   oxycodone APAP, that would be the generic

17   equivalent of Percocet, correct?

18   A.    Correct.

19   Q.    You all sold 270 million

20   Percocets that year?

21   A.    Correct.

22   Q.    One for every person in the

23   United States, or close to it?

24   A.    Approximately.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So about 400 million units that

2    year of opioid-containing products, right?

3    A.    Correct.

4    Q.    And as we look forward, sir, we

5    see some 7.7 billion products before and

6    after the merger with Endo attributable to

7    Par, correct?

8    A.    Yes.  With a decrease in the out

9    years, correct.

10   Q.    I think I said products, but

11   more correctly would have said extended

12   units, pills, dosing units, et cetera.

13         Is that fair?

14   A.    Thank you.  Yes.

15   Q.    Okay.  These products that we're

16   talking about, sir, oxycodone APAP

17   hydrocodone, Morphine, these are products

18   that were called out as in the CDC's note

19   from 2011, as part of the prescription

20   drug epidemic.

21         Fair?

22   A.    That's what the documents refer

23   to, yes.

24   Q.    Okay.  What I'd like to do, sir,

Highly Confidential - Subject to Further Confidentiality Review

1    is just kind of, so we can visualize this

2    a little bit.

3              (Pause.)

4              We're going to have one for you

5    as well.

6              MR. BUCHANAN:  This is going to

7       be Exhibit 210.

8              (Campanelli Exhibit 210,

9       document, was marked for

10      identification, as of this date.)

11   BY MR. BUCHANAN:

12      Q.    All right.  So, I'll represent

13   to you, sir, that what we've done, and you

14   can see the source is listed on the

15   bottom, is we've plotted the -- the sales

16   of pills in pills, not dollars, okay.

17   This is the pill volume shipped by the

18   three current Endo entities, Endo,

19   Qualitest and Par.

20              Do you see that?

21              MR. STERN:  Objection; lack of

22      foundation.

23      A.    Yes.

24      Q.    Okay.  We can see, sir, that

1    in -- the merger, obviously, with

2    Qualitest happens in 2010, correct?

3        A.    Endo and Qualitest occurred in

4    2010, yes.

5        Q.    And the merger with Par occurred

6    in 2015, correct?

7        A.    Correct.

8        Q.    What we've included, sir, so

9    this chart is reflective of the sales of

10   these entities for whatever you've given

11   us data for, is the sales that even

12   preceded those mergers, okay.

13           MR. STERN:  Objection to the

14       form.

15   BY MR. BUCHANAN:

16       Q.    Just so we're communicating,

17   okay?

18       A.    These represent the extended

19   units, correct.

20       Q.    Okay.  So, what we see, sir,

21   over time in the left-hand column is

22   extended units.  There's a legend there,

23   just so we're communicating with each

24   other, and a legend on the bottom that

Highly Confidential - Subject to Further Confidentiality Review

1   says extended units are pills or dosage

2   units, et cetera, okay.

3              Is that the way you report

4   things in terms of shipments in your

5   business, sir?

6        A.    I'm sorry?

7        Q.    Do you report extended units in

8   the pharmaceutical business?

9        A.    Probably units.

10       Q.    Units would be bottles?

11       A.    Correct.

12       Q.    Have you seen the reports that

13  also calculate the extended units?

14       A.    Yes.

15       Q.    Okay.  So it's a fair way to

16  report, if you will, the volume for a

17  product.  Fair?

18       A.    It's my understanding.

19       Q.    Okay.  So, we have here extended

20  units over the years, and we can see that,

21  you know, Endo, not -- we don't have data

22  prior to '99 and maybe not even a full

23  year for '99, but Endo at its early stage

24  is less than a billion pills, half a

Highly Confidential - Subject to Further Confidentiality Review

1    billion it looks like while it's getting

2    started.  You know, the yellow lines grow

3    and I guess kind of approach a billion in

4    maybe 700, 800 million in 2009.

5            You see that?

6        A.    Yes.

7        Q.    And then after 2010 there's some

8    reallocation of products between Endo and

9    Qualitest in terms of their relative,

10   which company's responsible for that.

11           Do you understand that, sir?

12       A.    In 2010 it appears that

13   there's -- Qualitest is producing generic

14   versions of Endo's products and that's

15   why, I assume, it's increasing from

16   Qualitest.

17       Q.    You see that Endo's attribution

18   declines over time while Qualitest's go

19   up, right?

20       A.    Correct.

21       Q.    And, is that something like what

22   happened with Par and Qualitest in 2015, a

23   reallocation of products between the two

24   companies?

1    A.    That's what appears to be

2    happening, yes.

3    Q.    We see, obviously, the sales for

4    Par in 2014, 2015, and they shift fairly

5    dramatically between Par and Qualitest,

6    right?

7    A.    Yes.

8    Q.    Okay.  So, reorienting us.

9         In 2011, we looked at that CDC

10   note talking about the epidemic

11   prescription drugs and overdoses.

12        We can see that the Endo,

13   Qualitest and Par entities are growing

14   business, right?

15        MR. STERN:  Mr. Buchanan, just

16        for the record, object to this

17        demonstrative to the extent it makes

18        it appear as though certain entities

19        were unified at times when they were

20        not.  The earlier testimony elaborated

21        the corporate history and we'd

22        respectfully submit that this

23        demonstrative is potentially

24        misleading on that point.

Highly Confidential - Subject to Further Confidentiality Review

1    MR. BUCHANAN:  I believe the

2    entities are defendants, and so I

3    understand your statement, counsel,

4    but I probably disagree with whatever

5    inference you're trying to draw from

6    it.

7    MR. STERN:  I'm not trying to

8    draw an inference.  It's just that in

9    2003, for example, Endo and Qualitest

10   were not the same company.  In fact,

11   they weren't even related at that

12   point.  And the single bar is

13   potentially misleading.

14   MR. BUCHANAN:  There is no fuss

15   on that fact, sir.

16   But where we might have a

17   disagreement is with regard to whether

18   Qualitest is, through a successor of

19   Qualitest, liable for the sales that

20   it made at any point in time.

21   MR. STERN:  That's an issue for

22   another day.

23   MR. BUCHANAN:  That's an issue

24   for another day.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I tried to present the chart in
 2         a way that reflected the sales
 3         attributable to each of them and so we
 4         can have accurate testimony.
 5              Your clarification is noted, but
 6         let's zoom forward to a period where
 7         we shouldn't have a dispute, and
 8         that's 2011.
 9    BY MR. BUCHANAN:
10         Q.   Can we agree, sir --
11              MR. STERN:  Mr. Buchanan, we
12         have the same dispute because Par
13         perches the top the 2011 bar and that
14         was pre-acquisition.
15              MR. BUCHANAN:  We can certainly
16         do this.  Let's forget about the blue
17         tip the top of 2011 and 2012.
18    BY MR. BUCHANAN:
19         Q.   Sir, can we agree that in the
20    year after the CDC announced the
21    prescription drug overdose epidemic that
22    the combined Endo/Qualitest entity grew
23    its sales?
24         A.   Well -- yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Thank you.

2             And, sir, when I use the term

3      "sales," I guess as a businessperson,

4      there's been some resistance to my use of

5      the term.  I won't say -- you've been

6      cooperative.  But you're interpreting that

7      as dollars as opposed to pills.

8             What's the right way to

9      communicate when I'm talking about pills

10     with you?

11     A.     Again, it's what you see here.

12     The extended units on the left part -- on

13     the Y part of the -- the Y portion of the

14     chart.

15     Q.     So my chart is sufficiently

16     descriptive in terms of by adding extended

17     units on the side we know what we're

18     talking about?

19     A.     When we talk about extended

20     units, we know we're talking about

21     individual pills.

22     Q.     Fair enough.

23            (Campanelli Exhibit 211,

24            document, was marked for

1      identification, as of this date.)

2  BY MR. BUCHANAN:

3      Q.    Passing you what we've marked as

4  Exhibit 211 to your deposition, sir.

5           Sir, 211 is the same exhibit we

6  just looked at?

7           MR. STERN:  Counsel, I'm sorry

8      to interrupt.

9           The same observation with

10     respect to 211 as 210.

11          MR. BUCHANAN:  Your objection,

12     or observation, is noted.

13 BY MR. BUCHANAN:

14     Q.    Mr. Campanelli, when we look at

15 Exhibit 211, what we've now incorporated

16 is the data from the CDC that reflects the

17 deaths secondary to opioid use in this

18 country.

19          You see that red line?

20     A.    Yes.

21     Q.    Okay.  At any point in time,

22 sir, prior to 2015, had any scientists

23 within your company or any employee within

24 your company brought to you the sales data

Highly Confidential - Subject to Further Confidentiality Review

1    in extended units and shown that in

2    combination with the deaths secondary to

3    this epidemic?

4         A.    I don't recall that happening.

5         Q.    Prior to sitting here today,

6    sir, has anybody in your company brought

7    to you the juxtaposition of your sales in

8    extended units with the deaths that have

9    been suffered in this country secondary to

10   the opioid epidemic?

11        A.    As I sit here today, I don't

12   recall seeing or hearing from the

13   individuals this type of data.

14             Based upon our -- our strategy

15   moving forward, we're winding down our

16   opioid production.

17        Q.    You say winding down, sir.  I

18   still see hundreds of millions of pills

19   being made, right?

20        A.    There are, but they're

21   significantly less than in 2013, '14, and

22   '15.

23        Q.    And we only have Qualitest

24   through 2015.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Is that because Qualitest data
 2    would now be in Par, sir?
 3         A.    Yes.
 4              Again, what's misleading is what
 5    you really need to be doing here is
 6    looking at the red and the blue bars and
 7    understanding that that is generic
 8    extended units and the yellow being
 9    branded extended units.  That's the way
10    you should be interpreting this data,
11    assuming it's correct.
12         Q.    Okay.  And all I can do, sir, is
13    compile what's been given to us by the
14    company as reflective of its sales, and
15    I'll represent to you we did our best to
16    do that accurately.
17              What I do see, sir, is in 2018,
18    Par made some 660 million opioid extended
19    units, right?
20              MR. STERN:  I'm sorry,
21         counselor.  2018?  I don't have that
22         on my --
23              MR. BUCHANAN:  I'm sorry.  I'm
24         back at the chart, which is 207, the
```

Highly Confidential - Subject to Further Confidentiality Review

1    data table, sir.

2         MR. STERN:  Okay.  Sorry.

3    BY MR. BUCHANAN:

4    Q.    See that?

5    A.    Could you just rephrase the

6    question, or repeat the question?

7    Q.    Certainly.  Yeah.

8         You see, sir, in 2018 that Par's

9    still made some 660 million opioid

10   tablets, right, or extended units?

11   A.    Yes, which is a significant

12   decrease from the prior year.

13   Q.    The 272 oxycodone APAPs, right?

14   A.    Yes.

15   Q.    Those would be Percocets, right?

16   A.    Yes.

17   Q.    Some 260 million hydrocodone

18   APAPs, right?

19   A.    Correct.

20   Q.    That would be Vicodin, right?

21   A.    Yes.

22   Q.    Okay.  And then a number of

23   other ones that are reflected on the

24   various schedules and that we saw in the

Highly Confidential - Subject to Further Confidentiality Review

1    pill charts earlier today, correct?

2        A.    And, yes, as you can see a

3    significant reduction over time.

4        Q.    Okay.  Still in the opioid

5    business today?

6              MR. STERN:  Objection to the

7        form.

8        A.    We still sell a small amount

9    of -- of opioids today, yes.

10       Q.    Well, 660 million last year,

11   right, sir?

12       A.    Yes, and declining.

13       Q.    I suppose it depends on how you

14   define small.

15       A.    Again, these medications have a

16   purpose for people in pain.

17       Q.    I suppose it matters on how you

18   define small, right?

19       A.    Yeah.

20       Q.    Okay.  All right.  We spent some

21   time, sir, talking about Percocet today.

22             I would like to talk about that

23   in a little more detail.

24             You didn't have to wait until

Highly Confidential - Subject to Further Confidentiality Review

1     the DEA --

2              MR. BUCHANAN:  Excuse me.

3         Withdrawn.

4

5

6

7

8

9

10

11

12

13

14

15

16              (Campanelli Exhibit 11, e-mail,

17         was marked for identification, as of

18         this date.)

19    BY MR. BUCHANAN:

20         Q.    You have Exhibit 11 in your

21    binder.  If I could direct you to that,

22    sir.

23              MR. BUCHANAN:  Corey, we're

24         going to start on the first page.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     It's an e-mail exchange between

2     some Endo folks.  You'll see a Bates

3     number in the bottom that indicates it was

4     produced to us in this litigation by Endo.

5

6

7

8

9

10

11

12          Q.     And at any point today, sir, if

13    you feel the need to look further in a

14    document, feel free.  I'm going to try and

15    orient you as best as I'm able, and maybe

16    you just want to until I do that and you

17    can decide what you need to read.  It's

18    your call.

19          A.     Okay.  Thank you.

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14      Q.    Let's look at Exhibit 12.

15            (Campanelli Exhibit 12,

16      document, was marked for

17      identification, as of this date.)

18   BY MR. BUCHANAN:

19      Q.    "The addiction potential of

20   oxycodone Percodan," Edward Bloomquist.

21   It's an article, reports on drugs.

22            You see that, sir?

23      A.    Yes.

24            MR. BUCHANAN:  Can you go to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1          right column, Corey, number 2?
 2      Q.    (Reading) Numerous non-criminal
 3  persons without previous history of
 4  addiction or of association with elicit
 5  narcotics are becoming addicted to the
 6  drug and are committing criminal offenses
 7  to obtain it.
 8          Did I read that correctly, sir?
 9      A.    You did.
10      Q.    Okay.  And this is not a report
11  from 2003; is it, sir?
12      A.    No.  It's not.
13      Q.    When is this report from?
14      A.    1963.
15      Q.    A report in the literature from
16  1963 about numerous non-criminal persons
17  without previous histories of addiction or
18  of association with elicit narcotics are
19  becoming addicted to the drug Percodan and
20  are committing criminal offenses to obtain
21  it.
22          You see, that, sir?
23      A.    I see that.
24      Q.    Certainly information you'd want
```

Highly Confidential - Subject to Further Confidentiality Review

1   to be mindful of in connection with

2   presenting this product to the public,

3   right?

4           MR. STERN:  Objection to the

5       form; lack of foundation.

6       A.    With what the article's also

7   saying is that the same care should be

8   used when using Percodan as also Morphine.

9       Q.    My question to you, sir, was

10  certainly information, information being

11  that numerous non-criminal persons without

12  previous histories of addiction or

13  associations with elicit narcotics, are

14  becoming addicted to the drug and are

15  committing crimes to get it, that's

16  something a company should be aware of in

17  connection with its marketing and

18  promotion of a product, right?

19      A.    I see that --

20          MR. STERN:  Objection to the

21      form.

22      A.    I see those words, but it also

23  says that the same care should be used

24  when exercising using Percodan as with

1    Morphine.  So, to me it's a general

2    statement.

3           I'd have to go through this

4    entire article in a little bit more

5    detail.

6           But I see your point, but I also

7    see that they're also making the point

8    that care needs to be given.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          Could I have -- actually, you

1    have them already.  Could you go, please,

2    to Exhibit 13 in your binder, sir?

3                (Campanelli Exhibit 13, e-mail,

4        was marked for identification, as of

5        this date.)

6    BY MR. BUCHANAN:

7        Q.    Exhibit 13 is exchange

8    between --

9                MR. BUCHANAN:  It's E1876,

10       Corey.

11       Q.    It's an exchange between an

12   individual named David Kerr and a host of

13   folks.

14                Pretty senior guy, right?

15       A.    Senior vice-president, yes.

16       Q.    Senior vice-president commercial

17   business for Endo at that point in time,

18   correct, sir?

19       A.    Yes.

20       Q.    Okay.  And I'd like to direct

21   your attention to dot-387.  It's a

22   presentation.

23                And it may be faster on the

24   screen.  You have my --

Highly Confidential - Subject to Further Confidentiality Review

1    MR. STERN:  I'm sorry.  Dot-387.

2    MR. BUCHANAN:  Dot-387.  There's

3    a series of presentations in this.

4    MR. STERN:  I see.

5  BY MR. BUCHANAN:

6

7

8

9

10

11    What tab am I on?

12    MR. STERN:  38 -- you're Tab 13

13    and then way toward the back -- near

14    Tab 14.  Go all the way -- you're

15    looking for this number.

16    THE WITNESS:  Yeah, I have it.

17    Okay.

18  BY MR. BUCHANAN:

19    Q.    You should see the same thing in

20  your binder that you see on the screen.

21    A.    Okay.

22    Q.    Can you just confirm for me that

23  you do?

24    A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Great.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5      Q.     Okay.  Let's look at Exhibit 14.

6           (Campanelli Exhibit 14,

7      document, was marked for

8      identification, as of this date.)

9    BY MR. BUCHANAN:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



12    Q.    I'm going to pass you what we're

13  marking as Exhibit 12, sir, see if this

14  refreshes your recollection.

15           Here you are, sir.

16           (Campanelli Exhibit 212,

17       document, was marked for

18       identification, as of this date.)

19           MR. BUCHANAN:  212 is the

20       demonstrative.

21  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23      Q.    Okay.  Let's look back now to

24      Exhibit 14, sir.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5          Can you go, please, to --

 6          MR. BUCHANAN:  What's the tab on

 7     this?

 8          (Pause.)

 9          (Campanelli Exhibit 101,

10     document, was marked for

11     identification, as of this date.)

12  BY MR. BUCHANAN:

13     Q.    I'm passing you what we're

14  marking as Exhibit 101.  This is a Power

15  Point from 2002, an executive committee

16  presentation.

17          You see that, sir?

18     A.    Yes, I do.

19          MR. BUCHANAN:  It's E1870.

20  BY MR. BUCHANAN:

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MR. BUCHANAN:  Could I please

21      have Exhibit 15?

22          (Campanelli Exhibit 15,

23      document, was marked for

24      identification, as of this date.)

1    BY MR. BUCHANAN:

2        Q.    Go to tab 15, please.  Now we're

3    back to your binder, sir.  Tab 15.

4        A.    Sorry.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5          MR. BUCHANAN:  So, counsel, I

6     don't know what you want to do

7     timewise.

8          MR. STERN:  It's totally up to

9     you.

10          MR. BUCHANAN:  I'm going to go

11     into a new area.  If we're ready for a

12     break and that's fine for the witness

13     and you, that's fine.

14          MR. STERN:  Let me ask Mr.

15     Campanelli, do you have a preference?

16          THE WITNESS:  Do you want to do

17     a quick break and come back?

18          MR. STERN:  Sure.  A quick break

19     and come back or a lunch break?

20          THE WITNESS:  I'm fine.  I'll

21     do -- let's do a bio break and keep

22     going.

23          MR. BUCHANAN:  Let's do a bio

24     break and do another hour.

 1              MR. STERN:  The last five was

 2       ten.  We'll try to keep it to that.

 3              MR. BUCHANAN:  That's fine.

 4              THE VIDEOGRAPHER:  Stand by,

 5       please.  Remove your microphones.

 6              The time is 12:23 p.m.

 7              Off the record.

 8              (Recess taken.)

 9              THE VIDEOGRAPHER:  We are back

10       on the record.

11              The time is 12:37 p.m.

12       BY MR. BUCHANAN:

13         Q.    Mr. Campanelli, we are back on

14       record.  You're still under oath.

15              Are you ready to proceed?

16         A.    Yes.

17         Q.    Okay, great.

18              We were looking at a

19       presentation a moment ago, Exhibit 15,

20       entitled "Endo commercial capabilities

21       overview."

22              Do you recall that?

23         A.    Yes.

24         Q.    Tab 15 in your binder.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Is that where you want me to go?

2    Q.    If you could real quick, just to

3  keep us oriented.

4    A.    Okay.

5        MR. STERN:  I'm sorry.  I

6    apologize.  Tab 15?

7  BY MR. BUCHANAN:

8    Q.    Okay.  And the way this was

9  produced to us, sir, is with an e-mail and

10  an attachment.

11        MR. BUCHANAN:  What I'd like to

12    do is ask my tech, if you could, to

13    pull up the Bates number for the file

14    so that we can tie it back to the

15    production so there's no dispute.

16        And for the record, the Bates

17    number of the file we were just

18    looking at is

19    ENDO_OPIOID_MDL_01139611.

20  BY MR. BUCHANAN:

21    Q.    Okay.  And, what I'd like to do,

22  sir, because there was some question about

23  who wrote this and -- and the

24  communications around it, is give you, if

Highly Confidential - Subject to Further Confidentiality Review

1    I could, the e-mail to which it was

2    attached (handing.)

3              (Campanelli Exhibit 102, e-mail,

4        was marked for identification, as of

5        this date.)

6    BY MR. BUCHANAN:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9      Q.   Okay.  Let's go to E139.  It's

10   Exhibit 16, sir.

11          From time to time, companies

12   like Endo --

13      A.   I apologize.  I don't think I

14   have an exhibit --

15          MS. SCULLION:  New binder.

16          MR. BUCHANAN:  Sorry.  Here you

17   go, sir (handing.)

18          THE WITNESS:  Should I --

19          MR. BUCHANAN:  You can set the

20   prior one aside.

21          MR. STERN:  You know what, I'll

22   take it from you, Paul.  I'm going to

23   take this off for just one second.

24          THE WITNESS:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              What tab would you like me to go

 2      to, sir?

 3              MR. BUCHANAN:  Probably the

 4      first one in that.  It's Tab 16.  Or

 5      hopefully it is.

 6              MR. STERN:  Bear with me a

 7      minute.

 8              MR. BUCHANAN:  No worries.

 9              (Pause.)

10   BY MR. BUCHANAN:

11      Q.    Do you see Tab 16?

12      A.    Yes.

13      Q.    An Exhibit 16 sticker on that

14   first page?

15      A.    Correct.

16              (Campanelli Exhibit 16,

17      document, was marked for

18      identification, as of this date.)

19   BY MR. BUCHANAN:

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
11          MR. BUCHANAN:  Can you put
12      Exhibit 17 on the screen, Corey?  It's
13      a video.  Just put it up on the screen
14      and pause it.
15  BY MR. BUCHANAN:
16      Q.    On the screen, sir, what I've
17  marked as 17 is the full footage of the
18  video.
19          For the record, what we're going
20  to supply, and I'd like the court reporter
21  to transcribe the portions that are
22  played, is an interview conducted with Ms.
23  Carol Ammon.
24          Do you know who she is?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    She was the founder of Endo.

2        Q.    She was the founder and also the

3   CEO, right?

4        A.    Correct.

5        Q.    Okay.  So, she came out of the

6   DuPont Merck joint venture in 1997, formed

7   the company, and then ultimately brought

8   it public a few years later?

9        A.    That's my general understanding.

10        Q.    Okay.

11             MR. BUCHANAN:  Could we queue up

12        this particular video at 3:37, Corey?

13             MR. STERN:  And I'm just going

14        to object, Mr. Buchanan, to the

15        playing of an excerpt instead of the

16        full video.

17             MR. BUCHANAN:  If there's some

18        other portion you'd like to play, you

19        have the disk, and my tech would be

20        happy to assist you in doing so, if

21        you'd like.

22             Can we roll?

23             (Video recording played.)

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12          Q.     Let's see if we have some

13     documents that can further elucidate this,

14     sir.

15                 Can you go, please, to --

16                 MR. STERN:  Are we sticking with

17          the new binder here?

18                 MR. BUCHANAN:  I thought we

19          were, but it looks like this is one

20          that's a standalone.

21                 MR. STERN:  Okay.

22                 (Campanelli Exhibit 103, e-mail,

23          was marked for identification, as of

24          this date.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    And, sir, what number do we have

3    on the bottom?

4        A.    103.

5        Q.    103, sir.

6              You see here an e-mail exchange.

7              MR. BUCHANAN:  Let's see 1256.

8        A.    Correct.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

12      Q.      Okay.  Let's go back, please, to

13   Exhibit 15.

14              (Campanelli Exhibit 15,

15          document, was marked for

16          identification, as of this date.)

17   BY MR. BUCHANAN:

18      Q.      It's in the prior binder, but

19   I'm just going to pop this one slide up.

20   Maybe you can just work with that.

21              MR. BUCHANAN:  It's dot-36,

22          Corey.

23   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4      Q.     Okay.

5             (Campanelli Exhibit 104,

6        document, was marked for

7        identification, as of this date.)

8   BY MR. BUCHANAN:

9      Q.     Passing over what we're marking

10    as Exhibit 104, sir.

11            I apologize we're in and out of

12    the binder.

13            MR. BUCHANAN:  Corey, could you

14        pull up 1251, E1251?

15   BY MR. BUCHANAN:

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
1
2
3
4
5
6
7
8
9
10
11
12
13
14        Q.    Okay.  All right.  Let's move
15   forward, please.  Passing another one
16   over.
17             (Campanelli Exhibit 105,
18        document, was marked for
19        identification, as of this date.)
20   BY MR. BUCHANAN:
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    Okay.  Let's look at Exhibit 19,

3     sir.

4               (Campanelli Exhibit 19, e-mail,

5          was marked for identification, as of

6          this date.)

7               MR. STERN:  Wait.  I'm sorry.

8          Book one?  Second book?

9               Sorry.

10     BY MR. BUCHANAN:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4          You see that?

5          MR. STERN:  Can you hold on just

6     a second, Mr. Buchanan?

7          MR. BUCHANAN:  Sure.  Whatever

8     time you need, counsel, and the

9     witness, of course, to catch up with

10    where we are.

11         I am on --

12         MR. STERN:  I'm not sure I'm

13    looking at the right thing.

14         MR. BUCHANAN:  Okay.  You should

15    be looking at Exhibit 19.

16         MR. STERN:  Right.  This is not

17    a letter response to a congressional

18    investigation.

19         MR. BUCHANAN:  I'm sorry.  Thank

20    you.

21         It's a letter responding to Vice

22    President Biden.  Thank you.

23         MR. STERN:  Then I have the

24    right document.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    You see Exhibit 19, sir?  You're

3    on the same page with us?

4         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



        Q.    In your binder, sir, I'm going
to move you forward to Exhibit 21.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Campanelli Exhibit 21,

 2         document, was marked for

 3         identification, as of this date.)

 4              MR. BUCHANAN:  I'm sorry.  Don't

 5         go to 21.  I'm told we have an exhibit

 6         snafu.  I'm passing you over, sir,

 7         what we've marked as Exhibit

 8         Number 21.

 9    BY MR. BUCHANAN:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4          Q.     Okay.  Let's go to Exhibit 22.

5               (Campanelli Exhibit 22,

6          document, was marked for

7          identification, as of this date.)

8     BY MR. BUCHANAN:

9          Q.     Should be in the binder.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Let's go to Exhibit 23.

19              (Campanelli Exhibit 23,

20          document, was marked for

21          identification, as of this date.)

22      BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11    Q.    And they were doing it in 2009,

12    if you go to Exhibit 24 next in order.

13        (Campanelli Exhibit 24,

14        document, was marked for

15        identification, as of this date.)

16    BY MR. BUCHANAN:

17    Q.    Do you see the 2009

18    presentation, sir?

19    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6       Q.    Okay.  We'll go to 2012.

7             MR. STERN:  Can you give us a

8       tab, or an exhibit?

9             MR. BUCHANAN:  It's exhibit

10      number -- I think I need it.

11            (Pause.)

12            MR. BUCHANAN:  Exhibit 25, next

13      in order.

14            (Campanelli Exhibit 25,

15      document, was marked for

16      identification, as of this date.)

17    BY MR. BUCHANAN:

18      Q.    This will take us to 2012, sir.



9          MR. STERN:  Objection to the

10      form; lack of foundation.

11      A.    It appears consistent.

12      Q.    Okay.  Well, let's go forward,

13   sir, to Exhibit 40.

14          (Campanelli Exhibit 40,

15      document, was marked for

16      identification, as of this date.)

17   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



5    Q.    Okay.

6         MR. BUCHANAN:  If I can have

7    Exhibit 26, please.

8         THE WITNESS:  Am I going to

9    tab --

10         MR. BUCHANAN:  You are, but I

11    think this is an audio file.

12         (Campanelli Exhibit 26, CD, was

13    marked for identification, as of this

14    date.)

15         MR. BUCHANAN:  Passing over

16    Exhibit 26 for counsel, if they'd like

17    to review the broader program.

18         MR. STERN:  Do you have copies

19    of either the video or the audio?

20         MR. BUCHANAN:  I don't, but

21    you're welcome to use those today.

22    You can take them to make copies.  We

23    can make a stipulation.

24         MR. STERN:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

1        MR. BUCHANAN:  I'm sorry.  Wait.

2        Do we have additional copies?

3        So one for the record and one

4    for counsel.

5        Okay.  We'll work it out.  We're

6    not trying to keep that stuff out of

7    your hands.

8    BY MR. BUCHANAN:

9        Q.    All right.  So, we're on Exhibit

10   26.

Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13

14      Q.    Okay.

15           MR. BUCHANAN:  Could we play --

16      let's pause for a moment.  I'll

17      represent before we play it, this is

18      Bates number KP360,

19      OHIO_MDL_000095691.  It's excerpts of

20      a Dr. Grace Ford, one of the NIPC

21      speakers during one of the speaker

22      programs.

23           MR. STERN:  Objection to the use

24      of just an excerpt.

Highly Confidential - Subject to Further Confidentiality Review

1              What is the date?  That's a good

2      question.

3              MR. BUCHANAN:  I don't have it

4      on my sheet.

5              Can we provide it?

6              I understand it's 2006.  I'll

7      get a formal month and day for you.

8              Could we queue up, please,

9      Corey, I believe it occurs about 17

10     minutes in, 17:45?

11  BY MR. BUCHANAN:

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13    Q.    Well, let's go to Exhibit 28.

14         (Campanelli Exhibit 28,

15    document, was marked for

16    identification, as of this date.)

17    BY MR. BUCHANAN:

18

19

20

21

22         MR. STERN:  Objection to the

23    form; lack of foundation.

24    A.    I would have to study this

1    document.

2        Q.    What you'd get back you'd see

3    was the message you wanted delivered being

4    heard and received, right?

5        A.    Again I would have to study this

6    document to understand what this executive

7    summary is indicating.

8        Q.    Okay.  So, this is a 1282.1,

9    it's Exhibit 28, National Initiative on

10   Pain Control executive summary, right?

11       A.    That's what it says.

12       Q.    This is reporting on a period of

13   time and it's describing really the -- the

14   efforts that were undertaken, the target

15   audiences, et cetera.

16            You see that?

17       A.    You'd have to give me a moment

18   to -- to understand this document.

19       Q.    And you're entitled to that

20   moment, sir.

1        Q.    Okay.  And let's go, please, to

2    dot-4.

3        A.    Okay.

4        Q.    And these are the exit

5    interviews of participants and the

6    comments that are provided back following

7    the CME, right?

8            MR. STERN:  Objection; lack of

9        foundation.

10        Q.    You're free to orient yourself

11    to the document, sir.  I understand you

12    didn't attend it.

13        A.    It appears to be feedback from

14    doctors.

15        Q.    Right.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



21          Right?

22     A.      There are --

23             MR. STERN:  Objection; lack of

24     foundation.  Except for what's on the

1        face of the document.

2        A.    Again, these are -- are -- are

3    quick, short bullets that contain other --

4    other open-ended questions.

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5              MR. STERN:  Objection to the

6        form of the question.

7    BY MR. BUCHANAN:

8        Q.    Do you see that, sir?  Second

9    bullet point.

10       A.    Again you're going to a snapshot

11   here.  I'd like to study this document in

12   more detail to see if there's other things

13   that would be important.

14       Q.    Do you see the bullet I'm

15   referring to, sir?

16       A.    I see two bullets you're

17   referring to.

18       Q.    Sure.  And we know what the CDC

19   ultimately came out and said in 2016,

20   right?

21       A.    Yes.

22       Q.    They said use less?

23              MR. STERN:  Objection.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    Right?

3            MR. STERN:  Objection; lack of

4        foundation; mischaracterizes the CDC

5        guidelines.

6            MR. BUCHANAN:  I don't think it

7        does, counsel, but if you want to

8        object to form, that's fine, or

9        foundation.

10            MR. STERN:  I am to both.

11            MR. BUCHANAN:  It precisely says

12        what I say.

13        A.    You'd have to show me that

14    document.

15        Q.    You don't have familiarity with

16    the CDC guidelines from 2016, sir?

17        A.    Not off the top of my head, no.

18        Q.    Go slow and go low.

19            Haven't heard that?

20        A.    No, I have not.

21        Q.    Certainly not saying use more

22    opioids.

23            Can we agree to that?

24        A.    If you show me the document, I

1    can opine on it.

2         Q.    Can we agree, sir, that just as

3    somebody who hasn't seen the document,

4    you're not hearing a message today in your

5    community of use more opioids?

6         A.    I'm not hearing that in our

7    community.

8         Q.    You're not hearing a message in

9    your community, sir, of use opioids

10   earlier with your pain patients?

11        A.    Okay.  Our understanding is to

12   use opioids responsibly for their intended

13   purposes.  Again, there's tens of

14   thousands, if not millions of patients

15   that require opioids to relieve pain for

16   its intended use.

17        Q.    Start low and go slow.  That's

18   what the CDC's telling people after those

19   big run-up in sales that you all led in

20   the early 2000s, right, sir?

21             MR. STERN:  Objection; lack of

22        foundation.

23        A.    Again, as I stated, I don't know

24   if that's what's in that document.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Let's go to Exhibit 27.

2         (Campanelli Exhibit 27, e-mail,

3    was marked for identification, as of

4    this date.)

5  BY MR. BUCHANAN:

6    Q.    Here is a report out of the

7  CME -- report out of a CME NIPC opioid

8  Cinci program.

9         You're familiar, sir, Cincinnati

10  is in Ohio?

11    A.    No, I'm not familiar with it.

12    Q.    Okay.  I'll represent to you,

13  sir, that Cincinnati is in Ohio.

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MR. STERN:  Objection to the

22     form; lack of foundation; selective

23     quotation of the e-mail.

24          A.    I don't know what she's doing

Highly Confidential - Subject to Further Confidentiality Review

1    here.

2         Q.    Okay.  You understand that

3    phobia is fear, right?

4         A.    As I said, it was a term I was

5    not -- I'm not familiar with this term.

6         Q.    Okay.  You don't understand the

7    reference to fear?

8         A.    I understand fear.

9         Q.    Okay.  And lessening fear,

10   correct?

11        A.    Yes.

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11     A.    I don't know what --

12          MR. STERN:  Objection; lack of

13    foundation.

14     A.    I don't know what she was

15 referring to.

16     Q.    I guess we all heard it and the

17 jury will hear it, and they'll have an

18 opportunity to decide.

19          Fair?

20     A.    Fair.

21          MR. BUCHANAN:  I'm about ready

22    to move into a different topic.  I

23    know there was discussion about having

24    lunch today.  I assume we're still

Highly Confidential - Subject to Further Confidentiality Review

1          going to try to do that.

2              What I would like to do before

3      we take a break, if you guys are

4      amenable to a break, is just mark a

5      couple of things for cleanup here.

6              Can I have the exhibits?

7              (Pause.)

8          MR. BUCHANAN:  Marking for the

9      exhibit the underlying source data for

10     the demonstratives just so they're

11     complete and you all have a record, to

12     the extent there's any desire to sync

13     things up later.

14             Exhibit 14 is E1848.  It's Par

15     sales.

16         MR. STERN:  Wait.  Hold on a

17     minute.

18         MR. BUCHANAN:  I'm going to pass

19     these over to you and you can have

20     them.

21         MR. STERN:  We have an

22     Exhibit 14.

23         MR. BUCHANAN:  No, I said

24     E1840 -- I'm sorry.  Exhibit 214.  I'm

1    sorry.

2         Exhibit 214, alternately

3    referenced as E1848, is a summary of

4    Par sales data that was produced by

5    defense counsel to plaintiffs, which

6    underlies some of the charts that we

7    looked at.

8         (Campanelli Exhibit 214,

9    document, was marked for

10   identification, as of this date.)

11        MR. BUCHANAN:  Exhibit 213,

12   alternately marked as E1847, is the

13   underlying data for Qualitest sales

14   that was produced to us.

15        (Campanelli Exhibit 213,

16   document, was marked for

17   identification, as of this date.)

18        MR. BUCHANAN:  Exhibit 209 is

19   the underlying data on a drive of the

20   Endo sales data, the CDC deaths, and

21   early Qualitest data.

22        (Campanelli Exhibit 209, flash

23   drive, was marked for identification,

24   as of this date.)

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BUCHANAN:  I think that

2     cleans up the exhibits prior to taking

3     lunch.

4          And you're free to peruse those

5     if you need to.

6          At this point, I propose we take

7     a break for lunch, as briefly as you'd

8     like.

9          MR. STERN:  Sure.

10          THE VIDEOGRAPHER:  All right.

11     Stand by.  Microphones.

12          The time is 1:56 p.m.

13          Off the record.

14          (Luncheon recess taken.)

15                    -  -  -

16      A F T E R N O O N   S E S S I O N

17                    -  -  -

18          THE VIDEOGRAPHER:  We are back

19     on the record.

20          The time is 2:38 p.m.

21     BY MR. BUCHANAN:

22     Q.    Sir, we're back on the record.

23          We spent some time before lunch

24     talking about the NIPC and other matters

Highly Confidential - Subject to Further Confidentiality Review

1    related to CD&E.  We're going to talk

2    about some other organizations the company

3    supported over the years.



15         Q.    Okay.  Is there a -- do you have

16    a relative

17    CCampanelli@Americangeriatrics.org?

18         A.    No.

19         Q.    Okay.  Thank you.

20              Now, moving forward.

21              I'd like to talk to you about

22    the American Pain Foundation.

23              Is that an entity or an

24    organization you've heard of, sir?

```
1         A.     I'm sorry.  One more time?

2         Q.     The American Pain Foundation?

3         A.     I'm not familiar with it.

4         Q.     You may have heard of it by its

5    acronym, APF?

6         A.     Fair.

7         Q.     Does that seem familiar to you?

8         A.     Yes.

9         Q.     Could we go to Tab 30 in your

10   binder, sir?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3          MR. STERN:  Objection to the

 4      form of the question.

 5      A.    I don't know that.

 6      Q.    Okay.  Let's go to Exhibit 31,

 7   next in order.

 8          (Campanelli Exhibit 31,

 9      document, was marked for

10      identification, as of this date.)

11   BY MR. BUCHANAN:

12

13

14

15

16

17

18

19

20

21

22

23

24
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9          A.      No, I have not.

10         Q.      Okay.  Let's go to -- let's go

11    to Exhibit 32, which is the next in order.

12             (Campanelli Exhibit 32,

13         document, was marked for

14         identification, as of this date.)

15    BY MR. BUCHANAN:

16         Q.      Do you have Exhibit 32 before

17    you, sir?

18         A.      Yes.

19         Q.      Okay.  Exhibit 32 says:  Reading

20    this could help ease your pain.

21             Right?

22         A.      Yes.

23         Q.      Pain Action Guide, American Pain

24    Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     That's what it says.

2          Q.     Okay.  We see, if you go to the

3     back, you see that it's, in fact, from

4     2000, right?

5          A.     That's what the copyright says.

6          Q.     Okay.  And this was the

7     organization we saw you were writing

8     checks to, right?

9               MR. STERN:  Objection to the

10         form of the question.

11    BY MR. BUCHANAN:

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



7      Q.    Okay.  All right.

8            So, this is that patient

9      brochure, the pain action guide, from the

10     American Pain Foundation, correct?

11     A.    That's what it says.

12     Q.    Exhibit 32, let's go to --

13     sorry.  Let's go to dot-8.

Highly Confidential - Subject to Further Confidentiality Review



20          MR. STERN:  Objection.

21     BY MR. BUCHANAN:

22          Q.    If their doctor doesn't give

23     them what they want, right?

24          MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1              form of the question and lack of

2              foundation.

3         A.    I see those words.

4              I also see the page before it

5    where it says:  Finding good pain care and

6    taking control of your pain can be hard

7    work.  Learn all you can about pain and

8    possible treatments.

9         Q.    Okay.

10             MR. BUCHANAN:  I'll move to

11        strike the non-responsive portion.

12        Q.    But the answer to my question is

13   yes, you see that, right?

14        A.    I see the words.

15        Q.    Okay.  Coaching patients to

16   doctor shop?

17             MR. STERN:  Objection to the

18        form of the question.

19   BY MR. BUCHANAN:

20        Q.    If they don't get what they want

21   from their doctor?

22             MR. STERN:  Objection to the

23        form of the question.

24        A.    It says if your doctor's unable

Highly Confidential - Subject to Further Confidentiality Review

1    to deal with your pain effectively.

2         Q.    Ask your doctor to consult with

3    a specialist or consider switching

4    doctors.

5              That's what they wrote, right?

6         A.    That's what it says.

7         Q.    Okay.  Let's look at the next

8    page, dot-9.  It says:  Pain medications

9    rarely cause addiction.

10             Do you see that?

11        A.    I see it.

12        Q.    That's not true?

13             MR. STERN:  Objection; lack of

14        foundation.  Objection to the form.

15        A.    Okay.

16        Q.    Agree?

17        A.    I don't know what the basis of

18   these -- of this brochure is.  I don't

19   know what's behind this.  I don't know why

20   they chose to say this.

21        Q.    It's got you scratching your

22   head though, right?  How the heck were

23   they saying that?

24             MR. STERN:  Object to the form;

1    lack of foundation.

2    A.    As I say, I don't know why they

3    chose the words here.

4    Q.    There is nothing rare about the

5    addiction with the use of pain medication,

6    sir?

7         MR. STERN:  Objection to the

8         form; lack of foundation.

9    BY MR. BUCHANAN:

10   Q.    You agree?

11        MR. STERN:  Objection to the

12        form; lack of foundation.

13   A.    Could you please say that again?

14   Q.    There is nothing rare about

15   addiction with the use of pain medications

16   like opioids, sir.  Agreed?

17        MR. STERN:  Objection to the

18        form; lack of foundation.

19   A.    Again, when used as -- as --

20   under the intended purposes, under the

21   labeled indication, we believe that they

22   are safe and effective.  When they're

23   abused or misused, they could be

24   addictive.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Pain medications rarely cause

2    addiction.  That was in the patient

3    brochure that you, Endo, financially

4    supported?

5         MR. STERN:  Objection to the

6         form.

7    BY MR. BUCHANAN:

8    Q.    Right?

9    A.    It also says:  Unless you have a

10   history of substance abuse, there is

11   little risk of addiction.

12   Q.    Okay.  Where is the study for

13   that, sir?

14   A.    I don't know if there is a study

15   or not.

16   Q.    There certainly should be one if

17   you're going to tell patients that, right?

18        MR. STERN:  Objection to the

19        form; lack of foundation; calls for a

20        legal conclusion.

21   A.    Again, I don't know why the

22   words were chosen to be here.

23   Q.    One of the ways to combat

24   opiophobia is to tell patients addiction

Highly Confidential - Subject to Further Confidentiality Review

1    is rare, right?

2              MR. STERN:  Objection to the

3         form; lack of foundation.

4    BY MR. BUCHANAN:

5         Q.    That will help combat fears,

6    right?

7         A.    I don't know the answer to that.

8         Q.    Okay.  It says:  Morphine and

9    similar pain medications called opioids

10   can be highly effectively for certain

11   conditions.  Unless you have a history of

12   substance abuse, there is little risk of

13   addiction when these medications are

14   properly prescribed by a doctor and taken

15   as directed.

16             Did I read that correctly?

17        A.    Yes.

18        Q.    We looked at the CDC chart,

19   right, from 2011?  You saw that?

20        A.    I saw it.

21        Q.    You saw as more people take

22   these drugs, more people are overdosing

23   and dying, more people are going in for

24   treatment for what, sir?

1           MR. STERN:  Objection to the

2      form of the question.

3   BY MR. BUCHANAN:

4      Q.    Addiction, right?

5      A.    I saw the chart.  I saw the

6   statistics that you showed me.  I saw the

7   sales going up.

8      Q.    That look rare to you?

9           MR. STERN:  Objection to the

10      form; lack of foundation.

11      A.    I don't know the answer to that.

12      Q.    Okay.  Let's go forward in time.

13           Let's go to I think we're in

14   Exhibit 33.

15           (Campanelli Exhibit 33,

16      document, was marked for

17      identification, as of this date.)

18   BY MR. BUCHANAN:

19      Q.    Next in order it looks like.

20           Again, another patient brochure,

21   Pain Action Guide from the American Pain

22   Foundation, right?

23      A.    I see it.

24      Q.    Okay.  We see -- let's see if we

Highly Confidential - Subject to Further Confidentiality Review

1      have a date on the back.

2                  It's 2003, okay.

3                  Let's go to dot-3.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12          MR. STERN:  Objection to the

13      form of the question; lack of

14      foundation.

15      A.    They're communicating this point

16  as you're referencing.

17      Q.    Okay.

18          (Reading) Pain medications

19  rarely cause addiction.  Morphine and

20  similar pain medications called opioids

21  can be highly effective for certain

22  conditions.  Unless you have a history of

23  substance abuse, there's little risk of

24  addiction.

Highly Confidential - Subject to Further Confidentiality Review

1               And it continues.

2               You see that?

3       A.      Yes.

4       Q.      That's not true.

5               MR. STERN:  Objection to the

6       form; lack of foundation.

7    BY MR. BUCHANAN:

8       Q.      Right, sir?

9       A.      I don't know the answer to that.

10      Q.      As a person sitting here, sir,

11   in 2019, president of a pharmaceutical

12   company, is it rare to --

13              MR. STERN:  I'm sorry.  I also

14      object because the entire sentence was

15      not read just now.

16              MR. BUCHANAN:  You just

17      interrupted my question, counsel.

18              MR. STERN:  I apologize.

19              MR. BUCHANAN:  There's

20      opportunity for redirect, and I

21      certainly wouldn't objected to a

22      comment before, but now I'm in a

23      question.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7     Q.    Okay.  Let's look at 34, next in

8     order.

9              (Campanelli Exhibit 34, e-mail,

10          was marked for identification, as of

11          this date.)

12     BY MR. BUCHANAN:

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4             MR. STERN:  Objection to the

5        form of the question; lack of

6        foundation.

7        A.    You're asking me to go back in

8   time back in 2003.  I would need to know a

9   lot of information to be able to -- to

10  really respond to that intelligently.

11       Q.    Okay.  Well, there's no debate,

12  sir, we got a lot of addicted people in

13  this country following the last 15 years

14  of messages like we just looked at, right?

15            MR. STERN:  Objection to the

16       form of the question; lack of

17       foundation.

18       A.    I will agree that we have too --

19  too much addiction in this country.  I do

20  not know if it's tied back to this

21  statement.

22       Q.    Let's go to Exhibit 36, please.

23            (Campanelli Exhibit 36,

24       document, was marked for

Highly Confidential - Subject to Further Confidentiality Review

1          identification, as of this date.)

2     BY MR. BUCHANAN:

3          Q.     Because when you use the term

4     "rare," rare actually does have a meaning

5     in the pharmaceutical industry, right?

6                MR. STERN:  Objection to the

7          form of the question.

8          A.     I'd have to look at it on a

9     product-by-product basis.

10         Q.     You've heard of CIOMS, sir?

11         A.     No, I have not.

12         Q.     Okay.  CIOMS is the Council for

13    International Organizations of Medical

14    Science.

15               Are you aware of that?

16         A.     No.

17         Q.     Don't know it by the long name

18    or the acronym?

19         A.     No.

20         Q.     Okay.  Exhibit 36, sir, is a

21    document entitled "Benefit-Risk Balance

22    for Marketed Drugs:  Evaluating safety

23    signals."

24               You see that, sir?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Reported by the CIOMS Working

3    Group.

4          You see that?

5    A.    I see it.

6    Q.    Geneva 1998?

7    A.    I see it.

8    Q.    Okay.  Quantification of risk.

9          Please go to dot-48.

10         As I said, sir, in your field,

11   the pharmaceutical industry, adverse

12   events are, in fact, characterized by

13   certain terms like "rare" and "common" and

14   "frequent."

15         Right?

16   A.    I -- I don't know the answer to

17   that.

18         MR. BUCHANAN:  Can you please

19   pull it up, Corey?

20   Q.    (Reading) Quantification of

21   risk.  Incidence of the reaction.

22         Okay.

23   A.    I see that.

24   Q.    Okay.  I'm going to the middle

Highly Confidential - Subject to Further Confidentiality Review

1    of the paragraph it says:  However, risk

2    can often be approximated in terms of

3    magnitudes of 10 as suggested in the CIOMS

4    III report.

5             Do you see that, sir?

6        A.    I see it.

7        Q.    (Reading) Greater than or equal

8    to 1 percent comon or frequent.

9             You see that?

10       A.    I see it.

11       Q.    (Reading) Greater than or equal

12   to 1 per 1,000 but less 1 percent uncommon

13   or infrequent.

14            You see that?

15       A.    I see it.

16       Q.    (Reading) Greater than or equal

17   to 1 per 10,000 but less than 1 per 1,000,

18   that's rare.

19            Right?

20            MR. STERN:  Objection; lack of

21       foundation.

22   BY MR. BUCHANAN:

23       Q.    Did I read that correctly, sir?

24       A.    You read it correctly.

1    Q.    (Reading) Less than 1 per 10,000

2    very rare.

3            Right?

4            MR. STERN:  Objection; lack of

5    foundation.

6            If you're asking what --

7            MR. BUCHANAN:  I'm asking the

8    questions I just asked, counsel.

9    A.    I see the words.

10   Q.    Okay.  Will you agree we looked

11   at the report from with inside the

12   company's walls from 2004, the 3.2 to 18.9

13   percent.

14           Do you recall seeing that just a

15   moment ago with me, sir?

16   A.    I see the estimates that you've

17   put back on the screen.

18   Q.    Yes, okay.

19           Let's now go back to the CIOMS

20   chart.  You tell us where does even the

21   low end of that range, 3.2 percent, where

22   does that fall in these categories for

23   ranking frequency?

24   A.    Can I bring up the other --

Highly Confidential - Subject to Further Confidentiality Review

1    bring up the other --

2              MR. BUCHANAN:  Can you pull them

3         up side-by-side, Corey, so he's got

4         them both?

5    BY MR. BUCHANAN:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    definitions, let's just stay with my

20    question.  Using the CIOMS definition, 3.2

21    percent addiction rate is common or

22    frequent, correct?

23            MR. STERN:  Objection to the

24        form; lack of foundation.

1    A.    Using that definition, I see

2    where it says common or frequent, but I

3    don't know if it's comparing apples to

4    apples here.

5    Q.    Okay.  Well, the CIOMS is saying

6    these are the frameworks for frequencies.

7         MR. STERN:  Objection; lack of

8         foundation.  Objection to form.

9    BY MR. BUCHANAN:

10   Q.    You see the CIOMS report, sir?

11   A.    I see the CIOMS report.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Okay.  Let's go to -- sorry.

16  Trying to move us along.

17         (Pause.)

18    Q.    Exhibit 38, please.

19         (Campanelli Exhibit 38, e-mail,

20    was marked for identification, as of

21    this date.)

22  BY MR. BUCHANAN:

23    Q.    Exhibit 38, sir, is an e-mail

24  attaching a outline of a presentation from

Highly Confidential - Subject to Further Confidentiality Review

1    the APS:  Fundamentals of pain management.

2    A primer for residents and fellows.

3              Do you see that?

4        A.    You're referring to the

5    syllabus?

6        Q.    I am, yes.

7        A.    I see it.

8        Q.    Okay.  Can we go to dot-5?

9              (Reading) Fundamentals of pain

10   management.  A primer for residents and

11   fellows.

12             Do you see that?

13       A.    I see.

14       Q.    Okay.  And one of the -- let's

15   go to the next slide.

16             MR. BUCHANAN:  I think it's on

17       dot-34, please, Corey.

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11     Q.     Okay.  You do see with me, sir,

12     in dot-34, the Screener and Opioid

13     Assessment For Patients in Pain, SOAPP?

14     A.     I see it.

15     Q.     Okay.  Well, let's look at what

16     the evidence review showed about the

17     effectiveness of these.

18            Let's go to Exhibit 39.

19            (Campanelli Exhibit 39,

20     document, was marked for

21     identification, as of this date.)

22     BY MR. BUCHANAN:

23     Q.     This is something that appears

24     in -- I'm sorry.  Before we get to

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 39, the SOAPP tool is something

2    you all the were using in your marketing,

3    you all were using through your support of

4    various patient groups and pain societies

5    to try and combat opiophobia, correct?

6              MR. STERN:  Objection to form

7         and foundation.

8    A.    I have no idea.

9    Q.    Well, we just looked at it in

10   the APS materials.  We can agree to that.

11   A.    I saw it in the APS materials.

12   Q.    Okay.  Let's look at this

13   Evidence Assessment of the Agency For

14   Healthcare Research and Quality.

15             Do you see that?

16   A.    No, I don't see it.

17   Q.    Okay.  It's at the bottom of the

18   page.  The writing might be small.

19             MR. BUCHANAN:   But maybe we

20        could blow it up a little, Corey, help

21        us all out.

22   A.    I see it.

23   Q.    It's an agency within U.S.

24   Government, sir?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I'm not familiar with this

2  agency.

3      Q.    Okay.  This is a 2014 review,

4  sir.  It says:  The effectiveness and risk

5  of long-term opioid treatment of chronic

6  pain.

7            MR. BUCHANAN:  Let's go to key

8       question 4B, dot-90.  Please blow it

9       up for us.

10      Q.    (Reading) In patients with

11  chronic pain, what is the effectiveness of

12  use of risk prediction instruments on

13  outcomes related to overdose, addiction,

14  abuse or misuse?

15            Do you see that question?

16      A.    Yes.

17      Q.    Key point, it's called out on

18  the screen.  What's it say?

19      A.    (Reading) No study evaluated the

20  effectiveness of risk prediction

21  instruments for reducing outcomes related

22  to overdose, addiction, abuse or misuse.

23      Q.    Okay.

24      A.    (Reading) SOE: Insufficient.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     Insufficient.

2            No study evaluated the

3     effectiveness of the tools you were

4     training residents and fellows with.

5            MR. STERN:  Objection to form

6        and foundation.

7     BY MR. BUCHANAN:

8     Q.     Right, sir?

9     A.     That's what the words say.

10    Q.     Okay.  Let's go to dot-91.

11    "Detailed synthesis" at the top.

12           (Reading) The APS review

13    identified no studies on the effectiveness

14    of risk prediction instruments in reducing

15    outcomes related to overdose, addiction,

16    abuse, or misuse.  We also did not

17    identify any studies published since the

18    APS review addressing this question.

19           Did I read that correctly, sir?

20    A.     Yes.

21    Q.     You can set those aside, sir.

22           Okay.  Now, in the early 2000s,

23    sir, there were hearings related to opioid

24    abuse, oxycodone, OxyContin in particular,

Highly Confidential - Subject to Further Confidentiality Review

1    before Congress.

2          Are you aware of that?

3    A.    No, I'm not familiar with that.

4    Q.    Okay.  Just being someone in the

5    industry, I mean you were in the industry,

6    obviously, in the early 2000s, correct?

7    A.    Correct.

8    Q.    Okay.  I guess we can go back

9    to -- go back to Exhibit 11 in one of the

10   earlier binders.  We can also pull it up

11   on the screen for the convenience of

12   everybody.

13         Dot-548.  This is that DEA

14   action plan from 2003.

15         THE WITNESS:  You know, I'm

16      going to take the binder.

17         (Pause.)

18   A.    What tab am I in?

19   Q.    You're in Tab 11 in the first

20   binder.

21         MR. STERN:  Do we have people on

22      the phone?

23         MS. SCULLION:  Sure.

24         MR. STERN:  Have they been

1      identified?

2              MS. SCULLION:  They e-mail in.

3              MR. BUCHANAN:  We can get names

4      at the break.

5              MR. STERN:  I wasn't aware of

6      that.  That answers my question.

7      BY MR. BUCHANAN:

8      Q.     You have it before you again,

9      sir?

10     A.     I do.

11     Q.     I think if you go to the second

12     page you'll see the DEA release:  Drugs of

13     chemical concern.  Action plan to prevent

14     the diversion and abuse of OxyContin.

15             You see that?

16     A.     I see it.

17     Q.     There was also a GAO report in

18     2003.

19             You know that?

20     A.     I see it.

21     Q.     A GAO report.

22             Are you aware of that?

23     A.     I'm not aware of the report.

24     Q.     Okay.  If you go to Exhibit 44

Highly Confidential - Subject to Further Confidentiality Review

1    in your other binder, if we can keep them

2    both --

3        A.    Sure.

4        Q.    -- reasonably handy.

5              MR. STERN:  Mine only goes up to

6        40.

7              New binder.  New binder, Paul.

8        No, it's not in there.

9              THE WITNESS:  Okay.  44, you

10       said?

11             MR. BUCHANAN:  Exhibit 44.

12             (Campanelli Exhibit 44,

13       document, was marked for

14       identification, as of this date.)

15   BY MR. BUCHANAN:

16       Q.    Do you know what the GAO is,

17   first of all?

18       A.    Government -- government

19   accounting -- accountability --

20   government -- I -- no, I -- general

21   accounting office.  I don't know.

22       Q.    Okay.  You know it's a -- it's

23   an office within the government that

24   periodically conducts investigations and

Highly Confidential - Subject to Further Confidentiality Review

1    reports to Congress and others, correct?

2        A.    Correct.

3        Q.    So, in December of 2003, sir,

4    they issue a report:  Prescription drugs

5    OxyContin abuse and diversion and efforts

6    to address the problem.

7              Do you see that, sir?

8        A.    I see it.

9        Q.    Okay.  And you all, Endo to be

10   clear, decide, at this point in time,

11   after a market that is built on

12   overaggressive promotion, that has

13   embedded within it diversion and abuse,

14   that this is a market you want to be in,

15   right?

16             MR. STERN:  Objection to the

17        form of the question; lack of

18        foundation.

19        A.    Endo is -- is -- is -- is -- is

20   marketing and promoting opioids into --

21   into this category -- into the U.S. at

22   this point in time.

23        Q.    Well, no.  I mean even more

24   specifically, sir.

Highly Confidential - Subject to Further Confidentiality Review

1          I mean you wanted to start

2     selling OxyContin, generic OxyContin, at

3     this point in time in the end of 2003,

4     after allegations of fraud and

5     manipulative marketing, that's the market

6     you wanted to get into and the product you

7     wanted sell, correct?

8          MR. STERN:  Objection to form

9       and foundation.

10     A.     Endo was looking to get into the

11     market.

12     Q.     Right.  And Endo did get into

13     the market, right?

14     A.     Over time.

15     Q.     It got into the market and made

16     generic oxycodone -- excuse me.  Generic

17     OxyContin, correct, sir?

18          MR. STERN:  Objection to form

19       and foundation for 2004.

20     A.     Endo produced the product.

21     Q.     Let's look.  Can we pull out,

22     please, the Endo sales chart that we had

23     this morning?

24          MR. BUCHANAN:  Corey, maybe just

Highly Confidential - Subject to Further Confidentiality Review

1    for the witness and all of us, we

2    could pull it up on the screen, it's

3    E1811.

4  BY MR. BUCHANAN:

5    Q.    We see oxycodone ER 2005.

6          Do you see that?

7          MR. BUCHANAN:  I'm sorry.  Can

8    you blow it up for us, please, Corey?

9    It's kind of hard to see.

10          Maybe just cut it off at 2006.

11          There we go.  Can you see it

12    all?

13          That's good.  Can you scroll a

14    little more over so we can have 2004,

15    2005, 2006?

16          Great.

17    Q.    So, just to reframe this, sir.

18  The DEA issues an alert on OxyContin in

19  2003 about concerns about abuse and

20  diversion, right?

21    A.    I see it.

22    Q.    The GAO issues a report on

23  OxyContin abuse and the concerns how it

24  was marketed and the representations that

1    were made and what doctors and patients

2    believe, right?

3        A.    I don't know what's in this

4    document.

5        Q.    Okay.  You can see it in the

6    summary on the left.

7        A.    I see the title.

8        Q.    Okay.  And we see little over a

9    year later, Endo's bringing generic oxy to

10   the market, right?

11           MR. STERN:  Objection; form and

12       foundation.  Other than what's on the

13       face of the document.

14       A.    It eventually enters the market.

15       Q.    Okay.  The eventually is in

16   2005, Endo sells -- brings generic

17   OxyContin to the market, sir, correct?

18           MR. STERN:  Objection; form and

19       foundation.

20       A.    I see the units in 2005.

21       Q.    And you see the units in 2006,

22   right?

23       A.    Correct.

24       Q.    Some 270 million pills in some

Highly Confidential - Subject to Further Confidentiality Review

1    period within those two years, right?

2         MR. STERN:  Objection; form and

3    foundation.

4    A.    Show me where you're looking.

5    Q.    I'm looking oxycodone ER.

6         MR. BUCHANAN:  Corey, could you

7    line them up a little bit, please?

8         THE WITNESS:  You're a little

9    off.

10         MR. BUCHANAN:  Yeah, they're a

11    little staggered, but I think you can

12    tell where.

13    A.    I see it.

14    Q.    So you see for 2005 130 million

15  pills?

16    A.    Yes.

17    Q.    You see for 2006 148 million

18  pills?

19    A.    Yes.

20    Q.    Into this market built on

21  fraudulent representations, marketing

22  problems, and diversion and abuse, right?

23         MR. STERN:  Objection; form and

24    foundation.

Highly Confidential - Subject to Further Confidentiality Review

1       A.    I see the report that talks

2   about abuse and diversion.  And I see that

3   Endo launched the product in 2005 and had

4   sales as well into 2006 and a little bit

5   in 2007.

6       Q.    Right.  And you know the story a

7   little bit there, sir.  That the company

8   got approval from the FDA, the AB generic,

9   to bring it to the market.  Then there was

10  a litigation that followed with Purdue.

11          Is that right?

12          MR. STERN:  Objection; form and

13      foundation.

14          MS. PARK:  Objection.

15      A.    I'm actually not familiar with

16  that.

17      Q.    You know Purdue litigated with

18  Endo over this.  You don't know that?

19      A.    No.

20      Q.    And shut it down?

21          MR. STERN:  Objection.

22  BY MR. BUCHANAN:

23      Q.    So they could keep the sales for

24  themselves?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  Objection; form and

2     foundation.

3     A.    I didn't know the history.

4     Q.    Okay.  So, 270 million pills by

5     Endo generic oxy in 2005 and 2006.  That's

6     what the data shows, right?

7     A.    I see it.

8     Q.    Okay.  Please look at Exhibit 9,

9     sir.

10          (Campanelli Exhibit 9, document,

11     was marked for identification, as of

12     this date.)

13     A.    Am I keeping this other binder

14     in front of me, or not?

15     Q.    You might need to.  I apologize

16     for that, sir.  It shouldn't happen too

17     often.

18          This is an article and I guess a

19     financial report.  Market Watch.

20          You see that?

21     A.    Yes, I see it.

22          MR. BUCHANAN:  Can you pull it

23     up, please, Corey?  It's E242.

24          And you can take down the

Highly Confidential - Subject to Further Confidentiality Review

1    numbers.

2    Q.    This is from March 24 of 2004.

3          You see that?

4    A.    I see it.

5    Q.    That's three months after the

6    GAO issues their report about all this

7    problem with OxyContin, right?

8          MR. STERN:  Objection; form and

9    foundation.

10   BY MR. BUCHANAN:

11   Q.    Do I have the dates right, sir?

12   A.    Correct.

13         MR. STERN:  Exhibit 9?

14         MR. BUCHANAN:  Exhibit 9.

15         MR. STERN:  It's missing from my

16   book.

17         It's behind Tab 8.  Okay.

18   BY MR. BUCHANAN:

19   Q.    It says:  Endo wins OxyContin

20   generics bid.

21         Right?

22   A.    I see it.

23   Q.    Endo wins?

24   A.    I see the headline.

1    Q.    It says:  Endo OxyContin, which

2    was nicknamed hillbilly heroin after

3    rampant abuse was seen in certain rural

4    areas had U.S. sales of about 1.9 billion

5    in 2003.

6         Right?

7    A.    I see it.

8    Q.    (Reading) We are extremely

9    pleased by the FDA's approval of our

10   oxycodone extended-release product which

11   represents a substantial market

12   opportunity for Endo.

13   A.    I see it.

14   Q.    Do you see that?

15        (Reading) And reinforces our

16   leadership position in pain management,

17   said the CEO Carol Ammon.

18        Right?

19   A.    I see it.

20   Q.    Three months after the GAO

21   reports about all these problems with

22   OxyContin.

23        You agree with that, right?

24   A.    The timing is understood.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    After the DEA reported about the

2  problems of abuse and diversion of

3  OxyContin, as well as your other two

4  products, Percocet and Percodan, right?

5    A.    Yes.

6    Q.    And after Congress held hearings

7  on the way in which OxyContin had been

8  promoted, correct?

9         MR. STERN:  Objection; form and

10        foundation.

11   A.    Yes.

12   Q.    And we saw, sir, later in time

13  as well, that Qualitest also made generic

14  OxyContin, right?

15   A.    Yes.

16   Q.    And Par made generic OxyContin,

17  right?

18   A.    No.

19   Q.    Par sold generic OxyContin?

20   A.    Yes.

21   Q.    Into the market that was built

22  on those representations as described in

23  these reports, right, sir?

24        MR. STERN:  Objection to the

1          form and foundation.

2      A.     Could you repeat the question?

3             MR. BUCHANAN:  Withdrawn.

4      Q.     Opana, that's one you sold for

5    longer than a couple years, right?

6             MR. STERN:  Objection; form and

7        foundation.

8      A.     Opana was sold for a number of

9    years.

10     Q.     Okay.  Opana, real potent,

11   right?

12            MR. STERN:  Objection to form

13       and foundation.

14   BY MR. BUCHANAN:

15     Q.     You can answer.

16     A.     It's a potent opioid.

17     Q.     Three times more potent than

18   Morphine, right?

19     A.     On an MME basis.

20     Q.     Two times more potent than the

21   drug we were just talking about that had

22   all the concerns about addiction and

23   abuse, OxyContin, right?

24            MR. STERN:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1            form.

2            A.     On an MME basis.

3            Q.     You sold a lot of it, right?

4                   MR. STERN:  Objection to the

5            form.

6            A.     Sold based on -- on

7       prescriptions.

8            Q.     You ultimately built Opana to be

9       the number 2 drug in this market segment;

10      didn't you, sir?

11                  MR. STERN:  Objection to the

12           form.

13      BY MR. BUCHANAN:

14           Q.     You being Endo?

15                  MR. STERN:  Objection; form and

16           foundation.

17           A.     What do you mean by number 2?

18           Q.     I mean you weren't in first

19      place, you were in second.

20                  MR. STERN:  Objection to form

21           and foundation.

22           A.     I'm not sure what you're

23      referring to.

24                  Based on what?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.
 2              MR. BUCHANAN:  Could I have
 3        Bingo 1, please?  Do you have a copy
 4        for counsel?
 5   BY MR. BUCHANAN:
 6        Q.    Do you know who Demir Bingo is,
 7   sir?
 8        A.    No.
 9        Q.    I'll represent to you, sir, he
10   was the head of the Opana brand.
11              MR. BUCHANAN:  Could we please
12        play Bingo 1, please?
13              (Video played.)
14              "Going to the first bullet point
15        under your description of your time at
16        Endo, you say you successfully
17        launched the Opana brand in 2006
18        building it into a 600 million dollar
19        franchise and becoming the Number Two
20        product in its market segment.  Safe
21        to say that your work on the Opana
22        brand was successful?
23              "It was -- yes, it was
24        successful as far as I was concerned.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A relatively small percentage of the

 2        overall market.

 3             "You did build it up to a 600

 4        million dollar franchise, correct?

 5             "Yes.

 6             "Okay.  And through the

 7        marketing promotion efforts, it did

 8        become Number Two product in the

 9        market segment at least, correct?

10             "Correct."

11   BY MR. BUCHANAN:

12        Q.    Sir, did you have that awareness

13   that, in fact, Opana, from its launch and

14   through the efforts of promotion, dollars

15   you backed behind it with sales revenues

16   and other efforts, rose it to a 600

17   million dollar brand?

18             MR. STERN:  Objection; form and

19        foundation.

20        A.    At what period of time?

21        Q.    At any point during the

22   product's life, sir.

23        A.    As I sit here today?

24        Q.    Yes.
```

1     A.    I'm aware.

2     Q.    Number 2 in the market segment,

3  according to that, for the product,

4  correct?

5     A.    As I sit here today, I'm aware.

6     Q.    Ultimately had some problems

7  with abuse and diversion with Opana,

8  right?

9          MR. STERN:  Objection to the

10        form and foundation.

11    A.    That, I don't know.

12    Q.    You have no knowledge of that,

13  sir?

14    A.    No, I don't.

15    Q.    I mean, this was a drug that was

16  on the market in its original and its

17  reformulated form at the time you were the

18  CEO, right?

19    A.    CEO of Endo?

20    Q.    Yes.

21    A.    I was the CEO starting in

22  September of 2016.

23    Q.    Yes, sir.

24    A.    No, I did not know.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Would it be surprising to you,

2    sir, that it was abused and diverted and

3    popular in the street?

4         MR. STERN:  At what -- I think

5      we're having a time frame issue here.

6    BY MR. BUCHANAN:

7    Q.    At any point in time.

8    A.    I've learned about the -- I

9    learned about general concerns with some

10   information flow at an advisory committee.

11   Q.    Okay.  And that would be the

12   advisory committee in 2017?

13   A.    Correct.

14   Q.    Okay.  Shortly thereafter, the

15   drug was withdrawn from the market at the

16   FDA request, correct?

17   A.    Correct.  Withdrawn voluntarily,

18   yes.

19   Q.    At the FDA's request, sir?

20   A.    It was voluntarily removed.  The

21   FDA asked us to voluntarily remove it and

22   we complied.

23   Q.    Okay.  The FDA asked you to

24   withdraw it and you did so, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    They ask -- they requested that

2  we would voluntarily withdraw and we did

3  so.

4      Q.    Okay.  We'll talk about that a

5  little later.

6            But that's not the first time

7  you pulled an oxymorphone product from the

8  market for safety, right?

9            MR. STERN:  Objection to the

10      form and foundation.

11            It's not a 30(b)(6).

12  BY MR. BUCHANAN:

13      Q.    You, sir, Endo.

14            MR. STERN:  He's not Endo.  He's

15      Mr. Campanelli.

16  BY MR. BUCHANAN:

17      Q.    Mr. Campanelli, as CEO of Endo,

18  a company that has been in the business

19  since the 1920s, that has marketed opioids

20  for a real long time, it's not the first

21  time the company had to pull an

22  oxymorphone product from the market?

23            MR. STERN:  Objection; form and

24      foundation.

1          A.     The company started in 1997, and

2     I am unaware if they pulled product in the

3     past.

4          Q.     You didn't know that Endo made

5     Numorphan?

6          A.     No.

7          Q.     You didn't know it pulled it off

8     the market in the '70s because of abuse

9     and diversion?

10         A.     No.

11         Q.     Same active ingredient, sir.

12    Oxymorphone.

13         A.     I'm not --

14         Q.     You were not aware of that?

15         A.     I'm not familiar with the

16    product.

17         Q.     History repeats itself, right?

18              MR. STERN:  Objection; form and

19         foundation.

20         A.     I'm not sure what you mean by

21    that.

22         Q.     I mean it helps to know history

23    so we know how not to let the same thing

24    happen twice, right?

Highly Confidential - Subject to Further Confidentiality Review

1        MR. STERN:  Objection to form

2     and foundation.

3     A.    You're referring to 1970?

4     Q.    Are you aware, sir, that the

5  company withdrew Numorphan from the market

6  in the '70s?

7     A.    No.

8        MR. BUCHANAN:  Could I take the

9     witness to 45?

10       Do you have it -- do they have

11    the binder with these exhibits?

12       MR. STERN:  Yeah.  We have 45.

13       (Campanelli Exhibit 45,

14    document, was marked for

15    identification, as of this date.)

16  BY MR. BUCHANAN:

17    Q.    Tab 45.  It's a chapter

18  entitled:  Oxymorphone abuse among

19  narcotic addicts.

20       Do you see that, sir?

21       MR. STERN:  Chapter of what,

22    Mr. Buchanan?

23       MR. BUCHANAN:  I'm sure we have

24    the book for you.  Or I can get you

Highly Confidential - Subject to Further Confidentiality Review

1        the title.

2                (Pause.)

3                MR. BUCHANAN:  I'm told it's on

4        page 5.  Is it on your page 5, sir, at

5        the back of the book?

6                MR. STERN:  The front of book.

7        Or maybe it would be the back.  Looks

8        like the front of the book.

9                MR. BUCHANAN:  Does that orient

10       you, sir?

11               MR. STERN:  Yes, it does.  Thank

12       you.

13               MR. BUCHANAN:  You're welcome.

14       BY MR. BUCHANAN:

15          Q.    This book from 1972 says:

16       Oxymorphone abuse among narcotic addicts.

17               We're at chapter 35.  Do you see

18       that?  Page 1, dot-1.

19          A.    Where are you?

20          Q.    I'm at dot-1.

21          A.    Okay.

22          Q.    (Reading) Numorphan, registered

23       trademark.

24               Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I see it.

2      Q.     (Reading) A narcotic analgesic

3  developed and first marketed by Endo Labs

4  in 1996 has become a drug of abuse among a

5  sizable segment of the narcotic addict

6  population.

7             Do you see that, sir?

8      A.     I think you misspoke.

9      Q.     I'm sorry, did I misread that?

10     A.     Yes.

11     Q.     Okay.

12            (Reading) Numorphan,

13  oxymorphone, a narcotic analgesic

14  developed and first marketed by Endo Labs

15  in 1966 has become a drug of abuse among a

16  sizable segment of the narcotic addict

17  population.

18            Do you see that, sir?

19     A.     I do.

20     Q.     And, did I read it correctly

21  that time?

22     A.     Yes.

23     Q.     Okay.  If you go down to

24  background, sir, you'll see:  On the

Highly Confidential - Subject to Further Confidentiality Review

1    Street.

2              (Reading) On the street,

3    Numorphan can be identified by its various

4    subculture names.

5              It's got street names, right?

6       A.    That's what it says.

7       Q.    (Reading) Numorphine, Blue

8    Morphine, Blue Morphan, or Blues.

9              Right?

10      A.    That's what it says.

11      Q.    And that was something you were

12   worried about in launching, you being

13   Endo, were worried about in launching

14   Opana.

15             Correct, sir?

16             MR. STERN:  Objection to form

17      and foundation.

18      A.    I have no idea what's going on

19   here in 1966.

20      Q.    No, I'm talking about in 2004,

21   '5, '6, sir when you're getting ready to

22   launch Opana.

23             You're worried about the story

24   of the Blues getting out, right?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. STERN:  Objection; no

2        foundation at all.

3     BY MR. BUCHANAN:

4        Q.     You're not aware of that, sir?

5        A.     I am not aware of that.

6        Q.     If you go to Exhibit 46, sir.

7               (Campanelli Exhibit 46,

8        document, was marked for

9        identification, as of this date.)

10    BY MR. BUCHANAN:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9              MR. STERN:  Objection; form and

10       foundation.

11   BY MR. BUCHANAN:

12       Q.    Right?

13       A.    I don't know that.

14       Q.    Okay.  Let's go forward to --

15   sorry.  Pass it over to you.  I understand

16   it's not in your binders.  It's

17   Exhibit 107.

18              (Campanelli Exhibit 107, e-mail,

19       was marked for identification, as of

20       this date.)

21   BY MR. BUCHANAN:

22       Q.    All right.  We're looking at

23   Exhibit 107, sir.  It's an e-mail among

24   folks and attaching Power Point to subteam
```

1    members.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          MR. BUCHANAN:  You can take that

16      down, Corey.

17  BY MR. BUCHANAN:

18      Q.    Before we do so, let's go to

19  Exhibit 47.  Should be in your binder,

20  sir.

21          (Campanelli Exhibit 47, e-mail,

22      was marked for identification, as of

23      this date.)

24

1    BY MR. BUCHANAN:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          Q.     Okay.  All right.  Let's look at

19     Exhibit 49, sir.

20               (Campanelli Exhibit 49, e-mail,

21          was marked for identification, as of

22          this date.)

23     BY MR. BUCHANAN:

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
```

9    BY MR. BUCHANAN:

10        Q.    I'm sorry, sir.

11            Does that forgive it?

12            MR. STERN:  Objection.

13        A.    Okay.  So, clearly it -- you

14    know, a lot of people -- everybody feels

15    bad about the abuse and deaths associated

16    with opioids.

17            You're pointing to me to a

18    statement made by marketing which I don't

19    have the ability to know where or how this

20    was used, if it was even used and if it

21    was mark approved or not.  So I don't know

22    how to respond to a bullet with some words

23    on it if it ever even got to the sales

24    reps.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Well, let's -- let's read

2     a little more closely then, sir.

3          A.    Okay.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          Did I read that correctly, sir?

15     A.    Yes, you did.

16          MR. BUCHANAN:  I suggest we take

17     a short break.

18          MR. STERN:  Sure.

19          THE VIDEOGRAPHER:  Okay.  The

20     time is 3:59 p.m.

21          Off the record.

22          (Recess taken.)

23          THE VIDEOGRAPHER:  We are back

24     on the record.

Highly Confidential - Subject to Further Confidentiality Review

1           The time is 4:14 p.m.

2   BY MR. BUCHANAN:

3       Q.    Okay.  Sir, we were just looking

4   at this late 2007 Opana ATU W3 review.

5           MR. STERN:  I'm sorry,

6       Mr. Buchanan.  I really apologize.  I

7       left my pad downstairs.  I'll be right

8       back.

9           MR. BUCHANAN:  No worries.

10          THE VIDEOGRAPHER:  The time is

11      4:15 p.m.

12          Off the record.

13          (Recess taken.)

14          THE VIDEOGRAPHER:  We are back

15      on the record.

16          The time is 4:18 p.m.

17  BY MR. BUCHANAN:

18      Q.    Sir, we were just looking at the

19  late 2007 Opana AT W3 review.  I'd like to

20  move us forward now into 2008.

21          Again, a marketing analysis of

22  what docs are retaining and the messaging

23  to doctors.

24          If you'll scroll forward in your

Highly Confidential - Subject to Further Confidentiality Review

1    binder to Exhibit 50.

2              (Campanelli Exhibit 50,

3         document, was marked for

4         identification, as of this date.)

5    BY MR. BUCHANAN:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7              MR. STERN:   Objection; form and
 8         foundation.
 9    BY MR. BUCHANAN:
10         Q.    Right?
11         A.    Again, I'd have to go to the
12    mark -- approved mark documents to see
13    what was given in front of the sales reps
14    to speak to doctors about.
15              MR. BUCHANAN:  Can we pull up
16
17
18
19
20
21
22
23
24
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13     Q.    Okay.  Let's look at Exhibit 52

14   then, sir.

15          (Campanelli Exhibit 52, e-mail,

16      was marked for identification, as of

17      this date.)

18   BY MR. BUCHANAN:

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    Let's go forward in your binder,

3     sir, to 54.

4               (Campanelli Exhibit 54,

5          document, was marked for

6          identification, as of this date.)

7          A.    54?

8          Q.    DEA released --

9          A.    I'm sorry, 54?

10         Q.    54, yes, sir.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18      Q.    Not good.

19           MR. STERN:  Objection; form and

20      foundation.

21   BY MR. BUCHANAN:

22      Q.    Right?

23      A.    It's not a positive statement.

24      Q.    Certainly it would not be

Highly Confidential - Subject to Further Confidentiality Review

1    appropriate to be endorsing and promoting

2    a low abuse potential about a drug about

3    which can generate a serious narcotic

4    habit rather quickly.

5         MR. STERN:  Objection; form and

6      foundation.

7    BY MR. BUCHANAN:

8      Q.    Agreed?

9      A.    Again, I don't know if Endo did

10   or did not do this.

11     Q.    Will you agree, sir, you are not

12   aware of any scientific data for Opana ER

13   or Opana ER formulated that had a low

14   abuse potential, right?

15        MR. STERN:  Objection; form and

16     foundation.

17     A.    I'm unaware.

18     Q.    Okay.

19        MR. BUCHANAN:  Could we play

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7        Q.    Okay.  Let's go forward to

8    Exhibit 53.

9              (Campanelli Exhibit 53, e-mail,

10             was marked for identification, as of

11             this date.)

12    BY MR. BUCHANAN:

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1          I realize it's late in the day

2    at this point.

3         A.    (Perusing document.)

4              MR. BUCHANAN:  Can you also blow

5    up the heading, Corey?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4        Q.    Well, let me show you, sir,

5    Exhibit 61.

6             (Campanelli Exhibit 61, e-mail,

7         was marked for identification, as of

8         this date.)

9    BY MR. BUCHANAN:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.    It certainly was distributed

3   within the company, right?

4         MR. STERN:  Objection; form and

5      foundation.

6   BY MR. BUCHANAN:

7      Q.    Can we go to the first page and

8   answer counsel's concern about whether it

9   was distributed --

10        MR. STERN:  Based on what's in

11     the document as opposed to his

12     personal knowledge, yes, we can go to

13     the first page.

14        MR. BUCHANAN:  Okay.

15  BY MR. BUCHANAN:

16     Q.    You have that, sir?

17     A.    I do.

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



10    Q.    Okay.  And acted on.  They

11  bought it.

12    A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9    Q.    Okay.  Let's go to Exhibit 66.

10        (Campanelli Exhibit 66, e-mail,

11    was marked for identification, as of

12    this date.)

13  BY MR. BUCHANAN:

14    Q.    It's an e-mail from Ms. Chapman

15  to the FDA.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9        Q.    Okay.  The company sought claims

10    that --

11              MR. BUCHANAN:  Withdrawn.

12              Could I get a time check?

13              THE VIDEOGRAPHER:  We're at six

14    hours and 19 minutes.

15              MR. BUCHANAN:  I'll withdraw my

16    last question to the extent it was

17    even half-asked.

18              Could we take a short break?

19              MR. STERN:  Sure.

20              THE VIDEOGRAPHER:  The time is

21    5:09 p.m.

22              We're off the record.

23              (Recess taken.)

24              THE VIDEOGRAPHER:  We are back
```

Highly Confidential - Subject to Further Confidentiality Review

1          on the record.

2                  The time is 5:19 p.m.

3    BY MR. BUCHANAN:

4          Q.     Thank you.  We're back on the

5    record, sir.  You're still under oath.

6                  You understand that, correct?

7          A.     Yes.

8          Q.     Okay.  Great.  We're going to

9    push through here and finish up shortly,

10   at least my examination.  The clock will

11   probably ring and end me.

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4          A.     I did not know that.

5          Q.     Let's go to exhibit -- sorry.  I

6     guess Exhibit 70, sir.

7                (Campanelli Exhibit 70,

8          document, was marked for

9          identification, as of this date.)

10    BY MR. BUCHANAN:

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Highly Confidential - Subject to Further Confidentiality Review

1

2            MR. BUCHANAN:  You can take that

3      down, please.

4   BY MR. BUCHANAN:

5      Q.    Let's go now to Exhibit 69.

6            (Campanelli Exhibit 69,

7      document, was marked for

8      identification, as of this date.)

9   BY MR. BUCHANAN:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  All right.  You can set

2     it aside, sir.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    BY MR. BUCHANAN:

2        Q.    For the original Opana product,

3    the company employed sales representatives

4    that called on physicians.

5            True?

6            MR. STERN:  Objection; form and

7        foundation.

8        A.    My understanding is we had sales

9    reps.

10       Q.    Okay.  And the systems within

11   the company called for sales

12   representatives to at least note the fact

13   that they were calling on doctors in a

14   system, right?

15           MR. STERN:  Objection to the

16       form and foundation.  We have no time

17       frame.

18           MR. BUCHANAN:  I'm referring to

19       this period of time, counsel, for

20       Opana ER.

21           MR. STERN:  Before September

22       2015 or after?

23           MR. BUCHANAN:  Well, Opana ER

24       non-reformulated is certainly going to

1    be between 2006 and 2012.

2         MR. STERN:  Okay.

3         MR. BUCHANAN:  Let's have that

4    time frame in mind.

5         MR. STERN:  Okay.

6    A.    I wasn't there, so I'm not sure

7    what the company was doing.

8    Q.    Okay.

9         MR. BUCHANAN:  Behind you,

10   counsel, are three boxes.  Each box is

11   a copy of the same exhibit.  What I'd

12   like to do, if you could, just maybe

13   just give the witness one folder.

14        Let me come over and help you.

15        (Pause.)

16        MR. BUCHANAN:  Sir, I'm going to

17   put this to your side.

18        For the record, Exhibit 108 is a

19   series of printouts of the company's

20   sales call detail database.

21        (Campanelli Exhibit 108, box of

22   documents, was marked for

23   identification, as of this date.)

24        THE WITNESS:  I'm sorry.  I

1    didn't hear that.

2         MR. BUCHANAN:  It's a printout

3    from the company's sales call database

4    that's been produced to us in the

5    litigation of the calls on physicians

6    in Ohio.

7         THE WITNESS:  Okay.

8  BY MR. BUCHANAN:

9    Q.    Okay.  Could you just pull up

10   one of the folders from the box, sir?

11   A.    Any one?

12   Q.    Any one.

13        I just want you to orient us,

14   sir, to the content of the sales call log

15   as produced to us.  Can you pull out a

16   page, first page?

17        MR. STERN:  Can I just, for

18   kicks, the one he pulled up is E1873

19   2008 to 2016 full Ohio Opana ER call

20   log ENDO_OPIOID_MDL number 00673566

21   and there's a Post-it note on the

22   front that says number 1. 1-1200.

23        MR. BUCHANAN:  And thank you for

24   that, counsel.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. BUCHANAN:

 2        Q.    I'll represent to you, sir, that

 3    the printouts in the other folders in the

 4    box that has been marked as this exhibit

 5    contain the remaining pages from that same

 6    file.  It is one file that contains all

 7    those pages, sir.

 8        A.    Okay.

 9        Q.    Do you see, sir, fields of

10    information as if a very long spreadsheet?

11            MR. STERN:  I won't keep doing

12        this, Mr. Buchanan, but just this is,

13        Mr. Campanelli is looking at the first

14        one he's looking at is E1783.3.

15            MR. BUCHANAN:  Thank you.  Thank

16        you.

17    BY MR. BUCHANAN:

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          MR. BUCHANAN:  Could I have

20      Exhibit 110, please?

21          (Campanelli Exhibit 110,

22      document, was marked for

23      identification, as of this date.)

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2        Q.    Passing you what's been marked

 3    as Exhibit 110, sir.

 4              What we've done, sir, is try to

 5    zoom in a little bit on a physician in

 6    Ohio.  Dr. Adolf Harper.

 7              Do you recognize the format of

 8    110 to be consistent with the field and

 9    data you were just reading to us, sir, in

10    terms of its format?

11        A.    It looks consistent.  Appears to

12    be consistent.

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
```

5      Q.    Passing you, sir, what we're

6    marking as Exhibit 109.

7            (Campanelli Exhibit 109, e-mail,

8        was marked for identification, as of

9        this date.)

10            MR. BUCHANAN:  I'm told we don't

11        have it on the screen, but how long

12        would it take to pop the Elmo?

13            THE VIDEOGRAPHER:  Seconds.

14            MR. BUCHANAN:  Okay.

15            You can take a look at it first,

16        sir.

17            (Pause.)

18    BY MR. BUCHANAN:

19      Q.    For the video I've got it on the

20    Elmo here, you'll see my little squiggles

21    and notes.

22            This is an interaction between a

23    couple Endo folks.

24            For the record, it's a Bates

Highly Confidential - Subject to Further Confidentiality Review

1      stamp ENDO_OPIOID_MDL-02816741.  From the



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
21        Q.      Okay.

22                MR. BUCHANAN:   Can we take a

23        short break?

24                THE WITNESS:   Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  All right.

 2       The time is 5:49 p.m.

 3              Off the record.

 4              (Recess taken.)

 5              THE VIDEOGRAPHER:  We are back

 6       on the record.

 7              The time is 5:55 p.m.

 8              MR. BUCHANAN:  Mr. Campanelli,

 9       thank you for your time today.  I am

10       advised I'm at the end of my -- my

11       time with you.  At this point, I'm

12       going to pass you to counsel for --

13       for other states and municipalities

14       for their examinations.

15              Thank you again, sir.  I

16       appreciate your time.

17              THE WITNESS:  Thank you.

18              MR. STERN:  Thank you,

19       Mr. Buchanan.

20       EXAMINATION BY

21       MS. HERZFELD:

22          Q.   Good afternoon, Mr. Campanelli.

23       How are you?

24          A.   Good.  How are you?
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Good.  My name is Tricia

2    Herzfeld, and I'm an attorney for the

3    Tennessee State plaintiffs.  I reserved

4    two hours to question you today, but

5    hopefully I won't need all that time.  I'm

6    sure you're in a hurry to get out of here.

7      A.    I'm here to answer your

8    questions.

9      Q.    Great.  Wonderful.

10         MS. HERZFELD:  Before we get

11      started, I just wanted to lodge the

12      Tennessee State -- state litigations

13      objections in all of the Tennessee

14      State cases about Endo's failure to

15      comply with the MDL protocol and the

16      protocol that has been listed in the

17      Dunaway and Staubus cases.

18         Just to note, we have not

19      received -- we have not received a

20      custodial file for Mr. Campanelli.  We

21      have not received any documents from

22      Mr. Campanelli.

23         So we are very specifically

24      reserving our rights to re-depose Mr.

Highly Confidential - Subject to Further Confidentiality Review

1      Campanelli in the future because it

2      certainly has hampered our ability to

3      prepare for today.

4          MR. STERN:  Ms. Herzfeld, I'm

5      sorry to interrupt.

6          MS. HERZFELD:  Yes.

7          MR. STERN:  I know that -- I

8      know there are other grounds for your

9      objection other than not producing Mr.

10     Campanelli's custodial files, but we

11     believe we have produced his custodial

12     files.

13         MS. HERZFELD:  No, I

14     double-checked right before I started

15     questioning.  We absolutely don't have

16     it, and we actually sent multiple

17     e-mails requesting it.

18         MR. STERN:  Can I have just a --

19     can we go off the record for a minute?

20         MS. HERZFELD:  Sure.

21         THE VIDEOGRAPHER:  All right.

22     The time is 5:57 p.m.

23         Off the record.

24         (Recess taken.)

 1          THE VIDEOGRAPHER:  We are back

 2      on the record.

 3          The time is 5:59 p.m.

 4          MR. STERN:  So, we're trying to

 5      move on with this, but it's my

 6      understanding that Mr. Campanelli's

 7      Endo custodial files were produced 14

 8      days ago.  We're going to try to find

 9      out to whom they were produced and get

10      you that information as promptly as we

11      can.

12          MS. HERZFELD:  Great.  And just

13      for your information, so, it looks

14      like we received the intent for

15      February 22nd.  The MDL issued its

16      notice of deposition on March 4th.  On

17      March 7th is when we e-mailed in

18      compliance with the protocol

19      requesting all the stuff we were

20      supposed to get.  On March 11th, Mr.

21      Davis wrote back and said that he

22      would write back separately to address

23      the deposition of Mr. Campanelli.  We

24      didn't get any follow-up on that.

Highly Confidential - Subject to Further Confidentiality Review

1        Then on March 13th, we sent another

2        e-mail requesting that we get Mr.

3        Campanelli's custodial files, various

4        documents, et cetera, et cetera, et

5        cetera.  We didn't hear anything back

6        from that.  We then e-mailed again

7        Friday, March 15th, explaining that we

8        hadn't received the custodial file for

9        Mr. Campanelli or any other of the

10       documents that would be required, and

11       we didn't hear back.

12            So that's our understanding of

13       where we are.

14            MR. STERN:  I understand there

15       are issues with respect to other

16       documents, and those I'm not --

17            MS. HERZFELD:  We'll address

18       that a different day.

19            MR. STERN:  But I am concerned

20       that we -- there may be some

21       miscommunication, and we're going to

22       try to get to the bottom of it.

23            MS. HERZFELD:  Okay, great.

24            I just want to be very clear for

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the record that I'm taking this
 2        deposition without the benefit of Mr.
 3        Campanelli's custodial file.  So,
 4        given that we're here, we're going to
 5        try to get through the questions that
 6        we can, but I am very, very
 7        specifically reserving my right to
 8        re-depose this witness at a later
 9        date, obviously subject to, you know,
10        the court in Staubus making a ruling
11        on that.
12            I'm not expecting you to agree,
13        is what I'm telling you.
14            MR. STERN:  No, no, no, I'm -- I
15        need to confer outside for just a
16        minute.
17            MS. HERZFELD:  Sure.
18        Absolutely.
19            THE VIDEOGRAPHER:  Okay.  The
20        time is 6:01 p.m.
21            Off the record.
22            (Recess taken.)
23            THE VIDEOGRAPHER:  All right.
24        We are back on the record.
```

```
 1            The time is 6:04 p.m.

 2            MS. HERZFELD:  Okay.  We're back

 3       on the record after a short break

 4       where before we went off the record we

 5       were discussing the lack of custodial

 6       file or any other necessary documents

 7       that we needed for today's deposition.

 8            My understanding is that counsel

 9       for Endo would like to go forward at

10       this point.

11            MR. STERN:  That's correct.

12            MS. HERZFELD:  Okay.  So, we

13       have reserved two hours today and are

14       specifically reserving our right to

15       re-depose this witness at a later

16       date, specifically under the rules of

17       the Tennessee Rules of Civil Procedure

18       which don't have a time limitation for

19       the deposition, and so we're reserving

20       all of our rights under that, plus all

21       of our prior objections for failure to

22       follow the various protocols in this

23       case.

24
```

1    BY MS. HERZFELD:

2        Q.    Okay.  Mr. Campanelli, like I

3    said before, my name is Tricia Herzfeld.

4    I'm an attorney from the State of

5    Tennessee.

6            How are you doing?

7        A.    Good.  Thank you.  And yourself?

8        Q.    Good.  Good.  Good.  Good so

9    far.

10           Have you heard anything about

11   the Tennessee litigation?

12       A.    No.

13       Q.    Okay.  Are you familiar at all

14   with the Tennessee litigation being

15   different in any way from the litigation

16   in the MDL?

17       A.    No.

18       Q.    Okay.  You talked a little bit

19   before in your deposition about being

20   aware of the opioid problem in this

21   country.

22           Are you aware that the opioid

23   problem is particularly bad in the

24   Appalachian region of the country?

1          MR. STERN:  Objection; form and

2      foundation.

3      A.    I'm not sure what you mean.

4      Q.    Do you know what the Appalachian

5   region of the United States is?

6      A.    Yes.

7      Q.    And, are you aware that the

8   opioid epidemic has hit the Appalachian

9   region particularly hard?

10          MR. STERN:  Objection to form;

11      foundation.

12      A.    I don't know specifically.

13          Generally I'm aware.

14      Q.    Okay.  And, do you consider

15   Tennessee to be part of Appalachia?

16      A.    Yes.

17      Q.    And you've heard of NAVIPPRO,

18   the National Addiction Vigilance

19   Intervention and Prevention Program.

20          Is that right?

21      A.    I've heard of it.  I'm not

22   specifically knowledgeable what it does.

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12          MS. HERZFELD:  Okay.  I'm going

13     to hand you what we will mark as

14     Campanelli 500.  We're going to start

15     the Tennessee exhibits with 500.

16          For those on the phone, it's

17     ENDO-OPIOID_MDL_06183930 through

18     '4083.

19          THE WITNESS:  Okay.

20          (Campanelli Exhibit 500,

21     document, was marked for

22     identification, as of this date.)

23   BY MS. HERZFELD:

24     Q.    Take a look at that for me,

Highly Confidential - Subject to Further Confidentiality Review

1    please.   I've handed you what is the



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1               Okay.  If you'll set that aside,

2      please.

3          A.    Are we done with this document?

4          Q.    Yes.

5               (Campanelli Exhibit 501,

6          document, was marked for

7          identification, as of this date.)

8      BY MS. HERZFELD:

9          Q.    I'm going to hand you what we're

10     marking as Campanelli Exhibit 501.

11         A.    Okay.

12         Q.    For the record, it's

13     EPI_001760592 through '60680.

14

15

16

17

18

19

20

21

22

23

24



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11          Q.     Okay.   I'm going to hand you

12     what we will mark as Campanelli

13     Exhibit 502.

14               (Campanelli Exhibit 502,

15          document, was marked for

16          identification, as of this date.)

17     BY MS. HERZFELD:

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



            Q.     Okay.   I'm going to hand you

Highly Confidential - Subject to Further Confidentiality Review

1  what we will mark as Campanelli

2  Exhibit 503.

3            (Campanelli Exhibit 503,

4       document, was marked for

5       identification, as of this date.)

6  BY MS. HERZFELD:

7       Q.    I'll submit to you, sir, that

8  this is the second quarter 2015 NAVIPPRO

9  report that was provided to Endo it looks

10  like the -- looks like the Bates numbers

11  are cut off the bottom of my copy.

12  However, I'll submit to you that that's

13  what it is.

14            Do you see that on the front?

15       A.    I'm sorry.  What's your

16  question?

17       Q.    Does it look to you to be the

18  NAVIPPRO report from the second quarter of

19  2015?

20            MR. STERN:  Objection; form and

21       foundation.

22       A.    I see the reporting period

23  starting in April.

24       Q.    Of 2015?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2        Q.    Okay.  Good.

 3              So, if you will then go with me

 4   to page 9.

 5        A.    Okay.

 6        Q.    Okay.  And if you will go to the

 7   second bullet point on page 9.

 8        A.    Okay.

 9        Q.    If you'll start about halfway

10   through that paragraph the one that starts

11   with "Further review."

12              Do you see where I'm at?

13        A.    Yes.

14        Q.    The one that starts with

15   "Demographically."  If you could start at

16   "Further review."

17        A.    (Reading) Further review of

18   route of administration data during Q2

19   2015 indicates that a greater percentage

20   of the past 30 day abusers of reformulated

21   Opana ER in Tennessee reported injections

22   76.9 percent versus past 30 day abusers of

23   products in all states except Tennessee

24   54.3 percent.
```

1     Q.    Okay.  You can stop there for

2     me, please.

3           Okay.  And if you could go to

4     page 43.  Figure 15.

5           Figure 15 describes the

6     distribution of routes of administration

7     reported by individuals within the ASI-MV

8     network in Tennessee and other states who

9     indicated past 30 days abuse of

10    reformulated Opana ER.

11          Is that correct?

12    A.    Yes.

13    Q.    Okay.  And here Tennessee is

14    also viewed separately from the rest of

15    the country.

16          Is that right?

17          MR. STERN:  Objection to the

18    form; foundation.

19    A.    I see Tennessee is separated

20    out.

21    Q.    Okay.

22          Okay.  So, we've looked at a few

23    of these now, and every time Tennessee is

24    always marked in these reports that Endo

1    was receiving as being dramatically

2    different from every other state for IV

3    injection of Opana.

4         Is that right?

5         MR. STERN:  Objection to the

6      form and foundation.

7      A.    I see that Tennessee has a

8    higher rate.

9      Q.    Okay.  And that's consistent

10   throughout all the NAVIPPRO reports that

11   we've looked at 2012 through 2015.

12        Is that correct?

13     A.    That's correct.

14     Q.    Okay.  And then, you joined Endo

15   in 2016.

16        Is that correct?

17     A.    I joined Endo in September 2015.

18     Q.    September 2015?

19     A.    Correct.

20     Q.    Okay.  So you certainly would be

21   familiar then with what was going on at

22   Endo in 2016, yes, sir?

23        MR. STERN:  Objection to the

24      form of the question.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      2015 I was aware of the generic

2   aspect of what was going on at Endo.

3      Q.      Okay.  But in 2016, you started

4   your current position at Endo.

5              Is that --

6      A.      In September of 2016 I would

7   have become aware.

8      Q.      Okay.  So, I'm going to hand you

9   what we'll mark as Campanelli Exhibit 504.

10     A.      Okay.

11             (Campanelli Exhibit 504,

12     document, was marked for

13     identification, as of this date.)

14   BY MS. HERZFELD:

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3           Is that right?

4           MR. STERN:  Objection; form and

5     foundation.

6     A.    I would agree that a dealer is

7  legal.

8           MR. STERN:  Can you just bear

9     with me one minute, Ms. Herzfeld?

10          Which exhibit are we on?

11          MS. HERZFELD:  Page 48.

12          MR. STERN:  Of which?  Of 504?

13          MS. HERZFELD:  Of 504.

14          MR. STERN:  Sorry.  Go ahead.

15  BY MS. HERZFELD:

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5      Q.    Okay.  Okay.  I'm going to hand

6   you what we will mark as Campanelli

7   Exhibit 505.

8           (Campanelli Exhibit 505, e-mail,

9      was marked for identification, as of

10      this date.)

11   BY MS. HERZFELD:

12      Q.    This is ENDO_OPIOID_MDL-02667006

13   and '7007.

14           Sir, there was a time when Endo

15   considered not shipping Opana to

16   Tennessee.

17           Is that correct?

18           MR. STERN:  Objection;

19      foundation; form.

20      A.    I don't know that.

21      Q.    Okay.  If you'll go ahead and

22   take a look at this e-mail reading from

23   the bottom up.

24      A.    (Perusing document.)

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Sir, who is Brian Lortie?

2          A.     Brian Lortie was the president

3     of the branded portion of Endo.

4          Q.     Okay.  And, who is Jason

5     Reckner?

6          A.     I don't know.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17        Q.    Okay.  Why was the decision made
18   not to suspend or stop shipping Opana ER
19   to Tennessee?
20             MR. STERN:  Objection;
21        mischaracterizes testimony; form and
22        foundation.
23        A.    What period of time?
24        Q.    Any period of time.
```

Highly Confidential - Subject to Further Confidentiality Review

1         A.    I don't know.  I can't answer

2    that question before my -- before my role

3    as CEO.

4         Q.    Okay.  What about during your

5    role as CEO?

Highly Confidential - Subject to Further Confidentiality Review



1　▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2　　　　Q.　　Okay.　And, you attended the

3　March 2017 ADCOM meeting?

4　　　　A.　　I did not.

5　　　　Q.　　You did not?

6　　　　A.　　No, I did not.

7　　　　Q.　　Okay.　Did -- do you know who

8　from Endo did attend?

9　　　　A.　　I -- I -- I know several people

10　would have.

11　　　　Q.　　Okay.　Did you ever review the

12　materials that were presented at the March

13　2017 ADCOM meeting?

14　　　　A.　　I would have received a copy.

15　　　　Q.　　Okay.

16　　　　　　MS. HERZFELD:　I'm going to mark

17　　　　this as Endo Exhibit 50 -- or,

18　　　　Campanelli Exhibit 506.

19　　　　　　(Campanelli Exhibit 506,

20　　　　document, was marked for

21　　　　identification, as of this date.)

22　BY MS. HERZFELD:

23　　　　Q.　　Okay.　Sir, if you'll take a

24　look at this, it's the slide deck from the

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1

2

3      Q.    Okay.  Great.  You can set that

4   aside for me, please.

5           MS. HERZFELD:  Okay.  And I'm on

6       my last one, for anybody trying to

7       figure out travel plans.

8      Q.    Okay.  I'm going to hand you

9   what we've marked as Campanelli Exhibit

10  507.

11          (Campanelli Exhibit 507, e-mail,

12      was marked for identification, as of

13      this date.)

14  BY MS. HERZFELD:

15     Q.    And for the record, it's

16  ENDO_OPIOID_MDL-01848038.  It's one-page

17  document.

18          Take a look at this for me, sir.

19  I'll give you a moment to review it.

20     A.    (Perusing document.)

21          MR. STERN:  I'm sorry.  What

22      number is this?  506?

23          Paul?

24          MS. HERZFELD:  507.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. STERN:  507.  Thank you.

2     BY MS. HERZFELD:

3          Q.     Have you had an opportunity to

4     review it, sir?

5          A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13          MS. HERZFELD:  Okay.  I'll just

14      take a five minute break, two minutes,

15      something.

16          MR. STERN:  Sure.

17          THE VIDEOGRAPHER:  All right.

18      The time is 7:00 p.m.

19          Off the record.

20          (Recess taken.)

21          THE VIDEOGRAPHER:  We are back

22      on the record.

23          The time is 7:03 p.m.

24          MS. HERZFELD:  Thank you, Mr.

1     Campanelli.  I'm going to suspend the

2     deposition at this time.  I don't have

3     any more questions for you today.  But

4     I'm suspending it based on the fact

5     that we haven't received any of the

6     documents in your custodial file and I

7     would like to have those in order to

8     be able to question you further.

9          So we'll suspend the deposition

10     at this time.

11          MR. STERN:  And, again, it's our

12     understanding that you have received

13     those documents.

14          MS. HERZFELD:  Understood.

15          (Pause.)

16     EXAMINATION BY

17     MR. STERN:

18     Q.     Mr. Campanelli, good evening.

19     A.     Good evening.

20     Q.     When did you start working at

21     Endo?

22     A.     September 2015.

23     Q.     And what was your position then,

24     would you remind us?

```
 1        A.    President of the generics

 2    position.

 3        Q.    And you held that position until

 4    when?

 5        A.    For one year to September 2016.

 6        Q.    When you became what?

 7        A.    President and CEO of Endo.

 8        Q.    Mr. Buchanan showed you about 70

 9    documents, give or take.  The record will

10    speak for itself on that point.

11              But, does that sound about right

12    to you?

13        A.    A number of documents.

14        Q.    Did -- and that included Endo

15    documents.

16              Is that right?

17        A.    Correct.

18        Q.    And by Endo documents I mean

19    e-mails, internal e-mails at Endo.

20              You saw those?

21        A.    Yes.

22        Q.    You saw other documents that had

23    Endo logos on them?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did any of -- were -- was your

2  name on any of those e-mails?

3    A.    No.

4    Q.    As a "to"?

5    A.    No.

6    Q.    As a "from"?

7    A.    No.

8    Q.    As a "cc"?

9    A.    No.

10    Q.    Anywhere in the body of any of

11  those e-mails?

12    A.    No.

13    Q.    What about the other Endo, what

14  I'm just defining as the Endo documents,

15  documents generated by Endo or with an

16  Endo logo on them, does your name appear

17  on any of those documents?

18    A.    No.

19    Q.    Did you ever receive any of

20  those documents?

21    A.    No.

22    Q.    Are any of the documents, with

23  the possible exception of the AOD, had

24  you, of all the documents that

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Buchanan showed you, had you seen any

2    of them before today?

3        A.    No, I have not.

4        Q.    With the possible exception of

5    the AOD, did any of them bear a date that

6    preceded, came before, September 1st,

7    2015?

8        A.    No.

9        Q.    For the time period before

10   September 1st, 2015, do you have any

11   personal knowledge of any internal

12   communications at Endo?

13       A.    I do not.

14       Q.    For that time period, do you

15   have any personal knowledge of what

16   decisions were made at Endo about opioids?

17       A.    I do not.

18       Q.    Do you have any personal

19   knowledge about why decisions were made at

20   Endo about opioids before September of

21   2015?

22       A.    I do not.

23       Q.    Do you have any personal

24   knowledge about anything that happened at

1      Endo before September of 2015?

2          A.     I do not.

3          Q.     So, to the extent that you were

4      answering questions about the documents

5      that you saw, what were those answers

6      based upon?

7          A.     The words on the paper.

8          Q.     Anything else?

9          A.     No.

10             MR. STERN:  I have nothing

11         further.

12             MR. BUCHANAN:  How long?

13             THE VIDEOGRAPHER:  He went for

14         four minutes.

15             MS. JONES-McDONALD:  No, there

16         was time.

17             THE VIDEOGRAPHER:  Three

18         minutes.

19             You want to go off the record?

20             MR. BUCHANAN:  Yeah.

21             THE VIDEOGRAPHER:  All right.

22         The time is 7:07 p.m.

23             Off the record.

24             (Recess taken.)

Highly Confidential - Subject to Further Confidentiality Review

1              THE VIDEOGRAPHER:  We are back

2        on the record.

3              The time is 7:10 p.m.

4    BY MR. STERN:

5        Q.    Mr. Campanelli, I think between

6    us, my going too fast and everyone's

7    schedule this evening, I think that

8    there's one question and answer that we

9    need to clear up.  I don't think this will

10   be in dispute, but I'm going to ask the

11   question again.

12             With the possible exception of

13   the AOD, were any of the documents -- did

14   any of the documents that Mr. Buchanan

15   showed you bear a date after September

16   1st, 2015?

17       A.    After?  No.

18             MR. STERN:  Okay.  Thank you.

19             THE VIDEOGRAPHER:  Stay on the

20        record or go off?

21             MR. BUCHANAN:  Just one moment.

22        We can go off.

23             THE VIDEOGRAPHER:  Off the

24        record, right?

Highly Confidential - Subject to Further Confidentiality Review

1     MS. SCULLION:  Yes.

2     THE VIDEOGRAPHER:  The time is

3     7:11 p.m.

4     Off the record.

5     (Recess taken.)

6     THE VIDEOGRAPHER:  The time is

7     7:13 p.m.

8     Back on the record.

9     FURTHER EXAMINATION BY

10    MR. BUCHANAN:

11    Q.    Now, sir, you are the president

12    and CEO of Endo, correct?

13    A.    Correct.

14    Q.    Within Endo, operating company

15    Par, correct?

16    A.    I'm sorry?

17    Q.    Within Endo, an operating

18    subsidiary Par, correct?

19    A.    Correct.

20    Q.    Also responsible for that,

21    correct?

22    A.    Yes.

23    Q.    Par has within it the operating

24    assets of Qualitest, correct?

Highly Confidential - Subject to Further Confidentiality Review

1         A.    Qualitest no longer exists.

2         Q.    Okay.  Those assets are now

3    within the company that is Par, correct,

4    sir?

5         A.    Correct.

6         Q.    Okay.  I'll pass you what we

7    marked as Exhibit 111 to your deposition,

8    sir.

9              (Campanelli Exhibit 111, e-mail,

10        was marked for identification, as of

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MR. BUCHANAN:  No further

15     questions.

16          THE VIDEOGRAPHER:  Okay.  Off

17     the record.

18          All right.  This marks the end

19     of today's deposition.  The time is

20     7:17 p.m.

21          (Deposition adjourned at

22     approximately 7:17 p.m.)

23

24

```
 1              A C K N O W L E D G M E N T

 2

 3    STATE OF              )

 4                               :ss

 5    COUNTY OF              )

 6

 7         I, PAUL CAMPANELLI, hereby

 8    certify that I have read the transcript of

 9    my testimony taken under oath in my

10    deposition of March 21, 2019; that the

11    transcript is a true and complete record

12    of my testimony, and that the answers on

13    the record as given by me are true and

14    correct.

15

16

17         _____

                    PAUL CAMPANELLI

18

19    Signed and subscribed to before me this

20    _____ day of _____, 2019.

21

22    _____

23    Notary Public, State of

24
```

Highly Confidential - Subject to Further Confidentiality Review

1             E R R A T A

2     PAGE / LINE / CHANGE    /     REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2    STATE OF NEW YORK

 3    COUNTY OF NEW YORK

 4

 5          I, Marie Foley, RMR, CRR, a

 6    Certified Realtime Reporter and Notary

 7    Public within and for the State of New

 8    York, do hereby certify:

 9          THAT PAUL CAMPANELLI, the witness

10    whose deposition is hereinbefore set

11    forth, was duly sworn by me and that such

12    deposition is a true record of the

13    testimony given by the witness.

14          I further certify that I am not

15    related to any of the parties to this

16    action by blood or marriage, and that I am

17    in no way interested in the outcome of

18    this matter.

19          IN WITNESS WHEREOF, I have

20    hereunto set my hand this 24th day of

21    March, 2019.

22

23    _____

                MARIE FOLEY, RMR, CRR

24
```

Highly Confidential - Subject to Further Confidentiality Review

1          LAWYER'S NOTES

2     PAGE / LINE

3     _____ _____ _____

4     _____ _____ _____

5     _____ _____ _____

6     _____ _____ _____

7     _____ _____ _____

8     _____ _____ _____

9     _____ _____ _____

10    _____ _____ _____

11    _____ _____ _____

12    _____ _____ _____

13    _____ _____ _____

14    _____ _____ _____

15    _____ _____ _____

16    _____ _____ _____

17    _____ _____ _____

18    _____ _____ _____

19    _____ _____ _____

20    _____ _____ _____

21    _____ _____ _____

22    _____ _____ _____

23    _____ _____ _____

24    _____ _____ _____